# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03-MD-01570 (GBD)(SN)<br>ECF Case |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279

# MEMORANDUM OF LAW
# IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
# EXPERT TESTIMONY OF JONATHAN BENTHALL, CHAS FREEMAN
# JONATHAN MARKS, AND JOHN SIDEL

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARDS ................................................................................................... 3

**EXPERT WITNESS JONATHAN BENTHALL**

I.      Jonathan Benthall's opinions are relevant and not unduly prejudicial ................................ 6

II.     Benthall Is Qualified to Opine on the Subjects within his Report ..................................... 12

III.    Benthall Does Not Opine Improperly on State of Mind or Offer Legal Conclusions ....... 15

IV.     Benthall Applies a Proper Methodology .......................................................................... 17

**EXPERT WITNESS AMBASSADOR CHAS FREEMAN**

I.      Chas Freeman, the Former U.S. Ambassador to the Kingdom of Saudi Arabia, is
        Qualified to Proffer the Opinions Expressed in his Report, all of which are Relevant ..... 18

II.     Amb. Freeman's Opinions Meet the Basic Requirements of Reliability Resting on his
        Vast Practical Experience Rather Than a Traditional Scientific Method ......................... 23

III.    Amb. Freeman's Opinions and Testimony Are Neither Conclusory Nor State of Mind .. 24

IV.     Plaintiffs' Attempt to Exclude Amb. Freeman's Testimony as "Unfairly Prejudicial"
        Under FRE 403 Is Without Merit as a Matter of Law ...................................................... 26

**EXPERT WITNESS JONATHAN MARKS**

I.      Marks is Qualified to Provide Relevant Testimony to Rebut Plaintiffs' Experts .............. 27

II.     Marks is a Highly-Qualified Financial Expert with Decades of Relevant Experience ...... 28

III.    Marks's Testimony about Charitable Projects Is Relevant ............................................... 31

IV.     Marks's Testimony about WAMY's Charitable Projects is Relevant and Not Unfairly
        Prejudicial ....................................................................................................................... 34

V.      Marks Found Abundant Evidence That WAMY Implemented Financial Controls .......... 35

VI.     Marks Does Not Offer State of Mind Testimony ............................................37

VII.    Marks's Opinions are Based on Reliable Methodology Consistent with Rule 702...........37

**EXPERT WITNESS JOHN SIDEL**

I.      Professor John Sidel's Expert Opinions are Directly Relevant to Core Allegations Raised Against MWL/IIRO Defendants and Do Not Create Unfair Prejudice ............................40

II.     Professor Sidel is Qualified to Offer the Opinions Proffered in his Report ....................45

        A.      Professor Sidel's Experience .................................................................45

        B.      Professor Sidel is Qualified to Speak Regarding Issues Relating to Southeast Asia and the Alleged Presence of Al Qaeda There .......................................46

III.    Professor Sidel Did Not Offer Improper State of Mind Testimony.................................50

CONCLUSION ...............................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
 303 F.3d 256 (2d Cir. 2002)....................................................................................4, 6

*Andrews v. Metro North Commuter R. Co.*,
 882 F. 2d 705 (2d Cir. 1989)........................................................................................11

*Berman v. Mobil Shipping & Transp. Co.*,
 No. 14Civ.10025 (GBD), 2019 WL 1510941 (S.D.N.Y. Mar. 27, 2019)
 (Daniels, J.) ...............................................................................................4, 14, 31, 34

*Buckley v. Deloitte & Touche USA LLP*,
 888 F. Supp. 2d 404 (S.D.N.Y. 2012), *aff'd,* 541 F. App'x 62 (2d Cir. 2013) ........................4

*Cates v. Trustees of Columbia Univ. in City of New York*,
 No. 16 Civ. 6524 (GBD), 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020)
 (Daniels, J.) ..............................................................................................................24, 25

*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab*
 *Jamahiriya*,
 811 F. Supp. 2d 53 (D.D.C. 2011) .............................................................................27

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)......................................................................................................4

*Davis v. Carroll*,
 937 F. Supp. 2d 390 (S.D.N.Y. 2013).........................................................................23

*Ebbert v. Nassau Cty.*,
 No. CV 05-5445 (FB) (AKT), 2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) ..................5, 17

*ECD Inv. Group. v. Credit Suisse Int'l*,
 No. 14-CV-8486 (VM) (SN), 2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017)......................4, 14

*Emig v. Electrolux Home Prod. Inc.*,
 No. 06-CV-4791 (KMK), 2008 WL 4200988 (S.D.N.Y. Sept. 11, 2008) ........................4, 12

*Est. of Puppolo v. Welch*,
 No. 5:14-cv-95, 2017 WL 4042342 (D. Vt. Sept. 12, 2017), *aff'd sub nom.*
 *Puppolo v. Welch*, 771 F. App'x 64 (2d Cir. 2019)...........................................................17, 18

*F.H. Krear & Co. v. Nineteen Named Trustees*,
 810 F.2d 1250 (2d Cir. 1987)........................................................................................17

*Faulkner v. Arista Recs. LLC*,
46 F. Supp. 3d 365 (S.D.N.Y. 2014) ........................................................................6, 15

*Fund of Funds, Ltd v. Arthur Anderson & Co.*,
545 F. Supp. 1314 (S.D.N.Y. 1982) ...............................................................................29

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ..................................................................................................25, 38

*Gill v. Arab Bank*,
893 F. Supp. 2d 523 (E.D.N.Y. 2012) .......................................................................16, 26

*Gussack Realty Co. v. Xerox Corp.*,
224 F.3d 85 (2d Cir. 2000) ............................................................................................6, 29

*Hart v. RCI Hospitality Holdings, Inc.*
90 F. Supp. 3d 250 (S.D.N.Y. 2015) ...............................................................................6

*Henkel v. Wagner*,
No. 12-CV-4098 (AJN), 2016 WL 1271062 (S.D.N.Y. Mar. 29, 2016) ...........................6, 37

*Highland Capital Management, L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................................................19

*Katt v. City of New York*,
151 F. Supp. 2d 313 (S.D.N.Y. 2001) .............................................................................26

*Linde v. Arab Bank, PLC*,
920 F. Supp. 2d 282 (E.D.N.Y. 2011) ....................................................................5, 14, 26

*Linde v. Arab Bank, PLC*,
922 F. Supp. 2d 316 (E.D.N.Y. 2013) ....................................................................*passim*

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) (Scheindlin, J.) ...................................................5, 8, 10

*In re M/V MSC Flaminia*,
No. 12-cv-8892 (KBF), 2017 WL 3208598 (S.D.N.Y. July 28, 2017) ...............................30

*Marvel Characters, Inc. v. Kirby*,
726 F.3d 119 (2d Cir. 2013) ...........................................................................................50

*Mesfun v. Hagos*,
No. CV-03-02182 (MMM), 2005 WL 5956612 (C.D. Cal. Feb. 16, 2005) ........................9, 26

*Nimely v. City of N.Y.*,
414 F.3d 381 (2d Cir. 2005) ............................................................................................4

*Olin Corp. v. Lamorak Ins. Co.*,
  332 F. Supp. 3d 818 (S.D.N.Y. 2018) (Rakoff, J.) .......................................4, 8, 41

*In re Pfizer Inc. Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016)......................................................................4, 8, 41

*In re Platinum-Beechwood Litig.*,
  469 F. Supp. 3d 105 (S.D.N.Y. 2020) (Rakoff, J.) ......................................... *passim*

*In re Platinum-Beechwood Litig.*,
  469 F. Supp. 3d at 116–17 ...............................................................................17

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
  988 F. Supp. 2d 395 (S.D.N.Y. 2013).............................................................5, 26

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ...........................................................5, 15, 28, 37

*Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*,
  305 F. Supp. 3d 486 (S.D.N.Y. 2018) (Daniels, J.) ....................................4, 12, 19

*Sheller v. Woods*,
  No. Civ. Act. . RDB-08-3501, 2010 WL 2428754 (D. Md. June 8, 2010)...........................5, 8

*Sprint/United Mgmt. Co. v. Mendelsohn*,
  552 U.S. 379 (2008).......................................................................................4, 8, 41

*In re Term Commodities Cotton Futures Litig.*,
  No. 12-CV-5126 (ALC), 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020).....................5, 16, 37

*Tokio Marine & Nichido Fire Ins. Co. v. Calabrese*,
  No. CV 07-2514 (JS) (AKT), 2011 WL 5976076 (E.D.N.Y. Nov. 28, 2011).........................4

*U.S. Commodity Futures Trading Comm'n v. Wilson*,
  2016 WL 7229056 (S.D.N.Y. Sept. 20, 2016)......................................................37

*United States v. Am. Exp. Co.*,
  No. 10-CV-4496 (NGG) (RER), 2014 WL 2879811 (E.D.N.Y. June 24, 2014) ....................4

*United States v. Castillo*,
  924 F. 2d 1227 (2d Cir. 1991)............................................................................11

*United States v. Choudhry*,
  330 F. Supp. 3d 815 (E.D.N.Y. 2018) ................................................................26

*United States v. Farhane*,
  634 F.3d 127 (2d Cir. 2011).............................................................................4, 9

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015) ........................................................................4, 34

*United States v. Locasio,*
    6 F. 3d 924 (2d Cir. 1993) ...................................................................................11

*United States v. McCallum,*
    584 F.3d 471 (2d Cir. 2009) ..................................................................................6

*United States v. Mejia,*
    545 F.3d 179 (2d Cir. 2008) ................................................................................11

*United States v. Rahman,*
    189 F.3d 88 (2d Cir. 1999) ............................................................................6, 50

*United States v. Tse,*
    375 F.3d 148 (1st Cir. 2004) ...............................................................................34

*United States v. Zong,*
    16-CR-614 (DLI), 2018 WL 6186474 (E.D.N.Y. Nov. 26, 2018) ........................27

*In re Zyprexa Prods. Liab. Litig.,*
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) .......................................................4, 14, 29

**Other Authorities**

Fed. R. Civ. P. 54(b) ......................................................................................................19

Fed. R. Evid. 401 ...........................................................................................4, 8,19, 34, 41

Fed. R. Evid. 403 ..........................................................................................6, 8, 26, 41, 45

Fed. R. Evid 702 ........................................................................................................ *passim*

Fed. R. Evid 703 ..............................................................................................................29

## INTRODUCTION

Plaintiffs' *Daubert* motion challenging certain defense experts[1] is rooted in neither fact nor law, but rather in Plaintiffs' dissatisfaction with the substance of Defense Experts' opinions and the fact that they undercut the false narrative that underpins Plaintiffs' case. In framing their objections, Plaintiffs invite the Court to view Defense Experts' proffered testimony through a misleadingly narrow lens divorced from the realities of this litigation. They fail to mention the expansive opinions of their own expert witnesses who discuss the very subjects they now contend are irrelevant. Plaintiffs' allegations cover a wide variety of topics, span decades (and in some instances centuries), and implicate the geopolitics of numerous geographic and political regions. Their allegations include repeated citations to irrelevant and tangential documents that Plaintiffs attempt to use as purported evidence of "material support" in an effort to prop up their meritless claims. Thus, Plaintiffs hide the ball in defining, in ultra-narrow terms, *what they would like to define* as the issues in this case and *what they would like to define* as the appropriate scope of defense expert testimony.

But what an adverse party thinks the opposing expert testimony ought to cover is not the standard; the standard is whether the evidence is relevant to an issue in the case. Under that standard, the proffered testimony of Benthall, Freeman, Marks and Sidel is relevant and necessary to help the factfinder understand the numerous complex issues raised by Plaintiffs' sweeping allegations. Some examples are illustrative. Plaintiffs and their experts allege that the mere fact that Islamic (and Saudi) charities work in war-torn regions and send money there for relief efforts evidences an intent to support Al Qaeda. They denigrate alternate explanations from Defense Experts for why these charities work in war-torn countries – *i.e.*, to assist victims of war, as

---

[1] Jonathan Benthall, Chas Freeman, Jonathan Marks, and John Sidel (collectively, "Defense Experts"), reports cited hereafter as "Benthall MWL-IIRO Rpt.", "Benthall Kadi Rpt.", "Freeman Rpt.", "Marks Rpt.", and "Sidel Rpt."

charities are wont to do – and claim that those alternate explanations are irrelevant and prejudicial. Plaintiffs allege that Defendants worked in coordination with the Kingdom of Saudi Arabia ("KSA") as part of an alleged mission to support global terrorist acts against the United States, yet claim that facts and testimony demonstrating the openly hostile relationship between the KSA and Osama Bin Laden ("OBL") and Al Qaeda, and the KSA's close orientation towards the United States, are not relevant. They also allege, without evidence, that entire categories of charitable aid are disguised wrongful acts, but then claim that Defense Experts' testimony pertaining to those very same categories of aid is irrelevant. They label Southeast Asia an "epicenter" of Al Qaeda and caricature local political groups as synonymous with Al Qaeda; yet they complain that an expert with actual knowledge of the region and those very same groups is providing irrelevant information. Plaintiffs' arguments are unavailing. These, and the bevy of other expert matters Plaintiffs complain of in their Motion, are all clearly related to issues in this case and are therefore proper expert testimony.

In their misleading attack on qualifications, Plaintiffs pay scant attention to the articulated actual fields in which Defendants seek to qualify Defense Experts and instead create a series of straw-experts to knock down. The scope of testimony proffered in each expert's report is well-defined. Defendants do not offer omnibus experts who seek to testify on all matters under the sun, as Plaintiffs do, but rather offer experts with recognized bona fide specialized expertise in particularized areas. These experts opine on discrete matters, closely related to the allegations at issue in this case pursuant to the Federal Rules of Evidence and *Daubert*. Plaintiffs cannot show that Defense Experts are unqualified to opine on the *actual* categories in their reports. Instead, they invent false alternate categories and devote several pages to attack Defense Experts' qualifications in these alternative areas. Such attacks are meaningless.

Plaintiffs' other arguments similarly fail. Their claims of unfair prejudice against Defense Experts' opinions appear to stem from their mistaken belief that Defendants must simply accept Plaintiffs' misleading narrative of wrongdoing without providing contextual analysis and alternative factual explanations for the issues at hand. That is not unfairly prejudicial; that is proper expert testimony. In addition, Plaintiffs repeatedly offer confused arguments challenging the Defense Experts' methodologies, implying that experts may speak only to prove a negative. But that is not how expert testimony works. If one side offers an opinion as definite, as Plaintiffs and their experts do time and again, the other party may offer experts to opine that the facts do not support those opinions and provide contrary conclusions. Lastly, Plaintiffs' claims of improper state of mind testimony fail. Defendants' experts do not purport to describe another's state of mind or intent but rather properly opine on contextual facts necessary to the factfinder's understanding of the issues. Plaintiffs' challenges against the Defense Experts are wholly without merit.

## LEGAL STANDARDS

Defendants' opening memorandum of law on their own bellwether *Daubert* motion details the relevant legal standards.[2] Those standards are equally applicable to Defendants' opposition. We discuss below additional legal principles concerning expert qualifications, methodology and testimony allegedly about legal conclusions and states of mind, as well as issues concerning admissibility, relevance and the danger of unfair prejudice.

Experts may be qualified by knowledge, skill, education, or experience and must opine on areas within their expertise.[3] If the expert's knowledge of the subject, from experience or education, "is such that his opinion will likely assist the trier of fact in arriving at the truth," it

---

[2] Memorandum Of Law In Support Of Defendants' Joint Motion To Exclude Expert Testimony Of Jonathan Winer And Brian Michael Jenkins, ECF No. 7343, Nov. 15, 2021 ("Defs. Mem."), *passim*.
[3] *See* Defs. Mem. at 3-4.

should be admitted.[4] And while expertise in one field does not necessarily extend to others,[5] educational or experiential expertise[6] "in a general field closely related to the subject matter in question" suffices.[7]

Expert testimony must be relevant, and it cannot contain legal conclusions.[8] Experts enjoy wide latitude to offer opinions,[9] but their testimony must be relevant to an issue in the case.[10] Courts look to the proponent's theory of the case in determining the expert's testimonial relevance,[11] and relevant context and background are routine features of expert testimony.[12]

---

[4] *Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 509 (S.D.N.Y. 2018) (Daniels, J.).

[5] *Nimely v. City of N.Y.*, 414 F.3d 381, 399 & n.13 (2d Cir. 2005).

[6] *Yorkville Advisors*, 305 F. Supp. 3d at 509 ("As a result, one may be an expert solely based on one's practical experience notwithstanding a lack of professional education or one's formal education despite a lack of practical experience.") (quotation omitted); *Emig v. Electrolux Home Prod. Inc.*, No. 06-CV-4791 (KMK), 2008 WL 4200988, at *5 (S.D.N.Y. Sept. 11, 2008) ("[I]t is well-settled that, to be an expert, a person need not hold a particular degree or license. Indeed, it is not uncommon for a person to qualify as an expert based on his or her experience alone.").

[7] *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."); *see, e.g.*, *Berman v. Mobil Shipping & Transp. Co.*, No. 14Civ.10025 (GBD), 2019 WL 1510941, *9-10 (S.D.N.Y. Mar. 27, 2019) (Daniels, J.) (permitting ship inspector to testify as expert despite no service experience); *ECD Inv. Group. v. Credit Suisse Int'l*, No. 14-CV-8486 (VM) (SN), 2017 WL 3841872, at *11-12 (S.D.N.Y. Sept. 1, 2017) (Netburn, M.J.) (expert without specific experience in securities or lending facilities but with extensive experience in capital markets had "more than sufficient" qualifications to render opinions that were "potentially useful to the trier of fact").

[8] Defs. Mem. at 10.

