UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re:                                                          03-MD-1570 (GBD) (SN)

       TERRORIST ATTACKS ON
       SEPTEMBER 11, 2001

-------------------------------------------------------x


**NON-PARTY JOHN FAWCETT'S
PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**


LANKLER SIFFERT & WOHL LLP
Michael Gerber (mgerber@lswlaw.com)
Helen Gredd (hgredd@lswlaw.com)
Gabrielle Friedman (gfriedman@lswlaw.com)
Brice Jastrow (bjastrow@lswlaw.com)

500 Fifth Avenue, 34th Floor
New York, NY 10110
(212) 921-8399

*Attorneys for Non-Party John Fawcett*

## <u>TABLE OF CONTENTS</u>

Proposed Findings of Fact ........................................................................................... 1

    A.    Mr. Fawcett's Reaction to the al-Jarrah Deposition ............................... 1

    B.    Mr. Fawcett's Decision to Send a Redacted Copy of the al-Jarrah
           Deposition Transcript to Michael Isikoff ............................................... 2

    C.    The Events of July 22, 2021 .................................................................. 5

    D.    The Investigation of the Protective Order Breach ................................. 7

    E.    Mr. Fawcett's Response to the Court's September 23 Order ................ 8

    F.    Mr. Fawcett's September 27 Declaration ............................................ 11

    G.    Mr. Fawcett's September 30 Declaration ............................................ 12

    H.    The October 4 Order ........................................................................... 13

    I.    Pre-Hearing Activity .......................................................................... 14

    J.    The Hearing ....................................................................................... 15

    K.    Mr. Fawcett Testified Truthfully in his Declarations and at the Hearing ............ 16

    L.    Mr. Fawcett Testified Truthfully About Why He Sent the Redacted al-
           Jarrah Transcript to Mr. Isikoff ......................................................... 18

    M.    Mr. Fawcett Testified Truthfully That He Acted on His Own ........... 20

    N.    Saudi Arabia's Criticisms of a Handful of Sentences in Mr. Fawcett's
           Declarations Reflect, At Most, Poor Wording or Mistaken Beliefs ................... 24

           Paragraph 2 of the September 27 Declaration ..................................... 25

           Paragraph 3 of the September 27 Declaration ..................................... 26

           The September 30 Declaration's Description of Calls with Mr. Isikoff .............. 29

    O.    Mr. Fawcett's Disposal of a Thumb Drive was Unrelated to the Court's
           Investigation ...................................................................................... 30

Conclusions of Law ........................................................................................................ 32

    A.    The Court's Power to Enforce Confidentiality Orders ........................................... 32

    B.    Significant Civil Sanctions Are Available for Mr. Fawcett's Conduct ................ 34

    C.    The Principle of Restraint and the Mitigating Circumstances of this Case Weigh Powerfully Against a Criminal Referral .................................................... 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Dunn*,
  6 Wheat. 204, 19 U.S. 231 (1821) ...............................................................................33

*City of Almaty, Kazakhstan v. Ablyazov*,
  No. 15-cv-5345, 2018 WL 1229730 (S.D.N.Y. Mar. 5, 2018)........................................32, 37

*DAddio v. Kerik*,
  No. 15-cv-5497 (JGK) (SDA), 2019 WL 2107721 (S.D.N.Y. Apr. 25, 2019)......................36

*Dole Fresh Fruit Co. v. United Banana Co., Inc.*,
  821 F.2d 106 (2d Cir. 1987)............................................................................................35

*Dorsett v. Cty. of Nassau*,
  No. 10-cv-1258 (ADS), 2012 WL 2076911 (E.D.N.Y. June 7, 2012) .............................32, 35

*Flaherty v. Filardi*,
  No. 03-cv-2167 (LTS) (HBP), 2009 WL 3762305 (S.D.N.Y. Nov. 10, 2009) .....................37

*In re Grand Jury Proceeding*,
  971 F.3d 40 (2d Cir. 2020)..............................................................................................38

*Joint Stock Company Channel One Russia Worldwide v. Infomir LLC*,
  No. 16-cv-1318 (GBD) (BCM), 2018 WL 4760345 (S.D.N.Y. Sept. 28, 2018)...................32

*Klein v. Harris*,
  667 F.2d 274 (2d Cir. 1981)............................................................................................14

*Knopf v. Esposito*,
  No. 17-cv-5833 (DLC), 2021 WL 276539 (S.D.N.Y. Jan. 27, 2021) ...................................14

*Koch v. Greenberg*,
  No. 07-cv-9600 (BSJ), 2011 WL 13260757 (S.D.N.Y. Aug. 16, 2011) ...............................32

*Lynch v. Southampton Animal Shelter Foundation*,
  No. 10-cv-2917, 2013 WL 80178 (S.D.N.Y. Jan. 7, 2013) ...................................................32

*New York State Nat. Org. for Women v. Terry*,
  886 F.2d 1339 (2d Cir. 1989)..........................................................................................35

*Paramedics Electrocina Comercial, Ltda. V. GE Mediccal Systems Information
  Technology, Inc.*,
  369 F.3d 645 (2d Cir. 2004)............................................................................................34

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010)..................................................................................32

*Schiller v. City of New York*,
    No. 04-cv-7921, 2007 WL 1623108 (S.D.N.Y. June 5, 2007) ...............................32

*Spallone v. United States*,
    493 U.S. 265 (1990)...............................................................................................33

*Spectacular Venture, L.P. v. World Star Int'l, Inc.*,
    No. 94-cv-8917 (JGK), 1998 WL 401535 (S.D.N.Y. July 17, 1998)....................33

*United States v. Brennerman*,
    816 F. App'x 583 (2d Cir. 2020) .........................................................................38

*United States v. Buczek*,
    531 F. App'x 105 (2d Cir. 2013) .........................................................................38

*United States v. Donziger*,
    No. 11-cv-691 (LAK), No. 19-cr-561 (LAP), 2021 WL 3141893 (S.D.N.Y.
    July 26, 2021)...............................................................................................36, 38

*United States v. Rangolan*,
    464 F.3d 321 (2d Cir. 2006)..................................................................................33

*United States v. Schulte*,
    S2 17–cr-548, 2020 WL 534508 (S.D.N.Y. Feb. 3, 2020) .....................................38

*United States v. Vale*,
    596 F. App'x 34 (2d Cir. 2015) ...........................................................................38

*Update Art, Inc. v. Modiin Pub., Ltd.*,
    843 F.2d 67 (2d Cir. 1988)....................................................................................32

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
    564 F.3d 110 (2d Cir. 2009)..................................................................................35

*World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*,
    694 F.3d 155 (2d Cir. 2012)............................................................................33, 34

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
    481 U.S. 787 (1987)........................................................................................33, 37

## Other Authorities

U.S. CONST. amend. V .......................................................................................1, 14, 15

Fed. R. Civ. P. 26 ...................................................................................................32

Fed. R. Civ. P. 37 ........................................................................................................32, 33, 34, 35

Fed. R. Crim. P. 42 ......................................................................................................36, 37, 38, 39

**NON-PARTY JOHN FAWCETT'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On November 1 and 2, 2021, the Court held an evidentiary hearing (the "Hearing") for the purpose of finding facts and recommending remedies or sanctions in connection with a breach of the protective orders entered in this multidistrict litigation (the "MDL"). Pursuant to the Court's November 4, 2021 order (ECF No. 7317), Non-Party John Fawcett respectfully submits proposed findings of fact and conclusions of law.

In making this submission, Mr. Fawcett does not waive and expressly preserves his prior arguments regarding his Fifth Amendment privilege against self-incrimination. The facts described in this submission are based upon the testimony given at the Hearing, the documents accepted into evidence at or following the Hearing, and other filings in the MDL. The scope of Mr. Fawcett's submission reflects Mr. Fawcett's status as a non-party in the MDL and the set of issues that specifically pertain to Mr. Fawcett.

**Proposed Findings of Fact**

**A.  Mr. Fawcett's Reaction to the al-Jarrah Deposition**

1.  On June 17 and 18, 2021, the law firms serving on the Plaintiffs' Executive Committees in the MDL (the "PECs") took Musaed al-Jarrah's deposition. (KSAX-32 at 1; K&K-102 at 1.) Kreindler & Kreindler LLP (the "Kreindler Law Firm") acted as lead counsel. (KSAX-32 at 2.)

2.  Mr. Fawcett attended the al-Jarrah deposition. (KSAX-32 at 6.) Mr. Fawcett is not an attorney but has for many years served as a research consultant to the Kreindler Law Firm in connection with the MDL. (*Id.*; Tr. 483:6–484:1.)

3.  In the course of his work on the MDL, Mr. Fawcett had heard rumors that Mr. al-Jarrah had an interest in child pornography. (Tr. 468:21–469:12.)

1

4. Mr. Fawcett had attempted to substantiate those rumors but had been unable to do so.  (Tr. 469:8–19.)

5. ███████████████████████████████████████████████████

███████████████████████████████████

6. Mr. Fawcett was disturbed █████████████████████████████████

█████████████████████████ and was concerned that Mr. al-Jarrah posed a danger to children.  (KSAX-59 ¶ 6; KSAX-62A ¶ 4; Tr. 392:5–15.)

7. Mr. Fawcett's concern about Mr. al-Jarrah was deepened by the fact that Mr. al-Jarrah lived in Morocco—which, as Mr. Fawcett knew from his many years of work with human rights and humanitarian organizations, was a country where the trafficking of children for sexual exploitation was prevalent.  (KSAX-62A ¶ 4; Tr. 483:14–18; Tr. 392:5–15.)

