# EXHIBIT AB

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001
03-MDL-1570 (GBD) (SN)**

**EXPERT REPORT OF VICTOR D. COMRAS**

Attached hereto, as Appendix A, is my true and correct resume, including a representative list of my various publications, articles and presentations.

## *Methodology*

In putting together this report, and formulating my opinion, I have relied on my professional experience developed over the course of my career at the U.S. State Department, the United Nations, and as a private consultant in dealing with terrorism financing, money-laundering, and sanctions-circumvention cases. I have relied also on the use of my forensic accounting, social science research, and evaluation skills in reviewing documentary evidence. I have employed secondary source analysis methodology [6] and used my AML/TF[7] practitioner's skills in evaluating the relevance, reliability and accuracy of secondary sources such as concurrent press reports, intelligence reports, testimonies, and other publicly available source information.  In each case I have identified the secondary source, author, and date.

I have also sought to evaluate secondary source information against disclosed and discovered related documentation.  This has involved the use of forensic accounting methodologies to evaluate related financial and transactional activities and documents. Forensic accounting involves the use of accounting, auditing, and investigative skills to examine the financial activities of an individual or business.  It involves analyzing the financial aspects of commercial and other types of transactions involving the transfer of financial assets. It includes the tracing of funds, asset identification, and the evaluation of, or absence of, record keeping and due diligence reviews. My objective has been to identify and evaluate "red flags," where present, signaling the potential or likelihood of terrorism financing activities. The criteria I used to identify and evaluate such "red flags" was developed by several public and private financial institutions, including FATF,[8] EGMONT,[9] the International Monetary Fund, The Wolfsberg Group[10], and The Federal

---

[6] Secondary analysis is a research method that involves analyzing data collected by someone else.

[7] Anti-Money Laundering/Terrorism Financing.

[8] The Financial Action Task Force which is located within the OECD headquarters.

[9] The Egmont Group of Financial Intelligence Units is an informal network of 164 national financial intelligence units ("FIUs") that collect information on suspicious or unusual financial activity from the

Financial Institutions Examination Council ("FFIEC").[11]  A number of these "red flag" indicators are discussed below.

## Summary Conclusions

From its inception, al Qaeda and its leader, Osama bin Laden, relied heavily on the provision of funds by individual donors, charities, and businesses to finance al Qaeda's organizational, indoctrination, recruitment, and operational activities. This involved the establishment of a complex and sophisticated network that intertwined Islamic charities, banks, shell companies, businesses, and business dealings to channel and mask such financial support and transactions, and to insulate the group's resource supporters and donors from suspicion. The bulk of these donations originated from wealthy Saudi Arabian donors, including members of the Saudi Royal family, those closely connected to them, and the charities they were associated with. Many of these people also held senior managerial government positions.

Based on my work as a member of the UNSC Al Qaeda and Taliban Monitoring Group, my independent research, and a review of documents provided to me, it is my expert opinion that Yasin Kadi and Wael Julaidan, both Saudi nationals, assisted in the establishment of this financial network and used its complex mechanisms to channel funds for al Qaeda's organization and its activities. These funds were provided to Osama bin Laden and al Qaeda through, and with the cooperation of, officials within or closely associated with the Saudi Government. This financial support predated and continued after bin Laden's declarations of war on America.[12] The support assisted bin Laden and al

financial industry and other entities or professions required to report transactions suspected of being money laundering or terrorism financing.

[10] The Wolfsberg Group is an association of thirteen global banks which aims to develop frameworks and guidance for the management of financial crime risks. *See* https://www.wolfsberg-principles.com/sites/default/files/wb/pdfs/wolfsberg-standards/8.%20Wolfsberg-Correspondent-Banking-Principles-2014.pdf.

[11] The FFIEC was established pursuant to title X of the Financial Institutions Regulatory and Interest Rate Control Act of 1978 ("FIRA"), Public Law 95-630.  Its website is https://www.ffiec.gov/about.htm.

