# EXHIBIT AC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:  *All Actions*

**EXPERT REPORT OF EVAN FRANCOIS KOHLMANN**

**I.**  **Pedigree**

1.      My full name is Evan Francois Kohlmann.  I am a private International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements.

2.      I hold a degree in International Politics from the Edmund A. Walsh School of Foreign Service (Georgetown University), and a Juris Doctor (professional law degree) from the University of Pennsylvania Law School.  I am also the recipient of a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University.  I currently work as the co-founder and Chief Innovation Officer at Flashpoint Global Partners, a New York-based business risk intelligence firm with branch offices in Washington D.C. and Dublin, Ireland. I additionally serve as an on-air analyst for NBC News in the United States.  I am author of the book <u>Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network</u> (Berg/Oxford International Press, London, 2004), which has been used as a teaching text in graduate-level terrorism courses offered at such educational institutions as Harvard University's Kennedy School of Government, Princeton University, and the Johns Hopkins School of Advanced International Studies (SAIS).

3.      As part of my research beginning in approximately 1997, I have traveled overseas to interview known terrorist recruiters and organizers (such as Abu Hamza al-Masri) and to attend underground conferences and rallies; I have reviewed thousands of open source documents; and, I have amassed one of the largest digital collections of terrorist multimedia and propaganda in the world.  The open source documents in my collection include sworn legal affidavits, original court exhibits, video and audio recordings, text communiqués, eyewitness testimonies, and archived Internet websites.  I have also personally developed computer software and database applications in PHP/MYSQL format designed to draw out this data and provide statistical trends and models to human analysts.

4.      I have testified on twelve occasions as an expert witness in jurisdictions beyond the United States—including the United Kingdom, Denmark, Australia, Switzerland, and Bosnia-Herzegovina.

- The money and other support that was channeled to Al-Qaida through Saudi-based dawah organizations fueled Al-Qaida's development – meaning, the Saudi-based dawah organizations were essential elements in Al-Qaida's engine. Without this fuel, Al-Qaida would not have been a global threat, nor capable of executing sophisticated, elaborate terrorist attacks on a global scale—including the September 11 terrorist attacks on the United States.

- Financial irregularities and atypical accounting practices used by these Saudi-based dawah organizations are not bugs, but rather features of these groups—and are consistent with typical terrorist financing modes and methodologies.

- The organizational and financial structures of the MWL, IIRO, and WAMY are evidence that their material support of al Qaeda and affiliated organizations was conducted with the awareness and knowledge of the senior officials who headed those organizations.

## V.   Discussion of Professional Opinions and Conclusions

18.     My professional opinions, as an International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements, regarding the role of Saudi state-sponsored dawah organizations in sponsoring acts of violence, the nature of the financial irregularities evidenced by these organizations, and the degree to which various far-flung regional offices were under the control and oversight of senior administrators in the Kingdom of Saudi Arabia, all of which I hold to a reasonable degree of certainty, are outlined in the sections and paragraphs that follow in this expert report. I have been compensated at a rate of $225/hour for my work on this report. Attached as Exhibit A to this report is a list of materials on which I relied in forming my opinions stated in this report, in addition to relying on my own personal recollections, involvement, and experience.

## VI.   Evidence of the Involvement of Saudi "Charities" in Financing and Directing Terrorist Activities

19.     The roots of the contemporary Al-Qaida terrorist financing network can be directly traced back to lessons learned by Arab-Afghan fighters during the early days of the Soviet-Afghan jihad nearly two decades ago. As the 1980s drew to a close, thousands of idealistic Islamic fundamentalist volunteers arrived in Pakistan, often with no local guide or requisite accommodations. At the time, several wealthy Arabian Gulf charitable organizations, under the guise of aiding Afghan and Pakistani refugees, stepped forward to help channel the jihadi recruits where they were most needed. These wealthy NGOs—sponsored by a number of prominent Gulf businessmen—provided weapons, guesthouses, and travel papers to needy members of the quickly-coalescing Al-Qaida movement. Medical ambulances belonging to the Saudi Red Crescent and other fundamentalist-run relief groups were even diverted to bring Arab mujahideen ("holy warriors") back and forth from

aware of IIRO's significant illegitimate and illegal activities that fund terrorist activity. We have been concerned about IIRO for many years now and have shared our concerns and information with the Government of Saudi Arabia on a regular basis."[178]

