# EXHIBIT AD

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001**

**03-MDL-1570 (GBD) (SN)**

**EXPERT REPORT OF JONATHAN BENTHALL
ON BEHALF OF YASSIN ABDULLAH KADI**

7. It is normal in the Gulf Arab states for individuals to rely in their financial commitments on friends and kinsfolk whom they trust – and this was characteristic of Mr Kadi's approach to charity. This norm has been described by social scientists as "clientelism".

8. Like most other Islamic charities, the Muwafaq Foundation concentrated on relieving poverty, lack of education, and distress caused by wars and disasters, in Muslim communities. However, I am not aware of evidence to suggest that the Foundation had any objection against also assisting non-Muslims; nor that Mr Kadi had any leanings towards proselytism or "political Islam" – let alone any sympathy towards Al-Qa'ida.

9. The fact that Mr Kadi was a major supporter of a pioneering women's college in Jeddah, founded  in 1999, the Dar Al Hekma College, indicates that his ideological leanings were progressive.

10. In my opinion, an overreaction against Islamic charities by the US justice system and the US Treasury has been sustained by some experts on counterterrorism and terrorist financing, whose methodology is often defective. They tend to rely on the attribution of guilt by association, and *petitio principii*[1], and their academic credentials are sometimes questionable.

### III.    QUALIFICATIONS

I have studied Islamic charities continuously for 25 years and published extensively about them. Born in Kolkata, India, in 1941, I graduated from the University of Cambridge in English Language and Literature in 1962. I was appointed Lecture Programme Organizer at the Institute of Contemporary Arts, London, in 1970, and  its Secretary from 1971 to 1973, and in 1974 I was appointed Director of the Royal Anthropological Institute of Great Britain and Ireland (RAI). In 1982 I was elected a Member of the Association of Social Anthropologists of the Commonwealth. In 2000 I resigned from the Royal Anthropological Institute to concentrate on my own research. In 1994 I was appointed an Honorary Research Fellow, Department of

---

[1] *I.e.* "begging the question".

Anthropology, University College London (until 2003, thereafter an Honorary Research Associate until currently). From 2009 till currently, I have been an Associate Fellow at the Humanitarian and Conflict Response Institute. Between 2008 and 2010, I was a member of the Advisory Committee of the Religions and Development Research Programme at the University of Birmingham. From 2019 until currently, I have been a member of the Editorial Board, *Journal of Muslim Philanthropy and Civil Society*, Indiana University.

In 1993 I was awarded the Anthropology in Media (AIME) Award by the American Anthropological Association as Founder Editor of *Anthropology Today* since 1985. In 2001, I was awarded the Patron's Medal of the RAI, and in 2015, I was appointed Director Emeritus.

I have also carried out voluntary work of a practical rather than an academic nature. Between 1981 and 1996, I served on a number of committees of Save the Children (UK), including six years of membership of the Overseas Committee, which was responsible for its international programme including disaster relief and development aid. Between 1997 and 2003, I was Chair of INTRAC (International NGO Training and Research Centre), Oxford (Board Member, 1996–2006), which is a not-for-profit company set up as a "support NGO", that is, supplying services to international Non-Governmental Organizations in the fields of training, consultancy, project planning, monitoring and evaluation of programmes, etc. Between 1997 and 2004, I was a Trustee of another successful British charity, the Alliance of Religion and Conservation, which was founded in 1995 by HRH Prince Philip, Duke of Edinburgh, to initiate environmental projects in collaboration with religious organizations and with intergovernmental organizations such as the UN Development Programme.

In 1993, I published *Disasters, Relief and the Media*, probably the first book-length study of the relations between international aid agencies and the communications media (new edition, 2010). In 1996, I was awarded a six-months sabbatical by the RAI, and I began a research project initially focused on the question of why some 30 National Societies of the International Red Cross and Red Crescent Movement use the red crescent rather than the red cross as their emblem. This led to field visits to Jordan, the Palestinian Territories, Oman and Algeria, and the research project quickly extended to cover the wider field of Islamic charities. After publishing

4

three peer-reviewed articles on the subject, I joined forces with Dr Jérôme Bellion-Jourdan, a French political scientist, to publish a co-authored book, *The Charitable Crescent: Politics of Aid in the Muslim World* in 2003 (new paperback edition, 2009). Since then I have published many articles on Islamic charities, some of which were collected in *Islamic Charities and Islamic Humanism in Troubled Times* (2016). I also co-edited (with Robert Lacey) *Gulf Charities and Islamic Philanthropy in the 'Age of Terror' and Beyond* (2014), based on the Gulf Charities Workshop, which he and I co-directed in July 2012 at the University of Cambridge in the context of the Gulf Research Meeting 2012.

Some publications – in addition to those republished in the 2016 collection – are:

"Islamic Relief Worldwide", "Médecins Sans Frontières (MSF), "Oxfam" and "Relief" (in *The Palgrave Dictionary of Transnational History*, 2009);

"Islamic humanitarianism in adversarial context" (in *Forces of Compassion: Humanitarianism Between Ethics and Politics*, ed. Erica Bornstein and Peter Redfield, 2011);

"'Cultural proximity' and the conjuncture of Islam with modern humanitarianism" (in *Sacred Aid: Faith and Humanitarianism*, ed. Michael Barnett and Janice Stein, 2012);

"Charity" (in *A Companion to Moral Anthropology*, ed. Didier Fassin, 2012);

"Charity" (in *The Oxford Encyclopedia of Islam and Politics*, Oxford University Press, 2014);

"Religion and humanitarianism" (in *The Routledge Companion to Humanitarian Action*, ed. Roger MacGinty and Jenny H. Peterson, 2015);

"Charity: modern period" (in the *Encyclopedia of Islam, Third Edition* (Brill, 2016, online);

"Experto crede: A legal and political conundrum" in *If Truth Be Told: The Politics of Public Ethnography*, ed. Didier Fassin, 2017);

"Charity" (in the *Cambridge Encyclopedia of Anthropology* online, 2017), also in French translation "Charité";

