# EXHIBIT AF

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

03-MDL-1570 (GBD) (SN)

EXPERT REPORT OF JONATHAN BENTHALL

Rebuttal Expert Opinions

17. Mr Winer's analysis, while pointing out that the issues of fraud and accounting controls are significant in the US and the UK, fails to take into account the significant additional factors that affect nonprofit organizations operating in multiple areas characterized by conflict and poverty. These factors are likely to result in even greater financial risk. Careful scrutiny of evidence in the operating context of the time would be necessary to support the charge of diversion of funds to extremist groups or to fund political agendas.

18. Prejudice against Arabs and Muslims has become more socially acceptable in Western countries than many other forms of prejudice, but that does not justify it. If the same accusation against Jews were made, as Mr Winer makes against Middle Easterners, it would be regarded as evidence of unacceptable anti-Semitism.

19. There are no grounds discernible in Mr Kohlmann's field of expertise, as stated by him, to attach any weight to his opinion that the "organizational and financial structures" of MWL and IIRO provide evidence that their purported wrongdoing would have been conducted with the awareness and knowledge of the heads of those organizations. Furthermore, he provides no evidence to substantiate this very serious allegation.

## III.   QUALIFICATIONS

I have studied Islamic charities continuously for 25 years and published extensively about them. Born in Kolkata, India, in 1941, I graduated from the University of Cambridge in English Language and Literature in 1962. I was appointed Lecture Programme Organizer at the Institute of Contemporary Arts, London, in 1970, and its Secretary from 1971 to 1973, and in 1974 I was appointed Director of the Royal Anthropological Institute of Great Britain and Ireland (RAI). In 1982 I was elected a Member of the Association of Social Anthropologists of the Commonwealth. In 2000 I resigned from the Royal Anthropological Institute to concentrate on my own research. In 1994 I was appointed an Honorary Research Fellow, Department of Anthropology, University College London (until 2003, thereafter an Honorary Research Associate until currently). From 2009 till currently, I have been an Associate Fellow at the Humanitarian and Conflict Response Institute. Between 2008 and 2010, I was a member of the Advisory Committee of the Religions and Development Research Programme at the University of Birmingham. From 2019 until currently, I have been a member of the Editorial Board, *Journal of Muslim Philanthropy and Civil Society*, Indiana University.

In 1993 I was awarded the Anthropology in Media (AIME) Award by the American Anthropological Association as Founder Editor of *Anthropology Today* since 1985. In 2001, I was awarded the Patron's Medal of the RAI, and in 2015, I was appointed Director Emeritus of the RAI.

I have also carried out voluntary work that provided me with additional first-hand exposure to NGO governance issues. Between 1981 and 1996, I served on a number of committees of Save the Children (UK), including six years of membership of the Overseas Committee, which was responsible for its international programme including disaster relief and development aid. Between 1997 and 2003, I was Chair of INTRAC (International NGO Training and Research Centre), Oxford (Board Member, 1996–2006), which is a not-for-profit company set up as a "support NGO", that is, supplying services to international Non-Governmental Organizations

in the fields of training, consultancy, project planning, monitoring and evaluation of programmes, etc. Between 1997 and 2004, I am a Trustee of another successful British charity, the Alliance of Religion and Conservation, which was founded in 1995 by HRH Prince Philip, Duke of Edinburgh, to initiate environmental projects in collaboration with religious organizations and with intergovernmental organizations such as the UN Development Programme.

In 1993, I published *Disasters, Relief and the Media*, probably the first book-length study of the relations between international aid agencies and the communications media (new edition, 2010). In 1996, I was awarded a six-month sabbatical by the RAI, and I began a research project initially focused on the question of why some 30 National Societies of the International Red Cross and Red Crescent Movement use the red crescent rather than the red cross as their emblem. This led to field visits to Jordan, the Palestinian Territories, Oman and Algeria, and the research project quickly extended to cover the wider field of Islamic charities. After publishing three peer-reviewed articles on the subject, I joined forces with Dr Jérôme Bellion-Jourdan, a French political scientist, to publish a co-authored book, *The Charitable Crescent: Politics of Aid in the Muslim World* in 2003 (new paperback edition, 2009). Since then I have published many articles on Islamic charities, some of which were collected in *Islamic Charities and Islamic Humanism in Troubled Times* (2016). I also co-edited (with Robert Lacey) *Gulf Charities and Islamic Philanthropy in the 'Age of Terror' and Beyond* (2014), based on the Gulf Charities Workshop, which he and I co-directed in July 2012 at the University of Cambridge in the context of the Gulf Research Meeting 2012.

Some publications – in addition to those republished in the 2016 collection – are:

> "Islamic Relief Worldwide", "Médecins Sans Frontières (MSF), "Oxfam" and "Relief" (in *The Palgrave Dictionary of Transnational History*, 2009);

> "Islamic humanitarianism in adversarial context" (in *Forces of Compassion: Humanitarianism Between Ethics and Politics*, ed. Erica Bornstein and Peter Redfield, 2011);

> "'Cultural proximity' and the conjuncture of Islam with modern humanitarianism" (in *Sacred Aid: Faith and Humanitarianism*, ed. Michael Barnett and Janice Stein, 2012);

> "Charity" (in *A Companion to Moral Anthropology*, ed. Didier Fassin, 2012);

> "Charity" (in *The Oxford Encyclopedia of Islam and Politics*, Oxford University Press, 2014);

> "Religion and humanitarianism" (in *The Routledge Companion to Humanitarian Action*, ed. Roger MacGinty and Jenny H. Peterson, 2015);

> "Charity: modern period" (in the *Encyclopedia of Islam, Third Edition* (Brill, 2016, online);

> "Experto crede: A legal and political conundrum" (in *If Truth Be Told: The Politics of Public Ethnography*, ed. Didier Fassin, 2017);

"Charity" (in the *Cambridge Encyclopedia of Anthropology* online, 2017), also in French translation "Charité";

"Humanitarianism as ideology and practice" (in *The Wiley-Blackwell Encyclopedia of Anthropology*, 2018);

"The Rise and Decline of Saudi Overseas Humanitarian Charities", Occasional Paper no. 20, Center for International and Regional Studies, Georgetown University – Qatar, 2018;

"Charitable Activities of the Muslim Brotherhood" (in *Journal of Muslim Philanthropy and Civil Society*, 2019, vol. 2 no. 2);

"The Care of Orphans in the Islamic Tradition, Vulnerable Children, and Child Sponsorship Programs", (in *Journal of Muslim Philanthropy and Civil Society*, 2019, vol. 3 no. 1);

"A note on humanitarian terminology", 2019, Allegra lab online: project on Muslim humanitarianism (MUHUM). https://allegralaboratory.net/a-note-on-humanitarian-terminology-muhum-2/.

