# EXHIBIT AK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THOMAS E. BURNETT, SR.** (P1), in his own right as the Father of **THOMAS E. BURNETT, JR.,** Deceased | **CIVIL ACTION** |
| | **Case Number** |
| **BEVERLY BURNETT** (P2), in her own right as the Mother of **THOMAS E. BURNETT, JR.,** Deceased | **1:02CV01616(JR)** |
| **DEENA BURNETT** (P3), in her own right and as Representative of the **ESTATE OF THOMAS E. BURNETT, JR.,** Deceased | |
| **MARY MARGARET BURNETT** (P4), in her own right as the Sister of **THOMAS E. BURNETT, JR.,** Deceased | |
| **MARTHA BURNETT O'BRIEN** (P5), in her own right as the Sister of **THOMAS E. BURNETT, JR.,** Deceased | |
| **WILLIAM DOYLE, SR.** (P6), in his own right as the Father of **JOSEPH M. DOYLE,** Deceased | |
| **CAMILLE DOYLE** (P7), in her own right as the Mother of **JOSEPH M. DOYLE,** Deceased | **THIRD AMENDED COMPLAINT** |
| **WILLIAM DOYLE, JR.** (P8), in his own right as the Brother of **JOSEPH M. DOYLE,** Deceased | **JURY TRIAL DEMANDED** |
| **DOREEN LUTTER** (P9), in her own right as the Sister of **JOSEPH M. DOYLE,** Deceased | |
| **DR. STEPHEN ALDERMAN** (P10), in his own right and as Co-Representative of the **ESTATE OF PETER CRAIG ALDERMAN,** Deceased | |
| **ELIZABETH ALDERMAN** (P11), in her own right and as Co-Representative of the **ESTATE OF PETER CRAIG ALDERMAN,** Deceased | |
| **JANE ALDERMAN** (P12), in her own right as the Sister of **PETER CRAIG ALDERMAN,** Deceased | |
| **YVONNE V. ABDOOL** (P13), in her own right as an Injured Party | |

members of the bin Laden family were whisked away from the United States to Saudi Arabia, at a time when commercial aviation was shut down in the United States.

Cash infusions from Saudia Arabia to front groups across the world works to ensure that perverse religious extremism takes hold internationally and in the United States. According to a briefing presented July 10, 2002 to the Defense Policy Board, a group of prominent intellectuals and former senior officials that advises the Department of Defense on policy: "The Saudis are active at every level of the terror chain, from planners to financiers, from cadre to foot-soldier, from ideologist to cheerleader." *Rand Corporation, Defense Policy Board briefing, July 10, 2002*. Certain entities and individuals in Saudi Arabia promote a culture of violence through the sponsorship of Osama bin Laden, al Qaeda and international terrorism. This culture of violence is also promoted through religious influence.

The Saudis are subjected to religious policing by the religious establishment which is dominated by descendants of Mohammed bin Abdul Wahhab. These religious police, the Committee for the Propagation of Virtue and the Prevention of Vice, exert strict and repressive control over the education system, and every aspect of social and personal behaviour. During the five daily prayers, religious police order ships and businesses to close, while in the mosques clerics rail against non-Muslims, the schools teach hatred, and the Ministry of Islamic Affairs publishes books describing Judaism and Christianity as deviant. The clerics dominate Saudi society, and anyone who talks of democracy, human rights or religious tolerance is put in jail or persecuted. This culture, which promotes hatred, religious intolerance and violence, is the prime enabler of al Qaeda and the growth of international terrorism. Ironically, the Defendants herein are the facilitators of international terrorism who use modern means and the "western" system while trying to destroy them.

practice of the zakat was perverted by Osama bin Laden as his radical terrorist organization expanded. The financial and logistical support given to al Qaeda by the Defendants funded al Qaeda growth siphoning off charitable donations to sponsor terrorism.

