# EXHIBIT AQ

# EXPERT REPORT OF

## JONATHAN T. MARKS, CPA, CFF, CITP, CGMA, CFE
### PARTNER, BAKER TILLY US, LLP

### AUGUST 7, 2020

Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE
Partner
Baker Tilly US, LLP
1650 Market Street, Suite 4500
Philadelphia, PA 19103
jonathan.marks@bakertilly.com
(267) 261-4947

# I.    OVERVIEW

## A.    RETENTION AND SCOPE

The Law Firm of Omar T. Mohammedi, LLC ("Counsel"), on behalf of its client, the World Assembly of Muslim Youth headquartered in Saudi Arabia ("WAMY") and the World Assembly of Muslim Youth USA ("WAMY USA"), engaged Baker Tilly US, LLP ("Baker Tilly", "we", or "us") to provide litigation support services and identified Jonathan T. Marks ("I", "me", or, "my") to serve as the rebuttal financial expert in the matter; *Terrorist Attacks On September 11, 2001, Case: 1:03-MD-01570-GBD-SN, United States District Court Southern District Of New York.*

My review involves an analysis of primary source documents, including financial documentation from WAMY and its chapters and uses of WAMY's funding for the period 1992 through 2002 to rebut claims raised in the Plaintiffs' experts' reports concerning WAMY's alleged involvement in terrorism financing.

## B.    QUALIFICATIONS

This expert report ("Report") is based upon my professional knowledge, education, training, and experience on similar investigatory engagements. I am the Partner and Practice Leader of the Forensic Investigations, Compliance, and Integrity Services group at Baker Tilly. I am a Certified Public Accountant, ("CPA"), Certified in Financial Forensics ("CFF"), a Certified Information Technology Professional ("CITP"), a Chartered Global Management Accountant ("CGMA"), and a Certified Fraud Examiner ("CFE"). I currently serve on the American Institute of Certified Public Accountants' ("AICPA") Fraud Task Force, which guides CPAs who specialize in fraud and forensic investigations. I am also a Board Fellow at the National Association of Corporate Directors and a published author appearing in the Journal of Forensic and Investigative

Accounting, Volume 11: Issue 3, July–December 2019.[1]  I was an adjunct professor at Rider University, where I taught auditing.  I was also a guest lecturer at Lehigh University, where I taught forensic accounting.

Attached, as **Exhibit A**, is my current curriculum vitae and information, which identifies my education, employment history, publications over the last ten years, and my expert testimony over the last four years.

## C.  DOCUMENTS CONSIDERED

I, and others under my direct supervision, have performed the analyses with the information made available through discovery. The information that I considered in my review includes (1) audit reports, (2) bank statements, (3) bank reports, (4) receipts, (5), financial reports,  (6), project reports,  (6) operational reports, and (7) communications regarding operations and financial documents. See **Exhibit B**. The documents and information that I considered and relied on are consistent with the types of documents and information that accountants and practitioners in my field typically consider and rely on in performing analyses such as those that I was asked to perform in this matter.

## D.  QUALIFYING LANGUAGE

This Report and the accompanying exhibits are intended solely for use in connection with this litigation and may contain confidential information.  Any unauthorized use or distribution of this Report or its attachments is strictly prohibited. I specifically reserve the right to supplement or update this Report on learning additional information that may impact the findings or opinions stated herein, and reserve the right to respond to any additional information obtained through discovery or issues raised by experts retained by Plaintiffs. In addition, I reserve the right to prepare

---

[1] *See* **Exhibit A**, the Curriculum Vitae of Jonathan T. Marks.

## II.      BACKGROUND

### A.      INTRODUCTION

WAMY is a charitable organization founded in 1972 which maintained global satellite offices during the period 1992 through 2002 ("Relevant Period"). WAMY defines itself as "an independent organization and Islamic forum that supports the work of Muslim organizations and needy communities" all over the world. This Report is prepared to rebut the expert reports of Evan Francois Kohlmann ("Kohlmann"), Dr. Matthew Levitt ("Levitt"), and Jonathan M. Winer ("Winer") (together referred to herein as the "Opposing Experts"). The Opposing Experts are not auditors, accountants, financial experts, certified fraud examiners, or CPAs.

### B.      THE ALLEGATIONS

In connection with the matter, the Plaintiffs have accused WAMY of knowingly providing material support to Usama Bin Laden ("Bin Laden") and his organization, Al-Qaeda.

Specifically, the Opposing Experts have argued the following:

1.      WAMY knowingly provided financial support to known terrorist organizations, including Al Qaeda.

2.      During the Relevant Period, the charitable sector was vulnerable to exploitation by terrorists due to lax regulatory requirements.

3.      Financial irregularities were inherent "features" of WAMY and "consistent with typical terrorist financing models".

4.      WAMY showed a recurrent pattern of deficient controls, missing funds, false invoicing, and other schemes to prevent the detection of their provision of material support to Al Qaeda and other terrorist groups prior to 9/11.

5.   The "organizational and financial structures of WAMY are evidence that their material support of Al Qaeda" … "was conducted with the awareness and knowledge of senior officials who headed these organizations."

6.   WAMY knowingly laundered money through their charitable projects, using portions for relief purposes and diverting other portions to Al Qaeda.

7.   WAMY knowingly provided material support to Al Qaeda by "hid[ing] what they were doing, such as by listing military and terrorist support activities as expenses for legitimate activities."

### III.     ANALYSIS

Based upon my review and analysis of the tens of thousands of primary source documents and other information produced in connection with this matter, I have not uncovered evidence to support a finding of financial mismanagement or misconduct indicative of terrorist financing activities on behalf of WAMY. The Opposing Experts describe WAMY as a terrorist-financing organization; however, their accusations point to no specific examples where WAMY knowingly financed terrorist activities, let alone the activities of UBL and Al Qaeda.  Instead, they rely generally upon a theory that, since non-profit organizations can sometimes be used to finance terrorist activity (with or without their knowledge), therefore WAMY must have been used by UBL and Al Qaeda.  Opposing Experts have no clear methodology or financial analysis with respect to their allegations against WAMY.  They have failed to base their opinions or reach conclusions on specific facts, circumstances, and documentary proof.  I have reached the opposite conclusions based upon my review and financial analysis in my capacity as a financial expert, trained CPA, and CFE. The accounting and audit methodology presented by the Opposing Experts—to the extent one exists—is not based on first-hand professional experience. None of the Opposing Experts are auditors, accountants, financial experts, certified fraud examiners, or CPAs. Yet, they purport to opine on issues that call for that expertise.  Moreover, experts who are CPAs, accountants, and auditors approach their analyses using tested and accepted methods and approaches, which the Opposing Experts have not applied.  Instead, they have just speculated without any analysis. Therefore, their combined methodologies are not based on relevant qualifications. Furthermore, the Opposing Experts do not base their conclusion on primary source financial documentation, which is central to our analysis. More problematic, the Plaintiffs' experts' conclusions are nothing more than speculation.

