# EXHIBIT AR

This Transcript Contains Confidential Material

1          UNITED STATES DISTRICT COURT

           SOUTHERN DISTRICT OF NEW YORK

2                   -  -  -

3

4    IN RE: TERRORIST ATTACKS    : 03-MDL-1570

     ON SEPTEMBER 11, 2001       : (GBD)(SN)

5

6

7

                    -  -  -

8               JULY 22, 2021

          THIS TRANSCRIPT CONTAINS

9          CONFIDENTIAL MATERIAL

                    -  -  -

10

11

12          Remote Videotaped

13   Deposition, taken via Zoom, of JONATHAN

14   MARKS, commencing at 9:00 a.m., on the

15   above date, before Amanda

16   Maslynsky-Miller, Certified Realtime

17   Reporter and Notary Public in and for the

18   Commonwealth of Pennsylvania.

19

20                  -  -  -

21       GOLKOW LITIGATION SERVICES

        877.370.3377 ph| 917.591.5672 fax

22           deps@golkow.com

23

24

This Transcript Contains Confidential Material

1       A.    I have.

2       Q.    On how many occasions?

3       A.    Between five and ten times.

4       Q.    Just to review the ground

5   rules for today, the court reporter will

6   be taking down my questions and your

7   answers.  So it's important that we try

8   to avoid talking over one another.

9       A.    Sure.

10      Q.    The court reporter also

11  can't take down gestures or nods of the

12  head, so it's important for you to

13  verbalize all of your answers.

14            If you want a break at any

15  time, please just let us know.  As long

16  as a question isn't pending, you can go

17  ahead and take a break.

18            Does that all sound fair and

19  reasonable to you?

20      A.    It does.  Thank you so much.

21            MR. CARTER:  I'd like to

22       mark as the next exhibit the

23       notice of deposition and show that

24       to you.

This Transcript Contains Confidential Material

1       Q.    And who is that?

2       A.    Angie, or Angela, is the

3    head of our consulting practice.

4       Q.    And do you know how she got

5    involved?

6       A.    I don't.

7       Q.    And do you know who she

8    spoke with before speaking to you?

9       A.    I don't.

10       Q.    Do you know whether anyone

11   in your overseas offices was contacted

12   about this matter before you first became

13   involved?

14       A.    I don't.  I'm not aware of

15   that, no.

16       Q.    Does Baker Tilly maintain a

17   presence in the Middle East?

18       A.    They do.

19       Q.    And does that include an

20   office in the Kingdom of Saudi Arabia?

21       A.    We have -- yes, we have

22   Baker Tilly International in Saudi

23   Arabia, I believe, yes.

24       Q.    And do you know how many

This Transcript Contains Confidential Material

1    out later and move on.

2         MR. GOETZ:  We can.  And if

3    it turns out he's not bound by it,

4    but I would rather err for the

5    sake of the side of caution.

6    BY MR. CARTER:

7         Q.    Mr. Marks, have you ever

8    been involved as an expert in any

9    litigation involving terrorism issues?

10        A.    Not litigation, no.

11        Q.    Have you ever been involved,

12   in any professional capacity, in any

13   terrorism-related matters?

14        A.    Can you -- can you describe

15   "terrorism" for me, please?

16             Not that I'm trying to --

17   I'm not trying to be difficult, I just

18   want to be specific.  Are you talking

19   about terrorism financing or are you

20   talking about terrorism?

21        Q.    Well, I'm using the term

22   "terrorism" to encompass a broader

23   portfolio of issues that would include

24   terrorism financing.

This Transcript Contains Confidential Material

 1        A.    Well, if you're talking
 2   about terrorism financing, the answer to
 3   that would be yes.
 4              If you're talking about a
 5   terrorism expert, I'm not a terrorism
 6   expert.
 7        Q.    And with regard to terrorism
 8   financing, what is your experience?
 9        A.    My experience is through
10   anti-money laundering-type fraud
11   investigations of -- that were done on a
12   global basis.
13        Q.    Did any of those involve
14   investigations of possible involvement of
15   a party in financing terrorism?
16        A.    That was one of the
17   allegations, yes.
18        Q.    And who was the party
19   accused of that conduct in that case?
20        A.    That's confidential.
21        Q.    Well, what was the nature of
22   your work with regard to the terrorism
23   financing issue that was raised in that
24   matter?

This Transcript Contains Confidential Material

1        A.    The nature of my work was to

2   analyze financial information and other

3   information, looking at various flows of

4   funds and other communications to

5   determine whether there was money

6   laundering and if the money laundering

7   led to some type of illegal acts, such as

8   terrorist financing.

9        Q.    Was there a specific

10  allegation that terrorist financing

11  activities had occurred, or was it just

12  within the broader set of potential

13  illegal acts you were asked to vet?

14       A.    Broader set of potential

15  illegal acts.

16       Q.    So the work that you're

17  describing there involved a forensic

18  investigation to determine if there had

19  been money laundering for any potential

20  crime, correct?

21       A.    That's right.

22       Q.    And it was not focused

23  specifically on money laundering for

24  purposes of delivering resources to a

This Transcript Contains Confidential Material

1    terrorist organization; is that correct?

2         A.    Repeat that one more time,

3    please.  I'm sorry.

4         Q.    It was not focused

5    specifically on money laundering for

6    purposes of delivering resources to a

7    terrorist organization?

8         A.    We didn't know.  There were

9    allegations.  So I don't -- I don't know

10   that your question -- I can answer your

11   question.

12        Q.    Well, you keep saying that

13   there are allegations.

14             Were there allegations that

15   resources were delivered to a particular

16   terrorist organization or party?

17        A.    No.

18        Q.    So there was no terrorist

19   party identified as a potential recipient

20   of funds or resources at any point in

21   that investigation?

22        A.    That's correct.

23        Q.    And so there weren't

24   actually allegations of terrorism

This Transcript Contains Confidential Material

1    that nature.

2         A.    Yes.

3         Q.    And where have you done work

4    that involved a conflict region?

5         A.    Israel and Palestine.

6         Q.    And what was the nature of

7    the work you did in Israel and Palestine?

8         A.    That's confidential.

9         Q.    What about work in

10   developing countries?

11        A.    I've done work in developing

12   countries, yes.

13        Q.    And what kind of work did

14   you do in developing countries?

15        A.    I've done bribery

16   investigations.

17        Q.    Did those involve Foreign

18   Corrupt Practices Act investigations?

19        A.    They did.

20        Q.    What countries were involved

21   in those?

22        A.    Let's see.

23              I'll name a few for you that

24   I can remember.  India, Russia, China,

This Transcript Contains Confidential Material

1    Brazil.

2            Q.    Have you done any work on

3    behalf of charitable organizations or

4    NGOs?

5            A.    Yes, sir.

6            Q.    And what did your work on

7    behalf of charities and NGOs involve?

8            A.    I've done fraud

9    investigations for charity organizations.

10   I've been involved with charitable

11   organizations on a finance and from a

12   governance perspective.

13                I'm currently the chairman

14   of the Campus Support Community of

15   Greater Philadelphia, and also serve on

16   the national board.

17                I would say I've done a lot

18   of work for charitable organizations over

19   my career.

20           Q.    What about organizations

21   involved in providing relief services in

22   developing countries?

23                MR. GOETZ:  Objection to

24       form.

