# EXHIBIT AAF

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

03-MDL-1570 (GBD) (SN)

EXPERT REPORT OF PROFESSOR JOHN T. SIDEL

## I.   SCOPE OF THIS EXPERT OPINION

1.   I have been asked by counsel for the Muslim World League, the International Islamic Relief Organization and Drs. Naseef, Al-Obaid, Al-Turki and Basha to offer an expert opinion on the following issues:

(a)   The historical and political context within which violent conflict emerged and evolved in the southern Philippines since the 1970s;

(b)   The role of the Moro Islamic Liberation Front (MILF) in the conflict in the southern Philippines;

(c)   The role of the *Abu Sayyaf* group in the conflict in the southern Philippines;

(d)   The historical and political context within which religious violence emerged in Indonesia over the late 1990s and early 2000s and the role of the *Jemaah Islamiyah* in such violence;

(e)   The nature and significance of the role of Southeast Asia within the global *jihad* waged by *Al Qa'ida*.

2.   In addition, I have reviewed the expert reports submitted by Plaintiffs' counsel in this litigation and offer rebuttal opinions on the following issues:

(a)   Questions of methodology: the use of empirical evidence, the mode of analysis, and the basis of conclusions inferred or implied with regard to individuals, organizations, and events in the Philippines and Indonesia;

(b)   The Bojinka Plot;

(c)   The identification of Southeast Asia as "a major center for operations" for *Al Qa'ida*;

(d)   The evidence regarding alliances between *Al Qa'ida* and the *Abu Sayyaf* group, the Moro Islamic Liberation Front (MILF), and the *Jemaah Islamiyah* (JI) network;

(e)   The activities, affiliations, and impact of Mohamed Jamal Khalifa in the context of the southern Philippines;

(f)   The determinations of the Office of Foreign Assets Control (OFAC) with regard to the Moro Islamic Liberation Front (MILF);

and

(g)     The activities, affiliations, and impact of *Kompak* in the context of violent religious conflict in Indonesia.

## II.     SUMMARY OF EXPERT OPINION

### *Affirmative Opinions*

3.      The drivers and dynamics of violent mobilization and conflict in the name of Islam in both the southern Philippines and Indonesia over the past several decades have been local in origin, representing responses to shifting political opportunities and constraints in these specific Southeast Asian contexts rather than to the imperatives and exigencies of some kind of broader struggle for 'global *jihad*' orchestrated from afar.

4.      The actual activities engaged in by the Moro Islamic Liberation Front (MILF), the *Abu Sayyaf*, and the *Jemaah Islamiyah* network over the years of initial contact, communications, and cooperation over the 1990s did not correspond to any grand plan for global *jihad* and were not in any way focused on the United States or 'the West'.

5.      Insofar as organizations like the MILF, the *Abu Sayyaf* group, and the *Jemaah Islamiyah* network have intersected with the multi-stranded circuitries of transnational Islamic outreach and Islamist activism, and with the clandestine activities of *Al Qa'ida*, they have done so episodically, opportunistically, and as a function of – and compensation for – the weakness of their positions on the local/national level.

6.      The MILF was focused on local and subnational aims, objectives, and antagonists, rather than on the ambitiously 'global' *jihad* focused on the United States launched by *Al Qa'ida* in the late 1990s leading up to and beyond 9/11.  Throughout these years, the MILF remained focus on the challenge of asserting its claims to represent the Moro people of the southern Philippines in general, and the communities in its stronghold area of central Mindanao in particular, as against those of the MNLF and other claimants to local political authority. Over the course of these years, the MILF engaged in very little in the way of actual armed guerrilla warfare against the Philippine government, and in practice it engaged in extensive forms of electoral participation, informal alliance-building, and effective live-and-let-live arrangements with local and national representatives of the Philippine government.

7.      The *Abu Sayyaf* group's operations throughout the mid-late 1990s remained essentially criminal, focused on kidnapping for ransom, extortion, and other predatory activities rather than anything credibly *jihadi* in objectives or orientation.

