EXHIBIT C

This Transcript Contains Confidential Material

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2
 3    IN RE: TERRORIST ATTACKS    )  03-MDL-1570 (GBD)(SN)
      ON SEPTEMBER 11, 2001       )
 4                                 )
 5
 6
 7
                          — — —
 8
                  Tuesday, July 13, 2021
 9                        — — —
10              THIS TRANSCRIPT CONTAINS
                 CONFIDENTIAL MATERIAL
11                        — — —
12
13     Remote video-recorded deposition of JONATHAN M.
      WINER, held at the location of the witness,
14    commencing at 10:04 a.m., on the above date, before
      Debra A. Dibble, Certified Court Reporter,
15    Registered Diplomate Reporter, Certified Realtime
      Captioner, Certified Realtime Reporter and Notary
16    Public.
17
                          — — —
18
19
20
21
22
23
              GOLKOW LITIGATION SERVICES
24         877.370.DEPS | fax 917.591.5672
                  deps@golkow.com
25
```

```
 1    REMOTE APPEARANCES:
 2
           LAW FIRM OF OMAR T. MOHAMMEDI, LLC
 3         BY:  OMAR T. MOHAMMEDI, ESQUIRE
                omohammedi@otmlaw.com
 4              JILL L. MANDELL, ESQUIRE
                jmandell@otmlaw.com
 5         Woolworth Building
           233 Broadway, Suite 820
 6         New York, New York 10279
           (212) 725-3846
 7         Counsel for World Assembly of Muslim Youth
 8
 9         GOETZ & ECKLAND P.A.
           BY:  FREDERICK J. GOETZ, ESQUIRE
10              fgoetz@goetzeckland.com
           Banks Building
11         615 1st Avenue NE, Suite 425
           Minneapolis, Minnesota 55413
12         (612) 874-1552
           Counsel for World Assembly for
13         Muslim Youth
14
           KREINDLER & KREINDLER LLP
15         BY:  ANDREW J. MALONEY, ESQUIRE
                amaloney@kreindler.com
16         485 Lexington Avenue, 28th Floor
           New York, New York 10017
17         (212) 687-8181
           Counsel for Plaintiffs' Executive
18         Committee and the Ashton plaintiffs
19
           COZEN O'CONNOR
20         BY:  SEAN P. CARTER, ESQUIRE
                scarter1@cozen.com
21              J. SCOTT TARBUTTON, ESQUIRE
                starbutton@cozen.com
22         One Liberty Place
           1650 Market Street
23         Philadelphia, Pennsylvania 19103
           (800) 523-2900
24         Counsel for Plaintiffs' Executive
           Committee and the Federal Insurance
25         plaintiffs
```

This Transcript Contains Confidential Material

```
 1
    REMOTE APPEARANCES:
 2
 3      MOTLEY RICE
        BY:  ROBERT HAEFELE, ESQUIRE
 4           rhaefele@motleyrice.com
             C. ROSS HEYL, ESQUIRE
 5           rheyl@motleyrice.com
             JOHN M. EUBANKS, ESQUIRE
 6           jeubanks@motleyrice.com
             JODI FLOWERS, ESQUIRE
 7           jflowers@motleyrice.com
        28 Bridgeside Blvd.
 8      Mt. Pleasant, South Carolina 29464
        (843) 216-9184
 9      Counsel for Plaintiffs' Executive
        Committee and Brunett plaintiffs
10
11      ALFAHAD & PARTNERS
        BY:  ABDULAZIZ AL FAHAD, ESQUIRE
12           alfahad@fahadlaw.com
        Riyadh, Saudi Arabia
13      Counsel for Kingdom of Saudi Arabia
14
        LEWIS BAACH KAUFMAN MIDDLEMISS PLLC
15      BY:  WALEED NASSAR, ESQUIRE
             waleed.nassar@lbkmlaw.com
16           SUMAYYA KHATIB, ESQUIRE
             sumayya.khatib@lbkmlaw.com
17           AISHA E.R. BEMBRY, ESQUIRE
             aisha.bembry@lbkmlaw.com
18           ERIC L. LEWIS, ESQUIRE
             eric.lewis@lbkmlaw.com
19      1101 New York Avenue, N.W.
        Suite 1000
20      Washington, D.C. 20005
        (202) 833-8900
21      Counsel for the Muslim World League
        and the International Islamic Relief
22      Organization.
23
24
25
```

This Transcript Contains Confidential Material

```
 1        A.    135 pages is correct.

 2        Q.    And is that correct that your rebuttal

 3   was 66 pages?

 4        A.    Yes.

 5        Q.    Do you agree with me that this is a

 6   massive case, correct?

 7        A.    Yes.

 8        Q.    With massive documents; correct?

 9        A.    Yes.

10        Q.    Massive documents produced?

11        A.    Yes.

12        Q.    This is for the finder to evaluate claims

13   and defense in this case.  Do you agree with me?

14        A.    Yes.

15        Q.    Did you choose which document to review

16   and which document not to review?

17        A.    Yes.

18        Q.    Did the lawyers select documents for you

19   to review?

20        A.    Yes and no.

21        Q.    What do you mean by yes and no?

22        A.    I was given an initial group of

23   documents.  After going through those documents, I

24   asked for more documents.  And that took place a

25   couple of times.
```

This Transcript Contains Confidential Material

```
 1  wanted an audit and I did request them.
 2       Q.   Is it fair to say that you did not review
 3  the audit before you produced your affirmative
 4  report; correct?
 5       A.   My report itself says I did not.
 6       Q.   Okay.  And are you aware that Muslim
 7  World League produced over 700,000 pages of
 8  documents?
 9            MR. HAEFELE:  Objection to form.
10       A.   I have stated and now repeat that I am
11  not aware of the amount of documents produced by
12  anyone involved in the case in terms of the numbers.
13       Q.   (BY MR. MOHAMMEDI)  And it's fair to say
14  that your affirmative report did not really rely
15  mostly on the documents produced in this case;
16  correct?
17            MR. HAEFELE:  Objection to form.
18       A.   I can't respond to that question with a
19  yes or a no.
20       Q.   (BY MR. MOHAMMEDI)  No, you can.
21       A.   It relied on the material that I've
22  listed.  I looked at every audit that I was able to
23  get my hands on and the financial records associated
24  with them.  And I went through depositions of the
25  officers of the defendants, for example, and sought
```

This Transcript Contains Confidential Material

1   to consider as much information as I could within

2   the time available.

3        Q.   Yeah.  It is fair to say it's over

4   2 million pages of documents between -- let's say

5   World Assembly Muslim Youth and Muslim World League,

6   we will call it WAMY and MWL.  So you have not

7   reviewed the over 2 million pages of documents that

8   were produced by WAMY and Muslim World League;

9   correct?

10            MR. HAEFELE:  Objection to form.

11       A.   It is correct that I have not reviewed

12  2 million documents from anyone at any time in my

13  life.

14       Q.   (BY MR. MOHAMMEDI)  I will direct you to

15  page 6 and page 26 of your reliance material.

16            If -- there is the highlighted version

17  there.  If you see Exhibits 267, which was actually

18  an exhibit to a deposition of WAMY, and there was a

19  document there, says, WAMYSA0276804.  Do you see

20  that?

21       A.   Yes.

22       Q.   That's one of your reliance material;

23  correct?

24       A.   It's material that was available to me,

25  which I considered.  I considered as much as I could

1    Q.    Okay.  So you are rendering your opinion

2    with this type of expertise in this report.  Is that

3    what you're claiming?  You are an expert in all

4    these areas that you are rendering your opinion on?

5    A.    I'm not claiming anything.  I have

6    rendered my opinion in these areas.

7    Q.    As an expert?

8    A.    As an expert in international financial

9    crime and terrorist finance, including the area of

10   charity abuse.

11   Q.    Okay.  So I'm just trying to understand

12   your area of expertise in this case.

13              MR. HAEFELE:  Objection to form.  Is

14    there a question there, Omar?

15   Q.    (BY MR. MOHAMMEDI)  Is there an area of

16   expertise you have and you're rendering an opinion

17   in this case?

18              MR. HAEFELE:  Objection to form.

19   A.    I have been studying and worked as a

20   practitioner in counter transnational financial

21   crime going back to the earliest phases of my career

22   beginning in 1980 when I did my first money

23   laundering case.  That expertise included

24   investigations of terrorist activity and terrorist

25   finance when I worked in the United States Senate in

1    wanted an audit and I did request them.

2         Q.    Is it fair to say that you did not review

3    the audit before you produced your affirmative

4    report; correct?

5         A.    My report itself says I did not.

6         Q.    Okay.  And are you aware that Muslim

7    World League produced over 700,000 pages of

8    documents?

9                    MR. HAEFELE:  Objection to form.

10        A.    I have stated and now repeat that I am

11   not aware of the amount of documents produced by

12   anyone involved in the case in terms of the numbers.

13        Q.    (BY MR. MOHAMMEDI)  And it's fair to say

14   that your affirmative report did not really rely

15   mostly on the documents produced in this case;

16   correct?

17                    MR. HAEFELE:  Objection to form.

18        A.    I can't respond to that question with a

19   yes or a no.

20        Q.    (BY MR. MOHAMMEDI)  No, you can.

21        A.    It relied on the material that I've

22   listed.  I looked at every audit that I was able to

23   get my hands on and the financial records associated

24   with them.  And I went through depositions of the

25   officers of the defendants, for example, and sought

This Transcript Contains Confidential Material

 1   to consider as much information as I could within

 2   the time available.

 3        Q.    Yeah.  It is fair to say it's over

 4   2 million pages of documents between -- let's say

 5   World Assembly Muslim Youth and Muslim World League,

 6   we will call it WAMY and MWL.  So you have not

 7   reviewed the over 2 million pages of documents that

 8   were produced by WAMY and Muslim World League;

 9   correct?

10            MR. HAEFELE:  Objection to form.

11        A.    It is correct that I have not reviewed

12   2 million documents from anyone at any time in my

13   life.

14        Q.    (BY MR. MOHAMMEDI)  I will direct you to

15   page 6 and page 26 of your reliance material.

16            If -- there is the highlighted version

17   there.  If you see Exhibits 267, which was actually

18   an exhibit to a deposition of WAMY, and there was a

19   document there, says, WAMYSA0276804.  Do you see

20   that?

21        A.    Yes.

22        Q.    That's one of your reliance material;

23   correct?

24        A.    It's material that was available to me,

25   which I considered.  I considered as much as I could

```
 1        Q.    (BY MR. MOHAMMEDI)  Did they submit

 2   reliance material, did they?

 3              John Marks would submit his reliance

 4   material.  Did you --

 5              MR. HAEFELE:  Object to the form.

 6        Q.    (BY MR. MOHAMMEDI)  Did you review the

 7   reliance materials that John Marks submitted in his

 8   report?

 9              MR. HAEFELE:  Objection to form,

10        foundation.

11        A.    I reviewed all the audit material that

12   was made available to me, and my conclusions about

13   that audit material were provided in my rebuttal

14   report.

15        Q.    (BY MR. MOHAMMEDI)  And is that fair to

16   say, based on his statement in his report?

17        A.    I looked at the statements in his report.

18   I looked at the audit material.  I asked if there

19   was any additional audit material, and I expressed

20   my concern that there was a lot of material that was

21   still missing.

