EXHIBIT E

*January 13, 2003*

### THE FINANCE OF ILLICIT RESOURCE EXTRACTION

### By Jonathan M. Winer and Trifin J. Roule[1]

*Summary:*

*The proceeds of illicit resource extraction, defined as the sale of natural resources by means that avoid the payment of taxes to the national government in the country from which the resources were extracted, or which is carried out in violation of resolutions issued by the United Nations, are laundered through the same financial services infrastructure relied on by drug traffickers, terrorists, and corrupt officials. The growing panoply of international initiatives targeting money laundering, terrorist finance, and corruption have yet to focus on money laundering relating to illicit resource extraction.*

*To date, international efforts to respond to abuses of commodities in connection with conflict have run along a number of separate tracks. To date, embargoes, certification programs, disclosure regimes, anti-corruption, drug trafficking, money laundering or terrorist standards, private sector "seal" initiatives, and name and shame exercises have yet to systematically address the finance of illicit resource extraction. The patchwork of initiatives for monitoring illicit commodities involve numerous institutions, none of which have broad jurisdiction over both the tracking of natural resource commodities and the tracking of the proceeds of these resources.  None of these have sought to create a reporting or disclosure mechanism to create documentation that would simultaneously track both the physical transactions and movement of commodities and the funds generated from such transactions.*

*Capacity limitations exist at both the national and international level. Many national regulatory and law enforcement agencies deal poorly with money laundering and the smuggling of goods that are clearly illicit, such as narcotics. International organizations responsible for developing harmonized standards to combat such smuggling have tiny secretariats and limited resources. Regional law enforcement agencies remain in their infancy. Moreover, other than diamonds, most types of natural resources abused in connection with conflict, including oil and gas, timber, coltan and tanzanite, are not yet subject to internationally agreed upon standards.*

*These gaps might be filled by the creation of an international legal framework to cover the sales of natural resources used in conflict or accompanied by serious corruption. Such a framework would focus on establishing common tracking and*

---

[1] Jonathan M. Winer is an attorney at the firm of Alston & Bird in Washington, D.C., where he practices international financial services regulatory law. He is a former U.S. Deputy Assistant Secretary of State for International Law Enforcement.  Trifin J. Roule is Assistant Editor of the Journal of Money Laundering Control, and routinely consults on U.S. government projects on money laundering , terrorist finance, and illicit resource extraction.

*disclosure mechanisms for the extraction and sale of certain categories of commodities, and extend the principles for international cooperation against money laundering to that involving the proceeds of illicit extraction of natural resources. An inter-governmental mechanism may also be needed to exercise oversight over the implementation of such a framework and to integrate work undertaken by existing institutions.  Such a framework and mechanism could cover a group of commodities, including gemstones, oil and gas, precious metals, and timber, and establish standard documentation and disclosure mechanisms that would be universally applicable. A framework that covered both the movement of commodities-in-transit through certifications and the corresponding financial movements would rely not only on the private sector involved in the handling of the commodities, but also the financial institutions already laboring to deal with drug money laundering, terrorist finance, criminal laundering, and the laundering of the proceeds of corruption.*

*Political impetus for a new intergovernmental organization might be given by the G-8 to a steering group whose initial mission would be to review the recommendations made here and in the other papers commissioned in this study, and provide the G-8 with a consensus view of whether an international framework and intergovernmental organization was necessary, or whether existing frameworks and organizations could be reoriented to deal with illicit resource extraction. The World Customs Organization (WCO) has extensive experience in developing standard certifications, and perhaps could be tasked to develop standard certifications for certain commodities that require more detailed information on chain-of-custody and payment mechanisms. Similarly, the Financial Action Task Force (FATF) might be asked to develop a set of typologies for the laundering of the proceeds of various commodities, and for recommendations on procedures by which FATF members could implement appropriate regulatory and enforcement actions to cover the funds generated by illicit resource extraction. A mixed private/sector public sector group provides another possible model for action. The G-7 could ask relevant international or intergovernmental entities who may have a role in combating illicit resource extraction to meet with representatives of the major sources of demand in relevant markets: oil and gas, timber, precious metals, and gemstones, together with major participants in the key transportation markets (ground, sea and air) and the global financial services infrastructure. The mixed private sector, public sector group, which could also include NGOs, might establish principles for tracking the purchase, sale and flow of those commodities and the financial mechanisms associated with such flows. An agreed upon plan of action could be reached, with designated responsibilities for follow-up by each participant and a timetable for completion of the mandated activities. The private-public group would meet periodically to discuss implementation issues and to report back to the G-7 on progress. Successes could be followed by additional mandates, and alternative approaches could be developed to respond to inadequacies in the regime. A related approach might involve the development of further "seal" for major market players among both purchasers and sellers of commodities subject to illicit extraction. Such "white lists" could include commercial entities and governmental entities involved in commodity extraction, as well as the elements of the transportation and financial infrastructures handling the commodities and the funds generated by their sale.*

## I.  INTRODUCTION

The exploitation of natural resources to provide funds to sustain conflict has become an increasingly visible global phenomenon. Of fifty armed conflicts active in 2001, some 25% may be related to resource exploitation, in which either licit or illicit exploitation of natural resources helped trigger, intensify, or sustain the continuation of a violent conflict.[2] In other countries subject to lower intensity conflicts, funds generated by the sale of natural resources, including timber, oil and gas, diamonds, and precious metals, are exploited by corrupt officials, collaborators, and their opponents, who may include organized criminals and terrorist organizations.[3] In addition to sustaining conflict and undermining civil stability, resource exploitation has contributed to famines, disease, and population displacement, and created long-term damage to the physical environment.

In each case, revenue streams diverted to non-governmental purposes from illicit or non-transparent sales of natural resources have weakened democratic governance. Illicitly extracted resources have provided economic rewards to the criminal, the corrupt, and the subversive in direct relation to the ability of such persons to evade laws that would restrict or regulate such transactions. These rewards in turn enable them further to build corrupt networks of officials and private sector elements to facilitate further exploitation.  Because illicit extraction turns the resources of a country against the principles of democratic government, it undermines existing standards of governance, whether already comparatively weak or strong.  Because illicit extraction provides political and economic power to regimes and forces that would otherwise be illegitimate, it becomes a central mechanism to sustain those who otherwise would not have sufficient popular support to retain power over people, geography, or the resources themselves.

An unintended consequence of the reduction in trade barriers and border controls has been the increased use of the infrastructure of legitimate cross-border trade to move narcotics and weapons, smuggle persons, and transport the proceeds of crime from one country to another in violation of applicable national legal and regulatory barriers.[4] This is sometimes referred to as the dark side of globalization.[5] Central to this problem have been abuses of the integrated system for global movements of funds, allowing people to store and transport monetized value almost anywhere.[6] To combat these abuses, a series of international initiatives have been undertaken. These began with the inclusion of anti-

---

[2] Michael Renner. (2002)"The Anatomy of Resource Wars", Thomas Prugh, Ed., *World Watch Paper*, No. 162, October.
[3] See Michael Ross. (Forthcoming) "How Does Natural Resource Wealth Influence Civil War? Evidence from 13 Case Studies", *Journal of Conflict Resolution*.
[4] See e.g., "The Globalization of the Drug Trade," *Sources*, 4 April 1999, No. 111, New York UNESCO. See www.unesco.org/most/sourdren.pdf, and; Mark Findlay, (1999), *The Globalisation of Crime: Understanding Transnational Relationships in Context*, London: Cambridge University Press.
[5] See e.g., Lawrence Summers. (2000) International Financial Crises: Causes, Preventions, and Cures," 2000 Ely Lecture, American Economic Association, and   Robert E. Litan. (2001), "Economic: Global Finance" in *Managing Global Issues Lessons Learned*, P.J. Simmons and Chantal de Jonge Oudraat, eds., Washington, D.C.: Brookings Institution.
[6] "Transnational Control of Money-Laundering." (2002) *Strategic Survey 2001/2002*.

drug money laundering and law enforcement commitments in the 1988 United Nations Convention to Combat Illicit and Psychotropic Drugs ("Vienna Convention") and the creation of the Financial Action Task Force ("FATF") by the G-7 in 1989. They have since included the project undertaken by the Organization for Economic Cooperation and Development ("OECD") against illicit tax competition in 1998, the G-7's creation of the Financial Stability Forum on 22 February 1999, the 2000 UN Convention Against Transnational Organized Crime ("Palermo Convention"), the Council of Europe's GRECO program to assess and implement corruption prevention and prosecution mechanisms, and the creation of various regional bodies to engage in a process of mutual assessment as a means to greater financial transparency.[7] Further, there have been related but separate initiatives to promote financial transparency undertaken by important sectoral self-regulatory organizations, such as the Basel Group of Bank Supervisors, in connection with its revisions of standards for assessing risk to bank capital, the International Organization of Securities Commissions ("IOSCO")[8], and the Offshore Group of Bank Supervisors, among others. Finally, a coalition of private sector financial institutions, denominated the Wolfsberg Group, established their own set of transparency standards, initially aimed in 2000 at preventing the use of their banks and brokerage firms from being used to hide the proceeds of corruption, and extended in late 2001 to prevent terrorist finance.[9]

The increasing integration of national financial payment and clearing systems into a global financial infrastructure has made it possible for changes in financial regulatory systems to be contemplated, mandated, and enforced at a global level, as the twin "name and shame" exercises initiated in 1999 by the FATF and the OECD have already demonstrated. In these exercises, countries with lax financial regulatory systems were warned that they could face loss of market access to the major financial centers if they did not harmonize their standards for financial transparency to the requirements levied by the members of those organizations. Both the FATF and the OECD developed lists of jurisdictions deemed not to be in compliance with those standards. In each case, many of the targeted jurisdictions complained bitterly that the approach did not respect their sovereignty. However, in each case, jurisdictions threatened with being blacklisted

---

[7] These include the Caribbean Financial Action Task Force (1990), the Asian-Pacific Group (1997), Financial Action Task Force on Money Laundering in South America (2000), the Eastern and Southern Africa (1999) to undertake assessments of anti-money laundering vulnerabilities and enforcement capacities. They also include Organization of American States conventions against money laundering (December 1995, amended October 1998), the European Unions 1st and 2nd Money Laundering Directives (1991 and 2001, respectively), and to some extent, the work undertaken by the Basel Committee of Bank Supervisors in its current initiative (2000-2003) to revise standards for the treatment of bank capital, which would include certain provisions pertaining to risks associated with non-transparency.

[8] IOSCO's current membership includes the securities regulators and enforcement agencies of approximately 60 countries.

[9] The Wolfsberg Group consists of the following leading international banks: ABN Amro N.V., Banco Santander Central Hispano, S.A., Bank of Tokyo-Mitsubishi, Ltd., Barclays Bank, Citigroup, Credit Suisse Group, Deutsche Bank AG, Goldman Sachs, HSBC, J.P. Morgan Chase, Société Générale, UBS AG. See http://www.wolfsberg-principles.com.

adopted comprehensive domestic legislation, which on paper complied with the required norms almost immediately.[10]

The initiatives share many common elements. These include the need to know one's customers to insure that they are not engaged in illicit activity; the need for financial institutions to share information pertaining to illicit activity with regulators, law enforcement, and when needed, with one another; to trace such funds; and the need of each country to assist all others in enforcing violations of their domestic laws. Principles initially used to combat drug trafficking and later extended to include all serious crimes and recently, terrorist finance and corruption, have now even been largely extended to include fiscal offenses through a mutual recognition that a beggar-thy-neighbor approach to tax violations threatens under current conditions to beggar all jurisdictions.

To date, cross-border exploitations of illicit extraction represent an aspect of the illicit use of the global financial services sector that has received comparatively little attention. Existing financial transparency initiatives have not addressed the need to combat the flow of funds from abuses of natural resources in cases of conflict. While such activity could often fall within the parameters of standards and regulations designed to address money laundering, terrorist finance, or corruption, the existing standards do not directly address the steps that a financial institution is supposed to take in handling what may be the proceeds of sales of timber, oil and gas, diamonds, coltan, tanzanite, or similar commodities used by warring political factions to fund their ability to sustain conflict. The closest the current standards come to dealing with these issues are the requirement that financial institutions eschew the proceeds of corruption and that such institutions respect, on a global basis, UN sanctions. While both standards have existed in principle for a long time, enforcement of either standard is exceedingly recent and remains to this day incomplete.

Access to the global financial services infrastructure is a critical element in sustaining resource-related conflict, as its use is usually required to safely transport and store wealth of those who are using the natural resources they may happen to control to sustain their ability to remain in power and fund conflicts. Indeed, these services are

---

[10] The FATF is engaged in a major initiative to identify non-cooperative countries and territories (NCCTs) in the fight against money laundering. Specifically, this has meant the development of a process to seek out critical weaknesses in anti-money laundering systems, which serve as obstacles to international co-operation in this area. The goal of this process is to reduce the vulnerability of the financial system to money laundering by ensuring that all financial centers adopt and implement measures for the prevention, detection and punishment of money laundering according to internationally recognized standards. In June 2000 fifteen jurisdictions (Bahamas, Cayman Islands, Cook Islands, Dominica, Israel, Lebanon, Liechtenstein, Marshall Islands, Nauru, Niue, Panama, Philippines, Russia, St. Kitts and Nevis, and St. Vincent and the Grenadines) were named as having critical deficiencies in their anti-money laundering systems or a demonstrated unwillingness to co-operate in anti-money laundering efforts. In June 2001, the FATF updated the list of NCCTs. Four countries left the list (Bahamas, Cayman Islands, Liechtenstein, and Panama). Six other jurisdictions were added (Egypt, Guatemala, Hungary, Indonesia, Myanmar, and Nigeria). At the subsequent FATF Plenary meeting in September 2001, two additional countries were added to the list (Grenada and Ukraine). In June 2002, the FATF removed four more countries from the NCCT list: Hungary, Israel, Lebanon, and St. Kitts and Nevis.

necessary to speed the transportation and investment of, and to provide security for, funds generated by the exploitation of resources by persons whose control of those resources is often very insecure. The power to control the resources may be simultaneously the most important asset a political combatant may control, and the one that opposing factions can most easily capture. Thus, the ability at times of conflict to strip assets quickly and convert them into money stored safely and securely can readily become a critical element in building the capacity to sustain a military or political force.

At times of conflict, purely domestic mechanisms within a country at internal war are especially unlikely to be effective in countering illicit exploitation of natural resources as a means of sustaining the conflict. If there are to be any practical impediments to such exploitation, those impediments must necessarily be built in such a fashion as to strengthen the capacity of critical institutions situated *outside* the country at war. To be effective, rules limiting financial transactions involving illicit commodities must be enforced not only locally, but also by persons and entities located at a considerable distance from the conflict. Absent other systems of incentive and sanction, those persons and entities may have little immediate stake in cutting off trade associated with the conflict.

As the Kimberly Process has suggested in connection with the sale of sanctioned diamonds, an adequate response to the exploitation of natural resources to sustain conflict will likely require new approaches to handling the movements of physical goods across borders.[11] To date, even the most developed states have had tremendous problems in combating cross-border smuggling, with substantial deficiencies being evident even in the world's most important borders, such as that of the Schengen Area in the European Union, or the two thousand mile long U.S.-Mexican border. A system of adequate controls to segregate licit from illicit goods that move across borders remains an essential element of combating other critical global security problems that may be separate from resource exploitation in connection with conflict, including drugs trafficking, arms trafficking, and terrorism. The sheer investment in personnel, engineering, systems and technology required to individually monitor and inspect goods in transit means that such initiatives will be long-term in nature. By contrast, extending the new regimes covering the global financial services infrastructure explicitly to cover abuses of natural resources could take advantage of initiatives that are well underway, and already beginning to have an impact in other areas important to global security. Although it may appear in some respects counter-intuitive, the enforcement of documentary requirements and regulatory oversight over non-tangible goods – money – may in certain respects be relatively easier than enforcing such controls on tangible goods. Intangible goods require legal rules of recognition for validity: thus, tightening such rules and insisting on their embodiment in

---

[11] The Kimberley Process was initially undertaken by a number of Southern African countries to stop the flow of "conflict" diamonds to the markets, while at the same time protecting the legitimate diamond industry. The Kimberley Process involves more than 30 governments, the European Community, the diamond industry and civil society and has been establishing minimum acceptable international standards for national certification schemes relating to trade in rough diamonds See http://www.kimberleyprocess.com.

the data processing software necessary for electronic fund transfers has the potential to regulate and monitor all the funds that enter electronic payment systems.

The still growing literature on the relationship between resource abuse and conflict includes many studies of how commodities such as oil and gas, timber, and diamonds have been used to fund corrupt political leaders and political parties, armies, guerrilla groups, and terrorists.[12] The literature also provides major insights into the economics of conflict and war. However, substantial gaps remain in articulating and assessing how the money generated by these relationships has actually moved, the nature of the persons and institutions used to handle the money, and the mechanisms used to launder the funds to sustain the activity and avoid sanctions or other legal restrictions. Accordingly, this paper seeks to provide an initial review of the financial infrastructure used to carry out the exploitation of natural resources in cases involving civil war and regional conflict.

The paper will first outline a conceptual framework for viewing the financial infrastructure used in connection with the export of natural resources in connection with violent conflict, corruption and poor governance. The paper will then turn to a series of case studies involving different forms of resource exploitation in connection with these phenomena and the mechanisms used to finance such exploitation. For each case study, the paper will review the existing regulatory and enforcement capabilities within the affected jurisdiction or region and their adequacy in countering illicit resource exploitation. The paper then reviews the existing initiatives created to address illicit resource exploitation, and their handling of the illicit money flows that arise from such exploitation. The paper will then seek to address the implications of the typological similarities and differences among the financial mechanisms used to exploit different kinds of natural resources at different levels of conflict.  This section of the paper will explore potential synergies between existing financial transparency and anti-corruption initiatives and their ability to be refocused to combat resource exploitation in areas of conflict. Finally, the paper will articulate a series of possible initiatives that could be undertaken to respond to the existing problem and capacity gaps by various institutions, including governments, international financial institutions, international organizations such as the United Nations, regional bodies, self-regulatory organizations, and components of the private sector. This section will identify possible new initiatives under which oversight mechanisms could be created to discourage resource exploitation in areas of conflict, and thereby counter the existing risks of protracted economic stagnation, decline in outputs of food and industrial goods, growth in inequality between groups, and increased threat from criminal, insurgency and terrorist groups.

Notably, any effective response to the exploitation of natural resources in areas of conflict will require cooperation among a diverse set of global and regional institutions and entities. These include not just individual governments and international organizations, but also international financial institutions, self-regulatory organizations,

---

[12] See e.g., Indra de Soysa. (2001) "Paradise is a Bazaar? Greed, Creed, Grievance and Governance," *World Institute for Development Economics Research Discussion Paper*, No. 2001/42, July.

important non-governmental organizations and key elements of the private sector. The integration of all the legitimate stakeholders in the solution is likely an essential sine qua non for progress in this field to be possible, let alone sustainable.

## II.      DEFINITIONS AND CONCEPTS.

With the end of the Cold War, policy analysts and academicians initiated a concerted effort to account for the growing number civil conflicts arising across the globe. Some widely held explanations for civil conflicts attribute the onset of civil strife to environmental stress, demographic pressure, and a variety of societal factors, such as religious and ethnic differences.[13]  Increasingly, the growth in conflicts has been attributed to groups determined to achieve a "payoff" for their efforts through the trafficking of illicit commodities.  As Paul Collier concludes, some individuals can "do well out of war."[14] Collier's conclusion can be extended beyond individuals, such as corrupt politicians, to entire governmental agencies, especially security forces such as the military, police, and customs officials, organized criminal groups, terrorists, and drug traffickers, and private security forces such as paramilitaries and guerrilla organizations. However, the literature devoted to the financial networks utilized by the above groups to engage in the exploitation of natural resources at times of conflict is negligible.

The exploiters of natural resources in areas of conflict generally rely on a common infrastructure for handling illicit proceeds. This infrastructure includes the formal financial services system of local banks linked to foreign banks, alternative remittance systems such as hawala and hundi institutions, import-export firms that participate in false invoicing schemes, precious metal markets, and the use of such devices as trusts, international business companies, and non-transparent jurisdictions as mechanisms to hide funds. Such exploiters are themselves often interrelated. Governments of questionable legitimacy involved in long-term civil conflicts often have significant ties to criminal organizations, especially when both are involved in resource extraction. However, there are also important differences in the elements of the infrastructure that tend to be available to governments, criminals, terrorists and private security forces. Accordingly, it may be useful to distinguish the principal types of exploiters in order to determine the elements of the financial services infrastructure that are most relevant to their exploitation. For the purposes of this paper, it is also important to define the major differences between lawful resource extraction and that which is illicit, in hopes of providing a more precise articulation of what is illicit than the more general formulation that "I know it when I see it."

*Defining Legitimate Resource Extraction.* Numerous legitimate governments license private sector entities to engage in resource extraction, or alternatively engage in such extraction themselves. The extraction of commodities as a legitimate function of

---

[13] See e.g., Donald M. Snow. (1996) *Uncivil Wars: International Security and the New Internal Conflicts,*  Boulder, CO: Lynne Rienner, and; Thomas F. Homer-Dixon. (1999) *Environment, Scarcity and Violence;* Princeton, NJ: Princeton University Press.

[14] Paul Collier. (2000). "Doing well out of war,"in Mats Berdal and David Malone (eds), *Greed &Grievance: Economic Agendas in Civil Wa*r, Boulder, CO: Lynne Rienner.

government commonly includes (a) fairness in bidding for sales or leasing, so that the government receives the maximum possible revenue for the resources that are sold; (b) transparency in the pricing and amounts of commodities sold; (c) conservation measures designed to minimize the permanent loss of the commodities and to maximize the length of the extraction period;  (d) reinvestment in means of production for extracting the resources, such as investments in pipes or drilling equipment for oil, or replanting of logs in connection with timber; (e) restoring the environment from which the commodities have been extracted, to minimize the environmental damage and to maximize the long-term economic value of the extraction area; and (f) deposit of the funds generated from the extracted resources to the state treasury, where they are then used to fund government operations or social benefits.[15]

    *Defining Illicit Resource Extraction.*  Illicit extraction by governments features the converse of the principles of licit resource extraction. Ordinarily, illicit extraction involves: (a) politicized or crony-based contracts for the sale of commodities; (b) limited or falsified information on pricing and quantities; (c) asset stripping with no regard to the future; (d) little to no investment in long-term production; (e) failure to restore stripped areas; and (f) the disappearance of the revenues from the sale of the resources so that they cannot be traced, with minimal or no benefit to the state treasury. When all of these factors are present, it is fair to define a particular case of extraction as likely to be illicit. Other cases may be less clear. For example, a government that issues contracts for the sale of commodities to insiders on a basis that in part ignores market pricing to permit kickbacks to corrupt officials may still insist on a portion of the revenues from those sales returning to the state treasury. Such routine corruption may undermine both the revenue base and the popular support for a government, but only the criminalized portion of the transaction might be characterized as illicit. The standard definition of corruption is the exploitation of public resources for private gain.[16]  In practice, the determination of whether particular natural resources are public goods or available for private sale may be both uncertain and fluid, as was demonstrated in the many ambiguities that arose in the course of the privatization of state-owned oil and gas resources from the Soviet Union during the 1990's. *Accordingly, for this paper, illicit resource extraction is defined as the sale of natural resources from a country by means that avoid the payment of taxes to the national government in the country from which the resources were extracted, or which is carried out in violation of resolutions issued by the United Nations.* Thus, when taxes are properly paid on resources extracted at market prices for goods not subject to sanction, the sale would be deemed licit. All of the situations in which these conditions are not met would be deemed illicit.

    *Defining Conflict.* Contemporary conflicts are most often intrastate, rather than between states, and involve aspects of both political and criminal violence, and it is these

---

[15] Countries that exemplify this model might include Botswana (diamonds), Canada (timber), and Norway (oil). An oil counter-example is Nigeria. Iraq's handling of its oil sales might be seen as including both the categories of licit and illicit resource extraction.

[16] See *Helping Countries Combat Corruption: The Role of the World Bank*, (1997), Washington D.C.: The World Bank Group, p. 8.

forms of conflict that have been most linked to exploitation of natural resources.[17] There have been numerous efforts to define "armed conflict."[18] This paper uses as its definition "a contested incompatibility that concerns government or territory or both where the use of armed force between two parties results in at least 25 battle-related deaths, and where at least one of the two parties is the government of a state." This definition fits nicely within a study whose focus is "contested incompatibilities" of control over natural resources that have economic value to the person or entity controlling them, and the mechanisms used to translate that value into wealth, store that wealth, and make that wealth available to strengthen the political control that person or entity is seeking to exercise over government, territory, or merely the commodities themselves.

*Defining the Entities Exploiting Illicit Commodities.*  Roughly speaking, there are at least four distinct types of entities that systematically use the funds from illicit commodities to fund their security operations and control in areas of conflict. The four entities are Governments Financed by Illicit Commodities (GFICS), Rebel Groups Funded by Illicit Committees (RGFICs), Organized Criminals Funded by Illicit Commodities (OCFICs) and Terrorists Funded by Illicit Commodities (TFICs). While there are important differences among them, and their relationship to the illicit commodities, the categories are not exclusive. Corrupt officials often form relationships with organized criminals, as do terrorists, in what Professor Michael Ross has termed "cooperative plunder."[19] Similarly, rebel groups often form relationships with both organized crime and terrorist groups. For example, relationships between corrupt officials and organized criminal groups exploiting natural resources have been identified in Brazil, Indonesia, Liberia, Nigeria, Tanzania, and Ukraine. Similar relationships between rebel groups and organized crime have existed in Angola, Congo, Kosovo, and the Philippines. Comparable linkages between organized criminal and terrorist groups are prevalent in Columbia, Sri Lanka, and Turkey. Typically, in cases where GFICs exist, OCFICs and TFICs also spring up, as GFIC activity is closely related to poor governance, popular unrest, and high levels of criminality and violence. Where there are GFICs, OCFICs, and TFICs, there is also likely greater risk of a secessionist movement or outright civil war, generating RGFICs.[20]

*Governments Financed by Illicit Commodities (GFICs).*  Because GFICs govern poorly and provide little in return from their resource exploitation to the people of the country GFICs are often non-democratically elected regimes that rely in part on the funds generated by the commodity sales as a means of retaining power. The non-democratic

---

[17] "Doing well out of war,"id.

[18] A summary of many of the efforts is set forth in "Armed Conflict 1956-1999: A New Dataset," by Nils Petter Geditsch & Havard Strand and Mikael Eriksson, Margareta Sollenbery & Peter Wallensteen, a paper prepared for 'Identifying Wars: Systematic Conflict Research and Its Utility in Conflict Resolution and Prevention,' a conference cosponsored by the International Peace Research Institute, Oslo (PRIO), the Department of Peace and Conflict Research, Uppsala University & World Bank, Development Economics Research Group (DECRG), Uppsala, June 8-9, 2001.

[19] "How Does Natural Resource Wealth Influence Civil War? Evidence from 13 Case Studies", id.

[20] For definitional purposes, a TFIC is a group whose violence is principally directed at civilian targets, and thus can be readily characterized as terrorist in nature, while a RGFIC is a group that is engaged in military activity directed against a government. In practice, the two categories are often difficult to distinguish.

and corrupt regimes in Burma and Cambodia, for example, have been subject to repeated rebellions, civil wars, warlordism, and guerrilla movements, but have survived in substantial part due to their ability to stay in control by sharing the revenues of the sales of timber, opium, and precious stones with those necessary to help them maintain their security.[21] The Abacha regime in Nigeria similarly retained power and put down challenges to that power in part by ensuring that oil revenue went to those factions of the military needed to sustain control.[22]  Control of resource extraction has also played an ongoing role in sustaining the undemocratic regimes of President Nazarbeyev in Kazakhstan, and President Kuchma in Ukraine.[23]  Charles Taylors' Liberia remains perhaps the prime example of such exploitation and its impact on a region, as his exploitation of Sierra Leone's diamonds played a substantial role in sparking and sustaining a brutal civil war.[24]  In other cases, countries may be democratic, but governance is weakened by the presence of GFIC activity, which weakens law enforcement structures, reduces tax collection, and empowers corrupt officials and organized criminals. Brazil and Indonesia exhibit some elements of GFICs in this regard.

*Rebel Groups Financed by Illicit Commodities (RGFICs).* As noted, the principal difference between rebel groups financed by illicit commodities and terrorist groups financed by illicit commodities is the nature of the forces.[25] Rebel groups control territory and target government territory in military operations, while terrorists primarily target civilians. Long-term rebel activity in which illicit commodities sustained rebel military forces have included Angola, where UNITA largely funded their war against the Angolan government through diamond revenues in the period 1992-2001; Sierra Leone, where the RUF similarly exploited diamonds throughout most of the 1990s, and; Afghanistan, where the Taliban and the Northern Alliance each built their military operations on exploitation of opium and precious stones.

*Organized Crime Financed by Illicit Commodities (OCFICs).*  In poorly governed countries, criminal organizations can leverage corrupt payments to well-placed officials in order to secure revenue streams for themselves from the exploitation of natural resources. In such cases, the corrupt officials may receive payment for the exploitation, but the greatest share of the proceeds is retained by the criminal organization, which

---

[21] See Hideyuki Takano, *The Shore Beyond Good and Evil: A Report from Inside Burma's Opium Kingdom*, Tokyo: Kotan Publishing, 2002; and; Grant Curtis, Cambodia Reborn?  The Transition to Democracy and Development, Washington, D.C.: Brookings Institute, 1998.

[22] See e.g., Julius Omozuanvbo Ihonvbere and Timothy Shaw, *Illusions of Power: Nigeria in Transition* Lawrenceville, New Jersey: Africa World Press, 1998.

[23] Governments that might be characterized as GFICs could include Burma (natural gas, precious stones, opium, and timber), Cambodia (precious stones, opium, timber), Congo (Diamonds, gold, coltan, copper, cobalt, timber), Kazakhstan (oil and gas), Nigeria under the Abacha regime (oil), and Ukraine (oil).

