EXHIBIT G

The International Institute for Strategic Studies



# Survival

The IISS Quarterly **Volume 44 Number 3** Autumn 2002

## Arc of Conflict

**Getting Serious about Iraq** Philip H. Gordon,
Martin Indyk and Michael O'Hanlon

**Re-imagining US–Iranian Relations** Ray Takeyh

**Walking Softly in Afghanistan: the Future of
UN State-building** Simon Chesterman

**Afghanistan After the Loya Jirga** Amin Saikal

**The Powers in Central Asia** Boris Rumer

**India and Pakistan at the Edge** Andrew C. Winner
and Toshi Yoshihara

## Dangerous Transactions

**Fighting Terrorist Finance** Jonathan M. Winer and Trifin J. Roule

**The Threat Within: Deregulation and Energy Security** David Buchan

## Strategic Postures

**Transforming European Forces** Hans Binnendijk and Richard Kugler

**Demystifying the US Nuclear Posture Review** Richard Sokolsky

# Fighting Terrorist Finance

## Jonathan M. Winer and Trifin J. Roule

For much of the 1990s, efforts to combat international financial crime were overseen by a small number of intergovernmental organisations, particularly the Financial Aid Task Force (FATF) and regional bodies, such as the Council of Europe, Caribbean FATF and Asia Pacific Group.[1] These organisations relied upon technocrats from the law-enforcement and regulatory agencies of participating countries to develop anti-money laundering recommendations, criteria and questionnaires for self-evaluations, and to undertake mutual evaluations among countries consenting to such review.[2] The result was a slow accretion of best practices and increasing harmonisation of laws. The process also bred a growing recognition among the technocrats that cross-border regulation and enforcement against financial crime had to be carried out globally, not just among cooperating countries.

By the fall of 1999, the Benex scandal demonstrated that Russians could launder tens of billions of dollars through the United States.[3] One shock was the fact that these huge sums moved through just a couple of computers housed at an unregistered money-transmission business with full access to the Bank of New York's international wire-transfer services. Another was the role played by the tiny phosphate island of Nauru in the South Pacific, whose unregulated financial institutions, with no physical presence anywhere, were used successfully to prevent identification of who actually owned the money. Meanwhile, the International Monetary Fund had undertaken staff studies suggesting that the offshore financial services sector played a 'catalytic role' in Asia's financial crisis due to the hiding of losses in bank-secrecy havens.[4] The Federal Reserve and its chairman, Alan Greenspan, had similarly come to recognise that the offshore location of Long Term Capital Management, a hedge fund based in the Caymans, had prevented US regulators from realising that the entity had not only accumulated leverage amounting to more than one trillion dollars – but used US banks to finance the huge risks involved. France had its own series of financial scandals, involving among other institutions Credit Lyonnais, whose losses had been hidden in Luxembourg.[5] At the same time,

**Jonathan M. Winer** was US Deputy Assistant Secretary of State for International Law Enforcement in 1994–1999. He currently practises international financial regulatory law at the firm of Alston & Bird LLP in Washington DC. **Trifin J. Roule** is an Assistant Editor of the *Journal of Money-Laundering Control*, and the Project Manager for a three-year study commissioned by the US government to analyse money-laundering efforts in 60 jurisdictions.

kleptocrats like Suharto in Indonesia and Abacha in Nigeria had been found to have looted national treasuries and hidden the proceeds in places like the Channel Islands, theoretically subject to the direct rule of the British Crown.[6]

The pervasive cross-border financial crime bred a new consensus. The FATF initiated a 'name and shame' process whereby non-member states would be evaluated, whether they wished to be or not, and if found wanting, would be subject to international sanctions – in particular, the threat of loss of access to the most significant financial institutions and jurisdictions of the world.[7] The OECD undertook a counterpart exercise, focusing on jurisdictions facilitating various forms of foreign tax evasion.[8] Very often, the jurisdictions were identical to those targeted by the FATF.

The threat of sanctions – especially the potential loss of market access to financial institutions regulated by the US and the EU – compelled a number of states, including the Bahamas and the Russian Federation, to pass comprehensive anti-money-laundering legislation. Nevertheless, while most jurisdictions passed such legislation by the late 1990s, enforcement was largely lacking. The smaller jurisdictions lacked the necessary investigative resources and intelligence, while in the larger ones – including the US – financial institutions of all sizes failed to observe their own money-laundering policies and procedures.

The terrorist attacks of 11 September 2001 kick-started a new era of financial oversight aimed at choking off sources of terrorist funds. International organisations – largely in response to US-led efforts – issued a series of measures mandating that jurisdictions curtail the passage of terrorist finance. These included UN Security Council Resolution 1373, the FATF Eight Special Recommendations on Terrorist Finance, and significant initiatives by the G-8 and the European Union. Each of these resolutions made clear in broad terms that nations must take more action to inhibit the passage of terrorist finance through domestic financial institutions. These international efforts were supported by individual acts of legislation passed by numerous jurisdictions, including global financial centres such as the United Kingdom and United States, and states in the Middle East and southwest Asia previously known for minimal oversight of their financial sectors. The resolutions were passed in an effort to impede the passage of funds to terrorist groups in the Americas, Asia, Middle East and Western Europe.

