EXHIBIT J

# THE 9/11 COMMISSION REPORT

80834

# CONTENTS

*List of Illustrations and Tables* ix

*Member List* xi

*Staff List* xiii–xiv

*Preface* xv

1. "WE HAVE SOME PLANES"  1
    1.1  Inside the Four Flights  1
    1.2  Improvising a Homeland Defense  14
    1.3  National Crisis Management  35

2. THE FOUNDATION OF THE NEW TERRORISM  47
    2.1  A Declaration of War  47
    2.2  Bin Ladin's Appeal in the Islamic World  48
    2.3  The Rise of Bin Ladin and al Qaeda (1988–1992)  55
    2.4  Building an Organization, Declaring
         War on the United States (1992–1996)  59
    2.5  Al Qaeda's Renewal in Afghanistan (1996–1998)  63

3. COUNTERTERRORISM EVOLVES  71
    3.1  From the Old Terrorism to the New:
         The First World Trade Center Bombing  71
    3.2  Adaptation—and Nonadaptation—
         in the Law Enforcement Community  73
    3.3  . . . and in the Federal Aviation Administration  82
    3.4  . . . and in the Intelligence Community  86

    3.5    ... and in the State Department and the Defense Department    93
    3.6    ... and in the White House    98
    3.7    ... and in the Congress    102

4. RESPONSES TO AL QAEDA'S INITIAL ASSAULTS    108
    4.1    Before the Bombings in Kenya and Tanzania    108
    4.2    Crisis: August 1998    115
    4.3    Diplomacy    121
    4.4    Covert Action    126
    4.5    Searching for Fresh Options    134

5. AL QAEDA AIMS AT THE AMERICAN HOMELAND    145
    5.1    Terrorist Entrepreneurs    145
    5.2    The "Planes Operation"    153
    5.3    The Hamburg Contingent    160
    5.4    A Money Trail?    169

6. FROM THREAT TO THREAT    174
    6.1    The Millennium Crisis    174
    6.2    Post-Crisis Reflection: Agenda for 2000    182
    6.3    The Attack on the USS *Cole*    190
    6.4    Change and Continuity    198
    6.5    The New Administration's Approach    203

7. THE ATTACK LOOMS    215
    7.1    First Arrivals in California    215
    7.2    The 9/11 Pilots in the United States    223
    7.3    Assembling the Teams    231
    7.4    Final Strategies and Tactics    241

8. "THE SYSTEM WAS BLINKING RED"    254
    8.1    The Summer of Threat    254
    8.2    Late Leads—Mihdhar, Moussaoui, and KSM    266

9. HEROISM AND HORROR    278
    9.1    Preparedness as of September 11    278
    9.2    September 11, 2001    285
    9.3    Emergency Response at the Pentagon    311
    9.4    Analysis    315

10. WARTIME  325
    10.1  Immediate Responses at Home  326
    10.2  Planning for War  330
    10.3  "Phase Two" and the Question of Iraq  334

11. FORESIGHT—AND HINDSIGHT  339
    11.1  Imagination  339
    11.2  Policy  348
    11.3  Capabilities  350
    11.4  Management  353

12. WHAT TO DO? A GLOBAL STRATEGY  361
    12.1  Reflecting on a Generational Challenge  361
    12.2  Attack Terrorists and Their Organizations  365
    12.3  Prevent the Continued Growth of Islamist Terrorism  374
    12.4  Protect against and Prepare for Terrorist Attacks  383

13. HOW TO DO IT? A DIFFERENT WAY OF
    ORGANIZING THE GOVERNMENT  399
    13.1  Unity of Effort across the Foreign-Domestic Divide  400
    13.2  Unity of Effort in the Intelligence Community  407
    13.3  Unity of Effort in Sharing Information  416
    13.4  Unity of Effort in the Congress  419
    13.5  Organizing America's Defenses in the United States  423

