**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:                    **ORAL ARGUMENT REQUESTED**

All Actions

**KREINDLER & KREINDLER, LLP'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

KIRSCH & NIEHAUS PLLC
Emily Bab Kirsch
Paul R. Niehaus
Lisa Frey (*Of Counsel*)
150 East 58th Street, 22nd Floor
New York, NY  10155
212-832-0170
917-744-2888
*Attorneys for Kreindler & Kreindler, LLP,*
*Megan Benett, John Hartney, James*
*Kreindler, Andrew Maloney, Steven Pounian*

Dated: November 24, 2021
        New York, New York

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

PROPOSED FINDINGS OF FACT ......................................................................................... 3

I.      BACKGROUND .......................................................................................................... 3

        A.     The Jarrah Deposition and Subsequent Leak ........................................... 3

        B.     Initial Response ......................................................................................... 4

        C.     John Fawcett is Revealed as the Source of the Leak ............................... 6

II.     PROCEDURAL HISTORY OF THE HEARING .......................................................... 8

        A.     The Scope and Subjects of the Hearing .................................................... 8

        B.     Pre-Hearing Discovery ............................................................................. 9

        C.     The November 1-2, 2021 Hearing ........................................................... 11

        D.     Kreindler & Kreindler's Role in the 9/11 Litigation ............................. 12

III.    EVIDENCE ADDUCED IN CONNECTION WITH THE HEARING ....................... 15

        A.     John Fawcett Carried Out the Leak by Misleading Kreindler &
              Kreindler and by Intentionally Evading Security Measures ................. 15

        B.     There Is No Evidence That Anyone Other
              Than Mr. Fawcett Participated In The Breach ...................................... 18

        C.     The Evidence Establishes That Neither Kreindler & Kreindler nor any of
              its Attorneys or Personnel Had Knowledge of or Participation in
              Fawcett's Leak Despite the Firm's Immediate and Continuing Investigation ..... 19

        D.     Additional Evidence Adduced at the Hearing Corroborates That
              Neither Kreindler & Kreindler Nor Any of Its Attorneys or
              Personnel Had Any Knowledge of or Involvement in Fawcett's Leak ............... 22

        E.     There Is No Evidence That Any Party Submitted False Or
              Knowingly Misleading Statements To The Court ................................. 25

IV.   OTHER SPECULATION AND INNUENDO BY THE KINGDOM
        THAT KREINDLER & KREINDLER HAD ANY INVOLVEMENT IN
        FAWCETT'S BREACH ARE IMPROPER AND WITHOUT SUPPORT ................. 30

CONCLUSIONS OF LAW .................................................................................................... 35

I.      THE RECORD LACKS PROOF OF A *PRIMA FACIE* CASE OF  CONTEMPT BY
        CLEAR AND CONVINCING EVIDENCE AGAINST KREINDLER & KREINDLER
        OR ANY OF ITS ATTORNEYS .............................................................................. 35

        A.     Civil Contempt is a Drastic and Inappropriate Remedy ....................... 35

        B.     A Magistrate Judge Has the Power on a Contempt Motion to Determine
              Whether or Not to Certify Facts to the District Judge for Further Proceedings ... 37

C.   The Kingdom Failed to Establish a *Prima Facie* Case for Contempt Against Kreindler & Kreindler for Violation of the Protective Orders ............... 38

D.   The Kingdom has Failed to Establish a *Prima Facie* Case Against Kreindler & Kreindler for Submitting False Statements to the Court .................. 43

II.   NO CONTEMPT SANCTIONS ARE WARRANTED AGAINST KREINDLER & KREINDLER.................................................................... 47

A.   Compensatory Damages are Not Warranted......................................... 48

B.   Compliance Sanctions Are Not Warranted........................................... 49

III.   THERE IS NO BASIS FOR THE COURT TO IMPOSE SANCTIONS ON KREINDLER & KREINDLER PURSUANT TO ITS INHERENT POWERS ........... 50

A.   The Court May Not Impose Sanctions Without A Finding of Bad Faith ............. 50

B.   Because the Record Is Devoid of Any Finding of Bad Faith, None of the Potential "Remedies" Listed by the Court in Its October 4 Order Should be Imposed. ..................................... 51

RESERVATION OF RIGHTS .................................................................. 56

CONCLUSION........................................................................................ 57

## TABLE OF AUTHORITIES

**Cases**

*Alston v. Select Garages LLC,*
   2013 WL 3357172 (S.D.N.Y. July 3, 2013) ........................................................ 37

*A.P. Moller-Maersk A/S v. Commercializadora De Calidad S.A.,*
   429 Fed. Appx. 25 (2d Cir. 2011) ...................................................................... 48

*Bower v. Weisman,*
   674 F. Supp. 109 (E.D.N.Y. 1987) .................................................................... 40

*Browning Debenture Holders' Committee v. DASA Corp.,*
   560 F.2d 1078 (2d Cir. 1977) ............................................................................ 39

*Burks v. Stickney,*
   837 Fed. Appx. 829 (2d Cir. 2020) .................................................................... 50

*Ceslik v. Miller Ford, Inc.,*
   2006 WL 1582215 (D. Conn. June 5, 2006) ...................................................... 37

*Chao v. Gotham Registry, Inc.,*
   514 F.3d 280 (2d Cir. 2008) ........................................................................ 41, 45

*China Shipping Container Lines Co. v. Big Port Serv. DMCC,*
   2020 WL 3966014 (S.D.N.Y. May 15, 2020) .................................................... 39

*City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n,*
   170 F.3d 279 (2d Cir. 1999) ........................................................................ 35, 41

*Collins v. Foreman,*
   729 F.2d 108 (2d Cir. 1984) .............................................................................. 37

*Dole Fresh Fruit Co. v. United Banana Co.,*
   821 F.2d 106 (2d Cir. 1987) .............................................................................. 49

*Dow Chemical Pac. v. Rascator Mar. S.A.,*
   782 F.2d 329 (2d Cir. 1986) .............................................................................. 39

*FDIC v. Tekfen Constr. & Installation Co.,*
   847 F.2d 440 (7th Cir. 1988) ............................................................................. 50

*Goodyear Tire & Rubber Co. v. Haeger,*
   137 S. Ct. 1178 (2017) ...................................................................................... 55

*IGT v. High 5 Games, LLC,*
   2018 WL 2939032 (S.D.N.Y. April 17, 2018) .................................................. 36

*Int'l Longshoremen's Ass'n v. Phil. Marine Trade Ass'n,*
    389 U.S. 64 (1967) ........................................................................................ 35

*Joint Stock Co Channel One Russ. Worldwide v. Infomir LLC,*
    2017 WL 5067500 (S.D.N.Y. Sep. 27, 2017) ......................................... 36

*King v. Allied Vision, Ltd.,*
    65 F.3d 1051 (2d Cir. 1995) ................................................ 35, 36, 48, 49

*Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y.,*
    558 F.3d 159 (2d Cir. 2009) ................................................................. 35, 36

*Lation v. Fetner Props.,*
    2019 WL 1614691 (S.D.N.Y. Apr. 16, 2019) ....................................... 54

*Levin v. Tiber Holding Corp.,*
    277 F.3d 243 (2d Cir. 2002) ................................................................... 36

*Mackler Prods., Inc. v. Cohen,*
    146 F.3d 126 (2d Cir. 1998) ................................................................... 55

*Marx v. Gen. Revenue Corp.,*
    568 U.S. 371 (2013) ................................................................................. 54

*Milltex Industries Corp. v. Jacquard Lace Co., Ltd.,*
    55 F.3d 34 (2d Cir. 1995) ....................................................................... 55

*Mirra v. Jordan,*
    2014 WL 2511020 (S.D.N.Y. May 28, 2014) ...................................... 55

*MPD Accessories B.V. v. Urban Outfitters, Inc.,*
    2013 WL 6869919 (S.D.N.Y. Dec. 23, 2013) ...................................... 37

*O'Hearn v. Bodyonics,*
    56 F. Supp. 2d 302 (E.D.N.Y. 1999) .................................................... 41

*Petrello v. White,*
    2011 WL 8198105 (E.D.N.Y. March 3, 2011) ..................................... 40

*Really Good Stuff LLC v. BAP Investors, L.C.,*
    2021 WL 246707 (S.D.N.Y. June 17, 2021) .................................. 36, 45

*Schlaifer Nance & Co., Inc. v. Estate of Warhol,*
    194 F.3d 323 (2d Cir. 1999) ............................................................. 50, 51

*Spallone v. United States,*
    493 U.S. 265 (1990) ........................................................................... 49, 52

*Stein Indus. v. Jarco Indus.,*
    33 F. Supp. 2d 163 (E.D.N.Y. 1999) ................................................................. 37

*United States v. International Brotherhood of Teamsters,*
    948 F.2d 1338 (2d Cir. 1991) ............................................................................. 50

*United States v. Pangburn,*
    983 F.2d 449 (2d Cir. 1993) ............................................................................... 51

*Wella Corp v. Wella Graphics, Inc.,*
    874 F. Supp. 54 (E.D.N.Y. 1994) ........................................................... 37, 41, 48

*Wolters Kluwer Fin. Servs. v. Sciavantage,*
    564 F.3d 110 (2d Cir. 2009) .......................................................................... 39, 50

*Yukos Capital S.A.R.L. v.* Feldman,
    977 F.3d 216 (2d Cir. 2020) ............................................................................... 50

## **Statutes and Rules**

Fed. R. Civ. P. 26 ....................................................................................................... 57

Fed. R. Evid. 801 ....................................................................................................... 57

Fed. R. Evid. 802 ....................................................................................................... 57

Fed. R. Evid. 901 ....................................................................................................... 57

28 U.S.C. § 636 ..................................................................................................... 37, 48

## **Treatises**

The Manual for Complex Litigation, Fourth……………………………………………………52

Kreindler & Kreindler LLP ("Kreindler & Kreindler"), together with Jim Kreindler, Andrew Maloney, Megan Benett, Steven Pounian, and John Hartney, by and through their undersigned counsel, respectfully submits these Proposed Findings of Fact and Conclusions of Law in connection with this Court's Contempt Hearing held on November 1-2, 2021 (the "Hearing").

## PRELIMINARY STATEMENT

Kreindler & Kreindler represents thousands of death and personal injury victims of the 9/11 terrorist attacks, who are the plaintiffs in this multi-district litigation. On September 27, 2021, John Fawcett, a long-time consultant to Kreindler & Kreindler, confessed to having leaked the confidential deposition transcript of Musaed Al Jarrah to Michael Isikoff of Yahoo! News in early July 2021. Mr. Fawcett acted on his own. He took extraordinary steps to hide his actions from Kreindler & Kreindler. Mr. Fawcett acted despite knowing that Kreindler & Kreindler would take immediate steps to stop him and unequivocally condemn his conduct. Mr. Fawcett testified that not a single human being other than he and Michael Isikoff knew who leaked the transcript until September 27, 2021.

Kreindler & Kreindler informed the Court of these facts that same day – September 27. Upon motion from the Kingdom of Saudi Arabia, the Court ordered further inquiry to:

> determine whether anyone other than Mr. Fawcett participated in the breach (including by directing or helping cover it up), how the breach was carried out, and whether any party submitted to the Court false or knowingly misleading sworn statements as part of its inquiry.

After extensive discovery, two full days of hearings, and the cross-examination of six witnesses, including the four lead 9/11 attorneys from Kreindler & Kreindler, not a single piece of evidence was adduced to suggest that Kreindler & Kreindler or any of its attorneys knew of, directed, encouraged, facilitated, suggested, turned a blind eye to, condoned, ratified, or covered

1

up Mr. Fawcett's leak. As the discovery and the Hearing have made clear, there is no evidence of wrongdoing by Kreindler & Kreindler – let alone competent evidence meeting the required clear and convincing standard for contempt. To the contrary, though Kreindler & Kreindler does not bear the burden of proving its good faith or innocence here, its good faith was indeed shown at the Hearing. Overwhelming and uncontradicted evidence shows that:

- Kreindler & Kreindler had no knowledge of the source of the leak until September 27;

- Kreindler & Kreindler could not have known and had no reason to know of the source of the leak until September 27;

- Kreindler & Kreindler did not direct, encourage, facilitate, condone, ratify, or cover-up the leak;

- Kreindler & Kreindler's statements to the Court were truthful and forthcoming to the very best of its knowledge, based on a reasonably diligent investigation. Kreindler & Kreindler scrambled to report to the Court the facts of the leak as soon as they became known and evidenced only good faith and diligence in its communications to the Court.

Rather than acting as a genuine officer of this Court to obtain the truth about what happened, the Kingdom's counsel leveraged this unfortunate incident into an opportunity for tactical advantage. Sanctions are a potent weapon, and the Kingdom has used this process for the wrong purpose, abusing the discovery process to gain insight into its adversary's work patterns, processes, and use of consultants in building a factual case against the Kingdom. The Kingdom sought to tarnish the professional reputations of its adversaries in the eyes of this Court, where the merits of the underlying litigation will be fought.

After the Hearing, the Kingdom all but acknowledged its failure to adduce any evidence that the facts were anything other than as Kreindler & Kreindler reported on September 27, much less any evidence of misconduct by Kreindler & Kreindler. The Kingdom acknowledged this lack of proof by filing three motions seriatim seeking not only the admission of forty-three (43) additional documents that they failed to move into evidence at the Hearing, but new lines of post-

Hearing discovery, as part of the Kingdom's relentless and desperate fishing expedition to find a hint of anything at all that Kreindler & Kreindler might possibly have done wrong.

There is no excuse for the breach of this Court's protective orders, and this Court has the authority and obligation to enforce its orders.  But Kreindler & Kreindler and its attorneys have done nothing wrong. Every opportunity imaginable has been afforded the Kingdom to investigate and adduce evidence of such wrongdoing – and it has failed to demonstrate that Kreindler & Kreindler had any knowledge of, or was in any way complicit in, this breach. Despite the lack of proof, the Kingdom will ask this Court to impose sanctions. No recommendation for any sanction or other remedy, however, is warranted against Kreindler & Kreindler or any of its attorneys.   To impose a sanction would not only be manifestly unfair to counsel and contrary to applicable law, but would prejudice the 9/11 families and the thousands of plaintiffs who have chosen Kreindler & Kreindler as their counsel.

