# **APPENDIX A1**

KSAX EXHIBITS  2 to 18

UNITED STATES DISTRICT COURT                            ECF
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br><br>**MEMORANDUM & ORDER** |

*This document relates to*: ALL ACTIONS

**RICHARD CONWAY CASEY, United States District Judge:**

       The Defendants' Executive Committee ("Defendants' Committee") makes an application for an umbrella protective order covering all materials produced during discovery in the above-captioned case. Rule 26(c) of the Federal Rules of Civil Procedure provides that upon motion a court may grant a protective order "which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," provided that the party or person requesting the protective order has demonstrated that good cause exists for its issuance. The Plaintiffs' Executive Committee opposes the instant application for a protective order on the grounds that the Defendants' Committee has not adequately demonstrated good cause, particularly in light of the intense public interest surrounding this litigation. Because the Court finds that the Defendants' Committee has demonstrated sufficient good cause to warrant a limited protective order, the Defendants' Committee's application is **GRANTED IN PART**.

**I.      MEMORANDUM**

       "The unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984). But courts also must be mindful that protective orders implicate a litigant's First Amendment right to speak, see id. at 34, as well as the public's common law and "likely constitutional" right of access

**KSAX-0002**

Case No.
03-md-1570

to the courts, <u>Gambale v. Deutsche Bank AG</u>, 377 F.3d 133, 140 (2d Cir. 2004). Rule 26(c) of the Federal Rules of Civil Procedure accommodates these important rights by requiring the party or person seeking a protective order to demonstrate good cause for its issuance. See <u>Seattle Times</u>, 467 U.S. at 37; <u>In re "Agent Orange" Prod. Liab. Litig.</u> ("<u>In re Agent Orange</u>"), 821 F.2d 139, 145 (2d Cir. 1987) ("[T]he party seeking a protective order has the burden of showing that good cause exists for issuance of that order . . . [and] if good cause is not shown, the discovery materials in question should . . . be open to the public for inspection.").

The specificity required in a showing of good cause varies with the scope and complexity of a case. Ordinarily, good cause exists "when a party shows that disclosure will result in a clearly defined, specific and serious injury." <u>Shingara v. Skiles</u>, 420 F.3d 301, 306 (3d Cir. 2005); <u>see also</u> <u>Havens v. Metro. Life Ins. Co.</u>, No. 94 Civ. 1402 (CSH), 1995 WL 234710, at *11 (S.D.N.Y. April 20, 1995) ("[D]efendant fails to specify the nature or extent of injury [that] it contemplates release of the sealed documents would bring about, and accordingly fails to establish good cause."). <u>But</u> <u>see</u> <u>Topo v. Dhir</u>, 210 F.R.D. 76, 77-78 (S.D.N.Y. 2002) (holding that while the "specificity requirement" of the good cause standard applies to companies, it does not apply to private individuals). In cases of unusual scope and complexity, however, broad protection during the pretrial stages of litigation may be warranted without a highly particularized finding of good cause. <u>See</u> <u>In re Agent Orange</u>, 821 F.2d at 148. Instead, a court may impose an initial protective order based upon a general showing of good cause, and may modify that order at a later time if more specific grounds for its continuance remain indiscernible. <u>Id.</u> (explaining that although the district court made no finding of good cause, the court "properly entered the [protective] orders initially as temporary measures, and properly lifted them thereafter").

2

In addition, the public's right of access to discovery materials depends on the type of materials and the stage of the litigation.  A court considering whether to issue a protective order must consider the public interests at stake.  <u>Shingara</u>, 420 F.3d at 308; <u>Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.</u>, 178 F.3d 943, 945 (7th Cir. 1999) (Posner, J.) (noting that "[t]he judge is the primary representative of the public interest in the judicial process").  But, as the Second Circuit indicated in <u>United States v. Amodeo</u>, 71 F.3d 1044, 1050 (2d Cir. 1995), public interest in particular litigation does not generate a public right of access to all discovery materials.  Indeed, no public right of access exists with respect to materials produced during the initial stages of discovery.  <u>Id.</u>  The Second Circuit in <u>Amodeo</u> explained that while a presumption of public access exists as to documents filed with the court, "[d]ocuments that play no role in the performance of Article III functions, such as those passed between the parties in discovery, lie entirely beyond the presumption's reach and stand on a different footing than a motion filed by a party seeking action by the court, or, indeed, than any other document which is presented to the court to invoke its powers or affect its decisions."  <u>Id.</u> (internal quotations, citations, and alteration omitted).

Thus, the public's right of access to discovery material only encompasses access to "judicial documents," that is, such "items filed with the court that are relevant to the performance of the judicial function and useful in the judicial process."  <u>SEC v. TheStreet.com</u>, 273 F.3d 222, 231 (2d Cir. 2001) (quoting <u>United States v. Amodeo</u>, 44 F.3d 141, 145 (2d Cir. 1995) (alterations omitted)).  This "presumptive right to public observation is at its apogee when asserted with respect to documents relating to matters that directly affect an adjudication.  Such documents include those relating to the decision of a motion for summary judgment . . . ."  <u>Gambale</u>, 377 F.3d at 140 (internal quotations and citations omitted).  Accordingly, a party seeking a protective order sealing trial, other

3

court hearings, or motions and accompanying exhibits filed with the court must satisfy a more demanding standard of good cause. See id. (noting that "documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons"); Byrnes v. Empire Blue Cross Blue Shield, No. 98 Civ. 8520 (BSJ), 2000 WL 60221, *1 (S.D.N.Y. Jan. 25, 2000).

In a two-page letter to the Court, dated May 4, 2006, the Defendants' Committee requests that all discovery in this multi-district litigation be subject to a protective order. The Committee has made this request on behalf of numerous defendants, including sovereign states, government institutions, public figures, private individuals, companies, charitable organizations, and others. The Defendants' Committee's application includes, inter alia, a request for provisions limiting the parties' use of all disclosure or discovery material to purposes associated with this litigation. It also requests provisions affording additional protections to specifically designated confidential materials. Among the latter provisions, the Defendants' Committee requests that the protective order require the parties to file under seal any confidential material submitted to the Court.

The Committee argues that good cause exists for an umbrella protective order because discovery will encompass "an enormous number of documents," and "[a] substantial portion of those documents may contain sensitive or confidential information, such as details about defendants' finances, the public disclosure of which would intrude on defendants' privacy." (Defs.'s May 4, 2006 Letter.) The Defendants' Committee also argues that imposing a protective order will prevent further prejudice to the defendants. It contends "that plaintiffs have already demonstrated their desire to try their case in the press," and therefore, that disclosure of any discovery materials "would irreparably tarnish defendants' reputations" and "would prejudice defendants' ability to defend

4

themselves at trial." (Id.)

Under normal circumstances, such broad assertions of good cause would be too generalized to support imposition of a protective order. See Shingara, 420 F.3d at 306; Havens, 1995 WL 234710, at *11. But the present circumstances are far from normal. Indeed, this multi-district litigation amounts to one of the largest private lawsuits in United States history. Defendant-by-defendant good cause determinations for individual protective orders at this juncture in this case, much less document-by-document confidentiality determinations where no protective order has issued, would impose an enormous burden upon the Court and severely hinder its progress toward resolution of pretrial matters. For this reason, the Court finds that the unusual scope and complexity of the instant litigation warrants broad protection during the pretrial stages of litigation based upon only a general finding of good cause. See In re Agent Orange, 821 F.2d at 148.

Furthermore, the Court finds that the Defendants' Committee's general assertions of good cause based upon privacy and prejudice concerns are sufficient to warrant imposition of a limited protective order in this case. Most, if not all, of the numerous defendants to these consolidated actions are accused of either committing the terrorist acts of September 11, 2001 or providing material support to those who did. Many of these same defendants will be asked to turn over a vast array of private and confidential information during discovery, much of which will have little or no bearing on the resolution of these actions but will be subject to widespread public scrutiny with prejudicial effects in the absence of a protective order. See Seattle Times, 467 U.S. at 34-35 (noting that "[i]t is clear from experience that pretrial discovery by depositions and interrogatories has a significant potential for abuse," and that such abuse "may seriously implicate privacy interests of litigants and third parties"). In light of these circumstances, the Defendants' Committee has shown

sufficient good cause for a protective order covering the initial stages of discovery.

Such a showing is not sufficient, however, to warrant a protective order covering all "judicial documents," particularly those submitted to the Court in connection with trial, other hearings, and motions. The public's right of access to the court and judicial process is at its "apogee" with respect to such documents, <u>Gambale</u>, 377 F.3d at 140, and a protective order sealing them requires a more specific, clearly defined demonstration of good cause than that which the Defendant's Committee presented here, <u>see</u> <u>Byrnes</u>, 2000 WL 60221, at *1. Thus, although the Court will permit the parties to designate particular discovery material as confidential and subject to heightened protections, the Court will not permit such materials to be filed under seal pursuant to the Defendant's Committee's current application.

## II. ORDER

### A. PURPOSES AND LIMITATIONS

Disclosure and discovery activity in the actions that make up this Multi-District Litigation (the "MDL") are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation will be warranted. Accordingly, the Court hereby adopts the following Protective Order ("Order").

### B. DEFINITIONS

1. "Party" shall mean any party to this MDL, including all of its officers, directors, employees, consultants, retained experts, and outside counsel (and their support staff).

2. "Disclosure or Discovery Material" shall include, but not be limited to, all items or information, regardless of the medium or manner generated, stored, or maintained

6

(including, among other things, testimony, transcripts or tangible things), that are produced or generated in disclosures or responses to discovery in this MDL.

3.       "Producing Party" shall mean a Party or non-party that produces Disclosure or Discovery Material in this MDL.

4.       "Receiving Party" shall refer to a Party that receives Disclosure or Discovery Material from a Producing Party.

5.       "Designating Party" shall mean a Party or non-party that designates Disclosure or Discovery Material as Confidential pursuant to paragraph F.3. of this Order.

6.       "Confidential Information or Material" or "Protected Material" shall mean all Disclosure or Discovery Material, or portions thereof, as well as any copies, summaries or abstracts thereof, which have been designated by the Designating Party as Confidential pursuant to paragraph F.3. of this Order.

7.       "Counsel" shall mean attorneys who are not employees of a Party but who are retained to represent or advise a Party.

8.       "Expert" shall mean a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this MDL.  This definition includes a professional jury or trial consultant retained in connection with this MDL.

9.       "Professional Vendors" shall mean persons or entities that provide litigation support services (e.g., photocopying; videotaping; translating; preparing exhibits or demonstratives; organizing, storing, retrieving data in any form or medium; etc.) and their employees and subcontractors.

7

C.      SCOPE

The protections conferred by this Order cover not only Protected Material (as defined above), but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by parties or counsel to or in court or in other settings that might reveal Protected Material.

D.      DURATION

Even after the termination of this MDL, the obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs.

E.      USE OF DISCLOSURE OR DISCOVERY MATERIAL

All Disclosure or Discovery Material (or any copies, summaries or abstracts thereof) produced in the course of the MDL shall be used solely for the purpose of the prosecution or defense of the MDL, or preparation of the MDL for trial.

F.      DESIGNATING PROTECTED MATERIAL

1.      Each Producing Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.  If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all, or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all Receiving Parties that it is withdrawing the mistaken designation.

2.      Each Producing Party wishing to designate material for protection under this Order must clearly so designate that material before it is disclosed or produced.

3.      The Designating Party shall label or mark Disclosure or Discovery Material

8

produced to any other Party that is deemed to contain Confidential Material as follows:

>   CONFIDENTIAL:  This document is subject to a Protective Order
>   regarding confidential information in 03 MDL 1570 (RCC), United
>   States District Court for the Southern District of New York.

4.      Stamping or writing the designated legend on the cover of the first page of any multi-page Disclosure or Discovery Material shall so designate all pages of such Disclosure or Discovery Material, unless otherwise indicated by counsel for the Designating Party. Confidentiality designations shall be made for good cause.

5.      Should the Producing Party inadvertently fail to mark Disclosure or Discovery Material as Confidential at the time of production, counsel for the Producing Party shall promptly notify counsel for all Receiving Parties upon discovery of the inadvertent production.  Correction of an omission of the Confidential designation and notice thereof shall be made in writing by counsel for the Producing Party, accompanied by substitute copies of each document or thing appropriately marked Confidential.  Within ten (10) business days of receipt of these substitute copies, counsel for the Receiving Parties shall return, or certify in writing the destruction of, the previously unmarked Disclosure or Discovery Material and all copies; and all summaries and abstracts thereof shall be maintained as Confidential by the Party or their counsel which created such copies, summaries or abstracts.

6.      If a Producing Party produces material qualifying for protection under this Order without designating that material for such protection, any other party may designate that material for protection under this Order.  Counsel for the Designating Party shall promptly notify counsel for all Receiving Parties upon discovery that the produced material may be so designated. Notice of the designated material shall be made in writing by counsel for the Designating Party,

9

accompanied by substitute copies of each document or thing appropriately marked Confidential. Within ten (10) business days of receipt of these substitute copies, counsel for the Receiving Parties shall return, or certify in writing the destruction of, the previously unmarked Disclosure or Discovery Material and all copies; and all summaries and abstracts thereof shall be maintained as Confidential by the Party or their counsel which created such copies, summaries or abstracts.

G.     DEPOSITION TESTIMONY

1.     In the case of depositions upon oral examination, if counsel for a Party has a reasonable and good faith belief that any question or answer contains Confidential Information or Material, counsel for that Party shall so state on the record and shall request that all pages that include such Confidential Information or Material be marked Confidential.

2.     When testimony designated as containing Confidential Information or Material is elicited during a deposition, persons not entitled to receive such information under the terms of this Order shall be excluded from the deposition.

3.     In addition to designating during the deposition any question or answer as containing Confidential Information or Material, counsel may designate any portion of the deposition transcript as containing Confidential Information or Material at any time within thirty (30) business days of receiving the deposition transcript from the court reporter.  Notice of such designation shall be made in writing to the court reporter, with copies to all other counsel, specifying the portion(s) of the transcript and exhibits that constitute or contain Confidential Information or Material and are to be marked as Confidential.

4.     Transcripts containing testimony or exhibits designated as containing Confidential Information or Material shall be marked by the court reporter, prior to transcript

10

distribution, with the legend "THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL" and shall be treated in accordance with the provisions of this Order.

5.      Until expiration of the thirty (30) business day period, all deposition transcripts shall be considered and treated as though marked Confidential, unless otherwise agreed on the record at the deposition.

H.      ACCESS TO, USE AND DISCLOSURE OF CONFIDENTIAL INFORMATION OR MATERIAL

1.      A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a non-party in connection with this case only for prosecuting, defending, or attempting to settle this litigation.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order.

2.      Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

3.      Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated as Confidential only to:

a.      Counsel for the Parties who are actively engaged in the conduct of the MDL on behalf of the named Parties, including partners, associates, secretaries, legal assistants of such counsel, and any other person in the employ of such counsel to the extent reasonably necessary to render professional services;

b.      The Court and those employed by the Court;

c.      Any person designated by the Court in the interest of justice, upon

11

Case 1:03-md-01570-GBD-SN Document 9350-1 Filed 10/13/23 Page 12 of 16

such terms as the Court may deem proper;

        d.    Any witness at a deposition or at a hearing, or to the extent reasonably necessary in the preparation of such witness for such deposition or hearing, and to counsel for the witness;

        e.    Court reporters or persons operating video equipment who record depositions or other testimony in the MDL;

        f.    Outside consultants or Experts retained for the purpose of assisting counsel in the MDL, but only to the extent the disclosure of Confidential Information or Material is directly related to and reasonably necessary to counsel's prosecution of the MDL;

        g.    Professional Vendors engaged in one or more aspects of copying, organizing, filing, coding, converting, storing or retrieving data or designing programs for handling data connected with the prosecution of the MDL;

        h.    Any other person after written consent given by counsel for the Designating Party; and

        i.    Clients, to the extent necessary to fulfill counsel's obligations of attorney-client communications.

        4.    If any Receiving Party desires to provide Confidential Information or Material produced by a Producing Party to any person(s) not set forth in paragraph H.3., and if the Parties cannot resolve the matter consensually, the Party seeking to make such disclosure may make an appropriate application to the Court.

        5.    It shall be the responsibility of counsel giving access to Confidential Information or Material produced by the Producing Party to create and retain records indicating that

12

the person receiving Confidential Information or Material agreed to be bound by the terms and restrictions of this Order.

      I.      INADVERTENT PRODUCTION OF PROTECTED OR PRIVILEGED MATERIAL

      1.      The inadvertent production of Disclosure or Discovery Material containing attorney-client privilege or work-product information or any other Protected Material or privileged information will not constitute, and may not be argued to constitute, a waiver of any applicable privileges or protections.

      2.      Any Disclosure or Discovery Material inadvertently produced and subject to a subsequent claim of privilege and/or protection shall, upon written request to Counsel for all Receiving Parties made promptly upon learning of the inadvertent production, be returned immediately to counsel for the Producing Party, and neither such Disclosure or Discovery Material, nor copies thereof, shall be retained and/or used by any Receiving Party without either the consent of the Producing Party or an order of the Court.  Any Party may then move the Court for an order compelling production of the Disclosure or Discovery Material, but said Party shall not assert as a ground for entering such an order the fact or circumstances of the inadvertent production.

      J.      PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED TO A NON-PARTY

      1.      If any Receiving Party receives a subpoena or other document production request from a non-Party to this Order seeking production or other disclosure of Confidential Information or Material produced by a Producing Party in this MDL, that Party shall notify Counsel for the Designating Party — in writing (by facsimile and email, if possible) immediately and in no event more than five calendar days after receiving the subpoena or document production request —

13

Case 2:03-md-01570-GBD-SN Document 9350-1 Filed 11/03/03 Page 15 of 120

identifying the Confidential Information or Material sought and enclosing a copy of the subpoena or request.

2.      Counsel for the Receiving Party shall make timely objections to the production of the Confidential Information or Material including, by reference, the existence of this Order. Unless and until such objections are overruled by the Court, or the Court otherwise orders production of the Confidential Information or Material, no Receiving Party may produce or divulge the contents of the Confidential Information or Material, except with the express written consent of the Designating Party.

K.     FINAL DISPOSITION

1.      Within 120 days after the entry of a final, non-appealable order disposing of all actions in this MDL, all Disclosure or Discovery Material, and all copies thereof, including but not limited to, any notes or other transcriptions made therefrom, shall be returned to counsel for the Producing Party or, in lieu thereof, counsel for the Receiving Party shall certify in writing to counsel for the Producing Party the destruction of such Disclosure or Discovery Material.

