# APPENDIX C2

ECF  7134 to 1537-2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/23/2021__

**03-MD-1570 (GBD)(SN)**

<u>**OPINION & ORDER**</u>

**SARAH NETBURN, United States Magistrate Judge:**

      Oath Inc., which offers the Yahoo! News Service ("Yahoo! News"), moves to intervene

to have the Court reconsider its order investigating the breach of its protective orders. ECF No.

7082 (the "Investigative Order"). It asks the Court to (1) permit it to intervene, (2) modify the

Investigative Order, and (3) if any part of its motion is denied, stay the Investigative Order

pending review. This motion is DENIED in its entirety.

**BACKGROUND**

      Yahoo! News's motion follows this Court's investigation into the breach of the two

protective orders governing discovery in this multidistrict litigation. On June 17 and 18, 2021,

the Plaintiffs' Executive Committees ("PECs") deposed Musaed Al Jarrah. ECF No. 6891 at 1.

The deposition covered material subject to the general protective order governing discovery,

ECF No. 1900 (the "General Protective Order"), and possibly the protective order governing

material produced by the FBI. ECF No. 4255 (the "FBI Protective Order," collectively the

"Protective Orders"). Al Jarrah was under no obligation to testify but did so voluntarily in part

because of the protections afforded by the Protective Orders. ECF No. 6981 at 1.

      The General Protective Order permits parties to designate transcripts as confidential. ECF

No. 1900 at § II.G.1. Confidential information can be used only in this multidistrict litigation, <u>id.</u>

at § H.1, and disclosed only to a limited array of people, such as the parties' counsel and their

experts. Id. at § H.3.a–i. The parties' deposition protocol also requires that transcripts be treated as confidential under the General Protective Order for 90 days after the deposition. ECF No. 6002-1 at ¶ 63, adopted by ECF No. 6204. The Al Jarrah transcript was so designated. ECF No. 7097 at 8.

The FBI Protective Order similarly prohibits the unauthorized disclosure of certain information produced by the FBI. ECF No. 4255 at ¶ 9. It requires that any deposition transcript containing information that would be prohibited from disclosure be treated as confidential for 30 days from the FBI's receipt of the transcript. Id. at ¶ 10.

Despite these orders, on July 15, 2021, 28 days after the close of the deposition, reporter Michael Isikoff of Yahoo! News published an article reporting that "[a] copy of the deposition [transcript] — with some redactions for law-enforcement sensitive material — was obtained exclusively by Yahoo News." ECF No. 6981-1 at 3. The article includes verbatim quotes from the deposition, id., and appears to confirm that Isikoff received a copy of the transcript.

In a motion filed on July 23, 2021, Saudi Arabia asserted that the General Protective Order had been breached. ECF No. 6981 at 1. The PECs effectively agreed that the General Protective Order had been breached, ECF No. 6988 at 1, though they disputed that the FBI Protective Order had also been breached. Id. at 1 n.1. The FBI, for its part, stated that the Al Jarrah transcript was subject to the FBI Protective Order, ECF No. 6999 at 2, which would mean that the provision requiring a 30-day confidentiality hold for FBI review was breached as well. At minimum, this Court has found, and all parties agree, that "[t]here has plainly been a breach of . . . the [General] Protective Order." ECF No. 7011 at 1.

The Court's investigation of this breach prompted Yahoo! News's motion. In addition to alerting the Court to the breach, Saudi Arabia proposed that the Court investigate by ordering

declarations from every individual with access to the Al Jarrah transcripts. ECF No. 6981 at 4. Leading by example, it submitted 27 declarations from its attorneys and support staff. These declarations stated, in substance, that the declarant did not disclose the Al Jarrah transcript, did not know anyone at the firm who had, and that they either had no communications with Isikoff since June 1, 2021, or had been contacted by Isikoff but had not provided him with any information. See generally ECF No. 6981-4. The PECs opposed Saudi Arabia's motion and suggested instead that the parties meet and confer to determine a process to investigate the breach. ECF No. 6988 at 1.

Despite this, firms began voluntarily submitting declarations distancing themselves from the breach. Cozen O'Connor and MotleyRice, both of which are members of the PECs, filed the first set of declarations. ECF Nos. 6991, 6992. Cozen O'Connor submitted five declarations, including two from senior attorneys, who attested that they had neither shared the transcript with Isikoff nor communicated with him at least since June 2021. ECF No. 6991 at 3–10. Two paralegals attested that they had not shared the transcript. Id. at 14–17. A fifth declaration was filed by the firm's "Director of User Support" who detailed the investigative steps the firm had taken to ensure that it was not the source of the breach. Id. at 11–13. Based on that investigation, the declaration affirmed that no one at the firm had corresponded with Isikoff between June 17 and July 29, 2021. Id. at 13.

MotleyRice submitted seven declarations showing similar thoroughness. It also submitted declarations from lawyers, ECF No. 6992 at 3–17, and legal support staff, id. at 18–21, all stating that firm staff had neither communicated with Isikoff nor knew anyone from the firm who had. MotleyRice also included a declaration from a "Compliance and Security Specialist" who affirmed that no emails had been sent to known email addresses for Isikoff. Id. at 23.

At this point, the inquiry turned to another member of the PECs: Kreindler & Kreindler. Several circumstantial factors suggested that Kreindler & Kreindler might be responsible for the leak or at least have insight into who is. In a July 5, 2021, communication to Saudi Arabia's lawyer Michael Kellogg, Isikoff indicated that James Kreindler had discussed the progress of the depositions with him. ECF No. 6981-4 at 10. Mr. Kellogg attached to his declaration an email from Isikoff in which Isikoff asked for a comment "in response to what Jim Kreindler had to say about where things stand." Mr. Kreindler has also discussed this case on Isikoff's *ConspiracyLand* podcast. ECF No. 6990 at 2. Additionally, the Court has previously found Mr. Kreindler's conduct discussing discovery materials to be "a breach of the confidentiality requirement." ECF No. 3619 at 9:6–7. While the Court has repeatedly reaffirmed that parties may speak to the press within the bounds of the Protective Orders, see, e.g., id. at 9:10-11, ECF No. 7011 at 2, the firm's connections to Isikoff and prior brushes with the limits of the General Protective Order suggested that Kreindler & Kreindler might be the source of the leak.

Accordingly, the Court ordered Kreindler & Kreindler to provide declarations stating whether anyone at the firm or acting under its direction had shared the Al Jarrah deposition transcript with Isikoff. ECF No. 7011. While the Court did not specify the number of declarations to be provided, it identified four attorneys that were expected to file submissions. Id. at 2.

Shortly after the Court entered this order, another PECs firm, AndersonKill P.C., voluntarily filed five declarations. ECF No. 7013. Like Cozen O'Connor and MotleyRice, AndersonKill included both attorney, ECF Nos. 7013-1, 7013-2, 7013-3, and support staff declarations, ECF No. 7013-4, stating that no one at the firm shared the Al Jarrah deposition with Isikoff or otherwise communicated with him. AndersonKill also included a declaration from the

director of their IT department saying that there were no emails on the AndersonKill system between Isikoff and any of the other four AndersonKill declarants. ECF No. 7013-5 at 3.

On August 16, 2021, Kreindler & Kreindler responded to the Court's order by submitting only four attorney declarations. ECF No. 7016. Kreindler & Kreindler's four declarations were less comprehensive and vaguer than the others that the Court had received. All four stated that neither the declarant nor anyone in the firm had shared the transcript "with anyone unauthorized to see it." None of the declarants denied communication with Isikoff during the relevant period. The firm also declined to produce declarations from support staff who had access to the transcript. And while one attorney offered that the firm's IT director performed a review to determine that no one had shared the deposition transcript, ECF No. 7016 at 3, the firm did not include a declaration from that director.

Accordingly, on August 30, 2021, the Court issued the Investigative Order. It required supplemental declarations from Kreindler & Kreindler that would bring their submissions in line with what the Court received from the other parties. ECF No. 7082. It ordered the four attorneys who submitted the original Kreindler & Kreindler declarations to: (1) identify all communications with Isikoff or anyone acting on his behalf from June 1, 2021, to August 1, 2021, and to supply copies of any written communications; (2) state whether they had ever discussed the Al Jarrah deposition with Isikoff or anyone acting on his behalf; (3) list every person they had provided the deposition transcript to who had not already submitted a declaration; and (4) state every person they know who had access to the deposition transcript who had not already submitted a declaration. At least one of these declarations was required to describe, in detail, the investigation Kreindler & Kreindler had undertaken to respond to the breach of the General Protective Order. Id. at 1.

In addition, the Investigative Order required Kreindler & Kreindler to submit declarations from anyone identified in their original submissions, stating whether those people had communicated with Isikoff or shared the Al Jarrah transcript. It also required a declaration from the head of the firm's information technology group or comparable figure. That declaration had to describe the investigation the firm took in response to the breach of the General Protective Order and state if anyone at the firm corresponded with two email addresses associated with Isikoff. Id. at 2.

Beyond Kreindler & Kreindler, the Investigative Order required declarations from all plaintiff and defendant law firms that attended the Al Jarrah deposition or had access to the transcript, as well as the court reporter firm Golkow Litigation Services. Those declarations had to affirm whether anyone at the firm had shared the deposition or otherwise communicated with Isikoff from June 1 to August 1, 2021. Id. at 3. Golkow Litigation Services is the only nonparty impacted by the Investigative Order. All other affected parties are law firms before this Court.

Four days after the Court entered the Investigative Order, Yahoo! News filed its motion. ECF No. 7094. That motion requested that the Court modify the Investigative Order on First Amendment grounds. If the Court denied any part of the motion, then it sought a stay so that Yahoo! News could seek review. ECF No. 7095 at 11. Saudi Arabia opposed the motion, ECF No. 7098, but the Court stayed the enforcement of the order pending replies by interested parties. ECF No. 7100. Yahoo! News filed its reply on September 9. ECF No. 7104. The only other party to submit papers was Kreindler & Kreindler. ECF No. 7103. In a letter submission, Mr. Kreindler joined Yahoo! News' motion and offered that "[c]ommunications with the media, provided they do not reveal protected material, are, of course, permitted." Id. The letter further argued more broadly that the Protective Orders "deny the Plaintiffs and the public critical

information" about the September 11 attacks and any role Saudi Arabia played in carrying them out. The Court also accepted an amicus letter brief from The Reporters Committee for Freedom of the Press, ECF Nos. 7105, 7108, making arguments similar to those pressed by Yahoo! News.

Meanwhile, despite the stay of the Investigative Order, parties continued to voluntarily submit declarations disassociating themselves from the breach. On September 10, the PECs filed declarations for all other plaintiffs' law firms affected by the Investigative Order as well as other counsel who, despite not being covered by the Investigative Order, volunteered declarations. ECF No. 7106 at 1.[1] In total, this submission included nine more declarations. All of these denied that the declarant, or to their knowledge, anyone at their firm, had shared the transcript with Isikoff. All but one affirmed that they had no communication with Isikoff at all. Id. at 5–21.

## DISCUSSION

Yahoo! News has neither suffered a legally cognizable injury, nor is it entitled to intervene to vindicate the interests of others. While it gestures in the direction of First Amendment rights, none of the rights to newsgathering, anonymous speech, or receipt of information it references has the vast reach that it tries to ascribe to them in order to justify intervention. This deficiency undercuts Yahoo! News's arguments at every turn: it deprives Yahoo! News of an injury that would provide standing, renders it devoid of protectable interest to support intervention, and counsels against permitting a stay.

## I.     Yahoo! News Lacks Standing to Intervene

Yahoo! News cannot demonstrate, even under the overbreadth doctrine, the injury Article III requires to grant standing and permit its intervention. "[T]he 'irreducible constitutional minimum' of standing consists of three elements." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547

---

[1] In a break from practice, Kreindler & Kreindler did not sign the PECs' letter submitting these additional declarations.

(2016) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 559–560 (1992)). Those are "(1) . . . an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>Spokeo, Inc.</u>, 136 S. Ct. at 1547 (citing <u>Lujan</u>, 504 U.S. at 560–61). Yahoo! News stumbles at "injury in fact, the '[f]irst and foremost' of standing's three elements." <u>Spokeo, Inc.</u>, 136 S. Ct. at 1547 (quoting <u>Steel Co. v. Citizens for Better Environment</u>, 523 U.S. 83, 103 (1998)). It cannot show injury of either its own rights or rights it can assert on behalf of third parties under the overbreadth doctrine.

**A. Yahoo! News Cannot Show Injury in Fact to Its Own Rights**

Normally, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" <u>Spokeo, Inc.</u>, 136 S. Ct. at 1548 (citing <u>Lujan</u>, 504 U.S. at 560).

Yahoo! News lacks this injury. It proposes a "right to gather news." ECF No. 7095 at 7. In support, it cites <u>Zerilli v. Smith</u>, 656 F.2d 705 (D.C. Cir. 1981), <u>Branzburg v. Hayes</u>, 408 U.S. 665 (1972), and <u>Baker v. F & F Inv.</u>, 470 F.2d 778, 780 (2d Cir. 1972). None of these cases, however, supports Yahoo! News's sweeping claim that nonparty journalists are entitled to interfere with discovery in a private civil action. <u>Zerilli</u> found that "[c]ompelling *a reporter* to disclose the identity of a confidential source raises obvious First Amendment problems." 656 F.2d at 710 (emphasis added). <u>Baker</u> similarly dealt with when a court may compel a reporter to reveal their sources. 470 F.2d at 785. These and other cases have "have affirmed the existence of a *journalists'* privilege," <u>Gonzales v. Nat'l Broad. Co.</u>, 194 F.3d 29, 34 (2d Cir. 1999) (emphasis added), that is, a qualified privilege that may be invoked when "information [is] sought from the press . . . ." <u>Id.</u> at 35.

8

That right does not apply here. Neither Isikoff nor any other Yahoo! News entity is required to disclose anything. What Yahoo! News is proposing then, is a sweeping expansion of the reporter's privilege such that a reporter can invoke it to shield a non-reporter party from its obligation to participate in discovery and obey a court's orders.

The Supreme Court foreclosed this argument nearly half a century ago. Branzburg noted that the reporter's privilege "is that of the reporter, not the informant, and that if the authorities independently identify the informant, neither his own reluctance to testify nor the objection of the newsman would shield him from grand jury inquiry . . . ." 408 U.S. at 695. In re Grand Jury Proceeding confirms that "a potential witness is not excused from compliance with a grand jury subpoena merely because the subpoena concerns the witness's communications with reporters." 971 F.3d 40, 55 (2d Cir. 2020). These cases make clear that the entity holding the reporter's privilege is the reporter, who cannot invoke it on behalf of a third party.

In fact, faced with the possibility that a reporter has information relevant to litigation, a party must first exhaust other available sources before turning to a journalist. In re Petroleum Prod. Antitrust Litig., 680 F.2d 5, 8 (2d Cir. 1982) (vacating an order compelling disclosure from a reporter because there was no evidence that the information had been sought from other sources first).

