# APPENDIX C3

ECF  7166 to 7384



**KREINDLER & KREINDLER LLP | 485 Lexington Avenue | New York, NY 10017-2629**
**office: 212.687.8181 | fax: 212.972.9432 | www.kreindler.com**

Filed Under Seal Pursuant to 03 MDL 1570 Protective Order

October 4, 2021

<u>Via ECF/CM</u>

The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

     Re:    *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)
              (Ashton 02-cv-6977 only)

Dear Judge Netburn:

       We are filing under seal the attached declarations of Consultant 1, identified by Kreindler and Kreindler LLP in ECF No. 7147, and John Fawcett, with this letter in accordance with this Court's October 1, 2021 Order. See ECF No. 7165.

                        Respectfully,

                        /s/ Megan Wolfe Benett
                        KREINDLER & KREINDLER LLP
                        485 Lexington Avenue
                        New York, New York 10017
                        Tel.: 212-687-8181
                        Email: mbenett@kreindler.com

Enclosures

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

### DECLARATION OF JOHN FAWCETT

I, John Fawcett, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1.       I have worked for the 9/11 Families as a researcher and consultant to Kreindler & Kreindler ("Kreindler") since 2002.

2.       As I told Kreindler for the first time earlier today, in early July 2021 I sent a redacted version of the transcript of the deposition of Musaed al Jarrah to Michael Isikoff. The redacted portions of the deposition I sent to Michael Isikoff were focused on Musaed al Jarrah's testimony about his possession of child pornography. I did not send any FBI protected portions of the deposition to Michael Isikoff.

3.       Until today, no one other than Michael Isikoff and I knew that I sent the redacted transcript to Michael Isikoff. I sent the transcript to Michael Isikoff using a non-Kreindler e-mail address. I did so to prevent the lawyers and staff of Kreindler from knowing about my intended action and to prevent them from stopping me, should they wish to do so. No one from Kreindler directed me to send the transcript to Michael Isikoff and I took steps so that no one from Kreindler would know what I had done.

4.       I felt compelled to release the information because I thought that the media was the only venue available to protect the public and children from Musaed al Jarrah and his

conduct. After the revelations at the deposition that he was a child pornographer, I did not believe that Musaed al Jarrah's criminal acts should remain a secret. The Saudi government's invocations of diplomatic immunity and the FBI's claims of secrecy about its own relationship with Musaed al Jarrah only served to protect Musaed al Jarrah rather than expose his dangers to children. No one was taking action to protect the children at risk because of the conduct of Musaed al Jarrah. I had a personal interest because Musaed al Jarrah worked for Saudi Arabia as a diplomat in Morocco for many years and still lives there, my own children are from that country, and I know from my prior international humanitarian and human rights work that Morocco has a dreadful history of child sex trafficking.

5.      I accept responsibility for my actions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
       September 27, 2021

By: _____
       JOHN FAWCETT

2

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

### DECLARATION OF ███████████

I, ███████████, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury

the following:

1.   ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

As part of my investigative and analysis work, I am often, if not primarily, in the field

interviewing witnesses with first-hand and eye-witness knowledge of the events in question. I

was retained by the law firm of Kreindler & Kreindler LLP on or about August 1, 2020, to

investigate aspects of the role Saudi officials and others played in assisting the 9/11 hijackers

Nawaf al Hazmi and Khalid al Mihdhar after they arrived in the United States. I also completed

other tasks on behalf of Kreindler & Kreindler apropos of the 9/11 case.

2.   After my retention, I reviewed the Court's protective orders concerning the FBI material

produced in this case as well as the separate order that pertains to material produced by the

Kingdom of Saudi Arabia, and I executed the authorization forms acknowledging the Court's

directive not to divulge the FBI or Saudi material to anyone outside of the Plaintiffs' attorneys in the 9/11 terror litigation.

3.     Over the past year, I have been provided with numerous documents that have been produced by the FBI and the Kingdom under the protective orders, including transcripts of the depositions of various witnesses. On Jul 7, 2021, I was provided with the un-redacted deposition transcript of Mussed al Jarrah with an explicit reminder not to share the transcript with anyone or discuss its contents with anyone outside of the Kreindler legal team. I adhered to that directive and did not share the Jarrah transcript with or describe its contents to anyone.

4.     At no time have I been in touch with Yahoo reporter Michael Isikoff or anyone acting on his behalf. I have never met Mr. Isikoff, I have never spoken to Mr. Isikoff, I have never communicated with Mr. Isikoff in any way, including by means of email or other electronic devices. I have no knowledge concerning any details related to Mr. Isikoff's reported access to the Jarrah transcript, which he reportedly cited in his Yahoo News story about Jarrah, except for what I read in the story by Mr. Isikoff published on July 15.


I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge and belief.

Dated: New York, New York

September 2, 2021



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

```
┌──────────────────────────────────┐
│ USDC SDNY                         │
│ DOCUMENT                          │
│ ELECTRONICALLY FILED              │
│ DOC #: _____             │
│ DATE FILED: ___10/4/2021___       │
└──────────────────────────────────┘
```

In re:

       **TERRORIST ATTACKS ON
SEPTEMBER 11, 2001**

**03-MD-1570 (GBD)(SN)**

**ORDER**

----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge:**

       The Court will conduct a hearing regarding the breach of the protective orders by Kreindler & Kreindler. The hearing will be held on Thursday, October 21, 2021 (and if necessary, Friday, October 22), and will be conducted in-person in a COVID-compliant courtroom. The hearing will begin promptly at 10:00 a.m. in a courtroom to be determined.

       The purpose of the hearing is to render findings of fact in connection with the breach and to determine the appropriate remedies. Such remedies may include, among other possible remedies, removal from the Plaintiffs' Executive Committees, monetary sanctions, a referral for professional discipline to the Committee on Grievances for the Southern District of New York, and a criminal referral to the U.S. Attorney's Office for the Southern District of New York. Following the hearing, the Court will solicit from the parties proposed findings of fact and recommendations on appropriate remedies.

       The following witnesses are ORDERED to appear:

1. James P. Kreindler

2. Andrew J. Maloney III

3. Megan Wolfe Benett

4. Steven R. Pounian

5. John Hartney

6.  John Fawcett

These witnesses are ORDERED not to discuss further the issues within the scope of this hearing with any member, employee, or consultant of Kreindler & Kreindler, including during the hearing.

The Court will admit the witnesses' previously filed declarations as their direct testimony. Lawyers for the Kingdom of Saudi Arabia will be permitted to cross-examine the witnesses but shall not be limited in scope by their direct testimony. Kreindler & Kreindler will be permitted to conduct a re-direct examination following the cross-examination.

If a party believes additional witnesses should be called to testify, such party must identify the witness and the subject matter for his or her testimony by October 12, 2021.

Kreindler & Kreindler is ORDERED to deliver to the Court the laptop used by Fawcett to transmit the deposition transcript to Michael Isikoff, along with any passwords to access the laptop. If the Court determines that it is necessary, it may conduct an independent forensic evaluation of the laptop at the expense of Kreindler & Kreindler. Kreindler & Kreindler is again reminded that it is a violation of this Court's orders to destroy or tamper with evidence in this manner. The laptop shall be delivered to the Courthouse by Tuesday, October 5, 2021. The Court will maintain the laptop in a secured location.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:     New York, New York
           October 4, 2021

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215

———

(202) 326-7900

FACSIMILE:
(202) 326-7999

October 6, 2021

*Via ECF*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

>     Re:    *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

I write on behalf of Defendant Kingdom of Saudi Arabia ("Saudi Arabia") concerning the admission by Kreindler & Kreindler LLP that the firm is responsible for the leak of the confidential deposition transcript of Musaed Al Jarrah to Yahoo! News reporter Michael Isikoff and the evidentiary hearing scheduled for October 21, 2021.

In advance of that hearing, Saudi Arabia respectfully requests that the Court Order Kreindler & Kreindler LLP and John Fawcett to produce by October 15, 2021 a limited set of documents relating to Kreindler & Kreindler LLP's admitted leak, the investigations concerning that leak, the declarations that were submitted to the Court, and Mr. Fawcett's working relationship with Kreindler & Kreindler LLP. The specific requests are attached hereto as Exhibits A & B.[1]

At issue in the October 21, 2021 hearing is the veracity of the declarations that Kreindler & Kreindler LLP submitted to the Court on August 16, 2021, September 27, 2021, and September 30, 2021; whether anyone at Kreindler & Kreindler LLP had knowledge of Mr. Fawcett's actions prior to September 27, 2021 (the date Kreindler & Kreindler LLP admitted to its breach); and whether anyone at Kreindler & Kreindler LLP directed this breach. The production of the requested documents will ensure that Saudi Arabia can properly cross-examine

---

[1] Saudi Arabia provided the Plaintiffs' Executive Committee with these requests prior to filing this motion. Counsel for Kreindler & Kreindler LLP, Emily Kirsch, has informed undersigned counsel that she will not consent to this motion, but that she is "willing to meet and confer to determine if you can identify specific relevant documents that Kreindler can produce in an effort to avoid motion practice." Given the exigency of this motion and the limited scope of the requests, Saudi Arabia is proceeding with this motion.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
October 6, 2021
Page 2

the relevant witnesses, and are necessary for the Court to render findings of fact and to determine the appropriate remedies.

Where, as here, a breach of the protective orders has clearly occurred, courts have routinely ordered appropriate discovery, including the production of documents from the offending entity. *See* Order at 1-2, *CEATS, Inc. v. TicketNetwork, Inc.*, No. 2:15-cv-01470-JRG, ECF No. 371 (E.D. Tex. May 14, 2019) (ordering five document requests, five interrogatories, depositions, and forensic imaging of all hard drives and mobile devices of the individuals involved in the breach to determine the full scope of a breach of a protective order); Order at 5, *Apple Inc. v. Samsung Elecs. Co.*, No. CV 11-01846 LHK, ECF No. 2483 (N.D. Cal. Oct. 2, 2013) (ordering discovery into a breach of a protective order, including the production of emails and the depositions of certain individuals).

Because the current breach involved the conduct of Kreindler & Kreindler LLP, not their clients, there is no significant likelihood that the documents requested implicate any attorney-client privilege. Moreover, attorney work-product protections cannot shield these documents from disclosure. "[I]n cases of attorney misconduct there is no protection for the attorney's work product." *Drummond Co. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1337 (11th Cir. 2018); *see, e.g.*, *Parrott v. Wilson*, 707 F.2d 1262, 1271 n.20 (11th Cir. 1983) ("Disclosure is clearly an appropriate remedy when the evidence sought was generated directly by the attorney's misconduct.") (emphasis removed); *Anderson v. Hale*, 202 F.R.D. 548, 559 (N.D. Ill. 2001) (holding that "any work-product protection that would have otherwise applied" to the evidence sought had been "vitiated" by attorney misconduct); *New York v. Solvent Chem. Co.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996) (concluding, with "no difficulty," that evidence sought was "not protected from disclosure under the work product rule," because the conduct of litigants and their counsel "threatened to undermine the integrity of the adversary process in this case"). This rule is well-founded:

> It would indeed be perverse . . . to allow a lawyer to claim an evidentiary privilege to prevent disclosure of work product generated by those very activities the privilege was meant to prevent. Non-disclosure would then provide an incentive for, rather than against, the disfavored practices. The integrity of the adversary process is not furthered by protecting a lawyer who steps outside his role as "an officer of the court . . . work(ing) for the advancement of justice while faithfully protecting the rightful interests of his clients." An attorney should not be able to exploit the privilege for ends outside of and antithetical to the adversary system any more than a client who attempts to use the privilege to advance criminal or fraudulent ends.

*Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)) (first ellipsis added; footnotes omitted).

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
October 6, 2021
Page 3

   In any event, to the extent that Kreindler & Kreindler LLP or Mr. Fawcett claim any purported privilege, Saudi Arabia requests that the Court order them to produce a privilege log by no later than October 15, 2021 that complies with the requirements of Federal Rule of Civil Procedure 26(b)(5).

   Because the October 21, 2021 hearing is only two weeks away, Saudi Arabia respectfully requests expedited treatment of this motion and that the Court order any opposition to be filed by October 8, 2021 and any reply be filed by October 11, 2021.

        Respectfully submitted,

        /s/ *Michael K. Kellogg*

        Michael K. Kellogg
        *Counsel for the Kingdom of Saudi Arabia*

cc:  All MDL Counsel of Record (via ECF)

# Exhibit A

## PRODUCTION OF DOCUMENTS FROM PLAINTIFFS' COUNSEL KREINDLER & KREINDLER LLP

### DEFINITIONS

1.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), as defined by S.D.N.Y. Local Rule 26.3(c)(1).

2.      "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A), as defined by S.D.N.Y. Local Rule 26.3(c)(2).  A draft or non-identical copy is a separate document within the meaning of this term.

3.      "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association, as defined by S.D.N.Y. Local Rule 26.3(c)(6).

4.      "Relating to," "related to," or "in relation to" means concerning, constituting, regarding, referring to, describing, discussing, embodying, evidencing, memorializing, mentioning, recording, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to.

5.      "You" or "your" refers to Kreindler & Kreindler LLP and any attorney, paralegal, assistant, employee, staff, agent, or consultant to Kreindler & Kreindler LLP.

6.      The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all tenses, moods, or voices, as necessary to bring within the scope of a topic all information that might otherwise be construed to be outside of its scope.

### GENERAL INSTRUCTIONS

1.      You must produce not only documents in your possession, custody, or control, but also those documents in the possession, custody, or control of other persons acting on your

behalf. This includes, but is not limited to, documents maintained on your premises, storage devices, email servers, or any other repository or location in which documents exist; for example, if an individual is in possession, custody, or control of responsive documents, all such documents must be produced, regardless of the type of premises or device on which they are maintained.

2.      The words "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of discovery all responses that might otherwise be construed to be outside of its scope, as set forth in S.D.N.Y. Local Rule 26.3(d)(2).

3.      The use of a singular form of any word includes the plural and vice versa, as set forth in S.D.N.Y. Local Rule 26.3(d)(3).

4.      The definitions provided herein shall apply to the terms defined regardless of capitalization.

5.      The terms "all," "any," "each," and "every" shall each be construed as encompassing any and all, as set forth in S.D.N.Y. Local Rule 26.3(d)(1).

6.      Each category requires the production of all documents and things described, along with any addenda, attachments, drafts, and non-identical copies, as found or located in your files, together with a copy of the descriptive file folder or database category in its entirety.

7.      If documents are withheld under claim of privilege, including, but not limited to, attorney-client privilege or work-product doctrine, you are required to identify each such document and state the specific basis for the claim of privilege for each document withheld, as well as by providing the following information: (1) the date of the document; (2) a description of the general nature of the document (e.g., whether it is a letter, memorandum, email, etc.);

(3) the author of the document; and (4) the identity of each person to whom the document was addressed and the identity of each person to whom a copy was sent.

8.      Each category shall be construed independently and, therefore, no category shall be construed to limit any other category.

9.      Your obligation to respond is continuing in nature.  If further information, evidence, or documentation comes into your possession, custody, or control or is brought to the attention of you or your attorneys or agents at any time subsequent to the service of any responses or production of any documents, prompt and complete supplementation is required.

10.      Unless otherwise stated, the relevant time period is from June 1, 2021, to October 5, 2021.

## DOCUMENTS REQUIRED TO BE PRODUCED

1.      All documents and communications relating to the July 15, 2021 article written by Michael Isikoff, titled "FBI tried to flip Saudi official in 9/11 investigation."

2.      All documents and communications relating to the leak of the confidential transcript of the Mussaed Al Jarrah deposition to Michael Isikoff.

3.      All documents and communications relating to any investigation or review You conducted regarding the leak of the confidential transcript of the Al Jarrah deposition to Michael Isikoff.

4.      All documents and communications relating to any investigation or review You conducted relating to the identities of individuals who accessed the confidential Al Jarrah deposition transcript or to how that transcript was transmitted to Michael Isikoff.

5.      All communications You had with Michael Isikoff or any member of the press relating to any confidential deposition taken in this case.  The relevant time period for this category is July 1, 2019, to the present.

6.      All phone records reflecting Your communications with Michael Isikoff.

7.      All communications You had with John Fawcett relating to the July 15, 2021 Isikoff article or the leak of the Al Jarrah transcript to Michael Isikoff.

8.      All documents and communications relating to all responses by You to the Court's orders dated August 12, 2021, ECF No. 7011; August 30, 2021, ECF No. 7082; and September 23, 2021, ECF No. 7134, including without limitation any information any person provided to You in connection with those responses to those court orders.

9.      Any contract or agreement between You and John Fawcett, including without limitation any contract or agreement requiring John Fawcett to keep confidential any information he received from You or in connection with his work with You.  The relevant time period for this category is January 1, 2000, to the present.

10.      Documents sufficient to show the compensation (including any benefits) You paid, provided, or agreed to provide to John Fawcett.  The relevant time period for this category is January 1, 2018, to the present.

11.      Any tax records reflecting your relationship with John Fawcett, including without limitation any Form 1099.  The relevant time period for this category is January 1, 2018 to the present.

12.      Documents sufficient to show John Fawcett's responsibilities in connection with any work he performed for You, including without limitation any work in the capacities of

investigator, researcher, or consultant.  The relevant time period for this category is January 1, 2018, to the present.

13.     Documents sufficient to show John Fawcett's access to any documents or information in this litigation that is protected by the MDL or FBI Protective Orders.  The relevant time period for this category is January 1, 2018, to the present.

14.     Any documents or communications containing any instructions from you to John Fawcett concerning the preservation or destruction of any document or communication.

# Exhibit B

# PRODUCTION OF DOCUMENTS FROM  JOHN FAWCETT

## DEFINITIONS

1.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), as defined by S.D.N.Y. Local Rule 26.3(c)(1).

2.      "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A), as defined by S.D.N.Y. Local Rule 26.3(c)(2).  A draft or non-identical copy is a separate document within the meaning of this term.

3.      "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association, as defined by S.D.N.Y. Local Rule 26.3(c)(6).

4.      "Relating to," "related to," or "in relation to" means concerning, constituting, regarding, referring to, describing, discussing, embodying, evidencing, memorializing, mentioning, recording, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to.

5.      "You" or "your" refers to John Fawcett and any attorney, consultant, or agent of John Fawcett.

6.      The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all tenses, moods, or voices, as necessary to bring within the scope of a topic all information that might otherwise be construed to be outside of its scope.

## GENERAL INSTRUCTIONS

1.      You must produce not only documents in your possession, custody, or control, but also those documents in the possession, custody, or control of other persons acting on your

behalf. This includes, but is not limited to, documents maintained on your premises, storage devices, email servers, or any other repository or location in which documents exist; for example, if an individual is in possession, custody, or control of responsive documents, all such documents must be produced, regardless of the type of premises or device on which they are maintained.

2. The words "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of discovery all responses that might otherwise be construed to be outside of its scope, as set forth in S.D.N.Y. Local Rule 26.3(d)(2).

3. The use of a singular form of any word includes the plural and vice versa, as set forth in S.D.N.Y. Local Rule 26.3(d)(3).

4. The definitions provided herein shall apply to the terms defined regardless of capitalization.

5. The terms "all," "any," "each," and "every" shall each be construed as encompassing any and all, as set forth in S.D.N.Y. Local Rule 26.3(d)(1).

6. Each category requires the production of all documents and things described, along with any addenda, attachments, drafts, and non-identical copies, as found or located in your files, together with a copy of the descriptive file folder or database category in its entirety.

7. If documents are withheld under claim of privilege, including, but not limited to, attorney-client privilege or work-product doctrine, you are required to identify each such document and state the specific basis for the claim of privilege for each document withheld, as well as by providing the following information: (1) the date of the document; (2) a description of the general nature of the document (e.g., whether it is a letter, memorandum, email, etc.);

(3) the author of the document; and (4) the identity of each person to whom the document was addressed and the identity of each person to whom a copy was sent.

8.      Each category shall be construed independently and, therefore, no category shall be construed to limit any other category.

9.      Your obligation to respond is continuing in nature. If further information, evidence, or documentation comes into your possession, custody, or control or is brought to the attention of you or your attorneys or agents at any time subsequent to the service of any responses or production of any documents, prompt and complete supplementation is required

10.      Unless otherwise stated, the relevant time period is from June 1, 2021, to October 5, 2021.

## DOCUMENTS REQUIRED TO BE PRODUCED

1.      All documents and communications relating to the July 15, 2021 article written by Michael Isikoff, titled "FBI tried to flip Saudi official in 9/11 investigation."

2.      All documents and communications relating to the leak of the confidential transcript of the Mussaed Al Jarrah deposition to Michael Isikoff.

3.      All communications You had with Michael Isikoff or any member of the press relating to any confidential deposition taken in this case, including without limitation any phone records reflecting such communications. The relevant time period for this category is July 1, 2019, to the present.

4.      All communications You had with anyone at Kreindler & Kreindler LLP relating to the July 15, 2021 Isikoff article or the leak of the Al Jarrah transcript to Michael Isikoff, including without limitation any phone records reflecting such communications.

5. Your telephone records (home phone, cell phone, work phone) from the relevant time period.

6. All documents and communications relating to all responses by Kreindler & Kreindler LLP to the Court's orders dated August 12, 2021, ECF No. 7011; August 30, 2021, ECF No. 7082; and September 23, 2021, ECF No. 7134, including without limitation any information You provided to inquiries from Kreindler & Kreindler LLP in connection with its responses to those court orders.

7. Any contract or agreement between You and Kreindler & Kreindler LLP, including without limitation any contract or agreement requiring You to keep confidential any information You received in connection with Your work for Kreindler & Kreindler LLP. The relevant time period for this category is January 1, 2000, to the present.

8. Documents sufficient to show the compensation (including any benefits) You received or that You were promised from Kreindler & Kreindler LLP. The relevant time period for this category is January 1, 2018, to the present.

9. Your time records relating to any work you conducted for Kreindler & Kreindler LLP. The relevant time period for this category is January 1, 2018, to the present.

10. Any tax records reflecting your relationship with Kreindler & Kreindler LLP, including without limitation any Form 1099. The relevant time period for this category is January 1, 2018 to the present.

11. Documents sufficient to show Your responsibilities in connection with any work you performed for Kreindler & Kreindler LLP, including without limitation your work in the capacities as investigator, researcher, or consultant. The relevant time period for this category is January 1, 2018, to the present.

12.     Documents sufficient to show Your access to any documents or information in this litigation that is protected by the MDL or FBI Protective Orders.  The relevant time period for this category is from January 1, 2018, to the present.

13.     Any documents or communications containing any instructions from Kreindler & Kreindler LLP to You concerning the preservation or destruction of any document or communication.

## KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
_____
(202) 326-7900
FACSIMILE:
(202) 326-7999

October 8, 2021

*Via ECF*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

      Re:    *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

      We write on behalf of Defendant Kingdom of Saudi Arabia ("Saudi Arabia") and Plaintiffs' counsel Kreindler & Kreindler LLP ("Kreindler & Kreindler") concerning Saudi Arabia's letter-motion for Kreindler & Kreindler and John Fawcett to produce materials related to the breach of the FBI and MDL Protective Orders (collectively, "the Protective Orders"). ECF No. 7215.

      Pursuant to the Court's October 7, 2021 Order, ECF No. 7234, counsel for Saudi Arabia and Kreindler & Kreindler have met and conferred regarding Saudi Arabia's motion and accompanying Requests for Production directed to Kreindler & Kreindler. ECF No. 7215-1. Non-Kreindler leadership of the Plaintiffs' Executive Committees ("PECs") also participated in the meet-and-confer discussions.[1]

      Saudi Arabia and Kreindler & Kreindler have reached agreement on many of Saudi Arabia's requests. Specifically, Kreindler & Kreindler has agreed to search for documents that are responsive to Request Nos. 1-4, 7, 9, 11, and 14, and to produce any responsive documents not subject to privilege or work product protections. Saudi Arabia and Kreindler & Kreindler have agreed that Request No. 8 is redundant of Requests Nos. 1 and 2. Kreindler & Kreindler also has agreed to provide a sworn declaration regarding the scope of Mr. Fawcett's responsibilities and a stipulation regarding Mr. Fawcett's access to documents subject to the

---

      [1] Mr. Fawcett did not participate in the meet-and-confer and has not contacted Saudi Arabia regarding Saudi Arabia's letter-motion. Counsel for Kreindler & Kreindler understands that Mr. Fawcett is in the process of obtaining counsel.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
October 8, 2021
Page 2

Protective Orders, which Saudi Arabia will treat as satisfying Request Nos. 12 and 13, respectively.

Saudi Arabia and Kreindler & Kreindler are at an impasse: (1) on three of Saudi Arabia's Requests; (2) on whether Kreindler & Kreindler's search for responsive documents will encompass certain personal devices (including phones) of firm attorneys and staff; (3) on the deadline for production; and (4) on production and inspection of Mr. Fawcett's laptop and other personal devices. Their respective positions on these issues are set forth below.

**Request No. 5. All communications You had with Michael Isikoff or any member of the press relating to any confidential deposition taken in this case. The relevant time period for this category is July 1, 2019, to the present.**

Saudi Arabia's position: Communications between Kreindler & Kreindler and members of the press about other confidential depositions in this case are relevant to assessing whether Kreindler & Kreindler has a pattern and practice of leaking confidential information about this case as part of its litigation strategy. There is reason to believe that such a pattern and practice exists. Before the current violation of the Protective Orders, attorneys or consultants from Kreindler & Kreindler were responsible for at least one adjudicated leak of confidential material to the press in violation of the MDL Protective Order, *see* ECF No. 6990 at 2 (discussing April 2017 hearing concerning *Politico* leak); and at least one speech that disclosed information the FBI then considered confidential, *see id.* (discussing James Kreindler's October 2019 Dartmouth speech). In addition, in or around January 2020, Kreindler & Kreindler investigator Daniel Gonzalez gave a lengthy interview to reporter Tim Golden that resulted in an article that contains extensive discussion of the FBI's investigation and interviews of various witnesses. *See* ECF No. 5905 at 2 & n.2 (discussing article).[2]

Now, a Kreindler & Kreindler staff researcher has claimed that he leaked the Al Jarrah deposition transcript to Mr. Isikoff around the same time that James Kreindler publicly complained to Mr. Isikoff about the Protective Orders, publicly described to Mr. Isikoff the confidential depositions in this case, and publicly stated to Mr. Isikoff that the information available in the case could lead Congress to declare war against Saudi Arabia, among other inflammatory and improper remarks. *See* ECF No. 6990 at 2 (describing James Kreindler's July 10, 2021 appearance on Mr. Isikoff's podcast *Conspiracyland*). Evidence of other leaks by Kreindler & Kreindler to members of the press would support the position that Mr. Fawcett's actions – if in fact he provided the confidential transcript to Mr. Isikoff – were not those of a

---

[2] *See* Tim Golden & Sebastian Rotella, *The Saudi Connection: Inside the 9/11 Case That Divided the F.B.I.*, N.Y. Times (Jan. 23, 2020), https://www.nytimes.com/2020/01/23/magazine/9-11-saudi-arabia-fbi.html. In addition to quoting Gonzalez extensively by name, the article contains several references to anonymous statements concerning confidential documents or interviews by "people familiar with" those documents or interviews. *Id.*

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
October 8, 2021
Page 3

rogue employee, but instead were actions consistent with the wishes of, if not authorized by, his Kreindler supervisors.  Alternatively, evidence concerning other leaks may also be relevant to the reasonableness of Kreindler & Kreindler's supervision of its employees and of the review or inquiry it claims to have performed before submitting sworn statements to the Court on August 16, 2021 claiming that it was not responsible for the leak.

During the meet-and-confer, counsel for Kreindler & Kreindler requested clarification regarding the scope of this Request.  Counsel for Saudi Arabia proposed that counsel for Kreindler & Kreindler (i) ask attorneys and staff at Kreindler & Kreindler to identify the press members with whom they have discussed the case against Saudi Arabia and then (ii) search for deposition-related communications with those press members.  Counsel for Saudi Arabia offered to provide a complete list of the confidential depositions taken in the case against Saudi Arabia.

Kreindler & Kreindler's position:  Kreindler & Kreindler objects to this request as overbroad and unduly burdensome. The record to date is clear that the leak that is the subject of this inquiry was an isolated incident. *See, e.g.* ECF No.  7147 and exhibits thereto.  There is no basis from the existing record to support a fishing expedition into the confidential files of counsel in this case, which files indisputably contain extensive privileged and protected materials. The Kingdom's attempt to broaden the inquiry to the firm's dealings with other confidential material and other members of the press, and to extend the relevant time frame to two years prior to the current leak, is unfounded; if there were a press article reflecting leaked information and any evidence linking that leak to Kreindler & Kreindler, counsel for the Kingdom would surely have brought it to the Court's attention in support of this extraordinary attempt for access to their adversaries' files. There is none and this request should be denied as irrelevant and inappropriate. Kreindler & Kreindler reserves the right to supplement this response as counsel has an opportunity to get up to speed, consistent with the Court's memo endorsement of earlier today. ECF No. 7248.

**Request No. 6.  All phone records reflecting Your communications with Michael Isikoff.**[3]

Saudi Arabia's position:  The Court has already determined that oral communications between Kreindler & Kreindler and Mr. Isikoff are relevant to its inquiry into whether Kreindler & Kreindler bears responsibility for the leak of the Al Jarrah deposition transcript.  In response to the deficient declarations submitted by four attorneys from Kreindler & Kreindler on August 16, 2021, ECF No. 7016, the Court directed Kreindler & Kreindler to submit supplemental declarations that, among other things, had to "identify all communications with Michael Isikoff or anyone acting on his behalf, whether *oral* or written, from June 1, 2021, to August 1, 2021," ECF No. 7082 at 1 (emphasis added).  And, in the supplemental declarations submitted by Kreindler & Kreindler in response to that directive, numerous attorneys for Kreindler &

---

[3] Saudi Arabia's Requests provide that, "[u]nless otherwise stated, the relevant time period is from June 1, 2021, to October 5, 2021."  ECF No. 7215-1 at 3.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
October 8, 2021
Page 4

Kreindler made representations to the Court regarding their phone calls (or lack thereof) with Mr. Isikoff. *See, e.g.*, ECF Nos. 7147-1 (Declaration of James Kreindler) at 2-3 (recalling two phone calls), 7147-2 (Declaration of Andrew Maloney) at 3 (stating that he had no communications at all with Mr. Isikoff), 7147-3 (Declaration of Megan Wolfe Benett) at 2 (same), 7147-4 (Declaration of Steven R. Pounian) at 2 (same). Those representations warrant scrutiny, particularly in light of several omissions from them that Saudi Arabia has already pointed out to the Court. *See* ECF No. 7157 at 3 (discussing omissions from the first John Fawcett Declaration); *id* at 4 (discussing omissions from the James Kreindler Declaration). Moreover, given the admitted destruction of relevant written evidence, *see* ECF No. 7162-2, phone records are critical objective evidence of the circumstances surrounding Kreindler & Kreindler's leak.

