## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03-MD-01570 (GBD)(SN)<br>ECF Case |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'[1] JOINT MOTION TO EXCLUDE EXPERT TESTIMONY OF JONATHAN WINER AND BRIAN MICHAEL JENKINS

---

[1] "Defendants" means Dubai Islamic Bank, World Assembly of Muslim Youth and World Assembly of Muslim Youth International (collectively, "WAMY"), International Islamic Relief Organization ("IIRO"), Muslim World League ("MWL"), Dr. Abdullah Omar Naseef, Dr. Abdullah bin Saleh Al Obaid, Dr. Abdullah Abdelmohsen Al Turki, Dr. Adnan Basha, and Yassin Kadi.

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ................................................................................................... iii

KEY OF EXHIBITS ............................................................................................................ vi

INTRODUCTION ...............................................................................................................1

ARGUMENT .....................................................................................................................2

I.    Experts Must Have Requisite Qualifications for Each Subject on Which They Opine.......2

       A.    Winer's Experience Is Not Closely Related to the Subjects on which He Opines and He Cannot Claim Expertise by Association with Qualified People. .......................2

       B.    Jenkins's Ostensible "Familiarity" with "Basic Concepts" Does Not Qualify Him to Testify on Religious Topics. ...................................................................10

II.    An Expert Must Not Proffer Irrelevant and Unhelpful Testimony, Must Not Speculate as to Motive and Mental State, and Must Not Offer Legal Conclusions ...............................10

       A.    Plaintiffs Fail to Establish That Winer's Opinions on the EO 13224 Designation Process and Saudi Corruption Are Helpful. ..........................................................10

       B.    Jenkins's Inability to Substantiate a Link Between 9/11 and the Non-9/11 Plots on which He Opines Destroys Plaintiffs' Argument that those Opinions Are Helpful. ...............................................................................................................11

       C.    Contrary to Plaintiffs' Argument, Winer's Impermissible State of Mind Speculation Is the Linchpin of His "Absence of Evidence Is Evidence" Theory. ......................12

       D.    No Authority Justifies Jenkins's Impermissible Speculation on Mental States. .....14

       E.    Plaintiffs Cannot Excuse Winer's Impermissible Legal Conclusions in the Guise of Expert Opinions. ....................................................................................................14

III.    Experts Must Reliably Apply Their Stated Methodology and Have a Sufficient Factual Basis for Their Testimony to Be Reliable........................................................................15

       A.    Winer Does Not Follow His Purported "All-Source" Approach. ...........................15

       B.    Plaintiffs Fail to Bridge the Gap Between Winer's Opinions and Facts and Data. .18

C.     Plaintiffs Grossly Understate Jenkins's Failure to Identify Factual Bases for His Conclusions, which Violated His Stated Methodology and Resulted in Irredeemable Unreliability. ........................................................................................................23

IV.    Winer and Jenkins Serve as Mere Conduits of Hearsay Without Applying Analysis.......23

CONCLUSION.....................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 4 Kids Entertainment, Inc.*,
    463 B.R. 610 (Bnkr. S.D.N.Y. 2011) ........................................................................8

*Bergin v. United States*,
    1985 WL 1664 (S.D.N.Y. 1985) ...............................................................................8

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ........................................................................................ *passim*

*ECD Inv'r Grp v. Credit Suisse Int'l*,
    2017, WL 3841872 (S.D.N.Y. 2017) .......................................................................21

*Faryniarz v. Nike, Inc.*,
    2002 WL 1968351 (S.D.N.Y Aug. 23, 2002) ...........................................8, 22, 25

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997) ...........................................................................................22, 25

*Gill v. Arab Bank PLC*,
    893 F. Supp. 2d 523 (E.D.N.Y. 2012) ............................................................ *passim*

*Henken v. Islamic Republic of Iran*,
    2021 WL 2914036 (D.D.C. 2021) ............................................................................8

*In re NewStarcom Holdings, Inc.*,
    547 B.R. 106 (Bankr. D. Del. 2016) .......................................................................15

*Nimely v. City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005) ....................................................................................10

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) ........................................................................ *passim*

*In re Rezulin Prod. Liab. Litig.*,
    309 F.Supp.2d 531 (S.D.N.Y. 2004) ................................................................13, 15

*S.E.C. v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ....................................................................23

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) .........................................................................15, 21

*Estate of Steinberg v. Islamic Republic of Iran*,
    2019 WL 6117722 (D.D.C. Nov. 18, 2019) ........................................................8

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ....................................................14, 23, 24

*United States v. Abu-Jihaad*,
    553 F. Supp. 2d 121 (D. Conn. 2008)................................................................14

*United States v. Mejia*,
    545 F. 3d 179 (2d Cir. 2008)...............................................................................25

**Other Authorities**

Annals of the American Academy of Political and Social Science, July 2008 .............................6

BCCI Affair, a Report to the Committee on Foreign Relations United States
    Senate by Senator John Kerry and Senator Hank Brown, December 1992,
    Congress 2d Session Senate Print 102-14
    https://ia800406.us.archive.org/9/items/TheBCCIAffair/The-BCCI-Affair.pdf ......................3

EO 13224 .................................................................................................9, 10

Jonathan M. Winer & Trifin J. Roule, *The Finance of Illicit Resource Extraction*
    (2003) ....................................................................................................5

Jonathan M. Winer and Trifin J. Roule, *Fighting Terrorist Finance* Vol. 44 No. 3
    (2002) ...................................................................................................5, 6

Jonathan M. Winer, *Countering Terrorism Finance: A Work, Mostly in Progress*,
    Vol. 618 (July 2008) ....................................................................................6

Jonathan M. Winer, *Illicit Finance and Global Conflict* (Fafo Institute of Applied
    Science (2002) ..........................................................................................6

*Report of an Independent Task Force Sponsored by the Council on Foreign
    Relations* (2002)........................................................................................7

Remarks Prepared by Mr. Jonathan Winer, Counsel Alston & Bird, Senate
    Committee on Banking, hearing of September 26, 2001 at
    https://irp.fas.org/congress/2001_hr/092601_winer.html ...........................................5

Testimony of Mr. Jonathan Winer, Senate Judiciary Committee, hearing of
    November 20, 2002  at
    https://www.judiciary.senate.gov/imo/media/doc/winer_testimony_11_20_02.
    pdf ........................................................................................................5

Transcript of Hearing before the Committee on Governmental Affairs, United States Senate, on terrorism financing: origination, organization, and prevention, 108 Cong. 110 (2003) https://www.govinfo.gov/content/pkg/CHRG-108shrg89039/html/CHRG-108shrg89039.htm ...........................................................................................................5

Transcript of Hearing before the Committee on Governmental Affairs, United States Senate, on terrorism financing: origination, organization, and prevention, 108 Cong. 7-10 (2004) https://www.finance.senate.gov/imo/media/doc/95477.pdf ......................................................5

**<u>Rules</u>**

Rule 702 ..................................................................................................................... *passim*

## Key of Exhibits

| Exhibits Submitted with Memorandum of Law in Support of Defendants' Joint Motion to Exclude Expert Testimony of Jonathan Winer and Brian Michael Jenkins | |
|---|---|
| Exhibit A | Expert Report of Jonathan M. Winer, dated March 10, 2020 |
| Exhibit B | Rebuttal Report of Jonathan M. Winer, dated February 2, 2021 |
| Exhibit C | The Road to 9/11: The September 11 Terrorist Attack on the World Trade Center, Brian Michael Jenkins, report dated March 10, 2020 ("Report of Brian Jenkins") |
| Exhibit D | Catalog of Impermissible Testimony of Plaintiffs' Experts Winer and Jenkins, with Exhibit 1 attached thereto |
| Exhibit E | Excerpt from telephone conference before the Honorable Sarah Netburn, September 29, 2021 |
| Exhibit F | Compilation of excerpts from the transcripts of the deposition of Jonathan M. Winer[2] |
| Exhibit G | Compilation of excerpts from the transcript of the deposition of Brian M. Jenkins |
| Exhibit H | Excerpt of the transcript of the deposition of Jimmy Gurulé |
| Exhibit I | Jonathan Winer – Reliance Material Chart |
| Exhibit J | Excerpt of Winer Deposition Exhibit 907 |
| Exhibit K | Excerpt of Winer Deposition Exhibit 941 |
| Exhibit L | IIRO 111692 - 99 |
| Exhibit M | Winer Deposition Exhibit 925 |
| Exhibit N | Winer Deposition Exhibit 946 |
| Exhibit O | Jonathan Marks – Reliance Material |
| Exhibit P | February 2, 2021, Rebuttal Report of Jonathan Winer Reliance Materials and Materials Considered List |

---

[2] As reflected in the letter from Kristie Martello of Golkow Litigation Services dated November 15, 2021, which is attached at Exhibit F hereto, despite the "confidential material" designation at the top of each page of the transcripts, the transcripts of the deposition of Jonathan M. Winer do not contain confidential material.

| Exhibit Q | Winer Deposition Exhibit 914 |
|---|---|
| Exhibit R | Winer Deposition Exhibit 915 |
| Exhibit S | Winer Deposition Exhibit 916 |
| Exhibit T | Winer Deposition Exhibit 919 |
| Exhibit U | Winer Deposition Exhibit 920 |
| Exhibit V | Winer Deposition Exhibit 922 |
| Exhibit W | Winer Deposition Exhibit 923 |
| Exhibit X | Winer Deposition Exhibit 909 |
| **Exhibits Submitted with Reply Memorandum of Law in Support of Defendants' Joint Motion to Exclude Expert Testimony of Jonathan Winer and Brian Michael Jenkins** | |
| Exhibit BA | Excerpts of Jonathan Winer Deposition Transcript |
| Exhibit BB | Winer Deposition Exhibit 900 |
| Exhibit BC | Excerpt(s) from the transcript of the hearing before the House Sub-Committee on Oversight and Investigations, dated Mar. 29, 2006 |
| Exhibit BD | Jonathan M. Winer, *Illicit Finance and Global Conflict* (Fafo Institute of Applied Science 2002) |
| Exhibit BE | Maurice R. Greenberg, et al., *Terrorist Financing*, *Report of an Independent Task Force Sponsored by the Council on Foreign Relations* (2002) |
| Exhibit BF | Excerpts of Jonathan Sidel Deposition Transcript |
| Exhibit BG | Defendants' Response to Plaintiffs' Exhibit U |
| Exhibit BH | Blankinship Deposition Exhibit 803 |
| Exhibit BI | Excerpts of the Jonathan Marks Deposition Transcript |
| Exhibit BJ | Excerpts of the Expert Report of Jonathan Marks |

**INTRODUCTION**

In their Moving Brief ("Brief"), Defendants demonstrate how Winer and Jenkins offer up wide-ranging, results-oriented opinions that fail to comply with Rule 702 and *Daubert*. In their Opposition Brief ("Opposition" or "Opp."), Plaintiffs attempt to deflect from these failures by repeatedly mischaracterizing the factual record and Defendants' challenges. They misapply the relevant case law, respond with generalities, falsely accuse Defendants of "resort[ing] to baseless personal attacks," and seek to minimize the importance of the Court's gate-keeping function at this stage. The issues raised by Defendants are properly before the Court and should be decided now.

