# EXHIBIT BA

This Transcript Contains Confidential Material

1            UNITED STATES DISTRICT COURT

            SOUTHERN DISTRICT OF NEW YORK

2

3    IN RE: TERRORIST ATTACKS    )   03-MDL-1570 (GBD) (SN)

     ON SEPTEMBER 11, 2001       )

4                                )

5

6

7

                         —— —— ——

8

                  Tuesday, July 13, 2021

9                     —— —— ——

10            THIS TRANSCRIPT CONTAINS

                CONFIDENTIAL MATERIAL

11                    —— —— ——

12

13     Remote video-recorded deposition of JONATHAN M.

     WINER, held at the location of the witness,

14   commencing at 10:04 a.m., on the above date, before

     Debra A. Dibble, Certified Court Reporter,

15   Registered Diplomate Reporter, Certified Realtime

     Captioner, Certified Realtime Reporter and Notary

16   Public.

17

                         —— —— ——

18

19

20

21

22

23

              GOLKOW LITIGATION SERVICES

24         877.370.DEPS | fax 917.591.5672

                  deps@golkow.com

25

This Transcript Contains Confidential Material

```
 1        A.    135 pages is correct.

 2        Q.    And is that correct that your rebuttal

 3   was 66 pages?

 4        A.    Yes.

 5        Q.    Do you agree with me that this is a

 6   massive case, correct?

 7        A.    Yes.

 8        Q.    With massive documents; correct?

 9        A.    Yes.

10        Q.    Massive documents produced?

11        A.    Yes.

12        Q.    This is for the finder to evaluate claims

13   and defense in this case.  Do you agree with me?

14        A.    Yes.

15        Q.    Did you choose which document to review

16   and which document not to review?

17        A.    Yes.

18        Q.    Did the lawyers select documents for you

19   to review?

20        A.    Yes and no.

21        Q.    What do you mean by yes and no?

22        A.    I was given an initial group of

23   documents.  After going through those documents, I

24   asked for more documents.  And that took place a

25   couple of times.
```

This Transcript Contains Confidential Material

1      Q.    And that's from the time, I assume, that

2   you start reviewing the documents to the time that

3   you issued your final report; correct?

4              MR. HAEFELE:  Objection to form.

5      A.    Yes.

6      Q.    (BY MR. MOHAMMEDI)  Were any documents in

7   Arabic?

8      A.    There are no documents in Arabic that I

9   have read.  I don't read Arabic.

10     Q.    Were there any documents translate -- I'm

11  sorry.

12     A.    There were documents in Arabic that were

13  translated into English in which I had both English

14  and Arabic language next to it.  I am not able to

15  determine whether the English was authentic to the

16  Arabic, but they were still represented.

17     Q.    Which documents did plaintiff give you to

18  review?

19              MR. HAEFELE:  Objection.

20     A.    Please repeat --

21     Q.    (BY MR. MOHAMMEDI)  What documents did

22  plaintiffs' lawyers give to you review?

23     A.    The documents listed in my reliance

24  report.

25     Q.    So it is fair to assume that all the

This Transcript Contains Confidential Material

```
 1    document that your reliance materials are the ones
 2    that plaintiff gave you to review?
 3              MR. HAEFELE:  Objection to form,
 4       foundation.
 5       A.    It's my understanding that the materials
 6    in the reliance report were the materials that were
 7    provided to me, that's correct, plus additional
 8    materials that I found.
 9       Q.    (BY MR. MOHAMMEDI)  And that includes the
10    materials that were produced in this litigation; is
11    that correct?
12       A.    It does include some materials produced
13    in this litigation, yes.
14       Q.    And do you know how many materials were
15    produced in this litigation?
16       A.    I do not.
17       Q.    So you have no idea how many documents
18    were produced in this litigation?
19       A.    It's not something that I have an opinion
20    on it.
21       Q.    Okay.
22       A.    I can make no representations of fact as
23    to how many documents have been produced in the
24    litigation.
25       Q.    Did you ask for that?
```

This Transcript Contains Confidential Material

```
 1      A.    I asked for -- to receive as much as
 2   possible given the amount of time that there was for
 3   me to prepare my report.
 4      Q.    So you specifically asked to be given --
 5   that plaintiffs' lawyers will give you as many
 6   documents as possible to review to render your
 7   opinion?
 8            MR. HAEFELE:  Objection to form,
 9       misstates testimony.
10      A.    What I have stated in this deposition and
11   am happy to restate is that I was given a lot of
12   material initially.  After spending some extensive
13   number of hours on that material, I requested
14   additional material of various kinds.  I did that on
15   more than one occasion.  I don't remember how many
16   occasions.
17            In addition, I asked for some academic
18   materials that I needed to get quickly, that I
19   understood the firm might have, which they were able
20   to provide me.  An example of that might be a report
21   by Mr. Benthall or Mr. Hegghammer.  Merely as
22   examples.  I don't recollect precisely which reports
23   those were, because once I had them, how I acquired
24   them was not particularly important.  Their
25   authenticity and accuracy, of course, was, but in an
```

This Transcript Contains Confidential Material

1   citations.  And in addition, they listed the

2   material they provided me.

3        Q.   Okay.  Just as a follow-up question, you

4   are not aware that -- how many pages the Assembly of

5   Muslim Youth produced in this case, correct?

6        A.   I do not know the number of pages that

7   any entity produced in this case.

8        Q.   Let me tell you how many pages Mr. -- I'm

9   sorry, what the Assembly of Muslim Youth has

10  produced.  It's 1.264621 pages.

11            And that's WAMY Saudi Arabia.

12            And WAMY International produced 15,202

13  pages of documents in this case.

14            Have you seen any of these?

15            MR. HAEFELE:  Objection, form,

16       foundation, misleading.

17       A.   I've seen some of them.  I've seen some

18  audits.  I have requested every bit of audit

19  material.

20       Q.   (BY MR. MOHAMMEDI)  But audits were not

21  listed in the affirmative report, were they?

22       A.   They were not.  I was not provided those

23  at the time.  I asked for them, and I got them

24  later.  And when I reviewed them, I then provided my

25  analysis.  But I wanted them from the beginning.  I

This Transcript Contains Confidential Material

1    wanted an audit and I did request them.

2         Q.    Is it fair to say that you did not review

3    the audit before you produced your affirmative

4    report; correct?

5         A.    My report itself says I did not.

6         Q.    Okay.  And are you aware that Muslim

7    World League produced over 700,000 pages of

8    documents?

9              MR. HAEFELE:  Objection to form.

10        A.    I have stated and now repeat that I am

11   not aware of the amount of documents produced by

12   anyone involved in the case in terms of the numbers.

13        Q.    (BY MR. MOHAMMEDI)  And it's fair to say

14   that your affirmative report did not really rely

15   mostly on the documents produced in this case;

16   correct?

17              MR. HAEFELE:  Objection to form.

18        A.    I can't respond to that question with a

19   yes or a no.

20        Q.    (BY MR. MOHAMMEDI)  No, you can.

21        A.    It relied on the material that I've

22   listed.  I looked at every audit that I was able to

23   get my hands on and the financial records associated

24   with them.  And I went through depositions of the

25   officers of the defendants, for example, and sought

This Transcript Contains Confidential Material

1   of the material that was provided within the time

2   that I had.

3       Q.    But my question is, is this the one that

4   you relied on?

5       A.    You would have to show me the document,

6   sir.

7       Q.    No, I don't need to show you the

8   document.

9       A.    Well, then I can't tell you to what

10  extent I considered it.

11      Q.    I am relying on the reliance material

12  that you produced and you said that those are the

13  documents you relied on when you produced your

14  report; correct?

15            MR. HAEFELE:  Objection, badgering.

16      A.    Those are the documents that were made

17  available to me by the law firm and which I did my

18  best to consider.  I considered as much as I

19  possibly could within the time allotted, within the

20  time that I had to get the report done.

21      Q.    (BY MR. MOHAMMEDI)  Is this reliance

22  material accurate?

23      A.    The material that was available to me,

24  it's accurate, yes.

25            Did I go through as much of it as I

This Transcript Contains Confidential Material

```
 1        Q.    (BY MR. MOHAMMEDI)  Did they submit
 2   reliance material, did they?
 3             John Marks would submit his reliance
 4   material.  Did you --
 5             MR. HAEFELE:  Object to the form.
 6        Q.    (BY MR. MOHAMMEDI)  Did you review the
 7   reliance materials that John Marks submitted in his
 8   report?
 9             MR. HAEFELE:  Objection to form,
10       foundation.
11        A.    I reviewed all the audit material that
12   was made available to me, and my conclusions about
13   that audit material were provided in my rebuttal
14   report.
15        Q.    (BY MR. MOHAMMEDI)  And is that fair to
16   say, based on his statement in his report?
17        A.    I looked at the statements in his report.
18   I looked at the audit material.  I asked if there
19   was any additional audit material, and I expressed
20   my concern that there was a lot of material that was
21   still missing.
22        Q.    Okay.  Which questions relating to the
23   involvement of charities in international terrorism
24   finance in the period leading up to 9/11 attacks
25   were you asked to opine on?
```

This Transcript Contains Confidential Material

```
 1   different.  Are all of the opinions you provide in

 2   this case were set forth in your affirmative report

 3   as well as your rebuttal report?

 4              MR. HAEFELE:  Objection to form.

 5       A.    I reserved the right in both reports to

 6   provide additional responses as appropriate based on

 7   additional information that I learn.  And I

 8   maintained that in, I believe, some formulation of

 9   that in each of the reports.

10       Q.    (BY MR. MOHAMMEDI)  Okay.  I'm talking

11   about your submission of the report.  Those opinions

12   are really the opinions that you express within your

13   report at the time of submission of your report and

14   your rebuttal report; correct?

15              MR. HAEFELE:  Objection to form.

16       A.    Yes.

17       Q.    (BY MR. MOHAMMEDI)  What areas are you

18   testifying as an expert in this case?

19              MR. HAEFELE:  Objection, form.

20       A.    You're asking me to recapitulate the

21   areas that I'm testifying about?

22       Q.    (BY MR. MOHAMMEDI)  Yes.  Yes.

23       A.    Al-Qaeda and its funding needs pre-9/11;

24   Saudi Arabia as a source of funds for al-Qaeda

25   terrorism to 9/11; charities as a source of funds
```

This Transcript Contains Confidential Material

```
 1    for al-Qaeda and terrorism to 9/11; the impact of
 2    the charities to build al-Qaeda's global strike
 3    capabilities.
 4         Q.    Are you reading from notes?
 5         A.    No.
 6         Q.    Okay.  Go ahead.
 7         A.    I'm reading from the list of my section
 8    in the table of contents.
 9         Q.    Okay.  No problem.  Go ahead.
10         A.    The role of training camps in building
11    al-Qaeda capabilities; why charity records would not
12    show al-Qaeda support; implications of financial
13    accounting irregularities; al-Qaeda's use of
14    charities for aligned terrorist groups; the role of
15    the IIRO, MWL, and WAMY in material support of
16    al-Qaeda.
17              No separation of purposes of funds used
18    in material support; purpose of the 13224 executive
19    order designation program; evidence the
20    United States needs to designate a person or entity
21    under executive order 13224; implications of
22    nondesignation of a personal entity under that same
23    order; implications of withdrawal of a designation
24    under that order; and implications of nondesignation
25    for withdrawal for UN program.
```

