# EXHIBIT BB



EXHIBIT
900
J. Winer
7/13/2021
Debra A. Dibble, RDR, CRR, CRC

**CITATION:** McDonald and Dickson v. TD Bank, 2021 ONSC 3872
**COURT FILE NO.:** CV-12-9780-00CL and CV-09-8373-00CL
**DATE:** 20210608

# ONTARIO

## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

<div style="writing-mode: vertical">2021 ONSC 3872 (CanLII)</div>

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| | ) | |
| MARK MCDONALD of Grant Thornton (British Virgin Islands) Limited and HUGH DICKSON, of Grant Thornton Specialist Services (Cayman) Ltd., acting together herein in their capacities as Joint Liquidators of Stanford International Bank Limited | ) ) ) ) ) ) | *Lincoln Caylor, Maureen M. Ward, Nathan J. Shaheen, Alexander C. Payne, Meg Bennett, Adam S.W. Zur* and *Shaan P. Tolani,* for the Plaintiffs in the JL Action and the Dynasty Action |
| | ) | |
| Plaintiffs | ) | |
| **– and –** | ) | |
| | ) | |
| THE TORONTO-DOMINION BANK | ) | *Geoff R. Hall, Junior Sirivar, Christine Wadsworth, Alison Bond, Erin Chesney* and *Jacob Klugsberg*, for the Defendant in the JL Action and the Dynasty Action |
| Defendant | ) | |
| | ) | |
| **AND BETWEEN:** | ) | |
| | ) | |
| DYNASTY FURNITURE MANUFACTURING LTD., SHAFIQ HIRANI, HANIF ASARIA, DINMOHAMED SUNDERJI and 2645-1252 QUEBEC INC. | ) ) ) ) | |
| | ) | |
| Plaintiffs | ) | |
| **– and –** | ) | |
| | ) | |
| THE TORONTO-DOMINION BANK | ) | |
| | ) | |
| Defendant | ) | |
| | ) | **HEARD:** January 11-15, 18-22, February 1-5, 8-12, 16-19, March 1-5, 8-12, 15-19, April 26-29, 2021 |

2021 ONSC 3872 (CanLII)

## REASONS FOR JUDGMENT

**Conway J.:**

## INTRODUCTION

[1]     Stanford International Bank Limited ("**SIB**") is an offshore bank in Antigua and Barbuda ("**Antigua**").  Its primary business was the sale of high-yield certificates of deposits ("**CDs**") to high net worth individuals located outside of Antigua.  SIB sold close to USD $8 billion of those CDs.

[2]     The sole ultimate owner of SIB is Robert Allen Stanford.  He, together with three other insiders, operated a massive Ponzi scheme at SIB, the second largest in history.  In 2009, SIB collapsed and was placed into liquidation.  Mr. Stanford is currently serving a 110-year jail term for his role in orchestrating the fraudulent scheme.

[3]     The Toronto-Dominion Bank ("**TD Bank**") was the primary U.S. dollar correspondent bank for SIB for 18 years from 1991 to SIB's collapse in February 2009.  The investors' funds for the purchase and redemption of the CDs flowed through the SIB account at TD Bank.

[4]     There are two actions before me.  The plaintiffs in both actions are suing TD Bank with respect to its role as the primary U.S. dollar correspondent bank for SIB.  The first is an action by Messrs. McDonald and Dickson in their capacities as joint liquidators of SIB (the "**Joint Liquidators**" or "**JLs**").  They advance claims on behalf of SIB against TD Bank for knowing assistance in breach of fiduciary duty and for negligence (the "**JL Action**").  The second is an action by the Dynasty plaintiffs, purchasers of the CDs, against TD Bank.  They are advancing their own personal claims against TD Bank for knowing assistance in breach of fiduciary duty (the "**Dynasty Action**").

[5]     For the reasons that follow, I have concluded that TD Bank is not liable for the plaintiffs' losses sustained as a result of Mr. Stanford's fraudulent scheme.  The actions are dismissed.

## STRUCTURE OF THESE REASONS

[6]     This was a lengthy trial that lasted 43 days.  Twenty-nine fact and expert witnesses testified.  Thousands of documents were entered as exhibits.  The events in issue go back decades.  There are numerous factual and legal issues to be decided.

[7]     Given the breadth of this case, and to put matters in their proper context, I have structured and organized these Reasons for Judgment as follows:

2021 ONSC 3872 (CanLII)

| Section 1 | Positions of the Parties |
|-----------|--------------------------|
| Section 2 | Onshore and Offshore Banks and the Role of Correspondent Banks |
| Section 3 | SIB, its History, Business and Eventual Collapse |
| Section 4 | TD Bank's Relationship with SIB |
| Section 5 | Factual Findings |
| Section 6 | Cause of Action #1 – Knowing Assistance in Breach of Fiduciary Duty (Both Actions) |
| Section 7 | Cause of Action #2 – Negligence (JL Action only) |
| Section 8 | Causation |
| Section 9 | Damages |
| Section 10 | TD Bank's Defences – Limitations and *Ex Turpi Causa* (JL Action only) |

## SECTION 1: POSITIONS OF THE PARTIES

[8]     In order to frame my review of the facts, I am articulating the parties' positions at the outset.

[9]     The plaintiffs in both actions admit that TD Bank had no actual knowledge of Mr. Stanford's fraudulent scheme at any point during the period that TD Bank operated the SIB account from November 1991 to February 2009 (the "**Relevant Period**").

[10]     The JL Action is brought on behalf of SIB, a customer of TD Bank.  The JLs' position is that SIB was a solely-owned, offshore bank operating in Antigua when it sought to open a correspondent banking account with TD Bank.  The JLs submit that the profile of SIB presented an inherent risk, namely that TD Bank's correspondent facilities might be used by SIB's sole owner, Mr. Stanford, to misappropriate SIB's assets for his own use.  The JLs refer to this as the risk of "**insider abuse**".

[11]     The JLs submit that TD Bank failed to adhere to the fundamental principles of know your client ("**KYC**"), due diligence, and basic banking practices and that if it had done so, it never would have opened the SIB account in the first place.  They submit that once the account was opened and due to the facts and circumstances that became known to TD Bank over the Relevant

Period, the risk of insider abuse increased to an intolerable level.  The JLs submit that these facts and circumstances should have caused TD Bank to reconsider its relationship with SIB and close down the account.

[12]     The JLs submit that TD Bank was reckless or wilfully blind to the risk of insider abuse at SIB and is therefore liable to SIB for knowing assistance in breach of fiduciary duty.  Alternatively, they say that TD Bank is liable to SIB in negligence.

[13]     The JLs submit that TD Bank's failure to close the SIB account enabled Mr. Stanford to sell CDs and receive funds through the TD Bank correspondent account.  This in turn enabled Mr. Stanford to perpetrate his Ponzi scheme and misappropriate SIB's assets.  The JLs submit that if TD Bank had closed the account, SIB would not have been able to continue selling the CDs, SIB would have ceased doing business earlier than in 2009, and Mr. Stanford would not have been able to continue his misappropriation of SIB's assets.

[14]     The Dynasty Action is brought by purchasers of the CDs.  They are not customers of TD Bank.  They originally brought their claim based on knowing assistance and negligence.  At trial, they pursued only their claim for knowing assistance on the same basis as the plaintiffs' claim in the JL Action.

[15]     TD Bank's position is that this was an ordinary correspondent banking relationship that operated without incident for 18 years until Mr. Stanford's fraudulent scheme became public.  It had no knowledge of the scheme or any reason to suspect that Mr. Stanford was perpetrating a fraud.  TD Bank submits that there is no basis for a claim in knowing assistance in either action.  It further submits that it had no duty to SIB unless TD Bank had actual knowledge of the fraud.  It submits that in any event, it met the applicable standard of care.  TD Bank disputes that its conduct caused any of the plaintiffs' losses.  It disputes the theory and calculation of damages.  Finally, TD Bank asserts that the JLs' claim is barred by the limitation period and the doctrine of *ex turpi causa*.

## SECTION 2: ONSHORE AND OFFSHORE BANKS AND THE ROLE OF CORRESPONDENT BANKS

[16]     This case concerns SIB, an "**offshore bank**", and TD Bank, its correspondent bank.  Mr. Stanford also owned Bank of Antigua, an "**onshore bank**".  There are fundamental differences between onshore and offshore banks.  An onshore bank (sometimes called a domestic bank) is one that is permitted to conduct banking activities within its licensing jurisdiction and to provide banking services to residents of that jurisdiction.

[17]     By contrast, an offshore bank is prohibited from providing banking services to residents of its licensing jurisdiction.  It receives its license from and pays fees to the local authorities but is only permitted to provide banking services to people located outside the jurisdiction.  Since offshore banks do not provide banking services to local residents, this has raised concerns of inadequate regulation of the offshore banking sector.

2021 ONSC 3872 (CanLII)

[18]    SIB was an offshore bank licensed in Antigua.  Its customers were located outside of Antigua.  Those customers used foreign currency (mainly U.S. dollars) to purchase the CDs sold by SIB.  To carry on business with its customers, SIB required the services of a "**correspondent bank**".

[19]    Correspondent banking involves the provision of services by one bank (the correspondent bank) to another bank (the respondent bank) to facilitate the movement of funds, exchange of currencies, and/or settlement of obligations.  A correspondent bank effectively acts as the respondent's agent or conduit, executing and/or processing payments or other transactions for the respondent and its customers.  Typically, a correspondent banking relationship occurs when a correspondent bank in one jurisdiction provides services to a respondent bank in another foreign jurisdiction.

[20]    While correspondent banking services are important to all banks, they are critical to offshore banks.  As SIB's former accounting manager Omari Osbourne testified, this is because offshore banks are unable to send, receive or hold any funds from their international customers without correspondent banking services.    Offshore banks operate exclusively through correspondent accounts at other banks.  Edward St. Clair Smith, SIB's former Manager, testified that, as an offshore Antiguan bank selling CDs in U.S. dollars, a U.S. dollar correspondent account was the "lifeblood" of SIB's ability to operate.

## SECTION 3: SIB, ITS HISTORY, BUSINESS AND EVENTUAL COLLAPSE

[21]    The following factual background about SIB is taken from the parties' agreed statement of facts or, unless otherwise noted, from facts that were undisputed at trial.

### Incorporation of Guardian, Acquisition of Bank of Antigua

[22]    Mr. Stanford originally incorporated his offshore bank in 1985 under the name Guardian International Bank Limited ("**Guardian**") in the British Overseas Territory of Montserrat ("**Montserrat**").  At the time, he was a 35-year old U.S. citizen with no prior banking experience.  A few months earlier, he had declared personal bankruptcy in Texas arising from over USD $13 million in personal debts as a failed gym operator.

[23]    Mr. Stanford was the sole owner of Guardian, as well as a director and President and Chief Executive Officer.  Mr. Stanford hired his former college roommate, James Davis, as Guardian's Vice President and Controller.  From 1985 to December 1990, Guardian operated in Montserrat as an offshore bank.  It then migrated to Antigua where Mr. Stanford was in the process of acquiring Bank of Antigua, a domestic bank.

[24]    From the early 90s onwards, Mr. Stanford was the sole owner of both an onshore bank (Bank of Antigua) and an offshore bank (Guardian).  In 1994, Guardian changed its name to Stanford International Bank Limited.  Unless otherwise noted, I will refer to Guardian as SIB for the balance of these reasons.

2021 ONSC 3872 (CanLII)

**The Business of SIB**

[25]    SIB's primary business was the sale of CDs to customers located outside of Antigua.  SIB's sales were based on representations made in SIB marketing materials and from personnel of the Houston, Texas-based Stanford Financial Group (the "**Stanford Group**").  The Stanford Group was a group of more than 100 Stanford-owned entities that employed thousands of employees and operated across the United States, Europe, the Caribbean, Canada and Latin America.

[26]    One of the Stanford Group companies was Stanford Group Company ("**SGC**"), a U.S.-based broker dealer and investment advisory firm with offices across the U.S.  SGC was first registered as a broker dealer with the Securities and Exchange Commission ("**SEC**") in October 1995.

[27]    SIB employees had primary responsibility for accurately recording purchases of the CDs, liabilities to customers, and redemption requests.  However, they were not responsible for SIB's treasury or investment functions, which were provided by other Stanford Group entities under related party contracts.  Therefore, the SIB employees did not know the true nature of SIB's assets.

[28]    SIB's sales of CDs increased dramatically from 1991 to 2008.  According to its financial statements, SIB's liabilities to purchasers of CDs, including accrued but unpaid interest, increased from USD $97 million in 1991 to USD $7.4 billion in 2008.

**The Fraudulent Scheme**

[29]    Mr. Stanford and the other perpetrators (the "**Perpetrators**") devised a scheme to fraudulently misappropriate and misapply SIB's assets.  Mr. Davis later admitted in his guilty plea agreement that he and Mr. Stanford were perpetrating their fraudulent scheme while operating Guardian in Montserrat.

[30]    As part of the scheme, Messrs. Stanford and Davis led potential and actual customers to believe that SIB earned consistently high investment returns allowing it to pay the guaranteed returns on its CDs and fund all redemption requests.  However, due to their misappropriation of SIB's assets, redemptions needed to be paid from new investor funds.

[31]    Mr. Stanford reported misleading investment types and fictitious investment balances because SIB did not have enough valid assets to back its CD liabilities. To do so, Mr. Stanford divided SIB's investment portfolio into three tiers. Two of the tiers were legitimate.  Tier 1 contained cash or cash equivalents.  Tier 2 contained various investment portfolio investments managed by arm's length third party financial institutions.

[32]    Tier 3 was illegitimate.  It consisted of illiquid and risky investments such as real estate and private equity, and ultimately contained at least USD $2 billion of personal loans to Mr. Stanford.  The composition of Tier 3 was known only to the Perpetrators.  Although Tier 3 made up 75% to 80% of SIB's investment portfolio, the Tier 3 investments were not separately identified on SIB's balance sheet.

2021 ONSC 3872 (CanLII)

2021 ONSC 3872 (CanLII)

[33]    Since the amount of investments in the CDs was accurately reported by SIB employees, the Perpetrators made it appear as though enough revenue was being generated to pay the returns promised to investors.  They did this by disseminating false financial information to conceal the lack of actual investment returns, fabricating excess revenue to make it appear that SIB was both solvent and profitable, and taking steps to conceal the fraudulent scheme.

[34]    Mr. Stanford bribed SIB's auditor, Charlesworth Hewlett of C.A.S. Hewlett & Co., an Antiguan audit firm, in return for which it did not verify SIB's investment portfolio and issued unqualified opinions on SIB's financial statements each year.  Mr. Stanford also bribed Leroy King, the Chair of the Financial Services Regulatory Commission in Antigua, to ensure that the regulator did not accurately review or audit SIB's financial statements as part of its regulatory function.

[35]    As a result of the fraudulent scheme, by February 16, 2009, only approximately USD $678 million in identifiable or traceable assets remained in SIB compared to the USD $7.4 billion owed to its customers.

**SEC Obtains the Freeze Order; SIB is Placed into Liquidation; Mr. Stanford and Others are Held to Account**

[36]    On February 16, 2009, the SEC filed civil charges in the U.S. District Court for the North District of Texas (Dallas Division) against, among others, Messrs. Stanford and Davis.  The SEC alleged a massive ongoing fraud involving the CDs.  That day, the U.S. court appointed Ralph Janvey as receiver (the "**U.S. Receiver**") over, among others, Messrs. Stanford and Davis and all entities that Mr. Stanford owned or controlled, including SIB.  It also rendered an order preventing SIB and other Stanford Group entities from carrying on business (the "**Freeze Order**").

[37]    On February 26, 2009, the Eastern Caribbean Supreme Court in the High Court of Justice, Antigua and Barbuda, appointed Nigel Hamilton-Smith and Peter Wastell as joint receiver-managers of SIB.  On April 15, 2009, the court appointed them as the original joint liquidators of SIB.  In 2010, the court removed them pending the appointment of new joint liquidators for SIB.  That occurred in May 2011 with the appointment of Marcus A. Wide and Hugh Dickson.  In November 2018, on Mr. Wide's retirement, the court replaced him with Mark McDonald as one of the Joint Liquidators.

[38]    The Perpetrators were held to account for their actions in connection with the fraudulent scheme.  On March 6, 2012, Mr. Stanford was convicted by a U.S. federal jury for his role in perpetrating the Ponzi scheme.  He was later sentenced to 110 years in prison and ordered to forfeit USD $5.9 billion.  On August 27, 2009, Mr. Davis entered into a plea agreement in which he pleaded guilty to his role in the fraudulent scheme.  He was later sentenced to five years in prison, three years of supervised release, and a judgment of USD $1 billion was rendered against him.  On November 19, 2012, Gilbert T. Lopez and Mark J. Kuhrt, officers of other Stanford Group companies, were convicted by a U.S. federal jury for their role in the scheme and later sentenced to 20 years in prison.

[39]    The Perpetrators were the only individuals employed by the Stanford Group entities who were convicted of perpetrating the fraudulent scheme.  No SIB employees were ever accused, tried or convicted of any criminal offences in connection with Mr. Stanford's fraudulent scheme.

## SECTION 4: SIB'S RELATIONSHIP WITH TD BANK

[40]    The relationship between SIB and TD Bank started in 1991.  In this section, I will review in general the chronology of that relationship from account opening in 1991 to its closing in 2009. While much of the evidence is set out for context, the plaintiffs made it clear in their closing submissions that they are relying on five events and dates that could give rise to liability on the part of TD Bank: Account Opening (November 1991); FinCEN Advisory (April to September 1999); Period following the Senate Report (February to July 2001); Philadelphia Inquirer Article (April 2003); and Reputational Risk Memorandum (February 2007).

