# EXHIBIT BC

# OFFSHORE BANKING, CORRUPTION, AND THE WAR ON TERRORISM

## HEARING

BEFORE THE

### SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

OF THE

### COMMITTEE ON INTERNATIONAL RELATIONS HOUSE OF REPRESENTATIVES

ONE HUNDRED NINTH CONGRESS

SECOND SESSION

MARCH 29, 2006

**Serial No. 109–154**

Printed for the use of the Committee on International Relations



Available via the World Wide Web: http://www.house.gov/international_relations

U.S. GOVERNMENT PRINTING OFFICE

26–777PDF                    WASHINGTON : 2006

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

85

persuaded to combat money laundering, can do so. But little effort has been made, as far as I know, to educate the technicians on the evils attendant on their money funds without leaving a trace.

A few months ago I was speaking with a European banker from a smaller institution, who was in the business of paying and receiving United States dollars to and from Cuba, in the face of economic sanctions. The mechanics were interesting. He would send dollars to, say, a Venezuelan bank by making a bank to bank transfer through New York. Cuban names, bank accounts, and other identifying information would simply not appear on the transfer. He would also send a SWIFT message to the Venezuelan Bank, not through the United States, instructing his Venezuelan banker to put the money into the account of the Cuban bank or company.

So much for that bank and sanctions against Cuba.

If we persuade the banking industry to stop using the bulk bank-to-bank transfers—the SWIFT 202s—we will establish better control over the ultimate beneficiary of the money being moved. But we can not implement such a rule without achieving consensus that it is a good idea. Just as laws depend on the consent of the governed, sanctions can work if they are kept simple, and the cause is perceived to be just. Sanctions can not be implemented and forgotten; the arguments in favor of any sanctions must be kept fresh, and made as often as necessary to keep people persuaded that sanctions, a step short of war, should be maintained.

Thank you.

Mr. ROHRABACHER. Thank you very much, and will return for some questions momentarily.

### STATEMENT OF JONATHAN M. WINER, ESQ., PARTNER, ALSTON & BIRD, LLP

Mr. WINER. Thank you, Mr. Chairman. This is an Oversight and Investigations Subcommittee. I am going to speak to those issues, and I also want to address the sanctions issue raised earlier.

Sanction busting is a very big issue for this country. When economic sanctions are widely adopted, they have an impact. When they are adopted by the U.S. alone, they can usually be circumvented and circumvented easily. It is easy for targets of sanctions to bust them when the foreign country does not honor them. Iran is a perfect example. Bank Melli Iran, a state-owned institution; go on the Web. You can find out their correspondent banks. They have correspondent bank relationships in Bahrain, France, Germany, Hong Kong, Oman, the UAE (United Arab Emirtes), and the United Kingdom. The entity that has those relationships is a UK subsidiary of the Iranian bank.

Another one that I want to bring your attention to: Bank Sepah is lovely because if you go on their Web site, not only do they have correspondent banks in the UAE, Australia, Canada, Switzerland, Denmark, Germany, the UK, Hong Kong, Japan, Norway, and Sweden; they say, oh, if you want to be in dollars, by the way, call and inquire. If you need to get it through the United States, call and inquire. Now that is available online.

Similarly, the United States has long imposed sanctions on Cuba. If a United States person wants to wire funds to Cuba, all he or she has to do is to go to a bank in Canada, including some that advertise on the Web, and wire funds to that bank, use a hush mail account or another closed e-mail account, tell them to keep your records over there, and use that foreign bank account, which you report on your 1040, Schedule B—you have not violated that law—to do whatever you want, including send funds to Cuba. It is going to be almost impossible for the United States to find out. That is merely one mechanism. There are lots of others. The fundamental problem: Canada does not believe in the sanctions, nor does the

86

EU. It makes them essentially impossible to enforce. My testimony goes into more detail as to how you go about violating those sanctions if you want to.

So given all of this, where might the Subcommittee consider spending its time? By the way, I would endorse pretty much everything that has been said by my counterparts on this table. First, the Subcommittee can, and should, investigate key nodes of illicit finance. The Treasury has indicated some of these nodes publicly: Latvia, northern Cyprus, and Burma. I believe the issue of how Iran moves its funds through international banks remains an important area for further exploration and one where Congress could play a significant role.

