# EXHIBIT BD

Jonathan M. Winer

# Illicit Finance and Global Conflict

Economies of Conflict: Private Sector Activity in Armed Conflict



 **Fafo**

Jonathan M. Winer

# **Illicit Finance and Global Conflict**

Economies of Conflict: Private Sector Activity in Armed Conflict

**Programme for International Co-operation and Conflict Resolution**
**Fafo-report 380** Electronic Version. Embargoed until 25 March 2002

© Fafo Institute for Applied Social Science 2002
ISBN 82-7422-363-2
ISSN 0801-6143
March 2002

# Contents

Preface .................................................................................................. 5
Executive Summary ........................................................................... 7

**1 Structural Consequences of the Globalization of Money ........... 17**

**2 Impact of Globalization on Political Stability and Conflict ........ 21**
2.1 The Money Launderer's Common Financial Infrastructure ................. 21
2.2 International Money Laundering and Grand Corruption ................... 33
2.3 The Financing of Terrorism and Armed Conflict .................................. 35
2.4 Conclusion: The Cross-Currents of Illicit Finance ................................. 38

**3 Existing Initiatives ........................................................................... 41**
3.1 "Know Your Customer" .......................................................................... 41
3.2 Naming and Shaming Jurisdictions ...................................................... 42
3.3 The OECD Harmful Tax Practices Initiative ........................................... 46
3.4 The Wolfsberg Principles: A Private Sector Alternative ....................... 47

**4 Implementing Global Standards for the Private Sector ............. 53**

Annex A: The FATF "Black List" ................................................................. 57

About the Author ...................................................................................... 59
About Fafo and PICCR ............................................................................... 59

"Globalisation can pose problems, not just for individuals, but for governments as well. New opportunities are opened up for individuals and enterprises to engage in illegal activities, such as hard core cartels, bribery, money laundering and tax abuses, which distort trade and investment flows . . . We must urgently address this dark side of globalisation if we are to maintain broad political support for open markets and for the benefits that these can bring in terms of greater freedom and choice for citizens and enterprises worldwide." Seiichi Kondo, Deputy Secretary General of the OECD, January 8, 2001.[1]

"When we talk about accumulation of wealth, we have an open system in this country. We have friends that help us as friends and that's how we get money. We do not get money from the Liberian people's money – *because it is not there.*" Charles Taylor, President of Liberia, explaining the sources of his wealth to listeners on Liberian radio, Monrovia, quoted February 15, 2001.[2]

---

[1] Opening speech at the High Level Consultations on OECD Harmful Tax Competition, Barbados, 8 January 2001, at http://www1.oecd.org/media/speeches.htm#kondo

[2] "Taylor's Acquired Wealth and the Moment of Truth," The Perspective, February 15, 2001; http://www.theperspective.org/wealth.html.

# Preface

The lifeblood of some armed conflicts is the revenue generated by natural resources or illicit trade. Illicit financial services are the arteries that transmit and deploy those revenues. Put in the simplest of terms, illicit finance is what makes it possible for money from the sale of conflict goods to buy small arms to be used in war. In the words of the author of this study, "(i)llicit finance has played and continues to play a role in undermining many of the goals of the United Nations and international security policy."

This study was commissioned by Fafo's Programme for International Co-operation and Conflict Resolution (PICCR) as part of a research project entitled *Economies of Conflict*. The project examines the links between certain private sector activity and armed conflict, focusing on the question, How does certain private sector activity help sustain armed conflict and what can be done about it?

The objective of *Economies of Conflict* is to contribute to policy and practice in the private, public and NGO sectors. As with past PICCR projects, we have chosen an inductive approach, seeking to contribute to these arenas through an analysis of experience and lessons-learned. To this end, we have commissioned studies from practitioners and researchers with a keen sense of what has worked – and what has not worked - in practice. This has been made possible by the financial support provided to *Economies of Conflict* by the Government of Norway, for which we are grateful. Thanks also to officials of Norway's foreign ministry who have shown particular leadership on this issue. Of course, the views and recommendations expressed in this report are those of the author alone and do not necessarily reflect the views of Norway, its Government or officials, or Fafo.

Jonathan M. Winer, the author of this study, has extensive experience from government and private practice on issues relating to the regulation of money laundering and the problems associated with corruption and financial crime. His study describes the global structural challenges presented by illicit finance, including its role in helping to sustain armed conflict, and analyses efforts now underway to meet these challenges. My thanks to Mr. Winer for an extremely useful and timely contribution to attempts to grapple with the financing of armed conflict.

Mark Taylor
Programme Director, PICCR
Series Editor, Economies of Conflict

# Executive Summary

In recent years, with every substantial national, regional, or global failure of governance, a financial scandal has been found in close attendance. Accompanying each financial scandal has been the systemic use of banking and financial secrecy to hide criminal activity. Over the past decade, this pattern has played out repeatedly in jurisdictions all over the world. Repeatedly, political conflict and major political destabilizing activity, including grand corruption, narcotics trafficking, arms smuggling, and civil war have been facilitated and sustained by illicit finance networks embedded in the world's licit financial services infrastructure.

### Structural Consequences of the Globalization of Money

In Latin America, Mexico lost a quarter century of economic growth when the peso collapsed in 1994, amid evidence of drug money laundering and massive high-level corruption. Similar financial catastrophes in which billions went missing attended the collapse of governments in Ecuador, Peru, and most recently, in late 2001 and early 2002, Argentina[3]. Fraudulent pyramid schemes decapitalized nations in transition in Albania, Bulgaria, and Latvia. Kleptocrats stole and then sequestered the national wealth of the Congo/Zaire, Indonesia, Nigeria, and Russia using the same infrastructure of globalized financial services to hide their money. The use of the offshore sector to mask large financial losses facilitated the industrial-corporate-governmental corruption that has burdened the economies of Japan, South Korea and Taiwan. The same global financial infrastructure and major global banks handled political slush funds laundered for former German Chancellor Helmut Kohl and similar monies for illicit arms trafficking by the son of the late

---

[3] See e.g. The Guardian, "In Argentina Today, the police raid foreign banks, January 18, 2002. "Police in Buenos Aires made dawn raids on foreign banks yesterday as part of an investigation into allegations that billions of dollars was smuggled out of Argentina in the days before its financial collapse last month. The investigation into reports that the regime of the former president, Fernando de la Rua, allowed $10bn to disappear offshore came as the slide into economic chaos continued with the resignation of the central bank governor, a sharp drop in the stock market and a further decline in the value of the peso."

French President Francois Mitterand[4]. Major international banks in Europe, the Americas and the Middle East processed the funds moved from the Persian Gulf by Al Qaeda and Osama bin Laden to terrorist cells around the world, transmitting them by electronic transfers until they became cash delivered by automatic teller machines. Even nations with strong anti-money laundering, financial transparency and disclosure laws continue to find themselves victimized by regulatory failures, as the recent case involving Enron - the seventh largest company in the U.S. prior to its bankruptcy - has vividly demonstrated.

In each case, the common infrastructure of global banking and financial services has been abused by criminals to accomplish serious crimes. Repeatedly, governments, regulators, law enforcement agencies, and the most important and prestigious international organizations have found themselves unable to trace illicit transactions after something has gone radically wrong.

## Structural Consequences of the Globalisation of Money

Affluent countries like the members of the G-7 or the European Union may be able to tolerate and ultimately to shrug off abuse of their financial institutions by criminals, fraudsters, corrupt officials, and terrorists who launder hundreds of billions of dollars per year in illicit funds. For countries in transition and for less developed economies, the theft of natural resources or development assistance, capital losses from public funds gone missing, or the perversion of government institutions through bribery, create burdens that are not so easily managed.

Recently, this problem has begun to be recognized within a macroeconomic context. In January 1999, International Monetary Fund (IMF) staff issued a report concluding that offshore banking centers had played a sometimes "catalytic" role in recent Asian and Latin American financial crises. The IMF found that global offshore assets and liabilities – whose ownership has often been impossible to trace - had grown by over 6 percent annually during the mid-1990s to about $4.8 trillion.

The IMF staff working paper found that services provided by such centers, and the banks, lawyers, accountants, and company formation agents working with them, had contributed to global financial crises by hiding risk and loss in ways that professional home country supervisors and auditors were unable to penetrate.

- In Argentina, some $3 billion to $4 billion were lost or hidden offshore by April 1995;

---

[4] See e.g. Newsweek, July, 2000, online international edition, "The Kohl Case: Oh, What a Tangled Web: The tale of how Germany's CDU nurtured a system of corrupt finance."

- In Venezuela, billions in problem loans were moved offshore in 1994;

- In South Korea, insider dealings off-shore circumvented regulatory limits on bank lending from 1993 through 1996;

- In Thailand, poor lending decisions were "rolled over" offshore from 1993 through 1996;

- In Malaysia, some $10 billions in losses were hidden offshore in 1997.

In each case, the IMF found that the offshore sector had created a problem of inadequate transparency and fragmented regulation, which "increases the potential for dubious activities and contributes to weakening good governance in banks and corporations." [5]

## Impact of Globalization on Political Stability and on Areas of Conflict

There is increasing recognition that globalization has facilitated the growth of local financial problems into international ones. Indeed, Robert Litan, an economist at the Brookings Institution in Washington, describes regional and international financial contagions as a direct consequence of a "process of globalization [that] has also facilitated the transmission of financial crises across national borders." [6]

At least as significant is the role that globalization has played as a process that has facilitated the transmission of crises of *governance* across national borders. There is also a growing body of academic work analyzing the impact of globalization on different forms of conflict within jurisdictions, including economic conflict, social conflict, and political conflict, as well as military conflict. For example, a 1999 study undertaken by Norwegian sociologists Ranveig Gissinger and Nils Petter Gleditsch on globalization and conflict used econometric modeling to research the relationship between high levels of trade and political stability world-wide between 1965 and 1993. The Norwegian researchers found that exports of manufactured goods create high levels of welfare and equality, while exports of agricultural products promote poverty and inequality, which in turn become among the factors that lead to political instability.[7]

[5] Lucia Errico and Alberto Musalem, Offshore Banking: An Analysis of Macro-and Micro Prudential Issues, IMF Working Paper (WP/99/5), January 1999.

[6] "Economics: Global Finance," Robert E. Litan, in Managing Global Issues, Carnegie Endowment for International Peace, 2001.

[7] "Globalization and Fonclit: Welfare, Distribution and Political Unrest," Ranveig Gissinger and Nils Petter Gleditsch, Journal of World-Systems Research, Vol 5, 2, 1999, 327-365.

Separately, an econometric study undertaken for the World Bank by Paul Collier and Anke Hoeffler found that an important predictive factor for civil war between 1960 and 1999 is the availability of finance, with primary commodity exports substantially increasing the risk of conflict due to making rebellion economically viable.[8]

Economist Dani Rodrik, a professor at the Kennedy School of Government at Harvard University, has also reviewed the relationship between globalization and conflict. His study found that where governance was weak, the economic changes brought by globalization increased internal conflicts. Professor Rodrik found that "the world market is a source of disruption and upheaval as much as it is an opportunity for profit and economic growth. Without the complementary institutions at home - in the areas of governance, judiciary, civil and political liberties, social insurance, and of course education – the result is too much of the former and too little of the latter." [9]

Financial transparency is a core structural requirement by which governments, regulators, law enforcement, judiciaries, civil litigants, and journalists can exercise oversight and insist on the accountability of both important private sector and public sector actors. Its absence facilitates impunity, which in turn often leads to conflict. Jurisdictions that do not have financial transparency, and which do have natural resources that can be readily exported with minimal accountability, are often those where direct foreign investment and agricultural exports have led to impoverishment and conflict, rather than development and democracy, as found in the Gissinger/Gleditsch study.

Lack of financial transparency plays a substantial facilitating role when members of a country's ruling class steal national wealth, or "grand corruption". The corruption of the Suharto family and crony capitalists in Indonesia, of the Nigerian military under Sani Abacha, and of the oligarchs in Russia were all made possible by international bankers. Funds stolen at home were transmitted to offshore havens in the Channel Islands, the South Pacific and the Caribbean, before coming to rest for investment in places like London, Zurich, and New York.

Less recognized, perhaps, has been the role that transnational movements of dirty money have played in harming the global environment. For example illegal trading in ozone-depleting chloroflorocarbons (CFCs) requires the smuggling of not only the CFCs but also the money generated by smuggled CFCs. Similarly, when illegal

[8] "Greed and Grievance in Civil War," Paul Collier and Anke Hoeffler, October 21, 2001, Development Research Group, World Bank.

[9] Rodrik, Dani (1997b), Has Globalization Gone Too Far?, Institute for International Economics, Washington, DC., see also Professor Rodrik's speech, Globalization, Social Conflict and Economic Growth, presented to UNCTAD in Geneva on October 24, 1997.

logging takes place in Cambodia, or toxic wastes are dumped in Guyana, the funds generated from those criminal activities are not limited to cash payments in the local economy. Smuggling large quantities of illegal timber or toxic wastes across international borders requires both falsified shipping documents and payments for the goods offshore. These payments are in turn moved through the global financial system so that criminals can enjoy or reinvest the fruits of their crime.

