EXHIBIT BE

# COUNCIL ON FOREIGN RELATIONS

# TERRORIST FINANCING

Report of an Independent Task Force
Sponsored by the Council on Foreign Relations

Maurice R. Greenberg, Chair
William F. Wechsler and Lee S. Wolosky,
Project Co-Directors

# Terrorist Financing

———————————

*Report of an Independent Task Force
Sponsored by the
Council on Foreign Relations*

Maurice R. Greenberg,
Chair
William F. Wechsler and Lee S. Wolosky,
Project Co-Directors

The Council on Foreign Relations is dedicated to increasing America's understanding of the world and contributing ideas to U.S. foreign policy. The Council accomplishes this mainly by promoting constructive debates and discussions, clarifying world issues, and publishing *Foreign Affairs*, the leading journal on global issues. The Council is host to the widest possible range of views, but an advocate of none, though its research fellows and Independent Task Forces do take policy positions.

THE COUNCIL TAKES NO INSTITUTIONAL POSITION ON POLICY ISSUES AND HAS NO AFFILIATION WITH THE U.S. GOVERNMENT. ALL STATEMENTS OF FACT AND EXPRESSIONS OF OPINION CONTAINED IN ALL ITS PUBLICATIONS ARE THE SOLE RESPONSIBILITY OF THE AUTHOR OR AUTHORS.

The Council will sponsor an Independent Task Force when (1) an issue of current and critical importance to U.S. foreign policy arises, and (2) it seems that a group diverse in backgrounds and perspectives may, nonetheless, be able to reach a meaningful consensus on a policy through private and nonpartisan deliberations. Typically, a Task Force meets between two and five times over a brief period to ensure the relevance of its work.

Upon reaching a conclusion, a Task Force issues a report, and the Council publishes its text and posts it on the Council website. Task Force reports can take three forms: (1) a strong and meaningful policy consensus, with Task Force members endorsing the general policy thrust and judgments reached by the group, though not necessarily every finding and recommendation; (2) a report stating the various policy positions, each as sharply and fairly as possible; or (3) a "Chairman's Report," where Task Force members who agree with the Chairman's report may associate themselves with it, while those who disagree may submit dissenting statements. Upon reaching a conclusion, a Task Force may also ask individuals who were not members of the Task Force to associate themselves with the Task Force report to enhance its impact. All Task Force reports "benchmark" their findings against current administration policy in order to make explicit areas of agreement and disagreement. The Task Force is solely responsible for its report. The Council takes no institutional position.

For further information about the Council or this Task Force, please write the Council on Foreign Relations, 58 East 68th Street, New York, NY 10021, or call the Director of Communications at (212) 434-9400. Visit our website at www.cfr.org.

Copyright © 2002 by the Council on Foreign Relations®, Inc.

All rights reserved.

Printed in the United States of America.

This report may not be reproduced in whole or in part, in any form (beyond that copying permitted by Sections 107 and 108 of the U.S. Copyright Law and excerpts by reviewers for the public press), without written permission from the publisher. For information, write the Publications Office, Council on Foreign Relations, 58 East 68th Street, New York, NY 10021.

## CONTENTS

| | |
|---|---|
| Foreword | v |
| Acknowledgments | vii |
| Executive Summary | 1 |
| Background and Findings | 5 |
| Nature of the Problem | 6 |
| Responses to the Problem | 12 |
| Obstacles to Effective Action | 15 |
| Principal Findings | 21 |
| Recommendations | 23 |
| Additional View | 32 |
| Task Force Members | 36 |
| Appendixes | 39 |
| Additional Sources of Information | 54 |

## FOREWORD

The "fog of war" has long befuddled military and political leaders. Of all the battlefronts in today's war on terrorism, few are as "foggy" as efforts to combat terrorist financing. Even to those in the midst of the campaign, uncertainty often colors the most fundamental question: Are we winning or losing the battle?

The Council on Foreign Relations established its Independent Task Force on Terrorist Financing to evaluate the effectiveness of U.S. efforts to disrupt terrorist financing. Under the leadership of Task Force chairman Maurice R. Greenberg, chairman and CEO of American International Group, this Task Force brought together, in a bipartisan atmosphere, some of the country's foremost experts on terrorist financing along with leading figures in the foreign policy community, on Wall Street, and in the law enforcement and intelligence services.

As none of the Task Force members currently hold government positions, they are able to say many things publicly that the U.S. government cannot—or will not—say about the nature of the problem, what the international community has done about it, what the major impediments have been, and what additional steps can be taken. In shining a light on the remaining problems—especially the distances yet to be traveled by some of our most important allies— their aim is to inform the public debate and, in the end, set out a road map for progress. In my judgment, they have succeeded.

The Task Force determined that after an initially robust attempt to curtail financing for international terrorism, the Bush administration's current efforts are "strategically inadequate" to assure the sustained results we need to protect U.S. security.

To regain momentum and give this issue the priority it requires, the Task Force urges the administration to take two key steps:

- Designate a special assistant to the president with the specific mandate and prestige to compel the various diplomatic, law

*Terrorist Financing*

enforcement, intelligence, regulatory, and policy agencies to work together to assure a sustained and effective U.S. response.

- Drive other countries—whose efforts are woefully inadequate—to greater effectiveness and cooperation. To accomplish this, the United States should lead an initiative to create a new international organization dedicated solely to curbing terrorist financing.

In addition to the very able leadership of Hank Greenberg, the Task Force relied most heavily on the formidable skills of its two co-directors and the principal authors of this report, William F. Wechsler and Lee S. Wolosky, both of whom brought a wealth of expertise on the subject from their years in the government. Project coordinator Rear Admiral (Lower Half) (select) Jeffrey L. Fowler, U.S. Navy, provided invaluable assistance in enabling the Task Force to complete its work on an expedited basis. We are grateful for their devotion to this multifaceted subject and thank them very much.

*Leslie H. Gelb*
President
Council on Foreign Relations

## ACKNOWLEDGMENTS

We are grateful for the hard work and dedication put forth by all of the Task Force members and particularly for the leadership of the chairman, Hank Greenberg. The members each brought unique backgrounds and areas of expertise to this complicated issue and worked hard to reach consensus under a tight schedule. We are also grateful for the generous support from Guardsmark, Inc., which made this Task Force and the publication of this report possible.

The Task Force's deliberations took advantage of the excellent work and publications on the subject by the Office of Foreign Asset Controls (OFAC) at the U.S. Department of the Treasury, the Office of the Coordinator for Counterterrorism and the Bureau for International Narcotics and Law Enforcement Affairs (INL) of the U.S. Department of State, the Monitoring Group and the Security Council Counter-Terrorism Committee of the United Nations, the Financial Action Task Force (FATF), and the Watson Institute for International Studies at Brown University. We are also grateful for the information and assistance provided by the Central Intelligence Agency (CIA).

Throughout our work we relied heavily on the wise counsel of Leslie H. Gelb, for which we are very grateful. We also benefited tremendously from the guidance of the Council's Michael P. Peters and Anne R. Luzzatto and the very able assistance of our project coordinator, Rear Admiral (Lower Half) (select) Jeffrey L. Fowler, U.S. Navy, the 2002–2003 Council military fellow. And finally, special thanks are due to Ferry Pausch, the Task Force's research associate, for all he did to make this Task Force a success.

*William F. Wechsler*
*Lee S. Wolosky*

[vii]

## EXECUTIVE SUMMARY

Unlike other terrorist leaders, Osama bin Laden is not a military hero, a religious authority, or an obvious representative of the down-trodden and disillusioned. He is a rich financier. He built al-Qaeda's financial network from the foundation of a system originally designed to channel resources to the mujahideen fighting the Soviets.

Thanks to the leadership of President George W. Bush, Congress, and the hard work of the Bush administration over the last year, that network has been disrupted. But it has certainly not been destroyed. And as long as al-Qaeda retains access to a viable financial network, it remains a lethal threat to the United States.

Al-Qaeda's financial network is characterized by layers and redundancies. It raises money from a variety of sources and moves money in a variety of manners. It runs businesses operating under the cloak of legitimacy and criminal conspiracies ranging from the petty to the grand. The most important source of al-Qaeda's money, however, is its continuous fund-raising efforts.

Al-Qaeda's global fund-raising network is built upon a foundation of charities, nongovernmental organizations, mosques, websites, intermediaries, facilitators, and banks and other financial institutions. Some whose donations go to al-Qaeda know full well the violent and illicit purposes their money will further. In other cases, donors believe their money will help fund legitimate humanitarian efforts, but the money is nonetheless diverted to al-Qaeda. For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al-Qaeda. And for years, Saudi officials have turned a blind eye to this problem.

Al-Qaeda moves its funds through the global financial system, the Islamic banking system, and the underground *hawala* system, among other money transfer mechanisms. It uses its global network of businesses and charities as a cover for moving funds. And it uses such time-honored methods as bulk cash smuggling and

[1]

*Terrorist Financing*

the global trade in gold and other commodities to move and store value. Al-Qaeda is not the only terrorist organization to make use of these mechanisms. Terrorists the world over have long used charities, for example, to help raise and move their funds—as the Irish Republican Army (IRA) did for decades in American cities such as Boston and New York.

Following September 11, 2001, the U.S. government undertook *tactical* actions to disrupt individual nodes in the terrorist financial network and *strategic* initiatives to change the environment within which terrorists raise and move their funds. But no single senior official in the U.S. government has the mandate and authority necessary to direct and coordinate the various diplomatic, law enforcement, intelligence, regulatory, and policy measures that will be required to assure a sustained and effective U.S. response.

Since much of the subject matter is highly classified, the effectiveness of tactical measures has been difficult to determine. As a group, the Task Force accepts the Bush administration's generalized assurances that the United States has received markedly improved tactical law enforcement and intelligence cooperation from foreign states since September 11. By contrast, obstacles to effective action in the strategic arena appear increasingly insurmountable, at least given the current approach. Progress in these areas has simply not been made a high enough priority.

Fundamentally, U.S. efforts to curtail the financing of terrorism are impeded not only by a lack of institutional capacity abroad, but by a lack of political will among U.S. allies. Some have a history of ignoring the problem and some simply do not assign the same priority to the issue—or they perceive correctly or incorrectly that U.S. attention to the subject has waned. Some fear the domestic political repercussions of taking action, and some simply disagree with the U.S. view of the nature and severity of the problem.

Confronted with this lack of political will, the current administration appears to have made a policy decision not to use the full power of U.S. influence to pressure or compel other governments to combat terrorist financing more effectively. Nearly all steps taken

[2]

*Executive Summary*

have been tactical rather than strategic in nature. And the lack of a single senior U.S. official with the mandate to define, direct, and reaffirm U.S. policy on a day-to-day basis reflects and compounds this strategically deficient approach.

