**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |

This document relates to: *All Actions*

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'**
***DAUBERT* MOTION [ECF No. 7345] TO EXCLUDE THE PROPOSED TESTIMONY OF**
**DEFENDANTS' PROPOSED EXPERTS, JONATHAN BENTHALL,**
**CHARLES W. FREEMAN, JONATHAN MARKS, AND JOHN SIDEL**

---

Jodi Westbrook Flowers
Robert T. Haefele
Donald A. Migliori
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
For the Plaintiffs' Exec. Committees

James Kreindler
Andrew J. Maloney, III
KREINDLER & KREINDLER LLP
485 Lexington Avenue, 28th Fl
New York, NY 10017
Tel: (212) 973-3438
Email: amaloney@kreindler.com
For the Plaintiffs' Exec. Committees

Sean P. Carter
Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com
For the Plaintiffs' Exec. Committees

February 18, 2022

**Table of Contents**

INTRODUCTION ................................................................................................................. 1

MWL/IIRO PROFFERED EXPERT JONATHAN BENTHALL ........................................ 1

    I.    Benthall is not Qualified to Offer Expert Testimony .............................................. 1

    II.   Benthall's Opinions are Unhelpful and Violate FRE 401 and 403 .......................... 3

    III.  Benthall Offers Inadmissible State of Mind Testimony and Legal Conclusions ..... 5

    IV.  Benthall's Methodology is Unreliable and Improper ............................................. 6

WAMY PROFFERED EXPERT CHAS FREEMAN ......................................................... 7

    I.    Freeman is Not Qualified to Offer His Irrelevant Opinions .................................. 7

    II.   Freeman's Methodology is Flawed and Unreliable ................................................ 9

    III.  Freeman's State of Mind Testimony Must be Excluded ....................................... 12

    IV.  Freeman's Testimony is Unfairly Prejudicial Because His Title Will Improperly Convey Authority and Expertise that He Lacks ...................................................... 13

WAMY PROFFERED EXPERT JONATHAN MARKS ................................................... 14

    I.    Marks is Unqualified to Testify about Terror Financing ..................................... 14

    II.   Marks' Methodology is Deficient ........................................................................ 16

    III.  Marks' Testimony About Charity Work is Irrelevant .......................................... 17

    IV.  Marks' Opinions About WAMY's General Control Awareness are Unreliable ..... 19

    V.   Marks Improperly Opines as to WAMY's State of Mind ..................................... 20

MWL/IIRO PROFFERED EXPERT JOHN SIDEL .......................................................... 21

    I.    Sidel is Not Qualified to Offer His Expert Opinions ........................................... 21

    II.   Sidel's Opinions Do Not Provide Relevant "Background" or "Contextualization" .... 22

    III.  Sidel Improperly Offers State of Mind Testimony ............................................... 25

CONCLUSION .................................................................................................................. 25

<u>**Table of Authorities**</u>

**CASES**

*523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600 (S.D.N.Y. 2014)............................................14

*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya,*
  811 F. Supp. 2d 53 (D.D.C. 2011) ........................................................................13

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)....................................................7

*Dura Automotive Sys. Of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2019) ....................16

*Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365 (S.D.N.Y. 2014) ..................................5, 16

*Haimdas v. Haimdas*, No. 09 Civ. 02034 (ENV) (MDG), 2010 WL 652823
  (E.D.N.Y. Feb. 22, 2010).......................................................................................14

*In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531 (S.D.N.Y.2004) ......................................21

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785
  (S.D.N.Y. July 28, 2006) ........................................................................................14

*Koppell v. New York State Bd. of Elections*, 97 F. Supp. 2d 477 (S.D.N.Y. 2000) ...........................7

*Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Cv. 1253(BSJ)(HBP), 2010 WL 2674584 ...............14

*Linde v. Arab Bank*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) ..................................................2

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................3

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...............................23

*Pension Committee of the Univ. or Montreal Pension Plan v. Banc of America Securities, LLC,*
  691 F. Supp. 2d 448 .............................................................................................14

*S.E.C. v. Tourre*, 950 F.Supp.2d 666 (2013) ..................................................................2

*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33 (S.D.N.Y. 2016).......................................5

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004)....................................................14

*United States v. Zong*, 16-CR-614 (DLI), 2018 WL 6186474 (E.D.N.Y. Nov. 26, 2018)...................13

**OTHER AUTHORITIES**

9/11 Commission Report............................................................................................. 10, 21

Financial Action Task Force, *International Standards on Combating Money Laundering and the
  Financing of Terrorism and Proliferation,* Octobert 2021 ("FATF Recommendations") ...............16

Financial Action Task Force, *Terrorist Financing Risk Assessment Guidance,* July 2019
  ("FATF Report") .................................................................................................4

**RULES**

Federal Rules of Evidence 401....................................................................................3

Federal Rules of Evidence 403.............................................................................. 3, 14

Federal Rules of Evidence 404(a)(1)............................................................................6

## Key to Exhibit Citations

- Exhibits 1-16 cited in this Memorandum of Law are exhibits to the Declaration of Robert T. Haefele [ECF No. 7351], filed on November 15, 2021, with the Memorandum of Law in Support of Plaintiffs' Memorandum of Law to Exclude and/or Limit Proposed Testimony of Defendants' Proposed Experts, Jonathan Benthall, Charles W. Freeman, Jonathan Marks, and John Sidel.
- Exhibits A to U cited in this Memorandum of Law are exhibits to the Declaration of Robert T. Haefele [ECF No. 7608], filed on January 14, 2022, with the Memorandum of Law in Support of Plaintiffs' Opposition Brief.
- Exhibits AA to AJ cited in this Memorandum of Law are exhibits to the Declaration of Robert T. Haefele filed with this Memorandum.
- In-text parenthetical citations refer to pages in Defendants' Opposition Brief filed at ECF No. 7602

| | |
|---|---|
| Exhibit AA | Excerpted pages from the Deposition of Jonathan Benthall, taken on July 20, 2021. |
| Exhibit AB | Financial Action Task Force, *Terrorist Financing Risk Assessment Guidance*, July 2019 ("FATF Report"). |
| Exhibit AC | Excerpted pages from the Deposition of John Sidel, taken on April 27, 2021. |
| Exhibit AD | Excerpted pages from the Deposition of Jonathan Marks, taken on July 22, 2021. |
| Exhibit AE | *Before the House Financial Services Subcommittee on Oversight and Investigations and the House International Relations Subcommittee on International Terrorism and Nonproliferation*, 109th Cong., First Session (May 4, 2005) (testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence U.S. Department of the Treasury), (located at https://archives-financialservices.house.gov/media/pdf/050405sl.pdf) |
| Exhibit AF | Expert Report of Victor D. Comras dated October 29, 2020. |
| Exhibit AG | Excerpted pages from the Deposition of Charles W. Freeman, taken on April 6, 2021. |
| Exhibit AH | John Roth, Douglas Greenburg, Serena Wille, *Monograph on Terrorist Financing*, Staff Report to the National Commission on Terrorist Attacks Upon the United States. |
| Exhibit AI | Financial Action Task Force, *International Standards on Combating Money Laundering and the Financing of Terrorism and Proliferation*, October 2021 ("FATF Recommendations"). |
| Exhibit AJ | Exhibit 549 to the Deposition of Charles W. Freeman (MEPC 1997 Contributions). |

**INTRODUCTION**

Defendants' Opposition Brief highlights deficiencies in their own experts' qualifications and methodologies and further supports exclusion of their testimony. Defendants mischaracterize the law and facts and misstate Plaintiffs' arguments.[1] Defendants claim that because the allegations and facts in this case are indeed "wide-ranging," it is appropriate to inundate this Court with endless "contextual" testimony that veers so far from the nexus of the issues that the expert testimony becomes irrelevant. This limitless contextual testimony is not helpful to the jury and will do nothing more than cause confusion.

When they are unable to adequately defend their own experts, Defendants spend valuable space in their Opposition Brief attacking Plaintiffs' experts with off-topic arguments. Defendants' contention that Plaintiffs have created "straw-experts" to knock down only evinces their proffered experts' lack of expertise in relevant fields. Defendants have proffered unqualified "experts" that testify to broad subject-matter overviews and can only demur when pressed on allegations central to the determination of liability in this case.

Finally, Defendants' experts improperly seek to apply their *ipse dixit* to testify impermissibly as to the motive, intent, and state of mind of organizations, foreign sovereigns, and individuals.

## MWL/IIRO PROFFERED EXPERT JONATHAN BENTHALL

### I.  Benthall is not Qualified to Offer Expert Testimony

Defendants' belated suggestion (at 12-14) that Benthall is an expert on terror financing relating to charities is unfounded. Defendants cannot argue that Benthall is an expert in Al Qaeda's history or financing because he testified that he does not know if Al Qaeda was ever funded by Islamic charities.[2] Benthall also has had no training in money laundering or experience investigating money laundering.[3]

---

[1] Plaintiffs have *not* alleged that the Defendants (MWL, IIRO, and WAMY) have not engaged in legitimate charitable work. Nor have Plaintiffs alleged that charitable presence in war-torn regions is *prima facie* evidence of terrorist intent. Defendants make both arguments centerpieces of their Opposition Brief.

