UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |
| ESTATE OF ALICE HOGLAN, BY ITS PERSONAL REPRESENTATIVE CANDYCE S. HOGLAN, ET AL.,<br><br>  Plaintiffs-Judgment Creditors,<br><br>v.<br><br>OAKTREE CAPITAL MANAGEMENT, LP; FLEETSCAPE CAPITAL HOLDINGS LIMITED; AND FLEETSCAPE SUEZ RAJAN LLC;<br><br>  Garnishees. | Case No. 11-cv-7550 (GBD)(SN) |

**MEMORANDUM OF LAW IN SUPPORT OF THE HOGLAN CREDITORS' MOTION FOR TURNOVER OF ASSETS FROM GARNISHEES OAKTREE CAPITAL MANAGEMENT, LP, FLEETSCAPE CAPITAL HOLDINGS LIMITED, AND FLEETSCAPE SUEZ RAJAN LLC**

## **TABLE OF CONTENTS**

I. Background ..................................................................................................................2

    A. The Hoglan Creditors' Judgment Against Iran.......................................................2

    B. The Assets Sought by the Hoglan Creditors ...........................................................3

    C. The Garnishees and Their Control Over the Suez Rajan ........................................3

    D. Procedural Background ............................................................................................5

II. Discussion ....................................................................................................................5

    A. TRIA Makes the Iranian Oil Subject to Attachment and Execution .......................6

    B. The Hoglan Creditors Satisfy N.Y. C.P.L.R. Section 5225(b) ................................8

    C. Conclusion ..............................................................................................................12

Judgment Creditors Estate of Alice Hoglan et al. (the "Hoglan Creditors"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their Motion for Turnover of Assets from Garnishees Oaktree Capital Management, LP, Fleetscape Capital Holdings Limited, and Fleetscape Suez Rajan, LLC (collectively, "Oaktree" or "the Garnishees").

This motion concerns a cargo of Iranian crude oil under the control of U.S. persons who must be compelled to turn over that oil to the Hoglan Creditors, who are family members and legal representatives of victims of the September 11 terrorist attacks. The Hoglan Creditors are owed more than three billion dollars in compensatory damages by Iran and certain of its instrumentalities for their provision of material support to al Qaeda in connection with the attacks. Among the judgment debtors are the National Iranian Oil Company ("NIOC") and the National Iranian Tanker Corporation, U.S.-sanctioned entities responsible for the Iranian government's export and transportation of crude oil. The Hoglan Creditors are seeking to collect on this judgment, and they are entitled to do so under the law—in particular the Terrorism Risk Insurance Act of 2002 ("TRIA").

As many as one million barrels of Iranian-owned crude oil have now come aboard a vessel subject to the control of the Garnishees. Oaktree owns and ultimately controls the Suez Rajan (IMO: 9524475), the tanker vessel that is transporting the crude oil in violation of U.S. sanctions. According to recent public reports, that vessel currently holds Iranian crude oil originating from the oil facility at Kharg Island, an Iranian port used to transport its crude oil into the international market. These public reports suggest that the crude oil aboard the Suez Rajan may have been illicitly procured in a ship-to-ship transfer. According to the reports, the Suez Rajan acquired the Iranian crude oil shortly after the oil left Kharg Island. *See* Declaration of Douglass A. Mitchell ("Decl."), ¶ 2, Ex. 1.

On February 17, 2022, the Hoglan Creditors served a letter and restraining notice on Oaktree. Decl., ¶ 3, Ex. 2. The Hoglan Creditors received no response. But since at least that time, according to publicly available information, the Suez Rajan has stayed largely in the same location and is idling in waters in Southeast Asia. *See* Decl. ¶ 22, Ex. 26. According to public reports, the Garnishees are investigating the matter and cooperating with authorities. *See* Decl. ¶ 7, Ex. 6.

As the property of the Iranian judgment debtors, this crude oil is now subject to attachment by the Hoglan Creditors, who accordingly move, pursuant to TRIA, Fed. R. Civ. P. 69(a), and N.Y. C.P.L.R. § 5225(b), for an order compelling the Garnishees to turn over the oil or the proceeds from its sale.

