# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES OWENS, et al.<br><br>   *Plaintiffs,*<br><br> v.<br><br>TALIBAN a/k/a ISLAMIC EMIRATE OF AFGHANISTAN<br><br>   *Defendant.* | Civil Action No. 22-1949 |

### DECLARATION OF MATTHEW D. MCGILL IN SUPPORT OF THE
### *EX PARTE* EMERGENCY MOTION FOR ORDER OF ATTACHMENT

I, Matthew D. McGill, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, in Washington, D.C., and counsel for Plaintiffs in the above-captioned action. I am admitted to practice in the United States District Court for the Southern District of New York. I am over the age of 18, I have personal knowledge of the facts stated herein, and if called to testify, I could and would competently testify to these facts. I make this declaration in support of Plaintiffs' *Ex Parte* Motion for an Order of Attachment.

### I. Plaintiffs' Need for *Ex Parte* Relief

2. Plaintiffs have made no prior request for the relief sought in the accompanying *ex parte* motion, namely the issuance of an order of attachment directed to the assets of Defendant Taliban a/k/a Islamic Emirate of Afghanistan, which are located in this District.

3. *Ex parte* disposition of the motion is necessary because it will likely take considerable time to serve the Taliban. As recent publications make clear, *infra* Exs. 25–26, the

Taliban's rule of Afghanistan remains volatile and unstable. The Taliban operates through a shadow government that makes it difficult to identify—much less locate and then contact—appropriate representatives of the Taliban on whom process could be served. Serving the Taliban could take weeks, if not months, and the delay caused by service would severely prejudice Plaintiffs because the funds to which they are entitled are at serious risk of dissipation.

4. There is reason to believe that the Taliban's assets held in the name of Da Afghanistan Bank's ("DAB") at the Federal Reserve Bank of New York may be imminently distributed and/or claimed by other creditors. Writs of execution totaling over $2.1 billion have already been levied against the funds and turnover proceedings will soon begin. In addition, there are numerous other individuals with unpaid judgments against the Taliban who may lay claim to the funds. Moreover, especially in light of the ongoing crisis in Afghanistan, the United States itself could reallocate or transfer the funds. The Department of the Treasury's Office of Foreign Assets Control has already licensed and segregated approximately half of the $7 billion in blocked assets for humanitarian relief related to Afghanistan. *Infra* Ex. 21. The Executive Branch may at any time decide to divert additional funds in light of the "deepening economic collapse in Afghanistan" or for other purposes. *Infra* Ex. 1.

5. Thus, without immediate relief, Plaintiffs will almost certainly miss their narrow window for attaching assets to which they are entitled as a result of the Taliban's role in the 1998 embassy bombings in Kenya and Tanzania. Because prompt adjudication of Plaintiffs' motion is imperative, and because serving the Taliban will be a lengthy and complicated process, there are "good and sufficient reasons" under Local Civil Rule 6.1 for *ex parte* emergency adjudication.

## II. Plaintiffs' Entitlement to Attachment under N.Y. CPLR Article 62

6. Plaintiffs are among the victims and surviving family members of the 1998

2

embassy bombings in Kenya and Tanzania perpetrated by Osama Bin Laden and al-Qaeda, with substantial assistance from the Taliban, Iran, and Sudan.

7. Both Iran and Sudan previously have been found liable for their roles in facilitating the embassy bombings, and the overwhelming majority of Plaintiffs have received judgments and damage awards against Iran or Sudan for the injuries they sustained in the attacks. *See* Order, *Owens v. Republic of Sudan*, No. 1:01-cv-2244, Dkt. No. 301 (D.D.C. Mar. 28, 2014) (awarding compensatory damages of $487,687,665.78); Order, *Mwila v. Islamic Republic of Iran*, No. 1:08-cv-1377, Dkt. No. 88 (D.D.C. Mar. 28, 2014) (awarding compensatory damages of $419,752,640.49); Order, *Khaliq v. Republic of Sudan*, No. 1:10-cv-356, Dkt. No. 40 (D.D.C. Mar. 28, 2014) (awarding compensatory damages of $49,761,544.86); Amended Order, *Owens v. Republic of Sudan*, No. 1:01-cv-2244, Dkt. No. 349 (D.D.C. Oct. 24, 2014) (awarding compensatory damages of $622,301,129.50); Order, *Lonnquist v. Islamic Republic of Iran*, No. 1:17-cv-1630, Dkt. 44 (D.D.C. Aug. 31, 2020) (awarding compensatory damages of $454,136,349.58 and punitive damages of $112,939,307.00). Collecting on these judgments has been difficult and over a billion dollars remains unpaid.

