# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |

| | |
|---|---|
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*, | Case No. 03-cv-9848 (GBD)(SN) |
|     Creditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|     Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|     Garnishee. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE HAVLISH CREDITORS' MOTION
FOR PARTIAL TURNOVER OF ASSETS
FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................. ii

I.    Introduction ................................................................................................................... 1

II.   Background .................................................................................................................... 4

      A.    Factual Background ............................................................................................. 4

            1.    Background On Pre-Judgment Proceedings ............................................. 4

            2.    Changes In Afghanistan And Its Central Bank ....................................... 5

            3.    *Havlish* Writ Enforcement Procedural History ...................................... 9

      B.    Statutory And Regulatory Background ............................................................. 10

            1.    The Taliban And The Federal Sanctions Regime ................................. 10

            2.    TRIA ...................................................................................................... 11

III.  Legal Standard ........................................................................................................... 13

IV.   Argument .................................................................................................................... 15

      A.    The Taliban Is A Terrorist Party Within The Meaning of TRIA ..................... 15

      B.    The Havlish Creditors Have A Judgment Against The Taliban Based On An Act Of Terrorism ..................................................................................................... 16

      C.    The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA ......... 16

      D.    The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or Instrumentality Of The Taliban ....................................................................... 17

            1.    DAB Holds The DAB Assets ................................................................ 17

            2.    DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA ..... 18

            3.    Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent With Binding Case Law, Statutory Text, And Congressional Purpose ................. 21

            4.    Alternatively, DAB Is The Taliban's Alter Ego ................................... 24

      E.    The Havlish Creditors Are Entitled To The DAB Assets ............................... 24

      F.    The Havlish Creditors' Writ Has Priority ....................................................... 25

V.    Conclusion .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bennett v. Islamic Republic of Iran*,
618 F.3d 19 (D.C. Cir. 2010) .........................................................................12–13

*Caballero v. FARC*,
No. 20-CV-1939, 2021 WL 6339256 (D. Conn. Jan. 14, 2021)...........................20, 23, 24–25

*Caballero v. FARC*,
No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) ...........................23

*Caballero v. FARC*,
No. 18-CV-25337, 2021 WL 3927826 (S.D. Fla. Aug. 24, 2021) ........................20

*Clark v. Martinez*,
543 U.S. 371 (2005)...........................................................................................23

*Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*,
423 F. Supp. 3d 45 (S.D.N.Y. 2019)...................................................................13

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*,
879 F.3d 462 (2d Cir. 2018).........................................................................13, 25

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*,
919 F. Supp. 2d 411 (S.D.N.Y. 2013)...........................................................14, 24

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
304 F. Supp. 2d 232, 241 (D.R.I. 2004)........................................................20–21

*Harrison v. Republic of Sudan*,
802 F.3d 399 (2d Cir. 2015), *rev'd on other grounds*, 139 S. Ct. 1048 (2019)................14, 24

*Hausler v. JP Morgan Chase Bank, N.A.*,
127 F. Supp. 3d 17 (S.D.N.Y. 2015)...............................................14, 17–18, 24

*Hill v. Republic of Iraq*,
No. 99-CV-3346, 2003 WL 21057173 (D.D.C. Mar. 11, 2003) ...........................25

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak
Dan Gas Bumi Negara ("Pertamina")*,
313 F.3d 70, 86 (2d Cir. 2002)............................................................................17

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
830 F.3d 107 (2d Cir. 2016), *abrogated on other grounds by
Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) .............................. *passim*

ii

*Miller v. City of Ithaca*,
  No. 10-CV-597, 2019 WL 2502712 (N.D.N.Y. June 17, 2019)............................................18

*Phoenician Trading Partners LP v. Iseson*,
  No. 04-CV-2178, 2004 WL 3152394 (E.D.N.Y. Dec. 11, 2004) ..............................................1

*Schneider v. National R.R. Passenger Corp.*,
  72 F.3d 17 (2d Cir. 1995).......................................................................................................9

*Smith v. Federal Rsrv. Bank of N.Y.*,
  280 F. Supp. 2d 314 (S.D.N.Y. 2003), *aff'd*, 346 F.3d 264 (2d Cir. 2003) ......................12, 21

*Stansell v. FARC*,
  771 F.3d 713 (11th Cir. 2014) ..............................................................................................18

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*,
  982 F. Supp. 2d 830 (N.D. Ill. 2013),
  *vacated and remanded on other grounds,* 783 F.3d 607 (7th Cir. 2015) ...............................16

*United States v. Santos*,
  553 U.S. 507 (2008) (plurality opinion) ................................................................................23

*Weininger v. Castro*,
  462 F. Supp. 2d 457 (S.D.N.Y. 2006)................................................................12, 14, 15, 24

*Weinstein v. Islamic Republic of Iran*,
  609 F.3d 43 (2d Cir. 2010)................................................................................12, 17, 25

**STATUTES AND RULES**

8 U.S.C. § 1182(a)(3)(B)(iii) .................................................................................................16

Fed. R. Civ. P. 69(a) ..........................................................................................................1, 13

Foreign Sovereign Immunities Act of 1976,
  Pub L. No. 94–583, 90 Stat. 2891 (codified at 28 U.S.C. § 1602 *et seq.*) ....................3, 12, 13

International Emergency Economic Powers Act,
  Pub. L. No. 95–223, 91 Stat. 1625 (codified at 50 U.S.C. § 1701 *et seq.*) ........................10, 11

Terrorism Risk Insurance Act of 2002 § 201,
  Pub. L. No. 107–297, 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note) .................... *passim*

N.Y. C.P.L.R. § 5225.......................................................................................................1, 13, 14

N.Y. C.P.L.R. § 5227.............................................................................................................1

N.Y. C.P.L.R. § 5232.............................................................................................................9

N.Y. C.P.L.R. § 5234 ....................................................................................................25

**LEGISLATIVE MATERIALS**

148 Cong. Rec. S11524 (daily ed. Nov. 19, 2002) ......................................................12

H. DOC. NO. 106-268 (2000)................................................................................3, 10, 11

H. DOC. NO. 107-16 (2001)...............................................................................10, 11, 23

H. REP. NO. 107-779 (2002) (Conf. Rep.) ..................................................................12

Hearing to Receive Testimony on Security in Afghanistan & in the Regions of
 South and Central Asia, S. Comm. on Armed Servs., 117th Cong., 1st Sess.
 (Oct. 26, 2021), https://www.armed-services.senate.gov/imo/media/doc/21-
 80_10-26-2021.pdf.................................................................................................4

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

31 C.F.R. § 594.201 ....................................................................................................11

31 C.F.R. § 594.310 ...............................................................................................11, 15

31 C.F.R. § 594.311 ....................................................................................................15

Agreement for Bringing Peace to Afghanistan, Taliban-United States, Feb. 29,
 2020, https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-
 Bringing-Peace-to-Afghanistan-02.29.20.pdf............................................................6

Background Press Call by Senior Admin. Officials on U.S. Support for the People
 of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/
 briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-
 support-for-the-people-of-afghanistan .....................................................................1