[9] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993); *United States v. Am. Exp. Co.*, No. 10-CV-4496 (NGG) (RER), 2014 WL 2879811, at *2 (E.D.N.Y. June 24, 2014); *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 412 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 62 (2d Cir. 2013).

[10] *Tokio Marine & Nichido Fire Ins. Co. v. Calabrese*, No. CV 07-2514 (JS) (AKT), 2011 WL 5976076, at *13 (E.D.N.Y. Nov. 28, 2011) ("[T]here is no question that any expert testimony related to acts or omissions set forth in the Third–Party pleading and charged against the Third–Party Defendants . . . are relevant."); *see Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) ("[T]rial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant . . . ."); *see also* FRE 401 (evidence is relevant if it has any tendency to make the existence of any fact that is of consequence more probable or less probable); *United States v. Litvak*, 808 F.3d 160, 179–80 (2d Cir. 2015) ("To be relevant, evidence need not be sufficient by itself to prove a fact in issue.") (internal quotation marks omitted).

[11] *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 835 (S.D.N.Y. 2018) (Rakoff, J.) (concluding that helpfulness of experts' opinions must be evaluated within the context of the proponent's theory of the case); *see In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 659 (2d Cir. 2016) (concluding expert testimony helpful in context of plaintiff's theory of the case); *see also Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008) ("Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case."); *id.* at 387-88 ("Relevancy . . . exists only as a relation between an item of evidence and a matter properly provable in the case.").

[12] *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 118 (S.D.N.Y. 2020) (Rakoff, J.) ("[Expert] may testify on these background facts . . . so long as they are relevant to laying a foundation for his expert testimony . . . .") (citing *Amorgianos*, 303 F.3d at 266-67); *see United States v. Farhane*, 634 F.3d 127, 160 (2d Cir. 2011) (expert testimony providing background on Al Qaeda's activities in Saudi Arabia was relevant to whether defendant knew he was

Experts also may reach ultimate issues if they do not dictate the factfinder's decision by offering ultimate legal conclusions.[13]

Even though expert opinion "as to the state of mind, intent, or motive of a government, a charitable entity, or a person" is improper,[14] experts may testify as to whether a given practice is consistent with a particular state of mind,[15] whether a given action is consistent with practices or customs,[16] or based on explicit, stated objectives or organizational mission statements.[17]

While expert opinion must be the product of reliable methodology applied to sufficient facts or data,[18] "[w]hen offering [rebuttal] expert testimony, the defendant has 'no burden to produce models or methods of their own; they need only attack those of the plaintiffs' experts.'"[19] Rebuttal experts should "'explain, repel, counteract or disprove evidence' presented by the

---

supporting a terrorist organization, whether or not it could be proven that Al Qaeda was responsible for those activities); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 677 (S.D.N.Y. 2007) (Scheindlin, J.) (denying motion to strike portion of expert testimony where expert provided "background facts . . . like 'context'"); *see also Sheller v. Woods*, No. Civ. Act. . RDB-08-3501, 2010 WL 2428764, at *4 (D. Md. June 8, 2010) ("[E]xpert testimony may aid the trier of fact by providing useful contextual information, which may be further complemented or particularized by other forms of probative evidence in the record . . . .").

[13] *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d at 116-17 (noting experts may embrace ultimate issues and describing and contrasting contextualizing evidence with legal conclusions); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (Netburn, M.J.) (expert may not state which legal conclusion to reach or provide legal opinions or conclusions or interpret legal terms); *Ebbert v. Nassau Cty.*, No. CV 05-5445 (FB) (AKT), 2008 WL 4443238, at *3, *12 (E.D.N.Y. Sept. 26, 2008) (reaching ultimate issue not objectionable so long as expert does not give ultimate legal conclusion based on those facts); *see also*, Defs. Mem. at 12-13.

[14] *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) ("*Linde I*").

[15] *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020) ("[A]n expert can testify to whether a given practice is consistent with a given state of mind. Analogously, an expert can testify to whether a given state of mind is consistent with a given practice—i.e., a defendant likely knows X if they do Y.") (citation omitted).

[16] *Scott*, 315 F.R.D. at 46 (while experts "may not testify on the 'intent, motives or states of mind of corporations, regulatory agencies and others' if the expert has 'no basis in any relevant body of knowledge or expertise[,]'" … they may "offer testimony discussing 'ordinary practices and usages' in a particular industry") (citation omitted); *see also Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 403-04 (S.D.N.Y. 2013) ("It is of course common for testimony regarding the 'customs and practices' in a particular industry to be the subject of expert testimony.") (collecting cases).

[17] *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 324 (E.D.N.Y. 2013) ("*Linde II*") (approving experts' references to explicit, stated objectives or organizational mission statements); *see Scott*, 315 F.R.D. at 46-47 (restaurant analyst and advisory consultant may testify to industry norms and offer business reasons why a restaurant chain might make the types of decisions it did).

[18] Defs. Mem. at 18; *see id.* at 18-35 (applying standard).

[19] *Scott*, 315 F.R.D. at 44 (quoting *In re Zyprexa*, 489 F. Supp. 2d at 285).

[opposing] expert."[20] Experts may also rely on data collected or tests performed by others.[21] Minor methodological flaws do not necessarily make expert testimony inadmissible, provided that testimony has good grounds and the expert otherwise applies a reliable methodology.[22]

Finally, under FRE 403,[23] relevant expert testimony may be "excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or waste of time."[24] "Unfair prejudice" results from evidence that unduly suggests a decision on an improper basis such as emotions rather than facts.[25] In conducting Rule 403 balancing, the district court should not view the disputed evidence "as an island," but should consider it along with other evidence on the same issue.[26]

## EXPERT WITNESS JONATHAN BENTHALL

### I.    Jonathan Benthall's opinions are relevant and not unduly prejudicial

Plaintiffs assert that much of the proffered testimony of Jonathan Benthall is irrelevant and unfairly prejudicial because, in Plaintiffs' view, "[t]his case is not about the history of Islamic charities or Islamic charities in general, but rather about the wrongful actions of the named

---

[20] *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014); *see Henkel v. Wagner*, No. 12-CV-4098 (AJN), 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016) (rebuttal experts need only apply expertise to case documents and affirmative experts' reports); *id.* ("A rebuttal expert, by nature, criticizes the methodology and/or opinions of another.") (quotation omitted).

[21] *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) (facts and data collected and tests); *Linde II*, 922 F. Supp. 2d at 322 (data collection).

[22] *Amorgianos*, 303 F.3d at 267-69; *Linde II*, 922 F. Supp. 2d at 321.

[23] In their opening memorandum of law, Defendants reserved their right to raise evidentiary challenges, including on FRE 403 grounds, to Plaintiffs' experts. ECF No. 7343 at 1 n.2. In light of the Court's Order requesting "bellwether *Daubert* motions," and the Defendants' position that FRE 403 evidentiary challenges should not be considered at the pretrial stage, Plaintiffs' arguments seeking to exclude expert testimony pursuant to FRE 403 should be denied as premature.

[24] *United States v. Rahman*, 189 F.3d 88, 134-36 (2d Cir. 1999) (concluding expert testimony suggesting that defendant's actions were justified by Islamic law was irrelevant or only marginally relevant under FRE 702 and likely confusing under FRE 403).

[25] FRE 403, Advisory Committee Notes, 1972; *see also Hart v. RCI Hospitality Holdings, Inc.* 90 F. Supp. 3d 250, 260 (S.D.N.Y. 2015).

[26] *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009); *see infra* at 26-27 and 45 (applying relevant FRE 403 standard).

defendants."[27] Their myriad claims and proffered expert testimony, however, are premised on distorted facts and misleading arguments concerning the operation of Islamic NGOs. Their claims of misconduct by certain Islamic charities and the individuals who managed them are expansive, spanning decades, involving many entities and individuals, and touching all corners of the globe.[28] Plaintiffs seek to ascribe nefarious intent to various aspects of how Islamic NGOs operated historically by twisting facts to conjure up some modicum of evidence of support for Al Qaeda. In so doing, Plaintiffs misapprehend facts about Islamic charities generally and the charity defendants specifically, including: (i) why and how Islamic charities raise awareness of Islam as part of their missions; (ii) the rationale for their presence and operations in conflict and disaster zones; (iii) how they prioritize beneficiaries of their aid; (iv) the mechanics of aid disbursement, including the widespread use of cash; and (v) practical considerations concerning the reporting and accounting of disbursements. For example, Plaintiffs assert through proffered expert testimony and pleadings:

- "*The charity work was itself problematic*, because the legal activities the charities engaged in were accompanied by propagation of extremist ideology, thus creating a foundation for indoctrination and recruitment. The genuine relief efforts made it possible to build public support for the extremist activities which accompanied them. They attracted funds from donors that were also use [sic] to build terrorist capacities. They also provided a cover for moving people and supplies, especially into areas of conflict, which became training grounds for al Qaeda." Winer Report (excerpts attached to Bembry Declaration[29] as Exhibit AA) at 25, ¶ 6.6.5 (emphasis added).

- "Islamic charities were used as cover while they were providing support for military activities, indoctrination, recruitment, and terrorist planning in areas where al Qaeda was operating. They did this undercover because their support was *covert*, not overt…." Ex. AA at 61, ¶ 9.7 (emphasis in original).

---

[27] Memorandum Of Law In Support Of Plaintiffs' Daubert Motion To Exclude And/Or Limit Proposed Testimony Of Defendants' Proposed Experts, Jonathan Benthall, Charles W. Freeman, Jonathan Marks, And John Sidel,  ECF No. 7346, Nov. 15, 2021 ("Pls. Mem.") at 23.

[28] *See, e.g.*, *Ashton* Sixth Am. Compl., Sept. 30, 2005, ECF No. 1463, at 161-62, ¶ 216, 165-66, ¶¶ 224-27.

[29] All exhibits referenced herein are attached to the declaration of Aisha E. R. Bembry ("Bembry Declaration").

- "Certain members of the Saudi Royal family, along with other wealthy Saudi supporters, contributed to the IIRO and related charities as a way to support AL QAEDA without suffering from the social (and legal) ramifications that such contributions bring. The IIRO received funds which were passed on to terrorists in part from the Zakat payments from individuals and companies in the kingdom of Saudi Arabia." *Ashton* Sixth Am. Compl., ECF 1463, at 161, ¶ 216.

- With respect to Mr. Kadi, Plaintiffs' expert Victor Comras attributes "common characteristics" of "compromised or complicit charities" to the Muwafaq Foundation ("Muwafaq"), which Mr. Kadi managed, and concludes from this that Muwafaq and Mr. Kadi funded terrorism. The "common characteristics" include "Islamic tenets of 'Zakat' or 'Sadaqa,'" having substantial funding, a global presence, and branches near al Qaeda.[30]

These expansive allegations put at issue several aspects of Islamic almsgiving as well as the motivations and operations of Islamic NGOs as a whole, and these Defendants specifically. Having put these matters at issue and proffered experts who repeatedly question the authenticity of Defendants' humanitarian objectives and twist practical realities of charitable giving into their narrative of *per se* nefarious intent, Plaintiffs should not now be heard to complain that Defendants' proffered expert testimony is somehow not relevant or unfairly prejudicial. Simply put, this case is about Plaintiffs' allegations, their purported evidence, and Defendants' responses and defenses thereto. The context and background of those responses and defenses, and those responses and defenses themselves, are routine features of expert testimony.[31] They fit squarely within the confines of such testimony.[32]

---

[30] Victor Comras Rpt. dated October 29, 2020 at 5, 10, 11, 35 and 54 (excerpts attached as exhibit AB). Comras asserted, *inter alia*, that: Islamic charities were part of a network that funded Al Qaeda (*id.*); Islamic charities used religious tenets to mask such funding (*id.* at 11, 54); Muwafaq and other charities were instrumental in spreading a radical, anti-Western version of Islam (*id.* at 35); and Muwafaq fit the profile of a terrorist-supporting charity because it provided services in conflict areas (*id.* at 54).

[31] *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d at 118; *see Louis Vuitton Malletier*, 525 F. Supp. 2d at 677 (permitting factual, contextual background); *Sheller*, 2010 WL 2428754, at *4 ("[E]xpert testimony may aid the trier of fact by providing useful contextual information, which may be further complemented or particularized by other forms of probative evidence in the record . . . .").

[32] *Olin*, 332 F. Supp. 3d at 835 (relevance of expert testimony evaluated in context of proponent's theory); *see Mendelsohn*, 552 U.S. at 387 ("Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case."); *In re Pfizer*, 819 F.3d at 659 (expert testimony helpful in context of plaintiff's theory of the case).

Because Benthall undermines Plaintiffs' false narrative, they complain that he "aims to confuse the fact finder through testimony about positive attributes of largely unidentified 'Islamic charities' not at issue in this litigation".[33] But Plaintiffs' claims make this testimony necessary because Plaintiffs distort facts to diminish and delegitimize these charities' humanitarian efforts. Plaintiffs seek to establish a connection between Al Qaeda and the Charity Defendants primarily by pointing to evidence of ordinary cultural practices and legitimate activities of these humanitarian organizations, claiming that even the most benign activity—such as acting in war zones, as aid agencies naturally do—was somehow designed to "benefit" Al Qaeda.[34] Benthall's reports discuss the principles, practices, culture and history of Islamic charities to explain how charities such as MWL, IIRO, and Muwafaq work, the context in which they operate, and their goals and obstacles.[35] This proffered testimony is not "extraneous," unfairly prejudicial, or a waste of time;[36] it directly responds to Plaintiffs' allegations in their Complaints and their experts' opinions, and provides contextual support for these Defendants' defenses. Indeed, it offers the very "commentary on the evidence in this case" that Plaintiffs accuse it of lacking.[37] Benthall's discussion of Islamic charities' cultural and religious principles explains why the Charity Defendants were present in "conflict areas" (characterized by Plaintiffs' expert, Victor Comras, as a "red flag" indicating likely terrorist support[38]), faced particular obstacles, and served predominantly Muslim populations. Thus, there is nothing improper about Benthall's proffered expert testimony.[39]

---

[33] Pls. Mem. at 23.

[34] *See, e.g.*, Ex. AA at 8, ¶ 3.7; 14, ¶ 4.3; 17, ¶¶ 4.9.3-4.9.4; 20, ¶ 5.3.3 n.24; 21, ¶ 6.2.2; 67, ¶ 9.16. *See also* Ex. AB at 22.

[35] *Mesfun v. Hagos,* No. CV-03-02182 (MMM) (RNBx), 2005 WL 5956612, at *5 (C.D. Cal. Feb. 16, 2005) (testimony regarding "political, cultural… and economic ties of Eritreans" admissible)

[36] Pls. Mem. at 23.

[37] *Id*. at 26.

[38] Ex. AB at 54.

[39] *Farhane*, 634 F.3d at 160 (expert testimony providing background on Al Qaeda's activities in Saudi Arabia was

Providing the context of political or cultural considerations would not, as Plaintiffs argue, confuse or mislead a factfinder into "wrongly considering" facts about the "history of beneficent conduct" or the "beneficent reasons" for these charities' disbursing aid.[40] To the contrary, having questioned the legitimacy, motives and intent of these Defendants, there is nothing "unfair" about Defendants offering expert testimony to contextualize the facts that Plaintiffs twist to support their claims.[41] As Plaintiffs acknowledge, the issues of Islamic charitable traditions and practices as to which they would silence Benthall "cannot be grasped from the air."[42] It is for that reason that Benthall's expert testimony is necessary. Denying Defendants the opportunity to rebut Plaintiffs' and their experts' characterizations of Islamic charities would be unfair as it would result in a one-sided, misleading presentation to the factfinder.

Plaintiffs' arguments against Benthall's testimony concerning the misconduct by the leadership of various Western charities in fact support the admission, not exclusion, of this testimony.[43] Plaintiffs argue that "the issues described in the context of Western charities primarily involve disorder during periods of expansion and scandal ignited by embezzlement" and that "[t]he situations [Benthall] describes are vastly dissimilar to those at issue here".[44] But Benthall's testimony is offered to support Defendants' theory that the purported "irregularities" in accounting and reporting of disbursements highlighted by Plaintiffs' experts[45] are typical of and experienced

---

relevant to whether defendant knew he was supporting a terrorist organization, whether or not it could be proven that Al Qaeda was responsible for those activities); *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d at 118 ("[Expert] may testify on these background facts . . . so long as they are relevant to laying a foundation for his expert testimony . . . ."); *Louis Vuitton Malletier*, 525 F. Supp. 2d at 677 (denying motion to strike portion of expert testimony where expert provided "background facts . . . like 'context'").

[40] Pls. Mem. at 25.
[41] *See supra* 7-8.
[42] Pls. Mem. at 22.
[43] Pls. Mem. at 26-27.
[44] *Id.* at 27.
[45] *See* Ex. AA at 74-77, ¶¶ 10.9-10.9.7; Excerpts of Evan Kohlmann Report (attached as Exhibit AC) at 7, ¶ 17 and 40-46, ¶¶ 126-154.

by *all* charities. It demonstrates that the challenges Islamic charities face in seeking to provide aid to the most vulnerable individuals in conflict or disaster zones are not unique; rather, they are similar to those faced by Western charities, except that Islamic charities face far more scrutiny. The same financial deficiency may be deemed "abuse" with respect to Western charities but characterized as "terrorist financing" with respect to Islamic charities. Benthall's testimony directly rebuts Plaintiffs' narrative, providing an alternative (and more plausible) explanation for facts that Plaintiffs distort into purported evidence of covert support for terrorism.[46] There is nothing confusing or misleading about an expert offering evidence that contradicts Plaintiffs' misplaced theory of the case. Under Plaintiffs' reasoning, any material that rebuts their allegations is unfairly prejudicial. That is not the law.