8. Mr. Fawcett's response to Mr. al-Jarrah's testimony also had a personal component: his two adopted children are from Morocco.  (KSAX-62A ¶ 4.)

**B. Mr. Fawcett's Decision to Send a Redacted Copy of the al-Jarrah Deposition Transcript to Michael Isikoff**

1. In the course of his work for the Kreindler Law Firm, Mr. Fawcett spoke from time to time with members of the press.  (Tr. 416:21–23.)  In the weeks following the al-Jarrah deposition, Mr. Fawcett spoke by telephone with Michael Isikoff of Yahoo! News.  (KSAX-59 ¶¶ 3–4.)

2. During that conversation, Mr. Isikoff asked whether there was anything that he should know about Mr. al-Jarrah.  (KSAX-59 ¶ 3.)  Mr. Fawcett responded that Mr. Isikoff should know that Mr. al-Jarrah had an interest in child pornography.  (*Id.*)

3. After further discussion with Mr. Isikoff, Mr. Fawcett concluded that Mr. Isikoff shared his view that it was important for the public to know about Mr. al-Jarrah's interest in child

pornography, and that Mr. Isikoff would publicize it if provided with adequate proof. (KSAX-59 ¶¶ 4–6; Tr. 472:9–21.)

4. Mr. Fawcett believed that publicizing Mr. al-Jarrah's interest in child pornography was the only available means to protect children from Mr. al-Jarrah because the relevant governmental authorities would not seek to prosecute Mr. al-Jarrah.  (KSAX-62A ¶ 4; K&K-73.)

5. Mr. Fawcett was troubled by the prospect of having the protective order in the MDL (the "MDL Protective Order") prevent the public from learning of the danger that Mr. al-Jarrah posed to children.  (KSAX-62A ¶ 4.)

6. Mr. Fawcett further believed that he could avoid violating the terms of the protective order that governed FBI material (the "FBI Protective Order") by sending Mr. Isikoff the version of the deposition transcript prepared by the court reporter that redacted any references to information received from the FBI (the "Redacted al-Jarrah Transcript").  (KSAX-62A ¶ 2.)

7. Mr. Fawcett accordingly decided to send a copy of the Redacted al-Jarrah Transcript to Mr. Isikoff.  (KSAX-62A ¶ 2.)

8. Although Mr. Fawcett does not recall the precise date on which he sent the Redacted al-Jarrah Transcript to Mr. Isikoff, he believes that he did so in early July 2021.  (Tr. 435:25–436:5; K&K-73.)

9. Mr. Fawcett did not discuss his plan to send the Redacted al-Jarrah Transcript to Mr. Isikoff with anyone at the Kreindler Law Firm.  (KSAX-62A ¶ 3; K&K-73.)

10. Indeed, Mr. Fawcett believes that if members of the Kreindler Law Firm had known of his plan, they would have sought to prevent him from sharing the Redacted al-Jarrah Transcript with Mr. Isikoff.  (Tr. 485:17–24; KSAX-62A ¶ 3.)

11. Mr. Fawcett sent Mr. Isikoff the Redacted al-Jarrah Transcript from a personal email address rather than his Kreindler Law Firm email address.  (KSAX-59 ¶ 7.)

12. In addition, Mr. Fawcett used an email platform that enabled him to program the email to delete itself after several days.  (KSAX-59 ¶ 7.)

13. Mr. Fawcett also spoke to Mr. Isikoff about the timing of the article.  During that conversation, he requested that the article not be published too close in time to the release of a podcast interview of James Kreindler that Mr. Isikoff had conducted on July 1, 2021.  Mr. Fawcett made that request so that no one would assume incorrectly that Mr. Kreindler had provided the Redacted al-Jarrah Transcript to Mr. Isikoff.  (KSAX-59 ¶ 8.)

14. On July 15, 2021, Mr. Isikoff published an article in Yahoo! News based on the Redacted al-Jarrah transcript.  (KSAX-40.)  The article was entitled *FBI Tried to Flip Saudi Official in 9/11 Investigation*.  (*Id.*)

15. In keeping with Mr. Fawcett's purpose in sending the Redacted al-Jarrah Transcript to Mr. Isikoff, the article's discussion of the al-Jarrah deposition focused on the pornographic images of children that the FBI found on Mr. al-Jarrah's computer.  (KSAX-40.)

16. At some point after Mr. Isikoff published his article, Mr. Fawcett discarded the thumb drive that he had used to copy the Redacted al-Jarrah Transcript from the Kreindler Law Firm's server.  (KSAX-59 ¶ 9; Tr. 440:17–442:2.)

17. As Mr. Fawcett explained at the Hearing, the thumb drive was one of several he had discarded because they were frequently malfunctioning, and his decision to discard the thumb drive was unrelated to the fact that it contained the Redacted al-Jarrah Transcript.  (Tr. 440:17–442:9.)

18. Mr. Fawcett could not recall when he discarded the thumb drive other than that it was at some point in the summer.  (Tr. 440:23–442:2.)

C. **The Events of July 22, 2021**

1. On the evening of July 21, 2021, the Kingdom of Saudi Arabia ("Saudi Arabia"), which is a Defendant in the MDL, notified the PECs that it intended to move for an investigation of the protective order breach evident in Mr. Isikoff's article.  (KSAX-42 at 4.)

2. The next morning, Mr. Fawcett reached out to Elizabeth Crotty, an attorney who had previously worked at the Kreindler Law Firm, and who had remained friendly with Mr. Fawcett and others at the firm.  (KSAX-135; KSAX-151; Tr. 447:9–10; *see also* Tr. 84:20–21, 85:7–9 (Kreindler) (Ms. Crotty had worked as an associate at the firm); Tr. 268:21–25 (Maloney) (Ms. Crotty had worked at the firm and "remained friends with all of us"); 345:10–19 (Benett) (describing Ms. Crotty as friend).)

3. As Mr. Fawcett explained at the Hearing, he reached out to Ms. Crotty because she had for several years provided Mr. Fawcett with legal advice from time to time.  (Tr. 447:15–21.) Mr. Fawcett further explained, when asked who paid Ms. Crotty for her advice, that Ms. Crotty advised him at no charge beyond a nominal amount that he had paid her on the first occasion that he consulted with her.  (Tr. 447:15–24.)

4. Mr. Fawcett sent Ms. Crotty a text message at 8:18 a.m. on July 22 that has been withheld as privileged.  (KSAX-151.)

5. Mr. Fawcett then called Ms. Crotty at 10:41 a.m. on July 22, spoke with her for approximately 22 minutes, and thereafter sent her an email at 12:07 p.m. that has also been withheld as privileged.  (KSAX-135; KSAX-151.)

6. Although Mr. Fawcett did not have an independent recollection of the July 22 call when he was first shown his phone records at the Hearing, he did recall reaching out to Ms. Crotty at some point in July for legal advice.  (Tr. 447:15–19, 448:16–24.)

7. Mr. Fawcett initially believed that his 22-minute call with Ms. Crotty on July 22 could have been when he had sought legal advice, but then questioned whether it could have been the July 22 call, because he remembered the exchange regarding legal advice as having been brief.  The only long discussion that he remembered having with Ms. Crotty in July concerned her unsuccessful campaign to win the Democratic nomination for District Attorney in Manhattan.  (Tr. 447:15–19, 448:16–24, 449:16–23, 450:6–20.)

8. Mr. Fawcett ultimately concluded that both topics were discussed on the July 22 call, and that conclusion is supported by Mr. Fawcett's cell phone records, which show only one telephone conversation with Ms. Crotty in July.  (Tr. 480:5–17; KSAX-134; KSAX-135.)

9. With respect to the legal component of the conversation, Mr. Fawcett recalled telling Ms. Crotty that he wanted to see her about a legal issue, but that Ms. Crotty had replied that she would be away for the next several weeks.  (Tr. 480:6–11.)

10. Mr. Fawcett did not tell Ms. Crotty the nature of the legal issue that he wanted to discuss with her, but he confirmed at the Hearing that it related to the fact that he had sent the Redacted al-Jarrah Transcript to Mr. Isikoff.  (Tr. 480:12–13, 481:6–9.)

11. Mr. Fawcett's cell phone records and privilege log indicate that he sent Ms. Crotty an email later that day (at 12:07 p.m.), and the next indication of any communication with Ms. Crotty was two months later, on September 24, 2021.  (KSAX-136; KSAX-151.)

12. Mr. Fawcett's cell phone records for July 22 also include two telephone calls with James Kreindler.  (KSAX-135.)  The first occurred at 9:17 a.m. and lasted 46 minutes.  (*Id.*)  The second occurred at 12:56 p.m. and lasted five minutes.  (*Id.*)

13. Mr. Fawcett did not recall the topics discussed on those calls but testified that they did not include any discussion of the fact that he had sent the Redacted al-Jarrah Transcript to Mr. Isikoff.  (Tr. 446:9–15, 451:9–23.)

14. Mr. Fawcett further testified that in light of the length of his first call with Mr. Kreindler, he regarded it as likely that the call was a conference call.  (Tr. 446:9–15.)

15. Mr. Fawcett's belief on that point has since been confirmed by a post-hearing declaration from Kreindler Law Firm attorney Steven Pounian, who testified to having also participated in each of the July 22 calls with Mr. Kreindler reflected on Mr. Fawcett's cell phone records, and who provided additional cell phone records demonstrating that he had been patched into both calls.  (ECF No. 7359-1 ¶¶ 3–4.)

16. Mr. Pounian also confirmed that Mr. Fawcett did not disclose in either call that Mr. Fawcett had sent the Redacted al-Jarrah Transcript to Mr. Isikoff.  (ECF No. 7359-1 ¶ 5.)