[12] In 1996, Osama bin Laden issued his "Declaration of War against the Americans Occupying the Land of the Two Holy Places" putting "Muslim brethren all over the world generally and the Arabian Peninsula specifically" on notice of his intention to employ "Mujahidin military attacks" against the United States and its interests overseas.

separately in another bank – Bank Al Muzare, which translates into "Farmers Bank."[19] The Farmers Bank was ostensibly intended to act as a conduit for financing local farming activity. These entities subsequently invited and obtained foreign investment and engaged in business transactions with outside sympathetic individuals. Many of these individuals were subsequently designated Specially Designated Global Terrorists ("SDGT") by the U.S. Treasury Department and the United Nations Al Qaeda and Taliban Sanctions Committee for supporting terrorist organizations, such as al Qaeda.[20]

The covert financial network constructed by Osama bin Laden and al Qaeda also involved the use of compromised or complicit charities. To a large measure these charities shared several common characteristics that made them particularly vulnerable to misuse for terrorist financing. They benefited from Islamic tenets of "Zakat"[21] or "Sadaqa,"[22] were well funded, and had a global presence that provided a framework for national and international operations and financial transactions. In most cases they had branches in or near areas in which al Qaeda operated and were able to engage locally in various humanitarian, social, or educational projects. As shown below Yasin Kadi's Muwafaq Foundation reflected these characteristics and Kadi actively engaged with these tainted companies and entities while channeling funds to bin Laden and al Qaeda through his own business entities and his Muwafaq Foundation charity.

Many of these transactions involved the use of "black-washing" techniques to siphon off funds for use by al Qaeda and other terrorist organizations.[23] This was done, for example, by cash payments, false invoicing, under-reporting actual sales and/or under-

---

invested $50 million in the bank." U.S. State Department Fact Sheet dated August 14, 1996.

[19] A/k/a The Farmers Bank for Investment and Rural Development.

[20] Adel Abdul Jalil Batterjee, a major stockholder and the Bank's chairman, was designated as an al Qaeda financier and SDGT by the U.S. Treasury Department on December 21, 2004. The U.S. Treasury Dept. Press Release JS 2164 stated "Adel Batterjee was ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida."

[21] An obligatory payment made annually under Islamic law on certain kinds of property and used for charitable and religious purposes.

[22] Sadaqa is a voluntary donation beyond the zakat obligatory payment.

[23] Black washing or money darkening is the term used to describe taking legitimate financial assets and, through a series of transactions used to obscure the trail, make the funds available to terrorist operations.

factorization. The related losses incurred from such activities would then be written off as unprofitable deals or investments gone sour. Such activities were further obscured by the indirect and often convoluted routing of related financial and trade transactions.

According to a U.S. Justice Department brief on the subject:

> "[Al-Fadl][24] understood from conversations with bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money for al Qaeda operations would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor or the needy."[25]

Many of these charities, as was the case with Muwafaq, also conducted business activities for their own account or were closely associated with extensive business networks run by potentially sympathetic donors. Such arrangements provided an additional, ostensibly legal, channel for transferring funds from abroad.

While bin Laden was in Sudan, al Qaeda was involved in a series of terrorist attacks. In 1992, the group bombed two hotels in Yemen, targeting U.S. troops en route to Somalia. Al Qaeda supported the Somali warlords who attacked U.S. military forces on a humanitarian mission in Mogadishu in 1993. Al Qaeda was also believed to have taken part in an assassination attempt against Egyptian President Mubarak. These attacks brought great international pressure on the Sudanese government to turn bin Laden over to U.S., E.U. or other international counter terrorism authorities. Instead of turning bin Laden over, Sudanese officials chose to ask bin Laden to leave Sudan, while allowing other al Qaeda operatives to remain.  A State Department report from 1998 that was published after the U.S. embassy bombings noted that "Sudan continued to serve as a meeting place, safe haven, and training hub for a number of international terrorist groups, particularly Usama bin Laden's al-Qaida organization."[26]

---

[24] Jamal Ahmed al-Fadl, ex bin Laden aide. As noted below, Wael Julaidan was also cited by Fadl as being a funder of al Qaeda.