126.     Despite the designation of the IIRO's branch office in the Philippines, U.S. officials raised concerns with Saudi Foreign Minister Prince Saud Al-Faisal a year later in 2007 that the Saudi Ambassador to the Philippines, Muhammad Amin Waly, was involved "in terrorism facilitation, particularly his intervention to get two members of IIRO out of prison."[179]

127.     In 2009, the U.S. government continued to express concerns about the IIRO's Eastern Province office despite assurances from the Saudi government that it had shut down the office, warning "that money continued to be funneled overseas from the Eastern Province Branch."[180]

128.     Fahd al-Harbi, who supervised the IIRO's branch office in Indonesia at the time of the 2006 designation, claimed that he did not conduct any inquiries concerning the designation.  According to al-Harbi, he never spoke to IIRO Secretary General Adnan Basha, Abd Al Hamid Sulaiman Al-Mujil, or anyone at the local Saudi Embassy about the designation of the office.[181]  Al-Harbi said that no one in the Indonesia office was fired or disciplined following the designation.[182]

129.     Abdelhadi Daguit, the former MWL and IIRO official in the Philippines, similarly feigned ignorance when asked about the 2006 designation of the IIRO office during his deposition.  Daguit claims that despite being affiliated with the IIRO in the Philippines for many years at the time of the designation, he did not conduct any inquiry to determine whether the designation of the IIRO's office was proper, and did not conduct any inquiry to determine if the people he worked with had any information concerning the allegations that Abd Al Hamid Sulaiman Al-Mujil was tied to terrorists.[183]  Daguit further testified that he did not conduct any inquires to determine why the IIRO office bank accounts in the Philippines had been frozen, and did not ask anyone why the IIRO office closed its operations or why he stopped receiving a salary.[184]

130.     In connection with the present litigation, I understand that the IIRO has produced a number of auditor reports that it conducted of its branch offices across the Muslim world, many of which identify critical deficiencies in accounting practices and significant financial irregularities.

---

[178] FED-PEC 220571-220572.

[179] FED-PEC 220503-220505.

[180] PEC-KSA 2346-2349.

[181] Transcript, Deposition of Fahd Mohammad Sanad Alharbi (March 27, 2019), at p. 352.

[182] Transcript, Deposition of Fahd Mohammad Sanad Alharbi (March 27, 2019), at p. 356.

[183] Transcript, Deposition of Abdulhadi T. Daguit (June 27, 2019), at pp. 156-157.

[184] Transcript, Deposition of Abdulhadi T. Daguit (June 27, 2019), at pp. 156-161.

disappeared entirely. According to a sworn statement from FBI Agent Robert Wright, an accountant at BMI later called another FBI agent to discuss his concerns that "funds the accountant was transferring overseas on behalf of [BMI] may have been used to finance the embassy bombings in Africa."[154]

106.     In January 1997, IIRO's Northern Virginia offices run by Sulaiman Al-Ali were raided by FBI agents as part of a terrorism, money laundering and fraud investigation.  The individuals and organizations named in the Search Warrant included Sulaiman Al-Ali himself.[155]   In an online chat session posted on March 22, 2002, a former IIRO employee explained:

> "I used to work with International Islamic Relief Organization [in the U.S.]. This organization ended its work about three years ago. The reason was …a decision of the administrative council at that time…The investigation to which IIRO was subject was for its being an investor in a commercial organization in Chicago which was raided by the authorities for a background of supporting terrorism, and IIRO was a chief investor. What touched the company touched the organization."[156]

107.     According to the Philippine military's southern command, the IIRO local office in Zamboanga City is the prime coordinating center for the Abu Sayyaf Group (ASG), a coalition of secessionist Islamic militants in the southern region of the Philippines linked to Al-Qaida.  The Zamboanga office, established in 1992, was under the direct control and guidance of Mohammad Jamal Khalifa, brother-in-law of Usama Bin Laden.[157]

108.     Khalifa, known to be close to Usama, was detained by American law enforcement officials as he attempted to return from San Francisco to the Philippines on December 16, 1994.  Travelling with Khalifa on this occasion was Mohamed Loay Bayazid (a.k.a. Abu Rida al-Suri), one of the founders and key international operatives of Al-Qaida.