"Humanitarianism as ideology and practice" (in *The Wiley-Blackwell Encyclopedia of Anthropology*, 2018);

"The Rise and Decline of Saudi Overseas Humanitarian Charities",
Occasional Paper no. 20, Center for International and Regional Studies,
Georgetown University – Qatar, 2018;

"Charitable activities of the Muslim Brotherhood" (in *Journal of Muslim
Philanthropy and Civil Society*, 2019, vol. 2 no. 2);

"The Care of Orphans in the Islamic Tradition, Vulnerable Children, and
Child Sponsorship Programs", (in *Journal of Muslim Philanthropy and Civil
Society*, 2019, vol. 3 no. 1);

"A note on humanitarian terminology". Allegra lab online: project on Muslim
humanitarianism (MUHUM). https://allegralaboratory.net/a-note-on-
humanitarian-terminology-muhum-2/

"Orphan programmes today and tomorrow", *The Forum: The Journal of the
British Muslim charity sector*, issue 3, Winter/Spring 2021.

Between 2005 and 2013, I was engaged as an adviser to the Swiss Federal Department of
Foreign Affairs (FDFA) Bern (Human Security Division) on a project entitled the Montreux
Initiative (later renamed the Islamic Charities Project). This was conceived as an exercise in
mediation or conflict resolution, whose objective was to remove obstacles from Islamic charities
in so far as they were unjustified. The argument was that the long tradition of Islamic charitable
giving was having difficulty expressing itself amid a growing climate of mistrust between Islam
and the "West", and there was a need for confidence building between, on the one hand, Islamic
charities determined to comply with internationally accepted codes of practice – including the
need for transparency and non-discrimination – and, on the other hand, Western governments
and regulatory authorities. I was commissioned by the FDFA to write a Feasibility Study in
January 2005 and shortly thereafter appointed a member of the "core group", which included
representatives of the FDFA and a number of experts with knowledge of humanitarian
institutions, both Muslim and non-Muslim. At the end of 2005, some seventeen Islamic charities
– from Europe but also from the Gulf and other Middle Eastern countries – met in Istanbul to
further the project. It was agreed that discussions would proceed discreetly with no media
involvement. For a short period, the project was co-sponsored by the UK Foreign and
Commonwealth Office (as it was then known).

Part of the plan was to offer "capacity building" services to Muslim charities that had been hitherto managed on informal lines, *i.e.* helping them to improve their performance and public profile through modern procedures of administration and accounting. Recommendations were also made with regard to desirable improvements in governmental policies.

I was also a member of a delegation sponsored by the Swiss Government to Washington, D.C., in February 2011, and took part with other members of the delegation in meetings with staff members of the Senate Judiciary Committee, the State Department, the US Treasury's Office of Foreign Assets Control, the National Security Council, and other government officials.[2]

I have been invited to speak in many academic and humanitarian forums and also at the Charity Commission, Foreign and Commonwealth Office, and Home Office, London; Centre National d'Éducation et de Formation (French police academy); Ditchley Foundation, England; National Defense University, Fort McNair, Washington, D.C., etc.

I am a fluent writer and reader of French, and have studied Standard Arabic to an intermediate standard.

A complete list of my publications can be found in my CV, which is attached as Exhibit A to this report, along with a complete list of documents (or translations thereof) considered in the preparation of this report attached as Exhibit B. During the previous four years I have not testified as an expert at trial or by deposition, although I have previously provided an expert report in this matter on behalf of Muslim World League, the International Islamic Relief Organization and Drs. Naseef, Al-Obaid, Al-Turki and Basha. I am being compensated for my time in this matter at a rate of $400 an hour.

---

[2] The Montreux Initiative failed to achieve all its goals, owing mainly to political turbulence, but it made an appreciable indirect impact. The focus on "capacity building" was no longer necessary in 2010, since numerous "support NGOs" had by then become committed to this type of work. The recommendations with regard to compliance and governmental policies remain highly relevant. *See* Jonathan Benthall, "The Islamic Charities Project (Formerly Montreux Initiative)", in *Islamic Charities and Islamic Humanism in Troubled Times* (Manchester University Press, 2016).

## IV.   METHODOLOGY

The research methodology that I have adopted has been as comprehensive as possible, enhanced by adherence to the principles of ethnography, which is a method of inquiry that I have learnt through exposure to the discipline of social anthropology. I make a distinction as far as possible between sources of factual information and how the information gained is presented and interpreted.

When I published *Disasters, Research and the Media* in 1993, there was as yet little academic research on international aid agencies of any kind. When I co-authored *The Charitable Crescent: Politics of Aid in the Muslim World* in 2003, there was little published on Islamic charities. Indeed, there was little published on Faith Based Organizations of all confessions. Though research on all these topics is now expanding rapidly, there is still little academic research on charities based in the Gulf. Consequently, I have pursued my enquiries by drawing on diverse sources of information wherever I have been able to locate them.

The sources used may be roughly classified as follows. First, primary sources are to be sought wherever possible. These include: interviews with all relevant interlocutors such as charity workers and trustees, both remunerated and unpaid, both active and retired; government officials, both central and local, including representatives of regulatory authorities; representatives of religious institutions; recipients of charity and welfare support (this is an important source of information, though for various reasons it is the hardest to get access to); government publications and websites; personal observations, especially through "participant observation"; written material such as letters, reports, business records, in-house memoranda, photographs, websites, and promotional and fundraising material; and court documents.

Next, secondary sources include open-source academic articles and books, especially those that have been subjected to rigorous peer review; newspaper articles and websites (to be checked with special caution); interviews with other researchers, and with journalists and diplomats; intelligence reports when made available; other government reports; and statistical surveys, including mass public opinion surveys.

political forces resulted in a uniquely intertwined relationship between the Islamic establishment and the government, reflected to some extent in other Gulf States.[16]

During the last two decades of the twentieth century, when the British Islamic charities were still relatively small, Islamic charities based in the Gulf, especially in Saudi Arabia and Kuwait, but also in Sudan, grew rapidly and were active in many conflict and disaster zones. Many Western charities had been launched or expanded during wars or shortly afterwards. The same was true of Islamic charities, which developed with particular vigour in the context of wars and civil unrest in the Middle East, the Horn of Africa, and Central Asia. They were particularly active during the Soviet–Afghan war of the 1980s and the civil war in former Yugoslavia during the 1990s.