Between 2005 and 2013, I was engaged as an adviser to the Swiss Federal Department of Foreign Affairs (FDFA) Bern (Human Security Division) on a project entitled the Montreux Initiative (later renamed the Islamic Charities Project). This was conceived as an exercise in mediation or conflict resolution, whose objective was to remove obstacles from Islamic charities in so far as they were unjustified. The argument was that the long tradition of Islamic charitable giving was having difficulty in expressing itself amid a growing climate of mistrust between Islam and the "West", and there was a need for confidence building between, on the one hand, Islamic charities determined to comply with internationally accepted codes of practice – including the need for transparency and non-discrimination – and, on the other hand, Western governments and regulatory authorities. I was commissioned by the FDFA to write a Feasibility Study in January 2005 and shortly thereafter appointed a member of the "core group", which included representatives of the FDFA and a number of experts with knowledge of humanitarian institutions, both Muslim and non-Muslim. At the end of 2005, some seventeen Islamic charities – from Europe but also from the Gulf and other Middle Eastern countries – met in Istanbul to further the project. It was agreed that discussions would proceed discretely with no media involvement. For a short period, the project was co-sponsored by the UK Foreign and Commonwealth Office.

Part of the plan was to offer "capacity building" services to Muslim charities that had been hitherto managed on informal lines, *i.e.* helping them to improve their performance and public profile through modern procedures of administration and accounting. Recommendations were also made with regards to desirable improvements in governmental policies.

I was also a member of a delegation sponsored by the Swiss Government to Washington, D.C., in February 2011, and took part with other members of the delegation in meetings with staff

members of the Senate Judiciary Committee, the State Department, the US Treasury's Office of Foreign Assets Control, the National Security Council, and other government officials.[1]

I have been invited to speak in many academic and humanitarian forums and also at the Charity Commission, Foreign and Commonwealth Office, and Home Office, London; Centre National d'Éducation et de Formation (French police academy); Ditchley Foundation, England; National Defense University, Fort McNair, Washington, D.C., etc.

I am a fluent writer and reader of French, and have studied Standard Arabic to an intermediate standard.

I am currently engaged, among other things, on a *pro bono* research contract with the International Committee of the Red Cross, Geneva, which has allowed me to have access to restricted archives and other information on condition that the work product is confidential and that the Committee has exclusive rights to it.

A complete list of my publications can be found in my CV, which is attached as Exhibit A to this report, along with a complete list of documents (or translations thereof) considered in the preparation of this report attached as Exhibit B. I have been compensated for my time in this matter at a rate of $400 an hour.

## IV.   <u>METHODOLOGY</u>

The research methodology that I have adopted has been as comprehensive as possible, enhanced by adherence to the principles of ethnography, which is a method of inquiry that I have learnt through exposure to the discipline of social anthropology. I make a distinction as far as possible between sources of factual information and how the information gained is presented and interpreted.

When I published *Disasters, Research and the Media* in 1993, there was as yet little academic research on international aid agencies of any kind. When I co-authored *The Charitable Crescent: Politics of Aid in the Muslim World* in 2003, there was little published on Islamic charities. Indeed, there was little published on Faith Based Organizations of all confessions. Though research on all these topics is now expanding rapidly, there is still little academic research on charities based in the Gulf. Consequently, I have pursued my enquiries by drawing on diverse sources of information wherever I have been able to locate them.

The sources used may be roughly classified as follows. First, primary sources are to be sought wherever possible. These include: interviews with all relevant interlocutors such as charity workers and trustees, both remunerated and unpaid, both active and retired; government officials, both central and local, including representatives of regulatory authorities;

---

[1] The Montreux Initiative failed to achieve all its goals, owing mainly to political turbulence, but it made an appreciable indirect impact. The focus on "capacity building" was no longer necessary in 2010, since numerous "support NGOs" had by then become committed to this type of work. The recommendations with regard to compliance and governmental policies remain highly relevant. *See* Jonathan Benthall, "The Islamic Charities Project (Formerly Montreux Initiative)", in *Islamic Charities and Islamic Humanism in Troubled Times* (Manchester University Press, 2016).

representatives of religious institutions; recipients of charity and welfare support (this is an important source of information, though for various reasons it is the hardest to get access to); government publications and websites; personal observations, especially through "participant observation"; written and online sources such as letters, reports, in-house memoranda; photographs, and promotional and fundraising material; and court documents.

Next, secondary sources include open-source academic articles and books, especially those that have been subjected to rigorous peer review; newspaper articles and websites (to be cross-checked with special caution); interviews with other researchers, and with journalists and diplomats; and statistical surveys, including mass public opinion surveys.

Examples of the fruits of this comprehensive method may be found in the pages on Jordan (pp.98–107) and on Algeria (pp.92–98) published in *The Charitable Crescent: Politics of Aid in the Muslim World* (2003), based on my field visits to those countries in 1996 and 2000 respectively. In Jordan I was able to make use of contacts with the French diplomatic service and a government-sponsored French residential research centre where I stayed for six weeks (which made possible "participant observation"); with numerous representatives of the International Red Cross and Red Crescent Movement; with numerous charity and government officials and academics; and with senior members of the Jordanian royal family. I engaged a Jordanian as a temporary research assistant to help with translation and interviews. We attempted to arrange interviews with charity beneficiaries, but this proved impracticable in the time available. I also absorbed as much as I could of the available published literature on the history of Jordan.