Osama bin Laden paid for the transportation of the new recruits to Afghanistan with some of his personal fortune, and set up camps there to train them. Osama bin Laden brought in experts from all over the world on guerilla warfare, sabotage, and covert operations to train and lead the recruits. Within a little over a year, he had thousands of volunteers in training in his private military camps. After the withdrawal of the Soviets in 1989, these politically and religiously radical and militaristic warriors spread out over the world to their countries of origin. Steeped in a bloody perversion of of the concept of Jihad for many years, these individuals were indoctrinated to the point they were not inclined to let go of the militant life they had grown accustomed to during the war. Many took up the radical Islamic cause in their home countries with the aim of destabilizing and overthrowing the more moderate Arab regimes, for not enforcing a "pure" form of Islam.

For example, one thousand of Osama bin Laden's faithfuls returned to Algeria where they began a nine-year civil war. Those returning to Egypt joined the al-Gama'a al-Islamiyya and the Egyptian Jihad groups determined to overthrow the government of that country. As many as two hundred of Osama bin Laden's followers settled in New York and New Jersey within the United States; some of these were later implicated in terrorist plots such as the 1993 World Trade Center bombing.[2] When Pakistan cracked down on al Qaeda members, many of them fled to Asia and joined radical Islamic groups in the Philippines. Some returned to Central Asia to continue the fight against the Russians in Tajikistan, or to other areas such as Bosnia and

---

[2] An admitted al Qaeda operative Ramzi Yousef was convicted on murder and conspiracy charges for his role in the plot to topple the trade center's two 110-story towers to punish the United States for its support of Israel.

## **Wahhabism**

Wahabbism is an Islamic sect founded by Mohammad Ibn Abdul-Wahhab in the 18th century. Abdul-Wahhab sought to rid Islam of the corruptions that he believed had crept into the religion from both within and without. His doctrine reverted to a strictly literal interpretation of the Koran and Wahhabism, in Abdul-Wahhab's view, became the sole source of legitimate Islamic thought and action. In direct contradiction to the civilized and moderate Arab world – the Wahabbists refused to move beyond outdated ideologies and codes of conduct. The Wahhabi rebellions of the nineteenth and twentieth centuries establishing the power of the sect in Arabia – were defined by their violence and brutality. As the sect took power, the Al Saud family united with the Wahhabi movement, eventually making it the official form of Islam practiced in Saudi Arabia. Hence, the intimate if tenuous relationship between the House of Saud and the Wahabbists.

In recent decades, certain schools of Wahhabism have become even more virulent toward non-Islamic civilization, extolling the virtues of martyrdom for the sake of saving Islam. For example, inflammatory Khutbahs (sermons) given by the Khateeb (preacher) Salaah Al-Budair in the Mosques of Mecca and Medina in August 2001 warned of the imminent threat the West posed to Islamic civilization:

> Fellow Muslims! We are nowadays confronted with a relentless war waged by the materialistic western civilization and culture that burns its producers and afflicts them with calamities, misery, immorality, disruption, suicide, and all kinds of evils . . . it is a civilization that races towards creating all means of trouble, disturbance, and destruction.

Al-Budair also emphasizes the greatness of offering to die as a martyr:

> Today we Muslims and indeed the entire world can witness the greatness of martyrdom being illustrated in the uprising in Palestine in general and the Al-Aqsaa in particular. This kind of stance, which revives the magnitude and virtues of martyrdom in the heart of the Muslim nation, is exactly what we need at this time. It is vital that the Muslims exert every

214

> effort to spread the love for achieving martyrdom just like the pious early generations of Muslims did. We must continue on the same road that they were on, which is that of our Prophet, and indeed all the prophets before him, in order to support our religion and defeat our enemies.
>
> Revive the importance of martyrdom and reawaken the spirit of seeking it! Instill the virtues of it in the hearts and minds by all methods possible. Our country [Saudi Arabia] has set an example in supporting this and donating generously in its cause from all different sections of the community. . .