My analysis finds that WAMY experienced very few internal control weaknesses, which, when discovered, were addressed with more robust control environments, and did not and do not rise to the level of culpable conduct described by Opposing Experts. Based on the documentation I reviewed, I found WAMY's overall accounting control environment and efforts in correcting control deficiencies to be in line with a well-operated organization, considering the challenges faced by a not-for-profit organization operating in various developing countries where resources are scarce and financial regulations are not anywhere near the sophistication of the U.S. financial and accounting system requirements. I do not concur with the conclusions reached in the Opposing Expert reports.

The bases for my opinions are set forth below.

**A.  WAMY's Financial Audit Observations Do Not Indicate Participation In or Support of Terrorist Activities**

The Opposing Experts stated that terrorist organizations rely on terrorist sympathizers "in specific foreign branch offices of large, international charities particularly those with lax external oversight and ineffective internal controls," for fundraising purposes.[2] WAMY did not experience lax oversight or ineffective internal controls. Specifically, by addressing limited instances of non-compliant reporting and recordkeeping with proactive internal control actions, WAMY has shown that it does not have lax external oversight and that it addresses internal control issues as they arise. What I found were increased external oversight and increased controls.

I, and others under my direct supervision, reviewed 57 audit reports / audited financial statements from WAMY and its international offices, in both English and Arabic.  I will tackle these head-on. Based on my review of the audit reports, I uncovered anodyne financial audit

---

[2] United States District Court Southern District of New York, In re Terrorist Attacks on September 11, 2001, 03 MDL 1570 (GBD) (SN) ECF Case, Expert Report of Evan Francois Kohlmann.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

observations relating to support surrounding the use of WAMY's funds and controls. The nature of the financial audit observations found in my review does not provide any indication that WAMY intentionally sponsored projects and individuals connected with terrorist activities.

The Opposing Experts simply ignore the fact that as early as 1997, WAMY began the process of implementing a more robust, centralized organizational accounting system and IT control system. This process introduced more strict and centralized controls of its national and foreign offices.[3] An organization seeking to hide illegal contributions to terrorist organizations does not heavily invest in top-flight accounting firms, and costly IT controls.

Implementing central controls is in line with practices of a large international not-for-profit organization and the Financial Action Task Force's ("FATF") *Best Practices Paper On Combatting The Abuse Of Nonprofit Organizations.*[4] Kohlmann's Report states that WAMY's financial irregularities and atypical accounting practices reflect "typical terrorist financing modes and methodologies." I reviewed the controls put in place by WAMY; the institution of centralized controls is not reflective of "typical terrorist financing modes and methodologies,"[5] but of a global organization that is improving its overall risk profile.[6] None of the Opposing Experts are auditors, accountants, financial experts, certified fraud examiners or CPAs; therefore, Kohlmann's use of the term "atypical" or "irregular" would be misleading as he does not have the prerequisite background or experience to understand not only what atypical or irregular would be, but what typical or regular would be.

---

[3] WAMYSA082520

[4] Financial Action Task Force, *Best Practices Paper On Combating The Abuse Of Non-Profit Organizations (Recommendations 8),* June 2015, Date Accessed: July 13, 2020; (https://www.fatf-gafi.org/media/fatf/documents/reports/BPP-combating-abuse-non-profit-organisations.pdf).

[5] Kohlmann Report at , page 4 and 7

[6] Guidance for a Risk-Based Approach, The Bank Sector, Issued: October 2014, pg. 4 (http://www.fatf-gafi.org/media/fatf/documents/reports/Risk-Based-Approach-Banking-Sector.pdf)

According to Winer, Bin Laden and other Islamist leaders issued a fatwa[7] calling upon Muslims around the world to kill Americans in 1998.[8]  Levitt claims that, by 1999, Al Qaeda had the capacity to conduct major terrorist attacks as it built a worldwide network in about 60 countries.[9] Levitt further claims that Bin Laden allegedly used the resources of international Islamic nongovernmental organizations ("NGO") to finance terrorist activities.[10] According to the Opposing Experts, "Terrorist abuse of such NGOs [took] place at the local branch office rather than at the organizations' headquarters."[11] Winer opines that organizations that supported Al Qaeda showed a recurrent pattern of deficient controls.[12]

Levitt does not show how the NGOs provided this financial support to finance the 9/11 attacks. His contention is vague and conclusory and does not speak to WAMY's operations. Winer states that he has "not found documentary evidence that an audit was conducted by WAMY or LBI to reconstruct the actual uses of the funds"; Winer uses this as the basis for his argument that, due to no audits being performed, the funds must have been used to support al-Qaeda and other terrorist activities.[13] As we have found in our review, WAMY performed numerous audits in Saudi Arabia and across its international offices, all of which do not highlight any concerns that money was being laundered to support al Qaeda. Furthermore, Winer is not a qualified CPA or forensic

---

[7] A fatwa is a legal opinion or decree handed down by an Islamic religious leader. *See* Definition of *fatwa*, Merriam-Webster, Date Accessed: July 24, 2020 (https://www.merriam-webster.com/dictionary/fatwa).

[8] *See* United States District Court For The Southern District of New York, In Re: Terrorist Attacks On September 11, 2001, Expert Report of Jonathan M. Winer, 03-MDL-1570 (GBD) (SN), page 13, paragraph 4.2, and Expert Report of Dr. Matthew Levitt, page 9

[9] Expert Report of Dr. Matthew Levitt, page 10

[10] *See* United States District Court For The Southern District of New York, In Re: Terrorist Attacks On September 11, 2001, Expert Report of Jonathan M. Winer, 03-MIDL-1570 (GBD) (SN), page 13, paragraph 4.2, and Expert Report of Dr. Matthew Levitt, page 19

[11] Islamic Terrorists: Using Nongovernmental Organization Extensively (FED-PEC0290360-85)

[12] *See* United States District Court For The Southern District of New York, In Re: Terrorist Attacks On September 11, 2001, Expert Report of Jonathan M. Winer, 03-MIDL-1570 (GBD) (SN), page 9, paragraph 3.9

[13] Winer report,  section 12.12.7 onwards, page 106

accountant, and he has not reviewed the wealth of financial information available to make such broad claims. A review of the primary source documents shows that WAMY supported other charitable organizations and initiatives that were in line with the goals enumerated in WAMY's charter, which includes humanitarian support for refugees and orphans affected by war. Based on our review of the project reports and receipts, WAMY provided financial support for refugee initiatives, which included humanitarian support in the form of clothing, food, and shelter. We reviewed project reports that include, for example, support for Kosovo refugees in Albania (1999),[14] Palestinian refugees in Lebanon (2002),[15] and Chechen refugees in Georgia (2000).[16] When providing funds for refugees, WAMY required the recipients to follow up with reports to ensure the charitable use of funds.[17] Supporting refugees and orphans affected by wars does not equate to terrorism, and is in line with WAMY's stated charitable goals. In addition, the control aspect of requiring reports continues with the transparent nature of its funding.