This Transcript Contains Confidential Material

```
 1                THE WITNESS:  I've done a
 2         few of those, yes.
 3    BY MR. CARTER:
 4         Q.    What did those involve?
 5         A.    The one that I mentioned to
 6    you before, but that's confidential.
 7         Q.    Well, what did your work
 8    involve, without telling me the names of
 9    the client?
10         A.    It involved doing an
11    investigation to see if the funds were
12    spent for legitimate business purposes.
13         Q.    And was it an investigation
14    of a charity or NGO?
15         A.    It was a charity, yes.
16         Q.    And was the charity in
17    question involved in providing relief
18    services?
19         A.    I don't recall.  I -- I
20    don't recall.
21         Q.    And where was that charity
22    operating?
23         A.    In Saudi Arabia.
24         Q.    What time period was that?
```

This Transcript Contains Confidential Material

```
 1            A.    I'm not certain as to the
 2  exact time period.
 3            Q.    Did the charity itself
 4  retain you to do that investigation or
 5  did some other party?
 6            A.    The organization retained
 7  us, yes.
 8            Q.    And by "us," you're
 9  referring -- are you referring to Baker
10  Tilly?
11            A.    That's correct.
12            Q.    So this would have been in
13  the last three years?
14            A.    It was.
15                  And I -- just to correct it,
16  it wasn't Saudi Arabia.  It was in
17  Palestine.  And they did provide relief
18  efforts.
19            Q.    And what was your role in
20  that particular investigation?
21            A.    I was the partner overseeing
22  the investigation.
23            Q.    And did that investigation
24  result in a finding of misconduct?
```

This Transcript Contains Confidential Material

```
1            A.     It does.
2            Q.     And were there other
3     individuals at Baker Tilly involved in
4     this project?
5            A.     Yes.
6            Q.     Do you recall approximately
7     how many other people were involved in
8     this project?
9            A.     I believe there was about 12
10    people on our team, yes.
11           MR. CARTER:  And if we could
12       mark collectively the invoices
13       that were produced that are
14       located at Tab 5 as the next
15       exhibit.
16                  -  -  -
17           (Whereupon, Exhibit
18       Marks-962, No Bates, Baker Tilly
19       Invoices, was marked for
20       identification.)
21                  -  -  -
22    BY MR. CARTER:
23           Q.     And, Mr. Marks, if you can,
24    can you just review those and let me know
```

This Transcript Contains Confidential Material

1    if those are, in fact, invoices issued by

2    Baker Tilly for your firm's work in this

3    matter?

4         A.   That's a Baker Tilly

5    invoice, yes.

6         Q.   Well, there's a bunch of

7    them, if you can scroll through all of

8    them.

9              MR. GOETZ:  I would suggest

10             that you download the exhibits on

11             the share file.

12             THE WITNESS:  I'm just

13             having a problem getting through

14             these, I apologize.  They won't

15             move.

16             Bear with me for one second.

17   BY MR. CARTER:

18        Q.   Sure.

19        A.   Okay.  I got it to work.

20   Thank you.  Thank you for your patience.

21   I appreciate it.

22        Q.   Sure.

23        A.   And, Mr. Carter, you'd like

24   me to review these?

This Transcript Contains Confidential Material

1    Q.    Yes.  I'd like you to just

2    confirm that those are all invoices that

3    Baker Tilly issued for its work on behalf

4    of the WAMY defendants in this case.

5         A.    Bear with me while I look

6    through them.

7              Mr. Carter?

8         Q.    Yes.

9         A.    I've scanned through these,

10   and I believe they are our invoices.

11   They also seem to be account statements

12   as well.

13        Q.    And I'll get into that in a

14   second.

15             But the invoices, as I see,

16   are dated from February 19th, 2020, and

17   the last one is September 24, 2020.

18             Am I correct there would be

19   some additional time for the work you

20   recently did in preparation for the

21   deposition that's not reflected in these?

22        A.    That is accurate, yes.

23        Q.    Do you have -- do you have

24   any sense of what the additional charges,

This Transcript Contains Confidential Material

1   beyond those reflected in these invoices,

2   would add up to?

3          A.    I believe our work in

4   process is approximately $80,000, yes.

5          Q.    And during what time period

6   did that $80,000 accrue?

7          A.    I don't have the specific

8   date ranges, but it's probably over the

9   last four months.

10         Q.    So there are additional

11  charges over the last four months that

12  aren't encompassed by the invoices and

13  supporting documents I have here?

14         A.    That's correct.

15         Q.    And were there bills sent

16  out over the last four months --

17         A.    No.

18         Q.    -- for that work?

19                Did you say no?

20         A.    That's correct.

21         Q.    So none of that work has

22  been invoiced as of this date?

23         A.    It was just recently

24  invoiced.

This Transcript Contains Confidential Material

```
1        Q.    When?

2        A.    I believe -- I think it was

3   last week or the week before.

4              MR. CARTER:  Fred, I don't

5         have our agreement in front of me,

6         but I think it would have

7         encompassed production of that

8         invoice as well.  So if you can

9         get that to us.

10             MR. GOETZ:  If we have it,

11        we'll send it to you.

12             MR. CARTER:  Thanks.

13             MR. GOETZ:  We'll just

14        check -- at the break, we'll check

15        the office in New York and see if

16        they have them.  And if they do,

17        we'll send them.

18             MR. MOHAMMEDI:  We're still

19        working with Baker Tilly on the

20        invoice.  When that is finalized,

21        we'll send that.

22             MR. CARTER:  I think we're

23        going to adhere to the view that

24        the invoice should be produced in
```

1          its current form so that we can

2          have an opportunity to talk to Mr.

3          Marks about it, if appropriate.

4               So we would ask you to do

5          that at a break.

6               MR. MOHAMMEDI:  We don't

7          have a description, that's why.

8          We need a description for Baker

9          Tilly.  You will not be able to

10         know exactly what the invoice is

11         for.  That's the reason.

12              MR. CARTER:  Unfortunately,

13         Omar, I can't understand you well

14         enough to know what you said.

15         There's a problem with your audio.

16              MR. GOETZ:  We'll look at

17         it, what we have, and send it to

18         you.  You'll find, I think, that

19         it's just a gross amount without

20         any breakdown.

21              But if we have an invoice,

22         we'll provide it, consistent with

23         our protocol, in terms of what we

24         have.

This Transcript Contains Confidential Material

1           Now, whether or not we're

2      talking to Mr. Tilly about that is

3      another issue, but we'll send you

4      what we have.

5           MR. CARTER:  And just --

6      when we do take a break, if we can

7      try and somehow improve the audio

8      for you, Fred, and for Omar,

9      because I'm having terrible

10      difficulty understanding what

11      you're saying.  So it's hard to

12      respond.

13           MR. GOETZ:  We'll work on

14      it.

15           MR. CARTER:  Thanks.

16  BY MR. CARTER:

17      Q.   Mr. Marks, just turning back

18  to this exhibit and using the invoice

19  that was sent out on February 19th, 2020,

20  as an example, is it fair to say that the

21  sort of invoicing convention here is that

22  the Page 1, which is on the right, right

23  now, not the one that's on the screen,

24  provides a sort of total statement of the

This Transcript Contains Confidential Material

1    charges, correct?