8.      The *Jemaah Islamiyah* network remained largely inactive in exile in Malaysia and elsewhere and maintained only an underground existence in Indonesia until 1999, when the revival of the dreams of an Islamic state from the era of the *Darul Islam* movement could be openly floated – however unsuccessfully – in the newly liberalized public sphere. This network was focused on defending Muslim communities and promoting Islamist aspirations in Indonesia as against domestic Christian and anti-Islamist opponents well into 2001. Its belated turn to global *jihad* came as a rear-guard action in the face of the dramatic shrinkage of its room for domestic manoeuvre.

exploited lax security conditions in Manila and who provided ideas which helped to inspire the 9/11 attacks six years later.

14.    From a comparative regional and historical perspective, it is difficult to see how Southeast Asia could be plausibly described as a "major center for operations" for *Al Qa'ida*. After all, if we stitch together the Southeast Asian bits and pieces of the narrative constructed in these expert reports, there is little in the way of coherent or compelling evidence of sustained activity or interest on the part of individuals identified, however loosely, with *Al Qa'ida*, or of sustained alliances or alignments of interest with local organizations in the region. Overall, looking back over the decade preceding the 11 September 2001 terrorist attacks, it is difficult to discern any evidence for the supposed centrality of Southeast Asia for the operations of *Al Qa'ida*. For most of this decade, the various groups caricatured in the expert reports submitted by the plaintiff's counsel as somehow allied or affiliated with *Al Qa'ida* remained very restricted in their activities and focused on local struggles rather than anything resembling a global *jihad*.

15.    The expert reports exaggerate the significance of the seemingly multifarious affiliations, reported activities, and alleged impact of Mohamed Jamal Khalifa in the context of the southern Philippines.  Mohamed Jamal Khalifa's period of work for the IIRO in the Philippines came to an end in late 1993 without any discernible achievements in terms of his presumed goals of advancing some kind of global *jihad* focused on the United States.  As for Khalifa's reported involvement in the Bojinka Plot of 1994-95, he was no longer employed by the IIRO by this time.

16.    The decision by the U.S. government to exclude the MILF from the OFAC sanctions list reflects an implicit acknowledgement and accurate understanding of the MILF as an organization whose established history, identity, and orientation gave reason for optimism as to the likelihood of peaceful collaboration rather than pessimism with regard to any enduring commitment to terrorism.

17.    Matthew Levitt's report claims that Dwikarna "was also the regional branch officer for the IIRO," however, there does not appear to be any solid evidence for the claim of an IIRO link to KOMPAK, Dwikarna, *Jemaah Islamiyah*, and *Al Qa'ida*, either in Matthew Levitt's expert report or in the sources cited.

### III.    QUALIFICATIONS

18.    I am an acknowledged expert on the Philippines and Indonesia, with special expertise on the role of Islam in the politics and societies of these two countries, particularly in contexts of violent conflict. My expertise on the Philippines dates back to the mid-1980s, when I spent a series of summers living and working in the country. Then from 1988 and into the mid-1990s, I was enrolled in the PhD program in Government at Cornell University, where I was affiliated with the Southeast Asia Program, then widely considered to be the leading center for the study of Southeast Asia in the world. In this context, I conducted research in the Philippines for several years in the late 1980s and early 1990s for my PhD dissertation, which was completed and defended in 1994 and awarded in 1995. I commenced work as a Lecturer in South East Asian Politics at the School of Oriental and African Studies (SOAS), University of London, in September

1994, and was subsequently promoted to the post of Reader in South East Asian Politics in 2001, before being awarded the Sir Patrick Gillam Chair in International and Comparative Politics at the London School of Economics and Political Science (LSE) in 2004, a post which I have held since that time.

19.    My research experience is of relevance to the analysis of the role of Islam in conflict, violence, and displacement in majority-Muslim provinces of the southern Philippines, in particular central Mindanao and the Sulu Archipelago. My research in the late 1980s and early-mid 1990s focused on local politics, and on corruption, criminality, conflict, and violence in the Philippines. The findings of this research bore fruit in a successfully completed PhD thesis from the world's leading program for the study of Southeast Asia, a book, *Capital, Coercion, and Crime: Bossism in the Philippines*, published by Stanford University Press in 1999, a co-authored book (with Eva-Lotta E. Hedman) titled *Philippine Politics and Society in the Twentieth Century: Colonial Legacies, Postcolonial Trajectories*, published by Routledge in 2000, and a number of other scholarly journal articles and book chapters, and other publications as well.