22        Q.    Okay.  Which questions relating to the

23   involvement of charities in international terrorism

24   finance in the period leading up to 9/11 attacks

25   were you asked to opine on?
```

This Transcript Contains Confidential Material

```
 1    the 1980s; that included exposure to these issues

 2    continuously during the time that I was at the State

 3    Department from 1994 through 1999.  So from the

 4    period of from 1985 to '99 while I was in the

 5    federal government, I was exposed -- 1985 to 1999 --

 6              MR. MOHAMMEDI:  Mr. Winer, I thought

 7         you were answering my question.  We are going

 8         to go through those.

 9              MR. HAEFELE:  I'm going to object to

10         the --

11    Q.   (BY MR. MOHAMMEDI)  My question is --

12              MR. HAEFELE:  Omar, let me object to

13         you interrupting and not letting him finish

14         the answer to the question.  I understand --

15              MR. MOHAMMEDI:  I don't think he's --

16         I don't think he's -- his answer is not

17         responsive and I want to make sure I have a

18         response.

19              MR. HAEFELE:  All right.  I just want

20         the record --

21              MR. MOHAMMEDI:  I am not asking

22         him --

23              MR. HAEFELE:  Omar, I just want the

24         record --

25              MR. MOHAMMEDI:  Listen, can you
```

This Transcript Contains Confidential Material

```
 1          not -- listen, this is my deposition, Robert.
 2                    MR. HAEFELE:  I know it's your
 3          deposition, but it's my opportunity to make
 4          sure that he gets to answer the questions, and
 5          you can't interrupt.
 6                    MR. MOHAMMEDI:  He is not answering
 7          the questions --
 8                    MR. HAEFELE:  Omar, I'm just --
 9                    MR. MOHAMMEDI:  He's not.
10                    MR. HAEFELE:  Omar, I'm just making a
11          record.  You can go on with your deposition.
12          I'm just making a record.
13                    MR. MOHAMMEDI:  Okay.  So I am -- I
14          want to make sure we don't waste a lot of
15          time.  We are going through those.  Sooner or
16          later we'll go through them.
17     Q.    (BY MR. MOHAMMEDI)  My question is very
18   specific:  Which area of expertise you're opining in
19   this case.  That's it.  You just need to tell me.
20   And you hold yourself as an expert.  Which area
21   you're holding yourself as an expert in this case.
22                    MR. HAEFELE:  And what is what he --
23                    MR. MOHAMMEDI:  You gave me page 2.
24                    MR. HAEFELE:  Just for the record,
25          that is what he was answering you, Omar, and
```

1        you interrupted.

2        Q.    (BY MR. MOHAMMEDI)  So anyway, this is

3    the list of expertise you have provide -- you are

4    providing in this case, correct, Mr. Winer?

5                MR. HAEFELE:  Objection to form.

6        A.    Yes.

7        Q.    (BY MR. MOHAMMEDI)  Are you an academic?

8        A.    Yes.

9        Q.    Do you teach?

10       A.    Yes.

11       Q.    Where do you teach?

12       A.    I've taught at various times, courses at

13   many different schools, Georgetown, George

14   Washington, American University, Princeton, Harvard,

15   NYU.  It's listed in my resumé, the various places

16   that I've taught in my CV.

17       Q.    And --

18       A.    I also taught for many years at the Kent

19   School operated by the CIA.  The CIA's Kent School,

20   and was regularly teaching there throughout most of

21   the 00s, most of the period from about 2000 to 2008.

22   I am affiliated today with the Middle East

23   Institute, where I regularly engage in various types

24   of teaching.

25       Q.    Now, you -- you said that you taught many

This Transcript Contains Confidential Material

```
 1        A.    I would have to look at precisely what
 2   their CV said.
 3        Q.    Are you an expert in history of al-Qaeda?
 4        A.    What is that?  Omar, I didn't hear you.
 5        Q.    Al-Qaeda.  Are you an expert on history
 6   of al-Qaeda?
 7        A.    In certain context, yes.  I know enough
 8   about its activities Afghanistan, Bosnia, Chechnya,
 9   Sudan, Southeast Asia, and elsewhere to have
10   familiarity with its activities.
11        Q.    How do you know that?
12        A.    I have some expertise in the area.  I am
13   not an Arabic reader, so there are things that are
14   in Arabic, I'm sure, that would allow me to know
15   more.
16        Q.    How do you -- how did you gain that
17   expertise?
18        A.    When the United States government first
19   became concerned about al-Qaeda in the 1990s, I was
20   meeting regularly with Richard Clarke at the NSC who
21   is the United States government's counterterrorism
22   czar at the time.  And I was dealing with the
23   interrelated issue of international crime, and in
24   particular international financial crime.  And the
25   two are inexorably intermingled, and the
```

This Transcript Contains Confidential Material

1    United States was seeking that period of time, both

2    to understand these phenomena and to begin to build

3    capacity to combat them.  And I had regular contact

4    with Mr. Clarke and was working for him and with

5    him, such as with Michael Sheehan, for example, and

6    Rand Beers on these issues in the late 1990s and

7    became aware of his concern.

8         Q.    Okay.  And is it fair to say those were

9    within the policy scope?

10             MR. HAEFELE:  Objection, form.

11        A.    I'm not sure I understand the question.

12        Q.    (BY MR. MOHAMMEDI)  Were you dealing with

13   this matter from a policy perspective?

14        A.    Yes, but I also was trying to -- it was

15   my job also to communicate to other countries about

16   what we needed them to do and what capacities we

17   needed.  I did not do that, however, regarding

18   al-Qaeda myself.  I was aware that others were, but

19   I was not.

20        Q.    You were not.  Okay.  Have you ever

21   studied terrorism in an academic setting?

22        A.    I couldn't understand the question.

23        Q.    Have you ever studied terrorism in any

24   academic setting?

25        A.    I have been asked to write about

```
1   terrorism by a number of academic publications and

2   have done so.  For example, International Institute

3   For Strategic Studies.

4       Q.   Mr. Winer, my question is not that.  My

5   question -- we're going to go through that, believe

6   me.

7               MR. HAEFELE:  Objection.  Omar, can

8       you not stop -- you cannot keep interrupting.

9               MR. MOHAMMEDI:  If you're going to --

10      stop interjecting, I'm going to call the

11      Court.

12              MR. HAEFELE:  You can call the Court.

13      Because I will tell the Court that you keep

14      interrupting the witness.

15              MR. MOHAMMEDI:  Listen, Robert, I am

16      not going to allow you, I am not -- you're

17      harassing.

18              MR. HAEFELE:  Omar, you have to let

19      him finish the question.

20              MR. MOHAMMEDI:  And now you will not

21      allow me to conduct my deposition.  I am

22      really being respectful to the witness.  I'm

23      asking question and --

24              MR. HAEFELE:  You are aren't doing a

25      deposition.  You are asking questions and then
```

This Transcript Contains Confidential Material

```
 1        A.     Yes.

 2        Q.     -- related to where?

 3        A.     Yes.

 4        Q.     Are you an expert on Islam?

 5        A.     I am not an expert on the doc --

 6   religious doctrine of any kind, except to the extent

 7   that it involves the political impact of different

 8   types of interpretations of religion when a religion

 9   is politicized into a political movement, where I

10   have expertise.

11              So when you have a combination of foreign

12   policy, security, and religion, that's an area that

13   I have devoted some extensive work on over a long

14   period of time.

15              And that is an area of expertise, yes.

16   In the Middle East bureau, where I was from 2013 to

17   2017, we were constantly dealing with -- within the

18   bureau and I was personally -- the competing agendas

19   of political Islam and various strands and strains

20   of political Islam, including that in the Islamic

21   state and al-Qaeda and other groups like Ansar

22   al-Sharia.  And that competing with -- Arab

23   nationalism competing with states that would be

24   modern unitarian states, competing with warlord and

25   different types of rule in which pan-Islamic rule
```

1    was one of the strains, political strains that had

2    all kinds of consequences for terrorism and

3    terrorist risk, and having to understand the various

4    strands of those was critically important to my

5    work.

6              In that period in particular, while I was

7    involved.

8        Q.   (BY MR. MOHAMMEDI)  But you are not an

9    expert on Islamic terms of concept from a religious

10   standpoint, are you?

11             MR. HAEFELE:  Objection, form.  Asked

12        and answered.

13       A.   I am not really -- I'm not willing to

14   adopt your question as an answer.  I'm happy to say

15   again what my expertise is.

16       Q.   (BY MR. MOHAMMEDI)  Are you a religious

17   expert?  "Yes" or "no."

18             MR. HAEFELE:  Objection to form.

19       Q.   (BY MR. MOHAMMEDI)  Are you a religious

20   expert?

21             MR. HAEFELE:  Still objection to

22        form.  It's the same question and he's

23        answered.

24       A.   I developed expertise in the political --

25       Q.   (BY MR. MOHAMMEDI)  I just say, are you a

1   religious expert?  I mean, it's -- you already

2   explained that.  I'm just asking you are you a

3   religious expert?

4                    MR. HAEFELE:  Omar, you keep asking

5            and repeating the same answer he gave.

6                    MR. MOHAMMEDI:  He already answer a

7            question that was not really what I was

8            asking.  I'm just asking if you are a

9            religious expert.

10   A.    I can answer it this way:  My father was

11   a medical researcher in cardiovascular disease and

12   learned some fundamental principles in connection

13   with the angiotensin system.  He was an expert in

14   that area.  He was also a doctor.  He was not an

15   expert in glioblastoma.  So if you're asking

16   somebody are you an expert in medicine, well, yes,

17   my father was a medical expert, a medical expert

18   with certain areas of expertise.

19                    I have certain areas of expertise.  Am I

20   a religious expert who spent my life on Islam,

21   Christianity, Judaism, Buddhism, Bahaism, Sufism,

22   the difference between Sunni and Shia, I have not

23   spent my lifetime on it, although I could give you

24   the basics of the Sunni/Shia split if it was of help

25   to you.  I could discuss when Wahhabism originated

 1   and when the modern Salafi movement originated, and

 2   the fact that some people think its antecedents go

 3   back earlier and foundations for it earlier.  I can

 4   talk about the relationship between Egypt and

 5   Saudi Arabia in competing for religious dominance.

 6   But does that make me an expert in religion?  No.

 7              MR. GOETZ:  Objection, nonresponsive,

 8         move to strike.

 9   Q.    (BY MR. MOHAMMEDI)  Do you hold yourself

10   as a religious expert in this case?

11              MR. HAEFELE:  Objection to form.

12              MR. MOHAMMEDI:  Just answer this

13         "yes" or "no."

14              MR. HAEFELE:  Objection, you can't

15         demand a "yes" or "no" answer.

16              MR. MOHAMMEDI:  Robert, you can stop

17         interjecting.

18              THE WITNESS:  I believe I've answered

19         the question.

20   Q.    (BY MR. MOHAMMEDI)  Are you an expert on

21   religion in this case?

22              MR. HAEFELE:  Objection to form,

23         asked and answered multiple times.

24   A.    I am expert on the political aspects of

25   Islam and how it played out in the region in the

1    1980s, 1990s, and 00s.

2        Q.    Are you an expert in Islamic terms and

3    concepts?

4        A.    I know about a few of them.  Not all of

5    them.

6        Q.    Are you an expert --

7              Knowing is not an expert.  Do you agree

8    with me?

9                  MR. HAEFELE:  Objection to form,

10        argumentative.

11       A.    I think it's really up to others to

12   determine the scope of my expertise.  I felt

13   comfortable and continue to feel comfortable

14   answering questions that were posed to me in my

15   expert report.

16       Q.    (BY MR. MOHAMMEDI)  Okay.  Then we go to

17   the next point.

18                  (Reporter clarification.)

19       Q.    (BY MR. MOHAMMEDI)  Are you an expert on

20   the Kingdom of Saudi Arabia history?

21       A.    I know a fair amount about the Kingdom of

22   Saudi Arabia.  I dealt with issues relating to it

23   every day in my last work, the state departments.  I

24   was not personally responsible for that

25   relationship, but I was in meetings each morning

```
 1    when I was in Washington to discuss the ins and outs

 2    of that relationship.