[24] Report of the Panel of Experts Appointed Pursuant to UN Security Council Resolution 1306, December 2000.  According to recent press accounts, Taylor has also facilitated terrorist finance through diamond smuggling involving agents of Al Qaeda, taking bribes in returning for providing safe harbor to financial officers of the terrorist organization. See **"Report Says Africans Harbored Al Qaeda Terror Assets Hidden In Gem-Buying Spree," Douglas Farah, Washington Post, December 29, 2002.

[25] Bard E. O'Neill, and Edward C. Meyer. (2001) *Insurgency & Terrorism: Inside Modern Revolutionary Warfare*, Dulles, Va: Brasseys, Inc.

11

manages most elements of the exploitation involved. In such countries, the governments formally oppose the asset stripping. Elements of the government may even be ineffectively trying to take action to discourage the asset stripping. The capacity of the government to prevent the exploitation is weaker than the capacity of the criminals to carry it out. In such cases, the only persons within the country benefited by the resource extraction are the criminals and those who have been corrupted by them. Examples of countries in which OCFICs operate include among many other countries Brazil (timber), Indonesia (timber, oil), Malaysia (timber, oil), and Thailand (timber).[26]

   *Terrorists Funded by Illicit Commodities (TFICs).*  While some aspects of terrorist finance remain uncertain, the reliance of a number of terrorist groups on trafficking in illicit drugs – chiefly, opium and coca – is well documented.[27] Illicit drugs, like illicit sales of timber, oil and gas, precious stones and metals, mostly move through the same transport systems and modalities, as do licit commodities. They also rely on the same forms of tools to hide the identities and the funds flows for those involved in the illicit activity. That is, TFICS, like GFICs and OCFICs, need to use the formal banking system to handle the proceeds of their illicit activity. To do so, they need to launder the revenues derived from their illegal activity, which they accomplish through similar techniques. These include false invoicing, trusts and international business companies, reliance on bank secrecy havens, and reinvestment of illicit funds in legitimate businesses. Unlike GFICs, TFICs also rely on black-market money exchange systems, such as the black-market peso exchange used between the U.S. and Latin America, and the hawala system used between South Asia, the Middle East and the rest of the world, to avoid having to move currency across borders and to retain value in their native currencies at home. For similar reasons, they also convert their funds into gold and gemstones, as both have (generally) been anonymous commodities that are readily convertible into cash.[28] TFICs have generally limited themselves to funding their activities through providing security to farmers growing illegal opium or coca crops, rather than engaging in more demanding forms of resource extraction. This limitation may be related to lack of opportunities to secure illicit control over licit commodities. Historically, TFICS have played an important role in sustained conflict in numerous countries, including Bolivia, Colombia and Peru (coca), Burma (opium), Afghanistan and Pakistan (opium), Kosovo (primarily opium) and Lebanon (opium). Recently, important TFICs have included the Abu Sayyaf Group in the Philippines, Al-Qaeda in Afghanistan and Pakistan, FARC in Colombia, LTTE in Sri Lanka, the KLA in Kosovo and the PKK

---

[26] "The Anatomy of Resource Wars", id.

[27] Each year, the U.S. Department of State published an International Narcotics Control Strategy Report ("INCSR"), which provides an overview of drug trafficking throughout the world. In the course of its country-by-country assessments, it has provided extensive information on the use of narcotics proceeds by terrorist groups in each of the major illicit drug producing areas. During the period of 1994 through 1999, when the principal author oversaw this publication, there was no exception to this phenomenon: wherever there were substantial amounts of illicit narcotics produced, there were terrorists and/or rebel groups taking advantage of drug profits.

[28] For terrorists, gold and gemstones have generally been vehicles to launder money, rather than commodities to be exploited. Since the September 11, 2001 terrorist attacks, a number of public reports have highlighted these mechanisms, discussed in greater detail below.

in Turkey, each of which has funded their operations through exploiting the sales of narcotics.

*Common Elements of Finance by Illicit Commodities.*  Money launderers, terrorist financiers, corrupt officials, and tax evaders have relied upon a relatively standard set of tools to transfer, store, and conceal money generated domestically from governmental mechanisms in their home countries. While there are many other tools in the illicit finance toolbox, the basics include:

To generate illicit proceeds:

- Work in collusion with purchasers of smuggled or illicit goods to prepare invoices that falsify the identification of importer, exporter, quality and/or quantity of goods;
- Unilaterally engage in invoice fraud, with false declarations of importer or exporter, quality or quantity of goods;
- Collude with customs or official corrupt officials to smuggle illicit goods from a country and to then sell them to an independent no-questions-asked third party at a discount from market prices;
- Provide a license for others to obtain illicit goods and sell them in violation of law, through providing safe haven for the illicit activity within a territory, and receiving a kick-back for providing this protection or opportunity;
- Obtain cash in return for the illicit good and place the bulk cash in a financial institution that either (a) does not object to receiving the proceeds of illicit commodities, or which (b) is in collusion with the seller.

To layer illicit proceeds in order to hide their actual ownership:

- Establish shell companies to engage in import and export transactions;
- Create overseas trusts to shield the ownership of assets, and to permit the assets to be managed by a trusted third-party with a duty of secrecy to the owner of the assets;
- Open bank accounts off-shore in the name of other fictitious trading, investment or service companies;
- Hire local agents to act as nominees for shell companies and bank accounts held in the name of shells or fictitious companies;
- Use underground or alternative remittance systems, including black market currency exchanges, to avoid cross-border currency controls;
- Exchange one potentially traceable commodity, such as oil or timber, for another less traceable commodity, such as gold;
- Sell a poorly traceable commodity, such as gold, in a major commodities market, such as Dubai in the United Arab Emirates or the Colon Free Zone in Panama;
- Smuggle bulk cash to another jurisdiction for placement in a financial institution willing to accept the cash.

To reinvest, use or expend illicit proceeds:

- Use funds held at a foreign bank in a false name or company to purchase legitimate businesses with the proceeds, and then using those legitimate businesses to generate new funds;
- Purchase goods outside of the country with the illicit proceeds, and then selling those goods inside of the country to generate new clean revenues;
- Receive payment domestically from a broker in local or hard currency at some discount, in return for the broker making an offsetting payment in another jurisdiction;
- Leave the funds in a foreign trust under the control of a local agent as an insurance policy against the day when the persons controlling the money need to flee their home jurisdiction.

*Common Elements of Conflicts Financed by Illicit Commodities (CFICs).*  A recent study by Michael Renner for the World Watch Institute, "The Anatomy of Resource Wars," describes a number of common elements in CFICs. As described by Renner, essential components of CFICs are (a) the availability of "lootable natural resource wealth"; (b) taxation, licit or illicit, on resource extraction, by various forces with uncertain legitimacy;(c) keeping revenue streams "off the books" and hidden from oversight; (d) enrichment of corrupt elites; (e) and the use of extreme violence against civilians to establish and enforce undisputed control over resources through intimidation.[29] These criteria are strikingly reminiscent of those applicable to traditional, mafia-style organized crime, and reflect the standard approaches to business still used by criminal organizations and terrorist groups wherever they operate to the present. Thus, CFICs themselves feature precisely the elements of the critical legal, social, and economic infrastructure required by criminals and terrorists. It is logical that CFICs generate organized crime and terrorism to accompany the exploitations of natural resources undertaken by governments and rebel groups, as each type of group takes advantage of common mechanisms to secure and harness the revenues extracted from the resources.

The case studies that follow illustrate both the common elements of illicit finance involving commodities and areas of difference arising out of the nature of the commodity, the nature of the conflict, or the type of group involved in the exploitation. In sum, however, they suggest that the commonalities are far more significant than the differences, with the implication that further changes to the overall regulatory and enforcement environment could have a positive effect on many forms of resource exploitation and therefore in potentially reducing resource-oriented conflict.

## III.    CASE STUDIES

## A.    Timber

---

[29] "The Anatomy of Resource Wars," id, pps. 10-14.

1.      <u>Indonesia and Malaysia.</u>

*Sources of Funds and Magnitude of Revenues.*  Forest products can provide a significant contribution to government revenues and export earnings. In an attempt to regain a dominant economic position in Asia, Indonesia has increasingly relied on the forest produce sector, which contributed ten percent of the country's GDP before the 1997-1998 economic crisis. However, the construction of an extensive network of paper production facilities by the Indonesian government in the mid-1990s resulted in an industry that has relied on illegal logging to maintain high factory production rates.[30] The quantity of timber logged illegally in Indonesia is staggering.[31] The Indonesian Government estimates that the trade in illegal logs costs the country $3.5 billion dollars per year.[32] Indonesian pulp producers have a domestic demand for timber processing that is nearly four times the possible legal timber supply.[33] One result is that between 1994 and 1999, an estimated 40 percent of the wood they consumed has been estimated to come from illegal sources.[34]

*Sources of Commercial Demand.*  Some of the largest paper manufacturers in Indonesia, whose operations have been financed by major international lenders, are significant participants in logging that appears on its face to have been illicit. The exponential growth of Indonesia's pulp and paper industry over the last decade was made possible through loans between $12 billion and $15 billion. The loans were provided without "financial institutions ensuring that the pulp and paper companies receiving their investment had secured a legal and sustainable raw material supply."[35] One prominent example is the Indonesian-based Asia Pacific Resources International Holding Ltd, otherwise known as APRIL, one of the world's biggest pulp and paper companies. [36] APRIL's main pulp subsidiary is Riau Andalan Pulp & Paper (RAPP), located in Riau Province on the Indonesian island of Sumatra. RAPP began operating in 1995 and has now developed a pulp mill with a capacity of 2.0 million tones per year, making it the

---

[30] Large commercial firms harvest the majority of the timber products in Indonesia. The largest importers of Indonesian forest products are the United States, Japan, Singapore, and the European Union. In recent years, China has become an increasingly larger importer as demands for good increase. China produces 142 million cubic meters, but consumes more than 280 million cubic meters of wood per annum.

[31] Estimates of total original forest loss in Indonesia vary between 50 percent and 72 percent. A World Bank study estimates that the deforestation rate in Indonesia is higher than it has ever been at 2 million hectares / year, representing an annual loss of forest equivalent in area to the size of Belgium. A study by the UK Government funded Indonesia UK Tropical Forest Management Programme concluded that 73 percent of all logging in Indonesia is coming from undocumented and presumably illegal sources.

[32] Indonesia: Natural Resources & Law Enforcement, International Crisis Group (ICG), December 2001. See http://www.intl-crisis-group.org.

[33] Joshua Brann. (2002) "Trade Policy in Indonesia: Implications for Deforestation," *The Bologna Center Journal of International Affairs*, Spring.

[34] Thomas Walton and Derek Holmes. (2000) "Indonesia's Forests are Vanishing Faster than Ever." International Herald Tribune, 25 January.

[35] Paper Tiger, Hidden Dragons 2: April Fools, (2001), Friends of the Earth, February. See http://www.foe.co.uk/resource/briefings/april_fools.pdf.

[36] Christopher Barr, Political Economy of Fiber & Finance in Indonesia's Pulp and paper industries - CIFOR and WWF's Macroeconomics Program Office, Washington DC, 2001.

world's largest pulp mill, and a consumer of logs well in excess of the amount that could be legally harvested given the moratorium on forest conversion agreed between the Indonesian Government and international creditors, including the IMF, in 2000.[37] Major investors in APRIL and APRIL's subsidiaries reportedly include some of Indonesia's most prominent financial institutions: Sukanto Tanoto (Indonesia), Bank Mandiri (Indonesia), Bank BNI (Indonesia), and Indonesian Bank Restructuring Agency (Indonesia). Additional international financial stakeholders in APRIL are reported to include ING Barings (UK/ Netherlands), Bank Nasional (Indonesia), UBS Bank (Switzerland), Bank Universal (Indonesia), and UPM-Kymmene (Finland).[38]

*Impact of Resource Exploitation and Relationship to Conflict.* The significant economic gains Indonesia and Malaysia could be realizing from timber products have been funnelled in large amounts to corrupt public officials, and organized criminal and military groups.[39] The profits garnered from illegal logging and conflict timber, rather than enhancing development, have undermined the rule of law, threatened civilian control over the military, and provided an arena in which criminal elements thrive.[40] The result is that in both countries, illegal logging and conflict timber fund corrupt government officials (GFICs), organized criminal groups (OGFICs), and a number of civilian, police, and military groups who engage in conflict (CFICs) to gain or maintain control of the lucrative timber market. There is an obvious relationship of illegal resource extraction to the ongoing governance problems in Indonesia, and actual violent conflict has taken place between the National Police and Indonesian military (TNI) in rural areas that lack strong support from the central government. Currently, the armed forces control large areas of land and strip the region of timber, especially in Sumatra and Kalimantan, which they use to extract revenues that currently make up some 70 percent of their total budget.[41] Armed forces and police units have also been involved in the trafficking of narcotics, and provide protection services to oil and gas companies.[42] So long as Indonesia's central government left these relationships alone, the two security forces were able to compete for control over illicit assets with only limited strife visible to outsiders. However, in early 2002, Indonesia placed its police under direct control of its Presidency, accelerating the already growing number of violent incidents between the two security forces. In early October 2002, nearly 100 Indonesian army troops attacked a

[37] See Government of Indonesia and Bank Indonesia Memorandum of Economic and Financial Policies Medium-Term Strategy and Policies for 1999/2000 and 2000, January 20, 2000.
[38] Paper Tiger, Hidden Dragons 2: April Fools, id.
[39] Besides the case studies in this paper, illegal logging and conflict timber is estimated to equal or exceed the legal harvest rates in a number of countries including: Cameroon (exceeded by 50 percent), the Brazilian Amazon (by 90 percent), Bolivia (by 90 percent), Indonesia (by more than 51 percent), Myanmar (by 80percent), and Cambodia (by 94 percent). See Strategies to Combat Illegal Logging and Forest Crime, Forest Trends, July 2002. See http://www.forest-trends.org/keytrends/pdf/USDA%20Briefs/9illegal_logging_forest_crime.pdf.
[40] The scope of the paper does not permit a review of the illicit use of oil by Indonesian officials.
[41] See United States Agency for International Development Bureau for Democracy, Conflict and Humanitarian Assistance Office of Transition Initiatives Field Report: INDONESIA, *September 2002*
[42] See e.g., Dan Murphy (2002) "Suspected in murders, Indonesian Army stalls inquiry," *The Christian Science Monitor*, 26 November.

local police station stole more than a ton of marijuana, freed captive soldiers, and burned the police station.[43]

*Corruption.* Corruption in Indonesia is systemic, ranging from the highest levels of government to the poorly paid members of the judiciary and police.[44] Bribes are routinely paid to government officials who oversee the protection of the Indonesian rainforests. Criminal entrepreneurs in the logging industry are closely linked to Indonesia's political leadership by which criminals obtain protection in return for financial support. The lucrative illegal logging market has permitted Indonesia has become a host state to criminal organizations, including Thai, Malaysian and Filipino gangs.[45]

*Cross-Border Smuggling.* Monitoring illegal logging and conflict timber in Indonesia is hampered by the smuggling of wood products into Malaysia by ship, or across the shared border on the island of Borneo, which obscures the origin of wood and facilitates disguising the ownership of the illicit proceeds. Malaysia is the largest exporter of tropical timber in the world and a major exporter of wood furniture. In 2000 the value of Malaysia's exports of tropical logs, sawn, ply and veneer was in excess of $2.4 billion, while wood furniture exports were valued at over $1 billion.[46] While efforts have been made to limit this activity, Indonesia's long-time emphasis on exporting processed wood over raw timber adds to the trade. Moreover, corrupt politicians routinely assist the trafficking of illegal forest products across the border and criminal gangs in Malaysia, where illegally imported logs from Indonesia are routinely processed into finished export products and labeled as of Malaysian origin.[47] Illegal profits garnered from the trafficking are used to bribe under-paid customs officials and police officers in both countries. The funds from the sale of illicit timber are then routinely used to purchase additional equipment and falsified permits.[48]

*Financial Mechanisms.* Timber smuggling networks in Indonesia and Malaysia are able simultaneously to take advantage of efficiencies in the Indonesian and Malaysian banking sectors, links to offshore accounts, and alternative remittance systems. In each country, both banking and non-banking sectors are vulnerable to money laundering given strict bank secrecy laws, corruption and the failure to implement anti-money laundering legislation. In recent years, several Indonesian banks have been used in significant laundering schemes that could have been prevented by ordinary safeguards.[49] In June 2001, the FATF identified Indonesia as non-cooperative in international efforts to fight

---

[43] *The Straits Times*. (2002) "Aceh Descends Into Chaos." 1 October.

[44] See e.g., *The Straits Times*. (2002) Indonesia wealth audit board to quiz 32 officials," 13 October.

[45] See e.g., *Jakarta Post* (2002) "Organized crime ring pillaging forests," 17 September.

[46] Press Release, "Environmentalists Welcome Commitment by Malaysia to Halt Imports of Illegal Logs from Indonesia," The Environmental Investigation Agency, 26 June 2002.

[47] *BBC World Monitoring Report*. (2002) "Malaysia 'laundering rainforest logs." 22 May.

[48] *The Malaysian National News Agency*. (2001) "Groups Involved in Illegal Logging in Three Forest Reserves." 21 May.

[49] 2001 International Narcotics Control Strategy Report, Bureau for International Narcotics and Law Enforcement Affairs, U.S. Department of State. See http://www.state.gov/g/inl/rls/nrcrpt/2001/

money laundering and threatened it with placement on its blacklist.[50] In assessing Indonesia, the FATF found a lack of basic anti-money laundering provisions, no mandatory system of reporting suspicious transactions to a financial intelligence unit, and unsatisfactory customer identification requirements.[51] While Malaysia is not a major regional financial center, it has offered a wide range of financial services in the formal financial sector as well as through alternative money remittance systems that are potentially attractive to money launderers. The true extent of money laundering in Malaysia is not known, and to date there have been no effective prosecutions of money laundering activities. As a result, essentially anyone engaged in the exploitation of natural resources would have found few if any barriers in practice to the placement of unlimited sums of cash directly into financial institutions in these countries, other than the potential risk that such deposits could get caught up in a corruption prosecution based on other evidence of abuse. Apart from the absence of effective laws to combat money laundering through the formal financial sector, Indonesia and Malaysia have a number of other obvious mechanisms for processing the proceeds of natural resource exploitation. The means by which illicit funds are laundered include:

- Predominantly cash economies, in which many transactions are paid for in dollars or gold, neither of which faces significant monitoring within the countries;

- Private banks that are in practice unregulated and not open to the public, which provide further opportunities for money laundering;

- Underground banking systems, which are widespread throughout both countries. These alternative remittance systems use legitimate banks to balance the accounts of those involved in the transactions. Participants in these systems include a network of businesses, especially import-export companies, money exchangers and finance companies, each of whom also play an important role in handling trade finance for the sale of natural resources, licit and illicit.  Alternative remittance systems allow users to avoid having to physically transfer funds through a system of credit and debit entries among the participating companies. Those who use this system also use larger banks to transfer funds through foreign intermediary banks to settle accounts.  Use of alternative remittances essentially eliminates any mechanism to trace beneficial ownership of the assets involved, as the transactions are essentially transmittals and disbursements of cash;

- Front companies intertwined with legitimate businesses, using the same bank accounts to introduce criminal currency into licit financial institutions by commingling legal proceeds with illicit ones;[52]

---

[50] In June 2002, the FATF welcomed the progress made by Indonesia in addressing deficiencies, but until deficiencies have been fully addressed and the necessary reforms have been sufficiently implemented, the FATF continued to view Indonesia as a non-cooperative jurisdiction. See http://www1.oecd.org/fatf/NCCT_en.htm.

[51] Id.

[52] 2001 International Narcotics Control Strategy Report, Bureau for International Narcotics and Law Enforcement Affairs, U.S. Department of State. See http://www.state.gov/g/inl/rls/nrcrpt/2001/

- Sharia (Islamic) banks, whose oversight remains casual at best, and which routinely establish offshore entities as mechanisms to pool investments;[53]

- The smuggling of bulk cash.  Indonesia's borders with Malaysia are particularly vulnerable given the large number of traffickers;

- Banks with commercial (and possibly ownership) links to logging firms, which provide ready access to Western financial institutions through correspondent banking activities, and thus the ability to move the proceeds of illicit logging to purchase goods and services in foreign countries;

*Domestic Regulatory and Enforcement Measures.*  To date, Indonesia has yet to enact adequate laws to counter money laundering, with the legislation recently passed in response to threats of sanctions by the FATF remaining grossly inadequate.  For example, under existing law, Indonesia's anti-money laundering regulator does not have the authority to impose any form of sanction on any financial institution that fails to abide by its guidelines, leaving it literally unable to force compliance with any element of the obligations to which such institutions are theoretically subject under Indonesia's proposed money laundering law.  Moreover, the new financial intelligence unit established under the law was not provided authority to compel the production of documents to it by either financial dealers or by other Indonesian regulators or law enforcement agencies, allowing its investigative efforts to be ignored by financial institutions with relative impunity.  As of November 2002, requests by the FATF and other organizations to Indonesia to make its anti-money laundering regime more plausible had yet to achieve results.  In contrast, Malaysia passed anti-money laundering legislation in May 2001 that if effectively implemented would constitute substantial reform. Malaysian law now criminalizes money laundering and lifts bank secrecy provisions for criminal investigations involving a long list of approximately 150 predicate expenses, requiring customer identification, record keeping and suspicious transaction reporting by both bank and non-bank financial institutions alike, as well as creating a new financial intelligence unit with full powers of investigation of financial crime.[54]  However, substantial gaps remain even in the legislative framework. The Malaysian law does not prevent money-laundering activities at its offshore banking center in Labuan, which continues to allow for the beneficial owners of International Business Companies (IBCs) to be anonymous. Labuan, which maintains separate laws for the financial institutions it licenses, currently hosts 54 offshore banks (46 foreign-owned), approximately 100 insurance companies, four mutual funds, twelve fund managers, and eighteen active trust companies.[55]  Because there is no requirement to register offshore trusts in Labuan, their number is not known. Nominee trustees are permitted in Labuan, as are nominee directors of Labuan's approximately 2,300 IBCs incorporated or registered in Labuan. There is no requirement to disclose the beneficial

---

[53] Id.
[54] Id.
[55] Id.

owner of a corporation. While there is a government registry of corporate directors and shareholders, this information is not available to the public.

*Regulatory and Enforcement Vulnerabilities.*  The domestic enforcement and regulatory regimes in both Indonesia and Malaysia continue to create a broad range of opportunities to hide the ownership of financial accounts and thereby to facilitate the laundering of the proceeds of every form of illicit activity, including illicit resource extraction. Indonesia's and Malaysia's shortcomings in meeting international standards include:

- The failure of their financial institutions to enforce reasonable measures to obtain information about the true identity of the persons on whose behalf an account is opened or a transaction conducted if there are any doubts as to whether these clients or customers are acting on their own behalf;

- Poor compliance with suspicious transaction reporting requirements. Many financial institutions pay little if any attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose;

- Few programs against money laundering undertaken by domestic financial institutions, which have to date largely failed to establish internal policies, procedures and controls, or adequate screening procedures to ensure high standards when hiring employees;

- Failure to implement measures to detect or monitor the physical cross-border transportation of cash and bearer negotiable instruments;

- Failure to mandate the implementation of a system where banks and other financial institutions and intermediaries would report all domestic and international currency transactions above a fixed amount, to a national central agency with a computerized data base, available to competent authorities for use in money laundering cases, subject to strict safeguards to ensure proper use of the information;

- Permitting the use of shell companies.

*Implications:*  Conflict over exploitation of timber is an ongoing feature of Indonesian political life, and to some extent, of Malaysia's. As one forestry expert concludes, "Almost all large forest areas have conflict relating to their financial potential and management."[56] While many of the conflicts are small, they are growing in number and scale, involving in various cases separatist movements, organized criminal gangs, industrial groups and elements of security forces.[57] Both the conflicts and the exploitation

---

[56] Interview with Robert Clausen, Forest Ecology and Management Specialist, 11 November 2002.
[57] Id.

are facilitated by corruption, and the corruption is itself facilitated by the absence of regulatory oversight of the countries' formal financial sectors. Thus, the combination of abundant and poorly guarded national resources and a financial regulatory system that permits impunity for those laundering the proceeds of illicit activity, has created an environment which exacerbates both corruption and resource exploitation, each of which in turn exacerbate the risks and intensity of conflict.

2.      Brazil.

*Sources of Funds and Magnitude of Revenues.*  As in Indonesia and Malaysia, corruption and organized crime have made Brazil vulnerable to illegal logging, and the ongoing revenues provided by such logging further contribute to corruption and organized crime. This vicious circle has the potential to undermine support for Brazil's government, even as it clearly has an impact on Brazil's environment. Environmentalists estimate some 80% of all timber extracted from the Amazon, the world's largest rain forest, comes from illegal sources. Sources of timber include (a) privatization, which some Brazilian officials take advantage of to exploit their access to public goods (timber) for private gain; (b) theft or exploitation of timber by criminal groups bribing officials; (c) local harvesting of illicit products, such as protected mahogany, which are then smuggled to ports for purchase by foreigners.  The sums generated, while difficult to estimate, are clearly large. In the State of Para for example, the mahogany market is estimated by local police to bring in more money than drug trafficking.[58]

*Sources of Commercial Demand.*   Sometimes referred to as "the green gold of the Amazon," mahogany fetches over $1,600 per cubic meter and is one of the most sought-after species of wood. Mahogany is listed under the Convention on International Trade of Endangered Species of Wild Fauna and Flora (CITES), which requires exporting countries to show documentation that the export is authorized. Five countries, the U.S., the Dominican Republic, the UK, the Netherlands and Germany, reportedly import all the Brazilian mahogany exported from the State of Para, the largest mahogany producing area in Brazil.[59] In October 2001, Greenpeace issued a detailed review of U.S. commercial importers of timber from Brazil, albeit focused solely on mahogany, and treating all mahogany extraction as implicitly illicit. The Greenpeace report identified some three dozen importers, ports and warehouses, wholesalers, dryers, storage yards, and buyers of mahogany, which taken together provided commercial demand not only for North America but also for Latin America.[60] According to the Washington-based environmentalist organization Friends of the Earth, 300,000 cubic meters of illegally logged wood entered Spain in 1999, with an import value of $50 million -- and that total was just five percent of the tropical wood trafficked into the European Union that year. Five companies from Santarem, in the northeastern Brazilian state of Para, have been accused of purchasing timber from ghost companies, continuing their logging activity

---

[58] *Estado de Sao Paulo* (2002) "The Mahogany Mafia,", 7 October.

[59] Export data, Brazilian Government Institute for Environment and Natural Resources (IBAMA), 2001. See www.ibama.gov.br/.

[60] Greenpeace Report, (2002) "Partners in Mahogany Crime," Annex, "U.S. Companies Purchasing Big Leaf (South American) Mahogany," October 24.

despite the cancellation of forest management plans by authorities, and logging on public land. Each of the five firms in question -- Cemex, Curuatinga, Estancia Alecrim, Madesa and Rancho da Cabocla --export timber to Spain. The wood sold by those five companies -- which accounted for 72 percent of Santarem's timber exports last year -- was purchased by importers, industries and shops throughout Spain.[61]

*Impact of Resource Exploitation and Relationship to Conflict.* Since loggers are aggressively expanding the lucrative timber market, timber extraction opens the door for widespread exploitation of the Brazilian Amazon. In addition to the immediate environmental damage caused by clear-cutting timber, structures built over streams and rivers to transport timber impede the migration of fish for reproduction and affect the riverside dwellers' food chain. The impact on social and political groups at the local level is also substantial, as criminals form alliances with corrupt officials not only to facilitate timber extraction but also to intimidate anyone who might be opposed to timber exploitation. Such alliances are shifting, and as competitive opportunities take place, conflict over timber exploitation is common. The industry has also become heavily criminalized, as criminal groups have lower operating costs than legitimate organizations, and therefore a competitive advantage. For example, Brazil's mahogany business is made up of a chain of informal actors and middlemen dominated by a small group of sawmills and exporters controlled by two Para state organized crime kingpins, Osmar Alves Ferreira and Moises Varvalho Periera. Mafia groups were buying illegally chopped mahogany from the Kayapo Indians in the eastern part of the rainforest for 25 dollars per square metre and selling it to foreign timber importers for 1,100 dollars per square metre.[62]

*Corruption.* Corruption has been a social, economic, and political problem in Brazil for a long time, and that corruption has extended to the country's handling of timber, including the systematic falsification of reporting to Brazilian timbering licensing authorities and the facilitation of smuggling activities. In December 2000, a Brazilian Congressional Investigative Committee (CPI) probing narcotics trafficking released a 1,200-page report that alleged the existence of a vast network of drug-related organized crime and corruption, including money laundering. The report implicated over 800 people, including two federal congressmen, former state governors and other officials, and estimated that criminals launder approximately $50 billion in Brazil annually. Among those found to have engaged in corruption and criminal finance were former ministers, policemen, military personnel, businessmen, and the presidents of seven prestigious banks, including the Banco Central, and thirty-one directors of telecommunication companies.[63] The corruption problem extends to foreign firms operating in Brazil, which routinely bribe Brazilian officials to avoid excise taxes. For instance, in mid-2000, the Brazilian subsidiary of Japanese logging company Eidai Co., one of the largest logging enterprises in the state of Para, which lies in the heart of the

---

[61] Tito Drago (2001) "Spain Imports Illegally Logged Wood From the Amazon," *Interpress Service*, 18 October.

[62] "The Mahogany Mafia," id.

[63] Cambio (Bogota) (2000) "Investigation Reveals Colombia Drug Trafficking, Guerrilla Ties in Brazil. 18 December.

Amazon region and is Brazil's main logging center, was fined US $1.88 million for unauthorized trade of timber harvested from the Amazon rain forest.[64] As the listing of the seven bank presidents by the CPI would suggest, corruption also plays an important role in making the banking system vulnerable to laundering by allowing launderers to circumvent due diligence. Although banks and other financial institutions have "negative lists" with the names of smugglers, and traffickers who are not permitted to open accounts, some of them also have "positive lists" containing the names of individuals who are considered to be above suspicion and not to be screened.[65] This level of corruption both feeds the problem of illicit resource exploitation and is in turn sustained by it.