During the first year after the 11 September attacks, these initiatives have achieved modest successes. Several dozen nations have seized terrorist assets, together comprising more than $115 million, according to the US Treasury Department.[9] Many more countries, including a number in the Middle East, have declared that despite diligent search, there have been no terrorist funds to be found. The US has shut down one substantial international *hawala* network, al-Barakaat.[10] However, there is little evidence to date that new laws requiring alternative remittance houses to register, enacted in the US, Hong Kong and elsewhere, have forced such institutions either to submit to regulation and transparency or to shut down. While a substantial number of countries have

enacted new laws and imposed new regulations to avoid name-and-shame lists, institutions licensed in poorly regulated jurisdictions still have substantially unimpeded access to the financial institutions and markets of New York, London, and Tokyo. Gold and diamond markets, hedge funds, and free-trade zones continue to abound, with few controls and open access to international wire transfer capabilities. In practice, while terrorist groups face new risks in laundering their money, they continue to have a variety of mechanisms by which to finance their activities, involving a range of both banking and non-banking financial institutions. Further progress in protecting against international terrorist finance is unlikely without international action to require customer identification and verification, know-your-customer, and the ability to trace funds across jurisdictions.

## Methods of funding terrorist groups

The methods employed by terrorist groups to garner illicit profits are varied, and each group routinely employs one or more mechanisms to raise funds, to place and layer[11] funds, and to invest funds for terrorism. These include a mixture of ideological, religious, criminal and business sources, which often mingle and merge, so that it becomes difficult to determine the provenance of any particular terrorist funds in any given case.

For example, funds for al-Qaeda have come not only from misapplied Islamic charitable contributions but also from investments in otherwise legitimate businesses, such as al-Barakaat's financial services and telecommunications empire. Traditional sources of funds for criminal organisations are also tapped, especially extortion. There have also been a number of reports that businessmen paid al-Qaeda operatives extortion money to prevent attacks on their business interests throughout the Middle East. The alleged payments were made to assuage bin Laden, who reportedly threatened to initiate attacks against targets in politically moderate Middle Eastern states, such as Jordan and Saudi Arabia. Similarly, the tiny Abu Sayyaf Group (ASG), which controls sections of the southern Philippines and has close ties with a number of Middle Eastern terrorist groups, routinely demands monthly 'revolutionary taxes' from local residents, businessmen and white-collar workers. It also raises funds through kidnappings for ransom.

Terrorist groups are also linked to narcotics trafficking. The Liberation Tigers of Tamil Eelam (LTTE, or Tamil Tigers), a highly organised terrorist group centred in the northern and eastern coastal areas of Sri Lanka, reportedly has close ties to drug trafficking networks in Burma, and members of Hizbollah are linked to drug trafficking in Lebanon. The al-Qaeda network received millions of dollars per annum through the production and distribution of opium, which was smuggled through neighbouring Central Asian states, or transported to distribution networks in East Africa. Many terrorist groups have also been linked to other criminal activities, including smuggling and counterfeiting operations. For instance, the Real IRA is active in smuggling assorted goods into Britain. In recent years, they have established close links to British criminal

Case 1:03-md-01570-GBD-SN   Document 7608-7   Filed 01/14/22   Page 6 of 19

including the attack on the *USS Cole* in October 2000. There are also reports in recent months that Iran has significantly increased funding to a number of Middle Eastern terrorist groups. In an attempt to derail the Israeli–Palestinian peace process and to establish an Islamic Palestinian state similar to its own, Iran has allegedly increased its financial support for Hamas through wire transfers in Jordan. According to public reports, the Iranian embassy in Damascus has been frequently used as a meeting place for members of Hamas and Iranian intelligence agents, suggesting ongoing cooperation among Syria, Iran and Hamas.

## Tracking terrorist finance

The United Nations Convention for the Suppression of Financing of Terrorism was proposed 18 months before 11 September 2001, but had received little serious attention. Forty-one states had signed the convention, but only six had ratified it before September 2001. After 11 September 2001, in an effort to assure UN support for combating terrorist finance schemes, the UN Security Council unanimously adopted Resolution 1373, a binding document that requires all 189 UN member states to:

- criminalise the use or collection of funds intended, or known to be intended, for terrorism;
- freeze immediately funds, assets or economic resources of persons who commit, attempt to commit, or facilitate terrorist acts and entities owned or controlled by them;
- prohibit nationals or persons within their territories from aiding or providing any aid to the persons and entities involved in terrorism;
- refrain from providing any form of support to entities or persons involved in terrorism; and
- deny safe haven to those who finance, plan, support, or commit terrorist acts, or provide safe havens.

Member states were required to submit progress reports, providing information as to how they have implemented Resolution 1373 by the end of 2001. The incomplete, and in some cases misleading responses provided a measure of the distance yet required to combat terrorist finance by governments in some of the most vulnerable countries. For instance, the UAE included as anti-terrorist legislation laws forbidding efforts to engage in armed overthrow of the government of the UAE. Responses by Yemen and Oman were too vague to permit analysis of whether they had undertaken any substantial anti-terrorist efforts.