*Appendix A: Common Abbreviations*  429
*Appendix B: Table of Names*  431
*Appendix C: Commission Hearings*  439
*Notes*  449

# LIST OF ILLUSTRATIONS AND TABLES

| | |
|---|---|
| p. 15 | FAA Air Traffic Control Centers |
| p. 15 | Reporting structure, Northeast Air Defense Sector |
| p. 32–33 | Flight paths and timelines |
| p. 49 | Usama Bin Ladin |
| p. 64 | Map of Afghanistan |
| p. 148 | Khalid Sheikh Mohammed |
| p. 238–239 | The 9/11 hijackers |
| p. 279 | The World Trade Center Complex as of 9/11 |
| p. 284 | The World Trade Center radio repeater system |
| p. 288 | The World Trade Center North Tower stairwell with deviations |
| p. 312 | The Twin Towers following the impact of American Airlines Flight 11 and United Airlines Flight 175 |
| p. 313 | The Pentagon after being struck by American Airlines Flight 77 |
| p. 313 | American Airlines Flight 93 crash site, Shanksville, Pennsylvania |
| p. 413 | Unity of effort in managing intelligence |



# COMMISSION MEMBERS

Thomas H. Kean
CHAIR

Lee H. Hamilton
VICE CHAIR

Richard Ben-Veniste

Bob Kerrey

Fred F. Fielding

John F. Lehman

Jamie S. Gorelick

Timothy J. Roemer

Slade Gorton

James R. Thompson

Ladin reportedly instructed him to case the Port of Aden, on the southern coast, instead.[30] The eventual result was an attempted attack on the USS *The Sullivans* in January 2000 and the successful attack, in October 2000, on the USS *Cole*.

Nashiri's success brought him instant status within al Qaeda. He later was recognized as the chief of al Qaeda operations in and around the Arabian Peninsula. While Nashiri continued to consult Bin Ladin on the planning of subsequent terrorist projects, he retained discretion in selecting operatives and devising attacks. In the two years between the *Cole* bombing and Nashiri's capture, he would supervise several more proposed operations for al Qaeda. The October 6, 2002, bombing of the French tanker *Limburg* in the Gulf of Aden also was Nashiri's handiwork. Although Bin Ladin urged Nashiri to continue plotting strikes against U.S. interests in the Persian Gulf, Nashiri maintains that he actually delayed one of these projects because of security concerns.[31] Those concerns, it seems, were well placed, as Nashiri's November 2002 capture in the United Arab Emirates finally ended his career as a terrorist.

## 5.2 THE "PLANES OPERATION"

According to KSM, he started to think about attacking the United States after Yousef returned to Pakistan following the 1993 World Trade Center bombing. Like Yousef, KSM reasoned he could best influence U.S. policy by targeting the country's economy. KSM and Yousef reportedly brainstormed together about what drove the U.S. economy. New York, which KSM considered the economic capital of the United States, therefore became the primary target. For similar reasons, California also became a target for KSM.[32]

KSM claims that the earlier bombing of the World Trade Center taught him that bombs and explosives could be problematic, and that he needed to graduate to a more novel form of attack. He maintains that he and Yousef began thinking about using aircraft as weapons while working on the Manila air/Bojinka plot, and speculated about striking the World Trade Center and CIA headquarters as early as 1995.[33]

Certainly KSM was not alone in contemplating new kinds of terrorist operations. A study reportedly conducted by Atef, while he and Bin Ladin were still in Sudan, concluded that traditional terrorist hijacking operations did not fit the needs of al Qaeda, because such hijackings were used to negotiate the release of prisoners rather than to inflict mass casualties. The study is said to have considered the feasibility of hijacking planes and blowing them up in flight, paralleling the Bojinka concept. Such a study, if it actually existed, yields significant insight into the thinking of al Qaeda's leaders: (1) they rejected hijackings aimed at gaining the release of imprisoned comrades as too complex, because al Qaeda had no friendly countries in which to land a plane and

now estimates that it cost al Qaeda about $30 million per year to sustain its activities before 9/11 and that this money was raised almost entirely through donations.[111]