**PROPOSED FINDINGS OF FACT**[1]

I.    **BACKGROUND**

A.    **The Jarrah Deposition and Subsequent Leak**

1.    On June 17 and 18, 2021, Megan Benett of Kreindler & Kreindler, LLP ("Kreindler & Kreindler") took the deposition of Musaed al-Jarrah. The transcript of Jarrah's deposition (the "Jarrah Transcript") was designated confidential by the Kingdom of Saudi Arabia (the "Kingdom") pursuant to the October 3, 2006 protective order entered by Judge Casey in this matter (the "MDL Protective Order"). *See, KSAX 0002 (ECF 1900).* The Jarrah Transcript was also presumptively confidential for 30 days from the date of the deposition pursuant to the November

---

[1] Record evidence cited to herein can be accessed as follows: KSAX Exhibits – Appendix A; KK Exhibits – Appendix B; ECF Exhibits – Appendix C.

14, 2018 Privacy Act Order and Protective Order for FBI Documents ("FBI Protective Order",
together with the MDL Protective Order, the "Protective Orders"). *See, KSAX-00015 (ECF 4255)
at ¶10.*

2.      On July 15, 2021, journalist Michael Isikoff published an article in Yahoo! News
entitled "FBI Tried to Flip Saudi Official in 9/11 Investigation." *KSAX-0040.* The article states
that "[a] copy of the [Jarrah] deposition – with some redactions for law-enforcement sensitive
material – was obtained exclusively by Yahoo! News." *Id. at p.1.* As such, it was immediately
apparent that Yahoo! News could only have obtained even a redacted copy of the Jarrah Transcript
through a leak, in violation of the Protective Orders.

B.      **Initial Response**

3.      In response to the leak, Kreindler & Kreindler immediately initiated an internal
investigation to satisfy itself that the firm was not the source of the leak. *See, infra ¶¶68-78.*

4.      On July 22, the Kingdom requested that all parties consent to a motion for Court-
ordered discovery into the leak. *KSAX-0042.* No parties consented to the Kingdom's request. *See,
id.* The PECs responded to the Kingdom by sharing their own concerns about the leak; they
expressed reservations that the Kingdom's proposed discovery could infringe on Plaintiffs' work
product, and suggested that a phone conference be scheduled. *See, ECF 6988.*

5.      The next day, without making any effort to meet and confer with other parties, as
required by this Court's own rules[2] – the Kingdom moved the Court for discovery into the leak,

---

[2] This Court's Individual Rules of Practice provide that "[a]ny party wishing to raise a discovery
dispute with the Court must first confer in good faith with the opposing party, in person or by
telephone, in an effort to resolve the dispute…" and also that "counsel contemplating the filing of
a motion shall first contact opposing counsel to discuss thoroughly, in person or by telephone, the
substance of the contemplated motion and any potential resolution."   Individual Rules of Practice,
Sarah Netburn, U. S. Mag. J. at II.d., III.a.

and submitted 27 declarations to the Court to support their claim of innocence.  That motion included a July 5th email from Mr. Isikoff to Mr. Kellogg requesting comment on a public quotation that Jim Kreindler made on Michael Isikoff's *Conspiracyland* podcast two weeks earlier. *Id.*  The Kingdom mischaracterized the July 5 e-mail as seeking comment on what the Kingdom fabricated to be a private conversation Mr. Kreindler had with Mr. Isikoff in preparation for the July 15 article. *Id.* There was no such private conversation.

6.     On July 29, 2021, a PECs' law firm, Cozen O'Connor, voluntarily submitted declarations stating it was not responsible for the breach. *ECF 6991.* On the same date another PECs' firm, Motley Rice, also voluntarily submitted declarations stating its firm was not responsible for the breach. *ECF 6992.* Other firms with access to the Jarrah transcript did not submit declarations until the Court entered an order.  *See, e.g., ECF 7103.*

7.     On August 12, the Court issued an order requiring Kreindler & Kreindler to submit declarations confirming certain facts regarding the leak. *ECF 7011.*

8.     The Court relied on the July 5th email and the Kingdom's mischaracterization as circumstantial evidence that Kreindler & Kreindler was responsible for the leak. *Id.* *("Circumstantial evidence suggests that [Kreindler & Kreindler] may be responsible for the leak. When seeking a pre-publication comment from the Kingdom, the journalist asked for 'any comments you can make in response to what Jim Kreindler had to say about where things stand – and how the depositions went'"; directly following stating that "Mr. Kreindler **also** appeared on Mr. Isikoff's podcast Conspiracyland.") (emphasis added.).*  Of course, Mr. Kreindler's statement was made publicly on the podcast, was not in any additional private conversation, and had no connection to the Jarrah article.  *See Kreindler 118:21-120:17.*

5

9.      On August 16th, Kreindler & Kreindler timely submitted declarations from its four lawyers working on the 9/11 case that each used the precise language specified by the Court's Order.  *ECF 7016.*

10.      On August 30, the Court ordered supplemental declarations from Kreindler & Kreindler and other parties. *ECF 7082.* Although those declarations were initially due by September 10, the deadline was stayed pending decision on the motion of Yahoo! News' motion to intervene.

11.      The Court denied Yahoo! News' motion on September 23, 2021 and required the supplemental declarations to be submitted by the following Monday, September 27.  *ECF 7134.*

12.      In the Court's September 23 Order (*ECF 7134*), the Court reiterated, *verbatim*, that circumstantial evidence of the mischaracterized July 5th e-mail suggested that Kreindler was the source of the leak. *Id.* (*"In a July 5, 2021 communication to Saudi Arabia's lawyer Michael Kellogg, Isikoff indicated that James Kreindler had discussed the progress of depositions with him and … asked for a comment 'in response to what Jim Kreindler had to say about where things stand'"; The court then stated that "Mr. Kreindler **also** appeared on Mr. Isikoff's podcast Conspiracyland.") (emphasis added.).*  Again, there was no additional private discussion between Mr. Kreindler and Mr. Isikoff.

13.      Kreindler & Kreindler worked throughout the weekend of September 24-26 to finalize and execute the required declarations. *See infra,* *¶¶78-88.*

C.      **John Fawcett is Revealed as the Source of the Leak**

14.      John Fawcett was an independent research consultant working with Kreindler & Kreindler since 2002. *ECF 7147; KSAX-0056-J.*  Prior to the September 27, 2021 admission, Mr. Fawcett had not leaked any protected information, and was, at all times, permitted to access confidential documents for many years.

6

15.      On September 27, 2021, Mr. Fawcett first admitted to Kreindler & Kreindler that, despite his earlier denials, he was the source of the leak of the Jarrah Transcript to Mr. Isikoff. *Id.*

16.      Upon learning of this information, Kreindler & Kreindler immediately turned all its attention to understanding the full extent of Mr. Fawcett's breach, and the facts of how it had occurred.  Kreindler & Kreindler also took immediate action to cut off Mr. Fawcett's access to the firm and to any confidential information. *ECF 7147.*

17.      That same day, September 27, Kreindler & Kreindler submitted a letter and accompanying declarations to immediately explain to the Court all the pertinent facts Kreindler & Kreindler wase able to learn. *ECF 7147.*

18.      Kreindler & Kreindler's submission included the declaration of Mr. Fawcett that confirmed he had acted alone and without the knowledge of Kreindler & Kreindler, and that he took exceptional steps to prevent Kreindler & Kreindler from knowing what he had done. *Id.* The submission included ten additional declarations from Kreindler & Kreindler attorneys and personnel also testifying that they had no idea who leaked the Jarrah Transcript to Michael Isikoff prior to that day – September 27. *Id.*   Those declarations copied the language from the Court's Order as a preamble before each declarant's individualized response to the Court's questions, which were noted in italicized type. *Id.*

19.      Kreindler & Kreindler made a second submission on September 28, 2021 to further update the Court on the firm's immediate efforts to protect against any future release of confidential information, including reporting that all protected materials on the Kreindler & Kreindler internal server were moved to a dedicated server and that the firm was in the process of implementing a new internal software system to track viewing and downloading of documents on that dedicated server. *ECF 7153.*

20.     On September 30, Kreindler & Kreindler made a third submission to the Court providing additional information about the breach, including another declaration from Mr. Fawcett providing more detail regarding how he carried out the leak and why Kreindler & Kreindler did not discover the leak during their investigation. *ECF 1537.*

21.     Notwithstanding these submissions, the Kingdom moved on September 29, 2021 for additional inquiry into the leak.  *ECF 7157.*

## II.     PROCEDURAL HISTORY OF THE HEARING

### A.     The Scope and Subjects of the Hearing

22.     By Order dated October 4, 2021, and as subsequently refined and supplemented by later Orders, the Court ordered an evidentiary hearing to be held on November 1-2, 2021 (the "Hearing") to:

> determine whether anyone other than Mr. Fawcett participated in the breach (including by directing or helping cover it up), how the breach was carried out, and whether any party submitted to the Court false or knowingly misleading sworn statements as part of its inquiry.

Oct. 4 Order, ECF 7167; Oct. 21 Order, ECF 7277; see also Memo Endorsement Nov. 1, ECF 7310 (the "Contempt Hearing").

23.     The Court ordered four Kreindler & Kreindler attorneys, the Kreindler & Kreindler IT professional, and Mr. Fawcett to appear as witnesses at the Hearing. *Oct. 4 Order, ECF 7167.* The Court also ordered the witnesses not to discuss the matter amongst themselves prior to the Hearing.  *Id.* In its November 1 Order, the Court stated for the first time that the Kreindler & Kreindler witnesses were in fact subjects of the Court's contempt hearing. *ECF 7310.*

**B.** **Pre-Hearing Discovery**

24.     In advance of the Hearing, the Court ordered extensive pre-Hearing discovery of Kreindler & Kreindler and of John Fawcett.  *October 21, 2021 Order ECF 7277.* Kreindler & Kreindler had previously consented to much of this discovery by joint letter (*ECF 7251; ECF 7215-1*), and certain additional discovery was ordered by the Court. *ECF 7277.*

25.     As directed, Kreindler & Kreindler conducted a thorough forensic search and produced, among other things, all documents and communications in its possession, custody and control relating to:

(i)     the July 15 article by Michael Isikoff;

(ii)     the leak of the confidential transcript of the Mussaed al Jarrah deposition to Michael Isikoff;

(iii)     any investigation or review conducted by Kreindler & Kreindler regarding the leak;

(iv)     any investigation conducted by Kreindler & Kreindler relating to the identities of individuals who accessed the Jarrah transcript or how the transcript was transmitted to Michael Isikoff;

(v)     communications between Kreindler & Kreindler and John Fawcett relating to the July 15 article of the leak of the Jarrah Transcript;

(vi)     contracts or agreements with Fawcett, including agreements regarding confidentiality;

(vii)     time records, invoices and compensation of Mr. Fawcett; and

(ix)     firm call logs documenting any communications with Isikoff.  *ECF 7251, 7215-1, 7277.*

26.     Kreindler & Kreindler also imaged personal devices of the named witnesses, and searched for and produced additional responsive documents found in personal emails, other messaging applications, and phone history. *Id.*

27.     Kreindler & Kreindler also produced a sworn statement detailing Mr. Fawcett's job responsibilities and access to confidential material. *ECF 7277.*

28.     In accordance with the Court's Oct. 21 Order, Kreindler & Kreindler made a document production of over 1,500 pages, and provided a privilege log, first to other members of the Plaintiff's Executive Committee on October 25, 2021, and subsequently to counsel for its adversary, the Kingdom, on October 27, 2021. *Id.*

29.     No allegations of any production deficiencies of any kind were timely raised by the Kingdom, or any other party, with respect to Kreindler & Kreindler's production.

30.     Mr. Fawcett was also ordered to make an extensive production, including producing all his call logs, professional and personal, and a full forensic imaging of his laptop. *ECF 7167; ECF 7277.*

31.     In light of the fact that this procedure and production required Kreindler & Kreindler to turn over its internal documents to its litigation adversaries – including material from the personal devices of its attorneys – Kreindler & Kreindler sought and obtained an order from the Court that its production would not constitute a waiver of any applicable privileges or the work product doctrine pursuant to Fed. R. Evid. 502(d), Oct. 21 Order, *ECF 7310.*

32.     Also pursuant to the Court's Oct. 21 Order, the parties were ordered to provide the Court with proposed exhibits by October 29, 2021.  *ECF 7277.*  Kreindler & Kreindler sought to coordinate an exchange of such exhibits with counsel for the Kingdom prior to the Hearing, but the Kingdom refused.  *See ECF 7337 and exhibits thereto.*

33.     Kreindler & Kreindler made an application to the Court to direct the exchange of exhibits prior to the Hearing for the purpose of, among other things, enabling an orderly process for meeting and conferring over objections. *Id.*  The Court denied Kreindler & Kreindler's request.

###     C.    The November 1-2, 2021 Hearing

34.     The Hearing took place over two days on November 1 and 2, 2021, and took testimony from the six witnesses that the Court ordered to appear: James Kreindler (Kreindler & Kreindler partner); John Hartney (Kreindler & Kreindler IT professional); Andrew "Duke" Maloney (Kreindler & Kreindler partner); Megan Benett (Kreindler & Kreindler partner); Steve Pounian (Kreindler & Kreindler of counsel); and John Fawcett. *See Transcript of Nov. 1-2 Hearing*.