2.      Counsel for the Receiving Party shall make a reasonable effort to retrieve any Disclosure or Discovery Material, or portions thereof, subject to this Order from any Party or non-party witness and Expert or consultant to whom such information has been given, and shall notify in writing counsel for the Producing Party of any failure to retrieve any such information, the reasons therefore, the identity of the person from whom the Disclosure or Discovery Material, or portions thereof, could not be retrieved, and the identity of any Disclosure or Discovery Material, or portions thereof, not returned.

L.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

KSAX-0002, Page 14 of 16

If any Party objects to the designation of any Confidential Information or Material, that Party shall state the objection and reasons therefore in a letter to Counsel for the Designating Party. Counsel shall then confer in an effort to resolve the dispute without court intervention. If the Designating Party does not change the designation within twenty (20) calendar days following the receipt of such written notice, then the Party objecting to the designation may make a motion seeking an order that such Confidential Information or Material shall be treated as no longer Confidential under this Order. Until the Court rules on any such motion and any and all proceedings or interlocutory appeals (assuming such a right exists) challenging such decision have been concluded, the Confidential Information or Material shall continue to be deemed Confidential, under the terms of this Order.

M.   MISCELLANEOUS

1.   No Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order. Similarly, no Party waives any right to object on any ground to the use in evidence of any of the material covered by this Order.

2.   Except as specifically provided herein, any violation of this Order is punishable by money damages caused by the violation, including, but not limited to, all attorneys fees, court costs, exhibit costs, expert witness fees, travel expenses, all related litigation costs, and actual damages incurred by the other Party, equitable relief, injunctive relief, sanctions or any other remedy as the Court deems appropriate.

15

3. Nothing in this Order shall be construed to apply to any Disclosure or Discovery Material filed with the Court in connection with any trial, other hearing, or as an exhibit or other attachment to any motion (other than a motion filed pursuant to paragraph L of this Order).

**So Ordered:** New York, New York
October 3, 2006

*Richard Conway*

**Richard Conway Casey, U.S.D.J.**

16

**KSAX-0002, Page 16 of 16**

H58WashC

1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In re Terrorist Attacks on
      September 11, 2001             03 MD 1570 (GBD)(SN)
4
                                     Telephone Conference
5   ------------------------------x

6

7                               New York, N.Y.
                               May 8, 2017
8                               12:15 p.m.

9   Before:

10                 HON. SARAH NETBURN,

11                             Magistrate Judge

12                APPEARANCES

13

14

15

     KREINDLER & KREINDLER LLP
16       Attorneys for Plaintiffs' Executive Committee
     BY: JAMES P. KREINDLER
17       -and-
     MOTLEY RICE, LLP
18   BY: ROBERT T. HAEFELE

19

20   OMAR T. MOHAMMEDI
     FREDERICK GOETZ
21       Attorneys for Defendant WAMY

22

23

24

25

KSAX-0010

Case No.
03-md-1570

H58WashC

```
 1              (In chambers)
 2              THE COURT:  Good afternoon.  I am here with a court
 3    reporter and with my law clerk.  I'm going to ask that those
 4    attorneys who intend to be speaking during this conference
 5    state their appearance.  If there are other people on the line
 6    but they're just listening, I don't need their appearance made.
 7    Let me remind you that when you speak you should introduce
 8    yourself each time so that your comments can be properly
 9    attributed, and anybody who doesn't state their appearance at
10    the outset but then decides to speak at a later time, please be
11    sure to state your appearance at that time.
12              Who do I have on the line on behalf of WAMY?
13              MR. MOHAMMEDI:  Good afternoon, your Honor.  This is
14    Omar Mohammedi on behalf of WAMY.
15              MR. GOETZ:  Good afternoon, your Honor.  Frederick
16    Goetz for WAMY as well.
17              THE COURT:  And on behalf of Mr. Kreindler.
18              MR. KREINDLER:  Hi, your Honor.  Mr. Kreindler
19    himself.
20              THE COURT:  OK.  Thank you.
21              I have reviewed the three letters in connection with
22    this application as well as a Politico article and the 2006
23    protective order that was entered into by Judge Casey.
24              Let me address first Mr. Kreindler's response to the
25    accusation that the information was information that's publicly
```

H58WashC

1     available and that should never have been designated as

2     confidential in the first place.  We have had several

3     conversations already in connection with confidentiality

4     issues.  This case has heightened public interest, but as Judge

5     Casey noted when he granted the protective order, there are

6     also serious allegations being made as to the defendants, and

7     until they are found responsible, it's not fair to disclose

8     information that's designated as confidential that might tend

9     to make the public think that somebody is guilty of certain

10    conduct.  In this instance, it's clear that the information was

11    designated confidential.  As I understand it, Mr. Kreindler,

12    nor anyone from the plaintiffs' executive committee, has moved

13    to dedesignate that information, and what I don't want is for

14    the parties to think that they can undermine the

15    confidentiality orders because, by their own likes, something

16    is not confidential or should not be confidential.  The parties

17    obviously negotiated a protective order a decade ago, and I

18    expect the parties to follow it.  I'm not moved by

19    Mr. Kreindler's initial remarks that the information at issue

20    here is otherwise publicly available.

21              MR. KREINDLER:  Your Honor, if I could start this way,

22    I want to be very clear, I never released any confidential

23    evidence at all to Caleb Hannan or to any other reporter.  John

24    Fawcett, our investigator, did not show a document or release

25    any confidential information at all.  I think Mr. Mohammedi has

| | |
|---|---|
| 1 | a misunderstanding borne of maybe the overly dramatic way in |
| 2 | which the reporter wrote his article, but I want to be clear, |
| 3 | neither the document that WAMY cited or any other piece of |
| 4 | paper or any other bit of information designated confidential |
| 5 | was ever, ever, ever released by me or anyone who works for me. |
| 6 | Now, what did happen, and maybe this is why |
| 7 | Mr. Mohammedi has this apprehension about something that never |
| 8 | existed, is the reporter spoke to me about themes in the case, |
| 9 | spoke to John, and was interested in how we went about |
| 10 | connecting the dots to show the connection between lower-level |
| 11 | Saudi officials like Basnan and Bayoumi to a higher official, |
| 12 | Saudi official, Thumairy, to Thumairy's boss' boss, Sowailem, |
| 13 | from the Saudi embassy. And I apologize if we didn't put this |
| 14 | in the letter the right way, but here is what happened, so |
| 15 | there's no misunderstanding at all. |
| 16 | The FBI had released, in its report, a number of phone |
| 17 | numbers called by Bayoumi, the Saudi embassy official in San |
| 18 | Diego and L.A. Among the numbers called was a number from the |
| 19 | Saudi embassy in Washington, particularly the number of the |
| 20 | Saudi Ministry of Islamic Affairs headed by Sowailem. John |
| 21 | explained to the reporter the process, never showed him a |
| 22 | single document, never read from a document, or referred from a |
| 23 | document. What John did say is when we saw the numbers that |
| 24 | Bayoumi called, I immediately went to our data and looked for |
| 25 | this D.C. number, suspecting it was from the embassy, and this |

H58WashC

```
 1   number is all over the place.  It's on the Saudi website.  It's
 2   in the FBI reports.  It's in State Department reports, and even
 3   though we haven't gotten a single piece of paper from Saudi
 4   Arabia yet, there is correspondence with the Saudi letterhead
 5   in the files of lots of defendants.  And as we've seen, there
 6   is correspondence with the number of the Saudi letterhead in
 7   WAMY files, but to be crystal clear, John never showed Caleb
 8   that document or any other document or said anything about the
 9   contents of any of those documents, simply pointed out that
10   that number, 202-3700, is public information all over the
11   place.
12           Now, when Caleb wrote up the article, he wrote it in a
13   dramatic way, that when John had the numbers Bayoumi dialed, he
14   found it on a piece of paper, but that piece of paper exists in
15   thousands of places in discovery and in the public record, but
16   the only thing we're talking about is the letterhead, just as
17   if my office number, 212-617-8181, if somebody wanted to look
18   up my number, maybe they grab some attorney-client privilege
19   and read my number that has nothing to do with anything
20   contained in that document.
21           THE COURT:  Mr. Kreindler, the article explicitly
22   cites to the receipt of hundreds of thousands of pages of
23   documents, and then makes the specific notation that at the top
24   of a single page they found this note, so I think the argument
25   here, whether it's dramatic writing or not, is that the import
```

1     of the narrative is that as a result of the documents that you

2     received, you received information that allowed you to connect

3     these dots, and I think that that is disclosing information,

4     even if you're not disclosing the specific number, but

5     information that was set forth in a confidential document.

6          MR. KREINDLER:  Yes, the reporter's description is

7     really not accurate, because when he says at the top is a note,

8     what he's referring to is just the Saudi letterhead which has

9     the phone number, which Mr. Mohammedi supplied in this and

10    probably a thousand other documents.  What John said is with

11    that number, I looked it up and found that it's the Saudi

12    embassy Ministry of Islamic Affairs headed by Sowailem, so the

13    reporter wrote it in a way that it's not wrong, but it's not

14    accurate; it creates an implication.  It creates the

15    implication that John somehow pulled a document that said the

16    letterhead says this number is the Saudi embassy Ministry of

17    Islamic Affairs, and that's not what happened.

18         Listen, I don't fault Mr. Mohammedi for being

19    concerned or suspicious, but had anyone asked me, I would have

20    explained this and made clear that John never ever read or

21    showed anything from a document, including the letterhead, to

22    this reporter or anyone else.  From the very beginning of the

23    case, we've been very careful, because there are a lot of

24    reporters interested.  And of course, the only thing we said

25    is:  We can never show any document.  You can read the

H58WashC

1    complaint and read court filings.  So it's not a crazy reading

2    for Mr. Mohammedi to make, but it's an incorrect reading, and

3    what he suspects happened absolutely never happened.

4            THE COURT:  OK.  Let me hear from either Mr. Mohammedi

5    or Mr. Goetz.

6            MR. MOHAMMEDI:  Thank you, your Honor.  I'd just like

7    to mention if WAMY's document was not described and it was not

8    mentioned in the interview, why would the reporter mention it?

9    Whether the confidential document had been the subject of the

10   disclosure with the reporter, it was the needle in the haystack

11   that Mr. Kreindler and his team found, and your Honor, even

12   worse, the context by which WAMY's document was described in

13   relation to the information provided put it in bad light.  And

14   even though the document does not describe exactly what the

15   article is, but when you look at page 6 where the reporter

16   says, "In their 15 years on the case, Kreindler's team hadn't

17   persuaded the U.S. government to provide them much of anything

18   useful," and then he goes on and he says, "But they had spent

19   more than a decade legally compelling some of the largest

20   charities in the Middle East," and he goes on and then says,

21   "U.S. government knew these charities had provided financial

22   and logistical support for the people and groups American

23   officials label as terrorists" -- when he put that within the

24   context, it makes it even worse the way WAMY document was,

25   "they found needle in the haystack," and that is the problem we

1    have with Mr. Kreindler's conversation with the reporter, and

2    the information specifically referred to that document, which

3    is the needle in the haystack.  So it's actually even worse,

4    and that's exactly what Judge Casey said in his order:

5             "Most, if not all, of the numerous defendants to these

6    consolidated actions are accused of either committing the

7    terrorist acts of September 11, 2001, or providing material

8    support to those who did.  Many of the same defendants will be

9    asked to turn over a vast array of private and confidential

10   information during discovery, much of which will have little or

11   no bearing on the resolution of these actions but will be

12   subject to widespread public scrutiny with prejudicial effects

13   in the absence of a protective order."

14            This is the reason why Judge Casey issued this order

15   for this type of information, the context by which the article

16   mentioned WAMY documents, and that's the problem we have, your

17   Honor.  If the reporter did not have any information of WAMY

18   documents, which you have in front of you, he would never

19   mention WAMY's documents as the needle in the haystack.  That

20   is the problem, your Honor, we have with Mr. Kreindler and his

21   communication with the reporter.

22            THE COURT:  OK.  I tend to agree with WAMY here that

23   the information that was disclosed did violate the letter of

24   the agreement.  The agreement does make clear that summaries or

25   abstracts of the documents are confidential as well, and as

1   counsel just mentioned, the information that Mr. Kreindler was

2   trying to convey to the reporter could just as easily have been

3   conveyed without making the direct link between confidential

4   documents that were provided in this case and your ability to

5   connect the dots.

6        I do find, Mr. Kreindler, that this is a breach of the

7   confidentiality requirement.  As I ordered a few weeks ago with

8   respect to the applications that came in more generally about

9   the Politico article, there is heightened interest in this

10  case, and I'm certainly not going to prohibit anybody from

11  speaking to the press, but the parties need to really be

12  careful here because of the reasons that Judge Casey first

13  referenced when he entered this order.  It is really unfair to

14  the parties who will be turning over a lot of confidential and

15  personal information to have those documents portrayed in a

16  light that has a particular viewpoint, and I believe that this

17  article -- and I just have a hard time believing that the

18  journalist came up with this bent, this viewpoint, on his

19  own -- does reveal as a technical matter information that was

20  provided in a confidential document.

21       Going forward, Mr. Kreindler, to the extent you are

22  going to be continuing to speak to the press, or any other

23  lawyer in this case, I expect the parties to hew much more

24  closely to the confidentiality order and to be exceedingly

25  discreet in the information that they reveal.

H58WashC

1          I'm not going to sanction Mr. Kreindler with any

2   monetary sanction or otherwise.  Consider this a first warning,

3   and it's my hope that I don't get these applications again.  I

4   do find that there was a breach, but I'm not going to enter a

5   particular sanction.

6          MR. MOHAMMEDI:  Your Honor, can I say something about

7   the sanction?  Monetary damages are not the most important

8   things for us.  I believe Judge Casey and I do believe that the

9   district court has a great deal of discretion as to the remedy

10   for violating a confidentiality or protective order, and even

11   outside the case, even Judge Casey's order, anything the judge

12   could relieve as part of the disclosure of any defendant's

13   documents should be ordered.  We also believe that maybe that's

14   very, very harsh, but I think that is the remedy to make sure

15   that plaintiff will not do that in the future, preclusion of

16   this particular document being used in evidence in this case,

17   and I really do believe this is fair and reasonable for us, for

18   this Court to issue this order.

19          THE COURT:  Mr. Kreindler, do you wish to be heard?

20          MR. KREINDLER:  Yes, your Honor.  First of all, I

21   don't even know what's in the document.  Mr. Mohammedi sent an

22   English translation to you, not to us, and I'm not sure what

23   he's talking about.  If he's talking about the Arabic text of

24   something I don't know what it says, all I can say is at this

25   moment we're not making use of unknown Arabic text.  If he's

1   talking about public information, he cannot exclude public

2   information.  I think what he's trying to do is try and exclude

3   the link between Sowailem and Bayoumi, and neither of them are

4   his clients and neither of them have anything to do with WAMY,

5   so I'm not sure what he's asking for.

6          MR. HAEFELE:  Your Honor, may I be heard for a moment?

7          THE COURT:  Yes.

8          MR. HAEFELE:  My concern from what I'm hearing from

9   what Mr. Mohammedi's saying is that the punishment related to

10  something Mr. Kreindler did should be passed on to the entire

11  plaintiffs, if I'm understanding him, he's asking for the

12  document to be precluded from evidence based on something that

13  Mr. Kreindler did and precluded from evidence on behalf of all

14  plaintiffs, if I'm understanding him right.  If I'm

15  misunderstanding, I'll stay quiet now.

16         MR. MOHAMMEDI:  Your Honor, I think that in response

17  to Mr. Kreindler, I'm asking that the document be precluded,

18  not the link.  Since the document was revealed in the article,

19  to the reporter should be precluded, and this is actually

20  within the remedies that are prescribed in the judge's order.

21  And I think WAMY should not be suffering, should not have to

22  give -- I mean, how are we to prevent them from making any

23  other communications with the reporters?  And also WAMY's being

24  put in bad light now, and like I said, evidence shown in the

25  report, and the article said, is being put in bad light, even

H58WashC

1    though the document itself is not really what it is, but the

2    way it was described, based on that, I do believe that it was a

3    communication, private communication between the kingdom of

4    Saudi Arabia and WAMY, and it was revealed to the reporter and

5    it violated the confidentiality agreement.  Therefore, I think

6    we should be entitled to preclude that.

7            THE COURT:  OK.

8            MR. KREINDLER:  I have to add something.  You keep

9    saying something that's utterly untrue.  This document was not

10   revealed to a reporter.  No reporter was shown this document or

11   had this document read to him.  All you're talking about is the

12   phone number on the letterhead, which is public information, so

13   I really wish you would stop saying that someone showed this

14   document to a reporter, because it never happened.

15           THE COURT:  OK.  I've heard enough.  I have read all

16   these letters and thought hard about this.

17           As I stated earlier, Mr. Kreindler, by describing to

18   the journalist that having received these confidential

19   documents from WAMY and then having identified this particular

20   piece of information you were able to connect the dots.  I do

21   believe that that was information that was confidential and you

22   were not entitled to disclose the source of your information.

23   As counsel for WAMY has said, you could have easily either left

24   that out or said you found this information through publicly

25   available sources, so I do believe it is a violation of the

**KSAX-0010, Page 12 of 13**

H58WashC

1    confidentiality order.

2         Mr. Kreindler, I'm speaking.

3         MR. KREINDLER:  OK.

4         THE COURT:  I am not going to impose a sanction at

5    this time.  I'm not going to impose a monetary sanction against

6    Mr. Kreindler, and I'm certainly not going to preclude the use

7    of this document, because I don't believe that the specific

8    contents were, in fact, disclosed; it was more the light in

9    which the documents were presented that was inappropriate.  At

10   this point, I am not going to impose a particular sanction.

11        Mr. Kreindler, this is the second time we've had to

12   deal with this Politico article, and it's my hope that you will

13   be more careful as you continue to litigate this case,

14   including given that you are an executive member of the

15   plaintiffs' executive committee and you have a heightened role

16   here representing all of the plaintiffs, and I don't want you

17   to lose sight of that.

18        MR. KREINDLER:  I won't.

19        THE COURT:  OK.  Thank you, everybody.

20        MR. KREINDLER:  Thank you.

21        MR. MOHAMMEDI:  Thank you, your Honor.

22        (Adjourned)

23

24

25



# POLITICO MAGAZINE

OUR LATEST | EMAIL SIGNUP | POLITICO.COM



**THE FRIDAY COVER**

## One Man's Quest to Prove Saudi Arabia Bankrolled 9/11

This New York lawyer says he has found a link between Saudi officials and the hijackers. The U.S. government refuses to do anything about it.