Accordingly, courts in this district have consistently approved discovery from non-reporters as an alternative to discovery against a reporter. See, e.g., Application of Behar, 779 F. Supp. 273, 275 (S.D.N.Y. 1991) (quashing a deposition subpoena because the moving party had not "demonstrate[d] that other available sources of the information have been exhausted"), In re Pishevar, No. 119-mc-00503 (JGK)(SDA), 2020 WL 1862586, at *5 (S.D.N.Y. Apr. 14, 2020) (denying discovery against a reporter where the movant failed to show that "the identity of [a]

9

Confidential Source is not obtainable from other available sources") (quoting In re Application of Shervin Pishevar, 439 F. Supp. 3d 290, 306 (S.D.N.Y. 2020)), Persky v. Yeshiva Univ., No. 01-cv-5278 (LMM), 2002 WL 31769704, at *4 (S.D.N.Y. Dec. 10, 2002) (finding that three depositions was insufficient to demonstrate that information sought was only available from a reporter), Giuffre v. Maxwell, 221 F. Supp. 3d 472, 480 (S.D.N.Y. 2016) (quashing the subpoena of a reporter because the movant failed to show she had turned to the reporter as a "last resort") (quoting In re Grand Jury Subpoenas Served on Nat. Broad. Co., Inc., 683 N.Y.S.2d 708 (N.Y. Sup. 1998)). This body of law is irreconcilable with Yahoo! News's position that the reporter's privilege is injured when discovery is sought from a non-reporter.

The Investigative Order is consistent with this law. It does not seek information from Isikoff or any other Yahoo! News employee. Instead, it seeks information from other sources: attorneys before this Court who already have a duty of candor. See New York Rule of Professional Conduct 3.3. Yahoo! News's reporter privilege is not harmed by this and so it lacks standing based on an injury to its own rights.

### B. The Overbreadth Doctrine Does Not Give Yahoo! News Standing

Yahoo! News cannot cure this standing deficiency through the overbreadth doctrine. It seeks to asserts two rights held by third parties: anonymous speech and receipt of information. But it lacks the necessary injury under even this doctrine. The Investigative Order does not infringe on these rights, and even if the overbreadth doctrine applied, the Investigative Order would survive the resulting review.

#### 1. Yahoo! News Lacks the Injury Necessary to Invoke the Overbreadth Doctrine

"The First Amendment doctrine of substantial overbreadth is an exception to the general rule that a person to whom a statute may be constitutionally applied cannot challenge the statute

on the ground that it may be unconstitutionally applied to others." Massachusetts v. Oakes, 491 U.S. 576, 581 (1989). "Invalidation for overbreadth is 'strong medicine' that is not to be 'casually employed.'" United States v. Williams, 553 U.S. 285, 293 (2008) (quoting Los Angeles Police Dept. v. United Reporting Publishing Corp., 528 U.S. 32, 39 (1999)).

Thus, the overbreadth doctrine still requires that the party making the challenge suffer an injury in fact. Farrell v. Burke, 449 F.3d 470, 499 (2d Cir. 2006). So, "[a] litigant who challenges a rule of law as overbroad may have constitutional standing even though the rule's application to her is constitutional, but only insofar as her own conduct falls within the ambit of the specific rule of law that she challenges." United States v. Smith, 945 F.3d 729, 737 (2d Cir. 2019).

Yahoo! News's problem is that its alleged injury to its First Amendment right to gather news does not "fall[] within the ambit of the" Investigative Order. Id. That order requires disclosures only from law firms before this Court and a single legal services provider in these firms' employ. ECF No. 7082. The Investigative Order does not apply to Yahoo! News and does not command it to do or not do anything. Because it is legally impossible for Yahoo! News to violate the order's terms or be penalized for doing so, it cannot demonstrate the injury in fact that the overbreadth doctrine requires.

### 2. Yahoo! News Cannot Demonstrate an Injury to Anonymous Speech

Even making the counterfactual assumption that Yahoo! News's right to gather news was somehow infringed by the Investigative Order, it still would be unable to demonstrate a cognizable injury to others. Its arguments about injury to anonymous speech fail because they are too conjectural, even under the overbreadth doctrine, to show an injury in fact. It suggest that the order "adversely affects potential source(s)' First Amendment right to speak anonymously." ECF No. 7095 at 8. However, an injury in fact must be "actual or imminent, not conjectural or

'hypothetical." Lujan, 504 U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155

(1990)) (internal quotations omitted). "[T]he overbreadth doctrine . . . does not provide a reason

to find such injury where none is present or imminently threatened in the first instance." Hedges

v. Obama, 724 F.3d 170, 204 (2d Cir. 2013).

     Yahoo! News does not identify what, if any, anonymous speech would be disclosed. It

does not state, for example, that a source shared the Al Jarrah deposition on condition of

anonymity, that any anonymous communications to Isikoff were made, or that the Investigative

Order will reveal these communications. The article itself does not quote anonymous sources or

state that such a source supplied the transcript. See ECF No. 6981-1. And, in fact, Mr. Isikoff

expressly asked Saudi Arabia's counsel to respond to "what Jim Kreindler had to say." Yahoo!

News is, presumably, in an unparalleled position to provide information concerning any

anonymous communications, even in a format that would protect the anonymity of its sources.

Instead, it merely speculates that the order could impact parties who wish to remain anonymous.

ECF No. 7104 at 10. This is not enough to show the concrete, imminent threat required to

establish an injury in fact.

     Moreover, permitting a party to invoke the overbreadth doctrine requires that they be

"expected satisfactorily to frame the issues in the case." Sec'y of State of Md. v. Joseph H.

Munson Co., 467 U.S. 947, 958 (1984). Yahoo! News's vagueness on the question of anonymity

prevents it from doing so. A party's right to speak anonymously varies based on its

circumstances. Arista Recs., LLC v. Doe 3, for example, noted that a "party's expectation of

privacy" should considered in determining whether to quash a subpoena in order to preserve

anonymity. 604 F.3d 110, 119 (2d Cir. 2010).

To the extent a lawyer in this case disclosed the transcript in violation of the General

Protective Order, that lawyer could have no expectation that his conduct would remain shielded

from the Court's review. Certainly, a court may, without offending the First Amendment, restrict

how a party may use materials obtained through discovery. Seattle Times Co. v. Rhinehart, 467

U.S. 20, 37 (1984). Indeed, the Supreme Court has "expressly contemplated that the speech of

those participating before the courts could be limited." Gentile v. State Bar of Nevada, 501 U.S.

1030, 1072 (1991). In particular, "the speech of lawyers representing clients in pending cases

may be regulated under a less demanding standard than that established for regulation of the

press . . . ." Id. at 1074.

Thus, parties and lawyers before a court will have an increased expectation that their

speech can be regulated, and this expectation may limit their expectation of privacy. The

Investigative Order was targeted at lawyers and law firms, so the question of who seeks to speak

anonymously is of crucial importance in determining the scope of any rights. Yahoo! News,

however, has been unwilling or unable to provide this information, meaning that they cannot

satisfactorily frame the case as the overbreadth doctrine requires.

### 3. No Right to Receive Information Is Implicated

The right to receive information also does not provide Yahoo! News with standing.

Yahoo! News cites Stanley v. Georgia, 394 U.S. 557, 564 (1969), for the principle that there is a

"public[] First Amendment right to receive newsworthy information . . . ." ECF No. 7095 at 8. It

is true that "[i]n a variety of contexts . . . [the Supreme Court] has referred to a First Amendment

right to 'receive information and ideas' . . . ." Kleindienst v. Mandel, 408 U.S. 753, 762 (1972).

That right limits the state's ability to restrict access to information. See Stanley, 394 U.S. at 564

(restrictions on the possession of obscene materials); Virginia State Bd. of Pharmacy v. Virginia

Citizens Consumer Council, Inc., 425 U.S. 748, 756 (1976 (restrictions on drug pricing advertisements); Lamont v. Postmaster Gen. of U.S., 381 U.S. 301, 306 (1965) (restrictions on the receipt of communist propaganda). "[T]he right to *receive* ideas follows ineluctably from the sender's First Amendment right to *send* them . . . ." Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 867 (1982) (emphases added).

Yahoo! News does not suggest that the Investigative Order directly interferes with its ability to send news or the public's ability to receive it. That argument would be meritless: the Investigative Order does not require that Yahoo! News do anything, much less stop covering this case, write less about it, or remove what it has already published. Instead, Yahoo! News argues that, because the Investigative Order will somehow "chill" its ability to gather news, it will limit the public's ability to receive it. ECF No. 7095 at 8. It does not offer any authority for this proposition that the right to send and receive ideas carries with it an unfettered right to collect information. Nor could it: "[t]he right to speak and publish *does not* carry with it the unrestrained right to gather information." Zemel v. Rusk, 381 U.S. 1, 17 (1965) (emphasis added). The public's generalized right to receive information thus does not provide the injury in fact required for overbreadth.

### 4. The Order is Appropriately Tailored

Finally, even if the Court found that Yahoo! News could invoke the overbreadth doctrine, the Investigative Order would survive the resulting analysis. To succeed in an overbreadth challenge, an order's "overbreadth [must] be substantial, not only in an absolute sense, but also relative to . . . [its] plainly legitimate sweep." Williams, 553 U.S. at 292. Because invalidation under overbreadth "is 'strong medicine,' the law rigorously enforces the burden on the

challenging party to demonstrate '*substantial*' infringement of speech." <u>United States v. Farhane</u>, 634 F.3d 127, 136–37 (2d Cir. 2011) (citing <u>Williams</u>, 553 U.S. at 292) (emphasis in original).

Yahoo! News does not make this showing, nor can it. In absolute terms, the amount of speech reached by the Investigative Order is minimal. The only parties who are required to disclose anything are law firms and litigation service providers before the Court. Thus, as opposed to statutes of general applicability, the Investigative Order affects only a small number of people.

The amount of speech affected is also limited. In drafting the order, the Court had the benefit of the submissions made by Saudi Arabia, and two plaintiff law firms. Those submissions suggest that the disclosure requirements impact few communications: neither of the plaintiffs' firms had to disclose a single communication with Isikoff. Saudi Arabia was able to disclose the whole of Isikoff's attempts to communicate with them in one page.

Subsequent events have confirmed the Court's intuition that the amount of speech covered by the Investigative Order is marginal. AndersonKill, which submitted declarations voluntarily after the entry of the Investigative Order, reported no communications with Isikoff. The supplemental declarations voluntarily submitted by plaintiff firms after the entry of the order report no communications with Isikoff. In short, based on the 53 declarations the Court has received thus far, the absolute volume of speech covered by the Investigative Order, and the number of parties who speech is affected at all is minimal.

Finally, the impact on speech is limited. <u>Tory v. Cochran</u>, which Yahoo! News cites in support of is overbreadth argument, dealt with a permanent injunction forbidding speech about a particular lawyer. 544 U.S. 734, 736 (2005). Violating that injunction could have resulted in criminal penalties. By contrast, the Investigative Order does not prohibit any speech: it merely

directs that communications be disclosed. ECF No. 7082 at 1, 3. Nor is there any suggestion that simply communicating with Isikoff will result in penalties. Quite the opposite: the Court has affirmed that parties may talk to Isikoff or any other member of the press so long as they do not violate the Protective Orders. ECF No. 3619 at 9:10–11. The Investigative Order does not change this. Thus, the absolute amount of speech affected by the Investigative Order is small.

Any protected speech affected by the Order is also limited relative to the scope of legitimate information sought. The First Amendment is not offended by limitations on litigants' dissemination of materials obtained purely through discovery. Seattle Times Co., 467 U.S. at 37. Thus, requiring disclosure of communications of non-reporters to leak the Al Jarrah transcript to Isikoff is legitimate. In response, Yahoo! News proffers two hypothetical ways the order could be overbroad. It suggests that the order could be overbroad as to time because it covers a period six weeks before and two weeks after the article's publication. It also suggests that the Investigative Order covers too much subject matter because it asks for communications with people acting on Isikoff's behalf and any discussion of the contents of the deposition.

Such speech is legitimately covered by the Investigative Order. The time frame is reasonable because the parties knew of Al Jarrah's deposition since at least late May. See, e.g., ECF No. 6817. Thus, it is possible that, if there was a plan to leak the deposition to Isikoff, people could have been discussing it by June 1. Similarly, it is possible that in the two weeks after the article, a culprit would communicate with Isikoff about the fallout from their breach of the order. Such communications are legitimate subjects for discovery.

Including people working with or for Isikoff is also sensible. Otherwise a declarant who leaked the transcript to one of Isikoff's associates could evade detection by truthfully saying they had not provided anything to Isikoff. Similarly, Yahoo! News suggests that it is problematic that

the Investigative Order would require parties to "disclose whether they communicated to Isikoff that certain topics were <u>not</u> addressed at the Al Jarrah deposition . . . ." ECF No. 7095 at 10. It could, and that is by design. Like a sculpture executed in relief, an intelligent party could, with the right set of responses to a clever reporter, convey confidential information about what was covered by indicating what was not covered.

While these might seem like remote concerns, the Court must consider them because it is increasingly disturbed that a party before it may be operating in bad faith by concealing material information about who breached the Protective Orders. It has already noted that there is circumstantial evidence that Kreindler & Kreindler breached the Protective Order. ECF No. 7011 at 2. That firm's initial submissions were also sparse enough that the Court felt they needed to be supplemented. ECF No. 7082. Thus, in assessing the legitimate scope of the Investigate Order, the Court must consider that relevant communications may have been crafted to elude detection, further legitimizing the framing of the Investigative Order.

Accordingly, mindful that "[i]nvalidation for overbreadth is 'strong medicine' that is not to be 'casually employed,'" <u>Williams</u>, 553 U.S. at 293 (quoting <u>Los Angeles Police Dept.</u>, 528 U.S. at 39), the Court finds that Yahoo! News has not shown the Order to be overbroad, even if it could invoke the doctrine. The speech it seeks is targeted and necessary to identify who breached the Protective Orders.

"[A]n intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests." <u>Town of Chester, N.Y. v. Laroe Ests., Inc.</u>, 137 S. Ct. 1645, 1651 (2017). Yahoo! News has failed to show the injury in fact required for this standing. This alone would be sufficient to deny its motion.

## II.    The Investigative Order Is Not Vague

Even if Yahoo! News had standing, its vagueness challenge would fail on the merits. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). This means that "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited . . . ." Id. Additionally, an order "may be invalid if it prohibits privileged exercises of First Amendment rights whether or not the record discloses that the petitioner has engaged in privileged conduct." NAACP v. Button, 371 U.S. 415, 432 (1963).

Yahoo! News's void for vagueness arguments are unsupportable for two reasons. First, the doctrine is inapposite here. In each of the cases Yahoo! News cites, the void for vagueness doctrine was invoked to strike down a law that prohibited some form of protected conduct. See, Reno v. Am. C.L. Union, 521 U.S. 844, 871 (1997) (applying the void for vagueness doctrine to the Communications Decency Act's prohibitions on the transmission of "indecent" materials); Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971) (striking down a statue prohibiting "annoying" people on a sidewalk); NAACP, 371 U.S. at 419 (striking down a prohibition on the solicitation of legal business).