    Kreindler & Kreindler's position:  Kreindler & Kreindler objects to this request as overbroad and unduly burdensome. Kreindler & Kreindler has already agreed to produce call logs from the personal devices of the Kreindler & Kreindler witnesses and any non-privileged materials from their personal devices responsive to requests #1 and #2. The request for firm call logs is excessive and unlikely to produce additional information not already covered by other requests and material agreed to be produced. The burden of review and redaction is disproportionate to the potential that any information relevant to the scope of this inquiry would be uncovered. Kreindler & Kreindler reserves the right to supplement this response as counsel has an opportunity to get up to speed, consistent with the Court's memo endorsement of earlier today. ECF No. 7248.

    **Request No. 10.  Documents sufficient to show the compensation (including any benefits) You paid, provided, or agreed to provide to John Fawcett.  The relevant time period for this category is January 1, 2018, to the present.**

    Saudi Arabia's position:  Kreindler & Kreindler has agreed to produce the relevant tax forms for Mr. Fawcett, but has taken the position that the actual amount of compensation should be redacted from those forms for personal privacy concerns. The compensation and benefits that Kreindler & Kreindler provided to Mr. Fawcett are relevant to determining the scope of Mr. Fawcett's relationship with Kreindler & Kreindler and whether he was an employee. Courts examine "all aspects of the arrangement between the parties" in evaluating whether an employment relationship exists. *Araneo v. Town Bd. for Town of Clarkstown*, 865 N.Y.S.2d 281, 283 (App. Div. 2d Dep't 2008). This includes details regarding compensation, such as "the method of compensation" and "whether the individual is paid on commission," *Quality Health Care Mgmt. Inc. v. Kobakhidze*, 977 N.Y.S.2d 568, 573 (Sup. Ct. 2013), and "whether Social Security and other taxes are withheld from such payments," *Greene v. Osterhoudt*, 673 N.Y.S.2d 272, 274 (App. Div. 3d Dep't 1998); *see Gfeller v. Russo*, 846 N.Y.S.2d 501, 503 (App. Div. 4th Dep't 2007) (concluding that the individual defendant was an independent contractor of the corporate defendant after pointing to evidence that the individual "was paid an agreed-upon price per vehicle that was repossessed" and that the company "did not withhold Social Security or other taxes from . . . payments" to the individual); *Harjes v. Parisio*, 766 N.Y.S.2d 270, 271-72

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
October 8, 2021
Page 5

(App. Div. 3d Dep't 2003) (describing the details of an individual defendant's billing practices, including the precise dollar figures used to calculate amounts owed, in concluding that the individual was not the employee of a corporate defendant). Moreover, Mr. Fawcett's compensation and benefits are relevant to assessing whether Mr. Fawcett has a motive to lie about Kreindler & Kreindler's involvement in, or knowledge of, his actions related to the leak. Indeed, Kreindler & Kreindler's submissions to the Court seem to suggest that Mr. Fawcett remains of the firm's payroll and that Kreindler & Kreindler's only action against him has been to restrict his access to confidential materials. *See* ECF No. 7147 at 1; *see also* ECF No. 7162 at 3 (defending Mr. Fawcett). Any confidentiality concerns are adequately addressed by producing the documents subject to the MDL Protective Order.

Kreindler & Kreindler's position: The Kingdom's request as drafted is unreasonably overbroad, burdensome and unfairly invades Mr. Fawcett's legitimate privacy concerns relating to his compensation. Subject to objections for attorney work product, attorney-client privilege and privacy, Kreindler & Kreindler has already agreed to produce documents sufficient to show the nature of Mr. Fawcett's compensation (including whether he is a 1099 or W2 worker) and to provide a statement describing his responsibilities at a high level that will not reveal work product. Kreindler & Kreindler will also produce certain non-privileged exemplars further reflecting the nature of compensation. Anything further is irrelevant to the scope of this inquiry or relevant remedies and appears to be designed only to invade the realm of work product. Kreindler & Kreindler reserves the right to supplement this response as counsel has an opportunity to get up to speed, consistent with the Court's memo endorsement of earlier today. ECF No. 7248.

**Search of Personal Devices**

Saudi Arabia's position: It is extremely likely that critical documents reside on the personal devices of Kreindler & Kreindler's attorneys and staff. Mr. Fawcett has already represented that the actual leak came from a personal device and personal email. In addition, many of the relevant communications sent by James Kreindler provided to the Court were sent from his iPhone, as indicated on the messages themselves. *See* ECF No. 7147-6 at 10-12, 25, 27. Saudi Arabia has agreed to limit the searches of Kreindler & Kreindler personal devices to: (1) the named witnesses who will testify on October 21, 2021 and any other individual that Kreindler & Kreindler knows to have communicated with Mr. Isikoff (such as Catherine Hunt, who appeared on the same July 10 podcast with Mr. Isikoff and who also attended the Jarrah deposition on behalf of Kreinder & Kreindler[4]); and (2) that the search will include any documents (*e.g.*, personal email, text messages, iMessage, WhatsApp, phone history, voicemail) relating to communications with Mr. Isikoff (*i.e.*, both communications with Mr. Isikoff and documents relating to such communications), to the leak of the Al Jarrah deposition transcript, to

---

[4] *See* ECF No. 7157, Ex. A.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
October 8, 2021
Page 6

the investigation of that leak, or to any submissions that Kreindler & Kreindler made to the Court about the leak.

<u>Kreindler & Kreindler's position</u>:  Kreindler & Kreindler LLP will search for responsive documents on the firm's servers. Kreindler & Kreindler LLP will also search the personal devices of the named witnesses for documents responsive to document requests #1 and #2, including text messages and other messaging services, if any, and for records of calls to/from Mr. Isikoff during the relevant time period. Kreindler & Kreindler LLP objects to Saudi Arabia's requests to search the personal devices of all attorneys and staff as overbroad, unduly burdensome and disproportionate to the scope of the Court's inquiry.

**Deadline for Production**

Kreindler & Kreindler has confirmed that it will produce documents and a privilege log that will comply with the requirements of Federal Rule of Civil Procedure 26(b)(5).[5]  The parties have not been able to agree on a deadline for production.

---

[5] During the meet-and-confer, and in follow-up communications, the PECs noted that certain of the Kingdom's requests would encompass privileged communications and information of non-Kreindler PECs' firms and counsel, *see* ECF No. 2644 (finding communications among plaintiffs' counsel in MDL 1570 are privileged and need not be included on privilege logs) and agreed with the proposal of Kreindler & Kreindler that PEC-privileged materials would be withheld from production, but agreed they may be listed on a privilege log, provided that (1) the PECs are provided copies of all PECs' documents and information gathered in the searches by Kreindler & Kreindler at least two days prior to their inclusion on any privilege log; and (2) the PECs are provided with the proposed language and information proposed to be included on a privilege log related to any PECs' communications, work product, or information, at least two days before production of any privilege log.  Saudi Arabia is amenable to the PECs' proposal, provided that (1) any privilege review by the PEC conduct does not delay the production of documents or of a privilege log; and (2) any non-privileged, responsive documents are produced. Further, Saudi Arabia reserves the right to challenge any privilege assertion.  In response to the Kingdom's qualifications, the PECs have expressed the views that (1) the process to address assertions of privilege is not a delay, and (2) the PECs' communications, information, and work product collected in the Kreindler searches are by definition privileged, consistent with the Courts' existing determination at ECF No. 2644, and disputes on that front will be resolved in the context of any necessary privilege disputes.  The PECs also expressed the view that similar protections are necessary to protect information that may be ordered to be produced from John Fawcett.  Kreindler & Kreindler objects to the other PECs' request to have any additional review period.  Kreindler & Kreindler undertakes to protect all privileges and work product, including those common to all PECs, and the additional level of review is redundant.  In any event, Kreindler & Kreindler cannot accelerate its already expedited production to accommodate any secondary review period.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
October 8, 2021
Page 7

    <u>Saudi Arabia's position</u>:  The production of documents and the provision of a privilege log should be provided by no later than October 15, 2021, so that Saudi Arabia can review these documents and use them at the October 21, 2021 hearing and challenge any assertion of privilege, as appropriate.

    <u>Kreindler & Kreindler's position</u>:  Kreindler & Kreindler is unable to confirm that it can make a full production and provide a privilege log by October 15, 2021.  The document requests are broad, and the privilege and work product review will be cumbersome, including the privilege and work product review for protection of other plaintiff's executive committee firms and lawyers which may reside within the universe of responsive documents.  In addition, we understand that the other PECs have made a request that they furnished all materials two (2) days prior to production which obviously places an additional timing burden on Kreindler & Kreindler.  Kreindler & Kreindler will make every effort to make the full production as expeditiously as possible and undertakes to update counsel for Saudi Arabia by October 13 with an estimate of when the production can be made.

### Production of Mr. Fawcett's Laptop and Personal Devices

    <u>Saudi Arabia's position</u>:  Saudi Arabia respectfully requests that the Court lift the stay of its order directing Mr. Fawcett to produce the laptop he used to violate the Protective Orders.  *See* ECF No. 7167.  Saudi Arabia further requests that Mr. Fawcett produce any other device, including the phone that he used to contact or message Mr. Isikoff so that it and his laptop may be forensically evaluated by a neutral third party.  Given the representations that Mr. Fawcett have made to the Court that he destroyed relevant evidence, including communications with Mr. Isikoff, this forensic evaluation is necessary to understand his conduct and any directions provided to him by Kreindler & Kreindler.

    <u>Kreindler & Kreindler's position</u>:  Kreindler & Kreindler objects to this request.  Kreindler & Kreindler agrees with the Court that the fulsome production it is making obviates the need for Mr. Fawcett's laptop to be produced.  Kreindler & Kreindler also notes that Mr. Fawcett's laptop likely contains significant work product and privileged material such that any investigation of its contents would have to be subject to an extraordinarily burdensome process in order to avoid tainting the Court or others by inadvertent access to information protected by attorney-client privilege or the attorney work product doctrine.

K ELLOGG , H ANSEN , T ODD , F IGEL & F REDERICK , P.L.L.C.

The Honorable Sarah Netburn
October 8, 2021
Page 8

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
*Counsel for the Kingdom of Saudi Arabia*

/s/ *Emily Kirsch*

Emily Kirsch
*Counsel for Kreindler & Kreindler LLP*

cc:    All MDL Counsel of Record (via ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

In re:

       TERRORIST ATTACKS ON
       SEPTEMBER 11, 2001

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/21/2021

03-MD-1570 (GBD)(SN)

**ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

On July 15, 2021, journalist Michael Isikoff published an article in Yahoo! News that revealed that he had obtained a copy of the deposition transcript of Musaed Al Jarrah, in violation of certain protective orders. The Court described this breach in its Opinion and Order at ECF No. 7134 and assumes familiarity with those facts. Following a preliminary inquiry and extensive submissions, Kreindler & Kreindler investigator John Fawcett admitted that he is responsible for the breach and claimed that he acted on his own for certain reasons unrelated to the September 11 Attacks. Other Kreindler lawyers swore they learned of his actions only on September 27, 2021. The Court has scheduled a hearing to determine whether anyone other than Mr. Fawcett participated in the breach (including by directing it or helping to cover it up), how the breach was carried out, and whether any party submitted to the Court false or knowingly misleading sworn statements as part of its inquiry. The Court intends to issue findings of fact and to recommend remedies to District Judge Daniels.

This Order addresses pre-hearing discovery and scheduling. The Court has received the joint letters from Kreindler & Kreindler and the Kingdom of Saudi Arabia, ECF No. 7251, and from Saudi Arabia and John Fawcett, ECF Nos. 7253, 7254, 7260, and 7275.

**DISCUSSION**

The parties disagree on both the discovery schedule for this hearing and the appropriate scope of discovery. These disputes concern: (1) the discovery and hearing schedule, (2) the scope of discovery against Kreindler & Kreindler, (3) the scope of discovery against Mr. Fawcett, and (4) the discovery protocol for Mr. Fawcett's laptop and personal device. The Court addresses each issue in turn, mindful of its obligation under Federal Rule of Civil Procedure 26 to ensure access to relevant discovery that is not unduly burdensome, cumulative, or able to be obtained from another, more convenient source.

## I.      Discovery and Hearing Schedule

The hearing is set for November 1, 2021, and if necessary, November 2. By no later than October 25, 2021, Kreindler & Kreindler shall provide the Plaintiffs' Executive Committees ("PECs") (1) copies of all PECs' documents and information gathered in the searches by Kreindler & Kreindler and (2) the proposed language and information to be included on a privilege log for any material related to PECs' communications or work product. By no later than October 27, Kreindler & Kreindler will complete production to the Kingdom of Saudi Arabia and provide it a privilege log that complies with the requirements of Federal Rule of Civil Procedure 26(b)(5). Mr. Fawcett shall complete production on the same schedule. By October 22, 2021, the Mr. Fawcett and Saudi Arabia shall file a joint status letter with the Court stating the status of the forensic imaging process. By October 29, the parties shall submit to the Court a list of any witnesses they wish to call beyond the six identified in the Court's order at ECF No. 7167. By that same date, each party shall also provide to the Court two binders with pre-marked exhibits that they plan to use during the hearing.

The hearing will take place in Courtroom 18B at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York, 10007. As the Court previously indicated, the parties' prior sworn statements will be admitted as direct testimony. Counsel for the Kingdom of Saudi Arabia will conduct a cross examination of the witnesses, not limited by their prior statements. Counsel for the witnesses will be permitted to conduct a redirect examination.

## II. Discovery Related to Kreindler & Kreindler

On October 6, 2021, Saudi Arabia moved for discovery from Kreindler & Kreindler and Mr. Fawcett. ECF No. 7215. Included with that motion was a copy of 14 numbered requests. ECF No. 7215-1. Through the meet and confer process, the parties were able to narrow their disputes over these requests to four areas: (1) Kreindler & Kreindler's press interactions, (2) firm phone records for Isikoff, (3) employment and compensation records for Mr. Fawcett, and (4) searches of Kreindler & Kreindler staff personal devices.

### A. Kreindler & Kreindler Press Interactions (Request No. 5)

Saudi Arabia requests all Kreindler & Kreindler communications with members of the press about confidential depositions. ECF No. 7251 at 2. This request is denied as overbroad and unlikely to result in relevant information. The purpose of the hearing is to uncover further evidence of misconduct in connection with the July 15 leak. Expanding the Court's inquiry into potential other instances of misconduct is not warranted. Moreover, where there have been leaks of confidential information, the parties have quickly alerted the Court. Prior press reports that impermissibly revealed confidential information have been raised with the Court, and attorney James Kreindler has previously been found to have violated the protective orders. ECF No. 3619 at 9:6–7. Thus, the likelihood that this search will reveal previously unknown leaks is small.

Conversely, the request is likely to produce much irrelevant information. The Court has consistently affirmed that parties may speak with the press so long as they do not violate the protective orders. See, e.g., ECF No. 3619 at 9:10–11. Kreindler & Kreindler, in particular, has liberally availed itself of this right. Thus, even with Saudi Arabia's proposal to limit disclosures to communications about depositions, the request will likely generate a large volume of irrelevant material.

**B.  Firm Phone Communications with Michael Isikoff (Request No. 6)**

Saudi Arabia's request for Kreindler & Kreindler's firm phone records relating to communications with Isikoff is granted. ECF No. 7251 at 3. The Court's prior orders investigating this breach are clear that Kreindler & Kreindler's communications with Isikoff go to the heart of the investigation. See, e.g., ECF No. 8072 (directing Kreindler & Kreindler to disclose communications with Isikoff). Firm call logs documenting communications with Isikoff are a reasonable extension of these prior disclosures.

**C.  John Fawcett Employment and Compensation Records (Request No. 10)**

Saudi Arabia's request for Mr. Fawcett's employment records is granted only to the extent described here. Kreindler & Kreindler shall produce any 1099 or W-2 tax forms for Mr. Fawcett from the relevant time period. These materials may be redacted to the extent necessary to protect personal information (*e.g.*, social security numbers and personal addresses) but not compensation. Kreindler & Kreindler shall also produce any employment contracts or termination letters between itself and Mr. Fawcett as well any documents summarizing the terms of Mr. Fawcett's employment.

### D.  Kreindler & Kreindler Personal Devices

The Court endorses Kreindler & Kreindler's proposal at ECF No. 7251 at 6 as the proper scope for searches of personal devices for Kreindler & Kreindler staff. The parties submitted two search proposals. Saudi Arabia proposes to search the devices of both the hearing witnesses named in the Court's order at ECF No. 7167 and other individuals who communicated with Isikoff. Kreindler & Kreindler proposes to search only the personal devices of named witnesses. Saudi Arabia's proposed discovery would incur burdens disproportionate to the need of this hearing and likely generate a large amount of irrelevant material. Therefore, Kreindler & Kreindler shall search for documents (*e.g.*, personal email, text messages, iMessage, Signal, WhatsApp, phone history, voicemail) responsive to Saudi Arabia's Requests Nos. 1 and 2 on the personal devices of witnesses named in the Court's order at ECF No. 7167.

## III.    Discovery Related to John Fawcett

Saudi Arabia issued 13 requests to John Fawcett. ECF No. 7215-2. Saudi Arabia, Mr. Fawcett, Kreindler & Kreindler, and the other PECs firms state that they are at an impasse on the seven issues below.

### A.  Interactions with the Press (Request No. 3)

The request for all of John Fawcett's press communications, ECF No. 7275 at 2, is denied in part as overbroad for the same reasons as the similar request from Kreindler & Kreindler above. Mr. Fawcett is, however, ordered to produce his records of any communications (whether by telephone, personal or professional email, text messages, iMessage, Signal, WhatsApp, etc.) with any member of the press from June 1, 2021, to October 5, 2021.

### B. Communications with Kreindler & Kreindler relating to the July 15 Article and the Transcript Leak (Request No. 4)

The request for communications between Mr. Fawcett and Kreindler & Kreindler about the Isikoff article or transcript leak, including email records and phone records, ECF No. 7275 at 4, is granted. Interactions between Mr. Fawcett and Kreindler & Kreindler about the breach or the Isikoff article address the central issue of this hearing and are particularly relevant given the Kreindler lawyers' statements that they only learned of Mr. Fawcett's violation on September 27, and Mr. Fawcett's admitted destruction of evidence. ECF No. 7162-2 at ¶ 7. His argument that responsive phone records should not be produced because such records do not list content is unavailing. Evidence such as when co-conspirators communicated may provide circumstantial evidence relevant to the Court's inquiry.

### C. All Phone Records from the Relevant Time Period (Request No. 5)

The request for all of Mr. Fawcett's phone records is granted. Circumstantial evidence including when Mr. Fawcett spoke with Isikoff and/or Kreindler lawyers, or whether Mr. Fawcett spoke with other journalists, may tend to establish circumstantial evidence relevant to the Court's inquiry. Mr. Fawcett may redact the phone records for personal communications.

### D. Compensation Time Records, Tax Records, and Work Summaries (Request Nos. 8–11)

The request for Mr. Fawcett's compensation records, time records, tax records, and work summaries are denied. The Court has already ordered Kreindler & Kreindler to produce Mr. Fawcett's compensation records, employment contracts and a summary of his work responsibilities. Kreindler & Kreindler has also agreed to produce examples of how Mr. Fawcett's time was billed. ECF No. 7275 at 6. Individual time records are not likely to lead to relevant evidence.

### E. Laptop and Device Search Protocol

The parties are at an impasse on three issues regarding the search protocol for Mr. Fawcett's laptop and personal device. Specifically, they disagree (1) if the file structure of Mr. Fawcett's laptop should be disclosed, (2) if they must search for copies of the Fahad Al Thumairy and Omar Al Bayoumi deposition transcripts, and (3) what criteria should be used to determine if materials is responsive. ECF No. 7275 at 7–10.

### 1. File Structure (Item No. 1)

The request to disclose the file structure and names of all relevant items on Mr. Fawcett's laptop is denied as disproportionate. Mr. Fawcett has been a consultant for Kreindler & Kreindler for almost two decades. This makes it likely that this request will yield an immense volume of information that is at best, tangentially relevant to the breach of the protective orders. It is also likely that this request, given the overlap in the investigations of Kreindler & Kreindler and other PECs firms in this matter, would require managing the disclosure of a large volume of non-Kreindler & Kreindler attorney work product. Resolving these disputes would impose disproportionate and unnecessary expense and delay.

### 2. Transcript Production (Item No. 4)

Saudi Arabia's request for any copies of confidential deposition transcripts of Omar Al Bayoumi and Fahad Al Thumairy on Mr. Fawcett's devices is granted. The disclosure of such materials is unlikely to present a major burden and may be relevant to confidential deposition transcripts were managed and if the breach of the protective orders was limited to the disclosure of the Al Jarrah deposition transcript.

### 3. Criteria for Responsivity (Item Nos. 6 and 7)

The parties' final dispute is how broadly responsiveness should be construed both in the search for communications between Mr. Fawcett and relevant parties (Item No. 6) and in the review of documents that hit on specific search terms (Item No. 7). Saudi Arabia states that anything that "may arguably [be] responsive" should be produced. As an example, they say that a July 3, 2021 email from Mr. Fawcett to James Kreindler saying "Done" would responsive. Mr. Fawcett and Kreindler & Kreindler argue that these criteria would render the search overbroad and disproportionate to the needs of the hearing. They propose only searching for documents that "facially relate" to the disclosure of the Jarrah deposition. ECF No. 7275 at 8.

The Court endorses Saudi Arabia's standard for responsiveness. Restricting disclosure to materials that are facially related to the breach excludes too much potentially relevant material. For example, Saudi Arabia's illustration is a communication that would be relevant to the hearing even though it is not facially related to the breach. Moreover, the Kreindler attorneys have testified that they first learned of the breach by Mr. Fawcett on September 27, and Mr. Fawcett has already admitted to destroying evidence, ECF No. 7162-2 at ¶ 7, making robust discovery more necessary to developing an accurate understanding of how the breach occurred. The Court endorses an over-inclusive production of discovery for the limited period June 1, 2021, to October 5, 2021. Mr. Fawcett may redact any obvious work product material.

## CONCLUSION

The evidentiary hearing on the breach of the protective orders is scheduled for November 1 and 2, 2021. Saudi Arabia and Mr. Fawcett shall file a joint status letter on the process of the forensic imaging process by October 22, 2021. Discovery will proceed according to the terms of this Order.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 7215.

**SO ORDERED.**

DATED:     New York, New York           SARAH NETBURN
             October 21, 2021            United States Magistrate Judge

# KIRSCH & NIEHAUS

EMILY KIRS...
150 E. 58TH...
NEW YORK...
O (212) 832...
M (917) 744...
EMILY.KIRSCH@KIRSCHNIEHAUS.COM
KIRSCHNIEHAUS.COM

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/1/2021

October 29, 2021

**VIA ECF**
The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

       Re:     *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

This firm represents Kreindler & Kreindler, LLP ("K&K") in connection with the hearing scheduled for November 1-2, 2021, concerning the recent leak of confidential information in the above-referenced matter (the "Hearing"). We write to request (1) entry of an order pursuant to Fed. R. Evid. 502(d) that the production or use of any materials (or provision of any testimony) protected by the work product doctrine, attorney-client privilege, or any other privilege, in connection with the Hearing does not constitute a waiver of such privilege and (2) that Mr. Fawcett testify first at the Hearing in an effort to minimize attorney testimony which is disfavored in this Circuit.

> ### The Production of Privileged Materials or Provision of Privileged Testimony in Connection with the Hearing Does Not Constitute a Waiver of any Privilege for any Other Purpose

The production of any materials (or provision of any testimony) protected by the work product doctrine, attorney-client privilege, or any other privilege, in connection with the Hearing does not constitute a waiver of such privilege for any other purpose. The standard in the Second Circuit is clear: "involuntary or compelled disclosure does not give rise to a waiver." *In re Parmalat Sec. Litig*. 2006 WL 3592936, at *4 (December 1, 2006), *citing SEC v. Forma*, 117 F.R.D. 516, 523 (S.D.N.Y. 1987). "Involuntary" or "compelled" disclosure encompasses information produced pursuant to court order. *See Pension Committee of Univ. of Montreal Pension Plan v. Banc of Am. Securities, LLC*, 2009 WL 2921302, at *1 (September 8, 2009) (voluntary disclosure means, among other things, "that the documents were not produced pursuant to judicial compulsion"; "permitting [defendants] to review the Declarations and redacted Exhibits does not result in a waiver of privilege as to these communications and the [defendants] may not use the information learned from the Declarations and redacted Exhibits as evidence outside this motion"); *Studiengesellschaft Kohle mbH v. Novamont Corp.*, 1980 U.S.Dist. Lexis 15042, at *9-10 (S.D.N.Y. Nov. 17, 1980) (J. Sweet) ("Attempts to comply with court orders ought not to be

# KIRSCH & NIEHAUS

penalized by subsequent judicial transformation into voluntary waivers.") These rules apply even more strongly with respect to work product. *See Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.,* 125 F.R.D. 578, 591 (S.D.N.Y. 1989) (there is no waiver of work product protection where there is "de facto" compulsion of such work product); *Bowne, Inc. v. AmBase Corp.,* 150 F.R.D. 464 (S.D.N.Y. 1993) (noting that "the protection of the work-product rule is less readily waived" than the attorney-client privilege).

This is an extraordinary proceeding wherein the Court has compelled discovery of K&K's protected materials, not just for the Court's review, but for production to K&K's adversaries. Beyond production of protected materials, the Court is also permitting cross-examination into the lawyers' protected states of minds, mental impressions, factual investigations and other core traditional work product. K&K maintains its objections to this irregular process.

K&K respectfully requests the entry of an order pursuant to Fed. R. Evid. 502(d) that the production of any materials (or provision of any testimony) protected by the work product doctrine, attorney-client privilege, or any other privilege, in connection with the Hearing does not constitute a waiver of such privilege, for any other purpose or proceeding.

## John Fawcett Should Testify First

In light of Your Honor's oral ruling during yesterday's hearing on the existence and scope of any waiver by John Fawcett of his Fifth Amendment rights, we respectfully request that Mr. Fawcett testify first at the Hearing, before any K&K attorneys are called to testify. In the Second Circuit, depositions of and testimony from opposing counsel are "disfavored." *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 185 (2d Cir. 1991). The rationale behind this presumption against such discovery is that "even a deposition of counsel limited to relevant and non-privileged information risks disrupting the attorney-client relationship and impeding the litigation." *Alcon Labs v. Pharmacia Corp.*, 225 F. Supp. 2d 340, 344 (S.D.N.Y. 2002), *quoting Madanes v. Madanes*, 199 F.R.D. 135, 151 (S.D.N.Y.). While testimony from counsel is not categorically prohibited, such discovery is generally permitted only where there are "no other persons available to testify as to the same information," and other methods of discovery have been "exhausted." *Alcon*, 22 F. Supp. 2d at 344-45 (permitting attorney deposition because it was the "only practical avenue" to obtain relevant information). *See also, Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Friedman*, 350 F.3d 65, 71-72 (2d Cir. 2003) (in *dicta*, suggesting flexible approach to attorney discovery, including consideration of existence of other means of discovery and extent of discovery already conducted).

In *SEC v. Collector's Coffee, Inc.*, 2020 WL 713375, at *2 (S.D.N.Y. Dec. 4, 2020), the court denied a party's request to have an SEC attorney testify at a contempt hearing. Citing *Friedman*, the court denied the request in part because, "speculation that a witness told a lawyer something that differs from the witness's testimony in the witness box is an insufficient basis to justify calling that lawyer as a witness at a deposition or trial." In *Schiller v. City of New York*, 2007 WL 1623108,

**KIRSCH & NIEHAUS**

at *3-4 (S.D.N.Y. June 5, 2007), the court declined a request to require counsel to submit sworn declarations that they were not the source of a leak of confidential information. The court noted that, "Courts are understandably reluctant to authorize wide-ranging discovery unrelated to the merits of an action simply to ferret out the source of a leak." *Id.* Citing *Jones v. Clinton*, 57 F. Supp. 2d 719, 722 (E.D. Ark. 1999), the court further noted that "the history of this case suggests that such additional discovery, rather than being limited, would be contentious and time-consuming." *Id.*

In this matter, Mr. Fawcett's testimony at the Hearing may well obviate the need for further testimony from K&K attorneys. At the very least, however, the Court should be given the opportunity to weigh the *Friedman* factors, and to determine – after hearing from Mr. Fawcett -- whether such testimony is needed. We therefore respectfully request that Mr. Fawcett testify first at the Hearing.

Respectfully Submitted,

The application of Kreindler & Kreindler ("K&K") is GRANTED in part and DENIED in part. The production of any material or testimony protected by the work product doctrine, the attorney-client privilege, or any other privilege, in connection with the contempt hearing does not constitute a waiver of such privilege for any other purpose or proceeding. Fed. R. Evid. 502(d).