In their Opposition, Plaintiffs posit that Winer – a seeming jack of all fields, but master of none – should be accepted as an "interdisciplinary" expert on essentially every issue relevant to this complex case, while critiquing Defendants' experts, who have specialized knowledge in their respective fields and who offer narrow, circumscribed opinions. Plaintiffs argue that Winer, who professes an expertise largely by osmosis through water cooler conversations with government officials, should be permitted to launder hearsay material without a reliable methodology or expertise in the pertinent fields. And they defend his opinions in spite of their fatal methodological flaws, including the catch-all "absence of evidence is evidence" theory that Winer propounds to fill in the gaps, serving more as an advocate than expert. Similarly, Plaintiffs argue that Jenkins, who admits opining on matters that fall outside his area of expertise, should be allowed to testify on irrelevant matters and regurgitate hearsay without analysis; Plaintiffs sidestep his opinions' hopeless unreliability. These are the types of challenges addressed herein;[3] pursuant to Rule 702 and *Daubert*, the Court should strike the reports of Winer and Jenkins and exclude their testimony.

---

[3] Due to page limitations, this Reply does not seek to respond to every argument raised in Plaintiffs' Opposition and the voluminous accompanying Winer declaration, but rather seeks to clarify the salient issues before the Court. To the extent an argument in the Opposition is not addressed herein, Defendants stand on the arguments in their Brief.

## ARGUMENT

### I.    Experts Must Have Requisite Qualifications for Each Subject on Which They Opine

#### A.    <u>Winer's Experience Is Not Closely Related to the Subjects on which He Opines and He Cannot Claim Expertise by Association with Qualified People.</u>

No United States court has ever found Winer to be qualified to provide expert testimony about the wide array of topics on which Plaintiffs now seek to have him opine. Indeed, nothing about Winer's background or experience has changed over the past decade that now qualifies him to provide testimony as an omnibus terrorism/Al Qaeda/Saudi Arabia/Saudi charities expert since Judge Weinstein found that, while Winer was qualified to testify on United States banking terminology, standards and practices, he was not qualified under *Daubert* or Rule 702 to opine on a certain foreign terrorist organization's agenda, its relationship with terrorist organizations, or its interaction with charitable organizations.[4] As in *Gill*, Plaintiffs seek to have Winer testify on, *inter alia*, a foreign terrorist organization's agenda and its interactions with the Charity Defendants.[5] Winer is not qualified to give such testimony.

Winer claims to have the requisite qualifications to opine on 14 diverse subject areas.[6] Contrary to Plaintiffs' arguments and Winer's self-serving declaration,[7] his experience, in and out of government; his testimony, both before Congress and in the courts; and his writings, show that

---

[4] *Gill v. Arab Bank PLC*, 893 F. Supp. 2d 523, 536 (E.D.N.Y. 2012) (As here Winer claims to be an expert on Al Qaeda, in *Gill* he claimed to be an expert on Hamas); *see also* Winer Dep. 65:4-25, 66:4-25, 67:1-25 (excerpts of the Winer deposition transcript cited herein are attached as Exhibit BA to the Second Declaration of Aisha E. R. Bembry ("Bembry Dec.")); Winer Dep. Ex. 900 (attached as Exhibit BB to the Bembry Dec.) (Court allowed Winer to testify on international banking standards but finding him not qualified to opine on Canadian banking laws, practices or regulatory scheme). Winer's claim that he was qualified by a "British court" to testify on Saudi Arabia's and Saudi entities' involvement in funding Al-Qaeda is not supported by any written opinion, court transcript, or other source showing that this is so, or what analysis or standards were applied in making such determination, if any. Winer Dec. at 15, ¶¶ 71-75.
[5] "Charity Defendants" refers to MWL, IIRO and WAMY.
[6] Ex. BA, Winer Dep. at 50:17 – 52:10; *see also id.* at 525:12-527:1. Plaintiffs' assertion that Winer was interrupted from answering questions about his expertise is without merit. Defense counsel was looking for answers to questions. Instead, Winer's answers were not responsive and thereby wasted valuable time. This behavior was repeated throughout his deposition. The sections in Winer's deposition Plaintiffs refer to are only a few examples. (Opp. at 5).
[7] Declaration of Jonathan Winer, dated January 12, 2022, ECF 7609, ("Winer Dec.").

while Winer certainly has experience in general financial regulation, banking standards and macro-level policy matters related to anti-money laundering and corruption, it is not closely related to the areas on which he seeks to opine.[8] In particular, he is not qualified to opine on issues related to Al Qaeda and its source of funding, Saudi Arabia and its religion and politics, or whether any of the Charity Defendants provided material support to Al Qaeda.[9]

Both Plaintiffs and Winer first seek to overcome his lack of relevant experience by attempting to transform the BCCI investigation and his role in it into something they were not. They argue that the BCCI report was, in meaningful part, an investigation into terrorist financing through the use of charities.[10] But it was not. BCCI was a bank "set up deliberately to avoid centralized regulatory review" and was embroiled in a Ponzi scheme that involved money laundering and other financial crimes.[11] BCCI's support of terrorism is seldom mentioned in the 583-page report and substantively discussed in but approximately two pages.[12] More importantly, Winer was not cited as a source or credited with the investigation of any terrorism-related part of the report.[13] Furthermore, the limited discussion of charities and charitable contributions in the BCCI report had nothing to do with charities as a source of terrorist funding.[14]

Plaintiffs and Winer are also incorrect when they claim that his experience during his time as Deputy Assistant Secretary for International Law Enforcement with the State Department was

---

[8] Contrary to Plaintiffs' argument (*see* Opp. at 3, n.11), Winer's career focuses on formulating policy measures in banking and financial regulation to address perceived terrorist financing problems that others claim to have identified, which does not qualify him to conduct the investigations and analysis necessary to identify such problems himself.

[9] *See* Opp. at 3-11; Winer Dec. at 1-17, ¶¶ 4-86.

[10] *See* Opp. at 4-5; Winer Dec. at 8-9, ¶¶ 33-38.

[11] The BCCI Affair, a Report to the Committee on Foreign Relations United States Senate by Senator John Kerry and Senator Hank Brown, December 1992, 102d Congress 2d Session Senate Print 102-140, at 51. https://ia800406.us.archive.org/9/items/TheBCCIAffair/The-BCCI-Affair.pdf.

[12] *Id.* at 66-68.

[13] *Id.* at 66-68, ns.61-70.

[14] *Id.* at 28, 40, 58, 59, 64, 65, 77, 78, 92, 109, 292, 459, 467-471, 475.

closely related to the issues on which he opines.[15] From 1994 to 1999 Winer worked with others, *e.g.*, Richard Clarke, with knowledge and experience on Al Qaeda, its funding sources, and whether or not the Saudi Charity Defendants had any part in such funding. Nothing in Winer's self-serving declaration or his deposition, report, or curriculum vitae show that he himself engaged in any investigation or analysis of these topics during this period. Indeed, while he notes that he had regular meetings with Clarke, it is clear that Clarke has the expertise on counter-terrorism, not Winer.[16] Winer made clear at his deposition that during his six years with the State Department addressing international law enforcement issues, his job was to communicate to other countries about what the United States needed from them in order to deal with international crime, but others were addressing Al Qaeda, not Winer.[17] Despite numerous opportunities to do so, including Winer's voluminous reports and his recently filed argumentative declaration, neither Plaintiffs nor Winer have provided one instance when, during this period, Winer did any investigation into a terrorist organization, including Al Qaeda, to determine its sources of funding and material support. Put simply, Winer's mere "exposure to these issues" does not make him qualified to opine on them.[18]

There is also nothing about Winer's testimony before congressional committees that qualifies him to be an expert in this case.[19] A review of Winer's actual testimony and remarks during these congressional hearings confirms that he lacks expertise in investigating Al Qaeda or other terrorist organizations, and in determining their sources of finance and material support, including whether they include charities. Winer consistently accepts without question others'

---

[15] *See* Opp. at 5; Winer Dec. at 3, ¶¶ 12-14; 9-10, ¶¶ 39-46.
[16] *See* Winer Dec. at 10, ¶ 46; Ex. BA, Winer Dep., at 59:5-60:19.
[17] *See* Ex. BA, Winer Dep., at 58:5-60:19.
[18] *Id.* at 52:19-53:5; *see also id.* at 88:19-89:25 ("My involvement was limited to an understanding that we needed to take on terrorist finance at the same time that we had a going problem associated with terrorist finance.").
[19] *See* Opp. at 5-6; Winer Dec. at 12-14, ¶¶ 57-65.