This Transcript Contains Confidential Material

```
 1      Q.    Okay.  So you are rendering your opinion
 2  with this type of expertise in this report.  Is that
 3  what you're claiming?  You are an expert in all
 4  these areas that you are rendering your opinion on?
 5      A.    I'm not claiming anything.  I have
 6  rendered my opinion in these areas.
 7      Q.    As an expert?
 8      A.    As an expert in international financial
 9  crime and terrorist finance, including the area of
10  charity abuse.
11      Q.    Okay.  So I'm just trying to understand
12  your area of expertise in this case.
13              MR. HAEFELE:  Objection to form.  Is
14       there a question there, Omar?
15      Q.    (BY MR. MOHAMMEDI)  Is there an area of
16  expertise you have and you're rendering an opinion
17  in this case?
18              MR. HAEFELE:  Objection to form.
19      A.    I have been studying and worked as a
20  practitioner in counter transnational financial
21  crime going back to the earliest phases of my career
22  beginning in 1980 when I did my first money
23  laundering case.  That expertise included
24  investigations of terrorist activity and terrorist
25  finance when I worked in the United States Senate in
```

This Transcript Contains Confidential Material

```
1     the 1980s; that included exposure to these issues

2     continuously during the time that I was at the State

3     Department from 1994 through 1999.  So from the

4     period of from 1985 to '99 while I was in the

5     federal government, I was exposed -- 1985 to 1999 --

6                 MR. MOHAMMEDI:  Mr. Winer, I thought

7           you were answering my question.  We are going

8           to go through those.

9                 MR. HAEFELE:  I'm going to object to

10          the --

11    Q.    (BY MR. MOHAMMEDI)  My question is --

12                MR. HAEFELE:  Omar, let me object to

13          you interrupting and not letting him finish

14          the answer to the question.  I understand --

15                MR. MOHAMMEDI:  I don't think he's --

16          I don't think he's -- his answer is not

17          responsive and I want to make sure I have a

18          response.

19                MR. HAEFELE:  All right.  I just want

20          the record --

21                MR. MOHAMMEDI:  I am not asking

22          him --

23                MR. HAEFELE:  Omar, I just want the

24          record --

25                MR. MOHAMMEDI:  Listen, can you
```

This Transcript Contains Confidential Material

1  places and you listed the universities and law

2  schools I believe that you taught at.  Where -- were

3  those positions are permanent positions, are they

4  adjunct professor positions, or they're just

5  occasional lectures you're giving to those

6  institutions?

7            MR. HAEFELE:  Objection to form.

8      A.    At the Kent School, my work was under

9  contract.  So that was regular and ongoing for the

10  period of many years.  I don't recollect precisely

11  the number of years.

12            The other were -- teaching has been

13  largely ad hoc, which is to say I've been invited to

14  teach a seminar by another academic.

15            In 2017, I taught a student -- a group of

16  students on transnational -- certain transnational

17  criminal issues at the MacDill school and I was an

18  adjunct faculty there at MacDill in Washington for a

19  semester.  So it's been a variety of different

20  capacities.  I have not been part of the regular

21  faculty or adjunct faculty at any school, but you

22  asked me the question, am I an academic.  I am

23  published in a number of academic journals.

24      Q.    (BY MR. MOHAMMEDI)  Okay.  We'll get into

25  that.

1          So is it fair, you have not been a

2   faculty of any academic institution.  Is that fair

3   to say?

4          A.    I have not been a resident faculty member

5   of any institution.  I am a nonresident scholar at

6   this time and have been since 2017 at the Middle

7   East Institute.

8          Q.    Are you a social scientist?

9          A.    I am an attorney.  I did study some

10   social science in law school.

11          Q.    But you are not a social scientist?

12          A.    I am not a Ph.D.

13          Q.    Are you a certified public accountant?

14          A.    No.

15          Q.    Are you a forensic accountant?

16          A.    No.

17          Q.    Are you certified fraud examiner?

18          A.    No.

19          Q.    Are you or have you been a member of the

20   law enforcement?

21          A.    Have I been a member of law enforcement?

22          Q.    Law enforcement.

23          A.    I worked as a prosecutor at the beginning

24   of my career.

25          Q.    But that's the -- that's the experience

This Transcript Contains Confidential Material

```
 1    that related to law enforcement that you are talking
 2    about, right?
 3         A.    No, that's incorrect.
 4         Q.    Okay.  Go ahead.
 5         A.    For six years I was the lead person at
 6    the United States Department of State, addressing
 7    international law enforcement issues.  In that
 8    period I worked with U.S. law enforcement on a daily
 9    basis.
10         Q.    Were you yourself a member of law
11    enforcement?
12              MR. HAEFELE:  Objection to form.
13         A.    Did I have the power to prosecute?  I did
14    not.  Did I have the power to arrest?  I did not.  I
15    was not a prosecutor or a police officer.  Except
16    early on when I did a -- when I did a money
17    laundering prosecution.
18         Q.    (BY MR. MOHAMMEDI)  Have you ever worked
19    as an intelligence service analyst or agent?
20         A.    I have worked under contract for a U.S.
21    government analytic agency for many, many years,
22    providing both intelligence and analysis to that
23    agency, as disclosed in my CV.
24         Q.    You testified that you are an expert in
25    history of al-Qaeda; correct?
```

This Transcript Contains Confidential Material

```
 1        A.    I would have to look at precisely what
 2   their CV said.
 3        Q.    Are you an expert in history of al-Qaeda?
 4        A.    What is that?  Omar, I didn't hear you.
 5        Q.    Al-Qaeda.  Are you an expert on history
 6   of al-Qaeda?
 7        A.    In certain context, yes.  I know enough
 8   about its activities Afghanistan, Bosnia, Chechnya,
 9   Sudan, Southeast Asia, and elsewhere to have
10   familiarity with its activities.
11        Q.    How do you know that?
12        A.    I have some expertise in the area.  I am
13   not an Arabic reader, so there are things that are
14   in Arabic, I'm sure, that would allow me to know
15   more.
16        Q.    How do you -- how did you gain that
17   expertise?
18        A.    When the United States government first
19   became concerned about al-Qaeda in the 1990s, I was
20   meeting regularly with Richard Clarke at the NSC who
21   is the United States government's counterterrorism
22   czar at the time.  And I was dealing with the
23   interrelated issue of international crime, and in
24   particular international financial crime.  And the
25   two are inexorably intermingled, and the
```

This Transcript Contains Confidential Material

```
 1   United States was seeking that period of time, both

 2   to understand these phenomena and to begin to build

 3   capacity to combat them.  And I had regular contact

 4   with Mr. Clarke and was working for him and with

 5   him, such as with Michael Sheehan, for example, and

 6   Rand Beers on these issues in the late 1990s and

 7   became aware of his concern.

 8        Q.   Okay.  And is it fair to say those were

 9   within the policy scope?

10             MR. HAEFELE:  Objection, form.

11        A.   I'm not sure I understand the question.

12        Q.   (BY MR. MOHAMMEDI)  Were you dealing with

13   this matter from a policy perspective?

14        A.   Yes, but I also was trying to -- it was

15   my job also to communicate to other countries about

16   what we needed them to do and what capacities we

17   needed.  I did not do that, however, regarding

18   al-Qaeda myself.  I was aware that others were, but

19   I was not.

20        Q.   You were not.  Okay.  Have you ever

21   studied terrorism in an academic setting?

22        A.   I couldn't understand the question.

23        Q.   Have you ever studied terrorism in any

24   academic setting?

25        A.   I have been asked to write about
```

This Transcript Contains Confidential Material

1    charities?  Sorry.

2         A.    I have done work in the field of

3    charities now over -- since the late 1980s.

4         Q.    In the McDonald versus TD Bank, you held

5    yourself as an expert on interpretation application

6    of Canadian banking laws; correct?

7         A.    No.

8         Q.    What did you hold yourself as an expert

9    in?

10        A.    My expertise was on international banking

11   standards, including as they applied in Canada.

12        Q.    So it is an application of Canadian

13   banking law?

14              MR. HAEFELE:  Objection, form.

15        Q.    (BY MR. MOHAMMEDI)  Is it?

16        A.    My expertise was on the comparative law

17   and the underlying international standards that were

18   applicable in Canada and elsewhere.  And

19   understanding the obligations of banks.

20              MR. LEWIS:  Court reporter, can you

21         put the Exhibit 61 we sent you, which I think

22         would be 900.

23              (Winer Deposition Exhibit 900,

24              McDonald and Dickson v TD Bank

25              citation, was marked for

This Transcript Contains Confidential Material

```
 1                      identification.)

 2                TRIAL TECHNICIAN:  And you said 61?

 3                MR. MOHAMMEDI:  Yes.

 4       Q.   (BY MR. MOHAMMEDI)  If you go --

 5   Mr. Winer, if you go to page 32, 33 of this --

 6                So it's McDonald versus TD Bank?

 7       A.   Yes.

 8       Q.   Right?  And it's a trial testimony;

 9   correct?

10       A.   Yes.

11       Q.   And in that exhibit, page 32, 33 -- I'm

12   trying to find here.  It's note 167.  Do you see

13   that?

14       A.   Yes.

15       Q.   What does it say?

16       A.   Do you want me to read it to you?

17       Q.   Yes, please.

18       A.   Messrs. Winer and Delston are U.S.

19   attorneys.  Mr. Winer has been referred to as a

20   leading architect of relevant laws, regulations, and

21   international standards addressing financial crime

22   and money laundering.  He served as counsel and a

23   legislative assistant to U.S. Senator John Kerry

24   from 1985 to 1994, following which he was directly

25   involved in numerous international anti-money
```

This Transcript Contains Confidential Material

1  laundering initiatives for the United States

2  government.  TD Bank objected to his testifying as

3  an expert on matters concerning a Canadian bank

4  since Mr. Winer is neither a banker nor a Canadian.

5  At trial, I qualified him as an expert on

6  international banking standards.

7      Q.    Okay.  And then, so -- and then you go to

8  same page, 169.

9            It says:  Despite qualifying them as

10 experts -- referring to you and another expert named

11 Delston -- were not qualified to provide opinion

12 evidence regarding the interpretation or ... laws of

13 Canada or Ontario.  Indeed, they both acknowledged

14 that they are not experts in Canadian banking

15 practices and had no experience with the Canadian

16 regulatory regime.

17     A.    That was her finding.  I don't agree with

18 her characterization of --

19     Q.    But that's the finding.  That is the

20 finding; correct?

21     A.    Yes.

22     Q.    And when you applied as an expert, you

23 did apply as an expert in a Canadian regulatory

24 regime, correct?  And you were excluded?