## Account Opening – 1991 (Plaintiffs' Potential Liability Date #1)

[41]    Stephen Cullen was the SIB relationship manager at TD Bank from 1991 to 2000.  He testified that in 1991, he was the director of a group that dealt with correspondent banking in the Latin America and Caribbean regions.  At the time, TD Bank had many correspondent bank account relationships in the region.  Mr. Cullen testified that he started with 20 and this amount grew to 100 over time.

[42]    In February 1991, Mr. Cullen was on a joint marketing trip to Antigua with a representative of Bank of New York, which was looking to exit its Caribbean correspondent business and transfer its accounts to TD Bank.  They met with Bank of Montserrat and Antigua Commercial Bank, who referred them to Bank of Antigua (not a Bank of New York customer).  Mr. Cullen met with Bank of Antigua's then General Manager William McDavid, who Mr. Cullen recognized from a prior conference in Anguilla.  They also met with Mr. Davis, the Chief Financial Officer of the Stanford Group.  Mr. Cullen learned that arrangements were being made for a new private owner to take over Bank of Antigua and that the new owner would be Mr. Stanford, who was based out of Houston.  Mr. Cullen testified that he was told that Mr. Stanford's acquisition of Bank of Antigua was only forthcoming when the FBI and Interpol had given Mr. Stanford a clean bill of health.  He understood that an offshore bank was being established by Mr. Stanford at the same time and would be known as Guardian Trust.

[43]    Mr. Cullen testified that he received references from Bank of Antigua's then correspondent banks that its accounts were handled satisfactorily (although he acknowledged that those references related to a period prior to Mr. Stanford's acquisition of Bank of Antigua).  He confirmed that the Antiguan license was issued to Bank of Antigua.  He asked one of his colleagues to check on Stanford Group in Houston and testified that he received positive feedback. He testified that he had no concerns about Bank of Antigua.

[44]    On April 19, 1991, Bank of Antigua requested that TD Bank provide it with U.S. and Canadian dollar correspondent accounts.  A few days later, TD Bank opened the accounts.  Mr.

2021 ONSC 3872 (CanLII)

Cullen testified that he understood that Bank of Antigua's correspondent accounts would be used primarily by tourists visiting Antigua with some connection to Canada.

[45]   Six months later, on November 18, 1991, TD Bank received a letter from Mr. St. Clair Smith asking to open Canadian and U.S. dollar correspondent accounts for SIB (Guardian at that time).[1]   That day, TD Bank opened the correspondent accounts for SIB.  Mr. Cullen testified that he followed normal procedures in opening the SIB account.  He said that the existing relationship with Bank of Antigua, and the due diligence he had done on that bank, were relevant to opening the SIB account and that TD Bank had had satisfactory experience up to that point.  Mr. Cullen testified that his understanding was that SIB was a new business with no prior history.  He did not find out that SIB had operated in Montserrat or that Mr. Stanford had previously been a bankrupt.

**Operation of the Accounts in the 90s**

[46]   Mr. Cullen continued as the relationship manager for SIB until 2000.  During the 90s, TD Bank had various routine calls and meetings in Antigua and Houston with Bank of Antigua and SIB personnel, including Mr. St. Clair Smith and Juan Rodriguez Tolentino, both experienced bankers.[2]   The meetings focussed on operational issues and other services that TD Bank could provide.

[47]   Mr. Cullen testified that he had no concerns with the relationship.  Apart from his dealings with the two bankers at SIB, he reviewed SIB's annual reports, which led him to believe that SIB appeared to be a genuine bank moving forward and increasing its assets each year.  Mr. Cullen testified that he followed up to see whether Mr. Stanford got his SEC license and did informal reference checking but nothing about SIB ever came up.

[48]   In June 1993, Mr. Cullen opened a U.S. dollar correspondent account for another solely-owned offshore Antiguan bank, American International Bank Ltd. ("**AIB**").  By 1997, Mr. Cullen closed AIB's U.S. dollar correspondent account due to his concerns that the account was being used to facilitate fraud by AIB's sole owner.  AIB subsequently collapsed due to the fraud.  Mr. Cullen agreed that he had questions about the Antiguan regulator because it had let the AIB situation occur.  He testified, however, that he had no concerns about SIB.

[49]   TD Bank points out that there were significant differences between SIB and AIB that explain why the AIB account was shut down while the SIB account was maintained.  Those included: (i) AIB had no physical presence or staff in Antigua and had relationships with other shell banks; (ii) AIB had nested correspondent relationships; (iii) AIB had payable through accounts with its U.S. dollar correspondents; (iv) AIB had internet gambling customers; and (v) SFG was regulated by the SEC in the United States and AIB was not.  In particular, there were

---

[1] The letter followed a letter dated November 12, 1991 from Mr. Davis to Mr. Holt, Assistant Manager of Correspondent Banking of TD Bank, and a telephone conversation between Messrs. Davis and Holt on November 18, 1991.
[2] Both Mr. Smith and Mr. Rodriguez Tolentino had worked for CIBC and Bank of Nova Scotia in the Caribbean and Mr. Rodriguez Tolentino had also worked for Bank of Boston in Puerto Rico.

2021 ONSC 3872 (CanLII)

problems with AIB's TD Bank account, including a series of fraudulent or NSF cheques that AIB presented that resulted in a significant potential loss for TD Bank.[3]  On the other hand, Mr. Cullen testified that he never had any concerns about SIB while he was the relationship manager.

[50]    Mr. Cullen testified that in 1998, SIB advised him that nearly USD $3.2 million belonging to suspected Mexican money launderers had been frozen by U.S. law enforcement authorities in accounts at SIB and that SIB had cooperated with authorities.  He testified that he viewed this as a positive event because he understood that SIB had good anti-money laundering practices and had detected and handed over the funds.

## The FinCEN Advisory – 1999 (Plaintiffs' Potential Liability Date #2)

[51]    In April 1999, the U.S. Department of Treasury's Financial Crimes Enforcement Network issued an advisory concerning Antigua (the "**FinCEN Advisory**").  The FinCEN Advisory was the second time that FinCEN had issued an advisory about a specific country (previously, Seychelles) and was much stronger than the prior advisory.  The FinCEN Advisory was directed at U.S. banks.  It advised them to give enhanced scrutiny to all financial transactions routed into or out of Antigua.  It stated that the Antiguan government had weakened its money-laundering legislation and that in 1998 it had changed the supervision of its offshore financial services sector by vesting authority in a new International Financial Sector Authority, whose board of directors "includes representatives of the very institutions the Authority is supposed to regulate, thus raising serious concerns that those representatives are in fact in control of the Authority…".

[52]    Jonathan Winer, a U.S. lawyer who testified as both a fact and expert witness for the JLs at trial, had direct involvement with the FinCEN Advisory when he worked in the U.S. State Department.  He testified that although it did not name Mr. Stanford or SIB, the FinCEN Advisory's reference to representatives sitting on the regulator's board was a reference to Mr. Stanford.  He admitted that the advisory, which referred to the fact that there were 50 offshore banks in Antigua, did not identify Mr. Stanford as one of the "representatives" sitting on the board.

[53]    Even though Mr. Stanford was not named as the target of the advisory, various media articles made the connection.  In April 1999, *The Wall Street Journal* published an article entitled "U.S., Antigua Duel on Money Laundering – Highflying Houston Financier is Caught in the Middle".  It described the tension between the U.S. and Antigua over recent changes to money-laundering laws in Antigua and said that the U.S. alleged that Antigua had not gone far enough in discouraging criminals from hiding dirty money in Antiguan offshore banks.  It stated that Mr. Stanford had been a major player behind Antigua's changes to its money laundering laws.  It stated that the U.S. was concerned about the fact that "Mr. Stanford – a major contributor to the recent re-election campaign of Prime Minister Lester Bird and the biggest banker on the island – was, along with another prominent banker, named to sit on a new board that has since been reconstituted to supervise the offshore sector, a seeming conflict of interest."  However, the article also stated

---

[3] On cross-examination, the plaintiffs' expert Mr. Delston conceded that he had not taken these differences into account when he gave his opinion that TD Bank should have closed the SIB account as it did the AIB account.

2021 ONSC 3872 (CanLII)

that some people viewed the legislative amendments as positive as they resulted in a clean-up of the offshore sector in Antigua.  There is no evidence that TD Bank had the article in hard copy or that it was available online at the time.

[54]    Mr. Stanford resigned from the board of the regulator shortly after his appointment in 1998.  By April 1999, the board was replaced with public officials who were not involved in the banking industry.

[55]    Mr. Cullen testified that he never became aware of the FinCEN Advisory or any of the media reports relating to the FinCEN Advisory.

[56]    On September 29, 1999, months after the FinCEN Advisory and the surrounding publicity, Mr. Davis wrote to Mr. Cullen stating: "I am sure you are aware of recent reports in the media, detailing questionable banking practices, which involve transactions with financial institutions located in offshore jurisdictions."  He offered to have SIB's legal department present its anti-money laundering and KYC program to TD Bank's compliance department or others.  Mr. Cullen's associate declined the offer but requested copies of the policies.  Mr. Davis sent the policies to him.

[57]    The FinCEN Advisory was withdrawn in August 2001.  The withdrawal described the significant reforms that Antigua had made to its counter-money laundering system and stated that enhanced scrutiny of Antiguan offshore banks was no longer required.

[58]    In April 1999, at the same time the FinCEN Advisory was issued, the United Kingdom issued a similar advisory to British banks.  It did not come to the attention of TD Bank at the time.  The U.K. advisory asked British financial institutions to pay particular attention to transactions involving Antiguan offshore financial institutions.  It did not prohibit or recommend that such transactions cease.  In November 2000, the U.K. advisory was modified after improvements in anti-money laundering regulations were made in Antigua.  In July 2001, the U.K. advisory was withdrawn.[4]

[59]    Canada did not issue any such advisory to Canadian banks on transactions with Antiguan offshore banks.

**Operation of the Accounts from 2000 Onwards**

[60]    In the early 2000s, Mr. Cullen, on his retirement, started the transition process for the SIB accounts to William Sebenski, who had been responsible for TD Bank's correspondent banking

---

[4] The plaintiffs note that there were several transactions through the SIB accounts while the FinCEN Advisory was in place.  On April 20, 1999, USD $400,000 was sent to Bank of Antigua to be credited to the Antiguan International Financial Sector Authority.  In August 1999, there were two transfers to Mr. Stanford personally.  There was insufficient evidence from the witnesses about these transactions at trial for me to draw any conclusions. In oral submissions, the plaintiffs' counsel acknowledged that this is not a transaction case but rather a relationship case.  They do not allege that TD Bank was put on notice of Mr. Stanford's fraud through any specific transactions.

relationships in the United States.  Mr. Cullen brought him up to speed about all Caribbean correspondent relationships, including the Stanford accounts.  Messrs. Cullen and Sebenski went together to meet with Stanford Group personnel in Houston.

[61]     As part of the transition process, Mr. Sebenski reviewed all of TD Bank's correspondent relationships in the region to determine which ones to keep open.  Mr. Cullen worked with him in deciding which ones to close and which ones to keep.  Mr. Sebenski testified that SIB and Bank of Antigua relationships were among the relationships reviewed at this time.  He testified that, as part of the review, everyone looked at the relationships and a recommendation was made to keep the SIB and Bank of Antigua accounts.

[62]     Mr. Sebenski testified that he considered the TD Bank country risk rating for Antigua, the length of the relationship, and the fact that there had been no issues with the account to date.[5]  He also testified that he took comfort from the fact that Mr. Stanford's Houston operation, which sold the CDs for SIB, was a major part of the operation and that it was regulated by the SEC.  Mr. Sebenski testified that he was aware of the FinCEN Advisory before it was withdrawn in August 2001 but could not remember exactly how or where he became aware of it.  He testified that the information in the advisory was taken into account in his review through the high-country risk rating that TD Bank had assigned to Antigua.

[63]     In 2002, Mr. Sebenski was joined in the TD Bank's Financial Institutions Group by Tarik Muzaffar, who became the Relationship Manager and Region Head for the TD Bank's correspondent banking relationships in the Latin America and Caribbean region ("**LATAM**").  Mr. Muzaffar remained in this role until late 2008.

### Senate Report on Correspondent Banking and TD Bank's Response – 2001 (Plaintiffs' Potential Liability Date #3)

[64]     On February 5, 2001, the Permanent Subcommittee on Investigations of the U.S. Senate Committee on Governmental Affairs released its report entitled "Correspondent Banking: A Gateway for Money Laundering" (the "**Senate Report**").

[65]     The Senate Report was a comprehensive report on the ways that criminals use correspondent banking as a gateway for money laundering and financial crime.  It contained warnings about the risks of providing U.S. dollar correspondent services to offshore banks, particularly those in Antigua.  The opening line of the Senate Report stated that U.S. dollar correspondent accounts "provide to foreign banks…conduits for dirty money flowing into the

---

[5] In February 2001, TD Bank had placed holds on the correspondent accounts of both SIB and Bank of Antigua.  Mr. Sebenski described those holds as a mistake and noted that the correspondent accounts of SIB and Bank of Antigua had been put on the review list, not the close list.  By June 2001, SIB and Bank of Antigua were placed on a spreadsheet named: "Accounts Recommended to Exit".  Mr. Sebenski was asked about the spreadsheet and his notations on it at trial.  He testified that he added the comment "Remains Open" to the SIB and Bank of Antigua accounts. On July 30, 2001, Mr. Sebenski signed a "Know Your Customer Application" for SIB.  The application indicated that the "Country regulatory Environment Rating" for SIB was "Very High Risk".  I accept Mr. Sebenski's evidence that this was all part of the review process that he undertook in 2001.

American financial system and have, as a result, facilitated illicit enterprises, including drug trafficking and financial frauds."

[66]    The Senate Report included case studies of high-risk foreign banks with U.S. dollar correspondent accounts.  One of the case studies was TD Bank's relationship with AIB, which Mr. Cullen had terminated in 1997.  The Report noted that the concerns involving AIB included "Financial fraud money".  The Report made no reference to Bank of Antigua or SIB.

[67]    The Report stated that the industry norm with respect to correspondent banking as of 2001 was for U.S. banks to have "dozens, hundreds, or even thousands of correspondent relationships, including a number of relationships with high risk foreign banks".  It noted that virtually every U.S. bank had accounts with offshore banks and that the prevailing principle among U.S. banks was that any bank holding a valid license issued by a foreign jurisdiction qualified for a correspondent account.[6]

[68]    After the Senate Report was issued, TD Bank's then CEO directed TD Bank's Internal Audit Group to perform an audit of TD Bank's correspondent banking practices.  Vince Chang, who was in the Audit Group at the time, testified about the steps he took in relation to the "general process" audit.  He reviewed the Caribbean banking relationships as part of the audit.  He focussed on account opening procedures, reviewed the portions of the Senate Report that mentioned TD Bank, and spoke to members of the correspondent banking group, including Messrs. Cullen and Sebenski.  The report prepared at the end of the audit concluded that there was a lack of proper account opening documentation and KYC information in the files and that the rating was therefore "unsatisfactory".   In December 2005, the Internal Audit Group upgraded its conclusion to "Satisfactory", although noted that there were still some areas for improvement.

**The Events of 9/11 and Changes to Bank Procedures**

[69]    After the attacks on September 11, 2001, there was an increased focus on correspondent banking as a potential conduit for money laundering and terrorist financing that led to the strengthening of anti-money laundering ("**AML**") and KYC standards.  I will discuss those standards in further detail below in Section 7 (Negligence).

[70]    TD Bank's evidence is that it strengthened its own practices to comply with the Canadian requirements of enhanced due diligence.  Mr. Sebenski testified about TD Bank's strengthened procedures after 9/11, such as ensuring its corresponding banking clients had strong AML and KYC policies and procedures in place.  Mr. Muzaffar also testified that TD Bank enhanced its policies and process for reviewing clients in correspondent banking and that SIB seemed to take AML seriously.  He testified that SIB had a very good handle on what those risks were, that it was very vigilant on money laundering, and that it had a good, strong policy.

---

[6] The Senate Report included the results of a survey of 20 correspondent banks conducted in February 2000, which stated that most banks had no relationships in Antigua but one had 12 such accounts.

2021 ONSC 3872 (CanLII)

[71]    Mr. Sebenski testified that TD Bank increased its monitoring of account activity and that SIB received the highest monitoring activity due to the risk rating of Antigua at the time.   The evidence of Mr. Doyle and Mr. Chang is that the monitoring of SIB's transactions took place across multiple groups in TD Securities, including the Financial Institutions Group, the AML Group (defined below), the fraud department, and the compliance group.   There were no reports of money-laundering involving customers of SIB.

[72]    As a result of the increased KYC requirements post-9/11, TD Bank escalated its KYC renewals, which involved collecting detailed documentation and information from SIB.   It also increased the frequency of its meetings with SIB.   There were 21 such meetings between 2001 and 2008.   Mr. Mersch testified that at the meetings, they discussed operational and service issues and often did the KYC renewals at the same time.