I would also still love to know where Saddam Hussein got his Iraqi currency. The amazing thing about the investigation that you looked at this morning is that it identified Iranian currency, Cuban currency, and what was the other one, Burmese currency perhaps? It never answered the question of where all of those fresh dollar bills came in Iraq. I think we ought to know. I do not know the answer, but we ought to. Somebody ought to be investigating it.

Secondly, investigate cases of international corruption. This Subcommittee could play an important role by focusing on illicit financing in jurisdictions where corruption and other financial crime relating to money laundering could have a particularly significant impact on the United States. One possible focus of such an investigation could be the banking system of China, which has long struggled with the problem of money laundering and corruption embedded in many of its major financial institutions. Other possible candidates for such investigative efforts, in addition to Iran, would be Pakistan and Nigeria.

It is worth, as my colleagues have suggested, focusing efforts on compliance in weak jurisdictions, in some of the smaller jurisdictions. Section 311 of the USA PATRIOT Act is a very powerful tool. The Treasury has barely used it, has been afraid to use it. The market access consequences of its use are immediate and profound. People respond to Section 311 designations almost instantaneously.

Mr. ROHRABACHER. Could you repeat what you just said, that last sentence?

Mr. WINER. Section 311 designations create limitations on market access to foreign financial institutions or, more broadly, the economic systems of a country that have been designated if a country is designated. It is not IEEPA (International Emergency Economic Powers Act) sanctions. It is not national security sanctions. It is PATRIOT Act sanctions, a powerful tool that Congress gave the Administration after September 11. It has been used a little. It will probably be used more.

Similarly, the PATRIOT Act gives the power, further, and the Administration has the power under IEEPA, the International Emergency Economic Powers Act, to designate a foreign financial institution or a business that facilitates terrorist finance as a supporter of global terrorism and freeze those assets. You can even freeze those assets using long-arm jurisdiction that the Congress gave the Administration. So if you have the assets at a foreign bank that touches the United States, you go to the foreign bank, and you say, "Sorry, Foreign Bank. We know you have got the as-

87

sets of that guy over there in that country. We are grabbing that amount of assets here in the United States. You can make it up over there." We barely use that.

The President has issued an Executive Order saying he is going to go after companies that facilitate WMD (Weapons of Mass Destruction) proliferation and put them as designees under IEEPA. That is a very significant action taken by the President. I would like to see the intelligent community and law enforcement agencies and regulators working with the Administration to use that very aggressively, and, again, Iran might be a terrific opportunity for further use in that regard, and this Subcommittee could do investigative work in that area that might facilitate it.

Finally, developing systems for regulating gold, diamonds, and other barter commodities used by terrorists needs to be done. There has been insufficient work doing it. This Subcommittee could focus on it. Reviewing the regulation of free zones, developing global standards for free zones—another area that people have just failed to undertake to this point. Reviewing the international regulation of charities is still an area that requires further work that has not been done.

Finally, I note that Congress, in 2001, passed the PATRIOT Act calling on the Administration to enact regulations comprehensively affecting all financial institutions within 12 months. It is now four and a half years later. There are significant sectors that are still not the subject of regulations. That invites regulatory arbitrage.

"Regulatory arbitrage" means that if a bank cannot do it, but a hedge fund can because a bank is regulated, and a hedge fund is not, I am going to do it in the hedge fund. That is regulatory arbitrage. That is merely one example. There are no hedge fund regulations now on money laundering. If you are a hedge fund, you have no antimoney laundering obligations right now. Proposed regs only. It has been four and a half years.

Finally, the criticality of traceability, which my colleagues referred to. There is no reason for any country in the world to be permitted to use the common plumbing, the common financial infrastructure that we all use to move money around the world, without guaranteeing that funds can be traced from beginning to end when something goes wrong, whether it goes wrong from sanctions busting, a terrorist, a drug money launderer, a spouse hiding money from a husband, or a wife hiding money from their ex-spouse. It does not matter. The transactions need to be traceable, and the information needs to be shared, and the U.S. foreign policy should be focused on that goal because there are a lot of goals that can be accomplished not just for the United States but for a lot of other countries that cannot tolerate what we can tolerate because they are not as wealthy, if we were to focus on that. Thank you very much for your attention.