Human rights, too, have been undermined by the ease with which international criminal organizations have been able to launder their funds across borders. Criminal organizations smuggling people across borders need to move funds across borders as well, to bribe officials, to pay off other elements of their infrastructure, and to send remittances back home for further recruitment of their human cargo. The same phenomenon is present as an element in the trafficking of women. The women's economic value is sharply greater at a distance from their original home. Funds they generate as sexual slaves have been reinvested in the transborder infrastructure that enslaved them, laundered across many national borders.

Illicit finance is also a key facilitator of civil war and civic instability. The laundering of the proceeds of crime is a necessary means to carry out the trade in diamonds that has fuelled armed conflict in Liberia, Angola and Sierra Leone, together with their accompanying arms deals and payoffs. The narcotics trade has long been understood as a massive generator of illicit money to be laundered, as well as a generator of corruption and weakened governance. Drug trafficking is also closely associated with conflict, and one of the enduring factors in such conflict is the fact that drug funds sustain combatants in civil wars. It is no accident that each of the three countries which produce most of the world's opium and coca crops — Afghanistan, Burma, and Colombia – have ongoing insurrections fuelled by drug money.

In short, illicit finance has played and continues to play a role in undermining many of the goals of the United Nations and international security policy. Dirty money laundered through the world's major financial institutions simultaneously threatens democracy, human rights, free markets, the environment, sustainable development, governance, political stability, and civil society. Contrary to the position of many banks and bankers, moving money from country to country, disguising its origin, and enabling its use for criminal purposes, is not a morally neutral activity.

**11**

### Existing Initiatives

As Brookings Institution economist Robert Litan has recently stated, successful international efforts to regulate cross-border finance generally only emerge in response to crises.[10] The sheer scope of the present anti-money laundering initiatives provide some indication that a lack of global financial transparency has created just such a crisis, requiring a comprehensive global response.

In the late 1990's, money laundering became recognized as a global problem requiring a global response. This response now includes new international instruments, such as the 2000 United Nations Convention to Combat Transnational Organized Crime and the Second Money Laundering Directive, issued by the European Union in late 2001. It is also includes the rapid development of "name and shame" sanctions programs. The most important has been that initiated by the member states of the Financial Action Task Force (FATF) against "non-cooperative countries and territories." In the first two years that the FATF threatened to limit market access to jurisdictions not meeting international standards, most of the nearly twenty targeted jurisdictions enacted new anti-money laundering laws. The Organization for Economic Cooperation and Development (OECD)'s similar exercise against "unfair tax competition" is having a similar impact on ring-fencing, the strategy by which jurisdictions offer unregulated financial services to non-residents that they deny to their own citizens. Most recently, the new consensus was demonstrated after September 11 2001. After the United Nations Security Council passed UN Resolution 1373, most nations took actions to freeze the assets of a wide range of terrorists and terrorist organizations, while taking other steps to make themselves less vulnerable to terrorist finance.

Principle self-regulatory organizations, such as the Basel Committee for Banking Supervision (BGBS), the International Organization of Securities Commissions (IOSCO), and the International Association of Insurance Supervisors (IAIS) have focused on extending standards for international regulation to cover transparency issues.[11] The new standards have been designed to respond to the major failures of existing financial regulation to provide protection against illegal activities. These failures have included:

• Fragmented supervision, within countries by sector, and among countries by national jurisdiction.

---

[10] Litan, id, p. 197.

[11] See e.g. Statement of the G-7, June 18, 1999; "Strengthening the International Financial Architecture," Report of the G7 Finance Ministers," June 18–20, 1999; "Financial Havens, Banking Secrecy and Money-Laundering, UN ODCCP, New York, May, 1998; and numerous recent analytic documents of the Basel Committee available on the website of the Bureau of International Settlements ("BIS").

- Exploitation of differences among national laws to use regulatory arbitrage[12] to circumvent more stringent national laws and international standards.

- Secrecy laws that impede the sharing of information among countries and between regulators and law enforcement.

- Inadequate attention to electronic payments in existing anti-money laundering supervision and enforcement, including "know your customer" rules, which focus on currency, even as the world's financial services businesses rapidly continue their move into E-money.

- The lack of international standards governing key mechanisms used in transnational financial transactions, such as international business companies (IBC), off-shore trusts, off-shore insurance and reinsurance companies, and off-shore fund vehicles, including but not limited to hedge funds.

- Minimal due diligence by company formation agents, attorneys, and financial institutions in the process of incorporating and licensing of new financial institutions and shell companies and trusts owned by their affiliates.

Over time, the existing international initiatives to respond to these problems are creating a new global code articulating new international standards for transparency. Each of these initiatives is based on the promise that national financial service regulators have the capacity to determine whether their own "local" institutions meet the standards or not. Under the principle of consolidated supervision, the home country regulator of any international financial institution is solely responsible for exercising oversight over the global operations of that institution. Although far from infallible, over the past ten years the principle of consolidated supervision has proven helpful by requiring multi-jurisdictional financial institutions to take their home regulators seriously. In turn, these home regulators are increasingly subject to a common set of standards, such as those established by the Basel Group of Bank Supervisors ("Basel Group"). Over time, these standards have come to promote global financial stability by promoting good practices for banks in their lending and investment practices. However, the same system has to date demonstrably failed to do much to protect the world from money laundering.

---

[12] Regulatory and enforcement arbitrage are mechanisms by which private sector entities structure transactions to avoid the laws of a jurisdiction with stricter standards in favour of a jurisdiction that is more lax. In the borderless world of global finance, the ability to engage in regulatory arbitrage has grown exponentially. As a result, there has been a corresponding reduction in the ability of domestic regulators and law enforcement agencies effectively to enforce local laws on businesses based in that jurisdiction.

There is mounting evidence to justify questioning whether global banks, operating transnationally to move money instantaneously across national borders, can be readily regulated or supervised by any one country. While these financial institutions may have their headquarters nominally based in a single country — typically one of the G-7 countries, the EU, or Switzerland – they generate profits and carry out activities on a global basis involving dozens of UN member states. As a result, they are for many purposes beyond the capacity of any single state to police. The current "name and shame" exercises have had the salutary effect of forcing some of the world's least-adequately regulated jurisdictions to abandon traditional notions of bank secrecy, and to begin insisting that their financial institutions carry out due diligence and know their customers. But these exercises have not and cannot create capacity at a national level to assess the meaning and integrity of cross-border financial transactions. It is not reasonable to expect a small jurisdiction that houses a subsidiary of a major international financial institution to fully understand the cross-border transactions engaged in by the subsidiary, let alone by its affiliates or far-away parent. In practice, even the most sophisticated and best regulated financial centers, including those of the G-7, European Union, and Switzerland, are similarly incapable of exercising adequate oversight over the global enterprises they license.

### Developing and Implementing Global Standards:
### A "White-list" for Global Finance

In recent years, the proposed solution has been a mixture of public sector regulation and private sector self-regulation. Self-regulation has been advocated as a means by which private institutions subject to market forces will, as a matter of good business, avoid transactions that could lead to transactional, institutional, or reputational risk. However, it is not clear that this approach has been effective. Indeed, the combination of both government regulation and self-regulation has not to date effectively discouraged abuse of financial institutions operating globally by drug traffickers, terrorists, major financial criminals, corrupt officials, arms smugglers, or sanctioned regimes, let alone those engaged in local armed conflict, timber theft, or other criminal activity.

Today, there is no list that evaluates whether international financial institutions have complied with basic rules of transparency or integrity. On the "name and shame" side, there is no compilation ranking major international institutions for the greatest or least laundering of proceeds of drug trafficking, corruption, terrorist finance, illegal logging, toxic waste, human trafficking, or corporate fraud, although such a ranking might be compiled from court documents, public investigations and press reports. Nor has there been a list involving a "seal" or "certificate" system by

which an institution can be endorsed as having put into place a series of best practices to promote transparency.

Every year, many billions of dollars flow from international organizations and international financial institutions through the world's major international banks. These public funds are deposited and held in these private-sector institutions without consideration as to whether these institutions have put into place excellent transparency policies and procedures, or minimal ones. Indeed, such funds are deposited and held in private sector institutions that have had no due diligence or know your customer principles, if they happen to be located in jurisdictions where such principles are either not required, or are minimally enforced. The value of such deposits to the private sector financial institutions is substantial, generating not only substantial fees but the ability to engage in further lending activities of their own, due to the multiplier effect of bank deposits.

To date, the only limitations placed on those holding or benefiting from such international funds has been the obligation of the institutions to adequately account for the uses of those funds. Broader obligations, such as requiring a particular bank to have in place strong measures for financial transparency or protection against money laundering, have not been expected of private sector banks by the international organizations and international financial institutions that deposit their funds in such institutions. Rewarding private sector institutions who agree to meet high standards of transparency for the funds they process on a global basis could create a significant incentive for banks, providing a further weight to existing national efforts.

**15**

# 1 Structural Consequences of the Globalization of Money

It may be self-evident that globalization has changed many practical elements of banking and financial services. However, the structural consequences - for the financial sector as well as for states - of globalized financial services are not often spelled out.

### Prior to globalization money was local, ...

Prior to globalization and since the days when money based on something real, like shells or gold, was replaced by state-created "fiat money," money in circulation in most countries has generally been issued by sovereign states, or alternatively, by private sector financial institutions solely regulated by the sovereign state in which the institution was based. The stored value that money represents has been a value determined locally, by the people within the jurisdiction that issued the currency, in relationship to the value of other commodities traded in that individual economy. Money was trusted locally to the extent that others would accept it in the society. To the extent that the national currency was valued at a distance by other countries, that currency would tend to be discounted, given that its principal value for the purchase of goods and services was local.[13]

### ...banks were local, ...

International finance is certainly not a new phenomenon. International lending was a substantial and familiar activity by the third quarter of the 19th century. But most banking prior to the era of globalization and securitization was done locally by local banks. These local banks were largely dependent on their local community, and vice-versa, with the respective fates of the local banks and the local

---

[13] In the U.S., for example, it is only the federal government that is required to accept the U.S. dollar as payment for a debt. Section 102 of the Coinage Act of 1965 states merely that all coins and currencies of the U.S. are legal tender for debts, public and private. That is, someone offering to pay in dollars has made a legal offer to pay a debt. However, no private business in the U.S. is required to accept currency as a form of payment. In theory, a private business preferring to be paid in gold, cheese, or Euros has the unfettered legal right to accept the alternative commodity, if the firm's confidence in the dollar is low.

communities at least moderately interdependent. To go beyond the community was potentially dangerous for a bank, because of the substantial impediments to enforcing a financial obligation at a distance.

### ...and cross-border transactions were costly and slow.

Prior to the establishment of comprehensive electronic payments systems in the last two decades, cross-border financial transactions were largely conducted on paper that required physical transport. For most transactions, the efficiencies of conducting those transactions locally  outweighed the benefits of obtaining a broader market of buyers or sellers, depositors or borrowers beyond the particular jurisdiction. In particular, use of the off-shore sector, such as Caribbean or the Channel Islands, were limited to very large financial institutions for tax structuring and trade finance, or alternatively, to small-time operators specializing in tax and creditor avoidance schemes. Access to the offshore sector was not something available to the ordinary business or citizen. For corrupt heads of state, money moved abroad was typically hand-carried to Switzerland.

### Regulators could monitor local financial services...

 In an environment in which most money was generated and spent locally, and not readily replaced by other currencies in other jurisdictions, regulators were free to develop local regulatory regimes for local purposes. Some of these regimes were minimalist, others were comprehensive, but few would have met what are today basic standards for safety and soundness. However, subject to local politics and the corruption factor, the regulatory regimes were inherently enforceable as an expression of national sovereignty. A financial institution definitively found to have engaged in unacceptable misbehaviour could be fined, lose its license, and be closed. While bank runs, bank frauds, and bank collapses remained an enduring part of the economic life of any free-market jurisdiction, enforcement at a local level was possible, and a recognized fact likely to have a substantial impact on market behaviour within the regulated institutions.

### ... and taxes were collected at borders.

Prior to globalization, the predominant mechanism for governments to collect revenues was not by taxing income, but by tariffs, levied on goods at point of sale, and most especially when crossing borders. Revenue collection in such a tax regime required the border to be a barrier before it could be a crossing. Strong controls at the borders, including currency controls, were vital to the survival of the state. In

this environment, barriers at the border, including barriers to unregulated cross-border finance, were an essential element of preserving and protecting national sovereignty.

### With Globalization, money has become a global commodity,…

Although a government can give its currency a name and a putative value, the actual value of a currency in a globalized world is determined by global markets, in particular private sector assessments of its value in comparison with other forms of stored value. Similar valuation is given to any currency the world over, regardless of location, making money a commodity the value of which can be affected by the actions of the government that issued it, but not controlled by it. The loss of local control over money has meant that the valuations given to it locally may be less relevant to its strength as a durable commodity – an object that stores value – than the valuations given to it by those who have no particular stake in that currency. Being a global commodity, money may also be less susceptible to local control and regulation. As Alan Greenspan, chairman of the United States' Central Bank, the Federal Reserve, has observed, "in the international arena . . . no overarching sovereign exists to decree what is money. Instead, a myriad of private agents must somehow reach agreement."[14]

### …and banks are international.

Where local banks were once dependent on local economies, international banks invest their capital wherever opportunities may present themselves, whether they are in New York, Jakarta, or Moscow. Home regulators cannot confine them, and indeed, neither can home regulation. If a local regulation appears inconvenient, it can be avoided through structuring some of the elements of the financial activity offshore. In many instances, transacting financial services offshore is more efficient and less expensive than conducting similar services on-shore. The offshore sector's minimal regulation reduces transaction costs.