The Task Force finds, among other things, that:

- Notwithstanding substantial efforts, currently existing U.S. and international policies, programs, structures, and organizations will be inadequate to assure sustained results commensurate with the ongoing threat to U.S. national security.

- Two administrations have now grappled with this difficult, cross-cutting problem. Neither has found a single "silver bullet," because none exists. Given the very nature of the problem, it must be continually "worked" rather than "solved."

- Gaining international cooperation through a mix of incentives and coercion is a necessary prerequisite for progress. Effective international efforts will require strong U.S. leadership.

- Deficiencies in political will abroad are likely to remain serious impediments to progress.

- Real and sustainable success will be achieved only over the long term, as key countries make fundamental changes to their legal and regulatory environments.

- Long-term success will depend critically upon the structure, integration, and focus of the U.S. government—and any intergovernmental efforts undertaken to address this problem.

With these findings in mind, the Task Force makes two core structural recommendations intended to reflect, channel, and advance a renewed political commitment in this country and abroad to combat terrorist financing:

- The president should designate a special assistant to the president for combating terrorist financing. This official would enjoy a specific mandate to lead U.S. efforts on terrorist financing issues and have the specific authority of the president of the United States.

[3]

*Terrorist Financing*

- The United States should lead international efforts, under
  the auspices of the Group of Seven leading industrialized
  nations (G-7), to establish a specialized international organi-
  zation dedicated solely to investigating terrorist financing.

The Task Force makes a number of additional recommendations
applicable to the United States, the international community,
key "source and transit" countries, and banks and other financial
institutions.

## BACKGROUND AND FINDINGS

Al-Qaeda differs from traditional, state-sponsored terrorist groups in one critical way: it is financially robust. Having developed multiple sources of support, it is free from the control of any government and able on its own to maintain its organizational infrastructure, communications systems, training programs, and operations. As such, it historically has been able to operate from failed or dysfunctional states. Indeed, when it was headquartered in Sudan and then Afghanistan, the al-Qaeda terrorist organization provided important financial support to its host state—instead of the other way around.

Building al-Qaeda's financial support network was Osama bin Laden's foremost accomplishment, and the primary source of his personal influence. Unlike other terrorist leaders, he was not a military hero, nor a religious authority, nor an obvious representative of the downtrodden and disillusioned. He was a rich financier, both a scion of one of Saudi Arabia's most influential families and a challenger to Saudi Arabia's existing system of governance, distinguished by his ability to organize an effective network.

He built al-Qaeda's financial network from the foundation of a system originally designed to channel resources to the mujahideen fighting the Soviets. It was that network that sustained the organization when bin Laden was forced to move from Saudi Arabia to Sudan, and then again when al-Qaeda was forced to uproot its infrastructure and relocate to Afghanistan. Al-Qaeda's financial network continues to support the organization today, even after being driven from its Afghan base, and allows it to maintain its capacity to attack Americans at home and abroad. As long as al-Qaeda retains access to a viable financial network, it remains a lethal threat to the United States.

Thanks to the leadership of President George W. Bush, Congress, and the hard work of the administration over the last year, al-Qaeda's financial network has certainly been disrupted. That

[5]

*Terrorist Financing*

is no small accomplishment. But it has not been destroyed, and it is unlikely even to have been permanently diminished. A great deal of work, therefore, remains to be done.

## NATURE OF THE PROBLEM

The U.S. government has for several years worked to build a comprehensive "theory of the case" on al-Qaeda's financial network. Through diplomatic, intelligence, regulatory, and law enforcement channels, the United States has gained information about how al-Qaeda's funds are raised, from whom and where; how al-Qaeda's assets are saved, invested, and moved, by whom, and through where; how al-Qaeda's money is distributed to cells in the field; and how al-Qaeda's financial network and operations overlap with those of other Islamic terrorist organizations such as Hamas and Hezbollah.

Organizationally, al-Qaeda is notably and deliberately decentralized, compartmentalized, flexible, and diverse in its methods and targets. The same description applies to its financial network. If al-Qaeda were financed only by Osama bin Laden's personal inheritance, or only by a small number of state sponsors, and if it were limited in scope to only a small area of the globe, or weren't continuously replenishing its coffers, the problem would be much easier to solve. Alas, there is not one big pile of al-Qaeda's loot somewhere, waiting to be discovered and confiscated.

Instead, al-Qaeda's financial network is characterized by layers and redundancies. It raises money from a variety of sources and moves money in a variety of manners. Much has been written about this recently, although mostly in the form of dense reports from government or multilateral agencies (see Additional Sources of Information). Following is a brief summary of the most material points.

Al-Qaeda has operated under a cloak of legitimacy—running legitimate businesses, such as the network of corporations Osama bin Laden created when he lived in Sudan, or the honey traders in Yemen that the U.S. government has now publicly identified as being a part of al-Qaeda's financial network. Profits earned from

[6]

*Background and Findings*

these legitimate businesses are then channeled to terrorist ends. Al-Qaeda also earns money from a wide range of criminal enterprises. Some of these have been grand, such as its symbiotic relationship with the heroin trade in Afghanistan. Others are petty: for example, local al-Qaeda cells are encouraged to become relatively self-sufficient financially and are taught to engage in crimes such as smuggling, fraud, and even simple theft.

However, the most important source of al-Qaeda's money is its continuous fund-raising efforts. Al-Qaeda's financial backbone was built from the foundation of charities, nongovernmental organizations, mosques, websites, fund-raisers, intermediaries, facilitators, and banks and other financial institutions that helped finance the mujahideen throughout the 1980s. This network extended to all corners of the Muslim world. It included everyone from wealthy Persian Gulf Arabs, who could be solicited directly to give huge sums themselves, to the masses, who would make regular charitable donations as part of their religious obligations, the *zakat*.

This religious duty—for all Muslims to give at least 2.5 percent of their income to humanitarian causes—is one of the pillars of Islam. But sadly and cynically, al-Qaeda and other Islamic terrorist groups have taken advantage of this enormous source of funds for their own ends. In many communities, the *zakat* is often provided in cash to prominent, trusted community leaders or institutions, who then commingle and disperse donated moneys to persons and charities they determine to be worthy. These widely unregulated, seldom audited, and generally undocumented practices have allowed unscrupulous actors such as al-Qaeda to access huge sums of money over the years.

Today al-Qaeda continues to raise funds from both direct solicitations of wealthy supporters and through retail charities. Some whose donations go to al-Qaeda know full well the terrorist purposes to which their money will be put. In other cases, donors believe their money will help fund legitimate humanitarian efforts, but the money is nonetheless diverted to al-Qaeda. Among those charities that have already been publicly identified by the U.S. government as supplying funds to terrorists are the Afghanistan-based

[7]

*Terrorist Financing*

Afghan Support Committee, the Pakistan-based Al Rashid Trust and Wafa Humanitarian Organization, the Kuwait-based Revival of Islamic Heritage Society, the Saudi-based al-Haramain organization, and the U.S.-based Holy Land Foundation for Relief and Development. These charities and their various international branches and affiliates—along with the many others like them that have not yet been publicly designated by the authorities or even privately discovered by intelligence agencies—have operated internationally, raising, moving, and holding their money in numerous countries simultaneously.

However, it is worth stating clearly and unambiguously what official U.S. government spokespersons have not: For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al-Qaeda; and for years, Saudi officials have turned a blind eye to this problem.

This is hardly surprising since Saudi Arabia possesses the greatest concentration of wealth in the region; Saudi nationals and charities were previously the most important sources of funds for the mujahideen; Saudi nationals have always constituted a disproportionate percentage of al-Qaeda's own membership; and al-Qaeda's political message has long focused on issues of particular interest to Saudi nationals, especially those who are disenchanted with their own government.

Significant funds have also come from other pockets of wealth in the Arab world, such as the Persian Gulf states, Egypt, and elsewhere. Other moneys have been raised in South Asia, Europe, the Americas (including the United States), Africa, and Asia. Recent reports suggest that al-Qaeda may now be devoting increased resources to its fund-raising activities in Southeast Asia, which would be a cause of significant concern. Additionally, in Asia and elsewhere, al-Qaeda has focused efforts in recent years on expanding its system of affiliates and surrogate organizations, such as Laskhar Jihad and Jemaah Islamiyah, many of which have independent financial support networks.

Once raised in the manners described, al-Qaeda's money is moved through a similarly diverse set of mechanisms. The first, and most simple, is the ubiquitous and highly efficient global finan-

[8]

*Background and Findings*

cial system, including the interconnected network of banks and other financial institutions that undergird the global economy. For years, al-Qaeda has been particularly attracted to operating in under-regulated jurisdictions, places with limited bank supervision, no anti–money laundering laws, ineffective law enforcement institutions, and a culture of no-questions-asked bank secrecy.

To find such jurisdictions, al-Qaeda did not have to look far. The regional banking centers of the Middle East—Dubai and other emirates of the United Arab Emirates (UAE), Kuwait, Bahrain, and (in its day) Lebanon—have each over the years generally ignored repeated calls by the international community to build anti–money laundering regimes consistent with international standards. Similarly, banking systems that have been major recipients of al-Qaeda's funds—most notably in Pakistan while the Taliban ruled neighboring Afghanistan—have also had weak or nonexistent anti–money laundering regimes.

But al-Qaeda did not limit itself to regional money centers; it also took advantage of the globalizing financial system to move its money through banks in virtually every corner of the world, including offshore jurisdictions long known for providing bank secrecy. For instance, in the case of al-Taqwa (a purported international financial services company now the subject of U.S. and international sanctions), al-Qaeda moved its funds through accounts in such familiar havens as Liechtenstein and the Bahamas. And the United States has not been immune from al-Qaeda money flows: We have all seen the video of Mohammed Atta withdrawing funds from an ATM in South Portland, Maine, on September 10, 2001—funds that were transferred from accounts run by a senior al-Qaeda operative, Khalid Sheik Mohammed, in the UAE.

Al-Qaeda also abuses the Islamic banking system, an entirely legitimate form of investment and finance that abides by *sharia*, or Islamic law, which prohibits the earning or payment of interest. Many prominent Islamic banks operate under loose regulatory oversight, in part because they are based in jurisdictions without proper controls, but also because their religious nature often allows them a greater degree of autonomy owing to obvious

[9]

*Terrorist Financing*

domestic considerations. Islamic banks regularly commingle funds from depositors to place them within group investments by fund managers, creating ready opportunities for anonymous money transfers and settlement. Moreover, al-Qaeda and other terrorist groups that use Islam to justify their activities are also more likely to find willing collaborators within the Islamic banking system. There is no reason to believe that al-Qaeda does not find other Islamic financial services, such as insurance or investment management services, to be similarly attractive vehicles for holding and transferring its assets.