[2] Ex. AA, Benthall Dep. 155:22 to 156:16, 263:22- 265:17.

[3] Ex. AA, Benthall Dep. 70:1-8.

Defendants, however, argue (at 14) that Benthall is an expert on "aspects of terrorist financing that pertain to charities" premised solely on his "'active[]' consider[ation]" of money laundering, his "active engagement with people who specialize in the subject" and his "reading as much [of the literature on the subject as he was able]."[4] These statements are meaningless and offer nothing concrete to support his claimed expertise. Indeed, Defendants offer little more than Benthall's *interest* in the subject of money laundering, and no basis at all for his qualifications to testify about terrorist financing issues.

In addition, Defendants' claim (at 10) that "Benthall's testimony is offered to support Defendants' theory that the purported 'irregularities' in accounting and reporting of disbursements… are typical of and experienced by all charities." Benthall is not a finance, accounting, or terror financing expert and has not been proffered as such.[5] This conclusory statement suggests that any reporting or disbursement for any charity is typical and does not deserve further analysis. This testimony is inappropriate and should be stricken.

Defendants' try to skirt Judge Gerson's ruling in *Linde II* that Benthall had "no reliable basis or methodology to reach the conclusions he reached on [financial irregularities, the provision of banking services by financial institutions, or whether charitable organizations were Hamas fronts]."[6]  Since Judge Gerson excluded his testimony, Benthall has received no additional training to enhance or legitimize his self-perceived expertise on the financial transactions of Islamic charities as they relate to alleged terrorist financing.[7] It is appropriate, therefore, to adhere to that ruling and disqualify Benthall from offering expert

---

[4] Defendants' Brief at 14, n. 67 (citing Benthall Dep. 70:2-3, 71:24-25, and 72:5-8). Defendants' citation to Benthall's deposition refers to Benthall's interest in money laundering, not terrorist financing.

[5] Despite his assertions otherwise which he bases on being "interested in it for a long period." Ex. AA, Benthall Dep. 71:16-23.

[6] *Linde v. Arab Bank*, 922 F. Supp. 2d 316, 327-238 (E.D.N.Y. 2013). Defendants try to avoid Benthall's lack of financial expertise by omitting the word "financial" before "irregularities" when discussing Judge Gerson's ruling in *Linde II*.

[7] Defendants argue (at 14) that Benthall's "deep expertise in Islamic charities" affords him expertise where "charities and terrorism finance intersect." For Defendants, "a deep understanding of Islamic charities" would grant expertise in terror financing. *First*, general expertise in an area does not necessarily afford expertise in all areas. *See S.E.C. v. Tourre*, 950 F.Supp.2d 666 (2013) (finding that purported expert could not opine to specific areas because he had "no relevant expertise" "even in areas closely related" to matters at issue). *Second*, Judge Gerson's ruling makes clear that Benthall's knowledge regarding charities does not allow him to testify about everything related to charities. Thus, Benthall is not qualified to testify on money laundering or terrorist financing.

testimony in this action.

## II.     Benthall's Opinions are Unhelpful and Violate FRE 401 and 403

Defendants' experts confuse issues before the Court by opening a broad dialogue on generalized topics that have no bearing on Defendants' specific conduct evidencing material support of terrorism. Defendants cite (at 5 n. 12; 8 n. 31) case law from the District of Maryland stating "[E]xpert testimony may aid the trier of fact by providing useful contextual information, which may be further complemented or particularized by other forms of probative evidence in the record . . .." Contextual information can be useful only if it is tethered to the facts and arguments in the case.[8] Defendants' repetitive attempts to insert unrelated beneficent actions and esoteric examinations of almsgiving go far beyond "context" and into irrelevancy. Such testimony must be excluded.

Thus, the Court must exercise its gatekeeping function to exclude expert testimony of Benthall because it is not relevant, it runs a substantial risk of unfair prejudice, and it will mislead the jury, waste time, and result in needless presentation of cumulative evidence.[9] Here, Benthall's testimony would improperly introduce irrelevant facts about the Defendants' benevolent work to encourage the trier of fact to balance their benevolent work against their bad conduct.

Defendants mischaracterize Plaintiffs' arguments, offering (at 7) a litany of reasons for Benthall to testify on a host of irrelevant topics.[10] They seek (at 9) to proffer testimony of "ordinary cultural practices" to support an argument that any indication the Defendants have spread extremist ideas and providing

---

[8] *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 653 (S.D.N.Y. 2007), case law cited in their own brief, disallows excessive background and context. The Court there found that an expert's "broad statements [went] far beyond what would be necessary to place [his] conclusions…in context." Finding that five of the twelve pages of the report contained "unsupported assertions about the factual or legal merit of…[plaintiff's] claim," the court noted "That is a lot of 'context'" and excluded nearly all of the expert's opinion. *Id.* at 653, 669.

[9] *See* Plaintiffs' *Daubert* Brief (ECF No. 7346 at 9-10).

[10] They argue (at 7):
> Plaintiffs misapprehend facts about Islamic charities generally and the charity defendants specifically, including: (i) why and how Islamic charities raise awareness of Islam as part of their missions; (ii) the rationale for their presence and operations in conflict and disaster zones; (iii) how they prioritize beneficiaries of their aid; (iv) the mechanics of aid disbursement, including the widespread use of cash; and (v) practical considerations concerning the reporting and accounting of disbursements.

financial support to terrorists is a misunderstanding of cultural practices. Cultural practices neither explain nor resolve the factual allegations fundamental to this case. Their arguments are untethered to the whole of Plaintiffs' allegations and ignore volumes of evidence. Defendants also reframe the "benign activity" of "acting in war zones" as if it must be examined divorced from other concurrent indicators of material support for terrorism.[11] Expert testimony on these points is unhelpful and confusing, particularly where Plaintiffs have never denigrated legitimate charitable efforts or suggested that a charity's presence in a disaster zone, alone, are *per se* nefarious or proof of provision of material support for terrorism.[12]

Defendants' proffered "expert opinions" about "ordinary cultural practice" are disconnected from the allegations and evidence and pose a risk of profound confusion to the factfinder. When questioned on the factual evidence and contacts between Defendants and Al Qaeda., Defendants' experts were unable to provide a clear answer.[13] Defendants' desire to have Benthall testify in the broadest possible terms that Islamic charities "raise awareness of Islam" bears no nexus to accusations that they materially supported terrorism.[14] Defendants purport to offer this testimony to rebut Plaintiffs' experts' "characterizations of

---

[11] For example, regarding Muwafaq's presence in Sudan at the same time as Osama Bin Laden, Benthall did not inquire into whether Yassin Kadi's businesses in Sudan employed Al Qaeda operatives, nor did he review Muwafaq financial reports. Ex. AA, Benthall Dep. 176:18 to 178:19 and 133:23-134:7.

[12] It is nonetheless undeniable that FATF recognizes these very kinds of activities indicative of terrorist activity, stating that "[t]hreat identification should not be limited to perpetrators of terrorist attacks, but more broadly include individuals who travel to conflict areas, as well as individuals and organisations who engage in recruitment, training and facilitation (including fundraising)." Ex. AB, FATF Report at 20.

[13] For example, when Benthall was asked if he was testifying as to whether Defendants provided funding to Al Qaeda, Benthall mischaracterized the question and stated he "couldn't possibly prove or argue that no such funds were sent. This would be proving a negative." Ex. AA, Benthall Dep. 214:14-23. Sidel was asked whether Al Qaeda was pursuing expansion via alliances, including in Southeast Asia in the 1990s, and responded "I'm not qualified to really comment on it, I don't think." Ex. AC, Sidel Dep. 64:5-16. Marks, despite being unable to name any organization that supported Al Qaeda, declared WAMY's practices "not in line with organizations that support Al Qaeda." Ex. AD, Marks Dep. 163:8-12. When pressed on whether he had worked on anything related to Al Qaeda, Marks admitted he has never worked on any matter involving possible funding of Al Qaeda, on counterterrorism in any capacity for any government, has no expertise pertaining to the history of Al Qaeda, is not an expert on any other designated terrorist organization, and has no professional background studying the funding of Al Qaeda. Ex. AD, Marks Dep. 41:19 – 42:17.

[14] Indeed, Defendants' experts' testimony is not wholly inconsonant with Plaintiffs' experts on at least some of these points. *See, e.g.,* Ex. D, Winer Report at 6.7.1, opining that terror groups can use "legitimate" charity activities to generate support for their causes and propagate terrorist ideologies; attract large numbers of witting and unwitting donors to increase funds available to terrorists; creates public support for the charities to disincline governments from taking action against them; and more. Ex. AE at 3-4 (Under Secretary Office of Terrorism and Financial Intelligence, U.S. Department of Treasury, Stuart Levey testifying that terrorist groups have long used charities).

Islamic charities;" not only do Plaintiffs not offer such generalized expert testimony, but Defendants' experts do not engage with the allegations in this case. The proper scope of expert testimony would be for Defendants' experts to rebut specific allegations that WAMY, IIRO, and MWL supported Al Qaeda; Benthall offers no testimony on this basis that would assist the trier of fact.