**I.     Background**

    **A.     The Hoglan Creditors' Judgment Against Iran**

On February 26, 2018, this Court entered final judgment for the Hoglan Creditors in the amount of $3,610,326,671 against, among others, the Islamic Republic of Iran and a number of Iran's political and military subdivisions, agencies, and instrumentalities, including NIOC.[1] *See* Dkt. 240-1. The basis for the judgment was Iran's provision of material support to al Qaeda and its sponsorship of the 9/11 terrorist attacks. *See* Dkt. 111. The judgments accordingly comported with 28 U.S.C. § 1605A, the provision of the Foreign Sovereign Immunities Act "which abrogates immunity for those foreign states officially designated as state sponsors of terrorism by the Department of State where the foreign state commits a terrorist act or provides material support

---

[1] The $3.6 billion sum includes pre-judgment interest at the rate of 4.96% per year awarded on the pain-and-suffering and solatium portions of the compensatory damages (collectively, $1,372,375,000) from September 11, 2001 through February 26, 2018, in the amount of $1,673,843,608 plus post-judgment interest on the total sum of compensatory damages from February 26, 2018 through the date of this motion in the amount of $94,643,028, of which $3,458,640,585.46 remains uncollected, due, and unpaid. *See* Dkt. 240-1; Decl. ¶ 3, Ex. 2.

for the commission of a terrorist act and the act results in the death or personal injury of a U.S. citizen." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48 (2d Cir. 2010). As a designated state sponsor of terrorism, Iran is also a "terrorist party" within the meaning of TRIA. *Id*.

Among the judgment debtors directly liable to the Hoglan Creditors is the National Iranian Oil Corporation. Overseen by Iran's Ministry of Petroleum, NIOC is owned, controlled, and managed by the Government of Iran, *see* Dkt. 111 at 10, and according to the U.S. Treasury Department is "responsible for the exploration, production, refining, and export of oil and petroleum products in Iran." *See* Decl. ¶ 4, Ex. 3. NIOC is subject to U.S. sanctions for its provision of financial support to Iran's Islamic Revolutionary Guard Corps Qods Force. *Id*. As such, "[a]ll property and interests in property of [NIOC] subject to U.S. jurisdiction are blocked." *Id*. The blocked property of terrorist parties, including the agencies and instrumentalities of terrorist parties, is subject to execution under TRIA "to the extent of any compensatory damages." TRIA § 201(a).

B.     **The Assets Sought by the Hoglan Creditors**

The Iranian crude oil that is currently aboard the Suez Rajan appears to be owned by NIOC or a front company under NIOC's control. According to public reports, the oil was transferred to the Suez Rajan in an illegal ship-to-ship transfer on February 13, 2022, from a crude oil tanker, Virgo (IMO: 9236250). *See* Decl., ¶ 2, Ex. 1. The Virgo, in turn, obtained the crude oil on January 22, 2022, from Kharg Island, *id.*, which is an Iranian port and oil facility that plays a key role in the export of Iranian oil. *See* Decl., ¶ 5, Ex. 4. Oil from Kharg Island is Iranian oil that is sold and distributed by NIOC. *See* Decl., ¶ 6, Ex. 5 & ¶ 7, Ex. 6. (stating that the oil is "Iranian oil").

C.     **The Garnishees and Their Control Over the Suez Rajan**

Oaktree Capital Management LP is a U.S.-based public global investment management