8. Plaintiffs bring this suit to hold the Taliban responsible for its role in the embassy bombings. As set forth in the Complaint filed in this action, the Taliban is liable under the Anti-Terrorism Act, 18 U.S.C. § 2333, the Alien Tort Statute, 28 U.S.C. § 1350, and under various state tort law claims.

9. Attached hereto as **Exhibit 1** is a true and correct copy of Executive Order 14064, which was issued by President Biden on February 11, 2022. Executive Order 14064, 87 Fed. Reg. 8391 (2022).

10. Attached hereto as **Exhibit 2** is a true and correct copy of a report created by the

3

Mapping Militants Project at Stanford University's Center for International Security and Cooperation entitled *Afghan Taliban*, which was last updated in June 2018.

11. Attached hereto as **Exhibit 3** is a true and correct copy of a report created by the Mapping Militants Project at Stanford University's Center for International Security and Cooperation entitled *Al Qaeda*, which was last updated in January 2019.

12. Attached hereto as **Exhibit 4** is a true and correct copy of a Department of Justice webpage containing the federal indictment of Zacarias Moussaoui.

13. Attached hereto as **Exhibit 5** is a true and correct copy of excerpts of The 9/11 Commission Report, which was published on July 22, 2004.

14. Attached hereto as **Exhibit 6** is a true and correct copy of an article published by the Los Angeles Times on November 18, 2001. Stephen Braun & Judy Pasternak, *Long Before Sept. 11, Bin Laden Aircraft Flew Under the Radar*, L.A. Times (Nov. 18, 2001).

15. Attached hereto as **Exhibit 7** is a true and correct copy of Osama Bin Laden's 1996 fatwa. This transcription has been excerpted from 4 Brian Bonhomme, *Milestone Documents in World History: Exploring the Primary Sources That Shaped the World* (2010).

16. Attached hereto as **Exhibit 8** is a true and correct copy of Osama Bin Laden's 1998 fatwa. This transcription has been taken from the Federation of American Scientists' Intelligence Resource Program, which is available at https://irp.fas.org/world/para/ladin.htm.

17. Attached hereto as **Exhibit 9** is a true and correct copy of a Congressional Research Service Report updated on May 4, 2006. Kenneth Katzman, Cong. Research Serv., RL30588, *Afghanistan: Post-War Governance, Security, and U.S. Policy* (2006).

18. Attached hereto as **Exhibit 10** is a true and correct copy of an article published by History.com editors on February 9, 2010, last updated on August 4, 2021. *This Day in History:*

4

*August 7: 1998: U.S. Embassies in East Africa Bombed*, https://www.history.com/this-day-in-history/u-s-embassies-in-east-africa-bombed (last updated Aug. 4, 2021).

19. Attached hereto as **Exhibit 11** is a true and correct copy of an excerpt of a report published by the Matthew B. Ridgway Center for International Security Studies at the University of Pittsburgh in 2005. Matthew B. Ridgway Center for International Security Studies, *Anatomy of a Terrorist Attack: An In-Depth Investigation Into The 1998 Bombings of the U.S. Embassies in Kenya and Tanzania* (2005).

20. Attached hereto as **Exhibit 12** is a true and correct copy of a statement given by J.T. Caruso in a hearing before the Subcommittee on International Operations and Terrorism of the Senate Committee on Foreign Relations on December 8, 2001. *The Global Reach of al-Qaeda: Hearing Before the Subcomm. on Int'l Operations and Terrorism of the S. Comm. on Foreign Rels.*, S. Hrg. 107-390 (2001) (statement of J.T. Caruso, Assistant Dir., Fed. Bureau of Investigation).

21. Attached hereto as **Exhibit 13** is a true and correct copy of Executive Order 13099, which was issued by President Clinton on August 20, 1998. Executive Order 13099, 63 Fed. Reg. 45167 (1998).