Exec. Order No. 13,129, 64 Fed. Reg. 36,759 (July 7, 1999)................................10, 11

Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ...................................11

Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002)................................11, 15

Exec. Order No. 14,064, 87 Fed. Reg 8391 (Feb. 11, 2022) ................................ *passim*

Remarks on United States Military Operations in Afghanistan,
 2021 DAILY COMP. PRES. DOC. 313 (April 14, 2021)..............................................6

Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking
 Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-
 center/press-releases/Pages/po943.aspx..............................................................11, 18

## OTHER AUTHORITIES

Brief of the United States in Response to Plaintiffs' Motion to Compel,
*Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169
(D.D.C. Feb. 2, 2005), 2005 WL 3518010, ECF No. 4 ..........................................................15

Dan De Luce et al., *Taliban Keep Close Ties with Al Qaeda Despite Promise to U.S.*,
NBC News (Feb. 17, 2021), https://www.nbcnews.com/politics/national-
security/taliban-keep-close-ties-al-qaeda-despite-promise-u-s-n1258033 ..............................4

Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on
the Taliban*, N.Y. Times (Aug. 18, 2021), https://www.nytimes.com/
2021/08/18/business/afghan-central-bank.html ........................................................................5

Order, *Caballero v. FARC*, No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020),
ECF No. 15 ..............................................................................................................................23

Reuters, *Taliban Name New Afghan Government, Interior Minister on U.S.
Sanctions List* (Sept. 7, 2021), https://www.reuters.com/world/india/taliban-
fire-air-scatter-kabul-protesters-no-reports-injuries-2021-09-07/ ...........................................8

Charlie Savage, *Spurning Demand by the Taliban, Biden Moves to Split $7 Billion in
Frozen Afghan Funds*, N.Y. Times (Feb. 11, 2022), https://www.nytimes.com/
2022/02/11/us/politics/taliban-afghanistan-911-families-frozen-funds.html ...........................1

Siegel, *New York Practice*, § 497 (6th ed.) .....................................................................................9

Jeff Stein, *Biden Administration Freezes Billions of Dollars in Afghan Reserves,
Depriving Taliban of Cash*, Wash. Post (Aug. 17, 2021), https://www
.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/...............3, 8

Karin Strohecker et al., *Analysis: Afghan Central Bank's $10 Billion Stash Mostly
Out Of Taliban's Reach*, Reuters (Aug. 18, 2021), https://www.reuters.com/
world/asia-pacific/afghan-central-banks-10-billion-stash-not-all-within-reach-
taliban-2021-08-17/...............................................................................................................2, 5

Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban
Takeover in Afghanistan: Frequently Asked Question*s (2021),
https://crsreports.congress.gov/product/pdf/R/R46879 ............................................................6

Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan:
Background and Issues for Congress* (2021), https://crsreports.congress.gov/
product/pdf/R/R46955 ..............................................................................................................8

Judgment Creditors Fiona Havlish *et al.* (the "Havlish Creditors"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their Motion for Partial Turnover of Assets from Garnishee the Federal Reserve Bank of New York ("FRBNY").

## I.   Introduction

On February 11, 2022, the President of the United States took a series of coordinated actions intended both to benefit the "welfare of the people of Afghanistan"[1] and to "clear a legal path" for the resolution of legal claims by U.S. victims of terrorism against the Taliban.[2] According to the White House, the steps were intended to permit U.S. claimants "a full opportunity to have their claims heard in U.S. courts."[3] Among other things, the steps taken that day blocked the property of Da Afghanistan Bank ("DAB") at the Federal Reserve Bank of New York, ensuring that the property is subject to execution under the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322.

As a result, the Havlish Creditors now move this Court, pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. §§ 5225(b) and 5227,[4] and Section 201 of TRIA for an order compelling the FRBNY to turn over to the Havlish Creditors those blocked assets of DAB in its possession (the "DAB Assets") sufficient to satisfy fully the compensatory damages for which the Taliban has been adjudged liable, plus interest, amounting to $2,086,386,669. Decl. of Douglass

---

[1] Exec. Order No. 14,064, 87 Fed. Reg 8391 (Feb. 11, 2022).

[2] Charlie Savage, *Spurning Demand by the Taliban, Biden Moves to Split $7 Billion in Frozen Afghan Funds*, N.Y. Times (Feb. 11, 2022), https://www.nytimes.com/2022/02/11/us/politics/taliban-afghanistan-911-families-frozen-funds.html.

[3] Background Press Call by Senior Admin. Officials on U.S. Support for the People of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-support-for-the-people-of-afghanistan/.

[4] Because Sections 5225 and 5227 are "essentially interchangeable," it is common practice to move for a turnover order under both provisions. *See Phoenician Trading Partners LP v. Iseson*, No. 04-CV-2178, 2004 WL 3152394, at *3 (E.D.N.Y. Dec. 11, 2004) (citation omitted).

A. Mitchell ISO Mot. for Partial Turnover ("Mitchell Decl.") ¶ 10.

The DAB Assets are subject to execution under TRIA. TRIA applies in cases where "a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism." TRIA § 201(a). The Havlish Creditors have obtained a judgment against a terrorist party, the Taliban, on a claim based on an act of terrorism, the September 11, 2001 attacks. Under Section 201 of TRIA, they may therefore execute against assets of the Taliban or its agencies or instrumentalities—like DAB.

It is undisputed that the Taliban has taken control of DAB, and it is binding law that an entity controlled by a terrorist party is an agency or instrumentality of that terrorist party under TRIA. It is also undisputed that DAB has a property interest in its account at the FRBNY, which now holds no less than $3.5 billion dollars in assets.[5] Because the Taliban now has an interest in these assets through its agency or instrumentality, DAB, they are subject to execution to the extent of the Havlish Creditors' compensatory damages under TRIA and state law. Notably, the United States does not say otherwise. *See Havlish* Dkt. 563 ("U.S. Statement") 19–20.

The United States raises several questions in its Statement of Interest related to the nearly unprecedented situation at issue. The circumstances giving rise to this motion are indeed highly unusual: A terrorist group seized control of a central bank and is now using that institution for its

---

[5] Mitchell Decl., Ex. 6; Karin Strohecker et al., *Analysis: Afghan Central Bank's $10 Billion Stash Mostly Out Of Taliban's Reach*, Reuters (Aug. 18, 2021), https://www.reuters.com/world/asia-pacific/afghan-central-banks-10-billion-stash-not-all-within-reach-taliban-2021-08-17/; *see also* Mitchell Decl. ¶¶ 4–8 & Ex. 4 (DAB held nearly $6 billion at the FRBNY at the end of 2020).