Plaintiffs' contention that Benthall's testimony would intrude on the province of the factfinder is wrong.[47] To the contrary, his testimony requires his specialized knowledge and will assist the factfinder. The cases that Plaintiffs cite to argue otherwise are inapposite.[48]

As to Mr. Kadi, he is entitled to rebut the allegations by Plaintiffs' sole purported expert against him, Victor Comras (should he be permitted to testify), that certain "common characteristics" are indicative of funding terrorism. Indeed, this testimony appears to be a

---

[46] *See supra* 7-8.

[47] *See* Pls. Mem. at 25.

[48] In *Andrews v. Metro North Commuter R. Co.,* 882 F. 2d 705, 708 (2d Cir. 1989), the plaintiff's expert, a purported "forensic engineer," improperly testified that an icy, dimly-lit railroad platform was not a "safe place." (The meaning of Plaintiffs' *Andrews* quote might have been clearer had they not omitted the word "lay" from the statement that "expert testimony is not proper if it concerns '[lay] matters which a jury is capable of understanding and deciding without the expert's help'" (Pls. Mem. at 25 and n.129)). In *United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008), the Second Circuit found error in allowing a police officer to testify as an expert witness because the jury did not need expert testimony to understand purely factual matters about the case, and case agents testifying as experts may enjoy unmerited credibility. In *United States v. Castillo*, 924 F. 2d 1227, 1233 (2d Cir. 1991), expert testimony from a police officer with respect to basic issues such as the function of a scale in a drug deal was deemed unnecessary to the jury's understanding of the facts. In *United States v. Locasio*, 6 F. 3d 924, 936-37 (2d Cir. 1993), expert testimony from a police officer about how organized crime families were structured and worked was deemed to be outside the ken of jurors and thus appropriate.

significant portion of Plaintiffs' case against Mr. Kadi.[49] Benthall's testimony, far from confusing or misleading the jury, will critically explain the innocent inferences that can be drawn from such characteristics and rebut Plaintiffs' attempt to draw sinister inferences from them.

Moreover, Benthall's extensive experience as a social scientist will be helpful to the factfinder in assessing Comras's opinions. As Benthall explained in his report's rebuttal section, although Comras claims to have relied on "social science research … there is no evidence in his report of grounding in any of the social sciences ...."[50] Benthall also identified Comras's "lack of scruple,"[51] demonstrated by misleading omissions from quotes;[52] making allegations without support;[53] attributing intent to Mr. Kadi;[54] distorting and misrepresenting facts;[55] and sloppiness.[56]

## II.   Benthall Is Qualified to Opine on the Subjects within his Report

Benthall has been proffered as an expert on a number of pertinent topics concerning Islamic NGOs.[57] He is a recognized scholar based on his years of research, study, and experience as an anthropologist and social science researcher.[58] He has co-authored books and many articles on aid,

---

[49] *See* Joint Letter to the Court re discovery status at 3, Oct. 13, 2021, ECF No. 7265 (attached as Exhibit AAM).

[50] Benthall Kadi Rpt. (excerpts attached as Ex. AD) at 39.

[51] *Id*. at 40.

[52] *Id*. at 40 (commenting on Comras Rpt. at 13), 44-45 (commenting on Comras Rpt. at 25 n.89).

[53] *Id*. at 40-41 (commenting on Comras Rpt. at 14 and 14 n.38 and 16 para. 3); 47 (commenting on Comras Rpt. at 45); 48 (commenting on Comras Rpt. at 53).

[54] *Id*. at 41 (commenting on Comras Rpt. at 14).

[55] *Id*. at 44-47.

[56] *Id*. at 45. Benthall pointed out that Comras portrayed an alleged example of unaccounted-for funds in connection with one of Mr. Kadi's charitable projects as resulting, discrepantly, in a loss of "up to $300,000" and "[b]etween $926,000 and $1.28 million." Ex. AB, Comras Rpt., at 33 and 50. At his deposition, Comras explained that the $300,000 was arrived at by the Swiss Police (who eventually abandoned their investigation of Mr. Kadi) and that the range of $926,000 to $1.28 million was a number he arrived at by some method he could not describe except as "the fungibility of money." Deposition of Victor Comras, July 23, 2021 at 306:19- 309:25 (excerpts attached as Ex. AE).

[57] *See, e.g.*, MWL, *et al.* Letter to Judge Netburn, Sept. 28, 2021, ECF No. 7150 at ¶4; Kadi Letter to Judge Netburn, Sept. 28, 2021, ECF No. 7151.

[58] Though Plaintiffs concede that Benthall is trained in Anthropology, they critique him for his undergraduate degree in English language and literature, arguing that it does not qualify him here. (Pls. Mem. at 5, 5 n.10, 10). This is wrong as a matter of law; Benthall has extensive experiential qualifications. *See Emig*, 2008 WL 4200988, at *5 ("[I]t is well-settled that, to be an expert, a person need not hold a particular degree or license. Indeed, it is not uncommon for a person to qualify as an expert based on his or her experience alone.") (citations and quotations omitted); *see also Yorkville Advisors, LLC*, 305 F. Supp. 3d at 509  (expert may be qualified by practical experience notwithstanding lack of professional education or vice versa).

charity and development in the Islamic world, including in *The Oxford Encyclopedia of Islam and Politics*, the *Cambridge Encyclopedia of Anthropology*, and the *Journal of Muslim Philanthropy and Civil Society*,[59] and has previously been qualified to testify in a terrorism case about the role of charitable organizations, their origins, governance, operations, and needs to which they respond.[60] In addition to his scholarship, Benthall has held prestigious posts at the University College London, was elected a Member of the Association of Social Anthropologists of the Commonwealth in 1982, served as Director of the Royal Anthropological Institute of Great Britain and Ireland from 1974 to 2000, and worked as a delegate of the Swiss Government meeting with U.S. government officials, the Senate Judiciary Committee, the State Department, OFAC, and the NSC.[61] He is, in short, a globally recognized expert.

Notably, Plaintiffs do not attempt to challenge Benthall's expertise with respect to any of these areas. Instead, they argue that Benthall is not qualified to testify as an expert in areas in which he never claimed to be qualified. He has not, for example, claimed expertise with respect to "material support," "terrorist financing" generally, or Al Qaeda's history, and Plaintiffs do not offer a citation to where in his report he purportedly made such claims.[62] In this way, Plaintiffs attack a strawman: they create a fictional "Benthall," who they claim has no training or experience in certain areas that Plaintiffs unilaterally declare are the only relevant ones, and then argue that

---

[59] Ex. AD, at 5-6.

[60] *Linde II*, 922 F. Supp. 2d at 327.

[61] Benthall MWL-IIRO Rpt. (excerpts attached as Exhibit AF) at 4, 6-7; Ex. AD at 3-4, 6-7.

[62] *See* Pls. Mem. at 10. Oddly, Plaintiffs cite passing mentions of these topics in Benthall's report, but when viewed in context, they are perfectly proper discussions within Benthall's expertise. His Kadi report contains no reference at all to material support, and Plaintiffs do not identify one. The cited references to "terrorist financing" (Ex. AD at 3, 25, 37-39) are passing references to the methodologies of many purported experts in this area and of U.S. government agencies. And the reference to "material support" in Benthall's MWL/IIRO report was used in the context of a rebuttal to Plaintiffs' experts who failed to provide a sound basis for opinions concerning the organizational structures of two Islamic NGOs. Benthall's extensive experience with the rigors of academic scholarship qualifies him to make judgments on the lack of scholarly rigor of these experts and agencies. *See infra* at 14 nn. 64-65. Benthall's references to money laundering (*id*. at 39) are similar; he comments in particular about Comras's reliance on "social science research," an expertise Comras claims (Ex. AB at 4) and Benthall indisputably has.

this fictive expert is not qualified to testify. Benthall is ably qualified in the precise areas he has been offered, as even Plaintiffs' own expert, Jonathan Winer, acknowledged when he cited Benthall's work six times[63] in his report and referred to Benthall as a "British scholar" thrice.[64]

Plaintiffs also belittle Benthall's qualifications to opine about money laundering and terrorist financing as concerns Islamic charities. Plaintiffs selectively focus on his use of the word "interest" at deposition.[65] But Benthall in fact testified that money laundering was something he had considered "actively" since his engagement by the Montreux Initiative began in 2005,[66] and his related expertise in "aspects of terrorist financing that pertain to Islamic charities" is derived not only from his "interest in the subject matter" but also from his "active engagement with people who specialize in the subject matter and in reading as much as [he has] been able to of the literature on the subject …."[67] Moreover, Benthall's deep expertise in Islamic charities permits him to testify where those charities and terrorism finance intersect.[68]

Plaintiffs also incorrectly assert that Benthall has no expertise to discuss operational "irregularities" of charities such as MWL, IIRO, and Muwafaq.[69] As Judge Gershon in *Linde v. Arab Bank* held, Benthall is qualified to testify about the "the role of charitable and non-

---

[63] Ex. AA at 40, ¶ 7.3.3 n.44; 65, ¶ 9.12.1 n.98; 75, ¶ 10.9 n.116; 82, ¶ 12.2 n.139; 84, ¶ 12.6.1 n.146; 85, ¶ 12.6.4 n.150.

[64] *Id.* at 64, ¶ 9.12.1; 82, ¶ 12.2 (citing Benthall); 85, ¶ 12.6.4 ("British scholar of the Middle East").

[65] Pls. Mem. at 5. The cited material, Benthall Dep. at 70:1-23, does not contain the word "interest" and is not relevant to the proposition in Plaintiffs' Memorandum of Law. We suspect the citation should be to page 71.

[66] Deposition of Jonathan Benthall, Jul. 20, 2021 (excerpts attached as Exhibit AG, as amended by the Errata Sheet) at 71:1-15. The "Montreux initiative," subsequently named the "Islamic Charities Project," was a project of the Swiss Federal Department of Foreign Affairs relating to removing obstacles for Islamic charities, for which Benthall was an independent adviser between 2005 and 2013. Ex. AD at 6.

[67] Ex. AG at 70:2-3, 71:24-25, and 72:5-8.

[68] *In re Zyprexa*, 489 F. Supp. 2d at 230 ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."); *see, e.g.*, *Berman,* 2019 WL 1510941, *9-10; *ECD Inv. Grp.*, 2017 WL 3841872, at *11–12. Here, Benthall has acknowledged expertise (*see supra* at 13 and n. 61 and 14 and nn. 64-65, and *infra* at 15 and n. 71), in both the general and specific areas on which he opines.

[69] Pls. Mem. at 11.

14

governmental aid organizations…including their origins, their organization, governance, operations, and the needs to which they typically respond"—precisely the topics here on which Benthall opines.[70] Benthall is especially well-qualified to discuss the personnel and logistical challenges that international charitable organizations face, particularly since they often focus their efforts in geographical areas plagued by poverty, war, and natural disasters.[71]

Plaintiffs also criticize Benthall for not being able to identify who "funded al Qaeda."[72] But Benthall was not charged with discovering who funded the 9/11 attacks, a question that even the 9/11 Commission could not answer.[73] He is an expert on the history, goals, obstacles and other practical considerations of Islamic charities, exactly what he is being offered to testify about.

## III.   Benthall Does Not Opine Improperly on State of Mind or Offer Legal Conclusions

Plaintiffs contend Benthall offers improper state of mind testimony and highlight five examples. None qualifies.[74] First, Plaintiffs argue that Benthall lacks the factual basis to criticize their expert Kohlmann even though Benthall's rebuttal shows that it is Kohlmann's opinion about MWL, IIRO, and WAMY that has no factual support.[75] This is proper rebuttal.[76] Second and third, Plaintiffs highlight Benthall's discussions of Muwafaq's letter from the Croatian Republic of Herzeg-Bosnia and of Mr. Kadi's support for women's training and education. These discussions[77]

---

[70] *Linde II*, 922 F. Supp. 2d at 327.

[71] *E.g.,* Ex. AD at 15, 27, 30 (banking and communications not nearly as developed when Muwafaq operated as they are now). Benthall explains that for these reasons, as well as cultural ones, it is not surprising that Mr. Kadi would rely on personal relationships with persons he trusted to aid in both his business and humanitarian endeavors. *Id. at*, at 30). *See also* Ex. AF at 14, 18-19, and 27-29.

[72] Pls. Mem. at 10 ("Perhaps most telling, Benthall acknowledged he did not know if Islamic charities funded al-Qaeda."); *see also* Pls. Mem. at 22 ("In fact, Benthall acknowledged his report was not written to address the issue of whether IIRO/MWL provided support to al-Qaeda before 2001.").

[73] 9/11 Commission Report at 172 (2004) (excerpts attached as Exhibit AH).

[74] *See* Defs. Mem. at 14-18 (describing and applying relevant legal standard); *supra* at 3-6.

[75] Ex. AF at 31.

[76] *Scott*, 315 F.R.D. at 44 ("When offering [rebuttal] expert testimony, the defendant has 'no burden to produce models or methods of their own; they need only attack those of the plaintiffs' experts.'"); *Faulkner*, 46 F. Supp. 3d at 386 (rebuttal testimony should "'explain, repel, counteract or disprove evidence' presented by the [opposing] expert.").

[77] They include a New Testament reference demonstrating Muwafaq's willingness to provide charitable services to Christians, a letter from the Sudanese Red Crescent commending Muwafaq for providing help to those in need without

do not opine on anyone's state of mind; they simply support Benthall's statement that he is unaware

of evidence showing that Mr. Kadi or Muwafaq objected to providing aid to Christians,[78] and they

relate evidence of actions by Mr. Kadi.[79]

Fourth and fifth, Plaintiffs attack Benthall's deposition testimony concerning Dr. Adnan

Basha's control of overseas transfers of funds and Benthall's dual conclusions that (i) there is no

reason to suppose that the leaders of MWL and IIRO had anything to do with Al Qaeda nor "shared

its ideology, goals or tactics" and (ii) charities with overseas branches experience practical

problems.[80] But Benthall, a recognized authority on Islamic charities, merely explains how Basha,

IIRO's Secretary General, was reorganizing IIRO and addressing issues left by his predecessor.[81]

Benthall then explains the charities' goals and obstacles, citing scholarly works, journalism, and

government reports.[82] There is no divination of Basha's or IIRO's intent or motives, just an

explanation of Basha's reform efforts, the lack of evidence of shared ideologies or goals between

Al Qaeda and IIRO leadership, and the difficulties IIRO (and other charities) faced when

expanding overseas, with appropriate referential citations.[83] In addition, Benthall also explained

that he did not speak to Basha, during the interview prior to his retention in this matter, about

---

regard to religion or race (significant given the Red Crescent's commitment to the principle of non-discrimination on religious grounds), Mr. Kadi's OFAC Statement describing his founding of a women's college and President and Mrs. Carter's visit to the opening, and a photograph of that visit published in the *Arab News*. Ex. AD at 34-37.

[78] *Id.*

[79] *See Gill v. Arab Bank,* 893 F. Supp. 2d 523, 540 (E.D.N.Y. 2012) (Benthall could "opine on the role and importance of *zakat* committees in the distribution of charitable goods and services" because the "jury will ultimately need to decide whether the Bank provided financial services to Hamas through *zakat* committees in violation of [U.S.] law" and that Benthall's "proposed testimony will assist the jury in assessing the Bank's conduct and state of mind."); *see also In re Term Commodities*, 2020 WL 5849142, at *14 ("[A]n expert can testify to whether a given practice is consistent with a given state of mind. Analogously, an expert can testify to whether a given state of mind is consistent with a given practice—i.e., a defendant likely knows X if they do Y.").

[80] Pls. Mem. at 45-48. Plaintiffs cite Benthall's executive summary only, Pls. Mem. at 46 n.241, neglecting his report's body, which expands on these points. Ex. AF, at 16-22.

[81] Ex. AG at 221:1-222:14, 232:5-233:1, and 237:6-23.

[82] Ex. AF at 16-22.

[83] Benthall explained: "I said nothing about their mental state. . . . I didn't see that they shared the ideology, goals, or tactics of al-Qaeda on the basis of what I've seen." Ex. AG at 226:18-226:24; *see also id.* at 251:12-14 ("The opinion I offer is that I haven't seen evidence as to the intentions of the leadership being nefarious.").

allegations of terrorist involvement because at that time Benthall had been seeking information about IIRO generally, not pushing to address meritless allegations of material support for terrorism.[84] Benthall sought out documentary evidence from Basha and IIRO, as the *Linde II* decision approved.[85] None of the five examples Plaintiffs highlight is state of mind testimony.[86] Nor has Benthall offered an improper legal conclusion in stating that IIRO leadership did not share Al Qaeda's goals or tactics and faced difficulties in overseas operations. He does not improperly tell the jury what conclusion to reach;[87] and Benthall disclaimed offering a legal opinion concerning whether organizations can act through their employees.[88] There is nothing to exclude.[89]

## IV.   **Benthall Applies a Proper Methodology**

In attacking Benthall's methodology, Plaintiffs' only point of contention is their claim that he "consulted only three of ten types of material he identified in his methodology."[90] This is untrue. First, Plaintiffs' argument ignores the fact that Benthall made plain at his deposition and in his

---

[84] Ex. AG at 239:20-241:17.

[85] *Id*. at 240:24-241:17; *Linde II*, 922 F. Supp. 2d at 324 (contrasting references to explicit, state objectives or mission statements of organizations with impermissible state of mind testimony).