**D.  The Investigation of the Protective Order Breach**

1. On July 23, 2021, Saudi Arabia moved under seal for an investigation into who provided the Redacted al-Jarrah Transcript to Mr. Isikoff.  (K&K-102.)

2. The next day, and before the Court ruled on Saudi Arabia's motion, Mr. Fawcett sent Mr. Isikoff an encrypted Signal Message on his cell phone, which Mr. Fawcett produced in connection with the Hearing, commenting that "there's a witch hunt for the source of your Jarrah story."  (KSAX-150 at 2.)

3.  Approximately three weeks later, on August 12, 2021, the Court ordered the Kreindler Law
    Firm to file declarations relating to the breach of the protective orders evident in Mr. Isikoff's
    article (the "August 12 Order").  (ECF No. 7011.)

4.  The August 12 Order stated that the Court expected to receive, at minimum, declarations
    from the four attorneys who were most involved in the MDL.  (ECF No. 7011.)

5.  Approximately two weeks later, on August 30, 2021, the Court issued an additional order
    (the "August 30 Order"), which required, among other things, that the Kreindler Law Firm
    submit declarations from anyone employed by or acting at the direction of the Kreindler Law
    Firm who was known to have had access to the al-Jarrah deposition transcript.  (ECF No.
    7082.)

6.  Shortly after it was issued, the August 30 Order was stayed pending resolution of Yahoo!
    News's motion to intervene, and the stay remained in place for the next several weeks.  (ECF
    Nos. 7100, 7134.)

7.  On September 23, 2021, after the motion to intervene was resolved, the Court directed that
    the declarations specified in the August 30 order be filed no later than September 27, 2021
    (the "September 23 Order").  (ECF No. 7134.)

**E.  Mr. Fawcett's Response to the Court's September 23 Order**

1.  Throughout the two months between July 21, 2021 (when Saudi Arabia first notified the
    PECs of its intent to request an investigation) and September 23, 2021 (when the Court set a
    deadline for individuals from the Kreindler Law Firm to submit declarations), Mr. Fawcett
    continued to conceal from the Kreindler Law Firm that he had sent the Redacted al-Jarrah
    Transcript to Mr. Isikoff.  (KSAX-62A ¶¶ 2–3; KSAX-59 ¶ 7; Tr. 485:22–24, 486:21–25.)

8

2.   In his testimony at the Hearing, Mr. Fawcett could not recall the precise words of his various discussions with the Kreindler Law Firm about the protective order breach, but he described himself as having "prevaricated and dissembled and avoided letting them know."  (Tr. 486:25.)

3.   In the days immediately following the Court's September 23 Order, Mr. Fawcett continued to avoid the issue by not responding to email inquiries or voicemails left by the Kreindler Law Firm attorney who was preparing the declarations that were due on September 27.  (Tr. 454:1–22; *see also* Tr. 340:15–341:10 (Benett).)

4.   In addition, Mr. Fawcett reached out again to Elizabeth Crotty.  As reflected in Mr. Fawcett's cell phone records and privilege log for Friday, September 24—two months after the last indication of any contact with Ms. Crotty—Mr. Fawcett sent a text message to Ms. Crotty at 8:38 a.m. (KSAX-151); spoke to Ms. Crotty by telephone for 14 minutes beginning at 8:44 a.m. (KSAX-136); sent an email with two attachments to Ms. Crotty at 9:04 a.m. (KSAX-151); and sent a text message to Ms. Crotty at 6:42 p.m.  (*Id.*)

5.   The cell phone records and privilege log do not reflect a response from Ms. Crotty to Mr. Fawcett's 9:04 a.m. email or his 6:42 p.m. text message.  Nor do those materials indicate that Ms. Crotty and Mr. Fawcett conferred over the weekend.  Instead, they reflect that Ms. Crotty and Mr. Fawcett appear to have next communicated on the morning of Monday, September 27, the date on which Mr. Fawcett's declaration was due to the Court.  (KSAX-136.)

6.   On September 27, Mr. Fawcett's cell phone records and privilege log show that he sent a text message to Ms. Crotty at 7:58 a.m. (KSAX-151); spoke to Ms. Crotty for 28 minutes at 9:34 a.m. (KSAX-136); and spoke to Ms. Crotty for eight minutes at 10:43 a.m.  (*Id.*)

7. In between Mr. Fawcett's two calls with Ms. Crotty, he also spoke by telephone with Megan Benett, an attorney at the Kreindler Law Firm, and informed her that he had sent the Redacted al-Jarrah Transcript to Mr. Isikoff.  (KSAX-136; Tr. 342:14–343:1 (Benett).)

8. Approximately two hours later, at 12:23 p.m., Mr. Fawcett sent a draft declaration to Ms. Benett and Mr. Pounian.  (K&K-73.)

9. Mr. Fawcett's draft declaration stated, among other things, that:

- Mr. Fawcett had sent the Redacted al-Jarrah Transcript to Mr. Isikoff in early July 2021;

- "[t]he redacted portions related to the sections of the deposition which were taken subject to the FBI protective order and irrelevant to the issue at hand, evidence of Jarrah's use of child pornography";

- no one from the Kreindler Law Firm had instructed Mr. Fawcett to send the Redacted al-Jarrah Transcript to Mr. Isikoff, nor until today was anyone other than Mr. Fawcett and Mr. Isikoff aware that Mr. Fawcett sent the Redacted al-Jarrah Transcript to Mr. Isikoff; and

- Mr. Fawcett sent the transcript to Mr. Isikoff via a non-Kreindler email address to "prevent the partners and staff of [the Kreindler Law Firm] from knowing about my intended action and to prevent them from stopping me, should they wish to do so."

(K&K-73.)

10. Mr. Fawcett's draft declaration also stated that he believed that publicity about Mr. al-Jarrah's possession of child pornography was the only available means of protecting the public from Mr. al-Jarrah, and that "[a] protective order should not extend to cover evidence of a criminal act such as possessing and viewing child pornography."  (K&K-73.)

11. Mr. Fawcett's draft declaration further explained that he sent the Redacted al-Jarrah Transcript to Mr. Isikoff because "[a]fter the revelations at the deposition that he was a child pornographer, I could not allow Musaed al Jarrah's criminal acts to remain secret, when I had the opportunity to do something about it."  (K&K-73.)

**F.  Mr. Fawcett's September 27 Declaration**

1.  Over the course of the day and into the evening of September 27, Mr. Fawcett spoke on

    multiple occasions with various Kreindler Law Firm attorneys and exchanged emails with

    them, commenting on proposed edits to his declaration, and ultimately signing a declaration

    that was filed with the Court on the evening of September 27 (the "September 27

    Declaration").  (KSAX-136; K&K-73; KSAX-118; KSAX-118A; KSAX-120; KSAX-121;

    KSAX-56J; Tr. 466:10–467:15 (Fawcett); Tr. 352:19–353:19 (Benett); Tr. 410:5–24

    (Pounian).)

2.  Mr. Fawcett's cell phone records and privilege logs do not reflect further consultation with

    Ms. Crotty on September 27 after his 8-minute call with her at 10:43 that morning. (KSAX-

    136; KSAX-151.)  Other than a 7-minute call on September 28, there is no indication that

    Mr. Fawcett communicated with Ms. Crotty again in September.  (*Id.*)

3.  In his September 27 Declaration, Mr. Fawcett stated, among other things, that:

    - he had sent the Redacted al-Jarrah Transcript to Mr. Isikoff (KSAX-62A ¶ 2);

    - no one from the Kreindler Law Firm had directed him to send the transcript to Mr.
      Isikoff (*id.* ¶ 3);

    - he had taken steps to prevent the Kreindler Law Firm from knowing that he had sent
      the Redacted al-Jarrah Transcript to Mr. Isikoff (*id.* ¶ 3);

    - he had told the Kreindler Law Firm for the first time on September 27 that he had
      sent the Redacted al-Jarrah Transcript to Mr. Isikoff (*id.* ¶ 2); and

    - until September 27, "no one other than Michael Isikoff and [Mr. Fawcett] knew that
      [Mr. Fawcett] had sent the redacted transcript to Michael Isikoff." (*id.* ¶ 3.)

4.  The September 27 Declaration explained that Mr. Fawcett's purpose in sending the Redacted

    al-Jarrah Transcript to Mr. Isikoff was so that Mr. Isikoff would publicize Mr. al-Jarrah's

testimony about possession of child pornography and thereby protect the public, especially

children, from Mr. al-Jarrah.  (KSAX-62A ¶¶ 2, 4.)

5.  In particular, Mr. Fawcett explained in his September 27 Declaration that

> I felt compelled to release the information because I thought the media was the only
> venue to protect the public and children from Musaed al Jarrah and his conduct.  After
> the revelations at the deposition that he was a child pornographer, I did not believe that
> Musaed al Jarrah's criminal acts should remain a secret.  The Saudi government's
> invocation of diplomatic immunity and the FBI's claims of secrecy about its own
> relationship with Musaed al Jarrah only served to protect Musaed al Jarrah rather than
> expose his dangers to children. No one was taking action to protect the children at risk
> because of the conduct of Musaed al Jarrah. I had a personal interest because Musaed al
> Jarrah worked for Saudi Arabia as a diplomat in Morocco for many years and still lives
> there, my own children are from that country, and I know from my prior international
> humanitarian and human rights work that Morocco has a dreadful history of child sex
> trafficking.

(KSAX-62A ¶ 4.)

6.  Mr. Fawcett concluded his September 27 Declaration by stating, under penalty of perjury,

that its contents were true and correct to the best of his recollection and belief.  (KSAX-62A

¶ 5.)