[25] Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *United States of America v. Enaam M. Arnaout*, United States District Court Northern District of Illinois, Eastern Division, Case No. 02 CR 892 (January 6, 2003), at p 25

[26] U.S. State Department Patterns of Global Terrorism, 1998 (1999).

core group of financial facilitators who raised money from a variety of donors and other fund raisers, primarily in the Gulf countries and particularly Saudi Arabia…. In addition, entire charities …wittingly participated in funneling money to al Qaeda."[31] This included the Muwafaq Foundation.[32]

Coming out of Sudan, the tentacles of al Qaeda began to reach beyond the Middle East into numerous conflict areas including, *inter alia*, the Balkans, the horn of Africa, Africa south of the Sahara, and Southeast Asia. As noted by the United Nations Al Qaeda and Taliban Sanctions Committee report in December 2003:

> "Al-Qaida has spread over past decades, from a movement which had its origins in the "holy war" against the Soviet occupation of Afghanistan into a global terrorist network, it has promoted a doctrine which provides for a battleground where aspiring Jihadis can undertake their misguided duty." [33]

## Yasin Kadi

Yasin Abdullah Ezzedine Kadi[34] is a wealthy Saudi businessman with close ties to the Saudi Royal family.  Born in Cairo, Egypt in 1955, he moved to Jeddah, Saudi Arabia in his early youth. He studied architecture at schools and universities in Saudi Arabia, Egypt and the United States. Upon returning to Saudi Arabia, he worked for a hospital supply company and in 1978-1979, he took up a training position with the Skidmore, Owings & Merrill's offices in Chicago. In Chicago, Kadi met bin Laden and provided him assistance by recruiting for the bin Laden family business.[35] He returned to Saudi Arabia in 1981 as Vice President of Jamjoom Hospital Supplies, a company started by his father.[36]

---

[31] 9/11 Commission Report pp. 170-71. See also Staff Monograph on Terrorist Financing, p. 21: "al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses…., entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization, including access to bank accounts."

[32] See infra at pp. 34-42

[33] UN Security Council Monitoring Group Report #2, Doc S2003/1070.

[34] Kadi's name is often spelled Qadi or al-Qadi. I will use Kadi in this report except for quotations.

[35] Kadi 2944.

[36] Statement of Yassin Abdullah Kadi In the Matter of Yassin Abdullah Kadi and the Office of Foreign

Kadi allegedly became associated in the 1980's with members of the Muslim Brotherhood and supporters of the Makhtab al-Khidamat, also known as the Afghan Services Bureau. The Makhtab al-Khidamat was co-founded in around 1984–1985 by Abdullah Azzam and Osama bin Laden to raise funds and recruit foreign mujahidin for the war against the Soviets in Afghanistan. The Makhtab network, often referred to as the precursor of al Qaeda, continued as a vehicle for recruiting and raising funds for al Qaeda even after the Soviet troop withdrawal.[37] Yasin Kadi became further acquainted with Osama bin Laden during this period.[38]

Yasin Kadi maintained and continued to develop multiple associations with individuals and entities associated with bin Laden and al Qaeda. This included regular business and social contact with a number of known financial facilitators, donors and supporters linked to al Qaeda and other jihadi groups. His associates included, inter alia, Wael Julaidan, Amir Mehdi, Chafiq Ayadi and Abdul Latif Saleh[39]. As detailed below, each had been linked with Makhtab al Khidamat and/or were subsequently implicated in the financing of al Qaeda and other jihadi groups. He continued these relationships despite their known connections to al Qaeda and terrorism financing. To avoid red flags, Kadi tried to mask many of these questionable dealings as business or humanitarian related transactions, using bearer checks, shell companies, and circuitous routings.