109.     After searching Khalifa's electronic organizer and personal address book, agents found entries for two telephone numbers of intimate associates of Ramzi Yousef, the convicted bombmaker in the February 1993 World Trade Center attack.   They also

---

[154] March 21, 2000, Sworn Statement of Special Agent Robert Wright obtained through the Free of Information Act.

[155] Attachment B In the Matter of the Search of: 360 S. Washington, 3rd Floor, Falls Church VA, USDC Eastern District of Virginia, Filed January 30, 1997.  See also IIRO 285529-285530 (October 16, 2002 letter from Sulaiman Al-Ali to IIRO Secretary General Adnan Basha describing the raid in 1997.).

[156] Islam Online chat session with Mohammad Omeish, March 22, 2002.

[157] See also PEC-KSA 294-295 (Notices authored by MWL Secretary General Dr. Abdullah Naseef and IIRO Director General Dr. Farid Y. Qurashi certifying that Mohammed Jamal Khalifa is "the Regional Director for the IIRO in South-East Asia" and "he is authorized to sign any agreement between the governments of South-East Asia Countries and the Muslim World League and the International Islamic Relief Organization."); FED-PEC 210798-210808 (IIRO's September 20, 1991 filing with the Philippines Securities and Exchange Commission establishing the IIRO branch office in the City/Municipality of Makati, Metro Manila under the leadership of Mohammed Jamal Khalifa.).

discovered documents on Khalifa "referring to the assassination of bishops and bombings of churches (at a time when evidence gathered in the investigation indicates that… others were planning to kill the Pope during a planned January 1995 visit to the Philippines and after churches had already been bombed in the Philippines in the preceding year)."[158]  Four days later, a State Department cable to the American Embassy in Khartoum, Sudan referred to IIRO administrator Khalifa as a "known financier of terrorist operations."[159]

110.    U.S. law enforcement officials were also able to recover a handwritten Arabic document from the luggage of Mohammad Jamal Khalifah which apparently represents a curriculum catalogue for an IIRO-sponsored school in the Philippines known as the Institute of al-Imam al-Shafi for Education (a.k.a. Dar al Imam al Shafi'i).  The catalogue indicates that the institute is headed by Mohammad Jamal Khalifa (a.k.a. Abu al-Baraa).  Advanced level courses at the institute included "Propaganda: introduction, its relation to jihad, illustrations of Islamic propaganda, Zionist hegemony over channels of propaganda…. Security of individuals, surveillance, how to escape surveillance, security of secret houses and secret documents, methods of information gathering on individuals… how to resist, importance of steadfastness and judgement to confession, methods of torture used in investigations."  An entire section of the curriculum is dedicated exclusively to "Jihad:" "Legal provisions for assassinations and kidnapping; Legal provisions for assassinate priests and Christians; Legal provision for bombing churches and places of worship; Legal provisions for martyrdom operations…. Assassinations: introduction, causes, methods, how to implement it; Explosives: types, how to put together simple explosives."  It emphasized the inclusion of "a round (training cycle) on weapons and explosives, 'full military training.'"[160]

111.    Following Khalifa's arrest, the Department of State's Coordinator for Counterterrorism, Philip C. Wilcox, Jr., submitted several letters to the immigration court in support of Khalifa's continued detention.  In a December 16, 1994 letter, Wilcox stated that "the United Stated Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the

---

[158] Sworn affidavit of FBI Special Agent Robert Walker.  United States of America v. Benevolence International Foundation, Inc.  April 29, 2002.  District of Illinois, Eastern Division.  Case number: 02CR0414.  See also 1996 Central Intelligence Agency report (FED-PEC 104843-104856) ("The former head of the IIRO office in the Philippines, Mohammad Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin.  Another high-ranking official in the Philippines leads Hamas meetings, and the majority of Hamas members in the Philippines are employed by the organization.").

[159] Sworn affidavit of FBI Special Agent Robert Walker.  United States of America v. Benevolence International Foundation, Inc.  April 29, 2002.  District of Illinois, Eastern Division.  Case number: 02CR0414.  See also December 2004 U.S. State Department diplomatic cable (PEC-KSA 2275-2276).