Islamic charities in general have a "family resemblance" in that they tend to give special emphasis to helping orphans, widows and refugees, as well as to projects linked to the Islamic calendar, such as the holy month of Ramadan; and to use religious symbolism in their fundraising and campaigning. For instance, the Muwafaq Foundation used the image of the crescent,[17] like many other Islamic charities. Some Islamic charities, including the Muwafaq Foundation, have also sponsored mosques and religious education. On the other hand, they are also frequently active with programmes such as providing food supplies and medical facilities that are barely distinguishable from those administered by non-Muslim NGOs.

## 2.    Activities and character of the Muwafaq Foundation

The Muwafaq Foundation was one of the Islamic charities that grew during the last quarter of the twentieth century. It was first registered in Jersey in 1992 [18].

---

[16] Stéphane Lacroix, 2010, *Les islamistes saoudiens: Une insurrection manquée* (Presses Universitaires de France), pp.317–8; Mehran Kamrava, 2018, *Inside the Arab State* (Hurst), p.171.

[17] See the Activity Reports from Zenica, Bosnia, 1995–1996. KADI0077711 and KADI0077763.

[18] KADI0002964 – KADI0002969

3. <u>**The importance of understanding cultural and historical norms in assessing**</u>
   <u>**transactions engaged in by charities and individuals associated with them**</u>

I consider that in recent years, disproportionate attention has been given to Islamic charities as alleged threats to security. In particular, the United States' processes of blacklisting certain charities and promoters of charity as "specially designated terrorists" has been criticized as draconian.[51] One account of the immediate reaction in US government circles after the attacks of September 11, 2001 suggests that the decision to embark on freezing assets – as early as September 24 – was taken with undue haste. The chief counsel to the Treasury Department is quoted as having said to a journalist "It was almost comical. … We just listed out as many of the usual suspects as we could and said, Let's go freeze some of their assets".[52]

There is no doubt that, owing to a refusal to recognize the special responsibilities of charities, lax management, or criminal intent – or a combination of these reasons – a few Islamic charities, as well as other charities, were made use of as conduits to fund or support paramilitary activities before 2001. This may be partially attributable to the fact that during the Soviet–Afghan war of the 1980s, a strong precedent was set by the United States government in mixing humanitarian, diplomatic and military aid to the *mujahideen* in Afghanistan – even to the extent of setting up ostensibly charitable entities which were in fact state-funded vehicles for anti-Soviet propaganda. A number of US non-profit organizations with tax-exempt status (501(c)(3) organizations), such as American Friends of Afghanistan, were formed to channel US government funds through USAID and the National Endowment for Democracy (NED),[53] to engage in such activities as

---

[51] See for instance ~American Civil Liberties Union", 2009, *Blocking Faith, Freezing Charity: Muslim Charitable Giving in the "War on Terrorism Financing"*, New York: ACLU.

[52] Ron Suskind, *The Price of Loyalty: George W. Bush, the White House, and the Education of Paul O'Neill*, p.193, 2004. New York: Simon and Schuster.

[53] National Endowment for Democracy, Annual Report, 1989, p.15. https://www.ned.org/wp-content/uploads/annualreports/1989-ned-annual-report.pdf; National Endowment for Democracy, Annual Report, 1990, p.19. https://www.ned.org/wp- content/uploads/annualreports/1990-ned-annual-report.pdf

United States foreign policy changed towards anathematizing the former Afghan "freedom fighters" as terrorists.

Working in 1980s Afghanistan is not evidence of support for terrorism. Numerous NGOs were present and active in the region during that time – both Western and Islamic – due to the widespread humanitarian crisis. The war came to an end at the end of that decade, and Saudi aid to Afghan *mujahideen* came to an end shortly after the fall of President Mohammad Najibullah in 1992. In his report Mr Comras appears to rely principally on US Treasury Department accusations for his assertion that Mr Kadi and the Muwafaq Foundation had a connection with the leaders of Al-Qa'ida and/or shared its ideology, goals or tactics[58]. However, neither unexplained transactions, nor accounting records that fall short of current Western standards, should be assumed to indicate systemic wrongdoing, or an intent to divert funds to terrorist organizations such as Al-Qa'ida.

It appears from the documents analysed above that the Muwafaq Foundation operated in numerous countries, and carried out a wide variety of humanitarian services: emergency relief aid in conflict zones, flood relief, health and medicine, training and education, etc. Electronic banking was not fully developed at this time, and emails and cellphones were only beginning to be used. Communications were particularly challenging in war zones. I am aware of no solidly grounded evidence of improper diversion of funds; but even if such evidence were forthcoming, I would submit that any organization working with as many offices, and in as many different countries, as the Muwafaq Foundation did in the early and mid-1990s would have had difficulty in maintaining full control of its finances and operations. I base this opinion on my experience of the practical management challenges faced by diversified international NGOs.

Furthermore, Mr Kadi appears to have been intent on keeping Muwafaq separate from political activities. A letter signed by him as Chairman of the Board of Directors, Muwafaq Foundation, dated May 5, 1994, is addressed to Dr Salaf Al-Din Al-Saleh, General Director of the Muwafaq Foundation, Sudan, and copied to the Executive Director. This letter directs that all

---

[58] Comras Report *e.g.* p.19, fn.62; p.29 fn.108; p.31 fn.121; p.41 fn.173, 175; pp.47, 48 fn.202–206.

necessarily correlated with any lack of authentic commitment to helping poor and disadvantaged people. Indeed, impartial observers have given special appreciation to the sincerity shown by fieldworkers employed by Islamic charities, and their strong solidarity with affected communities.[63] This attitude is consistent with the Qur'anic teaching that poor people have a right to *zakat* and should always be treated with respect.