As for Algeria, I visited it at a difficult time, in 2000, when the civil war that had started in 1991 was not completely over, though an amnesty had been declared in 1999. As a guest of the sociology department of the University of Bouzaréah in Algiers, I was able to interact with numerous academics. Among my interviewees were the Minister for National Solidarity, the Archbishop of Algiers and other Catholic priests, and the head of a leading national Islamic charity. I was able to draw on an internal report commissioned from INTRAC (see above) by the Algerian government. I also made use of articles published in the local Arabic-language as well as the French-language press. In the account of my findings published in 2003, I concluded that I had been initially over-optimistic about the willingness of the Bouteflika government to encourage the "associative movement" or voluntary sector.

Presentation and interpretation of factual information are important aspects of social research. My methodology is influenced by three principles of ethnography, as a research method distinctive of social-cultural anthropology.

First, an emphasis on studying the behaviour of individuals and groups, and giving due consideration to the viewpoints of all interest groups and stakeholders. It should not be assumed that the most prestigious or the most vociferous parties to a controversy are the only ones who deserve a serious hearing. For instance, in the Algerian case mentioned above, I concluded on the basis of the study carried out by INTRAC consultants, and conversations with local social scientists, that many of the Islamic voluntary associations were "performing good work with deep roots in the communities they serve". This contrasted with "the establishment view in Algeria, which is that all the Islamic voluntary associations are highly politicized…" (p.97). Voluntary associations based on the French model, inherited from the colonial period, did not necessarily "resonate with traditional ways of drawing on a community's resources for helping individuals in distress". I was obliged to rely, in particular, on the findings of an Algerian social

8

scientist, because it was not practicable to ascertain in any reliable way the view of charity recipients themselves.

A second principle is that of "decentring", that is to say unsettling prior assumptions. This has an analogy with the principle observed in Western law courts that judges and jury members are encouraged to put aside, as far as possible, all preconceptions. In the present context, I have ventured in my publications to "decentre" the assumption that charity and philanthropy are monopolies of the Christian and post-Christian West. This assumption has been extensively called into question recently by other scholars.[2]

Third, researchers in the anthropological tradition are especially committed to examining their own biases and prejudices, with a view to adjusting for them as far as possible, just as they should make allowance for biases in the publications of others. Not only is everyone encumbered with prejudices as a result of their personal background – especially with regard to members of other ethnic groups and religions – but those who express professional opinions on matters of public concern tend to develop a personal investment in their opinions that can too easily harden into bias and prejudice.

This third principle is related to an additional principle, which should be common to all branches of inquiry in social science (not merely anthropology). This is the principle that all interpretations are essentially provisional and dependent on factual evidence, and that one should modify one's conclusions, in the event that new evidence arises to challenge them. I give an example above, in that I was obliged in 2003 to change my over-optimistic view of the future of Algerian civil society under the presidency of Abdelaziz Bouteflika, which I formed during my visit to Algiers in 2000. In retrospect, I had given too much attention to those who were directly benefiting from the current regime. Thus, my methodology takes care to weigh the relative opinions of the speakers with the balance of alternative evidence, and not to over-rely on one particular source. In addition, I also take care to constantly re-evaluate my conclusions, in light of new evidence.

Over my 25 years as an expert on Islamic NGOs, my work has been peer reviewed and widely disseminated. As far as I am aware, my broad conclusions on the subject of Islamic charities have never been challenged by other researchers in academic publications.

## V.  **EXPERT OPINION**

### 1.  **The Role of Charitable Giving in Islam**

In broad terms, the tradition of Islamic charity has much in common with Judaism and Christianity, and hence with the secular Western traditions of charity, philanthropy and humanitarianism that developed historically from religious origins. The three Abrahamic religions all share the principle that wealth belongs to God, to whom human beings should be answerable as stewards of creation. The familiar English words that we use to describe aspects of altruism and voluntary giving are all loaded with cultural connotations: for instance,

---

[2] E.g. Amy Singer, 2008, *Charity in Islamic Societies* (Cambridge U.P.); Michael Barnett and Janice Stein (eds) 2012, *Sacred Aid: Faith and Humanitarianism* (Oxford U.P.); project on Muslim humanitarianism (MUHUM), 2019.   https://allegralaboratory.net/category/thematic-threads/muslim-humanitarianism/

Relief Worldwide, based in Birmingham, England, was founded in 1984 and is now the world's largest Islamic charity.[21]

By the end of the twentieth century, there were few countries without a presence of Islamic charities, either raising funds or disbursing them, or both. Islamic charities everywhere tend to be marked by a commitment to assisting orphans and displaced persons, and by reference to religious tradition, including motifs such as the crescent[22] or the minaret, and to the religious calendar, mainly the month of Ramadan and the Festival of Sacrifice (`Id al-Adha or Qurbani).

One type of Islamic charity may be categorized as "Islamist", that is to say, embodying an ideology that holds that all areas of life should be regulated by reference to Islam or at least one interpretation of it. Some Islamist charities in the Middle East were associated with opposition movements and found a role in providing effective welfare and relief services in national contexts, such as Egypt and the Palestinian Territories, where the state proved unable or unwilling to provide them. By contrast, in Saudi Arabia, a complex interplay of ideological and political forces resulted in a uniquely intertwined relationship between the Islamic establishment and the government, reflected to some extent in other Gulf states.[23]

During the last two decades of the twentieth century, when the British Islamic charities were still relatively small, Islamic charities based in the Gulf, especially in Saudi Arabia and Kuwait, but also in Sudan, grew rapidly and were active in many conflict and disaster zones. As noted above, many Western charities were launched or expanded during wars or shortly afterwards. The same was true of Islamic charities, which developed with particular vigour in the context of wars and civil unrest in the Middle East, the Horn of Africa, and Central Asia. They were particularly active during the Soviet–Afghan war of the 1980s and the civil war in former Yugoslavia during the 1990s.

A prominent field of activities, especially for IIRO, was the former Eastern Bloc after the fall of the Berlin Wall in 1989, when a number of former Communist republics with Muslim majorities rejected the ideology of Soviet atheism and reasserted their Islamic identities which had been suppressed, often ruthlessly. Geoffrey Wheeler, a pioneer of scholarship on central Asia, wrote in 1977: "[T]he at once contemptuous and suspicious, albeit tolerant attitude towards Islam adopted by Tsarist Russia has developed under the Soviet regime into one of active hostility".[24] The campaign against Islam in the 1920s had been "directed not only against

---

[21] See Jonathan Benthall, "Islamic Relief Worldwide", in *The Palgrave Dictionary of Transnational History*, 2009, pp. 605–606.