Al-Budair finishes up these sermons by justifying suicide bombings:

> The Jews are described in the Book of Allah as those who distort words and facts and quote them out of context and this is what they and their supporters from the tyrant regimes all over the world are currently doing. They use false terminology to misguide, confuse, and deceive. What your brothers are committing in Al-Aqsaa are not acts of mindless violence, but rather it is a blessed uprising to resist and curtail the Jewish oppression and aggression: this is a legal right which all religions, ideologies and international laws recognize. Nobody could deny this fact except the ignorant, arrogant, or evildoers.

Such are the perverse Wahabbi sermons currently preached to inspire young men to join forces with Osama bin Laden and al Qaeda in a war against the West. As the former head of counter-terrorism for the FBI (and head of security for the World Trade Center on September 11, 2001) John O'Neill, succinctly stated: "All the answers, everything needed to dismantle Osama bin Laden's organization can be found in Saudi Arabia." The hate-filled ideology of the Wahabbists and Al-Budair confirm John O'Neill's judgement that the ideological, political and financial essence of al Qaeda, the growth of which led to the September 11, 2001 terrorist attacks, stems from certain segments in Saudi Arabia.

This ideology of violence will continue to promote worldwide terrorism until its financial and support network is dismantled. Extremist Wahhabism is inherently dangerous given its propensity to promote non-tolerance and hatred, including the following:

(1) All non-believers, including non-Wahhabi Muslims, are guilty of shirk and apostasy;

215

 (2) Only Wahhabi's are true Muslims, all others are non-believers;

 (3) "Jihad" or holy war against all non-believers should be actively encouraged and participated in;

 (4) The only acceptable system of government is an Islamic State based on Sharia—or Islamic law;

 (5) In a strict and often misguided, misinterpreted and wholly unacceptable version—by almost the entire Muslim world—of Sharia law;

 (6) In a purely Islamic world, with no geographic limitations or boundaries.

Put simply, Wahhabists believe they have the right to kill anyone who disagrees with their version of Islam. One Islamic scholar stated: "Wahhabisms evil and twisted interpretation of Islam in and of itself provides sufficient proof of the inherent dangers of Wahhabist ideology." Osama bin Laden and his al Qaeda organization are Wahhabists who have advocated for all of the above Wahhabist beliefs, including killing all non-believers. Wahhabists do not believe in national or governmental boundaries; they seek only one belief system and one world order— and one global Islamic State, based on their ill-founded interpretations of Islam.

In the aftermath of September 11, 2001, fatwas were delivered in Saudi Arabia by Shaykhs Hamud al-Shu'aybi and Abdullah B. Jibrin which attempted to justify the terror attacks. Moreover, certain members of the Saudi Royal family have knowingly and willfully exported Wahhabi ideology in order to convert others and to deflect attention away from Saudi Arabia. Wahhabism has been rejected by almost the entire Muslim world and has been called a threat to Islam itself. Professor Hamid Algar, one of the world's foremost Islamic scholars, stated:

> First, in the extremely lengthy and rich history of Islamic thought, Wahhabism does not occupy a particularly important place. Intellectually marginal, the Wahhabi movement had the good fortune to emerge in the Arabian Peninsula (albeit in Najd, a relatively remote part of the peninsula) and thus in proximity of the Haramayn, a major geographical focus of the Muslim world; and its Saudi patrons had the good fortune, in

216

>  the twentieth century, to acquire massive oil wealth, a portion of which has been used in attempts to propagate Wahhabism in the Muslim world and beyond.

The majority of Islamic scholars denounce Wahhabist practices. Wahhabist movements, such as the Taliban militia in Afghanistan, have been almost universally criticized by the Muslim world. For example, President Musharraf of Pakistan said of the Taliban: "It is an ignorant, primitive interpretation of Islam that is condemned by the entire Islamic world." Extremist Wahhabism and the terror and use of violence it promotes, has been condemned by mainstream Muslim scholars and religious leaders as being violent, primitive and inconsistent with the principles of Islam.