By beginning to institute more strict and centralized controls in 1997, WAMY became a more transparent and better recordkeeping organization that is not in-line with organizations that supported Al Qaeda. WAMY strived to achieve for best practices when it demanded that its local offices report and be accountable for spending, which is not typical for an organization "hiding" something.  This structure and behavior are indicative of a control-based group, and not a group ran without control of its local branches.

---

[14] WAMYSA524838-WAMYSA524842

[15] WAMYSA525267-WAMYSA525272

[16] WAMYSA044850 - WAMYSA044851

[17] Ibid. The document includes the relief contract and sets out the agreement of support and amounts for each part, also requires the recipient party (in Georgia) to support expenditure with periodic reports.

As demonstrated below, this Report tackles head-on the few audit statements that presented any accounting issues which reveal no so-called "recurrent pattern of deficient control."

### 1. Pakistan

Lajnat al-Birr al-Islamiah ("LBI") was founded by Adel Batterjee[18] ("Batterjee") and registered in Pakistan on October 22, 1989,[19] with the main purpose of providing health services and urgent relief assistance to the poor in Northern Pakistan. LBI was established under the auspices of WAMY.[20]

LBI performed humanitarian works inside Afghanistan during its first two years of operations.[21] Initially, Batterjee kept satisfactory records of LBI's activities.[22] As WAMY's Assistant Secretary General explained, WAMY's policy was not to send funds unless they are allocated for specific projects and activities. Before the start of any project, a needs-assessment was performed, and the development of a budget followed this exercise. WAMY Saudi Arabia would follow up on every project, and if project reports were not received, WAMY would send someone from Jeddah to get the financial records and support[23]. We have found these declarations from Noorwali to be consistent with the supporting primary documents reviewed, and the project reports contained sufficient evidence for these processes, as we discuss in section C of our analysis. WAMY required the following items:

1. Needs Assessments

---

[18] PEC-WAMY040214, pg. 19/50

[19] WAMYSA018655 (BT: see WAMYSA057751, WAMYSA031896) (showing Pakistan registration March 12, 1991)

[20] Dr. Abdul Wahab Noorwali's Deposition Transcript, July 24, 2019, at 228.

[21] WAMYSA031308; WAMY028427; WAMYSA031293–8 and WAMYSA031301; and WAMYSA031289–92, and WAMYSA031302–4 (specific projects and their funding)

[22] April 2, 2018 Noorwali Declaration, at 8, 10; see also WAMYSA031289–92, and WAMYSA031302–4.

[23] Noorwali Declaration, at 17-24.

    2.   Project Reports

    3.   Operational Reports

    4.   Transactional Statements

WAMY would only send funds allocated for a specific project and would require reporting and audits on this funding to track the use of this funding.[24] The funding for WAMY's projects was thus done on a project by project basis. This is a version of control because it does not allow for a buildup of excess funds.   The funding of LBI on a project by project basis exhibits control over the funding of these projects.

However, by 1992, the relationship between WAMY and Batterjee was deteriorating due to Batterjee's progressive lack of reporting. This lack of reporting led to Batterjee's dismissal in early 1993.[25]

WAMY then became aware that Batterjee was using BIF, a separate charity unrelated to WAMY, to make donors feel as if they were donating to LBI when they were donating to BIF.[26] In response, WAMY immediately sent Batterjee a letter asking him to cease and desist.[27] On May 11, 1993, WAMY's Secretary General, Dr. al-Johani, informed then-Prince Salman bin Abdul Aziz about Batterjee's dismissal from LBI and about the deception.[28]   These active actions by WAMY highlight its proactive approach to control and show that WAMY was active in its management and removal of anyone it considered to be a bad actor. An organization that was

---

[24] April 2, 2018 Noorwali Decl. ¶ 15.
[25] April 2, 2018 Noorwali Decl. at Paragraphs 34-39.
[26] WAMYSA034247-248.
[27] FED-PEC0114419
[28] WAMYSA061345

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

actively financing terrorism would not proactively remove an individual and bring to light to any deception.

In July 1995, WAMY decided to dissolve LBI and take it over as a WAMY field office. "This was done in order to cut ties with Adel Batterjee clearly and to ensure that his activities with BIF were not attributed to or affiliated with WAMY."[29] As WAMY's Assistant Secretary General Dr. Noorwali stated, "the relationship with Adel Batterjee was cut, ended, and he used to carry out his activities in Benevolence International Foundation, of which we do not know any details. And our offices in the field, whether in Pakistan or other regions, did not deal with Benevolence International Foundation."[30] On May 28, 1996, that decision took effect, and LBI was dissolved and taken over by WAMY. LBI's name was merged into WAMY after the dissolution of all assets of LBI Pakistan.

Meanwhile, as Dr. Bahafzallah took over as LBI chairman in early 1993 after Batterjee's dismissal, he submitted LBI to annual external auditing by the Pakistani firm of Sidat Hyder Qamar Maqbook & Co., a representative of Arthur Anderson.[31] There was no mention of BIF anywhere in the LBI audit reports. Moreover, from all the audits carried out through 1997, when the organization was still named LBI,[32] it was clear that LBI had its main assets in Pakistan and Afghanistan. None of these assets were shared or transferred to any other organization, contrary to the speculative and unfounded statements in the Plaintiffs' experts' reports[33] when they lump

---

[29] Noorwali declaration II, at 13. See also WAMYSA065181–5.

[30] Noorwali deposition, July 24, 2019, at 267.

[31] WAMYSA018660–83.

[32] WAMYSA018648–83.