2         A.    Yes.

3         Q.    And then the second page

4    behind that includes an overview of the

5    individuals who billed time during the

6    relevant period and the total number of

7    hours and rate charged?

8         A.    Correct.

9         Q.    And then behind that there

10   are details regarding the daily time

11   descriptions relating to the work

12   performed by those individuals?

13        A.    That's correct.

14        Q.    And that's true for all of

15   the invoices we have in this collection,

16   correct?

17        A.    I believe so, yes.  Based on

18   my review, yes.

19        Q.    Based on our review of these

20   invoices, we understand that through the

21   date covered by these invoices, Baker

22   Tilly billed WAMY a total of $379,907.93,

23   and that was after an approximately

24   $36,000 discount.

This Transcript Contains Confidential Material

1              Does that sound right?

2         A.    I did not add it up, sir.

3    But I believe it sounds close, yes.

4         Q.    And with the additional

5    approximately $80,000 that you referenced

6    related to more recent work, the total

7    billings would be in the range of

8    $480,000?

9         A.    That's correct.

10        Q.    And I believe you said

11   earlier there were approximately 12

12   individual timekeepers who billed time

13   for work on this project; is that

14   correct?

15        A.    I believe that's what I

16   said, yes.

17        Q.    And based on my review, it

18   appears that the total hours you billed

19   during the period covered by these

20   invoices that we've marked as an exhibit

21   was 91.75 hours.

22              Does that sound right?

23        A.    That's what's recorded on

24   the time sheets, yes.

This Transcript Contains Confidential Material

1      Q.    And just turning to the time

2   sheets specifically, the first invoice,

3   dated February 19th, 2020, includes a

4   total of two hours for you?

5      A.    Yes.

6      Q.    And those two hours all

7   pertain to a meeting you had with Mr.

8   Mohammedi, correct?

9      A.    I believe so, yes.

10      Q.    And the next invoice, dated

11   March 5, 2020, records two and-a-half

12   hours of total time for you, correct?

13      A.    Yes.

14      Q.    And you describe that as

15   related to coordinating access and review

16   of preliminary information, communication

17   with staff, correct?

18      A.    I can't see the description.

19   I apologize.

20      Q.    Sorry.  It's on Page 3 of

21   this particular invoice.

22           MR. GOETZ:  Mr. Marks, you

23        can download the document if

24        that's better for you to see.

This Transcript Contains Confidential Material

```
 1              THE WITNESS:  Yes.  That's
 2         what it says.
 3    BY MR. CARTER:
 4         Q.    And just as a -- as a
 5    baseline proposition, as a large
 6    accounting firm, am I correct that Baker
 7    Tilly requires its personnel to record
 8    their time accurately?
 9         A.    We try our best, yes.
10         Q.    And does it require
11    employees to include accurate
12    descriptions of the work that they
13    performed?
14         A.    It requires them to provide
15    some general semblance of what tasks they
16    provided, yes.
17         Q.    And that semblance should be
18    accurate, correct?
19         A.    I would hope it would be,
20    yes.
21         Q.    And you personally adhere to
22    those requirements, correct?
23         A.    Again, I try my best, yes.
24         Q.    Turning to the invoice --
```

This Transcript Contains Confidential Material

1    the next invoice which is dated March

2    27th, 2020, and going to the summary of

3    the involved timekeepers, which is Page

4    2.

5              MR. CARTER:  The prior page,

6         I'm sorry.

7    BY MR. CARTER:

8         Q.    There was no time reflected

9    on this invoice for you, correct?

10        A.    That's correct.

11        Q.    And turning next to the

12   April 2, 2020, invoice, there are --

13   again, there was no time recorded for any

14   work by you on the project during the

15   period covered by that invoice, correct?

16        A.    That's correct.

17              And you're going to probably

18   see no time recorded for me in the

19   following month as well, probably.

20        Q.    Well, let's do it one by

21   one.

22              The invoice dated May 11,

23   2020, does not reflect any work performed

24   by you during the month covered by that

This Transcript Contains Confidential Material

1    invoice, correct?

2            A.    It does not.

3            Q.    And the invoice dated June

4    11, 2020, likewise, does not indicate any

5    work by you during the period covered by

6    that invoice, correct?

7            A.    Correct.

8            Q.    And then turning to the July

9    22, 2020, invoice, you're -- there's an

10   indication that you spent 35

11   and-a-quarter hours working on the

12   project during that month, correct?

13           A.    That's what it says, yes.

14           Q.    And then there are details

15   on Page 4 describing the nature of the

16   work that you performed.

17                 Do you see the entries

18   associated with your name?

19           A.    I do.

20           Q.    And as I read those entries,

21   they all pertain to the drafting of the

22   report and discussions; is that correct?

23           A.    That's what it says, yes.

24           Q.    And there are entries here

This Transcript Contains Confidential Material

1    and elsewhere for other individuals at

2    Baker Tilly relating to the drafting and

3    revision of the report, correct?

4         A.    I don't know what you're

5    referring to.  Other -- I don't know -- I

6    can only see what's on the screen.

7         Q.    Well, if you look, there's

8    an entry, the third name down, there's an

9    entry for P. Zikmund, and it's described

10   as, Report preparation.

11             Do you see that?

12        A.    I do.

13        Q.    And then there's another for

14   him to update the report.

15             Do you see that?

16        A.    Yes.

17        Q.    And a third for him, update

18   the report, and then a fourth and a

19   fifth.

20             So there are entries for --

21   several entries for other people, in this

22   case, Mr. Zikmund, related to the report,

23   correct?

24        A.    Correct.

This Transcript Contains Confidential Material

1          Q.    And the report referenced

2     there, is that your rebuttal report in

3     this matter?

4          A.    It is.

5          Q.    And turning to the invoice

6     from September 24, 2020, the second page

7     indicates that you spent a total of 52

8     hours working on the project during the

9     two months covered by that invoice; is

10    that correct?

11         A.    That's what it says, yes.

12         Q.    And then looking at the

13    individualized time description entries,

14    there's a number, as you'll see on Page 4

15    of 7 of this invoice, associated with

16    you, referring to rebuttal report prep,

17    draft, draft, rebuttal report prep,

18    rebuttal report prep.

19              Do you see those?

20         A.    I do.

21         Q.    And there are entries for a

22    number of other people that reference the

23    report as well.

24              Do you see that?

This Transcript Contains Confidential Material

```
 1              Three entries, for instance,

 2   for Mr. Goldberg right at the top of the

 3   report.

 4        A.    Yes.

 5        Q.    And a number of entries for

 6   Mr. Zikmund again, with report; is that

 7   correct?

 8        A.    Yes, sir.

 9        Q.    And entries -- an entry for

10   Mr. Scaccia for report revisions, and

11   several for Mr. Goldberg, correct?

12        A.    Yes, sir.

13        Q.    And one for Dardani?

14        A.    That's correct.

15        Q.    And then turning to the next

16   page of this particular invoice, there

17   are entries associated with your name,

18   and a few of them reference, Review

19   documents.  There is an entry for 1.25

20   hours associated with your name,

21   several -- a few entries for 4.25 hours

22   that include, among other work,

23   references to your involvement in

24   reviewing documents.
```

This Transcript Contains Confidential Material

1          Do you see those?

2     A.    Yes.

3     Q.    By my calculation, this

4  invoice indicates only 14 hours were

5  spent on any work that you describe as

6  involving review of documents.