20.    My research in the Philippines during this period involved many months – all told, two to three years – of fieldwork in the country, travelling widely, gathering documentary materials and conducting interviews in English, Tagalog, and Cebuano, two major languages of the country in which I achieved competence during this time. As part of this fieldwork, I travelled extensively in Mindanao, not only to the Cotabato and Davao provinces, but also to Zamboanga City and to the island of Basilan, which I visited on several occasions in the early 1990s.

21.    Since 2012, moreover, I have resumed this pattern of intensive empirical research on politics in the Philippines, in connection with a new role as strategic advisor and 'action researcher' for The Asia Foundation office and the Australian Embassy in Manila. Since that time, I have made fifteen visits to the Philippines, including a recent visit in September 2019. These trips have been focused on various reform initiatives supported by The Asia Foundation in the Philippines in the realms of disaster risk reduction, elections, economic policy, education, health, land governance, security sector reform, subnational governance, and conflict reduction in the southern Philippines. This research has generated a new wave of publications on Philippine politics, with a co-authored book, *Thinking and Working Politically in Development: Coalitions for Change in the Philippines*, which was published by The Asia Foundation earlier this year.

22.    In connection with this research, I have made repeated visits to areas of the southern Philippines since 2012, including many within what is now known as the Bangsamoro Autonomous Region of Muslim Mindanao (BARMM). This research has included repeated visits to the key urban centers of BARMM, namely Cotabato City, Zamboanga City, and even Jolo, the capital of the Province of Sulu. The research undertaken in connection with these visits included extensive readings of diverse written materials on the violent conflict in the southern Philippines as well as interviews with a wide range of individuals involved in the conflict, including senior members of the Moro Islamic Liberation Front (MILF), former members of the Moro National Liberation Front (MNLF), and civilian, military, and police officials affiliated with the Philippine government.

23.     Alongside this accumulated expertise on the Philippines (and the majority-Muslim provinces of the southern Philippines in particular), I have also considerable expertise with regard to Indonesia, with a special focus on the role of Islam in the politics and society of the country. My expertise on Indonesia dates back to the mid-late 1980s, when I studied the Indonesian language (*Bahasa Indonesia*) for three years and took specialist courses on Indonesian culture and society at Yale University, and travelled frequently to Indonesia while pursuing an undergraduate degree and a Master's degree in Political Science at Yale University and then my PhD in Government at Cornell University.

24.     Following the completion and submission of my PhD dissertation in the mid-1990s, I turned the primary focus of my empirical research from the Philippines to Indonesia, with a special focus on the question of religious violence, a topic of increasing interest in the context of recurring religious riots in towns and cities across the country during this period. I lived in Surabaya, the capital of East Java, for nine months in 1997-1998 and then returned to Indonesia for shorter research stints on many occasions over the subsequent decade, while maintaining a close watch on developments and trends in Indonesian politics and society through the Indonesian press and diverse academic and other sources of information and analysis. My research on Indonesia during this period focused on the role of religion in Indonesian society and politics, as seen in my book *Riots, Pogroms, Jihad: Religious Violence in Indonesia* (Cornell University Press, 2006) and *The Islamist Threat in Southeast Asia: A Reassessment* (East-West Center, 2007), a short monograph which covered Indonesia alongside the southern Philippines and southern Thailand. Since that time, I have been working on a major book-length study which spans the breadth of Southeast Asia and includes Indonesia, the Philippines, and the role of Islam in the history and politics of the region: *Republicanism, Communism, Islam: Cosmopolitan Origins of Revolution in Southeast Asia*, which is due to be published by Cornell University Press in 2021.

25.     Over the past three decades, my expertise on the Philippines and Indonesia has been widely recognized in a variety of ways. On the one hand, my published scholarship continues to be widely cited by other academic authors and to be assigned to students on undergraduate and graduate courses on Southeast Asia in universities in countries across the world. I have been appointed to the editorial boards of major journals focusing on Southeast Asia – *Asian Survey*, *Critical Asian Studies*, *Pacific Affairs*, *South East Asia Research* – and invited to review journal article submissions and book manuscripts – and to supervise or examine PhD dissertations – focused on Indonesia, the Philippines, and other countries in the region. I am regularly invited to attend workshops and conferences, and to give guest lectures and keynote speeches, in connection with my academic writings and research on Indonesia and the Philippines.