 3              And I'm familiar with the modern history

 4    of Saudi Arabia.

 5         Q.    Have you ever been posted in

 6    Saudi Arabia?

 7         A.    No.

 8         Q.    Have you ever been posted anywhere in the

 9    Middle East pre-9/11 as U.S. representative?

10         A.    I'm sorry, please repeat the question.

11         Q.    Have you ever been posted anywhere in the

12    Middle East pre-9-11 as a U.S. representative?

13         A.    I've undertaken missions in a variety of

14    places in the Middle East.  I have been posted in

15    Washington.  I've always been -- I've lived in

16    Washington since 1985.

17         Q.    If we go to you -- as Exhibit 2, your CV

18    and the experience and qualifications.

19                    MR. HAEFELE:  Just for the record,

20         it's not Exhibit 2.

21                    MR. MOHAMMEDI:  I'm sorry, I'm sorry.

22         Which exhibit, that CV and qualification.

23                    MR. HAEFELE:  896.

24                    Wait, do you want his CV or his

25         expert report?
```

1    the time?

2        A.    I was in law school.  I was not -- did

3    not have a law degree at that time.

4        Q.    And what did you do?

5            MR. HAEFELE:  Objection to form.

6        A.    I worked with the -- John Sharkey

7    comptroller of the currency and Tom Reardon of the

8    FBI in preparing materials for a trial involving

9    money laundering activity and fraud in the

10   Caribbean.  It was a cross-border crime, which

11   introduced me to a number of concepts in money

12   laundering and fraud.  That's how I began my

13   involvement in the skill.

14       Q.    (BY MR. MOHAMMEDI)  And you worked with

15   Financial Action Task Force; correct?

16       A.    Yes.

17       Q.    Which is the Financial Action Task Force?

18       A.    What is it?  Is that the question?

19       Q.    Yes.

20       A.    The Financial Action Task Force was

21   created in the meeting of the G7, I believe in 1989,

22   in response in part to legislation that I worked on

23   with Senator Kerry requiring the United States to

24   negotiate what were then called Kerry agreements so

25   that U.S. anti-money laundering laws, which were

```
 1    still quite basic, would be adopted in other
 2    countries to avoid regulatory enforcement
 3    arbitration.
 4            And the Bush administration did not want
 5    to negotiate bilateral agreements in that area, and
 6    what evolved was instead the Financial Action Task
 7    Force by a decision of the G7 in 1989.
 8        Q.    And at the time of its creation, did
 9    financial task force have any policies to combat
10    terrorism financing in particular?
11        A.    No.
12        Q.    And the role was mostly related to policy
13    matters; correct?
14        A.    No.
15        Q.    What is relate -- what was it related to?
16        A.    It was a mechanism to develop
17    international money laundering standards, which
18    countries would then put into place to provide a
19    foundation to combat money laundering and all forms
20    of financial crime, essentially because money
21    laundering involves disguising the actual uses of
22    funds.  So it applies to a very great range of
23    felonies, of serious crimes.  And the idea was to
24    have it -- initially it was to combat drug
25    trafficking only, but by 1996 it became modified
```

This Transcript Contains Confidential Material

1    to -- a system to combat all forms of serious crime.

2        Q.    Okay.  And as a deputy assistant

3    secretary of state for international law in 1984, on

4    September 11, 1996 you testified before the House

5    International Relations Committee; correct?

6        A.    I don't recollect the date.

7            MR. MOHAMMEDI:  Can you bring up

8        Exhibit 6, which is 902, I believe.  Right?

9            (Winer Deposition Exhibit 902, Cheap

10           Flights to Nigeria, was marked for

11           identification.)

12           TRIAL TECHNICIAN:  That might take a

13       second.  That didn't come through --

14           MR. MOHAMMEDI:  Can we go off record

15       until you figure this out?

16           THE VIDEOGRAPHER:  Going off the

17       record.  11:50 a.m.

18           (Recess taken, 11:50 a.m. to

19           11:51 a.m. EDT)

20           THE VIDEOGRAPHER:  Back on the

21       record.  The time is 11:51 a.m.

22       Q.    (BY MR. MOHAMMEDI)  So in page 1 of that

23   document, which is highlighted for you, in

24   paragraph 3, is you -- you refer to your bureau's

25   responsibility was to protect American citizens and

This Transcript Contains Confidential Material

```
1   that; right?

2       A.    Yes.

3       Q.    And your responsibility was for policy;

4   correct?

5       A.    That was part of my responsibility, yes.

6       Q.    And there was nothing referencing to

7   terrorism or terrorism financing, was there?

8       A.    That's correct.

9             MR. HAEFELE:  Objection to the form.

10      A.    But let me simply --

11            MR. MOHAMMEDI:  I don't have any

12       question pending.

13            MR. HAEFELE:  Let him finish the

14       answer, Omar.

15      A.    At my bureau, given our responsibility,

16  policy, and programs, the programs part got very

17  operational.  So it's a mistake and inaccurate to

18  state that it's limited to policy only.

19      Q.    (BY MR. MOHAMMEDI)  But it's a relate --

20  it's not related to anything about terrorism;

21  correct?

22      A.    That's correct.

23            MR. HAEFELE:  Objection to form.

24      A.    That statement is not related to anything

25  about terrorism.  The hearing was on Nigerian crime.
```

This Transcript Contains Confidential Material

```
 1                    MR. HAEFELE:  Omar, what's on the
 2         screen, is it Exhibit 902?
 3                    MR. MOHAMMEDI:  Yes.
 4                    MR. HAEFELE:  Okay.
 5         Q.   (BY MR. MOHAMMEDI)  All right.  So let's
 6    go -- in 1999 -- we can take this off screen.
 7                    In 1999, you return to private legal
 8    practice; correct?
 9         A.   Yes.
10         Q.   And it was from 1999-2008; correct?
11         A.   Correct.
12         Q.   Did you gain any expertise in terrorism
13    finance while engaged in private practice during
14    that time?
15         A.   Yes.
16         Q.   Did you represent any Gulf state during
17    this period?
18         A.   No.
19         Q.   And what type of expertise in terrorism
20    finance did you gain during that time?
21                    MR. HAEFELE:  Objection to form.
22         A.   As I've stated, I had developed broad
23    experience in my work in the Senate initially, and
24    then at the Department of State on cross-border
25    financial crime, which includes frauds of every
```

1    kind.  Money laundering of every kind.

2              And fraud and money laundering including

3    terrorism.  As mentioned, I first encountered the

4    terrorism problem in my work for the subcommittee on

5    Terrorism, Narcotics, and International Operations,

6    organizations, I believe the subcommittee was

7    called, in the years I was working for then-Senator

8    John Kerry.

9              That expertise was the foundation for my

10   understanding on terrorist finance.  They also

11   worked closely with Richard Clarke, who was the lead

12   person in the U.S. government during the Clinton

13   administration for dealing with terrorism, and

14   chatted with him about it in the course of my work,

15   which was directly adjacent and intersected with the

16   work that was being undertaken on terrorism.  My

17   involvement was limited to an understanding that we

18   needed to take on terrorist finance at the same time

19   and that we had a growing problem associated with

20   terrorist finance.  This emerged fairly rather late

21   in my time at the Department of State, '98, '99,

22   with particular focus after the terrorist bombings

23   of our embassies, which got everybody's attention at

24   the State Department and caused people to broaden

25   and deepen their focus on these issues.

This Transcript Contains Confidential Material

```
1              During this period of time, Mr. Clarke

2     was quite frustrated with the response of the U.S.

3     government to what he perceived as a tremendous

4     threat.  I was one of the people in the functional

5     bureaus who he could talk with about the nature of

6     the threat without getting push-back.

7              The regional bureaus very often would

8     push back when you were asking countries to do more.

9     And the Middle East bureau, in this period of time,

10    would push back sometimes.

11             And so I got exposed to it in that

12    period.  When I went to Alston & Bird, after 9/11, I

13    was reached out to by the United States Senate, by

14    ABC News, by academic institutions, and participated

15    in a number of seminars, conferences, and so on, on

16    terrorism finance; and used that period of time to

17    deepen my knowledge and research into the

18    phenomenon.  I also was retained by the

19    United States government from a period of about 2000

20    to a period of about 2008 to provide regular reports

21    on countries relating to money laundering, terrorist

22    finance, corruption, these countries'

23    vulnerabilities, and these companies' capacities to

24    deal with them.

25             And so my study continued while I was
```

1    under contract to the United States government

2    throughout that period.

3         Q.    (BY MR. MOHAMMEDI)  And that was from

4    1999-2008; correct?

5         A.    No, I believe it was 2000 to 2008, not

6    1999.

7         Q.    2000.  Because I think it says 1999.

8         A.    I was at Alston & Bird from 19 -- the end

9    of 1999 to 2008, but my work in this territory did

10   not take place in 1999.  I was there only two months

11   in 1999, and that work began later.

12        Q.    And, Mr. Winer, what percentage of your

13   time would you estimate that was spent in counseling

14   regarding terrorism finance for that period of time,

15   which is from 2000-2008?

16        A.    Could you please repeat the question.

17        Q.    What percentage of your time would you

18   estimate was spent on counseling regarding terrorism

19   finance from 2000, 2008?

20        A.    It's difficult for me to put a percentage

21   on something I've never put a percentage on.  I can

22   tell you that I had a contract with the

23   United States government, a series of contracts,

24   which --

25        Q.    How many?  I'm sorry.  How many

1    contracts?

2       A.    I can't tell you how many.  I can tell

3    you how many years.  They began in 2000 and

4    continued through 2008.  In which I was providing

5    work regularly to the United States government

6    throughout that period of time on this set of

7    issues.

8       Q.    And when you say, when you talk about

9    2000, 2008, and you talk about your -- the contract,

10   are those the clients that you were advising during

11   that time?

12      A.    I had private sector clients I provided

13   advice to in connection with OFAC, and I had the

14   government as a client providing analytic --

15   academic or analytic work on country studies,

16   principally, though it was not only country studies,

17   of vulnerability to money laundering, vulnerability

18   to terrorist finance.  Their capacities to combat

19   these phenomena.  And what measures of performance

20   might look like if they built greater capacity.

21      Q.    And did you represent any charity itself

22   in this -- during that time period?

23      A.    Yes, as I've mentioned, I did.

24      Q.    And was there --

25      A.    As I've stated, I have, yes.

This Transcript Contains Confidential Material

1    Q.    And those are foreign charities or U.S.

2    charities?

3    A.    Both.

4    Q.    And the foreign charities, which area

5    of --

6    A.    Middle East --

7    Q.    -- the world that you were representing?

8    A.    Middle East.

9    Q.    Middle East mostly?

10   A.    I can't -- you asked -- I talk about two

11   cases involving OFAC.  There's a third case which

12   did not involve that, which involved a U.S. domestic

13   charity which had other issues associated with

14   financial documentation of its activities and

15   investigated enforcement matters where I was

16   providing advice.

17   Q.    Did you represent any other government

18   other than the U.S. government?

19   A.    Let me think of what I did when.  Yes,

20   while I was at Alston & Bird, if that's the period

21   we're talking about, I represented the government of

22   Indonesia for a period.

23   Q.    Indonesia.  Any other government?

24   A.    Later, I represented the government of

25   Malaysia.

This Transcript Contains Confidential Material