   *Financial Mechanisms.* Brazil has a highly developed financial sector, which routinely launders money for smugglers and other illicit extractors of resources, as well as for drug traffickers and corrupt officials. Each category of financial crime has its own often highly organized methods, markets, routes and tricks of the trade, which include concealment, misdeclaration, permit fraud and laundering through the complexities of re-exports. Illegal logging is attractive to organized crime groups, especially those with smuggling capabilities, due to the combination of low risks, weak penalties, and high profits. While there is relatively little information available on the specific financial mechanisms used by those involved in illicit logging, there is extensive information on how financial crime takes place in general in Brazil. There are many links between drug traffickers, money launderers, corrupt officials, and those involved in resource extraction. Several of the following financial mechanisms have been documented as used by those involved in illicit timber, and the others are likely to have been similarly used, as they are commonly made use of by other financial criminals. They include:

- Establishment of pirate timber companies by drug traffickers to launder drug money. These companies in turn purchase timber with the proceeds of the drug money. Much of this timber is stolen, smuggled, or undertaken in violation of permits, and virtually all of it is illicit, as the drug traffickers routinely avoid paying taxes;[66]

- The transportation and deposit of large amounts of cash or merchandise generated by the sale of timber at the local level.  Particularly important in this connection has been the Ponte de Amizade Bridge, on the border between Ciudad del Este (Paraguay) and Foz de Iguacu.  Traffic (both pedestrian and motorized) is completely unregulated;

- Laundering through foreign exchange houses. Foreign exchange transactions are an important element of timber exploitation, as they become mechanism by which foreign currencies, such as dollars or Euros, paid to Brazilians by foreign firms, are repatriated to Brazil. Official transactions run the risk of both of becoming

---

[64] *Kyodo* (2000) "Japanese logging firm fined for illegal timber trade in Amazon," 12 July.
[65] Id.
[66] *Environment News Service.* (2002) "Organized Criminal Gangs Deal Wildlife and Drugs," 18 June.

subject to taxation and of creating a paper trail leading to exposure of the underlying illicit operation or corrupt activity. In 2000, over 100 black market dollar dealers from Foz de Iguacu (Parana) and Ponta Pora (Mato Grosso do Sul), who also owned or managed the foreign exchange houses in Ciudad del Este were arrested on money laundering charges;

- Hiding ownership of goods or financial assets through nominees or "laranjas," individuals who allow their names to be used for a fee and then act as nominees or front-persons for the actual owners;

- Over-and under-invoicing money laundering schemes. In under invoicing schemes, excess timber is exported beyond the amount reflected in shipping documents. The proceeds from the undocumented timber are then split between the participants in the smuggling. In over invoicing, importers pay exporters too much for the goods actually shipped, to pay for timber or other commodities that are being smuggled separately and not declared at all;

- Bulk transfers of cash and merchandise.  Particularly important in this connection was the Ponte de Amizade Bridge, on the border between Ciudad del Este (Paraguay) and Foz de Iguacu.  Traffic (both pedestrian and motorized) is completely unregulated. Over 100 black market dollar dealers from Foz de Iguacu (Parana) and Ponta Pora (Mato Grosso do Sul), who also owned or managed the foreign exchange houses in Ciudad del Este were deeply implicated in money laundering and were arrested;[67]

- Use of gambling operations such as bingo, lotteries and slot machines as a cover for laundering the proceeds of illicit activity in Brazil, including logging. In Brazil, the importance of this mechanism is underscored by allegations that Italian Mafia organizations have paid bribes to obtain licenses for gaming establishments;[68]

- Remittance of money through CC-5 accounts[69] with the remittances subsequently transferred to offshore centers. Such funds have been found to have been sent not

---

[67] Andrea Frota Machado de Morais, *Money Laundering in Brazil* School of Business and Public Management,  The Institute of Brazilian and Management Issues, XII Minerva Program Fall 2000, George Washington University. P.34.

[68] See Congressional Investigation Committee (CPI) Report, Brasilia, June 3, 1999.

[69] Although Brazil does not have an offshore sector, it does permit a special account for non-citizens called a CC-5 account from the abbreviation of *Carta-Circular No.5*, dated February 27, 1969. The regulations were altered by Circular No. 2677, April 10, 1996 to allow for greater capital mobility. In effect, these regulations resulted in creating a minimally regulated mechanism for exchanging unlimited amounts of differing national currencies for foreign exchange. The intent of the regulation was to provide a mechanism for the investment of dollars and other currencies into Brazil. However, in practice, the foreign exchange mechanism became a means for repatriation to Brazil in Brazilian Reals funds that had been generated outside Brazil in dollars. Not surprisingly, many narcotics and money laundering cases were then found to involve CC-5 accounts, and the same mechanism would be useful for exploitation of illicit timber. Currently, the regulations are being revised to make abuse more difficult. See Survey of Brazilian anti-

only to fiscal havens in the Caribbean, but to large banks in New York, Washington, Los Angeles, and Miami, in the United States; Beijing and Hong Kong in China; Tokyo in Japan, as well as banks in Switzerland and Taiwan.[70]

According to the Brazilian press, criminal proceeds flow through much of Brazil, with particular concentration in Fortaleza (Ceara), Belem (Para), Sao Paulo (Sao Paulo), Brasilia (Federal District), Rio de Janeiro (Rio de Janeiro), Manaus (Amazonas), Recife (Pernambuco), Natal (Rio Grande do Norte), Porto Alegre (Rio Grande do Sul), Florianopolis (Santa Catarina), Curitiba (Parana), Salvador (Bahia) and Teresinha (Piaui).   The final destination of most of these illegal resources is Foz de Iguacu, Parana State, which Brazilian authorities considered the largest laundering center in Brazil, given its location adjacent to the tri-border area with Paraguay and Argentina, making it a favored location for cross-border smuggling.[71] Campinhas, in Sao Paulo state, is also an important laundering center. The CPI report identified Campinhas as a major center for organized crime, responsible for laundering about a fifth of the drug proceeds in Brazil (about 6 billion dollars a year), largely through banks and currency exchange houses, in Campinhas, Rio de Janeiro, and Sao Paulo, which either failed to report the source of the funds or attributed ownership of the money to fictitious persons.[72] While much of the funds laundered involved drug money, the links between drug traffickers and illicit logging operations, cited above, suggest similar locations for the laundering of the proceeds of illicit timber.

*Regulatory and Enforcement Measures.*  Brazil has attempted to enforce laws making unlicensed logging illegal through a variety of regulations and enforcement actions involving the physical trade in logging, but has yet to address in a systematic fashion illicit finance and money laundering involving timber.[73]  For example, in late October 2001, after receiving evidence of illegal logging on Indian lands from Greenpeace, the Brazilian government temporarily froze all Amazonian mahogany-related logging activities and seized over $7 million worth of illegally cut trees. Brazil also enacted an environmental crimes law in September 2001, which sharply increased fines for violations. Brazil's President Fernando Cardoso launched a 1.5-billion-dollar system, called Sivam, to monitor drug and weapons trade and illegal logging within a 5.5 million square kilometer region. The system consists of a network of 30 airplanes and radar systems whose sensors are connected to 87 video receivers, coordinating stations and monitors. It is expected to be functioning within several months.[74] As of late 2002, Brazilian authorities have already confiscated 13,000 cubic meters of illegal mahogany. All of these initiatives are directed at measures of physical control, oversight, and

---

money laundering laws, Group of Financial Action of the South America against the Laundering of Assets (GAFISUD) at http://www.gafisud.org/.
[70] Edson Luiz and Hugo Marques. (2000) "Brazil: Federal Police Uncovers Largest Ever Money Laundering Scheme, *O Estado de Sao* Paulo, 16 November.
[71] Edson Luiz and Hugo Marques, Id.
[72] *EFE News Service*. (1999) "Brazil-Drugs Congress: Campinhas Is Nexus Of Money Laundering In Brazil", 13 November.
[73] *Birmingham Post*. (2001) "Ban at Last on Illegal Mahogany Logging." December 7.
[74] *Deutsche Presse*-Agentur. (2002) "Brazil launches controversial rainforest protection system." 26 July.

enforcement of timber as a tangible commodity. By contrast, Brazil does not appear to have targeted the financial operations of those involved in illicit timber. This result is not surprising, as Brazil did not put an anti-money laundering framework in place until 1998. The first indictments in Brazil for money laundering took place in 2000, and as of late 2001, no conviction of any person in Brazil for money laundering in any form had taken place.[75] Moreover, money laundering is defined by Brazil to include laundering the proceeds of drug trafficking, terrorism, smuggling of weapons and munitions, kidnapping, corruption, bank fraud, and organized crime, but does not specifically address any form of resource crime.[76] As a result, know-your-customer, suspicious activity reporting, and other elements of money laundering regulations would seem on their face to cover resource crimes, except to the extent they were brought in under the corruption or organized crime provisions.

*Regulatory and Enforcement Vulnerabilities.* Brazil's financial crime regime meets most international standards in theory, but has been weak in practice. Brazil has a current financial sector reform program supported by a $14 million technical assistance loan from the World Bank designed to assist the Central Bank and Brazil's Securities Commission in strengthening banking supervision and regulation, and such strengthened oversight will be a critical element of reducing Brazil's profound vulnerability to every form of financial crime. There remains a substantial gap between the size of Brazil's financial service sector and the limited resources currently allocated to enforcing regulatory regimes. The result is that enforcement largely depends on self-policing by Brazil's financial institutions, which to date have an uncertain track record of integrity. Other important vulnerabilities include:

- Large and porous borders. Substantial parts of Brazilian territory are remote from government authority. Extensive foreign trade provides many opportunities for the successful implementation of illegal logging schemes through false invoicing and long-established smuggling routes.

- Corruption. Logging licenses are routinely purchased from corrupt officials, or through the falsification of land titles or licenses. Although the license limits harvesting to a specific area, illegal logs are claimed to be a part of the legal harvesting zone. License holders cut outside the license area, and declare the logs as legally harvested. The logs are trafficked along routes also used by narcotics traffickers. Other illegal practices by companies working in countries that export timber are logging without permission or outside the authorized areas, and cutting a greater number of trees, or larger or smaller trees, than is permitted. Illegal timber is also frequently exported to consumer countries with fraudulent labels concealing its true origin.
- Large domestic and foreign criminal networks. In general, those that are involved in illegal logging appear to operate on a transactional rather than

---

[75] Brazil. Ministério da Fazenda; Conselho de Controle de Atividades Financeiras.  Annual report.  Brazilia, 2000.
[76] Law No. 9613, March 3, 1998, Brazilian Money Laundering Law, Section 1 (I-VII).

relational basis, and thus are more akin to networks of persons and entities engaged in an illicit trade, rather than tightly-structured criminal organizations. The CPI investigation estimated there were more than 200,000 people working for criminal organizations or gangs in Brazil.

- <u>Historically poor know-your-customer practices</u>. Financial institutions in Brazil have not taken reasonable measures to obtain information about the true identity of the persons on whose behalf an account is opened or a transaction conducted if there are any doubts as to whether these clients or customers are acting on their own behalf, for example, in the case of domiciliary companies (i.e. institutions, corporations, foundations, trusts, etc. that do not conduct any commercial or manufacturing business or any other form of commercial operation in the country where their registered office is located).

- <u>Lax suspicious reporting practices.</u>  Financial institutions do not pay special attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose.

- <u>No Guidance or Initiatives Against Laundering Of Funds From Illicit Logging</u>. Despite the putative importance given stopping illicit logging by Brazil, Brazilian regulators and law enforcement have not used Brazil's anti-money laundering law to target those involved in illicit logging. As noted, although the law does not explicitly cover such activity, its provisions criminalizing the laundering of the proceeds of organized crime and corruption could be used to target resource theft. Such targeting has yet to take place by either regulators or law enforcement.

*Implications*. While illicit logging in Brazil has not resulted in violent conflict under the definition used in this paper, it has resulted in a strengthening of criminal groups and corrupt officials, both of which play a substantial role in undermining security in the country and the political strength of its elected leaders. Given Brazil's comparatively large licit economy, the illicit activity has not proven to be a catalyst for civil war, guerrilla war, or any other form of sustained civil violence. However, Brazil's lax anti-money laundering enforcement has contributed to the ability of government officials, criminals, and private sector entities to work together to exploit illicit timber sales, with grave environmental consequences. Moreover, the existing lack of effective financial regulation has created irresistible opportunities for rental behavior by officials responsible for protecting Brazil's environment, undermining Brazil's ability to fulfill its domestic and international commitments regarding its natural resources

**B.    Minerals.**

1.    <u>Tanzania and Tanzanite.</u>

*Sources of Funds and Magnitude of Revenues*.  Tanzanite is a form of the mineral zoisite discovered in 1966 on a six square kilometre piece of land at Merelani in Arusha in Tanzania that when heat treated becomes an intensive purple, blue and grey gemstone. Tanzanite was then introduced to the world gem market by the New York jeweler Tiffany. The annual global market for tanzanite exported from Tanzania each year is estimated in a range of $150 million to $500 million.[77] The government of Tanzania nationalized all mineral production in the country in 1971. In 1983, it began reopening mining to both small-scale and international mining. When the core tanzanite area was to be reopened to non-governmental extraction in 1986, local miners did not await regulations, but occupied the land and began mining. As a result, the industry became highly informal and fragmented. Most tanzanite is smuggled out of the country, rather than sold through formal channels. Accordingly, the government of Tanzania has received very little revenues from these exports, with illicit sales estimated to involve 90% or more of all exports. According to the Ministry of Mineral Resources, Tanzania exported 1,200 kilogrammes of tanzanite in 1998 with a value of  $6 million. At the same time, the U.S. Department of Commerce reportedly assessed the value of tanzanite gems declared and imported to the U.S. from Tanzania as $328 million that year.[78] In 2000, the Tanzanian government reported $16.2 million in tanzanite exports in 2000 but acknowledged that this was only 10 percent of the actual value of stones leaving Tanzania.[79] While these amounts may be small in the context of western economies, Tanzania is among the world's poorest countries, and some 60 percent of its people live on less than $2 a day. Tanzanian mining officials have estimated that as many as 300,000 Tanzanian miners depend on tanzanite as their sole source of income.[80]

*Sources of Commercial Demand and Major Transit Mechanisms.*  With nearly $400 million dollars in tanzanite sales in 2000, the USA is by far the largest customer of the gems' dealers, accounting for an estimated 80 per cent of worldwide imports of the violet-blue stone, and Europe most of the rest.[81] There are several layers of transactions involving tanzanite before the gems arrive in western markets. The typical route for tanzanite begins with Masai herders who covertly carry gemstones across the border to Kenya, from where they are exported disguised as a less valuable form of the mineral zoisite. To avoid paying export duty and income tax, traders undervalue tanzanite shipments.  The gemstone is illegally extracted and smuggled across the country's borders as thousands of kilogrammes of tanzanite are purchased on the black market by businessmen and foreign dealers who remove the deposits, taking away millions of dollars at the expense of government earnings. As a result, most of quality gemstones

---

[77] The Tanzanian government estimates that approximately $160 million of tanzanite is exported a year, but other reported estimates state that imports to the U.S. of tanzanite amount to at least $400 million a year. An estimate of the U.S. market at 80% of the total would produce an estimate of $500 million for the value of the exported tanzanite.

[78] *Tomric News Agency*. (2001) "Tanzania Knows Only 10% of Its Exported Tanzanite," 23 March.

[79] *The Guardian*. (2001) "Al-Qaeda connection stuns tanzanite trade," 1 May.

[80] *The Guardian* (2001) "Tanzania: Miners' organization denies reports of Bin-Ladin connections." 19 December.

[81] *The East African* (2002) "US jewellers boycott tanzanite gemstones over possible links with Bin-Ladin." 21 January.

produced in Tanzania are not available in the country but are found in the neighboring country Kenya, not in the formerly self-created marketing towns in Tanzania. Unlicensed buyers, mostly foreigners, usually buy the unpolished gemstones at low prices, smuggle them out across the border to Kenya for polishing and cutting before exporting them to European and American markets, where they can fetch more than five times the prices paid at the pits. While many AAA-quality gemstones go to the United States, most of the lesser stones are shipped through India, where some 20,000 people are employed at tanzanite-cutting centers in Jaipur.[82]

*Impact of Resource Exploitation and Relationship to Conflict.*  Conflict over gems in Tanzania has been a constant feature of Tanzanian life for a century or more. Today, most conflict pertaining to tanzanite simultaneously involves Tanzanians and foreign interests with an economic interest in the mineral. One ongoing source of violent conflict, involving a number of local killings, has involved local Tanzanian miners against a state-authorized, licensed mining company, Afgem, which is 75% owned by a South African company. In one incident, jobless youths, commonly known as "takeaways," invaded the premises of Afgem in alleged pursuit of the gemstones stolen from them by armed guards from the company.[83] Separately, a foreign gemstone lobby based in India is reported to fuel unrest at the Mererani Tanzanite-mining area in northern Tanzania, in this case, pitting a Kenyan investment firm against small miners. According to one report, the Kenyan firm funded politicians, small miners and local reporters to fuel the unrest at the Tanzanite pits.[84]

*Exploitation by Criminals.*  The area of Tanzania where tanzanite is mined is both violent and lawless, with increasingly devastating social problems. Murders related to tanzanite are common, according to World Vision, the only international aid agency located in Mererani.[85] The trafficking in tanzanite has also fed the presence of a significant organized crime population, especially in the national capital of Dar es Salaam.[86]

*Exploitation by Terrorists.*  U.S. and UK investigations into the business of Al Qaeda found that the terrorist network used tanzanite, diamonds and gold, to move funds around the world.[87]  According to miners and local residents in Tanzania, Muslim extremists loyal to bin Laden bought stones from miners and middlemen, smuggling them out of Tanzania to free-trade havens such as Dubai and Hong Kong. Al Qaeda

---

[82] Stefan Lovgren. (2001) "All That Glitters," *U.S. News & World Report*, August 13.

[83] AFGEM is the first organised large-scale mining operation in the area, which has over 400 licensed small-scale miners. Government sources say the small miners have since 1996 been presenting questionable returns of their sales to the main dealers. The mining area is divided into four blocks, three of which are owned by the small miners. The largest of the blocks measures more than two square kilometres and belongs to a Kenyan company. Recently, small miners accused AFGEM of encroaching on a section of their mine, using guard dogs to scare them away and trying to drive them out of business.

[84] *The East African*. (2001) "Tanzania: Indian firm blamed for problems at tanzanite mining company in north," June 11.

[85] Stefan Lovgren, id.

[86] Nicodemus Odhiambo. (1999) "Crime Escalating in Tanzania," *PANA*, December 29.

[87] Sherilee Bridge. (2001) "Al-Qaeda connection stuns tanzanite trade," *The Guardian*, May 1.

established its base for exploiting tanzanite in Kenya through at least two companies, Asma, Ltd, and Tanzanite King.[88] Al Qaeda's efforts to enter the tanzanite business in the 1990s were detailed at length during the recent federal trial that convicted four bin Laden men in connection with the U.S. embassy bombings in Tanzania and Kenya. Wadih El-Hage, a Lebanese-born American and bin Laden associate, told a U.S. federal court investigating the 1998 bombings of the U.S. Embassies in Kenya and Tanzania how he smuggled gems through the Middle East and Hong Kong using front companies to raise funds for bin Laden's al Qaeda organization. His testimony included an account of his ultimately unsuccessful efforts to establish himself as a tanzanite dealer. For a period of three months, U.S. importers suspended the purchase of tanzanite on the grounds that the terrorist group Al Qaeda had penetrated the trade.[89] In the meantime, jewelry industry groups obtained a statement from the U.S. Department of State that there was no evidence that Al Qaeda was currently involved in buying and selling tanzanite. When the reports of the use of tanzanite to fund terrorism were not confirmed, the suspension was lifted, although U.S. officials warned that the structure of the tanzanite market made it difficult to prevent tanzanite from being used to fund terrorism in the future.[90]

*Corruption.* Corruption in Tanzania, one of the poorest countries in the world, is endemic and by some accounts, increasing. During the 1990's, as a consequence of weak control and poor delivery of services on the part of the central government, organized crime and corruption in Tanzania expanded enormously. The lack of transparency permits Tanzanian politicians to under-value assets, and manipulates the profits from local industries.[91]  Corruption is a particular problem in key state institutions, such as the customs, police and the revenue service.  As a result, the borders have become highly permeable.  In the event that criminals wanted to smuggle bulk cash across Kenya's border as part of a money-laundering scheme, there is little to stop them.[92] Tanzanian officials themselves are also directly involved in smuggling gemstones, including conflict diamonds. One recent report, for example, describes transactions in which officials from Tanzania buy diamonds coming from both insurgent groups and from corrupt officials for export from Dar es Salaam, in deals brokered by Zimbabwean officials.[93]

*Financial Mechanisms.*  Tanzania has no effective financial infrastructure, retaining a system that is largely pre-modern and which relies on other jurisdictions, such as Kenya, for handling sophisticated transactions. The financial mechanisms involving illicit trade in tanzanite reflect the poor documentation practices in financial transactions in Tanzania in general and the diffuse mechanisms by which money moves. For informal

---

[88] Report on Al Qaeda and bin Laden issued by Prime Minister Tony Blair, October 2001.

[89] Radio Tanzania. (2002) "Measures said in place to protect tanzanite trade from Al-Qa'idah," February 20.

[90] Stefan Lovgren, id.

[91] Jane Perlez, (1990) "Tanzania Torn as It Tries to Make Ends Meet," *The New York Times*, March 4.

[92] Tanzania has valuable potential resources including exclusive minerals, notably the Tanzanite. Besides Tanzanite, there are other abundant minerals and natural gas, which have been identified almost all over the country. Others are diamond, gold, rubies, nickel, marble, phosphates, lead, petroleum, iron ore, soda ash, Lime, coal and kaolin. See e.g., http://www.tanzania.go.tz/mining.html.

[93] *The EastAfrican.* (2002) "Growing" donors concern over Tanzania's links with Zimbabwe," April 29.

transactions involving tanzanite, these include barter, the use of alternative remittance systems such as hawalas, and the use of gold. Licensed buyers rely on such standard techniques of tax avoidance as declaring smaller amounts of tanzanite than are actually being sold. On several occasions, Members of Parliament have cast doubt on the figures issued by the mining firms and accused the government of mot exercising proper vigilance over mineral production.[94] One apparently significant mechanism for laundering the proceeds of gem smuggling is the relationship between Tanzania and Kenya, as illicit funds are readily transferred between Tanzania and the rest of the world by Kenyan financial institutions.[95] Kenya boasts a highly developed financial system, and is fully integrated into the global system, and has very limited measures to combat money laundering. In some cases, Kenya has been merely another pass-through jurisdiction; in others it has likely been the destination country. Kenya's financial institutions have yet to demonstrate that they are serious about meeting their legal responsibility to report suspicious activities. Kenya's regulators have yet to demonstrate they will sanction financial institutions that fail to do so. Kenya also has a highly vibrant economy with large trade flows. Within Kenya, the import-export sector provides considerable opportunities for money laundering. Over-invoicing and under-invoicing provide ostensibly legitimate cover for financial flows. A network of retailers, importers and local suppliers, clearing agents working for the customs department, lawyers, money launderers, accounting firms, employees and ex-employees of the Kenyan Revenue Service have reportedly developed schemes to avoid taxation and duties on electronic goods and fake clothing merchandise. Unfortunately, while it would be logical to assume these mechanisms are being used to handle the proceeds of illicit sales of tanzanite, there is little available documentation to date on such activities.

   *Domestic Regulatory and Enforcement Measures.* Tanzania has no legal framework in place, while law enforcement lacks the expertise or capacity to track dirty money. A system for identifying dirty money through suspicious transaction reporting has not been created, and, even when suspicions are aroused, bank secrecy provisions actually make it extremely difficult to either confirm or investigate money laundering. The Proceeds of Crime Act of 1991 criminalizes drug-related money laundering only, not laundering involving other crimes, let alone gemstones. When an institution believes that a transaction relates to money laundering, it may *voluntarily* choose to communicate this information to the police for investigation, but such reporting is not mandatory, and hence there are no penalties for ignoring suspicious transactions. There have been no prosecutions of money laundering cases per se and authorities lack the ability to seize assets in money laundering cases.

   *Regulatory and Enforcement Vulnerabilities.* Tanzania's capacity to prevent money laundering is minimal. These deficiencies take on greater importance because of the forces that are likely to exploit them. Tanzania remains immensely susceptible to laundering through banks, shell companies, underground banking, non-bank financial institutions, and real estate. This vulnerability is due to inadequate financial regulation,

---

[94] *The East African*. (2001) "Dar's Own Goldenberg?" July 30.
[95] *Africa News* (2002) "The Poor State of Finance in East Africa," 11 November.

no reporting requirements or culture of due diligence, and an under-resourced, corrupt and inefficient criminal justice system that allows criminals and corrupt officials to launder money with impunity.  Moreover, Tanzania has no effective legal means to identify, record or disclose the actual ownership of corporate and business entities.[96] Tanzania fails to meet most international standards for combating money laundering. Its deficiencies include:

- Permitting financial institutions permit anonymous accounts or accounts in obviously fictitious names;
- Failing to insure that financial institutions take reasonable measures to obtain information about the true identity of the persons on whose behalf an account is opened or a transaction conducted;
- Allowing shell corporations, foundations, trusts, and other companies to do business in Tanzania, regarding of whether they serve any purpose other than to launder funds;
- No system for reporting suspicious financial activities;
- No anti-money laundering programs mandated for financial institutions;
- No effective enforcement of anti-corruption laws;
- Poor enforcement of customs and tax laws.

In short, Tanzania has had no significant barriers to criminal activity in cross-border transactions generally, or in the financial services sector within the country. The lack of capacity of its government to conceive of or carry out regulatory and enforcement activity in turn has facilitated the massive leakage in the tanzanite trade, and the ability of criminals and terrorists to exploit tanzanite.

*International Regulatory and Enforcement Measures.*  After the governments of the U.S. and UK issued statements linking illicit tanzanite sales to terrorist finance for Al Qaeda, the international market for tanzanite collapsed. Sales to the U.S. halted, as major gem industry groups in the U.S. issued a joint statement promising to take whatever steps were necessary to insure that tanzanite not be used to support terrorism. The groups then developed as a stopgap a purchasing guidance certificate, which acknowledged that the origin of tanzanite could not be traced by buyers as legitimate or illegitimate. As an interim measure, the industry groups asked the sellers of tanzanite to commit to only purchasing tanzanite legally and to putting into place "reasonable measures to help prevent the sale and purchase of tanzanite with known links to illegal activity."[97]  The industry groups then rapidly developed a system for tightened controls on tanzanite, called the "Tucson Protocols," which call for mining, marketing, processing, manufacture and sales of tanzanite jewelry to be conducted by registered firms, each of which is required to warrant that its sources are legitimate. The industry groups established a U.S.

---

[96]  2001 International Narcotics Control Strategy Report, Bureau for International Narcotics and Law Enforcement Affairs, U.S. Department of State. See http://www.state.gov/g/inl/rls/nrcrpt/2001/
[97] Joint Statement by Jewelers of America, American Gem Trade Association, Jewelers Vigilance Committee, American Gem Society and Manufacturing Jewelers and Suppliers of America, following report linking tanzanite and Al Qaeda, November 20, 2001.

task force, which met with Tanzanians involved in the tanzanite business in April 2002, establishing a system of dealer's warranties that would travel with the tanzanite from origin until final sale. The Government of Tanzania and other important Tanzanian stakeholders then endorsed the Tucson Protocols. These included the Tanzanian Mineral Dealers Association, the Tanzanian Chamber of Mines, and the Federation of Mining Associations of Tanzania. Notably, the Tucson Protocols included in addition to a warranty process a set of ongoing research requirements. These requirements highlighted the undocumented nature of the existing tanzanite trade and included requiring a detailed ongoing analysis of the market chain for tanzanite to determine what steps could be taken to prevent abuses in bringing the product to market. Follow-up to the Tucson Protocols includes establishment of a series of committees to coordinate the warranty regime in Africa, South Asia, Asia, Europe, the Middle East and the Americas and a technical committee to design the documentation format and process.[98]

*Implications.*  The lack of controls on tanzanite by Tanzania simultaneously created a number of separate problems for the country, exacerbating corruption and criminality, reducing tax revenues, and creating ongoing low-level local violence and conflict. However, these local problems received essentially no attention until the U.S. and UK discovered a relationship between the tanzanite trade and terrorist finance. As Al-Qaeda's links to tanzanite were revealed, there were immediate market consequences. The loss of markets in turn stimulated the almost instantaneous development of a certificate and licensing system based largely upon the approach of the Kimberly Process developed for conflict diamonds. This system focused entirely on certifying the physical origins of tanzanite, leaving aside completely disclosures of pricing information, or the financial mechanisms used to pay for the tanzanite at any stage of the transaction. It remains far too early to assess the effectiveness of the Tucson Protocols in rechanneling tanzanite sales into licit channels. Future assessments may be able to determine whether the failure to require financial disclosures proves to be a fatal gap in preventing the use of false invoicing and other tax-avoidance techniques to perpetuate tanzanite theft, smuggling, violence, and use for terrorist finance.

2.      Coltan and the Democratic Republic of the Congo ("DRC").

*Sources of Funds and Magnitude of Revenues.*  Coltan is composed of a mixture of the elements columbium (or niobium) and tantalum, the latter of which is an extremely heavy element used throughout the electronic industry to carry a charge. The market price for Coltan has ranged from $20 a pound in 1990 to $350 a pound in December 2000, since retreating to prices of $100 to $120 per pound.[99]  Coltan mining during the DRC civil wars was undertaken by a number of different military forces. There have been no official figures for the revenues derived from illicit coltan sales during the years of civil war in the

---

[98] "Tracking Tanzanite: Tucson Protocol's Status Report," Lucie C. Phillips, International Business Initiatives For the American Gem Trade Association, Jewelers of America, Inc., and The Jewelers Vigilance Committee, May 24, 2002.
[99] Arnaud Zajtman, (2001), "Ore Fuels West's High-Tech Gear," *AP Online*, April 9.