At the community level, the European Union undertook several efforts against terrorist financing and money laundering in the wake of 11 September. On 4 December 2001, the European Community adopted an amendment to Directive 91/308, its main anti-money-laundering instrument, to expand reporting obligations to include attorneys, and require the oversight of funds channelled through exchange bureaus. The EU also froze the assets of terrorist

groups, charities and individuals linked to terrorist finance schemes, established a counter-terrorist unit within Europol intended to work closely with US counterparts, and pledged to ratify a convention on mutual assistance in criminal matters during the course of 2002. The EU undertook plans to introduce a union-wide arrest warrant to replace the current extradition system between the countries. Within the EU, however, legal measures are generally not applicable until they have been undertaken by individual EU member states, many of which have been slow to take action curtailing illicit finance schemes. In other cases, some EU states have taken independent views of which groups' activities are terrorist, and which are not subject to sanction. For instance, the EU has not frozen the assets of organisations affiliated with Hamas, only funds destined for Izz al-Din al-Qassam, the military arm of Hamas. Investigators, however, routinely link the funding of Hamas militant activities to Hamas front organisations that claim to support only social activities in the Middle East.

After a two-day Washington meeting in late October 2001, the FATF explicitly added terrorist finance to its existing remit to combat money laundering. It issued a series of eight special recommendations dealing specifically with terrorist financing, which – if systematically implemented and enforced – would have a substantial impact. The recommendations highlighted the level of work still to be undertaken, asking countries to ratify the 1999 UN Convention for the Suppression of the Financing of Terrorism and UNSCR Resolution 1373; to criminalise the financing of terrorism, terrorist acts and terrorist organisations; to freeze and confiscate terrorist assets; to report suspicious transactions linked to terrorism; to provide the greatest possible measure of assistance to enforcement agencies in other jurisdictions that investigate terrorist financing; to impose anti-laundering requirements, such as licensing, on alternative remittance systems; to strengthen customer identification measures in all wire transfers; and to ensure that non-profit organisations and charities are not misused to finance terrorism.

FATF member states pledged to implement the eight special recommendations by June 2002, and develop a process of self-assessment to aid other states in implementing the new recommendations. This deadline, however, was not met, because of a lack of cooperation in the international financial community, especially from the Gulf States, none of whom have yet to implement all eight recommendations. In theory, the FATF could blacklist non-cooperative countries and call on its member states to implement sanctions, such as detailed inspections of accounts that contain funds from non-compliant jurisdictions or a reduction in bi-lateral and international aid programmes. But to date, the FATF has not undertaken action to name and shame for failures to abide by terrorist finance recommendations.

After 11 September, the International Monetary Fund (IMF) and the World Bank each pledged to assist in the campaign to cut terrorist funding. In November 2001, the IMF's International Monetary Financial Committee (IMFC) called on all countries to establish financial intelligence units and to increase information sharing across jurisdictions. The IMFC also agreed to counter terrorist financing by accelerating its programme of offshore financial centre assessments, and to

work more closely with the FATF. The World Bank held a ministerial-level meeting in November 2001, and pledged to aid in capacity-building in states that are ill-equipped to regulate money laundering or terrorist financing and who are unlikely to meet the new international standards. However, neither of these organisations has chosen to make financial transparency, including effective action against money laundering and terrorist finance, a condition for further lending activities.

## The Middle East

Since the 11 September attacks, the Gulf Cooperation Council (GCC) – composed of Bahrain, Kuwait, Oman, Qatar, Saudi Arabia and the United Arab Emirates – agreed to be bound to the FATF's 40 recommendations on money laundering and the eight special recommendations on terrorist financing. Over the past year, however, there has been only limited action in making these commitments a matter of national law.

At a closed meeting held in Monaco on 7 June 2002, members of the Egmont group, an informal organisation composed of experts in financial intelligence from 78 countries, met to discuss on-going efforts to combat terrorist finance schemes. The frank discussions revealed a growing frustration towards a number of Gulf States for failing to track funds linked to al-Qaeda. Western regulators expressed marked concern over the failure by jurisdictions in the Middle East to provide assistance to enforcement agencies in other jurisdictions, confiscate terrorist assets, and impose licensing requirements on alternative remittance systems, especially *hawalas,* located throughout the region.

Underground banking systems, such as the *hawala* and *hundi* systems of South Asia, the Middle East, and East Asia, predate modern banking. They operate through brokers based in different locations who agree to pay off one another's debts locally in cash through chit or credit systems. For example, a broker based in Islamabad will request a broker based in New York to provide US $1,000 in cash to a person in Paris who gives the correct password. At some other point, the New York broker asks the Islamabad-based broker to make payments in the same amount locally in Islamabad to someone there. The two transactions are 'netted,' cancelling one another out, and no currency has to leave Pakistan, or the United States, or ever cross a national border. At each end, the broker takes a modest commission.