For many years, the United States thought Bin Ladin financed al Qaeda's expenses through a vast personal inheritance. Bin Ladin purportedly inherited approximately $300 million when his father died, and was rumored to have had access to these funds to wage jihad while in Sudan and Afghanistan and to secure his leadership position in al Qaeda. In early 2000, the U.S. government discovered a different reality: roughly from 1970 through 1994, Bin Ladin received about $1 million per year—a significant sum, to be sure, but not a $300 million fortune that could be used to fund jihad.[112] Then, as part of a Saudi government crackdown early in the 1990s, the Bin Ladin family was forced to find a buyer for Usama's share of the family company in 1994. The Saudi government subsequently froze the proceeds of the sale. This action had the effect of divesting Bin Ladin of what otherwise might indeed have been a large fortune.[113]

Nor were Bin Ladin's assets in Sudan a source of money for al Qaeda. When Bin Ladin lived in Sudan from 1991 to 1996, he owned a number of businesses and other assets. These could not have provided significant income, as most were small or not economically viable. When Bin Ladin left in 1996, it appears that the Sudanese government expropriated all his assets: he left Sudan with practically nothing. When Bin Ladin arrived in Afghanistan, he relied on the Taliban until he was able to reinvigorate his fund-raising efforts by drawing on ties to wealthy Saudi individuals that he had established during the Afghan war in the 1980s.[114]

Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia.[115] Some individual donors surely knew, and others did not, the ultimate destination of their donations. Al Qaeda and its friends took advantage of Islam's strong calls for charitable giving, *zakat*. These financial facilitators also appeared to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause.[116]

Al Qaeda also collected money from employees of corrupt charities.[117] It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities—particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation.[118] Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda.[119]

In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, al Qaeda operatives controlled the entire organization, including access to bank

AL QAEDA AIMS AT THE AMERICAN HOMELAND  171

accounts.[120] Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization.

It does not appear that any government other than the Taliban financially supported al Qaeda before 9/11, although some governments may have contained al Qaeda sympathizers who turned a blind eye to al Qaeda's fund-raising activities.[121] Saudi Arabia has long been considered the primary source of al Qaeda funding, but we have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization. (This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.)[122]

Still, al Qaeda found fertile fund-raising ground in Saudi Arabia, where extreme religious views are common and charitable giving was both essential to the culture and subject to very limited oversight.[123] Al Qaeda also sought money from wealthy donors in other Gulf states.

Al Qaeda frequently moved the money it raised by *hawala*, an informal and ancient trust-based system for transferring funds.[124] In some ways, al Qaeda had no choice after its move to Afghanistan in 1996: first, the banking system there was antiquated and undependable; and second, formal banking was risky due to the scrutiny that al Qaeda received after the August 1998 East Africa embassy bombings, including UN resolutions against it and the Taliban.[125] Bin Ladin relied on the established hawala networks operating in Pakistan, in Dubai, and throughout the Middle East to transfer funds efficiently. Hawaladars associated with al Qaeda may have used banks to move and store money, as did various al Qaeda fund-raisers and operatives outside of Afghanistan, but there is little evidence that Bin Ladin or core al Qaeda members used banks while in Afghanistan.[126]

Before 9/11, al Qaeda spent funds as quickly as it received them. Actual terrorist operations represented a relatively small part of al Qaeda's estimated $30 million annual operating budget. Al Qaeda funded salaries for jihadists, training camps, airfields, vehicles, arms, and the development of training manuals. Bin Ladin provided approximately $10–$20 million per year to the Taliban in return for safe haven. Bin Ladin also may have used money to create alliances with other terrorist organizations, although it is unlikely that al Qaeda was funding an overall jihad program. Rather, Bin Ladin selectively provided start-up funds to new groups or money for specific terrorist operations.[127]