35.     As the Court ordered, the witnesses' declarations were deemed direct testimony and the questioning began with cross-examination by counsel for the Kingdom in the order the Kingdom chose.  *ECF 7167.* Witnesses were ordered sequestered for the two-day hearing with no indication of which witness would be called next. Kreindler attorneys were ordered to stay in or adjacent to the Courtroom for the duration of the hearing. The cross-examination was not limited in scope by direct testimony, by time, or by any other stated parameters. *Id.* Kreindler & Kreindler was permitted a re-direct examination. *Id.*

36.     As set forth in detail below, the Hearing revealed no new material evidence, and revealed no evidence that Kreindler & Kreindler knew of, participated in, suggested, encouraged, condoned, ratified, or covered up any aspect of the leak of the Jarrah Transcript by John Fawcett.

37.     Following the Hearing, by letter-motions filed *seriatim* on November 9, November 10 and November 11, the Kingdom sought to obtain additional discovery from Kreindler & Kreindler and to admit certain documents into evidence that had not been authenticated or

identified, let alone offered or accepted into evidence during the Hearing. *ECF 7322, 7330, 7336; ECF 7327, 7337, 7356; ECF 7328, 7359, 7365.*

38.     The Court admitted all but one of the documents that the Kingdom requested post-Hearing. *ECF 7369.* Kreindler & Kreindler moved the Court to reconsider its decision on one document for which no foundation was laid, which was not introduced at the Hearing, and which was likely hearsay but because the Kingdom had never used, offered, argued from the document, it was not possible to know how the Kingdom intended to proffer the exhibit in their papers. *ECF 7375.* The Court again denied Kreindler & Kreindler's request that the basic rules of evidence be imposed upon the Kingdom.[3]

### D.     Kreindler & Kreindler's Role in the 9/11 Litigation

39.     The instant multi-district litigation involves efforts by the victims of the terrorist attacks of September 11, 2001 to hold those responsible for the attacks accountable.  Plaintiffs seek to hold the Kingdom of Saudi Arabia liable for aiding, abetting, and harboring the 9/11 hijackers themselves, fifteen of whom were in fact Saudi.

40.     In this litigation, Kreindler & Kreindler represents more than 600 of the estates of those murdered on 9/11[4] (constituting more than 20 percent of all of those killed in the attacks that day), as well as over 2,000 immediate family members of those victims and more than 20,000 personal injury clients – nearly 25,000 plaintiffs who have personally selected Kreindler & Kreindler as their counsel of choice.  *See, 03-md-1570 docket.*

41.     Kreindler & Kreindler has taken the lead in handling the litigation against the Kingdom of Saudi Arabia in several important ways. *Benett 370:25-371:3.* Kreindler & Kreindler

---

[3] Kreindler & Kreindler reserves all rights with respect to these rulings.

along with its investigators repeatedly uncovered critical information about the involvement of a group of seven Saudi government officials, including various diplomats, in the support plot for the 9/11 hijackers.  Kreindler & Kreindler tracked down witnesses, documents, information, and testimony around the world as part of this effort. In addition to obtaining this key evidence, Kreindler & Kreindler took the lead at every single fact witness deposition in the case against Saudi Arabia on behalf of *all* plaintiffs in this MDL, following the Court's order that they be completed by June 30, 2021.  Steve Pounian was the primary counsel for plaintiffs in approximately 30 depositions of current and former Kingdom officials and non-party witnesses between January 13 and June 30 of this year, with Megan Benett as primary counsel in two of those depositions.  Mr. Pounian and Ms. Benett represented Plaintiffs in defending the three depositions noticed by the Kingdom.  Further, of the 11 experts that the Plaintiffs' Executive Committees included in its August 4, 2021 notice, Kreindler & Kreindler retained and has had the working relationship with all but two of them.

42.     Kreindler & Kreindler plays a key role on the Plaintiffs' Executive Committee. Specifically, Jim Kreindler is the Co-Chair of the Plaintiffs' Executive Committee for Personal Injury and Death Claims, and Andrew Maloney is the Co-Liaison counsel for Plaintiffs' Executive Committee for Personal Injury and Death Claims. Currently, two additional Kreindler & Kreindler partners are also on that committee. *ECF 248.*

43.     By letter dated September 28, 2021, Kreindler & Kreindler has asked this Court to formally recognize Megan Benett and Steven Pounian as members of the PEC for Injury and Death Claims, replacing Justin Green and Marc Moller also of Kreindler & Kreindler, respectively. *ECF 7153.*   No opposition was filed to the request of Kreindler & Kreindler.  The Court has not yet ruled on that motion.

13

44.     By virtue of its lead role in building the case against the Kingdom on behalf of its clients and all Plaintiffs, Kreindler & Kreindler undertook a greater level of responsibility than the other members of the PECs and stood in a different situation regarding work product. *Id.* For example, Kreindler & Kreindler has the responsibility of protecting witnesses' identities from the Kingdom where there is a very real and present threat of witness intimidation. *Benett 371:9-372:3 (citing, inter alia, fact that Jamal Khashoggi was murdered after coming forward and expressing willingness to work with Kreindler & Kreindler and the 9/11 family members).*

45.     Each of the lawyers on Kreindler & Kreindler's 9/11 Team has been with the firm for approximately 25 years or more, with the exception of Ms. Benett who has been with the Kreindler & Kreindler firm for 15 years. *Maloney 273:10-11; Benett 398:4-5.* As would be expected, the 9/11 team works closely together and since 2016 after the passage of JASTA through today, they have been in regular interaction, almost on a daily basis. *Maloney 275:9-14.* The team has established great trust and respect for one another over the years. *See, e.g., Maloney 275:15-25.*

46.     Though not a lawyer, Mr. Fawcett was considered a core member of the 9/11 team. Mr. Fawcett worked with Kreindler & Kreindler as a researcher and consultant since 2002. *Benett 365:11-13; KSAX 56-J.* He is a researcher who analyzed documents and was part of the "whole analysis of the discovery material gathered." *Fawcett 283:22-24.* Until September 27, 2021 he managed the 9/11 discovery materials for Kreindler & Kreindler. *Kreindler 40:5-9.* Mr. Fawcett was a tireless advocate for the 9/11 Families. He spent a lot of time engaging with them, including participating in weekly calls with them and educating them about the progress of the case. *Fawcett 483:24-484:1; Benett 366:6-13.*

14

III.   **EVIDENCE ADDUCED IN CONNECTION WITH THE HEARING**

   A.   **John Fawcett Carried Out the Leak by Misleading
        Kreindler & Kreindler and by Intentionally Evading Security Measures**

47.    Since September 27, the Court has been aware that Mr. Fawcett "admitted that he is responsible for the breach" by the leak of the Jarrah Transcript to Mr. Isikoff and that Mr. Fawcett testified "that he acted on his own for certain reasons unrelated to the September 11 Attacks." *ECF 7277 at p.1.*

48.    The Hearing was called to determine: "whether anyone other than Mr. Fawcett participated in the breach (including by directing it or helping to cover it up), how the breach was carried out, and whether any party submitted to the Court false or knowingly misleading sworn statements as part of its inquiry." *Id.*

49.    Fawcett's background is in the human rights field, first working for a humanitarian aid organization in Iraq and in former Yugoslavia, and other countries including Afghanistan and Pakistan, and later focusing on financing and dictators. *Fawcett 483:13-17.* In the course of his humanitarian work around the world, Fawcett became aware of the prolific child sex trade in Morocco.  *KSAX-0062-A (ECF 7166-1).* Fawcett knew Morocco to have a dreadful record of protecting its children against sex trafficking and exploitation. *Id.*  Fawcett himself was so moved and concerned by this, he adopted two children from Morocco to give them a better life in the United States and protect them from the fate that would have awaited them had they remained in Morocco. They are now of college age.  *Fawcett 489:11-16.*

50.    Fawcett was aware that Jarrah had been stationed in Morocco as a Saudi diplomat and that he continued to live in Morocco even after his retirement from service. *KSAX 62-A (ECF 7166-1).* It was plain to Fawcett that Jarrah was involved with child sexual exploitation once he was aware of Jarrah's possession of multiple images of child pornography on his laptop.  *See Id.*

Fawcett was aware of only rumors about Jarrah's criminal activity in the months preceding the Jarrah deposition, but at or around the time of his deposition, Jarrah's involvement with the exploitation of children was confirmed for Fawcett. *Fawcett 468:21-470:4.*

51.     Fawcett explained his moral compulsion to leak the transcript of Jarrah's deposition. He believed the media was the only venue available to protect the public and children from Jarrah, whom he believed to be a consumer and possible trafficker in child pornography. *KSAX 62-A (ECF 7166-1) at ¶4; Benett 393:10-15.* Mr. Fawcett believed that without action, Jarrah's child pornography (and possibly more exploitive criminal activity) would continue because the Saudi government's invocation of diplomatic immunity and the FBI's claims of secrecy about its own relationship with Jarrah only served to protect Jarrah and put innocent children at risk. *Id.*

52.     Mr. Fawcett sent a redacted version of the Jarrah Transcript to Michael Isikoff in early July, and Isikoff wrote about the FBI's prior attempt to "flip" Jarrah to cooperate with their investigation into 9/11 by confronting him with child pornographic images found on his laptop. *KSAX 40.* There is no evidence that Mr. Fawcett's leak of the transcript had anything to do, either in purpose or effect, with personal gain or obtaining a tactical advantage in the underlying litigation.

53.     The evidence shows that Mr. Fawcett abused his position of trust at Kreindler & Kreindler, and used his technical knowledge, to circumvent the Kreindler & Kreindler protections that were in place, and took great pains to hide his actions from the 9/11 Team.

54.     As an authorized person who had long since agreed to be bound by both Protective Orders, Fawcett was able to access the Jarrah Transcript and was trained on how to find and access the Case Media platform on which Kreindler & Kreindler's internal office 9/11 case materials are

stored.[5] *Benett 373:1-374:2.* No non-9/11 Kreindler & Kreindler personnel were permitted access to the Case Media platform, and none of them received the training on the use of the platform. *Id.* Ms. Benett explained that though as a technical matter there was not an additional password firewall to case media, the point was moot as a practical matter because it would have been impossible to locate on a server and as a matter of firm policy, only individuals working on the 9/11 case were directed to the 9/11 materials on Case Media. *Benett 396:20-397:24.*

55.     However, these protections could not have prevented Fawcett's access as a trusted member of the team who had agreed to be bound by all relevant orders. *Benett 373:17-374:2.*

56.     Mr. Fawcett avoided the security systems that would have prevented downloading to his laptop by copying the Jarrah Transcript onto a thumb drive directly from an office computer. *ECF 1537-2, ¶7.* Once the Jarrah Transcript was on a thumb drive, Mr. Fawcett took it home and used an end-to-end encrypted email service, ProtonMail, to send the Jarrah Transcript to Isikoff. *Id.* To further protect against any detection, Fawcett set the self-destruction feature to delete any trace of the sent e-mail after seven days. *Id.* As of September 30, 2021, Mr. Fawcett checked, but could not find any evidence of the email to Isikoff with the Jarrah Transcript attached. *Id.* Fawcett testified that once Isikoff's article was published, he deleted and destroyed the thumb drive on which the Jarrah Transcript has been copied. *Id. at ¶9.*

57.     Mr. Fawcett specifically testified that he took steps to hide his actions from all the Kreindler & Kreindler lawyers because he knew that they would not condone his actions and they would tell him not to do it. *Fawcett 485:17-24.* Mr. Fawcett further testified that he not only misled

---

[5] All other matters have been migrated to newer platforms over the years. *Benett 373:4-7.* The 9/11 matter was not migrated because it is so large, so old, and the migrations to newer platforms would have been disruptive and unwieldy. *Benett 373:8-20.* Only those individuals who have signed the Protective Orders are directed how to access the 9/11 materials on Case Media. *Benett 373:20-25.*

the Kreindler & Kreindler lawyers about his actions, but he affirmatively "certainly prevaricated and dissembled and avoided letting them know." *Fawcett 486:21-25.* He was not being honest with them. *Fawcett 488:12.*

58.     Mr. Pounian asked Mr. Fawcett point blank, sometime between July 15 and July 27, if he knew anything about who leaked the Jarrah Transcript and Mr. Fawcett lied and told him that he knew nothing about it. *Pounian 407:8-17.*

59.     Mr. Maloney asked Mr. Fawcett directly in person within a day or two of July 15 whether he, Mr. Fawcett, had leaked the Jarrah Transcript; Mr. Fawcett lied to Mr. Maloney, denying that he had leaked the transcript. *Maloney 216:24-217:7.* Mr. Maloney followed up several times and each time Mr. Fawcett was not candid and indicated to Mr. Maloney he knew nothing about who leaked the Jarrah Transcript. *Maloney 217:18-219:6.*

60.     In every conversation that Mr. Kreindler had with Mr. Fawcett on the topic, Mr. Kreindler was similarly led to believe that Mr. Fawcett "had nothing to do with it." *Kreindler 98:3-8; Fawcett 438:12-439:3 (admitting that he misled Mr. Kreindler between the beginning of the investigation and September 27).*

### B.     There Is No Evidence That Anyone Other Than Mr. Fawcett Participated In The Breach

61.     No evidence adduced in connection with the Hearing indicates that Kreindler & Kreindler as an institution, or any of its attorneys, as individuals, had any knowledge of Mr. Fawcett's actions prior to September 27, 2021.  The evidence was all to the contrary.  *Kreindler 129:19-130:5; Maloney 304:18-305:4; Benett: 358:13-124; 402:5-8; Pounian 413:24-414:6; Fawcett 485:17-486:25.*

62.     Nor did any evidence adduced at the Hearing indicate that Kreindler & Kreindler, or any of its attorneys, had any reason to suspect that Fawcett had anything to do with the leak

18

prior to September 27, 2021. The evidence was all to the contrary. *Kreindler 129:19-130:5; Maloney 304:18-305:4; Benett 340:11-341:25 – 342:9; 358:13-124; 402:5-8; Pounian 413:24-414:6.*