By CALEB HANNAN | April 07, 2017

POLITICO Illustration / AP and iStock

 Facebook

 Twitter

 Comment

 Print

*Caleb Hannan is a writer in Denver. He's written for* Rolling Stone, Businessweek *and others. He can be reached at* iamcaleb2@gmail.com.



**THE FRIDAY COVER**

**Read more**

When Jim Kreindler got to his midtown Manhattan office on Friday, July 15, 2016, he had a surprise waiting for him. Twice in the previous eight years, Kreindler had been in the room as then-President Barack Obama promised Kreindler's clients he would declassify a batch of documents that had taken on near mythic importance to those seeking the full truth of who had helped plan and fund the September 11, 2001, terrorist attacks. Now, Kreindler learned, "the 28 pages" as they were known, were open for inspection and it was up to his team to find something of value. It wasn't long before they did—a single, vague line about a Somali charity in Southern California.

That obscure reference would soon become part of the backbone of an argument that Kreindler and his firm have been making for a long time: Without financial and logistical support from members of the government of Saudi Arabia, the 9/11 attacks would have never taken place.

Proving the link between Saudi Arabia and the hijackers has been Kreindler's nearly sole focus since the moment, several days after the Twin Towers fell, when grieving

AD

**KSAX-0011**

Case No. 03-md-1570

families began to file into the lobby of the burly, boisterous 61-year-old's firm. That firm, Kreindler & Kreindler, was started by his grandfather and brought to prominence by his father, Lee, who the families knew was the man who had won a $3 billion judgment against Libya for the bomb that in 1988 destroyed Pan Am Flight 103 over Lockerbie, Scotland. They were hoping he could find the culprit here, too. But, just over a year after the attacks, Lee was dead from a stroke. The case, and some 850 clients, became Jim's to manage.

On that July morning, the case had slogged on for nearly a decade and a half. Some judges found it too large and unwieldy to understand. Sometimes it seemed as though Kreindler's own government were actively working against the firm; agencies denied Freedom of Information Act requests and shared information with the Saudis as often as with his team. "I've stopped calling what our government has done a cover-up," says former Senator Bob Graham, the co-chair of Congress's 9/11 Joint Inquiry and the most prominent voice alleging a connection between the Saudis and the hijackers. "Cover-up suggests a passive activity. What they're doing now I call aggressive deception."



Lawyer Jim Kreindler. Courtesy of Jim Kreindler

Saudi Arabia was Kreindler's focus because many, including well-placed people like Graham, had long suspected that it had played a role in the plot, a charge the Saudis had always vociferously denied. Suspicions were fueled, however, by what the U.S. government had chosen *not* to reveal after the attacks. The post-9/11 Joint Inquiry, the first U.S. investigation led by the House and Senate intelligence committees, had exposed nearly 1,000 pages of documentation and evidence to public scrutiny. But upon its release in 2002, President George W. Bush ordered a small portion—the 28 pages—to remain classified. They were allegedly full of unpursued leads that hinted at a relationship between the 19 hijackers—15 of whom were Saudi nationals—and people possibly linked to the Saudi government. Then came the later 9/11 Commission, whose own members protested drastic, last-minute edits that seemed to absolve the Saudi government of any responsibility.

Kreindler's team knew they were unlikely to ever find a smoking gun, a document that they jokingly referred to as "a thank-you note from Osama bin Laden to the Saudi King." But even before the release of the 28 pages, they thought that they had amassed enough circumstantial evidence to meet the standards of a civil suit, where the burden of proof is considerably lower than in criminal court. Over the course of 15 years, Kreindler's firm had named hundreds of defendants, ranging from wealthy Middle Eastern businessmen to even wealthier charities. In that time, the firm had compiled a tremendous amount of revealing information on its defendants—from the inner workings of secretive Swiss bank accounts to internal audits of massive corporations. So much information, in fact, that its lawyers often wondered whether the people they were suing knew what they were handing over. Legally, the firm knew it would be difficult to win a case against Saudi Arabia—the country had never been considered a state supporter of terrorism, which was the minimum standard needed for a lawsuit. Still, the firm kept tabs on the most interesting evidence suggesting a connection between the Saudi

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/

Created 2021-10-11 at 12:57

government and the plotters, especially a support network in Southern California. Yet there was skepticism that Kreindler's team could ever turn its immense amount of data into a winning case. A newspaper editor once derisively described the firm's evidence as being burdened by the presence of "Too many Mohameds."

But on March 20, 2017, for the first time in the case's long history, the firm named the Kingdom of Saudi Arabia as its lead defendant. This was made possible because the Justice Against Sponsors of Terrorism Act, a bill that allows U.S. nationals to sue countries even if those countries have not been deemed a state sponsor of terrorism, had passed in September and survived Obama's veto.



Saudi Foreign Minister Adel al-Jubeir leaves after holding a press conference in Washington, DC, on July 15, 2016, following the release of 28 pages of a 9/11 congressional report. | Getty

The new filing—which seeks $10 million per death, the same as in the Lockerbie suit—is chock full of obscure names of private citizens and massive charities. Some of the names would be familiar to anyone who has waded into the minutiae of the Joint Inquiry and the lengthy, bestselling 9/11 Commission report. But the new filing also contains a narrative about a trail of money that Kreindler's team believes will help further implicate the Saudis. That trail is still centered in Southern California, but it involves people whom the firm says no one has connected before. One of the key players: a lanky former teacher's aide in San Diego.

\*\*\*

**Early on the morning of January 22, 2004,** Omar Abdi Mohamed sat across from Immigration and Customs Enforcement Senior Agent Steve Schultz looking untroubled. Mohamed, 42, 6'2" and rail thin, may have believed he had been called in to talk about his pending citizenship, for which he had applied four years earlier. But the real reason for the interview was more serious. Mohamed was one of roughly 25 men in the San Diego area who had been targeted by a Joint Terrorism Task Force established in the wake of 9/11. The goal was to use immigration laws to charge, convict and deport people suspected of having terrorist ties. Mohamed may have thought Agent Schultz to be harmless. He couldn't have been more wrong.

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/                    Created 2021-10-11 at 12:57

According to a government transcript, as the interview began Mohamed sketched out some of the details of his life. His first wife had been killed during a civil war in their home country of Somalia, and their son, now a teenager, lived in the same refugee camp in Kenya where Mohamed's parents had settled. Mohamed had arrived in the United States in 1995 on a religious worker's visa. He had come to work and study under the tutelage of an imam at a local mosque. Not long after he arrived he got a job as an instructor's aide in the San Diego City School system, where he helped young Somalis adjust to American culture. Mohamed had arrived in America with his second wife and their two kids. They now had four more. He was fluent in Arabic, well-versed in English, and knew some Swahili. He had a master's in health care management and dreams of opening an African food market, and he had started two separate nonprofits aimed at assisting his fellow countrymen. One was something like an after-school program designed to keep kids from joining the gangs that had become a problem among second-generation immigrants. The other was called the Western Somali Relief Agency. It was meant to help the hundreds of thousands of Somalis still struggling from the after-effects of a famine. Mohamed, it seemed, was a man doing his best to raise a family and benefit his community.


Omar Abdi Mohamed

Agent Schultz knew all this. He and Mohamed had gone over much of the same territory in another interview two years earlier. For this interview, though, Schultz wanted to start somewhere different. "The things that I was concerned about are the travel that you listed here," he told Mohamed, according to transcripts. "Have you done any travel since the last time that we interviewed you?"

Mohamed said he had recently come back from Australia. Then he did something that, according to the complaint, had become routine when speaking to federal officials: He told part of the truth. In their previous interview, Mohamed had told Schultz that he had cousins in Sydney whom he visited often. What he had failed to mention was his real reason for the visit—the birth of his second child with his third wife, a native Australian.

In his initial conversation with Schultz, Mohamed had said he had seven children— the teenager in Kenya and the six who lived with him and their mother in a one-story stucco home with a white picket fence. Mohamed had neglected to tell Schultz that the Australian woman had just given birth to *their* first child. Now he left out another detail. That most recent trip to Australia had been planned so Mohamed could visit his newest child, his ninth in total. His failure to give the government a proper accounting of his offspring would eventually be one of the details that led to Mohamed's deportation. But Schultz had more pressing matters on his mind.

Mohamed had claimed previously that the Western Somali Relief Agency brought in almost nothing in donations. "It didn't make it," he had told Schultz. Money was so tight, he said, that if he and his organization had been given a box of blankets they wouldn't have been able to afford postage for shipping.

By now, according to the agent's later grand jury testimony, Schultz knew this to be untrue. As he and Mohamed were speaking, Schultz's

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/                    Created 2021-10-11 at 12:57

colleagues were rifling through that stucco home and finding deposit slips that told a very different story. Far from destitute, the Western Somali Relief Agency had received more than $370,000 in donations in less than three years. The vast majority of that money had come from the suburban Chicago branch of an international nonprofit called Global Relief, according to the indictment that the government would ultimately file against Mohamed. In the two years between Mohamed's first interview and his second, Global Relief had been designated by the United States Treasury Department as a supporter of terrorism due to its alleged connections to Osama bin Laden and Al Qaeda, according to Schultz's grand jury testimony. What's more, the agents discovered checks that showed Mohamed quickly moved the cash he had received from Global Relief to a money transfer service that operated throughout the Middle East. For a nonprofit allegedly created to provide humanitarian assistance, the series of events looked suspicious. So did the fact that Mohamed refused to tell the truth.

Schultz also knew something else. Mohamed had claimed that his one and only job was as a teacher's aide. But ICE officials had just discovered that was also untrue. Even before his arrival in the United States, Mohamed had been employed as a "propagator" for the Kingdom of Saudi Arabia's Ministry of Islamic Affairs, an agency long suspected of ties to extremists. For nearly a decade, Mohamed had received $1,750 a month to provide written reports on the local Islamic community. Even Mohamed's listed reason for obtaining a religious worker's visa, that he was to assist a San Diego imam, had been untrue. That same imam had told Schultz that Mohamed didn't actually do any work. The mosque where he was supposedly first employed was just a small apartment. The story had been a ruse meant to help him gain entry into the United States.

Roughly 45 minutes into their conversation, Schultz asked Mohamed to stand up. He told him he was under arrest for immigration fraud. Mohamed pleaded with the agent. "I didn't hide anything," he said as he was being handcuffed. "I swear to God you have the wrong information." Within two years, Mohamed would be gone from the country for good.

***

**This might have been the last anyone ever heard** of Mohamed if it hadn't been for a member of Kreindler's team who noticed that one vague line in the "28 pages." It was a reference to a Somali nonprofit that, according to an FBI agent, "may allow the Saudi government to provide al Qaeda with funding through covert or indirect means." They knew of only one Somali nonprofit with Saudi ties in San Diego—Mohamed's Western Somali Relief.

In their 15 years on the case, Kreindler's team hadn't persuaded the U.S. government to provide them much of anything useful. And it certainly hadn't had any success with the government's Saudi counterparts. But they had spent more than a decade legally compelling some of the largest charities in the Middle East to hand over documents. Many individuals within the U.S. government knew these charities had provided financial and logistical support for the people and groups American officials labeled as terrorists. This trove of documents had grown into a database

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/                    Created 2021-10-11 at 12:57

made up of terabytes worth of information—the firm's well-organized haystack. And after Kreindler started looking more closely at Omar Abdi Mohamed, the firm found a needle.

During his 2004 interview with ICE, Mohamed said he once had been visited by an official from the Saudi Ministry of Islamic Affairs, the same department from which he was receiving a monthly check. Mohamed gave the man's name as "Khaleid", though the last name he offered was garbled. The ICE agent helpfully provided him with one: Sowailem. Khaleid Sowailem was, at the time, the head of Da'Wah, a department within the ministry whose stated goal is proselytizing. It's a mission the Saudis accomplish by spending more than anyone in the world to build, staff and support madrassas and mosques to spread Wahhabism, the ultraconservative form of Islam unique to the kingdom and embraced by Osama bin Laden. It's the main reason why one analyst once described Saudi Arabia as "both the arsonist and the firefighter" when it comes to global terrorism. It only made sense, then, that a man like Mohamed, a "propagator," would be of interest to Sowaleim, the bureaucrat in charge of propagation.



Former Senator Bob Graham, a Democrat from Florida, speaks during a news conference on the "Transparency for the Families of 9/11 Victims and Survivors Act of 2015" with Sen. Rand Paul, of Kentucky in Washington, D.C. in June 2015. | Getty

Bob Graham had long suspected that men like Sowailem working in the Ministry of Islamic Affairs were the strongest link between the hijackers and the Saudis. "I came to the conclusion that there was a support network by trying to assess how the 19 hijackers could pull it off with their significant limitations," Graham told me recently. "Most couldn't speak English, most had never been in the United States, and most were not well educated. How could they carry out such a complex task?" Graham's suspicions were heightened by the connections between the ministry and two men in what had come to be known as the San Diego cell.

The first man was Fahad al-Thumairy, an imam at the King Fahad mosque in Los Angeles who was known for his virulently anti-American views. Thumairy was also an employee of the Ministry of Islamic Affairs. The second was Omar al-Bayoumi, a garrulous man who many in San Diego's Islamic community assumed to be a spy, since he could often be found walking around with a video recorder, taping everyone he

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/                    Created 2021-10-11 at 12:57

encountered. Bayoumi was also paid by the Saudis—he had been
employed in a series of ghost jobs since the '70s, according to the
complaint. He was also the man who had made a claim that many U.S.
investigators still find too coincidental to be true.



Clockwise from top left: Fahad al-Thumairy; Omar al-Bayoumi; Khalid al-Mihdhar; Nawaf al-Hazmi.

In a post-9/11 interview with the FBI, Bayoumi had said that he was
dining in a Middle Eastern restaurant in Los Angeles in early 2000 when
he happened to strike up a conversation with two complete strangers
with familiar accents. A friendship developed, based off that single
encounter. Bayoumi helped the strangers find apartments in San Diego;
threw them a large welcome party; co-signed their leases and provided
them money for rent; let them borrow his cellphone; even introduced
them to people who helped them obtain drivers licenses and contact
flight schools. Those two men were hijackers Khalid al-Mihdhar and
Nawaf al-Hazmi, the first plotters to enter the United States, whose lives
would end when American Airlines Flight 77 crashed into the Pentagon.

The FBI has long believed that Bayoumi's chance encounter came
immediately after meeting with Thumairy. Shortly after that meeting,
Bayoumi's $3,000-a-month Saudi salary was bumped up to $7,000. To
people like Graham, the implication was clear: Thumairy, a Ministry of
Islamic Affairs employee, had tasked Bayoumi with helping the hijackers
settle into a foreign country, and his Saudi employers had provided him
with extra cash to do so.

Kreindler's team knew all of this, as did any student of 9/11. What they
didn't know was whether there was any link to Mohamed, or to the man
whom ICE agents had identified as his boss. So Kreindler's team took
Sowailem's name and plugged it into their database. They got a hit. Years
before, Kreindler had received hundreds of thousands of pages of
documents from a Saudi-funded charity called World Assembly of

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/          Created 2021-10-11 at 12:57

Muslim Youth, which according to the complaint, was linked to Al Qaeda. There, at the top of a single page, it found a note from Khaleid Sowailem written on official letterhead from the ministry. On that note was Sowailem's phone number at the Saudi Embassy in Washington, D.C. They then plugged that number into the database and, again, out came a hit—this time, one that linked back to the men Kreindler and the rest of the world had already heard of.



The FBI released a group of photos on March 30, 2017, showing the aftermath of the hijacked American Airlines Flight 77 crash into the Pentagon. | AP

According to heavily redacted FBI records gathered after 9/11, in the three months after Bayoumi allegedly randomly ran into and befriended the two hijackers, he also made nearly 100 calls to Saudi officials in the U.S. Thirty of those calls went to the number that Kreindler had uncovered as Sowailem's direct line. What's more, Kreindler's team knew that in December 2003 the U.S. State Department had quietly revoked the diplomatic credentials of two dozen Saudi personnel. Kreindler knew that the State Department published complete lists of diplomats every quarter. They checked the last listing in 2003—Sowailem's name was on it. They then checked the first listing in 2004—Sowailem's name was gone.

\*\*\*

**In its new filing,** Kreindler contends not only that Omar Abdi Mohamed was receiving and passing on hundreds of thousands of dollars from another charity, Global Relief, known to support Al Qaeda, but that the money itself was used to fund the attack. Here's Kreindler's theory:

Sometime late in 1998, a Somali Al Qaeda operative named Mohamed Sulaiman Barre established a branch of Dahabshiil in Karachi, Pakistan. (Dahabshiil is like an Islamic Western Union. A Somali-owned, Dubai- and London-based money transfer service.) Barre, who would later be held and interviewed repeatedly at Guantanamo Bay, operated the branch out of his apartment and internet cafes. He never had it registered, either, which meant that a branch supposedly intended to receive and send money to and from the whole world only had the capacity to accept it.

Also in Karachi at the same time was Khalid Sheikh Mohammed, the alleged mastermind of 9/11. KSM, as U.S. officials later called him, was the point man for getting money to the 19 hijackers. He did this in a

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/                                          Created 2021-10-11 at 12:57

number of different ways, including by sending $100,000 via courier to his nephew in Dubai, who would later wire it to the hijackers in the U.S. (In the interim, KSM's nephew hid the cash in a laundry bag stored under his bed.)

According to court documents filed in the case against him, starting in December 1998 and continuing until May 2001 Omar Abdi Mohamed wrote 65 checks—some as small as $370; others as large as $60,000—to Dahabshiil**.** The total amount, some $370,000, is roughly the same as what the 9/11 Commission estimated as the cost of the plot. When John Pistole, deputy assistant director of the FBI's Counterterrorism Division, testified in 2003 before the Senate Committee on Governmental Affairs, he acknowledged a "continuing investigation" into the "origin of the funding of 9/11 back to financial accounts in Pakistan." When Pakistan's CIA-equivalent raided Barre's apartment in November 2001, its agents found that the Dahabshiil employee's address book was full of aliases and phone numbers for senior Al Qaeda officials. They also interrupted Barre as he shredded documents.

To the people at Kreindler, there's something else suspicious about Mohamed's money transfers. It's not just that he lied about them to the government. Or lied about the fact that he conducted them while working for the Saudis. It's also the timing. The transfers came just months after two massive truck bombs went off almost simultaneously in front of U.S. embassies in Kenya and Tanzania. One of the statements issued by 9/11 Commission staff shows that in the aftermath of those bombings, Vice President Al Gore made a trip to Riyadh with the express purpose of getting the Saudis to give American investigators more access to people who could shed light on Al Qaeda's financial backing—people who were already in Saudi custody. The Saudis, the 9/11 Commission staff wrote, were "reluctant or unable to provide much help … the United States never obtained this access."