By contrast, the Investigative Order does not prohibit anything or regulate speech. It requires only that communications be produced. This is, in effect, a discovery proceeding, and Yahoo! News identifies no case that imports the vagueness doctrine into this context. That is no surprise. Many discovery proceedings involve the production of material that enjoys First Amendment protection. Parties in discovery will frequently debate the terms of what must be produced. Accepting Yahoo! News's argument about the applicability of the vagueness doctrine to these disputes would transform nearly every quotidian discovery dispute into a potential battle

over First Amendment rights. This would be a sweeping expansion of the void for vagueness doctrine, and Yahoo! News cites no case endorsing this enlargement.

Even if the void for vagueness doctrine applied, the Investigative Order's terms would survive it. All that is required to survive void for vagueness review is that the order be comprehensible to someone of ordinary intelligence. Thibodeau v. Portuondo, 486 F.3d 61, 65 (2d Cir. 2007) (quoting Betancourt v. Bloomberg, 448 F.3d 547, 552 (2d Cir. 2006)). Thus, an order does not need to lay out what it covers with "mathematical certainty" and can survive review even if it employs "flexibility and reasonable breadth . . . ." Grayned, 408 U.S. at 110.

Yahoo! News anchors its vagueness claim on the purported ambiguity of the phrase "the contents of the Al Jarrah deposition." ECF No. 7095 at 10. It suggests that this does not adequately convey whether a conversation about what was not covered in the deposition would be covered by the Investigative Order. It also suggests that the order does not indicate how to deal with broad subjects like the FBI Investigation into September 11, where only a portion of the topic was discussed in the deposition.

Neither of these are close calls. Discussing what was not covered in the deposition is discussing the contents of the deposition. It would, with effort, be possible to completely describe the contents of the deposition by describing what was not in it. Similarly, the question of when to include information about broad topics can be resolved by asking if the communication revealed information about the Al Jarrah deposition. If a communication does not implicitly or explicitly reveal information about what was covered in the deposition, then it is not about the contents of the deposition.

 "It will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" Grayned, 408 U.S. at

19

110 n.15 (quoting <u>Am. Comm. Assn. v. Douds</u>, 339 U.S. 382, 412 (1950)). The easy resolution

of these two purported areas of vagueness confirms to the Court that the term "the contents of the

Al Jarrah deposition" provides an adequate guide to inform an ordinary person (and certainly the

sophisticated legal parties here) what the Investigative Order requires.

## III.   Yahoo! News Cannot Intervene as a Matter of Right and Permissive Intervention Is Inappropriate

Yahoo! News moves to intervene both as of right under Federal Rule of Civil Procedure

24(a) and for permissive intervention under Federal Rule of Civil Procedure 24(b). Both

arguments are unavailing. Yahoo! News cannot make the showing required to intervene as a

matter of right and permissive intervention would be inappropriate.

### A.   Yahoo! News Cannot Make the Showing Required to Intervene as a Matter of Right

Yahoo! News may not intervene as a matter of right. Intervention as of right is

appropriate when an applicant "(1) files a timely motion; (2) asserts an interest relating to the . . .

transaction that is the subject of the action; (3) is so situated that without intervention the

disposition of the action may . . . impede its ability to protect its interest; and (4) has an interest

not adequately represented by the other parties." <u>United States v. Pitney Bowes, Inc.</u>, 25 F.3d 66,

70 (2d Cir. 1994). Failure to meet any of these requirements will result in denial. <u>Id.</u> The

decision is committed to the discretion of the district court. <u>Floyd v. City of New York</u>, 770 F.3d

1051, 1057 (2d Cir. 2014).

The timeliness of Yahoo! News's application is not in doubt, but its application fails

every other element of the test. It has not identified a single protectable interest it can assert. For

intervention, an "interest [must] be direct, substantial, and legally protectable." <u>Washington Elec.</u>

<u>Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.</u>, 922 F.2d 92, 97 (2d Cir. 1990). As

discussed, Yahoo! News has not identified such an interest. Though it asserts a "right to gather

news," ECF No. 7104 at 8, this right does not exist in a form that is harmed by the Investigative Order. The rights it identifies for others—to receive news and speak anonymously—are similarly unharmed by the Investigative Order because they do not have the capacious dimensions Yahoo! News ascribes to them. Because Yahoo! News thus does not have protectable rights in this action, nothing is impeded by barring its intervention. Its claims thus fail the second and third criteria for intervention.

Finally, Yahoo! News does not show that its interest will be inadequately represented by the existing parties. Every party directly affected by the Investigative Order is either a sophisticated law firm or litigation service provider. Each has demonstrated the ability to aggressively litigate issues before this Court. Some of these firms have also suggested that they believe that there should be greater disclosure of matters in this MDL to the public. ECF No. 7102 at 1 ("[T]he 9/11 Plaintiffs have repeatedly argued, the existing FBI and MDL Protective Orders deny the Plaintiffs and the public critical information about the 9/11 Attacks . . . .") Because they are directly affected by the Investigative Order and know what communications might be disclosed, they are perfectly positioned to raise any issues relating to anonymous speech, vagueness, and public access. The rights for which Yahoo! News proposes to intervene have ready and capable defenders already before the Court.

All told, Yahoo! News cannot to show three of the four elements required so the request to intervene as of right must be denied.

## B. Permissive Intervention Is Inappropriate

Permissive intervention under Federal Rule of Civil Procedure 24(b) is also inappropriate. Under this Rule, "the Court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of fact or law." Fed. R. Civ P.

24(b)(1)(B). In determining whether to permit this intervention, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

"Substantially the same factors [as govern intervention of right] are considered in determining whether to grant an application for permissive intervention . . . ." In re Bank of New York Derivative Litig., 320 F.3d 291, 300 n.5 (2d Cir. 2003). This would already be fatal to Yahoo! News's claims, and the prejudice that will result from allowing their intervention counsels against permissive intervention as well.

Plaintiffs, defendants, and non-parties forced to provide discovery are all prejudiced by the delay in enforcing the Protective Order occasioned by Yahoo! News's attempted intervention. Protective orders play a "vital function" in civil disputes "by encouraging full disclosure of all evidence that might conceivably be relevant." Martinell v. Int'l Tel. & Tel. Corp., 594 F.2d 291, 295 (2d Cir. 1979). "Unless a valid Rule 26(c) protective order is to be fully and fairly enforceable, witnesses relying upon such orders will be inhibited from giving essential testimony in civil litigation, thus undermining a procedural system that has been successfully developed over the years for disposition of civil differences." Id.

Thus, so long as the breach of the Protective Order is not fully addressed, plaintiffs will be prejudiced by inhibition of full disclosure, and defendants will be prejudiced by being forced to give evidence without the confidence that their disclosures are protected. This breach is a prime example: Al Jarrah was under no obligation to testify. He did so voluntarily in part because of the protections offered by the Protective Orders. ECF No. 6981 at 1. In the future, people similarly situated may be less likely to participate if the Court cannot enforce its protective orders.

Yahoo! News's attempt to inject itself into this collateral dispute has already delayed the Court's efforts to mend this breach. If it is permitted to intervene, there is no telling how long it will be able to delay adjudication through more demands to modify the Investigative Order. That prejudices the parties and counsels against permissive intervention.

## IV.    A Stay Pending Appeal Is Inappropriate

Yahoo! News does not make the necessary showing to stay the implementation of the Investigative Order "to consider seeking appropriate review." ECF No. 7104. "A stay involves extraordinary relief," In re Pine Lake Vill. Apartment Co., 21 B.R. 395, 398 (S.D.N.Y. 1982), and "[t]he burden on the movant is a 'heavy' one." In re DJK Residential, LLC, No. 08-10375 (JMP), 2008 WL 650389, at *2 (S.D.N.Y. Mar. 7, 2008) (quoting In re Adelphia Cmmc'ns Corp., 333 B.R. 649, 659 (S.D.N.Y. 2005)). The four factors a court considers in assessing if this burden is met are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Barretta v. Wells Fargo Bank, N.A., 693 F. App'x 26, 27 (2d Cir. 2017) (quoting In re World Trade Ctr. Disaster Site Litig., 503 F.3d 167, 170 (2d Cir. 2007)). Yahoo! News has not shown any of these factors.

Yahoo! News's papers suggest it will not succeed on the merits because it has not identified any right that it can invoke that will be injured by the Investigative Order. It has not identified any protectable rights that it holds so it will not be injured absent a stay. Conversely, the parties will be injured. The Court's inability to enforce its protective orders will prejudice the plaintiffs' access to fulsome discovery, Martindell, 594 F.2d at 295, and the defendants' interests

in assuring that materials they produce under a protective order do not become a means for abuse and oppression. Seattle Times Co., 467 U.S. at 35.

Denying a stay also benefits the public by protecting the effective functioning of the civil dispute resolution system. Martindell, 594 F.2d at 295. "Without an ability to restrict public dissemination of certain discovery materials that are never introduced at trial, litigants would be subject to needless "annoyance, embarrassment, oppression, or undue burden or expense." S.E.C. v. TheStreet.Com, 273 F.3d 222, 229 (2d Cir. 2001). Permitting Yahoo! News's meritless challenge to support an indefinite delay of the Investigative Order as it decides whether to seek appeal will undermine litigants' confidence in protective orders and impede the effective functioning of the judicial system.

## CONCLUSION

Yahoo! News's motion to intervene and for a stay is DENIED. The parties shall provide any outstanding declarations required by the order at ECF No. 7082 by September 27, 2021.

**SO ORDERED.**

DATED:    New York, New York
           September 23, 2021

SARAH NETBURN
United States Magistrate Judge

24



**KREINDLER & KREINDLER LLP | 485 Lexington Avenue | New York, NY 10017-2629**
office: 212.687.8181 | fax: 212.972.9432 | www.kreindler.com

September 27, 2021

<u>Via ECF/CM</u>

The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)
               (Ashton 02-cv-6977 only)

Dear Judge Netburn:

      Kreindler & Kreindler LLP ("Kreindler") is filing this letter together with supplemental and additional declarations pursuant to this Court's inquiry into the article published by investigative reporter Michael Isikoff on Yahoo! News on July 15, 2021. ECF No. 7082.

      Immediately after that article was published, Kreindler began an internal investigation regarding the transcript of the Musaed al Jarrah deposition, including a complete review of our computer storage and email systems and questioning of all individuals with access to the transcript, which are described in the declarations filed today. Based on that investigation, we believed – and told the Court – that Kreindler was not the source of the Jarrah deposition obtained by Michael Isikoff. ECF No.7016. Unfortunately, we learned earlier today for the first time that our prior statements to the Court were wrong. For this, we are very sorry and we apologize to the Court and counsel for this error.

      For the first time today, a consultant to our firm notified Kreindler that he provided portions of the transcript of the Jarrah deposition to reporter Michael Isikoff. The declaration of the consultant is being filed with the Court. In that declaration, he explains how he forwarded the transcript and the efforts he took to keep Kreindler from learning of this. No Kreindler attorneys or staff had any involvement in the release of the Jarrah transcript or knowledge prior to today of what the consultant had done.

      Kreindler is immediately taking steps today to prevent this from happening again and has denied access to all confidential documents on our system to the consultant. We need time to further assess the situation and will make a further report to the Court shortly with our proposals to protect the integrity of its Protective Orders going forward.

      **New York**               **Boston**             **Los Angeles**

September 27, 2021
Page 2

To permit other parties to present any confidentiality claims to the consultant's declaration, we are filing that today under seal. Kreindler, however, does not believe that the declaration should remain under seal, though asks that a small portion of it remain redacted and available only to the Court, as described below.

Kreindler moves for permission to file all or portions of two declarations before the Court *ex parte.* These materials are being sent separately to chambers via e-mail. First, Kreindler asks that a small portion of the declaration of the consultant be filed *ex parte* to protect the privacy interests of the individuals referenced in the section that has been redacted from the declaration being filed under seal (and that is highlighted in the version emailed *ex parte* to this Court).

Second, the entire declaration of another an individual identified as Consultant 1 should be reviewed *ex parte.* The identity of and work by Kreindler's investigators and consultants is information developed to assist in this litigation, and thus squarely within the work-product privilege. *United States v. Adlman,* 68 F.3d 1495, 1501 (2d Cir. 1995) ("The work-product rule shields from disclosure materials prepared in anticipation of litigation by a party … absent a showing of substantial need.") (quotation marks omitted). The Kingdom does not have a substantial need that could overcome the privilege with respect to the Consultant 1 Declaration. Rather, the breach of the MDL protective order in this case is an issue for this Court to decide, the Court has access to all the materials that Kreindler proposes remain *ex parte* and under seal and Consultant 1 has declared under penalty of perjury that he/she did not share any portion of the Jarrah transcript with anyone. In addition, there are genuine personal safety issues for Consultant 1 because of his/her current work and location, and concerns about potential reprisals for his/her work investigating the role of various Kingdom officials should his/her identity be provided to the Kingdom.

Respectfully,

/s/ Megan Wolfe Benett
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: mbenett@kreindler.com

Enclosures

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

DECLARATION OF JAMES KREINDLER

I, James P. "Jim" Kreindler, pursuant to 28 U.S.C. § 1746, hereby declare under penalty

of perjury

the following:

1.      I am an attorney duly admitted to practice before this Court, a partner at Kreindler

& Kreindler LLP ("Kreindler") and co-chair of the Plaintiffs' Executive Committee for Personal

Injury and Wrongful Death Claims.

2.      I am fully familiar with the history of this lawsuit and this Court's inquiry into the

Yahoo! News article published by Michael Isikoff on July 15, 2021.

3.      On June 17, 2021 and June 18, 2021 I attended on Zoom the deposition of

Kingdom of Saudi Arabia official Musaed al-Jarrah conducted by Kreindler partner Megan

Benett.

4.      I learned on July 15, 2021 that Yahoo! News investigative reporter Michael

Isikoff had published an article in which he stated that he had obtained a copy of the transcript of

the deposition of Jarrah.  That day, I discussed the Isikoff article with others at Kreindler

working on the 9/11 litigation and, subsequently, in a conference call with other members of the

Plaintiffs' Executive Committees in this lawsuit.

5.      After that call, I asked my Kreindler partner Andrew J. Maloney, Esq., who is co-liaison counsel to the Plaintiffs' Executive Committee for Personal Injury and Wrongful Death Claims in this case, to conduct an internal investigation to determine whether anyone at Kreindler was responsible for providing the information to Isikoff.

6.      My specific answers to the inquiry of this Court's Order, ECF No. 7082 at 1, (set forth in italics) are underscored below:

- *identify all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021. Any written communication must be provided to the Court;*

  - <u>I communicated with Michael Isikoff and his producer several times between June 1, 2021 and August 1, 2021.  Those communications concerned my appearance along with former FBI Special Agent Ali Soufan on Isikoff's Conspiracyland podcast on July 1, 2021 and preparations in advance of the podcast (including forwarding a letter from Senators Blumenthal, Gillibrand and Menendez to the Department of Justice expressing their concern about the invocation of the "state secrets privilege" in the lawsuit brought by the 9/11 Families); Kreindler's efforts to convince the Department of Justice to reverse its position regarding the state secrets privilege and its protective order that prevented the 9/11 Families and the public from accessing information developed during discovery; and my response to an article Isikoff published on July 10, 2021 concerning the death of Jamal Khashoggi and an interview Khashoggi gave to an investigator</u>

working with the 9/11 Families.  I recall having two phone calls with

Isikoff.  He called to ask me for a status report on the case including

how the depositions were going.  I told him that the depositions were

going great but that I could not tell him about what came out during

the depositions because of the "gag orders" in this case.  The first call

was on a Monday and I asked him to give me a couple of days to see if

there was anything I could talk about.  He called back on a Wednesday

and I told him that there was nothing I could discuss about what

developed during the depositions, but that Kreindler was planning to

file a motion to revisit the state secrets assertion and the application of

the protective orders in this case.  I exchanged several e-mails with

Isikoff, all of which are attached to the accompanying declaration of

John Hartney.