The application requesting that John Fawcett testify before any K&K attorney is DENIED. The breach of the protective order originated from K&K. As such, its attorneys are not collateral witnesses to Mr. Fawcett's breach of the protective order but are themselves subjects of the investigation. The cases cited by K&K are, therefore, not persuasive. See Schiller v. City of New York, No. 04-cv-7921 (KMK)(JCF), 2007 WL 1623108, at *4 (S.D.N.Y. June 5, 2007) (finding that there was an insufficient basis to believe that the breach originated with counsel); SEC v. Collector's Coffee Inc., No. 19-cv-4355 (LGS) (GWG), 2020 WL 7133735, at *2 (S.D.N.Y. Dec. 4, 2020) (attorney was not the subject of the contempt hearing). In this regard, the testimony of Mr. Fawcett will not "obviate the need for further testimony from K&K attorneys." The Court has additionally considered the factors in In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 71–72 (2d Cir. 2003). To the extent they are applicable, they do not justify a delay in the testimony of the K&K attorneys. The Court is investigating, among other things, whether someone other than Mr. Fawcett breached the protective order and whether anyone submitted false statements to the Court. As such, the need for the K&K attorneys' testimony is plain, and the lawyers' role in the matter before the Court is central. Because the scope of the hearing does not concern the merits of the underlying litigation, and because the Court has entered an order preserving all appropriate privileges, there is no risk that the attorneys' testimony will waive legitimate attorney-client or work product privileges.

Attorneys for the Kingdom of Saudi Arabia will be permitted to call the witnesses in the order of their choosing. To prevent against the possible coordination of testimony, witnesses will be sequestered in the jury deliberation room until they testify and then will be required to remain in the courtroom after their testimony.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

Dated: November 1, 2021
     New York, New York

# KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
────
(202) 326-7900
FACSIMILE:
(202) 326-7999

November 9, 2021

*Via ECF*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:  *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

I write on behalf of Defendant Kingdom of Saudi Arabia ("Saudi Arabia") concerning testimony given by Kreindler & Kreindler LLP attorney Megan Benett during the hearing on November 2, 2021. Ms. Benett's testimony provides substantial reason to believe that Kreindler & Kreindler has violated the deposition protocol in this case and, potentially, the MDL and FBI Protective Orders, by permitting individuals not authorized by the deposition protocol and not identified on the deposition record to attend the confidential depositions in this case.

Saudi Arabia respectfully requests that the Court order Kreindler & Kreindler to: (i) provide sworn declarations identifying the names of all individuals who attended each confidential deposition taken in this case whose names do not appear on the deposition record; and (ii) produce records showing that each such individual agreed to be bound by the protective orders before receiving confidential information, as required under Paragraph H.5 of the MDL Protective Order and Paragraph 8 of the FBI Protective Order, *see* ECF Nos. 1900, 4255.[*]

**1.** On January 13, 2020, the Court directed the parties to meet and confer regarding a deposition protocol governing fact depositions in this case. *See* ECF No. 6002-1, at 1, ¶ 1 (citing Jan. 13, 2020 Hr'g Tr. 35). The parties each submitted to the Court their respective proposals the following month. The parties agreed to the majority of provisions in those proposals; however, the Court resolved a few points of disagreement by order dated May 11, 2020. *See* ECF Nos. 6002-1, 6204. The Court has made clear that the deposition protocol is binding on the parties. *See* ECF No. 6792, at 1-2 ("the parties extensively negotiated, and the Court ordered, the Deposition Protocol").

───────────

[*] Saudi Arabia met and conferred with Kreindler & Kreindler and requested that they consent to the relief requested in this motion. Kreindler & Kreindler has refused.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 9, 2021
Page 2

> Paragraph 31 of the deposition protocol requires that:
>
> Unless otherwise agreed to by the Parties or ordered under Federal Rule of Civil
> Procedure 26(c) and subject to the terms of the MDL Protective Order (ECF No.
> 1900) and the Privacy Act and Protective Order for FBI Documents (ECF No.
> 4255), depositions may be attended (either in person or remotely) only by the
> witness, counsel for the witness, attorneys of record in the MDL Proceeding and
> their staff, court reporters, videographers, translators, and the Parties' in-house
> counsel. All persons in attendance (either in person or remotely) must be noted
> on the deposition record.

ECF No. 6002-1, at 9, ¶ 31; *see also* ECF No. 6204, at 2. Paragraph 31 thus imposes two
requirements. First, only "the witness, counsel for the witness, attorneys of record in the MDL
Proceeding and their staff, court reporters, videographers, translators, and the Parties' in-house
counsel" may attend depositions. ECF No. 6002-1, at 9, ¶ 31. Second, attendees "must be noted
on the deposition record" regardless of whether they attend "in person or remotely." *Id.*

Those requirements are in turn "subject to" the confidentiality requirements set forth in
the MDL Protective Order and the FBI Protective Order. *Id.* Paragraph 8 of the FBI Protective
Order requires an attorney disclosing "Protected Information" to a "Qualified Person" to deliver
to that individual a copy of the order "at or before the time of disclosure." ECF No. 4255, at 4,
¶ 8. Paragraph 8 further requires that, "[p]rior to receiving access to Protected Information,
each such Qualified Person shall agree to be bound by the terms of this order by executing an
Acknowledgement in the form [specified]." *Id.* at 4-5, ¶ 8. The MDL Protective Order
establishes similar protections for confidential information, specifying in Paragraph H.5 that
"[i]t shall be the responsibility of counsel giving access to Confidential Information or Material
produced by the Producing Party to create and retain records indicating that the person receiving
Confidential Information or Material agreed to be bound by the terms and restrictions of this
Order." ECF No. 1900, at 12-13, ¶ H.5.

**2.** On June 17 and 18, 2021, Ms. Benett took the Musaed Al Jarrah deposition.
Tr. 310:5-7. At the November 2, 2021 hearing, Ms. Benett testified that she was alone in a
"Zoom room" in the Kreindler & Kreindler office when she took that deposition. Tr. 328:14-20;
*see* Tr. 310:17-311:1. She further testified that "[t]here were people who were attending who
were in a conference room," also in the Kreindler & Kreindler office. Tr. 310:20-21.

According to Ms. Benett, she "was approached" in the Kreindler & Kreindler office
during a break in the deposition "and was told about the descriptions of the images." Tr. 334:6-7;
*see* Tr. 328:21-329:1 (testifying that she "stepped out" of the room where she was taking the
deposition and was "told" the "information"). She described the person who shared the
information as an "FBI special agent who had supervised the investigation into Jarrah and
specifically supervised the two agents who had obtained [images] from his hard drive."

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

The Honorable Sarah Netburn
November 9, 2021
Page 3

Tr. 324:1-14. This FBI agent provided the information unprompted. *See* Tr. 334:6-8 (testifying that the information "was not a response to a question from me"). Ms. Benett testified that she did not "have any reason to think that he didn't" also "attend[] [the Jarrah] deposition." Tr. 329:5-15; *see* Tr. 329:7-9 (testifying also that "I wouldn't be surprised if" if the agent attended the deposition from the conference room). She further testified that, after the deposition ended, she "certainly" discussed with the FBI agent the images that were raised at the deposition. Tr. 334:13-335:8.

Ms. Benett admitted that this FBI agent is not listed on the appearance sheet at the deposition. Tr. 329:16-330:1. When counsel for Saudi Arabia asked whether Ms. Benett knew whether the agent had reviewed and agreed to abide by the protective orders in this case, she was unable to testify definitively that he had done so. Tr. 331:21-332:25.

**3.** Ms. Benett's testimony provides substantial grounds to believe that Kreindler & Kreindler has violated Paragraph 31 of the deposition protocol, by allowing at least one unauthorized individual to attend a confidential deposition and by failing to disclose his appearance on the deposition record. Ms. Benett's testimony also calls into question Kreindler & Kreindler's compliance with the FBI and MDL Protective Orders, with respect to the confidential depositions conducted in this case. *See* ECF Nos. 1900, 4255.

This Court has authority to enforce the deposition protocol entered in this case and to order appropriate disclosures where, as here, there is reason to believe a breach occurred. *See Doe I v. Exxon Mobil Corp.*, --- F. Supp. 3d ---, 2021 WL 1840649, at *6-7 (D.D.C. May 7, 2021) (sanctioning a party's violation of a deposition protocol under Federal Rule of Civil Procedure 37(b)); *Hunt v. Enzo Biochem, Inc.*, 904 F. Supp. 2d 337, 344 (S.D.N.Y. 2012) (recognizing that the court has "inherent power to enforce [its] own orders" and "to issue orders designed to correct wrongs committed through its process").

Because Ms. Benett's testimony demonstrates that a likely breach has occurred, Saudi Arabia respectfully requests that the Court order Kreindler & Kreindler to: (i) provide sworn declarations identifying all individuals who attended each confidential deposition in this case but who were not listed on the appearance sheets; and (ii) produce records showing that each such individual agreed to be bound by the protective orders before receiving confidential information, as required under Paragraph H.5 of the MDL Protective Order and Paragraph 8 of the FBI Protective Order.

Kᴇʟʟᴏɢɢ, Hᴀɴsᴇɴ, Tᴏᴅᴅ, Fɪɢᴇʟ & Fʀᴇᴅᴇʀɪᴄᴋ, ᴘ.ʟ.ʟ.ᴄ.

The Honorable Sarah Netburn
November 9, 2021
Page 4

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
*Counsel for the Kingdom of Saudi Arabia*

cc:     All MDL Counsel of Record (via ECF)

## KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

November 10, 2021

*Via ECF*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

  Re: *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

   I write on behalf of Defendant Kingdom of Saudi Arabia ("Saudi Arabia") to move into evidence 43 exhibits that were used at the evidentiary hearing held by the Court on November 1 and 2, 2021, and to supplement the hearing record with five additional exhibits that were included in Saudi Arabia's exhibit binder but not used at the hearing. Counsel for Saudi Arabia has met and conferred with counsel for Kreindler & Kreindler LLP ("Kreindler & Kreindler") and counsel for John Fawcett concerning this motion.[1] Saudi Arabia and Fawcett have reached agreement on all relief sought in this letter. Saudi Arabia and Kreindler & Kreindler have reached agreement as to 34 exhibits but not about the remaining 14.[2]

   **1.** Saudi Arabia moves, and Kreindler & Kreindler and Fawcett have agreed, to admit the following exhibits that were in Saudi Arabia's binder submitted to the Court and that were used at the hearing:  KSAX-0002, KSAX-0010, KSAX-0011, KSAX-0014, KSAX-0015, KSAX-0032, KSAX-0039, KSAX-0042, KSAX-0043, KSAX-0043A, KSAX-0048C, KSAX-0049, KSAX-0051, KSAX-0056A, KSAX-0056B, KSAX-0056F, KSAX-0056J, KSAX-0059, KSAX-0062A, KSAX-0062B, KSAX-0074, KSAX-0086, KSAX-0093, KSAX-0099, KSAX-0100, KSAX-0112, KSAX-0112A, KSAX-0115, KSAX-0142. Saudi Arabia further moves, and Kreindler & Kreindler and Fawcett have agreed, to admit the following exhibits that were in Kreindler & Kreindler's binder submitted to the Court and that were used at the hearing: K&K 014, K&K 020, K&K 029, K&K 087, K&K 102.

   **2.** Saudi Arabia moves, and Fawcett has agreed – but Kreindler & Kreindler has not – to admit the following exhibits that were in Saudi Arabia's binder submitted to the Court and

---

  [1] Counsel for the non-Kreindler & Kreindler members of the Plaintiffs' Executive Committees were advised of and attended the parties' meet-and-confer call.

  [2] All call participants agreed that an agreement to admit documents into evidence is not a concession that the documents are relevant.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 10, 2021
Page 2

that were used at the hearing:  KSAX-0012, KSAX-0018, KSAX-0023 (with an agreed
redaction), KSAX-0031, KSAX-0038, KSAX-0067, KSAX-0068, KSAX-0079, and KSAX-
0150.  A brief description of and the basis for admitting each document is set forth below.
Although there is no genuine dispute about the authenticity of any of these documents, an attorney
declaration authenticating them is attached as Exhibit A to avoid unnecessary disagreement.

      **a.**       KSAX-0012 is a text message thread showing communications between Fawcett
and NPR reporter Laura Sullivan.  It was used at the hearing during the cross-examination of
James Kreindler.  *See* Tr. 42:17.  It was produced by Fawcett with the Bates range
JFawcett_0000007-11.  *See* Ex. A, ¶ 4.  Saudi Arabia proffers KSAX-0012 primarily for the fact
that the statements in KSAX-0012 were made (that is, that Fawcett was communicating with a
reporter and arranging to meet her at the Kreindler & Kreindler offices) rather than the truth of
the matter asserted.  Some statements are relevant for the truth of the matters they assert.  Those
statements constitute statements by Fawcett within the scope of his duties as an agent or
employee of Kreindler & Kreindler and are admissible as an opposing party's statement under
Federal Rule of Evidence 801(d)(2)(D).  *See* Tr. 42:17-44:23 (James Kreindler testifying that
Fawcett's actions as set forth in KSAX-0012 were done at his direction or the direction of a
Kreindler & Kreindler partner).[3]

      After the hearing, counsel for Fawcett advised that, due to a vendor error, KSAX-0012
and certain other previously produced documents contain erroneous timestamps for certain
communications.  The corrections are not material to the questions that were asked during cross-
examination at the hearing.  Saudi Arabia and Fawcett have agreed that KSAX-0012 should be
accepted into evidence as it was used at the hearing and that KSAX-0152, a corrected version of
the same document, should also be accepted.  A copy of KSAX-0152 is attached as Exhibit D.
KSAX-0152 was produced to Saudi Arabia on November 5, 2021, with the Bates range
JFawcett_00000059-63.  *See* Ex. A, ¶ 16.

      **b.**       KSAX-0018 is a transcript of a speech that James Kreindler gave on October 28,
2019, at Dartmouth College.  Dartmouth made the speech available on its YouTube channel at
https://www.youtube.com/watch?v=6nnz0YRy6So&ab_channel=Dartmouth, and the transcript
may be accessed by clicking the three dots just above the "Subscribe" button on the YouTube
page.  Saudi Arabia's counsel and staff accessed the transcript and copied it into KSAX-0018 as
an aid to the Court.  *See* Ex. A, ¶ 5.  Relevant parts of the video were played during the hearing,
*see* Tr. 47:14, and Kreindler did not deny that they were his statements.  These portions of the
video constitute an opposing party's statement under Federal Rule of Evidence 801(d)(2).  The

---

      [3] Neither Kreindler & Kreindler nor Fawcett is a party to the underlying litigation, but
both are parties in the functional sense that remedies against them were at issue in the November
1 and 2, 2021 evidentiary hearing.  Indeed, if they were not "parties" as that term is used in the
evidentiary rules, they could not object to the admission of evidence at all.  *See* Fed. R. Evid.
103(a)(1)(A) (explaining that, to preserve a claim of error, a "party" must "timely object[] or
move[] to strike").

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 10, 2021
Page 3

fact that Kreindler made the statements in the speech is subject to judicial notice because they
"can be accurately and readily determined from sources whose accuracy cannot reasonably be
questioned." Fed. R. Evid. 201(b)(2). There is no reasonable contention that Dartmouth faked
Kreindler's speech on its YouTube channel. Saudi Arabia may also rely on some statements in
the Dartmouth speech for the truth of the matters they assert. Such statements constitute
admissions by Kreindler within the scope of his duties as an agent of Kreindler & Kreindler.[4]

  **c.**  KSAX-0023 is a letter from counsel for Fawcett to counsel for Saudi Arabia. *See*
Ex. A, ¶ 6. Counsel for Fawcett has indicated that he does not object to its admission provided
that the attachment (pages 3-5) is redacted for confidentiality, and Saudi Arabia has agreed to the
redaction. A redacted version of KSAX-0023 is attached as Exhibit B. As to Kreindler &
Kreindler, Saudi Arabia proffers the letter for impeachment of John Hartney, as the letter
mentions a cloud-based platform called Tresorit. Hartney testified that he had never heard of
Tresorit, *see* Tr. 153:6-155:9, which suggests that the investigation described in his direct
testimony did not extend to all platforms on which Kreindler & Kreindler maintained
confidential information.

  **d.**  KSAX-0031 is a June 10, 2021 email from counsel for Saudi Arabia to the
Plaintiffs' Executive Committees. *See* Ex. A, ¶ 7. Saudi Arabia does not proffer it for the truth
of any matter asserted, but only for the fact that it was sent during the period from June 1 to
August 1, 2021; addressed to Kreindler, Maloney, Megan Benett, Steven Pounian, and Fawcett;
and contained the word "Jarrah." As such, it shows that Hartney either did not identify all emails
from the relevant period that would have been responsive to the searches he described in is
declaration or did not attach all responsive emails as his declaration states. *See* Tr. 171:11-16.

  **e.**  KSAX-0038 is a publicly available description of the July 10, 2021 podcast on
which Kreindler appeared with Isikoff. *See* Ex. A, ¶ 8. Saudi Arabia proffers it for
impeachment of Andrew Maloney concerning the thoroughness of his investigation. Maloney
testified that his "goal" was to conduct an "objective and comprehensive investigation to
determine whether anyone at the Kreindler firm was the source of the leak," Tr. 220:1-4, but
testified that he did not know that Kreindler & Kreindler consultant Catherine Hunt had appeared
on Isikoff's podcast, Tr. 205:14-206:12. KSAX-0038 shows that Maloney could have easily have
found publicly available documents so stating.

  **f.**  KSAX-0067 and KSAX-0068 are an email from counsel for Saudi Arabia to
counsel for Kreindler & Kreindler and an attached screenshot showing that as of Friday, October
15, 2021, there existed a Dropbox account in Fawcett's name containing confidential materials.
*See* Ex. A, ¶ 9. The existence of that account on that date is relevant to the accuracy of Kreindler

---

  [4] Counsel for Saudi Arabia similarly played at the hearing parts of the July 2021
*Conspiracyland* podcast in which Kreindler discussed various confidential depositions with
Michael Isikoff, and included as an aid to the Court a transcript prepared by counsel, marked as
KSAX-0039. Kreindler & Kreindler has agreed to the admission of KSAX-0039.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 10, 2021
Page 4

& Kreindler's representation to the Court that, "upon learning of the breach, [it] immediately acted to remove [Fawcett] from access to confidential materials." ECF No. 7162, at 1. KSAX-0067 and 0068 are also, like KSAX-0023, proffered for impeachment of Hartney as to the thoroughness of his investigation. *See* Tr. 150:8-153:5.

       **g.**     KSAX-0079 is a publicly available news article, written by Isikoff, dated March 1, 2021, and describing (on page 2) an "interview" with "James Kreindler." *See* Ex. A, ¶ 10. It is self-authenticating under Federal Rule of Evidence 902(6). Saudi Arabia proffers it for impeachment of Maloney concerning the thoroughness of his investigation. Maloney testified that, after conducting his investigation, he could not recall whether he knew that Kreindler had spoken with Isikoff in March 2021. *See* Tr. 203:13-24. KSAX-0079 shows that Maloney could easily have found publicly available materials so stating.

       **h.**     KSAX-0150 is an exchange of Signal messages between Fawcett and Isikoff, including one dated July 24, 2021, stating that there is "a witch hunt for the source of your Jarrah story." KSAX-0150 was produced by Fawcett's counsel with the Bates range JFawcett_0000017-18. *See* Ex. A, ¶ 14. It is relevant for a number of reasons, including to show that Fawcett and Kreindler & Kreindler failed to produce communications between Fawcett and Isikoff in response to the Court's August 30 order; that Kreindler & Kreindler failed to search Fawcett's personal device for communications with Isikoff both during its initial investigation and after admitting that Fawcett was the source of the leak; and that such a search would have revealed relevant and responsive communications. *See* Tr. 232:22-234:2.

       **3.**     Saudi Arabia also moves to add to the record three exhibits that were in its exhibit binder but not used at the hearing: KSAX-0101, KSAX-0136, and KSAX-0139; and two that are corrected versions of exhibits in the exhibit binder, KSAX-0151 and KSAX-0152. Counsel for Fawcett has agreed to these additions to the record, subject to the corrections made in KSAX-0151 and KSAX-0152. Counsel for Kreindler & Kreindler has indicated that Kreindler & Kreindler objects to the admission of any documents not specifically used at the hearing. The admission of a small number of additional documents is within the Court's discretion, will complete the record, and will aid the Court's fact-finding process.

       **a.**     KSAX-0101 is an email chain between Benett and Pounian that provides additional context for the language that appeared in Hartney's declaration concerning which Kreindler & Kreindler employees he had been "told . . . had been able to access the Jarrah transcripts." *Compare* KSAX-0056F, ¶ 5, *with* KSAX-0101. KSAX-0101 was produced by Kreindler & Kreindler with the Bates number KK01264 and is an opposing party's statement under Federal Rule of Evidence 801(d)(2). *See* Ex. A, ¶ 11. The accuracy and completeness of Hartney's statement, and Benett's involvement in writing it, were the subjects of testimony at the hearing. *See* Tr. 141:9-143:13. KSAX-0101 is relevant to show that Benett and Pounian were discussing which words to use on September 24, three days before the declaration was submitted, which is relevant to the Court's assessment of their states of mind when Hartney's declaration and their own declarations were submitted to the Court.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 10, 2021
Page 5

    **b.**    KSAX-0136 consists of phone records showing communications on Fawcett's personal cell phone during the period from September 5 to October 4, 2021. An earlier version of the same document was filed with the Court as pages 9-17 of ECF No. 7298-2 (filed under seal). KSAX-0136 differs from that earlier document only in that, at Saudi Arabia's request, counsel for Fawcett amended certain redactions to reveal the name of the personal counsel (Liz Crotty) with whom Fawcett spoke several times during the period from September 24 to 28, 2021. KSAX-0136 was produced by Fawcett in native format with the Bates number JFawcett_0000055. *See* Ex. A, ¶ 12. The dates and times of Fawcett's phone communications during this period with Kreindler & Kreindler and with his personal counsel are relevant for numerous purposes, including to reconstruct the timeline of events on September 27, 2021.

    **c.**    KSAX-0139 consists of records showing Fawcett's communications with Isikoff and others using the app Signal during the period from June 1 to July 5, 2021. KSAX-0139 was produced by Fawcett in native format with the Bates number JFawcett_0000053. *See* Ex. A, ¶ 13. Fawcett's Signal contacts specifically with Isikoff during this period are also shown on KSAX-0082, which was accepted into evidence at the hearing. *See* Tr. 433:19. KSAX-0139 is a more complete listing of Fawcett's Signal contacts during this time and should be accepted to complete the record.

    **d.**    KSAX-0151 is Fawcett's Second Amended Privilege Log of Withheld Materials, dated November 5, 2021. A previous version of this document was submitted to the Court as ECF No. 7298-1, which was filed under seal. Since that time, Fawcett has amended the log twice, including after the hearing to correct some timestamp inaccuracies created by vendor error. KSAX-0151 was produced to Saudi Arabia on November 5, 2021. *See* Ex. A, ¶ 15. A copy of it is attached as Exhibit C. The First Amended version of the log was in Saudi Arabia's hearing binder as KSAX-0146. During Fawcett's cross-examination, counsel and the Court discussed some of Fawcett's assertions of privilege, *see* Tr. 447:25-451:23, 480:5-482:9, but counsel for Saudi Arabia did not move the log into evidence. The log reflects some of the privilege assertions that were discussed and should be accepted to complete the record. The Court should accept the current version, which corrects inadvertent vendor errors, so that the timestamps on the log are accurate. This log is an opposing party's statement under Federal Rule of Evidence 801(d)(2)(D).

    **e.**    As discussed above, *see supra* ¶ 2.a, KSAX-0152 is a corrected version of KSAX-0012, which was used at the hearing. KSAX-0152 was produced to Saudi Arabia on November 5, 2021. *See* Ex. A, ¶ 16. A copy of KSAX-0152 is attached as Exhibit D. The Court should accept the corrected version, which corrects inadvertent vendor errors, so that the timestamps on the text messages are accurate.

    Saudi Arabia has met and conferred with counsel for Kreindler & Kreindler and Fawcett, who do not object to this letter being filed publicly.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 10, 2021
Page 6

Respectfully submitted,

*/s/ Michael K. Kellogg*

Michael K. Kellogg
*Counsel for the Kingdom of Saudi Arabia*

cc:    All MDL Counsel of Record (via ECF)

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
IN RE:  TERRORIST ATTACKS ON    )     Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001          )     ECF Case
_____)

This document relates to:  *All Actions*

I, Gregory G. Rapawy, declare as follows:

1.     I am a partner in the law firm Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen"), counsel for the Kingdom of Saudi Arabia ("Saudi Arabia") in the above action.  I submit this declaration in support of Saudi Arabia's letter-motion dated November 10, 2021.  The purpose of this declaration is to authenticate certain exhibits Saudi Arabia seeks to admit in connection with the evidentiary hearing that the Court held on November 1 and 2, 2021.

2.     I am familiar with the facts set forth below and could testify competently to them either from personal knowledge or based on information provided to me by the counsel and firm staff who prepared Saudi Arabia's exhibits for the hearing.

3.     Because almost all the documents described in this declaration have already been provided to the Court and to other counsel, I am not attaching exhibits to this declaration, but am referring to them by the KSAX numbers that have already been affixed to them.  In addition, a redacted version of previously provided KSAX-0023 is being filed today as Exhibit B to Saudi Arabia's letter-motion; KSAX-0151, which is a corrected version of previously provided KSAX-0146, is being filed as Exhibit C; and KSAX-0152, which is a corrected version of previously provided KSAX-0012, is being filed as Exhibit D.

4.     KSAX-0012 is a true and accurate copy of a document produced to Kellogg Hansen by counsel for John Fawcett on October 25, 2021, with the Bates range JFawcett_0000007-11.

5.     KSAX-0018 is a true and accurate copy of a transcript obtained by visiting the web page https://www.youtube.com/watch?v=6nnz0YRy6So&ab_channel=Dartmouth and clicking the three dots just above the "Subscribe" button on the YouTube page. A Kellogg Hansen paralegal cut and pasted the document into a Word document, and then converted it to PDF.

6.     KSAX-0023, pages 1 and 2, is a true and accurate copy of a letter sent to Kellogg Hansen by counsel for John Fawcett. The letter itself does not bear a date, but we received it with the filename "2021.10.25 Letter to Kellogg.pdf." The transmittal email for the letter was timestamped Tuesday, October 26, 2021, at 12:23 am. The remaining pages of KSAX-0023 as submitted to the Court are a true and accurate copy of a document we received as appended to the letter, but are not being offered into evidence. A redacted version of KSAX-0023 is being filed today as Exhibit B to Saudi Arabia's letter-motion.

7.     KSAX-0031 is a true and accurate copy of an email sent by Kellogg Hansen to the Plaintiffs' Executive Committees and other recipients on June 10, 2021, as converted to PDF and maintained in our firm's electronic document management system.

8.     KSAX-0038 is a true and accurate copy, created by a Kellogg Hansen paralegal, of a web page that was publicly available at https://play.acast.com/s/conspiracyland/ bonusepisode2-khashoggiandthe9-11lawsuit, on October 11, 2021, at 4:31 p.m. That link remains functional as of today.

9.     KSAX-0067 is a true and accurate copy of an email sent by Kellogg Hansen to counsel for Kreindler & Kreindler LLP and other recipients on October 15, 2021. Internal forwarding headers were removed at the top. KSAX-0068 is a true and accurate copy of a screenshot that was attached to KSAX-0067. I created that screenshot on my computer at the

date and time shown in the lower right-hand corner, which is October 15, 2021, at 4:09 p.m. It accurately depicts my web browser displaying the page shown on the screen, with my mouse pointer over the initials "JF" to cause the browser to display John Fawcett's full name. To reach that page, I opened a November 2018 email from John Fawcett to me that was saved in Kellogg Hansen's document management system, clicked on the link provided in that email, and provided my login credentials for dropbox.com.

10.     KSAX-0079 is a true and accurate copy, created by a Kellogg Hansen paralegal, of a web page that was publicly available at https://news.yahoo.com on October 25, 2021, at 10:54 am. The full URL is obscured in the printed PDF, but clicking on it reveals it to be https://news.yahoo.com/khashoggi-report-spurs-911-families-to-push-president-biden-for-more-saudi-disclosures-184614507.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbVS8&guce_referrer_sig=AQAAALy9YONq9vV5LZHhBQ9SyQSAHXFtcfND3N8zrkytXdsmgMGQbrItrFcFgE3JTeZ5CmAtJym6X6iah5NVThzx_0b-dkctKuaM3dAY_zzEpHJTgoU7sbs1xMvqOmdcqlB3N3kNwc_vj0WbfG8LhLOZpYiUjm1FZ691F_C35puxhlLA. That link remains functional as of today.

11.     KSAX-0101 is a true and accurate copy of a document produced to Kellogg Hansen by counsel for Kreindler & Kreindler LLP on October 27, 2021, with the Bates number KK01264.

12.     KSAX-0136 is a true and accurate copy of a document produced to Kellogg Hansen by counsel for John Fawcett on October 28, 2021, with the Bates number JFawcett_0000055. The document was originally produced in native Excel format. A Kellogg Hansen paralegal reformatted it for greater legibility and converted it to PDF.

13.    KSAX-0139 is a true and accurate copy of a document produced to Kellogg

Hansen by counsel for John Fawcett on October 28, 2021, with the Bates number

JFawcett_0000053.  The document was originally produced in native Excel format.  A Kellogg

Hansen paralegal reformatted it for greater legibility and converted it to PDF.

14.    KSAX-0150 is a true and accurate copy of a document produced to Kellogg

Hansen by counsel for John Fawcett on October 27, 2021, with the Bates range

JFawcett_0000017-18.

15.    KSAX-0151 is a true and accurate copy of John Fawcett's Second Amended

Privilege Log of Withheld Materials, dated November 5, 2021, and produced to Kellogg Hansen

by counsel for John Fawcett on that date.

16.    KSAX-0152 is a true and accurate copy of a corrected version of KSA-0012,

produced to Kellogg Hansen by counsel for John Fawcett on November 5, 2021, with the Bates

range JFawcett_00000059-63.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 10, 2021
Washington, D.C.