analyses or conclusions that Islamic charities funded terrorism, and then, relying on his experience in international banking and movement of funds, prescribes measures to better track the movement of funds internationally.[20]

Plaintiffs and Winer also overstate the nature of the articles Winer has published.[21] While some of Winer's articles and co-authored articles discuss Al Qaeda, charities and terrorist financing, Winer himself has never published any article in which the focal subjects are Al Qaeda and its history, Islamic charities as a source of funding for Al Qaeda, or any connection between Al Qaeda and Islamic charities, nor have any of his published articles included any analysis and investigation such as he purports to be qualified to do here.[22] Two of the articles cited as examples of Winer's relevant expertise were co-authored with Trifin J. Roule.[23] It is Roule who has the expertise in "terrorist finance" while Winer's area is "international financial services regulatory

---

[20] *See* Remarks Prepared by Mr. Jonathan Winer, Counsel Alston & Bird, Senate Committee on Banking, hearing of September 26, 2001 at https://irp.fas.org/congress/2001_hr/092601_winer.html (noting that he relied on "public information" for proposition that terrorist funds move through Islamic charities and going on to focus on seven areas for action); Testimony of Mr. Jonathan Winer, Senate Judiciary Committee, hearing of November 20, 2002 at https://www.judiciary.senate.gov/imo/media/doc/winer_testimony_11_20_02.pdf (noting that he is relying on the findings of the Council of Foreign Relations (CFR) report, and making five further suggestions to protect the U.S. against use of financial institutions by terrorists but not providing any analysis or investigation into whether Islamic charities in general or any Islamic charity in particular had provided funds or material support to any terrorist entity including Al-Qaeda); Transcript of Hearing before the Committee on Governmental Affairs, United States Senate, on terrorism financing: origination, organization, and prevention, 108 Cong. 110 (2003) (Statement of Jonathan Winer) at https://www.govinfo.gov/content/pkg/CHRG-108shrg89039/html/CHRG-108shrg89039.htm (Winer testifies based on his "understanding of what took place" in meetings of U.S. government delegations to Saudi Arabia that he was not a part of and focuses his testimony on U.S. and international efforts to curb support for terrorism); Transcript of Hearing before the Committee on Governmental Affairs, United States Senate, on terrorism financing: origination, organization, and prevention, 108 Cong. 7-10 (2004) (Statement of Jonathan M. Winer ) at https://www.finance.senate.gov/imo/media/doc/95477.pdf (discussing need for integration among departments and agencies in executive branch with respect to policy, regulation, and law enforcement related to terrorism finance); Transcript of Hearing before the House Sub-Committee on Oversight and Investigations of the Committee on international Relations, 109 Cong. 85-94 (2006) (Testimony of Jonathan Winer) (Winer relies on "public sources" for information on Al-Qaeda's movement of funds, and government officials for information on charitable organizations and funding of terrorist groups as well as for information from 1996 on support by Islamic NGOs for terrorist groups, while Winer himself provides expertise on regulatory changes for offshore banks and charities to track funds). A copy of this 2006 testimony is attached as Exhibit BC to the Bembry Dec.

[21] *See* Opp. at 9-11; Winer Dec. at 5-8, ¶¶ 22-32.

[22] *See* Brief at 5.

[23] *See* Plaintiffs' Opp. Ex. E, Jonathan M. Winer & Trifin J. Roule, *The Finance of Illicit Resource Extraction* (2003); and Plaintiffs' Opp. Ex. G, Jonathan M. Winer and Trifin J. Roule, *Fighting Terrorist Finance* Vol. 44 No. 3 (2002).

law."[24] Further, another article, "Illicit Finance and Global Conflict" merely describes Winer as having "extensive experience from government and private practice on issues relating to the regulation of money laundering and the problems associated with corruption and financial crime."[25]

Consistent with his time in government and congressional testimony, Winer's writings show he has never conducted any analysis or investigation of the kind he claims to have done in this case. Winer's claim of expertise to provide a "taxonomy of the sources of terrorist funds and the mechanics of terrorist financing," relies entirely on the work of others.[26] The quote attributed to Winer by Plaintiffs from the article "Fighting Terrorist Finance" appears not to be Winer's work and, when viewed in the context of the entire paragraph, it is clear that this was merely a long list of possible sources of funds for terrorist groups and not the result of any investigation or analysis Winer did himself.[27]

Winer's new claim in his declaration that from 2000 to 2008 the CIA relied on his "expertise on terrorist finance and Al Qaeda"[28] is materially different from the lengthy description of this work at his deposition.[29] Winer testified, "I had the government as a client providing analytic—academic or analytic work on country studies, principally, though it was not only country studies, of vulnerability to money laundering, vulnerability to terrorist finance. Their

---

[24] "Fighting Terrorist Finance", Plaintiffs' Opp. Ex. G, at 87, n.1.

[25] *See* Jonathan M. Winer, *Illicit Finance and Global Conflict*, at 5 (Fafo Institute of Applied Science 2002) (attached as Exhibit BD to the Bembry Dec.). The article does not include any analysis or investigation such as Winer claims to be qualified to do in this case and, while it mentions Al Qaeda, quotes public sources and others with knowledge and experience that Winer lacks. *Id*. at p. 10, p. 22 n.19, p. 23 n.25, p. 24, p. 36, p. 39 n.60, p. 38 ns.68, 69.

[26] Plaintiffs' Opp. Ex. F, Jonathan M. Winer, *Countering Terrorism Finance: A Work, Mostly in Progress*, Vol. 618 (July 2008), The Annals of the American Academy of Political and Social Science, July 2008, pp. 112-132, at 115 ns.9-12. Winer's area of expertise is to propose that "(t)he next administration must do seven things to address terrorist finance...." *Id*. at 112, 125-128; *see also* Winer Dec. ¶¶ 24-31.

[27] Winer Dec. at 6, ¶ 25; *Compare,* Opp. at 9-10; with Plaintiffs' Opp. Ex. G, *Fighting Terrorism Finance*, at 89.

[28] Winer Dec. at 11, ¶¶ 51-53.

[29] Ex. BA, Winer Dep., at 90:1-25; 92:20.

capacities to combat these phenomena. And what measures of performance might look like if they built greater capacity."[30] The reports, mostly after 9/11, were in a "country analysis framework" but also looked at "things like global financial risk from derivatives, [and] the money laundering and crime risk of internet gambling."[31] While the reports included "a charity finance department," Winer never testified that they were anything other than broad reports looking at a particular country's banking and financial regulatory system as a whole.[32]

Winer argues in his declaration that he is qualified as an expert here because of his contributions to the 2002 report on Terrorist Financing sponsored by the Council on Foreign Relations.[33] But his specific role with that report remains vague. From the report itself, it is impossible to determine what Winer's contributions were as opposed to those of the other thirteen members of the Task Force.[34] However, given that each member of the Task Force "brought unique backgrounds and areas of expertise," and that Winer's background and expertise do not include investigating Al Qaeda and determining its source of funding (including any use of charities), his contributions to this report do not qualify him to opine as he does here.[35]

Plaintiffs' portrayal of Winer as a person with forty years of relevant experience that includes "analyzing terrorism" and the financing of Al Qaeda is wrong.[36] Winer has admitted he is not qualified as a CPA, forensic accountant, or fraud examiner, and has never himself attempted to reconstruct the financial record of a charity to assess whether terrorist financing has occurred, as he now claims to be qualified to do here.[37] In another case he relied on a forensic accounting

---

[30] Ex. BA, Winer Dep., at 92:12-20.
[31] *Id.* at 95:5-24.
[32] *Id.* at 95:23-24.
[33] Winer Dec. at 14-15, ¶¶ 66-69.
[34] *See* Maurice R. Greenberg, et al., *Terrorist Financing*, *Report of an Independent Task Force Sponsored by the Council on Foreign Relations* (2002) (attached as Exhibit BE to the Bembry Dec.).
[35] *Id.* at vii.
[36] Opp. at 3.
[37] Ex. BA, Winer Dep., 57:13-18; 71:9-19; 277:10-17.

firm to reconstruct financial records, something he did not do here.[38] While courts have recognized experts in inter-disciplinary fields such as biomechanics, they have required that the expert have at least some specific training and experience in the sub-fields that make up the overall area of expertise.[39] Even accepting for the sake of argument that the study of terrorism is an inter-disciplinary field,[40] Plaintiffs have not shown that Winer has training or experience in the sub-fields on which he is opining, including Islam; the geopolitics and history of Saudi Arabia; and the history of Al Qaeda and its funding sources, including what role charities in general, and the Defendant Saudi Charities in particular, may have played as a source of funds for Al Qaeda. Plaintiffs and Winer concede that Winer is not an expert in Islam (knowing only the basics). He attended meetings in which Saudi Arabia was discussed, but he was never personally responsible for nor posted to Saudi Arabia, nor was he part of any mission to Saudi Arabia. Although he is only "familiar with the modern history of Saudi Arabia," he purports nonetheless to be qualified to opine on the "combination of foreign policy, security, and religion" with respect to Saudi Arabia and the Defendant Saudi Charities.[41] But being only "familiar" with the sub-fields in which he is opining does not transform Winer into an expert with the specialized knowledge required to opine in all of the sub-fields in combination under Rule 702. Far from taking a fragmented approach, Defendants ask that the Court consider Winer's admitted lack of expertise in requisite sub-fields

---

[38] *Id*. at 71:9-19; 73:10-16.

[39] *See, e.g., Faryniarz v. Nike, Inc*., 2002 WL 1968351 at *1, *1 n.2 (S.D.N.Y Aug. 23, 2002) (noting that biomechanics is an inter-disciplinary field which requires training and study in sub-fields of biology, chemistry, physics, statistics, and engineering); *Bergin v. United States*, 1985 WL 1664 at *11-14 (S.D.N.Y. 1985) (noting that biomedical engineering was an inter-disciplinary field, court preferred the evidence of medical authorities as to cause of fracture); *In re 4 Kids Entertainment, Inc.*, 463 B.R. 610, 677-678 (Bnkr. S.D.N.Y. 2011) (Japanese CPA with 30 years' experience in advising corporations on the issues qualified to opine on foreign withholding tax credits under Japanese law).