25     A.    In part.

This Transcript Contains Confidential Material

```
 1              I am an expert in financial crime and in
 2    the question of when inadequate disclosure creates
 3    opportunities for the abuse of charities.  And I've
 4    been a proponent for many years of stronger
 5    reporting standards for charities, because of that
 6    concern, and testified before Congress some
 7    substantial number of years ago, I think in the 00s,
 8    on that issue.
 9       Q.    And do you do your own financial analysis
10    of this reporting or do you use accountant or
11    forensic accountant for that purpose?
12       A.    It depends on the context in the case.  I
13    have been involved in a matter in which the
14    attorneys involved in the matter retained an
15    accounting firm to do the forensic accounting work,
16    which we then assessed as -- in connection with an
17    OFAC matter.  And part of providing the terms of
18    reference for the accounting firm, what we needed,
19    what we needed to analyze and understand.
20              So for that purpose, I was an expert in
21    order to assess what the U.S. government would
22    require to provide certainty, enough certainty that
23    there was no risk of terrorist findings to enable a
24    person or entity to be delisted.  When I was
25    investigating BCCI in the 1980s, I spent extensive
```

This Transcript Contains Confidential Material

```
 1        A.     Yes.

 2        Q.     -- related to where?

 3        A.     Yes.

 4        Q.     Are you an expert on Islam?

 5        A.     I am not an expert on the doc --

 6   religious doctrine of any kind, except to the extent

 7   that it involves the political impact of different

 8   types of interpretations of religion when a religion

 9   is politicized into a political movement, where I

10   have expertise.

11             So when you have a combination of foreign

12   policy, security, and religion, that's an area that

13   I have devoted some extensive work on over a long

14   period of time.

15             And that is an area of expertise, yes.

16   In the Middle East bureau, where I was from 2013 to

17   2017, we were constantly dealing with -- within the

18   bureau and I was personally -- the competing agendas

19   of political Islam and various strands and strains

20   of political Islam, including that in the Islamic

21   state and al-Qaeda and other groups like Ansar

22   al-Sharia.  And that competing with -- Arab

23   nationalism competing with states that would be

24   modern unitarian states, competing with warlord and

25   different types of rule in which pan-Islamic rule
```

This Transcript Contains Confidential Material

1   was one of the strains, political strains that had

2   all kinds of consequences for terrorism and

3   terrorist risk, and having to understand the various

4   strands of those was critically important to my

5   work.

6           In that period in particular, while I was

7   involved.

8       Q.   (BY MR. MOHAMMEDI)  But you are not an

9   expert on Islamic terms of concept from a religious

10  standpoint, are you?

11              MR. HAEFELE:  Objection, form.  Asked

12      and answered.

13      A.   I am not really -- I'm not willing to

14  adopt your question as an answer.  I'm happy to say

15  again what my expertise is.

16      Q.   (BY MR. MOHAMMEDI)  Are you a religious

17  expert?  "Yes" or "no."

18              MR. HAEFELE:  Objection to form.

19      Q.   (BY MR. MOHAMMEDI)  Are you a religious

20  expert?

21              MR. HAEFELE:  Still objection to

22      form.  It's the same question and he's

23      answered.

24      A.   I developed expertise in the political --

25      Q.   (BY MR. MOHAMMEDI)  I just say, are you a

This Transcript Contains Confidential Material

```
 1   religious expert?  I mean, it's -- you already

 2   explained that.  I'm just asking you are you a

 3   religious expert?

 4              MR. HAEFELE:  Omar, you keep asking

 5         and repeating the same answer he gave.

 6              MR. MOHAMMEDI:  He already answer a

 7         question that was not really what I was

 8         asking.  I'm just asking if you are a

 9         religious expert.

10   A.    I can answer it this way:  My father was

11   a medical researcher in cardiovascular disease and

12   learned some fundamental principles in connection

13   with the angiotensin system.  He was an expert in

14   that area.  He was also a doctor.  He was not an

15   expert in glioblastoma.  So if you're asking

16   somebody are you an expert in medicine, well, yes,

17   my father was a medical expert, a medical expert

18   with certain areas of expertise.

19              I have certain areas of expertise.  Am I

20   a religious expert who spent my life on Islam,

21   Christianity, Judaism, Buddhism, Bahaism, Sufism,

22   the difference between Sunni and Shia, I have not

23   spent my lifetime on it, although I could give you

24   the basics of the Sunni/Shia split if it was of help

25   to you.  I could discuss when Wahhabism originated
```

This Transcript Contains Confidential Material

```
 1    and when the modern Salafi movement originated, and

 2    the fact that some people think its antecedents go

 3    back earlier and foundations for it earlier.  I can

 4    talk about the relationship between Egypt and

 5    Saudi Arabia in competing for religious dominance.

 6    But does that make me an expert in religion?  No.

 7              MR. GOETZ:  Objection, nonresponsive,

 8         move to strike.

 9         Q.   (BY MR. MOHAMMEDI)  Do you hold yourself

10    as a religious expert in this case?

11              MR. HAEFELE:  Objection to form.

12              MR. MOHAMMEDI:  Just answer this

13         "yes" or "no."

14              MR. HAEFELE:  Objection, you can't

15         demand a "yes" or "no" answer.

16              MR. MOHAMMEDI:  Robert, you can stop

17         interjecting.

18              THE WITNESS:  I believe I've answered

19         the question.

20         Q.   (BY MR. MOHAMMEDI)  Are you an expert on

21    religion in this case?

22              MR. HAEFELE:  Objection to form,

23         asked and answered multiple times.

24         A.    I am expert on the political aspects of

25    Islam and how it played out in the region in the
```

1    1980s, 1990s, and 00s.

2        Q.    Are you an expert in Islamic terms and

3    concepts?

4        A.    I know about a few of them.  Not all of

5    them.

6        Q.    Are you an expert --

7              Knowing is not an expert.  Do you agree

8    with me?

9              MR. HAEFELE:  Objection to form,

10        argumentative.

11       A.    I think it's really up to others to

12   determine the scope of my expertise.  I felt

13   comfortable and continue to feel comfortable

14   answering questions that were posed to me in my

15   expert report.

16       Q.    (BY MR. MOHAMMEDI)  Okay.  Then we go to

17   the next point.

18              (Reporter clarification.)

19       Q.    (BY MR. MOHAMMEDI)  Are you an expert on

20   the Kingdom of Saudi Arabia history?

21       A.    I know a fair amount about the Kingdom of

22   Saudi Arabia.  I dealt with issues relating to it

23   every day in my last work, the state departments.  I

24   was not personally responsible for that

25   relationship, but I was in meetings each morning

```
 1    when I was in Washington to discuss the ins and outs

 2    of that relationship.

 3              And I'm familiar with the modern history

 4    of Saudi Arabia.

 5         Q.   Have you ever been posted in

 6    Saudi Arabia?

 7         A.   No.

 8         Q.   Have you ever been posted anywhere in the

 9    Middle East pre-9/11 as U.S. representative?

10         A.   I'm sorry, please repeat the question.

11         Q.   Have you ever been posted anywhere in the

12    Middle East pre-9-11 as a U.S. representative?

13         A.   I've undertaken missions in a variety of

14    places in the Middle East.  I have been posted in

15    Washington.  I've always been -- I've lived in

16    Washington since 1985.

17         Q.   If we go to you -- as Exhibit 2, your CV

18    and the experience and qualifications.

19              MR. HAEFELE:  Just for the record,

20         it's not Exhibit 2.

21              MR. MOHAMMEDI:  I'm sorry, I'm sorry.

22         Which exhibit, that CV and qualification.

23              MR. HAEFELE:  896.

24              Wait, do you want his CV or his

25         expert report?
```

This Transcript Contains Confidential Material

```
1              During this period of time, Mr. Clarke
2    was quite frustrated with the response of the U.S.
3    government to what he perceived as a tremendous
4    threat.  I was one of the people in the functional
5    bureaus who he could talk with about the nature of
6    the threat without getting push-back.
7              The regional bureaus very often would
8    push back when you were asking countries to do more.
9    And the Middle East bureau, in this period of time,
10   would push back sometimes.
11             And so I got exposed to it in that
12   period.  When I went to Alston & Bird, after 9/11, I
13   was reached out to by the United States Senate, by
14   ABC News, by academic institutions, and participated
15   in a number of seminars, conferences, and so on, on
16   terrorism finance; and used that period of time to
17   deepen my knowledge and research into the
18   phenomenon.  I also was retained by the
19   United States government from a period of about 2000
20   to a period of about 2008 to provide regular reports
21   on countries relating to money laundering, terrorist
22   finance, corruption, these countries'
23   vulnerabilities, and these companies' capacities to
24   deal with them.
25             And so my study continued while I was
```

This Transcript Contains Confidential Material

1   contracts?

2       A.   I can't tell you how many.  I can tell

3   you how many years.  They began in 2000 and

4   continued through 2008.  In which I was providing

5   work regularly to the United States government

6   throughout that period of time on this set of

7   issues.

8       Q.   And when you say, when you talk about

9   2000, 2008, and you talk about your -- the contract,

10  are those the clients that you were advising during

11  that time?

12      A.   I had private sector clients I provided

13  advice to in connection with OFAC, and I had the

14  government as a client providing analytic --

15  academic or analytic work on country studies,

16  principally, though it was not only country studies,

17  of vulnerability to money laundering, vulnerability

18  to terrorist finance.  Their capacities to combat

19  these phenomena.  And what measures of performance

20  might look like if they built greater capacity.

21      Q.   And did you represent any charity itself

22  in this -- during that time period?

23      A.   Yes, as I've mentioned, I did.

24      Q.   And was there --

25      A.   As I've stated, I have, yes.

This Transcript Contains Confidential Material

```
 1   laundering and antiterrorist laws and made
 2   recommendations on them.  But that wasn't -- that
 3   was a separate engagement that I did pro bono in
 4   addition to the formal engagement.
 5        Q.   Mr. Winer, every time you respond, you
 6   say money laundering and terrorism finance.  Is it
 7   that every time you dealt with money laundering you
 8   dealt with the terrorism finances as well?
 9        A.   I can't say every time, but after 9/11,
10   in the work that I did for the U.S. government, it
11   was, if not always, it was almost always.
12             As I said a few minutes ago, there were a
13   few reports that I did for the United States
14   government which were outside of the country
15   analysis framework.  The 100-plus reports that I
16   did -- and it might have been 120, I don't remember
17   the exact number.  It tended to be about 20 a year,
18   to the best of my memory -- were generally country
19   reports, but they also asked me to look at things
20   like global financial risk from derivatives, the
21   money laundering and crime risk of internet
22   gambling.  So occasionally there would be specialist
23   topics.  But the country reports always included,
24   the best of my memory, a charity finance department.
25        Q.   And were you responsible to get with
```

This Transcript Contains Confidential Material

```
 1        A.    Yes, I do.

 2        Q.    You do?  Okay.  And when you mentioned

 3   the primary sources, obviously primary sources can

 4   be in the form of document produced in a case;

 5   correct?

 6        A.    Yes.

 7        Q.    And then if you provide your

 8   information -- your opinion by not reviewing the

 9   documents in the case, would you consider that a

10   complete conclusion?

11              MR. HAEFELE:  Form.

12        A.    You told me that there were millions of

13   pages of materials produced in this case.  That's my

14   understanding.  Is there anything that you would

15   have to correct that understanding or is that

16   correct?  There were millions of documents produced

17   in this case?

18        Q.    (BY MR. MOHAMMEDI)  Yes, I did.

19        A.    I don't know how I or any other human

20   being who is an expert witness could review millions

21   of pages of documents in the case.  There wouldn't

22   be enough time in a year to do that.  There wouldn't

23   be enough time maybe in five years or ten years for

24   one person to do that.  So that cannot be what's

25   required of an expert.
```