### The Philadelphia Inquirer Article – 2003 (Plaintiffs' Potential Liability Date #4)

[73]    In 2000, TD Bank established an Anti-Money Laundering Group (the "**AML Group**"), headed by Martin Doyle.   He testified that initially the AML Group's main function was to conduct name screening for sanctions using the online search tools to which the group had access.   In 2003, the group's capabilities evolved to also be able to assess risk scores for countries.   Over time, the group evolved into a resource where individuals in the business lines would regularly come to the group with questions or concerns about KYC and due diligence.   However, as Mr. Muzaffar testified, although the AML Group provided valuable assistance, it was "additive" to the Financial Institutions Group's own due diligence efforts.

[74]    On April 23, 2003, Mr. Muzaffar sent an email to Mr. Doyle.   The email had the subject line "Stanford International Bank Limited, Bank of Antigua Limited and related ownership".   It stated that they were reviewing the KYC for those banks and wanted Mr. Doyle's input.   Mr. Muzaffar asked if Mr. Doyle had any information on Mr. Stanford and his two Antiguan holding companies.   He noted that the Stanford Group included a U.S. brokerage with a head office in Houston that was regulated by the SEC.

[75]    The same day, Messrs. Sebenski and Muzaffar received an email from a junior correspondent banker named Paul Kamin.   The email, which had been flagged for "Follow up", contained a link to an August 28, 2002 article in The Philadelphia Inquirer entitled "Offshore banker is Toricelli key donor" (the "**Philadelphia Inquirer Article**").   The article focussed on Mr. Toricelli, a U.S. politician, and referred to contributions that Mr. Stanford had made to a defence fund for legal proceedings in which Mr. Toricelli was involved.[7]

---

[7] The plaintiffs point to a report from the previous year, February 2002, by Public Citizen, a non-profit government watchdog group, on U.S. lobbying.   The report contained a section describing a case study on Mr. Stanford, entitled: "Stanford Financial Group Uses 527s As It Fights Money Laundering Legislation".   Very few questions were posed to the TD Bank witnesses about that report or TD Bank's response to it.

2021 ONSC 3872 (CanLII)

[76]    The Philadelphia Inquirer Article linked Mr. Stanford to the FinCEN Advisory.  It stated that three years before, Mr. Stanford had become embroiled in a bitter dispute with U.S. authorities who said he was using his financial and political clout to subvert banking laws in Antigua, threatening to make it a haven for money launderers.  It stated that Mr. Stanford's name was never mentioned in the advisory but that U.S. officials said they were referring to Mr. Stanford.  The article noted that Mr. Stanford had stepped down from the board of the regulator and that the U.S. officials had backed off and the conflict had died down.  The article quoted a lawyer retained by Mr. Stanford who said that he had actually helped to clean up the industry by enacting rules that would discourage money launderers.

[77]    Mr. Doyle testified that Messrs. Sebenski and Muzaffar never provided the Philadelphia Inquirer Article to him.  On April 28, 2003, Mr. Doyle responded that neither Mr. Stanford "nor any of the entities appear on any list anywhere in the world and their reputation appears to be unsullied.  There are no reported investigations into any of the U.S. based entities.  All in all they appear clean, and are generally regarded in favorable terms owing to the fact they are huge benefactors of economic development in Antigua".  He said that he received a daily news bulletin on regulatory issues and would let them know if anything came up on Mr. Stanford or any Stanford entities.  Mr. Doyle confirmed at trial that nothing came up.

[78]    At trial, when he was shown the Philadelphia Inquirer Article for the first time, Mr. Doyle agreed that the contents of the article were inconsistent with his conclusion that Mr. Stanford's reputation was unsullied and the complete opposite of the conclusions he had provided to Messrs. Sebenski and Muzaffar.

[79]    Messrs. Sebenski and Muzaffar testified that they do not recall the particular circumstances surrounding their review of this article in 2003.  Mr. Sebenski said that he likely saw it back then but could not testify about what he thought about it or did with it at the time.  When asked about the article at trial, Mr. Sebenski testified that it seemed mostly about "the politician, Toricelli" and that it was an "old story. This is talking about something that happened with Stanford three years ago. And it says he stepped down from the agency that regulated his offshore bank, but I believe he was trying to help."

## Mr. Mersch Becomes Head of the Group – 2003

[80]    In 2003, Wolfgang Mersch became Head of TD Securities' Trade Finance and Financial Institutions Group.  He testified that, given the scope of his responsibilities and the number of personnel under his command, he relied on the TD Bank personnel who reported to him, including Messrs. Sebenski and Muzaffar.

[81]    Mr. Mersch testified that in the entire 2003 to 2009 period he did not come across any reason not to keep the SIB relationship with TD Bank, and that there was in fact no information that came to his attention that caused him to feel uncomfortable.  In June 2004, Mr. Mersch went with Mr. Sebenski to meet with Stanford Group personnel in Memphis, Tennessee because he

2021 ONSC 3872 (CanLII)

2021 ONSC 3872 (CanLII)

wanted an understanding of who they were and what they did.  He did not become aware of some of the historical background concerning Mr. Stanford, such as the FinCEN Advisory from 1999.

**The Reputational Risk Memorandum – 2006-2007 (Plaintiffs' Potential Liability Date #5)**

[82]   By late 2006, Mr. Mersch decided to refer the Stanford relationship to Mark Evans, whose role at TD Bank included determining whether particular customer relationships should be considered by TD Securities' recently-formed Reputational Risk Committee.  Mr. Mersch testified that he oversaw approximately 1,000 TD Securities customer relationships.  The Stanford relationship was the first and only relationship that he thought necessary to submit to Mr. Evans at that time.

[83]   Mr. Muzaffar testified that this was a fairly new committee and that they wanted to follow prudent practices to make sure that they had risk identified and under control.  He noted that "Stanford stood out a little bit in terms of having some uniqueness to it, so we wanted to call that out and be forthcoming with that information, to share the information we knew about the relationship, and to see if this indeed is something that is worth looking at in greater detail."

[84]   Messrs. Sebenski and Muzaffar prepared and signed off on a memorandum to Mr. Evans dated February 14, 2007 (the "**Reputational Risk Memorandum**").  It stated that the Stanford accounts were unique for three reasons: (i) TD was effectively Stanford's main USD correspondent bank and "[n]ormally this business would be with a U.S. bank and the accounts were with TD Bank because of its long term history with the client (10 years)[8] and service levels.  Stanford first started with TD Bank when it was much smaller and stayed with the bank as it had grown"; (ii) the banks were owned by the Stanford Group, which was wholly owned by Mr. Stanford.  The memorandum stated that TD Bank normally does not "engage in sole personal ownerships due to the inherent risks. Note: we have no reason to be suspicious or uncomfortable with Mr. Stanford, and we verify his name with AML Compliance department regularly, as part of our normal KYC due diligence process"; and (iii) Stanford's client base consisted of "high net worth individuals with residence around the world.  Some clients may be considered PEPs (Politically Exposed Persons).  The inherent risk here are source of wealth and potential links to corruption.  Stanford performs due diligence and KYC checks on all new clients.  TD scrubs individual names against global AML lists when we receive wire instructions to or from Stanford's clients."

[85]   The memorandum analyzed the potential risks to TD Bank.  It said that there were comprehensive well-documented KYC and AML policies in place at SIB, Bank of Antigua, and the Stanford U.S. brokerage.  It noted that all wire payments were filtered at TD Bank against all world AML lists and TD Bank had not had any hits to date.  It said that, in addition to the local regulators for Bank of Antigua and SIB, the U.S. brokerage was regulated by the SEC and NASD in the U.S. and that Stanford's Montreal office was opened in 2005 and regulated by OSFI.  It noted that Stanford's custody business was with Bear Sterns, which conducted regular KYC

---

[8] The Reputational Risk Memorandum mistakenly states that TD Bank's relationship with SIB began in 1998 when in fact TD Bank began providing USD correspondent banking services to SIB in 1991.

checks and that this provided "an additional layer of review and accountability." It stated that TD Bank did its own KYC due diligence with client visits, AML questionnaires and minimum annual reviews.

[86]     The memorandum made specific reference to the 1998 incident in which U.S. officials had frozen funds at SIB that belonged to Mexican money launderers and that Stanford "acted quickly and cooperated fully with U.S. authorities." The memorandum did not refer to the FinCEN Advisory, the Senate Report or the Philadelphia Inquirer Article.

[87]     Several months later, Mr. Evans advised that a formal submission to the Reputational Risk Committee was not necessary in light of the robust KYC/AML procedures in place with respect to the Stanford relationship. This included: (i) TD Bank verified Mr. Stanford's name with the AML Group regularly as part of its normal KYC due diligence process; (ii) SIB performed its own due diligence and KYC checks on new clients and TD Bank scrubbed those names against global AML lists when they received wire instructions to or from SIB's clients; (iii) there were well documented KYC and AML policies in place at SIB, Bank of Antigua and their U.S. brokerage; and (iv) all wire payments were filtered at TD Bank against all world AML lists.

## Mr. Raffa Makes Inquiries – 2008

[88]     In January 2008, TD Bank began discussions about opening a new investment account at TD Private Investment Counsel for Stanford Bank Panama. Douglas Ball, a Compliance Officer, testified that he noticed some unusual features of that bank. He contacted Michael Raffa, Senior Manager of Global AML Compliance, who responded to Mr. Ball that he "looked at this real fast. Located in a high risk jurisdiction with (to be frank) unimpressive slate of mgmt and board. Agree we should discuss. Is this relationship one the business/risk mgmt know about and feel comfortable with?" Mr. Raffa sent an email to Margaret Wells, who worked in a KYC role at TD Securities, stating: "Maybe I should have given you a dingle first…am from Mars on this one? Maybe you are more accustomed to seeing small Caribbean banks?" He also emailed Mr. Sebenski to the same effect. Mr. Sebenski responded: "We feel that he and his senior management would not jeopardize their name and wealth with illegal activity."

[89]     Mr. Raffa convened a meeting of TD Bank personnel involved in the Stanford relationship to assess the potential risks as a group. Mr. Raffa emailed Messrs. Sebenski and Muzaffar and highlighted his concerns with both SIB's board and management, and SIB's jurisdiction. He also provided them with a list of questions to guide the discussion about due diligence at the upcoming meeting.

[90]     The meeting proceeded on January 30, 2008. Mr. Raffa attended the meeting along with Scott Saunders, Global Chief Anti-Money Laundering Officer. In addition to reviewing the Reputational Risk Memorandum at the meeting, Mr. Muzaffar brought a large binder of the KYC and due diligence materials he had on the Stanford Group. Mr. Raffa testified that he had received

2021 ONSC 3872 (CanLII)

satisfactory answers to the questions that he had asked and he and Mr. Saunders concluded that TD Bank had mitigated any potential risks with the Stanford relationship.[9]

**The Bloomberg Article – 2008**

[91]     On July 3, 2008, Bloomberg published an article entitled "SEC Investigating Stanford Group Offshore-Bank CDs". The article stated that the SEC had issued subpoenas to two former Stanford Group employees asking for information about the CD sales by SIB.  Mr. Muzaffar received an email from an acquaintance in August that contained an extract from an Offshore Alert article addressing the Stanford investigation, stating that for the second time in 19 years, an offshore bank controlled by Allen Stanford was being investigated by regulators.[10]  Mr. Muzaffar found the Bloomberg article and circulated it to his team.  He testified that he regarded this issue as a potential SEC licensing problem for the Stanford Group.

[92]     On August 26, 2008, Mr. Muzaffar received a response from a Public Relations specialist at the Stanford Group, who stated that these allegations had been made by two terminated employees of the Stanford Group and were totally without merit.  Mr. Muzaffar asked for a comment on the alleged SEC investigation.  Later that day, Mr. Muzaffar spoke with Mr. Davis, who confirmed in writing that there was no formal investigation going on with any Stanford company, as claimed by the Bloomberg article, or relating to any other issue.  Mr. Muzaffar forwarded the email to his internal team for its client files.

**Customers Demand Redemption – late 2008-early 2009**

[93]     Beginning in late 2008, during the financial crisis, SIB customers began demanding redemptions of their CDs in increasing numbers.

[94]     According to Andrew Richmond, an expert in fraud schemes who testified at trial, Ponzi schemes are often detected during times of financial crisis.   Customers start demanding redemptions at a rate that exceeds the inflow of cash required to continue the fraudulent scheme.  The fraudster runs out of money and the fraud is uncovered.

[95]     On February 16, 2009, the SEC obtained the Freeze Order.  The following day, TD Bank received the Freeze Order and froze SIB's correspondent accounts.

---

[9] In their written closing submissions, the JLs were critical that there was no discussion at the meeting about the rates of return offered on SIB's CDs.  TD Bank's expert on fraud schemes Mr. Richmond testified that these rates were in keeping with how Ponzi schemes operate – high enough to attract investors but reasonable enough that the fraudulent activity is not discovered.  Other fact witnesses, including Messrs. St. Clair Smith and Mersch, testified that the rates appeared reasonable to them at the time.
[10] The article stated that in the late 80s, Mr. Stanford's Montserrat-licensed Guardian International Bank voluntarily suspended its license rather than have it forcibly revoked by the local authorities as part of a general clampdown against approximately 300 banks licensed in the jurisdiction.

2021 ONSC 3872 (CanLII)

**TD Bank's Revenues from SIB Accounts**

[96]    The plaintiffs submit that SIB was a valuable correspondent account for TD Bank.  They note that by 1999, it generated the most revenue of any of TD Bank's correspondent relationships in the LATAM area.  From 2000 onwards, the Stanford relationship generally accounted for approximately 30-40% of the combined total revenue of the LATAM correspondent banking portfolio.  From 2003 until 2009, it was consistently one of TD Bank's top seven revenue-generating correspondent banking customers not just in LATAM, but worldwide.  However, Mr. Mersch testified that in terms of materiality to the Financial Institutions business, the SIB revenues were only around 1% from 2003 to 2008 and "miniscule" relative to the business of TD Securities overall.

[97]    It is not disputed that over the 18-year period, TD Bank's aggregate revenues from the Stanford relationship were USD $6.5 million.[11]

**SECTION 5: FACTUAL FINDINGS**

[98]    In assessing the factual evidence in this case, I bear in mind that the events in question span a period of 18 years.  The events started 30 years ago.  They ended 12 years ago.  The facts must be viewed in the context of what was transpiring and what the TD Bank employees knew and did not know at the time.  It is critical not to view the facts with the hindsight knowledge that Mr. Stanford was operating a Ponzi scheme throughout the period that SIB was a customer of TD Bank.

[99]    Mr. Stanford's fraudulent scheme was elaborate, highly sophisticated, and tightly concealed.  Only four insiders participated in it.  They hid the scheme from the approximately 100 employees at SIB, including the most senior ones, who thought they were working at a legitimate financial institution.  One of those employees, Mr. Osborne, testified that he did not believe it when he heard the news that his employer was involved in a fraudulent scheme.  Indeed, it was not until 2009 that a regulator, the SEC, took any action with respect to the Stanford Group.

[100]    The Perpetrators went to great lengths to present SIB as a responsible, upstanding bank.  They hired experienced bankers and accountants, had nice offices, and prepared professional-looking annual reports.  Mr. Richmond testified that one of the ways of ensuring that the scheme would go undetected was for the Stanford Group to have strong AML policies.  With the increased focus on the problem of money laundering in the banking system, the Stanford Group took proactive steps to assure TD Bank that the Stanford Group had rigorous AML policies and measures in place.  Mr. Muzaffar emphasized how solid the Stanford Group was on the AML front.  When Mr. Evans declined to submit the relationship to the Reputational Risk Committee, one of the reasons for doing so was that the Stanford Group had excellent AML policies in place.[12]

---

[11] TD Bank also provided some additional services to SIB and other Stanford entities including foreign exchange and money market services, investment advisory services, and letters of credit (fully cash collateralized).

[12] This is consistent with the evidence of Peter Lilley, a consultant who did research into Bank of Antigua in September 2000 and who testified as a witness for the plaintiffs.  He found and attached a copy of the FinCEN Advisory to his report.  However, he also

[101]   Eight former and two current employees of TD Bank testified at trial.  They all testified that they did not know that Mr. Stanford was operating a Ponzi scheme nor did they have any reason to suspect it.  They felt shocked, distressed and betrayed to learn that their long-time customer was involved in a fraudulent scheme.  As Mr. Muzaffar explained, it was similar to the feeling he had on learning the news of 9/11.

[102]   I accept their evidence.  I find that the TD employees had no reason to believe that Mr. Stanford and the insiders were operating a Ponzi scheme or engaging in fraudulent behaviour.  There is nothing in the evidence to suggest that the TD Bank employees had any indication that insider abuse was occurring at SIB.  I also find that there were no transactional or operational matters that raised any issues on the part of the TD Bank employees.  They all testified, credibly, that they had no concerns about SIB or its accounts and that the relationship worked well.  TD Bank employees, including Messrs. Cullen, Sebenski, Muzaffar and Mersch, had regular meetings with their Stanford counterparts in Houston, Montreal, Memphis, Miami and Toronto, none of which raised any suspicion or matters of concern.

[103]   The plaintiffs seek to cast many of the events in a nefarious light.  However, viewed in the context of the time without the later discovery that Mr. Stanford was a fraudster, there are far more innocuous explanations for the events in question.  I provide two examples.

[104]   The plaintiffs place great weight on the Philadelphia Inquirer Article and the fact that Messrs. Sebenski and Muzaffar did not send it to Mr. Doyle when he was doing an AML review on Mr. Stanford and his companies.  Messrs. Sebenski and Muzaffar did not remember the article or what they did with it at the time.  The plaintiffs' suggestion that Messrs. Sebenski and Muzaffar deliberately withheld the article from Mr. Doyle was not put to them on cross-examination and there is no basis for me to conclude that they were attempting to conceal it from him.