[The prepared statement of Mr. Winer follows:]

PREPARED STATEMENT OF JONATHAN M. WINER, ESQ., PARTNER, ALSTON & BIRD, LLP

Mr. Chairman and Members of the Subcommittee:

I am pleased to be here to discuss the role of offshore banks and their relationship to capital flight, money laundering, and other illegal activities, including their support of terrorism. I am also happy to provide you my understanding of how inter-

88

national banks have assisted U.S.-sanctioned countries in circumventing U.S. sanctions regimes. My understanding is based on some 20 years of experience working in this field, including undertaking investigations in this area during my service for the other Congressional body, and my six years as Deputy Assistant U.S. Secretary of State for International Law Enforcement from 1994–1999, prior to my becoming a partner at Alston & Bird, LLP, where my legal practice includes a significant focus on money laundering, sanctions, terrorist finance, corrupt payments, and related issues. In my testimony, I will address in brief each of the issues you have asked me to cover sequentially.

## THE HISTORIC ROLE OF OFFSHORE BANKS

During the 1990s, U.S. policymakers and some of their European counterparts had come to recognize that offshore banks had essentially no meaningful controls in place to prevent money laundering. Such banks were typically "ring-fenced," meaning that they offered services only to non-resident of the countries in which they were incorporated. Thus, in return for a fee, a foreign person could place funds into an account in a bank secrecy haven that would refuse to cooperate with law enforcement and regulators from their home country. The account was typically opened in the name of a trust or other shell entity, in turn was managed by nominees. In some cases, the shares of the shell entity would be bearer shares, so that no one could prove the beneficial ownership of the accounts. We used to refer to this practice as "renting sovereignty," and many of those trying to combat it viewed it as a form of state-sponsored piracy.

Such a system was designed for tax evasion and capital flight, and used aggressively and effectively from the dawn of the era of international electronic banking and payments systems in the early 1980's to the close of the 20th Century by Colombian drug traffickers, Russian oligarchs, Nigerian and Filipino kleptocrats, Serbian genocidaires, and sanctions-busters alike. In that period, international banks, functioning mostly as "off-shore" jurisdictions by providing services to non-residents, provided continuing technical services to a wide range of practical destabilizers. Periodic eruptions of scandal revealed that drug and arms money launderers, diamond and timber smugglers, traffickers in people, terrorists, and corrupt officials chose a similar range of institutions to move and maintain their funds. These institutions typically included (a) small international business companies or trusts, established in jurisdictions of convenience, which establish (b) bank accounts at local financial institutions, which have correspondent banking relationships with (c) major international financial institutions, which (d) move funds willy-nilly throughout the world without regard to the provenance of the funds. The infrastructure for non-transparent international finance has nodes that have specialized in particular kinds of services. For example, until recently, the Bahamas and the Virgin Islands were among the world's principal creators of anonymous international business companies ("IBCs"). The Channel Islands, Gibraltar, and the Dutch Antilles were world-class centers for the establishment of trusts to hide the true ownership of funds. A single firm in Liechtenstein laundered political slush funds for ruling political parties in France and Germany; arms purchases for civil wars in Liberia and Sierra Leone; drug money for Ecuadorian cocaine trafficker Jose Reyes-Torres, and stolen funds for various West African dictators. The Liechtenstein example is not unique. Financial nodes that initially provide services for one purpose, such as tax evasion, over time attract more sinister illicit purposes.

As an increasing number of significant global problems became linked to illicit finance, money laundering had become recognized during the 1990's as a global problem requiring a global response. Prior to September 11, this response included new international instruments, such as the 2000 United Nations Convention to Combat Transnational Organized Crime; the Second Money Laundering Directive, issued by the European Union in late 2001; and the Financial Action Task Force ("FATF") and Organization for Economic Cooperation and Development ("OECD") name and shame exercises. Notably, the major self-regulatory organizations, such as the Basel Committee for Banking Supervision ("BGBS"), the International Organization of Securities Commissions ("IOSCO"), and the International Association of Insurance Supervisors ("IAIS") had also focused on extending standards for international regulation to cover transparency issues. The new standards were designed to respond to the major failures of existing financial regulation to provide protection against illegal activities. Each organization focused on major gaps in the international regulatory system that had translated into injuries to domestic supervision and enforcement. These gaps included:

- Fragmented supervision, within countries by sector, and among countries by national jurisdiction.