[14] "The euro as an international currency," speech, Alan Greenspan before the Euro 50 Group Roundtable, Washington, D.C., November 30, 2001.

### Regulators cannot monitor international activities of financial institutions...

Home country regulators do not themselves in practice audit international financial institutions internationally[15]. For the most part they rely on self-regulation and reporting by the institutions they oversee, accompanied by the work of outside private sector auditors privately retained by those institutions. A financial institution that does not tell the truth to its regulator about its offshore activities runs the risk of eventual exposure and punishment. In the meantime, however, for that which is hidden offshore, there may be little effective oversight. As a consequence, there has been the opportunity (and perhaps, the market imperative) for financial institutions with cross-border operations to behave with relative impunity, especially in the operations they carry out in smaller, less fully regulated jurisdictions.

### ...and borders do not block transactions.

With tariffs largely gone and electronic money able to move across the planet at the speed of light, control of money at the border is largely anachronistic. Cross-border movements of currency can be monitored, and countries can impose cross-border currency declaration requirements, but these requirements can be readily circumvented through alternative remittance systems that substitute netting for cross-border currency movements.[16] To the extent that domestic regulations impose burdens, whether involving obligations to maintain certain levels of liquidity, transparency, or payment of taxes, those with money may circumvent domestic regulations entirely through capital flight. The ineffectiveness of borders means flight capital need not truly flee. Russia's oligarchs have provided a vivid illustration of the fact that illicit proceeds can be brought back easily into a home jurisdiction for reinvestment after having been laundered elsewhere with no practical impediments to their integration into the formal financial system.

---

[15] There is an inter-governmental mechanism to improve the regulation of such practices, which I discuss below; see section "4 Existing Initiatives".

[16] Underground banking systems, such as the *hawala* and *hundi* systems of South Asia, the Middle East, and East Asia, predate modern banking. They operate through brokers based in different locations who agree to pay off one another's debts locally in cash through chit or credit systems. For example, a broker based in Karachi will ask a broker based in Paris to provide 1000 Euros in cash to a person in Paris who gives the correct password. Later, the Paris broker asks the Karachi broker to make payments in the same amount locally in Karachi to someone there. The two transactions are "netted," cancelling one another out, and no currency has to leave Pakistan or France, or ever cross a national border. At each end, the broker takes a commission. In recent years, international banks have begun to use the same approach for electronic money, cancelling out one another's obligations through netting equivalent amounts.

# 2 Impact of Globalization on Political Stability and Conflict

The integration of electronic financial payments systems into a globally ubiquitous network is of remarkably recent vintage. It gathered speed in the 1980s, reaching widespread coverage at the consumer level, with the rapid proliferation of internationally linked automatic teller machines, in the mid-1990s. The benefits of this integrated payments system for international businesses and travelers have been immeasurable. However, these same benefits have simultaneously worked to the advantage of those exploiting the dark side of globalization.

## 2.1 The Money Launderer's Common Financial Infrastructure

Global banking has provided continuous technical services to a wide range of practical destabilizers. Periodic eruptions of scandal have shown that drug and arms money launderers, diamond and timber smugglers, traffickers in people, terrorists, and corrupt officials chose a similar range of institutions to move and maintain their funds. These institutions typically include (a) small international business companies or trusts, established in jurisdictions of convenience, which establish (b) bank accounts at local financial institutions, which have correspondent banking relationships with (c) major international financial institutions, which (d) move funds willy-nilly throughout the world without regard to the provenance of the funds.

A taxonomy of scandals shows money laundering activity to have been facilitated, at one time or another, by Bank of America,[17] the Bank of New York,[18] Barclay's Bank,[19] Chase Manhattan, (now J.P.Morgan-Chase) [20] Citibank,[21] Credit Lyonnais,[22]

[17] Handled proceeds of money laundering for suspect Antiguan financial institution. An extremely detailed investigation of the money laundering undertaken by the minority staff of the U.S. Senate Permanent Subcommittee on Investigations is contained in the Report on Correspondent Banking of the Minority Staff of the Permanent Subcommittee on Investigations, entitled "Correspondent Banking: A Gateway for Money Laundering," released February 11, 2001.

[18] Handled funds of Benex, which laundered billions of dollars from Russia, including some for Russian organized crime; two of the principals of Benex pled guilty on February 16, 2000 to money laundering charges involving their use the Bank of New York to launder money. See U.S. v. Berlin and Edwards, 99 Cr 914 (SWK)

[19] Handled terrorist funds for Al-Qaeda. Testimony of Jamal Ahmed Al-Fadl, U.S. v. bin Laden, Southern District of New York, February 2001, pertaining to the bombing by Al Qaeda of two U.S. embassies in 1999.

[20] Handled proceeds of Colombian cocaine trafficking, Transactional information provided by supplemental case history ten, Report of the Minority Staff of the U.S. Senate Permanent Subcommittee on Investigations, February 2001, published at http://www.senate.gov/~gov_affairs/psi_contents.pdf.

[21] Handled proceeds of Colombian cocaine trafficking, drug-related funds from Mexico's Raul Salinas, documented in U.S. Customs investigation of MA Bank of Argentina, set forth in detail in Report of the Minority Staff of the U.S. Senate Permanent Subcommittee on Investigations, id., Supplementary case history ten For Citibank's view of the case, see testimony of Citigroup Chairman John Reed, November 9, 1999, Senate Permanent Subcommittee on Investigations, describing Citibank's role in handling funds of Raul Salinas.

[22] Involved in massive financial frauds in connection with French political scandal, see e.g. "The Credit Lyonnajs Debacle," International Herald-Tribune, October 3, 1996; on January 21, 2001, the Associated Press reported that some former Credit Lyonnais executives may face criminal charges for their roles in an illegal deal that cost policyholders of a now-defunct California insurer billions of dollars. According to the Associated Press, U.S. prosecutors are readying criminal indictments against the state-controlled bank and at least a dozen French nationals who were involved in the 1992 takeover of Executive Life Insurance Co. Allegedly prosecutors in the U.S. attorney's office in Los Angeles have been able to show that Credit Lyonnais, in its efforts to skirt federal and state laws concerning ownership of insurance companies, filed false information with regulators and used some clients as fronts to acquire Executive Life's junk bonds and insurance businesses. Separately, in the second second superceding indictment in U.S. v. Lazerenko, July 23, 2001, U.S. District Court for the Northern District of California, describes how Credit Lyonnais was used to launder money stolen from Ukraine by former Ukrainian prime minister Pavel Lazerenko.

Credit Suisse, (now CSFB)[23] Daiwa,[24] Deutschebank,[25] Swiss Bank Corporation[26] (now part of UBS-AG), and Union Bank of Switzerland (now UBS-AG).[27] In some of these cases, the officers at the financial institutions may have been knowing or negligent. In other cases, the institutions themselves did nothing wrong under existing laws and frameworks. The fault lay not in the institutions, but rather in a system of international regulation that created neither legal norms nor regulatory mechanisms to prevent abuse.

The infrastructure for non-transparent international finance has nodes that have specialized in particular kinds of services. For example, until recently, the Bahamas and the Virgin Islands have been among the world's principal creators of anonymous international business companies ("IBCs"). The Channel Islands, Gibraltar, and the Dutch Antilles have been world-class centers for the establishment of trusts to hide the true ownership of funds. A single firm in Liechtenstein was reported to have laundered political slush funds for ruling political parties in France and Germany; arms purchases for civil wars in Liberia and Sierra Leone; drug money for Ecuadoran

---

[23] Involved in handling stolen funds from Philippines of Ferdinand Marcos. The Philippine press, citing official Philippine sources, has reported that the Swiss government has escrowed some $356 million in Marcos funds maintained at Credit Suisse and a second bank, Swiss Banking Corp, "Six Swiss Banks Continue to Hide Marcos Funds," Manila Times, December 27, 2001. Account numbers for Marcos' Credit Suisse accounts are available at :www.marcosbillions.com. Separately, the Financial Times has reported that Credit Suisse has been indicted by the Swiss government in connection with its handling of the funds of Sani Abacha of Nigeria, see "CS to be indicted in Abacha inquiry," Financial Times, December 7, 2000.

[24] Laundered funds in Caribbean to cover trading losses, indicted in U.S. v. Daiwa, 1995, U.S. Southern District of New York; plea agreement reached between U.S. government and Daiwa under which Daiwa paid fines of $340 million and agreed to cease doing business in the U.S.

[25] Handling terrorist funds for Al-Qaeda. See e.g. "Deutsche Bank and the Terror Money Trail," CNN, October 9, 2001, stating that 10 accounts linked to Al Qaeda had been found at the bank, holding $1 million.

[26] Handling stolen funds from Philippines of Ferdinand Marcos. Manila Times, December 27, 2001, id, and financial documentation at marcosbillions.com, id.

[27] Handled Colombian cocaine funds,  see e.g. 1995 U.S. Department of State International Narcotics Control Strategy Report, stating that UBS disclosed that it had discovered an account totalling $150 million belonging to Julio Nasser David, a Colombian fugitive drug dealer, who had maintained the account since 1979. The account, which was frozen, was maintained by David's wife, who was arrested near Geneva. Sheila Miriam Arana De Nasser, a Colombian national, was taken into custody by US Marshals on January 3, 1995, and returned to Florida for trial on charges of conspiracy to import and distribute multi-kilogram loads of cocaine and marijuana. The Swiss government has agreed to return $150 million in drug proceeds which were frozen in the account.

cocaine trafficker Jose Reyes-Torres, and stolen funds for various West African dictators.[28] The Liechtenstein example is not unique. Financial nodes that initially provide services for one purpose, such as tax evasion, over time attract more sinister illicit purposes.

### Case Study: Cyprus

Since World War II, Cyprus has provided trade finance and related services for a variety of cross-border trade and commercial activities throughout the Middle East and the Mediterranean. Many operating in this region have had practical reasons to avoid regulations in their home jurisdictions, as well as high taxes, bribes, the risk of nationalization, and political instability. Accordingly, Cyprus developed a strong financial secrecy regime, available through banking services, company formation, trusts, and related mechanisms. By the 1970's, this system had come to be used by terrorist organizations, arms dealers, Middle Eastern drug traffickers, Italian mafias, the Communist Party of the Soviet Union, and Israeli criminals, among many others. By the mid-1990's, as Cyprus sought to put into place a more transparent financial regime to prepare for entry into the European Union, many of the traditional illicit interests left the jurisdiction. Even then, elements of Al-Qaeda and much of the illicit finance that sustained Slobodan Milosevic's control of Yugoslavia and sustained his war in Bosnia and Kosovo remained embedded in Cyprus' financial institutions. Systems for transporting illicit funds, once established, become difficult to close even for a jurisdiction with strong incentives to do so.

### Import and Export Fraud: the Financing of Illicit Timber and Conflict Diamonds

Illicit exploitation of a country's natural resources is a common feature of jurisdictions experiencing serious failures of governance. Such cases typically involve both failures of legitimacy and of capacity. The complex political question of who has the right to control a country's natural resources devolves into the simpler question of who has the capacity to exercise such control in practice. The power to gain access to natural resources, to strip them, to transport them out of the country, and to reap the financial benefits, become the major practical requirements for those seeking to exploit them. The financial benefits are the principal objective of such asset stripping. Given the weakness of national currencies in such jurisdictions, obtaining money from beyond the jurisdiction is the *sine qua non* of the entire enterprise. Much of the money may in turn remain outside the juris-

---

[28] See e.g. extensive material on money laundering allegations involving Liechtenstein, including excerpts from German government report on website: http://www.marcosbillions.com.

diction, functioning as a political slush or retirement fund, or returned to the jurisdiction to pay for weapons, bribes, or luxury cars.

One of the most widespread mechanisms for laundering money is the use of false import and export documentation. Through the technique of under-invoicing, corrupt exporters declare a smaller quantity of the exported good, and then typically share the proceeds of the additional "invisible" export with their partner, usually either the importer or the shipper. Through over-invoicing, a corrupt exporter can pretend to ship goods that do not exist, as a cover for re-importing and legitimizing previously earned profits from other illicit activities. Both techniques provide effective mechanisms for facilitating trafficking in illicit commodities, such as conflict diamonds or stolen or conflict timber.

Corrupt payments, false documentation, theft of resources and evasion of controls, domestic and international, are an integrated set of criminal activities. For example, in the logging of Burma's frontier forests, the chainsaws and woodsmen would have no business without the simultaneous participation in the trade of corrupt officials and trans-national logging companies, who make substantial payments through financial institutions to pay for the illicit timber.[29] Similarly, money laundering is an integrated component of all other major cross-border environmental crimes, such as CFC smuggling and toxic waste dumping.[30] Each component of the activities is essential to the success and continuation of the overall enterprise. Thus, disruption of any element of the total activity, including the ability to move funds in and out of the jurisdictions involved, becomes a substantial impediment to its viability.

## Case Study: Sierra Leone

It has been said that the point of civil conflict in African countries such as Sierra Leone is not to win the war, but to "engage in profitable crime under cover of warfare," with the major opportunities involving diamonds, illicit timber, narcotics, and

---

[29] See e.g. Bangkok Post, March 26, 1999, "Massive Kickbacks Alleged;" "Business Indonesia, "Two Sawmills owned by General Assembly Member buys Illegal Logs," February 2, 2000.