Significantly, al-Qaeda also makes good use of the ancient *hawala* (or *hundi*) underground banking system, which allows money transfer without actual money movement, or any wire transfer. There is nothing inherently illegitimate about the *hawala* system—it offers critically needed financial services in many remote corners of the globe and is used extensively by millions of law-abiding persons. In Pakistan, for instance, government officials estimate that $7 billion enters the country each year through the *hawala* system; the true number is likely to be significantly higher. But its nature also makes it particularly susceptible to abuse by terrorists and other criminals.

Indeed, the *hawala* system, long dominated by South Asians and serving customers throughout the Middle East, appears custom-made for al-Qaeda. It is a cash business that leaves behind few, if any, written or electronic records for use by investigators in following money trails. It operates out of nondescript storefronts and countless bazaars and souks. It reaches both small villages throughout the region and large cities around the world. It is quick, efficient, reliable, and inexpensive. It draws from a long tradition of providing anonymous services. It is staffed primarily by members of families that have been in this business for generations. And it is almost entirely unregulated around the world—including in the United States. The *hawala* system often interacts with similar alternative banking systems operating in other parts of the globe, such as *fei ch'ien, phoe kuan, hui k'uan, ch'iao hui,* and *nging sing kek.*

[10]

*Background and Findings*

All the *hawala* system needs to operate are a network of *hawaladars*, trust, and open phone lines. Here is how it works: Customers in one city hand their local *hawaladar* some money. That individual then contacts his counterpart across the world, who in turn distributes money out of his own resources to the intended recipient. The volume of transactions flowing through the system in both directions is such that the two *hawaladars* rarely have to worry about settlement. The trust between and among *hawaladars*—who are in many cases related through familial, clan, or ethnic associations—allows them to carry each other's debts for long periods before finding ways to clear them.

Al-Qaeda also uses its network of businesses and charities as covers to move its funds. It is believed to employ traditional over-invoicing schemes to transfer value from one location to another without attracting the attention of authorities.

And finally, whenever these other methods are unavailable, al-Qaeda can and does rely on the oldest method of moving money: physically transporting it from one place to another. Cash smuggling is rampant throughout the Middle East, abetted by weak border controls and a cash-based culture very unlike the Western credit- and electronic-based economy. Al-Qaeda also moves its assets in the form of precious metals and gemstones, which can be easily and virtually anonymously transferred to cash in countless souks across the region. The gold trade and the *hawala* system are especially symbiotic, flourishing in the same locales, and offering complementary services to those who are looking to move assets across borders. In physically moving its assets, al-Qaeda also often relies on traditional smuggling routes and methods used by drug traffickers, arms dealers, and other organized criminal groups. According to recent published reports, it may be using illicit air logistic networks previously used by the Taliban and various African insurgency movements to transport gold and other assets.

Al-Qaeda is not the only terrorist organization to make use of these fund-raising and money-transfer mechanisms. Terrorists the world over have long used charities, for example, to help raise and move their funds—as the Irish Republican Army (IRA) did for decades in the United States. Other Islamic terrorist organizations,

*Terrorist Financing*

Hamas and Hezbollah specifically, often use the very same methods—and even the same institutions—to raise and move their money. And more recently, published reports suggest that al-Qaeda has formed additional tactical, ad-hoc alliances with these terrorist organizations to cooperate on money laundering and other unlawful activities.

## RESPONSES TO THE PROBLEM

One of the first actions taken by the Bush administration in the wake of the September 11 terrorist attacks was to target aggressively Islamic terrorism's financial infrastructure, expanding work begun by the previous administration. The responses can usefully be divided into two categories: *tactical* actions to disrupt individual nodes in the terrorist financial network, and *strategic* initiatives to change the environment within which terrorists (and other international criminals) raise and move their funds.

The tactical actions focused mainly on three areas. First, intelligence activities, which had previously been a leading component of U.S. efforts to combat terrorist financing, were stepped up. Second, unprecedented law enforcement efforts were made both at home and abroad, made possible by a newfound degree of cooperation between foreign intelligence and law enforcement agencies. Third—and certainly the most visible aspect of the tactical response—additional public designations under the International Emergency Economic Powers Act (IEEPA) were made of persons, businesses, and financial institutions associated with the al-Qaeda financial network and those of other terrorist organizations.

These designations meant that specific terrorist-related assets in U.S. banks were blocked and that persons subject to U.S. jurisdiction were barred from doing business with designated organizations and individuals. The United Nations followed with similar public designations and UN Security Council Resolution 1390, and many foreign governments followed with similar blocking orders.

[12]

*Background and Findings*

The sanctions associated with the designations—and the explicit threat of additional measures to follow—also provided the U.S. government with significant leverage to push foreign governments to investigate or disrupt terrorists' financial networks. In many cases, when confronted with such leverage, foreign governments and foreign institutions have taken actions that they otherwise would not have been willing to take with respect to suspect organizations, including their closure or consent to comprehensive on-site audits by U.S. government personnel.

Further *strategic* initiatives were undertaken to help change the environment that facilitates terrorist financial networks. These initiatives were undertaken by Congress, the administration, and the international community.

Congress passed sweeping new anti–money laundering laws as part of the Patriot Act, many of which were quickly and diligently implemented by the Treasury Department. These new laws and regulations established, among other things, new due diligence, recordkeeping, and reporting requirements for domestic financial institutions. The Patriot Act also gave the government new international anti–money laundering tools. The centerpiece of these new legal instruments are the so-called "special measures" enabling the executive branch to restrict or prohibit access to the U.S. financial system for states and individual foreign financial institutions that lack adequate anti–money laundering controls (see Appendix A). By complicating the access of such states and institutions to the U.S. financial system, this powerful new tool was intended to give the U.S. government additional leverage to persuade foreign countries and foreign financial institutions to improve their anti–money laundering regimes and otherwise cooperate with U.S. efforts to curtail terrorist financing.

The administration has worked with the international community to press forward with various long-term institution-building efforts. These efforts have included multilateral initiatives through the UN Counter-Terrorism Committee (CTC), the International Monetary Fund (IMF), the World Bank, and the Financial Action Task Force (FATF)—a twenty-nine-member intergovernmental organization established by the G-7 in 1989 to set

[13]

*Terrorist Financing*

international anti–money laundering standards. Within the UN system, implementation efforts associated with Security Council Resolutions 1373 and 1377 are helpfully focused on measures intended to assure the technical ability of member states to comply with their international obligations relating to the suppression of terrorist financing.

Some initiatives, such as the FATF's successful "naming and shaming" of international money laundering havens, were up and running before the September 11 attacks. Others, such as the FATF's publication of an additional Eight Special Recommendations on Terrorist Financing (see Appendix B) came immediately thereafter. Further multilateral efforts have recently begun to consider international best practices for the regulation of charities (under FATF auspices) and how to bring the *hawala* system out from the shadows (initial principles were enunciated in the Abu Dhabi Declaration on Hawala, dated May 2002).

As a result of these multilateral initiatives, a number of countries that had serious problems with terrorist financing have in recent years improved their anti–money laundering regimes by passing new laws and issuing new regulations—in many cases for the very first time. For instance, laws have very recently been passed by Bahrain ( January 2001), Lebanon (April 2001), the United Arab Emirates ( January 2002), and Egypt (May 2002).

But significantly, notwithstanding these considerable efforts, no international organization has emerged with the mandate and expertise to direct and coordinate global efforts to combat a problem that, by its very nature, requires global responses.

Similarly, no official of the U.S. government has been provided with the right mandate and authority to effectively disrupt terrorist financing. Following September 11, a reinvigorated interagency Policy Coordination Committee (PCC) on terrorist financing began operating under the leadership of the Treasury Department, and this organizational arrangement continues today. As an institutional matter going forward, the Task Force strongly believes that the best course would be to designate a special assistant to the president dedicated solely to issues related to terrorist financing, with the mandate to direct and coordinate the various diplomatic, law

[14]

*Background and Findings*

enforcement, intelligence, regulatory, and policy measures that will be required to assure a sustained and effective U.S. response. The task of providing coordination that takes account of a range of concerns and has the imprimatur of the president naturally is done best from the White House rather than from any executive agency.

And finally, the Bush administration recently announced what appears to be a significant policy departure regarding these issues. On June 8, 2002, in an on-the-record speech at the Council on Foreign Relations in New York, Deputy Secretary of the Treasury Kenneth Dam announced that U.S. efforts to combat terrorist financing had entered a "second phase." He elaborated: "This new phase will be dominated by greater leadership by our coalition partners.... Public designations and blockings will not dominate this new phase."

### OBSTACLES TO EFFECTIVE ACTION

For outside observers, the *tactical* actions that have been taken are difficult to evaluate, as much of the subject matter is highly classified. However, based on the personal experiences of many members of the Task Force and on informal conversations with others who are currently working on this subject officially in the United States and other countries, we can confidently conclude that the United States has received markedly improved cooperation from most key foreign governments, both on law enforcement and intelligence matters. Though some Task Force members retain significant doubts, as a group we accept the administration's generalized assurances that the degree of tactical law enforcement and intelligence cooperation now being received is broadly satisfactory.

Similarly, the general willingness of most foreign governments to cooperate with U.S.-led efforts to block the assets of designated persons and businesses with ties to terrorist financing has been welcome and unprecedented. However, in this area obstacles have emerged and the coalition may be fraying. The frequently cited total amount of terrorist-related assets blocked overstates the amount of money taken from al-Qaeda and its supporters specifically and

[15]

*Terrorist Financing*

undoubtedly represents only a small fraction of total funds available to that terrorist organization. Certain countries had difficulties implementing blocking orders owing to deficiencies in their technical capabilities or regulatory infrastructure. Moreover, after a quick start, the rate of blocking has clearly slowed.

America's closest allies in Europe are now publicly complaining that the United States is unwilling to share intelligence on many designated individuals or organizations. As a result, they are refusing to block bank accounts in some cases. On the other hand, only a handful of European states have invested the minimal resources necessary to develop their own intelligence capabilities in the Middle East and South Asia so they too could play a leading role in identifying and disrupting terrorist financial networks.

Many observers have noted a widening divide between the United States and Europe on the basic salience and parameters of global terrorism. This has repercussions on the financial campaign, and many U.S. allies, as a matter of policy, apply the blocking orders inconsistently. The European Union (EU), for instance, forbids fund-raising only for the "military wing" of Hamas—Izzedine al-Qassam Brigades—even though funds raised by other branches of Hamas for purportedly humanitarian purposes are known to be used for terrorist attacks. The European Union does not forbid the Iran-backed terrorist organization Hezbollah from fund-raising at all. (The policy divide is even greater in the Middle East, where almost no country characterizes Hamas or Hezbollah as a terrorist organization. Many allow, and even encourage, those terrorist organizations to fund-raise on their soil.)