Finally, with respect to Plaintiffs' claim that the testimony as to Yassin Kadi was irrelevant, Defendants do not defend their expert and instead (at 8, 12) attack Plaintiffs' expert Victor Comras, whom they have not challenged in their own *Daubert* motion. Comras is exceedingly qualified to testify that "common characteristics" shared among charities made them vulnerable to terrorist financing.[15] Defendants offer only the unsupported argument (at 12) that Benthall should be permitted to testify that these common characteristics are "innocent." Benthall's common knowledge statements about the basic functioning of charities worldwide are irrelevant to determining whether the defendants engaged in wrongful conduct, and would not serve to assist the trier of fact. Thus, his irrelevant opinions contained in his report as to defendant Kadi should be excluded.

Tellingly, if Benthall's entire report is taken as factually accurate, the opinions would not make it more or less likely that Defendants supported Al Qaeda. Thus, his testimony should be excluded.

## III.   Benthall Offers Inadmissible State of Mind Testimony and Legal Conclusions

Benthall offers several instances of improper state of mind testimony and an unqualified legal opinion. First, Defendants (at 15) misstate the law in justifying Benthall's state of mind testimony. The cases Defendants cite do not permit expert rebuttal testimony about state of mind as to individuals or organizations.[16] Benthall's testimony on IIRO's response to accusations of potential involvement in Al Qaeda activities was that "Basha was trying to put things right."[17] This is improper state of mind testimony

---

[15] Ex. AF, Comras Report at 10.

[16] The cases simply read that there is "no burden to produce models or methods" and that "rebuttal testimony should explain, repel, counteract or disprove evidence." Defs' Opp. Br. at 15, n. 76 (citing *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) and *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014)).

[17] Ex. AA Benthall Dep. 238:14-23.

and must be excluded.

Next, Defendants' statements about Yassin Kadi's motives and state of mind are beyond the scope of proper expert testimony. Plaintiffs' *Daubert* brief shows Benthall's statements on Kadi went far beyond merely relaying what the evidence implies and, in fact, assume Kadi's motives and state of mind, suggesting that any tendency towards "jihadist extreme violentism [sic]…would have seeped out."[18] This testimony suggests Benthall knows what was in Kadi's mind at the time of his actions and is, therefore, improper testimony. Likewise, Benthall's discussion of Kadi's good character is impermissible state of mind testimony and violative of FRE 404(a)(1).

Lastly, Defendants defend (at 16) Benthall's conclusions about Basha's "control of overseas transfers of funds" and his opinions that (i) leaders of MWL and IIRO did not share in Al Qaeda's "ideology, goals, or tactics" and (ii) charities with overseas branches experience "practical problems." Benthall's statement that his conclusion about Basha is "more speculation than concrete evidence" belies Defendants' argument that Benthall does not "divin[e]" as to Basha's intent or motives.[19] Defendants disagree (at 17) that Benthall reached a legal conclusion regarding "practical problems" experienced by "all NGOs," but a legal conclusion is precisely what Benthall's testimony offers by insisting the factfinder separate the actions of individuals from actions of an organization. Benthall's testimony on the "practical problems" "all NGOs" face must be excluded.

### IV. Benthall's Methodology is Unreliable and Improper

Defendants (at 17-18) try to rehabilitate Benthall's inability to apply his own methodology by incorporating all prior research and writing he has conducted in his career into his reports. This is not a reliable application of Benthall's stated methodology. While there is no "definitive checklist" to determine "whether reasoning or methodology underlying expert testimony is scientifically valid and whether that

---

[18] Ex. AA, Benthall Dep. 167:21-25.
[19] Plaintiffs' *Daubert* Brief at 45 (ECF No. 7346 at 52); Ex. AA, Benthall Dep. 241:18 to 242:7.

reasoning or methodology properly can be applied to the facts in issue,"[20] finding Benthall's methodology reliable would permit Defendants' experts to create their own methodologies on an *ad hoc* basis. Here, Benthall outlined his methodology in his report and stated that he did not apply this methodology to the facts at issue in this case.[21] Defendants offer nothing to counter this testimony. Thus, Benthall's application of his methodology, relying on *ipse dixit*, is unreliable.

## WAMY PROFFERED EXPERT CHAS FREEMAN

### I.    Freeman is Not Qualified to Offer His Irrelevant Opinions

Defendants advance a flawed argument that Freeman's "experiential" background—in short, rubbing shoulders with senior Saudi officials—is a sufficient basis to imbue him with "specialized knowledge" that qualifies him as an expert on the issues raised in his report.[22] It is not. Defendants show nothing about how Freeman's brief time as a diplomat in Saudi Arabia, or socializing with senior Saudi officials (principally for fundraising purposes[23]) while heading the primarily Saudi-funded Middle East Policy Council ("MEPC"), imbued Freeman with any expertise, let alone expertise to opine on topics ranging from "the relationship between the Kingdom of Saudi Arabia and WAMY" to "world conflicts and their relationship to 9/11."[24,25] His claimed expertise cannot be gleaned from little more than sporadic interactions with Saudi officials over a relatively short period, coupled with years of activity as a fundraiser for an entity that was a policy mouthpiece for Saudi interests.[26]

---

[20] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-593 (1993).

[21] Ex. AA, Benthall Dep. 157:3 – 160:17.

[22] *Koppell v. New York State Bd. of Elections*, 97 F. Supp. 2d 477 (S.D.N.Y. 2000) (excluding purported expert whose expertise was based on "political experience" relying on, *inter alia*, purported expert's "own memories" and "conversations with certain undisclosed individuals.")

[23] *See, e.g.*, Ex. AG, Freeman Dep. 109:15-19; Ex. AG, Freeman Dep. 84:4-10

[24] Contrary to Defendants' "strawman" assertions (at 22), Freeman opines on a wide variety of topics as to which he has failed to demonstrate qualification, including: WAMY's financial decisions and regulations, and terror financing. *See e.g.* Ex. AG, Freeman Dep. 267:1-15 (regarding charities' financial control over charitable receipts Freeman states "[t]he question of whether they control where the donations end up is very much within my purview.").

[25] What is clear from his deposition is that Freeman *may be* qualified to speak as a fact witness about suspicious midnight approaches by Saudi officials with large sums of money. *See* Ex. AG, Freeman Dep. at 138:17 to 140:10; 206:20 to 208:24.

[26] Defendants suggest that, during Freeman's tenure with the MEPC, he continued substantive relations with senior Saudi officials. Freeman's regular duties consisted of serving as the MEPC's chief fundraiser and using his previously boasted-

Freeman's testimony is also irrelevant because Defendants purport that he—like other defense experts—will offer "contextual and background issues that are necessary to understand the allegations against WAMY and WAMY's defenses."[27] This supposed "context" is little more than Freeman's bare assertion that WAMY is not, and could not be, at fault for *any* allegations when considering the "context" of its existence.[28] The parties do not dispute whether WAMY (or MWL, or IIRO) has charitable aspects to its existence; nor does it require Freeman's purported expertise to understand that WAMY (or MWL, or IIRO) has a charitable purpose. Indeed, the lengthy background Freeman offers is particularly irrelevant to a fact finder because it is nothing more than *ipse dixit*. In essence, Freeman asserts that, because WAMY is a Saudi charity with a publicly-stated charitable purpose, it could not have supported terrorism because Freeman "said it himself."[29] Freeman says as much in his report when he states that funding terrorism is "anathema to WAMY's reason for being."[30]  This is not the rigorous intellectual analysis of a qualified expert, and is not an admissible opinion.

---

about connections to secure large donations to the MEPC. Regarding his duties, Freeman stated, "[w]hen I went to Saudi Arabia, I tried to maximize the receipt of donations from individuals and from interested agencies of the government" Ex. AG, Freeman Dep. 142:21 – 143:2. Though he certainly secured substantial funding from Saudi officials (*See, e.g.*, Ex. AG, Freeman Dep. 146:22-147:5 discussing receipt of a $1,000,000 donation from Prince Alwaleed bin Talal al Saud), his testimony about his interactions with Saudi senior officials vacillated. First, he said his trips to Saudi Arabia for the MEPC were "mainly to meet with individuals in the Saudi private sector, as well as American company officials, who saw the value of the [MEPC's] work and, therefore, encouraged their headquarters in the United States to provide funding."  Ex. AG, Freeman Dep. at 85:8-16. Then he testified he also met to discuss substantive issues—not fundraising issues—with members of the Saudi governing Royal family. *Id.* at 85:18 to 89:3. Later testimony revealed that Freeman was less than forthcoming about the degree of funding that came from the Saudi government and its ruling family. (*See, e.g.*, Exhibit 549 evidences that in 1997 $564,210 was donated to the MEPC by the Kingdom of Saudi Arabia, $50,000 from the Saudi Binladin Group, $25,000 from the Saudi Chamber of Commerce, $10,000 from the Saudi Embassy, and $250,000 from the Crown Prince. Though these donations were in the year prior to Freeman's tenure as President of the MEPC, he confirmed that similar donations continued during his tenure. Ex. AG, Freeman Dep. 220:11 – 223:15). *See also* Ex. AG, Freeman Dep. 347:11-17 (recognizing that the MEPC presented views of the Middle East in the United States as "a service to the Kingdom [of Saudi Arabia] . . .."). Remarkably, Defendants contend that having passing conversations with high-level Saudi officials is enough to grant expert qualification, but simultaneously criticize Plaintiffs' expert Winer for serving in a high-level government position. Defs' *Daubert* Brief, ECF No. 7343 at 6. The difference between the two is that Freeman lacks the operational training and experience that Winer has, and thus his meetings with high level Saudi politicians do not qualify him to testify on the topics which he seeks to opine.