3

firm. *See* Decl., ¶ 8, Ex. 7. In 2017, Oaktree drew on funds that it manages to establish a new capital provider for the global maritime industry known as Fleetscape Capital Holdings Limited. *See* Decl., ¶ 9, Ex. 8. According to public sources, from the outset, there was (and remains to this day) almost complete overlap between Oaktree and the leadership of its maritime alter ego; today, for instance, five of Fleetscape Capital Holdings Limited's six employees appear to work at Oaktree concurrently. *See* Decl., ¶ 11, Exs. 10-15 (LinkedIn pages of Fleetscape employees). Fleetscape Capital Holdings Limited was led at its establishment by Tobias Backer, who had joined Oaktree the previous year. *See* Decl., ¶ 9, Ex. 8. Guillaume Bayol, who joined Oaktree in 2008 and today is a managing director of Fleetscape, was identified at the time of Fleetscape's creation as a senior vice president at Oaktree. *See id.*; *see also* Decl., ¶ 10, Ex. 9 (Fleetscape website's "team" page). "By combining Oaktree's history of investing in the maritime space and our experience in structuring tailor-made transactions," Bayol said in 2017, "we believe that Fleetscape will be a leading creative, flexible and innovative investment partner for the shipping and offshore industries for the long-term." *See* Decl., ¶ 9, Ex. 8. Fleetscape Capital Holdings Limited was set up to be run from offices in London, Frankfurt, and New York, *see* Decl., ¶ 12, Ex. 16 (Fleetscape's LinkedIn page), cities where Oaktree also has offices. *See* Decl., ¶ 14, Ex. 18. Today, all six of Fleetscape's publicly listed employees have significant ties to Oaktree. *See* Decl., ¶ 11, Exs. 10-15.

      According to public reports, the Garnishees are the ultimate owners and financial backers of the Suez Rajan. *See* Decl., ¶ 2, Ex. 1. IHS Maritime lists Oaktree Capital Management LP as the group owner of the Suez Rajan, and "Fleetscape Suez Rajan LLC"—apparently a special purpose vehicle set up in the United States to own and finance the vessel—as its registered owner. *See id.*; *see also* Decl., ¶ 20, Ex. 24. The authoritative Lloyd's List directory lists

4

Fleetscape Capital Holdings Limited with an address on Park Avenue in Manhattan, and a phone number with a New York area code. *See* Decl., ¶ 17, Ex. 22. Press reports have described Fleetscape Capital Holdings Limited, meanwhile, as the owner and financer of the Suez Rajan. *See* Decl., ¶ 13, Ex. 17 & ¶ 7, Ex. 6. These records demonstrate Oaktree's ultimate control over the Suez Rajan, and a clear nexus between Oaktree's maritime business (including the operation of the Suez Rajan) and New York.

### D. Procedural Background

Pursuant to Fed. R. Civ. P. 69(a) and N.Y. C.P.L.R. § 5222(b), on February 17, 2022, the Hoglan Creditors served Oaktree Capital Management, LP with restraining notices which forbid it from selling, assigning, or interfering with the Iranian crude oil that is currently in its custody. *See* Decl., ¶ 3, Ex. 2. (Similar notices were sent on February 25, 2022 to the Fleetscape entities.) Since February 17, 2022, the Suez Rajan has remained stalled in the same geographic vicinity, presumably because of the restraining notices and other public disclosures. *See* Decl. ¶ 22, Ex. 26. On February 24, 2022, the Hoglan Creditors obtained a writ of execution from this Court. The Hoglan Creditors are now seeking to enforce their judgments by way of an order compelling the Garnishees to turn over to them the Iranian crude oil aboard the Suez Rajan or the proceeds from its sale.

## II. Discussion

The Hoglan Creditors are entitled to attach the crude oil or its proceeds in partial satisfaction of their judgments. The oil is attachable under the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (2002), reprinted in relevant part at 28 U.S.C. § 1610 note ("TRIA"), because it is a blocked asset of a state sponsor of terrorism. Because the Iranian oil is subject to attachment under TRIA, the Hoglan Creditors can readily satisfy the procedures for obtaining a turnover order pursuant to Fed. R. Civ. P. 69(a)(1) and Section 5225(b) of the N.Y.

C.P.L.R., which together govern the enforcement of federal writs of execution in New York.

### A.     TRIA Makes the Iranian Oil Subject to Attachment and Execution

Plaintiffs are entitled to attach NIOC's oil under TRIA, which provides that "[n]otwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment." TRIA § 201(a). For purposes of TRIA, a state sponsor of terrorism is a "terrorist party." *Id*. § 201(d)(4). Congress enacted TRIA to allow victims of state-sponsored terrorism to execute upon blocked assets—just like the crude oil at issue here—in order to satisfy precisely the types of judgments that the Hoglan Creditors hold against Iran. TRIA permits attachment of blocked assets of a terrorist party to satisfy an award of compensatory damages even when such attachment might otherwise run up against the sovereign immunity protections afforded by the FSIA. *See Weininger v. Castro*, 462 F. Supp. 2d 457, 488 (S.D.N.Y. 2006); *see also Weinstein*, 609 F.3d at 53 ("notwithstanding" clause superseded U.S. treaty obligations with Japan); *see also Hill v. Republic of Iraq,* No. 99-CV-3346, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (holding that the "notwithstanding provision" is "unambiguous and effectively supersedes all previous laws") (citation omitted).