22. Attached hereto as **Exhibit 14** is a true and correct copy of an article published by the Washington Post on August 29, 1998. Bradley Graham, *Bin Laden Was At Camp Just Before U.S. Attack*, Wash. Post (Aug. 29, 1998).

23. Attached hereto as **Exhibit 15** is a true and correct copy of an article published by the Houston Chronicle on November 6, 1998. *Taliban Vows to Protect Suspect in U.S. Embassy Blasts 'At Any Cost'*, Houston Chron. (Nov. 6, 1998).

24. Attached hereto as **Exhibit 16** is a true and correct copy of a federal indictment of

5

Osama Bin Laden and other al-Qaeda members for their role in bombing the American embassies in Kenya and Tanzania. Indictment, *United States v. Bin Laden*, No. 98-CR-1023 (S.D.N.Y. May 8, 2000).

25. Attached hereto as **Exhibit 17** is a true and correct copy of a United Nations Security Council Resolution issued on October 15, 1999. S.C. Res. 1267 (Oct. 15, 1999).

26. Attached hereto as **Exhibit 18** is a true and correct copy of an article published by the New York Times on August 15, 2021, which was updated on August 17, 2021. David Zucchino, *Kabul's Sudden Fall to Taliban Ends U.S. Era in Afghanistan*, N.Y. Times (updated Aug. 17, 2021).

27. Attached hereto as **Exhibit 19** is a true and correct copy of an article published by the International Centre for Counter-Terrorism on December 15, 2021. Ben Saul, *"Recognition" and the Taliban's International Legal Status*, ICCT (Dec. 15, 2021).

28. Attached hereto as **Exhibit 20** is a true and correct copy of an article published by the New York Times on February 11, 2022. Charlie Savage, *Spurning Demands by the Taliban, Biden Moves to Split $7 Billion in Frozen Afghan Funds*, N.Y. Times (Feb. 11, 2022).

29. Attached hereto as **Exhibit 21** is a true and correct copy of a license issued by the Department of the Treasury's Office of Foreign Assets Control on February 11, 2022. Andrea M. Gacki, Off. of Foreign Assets Control, U.S. Dep't of Treasury, License No. DABRESERVES-EO-2022-886895-1 (2022).

30. Attached hereto as **Exhibit 22** is a true and correct copy of a transcript of an interview given by Taliban leader Mullah Mohammed Omar, which was compiled by the Washington Post. Washington Post Staff, *Transcript: VOA Interview With Taliban Leader*, Wash. Post (Sept. 23, 2001).

6

31. Attached hereto as **Exhibit 23** is a true and correct copy of a fact sheet issued by the White House Briefing Room on February 11, 2022. White House, *Fact Sheet: Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan* (Feb. 11, 2022).

32. Attached hereto as **Exhibit 24** is a true and correct copy of a statement given by William H. Taft, IV in a hearing before the Senate Committee on Foreign Relations on July 17, 2003. *Benefits for U.S. Victims of International Terrorism: Hearing Before the S. Comm. on Foreign Rels.*, S. Hrg. 108-214 (2003) (statement of William H. Taft, IV, Legal Adviser, Dep't of State).

33. Attached hereto as **Exhibit 25** is a true and correct copy of a background report published by the Council on Foreign Relations. Lindsay Maizland, *The Taliban in Afghanistan*, Council on Foreign Rels. (last updated Sept. 15, 2021).

34. Attached hereto as **Exhibit 26** is a true and correct copy of an article published by The Guardian on March 4, 2022. Stefanie Glinski, *Afghanistan Six months on from the Taliban Takeover – Photo Essay*, Guardian, https://www.theguardian.com/world/2022/mar/04/afghanistan-six-months-on-from-the-taliban-takeover-photo-essay (Mar. 4, 2022).

35. I am not aware of any counterclaim that the Taliban might have against any of the Plaintiffs in any context or forum. Accordingly, the amount owed by the Taliban exceeds all potential known counterclaims. I am equally unaware of any grounds upon which the Taliban could formulate a cause of action against any of the Plaintiffs, and no demand has been made on any of the Plaintiffs by the Taliban in connection with any potential cause of action. Thus, the amount sought by Plaintiffs to be attached exceeds all claims known to me.

* * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 8, 2022
Alexandria, VA

_____
Matthew D. McGill

8