The United States ordered even more of DAB's property—all of its property in the United States—to be consolidated at the FRBNY. Exec. Order No. 14,064 § 1(b). On February 25, 2022, the Court issued an order permitting the transfer of $3.5 billion of DAB's assets out of the Fed, subject to the terms of OFAC License No. DABRESERVES-EO-2022-886895-1. *Havlish* Dkt. 585.

own purposes, potentially including the facilitation of further acts of terrorism.[6] The only similar circumstances in memory occurred when the same terrorist group seized control of the same central bank in the 1990s and used it for its own purposes—including the facilitation of acts of terrorism. Then, the same facts led the United States to conclude that DAB was "controlled by the Taliban" and to find that the Taliban "ha[d] an interest" in DAB. H. Doc. No. 106-268, at 4 (2000). But despite this case's extraordinary facts, what the law requires is rather ordinary: the reasoned application of settled law. As described further below, this Court can and should adjudicate this motion under binding law. Notably, it can (and should) do so without any need to address any novel or complex issues that implicate difficult constitutional questions or unsettled legal standards.[7]

For the last twenty years, the Havlish Creditors—the families and estates of Americans murdered during the terrorist attacks of September 11, 2001—have sought justice for the injuries they suffered that day and have continued to suffer in the days, months, and years thereafter. Some have lost not only their loved ones, but also their homes, livelihoods, and aspirations as a result of

---

[6] Expert Decl. of Alex B. Zerden ("Zerden Decl.") ¶¶ 39–43, 144–145. Because of these circumstances, the United States cut off the Taliban's ability to withdraw DAB funds on account at the FRBNY last August. Jeff Stein, *Biden Administration Freezes Billions of Dollars in Afghan Reserves, Depriving Taliban of Cash*, Wash. Post (Aug. 17, 2021), https://www.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/.

[7] It is worth noting that the Havlish Creditors do not have a judgment against the State of Afghanistan (which is not a designated state sponsor of terrorism) and have never sought relief under the FSIA against the Taliban (which is not, and has never been, a recognized government of any state). Nor need they do so now (as the FSIA is expressly preempted by TRIA in all respects relevant to these proceedings). Under TRIA, the Court need not make any findings impacting the President's recognition authorities, the status of any State assets, or on any other issue outside of its Article III competencies in a manner impacting the Executive Branch's foreign policy prerogatives or as might be required if it were applying the FSIA. As the Government correctly notes: "When its conditions are satisfied, TRIA section 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA." U.S. Statement 10.

the ongoing, sustained trauma of the attacks and the financial hardships resulting therefrom.[8] They have sought justice against Osama bin Laden and al Qaeda, who planned and executed the attack. They have sought it against the state and instrumentalities of the Islamic Republic of Iran, who were found liable for providing material support for the attack. And they have sought justice against the Taliban, which once controlled, and now again controls, Afghanistan and DAB—for it was the Taliban that provided bin Laden and al Qaeda with a base of operations and safe harbor in Afghanistan in order to plot, train for, and commit the atrocities of 9/11 (and which has maintained its close relationship with al Qaeda ever since).[9]

At long last, after twenty Christmases and twenty birthdays, twenty Fourth of Julys and twenty Thanksgivings, an appropriate measure of justice can now be extracted from the terrorist group that nurtured, protected, and supported al Qaeda. Twenty years is long enough to wait.

## II.     Background

### A.     Factual Background

#### 1.     Background On Pre-Judgment Proceedings

The factual and procedural background giving rise to the *Havlish* judgment is well known to the Court and is provided here in only the most summary fashion. On September 11, 2001,

---

[8] While others have received compensation from the government-funded Victims of State Sponsored Terrorism program (VSST), the Havlish Creditors largely have not, pursuing instead justice from those who were actually responsible for killing their family members twenty years ago. The Havlish Creditors estimate they have received approximately one-half of one percent of the approximately $1.6 billion in total distributed by the government to 9/11 families through the VSST.

[9] *See, e.g.*, Dan De Luce et al., *Taliban Keep Close Ties with Al Qaeda Despite Promise to U.S.*, NBC News (Feb. 17, 2021), https://www.nbcnews.com/politics/national-security/taliban-keep-close-ties-al-qaeda-despite-promise-u-s-n1258033; *see also* Hearing to Receive Testimony on Security in Afghanistan & in the Regions of South and Central Asia, S. Comm. on Armed Servs., 117th Cong., 1st Sess. (Oct. 26, 2021), https://www.armed-services.senate.gov/imo/media/doc/21-80_10-26-2021 .pdf at 35 (statement of Dr. Colin Kahl, Under Secretary for Policy, U.S. Dep't of Defense) (al Qaeda could develop capability to attack U.S. from Afghanistan "within 1 to 2 years"); Zerden Decl. ¶¶ 20, 28, 40–42.

Osama bin Laden and al Qaeda committed the most heinous act of terrorism in the history of this nation. The terrorist organization known as the Taliban provided material support to al Qaeda before that day in territory under its control in Afghanistan, including through its control of DAB.[10] The Havlish Creditors consist of the estates and family members of Americans who were killed that day. On December 22, 2011, this Court ordered the entry of default judgment as to liability against, *inter alia*, the Taliban on the Havlish Creditors' claims. *Havlish* Dkt. 295. In subsequent proceedings, the Court determined that the Havlish Creditors were entitled to compensatory and punitive damages, in addition to prejudgment interest on their non-economic compensatory damages at a rate of 4.96 percent from September 11, 2001 through the date judgment was entered. *Havlish* Dkt. 314, 316. The Court entered final judgment on October 16, 2012 in favor of the Havlish Creditors and against all defendants, including the Taliban, *Havlish* Dkt. 317, and today the Havlish Creditors hold outstanding judgments for compensatory damages in the amount of $2,086,386,669, Mitchell Decl. ¶ 10.

### 2.    Changes In Afghanistan And Its Central Bank

DAB holds substantial asset reserves in accounts in foreign central banks, including at the Federal Reserve Bank of New York. As of August 15, 2021, approximately $7 billion of DAB's asset reserves were held at the FRBNY.[11]

---

[10] Zerden Decl. ¶¶ 19–27, 40.

[11] *See* Mitchell Decl., Ex. 6; Strohecker, *supra* note 5; Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on the Taliban*, N.Y. Times (Aug. 18, 2021), https://www.nytimes.com/2021/08/18/business/afghan-central-bank.html; *see also* Mitchell Decl. ¶¶ 4–8 & Ex. 4 (DAB held nearly $6 billion at the FRBNY at the end of 2020).

On Sunday, August 15, 2021, as the United States was completing its withdrawal from Afghanistan,[12] the former government of Afghanistan collapsed and its leaders fled the country.[13] The Taliban arrived in the capital city of Kabul and quickly took physical and operational control of certain Afghan offices, agencies, and instrumentalities for its own benefit.[14] Most significantly for present purposes, the Taliban takeover of facilities in Kabul included taking control of DAB.[15]

The Taliban now completely controls DAB.[16] Control is exercised and evidenced in several ways, including through DAB's new leadership. One of the Taliban's first acts in Kabul was installing, as DAB's Acting Governor, a staunch Taliban loyalist whose only prior financial experience was serving as head of the Taliban's finance commission—a body the Taliban tasked with managing money from narcotics trafficking and collecting illegal taxes the Taliban collected from businesses and farmers in areas where the Taliban ran shadow governments.[17] The Taliban also installed as the First and Second Deputy Governors, the number two and three leadership positions at DAB, individuals who are individually sanctioned by the United States, the United

---

[12] On February 29, 2020, the United States and the Taliban signed the Doha Agreement to bring the decades-long war in Afghanistan to an end and facilitate the transition to a "new post-settlement Afghan Islamic government." Agreement for Bringing Peace to Afghanistan, Taliban-United States, Feb. 29, 2020, https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-Bringing-Peace-to-Afghanistan-02.29.20.pdf. That transition accelerated with extraordinary speed after April 14, 2021, when President Biden announced the United States would withdraw all U.S. forces from Afghanistan by September 11, 2021. Remarks on United States Military Operations in Afghanistan, 2021 DAILY COMP. PRES. DOC. 313 (April 14, 2021). The Taliban rapidly took control of most territory in Afghanistan during the summer of 2021.