[86] *Linde II*, 922 F. Supp. 2d at 324 (approving experts' references to explicit, stated objectives or organizational mission statements); *see, e.g.*, Ex. AF at 27 n.69 (citing IIRO Newsletter). Plaintiffs note (at p. 47, n. 245) that *Linde II* partially excluded Benthall's testimony and attack his memory of that. That is neither here nor there. *Linde II*'s conclusion does not affect Benthall's testimony now, and Plaintiffs' counsel refused to show him the 2013 opinion to refresh Benthall's recollection despite his repeated pleas. Ex. AG at 88:19-94:1. Moreover, Benthall's testimony here does not cover those two topics excluded in *Linde II*. Instead, in *Linde II*, the court permitted Benthall to opine on, *inter alia*, the role of charitable organizations, their origins, governance, operations, and needs to which they respond—the same topics that Plaintiffs seek to exclude here. 922 F. Supp. 2d at 327.

[87] *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d at 116–17 (noting experts may embrace ultimate issues and describing contextualizing evidence versus legal conclusions); *Ebbert*, 2008 WL 4443238, at *3 (reaching ultimate issue is not objectionable so long as expert does not give ultimate legal conclusion based on those facts).

[88] Ex. AG at 270:7-272:7. Tellingly, Plaintiffs suggest that experts who are attorneys may instruct on the law, likely to save their expert Winer's testimony, which is riddled with legal conclusions, *see* Defs. Mem. at 12-13, but attorney experts may not testify as to legal conclusions either. *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1256, 1258 (2d Cir. 1987) (district court properly excluded testimony of attorney expert witness that contracts at issue were unenforceable because they lacked essential terms); *Est. of Puppolo v. Welch*, No. 5:14-cv-95, 2017 WL 4042342, at *17-18 (D. Vt. Sept. 12, 2017), *aff'd sub nom. Puppolo v. Welch*, 771 F. App'x 64 (2d Cir. 2019) (excluding attorney expert for offering legal conclusions and other failures under FRE 702).

[89] Benthall explained that he was not offering legal opinion and was basing his opinion on the hierarchical nature of Saudi society and his experience with the administration of large charities. Ex. AG at 222:2-225:18.

[90] Pls. Mem. at 40; *see also id.* n.203.

17

reports that his opinions incorporate much of his previous copious research and writing.[91] The methodologies used for that work inherently inform the opinions he has rendered in this case. Second, at his deposition, Benthall confirmed that he considered nine of the ten types of sources, including sources he relied upon in his previous research that was incorporated into this report.[92] Plaintiffs hide these facts from the Court. Instead, they cite to a portion of his deposition where he answered that he did not conduct interviews for the purposes of preparing for Kadi's report before explaining that he conducted interviews in the past for research on Islamic NGOs that he incorporated into these expert reports.[93] Third, Benthall does not claim that all categories of source material must be consulted in every case. He said, "primary sources are to be sought *wherever possible*."[94] It should be obvious that in 2020 not all categories that Benthall referred to are even available when the relevant time period is 1992-2001.[95] Thus, Benthall's extensive experience, and the methodology applied in his research, easily support the reliability of his opinions here.

**EXPERT WITNESS AMBASSADOR CHAS FREEMAN**

I.    **Chas Freeman, the Former U.S. Ambassador to the Kingdom of Saudi Arabia, is Qualified to Proffer the Opinions Expressed in his Report, all of which are Relevant**

Plaintiffs argue that Amb. Chas Freeman's background and "testimony concern issues that

---

[91] *See*, *e.g.*, Ex. AG at 129:23-130:3; 161:25-162:9; 163:3-7; 172:16-173:8; and Ex. AF at 4-9 and 27.

[92] Ex. AG at 160:18-23 (government publications and websites); 161:19-162:2 (personal/participant observation); 163:13-164:1 and 175:22-176:22 (written material, including financial reports); 168:20-169:2 (court documents); 171:24-172:6 (open-source academic articles and books); 172:7-10 (newspaper articles and websites); 172:11-173:8 (interviews with other researchers); and 173:16-25 (intelligence and other government reports). Benthall had also met and communicated with both former IIRO Secretaries General, Farid Qurashi and Basha, and conducted interviews in the larger context of his research into Islamic charities. *Id.* at 163:3-8, 171:11-173:8, 239:14-241:17, and Benthall MWL-IIRO Rpt. at 27.

[93] Pls. Mem. at 40, 40 n.203; Ex. AG at 163:3-8.

[94] Ex. AD at 8; Ex. AF at 7 (emphasis added).

[95] Plaintiffs criticize Benthall for not interviewing, *e.g.*, "anyone from the charities" (although Benthall had available numerous depositions taken by Plaintiffs of Mr. Kadi and representatives of MWL-IIRO) or "anyone who received charity from Muwafaq or Kadi; and for not making personal observations …." Pls. Mem at 40 n.203. No one can now reasonably make personal observations about activities of the charities prior to September 2001, or interview persons who received charity from Muwafaq or Kadi when Muwafaq closed long before 2001. In the context of his general research that forms the background for much of his opinions in this case, and with respect to MWL-IIRO, Benthall did indeed make personal observations. Ex. AG at 161:22-163:7.

are largely irrelevant to the claims against WAMY" and that "nothing in Freeman's testimony qualifies him as an expert to testify on the issues addressed in his report."[96] Plaintiffs' arguments fail under Fed. R. Evid. ("FRE") 702 and the relevant caselaw. Chas Freeman's practical experience, educational background, and knowledge of the subject are "such that his opinion will likely assist the trier of fact in arriving at the truth," and should therefore be admitted.[97]

The helpfulness requirement of Rule 702 includes that "the expert's testimony must actually be relevant to an issue in the case."[98] Plaintiffs' allegations, claims, and theories as to WAMY and the other defendant Saudi charities make the opinions offered by Amb. Freeman directly relevant to the issues in this case and therefore admissible under FRE 702.[99] Plaintiffs allege, in sum, that official KSA charities, including WAMY, were part of a global network, based in the KSA and operating under the tacit direction and approval of the Saudi Government and Saudi Royal family, that provided material support to a global "Wahhabist" jihad, led by OBL and Al Qaeda, that caused the 9/11 attacks.[100]

The critical question for purposes of FRE 702(a) is will Amb. Freeman's background and experience help the trier of fact understand any of the evidence or determine any fact in issue within the scope of Plaintiffs' allegations? The answer is yes. Plaintiffs' allegations have injected into this case issues "concerning the history, politics, and culture of Saudi Arabia, including

---

[96] Pls. Mem. at 12.

[97] *Yorkville Advisors, LLC,* 305 F. Supp. 3d at 508-09  (citing *Valentin v. City of New York*, No. 94 Civ. 3911 (CLP), 1997 WL 33323099 at *17 (E.D.N.Y. Sept. 9, 1997) and *Mahoney v. J J Weiser & Co.*, No. 04 Civ. 2592 (VM)(HBP), 2007 WL 3143710 at *7 (S.D.N.Y. Oct. 25, 2007)).

[98] *Highland Capital Management, L.P. v. Schneider,* 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005). *See also id.* at 473 (noting that the helpfulness requirement of Rule 702 is akin to the relevance requirement of Rule 401 but also requires that expert testimony have a valid connection to a pertinent inquiry).

[99] Pages 4-5 *supra*.

[100] Ashton Third Am. Compl., Sept 5, 2003 (attached as Exhibt AI) at ¶¶ 115, 447; Cont. Cas. Compl., Sept.1, 2004 (attached as Exhibit AJ) at ¶¶ 224-26, 293; Burnett, Third Am. Compl., Nov. 22, 2002 (attached as Exhibit AK) at pp. 206, 210, 214-20. *See also* Plaintiffs' Memorandum of Law in Support of Motion Pursuant to Fed. R. Civ. P. 54(b), Dec. 7, 2021, ECF No. 7432, at pp. 11-13 and n. 8, 9.

Wahhabism; world conflicts and their relationship to 9/11; the relationship between the Kingdom of Saudi Arabia and WAMY, as well as the relationship between the Kingdom, OBL, and al Qaeda."[101] Evan Kohlmann, one of Plaintiffs' own experts, acknowledged that an understanding of such issues concerning this history, religion and geopolitics of Saudi Arabia is necessary to understand whether the charities allegedly supported Al Qaeda.[102] It is equally true that an understanding of the issues on which Amb. Freeman will opine is necessary to understand how WAMY did not support Al Qaeda, and that any theory that a Saudi charity with close ties to the KSA would support Al Qaeda is nonsense.

Plaintiffs' claim that Amb. Freeman has a "dearth of expertise in the areas on which he proffers opinions" is wrong.[103] Amb. Freeman has the "specialized knowledge" and experience of the KSA's religion, history, geopolitics, government and institutions that qualifies him to testify on all of the issues addressed in his report. Plaintiffs make light of his 31 months of experience as U.S. Ambassador to Saudi Arabia and misrepresent his extensive experience in and knowledge of the region including years of personal contacts with Saudi officials at the highest level both during his time in government and long thereafter.[104] Amb. Freeman, who is fluent in Arabic, served as United States Ambassador to the KSA from 1989 to 1992.[105] From 1993 to 1994, he served as Assistant Secretary of Defense and was responsible for managing U.S. defense relations with all

---

[101] Excerpts of Chas W. Freeman Expert Report (attached as Exhibit AL) at 1 (footnote omitted).

[102] Affirmation of Evan Francois Kohlmann., Feb. 3, 2015 (attached as Exhibit AM) at ¶¶ 13-26 (stating in sum that "it is necessary to understand the role of Islam in the Saudi state, and the role of Dawah organizations in fulfilling Islamic obligations of the Saudi state"; "from its inception, a core function of the Saudi government has been the advancement of a Wahhabi ideology both inside and outside the borders of the Arabian Peninsula. The Basic Law of Governance expressly provides that the Propagation of Islam (Dawah) is an essential function and duty of the Saudi government.").

[103] *See* Pls. Mem. at 14.

[104] *Id.* at 12, 14 (suggesting Amb. Freeman's experience in the KSA was limited to 31 months).

[105] *See* Chas W. Freeman's *curriculum vitae* (attached as Exhibit AN) for a detailed exposition of his education, publications, experience, and credentials, including his schooling at Ivy League institutions for both his undergraduate and law school studies, and his many high level political appointments and awards, especially those exhibiting an unparalleled knowledge of the region (among them election to the American Academy of Diplomacy, Order of 'Abd Al-'Aziz, 1st Class [Diplomatic Service], Defense Meritorious Service, Distinguished Honor Award).

regions of the world, most notably the Middle East and specifically the KSA.[106] Plaintiffs also failed to mention that Amb. Freeman rounded out his long and in-depth experience in Middle East affairs, including those of the KSA, by serving twelve years as President of the Middle East Policy Council (from 1997 to 2009),[107] during which time he continued to travel extensively to the KSA[108] and regularly met with high level Saudi officials, including the then King, in furtherance of MEPC's work.[109] After Amb. Freeman left the Foreign Service in 2001, he continued to have regular meetings with Saudi Arabia's King, Crown Prince and government ministers.[110] The meetings covered issues "including regional situations and the issue of security in the Kingdom and the level of cooperation with the United States."[111] The meetings were so important and valuable that U.S. intelligence officials asked him to report back on them.[112]

Amb. Freeman's time as U.S. Ambassador to the KSA was during the first Gulf War and required him to manage the largest diplomatic mission in the world under crisis conditions.[113] In that capacity, he *inter alia* worked with and oversaw the work of intelligence officers and Treasury attachés[114] while focusing on international security issues and other such issues critical to U.S. and KSA relations.[115] He also had direct access to, and was in regular contact with, high level KSA

---

[106] *Id.*
[107] *Id.* The Middle East Policy Council ("MEPC") is a Washington, D.C. based 501(c)(3) non-profit organization that produces analysis and commentary on issues impacting U.S. national interests in the Middle East.
[108] Excerpts of Charles Freeman Dep. Tr. (attached as Exhibit AO) at 461:1-14, 492-96. Amb. Freeman traveled to the KSA as a special guest of the King approximately two to three times per year over an approximately 15-year period after his ambassadorship ended and prior to the termination of his tenure as MEPC President. On these trips, he would meet with Saudi officials (including Saudi Royalty), officials from other Middle East nations, and U.S. officials.
[109] *Id.* at 117-18; 493-94. Beside traveling to the KSA as Ambassador and as President of the MEPC, Amb. Freeman had access to high level KSA officials while visiting in an unofficial capacity.
[110] *Id.* at 459:7-24, 460:1-23.
[111] *Id.*
[112] *Id.*
[113] *Id.* at 325:3, 326:11
[114] *Id.* at 55:2-10
[115] *Id.* at 262:13-21 ("I was concerned, as an American Ambassador, that the Saudi government was insufficiently attentive to the growing extremism in some sectors of Saudi society. And this is a subject that I discussed with those concerned with both foreign and domestic intelligence on the Saudi side.")

officials (including the King and Crown Prince)[116] on these issues.[117] His ambassadorship to the KSA "occasioned an unprecedented and since unmatched degree and intensity of interaction with the [Saudi] king and officers of his government and religious establishment."[118]

Plaintiffs seek to disqualify Amb. Freeman as an expert by deploying their common strawman argument of demonstrating how he is not qualified to testify on issues that are not the subject of his expert testimony.[119] He is certainly an expert with first-hand experience on the foundational background and contextual issues concerning the KSA's government, history, geopolitics, and religion and the interplay of all of these, all of which are relevant.

Plaintiffs' attack on Amb. Freeman because he neither reviewed nor relied upon internal documents and has no personal knowledge of WAMY or its funding[120] is misplaced. Plaintiffs again fail to understand, or deliberately ignore, that he is not providing any expert testimony on WAMY's internal controls, its operations or its financing. Other WAMY experts will opine on these matters. Rather, Amb. Freeman's testimony goes to the contextual and background issues that are necessary to understand the allegations against WAMY and WAMY's defenses.

Finally, Plaintiffs argue in a footnote that Amb. Freeman should be barred from offering testimony about "the relationship between the [KSA] and WAMY" because one of WAMY's 30(b)(6) witnesses, Dr. Saleh Wohaibi, was produced allegedly in violation of a court order in that he was not able to answer certain questions.[121] Plaintiffs offer no authority that such alleged

---

[116] *Id*. at 85:23-86:1-7 ("Typically, I would see the King, the Crown Prince, the Minister of Interior, the Foreign Minister or his Deputy, the Chief of the Istikhbarat, which is the foreign intelligence organization of Saudi Arabia. I might also see the Minister of Petroleum and Minerals. All of whom are personal friends.").

[117] *Id*. at 336:9-16 ("Yes. I would have been the ultimate decision-maker on whether to report something to Washington, whether to make a recommendation on how to deal with it, and often would have been the person who went to meet a senior Saudi official to make an argument on behalf of the U.S. government.").

[118] Ex. AL at 14.

[119] *Id*. at 13-14 (arguing that Freeman is not an expert in "terror financing, Saudi Charities or WAMY itself").

[120] *Id.* at 14, 28.

[121] *Id*. at 6 n. 15.

deficiency, even if true, allows the exclusion of Amb. Freeman's testimony. Moreover, Plaintiffs' allegation misrepresents the record. Dr. Wohaibi testified at his deposition at great length about WAMY's relationship with, and financing from, the KSA as a 30(b)(6) witness.[122]

## II.   Amb. Freeman's Opinions Meet the Basic Requirements of Reliability Resting on his Vast Practical Experience Rather Than a Traditional Scientific Method

Egregiously and without basis, Plaintiffs attack Amb. Freeman for having "no methodology" and make the unfounded and intemperate claim that "he went out of his way to hunt for materials to corroborate his own view."[123] Amb. Freeman bases his opinions on his vast practical and field experience, and his opinions need not therefore "rest on traditional scientific methods."[124] The proper inquiry for a court evaluating the reliability of an expert's methodology is whether the expert basing their testimony upon personal experience "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[125] Amb. Freeman's 18-page report with 38 footnotes demonstrates the intellectual rigor required of an expert. His opinions are not simply his *ipse dixit*; rather they are solidly supported by primary sources, including his own observations and conclusions gained from decades of on-the-ground interaction with KSA society including meetings and interviews with KSA leadership and policy makers at the highest level, and his handling monumentally important issues relating to international terrorism with these leaders and policy makers.[126] His opinions are also supported by respected secondary sources such as Lawrence Wright, Karen Armstrong, and Steve Coll.[127]

---

[122] *See* Excerpts of Saleh Al Wohaibi, Ph.D. Dep. Tr. (attached as Exhibit AP) at 36, 44-48, 52, 70, 81, 105, 107 and 170, in which he testified about WAMY's interactions with KSA Ministry of Islamic Affairs, KSA Shura Council, and KSA Ministry of Finance and about financial support from the KSA Ministry of Finance.

[123] *Id*. at 40-41.

[124] *Davis v. Carroll,* 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (citing *Kumho Tire Co., Ltd. V. Carmichael,* 526 U.S. 137, 149-50 (1999)). *See* pages 3-4 *supra*.

[125] *Davis,* 937 F. Supp. 2d at 413.

[126] Ex. AO at 86-88. 139-40, 459-61, 492-96, 507-08.

[127] *See* Ex. AL at 1 n. 1; 6, n. 14; 9, nn. 25, 27; 10, n. 31; 12, n. 27.