## G. Mr. Fawcett's September 30 Declaration

1.  On September 30, 2021, the Kreindler Law Firm filed a supplemental declaration from Mr.

Fawcett (the "September 30 Declaration"), which provided additional information about Mr.

Fawcett's actions.  (KSAX-59.)

2.  The declaration was drafted by attorneys at the Kreindler Law Firm, and there is no

indication in Mr. Fawcett's cell phone records or privilege log that Mr. Fawcett spoke with

Ms. Crotty regarding this second declaration.  (KSAX-136; KSAX-151; Tr. 360:1–19

(Benett).)

3.  The topics addressed in Mr. Fawcett's September 30 Declaration included:

- the length, nature, and terms of Mr. Fawcett's relationship with the Kreindler Law Firm (KSAX-59 ¶ 2);

- Mr. Fawcett's recollections about his telephone communications with Mr. Isikoff (*id.* ¶¶ 3–5, 8, 10);

- Mr. Fawcett's recollections and reasoning about what he sent to Mr. Isikoff (*id.* ¶ 6); and

- steps that Mr. Fawcett took to send the Redacted al-Jarrah transcript to Mr. Isikoff without anyone at the Kreindler Law Firm knowing that he had done so. (*Id.* ¶ 7.)

4. Mr. Fawcett confirmed at the Hearing that he knew at the time he signed his Declarations that he could potentially be prosecuted for perjury if he knowingly made false statements in the Declarations. (Tr. 418:14–17.)

5. Mr. Fawcett further testified that he did not understand at the time that he signed his Declarations that he was disclosing information that could potentially subject him to criminal prosecution. (Tr. 417:19–418:13.)

## H. **The October 4 Order**

1. On October 4, 2021, the Court entered an order (the "October 4 Order") directing that Mr. Fawcett and five other individuals from the Kreindler Law Firm appear and provide testimony at an evidentiary hearing regarding the breach of the protective order described in Mr. Fawcett's September 27 and September 30 Declarations (collectively, the "Declarations"). (ECF No. 7167.)

2. The October 4 Order stated that the purpose of the hearing was to enable the Court to make factual findings regarding the breach and to determine appropriate remedies. (ECF No. 7167 at 1.)

3. The October 4 Order further stated that "[s]uch remedies may include, among other possible remedies, removal from the Plaintiffs' Executive Committees, monetary sanctions, a referral

for professional discipline to the Committee on Grievances for the Southern District of New York, and a criminal referral to the United States Attorney's Office for the Southern District of New York."  (ECF No. 7167 at 1.)

## I.  <u>Pre-Hearing Activity</u>

1. On October 5, 2021, the Kreindler Law Firm filed a letter with the Court stating, among other things, that "[g]iven the issues raised in the [October 4 Order], we have . . . communicated to Mr. Fawcett that he should consider retaining counsel of his own."  (ECF No. 7168.)

2. On October 12, 2021, Lankler Siffert & Wohl LLP ("LSW") entered a notice of appearance for the purpose of representing Mr. Fawcett in connection with the Hearing.  (ECF No. 7252.)

3. On October 25, 2021, LSW advised the Court by letter that Mr. Fawcett intended to assert his Fifth Amendment privilege against self-incrimination at the Hearing and responded to Saudi Arabia's contention that Mr. Fawcett had waived that privilege.  (ECF Nos. 7278, 7285.)

4. In arguing against waiver, LSW contended, among other things, that the Court's October 4 Order mentioning the possibility of a criminal referral constituted "new grounds for apprehension," *Knopf v. Esposito*, No. 17-cv-5833 (DLC), 2021 WL 276539, at *1 (S.D.N.Y. Jan. 27, 2021) (quoting *United States v. Miranti*, 253 F.2d 135, 140 (2d Cir. 1958)), and that Mr. Fawcett had therefore not waived his Fifth Amendment privilege by providing declarations prior to the October 4 Order.  *See Klein v. Harris*, 667 F.2d 274 (2d Cir. 1981). (ECF No. 7285.)

5. After hearing oral argument on October 28, 2021, the Court ruled that Mr. Fawcett had waived his Fifth Amendment privilege with respect to the subject matter of his Declarations. (Transcript of October 28, 2021 Oral Argument before Judge Netburn at 25:13–29:4.)

6. An immediate appeal was taken to the District Court, which heard argument on October 29, 2021.  The District Court upheld this Court's ruling and directed Mr. Fawcett to appear at the Hearing and answer questions about the subject matter of his Declarations.  (Transcript of October 29, 2021 Oral Argument before Judge Daniels at 44:22–48:22; ECF No. 7304.)

**J. <u>The Hearing</u>**

1. The Hearing took place on November 1 and 2, 2021.  All six of the individuals listed in the Court's October 4 Order, including Mr. Fawcett, testified at the hearing.  All of the witnesses were sequestered until they completed their testimony.  (ECF No. 7310.)

2. The declarations of the six witnesses were treated as their direct testimony (ECF No. 7167 at 2; Tr. 13:13–15), and Saudi Arabia was permitted to cross-examine the witnesses in the order of its choosing.  (ECF No. 7310; Tr. 13:21–23.)  Counsel for the Kreindler Law Firm was permitted to conduct a redirect examination of the Kreindler Law Firm witnesses.  (Tr. 117–130, 181–194, 273–305, 366–402, 410–414.)

3. The Court granted LSW a standing objection to questions regarding the subject matter of the Declarations based on Mr. Fawcett's Fifth Amendment privilege against self-incrimination. (ECF No. 7312.)  LSW also noted that in order to preserve Mr. Fawcett's ability to challenge his examination based upon his Fifth Amendment privilege, LSW would not conduct a redirect examination of Mr. Fawcett.  (Tr. 479:9–13.)

K. **Mr. Fawcett Testified Truthfully in his Declarations and at the Hearing**

1. Saudi Arabia has argued that Mr. Fawcett perjured himself in his Declarations and at the Hearing. That is not what the evidence shows. Both in his Declarations and in his testimony before the Court, Mr. Fawcett acknowledged what he had done, took responsibility for his actions, and sought to recount the events truthfully to the best of his recollection. Before turning to the particular allegations that Saudi Arabia has made to date about Mr. Fawcett's testimony, several general observations are warranted.

2. First, it is uncontested that Mr. Fawcett sent the Redacted al-Jarrah Transcript to Mr. Isikoff. The reason it is uncontested is because Mr. Fawcett told the truth on September 27 and acknowledged that he was the source for Mr. Isikoff's article. Mr. Fawcett submitted two declarations acknowledging his breach of the MDL Protective Order and describing facts that also established a breach of the FBI Protective Order. Mr. Fawcett described steps that he took to make it harder to identify him as Mr. Isikoff's source. He also described steps that he took to conceal from the Kreindler Law Firm that he had provided the Redacted al-Jarrah Transcript to Mr. Isikoff.

3. All of that conduct is known to the Court because Mr. Fawcett admitted it. He admitted his conduct in the two Declarations, and he admitted it again at the Hearing. If Mr. Fawcett had chosen another path—if he had submitted a declaration falsely denying that he had provided the transcript to Mr. Isikoff—there is no telling whether the truth would ever have been known. And because that is so, Saudi Arabia's claim that Mr. Fawcett has sought to mislead the Court in his Declarations and testimony does not make sense. If Mr. Fawcett were willing to perjure himself, he would simply have denied being Mr. Isikoff's source.

4. Second, Saudi Arabia's portrayal of Mr. Fawcett as a calculating liar bears no resemblance to the individual who testified before the Court.  In the face of aggressive and sarcastic cross examination, Mr. Fawcett answered the questions posed thoroughly and completely and did not seek to minimize his responsibility for his conduct.  While at times Mr. Fawcett was uncertain about specific facts, like the precise timing of conversations or the exact number of communications, that makes him no different from most witnesses.  There was no indication that Mr. Fawcett was trying to deflect or mislead in his testimony before the Court.  Indeed, following a break in his testimony (during which Mr. Fawcett remained isolated on the witness stand), he notified the Court that he realized he had made a mistake in his earlier testimony and wished to correct it.  Someone who was trying to deceive the Court would not do that.  On the contrary, it was a clear indication that Mr. Fawcett was doing his best to tell the truth.

5. Third, Saudi Arabia's readiness to ascribe perjurious intent to every awkward or imprecise phrase in Mr. Fawcett's Declarations ignores the circumstances under which those documents were prepared.  Mr. Fawcett did not have personal counsel by his side and the luxury of time in preparing his Declarations.  Instead, Mr. Fawcett worked on his Declarations with lawyers who did not represent him and who were proceeding in great haste.  Moreover, while the unusual circumstances under which the Declarations were prepared were attributable, at least in part, to Mr. Fawcett's delay in coming forward, the fact remains that those circumstances weigh against attributing flaws in the Declarations to an intent to mislead the Court.

6. With those considerations in mind, we turn to the particular points where Saudi Arabia has contended that Mr. Fawcett committed perjury.

17

**L.** **Mr. Fawcett Testified Truthfully About Why He Sent the Redacted al-Jarrah Transcript to Mr. Isikoff**

1. Saudi Arabia has made plain, both in its questioning at the Hearing and in various filings, that it believes that the true reason that Mr. Fawcett sent the Redacted al-Jarrah Transcript to Mr. Isikoff was "to smear a witness who had been uncooperative" (Tr. 478:2–4) or otherwise to gain some sort of tactical advantage in the MDL.

2. But Saudi Arabia has offered no basis—nor is there any—for rejecting Mr. Fawcett's sworn statements and testimony that he acted for the purpose of protecting children from an admitted possessor of child pornography.  Mr. Fawcett's sworn statements and testimony about the reason for his actions are consistent, credible, and fully in accord with the documentary evidence and the testimony of every other witness at the Hearing.