---

Assets Control Dated December 19, 2002. ("OFAC Statement")

[37] Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *United States of America v. Enaam M. Arnaout*, United States District Court Northern District of Illinois, Eastern Division. Case No. 02 CR 892 (January 6, 2003), at p 19: "By way of background, Usama bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ("MK") (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ('Abu Hassan al Madani') of the International Islamic Relief Organization … which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."

[38] Sources told the FBI that they saw Yasin Kadi more than once at bin Laden/al Qaeda guesthouses in Peshawar and at the Dawa Organization Guesthouse in Khartoum. Kadi 2944

[39] Deposition of Yassin Abdullah Kadi, In the Matter of: In Re Terrorist Attacks, July 10, 2018 ("Kadi Deposition"), p. 289, lines 1-10.

Muslim World League, ("MWL") Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), and the Saudi Red Crescent ("SRC"), among others. NCB also operated as a correspondent bank for the Sudan-based Al Shamal Islamic Bank[43], which had extensive activities in support of al Qaeda as noted below. The name Mahfouz was also found on the so-called "Golden Chain" list of al Qaeda's principal financiers.[44]

According to the 9/11 Commission Staff Monograph on Terrorist Financing, "the Saudi government turned a blind eye to the financing of al Qaeda" before September 11, 2001, and "the Saudis did not begin to crack down hard on Al Qaeda financing in the Kingdom until after the May 2003 al Qaeda attacks in Riyadh."[45]

Together, Yasin Kadi and Khalid bin Mahfouz used their resources to propagate a radical Islamic theology that contributed to the virulence and capabilities of such terrorist organizations as al Qaeda.

Kadi stated in his memorandum to OFAC that he had developed a professional relationship with Khalid bin Mahfouz in 1990 concerning the introduction of Islamic banking products at NCB.[46] Shortly afterwards, in 1991, according to Kadi, Mahfouz asked Kadi to establish and lead the Muwafaq Foundation in order to undertake relief, educational and healthcare projects, job creation, and training.[47]  Mahfouz provided the foundation's initial $5 million donation. Kadi indicated that he also initially contributed at least $2 million to the foundation.[48] The organization was co-directed at that time by Kadi and Khalid bin Mahfouz's son, Abdulrahman bin Mahfouz, and was subsequently registered as a charitable trust in Jersey on May 31, 1992.[49]

---

[43] Al Shamal Bank Website.

[44] According to the 9/11 Commission's report, Saudi individuals and other financiers associated with the Golden Chain enabled bin Laden and al Qaeda to replace lost financial assets and establish a base in Afghanistan following their abrupt departure from Sudan in 1996. These activities were facilitated in part, the report argues, by the "extreme religious views."

[45] 9/11 Commission Staff Monograph on Terrorist Financing, p 24, footnote 14.

[46] OFAC Statement p. 6

[47] Kadi Deposition, pp. 61-62

[48] Kadi Deposition, p. 62, lines 16-25.

[49] Jersey registry regulations, unlike the UK mainland, make no provision for oversight into the registered

Toward the end of Julaidan's tenure as head of Saudi Red Crescent in Pakistan, Abdullah Naseef, the Secretary General of the Muslim World League, met with bin Laden and others to plan the assistance that the MWL and the IIRO could provide to bin Laden and al Qaeda.  During that meeting, it was agreed that attacks would be launched from MWL offices:  "And if he is being subjected to any pressures, let it be a secret (*agreement*) in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from the (*these offices*) ….).[77]  Naseef and bin Laden further noted that they would need to find another organization to protect the passports of the mujahideen fighters as Julaidan would be leaving his Saudi Red Crescent post.[78]

In 1989, after the assassination of Abdullah Azzam, Julaidan was appointed director of the Muslim World League in Pakistan and served until 1994. Julaidan also worked closely with the International Islamic Relief Organization ("IIRO")[79] bureau in Peshawar, run by a senior Egyptian al Gama at Al-Islamiyyah leader, Abu Talaat-Qasimy (aka Talaat Fouad Qassem).