[160] FED-PEC 202848-202852.  See also MWL 8434-8453 (IIRO publication identifying the Dar al Imam al Shafi'i as one of several schools in the Philippines supported by the IIRO's Social Services Division); FED-PEC 211425-211465 (Philippines Intelligence report stating that teachers and staff of the Dar al Imam al Shafi'i, "one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar,'" which was used to train members of the Moro Islamic Liberation Front ("MILF") terrorist group and the IIRO.).

121.    In August 2006, the U.S. Treasury Department announced that it was blacklisting the Philippine and Indonesian branch offices of IIRO as Specially Designated Global Terrorist (SDGT) entities for "facilitating fundraising for al Qaida and affiliated terrorist groups."[171]   According to a statement from the Treasury Department:

> "The IIRO-PHL is a source of funding for the al Qaida-affiliated ASG [Abu Sayyaf Group].  IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups.  A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations. The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member.  IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of Khalifah.  While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan.  At the time Khalifah directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994.  In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992.... The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates."[172]

122.    In connection with this litigation, the IIRO has produced a letter written in 2002 from IIRO Secretary General Dr. Adnan Basha citing a visit to IIRO's headquarters by a delegation from the Moro Islamic Liberation Front ("MILF").[173]   The MILF is an armed

[171] https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.  See also FED-PEC 202100-202112, FED-PEC 202113-202132 (U.S. Treasury Department Office of Foreign Asset Control's evidentiary memorandum supporting the August 3, 2006 Executive Order 13224 designations of the IIRO branch offices in the Philippines and Indonesia and the Executive Director of the IIRO's Eastern Province Branch, Abd al Hamid Sulaiman al Mujil).

[172] https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[173] IIRO 97450.  See also IIRO 93331-93333 (correspondence between the Chairman of the Moro Islamic Liberation Front ("MILF") and MWL Secretary General Abdullah al Turki).

131.    For instance, in 2000, an IIRO delegation formed to review the financial performance of the IIRO-Pakistan office discovered that "[t]he collected evidence indicated the existence of cheating, forgery and misuse of the IIRO's funds, which were used for the disbursement of private projects."[185]   IIRO officials subsequently informed Pakistani authorities and the IIRO's accountant, Amer Jassim Mohammed Talib, was arrested.

132.    A formal audit of the IIRO branch office in Pakistan ordered by IIRO's senior leadership in Saudi Arabia for the 1996-2001 timeframe, confirmed the deliberate diversion of millions of dollars from that office through the deceptive fabrication of receipts, invoices, and project documents.[186]

133.    According to the Court of Appeal in Islamabad, the investigation into Talib's actions "found tremendous financial embezzlement; roughly millions according to the local currency.  [Talib] was the Head of Accounting Department in the IIRO.  He was responsible for and beneficiary of such embezzlements.  Large amounts of money were embezzled by him.  He, sometimes, forged the accounts or provided the higher management with wrong accounts." [187]

134.    The Court of Appeal further found that Talib "never bought medicines or food, but forged the documents and authorities and pretended to achieve the required actions. He transferred the gained amounts into his own account or pocket.  There are 185 authenticated copies of the documents and invoices (attached herewith) that include non-small amounts, and the material mentioned and registered therein were not bought. The concerned shops and storehouses were communicated, and they confirmed that such documents are forged and not issued by them and that the signatures shown thereon are irrelevant. Accordingly, they are not real."

135.    The Court of Appeal concluded that "the general nature of the events confirm that [Talib] manipulated the funds.  Whilst such manipulation, he was able to embezzle tremendous amounts of money by preparing forged documents and authorities. Such embezzled funds were allocated for orphans and other charitable purposes." [188]

136.    The director of the IIRO-Pakistan office, Moayad al Butairi, was also implicated in the cheating, forgery, and misuse of IIRO funds.[189]   According to investigation records,

---

[185] IIRO 31022-31023.  See also IIRO 31006-31007 ("For example, certain invoices are forged with names of unreal companies. The team went to the addresses of these companies and shops and confirmed that they are unreal.").

[186] IIRO 111020, IIRO 26468-26490.  See also Transcript, Deposition of Adnan Basha (February 21, 2019), at p. 238 (The "net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts which have been misused or misappropriated locally.").