In the context of international aid organizations, it must be remembered that the sophistication of the international banking system is not well adapted to conflict zones. This system historically depended on the establishing of relationships of trust between institutions and individuals in different countries and jurisdictions – relationships which are disrupted by military conflict.

Moreover, in the 1990s, the technologies of the Internet and cell phones were in their infancy. A dominant feature of Mr Kadi's commitments, both commercial and humanitarian, was his reliance on friends and relatives whom he trusted. Whereas the phenomenon of "clientelism" has been observed by social scientists in many other regions – from the Mediterranean to Latin America[64] – it is particularly marked in the Gulf Arab states. "Clientelism refers to relationships of patronage between people in the higher rungs of the socioeconomic ladder who use their status to facilitate access to goods and services by those below them."[65] "Although patron-client relationships are by definition invested with a certain quotient of affectivity, clientelism differs from mere instrumental friendship in the conditional character of the personal loyalties involved. This is largely a reflection of the discrepancies in status, power, and influence which serve both to segregate and to unite patrons and clients. The asymmetry inherent in the relationship is neatly expressed in Eric Wolf's phrase, "lopsided friendship."[66]

---

[63] Daniel Maxwell and Nisar Majid, 2016, *Famine in Somalia: Competing narratives, collective failures* (Oxford U.P.), p.196.

[64] Otherwise referred to as "patronage" or "patron–client relations". See William W. Stein, "Patronage", in David Levinson and Melvin Ember, Eds, *Encyclopedia of Cultural Anthropology* (New York: Henry Holt and Company), vol. 3, pp.905–907.

[65] Mehran Kamrava, 2018, *Inside the Arab State* (London: Hurst), p.157.

[66] Rene Lemarchand and Keith Legg, 1972, "Political clientism and development: a preliminary analysis", *Comparative Politics*, 4: 2 (January 1972), 149–178, p.152.

conceiving their recipients as whole persons rather than merely statistical units. This is true even of charities such as the British-based Islamic Relief Worldwide, which have opted out of explicitly religious activities. The distribution of food to poor families in the *iftar* meal breaking the Ramadan fast is both a way to help them materially and also the celebration of an important religious tradition.

There is some evidence that Islamic charities may cater more effectively than secular or Christian charities to the needs of Muslim beneficiaries (just as Christian charities may work with special effectiveness to assist Christian beneficiaries, *e.g.* in Latin America and in parts of Africa). While the advantages of this "cultural proximity" are by no means automatic, a strong body of opinion among aid workers accepts the importance of cultural sensitivity.[77] Similarly in Britain today, an Islamic charity (the National Zakat Foundation) supplies shelters to cater for the specific needs of single Muslim women in distress.[78]

Evidence that the Muwafaq Foundation was capable of contributing a "value added" to aid programmes because of its privileged access to Muslim and Arab recipients of aid – *i.e.* "cultural proximity" – is provided by the record of its cooperation with WHO in Sudan. In the case of WHO, it was called on specially to assist with the highly sensitive problem of mitigating the risk of Sexually Transmitted Diseases including AIDS among displaced young people (p.23 above).

I have seen no evidence, however, that the Muwafaq Foundation and its founder Mr Kadi had any objection to extending their charitable services to non-Muslims – specifically Christians in the religiously mixed communities of Sudan and former Yugoslavia. On the contrary, a testimonial in English dated April 7th, 1995 expresses gratitude to the Muwafaq Foundation "for the goods that you had done". This is signed and sealed by the Minister for Social Affairs of the Croatian Republic of Herzeg-Bosnia, an unrecognized proto-state that lasted between 1991 and

---

[77] For a summary of the debate about "cultural proximity", see Benthall, *Islamic Charities*…., 2016, pp.51–52, 55–56.

[78] Benthall, *Islamic Charities*…., 2016, p.15.

1996. The testimonial includes a text from the New Testament: "He scattered abroad and gave to the poor, his justice endures for ever" (2 Corinthians 9.9).[79]

Further evidence is a document dated October 23, 1998 by the Sudanese Red Crescent Society, Malakal, which states that the Muwafaq Foundation "is cooperative and provides its services without religious or racial discrimination".[80] This is significant because all Red Cross and Red Crescent National Societies, as members of the International Movement of the Red Cross and the Red Crescent, are committed to the principle of non-discrimination on religious grounds.

Mr Kadi's statement to OFAC, dated December 19th, 2002, includes the following:

> (133) Personally, I am strongly committed to promoting education in society in general and among women in particular, to enable women to exercise leadership roles in the family and society.  Accordingly in 1996 I founded and led a planning committee to establish higher educational institutions for women in Saudi Arabia.  This ultimately led to the founding of a pioneering women's college in Jeddah named Dar Al Hekma College in 1999.  Dar Al Hekma College is now one of the first private colleges for women in the Kingdom, offering university level degrees. It is also unique as it educates women in an English language setting.
>
> (134) As well as leading the planning committee of the college, I am chairman of its academic committee.  I decided to base the curriculum on the American higher education model.  Thus, under my initiative and direction the college sought professional assistance and expertise from the United States.  This led us to identifying and later contracting with the Texas International Education Consortium ("TIEC"), which is based in Austin, Texas.  TIEC is a consortium of 32 public universities in the State of Texas formed for the purpose of developing, co-ordinating and implementing international education projects and academic programs.
>
> (135) The collaboration between TIEC and the college has been most successful in preparing the complete academic program and administrative and organisational structure for the college. At the completion of the TIEC project, I recruited several American administrators and faculty members and have supported their

---

[79] KADI00092190.

[80] KADI00092196.

35

involvement ever since the establishment of the college. The college now employs internationally qualified faculty members representing ten different nationalities, including American and many others who are American trained, including the Saudi Dean and Vice Deans who have earned their doctorates in the United States.