[22] The existence of a transnational network known as the "Red Crescent" is often incorrectly assumed, whereas 33 National Societies of the International Red Cross and Red Crescent Movement use the red crescent rather than the red cross as their emblem. The Movement in its entirety is officially non-confessional, though, in practice, some of the Red Crescent National Societies have taken on a local Islamic colouring.

[23] Stéphane Lacroix, 2010, *Les islamistes saoudiens: Une insurrection manquée* (Presses Universitaires de France), pp.317–8; Mehran Kamrava, 2018, *Inside the Arab State* (Hurst), p.171.

[24] Geoffrey Wheeler, 1977, "Islam and the Soviet Union", *Middle Eastern Studies*, 13.1, January, 40–49, p.40.

the aim of the conference was to set out guidelines for bringing them appropriate assistance.[30] In the idiom of aid workers, this may be seen as an example of "cultural sensitivity", in that most displaced Muslim women belong to conservative societies where males and females are traditionally segregated and there is a strict differentiation of gender roles. Such an initiative supports the contention that in some circumstances Islamic charities may cater more effectively than secular or Christian charities for the needs of Muslim beneficiaries (just as Christian charities may work with special effectiveness to assist Christian beneficiaries, *e.g.* in Latin America and in parts of Africa[31]). While the advantages of this "cultural proximity" are by no means automatic, a strong body of opinion among aid workers accepts the importance of cultural sensitivity.[32] Similarly in Britain today, an Islamic charity (the National Zakat Foundation) supplies shelters to cater for the specific needs of single Muslim women in distress.[33]

Among other non-Muslim organizations with which IIRO collaborated or held discussions in the 1990s were the United Nations Environmental Programme, the World Conference on Religion and Peace, and Médecins Sans Frontières;[34] and the UN Commission on the Status of Women; and some leading NGOs based in London and Geneva.[35]

## 3.    The Backlash Against Islamic Charities After 9/11

I consider that in recent years, disproportionate attention has been given to Islamic charities as alleged threats to security. Abuse of the privileged status of charities is unfortunately recurrent across the whole charity sector, as will be indicated in this section. Such abuse may be for personal enrichment or for the pursuit of goals other than those for which a specific charity was set up. A distinction should be drawn between abuse by individual office-holders and systemic intent, at the apex of a charity's organization, to embezzle or divert assets.

There is no doubt that, owing to a refusal to recognize the special responsibilities of charities, lax management, or criminal intent – or a combination of these reasons – a few Islamic charities, as well as other charities, were made use of as conduits to fund or support paramilitary activities before 2001. One important reason for this is that during the Soviet–Afghan war of the 1980s, a strong precedent was set by the United States government in mixing humanitarian, diplomatic and military aid to the *mujahideen* in Afghanistan – even to the extent of setting up ostensibly charitable entities which were in fact state-funded vehicles for anti-Soviet

---

[30] Jérôme Bellion-Jourdan, 2003, in Benthall and Bellion-Jourdan, *The Charitable Crescent*, pp.84, 156; also, *IIRO Newsletter* 1.4, December 23, 1994, pp.1–5.

[31] Jonathan Benthall, 2012, " 'Cultural Proximity and the Conjuncture of Islam with Modern Humanitarianism", in Michael Barnett and Janice Stein (eds), *Sacred Aid: Faith and Humanitarianism* (Oxford U.P.), 65–89, pp.67–71.

[32] For a summary of the debate about "cultural proximity", see Benthall, *Islamic Charities*…., 2016, pp.51–52, 55–56.

[33] Benthall, *Islamic Charities*…., 2016, p.15.

[34] *IIRO Newsletter* 1.7, October 1995.

[35] *IIRO Newsletter* 1.5, April 1995.

propaganda. A number of US nonprofit organizations with tax-exempt status (technically, (501(c)(3) organizations), such as American Friends of Afghanistan, were formed to channel US government funds through USAID and the National Endowment for Democracy (NED), to engage in such activities as publishing a magazine, *Afghan Jehad*, arranging for injured *mujahideen* to be flown to the United States for medical treatment, training journalists to comment favourably on the *mujahideen*, and publishing leaflets for religious scholars. It was reported by an independent commentator in 1990 that the activities of some seventy advocacy NGOs worldwide had created an atmosphere of unconditional sympathy for the "freedom fighters", as they were then called by the US government, in which "anyone criticizing the rebels for their human rights violations or the alliance's lack of legitimacy is automatically seen as an apologist for the Soviet and Afghan armies".[36] Meanwhile the Soviets objected that the US administration was supporting international terrorism.[37] As noted above, the charity regulation regime in the US was relatively relaxed during the 1980s. I suggest that it encouraged certain Muslim and Arab activists to treat the structures of institutional charity in the same way,[38] whereas in the course of the 1990s United States foreign policy changed towards anathematizing the former Afghan "freedom fighters" as terrorists.

Working in 1980s Afghanistan is not evidence of support for terrorism. Numerous NGOs were present and active in the region during that time – both Western and Islamic – due to the widespread humanitarian crisis. The war came to an end at the end of that decade and Saudi aid to Afghan *mujahideen* came to an end shortly after the fall of President Mohammad Najibullah in 1992.[39] There is no reason to suppose that the leaders of the IIRO or MWL had anything to do with the leaders of Al-Qa`ida, or shared its ideology, goals or tactics.

With certain exceptions – notably Lashkar e Taiba (Army of the Pure), based in Pakistan, and an activist faction in the Revival of Islamic Heritage Society, based in Kuwait – the blame

---

[36] Helga Baitenmann, 1990. "NGOs, and the Afghan war: The politicisation of humanitarian aid." *Third World Quarterly* 12:1, 62–85, p.78. See also National Endowment for Democracy, Annual Report, 1989, p.15. https://www.ned.org/wp-content/uploads/annualreports/1989-ned-annual-report.pdf; National Endowment for Democracy, Annual Report, 1990, p.19. https://www.ned.org/wp-content/uploads/annualreports/1990-ned-annual-report.pdf

[37] Antonio Donini, 2004. "Principles, politics, and pragmatism in the international response to the Afghan crisis" (in *Nation-Building Unraveled? Aid, Peace and Justice in Afghanistan*, ed. A. Donini et al., Bloomfield: Kumarian Press, 117–142, p.121.