These facts are widely known through the Arab world, as it was known that the Taliban was fostering and harboring these extremists. Those entities and individuals that provided material support to the Taliban knew or should have known that they were supporting the al Qaeda terrorist organization and Osama bin Laden. The Taliban openly armed, funded, trained, provided housing, transportation, communication, false documentation, identification, weapons, explosives, personnel, and currency to al Qaeda terrorists. The Taliban knowingly financed terrorist manufacturing facilities, schools and training camps, and harbored known criminals.

Defendants knew or reasonably should have known they were providing material support to terrorists and terrorist organizations who committed the September 11, 2001 savagery that murdered thousands of innocent people. Defendants clearly knew, or clearly should have known, they were providing material support, aiding and abetting and enabling the terrorists that brutalized America and the world on September 11, 2001. By knowingly, purposely, recklessly and in many instances maliciously engaging in international terrorist activity, Defendants acts were a proximate cause of the events of September 11, 2001, for which they are jointly and

217

severally liable. They must be held accountable. Those providing financial resources and weapons, *inter alia*, to known terrorists who openly pronounced their intention to continue to murder innocent people, specifically American citizens, were on notice of the violence such sponsorship would cause. The sponsorship of international terrorism was reasonably anticipated to cause additional senseless murders of innocent people such as those that occurred on September 11, 2001.

This Complaint is brought pursuant to Rule 42 of the Federal Rules of Civil Procedure, which allows consolidation where actions involve common questions of law or fact. The Plaintiffs herein – United States citizens and citizens of foreign nations – close family members of those killed, including mothers, fathers, wives, husbands, children, sisters and brothers of those killed, along with those injured, on September 11, 2001. Plaintiffs include victims and injured eyewitnesses from each horrific attack, including those aboard all four of the doomed flights, at both Towers of the World Trade Center, inside the Pentagon, and those killed near Shanksville, Pennsylvania. These Plaintiffs seek full, just, timely compensation, treble damages, and punitive damages as appropriate and necessary to deter future acts of international terrorism. Because of the enormity and complexity of Defendants' collective and individual acts giving rise to liability, Plaintiffs herein provide a somewhat detailed explication of the facts as currently known or believed, which provide an abundant basis for this civil action.

While neither the government of Saudi Arabia nor the United States is a Party to this action, it is recognized that sensitive issues of United States foreign policy may nevertheless be raised, including the question of whether a suit of this nature interferes with or augments United States foreign policy interests. For this reason, it is important to note that it has been widely recognized, including by the United States government, that actions against foreign perpetrators

218

or facilitators of terrorism is consonant with United States foreign policy objectives. This action comports with vigorously pursuing the war against terrorism, and is consistent with enabling legislation and the jurisprudence regarding the civil liability imposed on behalf of terrorism's victims. As one former national security advisor noted:

> The process of discovery in this lawsuit on behalf of 9-11 families can lead to a vital contribution to our national security, and for that reason alone the United States Government should welcome the filing.

(Statement by Richard Allen, former National Security Advisor to President Ronald Reagan.)

Richard Murphy, a former United States Ambassador to Saudi Arabia, recently admitted:

> I have never said that the Government of Saudi Arabia is our ally. I have said that we have common interests . . . but that does not include the protection of individual princes.

(Richard Murphy, former United States Ambassador to Saudi Arabia, to NPR Radio.)

As the United States Department of Justice itself argued before the Second Circuit Court of Appeals in a case involving international terrorism:

> Any foreign person, entity, or state responsible for the intentional destruction of a U.S. aircraft, particularly one flying to the United States with many U.S. national aboard, 'should reasonably anticipated being haled into court' in the United States. Any foreign state must surely know that the United States has a substantial interest in the protection of its flag carriers and nationals in international air travel from the terrorist activity, and can reasonably expect that any action that harmed this interest would subject it to a response in many forms, including possible civil actions in U.S. courts. It is certainly in the interest of fairness and justice to do so.