[33] E.g. Winer Report section 12.12.

      i.   Follow up the application of the accounting system in all offices with supervision and review of financial restrictions in each office,

      ii.   Prepare the final annual accounts of the symposium in the eastern region, and

      iii.   Support the planning of budgets of new offices

b.   Internal correspondence from the WAMY head office was identified, which reprimanded managers for any employees not following employment procedures.[47]

c.   Minutes from a meeting held with the accountants from the Saudi regional offices on June 18, 2000, provide evidence of changing accounting protocols in the eastern provinces to rectify the issues. This included the installation of a unified accounting system in all eastern provinces, the hiring of accountants in all offices, and staff training.[48]

I have noted that WAMY updated and centralized its accounting systems in the late 1990s and early 2000s, which is supported by internal correspondence.[49] Moreover, WAMY requires international offices to report on the allocation of installments of funding, following proof of activities on a bi-annually or quarterly basis.[50] These proactive efforts to enhance WAMY's internal controls and financial operations demonstrate the organization's efforts to enhance its control environment.

## B.   WAMY Canada

I reviewed documents that highlighted the issues experienced by the Canadian office during the implementation of the new control and budgetary process: Mohammed Khatib

---

[47] WAMYSA528986-WAMYSA529175 pg 21

[48] WAMYSA1070344- 70599

[49] WAMYSA082521 &  WAMYSA082520

[50] WAMY SA 2179- 2180 &  WAMY SA 2100- 2102

("Khatib"), the director of WAMY Canada from 1997 through March 2001. In 1999, Khatib requested $12,000 for budgetary expenditures from WAMY,[51] but he only received a response for $3,000[52] of the requested amount. Additionally, by February 2001, WAMY Canada had not received any funds for the first quarter of 2001.[53] By March 2001, WAMY had demanded Khatib's resignation.[54] These actions were taken by WAMY because Khatib did not furnish detailed plans and reports of activities required to release the funds requested.

In a speech, "Identifying Terrorist Financing Red Flags and Emerging Trends" presented at ACAMS 9th Annual International Anti-Money Laundering Conference by Dennis M. Lormel, a terrorism expert and a former FBI agent responsible for having established an investigative organization within the FBI that identified the funding stream that supported the 9/11 attacks, Mr. Lormel highlighted the following;[55]

- The best chance to prevent terrorists from succeeding is to disrupt their ability to raise, move and access money

- Terrorists must have effective financial infrastructures

- Terrorists require financial support to achieve their goals

- Lack of government transparency

The defunding of WAMY Canada under Khatib was a direct response by WAMY to control funding and the actions of a director who was not operating in a controlled, transparent

---

[51] WAMY SA 2427- 29

[52] WAMY SA2579- 83 &  WAMYSA9807

[53] April 2, 2018 Declaration of Dr. Abdullah, ¶ 28.

[54] March 29, 2018 Declaration of Al-Khatib, ¶¶ 40, 43.

[55] ACAMS 9th Annual International Anti-Money Laundering Conference, Mandalay Bay, Las Vegas, Identifying Terrorist Financing Red Flags and Emerging Trends, September 20, 2010, Dennis M. Lormel, Founder and President, DML Associates.

manner.  WAMY took immediate action to correct the actions of one individual who was not being transparent.  WAMY promoted transparency, and when Khatib did not follow the control structure,[56] WAMY disrupted his ability to raise, move, and access money.  These actions are in line with Lormel's comments on what steps should be taken to prevent terrorists from succeeding, and they are not actions of a problematic organization or one ignoring misconduct.

## C.    THE CANADA REVENUE AGENCY

The Opposing Experts focus on the findings of the Canada Revenue Agency but reach the wrong conclusion. The Canada Revenue Agency ("CRA")[57] audited WAMY Canada and made an administrative decision regarding its taxable status. Along the way, the CRA points to WAMY Canada's connections to Benevolence International Foundation in Canada ("BIF Canada") and Benevolence International Foundation in the USA ("BIF USA") – neither of which were terrorist organizations or designated by any authority during the time period in question (January – June 2001).  Plaintiffs' experts focus on the fact that WAMY Canada and BIF Canada shared a common director, al- Khatib, a common address which was Khatib's home address, and a common bank account created by Khatib.

According to the CRA, BIF Canada and WAMY Canada shared an account at the Bank of Montreal with account number 8086-611.  The account was opened in October 2000 under the name "World Assembly of Muslim Youth." In January 2001, the name was changed by Khatib to "World Assembly of Muslim Youth o/a BIF," and then closed in June 2001.  In June 2001, the address on the account was the same as BIF Canada and Khatib's home address, in June of 2001 the address was the same as the last known address of BIF Canada. The 1998 address on

---

[56] WAMYSA067658

WAMY's application for charitable registration is the same as the address BIF used in its filings with the CRA. In Khatib's sworn declaration, he states that the Bank of Montreal account was a BIF account and that no WAMY funds were co-mingled with BIF funds.[58]  WAMY Canada and BIF Canada were two separate entities. Although they shared the Bank of Montreal bank account through Khatib, BIF Canada was not funded by WAMY Canada or by WAMY in Saudi Arabia. According to Khatib, the account was created this way to allow BIF Canada donors to take advantage of the tax-deductible status of WAMY Canada, while BIF Canada was waiting for approval of the request for charity status. He also stated that WAMY was not aware of his dealings with BIF because he did not disclose this relationship with anyone at WAMY.  As mentioned in Abdullah's testimony provided during his deposition, WAMY discontinued funding of WAMY Canada because Khatib failed to report the activities of the organization and terminated Khatib upon learning that he was volunteering or working for more than one charity without disclosing those relationships. The control actions of WAMY towards WAMY Canada are not in line with an organization supporting terrorist activities.

1.  *WAMY Canada did not make a payment to the orphan program of BIF USA.*

The CRA audit report includes references that funds moved from WAMY Canada to BIF USA. The documents I reviewed only disclosed the movement of funds between BIF Canada to BIF USA. The audit reports I reviewed did not reveal, as Winer claims, "recurrent patterns of gross abuse, as one would expect of charities whose personnel intentionally were expending charitable funds for prohibited purposes, such as buying weapons and providing direct support to terrorist groups." Winer Report at 3.9. There were no supporting documents to show

---

[58] United States District Court Southern District of New York, In re Terrorist Attacks on September 11, 2001, 03-MD-1570 (GBD) (FM) ECF Case, Declaration of Mohammed Al Khatib.

that funds were used to purchase weapons or support terror.  Khatib was in control of the account, not WAMY.