7          Does that sound correct?

8     A.    That's what the time sheet

9  says, yes.

10    Q.    And reviewing all of the

11 other invoices, I have not seen any other

12 time entries on your behalf that

13 reference any involvement by you in

14 reviewing documents.

15         Does that sound correct?

16         MR. GOETZ:  Objection.

17    Form.

18         THE WITNESS:  There's

19    nothing on those invoices, no.

20    That's correct.

21 BY MR. CARTER:

22    Q.    And when was your report

23 issued?

24    A.    August 7th, 2020.

This Transcript Contains Confidential Material

```
 1                    And there are a lot of

 2    people that reviewed a lot of different

 3    documents.  And the way the process

 4    works, under my direct supervision, is,

 5    you know, I lay out the methodology and,

 6    you know, as we go through and -- as we

 7    go through the matter, I'm involved in --

 8    every step of the way.  And my team

 9    reviews information and then brings it to

10    me, you know, I ask questions and they go

11    back and bring me more information.

12                    But that's generally the way

13    it works.  So we work as a team.

14         Q.    So this is a list of

15    documents reviewed by your team, not by

16    you personally?

17         A.    I reviewed -- yes, that's

18    correct.

19         Q.    And so you relied on other

20    members of your team to review and

21    analyze the documents on this list,

22    correct?

23         A.    Yes.

24         Q.    And the total time reflected
```

This Transcript Contains Confidential Material

```
1    in the invoices for you reviewing

2    documents was 14 hours, correct?

3               MR. GOETZ:  Objection.

4          Form.

5               THE WITNESS:  We went

6          through this.  Yes, that's what it

7          says on the time sheets.  Yes.

8    BY MR. CARTER:

9          Q.    Do you know how many

10   documents you personally actually

11   reviewed --

12         A.    I don't.

13         Q.    -- prior to the issuance of

14   your report?

15         A.    I don't.

16         Q.    Well, did you review tens of

17   thousands of documents or fewer?

18         A.    We reviewed -- we reviewed a

19   lot of documents.  I don't know the exact

20   amount.

21         Q.    I'm not asking whether we,

22   "we" meaning Baker Tilly, reviewed.

23               I'm asking whether you

24   reviewed tens of thousands of documents?
```

This Transcript Contains Confidential Material

```
 1          A.    I wouldn't say I reviewed

 2    tens of thousands of documents, no.  Like

 3    I said, that's not the process that we

 4    went through -- go ahead.

 5          Q.    So you review -- you relied

 6    on other people to review documents and

 7    they provided their analysis to you; is

 8    that correct?

 9          A.    Yes.

10          Q.    And how did they provide

11    that analysis to you?

12          A.    We would have regular and

13    ongoing discussions.

14          Q.    And did they provide any

15    summaries to you relating to their

16    review, analysis or findings?

17          A.    I'm sure they summarized it

18    to me, otherwise -- yes.  Absolutely,

19    yes.  They summarized information for me.

20          Q.    And so you relied on those

21    summaries for purposes of developing your

22    opinions and writing your report,

23    correct?

24          A.    I relied on those summaries
```

This Transcript Contains Confidential Material

1    to evaluate whether I believed that those

2    were complete and accurate.  And if I

3    thought that we needed more information,

4    I would -- I asked my staff to go back

5    and get me more details.

6              So placing reliance on them,

7    it all depended on many different

8    factors.

9         Q.    Well, you considered them in

10   the context of developing your opinions

11   and report in the case, correct?

12        A.    Yes.

13        Q.    And do you list any of those

14   summaries or any analyses provided by

15   your staff in the documents considered

16   section of your report?

17              MR. GOETZ:  Objection.

18        Form.

19              THE WITNESS:  I don't have

20        any written summaries.  So the

21        answer to that is no.

22   BY MR. CARTER:

23        Q.    Well, they didn't provide

24   you any information in writing relating

```
1    to their review of the documents?

2         A.    No.  It was all done through

3    meetings and discussions.

4         Q.    And you were able to assess

5    the competence and quality of the review,

6    by a dozen employees, of tens of

7    thousands of documents based on verbal

8    communications at meetings?

9         A.    Yes.

10        Q.    And you didn't feel the need

11   to have anyone put any of their analysis

12   down in writing so you could study it and

13   make sure you thought it was accurate?

14        A.    I'm just telling you how it

15   worked.  We had conversations about the

16   documents.  If I thought that they

17   were -- if I thought -- if I understood

18   what it was that they were trying to say,

19   that was fine.

20             If not, if I needed more

21   information or required more information,

22   or there was something that I wanted to

23   be looked into further, then that's what

24   we did.
```

This Transcript Contains Confidential Material

```
1         Q.    Well, I mean, this is a
2   litigation engagement, it's not an audit
3   or forensic accounting engagement.
4         And so I'm trying to
5   understand exactly who was responsible
6   for the review and drafting of your
7   report within Baker Tilly.
8         A.    I think I answered that.
9              MR. GOETZ:  Objection.
10        Form.
11             THE WITNESS:  I believe I
12        answered that question.  I told
13        you I was.
14  BY MR. CARTER:
15        Q.    So if we can just turn back
16  to the September 24 invoice as an
17  example, and go to Page 4.
18        A.    Is that Exhibit-962?  I just
19  want to pull it up on my screen.
20             MR. GOETZ:  It is 962, Page
21        34 of the PDF.
22             THE WITNESS:  Give me a
23        moment to get there.
24  BY MR. CARTER:
```

This Transcript Contains Confidential Material

1   others under your supervision.

2          Do you see that?

3          A.    I do.

4          Q.    And those two statements

5   together, do they describe your

6   methodology for developing your opinions

7   and preparing your report in this matter?

8          A.    I don't think they describe

9   my methodology.  I think they outline my

10  qualifications and the documents that I

11  considered, not the complete methodology

12  for formulating my opinions and

13  conclusions.

14         Q.    So your report does not

15  describe in full your methodology for

16  developing your opinions and conclusions?

17         A.    There's not a methodology

18  section in here, no.  That's correct.

19         Q.    Just turning to the content

20  of your report and some general issues.

21               Do you agree that auditors

22  and forensic accountants should use terms

23  of art carefully and only where

24  appropriate?

This Transcript Contains Confidential Material

1           If you have a specific

2      example, I can certainly comment

3      on that.

4  BY MR. CARTER:

5      Q.    Well, I think you said

6  earlier that auditors should stick to the

7  facts.

8           You agree with that?

9      A.    Absolutely.

10     Q.    And do you agree that

11 auditors shouldn't offer broad

12 conclusions based solely on anecdotal

13 information?

14          MR. GOETZ:  Objection.

15     Form.

16          Go ahead and answer the

17     question if you can.

18          THE WITNESS:  Sure.

19          Again, I would need to be --

20     I would need to understand the

21     situation.