26.     On the other hand, my expert knowledge of the Philippines and Indonesia has also given rise to regular requests for assistance by a wide range of institutions beyond the world of academia. I have written a series of expert reports on Indonesia for the United Nations High Commission for Refugees (UNHCR) and for the Ford Foundation, and on the Philippines for the Crown Prosecution Service here in the United Kingdom in connection with two terrorism cases (*Regina v. Frederick Ludlow* and the case of Ryan Counsell). In those two terrorism cases I also provided expert testimony. I have written

a number of expert reports in connection with asylum cases here in the UK and in the United States, focusing on political and social conditions in the Philippines and Indonesia. I have provided expert briefings to UK and other diplomatic, intelligence, and military officials as well as expert assistance and commentary to journalists. Since 2012, my work in the Philippines has involved regular meetings and briefings with senior officials of The Asia Foundation and the Australian Department of Foreign Affairs and Trade.

27. More importantly, perhaps, these past three decades of sustained empirical research, immersion in scholarship, and teaching and supervision of post-graduate students have provided me with a strong basis of expert knowledge and understanding of the politics and societies of the Philippines and Indonesia, especially in terms of the intersection of Islam, politics, and violent conflict in the two countries. Alongside direct experience and understanding through my own research and analysis, I am fully immersed in the accumulated – and growing – body of academic and non-academic research and writing on conditions and developments in the Philippines and Indonesia. My own expertise is thus representative of a broader body of expert knowledge and understanding, and my analysis below reflects a fairly wide and deep consensus among established academic experts on the Philippines and Indonesia on the major issues at stake here.

28. A complete list of my publications can be found in my CV, which is attached as Exhibit A to this report, along with a complete list of documents considered in the preparation of this report attached as Exhibit B. I have been compensated for my work in this matter at a rate of £500 per hour.

## IV.    METHODOLOGY

29. Alongside and beyond my special expertise on the Philippines and Indonesia, this report is also informed by my methodological approach to the study of the intersection between Islam, politics, and violent conflict, which is very different from that of 'terrorism experts' working outside academic contexts. This approach is grounded both in 'area studies' and social-science methodology in at least three ways.

30. First of all, my research and analysis has been based on a broad and varied set of empirical sources ranging from interviews to government documents, NGO and media reports, and secondary scholarly literature which itself draws on a diverse range of sources. Here my extended history of fieldwork and research – and network of fellow scholars and other experts – has given me extensive local access as well as an accumulated body of materials dating back many years. In gathering and evaluating information and crafting my analysis, moreover, I have made efforts to maintain a critical distance on individual sources, given their inherent biases, distortions, and limitations, and to 'triangulate' sources rather than rely on individual sources without questioning or seeking confirmation of their validity.

31. Secondly, instead of focusing on a narrow set of actors engaged in various forms of violence in the name of Islam, my research and analysis has emphasized the importance of contextualization. Here I have been concerned to situate those actors engaged in violence in the name of Islam within the discrete political and sociological contexts in which they are embedded, both in terms of the contested field of religious authority (i.e.

and from his position as SPCPD Chairman, with corruption charges initiated against him.[7] In November 2001, Misuari declared war against the Philippine government, leading a short-lived and small-scale rebellion that quickly petered out, forcing him to flee to Malaysia, where he was soon arrested, incarcerated, and in due course extradited back to the Philippines to face trial. Subsequent years saw Misuari remaining under various forms of detention or house arrest, with the legal charges dropped and a quiet return to his home province of Sulu eventually allowed by 2009.

47.    Overall, the period from the late 1960s through the early 2000s was thus one which witnessed the rise and fall of the Moro National Liberation Front as an armed separatist insurgency fighting for an independent Moro – i.e. Muslim Filipino – homeland, settling for autonomy in the southern Philippines, oscillating between conflict and co-optation by the Philippine government, and degenerating into internal fractiousness and fragmentation, a picture familiar from many other secessionist or national liberation struggles elsewhere across the world during the same period.