```
 1              And you were aware before about this
 2    article, TD Bank cross-examination?
 3        A.    I was cross-examined on it by TD Bank,
 4    that's correct.
 5        Q.    Can you --
 6        A.    I just told you what its origin was and
 7    why.
 8        Q.    Okay.
 9              MR. MOHAMMEDI:  Can we take a break?
10              MR. HAEFELE:  Sure.
11              THE VIDEOGRAPHER:  Going off the
12       record.  The time is 12:33 p.m.
13              (Recess taken, 12:33 p.m. to
14              12:46 p.m. EDT)
15              THE VIDEOGRAPHER:  We are back on the
16       record at 12:46 p.m.
17        Q.    (BY MR. MOHAMMEDI)  Mr. Winer, have you
18    ever been a -- have you ever appeared before 9/11
19    Commission as a former government official?
20        A.    No.
21        Q.    Did the Commission refer to you as a
22    contributor to the report?
23        A.    No.
24        Q.    What is your methodology?
25              MR. HAEFELE:  Objection to the form.
```

```
 1        A.      When I'm asked a question, as an expert,
 2   I draw on my own personal experience in the field,
 3   and the -- whatever period of time that I worked on
 4   an issue directly when I was in the government, I
 5   draw on my experience as a practitioner, as a
 6   lawyer, in which I -- when I've been exposed to
 7   clients with issues in that area, and my study of
 8   the law and my past study of facts.  I draw upon, as
 9   well, analysis and academic work that I've
10   undertaken in the past and the research I did in
11   connection with that.
12             I look at primary source information when
13   it's available.  So Jamal al-Fadl, for example,
14   Mr. Ahmad, would both be examples of first-hand
15   information.  There's also -- can be first-hand
16   information in newspaper reports when you have
17   contemporaneous interviews or quotes from
18   individuals, and I will use that as well.
19             I rely on government reports, both from
20   the United States and sometimes from other
21   governments.  I rely on UN reports and other
22   official reports, because based on my experience,
23   those are typically based on a tremendous amount of
24   work, which often is documented; it's not always
25   explicitly documented.
```

 1              So what I try to do -- and this is --
 2    this was how I went about my work for the U.S.
 3    government from 2000 to 2008, when I was doing the
 4    analytic work I discussed with you.  It's
 5    essentially an all-source approach in which you take
 6    as many sources as you can and then weigh the
 7    sources and bring them together to form your
 8    analytic findings on a topic.  And so it's really I
 9    try and take advantage of the work that's been done
10    by others, as much first-hand information as I can
11    get my hands on, and analyze and assess it and bring
12    human reason to bear upon it.
13       Q.   (BY MR. MOHAMMEDI)  Do you apply any
14    scientific and social science methodology?
15       A.   I think I have just described the
16    methodology that I apply.  And I'm not sure
17    precisely what type of information you're looking
18    for.  Is it statistical information?
19       Q.   You are the expert here.  I guess you
20    will explain to me how you -- how you reach your
21    opinion by applying scientific and social science
22    methodology.
23              MR. HAEFELE:  Objection to form.
24       A.   As I've just described, I take primary
25    source material, which is capable of being read, and

1    then of being further validated or invalidated.

2            For example, an audit, which contains

3    statements that says we did no checking in the

4    field, we had to rely on assurances.  That is a

5    factual statement.  That provides information that

6    is hopefully contemporaneous about what was and what

7    wasn't done.  So a scientific approach to that set

8    compares that against an audit which did not contain

9    those caveats.

10           And so you compare the audits against one

11   another, look at what the international standards

12   are, and apply the facts contained in the

13   information, which is a mixture of primary source

14   information, information that can be a combination

15   of primary and secondary, plus others' academic

16   research together with one's own experience and

17   one's own interviews, and you put that together and

18   come to your opinions.

19           That's the approach that I took in the

20   many years that I did the work for the U.S.

21   government, and that's the approach that I've taken

22   when I've been an expert.

23   Q.    (BY MR. MOHAMMEDI)  Do you use your

24   methodology by applying all facts to you available,

25   either helpful or not helpful to reach a conclusion?

```
 1        A.    Yes, I do.

 2        Q.    You do?  Okay.  And when you mentioned

 3   the primary sources, obviously primary sources can

 4   be in the form of document produced in a case;

 5   correct?

 6        A.    Yes.

 7        Q.    And then if you provide your

 8   information -- your opinion by not reviewing the

 9   documents in the case, would you consider that a

10   complete conclusion?

11              MR. HAEFELE:  Form.

12        A.    You told me that there were millions of

13   pages of materials produced in this case.  That's my

14   understanding.  Is there anything that you would

15   have to correct that understanding or is that

16   correct?  There were millions of documents produced

17   in this case?

18        Q.    (BY MR. MOHAMMEDI)  Yes, I did.

19        A.    I don't know how I or any other human

20   being who is an expert witness could review millions

21   of pages of documents in the case.  There wouldn't

22   be enough time in a year to do that.  There wouldn't

23   be enough time maybe in five years or ten years for

24   one person to do that.  So that cannot be what's

25   required of an expert.
```

1          What I did was I looked at, in light of

2    my own experience and knowledge, which included the

3    academic analytic work that I did for the U.S.

4    government, as well as my own tenure working for the

5    Senate and my two tenures at the State Department,

6    and the work that I've done on behalf of clients, I

7    looked at the materials provided to me by the

8    attorneys in this case, supplemented it with

9    additional research into the secondary literature of

10   some scholars, who I cite in my reliance material,

11   and that's how I came to my formulations.

12          When there was first-hand information

13   that I thought was particularly relevant, I looked

14   at it.  And when I didn't have it, I asked for more

15   of it.  A particular case of that is there were

16   representations about the extent of audits.  I

17   wanted every audit that I could get my hands on.

18   The more, the better, because that's primary source

19   information that's very important to me.

20   Q.    So let's make it clear on the record that

21   the audit you're referring to are not in your

22   affirmative report.  Right?

23   A.    Yes.

24   Q.    Let's also --

25   A.    Excuse me, the audits for WAMY were not

This Transcript Contains Confidential Material

```
 1                    MR. HAEFELE:  Objection to form.

 2        Q.    (BY MR. MOHAMMEDI)  Do you use that as a

 3   fact or you corroborate the information in the --

 4   did you corroborate the information in the 1996?

 5                    MR. HAEFELE:  Form.

 6        A.    I looked at that report in the context of

 7   everything else that I know about terrorist finance.

 8   I look at that report in the context of what I was

 9   hearing about terrorist finance in the last years of

10   the Clinton administration, which is consistent with

11   that report.  I look at it with a continued

12   expression of concern about some of the entities

13   listed in the report by the United States government

14   all the way up to and including two thousand --

15   December 2009.  I look at it in connection with the

16   academic research in findings of a number of

17   different academic researchers.  I look at it in

18   connection with the findings of the 9/11 Commission.

19   And so I weigh it with a lot of other material.

20                    But I do find the 1996 CIA report to be

21   prescient and to reflect the concerns that the

22   United States government was having in that period

23   of time, of 1996, in which it began to formulate a

24   lot of concern about al-Qaeda and terrorism in

25   connection with support for conflicts in connection
```

This Transcript Contains Confidential Material

```
 1   with us, in a charitable support for conflicts in

 2   what I would call ABC, which is Afghanistan first,

 3   Bosnia, and Chechnya.  And as that concern began to

 4   emerge, this report reflected, I believe, that

 5   concern.  So I give that report substantial weight.

 6        Q.   (BY MR. MOHAMMEDI)  Okay.  And which is

 7   the standard for concern in your opinion?

 8                  MR. HAEFELE:  Objection, form.

 9        A.    Beg your pardon?

10        Q.   (BY MR. MOHAMMEDI)  What is the standard

11   of concern that you keep mentioning?

12                  MR. HAEFELE:  Form.

13        Q.   (BY MR. MOHAMMEDI)  Is there a standard

14   of concern?

15        A.    When the United States government says

16   it's concerned about something, in a formal

17   diplomatic cable, for example, or expresses it

18   publicly to another government, that's often -- it's

19   not always, but often a term that's used to indicate

20   a démarche.  A démarche is a communication from the

21   United States government to a foreign government

22   saying, in effect, we have a problem that we need to

23   discuss with you.  We're concerned about this.  We

24   need to have steps taken.  So it is expressing a

25   sense that there is a problem, and that concern can
```

1  reporting on WAMY; right?  And those adverse

2  reporting listed many newspaper articles, or as a

3  matter of fact, listed is some other matters in this

4  lawsuit.  Will you consider those as a primary

5  source for you to consider?

6      A.    The primary source is the Canadian

7  report.  Their primary source may not be primary, it

8  may be secondary sources.  I'd have to look at the

9  various materials.  But that document itself

10  reflects what the findings were of Canada in

11  connection with this chart.  And so it's a primary

12  source for that purpose.  That's what it is.

13      Q.    Okay.

14      A.    But is that -- is that report in turn

15  based on secondary sources?  It's based on mixture

16  of primary source data such as financial records and

17  financial information, statements made to them, and

18  secondary source information, which are also relied

19  on.  That's my understanding of that report.

20      Q.    Okay.  Do you agree that charities --

21  that -- do you agree that charities

22  supported al-Qaeda?  They don't support the al-Qaeda

23  just because they operate in conflict zone?

24          MR. HAEFELE:  Objection to the form.

25      A.    If I understand the question correctly,

```
 1    your understanding of whether a charity that's

 2    operating in a conflict zone is necessarily engaged

 3    in terrorist support or terrorist finance?

 4         Q.    (BY MR. MOHAMMEDI)  Correct.

 5         A.    If that's the question, the answer is no,

 6    they are not.

 7         Q.    If you, Mr. Winer, if you can just refer

 8    to your report.  We're going to go through a series

 9    of sections about the report.

10              If you go to Section 5, page 18.

11              So in that one you said, Saudi Arabian

12    charities, and that's Section 501.  5.1, sorry.

13              Do you see that?

14         A.    Yes.

15         Q.    Okay.  You said:  Saudi Arabian charities

16    and Saudi nationals played a central role in helping

17    al-Qaeda create its global infrastructure, uniting

18    disparate Muslim groups in different parts of the

19    world into a common extremist cause.