DRC, although one estimate has placed revenues for the Rwandan army alone from coltan at $20 million a month in 2000.[100]

*Sources of Commercial Demand.*   Tantalum has become an increasingly important component of high-end consumer electronics, especially in cellular phones, computers, and automobiles. The demand prompted many international companies to import coltan from the DRC through Rwanda for these purposes, which paid bribes to obtain concessions. The 2000 UN expert panel identified 85 multinational businesses that it says violated ethical guidelines set down by the Organization for Economic Cooperation and Development. They included banks and gem and mining firms based in the United States, Germany, Belgium, Canada and Britain. [101]

*Impact of Resource Exploitation and Relationship to Conflict.*  Illicit trade in diamonds, gold, coffee, cobalt, timber, and coltan have contributed to what has sometimes been referred to as Africa's "first world war" in which the death toll from conflict approached four million in three years of war. [102] Coltan is the most lucrative raw material mined in the region.  Rebel forces and armies from neighboring states have been able to fund their operations through undertaking full-fledged commercial operations in coltan, which has thereby provided the funds to prolong the conflict. These armed groups making have included the Uganda People's Defense Forces ("UPDF"), the Rwandan Patriotic Front ("RPF"), their Congolese counterparts, the Rally for Congolese Democracy (RCD) and the Congolese Liberation Front ("CLF").[103]  Since none of the groups are licensed to trade in coltan, the trade is illegal.[104]

*Cross-Border Economic Factors.* The DRC civil war created a situation where cross-border security forces and businesses played a critical role in resource exploitation. The coltan mining areas in the eastern region of the DRC have no significant roads and minimal employment opportunities other than mining. As a result, coltan mining is a central means to obtain food and other supplies from the military forces occupying the area. Military forces in the area in effect occupied mining territory, which became the spoils of war for the RCD and the RPF in particular.[105] Coltan profits from the DRC have financed

---

[100] Natalie D. Ware. (2001) *ICE Case Studies*, No. X, December.

[101] United Nations Security Council, Report of the Panel of Experts on the Illegal Exploitation of  Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo, June 2000, listing Banco-Resources Corporation, Geologistics Hannover, Rwasibo-Butera, Eagleswings, Veen, Soger, Afrimex, Cogecom, Ventro Star, Raremet, Finiming Ltd., Union Transport, Speciality Metal and Finconcorde as among the companes that have imported coltan from the DRC through Rwanda for use in Europe, Asia and the U.S.  See also "Stolen Goods: Coltan and Conflict in the Democratic Republic of Congo," Dena Montague, *SAIS Review* vol. XXII, no 1 (Winter-Spring 2002).

[102] The scope of the paper does not permit a review of the illicit use of many of the illicit commodities used by political officials in the Congo.

[103] Once processed into capacitors, it conducts the electric charge in high-tech equipment ranging from cellular phones and computers to jet engines, missiles, ships, and weapons systems. See e.g., http://www.africanfront.com/coltantrade.php.

[104] The illegal trade violates UN Resolution 1803, which assures "people and nations to permanent sovereignty over their natural wealth and resources must be exercised in the interest of their national devlopment and of the well-being of the people of the State concerned."

[105] Dominic Johnson (2000) "Archenemies in Coltan Fever," *Die Tageszeitung*, December 22.

a large part of Rwanda's military budget. They have also provided substantial funds to Rwandan elites. For example, according to the 2000 UN report, after Rwandan Army soldiers took control of a mine near Kasese, a single firm, Societe Miniere des Grands Lacs (Somigl), was awarded the right to commercialize the ore. The company was then able to pay approximately $1 million per month to the Congolese Assembly for Democracy ("RCD"), a rebel movement, allowing the Rwandan Army to maintain a force of 40,000 men. By 2001, the RCD rebels controlled a near monopoly on the exploitation of coltan through Somigl, a mining company owned by a Belgian, Rwanda and South African consortium of three companies, which reportedly paid the RCD $10 per kilogram of exported coltan until the RCD abolished the monopoly late in the year.[106]

*Financial Mechanisms.* The most detailed information and analysis available on the logistical mechanisms used in the exploitation of natural resources in DRC was that undertaken by the UN Panel of Experts. The panel described the specific military forces (the RCD) controlling the coltan, individuals transporting it from eastern DRC (Vikor Bout's aircraft) and various commercial middlemen and ultimate purchasers of the coltan, including most of the major global producers of tantalum. The mechanisms described by the panel included elaborate multi-party transactions that involved false documents establishing Mozambique as the origin of a shipment of coltan originating in Rwanda (and therefore likely from the DRC) and transiting trough South Africa ultimately sold to a German company's Thailand offices using a letter of credit overseen by a Dutch company. However, apart from the reference to the letter of credit, the panel did not specify the financial mechanisms used to pay for the complex logistical transactions.[107] Notably, these are likely to involve not the DRC itself, but its neighbors. DRC has not had a modern financial system. According to the head of its Central Bank in late 2001, it is still common practice for a businessman in the DRC "to eschew regular banking channels to transfer funds from, say, Kinshasa to Lubumbashi. Packing the cash in a suitcase and catching the next flight could save a wait of 30 days."[108] Throughout the civil war, the DRC continued to have access to international banks, both from local offices of major banks and from local banks that in turn maintained correspondent accounts with major banks. For example, Citibank has maintained offices in the DRC since 1971. According to Citibank Kinshasha web site, Citibank retains a 15% share of the market in the DRC, clearing most of its domestic payments through paper-based instruments.[109] However, Kinshasha is located at the western end of the DRC, and coltan is located on the DRC's east. With control of coltan, it is logical that rebel armies would repatriate excess funds to their home countries. Indeed, both reports by NGOs operating

---

[106] The three companies are Africom (Belgium), Promeedco (Rwanda) and Cogecom (South Africa). See Colette Braeckman. (2001) "Coltan: The New War Prize," *Le Soir*, March 27.

[107] United Nations Security Council, Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo, June 2000, paragraphs 79-82.

[108] International Spotlight Advertising Supplement to The Washington Post (purchased by the DRC), November 28, 2001, in a promotional article intended to promote the DRC's intention to adopt a new electronic payments system in the near future.

[109] There are several clearing locations in the country. Citibank is a member of the main Central Bank clearing house in Kinshasa. The clearinghouse holds daily sessions at the Central Bank offices, where all paper based payments are settled. See http://www.citibank.com/westafrica/co/co/en/index.htm.

in the DRC and the UN Experts Panel linked Rwandan officials with profiteering, and suggested that they were using Rwandan banks to handle the funds.[110]  Regional financial institutions have also remained engaged in the DRC throughout the conflict and some have directly profited from it. Uganda and Rwanda are not regional financial centers, but both countries have minimal anti-money laundering frameworks and neither country can curtail illicit financial transactions. Kenya's capital, Nairobi, with approximately 50 banks, is a regional financial center for East Africa, and has been a location for the placement of illicit profits for decades.[111] Notably, such placement is not illegal in Kenya, which has only criminalized money laundering related to narcotics trafficking, and has yet effectively to enforce even anti-drug money laundering.[112]

*Domestic Regulatory and Enforcement Measures.* The DRC has no functioning government in the coltan extracting areas. Unsurprisingly, the various military forces that have controlled the areas of mining have applied no regulatory or enforcement measures except the use of force against their enemies. Regulatory or enforcement action would only be possible if the DRC's neighbors were to undertake such action. Instead, the DRC's neighbors, including elements in Rwanda, Kenya, and Tanzania have sought themselves to profit from the civil war. In general, these countries have poor regulation and enforcement of money laundering laws in any case. The failure is both one of political will and institutional capacity.

*Regulatory and Enforcement Vulnerabilities.* Given the on-going conflict, the DRC fails to meet the most rudimentary international anti-money laundering norms. Regulatory and enforcement gaps include:

- No meaningful measures by financial institutions to obtain information about the true identity of the persons on whose behalf an account is opened or a transaction conducted;
- No suspicious transaction reporting requirements;
- No programs in financial institutions against money laundering, such as internal policies, procedures and controls, or screening procedures to ensure high standards when hiring employees;
- No measures to detect or monitor the physical cross-border transportation of cash and bearer negotiable instruments;
- Permitting the use of anonymous accounts or accounts in obviously fictitious names;

---

[110] See UN Experts Panel Report, id, and *Africa Energy & Mining*. (2000) "Four Companies Named," September 27.

[111] *The East African* (2002) "Will Narc Govt Go After Stolen Billions?" 11 November.

[112] Although the UN Experts Panel does not provide details of the financial mechanisms used to handle the proceeds of illicit resource extraction involving coltan, or other commodities, it did name a number of banks as "considered by the Panel to be in violation of the OECD Guidelines for Multinational Enterprises." Those named without a specification of their specific role in connection with the DRC included Barclay's Bank (UK), BBL (Belgium), Belgolaise (Belgium), Fortis (Belgium) and Standard Chartered Bank (UAE).

- No barriers in practice to the laundering of funds by essentially any person for any purpose, other than the logistical barrier of placing funds in a banking system within the DRC that is still largely based on outdated practices and technologies.

In 2002, the International Monetary Fund announced a program of technical assistance for the DRC, which includes reforms to the banking sector. Regardless of such reforms, the exercise of control over coltan mines by foreign security and rebel forces means that the DRC with the best of intentions would not be able, by itself, to discourage the exploitation of coltan that has sustained such forces in the east of the DRC throughout the civil war.

*Implications.* There is very little information available specifying the particular financial institutions and financial mechanisms most involved in handling conflict coltan, although it is likely they are similar to those used in handling illicit diamonds and other commodities extracted from the DRC. The lack of information does not hide the basics of the trade, however, which involve: (a) military forces; (b) self-financing; through (c) resource exploitation involving; (d) the sale of coltan from local, low-paid miners to; (e) intermediaries on the Congo's borders who in turn; (f) sell the coltan to middlemen from more developed countries by making payment of electronic funds to; (g) banks located in Kigali, Nairobi and Dar es Salam. In turn, these banks have been able to conduct transactions upstream with financial institutions based in major financial markets, and downstream with local institutions created in the DRC to take advantage of the profits of the war. The breakdown in governance in the DRC did not create a corresponding breakdown in the payments system. Instead, local, regional and international financial institutions adapted to the conditions created by the war to continue to provide services, without regard to the provenance of either the goods sold, the sellers of the goods, the buyers of the goods, or the source or purposes of the funds involved in the transactions. In short, rather than constituting a technical failure susceptible to technocratic solutions, the exploitation of coltan in the DRC represented an ongoing political problem arising out of decisions of parties throughout central Africa to exploit coltan and the DRC, rather than to seek to cut off the trade and finances used to maintain the war. Accordingly, even if the sensible suggestions for reform made by the UN Panel of Experts were put into place by the DRC, regional agreement and regional corrective action are a sine qua non of addressing the financial mechanisms sustaining conflict in the DRC.[113]

---

[113] The UN Experts Panel recommended, among other suggestions, that measures must be developed to deal with the revenues that would be lost for all of the parties involved in the illegal exploitations within the DRC, and that should measures would only be effective in the context of a regional political process. Specific reforms suggested by the Experts Panel included capacity building for DRC institutions, including customs, tax authorities and natural resource agencies. The Experts Panel also recommended restrictive measures be undertaken including freezing the personal assets of persons involved in illegal exploitation and barring selected companies and individuals from accessing banking facilities and other financial institutions and from receiving funding or establishing a partnership or other commercial relations with international financial institutions. These recommendations would seem congruent with a view that the financial mechanisms used for resource exploitation in the DRC knit together illicit resource extraction within the country with broad access by those engaged in this criminal activity to the financial resources and institutions of developed countries.

C.      **Oil and Gas**.

1. <u>Nigeria</u>

*Sources of Funds and Magnitude of Revenues*.   Nigeria one of the top twelve largest producers of oil in the world, and the oil sector provides some 95% of the country's total foreign exchange earnings. The sales of oil upstream to foreign processors constitute 90% of Nigeria's total exports. In addition, Nigeria has its own downstream industry, consisting of four oil refineries, eight oil companies, and some 750 independent marketers of Nigerian oil within the country. Oil remains 100% state owned under the responsibility of the Nigerian National Petroleum Corporation ("NNPC") and the Ministry of Petroleum Resources, which together set prices at the wholesale and retail level. In 2000 and 2001, oil revenues have amounted to about $19 billion. Nine of Nigeria's thirty-six states produce all of the country's oil, and Nigeria's current President, Olusegun Obasanjo, has increased oil revenue sharing with these states from 3 percent under the military government to 13 percent since April 2000. In turn, the states sought greater local control and revenues over oil, and in September 2001 a compromise was reached where the federal government would share 50% of some $1.1 billion received by the government during the first half of 2001.[114]

*Commercial Partners.*  Nigeria's oil sector is highly concentrated. Ninety-five percent of Nigeria's oil is produced under joint ventures with foreign countries. The largest joint venture is operated by Shell, which produces some 50% of Nigeria's oil. Other major joint ventures are operated by British Gas, BP, ExxonMobil, ChevronTexaco (formerly Chevron), ENI/Agip, ChevronTe (formerly Texaco), Petrobras, Sunoil and TotalFinaElf. The NNPC is the Nigerian partner in each of these joint ventures. U.S. and Europe are the principle purchasers of Nigerian oil, although Asia has recently become a significant third market. In 2000, Nigeria agreed to supply oil to India and in 2001 to supply refined oil products to Guinea.

*Impact of Resource Exploitation and Relationship to Conflict.*  Approximately 120 million people from some 200 identifiable ethnic groups live in Nigeria. Over the past twenty years, the country has experienced frequent internal conflicts, which in recent years have cost 1000 to 2000 civilian lives annually. Outbreaks of fighting have taken place within ethnic groups, between ethnic groups, between an ethnic group and the Nigerian Army, and between religious groups. Much of the fighting has centered on the perception by many in Nigeria that the Nigerian government was operating on a spoils system, by which the rulers, mostly Hausa tribesmen from northern Nigeria, stated in power through controlling Nigeria's oil revenues. Since 1990, numerous skirmishes have taken place between local forces and the Nigerian government in the Niger Delta region where most of Nigeria's oil is produced. There have been persistent attacks against oil companies by young Nigerians protesting environmental degradation and the lack of

---

[114] Statistics maintained by the Organization of Petroleum Exporting Countries ("OPEC") and the U.S. Energy Information Center. See www.opec.org and http://www.eia.doe.gov/.

return their region receives for its oil. A thriving black market has led to widespread illegal fuel siphoning, oil explosions, and fires, in one case costing the lives of more than 1000 people. Some 800 cases of pipeline vandalism were reported for first ten months of 2001 by the NNPC, amounting to a loss of about $4 billion in oil revenues, according to the Nigerian government.

*Corruption.* Nigeria's oil sector is extremely concentrated, with a relatively small number of participants as sellers and as purchasers in an industry that is highly regulated, with pricing that is reasonably transparent, given the centrality of oil in the global economy. The sector thus differs in critical ways from those of timber, tanzanite, coltan, diamonds, and other commodities where price is far more elastic and less visible. Yet none of these elements have failed to prevent Nigeria's oil industry from being permeated by a corruption that was endemic under military rule and which has yet to be effectively controlled.[115] President Olusegun Obasanjo entered office in 1999 with a promise of cracking down hard on the corruption that has left the oil-rich nation with high levels of poverty and low standards of living for most ordinary people. However, the results of the anti-corruption campaign President Obasanjo initiated have yet to be effective in discouraging oil-related corruption. The many visible areas of serious abuse of Nigerian resources include:

- The NNPC, the Department of Petroleum Resources (DPR), National Maritime Authority, and Nigerian Ports Authority (NPA) are accused of conspiring with their NNPC counterpart in perpetuating frauds involving $2.5 billion stolen between May 1999 and September 2000. The amount includes more than $2 billion in a documented shortfall of about 80 million barrels of crude oil remain unaccounted;[116]

- Inability of the present management committee of Nigeria's Petroleum Trust Fund (PTF) to determine what had happened to 25 billion Naira (approximately $124 million) missing from the Fund's accounts since 1998 as a result of over invoicing and over payments reflected in PTF books;[117]

- Alleged fraud by the management of Kaduna Refining and Petrochemical Company (KRPC) involving materials worth $124 million.[118]  The materials were said to have been improperly removed from the plant's warehouses in the last three years;

- Alleged hiding of oil wells by Nigerian oil companies operating in Nigeria, thereby depriving the government of huge revenue. Smuggled oil from these

---

[115] *Associated Press WorldStream.* (2002) "Cash under the mattresses, on the streets in oil-rich Nigeria, anywhere but in the banks," 25 June.
[116] Adamu Abuh. (2002) "Reps panel alleges N250b scam in NNPC," *The Guardian*, 2 August.
[117] "Alleged N25bn PTF fraud worries Senate," (2001) *The Post Express,* 11 May.
[118] Saxone Akhaine. (2000) "Refinery Officials to Account for N12.6 Materials," *The Guardian*, 8 July.

oil wells was estimated by the Nigerian government at about 300,000 barrels of Nigerian crude daily;[119]

- Abuses involving African Petroleum Plc (AP), which has been embroiled in financial scandal both after its nationalization in 1976 and since its reprivatization in 1999;[120]

- Allegations that the Managing Director of Pipelines and Products Marketing Company (PPMC), Mr. Dan Nzelu, stole "hundreds of thousands of dollars" in a single crude oil transaction;[121]

- Diversion of some 594,000 metric tons of downstream intended for Nigerians in Kaduna State. More than 90 per cent of their quantity was lifted from two Nigerian depots.  Nigeria's Department of Petroleum Resources stated that it had identified and indicted twenty-two dealers involved in the illicit diversion, including those representing such major marketers as TotalFina, AP, and Unipetrol, as well as some independent marketers. [122]

*Criminal Involvement in Exploitation.* In Nigeria, the merger between corruption, business, and criminal interests is substantial, and thus it is difficult to segregate criminal involvement in exploitation of oil from corrupt diversion of oil by officials. The direct involvement of criminal organizations in diversions authorized by high-level Nigerian officials from the central government would not seem to be necessary. In contrast, there have been a number of obvious connections between local authorities and the smuggling of oil by Nigerian criminal groups assisted by local authorities. Typically, these cases have been uncovered by the Nigerian navy, which has begun to patrol the Nigerian coast to seek ships carrying undocumented oil. Recent cases include:

- Discovery of a major syndicate in Calabrar, which has specialized in cross border smuggling of oil. The Nigerian Navy seized 17 large barges operated by the criminal enterprise, each of which was capable of carrying about 100 tanker loads of petroleum products;[123]

- Interception on the high sea by the Nigerian Navy of more than 48 units of crude oil worth $688 million between 1999 and 2002;[124]

---

[119] Rotimi Ajayi. (2000) "Oil Firms Rip Off FG, Hide Wells From Govt," *Lagos Vanguard*, 11 December.
[120] *BBC Worldwide Monitoring*. (2002) "President Obasanjo appoints team to investigate privatized oil firm," 22 July.
[121] Chuks Akunna. (2002) "AAGM: NWODO, PPMC Boss Dragged before Anti-Graft Panel," *This Day*, 9 July.
[122] Olusola Bello And Emeka Ugwuanyi. (2001) "DPR Sanctions 27 Oil Companies Over Product Diversion," *Vanguard* (Lagos), 3 May.
[123] Kingsley Omonobi. (2001) "Calabar navy smashes major oil smuggling syndicate," *Vanguard* (Lagos), 21 March.
[124] Anietie Ben-Akpan. (2002) "Navy intercepts $688 million worth of crude oil from bunkerers," *The Guardian*, 8 April.

- Impoundment in early 2001 by the Nigerian Navy yesterday of five ocean-bound barges loaded with 180,000 liters of Automotive Gas Oil (AGO-Diesel) valued at about 65 million Naira ($524,000) from suspected oil bunkers in Warri.[125]

    *Financial Mechanisms.*  Except for the elites, Nigeria became substantially a barter or cash economy under the Abacha government, with relatively limited participation in electronic payments systems by ordinary Nigerians. Unlike many other countries at a similar level of development, credit cards and payment systems did not develop for widespread use in Nigeria, although Nigerian had a relatively open banking system due in part to the constant requirement for trade finance. From 1995 through 1999, Nigeria maintained two rates for the Naira – an official rate, available only to the government of 22 Naira to the dollar, and a market exchange for all others, which ranged from 110 to 125 Naira to the dollar. The result was a system whereby Nigerian officials would obtain dollars from the government at the official rate, and then sell them to Nigeria's banks at a slight discount. The system thus created resulted in preventing any mechanism capable of tracking sources of funds for banks and Nigeria's banks became complicit in many forms of corrupt activity. Despite Nigeria's reputation for corruption, Nigeria's banks suffered little loss of market access to the rest of the world. Numerous Nigerian banks maintained correspondent bank accounts in U.S. and European financial institutions, including Citibank, Deutsche Bank, HSBC Equator Bank (UK), Banque Belgolaise (UK) and CSFB.[126] These correspondent relationships meant that funds could be deposited into Nigerian bank accounts from overseas, or transferred from Nigerian bank accounts to overseas, subject to approval by Nigeria's Central Bank, which had a reputation of significant integrity problems. Nigerian banks were able to offer high net worth customers a wide range of banking services, including portfolio and asset management, financial planning, custodial services, and trade finance. Core services included providing trustees to handle funds anonymously and nominees to act as custodians of anonymous funds. In essence, minimally regulated banks operating in a corrupt political environment to meet the needs of political and business elites had unrestricted access to banks in other countries that were highly regulated. Accordingly, there were no significant barriers to the handling of the proceeds of illicit oil transactions involving Nigeria.

    *Domestic Regulatory and Enforcement Measures.*  Nigerian had no framework to combat money laundering during the period of military rule, and no such regime has been put into place by Nigeria to date. Upon taking office in 1999, President Obasanjo initiated a comprehensive anti-corruption initiative that included prohibitions on Nigerian federal officials owning or operating foreign accounts. It remains illegal for any public office holder to operate a foreign account, going by provisions of the Code of Conduct for

---

[125] Uwakwe Abugu. (2001) "Navy impounds vessel smuggling oil worth N65 million," *Vanguard* (Lagos), 16 February.
[126] Nigeria Country Commercial Guide FY 2002, U.S. Commercial Service, Trade and Project Financing. See http://www.usatrade.gov/website/ccg.nsf/ShowCCG?OpenForm&Country=NIGERIA.

Public officers. The effectiveness of this action, in the absence of broader regulatory reforms, remains uncertain. To date, no Nigerian official has been arrested or prosecuted for any violation of this law. In laundering the proceeds of corruption, Nigeria's banks have also had non-Nigerian partners. While Nigerian money laundering is a serious, substantial component of the global problem, it has been interdependent on vulnerabilities in regulation and oversight in the world's major money centers. Money laundering and asset-recovery cases undertaken in Western countries by Nigeria to recover funds looted by its former military government have highlighted the laundering of Nigerian funds in Europe by prominent, globally known financial institutions, and highlight the interconnections between Nigerian money laundering and money laundering elsewhere. Within Nigeria, government capabilities to combat crime remain low. Enforcement and implementation of Nigeria's basic anti-money laundering legal and administrative framework remain by all accounts exceedingly limited. Lack of compliance with existing anti-money laundering laws by Nigerian banks has remained the norm. Legal coverage of other categories of Nigerian financial institutions by anti-money laundering laws remains uncertain. No compliance efforts within such institutions are visible. Notably, the legacy of persistent endemic corruption plays a continuing and fundamental role in Nigeria's money laundering vulnerabilities and its lack of capacity to respond to the problem. Nigerian government officials were long the country's most successful launderers of funds, engaging both in smuggling currency out of the country, and techniques used by money launderers to conceal funds through electronic means. Corruption has ensured minimal enforcement of a variety of legal norms, including those pertaining to financial crime. The lack of enforcement has extended to every Nigerian institution responsible for combating money laundering and financial crime: police, anti-narcotics agents, bank regulators, customs, and the judiciary.

   *Regulatory and Enforcement Vulnerabilities.*  Nigeria remains one of the world's most vulnerable countries to money laundering.[127] Enforcement and implementation of Nigeria's basic anti-money laundering legal and administrative framework remain by all accounts exceedingly limited. Lack of compliance with existing anti-money laundering laws by Nigerian banks has remained the norm.  In June 2001, FATF listed Nigeria as a non-cooperative jurisdiction in the international fight against money laundering, threatening it with loss of market access to other countries financial systems. The FATF report stated that Nigeria did not cooperate with the review of its system, and so has a broad number of inconclusive criteria. The FATF report identified deficiencies as including discretionary licensing for the right to operate a financial institution, inadequate customer identification, and the lack of the obligation to report all suspicious transactions if the financial institution decides to carry out the transaction. The FATF identified numerous other weaknesses in Nigeria's regulatory and enforcement system. These include:

- Financial institutions permit anonymous accounts or accounts in obviously fictitious names;

---

[127] Nigeria's non-transparent banking system also is used to launder funds from trafficking in women, other immigration crime, and funds generated through false invoicing of commodities delivered to Nigeria.

- Financial institutions do not take reasonable measures to obtain information about the true identity of the persons on whose behalf an account is opened or a transaction conducted if there are any doubts as to whether these clients or customers are acting on their own behalf, for example, in the case of domiciliary companies (i.e. institutions, corporations, foundations, trusts, etc. that do not conduct any commercial or manufacturing business or any other form of commercial operation in the country where their registered office is located)'

- Financial institutions do not pay special attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose. The background and purpose of such transactions should, as far as possible, be examined, the findings established in writing, and be available to help supervisors, auditors and law enforcement agencies'

- Financial institutions have not developed programs against money laundering that establishes internal policies, procedures and controls, and adequate screening procedures to ensure high standards when hiring employees;

- Financial institutions do not give special attention to business relations and transactions with persons, including companies and financial institutions, from countries that do not or insufficiently apply these Recommendations. Whenever these transactions have no apparent economic or visible lawful purpose, their background and purpose should, as far as possible, be examined, the findings established in writing, and be available to help supervisors, auditors and law enforcement agencies;

- Nigeria does not mandate the implementing feasible measures to detect or monitor the physical cross-border transportation of cash and bearer negotiable instruments, subject to strict safeguards to ensure proper use of information and without impeding in any way the freedom of capital movements;

- Nigeria does not take notice of the potential for abuse of shell corporations by money launderers and should consider whether additional measures are required to prevent unlawful use of such entities;

- Nigeria does not make efforts to improve a spontaneous or "upon request" international information exchange relating to suspicious transactions, persons and corporations involved in those transactions between competent authorities.

*Implications.* For decades, Nigeria has been a classic example of a government funded by illicit commodities (GFIC). The result has been catastrophic for the country, in

which transparency and accountability remain largely absent. The removal of Abacha created a de-centralized state with individual regions ruled by kleptocrats. Individual officials enjoy a high degree of discretion in their interpretation of regulations.  In Nigeria official accounting for the revenue derived from oil and gas is either incomplete or obscure. Much of the revenue is thought to end up in the private bank accounts of well-placed individuals. Corruption has ensured minimal enforcement of a variety of legal norms, including those pertaining to financial crime. The lack of enforcement has extended to every Nigerian institution responsible for combating money laundering and financial crime: police, anti-narcotics agents, bank regulators, customs, and the judiciary. During the years of military rule, officials in most of these institutions engaged in various forms of financial crime to enrich themselves, including money laundering, creating a culture of corruption that extended to Nigerian cabinet-level officials and to Nigeria's military rulers. These problems have been exacerbated by other economic, social, and political factors, starting with the dependence of the Nigerian economy on oil revenues, which has provided a significant source of revenue to be laundered by corrupt officials, and thereby dominated Nigeria's financial system. Other factors have included:

- Nigeria's huge population and inherently limited government capacity, due to its small size in comparison to the population;
- Persistent national unemployment levels in excess of 25 percent;
- The pervasiveness of fraud in Nigerian society, including but not limited to Advance Fee Frauds targeting foreigners;
- Limited use of the formal banking system by substantial portions of Nigeria's population, who rely on cash and may use underground money transmitters for cross-border transactions;
- The imposition of currency controls and limits on the holding of foreign currencies in 1995, which created a black market in foreign currencies and the massive devaluation of the Nigerian currency, the Naira, further increasing the volume of currency required for routine commercial and consumer transactions;
- Nigeria's cellular version of organized crime, which makes detection and apprehension of criminals difficult due to the insular nature of each cell providing a protection against the risk of discovery;
- Low salaries for public officials in Nigeria, which decreased in real terms throughout the 1980's and 1990's due to the military governments' policies designed to restore Nigeria's balance of payments through devaluing the Naira;
- Frequent delayed payment or non-payment of salaries to law enforcement officials in Nigeria, forcing officials to become corrupt in order to feed their families;
- Nigeria's failed economy and failed government, moving Nigeria from a ranking of the 50th wealthiest nation on a per capita basis in 1981 to 146th out of 176 nations as of 2000.[128]

---

[128] *The Post Express* (2001) "Recommendations for an Economy in Crisis." 18 June.

The small number of participants in Nigeria's oil business on the part of both purchasers and sellers suggests that the striking lack of transparency in Nigeria's oil finances is a choice that has been agreed and accepted by all participants. One consequence has been that Nigeria has exported roughly $400 billion of oil since 1980 over the past twenty years with little positive results for the country, let alone the people within Nigeria's oil production region. The revenues from that oil largely disappeared, as corrupt officials and criminals took advantage of the absence of mechanisms to monitor the sales of oil as a physical commodity or the proceeds from such sales as a financial commodity. Thus, in a situation in which Nigeria's government failed to protect the interests of the people of Nigeria, neither the international oil sector nor the international financial sector took action to discourage gross abuse. The decision by the FATF in 2001 to threaten Nigeria with sanctions remains the first multilateral exercise to require Nigeria to develop and implement comprehensive financial transparency and anti-money laundering mechanisms. It remains unclear whether the threat of loss of market access to an oil-producing country will prove sufficiently credible to result in reduction of Nigeria's ongoing squandering of its natural resources.