The well-publicised transfer of funds from financial institutions in the UAE to al-Qaeda cell members in the United States has caused the UAE to reverse years of inactivity, and pass legislation to combat financial crimes. In early October 2001, the UAE put into force the Law Regarding the Criminalisation of Laundering of Property Derived from Unlawful Activity, and drafted legislation to criminalise *hawalas.* Individuals convicted of an irregular money transfer to finance kidnapping, piracy and terrorism in the UAE could receive a seven-year prison sentence and a fine equivalent to $272,000. Financial institutions are now obliged to report suspicious transactions and the Central Bank is authorised to freeze suspected assets for up to seven days. A financial information unit is to be

formed within the Central Bank, as well as a National Anti-Money Laundering Committee, chaired by the Governor of the Central Bank.

But there have been no convictions related to financial crimes in the Emirates, and Western regulators remain sceptical over the ability of UAE to oversee transactions through *hawala* brokers. Notably, many bank tellers in the UAE are South Asian immigrant workers, for whom questioning or challenging of the local documentation of an UAE citizen could prove problematic.

UAE efforts resulted in other Middle Eastern states taking nascent steps to combat terrorist finance schemes. In early 2002, Saudi officials invited the FATF into the Kingdom and instructed the appropriate authorities to assist in the preparation of regulations to curtail financial crimes. The Saudi Arabian Monetary Authority reportedly began monitoring 150 suspicious accounts at the request of US law enforcement officials. Western officials have expressed concerns, however, at statements from Saudi officials that accounts held by Saudi nationals are only being monitored in financial institutions located *outside* the Kingdom.[14] Despite conflicting statements by US officials, no one has yet identified any bank accounts related to terrorist-finance schemes that have been frozen by Saudi officials. Other states in the Gulf have followed Saudi Arabia, mixing reform and denial. In late March 2002, Oman issued an anti-money laundering law as part of a pledge to combat the financing of global terrorism. At the same time, however, authorities in Oman continue to contend that domestic financial institutions are not vulnerable to money-laundering, despite the reality that Oman abuts the Pakistan–Afghanistan–Iran–Europe drug-smuggling route, and offers a sophisticated financial infrastructure to assist in the transfer of illicit assets out of the region.

## Central Asia and the Caucasus

After the US-led war in Afghanistan, members of al-Qaeda fled to a number of neighbouring Central Asian states. Western investigators quickly took an interest in the financial institutions that could be used to transfer funds to members of the Taliban and al-Qaeda. With the exception of Kazakhstan, no state in Central Asia is a major financial centre. The laundering of illicit profits through Central Asian financial institutions, however, continues to present a chronic challenge to domestic and international financial regulators and law-enforcement personnel who combat terrorist finance in the region. Western regulators have found it difficult to rely on banking officials in the region, some of whom have been reported to facilitate the laundering of illicit funds for government officials who embezzle significant amounts of foreign aid.

Central Asia remains highly vulnerable to terrorist finance schemes, mainly because of significant deficiencies in the financial, legal and law-enforcement sectors. The financial sector in Central Asia is composed of a largely unregulated banking system in which individual banks routinely enforce their own set of regulations. The routine passage of illicit profits through Central Asian financial institutions is also facilitated by the lack of training for banking personnel responsible for detecting suspicious or unusual financial transactions.

The legislative deficiencies in the region are immense. A number of states in the region, including Azerbaijan, Kyrgyzstan and Tajikistan, lack money-laundering legislation, and cannot prevent the most overt placement of suspicious funds in financial institutions. The legislative deficiencies could be largely remedied through the passage of comprehensive money-laundering legislation that would establish a wide-range of predicate offences related to money laundering, and require financial institutions to enforce stringent customer-identification provisions and record-keeping requirements. Efforts have been recently initiated in Georgia to establish an anti-money laundering regime, but the legislation, which went into effect in June 2000, does not require reporting of suspicious financial transactions, or limit the amount of money that an individual may bring into the country.[15] The growing links between Georgian and European financial institutions makes this especially troubling.

The passage of comprehensive anti-money laundering legislation could also bolster domestic law enforcement efforts by mandating the formation of a financial intelligence unit (FIU) to assist in the investigation of money-laundering offences. More importantly, the establishment of a FIU would eliminate the overlapping portfolios of law enforcement bodies that routinely hinder on-going investigations. For example, the establishment of a FIU in Azerbaijan would resolve a number of problems associated with Azerbaijani law-enforcement agencies, including inter-agency rivalries and poor data-sharing that exists between the Organised Crime Division of the Ministry of Internal Affairs and the Ministry of National Security, the two agencies currently vested with the power to conduct investigations into illegal-source currency. The creation of a FIU would also permit Internal Affairs and National Security personnel to devote more time to their larger mission of combating terrorism.

The urgent need to combat money laundering in the region has resulted in several significant agreements between a number of Caucasus states and European and US agencies. Armenia, Azerbaijan and Georgia are members of the Select Committee of Experts on the Evaluation of Anti-Money Laundering Measures (PC-R-EV), which is overseen by the Council of Europe. The PC-R-EV provides an evaluation by local experts and external evaluators of money-laundering initiatives in each country. The evaluations are designed to provide assistance to judicial and law enforcement agencies, assess money-laundering legislation, and increase cooperation with regional and international organisations.[16] The first evaluation in the region will be conducted in Georgia, and the evaluations of the other regional states that are members of the PC-R-EV will be released over the next two years.