Al Qaeda has been alleged to have used a variety of illegitimate means, particularly drug trafficking and conflict diamonds, to finance itself. While the drug trade was a source of income for the Taliban, it did not serve the same purpose for al Qaeda, and there is no reliable evidence that Bin Ladin was involved in or made his money through drug trafficking.[128] Similarly, we have seen no persuasive evidence that al Qaeda funded itself by trading in African conflict diamonds.[129] There also have been claims that al Qaeda financed itself through

al Qaeda might kill, and how soon it might do it. At some level that is hard to define, we believe the threat had not yet become compelling.

It is hard now to recapture the conventional wisdom before 9/11. For example, a *New York Times* article in April 1999 sought to debunk claims that Bin Ladin was a terrorist leader, with the headline "U.S. Hard Put to Find Proof Bin Laden Directed Attacks."[8] The head of analysis at the CTC until 1999 discounted the alarms about a catastrophic threat as relating only to the danger of chemical, biological, or nuclear attack—and he downplayed even that, writing several months before 9/11: "It would be a mistake to redefine counterterrorism as a task of dealing with 'catastrophic,' 'grand,' or 'super' terrorism, when in fact these labels do not represent most of the terrorism that the United States is likely to face or most of the costs that terrorism imposes on U.S. interests."[9]

Beneath the acknowledgment that Bin Ladin and al Qaeda presented serious dangers, there was uncertainty among senior officials about whether this was just a new and especially venomous version of the ordinary terrorist threat America had lived with for decades, or was radically new, posing a threat beyond any yet experienced. Such differences affect calculations about whether or how to go to war.

Therefore, those government experts who saw Bin Ladin as an unprecedented new danger needed a way to win broad support for their views, or at least spotlight the areas of dispute, and perhaps prompt action across the government. The national estimate has often played this role, and is sometimes controversial for this very reason.[10] Such assessments, which provoke widespread thought and debate, have a major impact on their recipients, often in a wider circle of decisionmakers. The National Intelligence Estimate is noticed in the Congress, for example. But, as we have said, none was produced on terrorism between 1997 and 9/11.

By 2001 the government still needed a decision at the highest level as to whether al Qaeda was or was not "a first order threat," Richard Clarke wrote in his first memo to Condoleezza Rice on January 25, 2001. In his blistering protest about foot-dragging in the Pentagon and at the CIA, sent to Rice just a week before 9/11, he repeated that the "real question" for the principals was "are we serious about dealing with the al Qida threat? ... Is al Qida a big deal?"

One school of thought, Clarke wrote in this September 4 note, implicitly argued that the terrorist network was a nuisance that killed a score of Americans every 18–24 months. If that view was credited, then current policies might be proportionate. Another school saw al Qaeda as the "point of the spear of radical Islam." But no one forced the argument into the open by calling for a national estimate or a broader discussion of the threat. The issue was never joined as a collective debate by the U.S. government, including the Congress, before 9/11.

We return to the issue of proportion—and imagination. Even Clarke's note

WHAT TO DO? A GLOBAL STRATEGY     373

against Iraq. American soldiers and airmen have given their lives to help protect Saudi Arabia. The Saudi government has difficulty acknowledging this. American military bases remained there until 2003, as part of an international commitment to contain Iraq.

For many years, leaders on both sides preferred to keep their ties quiet and behind the scenes. As a result, neither the U.S. nor the Saudi people appreciated all the dimensions of the bilateral relationship, including the Saudi role in U.S. strategies to promote the Middle East peace process. In each country, political figures find it difficult to publicly defend good relations with the other.

Today, mutual recriminations flow. Many Americans see Saudi Arabia as an enemy, not as an embattled ally. They perceive an autocratic government that oppresses women, dominated by a wealthy and indolent elite. Saudi contacts with American politicians are frequently invoked as accusations in partisan political arguments. Americans are often appalled by the intolerance, anti-Semitism, and anti-American arguments taught in schools and preached in mosques.