63. Fawcett himself testified that until September 27, 2021, no one other than Isikoff and Fawcett knew that it was Fawcett who was the source of the leak, and in fact he was very clear with Ms. Benett and Mr. Pounian in preparing his September 27 declaration "that the first time [any of them] had heard about it was the day he signed the declaration". *KSAX-0062-A at ¶3; Fawcett 444:13-15.* In fact, on cross-examination Mr. Fawcett testified that prior to September 27 he did not "communicate to any human being … that [he] had sent the redacted transcript to Michael Isikoff, attorneys included". *Fawcett 465:11-17.*

### C. The Evidence Establishes That Neither Kreindler & Kreindler Nor Any of Its Attorneys or Personnel Had Knowledge of or Participation in Fawcett's Leak Despite the Firm's Immediate and Continuing Investigation

64. Upon learning of the leak of the Jarrah Transcript on July 15, Kreindler & Kreindler immediately recognized it as a serious issue because it must have resulted from a violation of the Court's protective orders. *Maloney 277:9-13.*

65. On the same day, Mr. Maloney sent a text to the whole 9/11 Team, including Mr. Fawcett, to schedule a call to discuss. *Maloney 278:7-16, KK Exh. 1.*

66. On that July 15 call, the Kreindler 9/11 Team, including Mr. Fawcett, all discussed "whether anyone knew how Isikoff had obtained the transcript, whether anybody at Kreindler had sent the transcript to him or told Mr. Isikoff anything about the Jarrah deposition, the substance of the Jarrah deposition." *Maloney 278:18-21.* The Kreindler & Kreindler lawyers testified that the takeaway from that call with the 9/11 team was that "no one had sent the transcript and no one knew how he got it" – including Fawcett. *Maloney 216:5-11; 278:22-2; Kreindler 123:18-21.*

19

67.     Though confident that no one at Kreindler & Kreindler was the source of the leak, Mr. Maloney undertook to investigate the leak, working with John Hartney, the information technology professional, to verify that fact. *Maloney 278:25-13; KK Exh. 2.* Mr. Pounian similarly was very concerned about nailing down exactly what had happened with the transcript…. [and] wanted to determine if the transcript had left the law firm in any way, shape or form." *Pounian 406:2-3; 23-24.*

68.     The internal investigation began with searches of the e-mail and document servers to track any movement of the Jarrah Transcript and also included a review of the Citrix cloud-based system, all to see who, if anyone, accessed, downloaded, or printed the Jarrah Transcript. *Hartney 185:2-186:10; KK Exh. 14 (reflecting report of access to Jarrah Transcript on Citrix system).*

69.     The initial e-mail server searches confirmed that there was no evidence of the Jarrah Transcript being sent outside the firm over the firm's email servers. *Maloney 283:4-285:9; Hartney 182:7-13, KK Exhs. 2, 3.*

70.     Mr. Maloney and Mr. Hartney performed and reviewed additional searches including broader searches, more refined searches, and searches more specifically targeted to Mr. Isikoff and Yahoo! News. *Hartney 183:22-183:20, KK Exh. 4.*

71.     These refined searches confirmed that the Jarrah Transcript was not transmitted via anyone's email other than a small handful of approved recipients. *Hartney KK Exh. 20.*

72.     This search for communications of any nature with Mr. Isikoff did uncover certain email exchanges between Jim Kreindler and Isikoff (unrelated to the leak) as well as one email from Mr. Fawcett and Mr. Isikoff.  *Hartney 160:7-24; KSAX 56-J, Exh 1.*

73.     Mr. Hartney testified that when Mr. Maloney sent the first draft of a declaration for him to sign, he immediately went back and reperformed all of the requested searches to ensure that everything was absolutely correct. *Hartney 188:16-190:2; KK Exh. 34*.  At the end of August, as Mr. Hartney prepared his declaration and reperformed searches, nothing new was turned up, confirming that the initial searches in the latter part of July and early August yielded comprehensive results. *Hartney 189:24-190:54.*

74.     Based on the declarations submitted by Cozen O'Connor and Motley Rice, Kreindler & Kreindler's investigation was fundamentally similar but more comprehensive than the other PECs members.  *ECF 6991, 6992*. E-mail traffic was analyzed and all relevant persons who had access to the transcript were asked what they did with it and whether it was sent to anyone. *Id.* Communications with Michael Isikoff were searched and reviewed. *Id.*  Neither Cozen nor Motley reported that they conducted in depth face-to-face interviews from a script. *Id.*  Neither of the other PECs members claim to have screened anyone. *Id.*  Neither firm conducted any search of personal devices. *Id.*

75.     None of the declarations submitted by the Kingdom described any investigation undertaken to search email servers, or to conduct any forensic review of the systems (other than to describe the servers themselves). *ECF 6981 – Exh. D.* No suggestion was made that any investigation of personal devices, phones, laptops, personal email, messaging applications was conducted. *Id.*

76.     Kreindler & Kreindler's similar investigation uncovered no evidence that the leak originated anywhere within Kreindler & Kreindler.

### D. Additional Evidence Adduced at the Hearing Corroborates
### That Neither Kreindler & Kreindler Nor Any of Its Attorneys
### or Personnel Had Any Knowledge of or Involvement in Fawcett's Leak

77.     In addition to a complete lack of evidence that any Kreindler & Kreindler attorney knew of or participated in the leak, all *affirmative* evidence corroborates that fact.

78.     At the end of the day, on Thursday, September 23, the Court lifted the stay on the requirement for further declarations and directed that they be filed by Monday September 27. *ECF 7134.* By midday on September 24, Ms. Benett circulated to everyone that would be required to sign declarations, including Mr. Fawcett, the language required, to ensure that everyone would be comfortable signing.  *Benett 368:6-13; KK Exh 51.*

79.     Ms. Benett also worked to secure all the emails that were identified in searches that hit on the name "Isikoff" since that was what the Court's August 30 Order required. *KK Exh. 63, KK Exh. 64, KK Exh. 65.*

80.     That Friday and over the weekend, Ms. Benett spent time discussing with declarants what it meant to swear under penalty of perjury and ensuring that the declarations they were to sign were completely accurate. *Benett 368:22-369:7.*

81.     Mr. Pounian helped Ms. Benett with this effort. *Benett 374:19-21; KK Exh 52.* Mr. Pounian made edits on the draft declarations that Ms. Benett prepared for Kreindler & Kreindler personnel, including that on September 25 he believed every single declarant should be able to swear: "I have no idea how Michael Isikoff got the transcript."  *KK Exh. 61.*

82.     Ms. Benett agreed that that sentence was "worth adding, since we believed it to be true on September 25."  *Benett 378:18-379:7.*

83.     That sentence was added into the draft declarations that were circulated on Saturday September 25 to each of the declarants, including John Fawcett.  *KK Exh 62.*

84.     Ms. Benett spent time with Mr. Hartney understanding the details of the investigation and working with him on his declaration. *Benett 374:22-375:19; 377:24-3, KK Exh. 58.* In particular, at 5:43 p.m. on Sunday September 25, Ms. Benett was still assembling and doublechecking the emails that hit on the name "Isikoff" in native format to attach to Mr. Hartney's declaration because that was what the Court's August 30 Order called for. *KK Exh. 65; ECF 7082 at A-1 ("identify all communications with Michael Isikoff or anyone acting on his behalf, whether or oral or written, from June 1, 2021 to August 1, 2021. Any written communications must be provided to the Court").*

85.     Because Ms. Benett and Mr. Pounian were not involved in the firm's original investigation, much time was spent reviewing the process and results in order to be able to fully, accurately and completely report to the Court on September 27 as directed. *Benett 375:14-378:7.* Ms. Benett went back to Mr. Kreindler and reviewed his communications with Mr. Isikoff yet again. *Benett 380:3-11; KK Exh. 61; KK Exh. 67.* Ms. Benett "took it very seriously, and …did not want to miss, for example, an Isikoff call or email that was out there." *Id.*

86.     Ms. Benett reviewed the emails uncovered by Mr. Maloney's work earlier in the summer. *Benett 375:20-377:21 and KK Exh. 53, KK Exh. 54, KK Exh 55, KK Exh. 56, KK Exh. 57.*

87.     Mr. Pounian also testified that as early as the morning of September 27 he and Ms. Benett were still working to finalize the declarations ordered by the Court. *Pounian 410:10-13, see e.g., KK Exh. 69.*

88.     Ms. Benett tried to reach Mr. Fawcett all weekend to try to secure his signature on the declaration she had drafted that she believed to be true based on numerous discussions – that

Fawcett had nothing to do with the leak.  *Benett 340:19-341:10; Benett 379:8-18 and KK Exh. 61; KK Exh. 62; Pounian 410:10-13.*

89.     The work of the Kreindler & Kreindler attorneys leading up to September 27 is wholly inconsistent with any suggestion that they knew Mr. Fawcett was the source of the leak.

90.     Nor is there any evidence that Kreindler & Kreindler should have suspected Mr. Fawcett as a potential leak source.  The Kreindler attorneys testified they had no reason to believe Fawcett was the source of the leak.  *Benett 340:11-14 ("I had no reason to believe prior to [September 27] that John Fawcett was not going to sign his declaration. He gave me no indication that he had any concern about the declaration I was preparing for him"); Benett 342:22-24 ("Every indication leading up to 10:15 on Monday September 27th, was that I was getting a signed declaration from John Fawcett that said not only I didn't leak it, but I have no idea who leaked it."); Kreindler 98:3-5 ("in everything John said to me, I was certain that he had nothing to do with it"); Pounian 414:3-6 ("I didn't have any reason to suspect that [Mr. Fawcett] shared the Jarrah Transcript with Mr. Isikoff").*

91.     There was no evidence that Kreindler & Kreindler failed to properly supervise Mr. Fawcett. The Kreindler & Kreindler attorneys testified that they were in daily contact with Mr. Fawcett. *Kreindler 86:10-12 ("Not a day goes by that I'm not talking to John Fawcett about our case .…"); Pounian 411:3-8 ("we communicated typically over the past three years almost every day…we would be in touch constantly all the time…").*

92.     The Kreindler & Kreindler attorneys were aware of Mr. Fawcett's whereabouts and what he was doing. Pounian 411:8-14 ("we shared an office at the law firm … I would communicate with him practically every day. So I was aware of where he was and what he was doing."); Benett 398:13-399:13.

93.     Mr. Pounian supervised Mr. Fawcett's work closely, testifying that he regularly "would talk to John about what his assignments were on the case and what he was supposed to be doing on the case*." Pounian 411:18-22.*

94.     The uncontroverted evidence established that Mr. Fawcett well understood the Protective Orders and that the Kreindler & Kreindler attorneys had every reason to believe that Mr. Fawcett intended to carefully abide by them.  *Kreindler 126:12-128:12; Pounian 412:21-413:8; Benett 399:14-401:6; 401:24-402:1.* Mr. Fawcett had never behaved unprofessionally or irresponsibly in any way before. *Pounian 413:9-20.*

95.     The testimony shows that in this complex case with multiple protective orders and sealing requirements, Kreindler & Kreindler "… always went to great pains to make doubly sure that every document we are showing one of the family members or a reporter was the public version and not the prohibited version." *Kreindler 44:10-23 (commenting on KSAX 12 which includes text from Fawcett to Sullivan of NPR that "Megan says no problem for those two documents"); ECF 7379 ("When Kreindler & Kreindler provided me with the MDL and FBI protective orders, they emphasized the importance of maintaining strict confidentiality with any materials or information subject to those").*

96.     Kreindler & Kreindler has clear and unconditional procedures for ensuring that anyone who is provided with protected materials is first asked to review and agree to be bound by the Protective Orders and to sign the FBI Protective Order. *Benett 331:21-332:25.*

### E.     There Is No Evidence That Any Party Submitted False Or Knowingly Misleading Statements To The Court

97.     No evidence adduced in connection with the Hearing indicates that Kreindler & Kreindler or any of its personnel made any false or knowingly misleading statements to the Court

– particularly with respect to the core matters at issue: did Kreindler & Kreindler know John Fawcett was the source of the leak, and did Kreindler & Kreindler participate in any way.