Kreindler's theory holds that in the wake of the embassy bombings and increased pressure from then-President Bill Clinton's administration for the Saudis to provide investigative assistance, Al Qaeda was either encouraged or decided independently to make its money harder to trace. Kreindler's complaint and other government documents, including the indictment against Omar Abdi Mohamed, trace a circuitous route that would take hundreds of thousands of dollars from the Chicago office of the Al Qaeda-linked charity Global Relief on to San Diego and Omar Abdi Mohamed's Western Somali Relief Agency, then through the money transfer service Dahabshiil to Karachi, Pakistan, where a waiting Khalid Sheikh Mohammed sent it to his nephew in Dubai, who put it into the pockets of the 19 men who would travel to the United States.

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/                    Created 2021-10-11 at 12:57

 

Getty

Kreindler's team knows the chain they've put together is missing a link. They have no direct evidence that when Mohamed wrote checks to Dahabshiil from his charity's bank accounts that they ended up in the Karachi branch. Yet they do have Barre, the Al Qaeda operative who set it up, telling U.S. investigators specifically that he received money from Somalis in the U.S. Kreindler also has the knowledge that the U.S. Department of Defense has extensive records seized at the time of Barre's arrest that they've yet to share with them or anyone else. They, of course, would like to see those records.

In the aftermath of the "28 pages" release, the Saudis once again proclaimed their innocence and asserted that the details within were vindicating. (Neither Michael Kellogg, the lawyer representing the Saudis in the lawsuit, nor the Saudi Embassy would answer questions for this story.) And there is always the possibility that a very small number of officials in one branch of government, the Ministry of Islamic Affairs, went rogue without the knowledge or blessing of the kingdom's royal family. But Kreindler has experienced that scenario before with Libya, where then-Libyan leader Muammar al-Qadhafi paid the settlement even as he denied ordering the bombing. Even if that happens, Kreindler believes he and his clients still win.

There's also another element that ties the 9/11 case back to Libya. "Our secret sauce," says Kreindler, "is sharing all the information we have with Justice and State and then getting to the point where plaintiffs' demand for compensation becomes part of U.S. policy." In short, Kreindler thinks he can win by being transparent and accommodating with a series of administrations that have shown no willingness to offer their own transparency or accommodation.

\*\*\*

**Omar Abdi Mohamed's second wife and their six children** still live in San Diego today. When reached by phone, one of them, now an adult, says her father is living happily in Nairobi, Kenya, with his third wife, the Australian, and the children they have together. That adult daughter, who didn't want to be named, says the family isn't sure whether her father has plans to return to the United States, though she thinks he may have recently reached out to an immigration attorney. What Mohamed's daughter does finally know is that the case she had always assumed was a mere religiously motivated witch hunt actually had the weight of evidence behind it. It's fair to characterize her reaction to

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/

Created 2021-10-11 at 12:57

this new information as shock. She promised to pass along my contact
information to Mohamed at his new home in Nairobi. She said she
thought there was a chance he would call. So far he hasn't.

Similar attempts to reach ICE's Schultz and the FBI agent who helped
investigate Mohamed were also unsuccessful. During Mohamed's
immigration trial, the government successfully persuaded a judge to
suppress the evidence it had gathered against him, citing matters of
national security. In late March, Jim Kreindler's firm received a formal
notice from the Justice Department that its request to review that
evidence would be denied.

What happens next in Kreindler's case against Saudi Arabia is unclear.
JASTA allowed him and his firm to name the country as a defendant, but
the bill has come under serious attack since its passage. (Congress
overrode Obama's veto, the first of his two terms.) Senators John McCain
and Lindsay Graham have spent a considerable amount of time arguing
against it, and continue to argue to water it down, saying that if other
countries pass similar laws the nation hurt most by the trend may be our
own. Then there is the Saudi lobbying apparatus, which at one point last
fall numbered more than 10 firms and millions of dollars in fees per
month. Just recently, the *Daily Caller* reported that U.S. military veterans
were allegedly being offered what they thought were merely free trips to
Washington, D.C., that were actually a Saudi-backed attempt by a
lobbying firm to use former service members to argue against JASTA.

Least known of all is what might happen now that Donald Trump is
president. During the campaign, Trump described Obama's veto of JASTA
as "shameful" and "one of the low points of his presidency." Once in
office, however, Trump has seemingly reverted to the status quo. He
recently held a series of high-level meetings with Saudi deputies that the
country's delegates described optimistically as a "historic turning point"
in the two allies' relationship. Trump's administration is now said to be
weighing even greater involvement in Saudi Arabia's war in Yemen,
which the Saudis see as a proxy battle with Iran, its primary Middle East
antagonist. The Trump State Department has also approved a resumption
of sales of precision-guided weapons to the Saudis, a measure that was
suspended late in the Obama administration.

It seems exceedingly unlikely that Kreindler's firm will receive anything
like the sort of treatment it got from the U.S. government during its two
decades-long case against Libya. Back then, the firm worked hand in
glove with high-ranking officials in the State Department in order to
resolve the Lockerbie case—paying victims' families their settlement
money was one of the conditions Qadhafi had to satisfy in order to have
key economic sanctions finally lifted. In lieu of that level of support,
Kreindler has identified a series of smaller measures Trump could take
that would still help his case and, just as important, paint a fuller picture
of the years and months of stateside planning prior to 9/11. Key among
those are FBI reports that might shed light on who, if anyone, was
helping the terrorists in the many other American cities in which they
lived. As Bob Graham points out, the only reason the evidence in San
Diego is compelling is because we actually know it, a result of some good
detective work by a member of his Joint Inquiry staff. "I believe if we
knew *all* the facts," Graham says, "We would find that there were people

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/                Created 2021-10-11 at 12:57

similar to al-Bayoumi and Mohamed in southeast Florida, Virginia and New Jersey."

That we don't have definitive answers is a testament to the enduring secrecy that persists almost 16 years later. It's also a testament to the patience of people like Kreindler, whose team has been working that whole time to get what it needs to prove its case, and who believes that no matter who is in office, there will only be one conclusion.

"If the president does nothing, we'll still prevail," he says. "The only question is how much longer it will take."

Share on Facebook     Share on Twitter

**This article tagged under:**

Terrorism     Saudi Arabia     The Friday Cover     POLITICO Magazine

September 11

SHOW COMMENTS

**MORE FROM POLITICO MAGAZINE**



CALIFORNIA
**California's road to recovery runs through D.C. Republicans**

By JEREMY B. WHITE | Updated 05/08/20 09:44 PM EDT



**Why New Jersey's ventilator guidelines may favor younger, whiter patients**

By SAM SUTTON and CARLY SITRIN



**Rhode Island ends specific restrictions on New Yorkers — by making them national**

By BILL MAHONEY and JOSH GERSTEIN | Updated 03/29/20 02:48 PM EDT

SPONSORED CONTENT                                                        By Outbrain

**Read This Before You Renew Amazon Prime Again**
Capital One Shopping

**Users say these $29 gummies ease pain so well they 'only need 1 a day'**
webmdnews.com

**This Is Where the Majority of Singles Over 50 Are Finding Love in Washington**
SilverSingles



POLITICO MAGAZINE

OUR LATEST   WEEKLY NEWSLETTER   PRINT ARCHIVE   WEB ARCHIVE   ABOUT US   WRITE FOR US   FAQ

© 2021 POLITICO LLC                                                    Terms of Service | Privacy Policy

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/                    Created 2021-10-11 at 12:57

**Short Message Report**

| Conversations: 1 | Participants: 3 |
|---|---|
| Total Messages: 52 | Date Range: 6/9/2021 - 9/12/2021 |

**Outline of Conversations**

💬 **IM (Phone) : [Sullivan Laura  (+12027447185),Fawcett, John]** • 52 messages between 6/9/2021 - 9/12/2021 • Fawcett, John • Sullivan Laura  (+12027447185)

```
┌─────────────────┐
│    KSAX-0012    │
│                 │
│    Case No.     │
│   03-md-1570    │
└─────────────────┘
```

Confidential and Subject to Protective Order

JFawcett_0000007

**CONFIDENTIAL - SUBJECT TO MDL PROTECTIVE ORDER**
**KSAX-0012, Page 1 of 5**

**Messages in chronological order** (times are shown in GMT -04:00)

---

💬   **IM (Phone) : [Sullivan Laura  (+12027447185),Fawcett, John]**

SL    **Sullivan Laura  (+12027447185)**                   6/9/2021, 9:55 AM
Hi John! It's Laura Sullivan from NPR. Hope the day is going well with the deposition. I'm sure you guys are swamped. Wanted to touch base about tomorrow and what might work best. Looking forward to meeting!

US    **Unknown Sender**                             6/10/2021, 3:25 AM
Hi Laura,  if you can't get me then contact Julia Sienski 714 264 9389

US    **Unknown Sender**                             6/10/2021, 5:29 AM
Laura, whats your email address? I need to send you our covid form

SL    **Sullivan Laura  (+12027447185)**                  6/10/2021, 5:36 AM
Lsullivan@npr.org

SL    **Sullivan Laura  (+12027447185)**                  6/10/2021, 5:38 AM
Liked "Hi Laura,  if you can't get me then contact Julia Sienski 714 264 9389"

SL    **Sullivan Laura  (+12027447185)**                  6/10/2021, 5:38 AM
I have one call and should be there around 1030-11

SL    **Sullivan Laura  (+12027447185)**                  6/10/2021, 5:47 AM
Can you shoot me the address?

US    **Unknown Sender**                             6/10/2021, 5:48 AM
485 Lexington 28th flr

US    **Unknown Sender**                             6/10/2021, 5:48 AM
46th st

SL    **Sullivan Laura  (+12027447185)**                  6/10/2021, 6:49 AM
I'm here

SL    **Sullivan Laura  (+12027447185)**                  6/21/2021, 9:36 AM
Hi John! Got a minute? No rush!

SL    **Sullivan Laura  (+12027447185)**                  6/23/2021, 5:40 AM
Hi again! Wondering if you may be out this week. Would love to talk if you get a chance. I'm going to make a couple calls but wanted to talk to you first. If you're on vacay ignore this 😊

US    **Unknown Sender**                             6/23/2021, 5:48 AM
Hi Laura, deps every day.  Will try to call this aft.

SL    **Sullivan Laura  (+12027447185)**                  6/23/2021, 5:53 AM
Ahh so no umbrella drinks. Thanks John!

SL    **Sullivan Laura  (+12027447185)**                  8/7/2021, 7:32 AM
Hi John I'm going to be in NYC Tuesday! Are you around? Can I stop by the office and talk hijacker info? I'm struggling to keep all the data points straight/ figure out what I should focus on. I could really use your expertise!!

US    **Unknown Sender**                             8/9/2021, 12:21 PM
Efrain's email is justice030@aol.com  he's open to having a coffee

SL    **Sullivan Laura  (+12027447185)**                  8/9/2021, 12:24 PM

That's wonderful! I'll see if he's around Wednesday. Can I stop by on Wednesday and pester you for an hour? I need to get my head straight! too much good stuff.

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 8/10/2021, 4:41 PM |

Efrain was amazing. Thanks so much!  Please let me know if you have some time tomorrow. I could really use your help. Phone records especially.

| | | |
|---|---|---|
| US | **Unknown Sender** | 8/10/2021, 5:33 PM |

I think I'll be in the office. Give me a call about 10.

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 8/10/2021, 7:01 PM |

Will do!

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 8/11/2021, 10:32 AM |

Hi John  I'm downstairs

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 8/11/2021, 10:34 AM |

Let me know if I should come up or wait here

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 8/11/2021, 10:36 AM |

Guy is sending me up

| | | |
|---|---|---|
| US | **Unknown Sender** | 8/11/2021, 10:36 AM |

Ok

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 9/3/2021, 7:52 AM |

Hi John - my (mini) story is airing early next week. Do you have a couple minutes today for a quick fact check? I want to run a couple things by you before I put them on air

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 9/3/2021, 8:11 AM |

Was it jarrah or thumairy who left the country two weeks before the attacks?

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 9/7/2021, 10:10 AM |

Just a heads up that the story is running on All Things Considered today at about 5 pm after the newscast.  I'll send a link when it airs!

| | | |
|---|---|---|
| US | **Unknown Sender** | 9/7/2021, 1:26 PM |

Good piece Laura.  You hit all the right points.  Even made Zelikow sound like a potential supporter!  Also you raised the expectation re the 2016 report.    Good.

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 9/7/2021, 1:29 PM |

Good!!! I found Zelikow very surprising too ... Kellogg keeps saying nothing changes the 9/11 report, but even Zelikow is like it was a beginning, not an end. Hardly an exoneration.

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 9/7/2021, 1:29 PM |

Dying to see what they actually release this week!

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 9/9/2021, 8:34 AM |

This request *seems* positive ... like they want to release more underlying info? What's your take?

| | | |
|---|---|---|
| US | **Unknown Sender** | 9/9/2021, 10:59 AM |

Yes. I agree.  Two reasons it seems positive.  The 2016 report contains phone analysis, a strong part of the evidence and second it will be public (not redacted).

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 9/9/2021, 11:00 AM |

Got it!  Really cutting it close with the deadline..!!

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 9/9/2021, 12:29 PM |

Confidential and Subject to Protective Order

JFawcett_0000009

**CONFIDENTIAL - SUBJECT TO MDL PROTECTIVE ORDER**
**KSAX-0012, Page 3 of 5**

Please keep me posted as soon as anything is released *hopefully* tomorrow!!!

| US | **Unknown Sender** | 9/9/2021, 2:41 PM |
| | You got it.  Phone records.  That's the key. | |

| SL | **Sullivan Laura  (+12027447185)** | 9/9/2021, 2:41 PM |
| | Liked "You got it.  Phone records.  That's the key." | |

| SL | **Sullivan Laura  (+12027447185)** | 9/10/2021, 10:38 AM |
| | Saw the judge granted the motion!  Now what happens? | |

| US | **Unknown Sender** | 9/10/2021, 1:28 PM |
| | Waiting for shoe to drop.  The WH told us it will be on a website. | |

| SL | **Sullivan Laura  (+12027447185)** | 9/10/2021, 1:28 PM |
| | Ok! | |

| SL | **Sullivan Laura  (+12027447185)** | 9/10/2021, 6:34 PM |
| | What the hell is going on with this thing? | |

| SL | **Sullivan Laura  (+12027447185)** | 9/11/2021, 5:31 PM |
| | Who do you think PII is? | |

| SL | **Sullivan Laura  (+12027447185)** | 9/11/2021, 5:33 PM |
| | Sorry I mean on page 6 - the person who was "tasked by Thumairy to assist Hazmi and Midhar" | |

| US | **Unknown Sender** | 9/11/2021, 6:21 PM |
| | Give me a minute | |

| SL | **Sullivan Laura  (+12027447185)** | 9/11/2021, 6:21 PM |
| | Liked "Give me a minute" | |

| SL | **Sullivan Laura  (+12027447185)** | 9/11/2021, 6:21 PM |
| | I have to file story ASAP - let me know if you have any idea who was tasked by Thumairy ! | |

| SL | **Sullivan Laura  (+12027447185)** | 9/11/2021, 6:22 PM |
| | And who the phone buddies are in the previous paragraph | |

| US | **Unknown Sender** | 9/12/2021, 1:23 PM |
| | Megan says no problem for those two documents. | |

| SL | **Sullivan Laura  (+12027447185)** | 9/12/2021, 1:23 PM |
| | Excellent!!! | |

| SL | **Sullivan Laura  (+12027447185)** | 9/12/2021, 2:58 PM |
| | How do you pronounce Mutaib al sudairy?  Moo-tabe al Sudairy (as in dairy comes from cows) ? | |

| US | **Unknown Sender** | 9/12/2021, 2:59 PM |
| | Moo tie ab | |

| SL | **Sullivan Laura  (+12027447185)** | 9/12/2021, 2:59 PM |
| | Ahh like he has abs | |

| SL | **Sullivan Laura  (+12027447185)** | 9/12/2021, 3:00 PM |
| | Thank you!! | |

JFawcett_0000010

Confidential and Subject to Protective Order

JFawcett_0000011

CONFIDENTIAL - SUBJECT TO MDL PROTECTIVE ORDER
KSAX-0012, Page 5 of 5

Case 1:03-md-01570-GBD-SN Document 4253 Filed 11/14/18 Page 1 of 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/14/2018
```

------------------------------------------------------------------- x
                                         :
                                         :

In re Terrorist Attacks of September 11, 2001,    :      03 MDL 1570 (GBD) (SN)
                                         :
                                         :
------------------------------------------------------------------- X

## PRIVACY ACT ORDER AND PROTECTIVE ORDER
## FOR FBI DOCUMENTS

Pursuant to the provisions of Rule 26(c) of the Federal Rules of Civil Procedure, the

Court enters this Privacy Act Order and Protective Order, upon the joint request of the Plaintiffs

and the Federal Bureau of Investigation (the "FBI"), for the purposes of facilitating the

disclosure of information that otherwise would be prohibited from disclosure under the Privacy

Act of 1974, 5 U.S.C. § 552a (the "Privacy Act"), and assuring the confidentiality of information

that may be disclosed by the FBI in the course of discovery proceedings.  The Court, having

found that good cause exists for entry of this Privacy Act Order and Protective Order, HEREBY

ORDERS:

1.      Pursuant to 5 U.S.C. § 552a(b)(11), this Order authorizes the FBI to produce

information that otherwise would be prohibited from disclosure under the Privacy Act without

presenting Privacy Act objections to this Court for a decision regarding disclosure.  To the extent

the Privacy Act allows the disclosure of information pursuant to a court order, this Order

constitutes such a court order and authorizes the disclosure of that information.  However,

nothing in this paragraph shall require production of information that is prohibited from

disclosure (even with the entry of this Order) by other applicable privileges, statutes, regulations,

or authorities.  The terms of this Order shall govern the safeguarding of such information by all

individuals referenced herein.