- *declare whether they have ever discussed the contents of the Musaed Al
  Jarrah deposition with Michael Isikoff or anyone acting on his behalf. Any
  communication must be described in detail, including whether portions of the
  transcript were read or testimony was described;*

  o I never discussed the content of the Jarrah deposition with Isikoff or
  anyone acting on his behalf..

- *state every person with whom they shared the Al Jarrah deposition transcript
  who has not already supplied the Court with a declaration in this
  investigation; and*

  o None.

- *state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation.*
  - *None.*

7.      For the first time today I learned the information set forth in the declaration of John Fawcett.

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge and belief.

Dated:  New York, New York
          September 27, 2021


KREINDLER & KREINDLER LLP


By: /s/ James P. Kreindler
JAMES P. KREINDLER
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

## DECLARATION OF ANDREW MALONEY

I, Andrew Maloney, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of

perjury

the following:

1.      I am an attorney duly admitted to practice before this Court, a partner at Kreindler

& Kreindler LLP ("Kreindler") and liaison counsel to the Plaintiffs' Executive Committee for

Personal Injury and Wrongful Death Claims.

2.      I am fully familiar with the history of this lawsuit and this Court's inquiry into the

Yahoo! News article published by Michael Isikoff on July 15, 2021.

3.      On June 17, 2021 and June 18, 2021 I attended on Zoom the deposition of

Kingdom of Saudi Arabia official Musaed al-Jarrah conducted by Kreindler partner Megan

Benett.

4.      I learned on July 15, 2021 that Yahoo! News investigative reporter Michael

Isikoff had published an article in which he stated that he had obtained a copy of the redacted

transcript of the deposition of Jarrah.  That day, I discussed the Isikoff article with others at

Kreindler working on the 9/11 litigation and, subsequently, in a conference call with other

members of the Plaintiffs' Executive Committees in this lawsuit.

5.      On July 16, 2021, I conferred with Kreindler's information systems manager John Hartney and asked him to conduct an analysis of Kreindler's document storage and email systems to determine whether the Jarrah transcript had been sent to anyone outside of Kreindler. The rough and final Jarrah transcripts are saved in a directory within a network share drive along with materials relating to this lawsuit. Only individuals with Kreindler login credentials can access that directory. Anyone who intends to access materials produced pursuant to the Federal Bureau of Investigation protective order or the MDL protective order, saved on that case-specific directory, must first review those protective orders and agree to be bound by the direction that no materials subject to the protective orders or the information contained therein can be shared with anyone other than Plaintiffs' counsel. No one who has not signed those protective orders is permitted to review protected materials. Only the following individuals with Kreindler login credentials were provided access to the Jarrah transcripts: Jim Kreindler, Steven R. Pounian, myself, Megan Wolfe Benett, Gavin Simpson, John Fawcett, Debra Pagan, Julia Sienski, and Lisa Ranieri.

6.      Shortly after asking conferring with Mr. Hartney, I asked each of the individuals listed above if they had sent any portion of the Jarrah transcript to Isikoff or anyone working on his behalf. Each person told me that they had not.

7.      Some of the materials produced under the protective orders are uploaded to a cloud-based storage system which our experts and consultants can access. Any consultant or expert who is given permission to access those materials must first review the FBI and MDL protective orders and agree to be bound by them. Mr. Hartney and I reviewed the cloud-based storage system and determined that no one had accessed the Jarrah transcripts saved there.

8.     On July 16, 2021, I also asked Mr. Hartney to conduct a search of our email system to determine if the Jarrah transcripts and been sent from the Kreindler system to anyone other than the individuals listed in paragraph three, above.  The only emails within the Kreindler system forwarding any portion of the Jarrah transcripts went to a Kreindler consultant who had reviewed and agreed to be bound by the FBI and MDL protective orders ("Consultant 1"), who has provided a declaration in connection with this Court's inquiry into the Isikoff article, and to the law firm of Baumeister & Samuels.

9.     My specific answers to the inquiry of this Court's Order, ECF No. 7082 at 1, (set forth in italics) are underscored below:

- *identify all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021. Any written communication must be provided to the Court;*
  - I had no communications with Michael Isikoff or anyone acting on his behalf.
- *declare whether they have ever discussed the contents of the Musaed Al Jarrah deposition with Michael Isikoff or anyone acting on his behalf. Any communication must be described in detail, including whether portions of the transcript were read or testimony was described;*
  - I have not discussed the contents of the deposition with Michael Isikoff or anyone acting on his behalf.
- *state every person with whom they shared the Al Jarrah deposition transcript who has not already supplied the Court with a declaration in this investigation; and*

- o  <u>None.</u>

- *state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation.*

  - o  <u>None.</u>

10.     For the first time today I learned the information set forth in the declaration of

John Fawcett.

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge and belief.

Dated: New York, New York
          September 27, 2021

KREINDLER & KREINDLER LLP


By:  <u>/s/ Andrew J. Maloney</u>
ANDREW J. MALONEY
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

## DECLARATION OF MEGAN WOLFE BENETT

I, Megan Wolfe Benett, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1.     I am an attorney duly admitted to practice before this Court, am a partner at Kreindler & Kreindler LLP ("Kreindler") and represent the family members of those killed in the 9/11 Terrorist Attacks as well as the survivors of those attacks. I am fully familiar with the history of this lawsuit and this Court's inquiry into the Yahoo! News article published by Michael Isikoff on July 15, 2021.

2.     On June 17, 2021 and June 18, 2021 I took the deposition of Kingdom of Saudi Arabia official Musaed al-Jarrah via Zoom.

3.     I learned on July 15, 2021 that Yahoo! News investigative reporter Michael Isikoff had published an article in which he stated that he had obtained a copy of the transcript of the deposition of Jarrah. That day, I discussed the Isikoff article with others at Kreindler working on the 9/11 litigation and, subsequently, in a conference call with other members of the Plaintiffs' Executive Committees in this lawsuit.

4.     The paralegal I previously described as having been on the Jarrah transcript distribution list from the court reporting service Golkow Litigation Services was Debra Pagan. *See* ECF No. 7016 at 3.

     5.      My specific answers to the inquiry of this Court's Order, ECF No. 7082 at 1, (set forth in italics) are underscored below:

- *identify all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021. Any written communication must be provided to the Court;*
  - <u>I had no communications with Michael Isikoff or anyone acting on his behalf.</u>

- *declare whether they have ever discussed the contents of the Musaed Al Jarrah deposition with Michael Isikoff or anyone acting on his behalf. Any communication must be described in detail, including whether portions of the transcript were read or testimony was described;*
  - <u>I have not discussed the contents of the deposition with Michael Isikoff or anyone acting on his behalf.</u>

- *state every person with whom they shared the Al Jarrah deposition transcript who has not already supplied the Court with a declaration in this investigation; and*
  - <u>None.</u>

- *state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation.*
  - <u>None.</u>

     6.      For the first time today I learned the information set forth in the declaration of John Fawcett.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.


Dated: New York, New York
      September 27, 2021


   KREINDLER & KREINDLER LLP


By:  /s/ Megan Wolfe Benett
Megan Wolfe Benett
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

DECLARATION OF STEVEN R. POUNIAN

I, Steven R. Pounian, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1.      I am an attorney duly admitted to practice before this Court, am of counsel at Kreindler & Kreindler LLP ("Kreindler") and represent the family members of those killed in the 9/11 Terrorist Attacks as well as the survivors of those attacks.  I am fully familiar with the history of this lawsuit and this Court's inquiry into the Yahoo! News article published by Michael Isikoff on July 15, 2021.

2.      On June 17, 2021 and June 18, 2021 I attended on Zoom the deposition of Kingdom of Saudi Arabia official Musaed al-Jarrah conducted by Kreindler partner Megan Benett.

3.      I learned on July 15, 2021 that Yahoo! News investigative reporter Michael Isikoff had published an article in which he stated that he had obtained a copy of the transcript of the deposition of Kingdom of Saudi Arabia employee Jarrah.  That day, I discussed the Isikoff article with others at Kreindler working on the 9/11 litigation and, subsequently, in a conference call with other members of the Plaintiffs' Executive Committees in this lawsuit.

4.      My specific answers to the inquiry of this Court's Order (set forth in italics) are underscored below:

- *identify all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021. Any written communication must be provided to the Court;*
  - o <u>I had no communications with Michael Isikoff or anyone acting on his behalf.</u>
- *declare whether they have ever discussed the contents of the Musaed Al Jarrah deposition with Michael Isikoff or anyone acting on his behalf. Any communication must be described in detail, including whether portions of the transcript were read or testimony was described;*
  - o <u>I have not discussed the contents of the deposition with Michael Isikoff or anyone acting on his behalf.</u>
- *state every person with whom they shared the Al Jarrah deposition transcript who has not already supplied the Court with a declaration in this investigation; and*
  - o <u>None.</u>
- *state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation.*
  - o <u>None.</u>

5.     For the first time today I learned the information set forth in the declaration of John Fawcett.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York

September 27, 2021


KREINDLER & KREINDLER LLP


By: /s/ Steven R. Pounian
Steven R. Pounian
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

### DECLARATION OF JAMES GAVIN SIMPSON

I, James Gavin Simpson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1.      I am an attorney duly admitted to practice before this Court, working as a consultant to Kreindler & Kreindler LLP ("Kreindler") on behalf of the family members of those killed in the 9/11 Terrorist Attacks, as well as the survivors of those attacks.  I am familiar with the history of this lawsuit and this Court's inquiry into the Yahoo! News article published by Michael Isikoff on July 15, 2021.

2.      My specific answers to the inquiry of this Court's Order (set forth in italics) are underscored below:

- *identify all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021. Any written communication must be provided to the Court;*

  - I had no communications with Michael Isikoff or anyone acting on his behalf.

- *declare whether they have ever discussed the contents of the Musaed Al Jarrah deposition with Michael Isikoff or anyone acting on his behalf. Any*

*communication must be described in detail, including whether portions of the transcript were read or testimony was described;*

- I have not discussed the contents of the deposition with Michael Isikoff or anyone acting on his behalf.

- *state every person with whom they shared the Al Jarrah deposition transcript who has not already supplied the Court with a declaration in this investigation;*

  - None.

- *state every person that they know had access to the deposition transcripts who has not already supplied a declaration in this investigation.*

  - None.

3.      For the first time today I learned the information set forth in the declaration of John Fawcett.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  New York, New York
            September 27, 2021

KREINDLER & KREINDLER LLP

By: /s/ James Gavin Simpson
James Gavin Simpson
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to:*
All Actions

## DECLARATION OF JOHN HARTNEY

I, John Hartney, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1.     I am the head of Information Technology ("IT") at Kreindler & Kreindler LLP ("Kreindler") and manage the firm's email and document systems. In connection with the *In re Terrorist Attacks on September 11, 2001* suit, I am familiar with the system managing retention and sharing of documents and other electronically stored information. I can search Kreindler's email accounts and have access to all the drives within our network. I also have managerial access to Kreindler's cloud-based document storage system.

2.     On July 16, 2021, I was advised that journalist Michael Isikoff published an article the day before on Yahoo! News in which he reported that he had obtained a copy of a redacted deposition transcript of Kingdom of Saudi Arabia official Musaed al-Jarrah ("Jarrah") and asked to assist with an internal review to determine if Isikoff received it from a source at Kreindler. I was told that the Jarrah deposition took place on June 17, 2021 and June 18, 2021 and that there had been both a rough transcript and a final transcript for both days.

3.     In connection with that request, I reviewed Kreindler's proprietary server, its cloud-based storage system and its email system. Based on my review, I determined the following.

4.      The rough Jarrah transcripts were saved on Kreindler's server within a share drive specific to documents related to the 9/11 litigation on June 17, 2021 and June 18, 2021. The final Jarrah transcripts were saved on Kreindler's server within the same share drive on June 29, 2021. The final Jarrah transcript was uploaded to the cloud-based storage system on June 29, 2021. The rough Jarrah transcript was not uploaded to the cloud-based storage system.

5.      Only individuals given Kreindler login credentials have access to Kreindler's server. To manage information relating to this lawsuit, I created a directory on a network share drive within the server where all 9/11 litigation-related documents can be saved. That directory is for use only by individual Kreindler attorneys and staff involved in this litigation and one consultant to Kreindler, John Fawcett. The Jarrah transcripts were saved within that network share. I was told that the following had been able to access the Jarrah transcripts: Kreindler attorneys Jim Kreindler, Steven R. Pounian, Andrew J. Maloney, Megan Wolfe Benett, and Gavin Simpson; Kreindler staff members Debra Pagan, Julia Sienski and Lisa Ranieri; and Kreindler consultant John Fawcett. I did not find any evidence that the Jarrah transcripts had been downloaded, printed, or emailed by anyone else.

6.      Consultants, experts, or others outside of Kreindler's system could access the Jarrah transcript on the cloud-based storage system if Kreindler provided them access to the system. To view documents saved on that system the documents must be downloaded by the user. The system tracks which users have downloaded documents. On July 29, 2021, I reviewed the user history for the cloud-based system and determined that as of that date no one had downloaded the Jarrah transcript that was saved on the cloud-based storage system.

7.      Based on my search of Kreindler's e-mail system, I determined that the only Kreindler personnel who received the rough or final Jarrah transcripts via email from the court

reporting service Golkow Litigation Services ("Golkow") were Jim Kreindler, Steven R. Pounian, Andrew J. Maloney, Megan Wolfe Benett, and Debra Pagan.

8.     I also conducted a search of Kreindler's email system for any incoming or outgoing messages to misikoff@yahoo-inc.com, misikoff@oath.com, misikoff@verizonmedia.com and misikoff52@gmail.com between June 1, 2021 and August 1, 2021.

9.     I also searched the email server for all outgoing, incoming, saved or deleted messages during that same time period containing the names "Jarrah" or "Isikoff" or the name that Golkow had given to the Jarrah transcripts when they were originally provided to Kreindler.

10.     The only emails returned as a result of the searches I conducted are attached hereto as Exhibit 1.  None of those emails had any portion of the Jarrah deposition transcripts attached to them.