_Gregory G. Rapawy_
Gregory G. Rapawy

# Exhibit B

LANKLER SIFFERT & WOHL LLP

500 FIFTH AVENUE
NEW YORK, N.Y. 10110
+1.212.921.8399
WWW.LSWLAW.COM

WRITER'S DIRECT CONTACT:
+1.212.930.1247
gfriedman@lswlaw.com

Andrew Shen
Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.
Sumner Square
1615 M Street N.W.
Suite 400
Washington, D.C. 20036-3215

   Re:  **In re Terrorist Attacks on September 11, 2001, 03-md-1570 (GBD) (SN)**

Dear Andy:

   As you know, we represent non-party John Fawcett in the proceeding related to the above-captioned matter.  I write in regarding the discovery and other information requests in connection with the hearing scheduled for November 1 and 2, 2021.

   *Initial Production*

   In response to the Court's Order dated October 21, 2021 (ECF No. 7277) ("October 21, 2021 Order") regarding discovery for the hearing, enclosed please find responsive, non-privileged materials bearing Bates numbers JFawcett_0000001–JFawcett_0000021.  These materials, stamped CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER, are to be treated as confidential material pursuant to the Protective Orders in this case dated October 3, 2006 (ECF No. 1900) and November 14, 2018 (ECF No. 4255).

   In addition to this production, consistent with the October 21, 2021 Order, we have provided certain potentially responsive materials to counsel to Kreindler & Kreindler LLP ("Kreindler Firm"), for its review for privilege and/or work product protection.  We have also requested that the Kreindler Firm advise us as to whether any of these materials should be provided to the PECs for the PECs' determination as to whether to assert privilege or work product protection.

   Following that review, we will supplement our production as appropriate, including to the extent we identify additional responsive, non-privileged documents.  We will also produce a Privilege Log on behalf of Mr. Fawcett that, consistent with the October 21, 2021 Order, reflects any privilege or work product protection asserted by the Kreindler Firm or the PECs over responsive materials in Mr. Fawcett's possession.  None of the information we are providing is intended to constitute a waiver of any privilege or work product protection.  Any production of privileged or otherwise protected documents is inadvertent.

**KSAX-0023**

Case No.
03-md-1570

LANKLER SIFFERT & WOHL LLP

### *Forensic Status Report*

As you know, with the Court's permission (ECF No. 7261), LSW has retained StoneTurn Group LLC ("StoneTurn"). Attached to this letter is a forensic status report from StoneTurn (the "StoneTurn Report") regarding searches of Mr. Fawcett's personally owned devices performed at the Court's direction. We are producing the StoneTurn Report pursuant to the direction of the Court, and without waiver of any privilege or work product protection. The StoneTurn report, marked "Confidential," is to be treated as such pursuant to the Protective Orders in this case dated October 3, 2006 (ECF No. 1900) and November 14, 2018 (ECF No. 4255). With respect to the StoneTurn Report, please note that StoneTurn has advised that files contained in the Recycle Bin on Mr. Fawcett's computer are not deleted files and are considered active files. As such, these files—which may be opened by the user without need for any forensic tools—would not be identified in a forensic search for deleted files.

### *Confidential Materials*

With respect to your request regarding whether Mr. Fawcett has access to materials designated as Confidential by Saudi Arabia, as an update, Mr. Fawcett has returned to the Kreindler Firm, at its request and via counsel, the external storage devices in his possession that contained 9/11 case-related materials. One such device remains in the custody of LSW, as it may also contain confidential work product that belongs to a different and unrelated client of Mr. Fawcett's research firm, Humanitarian Research Services, Inc.

We have also learned that in connection with his work for the Kreindler Firm, which included managing case-related documents for the Kreindler Firm, Mr. Fawcett had access to and maintained a secure archive of case-related materials on a platform called Tresorit, which is a Swiss end-to-end encrypted content storage platform on the cloud designed for the secure storage of sensitive materials. In an excess of caution, we have directed StoneTurn to access the Tresorit storage platform and create a forensic image, so that the content may be secured, and if necessary reviewed and returned to the Kreindler Firm.

Owing to the pace of forensic review and discovery, we are still gathering information regarding the extent to which any materials designated as confidential may be present in Mr. Fawcett's personal emails or on his personal devices.

Sincerely,

/s/ *Gabrielle S. Friedman*
Gabrielle S. Friedman

Enc.

cc:    Emily Kirsch, Esq., Kirsch & Niehaus
       Sean Carter, Joseph Tarbutton, Cozen O'Connor
       Robert Haefele, Jodi Flowers, John Eubanks, Motley Rice

**KSAX-0023, Page 2 of 5**



KSAX-0023, Page 3 of 5





# Exhibit C

In re: Terrorist Attacks on September 11, 2001
Case No. 03-md-1570
Non-Party John Fawcett Second Amended Privilege Log of Withheld Materials
November 5, 2021

| | Date | Document Type | Author(s) | Addressee(s) | Cc(s) | Subject Matter | Privilege | Privilege Holder |
|---|---|---|---|---|---|---|---|---|
| 1 | 6/1/2021 | Screenshot | [Redacted as Work Product] | | | Screenshot of ProtonMail inbox showing sender and subject line. | Work Product | Kreindler & Kreindler LLP |
| 2 | 7/22/2021 12:07 pm | Email | John Fawcett | Liz Crotty | | Fawcett email to Crotty re legal advice. | Attorney-Client | John Fawcett |
| 3 | 7/22/2021 8:18 am  9/24/2021 8:38 am 6:42 pm  9/27/2021 7:58 am  10/5/2021 12:11 pm | Text messages | John Fawcett | Liz Crotty | | Fawcett text messages to Crotty re legal advice. | Attorney-Client | John Fawcett |
| 4 | 9/24/2021 9:04 am | Email | John Fawcett | Liz Crotty | | Fawcett email to Crotty re legal advice. | Attorney-Client | John Fawcett |
| 5 | 9/24/2021 9:04 am | Attachment to Email | | | | Attachment to Fawcett email to Crotty. | Attorney-Client | John Fawcett |
| 6 | 9/24/2021 9:04 am | Attachment to Email | | | | Attachment to Fawcett email to Crotty. | Attorney-Client | John Fawcett |
| 7 | 10/5/2021 9:03 am | Email | John Fawcett | Liz Crotty | | Fawcett email to Crotty re legal advice. | Attorney-Client | John Fawcett |
| 8 | 10/5/2021 9:03 am | Attachment to Email | | | | Attachment to Fawcett email to Crotty. | Attorney-Client | John Fawcett |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

KSAX-0151

Case No.
03-md-1570

**CONFIDENTIAL - SUBJECT TO MDL PROTECTIVE ORDER**
**KSAX-0151, Page 1 of 2**

In re: Terrorist Attacks on September 11, 2001
Case No. 03-md-1570
Non-Party John Fawcett Second Amended Privilege Log of Withheld Materials
November 5, 2021

| | Date | Document Type | Author(s) | Addressee(s) | Cc(s) | Subject Matter | Privilege | Privilege Holder |
|---|---|---|---|---|---|---|---|---|
| 9 | 10/5/2021 1:37 pm | Text message | Liz Crotty | John Fawcett | | Text message from Crotty to Fawcett re legal advice. | Attorney-Client | John Fawcett |
| 10 | 10/5/2021 1:37 pm | Attachment to text message | | | | Attachment to Text message from Crotty to Fawcett. | Attorney-Client | John Fawcett |

 CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL - SUBJECT TO MDL PROTECTIVE ORDER

# Exhibit D

**Short Message Report**

| Conversations: 1 | Participants: 3 |
|---|---|
| Total Messages: 52 | Date Range: 6/9/2021 - 9/12/2021 |

**Outline of Conversations**

💬    **IM (Phone) : [Sullivan Laura  (+12027447185),Fawcett, John]** • 52 messages between 6/9/2021 - 9/12/2021 • Fawcett, John • Sullivan Laura  (+12027447185)

KSAX-0152

Case No.
03-md-1570

Confidential and Subject to Protective Order

JFawcett_00000059

**CONFIDENTIAL - SUBJECT TO MDL PROTECTIVE ORDER**
**KSAX-0152, Page 1 of 5**

## Messages in chronological order

---

💬 **IM (Phone) : [Sullivan Laura  (+12027447185),Fawcett, John]**

| | | |
|---|---|---|
| SL | **Sullivan Laura  (+12027447185)** | 6/9/2021, 1:55 PM |
| | Hi John! It's Laura Sullivan from NPR. Hope the day is going well with the deposition. I'm sure you guys are swamped. Wanted to touch base about tomorrow and what might work best. Looking forward to meeting! | |
| US | **Unknown Sender** | 6/10/2021, 7:25 AM |
| | Hi Laura,  if you can't get me then contact Julia Sienski 714 264 9389 | |
| US | **Unknown Sender** | 6/10/2021, 9:29 AM |
| | Laura, whats your email address? I need to send you our covid form | |
| SL | **Sullivan Laura  (+12027447185)** | 6/10/2021, 9:36 AM |
| | Lsullivan@npr.org | |
| SL | **Sullivan Laura  (+12027447185)** | 6/10/2021, 9:38 AM |
| | Liked "Hi Laura,  if you can't get me then contact Julia Sienski 714 264 9389" | |
| SL | **Sullivan Laura  (+12027447185)** | 6/10/2021, 9:38 AM |
| | I have one call and should be there around 1030-11 | |
| SL | **Sullivan Laura  (+12027447185)** | 6/10/2021, 9:47 AM |
| | Can you shoot me the address? | |
| US | **Unknown Sender** | 6/10/2021, 9:48 AM |
| | 485 Lexington 28th flr | |
| US | **Unknown Sender** | 6/10/2021, 9:48 AM |
| | 46th st | |
| SL | **Sullivan Laura  (+12027447185)** | 6/10/2021, 10:49 AM |
| | I'm here | |
| SL | **Sullivan Laura  (+12027447185)** | 6/21/2021, 1:36 PM |
| | Hi John! Got a minute? No rush! | |
| SL | **Sullivan Laura  (+12027447185)** | 6/23/2021, 9:40 AM |
| | Hi again! Wondering if you may be out this week. Would love to talk if you get a chance. I'm going to make a couple calls but wanted to talk to you first. If you're on vacay ignore this 😊 | |
| US | **Unknown Sender** | 6/23/2021, 9:48 AM |
| | Hi Laura, deps every day.  Will try to call this aft. | |
| SL | **Sullivan Laura  (+12027447185)** | 6/23/2021, 9:53 AM |
| | Ahh so no umbrella drinks. Thanks John! | |
| SL | **Sullivan Laura  (+12027447185)** | 8/7/2021, 11:32 AM |
| | Hi John I'm going to be in NYC Tuesday! Are you around? Can I stop by the office and talk hijacker info? I'm struggling to keep all the data points straight/ figure out what I should focus on. I could really use your expertise!! | |
| US | **Unknown Sender** | 8/9/2021, 4:21 PM |
| | Efrain's email is justice030@aol.com  he's open to having a coffee | |
| SL | **Sullivan Laura  (+12027447185)** | 8/9/2021, 4:24 PM |

**CONFIDENTIAL - SUBJECT TO MDL PROTECTIVE ORDER**
**KSAX-0152, Page 2 of 5**

That's wonderful! I'll see if he's around Wednesday. Can I stop by on Wednesday and pester you for an hour? I need to get my head straight! too much good stuff.

SL  **Sullivan Laura  (+12027447185)**                                      8/10/2021, 8:41 PM
Efrain was amazing. Thanks so much!  Please let me know if you have some time tomorrow. I could really use your help. Phone records especially.

US  **Unknown Sender**                                                          8/10/2021, 9:33 PM
I think I'll be in the office. Give me a call about 10.

SL  **Sullivan Laura  (+12027447185)**                                      8/10/2021, 11:01 PM
Will do!

SL  **Sullivan Laura  (+12027447185)**                                      8/11/2021, 2:32 PM
Hi John  I'm downstairs

SL  **Sullivan Laura  (+12027447185)**                                      8/11/2021, 2:34 PM
Let me know if I should come up or wait here

SL  **Sullivan Laura  (+12027447185)**                                      8/11/2021, 2:36 PM
Guy is sending me up

US  **Unknown Sender**                                                          8/11/2021, 2:36 PM
Ok

SL  **Sullivan Laura  (+12027447185)**                                      9/3/2021, 11:52 AM
Hi John - my (mini) story is airing early next week. Do you have a couple minutes today for a quick fact check? I want to run a couple things by you before I put them on air

SL  **Sullivan Laura  (+12027447185)**                                      9/3/2021, 12:11 PM
Was it jarrah or thumairy who left the country two weeks before the attacks?

SL  **Sullivan Laura  (+12027447185)**                                      9/7/2021, 2:10 PM
Just a heads up that the story is running on All Things Considered today at about 5 pm after the newscast.  I'll send a link when it airs!

US  **Unknown Sender**                                                          9/7/2021, 5:26 PM
Good piece Laura.  You hit all the right points.  Even made Zelikow sound like a potential supporter!  Also you raised the expectation re the 2016 report.    Good.

SL  **Sullivan Laura  (+12027447185)**                                      9/7/2021, 5:29 PM
Good!!! I found Zelikow very surprising too ... Kellogg keeps saying nothing changes the 9/11 report, but even Zelikow is like it was a beginning, not an end. Hardly an exoneration.

SL  **Sullivan Laura  (+12027447185)**                                      9/7/2021, 5:29 PM
Dying to see what they actually release this week!

SL  **Sullivan Laura  (+12027447185)**                                      9/9/2021, 12:34 PM
This request *seems* positive ... like they want to release more underlying info? What's your take?

US  **Unknown Sender**                                                          9/9/2021, 2:59 PM
Yes. I agree.  Two reasons it seems positive.  The 2016 report contains phone analysis, a strong part of the evidence and second it will be public (not redacted).

SL  **Sullivan Laura  (+12027447185)**                                      9/9/2021, 3:00 PM
Got it!  Really cutting it close with the deadline..!!

SL  **Sullivan Laura  (+12027447185)**                                      9/9/2021, 4:29 PM

Please keep me posted as soon as anything is released *hopefully* tomorrow!!!

| US | **Unknown Sender** | 9/9/2021, 6:41 PM |

You got it. Phone records. That's the key.

| SL | **Sullivan Laura (+12027447185)** | 9/9/2021, 6:41 PM |

Liked "You got it. Phone records. That's the key."

| SL | **Sullivan Laura (+12027447185)** | 9/10/2021, 2:38 PM |

Saw the judge granted the motion! Now what happens?

| US | **Unknown Sender** | 9/10/2021, 5:28 PM |

Waiting for shoe to drop. The WH told us it will be on a website.

| SL | **Sullivan Laura (+12027447185)** | 9/10/2021, 5:28 PM |

Ok!

| SL | **Sullivan Laura (+12027447185)** | 9/10/2021, 10:34 PM |

What the hell is going on with this thing?

| SL | **Sullivan Laura (+12027447185)** | 9/11/2021, 9:31 PM |

Who do you think PII is?

| SL | **Sullivan Laura (+12027447185)** | 9/11/2021, 9:33 PM |

Sorry I mean on page 6 - the person who was "tasked by Thumairy to assist Hazmi and Midhar"

| US | **Unknown Sender** | 9/11/2021, 10:21 PM |

Give me a minute

| SL | **Sullivan Laura (+12027447185)** | 9/11/2021, 10:21 PM |

Liked "Give me a minute"

| SL | **Sullivan Laura (+12027447185)** | 9/11/2021, 10:21 PM |

I have to file story ASAP - let me know if you have any idea who was tasked by Thumairy !

| SL | **Sullivan Laura (+12027447185)** | 9/11/2021, 10:22 PM |

And who the phone buddies are in the previous paragraph

| US | **Unknown Sender** | 9/12/2021, 5:23 PM |

Megan says no problem for those two documents.

| SL | **Sullivan Laura (+12027447185)** | 9/12/2021, 5:23 PM |

Excellent!!!

| SL | **Sullivan Laura (+12027447185)** | 9/12/2021, 6:58 PM |

How do you pronounce Mutaib al sudairy? Moo-tabe al Sudairy (as in dairy comes from cows) ?

| US | **Unknown Sender** | 9/12/2021, 6:59 PM |

Moo tie ab

| SL | **Sullivan Laura (+12027447185)** | 9/12/2021, 6:59 PM |

Ahh like he has abs

| SL | **Sullivan Laura (+12027447185)** | 9/12/2021, 7:00 PM |

Thank you!!

**CONFIDENTIAL - SUBJECT TO MDL PROTECTIVE ORDER**
**KSAX-0152, Page 4 of 5**

Confidential and Subject to Protective Order

JFawcett_00000063

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

November 11, 2021

*Via ECF*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

  Re: *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

  I write on behalf of Defendant Kingdom of Saudi Arabia ("Saudi Arabia") to request that
the Court order Kreindler & Kreindler LLP ("Kreindler & Kreindler") to produce
communications between any of the witnesses at the November 1 and 2, 2021 hearing and Liz
Crotty, who provided legal advice to John Fawcett in connection with the leak of the Musaed Al
Jarrah transcript to Michael Isikoff.  *See* ECF No. 7215-1, at 3, ¶¶ 1-2.

  Evidence and testimony presented during the November 1 and 2 hearing establish that
Fawcett contacted Crotty, a former Kreindler & Kreindler attorney, on at least six separate
occasions to request legal advice, all of which was responsive to Saudi Arabia's document
requests because it "relat[ed] to the July 15, 2021 article written by Michael Isikoff" (Request
No. 1) and to "the leak of the confidential transcript of the Mussaed Al Jarrah deposition to
Michael Isikoff" (Request No. 2).  *Id.*; *see* ECF No. 7277, at 5 ("October 21 Order"); KSAX-
0135, KSAX-0151 (motion to admit pending).  Circumstantial evidence also gives rise to a
strong inference that James Kreindler knew of Fawcett's outreach to Crotty and discussed this
outreach with Fawcett in two telephone calls on July 22, 2021, the day after Saudi Arabia
informed Plaintiffs it would file a motion with the Court regarding the leak.  Those calls took
place immediately before and after Fawcett's first telephone call to Crotty in which he sought
legal advice concerning the leak.

  Kreindler & Kreindler has refused to disclose whether it has searched for or produced
communications and telephone history between any of the witnesses who testified at the hearing
and Crotty.  It has further refused to state its position on whether such documents are even
responsive to requests for production, to which this Court's October 21 Order requires Kreindler
& Kreindler to fully respond.  Any such communications between Kreindler & Kreindler and
Crotty would further demonstrate Kreindler & Kreindler's knowledge of or willful blindness to

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 11, 2021
Page 2

the leak. Accordingly, Saudi Arabia respectfully requests that the Court order Kreindler & Kreindler to produce all communications and telephone history between Crotty and the named witnesses during the relevant time period, including from the witnesses' personal devices.

      1.      On October 6, 2021, Saudi Arabia filed a motion requesting that the Court order Kreindler & Kreindler and Fawcett to produce documents responsive to Saudi Arabia's Requests for Production. *See* ECF No. 7215. Request Nos. 1 and 2 to Kreindler & Kreindler sought:

      1.  All documents and communications relating to the July 15, 2021 article written by Michael Isikoff, titled "FBI tried to flip Saudi official in 9/11 investigation."

      2.  All documents and communications relating to the leak of the confidential transcript of the Mussaed Al Jarrah deposition to Michael Isikoff.

ECF No. 7215-1, at 3, ¶¶ 1-2. The parties met and conferred regarding Saudi Arabia's Requests for Production. Kreindler & Kreindler agreed to produce all documents responsive to Request Nos. 1 and 2. *See* ECF No. 7251, at 1. On October 21, 2021, the Court further ordered Kreindler & Kreindler to "search for documents (*e.g.*, personal email, text messages, iMessage, Signal, WhatsApp, phone history, voicemail) responsive to Saudi Arabia's Requests Nos. 1 and 2 on the personal devices of witnesses named in the Court's order at ECF No. 7167." ECF No. 7277, at 5.

      2.      Evidence presented at the November 1 and 2 hearing establishes that at 9:14 p.m. on the evening of July 21, 2021, Saudi Arabia notified Kreindler & Kreindler that Saudi Arabia would file a motion with the Court requesting targeted discovery concerning the Al Jarrah deposition leak. *See* KSAX-0042, at 3-4. The next morning, at 9:17 a.m., Fawcett called James Kreindler and spoke with him for 46 minutes. *See* Tr. 83:24-84:8; KSAX-0135, at 3. Kreindler testified that he did not recall what was discussed during his "long" conversation. Tr. 84:3-16. Fawcett also testified that he could not "remember anything about what was said by [himself] or [Kreindler]" during that 46-minute 9:17 a.m. telephone call. Tr. 446:21-23.

      Almost immediately after speaking with Kreindler, Fawcett called Crotty at 10:41 a.m. *See* Tr. 447:11-14; KSAX-0135, at 3. Crotty is a criminal defense attorney and former attorney at Kreindler & Kreindler. *See* Tr. 84:20-24. Fawcett has asserted that his discussions with Crotty on this call are protected under the attorney-client privilege. *See* Tr. 447:5-448:24. At the hearing, Fawcett first testified that he "d[id]n't think" that the topic of his 22-minute call with Crotty "ha[d] to do with the 9/11 case," instead averring that their discussion concerned only her "run for [the office of] District Attorney." Tr. 449:1-20. On further examination, he gave the same answer at least five separate times. *See* Tr. 450:6-451:3.

      Fawcett then testified that his next telephone call was to Kreindler, at 12:56 p.m. *See* Tr. 451:4-19; KSAX-0135, at 3. Fawcett again represented that he could not recall what he and

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 11, 2021
Page 3

Kreindler discussed during that call, which lasted 5 minutes.  *See* Tr. 451:13-23; KSAX-0135, at 3.*

The Court took a 5-minute recess after Fawcett's cross-examination.  *See* Tr. 478:8-10. Following that recess, Fawcett requested the Court's permission to "correct an answer."  Tr. 478:17-20.  Although he had denied six times during cross-examination that his July 22, 2021 call with Crotty did not concern the leak of the Al Jarrah transcript to Isikoff, Fawcett changed his testimony and stated that he "recalled the conversation with Ms. Crotty in July" and that he "remember[ed] calling her after the Court's order had come out, so [he] was calling her about [that] order."  Tr. 480:5-8.  Fawcett added that he told Crotty that he would "like to come see [her] . . . about an [attorney-client] issue," but that Crotty was unavailable to meet with him so "the rest of the conversation was about her campaign [for District Attorney]."  Tr. 480:8-17.  The July 22, 2021 call is the only call between Fawcett and Crotty in July 2021 reflected on Fawcett's call log.  *See* KSAX-0135.  At that time, the Court had not yet issued any investigative order concerning the breach of the protective orders.

3.       This evidence gives rise to a strong circumstantial inference that on July 22, 2021, Kreindler discussed with Fawcett his breach of the protective orders in this case and Fawcett's outreach to Crotty concerning this breach.  Kreindler's and Fawcett's joint lack of memory concerning their two calls on July 22, Fawcett's repeated and then-abandoned insistence that his call with Crotty did not relate to the leak to Isikoff, and Fawcett's retreat after a recess to the (clearly untrue) fallback position that the call related to a Court order that had just "come out" combine to suggest that the two witnesses were attempting to conceal the actual contents of Kreindler's calls with Fawcett.  The only apparent motive to conceal those contents would be that Kreindler discussed information with Fawcett during those calls that would contradict Kreindler's and Fawcett's position that Kreindler did not know of Fawcett's actions in July 2021.

Any additional evidence that James Kreindler or any of the other named witnesses communicated with Crotty during the relevant period – especially on or around July 22, 2021 – is relevant to whether Kreindler & Kreindler knew of Fawcett's actions, was willfully blind to those actions, or acted to cover them up.  Such evidence would also be responsive to Saudi Arabia's Requests for Production Nos. 1 and 2, to which this Court ordered Kreindler & Kreindler to fully respond in its October 21 Order.  *See* ECF No. 7277, at 5.

Saudi Arabia therefore requests that this Court again order Kreindler & Kreindler to fully respond to Requests for Production Nos. 1 and 2, and produce all communications and telephone logs reflecting communications between any of the named witnesses and Crotty.

---

* There are a total of only four calls between Kreindler and Fawcett in July 2021.  In addition to the calls on July 22, 2021, there is a 1-minute call on July 21, 2021, at 1:54 p.m., and a 4-minute call on July 23, 2021, at 10:19 a.m.  *See* KSAX-0135, at 3.

Kᴇʟʟᴏɢɢ, Hᴀɴsᴇɴ, Tᴏᴅᴅ, Fɪɢᴇʟ & Fʀᴇᴅᴇʀɪᴄᴋ, ᴘ.ʟ.ʟ.ᴄ.

The Honorable Sarah Netburn
November 11, 2021
Page 4

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
*Counsel for the Kingdom of Saudi Arabia*

cc:    All MDL Counsel of Record (via ECF)



**EMILY KIRSCH**
150 E. 58TH STREET 22ND FLOOR
NEW YORK, NY 10155
**O** (212) 832-0170
**M** (917) 744-2888
EMILY.KIRSCH@KIRSCHNIEHAUS.COM
KIRSCHNIEHAUS.COM

November 12, 2021

<u>**VIA ECF**</u>
The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:     *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

We represent the firm Kreindler & Kreindler, LLP ("Kreindler & Kreindler") in connection with the November 1-2, 2021 hearing regarding John Fawcett's breach of the protective orders in this matter (the "Hearing"). We write in opposition to the Kingdom of Saudi Arabia's (the "Kingdom") letter motion dated November 9, 2021 ("Nov. 9 Motion") requesting that Kreindler & Kreindler submit declarations listing attendees at all depositions who are not already listed as appearing, and providing records of each such person's agreement to be bound by the protective orders. *ECF 7322*. Perhaps now recognizing that neither the documentary nor the testimonial evidence adduced at the Hearing supports its accusations against the Kreindler & Kreindler lawyers as complicit in Fawcett's breach, the Kingdom is pivoting to other unsupported allegations in its relentless – and highly improper – effort to get at its adversaries' work-product.

The Kingdom's Nov. 9 Motion asserts that Ms. Benett's testimony at the Hearing "provides substantial reason to believe that Kreindler & Kreindler has violated the deposition protocol in this case and, potentially, the MDL and FBI Protective Orders, by permitting individuals not authorized by the deposition protocol and not identified on the deposition record to attend the confidential depositions in this case." *Nov. 9 Motion at p.1*. More specifically, the Nov. 9 Motion alleges that Ms. Benett's testimony provides a basis to speculate that one particular consultant with information about Musaed Al Jarrah's child pornography (the "Consultant") was in a conference room listening to Mr. Jarrah's deposition, and that the Consultant may not have signed a protective order. But Ms. Benett's testimony does no such thing. To the contrary, her testimony establishes that (i) she could not have knowledge of who may or may not have been in the conference room during the Jarrah deposition because she was in a room by herself, elsewhere, taking the deposition, and (ii) Ms. Benett could confirm under oath with 100% certainty that the firm had processes in place to ensure that any consultant with access to confidential information – depositions included – reviewed and agreed to the protective orders in this case. For this reason alone, the Nov. 9 Motion must be denied.

But the Nov. 9 Motion is further troubling in several respects.

**KIRSCH & NIEHAUS**

***First,*** As explained more fully below, the Nov. 9 Motion knowingly misstates Ms. Benett's testimony by taking snippets out of context and stringing them together in decontextualized argument that amounts to an obvious attempt to mislead this Court. In fact, the Court itself has ***already stated on the record*** what the established facts of Ms. Benett's testimony are in this regard. The Kingdom's motion not only disregards what the Court has said on the matter, it is founded on a supposition diametrically opposed to the facts as articulated by the Court.

***Second,*** this is not the first time that the Kingdom's counsel has misled the Court in one of its motions by deliberately withholding critical facts and context and instead arguing innuendo and speculation that it knows to be contrary to the established facts.

***Third***, the Nov. 9 Motion represents yet another attempt to disingenuously "raise issues" about Kreindler & Kreindler's handling of confidential information without regard for the truth. If the Kingdom cared about the truth of this incident, its counsel would have questioned either Mr. Fawcett or Mr. Pounian – both of whom were shown to potentially have relevant knowledge – about the Consultant's absence or presence at the deposition. But the Kingdom has shown its objectives to be otherwise. They seek "relief" that does not protect confidential information, but rather is carefully targeted to gain access to protected work product and information about how lead plaintiffs' counsel is building its case. In particular, the Kingdom seeks to learn the identities of Kriendler & Kreindler's and the PECs' consultants, whose names constitute privileged information that is closely held because of, *inter alia*, the risk of threats and intimidation.[1] The Court's processes must not be abused in this way. The Nov. 9 Motion should be recognized for the fishing expedition it is, and be denied.

    **A. The Kingdom Has Grossly Misrepresented Ms. Benett's Testimony to This Court in Direct Contradiction of What the Court Has Already Stated Regarding Ms. Benett's Testimony, and What a Fair Reading of the Transcript Makes Clear.**

Contrary to the Kingdom's claims, Ms. Benett's testimony neither: (1) suggests that deposition protocol was breached, nor (2) suggests that any protective orders were not followed. The Court itself aptly summarized Ms. Benett's testimony on the record at the Hearing on November 2:

> **The COURT:** I think Ms. Benett has …testified that [the Consultant] spoke with her or communicated with her somehow during the deposition in order to provide this information [about child pornography on Mr. Jarrah's computer]. **But she doesn't know whether he was actually listening to the deposition, and it would be the practice of the firm that he would**

---

[1] The risk here is not theoretical. A potential witness in this case, Jamal Khashoggi, was murdered by Saudi Arabia at its Consulate in Istanbul, Turkey, after the Kingdom learned that Plaintiffs privately reached out to Mr. Khashoggi, a former official of the Saudi Embassy in Washington, to obtain relevant information. *ECF 6003-2 at ¶¶ 9-16.*


KIRSCH &
NIEHAUS

**have signed the MDL order, but he did not make an appearance at the deposition. I think those are the facts we have established.**

*Benett 331:9-16 (emphasis added).*[2]  Undeterred by these established facts, the Kingdom's motion brazenly insists otherwise.