[40] The cases cited by Plaintiffs for this proposition (*see* Opp. 3, n.9), are not Rule 702 or *Daubert* cases and contain no analysis of the nature of the study of terrorism. *See Estate of Steinberg v. Islamic Republic of Iran*, 2019 WL 6117722 (D.D.C. Nov. 18, 2019); *Henken v. Islamic Republic of Iran*, 2021 WL 2914036 (D.D.C. 2021).

[41] *See* Opp. at 7-9; *see also* Ex. BA, Winer Dep., at 74:4-75:7; 76:10-77:6; 77:24-78:15; 78:1979:16; 294:16-295:8.

when it considers whether to allow him to testify on these topics alone or in combination. Ironically, Plaintiffs criticize Defendants for relying on actual experts in these fields, yet they ask the Court to accept the testimony of Winer, a purported expert in everything with no first-hand experience or training in the necessary sub-fields on which they would have him testify.[42]

On the subject of designations, Plaintiffs do not defend Winer's lack of qualifications to testify as to the United Nations Security Council's ("UNSC") Resolution 1267 listing and delisting processes. As explained in Defendants' Brief, he lacks expertise in those subjects.[43] With respect to Winer's opinions on the Office of Foreign Assets Control's ("OFAC") Executive Order ("EO") 13224 designation process, Plaintiffs barely defend his qualifications. They emphasize that practical experience may, in some cases, suffice under Rule 702. But none of *Winer's* practical experience qualifies or enables him to opine on the EO 13224 process, as Defendants have demonstrated and as Winer's new declaration fails to contravene.[44] Rather than dispute this disconnect, Plaintiffs reiterate that Winer over the years has represented (two) clients seeking de-designation under EO 13224. But that limited, anecdotal experience with *de-designations* cannot make him an expert on the inner workings of the designation process. Plaintiffs also cite three articles by Winer on various topics, including allegedly, "the OFAC designation process."[45] But none of the proffered pieces describes EO 13224 or OFAC's process for designations under that or any other authority. Finally, Plaintiffs retreat to Winer's own "adept" testimony as proof of his expertise.[46] That is backwards; a witness must be qualified as an expert *in order to* testify as one.

---

[42] *See* Opp. at 1-2.
[43] Brief at 8–9.
[44] *Compare id.* at 7–8, *with* Winer Dec. at 16-17, ¶¶ 82–84. Winer does not deny that, in his first period in government, EO 13224 did not exist and none of his designation-related discussions concerned terrorism. Nor does he deny that, in his second period in government, none of his designation-related discussions concerned EO 13224.
[45] Opp. at 9–10.
[46] *Id.* at 10.

**B. Jenkins's Ostensible "Familiarity" with "Basic Concepts" Does Not Qualify Him to Testify on Religious Topics.**

As Plaintiffs do not dispute, Jenkins conceded his lack of expertise in religion, Islam, and Islam's history.[47] Plaintiffs nonetheless try to assure the Court that, given his "experience in … counterterrorism and national security," Jenkins has "a familiarity" with the "terminology and basic concepts" of the religious topics.[48] However, "it by no means follows" that a witness with expertise in one area "is qualified to express expert opinions as to other fields."[49] Further, "familiarity" with "basic concepts" does not at all resemble Rule 702(a)'s required "specialized knowledge." Plaintiffs also contend that Jenkins "*need not* be an expert on theology or Islam," pointing to U.S. counterterrorism officials as generally untrained in theology.[50] This argument is unavailing: such officials are not required to meet Rule 702's requirements to execute their duties, whereas Jenkins must satisfy Rule 702 to testify.

**II. An Expert Must Not Proffer Irrelevant and Unhelpful Testimony, Must Not Speculate as to Motive and Mental State, and Must Not Offer Legal Conclusions**

**A. Plaintiffs Fail to Establish That Winer's Opinions on the EO 13224 Designation Process and Saudi Corruption Are Helpful.**

Plaintiffs do not defend Winer's irrelevant opinions concerning the UNSC Resolution 1267 process. But they contend that his opinions about the EO 13224 designation process are helpful.[51] Plaintiffs have the burden to establish the admissibility of their experts' testimony, and they may not reverse-engineer its relevance by gesturing at Defendants' *responses* to Plaintiffs' efforts to introduce this topic in this case. Plaintiffs also argue that Winer's opinions go to "whether or not there is evidence that the entity in question" supported or conspired with terrorists.[52] They do not

---

[47] *See* Brief. at 9–10.
[48] Opp. at 12–13.
[49] *Nimely v. City of N.Y.*, 414 F.3d 381, 399 n.13 (2d Cir. 2005).
[50] Opp. at 12 (emphasis added).
[51] *Id*. at 14.
[52] *Id.*

for the reasons articulated in Defendants' Brief.[53] For example, the standard of proof for designations differs from that for civil liability, as Winer himself testified and as *Gill* pointed out.[54] Contrary to Plaintiffs' suggestion, *Gill* did not indicate that the testimony regarding designations was "useful," nor did Defendants "concede" that such testimony is "proper."[55] *Gill* temporarily allowed such testimony while directing its proponent to identify its "probative force, if any," at summary judgment.[56] Plaintiffs are wrong to characterize a violation of Rule 702's helpfulness requirement as an issue of "weight, not admissibility," or a quibble for cross-examination.[57]

Plaintiffs make the bewildering claim that Winer's multi-paragraph detour in his report discussing alleged Saudi "corruption" somehow "serves as a building block" to his other opinions. This includes Winer's statements that "Saudi princes and princesses, of whom there are thousands, are known for their stories of their fabulous wealth – and their tendency to squander it,"[58] and his allegations of large monthly stipends given to members of the royal family,[59] which read more like a tabloid article than an expert report. It remains unclear, however, what purpose such statements serve, apart from seeking to disparage the Saudi royal family.

### B. Jenkins's Inability to Substantiate a Link Between 9/11 and the Non-9/11 Plots on Which He Opines Destroys Plaintiffs' Argument that Those Opinions Are Helpful.

Plaintiffs declare that Jenkins must be allowed to testify about the 1993 World Trade Center bombing and the mid-1990s Bojinka plot because he "draws a clear connection between

---

[53] *See* Brief at 11–12.
[54] *Gill*, 893 F. Supp. 2d at 535–36 (therefore, designation testimony has "limited bearing" on defendant's liability).
[55] Opp. at 14 & n.65 (citing Brief at 12 n.63).
[56] Brief at 12 n.63 (quoting *Gill*, 893 F. Supp. 2d at 535–36). The court ultimately granted summary judgment to the opposing party without discussing the issue. *Gill* 893 F. Supp. 2d at 547.
[57] *See* Opp. at 2 n.7. Testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful," violating Rule 702's mandate that an expert's "specialized knowledge help the trier to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993).
[58] Ex. A, Winer Rpt., at 65, ¶ 9.13.1.
[59] *Id.* at 65-66, ¶ 9.13.2.

[them], Al Qaeda, and the September 11th Attacks."[60] But that is precisely what Jenkins could not do.[61] He conceded that both the 1993 bombing and Bojinka were not Al Qaeda plots. He was unable to provide any evidence that the 1993 bombing plotters were Al Qaeda members, and, as he wrote, KSM did not meet with Bin Laden about working together to attack the U.S. until after both plots.[62] In short, Jenkins could not substantiate the connection that Plaintiffs contend makes his testimony relevant.[63] Nor is it clear why the differences between these plots and the 9/11 attacks are a helpful subject to the extent Plaintiffs (incongruously) suggest as much.

### C. Contrary to Plaintiffs' Argument, Winer's Impermissible State of Mind Speculation Is the Linchpin of His "Absence of Evidence Is Evidence" Theory.

Although Plaintiffs contend that Winer offers no state of mind testimony, including as to the Defendants, and that Defendants failed to precisely identify any such testimony, Defendants' moving papers catalog such impermissible opinions regarding states of mind.[64] For example, Winer opines that the charities operated covertly so as to avoid detection.[65] Although Plaintiffs falsely accuse Defendants of resorting to *ad hominem* attacks,[66] Winer opines that the absence of

---

[60] Opp. at 16.

[61] Brief at 13–14.

[62] *Id.*

[63] In an attempt to bolster the relevancy of Jenkins's testimony regarding the Bojinka plot, Plaintiffs attempt to impute Maria Ressa's mistaken belief that the Bojinka Plot was an Al Qaeda plot to defense expert Jonathan Sidel. Opp. at 17. But when questioned about Ressa's views on the Bojinka Plot, Sidel testified that her work was "rather sensationalistic and overly credulous" and he is "not a big believer in her earlier reportage and her account." Sidel Dep. Tr. at 90:23-91:21; *see also id.* at 116:24-117:20 (explaining the lack of evidence linking the Bojinka plot to Al Qaeda, Sidel opined and testified that such a link is questionable, "seems strange" to him and "seems out of step.") (excerpts of the deposition of Jonathan Sidel attached as Exhibit BF to the Bembry Dec.).

[64] Brief at 15-16; *see also* Brief, Exhibit D. In response to Defendants' Exhibit D, Plaintiffs append Exhibit U to their Opposition. In it, they raise numerous legal arguments which are, in sum and substance, adequately addressed in Defendants' Brief. As to Plaintiffs' criticism that Defendants' rationales for inclusion are not provided in Exhibit D, Defendants reiterate that, due to page limitations and the need to address the near 200 collective pages of Winer's reports and 36 of Jenkins's, the exhibit is meant simply to serve as an inventory of impermissible testimony. In response to certain inaccuracies contained in Plaintiffs' Exhibit U, however, Defendants refer the Court to Exhibit BG to the Bembry Dec. Other inaccuracies are apparent even from the relevant paragraphs of the expert reports.