This Transcript Contains Confidential Material

```
1              What I did was I looked at, in light of
2    my own experience and knowledge, which included the
3    academic analytic work that I did for the U.S.
4    government, as well as my own tenure working for the
5    Senate and my two tenures at the State Department,
6    and the work that I've done on behalf of clients, I
7    looked at the materials provided to me by the
8    attorneys in this case, supplemented it with
9    additional research into the secondary literature of
10   some scholars, who I cite in my reliance material,
11   and that's how I came to my formulations.
12             When there was first-hand information
13   that I thought was particularly relevant, I looked
14   at it.  And when I didn't have it, I asked for more
15   of it.  A particular case of that is there were
16   representations about the extent of audits.  I
17   wanted every audit that I could get my hands on.
18   The more, the better, because that's primary source
19   information that's very important to me.
20        Q.   So let's make it clear on the record that
21   the audit you're referring to are not in your
22   affirmative report.  Right?
23        A.   Yes.
24        Q.   Let's also --
25        A.   Excuse me, the audits for WAMY were not
```

This Transcript Contains Confidential Material

```
 1    in my affirmative report.  There were some IIRO

 2    audits.  I asked for them and I wanted them.  I got

 3    more audits from my rebuttal report and then

 4    analyzed those.

 5         Q.   And let's make it clear that the reliance

 6    materials that you have, the documents produced in

 7    this -- the documents produced in this case were

 8    given to you by plaintiffs' attorneys; correct?

 9         A.   Most of them were, or many of them were.

10    I supplemented as best I could with additional

11    research when I felt that additional research that I

12    was able to get in the limited amount of time that I

13    had between the time of my retention and the time

14    that my report was due, I would supplement.

15         Q.   In your prior testimony, you stated those

16    are the documents that you relied on in rendering

17    your opinion in your affirmative report, correct?

18         A.   Yes.

19         Q.   The index.  Okay.  If an allegation

20    appears in a government document in your

21    methodology, do you accept the fact -- accept it as

22    a fact or do you do anything to attempt to

23    corroborate or dispel fact assertions?

24              MR. HAEFELE:  Objection to form.

25         A.   That's a very broad category, government
```

```
 1    how you put it against other material.  In the case
 2    of that article, I now understand that the
 3    chairman --
 4         Q.    Okay.  So I think -- I really --
 5         A.    Yeah.
 6         Q.    Let me -- I'm sorry, let me ask you this.
 7    So you are saying any quotes in a newspaper article
 8    will -- you would consider it as primary source,
 9    anything else would not be -- you don't consider as
10    primary source.  Correct?
11         A.    No, it's not that simple.
12         Q.    Okay.  All right.  That's fine.  That's
13    fine.  We'll move on.
14               It's fine.
15               Do you know about Harmony database?
16         A.    Yes.
17         Q.    What is it?
18         A.    It's a collection maintained by
19    West Point, I believe, of various materials related
20    to terrorism.  Most recently it had materials up
21    that relate to the January 6th insurrection, for
22    example; and also contains collections of material
23    found in situ over time relating to al-Qaeda and
24    other terrorist groups.
25         Q.    So do you know where they came from?
```

1    A.    Pardon?

2           MR. HAEFELE:  Object to the form.

3    Q.    (BY MR. MOHAMMEDI)  Where did they come

4    from?

5    A.    Some of the material came from --

6    material -- from my understanding, came from

7    material captured by American troops and that kind

8    of thing, in the field.

9           It -- I believe it contains some kind of

10   legend because it's just stuff that's been captured

11   that you can't rely on it because it's not

12   systematic.  It's just stuff.  It's the legend.  And

13   that's what it is.

14   Q.    Okay.  Did you consider documents in the

15   database in rendering your opinion?

16   A.    Well, I didn't rely on anything in that

17   database.  I looked at it, and it said it was a

18   collection of stuff.  And I tried searching it.  It

19   wasn't really searchable in a very easy way.  And

20   the stuff that I found was involved -- it was

21   purchases of sheep.  A recipe of some kind for some

22   kind of treatments for a woman's illness, that kind

23   of thing.

24          And so it became clear to me it wasn't an

25   efficient use of my time and wasn't going to lead me

This Transcript Contains Confidential Material

1    anywhere in particular, and so at that point I

2    stopped.  It does have a good -- it does have a good

3    study on the January 6th insurrection.  That was of

4    value.

5        Q.    And letter from lawyers that hired you

6    and other plaintiffs' lawyers about the production,

7    you cite them.  Do you consider them primary

8    sources?

9        A.    I'm sorry, what material?

10       Q.    You cited to lawyers' letters in your

11   report.  Right?  Your -- the lawyers who hired you,

12   the defense lawyers, you cite them in your report.

13   Do you consider this primary sources?

14             MR. HAEFELE:  Objection to the form.

15       A.    For the communications that took place,

16   the documents, the history between -- on the

17   discovery requests, for that purpose, it's a primary

18   source; it's a limited use and it's a very limited

19   issue covered by that letter.

20       Q.    (BY MR. MOHAMMEDI)  Okay.

21       A.    I don't have a better source for it.  The

22   only way I have a better source for it would have

23   been if I had been present for the communications.

24       Q.    Did you ask the lawyers to provide you

25   with other documentation related to that matter?

This Transcript Contains Confidential Material

```
 1        A.     I don't recollect.

 2        Q.     Okay.  So -- strike that.

 3               How many times did you -- how much time

 4   did you spend reviewing the Harmony database?

 5        A.     Not a lot.  As I said, the legend on it

 6   cautioned me on.  I tested the legend by looking at

 7   a couple of things to see if it was going to be of

 8   any value.  Found it wasn't any value for that

 9   purpose and didn't spend more time on it.  I had a

10   very limited amount of time between December and

11   when I turned the report in, and didn't spend much

12   time on it.

13        Q.     So it is your testimony you didn't find

14   any evidentiary value in those documents, that's why

15   you stopped looking at them?

16        A.     That's correct, I did not.

17        Q.     Does the CRA have any agency -- in your

18   report, you went through the details.  And I'm not

19   going to go through the details now, but I just

20   wanted to for the purposes of your methodology, did

21   you consider the adverse reporting in that case part

22   of -- as a primary source?

23        A.     I don't understand what you --

24        Q.     Okay.  So just to be very quick, the

25   Canadian report, the CRA report, listed adverse
```

This Transcript Contains Confidential Material

1    terrorist groups.

2             Do you see that?

3       A.    Yes.

4       Q.    At the time of its formation, 1988, was

5    al-Qaeda designated by U.S. government?

6       A.    United States didn't know about al-Qaeda

7    in 1988.

8       Q.    Was al-Qaeda designated in 1988?  When

9    was al-Qaeda designated?

10      A.    I believe 1998.  That's my memory.

11      Q.    Okay.  Turn to exhibit -- and this is

12   for -- it's our Exhibit 11.  I can't remember where

13   we are now.

14               (Winer Deposition Exhibit 908,

15               Letters From Bin Laden, Date: 12

16               April 1994 to 7 May 1998, was marked

17               for identification.)

18      Q.    (BY MR. MOHAMMEDI)  Is a document titled

19   Letters From Bin Laden.  Do you see that, Mr. Winer?

20      A.    Yes.

21      Q.    And its date is April 12, 1994 to May 7,

22   1998.  Do you see that?

23      A.    Yes.

24      Q.    Do you know what this document -- do you

25   know where this document comes from?

This Transcript Contains Confidential Material

```
 1        A.    No.

 2        Q.    Okay.  This document came from the

 3   Harmony database.

 4        A.    Oh, good.  Uh-huh.

 5        Q.    If you go to page 53 -- 51-53 of the PDF.

 6        A.    Okay.

 7        Q.    And go with starting with page 51.

 8              Just trying to see where it starts.

 9   Besides -- can you go -- can you go to page 52

10   again?  I'm sorry, that's page 52.  Sorry about

11   that.

12              Do you see that?  It says:  Beside the

13   regime's political and ideological blockade, it also

14   exercised a harsh economic and financial (policy) as

15   well.  Part of this blockade was dissolving

16   charitable organizations that used to deliver

17   donations from citizens to the many needy people

18   inside and outside the country.  It replaced them

19   with organizations and foundations subservient to

20   royal family members and particularly Prince Salman.

21              Do you see that?

22        A.    Yes.

23        Q.    And then at page 52-53 -- at section

24   52-3, which is bottom of 52, top of 53.

25              He goes on to say:  The reason behind
```

This Transcript Contains Confidential Material

```
 1   this procedure does not encourage good deeds, as the
 2   regime claims, but rather the following:  Prevents
 3   these funds from being delivered to areas where they
 4   could be used to serve Islam and Muslims following
 5   the principle "do not spend on those who are with
 6   the messenger of Allah till they desist."
 7          Do you see that?"
 8      A.    Yes.
 9      Q.    And then he goes on page 53, paragraph 3:
10   Based on what was stated, we, at the reform and
11   advice foundation, while celebrating this blessed
12   month as a month of giving for Allah's sake, wish to
13   draw the attention of all donors to the danger of
14   donating funds or zakat to these foundations and
15   organizations.  The regime is using them against God
16   and his messenger.  We are asking the donors to
17   provide these funds directly to the needy, whether,
18   inside or outside the country.  They could not --
19   they could also provide it to those trusted
20   individuals who will deliver them.  It is known that
21   the Saudi leaders cannot be trusted.  There are
22   other safe ways you can assist in delivering funds
23   to those who deserve them.  Among them are
24   benevolence foundations in Qatar, Kuwait, Jordan,
25   Yemen, Sudan, and others.  To assure that funds
```

This Transcript Contains Confidential Material

```
 1   transfer to these foundations' bank accounts, we

 2   draw your attention to the importance of

 3   transferring these funds outside the Saudi peninsula

 4   away of the pursuing regime's spies.

 5             That's correct, right?

 6             MR. HAEFELE:  Objection to form.

 7        A.    If I could just -- where is the date of

 8   this, please?

 9        Q.    (BY MR. MOHAMMEDI)  Okay.  So this is --

10   if you go up, you see what I mentioned, it's date

11   from -- so statement No. 13 is February 12, 1995.

12        A.    Right.  Okay.

13        Q.    Okay?  And then on August -- actually,

14   then on August 3rd, 1995, at page 85 of the PDF, he

15   also goes on to say:  Thanks to Allah and prayers

16   and mercy upon the messenger of Allah and those that

17   were rightly guided by his guidance.  It is no

18   longer hidden that the Saudi regime persistently

19   sought to block all the abilities and capabilities

20   of the ummah by placing control over it.  But the

21   regime was not satisfied with its unjust policies;

22   it had to go further by imposing control on the

23   minds and the politics of the nation.

24             Moreover, the regime sought to impose

25   economic control.  This resulted in the closure of
```

```
 1   charitable organizations that delivered the

 2   contributions of the benefactors from this country

 3   to its deserving lawful owners.  The regime replaced

 4   these charitable organizations with associations and

 5   organizations that were supervised by members of the

 6   ruling family, such as Prince Sultan and Prince

 7   Salman.  This revealed a scheme by which they

 8   monopolized the charitable contributions in such a

 9   way that it prevented Islam and the Muslims from

10   benefitting from them.  The regime used the

11   contributions the same way it used the money of the

12   Afghani mujahidin.  That money was used to pressure

13   the mujahidin and influence their policies in a way

14   that would benefit the interests of the West.

15   Sometimes these contributions were used for the

16   private interests of the Princes.

17            Now, if you go to page 88, and I'm

18   reading this to you.  To 89.

19            Again, and he said:  We are drawing their

20   attention to the risk of forwarding those

21   contributions through the ruling regimes and its

22   organizations.  We are advising them to deliver

23   their contributions directly to the people or

24   through safe hands of the individuals,

25   organizations, and societies that are trusted, such
```

This Transcript Contains Confidential Material

1   as the charitable societies in Qatar, Kuwait, Sudan,

2   Yemen, and Jordan.  We are advising them to be

3   careful that their contributions stay far from the

4   pursuit of the servant of the two holy mosques and

5   his agents, and to make sure that the money will

6   reach the people it is intended for.