[105]   The evidence about this article must be seen in context.  Mr. Muzaffar testified that the Financial Institutions Group did its own due diligence on their customers and that Mr. Doyle's AML group was "additive".  The employees in the Financial Institutions Group were not required to seek Mr. Doyle's input – they requested it.  Messrs. Sebenski and Muzaffar were in a position to decide whether or not the article was relevant to this exercise or whether they could evaluate its significance themselves.

[106]   Looking at the article itself, to the extent that it refers to the FinCEN Advisory or the struggle between the U.S. and Antigua over reforms to local AML laws or Mr. Stanford's connection to it, that was historical information.  The FinCEN Advisory was four years old by that point and had been withdrawn two years earlier.  Mr. Stanford had been off the board of the regulatory authority for four years after sitting on it for one year.  The primary focus in the article was on Mr. Toricelli and Mr. Stanford's contributions to his defence fund in legal proceedings unrelated to Mr. Stanford, SIB or Antigua.  There is no suggestion in the article that Mr. Stanford

---

testified that all of Mr. Stanford's public statements at the time showed that Mr. Stanford was supportive of taking action against money laundering and strengthening AML regulation in Antigua.

was suspected or accused of any fraudulent behavior – the references are to AML laws in Antigua and, as noted above, Messrs. Sebenski and Muzaffar were satisfied with the high AML standards in place at SIB.

[107]   Under the circumstances, I cannot draw a negative inference about the fact that Messrs. Sebenski and Muzaffar did not send the article to Mr. Doyle at the time.

[108]   Second, the plaintiffs point to the Reputational Risk Memorandum in 2007 as an example of Messrs. Sebenski and Muzaffar concealing or not providing relevant information to their superiors.   Mr. Mersch decided to refer the Stanford relationship to Mr. Evans to determine whether it should be formally submitted to the Reputational Risk Committee for review.   The memorandum did not hide the unusual features of the relationship but highlighted them at the beginning.   The primary focus of the memorandum was on the potential risk that TD Bank's facilities would be used for money laundering and the measures that were in place to mitigate that risk.

[109]   Messrs. Sebenski and Muzaffar did not include certain facts from the past including the FinCEN Advisory, the Senate Report, and the Philadelphia Inquirer Article from 2003.   Those events were years old by that time.   The Reputational Risk Memorandum was not designed to be a comprehensive recital of all historical facts related to the Stanford relationship.   Messrs. Sebenski and Muzaffar used their judgment in putting forward the relevant facts for Mr. Evans to consider TD Bank's potential reputational risk.   I find that any failure to include this historical information was not a deliberate attempt to hide or skew the memorandum in order to maintain the Stanford relationship.

[110]   I address several other factual matters.

[111]   The plaintiffs submit that it was unusual for TD Bank to be offering U.S. dollar correspondent services to SIB if it had no business or customers in Canada and that this was or should have been a "red flag" to the bank.   They rely on the testimony of Mr. Cullen that he understood that SIB's customers had a connection to Canada when he opened the account in 1991.   They emphasize the fact that the TD Bank letter sent to SIB on account opening states that TD Bank was pleased to have the "opportunity to service any business you and your customers may have in Canada."   Mr. Cullen testified that this was standard language in the form letter used for all new business at the time and it was simply inviting SIB to refer transactions to TD Bank.

[112]   Mr. Cullen's testimony about the Canadian connection issue was not definitive.   He testified that his understanding on opening was that Guardian "may" have Canadian customers and that on account opening, the bank would not know when it sent the letter out what business Guardian and its customers would have in Canada.   He testified that if a transaction came in, the bank would consider it on its merits and decide whether or not to do it.

[113]   The plaintiffs rely on Mr. Cullen's testimony that he never became aware that the SIB account was providing services to non-Canadians during the time that he was the relationship

2021 ONSC 3872 (CanLII)

manager.  I have difficulty accepting this evidence given that he was the relationship manager for the Stanford accounts for nine years and would have been able to see from the flow of funds that customers were located outside of Canada.  Indeed, TD Bank's expert Ms. Joyce testified that Mr. Cullen may have been mistaken because it was obvious from the beginning that TD Bank was clearing U.S. cheques received from SIB depositors around the world.

[114]   The plaintiffs rely on statements in various pieces of documentary evidence to support their submission that TD Bank did not open correspondent bank accounts where there was no Canadian connection or other main USD correspondent account.  In my view, those statements are context specific and inconclusive.  For example, in June 1993, AIB had just started operations in Antigua and contacted Mr. Cullen to open a correspondent account at TD Bank.  Mr. Cullen told the principal of AIB that he wanted to wait until AIB was operational and made an internal note that he wanted to find out who AIB's main U.S. correspondent bank was before opening the account.  In April 2001, Mr. Cullen had an email exchange with Mr. Sebenski about whether or not TD Bank should provide a letter of credit to an unrelated bank, Antigua Barbuda Investment Bank (ABIB), with respect to an exporter located in Miami.  ABIB was on TD Bank's exit list at the time.  Mr. Cullen questioned why ABIB was using TD Bank to do the transaction instead of a correspondent bank in Miami and that it was an ominous sign that ABIB did not have a U.S.-based correspondent account.  In 2002, Mr. Muzaffar prepared a call report about National Commercial Bank of St. Vincent, in which he stated that he had just discovered that the St. Vincent bank was using TD Bank as its main USD correspondent account.  He explained that he had not been aware of this fact and it was new information that the customer had not communicated to them.  I note that TD Bank was closing down the St. Vincent account because, among other things, it was in a location that was on the FATF (defined below) non-compliant list, which raised heightened concerns for financial institutions in that jurisdiction.

[115]   Looking at the bigger picture, Messrs. Sebenski, Muzaffar, and Mersch each testified that seeking out broad-based U.S. dollar clearing opportunities was part of TD Bank's strategy in the 90s.  Mr. Sebenski explained that at that time, it did not matter where the beneficiaries were located.  However, the strategy of seeking USD broad-based clearing opportunities changed when Mr. Mersch was head of the Financial Institutions Group from 2003 to 2009, for competitive reasons.  TD Bank's expert Ms. Joyce also testified that several Canadian banks, including her own (Bank of Montreal) were promoting their direct USD clearing services to correspondents.  She testified that in the early 90s, the location of the beneficiaries of these accounts was not a big issue.  That became more of an issue later in the 2000s when Canadian banks started paying much more attention to what was coming in over USD accounts in wire form.

[116]   Mr. Mersch testified that despite the bank's change in strategy, he kept the SIB relationship because it was a very straightforward correspondent account, TD Bank had the capability of doing the clearing, and there was no reason not to keep it.  This distinctive feature of the SIB account was highlighted in the Reputational Risk Memorandum and considered by TD Bank in its analysis.  The memorandum noted that normally the business would be with a U.S. bank but that the accounts were with TD Bank because of SIB's long term history and service levels.  It further noted that SIB first started with TD Bank when it was much smaller and stayed with the bank as it had

2021 ONSC 3872 (CanLII)

2021 ONSC 3872 (CanLII)

grown.[13]   Mr. Mersch explained that he highlighted this feature because the lack of a nexus between SIB's customers and Canada presented a different type of AML risk for the bank to consider in its reputational risk analysis.

[117]   Considering all of the evidence, I cannot find that this feature of the SIB account was the red flag that the plaintiffs suggest it was.  Whatever Mr. Cullen's understanding may have been at the time he opened the account, the evidence of Messrs. Sebenski, Muzaffar and Mersch is that opening a broad-based clearing account with non-Canadian beneficiaries was consistent with TD Bank's strategy in the early 90s (and with that of other Canadian banks, according to Ms. Joyce). I accept their evidence.  I further accept their evidence that although the SIB account became non-conventional by the 2000s when that strategy changed, the account was permitted to continue because of the length of the relationship, the fact that SIB had started small and grown over the years, and the lack of any concerns with SIB as a customer.  It is clear from the Reputational Risk Memorandum and Mr. Evans' response that TD Bank took this additional AML risk factor into account in deciding to continue the Stanford relationship.  I also find that nothing about this feature would have suggested or indicated that Mr. Stanford was using the USD correspondent account to perpetrate a fraudulent scheme.

[118]   On the issue of Mr. Stanford's prior bankruptcy, I have considered Mr. Cullen's evidence that if he had known of the bankruptcy, he probably would not have opened the account.  When I view it in the context of all the evidence at trial, I cannot put much weight on that statement.

[119]   First, I have looked at Mr. Cullen's evidence as a whole on the bankruptcy issue.  He initially testified that it would not have been a concern to him unless Mr. Stanford was an undischarged bankrupt.  The evidence is that Mr. Stanford had been discharged from bankruptcy six or seven years before account opening.  Next, Mr. Cullen testified that he probably would not have opened the account if he had known about the bankruptcy.  On cross-examination, he agreed with the statement that a former bankrupt would not be a fit and proper person to operate a bank. That is inconsistent with his first statement that focussed only on whether or not Mr. Stanford was an undischarged bankrupt.  Next, when Mr. Cullen was asked whether it would be relevant if the bankruptcy was from a failed gym business, he responded that he was not really sure and that the circumstances of the bankruptcy would be relevant.  He also was not definitive about what would or would not have happened if he had learned about the bankruptcy.  He testified that he "probably" would not have opened the account.

[120]   Second, I have looked at Mr. Cullen's conduct at the time.  He was on a marketing trip to develop new business in the Caribbean area.  He knew that Mr. Stanford was the sole owner but was satisfied with what he learned in his meeting with Messrs. McDavid and Davis.  He did not

---

[13] It was also highlighted in the Suspicious Transaction Report that TD Bank filed in 2012 after Mr. Stanford was convicted. This was the only such report filed with respect to SIB.  Mr. Chang also testified that in his experience it was unusual for TD Bank to have USD correspondent accounts where the beneficiaries were not located in Canada.

2021 ONSC 3872 (CanLII)

inquire about whether Mr. Stanford had had any previous bankruptcies.  He opened the account when asked to after the meeting.

[121]   Third, and as described below in Section 7 (Negligence), the evidence of TD Bank's expert Ms. Joyce is that it would not have been common to search for bankruptcy information about the owner at that time.  Mr. Cullen's conduct was consistent with the existing banking practice that Ms. Joyce described.  She also testified that even if there had been a prior bankruptcy, the concern would be whether there had been issues with the discharge from bankruptcy or if the bankruptcy had involved the operation of a bank.[14]  Again, that is consistent with Mr. Cullen's initial statement that he would only have been concerned about a prior bankruptcy if the person was an undischarged bankrupt.

[122]   With the benefit of hindsight, Mr. Cullen now says that he probably would not have opened the account if he had known that Mr. Stanford had been bankrupt from the failed gym business many years before the account opening.  Considering all of the evidence, I am not persuaded that Mr. Stanford's bankruptcy would have been the impediment that Mr. Cullen now says it would have been.[15]

[123]   With respect to the issue of Montserrat, the evidence at trial is that Mr. Cullen's understanding was that SIB was a new bank and he therefore did not know that SIB had previously operated in Montserrat.  However, I will nonetheless address the plaintiffs' statements in their closing submissions that Mr. Stanford moved Guardian from Montserrat to Antigua to avoid revocation of its license in Montserrat.  The evidence is that Guardian received a letter on November 28, 1990 from the Ministry of Finance and Economic Development advising that the Ministry proposed to revoke Guardian's license for contravening sections of the Banking Ordinance by: (i) failing to employ an approved auditor; (ii) operating in a manner detrimental to depositors; (iii) failing to supply satisfactory details as to liquidity; (iv) having a director who is a former bankrupt; and (v) failing to submit an annual return for the period ended January 31, 1990.

[124]   The letter invited Mr. Stanford to object to the proposed revocation by letter within 14 days.  Mr. Stanford did not file an objection.  Guardian moved to Antigua on December 7, 1990, the day before Mr. Stanford acquired Bank of Antigua.  The plaintiffs submit that the move was done to avoid revocation of the license in Montserrat, which subsequently occurred on May 31, 1991.

[125]   Mr. St. Clair Smith (Guardian's Manager) testified that there had been a review by the British government of Guardian's banking activities in Montserrat and that Guardian had faired

---

[14] The JLs' expert Mr. Winer testified that a person who has been bankrupt is generally viewed not to be fit and proper to receive a license as a bank.  I note that Mr. Cullen was not being asked to grant a license to Bank of Antigua or SIB but rather to open a correspondent account for those banks.  Further, and as I explain below, I prefer Ms. Joyce's expert evidence on how a reasonable Canadian bank would have viewed the bankruptcy issue at the time.

[15] I also note that Mr. Lilley, in his report on Bank of Antigua in 2000, did not mention Mr. Stanford's prior bankruptcy as an issue of concern.

very well in that review.[16]  He testified that Guardian already had a connection to Antigua because its auditors were located there.  He understood that a decision had been made by Guardian's board in the fall of 1990 to consolidate Guardian's operations in Antigua.  This is supported by a statement in Guardian's 1990 financial statements that on September 17, 1990 the board decided to consolidate the bank's operations in Antigua.

[126]  Mr. Stanford contested the May 1991 revocation of Guardian's license.  In a 1994 Judgment of the High Court of Justice Colony of Montserrat, the court concluded that Guardian had consummated its plans to move to Antigua before October 30, 1990, that it voluntarily surrendered its license in Montserrat on December 19, 1990, and that the revocation of the Guardian license in May 1991 was null and void and of no effect.[17]  It is not entirely clear to me what transpired with the move from Montserrat.  However, on the basis of the record before me and in light of the evidence with respect to Guardian's intention to move to Antigua earlier in the fall of 1990, I am not prepared to make a finding that Guardian moved to Antigua to avoid revocation of its license.

[127]  Finally, I find that there is simply no evidence that whatever additional due diligence Mr. Cullen might have done at the time, he would have uncovered facts indicating or giving rise to the suspicion that Mr. Stanford was a criminal or that he might be engaged in fraud or any type of financial crime.

## SECTION 6: CAUSE OF ACTION #1 – KNOWING ASSISTANCE IN BREACH OF FIDUCIARY DUTY (BOTH ACTIONS)

[128]  The plaintiffs in both actions assert that TD Bank is liable for knowing assistance in breach of fiduciary duty.  Knowing assistance is an equitable doctrine.  A stranger to a fiduciary obligation may be liable in equity on the basis of knowing assistance where the stranger, with actual knowledge, participates in or assists a fiduciary in a fraudulent and dishonest scheme.  The rationale underlying this category of liability is that actual knowledge of and assistance in the fraudulent conduct is sufficient to "bind the stranger's conscience" so as to give rise to personal liability: *Air Canada v. M & L Travel Ltd*, [1993] 3 S.C.R. 787, at para. 32.  Liability for knowing assistance in a breach of fiduciary duty is fault-based.  It requires an intentional wrongful act on the part of the stranger or accessory, to knowingly assist in the fraudulent and dishonest breach of fiduciary duty: *DBDC Spadina Ltd v. Walton*, 2018 ONCA 60, 419 D.L.R. (4th) 409, at para. 216.

[129]  The elements of knowing assistance are: (i) a fiduciary duty, (ii) a fraudulent or dishonest breach of the duty by the fiduciary, (iii) actual knowledge by the third party to the fiduciary duty of the fiduciary relationship and the fiduciary's fraudulent or dishonest conduct, and (iv)

---

[16] Ms. Joyce testified that there had been an extensive culling of the offshore sector in Montserrat and Guardian had survived the initial culling and was on a short list of banks that were approved to continue in Montserrat.  However, Mr. Davis admitted in his plea agreement that Guardian moved out of Montserrat, in part, because of his concern with heightened scrutiny by bank regulators.
[17] Mr. Winer had not seen a copy of this judgment until trial and did not take it into consideration when he gave his opinion based on the assumption that Guardian had fled Montserrat to avoid revocation of its license.

2021 ONSC 3872 (CanLII)

participation by or assistance of the third party in the fiduciary's fraudulent or dishonest conduct: *DBDC*, at para. 211, citing *Harris v. Leikin Group Inc.*, 2011 ONCA 790, at para. 8.

[130]   Actual knowledge includes recklessness or wilful blindness: *Caja Paraguaya de Jubilaciones y Pensiones del Personal de Itaipu Binacional v. Garcia*, 2020 ONCA 412, 151 O.R. (3d) 529, at paras. 33-34, citing *Air Canada* and *Harris*.

[131]   In this case, there is no dispute that Mr. Stanford owed SIB a fiduciary duty, he breached that duty by perpetrating his fraudulent scheme, TD Bank's correspondent banking facilities assisted Mr. Stanford in carrying out that scheme, and TD Bank knew that Mr. Stanford owed a fiduciary duty to SIB.

[132]   The only issue relates to TD Bank's knowledge of Mr. Stanford's breach of his fiduciary duty.  The plaintiffs have admitted that TD Bank did not have actual knowledge that Mr. Stanford was conducting the fraudulent scheme.  The question is therefore whether TD Bank was reckless or wilfully blind to Mr. Stanford's breach of his fiduciary duty.

[133]   The concept of recklessness originated in the criminal law context.  In *R. v. Sansregret*, [1985] 1 S.C.R. 570, at para. 16, the Supreme Court of Canada held that recklessness:

> …is found in the attitude of one who, aware that there is danger that his conduct could bring about the result prohibited by the criminal law, nevertheless persists, despite the risk. It is, in other words, the conduct of one who sees the risk and who takes the chance.