89

- Exploitation of differences among national laws to use regulatory arbitrage to circumvent more stringent national laws and international standards.
- Secrecy laws which impede the sharing of information among countries and between regulators and law enforcement.
- Inadequate attention to electronic payments in existing anti-money laundering supervision and enforcement, including "know your customer" rules, that focus on currency, even as the world's financial services businesses rapidly continue their move into E-money.
- The lack of international standards governing key mechanisms used in transnational financial transactions, such as international business companies ("IBCs"), off-shore trusts, off-shore insurance and reinsurance companies, and off-shore fund vehicles, including but not limited to hedge funds.
- Minimal due diligence by company formation agents, attorneys, and financial institutions in the process of incorporating and licensing of new financial institutions and shell companies and trusts owned by their affiliates.

In response, there was a convergence as to what the standards must be to protect many countries against many simultaneous threats. In essence, the standards had begun to require a form of "know your customer" at both the front end and the back end of any transaction. At the front end, bankers and other financial facilitators had become required to know with whom they are dealing, and at some level, what there customers have been doing with their money. At the back end, those permitting withdrawals of funds have needed to know not only who has been getting the money, but where it came from. That way, should something go wrong, the funds can be traced.

Requiring financial institutions to "know your customer," and countries to share bank records with one another in cases involving financial crime, are at the core of the international money laundering and terrorist finance enforcement and regulatory regime that has begun to be built over the past decade. This principle became embedded in the work of the G–7 Financial Stability Forum, of the EU's Third Directive on Money Laundering, effective last year, and in the USA–PATRIOT Act, enacted after September 11. These new legal regimes no longer treat all bank accounts as inherently equal, but require those who handle the funds of others to know who the beneficial owner is of an account, regardless of the nature of the account. In cases where an account is established through a jurisdiction that is inadequately regulated, or designed to hide beneficial ownership, these regimes would shut off access entirely.

In the period from 1999 through 2004, the U.S. participated in naming and shaming a number of jurisdictions, in providing evaluation, training and technical assistance to many more jurisdictions, and thereby contributing substantially to a very great change in the prevailing banking practices. In brief, "ring fencing," or the provision of services by banks solely to non-residents, became generally deemed to be unacceptable, and has been dramatically attenuated. Exchange of bank records instead of being a rarity, became increasingly commonplace. And the U.S. risk from shell banks and under-regulated jurisdictions became substantially more manageable.

BANKS AND CAPITAL FLIGHT

Capital flight is the phenomenon of money leaving a country as a matter of avoiding political risk or taxation, or of receiving higher rates of returns elsewhere. It is ordinarily a sign that the economic and governance conditions in the country from which the capital is fleeing are uncertain or deteriorating. In recent years, we have seen massive amounts of capital flight from the countries of the former Soviet Union, from much of sub-Saharan Africa, and from elites in Latin America and Asia at times of political upheaval. It is normal for banks to want to serve wealthy customers, and jurisdictions such as Cyprus, the Channel Islands, the Bahamas, Singapore, Gibraltar, and Liechtenstein became prominent providers of financial services for such capital flight.

Provision of services for capital flight has been a somewhat subtler process than the provision of ring-fenced offshore services to criminals, and less susceptible to regulation. To this day, the process of capital flight continues to be facilitated by banks. Very often this takes place through legitimate banks accepting what appear to be legitimate proceeds of transactions involving international trade, especially natural resources. The technique of under-invoicing for goods allows an exporter to generate funds outside of a country and thus free from taxation and regulation. The technique of over-invoicing for goods allows an expert to send additional funds out of the country to a confederate or to a shell company under the guise of an arms-

length transaction, and thereby similarly to create funds off-shore. Preventing these kinds of frauds is very difficult, and requires a great of cooperation among competent—and honest—customs officials in the countries involved. Needless to say, competent, honest customs officials are not always present in countries experiencing substantial levels of capital flight.