[30] Within the U.S. for example, smuggling of CFCs from outside the U.S. into the U.S. was estimated by a U.S. government study to amount to 60 million pounds of CFCs between 1994 and 1997 from such countries as Mexico, Russia and Venezuela. In a series of cases, the U.S. indicted the smugglers for money laundering violations, as well as environmental crimes. See EPA Enforcement Actions Under Title VI of the Clean Air Act, "Texas Man Arrested For Smuggling Freon Into U.S. – Arrest Underscores Federal Crackdown on Black Market in Ozone-Depleting Chemicals," June 24, 1999. Currently, China and India, both countries with essentially no money laundering laws, are the world's major source of illicit CFCs, especially to countries in the European Union, in violation of the Montreal Protocol. Detailed information on the illicit CFC trade has been brought together by the London- based NGO, the Environmental Investigation Agency.

weapons smuggling.[31] As a consequence of the work of the British non-governmental organization Global Witness and other groups, there has been widespread recognition that "conflict diamonds" have been fuelling civil wars in Sierra Leone and Angola. When international sanctions were put into place, the normal revenues from international trade for the participants in each country's civil wars were eliminated. Diamonds became the key currency for the criminals. The value of the diamonds increased exponentially once they were smuggled out of the region and into Western Europe for processing. The laundering of the proceeds of the diamonds was an essential component in sustaining the conflicts.[32]

In response, a system has been negotiated that would require a series of certificates to follow diamonds as they are transported, in an effort to establish a chain-of-custody that documents the legitimacy of such diamonds and thereby makes it more difficult for diamond sales to support civil war, and *vice-versa*. Yet, while it has been recognized that conflict diamonds have been largely purchased and processed in Antwerp, Belgium, which is also home to numerous international banks, there is no public documentation on the nature of the money laundering involved in the conflict diamond trade. What is evident, even in the absence of data, is that banks in Belgium – not just banks in western Africa – have handled the proceeds of conflict diamonds without impediment, thereby making the business viable. The money flows continued unimpeded until DeBeers, the largest buyer of the conflict diamonds, determined that reputational risk substantially exceeded transactional profits, and moved to extricate itself from the illicit business.

Money laundering regulation in Sierra Leone and Belgium, among other countries, has been so weak that it has not become a factor in the suppression of the business. Were financial institutions operating in Belgium and elsewhere in Europe effectively prohibited from laundering the proceeds of illicit diamonds, the value of such diamonds in Antwerp would be necessarily reduced, given the heightened risk to any financial institution processing the proceeds.

## Case Study: Liberia

The Liberia of Charles Taylor has been termed "a criminal state," a reference to the fact that the president is an escapee from an American prison and presides over a

---

[31] Ian Smillie, Lansana Gberie and Ralph Hazelton, "The Heart of the Matter: Sierra Leone, Diamonds and Human Security," Partnership Africa Canada, January 2000.

[32] See the Report of the Panel of Experts appointed pursuant to Security Council resolution 1306 (2000), paragraph 19, in relation to Sierra Leone; also see "The Heart of the Matter, Sierra Leone, Diamonds and Human Security," Partnership Africa Canada, January 2000, "Conflict Diamonds: Possibilities for the Identification, Certification and Control of Diamonds," May 2000, Global Witness.

series of businesses of dubious legality, including indiscriminate logging, looting of diamond mines, systematic theft of public funds, drug trafficking, and extortion.[33] Few substantial sources of revenue in the country have remained outside the control of Taylor and his corrupt associates.

Throughout Liberia's civil war, Liberia has also remained a tax haven, offering "flag of convenience" services in a variety of sectors, with the revenues being used to sustain control of the country by former dictator Samuel Doe, and currently, by Taylor. Similarly, Liberian diplomatic passports have been advertised (and actually made available) on the Internet, reflecting a regime that protects criminals outside of Liberia as well as within the jurisdiction.[34] Liberia's commercial laws allow businesses from anywhere in the world to register in Liberia, with no requirement they have any physical presence in the country. Liberia's financial regime included corporations with no capital requirement, issuance of shares that need not be reported or recorded in Liberia, companies with no obligation to file annual reports, tax forms, or audit statements, bearer shares, and similar freedoms that in effect make the creation of an entity in Liberia a guarantee of world-wide anonymity and non-accountability. The U.S. dollar is legal currency in Liberia, allowing foreign investment low-cost entry (and exit) to (and from) the Liberian economy.

Liberia's connections with the international payments system broke down during its civil war from 1991 through 1997. The most prominent non-Liberian financial institution, Citibank, left the country. Settlements among Liberian banks, and movements of funds from Liberia to other countries, were handled on ad hoc basis. Yet throughout this period, Liberia's armies have been able to generate and use funds from beyond the country, with President Charles Taylor accumulating substantial personal wealth in the process. This phenomenon has continued to the present. For example, in November 2001, the government of Singapore sought information from the UN regarding financial and weapons transactions involving payments for weapons deliveries that used the Chase Manhattan Bank in New York to transfer some $500,000 to a Singapore arms trafficking company. Significantly, the firms involved in the arms transfer have also been alleged to be involved in illegal

---

[33] There is no authoritative estimate of Taylor's illicit wealth, although it is widely understood to come from the sale of iron ore and timber within Liberia, and diamonds obtained from Sierra Leone. See e.g. "Liberia stokes African gem war," Financial Times, July 10, 2000. The Sierrra Leone UN Expert Panel Report of 2000 describes Taylor's use of diamonds from Liberia as a source of personal revenue.

[34] Personal inquiry by the author in 1997, during his service in the U.S. Department of State. In March 1999, British and U.S. law enforcement officials provided the author additional information on abuses involving the sales of Liberian diplomatic passports online, offline, and in connection with substantial money laundering activities involving Russian organized crime.

timbering in Liberia and Malaysia.[35] Separately, in looking at the impact of Taylor's involvement in prolonging Sierra Leone's civil war, the UN Panel of Experts discovered that Liberia secured weapons and made payments for weapons destined for Sierra Leone through accounts at the Standard Chartered Bank in Sharjah in the United Arab Emirates.[36]

## Case Study: Cambodia

Corruption in Cambodia is pervasive and systemic, extending from low level policemen to the top of the government. Important criminals have close links to Cambodia's government. For example, Theng Bun Ma, Chairman of the Phnom Penh Chamber of Commerce and a major financial supporter of Prime Minister Hun Sen, has been reportedly identified by the U.S. as a major drug trafficker.[37] A second figure reported to be associated with the Prime Minister, Chung Sopheaph, also known as Yeay Pho, is chairperson of the Phea Pimech Company, Cambodia's biggest salt producer. Sopheaph/Pho is also alleged in Cambodia to be one of the country's most destructive loggers.[38] Cambodia's own financial services sector is extraordinarily weak. Some money laundering in Cambodia nevertheless goes through its rather specialized banking system: most of Cambodia's banks are private institutions, not open to the public, existing mostly to move and launder money.[39] Other funds from illegal logging (as well as other criminal activities) are laundered in Cambodia's neighbours, particularly Thailand. Notably, Cambodian financial institutions have correspondent banking relationships with major financial institutions all over the world,

[35]"Singapore to probe alleged involvement of company in arms smuggling in Liberia," Singapore Business Times, November 6, 2001.

[36] Sierra Leone UN Expert Report, December, 2000 (UN reference number?).

[37] Nate Thayer, "Drug Suspects Bankroll Cambodian Coup Leader," *Washington Post*, July 22, 1997, p. A1.

[38] Phnom Penh Moneakseka Khmer, "Cambodia's Hun Sen embracing new tycoons," Report by Chan Chamnan, September 21, 2001 pp. 1, 2. The allegations concerning Chung Sopheap's/Yeay Pho's involvement in illegal timbering were originally reported by the London-based non-governmental organization, Global Witness. See e.g. Global Witness press release, October 30, 1998, welcoming decision of Hun Sen to take more active measures against illicit logging, and asking him to distance himself from Chung Sopheap.

[39] Phnom Penh Samleng Yuveakchon Khmer, "Paper: Banks in Cambodia involved in money laun40dering," Report by Sophal, 30 March 2000, pp. 1,3

including some based in Canada, France, and the United States, as well as in Korea and Thailand.[40]

**Case Study: Thailand**

The impact on the larger society of illicit finance can become broader than the illicit activity initially involved. In Thailand, illegal timber sales have for many years been a substantial source of funds for both politicians and corrupt law enforcement officials. Indeed, scandals involving such sales are frequently reported in the Thai press, and are elements in Thai political jockeying.[41]In 1996, the government of Thailand began to recognize that non-drug money laundering was creating problems, and the government introduced comprehensive anti-money laundering legislation. For the following three years, the legislation stalled over a single issue: the inclusion of illicit timbering as a predicate offence for the prosecution of money laundering crimes. Finally, in 1999, Thailand's government reached a compromise and passed comprehensive money laundering legislation. The price of compromise was the elimination of illegal timbering as a money laundering crime, permitting corruption involving that activity to continue without restriction.

**Drug Money and Civil Conflict**

Areas where opium and coca are grown include many of the world's longest-enduring civil wars and internal conflicts. Opium production has fuelled destabilizing guerrilla and paramilitary movements in Afghanistan, Burma, Lebanon, Pakistan, and Turkey. Coca has a similar record in Bolivia, Colombia, and Peru. In each case, proceeds from narcotics production and trafficking became a mechanism for relatively unpopular governments, militia, or rebels to control the territory where the narcotics were produced, thereby sustaining themselves and perpetuating conflict with other forces in the jurisdiction. In each of these countries, the political and military forces systematically have taken "tithes" or regular pay-

---

[40] For example, the Cambodia bank Canadia, Ltd., has correspondent banking relationships with the Bank of America, Republic National Bank, Standard Chartered Bank, and Banque Nationale de Paris; the First Overseas Bank of Cambodia has correspondent banking relationships with HSBC, which in turn has branched and subsidiaries throughout the world. Given the absence of any controls on money laundering in Cambodia, it would be difficult to imagine how such correspondent banking accounts could be protected against laundering the proceeds of narcotics, illegal logging, and other criminal activities.

[41] See e.g, Asia Week, March 13, 1998, "Chuan is Expected to Survive a Censure Vote," describing how political opponents of Thailand's ruling party were attempting to use the uncovering of an illegal logging scam to target government officials.

ments as protection money for the illicit crops, thereby gaining a resource advantage over any force that has not similarly accepted drug protection money.

## Case Study: Burma

In Burma, opium has perpetuated the rule of an entirely non-democratic junta, while providing the means for ethnic warlords to arm their local soldiers. At the same time, Burmese officials have used opium profits to invest in partnerships in legitimate businesses in neighbouring countries such as Burma, Malaysia, Singapore and Thailand, reducing regional pressure for more democratic governance. Burma's repressive government has continued to generate international sanctions, and impede foreign investment. Yet Burmese banks are thriving and experiencing rapid growth, apparently  fuelled by funds generated from the opium trade. For example; prominent among Burma's 21 domestic banks are the Asia Wealth Bank, whose chairman and vice chairman are alleged to be former drug lords; the Mayflower Bank, established by Kyaw Win, a partner of drug warlord Khun Sa; and the Kanbawza Bank, closely tied to the ruling junta and alleged to be involved in the laundering of proceeds from ruling party corruption.[42] Thus, the drug economy and the political control exercised by Burma's un-elected leadership have proved mutually reinforcing.

This economy has been sustained by Burma's ability to readily move funds to and from the rest of the world. Despite the allegations of its ownership by drug lords and its involvement in money laundering, the Mayflower Bank reports maintaining correspondent relationships with the Marine Midland Bank and American Express Bank in New York.[43] It is difficult to imagine that any U.S. institution is well situated to assess the provenance of funds from Mayflower Bank.[44] EU sanctions against Burma were toughened in 2000, theoretically freezing the funds of members of the junta and those associated with them. However, the state-owned Myanmar Foreign Trade Bank currently reports a network of over 120 correspondent

[42]"Above it all, Burmese banks are thriving even as the country's economy suffers its worst slump in years," Maung Maung Oo, the Irrawaddy, February 2, 2001. A May 3, 2001, Singapore's Financial Times reported that as of that date, the ethnic Wa hill tribe in Burma – once dubbed – "the world's biggest gang of armed drug traffickers" – had taken control of the ailing Myanmar Mayflower Bank in Rangoon and its 21 nationwide branches. The article described the takeover as "underlining the importance of drug money in a troubled economy."

[43] For example, Hamsa Travels and Tours of Yanon, Myanmar, which offers tourist services for Burma, currently specifies on its web-pages the use of these institutions to make payment to its account at the Mayflower Bank from the U.S.

[44] Existing U.S. sanctions against Burma prohibit new investment, but do not prevent financial transactions for such purposes as tourism.

banking relationships in 58 countries, so that "banking transactions can be made with almost any country in the world." [45] Burma's repressive government retains access to international financial institutions, irrespective of the sources of Burmese assets or international sanctions.