And finally, Europe's own domestic institutional capacities are often found wanting. The annual number of suspicious activity reports (SARs) submitted by financial institutions in many European countries has long been unusually low. As the recent report of the UN group monitoring global sanctions against members of al-Qaeda and the Taliban noted, EU efforts are hampered by lax border controls in many European countries, particularly those in the Schengen Area group—thirteen of the fifteen EU member countries that abolished border controls among themselves—and the "stringent evidentiary standards" required by certain European legal sys-

[16]

*Background and Findings*

tems to block assets. And finally, as Brown University's Watson Institute documented in its research on targeted financial sanctions several years ago, while the U.S. Treasury's Office of Foreign Asset Controls (OFAC) had more than a hundred staff working full time on implementation of financial sanctions (and was still understaffed), the Bank of England had a staff of about seven, the French Ministry of Finance had two people working part-time, the German Bundesbank had one, and the European Commission in Brussels had only one person and a half-time administrative assistant.

This being the case, the administration's recent announcement of a "second phase" in the war against terrorist financing that will rely on greater leadership by America's coalition partners may well be overly optimistic and risks not producing future tactical successes. Greater participation of U.S. coalition partners in the targeting process is welcome and can help further international cooperation. But coalition efforts will most certainly require U.S. leadership to maintain the momentum that has been achieved since concerted international efforts began last year.

At the same time, the U.S. government has not made full use of all relevant legal and policy tools at its disposal. IEEPA designations—among the most powerful tools in the U.S. legal arsenal—have become less frequent and have focused primarily on the "low-hanging fruit" in countries like Yemen and Somalia. In the "second phase" they will, as a matter of policy, become less frequent still. None of the new "special measures" provided to the secretary of the Treasury in the Patriot Act to restrict or prohibit access to the U.S. financial system has ever been used. Not once.

Any weaknesses in the U.S. government's tactical responses to terrorist financing have been exacerbated by the lack of interagency coordination within the U.S. government on these issues. This problem is compounded by the multifaceted nature of the terrorist financing problem, which requires information to be shared among the U.S. diplomatic, intelligence, law enforcement, and regulatory communities.

After September 11, for example, officials from the Treasury Department, the Central Intelligence Agency (CIA), and other agencies wrangled over the president's direction to form a Foreign Terrorist

[17]

*Terrorist Financing*

Asset Tracking Center. The center was intended to serve as the lead organization within the U.S. government on issues pertaining to terrorist financing. Despite the fact that $6 million was appropriated and spent to construct facilities for the center within the Treasury Department, after months of bureaucratic infighting the group ended up at the CIA, and the facility constructed to house the center at the Treasury Department stands empty. Relevant law enforcement functions are divided between the Federal Bureau of Investigation (FBI) and enforcement agencies of the Treasury Department, such as the Customs Service. FBI officials complain that they are not adequately apprised of Treasury-led initiatives (such as the Customs-led "Operation Green Quest"), and vice versa. And coordination problems exist within particular agencies. Since the September 11 attacks, the American public has learned about some of the structural, cultural, and technological barriers within the FBI that prevented certain parts of the organization from getting access to important information held by other parts.

Turning to the *strategic* initiatives to combat terrorist financing, obstacles to effective action appear increasingly insurmountable, at least given the current approach.

Far too many key countries—including virtually all in the Middle East and South Asia—still have in place ineffective or rudimentary bank supervisory and anti–money laundering regimes. In those cases where laws are on the books, implementation has often been weak or nonexistent. The relevant governmental institutions are not well developed, and international law enforcement cooperation has been slow, made inordinately difficult, or simply refused altogether. In no country—including the United States—are either Islamic charities or the underground *hawala* system effectively regulated.

Progress in these areas has simply not been made a high enough priority. Judging from White House briefings and reported accounts, it has unfortunately become uncommon for the president or the vice president to raise these subjects in bilateral discussions with counterparts from key states. Rather, these discussions have recently been left to working level subordinates, a clear signal of their relative importance to the United States.

[18]

*Background and Findings*

Even in those cases in which laws have been passed in recent years, effective implementation in key states has generally not followed—with no adverse repercussions. In 1999, for instance, Saudi Arabia approved amendments to its existing money laundering laws intended to bring them into compliance with international standards, but to date these amendments have not been implemented, according to the most recent State Department reports. Pakistan only recently announced plans to introduce amendments to its Anti-Terrorism Act of 1997 that would, consistent with international standards, criminalize the laundering of terrorist funds and fund-raising by terrorists.

The never-used punitive provisions of the Patriot Act were intended to provide critical leverage over recalcitrant states to assure sustained compliance in these areas. So too, in recent years, was an FATF "blacklist" of noncooperative countries in the international fight against money laundering. Within one year of the first such FATF designations in 2000, for example, eight of the fifteen states included on the FATF blacklist took steps to bring themselves into substantial compliance with international standards.

It is unfortunate that the United States has recently avoided full use of these powerful levers of influence. The United States recently allowed Lebanon, for example, to be removed from the FATF blacklist before it demonstrated a commitment to real implementation of its new anti–money laundering law and despite what the State Department's own report on the subject called its "historical commitment to bank secrecy." Egypt has been allowed to stay on the FATF blacklist without any real threat of sanctions— and may soon be removed without any real implementation. And as this report was going to press, published reports indicated that, with the acquiescence of the United States, the FATF blacklist process would be suspended and "superceded" by a "universal, cooperative approach."

Aside from compromising enforcement capabilities, the failure to build institutional capacities has resulted in the neglect of nascent international efforts to develop, analyze, and share financial intelligence. In 1995, international efforts resulted in the formation of the Egmont Group, which was intended to knit together

[19]

*Terrorist Financing*

like-minded nations focused on preventing financial crimes through the work of Financial Intelligence Units (FIUs) in each member nation. Each FIU would develop and analyze financial intelligence with respect to its jurisdiction and share that information with other member nations, enabling each to develop better intelligence with respect to financial flows beyond its jurisdiction. However, a lack of resources and technical capacity in most member nations of the Egmont Group has prevented this effort from realizing its theoretical potential. Indeed, America's FIU—the Treasury Department's Financial Crimes Enforcement Network (FinCEN)—is vastly under-resourced and lacks the capacity to serve as the FIU for the U.S. government. Implementation of the Patriot Act will significantly increase the burdens on FinCEN, making resource restraints and effectiveness concerns even more acute.

It would be wrong to say that no progress has been made in building many countries' institutional capacities to cooperate in the global war against terrorist financing. But it would be equally wrong to overstate the progress that has been made—a mistake that is too often made by U.S. government spokespersons. In recent years, for instance, Saudi Arabia has taken two or three important steps to improve its capability to cooperate on these matters with the United States, for which it should be commended. A hundred more steps and Saudi Arabia may be where it needs to be.

This is not to ignore the political context in which those steps are being taken or avoided. It may well be the case that if Saudi Arabia and other nations in the region were to move quickly to share sensitive financial information with the United States, regulate or close down Islamic banks, incarcerate prominent Saudi citizens or surrender them to international authorities, audit Islamic charities, and investigate the *hawala* system—just a few of the steps that nation would have to take—it would be putting its current system of governance at significant political risk. Successors to the current regime could easily be drawn from the very elements in their societies that the United States is seeking to suppress.

However, it may just as well be the case that by not moving quickly to combat the infrastructure of terrorist financing on their own

[20]

*Background and Findings*

soil, these governments are allowing the terrorists and their supporters to gain strength and influence steadily among their own populations—and in so doing are setting the stage for their own eventual demise.

In truth, nobody knows which scenario is more likely. In the past, the first scenario provoked the most concern, both inside the ruling families of the nations in question and among U.S. government regional experts. As a result, the United States did not seriously push these countries to make necessary reforms. However, in the wake of the terrorist attacks of September 11, both the United States and the royal families in the concerned states must recognize the risks of inaction and must push reform efforts far more aggressively.

Fundamentally, U.S. efforts to curtail the financing of terrorism are impeded not only by a lack of institutional capacity abroad, but by a lack of political will among U.S. allies. Some have a history of "turning a blind eye" to the problem, some simply do not assign the same priority to the issue—or perceive correctly or incorrectly that U.S. attention to the subject has waned. Some fear the domestic political repercussions of taking action, and some simply disagree with the U.S. view of the nature and severity of the problem.

Confronted with this lack of political will, the administration appears to have made a policy decision not to use the full power of U.S. influence and legal authorities to pressure or compel other governments to combat terrorist financing more effectively. Nearly all steps taken have been tactical rather than strategic in nature. And the lack of a single senior U.S. official with the mandate to define, direct, and reaffirm U.S. policy on a day-to-day basis reflects and compounds this strategically deficient approach.

## PRINCIPAL FINDINGS

1. The Task Force recognizes and welcomes the recent progress that has been made in combating terrorist financing, both at home and abroad. It congratulates Congress and the Bush admin-

[21]

istration—and President Bush personally—for focusing on this issue, particularly in the immediate wake of the September 11 terrorist attacks.

2. Notwithstanding substantial efforts, the Task Force finds that currently existing U.S. and international policies, programs, structures, and organizations will be inadequate to assure sustained results commensurate with the ongoing threat posed to the national security of the United States. Combating terrorist financing must remain a central and integrated element of the broader war on terrorism

3. Two administrations have now grappled with this difficult, cross-cutting problem. Neither has found a single "silver bullet," because none exists. Given the very nature of the problem, it must be continually "worked" rather than "solved."

4. Gaining international cooperation though a mix of incentives and coercion is a necessary prerequisite for progress. Effective international efforts will require strong U.S. leadership.

5. Deficiencies in political will abroad—along with resulting inadequacies in regulatory and enforcement measures—are likely to remain serious impediments to progress. One-time affirmations cannot substitute for sustained enforcement, regulatory and institution-building measures.

6. In the short term, "following the money" can go a long way toward disrupting terrorist cells and networks and thereby can help prevent future terrorist attacks. But real and sustainable success will be achieved only over the very long term, as key countries make fundamental changes to their legal and regulatory environments.

7. Long-term success will depend critically upon the structure, integration, and focus of the U.S. government—and any intergovernmental efforts undertaken to address this problem.

## RECOMMENDATIONS

With these findings in mind, the Task Force makes the following core structural recommendations:

1. *The president should designate a special assistant to the president for combating terrorist financing with the specific mandate to lead U.S. efforts on terrorist financing issues.* Such an official would direct, coordinate, and reaffirm the domestic and international policies of the United States on a day-to-day basis and with the personal authority of the president of the United States. He or she would report to the president through the national security adviser. In addition, he or she would serve as sous-sherpa at the G-7 and as chief U.S. representative to all important regional organizations with respect to terrorist financing issues once they are made permanent agenda items as described below. He or she would be responsible for implementing the strategic and tactical recommendations contained in this report and leading U.S. efforts with respect to the international initiatives described below.