[27] Defs' Opp. Br. at 22 (ECF No. 7602 at 29).

[28] The argument that Defense experts are providing excessive amounts of "context" is further discussed at *infra* 3.

[29] This is the general translation for *ipse dixit*. It has also been understood to mean "that's just how it is." This is the thrust of Freeman's argument that "[a]ny support for al Qaeda by WAMY or its leaders would be a betrayal of the organization's very *raison d'être* and regarded as treasonous collusion with terrorism." Ex. 3, Freeman Report at 12.

[30] Ex. 3, Freeman Report at 11.

## II.     Freeman's Methodology is Flawed and Unreliable

Defendants trivialize the disqualifying flaws in Freeman's methodology to hide that his methodology evinces a lack of any academic rigor and is wholly unreliable. At his deposition, Freeman candidly admits that he relied on no documents and his methodology was to write a report, then search for information that "corroborates" his views.[31] That is not an acceptable expert methodology.

Contrary to the argument that Freeman's opinions are "solidly supported" by "primary sources" and his "own observations" of "[his] on-the-ground interaction with KSA society,"[32] Freeman concedes that he relied on *nothing but himself* for his opinions.[33] Freeman explained that he relied on no documents to form his opinions but looked for and, after his report was written, inserted references that agreed with his opinions.[34] Defendants defend Freeman suggesting, without citation, that the Court be persuaded that Freeman's report satisfies a mythic ratio of pages to citations, arguing that his "18-page report with 38 footnotes demonstrates the intellectual rigor required by an expert."[35] As Plaintiffs previously recognized,[36] there is no such magical ratio of pages to citations, and Defendants' argument does not address that Freeman inserted references after-the-fact only to the extent that the references agreed with him. Even more problematic is that neither Freeman's report nor Defendants identify any rigorous support for Freeman's *ipse dixit* opinions. Although Defendants emphasize Freeman's reliance on "primary source" evidence, Freeman cites no materials WAMY produced and stressed that he relied on no WAMY

---

[31] Freeman states "[m]y opinion does not depend on documents." Ex. AG, Freeman Dep. 292:23-24. Shortly thereafter he states "I wrote the report. And then I looked online for things of which I was already familiar or which addressed the topic." Ex. AG, Freeman Dep. 293:11-19.

[32] Defendants' Br. at 23 (ECF No. 7602 at 30).

[33] In his own words "[he] wrote the report and then [he] looked for references that would corroborate what [he] knew" Ex. AG, Freeman Dep. 409:10-13

[34] Ex. AG, Freeman Dep. 354:14 ("I did not rely on documents"); 292:19 to 293:1 ("I cited [documents] to corroborate my opinion, not the other way around."); 409:10-13 ("I wrote the report and then I looked for references [to] corroborate what I knew.").

[35] Defs' Opp. Br. at 23 (ECF No. 7602 at 30).

[36] *See* ECF No. 7606 at 46.

documents—*or any documents*—for his opinions.[37]

Defendants also confusingly assert that Freeman's report is "supported by respected secondary sources such as Lawrence Wright, Karen Armstrong, and Steve Coll."[38] This is a liberal use of the term "supported." Freeman cites to Lawrence Wright twice, Karen Armstrong once, and Steve Coll three times.[39] But the sundry cites to those authors provide little support for the overall opinions Freeman asserts and the dearth of support reveals the frailty of his methodology.

Freeman's citations to an anonymous blog that references a long debunked 9/11 conspiracy theory are illustrative of  the deficiency in Freeman's methodology; Defendants' efforts to brush aside the problems cannot be overstated.[40] The deficiency in Freeman's methodology is apparent from the revelation that he not only resorts to internet searches as *post hac* support for his opinions, but he also shows little care for the nature of the references he cites, and (most concerning) sought to conceal from the Court the weakness of his references by fabricating a story to conceal their true nature.[41]

Defendants offer a weak defense of Freeman's citation to an anonymous blog post (without disclosing that is what it was) by arguing that the underlying assertion Freeman associated with the blog post is "unremarkable" and "consistent with the general description in the 9/11 Commission Report of where the hijackers came from."[42] *First*, if this is so, then Freeman evinced poor intellectual rigor in citing to the blog post rather than to the 9/11 Commission Report, which has been thoroughly vetted and is a

---

[37] Ex. AG, Freeman Dep. at 35:8-9 ("I am not testifying on the basis of documents"); 259:11-12 (same); 292:15-16 ("I'm not testifying from documents"); 301:18-19 ("My testimony is not based on documents"); 354:14 ("I did not rely on documents"); 286:23 to 287:16 (confirming that he did not rely on any documents produced in the litigation in forming his opinions, and in fact did not receive them until after his report was complete); 290:5-8 (he has never seen internal documents of any of the charities); 292:23-24 ("My opinion does not depend on documents").

[38] For cites to Wright, see Ex. 3, Freeman Report at 9 n.25 and 12 n.37; for Armstrong, see Ex. 3, Freeman Report at 6 n.14; for Coll, see Ex. 3, Freeman Report at 1 n.1, 9 n.27, and 10 n.31.

[39] *Id.*

[40] Defendants allege that Plaintiffs have "grossly mischaracterized the significance" of Freeman's use of an anonymous blog post to support an assertion.

[41] Defendants downplay a complete lack of citational attribution by describing it as not "noting the name of the blog on which the information appeared," Defs' Opp. Br. at 24 (ECF No. 7602 at 31). Defendants and Freeman would leave the Court to hunt down the source for the footnote. Most telling, however, is that Freeman never identified the blog anywhere in his report and evaded identifying it as a source in his deposition until directly questioned about it.

[42] Defs' Opp. Br. at 24 and n.131.

well-regarded chronicle of the 9/11 Attacks. *Second*, Defendants' suggestion that Freeman intended the point he was making in referencing the blog post to be minor is belied by the fact that Freeman devoted more than an entire page to cutting and pasting the post into a standalone endnote in his report and went out of his way to evade disclosing that the text was cut and pasted from a blog post or that he had no familiarity with the poster or the poster's competency. *Third*, Defendants' defense of Freeman completely misses that his decisions to resort to the blog post, to excerpt from the blog only parts that service his opinion, and to write his report in a manner to conceal the nature of the blog post reference all undermine and infect the reliability of his methodology for his entire report. *Fourth*, in dismissing the methodological flaw, because (as Defendants argue) Plaintiffs did not "question the accuracy of the factual assertion" or the "methodology Freeman used in independently reaching this conclusion,"[43] Defendants miss the root flaw with Freeman's methodology of asserting *ipse dixit* opinions and then scouring for sources that agree with him.

Freeman's opinions about the relative compatibility of Wahhabism with Al Qaeda and the *ulema's* support for Al Qaeda are merely dressed up impermissible *ipse dixit*. Defendants argue (at 25) that two of his opinions (that Saudi Wahhabism is incompatible with Al Qaeda's calls for "overthrow and uprising" and that the Saudi *ulema* have been unequivocal in their condemnation of Al Qaeda) are supported by "detailed fact-based historical analysis going back to 1744." Consistent with Freeman's own explanation about how he wrote his report (his "methodology") and as his use of the blog post reveals, these two opinions (as well as his entire report) are *ipse dixit* dressed up with after-the-fact references that agree with him. Because his methodology fails, so do his opinions.

His *ipse dixit* opinions, coupled intentionally with one-sided references, are flawed because they consider only facts that Freeman finds convenient for his opinions. For example, Freeman's opinion that some unmalleable antagonism exists between the KSA and Al Qaeda suggests that Saudi actors, including

---

[43] Defs' Opp. Br. at 24 (ECF No. 7602 at 31).

within the ruling family and the *ulema*, act monolithically, consistently, and without subterfuge. The analytical gap in Freeman's methodology used to reach his opinion is that he ignores dozens of individuals, facts, and evidence and instead references only views that support his preconceived storyline that, because the *ulema* has at some point in time publicly condemned Al Qaeda, WAMY could not and would not have ever supported Al Qaeda.[44] *First*, the methodology he used does not account for the fact that relevant actors within the government do not act monolithically, have not acted consistent over time, and (at least appear to) have acted with subterfuge at times.[45] *Second*, Freeman's *ipse dixit* opinion flies in the face of thousands of years of human history, and ignores the actors within organizations that possess their own motives and goals.[46] Freeman merely buttresses his conclusory statements with his own dogmatic understandings of history to craft a narrative with his conclusory statements and state of mind testimony that is not supported by the facts.

For all the foregoing reasons, Freeman's methodology is critically flawed and disqualifying.