To attach the oil aboard the Suez Rajan under TRIA, the Hoglan Creditors must establish that they possess (1) a "judgment against a terrorist party"; that (2) arises from an act of terrorism; and that they are (3) seeking to execute against "blocked assets" of that terrorist party or an agency or instrumentality of that terrorist party. *See Weininger*, 462 F. Supp. 2d at 479. The Hoglan Creditors easily satisfy this test.

First, they have a judgment against a terrorist party: Iran. TRIA defines "terrorist party" to include "a foreign state designated as a state sponsor of terrorism." *Id*. § 201(d)(4). Iran has been designated a terrorist party pursuant to section 6(j) of the Export Administration Act of 1979 and therefore is a "terrorist party" under TRIA. *Weinstein*, 609 F.3d at 48.

Second, the judgment is unquestionably "on a claim based upon an act of terrorism," *i.e.*, the September 11 attacks. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 982 F. Supp. 2d 830 (N.D. Ill. 2013) (undisputed that September 11 attacks were an act of terrorism), *vacated and remanded on other grounds,* 783 F.3d 607 (7th Cir. 2015); *see also* 8 U.S.C. § 1182(a)(3)(B)(iii) (cross-referenced in TRIA § 201(d)(1) and defining "terrorist activity" as "[t]he highjacking or sabotage of any conveyance"; "[a] violent attack upon an internationally protected person"; and/or "[t]he use of any … explosive, firearm, or other weapon or dangerous device … with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property").

Third, the oil aboard the Suez Rajan is a blocked asset of NIOC, which is indisputably an agency or instrumentality of Iran under TRIA. According to the U.S. Treasury Department, NIOC is "owned or controlled by the Government of Iran," *see* Decl., ¶ 21, Ex. 25, which under Second Circuit precedent qualifies it as an agency or instrumentality. *See Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 135 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) (an entity that is "owned, controlled, or directed by [a] terrorist party" is an agency or instrumentality of that party under TRIA). The oil is blocked because all "property and interests in property of [NIOC] subject to U.S. jurisdiction are blocked." *See* Decl., ¶ 4, Ex. 3. Because U.S. persons control such property and interests in property, they are unquestionably subject to U.S. jurisdiction. The Hoglan Creditors therefore can attach the

property of the judgment debtors in the possession of the Garnishees to the extent of their compensatory damages.[2]

### B. The Hoglan Creditors Satisfy N.Y. C.P.L.R. Section 5225(b)

Finally, the Hoglan Creditors satisfy the procedural requirements governing the enforcement of writs of execution in New York state. Federal Rule of Civil Procedure 69(a)(1) provides that proceedings on execution "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." In New York, C.P.L.R. §5225(b) provides the relevant procedure for enforcement of a judgment "against a third party who 'is in possession or custody of money or other personal property' in which the judgment debtor has an interest." *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir.