[13] *See* Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban Takeover in Afghanistan: Frequently Asked Questions* 10, 12–13 (2021), https://crsreports.congress.gov /product/pdf/R/R46879.

[14] Zerden Decl. ¶¶ 39–40; Thomas, *supra* note 13, at 10, 13–14.

[15] Zerden Decl. ¶¶ 39, 49; *see* Thomas, *supra* note 13, at 40.

[16] Zerden Decl. ¶ 51.

[17] Zerden Decl. ¶¶ 54–58 (concerning Haji Mohammed Idris, DAB's Acting Governor).

Nations, and others for terrorist activities undertaken as members of the Taliban.[18] DAB's organizational structure assigns those sanctioned terrorists significant operational and management responsibilities.[19] By means of example, DAB's First Deputy Governor, sanctioned terrorist Noor Ahmad Agha, is now charged with supervising DAB's countering terrorist financing functions, among others.[20]

The Taliban permeates every level of DAB. The Taliban is driving essential technical experts who work for DAB out of the country[21] and replacing them with loyalists who do not have the requisite education, experience, and expertise to operate a central bank independently and competently.[22] Many DAB staff remain at the bank only because the Taliban compels them to work.[23] The private business sector reports encountering more and more frequently Taliban-affiliated staff at all levels of DAB.[24]

The Taliban Council of Ministers' open control over DAB removes any illusion that DAB is or can be independent of the Taliban.[25] The Council of Ministers consists of the heads of all Taliban government ministries, and, like DAB's leadership, includes individuals sanctioned for

---

[18] Noor Ahmad Agha is DAB's First Deputy Governor. He was sanctioned for his activities as the leader of the Taliban's military council and as a finance officer. Among other things, Agha had responsibilities for financing Taliban commanders and funding improvised explosive devices. Zerden Decl. ¶¶ 59–72. Abdul Qadeer Ahmad is DAB's Second Deputy Governor. He was sanctioned for, among other things, providing funds to Taliban commanders who carried out terrorist attacks in Afghanistan, collecting financial aid from the Taliban's domestic and foreign sponsors, distributing funds to Taliban shadow governors, and collecting Taliban revenues from narcotics trafficking. *Id.* at ¶¶ 73–82.

[19] Zerden Decl. ¶¶ 59, 73.

[20] Zerden Decl. ¶ 69.

[21] Zerden Decl. ¶ 101.

[22] Zerden Decl. ¶¶ 85–91; 136–137, 138(f).

[23] Zerden Decl. ¶¶ 85–91.

[24] Zerden Decl. ¶ 85.

[25] Zerden Decl. ¶¶ 92, 139.

Taliban terrorist activities.[26] The Council of Ministers has directed DAB policy.[27] The Taliban's Deputy Prime Minister has chaired meetings at DAB.[28]

On the same day the Taliban took control of Afghanistan's capital, including the facilities of DAB, the United States locked down DAB's assets at the FRBNY to prevent them from being withdrawn by a Taliban-controlled DAB or otherwise transferred to the Taliban.[29]

On February 11, 2022, President Biden signed an executive order designating "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, a[s] blocked[.]" Exec. Order No. 14,064 § 1(a). The Order further provides that all U.S. financial institutions must transfer all property and interests in property of DAB in the United States to the FRBNY. *Id.* § 1(b). Contemporaneously with the issuance of that Order, the Government issued a license through the Treasury Department's Office of Foreign Assets Control which authorizes, directs, and compels the FRBNY, upon further instructions, to transfer up to $3.5 billion of DAB's blocked assets "for the benefit of the people of Afghanistan, or to a United Nations fund, programme, specialized agency, or other entity or body for the benefit of the people of Afghanistan." *Havlish* Dkt. 563-2 at 2. The remainder of the blocked assets were left behind so that victims of terrorism, using TRIA, could "have their claims heard in U.S. courts."[30]

---

[26] Zerden Decl. ¶¶ 93, 130; *see also* Reuters, *Taliban Name New Afghan Government, Interior Minister on U.S. Sanctions List* (Sept. 7, 2021), https://www.reuters.com/world/india/taliban-fire-air-scatter-kabul-protesters-no-reports-injuries-2021-09-07/.

[27] Zerden Decl. ¶¶ 92, 139.

[28] Zerden Decl. ¶¶ 94–95, 139.

[29] *See* Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress* 39 (2021), https://crsreports.congress.gov/product/pdf/R/R46955; Stein, *supra* note 6.

[30] White House, *supra* note 3.

### 3.   *Havlish* Writ Enforcement Procedural History

The Havlish Creditors obtained a writ of execution from this court against the DAB assets at the FRBNY on August 27, 2021. *Havlish* Aug. 27, 2021 Minute Order; Mitchell Decl. Ex. 1. That writ was delivered that same day to the officer with jurisdiction to levy,[31] the U.S. Marshal for the Southern District of New York. Mitchell Decl. ¶ 2 & Ex. 2. The Marshal levied against DAB's assets at the FRBNY by service of the writ on the FRBNY on September 14, 2021.[32] Mitchell Decl. ¶¶ 3–4 & Ex. 3; *see also Havlish* Dkt. 526-1.

On September 16, 2021, the United States notified the Court that it was considering filing a Statement of Interest in the case and asked that the Court "defer judicial enforcement of the *Havlish* Writ" while it decided whether to do so. *Havlish* Dkt. 526 at 2. On October 14, 2021, the United States notified the Court that it would file a Statement of Interest, and the Court shortly thereafter stayed judicial enforcement of the writ. *Havlish* Dkt. 551. In light of the stay, the Havlish Creditors sought, and the Court granted, an extension of the *Havlish* Writ, which provides that the writ "will not expire until further order of the Court." *Havlish* Dkt. 551 at 2. The Government maintained that the DAB Assets were "subject to and restrained by" the *Havlish* Writ during this time. *Havlish* Dkts. 545 at 2, 558 at 2; *see also* U.S. Statement 3. The Government filed a Statement of Interest on February 11, 2022. *Havlish* Dkt. 563.

---

[31] *See Schneider v. National R.R. Passenger Corp.*, 72 F.3d 17, 18–19 (2d Cir. 1995).