Amb. Freeman also cites primary source and contemporary secondary source documents and his own published works.[128] Plaintiffs grossly distort the significance of one footnote in Amb. Freeman's report in which he cited to a "former U.S. intelligence officer who wishes to remain anonymous" without noting the name of the blog on which the information appeared.[129] Although Plaintiffs complain about what they claim is a "ruse" and "ploy,"[130] they never once question the accuracy of the factual assertion in the report that the cite supports.[131] Neither do Plaintiffs question the methodology Amb. Freeman used in independently reaching this conclusion.[132] The fact asserted is consistent with the general description in the 9/11 Commission Report of where the hijackers came from.[133] The only ruse or ploy here is the Plaintiffs' seeking to disqualify a highly-credentialed and experienced witness on a premise they know to be baseless. Even assuming arguendo that this one citation is a flaw in Amb. Freeman's report, a "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not necessarily render an expert's opinion inadmissible.[134]

## III.   Amb. Freeman's Opinions and Testimony Are Neither Conclusory Nor State of Mind

Plaintiffs challenge three of Amb. Freeman's opinions as impermissible conclusory expert testimony by claiming there is an "analytical gap between the data and the opinions proffered" by Amb. Freeman.[135] Plaintiffs are wrong on each count.

---

[128] *See id*. at 6, n. 15; 7, n. 17; 8, n. 24; 9, n. 26; 10, n. 33; 12, n. 38.

[129] Pls. Mem. at 41-42; Ex. AI,  at 4, n.7 and endnote i.

[130] Pls. Mem. at 41-42.

[131] The "nefarious" footnote supports the wholly unremarkable and undisputed fact that "[a]lmost all the Saudi 9/11 hijackers came from this southwestern frontier region [of the KSA]." Freeman Rpt. at 4.

[132] Amb. Freeman used his first-hand knowledge of Saudi tribal names typical from that region and compared such names with the names of the 9/11 hijackers. Ex. AO at 392:24, 393:1-25, 394:1-17.

[133] *Id*. at 395:9-18.

[134] *Cates v. Trustees of Columbia Univ. in City of New York*, No. 16 Civ. 6524 (GBD), 2020 WL 1528124, at *6 (S.D.N.Y. Mar. 30, 2020) (Daniels, J.) (citing *Amorgianos,* 303 F.3d at 265). *See also* supra at 6.

[135] Pls. Mem. at 28, 43. Plaintiffs claim that the following opinions are conclusory: (1) "… that Saudi Wahhabism is not 'compatible' with al Qaeda, that the Saudi *ulema*, which speaks for Saudi Wahhabism, has been 'unequivocal in its condemnation of al Qaeda its ideology, and its practices, which it considers perversions of Islamic principles'" (2) that WAMY or its leaders supporting Al Qaeda would be inconsistent with WAMY's reason for being in the context

"Conclusory" is defined as "expressing a factual inference without reference to "the underlying facts on which the inference is based."[136] The challenged opinions are not conclusory as Amb. Freeman plainly references the underlying facts upon which they are based and includes explanations as to "how and why" he reached these conclusions.[137] For example, Amb. Freeman supports his opinion that Saudi Wahhabism is not compatible with Al Qaeda's calls for overthrow and uprising,[138] and that the Saudi ulema have been unequivocal in their condemnation of Al Qaeda,[139] with a detailed fact-based historical analysis going back to 1744[140] and buttressed by reputable sources.[141] He discusses in detail the fallout and openly hostile relationship between OBL and the KSA which includes OBL's vehement opposition to the KSA's enlisting U.S. support in the first Iraq war, leading the KSA to ultimately strip OBL of his Saudi citizenship in 1994, and attempts by the KSA to have the Taliban hand OBL over to them for trial once he returned to Afghanistan in 1996.[142] Amb. Freeman demonstrates how OBL and Al Qaeda after these events, and certainly up to the 9/11 attacks, were identified by the KSA as "its most dangerous enemy."[143]

Amb. Freeman's opinion that WAMY's support of Al Qaeda would be contrary to its purpose is also supported by facts, including WAMY's establishment by royal decree.[144] Amb. Freeman notes that WAMY is "an instrument of the Saudi government" and is headed by members

---

of its place within Saudi society and "the ulama and the Royal family"(3) that "support of al Qaeda . . . would place WAMY leadership at odds with the Saudi state," in which case "retribution would have been both immediate and harsh for supporting al Qaeda." *Id.* at 28, 42-43.

[136] Black's Law Dictionary 351 (10th Ed. (2014)).

[137] *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

[138] Ex. AL, at 6-7, n.16-17.

[139] *Id*. at 7. Amb. Freeman supports this factual assertion by citing *inter alia* to Sheikh `Abd al-Aziz ibn Baaz, the Grand Mufti of the KSA from 1993-99, who "declared that it was forbidden for 'anyone to cooperate with [OBL and others like him] in their evil,' and demanded that right-thinking Muslims 'destroy and annihilate those publications that have emanated from … the callers of falsehood (bin Laden and those like him). . ."

[140] *Id*. at 6-8, n. 14-23.

[141] *Id*. at 6-7, n.16-17.

[142] *Id*. at 8-10.

[143] *Id.* at 6-8, 11.

[144] *Id*. at 11.

25

of the Saudi Wahhabist religious establishment.[145] This robust and detailed factual explanation about the virulent hostility between the KSA and OBL/AQ in the years leading up to the terrorist attacks of 9/11, as well as the close relationship between WAMY and the KSA government and the Saudi royal family demonstrates, clearly, that the challenged opinion is not conclusory.

Plaintiffs also incorrectly characterize as inadmissible state of mind testimony Amb. Freeman's opinion that any support of Al Qaeda would have placed WAMY and its leadership "at odds with the Saudi state," "in which case retribution would have been both immediate and harsh."[146]  Unlike some of the proffered testimony in *Linde v. Arab Bank, PLC,* 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011), upon which Plaintiffs rely, Amb. Freeman did not opine on the intent or motive of either WAMY or the KSA with respect to any actions. He described *actions* that the Saudi state would have taken. Amb. Freeman has provided the jury with essential information as to the customs, practices, politics and culture in which WAMY exists. Such testimony will help the factfinder evaluate Plaintiffs' wide-ranging allegations.[147] Such opinions also have robust factual support, including Amb. Freeman's years of personal experience with Saudi law and society,[148] and the documented severe measures the KSA took against Al Qaeda.[149]

**IV.     Plaintiffs' Attempt to Exclude Amb. Freeman's Testimony as "Unfairly Prejudicial" Under FRE 403 Is Without Merit as a Matter of Law**

Plaintiffs argue that the "[o]pinions offered by Freeman would also be unfairly prejudicial

---

[145] Ex. AO at 378:10-24, 379:1-25, 380:1-24, 381:1-8; Ex. AL at 11-12, nn.35-36.

[146] Pls. Mem. at 42-43.

[147] *See United States v. Choudhry,* 330 F. Supp. 3d 815, 851-53 (E.D.N.Y. 2018) (Expert witness may testify about Pakistani culture including Islam and Islamization, religious movements; identity politics and postcoloniality; gender and sexuality; and cultural and social theory); *Mesfun v. Hagos,* No. CV-03-02182 (MMM), 2005 WL 5956612, at *5 (C.D. Cal. Feb. 16, 2005) (testimony regarding political, cultural and economic ties of Eritreans admissible); *Gill,* 893 F. Supp. 2d at 537 (expert testimony about U.S. customs and practices under which defendant bank operates admissible); *see also Reach Music Pub., Inc.,* 988 F. Supp. 2d at 403-04 (collecting cases noting common to allow custom and practice testimony); *Katt v. City of New York,* 151 F. Supp. 2d 313, 354-55 (S.D.N.Y. 2001) (Expert testimony on culture and practices of New York Police Department admissible). *See also supra* at 4.

[148] Ex. AL at 7 n.16-17 (providing commentary on KSA laws clearly requiring obedience to the established ruler which, if violated, would call for punishment.).

[149] Ex. AL at 12, nn. 37, 38.

as Freeman's career as a diplomat would suggest decision on an improper basis such as an emotional one," or would otherwise "confuse[]" the jury "by virtue of his use of his title."[150] Yet Plaintiffs' do not show how hearing testimony from a former Ambassador would trigger an emotional response from jurors and cite no authority supporting this claim. Nor do Plaintiffs explain why the title of "Ambassador" would be any more or less unfairly prejudicial than any of the titles of the other former governmental officials they proffer as expert witnesses. Quite the contrary, there is ample precedent for expert testimony by a former U.S. ambassador.[151]

## EXPERT WITNESS JONATHAN MARKS

### I.   Marks is Qualified to Provide Relevant Testimony to Rebut Plaintiffs' Experts

Plaintiffs allege that WAMY used its charitable projects to willingly fund terror groups. They retained purported experts without accounting or forensic expertise to opine without basis that from 1992 to 2002 WAMY's financial structure demonstrated such pattern. To rebut these opinions WAMY retained Jonathan Marks, of the international accounting and financial consulting firm Baker Tilly, to conduct a macro analysis of WAMY's financial practices and controls for the period from 1992 to 2002 to determine whether there is evidence of financial improprieties including money laundering or material support for terror groups.[152]

Marks analyzed the factual basis for six of the allegations made against WAMY,[153] including that WAMY's financial data show "improprieties" and "irregularities" establishing

---

[150] Pls. Mem. at 28-29 (internal quotation marks omitted).

[151] *United States v. Zong*, 16-CR-614 (DLI), 2018 WL 6186474, *6 (E.D.N.Y. Nov. 26, 2018) ("Evidence of Defendant's acts while he was an accredited diplomat is not unduly prejudicial."). *See also Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 56 n.5 (D.D.C. 2011) ("Ambassador Oakley was accepted as an expert witness by this Court in the fields of terrorism, counterterrorism, Middle Eastern affairs, politics, and Syria's sponsorship of the Abu Nidal Organization prior to, during, and following the EgyptAir Flight 648 hijacking, and Rome and Vienna Airport attacks.").

[152] Excerpts of Jonathan Marks Report (attached as Exhibit AQ) at 4-5; Ex. AA at 8 ¶ 3.9; 10 ¶ 3.11.3; 10 ¶ 3.12; 40 ¶ 7.3.4; 41 ¶ 7.3.4.3; 62 ¶ 9.7.2, ¶ 68-70; 71 ¶ 10.4; 101-02; 104-12; Ex. AC at 47 at ¶ 159; 57 at ¶ 191; 62 at ¶ 204 and 62 at ¶ 206).

[153] Ex. AQ at 4-6; *see also* Pls. Mem. at 8.

material support for Al Qaeda, and offers rebuttal opinions based on his findings.[154] Marks and his team reviewed and analyzed extensively WAMY's produced financial documents from which he concluded that the financial evidence does not "support misconduct, criminal behavior, or terrorist financing activities on behalf of WAMY during the period 1992 through 2002."[155] Marks's rebuttal report is "intended solely to contradict or rebut evidence on the same subject matter identified by [Plaintiffs' Experts]."[156] Plaintiffs cannot legitimately complain about such proper rebuttal.

## II.   **Marks is a Highly-Qualified Financial Expert with Decades of Relevant Experience**

Marks is a forensic financial expert and fraud examiner. He is a Certified Public Account (CPA), is Certified in Financial Forensics (CFF), a Certified Information Technology Professional (CITP), a Chartered Global Management Accountant (CGMA), a Certified Fraud Examiner, and a member of the American Institute of Certified Public Accountant (AICPA) Fraud Task Force.[157]

Plaintiffs discount Marks's expertise, claiming he lacks material support and terror financing experience and therefore cannot opine on "terror financing."[158] This argument has no merit. As a fraud examiner and a forensic accountant, Marks's experience is directly related to terror financing.[159]   Financial investigations – whether terror related or not – involve expert analysis of the flow of funds, communications, and the existence of money laundering that leads

---

[154] Ex. AQ at 1 & 4 (his expert report was "prepared to rebut Plaintiffs' Experts reports of Evan Kohlmann, Dr. Matthew Levitt, and Jonathan Winer").

[155] Ex. AQ at 36-37 (finding that WAMY observed transparency, proactive improvement and controls; increased spending on audit; increased IT controls; required reporting; had robust requirements for Audits and Reports and Accountability from senior leadership in WAMY; enforced mechanisms of control that were used proactively, defining areas that did not follow control and accounting policies; funded good causes, used top audit firms, had leadership and control over rogue individuals; and had well run accounting practices).

[156] *Scott*, 315 F.R.D. at 44; Excerpts of Marks Dep. Transcript (attached as Exhibit AR) at 150:8-14 (Marks discusses the importance of accurately representing Plaintiffs' experts' opinions that he intends to rebut).

[157] Ex. AQ at 1 & Marks App. A (attached as Exhibit AS) (for details on Marks's qualifications).

[158] Pls. Mem. at 15-16.

[159] Ex. AR at 35:11-36:12 (Marks terror financing expertise is through anti-money laundering and fraud investigations. When asked if he ever worked in terror financing matters he replied, "well if you're talking about terrorism finance, the answer would be yes. If you are talking about a terrorism expert, I'm not a terrorism expert).

to other illegal activities.[160]  Marks has more than thirty years' experience as a fraud and forensic investigator, CPA and anti-money laundering expert.[161] Such qualifications are more than closely related to the financial and accounting issues Plaintiffs' experts raise.[162] Marks has experience with similar engagements[163] and knowledge of established guidelines.[164] This is the basis for his analysis that WAMY neither engaged in financial mismanagement indicative of knowingly supporting criminal organizations—be they terrorist organizations or not—nor was derelict in having internal controls, thereby making WAMY vulnerable to exploitation from criminal elements.[165] Marks's expertise as a financial fraud, anti-money laundering and finance investigator will help the trier of fact understand critical issues of whether WAMY's internal controls, vulnerabilities, or alleged improprieties left it susceptible to terror groups, including Al-Qaeda.[166]

Plaintiffs argue without evidence that WAMY guided Marks to his opinions. This argument rests on the faulty premise that Marks's opinions rely on an incomplete "handful of documents" and on the "unexamined work of others, rather than on his own."[167] Marks headed up a team of financial specialists at Baker Tilly who reviewed tens of thousands of primary source documents produced in this case including "audit reports, bank statements, bank reports, receipts, financial reports, project reports and communications regarding operations and financial documents."[168]

---

[160] *Id.* at 36:21-37:8; Ex. AQ at 8-11 (being an auditor, financial expert, certified fraud examiner or CPA is required to distinguish what is atypical or irregular financial practices.  Marks has these qualifications and discusses how Plaintiffs' experts do not and therefore cannot opine on WAMY's purported financial irregularities).

[161] Ex. AQ at 1 and Ex. AS.

[162] *In re Zyprexa*, 489 F. Supp. 2d at 282.

[163] Ex. AQ at 1.

[164] *Id.* at 8.

[165] *Fund of Funds, Ltd v. Arthur Anderson & Co.*, 545 F. Supp. 1314, 1372 (S.D.N.Y. 1982) (setting out the Rule 702 requirements for expertise and that an expert who meets the criteria can testify even to ultimate issues of fact).

[166] Ex. AQ at 4; Ex. AR at 38:18-40:12 (determining whether a case involves terrorism finance can only be resolved after a full investigation. One may find other wrongdoings but not terror financing).

[167] Pls. Mem. at 7. *See* Marks' Rpt., App. B (attached as Exhibit AT), highlighting the tens of thousands of documents he and his team reviewed.

[168] Ex. AR at 2; Ex. AR at 77:3-81:9 (discussing the dynamics of working with a under his direct supervision to whom he lays out his methodology and with whom he discusses questions after reviewing their work);  *See also* FRE 703; *Gusack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir 2000) ("The Federal Rules of Evidence specifically

Marks's invoices document the extensive time Marks and his team spent reviewing these documents.[169] There is simply no basis to support Plaintiffs' hollow claims of Marks being guided to an opinion or that he relied on a mere handful of documents.

Plaintiffs also argue that Marks must be excluded because he was unable to identify any organization that supported Al Qaeda. Marks is not testifying on such broad issues. Rather, he conducted a  financial analysis to rebut the WAMY specific claims of financial improprieties made by Plaintiffs' experts[170] including their baseless claim that WAMY financed Al Qaeda.[171] Marks concentrated his analysis on *WAMY's* financial practices, policies and controls and whether they supported the claim that *WAMY* provided material support to Al Qaeda.[172] When asked to identify organizations that supported Al Qaeda, Marks appropriately responded, "not WAMY"[173] as Al Qaeda's broader sources of support is immaterial to his rebuttal opinions.

Plaintiffs assert but could not cited to the deposition or elsewhere, that Marks could identify no training regarding hallmarks of terrorism financing, nor any other education or experience to qualify him to opine on whether or not WAMY provided material support to Al Qaeda or OBL

---

provide that an expert may rely on facts or data perceived by or made known to the expert at or before [a] hearing. The expert need not have conducted her own tests." [internal quotations omitted]); *In re M/V MSC Flaminia*, No. 12-cv-8892 (KBF), 2017 WL 3208598, at *2 (S.D.N.Y. July 28, 2017) (The rules of evidence "allow an expert to present the work of others if the expert supervised, directed, or participated in that work, and if the expert is qualified in the field and could perform the work themselves"); *Linde II*, 922 F. Supp. At 322; Ex. AR, at 7. The team conducted an extensive analysis of mostly Arabic financial documents. Marks worked with a team from various regions, including Saudi Arabia, to assist him in analyzing WAMY's financial documents and write the report.

[169] Ex. AR at 54, 56:9-70:9 (14 pages of the deposition transcript are spent discussing invoices and the extensive review of financial documents Marks and his team conducted which none of Plaintiffs' expert demonstrate when they provided conclusory statements about WAMY's financial support to Al Qaeda); 84, 283 and 284; Marks Dep. Ex. 962 (attached as Exhibit AU).

[170] Ex. AQ at 6-7 (noting that "none of the Opposing Experts are auditors, accountants, financial experts, certified examiners or CPAs. Yet, they purport to opine on issues that call for that expertise. Moreover, experts who are CPAs, accountants and auditors approach their analyses using tested and accepted methods and approaches, which Opposing Experts have not applied. Instead, they have just speculated without any analysis.")