3. Saudi Arabia has sought to undermine the motive described in Mr. Fawcett's September 27 Declaration by suggesting that it represents the words of the Kreindler Law Firm rather than Mr. Fawcett.  But each of the three sequestered witnesses who participated in drafting the September 27 Declaration independently confirmed that it accurately describes what Mr. Fawcett told the Kreindler Law Firm about why Mr. Fawcett sent the Redacted al-Jarrah Transcript to Mr. Isikoff.

4. Mr. Fawcett, Megan Benett, and Steven Pounian each confirmed that while Kreindler Law Firm attorneys had in fact proposed edits to Mr. Fawcett's September 27 Declaration, including the portion discussing Mr. Fawcett's motive, their edits were based upon his answers to questions that the attorneys asked him after he shared his draft declaration with them.  (Tr. 352:3–353:19 (Benett); Tr. 410:5–24 (Pounian); Tr. 466:5–467:15 (Fawcett).)

5. Ms. Benett explained that it was important for her to understand why Mr. Fawcett would do "something this grave" (Tr. 392:2–5), and that she thought it was important for Mr. Fawcett to provide that information to the Court. (*Id.*)

6. Ms. Benett further testified:

> I knew that he was deeply troubled by the Jarrah child pornography images. I did not have any sense that he was so upset about it that he was behind the leak to Isikoff, but once I had the information about his—you know, his—not just his sense of righteousness about the child pornography itself but also his, what seemed to me, genuine and heartfelt concerns about the fact that Jarrah was in Morocco, that he believed it was a place where children were routinely trafficked for sexual purposes, and I knew a little bit more about his personal background, it did seem to me that that was really important context.

(Tr. 392:5–15.)

7. Moreover, Mr. Fawcett's initial draft declaration is consistent with the September 27 Declaration that he ultimately signed on this point. That draft declaration makes clear that Mr. Fawcett was motivated by distress and concern after learning of Mr. al-Jarrah's possession of child pornography, not by some desire to gain an advantage in the MDL. (K&K-73.) The September 27 Declaration simply provides more detail about why this had personal significance for Mr. Fawcett.

8. Nor does the fact that Mr. Fawcett did not go to the authorities to report what he learned at Mr. al-Jarrah's deposition provide a reason to doubt his explanation for why he sent the Redacted Al-Jarrah Transcript to Mr. Isikoff. (Tr. 470:5–471:16.) The record makes clear that Mr. Fawcett believed that publicity about the child pornography found on Mr. al-Jarrah's computer was the only effective way to protect children from Mr. al-Jarrah because he believed that the relevant government authorities would not take steps to prosecute Mr. al-Jarrah. (KSAX-62A ¶ 4.)

9. Similarly, while Saudi Arabia has suggested that Mr. Fawcett shared more of the Redacted al-Jarrah Transcript than was necessary to achieve his stated purpose (Tr. 459:3–6, 459:22–

460:2, 460:8–11), Mr. Fawcett credibly explained in both his September 30 Declaration and at the Hearing that he believed that the portions of the deposition that explicitly referenced child pornography "need[ed] to be read in conjunction with other portions." (Tr. 460:1–4; *see also* KSAX-59 at ¶¶ 5–6 (explaining that Mr. Isikoff could not assess the import of Mr. al-Jarrah's testimony regarding the pornographic images found on his computer without understanding the surrounding context).) Moreover, when Mr. Fawcett was pressed on that point at the Hearing, he looked to the Court for guidance, explaining that he could not elaborate without addressing other portions of the deposition, and Saudi Arabia elected to withdraw its question. (Tr. 460:12–22.) As a result, the record does not support a claim that Mr. Fawcett was unable to explain why he believed it was necessary to send the entire Redacted al-Jarrah Transcript to Mr. Isikoff. Instead, to the extent that Mr. Fawcett's testimony on that point was truncated, it reflected his concern that he adhere to the Court's ruling on the permissible limits of testimony at the Hearing.

**M. <u>Mr. Fawcett Truthfully Testified That He Acted on His Own</u>**

1. Saudi Arabia apparently believes that James Kreindler of the Kreindler Law Firm either directed Mr. Fawcett to send the Redacted al-Jarrah Transcript to Mr. Isikoff or somehow condoned his decision to do so. The evidence does not support Saudi Arabia's view.

2. Beginning with his draft declaration and continuing through his September 27 Declaration, his September 30 Declaration, and his testimony at the Hearing, Mr. Fawcett has consistently stated that he acted alone. (K&K-73; KSAX- 62A ¶¶ 2–3; KSAX-59 ¶¶ 7–8; Tr. 485:1–24.) There is no evidence to the contrary. Indeed, there is abundant evidence that Mr. Fawcett took affirmative steps to conceal his actions from the Kreindler Law Firm and did not tell anyone at the Kreindler Law Firm what he had done until September 27.

3.  In a post-hearing letter to the Court about a discovery dispute with the Kreindler Law Firm, Saudi Arabia argued that "circumstantial evidence" presented at the Hearing gives rise to a "strong inference" that Mr. Kreindler knew as early as July 22 that Mr. Fawcett had sent the Redacted al-Jarrah Transcript to Mr. Isikoff, and that Mr. Fawcett tried to blunt the force of that inference by lying at the Hearing about how to interpret his phone records for July 22. (ECF No. 7328 at 1, 3.)  But there is no inference to be drawn here, let alone a strong one, and Saudi Arabia's claim has no support in the record.

4.  The circumstantial evidence that Saudi Arabia points to is that on the day after it informed the Kreindler Law Firm of its intent to ask the Court to investigate the leak to Mr. Isikoff, Mr. Fawcett not only reached out to Ms. Crotty, but did so "immediately" after a call with Mr. Kreindler, and then made another call to Mr. Kreindler "immediately" after his call with Ms. Crotty.  (ECF No. 7328 at 1.)

5.  In fact, Mr. Fawcett did not immediately call Ms. Crotty after his call with Mr. Kreindler, nor did he immediately call Mr. Kreindler back after his call with Ms. Crotty.  Mr. Fawcett's first call with Mr. Kreindler had ended approximately 40 minutes before Mr. Fawcett reached out to Ms. Crotty.  (KSAX-135.)  His second call to Mr. Kreindler occurred approximately two hours after his call with Ms. Crotty had ended.  (*Id.*)

6.  Moreover, to the extent Saudi Arabia contends that Mr. Fawcett decided to reach out to Ms. Crotty as a result of his 46-minute call with Mr. Kreindler at 9:17 a.m., that contention is belied by Mr. Fawcett's privilege log, which shows that Mr. Fawcett had sent a text to Ms. Crotty at 8:18 a.m.—an hour before his call with Mr. Kreindler.  (KSAX-135; KSAX-151.)

7. While it is reasonable to infer that on the morning of July 22 Mr. Fawcett was reflecting on the significance of his actions, it does not follow that he shared those reflections with Mr. Kreindler, and Mr. Fawcett has confirmed that he did not.  (Tr. 445:25–447:1.)

8. Nor is it surprising or suspicious that Mr. Kreindler and Mr. Fawcett could not recite, more than three months later, what precisely they had spoken about in their calls on July 22.  And even if one assumes that the topics they discussed might have included Saudi Arabia's request for an investigation into the protective order breach, that still would not give rise to an inference that Mr. Fawcett confessed his responsibility for the breach to Mr. Kreindler. Indeed, given the substantial evidence in the record concerning Mr. Fawcett's efforts to conceal what he had done from the Kreindler Law Firm, the far more reasonable inference is that, as Mr. Fawcett testified, he kept any concerns he had to himself during the July 22 phone call.

9. A post-hearing declaration by Mr. Pounian, who had been patched into both calls, also confirms that Mr. Fawcett said nothing on those calls to suggest that he had been the source for Mr. Isikoff's story.  (ECF No. 7359-1 ¶ 5.)

10. Saudi Arabia also misstates the record in claiming that Mr. Fawcett's testimony suggests that he realized that the sequence of his calls that day was suspicious and therefore lied about the nature of his call with Ms. Crotty.  (ECF No. 7328 at 3.)  While Mr. Fawcett certainly showed confusion about the timeline, Saudi Arabia is incorrect that Mr. Fawcett repeatedly denied having spoken with Ms. Crotty about a legal matter on July 22, before finally admitting that he did.  (*Id.*)

11. Instead, when Mr. Fawcett was first asked about the July 22 call, his immediate reaction was that while he did not recall that particular conversation, he "may very well have been" getting legal advice from Ms. Crotty.  (Tr. 447:15–19.)

12. Mr. Fawcett retreated from that answer only because the length of the July 22 call did not comport with his recollection of the attorney-client discussion as brief.  (Tr. 448:16–24, 449:16–20, 450:6–20.)  Mr. Fawcett explained that he recalled a lengthy discussion with Ms. Crotty regarding her race for Manhattan District Attorney, and it made sense to him that the 22-minute call with Ms. Crotty was on that subject.  (Tr. 449:16–20 ("I do remember a call with Liz in the summer in which we talked about her having run for District Attorney, and she was telling me about how she felt about it afterwards and having lost, and I remember that being quite a long conversation."); 450:19–20 ("That's why I remember why it took 22 minutes, because we were talking quite a bit about her running for office.").

13. Mr. Fawcett was not shown critical documents to contextualize the 22-minute phone call, including the complete phone records demonstrating that this was his only call with Ms. Crotty in July, and the privilege log reflecting his other communications with Ms. Crotty on July 22.  The result, not surprisingly, was confusion.