The IIRO was established ostensibly to provide humanitarian assistance to refugees from the Afghan war. However, this "humanitarian" facade became a cover for the charities channeling covert military and financial assistance to various Arab-Afghan militant groups fighting both in Afghanistan and Bosnia, including al Qaeda. By 1992, the Peshawar IIRO was also actively engaged in sending recruited Afghan fighters to Bosnia.

During this time, Julaidan as head of the Saudi Red Crescent in Pakistan helped his associate Aqeel Abdulaziz al Aqeel[80] set up the Al Haramain Islamic Foundation

---

the Saudi Red Crescent, the Muslim World League, and the International Islamic Relief Organization, all affiliated at some point with Julaidan, were principal sources of support for al Qaeda.

[77] FED-PEC 212276-281 (MWL/IIRO letterhead).

[78] *Id.  See also* FED-PEC 212309-310 and 212164-167 (Julaidan was also responsible for the procurement of weapons for bin Laden.).

[79] The IIRO had been founded by the Muslim World League in 1978 and serves as a major financial sub-branch of the Muslim World League.  It reportedly receives 70% of its charitable funding directly from the Saudi government.  *Canada v. Jaballah*, Reasons for Order, DES-6-99, Federal Court of Canada. November 2, 1999, p. 13.

[80] Aqeel, under Julaidan's supervision, ran a sub-office of the SRC in Quetta, Pakistan. BUR-PEC 75113-75133

In separate interviews, Jamal al-Fadl also provided the following information to the FBI concerning Julaidan's connection to the IIRO-Pakistan office, and the use of the office to funnel funds from Yasin Kadi to purchase weapons for al Qaeda:

> "Abu al Hassan listed under the title 'Jihad support.'  Source advised that Abu al Hassan was from Madina, Saudi Arabia and source referred to him as Abu al Hassan al Madani.  Source advised that Abu Al Hassan's true name was Wael Jelaidan.  Source explained that he was of Saudi Arabian descent.  Source was aware that Abu al Hassan al Madani ran the Pakistan office of the International Islamic Relief Organization which source also referred to as IGASA.  Source explained that the International Islamic Relief Organization fell under the Rabita al Islami organization which source also knew to use the name MWLKA."[91]

> "The source [al-Fadl] advised that Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group.  These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi.  The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989.  According to [Jamal al Fadl], this office was located inside the offices of the Islamic Relief Organization (IRO).  The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani.  According to the source, Julidan was one Bin Laden's closest friends at the time.  The source was told by Abu Fadl Al-Makki that Al-Kadi would bring donated money from the Gulf area, mainly Saudi Arabia, to Al-Qaida which was used to purchase weapons in Jalalabad, Afghanistan."[92]

In 1994, with Afghanistan embroiled in a civil war between competing Islamist factions, and as Pakistan was becoming less welcoming to al Qaeda fighters, Julaidan returned to Saudi Arabia. Bin Laden had already departed for Sudan, and many of his al Qaeda jihadists had already begun to scatter to other battlefields including Sudan, Iraq, the Horn of Africa, and the Balkans. The Saudi government was increasingly reticent to involve itself in the inter-Afghan fighting and focused greater interest and involvement in the intensifying Bosnia war.

---

[91] PEC-KSA 329-352 at 335.

[92] PEC-KSA 2133-2134.

Despite the company's continued series of losses, Euro-invest loaned substantial funds to KA Stan, Ayadi, and some $6200 as a personal loan to Julaidan.[130] There are no indications that the loan was ever repaid. The rationale for these transactions is never presented. These are precisely the kind of blind transactions that international financial organizations warn are indicative of likely terrorism financing.