[187] IIRO 31160-31166.

[188] IIRO 31160-31166.

[189] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 212-215 (Basha testifies that the IIRO received evidence that Butairi was involved in the cheating, forgery, and misuse of IIRO funds); pp. 237-238 (Basha confirms "that the embezzled funds were stolen by Amir Jasim, with the knowledge of Moayad al Butairi," and "it was explicit that there was fabrication in invoices, fabrication of documents.").

Butairi directed Talib to burn IIRO records to conceal their criminal acts.[190]  However, despite their roles in the diversion of millions of IIRO dollars and attempts to conceal those acts, the IIRO never prosecuted Butairi and eventually settled the case with Talib who was released from custody. [191]

137.    Former Al-Qaida member Jamal al-Fadl explained to U.S. investigators that Al-Qaida had a unit that was dedicated to manufacturing false documents: "Gamal explained that the Islamic Army was very efficient in producing false documents, and they actually had a separate unit that handled this…. Two of the individuals that were specialists in in manufacturing false documents were Ahmed Ali Mohammad Abu Abaida from Alexandria, Egypt, and Hawah al Masri, who was from the Jihad group in Egypt, which is linked to the Islamic Army. In order to become an expert in the manufacture of these documents, you had to attend instructional courses."[192]

138.    In his deposition for the present litigation, IIRO Secretary General Adnan Basha confirmed that "financial improprieties" were occurring in the IIRO's Eastern Province branch office in the Kingdom as well.[193] According to the Secretary General, the Eastern Province office was implementing and financing projects in IIRO offices outside the Kingdom without informing the General Secretariat and going through the required validation process.[194]  According to Dr. Basha, the Eastern Province would send funds from the accounts of the Eastern district office to the accounts of the external offices of the IIRO outside Saudi Arabia," including Pakistan, Philippines, Indonesia, Sudan, and others.[195]

139.    Dr. Basha testified he contacted the head of the Eastern Province office, Prince Turki bin Fahad bin Jiluwi, and asked him to stop sending funds to IIRO overseas offices without informing IIRO headquarters.  Prince Turki did not comply with his request.[196] Dr. Basha confirmed that this was during the same time period that Moayad al Butairi and Amer Jassim Mohammed Talib were in the IIRO office in Pakistan.[197]

140.    The IIRO formed a committee to investigate the financial irregularities at the Eastern Province office, and an audit of the office revealed that Khalil Ibrahim, the manager of the Eastern Province, was making payments without supporting vouchers, "a violation of the regulations."  Prince Turki was Ibrahim's supervisor at this time.[198]

---

[190] IIRO 168291.

[191] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 220, 247-248; IIRO 127895.

[192] PEC-KSA 2115-2132.

[193] Transcript, Deposition of Adnan Basha (February 21, 2019), at p. 278.; IIRO 287007-287013.

[194] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 265-266.

[195] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 267-268.

[196] Transcript, Deposition of Adnan Basha (February 21, 2019), at p. 268.

[197] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 268-269.

[198] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 269-271, 272; IIRO 49708-49710; IIRO 49696.

141.    Dr. Basha further testified that Prince Turki resigned as the regional supervisor of the Eastern Province office following the audit's findings "[b]ecause he did not wish to implement the recommendations of the auditor."  According to Dr. Basha, "the auditor's report connected all the violations to requests from the Prince."[199]  Ironically, it was "Million Dollar Man" Abd Al Hamid Sulaiman Al-Mujil who was appointed to manage the activities of IIRO's Eastern Province branch in the wake of Prince Turki's abrupt departure.[200]

142.    In early October 2004, an "internal auditor" from IIRO's headquarters in Saudi Arabia visited the IIRO branch office in Indonesia and subsequently wrote a report that identified critical deficiencies in accounting practices and significant financial irregularities—including an ineffective "accounting system," financial expenditures missing any references to the "source of fund[ing]," and significant balance discrepancies.[201]

143.    In his deposition, former IIRO official in Indonesia Fahd al-Harbi acknowledged that the auditor's report concludes that the auditor cannot match IIRO-Indonesia's debit balance of 3,277,546 Saudi Riyals; excesses in expenditures on administrative affairs amounted to 110,045 Saudi Riyals; the Indonesia office spent 25,869 Saudi Riyals from the currency exchange differences without authorization from the main office; and there is a deficit of $6,001 in the Eastern District account.[202]