(136) The college was inaugurated by HRH Crown Prince Abdullah of Saudi Arabia in September 1999 after 4 years of planning. The college has won support from the Saudi Royal family, business people, local and foreign dignitaries, all of whom have commended its work. The college has been visited by Ambassadors and their wives including the US Ambassador to Saudi Arabia and by his wife and the wife of the UK Ambassador. I also had the honour of receiving the former President of the United States, President Jimmy Carter and Mrs Rosalyn [sic] Carter, during their visit to Saudi Arabia in the year 2000. They were very pleased with their visit to the college. President Carter gave a speech expressing his pride to be given the opportunity to visit the college; he said the college reflected the advances made by Saudi society and stressed the importance of private education adding that education was a source of freedom. Rosalyn Carter remarked that she had been very impressed by the achievements of Saudi women and that she had met many women during her visit to the college who had asked her to speak of the positive impression she had gained.

(137) I have supported the college, not only ideologically by supporting the aims of the college, but also financially, by providing finance myself and raising funds for the college from others. Since 1996 I have personally contributed substantial sums to the college and have raised very substantial donations and scholarship funds from others. I am also a very active member of the Board of Trustees of the college and attend the college meetings and other functions one or more times per week throughout the year.

(138) Soon after the tragic events of September 11th, I called a meeting with the American staff and faculty to express personally my regrets, sympathy and support for them; to offer them help in contacting their families back in the USA; and to reassure them that they would be protected and secure while working at the college and living in Saudi Arabia. I also sought to assure them of the solidarity of myself and of my fellow Board members against the vile acts of September 11th.[81]

---

[81] Statement to OFAC, KADI0002265–2267.

The visit by Former President Jimmy Carter and his wife on February 3, 2000 was recorded in the next day's issue of *Arab News*.[82] Mr Kadi appears with them in the group photograph, identified as "secretary-general of the board of trustees", as does the US Ambassador Wyche Fowler.

A "Catalog" published by the College in 2001–2002 is also available[83]. Mr Kadi is listed as a Member of the Board of Trustees (p.6). Notably, the curriculum includes disciplines such as Accounting and Business Information Systems – clearly designed to enable alumnae of the College to embark on careers in the national economy and in public life, rather than be confined to domestic roles.

According to Mr Kadi, some years before the actual foundation of the women's college in Saudi Arabia, in around 1992 Chafiq Ayadi "assisted me to establish an advanced teachers' college in Zagreb for helping women refugees to become teachers".[84]

## 6.   The regrettable result of the overreaction against Islamic charities

The US justice system and the US Treasury have relied on a number of experts on counter-terrorism and terrorist financing with special reference to Muslim individuals and entities. Without questioning their motivations, it is reasonable to question their methodologies.

Police and intelligence agents – responsible for keeping our populations safe from terrorism – rightly make extensive use of the technique of building up and analysing webs of association between individuals and between organizations. They are not responsible for proving their assertions to a neutral fact finder, and they are excused for erring on the side of caution when identifying an individual or an entity as terrorist. But for those responsible for arriving at judicial

---

[82] KADI0158736. *Arab News*, XXV: 68, February 4, 2000.

[83] KADI0158750 – KADI0158829.

[84] Statement to OFAC, para. 70, KADI0002236.

or administrative decisions, and those giving them expert advice, there is a material risk that they attribute guilt by association, and indulge in *petitio principii*.

Serious social scientists insist on well-grounded evidence, on contextualization, on making allowance for cultural differences, and on trying to understand the viewpoints and intentions of all relevant parties rather than only selected individuals. Normal standards for assessing academic credibility do not always appear to be maintained in the process of accreditation of experts. These standards include peer review, both at the stage of acceptance of books and articles for publication, and at the stage of reception when books and articles are reviewed and commented on by other scholars. Counterterrorism experts – whether official or self-described – frequently lack experience of the realities of disaster relief and poverty alleviation projects, and of the management of non-profit institutions, whose international programmes in conflict zones are always exposed to enhanced risks. They frequently ignore the growing research literature on contemporary Islam and on Faith Based Organizations, of which Islamic charities are a subset. Within the specific field of study of terrorism and terrorist financing, they frequently exaggerate the strength of evidence for the arguments they are advancing and ignore or discount the countervailing evidence. The basic principle of fairness, which dictates that those accused of serious misconduct should have a right to be heard, is often ignored.[85]

## VI.   EXPERT REBUTTAL OPINION

### 1.  Background and qualifications

Mr Comras appears to have expertise on issues relating to money laundering and terrorism financing. Nothing in his résumé, however, or in the Library of Congress interview cited therein, suggests that he has expertise on issues relating to philanthropy, relief, and development aid – especially in the context of the Middle East – which are essential aspects of the present case.

---

[85] Jonathan Benthall, "Experto crede: A legal and political conundrum" in *If Truth Be Told: The Politics of Public Ethnography*, ed. Didier Fassin, 2017, pp.160–183.

## 2.  Methodology

Mr Comras mentions that he relies inter alia on "social science research". But there is no evidence in his report of grounding in any of the social sciences such as sociology, political science or cultural anthropology. More specifically, he evinces no expertise either with regard to the history and cultures of the Middle East, or with regard to the study of charitable and humanitarian endeavours at different times and places, especially those inspired by Islamic traditions.

In consequence, his methodology is skewed towards one particular interpretative lens, that of terrorism financing and the prevention of money-laundering. Though important, these approaches need to be balanced by the other considerations mentioned above.

His report also fails to recognize the specific practical difficulties experienced by nonprofit organizations in supplying charitable and humanitarian services in conflict zones, where the normal services of banks, wire transfers, safe-deposit facilities etc. are often lacking or limited. These difficulties were specially salient during a period before the use of mobile phones and the Internet.

Mr Comras's report may be particularly faulted on several counts:

1. The fallacy of *petitio principii* or "begging the question": for example, to presume a sinister explanation of an act by X in the course of advancing arguments to demonstrate that very conclusion.

2. The attribution of guilt by association without probative evidence.

3. Lack of historical contextualization.

4. Blanket statements with inadequate support.

5. Misleading quotation.

6. One-sided presentation of documentary evidence.

7. Equivocal and vague language.

39

As evidence of the lack of scruple evinced in Mr Comras's report, indicating a defective methodology, examples are given hereunder. The examples are not intended to be exhaustive.