[38] Benthall, "Islamic humanitarianism in adversarial context" (in *Forces of Compassion: Humanitarianism Between Ethics and Politics*, ed. Erica Bornstein and Peter Redfield, 2011), p.117. See also Erica Caple James, 2019, "Policing Philanthropy and Criminalizing Charity in the 'War on Terror'" in *Governing Gifts: Faith, Charity, and the Security State,* ed. Erica Caple James (School for Advanced Research Press), 141–160, p.153.

[39] Thomas Hegghammer, 2007, "Violent Islamism in Saudi Arabia, 1979–2006: The Power and Perils of Pan-Islamic Nationalism", doctoral dissertation, Institut d'Études Politiques de Paris, p. 198. https://hegghammer.files.wordpress.com/2019/07/hegghammer-thesis-violent-islamism-in-saudi-arabia.pdf.

attached to the Islamic sector for the funding of violent extremism has been exaggerated. Abuse of the privileges of organized charities occurs everywhere from time to time and can be particularly hard to prevent because they depend on trust. The reputations of some of the world's most established and respected charities, such as Oxfam, Save the Children, and Unicef, have been tainted by proven serious misconduct.

The administration and financial control of large international charities with many overseas branches always present practical problems. For example, two leading international aid agencies, Oxfam and Médecins Sans Frontières (Doctors Without Borders) – having originated in Britain and France respectively – experienced considerable administrative turbulence in expanding their operations on a worldwide scale.[40]

Furthermore, the prestige of some major Western charities has been damaged by major financial scandals at the highest level of responsibility. For instance, in 1992 William Aramony, the president of the United Way of America, which was then a network of over 2,000 local organizations and raised over $3 billion per year for charity, was found guilty of 25 felony charges, after engaging in a lavish lifestyle, and sentenced to 7 years in prison.[41] In 1996, the executive director of the American Parkinson Disease Association, Frank L. Williams, was convicted for embezzling more than $1 million worth of contribution cheques.[42] These and many other crimes are recorded as having escaped detection for long periods despite the fiduciary duties of charity trustees, finance directors and auditing firms. The two scandals cited above took place in the 1990s. Two specialists in social work comment in an article published in 2001:

> The United States has already experienced the consequences that can accrue from NGO scandals in terms of loss of contributions, loss of status, and organizational turmoil. For countries in which the third sector [i.e. the non-profit] sector is at an earlier stage of development, the notion of NGO accountability to the public is not yet entrenched. The majority of NGOs do not as yet evidence a commitment to the concept of accountability and, in general, their boards are not meeting the basic roles and responsibilities essential for effective governance.[43]

This was certainly true of the Gulf based charities in the 1990s. In the case of a charity such as IIRO that grew very fast with many overseas branches in difficult conflict and disaster zones, it would have been surprising if there were no cases of personal embezzlement and fraud during this period.

---

[40] See Benthall, "Médecins Sans Frontières (MSF)", 2009. in *The Palgrave Dictionary of Transnational History*, pp.707–78, and "Oxfam", pp.801–802.

[41] Margaret Gibelman and Sheldon R. Gelman, "Very public scandals: Nongovernmental organizations in trouble", *Voluntas* 2001, 12: 1, pp.49–66.

[42] Lynda Richardson, 1996, "Former Charity Head Ordered to Prison", *New York Times*, July 31.https://www.nytimes.com/1996/07/31/nyregion/former-charity-head-ordered-to-prison.html

[43] Margaret Gibelman and Sheldon R. Gelman, p.61.

The IIRO annual report for 2001–2002 shows how dispersed, both geographically and conceptually, the charity was at this time:

> *Domestic branches*: 13 in number, with 3 more planned to open shortly.
> *Number of countries worked in*: 95.
> *Sectors worked in*:
>
> > Social welfare
> > Emergency relief
> > Social centres
> > Wells
> > Other infrastructure projects
> > Health care
> > Education
> > Free meals
> > Social programmes
> > Cultural assistance
> > Personal assistance
> > Human development

For any NGO, the prospect of monitoring all conduct of all employees at all times, even outside the scope of their employment, is not feasible. Sporadic abuse by individuals of the privileges of charities – whether for personal enrichment or for the pursuit of goals other than those for which the charity was set up – should not be assumed to indicate systemic wrongdoing, or to reflect the intentions of the policy-making heads of the charity, without solidly grounded evidence. Any organization with as many operating sections, and working in as many different countries, as IIRO in 2001–2002 would have run the risk of administrative disarray and consequent leakage of resources.

As an example of the monitoring and auditing difficulties experienced by any nonprofit organization operating in many different countries, we may cite the Report to Congressional Committees submitted by the United States General Accounting Office in March 1991, addressing "the programs and operations of the National Endowment for Democracy (NED) and its Board of Directors in providing oversight over program activities". The Report concluded, that though the NED "has been successful in developing an expanding worldwide grants program", among its deficiencies were the following: "The Endowment monitoring procedures have not been effective. Grantee noncompliance with the Endowment's key financial and internal controls has resulted in instances of funds being misused, mismanaged, or not effectively accounted for".[44]

Well into the twenty-first century, it has still been possible for such a sophisticated and prestigious agency as USAID to lose control of its finances when its operations are geographically stretched. USAID committed $589 million of emergency food assistance

---

[44] United States General Accounting Office, 1991, Report to Congressional Committees, "Promoting Democracy: National Endowment for Democracy's Management of Grants Needs Improvement". GAO/NSIAD-91-162, p.3. https://www.gao.gov/assets/160/150240.pdf

projects in Afghanistan since 2010.[45] But the audit by the Special Inspector General for Afghanistan Reconstruction (SIGAR) in 2020 found that "incomplete reporting and limited site visits reduced USAID's ability to conduct oversight of its emergency food-assistance activities in Afghanistan" Furthermore, USAID "lacked data to evaluate whether it achieved intended outcomes related to its emergency food-assistance projects", and whereas it tracked individual incidents of theft, diversion and loss, it did not know the "total amount of assistance lost", or the "total number of beneficiaries who did not receive" that assistance.[46]