(Brief by the United States Department of Justice as intervening party in *Rein vs. Libyan Arab Jamahariyah, et al.*, United States Court of Appeals for the Southern District of New York, 1998.)

As President George W. Bush stated in a joint session of Congress on September 20, 2001:

> We must starve terrorists of funding, turn them against another, drive them from place to place until there is no refuge or no rest.

219

The evidence and substantive law in this case require that the sponsors of terrorism will be held accountable, and this is fully consistent with and done in support of United States foreign policy. As one United States government official noted "stopping the money flow is the best way to stop terrorism. Audit trails do not lie, they are the diaries of terror." Given the gravity of the existing threat and the overwhelming suffering inflicted to date, Plaintiffs herein are committed to uncovering the truth and bringing to justice those who caused the attacks to occur.

## JURISDICTION AND VENUE

1. Jurisdiction arises pursuant to 28 U.S.C. §§ 1330(a), 1331 and 1332(a)(2), and 18 U.S.C. § 2338. Jurisdiction also arises pursuant to 28 U.S.C. §§ 1605(a)(2), 1605(a)(5) and (a)(7) (the Foreign Sovereign Immunities Act), 28 U.S.C. § 1350 ("Alien Tort Act"), the Torture Victim Protection Act, PL 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993)), and 18 U.S.C. §§2334, 2338. This Court also has jurisdiction over claims herein pursuant to 28 U.S.C. § 1367. This Court has both personal and subject matter jurisdiction over the Defendants herein.

2. As herein alleged, actions for wrongful death, permanent personal injury, trauma, loss of consortium, companionship, survival, and related torts perpetrated by a Foreign State, such as The Republic of Sudan, through its agencies, instrumentalities, its officials, employees and/or agents, fall within the exceptions to jurisdictional immunity under 28 U.S.C. §§ 1605(a)(5) and 1605(a)(7).

3. Venue is both proper and convenient in this District pursuant to 28 U.S.C. §§ 1391(d), 1391(f)(4), and 28 U.S.C. § 2334.

# JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,

/S/ Ronald L. Motley
Ronald L. Motley, Esq. (SC Bar No. 4123)
Joseph F. Rice, Esq. (SC Bar No. 4710)
Jodi Westbrook Flowers, Esq. (SC Bar No. 66300)
Donald Migliori, Esq. (RI Bar No. 4936; MA Bar No. 567562; and MN Bar No. 0245951)
Michael Elsner, Esq. (NY & VA Bar Nos. ME-8337)
Anne McGinness Kearse, Esq. (SC Bar No. 15642)
Elizabeth Smith, Esq. (SC Bar No. 68246)
NESS, MOTLEY, P.A.
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000


/S/ Allan Gerson
Allan Gerson, Esq.  (DC Bar No. 327494)
ATTORNEY AT LAW
4221 Lenore Lane
Washington, DC 20008
Tel:  (202) 966-8557


/S/ Harry Huge
Harry Huge, Esq. (DC Bar No._55640)
ATTORNEY AT LAW
Market Street North
401 Ninth Street, N.W., Suite 450
Washington, DC 20004
Telephone:  (202) 824-6046


/S/ John D'Amato
John D'Amato, Esq., (NY Bar No. JD-9041)
Guy Molinari, Esq., (NY Bar No. GM-2155)
RUSSO, SCARNARDELLA & D'AMATO, P.C.
1010 Forest Avenue
Staten Island, NY 10310
Telephone:  (718) 442-0900

/S/ William N. Riley
William N. Riley, Esq.(IN Bar No. 4941-49)
R. Douglas Hailey, Esq. (IN Bar NO. 7375-49)
Mark K. Dudley, Esq. (IN Bar No. 15418-49)
Amy Ficklin DeBrota, Esq. (IN Bar No. 17294-49)
Mary Beth Ramey, Esq. (IN Bar No. 5876-49)
ATTORNEYS AT LAW
3815 River Crossing Parkway, Suite 340
Indianapolis, Indiana 46240
Telephone:  (317) 848-7939