Opposing Expert Winer stated:

> "Canada's audit of WAMY illustrates how financial improprieties and irregularities in a charity that included inadequate books and records create a situation where it becomes impossible to determine how funds were actually used, even when other evidence shows that the charity is linked to terrorist groups, makes payments to other charities found to have directly funded terrorism; and disseminates hate speech consistent with ideological support of terrorism. Inadequate and fraudulent books and records are typical of charities that are hiding bad conduct. For charities linked to terrorism, bad books and records become the means of hiding terrorist support activities."

These statements are not correct with regards to WAMY Canada. Our first-hand review of the documentation shows clear evidence of the fund movement and to whom the funds are going to. There is no lack of transparency on behalf of WAMY Canada with this fund movement. Neither WAMY nor WAMY Canada funded BIF USA.  My review of the documents shows that the BIF USA money was sent out by Khatib to a charity organization, not a terrorist organization.  This is based on the evidence provided by WAMY Canada and the Canadian Government, not a third-hand comment.

The payment amount of $50,246 related to the orphan program was reflected in WAMY Canada's 2001 T3010 Registered Charity Information Return, WAMY Canada's unaudited financial statements, the WAMY Canada bank statements, and the CRA 2001 audit report.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

## SECTION H. GIFTS TO QUALIFIED DONEES

The terms **qualified donee, specified gift,** and **associated charity** are explained in the guide.
H1 Did the charity make gifts to qualified donees? _____ 500 ☒ Yes ☐ No
If *no*, go to section I.
If *yes*, provide the information outlined below. Please enter the total amount the charity gave each donee during the fiscal period, and list donees in order of the amount they received from largest to smallest.

| Name of donee | Check if donee is an associated charity | Location | BN/Registration number of donee if a charity | Amount of Gift | |
|---|---|---|---|---|---|
| | | | | Gifts (do not include specified gifts) ($) | Specified gifts ($) |
| ISLAMIC COMMUNITY CENTRE | ☐ | TORONTO ON | | 48,209 | |
| ORPHAN PROGRAM | ☐ | USA | | 50,246 | |
| AL HIJRA SCHOOL | ☐ | WINDSOR ONTARIO | | 66,721 | |
| DAR AL IMAN SCHOOL | ☐ | ST. LAURANT QC | | 21,891 | |
| IQRA ISLAMIC SCHOOL | ☐ | SURRY BC | | 13,970 | |
| REGINA HUDA SCHOOL | ☐ | REGINA SA | | 6,982 | |
| | ☐ | | | | |
| | | | Totals: 501 | 208,019 | 502 |

Total amounts given to qualified donees (add lines 501 and 502) _____ 503 $ 208,019

---

CANADA REVENUE AGENCY - AUDIT REPORT                    PROTECTED B

CLIENT: WORLD ASSEMBLY OF MUSLIM YOUTH (WAMY)

- 2001  -$50,246 to the **Benevolence International Fund** Orphan Program.
       -$4.000 to the **Muslim Student Association**.

EXPENSE

| | | |
|---|---|---|
| **Cost of Goods Sold** | | |
| Net Purchase | 0.00 | 0.00 |
| Total Cost of Goods Sold | 0.00 | 0.00 |
| | | |
| **Payroll Expenses** | | |
| Total Payroll Expense | 0.00 | 0.00 |
| | | |
| **General & Administrative Expenses** | | |
| Support to Charitable Organizations | 91,051.43 | 91,051.43 |
| Camp | 7,224.01 | 7,224.01 |
| Festival | 920.00 | 920.00 |
| Support -Al Hijra School | 66,721.26 | 66,721.26 |
| Designated Donation-Orphange Proj | 73,811.89 | 73,811.89 |
| Lisence & Registration | 30.00 | 30.00 |
| Interest & Bank Charges | 77.74 | 77.74 |
| Office Supplies | 252.96 | 252.96 |
| Gas | 0.00 | 0.00 |
| Food | 0.00 | 0.00 |
| Storage | 0.00 | 0.00 |
| Moving | 0.00 | 0.00 |
| Parking | 0.00 | 0.00 |
| Total General & Admin. Expenses | 240,089.29 | 240,089.29 |
| | | |
| TOTAL EXPENSE | 240,089.29 | 240,089.29 |
| | | |
| NET INCOME | -37,178.31 | -37,178.31 |

**EXPENSES**

| | |
|---|---:|
| Programme expenses | 165,917 |
| Designated donations | 73,812 |
| Office and general | 360 |
| Amortization | 510 |
| | **240,599** |

| | |
|---|---:|
| **EXPENDITURES IN EXCESS OVER REVENUES** | (37,688) |
| Net assets, beginning of year | 47,112 |
| **Net assets, end of year** | **$ (9,424)** |

**WORLD ASSEMBLY OF MUSLIM YOUTH**
STATEMENT OF OPERATIONS AND NET ASSETS

| FOR THE YEAR ENDED DECEMBER 31, | 2001 |
|---|---:|
| **REVENUES** | |
| Donations (Note 2) | $ 130,472 |
| Designated donations | 72,281 |
| Other Income | 158 |
| | **202,911** |
| **EXPENSES** | |
| Programme expenses | 189,483 |
| Designated donations | 50,246 |
| Office and general | 360 |
| Amortization | 510 |
| | **240,599** |

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)
Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

## Transaction details

| Date | Description | Amounts debited from your account ($) | Amounts credited to your account ($) | Balance ($) |
|---|---|---|---|---|
| | **CAD FirstBank Business Investment Account® # 0430 8086-611** | | | |
| | Account type: NPO | | | |
| Mar 6 | Opening balance | | | 8,100.71 |
| Mar 6 | Credit, BR.0309, ABM DEPOSIT ADJUSTMENT, 9562244 | | 3,087.00 | 11,187.71 |
| Mar 6 | Sundry Item, BR.0309, IB | 4,969.00 | | 6,218.71 |
| Mar 14 | Error Correction, USD NOTES, AT1.526     HC $0.00, 420.00 | 640.92 | | 5,577.79 |
| Mar 14 | US $ Cash Sale, AT1.526     HC   $0.00, 420.00 | | 640.92 | 6,218.71 |
| Mar 14 | US $ Cheque Sale, AT1.5297     HC   $2.75, 420.00 | | 639.72 | 6,858.43 |
| Mar 14 | ABM Deposit, 985 DUNDAS ST. | | 4,825.00 | 11,683.43 |
| Mar 20 | ABM Deposit, 985 DUNDAS ST. | | 12,255.00 | 23,938.43 |
| Mar 20 | ABM Deposit, 985 DUNDAS ST. | | 1,017.00 | 24,955.43 |
| Mar 20 | US $ Wire Payment, USD PO   2987 | | 50,293.13 | 75,248.56 |
| Mar 26 | Deposit | | | |