22 BY MR. CARTER:

23     Q.    You're not in a position to

24 say whether it's appropriate for an

This Transcript Contains Confidential Material

```
 1   BY MR. CARTER:

 2          Q.    Yes.

 3                Were you asked to perform a

 4   comprehensive review to identify any and

 5   all red flags relating to WAMY and its

 6   branch offices during the period in

 7   question?

 8          A.    We were asked to perform a

 9   review.

10          Q.    And as part of that review,

11   were you asked to identify any things

12   that you saw as potential red flags?

13          A.    We were.

14          Q.    And did you develop a

15   comprehensive list of things that you saw

16   as red flags?

17          A.    That list would be small.

18          Q.    Okay.  But did you develop

19   one?

20          A.    Not a formal list, no.

21          Q.    On that same page of your

22   report, you say that the opposing experts

23   are not auditors, accountants, financial

24   experts, certified fraud examiners or
```

This Transcript Contains Confidential Material

1   U.S. financial and accounting system

2   requirements?

3          A.     Can we break this question

4   down?

5          Q.     Sure.  You can answer how

6   you see fit.

7          A.     Okay.  So considering the

8   challenges faced by a not-for-profit

9   organization, so challenges faced by a

10  not-for-profit organization, based on my

11  experience, are, you know, many of them

12  are volunteers, their skill sets are not

13  what they should be in comparison with

14  for-profit organizations.

15          The fact that they're in

16  developing countries makes it a little

17  bit more challenging to get specific

18  resources.

19          And the financial

20  regulations with regard to what is

21  happening or where -- the financial

22  regulations in the Middle East are not as

23  sophisticated as those are in the U.S.

24  financial and accounting system.  The

This Transcript Contains Confidential Material

1   oversight?

2       A.   I think there's always an

3   opportunity to improve the control

4   environment.

5       Q.   And WAMY recognized that

6   need in 1997, in your opinion, correct?

7       A.   I believe they recognized

8   the need to maintain a control

9   consciousness and to implement adequate

10  internal controls from the beginning.

11      Q.   But in 1997 they recognized

12  a need for improvement; that's what you

13  say in your report, correct?

14      A.   Right.

15      Q.   And in support of that and

16  your opinion that WAMY took action at

17  that time, you cite a document that was

18  produced at WAMY -- by WAMY at Bates

19  82520.

20          MR. CARTER:  Which, if we

21      can pull it out, it's at Tab 25.

22      Let's mark this as the next

23      exhibit.

24              -  -  -

This Transcript Contains Confidential Material

1    Q.    Do you see any of those

2  people referenced or copied on this

3  document?

4    A.    I don't.

5    Q.    Does this document say

6  anything about auditing or financial

7  controls at all?

8    A.    Well, the mere fact that

9  they're putting in a computer system is a

10  control.  They're enhancing their

11  computer system.

12    Q.    Okay.  So the establishment

13  of a computer system, you believe,

14  reflected an effort on the part of WAMY

15  to implement more robust auditing and

16  financial controls?

17    A.    I do.

18    Q.    Does the document say

19  anything about using that computer system

20  for purposes of centralizing financial

21  reporting or auditing?

22    A.    I think it's inherent in

23  what they're trying to achieve.  They

24  link together.  To better -- it's

This Transcript Contains Confidential Material

1    capturing more information, allowing them

2    to understand and monitor that

3    information, the control.  And it's

4    enhancing their overall control

5    environment, yes.

6          Q.    But you agree with me that

7    it doesn't refer to financial records or

8    auditing records at all?

9          A.    No.  And oftentimes, in my

10   experience, when you're designing a

11   computer system to capture data, it

12   wouldn't refer to auditing records or

13   financial records.

14         Q.    Well, do you know if this IT

15   system was actually implemented for

16   purposes of housing financial and

17   auditing records?

18         A.    I think it was for housing

19   records.  I believe that's what it says.

20         Q.    And, in fact, when it talks

21   about the records that could potentially

22   be included in this new system, it talks

23   about a media archive, an archive for the

24   international organizations, associations

This Transcript Contains Confidential Material

```
 1   BY MR. CARTER:
 2        Q.    Aside from that reference in
 3   Paragraph 6 to using e-mails for
 4   correspondence, either inside the Kingdom
 5   or abroad, is there any reference in this
 6   document to the offices abroad?
 7        A.    There isn't.
 8        Q.    Overall, would it be correct
 9   to say that this document addresses a
10   potential IT initiative?
11             MR. GOETZ:  Objection.
12        Form.
13             THE WITNESS:  I think it
14        addresses the control
15        consciousness of WAMY in
16        continuously improving their
17        overall controls.
18   BY MR. CARTER:
19        Q.    Well, couldn't you more
20   easily read it as a proposal for WAMY to
21   begin using computers more as the
22   availability of computer systems became
23   available?
24             MR. GOETZ:  Objection.
```

This Transcript Contains Confidential Material

```
 1            Form.
 2                 THE WITNESS:  I don't know
 3            that -- I don't know that to be
 4            true or not.
 5  BY MR. CARTER:
 6       Q.    Well, you described this as
 7  an initiative to implement more robust
 8  controls.
 9            Do you know whether this
10  actually happened?
11       A.    I don't know specifically
12  whether it happened or not.
13       Q.    Okay.  Well, do you agree
14  that if this never happened, this memo
15  wouldn't really provide a firm basis for
16  you to opine that WAMY began implementing
17  more rigorous controls in 1997?
18       A.    That would be true.  But I
19  haven't seen any evidence to the
20  contrary.
21       Q.    And in terms of what this
22  document is and what it isn't, is this a
23  directive or is this an outline of a
24  proposal?
```

This Transcript Contains Confidential Material

```
1              THE WITNESS:  I don't know.
2       I wasn't there.
3  BY MR. CARTER:
4       Q.    Between the date of this
5  document in 1997 and January of 2000, are
6  you aware, based on your review, of any
7  other documents reflecting implementation
8  of new financial or fraud controls?
9       A.    Am I aware of any other
10  documents?
11       Q.    Yes.
12              Did you find any other
13  documents, between the date of this
14  document in 1997 and a document you later
15  referred to on January 1st of 2000, in
16  all of the materials WAMY provided, that
17  reflected implementation of any new
18  financial or auditing controls during
19  that three-year period?
20       A.    I don't think new controls
21  need to repose in a document, sir.
22       Q.    Well, did you see any
23  evidence of new controls being
24  implemented as part of what you describe
```

This Transcript Contains Confidential Material

1   in your report as a process initiated in

2   1997?

3          A.    I see evidence of controls.

4   I see evidence of continued controls.  I

5   see evidence of transparency.  I see

6   evidence of project-based financing,

7   which is a control.  I see evidence of

8   actions taken against individuals for bad

9   or poor acts.

10             I see a lot of controls.

11   Not all --

12         Q.    I --

13         A.    Can I please finish?  I

14   apologize.

15         Q.    Sure.

16         A.    Not every company documents

17   every control enhancement that they have.

18   That's just not the way this works.

19         Q.    Well, but what I'm asking

20   you is, what's the basis for your opinion

21   in this matter that WAMY recognized --

22   that WAMY recognized the need for greater

23   controls in 1997 and began a process at

24   that time that continued, aside from this

This Transcript Contains Confidential Material

1    implementing greater control systems,

2    correct?

3              MR. GOETZ:  Objection.

4         Form.

5              THE WITNESS:  Can I answer?

6              MR. GOETZ:  Go ahead, you

7         can answer if you can.

8              THE WITNESS:  I think the

9         fact that they talk about

10        continuously enhancing their

11        overall control environment is a

12        control all in itself.

13             Having a control

14        consciousness and a proper tone

15        from the top, whereby you have an

16        organization that is constantly

17        looking to maintain control, I

18        think that is very important.