48.    From the outset, it is worth noting, the violent conflict in the southern Philippines did not involve Islam per se in terms of the ideological and organizational bases for mobilization in support of an independent Moro – i.e. Muslim – homeland. The onset of violent conflict in the late 1960s and early 1970s did not unfold amidst any noticeable movement towards greater Islamic piety or strengthened religious identity among the Moros of the southern Philippines. The leadership of the MNLF was notably secular nationalist in its idiom and orientation, as were those of its external sources of support – the Malaysian and Libyan governments. On the ground, the MNLF's infrastructure was rooted in local political, familial, and business networks at odds with the Marcos government and its local allies in the southern Philippines, rather than in networks of religious schools and scholars. In considerable measure, the conflict in the southern Philippines has concerned Muslims but not Islam per se.

**B.    The Role Of The Moro Islamic Liberation Front (MILF) In The Conflict In The Southern Philippines**

49.    The legacies of the 1970s endured over subsequent decades, enabling periodic resurgences of violent conflict in the southern Philippines. Meanwhile, over the course of the 1980s and 1990s, Islam emerged as an important discursive and organizational rubric for new forms of violent mobilization in the southern Philippines in the context of the degeneration of the MNLF during this period as described above. The MIM and then the MNLF, it is worth noting, had included small numbers of Islamic scholars, students, and graduates of the limited network of Islamic schools across the southern Philippines, as well as some activists whose pilgrimages and peregrinations had drawn them into the transnational circuitries of Islamic educational institutions and Islamist political activism centered in the Middle East and South Asia. Most notable in this regard was Hashim Salamat, who left his native Maguindanao Province in central Mindanao in 1959 to study at the world-famous Islamic university of Al Azhar in Cairo

---

[7] For a concise and prescient overview, see: Jacques Bertrand, "Peace and Conflict in the Southern Philippines: Why the 1996 Agreement is Fragile," *Pacific Affairs*, Volume 73, Number 1 (Spring 2000), pp. 37-54.

the sensationalized picture of longstanding and widespread Islamist terrorism activity in support of 'fundamentalist' Islamic states across Indonesia, Malaysia, and the Philippines does not correspond to the realities of the recent historical record of these three countries.

101.    Finally, the expert report authored by Matthew Levitt oddly seems to suggest (on page 35) that there was an active organizational presence of the Palestinian group *Hamas* (the *Harakat al-*Muqawama *al-Islamiyya* or Islamic Resistance Movement) in the IIRO Philippines offices in the mid-1990s, on the basis of a single CIA document and a related article in the *Wall Street Journal*. This suggestion seems rather implausible or at least inexplicable, given the lack of any obvious rationale for this Palestinian organization to establish a base in the Philippines, whether in terms of diplomatic outreach, media activism, fund-raising, or logistical support for the organization's activities and members in the Gaza Strip and the West Bank. It is possible that the IIRO's office in Manila in the 1990s had Palestinians on its staff who were – theologically and politically – aligned with *Hamas*. But it is difficult to see what, if anything, could or should be concluded from the rather obscure, seemingly unimportant, and unverified – but suggestively sensationalized – claim of a foothold for the Palestinian Islamist group *Hamas* in the far-flung Philippines.

102.    This kind of claim epitomizes a broader tendency in all of the discussion on Southeast Asia contained within the expert reports submitted by the plaintiffs' counsel, namely the imputation or insinuation of some kind of seamless, sustained, single conspiracy somehow encompassing and unifying a diverse set of individuals and organizations with disparate identities, orientations, aims, and objectives, on the basis of very limited evidence of interaction much less affiliation or alignment of interest. Close, careful analysis reveals that the evidence of communications and coordination among these actors and organizations is thin and that the vague claims or insinuations of their impact and importance are unsubstantiated.

### B.    The Bojinka Plot

103.    Meanwhile, there is a similar tendency towards wild extrapolation – and/or vague insinuation – with regard to the so-called Bojinka Plot in some of the expert reports submitted by the counsel for the plaintiffs. Matthew Levitt's report, for example, briefly mentions this plot (on page 11) in the context of an *Al Qa'ida* strategy of "expansion through building alliances with likeminded militant groups around the world" (p. 10). Jonathan Winer's report describes this plot as a "precursor to the 9/11 attacks" (paragraph 6.6.6.6, page 27) undertaken by "al-Qaeda personnel incubated by IIRO support" (paragraph 12.9.17, page 100). Brian Michael Jenkins's report likewise treats the plot as "a direct precursor to the 9/11 operation" (p. 11).