20              Can you read that?

21         A.    Yes.

22         Q.    What do you mean by central role?

23         A.    I think if you turn to the 9/11

24    Commission report, I've given a great deal of

25    thought to this, and pages 170 to 171 I think
```

This Transcript Contains Confidential Material

1  funded by these large Gulf charities and had

2  employees who would siphon the money to al-Qaeda.

3      Q.   (BY MR. MOHAMMEDI)  So it says

4  al-Haramain.  It doesn't say WAMY, it doesn't say

5  Muslim World League, correct?

6           MR. HAEFELE:  Objection to form and

7       objection to the interruption.

8      A.   It says, smaller charities in various

9  parts of the globe were funded by these large Gulf

10  charities.  The al-Haramain reference is a reference

11  to an entity which Saudi Arabia joined and

12  sanctioned, and it is a "such as."  Such as means

13  it's not the only one.  Now, there were a limited

14  number of large international charities in

15  Saudi Arabia.  And the one the United States

16  government referred to repeatedly as a particular

17  concern in public testimony and in private

18  communications to the Saudi Arabian government were

19  IIRO, the Muslim World League, and WAMY.

20      Q.   (BY MR. MOHAMMEDI)  So here, if you --

21  Mr. Winer, what does it say on those pages that

22  WAMY, Muslim World League, and IIRO played any role

23  in helping create al-Qaeda's global infrastructure.

24  What does it say here?

25      A.   I believe it says, the statement, large

1    international charities such as, which set up, were

2    supporting, smaller charities, is a reference to

3    those three entities.

4         Q.    But my question is very specific.  Has it

5    said those names that they form helping create

6    al-Qaeda global infrastructure.  Based on your

7    statement in 5.1:  Central role in helping al-Qaeda

8    creates its global infrastructure, uniting disparate

9    Muslim groups, in different parts of the world into

10   a common extremist cause.  I'm just asking, does --

11   is it true that WAMY, Muslim World League, and IIRO

12   were not named in this; correct?

13              MR. HAEFELE:  Objection to form.

14        Q.    (BY MR. MOHAMMEDI)  That is 9/11

15   Commission report; correct?

16              MR. HAEFELE:  The report is reticent

17        on the names of who the other large

18        international charities were.

19        Q.    (BY MR. MOHAMMEDI)  You're -- but,

20   Mr. Winer, you're the one who wanted to refer me to

21   page 170, 171 to support your opinions; right?

22   Correct?

23        A.    Yes, I'm asking to you understand this in

24   connection with many statements made by U.S.

25   government officials in other forums about these

```
 1   entities, and you put two and two together and it
 2   makes four.
 3           Now, if you look on page 171 --
 4       Q.    These are your assumptions; correct?
 5       A.    I beg your pardon?
 6       Q.    These are your assumptions; correct?
 7       A.    This is my understanding.  Page 171,
 8   please.  The end of the first paragraph, the first
 9   full paragraph:  This conclusion does not exclude
10   the likelihood that charities with significant Saudi
11   government sponsorship -- charities -- diverted
12   funds to al-Qaeda.  Charities is more than one.
13   It's not just al-Haramain.
14       Q.    First of all, it does not say WAMY,
15   Muslim World League, and IIRO, correct?
16               MR. HAEFELE:  Objection.
17        Argumentative.
18       A.    It is reticent on the identity of those
19   charities.
20       Q.    (BY MR. MOHAMMEDI)  And that's based on
21   your assumption, correct?
22               MR. HAEFELE:  Objection.
23       A.    Based on the other statements made by
24   U.S. government officials in a number of other
25   contexts.  That is what I believe, correct.
```

This Transcript Contains Confidential Material

```
 1        Q.    (BY MR. MOHAMMEDI)  Okay.  Just bear with

 2   me a second.  I just want to -- while you're here,

 3   I'd like to address one more.  So the commission

 4   report does not exclude the likelihood; correct?

 5        A.    That's correct.

 6        Q.    Your testimony said is the likelihood;

 7   correct?

 8        A.    Yes.

 9        Q.    Why do you do that?

10              MR. HAEFELE:  Objection to the form.

11        A.    Because I looked at the entire record

12   that's been available to me that I was able --

13        Q.    (BY MR. MOHAMMEDI)  But you are -- but

14   you are misquoting, Mr. Winer.  You're misquoting

15   the 9/11 Commission report; correct?

16              MR. HAEFELE:  Objection on

17         interrupting the witness.

18        A.    Please, sir, show me where I'm misquoting

19   the report.

20        Q.    (BY MR. MOHAMMEDI)  Let me show you.

21              MS. ROTHSTEIN:  Do not argue with the

22         witness.

23              MR. MOHAMMEDI:  Can we go off the

24         record for a second?

25              THE VIDEOGRAPHER:  We are going off
```

1          the record at 1:29 p.m.

2                    (Recess taken, 1:29 p.m. to

3                    1:30 p.m. EDT)

4                    THE VIDEOGRAPHER:  Back on the record

5          at 1:30 p.m.

6          Q.   (BY MR. MOHAMMEDI)  Mr. Winer, I direct

7     you to paragraph 5.34 of your report, affirmative

8     report at page 21.

9               And you put that in bold.

10              Commission noted, a likelihood that

11    charities with significant Saudi government's

12    sponsorship diverted funds to al-Qaeda.

13              Do you see that?

14         A.   Yes.

15         Q.   You don't think that's misquoting what

16    the commission said?

17         A.   No, I do not.

18         Q.   So you think exclusion of likelihood is

19    the same thing as likelihood?

20         A.   Not excluding the likelihood.  You just

21    misquoted the report, I believe.

22         Q.   Okay.  Let's move on, then.

23              Can you tell me who established this

24    infrastructure that you're referring to from the

25    charities?  And how this infrastructure was

1    had a lot of information from other sources, and I

2    could not read everything.

3            As you pointed out, there are millions of

4    pages.

5        Q.   Sure.  Let's -- if you can -- we can take

6    this down.  We just go to -- and very quickly,

7    Mr. Winer, I'd like to ask you about your summary

8    section three, 3.1-3.17.  And I assume this is an

9    affirmative report.  I think that was 698, I

10   believe.

11           And this -- there is no citation because

12   they are executive summaries; correct?

13       A.   That's correct.

14       Q.   Okay.  Now, Section 3.12, you state that

15   charities such as IIRO, Muslim World League, and

16   WAMY did not accurately report support they provided

17   for terrorism; correct?

18       A.   Yes.

19       Q.   Okay.  And in footnote four of your

20   report, page 10, it's -- you say -- you stated that

21   you have seen no audit pertaining to WAMY or Muslim

22   World League, but audit entities -- of entities they

23   funded or assisted show false recordkeeping.

24           Which other organization did you review a

25   document showing WAMY audits were reported in this

1    or any other -- or Muslim World League?

2        A.    Well, WAMY, for example, provided support

3    to --

4        Q.    That's not my question, Mr. Winer.

5        A.    I'm sorry --

6        Q.    I'm asking which other organization you

7    reviewed documents showing WAMY audits.

8                MR. HAEFELE:  Mr. Mohammedi, I'm

9        going to caution you again, you have to let

10       the witness answer the question.  If you don't

11       like his answer --

12               MR. MOHAMMEDI:  If the witness does

13       not answer my question, I'll have to ask again

14       for it to --

15               MR. HAEFELE:  That's fine, you can

16       ask again, I suppose, and take the time, but

17       you can't interrupt the witness from answering

18       the question.

19               MR. MOHAMMEDI:  Okay.  I'm going to

20       ask another question -- I'm going to ask this

21       question again:  Which other organization you

22       reviewed documents showing WAMY audits?

23       A.    The Third World Relief Association.

24       Q.    (BY MR. MOHAMMEDI)  You reviewed the

25    documents showing WAMY audits?

1     A.    No, I didn't say WAMY audits.

2     Q.    Okay.  So my question, which other

3  organization you reviewed documents showing --

4  because in your footnote, you state that you have

5  seen no audits pertaining to WAMY or Muslim World

6  League.  But audit of entities they funded or

7  assisted show false recording.

8     A.    I have sought to answer your question

9  accurately each time you've asked it.  Let me try

10  again.

11        At the time I wrote the first report, I

12  asked for but did not receive audits pertaining to

13  WAMY or Muslim World League.  I wanted them, I

14  didn't get them.  I got them and discussed them in

15  the rebuttal -- my rebuttal report.  I did see

16  audits of entities they funded or assisted which

17  showed false recordkeeping.

18     Q.    And which organizations are those?

19     A.    The Third World Relief Association is

20  one.  And the IIRO is another.

21     Q.    So how come we don't have that in the

22  reliance material, the document of WAMY showing the

23  false recording in the Third World Relief

24  organization?

25     A.    I believe they are in the reliance

```
 1   material.  I believe that they are cited in my

 2   report.

 3        Q.    So you -- so the documents in your

 4   reliance material show that -- which you stated show

 5   that false -- I mean the false recording of WAMY,

 6   when -- it was audits from WAMY, at TWRA, that show

 7   false recording from WAMY audits; correct?

 8        A.    That's not what my statement says.

 9        Q.    Okay.  So I'm going to repeat that.

10              You state that you have seen no audit

11   pertaining to WAMY and Muslim World League, but

12   audits of entity they funded or assisted show false

13   recording.

14              Do you see that?

15        A.    Yes.

16        Q.    What do you mean by that?

17        A.    If you look at the Canadian audit of the

18   Canadian entity, if you look at the audit that was

19   undertaken of the Austrian, Vienna-based entity, the

20   Third World Relief Association, there are

21   transactions from WAMY in that case to them, and

22   they engage in false recordkeeping.  It's quite

23   clear from the audit -- had additional material that

24   that charting was providing, among other things,

25   military support, and that the recorded records,
```

1    financial transactions, were in one clearance is not

2    the same as what a fax showed.

3              And from context it's clear to me that

4    there was pretty comprehensive false bookkeeping for

5    the Third World Relief Agency.  It's also consistent

6    with what I've seen in many financial --

7    international financial crime cases, in which the

8    purposes of transactions are mischaracterized for

9    the purpose of transactions that went through banks

10   or that were recorded.  It's very typical of a lot

11   of various kinds of criminal activity.  And that's

12   the case with that organization.

13       Q.    So we're talking about WAMY Canada, we're

14   talking TWR; correct?

15       A.    Yes.  And IIRO --

16       Q.    Okay.

17       A.    -- and IIRO as well.

18       Q.    Okay.  We will get to that at some point.

19              If I can get Exhibit 12, monograph on

20   terrorist finance.

21              (Winer Deposition Exhibit 909,

22              Monograph on Terrorist Financing -

23              Staff Report to the Commission, was

24              marked for identification.)

25       Q.    (BY MR. MOHAMMEDI)  If you go to page 20,

This Transcript Contains Confidential Material

```
 1   writings you rely on claim that WAMY ever justified
 2   killing of nonbelievers.
 3       A.    If we go to Section 12.11 of my report,
 4   it provides a number of specific examples.
 5       Q.    Section 12 of your report?
 6       A.    12.11.
 7       Q.    Can you just -- can you just point me to
 8   where it says that specifically?  Where WAMY
 9   specifically had text publication or writing --
10       A.    Pages 102 and 103 of my report.
11       Q.    It was quote from Kane; correct?
12            MR. HAEFELE:  Objection to form.
13       Q.   (BY MR. MOHAMMEDI)  That was not the
14   statement directly; right?
15            MR. HAEFELE:  Objection to form.
16       A.    My understanding is these come from the
17   documents that were cited.
18       Q.   (BY MR. MOHAMMEDI)  Which document are
19   you referring?
20       A.    They're set forth and specified in
21   paragraph 12.11.
22       Q.    So you were saying that there are
23   documents in WAMY, texts or publications, that
24   justify the killing of nonbelievers?
25       A.    Yes, that's my --
```

```
 1       Q.    Is that correct?

 2       A.    That's my understanding of when they say:

 3   Who was behind the biological crisis which became

 4   like brainwashing?  A Jew.  And it goes on from

 5   there, and they talk about why are you so miserly

 6   with your blood.

 7       Q.    Okay.  So to you that is --

 8       A.    Teach our children to love taking revenge

 9   on the Jews and the oppressors.

10       Q.    Do you agree that there are hatred

11   statements made all over the world?

12             MR. HAEFELE:  Objection.

13       A.    I'm not in a position to discuss -- to

14   opine on hatred statements all over the world.  This

15   is calling for revenge on the Jews.