2.    Kazakhstan.

*Sources of Funds and Magnitude of Revenues.*  At the time of the collapse of the former Soviet Union, Kazakhstan was the second largest oil-producing republic in the country after Russia, producing more than half a million barrels per day (bbl/d) in 1991. Today, Kazakhstan has significant petroleum reserves, with proven reserves estimated at 5.4 billion barrels of oil. Kazakhstan's possible hydrocarbon reserves, both onshore and offshore, dwarf its proven reserves, with estimated possible reserves -- mostly in the Kazakh sector of the Caspian Sea -- of between 30 billion and 50 billion barrels. Kazakh officials have said that the offshore Kashagan field alone may contain up to 50 billion barrels of oil. Following its independence in 1991 Kazakhstan opened up its oil sector to investment and development by foreign energy companies. Kazakhstan's post-independent economic growth has been closely linked to foreign investment in the country's booming oil and natural gas industries. Since independence from Soviet rule in 1991, Kazakhstan has received approximately $13 billion in foreign investment in its oil and natural gas industries. The oil industry currently accounts for approximately 30% of Kazakhstan's government budget revenue, and oil accounts for half of Kazakhstan's exports.[129]

*Commercial Partners.*  Since its independence in 1991, Kazakhstan has permitted foreign companies to invest and develop its oil sector through joint ventures with Kazakhoil (renamed Kazmuinaigaz), the country's national oil company, as well as by production-sharing agreements and exploration or field concessions. Major participants in the development and management of Kazakh oil include the U.S. oil company Chevron (now Chevron-Texaco), the UK company BG, and the Italian oil company, Agip. In

---

[129] Kazakhstan Country Analysis Brief (2002), Energy Information Administration, U.S. Department of Energy, July. See http://www.eia.doe.gov/emeu/cabs/kazak.html.

January 2002, Kazakhstan undertook modernization of one of its three major oil refineries (Atyarau) to a Japanese partnership including Marubeni Corporation and the Japan Gas Corporation, in a project financed by the Japan Bank for International Cooperation.[130]

    *Impact of Illicit Resource Exploitation.*   Oil and gas are Kazakhstan's most important natural resources and potential source of tax funds. Accordingly, lost revenues due to corrupt schemes involving improperly priced sales of oil and gas have the potential to do tremendous harm to the country's long-term capacity to deliver services. Kazakhstan's external debt as of December 2001 was approximately $13.8 billion, which represents approximately 64% of its gross domestic product of $21.4 billion. Petrodollars amount to more than 30 percent of all receipts to budget of Kazakhstan.  The oil production industry accounts for more than 40 percent of the entire production volume in the country. Corporate taxes and value added taxes are constantly being understated in Kazakhstan due to leakage caused by corruption, and the problem is particularly severe in the oil and gas sectors. Losses to the state budget of Kazakhstan from these practices have been estimated to amount to some $500-600 million every year,[131] which would amount to some 40% of the country's current account balance deficit of $1.35 billion. The massive diversions of Kazakhstan's natural resources have also had political consequences. By diverting public resources to the private gain of a few senior government officials and their associates, it has solidified near-term control of the government by the country's president and inner circle, while impeding longer-term democratization. In short, Kazakhstan's oil and gas revenues today reward a corrupt elite and help deprive the rest of the population of the country with a voice in governance.

    *Corruption.*  Kazakhstan remains riddled with corruption, and government capabilities to combat crime remain low.[132]  The legacy of persistent endemic corruption plays a continuing and fundamental role in Kazakhstan's money laundering vulnerabilities and its lack of capacity to respond to the problem. In Kazakhstan, corrupt political leaders routinely accept "facilitation" payments, otherwise known as "speed money." Companies in Kazakhstan pay as much as 4.7 percent of annual revenue as so-called bribe taxes, unofficial payments aimed at helping "get things done," according to a survey by the European Bank for Reconstruction and Development and World Bank. Corruption has ensured minimal enforcement of a variety of legal norms, including those pertaining to financial crime. The lack of enforcement has extended to every Kazakhstan institution responsible for combating money laundering and financial crime: bank regulators, customs, and the judiciary. Corruption also extends to the top of the government, with persistent charges that Kazakhstan President Nursultan Nazarbayev routinely takes bribes from foreign firms as a condition of doing business in the

---

[130] Id.

[131] Gulmira Kenzhegaliyeva. (2002) "Karachaganak's Money Is Spilling Into Offshore Entities. Foreign Investors Are Taking Billions of Dollars Out of the Country," *Almaty Karavan*, 12 July.

[132] Kazakhstan is ranked 88Th out of 102 states listed in the 2002 Transparency International  Corruption Perceptions Index. See http://www.transparency.org.

country.[133] Indeed, allegations and examples of corruption and money laundering involving senior Kazakh officials are pervasive, especially in the oil and gas sector.[134]

*Financial Mechanisms.* The oil business in Kazakhstan involves a small number of participants, with concentration among both buyers and sellers. There are only a small number of major international oil companies in a position to undertake large joint ventures with the government, and relatively few officials in Kazakhstan with the authority to agree on such ventures. This concentration of economic and political authority has resulted in Kazakhstan's most senior officials taking bribes as a condition of granting the rights to exploit the country's most significant natural resource. The bribes have been paid through standard money-laundering mechanisms and infrastructure, as documented in the Swiss investigation discussed in detail below. These include the use of front-companies based in microstates and money laundering havens, trusts managed by nominees on behalf of hidden beneficiaries, and private banking facilities that in turn hold accounts at major international banks. Fraud and bribery in connection with Kazakhstan oil exploitation has also included various forms of invoice fraud, which involve establishing non-market prices for the sale of raw hydrocarbons, with offsetting payments made in foreign bank accounts to corrupt officials, typically through sending the funds to off-shore bank accounts.

*The Swiss Investigation of Oil Theft.* In 1999, the Kazakhstan Government asked the Swiss to look into foreign bank accounts held by one of the opponents of the Kazakhstan President. As the investigation grew, the Swiss found themselves in the end freezing an account at Credit Agricole Indosuez, the Swiss affiliate of a French bank, believed held for the benefit of President Nazarbayev.[135] In the course of the Swiss investigation, the Swiss uncovered apparent bribery of senior Kazakhstan officials by some of the world's largest, publicly traded oil companies, involving the use of the financial infrastructure of many countries and several international banks. The case shows how (a) bribes were paid by major oil companies to (b) senior Kazakh officials with control of the revenues and then placed in (c) non-transparent trusts and international companies based in micro-states providing off-shore banking services and in countries known for facilitating money laundering, for transfer to (d) financial accounts maintained outside of Kazakhstan held in (e) major financial centers, such as Switzerland, for management by (f) private bankers at a private bank with (g) an account at a major international European bank. The private bank involved was Banque Pictet, based in Geneva, which held about $84 million in apparent bribes to Kazakh officials that was first frozen, and then unfrozen by Swiss judicial order, but sequestered from control by the Kazakh government pending a U.S. investigation. In addition to accounts alleged to be available for the benefit of the Kazakh president, were accounts for other officials and members of their families, intermingled with accounts that

---

[133] Sergey Kozlov. (2001) "Corruption or Political Speculation: the Scandal Surrounding President Nazarbayev Continues," *Nezavisimaya Gazeta*, 13 November.
[134] John Tagliabue. (2000) "Kazakhstan Is Suspected Of Oil Bribes In the Millions*," The New York Times*, 28 July.
[135] Steve LeVine and John Tagliabue. (1999) "Swiss Freeze Bank Account Linked to Kazakh President," *The New York Times*, 16 October.

remained in the name of the Kazakhstan government. According to public accounts, in January 2000 the Geneva investigating magistrate advised U.S. officials that the accounts appeared to have been financed by U.S. and European oil companies as bribes to Kazakh officials. Swiss investigators had found a pattern of clandestine and circuitous routes by which the funds were transferred to Switzerland. These routes included foundations in Liechtenstein and shell companies in Switzerland, Panama and the British Virgin Islands. Swiss officials said that bank records showed that both U.S. and EU oil companies had made large deposits into the accounts. Accordingly, the Swiss advised the U.S. Department of Justice that they had concluded some of the payments likely violated the United States Foreign Corrupt Practices Act ("FCPA"). The Swiss officials said investigators in Geneva had identified four large transactions, two of them involving U.S. companies, and two others involving European oil companies they declined to identify. Swiss officials said account documents indicated that the money in the Swiss accounts had been available for the benefit of President Nazarbayev, former Prime Minister Kazhegeldin, and a more recent former Prime Minister Balgimbayev, 52, who had also served as Kazakhstan's oil minister and the head of Kazakhstan's state oil company. On April 4, 2002, the current Kazakh Prime Minister, Imangali Tasmagambetov, told the Kazakhstan parliament that the Kazakh authorities had created a secret fund in which to park revenues from the sale of a 20 percent stake in the Tengiz oilfield, and stated that the president could have foreign bank accounts in his name. [136] A U.S. Department of Justice document dated June 12, 2002 reportedly identifies Mr. Giffen and his Mercator Corporation of New York as under investigation on suspicion of improperly funneling to Kazakh officials money from the Phillips Petroleum Company; the former Mobil Corporation, now Exxon Mobil; and the former Amoco Corporation, now BP Amoco. According to press accounts, U.S. oil companies may have paid bribes totaling at least $35 million to Kazakh officials.[137]   The Justice document reportedly lists payments made by U.S. oil companies to Liechtenstein-based foundations established on behalf of former Prime Minister Balgimbayev and his daughter.  The U.S. oil companies have defended their actions as lawful, on the ground that they were making the payments according to terms specified by the Kazakh government and believed the payments were being paid to the Kazakh government.

   *Domestic Regulatory and Enforcement Measures.*  Enforcement and implementation of Kazakhstan's basic anti-money laundering legal and administrative framework remain by all accounts exceedingly limited. Lack of compliance with existing anti-money laundering laws by Kazakhstan banks has remained the norm. Legal coverage of other categories of Kazakhstan financial institutions by anti-money laundering laws remains uncertain, and no compliance efforts within such institutions are visible. However, these traditional approaches to curbing money laundering would seem inapplicable to Kazakhstan's problems with corruption in its oil sector, as the most important illicit oil payments appear to be made almost entirely outside the country.

---

[136] *Transition On-Line*. (2002) "Kazakh scandals throw spotlight on democracy,", 16-22 April.

[137] *Interfax*. (2000) "Kazakh prosecutor general denies reports about officials taking bribes," 2 August.

*Regulatory and Enforcement Vulnerabilities.* Kazakhstan fails to meet a number of international standards for combating money laundering, including:

- Inadequate rules for the licensing and creation of financial institutions, including assessing the backgrounds of their managers and beneficial owners;

- Regulatory or other systems which allow financial institutions to carry out financial business where the beneficial ownership of the funds involved in the transactions is unknown, or is represented by an intermediary who refuses to divulge that information;

- Laws or regulations prohibiting international exchange of information between judicial authorities (notably specific reservations formulated to the anti-money laundering provisions of mutual legal assistance treaties or provisions by countries that have signed a multilateral agreement) or placing highly restrictive conditions on the exchange of information are detrimental rules;

- Secrecy provisions related to financial activities and professions, notably banking secrecy, which can be invoked against, but not lifted by competent administrative authorities in the context of enquiries concerning money laundering or which cannot be lifted by judicial authorities in criminal investigations relating to money laundering;

- Failure to exchange financial regulatory information with other jurisdictions without unduly restrictive conditions.

*Implications:*  Kazakhstan is not likely to create an effective anti-money laundering or anti-corruption regime in the immediate future, as neither is in the interest of the country's leaders. However, even if legal frameworks for such regimes were created, they would not be likely to have an impact in Kazakhstan, given the arrangements that have been made to insure that payments to corrupt officials are made outside of the country.  In theory, greater accountability in the oil sector itself could be created by the enactment of laws and regulations that require detailed reporting of the prices paid for various commodities, adoption of transparent competitive procedures for procurement, contracting, and licensing, and adoption and implementation of oversight mechanisms to insure the integrity of records created under such procedures and systems. None of this regulatory and enforcement superstructure appears to be in place today in Kazakhstan, or would be likely to be put in place so long as those exploiting Kazakhstan's oil and gas are in control of its government. Accordingly, regulatory and enforcement measures would necessarily have to be taken by those based outside of Kazakhstan by imposing regulatory and enforcement requirements on the Kazakhstan activities of the major oil companies bidding for rights in the country. Enforcement actions arising out of the current investigations in Europe and the U.S. of allegations of corrupt payments could be helpful in creating disincentives for oil companies to pay

49

bribes. A system in which each of the foreign oil companies participating in the Kazakhstan energy sector agreed upon and implemented "publish what you pay" principles could have a substantial impact. Implementation of such principles could both discourage those companies from colluding with corrupt Kazakhstan officials in the exploitation of energy, and facilitate enforcement action against any such officials diverting funds from the sale of energy.

3.    Ukraine.

*Sources of Funds and Magnitude of Revenues*.  Ukraine has 395 million barrels of oil reserves, most of which are located in the Dneiper-Donetsk basin in the eastern part of the country. Ukraine's oil production satisfies only about 25% of the country's domestic needs, making the country dependent on imports of foreign oil, most of which is imported from Russia through an extensive pipeline system. Ukraine's natural gas reserves are estimated at 39.6 trillion cubic feet, with annual production of 636 billion cubic feet. Ukraine's gas production amounts to about 20% of that consumed within the country, again leaving Ukraine largely dependent on imports of gas from Russia. Ukraine's oil and natural gas sectors are overseen by Naftohaz Ukrainy, a state-owned holding company. There have been few foreign investors in Ukrainian energy, a consequence of a political and economic system without reliable norms protecting property. Since 1999, some, Russian oil companies, including Lukoil and Tyumen Oil have acquired interests in Ukrainian refineries, but privatisation of the natural gas sector has yet to take place.[138]

*Impact of Resource Exploitation and Relationship to Governance.*  Life in Ukraine since independence has not been easy.  Millions of Ukrainians remain impoverished and have little opportunity for improving their lives. Many Ukrainians still live by a barter system, which is largely sustained by the structure of the Ukrainian gas industry, as over 90 percent of the energy consumed domestically is paid for at the local level by barter. The death rate in Ukraine now substantially outnumbers the birth rate, with 16.4 deaths per 1000 dying per year and 9.3 births per 1000 per year. Overall, the Ukrainian economy has shrunk by about 40% since 1991. In the same period, whoever has controlled Ukraine's central government has also controlled the disposition of the preponderance of Ukrainian energy resources. One outcome has been substantial stability at the top of the Ukrainian government, with President Leonid Kuchma in charge since 1994. At the same time, the stability has been accompanied by massive corruption at the top of Ukraine's government, which has helped to stall privatization and discourage economic progress in the country. The energy sector was described in 2000 by Ukraine's deputy prime minister for fuel and energy s as "the most corrupt, the blackest sector of all."[139]  Because corruption both diverts revenues derived from selling energy from Ukrainian sources and substantially increases the costs of energy purchased by Ukraine from other sources, those in the country not directly profiting from the corruption in the

---

[138] Ukraine Country Analysis Brief (2002), Energy Information Administration, U.S. Department of Energy, August. See http://www.eia.doe.gov/emeu/cabs/ukraine.html.
[139] *Khreshchatvk*. (2000), "Deputy Premier Tymoshenko Urges State Supervision of Energy Sector," 26 May.

energy sector are burdened by higher energy costs. These higher costs continue to weaken Ukraine's ability to maintain industrial and agricultural production, as well punish lower-income Ukrainians who cannot afford the higher costs of home heating, transportation, and food heat their homes that result from the abuses in the energy sector.

*Corruption.*  Economic and political power in Ukraine remains concentrated and closely intertwined. Corruption in the Ukrainian gas market can be characterized as follows: illegal activities which involve a personal or group infringement of institutional rules for individual purposes, and entrepreneurial activities of individuals, political and administrative agencies as well as local governments in order to seize opportunities to their own benefit by exploiting shortcomings and contradictions in official regulations and using their institutional power to exploit the market potential of resources under their control.[140] Senior Ukrainian officials face serious corruption charges, including President Kuchma, who has reportedly stolen $1 billion or more.[141] The IMF, in recognition of the magnitude of corruption in Ukraine's oil and gas industry, in late 2001 demanded an audit of the national state oil and gas company Naftohaz Ukrayiny before the Ukraine would receive further funding from the IMF its Extended Fund Facility [EFF] program.[142] High-ranking officials involved in criminal activity involving oil include senior officials in the major Ukrainian oil and gas companies, past and present prime ministers and various deputy prime ministers.[143] A typical, well-publicized case of looting involved former Prime Minister Pavel Lazarenko, who has been indicted in the U.S. in connection with his pumping hundreds of millions of dollars out of the country by means of the United Energy Systems-Yedinyye Energeticheskiye Sistemy Ukrainy company, which won an exclusive contract during his premiership to supply gas to one-third of Ukraine.[144]

*Financial Mechanisms.*  In Ukraine, the ability to buy or sell energy has been a means of coining money for well-placed political figures and their associates. Typically, these arrangements involved a mixed government-business partnership, in which the government would create the means for resources to come under the control of commercial interests at prices that differ substantially from their true market value. The role of the businessman was then to kickback a portion of the profits to the key officials. Thus, most of the money paid by consumers has not gone to energy producers because of the companies between the former and the latter that "wash away" the money paid by those who use the energy to off-shore zones. For example, until 2000, Ukraine relied on a system of for selling gas involving "trading houses," which paid credit rather than cash to those extracting or importing gas, using promissory notes and other securities. The sellers

---

[140] V. Khmurych & T. Tkachenko (1999) "Opportunities for Corruption in the Ukrainian Gas Market," The Eurasia Foundation. See http://www.eurasia.org/programs/eerc/kiev/papers/khtk.htm.

[141] See e.g. allegations made by former Kuchma presidential security guard Mikola Melnichenko, and Patrick E. Tyler, (2001) "From Under a Couch, an Effort to Stop Ukraine Corruption," *The New York Times*, 26 February.

[142] *UNIAN*. (2001) "IMF loan conditional on budget adoption, state oil company audit," 14 November.

[143] *Nezavisimaya Gazeta*. (2001) "Vice Premier Tymoshenko Criminal Case Said Staged To Eclipse 'Tape Scandal',"10 January.

[144] *Novyye Izvestiya* (1998) "Lazarenko's Financial Scams Described, " 15 December, p 5.

of the commodities received paper that ultimately would sell at an 80 to 90% discount from its declared value. The purchasers of the commodities would then enter into kickbacks to the state officials who agreed to the arrangements.[145] Profits from such mechanisms have then been laundered through two basic methods: anonymous bank accounts, which frequently mix legal and illegal proceeds, and 'front' companies, which are opened with stolen passports, or the illicit profits are launder money through off-shore zones, such as Antigua, the Cayman Islands, and the Republic of Nauru. By one account, 30 percent of the crude oil imported to Ukraine from Kazakhstan in 2001 was reported as supplied through the Caribbean Island of St. Vincent and the Grenadines.[146]  The ability of Ukrainian officials to move their money was facilitated by cooperation from banks in many other countries.

*Matriochka Companies and Private Banks*.  Typically, Ukrainian officials have established companies nested inside other companies in order to obscure ownership of funds generated from corrupt activities. For example, one senior Ukrainian energy official established trading companies in Belgium, one of which was managed by his wife, together with bank accounts in Belgium at the Generale de Banque and the Kredietbank, with money paid in from offshore companies under his control in the Seychelles, Bahamas, Mauritius, Jersey, and the Virgin Islands. The official also reportedly established accounts to deposit the proceeds expropriated from coal sales with Citibank, Deutsche Bank, Banque Unie Est-Ouest in Luxembourg, Barclays Bank in London, BNP in Monaco, and Parexbank in Riga, Latvia, among others. A press account described his business structures, which included a Swiss company owning a Belgian company owning other companies as resembling a series of matriochka dolls at work.[147] In various corruption cases that have been made public, laundered money has been found to return to Ukraine for the purchase of real estate and state-owned firms, or the illicit monies have been transferred through correspondent bank accounts and remain abroad. Ukraine's private banks have been especially open to laundering. A few large shareholders who are also the banks main clients own a number of banks, such as Big Energy Bank and Ukrasbank.  These relationships are both vertical and horizontal, in that the banks can simultaneously purport to act as independent, third party entities that handle funds on behalf of energy clients, and as subsidiaries of the energy firms who are providing services on a basis that is fully controlled by their energy-company owners. As a result, there are no internal controls, in practice, to prevent abuses, and Ukraine has yet to impose external control mechanisms. Funds generated from the energy sector are freely funneled to offshore entities and then routinely laundered through these private banks.[148] Once laundered, a substantial portion of the funds have been invested overseas,

---

[145] See interview of Ukrainian Deputy Premier Yuliya Tymoshenko. "Deputy Premier Tymoshenko Urges State Supervision of Energy Sector," *Khreshchatyk*, 26 May 2000.

[146] See interview with Ukrainian State Tax Administration head Mykola Azarov. "Ukrainian president wages war on money-laundering," *Novy Kanal TC*, 20 October 2001.

[147] Alain Lallemand. (1999)  "Olekssander Volkov Could Change Coal into Gold," *Le Soir*, 24 September.

[148] For a discussion on private banking in Ukraine, see e.g., Kyiv Post. (2002) "Financial sanctions loom as dirty money flows", 3 October.

including in the U.S., where Ukrainian officials have purchased real estate from illicit diversions of funds from the energy sector.[149]

    *Domestic Regulatory and Enforcement Measures.*  Ukraine has had one of the weakest anti-money laundering and anti-corruption regimes in the world. When the Council of Europe's Select Committee of Experts on the Evaluation of Anti-Money Laundering Measures (PC-R-EV) on Ukraine conducted an assessment in May 2000, it was highly critical of Ukraine's anti-money laundering regime, and cited significant deficiencies in the law enforcement, legal, and financial sectors.[150]  Over the next twelve months only piece-meal efforts were made by Ukraine to establish an anti-money laundering regime. Noting a lack of progress to combat money-laundering schemes, the Financial Action Task Force (FATF) placed Ukraine on its Non-Cooperative Countries and Territories (NCCT) list on 7 September 2001. Evaluators were especially troubled by the lack of an efficient system for reporting suspicious transactions to a financial investigative unit (FIU), inadequate customer identification requirements, and insufficient resources devoted to combat money laundering.[151]  Another mutual review by the Council of Europe's Select Committee of Experts on the Evaluation of Anti-Money Laundering Measures (PC-R-EV) of Ukraine, issued on 21 June 2002, stated that tax fraud, abuse of powers, illegal entrepreneurship and illegal banking activity continue to generate significant illegal proceeds in Ukraine.[152] The Council of Europe also concluded that Ukraine had failed to adequately amend the legislative, regulatory, and bureaucratic frameworks to ensure that Ukraine meet international standards to combat money laundering.

    *Regulatory and Enforcement Vulnerabilities.* The laundering of illicit income from oil smuggling has been facilitated by the failure of Ukrainian regulators and law enforcement agencies to monitor the financial sector. The decade-old banking system in Ukraine remains largely unregulated, and each bank enforces its own set of regulations. As of November 2002, despite the threat of international sanctions if Ukraine does not enact comprehensive anti-money laundering legislation, a draft of such a bill has remained stalled in Ukraine's parliament, the Rada.   The draft legislation would establish a wide-range of predicate offenses related to money-laundering, clarify existing legislation, impose penalties, including fines and imprisonment, for individuals who violate money-laundering laws, and require financial institutions to enforce stringent customer identification provisions, and record-keeping requirements. In the meantime, Ukraine fails to meet a number of international standards for combating money laundering:

---

[149] Patrick E. Tyler. (2001) "From Under a Couch, an Effort to Stop Ukraine Corruption," *The New York Times*, 26 February.

[150] International Narcotics Control Strategy Report (INCSR) 2001 Report, US Department of State, March 2002, available at URL: http://www.state.gov/g/inl/rls/nrcrpt/2001/rpt/8487.htm

[151] Developments in Non-Cooperative Countries and Territories, FATF, Paris 7 September 2001, available at URL: http://www1.oecd.org/fatf/pdf/PR-20010907_en.pdf

[152] Council of Europe, European Committee on Crime Problems (CDPC), Select Committee of Experts on the Evaluation of Anti-Money Laundering Measures (PC-R-EV), Ukraine Progress Report 2001-2002, Strasbourg, 21 June 2002.

- Financial institutions do not take reasonable measures to obtain information about the true identity of the persons on whose behalf an account is opened or a transaction conducted if there are any doubts as to whether these clients or customers are acting on their own behalf, for example, in the case of domiciliary companies (i.e. institutions, corporations, foundations, trusts, etc. that do not conduct any commercial or manufacturing business or any other form of commercial operation in the country where their registered office is located);

- Financial institutions do not pay special attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose. The background and purpose of such transactions should, as far as possible, be examined, the findings established in writing, and be available to help supervisors, auditors and law enforcement agencies;

- Financial institutions have nor developed programs against money laundering that establishes internal policies, procedures and controls, and adequate screening procedures to ensure high standards when hiring employees;

- Ukraine has ignored the abuse of shell corporations by money launderers;

- Ukrainian financial regulators do not ensure that the institutions they supervise have adequate programs to guard against money laundering.

In this environment, impediments to moving funds overseas generated from false invoicing or false pricing of oil, gas, or coal through collusion between officials and businessmen have been minimal.

*Implications.* As in other countries with concentrated energy sectors, collusion between officials and businessmen has made it possible for vast amounts of wealth to be appropriated and hidden as a result of non-transparency on both the movements of the commodities and the movements of the funds generated by the commodities. Reputable financial institutions outside Ukraine have readily accepted these funds with no evident review of their provenance.  Accepting the proceeds of corruption is illegal under the money laundering laws of a number of countries, including all of the countries of the European Union and since October 2001, in the U.S. Moreover, as of the end of 2002, Ukraine has remained on the NCCT list of the FATF, requiring FATF members to impose limits on market access or heightened scrutiny of funds from the Ukraine. Enforcement action undertaken against non-Ukrainian financial institutions found to have accepted the proceeds of illicit activity in Ukraine as a result of failures of due diligence could have a potentially significant impact in creating disincentives for handling such funds in the future. Similarly, methods of monitoring energy and energy payments in some fashion that would enable oil, gas and coal and the proceeds of such sales to be

traced would seem to be a necessary element of constraining the powerful forces propelling corrupt activity in the Ukrainian government.

**D.     Illicit Drugs.**

1.     <u>Narcotics and Terrorists</u>.

*The Terrorist-Drug Nexus.*   Since the decline of state sponsorship of terrorism, terrorist groups have increasingly turned to the sale of illicit drugs to finance their operations, making many terrorist organizations "terrorists financed by illicit commodities or TFICs.  Indeed, in 1994, Interpol's chief drugs officer, Iqbal Hussain Rizvi, observed that "drugs have taken over as the chief means of financing terrorism."[153] In every case where large quantities of illicit narcotics have been produced and required to transit to licit markets, the illicit drug activity has, over time, drawn terrorist organizations. Links between terrorist organizations and drug traffickers take many forms, ranging from facilitation, protection, transportation and taxation, to the terrorist organization itself trafficking in the drugs to finance its activities. Traffickers and terrorists have similar logistical needs to move illicit goods, people and money, and relationships between them often benefit both. The military skills, weapons supply and access to clandestine infrastructure possessed by terrorists can help trafficker move illicit drugs. At the same time, drug traffickers can provide both drug derived revenues and expertise in money laundering to the terrorists. Moreover, both groups rely on corrupt officials to assist them in moving illicit goods, people and money across borders. Both types of organizations tend to rely on cell structures to accomplish their goals, with the members of local cells responsible for carrying out operations on a day-to-day basis. Drug traffickers and terrorists also use similar financial mechanisms: bulk cash smuggling, front companies and multiple bank accounts in the name of such fronts, together with the use of alternative remittance systems (hawala) or black market currency exchanges.

*Major Terrorist-Drug Links*.  Drugs have financed terrorist groups in many regions in conflict, including Latin America, South Asia and the former Soviet Union, the Middle East, Europe, and Southeast Asia. Major cases include the Shining Path in Peru from the 1980s through the 1990s, the FARC, ELN and AUC in Colombia from the 1980s to the present, Al-Qaeda and Kashmiri separatist groups operating in South Asia, the Tamil Tigers of Sri Lanka, Hizballah in Lebanon, members of the Irish Republican Army ("IRA") the Basque Fatherland and Liberty Party ("ETA"), and the United Wa State Army ("UWSA") in Burma among others. Such groups tend to intensify their drug trafficking and their terrorist activities in parallel with intensified civil conflict. For example, the Kosovo Liberation Army ("KLA"), which became increasingly central to the conflict between Serbs and other ethnic groups in the former Yugoslavia, was created

---

[153] *Reuters News Agency*, 15 December 1994.

by and financed by heroin trafficking from Istanbul.[154] The KLA sold the heroin in Switzerland to purchase light military equipment, including Kalashnikov rifles, and handguns. Western sources allege that Bin laden gave a significant portion of his drug smuggling profits to ethnic Albanian separatists and regional terrorists.[155]  The Abu Sayyaf Group ("ASG") operating in the Philippines, whose principle source of income is kidnapping-for-ransom (KFR), also relies on drug trafficking, building and operating marijuana plantations.[156] The Kurdistan Workers' Party (Partiya Karkeren Kurdistan-PKK), has been largely funded by state sponsors, such as Iran and Syria. But it has also funded its activities through criminal enterprises, including narcotics, to maintain an estimated 400-500 soldiers in southeast Turkey, more than 4,000 troops in Northern Iraq, and Iran, and a small contingent of forces in Syria.

*Al-Qaeda.* The most successful use of narcotics to fund terrorist activities was overseen by the Al-Qaeda network, which received millions of dollars per annum through the production and distribution of opium. Prior to the US-led invasion of Afghanistan, the Taliban and Al-Qaeda produced thousands of metric tons of opium each year in 18 of the 31 Afghan provinces. Opium cultivated by Al-Qaeda has been smuggled through neighboring Central Asian states and transported to distribution networks in East Africa. Although the Taliban officially banned opium poppy growing in July 2000, a United Nations Security Council report found that the move was aimed at boosting the price of heroin, while the Taliban retained large stocks of the drug to continue to supply the market.[157] The Taliban also taxed heroin laboratories and heroin and opium convoys passing through Taliban checkpoints, charging producers and smugglers between ten and twenty percent of the total value of the wholesale opium, with the tax collected by village mullahs for the leadership in Kabul. During the period of Taliban rule, the military and security forces of the Taliban and Al-Qaeda were intermingled. Because of the use of alternative remittance systems and an absence of oversight of financial transactions in Southwest Asia, it has not been possible to trace opium profits from Afghanistan to particular Al Qaeda operations.  However, it is clear that prior to the onset of the Allied invasion of Afghanistan, stockpiles of raw opium grown in Afghanistan were moved out of the region in anticipation of military strikes, and reached markets, in Europe,[158] and Southwest Asia, including Hong Kong.[159]  Italian financial enforcement police contend they have evidence that Al Qaeda has raised substantial funds in Italy through traffic in opiates.[160]

---

[154] Testimony, Alain Labrousse, the head of Observatoire francais des drogues et des toxicomanies, a French organization that studies drug trafficking before a Canadian Senate committee. See http://www.parl.gc.ca/37/1/parlbus/commbus/senate/com-e/ille-e/presentation-e/oscapella1-e.htm.