The United States has also taken an active interest. Recognising the region's susceptibility to money-laundering schemes, the Bureau for International Narcotics and Law Enforcement Affairs of the Department of State has funded training programmes to provide technical assistance and instruction in financial investigative techniques to several Central Asian states, including Kazakhstan, Kyrgyzstan and Uzbekistan. The US Customs Service is also involved in multi-agency international money-laundering training programmes

*96* **Jonathan M. Winer and Trifin J. Roule**

in Kazakhstan and Kyrgyzstan. In addition, the Federal Bureau of Investigation recently pledged material and financial aid to the Georgian Prosecutor-General's Office to assist in the detection of suspicious transactions in domestic financial institutions, and USAID currently provides technical assistance and training to the Georgian tax inspectorate in support of initiatives to identify questionable gains from illegal sources. The United States also recently scheduled courses on financial-institution fraud and money laundering in Turkmenistan, and initiated an international visitor program on transnational crime and counter-narcotics measures with Mongolian law-enforcement personnel.

Similar efforts are underway to assist Afghanistan in regulating its financial institutions. The era of Taliban rule and the recent armed conflict with Western forces drastically reduced the number of formal banking institutions in the country. The largely non-functioning financial sector was rapidly replaced by the long-trusted *hawala* system, which became a reliable mechanism for facilitating anonymous funds payments to terrorists. While heavily involved with *hawala*, Pakistan has had a functioning formal financial services sector. But Pakistan has lacked a comprehensive money-laundering regime, including adequate legislation and banking regulations or a financial-intelligence unit to oversee efforts to combat the passage of illicit finance.

Material and financial assistance from Europe and the United States could significantly aid Central Asian states and Pakistan by reducing the immense illicit profits that support insurgency groups and facilitate arms and narcotics trafficking in the region. The international support could also directly assist and train financial regulators and law enforcement personnel who are responsible for the scrutiny of suspicious financial transactions. And even if reforms did take place in Central Asia, the financial institutions of Lebanon and Syria – which regard some terrorist groups, such as Hizbollah and Hamas, as legitimate – would still require special attention. Increased scrutiny of financial transactions between Iranian and Iraqi financial institutions and banks located in neighbouring states could result in sanctions against jurisdictions failing to comply with international norms against illicit finance schemes.

## Global financial centres on heightened alert

Global financial centres have also introduced significant legislation to curtail terrorist finance schemes. In October 2001, the UK introduced a series of legislative initiatives including proposals to deport anyone suspected of terrorism and to license and regulate exchange bureaus. These bureaus processed $6 billion in 2000, of which two-thirds are believed to be illegal transactions. The New Terrorism Bill would make it illegal for either an individual or a high-street bank to use unlicensed bureaus, and the police would be given greater powers to monitor suspicious accounts, a measure already employed in Northern Ireland. This legislation secures anti-terrorist finance legislation of a wider breadth than that found in the EU, and is one of the first anti-terrorist finance initiatives that make a distinction between more traditional money laundering schemes and terrorist financing. Despite the UK's proven track record of anti-terrorist financing

legislation, a persistent source of embarrassment had been the off-shore crown dependencies, which are reputed centres of money laundering and illicit transactions due to a lack of effective legislation, strong bank privacy laws and weak enforcement. Financial institutions from Jersey have been linked by foreign law enforcement investigations to money laundering, and terrorist finance schemes. For many years, Jersey, like Guernsey and the Isle of Man, did not mandate the disclosure of beneficial ownership of financial accounts. While know-your-customer regulations currently apply to all financial institutions on Jersey, accounts established before 1999 still concern financial regulators and law enforcement personnel.

Canada introduced into parliament on 15 October 2001 a bill to criminalise direct and indirect terrorist activities, curtail terrorist funding and increase the reporting obligations of financial institutions. The funding, aiding and abetting, and facilitating of terrorist activity will now be a specific criminal offence. (Prior to this bill, terrorist activity was prosecuted under ordinary criminal laws, such as hijacking, murder and extortion). The Financial Transactions and Reports and Analysis Centre (FINTRAC), which was created by the Money Laundering Act of 2001, tracks all reports of suspicious transactions that all persons are required to file. The new bill broadens FINTRAC's mandate beyond pure money, so that banks, trust companies, insurance companies and other institutions will be required to submit reports on an on-going basis, greatly increasing the reporting obligations of the private sector. Also, given sufficient grounds, FINTRAC will be authorised to share information with the Royal Canadian Mounted Police or the Canadian Security Intelligence Service. In accordance with existing UN resolutions and sanctions, the federal government may seize any property on suspicion that it is owned or controlled or will be used by a terrorist group, or to facilitate terrorist activity.