Saudis are angry too. Many educated Saudis who were sympathetic to America now perceive the United States as an unfriendly state. One Saudi reformer noted to us that the demonization of Saudi Arabia in the U.S. media gives ammunition to radicals, who accuse reformers of being U.S. lackeys. Tens of thousands of Saudis who once regularly traveled to (and often had homes in) the United States now go elsewhere.[17]

Among Saudis, the United States is seen as aligned with Israel in its conflict with the Palestinians, with whom Saudis ardently sympathize. Although Saudi Arabia's cooperation against terrorism improved to some extent after the September 11 attacks, significant problems remained. Many in the Kingdom initially reacted with disbelief and denial. In the following months, as the truth became clear, some leading Saudis quietly acknowledged the problem but still did not see their own regime as threatened, and thus often did not respond promptly to U.S. requests for help. Though Saddam Hussein was widely detested, many Saudis are sympathetic to the anti-U.S. insurgents in Iraq, although majorities also condemn jihadist attacks in the Kingdom.[18]

As in Pakistan, Yemen, and other countries, attitudes changed when the terrorism came home. Cooperation had already become significant, but after the bombings in Riyadh on May 12, 2003, it improved much more. The Kingdom openly discussed the problem of radicalism, criticized the terrorists as religiously deviant, reduced official support for religious activity overseas, closed suspect charitable foundations, and publicized arrests—very public moves for a government that has preferred to keep internal problems quiet.

The Kingdom of Saudi Arabia is now locked in mortal combat with al Qaeda. Saudi police are regularly being killed in shootouts with terrorists. In June 2004, the Saudi ambassador to the United States called publicly—in the Saudi press—for his government to wage a jihad of its own against the terrorists. "We must all, as a state and as a people, recognize the truth about these criminals,"

ing with Two of UBL's Brothers, May 19, 2000; Youssef M. Ibrahim, "Saudis Strip Citizenship from Backers of Militants," *New York Times*, Apr. 10, 1994, p. 15; "Saudi Family Disassociates Itself from 'Terrorist' Member," Associated Press, Feb. 19, 1994.

114. Frank G. and Mary S. briefing (July 15, 2003); Frank G. interview (Mar. 2, 2004); Intelligence report, interrogation of KSM, July 30, 2003; Robert Block, "In War on Terrorism, Sudan Struck a Blow by Fleecing Bin Laden," *Wall Street Journal*, Dec. 3, 2001, p. A1. Despite substantial evidence to the contrary and his own assertion that Bin Ladin arrived in Afghanistan with no money, KSM has told his interrogators that he believes the bulk of the money (85–95 percent) for the planes operation came from Bin Ladin's personal fortune. Intelligence reports, interrogations of KSM, July 30, 2003; Apr. 5, 2004; June 15, 2004.

115. Frank G. interview (Mar. 2, 2004); CIA analytic report, Financial Support for Terrorist Organizations, CTC 2002-40117CH, Nov. 14, 2002. The United States was not a primary source of al Qaeda funding, although some funds raised in the United States may have made their way to al Qaeda or its affiliated groups. Frank G. and Mary S. briefing (July 15, 2003).

116. Frank G. interview (Mar. 2, 2004); CIA analytic report, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," CTC 2002-40029CH, Feb. 27, 2002.

117. CIA analytic report, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," Feb. 27, 2002; CIA analytic report, spectrum of al Qaeda donors, CTC 2003-30199HC, Oct. 30, 2003; Frank G. interview (Mar. 2, 2004).

118. CIA analytic report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003, Jan. 27, 1999; CIA analytic report, "Gauging the War against al-Qa'ida's Finances," CTC 2002-30078CH, Aug. 8, 2002; CIA analytic report, paper on Al-Haramain, CTC 2002-30014C, Mar. 22, 2002.