1.    *Kreindler & Kreindler's August 16 Declarations Answered the Court's Questions Fully and Truthfully Based on Its Internal Investigation*

98.    Kreindler & Kreindler's decision to not file declarations voluntarily with the Court in July when the Kingdom's counsel demanded they do so is not evidence that the firm was attempting to mislead the Court.  Nor does the decision suggest that its internal investigation was somehow less robust than those conducted by other counsel.  *See, supra* ¶¶*68-75.* Notably, PEC Firm Anderson Kill, like Kreindler & Kreindler, internally investigated, but filed no declarations with the Court until after the Court's August 12 order requiring them. *ECF 7013.*

99.    During the second half of July, and into August 2021, while continuing with its own internal investigation, Kreindler & Kreindler waited for the Court to provide guidance on what it wanted in furtherance of its inquiry into the leak. *Benett 336:13-21.*  Ms. Benett explained that, "[w]e did not think it was appropriate for opposing counsel for the Kingdom to be directing the process. We were concerned that it would inevitably turn into an opportunity to dig through our files and to get into our work product." *Id.*  Mr. Kreindler further explained: "[i]f the Court wanted more information like some of the other firms were providing, or anything else, we'd comply. But we were doing what the Court asked and keeping it simple. It had nothing to do with trying to hide anything, because there is nothing to hide." *Kreindler 97:8-17.*

100.    Kreindler & Kreindler was particularly concerned about guarding its work product because of the potential threat to certain witnesses, including a consultant living abroad.  *Benett 370:14-17 ("that consultant was living in a place where we had concerns about his safety if we were to reveal his name to anybody but the court -- or at least reveal his name to the defendants.").*

101.     On August 12, 2021, the Court issued an order describing precisely what declarations it would require of Kreindler & Kreindler (*ECF 7011*), and on August 16, 2021 Kreindler & Kreindler filed the declarations that were requested. *ECF 7016.*  The Kreindler & Kreindler attorneys' August 16 declarations answered the Court's questions based on their own personal knowledge, as well as on good faith reliance on their serious investigation of the circumstances of the leak.  *Id.*

102.     When counsel for the Kingdom suggested to Mr. Maloney on cross that Kreindler & Kreindler's August 16, 2021 declarations should perhaps have described the firm's investigation and that their failure was somehow misleading or untruthful, Mr. Maloney again reiterated the firm's position.  *Maloney 212: 20-24 ("We were not asked by the Court to describe it.  We gave the Court what it asked for").*

> 2.     *Kreindler & Kreindler's September 27-30 Declarations and Letters Answered the Court's Inquiries and Advised the Court Fully, Truthfully, and Promptly of Facts as they were Available*

103.     Ms. Benett and Mr. Pounian worked through the weekend of September 23-27 as described above to ensure that all the information requested by the Court in its August 30 Order would be properly provided.  *See supra, ¶¶77-89; ECF 7082.*

104.     But the declarations needed to be modified after approximately 10:30 a.m. on September 27 when Mr. Fawcett called Ms. Benett and first confessed to being the source of the leak. *Benett 388:22-389:18.*

105.     Kreindler & Kreindler then sought to "reconstruct what had happened in leaking the transcript and [understand] why we hadn't captured it during our search…. And it came from Fawcett, and we needed to figure out how he could have done that without us ever having known." *Benett 364:1-15.*  Kreindler & Kreindler needed to fully understand what had happened, take steps to ensure that confidential information was protected against anything further, rework all the

declarations that had been previously drafted and finalized, and advise the Court about the newly developing facts. *Benett 388:22-389:18.*

106.     In addition, it was an emotional day for Kreindler & Kreindler. As Ms. Benett testified: "…it felt to me like a real understanding on everybody's part that not only was this a really big deal, but that this now potentially irrevocably would change the relationship we had with an individual who had been working on the case with the firm for the families for the last 20 years." *Benett 261:11-19.*

107.     Over the course of the next three days, Kreindler & Kreindler informed the Court that (i) Mr. Fawcett was source of the leak; (ii) Mr. Fawcett evaded all Kreindler & Kreindler security measures and lied to Kreindler & Kreindler about his actions; (iii) Mr. Fawcett acted alone and hid his actions; (iv) Kreindler & Kreindler had no knowledge or involvement; (v) Mr. Fawcett's access had been completely shut down and he was immediately screened off from the firm and from any confidential information; and (vi) though there was nothing Kreindler & Kreindler could have done to prevent or mitigate the leak, it was nevertheless reviewing its security systems to try to do even better.

108.     In the scrambling to advise the Court of the facts the same day as they were learned, there were two ministerial errors in Kreindler & Kreindler's September 27 filings.

109.     ***First,*** there was a clerical error in Mr. Hartney's September 27 declaration. *KSAX-0056-F.* Paragraphs 9 and 10 were inadvertently reversed so that the declaration could be read as though he intended to attach as his Exhibit 1 every single e-mail within the Kreindler & Kreindler servers that hit on the name Jarrah, as opposed to the e-mails that hit on the name Isikoff. *Hartney 191:20-192:15.*

110.     The record makes clear, however, that this was a ministerial error.  The Court only requested communications that involved Mr. Isikoff.  *ECF 7082.* Kreindler & Kreindler never intended to so broaden the requirement to include every internal email with the word "Jarrah" because, for example, in the month of June alone while preparing for the Jarrah deposition, there would be hundreds of internal emails, all protected work product, that Kreindler & Kreindler would never have publicized to its adversaries or the public docket.

111.     Kreindler & Kreindler's intent to obey the Court's order regarding Isikoff communications (and not voluntarily broaden it to attach every internal document bearing the name "Jarrah") is demonstrated by Ms. Benett's communications over the previous weekend in which only the "Isikoff" communications were collected or considered. *Hartney 190:11-191:9, KK Exh 66.*

112.     Mr. Hartney acknowledged that this paragraph reversal was confusing and in error. *Hartney 192:11-19.* However, the record is clear that this was a good faith error made in the rush of the day on September 27 to finalize a very significant filing to advise the Court of the news they had just learned from John Fawcett. The meaning or import is unaffected. The Kingdom's efforts to suggest otherwise are without evidence and should be rejected.

113.     ***Second,*** paragraph 2 of Mr. Fawcett's September 27 declaration contains a garbled sentence: "The redacted portions of the deposition I sent to Michael Isikoff were focused on Musaed Al Jarrah's testimony about his possession child pornography." *KSAX-0056 J.*

114.     Mr. Fawcett admitted on the stand that the sentence "doesn't really make any sense," "it's a sentence that makes no sense," the redacted portions are not Musaed Al Jarrah's testimony about child pornography… [r]edacted portions were the FBI material." *Fawcett 458:3-12, 20-21, 459:12-16.* Although counsel for the Kingdom again tries to position this as false or

misleading, Mr. Fawcett was quite adamant that "in the pace of doing this, I've got a very poor sentence in my [declaration]." *Fawcett 459-20-21.*

115.    There is no reading of this garbled sentence that changes the meaning or import of the declaration which quite clearly confesses that Mr. Fawcett was the source of the leak of the Jarrah Transcript. The Kingdom's efforts to suggest otherwise are without merit.

116.    More broadly, the Kingdom seemed to suggest that John Fawcett's September 27 declaration was not written by Mr. Fawcett, but rather by Ms. Benett or Mr. Pounian with some nefarious intent.

117.    Mr. Fawcett drafted his own declaration, with formatting and editing by Ms. Benett and Mr. Pounian. The first draft was written exclusively by Mr. Fawcett and sent to Ms. Benett and Mr. Pounian for review, though neither had asked him to do so. *Benett 390:2-9; KK Exh. 73.*

118.    Mr. Fawcett's original draft – written exclusively by him – included the words: "No one at Kreindler & Kreindler instructed me to send the transcripts to Michael Isikoff. Nor did anyone at Kreindler & Kreindler have any knowledge of my sending it to Mr. Isikoff." *Benett 390:10-25; KK Exh. 73.*

119.    The language in Mr. Fawcett's September 30 declaration also came from Mr. Fawcett. *Benett 391:1-393:15.* Despite the Kingdom's suggestion to the contrary, the testimony in Mr. Fawcett's declaration came from Mr. Fawcett; he explained his motives in a lengthy call or series of calls to Ms. Benett who aided in typing them up in a formatted declaration. *Id.*

## IV.    OTHER SPECULATION AND INNUENDO BY THE KINGDOM THAT KREINDLER & KREINDLER HAD ANY INVOLVEMENT IN FAWCETT'S BREACH ARE IMPROPER AND WITHOUT SUPPORT

120.    The Kingdom argued at the Hearing that the Court should view the fact that Kreindler & Kreindler objects to the restrictions of the Protective Orders as evidence that Kreindler & Kreindler sought to breach them. The Court should not jump to this unsupported inference.

Kreindler & Kreindler's dislike of the Protective Orders and its frustration with keeping information secret from their clients and the public is not evidence that Kreindler & Kreindler or its attorneys violated or participated in the violation of the orders or ever would do so.

121.    The evidence was to the contrary. As Mr. Kreindler testified, "every lawyer representing the victims dislikes the fact that we are under these orders and looks forward to these orders being lifted, or largely lifted. …The message is very clear. We all hate the orders, but we have to live with them until they are lifted soon, and hopefully soon is very soon." *Kreindler 30:218-31:4.*

122.    Mr. Pounian testified that the "protective orders were a source of frustration in that we couldn't share certain information with our clients, but we adhered to them strictly and it was something we obeyed all the time. There was no question about it." *Pounian 412:17-20.*  Mr. Fawcett testified that everyone at Kreindler & Kreindler knew that they absolutely needed to be completely obeyed, even though it was difficult to withhold information from their own clients. *Fawcett 484:10-21.*

123.    The Kingdom argued at the Hearing that Jim Kreindler's media presence comprises evidence of a breach or a willingness to breach the Protective Orders. The Kingdom argues that this Court should conclude because Mr. Kreindler appears publicly and speaks about the case, that he must also be engaging in or encouraging surreptitious leaks of confidential information to the press. The Court may not draw that unsupported inference.

124.    To the contrary, the evidence shows that Mr. Kreindler embraces a public presence and speaks directly to the public to the extent he can, consistent with the Protective Orders. He testified that "I don't recall a time when I have ever said to a reporter, I am speaking off the record.

… and that's not the way I deal with the press. I tend to say things that are public and I'm glad to have them public." *Kreindler 25:12-20.*

125.     It is undisputed – and certainly no secret – that Mr. Kreindler appeared on the podcast *Conspiracyland*. He spoke openly about what he was permitted to say, consistent with the Protective Orders. *See KSAX-0038.*

126.     It is undisputed – and certainly no secret – that Mr. Kreindler gave a speech at Dartmouth College in 2019. He spoke openly about what he was permitted to say, consistent with the Protective Orders. *See KSAX-0018.*

127.     Though the FBI wrote a letter expressing its objection regarding the 2019 Dartmouth speech, the matter came to the Court and there was no finding that that speech violated any Court Order. There was no finding – or suggestion – that Mr. Kreindler acted or would act surreptitiously or that he intended to hide anything he did or said from the Court, the public or anyone, or that he would encourage anyone to do so.

128.     It is undisputed – and certainly no secret – that Mr. Kreindler participated in Caleb Hannan's April 2017 article for Politico magazine titled: "*One Man's Quest to Prove Saudi Arabia Bankrolled 9/11.*" *KSAX-0011.* Of course, the "one man" Mr. Hannan is writing about is Jim Kreindler himself and the article prominently features Mr. Kreindler and his 9/11 work and displays his photo. *Id.*

129.     In providing interviews for the feature article, there was a finding that reference to a publicly available phone number on a confidential document was a technical breach of the MDL Protective Order.  But because it was technical, accidental, and caused no harm to the litigation, no sanction was imposed.  The Court at the time, explained: "I'm not going to impose a monetary sanction against Mr. Kreindler, and I'm certainly not going to preclude the use of this document,

because I don't believe that the specific contents were, in fact, disclosed; it was more the light in which the documents were presented that was inappropriate." *KSAX-0010, at page 13 of 13.*

130.    Once again, there is no suggestion that Mr. Kreindler acted surreptitiously or sought to hide anything from the Court. Mr. Kreindler took the incident to heart, and has spoken more carefully and conservatively since.

131.    There is no evidence in the record tending to suggest that Mr. Kreindler ever has – or would – engage in sneaky or surreptitious conduct.  If anything, he is criticized for his public presence being too forceful, too proud, or too loud.

132.    And there is certainly no evidence that these media appearances constitute evidence that an unblemished member of the bar for forty years would knowingly violate or participate in the violation of a court order.

133.    The Kingdom also argued that a call log reflecting a 46-minute call and a later 5-minute call placed between Mr. Fawcett and Mr. Kreindler on July 22, 2021 "must have been" a private discussion between those two discussing Mr. Fawcett's leak.  *See generally, Kreindler 84-86; Fawcett 445-447.*

134.    Both Mr. Kreindler and Mr. Fawcett rejected this suggestion outright.  Kreindler 84:11-12 (Q: You talked about the leak, right? A: No.); Fawcett 445:25-446:2 (Q: in that call you talked about the fact that you had provided the Jarrah Transcript to Michael Isikoff, correct? A: No.).

135.    The Kingdom was further proven wrong in its speculation and innuendo about what may have transpired on those calls. Mr. Pounian testified that he was also dialed into that same call in which several matters were discussed.  *ECF 7359; 7359-1 and exhibit thereto, attaching Mr. Pounian's July cell phone bill).* Mr. Pounian attested with "100% certainty" that during those

33

July 22 calls with Jim Kreindler and John Fawcett, Mr. Fawcett's leak of the Jarrah Transcript was not discussed "in any way, shape or form." *Id.*

136.     The Kingdom also argued post-Hearing, once it was clear that Kreindler & Kreindler had no involvement whatsoever in Mr. Fawcett's breach, that Kreindler & Kreindler may have done something else wrong, namely breaching deposition protocol.  Brian Weidener, a consultant and authorized individual who had long since reviewed and agreed to be bound by the Protective Orders (*ECF 7384-1),* while working at the Kreindler & Kreindler offices on unrelated matters "entered a conference room where [he] saw portions of the Jarrah deposition" . . . "at certain points." The Court reporter did not note his appearance. *See, KSAX-0039.*   Robert Horkovich, managing shareholder of PEC firm Anderson Kill, testified that he was present for "substantial portions of the Jarrah deposition."  *ECF 7013-2.*  Mr. Horkovich was never noted on the attendance sheet either. *KSAX-0039.*

## CONCLUSIONS OF LAW

I.   **THE RECORD LACKS PROOF OF A *PRIMA FACIE* CASE OF CONTEMPT BY CLEAR AND CONVINCING EVIDENCE AGAINST KREINDLER & KREINDLER OR ANY OF ITS ATTORNEYS**

As the findings of fact make abundantly clear, the Kingdom presented no proof at the Hearing that either Kreindler & Kreindler, or any of its attorneys, were in any way complicit in John Fawcett's leak of the Jarrah Transcript to Michael Isikoff. The record is equally devoid of any proof that the firm or its attorneys made any misrepresentations to the Court, or attempted to mislead it. Accordingly, as shown below, there is no basis for this Court to certify facts to the District Court in support of a finding of contempt, nor is there any basis for the Court to exercise its inherent powers to otherwise impose sanctions on Kreindler & Kreindler or its attorneys.[6]

### A.   Civil Contempt is a Drastic and Inappropriate Remedy

The Supreme Court has long cautioned that contempt is a powerful weapon, and in fact can be a ruinous one. *Int'l Longshoremen's Ass'n v. Phil. Marine Trade Ass'n,* 389 U.S. 64, 76 (1967); This Circuit has similarly noted that "a contempt order is a potent weapon that is inappropriate if there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y.*, 558 F.3d 159, 164 (2d Cir. 2009); *City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n,* 170 F.3d 279, 282 (2d Cir. 1999) (contempt power is "formidable and potentially harmful" in nature); *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995) (same).