```
KSAX-0015

Case No.
03-md-1570
```

2.      As used in this Order, the term "Protected Information" constitutes any and all documents or records, and information contained therein, that contain any confidential, proprietary, personal, or similar information, including, but not limited to, information protected from disclosure by the Privacy Act.

3.      Information that the FBI deems Protected Information shall be designated as such by stamping the phrase "Subject to FBI Protective Order" on any document or record containing Protected Information prior to the production of such document or record.

4.      Any party who contests the designation of a document or record as Protected Information shall provide the FBI written notice of its challenge.  If the dispute cannot be resolved, the party or parties and the FBI shall follow the Federal Rules of Civil Procedure, the Local Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York, the individual practices of the Court, and/or any court orders for addressing discovery disputes.  Failure to challenge a designation immediately does not waive a party's ability to bring a later challenge.

5.      Except as provided in this Order, all Protected Information produced pursuant to this Order shall be used solely for the purposes of this action and for no other purpose whatsoever, and shall not be published to the general public in any form, or otherwise disclosed, disseminated, or transmitted to any person, entity, or organization, except in accordance with the terms of this Order.

6.      Except as otherwise provided herein, any document or record designated as Protected Information may be disclosed only to the following Qualified Persons:

i.      Members of the Plaintiffs' Executive Committees ("PECs"), and any support staff of such PEC members who require access to Protected Information in order to assist in the prosecution of this action and whose offices are in the United States, as well as attorneys who are members of the same law firm as a member of the PEC, so long as such attorneys are

licensed to practice law in the United States and have filed a notice of appearance on the docket of this action;

        ii.      Attorneys who are licensed to practice law in the United States, whose offices are in the United States and who have filed a notice of appearance on the docket of this action on behalf of Defendants the Kingdom of Saudi Arabia and Dallah Avco, and any support staff of such attorneys of record who require access to Protected Information in order to assist in the defense of this action and whose offices are in the United States;

        iii.      Witnesses who are deposed by the PECs or counsel for Defendants the Kingdom of Saudi Arabia and Dallah Avco in this action, but only to the extent the witnesses' testimony may relate to documents designated as Protected Information;

        iv.      Experts or consultants whose offices are in the United States and who are retained or consulted for this action by the PECs or counsel for Defendants the Kingdom of Saudi Arabia and Dallah Avco, and any support staff for such experts or consultants who require access to Protected Information in order to assist in the expert's or consultant's work for this action and whose offices are in the United States;

        v.      Court reporters, stenographers, videographers and translators engaged to translate and record deposition testimony, and their employees who are assisting in the preparation of transcripts of such deposition testimony.

        Protected Information shall not be disclosed to Plaintiffs or Defendants absent consent of the FBI or further Order of the Court pursuant to ¶¶ 4, 7, 11 or 13 of this Order.

7.      Any party to this litigation may seek the consent of the FBI to share a particular document (or a portion thereof) that contains Protected Information with an individual who is not a Qualified Person (a "Limited Access Individual"). In making this application to the FBI, the party must identify the specific Protected Information to be shared, the name and address of the

individual to whom such Protected Information is to be shared, and make a showing of good

cause for sharing such Protected Information.

        i.      If the FBI consents to the disclosure, a copy of this Order shall be

delivered to the Limited Access Individual, at or before the time of disclosure, by the attorney

making the disclosure.  Prior to receiving access to Protected Information, each such Limited

Access Individual shall agree to be bound by the terms of this order by executing an

Acknowledgement in the form attached hereto. The provisions of this Order shall be binding

upon each such Limited Access Individual to whom disclosure is made.

        ii.      A Limited Access Individual is only authorized to access the specific

Protected Information that was identified in the application and approved by the FBI.  The FBI's

consent to such disclosure should not be deemed to be authorization to disclose any additional

Protected Information to such Limited Access Individual.

        iii.      To the extent there is any dispute between the party seeking to make a

disclosure to a non-Qualified Person under this paragraph and the FBI, within fourteen (14) days

of making the application, the party and the FBI shall meet and confer and attempt to resolve the

dispute.  If the dispute is not resolved within the fourteen (14) day period, the party making the

application shall submit to the Court a motion (filed under seal) identifying the individual and

the specific Protected Information that the party seeks to share, as well as the justification for

why this information should be shared.  The FBI shall have ten (10) business days to file papers

in opposition to such motion.

      8.      A copy of this Order shall be delivered to each Qualified Person to whom a

disclosure of Protected Information is made, at or before the time of disclosure, by the attorney

making the disclosure.  Prior to receiving access to Protected Information, each such Qualified

Person shall agree to be bound by the terms of this order by executing an Acknowledgement in

the form attached hereto. The provisions of this Order shall be binding upon each such person to whom disclosure is made.

9.      All Qualified Persons to whom Protected Information is disclosed are hereby prohibited from disclosing information designated as Protected Information to any unauthorized person, except as provided in this Order.

10.      Any deposition questions intended to elicit testimony regarding Protected Information shall be conducted only in the presence of persons authorized to review the Protected Information.  Pending review of the deposition transcript by the FBI, any deposition transcripts containing such questions and testimony shall be automatically subject, in their entirety, to the same protections and precautions as the Protected Information.  Upon receipt of the deposition transcript, a copy shall be served on the FBI by the PECs.  The FBI will have thirty (30) days to review and designate the portions of the deposition transcript that contain Protected Information.  The portions of the deposition transcript designated by the FBI shall be stamped "Subject to FBI Protective Order" and made subject to the provisions of this Order.

11.      If any party seeks to file with the Court any Protected Information, or portions of pleadings, motions, or other papers that disclose such Protected Information, that party must either obtain prior permission in writing from the FBI or file the information under seal.  The filing party will not need to separately file a motion or submission seeking leave to file such papers under seal prior to filing, and this Order shall constitute authorization for such sealed filing.  The filing party shall, on the same date as the papers are filed under seal, serve upon counsel for the relevant parties and the FBI, and provide to the Court, an unredacted copy of the papers filed under seal as well as a copy of the papers that the party proposes to file on ECF with all Protected information redacted.  The FBI and any relevant parties shall have seven (7) days to inform the filing party whether it opposes any redactions proposed by the filing party, and/or whether it proposes any additional redactions to any such papers.  The filing party may then file

the documents on ECF with the redactions agreed upon (or not objected to) by the FBI and any

relevant parties. To the extent there is any dispute between the filing party and the FBI and/or

any relevant party regarding the information to be redacted from the publicly-filed documents,

within fourteen (14) days of sealed filing, the filing party and the FBI and/or any relevant party

shall meet and confer and jointly submit to the Court a motion identifying the documents, or

portions thereof, that the FBI and/or any relevant party believes should be redacted and filed

under seal, along with the justification for why the information should be filed under seal and

any statement by the filing party in opposition to filing under seal.

12.     Nothing in this Order shall preclude any disclosure of Protected Information to

any judge, magistrate, or employee of the Court for purposes of this action.

13.     Any party intending to disclose Protected Information in open court must notify

the FBI at least 30 days prior to such disclosure, and that party and the FBI shall meet and

confer. If the FBI does not consent to the disclosure of the information in open court, the party

intending to disclose the information must file a motion under seal and serve said motion upon

counsel for the relevant parties and the FBI at least 14 days prior to the intended disclosure. The

FBI shall have 10 days to respond to such motion. Protected Information shall not be disclosed

in open court unless specifically authorized by Court order after the filing of said motion. To the

extent the scheduling of hearings or deadlines set by the court do not afford adequate time to

comply with the notice and service requirements of this provision, the party intending to disclose

Protected Information in open court and the FBI will confer in good faith in an effort to

accelerate the notice and service requirements of this provision, but in any case, Protected

Information shall not be disclosed in open court unless specifically authorized by the FBI or

pursuant to a Court order.

14.     Within thirty days after the final disposition of this action, including any and all

appeals, all Protected Information and copies thereof in the possession of any Qualified Persons

shall be returned to the FBI or destroyed. If the Protected Information is destroyed, the party that

has destroyed the Protected Information shall certify in writing to counsel of record for the FBI

that the Protected Information in its possession has been destroyed.

15.     If the FBI inadvertently fails to designate material as Protected Information at the

time of production, this shall not in itself be deemed a waiver of any claim of confidentiality as

to that Protected Information. The FBI may correct its failure to designate an item as Protected

Information by taking reasonable steps to notify all receiving persons of its failure, and by

promptly supplying all receiving persons with new copies of any documents bearing corrected

designations. Within five business days of receiving copies of any documents bearing corrected

designations pursuant to this paragraph, the receiving persons shall return or destroy the

improperly designated materials, and certify in writing to the FBI that such materials have been

returned or destroyed.

16.     All service, notices, and applications that are to be provided under this Protective

Order to the FBI shall be effected by sending an email to the United States Attorney's Office for

the Southern District of New York at the following email addresses: sarah.normand@usdoj.gov

and jeannette.vargas@usdoj.gov.

17.     This Order does not constitute any ruling on the question of whether any

particular document or category of information is properly discoverable, and does not constitute

any ruling on any potential objection to the discoverability, relevance, or admissibility of any

document or information. Nothing in this Order constitutes an agreement by the FBI to produce

any particular document or information in the litigation, and it is without prejudice to any

objection the FBI may have to any party's discovery requests.

18.     Nothing in this Order shall be construed as a waiver of any defense, right,

objection, or claim by any party or the FBI, including any objection to the production of

documents and any claim of privilege or other protection from disclosure. Any disclosure of a

document (or portion thereof) or information by the FBI shall not constitute a waiver by the FBI

of any privilege or other protection that may be applicable to any other document (or portion

thereof) or information not disclosed.

19.    Nothing in this Order shall affect the right of any party or the FBI to seek

additional protection against the disclosure of any documents or materials, or of the parties to

seek additional disclosures.

20.    Nothing in this Order shall prevent the disclosure of Protected Information to

Government authorities for purposes of enforcement of criminal laws or in furtherance of civil

enforcement or regulatory proceedings.

21.    Nothing in this Order shall prevent any disclosure of Protected Information by

FBI.

22.    The terms of this Order shall survive the termination of this action for purposes of

enforcing this Order.


SO STIPULATED AND AGREED TO BY:


Dated:   November 2, 2018

    *Attorney for the United States of America*

    GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York

By:   *Jeannette Vargas*
    JEANNETTE A. VARGAS
    SARAH S. NORMAND
    Assistant United States Attorneys
    86 Chambers Street, Third Floor
    New York, New York 10007
    Telephone: (212) 637-2678/2709

*For the Plaintiffs Exec. Committees*

COZEN O'CONNOR

By: _Sean P. Carter_____
    Sean P. Carter
    COZEN O'CONNOR
    One Liberty Place
    1650 Market Street, Suite 2800
    Philadelphia, Pensylvania 19103
    Telephone: (215) 665-2105

MOTLEY RICE LLC

By: _Robert T. Haefele_____
    Robert T. Haefele
    MOTLEY RICE LLC
    28 Bridgeside Boulevard
    Mount Pleasant, South Carolina 29465
    Telephone: (845) 216-9184

KREINDLER & KREINDLER LLP

By: _James P. Kreindler_____
    James P. Kreindler
    KREINDLER & KREINDLER LLP
    750 Third Avenue
    New York, New York 10017
    Phone: 212-687-8181

SO ORDERED.

_____
SARAH NETBURN
United States Magistrate Judge

November 14, 2018
New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                        :
                                                        :
In re Terrorist Attacks of September 11, 2001,          :        03 MDL 1570 (GBD) (SN)
                                                        :
                                                        :
------------------------------------------------------------------ X

## <u>ACKNOWLEDGEMENT</u>

I have read and I understand the Privacy Act Order and Protective Order for FBI

Documents entered by the Court in the case *In re Terrorist Attacks of September 11, 2001*, 03

MDL 1570(GBD)(SN), and I agree to be bound by its terms.


Date:                    _____


Name (printed):          _____


Signature:               _____

# Transcript

00:00
- Well good afternoon.
00:01
I'm Daniel Benjamin.
00:02
I'm the Director of the Dickey Center.
00:04
And I'm delighted to welcome you to this event
00:06
on Saudi Arabia's role in 9/11,
00:09
and why the U.S. Government has kept it hidden.
00:12
So we are now headed toward the 20th anniversary
00:17
of the historic events of 9/11.
00:22
We are reminded of this, especially today,
00:24
after the discovery and killing of Abu Bakr al-Baghdadi,
00:28
the so-called Caliph of the Islamic State in Syria,
00:33
over the weekend,
00:34
someone who had eluded U.S. Forces for many years.
00:37
And of course Abu Bakr al-Baghdadi connects us,
00:42
and is really part of the long shadow of 9/11.
00:45
The group he led was the successor to al-Qaeda in Iraq,
00:49
which arose after the 2003 invasion of that country
00:53
by the United States.
00:54
Now as someone who has been deeply involved
00:57
in counter-terrorism since 1998
01:00
when Osama Bin Laden issued his famous fatwa,
01:03
calling for believers to kill Americans

**KSAX-0018**

Case No.
03-md-1570

01:06
wherever they could find them,
01:08
and who was working in the White House
01:09
when we lost two embassies in East Africa, and who spent...
01:16
the day in the State Department Operations Center
01:18
when Bin Laden himself was found and killed in 2011,
01:22
this seems like a chain of events
01:24
that we will never be fully free of.
01:28
In the investigations following 9/11
01:32
by the Congress, the Blue Ribbon 9/11 Commission,
01:35
and the federal government,
01:38
the actions of many, many players were scrutinized.
01:41
And one of those players that drew the most interest
01:43
was the Kingdom of Saudi Arabia,
01:45
home of 15 of the 19 9/11 hijackers,
01:48
as well of course as Bin Laden himself.
01:52
Saudi Arabia stood accused of having laid the seabed
01:56
for jihadist violence because of its advocacy,
01:59
its global advocacy for Wahhabi Islam,
02:03
and the missionary work of its many religious NGOs.
02:06
Yet all three of those inquiries
02:09
ultimately absolved the Saudi Arabia government
02:11
of direct responsibility for the events of 9/11.
02:14
Were those findings correct?

02:16
Well judging by the size of the audience here,
02:19
I'm guessing there are plenty of people
02:20
who are still uncertain, not to say, suspicious.
02:24
Today we will hear from Jim Kreindler,
02:26
who is leading a group of attorneys and survivors of victims
02:33
who are seeking to demonstrate
02:35
that the government of Saudi Arabia
02:36
does indeed bear responsibility for 9/11
02:39
and must compensate survivors
02:42
of the victims of that horrible day.
02:45
And let me say at the outset
02:46
that if Jim Kreindler says it's so,
02:48
we need to take the issue very seriously,
02:51
not only because he is a magna cum laude member
02:54
of the Class of 1977,
02:57
or the son of a member of the Class of 1945
03:00
whose name is on the Conference Center
03:02
just across the hall from this room.
03:06
Jim Kreindler is one of the foremost attorneys
03:09
working in the field of redress
03:12
for victims of terrorism and in aviation law.
03:17
And he took the lead role
03:19
as a member of the plaintiffs committee

03:20
in the Pan Am 103 litigation against Libya,
03:24
which produced a $2.7 billion settlement
03:28
in additional compensation for the families of Lockerbie.
03:33
And that is still the only case where any foreign state
03:37
has ever made such a payment to terrorist victims.
03:41
That's just one of the many famous cases
03:44
he's been involved with.
03:45
Among the others, EgyptAir 990,
03:49
Swissair Flight 111, which crashed in Nova Scotia in 1998,
03:55
and of course the famous TWA Flight 800 disaster
03:59
off Long Island.
04:02
Jim Kreindler received his JD
04:05
from Columbia University in 1980,
04:08
where he was a Harlan Fiske Stone Scholar.
04:11
And he started out his career
04:12
as an assistant district attorney in Kings County,
04:15
otherwise known as Brooklyn,
04:17
in the district attorney's office there.
04:20
He is the recipient
04:21
of the 2009 Public Justice Lawyer of the Year Award.
04:26
He is obviously a very distinguished attorney,
04:30
but I am pretty much in awe of Jim
04:33
also because of his political shrewdness,

04:37
because he led the effort
04:40
to enact JASTA, which is the acronym
04:45
by which the Justice Against Sponsors of Terrorism Act law,
04:49
which was passed by the Congress,
04:53
and that law narrows the scope of diplomatic immunities,
04:56
foreign sovereign immunities,
04:58
and allows U.S. citizens to sue,
05:03
if I understand it correctly,
05:05
foreign states even if they are not designated
05:07
as state sponsors of terrorism,
05:10
which has hitherto not been the case.
05:14
So this was, was it unanimous in both houses?