11.     I also determined that on two occasions between June 1, 2021 and August 1, 2021 the Jarrah transcripts were emailed from the Kreindler system to someone outside of the Kreindler firm: (1) an email from Kreindler consultant John Fawcett to another Kreindler consultant ("Consultant A"); and (2) an email from Debra Pagan to the law firm of Baumeister & Samuels.  I determined that there were no other occasions when the Jarrah transcripts were emailed from the Kreindler system to anyone outside of the Kreindler firm.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Dated: New York, New York
       September 27, 2021


KREINDLER & KREINDLER LLP

By:
JOHN HARTNEY
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181

# EXHIBIT 1

**From:**   Jim Kreind er  JKreind er@kreind er.com>
**Sent:**    28 202  2:  : 7 PM
**To:**     Mark Seman  mark@yahoonews.com>
**Cc:**     Michae  Isikoff  misikoff@verizonmedia.com>;
**Subject:** Re: Thurs. Ju y  st 2: 0pm   Isikoff   Conspiracy and Interview

---

Thanks

Sent  rom my  Phone

    On   n  8,    , at  : 8 PM, Mark Seman <mark yahoonews.com> wrote:

> | **CAUTION:**  his email originated  rom outside o  the organization  Do not click links or open attachments unless you are expecting the link or attachment  rom the sender and know the content is sa e
> m,

   hope yo  are we  .
Mark here   M chae  s ko   s prod cer.

  ere s the Zoom  ntv.  n o  or th s Th rs. at  :3 pm

Mark Seman  s  nv t ng yo  to a sched  ed Zoom meet ng.

Top c:  s ko  w/   m  re nd er & A  So  an
T me:      ,        :3  PM Eastern T me (US and Canada)

  o n Zoom Meet ng
https:// s  we . oom. s/ /8996789  8 ?pwd=OWtVZ RvZGd UV ROC9UeUt OVVsZ  9

Meet ng  : 899 6789   8
Passcode: 4  7 4
One tap mo  e
  6465588656,,8996789  8 #,,,,*4  7 4# US (New York)
  3  7 5859 ,,8996789  8 #,,,,*4  7 4# US (Wash ngton  C)

   a   y yo r  ocat on
          646 558 8656 US (New York)
          3   7 5 859  US (Wash ngton  C)
          3   6 6 6799 US (Ch cago)
          669 9   9  8 US (San  ose)
          53   5 878  US (Tacoma)
          346  48 7799 US ( o ston)
Meet ng  : 899 6789   8
Passcode: 4  7 4
F nd yo r  oca  n m er: https:// s  we . oom. s/ /kctag  RM

Mark Seman
  ead o   A d o / Podcasts
Yahoo News
9 7.7 3.4639

**From:**     Jim Kreindler JKreindler@kreindler.com>
**Sent:**     7   202  : 4:08 PM
**To:**       Mike Isikoff  Misikoff 2@gmai .com>
**Subject:**  Letter from Sen. B umentha , Gi  ibrand, Menendez to DOJ   FBI re State Secrets Privi ege   v    fina .pdf

**Attachments:** Letter from Sen. B umentha , Gi  ibrand, Menendez to DOJ   FBI re State Secrets Privi ege   v   .pdf

Sent  rom my  Phone



### United States Senate

WASHINGTON, DC 20510

July 1, 2021

The Honorable Merrick Garland
Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

The Honorable Christopher Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C. 20535

Dear Attorney General Garland and Director Wray:

We write again concerning the decision by the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI), under the previous Administration, to invoke the "state secrets privilege" in litigation brought by victims of the terrorist attacks of September 11, 2001. For years, these survivors and family members have sought information from the DOJ and, in particular, the FBI, which has been withheld, purportedly for national security reasons. Unfortunately, in fact, the reasons for continued concealment of this potentially critical evidence have never been credibly or adequately explained.

As we have noted previously, on September 11, 2019, then-President Trump made a promise to the survivors and families that DOJ would disclose documents relevant to the case. Yet, the next day, then-Attorney General William Barr invoked the state secrets privilege to prevent the release of the very documents and information that the then-President vowed to disclose.[1]

The 9/11 families—many of whom we are honored to represent in Congress—have fought relentlessly for justice and to hold accountable all associated with the worst terrorist attack ever committed on American soil. We are now less than three months away from the twentieth anniversary of the 9/11 attacks. The lengthy passage of time since the attacks creates powerful questions about the need for continued classification of documents and the ongoing withholding of related information.

A fair day in court for these brave 9/11 families requires access to evidence. Their case and this cause is about truth, justice, and accountability. DOJ must not gratuitously stand in their way. If there is any credible reason to withhold facts, testimony, and documents concerning the attacks and the FBI's handling of subsequent investigations twenty years after 9/11, the American people deserve to know it.

---

[1] *See* Tim Golden and Sebastian Rotella, *The Saudi Connection: Inside the 9/11 Case That Divided the F.B.I.*, N.Y. TIMES (Jan. 23, 2020), https://www.nytimes.com/2020/01/23/magazine/9-11-saudi-arabia-fbi.html.

In previous appearances before the Senate Judiciary Committee,[2] you have both committed to review the situation in an effort to make documents and information available to the families to the greatest extent possible. As yet, however, there has been no tangible progress and we received no response to several additional letters on this issue. We again urge you to review past decisions to invoke the state secrets privilege and to meet with representatives of the families. We request a response to this letter no later than July 14, 2021. Thank you for your prompt consideration.

Sincerely,

_____
RICHARD BLUMENTHAL
United States Senate

_____
KIRSTEN GILLIBRAND
United States Senate

_____
ROBERT MENENDEZ
United States Senate

---

[2] The Nomination of the Honorable Merrick Brian Garland to be Attorney General of the United States: Day 1, Hearing before the Senate Judiciary Committee, 117th Cong. (Feb. 22, 2021), *available at* https://www.judiciary.senate.gov/meetings/the-nomination-of-the-honorable-merrick-brian-garland-to-be-attorney-general-of-the-united-states-day-1; Oversight of the Federal Bureau of Investigation, Hearing before the Senate Judiciary Committee, 116th Cong. (July 23, 2019), *available at* https://www.judiciary.senate.gov/meetings/07/23/2019/oversight-of-the-federal-bureau-of-investigation.

**From:** Michae Isikoff misikoff 2@gmai .com>
**Sent:** 7  202 2: 4: 2 PM
**To:** Jim Kreind er  JKreind er@kreind er.com>
**Subject:** Re: Letter from Sen. B umentha , Gi ibrand, Menendez to DOJ  FBI re State Secrets Privi ege  v   fina .pdf

---

**CAUTION:** his email originated rom outside o the organization Do not click links or open attachments unless you are expecting the link or attachment rom the sender and know the content is sa e

Thanks, Look ng  orward to o r chat at  :3

On Th ,    ,     at  :34 PM  m  re nd er < re nd er kre nd er.com> wrote:

Sent  rom my  Phone

**From:**    Jim Kreind er  JKreind er@kreind er.com>
**Sent:**    7  202  2:  :24 PM
**To:**      Michae  Isikoff  misikoff 2@gmai .com>
**Subject:** Re: Letter from Sen. B umentha , Gi ibrand, Menendez to DOJ   FBI re State Secrets Privi ege   v   fina .pdf

Me too

Sent  rom my  Phone

    On      ,    , at  : 4 PM, M chae   s ko   <m s ko  5  gma  .com> wrote:

> **CAUTION:** his email originated  rom outside o  the organization  Do not click links or open attachments unless you are expecting the link or attachment  rom the sender and know the content is sa e

Thanks, Look ng  orward to o r chat at  :3

On Th ,     ,     at  :34 PM   m  re nd er <  re nd er kre nd er.com> wrote:

Sent  rom my  Phone

**From:**     Jim Kreindler  JKreindler@kreindler.com>
**Sent:**     7  0 202   0: 8: 7 AM
**To:**       Mike Isikoff  Misikoff 2@gmai .com>
**Subject:**

---

Great art c e. Thanks m ke

Sent  rom my  Phone

**From:** John Fawcett  Jfawcett@kreind er.com>
**Sent:** 7  2 202   : 8:0  AM
**To:** Michae  Isikoff  misikoff@verizonmedia.com>
**Subject:**
**Attachments:** 202     Unc assified_privi ege_ og_updated_May   202 .pdf ,image00 .jpg

---

**John Fawcett**

**Kreindler & Kreindler LLP**
**KREINDLER**  485 Lexington Ave      T  212.973.3469      E-mail  jfawcett@kreindler.com
New York, NY 10017      F  212.972.9432      Web  www.kreindler.com

Please consider the environment before printing this e mail.

**FBI PRIVILEGE LOG**
**Tranche 26**
**May 6, 2021**
*In re Terrorist Attacks on September 11, 2001 Litigation*
**Civil Action No. MDL 03-1570**

| Log No. | Document Type | Pages | Date | Subject Matter | Bases for Withholding |
|---|---|---|---|---|---|
| 1 | Investigative Accomplishments Report | 6 pages | January 2008 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/Privacy/ National Security Act/State Secrets Privilege |
| 2 | Confidential Human Source Reporting Document | 3 pages | November 2009 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/Privacy/ National Security Act/State Secrets Privilege |
| 3 | Teletype | 3 pages | March 2010 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/Privacy/ National Security Act/State Secrets Privilege |
| 4 | Letter | 3 pages | March 2011 | Communication with foreign government (not the Kingdom of Saudi Arabia) re Confidential Human Source | Classified/Law Enforcement Privileged/Informant Privilege/Privacy/ National Security Act/State Secrets Privilege |
| 5 | Electronic Communication | 3 pages | April 2003 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/Privacy/ National Security Act/State Secrets Privilege |

| 6 | Electronic communication | 11 pages | January 2007 | Communication re intelligence information provided to the FBI by a foreign government (not the Kingdom of Saudi Arabia) and coordination between FBI and foreign government | Classified/Law Enforcement Privileged/National Security Act/ State Secrets Privilege |
|---|---|---|---|---|---|
| 7 | Report | 8 pages | December 2006 | Communication from foreign government to FBI containing intelligence information and reflecting coordination between FBI and foreign government | Classified/Law Enforcement Privileged/National Security Act/State Secrets Privilege |
| 8 | Letter | 2 pages | July 2017 | Communication from foreign government to FBI containing intelligence information and reflecting coordination between FBI and foreign government | Classified/Law Enforcement Privileged/National Security Act/State Secrets Privilege |
| 9 | Electronic Communication | | | Communication re initiation of investigation of Bayoumi | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/State Secrets Privilege |
| 10 | Electronic Communication | | | Communication re initiation of investigation of Thumairy | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/State Secrets Privilege |

| 11 | Electronic Communication | | | Communication re initiation of investigation of third subject identified in 2012 FBI report | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/State Secrets Privilege |
|----|--------------------------|---------|---------------|-----------------------------------------------------------|---------------------------------------------------------------------------------------------------------|
| 12 | Electronic Communication | 16 pages | April 2016 | Analytic review and assessment of case | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/Deliberative Process Privilege/State Secrets Privilege |
| 13 | Briefing document | 6 pages | February 2010 | Case overview | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/Deliberative Process Privilege/Work Product Privilege/State Secrets Privilege |
| 14 | Electronic Communication | 15 pages | September 2010 | Communication re information to be disseminated to foreign government | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/State Secrets Privilege |
| 15 | Electronic Communication | 13 pages | December 2009 | Working document outlining results of investigation | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/Deliberative Process Privilege/State Secrets Privilege |

| 16 | Electronic Communication | 3 pages | January 2003 | Communication re bank records acquired with assistance from foreign government | Classified/Law Enforcement Privileged/National Security Act/State Secrets Privilege |
|----|----|----|----|----|----|
| 17 | Memorandum | 3 pages | February 2016 | Report from foreign government of communication from witness | Classified/Law Enforcement Privileged/National Security Act/State Secrets Privilege |
| 18 | Electronic Communication | 5 pages | November 2002 | Report of interview by foreign government | Classified/Law Enforcement Privileged/National Security Act/State Secrets Privilege |
| 19 | Electronic communication | 9 pages | May 2008 | Report of interview involving foreign government | Classified/Law Enforcement Privileged/National Security Act/Privacy/State Secrets Privilege |
| 20 | Electronic communication | 9 pages | December 2007 | Report of interview involving foreign government | Classified/Law Enforcement Privileged/National Security Act/Privacy/State Secrets Privilege |

| 21 | Classified Record(s): Because the FBI cannot provide any description of certain record(s) without thereby disclosing classified information, a classified privilege log describing such record(s) will be provided separately to the Court | | | | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/Privacy/State Secrets Privilege |
|----|----|----|----|----|----|
| 22 | Electronic communication | 12 pages | February 2010 | Discussion of investigative results | Classified/Law Enforcement Privileged/National Security Act/ Privacy/Deliberative Process Privilege/ State Secrets Privilege[*]/Privacy |
| 23 | Teletype | 9 pages | March 2010 | Report of briefing | Classified/Law Enforcement Privileged/National Security Act/ Privacy/Deliberative Process Privilege/ State Secrets Privilege[*]/Privacy |
| 24 | Electronic communication | 5 pages | June 2010 | Document outlining research results | Classified/Law Enforcement Privileged/National Security Act/ Privacy/State Secrets Privilege[*]/Privacy |

---

[*] The documents listed at entries 22-36 and 38-45 of the Privilege Log were identified and processed after the Attorney General asserted the state secrets privilege on April 13, 2020.  However, these documents contain classified information falling within one or more of the categories of information over which the Attorney General asserted the state secrets privilege.

| 25 | Electronic communication | 4 pages | November 2001 | Request regarding investigative action | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Deliberative Process Privilege/Privacy/ State Secrets Privilege* |
| 26 | Electronic communication | 4 pages | November 2001 | Request regarding investigative action | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Deliberative Process Privilege/Privacy/ State Secrets Privilege* |
| 27 | Memorandum | 5 pages | February 2004 | Investigative summary for foreign government | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/State Secrets Privilege* |
| 28 | Teletype | 9 pages | December 2004 | Information Report for various federal agencies and foreign governments | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege* |
| 29 | Electronic communication | 5 pages | January 2002 | Approval regarding investigative action | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege* |
| 30 | Electronic communication | 3 pages | June 2002 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege* |

| 31 | Teletype | 7 pages | July 2004 | Information Report for various federal agencies re Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |
|----|----------|---------|-----------|---------------------------------------|------------------------|
| 32 | Electronic communication | 2 pages | August 2002 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |
| 33 | Electronic communication | 3 pages | August 2005 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |
| 34 | Electronic communication | 2 pages | March 2006 | Administrative document relating to Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |
| 35 | Memorandum | 5 pages | March 2004 | Investigative summary for foreign government | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/State Secrets Privilege[*] |
| 36 | Electronic communication | 4 pages | June 2004 | Report of investigative updates | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |

| 37 | FD-302 | 1 page | October 2001 | Interview of witness requesting identity be protected; content determined to be source-identifying | Law Enforcement Privileged/Informant Privilege/Privacy |
|----|--------|--------|--------------|-----|-----|
| 38 | Memorandum | 2 pages | November 2001 | Report of investigative activity | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |
| 39 | Electronic communication | 16 pages | October 2007 | Communication re initiation of investigation | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |
| 40 | Electronic communication | 6 pages | December 2007 | Request regarding investigative action | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |
| 41 | Electronic communication | 3 pages | July 2004 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |
| 42 | Electronic communication | 5 pages | November 2005 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |

| 43 | Electronic communication | 2 pages | February 2006 | Confidential Human Source reporting | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |
| 44 | Memorandum | 8 pages | August 2002 | Communication to foreign government regarding investigative information | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/State Secrets Privilege[*] |
| 45 | Electronic Communication | 7 pages | April 2008 | Interview of witness requesting identity be protected; content determined to be source-identifying | Classified/Law Enforcement Privileged/Informant Privilege/National Security Act/ Privacy/State Secrets Privilege[*] |

**From:**    Michae  Isikoff  misikoff@verizonmedia.com>
**Sent:**    7    202    :  :29 AM
**To:**      Jim Kreind er  JKreind er@kreind er.com>
**Subject:** checking in

**CAUTION:**  his email originated  rom outside o  the organization  Do not click links or open attachments unless you are expecting the link or attachment  rom the sender and know the content is sa e

    m   where do yo  stand on yo r req est to  O  to   t the state secrets pr v  ege and gag order? Am p ann ng on wr t ng
someth ng th s week.
M ke  s ko
c      58  535

**From:**   Jim Kreind er  JKreind er@kreind er.com>
**Sent:**   7   202   2:  :2  PM
**To:**    Michae  Isikoff  misikoff@verizonmedia.com>
**Subject:** Re: checking in

---

St    work ng on mot on.  Too many che s….