### 1. Ms. Benett's Testimony Establishes That She Was Completely Unaware Of What the Consultant Was Doing During the Jarrah Deposition.

As the Court noted, Ms. Benett's testimony conclusively established that she was in a room by herself taking the deposition and has no knowledge of anyone else's whereabouts during that deposition, including the Consultant. Although Ms. Benett had previously testified that the "deposition was by Zoom. I was in a room by myself," *(Benett 310:19-20),* Mr. Shen returned to this topic and badgered Ms. Benett with several more repetitive questions about whether the Consultant attended the deposition. The relevant testimony is reproduced in its entirety below, including the entirety of Ms. Benett's answers explaining that she did not know and could not have known whether the Consultant attended the deposition.  As an aid to the Court, we have underlined the words that the Kingdom quoted in its motion, and bolded the words that the Kingdom omitted. *See Nov. 9 Motion at p.3.*

> Q:      Was this FBI agent actually attending this deposition?
> …
> A:      So, there was, in the office next – I was taking the Zoom deposition in a room in our office by myself. In that wing, there were people who were walking, not in the office, not in the Zoom room, not where the deposition was happening. He was one person who was there during that time, generally in the office. There were a number of other people, it was a weekday. Certainly, nobody was in the Zoom room with me.
> Q:      So, you were in a separate Zoom room. People were in another room listening to the deposition, correct?
> A:      What I am saying is that when I spoke with him, he was not watching a deposition. He was – there is a corridor, there are workstations. I stepped out. I had not met him before. I don't think I met him before. He told me information.
> Q:      **But you don't know if he was watching the deposition in the other room because you are taking a deposition by yourself?**
> **A:      Right.**
> Q:      You don't know whether he is in the other room watching or not, is that your testimony? Let me ask you this: Do you know whether he attended that deposition?
> A:      <u>I wouldn't be surprised if he did</u>. **I was in a room taking the deposition by myself. How could I know where he was at the very time I am in that room?** I don't have any

---

[2]      Citations in the form "*Name, page:line*" are to the transcript of the Hearing, and identify the witness testifying.

**KIRSCH &**
**NIEHAUS**

reason – I guess I <u>don't have any reason to think that he didn't</u>, **but I can't tell you that I was in there with him during the deposition because I was taking the deposition in a room by myself.**

*Benett 328:6-329:15.* This is the testimony upon which the Kingdom relies in telling this Court that the Court's own summary of established facts was wrong, and instead constitutes "substantial grounds to believe that Kreindler & Kreindler has violated paragraph 31 of the deposition protocol." *Nov. 9 Motion at p.1.* We not only disagree with the Kingdom's overreach, but find the tactic troubling.

     **2.** **Ms. Benett's Testimony Conclusively Established That Kreindler & Kreindler Ensured That Individuals Were Shown and Agreed to the Protective Orders Prior to Receiving Any Protected Materials – Including Depositions.**

The Kingdom also asserts that "[w]hen counsel for Saudi Arabia asked whether Ms. Benett knew whether the agent had reviewed and agreed to abide by the protective orders in this case, she was unable to testify definitively that he had done so." *Nov. 9 Motion at p.3.* Without belaboring the point, and as the Court has already noted at the Hearing, Ms. Benett's testimony was crystal clear that the firm has practices and procedures in place to ensure that anyone who had access to confidential information was first presented with the protective orders for review and agreement, and it maintains a chart of everyone who has signed, together with a file of all the signatures. Ms. Benett was 100% confident under oath that if the Consultant was privy to confidential information, such as being present in a room with a feed of the deposition, he signed the protective order. *Benett 330:10-13; 331:7-8 ("if he was in the room, he signed the protective order").* Below is the relevant portion of Ms. Benett's testimony.

     Q:    Sitting here today, you don't know whether he signed the FBI protective order, correct?

     A:    I have recently looked at them. It is true I cannot remember. I have looked recently at the entire file of everybody who has signed the protective orders. I believe he has, but I cannot say with absolute certainty without looking at that file, sitting here on the stand right now.

     Q:    And you don't know sitting here today whether he agreed to abide by the MDL protective orders, correct?

     A:    If he had access to any MDL protected information, he absolutely would have had to review and agree to the MDL protective order.

     Q:    That's not my question. The question is, do you know sitting here today?

     A:    So, just to be clear, your question is, irrespective of whether he looked at protected material, did he review the protective order?

     Q:    Do you know whether he looked at and agreed to abide by the MDL protective order?

     A:    If he was given MDL protected materials, yes.

     Q:    But you don't know that, correct?

     A:    I mean –

**KIRSCH & NIEHAUS**

> Q:      I am asking if you know if he looked at and agreed to abide by it. Do you
> know if he did that?
> A:      If he was given MDL protective materials, he looked at it and agreed to
> abide by it because that was our practice.
> Q:      But you don't know one way or another whether he did?
> A:      **I know with 100% certainty that if he looked at MDL protected
> materials, he reviewed and agreed to abide by the MDL protective order
> because that is what our practice was.**

*Benett 331:21-332:25.* We honestly do not understand how the Kingdom could so mischaracterize this testimony as providing "substantial reason to believe that Kreindler & Kreindler has violated … potentially, the MDL and FBI Protective Orders." *Nov. 9 Motion at p. 1.* The Kingdom had nothing to quote – even out of context – and merely stated "[w]hen counsel for Saudi Arabia asked whether Ms. Benett knew whether the agent had reviewed and agreed to abide by the protective orders in this case, she was unable to testify definitively that she has done so." *Nov. 9 Motion at p.3.* Ms. Benett decisively testified that Kreindler & Kreindler's practices require obtaining agreement to abide by protective orders – as the Court observed in just so many words at the Hearing.[3] Again, this disingenuous overreach is troubling.

### B.   This is Not the First Time the Kingdom Has Misled the Court with Incomplete Facts and Improper Innuendo

Regrettably, the tactics in this Nov. 9 Motion echo prior filings by the Kingdom. Mr. Kellogg's July 23, 2021 letter motion and accompanying declaration, for example, also deliberately misled the Court with respect to a July 5 email from reporter Michael Isikoff to Michael Kellogg. *ECF 6981.* By omitting key facts, Mr. Kellogg created the false impression that Jim Kreindler was having substantive discussions with Mr. Isikoff about confidential depositions, and as such was somehow responsible for Mr. Fawcett's breach of the protective order. *Id.*

The facts, however, as the Court will recall from the Hearing, are that:  Mr. Kreindler taped a *Conspiracyland* podcast with Mr. Isikoff on July 1. *KK Ex. Tab 9.* On July 5, Mr. Isikoff reached out to Mr. Kellogg seeking comment on statements Mr. Kreindler made on the already-recorded podcast. *ECF 6981-4 Exh. D.* The podcast "dropped" on July 10, 2021, and has been publicly available and accessible on the Yahoo! News Website ever since. *See, e.g., ECF 6981-3, Exh. C.* The podcast did not disclose any information about the Jarrah deposition. *Id.*

---

[3] Nor can Ms. Benett be blamed for not passing Mr. Shen's memory test about who had definitively signed the protective orders. The purpose of this Hearing was for the Court to inquire further into Mr. Fawcett's breach of the protective orders for which Ms. Benett was well prepared to testify. Mr. Shen's probing into the inner workings of Kreindler & Kreindler, who was present in the office and precisely what they were doing on that day and what Kreindler & Kreindler's internal records show, was an improper attempt to access his adversary's work product and was well beyond the scope of the Hearing.

# KIRSCH & NIEHAUS

On July 23, Mr. Kellogg filed a sworn declaration with this Court concerning the leak of the Jarrah transcript, and attached a copy of the July 5 email sent to him by Mr. Isikoff. *ECF 6981- 4, Exh D3*. Mr. Kellogg's declaration ***did not*** inform the Court that Mr. Isikoff sought comment from Mr. Kellogg on Mr. Kreindler's public podcast quote, which had been widely available for two weeks. Mr. Kellogg swore only that: "**Mr. Isikoff has contacted me in the past to request comment on a story he was working on, but I never have given him comment about this case. A true and correct copy of a July 5, 2021 email from me is attached as Exhibit A.**" *Id.*

But in his accompanying unsworn letter to the Court, Mr. Kellogg described the July 5 email and then *immediately* discussed the Jarrah article, as though the July 5 email was a request to comment on private statements Mr. Kreindler gave to Mr. Isikoff in connection with the Jarrah article rather than the public statements that aired on the podcast. Mr. Kellogg then further falsely implied that Mr. Kreindler was having private discussions with Mr. Isikoff by cagily stating that we "have not found any other published *article* containing the quotations that Isikoff attributed to [Jim Kreindler] in his July 5 email" – but, of course, the statement by Mr. Kreindler was from a published *podcast*. *ECF 6981 at p. 3.*[4] Mr. Kellogg withheld from the Court the fact that the podcast was the source of the quotation. He then used the July 5 email referencing the podcast quotation as the "reason to believe that [Isikoff] had substantive discussions with [Jim Kreindler] concerning the depositions at the time he was preparing the July 15 article". Just as there is zero basis today to draw the inferences from Ms. Benett's testimony that the Kingdom asks this Court to draw, there was zero basis then for Mr. Kellogg to imply that Mr. Kreindler had any private discussions with Mr. Isikoff, as the extensive discovery and the testimony at the Hearing have completely borne out. Counsel for the Kingdom knew as early as July 23 that there was no basis to assume that Jim Kreindler was speaking privately to Mr. Isikoff about Jarrah, but they fostered the misconception for months.[5]

## C. With Demonstrated Disregard for the Facts, The Kingdom's Motion Is Designed Solely to Seek Access to The Names of Kreindler & Kreindler's Consultants.

In addition, if the Kingdom actually cared whether the Consultant attended the Jarrah deposition (as opposed to caring about what the Consultant's name is), its counsel would have asked either

---

[4] Nor can Mr. Kellogg claim to have been unaware of the *Conspiracyland* podcast. Not only has the Kingdom demonstrated it scrupulously follows Mr. Kreindler's public appearances, but, remarkably, Mr. Kellogg himself cited to and attached a Yahoo! News page in that very filing ***that references and links to the podcast itself.*** *ECF 6981, at footnote 3, ECF 6981-3, Exh. C.*

[5] This misleading filing was hardly harmless. This Court relied at least twice on Mr. Kellogg's demonstrably false representations and inuendo in its orders. *See ECF 7011 at p.2; ECF 7134, 4 of 24* (both citing Mr. Kellogg's letter and declaration and noting that "circumstantial evidence" existed that Jim Kreindler was the source of the leak because, *in addition to* his appearance on the podcast, the July 5 email suggests that Jim Kreindler discussed depositions with Mr. Isikoff privately).

**KIRSCH & NIEHAUS**

Mr. Fawcett or Mr. Pounian, both of whom were shown to possibly have relevant knowledge, and both of whom testified after Ms. Benett. When Ms. Benett testified that "there were people who were attending who were in a conference room" *Benett 310:20-21; Nov. 9 Motion at 2,* she also testified just three lines down that "I believe John [Fawcett] was there." *Benett 310:24-25.* Yet when Mr. Fawcett took the stand at the Hearing about two hours later, not a single question was asked about his attendance at the Jarrah deposition or whether the Consultant was present. Moreover, during Ms. Benett's cross-examination, Mr. Shen displayed the appearance sheet for the Jarrah deposition on the monitors and focused on the Kreindler & Kreindler attorneys present. *Benett, 329:18-22; KSAX 0032.* One such attorney was Steven Pounian, who took the stand directly after Ms. Benett. The Kingdom did not ask Mr. Pounian a single question about the attendance at the Jarrah deposition or whether the Consultant was present.[6]

What the Kingdom cares about is obtaining names or other information about Kreindler & Kreindler's and the PECs' consultants, experts, or sources, who are helping to build the case against the Kingdom. If there is any doubt that the Kingdom's true goal is to obtain details of this protected work product, one need look no further than the Kingdom's questioning at the Hearing itself. In questioning Ms. Benett, Mr. Shen inquired:

> Q:     Ms. Benett, the reason you know about the event that you asked Mr. Jarrah at his deposition is because an investigator who works at the who is a former FBI agent told you about that event, correct?
> [Objection as to Work Product and caution to Kingdom counsel from the Court]

...

> Q:     You said you heard rumors. Who had you heard rumors from?
> [Objection. Mr. Shen asks a new question without a ruling, knowing it was improper].
> *Benett 319:4 - 320:16.*

…

> Q:     When did this former FBI agent work for the Kreindler firm?

---

[6] The Kingdom employed this approach throughout the hearing, asking witnesses without a basis of knowledge to answer questions they were not competent to answer and then choosing not to pose the questions to the witnesses who could answer. *See, e.g., KSAX 0012* (purported text messages between Mr. Fawcett and a third party, presented only to Mr. Kreindler), *Kreindler 42:12 – 44:23; KSAX 0018* (purported transcript of Mr. Kreindler's Dartmouth speech, presented only to Ms. Benett), *Benett 316:2 – 318:5; KSAX 0023* (letter from Mr. Fawcett's attorney to Kellogg Hansen discussing Mr. Fawcett's storage systems, presented only to Mr. Hartney), *Hartney. 154:20 – 155:9; KSAX 0038* (purported webpage for Conspiracyland presented only to Mr. Maloney, who had never listened to the podcast or seen the webpage), *Maloney. 205:22 – 206:9; KSAX 068* (purported screenshot of a dropbox account of Mr. Fawcett, presented only to Mr. Hartney), *Hartney 150:19 – 152:12; KSAX 0079*(purported article by Michael Isikoff describing an interview with Mr. Kreindler, presented only to Mr. Maloney), *Maloney203:13 – 205:21; KSAX 0150* (purported "Signal" messages of Mr. Fawcett, presented only to Mr. Hartney), *Hartney 232:20-234:2.*

# KIRSCH & NIEHAUS

[Objection as to who is retained and how the firm works with consultants is protected work product. Court instructs a rephrasing of the question to be more narrow].

*Benett 325:19-326:11.* Mr. Hansen similarly sought to obtain the names of consultants working for the Kreindler firm when questioning Mr. Fawcett:

> Q: So who confirmed it [the fact that Jarrah had child pornography on his computer]? Did someone confirm it for you?
> A: … I didn't get more confirmation that from the source that told me about it.
> Q: Who's the source?
> [Objection by counsel for Kreindler & Kreindler, sustained by the Court.]

*Fawcett 469:17-21.* Multiple times, in the face of consistent rulings and warnings from the Court, counsel for the Kingdom attempted to delve into its adversary's work product, and to obtain information regarding consultants who, at potential risk to themselves, are assisting in this litigation. This motion is a thinly-veiled attempt to achieve the same goal.

### D. The Kingdom's Legal Citations are Equally Misleading and in Fact Further Reveal Their Improper Motives

The Kingdom's legal citations are equally as misleading as its factual citations. It is not in dispute that a federal district court has inherent authority to issue sanctions for violation of its orders upon a finding established by clear and convincing, competent evidence that a violation has occurred. In the *Exxon Mobil* case cited by the Kingdom, the district court judge imposed sanctions, after having established by clear and convincing competent evidence that a witness failed to answer more than 100 questions at a deposition by reading a pre-prepared non-responsive statement into the record as his answer. *Doe I v. Exxon Mobil Corp.,* No. 1:01-CV-1357-RCL, 2021 WL 1840649, at *5 (D.D.C. May 7, 2021). It is also not in dispute that a federal district court has the authority to issue orders in furtherance of enforcing existing orders. *Hunt v. Enzo Biochem, Inc.*, 904 F. Supp. 2d 337, 344 (S.D.N.Y. 2012). However, if the Kingdom were to establish by clear and convincing competent evidence that the protective orders were violated – which they obviously have not done and cannot do – they would be entitled to seek relief fashioned to protect their confidential information. The relief the Kingdom seeks tellingly has nothing to do with protection of their information. They seek a list of names of consultants whose names Kreindler & Kreindler, in order to protect against witness intimidation, has not disclosed.

For all of the reasons stated above, the Kingdom's Nov. 9 motion should be denied in its entirety.

Respectfully Submitted,

_____/s/ Emily Kirsch_____
Emily Bab Kirsch

8

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
_____
(202) 326-7900
FACSIMILE:
(202) 326-7999

November 15, 2021

*Via ECF*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

     Re:    *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

     Defendant Kingdom of Saudi Arabia ("Saudi Arabia") respectfully submits this reply in support of its letter-motion for discovery, ECF No. 7322, and in response to the letter-opposition of Kreindler & Kreindler LLP ("Kreindler & Kreindler"), ECF No. 7330. As Saudi Arabia explained in its motion (at 2-3), the testimony given by Kreindler & Kreindler counsel Megan Benett at the November 2, 2021 hearing provides substantial grounds to believe that a former FBI agent attended the Musaed Al Jarrah deposition without appearing on the deposition record, violating Paragraph 31 of the deposition protocol. Indeed, Kreindler & Kreindler's letter as much as concedes that one or more unnamed individuals did attend the confidential depositions in this case. The Court should direct Kreindler & Kreindler to provide sworn declarations identifying any individuals who attended each confidential deposition in this case not listed on the deposition record, and to produce records showing that such individuals agreed to abide by the protective orders.

     **1.**    We respond initially to Kreindler & Kreindler's false allegation (at 5) that on July 23, 2021, Michael Kellogg, undersigned counsel for Saudi Arabia, "deliberately" withheld from the Court the fact that James Kreindler's statements discussing the contents of confidential depositions in this case were made to Michael Isikoff during Isikoff's *Conspiracyland* podcast, as opposed to a private conversation between Kreindler and Isikoff. *See* ECF No. 6981, Ex. D3, ¶ 4 (Kellogg Decl.) & attach. A (filed under seal). The record shows that is nonsense. Less than a week after his July 23 letter, undersigned counsel filed a reply letter advising the Court that Saudi Arabia had "since learned" that the statements quoted had been broadcast on the July 10, 2021 episode of *Conspiracyland*. ECF No. 6990, at 2. So much for Kreindler & Kreindler's baseless assertion (at 6) that Saudi Arabia "fostered [a] misconception for months."

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 15, 2021
Page 2

Even were it not contrary to the record, Kreindler & Kreindler's claim would make no sense. It hardly helps James Kreindler that his statements about the contents of confidential depositions were broadcast publicly rather than made privately to a reporter. And if he had thought it did, he or his firm could have called the supposed omission to the Court's attention in the letter they and other PEC members filed in opposition to Saudi Arabia on July 27, 2021. ECF No. 6988 (filed under seal). Instead, that letter did not mention the podcast at all.

2.      Kreindler & Kreindler also errs in contending (at 2-3) that there is no evidence to "suggest[ ] that [the] deposition protocol was breached." As Saudi Arabia explained in its letter-motion (at 2-3), Benett testified that she was alone in a "Zoom room" in the Kreindler & Kreindler office when she took the Jarrah deposition and that "[t]here were people who were attending [the deposition] . . . in a [nearby] conference room." Tr. 310:17-311:1, 328:14-20. Benett then testified that during a break in the "middle of the deposition" she met in person with and received certain information from a former FBI agent who she "had not met . . . before." Tr. 328:23-329:1, 334:6-7. When asked whether she knew "whether [the former agent] attended that deposition and watched that deposition," Benett answered: "I wouldn't be surprised if he did. . . . I guess I don't have any reason to think that he didn't." Tr. 329:7-12. She then admitted that the agent's name was not on the appearance sheet for the deposition. *See* Tr. 329:18-330:1. After that, Benett again repeated that she "d[id]n't know if he was in the room." Tr. 331:7.

Benett's testimony shows that she, the attorney conducting the Al Jarrah deposition for Kreindler & Kreindler, believed it was not unlikely that there were individuals attending the deposition who did not appear on the appearance sheet. Further, when asked whether it was "the practice of the Kreindler firm to have people who did not actually make an appearance at these confidential depositions . . . listen in on the depositions," Benett answered only that she "d[id]n't think it was a practice to do that." Tr. 330:2-8. By contrast, she was willing to testify that she "kn[e]w with 100 percent certainty" that, "[i]f [the agent] was in the room, he signed the protective order." Tr. 331:8, 332:23-25. It is reasonable to infer from those answers that Benett was aware of at least some individuals who, contrary to the deposition protocol, attended depositions without making appearances.

3.      Kreindler & Kreindler's letter itself as much as confirms that the unnamed former FBI agent or others like him listened in on the Al Jarrah deposition or others like it. At its end, the letter states (at 8) that Saudi Arabia "seek[s] a list of names of consultants whose names Kreindler & Kreindler, in order to protect against witness intimidation, has not disclosed." That gives up the game. Saudi Arabia's letter-motion asks (at 1) only for a list of the "names of all individuals who attended each confidential deposition taken in this case whose names do not appear on the deposition record." If Kreindler & Kreindler had complied with the deposition protocol's requirement that "[a]ll persons in attendance (either in person or remotely) must be noted on the deposition record," ECF No. 6002-1, at 9, ¶ 31, that would impose no burden. The answer would be that there are no such persons. A "list" will be required only if there are multiple violations.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 15, 2021
Page 3

Kreindler & Kreindler purports (at 6-7) to find fault with Saudi Arabia for not using limited hearing time to further explore this issue with Kreindler & Kreindler attorney Steven Pounian and researcher John Fawcett. But Kreindler & Kreindler has access to Pounian, at least, if no longer to Fawcett. If Pounian could truthfully say that no one attended the depositions who did not appear on the appearance sheets – or even that the former FBI agent to whom Benett referred at the hearing did not attend the Al Jarrah deposition – that would give Kreindler & Kreindler a basis to represent that it complied with the deposition protocol. No such representation appears in Kreindler & Kreindler's letter. That can only be because, having discussed the matter with her clients, she cannot make such a representation.

4.      Saudi Arabia continues to object to Kreindler & Kreindler's repeated but unfounded assertions (at 2 & n.1, 8) that witnesses' or consultants' names cannot be revealed because Saudi Arabia might threaten or intimidate them. We have never participated and would never participate in such conduct. We respectfully refer the Court to Saudi Arabia's past response to Plaintiffs' falsehoods, including a sworn denial from the Minister of State who supervises this litigation. *See* ECF No. 6017-1.

Kreindler & Kreindler's assertion of a right to withhold attendee names is also contrary to the agreed deposition protocol provisions that Kreindler & Kreindler attorneys Andrew Maloney and Steven Pounian, among other PEC representatives, presented to the Court in the very same filing on the very same day that they first proffered their baseless allegations of intimidation to the Court. *See* ECF No. 6003, at 6 (signatures); *id.* addendum, ¶ 31 (agreement to list attendees); ECF No. 6003-2 (Maloney Decl.). Those attorneys did not then reserve any right to keep attendee names secret and did not raise any concerns about safety.

Should the Court wish to accommodate Kreindler & Kreindler's purported concerns, it can use a procedure similar to the one it has used in the past, where Kreindler & Kreindler has filed declarations with redactions for consultant-identifying information and has sent to chambers an unredacted version accompanied by a motion giving reasons for sealing. *See* ECF No. 7166-2. The Court can then decide whether maintaining the unredacted version under seal is warranted. Similarly, names can be redacted from the documents showing that individuals have agreed to comply with the MDL and FBI Protective Orders. In this situation, any documents with redacted names should be marked with unique identifiers (Consultants 2, 3, 4, and so on).

Finally, contrary to Kreindler & Kreindler's assertions (at 1), Saudi Arabia's discovery request is neither "pivoting" to other allegations nor an "effort to get at its adversaries' work product." It is legitimate, appropriate, necessary follow-up on information revealed for the first time at the evidentiary hearing that shows the scope of Kreindler & Kreindler's cavalier disregard for procedure extends beyond the protective order violations that prompted the Court to order the hearing.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 15, 2021
Page 4

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
*Counsel for the Kingdom of Saudi Arabia*

cc:     All MDL Counsel of Record (via ECF)



**KIRSCH &**
**NIEHAUS**

**EMILY KIRSCH**
150 E. 58TH STREET 22ND FLOOR
NEW YORK, NY 10155
**O** (212) 832-0170
**M** (917) 744-2888
EMILY.KIRSCH@KIRSCHNIEHAUS.COM
KIRSCHNIEHAUS.COM

November 15, 2021

<u>VIA ECF</u>
The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:     *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

We write on behalf of Kreindler & Kreindler, LLP in opposition to the Kingdom of Saudi Arabia's (the "Kingdom") letter motion seeking to admit fourteen documents, post-Hearing, into evidence. *See Kingdom Letter to the Court, November 10, 2021, ECF 7327 ("Nov. 10 Letter").* We oppose the admission of eleven of these documents, because the Kingdom failed, both at the hearing held November 1-2, 2021 (the "Hearing") and subsequently, to establish their competency as evidence. Accordingly, this Court should deny the highly irregular *ex post facto* attempt to make these incompetent documents part of the evidentiary record.[1]

## A.  ONLY COMPETENT EVIDENCE MAY BE CONSIDERED ON A MOTION FOR CONTEMPT

1.  Legal Standard.

As the Court has made clear, consideration of a finding of contempt is a matter of the utmost gravity. *October 4, 2021 Order, ECF 7167 at p. 1.* The parties are now preparing findings of fact and conclusions of law to address whether the Kingdom has established, by clear and convincing evidence, a *prima facie* case of contempt against Kreindler & Kreindler as the prerequisite for this Court to certify facts constituting contempt to the District Judge. *Joint Stock Co. Channel One Russ. Worldwide v. Infomir LLC,* 2017 WL 5067500 at *9-10 (S.D.N.Y. Sep. 27, 2017) (Moses, M.J.) (where the moving party fails to establish a *prima facie* case of clear and convincing evidence of contempt based on evidence meeting the standards for admission under the Federal Rules of

---

[1] The Kingdom acknowledges in its motion papers that Kreindler & Kreindler has agreed to the admission of 34 exhibits, and only objects to the admission of the eleven addressed here: *KSAX 0012* (and its corrected version, *KSAX 0151), KSAX 0018, KSAX 0023, KSAX 0038, KSAX 0067, KSAX 0068, KSAX 0079, KSAX 0150, KSAX 0101, KSAX 0136, and KSAX 0139.*

1

# KIRSCH & NIEHAUS

Evidence, the Magistrate Judge "must decline to certify facts" to the District Judge). Proof of noncompliance with a court's order must be clear and unambiguous, and evidence that would not be admissible under established federal rules regarding the competency of evidence at trial may not be considered. *Id.* at *7-8; *Really Good Stuff, LLC v. BAP Investors, L.C.,* 2021 WL 246707 at *3 (S.D.N.Y. June 17, 2021) (Gorenstein, M.J.) (only evidence that meets the standards set by the Federal Rules of Evidence can be considered in determining whether the moving party has established clear and convincing proof of contempt). Presumably recognizing that it failed to make such a *prima facie* case, the Kingdom now attempts to bulldoze into evidence incompetent documents that they failed at the Hearing to make any effort to authenticate or to move into evidence – and which they could not properly move into evidence. As shown below, their request is contrary to established law.

2. Attorney Affidavits Do Not Establish Competency of Evidence

The Kingdom's cavalier approach to evidentiary issues is reflected in its statement to the Court that "there is no genuine dispute about the authenticity of any of these documents." *Nov. 10 Letter, p. 1.* We disagree. The Kingdom has offered not even the slightest authentication proof for any of the eleven disputed documents it now seeks to have admitted. No doubt recognizing this inadequacy, the Kingdom submits an affidavit signed by the Kingdom's attorney, Greg Rapawy, endeavoring to attest to the authenticity of the exhibits. *Nov. 10 Letter, Exh. A.* But attorney declarations alone, which an opposing party cannot test in any meaningful fashion, cannot establish authenticity. *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir. 1986) (an attorney affidavit is "entirely insufficient" to establish competent evidence); *Really Good Stuff,* 2021 WL 246707 at *5, 10 ("a charge as serious as contempt" cannot rely on an attorney's declaration to authenticate a document); *Novak v. Tucows, Inc.,* 2007 WL 922306 at *5 (E.D.N.Y. Mar. 26, 2007) *aff'd* 330 Fed. App'x 204 (2d Cir. 2009) (a declaration not based on personal knowledge of the document sought to be entered into evidence is insufficient to establish authenticity). Notably, the Kingdom's motion is utterly lacking in any caselaw supporting its approach, and it nowhere provides any reason or justification for departing from the established Federal Rules of Evidence employed in every federal court in this country

Issues of authenticity can often be resolved – and generally are as a matter of federal court practice - when parties exchange documents before the hearing. To the extent that a party contests authenticity, the proponent is on notice to present a witness at trial to properly authenticate the document. Because the Kingdom rejected Kreindler & Kreindler's offer to confer on admissibility and authenticity before the Hearing and refused to exchange exhibits at the time the proposed exhibit books were sent to the Court, the Kingdom assumed the burden to authenticate all of its documents at the Hearing.[2] *Bell v. Rochester Gas & Elec. Corp.,* 329 Fed. Appx. 304, 306 (2d Cir. 2009) (the proponent of evidence carries the burden to elicit testimony establishing admissibility); *United States v. Stein,* 521 F. Supp. 2d 266, 268 (S.D.N.Y. 2007) (Kaplan, J.) (the

---

[2] For the Court's reference, the email exchanges between counsel and with the Court regarding pre-hearing exchanges of documents are attached here as Exhibit A.

# KIRSCH & NIEHAUS

proponent of evidence "has the burden of establishing admissibility"). As to each of the eleven documents addressed in this opposition letter, the Kingdom failed to meet that burden.