[65] *See, e.g.,* Ex. A, Winer Rpt., at 61, ¶ 9.7 ("*The work of the charities to support militancy, warfare, and terrorism, was intended to be covert, not overt, so that formal records did not show such support.*") (emphasis in original).

[66] Opp. at 18-19. While Plaintiffs take umbrage at Defendants' pointing out the fallacy of relying on bigoted rhetoric as a rationale for Winer's opinion, they do nothing to explain why such statements made their way into an expert report in the first place or how they can possibly reflect a reliable methodology.

evidence in this case is evidence because "people and institutions [in the Middle East] send different messages to different audiences as a means of seeking to avoid direct confrontation with powerful western countries, especially the United States" based on their "*intent to avoid direct conflict with the West through duplicity,*[67] *or engaging in a double game.*"[68] Such statements evidence an inherent bias and, in seeking to ascribe a duplicitous intent to an entire region's population, constitute impermissible state of mind testimony—and the wellspring for Winer's conclusion that the absence of evidence somehow shows Defendants' support of terrorism.

Plaintiffs' sole citation supporting Winer's "absence of evidence" theory,[69] *Owens v. Republic of Sudan*, is inapposite. Courts do not, as Plaintiffs contend, welcome the absence of evidence as evidence of terrorist activity.[70] In *Owens* the defendant Republic of Sudan "refused to participate in the litigation," and therefore "made it virtually impossible for the plaintiffs to get eyewitness accounts of its activities" by "skipping discovery and the evidentiary hearing."[71] This case bears no resemblance to *Owens*. Defendants' participation spans nearly twenty years, and their discovery crossed continents and produced millions of documents and weeks of depositions.[72] Plaintiffs' arguments utterly fail to justify Winer's impermissible state of mind testimony.

---

[67] Winer criticizes Defendants for placing the word duplicitous in quotation marks, arguing that "at no time did I use in my reports or my deposition the word defendants have placed in 'quotes' and attribute to me." Winer Decl. at 17-18, ¶ 88. This criticism is disingenuous: Winer used the noun form "duplicity" to describe Middle Easterners' intentions. Ex. A at 59, ¶ 9.5.

[68] *Id. see* Brief at 15-16.

[69] Plaintiffs also indicate that Winer extensively analyzed the Al Haramain Foundation as an example of a charity that did not disclose its support to Al Qaeda. Al Haramain's actions, however, are not indicative of whether the Charity Defendants in this case supported Al Qaeda. Not all Islamic charities are the same.

[70] Opp. at 19.

[71] *Owens v. Republic of Sudan,* 864 F.3d 751, 788 (D.C. Cir. 2017). The court also noted that the plaintiffs could not "ordinarily subpoena members of al Qaeda, many of whom are dead or in hiding, to testify regarding the actions of the [Sudanese] regime." *Id.*

[72] For these same reasons, Plaintiffs' defense of Winer's opinions based on his "absence of evidence is evidence" theory fails, and those opinions are unreliable. *See* Ex. A at 8, 3.8, at 9, ¶ 3.11, at 10, ¶ 3.11.3, at 10 ¶, 3.12, at 17 ¶¶ 4.9.3, 4.10, at 21, ¶ 6, at 26-27 ¶ 6.6.6.2, at 31, ¶ 6.7, at 37, 6.7.12, at 61, ¶ 9.7, at 62, ¶ 9.7.2, at 62-63, ¶ 9.8, at 100, ¶ 12.10.1; *see also In re Rezulin Prod. Liab. Litig.*, 309 F.Supp.2d 531, 563 (S.D.N.Y. 2004), *infra* at 15-22.

**D.  No Authority Justifies Jenkins's Impermissible Speculation on Mental States.**

Plaintiffs assert that experts may opine on "the objectives and goals of a terrorist organization, as informed by the expert's specialized knowledge," but cite two decisions that fail to establish such a rule.[73] In neither did the court rule on any argument that experts impermissibly opined about motives and mental states.[74] Here, Jenkins improperly speculated as to the state of mind of both groups and individuals (not only Al Qaeda, as Plaintiffs seem to suggest).[75] Plaintiffs assert that his statements "reflect" grounding in "source material,"[76] but, whatever such material may be available generally, Jenkins provided scant support for his assertions, and occasionally even relied on his bare "surmise."[77] Finally, Plaintiffs' observation that experts may properly rely on hearsay about terrorist groups' "origin, leadership, and operational structure"[78] has no bearing on Jenkins's speculative opinions on state of mind.

**E.  Plaintiffs Cannot Excuse Winer's Impermissible Legal Conclusions in the Guise of Expert Opinions.[79]**

Plaintiffs incorrectly assert that Winer is permitted to opine that "IIRO, MWL, and WAMY each provided significant material support to [A]l Qaeda without which it would not have achieved its global capabilities" because he does so in his Executive Summary.[80] Plaintiffs acknowledge that this very conclusion is precisely what the factfinder must determine.[81] Thus, no matter its

---

[73] Opp. at 18 & n.77.
[74] *See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 436–37 (E.D.N.Y. 2013); *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 123–27 (D. Conn. 2008) (rejecting the challenger's arguments on other issues). Even so, the court in *Abu-Jihaad* explicitly warned the expert against testifying to the defendant's motivations, lest he "usurp[] the jury's function." 553 F. Supp. 2d at 127.
[75] *See* Brief at 17–18.
[76] Opp. at 20.
[77] Brief at 17.
[78] *Id.* at 20 & n.86. Of course, experts must do more than simply act as conduits for such hearsay. *See infra* at 23-25.
[79] In light of the Court's recognition that portions of the Winer Declaration submitted with Plaintiffs' Opposition contain impermissible legal argument, *see* Order (ECF 7647), Defendants are not addressing those inadmissible sections.
[80] Opp. at 15; Ex A at 9, ¶ 3.11.
[81] *See, e.g.,* Opp. at 1 ("In litigation that, on its face, concerns the Defendants' alleged material support of, aid to, and conspiracy with, the Al Qaeda terrorist organization . . . ."). *Id.* at 14 ("Winer's knowledge and experience . . . goes to

14

location,[82] Winer's opinion that the Charity Defendants provided "significant material support" to Al Qaeda improperly invades the province of the factfinder.[83] Plaintiffs' unsupported assertion that Winer's legal conclusions are permissible because they are supported by his "research" similarly fails. Experts may not offer legal conclusions, and underlying citations do not overcome this prohibition.[84] The legal conclusions and opinions in Winer's report should be excluded.[85]

## III. Experts Must Reliably Apply Their Stated Methodology and Have a Sufficient Factual Basis for Their Testimony to Be Reliable

### A. Winer Does Not Follow His Purported "All-Source" Approach.

Rather than respond directly to Defendants' criticism that Winer fails to apply his stated "all-source" approach, Plaintiffs misapprehend the arguments[86] and shift the focus from methodology to Winer's purported experience.[87] Despite Plaintiffs' attempts, the key inquiry remains whether Winer reliably applied his stated methodology in this case. He did not.[88] Winer's claim that he applied his "all-source" approach "to all facts available to him, helpful and unhelpful"

---

the heart of whether or not there is evidence that the entity in question was engaged in providing material support, resources, and aid to, or conspiring with, a terrorist organization.")

[82] *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 138 (Bankr. D. Del. 2016) (subsequent affirmances omitted) ("The 'Executive Summary' . . . of the Report will be stricken completely; there is no doubt these pages are rife with improper 'legal' conclusions . . . .").

[83] Defs.' Opp. to Pls.' Mot. to Exclude, ECF No. 7602 ("Defs. Opp.") at 5 n.13 (experts not permitted to provide ultimate legal conclusions based on facts). *See e.g.*, Ex. A at 7, ¶ 3.5 (Winer concludes without citation that Islamic charities provide funds to support terrorists through mosques and teaching through madrassas that killing non-believers is proper); at 7, ¶ 7.1.1 (same).

[84] Brief at 10 (describing relevant legal standard); Defs. Opp. at 4-5 (same); *e.g.*, *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (Netburn, MJ) ("While an expert may opine on an issue of fact within the jury's province, an expert may not give testimony stating ultimate legal conclusions based on those facts.").

[85] *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 541. ("[A]n expert . . . may not tell the jury what result to reach or communicate 'a legal standard-explicit or implicit-to the jury.' This principle requires the exclusion of testimony that states a legal conclusion . . . .").

[86] *See* Opp. at 23 (Defendants never claimed that the quantity of documents reviewed alone is "indicative of reliability").

[87] *Id.* at 21, 22, 27, 28, 31, 32, 34, 36-39 (Plaintiffs refer to Winer's experience 14 times in the methodology section). Critically, Winer also lacks sufficient experience to testify in the proffered areas. *See supr*a at ns.7, 8.

[88] Winer's Deposition testimony reflects that Winer did not consider all the primary sources nor all the relevant documents even though they were available to him. *See, e.g.*, Ex. BA, Winer Dep., at 121:2-25, 122:12-123:4, 231:18-232:4. Instead, Plaintiffs repeatedly cite to Winer's experience to fill this gap. *See, e.g.*, Opp. at 22, 27, 31, 36, 38 and 39.

as Plaintiffs emphasize in their Opposition,[89] is not supported by the facts. Winer renders opinions

on the Charity Defendants' operations and attempts to connect them to Al Qaeda without sufficient

factual support[90] and without considering all the relevant documents produced in this case,

including ones that directly contradict his conclusions.[91] While repeatedly touting his inside-the-

Beltway knowledge of the views of "the U.S. government," Winer ignores statements of high-

level U.S. government officials that followed extensive investigation and contradict his opinions

that WAMY ever supported Al Qaeda, a flaw that, contrary to plaintiffs' argument, is not

"isolated."[92] He relies on others' advocacy work without reviewing the primary sources available

to him, which present facts contradictory to his conclusions.[93]

Winer's conclusion that there is an association between Benevolence International

Foundation, Inc., ("BIF") and Lajnat Al-Birr Al-Islamiah ("LBI") through Adel Batterjee, contrary

to Plaintiffs' argument, could not have been based on "all the information available to him."[94] For

instance, Winer never considered primary source documents available to him evidencing that

WAMY pushed Batterjee out of LBI in 1993. He never reviewed documents produced showing

---

[89] *Id.* at 22.