7              Are these recipes?

8              MR. HAEFELE:  Objection to form.

9       Q.   (BY MR. MOHAMMEDI)  Just because they

10  come from the Harmony database.  You agree with me

11  these are not recipes, right?

12             MR. HAEFELE:  Objection to form.

13      A.   I made no representation that all the

14  materials in the Harmony database were recipes.

15      Q.   (BY MR. MOHAMMEDI)  Okay.  Now, so

16  let's -- let's -- those were made in 1995.

17      A.   Yes.

18      Q.   And as of the time they were made, it

19  shows, like you said, the safe contemporaneous that

20  were made that those Harmony database were found

21  this is what Bin Laden's; correct?

22             MR. HAEFELE:  Objection to form,

23       foundation.

24      A.   I can't say what the original source was

25   for this document.

This Transcript Contains Confidential Material

1        4:18 p.m.

2        Q.    (BY MR. MOHAMMEDI)  Mr. Winer, are you

3    aware of any person who attended madrassas, as you

4    mentioned from WAMY, WAMY madrassas, that became a

5    member of al-Qaeda?

6        A.    I don't know who attended WAMY madrassas

7    and who did not.

8        Q.    But you are not aware of anyone who was

9    at the madrassas that became a member of al-Qaeda?

10       A.    I do not know what madrassas incubated

11   which fighters and which terrorists, period.

12       Q.    Okay.  So the question you are not aware

13   of anyone who attended madrassas, it doesn't matter

14   which type of madrassas, that became a member of

15   al-Qaeda.

16       A.    I know that there are people who became

17   members of al-Qaeda who attended madrassas.

18       Q.    What about WAMY?

19       A.    I don't know which madrassas they

20   attended, whether they were related to WAMY or any

21   other organization that sponsored a madrassas.

22       Q.    So as you sit here, you don't "know"

23   know; correct?

24       A.    That's correct.

25       Q.    Let's go to your report, Section 12,

This Transcript Contains Confidential Material

1   which starts with page 104-110.

2            In your affirmative report, you refer to

3   Adel Batterjee as chairman of WAMY and global

4   chairman of WAMY.  Do you remember that?

5       A.    Yes.

6       Q.    At that time you did not review WAMY

7   documents; correct?

8       A.    I had reviewed some WAMY documents.  I

9   relied on his identification of himself as that role

10  to the New York Times.  That's not correct.  I

11  corrected it in my rebuttal report.

12      Q.    And you corrected that in your rebuttal

13  report; correct?

14      A.    I did.

15      Q.    Okay.  But then you mentioned in your

16  rebuttal which is 2.38.6, at page 31, if you look at

17  it, and you refer to Batterjee was the chairman of

18  LBI; correct?

19      A.    Yes.

20      Q.    Where do you get that information from?

21      A.    His function and the role in the field at

22  LBI.  I don't have a footnote there.  I don't

23  recollect the source but I believe it to be

24  accurate.

25      Q.    I'm sorry, what do you say?  You believe

This Transcript Contains Confidential Material

```
 1          Q.    Okay.  I'm also going to include to have

 2    an exhibit, which is 25, ours.  Where are we?  Which

 3    number are we at?

 4                    (Winer Deposition Exhibit 916,

 5                     5-11-1993 letter to Salman bin

 6                     Abdulaziz, was marked for

 7                     identification.)

 8          Q.    (BY MR. MOHAMMEDI)  This is a letter from

 9    Dr. Al-Juhani, who was the head of Muslim -- the

10    World Assembly of Muslim Youth.

11          A.    Yes.

12          Q.    Have you seen this document before?  You

13    can show the English version of it.

14          A.    Yes.  Thank you.

15          Q.    And it's dated May 11, 1993; correct?

16          A.    Yes, that's the date of it, if you'll

17    give me a minute, please.

18          Q.    Have you seen this document before?

19          A.    I need to read it to remember whether

20    I've seen it before or not.

21          Q.    Sure.  Just the highlighted sections.

22          A.    Yeah, I've not read this document before.

23          Q.    Do you have any reason to question the --

24    this document?

25          A.    No.
```

This Transcript Contains Confidential Material

```
 1          Q.    It's a primary source; correct?

 2          A.    Yes.

 3          Q.    And it's dated May 11, 1993; correct?

 4          A.    Yes.

 5                     MR. MOHAMMEDI:  Can we get

 6           Exhibit 27?

 7                     (Winer Deposition Exhibit 917,

 8                     6-14-1996 Minutes of Islamic

 9                     Benevolence Committee dissolution and

10                     merging with World Assembly of Muslim

11                     Youth, was marked for

12                     identification.)

13          Q.    (BY MR. MOHAMMEDI)  As of May 28, 1996,

14    LBI merged with WAMY; correct?

15          A.    Yes.  I am familiar with this.

16          Q.    You are familiar with this one, right?

17                     MR. HAEFELE:  Omar, just so we're

18           keeping consistent with the markings here,

19           this is already Noor Wali Exhibit 267, I

20           think.

21                     MR. MOHAMMEDI:  Okay, yeah.  That's

22           fine.  Yes.  Thank you, Robert.

23          A.    I do not remember whether I saw this

24    document or not.  I think I did, but I'm not

25    positive, but I'm certainly familiar with the action
```

This Transcript Contains Confidential Material

```
 1   relationship to its merger into WAMY.

 2       Q.    Okay.

 3       A.    I knew that that happened, and consistent

 4   with the timing that you have provided me.

 5       Q.    Are you aware of all asset of LBI, what

 6   happened to them after the dissolution?

 7       A.    No.

 8              MR. MOHAMMEDI:  Can we get

 9         Exhibit 29?

10              (Winer Deposition Exhibit 918,

11              8-18-1997 letter to Your Eminence the

12              Secretary General of the World

13              Assembly of Islamic Youth, was marked

14              for identification.)

15              (Discussion off the record.)

16              MR. MOHAMMEDI:  Can we go to the

17         English translation?

18              Sorry, I'm just having a hard time

19         seeing the whole document.

20       Q.    (BY MR. MOHAMMEDI)  The dates -- can you

21   repeat the dates for us, Mr. Winer, of this

22   document?

23       A.    Sure.  The English language dates are

24   August 18, 1997, is the date at the top.  And then

25   it refers to some other documents in 1997 and 1996.
```

This Transcript Contains Confidential Material

```
 1   International was founded in 1987 and alleged in a

 2   federal indictment to have supported al-Qaeda for

 3   more than a decade, as the successor to the Saudi

 4   charity LBI, which then merged into WAMY.

 5              Correct?

 6        A.    That's what it says.  That's right.

 7        Q.    Then you reference to Benevolence

 8   International, headquarters in Sarajevo.  Were you

 9   aware that any documents found in that raid that

10   was -- you cannot -- you cannot claim that there

11   were LBI documents in that raid; correct?

12              MR. HAEFELE:  Objection, form.

13        Q.    (BY MR. MOHAMMEDI)  Sorry, that was

14   poorly phrased.  Let me go back.

15              In your testimony, you mentioned in your

16   report, you refer to raids by Benevolent

17   International headquarters in Sarajevo; correct?

18        A.    That's correct.

19        Q.    Are you aware of any documents found in

20   that raid that was LBI document?

21        A.    The documents refer -- my -- my memory

22   and understanding of this is that the documents

23   refer to Batterjee and Benevolence, but I don't

24   recollect whether it was to LBI, BIF, related to

25   benevolence activities in Sarajevo.  That's my
```

This Transcript Contains Confidential Material

```
 1   memory.  That's what I wrote, and that's what I
 2   believe to be happening.
 3           If you have other information to add to
 4   that, I'm certainly happy to look at it.  The word
 5   as I mentioned al-Barr, A-L-B-A-R-R is benevolence.
 6   That's the name of both entities, as was referenced
 7   in the documents you showed me earlier about the
 8   possibility for confusion.
 9      Q.    So is it fair to say that one is called
10   Islamic Benevolent Committee, and the other is
11   Benevolent International, based on the documents I
12   showed you?
13      A.    Yeah, the word "benevolence" is in both.
14      Q.    Okay.  What is your basis that BIF was
15   founded in 1987?
16      A.    I believe the reference should be LBI.
17      Q.    Okay.
18      A.    I believe I corrected it, or if I didn't
19   correct it, I certainly intended to.
20      Q.    Is an indictment evidence?
21      A.    An indictment lays out the U.S. -- lays
22   out a case being brought by the indicting -- by the
23   prosecutors.  It's typically -- now, it's a --
24   always in the case of the U.S. government case,
25   based on some evidence.  The amount of evidence is
```

This Transcript Contains Confidential Material

```
 1        Q.    If you go to page 3.  And it's
 2   highlighted.
 3              You reviewed this document; correct?
 4   Before you rendered your opinion?
 5        A.    Yes.
 6        Q.    Why do you rely on rejected proffer?
 7        A.    Because the basis for the rejection is
 8   based on the hearsay rules that were applicable for
 9   a criminal case as found by a particular judge,
10   which prevented, as I understand the case,
11   additional sufficient evidence from the judge's
12   point of view to have co-conspirators.  And so the
13   exclusion --
14        Q.    And --
15        A.    Please allow me to finish.
16        Q.    Sorry, sorry.  Go ahead.  I thought you
17   finished.
18        A.    I was not finished.
19        Q.    No, sorry.  Go ahead.
20        A.    Thank you.
21              So as I understand the case, the judge's
22   ruling in relationship to the issue of hearsay
23   prevented information coming in regarding the other
24   co-conspirators, which thus caused an elimination
25   for a substantial portion of the case.
```

1    al-Qaeda.

2         Q.    Where is it in the CRA report that this

3    finding was made?

4         A.    I would have to go back to the CRA report

5    to tell you.