[134]   Recklessness has been applied in the civil context.  In *Carriere Industrial Supply Ltd. v. Toronto-Dominion Bank*, 2015 ONCA 852, at para. 31, the Ontario Court of Appeal held that "recklessness consists of knowledge of a danger or risk and persistence in a course of conduct that creates a risk that the prohibited result will occur."  In that case, the bank had given its customer unmonitored access to electronic banking facilities.  The principal of the customer used the account to perpetrate a fraud.  The court found that the bank had clear notice of past actions constituting a breach of trust on the part of the principal.  In the face of that knowledge, the bank was reckless in giving him continued access to the account.

[135]   Wilful blindness also originated in the criminal law context.  In *Sansregret*, the Supreme Court of Canada said that wilful blindness:

> …is distinct from recklessness because, while recklessness involves knowledge of a danger or risk and persistence in a course of conduct which creates a risk that the prohibited result will occur, wilful blindness arises where a person who has become aware of the need for some inquiry declines to make the inquiry because he does not wish to know the truth. He would prefer to remain ignorant.

[136]   Wilful blindness has also been applied in the civil law context.  In *Wescom Solutions Inc. v. Minetto*, 2019 ONCA 251, at para. 12, the Ontario Court of Appeal held that wilful blindness

2021 ONSC 3872 (CanLII)

arises when a person who has become aware of the need for some inquiry declines to make the inquiry because he does not wish to know the truth.  See also *Caja*, at para. 35.

[137]   However, the case law has made it clear that a person must actually know facts that make their conduct reckless or makes their blindness wilful.  Mere constructive knowledge – that is, knowledge of circumstances which would indicate the facts to an honest person, or knowledge of facts which would put an honest person on inquiry – will not suffice: *Air Canada*, at para. 41; *Carriere*, at paras. 27 to 29; and *DBDC*, at para. 237.[18]

[138]   The plaintiffs submit that TD Bank was reckless or wilfully blind because its employees were aware of the risk of insider abuse in a solely-owned bank and the risks of doing business with a poorly regulated offshore bank in Antigua.[19]   The plaintiffs submit that TD Bank did not do sufficient due diligence into Mr. Stanford personally when opening the account or make any meaningful inquiry thereafter when presented with, for example, the Philadelphia Inquirer Article that tied Mr. Stanford to the FinCEN Advisory.[20]

[139]   In my view, there is nothing in the record to support a conclusion that TD Bank was reckless or wilfully blind.  As the cases make clear in applying those concepts, the defendant has to know facts that give rise to a specific risk that a danger is going to occur and, in the face of that knowledge, turns its head or decides to proceed anyway.  The defendants must know more than the existence of a risk in general or theoretical terms.  It is a high bar.  In this case, the risk is that Mr. Stanford would breach his fiduciary duty to SIB.  Is there any evidence that TD Bank had a basis to believe that Mr. Stanford might breach his fiduciary duty and misappropriate SIB's assets for his own use?  The answer is no.

[140]   As set out in my factual findings above, when Mr. Cullen opened the account in 1991, there is no evidence of facts that he could have discovered that would have suggested that Mr. Stanford was or would become a fraudster.  Further, none of the facts known to TD Bank when it operated the account, whether from the Philadelphia Inquirer Article or otherwise, suggested or put TD Bank on notice that Mr. Stanford might be defrauding SIB. At most, the only evidence at trial is

---

[18] The plaintiffs submit that while both recklessness and wilful blindness require subjective knowledge of relevant facts, they can be inferred from a wide range of factors, including what the defendant ought to have known.  They rely on the words of Pepall J.A. in dissent in *Caja*, at para. 101.  See also *Sorrel 1985 Ltd. Partnership v. Sorrel Resources Ltd*, 2000 ABCA 256, at para. 72. While those cases suggest that other factors may also be taken into account, they do not displace the requirement of subjective knowledge of facts that put the defendant on notice of the particular risk in question.

[19] For example, they point to the fact that Antigua was listed as a Major Money Laundering Country on the International Narcotics Control Strategy Reports (INCSR) issued by the U.S. State Department from 1996 onwards.  The only witnesses that gave evidence about the INSCRs were the experts, not the TD Bank fact witnesses.  TD Bank points out that many countries, including Canada, were classified as Major Money Laundering Countries in the INSCRs (for example, 40 countries in the 1996 and 1999 INSCRs).

[20] The JLs contrast the level of due diligence conducted by TD Bank with that of Pershing LLC, which became a clearing broker for SGC in 2005.  I note that even after six months of extensive due diligence, Pershing entered into a five-year relationship with SGC.

2021 ONSC 3872 (CanLII)

that the TD Bank witnesses knew in general or theoretical terms that there was a risk of insider abuse at a solely-owned bank.[21]

[141]   Although it is now known that Mr. Stanford was a fraudster, there is no basis to conclude that TD Bank knew or suspected that Mr. Stanford was breaching his fiduciary duty to SIB but continued to allow him to use TD Bank's banking facilities.  Nor is there any basis to conclude that TD Bank become aware of the need to inquire about whether Mr. Stanford was defrauding SIB but chose not to ask questions.

[142]   The plaintiffs' claims in both actions for knowing assistance in breach of fiduciary duty must fail.

## SECTION 7: CAUSE OF ACTION #2 – NEGLIGENCE (JL ACTION ONLY)

[143]   The Joint Liquidators claim that TD Bank is liable in negligence performance of a service.  As noted, the Dynasty plaintiffs are no longer pursuing their claim against TD Bank in negligence.

[144]   A successful action in negligence requires that the plaintiff demonstrate that: (1) the defendant owed the plaintiff a duty of care; (2) the defendant's behaviour breached the standard of care; (3) the plaintiff sustained damage; and (4) the damage was caused, in fact and in law, by the defendant's breach: *Mustapha v. Culligan of Canada Ltd*, 2008 SCC 27, [2008] 2 S.C.R. 114, at para. 3.

## Duty of Care

### Applicable Principles

[145]   The duty of care analysis has recently been refined by the Supreme Court of Canada in *Deloitte & Touche v. Livent Inc. (Receiver of)*, 2017 SCC 63, [2017] 2 S.C.R. 855.  Establishing a duty of care requires a two-step analysis.  At the first stage, the court asks whether there is a *prima facie* duty of care by considering proximity and foreseeability.  Proximity is often established on the basis of finding a previously established or analogous category.  If the relationship falls within an established category of proximity, or is analogous to one, the requisite proximity is established and residual policy considerations will not be engaged.  If not, a full proximity analysis considering "all relevant factors arising from the relationship between the plaintiff and the defendant" must be undertaken.  For a full proximity analysis in cases of pure economic loss arising from negligent performance of a service, the nature of the defendant's undertaking and the plaintiff's reliance are the determinative factors in the proximity analysis: *Livent*, at paras. 25 to 31.

[146]   At stage one, the foreseeability of the injury suffered by the plaintiff must also be assessed.  Foreseeability is determined using an objective test focussed on whether a person in the

---

[21] Mr. Cullen testified that it was common for banks in the Latin America area to be solely-owned.  He testified that the owner should be included in the due diligence, which is why he asked his colleague to make inquiries about Mr. Stanford in Houston.

2021 ONSC 3872 (CanLII)

2021 ONSC 3872 (CanLII)

defendant's circumstances ought reasonably to have foreseen the risk that the type of injury suffered by the plaintiff could occur from the defendant's conduct: *Rankin (Rankin's Garage & Sales) v. J.J.*, 2018 SCC 19, [2018] 1 S.C.R. 587, at paras. 24 and 53.  The purpose underlying the defendant's undertaking and the plaintiff's corresponding reliance defines the type of injury that could be reasonably foreseen to result from the defendant's negligence: *Livent*, at para. 35.

[147]   Stage two of the duty of care framework asks whether despite proximity and reasonable foreseeability, the defendant should nonetheless be insulated from liability due to residual policy considerations.  Factors to consider are whether the law already provides a remedy, whether the duty of care would create concerns of indeterminate liability, and whether there are any other policy reasons that the duty of care should not be recognized: *Livent*, at para. 40.

### Duty of Care by a Bank to its Customer

[148]   TD Bank argues that no duty of care should arise in this case unless TD Bank had actual knowledge that Mr. Stanford was defrauding SIB.  It relies on the case of *1169822 Ontario Limited v. The Toronto-Dominion Bank*, 2018 ONSC 1631 ("**Seaquest**") to support this proposition.  In that case, Seaquest Corporation was a customer of TD Bank and was found to have orchestrated a Ponzi scheme.  Investors lost money and sued TD Bank in tort to recover their losses.  The court held that a duty of care to the investor plaintiffs could not arise unless the bank had actual knowledge that its customer was committing fraud (or was reckless or willfully blind to the fraud).[22]

[149]   In my view, *Seaquest* is distinguishable as it involved a bank's duty to a non-customer. The case at bar involves the duty of care owed by TD Bank to its own customer, SIB.  The analysis must therefore focus on the existence and nature of the bank's duty of care to its customer, applying the principles and analytical framework set out in *Livent*.

[150]   This case involves two stages of the bank-customer relationship: account opening and ongoing operation of the account.  The existing case law has recognized a duty of a bank to its customer at each of those stages.  However, the nature of that duty has to be analyzed carefully. As *Livent* instructs at para. 52, the mere fact that proximity has been recognized as existing in a relationship for *one* purpose is insufficient to conclude that proximity exists between the same parties for *all* purposes.  *Livent* also cautioned at para. 28 that courts should avoid identifying established categories in an overly broad manner because residual policy considerations are not considered where proximity is found on the basis of an established category.

[151]   The case law establishes that a bank's duty to its prospective customer on account opening is quite limited.  It consists primarily of verifying the identity of the prospective customer and

---

[22] TD Bank submits that this is consistent with the conclusion reached in other cases brought by non-customers of a bank: *Dynasty Furniture Manufacturing Ltd. v. The Toronto-Dominion Bank*, 2010 ONSC 436, 74 C.C.L.T. (3d) 286, aff'd 2010 ONCA 514, 321 D.L.R. (4th) 334; *Ramias v. Johnson*, 2009 ABQB 386; *Javitz v. BMO Nesbit Burns Inc.*, 2011 ONSC 1332, 105 O.R. (3d) 279; *Big X Holdings Inc. v. Royal Bank of Canada*, 2015 NSSC 184.

ascertaining who will be the authorized account signatories: *Toronto Dominion Bank v. Whitford* 2020 ABQB 802, at para. 139; *J & F Transport Ltd. v. Markwart*, [1982] SJ No 481 (SK QB), at para. 10; *Richmond Raiders Football Club v. Richmond Savings Credit Union*, [1993] B.C.W.L.D. 757 (BC SC), at para. 21.  The rationale underlying those safeguards is that opening an account for someone in their name and without their knowledge presents the risk that money otherwise belonging to them might be misappropriated by someone else: *Whitford*, at para. 139.  Similarly, if proper signing procedures are not put in place, the customer's funds are at risk of being transferred out by an unauthorized person.

[152]   The case law on the bank's duty to its customer once the account has been opened has been described in various terms such as "the duty to exercise reasonable care and skill in performing all banking services with its customer" (*Whitford*, at para. 133) or the duty "to exercise care as a reasonable banker would consider requisite to ensure that what is suspicious or questionable is queried" in order to prevent or avoid use of the banks' facilities in a manner that appears "unusual or out of the ordinary course of business": *Don Bodkin Leasing Ltd. v. Toronto-Dominion Bank* (1993), 14 O.R. (3d) 571 (Gen. Div.), p. 578, aff'd (1998), 40 O.R. (3d) 262, leave to appeal denied, [1998] S.C.C.A. No. 381.

[153]   The cases establish, however, that the nature of the duty relates to the operation of the account or the use of the bank's facilities.  That includes carrying out the customer's instructions properly or questioning suspicious transactions involving transfers in or out of the account.  For example, in *Groves-Raffin Construction Ltd. v. Canadian Imperial Bank of Commerce*, [1975] 64 D.L.R. (3d) 78 (BC CA), the issue was whether the bank ought to have permitted an officer of the customer to write a cheque paying the entire balance of the account out to himself.  The court found that in these circumstances, there were sufficient indicia of something suspicious with the transaction to impose a duty on the bank to make further inquiries before processing the transaction.[23]

[154]   In *Oak Incentives Group Inc. v. Toronto Dominion Bank,* 2011 ONSC 3245, the bank had a duty to advise its customer that funds, expected to be received by wire, were in fact received by ordinary cheque.  The funds could not be said to be secure and the customer had explicitly enquired as to the security of the funds.

[155]   In *Good Mechanical v. Canadian Imperial Bank of Commerce*, [2005] O.J. No. 3909 (SC), the bank had a duty to ensure that a bank draft was properly authorized by the bank, where it was foreseeable that preparation of a defective bank draft without an authorized signature would lead to the customer losing a construction contract.  In *Lee v. Canadian Imperial Bank of Commerce*, [2001] O.T.C. 640 (SC), the bank had a duty to record and follow the customer's instructions

---

[23] This is similar to the cases out of the United Kingdom that have recognized a "*Quincecare* duty": *Barclays Bank plc. v. Quincecare Ltd.*, [1992] 4 All E.R. 363 (E.W.H.C.)  The *Quincecare* duty arises where the bank is put on inquiry that there are reasonable grounds to believe that the directions being given by the representative of the customer are an attempt to misappropriate funds. The bank must not execute the order and should make further inquiry.

where the failure to do so led to amounts being paid out without the customer's approval. In *Toronto-Dominion Bank v. 1633092 Ontario Ltd.*, 2019 ONSC 1473, the bank was found to have breached its duty when it failed to secure a loan in the amount discussed with the customer or to inform the customer that the loan was not available before the customer expended necessary fees and was ultimately denied promised funding.

[156]   What is the duty the Joint Liquidators say exists in this case?  They present various formulations of that duty – the duty to exercise reasonable care and skill in providing the U.S. dollar account to SIB or the duty to prevent use of that account in the face of circumstances objectively indicating misuse of the account.  They refer to the risk of insider abuse and the overarching obligation of a bank to protect its customer.

[157]   At its essence, the Joint Liquidators are seeking to impose a duty of care to protect the bank's customer from insider abuse.  They submit that at some point, the risk of insider abuse increased to such a level that the bank had a duty to review the relationship, shut down the account, and cease providing services to the customer.

[158]   The Joint Liquidators have not presented the court with any case that establishes a duty of this nature.  As noted above, all of the cases that have imposed a duty of care on a bank relate to basic procedures on account opening and operational matters during the course of the banking relationship.

[159]   What the Joint Liquidators are proposing is a novel duty of care and one that requires a full proximity analysis under the *Livent* framework.  In terms of TD Bank's undertaking, it was to provide correspondent banking services to SIB.  TD Bank undertook to act as SIB's agent for the purpose of receiving and disbursing funds to purchasers of the CDs.  It undertook to process those payments (primarily by wire transfer), to account to SIB for the funds that flowed through the account, and to comply with any directions provided by SIB.  TD Bank undertook to comply with the banking procedures that applied to the operation of a correspondent account.

[160]   There is nothing about the bank's undertaking that would support the novel duty proposed by the Joint Liquidators, whether at the account opening or operating stage.  The nature of TD Bank's undertaking to operate a correspondent account did not extend to monitoring the internal operations of SIB.  It did not extend to protecting SIB from insider abuse, unless there were clear indicia to put the bank on notice that the account was being used for nefarious purposes or that fraudulent conduct might be in issue.

[161]    To hold otherwise would expand the role of the bank well beyond what it undertook to do in acting as a correspondent bank.  The bank undertook to provide banking services.  It did not assume the role of a regulator, auditor or insurer.  Given the nature of the bank's undertaking, there was also no basis for SIB to reasonably rely on TD Bank to protect it from insider abuse.

[162]   The Joint Liquidators have therefore not established the required proximity to give rise to the novel duty of care proposed in this case.

2021 ONSC 3872 (CanLII)

[163]   Further, given the evidence presented at trial, there is no good reason to extend the duty of care in this case as the Joint Liquidators suggest.  If, in another case, there are clear indicia that an account is being used for nefarious purposes or that fraudulent conduct might be in issue, a plaintiff may have legal remedies based on the duty of care already recognized at law or a novel duty established under the *Livent* analysis in that particular case.  It may also have recourse to the equitable remedy of knowing assistance, depending on the facts of the case.

[164]   In my view, the Joint Liquidators' negligence claim fails at the duty of care stage.

**Standard of Care**

[165]   If I am incorrect in my duty of care analysis, the Joint Liquidators must still prove that TD Bank fell below the standard of care.  I will therefore address the expert and other evidence that was tendered at trial on this issue.

Expert Witnesses

[166]   The Joint Liquidators called two expert witnesses on liability, Jonathan Winer and Ross Delston.  TD Bank called one expert witness on liability, Sara Joyce.

[167]   Messrs. Winer and Delston are U.S. attorneys.  Mr. Winer has been referred to as a leading architect of relevant laws, regulations, and international standards addressing financial crime and money laundering.  He served as counsel and a legislative assistant to U.S. Senator John Kerry from 1985 to 1994, following which he was directly involved in numerous international anti-money laundering initiatives for the U.S. government.  TD Bank objected to his testifying as an expert on matters concerning a Canadian bank since Mr. Winer is neither a banker nor a Canadian.  At trial, I qualified him as an expert on international banking standards.[24]

[168]   Mr. Delston specializes in the assessment of banks' compliance with relevant laws, regulations, and international standards for addressing financial crime and money laundering.  He is a certified anti-money laundering specialist and former banking regulator with expertise in assessing financial crime issues in offshore financial centres in the Caribbean.  TD Bank objected to Mr. Delston testifying on matters concerning a Canadian bank.  At trial, I qualified Mr. Delston as an expert on financial institution compliance matters.[25]

[169]   Despite qualifying them as experts, I ruled that both Mr. Winer and Mr. Delston were not qualified to provide opinion evidence regarding the interpretation or application of the laws of

---

[24] Specifically, he was qualified as an expert on the development, purpose, and implementation of international standards, and guidelines to combat international financial crime and abuses of the banking system, including money laundering; the supervision and enforcement of standards in the international financial system; and compliance with the standards by countries and individual financial institutions.