MONEY LAUNDERING AND CORRUPTION

The world's kleptocrats, whether Marcos, Mubuto, Abacha, or Sukarto, have used a common financial services infrastructure to steal national wealth. Grand corruption has been a prominent feature of political and social conflict or civic breakdown in Albania, Argentina, Burma, Cambodia, Congo (Zaire), Colombia, Haiti, Indonesia, Iran, Liberia, Nigeria, Panama, Pakistan, Peru, the Philippines, Romania, Sierra Leone, Yugoslavia, and Zimbabwe, among other jurisdictions. In each case, the looting of government treasuries has involved funds or resources residing within these countries being moved from the countries to other jurisdictions through the world's major international banks. In some cases, the theft of national treasuries has been accompanied by other harmful activities, whose proceeds have been laundered by the same mechanisms. These include costly or illegal arms deals (Angola, Colombia, Liberia, Sierra Leone, Somalia, Sudan), the smuggling of diamonds used to purchase arms deals in civil wars (Angola, Liberia, and Sierra Leone), grand-scale theft of oil and timber (Burma, Cambodia, Nigeria, Russia, Thailand), illegal dumping of environmental toxics (Guyana, Suriname), and embezzlement or other abuses of funds lent by international financial institutions such as the World Bank (endemic).

Countries that during the 1990's saw their national wealth disappear to other jurisdictions at the direction of ruling kleptocrats include (from A to Z):

- Albania, decapitalized by a pyramid scheme that moved its funds to Italy and Western Europe;
- Angola, whose immense national resources vanished amid the ongoing civil war between President Dos Santos and Jonas Savimbi;
- Burma, where funds generated by narcotics, jewels, and illicit timber were exported for covert reinvestment in more business friendly environments such as Singapore and Hong Kong by people working with the junta;
- Cambodia, which featured similar features of first generating illicit funds and then having them become flight capital under Hung Sen;
- Estonia, which found substantial amounts of its national wealth apparently transferred to Russia in the mid-1990's in a pyramid scheme arranged by a prominent banker with close ties to Latvia's then government;
- Gabon, whose oil revenues were sent offshore and handled by U.S financial institutions on behalf of senior leaders who had stolen the proceeds;
- Indonesia, where billions of dollars disappeared offshore in connection with grand corruption under former dictator Suharto, with some $9 billion ending up in a nominee account maintained at an Austrian bank;
- Kazakstan, where funds from oil revenues were laundered offshore for the benefit of senior leaders;
- Mexico, where the brother of president Carlos Salinas, Raul Salinas, was found to have moved at least hundreds of millions of dollars representing either stolen government funds, bribes, or the proceeds of narcotics trafficking, to Switzerland;
- Nigeria, where General Sani Abacha stole billions that were then stored in major banks in Luxembourg, the U.K., Liechtenstein, Switzerland and the Channel Islands, among other locations;
- Pakistan, where military rule replaced democratic civilian rule after hundreds of millions of the proceeds of corruption were found in Swiss banks, discrediting the elected Prime Minister and her family;
- Russia, whose financial system collapsed in 1999 amid massive money laundering overseas through the Caribbean, the South Pacific, New York, and London;
- Serbia, whose wealth was converted to the control of Slobodan Milosevic and his wife through such jurisdictions as Cyprus and Lebanon, while Serbia was subject to global sanctions by the United Nations;
- Ukraine, where substantial stolen assets of the state were found to have been laundered to the United States under the control of a former prime minister, after being handled by a number of Swiss banks;

- Zaire (Congo), whose national wealth was exported by the late dictator Mobuto to Swiss banks.

### TERRORIST FINANCE

International terrorism represents an obvious threat to global security, just as domestic terrorism does to individual nations. In every case, terrorist organizations need to generate, store, and transport funds, often across borders. While not every domestic terrorist organization needs to launder money through cross-border transfers, over time, many such organizations choose to locate portions of their infrastructure at some distance away from planned terrorist activities. To do so, they establish cells to operate in jurisdictions separate from those where their political base is, or where their operations will be carried out. Prior to September 11, multinational movements of terrorist funds, involving the use of major international financial institutions have been traced to terrorist movements based in Afghanistan, Burma, Chechnya, Colombia, Israel, the Palestinian Territory, Kosovo, Lebanon, Northern Ireland, Pakistan, Papua-New Guinea, the Philippines, Somalia, Sri Lanka, Sudan, and Turkey. Although the terrorist organizations based in each of these countries have some level of minority popular support, their power and effectiveness have been leveraged by their ability to hide, invest, and transport their funds through the world's international financial institutions. A summary of the nations whose banks were used to handle funds for Al-Qaeda's attacks prior to September 11 instructive. Available public sources show Al Qaeda and related groups to have been able to move funds to institutions in the following countries: Albania, Australia, Austria, the Bahamas, Belgium, Canada, the Caymans, Cyprus, France, Germany, Greece, Hong Kong, Indonesia, Iraq, Italy, Kosovo, Kuwait, Libya, Macao, Malaysia, Malta, Mauritius, the Netherlands, Nigeria, Panama, Pakistan, the Philippines, Poland, Qatar, Saudi Arabia, the Seychelles, Singapore, Somalia, South Africa, Sudan, Switzerland, the United Arab Emirates, the United Kingdom, the United States, and Yemen.