## Case Study: Afghanistan

In Afghanistan, decades of tribal conflict have been fuelled in part by opium funds, with each of the major forces, including the Northern Alliance and the Taliban, taking drug money to finance their military campaigns. Opium's impact in acting as a regional destabilizer extends beyond Afghanistan. Drug-related corruption has been an ongoing problem within the Pakistan military. According to a recent French analysis, from approximately 1983 through 1998, Pakistan's military intelligence agency used heroin trafficking from Afghanistan to fund secret operations aimed at destablizing Indian through Muslim rebellion in Kashmir.[46] While much of the opium trade at the local level is cash-based, opium money from Pakistan arriving to Gulf State financial institutions is transformed into electronic funds, which can be used not only to pay bribes further a field, but to support terrorist activity around the world.[47]

## Case Study: Colombia

For many years, the Colombian terrorist guerrilla group, the FARC, has funded its military attack on the Colombian government by taking protection money in

[45] Myanmar Financial Structure and Exchange Arrangements, published by the Government of Myanmar, http://www.myanmar.com/gov/trade/fin.html.

[46] 1998–1999 Report on Drug Trafficking in Asia published by the Observatoire Geopolitique de Drouges or OGD, a French academic institute. Separately, former Pakistani Prime Minister Nawaz Sharif told the Washington Post in 1994 that Pakistan's army chief and the head of its intelligence agency had proposed a detailed blue-print for selling heroin to pay for the country's covert military operations in early 1991. See Washington Post, September 12, 1994, "Heroin Plan by Top Pakistanis Alleged."

[47] U.S. Department of State, 1999 International Narcotics Control Strategy Report, March 2000, Afghanistan Country Report, stating that "drug production in and trafficking from Afghanistan has funded terrorist groups, increased regional heroin addiction in refugee and indigenous populations, undermined rule of law, led to frequent incidents of armed conflict between traffickers and law enforcement forces in neighbouring countries, destabilizing the entire region." Separately, the INCSR further stated "opium for the Pakistan market enters through Baluchistan and the Northwest Frontier Province. Raw opium remains primarily for local consumption in Pakistan and Iran. Trafficking organizations also have strong links to Gulf countries, and Dubai seems to be emerging as an important center for money laundering."

coca-growing areas.[48] In regions controlled by FARC, the guerrillas have deployed in rings outside and around each of the major coca-growing areas, thereby placing the group in a position to exact a toll for the transit of the drugs by any route. The FARC has used the drug money for arms purchases, as have the major Colombian smuggling organizations. In turn, both the Colombian traffickers and the FARC use the weapons funded by the drug trade to protect themselves in their respective struggles against Colombia's elected government, perpetuating the civil war in that country. The traffickers have heavily penetrated Colombia's financial institutions and purchased a substantial number of legitimate businesses, facilitating their ability to corrupt elements of the Colombian government, and reducing the efficacy of the government's efforts to enforce Colombia's laws.[49] As drug influence increases and government capacity is weakened, the legitimacy of the Colombian government is further eroded, in turn providing a greater base for political support by disaffected Colombians for the guerrillas and the civil war. Again, as with Afghanistan's and Burma's drug money, Colombian drug money exercises a negative political impact well beyond Colombia itself. For example, both Manuel Noriega of Panama and the military junta that ruled Haiti in the mid-1990's sustained control of their respective governments through drug-related corruption.

[48] See e.g. "FARC: finance comes full circle for bartering revolutionaries," Jane's Terrorism and Security Monitor, January 16, 2001, quoting Paul Reyes, a high-ranking official of the FARC, as stating: "We charge them a tax. We don't do them any favours, and they don't do us any. Where the economic base is coca ... that's what we tax – not the traffickers directly, but their intermediaries. In other regions we tax the cattle ranchers, the sugar growers, the businesses." According to Jane's, for drug traffickers, the tax has been estimated at between 10 and 15 percent of the drug's value.

[49] "In 1998, DEA reported that drug-related corruption existed in all branches of the [Colombian] government, within the prison system, and in the military... In November 1998, U.S. Customs and DEA personnel searched a Colombian Air Force aircraft in Florida and found 415 kilograms of cocaine and 6 kilograms of heroin.", U.S. General Accounting Office, Drug Control: Narcotics Threat from Colombia Continues to Grow (Washington, DC: USGPO, 1999), p. 15. To date, the United States has imposed economic sanctions under Presidential economic war powers authorities contained in the International Economic Emergency Powers Act ("IEEPA") against more than four hundred businesses affiliated with Colombian criminal drug organizations. See U.S. White House National Drug Strategy Policy, 1998.

## 2.2 International Money Laundering and Grand Corruption

The world's kleptocrats, whether Marcos, Mubuto, Abacha, or Suharto, have used a common financial services infrastructure to steal national wealth.[50] Grand corruption has been a prominent feature of political and social conflict or civic breakdown in Albania, Argentina, Burma, Cambodia, Congo (Zaire), Colombia, Haiti, Indonesia, Iran, Liberia, Nigeria, Panama, Pakistan, Peru, the Philippines, Romania, Sierra Leone, Yugoslavia, and Zimbabwe, among other jurisdictions. In each case, the looting of government treasuries has involved funds or resources residing within these countries being moved from the countries to other jurisdictions through the world's major international banks. In some cases, the theft of national treasuries has been accompanied by other harmful activities, whose proceeds have been laundered by the same mechanisms. These include costly or illegal arms deals (Angola, Colombia, Liberia, Sierra Leone, Somalia, Sudan), the smuggling of diamonds used to purchase arms deals in civil wars (Angola, Liberia, and Sierra Leone), grand-scale theft of oil and timber (Burma, Cambodia, Nigeria, Russia, Thailand), illegal dumping of environmental toxics (Caribbean, Africa), and embezzlement or other abuses of funds lent by international financial institutions such as the World Bank (endemic).[51]

Countries that during the 1990's saw their national wealth disappear to other jurisdictions at the direction of ruling kleptocrats include:

---

[50] This phenomenon has been labeled "indigenous spoilation," by N. Kofele-Kale, who defines this act as an "illegal act of depredation which is committed for private ends by constitutionally responsible rulers, public officials or private individuals," in the International Law of Responsibility for Economic Crimes (Kluwer) at 10 (1995).

[51] See e.g. Final Report of the UN Panel of Experts on Violations of Security Council Sanctions Against Unita, The "Fowler Report," S/2000/203, 10 March 2000; Security Council Meeting on Small Arms (September 24, 1999), UN Document S/PV.4048 (1999); Report of the UN Secretary-General on Illicit Traffic in Small Arms (August 25, 2000), UN Document A/55/323; UN Panel of Experts on Liberia submitted to the Council its investigation into the government's compliance with Resolution 1343 of March 2001 (diamonds); Greenpeace, "The Transboundary Movement of Hazardous and Nuclear Wastes in the Wider Caribbean Region - A Call for a Legal Instrument within the Cartagena Convention. Edited by: Jim Puckett and Sergio López Ayllon. CEP Technical Report No. 7. UNEP Caribbean Environment Programme, Kingston, 1991 (toxic dumping). Abuses of World Bank funds have been alleged in press accounts in numerous recipient countries. One recent reported assessment by the World Bank itself in 2000 suggested that about 30 percent of World Bank loans fell victim to corruption in Indonesia under the 30 year rule of former President Soharto, amounting to some $10 billion, most of which was pocketed by him or members of his family, friends and cronies. See World Bank Memo Depicts Diverted Funds, Corruption in Jakarta, Institution Says it Made Reforms, Glenn R. Simpson, The Wall Street Journal, August 19, 1998.

- Albania, decapitalized by a pyramid scheme that was widely reported to have moved its funds to Italy and Western Europe;

- Angola, whose immense national resources have vanished amid the civil war between the government, led by President Dos Santos, and UNITA, led by Jonas Savimbi, until his death in early 2002;[52]

- Estonia, which found substantial amounts of its national wealth apparently transferred to Russia in the mid-1990's in a pyramid scheme widely reported to have been arranged by a prominent banker with close ties to Latvia's then government;

- Gabon, whose oil revenues were sent offshore and handled by U.S financial institutions on behalf of senior leaders who allegedly had stolen the proceeds;[53]

- Indonesia, where billions of dollars disappeared offshore in connection with widely reported grand corruption under former dictator Suharto, with some $9 billion ending up in a nominee account maintained at an Austrian bank;

- Kazakstan, where funds from oil revenues were laundered offshore reportedly for the benefit of senior leaders;

- Mexico, where the brother of president Carlos Salinas, Raul Salinas, was indicted in 1998 for laundering  hundreds of millions of dollars representing either stolen government funds, bribes, or the proceeds of narcotics trafficking, to Switzerland;[54]

[52] See e.g. Report of the Panel of Experts on Violations of Security Council Sanctions Against UNITA, sometimes known as the Fowler Report, after the name of the Committee Chairman, Canadian UN Ambassador Robert R. Fowler, March 10, 2000.

[53] A U.S. Senate investigation found in 1999 that Omar Bongo, the President of Gabon, had moved over $130 million through Citibank private bank accounts since 1970. In response to an investigation by the Office of the Comptroller of the Currency, the private bank identified Gabon government funds, totaling $111 million, as the primary source of funds in the Bongo accounts. The chairman of the hearings, U.S. Senator Carl Levin (D-MI) stated that President Bongo remained the subject of a French criminal investigation into bribery; See hearings, Senate Permanent Subcommittee on Investigations, November 9, 1999.

[54] In addition to being indicted for money laundering in Mexico in 1998, Salinas became the subject of other money laundering investigations in the U.S. and Switzerland. A U.S. report by the General Accounting Office found that Salinas was able to transfer $90 million to $100 million between 1992 and 1994 by using a private banking relationship formed by Citibank New York in 1992. The funds were transferred through Citibank Mexico and Citibank New York to private banking investment accounts in Citibank London and Citibank Switzerland.See e.g. "FARC: finance comes full circle for bartering. Report of the GAO, Raul Salinas, Citibank, and Alleged Money Laundering, October, 1998.

34

- Nigeria, where General Sani Abacha stole billions that were then stored in major banks in Luxembourg, the U.K., Liechtenstein, Switzerland and the Channel Islands, among other locations;[55]

- Pakistan, where military rule replaced democratic civilian rule after suspected proceeds of corruption were found in Swiss banks, discrediting the elected Prime Minister and her family, and resulting in her conviction in Pakistan on corruption charges;

- Russia, whose financial system collapsed in 1999 amid massive and widely reported money laundering overseas through the Caribbean, the South Pacific, New York, and London;

- Serbia, whose wealth was widely reported to have been converted to the control of Slobodan Milosevic and his wife through such jurisdictions as Cyprus and Lebanon, while Serbia was subject to global sanctions by the United Nations;

- Ukraine, where substantial stolen assets of the state were found to have been laundered to the United States under the control of a former prime minister, after being handled by a number of Swiss banks;[56]

- Zaire (Congo), whose national wealth was widely known to have been exported by the late dictator Mobuto to Swiss banks.

## 2.3 The Financing of Terrorism and Armed Conflict

Terrorist organizations need to generate, store, and transport funds, often across borders. While not every domestic terrorist organization needs to launder money through cross-border transfers, over time, many such organizations choose to locate portions of their infrastructure at some distance away from planned terrorist activities. To do so, they establish cells to operate in jurisdictions separate from those

---

[55] See e.g. "Swiss banks criticised over Nigerian funds," Associated Press, September 5, 2000, describing finds of the Swiss Federal Banking Commission regarding the handling of some $670 million of funds stolen by Sani Abacha and his "entourage" from Nigeria, held by 19 Swiss banks. According to the article, the Government of Nigeria says the total funds stolen by Abacha amounted to some $3 billion, some of which remained in other accounts in Belgium, Germany and France.

[52] See U.S. v. Lazarenko, Northern District of California, superceding indictment, July 23, 2001, describing Lazarenko's use of SCS Alliance, Banque Populaire Suisse, Credit Suisse, Credit Lyonnais (suisse), and European Federal Credit Bank in Antigua to launder $21 million stolen from Ukraine..

where their political base is, or where their operations will be carried out. In recent years, multinational movements of terrorist funds, involving the use of major international financial institutions have been traced to terrorist or rebel movements based in Afghanistan, Burma, Chechnya, Colombia, Israel, the Palestinian Territory, Kosovo, Lebanon, Northern Ireland, Pakistan, Papua-New Guinea, the Philippines, Somalia, Sri Lanka, Sudan, and Turkey. Although the terrorist or rebel organizations based in each of these countries have some level of popular support, their power and effectiveness have been leveraged by their ability to hide, invest, and transport their funds through the world's international financial institutions.

A summary of the nations whose banks have been used to handle funds for Al-Qaeda's attacks on the U.S. is in this regard instructive. Available public sources show Al Qaeda and related groups to have been able to move funds to institutions in the following countries: Albania, Australia, Austria, the Bahamas, Belgium, Canada, the Caymans, Cyprus, France, Germany, Greece, Hong Kong, Indonesia, Iraq, Italy, Kosovo, Kuwait, Libya, Macao, Malaysia, Malta, Mauritius, the Netherlands, Nigeria, Panama, Pakistan, the Philippines, Poland, Qatar, Saudi Arabia, the Seychelles, Singapore, Somalia, South Africa, Sudan, Switzerland, the United Arab Emirates, the United Kingdom, the United States, and Yemen. Significantly, where these jurisdictions are used by Al Qaeda they also tend to be used by other criminals and corrupt officials, as the case of the United Arab Emirates demonstrates.