2. *The United States should lead international efforts, under the auspices of the G-7, to establish a specialized international organization dedicated solely to combating terrorist financing.* Such an organization would assume ad hoc terrorist financing–related initiatives undertaken by the FATF since September 11, 2001, and support and reinforce the activities of the UN Counter-Terrorism Committee undertaken since that time to coordinate and assist in the implementation of member states' obligations under Security Council resolutions pertaining to terrorist financing. Membership in this specialized organization could initially be limited to the G-7 itself, an approach similar to that taken by the G-8 in 1994 in forming the Lyons Group against international crime. Membership could then be expanded to include other states with highly developed financial reg-

[23]

ulatory and enforcement systems that are committed to the top-down promulgation of the most stringent international standards to combat terrorist financing. This new organization would be tasked with the implementation of the *multilateral* initiatives described below (see section II: Recommendations Applicable to the International Community).

## I. RECOMMENDATIONS APPLICABLE TO THE UNITED STATES

### *Strategic*

1. Put issues regarding terrorist financing front and center in every bilateral diplomatic discussion with every "front-line" state in the fight against terrorism—at every level of the bilateral relationship, including the highest. Where sufficient progress is not forthcoming, speak out bluntly, forcefully, and openly about the specific shortfalls in other countries' efforts to combat terrorist financing. The Task Force appreciates the necessary delicacies of diplomacy and notes that previous administrations also used phrases that obfuscated more than they illuminated when making public statements on this subject. Nevertheless, when U.S. spokespersons are willing to say only that "Saudi Arabia is being cooperative" when they know very well all the ways in which it is not, both our allies and our adversaries can be forgiven for believing that the United States does not place a high priority on this issue.

2. Reconsider the conceptually flawed "second phase" policy that (a) diminishes the likelihood of additional U.S. designations under IEEPA of foreign persons and institutions with ties to terrorist finances, and (b) relies on other countries for leadership, a role they are not suited for nor willing to play. IEEPA designations and blocking orders—actual or threatened—are among the most powerful tools the United States possesses in the war on terrorist finances. The United States should not relinquish them, nor should the United States relinquish leadership to coalition partners uninterested in or unsuited for this role.

[24]

*Recommendations*

3. As an example to U.S. friends and allies, bring *hawaladars* and other underground money service businesses fully into the federal regulatory system. During both the Clinton and Bush administrations, FinCEN has been very slow in its efforts to register *hawaladars*. There is currently no federal plan to coordinate federal, state, and local law enforcement efforts to identify, surveil, and prosecute unregistered *hawaladars*. FinCEN should immediately make its register of money services businesses available online, to facilitate the use of the information by federal, state, and local law enforcement agencies seeking to determine the legality of local money changers' and money transmitters' operations. Similarly, as a further example to America's friends and allies, require charities operating in the United States to abide by certain U.S. anti–money laundering laws, by, for example, having the Treasury Department define them as "financial institutions" for purposes of implementing any "special measures" put in place pursuant to the Patriot Act.

4. Expand U.S. bilateral technical assistance programs in problem countries to assist in the creation of effective regulatory, enforcement, and control regimes for financial institutions and charitable organizations. The president's fiscal year 2003 budget includes only $4 million for the Treasury Department's Office of Technical Assistance to provide training and expertise to foreign governments to combat terrorist financing; funding for such efforts should increase at least tenfold. Rather than being distributed directly to individual providers, such funds should be centralized and then distributed to appropriate providers, consistent with priorities established by an interagency process. Integration and coordination of such assistance is vital so that such assistance reflects administration policy. The United States should urge other nations with developed financial regulatory infrastructures, and the IMF and World Bank, to provide similar assistance.

5. Immediately develop and implement a comprehensive plan to vet and conduct background investigations on institutions, corporations, and nongovernmental organizations that receive

[25]

*Terrorist Financing*

U.S. government grant funding to ensure that U.S. funds are not diverted to organizations that have either links to terrorist groups or a history of supporting terrorist aims.

6. For the first time, make use of the new powers given to the secretary of the Treasury under the Patriot Act to designate individual foreign jurisdictions or financial institutions as being of "primary money laundering concern" to the United States, and thereby impose sanctions short of full IEEPA blocking orders. These sanctions could include cutting off correspondent relations between foreign financial institutions with weak anti–money laundering practices and U.S. banks. Unlike IEEPA, these "special measures" do not require presidential action and do not require the United States to prove a specific connection to terrorism, only that the jurisdictions or institutions targeted do not have adequate anti–money laundering controls—a much lower hurdle.

*Tactical*

1. Create streamlined interagency mechanisms for the dissemination of intelligence, diplomatic, regulatory, and law enforcement information. All information relating to terrorist financing—regardless of its source—should be centrally analyzed and distributed to *all* relevant policymakers. The formation of the CIA-based Foreign Terrorist Asset Tracking Group is a good start, but adequate budgets should be requested, and intelligence agencies will need to build up the level of linguistic, financial, and cultural expertise to investigate and combat Islamic terrorist financing effectively.

2. Broaden U.S. government covert action programs to include the disruption or dismantling of financial institutions, organizations, and individuals knowingly facilitating the financing of terror. Information warfare—computer hacking—and other forms of disruption should be considered when intelligence compellingly demonstrates that foreign financial institutions are knowingly and actively participating in the financing of terrorism.

[26]

*Recommendations*

3. Reinvigorate U.S. intelligence and law enforcement capacities against terrorist finance by further strengthening FinCEN. As the financial intelligence unit for the United States, FinCEN needs to be able to play a significant role in terrorist finance intelligence and analysis; liaise with other financial intelligence units and with domestic and international training and institution building efforts to combat terrorist finance; and play a role in international regulatory harmonization. The administration should act promptly to strengthen FinCEN's funding, personnel, and authorities to make it possible for FinCEN to perform these roles.

4. Assure the full implementation of the provisions of the Patriot Act intended to improve and deepen U.S. anti–money laundering capabilities.

## II. RECOMMENDATIONS APPLICABLE TO THE INTERNATIONAL COMMUNITY

### *Multilateral*

1. The new international organization dedicated solely to issues involving terrorist financing would be tasked with the implementation of the multilateral initiatives described below.

- Contribute to agenda-setting for the G-7 and other international and regional organizations, as described below.

- From the top down, establish strong international standards on how governments should regulate charitable organizations and their fund-raising. Once those standards have been set, have technical experts publicly evaluate countries, including those in the Middle East, against them.

- Engage in similar international standard setting with regard to the regulation of *hawala*, and create and maintain a global registry of institutions that participate in *hawala* and similar alternative remittance systems.

[27]

*Terrorist Financing*

- Work with the private and nongovernmental organization (NGO) sectors to create global "white lists" of financial institutions and charities that, regardless of the legal environment in their home jurisdiction, commit to the highest due diligence, anti–money laundering, and anti–terrorist financing procedures, and agree to a system of external assessment of compliance. In addition to the reputational benefit from being included on such a "white list," inclusion on the list could be a factor taken into consideration by the World Bank, the IMF, and other international financial institutions (IFIs) in considering which financial institutions to work with. It could similarly be a factor taken into account by the U.S. Agency for International Development (USAID) and other national development and humanitarian relief agencies, as well as the United Nations High Commissioner for Refugees (UNHCR), the United Nations Development Programme (UNDP), and other multilateral agencies in determining what charities or relief organizations to work with.

- Facilitate multilateral cooperation and information sharing between the various government offices responsible for sanctions enforcement, such as the U.S. Treasury's Office of Foreign Asset Controls (OFAC). This will require each government to identify a central contact point to coordinate implementation of efforts to block terrorist finances.

- Facilitate the provision of technical assistance for all countries that need it, and further the development of the Egmont Group and capabilities to develop and share, on an intergovernmental basis, tactical financial intelligence.

- Recommend to the IMF ways in which its funding can be made contingent upon countries' implementation of strict anti–terrorist financing laws.

- Make formal recommendations to the FATF concerning which countries should be included in its "naming and shaming" processes on the basis of passive acquiescence to terrorist financing.

[28]

*Recommendations*

- Establish procedures for appeal and potential removal of the names of individuals and institutions wrongly designated as being associated with the financing of terrorism. Legitimate disquiet in some quarters concerning the potential for due process violations associated with the inaccurate listing of targeted individuals can retard progress in global efforts. Since the full sharing of sensitive intelligence information is unlikely, the establishment of such procedures will take such concerns "off of the agenda" and prevent them from being used as an excuse for inaction.

2. Terrorist financing should become a permanent agenda item of the G-7/8 and a permanent part of the agenda of all regional organizations as appropriate, such as the Association of Southeast Asian Nations (ASEAN), Asian-Pacific Economic Cooperation (APEC), and the US-SADC (Southern African Development Community), among others.

3. Terrorist financing should become a permanent part of the EU-U.S. summit agenda. EU-U.S. summits are held twice a year and are supported by the Senior Level Group of EU and U.S. officials, which meets two or three times a semester. The Senior Level Group can and should act as a "scorecard" to monitor the progress of transatlantic cooperation.

4. Rather than superceding the FATF process of "naming and shaming" noncooperative jurisdictions in the fight against money laundering with a "cooperative" approach, the G-7 should agree to resume and expand immediately the blacklisting of such countries. Countries on the FATF blacklist should be ineligible for certain types of IMF and World Bank lending. Once reinvigorated, the FATF needs to begin requiring full implementation and enforcement of laws and regulations, not just their passage or issuance.

5. The World Bank should provide technical assistance to less developed countries to help them establish anti–money laundering and anti–terrorist financing regimes that meet international standards.

[29]

*Terrorist Financing*

### Source and Transit Countries

Significant "source and transit" countries—especially Saudi Arabia, Pakistan, Egypt, the Persian Gulf states, and other regional financial centers—have special responsibilities to combat terrorist financing. They should:

- Make a fundamental policy decision to combat all forms of terrorist financing and—most important—publicly communicate this new policy to their own nationals.

- Cooperate fully with international—especially U.S.—requests for law enforcement assistance and intelligence requests for information and other forms of cooperation. This means, among other things, allowing U.S. investigators direct access to individuals or organizations that are suspected of being involved in terrorist financing.

- Bring their bank supervision and anti–money laundering laws, regulations, and institutions completely up to international standards, and have them cover all financial institutions, including Islamic and underground ones—like the *hawala* system. Implementation of laws is necessary, not just their drafting and passage. For the most part, these countries each have the resources to do this themselves. If not, international financial and technical assistance are readily available from a variety of multilateral and bilateral sources. The UN Counter-Terrorism Committee has compiled a directory of sources of support for this purpose.