### III.      Freeman's State of Mind Testimony Must be Excluded

Freeman's state of mind testimony must be excluded because he cannot testify as to the states of mind identified in his testimony and because that testimony is premised on *ipse dixit*. For example, his conclusory statement that WAMY's alleged support of Al Qaeda is impossible because it is counter to its "*raison d'etre*"[47] is unsupported by the facts and evidence and is based on *ipse dixit*. Freeman routinely

---

[44] *See* ECF No. 7346 at 47-48 (pp. 40-42) (Freeman describes not seeking out facts that counter his pre-existing opinions).
[45] Consider, for example, the Saudi government's approach to the Saudi-based al Haramain Islamic Foundation, which had its branch offices and its headquarters in Saudi Arabia designated as SDGT entities between 2002-2008 for providing financial and material support to al Qaeda and other terrorists and terrorist organizations. Despite warnings from U.S. officials as early as 1998 that Al Haramain served as a primary source of funding for al Qaeda's terrorist activities, the Saudi government continued to allow Al Haramain's branch offices to operate throughout the world in Afghanistan, Pakistan, Kenya, Somalia, and other areas geographically important to Osama bin Laden and al Qaeda.  The Saudi government's "ineffective" attempts to "rein in" Al Haramain left the 9/11 Commission Staff to doubt whether Saudi Arabia had the "political will to . . . stem the flow of funds to Al Qaeda." Ex. AH at 12.
[46] One does not have to look deep into history to find examples of organizations that espouse one idea publicly but take the different action in private. Consider the Catholic church's history of condemning the actions of ordained priests, but systematically protecting them from legal repercussions, or consider the Saudi's shifting public positions about Jamal Khashoggi's murder in their Istanbul consulate.
[47] Ex. 3, Freeman Report at 12 (emphasis added).

interprets the Saudi government's state of mind, for example, saying the Saudi state "**would have** imposed swift and serious punishment" and "[o]fficial retribution **would have** been both immediate and harsh."[48] He offers WAMY state of mind evidence, too, asserting that WAMY's leadership "**would have** … reported at once" any al Qaeda support that came to their attention.[49] The testimony suggests Freeman knows the inner mind of the Saudi government and WAMY's leadership, assuming their motives and intents, and opining on actions they *would have* taken. These opinions are improper as one must understand the states of mind of the entities and the various individuals acting for the entities, as well as the political and other motivations that drive them to act or not to act.

## IV.    Freeman's Testimony is Unfairly Prejudicial Because His Title Will Improperly Convey Authority and Expertise that He Lacks

Case law Defendants cite to support their argument that "there is ample precedent for expert testimony by a former U.S. ambassador" is misleading. The first case they cite (at 27 n.151), *United States v. Zong*,[50] offers no precedent for expert testimony by an ambassador because it did not involve expert testimony by a former ambassador. Instead, in *Zong,* the defendant (critically, not the expert) was a former ambassador who was accused of a "forced labor conspiracy and visa fraud scheme, among other illegal activities."[51] So, *Zong* does not offer the precedent Defendants suggest. Defendants next cite (at 27 n.151) *Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya,*[52] wherein Ambassador Robert Oakley was qualified to testify on, *inter alia*, "Syria's sponsorship of the Abu Nidal organization."[53] Ambassador Oakley did not testify about any country where he was a diplomat, nor were the countries

---

[48] *Id* (emphasis added).
[49] *Id* (emphasis added).
[50] *United States v. Zong*, 16-CR-614 (DLI), 2018 WL 6186474, *6 (E.D.N.Y. Nov. 26, 2018).
[51] *Id.* Defendant argued that his participation in a forced labor scheme while an accredited diplomat and employee of a construction company, China Rilin, was "irrelevant to Defendant's charged participation in the alleged forced labor scheme as an employee of [the U.S. based subsidiary of China Rilin]." *Id.* The EDNY found that "the probative value of Defendant's conduct . . . is not outweighed by the danger of any potential prejudicial effect such evidence may have." *Id.* This has nothing to do with a proffered expert being a former diplomat and the case is not precedential here.
[52] 811 F. Supp. 2d 53, 56 n.5 (D.D.C. 2011).
[53] *Id.*

where he was assigned Defendants in the case. Here, Freeman's testimony would be unfairly prejudicial because he was stationed in Saudi Arabia and thus a jury may be improperly influenced by this fact, viewing him as more authoritative based simply on his title and place of station. This would unfairly prejudice Plaintiffs under Rule 403.

## WAMY PROFFERED EXPERT JONATHAN MARKS

### I.  Marks is Unqualified to Testify about Terror Financing

Marks is unqualified to testify about terror financing (or other material support) because he lacks experience or expertise in the areas of terrorist financing and terror organizations. Alleged experience in one area (*e.g.*, in fraud or money laundering), does not automatically qualify Marks for other purposes (*e.g.*, not for terror financing or terror organizations).[54]  The Court must ensure that Marks is testifying on issues that are within his area of expertise, otherwise his testimony becomes little more than improper advocacy.[55] For the subject matter of the testimony, "the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth."[56]  Here, Marks' opinions on terror financing are outside his expertise, unhelpful to the trier of fact, and risk confusing the trier of fact.

Defendants try to spin other accounting experience into terrorist financing experience,[57] but Marks himself acknowledges he has no experience investigating terrorist financing and no knowledge about terror

---

[54] *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014) ("An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.")

[55] *Id.* (citing *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004); *Haimdas v. Haimdas*, No. 09 Civ. 02034 (ENV) (MDG), 2010 WL 652823, at *2 (E.D.N.Y. Feb. 22, 2010).

[56] *Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Cv. 1253(BSJ)(HBP), 2010 WL 2674584, at *3 (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006)); *see also Pension Committee of the Univ. or Montreal Pension Plan v. Banc of America Securities, LLC*, 691 F. Supp. 2d 448, 459–60 & n. 58.

[57] To support their assertion that Marks has "experience in similar engagements" and "knowledge of established guidelines," Defendants cite (at 29, notes 163, 164) excerpts from Marks' report (Ex. 4) that offer nothing to support any experience regarding terror financing issues—*e.g.*, page 1 describes Marks' general accounting background, but nothing about experience regarding terror financing issues.

organizations.[58] Marks made clear that he was unfamiliar with specific attributes related to terror financing[59] and lacks the necessary experience to detect and note the subtle differences that make terror financing so difficult to detect.[60]

Defendants try to rehabilitate Marks' qualifications by arguing (at 28-29) that fraud examination is related to terror financing and that "[f]inancial investigations—whether terror related or not—involve expert analysis of the flow of funds, communications, and the existence of money laundering that leads to other illegal activities." This is not true; in fact, Marks' failure to recognize the distinction between the two is a critical flaw to his expertise. Put simply, terror financing requires an interdisciplinary expertise.[61] Terror financing and money laundering differ because funds for money laundering "are always of illicit origin, whereas in the case of terror financing, funds can stem from both legal and illicit sources."[62] Further, "[t]he primary goal of individuals or entities involved in the financing of terrorism is therefore not necessarily to conceal the sources of the money but to conceal both the funding activity and the nature of the funded activity."[63]

Defendants' insistence (at 30) that Marks is not testifying on such "broad issues" like "organization[s] that supported Al Qaeda" misses the point. Knowledge about organizational support for Al Qaeda cannot be parsed apart from Marks' conclusory opinion that WAMY did not fund Al Qaeda. Precisely because Marks, admittedly, has no expertise regarding organizational funding of Al Qaeda, he

---

[58] Ex. AD, Marks Dep. 41:9-18 (I have never been involved in an investigation that has led to anything related to terrorist financing, no, that's correct."); 41:19 to 42:17 (acknowledging that he never worked on any matter involving the possible funding of Al Qaeda, has no expertise pertaining to the history or funding of Al Qaeda; nor any expertise regarding any designated terrorist organizations

[59] Marks conceded he could not dispute Plaintiffs' experts on details about Al Qaeda. *See* Marks Dep. 137:6-138:2.

[60] Marks himself admitted "[he] ha[s] never been involved in an investigation that has led to anything related to terrorist financing." Ex. AD, Marks Dep. 41:9-18.

[61] The interdisciplinary nature of combatting terrorist financing is evident in FATF's Recommendations. FATF notes in its Recommendations that "some Recommendations…are unique to terrorist financing" and notes that combatting terrorist financing involves recommendations related to "criminalization," "targeted financial sanctions," and "measures to prevent the misuse of non-profit organizations." Ex. AI, FATF Recommendations at 8.

[62] International Monetary Fund, *Anti-Money Laundering/Combating the Financing of Terrorism - Topics* https://www.imf.org/external/np/leg/amlcft/eng/aml1.htm#:~:text=Terrorist%20financing%20involves%20the%20solicitation,both%20legal%20and%20illicit%20sources. (Last accessed February 17, 2022).