---

[2] The Hoglan Creditors note that Judge Oetken recently applied the presumption against the extraterritorial application of U.S. laws to hold that TRIA does not permit the attachment of assets located outside of the United States. *See Levin v. Bank of New York*, No. 09-CV-5900 (JPO), 2022 WL 523901, at *3 (S.D.N.Y. Feb. 21, 2022). This Court is not, of course, bound by *Levin*. *See Camreta v. Greene*, 563 U.S. 692, 709 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."). Respectfully, for a number of reasons, the Hoglan Creditors submit that *Levin* is not persuasive, and in any event, in this case, Garnishees should not be permitted to deliberately permit the Suez Rajan, which they control, to remain in international waters in an effort to divest this Court of jurisdiction since such a result would make a mockery of the remedies the Congress afforded to terrorism victims by enacting TRIA. The Hoglan Creditors observe that TRIA contains no express prohibition on the attachment of extraterritorial property, and when its conditions are satisfied, it authorizes attachment "notwithstanding any other provision of law," including the immunity provisions of the FSIA. *Weininger*, 462 F. Supp. 2d at 488. Moreover, Fed. R. Civ. P. 69(a) provides that proceedings to enforce a judgment are governed by the law of the forum state where the proceedings take place, unless a contrary federal statute applies. In this case, the law of New York plainly allows for enforcement proceedings against extraterritorial property, so long as the court possesses personal jurisdiction over the garnishee. *See Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 540 (2009). In holding that TRIA—which is silent on the question of extraterritorial attachment—would preempt article 52 of the N.Y. C.P.L.R., *Levin* disregarded the principle that "the Supreme Court's preemption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as pre-empting state law." *U.S. Smokeless Tobacco Mfg. Co., LLC v. City of New York*, 703 F. Supp. 2d 329, 336 (S.D.N.Y. 2010) (citation omitted). The presence of the oil under the control of U.S. persons outside the United States is thus no obstacle to attachment under TRIA.

2018).[3] A court acting pursuant to Section 5225 may order a garnishee to turn over property located outside of New York, so long as it has personal jurisdiction over the garnishee. *See Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 540 (2009); *Shaheen Sports, Inc. v. Asia Ins. Co.*, No. 11-CV-920 LAP, 2012 WL 919664, at *3 (S.D.N.Y. Mar. 14, 2012).

Section 5225(b) "requires a two-part showing before the Court can order [a] third party to turn over the money to the judgment creditor. The first prong requires that the judgment creditor show the judgment debtor has an interest in the property that the creditor is trying to reach. To satisfy the second prong, the Court must find either that the judgment debtor is entitled to the possession of such property, or that the judgment creditor's rights to the property are superior to those of the party who controls or possesses that property." *Commodities & Mins. Enter. Ltd. V. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019) (internal citations and quotation marks omitted).

In this case, the first prong of the Section 5225(b) inquiry is satisfied because, as discussed above, judgment debtors NIOC and Iran have an interest the oil in question. The second prong of the Section 5225(b) analysis is satisfied because, for the reasons stated above, TRIA provides the Hoglan Creditors with a substantive legal entitlement to attach assets of the Iranian judgment debtors to the extent of their compensatory damages against Iran and its instrumentalities. *See Est. of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013) (where petitioners established their entitlement to attachment under TRIA, the procedures under CPLR Section 5225(b) were satisfied).

---

[3] While the text of Section 5225(b) contemplates that enforcement actions under that statute will be brought as a "special proceeding," the Second Circuit has clarified that "a party seeking a money judgment against a non-party garnishee" in federal court "may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee." *CSX Transp.*, 879 F.3d at 469.

Finally, the Court has personal jurisdiction over Oaktree, which is a prerequisite under New York law for an order compelling a third party to "transfer money or property into New York from another state or country." *Koehler*, 12 N.Y. 3d at 539. "[I]t is . . . established law in New York that where a court has jurisdiction over a potential garnishee holding an asset in which a judgment debtor has an interest, the court can generally direct turnover of that asset in the post-judgment context even if it is located outside New York." *Shaheen Sports*, 2012 WL 919664 at *3.

The court has personal jurisdiction over Oaktree under New York's long-arm statute, which permits personal jurisdiction over "any non-domiciliary … who in person or through an agent … transacts any business within the state[.]" N.Y. C.P.L.R. 302(a)(1). "To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006); *see also AlbaniaBEG Ambient Sh.p.k. v. Enel S.p.A.*, 73 N.Y.S.3d 1, 8 (N.Y. App. Div. 1st Dept. 2018) (a New York court may exercise "specific" personal jurisdiction over a corporation where "the suit arises out of or relates to the defendant's contacts with the forum.").