[32] Levy was accomplished by service because the FRBNY has refused to turn DAB's assets over to the Marshal. N.Y. C.P.L.R. § 5232(a) (property not capable of delivery is levied upon service by marshal). This is precisely the sort of case where levy by service is appropriate. *See also* Siegel, *New York Practice*, § 497 (6th ed.) ("Any situation in which the sheriff cannot readily lay hands on the property interest involved, and by some means take immediate actual or at least constructive custody of it, should be deemed to involve property 'not capable of delivery' and therefore to permit levy by service under subdivision (a) of CPLR 5232[.]").

On February 25, 2022, the Court ordered that the $3.5 billion in DAB assets regulated by OFAC License No. DABRESERVES-EO-2022-886895-1 "are not judicially restrained[.]" *Havlish* Dkt. 585. It further ordered that, with respect to the DAB assets not regulated by the OFAC License, "the Havlish writ dated August 27, 2021, and the Doe writ dated September 27, 2021 . . . remain in effect pending further order of this Court." *Id.*

### B.      Statutory And Regulatory Background

#### 1.      The Taliban And The Federal Sanctions Regime

Congress enacted the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95–223, 91 Stat. 1625, 50 U.S.C. § 1701 *et seq.*, at the end of 1977. The law provides that whenever the United States is faced with an "unusual and extraordinary threat . . . to [its] national security, foreign policy, or economy" which "has its source in whole or substantial part outside the United States," the President may "declare[] a national emergency with respect to such threat" and implement measures to regulate international economic transactions. 50 U.S.C. § 1701.

The Taliban is an Islamic fundamentalist terrorist group that has twice taken control of territory and institutions in Afghanistan, including DAB. The first time the Taliban did so, in the late 1990s, President Clinton declared a national emergency and exercised his power under IEEPA to block (1) "all property or interests in property of the Taliban," (2) all property or interests in property of anyone determined by the executive "to be owned or controlled by" or "to act for or on behalf of" the Taliban, and (3) all property or interests in property of anyone found "to provide financial, material, or technological support for, or services in support of" anyone owned, controlled by, or acting for or on behalf of the Taliban. Exec. Order No. 13,129 § 1, 64 Fed. Reg. 36,759 (July 7, 1999). Months later, the administration added DAB to the list of persons blocked under this order. H. Doc. No. 106-268, at 4; *see also* H. Doc. No. 107-16, at 4 (2001) (same). In his report to Congress, President Clinton stated that DAB "ha[s] been found to be controlled by

the Taliban, and to be [an] entit[y] in which the Taliban has an interest." *Id.* Notably, the United States did not recognize the Taliban as the government of Afghanistan but nevertheless recognized that the Taliban controlled DAB (even though DAB was Afghanistan's central bank).[33]

After the September 11 attacks, President George W. Bush took immediate action pursuant to IEEPA to block terrorists from accessing any property in the United States or within the control of any U.S. person. On September 23, 2001, he directed that "all property and interests in property" in the United States in which certain identified terrorists had any interest were henceforth blocked. Exec. Order No. 13,224 § 1, 66 Fed. Reg. 49,079. Nine months later, he added the Taliban to the list of persons blocked pursuant to that order, thereby deeming the Taliban a "Specially Designated Global Terrorist" or "SDGT." Exec. Order No. 13,268 § 1, 67 Fed. Reg. 44,751 (July 2, 2002); 31 C.F.R. §§ 594.201(a), 594.310. The Taliban remains a blocked person and an SDGT to this day.

### 2.    TRIA

Shortly after the September 11 attacks, Congress became frustrated with the executive's longstanding sanctions rules that had the effect of preventing enforcement of money judgments issued to victims of terrorism against the assets of terrorist groups. Congress enacted a new law with the specific purpose of allowing victims of terrorism to obtain relief from blocked terrorist funds. Terrorism Risk Insurance Act of 2002 ("TRIA") § 201, Pub. L. No. 107–297, 116 Stat. 2322, 2337–2340 (codified at 28 U.S.C. § 1610 note). TRIA provides in operative part that:

> *Notwithstanding any other provision of law,* and except as provided in subsection (b), in every case in which a person has obtained a *judgment against a terrorist party* on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party

---

[33] *See* Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-center/press-releases/Pages/po943.aspx. After the fall of the Taliban at the end of 2001, the Treasury Department issued a license authorizing the new Afghan government to access the DAB assets. *Id.*

> (*including the blocked assets of any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Id.* § 201(a) (emphasis added).

As Senator Tom Harkin, one of the primary sponsors of TRIA, explained: "The purpose of [Section 201] is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties. . . . [TRIA] establishes once and for all, that such judgments are to be enforced against any assets available in the U.S., and that *the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act.*" *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (quoting 148 Cong. Rec. S11524, S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin)) (emphasis added). The conference committee's report echoed this theme: "The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced." H. REP. NO. 107-779, at 27 (2002) (Conf. Rep.).

It is settled law that TRIA preempts the Foreign Sovereign Immunities Act ("FSIA"). *Smith v. Federal Rsrv. Bank of N.Y.*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003) ("[T]o the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict."), *aff'd*, 346 F.3d 264 (2d Cir. 2003); *Weininger v. Castro*, 462 F. Supp. 2d 457, 477, 488 (S.D.N.Y. 2006) (TRIA overrode FSIA immunity for Central Bank of Cuba); *accord Bennett v. Islamic Republic of Iran,* 618 F.3d 19, 21

(D.C. Cir. 2010); *see also* U.S. Statement 10 ("When its conditions are satisfied, TRIA [§] 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA.").

## III.    Legal Standard

The procedure for enforcement of writs of execution is governed by Federal Rule of Civil Procedure 69(a)(1), which provides that proceedings on execution "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." In the state of New York, C.P.L.R. Section 5225(b) provides the relevant procedure for enforcement of a judgment "against a third party who 'is in possession or custody of money or other personal property' in which the judgment debtor has an interest." *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018).[34]

In ordinary turnover proceedings, "N.Y. C.P.L.R. § 5225(b) requires a two-part showing before the Court can order [a] third party to turn over the money to the judgment creditor. The first prong requires that the judgment creditor show the judgment debtor has an interest in the property that the creditor is trying to reach. To satisfy the second prong, the Court must find either that the judgment debtor is entitled to the possession of such property, or that the judgment creditor's rights to the property are superior to those of the party who controls or possesses that property." *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019).

But in this case, the Court must also consider the effect of TRIA, which supersedes other laws by virtue of its preamble. Under that federal statute, assets in which a blocked terrorist party

---

[34] While the text of Section 5225(b) contemplates that enforcement actions under that statute will be brought as a "special proceeding," the Second Circuit has clarified that "a party seeking a money judgment against a non-party garnishee" in federal court "may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee." *CSX Transp.*, 879 F.3d at 469.

has an interest, "including the blocked assets of any agency or instrumentality of that terrorist party[] shall be subject to execution," "[n]otwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a).[35]

Because TRIA provides the relevant framework for analyzing whether a terrorist party "has an interest in the property the judgment creditor is trying to reach" under C.P.L.R. § 5225(b), and because it mandates that such property "shall be subject to execution" if so, courts in this district routinely analyze whether assets are subject to TRIA in the first instance and then rely on the relevant TRIA holding to find that turnover is appropriate under the New York statute. *See, e.g.*, *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 48 (S.D.N.Y. 2015); *Weininger*, 462 F. Supp. 2d at 499; *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013).