[171] *Id.*(On their conclusions, Marks says that "Opposing Experts describe WAMY as a terrorist-financing organization; however, their accusations point to no specific examples where WAMY knowingly financed terrorist activities, let alone the activities of UBL and Al Qaeda").

[172] *See* Ex. AQ at 8, 10, 33, 37; Ex. AT ; *see also* Ex. AR at 265:10-17, 166:18-167:20 and 169:15:-170:6.

[173] Ex. AR at 163:8-12.

leading up to the September 11, 2001 attacks.[174] Marks's global anti-money laundering, terrorism finance  and forensic financial expertise detailed above fully equips him to directly opine on this "core issue."[175] Plaintiffs plainly ignore his more than thirty years of relevant experience. [176]

### III.   Marks's Testimony about Charitable Projects Is Relevant

Discussion of WAMY's charitable projects provides important context for Marks's opinion that the projects are "reported and sufficiently supported,"[177] and therefore not linked to financial wrongdoing, criminal or terror activities. Marks's rebuttal goes to the heart of the allegations of financial improprieties by Plaintiffs' Experts.[178] Plaintiffs' experts seek to testify on financial issues related to WAMY despite their lack of qualifications in forensic accounting and without having reviewed the financial data necessary to render such opinions. For example, Plaintiffs' Experts' opinion on the Canada Review Agency ("CRA") tax audit on WAMY Canada[179] was guided by opposing counsel and is not the product of the available data.[180] The CRA findings were tax related issues. Marks spent nine pages in his report conducting extensive financial analysis of the CRA report and other WAMY documents and Declarations submitted in this litigation[181]. Plaintiffs argue in their motion that Marks contradicted the CRA report mistakenly claiming that

---

[174] Pls. Mem. at 16.

[175] In *Berman,* 2019 WL 1510941, at *10, Judge Daniels permitted a ship inspector to testify as an expert despite no crew service experience. *See also* Ex. AR. at 36:9-12; Ex. AQ at 19, n.55 (Marks relied on former FBI agent and terrorism expert's Anti-Money Laundering investigative techniques to evaluate whether WAMY maintained controls that would disrupt terrorists ability to raise funds); Ex. AR at 44:9-45:1 (Marks has also done work in countries such as India, Russia, China and Brazil concerning bribery investigations and the Foreign Corrupt Practices Act).

[176] Ex. AR at 45:17-47:18 (additionally, Baker Tilly has worked on several charitable organizations financial operations globally, including one that did relief work in Palestine).

[177] Ex. AQ at 30.

[178] *Id*. at 30-34; Ex. AA 8 ¶ 3.9; 10 ¶ 3.11.3; 10 ¶ 3.12; 40 ¶ 7.3.4; 41 ¶7.3.4.3; 62 ¶ 9.7.2;,68-70; 71 ¶t 10.4; 101-102; 104-112; Ex. AC, , 47 ¶159; 57 ¶191; 62 ¶ 204; 62 ¶ 206.

[179] Pl. Memo at 36 (Plaintiffs allege that if Marks was not tasked with determining if orphan and refugee programs were used to finance terrorism. Then, they misrepresented the CRA's findings that WAMY or WAMY Canada intentionally supported terrorism.

[180] Guided by Plaintiffs' counsel, all three experts make the same false claim about CRA's findings relying on adverse which cites to the complaint in this case; *see* CRA Report (attached as Exhibit AV) at 9/22-12/22(adverse reporting); *see* also, Excerpts of Winer Dep. (attached as Ex. AW) at 136:17-137:23; *see infra*, fn 185 related to Levitt and Kohlmann.

[181] Ex. AQ  at 18-29.

it found WAMY financially supported Al Qaeda and its affiliates. Such argument is misleading. Marks' disagreement with the CRA was not about WAMY intentionally supporting terrorism since CRA did not reach such findings.[182] The financial data, which Marks reviewed extensively,[183] rebuts the Plaintiffs' experts' conclusory opinions.[184]

Marks demonstrated through the analysis of WAMY's tens of thousands of financial documents produced in this case[185] that Winer's baseless opinion that it was "standard practice for charities that provided support to terrorists organizations to hide what they were doing by listing military and terrorist support activities as expenses for legitimate activities"[186] has no facts or data to support it.[187] Marks dispenses with the idea that WAMY hid support for terrorist activities under legitimate expense headings[188] with "photo evidence of project[s] and events, receipts, multiple phases of construction reports, student records, and follow up reports for

---

[182].*See* Ex. AV at 1 (revoking WAMY Canada's tax-exempt status for violation of provisions of the Income Tax Code).

[183] Ex. AQ at 18-29. (Marks spends nine pages addressing CRA with imbedded photos of Marks's first-hand review of CRA documents which show to whom funds were sent and that neither WAMY nor WAMY Canada funded Benevolent International Foundation ("BIF"). *Id*. 26. Marks found no documentary evidence to support this narrative. *Id*. at 29. Plaintiffs and their experts failed to consider primary sources such as Khatib and Abdullah's declarations. *Id*. at 25. When WAMY discovered Khatib to be a bad actor, he was immediately removed *Id*. at 28. Khatib's Declaration corroborates Marks findings. Plaintiffs could have deposed Khatib but chose not to do so. *See* Mohamad Khatib Declaration (attached as Exhibit AX) at 18 and 45; *see also* Ibrahim Abdullah's Declaration (attached as Exhibit AY) at ¶21-28 (the former WAMY USA head agreed with Khatib).

[184] Winer's false narrative opinion on the CRA report and WAMY Canada is addressed in Defendants' Daubert motion (ECF No.7343) at pages 28-29; Excerpts of Levitt Report (attached as Ex. AZ) at 29 (deceptively repeating the claim that CRA linked WAMY to terrorist organizations, which it did not); Excerpts of Levitt Dep. (attached as Ex. AAA) at 502:2-5 (admitting he was not familiar with the adverse reporting cites referenced in the CRA Report); *Id*. at 503:5-506:8; Excerpts Kohlmann Rebuttal Rpt. (attached as Ex. AAB) at 75-80 (admitting the CRA Notice of Intention to Revoke was provided to him for rebuttal only). He admitted he never reviewed WAMY financial documents the CRA relied on as Marks did; Excerpts of Evan Kohlmann Dep. (attached as Ex. AAC) at 715:11-24 (testifying he has no formal accounting or auditing training); *Id*. at 715:25-716:10 (testifying he has never given expert review on accounting "on basis of international accounting standards, international audit standards, whether or not an audit did or did not meet those standards).

[185] Ex. AQ at 2; Ex AT.

[186] Ex. AA at 8 ¶ 3.8; 55 ¶t 9.1 and 45 ¶ 7.4.7

[187] Ex. AQ at 27, 28, 30, 33; Ex. AA at 8 ¶ 3.8; 55 ¶ 9.1 and 45 ¶7.4.7; *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d at 118 (allowing for relevant factual background information to contextualize evidence so that the jury may understand testimony).

[188] Ex. AA at 8 ¶ 3.8; 55 ¶ 9.1 (where Winer makes his claims); Ex. AQ at 8, 30-34.

spending, and other supporting evidence."[189] Based on his analysis, Marks found that 98.8% of the projects were supported by WAMY's financial documents.[190] "Only 1.2% of the reviewed WAMY funded projects did not include sufficient support documentation."[191] This financial data-based opinion contradicts Plaintiffs' experts.

Similarly, Marks and his team conducted extensive analysis of documents on WAMY's funding of refugee and orphan projects, which has been part of its mission and operations for decades, to rebut Plaintiffs' experts' claims that WAMY did not have adequate controls in place or that these budget items were false.[192] Marks was not, as Plaintiffs suggest, "tasked to determine whether refugee and orphan support programs (other than WAMY's) have been used to disguise and conceal funding for terrorism," as if he needed to prove the negative.[193] Marks did not have to examine every other organization in the world to establish that WAMY did not fund terrorism. He was tasked to determine if WAMY's refugee and orphan programs funding was used to support terror activities. He found they were not.[194]

---

[189] *Id.* at 30.

[190] *Id*. at 31 (The supported projects included: Plans for various projects such as promotion of women, professional skills, Islamic education and inclusion of all Muslims worldwide; Audit report for Project relating to rehabilitation of stranded Pakistanis, 1992; Report following a visit to Niger for a water project with Unicef; Project report from a Mosque built in Kashmir; Report on projects for supporting refuges in Kosovo, 2000; Project report and transfer of funds for a Mosque project in Mali, 1998; Project summary of the Third Annual Camp in WAMY Canada for Muslim women to Shadow Lake, 1999; Project report and transfer of funds for a Mosque project in Indonesia, 1998; Report on completed projects in the Egypt office during 2002; Report for a Well and Reservoir project, Kashmir 2001; Eid clothing project for orphans in Sudan in 1998).

[191] *Id*. at 31-32. (Marks eventually resolves the remaining 1.2% because regional limitations explained the absence of some documentation (*Id.* at 31) or reports were produced as a substitute to documents (at 32), or WAMY restricted use of funds until a report was sent (*Id*. at 33). Marks found no "evidence of any patterns of funding terrorism, neither hidden or apparent" [*Id,* at 32]); Ex. AR at 108:7-18 (noting the challenges not-for-profits face, especially in Middle Eastern countries).

[192] Pls. Mem. at 36; Ex. AQ at 10 and 30 (addressing financial controls in place to monitor charities and refugee/orphan programs; for example, one such document used to monitor projects is a contract that "sets out the agreement of support and amounts for each part, [and] requires the recipient to support expenditure with periodic reports"); In his deposition Marks was asked and discussed numerous instances of WAMY controls: Ex. AR at 11:2:4, 114:5-23, 118:12-119:5, 122:8-123:20, 127:22-128:10, 131:8-18, 156:23-157:19, 158:17-159:18, 166:18-170:6, 186:21-187:13, 249:9-18, 254:21-255:6, 264:15-265:9, 272:11-278:12.

[193] Pls. Mem. at 36.

[194] Ex. AQ at 9-10 (Marks found that the audits did "not highlight any concerns that money was being laundered to support al Qaeda;" "[w]hen providing funds to refugees, WAMY required the recipients to follow up with reports to

## IV.   Marks's Testimony about WAMY's Charitable Projects is Relevant and Not Unfairly Prejudicial

Plaintiffs claim that Marks's rebuttal testimony about charitable projects is unfairly prejudicial.[195] Remarkably, they argue that Marks cannot rebut their expert on charitable programs unless his opinion confirms that such programs were used to support terrorism.[196] To say otherwise, Plaintiffs claim, is unfairly prejudicial.[197] Marks's findings that WAMY maintains controls to monitor charitable projects is prejudicial to Plaintiffs' claims[198] but Plaintiffs have failed to prove how "unfair prejudice" will result from a charity defendant showing it had controls to ensure funding for charitable projects was used as intended.[199]

Marks's discussion of project documents is critical, not just to an assessment of WAMY's projects but to an overall understanding of WAMY's controls.[200] Plaintiffs and their experts assert without evidence or facts that WAMY's charitable projects were used to funnel money to terror groups.[201] Rebutting that charge of course has a "tendency to make a fact of consequence more or less probable than it would be without the evidence."[202] Marks did exactly that.  He and those "under [his] direct supervision, reviewed 57 audit reports/audited financial statements from WAMY and its international offices, both in English and Arabic."[203] From these and other documents, such as receipts and operational reports, he finds no evidence of such funneling because WAMY maintained a mechanism to ensure that funds were properly used.[204] Plaintiffs

---

ensure the charitable use of funds;" "WAMY strived to achieve for best practices when it demanded that is local offices report and be accountable for spending, which is not typical for an organization hiding something."); *id.* at 14.
[195] Pls. Mem. at 29, 36.
[196] *Id*.
[197] *Id.* at 29.
[198] Ex. AQ at 32.
[199] *United States v. Tse*, 375 F.3d 148, 164 (1st Cir. 2004); *Berman,* 2019 WL 1510941, at *10.
[200] Ex. AQ at 7, 32; Ex. AW at 123:5-14 (relied on what Plaintiffs gave him).
[201] Ex. AA at 44-45 ¶ 7.4.7; 46 ¶7.7.3.
[202] *Litvak,* 808 F.3d at 189; Fed. R. Evid. 401.
[203] Ex. AQ at 2, 8; Ex. AR  at 27:16-23.
[204] Ex AQ at 30-31.

have not shown how the evidence of the charitable projects would be unfair let alone that any unfair prejudice substantially outweighs the probative value of this important evidence.

## V.   Marks Found Abundant Evidence That WAMY Implemented Financial Controls

Plaintiffs use five pages of their memorandum to claim, inaccurately, that Marks relied solely on the contents of a two-page letter for his opinion that WAMY's financial policies, practices and controls did not support Plaintiffs' claim that WAMY provided material support to Al-Qaeda.[205] Although that document deals mostly with information technology ("IT"), Marks cites it as one example of the greater "overall control consciousness."[206] Marks's detailed analysis of financial control issues does not rely solely on IT controls.[207] He opines that numerous controls, not just the IT initiatives, were indicative that WAMY's operations around the world were subject to a transparent financial system well before September 11, 2001.[208] Marks concluded that WAMY's initiatives were not characteristic of an organization that supports terrorism.[209]

The question before Marks during his investigation was whether evidence of controls exists, not whether documents exist to memorialize each control. Marks found "evidence of controls…of continued controls…, evidence of transparency, evidence of project-based financing, which is a control…and evidence of actions taken against individuals for bad or poor acts;" all symbols of controls.[210] As Marks put it, "not every company documents every control

---

[205] Ex. AQ at 6 (remarking on the tens of thousands of documents Marks and his team reviewed to reach his opinion); *id.* at 30 (The two-page letter is from WAMY's Assistant Secretary General and discussed attempts to implement an organization-wide recordkeeping system). Plaintiffs argue without citation to the record that "Marks claims the document in question is an organization-wide directive from WAMY's Secretary General to implement a robust, centralized accounting systems and IT control system." See, Pls. Mem. at 31-36.

[206] Ex. AR at 156:23-157:19 (discussing contracts for refugee programs to determine levels of control and that his team also looked at the overall project for indications of other controls).

[207] *Id.*

[208] Ex. AQ at 10.

[209] *Id.* at 32 ("WAMY instructed all the projects mentioned above to produce a report upon completion of the initiative as per the organization's ordinary course of business"); *id.* at 33 ("I did not observe any financial document indicating support of terrorist activities let alone 9/11 attacks, and the amounts of the expenditures reviewed were not indicative of material support of terrorism or support of Al-Qaida").

[210] Ex. AR at 128:3-9, Ex. AQ at 37.

enhancement that they have… that's just not the way this works."[211]

In reaching his rebuttal opinions about WAMY's financial policies, practices and controls, Marks and the Baker Tilly team from around the world reviewed documents and data in Arabic and English spanning at least the decade from 1992 to 2002 to determine whether WAMY was in fact a "terror-financing organization."[212] The purpose of the hundreds of hours Marks and his team spent was to examine WAMY's compliance operations and to dispel Plaintiffs' experts' conclusory opinions.[213] Marks with his team at Baker Tilly investigated WAMY's developing financial policies and practices over a ten-year period looking to WAMY's "overall control consciousness."[214] As a result, Marks opines that WAMY showed financial controls and transparency, including audits, financial reports, verification of project expenditures and receipts.[215] Marks found that WAMY, for a not-for-profit organization operating in developing countries, showed control and transparency that even for-profit companies do not practice. Marks concluded that such behavior is not the work of a "terror-financing organization."[216]

Marks also considered WAMY's steps to rectify any lack of transparency as a sign of a responsible organization trying to avoid any financial discrepancies. For instance, Marks explained that measures were taken against individuals like Adel Batterjee for potentially improper acts.[217] Consistent with WAMY's control mechanism, Marks also explained WAMY's steps to stop funding WAMY Canada and later dismissing Mohammed Khatib of WAMY Canada from conducting WAMY operations when he failed to report to WAMY International.[218]

---

[211] Ex. AR at 128:16-18.
[212] Ex. AQ at 6.
[213] Ex. AR at 54, 84, 283 and 284; Ex AU (Marks invoices demonstrating the extensive hours and work done).
[214] Ex. AR at 122:8-17, 131:8-18, 156:23-157:19; 272:11-18; 277:14-13.
[215] Ex. AQ at 33.
[216] *Id*. at 6, 8; Ex. AR at 162:11-22.
[217] Ex. AQ at 12-13.
[218] *Id*. at 19-20 and 25. Ex. AX at 2, ¶¶18 and 43-44 (confirming the stoppage of funds as well as his resignation).

## VI.     Marks Does Not Offer State of Mind Testimony

Throughout his report, Marks properly opined on WAMY's practices and whether those practices, based on guiding principles mentioned *infra*, are consistent with best financial practices.[219] One such opinion concerned WAMY's removal of Adel Batterjee.[220] Marks's opinion was based on facts showing WAMY's financial controls and transparency. Marks's statement that the removal of Batterjee evidences WAMY's commitment to controls is testimony of a practice inconsistent with a charitable organization that launders money to support terrorist groups.[221]

## VII.    Marks's Opinions are Based on Reliable Methodology Consistent with Rule 702

Citing to the deposition transcript,[222] Plaintiffs claim that Marks's "report does not contain a section recounting what, if any, methodology he applied in researching and drafting [his] report."[223] However, Marks sets forth his methodology, as a rebuttal expert, in the very first page of his report,[224] which is evident throughout his report. Marks explains how he relies on guiding principles outlined in the Financial Action Task Force's ("FATF") *Best Practices Paper on Combatting The Abuse Of Nonprofit Organizations*,[225] Guidance for a Risk-Based Approach, The Bank Sector,[226] and the *CPA Journal*, "Using Disclaimer in Audit Reports Discerning Between

---

[219] *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *14 (citing *In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y 2004) and *U.S. Commodity Futures Trading Comm'n v. Wilson*, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 20, 2016).