14. Moreover, as the record reflects, when Mr. Fawcett remained alone on the witness stand during a brief recess, he continued to think about his July 22 call with Ms. Crotty.  (Tr. 478:8–20.)  When proceedings resumed, Mr. Fawcett asked for an opportunity to correct his testimony about that phone call.  (Tr. 478:17–20, 480:2–21.)

15. Mr. Fawcett then testified:

> During the break there, I recalled the conversation with Liz Crotty in July.  I remember calling her after the Court's order had come out, so I was calling her about this Court's order.  And I remember telling her on the phone:  I'd like to come see you, Liz, about an issue.  And she said:  Well, I'm not going to be here.  I'm leaving.  I'll be back in a

couple of weeks.  And then we – I didn't tell her why I wanted to talk to her on the phone, and then the rest of the conversation was about her campaign.  So it was correct that I originally called her about attorney-client – attorney client relations because I saw the court order.  Had nothing to do with the call to Jim Kreindler.

The Court:  It had nothing to do with?

The Witness:  The call to Jim Kreindler that I had just done previously.  It was because the order had come out the day before, and I was –

The Court:  OK.  Thank you.

(Tr. 480:5–22.)

16. While Mr. Fawcett's answer reflects that he was still struggling with the timeline—because what had occurred the day before was not an order from the Court regarding an investigation, but instead Saudi Arabia's written notice of its intent to request one—Mr. Fawcett was able to reconstruct that he had learned something the day before that caused him to reach out to Ms. Crotty.

17. In addition, as noted above, Mr. Fawcett's privilege log shows that Mr. Fawcett sent Ms. Crotty a text message on July 22 at 8:18 a.m.—well before his 9:17 a.m. call with Mr. Kreindler, confirming that his conversation with Ms. Crotty was not prompted by his morning conference call with Mr. Kreindler and Mr. Pounian.  (KSAX-135; KSAX-151; ECF No. 7359-1.)

18.  As a result, the record in no way suggests that Mr. Fawcett's difficulties with the timeline of his July call with Ms. Crotty was attributable to anything other than confusion, exacerbated by his lack of access to the documents that would have assisted him with the timeline.

**N.  Saudi Arabia's Criticisms of a Handful of Sentences in Mr. Fawcett's Declarations Reflect, At Most, Poor Wording or Mistaken Beliefs**

1.  The Hearing also demonstrated that while Mr. Fawcett's September 27 and September 30 Declarations contained an error and some inartful wording—unsurprising given the

24

circumstances under which they were prepared—they reflect Mr. Fawcett's good faith effort
to provide the Court with the relevant facts and take responsibility for his actions.

**Paragraph 2 of the September 27 Declaration**

2. Saudi Arabia has taken issue, for example, with the accuracy of a sentence in the second
paragraph of Mr. Fawcett's September 27 Declaration that states:

> The redacted portions of the deposition I sent to Michael Isikoff were focused on Musaed
> al Jarrah's testimony about his possession of child pornography.

(KSAX-62A ¶ 2.)

3. Saudi Arabia has characterized that sentence as a deliberate effort to mislead the Court by
falsely stating that Mr. Fawcett only provided Mr. Isikoff with those pages of the al-Jarrah
deposition transcript that referenced child pornography.  (Tr. 456:25–461:22.)

4. But, as Mr. Fawcett testified at the Hearing, the sentence "doesn't really make any sense"
(Tr. 458:12) because the redacted portions of the deposition did not in fact relate to child
pornography but were instead the FBI material.  (Tr. 459:12–16.)

5. Moreover, Mr. Isikoff's article itself stated that he had received a copy of the entire
transcript, subject only to redactions for "law-enforcement sensitive material" (KSAX-40 at
1), and there would be no reason for Mr. Fawcett to attempt to mislead the Court about
information that was readily available in the very article that gave rise to this investigation.
In addition, Mr. Fawcett's draft declaration and September 30 Declaration each state clearly
that the material sent to Mr. Isikoff was not limited to the specific pages on which child
pornography was mentioned.  (K&K-73; KSAX-59.)  Given those two facts, the mangled
sentence contained in Mr. Fawcett's September 27 Declaration cannot reasonably be read as
anything other than what Mr. Fawcett described it to be:  the "very poor" product of a rushed

process.  (Tr. 459:17–21; *see also* Tr. 343:9–18, 363:24–364:4 (Benett) (describing the hurried pace of September 27).)

6. Similarly, with respect to the sentence that immediately followed—which stated that "I did not send any FBI protected portions of the deposition to Michael Isikoff." (KSAX-62A ¶ 2)—there is no basis for concluding that Mr. Fawcett believed that sentence to be untrue when he submitted his September 27 Declaration.

7. As Mr. Fawcett explained, he had not recalled that the FBI Protective Order contained a provision requiring that the entire al-Jarrah transcript be treated as confidential for the first 30 days following the deposition, and he therefore thought that he had avoided any breach of the FBI Protective Order by providing a transcript that redacted the FBI material.  (Tr. 423:2–12, 461:24–462:23; KSAX-59 ¶ 6.)

8. Moreover, it was clear from the publication date of Mr. Isikoff's article (which was less than 30 days after the al-Jarrah deposition had concluded) that Mr. Isikoff had received the transcript while it was still deemed confidential under the FBI Protective Order.  It makes no sense to suggest that Mr. Fawcett, while admitting that he violated the MDL protective order, was somehow trying to conceal his violation of the FBI protective order by making a statement that was verifiably incorrect given the date of Mr. Isikoff's article.

9. The far more logical explanation for the statement is the one that Mr. Fawcett provided at the Hearing: he believed, at the time of the September 27 Declaration, that the statement was true.  (Tr. 455:18–456:6.)

**Paragraph 3 of the September 27 Declaration**

10. At the Hearing, Saudi Arabia also took issue with two aspects of Paragraph 3 of Mr. Fawcett's September 27 Declaration.  First, Saudi Arabia claimed that Mr. Fawcett took out a

sentence drafted by attorneys at the Kreindler Law Firm—"Until today, I had told Kreindler & Kreindler that I did not know how Michael Isikoff had obtained the transcript."—because he knew it to be false, but then lied at the Hearing when he suggested that he deleted the sentence for other reasons.  (Tr. 442:10–22; KSAX-121.)  Second, Saudi Arabia claimed that Mr. Fawcett drafted and included another sentence that was false: "Until today, no one other than Michael Isikoff and I knew that I sent the redacted transcript to Michael Isikoff." (KSAX-62A ¶ 3; Tr. 463:25–464:3, 465:11–17.)

11. As to the first issue—why the sentence "Until today, I had told Kreindler & Kreindler that I did not know how Michael Isikoff had obtained the transcript." was removed—it was clear at the Hearing that Mr. Fawcett was thoroughly confused about who had made the edit to the document, and was speculating as to why the edit might have been made:

> Q. I'm asking if you, John Fawcett, made the edit to this document that's indicated in the redline in the second and third lines of paragraph 3?
> A. The edit meaning the – deletion with the red line?
> Q. Yes.
> A. I'm not sure. If it's – if this is an email from me, then I would have made it.  If this is an email coming back, then –
> Q. But do you recall being presented with a declaration that said you'd lied to Kreindler & Kreindler and you crossing that out because you hadn't done that?
> A.  No, I don't – I'm – not quite understood that.
> . . .
> Q. Do you have any knowledge of why this was struck out in this draft?
> A. I think maybe it – maybe it doesn't just – just doesn't flow well.  It's –
> Q. Bad grammar?
> A. Yeah, I think it's –
> Q. Oh, please.

(Tr. 443:21–444:6, 444:17–23.)

12. Moreover, Saudi Arabia's theory appeared to be that Mr. Fawcett was lying about the reason the sentence was deleted because he was trying to protect the Kreindler Law Firm by withholding testimony that he did not recall having been asked directly whether he was the

source of the leak.  But Mr. Fawcett testified to exactly that just minutes before he was asked

about the edit to his Declaration:

> Q. But my question is does [Mr. Kreindler] come to you and say, ask you the question,
> did you disclose this transcript?
> A. I don't remember that, no.
> Q. Did Megan Benett come to you and say, did you disclose this transcript?
> A. No, I don't recall that.
> Q. Did Andrew Maloney come to you and say, did you disclose the transcript?
> A. I don't recall that.
> Q. Did Steven Pounian come to you and say, did you disclose the transcript?
> A. No, I don't recall that.

(Tr. 439:1–12.) Saudi Arabia's suggestion that Mr. Fawcett was somehow fashioning his

testimony to benefit the Kreindler Law Firm cannot be squared with the record.

13. As to the second issue—Mr. Fawcett's statement in the September 27 Declaration that

"[u]ntil today, no one other than Michael Isikoff and I knew that I sent the redacted transcript

to Michael Isikoff"—Saudi Arabia's theory was that Mr. Fawcett was lying because he had

previously conveyed this information to Ms. Crotty.  When asked about the sentence at the

Hearing, Mr. Fawcett did not recall telling anyone (other than Mr. Isikoff) prior to September

27 that he had sent the Redacted al-Jarrah Transcript to Mr. Isikoff.  (Tr. 465:3–465:17.)

14. To the extent Saudi Arabia was suggesting that Mr. Fawcett had informed Ms. Crotty in July

that he sent the Redacted al-Jarrah Transcript to Mr. Isikoff, all evidence is to the contrary.

To the extent Saudi Arabia intends to claim that Mr. Fawcett told Ms. Crotty what he had

done when he spoke to her and emailed her on September 24, that claim, even if assumed to

be true, is utterly irrelevant.  In his September 27 Declaration, Mr. Fawcett was conveying

that no one at the Kreindler Law Firm knew prior to September 27 that he had provided the

Redacted al-Jarrah Transcript to Mr. Isikoff.  The idea that Mr. Fawcett was trying to mislead

the Court in his September 27 Declaration by omitting a privileged communication from

three days earlier is nonsensical.