Kadi also engaged in a number of other questionable financial transactions with Julaidan. For example, Kadi acknowledged transferring some $1.25 million to Julaidan's personal account between February and August 1998.  These transfers were made from Kadi's Karavan Development Company in Albania, ostensibly to fund housing units for Al Emam University in Sanaa, Yemen. The Al Emam project had been contracted to the Maram company which while controlled by Julaidan, held its own accounts. Transferring money intended for this project to Julaidan's private account was irregular, raising both money laundering and potential terrorist financing issues. These suspicions were exacerbated by a subsequent accounting indicating that up to $300,000 of these funds remained unaccounted for. More about this Maram project below.

## The Muwafaq Foundation and Yasin Kadi's Business Dealings

As noted above, the Muwafaq Foundation was established in Saudi Arabia in 1991 with a starting contribution from Khalid bin Mahfouz.[131] The organization was co-directed by Kadi and Khalid bin Mahfouz's son, Abdelrahman bin Mahfouz, and registered as a charitable trust in Jersey on May 31, 1992.[132] The board of trustees, in addition to Kadi and Abdurrahman bin Mahfouz, included Rais bin Mahfouz, Talal Badkook, Mohamed Ali Bin Eid, and Abdul Gani Al-Khariji. However, the Board relegated to Kadi the actual running and operation of the foundation.

---

[130] Kadi 51469.

[131] Kadi Deposition, p. 62, lines 6-15.

[132] *Id.* at 10-12. According to an investigative report in the Guardian (Sept. 25, 2001), Jersey does not have a charities commission and does not appear to maintain any public record of the Muwafaq Foundation. Officials there say if it was structured as a financial trust, it would not require to be registered at all.

> Khartoum. Bin Laden also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf."[138]

Muwafaq began its operations in Sudan in 1992 with its principal office in Khartoum. The charity operated in and around Port Sudan and Khartoum, as well as at a number of so-called "Peace villages" and displaced persons camps controlled by the National Islamic Front (NIF). Muwafaq's projects were largely developed in conjunction with the Turabi Government's "Peace and Development Foundation (PDF)," and the NIF.[139] The government of Sudan contributed substantial sums raised from government collected "zakat." By 1993, the NIF and Sudan's Islamic Relief Agency had taken full control of the Peace and Development Foundation and were exercising considerable influence on Muwafaq. The Peace and Development Foundation proved to be an effective channel for the NIF to spread its radical Islamic influence, along with arms and funds, throughout the horn of Africa, and particularly to Somalia and Ethiopia where Muwafaq also maintained branches.[140]

The American Embassy in Khartoum reported at that time that the National Islamic Front was using a number of charities, including Muwafaq, to promote its radical, anti-Western version of Islam. "It promotes its ideology abroad by training and helping foreign Islamist and by proselytizing through Islamic non-governmental organizations"[141] The embassy also reported that the Muwafaq Foundation "purports to be an international Islamic non-governmental organization…[with ] markedly pro- National Islamic Front sympathies."[142] The links between the NIF and Muwafaq were so tight that the U.S.

---

[138] CIA - Usama Bin Laden: Islamic Extremist Financer, 1996 from the National Security Archive FOIA- https://nsarchive2.gwu.edu/NSAEBB/NSAEBB343/.

[139] Burr, Millard & Collins, Robert, *Revolutionary Sudan: Hasan Al-Turabi and the Islamist State, 1989-2000*, p. 89.

[140] *Id.* p 89-90.  Muwafaq also opened an office in Mogadishu and was reportedly engaged in providing weapons and ammunition to Islamists in the city.

[141] U.S. State Dept cable, *Sudanese Mischief-Making: Does it Matter*?, Khartoum 06366, Dec 14, 1994 via Wikileaks.

[142] U.S. State Dept cable, *Anatomy of an Islamist NGO*, Khartoum 04913, Sept 21, 1994.

Post-Communist Albania, Bosnia, and Kosovo offered fertile ground for Islamic charities, such as Muwafaq, seeking to provide economic assistance while propagating Salafist Islamic doctrine. Albania, for example, lacked the capacity to regulate or oversee the activities of the Islamic nongovernmental organizations and businesses flooding in. This made it an enticing environment for Kadi, but also for Islamic terrorist organizations, including al Qaeda[194] and brethren terrorist groups, which came there to solicit support, assist local mujahidin, and recruit new members. A nexus quickly developed between a number of these charities and terrorist organizations.[195] They used Albania as a bridge to promote their terrorist activities and operations throughout the Balkans and overseas.