144.    When asked about allegations "that IIRO Indonesian office failed to use sound accounting practices" by allowing direct transfers of funds to Indonesia from IIRO's Eastern Province office in Saudi Arabia, al-Harbi professed ignorance:  "I'm not concerned by this audit—by what the auditor's talking about… These are financial issues.  We do not interfere with them."  However, al-Harbi admitted that donor funds were typically "supposed to go to the headquarters—to the General Secretariat, and then the General Secretariat would send them…. If the monies go directly, it's an error in the procedures…. They are supposed to go first to the General Secretariat."[203]  Nonetheless, al-Harbi conceded that IIRO's auditors had noted that its Indonesia office lacked a proper accounting ledger and that thousands of dollars of funds were missing from its account.

145.    Financial irregularities and accounting deficiencies also plagued the IIRO's branch office in the Philippines, which also received financial support from the IIRO's Eastern Province Office.[204]

---

[199] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 271-274.

[200] IIRO 287391.

[201] IIRO 34989-35007.

[202] Transcript, Deposition of Fahd Mohammad Sanad Alharbi (March 27, 2019), at pp. 347-348.

[203] Transcript, Deposition of Fahd Mohammad Sanad Alharbi (March 27, 2019), at pp. 322-323.

[204] IIRO 212-330 (1999-2000 IIRO Annual Report identifying the Philippines and Indonesia offices as the beneficiaries of the Eastern Province under the leadership of Prince Turki bin Fahad bin Jalawi Al-Saud); IIRO 331-441 (2000-2001 IIRO Annual Report indicating same); IIRO 442-552 (2001-2002 IIRO Annual Report indicating same).

146.    A Report on the Visit of the Supervisor of the Social Care Department to the Philippines, dated July 19-25, 1998, describes the lack of financial controls by the IIRO-Philippines branch office with respect to the distribution of financial aid to orphans in the Philippines.[205]   According to the report:  (1) "there was no prior preparation for the distribution of the orphans 'allowances" and "there was no plan for this purpose;"[206] (2) the IIRO-Philippines office failed to "carry out the instructions of the Social Care Department to form the Tripartite Committee for the delivery of the allowances to the orphans;"[207] (3) the orphans 'allowances were distributed "without scrutiny or control;"[208] (4) orphan files were "incomplete" and lacked the required documentation;[209] (5) records at the IIRO's Social Care Department in Saudi Arabia indicated there were 80 male and female orphans at a certain orphanage, but it was determined there were really only 22 female orphans and 23 male orphans;[210] and (6) certain orphans did not receive financial assistance despite the fact that IIRO headquarters had sent the funds earlier in the year.[211]  The report additionally indicates that the IIRO Eastern Province Branch directly supervised and funded projects and entities in the Philippines.[212]

147.    In his deposition for the present litigation, former MWL and IIRO official in the Philippines Abdelhadi Daguit[213] was unable to account for why IIRO's Eastern Province office in Saudi Arabia would be directly funding any program in the Philippines "[b]ecause the protocol is anything that came from them, in the form of budgets or in form of assistance, it will be sent through the Jeddah office."[214]

148.    Daguit did acknowledge at least two visits to the Philippines by IIRO Eastern Province representative Abd Al Hamid Sulaiman Al-Mujil:  "Maybe the late part of the '90s… I honestly did not ask them why they visited the Philippines… There are three or not less than five… persons… I don't know what is the purpose of this visit."[215]

149.    Concerns about the financial integrity of the IIRO-Philippines branch office persisted for years after the 1998 visit by the Supervisor of the Social Care Department, Dr. Saleh Marzouk al-Harbi.  In late 2003, Dr. al-Harbi again raised issues with IIRO headquarters about "a lack of clarity in the Philippines Office about the balances of custodies recorded on it."  In a January 7, 2004 letter to IIRO Secretary General Basha

---

[205] IIRO 111421-111431.

[206] IIRO 111422.

[207] IIRO 111423.

[208] IIRO 111423.

[209] IIRO 111424.

[210] IIRO 111424.

[211] IIRO 111425.

[212] IIRO 111427.