**Pp.6–8.** With regard to the relevance of "red flags" for the evaluation of charities, as described by Mr Comras, they take no account of the practical difficulties that faced charities working in conflict zones twenty to thirty years ago. Although Mr Comras concedes that red flags are "indicators that are meant to alert government regulators and financial institutions" (Comras Report, p.7), he proceeds to treat them as retrospectively probative of guilt.

The effect is to create an impression by smearing, rather than by presenting solidly grounded evidence of culpable behaviour.

**Pp.9 to 14.** The report does not mention that until 1992 support of the Afghan mujahideen through military, diplomatic and humanitarian means was given by many Western governments, including the United States. No culpability should be ascribed to any individual or entity solely on the grounds that they took part in this broadly based project to displace the Soviet army and Soviet influence from Afghanistan. This passage suffers from an unbalanced historical perspective. (See above pp.25 - 27).

**P.13.** The 9/11 Commission Report published in 2004 contains these words: "In addition, entire charities, such as the al Wafa organization, **may have** wittingly participated in funneling money to al Qaeda." (p.170, emphasis added)

Mr Comras quotes this sentence as follows (p.13): "In addition, entire charities ...wittingly participated in funneling money to al Qaeda".

Omission of the words "may have" through ellipsis turns the sentence into a statement of fact rather than, as intended, a speculation. This is a serious misquotation.

**P.14.** Mr Comras writes: "Kadi allegedly became associated in the 1980's with members of the Muslim Brotherhood and supporters of the Makhtab al-Khidamat, also known as the Afghan Services Bureau."

No support is given for the allegation. Moreover, the word "associated" is equivocal. The extent of association could range from a single chance encounter to a close and enduring relationship, rendering the statement so vague as to be meaningless.

**P.14 n.38.** Mr Comras states, "Sources told the FBI that they saw Yasin Kadi more than once at bin Laden/al Qaeda guesthouses in Peshawar and at the Dawa Organization guesthouse in Khartoum. Kadi 2944".

The document he cites to support this assertion fails to do so. In fact, KADI0002944 (2944–45) is a portion of a statement by Mr Kadi in which, among other things, he describes all of his encounters with Osama bin Laden, the last of which was in 1993. Nowhere in the entire document[86] is there a mention of guesthouses.

**P.14 last sentence**. Mr Comras writes: "To avoid red flags, Kadi tried to mask many of these questionable dealings as business or humanitarian related transactions, using bearer checks, shell companies, and circuitous routings."

"To avoid red flags" is a *petitio principii*. The statement is also an empty exercise in mind-reading.

**P.16 para. 3**. Mr Comras writes: "Together, Yasin Kadi and Khalid bin Mahfouz used their resources to propagate a radical Islamic theology that contributed to the virulence and capabilities of such terrorist organizations as al Qaeda."

No evidence is provided to indicate that Mr Kadi had any interest in propagating a "radical Islamic theology" (see also reference to "radical Islamic ideology", **p. 53** last line but 1). Indeed, the fact that he was a major supporter of a university for women in Saudi Arabia (see above at pp. 35 - 37) indicates on the contrary that he held progressive views.

**P.22 para. 3**. Mr Comras writes: "The IIRO was established ostensibly to provide humanitarian assistance to refugees from the Afghan war. However, this 'humanitarian' facade became a cover

---

[86] KADI0002928–2958.

for the charities channeling covert military and financial assistance to various Arab-Afghan militant groups fighting both in Afghanistan and Bosnia, including al Qaeda."

"'Humanitarian' façade" is another *petitio principii*.

**P.25 Block text (2 paragraphs).**

Mr Comras's use of the interviews given by Jamal Al-Fadl is a one-sided presentation of material in the record. Mr Al-Fadl is the former Al-Qa'ida member who became an informant for the FBI. (See Comras Report, p. 24). On May 24, 2007, Mr Kadi's attorney in Switzerland, Maître Marc Bonnant, wrote a letter to the Office of the Federal Investigating Magistrates in Geneva, denying and rebutting all the allegations advanced against Mr Kadi by Mr Al-Fadl in four interviews conducted in 2004.[87]

In particular, Maître Bonnant presented Mr Kadi's view, which contradicts Al-Fadl:

1. Para. a (1) of his letter: Mr Kadi has never been a member of the Dosari tribe in Saudi Arabia.
2. Para. a (2): He has never used the alias "Abu Khalid".
3. Para. a (4): He "never went to a guesthouse owned by Mr Oussama ben Laden, be it in Khartoum or elsewhere".
4. Para. a (5): He denies all allegations of support for "militant Islamic doctrine promoting violence", for Osama bin Laden, Al Qa'ida or any affiliate entity, anywhere in the world.

Through Maître Bonnant, Mr Yassin Kadi suggested that Mr Al-Fadl might have confused him with Dr Mansour Al-Kadi, who was known to be a supporter of the charity Al Haramain Foundation, whereas Mr Yassin Kadi has never supported it in any way or had any connection with it.

---

[87] KADI0007223–7229.

This hypothesis is corroborated by the fact that Mr Al-Fadl, as reported in his November 3rd 2004 interview, referred to Mr (Yassin) Kadi as the director of Al Haramain Foundation, and in the same interview stated that he had never heard of Dr Mansour Al-Kadi.[88] The fact that Mr Al-Fadl referred to Mr Yassin Kadi with the title "Doctor" suggested to Maître Bonnant that this was indeed a case of mistaken identity, as Mr Yassin Kadi had no doctorate. Moreover, Maître Bonnant states that "on several occasions Mr Jamal Al Fadl has incorrectly identified persons on the pictures which have been submitted to him – including Mr Yassin Abdullah Kadi" (pp.3–4 of his letter).