Islamic charities in general have experienced considerable difficulties since 9/11 owing to suspicions on the part of some Western governments that they have been used as fronts for terrorist activities. Among the obstacles they have faced are "designations", *i.e.* blacklisting, with very limited access to due process and rights of appeal; and arbitrary closure of accounts by banks as a result of litigation against banks and consequent "de-risking". After 9/11, the whole sector of Islamic charities fell under a cloud. International NGOs as a whole soon realized that legal measures taken against Islamic charities, especially the US "material support" laws, put at legal risk the operations of *all* NGOs in conflict zones where Muslims are in the majority (in addition to the physical risks of operating in conflict zones). Their concerns today are articulately expressed by the Washington-based Charity and Security Network[47] and elsewhere. But, as noted in a professional report published in 2018, "Muslim charities (or those with a Muslim name) have faced the greatest obstacles in accessing financial services. This is despite non-Muslim and secular agencies being forced to rely increasingly on Muslim charities to deliver assistance in conflict zones such as Afghanistan, Somalia, Syria and Yemen".[48]

The United States justice system has been exposed to the criticism both domestically and internationally that the PATRIOT Act and the material support laws bear too hard on humanitarian work in general and on Muslim charities in particular.[49] Under these laws, the slightest taint of alleged collaboration with a terrorist entity is enough for a hospital, a dairy or a bakery to be considered as a criminal enterprise.

In general, Muslim charities are subjected to more scrutiny than others. Muslim charities seen to be affiliated with foreign governments often find themselves subjected to deep scrutiny due

---

[45] SIGAR Quarterly Report to the United Congress, January 30, 2020. p.iv. https://www.sigar.mil/pdf/quarterlyreports/2020-01-30qr.pdf.

[46] SIGAR Quarterly Report p.19.

[47] https://charityandsecurity.org.

[48] Stuart Gordon and Sherine El Taraboulsi-McCarthy, "Counter-terrorism, bank de-risking and humanitarian response: a path forward", Humanitarian Policy Group, Overseas Development Institute, London, Policy Brief 72, August 2018, p.2. https://www.odi.org/sites/odi.org.uk/files/resource-documents/12368.pdf.

[49] Cf. American Civil Liberties Union 2009, "Blocking faith, freezing charity: Chilling Muslim charitable giving in the 'war on terrorism financing'; Francis FitzGibbon QC, "Low-hanging fruit", *London Review of Books*, 22 January 2015, pp.13–14.

to such affiliation, while, for instance, the Jewish National Fund encounters no legal obstacles in the USA when it raises tax-exempt funds for military installations in Israel.[50]

The US justice system and the US Treasury have relied on a number of experts on counter-terrorism and terrorist financing with special reference to Muslim individuals and entities. Without questioning their motivations, it is reasonable to question their methodologies. Police and intelligence agents – responsible for keeping our populations safe from terrorism – rightly make extensive use of the technique of building up and analysing webs of association between individuals and between organizations. But for those responsible for arriving at judicial or administrative decisions, and those giving them expert advice, there is a material risk that they attribute guilt by association. For instance, it is sometimes argued in a circular fashion that organization X is blameworthy because of its association with organization Y, while organization Y is blameworthy because of its association with organization X.

Serious social scientists insist on well-grounded evidence, on contextualization, on making allowance for cultural differences, and on trying to understand the viewpoints and intentions of all relevant parties rather than only selected individuals. Normal standards for assessing academic credibility do not always appear to be maintained in the process of accreditation of experts. These standards include peer review, both at the stage of acceptance of books and articles for publication, and at the stage of reception when books and articles are reviewed and commented on by other scholars. These counterterrorism experts frequently lack experience of the realities of disaster relief and poverty alleviation projects, and of the management of nonprofit institutions, whose international programmes in conflict zones are always exposed to enhanced risks. They frequently ignore the growing research literature on contemporary Islam and on Faith Based Organizations, of which Islamic charities are a subset. Within the specific field of study of terrorism and terrorist financing, they frequently exaggerate the strength of evidence for the arguments they are advancing and ignore or discount the countervailing evidence. The basic principle of fairness, which dictates that those accused of serious misconduct should have a right to be heard, is often ignored.[51]

If it is agreed, as argued above, that there has been an overreaction against Islamic charities, we may note that two consequences have followed. Enforced closures and downsizing of Islamic charities have resulted in a *humanitarian deficit*. For example, the Islamic charities of the Gulf have sharply reduced their operations, with the partial exceptions of Kuwait and Qatar. These include the IIRO, in its day the largest Islamic charity in the world (before downsizing over the last twenty years). Simply put, an incalculable number of possible beneficiaries have missed out on charitable services that might have been provided if these charities had grown and developed at the same pace and with the same success as their counterparts in Britain.

A snapshot of the damage to the interests of charities' beneficiaries that arose since 2001 may be taken from the small, crisis-torn country of Chad. According to a presentation given in Qatar in February 2006, 18 Islamic NGOs were operating in Chad before 9/11. In 2006 there were only five, all of them funded from the Gulf. Three of these were threatened with closure.

---

[50]   https://www.kkl-jnf.org/people-and-environment/community-development/soldier-family-meeting-points/
Accessed August 1, 2020.
[51] Jonathan Benthall, "Experto crede: A legal and political conundrum" in *If Truth Be Told: The Politics of Public Ethnography*, ed. Didier Fassin, 2017), pp.160–183.