/S/ Paul J. Hanly, Jr.
Paul J. Hanly, Jr., Esq. (NY Bar No. PH-5486)
HANLY & CONROY, LLP
415 Madison Avenue
New York, NY 10017-1111
Telephone:  (212) 401-7600

/S/ Jack Cordray
Jack Cordray, Esq. (SC Bar No. 1400)
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone:  (843) 577-9761

/S/ Thomas E. Mellon, Jr.
Thomas E. Mellon, Jr., Esq. (PA Bar No. 16767)
John A. Corr, Esq., (PA Bar No. 52820)
Stephen A. Corr, Esq. (PA Bar No. 65266)
MELLON, WEBSTER & SHELLY
87 North Broad Street
Doylestown, PA 18901
Telephone:  (215) 348-7700

/S/ Don Howarth
Don Howarth, Esq. (CA Bar No. 53783)
Suzelle M. Smith, Esq. (CA Bar No. 113992)
Robert D. Brain, Esq. (CA Bar No. 98815)
HOWARTH & SMITH
800 Wilshire Boulevard, Suite 750
Los Angeles, CA 90017
Telephone:  (213) 955-9400

/S/ Sanford Rubenstein
Sanford Rubenstein, Esq. (NY Bar No. SR-4488)
RUBENSTEIN AND RYNECKI
16 Court Street
Brooklyn, NY 11241
Telephone:  (718) 522-1020


/S/ Michael N. Block
Michael N. Block, Esq. (NY Bar No. 0957)
SULLIVAN, PAPAIN, BLOCK, MCGRATH
    & CANNAVO, P.C.
120 Broadway Avenue, 18th Floor
New York City, NY 10271
Telephone:  (212) 732-9000


/S/ Vincent F. Pitta
Vincent F. Pitta, Esq. (NY Bar No. VFP1435)
Milton Mollen (NY Bar No. MM1504A
HERRICK, FEINSTEIN, LLP
2 Park Avenue
New York City, NY 10016
Telephone:  (212) 592-1400


/S/ Robert Conason
Robert Conason, Esq. (NY Bar No. RC2605)
GAIR, GAIR, CONASON, STEIGMAN
    & MACKAUF
80 Pine Street
New York City, NY 10005
Telephone:  (212) 943-1090


/S/ J.D. Lee
J. D. Lee, Esq. (TN Bar #2030)
LEE, LEE & LEE
422 S. Gay Street
Knoxville, TN 37902
Telephone:  (865) 544-0101

/S/ Gary O. Galiher
Gary O. Galiher, Esq. (HI Bar No. 2008)
GALIHER, DEROBERTIS, NAKAMURA, ONO
   & TAKITANI
610 Ward Avenue, Suite 200
Honolulu, Hawaii 96814
Telephone:  (808) 597-1400


/S/ Anthony M. Sellitto, Jr.
Anthony M. Sellitto, Jr., Esq.
OLIVER & SELLITTO
205 Bond Street
Asbury Park, NJ 07712
Telephone (732) 988-1500


/S/ Kenneth Sacks
Kenneth Sacks, Esq.
SACKS AND SACKS, LLP
150 Broadway, 4th Floor
New York, NY 10038
Telephone:  (212) 964-5570


/S/ Clare Sproule
Clare Sproule, Esq.
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, NY 10177-1211
Telephone:  (212) 351-4500


/S/ Samuel L. Davis
Samuel L. Davis, Esq.
(DC Bar No. 326579 & NJ Bar No. 7257)
DAVIS, SAPERSTEIN & SALOMON, P.C.
375 Cedar Lane
Teaneck, NJ 07666
Telephone:  (201) 907-5000


**Attorneys for Plaintiffs**


Dated:  November 22, 2002