By reviewing the primary source documents, it is simple to establish the fact that WAMY stopped funding WAMY Canada before this $50,293.13 payment was made from a source other than WAMY and to BIF--not WAMY. In March 2001, WAMY did not provide any funds to Al Khatib for WAMY Canada's operations because he was not reporting operations back to WAMY USA on behalf of WAMY Canada. Neither WAMY nor WAMY USA knew Khatib was a director of BIF Canada until after he was forced to resign as WAMY Canada's Director.  In his sworn declaration, Khatib stated that the funds were paid by BIF and not WAMY Canada.[59] This corroborates Abdullah's deposition that none of the money going to Khatib in March 2001 came from WAMY, which contradicts the CRA Audit Report. But

---

[59] United States District Court Southern District of New York, In re Terrorist Attacks on September 11, 2001, 03-MD-1570 (GBD) (FM) ECF Case, Declaration of Mohammed Al Khatib.

Opposing Experts ignore all of this primary source material in favor of their unsupported conspiracy theories.

In the T20 2011 CRA charity audit report, the CRA states that the documentation does not allow the CRA to "determine the nature and intended purpose of WAMY's business dealings, what relationships have been developed, and who, effectively, exercises ultimate control over the arrangements or transactions." The CRA is stating that it cannot determine these facts, which fails to support the CRA's and Winer's accusations of WAMY Canada's involvement with terrorist financing activities.

The CRA suggests that WAMY Canada's finances were obtained through WAMY, which is incorrect. There is no financial evidence showing that WAMY Canada funded BIF projects. The CRA also states that WAMY Canada made a payment in 2001 from a dual account with BIF Canada to BIF USA. This is incorrect as WAMY Canada and BIF Canada were two separate entities,[60] and although they shared the Bank of Montreal bank account, BIF Canada performed its funding activities. WAMY Canada did not fund BIF Canada. While perhaps the work of an amateur office administrator, the creation of the Bank of Montreal account for BIF Canada does not mean, in and of itself, that WAMY funds were used by BIF Canada. Recall too that BIF Canada and BIF USA were not added to the terrorism watch list until November 2002.[61] At the time of the March 2001 wire payment, banks in Canada and the USA were required to maintain a program to stop the movement of money to agencies listed on the terrorist watch

---

[60] Letter dated June 16, 2004 from Dr. Khalid Bin Abdel Mohsen Al-Mehesan to Mr. Muhammed Bin Ali Al-Kotobi, with the subject Re: A proposal for Canada's Bureau

[61] https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/benevolence-international-foundation / https://www.treasury.gov/press-center/press-releases/Pages/po3632.aspx

and/or sanctions list. However, the payment was not stopped because BIF Canada was not listed as a terrorist organization at the time of the payment.

WAMY did not become aware of WAMY Canada's audit findings until the CRA report had been released in August 2011.[62] Once aware of the CRA audit findings, WAMY offered to help WAMY Canada find an attorney in Canada so that they could file an appeal.[63] WAMY Canada responded by explaining that they were independent of WAMY USA and WAMY[64] and were required to follow separate regulations. Therefore, they were not allowed to have WAMY find an attorney for them in Canada. WAMY's Secretary General, Dr. al Wohaibi, detailed WAMY Canada's lack of responsiveness and instructed WAMY Canada to cease and desist from causing further harm to WAMY.[65]

Opposing Expert Winer (3.8) stated: Winer (3.8)_stated

> "I know of no charity that has among its lawful, public,
> authorized uses providing funds and other support for acts of
> violence. Recordkeeping by any charity involved in support
> for such acts of violence or for any form of serious crime
> necessarily seeks to hide the evidence of such support.
> Documenting terrorist activities in the books of a charity is
> counter to the interests of both the charities supporting
> terrorist groups and to the interests of the terrorist groups
> themselves. Doing so would increase the risk that the donor as
> well as the recipient will be indicted, arrested, subject to civil
> liability to their victims, sanctioned, and/or put out of
> business. It was standard practice for charities that provided
> support to al Qaeda to hide what they were doing, such as by
> listing military and terrorist support activities as expenses for
> legitimate activities."

---

[62] Letter dated April 9, 2012 from The Law Firm of Omar T. Mohammedi, LLC to Aymen Taher, Board of Director of WAMY Canada, with the subject "Re: In re Terrorist Attacks of September 11, 2001, 03 MDL 1570

[63] Letter dated April 9, 2012 from The Law Firm of Omar T. Mohammedi, LLC to Aymen Taher, Board of Director of WAMY Canada, with the subject "Re: In re Terrorist Attacks of September 11, 2001, 03 MDL 1570"

[64] Letter dated August 14, 2012 from Nasser (Irfan) Syed, Esq. of Goetz & Eckland P.A. to Sean P. Carter , Esq. of Cozen O'Connor, with the subject "In Re: Terrorist Attacks on September 11, 2001, 03 MD 1570 (GBD) (FM)"

[65] Letter dated May 9, 2012 from Dr. Saleh Al Wohaibi, WAMY Secretary General, to Aymen Taher, Board of Director of WAMY Canada, with the subject "Re: World Assembly of Muslim Youth Canada"

In my review, I did not find falsified expenses presented as legitimate expenses. What I found, using the above as an example, was transparency as to these types of items. This transparency by WAMY Canada refutes the unfounded statement made above.  In my first-hand review of the CRA report, I found:

1) The "thousands of dollars" sent to BIF USA was done before they were on the UN list. The funds were accepted by a rogue individual who was removed from their position at WAMY Canada (and the funds themselves were not provided by WAMY). In addition, there is no evidence that BIF contributed to 9/11.

2) The facts show that the control of WAMY Canada by WAMY put an end to subversive actions by Khatib. These actions were not an act of WAMY forcing "its own objectives" in Canada, but a charity using its monetary oversight to control bad actors.