19   BY MR. CARTER:

20        Q.    Okay.  But what you cite in

21   support of that is a single document

22   referring to a possible IT initiative

23   from 1997.

24             A.    Well, it's more than a

This Transcript Contains Confidential Material

```
 1              MR. GOETZ:  Objection.
 2        Form.
 3              THE WITNESS:  Like I said,
 4        I'm going to have to go back and
 5        re-review this.  I'm not 100
 6        percent sure.
 7   BY MR. CARTER:
 8        Q.    But you would agree with me
 9   that it's important to present the
10   opposing experts' opinions you're
11   purporting to rebut accurately, isn't it?
12        A.    Absolutely.  And if I made a
13   mistake, I'm the first one to admit it.
14   And I'll make sure it's corrected.
15        Q.    On Page 10 -- I'm sorry,
16   before I get to that.
17              On Page 9, there is a
18   reference in the next sentence, after the
19   one that we were discussing, that states,
20   As we have found in our review, WAMY
21   performed numerous audits in Saudi Arabia
22   across its international offices.
23              Do you see that?
24        A.    Yes.
```

This Transcript Contains Confidential Material

1    cite, did you review documents that

2    established that the verification process

3    contemplated by the contract was actually

4    followed?

5         A.    I'm sorry, repeat that

6    question.

7         Q.    Did you review documents

8    with regard to the Georgia refugee

9    project confirming that the verification

10   process contemplated by the contract was

11   actually followed?

12        A.    I don't know whether the

13   contract was actually followed, but we

14   did review the project reports.

15        Q.    As an auditor, do you agree

16   that you can't opine as to an

17   organization's protocols and compliance

18   with them for a period encompassing ten

19   years and dozens of offices on the basis

20   of a single contract?

21        A.    I don't understand the

22   question.

23        Q.    Well, the fact that there is

24   a contract including these requirements

This Transcript Contains Confidential Material

1   in the case of the Georgia program in

2   2000 doesn't establish that it was a

3   uniform procedure applied throughout the

4   entire time period and by all of WAMY's

5   offices, does it?

6          A.    No.  But you can't look at

7   this -- there are other -- there were

8   other areas that we looked at to indicate

9   that there were controls around this.

10         Q.    Well, you don't cite here

11  any protocol issued by the headquarters

12  requiring the existence of a contract and

13  that kind of verification process,

14  correct?

15         A.    Well, they didn't say that.

16  But, you know, from an overall project --

17  you know, the project financing controls

18  that they had in place, that was the

19  control.

20         Q.    Well, so you reviewed

21  certain projects and saw evidence of this

22  kind of procedure being implemented,

23  correct?

24         A.    That's right.

This Transcript Contains Confidential Material

1        Q.    But you didn't review all of

2   the projects that WAMY conducted during

3   the time period, correct?

4        A.    Correct.  Which you wouldn't

5   do in an audit, anyway.

6        Q.    Okay.  That's fine.

7              But do you know what

8   percentage of the refugee projects you

9   reviewed?

10       A.    No.

11       Q.    Well, what percentage would

12  be satisfactory for you to establish an

13  opinion as to the overall controls for

14  WAMY as an organization?

15       A.    It really wouldn't be by

16  percentage.

17       Q.    Well, isn't it fair to say

18  that all you've offered in your report is

19  a few anecdotal examples of this having

20  been done?

21            MR. GOETZ:  Objection.

22       Form.

23            THE WITNESS:  No.  I think

24       what I offered in my report is the

This Transcript Contains Confidential Material

```
 1            fact that I've laid out evidence

 2            that showed -- or I laid out -- I

 3            laid out my opinions that show I

 4            reviewed hard evidence and that

 5            that evidence is supportive of a

 6            control environment, and a control

 7            environment that has certain

 8            processes and procedures in place

 9            in order to make sure that

10            funding, when it was actually

11            issued, was spent for those

12            particular projects.  That's the

13            project-based financing.  That is

14            an absolute control.

15                 And so when it comes to

16            doing an audit, an audit would

17            definitely consider that, but it

18            doesn't consider everything.

19   BY MR. CARTER:

20            Q.    Well, you agree that for

21   purposes of the control that you cite

22   here, all you've offered in the report is

23   a citation to the single contract for

24   Georgia?
```

This Transcript Contains Confidential Material

1        Q.     Further down on Page 10,

2    there's another statement referring to

3    the 1997 issue that reads, By beginning

4    to institute more strict and centralized

5    controls in 1997, WAMY became a more

6    transparent and better recordkeeping

7    organization that is not in line with

8    organizations that supported al-Qaeda.

9            Do you see that?

10       A.     I do.

11       Q.     What organizations that

12   supported al-Qaeda have you studied that

13   provide the basis for that comparative

14   assessment?

15       A.     It's my general overall

16   understanding that organizations that do

17   not have controls and are not

18   transparent, those were the general

19   attributes and characteristics of the --

20   of their mode to fund terrorist

21   organizations in general, not

22   specifically al-Qaeda, but in general.

23       Q.     Well, what organizations can

24   you name that the United States

This Transcript Contains Confidential Material

1  government has identified as having

2  supported al-Qaeda?

3          MR. GOETZ:  Objection.

4      Scope.

5          THE WITNESS:  Repeat the

6      question one more time.

7  BY MR. CARTER:

8      Q.    What organizations can you

9  name that the United States government

10  has identified as having supported

11  al-Qaeda?

12      A.    Not WAMY.

13      Q.    Okay.  Well, can you name

14  any?

15      A.    I don't know of any other

16  specific organizations by name.

17      Q.    And, again, here you

18  indicate that the initiative referenced

19  in the 1997 memo would not be in line

20  with organizations that supported

21  al-Qaeda.

22          And we agree that the 1997

23  document relates to IT processes and

24  greater uses of computers?

This Transcript Contains Confidential Material

 1   demanded that its local offices report

 2   and be held accountable for spending,

 3   which is not typical for an organization

 4   hiding something.

 5              Do you see that?

 6        A.    I do.

 7        Q.    And, again, aside from the

 8   1997 IT memo, are there any other

 9   documents that you recall seeing between

10   1997 and 2000 that reflected

11   implementation of new financial controls?

12        A.    Yes.  There's project-based

13   financing.  There was a lot of different

14   things that we saw.

15        Q.    Well, again, Mr. Marks, I'm

16   trying to meet the language of your

17   report directly here.

18              And you're describing a

19   process that occurred within WAMY.  And

20   what I'm trying to understand is, did you

21   see documentation between 1997 and 2000

22   through which WAMY's senior management

23   implemented new financial controls across

24   the entire organization?