104.    The so-called Bojinka Plot involved Ramzi Yousef, the Pakistani mastermind of the 1993 World Trade Center bombing and his uncle, Khalid Sheikh Mohammed, and other compatriots in plans developed and undertaken in Manila over late 1994 and into 1995 to assassinate Pope John Paul II and to detonate explosives on as many as eleven U.S.-bound passenger airplanes departing from Manila and other airports in the region. By December 1994, the development of the plot reached the point where experimental explosions were staged in Cebu City, in Manila, and on a flight bound for Japan, leaving a number of victims injured and one fatality, emboldening the plotters to move to bring

their plot to fruition. But an accidental fire in the plotters' apartment in Manila led to the discovery by the local authorities, the forced flight from the Philippines of Yousef and Khalid, and the arrest of their co-conspirators. This much seems clear from available sources and is not a matter of dispute here.[47]

105. But the aforementioned expert reports submitted by the counsel for the plaintiffs suggest – through exaggeration, extrapolation, and insinuation – a set of implications with regard to the Bojinka Plot which are essentially unwarranted. The reports situate this very ambitious – if unsuccessful – terrorist operation of 1994-95 within a broader narrative in which Southeast Asia figures as a seemingly central part of the trajectory of 'global *jihad*' leading to the 11 September 2001 attacks and beyond. This kind of contextualization is most evident in Jonathan Winer's report, in which a brief description of the plot on page 100 appears as the final paragraph – and thus the culmination, punchline, or grand finale – of a discussion of the IIRO's activities in Indonesia and the Philippines which begins on page 92 and consists of no less than twenty-five (25) paragraphs.

106. A close, careful analysis of the Bojinka Plot, however, raises questions as to the credibility of this kind of contextualization and the kinds of implications which are insinuated in the reports. After all, the available sources indicate that the plot was undertaken by non-Filipino nationals, without local participation, and without any organic connection to one or another group or network or organization linked to the conflict in the southern Philippines. Instead, the location of the plotters in Manila and their use of the city and its airport as a launching pad for the planned terrorist operation of 1994-1995 appear to be understandable as almost incidental or related not to the specific circumstances and struggles of Muslims in the Philippines, but rather to the relative ease with which foreign tourists could move in and out of the country and engage in a variety of activities without attracting the unwanted attention and interference of the authorities. In other words, there does not appear to be any actual connection between the Bojinka Plot of 1994-94 in Manila and the broader developments in the Philippines, Indonesia, and elsewhere in Southeast Asia over subsequent years which are discussed in detail above and alluded to much more sketchily, selectively, and at times in sensationalist terms in the expert reports submitted by the counsel for the plaintiffs.

107. A close, careful analysis of the 1994-95 Bojinka Plot, moreover, raises further questions with regard to the supposedly self-evident and seamless linkages between Ramzi Yousef, Khalid Sheikh Mohamed, and Mohamed Jamal Khalifa and the IIRO on the one hand, and Osama bin Laden, *Al Qa'ida*, and the 11 September 2001 terrorist attacks on the other. Here the retrospective identification and conflation of individuals, organizations, aims and objectives in a single sustained coherent conspiracy is highly anachronistic in descriptive terms and ambiguous in terms of causation. In fact, the identities and activities of the individuals and organizations in question in 1994-1995 do not correspond to Mohamed Jamal Khalifa's period of employment by the IIRO

---

[47] For the most detailed published account of the Bojinka Plot, see: Maria R. Ressa, *Seeds of Terror: An Eyewitness Account of Al-Qaeda's Newest Center of Operations in Southeast Asia* (New York: Free Press, 2003), pp. 18-44.

office in the Philippines, which ended in late 1993, and they do not fit within a unified, linear plot line leading to 2001 and the terrorist attacks in September of that year.[48]

108.  If, after all, the 1994-95 Bojinka Plot was a 'direct precursor' of the 9/11 attacks, the passing of more than six years between the two terrorist operations remains to be explained, as does the absence of any similar plots in the Philippines or elsewhere in Southeast Asia during the intervening period. Thus overall, a close, careful, and properly contextualized analysis of the Bojinka Plot is suggestive of a failed experiment with anti-Western and anti-American terrorism by adventurous independent operators who exploited lax security conditions in Manila and who provided ideas which helped to inspire the 9/11 attacks six years later.