16       Q.    (BY MR. MOHAMMEDI)  And you are saying

17   that WAMY text specifically said that we are

18   justifying the killing of nonbelievers?

19       A.    Yes.

20       Q.    Okay.  We'll move on.

21             I'm just going to ask you another

22   question.  You are not a religious expert, are you?

23       A.    We've discussed this issue earlier.

24   You've asked me this question.  I understand a

25   religion in a political context when religion is
```

```
 1   used for political purposes as part of my

 2   understanding of relationships among states, as part

 3   of my understanding of terrorism.  We had national

 4   and global security issues.  And so in that context,

 5   yes.  In the context of various religious doctrines,

 6   intrareligious discussions of text, there are people

 7   who spend their lifetimes as religious scholars, and

 8   that has not been my work.

 9       Q.   And you're referring -- is it fair that

10   you are referring to a document that's expressed

11   religious views of an organization, and you are

12   making the -- you are reaching the conclusion that

13   was calling for justifying the killing of

14   nonbelievers; correct?

15            MR. HAEFELE:  Objection to form.

16       A.   Yes.

17       Q.   (BY MR. MOHAMMEDI)  You understand the

18   meaning of jihad?

19       A.   It has multiple meanings.

20       Q.   Okay.  Do you understand the meaning of

21   Salafis?

22       A.   I believe so.

23       Q.   You do?  And are you testifying as an

24   expert here to discuss jihad and Salafis?

25       A.   Only in the context of the political
```

```
 1    Administrative Review Board Proceedings; is that

 2    correct?

 3        A.    That's what the citation says; that's

 4    right.

 5        Q.    And it's undated, correct?  There's no

 6    date here?

 7        A.    I'm sorry, I couldn't understand you just

 8    now.

 9        Q.    There is no date here; correct?

10        A.    Not on this page.

11        Q.    And then, in your footnote 97 you said:

12    The U.S. government has also stated according to top

13    WAMY officials, both United States and Israel must

14    be destroyed; correct?

15        A.    That's what the footnote says.

16        Q.    What do you mean by U.S. government?

17        A.    Sure.  The way in which the United States

18    government works, when someone is engaged in this

19    kind of a process, is they're doing it according to

20    a variety of designations that they have made.

21              So, for example, as I explain in my

22    report, a Tier 1 NGO is defined as a particular

23    definition.  And that particular definition is

24    having demonstrated sustained and active support of

25    a terrorist organization, willing to attack U.S.
```

This Transcript Contains Confidential Material

1    persons or interests.

2            But before I go on, what I would like to

3    do is to look at this entire document for a minute,

4    rather than just this one page.

5        Q.    Yeah.  I mean, Mr. Winer, the only

6    thing -- I'm ask -- I'm going to ask you about some

7    of the document.

8        A.    Just give me --

9        Q.    Bear with me.

10       A.    You have asked me a question, and I would

11   like to -- in order to answer the question properly,

12   I would like to take a minute to review the

13   document.

14           May I do that?

15           MR. HAEFELE:  Yes, Jonathan, you may.

16           MR. MOHAMMEDI:  I am not asking you

17       about this document, I'm asking you about the

18       report where you making the statement.

19           MR. HAEFELE:  Yeah, but you've asked

20       him about the document.  If there's something

21       in the document, he feels the need to review

22       the document, we've --

23           MR. MOHAMMEDI:  I have no question

24       pending, Robert.

25           MR. HAEFELE:  Omar, we've

1    govern that process.

2          So it will be reviewed from all of those

3    perspectives.  It may well also have been reviewed

4    from other perspectives if it was going to be used

5    in connection with an external legal process.

6      Q.    Can an NGO designee challenge the

7    designation in this process?

8      A.    No.  No, to the best of my knowledge, no.

9      Q.    Is there any due process procedure for

10   seeking in these matters?

11          MR. HAEFELE:  Objection to form.

12     A.    There's due process proceedings that

13   apply to designations undertaken by OFAC.  In these

14   national security processes, in terms of who is

15   designated as a Tier 1, I don't believe there are

16   any.  However, you're beginning to get into

17   Guantanamo territory, where you have this very

18   complex array of laws as to what is proper and what

19   is not proper when it intersects with the criminal

20   justice system and when it doesn't.  And in that

21   highly technical area, I would have do a great deal

22   of additional study before being able to provide

23   further guidance.

24     Q.    (BY MR. MOHAMMEDI)  But you did have that

25   in your report, right?  You did explain Guantanamo,

1          4:18 p.m.

2          Q.    (BY MR. MOHAMMEDI)  Mr. Winer, are you

3    aware of any person who attended madrassas, as you

4    mentioned from WAMY, WAMY madrassas, that became a

5    member of al-Qaeda?

6          A.    I don't know who attended WAMY madrassas

7    and who did not.

8          Q.    But you are not aware of anyone who was

9    at the madrassas that became a member of al-Qaeda?

10         A.    I do not know what madrassas incubated

11   which fighters and which terrorists, period.

12         Q.    Okay.  So the question you are not aware

13   of anyone who attended madrassas, it doesn't matter

14   which type of madrassas, that became a member of

15   al-Qaeda.

16         A.    I know that there are people who became

17   members of al-Qaeda who attended madrassas.

18         Q.    What about WAMY?

19         A.    I don't know which madrassas they

20   attended, whether they were related to WAMY or any

21   other organization that sponsored a madrassas.

22         Q.    So as you sit here, you don't "know"

23   know; correct?

24         A.    That's correct.

25         Q.    Let's go to your report, Section 12,

1    the information is accurate?

2        A.    I believe that he ran LBI.  And in the

3    deposition of Noor Wali, Noor Wali talks about

4    Batterjee's central role.

5        Q.    I do understand that.  But you paint him

6    as a chairman of LBI; correct?

7        A.    He ran it.  Did he have the formal title

8    of chairman?  I don't recollect.

9        Q.    And it is fair to say you have not

10   reviewed documents produced in this case as to the

11   role of Batterjee with LBI; correct?

12       A.    I don't think it's fair to say that.  I

13   reviewed Noor Wali's deposition, which goes into it

14   in some depth about Batterjee's role.  I reviewed

15   other documents in which Batterjee was characterized

16   as the founder of LBI.  This includes the U.S.

17   government, and I think the UN's findings about

18   Batterjee, which in turn are consistent with the

19   proffer in the Arnaout case, put together by Patrick

20   Fitzgerald.  All of this is made complicated by the

21   fact that the word al-Barr in Arabic, A-L dash

22   B-A-R-R, I understand to be the word that's

23   translated often as "benevolence."  And that becomes

24   part of the elements of confusion, as well as what

25   Batterjee was doing within LBI and what Batterjee

 1    government employee is always right?

 2                MR. HAEFELE:  Objection to form.

 3        A.    I'm sorry, I couldn't understand what you

 4    just said.  Please repeat it.

 5        Q.    (BY MR. MOHAMMEDI)  Do you believe a

 6    government employee is always right?

 7        A.    No.

 8        Q.    And if the documentary evidence in a case

 9    that proves the opposite of that government

10    employee, will you consider that?

11                MR. HAEFELE:  Objection, form,

12         foundation, misstates the evidence.

13        A.    I try to consider everything.  In the

14    case of Arnaout and LBI and BIF, and WAMY, you have

15    a very complicated environment in which Arnaout and

16    Batterjee are meeting with key people who are part

17    of al-Qaeda early on, in which WAMY provides early

18    support to LBI, which is simultaneously Saudi and

19    Pakistani.  LBI at some -- at some point Batterjee

20    creates another benevolence, similarly named.  So a

21    person who previously met with Bin Laden becomes

22    head of the U.S. organization.

23                So sorting all of that out in a way that

24    is transparent, clean, and linear is not possible

25    because it's all concatenation.  It has to be looked

This Transcript Contains Confidential Material

```
 1   at together.  And that's how I understand the

 2   situation.

 3        Q.   (BY MR. MOHAMMEDI)  Isn't it a fact that

 4   because you are making a statement that BIF and LBI

 5   are intertwined and you mentioned that many times,

 6   interchangeable, based on a proffer; right?

 7   That's --

 8        A.   No.

 9        Q.   Okay.  So let me ask you a question.

10   Another question.

11             It's not based on a proffer you say;

12   correct?

13        A.   It's based on all the information

14   available to me.

15        Q.   Okay.  Okay.  So let's go through some of

16   the documents to show you.

17             If you put in Exhibit 26, which is --

18   just remind me where we are.

19                  TRIAL TECHNICIAN:  914, I have.

20                  (Winer Deposition Exhibit 914,

21                  Minutes of the Seventh Meeting of the

22                  Benevolence Committee's Supervisory

23                  Council, was marked for

24                  identification.)

25        Q.   (BY MR. MOHAMMEDI)  This is an Arabic
```

This Transcript Contains Confidential Material

1    director starting February 1993; correct?

2                    MR. HAEFELE:  Objection, form.

3         A.    It does -- it actually doesn't say that.

4    It refers to a handover from the former director.

5    And refers to an attempt to ease the tension, which

6    suggests there are still actions to be taken.  So I

7    can't assess from this when he was dismissed.

8         Q.    (BY MR. MOHAMMEDI)  But you can assess

9    that he was not with LBI as of February 1993,

10   correct?

11                   MR. HAEFELE:  Objection, form.

12        A.    No, I cannot.

13        Q.    (BY MR. MOHAMMEDI)  You cannot?

14        A.    I can't tell what date he left, based on

15   this.

16        Q.    If you --

17        A.    If I may continue.  It looks to me from

18   this document that at some point in this period, a

19   new executive director took over from the old

20   executive director.  It doesn't say that the old

21   executive director was dismissed.  It does say that

22   there was tension and action going -- needed -- that

23   needed to take place to ease the tension.

24                   So the dates -- the basic idea that he

25   was leaving the position seems to me the most

This Transcript Contains Confidential Material

```
 1   plausible interpretation of this.  The statement
 2   that he's dismissed does not -- is not set forth in
 3   this document.
 4        Q.    Okay.  I think we -- you know, I guess we
 5   will go through the documents.
 6             If we can have Exhibits 23.
 7                  (Winer Deposition Exhibit 915,
 8                  2-23-1993 letter to Adel Batterjee,
 9                  was marked for identification.)
10        Q.    (BY MR. MOHAMMEDI)  Which is dated
11   February 23, 1993.
12             That is the English version, which is
13   FED-PEC0114419, the Arabic document.
14             And then there is a translation.
15             If you can just make that bigger.
16             Can you read it for -- I mean, you can
17   read it to yourself if you want to.
18        A.    Yes, this is consistent with Mr. Noor
19   Wali's deposition.
20        Q.    And you do not have any reason to dispute
21   this accurate -- the accuracy of this document,
22   right?
23        A.    No, I do not.  I believe this is likely
24   to be accurate.  I have no reason not to think it
25   accurate.
```

1    the hearsay rules and the introduction of evidence

2    in that case.

3        Q.    Can you read the last -- I mean, it

4    says -- when it says:  Given the insufficiency of

5    the Santiago proffer, the Court cannot find by a

6    preponderance of the evidence -- right -- that the

7    proffer -- that -- I can't see it.  Unfortunately I

8    have this.

9            You read the statement, right?  So the

10   Court finds insufficient evidence in Santiago

11   proffer; correct?

12       A.    Let me read the sentence and then I will

13   provide you my assessment of it.

14           Given the insufficiency of the Santiago

15   proffer, the Court cannot find by a preponderance of

16   the evidence that the proffered statements -- that

17   would be proffered statements -- that the proffered

18   statements are admissible under the co-conspirator

19   exception to the hearsay rule before trial.

20           So this is a reference to proffered

21   statements by co-conspirators.  It's not about the

22   prosecutor's statement, it's about the proffered

23   statements about what the co-conspirators said, is

24   how I read that sentence.

25       Q.    And the Santiago proffer --

This Transcript Contains Confidential Material

```
 1                    MR. HAEFELE:  Objection to form.