[155] *Tanjug* (Belgrade) (1999) "'Diplomat' Cited on Bin Laden's Drug Deals With Kosovars" in 19 August.

[156] Rohan Gunaratna (2001) "The evolution and tactics of the Abu Sayyaf Group" *Jane's Intelligence Review*, 1 July.

[157] *Agence France Presse* (2001) Afghan opium threatens all central Asia, 16 September.

[158] *La Repubblica* (2001) "Italian Police in Taliban-Linked Drug Bust in Rome" 8 November.

[159] *The Wall Street Journal* (2001) "Hong Kong to see surge in heroin smuggling" 21 October.

[160] *Australian Financial Review* (2001) "Cheap Opium Stocks Dumped On World Markets," 14 November.

*The PKK.*   The PKK continues to destabilize southeastern Turkey and northern Iraq, funding its ongoing rebellion against Turkey through a wide range of criminal activities, including extortion, people smuggling, the smuggling of counterfeit goods and theft. While precise specification of the relative percentage of the PKK's funding from drugs is not possible, it is clear that they are substantial. Turkey lies on a major heroin trafficking route from Asia to Europe. In Istanbul, the price paid for a kilogram of heroin is nearly US $2500. Through the drug trade, the PKK has maintained links to Turkey's major organized crime groups, further strengthening its logistical capacities.

*The FARC.* The enormous profits created from the drug trade have enabled FARC to create a vast and sophisticated military and financial network.  This network is responsible for the sustained growth and success of FARC throughout the 1990s. The drug trade, combined with the other sources of funds (kidnappings, road tolls, and robberies) have enabled the continued purchasing of large amount of weapons including sophisticated surface to air missiles as well as heavy weaponry and military vehicles.[161] With over half of FARC's funds coming from the drug trade, some $250-300 million annually, drug cartels have become FARCs partners in maintaining its capacity to operate against the Colombian government.  FARC commonly purchases arms and equipment with large amounts of cocaine.[162]  It is believed that FARC has an annual income of between 500 to 600 million U.S dollars.[163] Each Bloc and front is charged with a quota that it is required to bring in each year to add to the FARC coffers.  As a result, the individual units of FARC are given wide latitude in order to secure enough funds to fulfill their particular quota.  The evidence points to FARC running a drug trafficking organizations as the prime source of funds. Once the funds are acquired FARC does not simply accumulate and store bulk cash at different locations, although this was the initial method for the FARC's financial operations.[164]

*Financial Mechanisms.*   While drug traffickers may receive the proceeds of drug sales at various stages of the chain of distribution, from opium or coca field all the way through small urban dealers, terrorist groups that control national territory receive funds almost entirely at the first stages of production, that is, at the location of extraction. These terrorist groups typically receive their share of narcotics funds in cash and then seek to avoid cross-border currency controls through placing the funds in local financial institutions that are willing to accept drug proceeds. Alternative remittance systems, such as hawala and black market peso, become central to the placement function, permitting the terrorist groups to move funds to where they need them without detection at the front end. Other techniques for hiding drug funds often rely on barter, or substitute commodities, for cash, such as gold or precious gems. A country like Dubai that is simultaneously a center for hawala and gold can readily be used to move funds from non-regulated financial sectors into the regulated financial sector, and from that to major financial centers throughout the world. It is sometimes said that terrorist finance differs

---

[161] Jeremy Kinsell (2000), Unpublished Report on the FARC, University of Pittsburgh.
[162] Id.
[163] Klepak, Hal  (2000) "Why doesn't the war in Colombia end?" *Jane's Intelligence Review*, June 1.
[164] Kinsell, id.

from money laundering in that terrorists take clean money and hide it to fund criminal activities, while money launderings take dirty money and hide it to fund lawful activities. In the area of terrorism funded by narcotics, however, the terrorists use precisely the same infrastructure for handling their funds as do drug traffickers. Systems that are open to drug money laundering prove to be equally as open to terrorist money laundering, except that the identity of the collusive parties may be colored by ideological overlays not present in a pure commercial drug context.  The differences between money laundering by terrorist organizations in Southwest Asia, Southeastern Europe, and Latin America are more the result of minor regional differences in mechanisms rather than by deep operational distinctions. With that in mind, examples of financial mechanisms used by Al-Qaeda, the PKK, and the FARC to launder drug funds have included:

- Exploitation of poor governance to provide safe havens for those generating drug wealth in source countries, and making payoffs to underpaid officials in such regions. This feature accompanies the use of narcotics funds by terrorists in Southeast Asia (Burma, Cambodia, Philippines), Southwest Asia (Afghanistan and Pakistan), the Middle East (historically, Lebanon), and Latin America (Colombia and Peru);

- Reliance on ideologically sympathetic corrupt officials to facilitate placement of drug funds for terrorist groups. This phenomenon has been especially important in Pakistan for both Al Qaeda and various Kashmiri militant groups, but has may have played a role in the Andes (Colombia and Peru), Southeast Asia (Burma and Cambodia), and Lebanon (Hezballah);

- The use of long-established money laundering centers, such as Dubai, Panama, and Indonesia for placement of funds, before moving them to jurisdictions that previously had paid little attention to terrorism, such as Malta, Singapore, and Kenya;

- Reliance on non-traditional methods of transferring currency, including hawalas and cash couriers, then infiltrating these funds into the formal financial system;

- Physical transportation through complacent or collusive banks or other financial institutions, typically located in developing countries adjacent to countries producing the drugs. For example, FARC is believed to have a series of such banks operating in Ecuador to facilitate the transfer of funds outside of Colombia.[165] From there, FARC can manage its finances electronically, using computers and accessing its accounts online from the jungle. Arms shipments have frequently been arranged using this method, minimizing risk;[166]

---

[165] Id.
[166] Id.

- Camouflage of terrorist finance through import/export businesses, such as buying and selling honey, fish, or grain, a technique used by Al Qaeda in Somalia and Sudan;

- Collusion with otherwise legitimate businessmen who work with collusive financial institutions to invest terrorist funds in legitimate real estate and business ventures;[167]

- Investment of the proceeds of narcotics trafficking in real estate. The FARC in Colombia and the PKK in Turkey have both purchased real estate outside of their countries but in their region (Panama and Germany, respectively). Real estate investment is a traditional refuge for the proceeds of drug trafficking, and drug traffickers have controlled substantial elements of the urban construction of luxury hotels and resorts in Colombia, Panama, Venezuela, and Central America.

*Enforcement Mechanisms.* Prior to the September 11 terrorist attacks, there were only minimal global efforts targeting terrorist finance per se. Few countries had ratified the only significant international treaty covering the issue, the 1999 United Nations Convention for the Suppression of the Financing of Terrorism. As a result, the Convention had yet to come into effect.[168] The principal anti-money laundering organizations, including the FATF, had yet to take up terrorist finance in a meaningful way. After September 11, the FATF issued eight Special Recommendations on Terrorist Financing. These included: (1) ratifying the 1999 UN convention; (2) criminalizing terrorist finance and money laundering; (3) freezing and confiscating terrorist assets; (4) requiring financial institutions to report suspicious activities related to terrorism; (5) call for international cooperation and sharing of information on terrorist finance, and for countries to take measures to insure they do not provide safe harbor to terrorist financiers; (6) taking measures to regulate alternative remittance systems; (7) taking measures to require financial institutions to include accurate and sufficient information on wire transfers to permit transactions linked to terrorism to be traced to their source; (8) reviewing the adequacy of laws and regulations of non-profit organizations such as charities, to discourage terrorist finance.[169]  These very general recommendations have yet to be implemented in the countries most central to the placement of terrorist funds, or in a meaningful way, in countries ideologically sympathetic to particular terrorist causes. Generally, they added little to existing anti-drug money laundering enforcement requirements, in effect adding terrorist finance to the pre-existing framework for anti-money laundering regulation and enforcement established by the FATF over the previous ten years.  A few of the recommendations, however, were potentially significant,

---

[167] Id.

[168] On March 10, 2002, the UN Convention reached the minimum number of ratifications (22) stipulated as necessary for it to come into effect. As a result, it went into effect on April 10, 2002. As of the end of March 2002, 132 countries had signed the Convention, but just 24 had deposited ratification instruments with the UN.

[169] FATF Special Recommendations on Terrorist Financing, October 31, 2001. See http://www1.oecd.org/fatf/TerFinance_en.htm.

especially the recommendations to require registration of alternative remittance systems, regulation of non-profit organizations, and adequate documentation of wire transfers. Notably, none of them addressed the relationship of terrorism to the exploitation of drugs or any other form of natural resource, focusing solely on the identity of the persons moving the funds (that is, terrorist groups).

*Implications.* The global effort to combat terrorist finance is still in its infancy, and there has yet to be any particular focus in regulatory or enforcement efforts on the relationship between the finance of terrorism and drug trafficking. To the contrary, enforcement efforts against narcotics and terrorism have tended in most governments to remain discrete, with limited cross-fertilization between those responsible for combating each problem. While there is relatively limited information on how terrorists move the proceeds of narcotics to fund their operations, the information that is available suggests, not surprisingly, that the terrorists use essentially the same infrastructure and armamentarium as do the traffickers, from bulk cash to barter, from alternative remittance systems to front companies. They also use many of the same jurisdictions and even the same financial agents, relying on many of the same mechanisms to prevent the tracing of their funds back to their source. The effort to combat narcotics-financed terrorism therefore requires similar solutions as the effort to combat narcotics-financed crime and corruption more generally. These solutions begin with insuring that formal financial institutions maintain barriers against money of uncertain provenance, monitoring those barriers, and sanctioning those that fail to maintain standards. While such standards are increasingly being adopted, even in countries where corruption is endemic, too often they remain inspirational only. In countries where governance is weakest, and terrorists comparatively strong, such standards remain largely absent, and when present at all, remain systematically ignored. To date, despite the NCCT name and shame process initiated by the FATF, sanctions have not actually been imposed on any country, as potential targets enact laws that bring them in formal compliance with international standards. To date, it is too early to determine whether the new frameworks that have been established in many countries during 2001 and 2002 will be enforced in practice. Without such enforcement in the jurisdictions where narcotics are placed, the targets of terrorism in other jurisdictions are likely to remain largely unprotected, absent controls on access from the poor regulated or lax jurisdictions. In this regard, the involvement of terrorists in drug trafficking out of the world's least governed locales raises fundamental questions about whether globalization can proceed safely on an all-inclusive basis, or whether cordon sanitaires may be a necessary alternative.

## IV.    EXISTING INITIATIVES

International efforts to respond to abuses of commodities in connection with conflict have run along a number of separate tracks, only some of which deal with the financial aspects of such abuses. Most of the initiatives fall into one or more of the following categories, each of which are briefly reviewed below to assess the degree to which they have addressed financial flows and mechanisms associated with resource exploitation:

1.    Embargoes, in which the UN has agreed upon measures to limit transborder transactions during the pendency of a conflict.

2.    Certification programs, in which goods are only permitted to move across borders if they meet certain documentation requirements.

3.    Disclosure regimes, in which public or private participants in transactions involving a commodity that has been linked to conflict must disclose certain information about any transaction for it to be deemed lawful.

4.    Anti-corruption and transparency standards and norms, which may indirectly criminalize the activities of officials and private sector persons involved in various forms of commodity exploitation.

5.    Anti-money laundering standards and norms, which may sanction countries that facilitate various forms of commodity exploitation.

6.    Anti-terrorist standards and norms, which may lead to regulation of important financial mechanisms used by terrorists that are also regularly used for illicit commodity exploitation.

7.    Drug control or crime control standards or norms, which establish broad international obligations to combat drug-trafficking or organized crime through criminalizing certain forms of conduct, authorizing procedures for enforcement, requiring certain regulations and mandating forms of international cooperation, including criminalizing and regulating the laundering of the proceeds of illicit transactions involving narcotics.

8.    Private sector "seal" initiatives that establish minimum standards to which a business must agree to adhere in order to be certified as a member in good standing of the seal organization.

9.    Name and shame exercises, both governmental and non-governmental.

Each of these categories of initiatives has areas of effectiveness and limits, and these, together with examples of each type of initiative, are discussed below.[170]

**A.    Embargoes.** [171]

1.    <u>General.</u>

*Trigger.*  An ongoing conflict with the presence of contesting military or security forces operating within a territory is generally the prerequisite to the UN authorizing a broad sanctions regime that covers a territory, with certain exceptions to allow for the imposition of sanctions regimes that have initiated conflict and which are deemed to remain dangerous (such as Iraq). Sanctions regimes can be total or partial, short-term or long-term.

*Strengths.*  Imposition of embargoes reduces access to markets, especially those in the most developed countries that constitute the most sustained source of demand for the products of an embargoed country.  In cases where there is a political consensus in support of the sanctions, the loss of market access for both imports and exports can have an immediate and substantial impact on the civilian population of a targeted country, undermining political support over time for the continuation of the conflict.  Embargoes also may make it harder for people to export illicit natural resources, as buyers become scarce. By reducing demand, embargoes may accomplish their immediate objective: reducing the sources of funds for warring combatants. They may have the secondary benefit of reducing the harvesting of the commodities involved as well.

*Limitations.* Embargoes are only as good as the political consensus that sustains them. Black marketers, criminal organizations, corrupt officials, and legitimate businesses willing to ignore sanctions in favor of profits will routinely violate sanctions to the extent that broader regulatory and enforcement measures do not prevent them from doing so. Embargoes on countries selling goods such as timber and oil that have inelastic markets may increase the price on global markets of the banned commodity, rewarding those willing to violate the sanctions. Embargoes may also strengthen the relative political and economic power of those violating the embargoes, both within and outside the embargoed country, by giving those willing to break the law a market advantage over those who abide by the law. Civilian populations tend to experience the brunt of across-the-board sanctions, as local security forces requisition key commodities for themselves,

---

[170] Due to limitations in the scope of this paper, the examples provided are illustrative, rather than exhaustive.

[171] Many other studies have undertaken considered reviews and assessments of the impact of sanctions on areas of conflict. See e.g. David Cortright and George A. Lopez, "Smart Sanctions: Targeting Economic Statecraft," 2002; Gary Clyde Hufbauer, Jeffrey J. Schott and Kimberly Ann Elliott, "Economic Sanctions Reconsidered," Washington Institute for International Economics, 1990.  Adequate consideration of this topic is beyond the scope of this paper. The following brief discussion of sanctions is offered solely as a shorthand summary relevant to the consideration of financial mechanisms pertaining to illicit commodities transactions in the context of conflict for the sake of comprehensiveness.

focusing any market deprivations on the general population, which may then blame the sanctions rather than the government or local security forces for their suffering.

*Examples and Assessment*. The imposition of sanctions on South Africa played a critical role, over time, in forcing the dismantling of apartheid and the creation of democracy in the country. Sanctions imposed on Serbia were an essential element of eventual displacement of the Milosevic regime. Indeed, some U.S. policymakers have argued that Milosevic's downfall was brought about by the impact of sanctions once funds controlled by Milosevic held in financial institutions outside Serbia were identified and the sanctions began to impose constraints on the well-being of those within the regime.[172] By contrast, sanctions imposed on Iraq after the Gulf War did not bring about regime change or attenuate the power of Iraq's military ruler to remain in control of the country, as the Iraqi regime was able to sell enormous quantities of oil illegally (largely smuggled through Turkey) despite the sanctions. Similarly, there is little evidence that sanctions have had a substantial impact to date in stopping conflict in the DRC. Notably, in neither case did the limitations on the sale of commodities actually stop the conflict or bring about regime change. In the South Africa case, the sanctions never prevented the South African government from exporting large quantities of the country's most important commodity, diamonds. Serbia had no commodities to exploit. The comprehensive UN sanctions on Iraq and the DRC do not seem to date to have been effective in preventing sufficient sales of commodities by security and military forces to sustain themselves irrespective of sanctions. There have also been extraordinary few prosecutions or seizures of assets of entities or persons engaged in even systematic violations of sanctions, rendering enforcement risks low and enforcement action largely symbolic.

*Implications.* As has been commonly observed, broad sanctions imposing barriers on trade can have an impact in reducing the funds available to regimes engaged in conflict, but require active support from many (and perhaps most or all) countries to be effective.[173] Such sanctions certainly have not prevented exploitation of natural resources when the legitimate market for the commodity is of substantial size and scope. To date, there is little evidence that the sanctions imposed on Iraq have prevented the Iraqi regime from exporting and exploiting the revenues of substantial quantities of oil (outside the authorized sales under the UN oil for food program) despite its illegality. Other limitations on effectiveness include the capacity limitations of some governments and the impact of corruption and criminality in facilitating illicit activity.

2.      Sectoral.

*Trigger.* A small number of commodities are widely viewed to be incompatible with social stability in general and are subject to international embargo, with limited

---

[172] Interviews of former U.S. Ambassador for the implementation of the Dayton Accords, Robert Gelbard November 2002 and of former U.S. Special Envoy to the Balkans James O'Brian, March 2002, each by principal author of this paper.
[173] David Cartright and George A. Lopez, id and  Gary Clyde Hufbauer, Jeffrey J. Schott and Kimberly Ann Elliott, id.

exceptions for commercial or military use. Primarily, these include illicit drugs, especially opium and coca derivatives, certain forms of weaponry associated primarily with military forces, and some precursor materials usable in creating weapons of mass destruction (WMD).  Of these, narcotics and nuclear material controls are most relevant to this study, as each is a prohibited commodity.

*Strengths.*  Sectoral embargoes on illicit narcotics, military weapons and WMD precursors have established global standards and norms that have for all practical purposes eliminated any lawful commercial market for these products. Those participating in buying or selling embargoed goods face substantial criminal as well as civil penalties in almost every country. Most countries cooperate well with one another in investigating cases of violations of sectoral sanctions, and will in general extradite violators. Over time, most of the persons violating sectoral sanctions will experience sanctions. Over time, most of the persons producing the illicit commodities will find they can no longer remain in the illicit business.

*Limitations.*  Prohibitions on commodities may not eliminate substantial market demand for the commodities. To the extent such market demand continues, those willing to violate the legal norms are likely to have substantial economic sanctions to engage in the prohibited conduct. Regions of conflict produce especially widespread violations of sectoral sanctions. Typically, such regions result in countries or provinces that provide safe havens or impunity for those involved in illicit production, sales, and purchases of sanctioned goods. Indeed, sectoral embargoes tend to concentrate production of embargoed commodities in areas where governments, military forces, or other security forces can exploit illicit production. Sectoral sanctions also tend to reward those involved in black markets, increase the size of the black markets, and over time create networks of private sector entities and corrupt officials participating in the illicit activity. Thus, sectoral prohibitions can lead to further weakening of governance by encouraging rental behavior and increasing the relative economic and political strength within a society of criminals and criminal organizations.

*Examples.*  International conventions universally regulate opium and coca derivatives, with the most important instrument remaining the Vienna Convention, which prohibits the cultivation and production of the sanctioned products, as well as their transportation, purchase and sale, and their financing. The Vienna Convention has been the backbone of all subsequent international efforts to combat sales of illicit drugs. Its signatories include almost every country in the world.[174] The requirements of the prohibition regime have driven signatories over time to build new anti-money laundering enforcement and regulatory regimes, capacities and agencies. Many countries created entire anti-drug agencies to implement their obligations under the Vienna Convention. Notably, the impetus for the creation of financial intelligence units (FIUs) and the Egmont Group also arose as one of many consequences of the Vienna Convention's adoption. Drug money laundering prosecutions are not uncommon internationally, and

---

[174] As of November 2002, 166 countries were signatories to the Vienna Convention. Two notable exceptions remain Burma and Cambodia. See http://www.vienna.convention.at/.

asset seizures are common, making drug trafficking and drug money laundering a business that has real rather than theoretic risks for the market participants. The UN has played an ongoing role in assessment and assistance in implementing the prohibition regime through the UN International Drug Control Program and the annual meetings of the Commission on Narcotic Drugs (CND) in Vienna. Similarly, the many conventions covering nuclear weapons have created an international prohibition regime that is largely, although not universally, accepted. The conventions include the Treaty on Non-Proliferation of Nuclear Weapons, the Convention on the Physical Protection of Nuclear Material, and the Convention on Nuclear Safety, among others, which generally prohibit acquisition of nuclear weapons and relevant precursors by those who do not already have them. These control regimes criminalize and/or regulate relevant forms of commercial activity, domestic or transborder, involving nuclear material and related items, with national adherence to the regimes monitored through the International Atomic Energy Agency (IAEA), also based in Vienna. The relevant conventions and the IAEA are focused on the control of particular substances and technologies, not on the financial aspects of nuclear smuggling. However, criminal involvement in nuclear smuggling has been separately covered by the Palermo Convention, which does cover money laundering.

*Implications*. Effective action against narcotics has required the development of anti-money laundering capacities on the basis of globalized international standards. By contrast, control of nuclear material within the private sector has been largely effective irrespective of financial control mechanisms, with the notable exception of nuclear smuggling in which the sources of demand have been state actors.[175] The international consensus that the material should not enter the stream of commerce for any entity other than a state has helped maintain adequate controls. However, one additional and unique element of controls over nuclear material is the physical danger involved in smuggling radioactive substances, which both increases the barrier to entry in direct exploitation of the material (mining) and reduces the incentive to smuggle. Notably, even in this extraordinarily tough enforcement and regulatory environment, nuclear smuggling has remained an active although comparatively infrequent ongoing phenomenon.[176]

## B.    Certification Regimes.

*Typologies*.  In at least a general sense, customs authorities have always relied in part on country-of-origin certification requirements, which though often falsified or ignored, provide a base line for the imposition of duties. Beyond the standard country-of-origin requirements levied by customs authorities, commodities long covered by

---

[175] This paper does not seek to address illicit resource *purchases* by governments as a matter of government policy, which raise distinctly different issues from illicit resource *sales* by officials within a government acting in their individual capacity.

[176] A U.S. Central Intelligence Agency chronology on nuclear smuggling from November 1993 through March 1996 lists more than 70 reported incidents involving nuclear material found in commercial and/or criminal channels in Belarus, Bulgaria, the Czech Republic, Estonia, Germany, Hungary, India, Iran, Lithuania, Poland, Romania, Russia, Slovakia, Switzerland, Tanzania, Turkey, and Zaire (now the DRC). See http://www.cia.gov/cia/public_affairs/speeches/archives/1996/go_appendixa_032796.html.

international certification regimes have tended to fall into two categories: (a) commodities regulated because they are dangerous, such as weapons, both military and small, and technologies useful in military technologies as well as for standard commercial applications, and; (b) commodities regulated because they are deemed irreplaceable or "at risk" as a result of prior exploitation, such as endangered species. Recent efforts to create certification programs covering timber might also fall into the second category. However, a third category may also now exist, (c) commodities regulated because of their exploitation in connection with sustaining military or security forces in conflict. Diamonds were the first commodities subject to certification within this category, as a result of the Kimberly Process. Tanzanite may be a second example if the Tucson Protocols are implemented.

*Common Elements*.  Goods moving in international commerce are generally required to bear country-of-origin certifications, using a standard form of certificate or origin adopted by the Customs Cooperation Council of the World Customs Organization in 1973. The standard form requires identification of the exporter, consignee, particulars of transport, description of the goods, and country-of-origin. Customs agencies have generally been the sole enforcers of such certifications. The limitations of individual customs agencies due to low-pay, poor training, inadequate resources, and corruption are inhibit effective enforcement of country-of-origin certifications in lesser-developed countries. Because the goods move cross-border, these domestic weaknesses are exported with the goods, as certifications of origin are only as good as the enforcement mechanisms in the weakest link in the customs chain. Customs certifications typically are accompanied by declarations of value. False declarations are endemic to international trade, especially as under-invoicing the amount of the goods in transit provides the opportunity to reduce taxes at country-of-origin and tariffs at country-of-destination. To date, there has been no systematic effort to tie certification schemes on a global basis to transparent payment mechanisms.

*Sectoral Certifications.*

*(a) Diamonds.* Since May 2000, representatives from 37 nations, the diamond industry, and a number of NGOs have conducted negotiations (referred to as the Kimberley Process, after the town in South Africa where the first meeting was held) to develop an inter-national system. In March 2002, delegations reached agreement on a range of issues, including establishment of a database and standards for handling rough diamonds at each successive stage, from the mine to where they are cut and polished. Ultimately, the Process failed to adopt one important element that had been recommended by a number of participants, namely independent, effective monitoring of the regulations and control mechanisms that each nation is supposed to put in place so that a global system can go into effect. Currently, very few countries have adequate measures in place. Consequently, the process relies primarily on voluntary participation and adherence by governments and industry, and lacks an inter-national authority to monitor and enforce rules. The draft proposal entails recommendations, rather than binding controls, for how diamonds are to be

handled from the time they are mined to the time they are first exported. Participation in the "chain of warranties" that follows the initial export (as diamonds are sold and resold, polished, and incorporated into jewelry) is to be voluntary, and monitoring and enforcement are left to self-regulation. After the rumors that members of al-Qaeda were attempting to exploit the loosely regulated tanzanite markets, American dealers in precious stones under the initial steps to apply measures similar to the Kimberley process to tanzanite, although implementation has yet to take place.[177] Neither the Kimberly Process nor the Tucson Protocols include any measures covering the financial mechanisms used by those in violation of the regulations and control mechanisms envisioned by these processes.

(b) *Endangered Species.*  In 1975, the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) came into force affording various degrees of protection to more than 30,000 species of animals and plants, whether they are traded as live specimens, fur coats, or dried herbs. There are currently 160 parties to CITES, which requires that any export of any specimen of a species included in its Appendix I require permission and the presentation of an export permit, and that any import similar require permission, an import permit and either an export permit or a re-export certificate.[178] CITES requires parties to criminalize trade in protected species and maintenance of records of trade in the protected species.[179] The Convention does not address financial mechanisms that may be used in connection with such trade. The Palermo convention covers transnational criminal activity involving endangered species, however, including an obligation to regulate and enforce the laundering of the illicit proceeds of trafficking in such species.

(c) *Firearms.* Although many countries have long required end-user certificates for weapons, a common certification approach was not adopted until the passage in June 2002 of the Protocol against the Illicit Manufacturing of and Trafficking in Firearms, their Parts and Components and Ammunition (Firearms Protocol) supplementing the Palermo Convention.[180]  The certification approach is similar to that of CITES, requiring import, export and re-export certificates as applicable. Notably, the Firearms Protocol lies within the framework of a Convention that criminalizes the laundering of the

---

[177] *Africa Mining Intelligence*. (2002) "Kimberly Process for Tanzanite," January 23.

[178] Article III, Regulation of Trade in Specimens of Species Included in Appendix I, CITES.

[179] Article VIII, CITES.

[180] The UN Firearms protocol was in turn based on a ground-breaking regional convention, the Interamerican Convention Against the Illicit Manufacturing of and Trafficking in Firearms, Ammunition, Explosives, and other Realted Materials adopted by the Organization of American States, November 4, 1997, signed by 33 of the 34 OAS member states ("OAS Firearms Convention"). The OAS Firearms Convention requires signatories not to export, import, or permit the transit of weapons except when the movement of the firearms is simultaneously lawful in the countries of export, import and transit. The OAS treaty mandated not only end-user certifications, but the labeling of all firearms with unique markers at the time of manufacture and the time of import.

proceeds of any activity that violates its terms. Thus, the Firearms Protocol is backstopped by the obligation to criminalize, regulate, and enforce against violations of the Protocol, which include essentially all forms of illicit cross-border activities involving firearms. The Firearms Protocol also prompted the Customs Cooperation Council of the World Customs Organization to add particular categories of weapons and components to the harmonized system by which goods in transit are tracked by national customs agencies.

*Strengths.* Certification regimes provide a level of harmonization and control over commodities requiring certificates. The regimes provide a means by which well-intentioned entities and persons can choose to deal only in licit commodities, thereby creating market incentives for licit goods to be of greater value than illicit commodities. The certification process simultaneously create universal rules to distinguish licit from illicit activity, and thus provide a basis to structure national regimes and national regulatory and enforcement activity in support of national regions. Finally, the certification regimes provide an evidentiary trail for regulatory and enforcement activity, as abuses by corrupt officials and criminal organizations through unlawful issuance, forgery of certificates, or frauds are exposed and responded to.

*Limitations.*  Regimes requiring the certification of goods have not tended to create adequate verification mechanisms. None of the certification regimes have simultaneously provided for immediate integration of record keeping regarding certified commodities and the actual financial mechanisms (whether wire transfers or deposits of currency) that accompany the physical movements of goods. The sectoral regimes have also not been able to address problems of domestic capacity and corruption in areas of weakened governance, with the result that the links in the chain have facilitated considerable circumvention of the certificate process. Notably, enforcement activity against those involved in illicit buying and selling of prohibited commodities, including endangered species, diamonds and firearms, remain relatively haphazard, and often confined to a few jurisdictions. Generally speaking, financial institutions have little awareness of certification regimes, and financial regulators do not make enforcement of certification regimes a visible component of anti-money laundering obligations.

*Implications.* Certifications have had an impact in every sector in which they have been adopted. However, capacity limitations and corruption create substantial gaps in regulatory and enforcement activity, and criminal organizations structure their activities to circumvent certification programs. Certification regimes rely especially on the institutional competence and integrity of customs agencies, which are often deficient. These deficiencies worsen substantially where such competence and integrity is most needed – in areas of resource exploitation and in areas of conflict. To date, cross-fertilization between certification regimes and anti-money laundering regulations has been minimal. The Palermo Convention requires anti-money laundering laws to cover the laundering of all illicit proceeds. Accordingly, the Convention necessarily would include the laundering of the proceeds of crimes involving certification abuses.  There remains no international mechanism to coordinate activity between those regulating and enforcing

money laundering or financial transparency laws and those involved in seeking to enforce certification regimes.