After 11 September, the US introduced and passed wide-ranging anti-terrorist laws. The most prominent is the USA Patriot Act of 2001, signed on 26 October by President George W. Bush, which bolstered existing anti-money-laundering laws and the Bank Secrecy Act. The Patriot Act requires every financial institution, including such previously unregulated sectors as hedge funds and commercial loan and finance companies, to maintain anti-money-laundering programmes, requiring some 25 different categories of financial institutions to develop internal policies, procedures and controls, designate a compliance officer, conduct ongoing employee-training programmes and perform independent audit functions to test programmes. It also requires toughened standards for customer identification and verification and due diligence, mandating extremely intrusive obligations to identify the ownership of institutions and assets deemed to be high-risk. High-risk accounts and transactions subject to enhanced due diligence include most offshore banks (other than those in a handful of jurisdictions approved by the US Federal Reserve), accounts involving foreign senior political figures, families and friends, and private banking accounts, defined as an account or set of accounts involving $1 million or more managed on behalf of an identifiable individual or group of individuals. Transactions and relationships

involving shell banks, or banks that cannot identify their ownership, or banks that will not appoint an agent to accept process and provide documents upon request by the US government, are prohibited entirely.

The US Treasury Department was given a six-month deadline to implement the measures. Given the diversity of the institutions, however, drafting a uniform code covering every financial institution within the allotted six months proved to be beyond the capability of the Department. Many of the institutions that were not previously defined under the Bank Secrecy Act, such as automobile and boat dealers, pawnbrokers, real-estate dealers and insurance companies, have been exempted from implementing a suspicious activities reporting regime until a later date. Over time, however, the Patriot Act will have an enormous effect, especially on the treatment of transactions involving financial institutions regulated in jurisdictions that do not impose tough customer identification, verification, and know-your-customer requirements. The desire to maintain access to US financial markets may compel jurisdictions to adopt more US-like regulatory structures, or alternatively, to structure transactions to avoid direct contact with the US through intermediaries. In the meantime, international financial institutions and financial regulators of every country will find the compliance demands now being imposed by the US to be extremely demanding, requiring substantial changes from existing practices. Notably, prior to 11 September, at least one major US bank, which had been long required to apply strict customer-identification and verification rules, did not bother to verify false social security numbers provided by the 11 September terrorists when they opened accounts. The example illustrates the enormous enforcement challenge remaining within the US as well as globally.

## Problems remain

The evidence suggests that the overwhelming majority of states favour a crackdown on terrorist finance. Persuading countries to pass new legislation, however, is easier than achieving meaningful enforcement. While the use of illicit funds in terrorist finance schemes differ from other financial crimes, the methods employed to place, layer and integrate the funds are familiar to regulators and investigators. Most countries have similar difficulties in combating money laundering, including low budgets for financial intelligence units and inadequate staffing. This permits a high volume of financial transactions, including modest sums of terrorist finance, to pass through banking and non-banking institutions undetected.

Tracking funds of terrorist groups remains an arduous task. Investigators are slowed by a number of factors, including the immense sums of money that are transferred daily through alternative remittance systems. Forensic accountants have long expressed concerns about the use of unregulated systems that leave little trace of money transferred around the world. For example, in the mid-1990s, an investigation uncovered a number of money-transfer businesses in Toronto that were transferring cash to the Tamil Tigers in Sri Lanka. A number of high-

ranking al-Qaeda leaders who planned the 11 September attacks allegedly also allegedly used *hawalas* to transfer funds to cells outside the Middle East.

If *hawalas* did not exist, however, members of terrorist groups could still use cash, given the absence of cash reporting or cross-border reporting requirements in most countries. While such reports are generally required in the US, there are numerous exceptions and exclusions. Reporting is only required for transactions involving more than $10,000 in cash, and it is relatively easy to make multiple deposits below the threshold, despite anti-structuring laws designed to close out this loophole. Financial institutions are also inadequately prepared to deal with individual terrorists who open or access accounts with false identification, or grant another individual authority to access the account.

Improved intelligence acquisition and sharing is essential to identifying potential terrorist finance. The US is currently devising a means to integrate information obtained by intelligence agencies, and financial information from the public sector. This system would permit the immediate freezing of suspect bank accounts, which allows forensic accountants to review the account for links to terrorist activities. The US is asking all major financial centres to establish similar systems to flag transactions conducted by suspected terrorists in the short term. In the meantime, intelligence on money laundering remains fragmented, with many jurisdictions finding it difficult to share information effectively among domestic agencies, let alone with other states.

Most significantly, the efforts to harmonise global anti-money-laundering and terrorist-finance law and regulations have yet to achieve substantial success in key regions. Major financial centres today have similar rules in place, and evidence of sufficient enforcement to provide at least a base-line level of deterrence and detection. Most countries in the Americas, Europe and the Pacific Rim have comprehensive money-laundering laws, routinely sanction non-compliant financial institutions and indict, prosecute and convict launderers. By contrast, relatively little has yet been achieved in the Middle East, South Asia, most of Africa, China, and much of Islamic Southeast Asia, including Indonesia and Malaysia. These jurisdictions continue to provide wide opportunities for the placement of terrorist funds, presenting an ongoing clear and present risk to the financial institutions elsewhere who do business with them, as well as to each potential victim of terrorism.

## Conclusion

Within a few months of the attacks, efforts to combat illicit finance schemes were making rapid progress. Smaller jurisdictions that have previously relied on financial and tax piracy for revenues are finding themselves seriously threatened with exclusion from the global financial services system, and are taking at least statutory measures to change their systems. Jurisdictions such as the Channel Islands and the Bahamas have radically restructured their trust and company laws to make anonymity more difficult, and Liechtenstein has begun to adopt EU-like customer identification rules. Securities markets are recognising their susceptibility to abuse and are initiating new controls and procedures.