119. CIA analytic report, "Al Qa'ida's Financial Ties to Islamic Youth Programs," CTC 2002-40132HCX, Jan. 17, 2003; CIA analytic report, Al Qaeda Financial Network, CTC 2002-40094H, Aug. 7, 2002.

120. Frank G. interview (Mar. 2, 2004); CIA analytic report, Financial Links of Al Qaeda Operative, CTC 2002-30060CH, June 27, 2002.

121. Frank G. and Mary S. briefing (July 15, 2003). The Taliban's support was limited to the period immediately following Bin Ladin's arrival in Afghanistan, before he reinvigorated fund-raising efforts. By 9/11, al Qaeda was returning the favor, providing substantial financial support to the Taliban.

122. David Aufhauser interview (Feb. 12, 2004). We have found no evidence that Saudi Princess Haifa al Faisal provided any funds to the conspiracy, either directly or indirectly. See Adam Drucker interview (May 19, 2004).

123. On limited Saudi oversight, see Bob Jordan interview (Jan. 14, 2004). In Saudi Arabia, *zakat* is broader and more pervasive than Western ideas of charity, in that it functions not only as charity but also as social welfare, educational assistance, foreign aid, a form of income tax, and a source of political influence.

124. A *hawala*, at least in the "pure" form, transfers value without the use of a negotiable instrument or other commonly recognized method for the exchange of money. For example, a U.S. resident who wanted to send money to a person in another country, such as Pakistan, would give her money, in dollars, to a U.S.-based hawaladar. The U.S. hawaladar would then contact his counterpart in Pakistan, giving the Pakistani hawaladar the particulars of the transaction, such as the amount of money, the code, and perhaps the identity of the recipient. The ultimate recipient in Pakistan would then go to the Pakistani hawaladar and receive his money, in rupees, from whatever money the Pakistani hawaladar has on hand. As far as the sender and ultimate recipient are concerned, the transaction is then complete. The two hawaladars would have a variety of mechanisms to settle their debt, either through offsetting transactions (e.g., someone in Pakistan sending money to the United States using the same two hawaladars), a periodic settling wire transfer from the U.S. hawaladar's bank to the Pakistani hawaladar's bank, or a commercial transaction, such as the U.S. hawaladar paying a debt or an invoice, in dollars, that the Pakistani hawaladar owes in the United States. Hawalas typically do not have a large central control office for settling transactions, maintaining instead a loose association with other hawaladars to transfer value, generally without any formal or legally binding agreements. See Treasury report, "A Report to Congress in Accordance with Section 359 of the [USA PATRIOT Act]" Nov. 2002; Treasury report, "Hawala: The Hawala Alternate Remittance System and its Role in Money Laundering," undated (prepared by the Financial Crimes Enforcement Network in cooperation with INTERPOL, probably in 1996).

125. Frank G. and Mary S. briefing (July 15, 2003); CIA analytic report Al-Qa'ida Financiers, CTC 2002-30138H, Jan. 3, 2003. Moreover, because al Qaeda initially was living hand to mouth, there was no need to store funds.

126. CIA analytic report, "Pursuing the Bin Ladin Financial Target," CTC 01-40003HCS, Apr. 12, 2001; CIA analytic report, "Couriers, Hawaladars Key to Moving Al-Qa'ida Money," CTC 2003-40063CH, May 16, 2003.

127. For al Qaeda spending, see Frank G. and Mary S. briefing (July 15, 2003). The 1998 U.S. embassy bombings in East Africa cost approximately $10,000. CIA analytic report, "Gauging the War on Terrorism: Most 11 September Practices Still Viable," Jan. 30, 2002; Intelligence report, interrogation of KSM, June 3, 2003. Although there is evidence that al Qaeda experienced funding shortfalls as part of the cyclical fund-raising process (with more money coming during the holy month of Ramadan), we are not aware of any intelligence indicating that terror-