---

[6] These Conclusions of Law address the wrongs stated by the Court in its Orders of *Oct. 4, ECF 7167, Oct. 21, ECF 7277,* and its *Memo Endorsement Nov. 1, ECF 7310.* Any other issues raised by the Kingdom are those for which Kreindler & Kreindler has not been provided with proper notice and are therefore not addressed here. *Chambers v. NASCO,* 501 U.S. 32, 56 (1991).

Specifically, there can be no finding of contempt until all three of the following elements are met: "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Latino Officers,* 558 F.3d at 164; *IGT v. High 5 Games, LLC,* 2018 WL 2939032 at *2 (S.D.N.Y. April 17, 2018) (same).

On this motion, the Kingdom bears the burden of establishing contempt by clear and convincing evidence. *Latino Officers,* 558 F.3d at 164 ("we underscore that it is the moving party . . . who bears the burden of establishing the three factors [for contempt]"); *King.,* 65 F.3d at 1058 ("[a] contempt order is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict"); *Levin v. Tiber Holding Corp.,* 277 F.3d 243, 250 (2d Cir. 2002) (no contempt where the record is devoid of clear and convincing proof of wrongdoing by alleged contemnor); *Joint Stock Co Channel One Russ. Worldwide v. Infomir LLC,* 2017 WL 5067500 at * 9 (S.D.N.Y. Sep. 27, 2017) (movant bears the burden of producing the required elements by "clear and convincing" competent evidence); *Really Good Stuff LLC v. BAP Investors, L.C.,* 2021 WL 246707 at *3 (S.D.N.Y. June 17, 2021) ("[t]he party moving for contempt bears the burden of proving non-compliance by 'clear and convincing competent evidence'"); *IGT v. High 5 Games, LLC,* 2018 WL 2939032 at *2 (S.D.N.Y. April 17, 2018) (J. Carter) (same).[7]

---

[7] Kreindler & Kreindler reserves all rights with respect to its objections to the competency of evidence relied upon in this matter, including but not limited to its objections regarding foundation – when, for example, the Kingdom chose to not present a communication to the parties themselves, which would, under the Federal Rules of Evidence, be a necessary predicate to establish the foundation of the communication.

And, even where the moving party proves a violation, no finding of contempt can be made unless the moving party 'prove[s] by clear and convincing evidence that [the alleged contemnor] has been insufficiently diligent and energetic in attempting to comply." *Wella Corp v. Wella Graphics, Inc.,* 874 F. Supp. 54, 56 (E.D.N.Y. 1994) (even where a violation is found, there can be no finding of contempt where the moving party fails to show the third element of contempt, that is, reasonable diligence in attempting to comply with the court's order).

### B.   A Magistrate Judge Has the Power on a Contempt Motion to Determine Whether or Not to Certify Facts to the District Judge for Further Proceedings

Where, as here, the parties have not consented to the Magistrate Judge's exercise of plenary jurisdiction pursuant to 28 U.S.C. §636(c), the Court's role with regard to a civil contempt motion is circumscribed by §636(e). *Stein Indus. v. Jarco Indus.,* 33 F. Supp. 2d 163, 165-167 (E.D.N.Y. 1999) (pursuant to the jurisdictional constraints on a Magistrate's powers under 28 U.S.C. §636(c), an evidentiary hearing held before a Magistrate Judge can only be used to determine whether the Magistrate Judge can certify the alleged contemnor's conduct to a judge of the District Court for further proceeding, and not to issue a contempt order); *Alston v. Select Garages LLC*, 2013 WL 3357172 at *2 (S.D.N.Y. July 3, 2013) (under § 636(e) (6)(B)(iii) for non-consent civil contempt cases, the Magistrate Judge's role is limited to certifying facts to the District Judge); *MPD Accessories B.V. v. Urban Outfitters, Inc.*, 2013 WL 6869919 at *4 (S.D.N.Y. Dec. 23, 2013) (same); *Ceslik v. Miller Ford, Inc.,* 2006 WL 1582215 at *1 (D. Conn. June 5, 2006) (same), *citing Collins v. Foreman*, 729 F.2d 108, 117 (2d Cir. 1984) (contempt powers remain with the district court).  And, where, as here, the moving party fails to establish a case of contempt by clear and convincing evidence before the Magistrate Judge, the Court must "decline to certify facts constituting contempt to the district judge and may close the motion." *Joint Stock, 2017 WL 5067500* at * 10 (Sep. 27, 2017) (on non-consent civil contempt matters, the Magistrate Judge's

role is to certify facts to the District Court Judge only where the movant has established a prima facie case of contempt by clear and convincing evidence); *MPD Accessories*, 2013 WL 6869919 at *9 (closing contempt motion where no basis existed for Magistrate judge to certify facts to the assigned District Judge); *Jarco Indus.,* 33 F. Supp.2d at 171 (declining to certify facts to District Judge where there was insufficient proof of contempt). As shown here, there are no facts to certify to the District Court Judge on the matter of contempt.

### C. The Kingdom Failed to Establish a *Prima Facie* Case for Contempt Against Kreindler & Kreindler for Violation of the Protective Orders

The Court ordered a Hearing on this matter to determine, in part, "whether anyone other than Mr. Fawcett participated in the breach (including by directing or helping cover it up) [and] how the breach was carried out." *Oct. 4 Order, ECF 7167, Oct. 21 Order, ECF 7277, Memo Endorsement Nov. 1, ECF 7310.* The Kingdom had full discovery and two full days of testimony, and yet no evidence was adduced that "anyone other than Mr. Fawcett participated in the breach," that any other person directed him to commit the breach, and that any other person helped him cover up the breach. *FoF 15-21; 56-60.* The uncontroverted testimony was that Mr. Fawcett carried out the breach on his own. *FoF 61-63.*

Notably, it is not the burden of Kreindler & Kreindler to prove its innocence on this motion; rather, it is the burden of the Kingdom to meet the high bar for of establishing a case on clear and convincing evidence for contempt. The Second Circuit has stated:

The relevant inquiry is not whether defendants [the alleged contemnors] adequately rebutted plaintiff's [the moving party's] evidence, but rather, whether plaintiff's evidence alone was adequate that (1) the order was clear and unambiguous, (2) defendants did not in fact comply with the order (and the evidence must be clear and convincing), and (3) defendants did not

diligently attempt to comply with the order in a reasonable manner. *Latino Officers Ass'n,* 558 F.3d at 164.  As shown below, the Kingdom failed to meet its burden of proof.

> 3.   *The Record Lacks Clear and Convincing Proof of any Participation by Kreindler & Kreindler or its Attorneys in the Leak of the Jarrah Transcript*

As set forth in the Findings of Fact above, there is simply no evidence – much less competent, clear and convincing evidence – that either Kreindler & Kreindler as a firm, or any of its individual attorneys, participated in, was aware of, encouraged, or in any way facilitated the leak of the Jarrah Transcript by John Fawcett.  *FoF 61-63.*  In fact, both the documentary evidence and the uncontradicted testimony show that the Kreindler & Kreindler attorneys were shocked to learn of Mr. Fawcett's actions.  *FoF 77-90; 105-107.*  The Kingdom has thus failed to satisfy a requisite element of contempt, that it show by clear and convincing evidence that anyone other than Mr. Fawcett violated the Protective Orders.  *See Latino Officers Ass'n,* 558 F.3d at 164.

Nor can Mr. Fawcett's leak of the Jarrah Transcript be imputed to Kreindler & Kreindler for purposes of contempt.  There is no question that Mr. Fawcett's intentional and knowing breach of the Protective Orders was an act of bad faith.  But pursuant to specific Second Circuit authority, one party's bad faith cannot be imputed to another.  *Wolters Kluwer Fin. Servs. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) *cert. denied,* 558 U.S. 1037 (2009), *citing Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1089 (2d Cir. 1977) (a bad faith ruling is personal  in nature, and cannot be visited on others); *Dow Chemical Pac. V. Rascator Mar. S.A.,* 782 F.2d 329 (2d Cir. 1986) (because bad faith is personal, a sanction based on bad faith can only be assessed against "the particular party" who acted in bad faith); *China Shipping Container Lines Co. v. Big Port Serv. DMCC,* 2020 WL 3966014 at *8 (S.D.N.Y. May 15, 2020) ("the Second Circuit has noted that bad faith is personal, meaning '[t]here must be clear evidence of bad faith by a particular party" before any sanction can be imposed against that party); *Petrello v. White,*

2011 WL 8198105 at *7 (E.D.N.Y. March 3, 2011) (same); *Bower v. Weisman,* 674 F. Supp. 109, 112 (E.D.N.Y. 1987) (bad faith of client cannot be held against the attorney because "bad faith is personal").

The *Wolters* case makes patently clear that, the Kreindler & Kreindler firm (and its individual attorneys) cannot be held in contempt for Mr. Fawcett's bad acts.  In *Wolters,* a partner in a law firm ("Peters") understood that a deposition transcript was subject to a confidentiality order.  Peters violated that order by using the transcript in a separate action.  The district court judge sanctioned Peters and his law firm, jointly and severally.  The court stated that the firm's conduct was sanctionable because Peters's supervising partner "signed off" on the use of the transcript, neglecting to review the requirements of the operative confidentiality order.  The Second Circuit reversed the sanctions finding against the firm, because "nothing in the record suggests that the decision to permit the [prohibited] filing was made by the firm in bad faith or for any improper purpose." *Wolters Kluwer,* 564 F.3d at 115.  In so ruling, the Court repeated the well-recognized rule in this Circuit that "bad faith is personal and may not automatically be visited on others." *Id.* Critically, in *Wolters Kluwer,* the Second Circuit reversed a finding that the law firm was responsible for the acts of one of its *partners* – acts which the firm "signed off on."  Here, the wrongful acts were committed secretly by and independent contractor of the law firm.  Thus, under both *Wolters* and general equitable principles prohibiting the imputation of a bad faith to a separate party, Mr. Fawcett's acts cannot be imputed to Kreindler & Kreindler or its attorneys for purposes of a contempt finding.

4. *Kreindler & Kreindler Took Reasonable Measures and Made Diligent Efforts to Comply with the Protective Orders*

Kreindler & Kreindler (and its attorneys) may not be held in contempt for a second, independent, reason:  the Kingdom also failed to show by clear and convincing evidence that

Kreindler & Kreindler failed to take reasonable measures or to make diligent efforts to comply with the court order. *Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 293 (2d Cir. 2008) (no finding of contempt where the moving party failed to show that the alleged contemnor had "not been reasonably diligent and energetic in attempting to comply"); *City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n,* 170 F.3d 279, 283 (2d Cir. 1999) (for a finding of contempt, "it must be demonstrated that the contemnor was not reasonably diligent in attempting to comply"); *O'Hearn v. Bodyonics,* 56 F. Supp. 2d 302, 312-313 (E.D.N.Y. 1999) (denying contempt motion on the grounds that the moving party failed to show that the alleged contemnor was not reasonably diligent in attempting to comply, even where the violation was plain); *Wella Corp. v. Wella Graphics, Inc.,* 874 F. Supp. 54, 56 (E.D.N.Y. 1994) (no contempt where moving party fails to prove alleged contemnor was insufficiently diligent in attempting to comply with court order).

In fact, the record was replete with evidence that Kreindler & Kreindler took reasonable measures and made diligent efforts to the comply with the Protective Orders:

- The 9/11 Team of attorneys exclusively include only long-standing members of the bar with unblemished records. *FoF 45.*

- Mr. Fawcett, the non-attorney member of the 9/11 Team was a trustworthy consultant who had demonstrated a high degree of professionalism in his decades-long affiliation with Kreindler & Kreindler. *FoF 46, 94.*

- Mr. Fawcett was made aware of the seriousness of the Protective Order restriction. *FoF 94*

- Mr. Fawcett, as the non-attorney member of the 9/11 Team, was regularly supervised by Mr. Pounian and Mr. Kreindler. *FoF 91-93.*

- No one at Kreindler & Kreindler who was not on the 9/11 Team was permitted access to any information protected by the Protective Orders. *FoF 91-93.*

- No outside consultants of Kreindler & Kreindler were provided with confidential information until after they agreed to the MDL Protective Order and signed the FBI Protective Order. *FoF 53-55.*

- Over the years, Kreindler & Kreindler consistently ensured that no confidential documents were released to the 9/11 families or to the public.  *FoF 54, 96.*

- The acts of the Kreindler & Kreindler attorneys, upon learning of the Isikoff article, demonstrated behavior evincing a strong commitment to complying with the court orders. These acts include, without limitation:
  - Immediately commencing an investigation, before there was any order to do so, *FoF 64-68*;
  - Assigning its internal Information Technology employee to search Kreindler & Kreindler emails and servers for evidence of transmission of the Jarrah transcript. *FoF 68-72*;
  - Questioning personnel, including Mr. Fawcett, *FoF 58-60, 75*; and
  - Repeating searches, double-checking and triple-checking their accuracy. *FoF 73.*

- The fact that Mr. Fawcett leaked the transcript is due to his unilateral efforts to act secretly, and not because Kreindler & Kreindler failed to be diligent in its efforts to comply with the Protective Orders. *FoF 53-57.*

- The 9/11 Team provided uncontradicted testimony that despite their dislike of the restraints of the Protective Orders, they took their responsibility to comply with the restrictions very seriously.  *FoF 121-122.*

Finally, the Kingdom failed to show that Kreindler & Kreindler's efforts to comply with the Protective Orders was "unreasonable" by virtue of the fact that the information stored in the firm's files was not double password protected.  Clearly, neither of the Protective Orders has such a requirement, and the testimony explained fully that only 9/11 team members were trained and permitted to access the material.[8]  *FoF 54.* Even had there been a double password protection in place, Fawcett would have been given passwords for access as a trusted member of the 9/11 Team.