05:19
- [Jim] Well JASTA was passed,
05:24
and then vetoed by President Obama.
05:25
- And then overridden.
05:26
- Overridden 98 to one, and 346 to 77.
05:31
- So those are good numbers, if you're on that side.
05:35
So anyway, clearly he knows what he's doing,
05:38
both in the political arena as well as in the courtroom.
05:42
And with that, Jim, why don't you tell us
05:44
your story and your findings.
05:46
- Thank you, Dan.
05:48
(audience applauding)

05:54
It's always a great pleasure for me to be back at Dartmouth,
05:57
and I'm here with my wife which makes it even more fun.
06:01
But to talk to you in this room dedicated to my dad
06:07
about our life's work, Pan Am 103 and 9/11,
06:12
is especially gratifying.
06:14
Walking over here, we passed Silsby,
06:18
and when I was here, and I was Class of '77,
06:22
that was, and I think still is, the government building,
06:25
and like many government majors,
06:27
I at the time had an abiding faith and belief
06:31
in the integrity and efficacy of our government.
06:37
Talking to you now, I'll make a prediction.
06:41
By the time we're done, you will be revolted and horrified
06:49
to learn what prominent members of our government,
06:53
including past presidents, have done.
06:57
You will be equally amazed and thrilled
07:02
with the courage and determination
07:04
of a few private citizens and former FBI agents
07:10
who have beaten the government
07:14
and defeated the largest lobby effort
07:18
in the world's history.
07:21
To begin with 9/11, and as Dan said,
07:24
when all of you came in the room,

07:27
if asked, well what did Saudi Arabia have to do with 9/11?
07:33
The first thing you'd say is
07:35
15 of the 19 hijackers were Saudi Nationals.
07:39
Some of you pay who pay particular attention to this
07:42
might also make the comment that Dan made,
07:46
and Saudi Arabia has been known to give money to charities
07:50
who in turn funded al-Qaeda.
07:54
But the fact is, 9/11 was an attack on the United States
08:01
with the active intent and cooperation
08:06
from 11 known Saudi government officials.
08:11
Saudi Arabian government officials were the accomplices
08:16
without whom there never could have been a 9/11 attack.
08:22
And I'm going to give you a little information about that.
08:27
The starting place I guess is why would Saudi Arabia
08:33
support al-Qaeda, Osama Bin Laden, who's Sunni, et cetera.
08:39
And to understand that, we have to go back to 1979.
08:45
Most of you with the same hair color as me
08:49
will remember that year.
08:51
I was in my third year of law school.
08:54
The current students obviously will not.
08:58
But 1979 was a wake-up call to the world,
09:02
and the Islamic world in particular.
09:05
Two cataclysmic events happened.

09:08
The Shah of Iran was overthrown,
09:12
something that seemed unthinkable at the time,
09:15
by radical Shiite Muslims, and in the same year,
09:21
the mosque in Mecca was taken over by Wahhabi radicals.
09:27
Now the House of Saud was built in partnership
09:32
with the founder of Wahhabism.
09:34
And you must remember that the King of Saudi Arabia,
09:39
now King Salman, in Arabic, his title is
09:43
the keeper and protector of the holy mosques.
09:47
The word king doesn't appear in his Arabic title.
09:52
When that happened the royal family had an oh-my-God moment.
10:00
If the Shah can be overthrown,
10:03
and Wahhabi radicals can take over the mosque,
10:06
we are next unless we take dramatic action.
10:12
And that event prompted the royal family
10:16
to deliberately start accommodating the Wahhabi Muwahs.
10:23
They did it in two ways.
10:26
Sometime later they created a new branch
10:30
of the Saudi government called
10:32
the Ministry of Islamic Affairs.
10:35
The Ministry of Islamic Affairs is dedicated
10:40
to the spread of Wahhabism internationally,
10:44
and every embassy and consulate in the world

10:49
has Ministry of Islamic Affairs officials embedded in it,
10:55
as well as foreign ministry intelligence, what have you.
11:00
The second thing to keep in mind is the nature
11:04
of the Saudi Arabian government.
11:06
You all know that there are many members
11:08
of the royal family.
11:10
Well, how do you get ahead there?
11:13
How do you become foreign minister, defense minister,
11:18
deputy crown prince, crown prince, or king?
11:22
They don't have elections.
11:24
The way in which you rise to prominence and power
11:28
in Saudi Arabia is to seek and obtain the support
11:33
of the Wahhabi Muwahs.
11:36
So every prominent person in Saudi Arabia,
11:41
King Salman, his predecessor, all,
11:45
made their pilgrimages to kiss Bin Laden's ring in Kandahar.
11:52
Without doing that, they would not have the internal support
11:56
they needed to rise into positions of power.
12:01
In my mind it's not so much affinity with Wahhabism
12:06
that prompts the leaders of Saudi Arabia
12:08
to support Bin Laden, who is not a black sheep by any means.
12:13
Just as an aside, one of his close relatives on 9/11
12:20
is working in the Washington, D.C. embassy,

12:24
as an embassy official, and the head
12:27
of one of the Saudi charities that are supporting al-Qaeda.
12:33
What did these Saudi officials do?
12:38
They had supported al-Qaeda, not just with money,
12:42
but with the logistical support al-Qaeda needed
12:46
to mount the 9/11 attacks and the Cole bombing before it.
12:54
Those of you who are our age remember the embassy bombings?
12:57
Okay.
13:01
Before we get to 9/11, you know,
13:08
it's worth remembering,
13:11
and it's something that you and I talked about at lunch,
13:14
why did Bin Laden turn from an ally
13:17
of the United States fighting the Russians
13:20
to the vitriolic hatred of the United States?
13:24
In my mind, the number one reason
13:27
that caused him to despise us was the presence
13:32
of U.S. Military troops, particularly female troops.
13:37
in Saudi Arabia after we were protecting Kuwait
13:41
and the Emirates and Saudi Arabia from Saddam Hussein.
13:47
So for many years before 9/11
13:50
you had Saudi government officials working with al-Qaeda
13:56
and coordinating with al-Qaeda.
13:59
What happened on 9/11?

14:02
The two lead hijackers, Hazmi and Mihdhar,
14:08
attended, toward the end of 1999, attended a convention,
14:14
a conference in Malaysia of al-Qaeda and other terrorists
14:19
at which the 9/11 attack was planned,
14:23
as well as the Cole attack.
14:26
These terror attacks all emanated
14:31
from a tragic event in 1988.
14:35
How many of you remember when the USS Vincennes
14:38
shot down the Iranian Airbus mistakenly,
14:41
killing 300 plus people?
14:43
So, Iran vowed revenge.
14:47
The plot to destroy 10 U.S. commercial air carriers
14:53
was called the Bojinka plot.
14:56
A plot that Khalid Sheikh Mohammed knew about,
15:01
and tried to implement.
15:03
Khalid Sheikh Mohammed's nephew, Ramzi Yousef,
15:06
was the convicted bomber of the 1993 attack
15:10
on the World Trade Center.
15:14
9/11 was a combination of the Bojinka plot,
15:19
to destroy 10 U.S. aircraft
15:23
with the attack on the World Trade Center in '93.
15:27
The World Trade Center of course is seen
15:29
as the symbol of American capitalism,

15:33
particularly Jewish-American capitalism,
15:37
and that's why it was such a potent target for Bin Laden.
15:42
And our intelligence community knew all this.
15:46
There's no secret about the Bojinka plot
15:51
and Bin Laden's antipathy toward the United States,
15:55
and the support of Saudi government officials.
16:00
So where did this all begin?
16:03
The Fall of '99 Hazmi and Mihdhar
16:06
are in Malaysia planning the 9/11 attack,
16:10
along with other terrorists in the Cole attack.
16:14
They were monitored by the CIA, daily.
16:20
From Malaysia, after their planning was complete,
16:25
they went on a holiday that had particular appeal
16:30
to two radical Wahhabists, soon to be suicide murderers
16:39
who were on their way to heaven in a couple years.
16:42
So they went on a sex vacation to Bangkok.
16:46
The CIA monitored them there.
16:49
From Bangkok they arrived in Los Angeles January 15th, 2000.
16:56
The CIA monitored their flight and their arrival.
17:03
Before January 15th, 2000, a high-ranking official
17:11
in the Saudi Embassy, whose name I know,
17:14
and because of these disgusting protective orders
17:17
imposed upon us by the Justice Department

17:20
with the blessing of the court,
17:22
I can't tell my clients, one of whom in this room,
17:26
this official sent an instruction
17:29
to a Saudi consular official in Los Angeles, Thumairy,
17:35
ordering him to provide the help
17:37
that Hazmi and Mihdhar needed.
17:40
They didn't speak a word of English.
17:42
They wouldn't know the exit sign from the entrance sign.
17:46
So Thumairy and his accomplice,
17:51
who is a Saudi intelligence official, Bayoumi,
17:55
arranged with people who were working with them.
18:01
And this is an interesting thing.
18:03
Al-Qaeda has had, and still has today,
18:08
operatives in the United States.
18:10
They, in California, in L.A.,
18:13
they needed blue-eyed, blonde-haired surfer dudes
18:18
who could take Hazmi and Mihdhar around and teach them
18:21
how to look and act like Americans.
18:25
The terrorists were helped by dozens of these people
18:31
under the control and direction
18:33
of Saudi government officials.
18:35
So they were picked up at the airport.
18:37
They were provided housing near the King Fahad Mosque,

18:42
that was the center point funded by the then King Fahad.
18:47
His son came over with $10 million.
18:51
That was the meeting place for al-Qaeda.
18:53
Hazmi and Mihdhar were given money.
18:58
Prince Bandar, Bandar Bush, best friend of George Bush,
19:03
Saudi Ambassador to the United States, his wife,
19:06
through Bayoumi, gave Hazmi and Mihdhar $25,000.00.
19:11
We have traced the exact money trail
19:14
from one of the dirty charities under scrutiny
19:18
into the hands of a Saudi government agent in L.A.
19:25
who ran of fake charity who sent the money to Karachi,
19:30
and then ultimately to Mohamed Atta in the Hamburg cell.
19:34
So the money trail was known.
19:37
The Saudi government officials,
19:40
in addition to introducing the two terrorists
19:45
to other people in the mosque, as I said,
19:47
start English lessons, gave them money, housing,
19:50
introduced them to Saudi military pilots,
19:55
who I believe, were instrumental
19:57
in training them to fly jets.
20:01
They did a little trip to Las Vegas.
20:04
I don't know, but I believe that they received training
20:07
from Saudi military pilots in the deserts around Las Vegas.

20:13
In a short period of time, the FBI was alerted
20:20
to the presence of Hazmi and Mihdhar.
20:23
Hazmi and Mihdhar are in fact roomed with an FBI informant.
20:29
The FBI did not arrest them,
20:32
did not question them, lost them.
20:37
The CIA, of course what they're doing is illegal,
20:40
and was probably under the mistaken approach
20:45
that they could turn the two and that the two terrorists
20:51
would help root out Saudi dissidents
20:54
who the royal family would have exterminated.
20:59
Later I'll talk about that,
21:01
I'll tell you a little bit about Khashoggi
21:06
and why he was killed, it's not because he was a dissident,
21:09
it's because of his contact with us.
21:14
If I don't get to it, remind me.
21:17
So the two terrorists are in the United States,
21:23
monitored, until they're lost by the FBI and the CIA.
21:28
And of course 9/11 happens.
21:31
Bob Mueller became director just, I think,
21:34
a week or two before 9/11.
21:38
What happened on 9/11?
21:42
It was the perfect storm to create the worst
21:47
and most pervasive cover-up in our nation's history.

21:55
When President Bush was told about the attack,
21:58
he was in Sarasota, Florida reading "Horton Does the Who",
22:03
written by one of our famous alumni, to a kindergarten class
22:09
when he was told about the attack.
22:11
The first words out of his mouth was, was it Saddam?
22:17
Remember how set he was upon killing Saddam Hussein,
22:22
who had vowed to kill his father,
22:24
the previous President Bush.
22:27
Bandar was maybe his closed friend,
22:30
been to the ranch in Crawford, Texas more than anybody else.
22:34
On 9/11 we were still dependent upon Saudi oil,
22:38
it's long before fracking.
22:42
President Bush was set upon using the 9/11 attack
22:46
as an excuse to go to war with Iraq and kill Saddam Hussein,
22:51
and who was our most important ally in that war?
22:55
Saudi Arabia.
22:57
So immediately,
23:03
he, and those close to him in the White House,
23:05
did not want to hear anything
23:07
about the Saudi government role in 9/11.
23:10
On the FBI front, Bob Mueller said, oh my God,
23:15
look at the mess I've inherited and this colossal failure.
23:21
This cannot see the light of day.

23:26
You would expect that the top counter-terrorism agents
23:31
in the FBI would be put in charge of the investigation.
23:36
One of them is now working with us,
23:39
and he and I are talking together everyday.
23:42
Bassem Youssef was the first Arabic speaking FBI agent,
23:47
the first agent to infiltrate al-Qaeda,
23:49
and turn a high level al-Qaeda operative.
23:53
He was the FBI legat in Saudi Arabia, and had been
23:57
with the King, and knows the Saudi's intimately.
24:01
Was he put in charge of any of the 9/11 flights
24:05
and their investigations?
24:07
Uh uh, he was kept away from 9/11.
24:12
Flight 77, the flight that crashed into the Pentagon,
24:16
Hazmi and Mihdhar, were two of the terrorists
24:19
on that flight.
24:21
Who was put in charge of investigating Flight 77,
24:25
where Hazmi and Mihdhar played the most important role
24:29
in planning the attack with the assistance
24:31
of Saudi government officials?
24:34
Who did Bob Mueller pick
24:36
to run probably the most important
24:38
of the four flights investigation?
24:41
Jackie Maguire was a probationary officer,

24:45
six months out of Quantico.
24:51
If you want to institute a cover-up,
24:55
you need a young, dumb kid who is going to follow orders.
25:05
Who was his new head of counter-terrorism?
25:08
Michael McGarrity who came from organized crime,
25:12
and organized crime is
25:13
a completely different model than terrorism.
25:17
Michael McGarrity is a principal architect today
25:21
of lying to the families and keeping the documents
25:24
that we know exist away from us.
25:29
In L.A., Steve Moore was put in charge
25:32
of a 400 person FBI team looking at the activities
25:38
of Hazmi and Mihdhar, and looking at Thumairy, Bayoumi,
25:43
and the other nine identified Saudi government officials.
25:48
Being in L.A. at 3:00 a.m. every morning
25:52
he would personally call Director Mueller.
25:55
He did it every 48 hours to update him on the investigation.
25:59
Mueller is reporting to the president for his daily,
26:03
President Bush, for his daily intelligence briefing.
26:07
Steve Moore is reporting to Director Mueller
26:11
on the progress they're making
26:13
in investigating Saudi government officials.
26:18
Enormous progress was made by the agents in the field

26:22
in the first two or three months, until Bob Mueller,
26:29
deputized Michael McGarrity and Jackie Maguire
26:32
to shut them down.
26:36
Subpoenas that have served would not be followed up.
26:39
Interviews were canceled.
26:41
It's over.
26:43
So when Dan said, why did the 9/11 commission
26:47
exonerate Saudi Arabia?
26:50
Because they were lied to
26:53
by Robert Mueller under oath in Congress
26:57
and others who did not want the commission to know
27:01
what role the Saudi government played,
27:04
because then Saudi Arabia is our ally
27:08
in the war against Iraq,
27:10
and he did not want the world to know
27:13
about this colossal intelligence
27:16
and law enforcement failure.
27:19
The investigation was dead.
27:23
The agents who were working the case
27:25
are disgusted, horrified,
27:29
and after a couple of years
27:32
when the 9/11 commission came out,
27:34
and they know what a lie it is,

27:39
on their own they resurrect the investigation.
27:43
In 2007 they go back to the witnesses
27:46
and start building the criminal case
27:49
that every one of them joined the FBI to do,
27:54
to investigate and prosecute crime,
27:58
not to be part of lying to America
28:02
and lying to the families of 3,000 murdered Americans.
28:07
Their investigation proceeded from 2007
28:13
until it was shut down
28:16
in February, March, and April of 2016.
28:23
At that point we had President Obama in the White House
28:27
and James Comey as Director of the FBI.
28:32
I was a fan until I learned this of President Obama,
28:38
Joe Biden's a friend, I was his New York chair
28:42
when he ran for president,
28:44
my dad and I helped him in 1988 in his campaign.
28:51
What President Obama did
28:54
is the most treacherous and outrageous act
28:59
I know of in our nation's history.
29:03
President Obama and John Kerry wanted the Iran nuclear deal
29:10
and the eventual normalization of relations with Iran
29:15
as their signature foreign policy achievement.
29:18
And it's a goal we all share.

29:20
It would be great if you could get Iran
29:22
to abandon nuclear weapons and change.
29:27
What was treasonous is the quid pro quo
29:31
he entered into with King Salman.
29:34
The Saudis and the Israelis, Netanyahu,
29:39
were the strongest opponents to the Iran nuclear deal.
29:43
Everyone, everyone in the room knows
29:45
there was no shaking Netanyahu
29:47
in opposing the Iran nuclear deal.
29:50
But Obama thought he could shake the Saudis
29:53
and get them to drop their opposition.
29:55
With their opposition and the Israelis
29:58
there was no chance of it passing the Senate.
30:01
So he cut a deal with King Salman.
30:05
And his deal was, I will kill the 9/11 litigation
30:09
if you stand down in opposing the Iran nuclear deal.
30:13
That deal was struck.
30:17
As we mentioned before, when Congress passed
30:21
JASTA overwhelmingly, Obama vetoed it.
30:26
The only veto of his presidency that was overridden,
30:30
and as I've said, overwritten 98 to one,
30:34
just Harry Reid dissented, and 346 to 77 in the House.
30:40
What I thought at the time was that's what Obama did

30:45
to kill the agents' investigation into 9/11.
30:53
What I didn't know when JASTA was passed then,
31:00
was what happened in the Bureau.
31:03
That's when James Comey had Michael McGarrity
31:08
and Jackie Maguire shut down
31:10
the resurrected FBI investigation.
31:14
You know, being at Dartmouth,
31:18
the room is filled with smart people,
31:20
and you're thinking like,
31:21
how does this guy know any of that?
31:24
The answer is, after all these years,
31:27
the agents who have worked the case,
31:30
many of them have retired, and they've come to us and said,
31:34
here's what we know, we want to finish
31:37
what we started when we joined the Bureau.
31:40
The only way for the truth to come out
31:44
is for us to join with you.
31:46
So when we demand documents from the FBI
31:51
and the Department of Justice,
31:52
we know exactly what we're looking for.
31:55
So we have been in a fight, not just with Saudi Arabia,
32:01
oh, JASTA, Saudi Arabia hired 19 lobby firms,
32:09
and my estimate is they were paid

32:14
something between $50 and a $100 million a year
32:18
to lobby against us and kill JASTA.
32:22
They enlisted Veterans and put them up
32:24
at the Trump Hotel, and steak dinners and said,
32:26
help us get rid of this stupid law,
32:28
without telling the Veterans
32:31
that they were going to be screwing the 9/11 families.
32:35
That JASTA was the law the families needed
32:38
to lift the legal immunity that Saudi Arabia claimed.
32:43
So we overrode the veto, we beat the Saudi lobbyists,
32:47
JASTA became law, and we started our lawsuit
32:51
against Saudi Arabia in 2016,
32:55
15 years after we've been engaged in this war.
33:01
The Saudis were shocked.
33:03
They've got the king on their side, King Obama.
33:08
They're spending $50 million.
33:11
How can a bunch of cripples and widows and orphans
33:14
hobbling around Congress beat them?
33:18
So when I said at the beginning,
33:20
you will be revolted by what our government did,
33:23
but thrilled with what Americans can accomplish,
33:28
that is what I'm talking about.
33:31
A few dozen families saying,

33:34
we're going to knock on every door
33:36