Sent  rom my  Phone

    On    3,    , at   :53 AM, M chae   s ko   <m s ko   ver   onmed a.com> wrote:

> **CAUTION:**   his email originated  rom outside o  the organization  Do not click links or open attachments unless you are expecting the link or attachment  rom the sender and know the content is sa e

    m    where do yo   stand on yo r req est to  O  to    t the state secrets pr v  ege and gag order? Am p ann ng on
wr t ng someth ng th s week.
M ke  s ko
c     58  535

**From:**   Michae  Isikoff  misikoff@verizonmedia.com>
**Sent:**  7   202   :2 :28 PM
**To:**   Jim Kreind er  JKreind er@kreind er.com>
**Subject:** Re:  E  Re: checking in

---

| CAUTION:  his email originated  rom outside o  the organization  Do not click links or open attachments unless you are expecting the link or attachment  rom the sender and know the content is sa e |

Ok, a m ng to wr te someth ng  or Th rsday or Fr day   so   any  pdate  y then,  et me know.

On T e,    3,   at   :3  PM  m  re nd er <__ re nd er kre nd er.com> wrote:

St    work ng on mot on.  Too many che s….

Sent  rom my  Phone

    On    3,   , at   :53 AM, M chae  s ko   <m s ko    ver  onmed a.com> wrote:

| CAUTION:  his email originated  rom outside o  the organization  Do not click links or open attachments unless you are expecting the link or attachment  rom the sender and know the content is sa e |

    m   where do yo  stand on yo r req est to  O  to    t the state secrets pr v  ege and gag order? Am p ann ng on
wr t ng someth ng th s week.
M ke  s ko
c    58  535

**From:**   Jim Kreind er  JKreind er@kreind er.com>
**Sent:**   7   202  :2 :  PM
**To:**    Michae  Isikoff  misikoff@verizonmedia.com>
**Subject:** Re:  E  Re: checking in

W    do

Sent  rom my  Phone

    On    3,    , at  : 5 PM, M chae  s ko   <m s ko   ver  onmed a.com> wrote:

**CAUTION:**  his email originated  rom outside o  the organization  Do not click links or open attachments unless you are expecting the link or attachment  rom the sender and know the content is sa e

Ok, a m ng to wr te someth ng  or Th rsday or Fr day   so    any  pdate  y then,   et me  know.

On T e,     3,    at   :3  PM   m  re nd er <  re nd er kre nd er.com> wrote:
 St    work ng on mot on.  Too many che  s….

Sent  rom my  Phone

    On    3,    , at  :53 AM, M chae   s ko   <m s ko   ver  onmed a.com> wrote:

**CAUTION:**  his email originated  rom outside o  the organization  Do not click links or open attachments unless you are expecting the link or attachment  rom the sender and know the content is sa e

      m   where do yo  stand on yo r req est to  O  to    t the state secrets pr v  ege and gag order? Am p  ann ng
on wr t ng someth ng th s week.
M ke  s ko
c     58  535

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

### DECLARATION OF DEBRA PAGAN

I, Debra Pagan, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1.    I am a paralegal at Kreindler & Kreindler LLP ("Kreindler") and am involved in Kreindler's work in the *In re Terrorist Attacks on September 11, 2001* suit.

2.    I was asked to provide a declaration in connection with this Court's inquiry into how investigative reporter Michael Isikoff obtained a copy or portions of the deposition transcript of Kingdom of Saudi Arabia official Musaed al-Jarrah ("Jarrah").

3.    On June 17 and 28, 2021, I received an email from Golkow Litigation Services with the rough transcript of the Jarrah deposition transcripts. I forwarded those to Kreindler employee Julia Sienski. On June 29, 2021, I received an email from Golkow that included a link providing access to the final Jarrah transcripts, which I forwarded to Julia Sienski.

4.    My specific answers to the inquiry of this Court's Order, ECF No. 7082 at 2, (set forth in italics) are underscored below:

- *whether the declarant shared with anyone any portion of the Al Jarrah deposition transcript (either by providing copies of any portion of the transcript, reading any portion of the transcript, or describing it);*

- I shared the Jarrah transcripts with the law firm Baumeister & Samuels. I did not share any portion of the Jarrah transcripts with anyone else.

- *identify and describe all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021.*

  - I have never had any communications with Isikoff or anyone acting on his behalf.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
       September 27, 2021

KREINDLER & KREINDLER LLP

By: _____
Debra Pagan
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

### DECLARATION OF JULIA SIENSKI

I, Julia Sienski, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1.    I am a client liaison and case manager at Kreindler & Kreindler LLP ("Kreindler") and am involved in Kreindler's work in the *In re Terrorist Attacks on September 11, 2001* suit.

2.    I was asked to provide a declaration in connection with this Court's inquiry into how investigative reporter Michael Isikoff obtained a copy or portions of the deposition transcript of Kingdom of Saudi Arabia official Musaed al-Jarrah ("Jarrah").

3.    Kreindler paralegal Debra Pagan forwarded to me the email with the rough transcripts of former Kingdom of Saudi Arabia official Musaed al-Jarrah ("Jarrah") and the link from court reporters Golkow Litigation Services providing access to the final Jarrah transcripts. I saved the rough Jarrah transcripts on Kreindler's server on June 17, 2021 and June 18, 2021 and the final Jarrah transcripts on June 29, 2021. I also uploaded the final Jarrah transcript to Kreindler's cloud-based storage system on June 29, 2021.

4.    My specific answers to the inquiry of this Court's Order, ECF No. 7082 at 2, (set forth in italics) are underscored below:

    *i.*    *whether the declarant shared with anyone any portion of the Al Jarrah*

         *deposition transcript (either by providing copies of any portion of the*

         *transcript, reading any portion of the transcript, or describing it);*

         o    <u>I have not shared any portion of the Jarrah transcript with anyone.</u>

    •    *identify and describe all communications with Michael Isikoff or anyone*

         *acting on his behalf, whether oral or written, from June 1, 2021, to August 1,*

         *2021.*

         o    <u>I have never had any communications with Isikoff or anyone acting on his</u>

         <u>behalf.</u>

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge and belief.

Dated: New York, New York
       September 27, 2021


KREINDLER & KREINDLER LLP


By: _____
JULIA SIENSKI
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

### DECLARATION OF LISA RANIERI

I, Lisa Ranieri, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1.  I am a legal secretary at Kreindler & Kreindler LLP ("Kreindler") and am involved in Kreindler's work in the *In re Terrorist Attacks on September 11, 2001* suit.

2.  I was asked to provide a declaration in connection with this Court's inquiry into how investigative reporter Michael Isikoff obtained a copy or portions of the deposition transcript of Kingdom of Saudi Arabia official Musaed al-Jarrah ("Jarrah").

3.  My specific answers to the inquiry of this Court's Order, ECF No. 7082 at 2, (set forth in italics) are underscored below:

- *whether the declarant shared with anyone any portion of the Al Jarrah deposition transcript (either by providing copies of any portion of the transcript, reading any portion of the transcript, or describing it);*

  - <u>I emailed the transcript to Megan Wolfe Benett. I did not share any portion of the Jarrah transcripts with anyone else.</u>

- *identify and describe all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021.*

       ○  <u>I have never had any communications with Isikoff or anyone acting on his behalf.</u>

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
       September 27, 2021

KREINDLER & KREINDLER LLP

By:_____
LISA RANIERI
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181

CONSULTANT 1 DECLARATION
FILED UNDER SEAL AND EX PARTE

JOHN FAWCETT DECLARATION
FILED UNDER SEAL



**KREINDLER & KREINDLER LLP | 485 Lexington Avenue | New York, NY 10017-2629**
**office: 212.687.8181 | fax: 212.972.9432 | www.kreindler.com**

September 28, 2021

<u>Via ECF/CM</u>

The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

   Re: *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)
     (Ashton 02-cv-6977 only)

Dear Judge Netburn:

   Kreindler & Kreindler (Kreindler) is writing the Court, as set forth in our September 27, 2021 letter, ECF No. 7147, to provide a further report on our efforts to protect against any future release of confidential designated material from our files.  In addition, Kreindler asks the Court to formally recognize the roles of two Kreindler attorneys working on behalf of the Plaintiffs represented by the Plaintiffs' Executive Committee (PEC) in lieu of two Kreindler attorneys on the original Case Management Order 3 establishing committees. ECF No. 248-2.

   Kreindler can report that it has moved all 9/11 case protected materials into a separate file on its computer system.  Access to that file is now strictly limited to Kreindler lawyers and staff working on the 9/11 case.  Kreindler is also in the process of setting up a new system that will automatically track the viewing and download of all documents on the system.  This will permit us to have a means to check on the use of any documents by users of the system.  For the time being, until we can establish our new system, we have directed the lawyers and staff working on the case to keep a log of all documents that they access.

   Also, we now ask the Court to formally endorse the roles of the following individual attorneys at Kreindler & Kreindler LLP fulfilling the responsibilities of the positions on the PEC established in Case Management Order 3 (CMO 3), ECF No. 248-2 at ¶¶ 5 – 6, specifically:

  1.  as a member of the PEC for Personal Injury and Death Claims: Steven R. Pounian of Kreindler & Kreindler LLP will replace Justin T. Green of Kreindler & Kreindler LLP; and

  2.  as a member of PEC for Personal Injury and Death Claims: Megan Wolfe Benett of Kreindler & Kreindler LLP will replace Marc S. Moller of Kreindler & Kreindler LLP.

September 28, 2021
Page 2


As the Court likely knows from many judicial filings and appearances, this would simply formalize the roles the individuals above have effectively been performing for several years.  We therefore respectfully ask that this Court so-order this request, modifying CMO 3 to reflect the changes described above.


Respectfully,

/s/ Megan Wolfe Benett
KREINDLER & KREINDLER LLP
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: mbenett@kreindler.com

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
——
(202) 326-7900
FACSIMILE:
(202) 326-7999

September 29, 2021

**FILED UNDER SEAL**
**SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

*Via ECF (under seal)*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:     *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

I write on behalf of Defendant Kingdom of Saudi Arabia ("Saudi Arabia") concerning the belated admission by Kreindler & Kreindler LLP ("Kreindler & Kreindler") that the firm is responsible for the leak of the confidential deposition transcript of Musaed Al Jarrah to Yahoo! News reporter Michael Isikoff.  *See* ECF No. 7147.  All parties agree that this leak is a violation of the MDL Protective Order.  The FBI has made clear that it is also a violation of the FBI Protective Order.  *See* ECF No. 6999.

Although Kreindler & Kreindler has now admitted its serious violation, the declarations and materials it submitted to the Court on September 27, 2021, do not comply with this Court's August 30, 2021 Order, ECF No. 7082.  The Court should direct full compliance.  Also, in light of the new admission, earlier submissions of Kreindler & Kreindler warrant further inquiry.

        **1.**        This Court is familiar with relevant factual and procedural background, as set forth in its August 12, August 30, and September 23, 2021 Orders.  *See* ECF Nos. 7011, 7082, 7134.  On July 23, 2021, Saudi Arabia moved for an order requiring that all entities and individuals who had access to the confidential Al Jarrah transcript submit declarations to the Court stating whether the entity or individual shared the Al Jarrah transcript with Isikoff, state and describe communications with Isikoff during a limited time period, and produce any such written communications.  *See* ECF No. 6981.  Even before the Court ruled on that motion, two firms on the Plaintiffs' Executive Committees voluntarily submitted declarations from all individuals at the firms who had access to the Al Jarrah transcript, each stating that no one from the firms leaked the Al Jarrah transcript or had relevant communications with Isikoff.  *See* ECF Nos. 6991, 6992.  Notably, Kreindler & Kreindler did not.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
September 29, 2021                    **FILED UNDER SEAL**
Page 2                    **SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

On August 12, 2021, the Court ordered Kreindler & Kreindler "to follow the lead of" other law firms on the Plaintiffs' Executive Committees "and to file declarations, under penalty of perjury, as to whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by the Protective Order and the FBI Protective Order." ECF No. 7011, at 2. On August 16, 2021, Kreindler & Kreindler submitted declarations from four attorneys. Each contained identical language stating "to my knowledge, no one with the firm or anyone acting on its direction shared the Jarrah deposition transcript with anyone unauthorized by the Protective Order and the FBI Protective Order." ECF No. 7016.

The Court found the four declarations submitted by Kreindler & Kreindler to be insufficient. On August 30, 2021, it issued an order requiring the same four Kreindler & Kreindler attorneys to submit supplemental declarations that: (1) "identify all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021," and to provide all written communications to the Court; (2) state whether they had "ever discussed the contents of the Musaed Al Jarrah deposition with Michael Isikoff or anyone acting on his behalf"; (3) identify "every person with whom they shared the Al Jarrah deposition transcript"; and (4) identify "every person that they know had access to the deposition transcripts." ECF No. 7082, at 1.

The August 30 Order further required all individuals "employed by or acting at the direction of Kreindler & Kreindler" with access to the Al Jarrah transcript to submit declarations that "address whether the declarant shared with anyone any portion of the Al Jarrah deposition transcript." *Id.* at 2. Each such declarant was ordered to "identify and describe all communications with Michael Isikoff or anyone acting on his behalf, whether oral or written, from June 1, 2021, to August 1, 2021," and to provide to the Court "[a]ny written communication." *Id.*

In addition, the Court required the head of Kreindler & Kreindler's "information technology group" to submit a declaration "describing the investigation that was undertaken in response to the breach of the Protective Order" and to "demonstrate that a forensic analysis was done to identify who accessed the deposition transcripts, determine the dates of any access, and assess whether anyone from the firm emailed either of the two known Isikoff email addresses . . . or any other email addresses known to be associated with Isikoff." *Id.*

**2.** On September 27, 2021, Kreindler & Kreindler submitted a letter to the Court admitting that its prior statements to the Court "that Kreindler was not the source of the Jarrah deposition obtained by Michael Isikoff . . . were wrong." ECF No. 7147, at 1. Attached to that letter is a declaration from John Fawcett, stating that "in early July 2021 I sent a redacted version of the transcript of the deposition of Musaed al Jarrah to Michael Isikoff." ECF No. 7147-11, ¶ 2. Kreindler & Kreindler's September 27 letter describes Fawcett as a "consultant," ECF No. 7147, at 1, and Fawcett's declaration identifies him as "a researcher and consultant to Kreindler & Kreindler[ ] since 2002," ECF No. 7147-11, ¶ 1. He is identified as "Staff, Kreindler & Kreindler" in the transcripts of the depositions that he attended, including the Al Jarrah deposition, *see* Ex. A, and Kreindler & Kreindler has previously described him to the Court as an

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
September 29, 2021                    **FILED UNDER SEAL**
Page 3                    **SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

"investigator and researcher," ECF No. 2856. Fawcett appears to be a non-lawyer and hence not subject to ethical sanctions by the New York Bar.