3. The Federal Rules of Evidence Should Not Be Disregarded – Particularly in a Matter of Such Gravity.

The Kingdom's motion suggests that the evidentiary rules, including authenticity rules, should be disregarded here. The Kingdom is wrong. Rules of evidence must be followed in federal court, and authenticity rules are no exception. *United States v. Vaynor,* 769 F.3d 125, 131, 134-135 (2d Cir. 2014) (reversible error for trial court to admit unauthenticated document). In fact, authentication is a "condition precedent" to the admission of any document. *Id* at 129. Specifically, in determining the quantum of proof on a contempt motion, the court may not consider unauthenticated documents. *Really Good Stuff,* 2021 WL 246707 at *5, 10 (on a motion for contempt, a court may not consider *any evidence* that is not properly authenticated); *Joint Stock Co. Channel One Russ. Worldwide,* 2017 WL 5067500 at * 9 (on a motion for contempt, evidence "may not be considered" where it does not meet "established federal rules regarding the competency of evidence at trial"); *citing, Ceslik v. Miller Ford, Inc.,* 2006 WL 1582215 at *1 (D. Conn. June 5, 2006) (refusing to consider, on a motion for contempt, evidence "would not be admissible under established federal rules"; *citing, United States v. Bukowski,* 435 F.2d 1094, 1105-1106 (7th Cir. 1970), *cert. denied,* 401 U.S. 911 (971) ("[w]e see no grounds for departing in contempts from established federal rules regulating the competency of evidence."); *see also,* 17 C.J.S. Contempt §89 ("evidence which is not competent, relevant, and material is inadmissible in a contempt proceeding"); Fed. R. Evid. 1101(a) (Federal Rules of Evidence apply to proceedings before Unites States Magistrates); Fed. R. Evid. 1101(b) *(*Federal Rules of Evidence apply to contempt proceedings).

This authenticity rule, Fed. R. Evid. 901, while not a burdensome obligation, establishes a minimum requirement for admissibility which must be met in every instance. The rule simply sets a bar for admissibility – a bar the Kingdom failed to meet as to each of the eleven exhibits at issue here – that the proponent of evidence provide such testimony as can be elicited "through a witness with knowledge that a matter is what it is claimed to be." *United States v. Vayner,* 769 F.3d 125, 130 (2d Cir. 2014) (while the bar to authenticate documents "is not particularly high," the authenticity rule cannot be ignored, and it is reversible error to admit a document that has not been properly authenticated); *United States v. Ganias,* 824 F.3d 199, 234 (2d Cir.), *cert. denied* 137 S.Ct. 569 (2016) (although the bar to authentication is not high, the party proposing admission is required, at a minimum, to produce a witness to attest to authenticity). Here, for the documents it seeks to admit on this motion, the Kingdom failed to meet this minimal requirement, inexplicably failing to offer any basis for authenticity at the Hearing. As explained below, overwhelming authority on the rigor of evidentiary rules in contempt hearings requires denial of the Kingdom's motion.[3]

---

[3] The Kingdom has been already been shown to mischaracterize and misrepresent even properly authenticated evidence (*e.g.,* July 5 email from Isikoff to Kellogg in July 23 Kellogg Declaration

**KIRSCH & NIEHAUS**

4.      Testimony From Witnesses Without Personal Knowledge of
        Documents is Inadmissible and Should be Disregarded

Finally, while the Kingdom failed either to seek admission of the eleven documents in question prior to the Hearing or at the Hearing, it repeatedly asked questions concerning the documents of witnesses who had no knowledge of the document in question. This testimony should be disregarded by the Court.  *See, e.g.*, *KSAX 0012* (purported text messages between Mr. Fawcett and a third party, presented only to Mr. Kreindler), *Kreindler 42:12 – 44:23*; *KSAX 0018* (purported transcript of Mr. Kreindler's Dartmouth speech, presented only to Ms. Benett), *Benett 316:2 – 318:5; KSAX 0023* (letter from Mr. Fawcett's attorney to Kellogg Hansen discussing Mr. Fawcett's storage systems, presented only to Mr. Hartney), *Hartney. 154:20 – 155:9; KSAX 0038* (purported webpage for Conspiracyland presented only to Mr. Maloney, who had never listened to the podcast or seen the webpage), *Maloney. 205:22 – 206:9; KSAX 068* (purported screenshot of a dropbox account of Mr. Fawcett, presented only to Mr. Hartney), *Hartney 150:19 – 152:12; KSAX 0079*(purported article by Michael Isikoff describing an interview with Mr. Kreindler, presented only to Mr. Maloney), *Maloney203:13 – 205:21; KSAX 0150* (purported "Signal" messages of Mr. Fawcett, presented only to Mr. Hartney), *Hartney 232:20-234:2.* Federal Rule of Evidence 602, "Need for Personal Knowledge" requires a witness to have personal knowledge of a matter in order to testify competently.  "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed R. Evid. 602.  Any testimony regarding documents about which the witness had no knowledge is inadmissible, and should be disregarded by the Court.

**B.  THE KINGDOM FAILED TO ESTABLISH THE COMPETENCY OF THE ELEVEN DOCUMENTS OPPOSED HERE**

We address the insufficiency of these exhibits in the order found in the Kingdom's motion.

**1.  KSAX 0012:**  *Purported Text Messages Produced by John Fawcett*

The purported text message of John Fawcett, *KSAX 0012*, was displayed during the testimony of Mr. Kreindler.  *Kreindler, 42:12.*  No one identified the document at the Hearing. Although John Fawcett testified at the Hearing, and *KSAX 0012* is purportedly a record of his text messages, the Kingdom chose not to ask Mr. Fawcett to identify the document as true and correct copies of his

---

and accompanying motion, *ECF 6981*) and testimony itself that was in front of the Court (*e.g.*, Kingdom's November 9 Motion for Declarations, *ECF 7322*).  *See, ECF 7330.*  It would simply pose too high a risk of distortion of the facts to allow unauthenticated documents into evidence post-Hearing and to permit the Kingdom to bowdlerize and mischaracterize documents about which Kreindler & Kreindler has no further opportunity to elicit testimony.

# KIRSCH & NIEHAUS

text messages. For text messages to be admissible, a person with personal knowledge must testify that the printouts offered for admission are authentic copies of the actual texts. *Bell v. Rochester Cas & Elec. Corp.*, 329 Fed. App'x 304, 306 (2d Cir. 2009) (affirming district court ruling excluding electronic communications where proponent did not meet his burden to provide required evidence of authentication); *Deptula v. Rosen*, 2020 WL 6135793 at n. 1 (S.D.N.Y. Oct. 16, 2020) (admission of "electronic communications . . . require a *specific* attestation by a person with personal knowledge of the communications that they are authentic") (emphasis in original). Because the Kingdom failed to meet the minimal requirements for admissibility as to *KSAX 0012*, its motion to admit the document should be denied.[4]

## 2. KSAX 0018: *Purported Transcript of a Speech by Jim Kreindler*

The Kingdom displayed *KSAX 0018, a purported "transcript" of Mr. Kreindler's 2019 speech,* during the testimony of Ms. Benett. *Benett, 316:2.* Only counsel for the Kingdom identified the document at the hearing. The Kingdom now attempts to introduce this purported "transcript" into evidence by attorney declaration. *See, Nov. 10 Letter, Exh. A, Declaration of Gregory Rapawy,* ¶5. On the face of the document itself, there is no date, no indicia of its origins, no record of who prepared it, or how it was prepared, or how it was maintained, or how accurate it may – or may not - be. Mr. Rapawy admits that some unnamed person – not even Mr. Rapawy personally – "cut and pasted" a document after clicking on "three dots" on a website – and created a new, second document in Microsoft Word, and then created yet a third document in Adobe ".pdf" format and now presents the .pdf – a third iteration from what may or may not be the "original" – for admissibility. On every level, this document fails the minimal evidentiary requirements for authentication. *United States v. Rommy,* 506 F.3d 108, 137 (2d Cir. 2007) (to lay a proper foundation for the admission of a transcript, the proponent must "produce clear and convincing evidence" of both "authenticity and accuracy."); *Joint Stock Co. Channel One Russ. Worldwide*, 2017 WL 5067500 at n. 9 (transcript may be recognized where it was accompanied by a certification declaring that it was a "true and accurate translation" of a recording so long as the recording itself is also properly authenticated). Here, Mr. Rapawy's declaration, *not* based on personal knowledge, that someone else copied a transcript that was created by an unknown party, at an unknown date, by an unknown procedure, and maintained by an unknown person on the internet fails to meet even the barest minimum of standards for admissibility. The Court should deny the admission of *KSAX 0018.*

## 3. KSAX-0023: *Letter from Attorneys for Mr. Fawcett to Kellogg Hansen*

The Kingdom displayed *KSAX 0023*, a letter between counsel, to Mr. Hartney during his testimony. *Hartney, 154:20.* Mr. Hartney did not identify the document. Although Mr. Rapawy's declaration indicates that his firm received this letter from Mr. Fawcett's attorneys, the letter is not

---

[4] We note that although Mr. Fawcett has not objected to the admission of his text messages, *KSAX 0012* and *KSAX 0150* (*see* Point # 7, *infra*), the record remains devoid of any sworn statement on his part or from any party that would have knowledge attesting to the authenticity of these texts.

# KIRSCH & NIEHAUS

written by his firm, and is plainly hearsay. *Price v. Worldvision Enterprises,* 455 F. Supp. 252 n. 25 (S.D.N.Y. 1978) (Haight, J.) (a letter attached to a declaration is hearsay and "patently insufficient in law"); *see also, Sadler v. Moran Towing Corp.,* 204 F. Supp.2d 695, 697 and n. 10 (S.D.N.Y. 2002) (unsworn letters are hearsay and not admissible evidence) (Kaplan, J.).

The Kingdom argues that, despite the hearsay nature of the document, it is admissible for impeachment purposes to the extent it mentions something called "Tresorit." *Nov. 10 Letter* at p. 3. Again, the Kingdom fails to provide any law –statutory or precedential – in support of this claim. This document was not introduced to impeach a prior statement of Mr. Hartney: Mr. Hartney never gave any testimony with respect to something called "Tresorit," and *KSAX* 0023 is not even a statement made by Mr. Hartney. A document not inconsistent with a prior statement that is really offered for its truth is not admissible under Fed. R. Evid. 806. *United States v. Mejia-Velez,* 855 F. Supp. 607, 616 (E.D.N.Y. 1997), *aff'd sub. nom. United States v. Castano,* 234 F.3d 111 (2d Cir. 2000) (hearsay document excluded from evidence where because it was not a prior inconsistent statement and was really offered for its truth), *citing United States v. Graham,* 858 F.2d 986, 990 n.5 (5th Cir. 1988), *cert. denied* 489 U.S. 1020 (1989) ("the hallmark of an inconsistent statement offered to impeach a witness's testimony is that the statement . . . is not offered for the truth of the matter asserted . . . rather, it is only offered to establish that the witness has said both "x" and "not x" and is therefore unreliable."). Here, the Kingdom seeks to have *KSAX 0023* admitted to establish that Mr. Fawcett stored Kreindler & Kreindler documents on a platform called "Tresorit." *Nov. 10 Letter* at p. 3. This testimony would have to be elicited from a person with personal knowledge of the Tresorit platform and application in question, and that person, presumably, is Mr. Fawcett. Again, the Kingdom failed to elicit any testimony from Mr. Fawcett with respect to "Tresorit."

We will not speculate as to why the Kingdom chose not to ask Mr. Fawcett even one question to identify "Tresorit" for the Court. What is clear, however is that Mr. Hartney was wholly unfamiliar with the letter and with "Tresorit," *Hartney 154:20-155:9,* and information about "Tresorit" contained in *KSAX 0023* is inadmissible hearsay. Accordingly, the Kingdom's motion to admit *KSAX 0023* should be denied.

### 4. KSAX 0038: *Purported Webpage of Conspiracyland Podcast*

During the testimony of Mr. Maloney, the Kingdom displayed *KSAX 0038*, a printout of the purported webpage of the *Conspiracyland* Podcast. *Maloney, 205:22.* Once again, the sole individual who identified the document was the Kingdom's attorney. *Tr. 205:22-206:2.* Of course, as stated above, an attorney cannot authenticate a document, and more specifically, an attorney cannot authenticate a document pulled from the internet with nothing more than a barebones assertion by counsel that it was accessed from the internet. *Disney Enterprises Inv. v. Sarelli,* 322 F. Supp.3d 413, 443 (S.D.N.Y. 2018), *reconsid. denied,* 2018 WL 5019745 (S.D.N.Y. Sept. 26, 2018) (unauthenticated screenshots of webpages submitted to the court through an attorney declaration are not admissible evidence and cannot be considered by the court); *see also, United States v. Vayner,* 769 F.3d 125, 131-132 (2d Cir. 2014) (reversing the lower court's ruling

# KIRSCH & NIEHAUS

admitting into evidence a printout of a webpage, stating that admission is not proper where the evidence failed to present any "extrinsic evidence" relating to the website other than it was "presently accessible on the Internet"); *Novak v. Tucows, Inc.,* 2007 WL 922306 at * 5, (where the proponent "proffers neither testimony nor sworn statements attesting to the authenticity of the contested web page exhibits by any employee of the companies hosting the sites from which plaintiff printed the pages, such exhibits cannot be authenticated as required under the Rules of Evidence"). Here, the Kingdom presented no extrinsic evidence relating to the website whatsoever and relied on precisely the sort of skeletal attorney's declaration that cannot authenticate a document; accordingly, *KSAX 0038* should not be admitted into evidence.

5. **KSAX 0067 and 0068:** *An Email from the Kingdom's Counsel to Kreindler & Kreindler attaching a purported screenshot of a Dropbox account*

During the testimony of Mr. Hartney, the Kingdom displayed *KSAX 0067* and *0068*, an email from counsel attaching a screenshot purporting to represent a Dropbox account that counsel for the Kingdom said was owned by Mr. Fawcett. *Hartney, 150:19.* Once again, the only person at the Hearing who gave any information about this screenshot was the attorney for the Kingdom, who "represented" that Mr. Fawcett was the owner of the account. *Tr. 150:19-22.* It bears repeating that (1) an attorney cannot authenticate a document, *Kamen v. American Tel. & Tel. Co.,* 791 F.2d at 1011, and (2) the Kingdom had ample opportunity to ask Mr. Fawcett if this screenshot was in fact a true representation of a current Dropbox account owned by him, but again, for reasons only the Kingdom knows, the Kingdom neglected to do so.

Specifically, before the court can allow the admission of a screenshot, the proponent must present a person with knowledge of how the image came to be seen on the screen. *Really Good Stuff,* 2021 WL 2469707 at * 10 (courts reject screenshots where "the only evidence submitted were screenshots attached to an attorney declaration"); *Nixon v. Inquisitr*, 2021 WL 3667154 at *4 (E.D.N.Y. Aug. 17, 2021) (screenshot from the website glassdoor.com is not admissible); *Knowyourmem.com Network v. Nizri*, 2021 WL 3855490 at *9 (S.D.N.Y. Aug. 30, 2021) (Cott, M.J.) (unauthenticated screenshots from websites are not "competent proof"). Here, we have no information except what one can read on the face of the screenshot itself. The Kingdom chose not to elicit any independent verification from Mr. Fawcett, and therefore *KSAX 0067 and KSAX 0068* this document should not be admitted into evidence for any purpose.[5]

---

[5] Had the Kingdom sought to admit this document, Kreindler & Kreindler could, at the Hearing, have elicited testimony that even if Mr. Fawcett had created or maintained a Dropbox account, given that his Kreindler & Krriendler credentials had been terminated he could not have accessed that account or the documents maintained in it. Having chosen not to do so, the Kingdom no doubt will try to argue that the absence of any evidence that Mr. Fawcett could not access a Dropbox account must be taken as proof that he *could* access it. This is precisely the sort of problem that could have been avoided had the Kingdom properly sought to admit this exhibit into evidence at the Hearing.

**KIRSCH & NIEHAUS**

6.     **KSAX 0079:** *Purported News Article from the Internet*

The Kingdom displayed *KSAX 0079,* an article purportedly downloaded from the internet, during the testimony of Mr. Maloney. *Tr. 203:13.* And again, the only individual who provided any identification of this article was counsel for the Kingdom. *Tr. 203:13 and 203:17-19.* The Kingdom asks this Court to take judicial notice of this article pursuant to Fed. R. Evid. 902(6), but without more information with respect to the website publishing the article, the article cannot be admitted. *Novak v. Tucows, Inc.,* 2007 WL 922306 at *5, 330 Fed. Appx. 204, 205 (2d Cir. 2009) (affirming lower court ruling which excluded, *inter alia,* a news article from the *Poughkeepsie Journal* and a news article from a British website, the *Register*). The Kingdom provides no support for its position that news articles from the web, without more, can be self-authenticating. Accordingly, the Kingdom's motion to admit *KSAX 0079* should be denied.

7.     **KSAX 0150:** *Purported Text Messages of John Fawcett*

The Kingdom displayed *KSAX 0150*, purported text messages of John Fawcett, during the testimony of Mr. Maloney. *Maloney, 232:20.* Once again, the only individual who provided any identification of these text messages was counsel for the Kingdom. *Tr. 232:22-233:4.* And once again, the Kingdom had ample opportunity to have Mr. Fawcett identify the text messages, but chose not to do so. As stated above, text messages need to be authenticated by a witness with personal knowledge. *See point numbered 1, above, citing Bell v. Rochester Cas & Elec. Corp.*, 329 Fed App'x at 306 and *Deptula v. Rosen,* 2020 WL 6135793 at n. 1. Accordingly, the Kingdom's motion to admit *KSAX 0150* should be denied.

8.     **KSAX 0101:** *Email Chain*
       **KSAX 0136:** *Purported Phone Records of Mr. Fawcett*
       **KSAX 0139:** *Purported Messages of Mr. Fawcett*

The three documents listed here, *KSAX 0101, 0136,* and *0139* were never even displayed, discussed or mentioned at the Hearing. They are not self-authenticating, and therefore it would be a violation of the Federal Rules of Evidence to admit them. As stated above, email chains and text message *must be authenticated* to be considered on a motion for contempt, and none of these three exhibits has been authenticated. *See above, Really Good Stuff,* 2021 WL 2469707 at * 10; *Joint Stock Co. Channel One Russ. Worldwide,* 2017 WL 5067500 at * 9; *Ceslik v. Miller Ford, Inc.,* 2006 WL 1582215 at *1. The Kingdom's request to have these documents admitted post-hearing is tantamount to asking the Court to disregard the laws governing all the federal courts in this country on this most serious of matters. None of these documents should be admitted.

**C. CONCLUSION**

For the foregoing reasons, in this contempt hearing of the utmost gravity, the Court should apply the Federal Rules of Evidence and deny admission of the eleven documents cited above. It bears noting that the Kingdom's decision to proceed informally with respect to evidentiary matters on

**KIRSCH & NIEHAUS**

this hearing for contempt was a tactical decision.  The Kingdom flatly refused to exchange documents pre-Hearing to discuss authenticity objections as is the practice in every trial or hearing in federal court. The Kingdom made a further tactical decision not to ask Mr. Fawcett to identify any documents that he produced, or to move documents into evidence at the Hearing. It defies credulity that three partners from Kellogg Hansen sitting at counsel table forgot to identify documents or to ask to move documents into evidence.  The Kingdom made a strategic decision to avoid the rigor of the Federal Rules of Evidence at the Hearing, and, specifically as to seven of these eleven documents, not to ask Mr. Fawcett to identify them (*see KSAX 0012, 0023, 0067, 0068, 0150, 0136, 139*). The Kingdom had the burden to present their documents in admissible form, and they failed to do so for the eleven documents addressed here. Accordingly, the Kingdom's motion should be denied as to these eleven documents.


                                                    Respectfully Submitted,


                                                    _____/s/ Emily Kirsch_____
                                                    Emily Bab Kirsch

# EXHIBIT A

RE: Hearing Exhibits

Shen, Andrew C. <ashen@kellogghansen.com>
Fri 10/29/2021 2:12 PM

To: Lisa Frey <lisa.frey@kirschniehaus.com>

Cc: Emily Kirsch <emily.kirsch@kirschniehaus.com>; Michael Gerber <mgerber@lswlaw.com>; Rapawy, Gregory G.
<grapawy@kellogghansen.com>; Kellogg, Michael K. <mkellogg@kellogghansen.com>; Carter, Sean <SCarter1@cozen.com>;
Young, Christopher M. <cyoung@kellogghansen.com>; Flowers, Jodi <jflowers@motleyrice.com>; Gabrielle Friedman
<GFriedman@lswlaw.com>; John <jeubanks@motleyrice.com>; Tarbutton, Joseph <starbutton@cozen.com>;
bjastrow@lswlaw.com <bjastrow@lswlaw.com>; Haefele, Robert <rhaefele@motleyrice.com>

Lisa, Emily & Gabi —

We do not intend to exchange exhibits with you today. We will provide you with a hard copy of the exhibits we
intend to use on Monday before the cross examination begins.

We would, however, like to discuss the use of documents that the Kreindler firm and Mr. Fawcett have produced
during Monday's hearing. Every document has been marked as confidential. Please let us know whether you are
available this afternoon at 5:00pm for a call.

Regards,

Andy

---

**From:** Lisa Frey <lisa.frey@kirschniehaus.com>
**Sent:** Friday, October 29, 2021 1:08 PM
**To:** Shen, Andrew C. <ashen@kellogghansen.com>
**Cc:** Emily Kirsch <emily.kirsch@kirschniehaus.com>; Michael Gerber <mgerber@lswlaw.com>; Rapawy, Gregory G.
<grapawy@kellogghansen.com>; Kellogg, Michael K. <mkellogg@kellogghansen.com>; Carter, Sean
<SCarter1@cozen.com>; Young, Christopher M. <cyoung@kellogghansen.com>; Flowers, Jodi
<jflowers@motleyrice.com>; Gabrielle Friedman <GFriedman@lswlaw.com>; John <jeubanks@motleyrice.com>;
Tarbutton, Joseph <starbutton@cozen.com>; bjastrow@lswlaw.com; Haefele, Robert <rhaefele@motleyrice.com>
**Subject:** [EXTERNAL] Re: Hearing Exhibits

Andy,

We are delivering our exhibit binders to the Court today as per Judge Netburn's Order.

When would you like to exchange exhibits by email?

Lisa Frey
917 565 1066

## In Re Terrorist Attacks on September 11, 2001: Exhibit Deliveries for Monday's Hearing

**Lisa Frey** <lisa.frey@kirschniehaus.com>

Fri 10/29/2021 3:20 PM

To: rachel_slusher@nysd.uscourts.gov <rachel_slusher@nysd.uscourts.gov>

Cc: Shen, Andrew C. <ashen@kellogghansen.com>; 'Gabrielle Friedman' <GFriedman@lswlaw.com>; Emily Kirsch <emily.kirsch@kirschniehaus.com>; Paul Niehaus <paul.niehaus@kirschniehaus.com>

Dear Ms. Slusher:

This firm represents Kreindler & Kreindler, LLP in connection with the above-referenced action. Pursuant to the Court's Order of October 21, 2021 [ECF 7277] we are today delivering to the Court two binders of our exhibits for Monday's hearing.

Earlier today, by email, I asked Andy Shen, attorney for the Kingdom of Saudi Arabia, at what time today he would like the parties to exchange exhibits by electronic mail. Mr. Shen advised me that he will not be providing us with a copy of his exhibits until Monday morning.

We view the delivery of exhibits to the Court without a copy to the parties as an unauthorized ex parte communication with the Court, and the refusal to provide Kreindler & Kreindler with proposed exhibits prior to the hearing as unduly prejudicial and incompatible with appropriate due process.

We write to ask the Court's guidance regarding the pre-hearing exchange of exhibits, and respectfully suggest that same-day delivery of exhibits to the Court and to opposing counsel is appropriate.

I have copied Andy Shen, attorney for the Kingdom, and Gabrielle Friedman, attorney for Mr. Fawcett, on this email.

Respectfully Submitted,


Lisa Frey
**KIRSCH & NIEHAUS**
**O:** 212-832-0170
**M:** 917-565-1066

RE: In Re Terrorist Attacks on September 11, 2001: Exhibit Deliveries for Monday's Hearing

Shen, Andrew C. <ashen@kellogghansen.com>

Fri 10/29/2021 4:37 PM

To: Lisa Frey <lisa.frey@kirschniehaus.com>; rachel_slusher@nysd.uscourts.gov <rachel_slusher@nysd.uscourts.gov>

Cc: 'Gabrielle Friedman' <GFriedman@lswlaw.com>; Emily Kirsch <emily.kirsch@kirschniehaus.com>; Paul Niehaus <paul.niehaus@kirschniehaus.com>; Kellogg, Michael K. <mkellogg@kellogghansen.com>; Rapawy, Gregory G. <grapawy@kellogghansen.com>; Hansen, Mark C. <mhansen@kellogghansen.com>

Ms. Slusher:

This firm represents the Kingdom of Saudi Arabia. We read the Court's order to direct the parties to provide advance copies of the exhibits to the Court, but not to each other. That would be consistent with the usual practice for cross exhibits, which in our experience are not shown to the witness in advance of the hearing. We disagree with Ms. Frey's characterization of our actions as an unauthorized *ex parte* communication, because the Court's order requires the submission of exhibits. We will of course comply with any further direction or guidance the Court may provide.

Respectfully Submitted,

Andrew C. Shen
Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Direct: (202) 326-7963
Fax: (202) 326-7999

The above communication contains information that may be confidential and/or privileged. Except for use by the intended recipient, or as expressly authorized by the sender, any person who receives this information is prohibited from disclosing, copying, distributing, and/or using it. If you have received this communication in error, please immediately delete it and all copies, and promptly notify the sender at the above telephone number or electronic mail address. Nothing in this communication is intended to operate as an electronic signature under applicable law.

---

**From:** Lisa Frey [mailto:lisa.frey@kirschniehaus.com]
**Sent:** Friday, October 29, 2021 3:21 PM
**To:** rachel_slusher@nysd.uscourts.gov
**Cc:** Shen, Andrew C. <ashen@kellogghansen.com>; 'Gabrielle Friedman' <GFriedman@lswlaw.com>; Emily Kirsch <emily.kirsch@kirschniehaus.com>; Paul Niehaus <paul.niehaus@kirschniehaus.com>
**Subject:** [EXTERNAL] In Re Terrorist Attacks on September 11, 2001: Exhibit Deliveries for Monday's Hearing

Dear Ms. Slusher:

This firm represents Kreindler & Kreindler, LLP in connection with the above-referenced action. Pursuant to the Court's Order of October 21, 2021 [ECF 7277] we are today delivering to the Court two binders of our exhibits for Monday's hearing.

Earlier today, by email, I asked Andy Shen, attorney for the Kingdom of Saudi Arabia, at what time today he would like the parties to exchange exhibits by electronic mail. Mr. Shen

advised me that he will not be providing us with a copy of his exhibits until Monday morning.

We view the delivery of exhibits to the Court without a copy to the parties as an unauthorized ex parte communication with the Court, and the refusal to provide Kreindler & Kreindler with proposed exhibits prior to the hearing as unduly prejudicial and incompatible with appropriate due process.

We write to ask the Court's guidance regarding the pre-hearing exchange of exhibits, and respectfully suggest that same-day delivery of exhibits to the Court and to opposing counsel is appropriate.

I have copied Andy Shen, attorney for the Kingdom, and Gabrielle Friedman, attorney for Mr. Fawcett, on this email.

Respectfully Submitted,


Lisa Frey
**KIRSCH & NIEHAUS**
**O:** 212-832-0170
**M:** 917-565-1066

## Exhibit Deliveries for Monday's Hearing

### Netburn NYSD Chambers <Netburn_NYSDChambers@nysd.uscourts.gov>

Fri 10/29/2021 7:52 PM

To: ashen@kellogghansen.com <ashen@kellogghansen.com>; Lisa Frey <lisa.frey@kirschniehaus.com>;
GFriedman@lswlaw.com <GFriedman@lswlaw.com>; Emily Kirsch <emily.kirsch@kirschniehaus.com>; Paul Niehaus
<paul.niehaus@kirschniehaus.com>; mkellogg@kellogghansen.com <mkellogg@kellogghansen.com>;
grapawy@kellogghansen.com <grapawy@kellogghansen.com>; mhansen@kellogghansen.com
<mhansen@kellogghansen.com>

Good Evening Counselors,

Regarding the parties' email to Ms. Slusher this afternoon, parties are not required to exchange copies of exhibits
with each other in advance of Monday's evidentiary hearing.

Best,
Sam



**Samuel Bieler**
Law Clerk to the Honorable Sarah Netburn
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
_____
(202) 326-7900
FACSIMILE:
(202) 326-7999

November 16, 2021

*Via ECF*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:     *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

Defendant Kingdom of Saudi Arabia ("Saudi Arabia") respectfully submits this reply in support of its letter-motion, ECF No. 7327, to admit exhibits into evidence and to supplement the record. Kreindler & Kreindler's opposition, ECF No. 7337, confirms (at 1 n.1) that Kreindler & Kreindler does not oppose the admission of the 34 exhibits set forth in ¶ 1 of Saudi Arabia's letter-motion. The opposition addresses only 12 of the 14 remaining exhibits.* It does not object to KSAX-0031, which is correspondence from counsel, and it contains no argument about KSAX-0151, John Fawcett's Second Amended Privilege Log of Withheld Materials. The 36 unopposed and the 12 opposed exhibits should all be admitted.

**1.**     The opposition focuses on authenticity. The objections are purely technical; there is no showing that any exhibit is actually inauthentic. They are also meritless. Authentication requires only "evidence sufficient to support a finding that the item is what the proponent claims it is," Fed. R. Evid. 901(a), and this Court has "broad discretion" to make such findings, *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999). The Second Circuit has "often commented" that "'[t]he bar for authentication of evidence is not particularly high'" and "proof of authentication may be direct or circumstantial." *United States v. Al-Moayad*, 545 F.3d 139, 172 (2d Cir. 2008) (quoting *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007)) (brackets in original).