[90] Ex. A, Winer Rpt., at ¶¶ 7-7.1.11, ¶ 7.3.4 (only cites to rejected proffer in *U.S. v. Arnaout*), ¶ 7.3.4.3, ¶¶ 9.4-9.4.2, ¶¶ 9.6-9.7.1, ¶ 9.8.1, ¶ 9.9, ¶¶ 9.10–9.10.1, ¶ 9.11, ¶¶ 10-10.3.5, ¶ 10.4, ¶ 12.10.1, ¶¶ 12.10.4 – 12.10.6, ¶ 12.10 (citing paragraphs where Winer claims links to Al Qaeda without supporting citation; not a single cited document links WAMY to Al Qaeda).

[91] *Id.*, *see also infra* n.92 (discussing LBI and BIF); *see also e.g.*, Ex. BA, Winer Dep., at 133:15-135:4; 136:3-136:16; 152:14-157:14 (Winer admits never considering Harmony Database, including Bin Laden's letter encouraging donors not to donate to Saudi-based charities). Plaintiffs argue that defense expert Chas Freeman equally did not rely on documents produced in this case. However, Freeman does not opine on the Defendants' operations. Freeman opines on the KSA and its history, religion and geo-politics. Freeman reviewed documents relevant to his expertise. WAMY's other experts relied extensively on documents produced in this case to reach their opinions about WAMY's operations as an Islamic charity.

[92] Opp. at 33. *See also* Brief at 20, n.120 (describing Newcomb's testimony about the U.S. extensive investigation of WAMY where no terrorist link was discovered). This statement is not isolated and is a testament to Winer's lack of methodology. Newcomb's testimony does not support Winer's opinion yet Plaintiffs do not explain why such an important investigation was not considered, especially in light of Winer's all-sources approach.

[93] Even though Winer claims that the more primary sources, the better, (Ex. BA, Winer Dep., at 122:18-19), he ignores contradictory information that was available to him. *See id.* at 241:6-243:2 (Winer relies on the rejected *Santiago* proffer eleven (11) times in his report but ignores that the District Court and the Seventh Circuit both rejected the claims of terrorism in the proffer (*see* Brief at 32, ns.196-197)).

[94] Ex. A, Winer Rpt., at ¶¶ 12.12-12.12.5; Opp. at 25 (quoting Winer's testimony at 225:9-14).

that WAMY put Batterjee on notice and informed the Kingdom of Saudi Arabia ("KSA") about Batterjee's newly established BIF (which created confusion for the public due to its similar Arabic name to LBI) after his dismissal.[95] Due in part to his failure to review pertinent documents, Winer himself confused BIF with LBI.[96] He never considered documents WAMY produced showing that LBI was dissolved and merged with WAMY three years later, and that its assets were returned to WAMY.[97] These and other primary source documents produced in this case demonstrate that there is no link between BIF and LBI, and that BIF was cleared of all terrorism charges.[98] Contrary to Plaintiffs' argument, Winer does not reliably apply his stated methodology simply by answering questions on one of many documents, which he never reviewed before issuing his reports.[99] If Winer had reviewed LBI documents produced in this case, he would have concluded that LBI in fact dismissed Batterjee in 1993.[100] While disputed facts do not authorize the exclusion of experts, here Winer did not consider the facts in the first place.[101]

In responding to Defendants' challenge to Winer's wide-ranging opinions regarding asserted "financing improprieties and irregularities,"[102] Plaintiffs confuse the issue by arguing that it would be "profoundly irresponsible to turn over millions of irrelevant documents" to experts and that it is "commonplace" in complex litigation for counsel to select "documents relevant to the experts' area of analysis and inquiry."[103] This argument misses the point. Defendants are not

---

[95] *See, e.g.,* Brief at 32, n.194 (describing the two letters, Winer Dep. Exhibits 915 (Ex. R) and 916 (Ex. S), which Winer failed to review).

[96] *Id.; see also,* Ex. BA, Winer Dep., at 237:13-238:8.

[97] Ex. BA, Winer Dep., 234:5-7 (acknowledging he knew nothing about LBI assets).

[98] Opp. at 24-25; *see also,* Brief at 32, n. 195-198; *see also,* Ex. BA, Winer Dep., at 220:8-14 (relies on NY Times article regarding Adel Batterjee Chairman of WAMY instead of primary sources saying otherwise); at 241:6-243:2 (relies on the rejected *Santiago* proffer, *see supra* at n.92); at 227:1-4 (Winer claimed he was unable to make out Batterjee's dismissal from the document reference in Plaintiffs' Opp., n.107); Winer Rebuttal Report (Ex. B) at ¶ 2.38.9-10 (continues to maintain links between BIF and LBI based on proffer).

[99] Opp. at 25.

[100] Brief at 31-32.

[101] Opp. at 24, n.103.

[102] *See, e.g.,* Ex. A, Winer Rpt., at ¶¶ 10-10.2; *see also,* Brief at 28.

[103] Opp. at 23.

claiming that Winer should have reviewed millions of documents. Winer failed to consider in his affirmative report relevant *financial* documents produced by the Charity Defendants.[104] Indeed, at his deposition, Winer admitted that, prior to issuing his affirmative report, he asked Plaintiffs' counsel for more audits but was not provided any relating to the Charity Defendants.[105] He nonetheless included in his report that Charity Defendants provided material support to Al Qaeda. Due to this failure to apply his stated methodology, Winer's wide-ranging opinions, including that it was "standard practice for charities which provided support to [A]l Qaeda to list the support as expenses for legitimate activities" to avoid detection,[106] are unreliable.[107]

### B.   Plaintiffs Fail to Bridge the Gap Between Winer's Opinions and Facts and Data.

Plaintiffs assert that Winer relied on materials that are consistent with those relied upon by experts "in these fields, and are the precise sources that courts have approved when admitting expert testimony in terrorism arena."[108] These materials – none of which is a primary source – allegedly include Senate committee reports and testimony, press releases and newspaper articles, criminal indictments and governmental publications.[109] Plaintiffs claim that "there is no doubt that

---

[104] As further detailed in Defendants' Brief (pp. 27-28), Winer failed to review *any* audits or financial records of MWL and WAMY and only reviewed *three* IIRO audits *prior to drafting his affirmative report. See also* Ex. BA, Winer Dep., at 503:1-12 for examples of other IIRO audits that were produced and accessible to Winer, but were not considered prior to the issuance of his report.

[105] *Id.* at 41:20-42:5.

[106] Brief at 28 (citing to Ex. A, Winer's Rpt., at 55-67, ¶ 9 et seq), *see also, e.g.*, Ex. A, Winer Rpt., at 77, ¶ 10.9.7 (the "financial improprieties and irregularities…reflect conditions within IIRO that made it possible for persons within IIRO to misdirect IIRO resources to support Islamic jihad, al Qaeda, and terrorism"); *id.* at 121, ¶ 13.8 ("I conclude that comprehensive and accurate audits of all the offices of each of these charities (if they were to exist) would uncover additional discrepancies between the claimed uses of funds and proofs that these uses of funds were the actual activities carried out in practice").

[107] Rather than addressing this glaring deficiency in Winer's methodology, Plaintiffs attack WAMY's expert Jonathan Marks and the process he undertook in reviewing the tens of thousands of produced WAMY financial documents, which Plaintiffs claim are not relevant, *see supra* n.87, prior to issuing his rebuttal report. Opp. at 23-24. Plaintiffs' attempt at shifting the focus from Winer to Marks fails, as this attack is completely irrelevant to whether *Winer* applied his purported methodology. Winer's reliance material and his admission during his deposition demonstrate that he was not provided or reviewed financial documents for his affirmative report and was provided with only selective audit reports for his rebuttal. *See* Brief at 27-29.

[108] Opp. at 30 (Plaintiffs, however, cite to no case for this proposition).

[109] *Id.*, *see also* Brief at 32.

there is more than a sufficient factual basis for [Winer's] opinions."[110] This is not true.[111] Even if Winer had sufficient expertise with charities (which he does not, as noted above), he failed to consider pertinent documents or cite facts to support his conclusion that WAMY, MWL, or IIRO provided material support to Al Qaeda.[112] As detailed in Defendants' Brief, the materials he cites do not support his opinions.[113]

Defendants do not simply disagree with Winer's opinions, as Plaintiffs suggest.[114] Defendants' Brief demonstrates that Winer's opinions are without factual support.[115] For example, in an attempt to prop up Winer's factually unsupported assertion that the Rabita Trust is a "subsidiary" of MWL, Plaintiffs rattle off a series of specious claims concerning the purported relationship between the two separate entities.[116] Here, again, Plaintiffs seek to distract from the matter at hand. Not only has Winer himself not cited to these documents – perhaps because none reflect the "subsidiary" status that he claims – none are listed as having been relied upon by Winer in preparing his reports. Thus, Winer's claim that the Rabita Trust is a "subsidiary" of MWL remains factually unsupported and remains a clear example of his flawed methodology.