6              I can't tell you out of my memory where

7    it said that.  I believe that summarizes what they

8    found.

9         Q.    So if you go to page --

10        A.    In paragraph 10.3.4, I quote what CRA

11   found.

12        Q.    Okay.  So if you go to -- let me just

13   look at it.

14             Page 1 of the CRA report at exhibit --

15   page 1.  The CRA report.  That's where we entered.

16   I can't remember the exhibit number now.

17             TRIAL TECHNICIAN:  Was it the last

18     exhibit entered?

19             MR. MOHAMMEDI:  925.

20        Q.    (BY MR. MOHAMMEDI)  So in page 1 of the

21   report, WAMY Canada parent organization located in

22   Saudi has been alleged to support terrorist.

23             Does it say that?  It says that, correct?

24        A.    Yes.

25        Q.    Okay.  So your statement -- do you -- is

This Transcript Contains Confidential Material

```
 1   it fair to say your statement on CRA report on WAMY

 2   is not correct?

 3       A.    I would have to take a look at the rest

 4   of the report.  There is a difference between the

 5   word assessed and which has been alleged, and I

 6   think we have to look at the whole report in order

 7   to fully address that issue, and not just this

 8   paragraph.

 9       Q.    Okay.  Do you agree -- do you know that

10   in Exhibit 45, if you go to exhibit that were just

11   entered now.  Right.

12             At page 4, can you read that, which is

13   highlighted?  That's what off of the -- that's the

14   information, the content of the CRA report.

15             Can you read that?

16             It says United States District Court For

17   the District of Columbia lawsuit filed by victims

18   families of 9/11.

19             Do you see that?

20       A.    Yes.

21       Q.    Are you aware the CRA considered an

22   allegation made by the lawyers who hired you?

23             MR. HAEFELE:  Objection to form.

24       A.    They considered everything that they

25   listed, which was --
```

This Transcript Contains Confidential Material

1      Q.    (BY MR. MOHAMMEDI)  The lawyers that

2  hired you, those allegations, correct?  They're

3  still allegations.

4            MR. HAEFELE:  Objection to form.

5      A.    That's correct.

6      Q.    (BY MR. MOHAMMEDI)  In 10.3.1, page 68,

7  again, you say that CRA audit found massive

8  deficiencies.  Do you see that?

9      A.    Yes.

10     Q.    Are you an auditor?

11     A.    No, I am not an auditor, I'm an attorney.

12     Q.    Are you a CPA?

13            MR. HAEFELE:  Objection, asked and

14     answered.

15     A.    You asked me this question earlier.  I

16  previously have responded to that question to tell

17  you that I am not a certified public accountant.

18     Q.    (BY MR. MOHAMMEDI)  So what qualification

19  do you have to render this opinion?

20            MR. HAEFELE:  Objection.

21     A.    I have laid out my qualifications

22  previously in this deposition.  I'm going to respond

23  to your current question at some length since the

24  question is a very broad question.

25            I first began dealing with bank

```
1    relevant to interpreting a financial report.  In

2    fact, essential.  Particularly in a field where

3    there is assistance being provided in a conflict

4    zone, for example.

5              So it's of great relevance and

6    importance.  The fact that an audit report -- an

7    audit has not been undertaken, its significance is

8    going to be different in different circumstances.

9    In the circumstances of this case, it's very

10   important.

11      Q.    Is a not-for-profit organization

12   obligated to issue a report?

13      A.    It depends on the laws of the country in

14   which it's operating, and the laws of the country in

15   which it's charted, what's it required to do.

16      Q.    And are you an expert on financial

17   aspects of income in Saudi Arabia?  On the standard?

18      A.    It depends what question you're asking.

19   I am very familiar with the lack of controls in

20   accounting, auditing -- please let me answer your

21   question -- and money laundering controls that were

22   in place at the time that I did my investigations of

23   BCCI in the senate.  I was also familiar with the

24   lack of accountability in the Kingdom of Saudi

25   Arabia as of the time I left the Department of State
```

This Transcript Contains Confidential Material

1    in the late 1990s.

2            I've had recent experience in connection

3    with certain matters associated with Saudi Arabia

4    which lead me to believe that the standards have

5    changed substantially over the last 20 years, but I

6    did have representations made in the amount of

7    standards back then, and they were not standards the

8    United States government was happy about.

9        Q.    (BY MR. MOHAMMEDI)  Are you an expert in

10   countries implementing the international standards

11   in their own countries?  Are you an expert in the

12   field?

13       A.    That's what I was retained to provide

14   analysis and assistance on to the United States

15   government from 2000 through 2008 in the area of

16   money laundering, terrorist finance, and corruption,

17   vulnerability; both vulnerability, the systems to

18   combat it, the nature of the threat, and how we

19   might evaluate the effectiveness of the system

20   against the threat.

21           So where I was asked to look at that set

22   of issues in an integrated fashion for, as mentioned

23   in one of my statements, for a very large number of

24   countries around the world, including essentially

25   every country, if not every country in the Middle

```
 1              The auditor is not saying that.  You are

 2      saying that.

 3                   MR. HAEFELE:  Objection to form.

 4          Watch your tone, please.

 5          A.    Is that a question, sir?

 6          Q.    (BY MR. MOHAMMEDI)  The question, do you

 7      have any evidence that food, tents, clothes went to

 8      al-Qaeda instead of the needy?

 9          A.    This report does not allow one to know

10      what the material -- what the goods went to or even

11      if the goods that went there were as represented in

12      the report.

13          Q.    And what is in your report is an

14      assumption; correct?

15          A.    I couldn't understand your last --

16          Q.    What's in your report is assumption.

17                   You're assuming.  You don't have evidence

18      to show.

19          A.    I disagree with your characterization of

20      my report and of the testimony I've given.

21          Q.    Okay.  In your rebuttal Section 2.17.5,

22      page 14, from 1998 to 1994, Pakistan audit.  You're

23      referring to that.

24                   You went on and explained the categories

25      are student welfare.  That is a red flag; right?
```

1    For supporting terrorists.  Is that correct?

2        A.    It's a red flag for the kind of slush

3    fund category that would enable a charity operating

4    in an area of conflict to provide support for a

5    terrorist group because it's providing support for

6    young men in an area of conflict that is foreign to

7    them.  In other words, you had foreign fighters in

8    this period of time in Pakistan and Afghanistan,

9    foreign meaning they're not Pakistani and they're

10   not Afghani, and there's money being provided for

11   them for student welfare.  So it's a slush fund.

12   And there are no controls.  There's a complete lack

13   of controls.  There's no evidence of any controls on

14   the actual uses.  And that's what I'm -- my

15   statement is essentially saying.

16       Q.    Do you know which is the objective of

17   WAMY?

18             Do you know the name itself, what it

19   means?  The World Assembly of Muslin Youth?

20             MR. HAEFELE:  Object to form.

21       Q.    (BY MR. MOHAMMEDI)  Do you know the

22   objective of providing student with funds to educate

23   them?

24       A.    Yes, I'm -- but what -- it's more

25   difficult for me to know what's being done when the

This Transcript Contains Confidential Material

```
 1    people to whom the funds are being provided are in

 2    an active area of conflict or in an area that is

 3    over -- has got a substantial number of terrorist

 4    training camps and a terrorist presence in it.

 5         Q.    And that's --

 6         A.    And the issue --

 7               Let me finish my answer, please, sir.

 8         Q.    Go ahead.

 9         A.    Thank you.

10               So the issue is the location of where the

11    activity is, and the fact that this category of

12    funding is different from the kinds of categories of

13    funding audits show for areas that were not in

14    conflict.  You don't -- I didn't see these

15    categories in the other -- in the audits you

16    provided to me, and were provided to me, for WAMY,

17    in areas that were not conflict zones, that were

18    less susceptible to terrorist risk.

19               The fact that these categories appear in

20    these audits in this location at this time is of

21    concern and fits precisely within the

22    vulnerabilities that have been -- that have been

23    evident for years, and which reflect the 1996

24    findings of the CIA in the 1966 report -- pardon me,

25    the 1996 report in Bosnia.
```

```
 1              So it's not merely that this is a
 2   category of potential substantial risk and abuse,
 3   it's also that this category was not present --
 4        Q.    Okay.  And --
 5        A.    -- in the audits that took place after
 6   9/11, in areas that were not conflict areas.
 7        Q.    So your testimony, because it's in an
 8   conflict zone that then it should be used to support
 9   terrorism; correct?
10        A.    That's not a correct statement of my
11   views or --
12        Q.    You said that exactly.  You said because
13   of a place of conflict.  That's exactly what you
14   said.  Correct?
15              MR. HAEFELE:  Objection,
16        argumentative.
17        A.    It is not exactly what I said.
18        Q.    (BY MR. MOHAMMEDI)  Okay.  Let me -- so
19   is it fair to say --
20        A.    That's not what I said at all.
21        Q.    Okay.  So is it fair to say place of
22   conflict and the places where there is a war, where
23   there are refugees, place of, that's exactly -- we
24   can assume that where you have the students' welfare
25   being used to help the population that is affected
```

This Transcript Contains Confidential Material

1    by the war; correct?

2        A.    That's partially true.  There's going to

3    be refugees in many areas that are affected by war

4    and conflict.  The issue is that in this area they

5    were foreign fighters.  And so it made it

6    particularly vulnerable.  And when you have an area

7    that's particularly vulnerable to abuse because of

8    the overall conditions, it's a good idea to put more

9    controls in place.  And rather than having more

10   controls in place, what you have instead is this

11   kind of slush fund category, that you don't see

12   elsewhere.  And this was precisely the period of

13   time when al-Qaeda was preparing using foreign

14   fighters who had been in conflict zones to send them

15   to the United States and had them in training camps.

16       Q.    As you sit here, you have no facts to

17   show that; correct?

18                MR. HAEFELE:  Objection.

19       A.    I disagree with your assertion.

20       Q.    (BY MR. MOHAMMEDI)  And the facts are in

21   your report; correct?

22                MR. HAEFELE:  Objection to form.

23       A.    There are facts in my report which

24   references additional reports.  There was

25   paramilitary support by charities for combatants in

This Transcript Contains Confidential Material

```
 1    the countries that were going through religious war

 2    or wars involving Muslims and non-Muslims.

 3            And --

 4    Q.    (BY MR. MOHAMMEDI)  Mr. Winer --

 5    A.    Okay.

 6    Q.    Mr. Winer, why do you always refer to

 7    this matter of conflict as a religious war, Muslims

 8    versus non-Muslims.  Do you know?

 9            MR. HAEFELE:  Objection to form --

10        wait.  Objection to form, objection he cut the

11        witness off, and objection to the

12        argumentative nature of your constant barrage

13        with the witness.

14    A.    I'm responding to your questions with

15    answers that reflect my understanding of how

16    al-Qaeda built its global strike capability over a

17    period from the late 1980s through the late 1990s in

18    preparation for 2001.  And this is how it did it.

19    And I have described that over the course of my

20    testimony and over the course of my reports, and

21    I've referenced a great deal of material in both.

22    Q.    (BY MR. MOHAMMEDI)  I just for the

23    record, I, for the seven hours that I have been

24    asking you questions about this matter, you have not

25    provided one single fact related to your statements
```

1    about money being used to support al-Qaeda.