[25] Specifically, he was qualified as an expert in (i) international anti-money laundering, know your customer, due diligence, and related financial institution compliance matters, including regarding offshore financial centres, financial institutions in offshore financial centres, and correspondent banking; and (ii) training of bankers, compliance officers, bank examiners and regulators internationally on anti-money laundering, know your customer, due diligence and related financial institution compliance matters.

2021 ONSC 3872 (CanLII)

2021 ONSC 3872 (CanLII)

Canada or Ontario.  Indeed, they both acknowledged that they are not experts in Canadian banking practices and had no experience with the Canadian regulatory regime.

[170]   TD Bank called as its expert witness Sara Joyce.  She is an Ontario lawyer and former Canadian banker with over 35 years of experience in the Canadian banking industry.  Among other things, she oversaw relationship managers in the correspondent banking group at Bank of Montreal.  She authored the bank's account opening and monitoring guidelines, and was involved in the implementation and review of the bank's AML and KYC due diligence procedures for correspondent banks.  The plaintiffs did not object to her qualification as an expert.[26]  I qualified Ms. Joyce as an expert in international and correspondent banking, including account opening, know your client, due diligence and anti-money laundering standards, and the standard of care applicable to a Canadian bank providing correspondent banking services to foreign banks between 1991 and 2009.[27]

[171]   In their closing, the JLs submitted that Ms. Joyce lacked impartiality because she had past relationships with TD Bank personnel and had previously testified as an expert in another case involving TD Bank.  They say that she did not disclose her relationships with the TD Bank employees until asked about them at the end of her cross-examination.  Those criticisms are unfair and unwarranted.  Ms. Joyce acknowledged that the Canadian banking community is a very small circle and that the major players knew one another from industry events.  While she had various interactions with Messrs. Mersch, Muzaffar, and Doyle in their professional capacities over the years, there is no basis for me to conclude that her testimony was anything but impartial.  Nor do I consider that she lacks impartiality simply because she testified as an expert for TD Bank in another case.

### International and Domestic Banking Standards

[172]   All three experts testified about the applicable KYC and due diligence standards.  Several of the TD Bank fact witnesses also testified about banking practices and the internal policies at the bank.  The documentary evidence includes copies of the international and domestic standards, regulatory guidance to Canadian banks, and TD Bank policies.

[173]   The experts agreed that the foundational international standards are those established by two industry groups, the Basel Committee on Banking Supervision (“**Basel**”) and the Financial

[26] In closing, the JLs submit that Ms. Joyce lacked personal experience during the period prior to 2001 when she began her work in correspondent banking.  That submission runs contrary to my ruling that qualified her as an expert for the entire Relevant Period.  Further, I found Ms. Joyce to be very knowledgeable about the pre-2001 standards from her work as head of correspondent banking when she was putting new guidelines in place in 2001.
[27] The plaintiffs had another expert on their witness list, Sean Watts, a Canadian banker who ran the Trade Finance and Financial Institutions Group at Scotiabank.  Although he apparently delivered two reports prior to trial, the plaintiffs did not call him to testify.  The plaintiffs' counsel said that it was not necessary to call him in light of the fact that Ms. Joyce would be providing testimony on the applicable Canadian legal and regulatory framework that incorporated the international standards on which Messrs. Winer and Delston testified.  I am therefore not prepared to draw an adverse inference on the plaintiffs' failure to call Mr. Watts as an expert witness as TD Bank requested.

Action Task Force ("**FATF**").[28]  Basel was founded by a subset of the Organization for Economic Cooperation and Development, including the U.S. and Canada.  FATF is an intergovernmental body created in 1990 by the Group of Seven nations including Canada.

[174]  Ms. Joyce testified about the Canadian regulatory regime.  In Canada, the Office of the Superintendent of Financial Institutions ("**OSFI**") is the primary regulator for financial institutions in Canada.  It regularly issues guidance based on input from Canadian banks and on the international recommendations of FATF and Basel, although there is usually a delay in incorporating those recommendations.

[175]  In 1988, Basel issued a statement entitled "Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering."  It encouraged banks to put in place procedures to ensure that their customers were properly identified, transactions that did not appear legitimate were discouraged, and cooperation with law enforcement agencies was achieved.  The Basel statement was incorporated by OSFI in its first guideline issued in 1990.

[176]  In 1990, FATF issued its "Forty Recommendations" on money laundering to participating countries.  Those recommendations emphasized customer identification and record-keeping and encouraged banks to pay special attention to complex and unusual large transactions and those with no apparent economic or visible lawful purpose.  Ms. Joyce testified that Canada adopted some of these recommendations initially and the balance over a period of 10 to 15 years.

[177]  Both the Basel 1988 statement and the FATF Forty Recommendations state that in certain circumstances a financial institution should deny assistance to a customer, sever relations, and close the account.  For example, under the Basel statement, the bank should close an account when it becomes "aware of facts which lead to the reasonable presumption that money held on deposit derives from criminal activity or that transactions entered into are themselves criminal in purpose…".[29]

[178]  The events of 9/11 accelerated the regulatory reforms that applied to correspondent banking.  The U.S. passed the PATRIOT ACT in the fall of 2001 based on the belief that the terrorist attacks of 9/11 had been financed with monies that flowed through bank accounts in the U.S.  As Ms. Joyce explained, prior to 9/11, these international standards were not specific to

---

[28] Ms. Joyce agreed that a Canadian correspondent banker would also have had regard during the Relevant Period to other standards, laws, regulations, guidance and other reports promulgated by: (a) the United Nations, (b) U.S. legislation, including the U.S. *PATRIOT ACT*, (c) the Financial Crimes Enforcement Network, (d) the United Kingdom Treasury, (e) the U.S. Senate, (f) the New York Clearing House, and (g) The Wolfsberg Group.

[29] The TD Bank witnesses agreed that there were circumstances in which they might exit a customer relationship.  For example, Mr. Mersch testified that the bank would exit a relationship where it became uncomfortable with the customer.  TD Bank's Terms and Conditions for Correspondent Banks provide that it can close any account, without notice, if "TD reasonably believes that there has been or may be improper, unauthorized or unlawful use of any Service."

2021 ONSC 3872 (CanLII)

correspondent banking and were directed generally to the AML procedures that banks should have in place.[30]

[179]   Following 9/11, Basel issued an updated paper that set out more specific KYC and due diligence requirements for correspondent banks to follow.[31]  In 2003, OSFI updated its guidelines to incorporate the 2001 Basel paper.  It recognized that money laundering continued to be a serious international problem and noted the critical need for customer identification and monitoring procedures.  According to Ms. Joyce, this enhanced due diligence could be satisfied in several ways, including asking for the respondent bank's own KYC policies.  In May 2003, TD Bank introduced its Global AML Policy addressing KYC and due diligence.  The policy specifically listed correspondent bank accounts as higher risk and set out the due diligence required on opening an account for a correspondent bank.

[180]   All three experts agreed that KYC is a fundamental rule of good banking practice.  They also agreed that KYC is broader than just anti-money laundering and that it is meant to assess whether the bank is providing services to criminals or the account is being used for nefarious purposes.  They agreed that the level of due diligence must correspond to the degree of risk of misuse of the banking facilities.  In this case, the plaintiffs focus only on the risk of insider abuse, namely the risk that TD Bank's U.S. dollar correspondent facilities would be used by Mr. Stanford to perpetrate insider abuse.

Did TD Bank Fall below the Standard of Care?

(a)  Account Opening

[181]   The plaintiffs submit that TD Bank fell below the standard of care when it opened the correspondent account for SIB in November 1991.  They submit that Mr. Cullen did no meaningful due diligence on Bank of Antigua and did no additional due diligence on SIB when it opened its account six months later.

[182]   With respect to Bank of Antigua, Messrs. Winer and Delston criticized Mr. Cullen's due diligence as it was limited to confirming that Bank of Antigua was licensed by the Antiguan

---

[30] In Canada, the *Proceeds of Crime (Money Laundering) Act*, S.C. 1991, c. 26 was the statute in place to combat money-laundering and financial crime.  In June 2000, it was replaced by the *Proceeds of Crime (Money Laundering) Act*, S.C. 2000, c. 17 that imposed mandatory reporting systems for suspicious transactions for the first time, and created FINTRAC (Financial Transactions and Reports Analysis Centre of Canada) to ensure Canadian banks complied with the statutory record-keeping and reporting obligations.  In 2001, the Act was renamed the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*, S.C. 2000, c. 17.  It required financial institutions to report every transaction where there were reasonable grounds to suspect that it was related to the commission of a money laundering or terrorist activity financing offence.  In 2006, the Act was further amended to enhance client identification, record-keeping and reporting requirements, and to expand FINTRAC and the Canadian Border Service Agency's power to disclose information in the effort to combat money laundering and terrorist financing.
[31] It stated that banks should gather sufficient information about their respondent banks to understand fully the nature of the respondent's business including information about the respondent bank's management, major business activities, location, money-laundering prevention and detection efforts, the purpose of the account, identity of third parties using the correspondent banking services, and condition of bank regulation and supervision in the respondent's country.

2021 ONSC 3872 (CanLII)

regulator and asking his colleague to enquire about the Stanford operation through his contacts in Houston. They say that Mr. Cullen should not have relied on the Antiguan licensing authority because of its weak reputation at the time. He should have further investigated Mr. Stanford personally as the sole owner of the bank.

[183]   Mr. Winer testified that on account opening, TD Bank was required to know all aspects of its client's business. Ms. Joyce disagreed, calling that an overstatement. Mr. Winer conceded that his statement was based not on the Basel and FATF requirements from 1991 but on the higher Basel standards from 2001.

[184]   Ms. Joyce explained that the 90s were the early days of the fight against money laundering. The Basel and FATF initiatives recognized that the banking community had a role to play in assisting law enforcement authorities in that fight. However, the focus at that time was for banks to keep records of unusual or suspicious transactions, verify the identity of customers, and identify the true beneficial owners of the account. She testified that much more emphasis was placed on correspondent banking after the events of 9/11, and that the due diligence requirements on opening a correspondent bank account at that time were more stringent than those that existed in the early 90s. She testified that on opening an account in the 90s, KYC required the bank to understand the size and nature of the customer's business and obtain a copy of the license issued by the regulator but there was no requirement to know everything about the customer's business.

[185]   Ms. Joyce's opinion was that Mr. Cullen met (and even exceeded) the standard of the time in opening the Bank of Antigua account. He collected all of the required banking documentation. He went further and met in person with representatives of the prospective customer in advance. In addition to meeting with the General Manager of Bank of Antigua, Mr. Cullen met with Mr. Davis, the Chief Financial Officer of the ownership group from Houston.

[186]   Ms. Joyce testified about the fact that the regulator in Antigua had approved the Stanford takeover of Bank of Antigua. Her opinion was that Mr. Cullen did a significant amount of work in the Caribbean and would have been in a good position to assess the quality of the regulator. It was not unreasonable for him to rely on the license issued by the authorities. She noted that Mr. Cullen had his colleague make inquiries about the Stanford Group through his contacts in Houston, that TD Bank had a large Houston office, and that this would have been the typical way of getting background on a company at the time.

[187]   With respect to the opening of the SIB account six months later, the plaintiffs' experts are likewise critical of TD Bank. They testified that Mr. Cullen's misunderstanding that SIB was a new business led him to make multiple mistakes. He failed to obtain references on SIB, which

2021 ONSC 3872 (CanLII)

would have led Mr. Cullen to discover that SIB's previous bank was a small one that did not have the capacity to handle the volume of SIB's transactions.[32]

[188]   Messrs. Winer and Delston testified that Mr. Cullen should have obtained an annual report for SIB.  If he had done so, he would have discovered that SIB had previously operated in Montserrat and that its license was in the process of being revoked.  Messrs. Winer and Delston also testified that if Mr. Cullen had conducted additional due diligence, he would have discovered that Mr. Stanford was a former bankrupt.  This would have led TD Bank not to open up the account because Mr. Stanford would not be deemed to be a fit and proper person to be a banker.

[189]   Messrs. Winer and Delston gave evidence about TD Bank opening an account for SIB in the absence of any connection to Canada.  Mr. Winer testified that this should have put TD Bank on inquiry to find out why these funds were being routed through Canada.  Mr. Delston testified that since there was no apparent economic or visible lawful purpose to the account, it would have raised alarm bells at a reasonable bank.

[190]   Ms. Joyce's opinion was that TD Bank met the standard of care in opening the SIB account. TD Bank had been operating an account for Bank of Antigua satisfactorily for six months.  It referred SIB, its affiliate, to the same correspondent bank.  It was typical for different business units to cluster their business with one bank.  Ms. Joyce testified that it was reasonable for TD Bank to take into account the fact that SIB was part of a larger umbrella organization based in Houston and that this was not purely a relationship with an Antiguan offshore bank.

[191]   Ms. Joyce observed that TD Bank had sufficient knowledge about the business of SIB (private banking arm of the Stanford Group), as well as the location of its customers (primarily Latin America).  She testified that it would not have been common to conduct ownership or negative news searches on the owner at the time.

[192]   She further testified that it would not have been common to search for bankruptcy information about the owner.  Even if TD Bank had the information that Mr. Stanford was a discharged bankrupt from years before, it would not have been a relevant consideration.  The *Bank Act*, S.C. 1991, c. 46 did not prohibit dealing with a bank that has a discharged bankrupt as its owner.  Typically, the concern was with a director or owner going into bankruptcy during the time they were licensed to manage a bank.  It might have been relevant if there had been issues with the discharge from bankruptcy or if the bankruptcy had involved the operation of a bank.

[193]   With respect to audited statements, Ms. Joyce testified that it was not mandatory to get them from a prospective customer at the time, although she agreed that it was the general practice. Ms. Joyce testified that statements would be helpful to give a better understanding of the customer's business but it would mostly be for the bank to understand what opportunities there

---

[32] Although the JLs rely on the evidence of Mr. St. Clair Smith that Guardian's previous bank, First Interstate Bank of Thibodeaux, Louisiana, had grown uncomfortable with the SIB relationship, there was no evidence at trial from First Interstate about its relationship with SIB.

2021 ONSC 3872 (CanLII)

2021 ONSC 3872 (CanLII)

were with the client.  It was less critical to get audited financial statements (and due diligence was generally more limited) when no credit was being provided to the customer.

[194]   With respect to the issue of SIB originating in Montserrat, Ms. Joyce testified that it would not have been relevant to ask whether SIB had been previously operating in another jurisdiction, although it might come up in conversation.  She noted that it was not a question that would normally have come up in the context of Mr. Stanford having just been approved to acquire Bank of Antigua.  This is consistent with the evidence that Mr. Cullen knew Mr. Stanford had been approved to acquire Bank of Antigua and his understanding that a new offshore bank was being established at the same time.

[195]   I have already discussed Ms. Joyce's evidence that in the early 90s, several Canadian banks were seeking out broad-based USD clearing account business.  She testified that at the time, it was not a big issue where the beneficiaries were located – if a cheque came in, the bank paid it.  The location of beneficiaries became more of an issue later in the 2000s when Canadian banks started paying much more attention to what was coming in over USD accounts in wire form.

[196]   As between the experts, I prefer Ms. Joyce's expert evidence on the issue of the SIB account opening.  I find that her analysis was more nuanced and took into consideration the unique circumstances of this case – in particular, the interplay of the opening of accounts for Bank of Antigua and its affiliate SIB and the fact that both banks were connected to a larger organization based in the U.S.  She articulated the standards of the time and what KYC actually consisted of in the 90s, when the focus was on ascertaining the identity of the customer and detecting unusual or suspicious activity to assist in the fight against money laundering.  She measured TD Bank's conduct against those earlier standards. She was forthright in acknowledging where Mr. Cullen might have done better but nonetheless said that he met the standard of care at the time.  She was reasonable in her assessment of the bankruptcy and Montserrat issues.  She explained in practical terms how the location of beneficiaries was not a concern in the early 90s for Canadian banks offering broad-based USD clearing accounts and how that changed over time.  Her evidence was consistent with that of Messrs. Sebenski, Muzaffar and Mersch.

[197]   I accept Ms. Joyce's evidence on the account opening process.  The JLs have not proven, on a balance of probabilities, that TD Bank fell below the standard of care with respect to account opening.  The FinCEN Advisory

[198]   The FinCEN Advisory was issued in April 1999 by the U.S. Treasury Department.  Mr. Cullen testified that he did not receive a copy of the FinCEN Advisory at any time while he was the SIB relationship manager.[33]

---

[33] As noted above, Mr. Sebenski testified that he aware of the FinCEN Advisory some time before it was withdrawn in August 2001 but could not remember exactly how or where he became aware of it.  He testified that the information in the advisory was taken into account in his review through the high-country risk rating that TD Bank had assigned to Antigua.

[199]   All of the experts agree that the FinCEN Advisory was directed at U.S. banks.  Messrs. Winer and Delston were critical that TD Bank did not receive the FinCEN Advisory or have systems in place to bring it to Mr. Cullen's attention.[34]  Messrs. Winer and Delston both testified that in response to the FinCEN Advisory, TD Bank should have terminated the relationship with SIB.