But all of that was pre-September 11. Do international banks knowingly move terrorist funds today? The short, simple answer is "no." The down-sides are huge, and the banks make very serious efforts to avoid handling such funds, backed up by a harmonized international regime of know-your-customer and the customer's activities, UN and U.S. lists of sanctioned persons and entities, customer identification requirements, and suspicious transaction reporting requirements. But does that mean that the terrorists cannot move their funds? Certainly they can.

Today, the movements of terrorist funds involve a significant amount of cash couriers moving bulk currency from sources to recipients. Such funds also move to some extent through alternative remittance mechanisms such as halawadars, otherwise known as informal value transfer systems, usually operating in ethnic communities. It is not yet clear whether terrorists are taking advantage of new online payment mechanisms using the Internet to move funds through one-time-use facilities that do not require customer identification, but such mechanisms would likely be usable by terrorist groups sending funds to a cell in a different country. For similar reasons, stored value cards, in which one can load money at a merchant location for use at an ATM machine anywhere in the world, have an obvious terrorist finance potential. Again, it is not yet possible to determine whether this mechanism is actually being used for this purpose.

### SANCTIONS BUSTING

The U.S. has long had vigorous programs of economic sanctions that apply to U.S. based financial institutions under the Trading With the Enemy Act ("TWEA"), applied for more than 40 years to Cuba, and under the International Emergency Economic Powers Act ("IEEPA"), applied to many different countries, organizations, and individuals over the past 25 years. Economic sanctions are intended to deprive the target of the use of its assets and deny the target access to the U.S. financial system and the benefits of trade, transactions and services involving U.S. markets. These financial sanctions have had widely varying effectiveness, with the degree of effectiveness heavily related to their degree of universality. Those adopted widely often have an impact. When they have been adopted by the U.S. alone, they have generally been widely circumvented.

In a nutshell, it is easy for targets of sanctions to bust sanctions if a foreign country does not honor them. For example, the government of Iran has long been subject to financial sanctions in the U.S. Yet Bank Melli Iran, one of the Iranian government's major state owned institutions, has an extensive international network of correspondent banking relationships, with branches and offices in Azerbaijan, Bahrain, France, Germany, Hong Kong, Russia, Oman, the UAE and the United King-

92

dom. In practice, there is very little, if anything, that Iran cannot obtain in the international markets with this kind of access to international banks—access that is provided as a matter of state policy by the governments concerned. The Iranian bank, Bank Sepah, has a UK subsidiary that advertises itself as "truly international in character with relationships in over 45 countries worldwide," whose main business trade finance for Iranian exports and imports, with correspondent banks in the UAE, Australia, Canada, Switzerland, Denmark, Germany, the UK, Hong Kong, Japan, Norway, Sweden—and the U.S.—though for that relationship one is required to "call and inquire."

Similarly, the U.S. has long imposed sanctions on Cuba. Yet if a U.S. person wants to wire funds to Cuba, all he or she has to do is to a bank in Canada, including some that advertise on the web, and wire funds to that bank. For example, funds are transferred to Cuba via Canada-based Transcard from secure bank accounts in Canada. Similar businesses located in Europe, such as Spain and Italy-based SerCuba and Switzerland-based AWS Technologies, are proliferating. The problem is that other countries do not support the U.S. on these sanctions, making them effectively unenforceable.

If I choose to engage in sanctions busting, it would be very easy for me to do so without getting caught. I could open up a bank account in a foreign country, such as Canada, that does not abide by the particular sanction. I would duly report that account on my federal income tax forms, thereby abiding by U.S. tax reporting laws. I would wire funds to that account. And then, using an anonymous and encrypted e-mail account, and there are many such services my personal computer, I would instruct the foreign bank to wire funds to the sanctioned country, and to send me records pertaining to that account solely to my secret, anonymous, encrypted e-mail account.