**Case Study: United Arab Emirates**

The UAE houses the Middle East's most sophisticated financial services sector, which is intensely competitive and lightly regulated. It is also a cash-intensive society, with Dubai constituting the regional gold center. Cash transactions at restaurants, hotels, nightclubs, money exchange houses, and investment firms remain common and effective mechanisms to launder money throughout the world from the UAE.[57] Trading in precious metals, especially gold, has been simultaneously implicated in tax frauds, money laundering, organized crime, and the smuggling of stolen cargo from the UAE.[58] Islamic banks, once a conservative mechanism for relative low-cost entry into the international financial system, have expanded rapidly, remaining little regulated beyond the requirements of Islamic shari'a. Alternative remittance houses, such as *hawalas*, have been abundant, and minimally regulated.

The implications for global security became evident in the September 11 terrorist attacks. One *hawala* based in Somalia, Al Barakaat, with major offices in the UAE, was found to have been heavily involved in funding Al Qaeda's global oper-

---

[57] "Dubai Police Study on Money Laundering," Khalij Times, December 10, 1999.

[58] "Duped banks get wise to crime" Lloyd's List, January 8, 2001.

ations. Another unnamed money changer was found to have transferred funds to Marwan Al-Shehhi, a UAE citizen who was the suspected pilot of United Airlines Flight 175, the second plane to hit the World Trade Center on September 11.[59] According to numerous press accounts, funds were allegedly wired between three of the terrorist attackers and one of bin Laden's financial chiefs, Shaykh Said, also known as Mustafah Muhammad Ahmed, who resided in Dubai until September 11.[60] Subsequent press accounts traced the funds to the Al Ansari Exchange branch in Abu Dhabi.[61] Another account cited an unnamed U.S. intelligence official as stating that two of bin Laden's sisters used the UAE as a transit point for shuttling cash to bin Laden and his hide-out in Afghanistan.[62]

Long before the September 11 terrorist attacks, the UAE's financial system was repeatedly linked to terrorist finance. Al Qaeda also used the Dubai Islamic Bank as a mechanism to process funds used in the bombings of the U.S. embassies in Kenya and Tanzania in 1998.[63]UAE financial institutions were central to the September 11 terrorist attacks on the U.S. financed by Osama bin Laden and Al-Qaeda. UAE institutions were also reportedly used by other bin-Laden terrorist finance operations carrying out activities from Malta.[64]

This terrorist finance infrastructure overlaps substantially with other money laundering operations, including those used in the finance of armed conflict. For example, the same networks in the UAE have been used to launder drug money[65] and to handle the proceeds from Russian criminal activity, by one account laundering some $300 million in Russian funds in the month of January 1999 alone.[66] The UAE has been home to Russian arms merchant Viktor Bout, implicated in black market weapons sales to Rwanda, Sierra Leone, and Angola. False end-user certificates were delivered from the UAE to provide a veneer of legality to Bout's

[59] "UAE Central Bank Withdraws License of Money Changer," Wall Street Journal, November 2, 2001.

[60] See e.g. "In Emirates, An Effort to Examine Bank System," New York Times, October 15, 2001; "$100,000 trail links hijackers to Al-Qaeda, sleuths say," Dubai Gulf News, October 12, 2001

[61] "UAE Central Bank Withdraws License of Money Changer," Wall Street Journal, October 31, 2001.

[62] "United Arab Emirates emerges as key link in money trail that led to attacks," Knight Ridder Washington Bureau, October 2, 2001.

[63] "UAE Bank Sources Deny Knowledge of Bin-Ladin Dealings," London Al-Sharq al-Awsat in Arabic, July 9, 1999, p. 5.

[64] "Malta's Central Bank Asked to Investigate Possible Bin-Ladin Financial Assets," London Al-Sharq Awsat, November 16, 2000.

[65]Financial Times, February 24, 2001.

[66] "Capital Flight, Money Laundering Eyed," Moscow Noryye Izvestiya in Russian, March 5, 1999.

illicit arms sales, according to a United Nations report. Bout's illicit arms shipments were carried out from the UAE through his UAE-based air transport company, Air Cess, whose operations would clearly require financing through the UAE.[67] Even as Bout engaged in smuggling activities to these jurisdictions in conflict, UAE financial institutions handled the proceeds to finance terrorist and criminal activity. For example, Al Qaeda used diamonds purchased in Sierra Leone, the Democratic Republic of the Congo (DRC, the former Zaire) to fund its activities, in turn laundering these commodities through Dubai.[68]

## 2.4 Conclusion: The Cross-Currents of Illicit Finance

The world's networks of non-transparent financial services mingle licit and illicit funds, thus rendering the illicit funds more difficult to see. They also provide vessels for the intermingling the proceeds of different types of illicit activity. Although different, these activities are often similar in their destabilizing effects, and they may have in common the involvement of similar persons and institutions.

The ubiquity of off-shore havens such as the Caymans, Channel Islands and Liechtenstein for the common use of drug, arms, and people traffickers and kleptocrats is reasonably well understood. The interconnections between Al Qaeda's terrorist finance and the illicit sale of diamonds mined by rebels in Sierra Leone is less obvious, although increasingly well-documented, and tied to the financing of groups such as Hezbollah. Within the West Africa region, the diamonds are transferred to the terrorists in return for weapons or for cash. The terrorists then transport the diamonds to diamond processing centers such as Belgium, and thereby launder their funds anew for further terrorist activity.[69] Neither the diamond dealers of Antwerp nor the financial institutions that serve them currently have in place any "trip-wires" that would alert them to the possibility that either the diamonds, or their owners, were involved in funding destabilizing conflict in western Africa or global terrorism.

---

[67] "The Great Small-Arms Bazaar," Cox News Service, July 6, 2001; "UN Report: Former Russian KB Officer Arming African Rebels," London Guardian, December 23, 2000.

[68] "Al Qaeda's Road Paved With Gold, Secret Shipments Traced Through a Lax System in United Arab Emirates," Douglas Farah, Washington Post, February 17, 2002, citing U.S. and European intelligence sources and investigators.

[69] "Al Qaeda Cash Tied to Diamond Trade," Douglas Farah, Washington Post, November 2, 2001, citing U.S. and European intelligence officials.

The problem is not necessarily one of witting intention on the part of the institutions that populate the vast infrastructure supporting many of the world's most destabilizing illicit activities. Rather, the global money laundering problem is a structural consequence of globalization putting bankers, banks, and banking accounts in constant contact with people and businesses they do not know. Instead of having relationships with people they trust, these institutions have accepted the notion that they could trust in the money itself, with no further obligation.

Twenty years ago, the risks posed by "no-questions asked" banking were not universally evident. Now the need for greater transparency, accountability, and "traceability" of financial transactions, regardless of their provenance, destination, and the mechanics of their movement, is widely accepted. Within the past two years many countries, in some cases threatened with possible loss of access to major financial centers, have enacted comprehensive measures to combat money laundering and to promote financial transparency. These countries include Antigua, Austria, the Bahamas, the Channel Islands, Israel, Japan, Liechtenstein, Panama, Russia, and the United Arab Emirates. The September 11 terrorist attacks on the United States have led to a further wave of legislation and regulation. The result has been closer financial scrutiny of many Gulf states, a number of countries in Southeast Asia, and of the placement of funds in jurisdictions in the Americas and Europe. This new scrutiny has included the first comprehensive efforts to understand, register, and regulate alternative remittance systems or *hawalas*.

Yet, governments - whose jurisdictions begin and end at their own borders - may be poorly placed to exercise effective oversight of private sector financial institutions whose activities may extend through many dozens of jurisdictions. If individual nations are incapable of exercising authority over the global operations of the financial institutions they license, there is an obvious question as to who is in a position to exercise such authority. One answer – the market shall rule – is clearly incompatible with other important social, economic and political goals. A second answer, that the institutions will regulate themselves, has to date not proven to effective. Soft standards (typically, guidelines), imposed by self-regulatory organizations such as the BCBS, IOSCO, and the IAIS, have given national regulators responsibility to decide on sanctioning cases of institutional misbehavior, and this too, has not proven very effective.

Each of the many exercises seeking to improve international financial regulation and to oppose illicit finance have adopted one core principle, a principle of particular import in an age of globalization. This principle, sometimes summarized as "know your customer," suggests merely that the obligation of knowing with whom you are doing business – a matter of prudence in a local economy – becomes even more essential in a global economy. There is no disagreement on this core standard, only a clear failure to date to impose it on a universal basis.

Assessing the existing and potential mechanisms for implementing this principle take up the remainder of this paper.

# 3 Existing Initiatives

The major financial services jurisdictions, including the countries of the G-8, the EU and Switzerland, have already begun to implement financial regulatory regimes based on the premise that the best possible protection against being victimized by financial crime of any kind is to know the true identity and business of any party to whom one is exposed in a transaction, from one's customer to one's correspondent bank. This principle is embedded in the work of the G-7 Financial Stability Forum, of the EU's Second Directive on Money Laundering, agreed to in October, 2001, and in the USA-PATRIOT Act, enacted by the U.S. to counter terrorism and terrorist finance in the wake of the September 11 attacks. These new legal regimes no longer treat all bank accounts as inherently equal, but require those who handle the funds of others to know who is the beneficial owner of an account, regardless of the nature of the account. In cases where an account is established through a jurisdiction that is inadequately regulated, or designed to hide beneficial ownership, these regimes would shut off access entirely, as the new law in the U.S. has required since the end of 2001.

## 3.1 "Know Your Customer"

The principle of "know your customer" is now true not only for banks but for all financial intermediaries engaged in trans-national financial activity, especially that which is electronic. In the age of the Internet, no other approach is workable. If merely banks are regulated, and their non-bank competitors are not, the competitors will engage in unregulated bank-like activity. To be effective, the "know your customer" requirements of the original Basel Committee recommendations of a decade ago (see below) are now slowly being updated and broadened to cover those who offer banking-like services. Jurisdictions that lag behind in undertaking this approach, either through self-regulation, government regulation, or a mixture of the two, are finding themselves and their financial institutions at risk of having reduced access to other jurisdictions. The result has been a jurisdictional regulatory "race to the top" instead of a "race to the bottom". Nevertheless, the emerging new

international instruments, standards, and initiatives have yet to have a substantial impact in reducing global conflict.

## 3.2 Naming and Shaming Jurisdictions

A common feature of the major initiatives undertaken to date by governments, international organizations, and non-governmental organizations (e.g. Transparency International) has been a focus on reforming governments, and through the reform of the governments, enhancing regulation and oversight of the private sector. Existing international instruments to combat money laundering include the 1988 United Nations Vienna Convention Against Illicit and Psychotropic Drugs, the 2000 United Nations Convention Against Transnational Organized Crime, the 1998 OECD Convention Against Illicit Payments (covering bribery), and numerous instruments enacted by the Council of Europe, the Organization of American States, and other regional groupings. Over time, these international instruments have come to create a body of international standards, embedded in the increasing number of mutual assessment mechanisms. The first and most successful of these remains that undertaken by the FATF and its progeny. In recent years, failures to meet these standards have even come to have consequences, as specific jurisdictions have been named, shamed, and in effect forced to change their laws in order to avoid economic, political and reputational risk. However, in many countries, governments simply do not control the private sector, and globalization has made cross-border control inherently impossible even for the most powerful governments. International regimes that direct governments to regulate private sector institutions that may be more sophisticated, more international, wealthier, and larger than the governments purporting to regulate them have inherent practical limits.

The nature of these limits has been visible already, as the name and shame exercises have taken hold. While individual jurisdictions have been forced to change their rules, individual institutions have been able to continue to engage in regulatory arbitrage, pushing their riskiest and least attractive transactions to jurisdictions that require the least transparency. For example, during the last half of 2001, the tiny Channel Island of Jersey was found to house millions of dollars stolen from investors in the Gulf States by a Hong Kong-based investment company;[70] $200 million allegedly looted from Brazil in a major political scandal, deposited in a branch of Citibank;[71] and some $300 million in accounts belonging to the late Sani Abacha,

---

[70] Dubai Khalej Times, "UAE: Investment Firms Defraud Investors," 21 August 2001.

[71] The Observer, "Brazil scandal hits Citibank," September 9, 2001.

his family and entourage. Jersey was in compliance with all of the FATF anti-money laundering criteria, and most of the obligations required by the OECD tax haven exercise. Yet the persistent use of Jersey to conceal financial crime reflected the reality that anyone who deliberately structured their transactions across multiple jurisdictions was still able to protect their illicit activities from scrutiny for a very long time. The problem may not in fact be with Jersey's ability to enforce its anti-money laundering regime, but with the inadequacies of regulators and law enforcement the world over to keep track of the transnational activities of the private sector entities they purport to oversee.

Just as globalization has caused even the smallest, local financial jurisdiction, such as that of Jersey or Liechtenstein, to be accessible for use by any and all of the world's businesses, legitimate and illegitimate, the same phenomenon has required the extension, bit by bit, of regulation from its initial application to limited problems in limited sectors to universal problems in all sectors, as the evolution of the FATF and the OECD Harmful Tax Practices initiatives have demonstrated.

## The Financial Action Task Force (FATF)

The FATF was established during the French presidency of the G-7 in 1989, in response to the G-7's recognition of the threat posed to banking and financial systems from drug money laundering. At the time, drug money laundering in the Americas emanating from Colombia were fresh in the minds of policy-makers, following the crisis between the U.S. and Panama that ended with the removal and arrest of General Manuel Noriega.