- Require the registration and licensing of all alternative remittance mechanisms, such as *hawalas*, and close down financial institutions that fail to obtain licenses or that fail to maintain adequate customer and transaction records.

- Fully and unapologetically regulate charities subject to their jurisdiction, particularly those with branches dispersing funds overseas. Donors to legitimate charities deserve to know that their money is actually going to good causes; unknowing donors to illegitimate charities deserve to know they are being

*Recommendations*

defrauded; individuals who knowingly donate to terrorist front organizations deserve to be prosecuted.

- Fully regulate the trade in gems, precious metals, and other stores of value regularly used to store and transfer terrorist wealth. This effort can draw on the precedents established by international efforts (what is known as the Kimberly Process) to curtail the trade in "blood diamonds."

### III. RECOMMENDATIONS APPLICABLE TO THE NONGOVERNMENTAL/PUBLIC-PRIVATE SECTOR

1. Recognizing that the financial services sector does not have the necessary information and intelligence to identify potential terrorists or their activities, the U.S. government should work diligently with the financial services sector to create new public-private partnerships that facilitate the sharing of intelligence information.

2. Banks and all other financial institutions should:

- Build specific anti–terrorism financing components into their compliance and due diligence processes.

- Utilize widely available name recognition software to improve the efficiency of their compliance with regulatory efforts, and avail themselves of reputable public and private sources of information on the identities of persons and institutions who are suspected of links to terrorist financing and who therefore should be the subject of additional due diligence.

- Cooperate fully with any multilateral efforts to build a "white list" of institutions that have adequate anti–terrorist financing controls. A key factor for inclusion on such a list would be evidence of an institution's ability to identify and manage potential risks, such as the development and implementation of adequate anti–money laundering controls.

## ADDITIONAL VIEW

Though the level of dedication and effort in the realm of countering terrorist financing within the U.S. government has been both impressive and comprehensive, there is still insufficient creative and strategic thinking as to how the financial network of an unconventional adversary such as al-Qaeda might be defeated. There are numerous proposed and implemented bureaucratic initiatives, many of which have been mentioned here, but they lack the same creativity and innovation that al-Qaeda financiers use each day in their planning. Unless, as this report suggests, one individual and one office emerge that will focus and direct U.S. government efforts, then our efforts will remain divergent, and we will remain one step behind the terrorists.

The central organizational recommendation of this Task Force is the creation of a new position on the National Security Council staff and office in the White House that will definitively take the U.S. government lead in directing and coordinating all issues and efforts to combat terrorist financing at home and abroad. As special assistant to the president for combating terrorist financing, the individual selected will chair the Policy Coordination Committee (PCC) on Terrorist Financing and chair all meetings related to the subject.

The position of a special assistant to the president for combating terrorist financing must be supplemented by a team of directors on the National Security Council staff that will assist in coordinating and directing the efforts of the U.S. government on all issues related to terrorist financing. This team of four to six directors would focus its attentions on evaluating the all-source intelligence available on terrorist organizations, conducting link analysis on the organizations with information and technical intelligence available from other departments and agencies, and developing tac-

*Additional View*

tics and strategies to disrupt and dismantle terrorist financial networks.

The special assistant to the president would report directly to the assistant to the president for national security affairs (national security adviser), sit as a primary participant in all Principals Committee meetings that address issues of terrorism, and have access to the president on these issues in order to quickly resolve major interagency disputes as they arise. In the case of dealing with the domestic incidence of terrorist financing, the Office to Combat Terrorist Financing will be the lead for the Office of Homeland Security as well. On such occasions, the special assistant will report directly to the president's homeland security adviser and chair all meetings on the subject. The Office to Combat Terrorist Financing should be empowered to coordinate, manage, and direct all efforts related to this cross-cutting effort, and make timely policy determinations that translate into quick action in the enforcement realm.

On the international side, the special assistant to the president would work in concert with the State Department's Office of Counterterrorism to develop and closely manage a system of bilateral terrorist financing initiatives among nations whose support is deemed to be crucial to the overall effort. These bilateral meetings should comprehensively address our expectations of participating countries and be focused on developing a set of common objectives and methods between our nations. It is not enough for the diplomats to take part in the discussions; among the participants from each participating nation should also be the practitioners who will be charged with implementing terrorist financing legislation, the senior analysts responsible for directing intelligence efforts, and senior agents from each respective law enforcement community. The best international cooperation will be achieved through careful management and close coordination. Highly organized and carefully managed bilateral regimes should become the cornerstone of U.S. efforts to counter terrorist financing.

In the short term, the focus would be on developing methods to actively disrupt the capacity of terrorist groups to raise, hold, and move funds. In the long term, the objective should be to imple-

[33]

ment strategies that will cripple terrorist organizations and stem the flow of their funds.

*On strategic and tactical programs:*

- Robust Dissemination: Create streamlined interagency mechanisms for making and implementing policy in this crosscutting area. This suggests that all information relating to terrorist financing—whether it comes from diplomatic, intelligence, law enforcement, or regulatory sources—should be centrally analyzed and distributed to *all* relevant and cleared policymakers.

- Identify Regional Leaders: Work closely with nations that either have a preexisting capability or demonstrate a strong willingness to aggressively cooperate in combating terrorism, and identify them as "regional leaders" in the effort. In such a way, the urgent voice of cooperation will come to noncooperative nations not solely from the United States and the strategy will then become, if incrementally, truly international in scope.

- Encourage *Hawaladar* Registration: A comprehensive plan to enforce the registration of *hawaladars* in the United States should be adopted and a system of incentives (tax breaks, etc.) should be developed to encourage registration of *hawaladars*. Incentives are likely to diminish the reluctance of standard *hawaladars* to adhere to the new law and, in the process, those *hawaladars* who traffic funds for terrorist groups will be more isolated and easier for law enforcement officials to identify.

- Empower the Egmont Group: More fully support the development of the Egmont Group and the expansion of its "financial intelligence" charter. Transforming an already effective but little understood multilateral group into one that receives the full support and backing of each nation's most senior officials will undoubtedly create a venue where methods of collecting financial intelligence are discussed and cooperation for future investigations and efforts is forged.

*Additional View*

- Cooperation with Private Sector: The U.S. government should seek opportunities for the private sector (particularly the compliance divisions of commercial banks and other financial institutions) to cooperate with government regulators. Open a dialogue between corporate security officers and those government officials currently responsible for directing U.S. efforts to combat terrorist financial flows. Additionally, non-liability provisions ought to be considered to protect private sector institutions that cooperate with the U.S. government and strictly enforce UN security resolutions.

- Prevent Reporting Bottleneck: Expand individual reporting regimes for suspicious activity and identified incidents of fraud from the local and state level to the federal level, as a matter of course. The nature of fraud cases that must be reported should be broadened to ensure maximum visibility of infractions and an ever widening database available for federal level experts to conduct link analysis. A reporting "bottleneck" between local/state levels and the federal level must be prevented, and efforts to streamline relevant security information flow must become a priority.

*Michael R. Fenzel*

## TASK FORCE MEMBERS

THOMAS J. BIERSTEKER, Henry R. Luce Professor and Director, Watson Institute, Brown University

DAVID COHEN, Deputy Commissioner for Intelligence, New York City Police Department; former Deputy Director for Operations, Central Intelligence Agency

W. BOWMAN CUTTER, Managing Director, Warburg Pincus; former Deputy Assistant to the President for Economic Affairs

STUART E. EIZENSTAT, Partner, Covington & Burling; former Deputy Secretary of the Treasury

MICHAEL R. FENZEL, Chairman, Council for Emerging National Security Affairs (CENSA); former Director for Transnational Threats, National Security Council

MAURICE R. GREENBERG (chairman), Chairman and CEO, American International Group

RICK SMALL, Director for Global Anti–Money Laundering, Citigroup; former Deputy Associate Director, Board of Governors of the Federal Reserve System

MAURICE SONNENBERG, Senior International Adviser, Bear, Stearns & Co.; Senior International Adviser, Manatt Phelps & Phillips, LLP; former Vice Chairman, National Commission on Terrorism

JOAN E. SPERO, President, Doris Duke Charitable Foundation; former Under Secretary of State for Economic Affairs

TODD D. STERN, Partner, Wilmer, Cutler & Pickering; former Counselor to the Secretary of the Treasury and Staff Secretary, the White House

---

*Note*: Institutional affiliations are for identification purposes only.

*Members of the Task Force*

WILLIAM H. WEBSTER, Senior Partner, Milbank, Tweed, Hadley & McCloy; former Director, Federal Bureau of Investigation, and Director, Central Intelligence Agency

WILLIAM F. WECHSLER (co-director), Vice President, Greenwich Associates; former Director for Transnational Threats, National Security Council, and Special Adviser to the Secretary of the Treasury; former chair of the interagency group charged with disrupting al-Qaeda's financial network

JONATHAN WINER, Counsel, Alston & Bird; former Deputy Assistant Secretary of State for International Law Enforcement Affairs

LEE S. WOLOSKY (co-director), Head of the International Corporate Practice Group, Boies, Schiller & Flexner LLP, and Adjunct Fellow, Center for Strategic and International Studies; former Director for Transnational Threats, National Security Council

[37]

APPENDIXES

## APPENDIX A

SEC. 311. SPECIAL MEASURES FOR JURISDICTIONS, FINANCIAL
INSTITUTIONS, OR INTERNATIONAL TRANSACTIONS OF
PRIMARY MONEY LAUNDERING CONCERN
(a) IN GENERAL- Subchapter II of chapter 53 of title 31, United
States Code, is amended by inserting after section 5318
the following new section:
SEC. 5318A. SPECIAL MEASURES FOR JURISDICTIONS, FINAN-
CIAL INSTITUTIONS, OR INTERNATIONAL TRANSACTIONS OF
PRIMARY MONEY LAUNDERING CONCERN

### (A) INTERNATIONAL COUNTER–MONEY LAUNDERING
REQUIREMENTS

(1) IN GENERAL—The Secretary of the Treasury may require
domestic financial institutions and domestic financial agencies to
take 1 or more of the special measures described in subsection (b)
if the Secretary finds that reasonable grounds exist for conclud-
ing that a jurisdiction outside of the United States, 1 or more finan-
cial institutions operating outside of the United States, 1 or more
classes of transactions within, or involving, a jurisdiction outside
of the United States, or 1 or more types of accounts is of prima-
ry money laundering concern, in accordance with subsection (c).

(2) FORM OF REQUIREMENT—The special measures described in:

(A) subsection (b) may be imposed in such sequence or com-
bination as the Secretary shall determine;

(B) paragraphs (1) through (4) of subsection (b) may be imposed
by regulation, order, or otherwise as permitted by law; and

(C) subsection (b)(5) may be imposed only by regulation.