[63] *Id.*

has no experience on which to premise any opinion about what funding Al Qaeda looks like, how it is done, or what other methods have been employed by any organization—WAMY or otherwise—to fund Al Qaeda. Thus, Marks' admitted lack of experience in terror financing,[64] lack of expertise regarding Al Qaeda[65] and the funding of Al Qaeda[66] are disqualifying.[67]

## II.      Marks' Methodology is Deficient

Defendants' attempts to rehabilitate Marks' lack of methodological rigor fall short. First, Marks agreed that his report failed to describe a methodology.[68] Defendants cannot now, after-the-fact, invent a methodology based on documents relied on or cited in his report, specifically the Financial Action Task Force's *Best Practices Paper on Combatting the Abuse of Nonprofit Organizations* when Marks did not even appropriately review or apply FATF's guidelines.[69]

Marks and his team may have "pored over thousands" of WAMY documents but it is impossible to discern what Marks himself reviewed. He was provided regular updates and briefing from his staff and did not lay eyes on every document that WAMY claims he reviewed.[70] Several times during his deposition,

---

[64] Ex. AD, Marks Dep. 41:9-18.

[65] Ex. AD, Marks Dep. 41:19 – 42:27.

[66] *Id.*

[67] Defendants dispute that Marks was "guided," arguing (at 29-30) that his opinions were properly premised on review of documents by others and summarized to Marks. This overstates Marks' engagement in the review and the documents reviewed and understates WAMY counsel's role in directing the review. The record show Marks did not personally review the volume of documents referenced in his report; instead, lawyers for WAMY met with Marks' team who summarized documents. The record does not reflect any team members had any more expertise in terror financing and Marks cannot rely upon analysis done by team members in an area in which he, himself, is unqualified. *See Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 385-86 (S.D.N.Y. 2014) (experts cannot rely on assistants for matters beyond the expert's ken); *Dura Automotive Sys. Of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 615 (7th Cir. 2019) (same); *see also* Ex. AD, Marks Dep. 41:9-18 (stating he has never been involved in an investigation that has led to anything related to terrorist financing). It is impossible to determine Marks' contribution to his report where he was one of 12 individuals drafting the report, he billed no time toward the report for months, and he conceded that he began writing his opinions before he saw documents. Ex. AD, Marks Dep. 72:18-24. Moreover, while WAMY disputes that its counsel "guided" Marks, Marks' review was premised on summaries his team gave him, and the teams' summaries were done after consultation with WAMY counsel. Ex. AD, Marks Dep. 79:20 – 80:8.

[68] Ex. AD, Marks Dep. 97:14-18

[69] Marks admitted neither he nor his team developed a list of FATF recommended "red flags." Ex. AD, Marks Dep. 105:14-20.

[70] Regarding 14 audit reports for the WAMY Pakistan office covering 1994 – 2002 and three audit reports produced by WAMY in Arabic for the WAMY Eastern Province office, Marks did not personally review them (doesn't speak Arabic) but members of his team did. Ex. AD, Marks Dep. 200:9 – 201:7.

Marks referenced that he would have to "double check" regarding questions that were posed to him.[71] In fact, in at least one instance Marks did not even know who a member of his team was when questioned.[72] It is misleading for Defendants to continuously recite that Marks "and his team" looked at thousands of documents when it is clear that Marks reviewed work that was done by others, with whom he deferred to on critical information.[73]  Marks has never articulated any methodology and did not analyze the volume of documents WAMY claims he did.[74]

Lastly, Defendants' attempts to downplay Marks' disregard for red flag indicators do not rehabilitate, and in fact are irrelevant to, Marks' lack of methodology.

## III.   Marks' Testimony About Charity Work is Irrelevant

Despite conceding that Marks is unqualified to opine about charitable projects,[75] Defendants argue in a single conclusory non sequitur (at 31) that his testimony about charitable projects is relevant as "context" to show that the purported charitable projects were "reported and sufficiently supported" and therefore could not be linked to wrongdoing or terrorist activities. *First*, Marks' testimony for the sole sake of "context" suffers the same problem of over-contextualization as discussed regarding Benthall's and Freeman's testimony. *See supra* at 3, 8. *Second*, the statement is a non sequitur; the conclusion does not logically follow from the premise, and Defendants offer no other support.[76]

---

[71] Ex. AD, Marks Dep. 190:10 to 192:18.

[72] Ex. AD, Marks Dep. at 292:10-14.

[73] For example, regarding whether a not a letter from the assistant secretary general was a directive, Marks went off the record, then came back onto say that "my conversations…with my team in [Saudi Arabia] told me that because it came from the office of the assistant secretary general, that this does act like a directive." Exh. AD, Marks Dep. 262:8 to 263:18.

[74] Defendants' accusations that Plaintiffs "attempt to project onto Marks the failings from which their experts suffer" is stunning, considering, for example, WAMY's claim that Plaintiffs' counsel "guided" their experts' opinions on the CRA audit when counsel for WAMY have admitted to sending their own experts an excel sheet to "guide" WAMY's own experts in specifying which documents to review. *See* ECF No. 7608, Exhibit R.

[75] ECF No. 7346 at 4 ("Marks admits he was not tasked to determine whether refugee and orphan support programs have been used to disguise and conceal funding for terrorism, and that he is not qualified to do so") (citing Marks Dep. 161:3-24).

[76] Marks' conclusion (that the charity projects could not be related to terrorism) does not follow logically from his premise (that his team saw some reports showing the charity supporting projects). First, as the IMF explains, *supra* n. 62, terrorist finance differentiates from money laundering by concealing the destination of funds received via legitimate activity. Even if Marks' team saw money going to projects (suggesting an absence of money laundering), he did not see what all the money was used for (*i.e.*, did not negate terror financing). Moreover, failing to account for even 2% of funds sent for millions of dollars of projects is immensely problematic.

Most of Defendants' argument regarding the purported relevance of Marks' testimony about charitable projects (at 31) concerns Plaintiffs' experts' references to the Canada Revenue Agency ("CRA") audit of WAMY's Canadian office. Defendants say the CRA findings were "tax related issues," as if this is exculpatory. But, as stated in Plaintiffs' *Daubert* brief (ECF No. 7346 at 36, n. 186), the CRA Report uncovered documents and information linking WAMY's Canadian branch office and its Saudi headquarters to terrorism, including evidence of connections with Specially Designated Global Terrorist ("SDGT") Benevolence International Fund-Canada ("BIF-Canada") and SDGT Benevolence International Foundation in the United States. Marks' opinion on the nature of WAMY's actions in response to the CRA Report includes improper state of mind testimony as to why WAMY took certain actions regarding SDGT Adel Batterjee,[77] including why the Batterjee matter was referred to then-Prince Salman, about whom Marks apparently knows nothing.[78] In deposition, Marks resorted to his tired rebuttal that this subject is "not part of [his] scope"[79] despite opining that reporting to then-Prince Salman evinced "accountability."[80] Thus, in addition to excluding irrelevant charitable conduct testimony, Marks should also be precluded from offering improper state of mind testimony about WAMY's response and actions taken regarding the CRA Report.

Rather than argue the relevancy of their experts' testimony, Defendants instead argue against Plaintiffs' expert Winer's findings and discussing that WAMY did in fact conduct legitimate charitable work.[81] Marks' excessive discussion of WAMY's charitable practices is a distraction from the question at hand. As urged in Plaintiffs' *Daubert* brief, Plaintiffs have never claimed that WAMY has engaged in no charitable activity.[82] The issue is not whether any of the Defendants engaged in any charitable activity, but

---

[77] Ex. 4, Marks Report at 12, stating "…the relationship between WAMY and Batterjee was deteriorating due to Batterjee's progressive lack of reporting." Also at 12-13, stating "[a]n organization that was actively financing terrorism **would not** proactively remove an individual and bring to light any deception" (emphasis added).
[78] Ex. AD, Marks Dep. 174:13-15.
[79] Ex. AD, Marks Dep. 174:16-24.
[80] Ex. AD, Marks Dep. 175:7 – 176:5.
[81] Defs' Opposition Br. at 32-33.
[82] Pltfs' *Daubert* Br. at 29 ("Plaintiffs have never claimed WAMY was not engaged in charity.").

whether they aided, or otherwise supported, terrorism. Defendants argue against a strawman in proffering Marks to selectively cite that, of the documents he reviewed, "98.8% of the projects were supported by WAMY's financial documents."[83] If even 1% of WAMY's budget financed terrorism, it does not matter that the other 99% went to legitimate causes.

Finally, Defendants mischaracterize Plaintiffs' argument, saying Marks need not have "examine[d] every other organization in the world to establish that WAMY did not fund terrorism."[84] Marks is unqualified to opine whether refugee and orphan support programs were used to fund terrorism because Marks never worked on an investigation of alleged material support of terrorism by a charity.[85] Defendants misleadingly cite Marks' testimony to argue (at 33) that he was "tasked to determine if WAMY's refugee and orphan programs funding was used to support terror activities" and "found they were not." *First*, Marks agreed that the issue of whether refugee and orphan support programs were used for terrorism funding is not within his expertise.[86] *Second*, while Marks' report (ECF No. 7604-17 at 10, Ex. AQ at 9-10), states that numerous audits (not specific to any program), found nothing "highlight[ing] any concerns," and that sometimes WAMY took action "not typical for an organization hiding something," neither of the quotes on which WAMY relies refutes Marks' own testimony. Whether refugee and orphan support programs were used to conceal terrorism funding is not within his expertise.[87] For the foregoing reasons, Marks' opinions about refugee and orphan support programs should be excluded.