Both prongs under Section 302(a)(1) are met here on the basis of facts currently known to the Hoglan Creditors.[4] First, Oaktree transacts business within the state of New York. Oaktree Capital Management LP is based in California, but has offices in New York, *see* Decl., ¶ 14, Ex. 18; leadership in New York, *see* Decl., ¶ 15, Exs. 19-20; and an agent for process in New York, *see* Decl., ¶ 16, Ex. 21. Fleetscape Capital Holdings Limited appears to be headquartered in London, but most of its employees are repurposed Oaktree employees, *see* Decl., ¶ 11, Exs. 10-

---

[4] To the extent the Court finds that additional information is necessary to establish personal jurisdiction over the Garnishees, the Hoglan Creditors request the opportunity to undertake limited jurisdictional discovery.

15, one of whom has publicly listed ties to New York, *see* Decl., ¶ 11, Ex. 11. Further, Fleetscape Capital Holdings' LinkedIn page lists an office in New York, *see* Decl., ¶ 12, Ex. 16, and the Lloyd's List directory lists Fleetscape Capital Holdings with an address on Park Avenue in Manhattan and a phone number with a New York area code. *See* Decl., ¶ 17, Ex. 22. Fleetscape Capital Holdings remained reachable at that phone number as of February 2022. *See* Decl., ¶ 18. It is plain, then, that Oaktree Capital Management and the Fleetscape entities have transacted their maritime business in the state of New York.

Moreover, the claims raised in this turnover motion have a sufficient nexus to Oaktree's New York-based activity. As the Second Circuit has made clear, "the 'arising from' prong of section 302(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury," only "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168–69 (2d Cir. 2013). Based on publicly available information, Oaktree's maritime business, of which the Suez Rajan forms part, appears to be carried out at least in part in New York. As noted above, Oaktree is a U.S.-based firm with an office in New York, and its alter ego Fleetscape Capital Holdings has had a New York presence. *See* Decl., ¶ 12, Ex. 16. To the extent the Garnishees conduct their maritime business in the U.S., that activity clearly has involved New York, and their activity relating to the ownership or management of the Suez Rajan appears to have occurred at least in part in New York.

Further, the court's exercise of personal jurisdiction is consistent with the due process protections provided by the United States Constitution because Oaktree has "certain minimum contacts [with New York] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

(1945). As the Second Circuit has noted, although section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, only in a rare case would the exercise of personal jurisdiction satisfy the C.P.L.R. but violate the Constitution. *Licci*, 732 F.3d at 170. Here, the fact that Oaktree appears to have conducted maritime business in New York shows that it purposefully directed maritime-related activities toward the state, such that its being subject to the personal jurisdiction of this Court is neither unreasonable or unfair.

### C. Conclusion

For the foregoing reasons, the Court should grant the Hoglan Creditors' turnover motion as to an amount of oil or proceeds from the sale of oil sufficient to satisfy the award of compensatory damages in the amount of $3,443,809,718, which represents the amount outstanding on the judgment.

Dated: March 2, 2022                                                         Respectfully submitted,

/s/ Lee S. Wolosky  
Lee S. Wolosky  
JENNER AND BLOCK  
1155 Avenue of the Americas  
New York, NY 10036  
(212) 891-1628  
lwolosky@jenner.com  

Dennis G. Pantazis  
(AL Bar No. ASB-2216-A59D)  
WIGGINS CHILDS PANTAZIS  
FISHER GOLDFARB, LLC (Lead Counsel)  
301 19th Street  
North Birmingham, AL 35203  
(205) 314-0500  

Douglass A. Mitchell (*pro hac vice*)  
JENNER AND BLOCK  
1099 New York Avenue, NW, Suite 900  
Washington, DC 20001  
(202) 639-6090  
dmitchell@jenner.com  

Timothy B. Fleming (DC Bar No 351114)  
WIGGINS CHILDS PANTAZIS  
FISHER GOLDFARB PLLC  
2202 18th Street, NW, #110  
Washington, DC 20009-1813  
(202) 467-4489  

Richard D. Hailey (IN Bar No. 7375-49)  
RAMEY & HAILEY  
9333 North Meridian Street, Suite 105  
Indianapolis, IN 46260  
(317) 582-0000  

Robert M. Foote (IL Bar No. 03124325)  
FOOTE, MIELKE,  
CHAVEZ & O'NEIL, LLC  
10 West State Street, Suite 200  
Geneva, IL 60134  
(630) 232-7450  

*Counsel for Judgment Creditors Estate of Alice Hoglan, et al.*