The DAB Assets are blocked assets pursuant to Executive Order 14,064. TRIA Section 201(a) thus authorizes the Havlish Creditors to enforce their judgment against either (i) blocked assets of the Taliban or against (ii) blocked assets of an agency or instrumentality of the Taliban. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016) ("[T]he fact that Plaintiffs obtained their underlying judgments against [the Taliban] . . . does not prevent" them from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA."), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

---

[35] An OFAC license is not required to execute against blocked assets under TRIA. *Harrison v. Republic of Sudan*, 802 F.3d 399, 408–09 (2d Cir. 2015), *rev'd on other grounds*, 139 S. Ct. 1048 (2019).

Therefore, the Havlish Creditors are entitled to enforce their judgments under TRIA and New York law against the blocked assets at the FRBNY so long as they establish these elements: (1) possession of a "judgment against a terrorist party"; (2) arising from an act of terrorism; (3) seeking to execute against "blocked assets" within the meaning of TRIA (*i.e.*, blocked assets of that terrorist party or an agency or instrumentality of that terrorist party); (4) to the extent of their "compensatory damages." *Weininger*, 462 F. Supp. 2d at 479.

## IV.   Argument

The Havlish Creditors have satisfied all four TRIA elements. They have obtained a judgment against a terrorist party (the Taliban), on a claim based on an act of terrorism (the September 11, 2001 attacks) and seek to execute against the blocked assets of an agency or instrumentality of that terrorist party (DAB). The Havlish Creditors are thus entitled to execute against the DAB Assets to the extent of their compensatory damages.

### A.   The Taliban Is A Terrorist Party Within The Meaning of TRIA

The Taliban is, without question, a terrorist party within the meaning of TRIA, as the United States agrees. *See* U.S. Statement 19. Section 201(d)(4) defines a "terrorist party" as, among other things, "a terrorist[.]" And the United States has classified the Taliban as a Specially Designated Global Terrorist since July 2, 2002. *See* Exec. Order No. 13,268 § 1; *see also* 31 C.F.R. §§ 594.310, 594.311. In conformity with that designation, the United States has represented to courts in other matters both that the Taliban is a "terrorist party" and that its assets are subject to attachment under TRIA. *See* Brief of the United States in Response to Plaintiffs' Motion to Compel at 3–4, *Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169 (D.D.C. Feb. 2, 2005), 2005 WL 3518010, ECF No. 4.

### B.    The Havlish Creditors Have A Judgment Against The Taliban Based On An Act Of Terrorism

There is also no question that the Havlish Creditors have a judgment against the Taliban "based on an act of terrorism[,]" as the United States agrees. *See* U.S. Statement 19. TRIA Section 201(d)(1)(A) defines an "act of terrorism" to include any "terrorist activity" as defined in 8 U.S.C. § 1182(a)(3)(B)(iii). The Havlish Creditors' judgment against the Taliban is based on the Taliban's participation in, and liability for, the September 11, 2001 terrorist attacks. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 982 F. Supp. 2d 830, 843–44 (N.D. Ill. 2013) (undisputed that September 11 attacks were an act of terrorism), *vacated and remanded on other grounds,* 783 F.3d 607 (7th Cir. 2015); *see also* 8 U.S.C. § 1182(a)(3)(B)(iii) (cross-referenced in TRIA § 201(d)(1) and defining "terrorist activity" as "[t]he highjacking or sabotage of any conveyance[,]" "[a] violent attack upon an internationally protected person[,]" and/or "[t]he use of any . . . explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property").

### C.    The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA

TRIA defines "blocked asset[s]" as "any asset seized or frozen by the United States under . . . sections 202 and 203 of [IEEPA] (50 U.S.C. 1701; 1702)." TRIA § 201(d)(2)(A). On February 11, 2022, President Biden ordered, pursuant to IEEPA, that "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in[.]" Exec. Order No. 14,064 § 1(a). President Biden did so fully cognizant of the enforcement proceedings before this Court. 87 Fed. Reg at 8391 ("I also understand that various parties, including representatives of victims of

16

terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order."). The DAB Assets are therefore blocked property under TRIA, as the United States agrees. U.S. Statement 19.

> **D.    The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or Instrumentality Of The Taliban**

The Havlish Creditors can execute against the DAB Assets if the Court finds that (1) they are "held in the hands of" DAB, and (2) DAB is an agency or instrumentality of the Taliban. *Kirschenbaum*, 830 F.3d at 132 (quoting *Weinstein*, 609 F.3d at 49). The Havlish Creditors have met these conditions.

> **1.    DAB Holds The DAB Assets**

Section 201 of TRIA authorizes execution against property belonging to "an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment." *Kirschenbaum*, 830 F.3d at 132 (citing *Weinstein*, 609 F.3d at 50). "[T]he fact that Plaintiffs obtained their underlying judgments against [the Taliban] . . . does not prevent" them from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA." *Id.*

There is no question that the DAB Assets belong to DAB. They are in DAB's account at the Fed,[36] and a property interest may thus be presumed. *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002) ("When a party holds funds in a bank account, possession is established, and the presumption of ownership follows."); *see also Hausler*, 127 F. Supp. 3d at 49 ("[U]nder New York law, the account holder of accounts containing assets belonging to the account holder has a property interest

---

[36] *See* Mitchell Decl. ¶¶ 5, 7–8 & Exs. 4, 6; *see also* U.S. Statement 8 ("The DAB Assets at issue are housed in accounts held at FRBNY for DAB[.]").

in those assets[.]"); *Miller v. City of Ithaca*, No. 10-CV-597, 2019 WL 2502712, at *3 (N.D.N.Y. June 17, 2019) (where funds in bank's possession were the judgment debtor's, the judgment debtor "necessarily ha[d] an interest in those funds"). Indeed, President Biden recognized that DAB holds assets at the FRBNY on February 11—and ordered all of DAB's assets in the country transferred to a consolidated account there. Exec. Order No. 14,064 § 1(a)–(b).

### 2.     DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA

The Second Circuit has defined three independent ways in which DAB can qualify as an agency or instrumentality of a terrorist party under TRIA. First, DAB will be an agency or instrumentality if it is "a means through which a material function of the terrorist party is accomplished[.]" *Kirschenbaum*, 830 F.3d at 135. Second, DAB will be an agency or instrumentality of the Taliban if it provides "material services to, on behalf of, or in support of the terrorist party." *Id.* Or third, DAB will be an agency or instrumentality if it is "owned, controlled, or directed by the terrorist party." *Id.* The Eleventh Circuit has adopted a similar test. *See Stansell v. FARC*, 771 F.3d 713, 724 n.6, 732 (11th Cir. 2014) (cited with approval in *Kirschenbaum*, 830 F.3d at 135–36, 135 n.19). The Havlish Creditors need to satisfy only one of the three alternative tests. Here, the Havlish Creditors satisfy all three tests.