[220] Ex. AQ at 11-12 (citing to WAMYSA061345 and April 2, 2018 Noorwali Decl.(attached as Exhibit AAD) at ¶¶ 34-39).

[221] *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *14; *Scott*, 315 F.R.D. at 44 (citing *Highland Capital Mgmt.*, L.P 379 F.Supp 2d at 471); *Linde II*, 922 F. Supp. 2d at 324.

[222] Ex. AR at 97:14-18.

[223] Pls. Mem. at 43.

[224] Ex. AQ at 1 ("My review involves an analysis of primary source documents, including financial documentation from WAMY and its chapters and uses of WAMY's funding for the period 1992 through 2002 to rebut clams raised in the Plaintiffs' experts' reports concerning WAMY's alleged involvement in terrorism financing"); Ex. AR at 100:5-9 (Auditors should stick to facts); *Henkel v. Wagner*, 12-CV-4098 (AJN), 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016) (stating that expert does not need "a model or theory to identify purported flaws in [opposing expert's] testimony. Rather, she need only her expertise and the method identified at the beginning of her report, namely, reviewing the documents in this case, along with [opposing expert's] report.."); *see also* Ex. AQ at 6 ("experts who are CPAs, accountants, and auditors, approach their analyses using tested and accepted methods and approaches").

[225] Ex. AQ at 8, n. 4; Ex. AQ at 30, n. 68.

[226] Ex. AQ at 8 and n. 6 (noting that WAMY's centralized control are not reflective of "typical terrorist financing

Shades of Opinion," to rebut Plaintiffs' Experts.[227] On the question of identifying any red flags, in addition to his extensive experience, Marks relies on guidelines from other experts as well.[228]

Using these principles and prescriptions, Marks and his team pored over thousands of primary source documents to determine if WAMY engaged in financial mismanagement.[229] As a finance expert, Marks identified these data points as "the types of documents and information that accountants and practitioners in [his] field typically consider and rely on in performing analyses such as those that [he] was tasked to perform in this matter."[230] There is never an analytical "gap [for the trier of fact to fill] between data and the opinion proffered."[231] Armed with his experience, the guidelines and the data, Marks provides an overall analysis of his findings which include the following common themes: (1) there is no evidence of WAMY's knowingly financing any terrorist activities;[232] (2) WAMY had few internal control weaknesses and when such weaknesses were discovered, they were met with stricter controls;[233] (3) WAMY's overall control mechanisms were consistent with a "well-operated organization;"[234] and (4) Plaintiffs' Experts have no methodology or financial analysis, based on the available evidence, by which they reached their conclusions.[235]

The remainder of Plaintiffs' challenges to Marks's methodology can be characterized as an attempt to project onto Marks the failings from which their experts suffer. For example,

---

modes and methodologies").

[227] Ex. AQ at 14 & n. 36 (used to evaluate auditor inconsistencies).

[228] For example, Marks reviewed a speech by former FBI Agent Dennis Lormel entitled "Identifying Terrorist Financing Red Flags and Emerging Trends" at the ACAMS 9th Annual Anti-Money Laundering Conference. Ex. AQ at 19 & n. 55; Ex. AR at 105:3-13.

[229] The classes of documents are outlined as (1) audit reports, (2) bank statements, (3) bank reports, (4) receipts, (5) financial reports, (6) project reports, (7) operational reports, and (8) communications regarding operations and financial documents. Ex. AQ at 2.

[230] Id.

[231] General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).

[232] Ex. AQ at 6.

[233] Id. at 7.

[234] Id. at 7; Ex. AR at 131:8-18(discussing how WAMY was continuously enhancing their overall control environment, which itself is a means of control).

[235] Ex. AQ at 6, 36.

Plaintiffs go to great lengths to highlight a claim that Marks was unable to determine whether he received audits from several WAMY offices and whether some of those WAMY offices were operational. However, the fact that audits from these varying countries did not exist, is not itself evidence of criminal activity—a fallacious trope that Winer is often fond of repeating.[236] Marks outlines all the financial documents he reviewed, not only audits.[237] Marks testified that the lack of audits from these WAMY offices did not concern him because his team had other financial records from the same countries at their disposal.[238]

Finally, the red flags alluded to by Plaintiffs relate to an issue addressed in Marks's report when he discusses WAMY Canada, the only time a small number of red flags arose. In his deposition, Marks describes a red flag as an "observable event that should cause the individual to stop, evaluate and, if need be, investigate further."[239] A red flag, as his definition suggests, is not by itself an indication of fraud or wrongdoing and may be disposed of after further investigation.[240] Following his methodology, which relies on guiding principles, Marks found "red flags" but went on to find that the actions WAMY took to address them were "in line with Lormel's comments on what steps should be taken to prevent terrorists from succeeding"[241] Marks found that WAMY's actions "are not actions of a problematic organization or one ignoring misconduct."[242]

Marks is a financial expert qualified to provide opinions to rebut Plaintiffs' Experts' conclusory opinions. He has reliably applied established forensic accounting methodology to a wealth of financial facts and data in reaching his opinions. His proffered testimony is therefore admissible and Plaintiffs' motion to exclude him and his testimony should be denied.

---

[236] Ex. AA at 120 – 21, ¶¶ 13.5.5, 13.7, and 13.8.
[237] Ex. AQ at 2; Ex. AT.
[238] Ex. AR at 313:1-13.
[239] Ex. AR at 310:16-19.
[240] *Id*. at 311:17-312:7.
[241] Ex. AQ at 20.
[242] *Id*.

## EXPERT WITNESS JOHN SIDEL

I.      **Professor John Sidel's Expert Opinions are Directly Relevant to Core Allegations Raised Against MWL/IIRO Defendants and Do Not Create Unfair Prejudice**

In an attempt to overcome the absence of any evidence showing MWL or IIRO support for Al Qaeda, Plaintiffs rely heavily upon a set of dubious allegations that ascribe a shadowy nexus between the charities and a smattering of independent regional Southeast Asian extremist groups: the Moro Islamic Liberation Front ("MILF"), the Abu Sayyaf Group ("ASG"), and Jemaah Islamiyah ("JI") (collectively, the "Southeast Asia Groups"), which they allege are closely connected to Al Qaeda. Despite this, in their motion they seek to limit Professor John Sidel's expert testimony about the true nature of these groups, including their complex histories and varied missions, as well as what links, if any, have been *substantiated* between these Southeast Asia Groups and Al Qaeda. Professor John Sidel's testimony rebuts Plaintiffs' crude caricature of these complex political movements as mere proxies of Al Qaeda and meets the relevance test.

Sidel, a world-renowned and widely published expert on the Southeast Asia Groups, has been proffered to properly explain to a jury what they really are (and what they are not), and whether any alleged support or interaction with them can be taken as evidence of support of Al Qaeda's global agenda, as opposed to their localized political missions, particularly at the times in question. In their misguided relevancy attacks on Sidel's expert opinions, Plaintiffs hide the ball on the wide-sweeping allegations and rampant mischaracterizations made in their pleadings concerning the Southeast Asia Groups. For example, Plaintiffs allege that IIRO funded the "*terrorist group*" MILF;[243] that the ASG is a "*Philippine proxy for al Qaeda*" established by a former IIRO-Philippines director using IIRO's funds and resources;[244] and that "since its formation

---

[243] *Ashton* Sixth Master Compl., at 167, ¶ 229, ECF 1463, (emphasis added).
[244] Plaintiffs' Averment of Facts and Evidence in Support of Claims Against the Kingdom of Saudi Arabia and the Saudi High Commission for Relief of Bosnia & Herzegovina, Feb. 3, 2015, ECF 2927-1, at 23 ¶ 83 (emphasis added).

through the patronage of the MWL/IIRO," ASG has "*systematically targeted U.S. citizens in a series of kidnappings, bombings and brutal killings*."[245] Plaintiffs and their experts also rely on documents that claim that JI is "*an al Qaida-linked terrorist group*,"[246] and their expert Matthew Levitt labels Southeast Asia a "'*major center for operations' for Al Qaeda*"[247] while Evan Kohlmann also describes MILF as a "*terrorist group*" and ASG as a "*coalition of secessionist Islamic militants…linked to Al-Qaida*."[248]

Because these, and numerous related allegations regarding Southeast Asia, rely upon fundamental misunderstandings of the Southeast Asia Groups, it is critical to the defense of MWL and IIRO that they be provided an opportunity to offer accurate expert opinion on what these groups were at the times in question and what is actually *known* about that region and the groups involved in the conflicts. Sidel's expert testimony is plainly relevant to counter Plaintiffs' incorrect assertions, flawed expert opinions, and the documents they rely upon and misinterpret.[249] Indeed, denying these Defendants the opportunity to rebut the Plaintiffs' and their experts' mischaracterizations of the Southeast Asia Groups and the Defendants' connections to them, as well as Al Qaeda's purported presence in the region, as if they are incontrovertible facts, unfairly allows Plaintiffs to present a one-sided narrative, and would tie Defendants' hands from presenting relevant counter-evidence.

Plaintiffs complain that Sidel provides "tangential" and "background information," but he provides necessary testimony on multiple issues that Plaintiffs themselves have forcefully injected

---

[245] *Id.* at 75, ¶ 307 (emphasis added).
[246] *See* Sidel Deposition Exh. 602 (attached as Exhibit AAE) (highly redacted Department of Treasury Memorandum regarding IIRO Designation) at FED-PEC0202118 (emphasis added).
[247] Ex. AZ, Levitt Rpt., at 11 (emphasis added).
[248] Ex. AC, Kohlmann Rpt. at 34, ¶ 107; 35 n.160 (emphasis added).
[249] *See, e.g. Olin*, 332 F. Supp. 3d at 835 (relevance of expert testimony evaluated in context of proponent's theory); *see In re Pfizer Inc. Sec. Litig.*, 819 F.3d at 659 (concluding expert testimony helpful in context of plaintiff's theory of the case); *see also Mendelsohn.*, 552 U.S. at 387 ("Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case.").

into the heart of this case against MWL and IIRO. Sidel explains:

> The drivers and dynamics of violent mobilization and conflict in the name of Islam in both the southern Philippines and Indonesia over the past several decades have been local in origin, representing responses to shifting political opportunities and constraints in these specific Southeast Asian contexts rather than to the imperatives and exigencies of some kind of broader struggle for 'global *jihad*' orchestrated from afar.
>
> The actual activities engaged in by the [MILF], the *Abu Sayyaf*, and the *Jemaah Islamiyah* network over the years of initial contact, communications, and cooperation over the 1990s did not correspond to any grand plan for global *jihad* and were not in any way focused on the United States or 'the West.[250]

In sum, Sidel's testimony addresses "facts that would make it more or less likely that MWL/IIRO provided support to al Qaeda leading up to the September 11, 2001 attacks".[251] His testimony is critical to rebut Plaintiffs' misleading assertions and mischaracterizations about the Southeast Asia Groups and the nature of religious violence in the region are unfounded.

Experts may lay the factual foundation for their opinions.[252] Sidel's discussion of the history and emergence of the Southeast Asia Groups and the *known* links between them and Al Qaeda as well as the Bojinka plot masterminds, will assist the trier of fact to navigate this complex geopolitical milieu and explain the implausibility of many of Plaintiffs' allegations.[253] These subjects are not merely "tangentially related to the claims and defenses" in this case.[254] Plaintiffs and their experts repeatedly cite to allegations tying defendants to the Southeast Asia Groups as purported evidence of a connection to Al Qaeda, and they trumpeted these supposed facts at

---

[250] *See* Excerpts of Sidel Rpt. (attached as Exhibit AAF) at 2, ¶¶ 3-4.
[251] Pls. Mem. at 39.
[252] *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d at 118 ("[Expert] may testify on these background facts . . . so long as they are relevant to laying a foundation for his expert testimony…") (citing *Amorgianos*, 303 F.3d at 266-67).
[253] *See, e.g.*, Excerpts of Sidel Dep. Tr. (attached as Exhibit AAG) at 134:12-135:14 (possibility that the Bojinka plotters chose Manila because of their relationship with Janjalani (ASG's founder) and the potential use of ASG resources is "highly implausible" because ASG's experience, access, protection and capacity for operation was "limited…to a remote part of the Philippines" and if they had traveled to Manila to assist in this operation, they would "stand out like a sore thumb" because they would not have spoken the right language and would not have known how to get around, and they would have been "the least qualified, least capable people…in trying to undertake something in the urban context of metro Manila.")
[254] Pls. Mem. at 39.

depositions, including Sidel's.[255] For instance, Plaintiffs confronted Sidel with a so-called evidentiary memorandum from the Treasury Department relating to ASG's alleged receipt of "seed money" from Al Qaeda; Sidel questioned the "credibility" of the memorandum's conclusions, explaining that allegations like these are often recycled by the U.S. government without evidentiary bases.[256] Plaintiffs' real gripe is that Sidel undercuts their contentions. The relevance of Sidel's explanation is clear. Plaintiffs cannot create a factual dispute on the one hand, and, on the other, claim that it is "tangential" when Defendants put forth contradictory evidence.

Plaintiffs further argue that Sidel's testimony is irrelevant because MWL[257] and/or IIRO did not factor much into his previous research.[258] Plaintiffs attack a strawman. Sidel is offered as an expert on the histories and missions of political groups that Plaintiffs repeatedly mischaracterize in their case against the charities, not on MWL or IIRO's activities in the region.[259] Plaintiffs also misleadingly claim that Sidel's testimony is irrelevant because he was unaware of OFAC's 2006 designations of IIRO offices in Indonesia and the Philippines prior to drafting his report.[260] Not only were those offices designated several years after 9/11, but those designations have no bearing

---

[255] *See, e.g.*, Ex. AZ, Levitt Rpt., at 36; Ex. AA, Winer Rpt., at 83-84, ¶12.4; and 92-93, ¶12.9.2; Ex. AC, Kohlmann Rpt., at  38, ¶ 121; Ex. AAG, Sidel Dep. Tr., at 84:11-85:8, and 183:7-18; Excerpts of Basha Dep. Tr. (attached as Exhibit AAH) at 276:9-18, Excerpts of Al Harbi Dep. Tr. (attached as Exhibit AAI) at 40:15-41:24; Excerpts of Daguit Dep. Tr. (attached as Exhibit AAJ) at 154:3-157:23.

[256] Ex. AAG at 84:11-85:8; 86:20-87:21; *see also, id.* at 82:6-12.

[257] Plaintiffs also claim that Sidel's familiarity with MWL's peace efforts between the Philippines Government and the Moro National Liberation Front ("MNLF") is limited to Paragraph 3 of his report, but indicate that even that paragraph does not mention MWL. Pls. Mem. at 37 (citing Ex. AAG at 29:3-14). The reference to Paragraph 3 is simply an error in the transcript as the examining attorney had initially directed Sidel to Paragraph 53 of his report in discussing this issue, as is clarified in Sidel Deposition Transcript (Ex. AAG) at 27:13-28:5.

[258] Pls. Mem. at 37. *But see also* Ex. AAG at 27:1-12 and 29:20-22 (testifying that there were "references and information and common knowledge" of the affiliation of a local Indonesia group with the MWL and that he was aware of the "same story that has been recycled and…reiterated over the years" regarding IIRO).

[259] Hence, contrary to Plaintiffs' claim, Sidel did not need to discuss MWL or IIRO at length in his report. Pls. Mem. at 39. Nor did he need to immerse himself in the facts alleged in this case or cite to documents produced in this litigation, Pls. Mem. at 38, because those recycled and repeated allegations and documents produced by Plaintiffs did not provide specific evidence to substantiate those claims. Sidel did cite to one document from IIRO's production: Mohammed Jamal Khalifa's resignation letter, in support of the assertion that his tenure had ended with IIRO in late 1993, *see* Ex. AAF at 32, ¶ 107, and Plaintiffs strangely criticized this citation as somehow accepting the "lawyers' interpretation" on this matter. Pls. Mem. at 21.

[260] Pls. Mem. at 37-38.

on the content of Sidel's report since they include no evidence to support the allegations underlying the designations. In any event, Sidel questions the credibility of the Treasury Department's so-called evidentiary memorandum relating to IIRO's designations. Based on his experience working in the U.S. embassy and with the State Department, Sidel testified that U.S. government documents sometimes "reiterat[e] something that has come to be taken as conventional wisdom" and that the people who write these reports "don't have fact-checkers" to confirm these allegations.[261] Again, Plaintiffs, who rely on this document heavily, may not like his answer, but that does not make it excludable.

Plaintiffs next claim that Sidel "never conducted any independent research concerning . . . allegations" of Al Qaeda's support to the Southeast Asia Groups.[262] This is a red herring. Sidel clarified at deposition that he was "in a position before and during this case to look at evidence of al-Qaeda's presence and activities and allegations thereof in Southeast Asia";[263] and that he closely analyzed the cited evidence.[264] Sidel repeatedly noted the lack of evidence to support the recycled claims regarding Al Qaeda there.[265] Consequently, in his expert view, Plaintiffs' expert reports "exaggerate the nature and extent of continuities, connections, communications and confluences

---

[261] Ex. AAG at 86:20-87:21.