**The September 30 Declaration's Description of Calls with Mr. Isikoff**

15. Finally, Mr. Fawcett's cell phone records do not support Saudi Arabia's contention that Mr. Fawcett lied in his September 30 Declaration about the number of times that he spoke with Mr. Isikoff.  Instead, as Mr. Fawcett correctly noted (Tr. 432:10–22), Saudi Arabia's reading of his cell phone records overstates the number of conversations that in fact occurred.

16. Thus, for example, Saudi Arabia's tally of "about ten" conversations between Mr. Fawcett and Mr. Isikoff (Tr. 432:10–11) depends, in part, on a conclusion that there were multiple separate conversations on July 3, when in fact the phone records suggest a single conversation, broken up by connection difficulties into multiple entries.  (KSAX-134; KSAX-139.)[1]  Saudi Arabia's tally further assumes that there were two separate, but close-in-time, calls on July 12, when in fact the Signal call records are consistent with the existence of one completed call.  (KSAX-138.)[2]  Finally, the Signal phone records for the remaining two calls (on July 15 and August 2) likewise do not indicate whether the calls went through or were merely attempted.  (KSAX-0138.)

---

[1] For July 3, Mr. Fawcett's T-Mobile cell phone records show four calls between Mr. Fawcett and Mr. Isikoff beginning at 1:53 p.m. and ending with a call placed at 2:35 p.m., with the total time for those calls listed as 27 minutes.  (KSAX-134.)  Mr. Fawcett's Signal phone records for the same day show eight calls initiated during a nine-minute period on July 3, including one missed call.  (KSAX-139.)  That pattern of calls clearly suggests Mr. Fawcett and Mr. Isikoff had difficulty connecting the call, and a Signal message that Mr. Isikoff sent to Mr. Fawcett around the same time confirms that they did.  (KSAX-82) ("Try calling me – it's not going thru on signal.")

[2] Mr. Fawcett's Signal phone records also show six entries for July 5, July 12, July 15, and August 2, but do not indicate the length of the call or whether the calls originating from Mr. Fawcett actually occurred or were merely attempted.  (KSAX-138; KSAX-139.)  Moreover, the records indicate that the first call on August 2 was a missed call.  (KSAX-138.)  And Mr. Fawcett sent Mr. Isikoff a Signal message asking Mr. Isikoff to "[c]all when you can" one minute after the first call on July 12, indicating that this call likely did not connect either. (KSAX-150.)

17. As a result, even reading the cell phone records in the light most favorable to Saudi Arabia, they suggest, at most, a total of four calls, as opposed to the three that Mr. Fawcett recalled having made.  Mr. Fawcett's cell phone records thus do not support an argument that Mr. Fawcett's September 30 Declaration sought to understate the number of times Mr. Fawcett spoke with Mr. Isikoff.  (*Cf.* KSAX-59 ¶¶ 3, 8. 10.)

18. Moreover, the notion that Mr. Fawcett was trying to deceive the Court about the number of times he spoke with Mr. Isikoff is illogical.  Mr. Fawcett admitted to providing information to Mr. Isikoff in violation of a court order.  He also admitted to speaking with Mr. Isikoff on multiple occasions.  Even if the Court believes that Mr. Fawcett could have been more precise with his tally of phone calls, there is no reason to doubt that his testimony reflected his best recollection of his communications with Mr. Isikoff several months prior to his Declarations.

## O. **Mr. Fawcett's Disposal of a Thumb Drive was Unrelated to the Court's Investigation**

1. At the Hearing, Saudi Arabia suggested that Mr. Fawcett acted with intent to obstruct this Court's investigation by disposing of the thumb drive to which he had copied the Redacted al-Jarrah Transcript.  (Tr. 418:9–12.)  The record does not support that claim.

2. Mr. Fawcett could not recall when he disposed of the thumb drive beyond saying that it was at some point during the summer.  (Tr. 440:17–442:2.)  Mr. Fawcett also made clear that the disposal was unrelated to any concern that the thumb drive might have evidentiary significance.  (Tr. 441:2–13.)  Instead, as Mr. Fawcett explained, he disposed of it, along with several other thumb drives that likewise contained MDL materials, because the thumb drives were chronically malfunctioning.  (*Id.*)

3. Saudi Arabia may contend that the Court should accept the portion of Mr. Fawcett's testimony that is favorable to Saudi Arabia and reject the rest. But Mr. Fawcett's forthrightness about his inability to recall precisely when he disposed of the thumb drive makes his testimony on this subject all the more credible. Were Mr. Fawcett willing to lie to serve his interests, he would have testified that he knew for a fact that he disposed of the thumb drive immediately after Mr. Isikoff's article came out and before he had any idea that the Court might investigate the leak. The fact that Mr. Fawcett testified that he could not pinpoint the timing of the thumb drive disposal—even when testimony about immediate disposal could have been helpful to him—demonstrates that he was testifying truthfully.

4. Nor, in any event, does the record support an inference that Mr. Fawcett would have regarded the thumb drive as having any evidentiary significance. Mr. Fawcett was permitted to possess the Redacted al-Jarrah Transcript. The fact that Mr. Fawcett had a copy of the Redacted al-Jarrah Transcript, along with other MDL materials, on a set of thumb drives would not speak to why he had the transcript, much less that he had provided the Redacted al-Jarrah Transcript to a third party.

5. The record as a whole also weighs against a finding that Mr. Fawcett acted with intent to obstruct the Court's inquiry. The key evidence regarding Mr. Fawcett's actions are the statements that Mr. Fawcett himself provided in his Declarations. His conduct came to light precisely because Mr. Fawcett told the Court what he had done. That does not excuse Mr. Fawcett's actions. But it does run counter to Saudi Arabia's portrayal of Mr. Fawcett as seeking to obstruct the Court's investigation.

## Conclusions of Law

### A.  The Court's Power to Enforce Confidentiality Orders

1.  It is well settled that courts have the power under Rule 37(b) of the Federal Rules of Civil Procedure to enforce discovery orders, including confidentiality orders issued under Rule 26(c).  *See, e.g., Koch v. Greenberg*, No. 07-cv-9600 (BSJ), 2011 WL 13260757, at *8 (S.D.N.Y. Aug. 16, 2011) (courts have "consistently held that a protective order issued under Rule 26(c) can be enforced through Rule 37(b)"); *Joint Stock Company Channel One Russia Worldwide v. Infomir LLC*, No. 16-cv-1318 (GBD) (BCM), 2018 WL 4760345, at *8 (S.D.N.Y. Sept. 28, 2018) ("Rule 37 applies directly to the problem confronting the court," which was failure to comply with the Court's order to produce discovery) (citing *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 n.7 (2d Cir. 2010)).[3]

2.  If a protective order has been breached, whether by a party or by a non-party, Rule 37(b) permits the Court to issue orders to remedy the breach, to ensure future compliance with the protective order, and to deter future breaches either in the case or more broadly.  *See, e.g.*, *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (the three purposes of remedies under Rule 37 are to ensure that "a party will not benefit from its own failure to comply"; to serve as "specific deterrents and seek to obtain compliance with the particular order issued"; and "to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault"); *Dorsett v. Cty. of Nassau*, No. 10-cv-1258 (ADS), 2012 WL 2076911, at *8

---

[3] *See also City of Almaty, Kazakhstan v. Ablyazov*, No. 15-cv-5345, 2018 WL 1229730, at *4 (S.D.N.Y. Mar. 5, 2018); *Lynch v. Southampton Animal Shelter Foundation*, No. 10-cv-2917, 2013 WL 80178, at *4 (S.D.N.Y. Jan. 7, 2013); *Schiller v. City of New York*, No. 04-cv-7921, 2007 WL 1623108, at *3 (S.D.N.Y. June 5, 2007).

(E.D.N.Y. June 7, 2012) (non-parties as well as parties are subject to sanctions under Rule 37(b) for violating a protective order).

3.  In addition, courts have "wide discretion in imposing sanctions under Rule 37." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012). When determining the appropriate sanction under Rule 37, courts are guided by a non-exclusive list of factors, including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance." *Id.* (citation omitted).

4.  At the same time, however, a court's imposition of sanctions is "restrained by the principle that only the least possible power adequate to the end proposed should be used in contempt cases." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (internal quotation marks and alterations omitted) (reversing criminal contempt convictions prosecuted by counsel for an interested party and noting the importance of courts exercising their power of self-protection only as a "last resort").

5.  The principle of restraint described in *Young* was first articulated by the Supreme Court two centuries ago, *see Anderson v. Dunn*, 6 Wheat. 204, 19 U.S. 231 (1821), and courts routinely invoke it in determining how contempt should be addressed. *See, e.g.*, *Spallone v. United States*, 493 U.S. 265, 276 (1990) (reversing civil contempt sanctions that violated the "least possible power" principle); *United States v. Rangolan*, 464 F.3d 321, 327 (2d Cir. 2006) (reversing a conviction for criminal contempt and citing the principle of restraint in determining when summary contempt proceedings are appropriate); *Spectacular Venture, L.P. v. World Star Int'l, Inc.*, No. 94-cv-8917 (JGK), 1998 WL 401535, at *2–3 (S.D.N.Y.

July 17, 1998) (noting the "least possible power" doctrine in declining to appoint a prosecutor after the United States Attorney's Office declined to prosecute a criminal contempt case).