Kadi was a founding shareholder of the Arab Albanian Islamic Bank, whose other shareholders were companies owned by himself and Saudi Prince Mohamed al Faisal. Kadi, Muwafaq, and Kadi's companies and affiliated persons held over 40 accounts at this bank. One of the affiliated persons, Abdul Latif Saleh, was appointed as Muwafaq Albania's local director. According to the independent Albanian newspaper *Shekulli*, Albanian police subsequently opened an investigation into the bank's activities on evidence that it was being used by terrorists to transfer large amounts of money.[196] Kadi opened account #101 at the Arab Albanian Islamic Bank, and in the first two weeks just over $600,000 was transferred into the account.[197] The United Nations stated that "Bin

---

March 4, 2008 in the city of Doboj, Bosnia-Herzegovina. See also Kadi 79406.

[193] Nawaf al Hazmi and Khalid al Mihdhar hijacked American Airlines Flight 77 which crashed into the Pentagon.  CIA Report, The Plot and the Plotters, June 2003, pp. 49-50.

[194] According to the London Independent, bin Laden was reported by Interpol to have visited Albania to attend a 1994 meeting. "It was during this meeting that many structures and networks were established for propaganda and fund raising activities and for providing the Algerian armed groups with logistical support," The Independent, Colin Brown, *Bin Laden linked to Albanian drug gang*, October 21, 2001.

[195] "Terrorist organizations such as al-Qaeda, Egyptian Islamic Jihad (EIJ), the Algerian Islamic Salvation Front (FIS), and the Islamic Armed Islamic Group (GIA) used the cover of NGOs and charities to raise and distribute funds in Albania." Bala, Edward, "The Financing of Islamic Groups in Albania" in Freeman, M, Financing Terrorism, Case Studies (2012).

[196] Los Angeles Times, *10 Arrested in Anti-Terrorism Raids in Albania*, August 23, 1998.

[197] Kadi 45871.

money-darkening scheme centered on al Eman University.[217] All the principals involved in this project knew each other and bin Laden well.[218] Working with Yasin Kadi, they agreed that Kadi would provide the bulk of funding for a contract with Julaidan's Maram company ostensibly for the purchase and installation of pre-fabricated barrack-style student housing for the University.[219]

Between February and May 1998, Kadi transferred some $1.25 million through his Karavan company in Turkey to Julaidan's Faisal Finance Switzerland account for this project. There was also a $250,000 transfer from the Saudi National Commercial Bank to Julaidan's Faisal Finance account in June 1998. The records show that Julaidan transferred $850,000 of these funds to Maram's Faisal Finance Turkey account and another $300,000 to his own personal account. While Maram did purchase Turkish-made, pre-fabricated houses and other needed equipment, and shipped and installed them, the expenditures and actual payments recorded in the ledgers indicate that Maram actually only covered a small percentage of the actual costs from the funds at its disposal for this purpose. This indicates that the remainder had to have been covered from other non-Maram sources. Between $926,000 and $1.28 million of the Kadi/Karavan provided funding for this transaction remained unaccounted for and was likely skimmed off for other purposes, including for al Qaeda.[220]

The Maram Company was closed and liquidated in 2002.  Following OFAC's designation of Julaidan, Swiss authorities froze his Faisal Finance account.[221]

## Kadi Designated a Terrorist Supporter

Yasin Kadi was among the first to be designated by the U.S. Treasury Department as a terrorism financier after the 9/11 Attacks. On October 12, 2001, Yasin Kadi was listed by the Office of Foreign Assets Control ("OFAC") as a Specially Designated National

---

[217] Kadi 4273-4278, 12169.  Kadi's uncle, Omar Zubayr and Zindani had become acquainted when Zindani was a guest lecturer at King Abdul Aziz University in Jeddah, while Zubayr was its president.