[213] FED-PEC 202110-202112 (According to the U.S. government designation of the IIRO-Philippines office, "IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of [Mohammed Jamal] Khalifa.").

[214] Transcript, Deposition of Abdulhadi T. Daguit (June 27, 2019), at p. 133.  See also p. 64 (stating that any assistance from the Eastern Province office "must be sent through the office in Jeddah").

[215] Transcript, Deposition of Abdulhadi T. Daguit (June 27, 2019), at pp. 65-68.

addressing Dr. al-Harbi's concerns, it is recommended that a committee should be formed to investigate "all the custodies including the last five transactions and to issue a statement detailing the custodies recorded on the Philippines Office" from October 22, 1998 through January 15, 2002. "I suggest that these custodies should be liquidated as soon as possible so that the problem of the Pakistan Office is not repeated."[216]

150.    The apparent discrepancy involving questionable financial transfers from the IIRO's Eastern Province office was not unique to southeast Asia.  An internal IIRO auditor report (produced in response to this litigation) from the IIRO office in Jordan dated 1999-2000 similarly identified accounting irregularities and deviations, such as cash dispersals "without expense vouchers."[217]  The audit also discovered significant issues concerning the IIRO Eastern Province relationship with the Jordan office:  "[T]he examination and audit revealed a procedural defect in the flow of funds from the local organization's office in the eastern region to implement the organization's projects that are overseen by the organization's office in Jordan, a lack of clarity in the mechanism of project and program implementation, [and] the absence of oversight of these projects and program's by the organization's office in Jordan."[218]

151.    The IIRO's branch office in Sarajevo, Bosnia-Herzegovina was similarly found to have deficient accounting practices as a result of an investigation and audit conducted by the Bosnian Financial Police.  A May 27, 2002 report of the Federation Ministry of Justice Financial Police indicates that an audit, for the period from January 1, 1996 to December 31, 1998, found that "there were no business books prescribed by the Law on Accounting," including "general ledger, journal, and analytic entries, cashier and other auxiliary books." The Financial Police further concluded that the IIRO "has not been balancing bookkeeping positions of assets and liabilities and the sources of the funds" … "did not have documentation available with reference to the securing and acquisition of financial funds, nor the records about its use for the period of 1996, 1997, and 1998" … and "has not been preparing annual and semi-annual accounting statements and financial reports."[219]

152.    A subsequent audit report issued by the Bosnian Financial Police on July 25, 2002 described its findings as follows:  "In the course of supervision and researches of disposing documents and records of business legality and the way of obtaining and spending money means by the [IIRO], it was found that it did not have constituted Business books prescribed by the Law of Accountancy … and it did not contain annual, half annual accountancy reports i.e. financial reports (balance of statement and balance of success) for the period in which the supervision and research works were done … and it did not have documents concerning to obtaining and providing financial means as well as records of their spending, the could be the basis for establishing the sources from which the [IIRO] provided money means…."[220]

---

[216] IIRO 59754.

[217] IIRO 287559-287561.

[218] IIRO 287560.

[219] FED-PEC 212644-212646.

[220] IIRO 270967-271042.

153.    Deficient accounting practices and financial irregularities were also found in the IIRO's branch office in Tuzla, Bosnia-Herzegovina.  An April 1997 Report of the IIRO Monitoring Committee on the Disbursement of Orphans 'Allowances in the Tuzla Office discovered a number of financial irregularities:  (1) orphans received an amount less that what was recorded in the books; (2) orphans did not receive any financial disbursements despite being recorded in the books; and (3) signatures of financial aid recipients were often forged.[221]

154.    The IIRO has also produced documents indicating that IIRO Secretary General Adnan Basha ordered an investigation into the disappearance of a sum of 779,750 Saudi Riyals that was transferred to the director of the IIRO's branch office in Vienna, Austria, El Fatih Hassanein, that was subsequently delivered to Abdelaziz Zaher (a.k.a. Abu Anas, Abu Enes).[222]  Hassanein simultaneously served as the head of the Third World Relief Agency ("TWRA").  The 9/11 Commission Final Report at p. 58 affirms that Usama bin Laden used the TWRA "covertly provide[] financial and other support for terrorist activities."