Mr Comras makes no reference to the Bonnant letter. That letter raises the strong possibility that Mr Yassin Kadi is the victim of a confusion of identity. It is well known that Dr Mansour Al-Qadi, a Saudi academic, was a senior office holder in the large international charity Al Haramain Foundation. Mr Yassin Kadi has stated that he never had any connection with the Al Haramain Foundation or supported it in any way. Mr Yassin Kadi did support a smaller charity with a similar name, Al Haramain Wa Al-Masjed Al-Aqsa Charity [the two Holy Sanctuaries and the Al-Aqsa Mosque Charity] which was registered in Saudi Arabia and had a branch in Sarajevo. Mr Yassin Kadi has stated that it was headed by a relative, Mr Mahmoud Taibah, who asked him to support this endeavour.[89] Mr Yassin Kadi has also stated "The charity was authorised to perform the following: Al-Walidein-Gazzaz primary school for children who had lost their father or both parents and the financing and supervising of Dar Al Walidein (a home for up to 320

---

[88] KADI0028428 (FBI Letterhead Memorandum (LHM) dated 26 April 2005, beginning at KADI0028380). This same page of the LHM (p.49), which is a response to questions posed by the Swiss investigators, shows that the Swiss investigators, at least, knew that Mansour "used to work for … Al-Haramain Islamic Foundation [AHIF]", and that Mansour was "most likely … not related to Yassin Al-Kadi".

[89] Kadi Deposition, p.193–194 and Errata Sheet (for spelling of "Taibah"). The Arabic words "Al Haramain", "the Two Sanctuaries", as the dual form of *haram*, refers to the two most sacred sites in Islam, the cities of Mecca and Medina in Saudi Arabia. It is a name chosen for numerous entities such as schools, but also currently for at least one travel company and a large perfume manufacturer.

children and single mothers who had lost their husbands/fathers as a result of the war in Sarajevo)."[90]

More scrupulous examination by Mr Comras of the documentation would have, or should have, caused him to provide a more balanced picture of the Al-Fadl statements.[91]

**p.25 fn.89**. Mr Comras mischaracterizes on two counts the 9/11 Commission interview with Patrick Fitzgerald. Mr Comras writes:

> "U.S. Attorney Patrick Fitzgerald subsequently told the 9/11 Commission, 'Fadl was an invaluable source of information; the mystery was over, and it was clear that bin Laden was running a major terrorist organization. Fadl's information later played a very important role in the investigation and prosecution of the 1998 Embassy Bombings conspirators.' He also stated that he has complete confidence in Fadl's honesty, and that Fadl accurately remembered everything in which he participated. See 911 Commission Interview of Patrick J. Fitzgerald, Jan. 28, 2004, p. 2."

What the memorandum of the interview with Mr Fitzgerald actually states is as follows:

> "He [Fitzgerald] also stated that he has complete confidence in Fadl's honesty, and **believes that** Fadl accurately remembered everything in which he participated. Fadl's recollection may not have been as good when he tried to recount what other people had told him about events in which he had not participated, plus he was not good at identifying photographs." (Emphasis added.)

First, Mr Comras has omitted the key word "believes" – which, when reinserted, draws attention to the subjective and unverifiable character of Mr Fitzgerald's stated opinion, as properly reported by members of the 9/11 Commission staff.

---

[90] OFAC statement para. 90 (KADI0002244).

[91] Citing the typed record of a "Co-operating Witness Interview" with Mr Al-Fadl conducted by the FBI on January 31, 2004, Mr Comras writes: "The source [Jamal Al-Fadl] was told by Abu Fadl Al-Makki that Al-Kadi would bring donated money from the Gulf area, mainly Saudi Arabia, to Al-Qaida [apparently "circa 1989"] which was used to purchase weapons in Jalalabad, Afghanistan". (Comras Report, p.25, fn.92). On its face this statement is of dubious reliability considering, among other things, its double-hearsay character.

Second, Mr Comras has omitted the second sentence wherein Mr Fitzgerald is reported as casting doubt on:

(a) Mr Al-Fadl's recollection of other persons' accounts to him "about events in which he had not participated", and

(b) Mr Al-Fadl's ability to identify photographs. Taken together with the statement of Maître Bonnant that "on several occasions Mr Jamal Al Fadl has incorrectly identified persons on the pictures which have been submitted to him – including Mr Yassin Abdullah Kadi" (see above), this reported opinion of Mr Fitzgerald's casts further doubt on the accuracy of Mr Al-Fadl's statements.

Mr Comras's fairmindedness is made questionable by these omissions.

**P.33.** Symptomatic of the lack of care evinced in this report is the discrepancy between the figure of $300,000 stated on this page and the estimate of "between $926,000 and $1.28 million" stated on **p.50**, end of para. 2.

**P.38.** Mr Comras writes: "One of the companies through which this trade [in Sudanese agricultural products] was conducted was Rowad Development & Investment, which was registered in Khartoum on Dec. 19, 1992. That Registration shows that shareholders in Rowad included the Wadi al-Aqiq Corporation owned by Osama bin Laden. Bin Laden's signature was included on the registration document. Kadi was also a shareholder via his wholly owned Loxhall Corporation."

It is true that Mr Kadi was a minority shareholder in Rowad through his Loxhall Limited company, and that the Muwafaq Foundation was also a minority shareholder. This does not demonstrate a relationship with an Osama bin Laden company except that of co-shareholders. Mr Kadi stated in his deposition that he did not know at the time that Wadi al Aqiq was a shareholder in Rowad, did not in the early 1990s know what it was, did not know it was an Osama bin Laden company, and did not know what Osama bin Laden was doing in Sudan (Kadi Deposition, pp.87–88). He also stated that he did not sign the shareholder list on behalf of either

of the entities related to him (pp.141–42), and that he was not present at the meeting where the shareholder list was signed (p. 148 line 1). A fairminded report by Mr Comras might have made some mention of these mitigating facts.

Mr Comras's observation on the Rowad registration document goes beyond the facts to insinuate that there was a business relationship between Mr Kadi and Osama bin Laden, which Mr Kadi has denied, and for which there appears to be no support.