(Meanwhile, there were in 2006 some 300 active Western NGOs in Chad, including Christian missionary organizations.) One of the results was that nearly 500 orphans – some of them placed with families, some in residential orphanages – were abandoned by Islamic charities that had been supporting them. Many of these probably became street children.[52]

A *humanitarian vacuum* may also be identified. This is created when legitimate humanitarian actors are absent, allowing space for violent extremist regimes to make use of the idiom of charity for purposes that have nothing to do with charitable ideals. The so-called "Islamic State" set up a Ministry of Zakat and Charities to finance its administration in 2014–15, which helped it, according to one researcher, to bring in six times more revenue from tax than it received from oil sales.[53] The "Islamic State" also rebranded some UN/WHO food aid to gain credit for itself.[54] Al-Qa`ida in the Arabian Peninsula and an Al-Qa`ida affiliate in Syria, Hayat Tahrir al-Sham, wooed civilians with a "hearts and minds" approach that included the provision of food and other services.[55]

## 4.      The Inevitable Interconnection between Politics and Charitable Giving Common to All NGOs

Until about twenty years ago, books about Western aid agencies were almost invariably hagiographies – uncritical celebrations of their virtuous founders and followers, working in the domain of humanitarianism which was seen as essentially ring-fenced from politics. It is now a commonplace that charity and humanitarian aid have, and have always had, an inescapable political dimension in practice.[56] This new analytical approach was not arrived at solely as a result of self-criticism by humanitarians, though this was an important element. It was also a response to criticism of international aid agencies from outside, and specially by and on behalf of their recipients or presumed beneficiaries. International aid agencies have been seen as agents of Western power and influence, as providers of enviable opportunities for members of the middle classes, and sometimes as carriers of Christian evangelism or post-Christian godlessness. These criticisms have been current for many years, long before recent public revelations of serious wrongdoing among some of the most established Western NGOs, especially relating to sexual abuse.

Muslim criticisms of Western NGOs have been especially hard-hitting. The argument is that Western devotion to a pure domain of charitable altruism is hypocritical; the Western aid system is deeply connected to national foreign policies and security concerns; humanitarian

---

[52] Benthall, *Islamic Charities…*, p.34.

[53] Rukmini Callimachi, "The ISIS Files", *New York Times*, 4 April 2018, citing research by Aymenn Jawad al-Tamimi and Mara Revkin; Mara Revkin, *Foreign Affairs*, "ISIS' Social Contract: What the Islamic State Offers Civilians", 10 January 2016.

[54] Jonathan Benthall, 2018, "The Rise and Decline of Saudi Overseas Humanitarian Charities", Occasional Paper no. 20, Center for International and Regional Studies, Georgetown University – Qatar, p.33.

[55] Ib., pp.33–34.

[56] See for example Antonio Donini, ed., *The Golden Fleece: Manipulation and independence in humanitarian action* (Sterling, VA.: Kumarian Prss, 2012).

The Gulf states have been marked by a more general culture of privacy and discretion. When questioned by myself in 1995 about the lack of detailed annual accounts published by IIRO, the Secretary General, Dr Farid Qurashi, replied that in Saudi Arabia the duty of accountability was held to be only to the donors of charity – not to the public at large.[69] In the 1990s, Saudi based charities only published very general statements about the sources and disbursement of funds. This was at odds with current practice in the USA and Western Europe, but looking back only a decade or two earlier in Britain, at least, some charities had been managed very informally – with little documentation apart from stubs in a chequebook.

The standards of charity regulation that we now take for granted in Western Europe and the USA are in fact of fairly recent historical origin. In Britain, Charity Commissioners were appointed by the government in 1853, but it was only in 1960[70] that charities were required to keep proper books of account and keep these records for at least seven years. No auditing or independent review was then required. Not until 1993 did a new Charities Act require registered British charities to lodge financial accounts with the Charity Commission and to submit to independent examination.[71] Whereas Islamic charities in the United Kingdom have complied with these requirements, it is understandable that in the 1990s the charities based in the Gulf were managed in a more informal way. This is not to say that the larger Gulf-based charities did not employ auditors, but they were under no obligation to publish their findings.

## 7.    Practical Considerations for the Disbursement of Aid on the Ground

Even today, and more so during the 1990s, Gulf-based charities have been less professionalized and specialized than their non-Muslim counterparts. Staff members in the charities studied by Petersen were, she notes, "all practicing Muslims, many of them with a religious education. Many had previously worked in the private sector or in government; very few, if any, had experience from the UN or any Western aid organizations".[72] Some impartial observers have given special appreciation to the sincerity shown by fieldworkers employed by Islamic charities, and their strong solidarity with affected communities.[73] Petersen concludes that for IIRO staff, personal care, compassion and religious solidarity were more important than professionalism. This attitude is consistent with the Qur'anic teaching that poor people have a right to *zakat* and should always be treated with respect.

---

Charitable Giving" Jewish Virtual Library. https://www.jewishvirtuallibrary.org/eight-levels-of-charitable-giving

[69] Interview in London. See IIRO *Newsletter,* 1.5, April 21, 1995, "London visit of IIRO delegates", p.6. Dr Qurashi (1949–2003) was Secretary General between 1985 and 1996.

[70] The Charities (Statement of Account) Regulations 1960 (SI 1960 No. 2425).

[71] Carolyn J. Cordery and Rachel F. Baskerville, 2007, "Charity financial reporting regulation: a comparative study of the UK and New Zealand", *Accounting History*, 12: 1, 7–27, pp.12–14.

[72] *Gulf Charities*, p.28.

[73] Daniel Maxwell and Nisar Majid, 2016, *Famine in Somalia: Competing narratives, collective failures* (Oxford U.P.), p.196.

Case 1:03-md-01570-GBD-SN   Document 7604-6   Filed 01/14/22   Page 18 of 20

As an example of actual charitable activity on the ground, I described in *The Charitable Crescent* my visit in 1996 to an orphans' day centre in Amman, the capital of Jordan, run by the IIRO. This was just outside the Jabal Al Husayn refugee camp, and the centre cared for two hundred children up to the age of 15, just over half of them boys. Boys and girls, on alternate days, attended Qur'anic instruction and extra classes, and courses were provided to help their families become economically self-sufficient. The character of this programme brings out the point made above, that Islamic charities are conspicuously different in some ways, but similar in other ways to non-Muslim charities. Learning the Qur'an by rote is deprecated by most Western educationalists, who set a high value on the encouragement of problem-solving and creativity. Though this kind of instruction would be defended by Salafi Muslims on the grounds that a priceless religious heritage is being transmitted to the children, I could not but contrast what I saw with the atmosphere of a typical European or American classroom today. However, when I interviewed the head of the day centre, I found that her views on the care of vulnerable children were similar to those current in Save the Children UK in the 1990s. Like my colleagues in Save the Children, she was opposed to institutional orphanages and spoke strongly in favour of local initiatives and of the importance of volunteering without reward. I wrote in 2002 that this orphan centre "represents an approach to the care of children that accords with current expert Western thinking in seeking to strengthen family bonds through day centres, rather than board children in institutions".[74]