The Opposing Experts attempt to make a finding of links to terrorism based upon a regulatory agency's findings concerning taxable status:

> It is important to note that the three Saudi charities examined below are not the only ones that have raised concerns of intelligence, law enforcement, and policy officials. Consider, for example, the Canada Revenue Agency's (CRA) decision to revoke the charity registration of the World Assembly of Muslim Youth (WAMY) in Canada. The CRA found that WAMY provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF), an entity on the U.N.'s list of entities tied to al Qaeda. CRA found that the WAMY office in Saudi Arabia "maintains substantial control over WAMY's finances [in Canada], and uses this control to carry out its own objectives in Canada." The CRA report went on to lists examples of "adverse reporting on WAMY and its affiliates," linking the groups to terrorist organizations.[96]

The above is a broad-brush personal summary based on second-hand information that does not rely on fact.   Our first-hand review of the primary source of information show that the audit by

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

the CRA came to the following conclusion "We are unable to conclude with any degree of certainty that payments made to qualified donees from WAMY's Bank of Montreal account were carried out as part of the activities of WAMY."   As a CPA, I cannot come to a conclusion that WAMY paid "thousands of dollars" to BIF when the audit is not able to come to that conclusion.[66]

### D.   WAMY DOES NOT HAVE A LACK OF OR SYSTEMATIC RECORDKEEPING ISSUES

The complaints and other experts repeatedly mention that WAMY financials are incomplete, and bank statements are missing from WAMY's records.  Based on my review, the records following 1992 substantially exist, and I have not identified any systemic issues related to missing documents following 1992, or systematic patterns of missing documents.  We have reviewed documents regarding WAMY's IT and accounting systems being centralized as early as 1997, and due to this shift, it would not be uncommon for the centralization and consolidation of these systems to result in the minor loss of some less significant paper documents. Furthermore, it is not uncommon for large decentralized organizations to periodically misplace, inadvertently discard or destroy files and records, which are over seven (7) years old.  The infrequent loss or discarding of documents is not indicative of an organization engaged in criminal activity. Lastly, WAMY's Assistant Secretary General stated that due to a 2008 flood in Jeddah, Saudi Arabia, many financial records stored in the basement were apparently lost.[67]

---

[66] https://www.canadiancharitylaw.ca/uploads/World_Assembly_of_Muslim_Youth.pdf

[67] 4.3.19 Declaration of Dr. Abdul Wahab Noorwali at ¶ 25 ("in 2008 there was a massive flood in Jeddah. Unfortunately, WAMY's office was in the path of the flood. I know that WAMY lost many records in this flood. I do not know exactly which records were lost").

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

E.   **WAMY's Sources and Use of Funds Were Sufficiently Supported and Were Not Indicative of Participating Inn or Supporting Terrorist Activities**

The FATF states that materials to stage-specific attacks include, but are not limited to, vehicles, improvised bomb-making components, maps, and surveillance material.[68] The Opposing Experts mention that donors may donate funds under the impression they are donating money for humanitarian purposes, but funds are instead diverted to fund terrorist activities.[69] Opposing Experts stated that it was standard practice for charities that provided support to terrorist organizations to hide what they were doing by listing military and terrorist support activities as expenses for legitimate activities.  Based on my review of tens of thousands of documents produced in this case, I found that WAMY did not have expenses related to the aforementioned items, but rather, WAMY had activities and projects reported and sufficiently supported. These projects were implemented across various countries and included sufficient evidence to support that the funds were not used in terrorist financing. Examples include photo evidence of the project or event, receipts, multiple phases of construction reports, student records, and follow up reports for spending, and other supporting evidence.

While WAMY has been accused by non-accountants of using charitable activities as a cover-up for terrorist-supporting activities, my analysis determined that 98.8% of the projects reviewed have been supported with a detailed plan and documentation as evidence of their operations and use of funds. Examples of such projects include:

---

[68] Financial Action Task Force, *Best Practices Paper On Combating The Abuse Of Non-Profit Organizations (Recommendations 8),* June 2015, Date Accessed: July 13, 2020; (https://www.fatf-gafi.org/media/fatf/documents/reports/BPP-combating-abuse-non-profit-organisations.pdf).

[69] Expert Report of Dr. Matthew Levitt, Dated March 9, 2020.

*In Re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)

Expert Report of Jonathan T. Marks, CPA, CFF, CITP, CGMA, CFE

- Plans for various projects such as promotion of women, professional skills, Islamic education, and inclusion of all Muslims worldwide[70]
- Audit report for Project relating to rehabilitation of stranded Pakistanis, 1992
- Report following a visit to Niger for a water project with Unicef[71]
- Project report from a mosque built in Kashmir[72]
- Report on projects for supporting refugees in Kosovo, 2000[73]
- Project report and transfer of funds for a Mosque project in Mali, 1998[74]
- Project summary of the Third Annual Camp in WAMY Canada for Muslim women to Shadow Lake, 1999[75]
- Project report and transfer of funds for a Mosque project in Indonesia, 1998[76]
- Report on completed projects in the Egypt office during 2002[77]
- Report for a Well and Reservoir project, Kashmir in 2001[78]
- Eid clothing project for orphans in Sudan in 1998[79]

Furthermore, regional offices were required to produce annual reports on the operations, events held, employee information, and initiatives conducted on behalf of WAMY in the respective countries during the year.[80]

Only 1.2% of the reviewed WAMY funded projects did not include sufficient supporting documentation.  In most projects reviewed outside of Western Europe, the United States, and Canada, project funds were sent to the personal account of a regional representative or director where bank accounts were not available. For example, in 1998, $6,134 was sent for social

---

[70] WAMYSA0819355-504

[71] WAMYSA018778-857

[72] WAMYSA523729-33

[73] WAMYSA524851-57

[74] WAMYSA043733-53

[75] WAMYSA041981-WAMYSA041982

[76] WAMYSA044943 - WAMYSA044946

[77] WAMYSA525586-WAMYSA525619

[78] WAMYSA040392 - WAMYSA040402

[79] WAMYSA042658 - WAMYSA042660

[80] Thailand - WAMYSA706710-WAMYSA706779, Malawi - WAMYSA1204564-WAMYSA1204579, Egypt - WAMYSA178403-WAMYSA1784425, US and Canada - WAMYSA061037 - WAMYSA061117, Eastern Europe - WAMYSA063241 - WAMYSA063246, Latin America - WAMYSA065390 - WAMYSA065409

welfare programs in Russia. The funds were sent to the director's personal bank with the WAMY

Russia address included in the recipient's details.[81]  Further, in 1997, 32,062 Saudi Riyals were

sent directly to the Chad country director for distribution to orphans.[82]  In Kurdistan during 1998,

$86,107 were sent to build Mosques and schools, and the funds were sent through a

representative in Turkey who was charged with distributing the funds accordingly.[83] WAMY

instructed all the projects mentioned above to produce a report upon completion of the initiative,

as per the organization's ordinary course of business.  Based on the low rate of unsupported

funding and the required reports for WAMY funded projects, I did not find evidence of any

patterns of funding terrorism, neither hidden nor apparent.