This Transcript Contains Confidential Material

```
 1              MR. GOETZ:  Objection.
 2       Form.
 3              THE WITNESS:  Should I
 4       answer?
 5              I saw a pattern of evidence,
 6       I saw evidence, we reviewed
 7       evidence, report through various
 8       things, that are indicative of an
 9       organization that strives to have
10       controls.
11              The structure and behavior
12       that WAMY put in place are
13       indicative of a control-based
14       group and not a group that ran
15       without control over its local
16       branches.
17              So, you know, it's not one
18       particular thing, Mr. Carter.
19       It's a variety of different things
20       that basically make up control.
21  BY MR. CARTER:
22       Q.    Okay.  But you say, WAMY
23  strived to achieve for best practices
24  when it demanded that its local offices
```

This Transcript Contains Confidential Material

```
 1   report and be accountable for spending,

 2   in the sentence immediately after the

 3   more strict and centralized controls in

 4   1997.

 5                  What documents did you

 6   review between 1997 and 2000 through

 7   which WAMY issued directives to its

 8   offices demanding that they report and be

 9   held accountable for spending?

10              MR. GOETZ:  Objection.

11         Form.  Repetitive.

12              THE WITNESS:  I don't think

13         there's a -- one document.  But

14         the actions of the overall

15         organization, with regards to

16         their reporting in to WAMY Saudi

17         Arabia, are indicative of control,

18         are indicative of the fact that

19         that was something that was

20         demanded.

21              The actions that WAMY took

22         when that didn't happen were

23         severe.  If you did not provide

24         project-based -- if you did not
```

This Transcript Contains Confidential Material

1          provide support for monies that

2          you needed in order to promote the

3          mission of WAMY, you did not get

4          funding. Full period, the end.

5    BY MR. CARTER:

6          Q.    Mr. Marks, we're discussing

7    two different things.  And we'll get to

8    it later.

9               But I'm asking you

10   specifically about what steps were

11   undertaken between 1997 and 2000 by

12   WAMY's management to implement new

13   financial controls across the

14   organization?

15              I'm not asking you about

16   what you divined from the controls that

17   were in place.  I'm just asking you what

18   documents you saw that referred to the

19   implementation of new controls, if any?

20              MR. GOETZ:  Objection.

21         Form.  Repetitive.

22              THE WITNESS:  There's not

23         one document that I saw that

24         clearly lays this out.

This Transcript Contains Confidential Material

```
 1              Like I said to you before,
 2         in my -- in my experience, there
 3         doesn't need to be a document that
 4         exists to actually outline
 5         controls to be in place.  It's the
 6         actions of the organization.
 7    BY MR. CARTER:
 8         Q.    On Page 11 of your report,
 9    there's a sentence discussing Dr.
10    Noorwali's declarations.
11              And you say that, We have
12    found these declarations from Noorwali to
13    be consistent with supporting primary
14    documents reviewed, and the project
15    reports contained sufficient evidence for
16    these processes as we discussed in
17    Section C of our analysis.
18              And Section C of the
19    analysis, at least as I see it, begins on
20    Page 20 and concerns the Canada Review
21    Agency.
22         A.    Canada Revenue Agency.
23         Q.    Yes.  Sorry.
24         A.    That's okay.
```

This Transcript Contains Confidential Material

1    A.    I don't have a file, but I

2    know that they're in Exhibit B.

3    Q.    So I think we'd just ask

4    that -- that you provide some

5    identification of the -- as we understand

6    it now, 54 audit reports that are being

7    referenced on Page 7 of the report.

8         MR. GOETZ:  And, again,

9         Sean, my continuing objection to

10        the form.  There's audit reports

11        and then financial statements,

12        that's how it was reported.

13        MR. CARTER:  Okay.  If you

14        could just identify those when we

15        take a break.

16   BY MR. CARTER:

17   Q.    I'm going to get into some

18   specifics with regard to those documents

19   in a second, but I would first like to

20   discuss just some general considerations.

21        For purposes of undertaking

22   a review of the financial and accounting

23   controls of the organization as a whole,

24   is it customary to try to first get an

This Transcript Contains Confidential Material

1    understanding of the organization, its

2    operations and footprint?

3            MR. GOETZ:  Objection.

4        Form.

5            THE WITNESS:  That's part of

6        it, yes.

7    BY MR. CARTER:

8        Q.    For purposes of offering

9    your opinions in this case, did you

10   determine how many physical offices WAMY

11   had, both in the Kingdom and abroad,

12   during the period from 1992 to 2002?

13       A.    No.

14       Q.    Sitting here today, do you

15   know how many offices WAMY was operating

16   during that time?

17       A.    The exact number, no.

18       Q.    Can you provide an

19   approximation?

20       A.    Between 30 and 40.

21       Q.    Did you or your team

22   undertake any effort to catalogue the

23   offices in years for which you did

24   receive audits or audited financial

This Transcript Contains Confidential Material

1          So the fact that an auditor

2     signed off on these as with

3     regards to, you know, the

4     financial -- it says it right

5     here, In our opinion, the

6     financial statements present

7     fairly, in all material respects,

8     the fund accountability.

9          If they didn't have good

10     controls in place, you wouldn't be

11     able to crank out a financial

12     statement like this.

13          You know, I've been involved

14     in other charitable organizations

15     that don't have controls, where

16     generating financial statements is

17     like, literally, trying to get

18     from here to Jupiter.

19     BY MR. CARTER:

20          Q.    Do you know the firm Kantor

21     Akuntan Publik?

22          A.    We looked them up.  I don't

23     know them personally, but we looked them

24     up.

This Transcript Contains Confidential Material

1        Q.    Doesn't -- do you think

2   those figures accurately reflect the cost

3   of those items?

4        A.    I don't know whether they

5   reflect the cost of the items.

6             But this is my point.

7   There's complete and total transparency

8   here.  They are accounting for

9   everything.  Everything is being

10  accounted for.

11            So when we went back and we

12  did our review and we looked at all of

13  the evidence, the grave level of detail

14  for a charitable organization like this,

15  based on where they are located and based

16  on the situation and the timeframe that

17  we're dealing with, is actually quite

18  remarkable.

19            The fact that they had any

20  documentation whatsoever to me was

21  remarkable.  So, you know, I don't know

22  what your point is here, but these small

23  amounts, to me, are -- are them being

24  transparent.

This Transcript Contains Confidential Material

1    Whether it's $20 for a broom

2    or $20 for detergent, it doesn't matter.

3    They are accounting for things, which is

4    an indication of control, good controls,

5    solid controls, which is what we were

6    looking for.

7        Q.   Doesn't it perhaps indicate

8    that they were reconstructing their

9    financial activities after the fact and

10   assigning general values to things?

11       A.   Okay.  So --

12            MR. GOETZ:  Objection.

13       Object to the form.

14            THE WITNESS:  So then you're

15       calling the auditors who signed

16       off on these liars.

17   BY MR. CARTER:

18       Q.   Well, the auditors that

19   signed off on them may have taken in good

20   faith representations that those were the

21   approximate amounts?

22       A.   No, you're --

23            MR. GOETZ:  Objection to

24       form.

This Transcript Contains Confidential Material

1          Do you see that?

2     A.    I do.

3     Q.    And so it wasn't in the form

4  of a directive, was it?

5          MR. GOETZ:  Objection.

6          Form.

7          THE WITNESS:  Well, my

8          understanding is, with regards to

9          this particular document, when a

10         directive is issued like this,

11         when it comes to internal control,

12         there's always an opportunity to

13         reply back.

14  BY MR. CARTER:

15     Q.    Mr. Marks, the sentence I

16  just read you of your report, Over the

17  course of centralizing recordkeeping,

18  WAMY gradually became aware of issues in

19  their internal controls and made a

20  conscientious effort to improve any

21  control issues, do you see that?

22     A.    I do.

23     Q.    There is no citation for

24  that statement.

This Transcript Contains Confidential Material

1          What is the basis for that

2    statement?