## C.    Southeast Asia As A "Center For Operations For *Al Qa'ida*"

109.  In a similar vein, the expert report authored by Matthew Levitt cites the 'terrorism expert' Zachary Abuza's description of Southeast Asia as a "major center for operations" for *Al Qa'ida* (page 11), a claim which is neither elaborated upon in terms of definitional criteria or substantiated in terms of empirical evidence. This claim fits well within the aforementioned tendency on the part of the expert reports submitted by the plaintiffs' counsel to engage in extrapolation and exaggeration without sufficient evidence or proper contextualization.

110.  Viewed from a comparative regional and historical perspective, it is difficult to see how Southeast Asia could be plausibly described as a "major center for operations" for *Al Qa'ida*. After all, if we stitch together the Southeast Asian bits and pieces of the narrative constructed in these expert reports, there is little in the way of coherent or compelling evidence of sustained activity or interest on the part of individuals identified, however loosely, with *Al Qa'ida*, or of sustained alliances or alignments of interest with local organizations in the region. There is the failed 'Bojinka Plot' of 1994-95; there are reports of funding to the small, shadowy *Abu Sayyaf* group during its early years on the island of Basilan, initially as a religious group and then as a criminal racket. There are reports of some flows of funding to the MILF during a period in which it was embattled in a small pocket of central Mindanao, and there are claims with regard to linkages with the shadowy *Jemaah Islamiyah* network, whose only contributions to 'global *jihad*' during the peak period of *Al Qa'ida* strength were the single annual terrorist attacks of 2002, 2003, 2004, and 2005 in Indonesia.

111.  Overall, looking back over the decade preceding the 11 September 2001 terrorist attacks, it is difficult to discern any evidence for the supposed centrality of Southeast Asia for the operations of *Al Qa'ida*. For most of this decade, the various groups caricatured in the expert reports submitted by the plaintiff's counsel as somehow allied or affiliated with *Al Qa'ida* remained very restricted in their activities and focused on local struggles rather than anything resembling a global *jihad*. The only evidence or examples of active involvement of Islamist groups in Southeast Asia in a seemingly more grandiose and global struggle in the name of Islam came in the aftermath of 9/11 in the context of the 'Global War On Terror', namely the series of bombings of Western targets in Indonesia over 2002-2005 and the much later attraction and affiliation of

---

[48] IIRO 287370.

small numbers to the so-called Islamic State in Iraq and Syria (ISIS) in the mid-late 2010s. In terms of the period preceding 9/11, the reported numbers of identified *Al Qa'ida* operatives and the estimated quantities of *Al Qa'ida* funding in Southeast Asia appear to have remained very small, and the overall influence and impact of *Al Qa'ida* with regard to so-called *jihad* in the region is very difficult to discern.

### D. Evidence Of Alliances Between *Al Qa'ida*, *Abu Sayyaf*, The MILF, And *Jemaah Islamiyah*

112.  Moreover, in the expert reports' claims with regard to alleged alliances between *Al Qa'ida* and the *Abu Sayyaf* group, the Moro Islamic Liberation Front (MILF), and the *Jemaah Islamiyah* (JI) network, there is likewise a pronounced tendency to extrapolate from available evidence to exaggerate the nature and extent of continuities, connections, communications, and confluences of interests among these different groups. As noted in the affirmative report, there does appear to be evidence that small numbers of *Jemaah Islamiyah* activists enjoyed a safe haven in the southern Philippines thanks to the hospitality of elements of the *Abu Sayyaf* group and the MILF and that there were forms of training and sharing of expertise in explosives across these groups in this context. As further noted in the affirmative report, there also appears to be evidence of some communications between *Al Qa'ida* and these groups as well, albeit only at specific junctures in each case rather than in a more sustained and systematic fashion. The coincidence of interests – and the alignment of a 'global *jihad*' with longstanding local struggles – was only ever partial, provisional, and short-lived.