 2                    Is there a question?

 3          Q.    (BY MR. MOHAMMEDI)  Do you -- have you

 4     considered this?

 5                    MR. HAEFELE:  Objection to form.

 6          A.    Yes, I read the terrorist financing staff

 7     monograph.  And these cases, complex financial crime

 8     cases from all counts.

 9          Q.    (BY MR. MOHAMMEDI)  Did you --

10          A.    Please allow me to respond.

11                Complex financial crime cases, I've seen

12     repeatedly, run into problems even when it was clear

13     to me, in connection with such cases, that there was

14     serious criminal activity.  I've seen this

15     repeatedly.  They are hard cases to make, because

16     the actions that relate to complex international

17     crime cases, which include terrorist finance cases,

18     can take place over a long time.  They can involve

19     people who aren't available for testimony in the

20     United States.  The source is going to be a

21     mixture -- can involve intelligence sources which

22     can't be readily converted into physical evidence.

23     So they are hard case to make.

24                In this case, there is a reference here

25     to at least after al-Qaeda was designated a foreign
```

```
 1   terrorist organization in 1999.  One of the issues
 2   in the BIF case, as I understand it, was in the time
 3   period that the -- that was relating to the proofs.
 4   Some of the activity that the government alleged was
 5   from older activity.
 6            So all of those, that has to be taken
 7   into consideration, as one thinks about this
 8   paragraph.
 9            Finally, from the question of negative
10   public opinion, in any community, contend that
11   destruction of the charity reflects bias and
12   injustice, with no measurable gain to national
13   security.  I don't, as an expert, view the public
14   opinion in a particular community, whether it's
15   Muslim, Christian, or Jewish, Arab or Hispanic or
16   Latin, or any other group, to be a determining
17   factor of whether one should bring a case if a
18   prosecutor believes that they have a criminal case
19   to make.
20            And so I note here that the terrorist
21   financing staff monograph doesn't say that it
22   should, it simply said that these communities
23   contended this.
24            And so that's how I thought about this
25   paragraph when I read it, and that's how I think
```

1    about it now.

2         Q.   (BY MR. MOHAMMEDI)  So your opinion, all

3    the exhibit they enter here into evidence for you to

4    look at, you don't think there were, you know, you

5    have a better understanding of all of these findings

6    than those exhibits that we entered into evidence

7    today that you did not consider them also in your

8    report; correct?

9              MR. HAEFELE:  Objection to form.

10        A.   That's a misstatement of my testimony.

11        Q.   (BY MR. MOHAMMEDI)  Okay.  That is -- I'm

12   not saying this is your statement, and actually I'm

13   asking the question, and that's fine.

14        A.   What is your question, please?

15        Q.   The question, you are -- all the exhibits

16   that we entered now into evidence for you to

17   evaluate, right?  Which you missed most of the time

18   in your reports, those evidence are not enough for

19   you to conclude -- right? -- what you have not

20   concluded before in your report by not considering

21   this information -- those information; correct?

22             MR. HAEFELE:  Objection to form.

23        Q.   (BY MR. MOHAMMEDI)  You still stood by

24   your opinion, what you wrote in your report;

25   correct?

```
 1       Q.    (BY MR. MOHAMMEDI)  The lawyers that

 2  hired you, those allegations, correct?  They're

 3  still allegations.

 4             MR. HAEFELE:  Objection to form.

 5       A.    That's correct.

 6       Q.    (BY MR. MOHAMMEDI)  In 10.3.1, page 68,

 7  again, you say that CRA audit found massive

 8  deficiencies.  Do you see that?

 9       A.    Yes.

10       Q.    Are you an auditor?

11       A.    No, I am not an auditor, I'm an attorney.

12       Q.    Are you a CPA?

13             MR. HAEFELE:  Objection, asked and

14        answered.

15       A.    You asked me this question earlier.  I

16  previously have responded to that question to tell

17  you that I am not a certified public accountant.

18       Q.    (BY MR. MOHAMMEDI)  So what qualification

19  do you have to render this opinion?

20             MR. HAEFELE:  Objection.

21       A.    I have laid out my qualifications

22  previously in this deposition.  I'm going to respond

23  to your current question at some length since the

24  question is a very broad question.

25             I first began dealing with bank
```

1  statements and the way in which financial crimes

2  take place internationally in 1980 in a very early

3  anti-money laundering case.  In the mid '80s, I was

4  on the staff of a series of Senate investigations

5  chaired by my -- man that I was employed by, Senator

6  John Kerry, in which I acted as his counsel.

7            And in the course of that, undertook

8  investigations that required me to look at and

9  understand financial reports and auditing and

10 accounting statements which included a review in the

11 Bank of Credit and Commerce International of

12 accounting and auditing standards that were in

13 effect at the time.  How to read what's in the

14 accounting review or an audit.  Because not every

15 accounting review is, of course, an audit.

16       Q.   (BY MR. MOHAMMEDI)  Okay.

17       A.   I continued to work in this space as an

18 attorney.  As previously mentioned, I represented

19 several persons or entities who were engaged in

20 activity that raised issues relating to terrorist

21 finance and accounting or audit, and in the course

22 of that work continued to become familiar with by

23 such standards.

24       Q.   So --

25       A.   In this case --

```
 1        Q.    Let me ask you --

 2        A.    You asked me a question --

 3        Q.    I need to ask you -- you --

 4        A.    I am not --

 5              MR. HAEFELE:  Let him answer the

 6        question.

 7              MR. MOHAMMEDI:  What you have done

 8        before -- we have heard that already.

 9        A.    I am not -- you have asked me a question.

10   I would like to --

11        Q.    (BY MR. MOHAMMEDI)  I am asking you a

12   specific question.

13        A.    Yes, you did.  You asked me what my

14   expertise was.

15        Q.    No, I'm asking you what the basis of you

16   making many statement massive, what is your -- what

17   is your basis for --

18              MR. HAEFELE:  Mr. Mohammedi, I'm

19        going to object that you're not letting the

20        witness answer the question yet again.  This

21        is -- he's exactly answering exactly the

22        question you asked him.  Don't interrupt.

23        Q.    (BY MR. MOHAMMEDI)  So the question is,

24   what is the standard of massive?

25              MR. HAEFELE:  Mr. Winer, if you need
```

This Transcript Contains Confidential Material

```
1              to finish answering your previous question,

2              finish answering the question before you

3              proceed on to Mr. Mohammedi's new question.

4                   Mr. Mohammedi, please do not

5              interject and interrupt the witness.

6                   MR. MOHAMMEDI:  We'll move on.  It's

7              fine.  I don't need to hear it.  I really

8              don't need to hear it.  I asked a question and

9              you didn't answer.  It's nonresponsive so I'm

10             going to move on.

11                  MR. HAEFELE:  Let the record reflect

12             that his extensive experience surpasses what

13             you've allowed him to answer.

14                  MR. MOHAMMEDI:  We've heard that over

15             and over again.  I'm asking specific questions

16             related to CRA report.

17        A.   The answer to that not --

18        Q.   (BY MR. MOHAMMEDI)  There is no question

19   pending, Mr. Winer.  We are moving on.

20        A.   Excuse me, there was a question pending,

21   sir.

22        Q.   I heard it.  I heard your answer.

23        A.   You had a second question, which

24   lasted --

25                  Do you withdraw that question?  I just
```

1    want to make sure that I answer your question.

2        Q.    I'm withdrawing the question.  We'll move

3    on.

4            In preparing your affirmative report,

5    we -- you already stated that you did not review

6    WAMY audits; correct?

7        A.    I asked for but did not receive --

8        Q.    And you asked from who, the plaintiff

9    attorneys?

10       A.    Yes.

11       Q.    And, I mean, you -- so you asked for it

12   but you never received it; correct?

13       A.    That is correct.  I received it after

14   asking again, after the audit reports -- after the

15   expert reports for the defense were provided, I

16   asked for them again and got more.  There were still

17   many, many, many missing reports, but I did receive

18   some reports as set forth in my supplemental

19   statement.

20       Q.    Okay.  How many of the approximate 825

21   projects report listed in Mark's appendix did you

22   review in preparing for your rebuttal?

23       A.    I reviewed the materials that I listed in

24   my reliance report.  I reviewed all the audits and

25   material that were characterized as audits that I

1    could find and was provided.  If there were more, I

2    would have -- been provided more, I would have read

3    more.  It's information that I consider to be of

4    great use when there's audits.

5            The audits that were provided me and I

6    asked for more did not correspond to the number

7    described in one of your expert's reports, and I

8    highlighted the difference between the number that

9    was described and what was made available to me.  I

10   don't know whether there were additional audit

11   reports available or not.  I am aware of the

12   representations regarding the report.

13       Q.   Do you know how many financial documents

14   have been produced in this case?

15       A.   I do not know, first, how you described

16   it, what the word financial means in this case.

17       Q.   Have you reviewed the receipts, WAMY

18   receipts produced in this case?

19            MR. HAEFELE:  Objection to form.

20       A.   You'd have to show me receipts in a

21   particular area.  I reviewed some receipts.  They

22   were purported to be audit material that's described

23   in one of your expert reports.  I went in the

24   reports and looked at all of the references to

25   material in the expert report on the auditing

1    East.

2        Q.    So as you sit here, you are telling me

3    that you are an expert in maintaining of the

4    standard -- international banking standard in the

5    countries that you are referring to?

6        A.    In relationship to financial crime, yes.

7        Q.    What about the standard --

8        A.    The --

9        Q.    I'm talking about the financial standard,

10   not the crimes.  I'm talking the standard of

11   implementation of banking standard in countries.

12       A.    In the late 1990s, when I was in the

13   United States government, we became very focused on

14   the fact that there were essentially no controls on

15   movements of funds in most if not all -- actually

16   all at that point of the Middle Eastern states.

17   Whether they were Christian states, Muslim states,

18   or Jewish states, it was a problem across the board.

19   It was particularly a problem in countries that

20   didn't have annual taxes, that didn't have an income

21   tax.

22            And so one of the things that the

23   treasury department, the justice department, the

24   State Department focused on, in response to

25   direction from the White House, was how we start

1    ratcheting up to these standards.  And that was part

2    of the work that was undertaken by the Financial

3    Action Task Force in the late 1990s.

4              After I left the government, I was asked

5    to continue to evaluate the situation in a large

6    number of countries, including all the countries in

7    the Middle East in this territory.

8        Q.    And you were saying this including the

9    Saudis and the accounting standard as implemented

10   from the international standards; correct?

11       A.    It would -- no, it would be too much to

12   say the accounting standard, because I did not cover

13   the details of accounting standards.  I looked at

14   the overall regulatory and enforcement system, which

15   looked at financial transparency and accountability,

16   and what the controls were in place in the banking

17   system at that time.  And that in turn looked at the

18   practices of businesses and sort of the general

19   level of oversight, which was poor.

20       Q.    And is it fair to say you did make the

21   similar statement during the TD Bank case when you

22   said that you were an expert in implementation of

23   the accounting standard in Canada and you were

24   excluded; correct?

25       A.    That's not correct.

This Transcript Contains Confidential Material

```
 1   For supporting terrorists.  Is that correct?
 2        A.    It's a red flag for the kind of slush
 3   fund category that would enable a charity operating
 4   in an area of conflict to provide support for a
 5   terrorist group because it's providing support for
 6   young men in an area of conflict that is foreign to
 7   them.  In other words, you had foreign fighters in
 8   this period of time in Pakistan and Afghanistan,
 9   foreign meaning they're not Pakistani and they're
10   not Afghani, and there's money being provided for
11   them for student welfare.  So it's a slush fund.
12   And there are no controls.  There's a complete lack
13   of controls.  There's no evidence of any controls on
14   the actual uses.  And that's what I'm -- my
15   statement is essentially saying.
16        Q.    Do you know which is the objective of
17   WAMY?
18              Do you know the name itself, what it
19   means?  The World Assembly of Muslin Youth?
20                   MR. HAEFELE:  Object to form.
21        Q.    (BY MR. MOHAMMEDI)  Do you know the
22   objective of providing student with funds to educate
23   them?
24        A.    Yes, I'm -- but what -- it's more
25   difficult for me to know what's being done when the
```

This Transcript Contains Confidential Material

```
 1   people to whom the funds are being provided are in

 2   an active area of conflict or in an area that is

 3   over -- has got a substantial number of terrorist

 4   training camps and a terrorist presence in it.