## C.     Disclosure and Monitoring Initiatives.[181]

The UN, international financial institutions, and various non-governmental organizations have undertaken a wide range of private sector disclosure and public sector monitoring initiatives in connection with the illicit exploitation of commodities. These include all of the sectoral certification processes discussed above, but also include various local mechanisms in other sectors. These include:

*Timber Related Initiatives.* The Forest Crimes Monitoring Unit, established in Cambodia by the World Bank and the government and supported by the United Nations Development Program (UNDP), the U.N.'s Food and Agriculture Organization (FAO), the U.K., Australia and Denmark. The unit is designed to assist the Cambodian government with combating forest crime. This unit includes a Forest Crime Monitoring Office in the Department of Forestry and Wildlife, a Department of Inspection in the Ministry of the Environment, and independent monitoring by Global Witness, whose previous efforts led to the initiative. A key component is the development of systems for tracking logs and forest crime cases, which have increased accountability and transparency, and led to a significant increase in enforcement actions. In an attempt to curtail illegal logging, bilateral agreements have been drawn up between Indonesia and its largest trading partners. Indonesian Government has signed an agreement with the British Government under which the UK will move to ban imports of illegal Indonesian logs into Europe. This was driven by the large "green movement" in the UK who also assisted in the "light touch mechanisms" placed in the UK Pension Act. Extensive use of such agreements with other countries may result in a significant decrease in the export of illicit timber from Indonesia. International pressure has resulted in Malaysia signing the International Tropical Timber Organization (ITTO), which issues Guidelines for Sustainable Management of Natural Tropical Forests. To date, none of these timber-related initiatives contained a financial monitoring element relating to formal or informal financial sectors. Indeed, as detailed above, Indonesia and Malaysia are both countries where financial transparency generally has been lacking, and financial regulation and enforcement of anti-money laundering obligations minimal at best.

*Oil Related Initiatives.*   Although other initiatives have been undertaken whereby private sector entities make various commitments to socially responsible extraction, the publish-what-you-pay initiative, launched in June 2002 by George Soros and Global Witness, provides the first significant effort to focus attention on monitoring not only the purchase and sales of a commodity, but simultaneously the funds used to pay for the commodities. Notably, publish-what-you-pay would not focus on the mechanisms by

---

[181] The following section is included for the sake of a complete review that analyses the financial aspects of commodity control regimes, and is necessarily incomplete given the scope of the paper. A more detailed and precise discussion of the reporting of resource revenues, especially in timber and oil, is set forth elsewhere among these papers See Leif Lund, Phil Swanson and Mai Oldgard, "Reporting of Resource Revenues," draft paper commissioned by the World Bank, November 2002.

which illicit commodity sales move, but rather, on the amounts, timing, and recipients of particular revenues paid by licit private sector companies purchasing energy. The information that could be developed from a publish-what-you-pay regime would in turn be available to assist regulators and law enforcement officials in determining whether a particular transaction not reported under publish-what-you-pay may have been illicit in nature.  Separately, the International Association of Oil & Gas Producers ("OGP") has established industry guidelines on issues such as environmental management and in November 2001 held an initial meeting in Houston to discuss the corruption issue. Among the ideas discussed were proposals to share best practice in due diligence and training, both within the OGP and -- ideally -- with other related industry associations.[182] Potentially, the OGP initiative could propose responses to oil related corruption to standardize the provision of information to the public that would facilitate the tracing of corrupt payments in the energy sector.

**D.      Anti-Corruption and Transparency Standards and Norms.**

During the late 1990s, anti-corruption initiatives were being undertaken at a rapid rate, covering both active and passive bribery.[183] These included regional conventions against corruption within the OAS and the Council of Europe (COE), each of which focused on criminalizing the taking of bribes, and a major global convention undertaken at the OECD, which focused on the making of bribes. The initiatives arose in an environment in which capital flows to emerging and developing countries had shifted markedly in favor of the private sector, rather than on a government-to-government basis. As a result, multinational corporations and financial markets generally became a more significant factor in transfers of capital than official assistance. Economic collapses in such countries as Mexico, East Asia, and Russia often revealed extreme corruption in financial and business sectors, even as they created substantial private sector losses. The Latin American malaise and the Asian economic flu in turn prompted the IMF and the World Bank to focus on strengthening standards and norms in not only fiscal but also regulatory areas. The regulatory standards emphasized documenting financial transactions involving governments, and account records at financial institutions generally, as mechanisms to facilitate prevention and punishment of corruption.

*OECD Convention.*  The OECD convention on bribery in transnational business transactions was signed in 1997 and came into force in 1999. Under the terms of the convention, the OECD's 35 member countries have undertaken to introduce laws similar to the FCPA enacted in 1977 in the U.S. to make it possible to prosecute companies that pay bribes abroad. Major elements of the OECD Convention are the requirement to criminalize active bribery, to make bribes no longer tax deductible by corporations, to require company and business accounting requirements and practices that provide adequate recordation of relevant payments, and to provide mutual legal assistance to

---

[182] John Bray. (2002)  "Special Report: Progress solid but uneven in fight against corruption," *Oil & Gas Journal*, August 26.

[183] "Active" bribery is defined as the offering of or making of a bribe by the person or entity seeking to influence official action; "passive" bribery is the request for or acceptance of a bribe by an official offering to take a governmental action on behalf of a private interest.

facilitate inquiries into suspected breaches. Of particular importance to the issue of resource exploitation is the OECD Convention's requirement to criminalize extra-territorial bribery. As a result, bribes paid by a person who is a citizen of a signatory country anywhere in the world were criminalized and subject to prosecution. The OECD Convention also provided for a process of mutual assessments as a mechanism to evaluate and improve upon compliance. The process of evaluation is a critical element, as to date there have been no prosecutions of corrupt activity attributed to domestic laws enacted as a result of the convention. Enforcement of the OECD Convention could also have the consequence of first highlighting where corrupt practices have lead to resource exploitation, and then highlighting critical nodes by which corrupt payments have been made. Jurisdictions or institutions identified as nodes in handling funds relating to illicit exploitation of natural resources could be required to put greater due diligence mechanisms into place as a condition of market access for the jurisdictions, and of retaining a license for the institutions.[184]

### E.  Anti-Terrorism Standards and Norms.

After 11 September 2001, in an effort to assure U.N. support for combating terrorist finance schemes, the UN Security Council unanimously adopted Resolution 1373 (UNSCR 1373), a binding document that requires all 189 U.N. member states to:

- Criminalize the use or collection of funds intended, or known to be intended, for terrorism;
- Freeze immediately funds, assets or economic resources of persons who commit, attempt to commit, or facilitate terrorist acts and entities owned or controlled by them;
- Prohibit nationals or persons within their territories from aiding or providing any aid to the persons and entities involved in terrorism;
- Refrain from providing any form of support to entities or persons involved in terrorism;
- Deny safe haven to those who finance, plan, support, or commit terrorist acts, or provide safe havens.

The resolution requires member states to answer a series of queries, and report their findings to the United Nations. However, the United Nations cannot sanction member states under UNCSR 1373 for failing to comply with international standards for combating terrorist finance schemes.[185]

In April 2002, the FATF discussed further below, published guidance for financial institutions in detecting terrorist financing that specified in some detail criteria for the detection of possible terrorist transactions. This guidance would cover laundering

---

[184] OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions. See http:// www.oecd.org/pdf/M00017000/M00017037.pdf.
[185] For copies of UN member state reports and related documents, see: http://www.un.org/Docs/sc/committees/1373/.

of the proceeds of narcotics and other commodities by terrorists, as well as other forms of terrorist finance. The guidance asked financial institutions to focus on:

- Accounts that receive periodic deposits and which then become dormant at other periods. Such accounts may prove to be "sleeper" accounts for later use by terrorists.
- Accounts containing minimal sums that suddenly receive deposits or series of deposits followed by daily cash withdrawals that continue until the transferred sum has been removed.
- Refusals by a customer to provide adequate customer identification.
- Accounts for which several persons have signature authority when the persons appear to have no family ties or business relationship.
- Accounts opened by a legal entity or an organization that has the same address as other legal entities or organizations but for which the same person or persons have signature authority, with no apparent economic or legal reason for the arrangement.
- The opening by the same person of multiple accounts into which numerous small deposits are made that in aggregate are not commensurate with the expected income of the customer.
- Use of mutual personal and business accounts or the accounts to collect and then funnel funds immediately or after a short time to a small number of foreign beneficiaries.
- Foreign exchange transactions that are performed on behalf of a customer by a third party followed by wire transfers of the funds to locations that have no apparent business connection with the customer.[186]

These and the other mechanisms listed in the guidance have general applicability for money laundering and terrorist finance. They do not seem to be especially applicable to deter or detect financial transactions involving commodity exploitation in which officials and private sector companies are operating together collusively to place illicit funds under the name of front companies in a minimally regulated jurisdiction.

**F.   Anti-Money Laundering Standards and Norms and the FATF.**

*Institutional Aspects of FATF.* The FATF is an inter-governmental body whose purpose is the development and promotion of policies, both at national and international levels, to combat money laundering. The FATF is therefore a policy-making body that works to generate the necessary political will to bring about national legislative and regulatory reforms to combat money laundering. The FATF monitors members' progress in implementing anti-money laundering measures, reviews money laundering techniques and counter-measures, and promotes the adoption and implementation of anti-money laundering measures globally. In performing these activities, the FATF collaborates with other international bodies involved in combating money laundering. The FATF does not

---

[186] For a complete description of FATF initiatives related to terrorist finance, see http://www1.oecd.org/fatf/TerFinance_en.htm.

have a tightly defined constitution or an unlimited life span. The FATF conducts regular reviews of its mission every five years.

*History and Mission.* The FATF was established during the French presidency of the G-7 in 1989, in response to the G-7's recognition of the threat posed to banking and financial systems from drug money laundering. The FATF's initial mandate was to examine the methods used to launder drug proceeds and to develop recommendations for combating them. These 40 Recommendations, developed during the FATF's first year, in turn became the basis for what was then an innovative system for implementation. The FATF, which had a tiny secretariat and was not a chartered international organization, but only a voluntary association, initiated a system for self- and mutual assessment. Under this system, each member of the FATF would first assess its own compliance with the FATF's 40 Recommendations. Then, other FATF members would visit the jurisdiction, question authorities from the assessed jurisdiction, and reach their independent determination of where the jurisdiction was failing to meet the standards of the 40 Recommendations. This approach included several innovations. First, was the notion that technical experts would develop standards which over time would bind their countries in practice even in the absence of their entering into a formally binding international agreement. Second was the concept of mutual evaluation, in which a country would submit to peer review as a means of improving its domestic capabilities.

*Core Standards.* Although the FATF has 40 Recommendations, they can be summarized as five basic obligations:

1. Criminalizing the laundering of the proceeds of serious crimes and enacting laws to seize and confiscate them.
2. Obliging financial institutions to identify all clients, including all beneficial owners of financial property, and to keep appropriate records.
3. Requiring financial institutions to report suspicious transactions to competent national authorities and to implement a comprehensive range of internal control measures.
4. Putting into place adequate systems for the control and supervision of financial institutions.
5. Entering into agreements to permit each jurisdiction to provide prompt and effective international cooperation at all levels, especially with regards to exchanging financial information and other evidence in cases involving financial crime.[187]

*Broadened Mandate and the Name and Shame Process.* In 1996, under the U.S. Presidency of the FATF, the organization expanded its mission beyond reviewing capacities against narcotics money laundering to cover money laundering involving all serious crimes. It also agreed to take on new developments in money laundering trends, especially those involved with electronic funds transfers. The FATF also decided to

---

[187] The full text of the FATF's 40 Recommendations is available at the FATF's web site at http://www.oecd.org/fatf.

broaden its authority to include efforts to change the behavior of non-member jurisdictions in recognition that the ability of its member jurisdictions to protect themselves against money laundering would be undermined if non-member jurisdictions did not adopt and implement its 40 Recommendations as well. Accordingly, the FATF developed a "black list" of other countries whose practices were deemed to facilitate money laundering and therefore were deemed "non-cooperative" with the objectives of the FATF. The development of a black list reflected a dramatic change in approach by the FATF, necessitated by the growing recognition of the interdependence of the global financial infrastructure, and the inability of any jurisdiction unilaterally to protect itself in the face of bad practices in other jurisdictions. By 2000, the FATF had developed its initial list of "Non-Cooperative Countries and Territories." To date, the sanction of faced enhanced scrutiny or greater regulatory barriers have been threatened against a number of jurisdictions by the FATF, but imposed on none. The simple threat has been enough to cause essentially any country targeted with immediate action to change its laws, with countries taking action in response to the threat of sanctions to date including Antigua, the Bahamas, Hungary, Indonesia, Israel, Liechtenstein, Russia, St. Kitts and Nevis, and Vanuatu among others.

*No Focus on Money Laundering of Proceeds of Illicit Extraction.* Neither the FATF nor any of the regional FATF-style bodies, which replicate FATF standards and conduct mutual assessments[188], have focused any efforts to date on combating money laundering involving any illicit commodity apart from narcotics. There is literally no attention that has been given to the laundering of the proceeds of timber, oil and gas, tanzanite, coltan, or gemstones, except a few references to the use of gold and diamonds in connection with discussions of terrorist finance. Accordingly, the FATF and the regional FATF-style bodies have yet to develop typologies describing the mechanisms by which the funds from these commodities are handled. This is an informational, regulatory and enforcement gap that to date no other international body has sought to fill.

### G.    Anti-Narcotics and Anti-Crime Standards and Norms.

Given the limits in scope of this paper, only brief reference will be made to international instruments governing anti-narcotics and anti-crime and their relationship to

---

[188] These are the Asia/Pacific Group on Money Laundering, whose members include Australia, Bangladesh, Taiwan, Cook Islands, Fiji, Hong Kong, India, Indonesia, Japan, Macao, Malaysia, Marshall Islands, Nepal, New Zealand, Niue, Pakistan, Korea, Palau, Philippines, Samoa, Singapore, Sri Lanka, Thailand, the U.S. and Vanuatu; the Caribbean Financial Action Task Force, which includes all of the Caribbean and Central American countries other that Cuba, plus the British Dependent Territories and Venezuela; the Council of Europe Select Committee of Experts on the Evaluation of Anti-Money Laundering Measures, which includes essentially all European countries that are not members of the EU, including Russia and the Ukraine, other than Serbia; the Eastern and Southern Africa Anti-Money Laundering Group, which includes Botswana, Kenya, Lesotho, Malawi, Mauritius, Mozambique, Namibia, Seychelles, South Africa, Swaziland, Tanzania, Uganda, Zambia, and Zimbabwe; and the South American FATF, which includes Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, and Uruguay. Only two regions remain largely outside of the scope of these anti-money laundering institutions: Central and Western Sub-Saharan Africa, and the Middle East, each of which have little capacity to prevent the laundering of the proceeds of illicit activity, including that derived from commodity exploitation.

the financial mechanisms used in resource exploitation. The two most important of these are the 1988 Vienna Convention and the 2000 Palermo Convention, each of which require signatories to adopt anti-money laundering regulations and enforcement measures and to carry out mutual assistance to combat respectively, illicit drug production and trafficking and transnational organized crime. The Palermo Convention implicitly criminalizes the laundering of all proceeds of illicit commodities extraction, as it covers all serious transnational crime involving more than one person. It pays scant direct attention to extraction-related criminal activity, focusing largely on better-recognized crimes against private persons and private property such as trafficking in persons, trafficking in women for sexual exploitation, and firearms trafficking. Notably, it also criminalizes the laundering of the proceeds of corruption.

## H.  Private Sector Seal Initiatives.

Seal initiatives represent a method by which private sector institutions can agree to abide by certain standards of corporate conduct in return for being placed a white list that provides either practical or public relations benefits. Significant recent seal initiatives include:

*ICC Rules of Conduct to Combat Extortion and Bribery in International Business Transactions.*  These rules, developed by the International Chamber of Commerce ("ICC") in 1996, prohibit extortion and bribery for any purpose, a broader standard than the OECD Convention's focus on public officials. The Rules also call upon governments to make their procurement procedures more transparent and to condition procurement contracts on abstention from bribery, including the requirement for anti-bribery certification from bidders. The ICC's Standing Committee on Extortion and Bribery is discharged with promoting the Corporate Rules of Conduct; it could perhaps consider calling upon major companies in the forest products industry to participate in its proceedings and develop a corporate code of conduct when bidding for concessions, etc.

*The Wolfsberg Principles.*  In October 2000, 11 leading international banks working with the anti-corruption non-governmental organization Transparency International, announced agreement to a voluntary set of global anti-money laundering principles. Initially the "Global Anti-Money Laundering Guidelines For Private Banking," endorsed by the participating global banks in October, 2000, applied solely to private banking, that is, to the accounts of the extremely rich, those with deposits of $3 million to $5 million, but the obligations they articulate have potentially broad applicability. The guidelines are:

1.  Adopting client acceptance procedures so that the banks accept "only those clients whose source of wealth and funds can be reasonably established to be legitimate." These procedures are supposed to include: (a) taking reasonable measures to establish the identify of its clients and beneficial owners before accepting money, (b) demanding adequate identification before opening an account, (c) determining the source of wealth, the person's net worth and the

    source of the person's funds, and (d) requiring two persons, rather than just one, required to approve the opening of an account.

2. Engaging in additional diligence or attention in cases involving the use of numbered or alternative name accounts, high-risk countries, offshore jurisdictions, high-risk activities, or public officials.

3. Updating client files when there are major changes in control or identity.

4. Identifying unusual or suspicious transactions, following them up, and then deciding whether to continue the business relationship with heightened monitoring, ending the relationship, or advising authorities.

5. Monitoring accounts through some means.

6. Developing and implementing a "control policy" to insure compliance with bank rules.

7. Establishing a regular method of reporting on money laundering issues to management.

8. Training bank employees involved in private banking on the prevention of money laundering.

9. Requiring the retention of bank records that might be material to anti-money laundering matters for at least five years.

10. Establishing an "exception and deviation procedure that requires risk assessment and approval by an independent unit" for exceptions to the previous nine principles.

11. Establishing an anti-money laundering unit at the financial institution.[189]

The signatories to the Wolfsberg Principles did not create a mutual assessment or other evaluative mechanism, relying instead on an honor system whereby reputational injury was viewed to provide an adequate disincentive to any failure by a member financial institution to meet its public commitments. In just two years, the Wolfsberg Group has already extended its original mandate twice. In January 2002, it issued a set of principles on the Suppression of the Financing of Terrorism, and in September 2002, it issued a set of principles for correspondent banking, which has been one of the areas of greatest money laundering vulnerability for money center banks. Major elements of the Wolfsberg anti-terrorism principles include:

1. Requiring strict adherence to "know your customer" policies by requiring the proper identification of customers by financial institutions and the matching of such identifications against lists of know or suspected terrorists issued by competent authorities having jurisdiction over the relevant financial institution. This principle further included the requirement to implement procedures for consulting applicable lists, taking steps to determine whether customers were on the lists of sanctioned persons or persons of interest to the government, and reporting to the relevant authorities matches from lists of known or suspected terrorists.

2. Identifying high-risk sectors and activities, and.

---

[189] For a complete description of the Wolfsberg Principles and related documents, see http://www.wolfsberg-principles.com.

3. Engaging in heightened monitoring of unusual or suspicious transactions indicative of terrorist finance.[190]

Major elements of the Wolfsberg correspondent banking principles include:

1. Making risk-based due diligence a component of evaluating all financial institution accounts to determine whether higher scrutiny should be given to their transactions due to the jurisdiction in which they are based having inadequate anti-money laundering standards, insufficient regulatory supervision, or presenting greater risk for crime, corruption or terrorist financing.

2. Reviewing the location of owners, the corporate legal form of the financial institution and the transparency of ownership structure, as well as the involvement of high-level officials and their associates, termed "Politically Exposed Persons," in their management or ownership.

3. Reviewing the customer base of each financial institution for whom they provide correspondent banking services to determine whether their clients may be higher risk for money laundering or terrorist finance.

4. Creation of an international registry for financial institutions by which they could share information useful for conducting the due diligence specified in the principles.[191]

Each of these sets of principles is potentially applicable to combating the financing of illicit commodities. The terrorist finance principles together create a framework by which governments or international bodies could match their customers against a government-endorsed list, and then monitor or freeze their assets, as the government that regulates them may direct. One relevant recent example of such a list that could be matched against financial institution customers was that created by the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo. Both the opportunities and the pitfalls of such an approach are highlighted by that report, which named a number of persons and financial institutions as being in violation of international sanctions without, in many cases, providing any background on such violations, let alone evidence of them.[192] Any list provided financial institutions for heightened scrutiny or asset freezes of customers would necessarily have to be subjected to a high standard of care to prevent unacceptably high risks of violations of due process and personal rights. The correspondent banking principles could potentially be applied to customers in general, not just financial institutions, and thereby make financial institutions participating in the "seal" approach adopted by the Wolfsberg Group required to vet all new accounts for possible money laundering risk, including as may be appropriate the laundering of proceeds from illegal extraction. In order for due diligence to include a focus on illegal extraction, substantial publicity and education

---

[190] Id.
[191] Id.
[192] United Nations Security Council, Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo, June 2000, id.

would be required of both regulators and financial institutions to identify general "red flags" indicating such activity and specific examples of those laundering such funds.

**J.      Name and Shame Initiatives.**

The most prominent name and shame initiatives to date dealing with inappropriate handling of transborder financial activity have included that of the FATF, discussed above, and that of the OECD tax haven initiative, discussed below.

*The OECD Harmful Tax Practices Initiative*.  As of the late 1990's, the growing recognition that lack of transparency was creating substantial problems even for the most affluent countries as a result of globalization began to embrace the area of taxes. The OECD came to recognize that international tax evasion was linked to a host of other serious threats to the global system, stating in the words of its general secretary that "there are strong links between international money laundering, corruption, tax evasion, and other international criminal activities. These illegal activities are widespread and involve such sizeable sums that they can pose a threat to the stability of the global system of finance and even the global trading system."[193] In May 1998, the OECD governments issued a report on "Harmful Tax Competition," which led to the creation of a "Forum on Harmful Tax Practices," a set of "Guidelines for Dealing with Harmful Preferential Regimes in Member Countries," and finally, a series of Recommendations For Combating Harmful Tax Practices. The initiative adopted three elements of FATF's approach. First, the OECD developed a set of agreed standards to combat a set of agreed problems; second, the OECD put into place a system of multilateral assessment of each jurisdiction's implementation of the agreed standards; third, the OECD agreed to "name and shame" non-conforming jurisdictions that would face loss of market access or other sanctions if they did not take action.  In four years, the initiative has had substantial results, causing some targeted jurisdictions to change their laws immediately, and most others to agree to complete doing so by the end of 2005. The OECD standards are similar to those of the FATF and the Wolfsberg Group, and application of them to the financing of commodity exploitation would address a number of the mechanisms by which the proceeds of illicit extraction are today converted from public to private ownership.

1.  Ensuring that information is available on beneficial (that is, actual) ownership of companies, partnerships and other entities organized in the jurisdiction.
2.  Requiring that financial accounts be drawn up of companies organized in the jurisdiction in accordance with generally accepted accounting standards, and that they be appropriately audited.
3.  Putting into place mechanisms for the jurisdiction to share information pertaining to tax offenses with corresponding authorities in other jurisdictions.

---

[193] "Introductory Remarks of the Honourable Donald J. Johnston, Secretary-General of the OECD, High Level Symposium on Harmful Tax Competition," June 29, 2000.

4.  Ensuring that its regulatory and tax authorities have access to bank information that may be relevant for the investigation or prosecution of criminal tax matters.[194]

In particular, agreement to share information on the actual ownership of companies, regardless of where they are located, requiring appropriate audits of each company organized in a jurisdiction, requiring such audits to become available to the public, at least for publicly-traded firms, and matching tax information with bank information with the records maintained by the business of its activities all have potential applicability to efforts to punish those exploiting revenue streams from illicit commodity extraction.

## V.    GAPS AND POSSIBLE INSTITUTIONAL RESPONSES

Today a patchwork of initiatives for monitoring illicit commodities involve numerous institutions, none of which have broad jurisdiction over both the tracking of natural resource commodities and the tracking of the proceeds of these resources. Moreover, none of the existing initiatives have sought to create a reporting or disclosure mechanism to create documentation that would simultaneously track both the physical transactions and movement of commodities and the funds generated from such transactions. The recent "publish what you pay" initiative undertaken by the non-governmental organization Global Witness would provide a precursor mechanism to such tracking, by providing documentation at the front-end of a transaction involving commodities, such as oil and gas, that involve highly concentrated markets of both sellers and buyers. Similarly, the initiative undertaken by the Wolfsberg Group, which includes an obligation to exercise heightened scrutiny of large private bank accounts and correspondent banking accounts, could also provide a structure applicable to tracking the funds generated by natural resources sales. Notably, the existing Wolfsberg Group principles already require participating institutions to impose higher levels of scrutiny on certain types of transactions in some certain regions to determine whether they might be the proceeds of corruption. Thus, the Wolfsberg Group principles could be an important element of creating greater accountability over the illicit proceeds of commodity exploitation, should typologies for such exploitation and "red flags" be developed to act as indicators that illicit proceeds from commodity extraction are being laundered.

Current capacity limitations exist at both the national and international level. Many national regulatory and law enforcement agencies deal poorly with money laundering and the smuggling of goods that are clearly illicit, such as narcotics. International organizations responsible for developing harmonized standards to combat such smuggling, such as the World Customs Organization (WCO) and the FATF, have tiny secretariats and limited resources. Regional law enforcement agencies, such as Europol for cross-border police investigations within the EU and Eurojust for cross-border prosecutions of such crimes, remain in their infancy, and to date have focused on traditional crimes such as drug and people smuggling. Existing certificate-of-origin

---

[194] See e.g., *The OECD's Project on Harmful Tax Practices: The 2001 Progress Report*, 2001 at http://www.oecd.org/pdf/M00021000/M00021182.pdf.

mechanisms are also in their infancy and face significant limitations in enforcement .The example of the Kimberly process is instructive. A certificate-of-origin system can be undermined by poor enforcement and circumvented by intricate international smuggling networks. Lax government controls in the major diamond trading and cutting centers (Belgium, Switzerland, the United Kingdom, Israel, and others) and the opaque, unaccountable nature of the diamond industry have also been major obstacles in the struggle to root out conflict diamonds.

Other than diamonds, most types of natural resources abused in connection with conflict currently are not the subject of any internationally agreed upon standards. For example, there are no international rules or agreements that presently address the issue of illegal logging and conflict timber. The UN Forum on Forests, for instance, does not have a specific mandate for such a purpose, though it could prove a useful forum for international discussion. A certification system might build on existing efforts by the Forest Stewardship Council to ascertain whether timber is being produced in a sustainable manner. The Council effort, initiated in 1993, entails independent audits to verify compliance with a series of requirements. Of particular interest is its chain-of-custody certification, which seeks to trace the lumber or furniture on consumer store shelves all the way back to the forest where the trees were felled. Such a system of tracing and accounting could determine whether timber had been produced in conflict situations, but would then need to be matched against financial transactions to determine whether the asserted facts contained on certifications were authentic. This form of matching system could also be used to trace diversions of commodities through the middlemen participating in the transactions, as well as to identify the physical and financial infrastructure (transportation vehicles, financial institutions) used by those moving the illicit commodities.

Some of these gaps might be filled by the creation of an international legal framework to cover the sales of natural resources used in conflict or accompanied by serious corruption. Such a framework would focus on establishing common tracking and disclosure mechanisms for the extraction and sale of certain categories of commodities, and extend the principles for international cooperation against money laundering to that involving the proceeds of illicit extraction of natural resources. An inter-governmental mechanism may also be needed to exercise oversight over the implementation of such a framework and to integrate work undertaken by IFIs and development agencies, by existing intergovernmental organizations such as the WCO, CITES, INTERPOL, and the UNDCP.  Such a framework and mechanism could cover a group of commodities, including gemstones, oil and gas, precious metals, and timber, and establish standard documentation and disclosure mechanisms that would be universally applicable. Just as the Vienna Convention and the Palermo Convention established national requirements for money laundering regulation and enforcement and judicial cooperation covering narcotics and transnational organized crime, this framework and mechanism would focus on building a common approach to the handling both of the commodities and the funds they generate. The framework would more resemble the recent OAS firearms convention and the UN Firearms Protocol, as well as existing efforts by the WCO, by requiring standard documentation for the covered commodities, an approach outside the two UN

conventions. Notably, the UN Firearms Protocol and existing WCO certification requirements focus on document licit movements of goods across borders, highlighting non-conforming illicit activity in the process. The Firearms Protocol and existing WCO certification initiatives are largely to be implemented by the private sector. A framework that covered both the movement of commodities-in-transit through certifications and the corresponding financial movements would rely not only on the private sector involved in the handling of the commodities, but also the financial institutions already laboring to deal with drug money laundering, terrorist finance, criminal laundering, and the laundering of the proceeds of corruption.

As this study has suggested, there are very significant differences in the market structure for the exploitation of different kinds of commodities in different kinds of situations. As noted, oil and gas tends to be a concentrated market with few players. Tropical timber has some concentration of markets among the end-users of such timber, but many players among those capable of exploiting the timber. Coltan, diamonds and tanzanite more nearly resemble timber than energy, with an extremely deconcentrated set of suppliers and an increasingly narrow band of purchasers as the products move to the ultimate wholesale end-users. Accordingly, a framework covering all of these commodities would need to focus on the areas where there could be choke-points through which each type of commodity, and its financing, would be likely to pass.

Certain financial mechanisms currently used to handle the proceed of illicit extraction are already being addressed by existing money laundering and terrorist finance initiatives following on the recommendations of the FATF and OECD and with the recent assistance of both the IMF and the World Bank. Offshore money laundering havens, jurisdictions offering non-transparent international business companies and trusts that can be readily used as fronts are already under substantial pressure to replace their current laws with regimes that meet prevailing international standards. Geographical regions that remain largely uncovered by money laundering and financial transparency frameworks to date, especially the Middle East and most of Sub-Saharan Africa, will remain the object of ongoing efforts to bring about reform regardless of whether the financing of illicitly extracted natural resources is included within the scope of the reform efforts.