*100* **Jonathan M. Winer and Trifin J. Roule**

By the spring of 2002, however, the intensification of the Israeli–Palestinian and India–Pakistan conflicts had diverted attention from efforts to combat terrorist finance schemes. As a result, Pakistan and most of the Gulf States have yet to undertake much of the hard work necessary to create functional anti-money laundering and terrorist-finance regulation and enforcement.

In the absence of ongoing coercive measures, inadequate regulatory and enforcement measures are likely to remain impediments to comprehensive reform. Coercion in the form of isolation from global financial networks for states that provide active or passive support for terrorist financial networks remains a substantial tool. Similar disincentives for major financial institutions could also prove useful. Further exploration is also needed of potential incentive systems that would reward jurisdictions or institutions that enforce high standards against financial crime and terrorism. The possibility of international 'white lists,' especially for private institutions that agree to global standards and to assessment by outsiders, remains an intriguing potential source of further protection. The first of such efforts, undertaken by a number of major international financial institutions, which have termed themselves 'the Wolfsberg Group,' has produced useful standards that could be explored for broader application. For instance, a white-listed institution would be required to agree to maintain its know-your-customer and other anti-money laundering policies and procedures. To assure compliance, each institution must agree to routine external assessments of its compliance with the standards, and the publication of comprehensive reports, describing how it had met the standards. An institution that passes the assessment would receive preference for selection in processing the funds controlled by a number of multi-national organisations, including the United Nations and World Bank. By mixing rewards for good works with sanctions against the facilitation of terrorist acts, the capacities of strong private-sector entities can be enlisted in the fight against terrorist finance. This is a more promising route than relying solely on the often uncertain capacities of mere governments.

## Notes

[1] The Financial Aid Task Force (FATF), an inter-governmental body, which develops and promotes national legislative and regulatory reforms to combat money laundering and terrorist finance schemes. The FATF, currently composed of 29 countries, compiled and issued 40 recommendations regarding record-keeping requirements, mandatory reporting of suspicious, or large financial transactions, identification of beneficial ownership, and elimination of anonymous accounts, to assist states in combating money-laundering schemes. The FATF monitors members' progress in implementing anti-money laundering measures, reviews money laundering techniques and counter-measures, and promotes the adoption and implementation of anti-money laundering measures globally. In performing these activities, the FATF collaborates with other international bodies in combating money laundering. The FATF is assisted in these efforts by a number of regional organisations, including the Council of Europe, Caribbean Financial Aid Task Force and the Asia Pacific Group.

[2] FATF member countries are committed to the discipline of multilateral monitoring and peer review. The self-assessment exercise and the mutual evaluation procedure are the primary instruments by which the FATF monitors progress made by member governments in implementing the 40 recommendations. In the self-assessment exercise, every member country provides information on the status of its implementation of the Forty Recommendations by responding each year to a standard questionnaire. This information is then compiled and analysed, and

provides the basis for assessing the extent to which the Forty Recommendations have been implemented by both individual countries and the group as a whole. The second element for monitoring the implementation of the Forty Recommendations is the mutual evaluation process. Each member country is examined in turn by the FATF on the basis of an on-site visit conducted by a team of three or four selected experts from the legal, financial and law enforcement fields from other member governments. See http://www1.oecd.org/fatf/.

[3] The Bank of New York handled funds of Benex, which laundered billions of dollars from Russia, including some for Russian organised crime; two of the principals of Benex pled guilty on 16 February 2000 to money-laundering charges involving their use of the Bank of New York to launder money. See *US v. Berlin and Edwards*, 99 Cr 914 (SWK).

[4] In January 1999, International Monetary Fund (IMF) staff issued a report concluding that offshore banking centres had played a sometimes 'catalytic' role in recent Asian and Latin American financial crises. The IMF staff working paper found that services provided by such centres, and the banks, lawyers, accountants, and company formation agents working with them, had contributed to global financial crises by hiding risk and loss in ways that professional home country supervisors and auditors were unable to penetrate. In each case, the IMF found that the offshore sector had created a problem of inadequate transparency and fragmented regulation, which 'increases the potential for dubious activities and contributes to weakening good

102 **Jonathan M. Winer and Trifin J. Roule**

governance in banks and corporations. See Lucia Errico and Alberto Musalem, *Offshore Banking: An Analysis of Macro-and Micro Prudential Issues*, IMF Working Paper (WP/99/5), January 1999.

5 'The Credit Lyonnais Debacle', *International Herald-Tribune*, 3 October 1996; on 21 January 2001, the *Associated Press* reported that some former Credit Lyonnais executives may face criminal charges for their roles in an illegal deal that cost policyholders of a now-defunct California insurer billions of dollars. According to the Associated Press, US prosecutors are readying criminal indictments against the state-controlled bank and at least a dozen French nationals who were involved in the 1992 takeover of Executive Life Insurance Co. Allegedly, prosecutors in the US attorney's office in Los Angeles have been able to show that Credit Lyonnais, in its efforts to skirt federal and state laws concerning ownership of insurance companies, filed false information with regulators and used some clients as fronts to acquire Executive Life's junk bonds and insurance businesses.