---

[8] The MDL Order (*ECF 1900*) permits  "Counsel for the Parties who are actively engaged in the conduct of the MDL", that is, Kreindler & Kreindler, to allow access to the confidential material to all of its "partners, associates, secretaries, [and] legal assistants" as well as "any other person in the employ of such counsel" – such as independent contractors –  "to the extent reasonably necessary to render professional services."  Accordingly, no internal password is required for information maintained in the Kreindler & Kreindler server.  The FBI Protective Order (*ECF 4255*) also has no password requirements.

Because the Kingdom has failed to show by clear and convincing evidence that Kreindler & Kreindler did not take reasonable measures to substantially comply with the Confidentiality Order, no recommendation of contempt may be certified to the District Court.

### D. The Kingdom has Failed to Establish a *Prima Facie* Case Against Kreindler & Kreindler for Submitting False Statements to the Court

Aside from the issues of the source of and participation in the leak, this Court also ordered the Hearing to determine "whether any party submitted to the Court false or knowingly misleading sworn statements as part of its inquiry." *Oct. 4 Order, ECF 7167, Oct. 21 Order, ECF 7277, Memo Endorsement Nov. 1, ECF 7310.* The Kingdom has similarly failed to show that Kreindler & Kreindler, or any of its attorneys, contumaciously filed false or knowingly misleading sworn statements with the Court.

### 1. *The Kingdom Presented No Evidence that Any Sworn Statement Filed by Kreindler & Kreindler was False or Knowingly Misleading*

The Kingdom failed to show that the declarations submitted to the Court by Kreindler & Kreindler attorneys on August 16, September 27 and September 30 were untrue or knowingly misleading. *See Latino Officers Ass'n,* 558 F.3d at 164 (explaining a moving party's significant burden on contempt).

In response to the Court's August 12 Order, Kreindler & Kreindler truthfully submitted the declarations sought of Ms. Benett, Mr. Kreindler, Mr. Maloney, and Mr. Pounian, attesting to what was known to them at the time: that the leak of the Jarrah transcript did not come from Kreindler & Kreindler. *FoF 101.* These declarations were based on personal knowledge of the serious and good faith investigation that Kreindler & Kreindler undertook beginning the very day they learned about the leak. *FoF 64-67.* The investigation that formed the basis of the declarants' personal knowledge was in fact more robust and thorough than that of any other party in this litigation. *FoF 74.* The declarations were truthful, but notwithstanding considerable efforts, they were also

mistaken.    In what is now familiar territory, the lawyers did not discover this mistake until September 27, when John Fawcett confessed that not only did he leak the transcript, but he had concealed his wrongdoing from the firm.  *FoF 15.*

On September 27, the Kreindler & Kreindler lawyers scrambled to understand how – and why – Mr. Fawcett would do such a thing and how their investigation could have missed it.  *FoF 105-107.*  They took immediate steps to further protect all confidential materials and shut down Mr. Fawcett's access to Kreindler & Kreindler systems.  *FoF 19.*  And on the very same day, Kreindler & Kreindler advised the Court of all the facts that were available, undertaking to update the Court as more was understood. *FoF 18.*  And over the next three days, two such updates were made.  *FoF 19-20.*

Although there were some minor inaccuracies in the declarations, which occurred as a result of Kreindler & Kreindler's good faith efforts to provide as much information to the Court as expeditiously as possible, none of the mistakes was material.  *FoF 105-108.*

> 2.    *Kreindler & Kreindler Took Reasonable Measures and Made Diligent Efforts to Comply with the Court's Orders to Deliver Truthful Declarations to the Court*

Nor can the Kingdom prove by clear and convincing evidence that Kreindler & Kreindler failed to take reasonable measures or to make diligent efforts to comply with the Court's orders for declarations. *See Aug 12 Order, ECF 7011* and *Aug. 30 Order, ECF 7082.* As shown in Section C(2), above, such a failure will defeat a contempt motion.  *Chao v. Gotham Registry, Inc.,* 514 F.3d at 291(2d Cir. 2008); *Local 28, Sheet Metal Workers' Int'l Ass'n,* 170 F.3d at 283 (2d Cir. 1999).  This element that a moving party must disprove, by clear and convincing evidence, the alleged contemnor's "reasonable diligence," requires substantial compliance, not "perfect compliance." *Really Good Stuff,* 2021 WL 2469707 at *13 (a court is not empowered to command performance approximating perfection; substantial compliance is all that is required).

44

While it is not Kreindler & Kreindler's burden to prove its reasonable measures – it is the Kingdom's burden to show the firm did *not* take reasonable measures -- here, the record is replete with evidence of Kreindler & Kreindler's efforts to comply with the Court's August 12 and August 30 Orders and to provide precisely the information the Court sought.  *FoF 103-108.*  Not only are the statements truthful as the Kreindler & Kreindler lawyers believed the facts to be, but their good faith, diligence and reasonable measures are demonstrated by the extent of the investigation and additional efforts underlying all of those statements. [9]

With respect to the Declarations filed on August 16, Kreindler & Kreindler attorneys took diligent and reasonable measures to comply with the August 12 Order.  Such measures include but are not limited to:

- Mr. Pounian and Mr. Maloney asked Mr. Fawcett directly in person if he had leaked the transcript; in good faith Messrs. Pounian and Maloney believed Mr. Fawcett's lies; *FoF 58-59*

- Mr. Kreindler was led to believe that Mr. Fawcett "had nothing to do" with the leak; having worked with Mr. Fawcett for over a decade, it was reasonable for Mr. Kreindler to be convinced of Mr. Fawcett's innocence; *FoF 60*

- Mr. Fawcett's integrity and reputation led the Kreindler & Kreindler attorneys to believe that Mr. Fawcett had nothing to do with the leak; *FoF 62*

- Mr. Fawcett's involvement in the leak was unknown to the Kreindler & Kreindler attorneys on August 16, because Mr. Fawcett hid his deceit from them; *FoF 63*

- Mr. Fawcett did not reveal his deceit until September 27; *FoF 104*

---

[9]     In this way, the Kreindler & Kreindler firm acted consistently with the reaction espoused by Magistrate Judge Moses in *Joint Stock Co. "Chanel One. Russ. Worldwide" v. Infomir Ltd. Liab. Co.,* 2020 WL 1479018 at *8 (S.D.N.Y. Mar. 26, 2020).  There, Judge Moses found bad faith where plaintiffs, when the errors in their declarations were brought to their attention, "persistently insisted they were in full compliance" instead of "tak[ing] timely and meaningful steps to consider the alleged errors."  Here, Kreindler & Kreindler did exactly what the plaintiffs in *Joint Stock* failed to do:  they took *immediate* "meaningful steps" to correct their error.

- The initial email and server searches conducted by Mr. Hartney revealed no leak of the Jarrah transcript to any unauthorized recipients; *FoF 69*

- Further, more comprehensive searches by Mr. Maloney and Mr. Hartney continued to show no leak of the Jarrah transcript to any unauthorized recipients; *FoF 71*

- The declarations submitted by the Kellogg, Cozen and Motley Rice firms confirm that the investigation conducted by Kreindler & Kreindler was properly thorough; *FoF 74-75*

With respect to the Declarations filed on August 16, Kreindler & Kreindler attorneys took diligent and reasonable measures to comply with the August 30 Order.  Such measures include but are not limited to:

- In preparing his declaration, Mr. Hartney re-performed all of the requested searches to ensure that everything was absolutely correct; *FoF 73*

- Ms. Benett circulated draft declarations to everyone on September 24, ensured that all declarants understood what it meant to "swear under penalty of perjury"; *FoF 78*

- Ms. Benett spent time discussing the language of his declaration to Mr. Hartney; *FoF 84*

- Ms. Benett and Mr. Pounian spent significant time reviewing the investigation process to ensure that the declarations were based on a solid investigation of the facts; *FoF 85*

- Until Mr. Fawcett's revelation on September 27, Ms. Benett and Mr. Pounian, who were preparing the declarations for submission on September 27, both believed that it was accurate for all declarants to attest, "I have no idea how Michael Isikoff got the transcript;" *FoF 81-82*

- Kreindler & Kreindler did not learn until late morning, September 27, that Mr. Fawcett was responsible for the leak; *FoF 104*

- Further to their good-faith efforts to provide truthful declarations to the Court, Ms. Benett and Mr. Pounian scrambled throughout the day on September 27 to provide amended declarations, exposing the truth they had just learned; *FoF 105-107*

- During the day of September 27, in further efforts to comply with the Court's Order, Kreindler & Kreindler sought to reconstruct how it came to be that Mr. Fawcett leaked the transcript; *FoF 105*

46

- Over the course of the next three days, Kreindler & Kreindler worked tirelessly to collect all relevant information to explain the facts to the Court as they became known. *FoF 105-107*

These facts all show that Kreindler & Kreindler used reasonable and diligent measures to comply with the Court's Aug 16 and Aug 30 Orders.

## II.  NO CONTEMPT SANCTIONS ARE WARRANTED AGAINST KREINDLER & KREINDLER

As shown above, the Kingdom has failed to establish a *prima facie* case of contempt of the Protective Order because the Kingdom failed to show by clear and convincing evidence both that (1) Kreindler & Kreindler is in any way responsible for, or complicit in, Mr. Fawcett's leak; **and** (2) that Kreindler & Kreindler failed to be reasonably diligent in attempting to comply with the Protective Orders.  The Kingdom has also failed to establish a *prima facie* case of contempt on the declarations filed by the Kreindler firm because the Kingdom failed to show by clear and convincing evidence both that (1) Kreindler & Kreindler made any false statements to the Court **and** that (2) Kreindler & Kreindler failed to be reasonably diligent in their declarations to the Court. Accordingly, there should be no certification of facts on contempt by Kreindler & Kreindler to the District Court Judge.

An imposition of sanctions on the Kingdom's motion for contempt is outside the jurisdiction of this Court.  28 U.S.C. § 636(e).  Nevertheless, this Court may recommend sanctions to the District Court.  *See Section IB, above.*  To the extent the Court determines that it will certify facts to the District Court on contempt, for the reasons set forth here, no sanctions should be recommended.

Civil contempt sanctions may serve dual purposes, namely, to secure future compliance with court orders and to compensate the party that has been wronged. *A.P. Moller-Maersk A/S v.*

*Commercializadora De Calidad S.A.,* 429 Fed. Appx. 25, 30 (2d Cir. 2011) (civil contempt sanctions may serve dual purposes of securing future compliance with court order and compensate a party that has been wronged but may not be "purely punitive"); *Joint Stock,* 2017 WL 5067500 at *9 (Sep. 27, 2017).  Even had the Kingdom proven the three elements of contempt by clear and convincing evidence – which it did not – there is no basis for any recommendation of an award of either compensatory or compliance sanctions here.

### A.  <u>Compensatory Damages are Not Warranted</u>

Compensatory damages in civil contempt are only available where the moving party has shown an actual proof of loss. *King,* 65 F.3d at 1062 (district court committed abuse of discretion in awarding compensatory fines to moving party for contempt where there was no evidence of moving party's loss); *New York State NOW v. Terry,* 886 F.2d 1339, 1353-1354 (2d Cir. 1989) (sanctions cannot be payable to adversary without proof of loss);  *Joint Stock,* 2017 WL 5067500 at *9 (compensatory damages are available only where the moving party has suffered actual damage). Here, the Kingdom has submitted no evidence that it has suffered any actual damage as a result of Fawcett's leak of the Jarrah Transcript, much less presented competent evidence to quantify any such damage.

Nor are attorney's fees appropriate here, because they may not be awarded unless the moving party has established by clear and convincing evidence that (1) contemptuous behavior has occurred and (2) that such contemptuous behavior was willful.  *King,* 65 F.3d at 1063 (attorney's fees cannot be awarded unless there is a finding that the contempt behavior was willful); *Wella Graphics, Inc.*, 874 F.Supp. at 56 (the general practice in the Second Circuit is for courts to award attorney's fees only upon a showing of willful violation of the court's order).  Here, the Kingdom has failed to show that Kreindler & Kreindler ever willfully violated a court order.

Therefore, compensatory damages should not be awarded, even if the Court determines that a certification to the district judge is warranted.

### B.  <u>Compliance Sanctions Are Not Warranted</u>

Nor would compliance sanctions be warranted here, even had the Kingdom provided the requisite evidence of contempt.  Often called "coercive damages," a sanction can be entered to "coerce the contemnor into future compliance with the court's order." *King,* 65 F.3d at 1062. Coercive sanctions must account for (1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *Dole Fresh Fruit Co. v. United Banana Co*., 821 F.2d 106, 110 (2d Cir. 1987).  Here, there is no basis for "compliance" sanctions.  The character and magnitude of the harm of threatened contumacy is zero:  Mr. Fawcett, the offending party, has left the firm. *FoF 16 ,107.*

While coercive sanctions can be monetary, they can only be imposed when the fine can be shown to have a "coercive effect" on the alleged contemnor's behavior. *King,* 65 F.3d at 1062 - 1063; *Spallone v. United States,* 493 U.S. 265, 276 (1990) (coercive sanctions are imposed to only to "secure compliance").  Here, the record is devoid of any reason to believe that Kreindler & Kreindler, a firm that has been in existence for generations without sanction, or the attorneys, each of whom has been practicing for decades without sanction, poses any threat of some future contempt.  *FoF 45.*

Accordingly, there would be no "effectiveness" in any monetary sanction levelled against the firm.  In short, there is no basis to impose a "compliance" sanction on Kreindler & Kreindler.