and buttonhole senators and congressmen,
33:39
beat Obama and beat the Saudi lobby.
33:43
And now I'm waxing patriotic,
33:45
there's no other country in the world
33:47
where that could happen.
33:49
In our battle with Saudi Arabia, not surprisingly,
33:53
they're lying about the documents and keeping it from us,
33:56
and they've got a lot of high priced lawyers,
33:58
and that's a tough fight.
34:00
The fight we should not be having
34:02
is the fight we have on a second front
34:06
against the FBI and the Department of Justice.
34:11
Now we had served FOIA requests,
34:14
Freedom of Information requests,
34:17
to get documents we know are in the FBI files
34:21
on the investigation of the Saudi government officials.
34:24
Here's some of the answers we got
34:27
to our FOIA requests, early on.
34:31
The documents you seek contain information
34:35
about Osama Bin Laden.
34:38
We will not give them to you
34:41
because of his privacy interest in that information.

34:48
Another one was, oh, we're not giving you any documents
34:52
unless you produce death certificates for the 19 terrorists.
34:58
This is our government.
35:00
This is coming from the Department of Justice.
35:03
So we have asked for these files,
35:06
we've been fighting this fight in court
35:08
for a year and a half, the FBI has given us some documents.
35:13
Five tranches or batches.
35:16
What they give us has redacted information.
35:19
So I told you, the name of the high Saudi official
35:22
in Washington, D.C., who tasked Thumairy, that was redacted.
35:29
And what we have were given under a protective order
35:33
that precludes us from telling the families
35:37
and speaking about it publicly.
35:39
And I'm disgusted with these protective orders,
35:42
and we're doing whatever we can to overturn them.
35:46
But the judge is not terribly sympathetic.
35:51
So we know, for example, that in early 2016
35:57
when the investigation was shut down,
35:59
as I said, March, April,
36:01
the agents wrote a big summary
36:04
on their findings, it's there.
36:06
It has this vast body of information

36:09
about who, what, where, and how
36:12
the Saudi government officials acted
36:15
as the essential accomplices to al-Qaeda.
36:18
We've asked for it, we haven't gotten it.
36:21
The Senate unanimously passed a resolution,
36:25
Resolution 610 calling upon the declassification
36:29
and the release of this information.
36:32
The FBI has ignored what, you know, how many times
36:37
do you get the Senate to do anything unanimously now?
36:39
The FBI has ignored it.
36:41
The Justice Department has ignored it.
36:43
I and some of the families
36:45
were with President Trump on 9/11.
36:47
The next day, Attorney General Barr invoked State secrets
36:54
and National Security as an excuse
36:57
to keep the FBI documents hidden.
37:01
We're fighting that.
37:02
We have some champions.
37:05
Tomorrow Tulsi Gabbard at 1:00 o'clock
37:09
will hold a press conference saying,
37:11
release the information to the families.
37:14
So luckily we've got a lot of people fighting this fight.
37:20
But we should not have to be fighting our own government.

37:28
We're making progress in court.
37:32
But for us to win in court could take
37:34
another five or 10 years.
37:36
So we're trying to enlist support in Washington
37:42
for us to get the documents,
37:43
because if we get the FBI files,
37:46
the Saudis know the game is up.
37:49
And probably all of you have been reading about
37:53
Saudi Arabia's desire to take Aramco public,
37:59
do the IPO for 5% of the company,
38:03
a company that will be worth between,
38:05
depending upon the estimates, $1.3 to $2 trillion,
38:13
and New York is the preferred venue
38:15
over Hong Kong or London.
38:19
So we're operating in Washington
38:23
to try and get support there because there's no way
38:31
that us and the families are going to stand
38:34
for taking Aramco public a 100 yards away from Ground Zero.
38:40
So Saudi Arabia has to resolve the 9/11 case
38:45
for the Aramco IPO in New York to happen in my opinion.
38:50
So our fight is on two fronts in court,
38:53
with Saudi Arabia and with the FBI,
38:57
and daily interaction with people in Washington

39:01
who can help us and persuade MBS,
39:07
who was 15 when 9/11 occurred, to engage and resolve 9/11.
39:15
Oh, Khashoggi, you want to hear about Khashoggi?
39:19
- [Audience] Yes.
39:19
- Okay.
39:20
So MBS's younger brother KBS was at age 28
39:28
Saudi Ambassador to the United States.
39:31
You may remember after Khashoggi was murdered
39:34
the NSA released some intercepts with communications
39:39
from Khashoggi's phone to others,
39:42
and that contained an intercept of communication
39:46
between Khashoggi's phone and KBS's phone.
39:50
Within 24 hours of that information
39:55
being released by the NSA,
39:57
KBS, what's the proper verb?
40:03
Did a tweet, tweeted the following message,
40:07
I've not spoken to Khashoggi.
40:10
I only texted him, and my last text was October 26th, 2017.
40:19
Something, now that's, why put the date in?
40:21
That's weird.
40:22
So the best investigator in the world,
40:26
who knows more about al-Qaeda and their financing,
40:30
than a 100 people combined,

40:33
they said, John, what happened that day?
40:36
He said, oh, that's the day one of our investigators
40:39
met with Khashoggi in D.C.,
40:42
'cause Khashoggi was part of the intelligence community.
40:46
We knew he knew a lot
40:48
about Saudi government involvement in 9/11.
40:51
And I said, would you come to New York and talk to my boss?
40:54
He said, yeah, I would do that.
40:57
So I'm sure that as soon as she left,
41:00
he called KBS and said, look, the 9/11 lawyers are onto me.
41:06
They know that I know what you guys did.
41:09
Now, I didn't give them anything.
41:11
But you're holding my kid in Saudi Arabia,
41:14
you harm one hair on his head, and I will.
41:18
So my belief is Khashoggi was killed
41:22
not because he was a dissident, there's a lot of dissidents,
41:25
but because he was holding this ax over the Saudis' head.
41:30
So our fight continues.
41:36
I could be doing this for another 10 or 15 years,
41:40
but I am hopeful that, with the enthusiasm
41:47
and aid and support by people in Washington
41:51
we can kind of break through
41:53
and bring Saudi Arabia to the table,

41:57
because I know eventually they're going to lose,
41:59
and engaging sooner would be better
42:03
than all these details eventually coming out.
42:07
So, should I stop now and do some questions?
42:11
- [Daniel] Sure.
42:12
Why don't we sit down.
42:14
- Okay, that sounds good.
42:15
(chuckling)
42:20
- And I'll ask a few questions,
42:22
and then before I'm stampeded
42:25
we'll turn it over to the audience.
42:27
(audience laughing)
42:31
So, it's a lot for me to wrap my mind around.
42:33
I'm going to have to completely rewrite my book.
42:37
(audience laughing)
42:38
- We can coauthor the next one.
42:40
- Yeah, well if you give every different version
42:43
you can corner the market, right?
42:45
So let's drill down a bit.
42:50
From my work I know that the way
42:54
that some of these Saudi NGOs worked is
42:56
that you might have management
42:59
that was not criminally inclined,

43:02
but that there were sort of rotten veins,
43:04
that there were corrupt lines of communications,
43:08
and terrorist operations were being supported
43:12
in different countries by people who are operating
43:15
without the authorization
43:17
of the head of these very large NGOs, in some cases.
43:24
Is it your claim that the Saudi government officials
43:30
were in effect operating in the same sort of way?
43:34
Or is it your claim that responsibility goes very high
43:38
in the Saudi government?
43:39
- Yeah, I don't know how high it goes
43:42
in the Saudi government.
43:43
I'd say this.
43:45
Given Saudi Arabia, we think of a church-state distinction.
43:51
That doesn't exist there.
43:53
So to me, the charities are part of the Saudi government.
43:59
It's part of the mission of the Ministry of Islamic Affairs.
44:04
And they all have profit-making components,
44:07
whether it's growing poppy,
44:09
the walnut trade with Turkey's president
44:12
when he was mayor of Istanbul,
44:14
King Salman was involved in that.
44:17
And they cornered the walnut market

44:20
and money is being diverted to al-Qaeda.
44:23
So I think it was a government role.
44:30
My real pitch, if MBS is sitting right next to me now,
44:36
I would say this is the time to engage.
44:39
Right now we have taken culpability
44:42
to 11 Saudi government officials in the United States.
44:46
It's going to go up the totem pole eventually
44:49
if we're forced to keep fighting.
44:52
- So that raises a good question.
44:55
MBS, I would say, is not in great odor these days
44:58
because of Khashoggi and Yemen,
45:01
kidnapping the Lebanese Prime Minister,
45:04
the blockade against Qatar, a few other things,
45:08
small business, all of them,
45:10
but the one thing that he has done
45:13
that has earned him a lot of positive reviews in the West
45:18
is bringing the religious establishment to heel,
45:21
and supposedly putting modernizers in charge
45:25
of these enormous organizations,
45:27
the World Association of Muslim Youth,
45:30
the International Islamic Relief Organization,
45:32
and so on and so forth.
45:34
If he can make a compensation without admitting

45:43
that the royal family, for example, was involved,
45:45
that these were all unauthorized activities,
45:50
why hasn't he done that?
45:53
- I don't think he knows about it, and is engaged,
45:55
but you're right, he has said there's nothing magical
46:00
about 1979 and Wahhabism over the last 30 years.
46:05
So if you were he, I would say
46:09
in keeping with what you're doing,
46:12
you have actions taken by Saudi government officials
46:17
when you were 15 under an old regime.
46:20
You can demonstrate your commitment
46:23
to a more inclusive form of Islam by moving past that.
46:28
And Bassem told me a story.
46:32
The first day that President Sisi was in office
46:36
after the Muslim Brotherhood,
46:38
he went to the home of a woman
46:40
who had been kidnapped and beaten
46:42
by the Muslim Brotherhood, and washed her feet.
46:47
And in that world, he's not saying I did it,
46:51
I'm not responsible
46:53
for what the Muslim Brotherhood has done.
46:56
But as the new, current head of the country,
46:58
it's incumbent upon me to demonstrate

47:02
our desire to move past a painful past.
47:06
So I think it's the perfect narrative.
47:08
Our challenge is you can't get through
47:13
150 U.S. lawyers and functionaries to him in court.
47:24
- Well, they do have a significant part
47:27
of Washington, D.C. on their payroll.
47:29
So there are a number of channels you could use there.
47:32
I'll give you some names afterwards.
47:36
So one, I'm going to press you,
47:38
here's one problem I have with the narrative.
47:41
And that is the role of Bob Mueller.
47:43
Since I worked closely with Bob Mueller,
47:45
and in my view he's the straightest of straight arrows,
47:49
and if he saw something as horrible as you're suggesting,
47:59
I would find it kind of out of character
48:00
that he would want to hush it up.
48:02
Now as we have discussed earlier, there' no question
48:05
that in Washington there was a sense
48:07
that the CIA had failed,
48:10
but the FBI had failed catastrophically.
48:12
And that there was a danger that the FBI was going to be
48:15
so demoralized by this failure that it would not recover.
48:21
But even so, I have to say, I'm,

48:25
I question whether it's Mueller.
48:27
Isn't there someone further down the line who might have?
48:29
- Bob Mueller in 2003 testifies in Congress,
48:34
until the formation of the 9/11 Commission,
48:37
I had no information
48:40
that Saudi government officials were involved.
48:43
Steve Moore has testified under oath,
48:46
I was briefing Bob Mueller every 48 hours.
48:51
- [Dam] So it's one of those things?
48:53
Yeah.
48:54
- It's one of those things,
48:56
but look at the circumstances
49:00
and who was an incentive to continue,
49:05
it's like Watergate, you know, you do one bad thing
49:10
and then you start trying to keep pushing it under the rug
49:13
deeper and deeper and lying and lying.
49:17
And as between Steve Moore and what the agents were doing.
49:22
why would Steve Moore and others make up a lie
49:25
about talking to Mueller?
49:27
And in fact, we know, we can trace their movements.
49:34
The 9/11 Commission says, for example, there's no evidence
49:39
that Thumairy met Hazmi ad Mihdhar directly.
49:43
We have direct evidence of six meetings.

49:46
- [Daniel] There's a discrepancy there.
49:48
- Yeah, that's one way to put it.
49:50
Yeah. - Yeah.
49:54
In your view, does one of the things
49:57
that analysts have picked up on and often criticized,
50:01
is why was the entire Bin Laden family
50:04
quickly hustled out of the country,
50:06
is that something that also plays a role in your assessment?
50:11
- Yeah, I have no doubt that that immediately Bandar said,
50:14
oh, look, the public's going to be up in arms,
50:18
we got to get all these innocent people out of there.
50:21
But you look at every one of the Saudi government officials
50:26
who were involved and we want to depose, they were all
50:30
either voluntarily or deported to Saudi Arabia.
50:35
I mean, you take a step back,
50:38
here's the largest murder in U.S. history.
50:43
Anyone, me, you, you know when law enforcement,
50:46
you have one active shooter, there's going to be
50:50
15 witnesses who got him lunch and a car or whatever.
50:57
Not a single person has been arrested or indicted.
51:03
So there was a concerted effort
51:05
to move the Saudi Arabian officials,
51:08
and other Saudi Arabians who were involved,

51:11
out of the country.
51:12
And obviously they're not coming back now.
51:16
- So there is one other conspirator at least
51:18
who's in jail, Moussaoui.
51:20
- Yeah.
51:20
- Has he provided any information?
51:21
- Yeah, so, my team went to Supermax and talked to--
51:26
- In Florence, Colorado?
51:27
- Yeah, and talked to Moussaoui.
51:28
And he had some interesting things to say.
51:30
Some, I've got to think of what's under
51:33
this hated protective order and what isn't.
51:38
The one thing I can say is
51:40
Moussaoui was not the 20th hijacker.
51:42
We know who, or are sure who the 20th is,
51:45
and it's not Moussaoui, it's somebody else.
51:49
And just as an aside, one flight was a hijacker short,
51:57
I have no way of knowing this, but I think the reason why
52:05
the 9/11 attacks occurred that day was
52:12
the dogs were onto them, and I think they feared
52:16
that they were going to be unmasked.
52:20
So I think the attack may have been rushed.
52:27
I'm going to digress a little bit, you know, the Cole,

52:30
so Hazmi and Mihdhar go down to San Diego.
52:33
The Cole's sister ship, the John Paul Jones was there.
52:37
We believe they scouted out the John Paul Jones,
52:40
and observed how ships could approach, and that information,
52:43
when one of them went back and spoke to Bin Laden,
52:47
was given in use for the Cole attack.
52:49
I also think that their initial reason
52:53
for going to San Diego was to launch a terror attack
52:56
on the Ronald Reagan, the nuclear powered aircraft carrier,
53:01
which was mysteriously moved from San Diego
53:04
to Norfolk, Virginia that summer.
53:07
Now since the CIA has been tracking them, I am sure,
53:11
my own guess is CIA to the Defense Department,
53:18
you better move the Ronald Reagan.
53:21
- [Daniel] So last question, have you had any conversations
53:24
with any Saudi officials about this?
53:25
- No.
53:26
- No? - None.
53:28
- [Daniel] By choice, or they won't take the meeting?
53:30
- Well, the way it would work is I could talk
53:34
to their lawyer who's gone up and paid whatever, you know,
53:38
$50 million to defend the case, and say,
53:40
why don't we talk settlement, and it's going to go nowhere.

53:44
The only way it will happen is from the top.
53:48
For MBS to say to someone, why we don't explore
53:52
some possibilities of resolution?
53:55
- Did we just lose a mic?
53:56
- Was that me?
53:58
Okay, can you hear me okay?
54:00
- [Audience] Yeah.
54:01
- Okay, I must have squirmed.
54:04
- Okay, questions, please.
54:07
- Yeah.
54:08
- Oh wait, can you just wait for the microphone
54:11
so that posterity will know your question?
54:15
- [Woman] Thank you.
54:17
- [Male Audience Member] I can't assume
54:18
that Mueller was acting independently or on his own actions,
54:22
so what was the connection with Bush, and--
54:24
- We can't hear you.
54:25
- Move it closer. - Speak up.
54:27
- Yeah.
54:28
- [Male Audience Member] I assume that Mueller
54:31
wasn't acting independently and on his own initiative,
54:33
so what was the connection with the Bush?
54:36
- My own belief is given President Bush's affinity

54:43
with Bandar and the Saudis, and his desire
54:47
to go to war with Iraq with the Saudis,
54:50
he and others made it perfectly clear we don't want to hear
54:54
anything about others who were involved.
54:58
Particularly a key ally whose oil we needed.
55:03
I have no reason to think that President Bush
55:08
ever talked to Bob Mueller about this directly.
55:11
My own belief is Mueller had his own interest
55:16
in the story not coming out, and it perfectly coincided
55:22
with President Bush who wanted a close relationship
55:26
with Saudi Arabia for the war in Iraq.
55:32
- Let me just ask, do we have any students first of all?
55:35
No, well in that case,
55:37
wait, we have a student.
55:41
- Hi, I'm Matt.
55:42
- [Jim] Hi, Matt.
55:43
- So, if you think that this was mostly Saudi driven,
55:47
what do you think this says about
55:50
the kind of surveillance and suspension of habeas corpus
55:55
that President Bush activated after 9/11?
56:02
- I think it's independent.
56:06
There was a lot of hysteria after 9/11,
56:10
and a lot of, you know, outrageous bigotry

56:14
that you saw reflected in officials' actions in legislation.
56:20
But I don't think that had any cause and effect or any nexus
56:25
with what the Saudi government officials had done.
56:29
In fact, you know,
56:33
you can play the imaginary game of let's go back in time,
56:38
and had it been handled differently,
56:41
and look, I'm a big believer in being truthful,
56:47
and I think it could have been a very different world
56:50
if instead of what happened said, okay,
56:53
there's Saudi government officials involved.
56:56
We're identifying the ones who were involved.
56:59
The Saudi government is responsible
57:01
for the actions of its officials.
57:04
But this is not an indictment of the Islamic world.
57:09
I think we'd all be in a way better place.
57:18
- Okay, just to clarify, sorry,
57:20
I kind of meant, I didn't say this,
57:25
but of Iranian officials and Iranian citizens.
57:28
I didn't say that, but.
57:30
- Yeah, so we have a judgment against Iran
57:33
for the 9/11 victims, and Iran played a role.
57:38
A small role compared to al-Qaeda.
57:41
Here's what Iran did.

57:47
Eight or nine of the hijackers transited Iran
57:53
on the way to the Afghan al-Qaeda training camps.
57:58
Iranian officials, knowing they were al-Qaeda,
58:01
and they had special markers in their passports
58:04
indicating they were al-Qaeda,
58:06
did not stamp their passports with an Iranian stamp.
58:10
An Iranian stamp in their passports
58:13
would have made it impossible for them to get U.S. visas.
58:16
So one of the weird things is we tend to think
58:20
that there's no cooperation, but there was a nexus
58:24
between Iran and al-Qaeda, Saudi Arabia and al-Qaeda,
58:28
other terror groups.
58:30
There were occasions
58:32
when all their interests would coalesce.
58:35
So that's what Iran did.
58:41
And that's why we have huge judgments against Iran.
58:45
But Iran's role compared to Saudi Arabia's role is small,
58:51
because Iran's role was not operational control.
58:54
It was Revolutionary Guard, al-Qaeda,
59:00
meetings and sharing information.
59:05
The weird thing, I've talked about these terror conventions,
59:08
and it's like data technology people's conventions
59:15
or automotive conventions,

59:17
they all get together and say, oh, what's working?
59:20
What's a hot idea?
59:21
Let's share some ideas.
59:27