Although Fawcett admits to sending the Al Jarrah transcript in violation of the MDL and FBI Protective Orders, his declaration fails to "identify and describe all communications" he had with Isikoff, as the August 30 Order requires. Fawcett's declaration states that he emailed the Al Jarrah transcript to Isikoff "in early July," ECF No. 7147-11, ¶¶ 2-3, but does not give the exact date of that email, describe the contents of that email, attach that email, or attach the version of the transcript that Fawcett sent to Isikoff. Nor does it state whether Fawcett had any other communications with Isikoff or anyone acting on his behalf, or attach any such communications that may have taken place.

Some statements in the Fawcett declaration – presumably prepared for his signature by the lawyers at Kreindler & Kreindler – appear to be false. Fawcett states that the "redacted portions of the deposition I sent to Michael Isikoff were focused on Musaed al Jarrah's testimony about his possession of child pornography." *Id.* ¶ 2. The July 15 Isikoff article, however, describes portions of the deposition that have nothing to do with this subject matter – including Al Jarrah's denials that before the 9/11 attacks he had ever heard the names Khalid Al Mihdhar or Nawaf Al Hazmi. *Compare* ECF No. 6981-01 (filed under seal), at 6, *with* ECF No. 6981-02 (filed under seal), at 594-95. The article also purports to give an exact count of the number of times Al Jarrah used the words "I don't remember" throughout the entire deposition (by Isikoff's count, 103 times). ECF No. 6981-01 (filed under seal), at 7. ████████████████████████ ██████████████████████████████████████████████████████████████████ ECF No. 6981-02 (filed under seal), at 567-91. Fawcett's assertion that "I did not send any FBI protected portions of the deposition to Michael Isikoff," ECF No. 7147-11, ¶ 2, is also false. As the FBI made clear in its August 2, 2021 letter, the entire deposition is subject to the FBI Protective Order and is sealed pending the completion of the FBI's review. *See* ECF No. 6999, at 2 (citing FBI Protective Order ¶ 10).

In its September 27, 2021 submission, Kreindler & Kreindler has also submitted the declaration of John Hartney, its "head of Information Technology." ECF No. 7147-6, ¶ 1. That declaration states that the confidential Al Jarrah transcripts "were saved on Kreindler's server within a share drive specific to documents related to the 9/11 litigation." *Id.* ¶ 4. The declaration further states "*I was told* that the following had been able to access the Jarrah transcripts" and lists five attorneys, three staff members, and Fawcett. *Id.* ¶ 5 (emphasis added). Hartney thus appears to be relying on information he received from someone else. His declaration does not satisfy the Court's directives to "demonstrate that a forensic analysis was done to identify who accessed the deposition transcripts" and to "determine the dates of any access." ECF No. 7082, at 2. Nothing in the Hartney declaration or any other declaration submitted by Kreindler & Kreindler states when or how Fawcett accessed the Al Jarrah transcript, or describes any forensic investigation to determine how Fawcett was able to transfer the file from Kreindler & Kreindler's server to his own private email, in order to send it to Isikoff.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
September 29, 2021          **FILED UNDER SEAL**
Page 4          **SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Attorney James Kreindler's September 27, 2021 supplemental declaration is also not fully forthcoming. The Kreindler declaration states that "I never discussed the content of the Jarrah deposition with Isikoff or anyone acting on his behalf." ECF No. 7147-1, ¶ 6. As the Court is now well aware, Kreindler appeared on Isikoff's *Conspiracyland* podcast on July 10, 2021 – 3 weeks after the Al Jarrah deposition and 5 days before Isikoff's July 15, 2021 article. On that podcast, Kreindler was asked in particular about the depositions that Plaintiffs took of Omar Al Bayoumi, Fahad Al Thumairy, and Musaed Al Jarrah, described by Isikoff on the podcast as the "principals" of the FBI's investigation. July 10 Podcast at 35:46-36:43.\* Kreindler responded that "we've exposed all kinds of lies," that "lots and lots of people [are] inculpating every Saudi official," and that there have been "smoking guns." *Id.* at 37:05-45. Whether or not those (untrue) statements themselves violated the protective orders, they certainly purport to discuss the content of the Al Jarrah deposition. The Kreindler declaration's statement that Kreindler "never" discussed the content of the deposition with Isikoff at all thus cannot be squared with his own recorded words. That discrepancy calls into question the accuracy of his statements that he did not discuss the content of the deposition during other phone calls with Isikoff at all.

3.      Saudi Arabia and non-party Musaed Al Jarrah have been irreparably harmed by Kreindler & Kreindler's admitted breach of the protective orders. But the full scope of that breach and the appropriate sanction is not yet clear.

Saudi Arabia and Al Jarrah respectfully submit that Kreindler & Kreindler should be ordered fully to comply with the August 30 Order. Kreindler & Kreindler should be ordered to conduct a full forensic review to determine every person who accessed the Al Jarrah transcript and to provide a supplemental declaration providing specific information as to who accessed that transcript and when. It should further be ordered to conduct an investigation as to the specific circumstances of when and how Fawcett accessed the Al Jarrah transcript and how he was able to transmit that confidential transcript to Isikoff through a non-firm email account. That investigation should include a determination of whether anyone else at Kreindler & Kreindler had knowledge of Fawcett's communications with Isikoff, including his transmission of the Al Jarrah transcript to Isikoff. Any written communications regarding this leak, including internal firm communications, should be produced to the Court and the parties.

Fawcett should be ordered a second time to submit a declaration describing each of his communications with Isikoff and to produce all written communications, including the transcript he sent to Isikoff. Fawcett should also be ordered to identify, with particularity, all "steps" that he "took . . . so that no one from Kreindler would know what [he] had done." ECF No. 7147-11, ¶ 3. In addition, both Kreindler & Kreindler and Fawcett should be specifically directed to preserve all communications responsive to the Court's orders and to identify with particularity any communications that would otherwise have been responsive to the Court's orders and that

---

\* Apple Podcasts, *Conspiracyland*, Bonus Episode 2: "Khashoggi and the 9/11 lawsuit" (July 10, 2021), https://podcasts.apple.com/us/podcast/bonus-episode-2-khashoggi-and-the-9-11-lawsuit/id1471037693?i=1000528441443 ("July 10 Podcast").

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
September 29, 2021        **FILED UNDER SEAL**
Page 5            **SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

have been deleted. Fawcett should also be directed to identify the "non-Kreindler e-mail address" that he used to send the transcript to Isikoff. *Id.*

Once Kreindler & Kreindler and Fawcett have submitted appropriate supplemental declarations and produced documents, Saudi Arabia and Al Jarrah reserve the right to seek additional discovery, including (1) any depositions that may be appropriate, (2) independent forensic review of any relevant computers or devices and (3) third-party discovery from any third-party email provider that Fawcett used to send the Al Jarrah deposition transcript to Isikoff.

4.       The Court should also reject Kreindler & Kreindler's request to submit *ex parte* any portion of the Fawcett declaration and the entire declaration of "Consultant 1." *Ex parte* submissions are "strongly disfavored," and there is no "compelling justification" for such a submission here. *Schiller v. City of New York*, 2008 WL 1777848, at *3, *5 (S.D.N.Y. Apr. 14, 2008). Kreindler & Kreindler submits (at 2) that a portion of the Fawcett declaration should be submitted *ex parte* to protect individual privacy interests. That is precisely what a protective order is for. Fawcett's declaration taking personal responsibility for the current breach – with the apparent intent to protect his employer of two decades – places his personal credibility squarely at issue. Saudi Arabia should have access to his entire declaration to evaluate that credibility.

Nor is there any reason for the declaration of Consultant 1 to be submitted *ex parte*. Although the work of a consulting expert may be work product, Kreindler & Kreindler has made no showing that a declaration concerning whether such a consultant leaked a deposition transcript to the press would reveal work product. To the extent the identity of the consulting expert is at issue, the appropriate course is a motion to proceed anonymously, which requires a careful balancing of numerous public and private interests. *See Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008). Kreindler & Kreindler has made no such motion.

5.       Yesterday, September 28, 2021, Kreindler & Kreindler sent an additional letter to the Court styled as "a further report on our efforts to protect against any future release of confidential designated material from our files." ECF No. 7153, at 1. Those efforts consist of (1) "strictly limit[ing]" access to "9/11 case protected materials" by moving them into "a separate file on its computer system"; (2) "setting up a new system" that will, going forward, "track the viewing and download of all documents [by users] of the system"; (3) in the interim, "direct[ing] . . . lawyers and staff working on the case" to manually "keep a log of all documents that they access"; and (4) asking the Court "to formally endorse the roles of" two Kreindler attorneys by appointing them to the Plaintiffs' Executive Committee for Personal Injury and Death Claims. The new letter makes clear that for more than two months after the disclosure to Isikoff – a period during which its attorneys represented to the Court it had already "conducted a review of the handling of the Jarrah deposition transcript," ECF No. 7016 (Benett Decl. ¶ 8) – Kreindler & Kreindler still was not tracking access to sensitive and confidential material or appropriately restricting individuals qualified to access it. There is no indication that Kreindler & Kreindler will take its violation of the Court's orders seriously without further action by the Court.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
September 29, 2021                   **FILED UNDER SEAL**
Page 6                  **SUBJECT TO FBI AND MDL PROTECTIVE ORDERS**

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
*Counsel for the Kingdom of Saudi Arabia*

cc:      Counsel for Plaintiffs, Dallah Avco, and the FBI

**KREINDLER**

KREINDLER & KREINDLER LLP | 485 Lexington Avenue | New York, NY 10017-2629
office: 212.687.8181 | fax: 212.972.9432 | www.kreindler.com

Filed Under Seal Pursuant to 03 MDL 1570 Protective Order

September 30, 2021

<u>Via ECF/CM</u>

The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

  Re: *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)
    (Ashton 02-cv-6977 only)

Dear Judge Netburn:

  Kreindler & Kreindler LLP ("Kreindler") submits this response to the letter from the Kingdom of Saudi Arabia (ECF No. 7157), together with a supplemental declaration from John Fawcett.

  As explained in our September 27, 2021 letter, Kreindler is genuinely sorry to the Court and counsel for a breach Kreindler first discovered hours before our papers were due despite our investigation efforts, including questioning of all individuals we knew had access to the Jarrah transcript, including John Fawcett. *See* ECF No. 7147-2 at ¶¶ 5-6. But contrary to the suggestions in Saudi Arabia's letter, apart from our consultant John Fawcett, Kreindler: (a) did not act in bad faith; (b) preserved and reported to the Court its communications as requested; (c) was not aware of what our consultant had done until the day our papers were due; (d) did not discuss the confidential content of the deposition of Musaed al Jarrah with Michael Isikoff or anyone else who had not signed the protective order; (e) did not approve of or encourage the breach, tacitly or otherwise; and (e) upon learning of the breach, immediately acted to remove the consultant from access to confidential materials and take additional steps to prevent a recurrence.

  Kreindler questioned each person with access to the transcript of Musaed al Jarrah and prepared declarations in accordance with our understanding of each person's knowledge. Everyone at Kreindler – except its consultant John Fawcett – answered the questions directed by this Court and confirmed under oath that they did not share the Jarrah transcript with Michael Isikoff or anyone else. ECF Nos. 7147-1 to 7147-10. They also confirmed that they learned for the first time on September 27 the information revealed in John Fawcett's September 27 declaration. *Id.* Like numerous other law firms (*e.g.,* Anderson Kill, Speiser Krause, Baumeister & Samuels, MoloLamken, Jones Day), Kreindler waited until the Court issued an order about what to file before submitting its initial and supplemental declarations. When the Court lifted its stay, Kreindler timely filed its supplemental declarations and did not seek a delay, even after finding out about Mr. Fawcett's actions at the eleventh hour. Any suggestion by Saudi Arabia that Kreindler took these steps to avoid discovery of its consultant's role is wrong. Kreindler did

not know the truth about what happened until September 27 and immediately shared the information with the Court and the parties.

It was late in the morning on September 27 that Mr. Fawcett told Kreindler he could not sign his declaration because he had furnished the transcript to Michael Isikoff. Mr. Fawcett then drafted the declaration submitted to the Court. After learning the truth from Mr. Fawcett, Kreindler had its director of information technology and lawyers review their investigation to see what if anything we had missed and needed to report to the Court. As we told the Court, Kreindler always knew that Mr. Fawcett had access to the Jarrah transcript and as described in the declaration from John Hartney, Kreindler had no evidence of incoming, outgoing or deleted messages to Isikoff or involving the Jarrah transcript between June 1 and August 2, 2021 other than those produced on September 27, 2021. ECF No. 7147-6 at ¶¶8-10 and pp. 6-27. It was the fact that Mr. Fawcett did not disclose until September 27 that he provided the Jarrah transcript to Isikoff and the steps he took to ensure that no one at Kreindler knew he had done so that led to Kreindler believing – until mid-morning on Monday – that Isikoff could not have obtained the transcript from anyone at Kreindler.

To complete the record, we asked Mr. Fawcett today to prepare a supplemental declaration to provide further details to the Court about how he sent the transcript to Michael Isikoff. That supplemental declaration confirms again that Mr. Fawcett downloaded the transcript to his personal devices and sent it to Michael Isikoff through a private, encrypted email service using a self-destruction option that, within days of sending the transcript to Isikoff, erased all evidence even on his personal account of the email exchange. Kreindler was unaware of this breach until Mr. Fawcett admitted it and was unaware of the steps Mr. Fawcett took until he described them to us.

Saudi Arabia unfairly claims that Kreindler does not take the violation of this Court's Orders "seriously" because Kreindler "was not tracking access" to the deposition transcript by approved users. ECF No. 7157 at 5. Andrew J. Maloney stated in his declaration that Kreindler only allowed individuals who had agreed to be bound by the MDL and FBI protective orders to review protected material, including the Jarrah deposition transcript. ECF No. 7147-2 at ¶ 5. Mr. Fawcett was an individual permitted to access those materials. Having software that tracked access with greater detail would not have led to a different outcome, as Kreindler knew that Mr. Fawcett had access to the Jarrah transcript. Any system is necessarily based on trust of the users. Even with a system tracking downloads, an authorized person can decide to copy and release protected material to the public. We only know how the breach occurred in this instance because Mr. Fawcett provided the information. Nevertheless, since it may help deter and serve as a check, Kreindler is obtaining the software necessary to automatically track all viewing and access of protected documents and, in the meantime, requiring all attorneys and staff working with protected materials to keep a log of their access.