Contrary to Kreindler & Kreindler's contention (at 2-3), there is no rule against using an attorney declaration to establish authenticity. Attorney declarations can establish circumstances

_____
*     The opposition says (at 1 n.1) it is objecting to "eleven" exhibits, apparently counting "KSAX 0012 (and its corrected version, KSAX 0151)" (italics omitted) as a single exhibit. KSAX-0151 is not a corrected version of KSAX-0012. Saudi Arabia interprets the objection to apply to KSAX-0012 and its corrected version *KSAX-0152* and responds accordingly.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 16, 2021
Page 2

that support authenticity, such as whether a document came from a particular Internet source or whether a document was produced in discovery. *See*, *e.g.*, *Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 297-99 (S.D.N.Y. 2012) (accepting attorney declaration that website printouts were authentic); *Commercial Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 58-59 (S.D.N.Y. 2003) (accepting attorney declaration that "documents are true and correct copies of [discovery] responses" as "testimony by a witness with knowledge of what the firm received from its opponent in response to legitimate discovery requests"); *Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 306-07 (S.D.N.Y. 2011) (accepting attorney declaration combined with other "circumstantial evidence of admissibility"). That is what Saudi Arabia has done here.

Kreindler & Kreindler's cases (at 2) do not help it. *Kamen v. AT&T Co.*, 791 F.2d 1006 (2d Cir. 1986), rejected an attorney declaration that made a "crucial statement" on a substantive matter. *Id.* at 1011 (describing attorney's declaration that his client "receive[d] no federal financial assistance"). *Really Good Stuff, LLC v. BAP Invs., L.C.*, 2021 WL 2469707 (S.D.N.Y. June 17, 2021), rejected an attorney's attempt to authenticate an undated screenshot he did not take. *See id.* at *4. The screenshot at issue here is date-stamped and time-stamped, and it was personally taken by the declarant. *See* ECF No. 7327-1, ¶ 9. *Novak v. Tucows, Inc.*, 2007 WL 922306 (E.D.N.Y. Mar. 26, 2007), *aff'd*, 330 F. App'x 204 (2d Cir. 2009), rejected Internet-sourced documents for multiple reasons, including that they were hearsay offered for their truth and some were from third-party archives. *See id.* at *5. This case presents no similar problems.

**2.a.** KSAX-0012, John Fawcett's text message exchange used at the hearing, and KSAX-0152, a later corrected version, are authentic. Fawcett's counsel produced these documents bearing particular Bates numbers. ECF No. 7327-1, ¶¶ 4, 16; *see Commercial Data Servers*, 262 F. Supp. 2d at 58-59. Their "appearance" and "contents," Fed. R. Evid. 901(b)(4), including the Bates numbers, suggest their authenticity. Kreindler & Kreindler received the production and does not suggest that KSAX-0012 or KSAX-0152 are not true copies. The record reflects that Fawcett's counsel retained an independent third-party forensic discovery vendor to search for and produce these documents. *See* ECF No. 7280 (description of vendor's process). Those "circumstances," Fed. R. Evid. 901(b)(4), all show authenticity.

**b.** KSAX-0018, the transcript of the YouTube video of James Kreindler's Dartmouth speech, is authentic. Kreindler was cross-examined about relevant passages and did not deny that the video shows him speaking. *See*, *e.g.*, Tr. 49:4-5 ("[W]hat I was talking about is the public 2012 review."). He also admitted key statements from the speech, such as his reference to "these disgusting protective orders imposed upon us by the Department of Justice with the blessing of the court." Tr. 29:10-13; *see* KSAX-0018, at 12-13 (17:14-22) (same).

**c.** KSAX-0023, the letter from counsel for Fawcett, is undisputedly authentic. Kreindler & Kreindler objects that it is hearsay. In assessing John Hartney's credibility, the Court may give what weight it finds appropriate to the fact that Fawcett's counsel identified a cloud-based storage that Fawcett used but of which Hartney had never heard.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 16, 2021
Page 3

**d.** KSAX-0038, the webpage describing the *Conspiracyland* podcast, is authentic. Where a webpage is offered not for its substance but merely to show it was on the Internet, counsel can authenticate it. *See Lebewohl*, 890 F. Supp. 2d at 298. *Disney Enterprises, Inc. v. Sarelli*, 322 F. Supp. 3d 413 (S.D.N.Y. 2018), on which Kreindler & Kreindler relies (at 6), involved unauthenticated webpages offered to show acts of copyright infringement. *See* 322 F. Supp. 3d at 443; *see also United States v. Vayner*, 769 F.3d 125, 131 (2d Cir. 2014) (page offered as admission to prove a defendant's alias). Saudi Arabia offers KSAX-0038 only to show how easily Andrew Maloney could have found out that Catherine Hunt appeared on Isikoff's July 10, 2021 podcast.

**e.** KSAX-0067 and KSAX-0068, the screenshot of Fawcett's Dropbox account and cover email, are authentic. The screenshot was taken by the declarant personally. *See* ECF No. 7327, ¶ 9. Kreindler & Kreindler claims (at 7 n.5) it did not have the opportunity to ask follow-up questions about termination of Fawcett's Dropbox access, but in fact it did try to elicit such evidence. *See* Tr. 193:17-194-5. In any event, that has nothing to do with authenticity.

**f.** KSAX-0079 is "[p]rinted material purporting to be a newspaper or periodical," Fed. R. Evid. 902(6), and so is self-authenticating under the plain language of Rule 902(6). *Tucows*, on which Kreindler & Kreindler relies (at 8), did not consider that rule – likely because it had other reasons to exclude the challenged materials. *See* 2007 WL 922306, at *5.

**g.** KSAX-0101 is authentic. It is an email exchange that Kreindler & Kreindler itself produced during discovery. The Rapawy Declaration identifies it by Bates number. *See* ECF No. 7327-1, ¶ 11. Counsel for Kreindler & Kreindler does not deny it is the same document. She cannot object that a document she herself produced is inauthentic. *See Faulkner*, 797 F. Supp. 2d at 307 (rejecting a similar objection as "teeter[ing] on the edge of sanctionable").

**h.** KSAX-0136 and KSAX-0139 are authentic. They are Fawcett's phone and Signal records, produced by Fawcett's counsel, *see* ECF No. 7327-1, ¶¶ 12, 13, with the assistance of the independent third-party vendor. The Court may also compare them to KSAX-0134, KSAX-0135, and KSAX-0138, which were admitted and are undisputedly authentic. *See* Fed. R. Evid. 901(b)(3) (permitting "comparison with an authenticated specimen by . . . the trier of fact").

**i.** KSAX-0150, Fawcett's Signal message exchange with Isikoff used at the hearing, is authentic. Like the other exhibits above, it was produced by Fawcett's counsel, *see* ECF No. 7327-1, ¶ 14, working with the independent vendor. Rule 901(b)(3) also permits the Court to compare KSAX-0150 to KSAX-0082, which was admitted and is undisputedly authentic.

We agree with Kreindler & Kreindler's acknowledgment (at 8) that contempt is "serious" and "grav[e]." But that does not make every objection serious merely because it is asserted to block a contempt finding. Kreindler & Kreindler's authenticity complaints – made by counsel who has now had two weeks to investigate, yet does not point to the smallest piece of evidence that even one of those documents is not what it purports to be – are not serious ones.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 16, 2021
Page 4

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
*Counsel for the Kingdom of Saudi Arabia*

cc:     All MDL Counsel of Record (via ECF)



## KIRSCH & NIEHAUS

**EMILY KIRSCH**

150 E. 58TH STREET 22ND FLOOR
NEW YORK, NY 10155
**O** (212) 832-0170
**M** (917) 744-2888
EMILY.KIRSCH@KIRSCHNIEHAUS.COM
KIRSCHNIEHAUS.COM

November 16, 2021

**VIA ECF**
The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

      Re:    *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

We represent the firm Kreindler & Kreindler, LLP ("Kreindler & Kreindler") in connection with the November 1-2, 2021 hearing regarding John Fawcett's breach of the protective orders in this matter (the "Hearing"). We write in opposition to the Kingdom of Saudi Arabia's (the "Kingdom") letter motion dated November 11, 2021, *ECF 7328* ("Nov. 11 Motion") seeking an order to re-open discovery in this matter. For the third time since the close of the Hearing, the Kingdom has made an application to the Court to obtain information it failed to obtain at the Hearing,[1] and once again has fabricated "circumstances" to try to find evidence connecting Kreindler & Kreindler to John Fawcett's leak of the Jarrah deposition transcript. The Kingdom failed to discover any such evidence in the fulsome discovery produced prior to the Hearing, and it failed to elicit any such evidence during the extensive two-day Hearing itself, during which the Court put no time or other constraints on the testimony of any of the witnesses. Having failed so patently, the Kingdom has made repeated post-Hearing efforts to sling further, unfounded accusations at Kreindler & Kreindler, hoping to convince the Court of wrongdoing by innuendo, supposition, and speculation. This third post-Hearing motion, like the two that precede it, should be denied.

---

[1]      The common thread underlying each of the Kingdom's three motions is its strategic decision not to ask relevant questions of relevant witnesses at the Hearing itself. *See November 9, 2021 motion, ECF 7322* (seeking additional evidence regarding attendance at the Jarrah deposition, where the Kingdom declined at the Hearing to ask Kreindler & Kreindler attorneys who were present at the deposition for their testimony); *November 10, 2021 motion, ECF 7327* (seeking to move into evidence certain documents not admitted at the Hearing, where the Kingdom, as to many of them, chose not to seek their admission at the Hearing, not to show them to the relevant witnesses, and not to lay a foundation); *November 11, 2021 motion, ECF 7328* (seeking additional information regarding Ms. Crotty, where the Kingdom chose at the Hearing not to ask the Kreindler & Kreindler witnesses if they had any contact with Ms. Crotty during the month of July). The fact that the Kingdom's courtroom strategy failed is no basis to allow it another bite at the apple using different tactics.

# KIRSCH & NIEHAUS

*The Kingdom Has No Basis in Law or Fact to Re-Open Discovery*

As an initial matter, in making its request to re-open discovery, the Kingdom once again ignores the Federal Rules applicable to this proceeding. If the Kingdom seeks to compel further disclosure, the proper mechanism is a motion under Fed. R. Civ. P. 37(a). As with its prior motions, the Kingdom fails to identify the appropriate rule, fails to provide any citations to support its application, and fails to provide any legal basis to support its request to reopen discovery and compel further disclosure. We respectfully submit that, with the gravity of what the Kingdom is trying to do, the law matters.

So, too, do established facts. The record is clear that the Kingdom knew about Mr. Fawcett's attorney-client relationship with Liz Crotty well before the Hearing. The Kingdom received Mr. Fawcett's privilege log on October 27, 2021, wherein numerous "attorney-client" communications between Mr. Fawcett and Liz Crotty are listed. In fact, prior to the Hearing, the Kingdom was singularly focused on Ms. Crotty's role as Mr. Fawcett's counselor, as highlighted in the Kingdom's October 28 letter to the Court attaching the privilege log itself. *ECF 7298 and attachments.* Accordingly, if the Kingdom felt the absence of communications between the named witnesses and Ms. Crotty reflected a production deficiency, the time to raise the issue was pre-Hearing. But the Kingdom did not raise the issue, or any other purported discovery deficiency, because it had no grounds to do so. Kreindler & Kreindler has at all times been forthcoming and transparent – both in initially reporting Mr. Fawcett's leak and in complying with the Court's orders as a result of the leak – and its extensive production was complete (and the Kingdom knows it). Only after the close of the Hearing, after the Kingdom was unable to adduce a shred of evidence that Kreindler & Kreindler was complicit in any way with Mr. Fawcett's leak, did the Kingdom seek more discovery in its efforts to find something – anything – that Kreindler & Kreindler may have done wrong.

Nor can the Kingdom's rank speculation and misleading characterizations create what it wrongly refers to as "circumstantial evidence" to support its motion. The Kingdom's argument is founded on the fact that a call between Mr. Kreindler and Mr. Fawcett falls on the same day as a call between Mr. Fawcett and Ms. Crotty. At the Hearing the Kingdom attempted, but failed, to adduce evidence that the calls were related. But despite the fact that the record holds no support for the Kingdom's conjecture – and sworn testimony from Mr. Kreindler and Mr. Fawcett directly refutes that supposition (*Kreindler 84:3-19; Fawcett 445:18-446:8*) – the Kingdom now misrepresents to the Court that there exists "circumstantial evidence" of Mr. Kreindler's foul play. In other words, the Kingdom wishes that it had been able to elicit different testimony from the witnesses than it did, and now wants to re-open discovery to try again. Just as it advanced false innuendo in its July 23 filing to create a misconception around the July 5 email from Mr. Isikoff to Mr. Kellogg, and just as it misrepresented Ms. Benett's testimony with respect to the presence of a consultant at the Jarrah deposition in direct contradiction of Your Honor's apt summary of the testimony, the

# KIRSCH & NIEHAUS

Kingdom's speculation here about a phone call to support what amounts to perjury allegations is not only wholly unsupported, it is demonstrably false.[2]

In fact, the 46-minute call on July 22, 2021 had nothing to do with the subject matter of the Hearing. Nor was it even a private call between Mr. Fawcett and Mr. Kreindler, as Mr. Fawcett testified he believed was likely the case. *Fawcett 446:9-20.* It was an ordinary 9/11 team conference call that included Mr. Pounian as well as Mr. Kreindler and Mr. Fawcett. *See Accompanying November 15, 2021 Declaration of Steven Pounian and Exhibit A thereto.[3]* Mr. Fawcett called Mr. Kreindler at 9:17 a.m. on July 22 (for 46 minutes), and as Mr. Pounian's declaration makes clear, he was joined into the call at 9:18 a.m. for 45 minutes. A few hours later, Mr. Pounian similarly was dialed in to the 12:46 p.m. call for 5 minutes. Given the Kingdom's determination to create the misimpression of some misconduct during those calls, Mr. Pounian submits herewith his recollection of the calls, states the topics discussed and, consistent with all the documents and testimony to date, testifies with certainty that John Fawcett's leak of the Jarrah Transcript was not discussed.[4]

To further correct the record, and contrary to the Kingdom's claim, Kreindler & Kreindler did in fact supply a complete response to this inquiry prior to the Kingdom's instant motion. On Friday, November 5, counsel for the Kingdom sent undersigned counsel an email asserting that they deemed communications with Ms. Crotty as responsive to their document demands. Counsel demanded that I confirm that I searched for documents related to Liz Crotty and if I had not, further demanded that I do so and produce any newly-discovered material by no later than November 10. On Monday, November 8, I responded to the Kingdom's request, stating: "We have reviewed your below request. We confirm that Kreindler & Kreindler has complied fully with its discovery obligations, including communications and phone history, that were required by the Court's October 21, 2021 Order." I declined to walk counsel for the Kingdom through the steps that I took, to provide further interpretations of the terms of the discovery requests, or to be interrogated

---

[2] The Kingdom also continues to shamelessly (and newly) mischaracterize Ms. Benett's testimony, stating in its letter-reply filed November 15, 2021 that she testified that people were "in a [***nearby***] conference room" while she took Musaed al-Jarrah's deposition. *ECF 7336* at 2 (emphasis added). That is patently untrue. Ms. Benett, in fact, testified that she was in her own "wing" of the Kreindler & Kreindler offices. *Benett at 328:14:16.* The addition of the word "nearby" is a false characterization, and a blatant misrepresentation, that the Kingdom improperly adds to Ms. Benett's testimony.

[3] In the attachment to Mr. Pounian's Declaration, his personal calls have been redacted for privacy. His personal telephone bills were not requested discovery, nor are they in any way relevant to the instant matter, nor are they in any way responsive to the questions the Court sought to have answered at the Hearing. Kreindler & Kreindler presents them here to disprove facts that exist only in the Kingdom's imagination.

[4] Mr. Pounian's Declaration would not be necessary had the Kingdom asked any of the other Kreindler & Kreindler attorneys about their conferences that day. Because of the Kingdom's failure to elicit testimony at the Hearing, Mr. Pounian is now required to address the Kingdom's unwarranted inquiry into the firm's business matters conducted on that date.

**KIRSCH & NIEHAUS**

about my methods of responding to discovery, none of which is required, necessary or appropriate. The Kingdom's representation that I would not give my position is false.

<u>*The Kingdom's Litigation Tactics Should not be Tolerated*</u>

All of the above, and its other post-Hearing motions, represents the *modus operandi* of the Kingdom: Without authority in the Federal Rules or federal practice, and based on false characterizations (and often outright misrepresentations) of the record, the Kingdom demands information and sworn statements from its adversaries designed to expose the Plaintiffs' work product. When Plaintiffs' counsel declines to answer these invasive and improper demands in its legitimate attempt to guard work product, the Kingdom unfairly suggests that Kreindler & Kreindler is "hiding" something.[5]   Kreindler & Kreindler is thus presented with a Hobson's choice: Comply with the Kingdom's demands – irrespective of whether it has the right to make them, whether they would reveal work product, or whether they in fact distract attention and resources from the merits of the litigation – or else face continued specious allegations that Kreindler & Kreindler is hiding contumacious behavior.[6]

The Court should not countenance the Kingdom's endless, baseless, and unauthorized post-Hearing demands.   We respectfully remind the Court that Kreindler & Kreindler has cooperated fully at every step with the Court's inquiry.  When Kreindler & Kreindler learned of the leak by John Fawcett on September 27, it came forward that very day, in good faith, and with as much detail as was immediately available.  The Kingdom nevertheless made one of its characteristic motions on September 29 that Kreindler & Kreindler must be hiding something, and this process ensued.  *ECF 7157*. In the past six weeks, Kreindler & Kreindler has provided *extraordinary* discovery concerning its internal communications and protected work product, including additional invasive material from counsel's personal devices.  Four Kreindler & Kreindler lawyers were sequestered in the Court for two days, to be called for examination under oath *by their adversaries*. Kreindler & Kreindler cooperated fully with this entire process. The end result of this exceptional process has been to establish that Kingdom cannot make even a *prima facie* showing of any wrongdoing by Kreindler & Kreindler, and that the facts as Kreindler & Kreindler presented them to the Court on September 27 were true, accurate, and complete.

The Kingdom's serial requests for additional discovery clearly illustrate that no matter what information Kreindler & Kreindler provides in its attempt to prove a negative, the Kingdom will

---

[5] This method is further evidenced in the Kingdom's November 15, 2021 letter-reply, in which it incorrectly claims that Kreindler & Kreindler has, *de facto*, admitted that an individual not listed on the deposition appearance sheet of the Jarrah deposition attended it.  *ECF 7322* at 2.

[6] This strategy of seeking to burden-shift when it has no affirmative arguments in facts or law is also manifested in the Kingdom's misguided evidence motion.  *ECF 7346*. Having failed to meet even the most minimal evidentiary requirement for admission of a document at the Hearing, the Kingdom astonishingly argues that the Court should admit the documents anyway because *Kreindler & Kreindler* has failed to prove the *inauthenticity* of a document. *Id.*

4

**KIRSCH & NIEHAUS**

never be satisfied.  Unless stopped, it will continue to demand ever more-detailed recitations and proof of how Kreindler & Kreindler did *not* participate in John Fawcett's leak of confidential information (or otherwise commit any violation as imagined by the Kingdom), distracting its own adversary from the substance of this lawsuit, and delving deeper into its adversary's work product.

We respectfully submit that this extraordinary diversion must be brought to an end and the Kingdom's Nov. 11 motion should be denied in its entirety.

Respectfully Submitted,


_____/s/ Emily Kirsch _____
Emily Bab Kirsch

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |
|---|---|

This document relates to:

*All Actions*

I, Steven R. Pounian, pursuant to 28 U.S.C. §1746, hereby declare under penalty of perjury the following:

1.    I am an attorney duly admitted to practice before this Court, of counsel at Kreindler & Kreindler LLP and represent the Plaintiffs in the above-referenced matter. I submit this declaration in opposition to the Kingdom's November 11 motion seeking additional discovery information from Kreindler & Kreindler.

2.    Attached hereto as Exhibit A is a true and correct copy of my July 2021 personal cell phone bill, redacted for privacy and work product.  The final four digits of Mr. Kreindler's phone number are "1426".

3.    On July 22, 2021, I received a call from Jim Kreindler's phone at 9:18 a.m. for 45 minutes. Jim Kreindler conferenced me in to join his call with John Fawcett, and I participated in the call that day with them. As my phone bill also reflects, I participated in another conference call with Jim Kreindler and John Fawcett later that day at 12:56 p.m. for 5 minutes.

4.    I recall that we discussed several matters during the calls that day. One item was the recent indictment of Thomas Barrack and what comment, if any, we might want to make in response to press inquiries about the indictment (including an inquiry I received that morning). A

second matter was a proposed motion to lift restrictions imposed under the MDL and FBI protective orders. A third matter concerned our ongoing work with experts and their reports. A fourth item was that I would coordinate with the PECs concerning our response to the email received the evening before from Saudi Arabia's counsel, Gregory Rapawy.

5.     I can attest with 100% certainty that during the calls we did not discuss John Fawcett's leak of the Jarrah deposition in any way, shape, or form. I know this because I know for a fact that the first time I ever heard that John Fawcett was the source of the leak was on September 27, 2021, as I have testified and explained before.

Dated: New York, New York
           November 16, 2021

                                        _____/s/ Steven Pounian_____
                                        Steven R. Pounian

2

EXHIBIT A

Case 1:20-cv-10575-GBD-SN Document 635-1 Filed 11/24/21 Page 117 of 149

# verizon✓

PO BOX 489
NEWARK, NJ 07101-0489

**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**

**Invoice number**

KEYLINE
Կիտկիիիկիիիիկիիիիկիիիիիիիիիii

STEVEN POUNIAN



**Jul**     **Aug**

# Your August bill is $

It's due on Sep 5, 2021.You have Auto Pay scheduled for Sep 2, 2021.

Your August bill total is the same as last month's. Your August bill of $ is due on Sep 5, 2021. You can see a full breakdown of all this month's charges on go.vzw.com/mybill.

## Good to know

Steven Pounian                                          $

                                                        $

## Balance forward from last bill

| | |
|---|---|
| Previous balance (through Jul 13) | $ |
| Payment received - Thank you (Aug 2) | -$ |
| **Total balance forward** | **$0.00** |

### Check your online bill for all surcharges, taxes and gov fees

The total amount due for this month includes surcharges of **$3.32** and taxes and gov fees of **$2.34**. For an itemized list of taxes, fees and surcharges visit go.vzw.com/mybill.

### Surcharges

These cover the costs that are billed to us by federal, state or local governments so we can continue to provide you with the best service. See the full breakdown on go.vzw.com/mybill.

### Taxes and gov fees

We are required by law to collect these charges, which are based on your service address. You can update your service address on go.vzw.com/changeaddress.

1

## Understand your bill

**Late fee**

You'll be charged a late fee when you don't pay your bill on time. The amount is the greater of $5 or 1.5% of the unpaid balance, or as allowed by law in the state of your billing address.

# verizon✓

**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**

---

## Account Charges $0.00

You'll be charged a late fee when you don't pay your bill on time. The amount is the greater of $5 or 1.5% of the unpaid balance, or as allowed by law in the state of your billing address.

## Steven Pounian $▮▮▮

### iPhone XS

Save $10 on your GET MORE UNLIMITED 5G UW plan every month when you enroll in Auto Pay (using checking account or debit card) and paper-free billing. Enroll on the My Verizon app, or at go.vzw.com/gopaperfree.

| | |
|---|---|
| **Monthly charges and credits** | $▮▮▮ |
| Get More Unlimited 5G UW (Aug 14 - Sep 13) | $▮▮▮ |
| **Surcharges** | **$3.32** |
| Fed Universal Service Charge | $0.85 |
| Regulatory Charge | $0.21 |
| Administrative Charge | $1.95 |
| Gross Receipts Surchg | $0.31 |
| **Taxes and gov fees** | **$2.34** |
| Public Safety Comm Surchg | $1.20 |
| Local Pub Safety Com Surchg | $0.30 |
| State Sales Tax-Telecom | $0.42 |
| Sales Tax-Telecom | $0.42 |
| **Your bill this month** | $▮▮▮ |



3



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**

# Steven Pounian

**iPhone XS**

## Talk activity



| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**

# Steven Pounian



**iPhone XS**

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Jul 22 | 9:18 AM | 1426 | | Incoming, CL | 45 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| Jul 22 | 12:56 PM | 1426 | | Incoming, CL | 5 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**

# Steven Pounian



**iPhone XS**

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |
| ███ | ███ | ███ | ███ | ███ | █ | █ | █ | █ |



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**

# Steven Pounian



iPhone XS

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| ██ | ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | ██████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | ██████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | █ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | ██████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | ██████ | █ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ | |
| ██ | ██ | ██████ | █████ | ██████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | █████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | ███████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██████ | █████████ | █████ | ▌ | ▌ | ▌ | ▌ | |
| ██ | ██ | ██████ | █████ | ██████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | ██████ | █ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | █ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | █████ | █ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | ██████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | ██████ | █████ | ██████ | ▌ | ▌ | ▌ | ▌ |
| ██ | ██ | █████ | █████ | ██████ | █ | ▌ | ▌ | ▌ |



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**
███████████

# Steven Pounian



iPhone XS

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| ██ | ████ ██ | ████ | ████ | ██████ | █ | █ | █ | █ |
| ██ | ████ | ███████ | ████ | ██████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | █████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | █████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ███ | █ | █ | █ | █ |
| ██ | ████ | ████████ | ████ | ██████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ██████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ██ | █ | █ | █ | █ |
| ██ | ██ █████ | ████ | ████ | ███ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ███ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ██ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ███ | █ | █ | █ | █ |
| ██ | ████████ | ████ | ████ | ████ | █ | █ | █ | █ |
| ██ | ████████ | ████ | ████ | ████ | █ | █ | █ | █ |
| ██ | ████████ | ████ | ████ | ████ | █ | █ | █ | █ |
| ██ | ████████ | ████ | ████ | ████ | █ | █ | █ | █ |
| ██ | ████ ████ | ████ | ████ | ███ | █ | █ | █ | █ |
| ██ | ████████ | ████ | ████ | ██████ | █ | █ | █ | █ |
| ██ | ████████ | ████ | ████ | █████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ███ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ██ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | █████ | █ | █ | █ | █ |
| ██ | ████████ | ████ | ████ | █████ | █ | █ | █ | █ |
| ██ | ████ ██ | ████ | ████ | ████ | █ | █ | █ | █ |



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**
██████████

# Steven Pounian



iPhone XS

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| ██ | ██ ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ ██ | ██ | █ | █ | █ | █ |
| ██ | ██ ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ ██ | ██ | ██ ██ | ██ | ██ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ |
| ██ | ██ ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ |
| ██ | ██ | ██ | ██ | █ | █ | █ | █ |
| ██ | ██ | ██ | ██ | ██ | █ | █ | █ |



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**
███████████

# Steven Pounian



iPhone XS

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | ██ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | ██ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | ██ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | ██ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | ██ | █ | █ | █ |
| ██ | ████ | ██ | ███ | ███ | ██ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | ██ | █ | █ | █ |
| ██ | ████ | | ███ | ██ | █ | █ | █ | █ |
| ██ | ████ | | ███ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | ██ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ██ | █ | █ | █ | █ |
| ██ | ████ | ███ | ███ | ███ | ██ | █ | █ | █ |
| ██ | ████ | ███ | ███ | ███ | ██ | █ | █ | █ |
| ██ | ██ | ███ | ███ | ███ | █ | █ | █ | █ |



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**
██████████

# Steven Pounian



**iPhone XS**

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| ██ | ██ | ███ | ██ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ██ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ██ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ██ | ███ | █ | █ | █ | █ |
| ██ | ███ | ███ | ██ | ████ | █ | █ | █ | █ |
| ██ | ███ | ███ | ██ | ███ | █ | █ | █ | █ |
| ██ | ██ | ███ | ██ | ███ | █ | █ | █ | -|



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**

# Additional information

## Customer Proprietary Network Information (CPNI)

CPNI is information made available to us solely by virtue of our relationship with you that relates to the type, quantity, destination, technical configuration, location, and amount of use of the telecommunications and interconnected VoIP services you purchase from us, as well as related billing information. The protection of your information is important to us, and you have a right, and we have a duty, under federal law, to protect the confidentiality of your CPNI.

We may use and share your CPNI among our affiliates and agents to offer you services that are different from the services you currently purchase from us. Verizon offers a full range of services, such as television, telematics, high-speed Internet, video, and local and long distance services. Visit Verizon.com for more information on our services and companies.

If you don't want your CPNI used for the marketing purposes described above, please notify us by phone any time at 800.333.9956 or online at vzw.com/myprivacy.

Unless you notify us in one of these ways, we may use your CPNI as described above beginning 30 days after the first time we notify you of this CPNI policy. Your choice will remain valid until you notify us that you wish to change your selection. Your decision about use of your CPNI will not affect the provision of any services you currently have with us.

Note: This CPNI notice does not apply to residents of the state of Arizona.

## Explanation of Surcharges

Surcharges include (i) a Regulatory Charge (which helps defray various government charges we pay including government number administration and license fees); (ii) a Federal Universal Service Charge (and, if applicable, a State Universal Service Charge) to recover charges imposed on us by the government to support universal service; and (iii) an Administrative Charge, which helps defray certain expenses we incur, including: charges we, or our agents, pay local telephone companies for delivering calls from our customers to their customers; fees and assessments on our network facilities and services; property taxes; and the costs we incur responding to regulatory obligations. **Please note that these are Verizon Wireless charges, not taxes. These charges, and what's included, are subject to change from time to time.**

## Bankruptcy Information

If you are or were in bankruptcy, this bill may include amounts for pre-bankruptcy charges. You should not pay pre-bankruptcy amounts; they are for your information only. In the event Verizon receives notice of a bankruptcy filing, pre-bankruptcy charges will be adjusted in future invoices. Mail bankruptcy-related correspondence to 500 Technology Drive, Suite 550, Weldon Spring, MO 63304.

## More On Wireless Taxes And Surcharges

Your total charges for this month's bill cycle are $105.66. This includes charges for one or more bundled Verizon service plans that include voice, messaging, data, or other services for which you pay a monthly plan charge.
This bill cycle, your fixed monthly plan charges were $100.00 (before applying any discounts or credits, and excluding other charges such as overage, late payment, taxes, Verizon surcharges, and equipment).
To accurately bill taxes and Verizon surcharges, we regularly look at past network usage by you and other customers with similar plans to allocate this fixed monthly plan charge among the services included in the bundle.
In this bill cycle, we have allocated this amount as follows: $6.03 for voice, $1.22 for messaging, $86.76 for data, and $5.99 for other services.
For more information, please go to vzw.com/taxesandsurcharges.