Furthermore, when considering the documents he cites, Winer ignores their plain meaning and contorts them into support for his expansive opinions, without any logical connections to facts. For example, Winer concludes that the Charity Defendants "assisted al Qaeda" by "[i]ndoctrinating fighters and terrorists, by providing 'educational' and 'religious' materials in mosques and madrassas."[117] Winer states that when one reviews the material being propagated, it

---

[110] *Id.* at 31.
[111] Brief at 19-23.
[112] *Id.* at 22, n.129.
[113] *Id.; see also* Ex. A, Winer Rpt., at 3.7, 3.10, 4.3, 12.20 and 13.3 (alleges indoctrination with no basis); 9.9 (making conclusions on slush funds with no citation).
[114] Opp. at 33.
[115] Brief at 19-24.
[116] Opp. at 32-33. Notably, Plaintiffs' arguments repeatedly mischaracterize the Rabita Trust documents' import.
[117] Ex. A, Winer Rpt., at 7, ¶¶ 3.4-.5; 37-38, ¶¶ 7.1-7.1.1; *see also, id.* at ¶¶ 4.3, 6.2.1, 6.6.5, 8.5.3, 9.7, 12.9.13, 13.3

"becomes easy to understand how the propagation…incubated terrorism."[118] However, he does not support this with any evidence establishing that the material propagated by the Charity Defendants was tied to Al Qaeda in any way. Although Plaintiffs argue that Defendants "neglect to mention that footnote 86 [of Winer's report] contains eight separate sources,"[119] *none* of those sources ties any of the Charity Defendants to the madrassas in question. Furthermore, at his deposition, Winer could not link any of the madrassas which allegedly graduated Al Qaeda members to any of the Charity Defendants.[120] Although Winer does not know any Al Qaeda members who attended a WAMY madrassa, he implies in his report that Al Qaeda terrorists were produced by Charity Defendants' madrassas.[121] Plaintiffs' argument that Winer "knows that there are people who became members of al-Qaeda who attended madrassas" is irrelevant.[122] Winer's sworn statements say just the opposite, as he could not point to any evidence that these madrassas were operated by the Charity Defendants and that these "people" attended WAMY madrassas.[123]

Winer relies on assessments made by others without reviewing the underlying factual basis for their views. For example, Winer relied on the testimony of Dore Gold[124] and Steve Emerson, but neither Gold nor Emerson identifies facts to support Winer's claims.[125] Additionally, as

---

(examples of the 24 times Winer uses indoctrination and similar words in his affirmative report and three times in his rebuttal). The statements made are mostly without citation and summarize his conclusion.

[118] Ex. A, Winer Rpt., at 56, ¶ 9.4.3, and n.86.

[119] Opp. at 33.

[120] Ex. BA, Winer Dep., at 219:1-25.

[121] *See, e.g.*, Ex. A, Winer Rpt., at ¶ 7.3.2, ¶ 7.4.8, and ¶ 9.4 (claims that tens of thousands of Muslim radicals studied at madrassas that were largely supported by Saudi charities and that preached radical and extreme forms of Islam).

[122] Opp. at 33-34. Furthermore, Winer was unable to provide one fact demonstrating that the Charity Defendants in fact propagated support for the 9/11 terror attack.

[123] Opp. at 33. *See also*, Ex. BA, Winer Dep., at 219:8-24.

[124] Opp. at 34 (referencing Gold as a source of data about charity defendants). Simply because the Israeli Diplomat Dore Gold named WAMY, IIRO, and MWL as the original organizations spreading Wahhabi Islam, Winer remarkably concludes that these organizations must have supported Al Qaeda. *See also*, Ex. A, Winer Rpt., at ¶¶ 9.4.4, 9.4.4.2 (reliance on Dore Gold).

[125] *See* Ex. BA, Winer Dep., at 466:12-467:11 (noting he does not know the source of Emerson's information) and Ex. A, Winer Rpt., at ¶¶ 7.7.3.5, 12.6.7, 12.7.2.2, 12.11.2, 12.13.2, 12.17 (for reliance on Emerson); *see also*, Ex. BA, Winer Dep., at 469:18-470:20 and 482:2-483:18 (acknowledging criticism of Emerson; Winer cites heavily to Emerson despite his own admission that Emerson made two errors concerning the actors behind the Oklahoma City bombing and whether Birmingham is controlled by Muslims); 468:3 (acknowledging David Cameron called Emerson

discussed in Defendants' Brief, Winer admitted he did not have a factual basis to conclude that WAMY provided logistical support to Al Qaeda.[126] Plaintiffs' Opposition fails to address this admission. Instead, they argue, that Winer's professional experience was enough for him to render his conclusions absent facts and data.[127] Such arguments have no basis in the law.[128]

Plaintiffs assert that Winer may rely on materials published by the Financial Action Task Force ("FATF") to identify red flags without reviewing WAMY's or other Defendants' financial documents.[129] However, identifying red flags is simply the beginning of an investigation[130] that Winer did not complete.[131] Without reviewing relevant WAMY financial documents, Winer concludes that WAMY "student welfare" is evidence of a terrorist "slush fund."[132] His opinion is without any factual basis.

Plaintiffs defend Winer's baseless conclusions that connect the Charity Defendants to Al Qaeda by citing to his "exhaustive analysis" of the Al Haramain Foundation, which failed to disclose its illegal activities.[133] But, unlike the case against Al Haramain, there are no facts to support Winer's assumption that the Charity Defendants are secretly supporting terrorists. Winer did not conduct an "exhaustive analysis" in this case; instead, he relies on his "absence of evidence

---

an idiot). For example, Winer relies on Emerson's statements that *Islamic Views* was written by WAMY. Ex. A, Winer Rpt., at ¶ 12.11.2 (directly citing Emerson under the section "Ideological Support of al Qaeda by WAMY, referencing the aforementioned *Islamic Views*). Winer could have reviewed the book which shows that WAMY did not write it, and the book has no connection to Al Qaeda). *See Islamic View* cover page, Blankinship Deposition Ex. 803 (attached as Exhibit BH to the Bembry Dec.).

[126] *See* Brief at 20-21; *see also* Ex. A, Winer's Rpt., at ¶ 5.3.3 (where he tries to connect WAMY to violent jihad through schools but provides citation to Al Haramain as if WAMY and Al Haramain are one organization).

[127] Opp. at 34.

[128] *See ECD Inv'r Grp v. Credit Suisse Int'l*, 2017, WL 3841872, *13-14 (S.D.N.Y. 2017) (this court excluded portions of an expert's testimony that ignored facts and was therefore not based on facts and data); *Scott v. Chipotle Mexican Grill, Inc*., 315 F.R.D. at 50 (where experience is a basis for opinion, that experience must be applied to facts).

[129] Opp. at 34, n 148.

[130] Marks Dep. at 310:16-18 (explaining his analysis of red flags) (excerpts of the Deposition of Jonathan Marks attached as Exhibit BI to the Bembry Dec.).

[131] Marks Rpt. at 18-20 (Marks's completed investigation on red flags) (excerpts of the Expert Report of Jonathan Marks attached as Exhibit BJ to the Bembry Dec.).

[132] Ex. A, Winer Rpt., at ¶ 9.9; Opp. at 34-35; *see also* Ex. BA, Winer Dep., at 319:21-325:24 (saying that slush funds in conflict areas are red flags but never making that connection for WAMY).

[133] Opp. at 19.

is evidence" theory, implying that because one charity was found to have supported Al Qaeda the same must be true of the Charity Defendants. Moreover, contrary to Plaintiffs' argument, unlike in *Owens v. Republic of Sudan,* WAMY, MWL and IIRO produced close to two million pages of documents in discovery.[134] Similarly, Winer misrepresents the Canadian Revenue Agency report[135] and did not review the audits attached to the report.[136] Plaintiffs fail to address this important methodological flaw. Instead they claim, without legal basis that Winer's experience can compensate for the lack of sufficient facts and data, such as documents produced in this case which they failed to provide to Winer.[137] However, Winer's own interpretation of "significant body of facts" or "factual predicates"[138] or "professional experience,"[139] cannot be a substitute for actual facts that were available to him, which he selectively ignores, misrepresents, or reviews, including documents produced in this litigation.[140]

---

[134] For instance, this Court has already ruled that WAMY has fulfilled its obligations by producing tens of thousands of financial documents. *See* Brief at 30, n.185.

[135] Brief at 23-24, n.140; *see also*, Ex. BA, Winer Dep., 275:19-276:8 (Winer's testimony that he needed to review the entire report in order to answer the question before him is disturbing. The challenge was to present evidence of his crucial opinion that WAMY was linked to terrorism. On this key question, Winer was unable to provide an answer).

[136] *See General Electric Co. v. Joiner*, 522 U.S. 136, 145 (1997) (expert opinion cannot be based on unfounded assertions or ipse dixit). Marks Report at 20-29 (unlike Winer who did not review the audits, Marks devoted 9 pages of his report to reviewing CRA audit).

[137] Opp. at 36 (relying on decades of experience and purported "factual predicates" to form his opinion). Winer's reliance material (*see* Ex. I) and his admissions during his deposition that Plaintiffs selected the documents for his review speak for themselves. *See, e.g.*, Ex. BA, Winer's Dep, at 27:18-25, 28:21, 29:8, 30:4-16, 44:11-20, 47:11-14, 122:5-11, 123:5-14, 561:10-13. Despite PECs' egregious misrepresentation of the record that somehow Defendants did the same thing with Blankinship, the fact remains that Winer was not provided documents produced in this discovery and did not rely on them when reaching his conclusory statements.

[138] Opp. at 36.

[139] *Id*.

[140] *See Faryniarz v. Nike*, 2002 WL 1968351, at *3) (expert was excluded from testifying as to causation because his opinion was not based on technical analysis, and was based on inadequate investigation) (citing to *Cacciola v. Selco Balers, Inc.*, 127 F. Supp 2d. 175, 180-181 (E.D.N.Y 2001) (excluding expert testimony that was based upon "unsubstantiated generalizations, speculative hypothesis and subjective evaluation that are based neither upon any professional study or experience-based observation")).

**C. Plaintiffs Grossly Understate Jenkins's Failure to Identify Factual Bases for His Conclusions, which Violated His Stated Methodology and Resulted in Irredeemable Unreliability.**

Jenkins's near-wholesale failure to provide support for his conclusions violated his own stated methodology and frequently resulted in opinions lacking sufficient factual basis.[141] Far from simply failing "to provide immediate precise citations during his deposition," as Plaintiffs claim,[142] Jenkins provided *no* citations in the majority of his report and, at his deposition, repeatedly could not supply the missing support, making his conclusions impossible to evaluate. Plaintiffs cannot simply ask the Court to assume in their favor in the absence of concrete support or a reliably applied methodology. Their contention that self-evident, publicly available information *need not* be cited only continues to cast doubt on the "specialized knowledge" behind Jenkins's opinions.