2                   MR. HAEFELE:  Objection, and

3         that's --

4                   MR. MOHAMMEDI:  -- before this.

5                   MR. HAEFELE:  Objection to the

6         dialogue.  There is no question there.

7         Objection to your characterization --

8                   MR. MOHAMMEDI:  Is that correct?  Is

9         that correct?

10        A.    No, it's not correct.  And the facts are

11   set forth in my report and in the documents

12   referenced in my report.

13        Q.    (BY MR. MOHAMMEDI)  Okay.

14        A.    And I do provide specific examples in the

15   report.  You've chosen not to ask questions about

16   them.

17        Q.    I did ask a lot of questions about them,

18   but you don't have the facts.  There is no facts in

19   your report, and I'm asking you to show me the facts

20   in this deposition; correct?

21        A.    Am I invited to go through the elements

22   of my report that I would like to talk about?

23        Q.    I have given you all the chances to do

24   that.

25                   Sir, let me --

This Transcript Contains Confidential Material

```
 1                     CERTIFICATE
 2        I, DEBRA A. DIBBLE, Registered Diplomate
    Reporter, Certified Realtime Reporter, Certified
 3  Court Reporter and Notary Public, do hereby certify
    that prior to the commencement of the examination,
 4  JONATHAN M. WINER was duly sworn by me to testify to
    the truth, the whole truth and nothing but the
 5  truth.
 6        I DO FURTHER CERTIFY that the foregoing is a
    verbatim transcript of the testimony as taken
 7  stenographically by and before me at the time, place
    and on the date hereinbefore set forth, to the best
 8  of my ability.
 9        I DO FURTHER CERTIFY that pursuant to FRCP
    Rule 30, signature of the witness was not requested
10  by the witness or other party before the conclusion
    of the deposition.
11
          I DO FURTHER CERTIFY that I am neither a
12  relative nor employee nor attorney nor counsel of
    any of the parties to this action, and that I am
13  neither a relative nor employee of such attorney or
    counsel, and that I am not financially interested in
14  the
    action.
15
16
17
18
19  _____
    DEBRA A. DIBBLE, RDR, CRR, CRC
20  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
21  Certified Court Reporter
22
    Dated: 8-3-2021
23
24
25
```

This Transcript Contains Confidential Material

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2
 3    IN RE: TERRORIST ATTACKS   )  03-MDL-1570 (GBD) (SN)
      ON SEPTEMBER 11, 2001      )
 4                               )
 5
 6
 7
                          — — —
 8
                  Wednesday, July 14, 2021
 9                        — — —
10            THIS TRANSCRIPT CONTAINS
                 CONFIDENTIAL MATERIAL
11                        — — —
12
13     Remote video-recorded deposition of JONATHAN M.
      WINER, VOLUME II, held at the location of the
14    witness, commencing at 9:36 a.m., on the above date,
      before Debra A. Dibble, Certified Court Reporter,
15    Registered Diplomate Reporter, Certified Realtime
      Captioner, Certified Realtime Reporter and Notary
16    Public.
17
                          — — —
18
19
20
21
22
23
                 GOLKOW LITIGATION SERVICES
24          877.370.DEPS | fax 917.591.5672
                    deps@golkow.com
25
```

This Transcript Contains Confidential Material

```
1       A.    No, that's a misreading of that

2  statement.  You misunderstood it.

3       Q.    (BY MR. LEWIS)  I just asked you the

4  question.  Okay.  You said that they've -- that

5  they -- that there was a lack of completeness to the

6  report.  Was that because of a -- of -- what is your

7  explanation as to why they lacked completeness in

8  their report?

9             MR. HAEFELE:  Objection to the form.

10       Misstates the evidence.

11       A.    As I testified yesterday, and I'll

12  respond to your question with an explanation again

13  of exactly what I'm meaning in this paragraph.  The

14  9/11 commission did not make findings in all areas

15  of information it had and was available to it.

16             In some cases it makes references to

17  things generically than things specifically.  This

18  should not be surprising.  And it should not be

19  surprising because of the diplomatic sensitivities

20  between the United States and Saudi Arabia, and in

21  particular, the ongoing work that took place

22  throughout the 'OOs, by the United States government

23  to try to get controls on it.  And the Saudi Arabian

24  government to put greater controls on WAMY, the

25  Muslim World League, and the IIRO; which there is an
```

This Transcript Contains Confidential Material

```
 1    extensive record of evidence by the United States to

 2    do that and an expression of that concern that goes

 3    on for many years after 9/11.

 4              If you read carefully what the 9/11

 5    Commission said, I'm not talking about the lack of

 6    completeness of their work, I'm talking about the

 7    lack of completeness of their identifications of all

 8    the charities they're concerned about.

 9              If you read the paragraph carefully, the

10    second sentence makes this clear.  The 9/11

11    Commission did not identify all of the charities or

12    charity officials that funneled money and other

13    support to al-Qaeda.  Instead, it identified a few

14    examples of the charities involved in supporting

15    al-Qaeda using the phrase "such as," which referred

16    to al Haram, rather than providing assessments about

17    each charity, about which it had evidence.

18              And so the rest of my -- the rest of my

19    sentence refers to the decision made by the 9/11

20    Commission not to provide the specifics it found on

21    WAMY, on IIRO, on Muslim World League.  There are no

22    chapters of that report, that commission report,

23    whether the terrorist finance monograph by the

24    staff, which laid out all of the information the

25    government had on those charities, and explained why
```

This Transcript Contains Confidential Material

```
1    the government had ongoing concerns about it.

2              This is not a mistake.  It's not an

3    innocent gap.  It's a matter of intention, in my

4    opinion.  And the intention relates to trying to

5    manage this threat in the context of the overall

6    U.S.-Saudi relationship.

7         Q.    (BY MR. LEWIS)  Who on the 9/11

8    Commission told you that that was the intent of the

9    9/11 Commission?

10        A.    That's my reading of all of the

11   information available to me.  No one at the 9/11

12   Commission stated that to me.

13        Q.    So you -- that's pure speculation on your

14   part; correct?

15             MR. HAEFELE:  Objection to form.

16        A.    No, it's not speculation on my part.

17   That's what I believe this means.  I don't know of

18   any other large international charities operating

19   out of Saudi Arabia that are the three major

20   multinational charities about which the

21   United States government has expressed concerns,

22   many, many times over many, many years.

23        Q.    (BY MR. LEWIS)  The 9/11 --

24        A.    Their absence from being identified in

25   this context when al-Haramain was, for me is
```

This Transcript Contains Confidential Material

```
 1    plots, and you cite at footnote 153, a New York

 2    Times article, "Pakistan Denies Role in Plotting

 3    Bombings in India."  And you state, quite

 4    forthrightly, that the article itself, when you

 5    refer to it, doesn't say anything about Syed Abu

 6    Nasir; correct?

 7         A.    There are two footnotes.  There is a

 8    footnote relating to him, and then there is a

 9    separate footnote relating to the terrorist plots to

10    bomb the American consulates.  I would have to go

11    back to each of them to determine what they covered.

12         Q.    Okay.  Your -- but you've reviewed the

13    New York Times article that you cite at footnote

14    153, and you agree that at least the version that

15    the New York Times maintains doesn't mention a Syed

16    Abu Nasir; correct?

17         A.    I have not reviewed it in the last few

18    days.  I'd have to go look at it.

19         Q.    Well, you say:  I find this information

20    plausible, but I do not know the sources of

21    Emerson's information; the electronically maintained

22    cites provided in his testimony from the New York

23    Times do not cover the Nasir-Al-Gamdin --

24         A.    Now I know what you're talking about,

25    sure.  Right, I went and looked for it.
```

1    Q.    And you didn't find it, did you?

2    A.    No.

3    Q.    I didn't either.

4          And then you quote Senate testimony from

5    Steven Emerson.  And Emerson says that Nasir started

6    with IIRO in Thailand and then was sent to Lahore in

7    1994.  And you say, again, quite forthrightly:  I do

8    not know the sources of Emerson's information.

9    A.    That's right.  When I looked at it, I

10   wanted to see what the basis was, and didn't find

11   it.

12   Q.    Do you know Steven Emerson?

13   A.    Yes.  I don't know him well, but I know

14   who he is.

15   Q.    Are you aware, sir, that there was no

16   IIRO office in Lahore, Pakistan in 1994 or any other

17   time?

18          MR. HAEFELE:  Objection to form.

19   A.    I don't know whether there was or was

20   not.

21   Q.    (BY MR. LEWIS)  Do you have any

22   information about whether IIRO was sponsoring any

23   training that this Mr. Nasir may have received?

24   A.    I provided the basis for the information

25   that I have in this footnote.

This Transcript Contains Confidential Material

```
 1      Q.    Right.  The newspaper article that

 2  doesn't have it and then Steven Emerson.

 3            You are aware that the Prime Minister of

 4  the United Kingdom called Steven Emerson a complete

 5  idiot for saying that Birmingham was a no-go -- a

 6  no-go zone because of Muslims.

 7            Are you aware of his making that

 8  statement?

 9      A.    No, actually I'm not.

10      Q.    Okay.  Let's -- do you want to look at an

11  article and see -- let's look at document N as in

12  nervous, which is 942.

13                (Winer Deposition Exhibit 942, Fox

14                News man is 'idiot' for Birmingham

15                Muslim comments - David Cameron, was

16                marked for identification.)

17      Q.    (BY MR. LEWIS)  Do you see the article,

18  sir?

19      A.    Yes.

20      Q.    And do you see David Cameron?  Do you

21  remember he was the Prime Minister of the

22  United Kingdom in or around 2015, and he's

23  responding to Steven Emerson saying:  In Britain,

24  it's not just no-go zones.  There are actual cities

25  like Birmingham that are totally Muslim, where
```

1    non-Muslims just simply don't go in.  In parts of

2    London, there are actually Muslim religious police

3    who actually beat and actually wound seriously

4    anyone who doesn't dress according to religious

5    Muslim attire.

6              This is an article published by Fox.  It

7    looks like it's published in The Guardian.  Does

8    that kind of commentary concern you about the

9    neutrality or independence of somebody like Steven

10   Emerson?

11             MR. HAEFELE:  Objection, form.

12        A.   I use Mr. Emerson's work with care.  The

13   reason why you have this lengthy footnote is because

14   I was not able to corroborate further.

15             In other areas where he's cited

16   particular religious materials, for example, I've

17   tried to go back and see whether those materials

18   were accurately cited.  So I'm aware that

19   Mr. Emerson's views were developed over a long time,

20   and have included instances such as this, where he

21   has overstepped.  This is not the only one.  There's

22   a second one having to do with the Oklahoma bombing,

23   which I'm well aware.

24        Q.   (BY MR. LEWIS)  Right.  That's the one

25   where he said that the Oklahoma City bombing attack

```
 1    had a Middle Eastern trait because it was carried

 2    out with the intent to inflict as many casualties as

 3    possible, he told CBS News.  Oklahoma City I can

 4    tell you is probably considered one of the largest

 5    sectors of Islamic radical activity outside of the

 6    Middle East.

 7              Is that what you were referring to, sir?

 8         A.   Yes.

 9         Q.   And, in fact, the Oklahoma City bombing

10    was not carried out by Muslims, was it?