[200]   Ms. Joyce disagreed.  She testified that she never once received a FinCEN advisory directly during her career as a Canadian correspondent banker.[35]  She testified that these advisories were distributed only to U.S. banks.  She testified that she did not know how a Canadian banker would have become aware of the FinCEN Advisory and that "you would have to know it existed to ask for it."  She testified that FinCEN was not a standard-setting institution and that it was "a crime enforcement agency and they issue periodic pronouncements on certain topics to U.S. banks."[36]  She further testified that even if a bank had become aware of the advisory, it would have prompted questions but not necessarily have led to closure of the account.  She said that a Canadian bank would have taken it into account in determining how accounts should be monitored.  She observed that TD Bank was already scrubbing individual payments against AML lists and looking for any suspicious transaction behavior.

[201]   Ms. Joyce was a Canadian banker at the time that the FinCEN Advisory was issued.  I place more weight on her evidence as to whether a Canadian banker would have received the FinCEN Advisory and how it would have responded to it than I do on the evidence of Messrs. Winer and Delston.

[202]   The JLs rely on the fact that in cross-examination, Ms. Joyce agreed that Mr. Cullen was in a better position than her to determine what response TD Bank would have had to the FinCEN Advisory.  However, Mr. Cullen's testimony is far from conclusive and does not undermine Ms. Joyce's expert evidence.  Mr. Cullen testified that if he had received the FinCEN Advisory, he would have reviewed all of the TD Bank's Antiguan accounts.  He admitted that the advisory on its face did not refer to Mr. Stanford.  He then said that if he had found out that Mr. Stanford was the representative sitting on the board of the regulatory authority, he would have "probably closed the account."

---

[34] They were also critical that Mr. Cullen did not ask Mr. Davis about the reference to "questionable banking practices, which involve transactions with financial institutions located in offshore jurisdictions" in his September 29, 1999 letter.  Ms. Joyce was not concerned with Mr. Cullen's response to Mr. Davis' letter because Mr. Cullen asked for (and received) a copy of the AML policies.  She testified that she would have preferred to review the policies than have a self-serving presentation by the Stanford legal department.

[35] Ms. Joyce testified that she once got a FinCEN Advisory from a colleague at one of her bank's U.S. affiliates.  Even though TD Bank did have an account for SIB at its U.S. affiliate, it was not a direct clearing account.  It was only for international banking facility deposits.  The evidence is unclear as to whether the account even existed in 1999.  It is insufficient to support the JLs' submission that TD Bank should have received the FinCEN Advisory from its U.S. affiliate.

[36] The plaintiffs point to the fact that Ms. Joyce included the FinCEN Advisory as one of the standards to which a Canadian correspondent banker would have had regard during the Relevant Period.  At trial, she testified that this would only have been if the banker knew about it.  She was quite clear that it would not have been reasonable to expect that a Canadian bank would receive the advisory.

2021 ONSC 3872 (CanLII)

Page: 40

[203]   I place little weight on this evidence. There are too many contingencies built into his answer.  It was given over 20 years after the fact with the hindsight knowledge that Mr. Stanford was a fraudster.  Mr. Cullen admitted that the FinCEN Advisory had to do with money laundering issues, not fraud and there was evidence at trial that Mr. Stanford portrayed himself publicly as a supporter of the fight against money-laundering and regulatory reform in Antigua.[37]

[204]   It is difficult at this time to know what answers Mr. Cullen would have received to his inquiries and what the result would have been.  By the time the advisory was issued, Mr. Stanford had stepped down from the board.  It is speculative to say what Mr. Cullen might have done if he had known about the FinCEN Advisory, made inquiries, and found out that Mr. Stanford was no longer sitting on the board.  It is also speculative to say what TD Bank would have done in light of the fact that no Canadian advisory was issued to Canadian banks at the time.

[205]   I accept Ms. Joyce's evidence that it was not unreasonable for TD Bank not to have received the FinCEN Advisory and closed the SIB account in 1999.  The JLs have not proven, on a balance of probabilities, that TD Bank fell below the standard of care with respect to the FinCEN Advisory.

      (b)   <u>TD Bank's Response to the Senate Report</u>

[206]   Messrs. Winer and Delston were critical of TD Bank's response to the Senate Report that discussed the issues surrounding correspondent banks.  However, they both admitted that they were not aware of what banks in the U.S. were doing in response to the report nor could they give evidence on the response of Canadian banks.

[207]   Ms. Joyce testified that TD Bank's response to the Senate Report was reasonable as the internal audit addressed what changes were required to the bank's processes.  She observed that TD Bank assessed which correspondent relationships should be maintained and which should be exited.  She noted that Mr. Sebenski personally reviewed all of the accounts in the Caribbean and determined which ones to keep and which ones to close.  She concluded that this response was a reasonable one.

[208]   I accept Ms. Joyce's evidence on TD Bank's response to the Senate Report.  She drew on her practical experience as a Canadian banker and took into account what TD Bank actually did at the time with the audit and the review of correspondent accounts.  The JLs have not proven, on a balance of probabilities, that TD Bank fell below the standard of care with respect to the Senate Report.

---

[37] The Wall Street Journal article from April 27, 1999 noted that Mr. Stanford had brought in a team of U.S. consultants to advise the Antiguan government on a "sweeping overhaul of the financial sector" but that the U.S. government was not satisfied with the extent of the reforms that had been made.  As noted above, Mr. Lilley also testified that Mr. Stanford took a public stance against money laundering.

2021 ONSC 3872 (CanLII)

(c) The Philadelphia Inquirer Article

[209]   Messrs. Winer and Delston were critical that Messrs. Sebenski and Muzaffar did not send the Philadelphia Inquirer Article to Mr. Doyle when he was conducting his AML review.  They testified that the article should have led TD Bank to conduct further inquiries into Mr. Stanford and that it should have closed the SIB account in response to the article.

[210]   In her evidence in chief, Ms. Joyce described the article as containing "rumours and gossip."  Similar to Mr. Sebenski's evidence and my factual findings above, she noted that the information in the article was four years old at the time and that the FinCEN Advisory had been withdrawn by that point.  Ms. Joyce said that she would have looked at the situation in Antigua herself but that sending it to the AML Group for more details was an option.

[211]   The JLs rely on the fact that in cross-examination, Ms. Joyce agreed that Mr. Doyle was in a better position than her to determine what response TD Bank would have had to the Philadelphia Inquirer Article.  Mr. Doyle's evidence was that if the article had been brought to his attention, it would have warranted further investigation.  If there was reason to believe that the statements in the article were true, it would have opened up discussions on whether to recommend the exit of the relationship closing the account.  Again, this evidence suffers from the same frailties as Mr. Cullen's evidence about the FinCEN Advisory.  It is speculative, has too many built-in contingencies, and is made with the benefit of hindsight.  Further, the fact that Mr. Doyle says that he would have wanted to see the article is not determinative of whether Messrs. Sebenski and Muzaffar should have sent it to him.

[212]   I accept Ms. Joyce's evidence.  Among other things, she recognized the fact that the information in the article was years old by the time Messrs. Sebenski and Muzaffar received it.  She recognized the position that they were in and the fact that they were not required to send the article to Mr. Doyle.  The JLs have not proven, on a balance of probabilities, that TD Bank fell below the standard of care with respect to the Philadelphia Inquirer Article.

(d) Reputational Risk Memorandum

[213]   Mr. Winer was critical that the Reputational Risk Memorandum did not include a more comprehensive analysis of the risks associated with the Stanford account.  He testified that it should have included, among other things, details of Mr. Stanford's relationship with the Antiguan government, the risks relating to the Antiguan offshore sector, and whether Mr. Stanford himself was a politically exposed person.[38]  His opinion was that the Reputational Risk Memorandum did not permit Mr. Evans to evaluate the relationship properly.

---

[38] There was evidence at trial about whether Mr. Stanford himself was a PEP due to his close association with the Antiguan government led by Lester Bird.  One of the third party search services used by TD Bank, World Check, designated Mr. Stanford as a PEP in its 2004 report. The JLs submit that Mr. Stanford's designation as a PEP would have required a higher level of due diligence on SIB.  However, Ms. Joyce testified that, in her opinion, Mr. Stanford would not have been considered a PEP in Canada

Page: 42

[214]   Ms. Joyce disagreed.   She testified that it was very proactive for Mr. Mersch to be submitting this relationship to the Reputational Risk Committee.   She said that it showed a good sense of judgment given Mr. Mersch's awareness of the unique features of the Stanford relationship.   She did not have any concerns with the way that the relationship was presented to Mr. Evans for his consideration.

[215]   I accept Ms. Joyce's analysis as it takes into account the context in which the Reputational Risk Memorandum was submitted to Mr. Evans and the type of information that would have been relevant to his assessment.   It is also consistent with my factual findings above.   The JLs have not proven, on a balance of probabilities, that TD Bank fell below the standard of care with respect to the Reputational Risk Memorandum.

## SECTION 8: CAUSATION

[216]   In the event that I had found TD Bank liable in either action, I would have had to consider the issue of causation.   The parties agree that the test for causation is the "but for" test, namely that but for the conduct of TD Bank the plaintiffs would not have suffered injury.   The "but for" test does not require scientific or precise proof.   It must be applied using a robust common sense approach: *SFC Litigation Trust v. Chan*, 2019 ONCA 525, 147 O.R. (3d) 145 at para. 117.   It is unnecessary that the defendant's actions are the sole cause of the injury.   As long as the defendant is part of the cause of an injury, the defendant is liable for all losses suffered by the plaintiff, even if the defendant's act alone was not enough to create the injury: *Athey v. Leonati*, [1996] 3 S.C.R. 458, at para. 17.

[217]   The plaintiff must also prove that the loss is not too remote or unrelated to the defendant's wrongful conduct: *Mustapha*, at para. 11-12.   The analysis focuses on whether the plaintiff's actual injuries were foreseeable, as opposed to the type of injury relevant to foreseeability under the duty of care analysis: *Livent*, at para. 78.

[218]   The plaintiffs submit that TD Bank's correspondent account enabled Mr. Stanford to perpetrate the fraudulent scheme and was therefore a cause of SIB's losses.   SIB's U.S. dollar correspondent account at TD Bank was the primary artery for all financial transactions undertaken by SIB and a necessary means for Mr. Stanford to perpetrate his fraudulent scheme.   They submit, relying on Mr. Richmond's evidence, that without TD Bank's U.S. dollar correspondent account, Mr. Stanford's fraudulent scheme would have collapsed as he would not have had the influx of new investor deposits required to sustain the Ponzi scheme.

[219]   TD Bank submits that there is no causation in this case.   It argues that another bank might have provided the correspondent services to SIB, noting that SIB did have other correspondent banks such as Bank of America and HSBC.   The evidence from John Wulff of Bank of America, however, is that it made a policy decision in 1998 to close its correspondent banking business in

during the Relevant Period.   Her evidence is consistent with the definition of a PEP in the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*, S.C. 2000, c. 17.   I accept Ms. Joyce's evidence.

2021 ONSC 3872 (CanLII)

2021 ONSC 3872 (CanLII)

the Caribbean. With respect to HSBC, SIB did open a U.S. dollar account with that bank in 2004 in the U.K. but there is no evidence that HSBC would have been prepared to act as the primary U.S. dollar account for SIB with the volume that TD Bank handled. The plaintiffs rely on the TD Bank employees' evidence that if TD Bank had closed the primary U.S. dollar correspondent account, future banks would have considered that fact relevant in determining whether or not to open a correspondent account for SIB. This is supported by the evidence of both Mr. Delston and Ms. Joyce.

[220]   I accept the plaintiffs' submissions. I find that if TD Bank had been liable for knowing assistance or breach of its duty to SIB, the plaintiffs would have met their onus of proving that causation was established. Without the account, Mr. Stanford would not have been able to receive the continuous influx of new investor funds and maintain the Ponzi scheme. I accept that SIB would have had difficulty finding a replacement to step in as SIB's primary U.S. dollar correspondent bank if TD closed down the account. I accept that if the inflow of funds stopped and the scheme could not continue, SIB would have collapsed. That is precisely what occurred in February 2009. I further accept that if I had found TD Bank liable for Mr. Stanford's insider abuse, I would not have considered SIB's losses too remote as they would have been the natural consequence of his insider abuse.

## SECTION 9: DAMAGES

[221]   The Dynasty plaintiffs claim damages of USD $11,786,593. They rely on the evidence of Antonia Anderson, a chartered accountant and insolvency practitioner with Grant Thornton (British Virgin Islands) Limited and the adjudication letters setting out the Joint Liquidators' approved claims for the Dynasty plaintiffs. The Dynasty plaintiffs also tendered evidence of their recoveries to date. They claim the net amount as their damages.

[222]   TD Bank submits that the Dynasty plaintiffs did not testify at trial and that there is therefore no evidence of the damages they suffered. I reject that submission. I am satisfied that the documentary evidence furnished by the Joint Liquidators in the form of the adjudication letters, supported by the testimony of Ms. Anderson and the evidence of recoveries to date, is sufficiently reliable evidence of the Dynasty plaintiffs' losses. I assess the Dynasty plaintiffs' total damages as USD $11,786,593 and accept the specific calculations for each of the plaintiffs set out below.[39]

[223]   Turning to the JLs' damages claim, their expert Peter Steger of Cohen Hamilton Steger & Co. Inc. measured the losses of SIB as the difference between SIB's actual liquidation deficit as at the current date and the estimated liquidation deficit as at each potential liability date. This

---

[39] Hanif Asaria - Total approved claim amount (USD $873,380.56) less recoveries (USD $71,617.22 & CAD $6,168.10) equals USD $796,088.69. Dynasty Furniture Manufacturing Ltd. - Total approved claim amount (USD $827,677.54) less recoveries (USD $78,030.05 & CAD $6,168.10) equals USD $743,972.84. Dinmohamed (Dean) Sunderji - Total approved claim amount (USD $1,655,355.07) less recoveries (USD $26,485.68 & CAD $14,229.92) equals USD $1,615,777.86. Shafiq Hirani - Total approved claim amount (USD $5,132,283.15) less recoveries (USD $82,116.53 & CAD $50,827.31) equals USD $5,003,405.50. 2645-1252 Quebec Inc. - Total approved claim amount (USD $4,027,225.35) less recoveries (USD $371,523.71 & CAD $30,818.86) equals USD $3,627,348.26.

2021 ONSC 3872 (CanLII)

approach measures the deficit that would have been avoided if TD Bank had closed the account and SIB put into liquidation earlier.  Mr. Steger calculates SIB's losses as USD $4.288 billion if the court finds liability in 1991 and $1.147 billion if the court finds liability in 2007.  He is able to calculate the amount of the losses if TD Bank is found to be liable at some date in between.  All of these figures are exclusive of prejudgment interest and costs.

[224]   TD Bank submits that these calculations are based on the "deepening insolvency theory" that has been widely criticized and rejected in the United States.  It further submits that Mr. Steger's formula does not provide a meaningful measure of damages in this case.

[225]   TD Bank therefore proposes that damages be calculated on the basis of restitution and that TD Bank disgorge the $5.5 million in profits that TD Bank made from the Stanford relationship.  Alternatively, it says that nominal damages should be awarded.

[226]   I reject TD Bank's submissions.  First, TD Bank's submission that restitution damages are appropriate is inconsistent with the basic principle of tort law, namely that the plaintiff be placed in the position it would have been in had the tort not been committed: *Blackwater v. Plint*, 2005 SCC 58, [2005] 3 S.C.R. 3, at para. 74, citing *Athey v. Leonati*, [1996] 3 S.C.R. 458, at para. 32.  The same principle applies if the defendant is liable in knowing assistance: *Christine DeJong Medicine Professional Corp. v. DBDC Spadina Ltd.*, 2019 SCC 30, [2019] 2 S.C.R. 530, affirming dissenting opinion in *DBDC Spadina Ltd. v. Walton*, 2018 ONCA 60, 419 D.L.R. (4th) 409, at para. 239; *Bank of China v. Fan*, 2015 BCSC 590, at para. 165.

[227]   Second, the same issues with respect to the deepening insolvency theory were canvassed by the Ontario Court of Appeal in *Livent*, at paras. 329 to 357.  In that case, the trial judge had calculated damages using the formula (agreed on by the experts) that Mr. Steger used in this case.  On appeal, the court held that the defendant's criticisms about the deepening insolvency theory did not undermine or invalidate the trial judge's damages award.  It agreed with the proposition that traditional damages do not become invalid merely because they have the effect of increasing a corporation's insolvency.[40]

[228]   TD Bank says that if its submission on restitution or nominal damages is not accepted, the court should accept the evidence of its expert Jacob Dwhytie of PricewaterhouseCoopers LLP.  TD Bank's counsel instructed Mr. Dwhytie to calculate SIB's damages as the change in the unrecoverable value of SIB's legal claims relating to the SIB Looting between the time that TD Bank allegedly should have acted to cause SIB to cease operating and the date on which its accounts were frozen, being February 16, 2009.

---

[40] The court cited *Thabault v. Chait*, 541 F. 3d 512 (3d Cir. 2008), at p. 523.  The Court of Appeal's decision was reversed in part on other grounds, *Deloitte & Touche v. Livent Inc. (Receiver of)*, 2017 SCC 63, [2017] 2 S.C.R. 855.  The Supreme Court of Canada did not address the issue of the deepening insolvency theory on appeal.  I note that in *Livent*, the court dealt with the deepening insolvency theory in the causation analysis whereas here TD Bank raises it in the damages analysis.  Either way, the court held that the trial judge's award of damages against Deloitte using Mr. Steger's formula was not precluded by issues with the deepening insolvency theory.