The key for the U.S. to avoid this scenario is simple: obtain international support for the sanction involved. Because unilateral sanctions simply are no longer sustainable in a global environment.

OPPORTUNITIES FOR INVESTIGATION AND OVERSIGHT

In light of the complexity of the uses of offshore banks and international banks for illicit finance of one kind or another, and the advanced state of the multiple ongoing initiatives to discourage such use, what opportunities may exist for this Committee to undertake investigative and oversight work in this field? I suggest this committee consider the following options:

*1. Investigate Key Nodes of Illicit Finance.*

I respectfully suggest that there remain important nodes for illicit activity that may be worth focused attention by this Committee, with its international jurisdiction. The Treasury has indicated some of these nodes publicly, those in Latvia, Northern Cyprus, and Burma. I believe that the issue of how Iran moves its funds through international banks remains an important area for further exportation, and one where Congress could play a significant role. Treasury officials may be willing to identify other such nodes to this Committee behind closed doors. Investigations by the Committee into the correspondent banking relationships, historic and current, relating to these jurisdictions, of international banks, could well illuminate how bad actors are able to move funds internationally in the face of sanctions designed to prevent them from so doing. Similarly, if the Committee wishes to understand sanctions busting better, it can bring in the Federal Reserve and Treasury officials who have looked most closely at how the sanctions busting was done, and through investigation and oversight, assess additional steps that could be taken to respond.

*2. Investigate Cases of International Corruption.*

The other Congressional body carried out important oversight work in the years 2000–2002 on the issue of money laundering and corruption by focusing on particular jurisdictions. At this time, this Committee could play an important role by focusing on illicit finance relating to jurisdictions where corruption and other financial crime relating to money laundering could have a particularly significant impact on the United States. One possible focus of such an investigation could be the banking system of China, which has long struggled with the problem of money laundering and corruption. Other possible candidates for such investigative efforts could include Iran, Pakistan, and Nigeria.

*3. Focus Efforts on Compliance In Weak Jurisdictions*

Having reviewed key nodes, this Committee could look at which jurisdictions continue to have inadequate compliance measures in place, and could recommend the

93

U.S. government consider further actions to isolate the financial institutions of any countries that fail to address money laundering and terrorist finance sufficiently. Treasury has this power under Section 311 of the Patriot Act. To date it has been used sparingly and not at all in relationship to financial institutions in the Middle East. It may well be that further Congressional attention to Section 311 authorities and their use could result in additional focus by the Administration and by foreign governments on the implications of this tool.

*4. Proceed With Designations of Foreign Financial Institutions and Businesses as Facilitators of Terrorist Finance or Nuclear Proliferation.*

If we have any information regarding a foreign bank or business providing assistance or support to a terrorist group, our government should use its sanctions authority to designate such an institution. This has been done rarely since 2001, and again, tailored use of this tool could well leverage U.S. power. There is an especially significant opportunity to sue this tool in connection with the President's Executive Order regarding sanctions against persons and entities facilitating WMD proliferation. The Congress could play a useful focus in focusing the world's attention on this Executive Order and the entities against whom it could be used.

*5. Develop Systems for Regulating Gold, Diamonds, and Other Barter Commodities Used By Terrorists.*

It is in the interests of our government to understand how terrorists use commodities in conjunction with hawalas and other alternative remittance systems to go around the formal system of banking and thereby to fund terrorism. Our understanding of these areas remains inadequate. The need for understanding them and then developing systems for marking and regulation is critical for us to make it harder for terrorists to evade oversight. The pioneering work done by the Drug Enforcement Administration ("DEA") in understanding the black market peso exchange, which involved money laundering through commodities as well as alternative remittance systems may be a useful place to begin in this analysis. Ultimately, we will need regulatory regimes covering these additional sectors, applied on a global basis through the FATF.

*6. Review the Regulation of Free Zones and Develop Global Standards.*

The world's free zones have long been vulnerable to money laundering, due to their relative lack of customs controls. The Gulf States today have some prominent free trade zones, multiple mechanisms for alternative and informal payment systems, and these are adjacent to gold markets. Panama's Colon Free Zone has demonstrated that this combination is susceptible to money laundering abuse. Yet to date there is no global set of regulations applying to free zones to deal with money laundering and terrorist finance vulnerabilities. While regulation and review of free trade zones may today in the first instance be in the jurisdiction of other Committees, attention should be given to thinking through the intersection of the payments systems and trade documentation at the free trade zones to determine whether the zones today pose special vulnerabilities for terrorist finance.