The FATF's initial mandate was to examine the methods used to launder criminal proceeds and to develop recommendations for combating them. These 40 Recommendations, developed during the FATF's first year, became the basis for what was then an innovative system for implementation. The FATF, which had a tiny secretariat and was not a chartered international organization, but only a voluntary association, initiated a system for self- and mutual assessment. Under this system, each member of the FATF would first assess its own compliance with the FATF's 40 Recommendations. Then, other FATF members would visit the jurisdiction, question authorities from the assessed jurisdiction, and reach their independent determination of where the jurisdiction was failing to meet the standards of the 40 Recommendations.

This approach had several ground-breaking aspects. First, was the notion that technical experts could develop standards which over time would bind their countries in practice even in the absence of their entering into a formally binding international agreement. Second was the concept of mutual evaluation, in which a country would submit to peer review as a means of improving its domestic capabilities.

Each of these developments faced potentially substantial risks. For example, the withdrawal of any FATF member from consensus as to the standards could have had the impact of undermining both the legitimacy and effectiveness of the entire initiative. Similarly, the politicization of the mutual assessment process, either to unfairly exculpate or to unfairly criticize any jurisdiction, could also have fatally impaired the FATF's legitimacy. Both risks were avoided largely because of the technocratic nature of the staffing of the FATF by member governments. The FATF process was driven by technocrats from finance ministries, regulators, and law enforcement, not by foreign ministries or political figures. Its standards were neutral, and its judgments, initially confidential, were recognized to be fair. Moreover, the FATF proceeded slowly, first evaluating jurisdictions with robust regulatory and enforcement regimes, criticizing them, and only then moving to jurisdictions that diverged further from the 40 Recommendations.

The FATF moved forward steadily, but slowly, during the 1990's, in the process taking on two major changes to its original mandate. In 1996, under the U.S. Presidency of the FATF, the organization expanded its mission beyond reviewing capacities against narcotics money laundering to cover all money laundering involving all serious crimes. It also agreed to take on new developments in money laundering trends, especially those involved with electronic funds transfers. Secondly, the FATF decided that the ability of its member jurisdictions to protect themselves against money laundering would be undermined if non-member jurisdictions did not adopt and implement its 40 Recommendations as well. Accordingly, it chose to move beyond its initial mandate to assess its own members to develop a "black list" of other countries whose practices were deemed to facilitate money laundering and therefore be "non-cooperative" with the objectives of the FATF. The development of a black list reflected a dramatic change in approach by the FATF, necessitated by the growing recognition of the interdependence of the global financial infrastructure, and the inability of any jurisdiction to protect itself in the face of bad practices in other jurisdictions.

Both the FATF's standards and its selection of non-cooperative jurisdictions illustrate the nature of trans-national money laundering, and the practices most likely to facilitate it. Core FATF standards include:

1. Criminalizing the laundering of the proceeds of serious crimes and enacting laws to seize and confiscate them.

2. Obliging financial institutions to identify all clients, including all beneficial owners of financial property, and to keep appropriate records.

44

3. Requiring financial institutions to report suspicious transactions to competent national authorities and to implement a comprehensive range of internal control measures.

4. Putting into place adequate systems for the control and supervision of financial institutions.

5. Entering into agreements to permit each jurisdiction to provide prompt and effective international cooperation at all levels, especially with regards to exchanging financial information and other evidence in cases involving financial crime.[72]

In general, these standards have been changed little since their development in 1990. Nevertheless, they remain incompletely implemented internationally, prompting the FATF to develop in 2000 its list of "Non-Cooperative Countries and Territories." Four of the countries on the original list, Bahamas, Cayman Islands, Liechtenstein, and Panama, enacted comprehensive money laundering regimes rather than face the risk of possible loss of market access to FATF member states if they failed to take action. Others, such as Israel and Russia, enacted legislation, but failed to put in place an anti-money laundering system sufficient to meet FATF standards. To date, sanctions – such as enhanced scrutiny or greater regulatory barriers - have been threatened against a number of jurisdictions by the FATF, but imposed on none. The simple threat has been enough to cause any country targeted with immediate action to change its laws, as Austria, the Seychelles, and Turkey demonstrated even prior to the Non-Cooperative Countries and Territories initiative. Currently, 19 countries and territories are on the FATF black list, facing the risk of potential sanctions, termed "countermeasures" by the FATF, in the near future (see Annex A). Notably, none of these jurisdictions are as yet isolated from the world's major financial markets, although a few, especially those in the South Pacific,  have fewer relationships with  international financial institutions (since the exposure of the Bank of New York/Benex scandal in the fall of 1999) and face the potential of a wholesale closing of contacts with the United States under its recently passed legislation prohibiting U.S. banks from doing business with "shell banks."[73]

[72] The full text of the FATF's 40 Recommendations is available at the FATF's web site online at http:/www.oecd.org/fatf.

[73] Title III of the USA Patriot Act, enacted following the September 11, 2001 terrorist attacks on the United States, prohibits all financial institutions licensed in the United States from maintaining accounts with shell banks as of December 31, 2001. Shell banks are defined in the law as institutions lacking any physical presence and functioning as essentially unregulated institutions.

## 3.3 The OECD Harmful Tax Practices Initiative

As of the late 1990's, even the most affluent countries began to recognise that a lack of transparency resulting from globalization was beginning to affect the area of taxes. Finance ministries of OECD countries reached the conclusion that that they were losing extremely large amounts of revenue due to individuals and companies engaging in systematic tax evasion by structuring their activities cross-border and taking advantage of banking secrecy regimes.

Previously the OECD had been focused on eliminating regulations that could impede international trade or impose market distortions. Now its senior officials came to see what it termed "tax poaching" as a practice increasingly undermining the revenue base of governments throughout the world, reducing their ability to raise revenues and provide fundamental services. In short, the OECD saw globalization leading to tax evasion, which was in turn undermining domestic capacities to govern. As the OECD studied the problem, it also came to recognize that international tax evasion was linked to a host of other serious threats to the global system. In the words of the OECD's Secretary General, Donald J. Johnston, "there are strong links between international money laundering, corruption, tax evasion, and other international criminal activities. These illegal activities are widespread and involve such sizeable sums that they can pose a threat to the stability of the global system of finance and even the global trading system."[74] Notably, the OECD was not focused on weaker jurisdictions involved in civil conflict, but on the impact of financial secrecy in the tax arena on the world's *strongest* jurisdictions.

In May 1998, the OECD governments issued a report on *Harmful Tax Competition*, which led to the creation of a "Forum on Harmful Tax Practices," a set of "Guidelines for Dealing with Harmful Preferential Regimes in Member Countries," and finally, a series of "Recommendations For Combating Harmful Tax Practices".[75] The initiative built in many ways on the parallel work of the FATF, adopting in particular three elements of FATF's approach. First, the OECD developed a set of agreed standards to combat a set of agreed problems; second, the OECD put into place a system of multilateral assessment of each jurisdiction's implementation of the agreed standards; third, the OECD adopted a "name and shame" approach, creating a black list of jurisdictions that would face loss of market access or other sanctions if they did not take action. There vigorous protests from smaller jurisdictions that had been engaged in "ring-fencing" - the practice common to tax havens of promising little or no regulation or taxation of funds from overseas, as distinct

[74] "Introductory Remarks of the Honourable Donald J. Johnston, Secretary-General of the OECD, High Level Symposium on Harmful Tax Competition," June 29, 2000.

[75] 1998 Report of the OECD on Harmful Tax Competition, Recommendations pps. 40–46.

from regulation and taxation of funds of their own citizens - but the jurisdictions which were targeted rapidly enacted new regimes. To avoid being placed on a prospective black list, six prominent tax avoidance jurisdictions, Bermuda, Cayman Islands Cyprus, Malta, Mauritius, and San Marino committed in June 2000, in advance of their assessments to embrace international tax standards for transparency, exchange of information and fair tax competition prior to the end of 2005.

It is instructive to review the fundamentals of the OECD standards, as each of them applies to the lack of transparency common to all money laundering, not merely those pertaining to tax crimes.

1. Ensuring that information is available on beneficial (that is, actual) ownership of companies, partnerships and other entities organized in the jurisdiction.

2. Requiring that financial accounts be drawn up of companies organized in the jurisdiction in accordance with generally accepted accounting standards, and that they be appropriately audited.

3. Putting into place mechanisms for the jurisdiction to share information pertaining to tax offences with corresponding authorities in other jurisdictions.

4. Ensuring that its regulatory and tax authorities have access to bank information that may be relevant for the investigation or prosecution of criminal tax matters.

The OECD's insistence that such fundamental, common sense principles be adopted has produced substantial controversy in many historic tax havens, including a number of smaller jurisdictions in the Caribbean and South Pacific. The resistance to their universal adoption is itself evidence of how badly their adoption is needed, and of the degree to which basic elements of financial transparency have yet to be put into place internationally.

## 3.4 The Wolfsberg Principles: A Private Sector Alternative

Abuses of private banking by corrupt officials became substantially exposed in the late 1990's, in the course of changes of government, or the exposure of individual kleptocrats, as described above. In each of these cases, highly placed political officials were found to have laundered inexplicably large sums of cash through major international financial institutions which had been at the least incurious as to whether the sources of the funds involved were legitimate.

In response, twelve of the largest international banks and the anti-corruption organization, Transparency International (TI) undertook an initiative in 2000 that led to the development and adoption of "Global Anti-Money Laundering Guidelines For Private Banking." These Guidelines, endorsed by the participating global banks in October, 2000,[76] were intended only to apply to private banking, that is, to the accounts of the extremely rich, those with deposits of $3 million to $5 million. Lacking any oversight mechanism, they were to be self-regulatory guidelines to which each subscribing institution would adhere.

The lack of an oversight or assessment mechanism for the Wolfsberg Principles has led to some criticism. However, the eleven Wolfsberg Principles established for the private banking sector by the twelve international banks are themselves of great significance: they illustrate both potential solutions and aspects of the nature of the continuing challenge involved in discouraging the criminal and the corrupt from taking advantage of world's global financial infrastructure. In summary, they are:

1. Adopting client acceptance procedures so that the banks accept "only those clients whose source of wealth and funds can be reasonably established to be legitimate." These procedures are supposed to include: (a) taking reasonable measures to establish the identity of its clients and beneficial owners before accepting money, (b) demanding adequate identification before opening an account, (c) determining the source of wealth, the person's net worth and the source of the person's funds, and (d) requiring two persons, rather than just one, to approve the opening of an account.

2. Engaging in additional diligence or attention in cases involving the use of numbered or alternative name accounts, high-risk countries, off-shore jurisdictions, high-risk activities, or public officials.

3. Updating client files when there are major changes in control or identity.

4. Identifying unusual or suspicious transactions, following them up, and then deciding whether to continue the business relationship with heightened monitoring, ending the relationship, or advising authorities.

5. Monitoring accounts through some means.

6. Developing and implementing a "control policy" to insure compliance with bank rules.

---

[76] The participating banks, known as the Wolfsberg Group, consist of ABN Amro N.V., Banco Santander Central Hispano, S.A., Bank of Tokyo-Mitsubishi, Ltd., Barclays Bank, Citgroup, Credit Suisse Group, Deutsche Bank AG, Goldman Sachs, HSBC, J.P. Morgan Chase, Societe Generale, and UBS, A.G.

7. Establishing a regular method of reporting on money laundering issues to management.

8. Training bank employees involved in private banking on the prevention of money laundering.

9. Requiring the retention of bank records that might be material to anti-money laundering matters for at least five years.

10. Establishing an "exception and deviation procedure that requires risk assessment and approval by an independent unit" for exceptions to the previous nine principles.

11. Establishing an anti-money laundering unit at the financial institution.[77]

The principles were introduced at the time of their adoption in terms that highlighted the historic problem of bankers' willingness to handle the proceeds of corruption, a result of the historic unwillingness to question the provenance of funds received. The head of TI, Peter Eigen, described the creation of the Wolfsberg Group as a "unique event" because "few would expect the leading anti-corruption organization and the leading banks to be standing on the same platform." Dr. Eigen further stated that the Wolfsberg Principles "state unequivocally that banks agree they should not be used by corrupt crooks and that it is fully incumbent on individual banks to put into place fully effective systems to ensure that their institutions are not money laundering vehicles. The language is blunt. The burden for monitoring the implementation and day-to-day operations of the guidelines rests squarely on the banks. Their reputations are at stake."[78] In short, the Wolfsberg Principles would have an impact because an institution that had subscribed to it would have its reputation hurt if it failed to then meet its public commitments.

The universal adoption of each of the above principles (with the exception of principle number 10) would contribute to making it harder for corrupt officials or drug traffickers to establish accounts with funds of unknown provenance. Yet, by specifying their agreement to adopt these principles, the signatory international banks imply that previously such principles may not have been adopted by them in every jurisdiction in which they operate, although each has been either expressly or implicitly already required by the 40 Recommendations of the FATF. Notably, the banks subscribing to the Wolfsberg Principles did not commit to applying them to

[77] The full text of the Wolfsberg Principles is set forth at http://www.wolfsberg-principles.com/wolfsberg_principles.html

[78] Opening Statement, Dr. Peter Eigen, Chairman, Transparency International, October 30, 2000, available at Transparency.org.

all of their accounts, but only to their private banking departments. Moreover, principle number 10, exceptions and deviations, contemplates the possibility that such principles as knowing the customer, reporting suspicious transactions, or maintaining records might not be followed, if the bank decided there was an appropriate reason for ignoring the rule. Left outside the parameters of the Wolfsberg Principles entirely is the question of correspondent banking relationships with high-risk jurisdictions.