[41]

*Terrorist Financing*

(3) DURATION OF ORDERS; RULEMAKING—Any order by which a special measure described in paragraphs (1) through (4) of subsection (b) is imposed (other than an order described in section 5326):

(A) shall be issued together with a notice of proposed rulemaking relating to the imposition of such special measure; and

(B) may not remain in effect for more than 120 days, except pursuant to a rule promulgated on or before the end of the 120-day period beginning on the date of issuance of such order.

(4) PROCESS FOR SELECTING SPECIAL MEASURES—In selecting which special measure or measures to take under this subsection, the Secretary of the Treasury:

(A) shall consult with the chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency, as defined in section 3 of the Federal Deposit Insurance Act, the Secretary of State, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the National Credit Union Administration Board, and in the sole discretion of the Secretary, such other agencies and interested parties as the Secretary may find to be appropriate; and

(B) shall consider

(i) whether similar action has been or is being taken by other nations or multilateral groups;

(ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

(iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system,

[42]

*Appendixes*

or on legitimate business activities involving the particular jurisdiction, institution, or class of transactions; and

(iv) the effect of the action on United States national security and foreign policy.

(5) NO LIMITATION ON OTHER AUTHORITY—This section shall not be construed as superseding or otherwise restricting any other authority granted to the Secretary, or to any other agency, by this subchapter or otherwise.

(B) SPECIAL MEASURES—The special measures referred to in subsection (a), with respect to a jurisdiction outside of the United States, financial institution operating outside of the United States, class of transaction within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts are as follows:

(1) RECORDKEEPING AND REPORTING OF CERTAIN FINANCIAL TRANSACTIONS

(A) IN GENERAL—The Secretary of the Treasury may require any domestic financial institution or domestic financial agency to maintain records, file reports, or both, concerning the aggregate amount of transactions, or concerning each transaction, with respect to a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts if the Secretary finds any such jurisdiction, institution, or class of transactions to be of primary money laundering concern.

(B) FORM OF RECORDS AND REPORTS—Such records and reports shall be made and retained at such time, in such manner, and for such period of time, as the Secretary shall determine, and shall include such information as the Secretary may determine, including:

[43]

*Terrorist Financing*

> (i) the identity and address of the participants in a transaction or relationship, including the identity of the originator of any funds transfer;
>
> (ii) the legal capacity in which a participant in any transaction is acting;
>
> (iii) the identity of the beneficial owner of the funds involved in any transaction, in accordance with such procedures as the Secretary determines to be reasonable and practicable to obtain and retain the information; and
>
> (iv) a description of any transaction.

(2) INFORMATION RELATING TO BENEFICIAL OWNERSHIP—In addition to any other requirement under any other provision of law, the Secretary may require any domestic financial institution or domestic financial agency to take such steps as the Secretary may determine to be reasonable and practicable to obtain and retain information concerning the beneficial ownership of any account opened or maintained in the United States by a foreign person (other than a foreign entity whose shares are subject to public reporting requirements or are listed and traded on a regulated exchange or trading market), or a representative of such a foreign person, that involves a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts if the Secretary finds any such jurisdiction, institution, or transaction or type of account to be of primary money laundering concern.

(3) INFORMATION RELATING TO CERTAIN PAYABLE-THROUGH ACCOUNTS—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary may require any domestic financial institution or domestic financial agency that opens

[44]

*Appendixes*

or maintains a payable-through account in the United States for a foreign financial institution involving any such jurisdiction or any such financial institution operating outside of the United States, or a payable through account through which any such transaction may be conducted, as a condition of opening or maintaining such account:

(A) to identify each customer (and representative of such customer) of such financial institution who is permitted to use, or whose transactions are routed through, such payable-through account; and

(B) to obtain, with respect to each such customer (and each such representative), information that is substantially comparable to that which the depository institution obtains in the ordinary course of business with respect to its customers residing in the United States.

(4) INFORMATION RELATING TO CERTAIN CORRESPONDENT ACCOUNTS—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary may require any domestic financial institution or domestic financial agency that opens or maintains a correspondent account in the United States for a foreign financial institution involving any such jurisdiction or any such financial institution operating outside of the United States, or a correspondent account through which any such transaction may be conducted, as a condition of opening or maintaining such account:

(A) to identify each customer (and representative of such customer) of any such financial institution who is permitted to use, or whose transactions are routed through, such correspondent account; and

*Terrorist Financing*

(B) to obtain, with respect to each such customer (and each such representative), information that is substantially comparable to that which the depository institution obtains in the ordinary course of business with respect to its customers residing in the United States.

(5) PROHIBITIONS OR CONDITIONS ON OPENING OR MAINTAINING CERTAIN CORRESPONDENT OR PAYABLE-THROUGH ACCOUNTS— If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary, in consultation with the Secretary of State, the Attorney General, and the chairman of the Board of Governors of the Federal Reserve System, may prohibit, or impose conditions upon, the opening or maintaining in the United States of a correspondent account or payable-through account by any domestic financial institution or domestic financial agency for or on behalf of a foreign banking institution, if such correspondent account or payable-through account involves any such jurisdiction or institution, or if any such transaction may be conducted through such correspondent account or payable-through account.

(C) CONSULTATIONS AND INFORMATION TO BE CONSIDERED IN FINDING JURISDICTIONS, INSTITUTIONS, TYPES OF ACCOUNTS, OR TRANSACTIONS TO BE OF PRIMARY MONEY LAUNDERING CONCERN

(1) IN GENERAL—In making a finding that reasonable grounds exist for concluding that a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts is of primary money laundering concern so as to authorize the Secretary of the Treasury to take 1 or more of the special measures described in subsection (b), the Secretary shall consult with the Secretary of State and the Attorney General.

[46]

*Appendixes*

(2) ADDITIONAL CONSIDERATIONS—In making a finding described in paragraph (1), the Secretary shall consider in addition such information as the Secretary determines to be relevant, including the following potentially relevant factors:

(A) JURISDICTIONAL FACTORS—In the case of a particular jurisdiction

(i) evidence that organized criminal groups, international terrorists, or both, have transacted business in that jurisdiction;

(ii) the extent to which that jurisdiction or financial institutions operating in that jurisdiction offer bank secrecy or special regulatory advantages to nonresidents or nondomiciliaries of that jurisdiction;

(iii) the substance and quality of administration of the bank supervisory and counter–money laundering laws of that jurisdiction;

(iv) the relationship between the volume of financial transactions occurring in that jurisdiction and the size of the economy of the jurisdiction;

(v) the extent to which that jurisdiction is characterized as an offshore banking or secrecy haven by credible international organizations or multilateral expert groups;

(vi) whether the United States has a mutual legal assistance treaty with that jurisdiction, and the experience of United States law enforcement officials and regulatory officials in obtaining information about transactions originating in or routed through or to such jurisdiction; and

(vii) the extent to which that jurisdiction is characterized by high levels of official or institutional corruption.

[47]

*Terrorist Financing*

(B) INSTITUTIONAL FACTORS—In the case of a decision to apply 1 or more of the special measures described in subsection (b) only to a financial institution or institutions, or to a transaction or class of transactions, or to a type of account, or to all 3, within or involving a particular jurisdiction:

(i) the extent to which such financial institutions, transactions, or types of accounts are used to facilitate or promote money laundering in or through the jurisdiction;

(ii) the extent to which such institutions, transactions, or types of accounts are used for legitimate business purposes in the jurisdiction; and

(iii) the extent to which such action is sufficient to ensure, with respect to transactions involving the jurisdiction and institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

(D) NOTIFICATION OF SPECIAL MEASURES INVOKED BY THE SECRETARY—Not later than 10 days after the date of any action taken by the Secretary of the Treasury under subsection (a)(1), the Secretary shall notify, in writing, the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate of any such action.

(E) DEFINITIONS—Notwithstanding any other provision of this subchapter, for purposes of this section and subsections (i) and (j) of section 5318, the following definitions shall apply:

(1) BANK DEFINITIONS—The following definitions shall apply with respect to a bank:

(A) ACCOUNT— The term "account":

[48]

*Appendixes*

(i) means a formal banking or business relationship established to provide regular services, dealings, and other financial transactions; and

(ii) includes a demand deposit, savings deposit, or other transaction or asset account and a credit account or other extension of credit.

(B) CORRESPONDENT ACCOUNT—The term "correspondent account" means an account established to receive deposits from, make payments on behalf of a foreign financial institution, or handle other financial transactions related to such institution.

(C) PAYABLE-THROUGH ACCOUNT—The term "payable-through account" means an account, including a transaction account (as defined in section 19(b)(1)(C) of the Federal Reserve Act), opened at a depository institution by a foreign financial institution by means of which the foreign financial institution permits its customers to engage, either directly or through a subaccount, in banking activities usual in connection with the business of banking in the United States.

(2) DEFINITIONS APPLICABLE TO INSTITUTIONS OTHER THAN BANKS—With respect to any financial institution other than a bank, the Secretary shall, after consultation with the appropriate Federal functional regulators (as defined in section 509 of the Gramm-Leach-Bliley Act), define by regulation the term "account", and shall include within the meaning of that term, to the extent, if any, that the Secretary deems appropriate, arrangements similar to payable-through and correspondent accounts.

(3) REGULATORY DEFINITION OF BENEFICIAL OWNERSHIP—The Secretary shall promulgate regulations defining beneficial ownership of an account for purposes of this section and subsections (i) and (j) of section 5318. Such regulations shall address issues related to an individual's authority to fund, direct, or manage the account (including, without limitation, the power to direct pay-

[49]

*Terrorist Financing*

ments into or out of the account), and an individual's material interest in the income or corpus of the account, and shall ensure that the identification of individuals under this section does not extend to any individual whose beneficial interest in the income or corpus of the account is immaterial.

(4) OTHER TERMS—The Secretary may, by regulation, further define the terms in paragraphs (1), (2), and (3), and define other terms for the purposes of this section, as the Secretary deems appropriate.

(b) CLERICAL AMENDMENT—The table of sections for subchapter II of chapter 53 of title 31, United States Code, is amended by inserting after the item relating to section 5318 the following new item:

5318A—Special measures for jurisdictions, financial institutions, or international transactions of primary money laundering concern.

## APPENDIX B

FINANCIAL ACTION TASK FORCE ON MONEY LAUNDERING
SPECIAL RECOMMENDATIONS ON TERRORIST FINANCING

Recognizing the vital importance of taking action to combat the financing of terrorism, the FATF has agreed these Recommendations, which, when combined with the FATF Forty Recommendations on money laundering, set out the basic framework to detect, prevent and suppress the financing of terrorism and terrorist acts. For further information on the Special Recommendations as related to the self-assessment process, see the Guidance Notes.