## IV.   Marks' Opinions About WAMY's General Control Awareness are Unreliable

Defendants argue Plaintiffs overstate Marks' reliance on a two-page letter he relied on as an example of a greater "control consciousness."[88] Plaintiffs' *Daubert* brief (ECF No. 7346 at 38) is clear that

---

[83] Defs' Opposition Br. at 33.
[84] *Id.*
[85] Ex. AD, Marks Dep. 41:9-18.
[86] Ex. AD, Marks Dep. 160:24 to 161:24.
[87] *Id.*
[88] Defendants' Br. at 35. To support their argument, Defendants cite a passage from Marks' report (ECF No. 7604-17, Ex. AQ at 10) where Marks writes "By beginning to institute more strict and centralized controls in 1997, WAMY became

Marks' speculative conclusions about this letter, and WAMY's IT system in general, were overreaching. Marks illustrated this by repeatedly referring to the "implementation" of a robust IT system.[89] Marks conceded that he did not know whether this IT system was implemented,[90] but he talks around the fact by suggesting that merely proposing the idea of an IT system is itself a control.[91]

Ultimately, Defendants retreat to argue (at 35) that Marks' mandate was simply to address "whether evidence of controls exists, not whether documents exist to memorialize each control." That is, the simple fact that someone at WAMY raised a notion of implementing controls is sufficient to clear it of wrongdoing. Defendants argue (at 36) that Marks opines that WAMY's control "consciousness" is enough to deem it "not the work of a 'terror-financing organization.'" But, because Marks has never conducted a terror financing investigation[92] and has no expertise regarding terror financing, he is unqualified to opine what is (or is not) the work of a terror financing organization.

## V.    Marks Improperly Opines as to WAMY's State of Mind

Defendants argue (at 37) that Marks' opinion that WAMY's dismissal[93] of Adel Batterjee evinces "WAMY's commitment to controls" and a "practice inconsistent with a charitable organization that launders money to support terrorist groups." WAMY does not respond to Plaintiffs' position that Marks overextends his conclusion that WAMY would remove "anyone" it considered to be a bad actor, and that "[a]n organization that was actively fighting terrorism **would not** proactively remove an individual and bring to light any deception."[94] These opinions on what WAMY *would* do are opinions as to motive and

---

a more transparent and better recordkeeping organization that is not in-line with organizations that supported Al Qaeda. WAMY strived to achieve for best practices when it demanded that its local offices report and be accountable for spending, which is not typical for an organization 'hiding' something." But Marks offers no additional illustrative example of the so-called greater "overall control consciousness."

[89] *See, e.g.*, Ex. AD, Marks Dep. 114:11 to 115:15 (agreeing that, in his report, he cites to WAMYSA082520-21 (the 2-page letter) in support of his opinion that in 1997 WAMY recognized a need to improve its internal controls); 118:12-17; 123:6-20; 129:22 to 130:5; 132:20 to 133:14; Ex. 4, Marks Report at 8, 17 (citing WAMYSA 082521).

[90] Ex. AD, Marks Dep. at 123:6-12.

[91] Ex. AD, Dep. 131:8-12. ("that they talk about continuously enhancing their control environment is a control all in itself.").

[92] Ex. AD, Marks Dep. 41:9-18

[93] Whether Batterjee was dismissed remains a disputed issue.

[94] ECF No. 7346 at 55 (quoting Defendants' Ex. 4, Marks Report 12-13) (emphasis added).

state of mind, and thus should be excluded. In addition, Marks' opinions specific to WAMY's rationale for dismissing Batterjee are impermissible state of mind testimony that would allow Marks to testify from the witness stand as to what WAMY did and why WAMY did it.[95]

## MWL/IIRO PROFFERED EXPERT JOHN SIDEL

### I.        Sidel is Not Qualified to Offer His Expert Opinions

Defendants concede (at 45) that Sidel is not an expert in the following areas: Al Qaeda or its history, terrorist financing, the role of charitable organizations in facilitating the funding of terrorism, the operational requirements of sophisticated terrorist attacks, or Al Qaeda's global strategy. Defendants suggest that these matters are not central to this case when they are a focal point for the facts at issue. Sidel's experience in Southeast Asia does not adequately intersect with matters central to this case and Defendants ignore this critical point by seeking to qualify him on irrelevant matters.

Despite Sidel's own admissions to his lack of qualifications on Al Qaeda, Defendants try (at 46) to imbue Sidel with expertise based on his "readings." They expose Sidel's lack of experience on the subject matter when referring (at 47) to the 9/11 Commission Report as "peripheral to his sphere of expertise." The 9/11 Commission Report only covers topics that aid in understanding the September 11th Attacks. That the Bojinka Plot is discussed for "only two substantive paragraphs" establishes the irrelevancy of Sidel's excessive contextualization. Defendants' attempts to steer the discussion to topics "peripheral" to the litigation (*i.e.*, areas where Sidel has some experience) fail.

Defendants are wrong to characterize Sidel as having "ably" answered questions about the 9/11 Commission Report.[96] Expressing a general measure of "doubt" to documents with no further analysis or

---

[95] "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 547 (S.D.N.Y.2004).

[96] E.g., Sidel does not know who Jamal al-Fadl is or that he was described as an Al Qaeda financial chief in the early 1990s in Sudan. Ex. AC, Sidel Dep. 88:7 – 89:6. About testimony from al-Fadl that Al Qaeda provided seed money to Abu Sayyaf, Sidel responds "I don't know the context of that kind of evidence being produced or, you know, what period it refers to or – it's very, very vague." Ex. AC, Sidel Dep. 89:7-17. He did not review al-Fadl's testimony to the 9/11 Commission for report. Ex. AC, Sidel Dep. 89:19 – 90:4.

elaboration is not akin to "ably" answering questions.[97] In his deposition, Sidel was easily confused and unfamiliar with an advance man for Al Qaeda who operated in Southeast Asia, Wali Khan Amin Shah.[98] Defendants claim that Sidel's opinion that knowledge of Wali Khan is "peripheral" to the Southeast Asia groups, but Wali Khan is a central tie between Al Qaeda and the Bojinka Plot.[99] Sidel touts his expertise on the Philippines in the "80s and 90s" but has no information on Abdurajak Janjalani's apparent relationship with Ramzi Yousef.[100] Defendants state that it is Sidel's opinions that these critical facts are mere conjecture, yet Sidel avoids confrontation with these facts with his own conjecture that Khalid Sheikh Mohamed, Ramzi Yousef, and Wali Khan Amin Shah are "independent" and "not reliant on a broader support network."[101] Sidel sums up his expertise on Al Qaeda affiliates in Southeast Asia when he states he "did not do [his] homework."[102] These statements are reflective of Sidel's lack of expertise on the topics before the Court.

## II.     Sidel's Opinions Do Not Provide Relevant "Background" or "Contextualization"

Defendants take a broad reading to the facts and pleadings to dilute relevant subjects with over-contextualization and tertiary information. They argue (at 40-41) that Plaintiffs' "fundamental misunderstandings of the Southeast Asia Groups" necessitate expansive expert testimony about those groups. A primary point of the case against MWL/IIRO concerns their support for Al Qaeda, and the Southeast Asia Groups are relevant to that point only to the extent that they played a role in MWL/IIRO's

---

[97] Sidel has "no specific information" to contradict that AQ operatives helped in the training of Abu Sayyaf at Abu Sayyaf training camps in 1995 Ex. AC, Sidel Dep. 98:14-24 but (after lengthy off-topic explanation) also states "I just can't help but express my doubts on the basis of what I know through experience, personal experience, as well as otherwise in the Philippines." Ex. AC, Sidel Dep. 101:22 – 102:2. Again, regarding Jemaah Islamiyah's casing activities, providing suicide operatives, and bomb-making materials for Al Qaeda, as described by the 9/11 Report, Sidel can only offer general disagreement not based on facts or evidence, stating "I find it hard to accept this picture" Ex. AC, Sidel Dep. 169:16 – 174:20.

[98] Ex. AC, Sidel Dep. 109:1 – 110:12.

[99] Defs' Opp. Br. at 48.

[100] This relationship is reported to have occurred in Basilan in 1991, yet has no information on the possibility that Ramzi Yousef was in Basilan in 1991 with Janjalani. Ex. AC, Sidel Dep. 107:24 – 108:4.

[101] Sidel believes the activities of KSM, Yousef, and Wali Khan Amin Shah were "independent" and "not reliant on a broader support network." Ex. AC, Sidel Dep. 128:7-22.