First, DAB is and was controlled and directed by the Taliban at all times relevant to this litigation. It was controlled and directed by the Taliban in 2001, when the Taliban aided and abetted al Qaeda's execution of the September 11 attacks. H. DOC. NO. 106-268, at 4; *see also* Press Release, U.S. Dep't of Treasury, *supra* note 33 (DAB assets were "associated with the Taliban regime"). And it is again controlled and directed by the Taliban today—and has been since August 2021, when the Havlish Creditors served their writ as Taliban-installed leadership took control of

DAB and began managing DAB's operations and activities for the Taliban's benefit.[37] As demonstrated above and as more fully detailed in the Zerden Declaration, DAB is completely controlled by the Taliban.[38] Taliban leaders have been installed as leaders of DAB.[39] The Taliban Council of Ministers issues edicts for DAB to implement.[40] Current and former U.S. government officials recognize the Taliban controls DAB.[41] DAB's own media relations show the Taliban controls DAB.[42] Public and private organizations that previously worked with or through DAB are now bypassing it because of the Taliban's control.[43] The reality is that "DAB is now operating under the Taliban's direct, operational control."[44]

Second, the Taliban is using DAB to accomplish material functions supporting its illicit activities. For example, the Taliban is using DAB to facilitate and enhance illegal narcotics trafficking that generates revenue for the Taliban.[45] The Taliban can now use DAB's archive of highly sensitive Suspicious Activity Reports and financial investigation records to identify, punish, and retaliate against opponents.[46] By using DAB's authority to supervise Afghanistan's entire banking system, the Taliban has the power to remove all anti-money laundering and counter-terrorism financing controls, monitoring systems, and enforcement mechanisms that previously

---

[37] Zerden Decl. ¶¶ 39, 49–51.

[38] Zerden Decl. ¶¶ 14, 49–143; *see also supra* Part II.A.2.

[39] Zerden Decl. ¶¶ 54–84.

[40] Zerden Decl. ¶¶ 92–95.

[41] Zerden Decl. ¶¶ 99–114.

[42] Zerden Decl. ¶¶ 115–35.

[43] Zerden Decl. ¶¶ 140–43.

[44] Zerden Decl. ¶ 137; *see also id.* ¶ 51.

[45] Zerden Decl. ¶¶ 146–55.

[46] Zerden Decl. ¶¶ 156–59.

interfered with its terror financing activities.[47] In fact, a Taliban official who has been sanctioned for terror financing is now responsible for DAB's AML/CFT functions.[48] The Taliban's opportunity to expand its terrorist activities is also greatly enhanced by its ability to remove any oversight or attempts to regulate Afghanistan's *hawala* system, a centuries-old informal money exchange system that has also been used to fund terrorism.[49]

Third, the same evidence shows that DAB is providing material services to the Taliban.

Indeed, the present circumstances are just a return to form for the Taliban's relationship with DAB—it is using DAB in the same way that it did during the period when it controlled Afghan territory and institutions between 1997 and 2001.[50] These same facts led the United States to conclude then that DAB was "controlled by the Taliban." H. DOC. NO. 106-268, at 4. The Taliban has simply reimposed its former control and picked up where it left off twenty years ago.

Courts have found that entities are agencies or instrumentalities of terrorist organizations for purposes of TRIA based on far less than the circumstances of this case. *See, e.g.*, *Caballero v. FARC*, No. 18-CV-25337, 2021 WL 3927826, at *3 (S.D. Fla. Aug. 24, 2021) (individual who operated currency exchange program on behalf of terrorist party was an "agency or instrumentality" of that party under TRIA); *Caballero v. FARC*, No. 20-CV-1939, 2021 WL 6339256, at *2 (D. Conn. Jan. 14, 2021) (unaffiliated corporation was "agenc[y] or instrumentality" of terrorist party which "use[d]" it "to launder money"); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 241 (D.R.I. 2004) (subjecting assets of Holy Land Foundation to execution as an agency or instrumentality of Hamas based on "strong

---

[47] Zerden Decl. ¶¶ 160–67.

[48] Zerden Decl. ¶ 69.

[49] Zerden Decl. ¶¶ 168–78.

[50] Zerden Decl. ¶ 27.

evidence" it "operate[d] as a fund-raiser for Hamas in the United States").

Because DAB is an agency or instrumentality of the Taliban under governing Second Circuit precedent, its assets—including at the FRBNY—are subject to execution under TRIA.

> **3.    Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent With Binding Case Law, Statutory Text, And Congressional Purpose**

In its Statement of Interest, the United States takes no position on whether DAB is an agency or instrumentality of the Taliban under TRIA. U.S. Statement 19–20. Instead, it points out areas of sensitivity that the Court should be careful to avoid when adjudicating this motion. *Id.* There is a clear path that this Court should take to recognize the Havlish Creditors' entitlement to immediate relief without impinging upon Executive Branch prerogatives: a simple application of the binding standard in *Kirschenbaum*. To the extent that the Court must skirt legal territory related to the conduct of foreign relations as it walks down that path, that is so only because of Congress' choice in TRIA to prioritize the ability of victims of terrorism to recover judgments from terrorist parties (including from any agency or instrumentality of a terrorist party) over "any other provision of law," including the FSIA. *See* TRIA § 201(a); *Smith*, 280 F. Supp. 2d at 319. And the binding authority of *Kirschenbaum* does not compel—or even suggest—any different approach.

It is important to understand what the Havlish Creditors are not asking this Court to do. The Court does not need to recognize any government of Afghanistan or to preempt any Executive Branch determination on that matter. *See* U.S. Statement 26. The Court does not need to consider whether DAB is or is not an active central bank of any particular state—that is a determination relevant only for purposes of the FSIA, not TRIA. *See* U.S. Statement 25. The Court does not need to decide that the funds at the FRBNY are "assets of" the Taliban by virtue of its claim to be the government of Afghanistan. *See* U.S. Statement 25, 26. The Court does not need to deem either the Taliban or Afghanistan a state sponsor of terror. *See* U.S. Statement 20. The United States

asserts that these are sensitive areas of executive competency that the Court should take care to avoid, and we agree that those interests need not be disturbed.

The only thing this Court needs to do is apply the plain text of the "agency or instrumentality of any terrorist party" clause of TRIA pursuant to the Second Circuit's well-established, binding *Kirschenbaum* test and conclude that, under that test and on the present record, DAB is an agency or instrumentality of the Taliban (as the evidence overwhelmingly shows).[51]

Nor is there any basis to depart from the text simply because a non-state party is the defendant or because that non-state party has taken control of a state institution. As the Second Circuit has recognized, TRIA's definition of "agency or instrumentality" was intentionally drafted to extend much further than the definition of an "agency or instrumentality" under the FSIA. *Kirschenbaum*, 830 F.3d at 132–135. The Second Circuit did not hint that this test should be applied differently based on the identity of the terrorist party or instrumentality—in fact, it did quite the opposite. *See id.* at 134 ("The plain language of the TRIA refers only to 'the blocked assets of any agency or instrumentality of that terrorist party,' and does not differentiate among the variety of entities that might qualify as a 'terrorist party.'"). Notably, the *Kirschenbaum* Court applied its TRIA test to an alleged instrumentality of Iran (even though that is precisely the circumstance in which the FSIA's test would have traditionally applied).[52] *Id.* This Court must accordingly apply the same *Kirschenbaum* test for the same statutory phrase in this case. After all, "[t]he meaning of words in a statute cannot change with the statute's application. To hold otherwise

---

[51] Section 201(d)(4) of TRIA does not provide or suggest any limitation on what assets of a terrorist party can be attached; it merely contains the definition of a "terrorist party." *See* U.S. Statement 25 n.8.