[262] Pls. Mem. at 38. Plaintiffs similarly argue that Professor Sidel did not interview any member of ASG, JI or MILF regarding the allegations of "support from MWL/IIRO" or about their purported "ties to Al Qaeda." *Id*. While Sidel conducted many interviews throughout the course of his research, he did not interview ASG members as that "would have been very dangerous" but he interviewed members of MILF and MNLF. Ex. AAF at 5-6, ¶¶ 20, 22 and Ex. AAG at 20:6-7 and 38:15-39:9. Given that the focus of his research was not allegations of support by MWL and IIRO, it is not a surprise that he did not ask his interviewees about these issues. Additionally, given Sidel's view that claims of purported ties to Al Qaeda have not been substantiated, it is also no surprise that it would not have been the focus of his interviews. Plaintiffs cite no authority requiring a researcher to conduct interviews regarding all tangentially relevant matters relating to the research, nor did any of Plaintiffs' experts cite to any interviews they personally conducted with members of ASG, JI or MILF to support their claims.

[263] Ex. AAG at 142:15-19.

[264] "Close, careful analysis reveals that the evidence…is thin and that the vague claims...are unsubstantiated." Ex. AAF at 30, ¶ 102.

[265] *See, e.g.*, Ex. AAG at 59:2-5 (no "credible evidence" that OBL provided equipment to MILF); 82:10-12 (not aware of any "serious evidence" that Al Qaeda provided seed money to ASG); 82:13-19 (not aware of any evidence that Al Qaeda provided equipment and training to ASG); *see also* Ex. AAF at 4, ¶ 14; 32-33, ¶¶ 111-112.

of interest" between Al Qaeda and the Southeast Asia Groups, and the support and communications that did occur was "partial, provisional and short-lived."[266]

Finally, Plaintiffs argue that under FRE 403, the probative value of these opinions is outweighed by unfair prejudice and confusion. To the contrary, as noted above, Sidel's opinions concern core, not collateral, matters and clarify the complex geopolitics of groups central to Plaintiffs' allegations against MWL and IIRO and their alleged support to Al Qaeda. Plaintiffs fail to explain how this testimony, which contradicts their allegations, would be unfairly prejudicial; to the contrary, its exclusion would unfairly prejudice MWL and IIRO.

## II.   Professor Sidel is Qualified to Offer the Opinions Proffered in his Report

Seeking to distract the Court from Sidel's unquestioned expertise in matters central to this case, Plaintiffs instead argue that Sidel is not an expert on a bevy of alternative areas in which MWL and IIRO have not sought to qualify him.[267] These attacks warrant no response. Plaintiffs also argue that Sidel is not qualified to opine on certain matters because he "lacks even the basic familiarity of the 9/11 Commission Report" and he "does not possess specific critical knowledge of events surrounding [the Bojinka] plot."[268] Despite the fact that their allegations reach back decades, Plaintiffs wrongly claim that Sidel's experience is "outdated" and irrelevantly criticize him for not having spent extended periods of time in the region *since 2001*.[269]

### A.   Professor Sidel's Experience

As an undisputed, world-renowned expert on Southeast Asian political movements, Sidel

---

[266] Ex. AAF at 33, ¶ 112.
[267] Pls. Mem. at 16-17 (such as "Al Qaeda or its history, terrorist financing, the role of charitable organizations in facilitating the funding of terrorism, the operational requirements of sophisticated terrorist attacks, or Al Qaeda's global strategy").
[268] Pls. Mem. at 17.
[269] Pls. Mem. at 9. Bizarrely, Plaintiffs also note that Sidel was not in the region when the IIRO offices were designated in 2006, even though he was either living or frequenting the region in the 1980s and 1990s – which is the relevant time period leading up to 9/11.

has "three decades of sustained empirical research, immersion in scholarship, and teaching and supervision of post-graduate students" and is "fully immersed in the accumulated – and growing – body of academic and non-academic research and writing on conditions and developments" in the region.[270] He has lived and worked in the Philippines since the mid-1980s and has conducted years of field work there, acquiring competency in local languages and traveling "extensively" to its southern region, where ASG and MILF were based.[271] He also lived in Indonesia in 1997-98 and returned "for shorter research stints on many occasions over the subsequent decade, while maintaining a close watch on developments and trends in Indonesian politics and society through the Indonesian press and diverse academic and other sources of information and analysis."[272] Other academics widely cite his scholarship, and he has been appointed to the editorial boards of major journals focused on the region.[273] Sidel has written a series of expert reports for governmental and international bodies, as well as prestigious organizations such as the UNHCR, the Ford Foundation, and the Crown Prosecution Services in the UK, and has consulted for UK diplomatic and  intelligence officials, as well as the Australian Department of Foreign Affairs and Trade.[274]

**B.** **Professor Sidel is Qualified to Speak Regarding Issues Relating to Southeast Asia and the Alleged Presence of Al Qaeda There**

Through his work, Sidel made clear that he has studied "the evidence of al-Qaeda's presence and activities and allegations thereof in Southeast Asia" and is familiar with the "authoritative accounts of al-Qaeda and its development over the course of the 1990s and beyond" through his readings, teachings, supervision of students, and work.[275] While he concedes that his academic expertise is not "akin to that of a terrorism expert who knows and remembers who is

---

[270] Ex. AAF at 7, ¶ 27.
[271] *Id.* at 4-5, ¶¶ 18, 20; 12, ¶ 49; *see also* Ex. AAG at 19:16-20 and 40:19.
[272] Ex. AAF at 6, ¶ 24; *see also* Ex. AAG at 24:8-18.
[273] Ex. AAF at 6, ¶ 25.
[274] *Id.* at 6-7, ¶ 26.
[275] Ex. AAG at 142:13-143:8.

who and did what when",[276] like MWL and IIRO expert Vahid Brown, that does not detract from Sidel's expertise on the multitude of Southeast Asian matters Plaintiffs injected into this case.

Despite Plaintiffs' contrary claim, Sidel is plainly qualified to opine on Al Qaeda's alleged presence in Southeast Asia and the Bojinka plot, without having to read the full 9/11 Commission Report in preparing his expert report. Indeed, Sidel consulted other documents which "cite a variety of sources, some of which include the 9/11 report"[277] and explained that he did not read the 500 plus-page report entirely because its authors "do not claim to be experts on Southeast Asia" and "you can't expect the 9/11 report to be an authoritative document on every far-flung part of the world, in terms of the individuals and context involved."[278] Notably, the 9/11 Commission Report includes only two substantive paragraphs about the Bojinka plot.[279] His lack of direct engagement with a document peripheral to his sphere of expertise is no basis for exclusion.

Even so, at deposition, Sidel ably answered numerous questions regarding the 9/11 Commission Report. He opined on the report's accuracy to the extent it related to Southeast Asia; he questioned the report's sources and indicated where he saw no "credible evidence" for various assertions; and he indicated where contradictory evidence exists.[280] Contrary to Plaintiffs' argument, Sidel questioning the 9/11 Commission Report's statement that OBL provided support to MILF and ASG and whether this is substantiated was not his attempt at avoiding questions.[281] Rather, his conclusion that it is another instance of "recycled and repeated" allegations without proper basis in fact is in line with his methodology of holding a source's validity up to the light, instead of relying on sources "without questioning or seeking confirmation of their validity."[282]

---

[276] *Id.* at 143:17-20.

[277] *Id.* at 176:16-21.

[278] *Id.* at 176:24-177:13.

[279] 9/11 Commission Report, Sidel Dep. Exhibit 605 (attached as Exhibit AAK) at 147-148.

[280] Ex. AAG at 53:17-64:16, 80:18-83:18, 150:16-152:8, 161:5-183:5.

[281] Pls. Mem. at 17.

[282] Ex. AAF at 7, ¶ 30; *see also* Ex. AAG at 58:21-59:5 (stating that he cannot "agree or disagree" with Plaintiffs'

Plaintiffs also mischaracterize Sidel's testimony concerning the Bojinka plot.[283] As counsel for MWL and IIRO noted at deposition, Plaintiffs' attorney misleadingly asked Sidel to state whether Al Qaeda was involved in the Bojinka plot, based on excerpted documents, none of which actually show Al Qaeda's involvement.[284] In response, Sidel indicated that he could not do so, given his understanding that neither Khalid Sheikh Mohammed nor Ramzi Yousef, the main actors behind the Bojinka plot, were then members of Al Qaeda.[285] This is a perfectly valid opinion. Nobody, not even Plaintiffs' own experts, claims that Al Qaeda members were behind the Bojinka plot at the time of its planning.

Plaintiffs further criticize Sidel for not confirming a litany of complex details regarding a web of individuals allegedly involved in the Bojinka plot, such as Wali Khan Amin Shah.[286] But the individuals he was asked about were all peripheral to the Southeast Asia Groups, the focus of his expertise and report. Sidel's answers are thus no surprise and reflect the import of his report and testimony: the alleged Al Qaeda members who flitted in and out of the region "were not Southeast Asians" nor were they "connected to the local organizations and groups and individuals otherwise under…consideration here,"[287] despite Plaintiffs' attempts to contort the facts to make

---

assertions without seeing "some evidence and support" because he has not "seen any credible evidence" relating to equipment allegedly provided by OBL to MILF); *id.* at 59:9-24 (asking to review the support for the claim that OBL provided support to ASG because "these are the kinds of claims that we see recycled in a variety of different publications" but there is no "evidentiary basis" for it); *id.* at 82:13-19 (Sidel was not "aware" of evidence substantiating the claim that OBL provided equipment and training to ASG).

[283] Pls. Mem. at 17-21. Furthermore, Plaintiffs egregiously mischaracterize Sidel's criticism of Maria Ressa's work. *Id.* at 18. Sidel did not criticize her only after he was confronted with Ressa's assessment implicating IIRO with Al Qaeda and ASG. Rather, he first stated that he "found her early work to be…sensationalistic and overly credulous" of Philippine government sources, yet indicated that he still cited to her work, which provides the "lengthiest available written account" of the Bojinka plot. Ex. AAG at 90:23-92:5. When confronted with specific allegations in Ressa's work, Sidel referenced his earlier "concern" about her work being "overly sensationalist and credulous with regard to available sources." *Id.* at 94:10-15.

[284] Ex. AAG at 115:3-6; *see also* Ex. AAK at 147 and Sidel Dep. Exhibit 606 (attached as Exhibit AAL) at 91.

[285] Ex. AAG at 116:9-16.

[286] Pls. Mem. at 18-20. Plaintiffs claim that Sidel could not recall whether ASG created an urban guerilla squad. *Id.* at 19. This is plainly inaccurate. Sidel was asked if he knew whether this allegation was in fact true, and he stated: "No, I'm not sure that they did. I don't recall guerilla squads in Zamboanga City along those lines". Ex. AAG at 98:3-6.

[287] *Id.* at 111:1-5; *see also*, Ex. AAF at 31, ¶ 106.

them appear so. As to Abdujarak Janjalani (ASG's founder), Sidel testified that there is "so little solid evidentiary basis" about him and "so much that is rather shadowy and suspicious about" ASG that it is not surprising that Sidel could not confirm whether Janjalani met or had a relationship with specific individuals.[288] As noted above, Plaintiffs may claim that this is "critical knowledge" surrounding Bojinka, but Sidel's expert opinion is that this "critical knowledge" is based on pure conjecture.[289] Again, Plaintiffs may not like this opinion, but it is not excludable.

While Plaintiffs do not challenge Sidel's methodology, it is important to address a few methodological points they confusedly cite as part of their misguided attack on his qualifications, as outlined above. In his report, he makes clear that his research and analysis is "based on a broad and varied set of empirical sources" and that his methodology is to "triangulate" those sources "rather than rely on individual sources without questioning or seeking confirmation of their validity" as those individual sources have "inherent biases, distortions, and limitations."[290] Simply put, if Sidel does not have *evidence* to substantiate a proposition, he will not take a position on it, as was repeatedly made clear at his deposition.[291] Plaintiffs' criticism of Sidel is misplaced, as this reflects no lack of qualifications, but rather is evidence of a methodical expert careful not to arrive at conclusions based on "recycled and repeated" allegations that have no factual bases.[292]

---

[288] Ex. AAG at 76:7-77:18.

[289] *See, e.g., id.* at 130:1-5 (there is "little evidence" of "reliance or interaction between the small group of conspirators in Manila and anyone else.").

[290] Ex. AAF at 7, ¶ 30; *see also* Ex. AAG at 99:1-101:4 (explaining that the primary source of much of the allegations relating to Al Qaeda and Southeast Asia is a senior Philippine national police official, Rodolfo Mendoza, who has been implicated in "sponsoring and protecting and benefiting from the kidnapping activity" of a group of Marxist activists in metro Manila, and that there is "considerable evidence of collusion and protection" by Philippine government officials of ASG. Hence, Sidel has "a general sense of wariness about taking [these allegations] at face value.").

[291] *See, e.g.,* Ex. AAG at 58:5-59:8 (when asked if he agrees that OBL provided equipment and training to MILF, Sidel stated that he did not "agree or disagree" because he has not "seen any credible evidence" to support that claim); *id.* at 132:6-20 (when asked if ASG members were "slated to participate in the assassination of the Pope," he stated that he does not "recall seeing those details in the available sources"); *id.* at 129:23-130:5 (Sidel could not confirm that Bojinka plotters chose Manila due to ASG and Khalifa's presence there given "how little evidence there seems to be of reliance or interaction between the small group of conspirators in Manila and anyone else").

[292] Ex. AAG at 59:19-24; *see also id.* at 86:20-87:21.

### III.     Professor Sidel Did Not Offer Improper State of Mind Testimony

Plaintiffs argue that Sidel "impermissibly infers the state of mind" of actors and organizations because he opines on the local focus of ASG, JI, MNLF, and MILF, instead of the alleged global jihad that Plaintiffs seek to ascribe to these organizations.[293] Plaintiffs plainly misapply the relevant law. Sidel is not opining on the motives, thoughts, or intentions of these organizations in characterizing their activities as "local."[294] His opinion is based on factual evidence detailing the localized nature of the Southeast Asia Groups' activities, and the lack of evidence showing otherwise. For example, Plaintiffs claim that Paragraph 116 of Sidel's report, which concludes that the ASG focused on "localized criminal activities, rather than anything more recognizably 'global' or '*jihadi*' in orientation or impact," is state of mind testimony. However, Paragraph 116's conclusion is premised on Paragraph 62, which discusses ASG's turn to criminal activities, such as kidnappings for ransom money, which was shared by local officials.

Plaintiffs also characterize as impermissible Professor Sidel's testimony that his "understanding" from his "readings" is that while many individuals claim to have taken part in the Afghan jihad, their experience was in fact "more limited than they would subsequently like to let on."[295] Professor Sidel simply indicated that his research reflects that people claim to be more involved in the Afghan jihad than they actually were; he did not opine why they made those claims.

### CONCLUSION

Plaintiffs' motion to exclude the testimony of Defense Experts should be denied.

---

[293] Pls. Mem. at 49-50.
[294] *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999); *see Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (affirming exclusion of testimony, noting that experts speculated as to motives and intent); *Linde II*, 922 F. Supp. 2d at 324 (approving experts' references to explicit, stated objectives or organizational mission statements).
[295] Ex. AAG at 79:4-8.

January 14, 2022                    Respectfully submitted,

                                   /s/ *Waleed Nassar*
                                   Eric L. Lewis
                                   Waleed Nassar (admitted *pro hac vice*)
                                   Aisha E. R. Bembry (admitted *pro hac vice*)
                                   Sumayya Khatib (admitted *pro hac vice*)
                                   Lewis Baach Kaufmann Middlemiss PLLC
                                   1101 New York Avenue, NW Suite 1000
                                   Washington, DC 20005
                                   Telephone: (202) 833-8900
                                   Fax: (202) 466-5738
                                   Email: eric.lewis@lbkmlaw.com
                                   Email: waleed.nassar@lbkmlaw.com
                                   Email: aisha.bembry@lbkmlaw.com
                                   Email: sumayya.khatib@lbkmlaw.com
                                   *Counsel for Defendants Muslim World League,*
                                   *International Islamic Relief Organization, Dr. Abdullah bin*
                                   *Saleh Al Obaid, Dr. Adnan Khalil Basha, Dr. Abdullah*
                                   *Omar Naseef, and Dr. Abdullah bin Abdelmohsen Al Turki*

                                   /s/ *Omar T. Mohammedi*
                                   Omar T. Mohammedi
                                   Frederick Goetz, *of counsel* (admitted *pro hac vice*)
                                   The Law Firm of Omar T. Mohammedi, LLC
                                   233 Broadway, Suite 820
                                   New York, NY 10279
                                   Telephone: (212) 725-3846
                                   Fax: (212) 202-7621
                                   Email: omohammedi@otmlaw.com
                                   Email: fgoetz@goetzeckland.com
                                   *Counsel for Defendants World Assembly of Muslim Youth*
                                   *and World Assembly of Muslim Youth International*

                                   /s/ *Alan Kabat*
                                   Alan Kabat
                                   Bernabei & Kabat PLLC
                                   1400 16th St. NW #500
                                   Washington, DC 20036-2223
                                   Telephone: 202-745-1942
                                   Email: Kabat@BernabeiPLLC.com
                                   *Counsel for Dr. Abdullah bin Saleh Al Obaid, Dr. Adnan*
                                   *Khalil Basha, Dr. Abdullah Omar Naseef, and Dr. Abdullah*
                                   *bin Abdelmohsen Al Turki*

/s/ *Peter C. Salerno*

Peter C. Salerno
Amy Rothstein
Salerno & Rothstein
221 Schultz Hill Road
Pine Plains, NY 12567
Telephone: (518) 771-3050
Email: peter.salerno.law@gmail.com
Email: amyrothsteinlaw@gmail.com
*Counsel for Defendant Yassin Kadi*