**B. <u>Significant Civil Sanctions Are Available for Mr. Fawcett's Conduct</u>**

1. Mr. Fawcett acknowledges that the conduct described in his Declarations is sufficient to serve as a predicate for the imposition of civil sanctions against him. *See Paramedics Electrocina Comercial, Ltda. V. GE Mediccal Systems Information Technology, Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (a person may be held in civil contempt for failing to comply with a protective order if "(1) the order the contemnor failed to comply with is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the contemnor has not diligently attempted to comply in a reasonable manner"; "it need not be established that the violation was willful") (citations omitted)).

2. Mr. Fawcett likewise acknowledges that to serve the permissible purposes of remedying harm, ensuring future compliance with the MDL and FBI Protective Orders, and deterring violations of protective orders in the MDL and more generally, the Court has discretion to consider a range of remedies that would regulate, limit, or even prohibit Mr. Fawcett's future participation in the MDL.

3. More specifically, Mr. Fawcett acknowledges that an order restricting or barring his future participation in the MDL would accord with the remedial purposes of Rule 37(b) sanctions if the Court concludes, after undertaking the analysis articulated in *World Wide Polymers*, that such an order is needed to increase the confidence of parties and witnesses that the MDL and FBI Protective Orders can be relied upon.  Mr. Fawcett further acknowledges that an order restricting or barring his future participation in the MDL would accord with the

coercive and deterrent purposes of Rule 37(b) sanctions if the Court concludes that such an

order is needed to encourage future compliance with the MDL and FBI Protective Orders or

with protective orders more generally.  *See New York State Nat. Org. for Women v. Terry*,

886 F.2d 1339, 1350–51 (2d Cir. 1989) (sanctions involving "private benefits or relief" to a

"complaining party" are civil if they serve a remedial, coercive, or deterrent purpose);

*Dorsett*, 2012 WL 2076911, at *8 (civil sanctions appropriate "to coerce future compliance

and to remedy any harm past noncompliance caused the other party.") (citations omitted).

4.  Moreover, while barring Mr. Fawcett from any further participation in the MDL would have

a profound professional and financial impact on Mr. Fawcett, he acknowledges that it falls

within the range of civil sanctions that the Court may properly impose should the Court

determine, in exercising its discretion under Rule 37(b), that it is necessary and appropriate

to do so.  *Cf. Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 117–18 (2d Cir.

2009) (sanctions such as reprimanding or barring an attorney are not for the purpose of

punishment, but for the purpose of protecting the judicial function from persons who are

determined to be unfit to practice).

5.  With respect to financial sanctions, it is Mr. Fawcett's hope that the Court will consider that

the breach at issue was not for the purpose of personal gain or obtaining an advantage in the

MDL, but was motivated instead by concern for the safety of children.  *Cf. Dorsett*, 2012

WL 2076911, at *9, *11 (imposing a $2,500 sanction on a non-party who breached a

confidentiality order by publicly expressing concern about police misconduct).

6.  Mr. Fawcett also respectfully requests that the Court provide him with an opportunity to be

heard regarding his financial resources if the Court is contemplating the possible

recommendation of a significant financial sanction against him.  *See, e.g., Dole Fresh Fruit*

*Co. v. United Banana Co., Inc.*, 821 F.2d 106, 110 (2d Cir. 1987) (a "primary" factor "that must be weighed before entry of a coercive remedy" is "the contemnors' financial resources and the probable effectiveness of the sanctions"); *DAddio v. Kerik*, No. 15-cv-5497 (JGK) (SDA), 2019 WL 2107721, at *5 (S.D.N.Y. Apr. 25, 2019) (imposing certain nonfinancial sanctions and holding that "[a]warding the additional measure of costs and attorney's fees would be excessive [] and, therefore, unjust") (citation and internal quotation marks omitted).

**C.** **The Principle of Restraint and the Mitigating Circumstances of this Case Weigh Powerfully Against a Criminal Referral**

1. With respect to the possibility of a criminal referral—which the Court's October 4 Order expressly referenced—we note, as a preliminary matter, that in the context of conduct involving the violation of a court order, the term "criminal referral" has more than one meaning.  It can mean a communication from a court alerting a United States Attorney or other federal criminal authority to conduct that may warrant investigation for possible criminal prosecution.   Alternatively, it can mean a formal request, made pursuant to Rule 42(a)(2) of the Federal Rules of Criminal Procedure, to a United States Attorney that a person be prosecuted for criminal contempt.  *See, e.g., United States v. Donziger*, No. 11-cv-691 (LAK), No. 19-cr-561 (LAP), 2021 WL 3141893, at *54 (S.D.N.Y. July 26, 2021) (Rule 42(a)(2) request made where a since-disbarred attorney was found to have repeatedly violated court orders in order to advance his interests in civil litigation).[4]

---

[4] Rule 42(a)(2) provides that in order to initiate a criminal contempt proceeding predicated on conduct that did not occur in the presence of the court, the court "must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney."  Fed. R. Crim. P. 42(a)(2).  That provision was added to Rule 42 in 2002 to ensure that court-initiated criminal contempt prosecutions conform to the guidance

2.  In the case at hand, there is no danger that the Department of Justice might be unaware of the conduct at issue.  Its attorneys are signatories to the FBI Protective Order and have communicated with the Court and the parties in connection with the Hearing.  As a result, a criminal referral is not needed to ensure that the Department of Justice will proceed with a criminal case if it determines that it is appropriate to do so.

3.  Nor, respectfully, would a Rule 42(a)(2) request for prosecution accord with precedent in this Circuit or the principle of restraint.  Criminal contempt proceedings—whether initiated through a Rule 42(a)(2) request or through a grand jury convened by a United States Attorney—are very much the exception rather than the rule.  As a review of the caselaw within this Circuit demonstrates, sanctions for violating confidentiality or other discovery orders are most often civil in nature—even where the violator is an attorney, the violations are repeated, or the conduct is willful.  *See, e.g.*, *City of Almaty, Kazakhstan*, 2018 WL 1229730, at *7 (imposing a civil sanction even though "there is no question that the leak of the Transcript was willful"); *Flaherty v. Filardi*, No. 03-cv-2167 (LTS) (HBP), 2009 WL 3762305, at *5–6 (S.D.N.Y. Nov. 10, 2009) (imposing civil contempt sanction where the party, who was a *pro se* attorney, repeatedly and willfully violated the protective order by including confidential materials in public court filings and posting about confidential material on her blog, including after she was ordered to show cause why she should not be held in contempt).

4.  Within the Second Circuit, nearly all criminal contempt convictions in recent decades have been premised on conduct occurring outside the discovery phase, such as violations of

---

articulated in *Young*, 481 U.S. at 801.  *See* Fed. R. Crim. P. 42 advisory committee's note to 2002 amendment.

injunctions, consent decrees, or restraining orders.[5]  Criminal contempt for discovery-related conduct has been reserved for individuals demonstrating "recalcitrance" and "repeated violations of court orders."  *In re Grand Jury Proceeding*, 971 F.3d 40, 53 (2d Cir. 2020); *see also United States v. Brennerman*, 816 F. App'x 583 (2d Cir. 2020) (summary order) (criminal contempt conviction affirmed for an individual who controlled an entity that defied post-judgment discovery orders); *Donziger*, 2021 WL 3141893, at *1 (S.D.N.Y. July 26, 2021) (convicting since-disbarred attorney of criminal contempt predicated on repeated violation of court orders for the purpose of advancing his interests in civil litigation) (appeal pending at No. 21-2486 (2d Cir.)).[6]

5.  In addition, our research has disclosed no prior prosecution for criminal contempt involving a single breach of a protective order by a non-party, nor any in which the breach was for reasons unrelated to personal gain or securing an advantage in litigation, much less any in which the breach was for the purpose of protecting children.  Given those substantial mitigating circumstances, and given that Mr. Fawcett's conduct will necessarily have a profound professional and financial impact on him—especially if the Court bars Mr. Fawcett from further participation in the MDL—we respectfully submit that the principle of restraint weighs powerfully against a Rule 42 request for prosecution in the case at hand.

---

[5] *See, e.g., United States v. Vale*, 596 F. App'x 34 (2d Cir. 2015) (summary order) (criminal contempt conviction for violating preliminary injunction); *United States v. Buczek*, 531 F. App'x 105 (2d Cir. 2013) (summary order) (criminal contempt conviction for violating bail condition).

[6] Similarly, a recent criminal contempt prosecution in the Southern District of New York involved a defendant who, while awaiting trial for disclosing classified information to WikiLeaks (among other offenses), disclosed additional classified materials in violation of the protective order that governed his criminal case.  *United States v. Schulte*, S2 17–cr-548 (PAC), 2020 WL 534508, at *1 (S.D.N.Y. Feb. 3, 2020).

6.  In addition, it is relevant that the facts that would form the basis for a Rule 42 request for prosecution are known because Mr. Fawcett admitted them in his Declarations.  Mr. Fawcett understands that his Declarations do not absolve him of responsibility for his actions.  At the same time, the fact that Mr. Fawcett came forward and acknowledged what he did further weighs against a Rule 42 request for prosecution.

7.  We respectfully urge the Court to conclude, based upon the principle of restraint and the particular circumstances of this case, that civil sanctions are the most appropriate remedy for Mr. Fawcett's conduct.

Dated:  New York, New York
        November 24, 2021

                        LANKLER SIFFERT & WOHL LLP


                        By: */s/ Michael Gerber*
                            Michael Gerber (mgerber@lswlaw.com)
                            Helen Gredd (hgredd@lswlaw.com)
                            Gabrielle Friedman (gfriedman@lswlaw.com)
                            Brice Jastrow (bjastrow@lswlaw.com)

                            500 Fifth Avenue
                            New York, NY 10110
                            (212) 921-8399

                            *Attorneys for Non-Party John Fawcett*