[218] The three knew each other well having traveled together on several trips to Pakistan. Kadi 2229.

[219] Kadi 4273-78.

[220] Kadi 2191-2194.  Kadi 15390-15399.

[221] WJ 013.

resources in order to impede, impair, isolate and incapacitate the terrorist threat from Al-Qaeda, Usama bin Laden and the Taliban, and to encourage a change of conduct on the part of those who are members of these groups or 'associated with' this individual or these groups."[228] His presentation to the Sanctions Committee maintained that, in the present circumstance and at that time, Yasin Kadi no longer posed such risks.

Similarly, the United States Treasury Department's eventual removal of  Yasin Kadi from its SDN list in November 2014 stating only that "the circumstances resulting in Mr. Kadi's designation as an SDGT **no longer apply.**"(emphasis added) Kadi was further cautioned that "OFAC may consider re-designating Mr. Kadi should it become aware of information indicating that **he has resumed** the activities that resulted in his designation as an SDGT or that he has otherwise engaged in activities that would make him subject to designation pursuant to Executive Order 13224 or other authorities administered by OFAC."[229]

## Conclusion

The attack on America on 9/11 was well-planned, prepared, and perpetrated by a very sophisticated, well-organized, well-established and well-financed al Qaeda terrorist organization. From its inception, al Qaeda and its leader, Osama bin Laden, had benefited from the provision of funds by governments, individual donors, charities and businesses that financed its organizational, indoctrination, recruitment and operational activities. They were the enablers that allowed al Qaeda to gain strength and spread, to indoctrinate and recruit, and to plan and execute terrorist attacks. Yasin Kadi and Wael Hamza Julaidan were prominent among these enablers. They used their respective NPO, and business activities to channel funds to al Qaeda and other terrorist groups. Yasin Kadi and his circle of friends, colleagues and business associates, including Wael Hamza Julaidan, knowingly helped promote the radical Islamic ideology and resources that sustained them.

---

[228] *Id*.

[229] Kadi 103660 - OFAC letter re: Delisting (undated).

The financial network developed by al Qaeda and its supporters was sophisticated, complex and covert. Much of this financing was channeled through Islamic charities able to raise funds from anonymous rich donors seeking to hide their identity. They also benefited from the collection of "zakat" and "sadaqa." While these charities often did actively engage in legitimate humanitarian, developmental and social work, they had a double purpose. They provided a surreptitious channel for passing funds to support al Qaeda and brethren terrorist groups. Muwafaq was such a charity. It precisely fit the model of a terrorism financing charity as described by FATF experts: a service charity operating in close proximity to conflict areas where the local population provided sympathy, cover and support.

Many of Yasin Kadi's activities through his Muwafaq Foundation and personal and business transactions raised the "red flags" developed by FATF and other counter-terrorism financing groups, including:

1. Parties to the transaction came from countries known to support terrorist activities and organizations.

2. The funds were generated by a business located in a high-risk area that are owned or involving persons of some relations to those terrorists they may seek to support.

3. The parties have channeled funds through false corporations and shell-companies.

4. They have used a series of complicated transfers of funds as a means to obfuscate the source and intended use of the funds.

5. Multiple accounts were used to collect and funnel funds to a small number of foreign beneficiaries, both persons and businesses, particularly in higher-risk locations.

6. Multiple foreign bank accounts were used.

7. A person or persons involved in the transaction were associated with an individual on the United Nations 1267 Sanctions list.

8. Media reports have alerted the public to the possibility that an account or person involved is believed to be linked to known terrorist organizations.

9. The parties have used nominees, trusts, family member or third-party accounts to make the transfers.

57

substantially to al Qaeda's ability to launch terror attacks against Americans, including the September 11, 2001 terror attacks in the United States.


Victor D. Comras


Executed this 29th day of October, 2020