155.    As suggested by the activities of Prince Turki Bin Fahd Bin Jalawy Al-Saud, Abd Al Hamid Sulaiman Al-Mujil and others, IIRO's role in financing and providing logistical support jihadi operations was not a phenomenon limited merely to errant individuals at far-flung branch offices.  At least four members of the IIRO's board of directors in Saudi Arabia were also serving simultaneously as executives at the Specially Designated Global Terrorist (SDGT) entity Al Haramain Al Masjed Al Aqsa—including the Secretary General of IIRO Dr. Adnan Basha and Chairman of the IIRO Board of Directors Abdullah al-Turki.[223]

156.    On March 19, 2002, police and intelligent agents in Bosnia-Herzegovina raided a location as part of an international terrorism financing investigation, who seized a number of documents related to the Al-Qaida terrorist organization. One of these documents, known as the "Golden Chain," is a list of 20 of some of the most successful and influential merchants in the Arabian Gulf.[224]  The list, titled "And spend for God's cause," was identified by former Al-Qaida lieutenant-turned FBI informant Jamal Ahmed Al-Fadl. According to Al-Fadl, "the 'Golden Chain 'consisted of wealthy individuals from the Gulf region who provided Bin Laden and Al Qaeda with money on a regular basis."[225]  At least three names from the "Golden Chain" have served at various times on IIRO's Executive

---

[221] IIRO 115300-115302.

[222] IIRO 339030-339032.

[223] MWLIIRO 16233-16237 (Minutes of the 8th Session of the IIRO's Board of Directors held on May 27, 2001); MWLIIRO 16270-16276 (Minutes of the 8th Session of the IIRO's Board of Directors held on May 8, 1999).

[224] FED-PEC 134853-134955.

[225] Transcript of FBI interview of Jamal Ahmed Al-Fadl. Dated August 29, 2002. United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892, at p. 23.  See also PEC-KSA 329-352.

and I had various documents, from the, from the, from the, what is it called, from the job." Arnaout, not realizing how much Zahiragic had already disclosed attempted to order the Bosnian, "not to give information about the others… Meaning we now, I don't know a thing about you… I don't know your life… [W]hat do you know about me, you don't know a thing about me."[313]

204.    Consistent with the material presented above, there is clear and unambiguous public evidence that Saudi state-sponsored dawah organizations including (but not limited to) the Muslim World League, the International Islamic Relief Organization, and the World Assembly for Muslim Youth have endorsed the concept of violent jihad, have pushed young Muslims to join violent jihadist organizations, and have provided critical support and resources to al Qaeda and its affiliates. It is my professional opinion that the tens of millions of dollars in support provided by these dawah organizations was the fuel for Al-Qaida's engine in the period leading up to the September 11th attacks, and that Al-Qaida could not have successfully planned and carried out the attacks without that funding.

205.    Contrary to the wishful thinking of some former IIRO and MWL employees deposed in the present litigation, quite obviously, the financial irregularities and atypical accounting practices exercised by these dawah organizations were not acceptable for international charitable organizations, and instead represented convenient vehicles for illicit money laundering and providing material support to terrorists and other violent extremists. If they were the least bit normal or acceptable, they would never have come to the critical attention of their own internal financial auditors to begin with. One must ask themselves why these dawah organizations—after being repeatedly confronted (in some cases by their own internal auditors) with glaring evidence of these insufficiencies—still refused to take any real punitive or corrective action until (at least) long after the September 11 terrorist attacks on the United States, if ever.

206.    There is a litany of documentary evidence—in the form of internal correspondence, published editorials, and witness testimony—demonstrating how the senior leadership of Saudi state-sponsored dawah organizations including MWL, IIRO, and WAMY were well aware of the ideological agenda being pushed by their respective groups, the suspicious financial practices used by their employees, and the growing list of connections between their entities and violent jihadi extremists, most notably al Qaeda. Once again, the question begs itself—if top officials like former WAMY Secretary General Maneh al-Johani and former MWL Secretary General Dr. Abdullah Omar Naseef themselves explicitly endorse the concept of violent jihad (and the linked notion of "jihad by wealth") in their own dawah publications, if they refer to the U.S. and the West as the "enemies of Islam," and if they whitewash the illicit activities of their own employees—including the diversion of money, weapons, and travel documents to al Qaeda—what other result could they have logically expected?

---

[313] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at p. 103.