**P.38 n.159**.Mr Comras misrepresents the document KADI0052707 as incorporating Loxhall Limited in Sudan. In fact it is the registration certificate for a branch. Loxhall Limited was registered in the Isle of Man on July 17, 1990, and was an investment company. Although Mr Comras characterizes Loxhall Limited as "appear[ing] to be a shell company" (Comras Report at p.38 fn.159), it is not clear what he means by that. Loxhall Limited owned a minority shareholding in Rowad, as Mr Comras himself states (*Ibid*), as well as real estate in London,[92] shares in a chemical company in Pakistan,[93] and an investment portfolio.[94]

P.**40 last para**. Mr Comras refers to the investigation of Mr Kadi by the Swiss Police. But he omits to mention that on December 17, 2007 the Ministère Public de la Confédération (Swiss Federal Public Prosecutor's Office) wrote to Mr Kadi's Swiss attorney, Maître Bonnant, that it was abandoning the proceedings against Mr Kadi, and that the charges of supporting a criminal

---

[92] See letter from Stepien Lake Gilbert & Paling, Solicitors, dated April 16, 1997, referring to the sale for Loxhall Limited of 42 Trinity Court, a residential apartment in London WC1. KADI0162113

[93] See letter from Himont Chemicals (Pvt.) Limited, Lahore, Pakistan, to the Exchange Control Department, State Bank of Pakistan, Lahore, copied to Mr Kadi, referring to their receipt of US$236,680 from Loxhall Ltd (Isle of Man) against their subscription for equity in the company. KADI0172757.

Also a share certificate for 724,700 shares in Himont Chemicals (Pvt.) Limited, owned by Loxhall Ltd, Isle of Man, signed by Mr Intesar A. Siddiqui, Chief Executive (undated). KADI0172759.

[94] Investment report for Loxhall by A.G.I. Asset Management (Allianz Global Investors) dated January 23, 1997, showing capital of approximately US$1.28 million. KADI0171913.

organization had been dropped. Furthermore, all his [Swiss] accounts which had been frozen would be unblocked.[95] This is another example of a one-sided presentation of the documentary record.

**P.45 lines 7–8**. Mr Comras writes: "A nexus quickly developed between a number of these charities and terrorist organizations". If indeed this nexus existed, it is not demonstrated that the Muwafaq Foundation was part of such a nexus. This is an example of an unsupported assumption and alleging guilt by association. Mr Comras's Report is in fact permeated by the error of ascribing guilt by association.[96]

**P.52** Mr Comras quotes from the European Court of Justice's Judgment dated September 3, 2008 (paras.369–372), implying that it was confined to Mr Kadi's denial of due process with regard to his designation[97]. But it is clear from the judgment of the same court, *i.e.* the Grand Chamber of the European Court of Justice, dated July 18, 2013[98], that the court rejected, on a substantive basis, the evidentiary arguments advanced against Mr Kadi:

> **(para.153, p.35)** "It is however clear that no information or evidence has been produced to substantiate the allegations of the Muwafaq Foundation's involvement in international terrorism in the form of links with Makhtab al-Khidamat/Al Kifah and Al-Qaeda. In such circumstances, the indications of the role and duties of Mr Kadi in relation to that foundation are not such as to justify the adoption, at European level, of restrictive measures against him." ………

---

[95] Ref. KADI 0018537, English translation KADI0018536.

[96] Other examples of the error of ascribing guilt by association are found in Mr Comras's Report at: p.15 (association with Khalid bin Mahfouz); p.17 fn 53 (association with investment company which was investigated and was a subsidiary with a bank which did business with subsequently designated entities); p.31 fn 124 and p.32 (did business with individuals subsequently designated); p.39 (Yassin Kadi's Solano Limited bought sesame from a company which a few years previously handled Al Qa'ida's trade in sesame); p.38-39 (used a bank in which Osama Bin Laden was allegedly a part-owner and customer); p.44 (The Muwafaq Foundation reportedly supported a Bosnian fighters' group, one member of which was later arrested on terrorism charges). I by no means accept that Mr Comras has established the guilt of all the people and entities that Mr Kadi is alleged to have associated with.

[97] KADI0023373 - KADI0023438.

[98] KADI0025952 – KADI0025991.

**(para.163, p.38)** "It follows, from the analysis set out at paragraph 141 and paragraphs 151 to 162 of the judgment, that none of the allegations presented against Mr Kadi in the summary provided by the Sanctions Committee are such as to justify the adoption, at European Union level, of restrictive measures against him, either because the statement of reasons is insufficient, or because information or evidence which might substantiate the reason concerned, in the face of detailed rebuttals submitted by the party concerned, is lacking."

Mr Comras refers to the September 3, 2008 Judgment on procedural grounds by the European Court of Justice as its "critical ruling". Although he does refer to the later Judgment of the same court (dated 18 July 2013) in his page 51, fn.224, and it is listed in his "List of Reliance Materials", he seems to have overlooked the passage in the 2013 Judgment represented by the paragraphs cited above, nos. 153 and 163, or he would not have written that "the rulings did not detract from findings by the U.S. Treasury, The European Union, or the United Nations that Yasin Kadi had engaged in channeling funds to Osama bin Laden" **(p.52)**

This is a further instance of Mr Comras's slanted presentation of documentary evidence.

**P.53 last line.** Mr Comras alleges that Mr Kadi "and his circle of friends, colleagues and business associates, including Wael Hamza Julaidan, knowingly helped promote the radical Islamic ideology and resources that sustained them". This allegation against Mr Kadi is unsupported.

### 3. Conclusion

In sum, it is my opinion that Mr Comras lacks the grounding and experience to evaluate Mr
Kadi's charitable activities and the context in which they occurred prior to 9/11. His
methodology appears to be at variance with basic principles of social science and is seriously
lacking in fairmindedness.


February 1st, 2021
_____
Date

_____
Jonathan Benthall


I certify under penalty of perjury under the laws of the United States of America that the
foregoing report is my honest opinion, that all factual matters therein are true and correct to the
best of my knowledge and belief, and that if called to testify, I would testify under oath
consistently with the foregoing.

Executed on __1st__ February 2021


February 1st, 2021
_____
Date

_____
Jonathan Benthall