More generally, almost all Islamic charities undertake some kind of programmes to help orphans (defined in the Muslim world as children who have lost their father, though the category can also in practice include children born outside marriage, foundlings, and street children). These policies are grounded in Islamic Scriptures, for the Prophet Muhammad was an orphan himself and the Qur'an includes several passages that condemn those who misappropriate orphans' property. There is a clear analogy with the emphasis given by Christian charities to the care of children, in accordance with the teaching of the Gospels (*e.g.* Matthew 18: 1–10). The practice of international one-to-one child sponsorship was initiated by Christian charities but is now very widespread among Islamic charities.[75]

Another example of a practical consideration for the disbursement of aid on the ground is the widespread use of cash amongst Gulf Islamic charities. It is normal in Gulf countries for cash to be used even for large transactions. This is partly due to a mistrust of technology and of banks that charge and pay interest (prohibited in Islam, according to many schools of interpretation), but also because of an inclination towards privacy. It is an unwarranted assumption that records of movements in cash from the head office of a Saudi humanitarian organization to branch and affiliate offices, during the 1980s and 1990s and into the turn of the century, are *ipso facto* suspect.

The Saudi economy has been and remains relatively cash-intensive. There is great variation throughout the world's nations in the proportion of cash made use of in everyday transactions, as opposed to credit cards, wire transfers, cheques and the like. In the year 2000, the proportion of cash transactions to Gross Domestic Product in the Saudi economy was rather larger than

---

[74] *The Charitable Crescent*, pp.103–4.

[75] Benthall, "The care of orphans in the Islamic tradition, vulnerable children, and child sponsorship programs", *Journal of Muslim Philanthropy and Civil Society*, 2019, 3: 1.

the same proportion in the United States (8.0 percent as opposed to 6.0 percent), and considerably larger than the same proportion in the United Kingdom (3.2 per cent).[76]

The extent to which any given country's citizens make use of cash for transactions depends on cultural as well as technological factors, including the proportion of citizens who have no access to banks. In the 1970s, the Saudi economy was almost entirely based on cash transactions, and it has been transitioning since then towards an extensive use of modern financial technologies today – though with cash still retaining an important function.

In the context of international aid organizations, it must be remembered that the sophistication of the international banking system is not well adapted to conflict zones. It depends on sophisticated relationships of trust between institutions and individuals in different countries and jurisdictions – relationships which are disrupted by military conflict. Moreover, in the 1990s, the technologies of the Internet and cell phones were in their infancy. Cash couriers were often during this period the most secure way of making sure that humanitarian aid reached its desired destination.

## VI.   EXPERT REBUTTAL OPINION

### 1.   Fraud Risk in Domestic and International Charities and its Implications

Mr Winer in his expert report cites the study "An Investigation of Fraud in Nonprofit Organizations: Occurrences and Deterrents", by Janet Greenlee et al., published by the Hauser Center for Nonprofit Organizations, Harvard University, Working Paper no. 35, in December 2006 (Winer fn.105).  As Mr Winer writes, this study estimated that the fraud loss to US nonprofit organizations could be approximately $40 billion each year. Greenlee *et al.* write "A survey conducted by the Association of Certified Fraud Examiners (ACFE) estimates that all [US] organizations [*i.e.* both commercial or nonprofit] lose on average six percent of their revenue to fraud every year." And they argue that nonprofits are especially vulnerable to abuse in that they are founded on trust: "human failings lead trusted people to abuse their positions".

Yet this Harvard University study seems to have been confined in in its scope to US domestic charities and gives no attention to the additional risks of operating at an international level. We learn from the IIRO annual report for 2001–2002 (Kohlmann fn.204) that it was then operating in 95 countries in three continents, in a wide variety of sectors (pp.17–20). All these countries had their own laws relating to corporations, regulation of nonprofits, accounting, taxation and the like, including many differences of language, thereby greatly enhancing the risks to a Saudi-based international nonprofit organization of suffering losses through fraud.

Similar comments apply to Mr Winer's citation (also in fn.105) of the *Annual Fraud Indicator 2017*, published in the UK by the Centre for Counter Fraud Studies, University of Portsmouth,

---

[76] Morton Bech et al., "Payments are a-changin', but cash still rules", March 2018, *BIS Quarterly Review*, Annex "Payments data for CPMI jurisdictions: Table A", p.80. (However, in Japan, a highly developed industrial economy, the same proportion of cash transactions to GDP was much higher in 2000, *i.e.* 13.5 percent.) https://www.bis.org/publ/qtrpdf/r_qt1803g.pdf

3.    **The organizational structures of MWL and IIRO as purported evidence of organizational awareness of material support of al Qaeda.**

Mr Kohlmann writes in his expert report: "The organizational and financial structures of the MWL, IIRO, and WAMY are evidence that their material support of al Qaeda and affiliated organizations was conducted with the awareness and knowledge of the senior officials who headed those organizations" (para. IV. 17, p.7). Mr Kohlmann provides no evidence to substantiate this very serious accusation. Expertise on the "organizational and financial structures" of Non-Governmental Organizations – or for that matter, corporate bodies of any description – could be based on experience in project management, strategic planning, organizational consultancy, financial control and auditing, monitoring and evaluation, risk analysis, regulatory compliance, and the like. With respect, I can find no evidence in Mr Kohlmann's "Pedigree" (paras I. 1–10, pp.2–4) of any expertise of this type. Even if there were grounds for arguing that MWL or IIRO gave "material support of al Qaeda and affiliated organizations" – grounds which I consider to be lacking – it would be unwarranted to rely on Mr. Kohlmann's opinion to conclude that the "senior officials who headed those organizations" had an "awareness and knowledge" of any putative wrongdoing by individuals associated with the organizations at lower levels of responsibility.

August 3, 2020
_____
Date

_Jonathan Benthall_
_____
Jonathan Benthall

31