The overwhelming weight of the documents supports a robust reporting system. In my

opinion as a CPA, I agree with part of the Expert's quote found below, that you would expect

audits to find expenditures that may not be traced to the final user (e.g. an invoice to a plumber

without the auditor checking to see that the plumber purchased supplies from a legitimate

source), but what I did not find is the unauthorized use of funds, and Winer does not cite to any.

> "I would expect such audits to find expenditures whose
> actual use cannot be traced, in addition to instances in
> which funds were provided for unauthorized uses."[84]

It is clear WAMY placed great trust in the integrity and professionalism of its regional

representatives, and many were volunteers hired through word of mouth. As such, this could

invariably lead to someone less than able to perform the role to a satisfactory standard in the

position of regional or country director.

---

[81] WAMYSA042251 - WAMYSA042255

[82] WAMYSA526517-526

[83] WAMYSA043845-48

[84] United States District Court for the Southern District of New York, In Re: Terrorist Attacks on September 11, 2001, 03-MDL-1570 (GBD) (SN), Expert Report of Jonathan M. Winer, paragraph 10.1

This led to instances for projects occurring in the late 1990s/early 2000s, where WAMY determined that it would cease or restrict funding to offices or specific projects. In the WAMY Western Europe office, $37,500 was sent to the office as per the pre-authorized bi-annual budget. As a report with supporting documents and invoices of expenditures had not yet been received, WAMY instructed the regional office to consider the funds as a pledge and not use them until a report was sent.[85]

Other offices where issues were highlighted include WAMY Pakistan[86] and WAMY Canada[87] , as these offices failed to provide supporting documentation to WAMY for expenses or projects. These actions of control are further examples of WAMY's efforts to control spending and administer internal controls to mitigate risks of improper or overspending of funds, which is in line with a well-operated organization.[88]

I did not observe any financial document indicating material support of terrorist activity, let alone the 9/11 attacks, and the amounts of the expenditures reviewed were not indicative of material support of terrorism or support to Al-Qaida. My view runs contrary to the following Opposing Expert's point, but my opinion is the first-hand one after reviewing the financial statements. Opposing Experts do not claim to have reviewed ANY first-hand source material.

> "Based on the information I have reviewed, I conclude it was standard practice for charities which provided support to AQ to list the support as expenses for legitimate activities, as part of helping both themselves and AQ avoid detection by anyone who might seek to stop them from facilitating or carrying out terrorist activities."

---

[85] WAMY SA 2296

[86] WAMYSA525470-78

[87] United States District Court Southern District of New York, In re Terrorist Attacks on September 11, 2001, 03-MD-1570 (GBD) (FM) ECF Case, Declaration of Mohammed Al Khatib.

[88] WAMY SA 2296  and WAMYSA525470-78

I do note the late submission of financial records for tax purposes for WAMY USA for the period 2001 through 2002. However, the lateness of these submissions does not support a claim of terrorist activity.

As mentioned herein in this Report, WAMY had controls in place to attempt to monitor its worldwide chapters. Controls included but were not limited to local audits of financial statements, budgetary controls, and centralized controls.

## F.   WAMY DID NOT LACK CONTROLS

In his expert report, Winer states "[t]he lack of controls of Islamic charities headquartered in the Gulf States before 9/11, especially Saudi Arabia, left these charities especially vulnerable to multiple forms of abuse, as reflected in the evidence of financial improprieties and irregularities found in audits I have reviewed of covering some of these charities." Levitt states, "[t]he charitable sector remains vulnerable to terrorist financing. One reason for this, according to FATF, is that charities are subjected to lesser regulatory requirements than other entities, such as financial institutions or private companies."[89] While these work as generalities, neither Winer nor Levitt supports their conclusion with reference to primary source materials. As mentioned herein, in my review of primary source documentation, there were multiple examples of WAMY's internal control process, self-regulation, and a centralized IT accounting system. Another example of control and review is that WAMY, before commencing a relation with other charitable organizations, would request the organization's plans and objectives to see if they are in line with their objectives.[90] Finally, I came across various documents that present internal controls and the fact that these controls were revamped

---

[89] WAMY SA 2167- 74, WAMY SA 2253- 56, WAMY SA 2179- 80, and WAMYSA528986-9175
[90] WAMYSA065359 - WAMYSA065367

## IV.   CONCLUSION

Based on my professional knowledge, education, training, experience, and the evidence I have reviewed to date, contrary to the accusations in the complaints and from Opposing Experts, I conclude, within a reasonable degree of professional certainty, that there is insufficient evidence to support misconduct, criminal behavior, or terrorist financing activities on behalf of WAMY during the period 1992 through 2002.

During my review, I did ***not*** find any evidence that:

- WAMY knowingly supported the militant and terrorist activities of Al Qaeda.
- WAMY, including WAMY Canada, funded and co-mingled funds with BIF.
- WAMY allegedly raised and laundered funds.
- Audits that mention terrorist financing or the support of terrorists.

Opposing experts have made most of their accusations and assumptions with an extremely wide brush, not based on any accounting analysis or methodology, as they have no expertise. They are not auditors, accountants, financial experts, certified fraud examiners, or CPAs. Instead, their unfounded statements push for the claim that all Islamic charities based in Middle Eastern countries must have been a part of the conspiracy that led to the tragedy of 9/11.

We have not found this to be the case for WAMY based on our first-hand review of the vast primary source documentation. Furthermore, it should be mentioned that charitable giving in the Middle East, especially in the Arabian Gulf, is worth billions of dollars. This is both due to obligatory religious charity (zakat inclusive of 2.5% of earnings), as well as the voluntary charity to the poor, widowed, and orphaned. Charities play an essential role in the Middle East of facilitating the transaction: from those inclined to give to the people and causes which need it

most.[91] Charitable giving is not a terrorist activity just because the charities happen to be Muslim organizations or Saudi-based organizations.  No accounting or financial principles differentiate between religious organizations or non-religious organizations.  Unfortunately, the opposing non-financial and accounting experts appear to be making that distinction.

WAMY observed the following, which are **<u>contrary</u>** to the accusations in the complaints and from Opposing Experts:

- Transparency

- Proactive Improvements and Controls

- Increased spend on Audit

- Increased IT controls

- Amplified Reporting

- Robust requirements for  Audits and Reports

- Accountability from senior leadership in WAMY

- Enforced mechanisms of control that were used proactively

- WAMY defunded areas that did not follow control and accounting policies

- Examples of funding for good causes

- Use of top audit firms

- Leadership and control over rogue individuals

- Accounting practices of a well-run corporation

---

[91] https://www.arabnews.com/node/1024711/business-economy