3          A.    My basis for that statement

4    was reviewing the audit reports and audit

5    opinions and looking at those -- and the

6    financial information and other

7    information that highlighted certain

8    areas.  And we -- it looked like they

9    took corrective action.

10              So in my opinion, over the

11   course of this -- you know, over the

12   period, WAMY -- you know, WAMY, with

13   project-based accounting, issuing

14   policies and procedures, you know,

15   guidelines for recognizing revenue and

16   the like, that's an awareness.  That's

17   very common.

18         Q.    You say that this occurred

19   over the course of centralizing

20   recordkeeping.

21         A.    Okay.

22         Q.    What is the basis for

23   attributing this realization to the

24   centralization of recordkeeping?

This Transcript Contains Confidential Material

1          Q.     Further down you say, A new

2    accounting and financial policy was

3    introduced and implemented with immediate

4    effect on January 1st, 2000.

5                 Do you see that?

6          A.     I do.  Footnote 46, yes.

7          Q.     And then you describe the

8    principal points of the new policy,

9    correct?

10         A.     I do.

11         Q.     And am I correct that you

12   are of the opinion that the introduction

13   of that new policy was prompted by WAMY's

14   own internal recognition of control

15   issues from 1997 forward?

16         A.     I -- no.  I take exception

17   to that.  I think it's the overall

18   control consciousness of WAMY.  I --

19         Q.     When you say --

20         A.     -- think they always wanted

21   to -- any organization out there always

22   wants to improve their internal controls.

23                I don't -- you know, one

24   precipitating event, yes, might tip the

This Transcript Contains Confidential Material

```
1          while they get recommendations for
2          improvement, a lot of them just
3          don't do it, they ignore it.
4               The fact that they actually
5          did it and did something and
6          started to make changes and spent
7          money, like, real money to put in
8          an IT system and do all these
9          things that they were doing,
10         that's commendable.
11              You have publicly traded
12         companies that don't even do that.
13    BY MR. CARTER:
14         Q.   And, again, the actions that
15    you're just describing were the ones that
16    you reference from 1997 forward?
17         A.   You keep focusing in on
18    that, and I'm going to tell you that I
19    believe that, based on what I saw and the
20    evidence that I looked at, from 1992 to
21    2002, you know, with the level of
22    documentation, that there was a control
23    consciousness that dated back to 1992.
24              1997, again, could have been
```

This Transcript Contains Confidential Material

1    something -- there might have been some

2    precipitating event.  I just don't know.

3              But I do know that based on

4    my internal control experience, based on

5    my review of charitable organizations,

6    based on my overall audit experience,

7    based on my forensic skills and

8    capabilities, that organizations that do

9    this are very, very rare.

10             And, like I said, the fact

11   that they actually did this is somewhat

12   commendable.

13             MR. CARTER:  If we can, I'd

14        just like to mark as the next

15        exhibit the article at Tab 10.

16                  -  -  -

17             (Whereupon, Exhibit

18        Marks-970, No Bates, A Violation

19        of Trust: Fraud Risk in Nonprofit

20        Organizations, Marks, was marked

21        for identification.)

22                  -  -  -

23   BY MR. CARTER:

24        Q.   Mr. Marks, is this an

This Transcript Contains Confidential Material

```
 1          A.    Absolutely.

 2          Q.    All right.  Terrific.

 3                MR. HAEFELE:  I'm going to

 4          ask if we could pull up what was

 5          previously marked as Exhibit-962.

 6   BY MR. HAEFELE:

 7          Q.    And, Mr. Marks, 962 is the

 8   Baker Tilly invoices that we marked

 9   earlier today.

10                Do you remember those?

11          A.    Yes.

12          Q.    All right.  I'm going to ask

13   if we could flip over to Page 3 for a

14   moment.

15                MR. GOETZ:  Robert, sorry to

16          interject, but we did send that

17          other invoice to counsel.  So if

18          you check your inbox, you should

19          have that as well, just for your

20          reference, if you're talking about

21          this.

22                MR. HAEFELE:  Thanks.

23          Actually, that's a good point.

24                I don't know if somebody
```

This Transcript Contains Confidential Material

```
 1          from Cozen's office can -- if I
 2          can ask them if they would load
 3          that to the file share for the
 4          technologist, please.
 5               Is that possible, either
 6          Scott or Sean?
 7               MS. INT-HOUT:  You can
 8          actually load it directly in chat
 9          and I can grab it.
10               MR. HAEFELE:  Okay.
11          Actually, let's do that.  Let's
12          take a break at some point and do
13          that.  Let's keep going on now,
14          though.
15               MR. CARTER:  We just
16          e-mailed it to her.
17               MR. HAEFELE:  Great.  Great.
18     BY MR. HAEFELE:
19          Q.   So we're taking a look at
20     Page 3 of Exhibit-962.
21               And do you see that, Mr.
22     Marks?
23          A.   Yes.
24          Q.   I'm going to refer you, on
```

This Transcript Contains Confidential Material

1    into four general categories.

2              And then Mr. Carter asked

3    you some specific questions about some of

4    those categories.

5              Do you recall those

6    questions?

7         A.    I do.

8         Q.    And you wanted to explain

9    some of your answers, but you didn't have

10   the opportunity.

11             What explanation did you

12   want to give?

13        A.    Just that I mentioned that

14   these are red flags, and a red flag does

15   not mean that there is fraud.

16             A red flag is an observable

17   event that should cause an individual to

18   stop, evaluate and, if need be,

19   investigate further.  That's it.

20        Q.    So failure to reconcile

21   accounts in a timely manner, is that --

22   while a red flag, is that indicative, in

23   and of itself, of fraud or improprieties?

24        A.    No.

This Transcript Contains Confidential Material

1          Q.    Accounts with many large

2    round numbers or transactions that are

3    unusually large or small, is that, in and

4    of itself, indicative of fraud?

5          A.    No.

6          Q.    And as you said, I think

7    earlier at the beginning of your

8    testimony, you're not saying that there

9    were no red flags in your review of any

10   of the WAMY material, are you?

11         A.    No.

12         Q.    But did any of those rise to

13   the level where, in your opinion, there's

14   any evidence of fraud or financial

15   improprieties, money laundering, anything

16   like that?

17         A.    No.  Based on my review of

18   the financial information, which, if you

19   allow me one second here, which I

20   considered and our team considered the

21   audit reports, the bank statements, the

22   bank reports, the receipts, financial

23   reports, project reports, of which there

24   were over 800 of, operational reports,

This Transcript Contains Confidential Material

```
 1          Q.    Does the lack of audits from
 2   those chapters, is that at all a concern
 3   for you in your overall review of the
 4   evidence in this case?
 5          A.    No.  There are other
 6   financial -- other financial records and
 7   other financial information available for
 8   us to evaluate.  And having those -- just
 9   the mere fact of having that information
10   there is a control all in itself.
11          Q.    Other financial information
12   from those countries?
13          A.    Correct.
14          Q.    And, lastly, Mr. Haefele
15   asked you some questions, he broke down
16   some numbers about the invoices.
17                Accepting his numbers, it
18   looks like you billed 78.5 hours for
19   report-related work while other members
20   of your team billed, collectively,
21   27.5 -- 275.8 hours for report-related
22   work; is that right?
23          A.    That's correct.
24          Q.    But you testified that you
```