113.  Indeed, as suggested in the pages above, the determinants and drivers of various struggles in the name of Islam in the Philippines and Indonesia were local rather than global, as seen in the timing, targets, and forms of violent mobilization observed. In the case of the *Abu Sayyaf* group, for example, its essentially criminal and predatory nature prefigured a focus on kidnapping for ransom – rather than, say, terrorist bombings – over the years following its emergence in the early 1990s in areas of the Sulu Archipelago and the Zamboanga *Peninsula*. In the case of the MILF, moreover, competition with the MNLF for external recognition and resources – from the Philippine government as well as external actors like the OIC – led it to concentrate on the strengthening of its local base in central Mindanao for much of the 1990s. Peaceful accommodation rather than armed insurgency prevailed until the Philippine government launched a military campaign in the southern Philippines towards the end of the decade. Finally, the shadowy *Jemaah Islamiyah* group emerged and evolved in exile over the 1990s, only moving back to Indonesia and mobilizing its very limited network of cadres in 1999 to focus on the inter-religious violence between Christians and Muslims in Maluku, North Maluku, and Central Sulawesi alongside its broader non-violent agitation for an Islamic state in the country as a whole. It was only in the aftermath of 11 September 2001 and amidst a dramatic downturn in Islamist fortunes in Indonesia and a US-inspired government crackdown on Islamist groups in the country that *Jemaah Islamiyah* turned to terrorist attacks focused on Western targets.

114.  Thus overall it is difficult to identify any evidence that the episodic interactions, communications, and/or transactions with individuals affiliated with *Al Qa'ida* evidenced, alleged, or insinuated in the expert reports had a significant impact on the activities of the *Abu Sayyaf* group, the MILF, or *Jemaah Islamiyah*. These groups remained focused on local – in some cases, subnational – aims, objectives, and

33

until his release from prison and deportation to Indonesia in 2014.[52] Dwikarna also stood accused of affiliation with *Jemaah Islamiyah* and of serving as a 'facilitator' for *Al Qa'ida* in Indonesia, as seen in his inclusion on the *Al Qa'ida* Sanctions List of the United Nations Security Council.[53] But there is ample reason to doubt the evidence cited in the sanctions notice for Dwikarna, namely that he allegedly escorted *Al Qa'ida* deputy Ayman Al-Zawahiri and Al Qa'ida military chief Mohammed Atef during their visit to the Indonesian province of Aceh in June 2002. Given that Dwikarna was in prison in Manila as of March 2002, Al-Zawahiri was in hiding in the Federally Administered Tribal Areas (FATA) in Pakistan, and Atef had been killed in a US airstrike in November 2001, these claims can be safely dismissed as entirely spurious.

127.   As for Dwikarna's other reported affiliations, multiple sources identify him as the local representative of the Al Haramayn Foundation in South Sulawesi, if not in 2002 then at least in 2000. But Matthew Levitt's report claims that Dwikarna "was also the regional branch officer for the IIRO," an assertion lifted verbatim from an article by the 'terrorism expert' Zachary Abuza.[54] The article in question evidences this claim only by footnoting a lengthier report by the same author, which treats Dwikarna, KOMPAK, *Jemaah Islamiyah*, *Al Qa'ida*, and the Al Haramayn Foundation in greater depth over several pages, but without a single reference to the IIRO.[55] Thus there does not appear to be any solid evidence for the claim of an IIRO link to KOMPAK, Dwikarna, *Jemaah Islamiyah*, and *Al Qa'ida*, either in Matthew Levitt's expert report or in the sources cited.

128.   Overall, the case of Agus Dwikarna is suggestive of at least two fundamental methodological problems with the expert reports submitted by the counsel for the plaintiffs. First of all, these reports integrate a diverse set of actors and organizations in the Philippines and Indonesia into a unified and oversimplified narrative without acknowledging the diversity and specificity of their activities, affiliations, aims, and objectives as well as the absence of evidence of their actual involvement or interest in terrorist operations focused on the United States. Secondly, these reports are based on a highly selective and uncritical use of empirical sources whose veracity remains open to question.

29 July 2020

Date

*John T. Sidel*

Professor John T. Sidel

---

[52] For Indonesian-language media coverage and analysis of this controversial episode, see: *ManilaGate: Kontroversi Penangkapan Tamsil Linrung* (Jakarta: Merah Putih, 2003).

[53] https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/individual/ agus-dwikarna.

[54] Zachary Abuza, "Jemaah Islamiyah Adopts the Hezbollah Model," *Middle East Quarterly*, Volume 16, Number 1 (Winter 2009), pp. 15-26.

[55] Zachary Abuza, *Funding Terrorism in Southeast Asia: The Financial Network of Al Qaeda and Jemaah Islamiyah* (Seattle, WA: National Bureau of Asian Research, December 2003), pp. 29-33.