 5        Q.    And that's --

 6        A.    And the issue --

 7              Let me finish my answer, please, sir.

 8        Q.    Go ahead.

 9        A.    Thank you.

10              So the issue is the location of where the

11   activity is, and the fact that this category of

12   funding is different from the kinds of categories of

13   funding audits show for areas that were not in

14   conflict.  You don't -- I didn't see these

15   categories in the other -- in the audits you

16   provided to me, and were provided to me, for WAMY,

17   in areas that were not conflict zones, that were

18   less susceptible to terrorist risk.

19              The fact that these categories appear in

20   these audits in this location at this time is of

21   concern and fits precisely within the

22   vulnerabilities that have been -- that have been

23   evident for years, and which reflect the 1996

24   findings of the CIA in the 1966 report -- pardon me,

25   the 1996 report in Bosnia.
```

```
 1              So it's not merely that this is a

 2    category of potential substantial risk and abuse,

 3    it's also that this category was not present --

 4         Q.    Okay.  And --

 5         A.      -- in the audits that took place after

 6    9/11, in areas that were not conflict areas.

 7         Q.    So your testimony, because it's in an

 8    conflict zone that then it should be used to support

 9    terrorism; correct?

10         A.    That's not a correct statement of my

11    views or --

12         Q.    You said that exactly.  You said because

13    of a place of conflict.  That's exactly what you

14    said.  Correct?

15              MR. HAEFELE:  Objection,

16         argumentative.

17         A.    It is not exactly what I said.

18         Q.    (BY MR. MOHAMMEDI)  Okay.  Let me -- so

19    is it fair to say --

20         A.    That's not what I said at all.

21         Q.    Okay.  So is it fair to say place of

22    conflict and the places where there is a war, where

23    there are refugees, place of, that's exactly -- we

24    can assume that where you have the students' welfare

25    being used to help the population that is affected
```

```
 1   material weaknesses in the controls caused this

 2   person to engage in training, who then became a

 3   terrorist and participated in the 9/11 attack.  And

 4   the answer is, there is no proof of that because by

 5   their very nature, this funding took place, the

 6   support took place without the controls that would

 7   have enabled anyone to reconstruct the support that

 8   led to al-Qaeda.

 9            So instead, one has to rely on a lack of

10   controls and the material deficiencies in the

11   controls, the presence in the location, the nature

12   of the people who were being served, the fact that

13   they're foreign fighters rather than domestic or

14   local -- they're foreigners rather than domestic or

15   local people, and a variety of other factors as I've

16   illustrated in the report.

17            Moreover, the report goes into facts such

18   as the provision of travel documents and

19   facilitation and so on.  One would then have to get

20   quite granular, and you've not asked me about those

21   granular issues.

22       Q.   I did ask you to answer them, but let's

23   move on.

24            Now, rebut -- in your rebuttal 2.34-2.35,

25   page 28-29, you stated at Section 2.34, I understand
```

1   testified yesterday, from Afghanistan to Bosnia to

2   Chechnya and so on, and metastasized further.  The

3   training that was received in connection with the

4   foreign fighters in Afghanistan began within the --

5   at the end of that first period.  And the reason why

6   I divide it into periods is because different things

7   happened in different periods, and the end of the

8   first period was the period when al-Qaeda was

9   formed, and -- as al-Qaeda, which itself was an

10  outgrowth of the service office of the MAK.  A

11  foreign body itself.

12          MR. LEWIS:  Objection to strike.

13      Q.   (BY MR. LEWIS)  We're not going to

14  filibuster this, Mr. Winer.  I asked you a question:

15  Do you know when IIRO allegedly helped fund militant

16  training camps, "yes" or "no"?

17          MR. HAEFELE:  Objection, form.

18      A.   I don't have the dates.  It was in the

19  course by 1996, and I don't know how many years

20  prior to 1996.

21      Q.   (BY MR. LEWIS)  Well, you list it in the

22  first Afghan period, correct?

23      A.   I list the foundations of the -- in the

24  first Afghan period because of the foundations of

25  the service bureau, which was receiving funding from

1          Have you seen any primary evidence of

2   funding by IIRO of any training camps in

3   Afghanistan?

4        A.    No.

5        Q.    Now, you are aware that the UN report

6   says that IIRO knowingly or unknowingly may have

7   assisted in funding al-Qaeda.  So you -- the UN

8   couldn't make a definitive determination; correct?

9        A.    That's your characterization of their

10  finding, but I would prefer to see the finding up

11  and we can go through their exact words together.

12  So what I don't wish to do is to opine on a mixture

13  of their words and your words.

14       Q.    Well, you quote it, and I'm quoting your

15  report quoting that report.

16       A.    So bring me to that quote, please.

17       Q.    You're not remembering it?

18          Go to page 22 if you don't have it in

19  mind.  It's in your report.  6.2.3, sir.

20               TRIAL TECHNICIAN:  Do you know what

21        page that's on?

22               THE WITNESS:  Yes.  It's the top of

23        22.  What the report -- what I quoted is as

24        follows:  The UN report then named IIRO as an

25        important example of the use by al-Qaeda of

This Transcript Contains Confidential Material

```
 1           the charities, and stated that it, quote,

 2           works in close association with the Muslim

 3           World League.  Well, the MLW is what's in the

 4           quote.  The UN report stated IIRO is engaged

 5           in legitimate humanitarian activities but was

 6           also used, quote, knowingly or unknowingly, to

 7           assist in financing al-Qaeda.

 8      Q.   (BY MR. LEWIS)  So you would agree that

 9   the UN did not make a determination to your

10   knowledge.

11           (Reporter clarification.)

12      Q.   (BY MR. LEWIS)  You would agree that the

13   UN did not make a determination with respect to the

14   state of IIRO's knowledge with respect to any

15   assistance in financing al-Qaeda.

16      A.   I would interpret the statement which

17   says -- was used knowingly or unknowingly to assist

18   in financing al-Qaeda to be a sentence that says

19   that we're making no decision here on the intent of

20   IIRO as an institution.

21      Q.   And the 9/11 Commission did not make such

22   a finding either, did it?

23      A.   That's correct.  Not by name.

24      Q.   The UN report cited the 1996 CIA report.

25   Do you recall that, sir?
```

1    rather than distributed interagency at that point.

2    But that's speculative.  I would need to know more

3    to be able to determine in the end what its specific

4    provenance was.

5         Q.    (BY MR. LEWIS)  Do you see the

6    handwritten notation that says U.S., and then with

7    parentheses around it?

8         A.    What page are we on, sir, please?

9         Q.    The first page, sir.

10        A.    I'm sorry?

11        Q.    The first page.

12        A.    Yes, I see that parentheses.

13        Q.    Yes.  Do you have an understanding of

14   what that is meant to indicate?

15        A.    I assume but I do not know that that is

16   an indication that it's a United States document or

17   relates to the United States.

18        Q.    That it came from the United States or

19   that it is with the United States or...

20        A.    Well, my reliance on this document is

21   based on the fact that it was referred to as a CIA

22   document by the UN, which would know, Victor Comras

23   was on that committee at the time.  He was an

24   official I had worked with.  He had lots of

25   experience with the U.S. government, classified

```
 1    information, intelligence information.  And so I

 2    take the UN's characterization of it at face value

 3    and have no reason to think it was incorrect.  It's

 4    also consistent with the kind of data and the kind

 5    of presentation of data that I've seen a number of

 6    times in this period on a range of topics having to

 7    do with international threats.

 8        Q.    Except for the lack of any classification

 9    marking it as a classified document; correct?

10        A.    Well, no, this is -- I had FBI documents,

11    quite similar to this, going on and on and on about

12    international criminal organizations, which included

13    information on terrorism on behalf of the FBI

14    generated rather than CIA.  Quite similar, without

15    any markings on it, same kind of approach, which

16    were essentially internal analytic reports that

17    would sometimes go on at great length and would be

18    used for providing frameworks and foundations for

19    further work.

20        Q.    Do you know the difference, Mr. Winer,

21    between what the CIA would refer to as a finished

22    intelligence product and a preliminary intelligence

23    product?

24        A.    Well, there's a number of different

25    categories.  There's raw intelligence, there's
```

 1   preliminary intelligence, there's finished

 2   intelligence, and there are more categories than

 3   that, I'm sure.

 4       Q.   Can you tell from looking at this

 5   document what kind of product it is?

 6       A.   It's analytic intelligence.

 7       Q.   Mr. Winer, you -- I think you indicated

 8   earlier that the UN relied on this.  The URL link is

 9   broken.  Do you have knowledge that -- the URL link

10   that the UN cites is no longer operative.  Do you

11   have knowledge as to whether it is precisely this

12   document that the UN was citing or some other form

13   of the document?

14       A.   I have no reason to believe it was

15   anything other than this.

16       Q.   But you have no knowledge one way or

17   another?

18       A.   It's not something I can currently prove

19   myself, given the broken link.

20       Q.   Let me ask you, when did you first see

21   this document?

22       A.   I first saw this document after I was

23   retained in this matter in December of 2019.

24       Q.   You did not see it while you were in

25   government, did you?

```
 1                    MR. HAEFELE:  Don't interrupt the

 2         witness.  Don't interrupt the witness.

 3                    MR. LEWIS:  Then --

 4         A.    Then I've answered your question.

 5         Q.    (BY MR. LEWIS)  We're not going to

 6    filibuster.  Do you agree with that paragraph --

 7    what it says in the paragraph or do you disagree

 8    with --

 9                    MR. HAEFELE:  I just want to put on

10         the record my objection to the fact that Eric

11         Lewis won't allow the witness to finish his

12         answer.

13                    MR. LEWIS:  Your objection is noted.

14         A.    I think you've cherry-picked in your

15    question language from that paragraph.  If you look

16    at the whole paragraph, it has a different meaning

17    than the meaning you've ascribed to it.

18         Q.    (BY MR. LEWIS)  I just asked you whether

19    you -- I haven't ascribed any meaning.  I said do

20    you agree with the observation in the paragraph or

21    do you not agree with it?

22                    MR. HAEFELE:  But then you selected

23         portions of the paragraph.

24                    MR. LEWIS:  No, I read -- well, I

25         read everything except the last sentence, and
```