Other important financial mechanisms used to launder the proceeds of illicit resource extraction have yet to be adequately subject to international regulatory and enforcement standards or action. Some of these mechanisms, especially alternative remittance systems such as hawala and hundi, are now being developed to counter terrorist finance. Other mechanisms especially associated with illicit resource extraction in connection with conflict, such as the use of gold and precious metals to launder the proceeds of such extraction, have not yet been subject to international disclosure rules. An effective response to illicit resource extraction requires coverage of high-value barter commodities. Developing a strategy to integrate such commodities in international financial transparency and disclosure mechanisms might properly be undertaken by an intergovernmental organization focused on combating illicit resource extraction.

Any intergovernmental organization mandated to combat illicit resource extraction must also work to develop mechanisms by which existing anti-money laundering and terrorist finance frameworks can incorporate the financial movements of the proceeds of such extraction into suspicious activity reporting and due diligence requirements, as well as to bring out mechanisms for international mutual legal assistance in connection with investigations of illicit extraction. Such an organization would also need to assure compliance by the affected industries, and promote a regulatory scheme that harmonizes international standards, rather than impedes legitimate trade.

One alternative to a new intergovernmental organization would be establishment by the G-8 of a steering group whose initial mission would be to review the recommendations made here and in the other papers commissioned in this study, and provide the G-8 with a consensus view of whether an international framework and intergovernmental organization was necessary, or whether existing frameworks and organizations could be reoriented to deal with illicit resource extraction. For example, the WCO has extensive experience in developing standard certifications, and perhaps could be tasked to develop standard certifications for certain commodities that require more detailed information on chain-of-custody and payment mechanisms. Similarly, the FATF might be asked to develop a set of typologies for the laundering of the proceeds of various commodities, and for recommendations on procedures by which FATF members could implement appropriate regulatory and enforcement actions to cover the funds generated by illicit resource extraction.

The Wolfsberg Group approach provides a possible third model for action. The G-7 could ask that all relevant international or intergovernmental entities who may have a role in combating illicit resource extraction meet with representatives of the major sources of demand in the relevant markets: oil and gas, timber, precious metals, and gemstones, together with major participants in the key transportation markets (ground, sea and air) and the global financial services infrastructure. The mixed private sector, public sector group, which could also include NGOs, may possibly establish principles for tracking both the purchase, sale and flow of those commodities and the financial mechanisms associated with such flows. An agreed upon plan of action could be reached, with designated responsibilities for follow-up by each participant and a timetable for completion of the mandated activities. The private-public group would meet periodically to discuss implementation issues and to report back to the G-7 on progress. Successes could be followed by additional mandates, and alternative approaches could be developed to respond to inadequacies in the regime.

A related approach would involve the development of further "seal" for major market players among both purchasers and sellers of commodities subject to illicit extraction. Such "white lists" could include commercial entities and governmental entities involved in commodity extraction, as well as the elements of the transportation and financial infrastructures handling the commodities and the funds generated by their sale.

A necessary element of any approach will be continued research and analysis. This paper has provided only a partial overview of the mechanisms by which those engaged in illicit resource extraction handle the proceeds of their activities. As limited by its literature search and its scope of work, the paper has covered a few examples in a several of the most important sectors, but has not provided intensive detail in any of the cases covered.[195] To date there have been no detailed studies of the financial mechanisms used by the purchasers and sellers participating in illicit resource extraction. Such studies would provide greater texture and depth to the observations and analysis provided here on the basis of existing information, and would require field work in addition to this literature review.

With these options in mind, and setting aside the vast open areas for research, the remaining section of this paper provides a series of recommendations for consideration that could be included within a basic framework for combating illicit resource extraction. The recommendations will establish a basic framework designed for universal application. They cover the criminal justice system and law enforcement; the financial system and its regulation, and international cooperation. The measures build off existing international obligations and are designed to focus on disclosure, accountability, and cooperation on cross-border trade and financial transactions without impairing the freedom of any person or entity to engage in legitimate transactions or threaten economic development.

---

[195] Among the many gaps in this paper are a review of the handling of the proceeds of timber, gemstones (including diamonds) and minerals in Angola, Burma, Cambodia, Liberia and Sierra Leone and the handling of oil and gas in Indonesia, or a discussion of the monitoring and tracking mechanisms that have been put into place in such countries as Botswana and Norway that have avoided falling into the trap of "resource curse."

## VI.    RECOMMENDATIONS

The following constitutes a possible general international framework for combating illicit resource exploitation. They should be seen as an initial set of suggestions to stimulate further analysis and review, rather than as a finished set of guidelines for adoption in their current form.

GENERAL FRAMEWORK

Recommendation 1

Each country should take immediate steps to ratify and to implement fully, all international conventions related to the oversight of illicit commodities.

Recommendation 2

An effective oversight mechanism should include increased multilateral co-operation and mutual legal assistance in money laundering investigations and prosecutions and extradition in money laundering cases, where possible.

ROLE OF THE INDIVIDUAL FIRMS IN COMBATTING ILLICIT COMMODITIES

*Identification and Record-keeping Rules*

Recommendation 3

All industries should label the origination point of the product through a central data-base that includes the official or other reliable identifying document, and record the identity of their clients, either occasional or usual, when establishing business relations or conducting transactions.

In order to fulfill identification requirements concerning legal entities, financial institutions should, when necessary, take measures:

- To verify the legal existence and structure of the customer by obtaining either from a public register or from the customer or both, proof of incorporation, including information concerning the customer's name, legal form, address, directors and provisions regulating the power to bind the entity.

- To verify that any person purporting to act on behalf of the customer is so authorized and identify that person.

- Firms should maintain, for at least five years, all necessary records on transactions, both domestic or international, to enable them to comply swiftly with information requests from the competent authorities. Such records must be

sufficient to permit reconstruction of individual transactions, so as to provide, if necessary, evidence for prosecution of criminal behavior. Financial institutions should keep records on customer identification (e.g. copies or records of official identification documents like passports, identity cards, driving licenses or similar documents), account files and business correspondence for at least five years after the account is closed. These documents should be available to domestic competent authorities in the context of relevant criminal prosecutions and investigations.

*Increased Diligence of Firms*

Recommendation 4

If financial institutions suspect that funds stem from a criminal activity, including the evasion of taxes due on the sale of natural resources or represent the proceeds of any form of corruption, they should be required to report promptly their suspicions to the competent authorities.

Recommendation 5

Financial institutions should develop programs to assure proper oversight of commodities. These programs should include, as a minimum:

- The development of internal policies, procedures and controls, including the designation of compliance officers at management level, and adequate screening procedures to ensure high standards when hiring employees which include reference to prevention and detection of transactions involving the proceeds of illicit resource extraction;

- Issuance of instructions regarding "red flags" for transactions or accounts that may involve the proceeds of illicit resource extraction;

- An ongoing employee training program;

- An audit function to test the system.

*Measures to Cope with the Problem of Countries with No or Insufficient Anti-Money Laundering Measures*

Recommendation 6

Firms should ensure that the principles mentioned above are also applied to branches and majority owned subsidiaries wherever located, including in countries which do not or insufficiently apply these Recommendations, to the extent that local applicable laws and regulations permit. When local applicable laws and regulations prohibit this

85

implementation, competent authorities in the country of the parent institution should be informed by the financial institutions that they cannot apply these Recommendations.

Recommendation 7

Firms should give special attention to business relations and transactions with persons, including companies and financial institutions, from countries that do not or insufficiently apply these Recommendations. Whenever these transactions have no apparent economic or visible lawful purpose, their background and purpose should, as far as possible, be examined, the findings established in writing, and be available to help supervisors, auditors and law enforcement agencies.

*Other Measures to Monitor, Detect and Prosecute Illicit Trafficking*

Recommendation 8

Countries should consider implementing feasible measures to detect or monitor the physical cross-border transportation of specific commodities. Countries should consider the feasibility and utility of a system where banks and other financial institutions and intermediaries would report all domestic and international currency transactions above a fixed amount, to a national central agency with a computerized data base, available to competent authorities for use in money laundering cases, subject to strict safeguards to ensure proper use of the information.

Recommendation 9

Countries should further encourage in general the development of modern and secure techniques of commodity management, including increased use of checks, payment cards, direct deposit of salary checks, and book entry recording of securities, as a means to encourage the replacement of cash transfers.

Recommendation 10

Countries should take notice of the potential for abuse of shell corporations by money launderers and should consider whether additional measures are required to prevent unlawful use of such entities.

*Implementation and Role of Regulatory and Other Administrative Authorities*

Recommendation 11

The competent authorities supervising firms, or other competent authorities, should ensure that the supervised institutions have adequate programs to guard against trafficking in illicitly extracted resources. These authorities should co-operate and lend expertise spontaneously or on request with other domestic judicial or law enforcement authorities in money laundering investigations and prosecutions.

Recommendation 12

The competent authorities should establish guidelines that will assist firms in detecting suspicious patterns of behavior by their customers. It is understood that such guidelines must develop over time, and will never be exhaustive. It is further understood that such guidelines will primarily serve as an educational tool for financial institutions' personnel.

Recommendation 13

The competent authorities regulating or supervising financial institutions should take the necessary legal or regulatory measures to guard against control or acquisition of a significant participation in firms by criminals or their confederates, including any person or entity found to have been involved in illicit resource extraction.

STRENGTHENING OF INTERNATIONAL CO-OPERATION

*Administrative Co-operation*

Recommendation 14

National administrations should consider recording, at least in the aggregate, international flows of commodities through a series of tracking measures, including GPS and import/export records from relevant states. Such information should be made available to an international oversight body.

Recommendation 15

International competent authorities, perhaps Interpol and the World Customs Organization, should be given responsibility for gathering and disseminating information to competent authorities about the latest developments in combating the trafficking of illicit commodities. Central banks and bank regulators could do the same on their network. National authorities in various spheres, in consultation with trade associations, could then disseminate this to financial institutions in individual countries.

*Exchange of information relating to suspicious transactions involving illicit commodities*

Recommendation 16

Each country should make efforts to improve a spontaneous or "upon request" international information exchange relating to suspicious transactions, persons and corporations involved in those transactions between competent authorities. Strict safeguards should be established to ensure that this exchange of information is consistent with national and international provisions on privacy and data protection.

*Cooperation in confiscation, mutual assistance and extradition*

Recommendation 17

Countries should try to ensure, on a bilateral or multilateral basis, that different knowledge standards in national definitions - i.e. different standards concerning the intentional element of the infraction - do not affect the ability or willingness of countries to provide each other with mutual legal assistance. The signing of memoranda of understanding in instances where treaties are not viable may be especially important for the oversight of illicit commodities. The use of GPS systems and import records from allied states could assist in the oversight.

Recommendation 18

International cooperation should be supported by a network of bilateral and multilateral agreements and arrangements based on generally shared legal concepts with the aim of providing practical measures to affect the widest possible range of mutual assistance covering natural resources that may have been subject to illicit extraction.

*Focus of improved mutual assistance on combating illicit commodities*

Recommendation 19

Cooperative investigations among countries' appropriate competent authorities should be encouraged. There should be procedures for mutual assistance in criminal matters regarding the use of compulsory measures including the production of records by financial institutions and other persons, the search of persons and premises, seizure and obtaining of evidence for use in money laundering investigations and prosecutions and in related actions in foreign jurisdictions.

Recommendation 20

There should be authority to take expeditious action in response to requests by foreign countries to identify, freeze, seize and confiscate proceeds or other property of corresponding value to such proceeds, based on the extraction or trafficking of illicit commodities.

Recommendation 21

To avoid conflicts of jurisdiction, consideration should be given to devising and applying mechanisms for determining the best venue for prosecution of defendants in the interests of justice in cases that are subject to prosecution in more than one country. Similarly, there should be arrangements for coordinating seizure and confiscation proceedings that may include the sharing of confiscated assets.

Recommendation 22

Countries should have procedures in place to extradite, where possible, individuals charged with crimes related to the extraction or trafficking of illicit commodities. With respect to its national legal system, each country should recognize the extraction and trafficking of illicit commodities as an extraditable offence. Subject to their legal frameworks, countries may consider simplifying extradition by allowing direct transmission of extradition requests between appropriate ministries, extraditing persons based only on warrants of arrests or judgments, extraditing their nationals, and/or introducing a simplified extradition of consenting persons who waive formal extradition proceedings.

Recommendation 23

States, entities, or individuals found to be in violation of the above recommendations should be subject to sanctions, including freezing financial accounts, and restriction of travel.

*Development of Further Standards*

Recommendation 24

The Customs Cooperation Council associated with the WCO should be asked to review its existing certification form used to specify country-of-origin to determine whether it should contain additional information to facilitate identification and tracking of licit goods and financial payments, and thereby to distinguish them from illicit goods.

Recommendation 25

The FATF should be asked to review its 40 Recommendations to determine whether they provide an adequate basis for combating the laundering of the proceeds of illicit resource extraction and to develop recommendations or other mechanisms to improve the reporting of suspicious activities involving the proceeds of illicit resource extraction.

Recommendation 26

Transparency International and the Wolfsberg Group should be asked to determine whether they can agree upon the development of additional guidelines that could be used to assist financial institutions in preventing themselves from being used to launder the proceeds of illicit resource extraction and related corrupt activities.

Recommendation 27

An ongoing consultative process should be created with the mandate to reach agreement on methods to improve reporting, disclosure and tracking of natural resources in

international commerce, together with the financial aspects of the transactions. This process should be preceded by a special meeting of experts from relevant stakeholders, including representatives of other international and intergovernmental organizations, governments, resource extraction industries, non-governmental organizations, and financial institutions to assess whether these or other standards could become the basis for a global framework to combat illicit resource extraction.

*Oversight*

Recommendation 28

Consideration should be given to the creation of an international organization or intergovernmental process that includes a secretariat to coordinate efforts to combat illicit resource extraction and to monitoring implementation of this legal framework and related initiatives. Such an organization or process would also be responsible for administering the ongoing consultative process specified in Recommendation 27.

## VII.    POSSIBLE FURTHER STEPS FOR THE WORLD BANK

While the information developed to date regarding illicit resource extraction may be sufficient to provide an initial basis for further international action, there remain very substantial gaps in the understanding of the details and dynamics of the financing of such extraction. To date, investigations into illicit resource extraction have been conducted almost entirely by non-governmental organizations, such as Global Witness and CIFOR, on an ad hoc basis. These investigations have focused on particular cases involving the physical movements of commodities and the political and economic relationships of the participants in illicit resource extraction. They have provided little information on the financial mechanisms used to launder the proceeds from illicit resource extraction.  A comprehensive research initiative would be useful to provide further specification to the physical mechanisms used to engage in illicit resource extraction, the major participants in such extraction, and the financial mechanisms used in such extraction in each commodity sector that has been identified as subject to abuse by corrupt officials, military or security groups operating in conflict zones, terrorists or criminals.

In respond to this need, the World Bank may wish to consider undertaking an effort to prepare an evaluation and an action plan for a number of commodities, including timber, gold, tanzanite, and their unique relationship with corrupt politicians, and military, insurgency and terrorist groups. Each study could provide a means by which the World Bank could monitor and reduce the illicit use of these commodities by the groups listed above. Each study could provide careful analysis of the economic issues arising from the illicit use of the commodities. To begin addressing that informational gap and to provide the foundation for well-targeted and effective assistance programs to fill capacity gaps, the studies should call for the preparation of a series of detailed country profiles as an initial step. Each analysis would have the objective of providing a careful, comprehensive, and nuanced examination of the economic dimensions of corruption, insurgency and terrorism, as related to specific commodities. Analyses could also undertake comparative work of

illicit resource extraction in non-conflict, pre-conflict and post-conflict situations. Such analyses could include:

- Assessments of the dimensions of illicit commodity flows at the national, regional and local level and the extent and ramifications of the use of illicit commodities within a specific region, focusing on cross-border and international trade.
- Regional analysis, supplemented with an in-depth examination of the financial network of each commodity.
- Analysis of the financial dimensions and economic impact of each commodity at the national level.
- Separate assessments of the use and impact of revenues from illicit resource extraction on the phenomena of corruption, conflict, and terrorism.

These studies could be used to further identify programmatic responses that the World Bank might take in response to the trafficking of illicit commodities. Recommendations might be made regarding possible future initiatives by the World Bank to deal with illicit resource extraction, and regional and national responses to the problem. Based on the information gathered and analyzed above, further recommendations of the necessary steps to curtailing the trafficking of particular illicit commodities might be developed. In addition to producing a rigorous analysis of the relationship between commodities and the above groups, the co-authors suggest consideration of regional and sectoral workshops to broaden and deepen an understanding of the issue within the World Bank, and among other institutions seeking to manage the problem of illicit resource extraction.

## Bibliography

Sources consulted for "Finance and Resources" paper:

Addison et al, 2001: Addison, Tony, and S. Mansood Murshed, *The Fiscal Dimensions of Conflict and Reconstruction*, World Institute for Development Economics Research and United Nations Diversity, Discussion Paper No. 2001/49, 2001 (http://www.diw.de/deutsch/service/veranstaltungen/ws_consequences/docs/diw_ws_con sequences200206_murshed2.pdf).

Barr, 2001: Christopher Barr, *Political Economy of Fiber & Finance in Indonesia's Pulp and Paper Industries*, CIFOR and World Wildlife Fund Macroeconomics Program Office, Washington D.C.

Brann, 2002: Joshua Brann, "Trade Policy in Indonesia: Implications for Deforestation," *The Bologna Center Journal of International Affairs*, Spring, 2002.

Chabal, 1999: Patrick & Jean-Pascal Daloz,  *Africa Works - Disorder as Political Instrument*, Oxford: James Currey, 1999.

Collier, 2000: Collier, Paul, *Economic causes of civil conflict and their implications for policy*, World Bank Policy Paper, Washington DC, June 2000.

Collier, 2000: Paul Collier, "Doing well out of war,"in Mats Berdal and David Malone (eds), *Greed &Grievance: Economic Agendas in Civil Wa*r, Boulder, CO: Lynne Rienner.

Cortright, et al., 2002: David Cortright and George A. Lopez ed., *Smart Sanctions: Targeting Economic Statecraf*t, Lanham: Rowman & Littlefield, 2002

Curtis, 1998: Grant Curtis, *Cambodia Reborn?: The Transition to Democracy and Development*, Washington, D.C.: Brookings Institute, 1998.

Davis et al, 2001b: Davis et al, *Oil Funds: Problems Posing as Solutions?*, Finance & Development, IMF, Volume 38, Number 4, December 2001 (http://www.imf.org/external/pubs/ft/fandd/2001/12/davis.htm).

De Morais, et al., 2000: Andrea Frota Machado de Morais, *Money Laundering in Brazil* School of Business and Public Management,  The Institute of Brazilian and Management Issues, XII Minerva Program Fall 2000, George Washington University.

De Soysa, 2001: Indra de Soysa, "Paradise is a Bazaar? Greed, Creed, Grievance and Governance," *World Institute for Development Economics Research Discussion Paper*, No. 2001/42, July.

Findlay, 1999: Mark Findlay, *The Globalisation of Crime: Understanding Transnational Relationships in Context*, London: Cambridge University Press, 1999.

Friends of the Earth, 2001: *Paper Tiger, Hidden Dragons 2: April Fools*, February, 2001. (http://www.foe.co.uk/resource/briefings/april_fools.pdf.)

Gedirsch, et al., 2001: Nils Petter Geditsch & Havard Strand, Mikael Eriksson, Margareta Sollenbery & Peter Wallensteen, "*Armed Conflict 1956-1999: A New Dataset*," June 8-9, 2001.

Global Witness, 2002: Global Witness, *All the President's Men: The devastating story of oil and banking in Angola's privatised war*, Global Witness, London, 2002 (http://www.globalwitness.org/campaigns/oil/index.html).

Greenpeace Report, 2002: "*Partners in Mahogany Crime*," Annex, "U.S. Companies Purchasing Big Leaf (South American) Mahogany," October 24, 2002.

Hayes, 2002: Hayes, Karen T., *Coltan Mining in the Democratic Republic of Congo: The implications and opportunities for the telecommunications industry*, forthcoming report.

Homer-Dixon 1999: Thomas F. Homer-Dixon, *Environment, Scarcity and* Violence; Princeton, NJ: Princeton University Press, 1999.

Hufbauer, et al., 1990: Gary Clyde Hufbauer, Jeffrey J. Schott and Kimberly Ann Elliott, *Economic Sanctions Reconsidered* (Second Edition), Washington, D.C.: Washington Institute for International Economics, 1990.

IBAMA (2001): Export data, Brazilian Government Institute for Environment and Natural Resources (http://www.ibama.gov.br ).

Ihonovbere, et al., 1998: Julius Omozuanvbo Ihonvbere and Timothy Shaw, *Illusions of Power: Nigeria in Transition* Lawrenceville, New Jersey: Africa World Press, 1998.

IMF, 2000: International Monetary Fund, Fiscal Affairs Department, *Fiscal Transparency*, in Report on the Observance of Standards and Codes (ROSC), Azerbaijan Republic, 13 November 2000 (http://www.imf.org/external/np/rosc/aze/fiscal.htm).

IMF, 2001a: International Monetary Fund and The World Bank, *Assessing the Implementation of Standards: A Review of Experience and Next Steps*, IMF Public Information Notice (PIN) No. 01/17, 5 March 2001 (http://www.imf.org/external/np/sec/pn/2001/pn0117.htm).

International Crisis Group, 2001: Indonesia: Natural Resources & Law Enforcement, December 2001. (http://www.intl-crisis-group.org ).

International Narcotics Control Strategy Report, 2001: Bureau for International Narcotics and Law Enforcement Affairs (2001), U.S. Department of State (http://www.state.gov/g/inl/rls/nrcrpt/2001/).

93

Jackson, 2002: Stephen Jackson, "Criminalised Economies of Rumour and War in the Kivus, D R Congo," Unpublished paper presented at the Annual Conference of the American Association of Anthropology, San Francisco, November, 2002.

Kaldor, 2002: Centre for the Study for Global Governance, London School of Economics, Research project on "Oil and Conflict", led by Mary Kaldor, 2002 (http://www.lse.ac.uk/Depts/global/OtherProjects.htm).

Karl, 1997: Karl, Terry Lynn, *The Paradox of Plenty: Oil booms and Petro-States*, Berkely, University of California Press, 1997.

Kazakhstan Country Analysis Brief, 2002: Energy Information Administration, U.S. Department of Energy, July, 2002 (http://www.eia.doe.gov/emeu/cabs/kazak.html).

Khmurych, et al, 1999: V. Khmurych & T. Tkachenko, "Opportunities for Corruption in the Ukrainian Gas Market," The Eurasia Foundation, 1999 (http://www.eurasia.org/programs/eerc/kiev/papers/khtk.htm).

*Kinsell (2000): Jeremy Kinsell, Unpublished Report on the FARC, University of Pittsburgh, August 2000.*

Mack, 2002: Mack, Andrew, *The Private Sector and Conflict*, (http://65.214.34.30/un/gc/unweb.nsf/content/privateSector.htm).

Marshall, Ian, *Access to Information and the Fight Against Corruption in the Mining & Minerals Sector*. Speech to MMSD Workshop on Access to Information in the Mining and Mineral Sectors, Vancouver, Canada, 29 November 2001 (http://www.transparency.ca/Readings/Marshall_AccessToInformation.pdf

Litan, 2001: Robert E. Litan, "Economic: Global Finance" in *Managing Global Issues Lessons Learned*, P.J. Simmons and Chantal de Jonge Oudraat, eds., Washington, D.C.: Brookings Institution, 2001.

Lund, et al., 2002: Leif Lund, Phil Swanson and Mai Oldgard, "Reporting of Resource Revenues," draft paper commissioned by the World Bank, November 2002.

Montague, 2002: Dena Montague, "Stolen Goods: Coltan and Conflict in the Democratic Republic of Congo," *SAIS Review,* vol. XXII no. 1, Winter–Spring (http://www.worldpolicy.org/projects/arms/news/22.1montague.pdf).

Nest, 2001: Michael Nest, "Ambitions, Profits and Loss: Zimbabwean Economic Involvement in the Democratic Republic of the Congo," *African Affairs* Vol. 100: 469–490.

Nigeria Country Commercial Guide, 2002: U.S. Commercial Service, Trade and Project Financing
(http://www.usatrade.gov/website/ccg.nsf/ShowCCG?OpenForm&Country=NIGERIA).

OECD, 2001a: OECD, *Best Practices for Budget Transparency*, PUMA/SBO(2000)6/FINAL, Public Management Service, Public Management Committee, 15 May 2001.

OECD, 2001b: OECD, *The OECD's Project on Harmful Tax Practices: The 2001 Progress Report*, 2001 (http://www.oecd.org/pdf/M00021000/M00021182.pdf).

OECD, 2002b: OECD Directorate for Financial, Fiscal and Enterprise Affairs, *Multilateral Enterprises in Situations of Violent Conflict and Widespread Human Rights Abuses*, Working Papers on International Investment, Number 2002/1, May 2002 (http://www.oecd.org/pdf/M00030000/M00030496.pdf).

O'Neill, et al., 2001: Bard E. O'Neill, and Edward C. Meyer, *Insurgency & Terrorism: Inside Modern Revolutionary Warfare*, Dulles, Va: Brasseys, Inc, 2001.

Peter, 2001: Chris Maina Peter, "Combating Organised Crime in Tanzania," Chapter 5 Organised Crime in Southern Africa Assessing Legislation. Charles Gordema, ed., Monograph No 56, June, 2001.
(http://www.iss.co.za/PUBS/MONOGRAPHS/NO56/chap5.html).

Petersen, 2002: Petersen, Christian, and Nina Budina, *Governance Framework of Oil Funds in Azerbaijan and Kazakhstan*, presentation to Workshop on Petroleum Revenue Management, The World Bank, 23-24 October, 2002.

Phillips, 2002: Lucie C. Phillips, *"Tracking Tanzanite – Tucson Protocols' Status Report,"* International Business Initiatives For the American Gem Trade Association, Jewelers of America, Inc., and The Jewelers Vigilance Committee, May 24, 2002 (http://www.agta.org/tanzanite/tucsonprotocolstatus.pdf).

Renner, 2002: Michael Renner,"The Anatomy of Resource Wars", Thomas Prugh, Ed*., World Watch Paper*, No. 162, October 2002.

Michael Ross. (Forthcoming) "How Does Natural Resource Wealth Influence Civil War? Evidence from 13 Case Studies", *Journal of Conflict Resolution*.

Ross, 2001: Ross, Michael L., *Timber Booms and Institutional Breakdown in Southeast Asia*, Cambridge University Press, Cambridge, 2001.

Ross, 2002: Ross, Michael L, *Oil, Drugs and Diamonds: How Do Natural Resources Vary in their Impact on Civil War?*, International Peace Academy, project on Economic Agendas in Civil Wars, 5 June 2002.

Snow, 1996: Donald M. Snow, *Uncivil Wars: International Security and the New Internal Conflicts,* Boulder, CO: Lynne Rienner, 1996.

Takano, 2002: Hideyuki Takano, *The Shore Beyond Good and Evil :A Report from Inside Burma's Opium* Kingdom, Tokyo: Kotan Publishing, 2002.

"Transnational Control of Money-Laundering." 2002,  Oxford University Press: *Strategic Survey 2001/2002*.

Ukraine Country Analysis Brief, 2002: Energy Information Administration, U.S. Department of Energy, August (http://www.eia.doe.gov/emeu/cabs/ukraine.html).

United Nations University/WIDER project on "New Fiscal Policies for Growth and Poverty Reduction", (http://www.wider.unu.edu/research/2000-2001-3.4.htm).

UN GC, 2002a: UN Global Compact website (http://www.unglobalcompact.org).

UN GC, 2002b: Global Compact Policy Dialogue, *Recommendations of transparency working group to address problems in zones of conflict*, downloaded October 2002, (http://www.unglobalcompact.org).

UN GC, 2002c: The Global Compact, *Report on Progress and Activities*, 2002.

UN, 2002: United Nations, *Final Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of Congo*, 15.10.2002.

UN, 2001: United Nations, *Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of Congo*, 12.04.2001, paragraph 215.

UN, 2001: Report by the UN Monitoring Mechanism on Sanctions against UNITA, October 12.
http://www.un.org/Docs/sc/committees/Angola/966e.pdf

UN Security Council. (2001) Report of the UN Panel on the Illegal Exploitation of Natural Resources in the Democratic Republic of  Congo, November 13.
http://www.un.org/Docs/sc/letters/2001/1072e.pdf

UN Security Council. (2002) Additional Report by the United Nations Monitoring Mechanism on Sanctions against UNITA, April 26.
http://www.un.org/Docs/sc/committees/Angola/486e.pdf

UN Security Council. (2002) "Report of the Security Council mission to the Great Lakes region, 27 April-7 May.
http://www.un.org/Docs/sc/missionreports/537e.pdf

United States Agency for International Development Bureau for Democracy, 2002: Conflict and Humanitarian Assistance Office of Transition Initiatives *Field Report: INDONESIA*, September 2002.

Wakeman-Lin et al, 2002: Wakeman-Linn, John, Paul Mathieu and Bert van Selm *Azerbaijan and Kazakhstan: Oil Funds in Transition Economies: Revenue Management*, presentation to Workshop on Petroleum Revenue Management, The World Bank, 23-24 October, 2002.

Wolfson, 1998: Murray Wolfson, ed, "The Political Economy of War and Peace," *Recent Economic Thought*, No. 64. London: Klewer Academic Publishers, 1998.

World Bank, 1997: *Helping Countries Combat Corruption: The Role of the World Bank*, Washington D.C.: The World Bank Group, 1997.

World Bank, 2000b: World Bank, *Kazakhstan Public Expenditure Review*, Report No.20489-KZ, 27 June 2000.

World Bank, 2002a: World Bank, Project on the Economics of Civil Wars, Crime and Violence, (http://www.worldbank.org/research/conflict).

World Bank, 2002b: World Bank, website on Best Practices in Dealing with the Social Impacts of Oil and Gas Operations: Collaborative Work in Progress (http://www.worldbank.org/ogsimpact/mgroverview.htm).