6 This phenomenon has been labelled 'indigenous spoilation,' by N. Kofele-Kale, who defines this act as an 'illegal act of depredation which is committed for private ends by constitutionally responsible rulers, public officials or private individuals'. Ndiva Kofele-Kale, *International law of responsibility for economic crimes: holding heads of state and other high ranking state officials individually liable for acts of fraudulent enrichment* (Dordrecht and Boston: M. Nijhoff, 1995).

7 The FATF is engaged in a major initiative to identify non-cooperative countries and territories (NCCTs) in the fight against money laundering. Specifically, this has meant the development of a process to seek out critical weaknesses in anti-money laundering systems, which serve as obstacles to international co-operation in this area. The goal of this process is to reduce the vulnerability of the financial system to money laundering by ensuring that all financial centres adopt and implement measures for the prevention, detection and punishment of money laundering according to internationally recognised standards. In June 2000, fifteen jurisdictions (Bahamas, Cayman Islands, Cook Islands, Dominica, Israel, Lebanon, Liechtenstein, Marshall Islands, Nauru, Niue, Panama, Philippines, Russia, St Kitts and Nevis, and St. Vincent and the Grenadines) were named as having critical deficiencies in their anti-money laundering systems or a demonstrated unwillingness to cooperate in anti-money laundering efforts. In June 2001, the FATF updated the list of NCCTs. Four countries left the list (Bahamas, Cayman Islands, Liechtenstein, and Panama); however six other jurisdictions were added (Egypt, Guatemala, Hungary, Indonesia, Myanmar, and Nigeria). At the subsequent FATF Plenary meeting in September 2001, two additional countries were added to the list (Grenada and Ukraine). In June 2002, the FATF removed four more countries from the NCCT list: Hungary, Israel, Lebanon, and St. Kitts and Nevis.

8 The Organisation for Economic Cooperation and Development (OECD)'s similar exercise against 'unfair tax competition' is having a similar impact on ring-fencing, the strategy by which jurisdictions offer unregulated financial services to non-residents that they deny to their own citizens. See http://www.oecd.org/

EN/document/0,,EN-document-0-nodirectorate-no-9-27092-0,00.html

[9] By mid-2002, 210 groups and individuals were allegedly involved in terrorist finance schemes. 161 countries and jurisdictions have taken concrete action to block the assets of these groups and individuals and $116 million has been frozen worldwide. $34 million of that has been blocked domestically in the United States with the remaining $82 million blocked by its international partners. *US-EU Designation of Terrorist Financiers Fact Sheet*, The Office of Public Affairs, United States Department of Treasury, PO-3070, 3 May 2002. See http://www.treas.gov/press/releases/po3070.htm.

[10] Agents from the US Department of Treasury's Office of Foreign Asset Control, the Customs Service, and the IRS shut down eight al-Barakaat offices in the United States. The Department of Treasury also blocked assets and seized evidence at two al-Barakaat outlets in Virginia. The United Arab Emirates also blocked accounts of al-Barakaat. 'Statement by Treasury Secretary Paul O'Neill, The Office of Public Affairs, United States Department of Treasury, PO-770, 7 November 2001. See http://www.treas.gov/press/releases/po770.htm.

[11] The 'laundering cycle' consists of three stages: placement, layering and integration. In the initial or placement stage of money laundering, the launderer introduces his illegal profits into the financial system. This is routinely accomplished by depositing less conspicuous, smaller sums of cash into a bank account, or making a series of deposits into accounts at a number of different locations. In the second – or layering – stage, the launderer engages in a series of conversions or movements of the funds to distance them from their source. For instance, the launderer could wire the funds through a series of accounts at various banks across the globe. Having successfully disguised the origin of the illicit funds through the first two phases of the money laundering process, the launderer then moves them to the third stage – integration. In this stage, the illegal funds re-enter the legitimate economy through investments, such as the purchase of real estate or the establishment of a business concern.

[12] 'Forensic Accounting and Terrorist Finance,' *Jane's Counter-Terrorism Handbook*. See http://www.janes.com.

[13] 'Top Muslim Clerics Endorse Suicide Bombings, Note 'Strategic' Aspects', *Herzliyya International Policy Institute for Counter-Terrorism*, 12 January 2002.

[14] 'Nations losing Momentum in Fight Against Terrorist Finance', *Jane's Intelligence Review*, August 2002.

[15] *2001 International Narcotics Control Strategy Report, Money Laundering and Financial Crimes*, Bureau for International Narcotics and Law Enforcement Affairs, United States Department of State. See http://www.state.gov/g/inl/rls/nrcrpt/2001/rpt/8487.htm.

[16] The PC-R-EV was established in September 1997 by the Committee of Ministers of the Council of Europe to conduct self and mutual assessment exercises of the anti-money laundering measures in place in 21 Council of Europe countries, which are not members of the Financial Action Task Force (FATF). The PC-R-EV takes into account the practices and procedures of the FATF in its work. The PC-R-EV is a sub-committee of the European Committee on Crime Problems of the Council of Europe (CDPC). See http://www.coe.int.

*104* **Jonathan M. Winer and Trifin J. Roule**