III.   **THERE IS NO BASIS FOR THE COURT TO IMPOSE SANCTIONS ON KREINDLER & KREINDLER PURSUANT TO ITS INHERENT POWERS**

A.   **The Court May Not Impose Sanctions Without A Finding of Bad Faith**

While violation of a court order is typically addressed in the framework of contempt, a court may, in rare circumstances, exercise its inherent powers to impose sanctions even in the absence of a finding of contempt.  However, "[b]ecause of their very potency," inherent powers "must be exercised with restraint and discretion." *Chambers v. NASCO*, 501 U.S. at 44; *Yukos Capital S.A.R.L. v. Feldman,* 977 F.3d 216, 235 (2d Cir. 2020) (same); *FDIC v. Tekfen Constr. & Installation Co.,* 847 F.2d 440, 444 (7th Cir. 1988) (a sanctions ruling requires careful legal and factual analysis because such a ruling carries intangible costs for the punished lawyers, whose reputation is their stock in trade).

As the Second Circuit reiterated just last year, before imposing any sanction on an attorney under its inherent powers, this Court must find that the moving party – here, the Kingdom – has made a "clear demonstration" of bad faith under the "clear and convincing" standard of proof. *Burks v. Stickney,* 837 Fed. Appx. 829, n. 2 (2d Cir. 2020) (sanctions imposed under the court's inherent power requires a finding of bad faith); *Wolters Kluwer Fin. Servs. v. Scivantage,*  564 F.3d at 114  ("[i]mposition of sanctions under a court's inherent powers requires a specific finding that an attorney acted in bad faith" and such a finding "must be supported by a high degree of specificity in the factual findings" ); *United States v. International Brotherhood of Teamsters*, 948 F.2d at 1345 (2d Cir. 1991) (imposition of sanctions under the inherent power doctrine requires a "particularized showing" of bad faith); *see also, Schlaifer Nance & Co.,  v. Estate of Warhol*, 194 F.3d 323, 340 (2d Cir. 1999) (declining to impose sanctions under the Court's inherent authority, where evidence was lacking that the individual's conduct was undertaken with subjective bad faith). "Subjective bad faith" requires a finding of "intentional or deliberate misconduct." *United*

*States v. Pangburn*, 983 F.2d 449, 454 (2d Cir. 1993).  This element of subjectivity requires "a high degree of specificity in the factual findings." *Wolters Kluwer*, 564 F.3d at 114, *citing, Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d at 338.

As set forth in more detail above, the Kingdom has utterly failed to make any showing that any Kreindler & Kreindler attorney acted in "subjective bad faith," or engaged in "intentional or deliberate misconduct," either in connection with John Fawcett's leak of the Jarrah Transcript, or in submitting their Declarations to the Court. *First,* as explained above, under *Wolters Kluwer,* John Fawcett's bad faith cannot be "visited" upon Kreindler & Kreindler. *See* Conclusions of Law Section (C) above.[10] *Second,* the Kingdom failed to show any bad faith on Kreindler & Kreindler attorneys with respect to the leak. *Id. Third,* the Kingdom has failed to show any bad faith on the part of the Kreindler & Kreindler firm, or its lawyers or declarants, with respect to the declarations filed with the Court. *See* Conclusions of Law Section (D) above.

**B.   Because the Record Is Devoid of Any Finding of Bad Faith, None of the Potential "Remedies" Listed by the Court in Its October 4 Order Should be Imposed.**

In its October 4 Order, the Court listed "possible remedies" related to the occurrence of the leak of the Jarrah Transcript.  These remedies included: (1) removal from the Plaintiff's Executive Committees, (2) monetary sanctions, (3) a referral for professional discipline to the Committee on Grievances for the Southern District of New York, and (4) a criminal referral to the U.S. Attorney's Office for the Southern District of New York.  Because the Kingdom has failed to show by clear

---

[10] Specifically, a law firm's failure to supervise a subordinate who violates a court order cannot support the imposition of sanctions under a Court's inherent authority, because a failure to supervise does not constitute of "bad faith." *Mirra v. Jordan,* 2014 WL 2511020 at *6 (S.D.N.Y. May 28, 2014) (where the attorney of record had no reason to know that a junior attorney failed to follow court order regarding the issuance of subpoenas, the attorney of record's failure to supervise the junior attorney could not establish bad faith).

and convincing evidence any knowledge or complicity in the leak, let alone the required bad faith

on the part of any of the Kreindler & Kreindler attorneys, none of these "remedies" is warranted.

        1.    *There is No Basis for Removal from the PEC*

The removal of Kreindler & Kreindler or any of its attorneys from the Plaintiffs' Executive

Committee is unwarranted because there has been no showing of any misconduct by any attorney

or by Kreindler & Kreindler. The Manual for Complex Litigation, Fourth ("MCL, 4th"), addresses

sanctions in the context of a class action or a multi-district litigation such as this one and

emphasizes the directive for a Court inclined to impose any sanction to seek the "least severe

sanction available to accomplish the intended purpose." *MCL, Fourth, §10.154; Spallone v. United

States,* 493 U.S. at 276 ("[a] court is obliged to use the least possible power adequate" to bring

about compliance).  Removal of counsel "from a position as lead, liaison, or class counsel" is

considered a "more serious sanction, reserved for egregious circumstances." *Id.*

The MCL Fourth cautions a court that removal of counsel from a lead counsel position

"may disrupt the litigation, may cause significant harm to the client's case and the reputation of

the attorney or law firm, and can conflict with a party's right to counsel of its choosing." *Id.*  In

this case, such a sanction is not only warranted by would cause all of the above harms to an

inordinate degree.

Here, the evidence is substantial that any sanction limiting Kreindler & Kreindler's role

would severely harm the clients' case and disrupt the litigation. Kreindler & Kreindler has taken

the lead in handling the litigation against the Kingdom of Saudi Arabia in several important

ways.  *FoF 41.*  Kreindler & Kreindler along with its investigators repeatedly uncovered critical

information about the involvement of a group of seven Saudi government officials, including

various diplomats, in the support plot for the 9/11 hijackers. *Id.*  Kreindler & Kreindler tracked

down witnesses, documents, information, and testimony around the world as part of this effort. In

addition to obtaining this key evidence, Kreindler & Kreindler took the lead at every single fact witness deposition in the case against Saudi Arabia on behalf of *all* plaintiffs in this MDL, following the Court's order that they be completed by June 30, 2021.  *Id.* Steve Pounian was the primary counsel for plaintiffs over 20 depositions of current and former Kingdom officials and non-party witnesses between January 13 and June 30 of this year, with Megan Benett as primary counsel in two of those depositions.  *Id.* Mr. Pounian and Ms. Benett represented Plaintiffs in defending the three depositions noticed by the Kingdom.  *Id.* Further, of the 11 experts that the Plaintiffs' Executive Committees included in its August 4, 2021 notice, Kreindler & Kreindler retained and has had the working relationship with all but two of them.

More pointedly, in this case, literally tens of thousands of clients have independently chosen the firm of Kreindler & Kreindler – and Jim Kreindler in particular – as their counsel of choice to represent them in this matter.  *FoF 40.*  Where so many 9/11 Families have made the affirmative independent choice to be represented by Kreindler & Kreindler, it is undisputable that removal of Kreindler & Kreindler – or Mr. Kreindler individually - from the PEC would interfere with those thousands of plaintiffs' right to choose their counsel.

Furthermore, the 9/11 families have already experienced a substantial prejudice to the litigation.  Mr. Fawcett may be the single most knowledgeable person about the factual underpinnings of the case against the Kingdom and, after two decades of working on the case, has institutional knowledge, understanding and relationships that are virtually irreplaceable.  We take no position as to what sanction may or may not be appropriate for this Court to impose on Mr. Fawcett.  But it must be recognized that without his work going forward, the plaintiffs' case is undoubtedly seriously handicapped. Even if unavoidable, it is a fact that the plaintiffs are being prejudiced for acts that they had nothing to do with and played no part in. Any further sanction

that works a hardship or prejudice on the plaintiffs, including depriving them of counsel of their choice is cumulative and accretive and would be patently unjust.

With no evidence of wrongdoing of the part of Kreindler & Kreindler or any of its attorneys (let alone clear and convincing competent evidence of bad faith), a personal sanction and the harm it would visit on the reputation of the firm or any of its lawyers is not appropriate here.

### 2.   *There is No Basis for Referral to Disciplinary Committee*

Any referral to the Disciplinary Committee would be unwarranted because there has been no showing of any misconduct by any attorney or by Kreindler & Kreindler.

### 3.   *There is No Basis for Referral to U.S. Attorneys' Office*

Any referral to the U.S. Attorneys' Office would be unwarranted because there has been no showing of any misconduct by any attorney or by Kreindler & Kreindler.

### 4.   *No Basis for Monetary Sanctions*

Any imposition of monetary sanctions would be unwarranted here because the Kingdom has failed to prove any misconduct by any attorney or by Kreindler & Kreindler.  Nor has there been, or could there be, any finding of bad faith on the part of the Kreindler attorneys or the firm. Without a finding of bad faith, there can be no monetary sanctions imposed.

*First,* there is no basis for this Court to award attorneys' fees under its inherent powers. Under "the bedrock principle known as the American Rule, each litigant pays his own attorneys' fees, win or lose."  *Marx v. Gen. Revenue Corp.,* 568 U.S. 371, 382 (2013); *Lation v. Fetner Props.,* 2019 WL 1614691, *3 (S.D.N.Y. Apr. 16, 2019) (recognizing that a party must establish bad faith for a court to exercise its inherent power to invoke the narrow exception to the American Rule).  This Court has ruled that "relevant precedent erects a high bar for fee shifting through a court's inherent powers," and that such fee-shifting, according to Supreme Court precedent, "should be exercised with restraint and caution."  *Id.*, *citing Int'l Bhd. of Teamsters,* 948 F.2d at

54

1347 (an award of attorneys' fees pursuant to a court's inherent powers requires a "clear demonstration of bad faith"); *see also, Chambers v. NASCO, Inc*., 501 U.S. at 45-46, (the American Rule prohibiting fee shifting can only be disregarded in certain exceptional circumstances, such as "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"); *Mirra v. Jordan*, 2014 WL 2511020 at *4 (S.D.N.Y. May 28, 2014) (courts may not assess attorneys' fees under their inherent powers absent bad faith); *Milltex Industries Corp. v. Jacquard Lace Co., Ltd.*, 55 F.3d 34, 41 (2d Cir. 1995) (reversing an award for attorneys' fees exercised under the court's inherent power, stating, "mindful that an award of sanctions is a severe penalty, we will uphold sanctions under the bad faith exception to the American Rule only when serious misconduct clearly appears on the record").[11]

*Second,* there is no basis for the Court to impose any monetary fines on Kreindler & Kreindler or its attorneys.  Monetary fines are punitive in nature, and may not be imposed without the benefit of procedural protections employed in the criminal process.  *Goodyear Tire & Rubber Co. v. Haeger,* 137 S. Ct. 1178, 1186 (2017) (to impose a punitive, non-compensatory sanction pursuant to the Court's inherent powers, the Court must "provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof."); *Mackler Prods., Inc. v. Cohen,* 146 F.3d 126 (2d Cir. 1998) (vacating a punitive sanction, stating that the imposition of a "sufficiently substantial" sanction of $10,000 was punitive in nature and "requires that the person sanctioned receive the procedural protections appropriate to a criminal case").

---

[11] Moreover, such an award of attorneys' fees "may go no further than to redress the wronged party for losses sustained;" it may not impose an additional amount as punishment for the sanctioned party's misbehavior.  *Goodyear Tire & Rubber Co. v. Haeger,* 137 S. Ct. 1178, 1186 (2017).

## RESERVATION OF RIGHTS

Kreindler & Kreindler participated in good faith with the Court's inquiry into the breach of its Protective Order. Kreindler & Kreindler did so in furtherance of its duties as an officer of the Court and to its clients, because it had nothing to hide, and because the leak issue consumed enormous time and resources and had to be resolved quickly to avoid affecting Plaintiffs' case. But Kreindler & Kreindler's cooperation in this Hearing should not in any way be construed as consent to any of its procedural or substantive infirmities and all of Kreindler & Kreindler's objections are hereby expressly preserved. Most critically, but not exclusively, Kreindler & Kreindler specifically notes and preserves its objections to all matters of which it did not receive proper notice.  Though the Court stated its purpose as ***"to determine whether anyone other than Mr. Fawcett participated in the breach (including by directing it or helping to cover it up), how the breach was carried out, and whether any party submitted to the Court false or knowingly misleading sworn statements as part of its inquiry***" (*ECF 7277),* the Kingdom was not limited in the scope of its examination and was permitted to inquire into wholly unrelated matters far beyond the Hearing's stated purpose. The Kingdom was allowed (among other things and over objections) to relitigate unrelated press appearances of Mr. Kreindler including in 2017 and 2019, to delve into Kreindler & Kreindler's internal processes for managing Protected Material far beyond anything relevant to John Fawcett's breach, the internal affairs of Kreindler & Kreindler, such as its attorneys' fees, its engagement with certain sources, experts and consultants and what information they provided to the attorneys.  None of these matters was within the stated purpose of the Hearing and yet the Court permitted these invasive inquiries without notice of what rule or authority was invoked, without notice of what documents would be used – either before ***or even during*** the Hearing – all in violation of applicable law.  *See, e.g., Fed. R. Civ. P. 26, Fed. R. Evid. 801, 802(c),*

*901; see, also, Dole Fresh Fruit Co., v. United Banana Co.,* 821 F.2d 106, 110 (2d Cir. 1987) (procedural regularity, including notice and opportunity to prepare defense, required in all proceedings for contempt).

## <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should find that there was no wrongdoing by Kreindler & Kreindler or any of its attorney and personnel. We respectfully request that the Court decline to certify facts to the district court in connection with any contempt, should refrain from imposing any sanctions pursuant to its inherent authority or otherwise, and should close the matter.

Dated: November 24, 2021
      New York, New York

**KIRSCH & NIEHAUS, PLLC**

*s/ Emily Bab Kirsch*
Emily Bab Kirsch
Paul R. Niehaus
Lisa A. Frey *of Counsel*
150 E. 58th Street, 22nd Floor
New York, New York  10155
(212) 631-0223
emily.kirsch@kirschniehaus.com