- So actually, I want to follow up on that
59:29
because you started saying something
59:32
when you were at the podium,
59:34
and then I don't think you made the connection.
59:36
How do we get from the Vincennes to the Bojinka plot?
59:40
- Yeah.
59:41
So after the Vincennes was shot down, Iran vowed revenge.
59:48
Iran then, and still today, is working
59:51
through other terror groups,
59:54
Palestinian General Command, Hamas, et cetera.
60:00
Khalid Sheikh Mohammed was kind of a freelancer.
60:03
So in the groups talking about how to wreak revenge,
60:11
they came up with the idea of,
60:13
for Iran, we're going to destroy 10 aircraft.
60:17
And remember the two Air India planes, East and West,
60:21
were bombed, I think that was part of the Bojinka plot.
60:25
So here's how they all would cooperate and morph.
60:32
So a popular front for the liberation
60:36
of Palestine General Command has a cell in Germany.
60:40
They've built 10 IEDs, Improvised Explosive Devices

60:46
to be put in checked luggage to blow up U.S. air carriers.
60:51
The German police raid the cell in Neuss, Germany,
60:55
October of 1988, disrupting this plot.
60:59
That's when the Iranians
61:01
subcontracted their attack to Gaddafi.
61:06
Reputedly, Gaddafi was paid $10 million by Iran
61:11
for having the JSO, it's his intelligence agency,
61:15
do the Pan Am 103 plot.
61:19
Symbolically and intentionally,
61:21
we insisted upon a payment of $10 million per death
61:25
for each of the 270 murdered people in Pan Am 103.
61:30
So the world is filled with coincidences.
61:36
Captain Macquarrie was the captain of Pan Am flight 103.
61:40
His son flew the lead F-16 in the Tripoli bombing.
61:48
- [Daniel] Interesting.
61:49
Okay, more questions?
61:52
Right there, you've been very patient.
61:55
- Hi, my name is Liz.
61:57
- [Jim] Hi, Liz.
61:58
- I have a very basic question about the mental state
62:01
of King Bin Salman, because I was under the impression
62:04
that right when he became king, he was out to lunch.
62:09
So you were talking about Obama and he negotiating,

62:17
but I didn't even think he was making decisions back then.
62:20
- [Jim] The previous king.
62:21
- [Daniel] King Abdullah.
62:22
- Abdullah, okay, thank you.
62:27
But was, is Salman capable of making decision?
62:32
- I don't know.
62:34
The stories you read is MBS is the effective head
62:39
of the Saudi government, although we saw Salman step in
62:43
and pull back the IPO a year ago.
62:48
And there was some supposition
62:50
that MBS might be removed as Crown Prince.
62:56
- [Liz] That would be great.
62:58
(chuckling)
62:58
- Well, you know, yes and no, I mean...
63:06
The notion of being able with impunity
63:13
to kill someone who threatens your nation
63:16
is not a notion unique to him in that country or that world.
63:22
So I don't know.
63:28
When he removed Prince Nayef, Prince Nayef was Crown Prince,
63:32
and he was Deputy Crown Prince, and he bumped out Nayef,
63:35
and kind of held him--
63:36
- [Daniel] Muhammad Bin Nayef.
63:37
- Yeah, held him hostage, and there was a real power play

63:42
among these two branches of the royal family,
63:46
and MBS seems to have won out.
63:49
- Have you had any contact with anyone at Guantanamo?
63:53
- No, we've asked for permission to depose some of them,
63:59
and that's been granted in theory,
64:01
and in theory we're going to take those depositions.
64:05
And I have mixed feelings about those depositions.
64:11
Frankly I don't think it's essential for our case.
64:14
And I don't know that anyone there
64:19
could or would provide meaningful information
64:24
on what Saudi government officials did.
64:29
- I'm looking on this side of the room, back here.
64:36
- What would have been the geopolitical objective
64:38
of the high Saudi officials involved in this plot,
64:43
in this 9/11 plot?
64:45
Did they achieve it?
64:47
And what would be the result
64:50
of there being some 'fessing-up for having done so?
64:55
- Yeah.
64:56
Well I don't know who the highest officials were.
65:01
My guess is personal advancement.
65:07
Support from the Wahhabi Muwahs
65:11
for actively assisting Bin Laden.

65:15
And there's this universal, Imam-U,
65:18
and that's where all the imams are trained
65:21
and the Saudi government officials
65:23
who populate the Ministry of Islamic Affairs.
65:26
So you have this ministry directly dedicated
65:32
to the spread of Wahhabism.
65:34
If you'd ask me what would be a great thing for MBS to do?
65:40
Would be to say, I as a young man, I'm turning the page
65:45
on what some people in our government did 20 years ago,
65:50
'cause the planning is now more than 20 years ago,
65:53
and I am disbanding or altering
65:58
the Ministry of Islamic Affairs.
66:03
That's the best way to lend teeth to his statement
66:07
I'm clamping down on the Wahhabi extremists.
66:18
- Hi, my name is Jim.
66:19
And we were in Iran a couple of years ago.
66:21
And what the Iranians say, first of all,
66:24
they're very pro-American
66:25
if you talk to people on the street.
66:28
They're very welcoming to Americans.
66:30
What they say is we are surrounded by hostile people,
66:34
the Saudis, the Israelis, they want to kill us.
66:37
They've tried to destroy us.

66:39
And all we want to do is protect ourselves.
66:42
They say they don't have an Air Force.
66:45
So what do you say to that argument?
66:50
- (chuckling) I, you know, I don't know.
66:56
There have been and there are times
66:59
when the Saudis and the Iranians cooperate.
67:04
So clearly, each of them is saying
67:08
we are the threatened party under attack,
67:10
and we're protecting themselves.
67:13
I mean that's why, you know, when I talk about
67:16
President Obama and this deal.
67:19
I would love to see a de-nuclearized,
67:24
and Iran open and accessible to the West and at peace.
67:30
My own, let me add one other thing.
67:34
These wars serve a purpose.
67:37
So the war in Yemen is the way in which
67:41
MBS has made his wealth in the post-oil era.
67:48
You go back 20 years ago, and you had to, you know,
67:52
you want a deal, you want Saudi oil,
67:54
you have to pay big bribes.
67:56
Now any contract, anything the Saudis buy,
68:01
a percentage, 25%, 30%, has to be paid
68:06
to a local Saudi company

68:09
to help rejuvenate the Saudi economy.
68:14
Well guess who owns those local companies.
68:17
So if you need to generate,
68:22
if you need to buy billions and billions of dollars of arms
68:27
and nuclear power plants from Westinghouse and others,
68:31
you need a war to justify all those arms or a potential war
68:37
with a country like Iran.
68:39
So it relates to your question.
68:44
I think there's an enormous amount
68:47
of personal interest at play rather than ideology.
68:55
But I'm no expert.
68:58
I've never been to either country.
69:00
It's just from what I'm gathering
69:04
in a tangential way with my work.
69:11
- [Daniel] How 'about right over here.
69:16
- Thanks.
69:17
Thanks for coming.
69:18
My name's Luke.
69:19
So, just trying to understand then,
69:21
motivation on the U.S. side.
69:23
Are you claiming then that President Bush's motivation
69:26
for invading Iraq was sort of family-related
69:30
because he wanted just revenge for his father,

69:32
and he was completely ignoring any sort of other motivation?
69:37
It was purely like a, you're thinking
69:38
sort of a psychological analysis of President Bush then?
69:43
- Yes.
69:45
(audience laughing)
69:45
- Okay, that was the shortest answer of the day.
69:47
- [Luke] Nice, thank you.
69:48
- How 'about right here while we're,
69:51
Victor, hand that over here.
69:53
- [Female Assistant] I've got it.
69:54
- And remember, after 9/11, you got to do something.
70:00
You want a war to show we're hitting back.
70:03
So I think he had his antipathy toward Saddam Hussein,
70:07
and he needed an enemy and he needed a target.
70:12
- [Male Audience Member] So you mentioned,
70:13
Jim here, you mentioned that Attorney General Barr
70:16
suppressed release of the FBI report.
70:21
Have you had any other interactions
70:23
with the current Administration,
70:24
or any smoke signals from them that indicate a change
70:27
in approach to your litigation?
70:30
- Here's what I think, yes.
70:32
We had a very positive meeting with President Trump on 9/11.

70:38
Bill Barr is new to this.
70:42
Here's the point.
70:44
We've been seeking specific documents,
70:46
the 2012 FBI summary, 2016, the evidence referred to
70:52
as to what this high Saudi government official did.
70:59
Legally, to invoke National Security and State Secrets,
71:03
it has to be personally done by the head of the agency.
71:08
It can only be done by Bill Barr personally.
71:12
Now, we got an affidavit from Bill Barr
71:16
and Michael McGarrity.
71:18
Michael McGarrity says there's an active investigation,
71:21
which is a complete lie,
71:22
and National Security and State Secrets justified
71:26
keeping this information from the families.
71:28
In his affidavit, Bill Barr did not say,
71:33
I have personally reviewed these documents,
71:37
and I personally have determined that their release
71:42
would threaten National Security and State Secrets.
71:45
So I think government and bureaucracy,
71:49
you know better than I, I think he had a report
71:52
from McGarrity and others,
71:55
this is going to jeopardize an active investigation
71:58
and we need you to sign an affidavit, so he did.

72:01
And keep in mind what is remarkable
72:04
and offensive about this.
72:06
There are many cases where the government has invoked
72:09
National Security and State Secrets.
72:13
Every one of those cases involves CIA activities
72:18
in another country, intelligence in another country.
72:23
There has never been a case of domestic murder
72:28
where National Security and State Secrets were involved.
72:33
Now 9/11 is still a mass murder case
72:38
in our country to be investigated
72:41
and the perpetrators and their accomplices prosecuted.
72:46
And the reason that hasn't happened
72:49
is the identity of those accomplices, and in my opinion,
72:56
the intelligence and law-enforcement failure
72:59
from January 15th, '99 through 9/11.
73:06
- [Male Audience Member] I can talk loud.
73:08
Oh, okay.
73:08
- It's for the recording.
73:10
- Why then did they release the name of the third person,
73:16
who you now believe, or have now learned,
73:19
was a Saudi government official, why did they,
73:23
I mean, they gave you that, they threw that bone,
73:26
but they gave you nothing else.

73:28
Why did they give you that name?
73:29
- The families were personally asking for it.
73:32
So if you're going to handle it on a superficial level,
73:38
I mean, we have said, there is a file,
73:41
we need to see the file, we need to see the evidence,
73:44
and the most outrageous example
73:47
is keeping from the families the name and identity
73:50
of the higher official and what he did.
73:53
So when you deal at the highest levels of government,
73:56
with the presidency, you get,
73:57
yeah we're going to help, give him the name.
74:02
So I am optimistic that we're going to be able
74:07
to break through.
74:09
I don't think,
74:13
certainly the President or Bill Barr personally, you know,
74:16
has any familiarity with all this,
74:20
and I'm trying to encourage them.
74:24
Friday will be, the government's papers are due on Friday.
74:28
We filed a motion to give us this information.
74:31
So I am hoping that we can get the attention,
74:38
the challenge is not to convince the highest people,
74:43
the President, you know, Bill Barr.
74:46
The challenge in dealing with the Administration

74:49
is to get them to focus sufficiently
74:53
to overcome what I see is a clear cover-up
74:58
being perpetrated by McGarrity and McGuire.
75:01
And to state the obvious, when the news is,
75:06
other than Baghdadi, is impeachment, impeachment.
75:09
And everything else, it is enormously hard to break through.
75:19
I get called an optimist 'cause I've been doing this
75:21
for 19 years and I'm never going to stop.
75:23
And I am certain we're going to win.
75:26
It's not that I'm optimistic about winning,
75:29
it's we're telling the truth and we're right,
75:32
and eventually the stars will align so we get the attention
75:37
of the people with real control who can make it right.
75:41
And I think it's going to happen,
75:43
but the challenge I see in Washington
75:47
is to overcome the power and influence of those
75:52
who have been perpetrating the cover-up
75:54
and get the time and attention
75:57
from those who can do something about it.
76:01
- [Male Audience Member] If you were granted
76:04
everything that you're going for,
76:06
every court, every fight that you're in,
76:08
if you're granted everything,

76:10
could you give all of us some idea of the result, the fate,
76:14
of those in Washington and those in Saudi Arabia
76:18
that would be the result of your having everything?
76:22
- I don't know.
76:24
I mean, I think the whole story will come out eventually.
76:30
And the Obama-Salman deal is going to change
76:35
the way history sees President Obama.
76:38
I think MBS has an opportunity with us
76:45
to really move Saudi Arabia forward.
76:48
If they stopped thinking of us
76:50
as an enemy to be quashed and defeated by lobbyists,
76:55
but an opportunity to move past a problem they have
76:59
that isn't going to go away and only get worse,
77:03
you know, history could be kind to him.
77:08
Oh, you know, I keep, other things come to mind,
77:13
which is something you'll be interested in knowing.
77:16
The mastermind of Khashoggi's murder, Qahtani,
77:20
is one of the people who is very close to MBS.
77:24
He is not one of the 11 charged
77:27
with murder or crimes in Saudi Arabia.
77:31
Qahtani is the man who tried to kill JASTA.
77:35
He's on the FARA forms hiring the Washington, D.C. lobbyists
77:40
to prevent JASTA from becoming law.

77:43
So you have this weird scenario
77:47
where everything, everything coalesces.
77:54
And if he wants to get past the Khashoggi murder and 9/11,
78:02
here you have the man who was instrumental
78:05
in one physical murder and an attempted murder
78:09
of legislation that freed the families to sue Saudi Arabia.
78:14
- So, I have a question for you.
78:18
Having paid my dues in the government, I am quite sure that
78:25
pretty much every general counsel and every agency
78:29
would have been lobbying the White House
78:31
to preserve sovereign immunities.
78:36
And I guess the question that I have then is,
78:42
and I think the President would have been naturally inclined
78:45
to preserve sovereign immunities,
78:47
and therefore to veto JASTA.
78:49
What is the evidence that there was some kind of deal
78:53
with the Saudis in return for which
78:57
they would not campaign against the Iran nuclear deal?
79:01
Because as far as I can tell, they campaigned pretty heavily
79:04
against the Iranian nuclear deal.
79:07
- Well they stopped, they did, and then all of a sudden
79:10
they stood down for a six month period and then it's passed.
79:14
So, there's two answers.

79:16
One I know but I can't tell you.
79:19
Which is--
79:20
- [Daniel] I hate that answer.
79:21
- I know.
79:23
The second part of the answer is, you know better than I,
79:29
but there must be, and I'm sure there are,
79:31
extensive White House memoranda prepared,
79:35
'cause he didn't go into that meeting alone,
79:38
between translators and others.
79:41
So I am sure that the documentation is there,
79:46
but it's never seen the light of day.
79:48
And on that score, you know it's funny,
79:51
with all the talk about the Dark State,
79:55
to me there really is a Dark State,
79:58
but no one is talking about who and what and where it is,
80:02
'cause this is the Dark State, not, in my opinion,
80:08
not all this other stuff.
80:10
- Yeah.
80:10
So we have, I'm not going to call them out,
80:12
I'm not going to embarrass them, but we have at least
80:14
two or three Deep-Staters in the audience,
80:17
and I know that you have, as a litigator, a thick skin,
80:21
so I invite them to, if they have any critiques,

80:24
if they want to put them forward,
80:26
but since I will protect sources and methods
80:29
I won't point them out unless they raise their hands.
80:33
Are you a Deep-Stater?
80:35
(audience laughing)
80:36
You could have fooled me.
80:41
- If I may, I've used my role as a mic passer
80:43
to ask you a question.
80:46
Seeing as you can't really provide
80:47
the full details of this case or of this process,
80:52
what do you think this, that the narrative
80:55
that you are describing might,
80:57
I'm sorry, how do you think
80:58
the narrative you're describing might impact the perception
81:01
of American-Middle Eastern relations, et cetera,
81:03
since people are allowed to come to the conclusions
81:05
that are perhaps unsubstantiated by true details
81:10
that you may not be able to communicate,
81:12
or that you might not be sure on?
81:14
- Well, there's two reasons I can't provide all the details.
81:19
One is time, and the other is these protective orders.
81:23
So it is the Justice Department,
81:27
with the blessing of the court,

81:28
that has ordered us to not reveal
81:32
any of the material we're given
81:33
under the protective orders we hate.
81:37
All I can tell you is what I'm doing,
81:40
or trying to do here in an hour is give you
81:44
in kind of a single package,
81:49
the Cliff Notes so you get the main points
81:52
of what's been happening for 20 years.
81:56
- [Daniel] Okay, you've been very patient.
82:00
- Is there anything that we could do to help your efforts?
82:05
- [Daniel] I don't think you should've asked that.
82:08
(audience laughing)
82:13
- Yes, I'm bad at the technology, there is a website,
82:21
Declassify the FBI 9/11 Files, or something like it,
82:27
and it's open to the public,
82:30
it's largely populated by the 9/11 community.
82:33
But you could get on that.
82:36
And the old adage is sure, talk to your congressmen,
82:42
and just say, your senators,
82:47
I mean, the Senate has already passed
82:49
this resolution to declassify,
82:51
but I would say sure, speak to your congressmen and senators
82:55
and say, you know, who you are, what you listened to,

82:59
and what can you do to get the 9/11 FBI files declassified
83:04
and given to the 9/11 families?
83:07
You know, it's of concern.
83:09
And to state the obvious,
83:10
when it's of concern to a lot of voters,
83:14
things are going to happen.
83:16
- [Daniel] Is that a binding resolution or non-binding?
83:18
- Non-binding.
83:19
So we want to get a House resolution,
83:24
so if we have a joint resolution,
83:26
it's passed to the President, just to get him--
83:30
- Send him a message. - Right.
83:31
- Okay. - Eyes on it.
83:32
- Okay, we have time for one more question.
83:41
- [Female Audience Member] Looking back
83:41
over the last few years, Trump, when he became president,
83:45
made his first trip as a Head of State to Saudi Arabia.
83:49
Do you think there was anything in that or sheer stupidity?
83:52
(audience chuckling)
83:54
- Maybe this is the first time I say no comment.
83:57
(audience laughing)
83:58
No, I...
84:01
I think it was, when it happened, I and the clients were,

84:04
the families were really worried.
84:10
I think it's turned out to be a good thing for us,
84:14
if he engages, because of the relationship
84:18
that he and Jared and others have.
84:22
So, clearly he was determined to do
84:27
something different than previous presidents
84:30
who would go to London or whatever,
84:35
and he obviously reacted very positively
84:38
to the gold and ceremony and everything else.
84:42
- [Daniel] The orb.
84:42
- Yeah, the orb.
84:43
- [Daniel] Don't forget the orb.
84:45
- Yeah.
84:47
- Okay, well, before I ask you to thank our speaker,
84:51
I just want to tell you that tomorrow,
84:53
4:30 in Filene Auditorium, we'll be hosting Gayle Smith,
84:58
the former administrator of USAID,
85:01
and now the head of the ONE campaign,
85:04
which is the sort of mega charity NGO
85:07
that was created by the Rockstar Bono,
85:10
she'll be speaking about investment development in Africa.
85:14
I very much hope you can join us.
85:16
And now that I've said that,

85:17
I hope you all will give a warm thank you
85:19
to our speaker today.
85:20
(audience applauding)
85:23
- Thank you.