Contrary to Saudi Arabia's statements, Jim Kreindler's comments on Consipracyland did not disclose any content from the Jarrah deposition. The only specific reference by Jim Kreindler to Jarrah in the Conspiracyland broadcast was to the public allegations set forth in the 2012 and 2014 FBI Summary Reports that Jarrah tasked Fahad al Thumairy and Omar al Bayoumi to support the 9/11 hijackers. The comments made by Jim Kreindler about the depositions in general did not amount to disclosing the content of the Jarrah deposition and had previously been addressed by the Kingdom before the Court. ECF No. 7084 at 5 & n. 4.

2021-09-30 Kreindler & Kreindler LLP Letter
p. 3 of 3

We must note to the Court that until now, John Fawcett has worked on the litigation for nearly 20 years without blemish.  We do not condone his serious mistake.  Mr. Fawcett presented the facts about what he did to the Court.  He accepts the consequences of his act.  He explained the moral and emotional reasons that he felt compelled him to act in the way that he did.  His error must be judged together with the steadfast, tireless work he has done for two decades on behalf of the 9/11 Families.

Finally, the Kingdom's claim that it and Mr. Jarrah "have been irreparably harmed," ECF No. 7157 at 4, is based on technicalities, not substance.  It was Mr. Jarrah who actively tried to



but neither the Kingdom nor the FBI produced records documenting those meetings and while the Kingdom served supplemental interrogatory responses that stated Jarrah had advised them of three meetings, that response was neither subject to the MDL protective order nor, as we know now from Jarrah's deposition testimony, complete.)  None of Plaintiffs' questions or Jarrah's answers at issue here were based on documents subject to the protective orders.

Respectfully,

/s/ Megan Wolfe Benett
KREINDLER & KREINDLER LLP
Megan Wolfe Benett, Esq.
Steven R. Pounian, Esq.
James P. Kreindler, Esq.
Andrew J. Maloney, Esq.
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: mbenett@kreindler.com

Enclosures

This Transcript Contains Confidential Material

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2                       -   -   -
 3
 4   IN RE: TERRORIST ATTACKS    : 03-MDL-1570
     ON SEPTEMBER 11, 2001       : (GBD)(SN)
 5
 6
 7
                         -   -   -
 8                   JUNE 18, 2021
                      VOLUME II
 9          THIS TRANSCRIPT CONTAINS
               CONFIDENTIAL MATERIAL
10                       -   -   -
11
12
13              Remote Videotaped
14   Deposition, taken via Zoom, of MUSSAED AL
15   JARRAH, commencing at 7:00 a.m., on the
16   above date, before Amanda
17   Maslynsky-Miller, Certified Realtime
18   Reporter and Notary Public in and for the
19   Commonwealth of Pennsylvania.
20
21                       -   -   -
22          GOLKOW LITIGATION SERVICES
        877.370.3377 ph| 917.591.5672 fax
23              deps@golkow.com
24
```

**P. 1**

```
 1   APPEARANCES:

 2

 3          KREINDLER & KREINDLER LLP
            BY: MEGAN WOLFE BENETT, ESQUIRE
 4          BY: STEVEN R. POUNIAN, ESQUIRE
            BY: JAMES P. KREINDLER, ESQUIRE
 5          BY: ANDREW J. MALONEY III, ESQUIRE
            485 Lexington Avenue, 28th Floor
 6          New York, New York 10017
            (212) 687-8181
 7          mbenett@kreindler.com
            spounian@kreindler.com
 8          jkreindler@kreindler.com
            amaloney@kreindler.com
 9          Representing the Ashton, et al.,
            Plaintiffs
10

11

12          COZEN O'CONNOR P.C.
            BY: SEAN P. CARTER, ESQUIRE
13          BY: J. SCOTT TARBUTTON, ESQUIRE
            One Liberty Place
14          1650 Market Street
            Suite 2800
15          Philadelphia, Pennsylvania 19103
            (215) 665-2000
16          scarter1@cozen.com
            starbutton@cozen.com
17          Representing the Plaintiffs
18

19

20          ANDERSON KILL P.C.
            BY: JERRY S. GOLDMAN, ESQUIRE
21          1251 Avenue of the Americas
            New York, New York 10020
22          (212) 278-1000
            jgoldman@andersonkill.com
23          Representing the Plaintiffs'
            Steering Committee
24
```

**P. 2**

This Transcript Contains Confidential Material

```
 1   APPEARANCES:  (Continued)
 2
 3           MOTLEY RICE LLC
             BY: ROBERT T. HAEFELE, ESQUIRE
 4           BY: JADE A. HAILESELASSIE, ESQUIRE
             BY: C. ROSS HEYL, ESQUIRE
 5           28 Bridgeside Boulevard
             Mount Pleasant, South Carolina 29464
 6           (843) 216-9000
             rhaefele@motleyrice.com
 7           jhaileselassie@motleyrice.com
             rheyl@motleyrice.com
 8           Representing the Plaintiffs' Steering
             Committee and the Burnett Plaintiffs
 9
10
11
             BAUMEISTER & SAMUELS, PC
12           BY: DOROTHEA M. CAPONE, ESQUIRE
             140 Broadway
13           46th Floor
             New York, New York 10005
14           (212) 363-1200
             tcapone@baumeisterlaw.com
15           Representing the Plaintiff,
             Ashton, et al., Plaintiffs
16
17
18
             SHEPS LAW GROUP P.C
19           BY: ROBERT SHEPS, ESQUIRE
             35 Pinelawn Road
20           Suite 106 East
             Melville, New York 11747
21           (631) 249-5600
             rsheps@shepslaw.com
22           Representing Plaintiff Charter
             Oak Insurance Company
23
24
```

**P. 3**

This Transcript Contains Confidential Material

```
 1   APPEARANCES: (Continued)
 2
 3          FORD MARRIN ESPOSITO WITMEYER &
            GLESER, LLP
 4          BY: CATHERINE B. ALTIER, ESQUIRE
            Wall Street Plaza, 16th Floor
 5          New York, New York 10005
            (212) 269-4900
 6          cbaltier@fordmarrin.com
            Representing the Plaintiffs,
 7          Continental Casualty Company,
            Transcontinental Insurance Company,
 8          Transportation Insurance Company,
            Valley Forge Insurance Company,
 9          National Fire Insurance Company of
            Hartford, and American Casualty
10          Company of Reading, Pennsylvania
11
12
            SPEISER KRAUSE, PC
13          BY: JEANNE M. O'GRADY, ESQUIRE
            800 Westchester Avenue
14          Suite S-608
            Rye Brook, New York 10573
15          (914) 220-5333
            jog@speiserkrause.com
16          Representing the Plaintiff's
            Steering Committee
17
18
19
            LOCKE LORD LLP
20          BY:  ANN TAYLOR, ESQUIRE
            111 South Wacker Drive
21          Chicago, Illinois 60606
            (312) 443-0689
22          ataylor@lockelord.com
            Representing the Plaintiff, Global
23          Aerospace, Inc, et al.
24
```

**P. 4**

This Transcript Contains Confidential Material

```
 1   APPEARANCES: (Continued)
 2
 3          KELLOGG, HANSEN, TODD, FIGEL &
            FREDERICK, P.L.L.C.
 4          BY: ANDREW C. SHEN, ESQUIRE
            BY: CHRIS YOUNG, ESQUIRE
 5          BY: MICHAEL K. KELLOGG, ESQUIRE
            1615 M Street, N.W.
 6          Suite 400
            Washington, D.C. 20036
 7          (202) 326-7900
            ashen@kellogghansen.com
 8          cyoung@kellogghansen.com
            mkellogg@kellogghansen.com
 9          Representing the Defendant,
            Kingdom of Saudi Arabia
10
11
12          JONES DAY
            BY: ERIC SNYDER, ESQUIRE
13          BY: STEVEN COTTREAU, ESQUIRE
            BY: ABIGAEL BOSCH, ESQUIRE
14          51 Louisiana Avenue, N.W.
            Washington, D.C. 20001
15          (202) 879-3939
            esnyder@jonesday.com
16          scottreau@jonesday.com
            abosch@jonesday.com
17          Representing the Defendant,
            Dubai Islamic Bank
18
19
            MOLOLAMKEN LLP
20          BY: ERIC R. NITZ, ESQUIRE
            600 New Hampshire Avenue, N.W.
21          Washington, D.C. 20037
            (202) 556-2000
22          enitz@mololamken.com
            Representing the Defendant,
23          Dallah Avco
24
```

**P. 5**

This Transcript Contains Confidential Material

```
 1    APPEARANCES: (Continued)
 2

 3           LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
             BY: SUMAYYA KHATIB, ESQUIRE
 4           1101 New York Avenue, N.W.
             Suite 1000
 5           Washington, D.C. 20005
             (202) 833-8900
 6           sumayya.khatib@lbkmlaw.com
             Representing the Defendants,
 7           Muslim World League, the
             International Islamic Relief
 8           Organization, and
             Drs. Turki, Al-Obaid, Naseef and Basha
 9

10

11

12           LAW FIRM OF OMAR T. MOHAMMEDI, LLC
             BY: STEVE SEIGLER, ESQUIRE
13           233 Broadway
             Suite 820
14           New York, New York 10279
             (212) 725-3846
15           sseigler@otmlaw.com
             Representing the Defendant,
16           WAMY and WAMY International
17

18

     ALSO PRESENT:
19

     David Lane, Videographer
20   Dianne Int-Hout, Trial Technician
21   John Fawcett, Staff, Kreindler & Kreindler
     Debra Pagan, Paralegal, Kreindler & Kreindler
22   Julia Sienski, Client Liaison, Kreindler &
     Kreindler
23   Catherine Hunt, Consultant, Kreindler &
     Kreindler
24
```

**P. 6**

This Transcript Contains Confidential Material

1   APPEARANCES: (Continued)

2   ALSO PRESENT:

3

    Raymond Rivera, IT, Cozen O'Connor

4

5   Richard Cashon, Paralegal, Motley Rice

6

    Bachar Al-Halabi, Interpreter

7   Marwan Abdel-Rahman, Interpreter

    Rodina Mikhail, Interpreter

8   Ed Beeter, Check Interpreter

9

    Ziad al-Sudiary

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**P. 7**

This Transcript Contains Confidential Material



This Transcript Contains Confidential Material



**P. 9**



**P. 10**

This Transcript Contains Confidential Material



**P. 11**

This Transcript Contains Confidential Material



This Transcript Contains Confidential Material



**P. 13**

This Transcript Contains Confidential Material



**P. 14**

This Transcript Contains Confidential Material



This Transcript Contains Confidential Material



**P. 16**

This Transcript Contains Confidential Material



**P. 17**

This Transcript Contains Confidential Material



**P. 18**

This Transcript Contains Confidential Material



**P. 19**

This Transcript Contains Confidential Material



**P. 20**

This Transcript Contains Confidential Material



This Transcript Contains Confidential Material



**P. 22**

This Transcript Contains Confidential Material



**P. 23**

This Transcript Contains Confidential Material



**P. 24**

This Transcript Contains Confidential Material



**P. 25**

This Transcript Contains Confidential Material



**P. 26**

This Transcript Contains Confidential Material



**P. 27**



This Transcript Contains Confidential Material



**P. 29**

This Transcript Contains Confidential Material



**P. 30**

This Transcript Contains Confidential Material



**P. 31**

This Transcript Contains Confidential Material



**P. 32**

This Transcript Contains Confidential Material



**P. 33**

This Transcript Contains Confidential Material



**P. 34**

This Transcript Contains Confidential Material



**P. 35**

This Transcript Contains Confidential Material



**P. 36**

This Transcript Contains Confidential Material



**P. 37**

This Transcript Contains Confidential Material



**P. 38**

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

### DECLARATION OF JOHN FAWCETT

I, John Fawcett, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1. I provide this statement to supplement my sworn declaration dated September 27, 2021 concerning the information I provided to Yahoo! News investigative reporter Michael Isikoff.

2. As previously stated, I have worked for the 9/11 Families as a researcher and consultant to Kreindler & Kreindler ("Kreindler") since 2002. I have no contract and I bill Kreindler on an hourly basis. Kreindler granted me access to its computer network and provided me with a Kreindler email account. Kreindler shut down my access to its computer network as of September 27, 2021.

3. I privately communicated with Michael Isikoff several times between June 1 and August 1 of this year. I don't recall exactly the dates that I spoke with him, but I believe the first time was in early July. During the call, Isikoff asked me if there was anything he should know about the Jarrah deposition and I told him yes, that Jarrah was a child pornographer.

4. After I talked with Isikoff, I decided I would send him the Jarrah transcript. I don't recall if I sent him the rough or the final transcript. I do recall that I made sure that whatever I sent didn't have any of the questions or answers about FBI material.

5. I sent the Jarrah transcripts to Isikoff so he could see that Jarrah had admitted that he had sexual images of minors on his computer – after lying during the first day of his deposition and then claiming that he "couldn't remember" if FBI agents confronted him with the child pornography they found on Jarrah's computer.

6. I sent the Jarrah transcripts to Isikoff because I wanted someone to do something to stop Jarrah. The transcript I sent to Isikoff was the version that was heavily redacted, leaving out all the questions and answers that concerned information and documents that the FBI had provided under the FBI Protective Order. The only way Isikoff could understand that Jarrah had lied during the deposition was to compare his testimony after he was confronted with the fact that he had been questioned about the images on his computer with his earlier testimony claiming that he had only friendly meetings with FBI agents. The facts that the FBI interviewed Jarrah on at least three occasions were not subject to either protective order.

7. To send the transcript without anyone at Kreindler knowing, I took several steps. First, while I could access the network and share drive where the transcript was saved via my own laptop and the firm's remote access program, I couldn't find a way to save the transcript to my laptop directly, so I saved it onto a thumb drive. I took the thumb drive home. I used a personal email account I established on ProtonMail to send the transcript. ProtonMail is an end-to-end encrypted email service. My ProtonMail account had a self-destructing messages option which automatically deletes emails from a recipient's email inbox after a certain period of time. That option also automatically deletes the email from my sent folder. I believe I set up the self-destructing messages option on my ProtonMail account to delete after 7 days. I recently checked my ProtonMail account to see whether any emails to or from Isikoff about the Jarrah deposition

(or any other emails between June 1 and August 1, 2021) are saved in an inbox, a sent folder or a deleted folder. I could not find any such emails.

8. After I sent Isikoff the Jarrah transcript, I believe I had a second phone call with him about the timing of his article discussing Jarrah. I was worried that if he published an article around the same time as he aired the podcast with Jim Kreindler, people would assume that Jim Kreindler had given Isikoff the information about Jarrah, even though I knew that Jim hadn't done so, didn't know I'd done it, and hadn't encouraged me to do it or suggested I do it.

9. Once Isikoff published his article, I deleted everything from the thumb drive that contained the Jarrah transcript and then threw the thumb drive out in my household garbage.

10. I believe I had a third call with Isikoff before the publication of his article. He was interested in doing another article about the 2016 FBI Operation Encore report. He asked how to verify that such a report existed. I sent him the FBI privilege log. I told him that between the privilege log and the Pro Publica article entitled Operation Encore he should have enough to confirm the existence of the document.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
September 30, 2021

By: _John Fawcett_
JOHN FAWCETT

3