## Service Plan Features & Services

If your service plan has optional features or services that are included as part of your monthly subscription, electing to activate these subscriptions may affect your surcharges, taxes and governmental fees, even though your plan monthly service price does not change.
Examples of these features are Apple Music or the Disney bundle.

## Regulatory Charge Decrease

Effective September 1, 2021, the monthly Verizon Wireless Regulatory Charge for voice-capable devices will decrease from $0.21 to $0.16 per line. The charge for data-only devices remains at $0.02. Please note that this is a Verizon Wireless charge, not a tax. This charge, and what's included, are subject to change from time to time. For further information regarding this charge, review the "Explanation of Surcharges" section of this bill, or consult your wireless service agreement.

## Returned Payments

If you pay your wireless bill by check and your check is returned by your bank for insufficient funds, Verizon Wireless may resubmit your check to your bank for payment from your checking account.



# Additional information

## Subject to Cancellation

Our records indicate your account is past due. Please send payment now to avoid service disruption. If you have already made your payment please disregard this message and thank you.

## Late Payment Information

A late payment charge applies for unpaid balances. The charge is the greater of $5 or 1.5% per month, or as permitted by law. Failure to pay bills on time may result in negative credit reporting.

## Notice Provided to Residential and Small-Business Customers of Wireless Service

This notice is to make you aware of certain provisions of a new law affecting certain Verizon services, including your Verizon Wireless data service ("Service"). This law was enacted in response to the State Disaster Emergency declared by Governor Cuomo in response to the COVID-19 pandemic (the "Emergency"). The Emergency began on March 7, 2020, and was ended by an Executive Order on June 24, 2021.

Between May 11, 2021 through June 24, 2021, the law prevented your service from being terminated or disconnected for non-payment. If your service was inadvertently terminated or disconnected for non-payment during this period, we will restore the service at your request. You can request reconnection at 1-866-266-1445.

For a 180-day period after the end of the Emergency - that is, from June 25, 2021 through December 21, 2021 - we will not terminate or disconnect your service because of non-payment of past-due amounts, if you have experienced a change in financial circumstances due to the Emergency. You will need to contact us to let us know about your change in circumstances if you have not already done so. You can call us at 1-866-266-1445.

Further, in such cases you may enter into a Deferred Payment Agreement that will allow you to pay your past-due bills over time, without requiring a down payment, late fee, or penalties. Such an agreement can be tailored to reflect your ability to pay. Please contact us at 1-866-266-1445 to discuss the details of such an Agreement. You are not required to accept a Deferred Payment Agreement in order to be protected from disconnection or termination for non-payment.

These protections apply only to disconnection for non-payment. They do not protect customers from disconnection for other causes. Also, while your Service will not be disconnected for non-payment, premium features and/or levels of service may be subject to adjustment.

These new emergency measures are temporary; normal payment and collection practices will resume after the protections expire.

13



**Billing period**
Jul 14, 2021 - Aug 13, 2021

**Account number**

# You're all set.

## Pay in cash

Go to vzw.com/stores to find a Verizon Wireless store near you or find a Check Free Pay or Western Union near you to make a cash payment. Go to vzw.com/support/pay-bill-faqs/ to learn more.

## Autopay scheduled

$███ will be charged to your credit card on September 2.

## My Verizon

Use the My Verizon app or download it at go.vzw.com/mva to manage your account, pay your bill, check data usage, and much more.

## Go paper-free

Enroll in paper-free billing; the easy, clutter-free way to manage and pay your bill. Enroll at go.vzw.com/gopaperfree.

---





STEVEN POUNIAN

| | |
|---|---|
| Bill date | August 13, 2021 |
| Account number | |
| Invoice number | |

### Total Amount Due

Will be submitted to credit card on 09/02/21
DO NOT MAIL PAYMENT

$ 

P.O. BOX 408
NEWARK, NJ 07101-0408

||I||u|u|u||u|I|uuu|II|uu||u||I|u||u||u|

4234005926010887497156000010000001056600000105664

Questions? Visit go.vzw.com/contactus or call 1.800.922.0204.

Change your address at go.vzw.com/changeaddress

**IMPORTANT INFORMATION:**

Many questions regarding billing can be resolved easily online or in the My Verizon App. Our customer service representatives are also available by phone, chat or in a retail store to assist you with billing questions or disputes. All written communication related to billing disputes and checks tendered as payment in full to a billing dispute must be sent to the below address. **This address should not be used for bill remit slips or payments, and general customer service questions sent to this address will not receive a response.**

Verizon Attn: Correspondence Team
PO Box 15069
Albany, NY 12212

---

**Automatic Payment Enrollment for Account:** ▉▉▉▉▉▉▉ **STEVEN POUNIAN**

By signing below, you authorize Verizon to electronically debit your bank account each month for the total balance due on your account. The check you send will be used to setup Automatic Payment. You will be notified each month of the date and amount of the debit 10 days in advance of the payment. You agree to receive all Auto Pay related communications electronically. I understand and accept these terms. This agreement does not alter the terms of your existing Customer Agreement. I agree that Verizon is not liable for erroneous bill statements or incorrect debits to my account. To withdraw your authorization you must call Verizon. Check with your bank for any charges.

**1. Check this box.**     **2. Sign name in box below, as shown on the bill and date.**     **3. Return this slip with your payment. Do not send a voided check.**

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
————
(202) 326-7900
FACSIMILE:
(202) 326-7999

November 18, 2021

*Via ECF*

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

      Re:     *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

      Defendant Kingdom of Saudi Arabia ("Saudi Arabia") respectfully submits this reply in support of its letter-motion for an order directing Kreindler & Kreindler LLP ("Kreindler & Kreindler") to produce communications between Elizabeth ("Liz") Crotty and the Kreindler & Kreindler witnesses who testified at the November 1 and 2, 2021 hearing, ECF No. 7328.

      The evidence at the November 1 and 2 hearing showed that communications between Crotty and Kreindler & Kreindler witnesses between July and September 2021 are relevant to key issues: whether any Kreindler & Kreindler attorneys (i) actually knew before September 27, 2021, that John Fawcett had leaked the Musaed Al Jarrah transcript to Michael Isikoff; (ii) were willfully blind to Fawcett's actions; (iii) acted to cover up that leak; or (iv) made false statements to the Court. Those communications are clearly responsive to Saudi Arabia's Requests for Production Nos. 1 and 2, ECF No. 7215-1, at 3. Kreindler & Kreindler should already have produced them under the Court's October 21, 2021 Order and should do so now.

      **1.**      Kreindler & Kreindler all but confirms that it did not search for communications between its witnesses and Crotty – and that it will not do so absent a Court order. It asserts in its opposition (ECF No. 7359, at 3-4), as it did during the parties' meet-and-confer discussions,[*] that it has complied with its discovery obligations. But it fails to represent, because it cannot, that it has actually searched for communications between its witnesses and Crotty. The Court should direct Kreindler & Kreindler to produce all communications and telephone logs reflecting communications between any of the named witnesses and Crotty during the relevant period.

---

      [*] *See* Ex. 1 (showing counsel's refusal to state whether she has searched for and produced communications and phone history between the named witnesses and Crotty).

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 18, 2021
Page 2

    **2.**    Kreindler & Kreindler's November 17 letter attaches a declaration of Steven Pounian discussing his participation in the phone calls with Kreindler and Fawcett on July 22, 2021. The contents of this belated declaration are hearsay. Kreindler & Kreindler was well aware when Pounian was called as a witness that the July 22 calls were at issue. *See* Tr. 83:24-86:12 (Kreindler's earlier testimony). Because Pounian was her client and witness, counsel for Kreindler & Kreindler was also presumably aware – as counsel for Saudi Arabia and the Court were not – that Pounian participated in the call. Kreindler & Kreindler thus could and should have elicited his testimony about the call at the November 1 and 2 hearing when Pounian was still subject to cross-examination.

    But the declaration – or, rather, the document it attaches – still sheds light on the present discovery dispute by contradicting Kreindler & Kreindler's representations that it has complied with its discovery obligations under the October 21 Order. The declaration states that on July 22, 2021, Pounian participated in the two calls that Kreindler had with Fawcett before and after Fawcett's call with Crotty. ECF No. 7359-1, ¶ 3. It further states that, on those calls, a topic of conversation was the "response to the email received the evening before from Saudi Arabia's counsel, Gregory Rapawy," which notified Kreindler & Kreindler that Saudi Arabia would file a motion for targeted discovery concerning the leak of the Al Jarrah transcript. *Id.*, ¶ 4; *see also* KSAX-0042, at 3-4. The Pounian declaration attaches a redacted cell phone call log purporting to show his participation in the July 22 calls between Fawcett and Kreindler.

    This phone record showing Pounian's participation in those calls is responsive to Saudi Arabia's Request for Production. Request No. 1 asked for "[a]ll documents and communications relating to the July 15, 2021 article written by Michael Isikoff, titled 'FBI tried to flip Saudi official in 9/11 investigation,'" and Request No. 2 asks for "[a]ll documents and communications relating to the leak of the confidential transcript of the Mussaed Al Jarrah deposition to Michael Isikoff." ECF No. 7215-1, at 3. Kreindler & Kreindler agreed to produce all documents responsive to these Requests, *see* ECF No. 7251, at 1, and the Court directed Kreindler & Kreindler to search for responsive documents, including "phone history" for the personal devices of each named witness, ECF No. 7277, at 5. Personal phone records showing calls discussing the July 15, 2021 Isikoff article and the leak of the confidential Al Jarrah transcript should have been produced prior to the hearing. They were not. Nor did Kreindler & Kreindler produce Kreindler's own phone records, which presumably show the same calls.

    **3.**    The Pounian declaration is also inconsistent with Fawcett's testimony concerning the July 22 calls. When questioned about the 46-minute 9:17 a.m. phone call with Kreindler on the morning of July 22, KSAX-0135, at 3, Fawcett testified that he could not "remember anything about what was said by [himself] or [Kreindler]" during the call, but that the call "would *not* have been relating to the leak to [sic] the Jarrah transcript." Tr. 446:9-447:1 (emphasis added). Pounian now testifies that the Rapawy e-mail about the leak – and Kreindler & Kreindler's response to that e-mail – *was* discussed on this call. As Saudi Arabia explained in its motion (at 2-3), Kreindler's and Fawcett's testimony regarding their two calls on July 22,

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Sarah Netburn
November 18, 2021
Page 3

along with Fawcett's shifting testimony regarding his call with Crotty on that same day, gives rise to the inference that Kreindler and Fawcett were attempting to conceal the contents of Kreindler's calls with Fawcett. Pounian's testimony contradicting Fawcett's testimony only creates more reason to think that what happened on the call was important and at least one witness has given false testimony about it. It thus underscores, rather than detracts from, the importance of checking for other contacts with Crotty.

    4.    Kreindler & Kreindler errs in asserting (at 2) that Saudi Arabia should have raised the issue of its witnesses' communications with Crotty prior to the hearing. The evidence developed at the hearing showed the relevance of those communications, making it legitimate follow-up to raise the issue promptly afterwards, as Saudi Arabia did. *See* Ex. 1, at 2-3 (Nov. 5 e-mail). In any event, contrary to Kreindler & Kreindler's assertion (at 2), Saudi Arabia did question the sufficiency of Kreindler & Kreindler's production prior to the hearing, including whether Kreindler & Kreindler had searched witnesses' "phone histor[ies]" and whether it had produced all responsive documents. *See* Ex. 2, at 2. Kreindler & Kreindler's counsel responded by describing Kreindler & Kreindler's searches of "personal devices" and "billing records" and did not indicate that any responsive materials had been withheld. *See id.* at 1.

    The Court should also disregard Kreindler & Kreindler's assertion (at 4) that Saudi Arabia's motion is "designed to expose the Plaintiffs' work product." Kreindler & Kreindler has no basis to assert that communications between Kreindler & Kreindler witnesses and Crotty, who advised Fawcett personally about the leak, were the work product of the MDL Plaintiffs.

    5.    Finally, Kreindler & Kreindler's letter lodges unfounded attacks (at 2-4) on undersigned counsel and our motives ("shameless[ ]," "misleading," "misrepresent[ations]," and so forth). We have previously addressed similar attacks made by Kreindler & Kreindler and shown them to be baseless. *See* ECF No. 7336, at 1. We believe the record speaks for itself concerning our conduct and that of Kreindler & Kreindler. Nor will Saudi Arabia address here Kreindler & Kreindler's characterization of the underlying facts established at the November 1 and 2 hearing, other than to make clear our disagreement. That disagreement will be fully set forth in Saudi Arabia's proposed findings of fact and conclusions of law.

                                    Respectfully submitted,

                                    /s/ *Michael K. Kellogg*

                                    Michael K. Kellogg
                                    *Counsel for the Kingdom of Saudi Arabia*

cc:    All MDL Counsel of Record (via ECF)

# Exhibit 1

| From: | Emily Kirsch |
|---|---|
| To: | Shen, Andrew C.; Lisa Frey |
| Cc: | Kellogg, Michael K.; Rapawy, Gregory G. |
| Subject: | [EXTERNAL] RE: In re. 9/11 |
| Date: | Tuesday, November 9, 2021 10:19:54 AM |

Dear Andy:

We have answered your question.

We are happy to meet and confer, though in light of the facts that (1) I have already answered your question and (2) you have stated that you have no intention of dropping the issue, I am unsure whether your request to do so is genuine.

Regards,

Emily

**Emily Bab Kirsch**

**KIRSCH & NIEHAUS**

**O:** 212-832-0170

**M:** 917-744-2888

**From:** Shen, Andrew C.

**Sent:** Tuesday, November 9, 2021 9:28 AM

**To:** Emily Kirsch ; Lisa Frey

**Cc:** Kellogg, Michael K. ; Rapawy, Gregory G.

**Subject:** RE: In re. 9/11

Emily –

Your email does not state whether Kreindler & Kreindler has produced all communications and phone history between the named witnesses and Ms. Crotty. Please confirm that it has done so, or advise as to whether you are willing to meet and confer about this issue on our call today at 4pm, pursuant to Paragraph II.C of Judge Neuburn's Individual Practices in Civil Cases.

Your email states that you will "not be responding further" to our requests. We do not intend to drop this issue, nor do we agree with your characterization of the hearing testimony. If you are unwilling to provide confirmation or meet and confer about this issue, we will seek appropriate relief from the Court.

Regards,

Andy

**From:** Emily Kirsch <emily.kirsch@kirschniehaus.com>

**Sent:** Monday, November 8, 2021 8:28 PM

**To:** Shen, Andrew C. <ashen@kellogghansen.com>; Lisa Frey <lisa.frey@kirschniehaus.com>

**Cc:** Kellogg, Michael K. <mkellogg@kellogghansen.com>; Rapawy, Gregory G. <grapawy@kellogghansen.com>

**Subject:** [EXTERNAL] RE: In re. 9/11

Dear Andy:

We have reviewed your below request. We confirm that Kreindler & Kreindler has complied fully with its discovery obligations, including communications and phone history, that were required by the Court's October 21, 2021 Order.

We note there is no evidence - and you cite to none – to suggest that the Kreindler firm may not have complied fully with its obligations. We see nothing in the record that shows that Ms. Crotty provided legal advice or had any knowledge of Mr. Fawcett's actions prior to September 27, 2021 at

the earliest; in fact, what we do see is that you attempted – and failed – to elicit just such testimony. (*Fawcett* 480-482).

This inquiry is obviously motivated by an effort to create a misimpression about the Kreindler firm's compliance and not by any good faith or proper purpose. Please understand that we will not be responding to further such improper requests.

With respect to your November 4 letter, we do not consent to the motion.

Regards,

Emily

**Emily Bab Kirsch**
**KIRSCH & NIEHAUS**
**O:** 212-832-0170
**M:** 917-744-2888

**From:** Shen, Andrew C. <ashen@kellogghansen.com>
**Sent:** Monday, November 8, 2021 5:21 PM
**To:** Emily Kirsch <emily.kirsch@kirschniehaus.com>; Lisa Frey <lisa.frey@kirschniehaus.com>
**Cc:** Kellogg, Michael K. <mkellogg@kellogghansen.com>; Rapawy, Gregory G. <grapawy@kellogghansen.com>
**Subject:** RE: In re. 9/11

Emily –
Please let us know your position on this issue and the issue raised in our November 4 letter (attached).
Thanks,
Andy

**From:** Shen, Andrew C.
**Sent:** Friday, November 5, 2021 9:10 AM
**To:** Emily Bab Kirsch (emily.kirsch@kirschniehaus.com) <emily.kirsch@kirschniehaus.com>; 'Lisa Frey' <lisa.frey@kirschniehaus.com>
**Cc:** Kellogg, Michael K. <mkellogg@kellogghansen.com>; Rapawy, Gregory G. <grapawy@kellogghansen.com>
**Subject:** In re. 9/11

Emily & Lisa –
The Court's October 21, 2021 Order required Kreindler & Kreindler to search for "documents (*e.g.,* personal email, text messages, iMessage, Signal, WhatsApp, phone history, voicemail) responsive to Saudi Arabia's requests Nos. 1 and 2 on the personal devices of witnesses named in the Court's order at ECF No. 7167." ECF No. 7277, at 5. The evidence presented at the November 1 and 2 hearing makes clear that Liz Crotty provided legal advice to Mr. Fawcett in connection with his breach of the protective order. Any communications between the named witnesses and Ms. Crotty during the relevant time period are responsive to Saudi Arabia's requests Nos. 1 and 2, which are reproduced below:

  1. All documents and communications relating to the July 15, 2021 article written by Michael Isikoff, titled "FBI tried to flip Saudi official in 9/11 investigation."

  2. All documents and communications relating to the leak of the confidential transcript of the Musaed Al Jarrah deposition to Michael Isikoff.

Please confirm that Kreindler & Kreindler has produced all communications and phone history between the named witnesses and Ms. Crotty, including from the personal devices of the named

witnesses. If Kreindler & Kreindler has not produced this material required by the October 21, 2021 Order, please do so by no later than November 10, 2021.

Regards,

Andrew C. Shen

Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.

1615 M Street, N.W.

Suite 400

Washington, D.C. 20036

Direct: (202) 326-7963

Fax: (202) 326-7999

The above communication contains information that may be confidential and/or privileged. Except for use by the intended recipient, or as expressly authorized by the sender, any person who receives this information is prohibited from disclosing, copying, distributing, and/or using it. If you have received this communication in error, please immediately delete it and all copies, and promptly notify the sender at the above telephone number or electronic mail address. Nothing in this communication is intended to operate as an electronic signature under applicable law.

# Exhibit 2

| From: | Lisa Frey |
|---|---|
| To: | Shen, Andrew C.; Kellogg, Michael K.; Rapawy, Gregory G.; Young, Christopher M.; Haefele, Robert |
| Cc: | Emily Kirsch; Michael Gerber; Carter, Sean; Flowers, Jodi; Gabrielle Friedman; John; Tarbutton, Joseph; bjastrow@lswlaw.com; Winnie Brandfield-Harvey |
| Subject: | [EXTERNAL] Re: Kreindler & Kreindler Production |
| Date: | Thursday, October 28, 2021 4:07:33 PM |
| Attachments: | image001.png |

Andy:

We write in response to your inquiry this morning regarding telephone communications with Mr. Isikoff.

Pursuant to Judge Netburn's October 21 Order, we contacted the Kreindler firm's vendor to search all calls associated with Kreindler firm's telephone account and Mr. Isikoff's number for the period 6/1/2021 to 10/5/2021. No calls to 202-258-2535 were found.

Our vendor searched the personal devices of Andrew Maloney, Megan Benett, Jim Kreindler and Steven Pounian for "personal email, text messages, iMessage, Signal, WhatsApp, phone history, voicemail." The only responsive text messages were those that were produced

Kreindler & Kreindler was also able to search billing records for the cell phones of Jim Kreindler, Megan Benett, and Andrew Maloney through August 18. A search of the logs shows three calls to Jim Kreindler from Michael Isikoff. A redacted version of that call log, showing the calls from Mr. Isikoff's number, is being produced today. To the extent we receive any later billing records from our client, we will continue our search for communications with Mr. Isikoff.

Regards,

Lisa Frey

---

**From:** Shen, Andrew C. <ashen@kelloghhansen.com>
**Sent:** Thursday, October 28, 2021 10:16 AM
**To:** Winnie Brandfield-Harvey <winnie.brandfield.harvey@kirschniehaus.com>; Kellogg, Michael K. <mkellogg@kelloghhansen.com>; Rapawy, Gregory G. <grapawy@kelloghhansen.com>; Young, Christopher M. <cyoung@kelloghhansen.com>

**Cc:** Emily Kirsch <emily.kirsch@kirschniehaus.com>; Lisa Frey <lisa.frey@kirschniehaus.com>; Michael Gerber <mgerber@lswlaw.com>; Carter, Sean <SCarter1@cozen.com>; Flowers, Jodi <jflowers@motleyrice.com>; Gabrielle Friedman <GFriedman@lswlaw.com>; John <jeubanks@motleyrice.com>; Tarbutton, Joseph <starbutton@cozen.com>; bjastrow@lswlaw.com <bjastrow@lswlaw.com>
**Subject:** RE: Kreindler & Kreindler Production

Emily -

We have reviewed the production that you sent last night.  The production does not appear to include any firm call logs documenting communications with Mr. Isikoff, as required by the Court's October 21, 2021 Order.  Can you please confirm that you have searched for and produced any such documents, if they exist.  The production also contains a small number of text conversations, all of which appear to be from Andrew Maloney, but it does not appear to contain other documents from personal devices.  Can you please confirm that you have searched all personal devices of the named witnesses, including all "personal email, text messages, iMessage, Signal, WhatsApp, phone history, voicemail" and produced all responsive documents as required by the Court's October 21, 2021 Order.

We would also like to discuss with you the designation of documents as Confidential and your position on the use of these documents at the hearing.

Regards,

Andy

---

**From:** Winnie Brandfield-Harvey <winnie.brandfield.harvey@kirschniehaus.com>
**Sent:** Wednesday, October 27, 2021 8:53 PM
**To:** Kellogg, Michael K. <mkellogg@kellogghansen.com>; Rapawy, Gregory G. <grapawy@kellogghansen.com>; Young, Christopher M. <cyoung@kellogghansen.com>; Shen, Andrew C. <ashen@kellogghansen.com>
**Cc:** Emily Kirsch <emily.kirsch@kirschniehaus.com>; Lisa Frey <lisa.frey@kirschniehaus.com>; Michael Gerber <mgerber@lswlaw.com>; Carter, Sean <SCarter1@cozen.com>; Flowers, Jodi <jflowers@motleyrice.com>; Gabrielle Friedman <GFriedman@lswlaw.com>; John <jeubanks@motleyrice.com>; Tarbutton, Joseph <starbutton@cozen.com>; bjastrow@lswlaw.com
**Subject:** [EXTERNAL] Kreindler & Kreindler Production

https://www.dropbox.com/t/2CfGkhQ31Fb7lHWR


Sent on Behalf of Emily Kirsch

Counsel :

Pursuant to Judge Netburn's October 21 Order (ECF 7277) (the "October 21 Order"), please find a link to the production of Kreindler & Kreindler. You will receive an email with a link to the production followed by a separate email with the password.

The Court has compelled the production of documents and material that may be protected by attorney-client privilege or the attorney work product doctrine. We have produced documents that do in fact include such protected information. The law is settled, however, that such Court compelled productions do not constitute waiver of any privileges or protections. *See, e.g., Pirrello v. Gateway Marina,* 2010 U.S.Dist. Lexis 145505, 2010 WL 9506732 (E.D.N.Y. Aug. 23, 2010) (U.S. Mag. Judge Go) ("disclosure of confidential material constitutes a waiver of the attorney-client privilege only if it is voluntary and **not compelled**.") (citations omitted) (emphasis added). *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC* 2009, U.S.Dist. Lexis 82301 (S.D.N.Y. September 8, 2009) (J. Scheindlin) (no waiver of the attorney-client privilege where the documents were produced pursuant to court order). For the avoidance of doubt, nothing in the production voluntarily waives, is intended to waive, or does in fact waive, any attorney-client privilege, work product doctrine, or other similar privilege or protections. This rule for court-compelled production also specifically precludes use of any of this information for any purpose other than the Court's inquiry into this breach and its remedies, such as in litigation of the underlying matter. *Id.,* at *4-5 and n.4 (specifically holding that receiving counsel may not use the information learned from the court ordered production as evidence outside the isolated sanctions motion to which it related). In support of this reservation of rights, we note that "the standards for waiver of the attorney-client privilege and of work-product immunity differ to a degree, with ***greater*** protection afforded to work-product." *Bowne, Inc. v. AmBase Corp.,* 150 F.R.D. 464 (S.D.N.Y. 1993) (emphasis added) (noting that "the protection of the work-product rule is less readily waived" than the attorney-client privilege). We reserve all rights.

Sincerely,
Emily Kirsch



**WINNIE BRANDFIELD-HARVEY**

150 E. 58th STREET 22ND FLOOR
NEW YORK, NY 10155
t (713)-560-5722
WINNIE.BRANDFIELD.HARVEY@KIRSCHNIEHAUS.COM

KIRSCHNIEHAUS.COM



**EMILY KIRSCH**
150 E. 58TH STREET  22ND FLOOR
NEW YORK, NY  10155
**O** (212) 832-0170
**M** (917) 744-2888
EMILY.KIRSCH@KIRSCHNIEHAUS.COM
KIRSCHNIEHAUS.COM

November 24, 2021

<u>**VIA ECF**</u>
The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

   Re: *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Netburn:

Attached please find the Declaration of Brian Weidener [ECF 7369], with paragraphs 6-8
redacted as directed by Your Honor's November 23, 2021 Order [ECF 7381].

       Respectfully Submitted,

       _____*/s/ Emily Kirsch* _____
       Emily Bab Kirsch

1

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to*:
All Actions

### DECLARATION OF BRIAN WEIDNER

I, Brian Weidner, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1.      I am a retired Special Agent (SA) with the Federal Bureau of Investigation (FBI). I retired from the FBI after just short of 24 years with the bureau. For my first two years with the FBI, I worked primarily on white collar crime cases. For the next 22 years, I worked in Middle Eastern counterintelligence and counterterrorism. The six years before my retirement, from 2002-2008, I was a Supervisory Special Agent (SSA) of a counterintelligence and counterterrorism squad focusing on terrorist and intelligence threats originating from the Arabian Peninsula. I was also trained by the FBI as a hostage negotiator, a certification I obtained in 1996 and maintained through my retirement. Following my retirement, among other things, I have served as Course Chairman and as an instructor for threat country seminars with the Joint CounterIntelligence Training Academy (JCITA) with the Defense Intelligence Agency (DIA), an instructor with the FBI's CounterIntelligence Training Center, and as an instructor for the CounterIntelligence Center (CIC) (a private academy providing counterintelligence and counterterrorism instruction to various jurisdictions). Prior to joining the FBI, I was a Combat Arms Officer in the United States Army.

 11/22/21

2.      Following the 9/11 Terrorist Attacks, while I was an SSA with the FBI, I oversaw an investigation in which Musaed al-Jarrah, an official at the Kingdom of Saudi Arabia's Embassy in Washington, D.C., had come to our attention.

3.      In November 2020, the 9/11 Families, through Kreindler & Kreindler, retained me as a consultant. At that time, I was provided with copies of two protective orders: the MDL protective order and the FBI protective order. I reviewed and understood both and signed the acknowledgment page for the FBI protective order, a copy of which is attached. The MDL protective order had no acknowledgment page.

4.      In connection with my work for the 9/11 Families over the past year, I was requested traveled to New York City on or about June 18, 2021. At that time, I understood that expert reports were scheduled to be filed soon, and I had information that was relevant to them. I was advised that my presence would be helpful in connection with those reports and that it would be helpful to meet various members of the Kreindler & Kreindler team working on behalf of the 9/11 Families. While at the Kreindler & Kreindler offices that day, at certain points I entered a conference room where I saw portions of the Jarrah deposition, which Megan Benett, an attorney at Kreindler & Kreindler, was taking. I did not watch the deposition in its entirety, and I was not in the conference room at the beginning of it.

5.      At one point that day, I walked from the conference room to the opposite end of the Kreindler & Kreindler offices, where Ms. Benett was conducting the deposition by herself in a small office. When Ms. Benett stepped out of that office, I approached her to share information regarding Jarrah's meeting with two FBI SAs concerning child pornography.

6.







9.      I believed this information was important to share with Ms. Benett.  I provided this limited and redacted description of the public confrontation with Jarrah because, as noted above concerning the public exchange between the SAs and Jarrah, until confronted with evidence Jarrah generally lacked candor and failed to be forthright.

10.     That was the first time that I met Ms. Benett in person and I believe was the first time we had ever even spoken with each other.

11.     I never received a copy of the transcript of the Jarrah deposition.

12.     When Kreindler & Kreindler provided me with the MDL and FBI protective orders, they emphasized the importance of maintaining strict confidentiality with any materials or information subject to those. I understood my obligations under the MDL and FBI protective orders, have abided by them since reviewing them and signing the FBI acknowledgment page over a year ago, would never have violated them or encouraged anyone else to do so and only learned from Kreindler & Kreindler in October of this year that John Fawcett provided a copy of the Jarrah deposition transcript to a reporter.

Dated: New York, New York

        November 21, 2021

BRIAN WEIDNER

By:

Brian Weidner

485 Lexington Avenue

New York, New York 10017

Tel.: 212-687-8181

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                        :
                                                        :
In re Terrorist Attacks of September 11, 2001,          :        03 MDL 1570 (GBD) (SN)
                                                        :
                                                        :
------------------------------------------------------------------ X

## ACKNOWLEDGEMENT

I have read and I understand the Privacy Act Order and Protective Order for FBI

Documents entered by the Court in the case *In re Terrorist Attacks of September 11, 2001*, 03

MDL 1570(GBD)(SN), and I agree to be bound by its terms.

Date:               11/13/2020

Name (printed):     Brian G. Weidner

Signature:          Brian J. Weidner