**IV.  Winer and Jenkins Serve as Mere Conduits of Hearsay Without Applying Analysis**

The applicable law regarding an expert's ability to rely on hearsay in forming opinions is not in dispute (despite Plaintiffs' misplaced emphasis on it). The parties agree that key to the Court's analysis is the requirement that the expert "must form *his own opinions* by applying *his extensive experience* and *a reliable methodology* to the inadmissible materials."[143] However, in response to specific instances identified in Defendants' Brief, Plaintiffs argue that Winer is "providing valuable insight" or that he "provides assessment and analysis."[144] In reality, Winer simply quotes from or summarizes hearsay material without applying expertise.[145] That he occasionally offers his "comment" or "assessment" on areas about which he lacks requisite

---

[141] Brief at 24–26, 33–35.
[142] Opp. at 26.
[143] *Strauss*, 925 F. Supp. 2d at 438 (emphasis added) (quoting *United States v. Mejia*, 545 F. 3d 179, 197 (2d Cir. 2008)).
[144] Opp. at 37-38.
[145] *See S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Mere narration thus fails to fulfill *Daubert's* most basic requirements.").

experience[146] does not change that fact.

For example, after quoting from the *9/11 Commission Report* about the purported "role that Saudi charities played in funding al Qaeda," Winer fails to provide any expert analysis and instead offers commentary that is "not traceable to a reliable methodology."[147] He writes that he "spoke with U.S. government officials who were concerned about, and frustrated by their inability to correct, the involvement of Islamic charities in providing support to al Qaeda" and asserts (without analysis) that these officials expressed views "consistent with" the conclusions of the 9/11 Commission.[148] But because the *9/11 Commission Report* never implicated any of the Charity Defendants as providing support to Al Qaeda,[149] Winer then speculates, without basis, that the 9/11 Commission "did not identify *all* of the charities or charity officials that funneled money and other support to al Qaeda"; instead, according to Winer, the Commission just named a few charities and used the phrase "such as" rather than "providing assessments about each charity about which it had evidence."[150] Then later, at his deposition, he fills in the gap (the one he speculates was purposefully left by the drafters of the report) with his unsubstantiated claim that the phrase "such as" in the *9/11 Commission Report* refers to the Charity Defendants.[151] There was no application of a reliable methodology or logic.[152] Winer never identifies the "U.S. government officials" with whom he supposedly spoke, nor does he explain the bases for their purported views or how he compared them to the *9/11 Commission Report*. And Winer's conclusion that "such as" refers to

---

[146] *Strauss,* 925 F. Supp. 2d at 438.

[147] *Id*. *Tourre*, 980 F. Supp. 2d at 675.

[148] Ex. A, Winer Rpt., at 23, ¶ 6.4.

[149] On the issue of charities that allegedly supported Al Qaeda, the 9/11 Commission identified certain charities by name (*e.g.,* Al Haramain Islamic Foundation, *see* Ex. J at 170) but did *not* identify WAMY, MWL or IIRO. Winer conceded this fact when questioned at his deposition. *See* Ex. BA, Winer Dep., at 408:9-17.

[150] Ex. A, Winer Rpt., at 23, ¶ 6.5 (emphasis in original). These opinions also are inadmissible because they are not based on sufficient facts and data, as discussed in Defendants' Brief at 19-21.

[151] Ex. BA, Winer Dep.,407:3 – 409:22.

[152] Indeed, as to the UN Security Council report, Winer does not even pretend to offer any commentary (even if conclusory and improper). He merely quotes from the document. This is improper. *See* Brief at 36.

the Charity Defendants is connected to the data "only by the *ipse dixit*" of his report.[153] Thus, Winer "did not analyze his source materials so much as repeat their contents," which is impermissible.[154] The factfinder does not need an expert to narrate the contents of hearsay material.[155]

With respect to Jenkins's use of the most prominent of his limited sources, the *9/11 Commission Report*, one indicator that experts appropriately *analyzed* the hearsay on which they rely is that they formed their own conclusions by "piec[ing] together bits of information from different sources."[156] Jenkins did not merely rely on the *9/11 Commission Report*, but apparently relied on little else, and simply repackaged its straightforward facts without applying expertise.[157] Plaintiffs ignore Defendants' argument on this score.

## CONCLUSION

For the reasons above, as well as those stated in Defendants' moving papers, the Court should strike the reports and exclude the proffered testimony of Winer and Jenkins.

---

[153] As the Supreme Court made clear, "nothing . . . requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert . . . court[s] may conclude there is simply too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146. This example, where Winer launders hearsay from the *9/11 Commission Report* and purported statements of unnamed government officials without a reliable methodology is especially troubling in that it paved the way for Winer to offer speculative and conclusory opinions at his deposition about the intent of the 9/11 Commission in its use of the phrase "such as", improperly attempting to plug holes in the Plaintiffs' case. *See* Ex. BA, Winer Dep., at 407:3 – 409:22; *see also* Brief at 20-21.

[154] *Mejia*, 545 F.3d at 197-98 (holding that the expert failed to "explain how he had pieced together bits of information from different sources and reached a studied conclusion…"). Beyond failing to analyze this hearsay, Winer fails to explain why *his* experience qualifies him to "assess" or "comment" on it. *See Faryniarz*, 2002 WL 1968351, at *3 ("while … an expert may rely on his experience as the basis for his opinion, that expert must explain how that experience leads to his proffered conclusion and why it provides a sufficient basis for it."). Winer has not offered any explanation as to how he used *his* experience to form opinions concerning Islamic charities or why *his* experience is sufficient. As discussed above, *see supra* at 2-9, it is not.

[155] Plaintiffs' arguments as to other instances identified in Defendants' moving brief where Winer seeks to regurgitate hearsay material (Opp. at 37-39) are similarly unavailing. A close examination of Winer's supposed "analysis" and "insight" demonstrates, in each instance, that he fails to apply a reliable methodology, lacks relevant experience and/or merely repeats the contents of inadmissible hearsay. Notably, as to Winer's improper opinions concerning the "1996 CIA report," Plaintiffs again fall back on Winer's deposition testimony as proof of his expertise. Opp. at 38. As noted above, a witness must be qualified as an expert *in order to* testify as one. Winer has not demonstrated how his experience is sufficient and why he is qualified to summarize the document or speculate about its import.

[156] *Mejia*, 545 F.3d at 192.

[157] *See* Brief at 35–36, 39–40.

February 18, 2022                    Respectfully submitted,

/s/ *Waleed Nassar*
Eric L. Lewis
Waleed Nassar (admitted *pro hac vice*)
Aisha E. R. Bembry (admitted *pro hac vice*)
Sumayya Khatib (admitted *pro hac vice*)
Lewis Baach Kaufmann Middlemiss PLLC
1101 New York Avenue, NW Suite 1000
Washington, DC 20005
Telephone: (202) 833-8900
Fax: (202) 466-5738
Email: eric.lewis@lbkmlaw.com
Email: waleed.nassar@lbkmlaw.com
Email: aisha.bembry@lbkmlaw.com
Email: sumayya.khatib@lbkmlaw.com
*Counsel for Defendants Muslim World League,*
*International Islamic Relief Organization, Dr. Abdullah bin*
*Saleh Al Obaid, Dr. Adnan Khalil Basha, Dr. Abdullah*
*Omar Naseef, and Dr. Abdullah bin Abdelmohsen Al Turki*

/s/ *Omar T. Mohammedi*
Omar T. Mohammedi
Frederick Goetz, *of counsel* (admitted *pro hac vice*)
The Law Firm of Omar T. Mohammedi, LLC
233 Broadway, Suite 820
New York, NY 10279
Telephone: (212) 725-3846
Fax: (212) 202-7621
Email: omohammedi@otmlaw.com
Email: fgoetz@goetzeckland.com
*Counsel for Defendants World Assembly of Muslim Youth*
*and World Assembly of Muslim Youth International*

/s/ *Steven T. Cottreau*
Steven T. Cottreau
C. Kevin Marshall (admitted *pro hac vice*)
Gabrielle E. Pritsker
Audrey Beck (admitted *pro hac vice*)
Jones Day
51 Louisiana Ave, NW
Washington, D.C. 20001
Telephone: (202) 879-3939
Email: scottreau@jonesday.com
Email: ckmarshall@jonesday.com
Email: gpritsker@jonesday.com
Email: abeck@jonesday.com
*Counsel for Dubai Islamic Bank*

/s/ *Juan P. Morillo*
Juan P. Morillo (admitted *pro hac vice*)
Quinn Emanuel Urquhart & Sullivan LLP
777 Sixth St NW
Washington, DC 20001
Telephone: (202) 538-8174
Email: juanmorillo@quinnemanuel.com
*Counsel for Dubai Islamic Bank*

/s/ *Alan Kabat*
Alan Kabat
Bernabei & Kabat PLLC
1400 16th St. NW #500
Washington, DC 20036-2223
Telephone: 202-745-1942
Email: Kabat@BernabeiPLLC.com
*Counsel for Dr. Abdullah bin Saleh Al Obaid, Dr. Adnan Khalil Basha, Dr. Abdullah Omar Naseef, and Dr. Abdullah bin Abdelmohsen Al Turki*

/s/ *Peter C. Salerno*
Peter C. Salerno
Amy Rothstein
Salerno & Rothstein
221 Schultz Hill Road
Pine Plains, NY 12567
Telephone: (518) 771-3050
Email: peter.salerno.law@gmail.com
Email: amyrothsteinlaw@gmail.com
*Counsel for Defendant Yassin Kadi*

27