11         A.   It was not.

12         Q.   And doesn't these statements taken

13    together -- does that not present to you the

14    portrait of an anti-Muslim bigot?

15              MR. HAEFELE:  Object to the form.

16         A.   I think that people at various times will

17    make -- do make statements that they shouldn't make,

18    And Mr. Emerson on both of these occasions has made

19    statements that he should not have made, on Oklahoma

20    City and on Birmingham.

21         Q.   (BY MR. LEWIS)  Do you think inflicting

22    as many casualties as possible with a bomb is a

23    Muslim trait?

24              MR. HAEFELE:  Object to the form.

25         A.   A Muslim trait?  No.
```

This Transcript Contains Confidential Material

1       A.      Yes.

2       Q.      You also cite in your discussion of

3   Bosnia the testimony of Steven Emerson where he

4   cites a Serb news source as stating that a

5   Mr. Zaher, who was an IIRO person, in the view of

6   Serb officials, was responsible for oversight of the

7   logistics operation to provide Muslim militants with

8   weapons and ammunition.  We've just discussed

9   Mr. Emerson.  He also cites a Serbian website with

10  Serbs found an IIRO ID card on the body of a

11  guerilla in Bosnia.  Would you find a Serbian

12  website reliable as objective information of fact?

13              MR. HAEFELE:  Objection.

14      A.      I would view it to be lead information.

15  It's part of -- it's a data point that you have to

16  look at in the context of everything else.

17      Q.      (BY MR. LEWIS)  Including Mr. Emerson?

18      A.      I wouldn't use Mr. Emerson in connection

19  with the Oklahoma City bombing, if that's what you

20  mean.

21      Q.      I see.  You choose depending on whether

22  it -- I mean, do you think he has any special

23  expertise in Serbia, Mr. Emerson?  Or in -- or is

24  his expertise in -- only in Islamophobia?

25              MR. HAEFELE:  Objection to form.

This Transcript Contains Confidential Material

```
 1      A.     I don't believe his expertise is only in
 2   Islamophobia.  I don't agree with that statement.
 3      Q.     (BY MR. LEWIS)  Does he have expertise in
 4   Serbia and Bosnia?
 5      A.     He has looked at terrorist activity over
 6   a long period of time.  Terrorist activity has
 7   certain criteria and certain components that play
 8   out on a global basis, certain things in common just
 9   as money laundering does and other forms of
10   financial crime.  So you see certain types of
11   constellations of activity that repeat themselves in
12   many areas.
13            As you have pointed out, Mr. Emerson made
14   a fundamental mistake in connection with his
15   assessment on Oklahoma City.  I was in the
16   government at the time, and it struck me as
17   inappropriate at the time, and, of course, it was
18   untrue.  I'm aware of it.
19      Q.     Has Mr. Emerson studied terrorism by
20   non-Muslims to your knowledge?
21      A.     I think he's looked essentially at the
22   Islamic terrorism phenomenon.  There is -- it's a
23   particular phenomenon, from Dan Benjamin and Steve
24   Simon, wrote a book called The Age of Sacred Terror,
25   which is essentially on that phenomenon.  It is a
```

This Transcript Contains Confidential Material

```
 1      Q.    Did you get an audit from Nigeria?

 2      A.    I don't believe so.

 3      Q.    Did you get an audit from Sudan?

 4      A.    I don't believe so.

 5      Q.    Did you get an audit from Ethiopia?

 6      A.    I don't think so.

 7      Q.    Did you get an audit from Azerbaijan?

 8      A.    I don't believe so.

 9      Q.    Would those have been useful to you in

10   preparing your report?

11            MR. HAEFELE:  Objection to the form.

12      A.    I would like to see any and all audits

13   undertaken by IIRO branches for the period relevant

14   to the litigation.

15      Q.    (BY MR. LEWIS)  Okay.  You discuss

16   financial and accounting deficiencies at Islamic

17   charities.  You are aware, are you not, that

18   financial and accounting deficiencies are endemic in

19   charities, not just Islamic charities but charities

20   all over the world; correct?

21      A.    It is a problem in various types of

22   charities, not all charities everywhere, but I've

23   been retained in connection with some, as I

24   testified earlier, domestic and some foreign.

25      Q.    Let's take a look at your note 105.  On
```

This Transcript Contains Confidential Material

```
 1   Gulf state officials, leaders.

 2       Q.    The UAE, as we all recall it.

 3             Mr. Winer, you also referred to a British

 4   study that estimated 2.3 billion pounds in losses at

 5   charities due to fraud in 2016.  So now we're

 6   looking a decade later, those are still enormous

 7   losses for the sector in the UK, are they not?

 8       A.    Yes, this is a risky sector, which

 9   requires greater controls.

10       Q.    Would you agree that if senior officials

11   of a charity are dedicated to stealing money, that

12   the controls don't matter?

13             MR. HAEFELE:  Objection to form.

14       A.    No, I don't agree with that.

15             What I agree with is that controls can

16   make a difference in how easy or how hard it is.

17   When we have red lights and we have speed cameras,

18   you're not going to stop all speeding.  But you're

19   going to reduce -- you're going to make it harder to

20   do and easier to detect; and regulatory systems and

21   accounting controls and so on are designed to make

22   it harder to do and easier to detect when it

23   happens.  And when you fail to have those controls

24   in place, the problem gets worse than when you do

25   have controls in place.
```

This Transcript Contains Confidential Material

```
 1        A.    Nice to meet you, Ms. Pritsker.

 2        Q.    Are you all right to proceed or would you

 3   like to take a break before I go into some of my

 4   questions?

 5        A.    I'm fine.  At some point if they go on

 6   for a while, I might request a break, but I'm fine.

 7        Q.    Of course.  It at any time in my

 8   questioning if you feel the need for a break, please

 9   feel free to ask for one, I just ask that you answer

10   any pending questions before you do so.

11        A.    I understand.

12        Q.    Mr. Winer, the only area that you are

13   claiming to be an expert for the purposes of this

14   case is international financial crime and terrorist

15   financing; is that right?

16              MR. HAEFELE:  Objection to form.

17        A.    My expertise -- I previously in my

18   testimony specified the questions that I was asked,

19   and that I felt that I have expertise to answer the

20   18 questions that I was asked.

21        Q.    (BY MS. PRITSKER)  Mr. Winer, can --

22              My apologies.  Keep going.

23        A.    They include terrorist -- they include --

24   it's actually not 18 questions, it's about 14 or 15

25   questions in 18 sections.
```

This Transcript Contains Confidential Material

```
 1              The first was al-Qaeda and its funding

 2    needs before 9/11, the second was Saudi Arabia as a

 3    source of funds for al-Qaeda and terrorism to 9/11.

 4              The third was charities as a source of

 5    funds for al-Qaeda terrorism from 9/11.  And the

 6    next was charities' impact in building al-Qaeda's

 7    global strike capabilities.  The next was the world

 8    of training camps and building al-Qaeda

 9    capabilities.  The next is why charity records would

10    not show al-Qaeda's support.  The next is

11    implications of financial and accounting

12    irregularities.  The next was al-Qaeda's use of

13    charities for non-terrorist groups.  The next was

14    the role of IIRO Muslim World League and WAMY

15    material support of al-Qaeda.  The next was no

16    separation of purposes of funds used in material

17    support.  Finally, there was purpose of the 13224

18    executive order designation program, the evidence

19    the U.S. needs to designate a person or entity OF

20    that program.  The implications of nondesignation of

21    a person or entity under that program, the

22    implications of withdrawal of designation under that

23    program, and the implications of nondesignation and

24    withdrawal of the UN programs.

25              Those are the questions that I was asked
```

This Transcript Contains Confidential Material

1    and on which I provided my expertise.

2       Q.    Thank you, Mr. Winer.  The list you just

3    provided, those are your opinions in this case.

4    What I'm asking is, what fields would you say that

5    you are an expert in for the purposes of this case?

6       A.    I have expertise in transnational crime

7    and terrorist finance, and I also have expertise in

8    foreign policy with regard to U.S. relations with

9    many other countries and to geopolitical economic

10   and security issues associated with the United

11   States and its relations with many countries, having

12   spent many years at the State Department and Capitol

13   Hill.  And this includes the Middle East.

14          So my expertise goes to financial issues,

15   and financial regulatory issues, it goes to national

16   security issues, and it goes to the specific subset

17   of issues relating to terrorists.  I have particular

18   expertise in banking and banking regulation as well.

19          That's the general areas covered by the

20   questions I've been asked.  My expertise extends

21   beyond that to some other areas that haven't come up

22   in this litigation, to the best of my knowledge.

23      Q.    Based on your response, then, the full

24   list of fields in which you are relying upon your

25   expertise in this case includes transnational --

This Transcript Contains Confidential Material

```
 1        Q.    (BY MS. PRITSKER)  I'm going to restate

 2   my question.  Mr. Winer, can you please describe the

 3   methodology that you applied in this case?

 4        A.    Yes.

 5              MR. HAEFELE:  Objection, asked and

 6         answered.

 7        A.    I was asked a series of questions.  I was

 8   just going through the questions that I was asked.

 9   Because my methodology began with the questions.  In

10   order to answer the questions, I looked at as much

11   of the material that was made available to me as I

12   could relating to this case.  I looked at primary

13   source documents.  I looked at books about this

14   matter.  I looked at academic articles.  I looked at

15   statements by the United Nations.  I looked at

16   statements by treasury officials.  I looked at my

17   own prior testimony.  I looked at the testimony of

18   other people, including many people that I knew.

19              And in looking at all of that, I

20   systematically worked to build out what the answers

21   to those questions would be, based on the record

22   available to me, which included those types of

23   documents and sources as well as my own experience

24   in the United States government during this period

25   of time, in which I was having regular contact with
```

This Transcript Contains Confidential Material

```
 1                      CERTIFICATE
 2        I, DEBRA A. DIBBLE, Registered Diplomate
    Reporter, Certified Realtime Reporter, Certified
 3  Court Reporter and Notary Public, do hereby certify
    that prior to the commencement of the examination,
 4  JONATHAN M. WINER, was duly sworn by me to testify
    to the truth, the whole truth and nothing but the
 5  truth.
 6        I DO FURTHER CERTIFY that the foregoing is a
    verbatim transcript of the testimony as taken
 7  stenographically by and before me at the time, place
    and on the date hereinbefore set forth, to the best
 8  of my ability.
 9        I DO FURTHER CERTIFY that pursuant to FRCP
    Rule 30, signature of the witness was not requested
10  by the witness or other party before the conclusion
    of the deposition.
11
          I DO FURTHER CERTIFY that I am neither a
12  relative nor employee nor attorney nor counsel of
    any of the parties to this action, and that I am
13  neither a relative nor employee of such attorney or
    counsel, and that I am not financially interested in
14  the
    action.
15
16
17
18
19  _____
    DEBRA A. DIBBLE, RDR, CRR, CRC
20  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
21  Certified Court Reporter
22
    Dated: 8-5-2021
23
24
25
```