[229]   There is not a big discrepancy between the experts' calculations on damages unless liability is found to have occurred towards the end of the Relevant Period.  Mr. Dwhytie's calculations range from a loss of USD $4.56 billion starting in 1991 to zero in 2008.  As noted above, Mr. Steger's damages range from USD $4.288 billion to $1.147 billion.

[230]   If I had found liability and awarded damages, I would have preferred the calculation of Mr. Steger.  The premise of his analysis was that SIB's broader operations were intertwined with and used to prop up and conceal the fraud.  Mr. Dwhytie's analysis is based on a hypothetical scenario of what would have happened if SIB had operated as a legitimate company throughout the period.  I find that Mr. Steger's methodology is more consistent with all of the evidence adduced at trial on how the fraudulent scheme operated and is further supported by the evidence of Mr. Richmond on how SIB's operations were designed to conceal and perpetuate the fraud.  In my view, Mr. Steger's assumptions better reflect the reality of the situation.

[231]   TD Bank is critical of Mr. Steger for not making a deduction for contingencies.  In *Borrelli v. Chan*, 2018 ONSC 1429, the court refused to apply a deduction for contingencies where the legitimate businesses were used to mask the fraud being perpetrated by the defendant.  In my view, that approach is equally applicable in this case.  TD Bank is also critical of Mr. Steger for not taking into account the time value of money.  However, as he explained, it was not necessary or appropriate in this case when dealing with a deficit to deficit comparison.  I accept his evidence.

[232]   If liability had been established, I would have awarded damages to the JLs based on Mr. Steger's calculation for the liability date in question.

## SECTION 10: TD BANK DEFENCES – LIMITATIONS AND *EX TURPI CAUSA* (JL ACTION ONLY)

[233]   TD Bank asserts two defences in the JL Action.  It submits that the action was commenced beyond the limitation period and is statute-barred.  It also submits that the action is barred by the doctrine of *ex turpi causa*.

## Limitations

[234]   The JL Action was started on August 22, 2011.  TD Bank acknowledges that the first potential date that the JLs could have discovered the claim was February 17, 2009 when the Freeze Order was made public.  TD Bank submits that the claim was discoverable some time after February 17, 2009 and before August 22, 2009 (two years prior to the date the action was commenced) (the "**Discoverability Period**") and is therefore statute-barred.

[235]   The JLs were not the liquidators of SIB during the Discoverability Period.  Shortly after the Freeze Order was issued, the Antiguan court appointed two U.K. insolvency practitioners, Nigel Hamilton-Smith and Peter Wastell, as joint receiver-managers of SIB (the "**Former Officeholders**").  The receivership order did not grant them any authority to commence third party claims.  On April 15, 2009, the court appointed the Former Officeholders as the original joint liquidators of SIB with authority to pursue third party claims.  They remained in that position until

June 2010. The limitations analysis therefore focusses on whether the claim was discoverable by the Former Officeholders during the Discoverability Period as they were the court-appointed officers during that period of time. TD Bank makes it clear that the Former Officeholders were not actually required to commence the action during the Discoverability Period but that the claim had to be brought within two years of the date of discoverability.

[236]   The two-year limitation period begins to run when the claim is discovered within the meaning of the *Limitations Act, 2002,* S.O. 2002, c. 24, Sch. B. A claim is discovered when the plaintiff has the knowledge described in section 5(1)(a) or when a reasonable person as described in section 5(1)(b) ought to have had that knowledge:

> s. 5(1) A claim is discovered on the earlier of,
>
> > (a) the day on which the person with the claim first knew,
> >
> > > (i)    that the injury, loss or damage had occurred,
> > >
> > > (ii)   that the injury, loss or damage was caused by or contributed to by an act or omission,
> > >
> > > (iii)  that the act or omission was that of the person against whom the claim is made, and
> > >
> > > (iv)  that, having regard to the nature of the injury, loss or damage, a proceeding would be an appropriate means to seek to remedy it; and
> >
> > (b) the day on which a reasonable person with the abilities and in the circumstances of the person with the claim first ought to have known of the matters referred to in clause (a).

[237]   The Ontario Court of Appeal has described section 5(1)(b) as establishing a modified objective test: it seeks to make an objective determination by inquiring what a reasonable person ought to have known, but it imbues the hypothetical reasonable person with the subjective 'abilities and … circumstances of the person with the claim': *Service Mold + Aerospace Inc. v. Khalaf*, 2019 ONCA 369, 146 O.R. (3d) 135, at para. 26.

[238]   Peter Wilshire was counsel to the Former Officeholders and travelled with them to Antigua in February 2009. He described the situation they faced as completely chaotic. Investors were on site demanding their money. The SIB employees were stunned by the news. The Former Officeholders had to learn the basics of SIB's business from scratch. The business records in Antigua were voluminous yet did not contain any information relating to SIB's assets or investments. Those were maintained in Houston and the U.S. Receiver for the Stanford entities had control over those records.

2021 ONSC 3872 (CanLII)

[239]   Both sides tendered expert evidence on the approach that a reasonable liquidator would take in those circumstances.  They agreed that the priority for the Former Officeholders was to move quickly and follow the cash belonging to SIB in various jurisdictions.  That required them to seek foreign recognition to be able to access the cash.  Mr. Wiltshire explained how complicated that exercise was because the U.S. Receiver fought the Former Officeholders for recognition at every turn.

[240]   One of the jurisdictions was Canada.  The Former Officeholders moved for recognition before the Superior Court of Quebec (the "**Quebec Court**").  The U.S. Receiver challenged them and sought recognition in Canada through its representative Ernst & Young Inc. ("**EY**").  Competing motions were brought in April 2009 but not heard until late August and early September 2009.  On September 11, 2009, the Quebec Court rendered its decision appointing EY as the interim receiver of SIB's Canadian assets and excluding the Former Officeholders from acting in Canada.

[241]   On April 17, 2009, counsel for the Dynasty plaintiffs commenced an action against TD Bank in Alberta seeking information for use in a related action to recover their investment losses from SIB and various other Stanford companies and individuals (the "**Related Action**").  The action against TD Bank was a "***Norwich* Action**" that sought information from TD Bank.  While the claim alleged that TD Bank was a correspondent bank for SIB "and thereby became involved in the tortious acts of those companies", it did not assert any wrongdoing against TD Bank.  The Former Officeholders were told about the *Norwich* Action but decided not to intervene.  By June 2, 2009, the Former Officeholders' counsel received and forwarded to the Former Officeholders copies of the claims in the Related Action and the *Norwich* Action.  TD Bank submits that by that point at the latest, the Former Officeholders ought to have discovered that they had a claim against TD Bank.

[242]   There are two other points of note during this period.  One is that the Dynasty plaintiffs commenced an action against TD Bank on August 26, 2009 to recover their investment losses based on knowing assistance and negligence by TD Bank in its dealings with SIB.

[243]   The other is that Mr. Davis entered a plea agreement on August 27, 2009.  At that point, the details of the alleged Ponzi scheme were established and became public.  Mr. Wiltshire testified that he felt relief because it was the first time that he and the Former Officeholders had public hard information that gave them any real detail on how the actual fraud had been committed.[41]

[244]   The JLs argue that TD Bank's limitations defence must fail for two reasons.  First, they submit that the limitation period could not start to run before August 22, 2009 because they lacked capacity to bring a claim in Canada.  The earliest anyone had capacity to bring a claim against TD Bank was September 11, 2009 when the Quebec Court granted EY standing to act in Canada to the exclusion of the JLs.  They rely on the case of *Ridel v. Goldberg*, 2019 ONCA 636, 436 D.L.R.

---

[41] While it is not determinative in this litigation, the JLs point out that in other litigation in the U.S., TD Bank has taken the position that the date for limitations purposes was August 27, 2009, the date of the Davis plea agreement.

2021 ONSC 3872 (CanLII)

2021 ONSC 3872 (CanLII)

(4th) 453, to support their argument.  In my view, *Ridel* is distinguishable.  In that case, the plaintiff took an assignment of a claim from a trustee in bankruptcy under s. 38 of the *Bankruptcy and Insolvency Act*, R.S.C., 1985, c. B-3.  The issue was whether the knowledge of the plaintiff or the trustee started the limitation clock running.  In the case at bar, there is no issue of assignment as the Former Officeholders were authorized by the Antiguan court to act on behalf of SIB and therefore had the claim from the outset.

[245]   Alternatively, the JLs argue that, applying the modified objective test, a reasonable person with the abilities and in the circumstances of the Former Officeholders would not have known of the matters in s. 5(1)(a) of the *Limitations Act* before August 22, 2009.  I do not accept the JLs' argument that the limitation period did not start to run just because the Former Officeholders were pursuing other priorities or were short of financing to bring third party claims.

[246]   However, I do accept their submission that the claim is not statute-barred in light of the following circumstances that the Former Officeholders faced:

- While the SEC had alleged a massive fraud in February 2009, it was not until the date of the Davis plea agreement (August 27, 2009) that the Former Officeholders had confirmation that the Ponzi scheme had occurred and details of how it worked and who the perpetrators were.  Most importantly, until the date of the plea agreement, they did not know the role that SIB played in the scheme and how many people within SIB were responsible for the fraud.  It was reasonable for the Former Officeholders to know this information before asserting a claim on behalf of SIB.

- The fact that the Former Officeholders knew early on that TD Bank was a correspondent bank for SIB is not, in my view, a sufficient basis to know that there was wrongdoing that would give rise to a claim against TD Bank.

- I accept Mr. Wiltshire's evidence that the Former Officeholders' inability to access the business records of SIB in Houston before August 22, 2009 prevented them from having a complete picture of SIB's assets and its business operations with the TD Bank.  This information would have been critical in determining whether SIB, a customer of TD Bank, had a claim against its own bank.

- The *Norwich* Action did not allege any wrongdoing on the part of TD Bank.  It was simply an action by the Dynasty plaintiffs seeking information and disclosure for the purpose of pursuing claims against SIB, Mr. Stanford and others.  I do not accept that it was a point of discoverability for a claim against TD Bank.

- The fact that the Dynasty plaintiffs brought a claim on August 26, 2009 is irrelevant to the question of whether SIB's claim was discoverable by August 22, 2009.  The limitations analysis focuses on the abilities and the circumstances of the person with the claim.  The Dynasty plaintiffs were investors in the CDs and were not customers

of TD Bank.   Both the nature of their claim against TD Bank and their circumstances were markedly different than those of SIB.

[247]   On the record before me, I cannot be satisfied that the JLs' claim against TD Bank was discoverable before August 22, 2009, more than two years before the action was started.   TD Bank's limitation defence fails.

### *Ex Turpi Causa*

[248]   TD Bank submits that the JL action is barred by the doctrine of *ex turpi causa*.   That defence bars an otherwise valid action in tort on the basis that the plaintiff has engaged in illegal or immoral conduct and therefore should not recover: *Livent*, at para. 98.   TD Bank submits that the Perpetrators' actions should be attributed to SIB and that SIB should be precluded from recovering losses for its own fraud.

[249]   The test for the *ex turpi causa* defence was set out by the Supreme Court of Canada in *Livent*.   It is available in very limited circumstances.   The court confirmed the test in *Canadian Dredge & Dock Co. v. The Queen*, [1985] 1 S.C.R. 662 that to attribute an individual's fraudulent acts to a corporate employer, two conditions must be met: (i) the wrongdoer must be a directing mind of the corporation; and (ii) the wrongful acts of the directing mind must be within the scope of his authority.   However, for the purpose of the attribution analysis in the case of fraud, an individual will stop being a directing mind if the wrongful act: (i) was totally in fraud of the corporation; and (ii) was not by design or result at least partly for the benefit of the corporation.   The court noted, relying on *Canadian Dredge*, that the corporate attribution doctrine is only one of "judicial necessity" and that where its application would not provide protection of any interest in the community or would not advantage society by advancing law and order, the rationale for its application "fades away".   The court stated that a strict application of the corporate attribution doctrine will generally not be warranted in civil cases.

[250]   The *ex turpi causa* doctrine is applied only where necessary to "preserve the integrity of the justice system", and that integrity will only be compromised where a "damage award in a civil suit would, in effect, allow a person to profit from illegal or wrongful conduct.": *Livent*, at para. 98.   It stated that courts retain the discretion to refrain from applying it where, in the circumstances of the case, it would not be in the public interest to do so.

[251]   In this case, the fraud was perpetrated by the Perpetrators, including two of SIB's directors, Messrs. Stanford and Davis.   The scheme was not known to others at SIB.   TD Bank has admitted that through the fraudulent scheme, Messrs. Stanford and Davis misappropriated SIB's assets.   Mr. Richmond agreed that SIB was the victim of the scheme.

[252]   I cannot accept TD Bank's argument that Messrs. Stanford and Davis were the directing minds of SIB for purposes of attribution.   They were not acting within the scope of their authority when they were misappropriating SIB's assets.   Even if they were, they ceased to be directing

2021 ONSC 3872 (CanLII)

2021 ONSC 3872 (CanLII)

minds since their wrongful acts were "totally in fraud" of SIB and were not "by design or for the benefit of" SIB.  Once the fraud was discovered, SIB collapsed and was put into liquidation.

[253]   Even if I accept that Messrs. Stanford and Davis meet the minimum criteria for corporate attribution, I would exercise my discretion not to apply the *ex turpi causa* doctrine.  The JL Action is being brought by the Joint Liquidators seeking recovery of SIB's losses.  Any amounts recovered will be distributed to SIB's creditors, the investors whose funds were paid to SIB and misappropriated by Messrs. Stanford and Davis.  Mr. Stanford will not receive anything.  It would not be in the public interest to apply the doctrine of *ex turpi causa* to bar investors from seeking recovery of their losses from Mr. Stanford's fraudulent conduct.[42]

[254]   TD Bank's *ex turpi causa* defence fails.

**Conclusion and Decision**

[255]   Hindsight is 20/20.  While we now know that Mr. Stanford was a fraudster who operated a Ponzi scheme, TD Bank did not know or have any reason to suspect that he was engaged in fraudulent behaviour at the time.

[256]   These actions seek to hold TD Bank responsible for Mr. Stanford's wrongdoing.  Applying the legal principles to the facts of this case, and viewing the evidence from the perspective of the facts known to TD Bank prior to 2009, I have concluded that there is no basis at law for TD Bank to be held liable for that wrongdoing.

[257]   To summarize:

(a)   The claims of both the Joint Liquidators and the Dynasty Plaintiffs against TD Bank for knowing assistance in breach of fiduciary duty are dismissed.

(b)   With respect to the Joint Liquidators' claim against TD Bank in negligence, there was no duty of care by TD Bank to protect SIB from insider abuse in the circumstances of this case.  Even if TD Bank owed a duty of care to SIB, it did not fall below the standard of care of a reasonable banker.

(c)   If I had found TD Bank liable in either action, I am satisfied that the plaintiffs would have established causation.

---

[42] TD Bank relies on a 2013 decision of the U.S. District Court for the Northern District of Texas in a summary judgment motion brought by the SEC after the criminal convictions of Messrs. Stanford and Davis.  The court granted partial judgment against Messrs. Stanford and Davis, SIB and SGC.  As against SIB, the court permitted the SEC's claim for disgorgement but refused a civil monetary penalty. It distinguished between Mr. Stanford and SIB. The judgment against SIB was not based on any attribution of Mr. Stanford's actions to SIB. In my view, the U.S. case does not assist TD Bank on the issue of corporate attribution or support the application of the *ex turpi causa* doctrine.

(d)     If I had awarded damages in the Dynasty Action, I would have fixed those damages at USD $11,786,593.

(e)     If I had awarded damages in the JL Action, I would have used the calculations provided by Mr. Steger as at the liability date in question.

(f)     If I had found a basis for TD Bank's liability in the JL Action, I would have dismissed its limitation defence and its *ex turpi causa* defence.

[258]   The actions are dismissed.

[259]   If the parties are unable to agree on costs, I will receive written submissions (no longer than ten pages double spaced, exclusive of bill of costs).  TD Bank's costs submissions shall be delivered within 21 days and the plaintiffs' costs submissions within 21 days thereafter.  TD Bank may file reply submissions of not more than five pages within seven days thereafter.

_____
CONWAY J.

**Released:** June 8, 2021

2021 ONSC 3872 (CanLII)

**CITATION:** McDonald and Dickson v. TD Bank, 2021 ONSC 3872
**COURT FILE NO.:** CV-12-9780-00CL and CV-09-8373-00CL
**DATE:** 20210608

# ONTARIO

## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

**BETWEEN:**

MARK MCDONALD of Grant Thornton (British Virgin Islands) Limited and HUGH DICKSON, of Grant Thornton Specialist Services (Cayman) Ltd., acting together herein in their capacities as Joint Liquidators of Stanford International Bank Limited

Plaintiffs

**– and –**

THE TORONTO-DOMINION BANK

Defendant

**AND BETWEEN:**

DYNASTY FURNITURE MANUFACTURING LTD., SHAFIQ HIRANI, HANIF ASARIA, DINMOHAMED SUNDERJI and 2645-1252 QUEBEC INC.

Plaintiffs

**– and –**

THE TORONTO-DOMINION BANK

Defendant

---

## REASONS FOR JUDGMENT

---

**CONWAY J.**

**Released:** June 8, 2021

2021 ONSC 3872 (CanLII)