*7. Review International Regulation of Charities.*

Review the international regulation of charities. Terrorist groups continue to seize on charities as a means of raising and moving funds and logistical support. As NSC terrorist finance chief Juan Zarate has testified before Congress, "the infrastructure of charitable organizations and their geographic scope have enabled terrorist groups to shift funds, supporters and operatives around the world quietly through charities." The U.S. has worked to develop case studies and typologies of terrorist abuse of charities, working closely with the Financial Action Task Force ("FATF"). It has also developed measures that donors and charities can use to protect themselves, releasing the "Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S. Based Charities," which it released in November 2002. Mr. Chairman, these voluntary measures are fine. But they are voluntary. They should be mandatory. Charities should be no less responsible for combating terrorist finance than are financial institutions. We require banks, mutual funds, money services businesses, broker/dealers, investment advisers, and many other categories of financial institutions to put anti-money laundering policies and procedures in place as a condition of license. We are in the processing of requiring insurance companies, which are state-regulated, loan or finance companies, which are largely unregulated, and hedge funds, which by definition are not subject to regulation, to put these policies and procedures into place. And yet we have done nothing to require charities—which are tax exempt institutions and required to file documentation with the IRS to maintain that status—to put anti-money laundering policies and procedures in place.

94

If the voluntary standards are worth anything, they should be more than voluntary. The problem with charities funding terrorism has not been limited to foreign charities, but has involved charities based in the U.S. In an affidavit filed in U.S. federal court, U.S. Customs Agent David Kane cites a recent CIA report made public in response to a FOIA request, which states that of more than 50 Islamic nongovernmental organizations in existence in 1996, "available information indicates that approximately one-third of these Islamic NGOs support terrorist groups or employ individuals who are suspected of having terrorist connections." We should put into place regulations of charities similar to that of other businesses we have found to have substantial risk of money laundering or terrorist finance, with at least a baseline of anti-money laundering and terrorist finance policies and procedures made a condition of tax exempt status. We should then move to have that approach implemented internationally.

I thank you for providing me the opportunity to testify and remain available to respond to your questions.

Mr. DELAHUNT. Mr. Chairman, if I could, that was great testimony.

Mr. ROHRABACHER. Your may proceed.

Mr. DELAHUNT. I am going to excuse myself for 10 or 15 minutes. I shall return. I just have a few questions.

Mr. ROHRABACHER. It is unfortunate. This was just the 10 minutes I was going to ask about Halliburton.

Mr. DELAHUNT. I will check that record.

Mr. ROHRABACHER. Well, thank you all for your terrific testimony. A couple of things here. Mr. Evans, you talked about small money, money in small amounts being clean money, then going bad, as being perhaps the biggest component of the problem that we are looking at. What about big money that is basically drug money? Here we have, whether it is in Latin America or elsewhere, billions of dollars of drug money. Is not this a major component?

Mr. EVANS. Absolutely. It is a major component, and it is a major problem, but it is a different problem. The problem we have with criminal proceeds, whether it is from drugs or from stolen money, of tracing that money and recovering it is a very different kind of a problem than having mechanisms in place where we can prevent money coming into the country for bad purposes. The amount of money used to finance September 11th—I have heard the number, but it is very modest, a couple of hundred thousand dollars or something like that. It is a different problem. I am not suggesting one is a problem and the other is not, just that it is a different problem.

Mr. ROHRABACHER. Knowing those types of operations, I will tell you that it might have cost a couple of hundred thousand dollars for just the specifics of it, but in the setting up and the running of al-Qaeda during that time, the operations that were needed to support that, we are talking about tens of millions.

Mr. EVANS. Offshore, yes.

Mr. ROHRABACHER. Yes. The actual buying of tickets or something like that for somebody, paying for their hotel room or whatever was minimal, but that was a very well-financed operation. By the way, does anyone here know exactly where that money came from? Where did that money come from that paid for the training of the pilots, the keeping of the pilots, the communication, the sustaining of these 19 terrorist individuals who ended up slaughtering 3,000 Americans? Where did that money originally come from? What bank was being used to transfer it? Do we know that? Mr. Winer?