Also left outside the parameters of the Wolfsberg Principles are the hundreds of large international banks that have yet to endorse them, as well as the thousands of mid-sized financial institutions with multi-jurisdictional operations. Important components of the world's financial services sector are also missing from the members of Wolfsberg Group, which does not include a single institution based in China, Russia, Latin America, Africa or the Middle East. The absence of outside assessment or oversight for the Wolfsberg Principles and its members, illustrates the limits of this initiative, and the distance yet to be traveled before there is general acceptance of universal anti-money laundering standards among the world's interlinked financial institutions.[79]

The Wolfsberg Principles remain an important development. However, in light of the comprehensive mutual assessment mechanism adopted by the FATF, the adoption of the Wolfsberg Principles illuminates a significant gap. They demonstrate that in the absence of globally applicable agreements by private sector institutions, even widely accepted principles may remain incompletely adopted. So long as regulatory arbitrage remains available on an international basis, general agreement among most countries to adopt standards does not prevent private institutions from adhering to the standards only in those jurisdictions that require them. Broader, global adoption of the standards requires commitments from the private sector institutions that these standards apply everywhere, not merely where there is a good local regulator.

A set of principles, adopted by the world's major financial institutions on a global basis on a mandatory rather than optional basis, would have the potential of transcending the limits of individual national regulators, especially were it to be-

---

[79] See e.g. editorial of the Financial Times, October 30, 2000, "Banks Clean Up," stating that "it may be surprising that 11 of the world's biggest banks should find it necessary to declare that they are opposed to the use of their networks for criminal purposes. Yet a series of scandals has shown how corrupt politicians and other criminals have found it easy to launder their loot through the international banking system. . . The bad publicity stemming from such disclosures has persuaded the 11 signatories that the damage to their reputations of becoming involved, however inadvertently, in money-laundering is greater than any financial benefit . . . but ending the flows needs the involvement of the whole financial services industry including the host of other institutions whose transactions can help hide criminal plunder. The next step is for the financial regulators to adopt the Wolfsberg principles for the organisations they supervise and closely monitor their enforcement."

come applicable to all financial services sector operations, rather than only to private banking, and to become subject to assessment and oversight mechanisms by outsiders on a global basis. The final section of this paper illustrates how such a regime might operate.

# 4 Implementing Global Standards for the Private Sector

The largest financial institutions of the world operate in dozens of jurisdictions. Even smaller financial institutions are networked in practically all jurisdictions. This networking appears to be largely viable even when countries face international sanctions, as either sympathetic jurisdictions or financial institutions provide ongoing financial services to those theoretically sanctioned and off-limits.

The largest international financial institutions remain the most important nodes in the world's financial services infrastructure. Yet to date these institutions and those competing with them have continued to take advantage of the substantial regulatory and enforcement arbitrage afforded by the differences in government laws and capacities to launder the illicit proceeds of the world, and thereby to facilitate the circumvention of national laws.

Each of the major existing initiatives to promote financial transparency fails in part to address this problem. The FATF and OECD exercises focus on jurisdictions, not institutions, and create black-lists, but no "white lists" of jurisdictions that have met the highest standards of best practices. Even if every country and territory in the world were to agree upon their standards, local failures of governmental capacity to regulate or to enforce would preserve the ability of private sector financial institutions who were so inclined to circumvent the standards. The Wolfsberg Principles focus directly on financial institutions, but are limited in scope to private banking, in membership to twelve banks, in principles to basics only, and in enforcement to self-regulation. The Wolfsberg Principles create an implicit "white list" of subscribing institutions, but without any mechanism for outside audit or assessment, reducing the pressure for comprehensive implementation.

The foregoing initiatives have been innovative and recent. Few expect that they will be sufficient. The question remains as to whether additional mechanisms should be developed that combine the best features of exiting initiatives into a regime that further attenuates regulatory and enforcement arbitrage, holds the private sector financial services infrastructure accountable, and provides incentives to institutions that adopt best practices.

The World Bank, and the other International Financial Institutions (IFIs) are each among the most important international institutions operating in the world

today, controlling many billions of dollars in resources that are in turn allocated for lending around the world. These institutions each have a large number of correspondent banking relationships, and deposit funds for use in recipient countries not only in central banks, but in commercial ones. Similarly, the United Nations and its constituent elements direct substantial sums in development assistance, which also are necessarily deposited in banks in the countries where the activities are carried out. Trade finance activities undertaken by government-sponsored entities such as export-import banks also rely on private sector banks to handle the funds. National and international development programs place their funds in private banks. And government and international organizations alike, when they borrow and issue notes, also select international banks to act as agents and issuers.

Despite the existence of the FATF, OECD, and Wolfsberg models, there is no "white list" to which governments, international organizations, or non-governmental organizations that wish to foster transparency can turn as a principled means of selecting a bank to handle their funds. The lack of such a white list may constitute a missed opportunity. As Robert Litan has observed, these institutions, especially the IFIs, have "accumulated power akin to a domestic sovereign government," and have the means to enforce terms of their agreements with other countries.[80] Such power in relationship to sovereign states would imply that these institutions have equal leverage should they care to exercise it in relationship to private sector institutions. Creating an additional incentive for financial institutions to adhere to a comprehensive, global code of conduct to combat money laundering and protect against illicit finance would seem to be a logical goal for an international community increasingly focused on the risks created by financial secrecy. It would supplement the work of nations by asking institutions that operate in many jurisdictions to adhere to the same standards in all of them, even in cases where the governments themselves have little ability directly to regulate or enforce these standards.

To make a white list system work, the United Nations could, for example, take the recommendations previously made by the FATF, OECD and Wolfsberg Group and ask financial institutions to agree to adopt them on a global basis throughout their institutions. Such institutions could further agree to be assessed by a multinational team of experts who would make reports on the implementation of the principles by those institutions they assess. An institution that has agreed to an assessment, and passed it, would be credentialed and rewarded with a preference for selection in processing the funds controlled by the UN and by other international organizations. Other, non-white listed institutions would not be denied the opportunity to handle the funds of international organizations. However, they might well be limited to handling such funds in areas where there is no white list institution

---

[80] Litan, id, at 199.

available. To insure the integrity of the system, the white list would need to be up-
dated regularly, with periodic inspections and reviews of any institution placed on
such a list.

Such a system would retain the mutual assessment and oversight elements of
the FATF and OECD exercises, while adding the universality promised by the
Wolfsberg Principles, and combating the problem of regulatory arbitrage. Each
white listed institution would be required to agree to maintain its know-your-
customer and other anti-money laundering policies and procedures regardless of
whether it was located in a well-regulated jurisdiction, or one with a lax regime.
It would accept the principle of having others conduct period external assessments
of its compliance with the standards, and the publication of comprehensive re-
ports, describing how it had met the standards. To ensure fairness and the oppor-
tunity to improve anti-money laundering programs over time, white listed insti-
tutions would be given a period for correction following each evaluation before
being at risk of losing white-list status. Other institutions, not white listed, would
be given the ability to sign-up to the white list at any time by providing a public
specification of their methods of complying with the standards, and agreement to
submit to an outside assessment at the earliest convenience of the multilateral
experts group.

Given the magnitude of the potential commercial benefit to white listed finan-
cial institutions, it would be important to have the standards appropriately tailored
by sector, size of operation, and nature of risk. This approach would be similar to
that currently undertaken by the Basel Group in the area of risk-based capital stand-
ards for financial institutions. To be effective, anti-money laundering regimes need
to be structured so as to account for the actual mechanisms by which failures of
transparency are most likely to be exploited. Effective tailoring for a white list would
require further development of money laundering typologies by the FATF and other
organizations. However, even a base-line set of standards, based on those already
adopted by the FATF, the OECD, and reflected in the Wolfsberg Principles, might
provide a suitable place to begin.

Today, financial transparency is not a criterion for the selection of one financial
institution over another to be the holder, processor, or handler of the funds of gov-
ernments, development organizations, international financial organizations, or the
United Nations. An international bank that is involved in numerous money laun-
dering scandals or terrorist finance has approximately the same chance of obtain-
ing a lucrative source of government resources as does an international bank that
has imposed the highest standards of transparency and anti-money laundering pol-
icies and procedures. Through responsible bank selection based on transparent and
agreed criteria, state treasuries, multilateral organisations, and NGOs have ample

opportunity to help level the playing field, while at the same time helping to create incentives for financial institutions to begin remedying this state of affairs.

Creating and enforcing a white list to promote global standards of financial transparency might in time help make the activities of governments more accountable and even promote improved governance, strengthening popular support for those governments. As Paul Collier, the Director of the Development Research Group at the World Bank has recently observed, "a government can try to make loot-seeking rebels unpopular by transparently using the revenue from primary commodity exports to fund effective basic services delivery. If the money is seen to be funding primary education and rural health centers then the population is going to be more hostile to rebels than if they believe the money is sent off to Swiss banks."[77]

[81] "Economic Causes of Civil Conflict and their Implications for Policy," Paul Collier, Director, Development Research Group, World Bank, June 15, 2000, p. 16.

## Annex A: The FATF "Black List"[82]

These jurisdictions face the risk of potential sanctions, termed "countermeasures" by the FATF. They are listed below, with an brief description by the author of the type of money laundering risk:

1. Cook Islands, used by Russian criminals to loot Russia.

2. Dominica, providing false identities, passports, and banking services to Russian criminals and drug traffickers.

3. Egypt, a center for financial fraud and possibly terrorist finance; has had minimal transparency or anti-money laundering laws, so data is extremely limited.

4. Grenada, false identities and banking services to financial criminals and drug traffickers.

5. Guatemala, exploitation by drug money launderers.

6. Hungary, comprehensive banking secrecy exploited by Russian organized crime involved in trafficking of women, alien smuggling, and contraband smuggling.

7. Indonesia, money laundering for illicit timber, massive corruption and fraud.

8. Israel, money laundering for Russian organized crime, including trafficking in women.

9. Lebanon, laundered funds for sanctioned regimes including Libya and Serbia, as well as for various terrorist organizations; handles proceeds of drug trafficking from Middle East.

10. Marshall Islands, used by Russian criminals.

11. Myanmar (Burma), wide open to narcotics money laundering, arms trafficking, illicit timbering, precious gems smuggling, and the funding of private armies.

12. Nauru, principle launderer for theft of Russian national resources.

13. Nigeria, drug money laundering, major financial crime, terrorist finance.

14. Niue, handled Russian money laundering.

15. Philippines, laundered funds for Al Qaeda.

---

[82] The current list, and background documentation on each jurisdiction, is set forth by the FATF at http://www1.oecd.org/fatf/NCCT_en.htm

16. Russia, wide open to money laundering by Russia, Colombian, and Italian organized crime, including the proceeds of corruption, theft, drug trafficking, trafficking in women, people smuggling, stolen motor vehicles, intellectual property crime, extortion, and massive fraud.

17. St. Kitts and Nevis, handled drug money laundering.

18. Ukraine, laundered proceeds of corruption, trafficking in persons, theft of national resources, drugs.

**About the Author**

Jonathan M. Winer was U.S. Deputy Assistant Secretary of State for International Law Enforcement from 1994 through 1999. He currently practices international financial regulatory law at the firm of Alston & Bird LLP in Washington, D.C. and can be reached at jwiner@alston.com.


**About Fafo and PICCR**

The Fafo Institute in Oslo conducts policy-related research at the international level, concentrating primarily on countries undergoing substantial structural change. Fafo's Programme for International Co-operation and Conflict Resolution (PICCR) is an umbrella programme for initiatives related to the policies and practices of international responses to armed conflict. In partnership with other non-governmental organisations, governments, and multilateral institutions, PICCR is actively engaged in efforts to understand and promote sustainable conflict resolution, effective multilateral co-operation and efficient international organisation. PICCR is involved in research and dialogue activities that encourage and support principles of multilateralism and international co-operation in general. Since its inception in 1998, PICCR has implemented a series of policy fora and research projects related to peace operations and international responses to civil wars. The honourary Chair of PICCR is Terje Rød-Larsen.

# Illicit Finance and Global Conflict

Global banking has provided services to a long list of money launderers, diamond and timber smugglers, terrorists and corrupt officials, and traffickers in people, guns and drugs. Bank staff may have been knowing or negligent but, in most cases, the institutions themselves did nothing illegal. The problem lies not in the institutions, but in a system of international regulation that failed to create legal norms or regulatory mechanisms to prevent abuse. *Illicit Finance* looks at the global challenges presented by illicit finance, its role in helping to sustain armed conflict, and efforts now underway to meet these challenges.

The report was commissioned by the Fafo AIS Programme for International Co-operation and Conflict Resolution (PICCR) as part of the *Economies of Conflict* project, which examines the links between certain private sector activity and armed conflict. For additional titles in the Economies of Conflict Report Series and background information from the project, please check our website: www.fafo.no/piccr

PICCR is a policy research programme at the Fafo Institute for Applied International Studies (Fafo AIS). Financial support for *Economies of Conflict* has been provided by the Government of Norway.

Coverphoto: Soldiers from rebel group FARC, Colombia.
Photo ©Rune Eraker


Fafo

P.O.Box 2947 Tøyen
N-0608 Oslo
www.fafo.no

**Fafo-report 380**
**ISBN 82-7422-363-2**
**ISSN 0801-6143**