### I. Ratification and implementation of UN instruments.

Each country should take immediate steps to ratify and to implement fully the 1999 United Nations International Convention for the Suppression of the Financing of Terrorism. Countries should also immediately implement the United Nations resolutions relating to the prevention and suppression of the financing of terrorist acts, particularly United Nations Security Council Resolution 1373.

### II. Criminalising the financing of terrorism and associated money laundering.

Each country should criminalise the financing of terrorism, terrorist acts and terrorist organizations. Countries should ensure that such offences are designated as money laundering predicate offences.

### III. Freezing and confiscating terrorist assets.

Each country should implement measures to freeze without delay funds or other assets of terrorists, those who finance terrorism and terrorist organizations in accordance with the United Nations resolutions relating to the prevention and suppression of the financ-

[51]

*Terrorist Financing*

ing of terrorist acts. Each country should also adopt and implement measures, including legislative ones, which would enable the competent authorities to seize and confiscate property that is the proceeds of, or used in, or intended or allocated for use in, the financing of terrorism, terrorist acts or terrorist organizations.

### *IV. Reporting suspicious transactions related to terrorism.*

If financial institutions, or other businesses or entities subject to anti–money laundering obligations, suspect or have reasonable grounds to suspect that funds are linked or related to, or are to be used for terrorism, terrorist acts or by terrorist organizations, they should be required to report promptly their suspicions to the competent authorities.

### *V. International cooperation.*

Each country should afford another country, on the basis of a treaty, arrangement or other mechanism for mutual legal assistance or information exchange, the greatest possible measure of assistance in connection with criminal, civil enforcement, and administrative investigations, inquiries and proceedings relating to the financing of terrorism, terrorist acts and terrorist organizations. Countries should also take all possible measures to ensure that they do not provide safe havens for individuals charged with the financing of terrorism, terrorist acts or terrorist organizations, and should have procedures in place to extradite, where possible, such individuals.

### *VI. Alternative remittance.*

Each country should take measures to ensure that persons or legal entities, including agents, that provide a service for the transmission of money or value, including transmission through an informal money or value transfer system or network, should be licensed or registered and subject to all the FATF Recommendations that apply to banks and non-bank financial institutions. Each country should ensure that persons or legal entities that carry out this service illegally are subject to administrative, civil or criminal sanctions.

[52]

*Appendixes*

### VII. Wire transfers.

Countries should take measures to require financial institutions, including money remitters, to include accurate and meaningful originator information (name, address and account number) on funds transfers and related messages that are sent, and the information should remain with the transfer or related message through the payment chain. Countries should take measures to ensure that financial institutions, including money remitters, conduct enhanced scrutiny of and monitor for suspicious activity funds transfers which do not contain complete originator information (name, address and account number).

### VIII. Nonprofit organizations.

Countries should review the adequacy of laws and regulations that relate to entities that can be abused for the financing of terrorism. Non-profit organizations are particularly vulnerable, and countries should ensure that they cannot be misused:

i. by terrorist organizations posing as legitimate entities;
ii. to exploit legitimate entities as conduits for terrorist financing, including for the purpose of escaping asset freezing measures; and
iii. to conceal or obscure the clandestine diversion of funds intended for legitimate purposes to terrorist organizations.

[53]

## ADDITIONAL SOURCES OF INFORMATION

For those who wish to read more on this subject, a good place to start is on U.S. government websites. The U.S. Department of the Treasury recently published a report on the Bush administration's initiatives to combat terrorist financing, which can be found at www.ustreas.gov/press/releases/reports/2002910184556291211.pdf. The Treasury also publishes an annual National Money Laundering Strategy; see www.ustreas.gov/offices/enforcement/ml.html, which covers related topics. Specific, detailed information on the government's sanctions programs can be found on the website of the Treasury's Office of Foreign Asset Controls at www.ustreas.gov/ofac, and other regulatory and law enforcement information can be read on the website of the U.S. financial intelligence unit, the Financial Crimes Enforcement Network, at www.ustreas.gov/fincen.

The U.S. Department of State's Office of the Coordinator for Counterterrorism produces a useful annual report, *Patterns of Global Terrorism*; see www.state.gov/s/ct. Each year its Bureau for International Narcotics and Law Enforcement Affairs produces the *International Narcotics Control Strategy Report,* which can be found at www.state.gov/g/inl and which includes brief descriptions of the anti–money laundering regimes of virtually every nation in the world.

The twenty-nine-nation Financial Action Task Force has accumulated a great deal of information on money laundering and has, since September 11, 2001, published a number of papers on the subject of terrorist financing and the FATF's actions to combat the phenomenon. The FATF also produces an annual report on money laundering typologies, which last year included a useful discussion of terrorist financing. All of this can be found on the FATF website at www.oecd.org/fatf.

The reports of the United Nations Security Council Counter-Terrorism Committee and Monitoring Group are especially valuable and can be found at www.un.org/terrorism. Information on how the International Monetary Fund and the World Bank are

[54]

*Additional Sources of Information*

addressing terrorist financing can be found at www.imf.org/
external/np/sec/pn/2002/pn0287.htm.

Unfortunately, very few academic institutions, private think tanks,
or nongovernmental organizations have done serious work on this
subject. This is regrettable, especially since so many of the issues
discussed in this Task Force report regarding countries' regulato-
ry systems, institutional organizations, resource commitments, and
legal frameworks are "open source" matters that could benefit
from more thorough examination. A rare exception is the good
work done on sanction enforcement regimes by Brown Univer-
sity's Watson Institute for International Studies; see www.
watsoninstitute.org.

## OTHER REPORTS OF INDEPENDENT TASK FORCES
## SPONSORED BY THE COUNCIL ON FOREIGN RELATIONS

\*†*Threats to Democracy* (2002)
  Madeleine K. Albright and Bronislaw Geremek, Co-Chairs; Morton H.
  Halperin, Project Director; Elizabeth Frawley Bagley, Associate Director
\*†*America—Still Unprepared, Still in Danger* (2002)
  Gary Hart and Warren B. Rudman, Co-Chairs; Stephen Flynn, Project
  Director
\*†*Balkans 2010* (2002)
  Edward C. Meyer, Chair; William L. Nash, Project Director
 †*Enhancing U.S. Leadership at the United Nations* (2002)
  David Dreier and Lee H. Hamilton, Co-Chairs; Lee Feinstein and Adrian
  Karatnycky, Project Co-Directors; Cosponsored with Freedom House
\*†*Testing North Korea: The Next Stage in U.S. and ROK Policy* (2001)
  Morton I. Abramowitz and James T. Laney, Co-Chairs; Robert A. Manning,
  Project Director
\*†*The United States and Southeast Asia: A Policy Agenda for the New
  Administration* (2001)
  J. Robert Kerrey, Chair; Robert A. Manning, Project Director
\*†*Strategic Energy Policy: Challenges for the 21st Century* (2001)
  Edward L. Morse, Chair; Amy Myers Jaffe, Project Director
\*†*State Department Reform* (2001)
  Frank C. Carlucci, Chair; Ian J. Brzezinski, Project Coordinator;
  Cosponsored with the Center for Strategic and International Studies
\*†*U.S.-Cuban Relations in the 21st Century: A Follow-on Report* (2001)
  Bernard W. Aronson and William D. Rogers, Co-Chairs; Julia Sweig and
  Walter Mead, Project Directors
\*†*A Letter to the President and a Memorandum on U.S. Policy Toward Brazil*
  (2001)
  Stephen Robert, Chair; Kenneth Maxwell, Project Director
\*†*Toward Greater Peace and Security in Colombia* (2000)
  Bob Graham and Brent Scowcroft, Co-Chairs; Michael Shifter, Project
  Director; Cosponsored with the Inter-American Dialogue
 †*Future Directions for U.S. Economic Policy Toward Japan* (2000)
  Laura D'Andrea Tyson, Chair; M. Diana Helweg Newton, Project Director
\*†*Promoting Sustainable Economies in the Balkans* (2000)
  Steven Rattner, Chair; Michael B. G. Froman, Project Director
\*†*Nonlethal Technologies: Progress and Prospects* (1999)
  Richard L. Garwin, Chair; W. Montague Winfield, Project Director
\*†*U.S. Policy Toward North Korea: Next Steps* (1999)
  Morton I. Abramowitz and James T. Laney, Co-Chairs; Michael J. Green,
  Project Director
 †*Safeguarding Prosperity in a Global Financial System: The Future Interna-
  tional Financial Architecture* (1999)
  Carla A. Hills and Peter G. Peterson, Co-Chairs; Morris Goldstein, Project
  Director
 \* *Strengthening Palestinian Public Institutions* (1999)
  Michael Rocard, Chair; Henry Siegman, Project Director
\*†*U.S. Policy Toward Northeastern Europe* (1999)
  Zbigniew Brzezinski, Chair; F. Stephen Larrabee, Project Director
\*†*The Future of Transatlantic Relations* (1999)
  Robert D. Blackwill, Chair and Project Director
\*†*U.S.-Cuban Relations in the 21st Century* (1999)
  Bernard W. Aronson and William D. Rogers, Co-Chairs; Walter Russell
  Mead, Project Director

---

†Available on the Council on Foreign Relations website at http://www.cfr.org.
\*Available from Brookings Institution Press. To order, call 1-800-275-1447.

# TERRORIST FINANCING

### REPORT OF AN INDEPENDENT TASK FORCE
### SPONSORED BY THE COUNCIL ON FOREIGN RELATIONS

The "fog of war" has long befuddled military and political leaders. Of all the battlefronts in today's war on terrorism, few are as "foggy" as efforts to combat terrorist financing.

The Council on Foreign Relations established its Independent Task Force on Terrorist Financing to evaluate the effectiveness of U.S. efforts to disrupt terrorist financing. The Task Force found that although al-Qaeda's finances have been disrupted, they have not been destroyed—and that as long as al-Qaeda retains access to a viable financial network, it will remain a lethal threat to the United States.

Al-Qaeda's financial network is characterized by layers and redundancies, raising and moving money internationally in a variety of manners. For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al-Qaeda. And for years, Saudi officials have turned a blind eye to this problem. Following September 11, 2001, the U.S. government undertook many successful initiatives to curtail the financing of terrorism. Fundamentally, however, U.S. efforts remain impeded by a lack of political will among U.S. allies.

Confronted with this lack of political will, the Bush administration appears to have made a policy decision not to use the full power of U.S. influence to pressure other governments to combat terrorist financing more effectively. Present efforts are not commensurate with the ongoing threat to U.S. national security. With this core finding in mind, this Task Force report offers a number of specific recommendations to assure a more effective U.S. and international response.



COUNCIL
ON FOREIGN
RELATIONS
PRESS



ISBN 0-87609-324-1

9 780876 093245

90000