[102] Ex. AC, Sidel Dep. 110:13 – 111:10.

support of Al Qaeda. Excessive testimony about "historical and political context" beginning with a discussion on the 16th century Spanish conquest of the Philippine archipelago is irrelevant.[103] Defendants claim this is necessary "context," but Sidel does not even mention Al Qaeda substantively (*i.e.* outside of his summary opinions) until page 17 of his report (and only in a footnote), and even then he takes a brief reprieve until substantive discussion of Al Qaeda begins on page 25.[104] In the words of a SDNY case Defendants cite, "[t]hat's a lot of 'context.'"[105]

An examination of Defendants' arguments elucidates their experts' inability to focus on the nexus of the factual issues. Defendants (at 42) assert that "[e]xperts may lay the factual foundation for their opinions" and argue that Sidel's discussion of the "history and emergence of the Southeast Asia Groups and the *known* links between them and Al Qaeda as well as the Bojinka plot masterminds, will assist the trier of fact to navigate this complex geopolitical milieu. . .." But Sidel does not discuss the known links between the Southeast Asia Groups and Al Qaeda. Instead, he uses non-committal language when pressed to discuss facts that would aid a factfinder to determine whether MWL/IIRO supported Al Qaeda. For example, he says Janjalani is "reportedly" the founder of Abu Sayyaf, then says this has been "repeated so many times with so little solid evidentiary basis" before conceding he's "never seen anything to the contrary."[106] About Mohamed Jamal Khalifa's meeting with Janjalani's staff to transfer money to bomb a church in Jolo, he circuitously stated "I have specific information that would lead me to be suspicious of…taking this kind of account at face value…," but also he "do[es] not have any specific information of what was going on in Basilan in December of 1991."[107] He has "no specific information" to contradict

---

[103] Ex. 5, Sidel Report ¶ 36. Sidel's Affirmative Opinion begins at paragraph 35, page 8, of his report.

[104] Ex. 5, Sidel Report ¶ 63, n. 20; Sidel Report ¶ 87

[105] *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 653 (S.D.N.Y. 2007). Defendants neglect to discuss that the SDNY explicitly analyzed that Plaintiff's expert in this case provided too much "background" and "context" in their report. The Court found that the expert's (Anson) "broad statements go far beyond what would be necessary [to reach his conclusion]" and that "five pages" of his twelve-page report "is essentially unsupported assertions about the factual or legal merit" of plaintiff's claims. The SDNY concluded "That is a lot of 'context'."

[106] Ex. AC, Sidel Dep. 76:3-20; 78:6-8.

[107] Ex. AC, Sidel Dep. 96:8-14.

that Al Qaeda operatives helped to train Abu Sayyaf but still expresses general "doubts on the basis of what [he] knows through experience."[108] Asked if IIRO employee Mohamed Jamal Khalifa "had established other charities and businesses for purposes of supporting terrorist operations," he responds "I believe…*some* of that [is] in *some* of the reports I've been shown."[109] About Wali Khan Amin Shah's activities in the Philippines, Sidel says ambiguously that it "doesn't fit within his understandings of Al Qaeda's development and goals" despite his concession that he knows nothing about Shah and is not an expert on Al Qaeda.[110]

Sidel's language becomes authoritative only when he begins to parrot the irrelevant talking points Defendants have continuously pushed as exculpatory "evidence."[111] Context is helpful to set groundwork to understand a topic, but it is not evidence to make a fact more or less likely when relied on as much Sidel does. Presented with facts and evidence an expert should analyze and fluently discuss, Sidel balks[112] and resorts to irrelevant discussions of groups with no bearing on Al Qaeda or MWL/IIRO, declaring, based on "context," that the Groups' goals and intents, were "localized."[113]

Defendants try to spin Sidel's lack of basic knowledge of the United States government's

---

[108] Ex. AC, Sidel Dep. 101:22 – 102:2.

[109] Ex. AC, Sidel Dep. 137:6-10 (emphasis added); He is aware of the "**story**" that Mohamad Jamal Khalifa, while with the IIRO, "**supposedly** provided money to the early version of Abu Sayyaf" Ex. AC, 29:15 – 30:3 (emphasis added). With regard to Al Qaeda and bin Laden's support of local conflicts in the Muslim world, Sidel agrees but still attempts to downplay this fact, stating that there is "evidence to suggest some support and interest in some conflicts and parts of the world" but "not a kind of consistent or particularly powerful thrust of activity." Ex. AC, Sidel Dep. 50:9-18.

[110] Ex. AC, Sidel Dep. 33:22-24, stating he is not an expert in Al Qaeda; Ex. AC, Sidel Dep. 110:13-111:10, referring to Wali Khan Amin Shah and that he "did not do [his] homework on who this guy was."

[111] "Jemaah Islamiyah was focused on local activities and agendas until after 1991." Ex. AC, Sidel Dep. 158:7-12. Sidel does not believe that JI was engaged in collaborative efforts with AQ before 9/11, stating "there were contacts between individuals associated with these networks. But there was not a coordinated strategy that involved some kind of alliance between these two organizations" (*id.* 159:19 – 160:6). His statements that the activities of Khalid Sheik Mohammed, Yousef, and Wali Khan Amin Shah were "independent" and "not reliant on a broader support network," Ex. AC, Sidel Dep. 128:7-22, are unsupported, naïve, and contradicted by the evidence. *See* Ex. AC, Sidel Dep. at 129: 7 to 133:11.

[112] Offering no analysis, Sidel expresses generalized doubt when presented with evidence. *See, e.g.,* Ex. AC, Sidel Dep. 85:19 – 87:21 (discussing a diplomatic cable Sidel doubts because it does not have "fact-checkers like … the New Yorker Magazine….").

[113] Another example is Sidel's response to the 9/11 Report stating that "al-Qaeda's success in fostering terrorism in Southeast Asia stems largely from its close relationship with Jemaah Islamiyah," Sidel, without any evidence or analysis, responds that this is "quite odd to me and implausible" Ex. AC, Sidel Dep. 161:10 – 162:6.

designation of IIRO offices as a positive trait.[114] Despite his total unfamiliarity with the Treasury Department's evidentiary memorandum, Sidel questions the credibility of the statement supporting the government's designation.[115] This evinces that Sidel is not prepared to, and cannot, opine as to the relevant facts and evidence beyond expressing a general doubt that requires no intellectual rigor. Defendants, trying to salvage the relevancy of Sidel's expertise, quote Sidel stating that he was "in a position before and during this case to look at evidence of al-Qaeda's presence and activities and allegations thereof in Southeast Asia."[116] Sidel's lack of knowledge of renowned Al Qaeda-affiliates in the region unmasks his lack of familiarity, undercutting his testimony's relevance.

### III.    Sidel Improperly Offers State of Mind Testimony

Defendants argue (at 50) that Sidel's statements that the Southeast Asia Groups were "local" and not "'global' or 'jihadi' in orientation or impact" is "based on factual evidence detailing the localized nature" of their activities. Plaintiffs do not dispute that Sidel has given examples of local crimes committed by the Southeast Asia Groups. What Plaintiffs dispute is Sidel's inference of a "localized" mindset. This inference is improper as state of mind testimony. But Defendants (at 50) are also incorrect that there is a "lack of evidence showing otherwise." There is evidence of interaction between the Southeast Asia Groups and individuals engaged in global *jihad*.[117] Similarly, Sidel's testimony that individuals' claims to participation in the Afghan jihad is "more limited than they would subsequently like to let on" is clearly an opinion on the intent of individuals and is based on nothing more than his *ipse dixit* and is thus, also, excludable.

#### CONCLUSION

For the foregoing reasons, Defendants' proffered experts Benthall, Freeman, Marks, and Sidel should be excluded.

---

114 Defs' Opp. Br. at 43-44.
115 Ex. AC, Sidel Dep. 85:5-8.
116 Defs' Opp. Br. at 44 quoting Sidel Dep. 142:15-19.

Dated:  February 18, 2022          Respectfully submitted,

MOTLEY RICE LLC                    COZEN O'CONNOR

By:  /s/ Robert T. Haefele        By:  /s/ Sean P. Carter
ROBERT T. HAEFELE                  SEAN P. CARTER
JODI WESTBROOK FLOWERS             SCOTT TARBUTTON
DONALD MIGLIORI                    COZEN O'CONNOR
C. ROSS HEYL                       One Liberty Place
MOTLEY RICE LLC                    1650 Market Street, Suite 2800
28 Bridgeside Boulevard            Philadelphia, Pennsylvania 19103
Mount Pleasant, SC 29465           Tel.: (215) 665-2105
Tel.: (843) 216-9184               Email: scarter@cozen.com
Email: rhaefele@motleyrice.com     For the Plaintiffs' Exec. Committees
For the Plaintiffs' Exec. Committees


KREINDLER & KREINDLER LLP

By: /s/ Andrew J. Maloney
JAMES P. KREINDLER
ANDREW J. MALONEY, III
KREINDLER & KREINDLER LLP
750 Third Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: amaloney@kreindler.com
For the Plaintiffs' Exec. Committees

**Certificate of Service**

I hereby certify that, on February 18, 2022, I caused an electronic copy of Plaintiffs' Reply Memorandum of Law In Further Support Of Plaintiffs' *Daubert* Motion To Exclude The Proposed Testimony Of Defendants' Proposed Experts, Jonathan Benthall, Charles ("Chas.") W. Freeman, Jonathan Marks, And John Sidel and all accompanying papers to be served electronically by the Court's Electronic Case Filing (ECF) System. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

/s/_____
Robert T. Haefele