[52] A finding that DAB is an instrumentality of the Taliban thus does not require the Court to make any prerequisite finding about whether the Taliban is the government of Afghanistan, as would be necessary under FSIA, because under *Kirschenbaum* the definitions of "agency or instrumentality" under TRIA and the FSIA are entirely separate.

'would render every statute a chameleon,' and 'would establish within our jurisprudence . . . the dangerous principle that judges can give the same statutory text different meanings in different cases[.]'" *United States v. Santos*, 553 U.S. 507, 522–23 (2008) (plurality opinion) (quoting *Clark v. Martinez,* 543 U.S. 371, 382, 386 (2005)) (citations omitted). And at least one court in this circuit has already applied the *Kirschenbaum* test to hold that agencies or instrumentalities of foreign governments can also constitute agencies and instrumentalities of an entirely separate terrorist party under TRIA. *See Caballero v. FARC*, No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) (Venezuelan state oil company was agency or instrumentality of Colombian terrorist group pursuant to TRIA); Order, *Caballero*, No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020), ECF No. 15 (same); *see also Caballero*, 2021 WL 6339256, at *2 (PDVSA subsidiary was agency or instrumentality of FARC).

The idea that a non-state terrorist party might commandeer and control a state agency or instrumentality for its own purposes would not have been foreign to the 107th Congress when it enacted TRIA. Indeed, the very same Congress that passed TRIA had received a report from the President that, as of early 2001, the Taliban (in its role as a non-state actor) had taken control of DAB. H. Doc. No. 107-16, at 4. If that Congress had wanted to write a statute that limited the ability of terror victims to recover in these familiar circumstances—if it wanted terror victims to recover from only *private* agencies or instrumentalities of non-state terrorist actors, or wanted to limit them to recovery only under the principles established under the FSIA—it could have done so. But it plainly did not. To except the DAB's assets in this instance would effectively immunize the Taliban (or any other similarly situated terrorist party in the future) from TRIA and would frustrate the very purpose of that law: making assets of any agency or instrumentality of a terrorist

party, *i.e.*, any entity effectively controlled by or used for the benefit of that terrorist party, available for attachment by victims of that terrorist party.

And, as the United States agrees, in cases like this one, the statutory text of FSIA is wholly superseded by TRIA, which makes blocked assets of any terrorist party or any agency or instrumentality of any terrorist party available for execution "[n]otwithstanding any other provision of law." TRIA § 201(a); *see also Kirschenbaum*, 830 F.3d at 134–135 ("The FSIA definition of 'agency or instrumentality' . . . do[es] not pertain to those terms in the TRIA."). It thus makes little sense to attempt to graft principles of law gleaned from decades of interpreting the FSIA onto a provision that was intentionally written to supersede the limits of that statute.

### 4.    Alternatively, DAB Is The Taliban's Alter Ego

The Court could also conclude that DAB is an alter ego of the Taliban, subjecting its assets to TRIA as a "terrorist party" itself, because DAB "is so extensively controlled by [the Taliban] that a relationship of principal and agent is created[.]" *Kirschenbaum*, 830 F.3d at 128 (citation omitted). As has been exhaustively shown, the Taliban exerts such extensive control over DAB that DAB qualifies as its alter ego. *See supra* Part IV.D.2.

### E.    The Havlish Creditors Are Entitled To The DAB Assets

The second prong of the C.P.L.R. Section 5225(b) turnover analysis—that the judgment debtor is "entitled to possession of [the] property"—is satisfied because the property is indisputably DAB's and the only restraint on possession is the blocked nature of the assets. In such cases, TRIA makes blocked property available to qualified judgment creditors like the Havlish Creditors. *Weininger*, 462 F. Supp. 2d at 499; *see also Harrison*, 802 F.3d at 409 (funds subject to TRIA "may be distributed without a license from OFAC"). Courts thus routinely find that this prong is satisfied where the blocked assets at issue are subject to TRIA. *Hausler*, 127 F. Supp. 3d at 48; *Weininger*, 462 F. Supp. 2d at 499; *Heiser*, 919 F. Supp. 2d at 422; *accord Caballero*, 2021

WL 6339256, at *2 (Connecticut turnover statute satisfied based on TRIA agency/instrumentality analysis). Nothing else stands in the way of execution. *See also Hill v. Republic of Iraq,* No. 99-CV-3346, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (the "notwithstanding provision" is "unambiguous and effectively supersedes all previous laws"); *cf. Weinstein*, 609 F.3d at 53 ("notwithstanding" clause superseded U.S. treaty obligations).

### F.     The Havlish Creditors' Writ Has Priority

The Havlish Creditors were the first to deliver their writ to the U.S. Marshal (and the first to levy upon the assets). *See* Mitchell Decl. ¶¶ 2 (*Havlish* Writ delivered to U.S. Marshal on Aug. 27, 2021), 3–4 & Ex. 3 (U.S. Marshal levied *Havlish* Writ against DAB Assets by service on Sept. 14, 2021); *supra* note 32 (levy can be accomplished by service). These facts are undisputed and establish the absolute priority of the *Havlish* Writ. *See also* N.Y. C.P.L.R. § 5234 (executions "shall be satisfied . . . in the order in which they were delivered"); *CSX Transp.*, 879 F.3d at 472.

## V.     Conclusion

For the foregoing reasons, the Court should grant the Havlish Creditors' turnover motion as to the blocked assets of DAB (as an agency or instrumentality of the Taliban) which are in the possession, custody, or control of the FRBNY in an amount sufficient to satisfy their award of compensatory damages in the amount of $2,086,386,669, pursuant to Section 201(a) of TRIA.

Dated: March 20, 2022

*/s/ Lee S. Wolosky*
Lee S. Wolosky
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1628
lwolosky@jenner.com

Douglass A. Mitchell *(pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6090
dmitchell@jenner.com

Timothy B. Fleming (DC Bar No 351114)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB PLLC
2202 18th Street, NW, #110
Washington, DC 20009-1813
(202) 467-4489

Dennis G. Pantazis
(AL Bar No. ASB-2216-A59D)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB, LLC (Lead Counsel)
301 19th Street
North Birmingham, AL 35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN 46260
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
FOOTE, MIELKE,
CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
(630) 232-7450

Stuart H. Singer (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Phone 954 356 0011
Fax 954 356 0022

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Phone 212 446 2300

*Counsel for the Havlish Creditors*