Exhibit 8



# BARECON 2017

**STANDARD BAREBOAT CHARTER PARTY      PART I**

| | |
|---|---|
| 1. Place and date<br><br>**3 March 2021** | |

| | |
|---|---|
| 2. Owners (Cl. 1)<br>(i) Name: **Fleetscape Suez Rajan, LLC**<br>(ii) Place of registered office: **Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands**<br>(iii) Law of registry: **Marshall Islands** | 3. Charterers (Cl. 1)<br>(i) Name: **Suez Rajan Limited**<br>(ii) Place of registered office: **Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands**<br>(iii) Law of registry: **Marshall Islands** |
| 4. Vessel (Cl. 1 and 3)<br>(i) Name: **SUEZ RAJAN**<br>(ii) IMO number: **9524475**<br>(iii) Flag State: **Liberia**<br>(iv) Type: **Chemical Tanker** | (v) GT/NT: **81,282 / 52,295**<br>(vi) Summer DWT: **158574 mt**<br>(vii) When/where built: **2011/ Hyundai Heavy Industries Co., Ltd.**<br>(viii) Classification Society: **American Bureau of Shipping** |
| 5. Date of last special survey by the Vessel's Classification Society<br>**10 June 2016** | 6. Validity of class certificates (state number of months to apply)<br>(i) Delivery (Cl. 3): **As per MOA**<br>(ii) Redelivery (Cl. 10): **Three (3)** |
| 7. Latent Defects (state number of months to apply) (Cl. 1, 3)<br>**N/A** | 8. Port or place of delivery (Cl. 3)<br>**As per clause 5(a) of the MOA** |
| 9. Delivery notices (Cl. 4)<br>~~days' approximate notices and~~ ~~days' definite notices~~Notices to be given as per clause 5 of the MOA | 10. Time for delivery (Cl. 4)<br>**See Additional Clauses 58 (Redelivery)** |
| 11. Cancelling date (Cl. 4, 5)<br>**The date falling 90 days after the date of the MOA** | 12. Port or place of redelivery (Cl. 10)<br>**See Additional Clauses 58 (Redelivery) and 59 (Redelivery conditions)** |
| 13. Redelivery notices (Cl. 10)<br>~~days' approximate notices and~~ ~~definite notices~~See Additional Clauses 58 (Redelivery) and 59 (Redelivery conditions) | 14. Trading limits (Cl. 11)<br>**Trading worldwide always within International Navigation Limits; always via safe/always afloat ice free port(s)/berth(s) subject to compliance with this Charter including, without limitation, Additional Clauses 51.25 (Sanctions representations), 57.20 (Compliance with laws, anti-drug legislation, ISM Code and ISPS Code) and 55.22 (Sanctions undertakings)** |
| 15. Bunker fuels, unused oils and greases (optional, state if (a) (actual net price), or (b) (current net market price to apply) (Cl. 9)<br>**N/A (See Clause 9)** | 16. Charter period (Cl. 2)<br>**See definition of "Charter Period" under Additional Clause 39 (Definitions and interpretation)** |
| 17. Charter hire (state currency and amount) (Cl. 2, 10 and 15)<br>(i) Charter hire: **see Additional Clause 43 (Hire)**<br>(ii) Charter hire for optional period: **See Additional Clause 43 (Hire)** | 18. Optional period and notice (Cl. 2)<br>(i) State extension period in months: **N/A**<br>(ii) State when declarable: **N/A** |
| 19. Rate of interest payable (Cl. 15(g))<br>**See Additional Clause 43.8 (Default interest)** | 20. Owners' bank details (state beneficiary and bank account) (Cl. 15)<br>**See Additional Clause 43 (Hire)** |

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

| | |
|---|---|
| 21. New class and other regulatory requirements (Cl. 13(b))<br>(i) State if 13(b)(i) or (ii) to apply: **13(b)(i) applies.  See also Additional Clause 57.5 (Owners' consent for structural changes and alterations)**<br>(ii) Threshold amount (AMT): **N/A**<br>(iii) Vessel's expected remaining life in years on the date of delivery: **N/A** | |
| 22. Mortgage(s), if any (state if 16(a) or (b) to apply; if 16(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 1, 16)<br>**16(b) applies. See also Additional Clause 67 (Owners' Security). First priority ship mortgage in favour of Oxane Partners Limited to be entered into.** | |
| 23. Insured Total Loss value (Cl. 17)<br>**See Additional Clause 56 (Insurance Undertakings)** | 24. Insuring party (state if Cl. 17(b) (Charterers to insure) or Cl. 17(c) (Owners to insure) to apply)<br>**17(b) applies.  See also Additional Clause 56 (Insurance undertakings).** |
| 25. Performance guarantee (state amount and entity) (Cl. 27) (optional)<br>**See definition of "Charter Guarantees" and Additional Clauses Part II of Schedule 1 (Conditions to delivery) requiring the provision of the Charter Guarantees** | |
| 26. Dispute Resolution (state 33(a), 33(b), 33(c) or 33(d); if 33(c) is agreed, state Singapore or English law; if 33(d) is agreed, state governing law and place of arbitration) (Cl. 33)<br>**(d) See Additional Clause 82 (Law and arbitration)** | |
| 27. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies and if "yes", complete details below) (optional)<br>**No**<br>(i) Name of Builders:<br>(ii) Hull number:<br>(iii) Date of newbuilding contract:<br>(iv) Liquidated damages for physical defects or deficiencies (state party):<br>(v) Liquidated damages for delay in delivery (state party): | |
| 28. Purchase Option (indicate with "yes" or "no" whether PART IV applies) (optional)<br>**Yes**<br>See Additional Clause 64 (Purchase option) (Part IV does not apply) | 29. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies and if "yes", complete details below) (optional) **Yes**<br>(i) Underlying Registry: **Liberia**<br>(ii) Bareboat Charter Registry: **Marshall Islands** |
| 30. Notices to Owners (state full style details for serving notices) (Cl. 34)<br>**See Additional Clause 74 (Notices)** | 31. Notices to Charterers (state full style details for serving notices) (Cl. 34)<br>**See Additional Clause 74 (Notices)** |

It is mutually agreed that this Charter Party shall be performed subject to the conditions contained in this Charter Party which shall include PART I and PART II and the Additional Clauses. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II, and the provisions of the Additional Clauses shall prevail over those of Part I and Part II, to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter Party if expressly agreed and stated in Box 27, 28 and 29. If PART III and/or PART IV and/or PART V applies, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| | |
|---|---|
| Signature (Owners)<br>**Fleetscape Suez Rajan, LLC** | Signature (Charterers)<br>**Suez Rajan Limited**<br><br>Effie P.Paraskevopoulou<br>Director |

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

| 21. New class and other regulatory requirements (Cl. 13(b)) |
| --- |
| (i) State if 13(b)(i) or (ii) to apply: **13(b)(i) applies.  See also Additional Clause 57.5 (Owners' consent for structural changes and alterations)** |
| (ii) Threshold amount (AMT): **N/A** |
| (iii) Vessel's expected remaining life in years on the date of delivery: **N/A** |

| 22. Mortgage(s), if any (state if 16(a) or (b) to apply; if 16(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 1, 16) |
| --- |
| **16(b) applies. See also Additional Clause 67 (Owners' Security). First priority ship mortgage in favour of Oxane Partners Limited to be entered into.** |

| 23. Insured Total Loss value (Cl. 17) **See Additional Clause 56 (Insurance Undertakings)** | 24. Insuring party (state if Cl. 17(b) (Charterers to insure) or Cl. 17(c) (Owners to insure) to apply) **17(b) applies.  See also Additional Clause 56 (Insurance undertakings).** |
| --- | --- |

| 25. Performance guarantee (state amount and entity) (Cl. 27) (optional) |
| --- |
| **See definition of "Charter Guarantees" and Additional Clauses Part II of Schedule 1 (Conditions to delivery) requiring the provision of the Charter Guarantees** |

| 26. Dispute Resolution (state 33(a), 33(b), 33(c) or 33(d); if 33(c) is agreed, state Singapore or English law; if 33(d) is agreed, state governing law and place of arbitration) (Cl. 33) |
| --- |
| **(d) See Additional Clause 82 (Law and arbitration)** |

| 27. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies and if "yes", complete details below) (optional) |
| --- |
| **No** |
| (i) Name of Builders: |
| (ii) Hull number: |
| (iii) Date of newbuilding contract: |
| (iv) Liquidated damages for physical defects or deficiencies (state party): |
| (v) Liquidated damages for delay in delivery (state party): |

| 28. Purchase Option (indicate with "yes" or "no" whether PART IV applies) (optional) **Yes** See Additional Clause 64 (Purchase option) (Part IV does not apply) | 29. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies and if "yes", complete details below) (optional) **Yes** (i) Underlying Registry: **Liberia** (ii) Bareboat Charter Registry: **Marshall Islands** |
| --- | --- |
| 30. Notices to Owners (state full style details for serving notices) (Cl. 34) **See Additional Clause 74 (Notices)** | 31. Notices to Charterers (state full style details for serving notices) (Cl. 34) **See Additional Clause 74 (Notices)** |

It is mutually agreed that this Charter Party shall be performed subject to the conditions contained in this Charter Party which shall include PART I and PART II and the Additional Clauses. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II, and the provisions of the Additional Clauses shall prevail over those of Part I and Part II, to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter Party if expressly agreed and stated in Box 27, 28 and 29. If PART III and/or PART IV and/or PART V applies, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) **Fleetscape Suez Rajan, LLC** | Signature (Charterers) **Suez Rajan Limited** |
| --- | --- |

Jennifer Ashford
Attorney in fact

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

**1.    Definitions**

In this Charter Party:

"Banking Day" means a day on which banks are open in the places stated in Boxes 2, 3, 30 and 31, and, for payments in US dollars, in New York.

"Charterers" means the party identified in Box 3.

"Crew" means the Master, officers and ratings and any other personnel employed on board the Vessel.

"Financial Instrument" means any Senior Finance Document (as defined in Additional Clause 39 (Definitions and interpretation) the mortgage, deed of covenant or other such financial security instrument as identified in Box 22.

"Flag State" means the flag state in Box 4 or such other flag state to which the Charterers may have re-registered the Vessel with the Owners' consent during the Charter Period.

"Latent Defect" means a defect which could not be discovered on such an examination as a reasonably careful skilled person would make.

"Owners" means the party identified in Box 2.

"Total Loss" means an actual, constructive, compromised or agreed total loss of the Vessel under the insurances.

"Vessel" means the vessel described in Box 4 including its equipment, machinery, boilers, fixtures and fittings.

See Additional Clause 39 (Definitions and Interpretation)

**2.    Charter Period**

The Owners have agreed to let and the Charterers have agreed to hire the Vessel for the Charter Period period stated in Box 16 ("Charter Period").

The Charterers shall have the option to extend the Charter Period by the period stated in Box 18(i) at the rate stated in Box 17(ii), which option shall be exercised by written notice to the Owners latest as stated in Box 18(ii).

Subject to the terms and conditions herein provided, during the Charter Period the Vessel shall be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect.

**3.    Delivery**

See Additional Clause 42 (Delivery)(not applicable when Part III applies, as stated in Box 27).

(a)    The Owners shall deliver the Vessel in a seaworthy condition and in every respect ready for service under this Charter Party and in accordance with the particulars stated in Boxes 4 to 6.

If the Charterers have inspected the Vessel prior to delivery, the Vessel shall be delivered by the Owners in the same condition as at the time of inspection, fair wear and tear excepted.

The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place stated in Box 8 at such readily accessible safe berth or mooring as the Charterers may direct.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

(b)   The Vessel shall be properly documented on delivery in accordance with the laws and regulations of the Flag State and the requirements of the Classification Society stated in Box 4. The Vessel upon delivery shall have its survey cycles up to date and class certificates valid and unextended for at least the number of months stated in Box 6(i) free of any conditions or recommendations. If Box 6(i) is not filled in, then six (6) months shall apply.

(c)   The delivery of the Vessel by the Owners and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be liable for the cost of but not the time for repairs or renewals arising out of Latent Defects in the Vessel existing at the time of delivery under this Charter Party, provided such Latent Defects manifest themselves within the number of months after delivery stated in Box 7. If Box 7 is not filled in, then twelve (12) months shall apply.

**4.   Time for Delivery**

See Additional Clause 42 (Delivery)(not applicable when Part III applies, as stated in Box 27)

The Vessel shall not be delivered before the date stated in Box 10 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date stated in Box 11.

The Owners shall keep the Charterers informed of the Vessel's itinerary for the voyage leading up to delivery and shall serve the Charterers with the number of days approximate/definite notices of the Vessel's delivery stated in Box 9. Following the tender of any such notices the Owners shall give or allow to be given to the Vessel only such further employment orders as are reasonably expected when given to allow delivery to occur by the date notified.

**5.   Cancelling**

See Additional Clause 40 (Background)(not applicable when Part III applies, as stated in Box 27)

(a)   Should the Vessel not be delivered by the cancelling date stated in Box 11, the Charterers shall have the option of cancelling this Charter Party.

(b)   If it appears that the Vessel will be delayed beyond the cancelling date, the Owners may, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within three (3) Banking Days of the receipt by the Charterers of such notice. If the Charterers do not then exercise their option of cancelling, the readiness date stated in the Owners' notice shall be substituted for the cancelling date stated in Box 11 for the purpose of this Clause 5 (Cancelling).

(c)   Cancellation under this Clause 5 (Cancelling) shall be without prejudice to any claim the Charterers may otherwise have against the Owners under this Charter Party.

**6.   Familiarisation N/A**

(a)   The Charterers shall have the right to place a maximum of two (2) representatives on board the Vessel at their sole risk and expense for a reasonable period prior to the delivery of the Vessel.

The Charterers and the Charterers' representatives shall sign the Owners' usual letter of indemnity prior to embarkation.

(b)   The Owners shall have the right to place a maximum of two (2) representatives on board the Vessel at their sole risk and expense for a reasonable period prior to the redelivery of the Vessel.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

The Owners and the Owners' representatives shall sign the Charterers' usual letter of indemnity prior to embarkation.

(c)     Such representatives shall be on board for the purpose of familiarisation and in the capacity of observers only, and they shall not interfere in any respect with the operation of the Vessel.

**7.      Surveys on Delivery and Redelivery** N/A

(a)     The Owners and Charterers shall each appoint and pay for their respective surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. The Owners shall bear all the Vessel's expenses related to the on-hire survey including loss of time, if any. The Charterers shall bear all the Vessel's expenses related to the off-hire survey including loss of time, if any.

(b)     Divers inspection on delivery/re-delivery

The Charterers shall have the option at delivery and the Owners shall have the option at redelivery, at their respective time, cost and expense, to arrange for an underwater inspection by a diver approved by the Classification Society, in the presence of a Classification Society surveyor, to determine the condition of the rudder, propeller, bottom and other underwater parts of the Vessel.

**8.      Inventories**

A complete inventory of the Vessel's equipment, outfit, spare parts and consumable stores on board the Vessel shall be made by the ~~parties~~ Charterers on delivery and redelivery of the Vessel. See also Additional Clauses 57.21 (Bunkers, unused lubricating and hydraulic oils at delivery) and 57.22 (Bunkers, unused lubricating and hydraulic oils at redelivery).

**9.      Bunker fuels, oils and greases**

The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunker fuels and unused lubricating and hydraulic oils and greases in storage tanks and unopened drums at:

(a)*    The actual price paid (excluding barging expenses) as evidenced by invoices or vouchers.

(b)*    The current market price (excluding barging expenses) at the port and date of delivery/redelivery of the Vessel or, if unavailable, at the nearest bunkering port.

*Subclauses (a) and (b) are alternatives; state alternative agreed in Box 15. If Box 15 is not filled in, then subclause (a) shall apply. See Additional Clauses 57.21 (Bunkers, unused lubricating and hydraulic oils at delivery) and 57.22 (Bunkers, unused lubricating and hydraulic oils at redelivery)

**10.     Redelivery**

See Additional Clauses 58 (Redelivery) and 59 (Redelivery conditions)At the expiration of the Charter Period the Vessel shall be redelivered by the Charterers and taken over by the Owners at the port or place stated in Box 12 at such readily accessible safe berth or mooring as the Owners may direct.

The Charterers shall keep the Owners informed of the Vessel's itinerary for the voyage leading up to redelivery and shall serve the Owners with the number of days approximate/definite notices of the Vessel's redelivery stated in Box 13.

The Charterers warrant that they will not permit the Vessel to commence a voyage (including any preceding ballast voyage) which cannot reasonably be expected to be completed in time to allow redelivery of the Vessel within the Charter Period and in accordance with the notices given. Notwithstanding the above, should the

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

Charterers fail to redeliver the Vessel within the Charter Period, the Charterers shall pay the daily equivalent to the rate of hire stated in Box 17(i) applicable at the time plus ten (10) per cent or the market rate, whichever is the higher, for the number of days by which the Charter Period is exceeded. Such payment of the enhanced hire rate shall be without prejudice to any claims the Owners may have against the Charterers in this respect. All other terms, conditions and provisions of this Charter Party shall continue to apply.

Subject to the provisions of Clause 13 (Maintenance and Operation), the Vessel shall be redelivered to the Owners in the same condition and class as that in which it was delivered, fair wear and tear not affecting class excepted.

The Vessel upon redelivery shall have her survey cycles up to date and class certificates valid and unextended for at least the number of months agreed in Box 6(ii) free of any conditions or recommendations. If Box 6(i) is not filled in, then six (6) months shall apply.

All plans, drawings and manuals (excluding ISM/ISPS manuals) and maintenance records shall remain on board and accessible to the Owners upon redelivery. Any other technical documentation regarding the Vessel which may be in the Charterers' possession shall promptly after redelivery be forwarded to the Owners at their expense, if they so request. The Charterers may keep the Vessel's log books but the Owners shall have the right to make copies of the same.

**11.    Trading Restrictions**

The Vessel shall be employed in lawful trades for the carriage of lawful merchandise within the trading limits stated in Box 14.

The Charterers undertake not to employ the Vessel or allow the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to additional premium or otherwise as the insurers may require.

The Charterers will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Flag State, or of the places where the Vessel trades.

Notwithstanding any other provisions contained in this Charter Party it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof.

**12.    Contracts of Carriage**

(a)    The Charterers are to procure that all documents issued during the Charter Period evidencing the terms and conditions agreed in respect of carriage of goods shall contain a paramount clause which shall incorporate the Hague-Visby Rules, the Hague Rules or the Hamburg Rules unless any other legislation relating to carrier's liability for cargo is compulsorily applicable in the trade. The documents shall also contain the New Jason Clause and the Both-to-Blame Collision Clause.

(b)    The Charterers are to procure that all passenger tickets issued during the Charter Period for the carriage of passengers and their luggage under this Charter Party shall contain a paramount clause which shall incorporate the Athens Convention Relating to the Carriage of Passengers and their Luggage by Sea, 1974, and any protocol thereto, unless any other legislation relating to carrier's liability for passengers and their luggage is compulsorily applicable in the trade.

**13.    Maintenance and Operation**

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

See also Additional Clause 57 (Vessel Undertakings)

(a)    Maintenance

The Charterers shall properly maintain the Vessel in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice ~~and, at their own expense, maintain the Vessel's Class with the Classification Society stated in Box 4 and all necessary certificates.~~ in full compliance with all applicable national and international statutes, conventions and regulations for safe operation of the Vessel and the Charterers shall at their own expense:

(i) maintain the Vessel's Class with the Classification Society;

(ii) keep the Vessel's Class fully up to date;

(iii) keep the Vessel free of any overdue recommendations or conditions with the Classification Society; and

(iv) maintain all necessary certificates valid and unextended.

The Charterers shall always maintain the Vessel to the satisfaction of the Flag State.

The Vessels will timely be subjected to all relevant periodic surveys in accordance with the regulations of Class and in accordance with applicable statutes and regulations including those of the Flag State of the Vessel.

The validity of all applicable trading certificates and survey positions shall be preserved at all times.  Upon request the Charterers will supply the Owner with a copy of each of the certificates.

(b)    New Class and Other Regulatory Requirements

(i)*    In the event of any structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation or local regulations (including without limitation USCG or IMO rules) (collectively) ("Required Modification"), all such costs shall be for the Charterers' account, and at their sole time and cost to enable the Vessel to continue to operate in all customary trading areas for such vessels.

~~(ii)*    In the event of any structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of a Required Modification, the costs shall be apportioned as follows:~~

~~(1)    if the costs of the Required Modification are less than the amount stated in Box 21(ii), such costs shall be for the Charterers' account;~~

~~(2)    if the costs of the Required Modification are greater than the amount stated in Box 21(ii), the Charterers' portion of costs shall be apportioned using the formula below; all costs other than the Charterers' portion shall be for the Owners' account.~~

~~AMT = agreed amount stated in Box 21(ii)~~

~~CRM = cost of Required Modification~~

~~MEL = modification's expected life in years~~

~~VEL = the Vessel's expected remaining life in years stated in Box 21(iii) less the number of years between the date of delivery and the date of the modification.~~

~~RPY = remaining charter period in years~~

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

(i) If the Required Modification is expected to last for the remaining life of the Vessel, then:

Charterers' portion of costs = $\frac{CRM}{VEL}$ x RPY

(ii) If the Required Modification is not expected to last for the remaining life of the Vessel, then:

Charterers' portion of costs = $\frac{CRM}{MEL}$ x RPY

*Subclauses 13(b)(i) and 13(b)(ii) are alternatives, state alternative agreed in Box 21(i). If Box 21(i) is not filled in, then subclause 13(b)(i) shall apply.

(c)   Financial Security

The Charterers shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any relevant port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter Party without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so.

(d)   Operation of the Vessel

The Charterers shall at their own expense crew, victual, navigate, operate, supply, fuel, maintain and repair the Vessel during the Charter Period and they shall be responsible for all costs and expenses whatsoever relating to their use and operation of the Vessel, including any taxes and fees. The Crew shall be the servants of the Charterers for all purposes whatsoever, even if for any reason appointed by the Owners.

(e)   Information to Owners

The Charterers shall keep the Owners advised of the intended employment, planned dry-docking and major repairs of the Vessel, as reasonably required by the Owners. See also Additional Clause 57.18 (Notification of certain operational events)

(f)   Flag and Name of Vessel

During the Charter Period, the Charterers shall have the liberty to paint the Vessel in their own colours, install and display their funnel insignia and fly their own house flag. The Charterers shall also have the liberty, with the Owners' prior written consent, which shall not be unreasonably withheld, to change the flag and/or the name of the Vessel during the Charter Period. Painting and re-painting, instalment and re-instalment, registration and re-registration, if required by the Owners, shall be at the Charterers' expense and time. See Additional Clauses 57.2 (Registration) and 57.12 (Change of name)

(g)   Changes to the Vessel

Subject to subclause 13(b) (New Class and Other Regulatory Requirements), the Charterers shall make no structural or substantial changes to the Vessel without the Owners' prior written approval. If the Owners agree to such changes, the Charterers shall, if the Owners so require, restore the Vessel, prior to redelivery of the Vessel, to its former condition. See Additional Clause 57.5 (Owners' consent for structural changes and alterations)

(h)   Use of the Vessel's Outfit and Equipment

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

~~The Charterers shall have the use of all outfit, equipment and spare parts on board the Vessel at the time of delivery, provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as on delivery as per the inventory (see Clause 8 (Inventories)), ordinary wear and tear excepted. The Charterers shall from time to time during the Charter Period replace such equipment that become unfit for use. The Charterers shall procure that all repairs to or replacement of any damaged, worn or lost parts or equipment will be effected in such manner (both as regards workmanship and quality of materials, including spare parts) as not to diminish the value of the Vessel.~~

~~The Charterers have the right to fit additional equipment at their expense and risk but the Charterers shall remove such equipment at the end of the Charter Period if requested by the Owners. Any hired equipment on board the Vessel at the time of delivery shall be kept and maintained by the Charterers and the Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new hired equipment required in order to comply with any regulations.~~See Additional Clause 57.8 (Equipment)

(i)     Periodical Dry-Docking

The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once every sixty (60) calendar months or such other period as may be required by the Classification Society or Flag State.

**14.     Inspection during the Charter Period**

~~The Owners shall have the right at any time after giving reasonable notice to the Charterers to inspect the Vessel or instruct a duly authorised surveyor to carry out such inspection on their behalf to ascertain its condition and satisfy themselves that the Vessel is being properly repaired and maintained or for any other commercial reason they consider necessary (provided it does not unduly interfere with the commercial operation of the Vessel).~~

~~The fees for such inspections shall be paid for by the Owners. All time used in respect of inspection shall be for the Charterers' account and form part of the Charter Period.~~

~~The Charterers shall also permit the Owners to inspect the Vessel's class records, log books, certificates, maintenance and other records whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel.~~ See Additional Clause 57.9 (Inspection)

**15.     Hire** See Additional Clause 43 (Hire)

(a)     ~~The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter Party.~~

(b)     ~~The Charterers shall pay to the Owners for the hire of the Vessel a lump sum in the amount stated in Box 17(i) which shall be payable not later than every thirty (30) running days in advance, the first lump sum being payable on the date and hour of the Vessel's delivery to the Charterers. Hire shall be paid continuously throughout the Charter Period.~~

(c)     ~~Payment of hire shall be made to the Owners' bank account stated in Box 20.~~

(d)     ~~All payments of Charter Hire and any other payments due under this Charter shall be made without any set-off whatsoever and free and clear of any withholding or deduction for, or on account of, any present or future income, freight, stamp or other taxes, levies, imposts, duties, fees, charges, restrictions or conditions of any nature. If the Charterers are required by any authority in any country to make any withholding or deduction from any such payment, the sum due from the Charterers in respect of such payment will be increased to the extent necessary to ensure that, after the making of such withholding or deduction the Owners receive a net~~

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

~~sum equal to the amount which it would have received had no such deduction or withholding been required to be made.~~

~~(e)   If the Charterers fail to make punctual payment of hire due, the Owners shall give the Charterers three (3) Banking Days written notice to rectify the failure, and when so rectified within those three (3) Banking Days following the Owners' notice, the payment shall stand as punctual.~~

~~Failure by the Charterers to pay hire due in full within three (3) Banking Days of their receiving a notice from Owners shall entitle the Owners, without prejudice to any other rights or claims the Owners may have against the Charterers, to terminate this Charter Party at any time thereafter, as long as hire remains outstanding.~~

~~(f)   If the Owners choose not to exercise any of the rights afforded to them by this Clause in respect of any particular late payment of hire, or a series of late payments of hire, under the Charter Party, this shall not be construed as a waiver of their right to terminate the Charter Party.~~

~~(g)   Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 19. If Box 19 has not been filled in, the one month Interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 17, as quoted on the date when the hire fell due, increased by three (3) per cent, shall apply.~~

~~(h)   Payment of interest due under subclause 15(g) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date.~~

~~(i)   Final payment of hire, if for a period of less than thirty (30) running days, shall be calculated proportionally according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly.~~

16.   **Mortgage**

(only to apply if Box 22 has been appropriately filled in)

~~(a)*   The Owners warrant that they have not effected any mortgage(s) of the Vessel and that they shall not effect any mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~

(b)*   The Vessel chartered under this Charter Party <u>is</u> ~~is~~ financed by a mortgage according to the Financial Instrument. The Charterers undertake to comply, and provide such information and documents <u>relating to the Charterers and/or the Vessel</u> to enable the Owners to comply, with all such instructions or directions in regard to the employment, insurances, operation, repairs and maintenance of the Vessel as laid down in the Financial Instrument or as may be directed from time to time during the currency of the Charter Party by the mortgagee(s) in conformity with the Financial Instrument, including the display or posting of such notices <u>and such acknowledgements</u> as the Mortgagees may require. The Charterers confirm that, for this purpose, they <u>will, once such Financial Instrument is available</u> have acquainted themselves with all relevant terms, conditions and provisions of the Financial Instrument and agree to acknowledge this in writing in any form that may be required by the mortgagee(s). ~~The Owners warrant that they have not effected any mortgage(s) other than stated in Box 22 and that they shall not agree to any amendment of the mortgage(s) referred to in Box 22 or effect any other mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~ <u>See also Additional Clause 67 (Owners' Security).</u>

*(Optional, Subclauses 16(a) and 16(b) are alternatives; indicate alternative agreed in Box 22).

17.   **Insurance**

~~(a)   General~~

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

(i) The value of the Vessel for hull and machinery (including increased value) and war risks insurance is the sum stated in Box 23, or such other sum as the parties may from time to time agree in writing. The party insuring the Vessel shall do so on such terms and conditions and with such insurers as the other party shall approve in writing, which approval shall not be unreasonably withheld, and shall name the other party as co-assured.

(ii) Notwithstanding that the parties are co-assured, these insurance provisions shall neither exclude nor discharge liability between the Owners and the Charterers under this Charter Party, but are intended to secure payment of the loss insurance proceeds as a first resort to make good the Owners' loss. If such payment is made to the Owners it shall be treated as satisfaction (but not exclusion or discharge) of the Charterers' liability towards the Owners. For the avoidance of doubt, such payment is no bar to a claim by the Owners and/or their insurers against the Charterers to seek indemnity by way of subrogation.

(iii) Nothing herein shall prejudice any rights of recovery of the Owners or the Charterers (or their insurers) against third parties.

(b)*   Charterers to Insure

(i) During the Charter Period the Vessel shall be kept insured by the Charterers as per Additional Clause 56 (Insurance Undertakings) at their expense against hull and machinery, war, and protection and indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with subclause 13(c) (Financial Security)).

(ii) Such insurances shall be arranged by the Charterers to protect the interests of the Owners and the Charterers and the mortgagee(s) (if any), and the Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint.

(iii) The Charterers shall upon the request of the Owners, provide information and promptly execute such documents as may be required to enable the Owners to comply with the insurance provisions of the Financial Instrument.

(c)*   Owners to Insure

(i) During the Charter Period the Vessel shall be kept insured by the Owners at their expense against hull and machinery and war risks. The Charterers shall progress claims for recovery against any third parties for the benefit of the Owners' and the Charterers' respective interests.

(ii) During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with subclause 13(c) (Financial Security)).

(iii) In the event that any act or negligence of the Charterers prejudices any of the insurances herein provided, the Charterers shall pay to the Owners all losses and indemnify the Owners against all claims and demands which would otherwise have been covered by such insurances.

*Subclauses 17(b) and 17(c) are alternatives, state alternative agreed in Box 24. If Box 24 is not filled in, then subclause 17(b) (Charterers to Insure) shall apply.

**18.   Repairs**

See Additional Clause 59.3 (Surveyors and deficiencies)

(a)   Subject to the provisions of any Financial Instrument, and the approval of the Owners, the Charterers shall effect all insured repairs, and undertake settlement of all miscellaneous expenses in connection with such repairs as well as all insured charges, expenses and liabilities.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

To the extent of coverage under the insurances provided for under the provisions of subclause 17(c) (Owners to Insure), the Charterers shall be reimbursed under the Owners' insurances for such expenditures upon presentation of accounts.

(b)   The Charterers shall remain responsible for and effect repairs and settlement of costs and expenses incurred thereby in respect of all repairs not covered by the insurances and/or not exceeding any deductibles provided for in the insurances.

(c)   All time used for repairs under the provisions of subclauses 18(a) and 18(b) and for repairs of Latent Defects according to Clause 3 (Delivery) above, including any deviation, shall be for the Charterers' account and shall form part of the Charter Period.

**19.   Total loss**

See additional Clause 44 (Illegality, prepayment and Total loss) and 56 (Insurance undertakings)

(a)   The Charterers shall be liable to the Owners by way of damages if the Vessel becomes a Total Loss. Subject to the provisions of any Financial Instrument, if the Vessel becomes a Total Loss, all insurance payments for such loss shall be paid to the Owners who shall distribute the monies between the Owners and the Charterers according to their respective interests, which shall satisfy (but not exclude or discharge) the Charterers' liability to the Owners thereof. The Charterers undertake to notify the Owners and the mortgagee(s), if any, of any occurrences in consequence of which the Vessel is likely to become a Total Loss.

(b)   Notwithstanding any other clause herein, it is recognised that the Charterers have a continuing obligation to protect and preserve the Vessel as an asset of the Owners. The Charterers shall have a continuing duty after the termination of the Charter Party to preserve and present claims on behalf of Owners and Charterers and/or any subrogated insurers against any third party held responsible for the Total Loss during the Charter Period and account for any recovery achieved.

(c)   The Owners or the Charterers, as the case may be, shall upon the request of the other party, promptly execute such documents as may be required to enable the other party to abandon the Vessel to the insurers and claim a constructive total loss.

**20.   Lien**

The Owners shall have a lien upon all cargoes, hires and freights (including deadfreight and demurrage) belonging or due to the Charterers or any sub-charterers, for any amounts due under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned.

**21.   Non-Lien**

The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the VesselSee additional Clause 55.8 (Negative pledge).

**22.   Indemnity**

(a)   Without prejudice to any other indemnities in this Charter, tThe Charterers shall indemnify the Owners against any loss, damage or expense arising out of or in relation to the operation of the Vessel by the Charterers (including but not limited to any taxes due) or any breach of Sanctions, and against any lien of whatsoever nature arising out of an event occurring during the Charter Period. This shall include indemnity for any loss, damage or expense arising out of or in relation to any international convention which may impose liability upon the Owners.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

(b)      Without prejudice to the generality of the foregoing, the Charterers agree to indemnify the Owners against (i) all consequences or liabilities arising from the Master, officers or agents signing bills of lading or other documents (ii) any Break Costs whatsoever including if any swap/fixed interest agreement is terminated prior to maturity.

(c)      If the Vessel is arrested or otherwise detained for any reason whatsoever other than those covered in subclause (d), the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.

(d)      If the Vessel is arrested or otherwise detained by reason of a claim or claims against the Owners, the Owner Security Trustee, the Owners' Parent or any of their Affiliates or related companies. provided such claim(s) is:

_____ (i) the consequence of acts or omissions of the Owners, and

_____ (ii) the responsibility of the Owners (in whole, or shared jointly or severally with a third party which is not an Obligor or an Affiliate of an Obligor) and results from an act or omission of the Owners, and

_____ (iii) not related to the operation of the Vessel or a consequence of the physical position of the Vessel or caused by the acts of omissions of crew or third parties,

the Owners shall at their own expense take all reasonable steps to secure that within 30 days a reasonable time the Vessel is released, including the provision of bail.

In such circumstances the Owners shall indemnify the Charterers against any loss, damage or expense incurred by the Charterers (including hire paid under this Charter Party) as a direct consequence of such arrest or detention.

(e)      Without prejudice to the other indemnities contained in this Clause 22 and elsewhere in this Charter, the Charterers hereby undertake and agree with the Owners to indemnify and hold the Owners harmless and to keep the Owners indemnified and held harmless on the date of this Charter, at all times during the currency of this Charter, or at any time in respect of events arising during this Charter, against all losses, damages, liabilities, expenses and costs incurred or sustained whatsoever by the Owners as a consequence of any breach by the Charterers of this Charter or the occurrence of any Termination Event and any losses, damages, liabilities, expenses and costs whatsoever incurred in preventing or attempting to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or in the detention of the Vessel, or in securing the release of the Vessel therefrom and any Break Costs (unless such arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention is covered by clause 22(d)).

(f)      The indemnities contained in this Clause 22 and in this Charter shall survive any termination or other ending of this Charter.

**23.    Salvage**

All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers.

**24.    Wreck Removal**

If the Vessel becomes a wreck, or any part of the Vessel is lost or abandoned, and is an obstruction to navigation or poses a hazard and has to be raised, removed, destroyed, marked or lit by order of any lawful authority having jurisdiction over the area or as a result of any applicable law, the Charterers shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the Vessel and shall indemnify the Owners against any sums whatsoever, which the Owners become liable to pay as a consequence.

**25.    General Average**

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

The Owners shall not contribute to General Average.

26. **Assignment, Novation, Sub-Charter and Sale**

See Additional Clauses 67 (Owners' Security), 57.16 (Restrictions on employment and sub-chartering) and 67.2 (No assignment by Obligors)

(a)  The Charterers shall not assign or novate this Charter Party nor sub-charter the Vessel on a bareboat basis except with the prior consent in writing of the Owners, which shall not be unreasonably withheld, and subject to such terms and conditions as the Owners shall approve.

(b)  The Owners shall not sell the Vessel during the currency of this Charter Party except with the prior written consent of the Charterers, which shall not be unreasonably withheld, and subject to the buyer accepting a novation of this Charter Party.

(c)  The Owners shall be entitled to assign their rights under this Charter Party.

27. **Performance Guarantee**

See definition of "Charter Guarantees" and Part II of Schedule 1 of Additional Clauses

(Optional, to apply only if Box 25 filled in)

The Charterers undertake to furnish, before delivery of the Vessel, a guarantee or bond in the amount of and from the entity stated in Box 25 in a form acceptable to the Owners as guarantee for full performance of their obligations under this Charter Party.

28. **Anti-Corruption**

See additional Clause 55.5.2 (AML Laws)

(a)  The parties agree that in connection with the performance of this Charter Party they shall each:

(i) comply at all times with all applicable anti-corruption legislation and have procedures in place that are, to the best of its knowledge and belief, designed to prevent the commission of any offence under such legislation by any member of its organisation and/or by any person providing services for it or on its behalf; and

(ii) make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect the transactions in connection with this Charter Party.

(b)  If either party fails to comply with any applicable anti-corruption legislation, it shall defend and indemnify the other party against any fine, penalty, liability, loss or damage and for any related costs (including, without limitation, court costs and legal fees) arising from such breach.

(c)  Without prejudice to any of its other rights under this Charter Party, either party may terminate this Charter Party without incurring any liability to the other party if:

(i) at any time the other party or any member of its organisation has committed a breach of any applicable anti-corruption legislation in connection with this Charter Party; and

(ii) such breach causes the non-breaching party to be in breach of any applicable anti-corruption legislation.

Any such right to terminate must be exercised without undue delay.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

(d)   Each party represents and warrants that in connection with the negotiation of this Charter Party neither it nor any member of its organisation has committed any breach of applicable anti-corruption legislation. Breach of this subclause (d) shall entitle the other party to terminate the Charter Party without incurring any liability to the other.

### 29.   Sanctions and Designated Entities

See Additional Clauses 55.2 (Compliance with laws), 51.25 (Sanctions representations) and 55.22 (Sanctions undertakings)

(a)   The provisions of this clause shall apply in relation to any sanction, prohibition or restriction imposed on any specified persons, entities or bodies including the designation of specified vessels or fleets under United Nations Resolutions or trade or economic sanctions, laws or regulations of the European Union or the United States of America.

(b)   The Owners and the Charterers respectively warrant for themselves (and in the case of any sub-charter, the Charterers further warrant in respect of any sub-charterers, shippers, receivers, or cargo interests) that at the date of this fixture and throughout the duration of this Charter Party they are not subject to any of the sanctions, prohibitions, restrictions or designation referred to in subclause (a) which prohibit or render unlawful any performance under this Charter Party. The Owners further warrant that the Vessel is not a designated vessel.

(c)   If at any time during the performance of this Charter Party either party becomes aware that the other party is in breach of warranty in this Clause, the party not in breach shall comply with the laws and regulations of any Government to which that party or the Vessel is subject, and follow any orders or directions which may be given by any body acting with powers to compel compliance, including where applicable the Owners' Flag State. In the absence of any such orders, directions, laws or regulations, the party not in breach may, in its option, terminate the Charter Party forthwith in accordance with Clause 31 (Termination).

(d)   If, in compliance with the provisions of this Clause, anything is done or is not done, such shall not be deemed a deviation but shall be considered due fulfilment of this Charter Party.

(e)   Notwithstanding anything in this Clause to the contrary, the Owners or the Charterers shall not be required to do anything which constitutes a violation of the laws and regulations of any State to which either of them is subject.

(f)   The Owners or the Charterers shall be liable to indemnify the other party against any and all claims, losses, damage, costs and fines whatsoever suffered by the other party resulting from any breach of warranty in this Clause.

### 30.   Requisition/Acquisition

(a)   In the event of the requisition for hire of the Vessel by any governmental or other competent authority at any time during the Charter Period, this Charter Party shall not be deemed to be frustrated or otherwise terminated. The Charterers shall continue to pay hire according to the Charter Party until the time when the Charter Party would have expired or terminated pursuant to any of the provisions hereof. However, if any requisition hire or compensation is received by the Owners for the remainder of the Charter Period or the period of the requisition, whichever is shorter, it shall be payable by the Owners to the Charterers.

(b)   In the event of the Owners being deprived of their ownership in the Vessel by any compulsory acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then, irrespective of the date during the Charter Period when Compulsory Acquisition may occur, this Charter Party shall be deemed terminated as of the date of such Compulsory Acquisition. In such event hire to be considered as earned and to be paid up to the date and time of such

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

Compulsory Acquisition. The Owners shall be entitled to any compensation received for such Compulsory Acquisition.

31.    **Termination**

See Additional Clauses 44 (Illegality, prepayment and Total Loss, 62 (Termination Events) and 63 (Consequences of Termination Event)

(a)    Charterers' Default

The Owners shall be entitled to terminate this Charter Party by written notice to the Charterers under the following circumstances and to claim damages including, but not limited to, for the loss of the remainder of the Charter Party:

(i) Non-payment of hire (see Clause 15 (Hire)).

(ii) Charterers' failure to comply with the requirements of:

(1)    Clause 11 (Trading Restrictions); or

(2)    Subclause 17(b) (Charterers to Insure).

(iii) The Charterers do not rectify any failure to comply with the requirements of subclause 13(a) (Maintenance) as soon as practically possible after the Owners have notified them to do so and in any event so that the Vessel's insurance cover is not prejudiced.

(b)    Owners' Default

The Charterers shall be entitled to terminate this Charter Party with immediate effect by written notice to the Owners and to claim damages including, but not limited to, for the loss of the remainder of the Charter Party:

(i) If the Owners shall by any act or omission be in breach of their obligations under this Charter Party to the extent that the Charterers are deprived of the use of the Vessel and such breach continues for a period of fourteen (14) running days after written notice thereof has been given by the Charterers to the Owners; or

(ii) if the Owners fail to arrange or maintain the insurances in accordance with subclause 17(c) (Owners to Insure).

(c)    Loss of Vessel

This Charter Party shall be deemed to be terminated, without prejudice to any accrued rights or obligations, if the Vessel becomes lost either when it has become an actual total loss or agreement has been reached with the Vessel's underwriters in respect of its constructive total loss or if such agreement with the Vessel's underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred, or has been declared missing. The date upon which the Vessel is to be treated as declared missing shall be ten (10) days after the Vessel was last reported or when the Vessel is recorded as missing by the Vessel's underwriters, whichever occurs first.

(d)    Bankruptcy

Either party shall be entitled to terminate this Charter Party with immediate effect by written notice to the other party if that other party has a petition presented for its winding up or administration or any other action is taken with a view to its winding up (otherwise than for the purpose of solvent reconstruction or amalgamation), or becomes bankrupt or commits an act of bankruptcy, or makes any arrangement or composition for the benefit of creditors, or has a receiver or manager or administrative receiver or

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**

**BARECON 2017 Standard Bareboat Charter Party**

administrator or liquidator appointed in respect of any of its assets, or suspends payments, or anything analogous to any of the foregoing under the law of any jurisdiction happens to it, or ceases or threatens to cease to carry on business.

(e)    The termination of this Charter Party shall be without prejudice to all rights accrued due between the parties prior to the date of termination and to any claim that either party might have.

**32.    Repossession**

See Additional Clause 63.6 (Owners' right to withdraw or retake possession)

In the event of the early termination of this Charter Party in accordance with the applicable provisions of this Charter Party, the Owners shall have the right to repossess the Vessel from the Charterers at its current or next port of call, or at a port or place convenient to them without hindrance or interference by the Charterers, courts or local authorities. Pending physical repossession of the Vessel, the Charterers shall hold the Vessel as gratuitous bailee only to the Owners. The Owners shall arrange for an authorised representative to board the Vessel as soon as reasonably practicable following the termination of this Charter Party. The Vessel shall be deemed to be repossessed by the Owners from the Charterers upon the boarding of the Vessel by the Owners' representative. All arrangements and expenses relating to the settling of wages, disembarkation and repatriation of the Crew shall be the sole responsibility of the Charterers.

**33.    BIMCO Dispute Resolution Clause 2017**

See Additional Clause 82 (Law and arbitration)

(a)*    This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

In cases where the claim or any counterclaim exceeds the sum agreed for the LMAA Small Claims Procedure and neither the claim nor any counterclaim exceeds the sum of USD 400,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Intermediate Claims Procedure current at the time when the arbitration proceedings are commenced.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

## PART II
### BARECON 2017 Standard Bareboat Charter Party

~~(b)*~~  ~~This Charter Party shall be governed by U.S. maritime law or, if this Charter Party is not a maritime contract under U.S. law, by the laws of the State of New York. Any dispute arising out of or in connection with this Charter Party shall be referred to three (3) persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen. The decision of the arbitrators or any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the SMA Rules current as of the date of this Charter Party.~~

~~In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the SMA Rules for Shortened Arbitration Procedure current as of the date of this Charter Party.~~

~~(c)*~~  ~~This Charter Party shall be governed by and construed in accordance with Singapore**/English** law.~~

~~Any dispute arising out of or in connection with this Charter Party, including any question regarding its existence, validity or termination shall be referred to and finally resolved by arbitration in Singapore in accordance with the Singapore International Arbitration Act (Chapter 143A) and any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.~~

~~The arbitration shall be conducted in accordance with the Arbitration Rules of the Singapore Chamber of Maritime Arbitration (SCMA) current at the time when the arbitration proceedings are commenced.~~

~~The reference to arbitration of disputes under this Clause shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator and give notice that it has done so within fourteen (14) calendar days of that notice and stating that it will appoint its own arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other party does not give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.~~

~~Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.~~

~~In cases where neither the claim nor any counterclaim exceeds the sum of USD 150,000 (or such other sum as the parties may agree) the arbitration shall be conducted before a single arbitrator in accordance with the SCMA Small Claims Procedure current at the time when the arbitration proceedings are commenced.~~

~~**Delete whichever does not apply. If neither or both are deleted, then English law shall apply by default.~~

~~(d)*~~  ~~This Charter Party shall be governed by and construed in accordance with the laws of the place mutually agreed by the Parties and any dispute arising out of or in connection with this Charter Party shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.~~

~~(e)~~  ~~The parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Charter Party. In the case of any dispute in respect of which arbitration has been commenced under subclause (a), (c) or (d), the following shall apply:~~

~~(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.~~

~~(ii) The other party shall thereupon within fourteen (14) calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a~~

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

~~further fourteen (14) calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.~~

~~(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.~~

~~(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.~~

~~(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.~~

~~(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.~~

~~(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.~~

~~(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)~~

~~*Subclauses (a), (b), (c) and (d) are alternatives; indicate alternative agreed in Box 26.~~

~~If Box 26 in Part I is not appropriately filled in, subclause (a) of this Clause shall apply. Subclause (e) shall apply in all cases except for alternative (b).~~

34. **Notices**

See Additional Clause 74 (Notices)

~~All notices, requests and other communications required or permitted by any clause of this Charter Party shall be given in writing and shall be sufficiently given or transmitted if delivered by hand, email, express courier service or registered mail and addressed if to the Owners as stated in Box 30 or such other address or email address as the Owners may hereafter designate in writing, and if to the Charterers as stated in Box 31 or such other address or email address as the Charterers may hereafter designate in writing. Any such communication shall be deemed to have been given on the date of actual receipt by the party to which it is addressed.~~

35. **Partial Validity**

If by reason of any enactment or judgment any provision of this Charter Party shall be deemed or held to be illegal, void or unenforceable in whole or in part, all other provisions of this Charter Party shall be unaffected thereby and shall remain in full force and effect.

36. **Entire Agreement**

This Charter Party is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.

37. **Headings**

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART II**
**BARECON 2017 Standard Bareboat Charter Party**

**38.  Singular/Plural**

      The singular includes the plural and vice versa as the context admits or requires.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART III**
**BARECON 2017 Standard Bareboat Charter Party**
**PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY**
**(OPTIONAL, only applicable if Box 27 has been completed)**

1. Specifications and Building Contract

(a) The Vessel shall be constructed in accordance with the building contract between the Builders and the Owners including the specifications and plans incorporated therein ("Building Contract"). The Owners shall provide the Charterers with a copy of the Building Contract to the extent relevant to this Charter Party.

(b) No variations shall be made to the Building Contract without the Charterers' prior written consent. The Charterers shall be entitled to request change orders in accordance with the Building Contract. Any additional costs or consequences due to Charterers' change orders shall be borne by the Charterers.

(c) The Owners and the Charterers will liaise and cooperate in all matters regarding the construction of the Vessel and the Building Contract. The Charterers shall have the right to send their representative to the Builders' yard to inspect the Vessel during its construction.

(d) The Owners shall assign their guarantee rights under the Building Contract to the Charterers, if permitted. If not permitted, the Owners shall exercise their guarantee rights against the Builders for the benefit of the Charterers. The Charterers shall be obliged to accept such sums as the Owners are reasonably able to recover under the guarantee provisions of the Building Contract.

2. Delivery and Cancellation

(a) (i) Subject to the provisions of Clause 3 (Liquidated Damages) hereunder, the Charterers shall be obliged to accept the Vessel from the Owners, constructed and delivered in accordance with the Building Contract and including buyers' supplies, on the date of delivery by the Builders. The Charterers undertake that having accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects, if any.

(ii) The date of delivery for the purpose of this Charter shall be the date (the "Delivery Date") when the Vessel is in fact delivered by the Builders to the Owners in accordance with the Building Contract, whether that is before or after the scheduled delivery date under the Building Contract. The Owners shall be under no responsibility for any delay whatsoever in delivery of the Vessel to the Charterers under this Charter Party, except to the extent caused solely by the Owners' acts or omissions resulting in a default by the Owners under the Building Contract. The Owners shall be responsible to the Charterers for any direct losses incurred by the Charterers, if the Vessel is not delivered to the Owners due solely to the Owners' acts or omissions resulting in a default by the Owners under the Building Contract.

(iii) The Owners and the Charterers shall on the Delivery Date sign a Protocol of Delivery and Acceptance evidencing delivery of the Vessel hereunder.

(b) (i) The Owners' obligation to charter the Vessel to the Charterers hereunder is conditional upon delivery of the Vessel to the Owners by the Builders in accordance with the Building Contract.

(ii) If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel and exercise that right, the Owners shall be entitled to cancel this Charter Party by written notice to the Charterers.

(iii) If for any reason the Owners become entitled to cancel the Building Contract and exercise that right, the Owners shall be entitled to cancel this Charter Party by written notice to the Charterers. If, however, the Owners do not exercise their right to cancel the Building Contract, the Charterers shall be entitled to cancel this Charter Party by written notice to the Owners.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART III**
**BARECON 2017 Standard Bareboat Charter Party**
**PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY**
**(OPTIONAL, only applicable if Box 27 has been completed)**

3.    Liquidated Damages

(a)    Any liquidated damages for physical defects or deficiencies and any costs incurred in pursuing a claim therefor shall be credited to the party stated in Box 27(iv) or if not filled in shall be shared equally between the parties.

(b)    Any liquidated damages for delay in delivery under the Building Contract and any costs incurred in pursuing a claim therefor shall be credited to the party stated in Box 27(v) or if not filled in shall be shared equally between the parties.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART IV**
**BARECON 2017 Standard Bareboat Charter Party**
**PURCHASE OPTION**
**(OPTIONAL, only applicable if Box 28 has been completed)**

1. The Charterers shall have an option to purchase the Vessel (the "Purchase Option") exercisable on each of the dates stated below as follows:

| Date (state number of months after delivery of the Vessel) | Purchase Price (the "Purchase Option Price") |
|---|---|
| (months) | (amount and currency) |
| | |
| | |

2. To exercise their Purchase Option, the Charterers shall notify the Owners in writing not later than six (6) months prior to the relevant date stated in the table above. Such notification shall not be withdrawn or cancelled.

3. If the Charterers exercise their Purchase Option, the ownership of the Vessel shall be transferred to them on the relevant date. If such date is not a Banking Day, the ownership of the Vessel shall be transferred on the next Banking Day, on a strictly "as is/where is" basis, at the Charterers' sole cost and expense.

4. The Owners shall obtain and provide the Charterers with such documents and take such actions as the Charterers may reasonably request to facilitate the sale and the registration of the Vessel under the flag designated by the Charterers.

5. The Owners warrant that the Vessel at the time of transfer of ownership shall be free of any of Owners' encumbrance or mortgage and that they have not committed any act or omission which would impair title to the Vessel.

6. The Owners make no representation or warranty as to the seaworthiness, value, condition, design, merchantability or operation of the Vessel, or as to the quality of the material, equipment or workmanship in the Vessel, or as to the fitness of the Vessel for any particular trade.

7. In exchange for the transfer of ownership of the Vessel, the Charterers shall pay the Purchase Option Price to the bank account nominated by the Owners together with any unpaid charter hire and other amounts due and payable under this Charter Party.

8. Upon payment and transfer of ownership in accordance with Clause 7 above, this Charter Party and all rights and obligations of the parties shall terminate without prejudice to all rights accrued due between the parties prior to the date of termination and any claim that either party might have.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

**PART V**
**BARECON 2017 Standard Bareboat Charter Party**
**PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY**
**(OPTIONAL, only to apply if expressly agreed and stated in Box 29)**

1.   Definitions

"Bareboat Charter Registry" shall mean the registry stated in Box 29(ii) whose flag the Vessel will fly and in which the Charterers are registered as the bareboat charterers during the period of this Charter Party.

"Underlying Registry" shall mean the registry stated in Box 29(i) in which the Owners of the Vessel are registered as Owners and to which jurisdiction and control of the Vessel will revert upon termination of the Bareboat Charter registration.

2.   The Owners have agreed to and the Charterers shall arrange for the Vessel to be registered under the Bareboat Charter Registry. The Charterers shall be responsible for all costs thereof.

3.   Upon termination of this Charter Party for any reason whatsoever the Charterers shall immediately arrange for the deletion of the Vessel from the Bareboat Registry.

4.   In the event of the Vessel being deleted from the Bareboat Charter Registry due to any default by the Owners, the Charterers shall have the right to terminate this Charter forthwith and without prejudice to any other claim they may have against the Owners under this Charter Party.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published in 1974 as BARECON A and B. Amalgamated and revised in 1989. Revised 2001 and 2017.

## CONTENTS

39      Definitions and interpretations ................................................................... 3

40      Background ............................................................................................. 32

41      Conditions to Charter and to delivery ....................................................... 33

42      Delivery ................................................................................................. 34

43      Hire ...................................................................................................... 35

44      Illegality, prepayment and Total Loss ....................................................... 40

45      Hire Periods .......................................................................................... 43

46      Fees ..................................................................................................... 43

47      Tax gross-up and indemnities ................................................................. 43

48      Increased Costs ..................................................................................... 47

49      Other indemnities .................................................................................. 49

50      Costs and expenses ............................................................................... 52

51      Representations and warranties ............................................................... 53

52      Information undertakings ........................................................................ 63

53      Accounts .............................................................................................. 68

54      Valuation Reports, asset value coverage and additional Security ................. 75

55      General undertakings ............................................................................. 77

56      Insurance undertakings .......................................................................... 88

57      Vessel undertakings ............................................................................... 96

58      Redelivery ........................................................................................... 105

59      Redelivery conditions ............................................................................ 105

60      Diver's inspection at redelivery .............................................................. 108

61      Transport documents ............................................................................ 109

62      Termination Events ............................................................................... 109

63      Consequences of Termination Event ....................................................... 114

64      Purchase Option ................................................................................... 117

65      Put option ........................................................................................... 118

66      Transfer of title .................................................................................... 118

67          Owners' Security ........................................................................ 120

68          Senior Finance Party Quiet Enjoyment Agreement .................................... 122

69          Cumulative rights ...................................................................... 122

70          No waiver ............................................................................. 122

71          Entire agreement ...................................................................... 123

72          No partnership ........................................................................ 123

73          Set-off ............................................................................... 123

74          Notices ............................................................................... 123

75          Calculations and certificates ........................................................ 125

76          Partial invalidity ................................................................... 125

77          Remedies and Waivers.................................................................. 125

78          Conflicts ............................................................................ 125

79          Survival of Charterers' obligations .................................................. 126

80          Confidentiality ...................................................................... 126

81          Counterparts ......................................................................... 126

82          Law and arbitration .................................................................. 127

83          Waiver of immunity ................................................................... 127

Schedule 1  Conditions precedent and subsequent .................................................. 129

Schedule 2  Termination Sum and Lease Principal Outstanding ..................................... 136

Schedule 3  Form of Protocol of Delivery and Acceptance ......................................... 139

Schedule 4  Form of Title Transfer PDA .......................................................... 140

Schedule 5  Form of KPI Report .................................................................. 141

Schedule 6  Senior Finance Documents Conditions Precedent ....................................... 142

Schedule 7  List of Related Vessels and relevant information .................................... 145

<u>**ADDITIONAL CLAUSES**</u>

**TO BAREBOAT CHARTER FOR M.V. "SUEZ RAJAN"**

**39      Definitions and interpretations**

39.1    **Definitions**

In this Charter:

"**2018 Withdrawal Act**" means the European Union (Withdrawal) Act 2018.

"**2020 Withdrawal Act**" means the European Union (Withdrawal Agreement) Act 2020.

"**Account Bank**" means:

(a)      in respect of the Minimum Liquidity Account, Macquarie Bank Limited, London Branch acting through its office at Ropemaker Place, 28 Ropemaker Street, London EC2Y 9HD; and

(b)      in respect of the Dry Docking Reserve Account, the Charterers' Cash Collection Account and the HoldCo Cash Collection Account, Joh. Berenberg, Gossler & Co. KG acting through its branch at Neuer Jungfernstieg 20, 20354 Hamburg, Germany,

or such other bank or financial institution as selected or designated by the Owners or a Senior Finance Party from time to time and which holds an Account.

"**Accounts**" means:

(a)      during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account;

(b)      during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account; and

(c)      for the duration of the Agreement Term, the Minimum Liquidity Account and the Dry Docking Reserve Account,

and "**Account**" means any one of them.

"**Accounts Charge**" means:

(a)      during the Charterers' Accounts Charge Period, the deed of charge over the Charterers' Cash Collection Account and all amounts from time to time standing to the credit of the Charterers' Cash Collection Account, executed or to be executed by the Charterers in favour of the Owner Security Trustee; and

(b)      during the HoldCo Accounts Charge Period, the deed of charge over the HoldCo Cash Collection Account and all amounts from time to time standing to the credit of the HoldCo Cash Collection Account, executed or to be executed by HoldCo in favour of the Owner Security Trustee.

"**Actual Delivery Date**" means the date of delivery of the Vessel by the Owners to the Charterers under this Charter.

"**Actual Owners' Cost**" means the purchase price paid by the Owners to the Charterers for the acquisition of the Vessel pursuant to the MOA.

"**Additional Hire**" has the meaning given to such term in Clause 54.2 (*Asset coverage and assessment of Market Value*).

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Agreement Term**" means the period commencing on the date of this Charter and terminating on the later of:

(a)     the expiration of the Charter Period; and

(b)     the date on which all sums of any nature owing by the Obligors to the Owners under the Transaction Documents or otherwise in connection with the Vessel have been paid in full to the Owners and no obligations of the Obligors of any nature to the Owners or otherwise in connection with the Transaction Documents or with the Vessel remain unperformed or undischarged.

"**AML Laws**" means as to any person and in relation to money laundering, terrorism bribery or corruption, the constitutional or organisational documents of such person, and any treaty, law (including the common law), statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, order or determination of an arbitrator or a court or other governmental authority, and the interpretation or administration thereof, in each case applicable to or binding upon such person or any of its property or to which such person or any of its property is subject including, without limitation:

(a)     the U.S. Foreign Corrupt Practices Act of 1977 administered by the United States of America;

(b)     the UK Bribery Act 2010 administered by the United Kingdom;

(c)     the Money Laundering Control Act administered by the United States of America; and

(d)     the Proceeds of Crime Act administered by the United Kingdom.

"**Annex VI**" means Annex VI of the Protocol of 1997 (as subsequently amended from time to time) to amend the International Convention for the Prevention of Pollution from Ships 1973 (Marpol), as modified by the Protocol of 1978 relating thereto.

"**Anti Boycott Regulations**" has the meaning given to such term in Clause 51.25.

"**Applicable Rate**" means for the purpose of determining Hire, LIBOR.

"**Approved Budget**" means each budget prepared by the Charterers prior to the Actual Delivery Date and subsequently on each anniversary of the Actual Delivery Date, in each case for the following 12 month period, in a form and substance

satisfactory to the Owners setting out (i) the Operating Expenses, (ii) the Overhead Expenses, (iii) Dry Docking Reserve Budget and (iv) sums to be paid prior to the Actual Delivery Date.

"**Approved Classification**" means, in relation to the Vessel, as at the date of this Charter, each of A1, Oil Carrier, ESP, E, AMS, ACCU, CPS and CSR AB-CM or the equivalent classification with another Approved Classification Society.

"**Approved Classification Society**" means, in relation to the Vessel the vessel classification society referred to in Box 4 (*Vessel*) of this Charter or such other vessel classification society acceptable to the Owners and the Senior Finance Parties.

"**Approved Commercial Managers**" means, in relation to the Vessel, any one of the following:

(a)      Empire; or

(b)      such other vessel commercial manager as agreed with the Owners and the Senior Finance Parties; and

which has delivered a duly executed Managers' Undertaking.

"**Approved Insurance Brokers**" means such firms of insurance brokers appointed by the Charterers from time to time approved in writing by the Owners and the Senior Finance Parties.

"**Approved Insurers**" means such sound and reputable insurance companies, underwriters, protection and indemnity clubs or associations that provide insurance cover for the Vessel during the Charter Period having a minimum credit rating of BBB+ with Standard & Poor's Rating Services Inc and approved in writing by the Owners and the Senior Finance Parties.

"**Approved Managers**" means, as the context may require, the Approved Commercial Managers or the Approved Technical Managers.

"**Approved Shipbroker**" means each of Clarksons Valuations Limited, Fearnleys Shipbrokers A/S, Arrow Shipbroking Group, Simpsons Spence & Young Valuation Services Ltd., Howe Robinson Partners Marine Evaluations Ltd, Maritime Strategies International Limited, Braemar ACM Valuations Limited and VesselsValue (or an Affiliate of such persons through which valuations are commonly issued) or such other independent reputable shipbrokers agreed between the Owners and the Charterers from time to time.

"**Approved Technical Managers**" means, in relation to the Vessel:

(a)      Empire;

(b)      OSM Tanker Management Pte. Ltd., a company incorporated under the laws of Singapore with its registered office at 1 Magazine Road, #03-10 Central Mall, Singapore 059567; or

(c)      such other vessel technical manager as agreed with the Owners and the Senior Finance Parties; and

which has delivered a duly executed Managers' Undertaking.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means the period from and including the date of this Charter to and including the Long Stop Date or such later date as may be agreed by the Owners and the Charterers.

"**Basel III**" has the meaning given to such term in Clause 48.1.2 (*Increased Costs*).

"**Break Costs**" means:

(a)     all costs, losses, premiums or penalties incurred by the Owners and the Related Owners as a result of the receipt by the Owners of any payment under or in relation to the Transaction Documents on a day other than the due date for payment of the sum in question; and

(b)     any break cost (however such term or its equivalent may be described under the Senior Finance Documents) incurred by the Owners, the Related Owners or the Issuer under the Senior Finance Documents including, without limitation, any losses or costs resulting from liquidating or re-employing deposits from third parties required to effect or maintain any loan advanced under the Senior Finance Documents and any liabilities, expenses or losses incurred by a Senior Finance Party in terminating or reversing or otherwise in connection with any interest rate swap, transaction or arrangement entered into by a Senior Finance Party to hedge any exposure under the Senior Finance Documents.

"**BMP5**" means the Best Management Practice guide jointly released on 28 June 2018 by BIMCO, the International Chamber of Shipping, the International Group of P&I Clubs, INTERTANKO and the Oil Companies International Marine Forum.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks and financial markets are open in:

(a)     in relation to a Quotation Day, London;

(b)     during the Charterers' Accounts Charge Period, jurisdiction in which the Charterers' Cash Collection Account is located;

(c)     during the HoldCo Accounts Charge Period, the jurisdiction in which the HoldCo Cash Collection Account is located; and

(d)     in relation to:

(i)     the determination of the Actual Delivery Date, London; and

(ii)     any date for payment, New York and Athens.

"**BWM Convention**" means the International Convention for the Control and Management of Ships' Ballast Water and Sediments 2004, as the same may be amended or supplemented from time to time.

"**Change of Control Event**" means any event by which an individual:

(a)     acquires the legal or beneficial ownership (directly or indirectly) of 10% or more of the issued share capital of a Charter Guarantor, the Charterers or any Related Charterers;

(b)     acquires the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to (directly or indirectly) cast, or control the casting of, 10% or more of the votes that might be cast at a general meeting of a Charter Guarantor, the Bareboat Charterers or any Related Charterers; or

(c)     gains effective control over a Charter Guarantor, the Charterers or any Related Charterers.

"**Charter Guarantees**" means the guarantees made or to be made by each Charter Guarantor in favour of the Owners in respect of the Charterers' obligations under the Transaction Documents.

"**Charter Guarantors**" means HoldCo, Myrtle and VFS.

"**Charter Period**" means, subject to Clauses 44.1 (*Illegality*), 44.2 (*Sanctions*) and 62 (*Termination Events*), the period of five years commencing from the Actual Delivery Date.

"**Charterers' Assignment**" means the deed of assignment executed or to be executed (as the case may be) by the Charterers in favour of the Owner Security Trustee in relation to certain of the Charterers' rights and interest in and to (among other things) the Earnings, the Insurances, Requisition Compensation, any Sub-Charter, any Sub-Charter Guarantee and any Management Agreement.

"**Charterers' Accounts Charge Period**" means the period from the expiry of the HoldCo Accounts Charge Period until the expiry of the Agreement Term.

"**Charterers' Cash Collection Account**" means, in relation to the Vessel, the US Dollar account in the name of the Charterers to be opened with the relevant Account Bank, and includes any sub-account thereof and such account which is designated by the Charterers as the Charterers' cash collection account for the purposes of this Charter.

"**Consolidated Debt Service Coverage Ratio**" has the meaning given to such term in Clause 55.20.5 (*No dividends*).

"**CRD IV**" has the meaning given to such term in Clause 48.1.2 (*Increased Costs*).

"**Default Termination**" means a termination of the Charter Period pursuant to the provisions of Clause 62 (*Termination Events*).

"**Delegate**" means any delegate, agent, attorney or Receiver appointed by the Owner Security Trustee.

"**Disruption Event**" means either or both of:

(a)     a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in order for the transactions contemplated by the Transaction Documents to be carried out which disruption is not caused by, and is beyond the control of, either of the Parties; or

(b)     the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

  (i)     from performing its payment obligations under the Transaction Documents; or

  (ii)    from communicating with another Party in accordance with the terms of the Transaction Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

"**DOC**" means, in relation to the ISM Company, a valid Document of Compliance issued for the ISM Company by the Administration under paragraph 13.2 of the ISM Code.

"**Dry Docking Reserve Account**" means, in relation to the Vessel, the US Dollar account in the name of the Owners with account number 05-28413-008 opened with the relevant Account Bank, and includes any sub-account thereof and such account which is designated by the Charterers as the dry docking reserve account for the purposes of this Charter.

"**Dry Docking Reserve Budget**" has the meaning given to such term in Clause 53.4.2 (*Dry Docking Reserve Account*).

"**Earnings**" means, in relation to the Vessel, all hires, freights, pool income and other sums payable to or for the account of the Charterers in respect of the Vessel including (without limitation) all remuneration for salvage and towage services, demurrage and detention moneys, contributions in general average, compensation in respect of any requisition for hire, and damages and other payments (whether awarded by any court or arbitral tribunal or by agreement or otherwise) for breach, termination or variation of any contract for the operation, employment or use of the Vessel.

"**Earnings Shortfall**" has the meaning given to such term in Clause 53.2.4 (*Charterers' Cash Collection Account and HoldCo Cash Collection Account*).

"**Empire**" means Empire Navigation Inc., a company incorporated under the laws of The Republic of the Marshall Islands and whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

"**Environmental Approval**" means any present or future permit, ruling, variance or other Authorisation required under Environmental Laws.

"**Environmental Claim**" means any claim, proceeding, formal notice or investigation by any governmental, judicial or regulatory authority or any other person which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law and, for this purpose, "claim" includes a claim for damages, compensation, contribution, injury, fines, losses and penalties or any other payment of any kind, including in relation to clean-up and removal, whether or not similar to the foregoing; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset.

"**Environmental Incident**" means:

(a)     any release, emission, spill or discharge into or upon the air, sea, land or soils (including the seabed) or surface water of Environmentally Sensitive Material within or from the Vessel or any Related Vessel; or

(b)     any incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, sea, land or soils (including the seabed) or surface water from a vessel other than the Vessel or a Related Vessel and which involves a collision between the Vessel or a Related Vessel and such other vessel or some other incident of navigation or operation, in either case, in connection with which the Vessel or a Related Vessel is actually or potentially liable to be arrested, attached, detained or injuncted and the Vessel or a Related Vessel, any Obligor, any operator or manager of the Vessel or a Related Vessel or any combination of them is at fault or allegedly at fault or otherwise liable to any legal or administrative action; or

(c)     any other incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, sea, land or soils (including the seabed) or surface water otherwise than from the Vessel or any Related Vessel and in connection with which the Vessel or Related Vessel is actually or potentially liable to be arrested, attached, detained or injuncted and/or where any Obligor, any operator or manager of the Vessel or Related Vessel or any combination of them is at fault or allegedly at fault or otherwise liable to any legal or administrative action, other than in accordance with an Environmental Approval.

"**Environmental Law**" means any applicable present or future law, regulation and convention relating to pollution or protection of human health or the environment, to conditions in the workplace, to the carriage, generation, handling, storage, use, release or spillage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material which is applicable to the Charterers, any Related Charterers, the Vessel, a Related Vessel, the Owners, any Related Owners, an Approved Manager and/or an operator of the Vessel which is part of the Group or a Subsidiary of Myrtle.

"**Environmentally Sensitive Material**" means and includes all contaminants, oil, oil products, toxic substances and any other substance (including any chemical, gas or other hazardous or noxious substance) which is (or is capable of being or becoming)

polluting, toxic or hazardous and any other substance whose release into the environment is regulated or penalised by Environmental Laws.

"**EU Blocking Regulation**" has the meaning given to such term in Clause 51.25 (*Sanctions representations*).

"**Existing Security**" means:

(a)     any Security over the Vessel and her the Earnings, the Insurances, Requisition Compensation, any Sub-Charter, any Sub-Charter Guarantee and any Management Agreement;

(b)     any other Security granted by the Charterers; and

(c)     any Security granted over the shares in the Charterers,

which exists as at the date of this Charter.

"**Existing Indebtedness**" means any Financial Indebtedness of the Charterers under any existing financing made available to the Charterers in respect of the Vessel.

"**FATCA**" means:

(a)     sections 1471 to 1474 of the Code or any associated regulations;

(b)     any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)     any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraph (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"**FATCA Deduction**" means a deduction or withholding from a payment under a Transaction Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**Fee Letter**" means any letter or letters dated on or about the date of this Charter between the Owners, the Charterers and the Charter Guarantors setting out any of the fees referred to in Clause 46 (*Fees*).

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a)     moneys borrowed and debit balances at banks or other financial institutions;

(b)     any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in relation to any lease or hire purchase contract, which would, in accordance with GAAP, be treated as a balance sheet liability (other than any liability in respect of a lease or hire purchase contract which would, in accordance with GAAP in force prior to 1 January 2019, have been treated as an operating lease);

(e)     receivables sold or discounted;

(f)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that derivative transaction, that amount) shall be taken into account);

(g)     any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution;

(h)     any amount raised by the issue of shares which are redeemable (other than at the option of the issuer) before the Termination Payment Date or are otherwise classified as borrowings under GAAP;

(i)     any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 60 days after the date of supply;

(j)     any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under GAAP; and

(k)     the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in (a) to (j).

"**Forecast Earnings**" has the meaning given to such term in Clause 53.2.4 (*Charterers' Cash Collection Account and HoldCo Cash Collection Account*).

"**Forecast Expenses**" has the meaning given to such term in Clause 55.20.5 (*No dividends*).

"**Forecast Financing Costs**" has the meaning given to such term in Clause 55.20.5 (*No dividends*).

"**Forecast Net Revenues**" has the meaning given to such term in Clause 55.20.5 (*No dividends*).

"**Forecast Revenues**" has the meaning given to such term in Clause 55.20.5 (*No dividends*).

"**GAAP**" means generally accepted accounting principles in the United States of America.

"**Green Passport**" means a green passport statement of compliance issued by the relevant Approved Classification Society which includes a list of any and all materials known to be potentially hazardous utilised in the construction of the Vessel.

"**Group**" means HoldCo and each of their Subsidiaries from time to time.

"**Hire**" has the meaning given to such term in Clause 43.2 (*Hire*).

"**Hire Payment Date**" means the first day of each and any Hire Period.

"**Hire Period**" means each period determined in accordance with Clause 45 (*Hire Periods*).

"**HoldCo**" means Suez Holdings Limited, a company incorporated under the laws of The Republic of the Marshall Islands and whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

"**HoldCo Accounts Charge Period**" means the period from the date of this Charter until the date that all of the following have occurred in form and substance satisfactory to the Owners and the Senior Finance Parties:

(a)     the Owners have received evidence that the Charterers' Cash Collection Account) has been opened with the relevant Account Bank;

(b)     the Accounts Charge in respect of the Charterers' Cash Collection Account has been entered into;

(c)     the Owners have received online viewing rights in respect of the Charterers' Cash Collection Account;

(d)     the Charterers' Cash Collection Account has been credited with at least US$400,000;

(e)     the balance of the Initial Minimum Working Capital Amount following any deductions permitted by Clause 53.2.3 (Charterers' Cash Collection Account and HoldCo Cash Collection Account) has been credited to the Charterers; Cash Collection Account; and

(f)     such corporate authorisations and legal opinions in relation to the entry into the Accounts Charge in respect of the Charterers' Cash Collection Account as are reasonably required by the Owners or the Senior Finance Parties (to the extent these have not already been provided) or confirmation that such legal opinions will be given.

"**HoldCo Cash Collection Account**" means, in relation to the Vessel, the US Dollar account in the name of HoldCo (with IBAN number DE13 2012 0000 0528 6010 08) opened or to be opened with the relevant Account Bank, and includes any sub-account thereof and such account which is designated by the Charterers as the HoldCo cash collection account for the purposes of this Charter.

"**Holding Company**" means, in relation to a person, any other person in respect of which it is a Subsidiary.

"**IAPPC**" means a valid international air pollution prevention certificate for the Vessel issued under Annex VI.

"**Increased Costs**" has the meaning given to such term in Clause 48.1.2 (*Increased Costs*).

"**Indemnified Expenses**" has the meaning given to such term in Clause 49.2 (*Additional indemnities*).

"**Indemnitee**" has the meaning given to such term in Clause 49.2 (*Additional indemnities*).

"**Indirect Tax**" means any goods and services tax, consumption tax, value added tax or any tax of a similar nature.

"**Initial Minimum Working Capital Amount**" means US$1,300,000.

"**Innocent Owners' Interest Insurances**" means all policies and contracts of innocent owners' interest insurance from time to time taken out by the Owners in relation to the Vessel, including in particular innocent owners' additional perils' insurance.

"**Inspection Report**" means a report of any inspection undertaken pursuant to Clause 57.9 (*Inspection*).

"**Insurances**" means all policies and contracts of insurance (including all entries in protection and indemnity or war risks associations or other mutual insurance association) which are from time to time taken out or entered into in respect of or in connection with the Vessel or her increased value or her Earnings and (where the context permits) all benefits under such contracts and policies, including all claims of any nature and returns of premium.

"**Intra Group Loan Assignment**" means the assignment and subordination of any present or future intra group loans or receivables between a Group company on the one hand (as junior creditor) and HoldCo or the Charterers on the other (as borrowers) in favour of the Owner Security Trustee (as senior creditor).

"**ISM Code**" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention.

"**ISM Company**" means, at any given time, the company responsible for a Vessel's compliance with the ISM Code under paragraph 1.1.2 of the ISM Code.

"**ISPS Code**" means the International Ship and Port Facility Security Code adopted by the International Maritime Organisation (as the same may be amended, supplemented or superseded from time to time).

"**ISSC**" means a valid and current International Ship Security Certificate issued under the ISPS Code.

"**Issuer**" means Fleetscape Finance Parent, Inc., a company incorporated under the laws of the Republic of the Marshall Islands and whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

"**KPI Report**" means a report in substantially the form contained in Schedule 5 (*Form of KPI Report*).

"**Lease Principal Outstanding**" means the amount of the relevant "Lease Principal Outstanding" as set out in Schedule 2 (*Termination Sum and Lease Principal Outstanding*) as may be reduced by (in each case as applicable):

(a)     payment of Additional Hire pursuant to Clause 54.2 (*Asset coverage and assessment of Market Value*); or

(b)     a prepayment received by the Owners in accordance with Clause 53.2 (*Charterers' Cash Collection Account and HoldCo Cash Collection Account*) or Clause 55.20 (*No dividends*),

**provided that** each change in amount of the Lease Principal Outstanding at the commencement of each Period after the first Period set out in Schedule 2 (*Termination Sum and Lease Principal Outstanding*) is conditional on the receipt by the Owners of each Hire on the first day of the relevant Period.

"**Legal Reservations**" means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)     the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)     similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

(d)     any other matters which are set out as qualifications or reservations as to matters of law of general application in the legal opinions provided to the Owners pursuant to Clause 41 (*Conditions precedent to Charter and to delivery*).

"**LIBOR**" means:

(a)     the applicable Screen Rate; or

(b)     (if no Screen Rate is available on the Actual Delivery Date) the rate (rounded upwards to four decimal places) calculated in accordance with Clause 43.10 (*Unavailability of Screen Rate*) and Clause 43.11 (*Alternative rate*),

at the Owners' option at or about 11:00 am (London time) on (i) the date falling one Business Day before the Actual Delivery Date or (ii) on the Actual Delivery Date for the offering of deposits in US Dollars in an amount comparable to the Lease Principal Outstanding (or any relevant part of the Lease Principal Outstanding) and for a period of one month.

"**Limitation Acts**" means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984.

"**Long Stop Date**" means the date falling 90 days after the date of this Charter (or such later date as the Owners (as buyers under the MOA) and the Sellers (as sellers under the MOA) may agree in accordance with the terms of the MOA).

"**LTV**" has the meaning given to such term in Clause 55.20.4 (*No dividends*).

"**Major Casualty Amount**" means US$500,000 (or its equivalent in other currency or currencies).

"**Management Agreement**" means, in relation to the Vessel, the technical and/or commercial ship management agreement executed or to be executed (as the case may be) between the relevant Approved Managers and the Charterers on an arm's length basis on commercial terms acceptable to the Owners and, if applicable, the Senior Finance Parties.

"**Managers' Undertaking**" means any written letter of undertaking from the relevant Approved Managers in favour of the Owners and/or the Owner Security Trustee and, if applicable, the Senior Finance Parties in a form acceptable to the Owners and/or the Owner Security Trustee as the case may be and, if applicable, the Senior Finance Parties.

"**Mandatory Prepayment Event**" means each of the following events:

(a)     an illegality event referred to in and in accordance with Clause 44.1 (*Illegality*);

(b)     an event referred to in Clause 44.2 (*Sanctions*); and

(c)     a Total Loss.

"**Mandatory Prepayment Event Settlement Date**" means:

(a)     if the underlying Mandatory Prepayment Event is an illegality event referred to in and in accordance with Clause 44.1 (*Illegality*), the date stipulated in Clause 44.1 (*Illegality*);

(b)     if the underlying Mandatory Prepayment Event is an event referred to in and in accordance with Clause 44.2 (*Sanctions*), the date stipulated in Clause 44.2 (*Sanctions*); or

(c)     if the underlying Mandatory Prepayment Event is a Total Loss, the date which falls on the earlier of:

(i)     120 days after the relevant Total Loss Date;

(ii)     the date on which the Owners or if applicable, the relevant Senior Finance Party receive the relevant Total Loss Proceeds; and

(iii)    if the insurers do not admit such a claim, the date later determined by a competent court of law to have been the date on which the total loss happened,

or, in each case, if such date is not a Business Day, the immediately following Business Day.

"**Market Value**" means the value of the Vessel or a Related Vessel (or any other vessel over which additional security has been created or which is being offered as additional security in accordance with Clause 54.2 (*Asset coverage and assessment of Market Value*)) being shown by the average of the values in two Valuation Reports obtained by two Approved Shipbrokers selected by the Owners, the relevant Related Owners or the Senior Finance Parties provided that if such Valuation Reports differ by 10% or more a third Valuation Report will be provided by an Approved Shipbroker selected by the Owners, the relevant Related Owners or the Senior Finance Parties and the value of the Vessel or a Related Vessel (or any other vessel over which additional security has been created or which is being offered as additional security in accordance with Clause 54.2 (*Asset coverage and assessment of Market Value*)) shall be the arithmetic average of those three Valuation Reports, each valuation being dated not more than 15 Business Days prior to the date on which it is to be relied upon.

"**Material Adverse Effect**" means, in the reasonable opinion of the Owners, a material adverse effect on:

(a)     the business, operations, property, condition (financial or otherwise) or prospects of any Obligor; or

(b)     the ability of any Obligor to perform its obligations under any Transaction Document or Senior Finance Document; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to any of, the Transaction Documents or Senior Finance Documents or the rights or remedies of the Owners under any of the Transaction Documents or Senior Finance Documents.

"**Minimum Liquidity Account**" means, in relation to the Vessel, the US Dollar account in the name of the Owners (with account number 10869729) opened with the relevant Account Bank, and includes any sub-account thereof and such account which is designated by the Owners as the minimum liquidity account for the purposes of this Charter.

"**Minimum Liquidity Amount**" means US$200,000.

"**MOA**" has the meaning given to such term in Clause 40.1 (*Sale and purchase of the Vessel*).

"**Mortgagees' Insurances**" has the meaning given to such term in Clause 56.6 (*Mortgagees' Insurances*).

"**Multipartite Agreement**" means a multipartite agreement in respect of the Vessel to be made between amongst others the Owners, the Owners' Parent, the Charterers, the Charter Guarantors and the applicable security agent.

"**Myrtle**" means Myrtle Marine Corp, a company incorporated under the laws of The Republic of the Marshall Islands and whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

"**Net Sale Proceeds**" means the proceeds of a sale of the Vessel received or receivable, net of any fees, commissions, costs, disbursements or other expenses incurred by the Owners or the Charterers (as applicable) as a result of the Owners or the Charterers arranging the proposed sale.

"**Obligatory Insurances**" means, in relation to the Vessel, the insurances and entries referred to in Clause 56.1 (*Maintenance and amounts of Obligatory Insurances*) and, where applicable, those referred to in Clauses 56.4 (*Compliance with terms of Obligatory Insurances*) and/or Clause 57.16.1.

"**Obligor**" means each of the Charterers, the Charter Guarantors, the Approved Commercial Managers, any of the Approved Technical Managers that are a member of the Group and any person that may be party to a Transaction Document from time to time (other than the Owners, the Owner Security Trustee, and each Account Bank).

"**OFAC**" means the Office of Foreign Assets Control of the US Department of Treasury.

"**Operating Expenses**" means, in relation to the Vessel, the aggregate of all amounts which are payable by the Charterers or a Charter Guarantor in respect of the Vessel including crewing, victualing, insuring, maintaining, operating and managing the Vessel but excluding Overhead Expenses and subject to a maximum of US$7,250 per day during the first year of the Charter Period as may be increased by 1.00% in each subsequent year during the Charter Period with any excess amounts being covered by the Charterers or a Charter Guarantor in the form of equity contributions that are subordinated to the obligations of the Obligors pursuant to the Transaction Documents.

"**Original Financial Statements**" means:

(a)     in relation to Myrtle, its consolidated audited financial statements for the financial year ended 31 December 2019; and

(b)     in relation to each of VFS and HoldCo, its opening balance sheet.

"**Overhead Expenses**" means, in relation to the Vessel, the aggregate of all amounts which are payable by the Charterers or a Charter Guarantor in respect of the Vessel including general and administrative costs in respect of the Vessel but excluding Operating Expenses and subject to a maximum of US$250 per day as may be increased after the third anniversary of the Actual Delivery Date to US$750 per day **provided that**:

(a)     the Vessel and each Related Vessel are fixed on a time charter having a minimum charter rate of US$21,000 per day;

(b)      the Charterers are in compliance with their obligations pursuant to Clause 53.3.1 (*Minimum Liquidity Account*);

(c)      during the HoldCo Accounts Charge Period, an amount of at least US$1,300,000 is standing to the credit of the HoldCo Cash Collection Account;

(d)      during the Charterers' Accounts Charge Period, an amount of at least US$1,300,000 is standing to the credit of the Charterers' Cash Collection Account; and

(e)      no Termination Event or Potential Termination Event is continuing.

"**Owners' Earnings Account**" means, in relation to the Vessel, the US Dollar account in the name of the Owners (with account number 05-28413-032) opened with the relevant Account Bank, and includes any sub-account thereof (or such other account as the Owners may after the date of this Charter from time to time upon reasonable notice notify the Charterers) into which all payments to be made by the Charterers under this Charter shall be made.

"**Owner Security Trustee**" means Fleetscape Suez Hans, LLC, a company incorporated under the laws of The Republic of the Marshall Islands and whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

"**Owners' Parent**" means Fleetscape Alma Holdings, LLC, a company incorporated in the Republic of the Marshall Islands, with a registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

"**Party**" means a party to this Charter.

"**PDA**" means the protocol of delivery and acceptance in relation to the Vessel to be executed between the Owners and the Charterers, substantially in the form of Schedule 3 (*Form of Protocol of Delivery and Acceptance*) to this Charter.

"**Period**" means each "Period" set out in Schedule 2 (*Termination Sum and Lease Principal Outstanding*).

"**Permitted Disposal**" means any sale, lease, licence, transfer or other disposal:

(a)      of assets in exchange for other assets comparable or superior as to type, value and quality (other than an exchange of a non-cash asset for cash);

(b)      of obsolete or redundant equipment for cash;

(c)      arising as a result of any Permitted Security; and

(d)      of the Vessel by the Sellers (as sellers) in accordance with the MOA or by the Charterers as contemplated under the terms of this Charter.

"**Permitted Financial Indebtedness**" means:

(a)      any Financial Indebtedness incurred pursuant to any Transaction Document;

(b)     any Financial Indebtedness owing to other members of the Group which is unsecured and subordinated to the Owners pursuant to a subordination agreement on terms acceptable to the Owners;

(c)     liabilities or obligations reasonably incurred in the ordinary course of operating, chartering, repairing and maintaining the Vessel; and

(d)     until the Actual Delivery Date, any Existing Indebtedness.

"**Permitted Maritime Lien**" means:

(a)     Security created by the Senior Finance Documents;

(b)     liens for unpaid master's and crew's wages in accordance with first class ship ownership and management practice and not being enforced through arrest;

(c)     liens for salvage;

(d)     liens for master's disbursements incurred in the ordinary course of trading in accordance with first class ship ownership and management practice and not being enforced through arrest; and

(e)     any other lien arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance of the Vessel:

    (i)     not as a result of any default or omission by any Obligor; and

    (ii)     not being enforced through arrest; and

    (iii)     subject, in the case of liens for repair or maintenance, to Clause 57.16.2 (*Restrictions on employment and sub-chartering*),

provided such lien does not secure amounts more than 30 days overdue (unless the overdue amount is being contested in good faith by appropriate steps and (i) adequate cash reserves are held by the Charterers for payment of these amounts and (ii) such proceedings do not give rise to a material risk of the Vessel or any interest in it being seized, sold, forfeited or lost).

"**Permitted Purchaser**" has the meaning given to such term in Clause 67.4.2 (*Owners' right to sell the Vessel*).

"**Permitted Security**" means:

(a)     any Permitted Maritime Liens;

(b)     any Security in favour of the Owners or permitted by the Transaction Documents or otherwise with the prior written consent of the Owners (such consent not to be unreasonably withheld) and, if applicable, the Senior Finance Parties; and

(c)     until the Actual Delivery Date, any Existing Indebtedness.

"**Poseidon Principles**" has the meaning given to such term in Clause 52.7 (*Information: Poseidon Principles*).

"**Potential Termination Event**" means, an event or circumstance which, with the giving of any notice, the lapse of time, the making of any determination under the Transaction Documents or any combination of the foregoing will be a Termination Event.

"**Prepayment Fee**" means:

(a)     if the relevant prepayment is made prior to the second anniversary of the Actual Delivery Date:

(i)     the amount of Hire which would have accrued between the date on which that prepayment was made and the second anniversary of the Actual Delivery Date pro rata to the amount of the relevant prepayment as a proportion of the Lease Principal Outstanding at the time of that prepayment,

plus

(ii)     5.00% of the amount of the relevant prepayment;

(b)     if the relevant prepayment is made on or after the second anniversary of the Actual Delivery Date but prior to the third anniversary of the Actual Delivery Date, 3.00% of the amount of the relevant prepayment;

(c)     if the relevant prepayment is made on or after the third anniversary of the Actual Delivery Date but prior to the fourth anniversary of the Actual Delivery Date, 2.00% of the amount of the relevant prepayment;

(d)     if the relevant prepayment is made on or after the fourth anniversary of the Actual Delivery Date but prior to the fifth anniversary of the Actual Delivery Date, 1.00% of the amount of the relevant prepayment; and

(e)     if the relevant prepayment is made on or after the fifth anniversary of the Actual Delivery Date, nil.

"**Prohibited Person**" means any person (whether designated by name or by reason of being included in a class of persons) against whom Sanctions are directed.

"**Project Documents**" means, together:

(a)     any Sub-Charter;

(b)     any Sub-Charter Guarantee;

(c)     each Management Agreement; and

(d)     the Sale Agreement.

"**Purchase Option**" means the Charterers' option to purchase the Vessel at the relevant Purchase Option Price and thereafter terminate the chartering of the Vessel pursuant to this Charter in accordance with Clause 64 (*Purchase Option*).

"**Purchase Option Date**" has the meaning given to such term in Clause 64.1 (*Purchase Option Notice and Purchase Option Date*).

"**Purchase Option Notice**" has the meaning given to such term in Clause 64.1 (*Purchase Option Notice and Purchase Option Date*).

"**Purchase Option Period**" means the period commencing on the second anniversary of the Actual Delivery Date and ending on the date falling three months prior to the fifth anniversary of the Actual Delivery Date.

"**Purchase Option Price**" means, in relation to the Purchase Option on the Purchase Option Date an amount equal to the sum of:

(a)

      (i)      if the Charterers purchase the Vessel on or after the second anniversary of the Actual Delivery Date, but prior to the third anniversary of the Actual Delivery Date, US$21,925,000; or

      (ii)     if the Charterers purchase the Vessel on or after the third anniversary of the Actual Delivery Date, but prior to the fourth anniversary of the Actual Delivery Date, US$19,392,000; or

      (iii)    if the Charterers purchase the Vessel on or after the fourth anniversary of the Actual Delivery Date, but prior to the fifth anniversary of the Actual Delivery Date, US$16,727,000; or

      (iv)    if the Charterers purchase the Vessel on or after the fifth anniversary of the Actual Delivery Date,  US$13,923,000; or

(b)      any other sums as the Owners and the Owner Security Trustee may be entitled to under the terms of the Transaction Documents, including (but not limited to) any payments referred to in Clauses 49 (*Other indemnities*);

(c)      any Break Costs; and

(d)      any sums payable by the Owners or the Issuer to a Senior Finance Party pursuant to the Senior Finance Documents (other than Break Costs) in excess of the relevant amount shown in paragraph (a) above,

less:

(e)      the amount of any prepayment received by the Owners pursuant to Clause 53.2 (*Charterers' Cash Collection Account and HoldCo Cash Collection Account*) or Clause 55.20 (*No dividends*).

"**Put Option Notice**" means a written notice which the Owners may deliver to the Charterers for the purpose of the Owners exercising the put option contained in Clause 65 (*Put option*).

"**Put Option Price**" means the amount due and payable by the Charterers to the Owners pursuant to Clause 65 (*Put option*), being the aggregate of:

(a)      the Lease Principal Outstanding as at the relevant time;

(b)     any other Unpaid Sums due and payable together with interest accrued on such Unpaid Sums pursuant to 43.7 (*Default charter rate*) from the due date for payment of such Unpaid Sums up to the date of actual payment;

(c)     any other sums as the Owners and the Owner Security Trustee may be entitled to under the terms of the Transaction Documents, including (but not limited to) any Break Costs and payments referred to in Clauses 49 (*Other indemnities*); and

(d)     any sums payable by the Owners or the Issuer to a Senior Finance Party pursuant to the Senior Finance Documents (other than Break Costs) in excess of the Lease Principal Outstanding as at the relevant time.

"**Quasi-Security**" has the meaning given to such term in Clause 55.8 (*Negative pledge*).

"**Quotation Day**" means the date falling two Business Days before the Actual Delivery Date unless market practice differs in the London Interbank Market, in which case the Quotation Day will be determined by the Owners in accordance with market practice in the London Interbank Market (and if quotations would normally be given on more than one day, the Quotation Day will be the last of those days).

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Trust Property (as such term is defined in the Security Trust Deed).

"**Related Actual Owners' Cost**" means "Actual Owners' Cost" as defined in each Related Charter.

"**Related Charter**" means, in relation to each Related Vessel, a bareboat charter entered or to be entered into (as the case may be) between the relevant Related Owners (as owners) and the relevant Related Charterers (as bareboat charterers).

"**Related Charter Termination Event**" means each event or circumstance referred to in clause 62 (*Termination Events*) of each Related Charter.

"**Related Charterers**" means, in relation to each Related Vessel, the relevant bareboat charterer who has bareboat chartered or will bareboat charter (as the case may be) such Related Vessel pursuant to the terms of the relevant Related Charter, as more particularly set out in Schedule 7 (*List of Related Vessels and relevant information*) to this Charter.

"**Related Hire**" means "Hire" as defined in each Related Charter.

"**Related Hire Period**" means "Hire Period" as defined in each Related Charter.

"**Related Lease Principal Outstanding**" means "Lease Principal Outstanding" as defined in each Related Charter.

"**Related MOA**" means, in relation to each Related Vessel, a memorandum of agreement entered or to be entered into (as the case may be) between the relevant Related Sellers (as sellers) and the relevant Related Owners (as buyers).

"**Related Obligor**" means each "Obligor" as defined in each Related MOA or, as the context may require, each Related Charter.

"**Related Owners**" means, in relation to each Related Vessel, the relevant owner which has acquired or will acquire (as the case may be) title to such Related Vessel pursuant to the terms of the relevant Related MOA, as more particularly set out in Schedule 7 (*List of Related Vessels and relevant information*) to this Charter.

"**Related Sellers**" means "Sellers" as defined in each Related Charter.

"**Related Transaction Document**" means each document defined as a "Transaction Document" in each Related Charter.

"**Related Vessel**" means each of the vessels listed in Schedule 7 (*List of Related Vessels and relevant information*) to this Charter.

"**Related Vessel Dry Docking Reserve Account**" means "Dry Docking Reserve Account" as defined in each Related Charter.

"**Relevant Jurisdiction**" means, in relation to an Obligor:

(a)     its jurisdiction of incorporation;

(b)     any jurisdiction where any asset (other than the Vessel) subject to or intended to be subject to any Transaction Security is situated;

(c)     any jurisdiction where it conducts its business; and

(d)     the jurisdiction whose laws govern the perfection of any Transaction Security granted by such Obligor.

"**Repeating Representations**" means each of the representations set out in Clauses 51.1 (*Status*) to 51.6 (*Governing law and enforcement*), 51.10 (*No Termination Event*) to 51.13 (*Pari passu ranking*), 51.19 (*AML Laws*) and 51.23 (*No immunity*) to 51.36 (*No employee arrangements or pension exposure*).

"**Requisition Compensation**" means all compensation or other money which may from time to time be payable to the Charterers as a result of the Vessel being requisitioned for title or in any other way compulsorily acquired (other than by way of requisition for hire).

"**Sale Agreement**" means the memorandum of agreement in respect of the Vessel dated on or around the date of this Charter and made between the Charterers (as sellers) and the Sellers (as buyers) in relation to the sale and purchase of the Vessel.

"**Sanctioned Country**" means a country or territory that is, or whose government is, the subject or target of any comprehensive, country-wide or territory-wide Sanctions (which, as at the date of this Charter, includes Crimea, Cuba, Iran, Syria, North Korea and Venezuela).

"**Sanctions**" means any sanctions, embargoes, freezing provisions, prohibitions or other restrictions relating to trading, doing business, investment, exporting, financing or making assets available (or other activities similar to or connected with any of the foregoing):

(a)  imposed by law or regulation of the United Kingdom, the Council of the European Union, the European Commission, any member State of the European Union, the United Nations or its Security Council, the United States of America (including OFAC) or Australia, whether or not any Obligor or any Affiliate of the Obligors is legally bound to comply with the foregoing; or

(b)  otherwise imposed by any law or regulation by which any Obligor or any Affiliate of any of them is bound (which shall include without limitation, any extra-territorial sanctions imposed by law or regulation of the United States of America) or, as regards a regulation, compliance with which is reasonable in the ordinary course of business of any Obligor or any Affiliate of any of them,

against any state, natural or legal person, body or entity.

"**Sanctions Authority**" means the US, including without limitation the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the U.S. Department of Commerce, the United Nations Security Council, the European Union or any of its member states, including without limitation the Federal Republic of Germany, including without limitation the German Bundesbank, Federal Ministry of Economics and Energy (*Bundesministerium für Wirtschaft und Energie*), the United Kingdom, including Her Majesty's Treasury of the United Kingdom, Switzerland, including without limitation the State Secretariat for Economic Affairs of Switzerland (SECO) or the Swiss Directorate of International Law (DIL) or, without prejudice to the foregoing, any other relevant sanctions authority enacting, administering or imposing Sanctions applicable by law to any Senior Finance Party or an Obligor.

"**Screen Rate**" means, in relation to LIBOR, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for US Dollars and the relevant period displayed (before any correction, recalculation or republication by the administrator) on pages LIBOR01 or LIBOR02 of the Thomson Reuters screen (or any replacement Thomson Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters. If such page or service ceases to be available, the Owners may specify another page or service displaying the relevant rate after consultation with the Charterers.

"**Secured Indebtedness**" means all present and future obligations and other liabilities of any nature in any currency, at any time, of each Obligor and each Related Obligor (or any of them) due, owing or incurred under or in connection with the Transaction Documents and the Related Transaction Documents to the Secured Parties (or any of them) including, without limitation, any amendments, supplements or restatements of any Transaction Document or Related Transaction Document (however fundamental), together with all interest accruing thereon and all costs, charges and expenses incurred in connection therewith.

"**Secured Parties**" means, together, the Owners, each of the Related Owners, the Owner Security Trustee, each Receiver and each Delegate.

"**Security**" means a mortgage, charge, pledge, lien, assignment, trust, hypothecation or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Security Assets**" means all of the assets of the Obligors which from time to time are, or are expressed to be, the subject of the Security Documents.

"**Security Documents**" means, in relation to the Vessel and together, the following:

(a)     the Accounts Charge;

(b)     the Charter Guarantees;

(c)     the Charterers' Assignment;

(d)     each Managers' Undertaking;

(e)     the Security Trust Deed;

(f)     the Share Charges;

(g)     any Intra Group Loan Assignment; and

(h)     any other document that may at any time be executed by any person creating, evidencing or perfecting any Security to secure all or part of the Secured Indebtedness,

and "**Security Document**" means any one of them.

"**Security Trust Deed**" means the deed made or to be made between (among others) the Owners, the Related Owners, the Charterers, the Related Charterers and the Owner Security Trustee.

"**Security Trustees**" means the Owner Security Trustee and any party defined as "Security Trustee" or "Security Agent" or performs the role of the security trustee or security agent under any Senior Finance Document from time to time.

"**Sellers**" means Suez Rajan Shipping Limited, a company incorporated under the laws of The Republic of the Marshall Islands, and having their registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

"**Senior Finance Document**" means any facility agreement, security document, fee letters and any other document designated as such by the Senior Finance Parties and the Owners and which may be entered into between the Senior Finance Parties and the Owners, the Owners and the Issuer or the Issuer and other Senior Finance Parties and the for the purpose of, among other things, financing or refinancing all or any part of the Actual Owners' Cost.

"**Senior Finance Party**" means a party defined as "Finance Party" under any Senior Finance Documents from time to time and includes, without limitation, the Issuer.

"**Senior Finance Party Quiet Enjoyment Agreement**" means:

(a)     if required by the Owners, a Multipartite Agreement; or

(b)      in relation to the Vessel, an agreement which the Senior Finance Parties (or, if any, their authorised agent on their behalf) shall issue in favour of the Charterers (or, as the context may require, any Sub-Charterers), such agreement to be in an industry-standard form reasonably acceptable to the Owners, the Charterers, any relevant Sub-Charterers, and the Senior Finance Parties.

"**Senior Loan**" means any loan made available to, amongst others, the Owners by a Senior Finance Party.

"**Share Charges**" means the charges over the shares in each of the Charterers and HoldCo executed or (as the case may be) to be executed by HoldCo and Mrytle respectively in favour of the Owner Security Trustee.

"**SMC**" means a valid safety management certificate issued for the Vessel by or on behalf of the Administration under paragraph 13.7 of the ISM Code.

"**Sub-Charter**" means:

(a)      the Time Charter; and

(b)      any charterparty in respect of the Vessel entered or to be entered into between the Charterers (as disponent owners) and any Sub-Charterers with a charter period of more than 12 months (inclusive of extension options).

"**Sub-Charter Guarantee**" means any guarantee executed by any Sub-Charterers Guarantor in favour of the Charterers.

"**Sub-Charterers**" means:

(a)      the Time Charterers; and

(b)      any sub-charterers which are or will be parties to a Sub-Charter.

"**Sub-Charterers Guarantor**" means any guarantor under a Sub-Charter Guarantee.

"**Subsidiary**" of a person means any other person:

(a)      directly or indirectly controlled by such person; or

(b)      of whose dividends or distributions on ordinary voting share capital such person is beneficially entitled to receive more than 50%,

and a person is a wholly-owned Subsidiary of another person if it has no members except that other person and that other person's wholly-owned Subsidiaries or persons acting on behalf of that other person or its wholly-owned Subsidiaries.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Tax Credit**" has the meaning given to such term in Clause 47.1.1 (*Definitions*).

"**Tax Deduction**" has the meaning given to such term in Clause 47.1.1 (*Definitions*).

"**Tax Payment**" has the meaning given to such term in Clause 47.1.1 (*Definitions*).

"**Termination**" means the termination at any time of the chartering of the Vessel under this Charter.

"**Termination Event**" means each of the events specified in Clause 62 (*Termination Events*).

"**Termination Notice**" has the meaning given to such term in Clause 63.2.1.

"**Termination Payment Date**" means:

(a)   in respect of a termination of this Charter in accordance with Clause 44.2 (*Sanctions*), the date specified in the Termination Notice served on the Charterers pursuant to that Clause;

(b)   in respect of a Termination as a result of the Charterers' exercise of the Purchase Option in accordance with Clause 64 (*Purchase Option*), the Purchase Option Date; or

(c)   in respect of a Default Termination, the date specified in the Termination Notice served on the Charterers pursuant to Clause 63.2 (*Owners' option after Termination Event*) in respect of such Default Termination.

"**Termination Sum**" means an amount representing the Owners' losses as a result of the early termination of this Charter before the expiry of the Agreement Term, which both Parties acknowledge as a genuine and reasonable pre-estimate of the Owners' losses in the event of such termination and shall consist of the following:

(a)   the Lease Principal Outstanding as at the relevant Termination Payment Date;

(b)   any other Unpaid Sums due and payable together with interest accrued thereon pursuant to Clause 43.7 (*Default charter rate*) from the due date for payment of such Unpaid Sums up to the date of actual payment;

(c)   any other sums as the Owners may be entitled to under the terms of this Transaction Documents, including (but not limited to) any Break Costs and payments referred to in Clauses 49 (*Other indemnities*); and

(d)   any sums payable by the Owners or the Issuer to a Senior Finance Party pursuant to the Senior Finance Documents (other than Break Costs) in excess of the Lease Principal Outstanding as at the relevant Termination Payment Date,

**provided that** there shall be no double-counting of any of the items listed in paragraphs (a) to (d) above.

"**Time Charter**" means, in relation to the Vessel, the time charter party dated 1 November 2012 entered between the Charterers (as disponent owners) and the Time Charterers (as amended, novated, supplemented or restated from time to time).

"**Time Charter Deposit**" means US$950,000.

"**Time Charterers**" means Tara Transport Corporation, a company incorporated under the laws of Liberia, and having their registered office at 80 Broad Street, Monrovia, Liberia.

"**Title Transfer PDA**" means the protocol of delivery and acceptance in relation to the Vessel to be executed between the Owners and the Charterers, substantially in the form of Schedule 4 (*Form of Title Transfer PDA*) to this Charter.

"**Total Loss**" means during the Charter Period:

(a)     the actual or constructive or compromised or agreed or arranged total loss of the Vessel;

(b)     the requisition for title or compulsory acquisition of the Vessel by any government or other competent authority (other than by way of requisition for hire); or

(c)     the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture of the Vessel (not falling within paragraph (b) above), unless the Vessel is released and returned to the possession of the Owners or the Charterers within 60 day (or, in the case of piracy, three months) after the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture in question.

"**Total Loss Date**" means, in relation to the Total Loss:

(a)     in the case of an actual loss of the Vessel, the date on which it occurred or, if that is unknown, the date when the Vessel was last heard of;

(b)     in the case of a constructive, arranged, agreed or compromised Total Loss of the Vessel, the earlier of:

(i)      the date on which a notice of abandonment is given to the insurers; and

(ii)     the date of any compromise, arrangement or agreement made by or on behalf of the Charterers with the Vessel's insurers in which the insurers agree to treat the Vessel as a Total Loss; and

(c)     in the case of any other type of Total Loss, the date (or the most likely date) on which it appears to the Owners that the event constituting the Total Loss occurred.

"**Total Loss Proceeds**" means the proceeds of the Insurances or any other compensation of any description in respect of a Total Loss unconditionally received and retained by or on behalf of the Owners in respect of a Total Loss.

"**Transaction Documents**" means, together:

(a)     this Charter;

(b)     the MOA;

(c)     the Security Documents;

(d)     the Fee Letters;

(e)     any Senior Finance Party Quiet Enjoyment Agreement;

(f)     the Related Transaction Documents; and

(g)     such other documents as may be designated as such by the Owners from time to time.

"**Transaction Security**" means the Security created or evidenced or expressed to be created or evidenced under the Security Documents.

"**Unpaid Sum**" means any sum due and payable but unpaid by an Obligor under the Transaction Documents.

"**US Tax Obligor**" means:

(a)     an Obligor which is resident for tax purposes in the United States of America; or

(b)     an Obligor some or all of whose payments under the Transaction Documents to which it is a party are from sources within the United States for US federal income tax purposes.

"**Valuation Report**" means, in relation to the Vessel and any Related Vessel (or any other vessel over which additional security has been created or which is being offered as additional security in accordance with Clause 54.2 (*Asset coverage and assessment of Market Value*)), a valuation report addressed to the Owners and/or the Senior Finance Parties from an Approved Shipbroker on the basis of a charter-free sale for prompt delivery for cash (in US Dollars) at arm's length on normal commercial terms as between a willing seller and a willing buyer and having regard to any Inspection Report provided pursuant to Clause 57.9 (*Inspection*).

"**Vessel**" means the motor vessel named m.v. "SUEZ RAJAN" as more particularly described in Box 4 (*Vessel*) of this Charter.

"**VFS**" means VFS Holding Ltd., a company incorporated under the laws of The Republic of the Marshall Islands and whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands.

## 39.2     Construction

39.2.1     Unless a contrary indication appears, any reference in this Charter to:

(a)     the "**Owners**", the "**Charterers**", any "**Obligor**", any "**Senior Finance Party**", any "**Related Obligor**" or any other person shall be construed so as to include its successors in title, permitted assignees and permitted transferees to, or of, its rights and/or obligations under the Transaction Documents;

(b)     "**assets**" includes present and future properties, revenues and rights of every description;

(c)     a "**Transaction Document**", a "**Security Document**", a "**Project Document**" or any other agreement or instrument is a reference to that Transaction Document, Security Document, Project Document or other agreement or instrument as amended, novated, supplemented, extended or restated from time to time;

(d)     "**guarantee**" means any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(e)     "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(f)     a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(g)     a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(h)     a provision of law is a reference to that provision as amended or re-enacted from time to time;

(i)     a time of day (unless otherwise specified) is a reference to London time;

(j)     this Charter includes the Schedules hereto and references to Clauses and Schedules are, unless otherwise specified, references to Clauses of and Schedules to this Charter and, in the case of a Schedule, to such Schedule as incorporated in this Charter as substituted from time to time;

(k)     the term "**Vessel**" includes any part of the Vessel;

(l)     "**law**" includes common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, rule, statute, treaty or other legislative measure in any jurisdiction or any present or future directive, regulation, request or requirement, or official or judicial interpretation of any of the foregoing, in each case having the force of law and, if not having the force of law, in respect of which compliance is generally customary;

(m)  "**month**" means, save as otherwise provided, a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last day in that calendar month;

(n)  the "**winding-up**", "**dissolution**", "**administration**", "**liquidation**", "**insolvency**", "**reorganisation**", "**readjustment of debt**", "**suspension of payments**", "**moratorium**" or "**bankruptcy**" (and their derivatives and cognate expressions) of any person shall each be construed so as to include the others and any equivalent or analogous proceedings or event under the laws of any jurisdiction in which such person is incorporated or any jurisdiction in which such person carries on business;

(o)  "**protection and indemnity risks**" means the usual risks covered by a protection and indemnity association which is a member of the International Group of P&I Club acceptable to the Owners, including pollution risks, extended passenger cover and the proportion (if any) of any sums payable to any other person or persons in case of collision which are not recoverable under the hull and machinery policies by reason of the incorporation in them of clause 6 of the International Hull Clauses (1/11/02 or 1/11/03), clause 8 of the Institute Time Clauses (Hull)(1/10/83) or clause 8 of the Institute Time Clauses (Hulls)(1/11/1995) or the Institute Amended Running Down Clause (1/10/71) or any equivalent provision;

(p)  the "**equivalent**" in one currency (the "**first currency**") as at any date of an amount in another currency (the "**second currency**") shall be construed as a reference to the amount of the first currency which could be purchased with such amount of the second currency at the spot rate of exchange quoted by the Owners at or about 11:00 a.m. two Business Days (being a day other than a Saturday or Sunday on which banks and foreign exchange markets are generally open for business in London) before such date for the purpose of the first currency with the second currency for delivery and value on such date; and

(q)  words denoting the plural number include the singular and vice versa.

39.2.2   The determination of the extent to which a rate is "**for a period equal in length**" to a Hire Period shall disregard any inconsistency arising from the last day of that Hire Period being determined pursuant to the terms of this Charter.

39.2.3   Section, Clause and Schedule headings are for ease of reference only.

39.2.4   Unless a contrary indication appears, a term used in any Transaction Document or in any notice given under or in connection with any Transaction Document has the same meaning in that Transaction Document or notice as in this Charter.

39.2.5   A Potential Termination Event is "**continuing**" if it has not been remedied or waived and a Termination Event is "**continuing**" if it has not been waived or the Owners have exercised their rights in respect of such Termination Event pursuant to Clause 63.2 (*Owners' option after Termination Event*).

39.2.6   It is agreed that in each case where the Charterers require the consent, approval, acceptance or confirmation of the Owners under this Charter that it shall not be unreasonable for the Owners to withhold or deny any such consent, approval, acceptance or confirmation if the Owners have not received the corresponding consent, approval, acceptance or confirmation required from all relevant Senior Finance Parties under the relevant Senior Finance Documents.

39.3   **Currency symbols and definitions**

"**US$**" and "**US Dollars**" denote the lawful currency of the United States of America.

39.4   **Third party rights**

39.4.1   Unless expressly provided to the contrary in a Transaction Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Charter other than any Senior Finance Party.

39.4.2   Notwithstanding any term of any Transaction Document, the consent of any person who is not a Party is not required to rescind or vary this Charter at any time.

**40   Background**

40.1   **Sale and purchase of the Vessel**

By:

40.1.1   the Sale Agreement the Sellers have agreed to purchase and the Charterers have agreed to sell the Vessel to the Sellers subject to the terms and conditions therein; and

40.1.2   a memorandum of agreement dated on or about the date of this Charter (the "**MOA**") made between the Owners (as buyers under the MOA) and the Sellers (as sellers under the MOA), the Owners have agreed to purchase and the Sellers have agreed to sell the Vessel subject to the terms and conditions therein.

**41      Conditions to Charter and to delivery**

41.1    **Charter conditions precedent**

The obligations of the Owners to enter into this Charter shall be subject to the Owners having received, on or before the date of this Charter, the documents and evidence in listed in Part I (*Conditions precedent to Charter*) of Schedule 1 (*Conditions precedent and subsequent*) in form and substance satisfactory to the Owners. The Owners shall notify the Charterers promptly upon being so satisfied.

41.2    **Delivery conditions precedent**

The obligation of the Owners to deliver the Vessel to the Charterers pursuant to this Charter shall be subject to the Owners having received, on or before the Actual Delivery Date, the documents and evidence in listed in Part II (*Conditions precedent to delivery*) of Schedule 1 (*Conditions precedent and subsequent*) in form and substance satisfactory to the Owners and the documents and evidence listed in Schedule 6 (*Senior Finance Documents Conditions Precedent*) in form and substance satisfactory to the Senior Finances Parties. The Owners shall notify the Charterers promptly upon the Owners and the Senior Finance Parties being so satisfied.

41.3    **Further conditions**

The obligation of the Owners to deliver the Vessel to the Charterers pursuant to this Charter shall be subject to the following additional conditions:

41.3.1    no Termination Event or Potential Termination Event is continuing or would result from such delivery;

41.3.2    the Repeating Representations being true and correct on the date of this Charter and the Actual Delivery Date;

41.3.3    the Actual Delivery Date falls on or before the Long Stop Date;

41.3.4    the Owners (as buyers) have taken delivery of the Vessel from the Sellers (as sellers) in accordance with the terms of the MOA;

41.3.5    there is no event or circumstance that is continuing which in the opinion of the Owners would have a Material Adverse Effect;

41.3.6    no Mandatory Prepayment Event is continuing or would result from such delivery; and

41.3.7    a Senior Loan having been made on terms acceptable to the Owners.

41.4    **Delivery conditions subsequent**

The Charterers undertake to deliver or cause to be delivered to the Owners within the earlier of:

41.4.1    the time limits set out in Part III (*Delivery conditions subsequent*) of Schedule 1 (*Conditions precedent and subsequent*); and

41.4.2    ten Business Days after the Actual Delivery Date,

the documents and other evidence listed in Part III (*Delivery conditions subsequent*) of Schedule 1 (*Conditions precedent and subsequent*).

41.5    **Waiver of conditions precedent and conditions subsequent**

41.5.1    If the Owners in their sole discretion agree to either enter into this Charter or deliver the Vessel under this Charter to the Charterers before all of the relevant documents and evidence required by this Clause 41 have been delivered to or to the order of the Owners, the Charterers undertake to deliver all outstanding documents and evidence to or to the order of the Owners within such date as specified by the Owners, acting in their sole discretion.

41.5.2    The entry into this Charter by the Owners and the delivery of the Vessel by the Owners to the Charterers under this Clause 41 shall not, unless otherwise notified by the Owners (acting in their sole discretion) to the Charterers in writing, be taken as a waiver of the Owners' right to require production of all the documents and evidenced required by Clause 41.1 (*Charter conditions precedent*) or Clause 41.2 (*Delivery conditions precedent*).

**42    Delivery**

42.1    **Delivery and acceptance of Vessel**

42.1.1    Provided that the conditions referred to in Clause 41.1 (*Charter conditions precedent*) and Clause 41.2 (*Delivery conditions precedent*) have been fulfilled or waived to the satisfaction of the Owners, the Owners and the Charterers agree that:

(a)    the Charterers shall, at their own risk and expense, upon the Actual Delivery Date arrange for the Vessel to be registered in the name of the Owners;

(b)    the Charterers shall take delivery of the Vessel from the Owners under this Charter (such delivery to be conclusively evidenced by a duly executed PDA) simultaneously with the acceptance of delivery of the Vessel by the Owners from the Charterers pursuant to the MOA and the acceptance of delivery of the Vessel by the Sellers from the Charterers pursuant to the Sale Agreement;

(c)    the Charterers will accept the Vessel:

(i)    on an "as is where is" basis in exactly the same form and state as the Vessel is delivered by the Charterers to the Owners pursuant to the MOA;

(ii)    in such form and state with any faults, deficiencies and errors of description; and

(iii)    for the avoidance of doubt, no underwater inspection shall be performed at the time of commencement of

this Charter on the basis that any repairs required at the next scheduled dry-docking are the responsibility of the Charterers; and

(d)   the Charterers shall have no right to refuse acceptance of delivery of the Vessel into this Charter if the Vessel is delivered to the Owners pursuant to the MOA and, notwithstanding and without prejudice to the foregoing, the Owners and the Charterers nonetheless agree to enter into and execute the PDA on delivery of the Vessel under this Charter.

## 42.2   No representations or warranties from Owners

42.2.1   The Charterers:

(a)   acknowledge and agree that the Owners:

(i)   are not the manufacturer or original supplier of the Vessel which has been purchased by the Owners pursuant to the MOA; and

(ii)   have therefore made no representations or warranties in respect of the Vessel or any part of the Vessel; and

(b)   waive all their rights in respect of any warranty or condition implied (whether statutory or otherwise) on the part of the Owners and all claims against the Owners howsoever the same might arise at any time in respect of the Vessel, or arising out of the construction, operation or performance of the Vessel and the chartering of the Vessel under this Charter (including, without limitation, in respect of the seaworthiness or otherwise of the Vessel).

42.2.2   In particular, and without prejudice to the generality of Clause 42.2.1, the Owners shall be under no liability whatsoever, howsoever arising, in respect of the injury, death, loss, damage or delay of or to or in connection with the Vessel or any person or property whatsoever, whether onboard the Vessel or elsewhere, and irrespective of whether such injury, death, loss, damage or delay shall arise from the unseaworthiness of the Vessel. For the purpose of this Clause 42.2.2, "delay" shall include delay to the Vessel in respect of delivery under this Charter.

## 43   Hire

## 43.1   Charterers' obligation to pay Hire

In consideration of the Owners' agreement to charter the Vessel to the Charterers pursuant to the terms of this Charter, the Charterers agree to pay each of the following sums on each of the relevant dates in accordance with the provisions of this Clause 43.

43.2    **Hire**

43.2.1    Subject to Clause 43.2.2, the Charterers shall, on each and every Hire Payment Date, pay to the Owners by way of fixed hire (each such payment being "**Hire**") an amount equal to ten thousand three hundred US Dollars (US$10,300) multiplied by the number of days in the relevant Hire Period.

43.2.2    If, on the Actual Delivery Date but before the Vessel is delivered by the Owners to the Charterers pursuant to this Charter, the Applicable Rate is above 1%, the Owners may increase the Hire payable by the Charterers in an amount to be determined by the Owners, acting reasonably, **provided that** such increase shall not be greater than the difference between the Applicable Rate and 1%.   The Owners shall notify the increased rate of Hire to the Charterers on the Actual Delivery Date but before the Vessel is delivered by the Owners to the Charterers pursuant to this Charter and the Charterers shall be deemed to accept such increased rate of Hire.

43.3    **Calculations and related matters**

43.3.1    Promptly following receipt by the Owners of any amount which may be prepaid in accordance with Clause 53.2 (*Charterers' Cash Collection Account and HoldCo Cash Collection Account*) or Clause 55.20 (*No dividends*), the Owners shall recalculate the Lease Principal Outstanding and notify the Charterers in writing of such recalculated Lease Principal Outstanding.

43.3.2    All payments of Hire shall be paid in advance on each Hire Payment Date.

43.4    **Non-Business Day**

Any payment provided herein due on any day which is not a Business Day shall be payable on the immediately preceding Business Day.

43.5    **Payments into Owners' Earnings Account**

All payments under this Charter shall be made to the Owners' Earnings Account for credit to the account of the Owners.

43.6    **Charterers' obligation to pay Hire absolute**

Following delivery of the Vessel to, and acceptance by, the Charterers under this Charter, the Charterers' obligation to pay Hire in accordance with this Clause 43 shall be absolute irrespective of any contingency whatsoever including but not limited to:

43.6.1    any set-off, counterclaim, recoupment, defence or other right which either Party may have against the other or against a Senior Finance Party;

43.6.2    any unavailability of the Vessel, for any reason, including but not limited to seaworthiness, condition, design, operation, merchantability or fitness for use or purpose of the Vessel or any apparent or latent defects in the

Vessel or its machinery and equipment or the ineligibility of the Vessel for any particular use or trade or for registration of documentation under the laws of any relevant jurisdiction or lack of registration or the absence or withdrawal of any consent required under the applicable law of any relevant jurisdiction for the ownership, chartering, use or operation of the Vessel or any damage to the Vessel;

43.6.3 any lack or invalidity of title or any other defect in title, provided such lack or invalidity of title or defect does not affect the quiet and peaceful use, possession and enjoyment of the Vessel;

43.6.4 any failure or delay on the part of either Party, whether with or without fault on its part, in performing or complying with any of the terms, conditions or other provisions of this Charter;

43.6.5 any insolvency, bankruptcy, reorganisation, arrangement, readjustment of debt, dissolution, administration, liquidation or similar proceedings by or against the Owners or the Charterers or any change in the constitution of the Owners or the Charterers;

43.6.6 any invalidity or unenforceability or lack of due authorisation of or any defect in this Charter; and

43.6.7 any other cause which would but for this provision have the effect of terminating or in any way affecting the obligations of the Charterers under this Charter,

it being the intention of the Parties that the provisions of this Clause 43, and the obligation of the Charterers to pay hire and make any payments under this Charter, shall (save as expressly provided in this Clause 43) survive any frustration and that, save as expressly provided in this Charter, no moneys paid under this Charter by the Charterers to the Owners shall in any event or circumstance be repayable to the Charterers.

## 43.7 Default charter rate

While a Termination Event is continuing Hire shall be increased by US$1,500 per day.

## 43.8 Default interest

43.8.1 If the Charterers fail to pay any amount payable by it under a Transaction Document on its due date (other than any Hire), interest shall accrue on the relevant Unpaid Sum from the due date up to the date of actual payment (both before and after judgment) at a rate of 2.00% per annum.

43.8.2 Any interest accruing under this Clause 43.8 shall be immediately payable by the Charterers on demand by the Owners.

43.8.3 Default interest (if unpaid) arising on an Unpaid Sum will be compounded with the Unpaid Sum at the end of each Hire Period applicable to that Unpaid Sum but will remain immediately due and payable.

43.9     **Survival of obligation to pay**

If this Charter is terminated for whatever reason:

43.9.1    the Charterers' obligation to pay Hire and such other sums which (in each case) have accrued before the date of such termination shall continue notwithstanding such termination; and

43.9.2    all other rights of the Owners (including but not limited to any rights, benefits or indemnities which are expressly provided to continue after the termination of this Charter) are reserved under this Clause.

43.10    **Unavailability of Screen Rate**

43.10.1   If no Screen Rate is available for LIBOR on the Actual Delivery Date, then the applicable LIBOR shall be the Interpolated Screen Rate for a period equal in length to one month.

43.10.2   If:

(a)    no Screen Rate is available for LIBOR for:

(i)     US Dollars; or

(ii)    one month and it is not possible to calculate the Interpolated Screen Rate; or

(b)    a Screen Rate Replacement Event has occurred in relation to any Screen Rate,

then there shall be no LIBOR on the Actual Delivery Date, and Clause 43.11 (*Alternative rate*) shall apply.

43.10.3   For the purpose of Clause 43.10.2:

"**Interpolated Screen Rate**" means the rate which results from interpolating on a linear basis between:

(a)    the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than one month; and

(b)    the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds one months,

each on the Quotation Day.

"**Screen Rate Replacement Event**" means, in relation to a Screen Rate:

(a)    the methodology, formula or other means of determining that Screen Rate has, in the opinion of the Owners and the Charterers materially changed;

(b)

(i)

    (A)    the administrator of that Screen Rate or its supervisor publicly announces that such administrator is insolvent; or

    (B)    information is published in any order, decree, notice, petition or filing, however described, of or filed with a court, tribunal, exchange, regulatory authority or similar administrative, regulatory or judicial body which reasonably confirms that the administrator of that Screen Rate is insolvent,

**provided that**, in each case, at that time, there is no successor administrator to continue to provide that Screen Rate;

(c)    the administrator of that Screen Rate publicly announces that it has ceased or will cease, to provide that Screen Rate permanently or indefinitely and, at that time, there is no successor administrator to continue to provide that Screen Rate;

(d)    the supervisor of the administrator of that Screen Rate publicly announces that such Screen Rate has been or will be permanently or indefinitely discontinued; or

(e)    the administrator of that Screen Rate or its supervisor announces that that Screen Rate may no longer be used; or

(f)    the administrator of that Screen Rate determines that that Screen Rate should be calculated in accordance with its reduced submissions or other contingency or fallback policies or arrangements and either:

    (i)    the circumstance(s) or event(s) leading to such determination are not (in the opinion of the Owners and the Charterers) temporary; or

    (ii)    that Screen Rate is calculated in accordance with any such policy or arrangement for a period no less than ten Business Days; or

(g)    in the opinion of the Owners and the Charterers, that Screen Rate is otherwise no longer appropriate for the purposes of calculating any Hire under this Charter.

## 43.11   Alternative rate

43.11.1    If this Clause 43.11 applies, then the Owners and the Charterers shall enter into negotiations for a period of not more than 30 days (or such longer period as the Owners and the Charterers may agree) for the purpose of determining a mutually acceptable alternative rate to LIBOR.

43.11.2     Any alternative rate so agreed between the Owners and the Charterers in accordance with this Clause 43.11 shall apply retrospectively as if it were the applicable LIBOR on the Actual Delivery Date.

43.11.3     If the Owners and the Charterers cannot agree to a mutually acceptable alternative rate to the Screen Rate, then the applicable Screen Rate shall be the rate notified to the Charterers by the Owners as soon as practicable, to be that which expresses as a percentage rate per annum the cost to the Owners of funding from the London Interbank Market or, if cheaper, whatever source the Owners may reasonably select.

## 44      Illegality, prepayment and Total Loss

### 44.1    Illegality

44.1.1     If, in any applicable jurisdiction, it becomes unlawful or it is prohibited for the Owners or the Charterers to charter the Vessel pursuant to this Charter, except due to Sanctions (in which case Clause 44.2 (*Sanctions*) applies), then the Owners and Charterers, if such new or changed law or regulation or such interpretation or application permit, shall notify the other Party of the relevant event and negotiate in good faith for a period of 30 days (or such longer period as may be agreed by the Owners) from the date of the receipt of the relevant notice by the other Party to agree an alternative to the Owners or the Charterers chartering the Vessel pursuant to this Charter.

44.1.2     If any agreement referred to in Clause 44.1.1 is:

(a)     not permitted by any relevant new or changed law or regulation or such interpretation or application; or

(b)     not reached within the 30 day (or longer) period referred to in Clause 44.1.1,

then the Charterers shall immediately pay to the Owners the applicable Termination Sum.

### 44.2    Sanctions

If:

44.2.1     it becomes unlawful for either the Owners or the Charterers to charter the Vessel pursuant to this Charter, due to Sanctions (including in each case, without limitation, (A) the non-existence or cessation of legality, validity a binding effect or enforceability of a provision of a Transaction Document and (B) the presence of any circumstances resulting in the imposition of any civil, administrative or criminal measures on the Owners) and/or contrary, or declared by any Sanctions Authority to be contrary to Sanctions for any Affiliate of the Owners for Owners to do so; or

44.2.2      without prejudice to the generality of the preceding paragraph, the Charterers are or become or any other Obligor is or becomes a Prohibited Person, which would result in a breach of Sanctions by the Owners,

to the extent permitted by applicable law and any Sanctions Authority, the Owners shall promptly notify the Charterers upon becoming aware of that event, this Charter shall be terminated from the earlier of (i) the date falling 30 days after the date on which the Owners have notified the Charterers whereupon the Charterers shall be obliged to pay to the Owners the Termination Sum in accordance with Clause 63.3 (*Payment of Termination Sum*) and (ii) the last day of any applicable grace period permitted by law.

44.3    **Mandatory Prepayment Event – Total Loss**

44.3.1      If the Vessel is a Total Loss, the Charterers shall promptly notify the Owners of the facts of such Total Loss.

44.3.2      The Owners shall thereupon abandon the Vessel to the Charterers and/or execute such documents as may be required to enable the Charterers to abandon the Vessel to insurers and claim a Total Loss.

44.3.3      Without prejudice to the obligations of the Charterers to pay to the Owners all monies then due or thereafter to become due under this Charter, if the Vessel becomes a Total Loss during the Charter Period, then:

(a)      the Charter Period shall end on the relevant Mandatory Prepayment Event Settlement Date; and

(b)      the Charterers shall pay to the Owners the applicable Termination Sum on the relevant Mandatory Prepayment Event Settlement Date, **it being understood that** such obligation on the part of the Charterers to pay shall apply regardless of:

(i)      whether or not any moneys (or the amount of such moneys) are payable under any Insurances in respect of the Vessel;

(ii)      the cause of the Total Loss; or

(iii)      whether or not the Charterers have actually received any Total Loss Proceeds.

44.4    **Application of sale or Total Loss Proceeds**

44.4.1      The Charterers:

(a)      shall procure that all sale proceeds or Total Loss Proceeds will be paid to such account or accounts as the Owners may direct; and

(b)      agree and acknowledge that the Owners may apply all or any part of the sale proceeds or the Total Loss Proceeds towards:

        (i)      firstly, the reasonable and properly documented third party costs and expenses incurred by the Owners for the purpose of collecting the sale proceeds or the Total Loss Proceeds as the case may be or incurred by the Owners in respect of the sale of the Vessel;

        (ii)     secondly, satisfaction of the Termination Sum and any other sums outstanding pursuant to the Transaction Documents; and

        (iii)    thirdly, a prepayment of any Related Lease Principal Outstanding.

44.4.2    To the extent that there is any surplus after the application referred to in Clause 44.4.1(b), the Owners shall as soon as reasonably practicable afterwards pay such surplus to:

        (a)    during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account; and

        (b)    during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account,

for application in accordance with Clause 53.2.5 (*Charterers' Cash Collection Account and HoldCo Cash Collection Account*) on the next Hire Payment Date.

## 44.5    Obligation to continue to pay Hire

44.5.1    The Charterers shall continue to pay Hire on the days and in the amounts required under this Charter notwithstanding that the Vessel shall become a Total Loss.

44.5.2    Once the Charterers have paid all sale proceeds or Total Loss Proceeds to the Owners and any other amounts outstanding under this Charter, the Charterers shall be under no further obligation to pay Hire and, the Owners shall assign any interest it has in the Insurances to the Charterers and shall notify the relevant insurers of such assignment.

## 44.6    Restriction of prepayment

The Charterers shall not prepay all or any part of the Lease Principal Outstanding except at the times and in the manner expressly provided for in this Charter.

## 44.7    Onward sale proceeds

If the Charterers enter into an agreement to sell the Vessel prior to or within 60 days after the Charterers have served a Purchase Option Notice or the Owners have served a Put Option Notice, the Charterers shall procure any proceeds of such sale in excess of the Purchase Option Price or the Put Option Price as the case may be (the "**Excess Onward Sale Proceeds**") shall be credited to:

44.7.1    during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account; and

44.7.2      during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account,

and the Excess Onward Sale Proceeds shall be applied in accordance with Clause 44.4 (*Application of sale or Total Loss Proceeds*).

**45     Hire Periods**

45.1     **Determination of Hire Periods**

45.1.1      Unless otherwise provided pursuant to this Clause 45.1, each Hire Period that falls within the Charter Period shall have a duration of one month.

45.1.2      The first Hire Period shall commence on the Actual Delivery Date, and each successive Hire Period shall commence forthwith upon the expiration of the immediately previous Hire Period, **provided that** if a Hire Period would otherwise extend beyond the expiration of the Charter Period, then such Hire Period shall terminate on the expiration of the Charter Period.

45.1.3      No Hire Period shall extend beyond the Charter Period.

45.1.4      If the first Hire Period commences after the commencement of the first Related Hire Period, the first Hire Period shall terminate on the same day as the relevant Related Hire Period that was continuing on the first day of the Hire Period.

45.2     **Non-Business Days**

If a Hire Period would otherwise end on a day which is not a Business Day, that Hire Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

**46     Fees**

46.1     The Charterers shall pay to the Owners a fee computed at the rate of 4.00% per annum on the Actual Owners' Cost for the period commencing on the date of this Charter until the earlier of (i) the Actual Delivery Date and (ii) the last day of the Availability Period.  The accrued commitment fee is payable on the earlier of (i) the Actual Delivery Date when it may be set-off against the amount payable to the Charterers pursuant to the MOA and (ii) the last day of the Availability Period.  No commitment fee shall be payable if the underwriting fee referred to in the Fee Letter has been paid.

46.2     The Charterers shall on or before the Actual Delivery Date pay to the Owners an upfront fee, agency fee and underwriting fee in the amount and at the times agreed in the Fee Letter.

**47     Tax gross-up and indemnities**

47.1     **Definitions**

47.1.1      In this Charter:

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Transaction Document, other than a FATCA Deduction.

"**Tax Payment**" means either the increase in a payment made by an Obligor to the Owners under Clause 47.2 (*Tax gross-up*) or a payment under Clause 47.3 (*Tax indemnity*).

47.1.2   Unless a contrary indication appears, in this Clause 47 a reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination.

47.2   **Tax gross-up**

47.2.1   The Charterers shall, and shall procure that each Obligor will, make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

47.2.2   The Charterers shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Owners accordingly.

47.2.3   If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

47.2.4   If an Obligor is required to make a Tax Deduction, the Charterers shall procure that such Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

47.2.5   Within 30 days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Charterers shall procure that the Obligor making that Tax Deduction shall deliver to the Owners (via the Charterers if appropriate) evidence reasonably satisfactory to the Owners that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

47.3   **Tax indemnity**

47.3.1   The Charterers shall (within three Business Days of demand by the Owners (or such longer period as the Owners and the Charterers may agree)) pay to the Owners an amount equal to the loss, liability or cost which the Owners determine will be or has been (directly or indirectly) suffered for or on account of Tax by the Owners in respect of a Transaction Document.

47.3.2 Clause 47.3.1 shall not apply:

(a) with respect to any Tax assessed on the Owners:

(i) under the law of the jurisdiction in which the Owners are incorporated or, if different, the jurisdiction (or jurisdictions) in which the Owners are treated as resident for tax purposes; or

(ii) under the law of the jurisdiction in which the Owners' office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by the Owners; or

(b) to the extent a loss, liability or cost:

(i) is compensated for by an increased payment under Clause 47.2 (*Tax gross-up*); or

(ii) relates to a FATCA Deduction required to be made by a Party.

47.3.3 If the Owners wish to make, or intends to make a claim under Clause 47.3.1, they shall promptly notify the Charterers of the event which will give, or has given, rise to the claim.

## 47.4 Tax Credit

If an Obligor makes a Tax Payment and the Owners determine that:

47.4.1 a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

47.4.2 the Owners have obtained and utilised that Tax Credit,

then the Owners shall pay an amount to the Obligor which the Owners determine will leave them (after that payment) in the same after-Tax position as they would have been in had the Tax Payment not been required to be made by the Obligor.

## 47.5 Stamp taxes

The Charterers shall pay and, within three Business Days of demand (or such longer period as the Owners and the Charterers may agree), indemnify the Owners against any cost, loss or liability that the Owners incur in relation to all stamp duty, registration and other similar Taxes payable in respect of any Transaction Document.

## 47.6 Indirect tax

47.6.1 All amounts set out or expressed in a Transaction Document to be payable by any Obligor to the Owners shall be deemed to be exclusive of

any Indirect Tax. If any Indirect Tax is chargeable on any supply made by the Owners to any Obligor in connection with a Transaction Document, that Obligor shall pay to the Owners an amount equal to the amount of the Indirect Tax.

47.6.2 Where a Transaction Document requires any Obligor to reimburse or indemnify the Owners for any costs or expenses, that Obligor shall also at the same time pay and indemnify the Owners against all Indirect Tax incurred by the Owners in respect of the costs or expenses to the extent that the Owners reasonably determine that they are not entitled to credit or repayment in respect of the Indirect Tax.

47.7 **FATCA information**

47.7.1 Subject to Clause 47.7.3, each Party shall, within ten Business Days of a reasonable request by the other Party:

(a) confirm to that other Party whether it is:

(i) a FATCA Exempt Party; or

(ii) not a FATCA Exempt Party;

(b) supply to the other Party such forms, documentation and other information relating to its status under FATCA as the other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

(c) supply to the other Party such forms, documentation and other information relating to its status as the other Party reasonably requests for the purposes of the other Party's compliance with any other law, regulation, or exchange of information regime.

47.7.2 If a Party confirms to the other Party pursuant to Clause 47.7.1(a) that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify the other Party reasonably promptly.

47.7.3 Clause 47.7.1 shall not oblige the Owners to do anything, and Clause 47.7.1(c) shall not oblige the Charterers to do anything, which would or might in its reasonable opinion constitute a breach of:

(a) any law or regulation;

(b) any fiduciary duty; or

(c) any duty of confidentiality.

47.7.4 If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with Clause 47.7.1(a) or 47.7.1(b) (including, for the avoidance of doubt, where Clause 47.7.1(c) applies), then such Party shall be treated for the purposes of the Transaction Documents (and payments under them) as if it is not a FATCA Exempt Party until such

time as the Party in question provides the requested confirmation, forms, documentation or other information.

47.8 **FATCA Deduction**

47.8.1 Each Party may make any FATCA Deduction it is required to make by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

47.8.2 Each Party shall promptly, upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction), notify the other Party.

## 48 Increased Costs

48.1 **Increased Costs**

48.1.1 Subject to Clause 48.3 (*Exceptions*), the Charterers shall, within three Business Days of a demand by the Owners (or such longer period as the Owners and the Charterers may agree), pay to the Owners the amount of any Increased Costs incurred by the Owners as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Charter, or (ii) compliance with any law or regulation made after the date of this Charter, or (iii) the implementation or application of or compliance with Basel III or CRD IV or any other law or regulation which implements Basel III or CRD IV (whether such implementation, application or compliance is by a government, regulator or the Owners) made after the date of this Charter.

48.1.2 In this Charter:

"**Basel III**" means:

(a) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

(b) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(c)      any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

"**CRD IV**" means EU CRD IV and UK CRD IV.

"**EU CRD IV**" means:

(a)      Regulation EU No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending Regulation EU No 648/2012; and

(b)      Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC.

"**Increased Costs**" means:

(a)      a reduction in the rate of return from the Hire or on the Owners' overall capital;

(b)      an additional or increased cost; or

(c)      a reduction of any amount due and payable under any Transaction Document,

which is incurred or suffered by the Owners to the extent that it is attributable to the Owners having entered into any Transaction Document or funding or performing its obligations under any Transaction Document.

"**UK CRD IV**" means:

(a)      Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending Regulation (EU) No 548/2012 as it forms part of domestic law of the United Kingdom by virtue of the 2018 Withdrawal Act;

(b)      the law of the United Kingdom or any part of it, which immediately before IP Completion Day (as defined in the 2020 Withdrawal Act) implemented Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC and its implementing measures; and

(c)      direct EU legislation (as defined in the 2018 Withdrawal Act), which immediately before IP Completion Day (as defined in the

2020 Withdrawal Act) implemented EU CRD IV as it forms part of domestic law of the United Kingdom by virtue of the 2018 Withdrawal Act.

## 48.2 Increased Cost claims

48.2.1 If the Owners intend to make a claim pursuant to Clause 48.1 (*Increased Costs*), then they shall notify the Charterers accordingly and also of the event giving rise to the claim.

48.2.2 The Owners shall, as soon as practicable after having made a demand in respect of an Increased Costs claim, provide a certificate confirming the amount of their Increased Costs.

## 48.3 Exceptions

48.3.1 Clause 48.1 (*Increased Costs*) does not apply to the extent any Increased Costs is:

(a) attributable to a Tax Deduction required by law to be made by an Obligor;

(b) attributable to a FATCA Deduction required to be made by either Party, an Obligor or a Senior Finance Party (if applicable);

(c) compensated for by Clauses 47.3 (*Tax indemnity*) (or would have been compensated for under Clause 47.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in Clause 47.3.2 applied); or

(d) attributable to the wilful breach by the Owners of any law or regulation.

48.3.2 In this Clause 48.3, a reference to a "**Tax Deduction**" has the same meaning given to that term in Clause 47.1 (*Definitions*).

## 49 Other indemnities

## 49.1 Currency indemnity

49.1.1 If any sum due from an Obligor under the Transaction Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

(a) making or filing a claim or proof against that Obligor;

(b) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

the Charterers shall, as an independent obligation, within three Business Days of demand (or such longer period as the Owners and the Charterers may agree), indemnify the Owners against any cost, loss or liability

arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

49.1.2   The Charterers waive any right they may have in any jurisdiction to pay any amount under the Transaction Documents in a currency or currency unit other than that in which it is expressed to be payable.

49.2   **Additional indemnities**

Whether or not any of the transactions contemplated by this Charter are consummated, the Charterers shall, in addition to the provisions under Clause 22 (*Indemnity*) (Part II) of this Charter, within three Business Days of demand indemnify, protect, defend and hold harmless the Owners and the Issuer and their respective Affiliates, officers, directors, agents and employees (collectively, the "**Indemnitees**") throughout the Agreement Term from, against and in respect of, any and all liabilities, obligations, losses, damages, penalties, fines, fees, claims, actions, proceedings, judgement, order or other sanction, lien, salvage, general average, suits, costs, expenses and disbursements, including reasonable legal fees and expenses, of whatsoever kind and nature other than any liabilities, obligations, losses, damages, penalties, fines, fees, claims, actions, proceedings, judgement, order or other sanction, lien, salvage, general average, suits, costs, expenses and disbursements which arise due to the gross negligence or wilful misconduct of an Indemnitee (collectively, the "**Indemnified Expenses**"), imposed on, suffered or incurred by or asserted against any Indemnitee, in any way relating to, resulting from or arising out of or in connection with, in each case, directly or indirectly, any one or more of the following:

49.2.1   any Potential Termination Event or Termination Event that is continuing;

49.2.2   a failure by an Obligor to pay any amount due under a Transaction Document on its due date;

49.2.3   investigating any event which is continuing which the Owners reasonably believe is a Potential Termination Event or a Termination Event;

49.2.4   acting or relying on any notice, request or instruction which the Owners reasonably believe to be genuine, correct and appropriately authorised;

49.2.5   the instruction of lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under the Transaction Documents;

49.2.6   the taking, holding, protection or enforcement by the Owners of the Transaction Security;

49.2.7   this Charter and any other Transaction Documents and any amendment, supplement or modification to or of this Charter and any other Transaction Documents requested by any Obligor;

49.2.8   the Vessel or any part of the Vessel, including with respect to:

(a)     the ownership of, manufacture, design, possession, use or non-use, operation, maintenance, testing, repair, overhaul, condition, alteration, modification, addition, improvement, storage, seaworthiness, replacement, repair of the Vessel or any part of the Vessel (including, in each case, latent or other defects, whether or not discoverable and any claim for patent, trademark, or copyright infringement and all liabilities, obligations, losses, damages and claims in any way relating to or arising out of spillage of cargo or fuel, out of injury to persons, properties or the environment or strict liability in tort);

(b)     any claim or penalty arising out of violations of Sanctions or any applicable law by the Charterers, any Sub-Charterers or any other sub-charterers;

(c)     death or property damage of shippers or others;

(d)     any liens in respect of all or any part of the Vessel (save for any Permitted Security or other liens created by any Obligor in favour of the Senior Finance Parties);

(e)     any registration and/or tonnage fees (whether periodic or not) in respect of the Vessel payable to any registry of ships;

(f)     any Environmental Claim which may arise in connection with the Vessel; or

(g)     arising or asserted under or in connection with any law relating to safety at sea, the ISM Code, any Environmental Law or any Sanctions;

49.2.9    preventing or attempting to prevent the arrest, confiscation, seizure, taking and execution, requisition, impounding, forfeiture or detention of the Vessel in connection with the exercise of the rights of a holder of a lien created by the Charterers;

49.2.10    securing or attempting to secure the release of the Vessel in connection with the exercise of the rights of a holder of a lien created by the Charterers;

49.2.11    incurred or suffered in:

(a)     procuring the delivery of the Vessel to the Charterers under Clause 42 (*Delivery*);

(b)     recovering possession of the Vessel following termination of this Charter under Clause 63.6 (*Owners' right to withdraw or retake possession*); or

(c)     effecting the transfer of title from the Owners to the Charterers under any provision of this Charter;

49.2.12     arising from the master or officers of the Vessel or the Charterers' agents signing bills of lading or other documents;

49.2.13     in connection with:

        (a)      the arrest, seizure, taking into custody or other detention by any court or other tribunal or by any governmental entity; or

        (b)      subjection to distress by reason of any process, claim, exercise of any rights conferred by a lien or by any other action whatsoever,

of the Vessel which are expended, suffered or incurred as a result of or in connection with any claim or against, or liability of, the Charterers or any other member of the Charterers' group, together with any costs and expenses or other outgoings which may be paid or incurred by the Owners in releasing the Vessel from any such arrest, seizure, custody, detention or distress; or

49.2.14     incurred under or in connection with the Senior Finance Documents.

## 49.3   Run-off indemnities

Without prejudice to any right to damages or other claim which either party may, at any time, have against the other hereunder, it is hereby agreed and declared that the indemnities in favour of the Owners by the Charterers contained in this Charter shall continue in full force and effect.

## 49.4   Break Costs

The Charterers shall, within three Business Days of demand by the Owners (or such longer period as the Owners and the Charterers may agree), pay to the Owners any Break Costs.

## 50   Costs and expenses

### 50.1   Transaction expenses

The Charterers shall, within three Business Days of demand (or such longer period as the Owners and the Charterers may agree), pay the Owners the amount of all costs and expenses (including legal fees) reasonably incurred by them, the Secured Parties in connection with:

50.1.1     the negotiation, preparation, printing, execution and perfection of this Charter and any other documents referred to in this Charter;

50.1.2     the negotiation, preparation, printing, execution and perfection of any other Transaction Documents;

50.1.3     the negotiation, preparation, printing, execution and perfection of the Senior Finance Documents;

50.1.4     any other document which may at any time be required by the Owners to give effect to any Transaction Document or which the Owners are entitled to call for or obtain under the Transaction Documents;

50.1.5     any other document which may at any time be required by the Senior Finance Parties to give effect to any Senior Finance Document or which the Senior Finances Parties are entitled to call for or obtain under the Senior Finance Documents;

50.1.6     any discharge, release or reassignment of any Security Document;

50.1.7     the delivery of or transfer of title to the Vessel under the MOA and this Charter;

50.1.8     preparation or procurement of any survey, inspections or Valuation Report; and

50.1.9     any Tax or insurance advice (including the placing of any Innocent Owners' Interest Insurances).

50.2    **Amendment costs**

If any Obligor requests an amendment, waiver or consent, the Charterers shall, within three Business Days of demand (or such longer period as the Owners and the Charterers may agree), reimburse the Owners for the amount of all costs and expenses (including legal fees) reasonably incurred by the Owners and the Senior Finance Parties in responding to, evaluating, negotiating or complying with that request or requirement.

50.3    **Enforcement and preservation costs**

The Charterers shall, within three Business Days of the Owners' written demand (or such longer period as the Owners and the Charterers may agree), pay to the Owners the amount of all costs and expenses (including legal fees) incurred by the Owners in connection with the perfection, realisation, enforcement of, or the preservation of any rights under, any Transaction Document save for the Related Transaction Documents, the Related Security Documents and the Related Senior Finance Party Quiet Enjoyment Agreement) or Transaction Security and any proceedings instituted by or against the Owners as a consequence of entering into a Transaction Document (save for the Related Transaction Documents, the Related Security Documents and the Related Senior Finance Party Quiet Enjoyment Agreement), taking or holding the Transaction Security or enforcing those rights.

**51**    **Representations and warranties**

The Charterers make the representations and warranties set out in this Clause 51 to the Owners.

51.1    **Status**

51.1.1     Each Obligor is a limited liability corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

51.1.2    Each Obligor has the power to own its assets and carry on its business as it is being conducted.

51.1.3    No Obligor is a US Tax Obligor.

51.2    **Binding obligations**

Subject to the Legal Reservations:

51.2.1    the obligations expressed to be assumed by each Obligor in each of the Transaction Documents to which it is a party are legal, valid, binding and enforceable obligations; and

51.2.2    (without limiting the generality of Clause 51.2.1) each Security Document to which it is a party creates the security interests which that Security Document purports to create and those security interests are valid and effective.

51.3    **Non-conflict with other obligations**

The entry into and performance by each of the Obligors of, and the transactions contemplated by, the Transaction Documents and the granting of the Transaction Security do not and will not conflict with:

51.3.1    any law or regulation applicable to such Obligor;

51.3.2    the constitutional documents of such Obligor; or

51.3.3    any agreement or instrument binding upon such Obligor or any of such Obligor's assets or constitute a default or termination event (however described) under any such agreement or instrument.

51.4    **Power and authority**

51.4.1    Each Obligor has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Transaction Documents to which it is or will be a party and the transactions contemplated by those Transaction Documents.

51.4.2    No limit on the powers of any Obligor will be exceeded as a result of the grant of security or giving of guarantees or indemnities contemplated by the Transaction Documents to which it is a party.

51.5    **Validity and admissibility in evidence**

All Authorisations required or desirable:

51.5.1    to enable each of the Obligors lawfully to enter into, exercise its rights and comply with its obligations in the Transaction Documents to which it is a party or to enable the Owners or the Owner Security Trustee to enforce and exercise all its rights under the Transaction Documents; and

51.5.2    to make the Transaction Documents to which any Obligor is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained or effected and are in full force and effect.

51.6 **Governing law and enforcement**

51.6.1 The choice of governing law of any Transaction Document will be recognised and enforced in the Relevant Jurisdictions of each relevant Obligor.

51.6.2 Any judgment obtained in relation to any Transaction Document in the jurisdiction of the governing law of that Transaction Document will be recognised and enforced in the Relevant Jurisdictions of each relevant Obligor.

51.7 **Insolvency**

No corporate action, legal proceeding or other procedure or step described in Clause 62.7 (*Insolvency proceedings*) or creditors' process described in Clause 62.8 (*Creditors' process*) has been taken or, to the knowledge of the Charterers, threatened in relation to an Obligor; and none of the circumstances described in Clause 62.6 (*Insolvency*) applies to an Obligor.

51.8 **No filing or stamp taxes**

Under the laws of the Relevant Jurisdictions of each relevant Obligor, it is not necessary that the Transaction Documents be filed, recorded or enrolled with any court or other authority in any of those jurisdictions or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Transaction Documents or the transactions contemplated by the Transaction Documents.

51.9 **Deduction of Tax**

No Obligor is required under the law applicable to its Relevant Jurisdiction to make any Tax Deduction from any payment it may make under any Transaction Document.

51.10 **No Termination Event**

51.10.1 No Termination Event and, on the date of this Charter and each Hire Payment Date, no Potential Termination Event is continuing or is reasonably likely to result from the payment of any Hire or the entry into, the performance of, or any transaction contemplated by, any Transaction Document.

51.10.2 No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on any Obligor or to which its assets are subject which has or is reasonably likely to have a Material Adverse Effect.

51.11 **No misleading information**

Save as disclosed in writing to the Owners before the date of this Charter:

51.11.1     no event or circumstance has occurred or arisen and no information has been given or withheld that results in the information, opinions, intentions, forecasts or projections provided by or on behalf of any Obligor to the Owners being untrue or misleading in any material respect;

51.11.2     all material information provided to the Owners by or on behalf of any Obligor on or before the date of this Charter and not superseded before that date is accurate and not misleading in any material respect and all projections provided to the Owners on or before the date of this Charter have been prepared in good faith on the basis of assumptions which were reasonable at the time at which they were prepared and supplied; and

51.11.3     all other written information provided by any Obligor (including its advisers) to the Owners was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any respect.

51.12   **Financial statements**

51.12.1     The Original Financial Statements were prepared in accordance with the relevant GAAP consistently applied.

51.12.2     The audited Original Financial Statements fairly represent the relevant Obligor's financial condition and results of operations for the relevant period.

51.12.3     The opening balance sheet Original Financial Statements fairly represent the relevant Obligor's financial condition for the relevant date.

51.12.4     There has been no material adverse change in the relevant Obligor's assets, business or financial condition since the date of the Original Financial Statements.

51.12.5     The relevant Obligor's most recent financial statements delivered pursuant to Clause 52.1 (*Financial statements*):

(a)     have been prepared in accordance with GAAP as applied to the Original Financial Statements; and

(b)     fairly present its consolidated financial condition as at the end of, and consolidated results of operations for, the period to which they relate.

51.12.6     Since the date of the most recent financial statements delivered pursuant to Clause 52.1 (*Financial statements*), there has been no material adverse change in the assets, business or financial condition of any Obligor.

51.12.7     The accounting reference date of each Charter Guarantor is 31 December.

51.13   **Pari passu ranking**

The payment obligations of each Obligor under the Transaction Documents to which it is a party rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

51.14   **No Mandatory Prepayment Event**

No Mandatory Prepayment Event has occurred or is reasonably likely to occur from the entry into, the performance of, or any transaction contemplated by, any Transaction Document.

51.15   **No proceedings**

51.15.1   No litigation, arbitration or administrative proceedings or investigation of or before any court, arbitral body, arbitral tribunal or agency which, if adversely determined, are reasonably likely to have a Material Adverse Effect have (to the best of the Charterers' knowledge and belief (having made due and careful enquiry)) been started or threatened against any Obligor.

51.15.2   No judgment or order of a court, arbitral body, arbitral tribunal or agency or any order or sanction of any governmental or other regulatory body which is reasonably likely to have a Material Adverse Effect has (to the best of the Charterers' knowledge and belief (having made due and careful enquiry)) been made against any Obligor.

51.16   **No breach of laws**

None of the Obligors has breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

51.17   **Environmental Laws**

51.17.1   Each Obligor is in compliance with Clause 55.3 (*Environmental compliance*) and, to the best of the Charterers' knowledge and belief (having made due and careful enquiry), no circumstances have occurred which would prevent such compliance.

51.17.2   No Environmental Claim has been commenced or (to the best of the Charterers' knowledge and belief (having made due and careful enquiry)) is threatened against any Obligor.

51.18   **Taxation**

51.18.1   None of the Obligors is materially overdue in the filing of any Tax returns or is overdue in the payment of any amount in respect of Tax.

51.18.2   No claims or investigations are being, or are reasonably likely to be, made or conducted against any Obligor with respect to Taxes.

51.18.3   Each Obligor is resident for Tax purposes only in its jurisdiction of incorporation.

51.19 **AML Laws**

None of the Obligors or any Approved Manager that is part of the Group is, or will be, directly or indirectly, and whether knowingly or otherwise, involved in any transaction (including any sale and leaseback transaction):

51.19.1 which would be contrary to any AML Laws,

51.19.2 which may evade or avoid, or has the purpose of evading or avoiding, or be deemed to be an attempt to violate, any of the prohibitions set forth in any AML Law; or

51.19.3 the proceeds of which may be used for any purpose that would breach any anti-bribery or anti-corruption legislation in jurisdictions in which an Obligor or Approved Manager that is part of the Group conducts business.

51.20 **No adverse consequences**

51.20.1 It is not necessary under the laws of the Relevant Jurisdictions of any Obligor:

(a) in order to enable the Owners or the Owner Security Trustee to enforce their rights under any Transaction Document; or

(b) by reason of the execution of any Transaction Document or the performance by it of its obligations under any Transaction Document,

that the Owners or the Owner Security Trustee should be licensed, qualified or otherwise entitled to carry on business in any of the Relevant Jurisdictions of any Obligor.

51.20.2 The Owners or the Owner Security Trustee are not and will not be deemed to be resident, domiciled or carrying on business in any of the Relevant Jurisdictions of any Obligor by reason only of the execution, performance and/or enforcement of any Transaction Document.

51.21 **Disclosure of material facts**

The Charterers are not aware of any material facts or circumstances which have not been disclosed to the Owners and which might, if disclosed, have changed the decision of a person willing to enter into a transaction of the nature contemplated by the Transaction Documents.

51.22 **Completeness of Transaction Documents and Project Documents**

51.22.1 The copies of all Transaction Documents and Project Documents provided or to be provided by the Charterers to the Owners in accordance with Clause 41 (*Conditions to Charter* and to delivery) are, or will be, true and accurate copies of the originals and represent, or will represent, the full agreement between the parties to those Transaction Documents and (as applicable) Project Documents in relation to the subject matter of Transaction Documents and (as applicable) Project Documents.

51.22.2   There are no commissions, rebates, premiums or other payments due or to become due in connection with the subject matter of any Transaction Document or Project Document other than in the ordinary course of business or as disclosed to, and approved in writing by, the Owners.

51.22.3   There is no dispute under any Transaction Document or Project Document as between the parties to any such document.

## 51.23   No immunity

No Obligor or any of its assets is immune to any legal action or proceeding.

## 51.24   No money laundering

The performance of each Obligor's obligations under the Transaction Documents will be for its own account and will not involve any breach by it of any law or regulatory measure relating to "**money laundering**" as defined in Article 1 of the Directive ((EU) 2015/849) of the European Parliament and of the Council of the European Communities (as it forms part of the domestic law of the United Kingdom by virtue of the 2018 Withdrawal Act).

## 51.25   Sanctions representations

The following representations in Clauses 51.25.1 to 51.25.10 below are given on the date of this Charter but only to the extent that the making, the receiving of the benefit of and/or, where applicable, the repetition of and the compliance with these representations do not result in a violation of or conflict with Council Regulation (EC) No. 2271/96 of 22 November 1996 ("**EU Blocking Regulation**"), if applicable, any provision of Council Regulation (EC) 2271/96 of 22 November 1996 protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom (as it forms part of the domestic law of the United Kingdom by virtue of the 2018 Withdrawal Act) and any provisions of the Sanctions and Anti-Money Laundering Act 2018 (the "**UK Law EU Blocking Regulation**"), Section 7 of the German Foreign Trade Ordinance (*§ 7 Außenwirtschaftsverordnung*) or a similar applicable anti-boycott statute (together with the EU Blocking Regulation, the UK Law EU Blocking Regulation and Section 7 of the of the German Foreign Trade Ordinance the "**Anti Boycott Regulations**").

51.25.1   Neither the Obligors nor any of their respective Subsidiaries, directors or officers (or to the Charterers' best knowledge, none of such member's employees or agents):

(a)   is a Prohibited Person;

(b)   has violated or is violating any Sanctions; or

(c)   is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person, and none of such persons owns or controls a Prohibited Person.

(d)   has a Prohibited Person serving as a director, officer or employee;

51.25.2   no other Obligor or any Approved Manager that is part of the Group (or, to the Charterers' best knowledge, none of such member's or other Obligor's or Approved Manager's directors, officers, employee or agents) has taken or is taking any action  resulting in a violation by such persons of Sanctions;

51.25.3   no proceeds of the Transaction Documents have been made available, directly or indirectly, to or for the benefit of a Prohibited Person or otherwise shall be, directly or indirectly, applied in a manner or for a purpose prohibited by Sanctions;

51.25.4   each Obligor and their respective Affiliates is in compliance with all Sanctions;

51.25.5   the Vessel is not being used by or for the benefit of a Prohibited Person;

51.25.6   the Vessel is not being used in trading in a manner contrary to Sanctions (or which could be contrary to Sanctions if Sanctions were binding on each Obligor or any Approved Manager that is part of the Group) and the Vessel is not being employed in any way or in any activity which is unlawful under international law or the domestic laws of any relevant country;

51.25.7   the Vessel is not is being traded in any manner which would trigger the operation of any sanctions limitation or exclusion clause (or similar) in its Insurances;

51.25.8   the Vessel is not chartered or subject to any agreement pursuant to which it is required or may be required to call at any port in a Sanctioned Country;

51.25.9   all charter commitments for the Vessel existing as at the date of this Charter contain, for the benefit of the Charterers, language that gives effect to the provisions of Clause 55.2 (*Compliance with laws*) as regards Sanctions and Clause 55.22 (*Sanctions undertaking*) and permit refusal of employment or voyage orders if compliance would result in a breach of Sanctions (or which would result in a breach of Sanctions if Sanctions were binding on each Obligor or any Approved Manager that is part of the Group or any charterer of the Vessel) or would require the Vessel to call at a port in a Sanctioned Country; and

51.25.10   the Vessel shall not be employed:

(a)   in carrying illicit or prohibited goods;

(b)   in any manner whatsoever which may render it liable to condemnation, destruction, seizure or confiscation,

and the persons responsible for the operation of the Vessel shall take all necessary and proper precautions to ensure that this does not happen.

51.26    **Information relating to Valuation Reports**

    51.26.1    All information supplied by the Charterers or on the Charterers' behalf to an Approved Shipbroker for the purposes of preparing a Valuation Report in accordance with this Charter was true and accurate as at the date it was supplied or (if appropriate) as at the date (if any) at which it is stated to be given.

    51.26.2    No Obligor has omitted to supply any information to an Approved Shipbroker in its possession or knowledge which, if disclosed, would adversely affect such Approved Shipbroker's preparation of any Valuation Report.

    51.26.3    To the best of the Charterers' knowledge, there has been no change to the factual information supplied in connection with the preparation of any Valuation Report between the date such information was supplied and the date of that Valuation Report which renders that information untrue or misleading in any material respect.

51.27    **No breach, etc. of any Transaction Document**

No Obligor is in breach of any Transaction Document nor has anything occurred which entitles or may entitle any party to rescind or terminate it or decline to perform their obligations under any Transaction Document or which would render such Transaction Document illegal, invalid or unenforceable.

51.28    **Financial Indebtedness**

Except for Financial Indebtedness under this Charter and without prejudice to Clause 62.5.5 (*Cross default*), the Charterers and HoldCo do not have any Financial Indebtedness outstanding other than Permitted Financial Indebtedness and that on the date of this Charter and on the Actual Delivery Date the Charterer has no intercompany and/or intragroup Financial Indebtedness.

51.29    **No Security**

No Security exists over all or any of the present or future assets of the Charterers or HoldCo other than Permitted Security.

51.30    **Shares**

    51.30.1    The shares of the Charterers and HoldCo are fully paid and not subject to any option to purchase or similar rights.

    51.30.2    The constitutional documents of the Charterers and HoldCo do not and could not restrict or inhibit any transfer of those shares on creation or enforcement of the Share Charges.

    51.30.3    There are no agreements in force which provide for the issue or allotment of, or grant any person the right to call for the issue or allotment of, any share or loan capital of the Charterers or HoldCo (including any option or right of pre-emption or conversion).

51.30.4    With effect from the Actual Delivery Date the shares in the Charterers are wholly legally and beneficially owned by HoldCo.

## 51.31    No Change of Control Event

There has not been a Change of Control Event other than the acquisition of the entire legal and beneficial interest in the shares in the Charterers by HoldCo on the Actual Delivery Date.

## 51.32    No guarantees or indemnities

The guarantees and indemnities that have been given in the Transaction Documents are the only guarantees and indemnities that have been given by the Obligors (other than Myrtle) as at the date of this Charter.

## 51.33    Good title to assets

Each Obligor has power and authority to own its assets and to carry on its business as it is now being conducted and has good title to such assets.

## 51.34    Vessel status

The Vessel is:

51.34.1    operationally seaworthy and in every way fit for service;

51.34.2    classed with the Approved Classification free of all overdue requirements and recommendations of the Approved Classification Society; and

51.34.3    insured in the manner required by the Transaction Documents.

## 51.35    Vessel employment

The Vessel is free of any charter commitment which has a remaining term of more than 12 months (other than this Charter and the Time Charter) or any other charter commitment which is permitted by the Transaction Documents or has been approved by the Owners and the Senior Finance Parties.

## 51.36    No employee arrangements or pension exposure

No Obligor has any employees and no Obligor is, or may be, liable to contribute funds to any form of pension scheme or similar arrangement (other than a scheme or arrangement where the benefits conferred by it on its members are calculated solely by reference to a payment or payments made by the relevant member or by any other person in respect of that member).

## 51.37    No arrest

The Vessel is not subject to any capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture.

## 51.38    Repetition

Each Repeating Representation is deemed to be repeated by the Charterers by reference to the facts and circumstances then existing on:

51.38.1    the Actual Delivery Date; and

51.38.2    each Hire Payment Date.

**52      Information undertakings**

The undertakings in this Clause 52 remain in force for the duration of the Agreement Term.

52.1    **Financial statements**

The Charterers shall supply to the Owners in sufficient copies for the Owners and, if applicable, all the Senior Finance Parties:

51.1.1    as soon as the same become available, but in any event within 120 days after the end of each of its financial years the audited consolidated financial statements of each Charter Guarantor for that financial year comprising a profit and loss account, balance sheet and cash flow statement and including details of off balance sheet commitments;

52.1.2    as soon as the same become available, but in any event within 45 days after the end of each quarter of its financial years the consolidated unaudited financial statements of each Charter Guarantor for that financial quarter-year comprising a profit and loss account, balance sheet and cash flow statement and including details of off balance sheet commitments;

52.1.3    monthly, the final version of the monthly KPI Report prepared by the Charterers;

52.1.4    as soon as possible, but in no event later than 20 days before the end of each of its financial years, a draft of an Approved Budget prepared by the Charterers which shows the anticipated cash-flow projections for the Vessel including all Operating Expenses and Overhead Expenses in respect of the Vessel during the next calendar year;

52.1.5    as soon as possible, but in no event later than five Business Days before the end of each of its financial years, the final version of the draft Approved Budget referred to in Clause 52.1.4 in a format and whose contents are approved by the Owners and, if applicable, the Senior Finance Parties;

52.1.6    as soon as possible, but in no event later than 30 days before the end of each calendar year during the Charter Period, a budget prepared by Charterers in a format and whose contents are approved by the Owners and, if applicable, the Senior Finance Parties which shows the anticipated costs and expenses in respect of any special survey or drydocking survey in respect of the Vessel during the next calendar years up to and including the calendar year in which the Vessel's next special survey or drydocking survey is scheduled to occur;

52.1.7    as soon as they become available, but in any event within 90 days after the end of each financial year, the budget and business plan of the Group for the next financial year; and

52.1.8    any other information regarding the financial situation, assets, business and operations of the Obligors as the Owners and, if applicable, any Senior Finance Party may reasonably request.

52.2   **Requirements as to financial statements**

52.2.1    Each set of financial statements delivered pursuant to Clause 52.1 (*Financial statements*):

(a)    shall be certified by a director of the relevant company as fairly presenting its financial condition and operations as at the date as at which those financial statements were drawn up; and

(b)    shall be prepared using the relevant GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements unless, in relation to any set of financial statements, the Charterers notify the Owners that there has been a change in the relevant GAAP, the accounting practices or reference periods and the auditors of the relevant company delivers to the Owners a description of any change necessary for those financial statements to reflect the relevant GAAP, accounting practices and reference periods upon which the Original Financial Statements were prepared.

52.2.2    Any reference in this Charter to those financial statements shall be construed as a reference to those financial statements as adjusted to reflect the basis upon which the Original Financial Statements were prepared.

52.3   **Information: miscellaneous**

The Charterers shall supply to the Owners:

52.3.1    at the same time as they are dispatched, copies of all documents dispatched by any Obligor to its shareholders generally (or any class of them) or dispatched by any Obligor to its creditors generally (or any class of them);

52.3.2    promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending:

(a)    against any Obligor and which, if adversely determined, are reasonably likely to have a Material Adverse Effect; or

(b)    involving the Vessel where the amount claimed by any party (ignoring any counterclaim or defence of set-off) exceeds or may reasonably be expected to exceed the Major Casualty Amount;

52.3.3    promptly upon becoming aware of them, the details of any judgment or order of a court, arbitral body, arbitral tribunal or agency, or any other tribunal of any order or sanction of any governmental or other regulatory body which is made against any Obligor and which is reasonably likely to have a Material Adverse Effect and, to the extent permitted by law, details of any claim, action, suit, proceedings or investigation against the Charterers with respect to Sanctions by any Sanctions Authority (in sufficient copies for the Owners and, if applicable, all the Senior Finance Parties, if the Senior Finance Parties so request);

52.3.4    as soon as practicable upon becoming aware of any fact indicating that it or any other Obligor may be in breach, or be exposed to a breach, of Sanctions, provided that the notification as such does not constitute a breach of mandatory law applicable to it or any Sanctions Authority;

52.3.5    promptly, such information and documents as the Owners may reasonably require about:

(a)    any property which is the subject of any Transaction Security; and

(b)    compliance of the Obligors with the terms of any Security Documents;

52.3.6    promptly on request, such further information regarding the financial condition, assets and operations of any Obligor (including without limitation cash flow analyses and details of the operating costs of the Vessel);

52.3.7    as soon as practicable, such further information and/or documents regarding:

(a)    the Vessel, goods transported on the Vessel, its Earnings and its Insurances;

(b)    compliance of:

(i)    the Obligors with the terms of the Transaction Documents;

(ii)    the Charterers with the terms of this Charter;

(iii)    the Charterers with the terms of the Sale Agreement;

(iv)    the Sellers with the terms of the MOA;

(v)    any Sub-Charterer with the terms of the relevant Sub-Charter; and

(vi)    any Sub-Charterers Guarantor with the terms of the relevant Sub-Charter Guarantee; and

(c)    the financial condition, business and operations of any Obligor,

as the Owners or any Senior Finance Party may reasonably request;

52.3.8   as soon as they are available, a report on the seaworthiness and/or safe operation of the Vessel, from approved surveyors or inspectors. If any recommendations are made in such a report they shall be complied with in the way and by the time recommended in the report;

52.3.9   except where a Termination Event has occurred which is continuing (in which case all costs and expenses of all survey reports requested by the Owners shall be borne by the Charterers), the Owners may obtain, and the Charterers shall bear the cost and expense of, one survey report for the Vessel required by the Owners per year and any additional surveys shall be at the cost and expense of the Owners; and

52.3.10   promptly, such further information and/or documents as the Owners or any Senior Finance Party may reasonably request so as to enable the Owners or such Senior Finance Party to comply with any laws applicable to it or as may be required by any regulatory authority.

52.4   **Information undertakings – Sellers, Sub-Charters and Sub-Charter Guarantees**

The Charterers will disclose all information in relation to the Sale Agreement and/or the Sellers, any Sub-Charter and/or the relevant Sub-Charterers and any Sub-Charter Guarantee and/or the relevant Sub-Charterers Guarantor which is in their possession and which they are entitled to disclose under the Sale Agreement, the relevant Sub-Charter or Sub-Charter Guarantee to the Owners upon the Owners' reasonable request (including any information in relation to the Sellers', relevant Sub-Charterers' or Sub-Charterers Guarantor's fulfilment of their obligations pursuant to the Sale Agreement, the relevant Sub-Charter or Sub-Charter Guarantee).

52.5   **Notification of default**

52.5.1   The Charterers shall notify the Owners of any Potential Termination Event or Termination Event that is continuing (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless the Charterers are aware that a notification has already been provided to the Owners by another Obligor).

52.5.2   Promptly upon a request by the Owners, the Charterers shall supply to the Owners a certificate signed by an authorised signatory on its behalf certifying that no Potential Termination Event or Termination Event is continuing (or if a Potential Termination Event or Termination Event is continuing, specifying the Potential Termination Event or (as the case may be) Termination Event and the steps, if any, being taken to remedy it).

52.6   **"Know your customer" checks**

52.6.1   If:

(a)   the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Charter;

(b)   any change in the status of an Obligor (or of a Holding Company of an Obligor) or the composition of the shareholders of an Obligor (or of a Holding Company of an Obligor) after the date of this Charter;

(c)   a proposed assignment or transfer by the Owners of any of their rights and obligations under this Charter to another party; or

(d)   a proposed assignment or transfer by a Senior Finance Party of any of its rights and obligations under a Senior Finance Document to a party that is not a Senior Finance Party prior to such assignment or transfer,

obliges the Owners or a Senior Finance Party (or, in the case of Clause 52.6.1(c), any prospective new assignee or transferee) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Charterers shall (and shall procure that each other Obligor will) promptly upon the request of the Owners or that Senior Finance Party supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Owners or that Senior Finance Party (for itself or, in the case of the event described in Clause 52.6.1(c), on behalf of any prospective new assignee or transferee) in order for the Owners or that Senior Finance Party or, in the case of the event described in Clause 52.6.1(c), any prospective new assignee or transferee, to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Transaction Documents.

## 52.7   Information: Poseidon Principles

52.7.1   Without limiting the generality of Clause 52.3 (*Information: miscellaneous*), the Charterers shall, upon a written request from the Owners or (if applicable) a request from the Owners on behalf of a Senior Finance Party that so requires, provide such information which the Owners or such Senior Finance Party may require for the purpose of enabling the Owners or such Senior Finance Party to comply with the Poseidon Principles.

52.7.2   In this Clause 52.7, "**Poseidon Principles**" means the financial industry framework for assessing and disclosing the climate alignment of ship finance portfolios published on 18 June 2019 as the same may be amended or replaced (to reflect changes in applicable law or regulation or the introduction of or changes to mandatory requirements of the International Maritime Organization) from time to time.

52.8    **More favourable terms**

The Charterers shall promptly notify the Owners of the terms of any financial covenants given from time to time by a Charter Guarantor or any of its Subsidiaries to their banks, lessors or other financiers, and if the Owners so require then the Charterers shall procure that the relevant Charter Guarantor shall provide financial covenants on equivalent terms to the Owners and acceptable to the Owners.

**53    Accounts**

53.1    **Maintenance of Accounts**

53.1.1    The Charterers shall maintain the Charterers' Cash Collection Account with the relevant Account Bank for the duration of the Charterers' Accounts Charge Period free of Security and rights of set off other than any Transaction Security.

53.1.2    The Charterers shall not open any bank account except for the Charterers' Cash Collection Account.

53.1.3    The Charterers shall procure that HoldCo maintains the HoldCo Cash Collection Account for the duration of the HoldCo Accounts Charge Period free of Security and rights of set off other than any Transaction Security.

53.2    **Charterers' Cash Collection Account and HoldCo Cash Collection Account**

53.2.1    The Charterers shall procure that:

(a)    during the HoldCo Accounts Charge Period, all Earnings and all proceeds recovered by the Charterers under a Transaction Document are credited directly to the HoldCo Cash Collection Account;

(b)    during the Charterers' Accounts Charge Period, all Earnings and all proceeds recovered by it under a Transaction Document are credited directly to the Charterers' Cash Collection Account; and

(c)    any Requisition Compensation is credited to the Owners' Earnings Account.

53.2.2    The Charterers shall procure that:

(a)    on the Actual Delivery Date the HoldCo Cash Collection Account is credited with the Initial Minimum Working Capital Amount and the Initial Minimum Working Capital Amount shall be offset against the Actual Owners' Cost and the Owners shall pay the Actual Owners' Cost pursuant to the MOA net of the Initial Minimum Working Capital Amount; and

(b)    subject to Clause 53.2.3 below:

(i)    with effect from the day immediately after the Actual Delivery Date and for the remainder of the HoldCo

Accounts Charge Period, the HoldCo Cash Collection Account is credited with at least US$400,000;

(ii)    during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account is credited with at least US$400,000.

53.2.3    The Initial Minimum Working Capital Amount may, subject to Clause 55.20.2 (*No dividends*) be released by way of a dividend (a "**Special Dividend**") from the Charterers to HoldCo on each 31 March, 30 June, 30 September and 31 December **provided that** the first Special Dividend distribution shall not occur prior to 31 December 2021 (each a "**Special Dividend Date**") **and provided further that** the amount standing to the credit of:

(a)    during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account; and

(b)    during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account,

53.2.4    immediately after the relevant Special Dividend Date will be an amount equal to or greater than the sum of (i) any Earnings Shortfall and (ii) US$400,000.

"**Earnings Shortfall**" means the amount by which:

(a)    Hire, Operating Expenses and capital expenditure of the Charterers payable during the six month period following the date of such release,

exceeds the:

(b)    Forecast Earnings during the six month period following the date of such release,

if any.

"**Forecast Earnings**" means the lower of the four month trailing average of:

(a)    the Clarksons' 1 year timecharter rate for a 150,000 dwt D/H Suezmax; and

(b)    the Clarksons' Average Suezmax Earnings 2010-built,

such calculation to be made by the Charterers on the Special Dividend Date and approved in writing by the Owners prior to the distribution of the Special Dividend.

53.2.5    Subject to Clause 53.2.6, any amount standing to the credit of:

(a)    during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account; and

(b)     during the HoldCo Accounts Charge Period, or the HoldCo Cash Collection Account,

and during the Charter Period shall be applied, subject to paragraph 53.2.5(a) below, in the following order on the first day of each Hire Period (or, if the first day of each Hire Period does not fall on a Business Day, on the next Business Day to occur in that Hire Period), with the first application to take place on the Actual Delivery Date:

(a)     firstly, at any time during the Charter Period but subject always to this Clause 53.2.5, in or towards payment of the Operating Expenses;

(b)     secondly, if applicable, such amounts as are required to be transferred to the Dry Docking Reserve Account pursuant to Clause 53.4 (*Dry Docking Reserve Account*);

(c)     thirdly, transfer to the Owners' Earnings Account of all Hire then due;

(d)     fourthly, if applicable, such amounts as are required to be maintained in the Minimum Liquidity Account to ensure compliance with Clause 53.3 (*Minimum Liquidity Account*);

(e)     fifthly, on or after 31 December 2021, such amounts as are required to be retained in:

(i)      during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account; and

(ii)     during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account,

until the amount standing to the credit thereto is US$400,000;

(f)     sixthly, if applicable, such amounts as are required to be retained in the Charterers' Earnings Account in accordance with Clause 54.2 (*Asset coverage and assessment of Market Value*);

(g)     seventhly, transfer to:

(i)      during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account; and

(ii)     during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account,

any fees, costs and expenses then outstanding;

(h)     eighthly, in or towards payment of Overhead Expenses, provided that if a Termination Event or Potential Termination Event is continuing any such amounts may only be transferred from:

(i) during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account; and

(ii) during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account,

with the prior written consent of the Owners (such consent not to be unreasonably withheld) and, if applicable, the Senior Finance Parties; and

(i) ninthly, any surplus Earnings may, in the Charterers' sole discretion:

(i) in or towards payment or making of a Dividend subject to and in accordance with Clause 55.20 (*No dividends*); or

(ii) retained in the:

(A) during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account; and

(B) during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account,

**provided that** each of the conditions set out in Clause 55.20.2 (*No dividends*) has been satisfied. If one or more of the conditions set out in Clause 55.20.2 (*No dividends*) has not been satisfied, any surplus Earnings shall be applied as follows:

(iii) firstly, transferred to the Dry Docking Reserve Account so that the amount standing to the credit of the Dry Docking Reserve Account is an amount equal to the Dry Docking Reserve Budget; and

(iv) secondly, in prepayment of the Lease Principal Outstanding.

No Prepayment Fee shall be payable in respect of any prepayment made pursuant to Clause 53.2.5(i)(iv).

The Initial Minimum Working Capital Amount is not to be applied in accordance with this Clause 53.2.5.

53.2.6 Clause 53.2.5 shall not apply to a Special Dividend.

## 53.3 Minimum Liquidity Account

53.3.1 The Charterers shall procure that throughout the Agreement Term the Minimum Liquidity Amount remains credited to the Minimum Liquidity Account and blocked in such Account or (if and to the extent required by any Senior Finance Party which is a mortgagee lender) such other blocked account held with such mortgagee lender or its nominee)). The

Minimum Liquidity Amount shall be offset against the Actual Owners' Cost and the Owners shall pay the Actual Owners' Cost pursuant to the MOA net of the Minimum Liquidity Amount.

53.3.2   No withdrawals or transfers from the Minimum Liquidity Account except pursuant to Clause 67.1 (*Charterers' acknowledgement, consent and undertaking*) that would result in a total balance standing to the credit of the Minimum Liquidity Account of less than the relevant Minimum Liquidity Amount.

53.3.3   At the option of the Owners any amounts credited to the Minimum Liquidity Account at the end of the Agreement Term shall be either:

(a)   transferred to the Charterers' Cash Collection Account, the HoldCo Cash Collection Account (or such other account as may be nominated by the Charterers) on the date title to the Vessel is transferred to the Charterers pursuant to Clause 66 (*Transfer of title*) or (as the case may be) on the date on which the Termination Sum is received; or

(b)   deducted from the Purchase Option Price or the Put Option Price as the case may be or (as the case may be) deducted from the Termination Sum.

## 53.4   Dry Docking Reserve Account

53.4.1   The Charterers shall procure that the amount standing to the credit of the Dry Docking Reserve Account on the Actual Delivery Date is at least US$1,650,000 or such lesser amount as may be agreed to by Owners and, if applicable, Senior Finance Parties upon receipt by the Owners of copies of invoices and evidence of payment satisfactory to the Owners that the Charterers have paid certain amounts towards the installation of a ballast water treatment system on the Vessel (the "**DDRA Amount**"). The DDRA Amount shall be offset against the Actual Owners' Cost and the Owners shall pay the Actual Owners' Cost pursuant to the MOA net of the DDRA Amount.

53.4.2   From the date falling three years prior to the Vessel's next scheduled dry docking and quarterly thereafter, the Charterers shall deposit an amount equal to one twelfth of the budgeted costs and expenses of the Vessel's next scheduled dry docking as shown in the budget delivered by the Charterers to the Owners pursuant to Clause 52.1.6 (*Financial statements*) (the "**Dry Docking Reserve Budget**") into the Dry Docking Reserve Account so as to ensure that the amount standing to the credit of the Dry Docking Reserve Account is at least an amount equal to the amount of the Dry Docking Reserve Budget on the date of the next scheduled dry docking of the Vessel from time to time.

53.4.3   The Owners agree that that they will only withdraw funds from the Dry Docking Reserve Account in order to pay dry docking and special survey expenses in accordance with a dry docking and special survey budget

approved by the Owners and, if applicable, the Senior Finance Parties (the "**Dry Docking Expenses**").

53.4.4   If the amount standing to the credit of the Dry Docking Reserve Account is insufficient to cover the Dry Docking Expenses for each dry docking or special survey, the Charterers shall cover the shortfall on each occasion it occurs.

53.4.5   If the amount standing to the credit of the Dry Docking Reserve Account is higher than the amount of the Dry Docking Expenses for a dry docking or special survey, the difference between the amount standing to the credit of the Dry Docking Reserve Account and the amount of the Dry Docking Expenses shall be applied as follows:

(a)   first, if there is any shortfall in the funding of the dry docking or special survey for a Related Vessel due within the next 12 months, transferred into the relevant Related Vessel Dry Docking Reserve Account; and

(b)   second, transferred into:

(i)   during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account; and

(ii)   during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account,

and shall be applied in accordance with Clause 53.2.5 (*Charterers' Cash Collection Account and HoldCo Cash Collection Account*) on the next Hire Payment Date.

53.4.6   Subject to the provisions of the Senior Finance Documents, if there is a sale or Total Loss of the Vessel the balance remaining in the Dry Docking Reserve Account shall be applied as follows:

(a)   first, be applied by the Owners in payment or (as the case may be) part payment of the Purchase Option Price or (as the case may be) the Termination Sum; and

(b)   second, if all amounts due under this Charter have been paid, be repaid promptly by the Owners to the Charterers.

53.4.7   Provided that there are no amounts outstanding under this Charter or the Senior Finance Documents and Clause 64 (*Purchase Option*) or Clause 65 (*Put option*) have been complied with, any amount standing to the credit of the Dry Docking Reserve Account shall promptly be transferred to the Charterers' nominated account and the Owners irrevocably authorise the relevant Security Trustee to instruct the relevant Account Bank to make those transfers.

53.4.8   As at the date of this Charter the Vessel's next scheduled dry docking is on or around August 2021.

53.5 **Withdrawals**

53.5.1 During the HoldCo Accounts Charge Period, no sum may be withdrawn from the HoldCo Cash Collection Account without the prior written consent of the Owners (such consent not to be unreasonably withheld) other than as specified in this Charter, except for:

(a) any amount or costs to be paid pursuant to a Transaction Document; and

(b) the sums required to be transferred to the Charterers' Cash Collection Account referred to in paragraphs (d) and (e) of the definition of "HoldCo Accounts Charge Period" **provided that** all other conditions referred to in the definition of "HoldCo Accounts Charge Period" have been satisfied prior to such transfers taking place.

53.5.2 During the Charterers' Accounts Charge Period, no sum may be withdrawn from the Charterers' Cash Collection Account without the prior written consent of the Owners (such consent not to be unreasonably withheld) other than as specified in this Charter, except for any amount or costs to be paid pursuant to a Transaction Document.

53.5.3 Neither the Charterers' Cash Collection Account nor the HoldCo Cash Collection Account shall be overdrawn as a result of a withdrawal made in accordance with this Clause 53.5.

53.6 **Relocation of Accounts**

On and at any time after the occurrence of a Termination Event, the Owners may without the consent of the Charterers instruct an Account Bank to relocate the relevant Account to any other branch of such Account Bank, without prejudice to the continued application of this Clause 53.6 and the rights of the Owners under the Transaction Documents.

53.7 **Access to information**

53.7.1 The Charterers shall procure that the Owners have online viewing rights:

(a) in respect of the HoldCo Cash Collection Account during the HoldCo Accounts Charge Period; and

(b) in respect of the Charterers' Cash Collection Account during the Charterers' Accounts Charge Period,

and the Charterers agree that the Owners may disclose to the Senior Finance Parties statements of account in respect of the Charterers' Cash Collection Account or the HoldCo Cash Collection Account obtained through such online viewing rights.

53.7.2 The Owners may from time to time:

(a) during the HoldCo Accounts Charge Period in relation to the HoldCo Cash Collection Account; and

(b)     during the Charterers' Accounts Charge Period in relation to the Charterers' Cash Collection Account,

review the records held by an Account Bank in relation to:

(c)     during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account; and

(d)     during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account,

(whether in written or electronic form) and the Charterers irrevocably waive (and shall procure that HoldCo irrevocably waives) any right of confidentiality which may exist in relation to those records.

## 53.8     Time Charter Deposit

The Charterers shall procure that the Time Charter Deposit is transferred to the Owners' Earnings Account on or before the Actual Delivery Date.  The Time Charter Deposit may only be released in whole or in part to the Charterers with the prior written consent of the Owners and the Senior Finance Parties.

## 54     Valuation Reports, asset value coverage and additional Security

## 54.1     Valuation Reports

54.1.1     Valuation Reports for the Vessel and any Related Vessel may be obtained by the Owners from Approved Shipbrokers selected by the Owners, or, if applicable, the Senior Finance Parties at any time.

54.1.2     The Charterers and/or the Related Charterers shall bear the cost of two Valuation Reports in respect of the Vessel and any Related Vessel on two occasions each year and the Charterers and/or the Related Charterers shall also bear the cost of:

(a)     the Valuation Reports required as conditions precedent pursuant to Clause 41.1 (*Charter conditions precedent*);

(b)     any Valuation Reports which demonstrate a shortfall in accordance with Clause 54.2 (*Asset coverage and assessment of Market Value*);

(c)     any Valuation Reports obtained when a Termination Event or a Potential Termination Event is continuing;

(d)     any Valuation Reports obtained pursuant to Clause 55.20 (*No dividends*); and

(e)     any Valuation Reports in respect of any third valuation referred to below.

54.1.3     If two Approved Shipbrokers provide valuations and their valuations vary by 10% or more, then the Owners, or, if applicable, the Senior Finance Parties shall obtain a third Valuation Report by an Approved Shipbroker

whereupon the value of the Vessel and any Related Vessel shall be determined by reference to all three Valuation Reports.

54.1.4    If an individual Approved Shipbroker provides a range of values for the Vessel or any Related Vessel, then the value of the Vessel or Related Vessel will be the mid-point of that range.

54.1.5    The Charterers shall procure that the Related Charterers shall pay any costs incurred pursuant to Clause 54.1.2.

## 54.2    Asset coverage and assessment of Market Value

54.2.1    If at any time during the Agreement Term, the Lease Principal Outstanding is not below:

(a)    on or after the Actual Delivery Date, but prior to the first anniversary of the Actual Delivery Date, 90%;

(b)    on or after the first anniversary of the Actual Delivery Date, but prior to the second anniversary of the Actual Delivery Date, 85%;

(c)    on or after the second anniversary of the Actual Delivery Date, but prior to the third anniversary of the Actual Delivery Date, 80%; or

(d)    thereafter, 75%,

of the aggregate of (i) the Market Value of the Vessel and (ii) the value of any additional Security for the time being provided to the Owners under this Clause 54.2 (the "Asset Coverage"), the Charterers shall, within 30 days of the Owners' request, at the Charterers' option:

(a)    pay to the Owners' Earnings Account a cash deposit in the amount of the shortfall (each such deposit being an "Additional Hire"); or

(b)    give to the Owners at the cost of the Charterers other additional Security in amount and form acceptable to the Owners and, if applicable, the Senior Finance Parties for a value determined in accordance with Clause 54.2.2.

54.2.2    The value of any additional Security for the purpose of this Clause 54.2 shall be:

(a)    in the case of each Additional Hire, the face amount of the deposit;

(b)    in the case of a vessel, the Market Value of such vessel;

(c)    in the case of other charged assets other than a vessel, determined conclusively by appropriate advisers appointed by the Owners; and

(d)      in all other cases, determined by the Owners.

54.3    **Owners' right to deal with Additional Hire**

In respect of any Additional Hire that may be deposited into the Owners' Earnings Account in accordance with Clause 54.2 (*Asset coverage and assessment of Market Value*), the Charterers acknowledge and consent that the Owners may:

54.3.1   subject to Clause 54.4 (*Release of additional Security*), retain all or any part of such Additional Hire as additional security for the Secured Indebtedness; and/or

54.3.2   when a Termination Event is continuing, withdraw and apply all or any part of such Additional Hire against the Lease Principal Outstanding.

54.4    **Release of additional Security**

If, at any time after the Charterers have provided additional Security in accordance with the Owners' request under Clause 54.2 (*Asset coverage and assessment of Market Value*), the Owners shall determine when testing compliance with the Asset Coverage by reference to at least four tests that are at least three months apart that all or any part of that additional Security may be released without resulting in a shortfall in the Asset Coverage, then, provided that no Potential Termination Event is continuing, the Owners shall release all or such part of that additional Security, **it being understood however that** this shall be without prejudice to the Owners' right to make a further request under Clause 54.2 should the value of the remaining security subsequently merit it.

55      **General undertakings**

The undertakings in this Clause 55 remain in force for the duration of the Agreement Term.

55.1    **Authorisations**

The Charterers shall promptly:

55.1.1   obtain, comply with and do all that is necessary to maintain in full force and effect; and

55.1.2   supply certified copies to the Owners of any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

(a)      enable any Obligor to perform its obligations under the Transaction Documents to which it is a party;

(b)      ensure the legality, validity, enforceability or admissibility in evidence of any Transaction Document; and

(c)      enable any Obligor to carry on its business.

55.2 **Compliance with laws**

55.2.1 Without prejudice to Clauses 55.3 (*Environmental compliance*) and 57.20 (*Compliance with laws, anti-drug legislation, ISM Code and ISPS Code*), the Charterers shall comply (and shall procure that each other Obligor and each Affiliate of any of them will comply), in all respects with all laws and regulations to which it may be subject (except as regards (a) Sanctions, to which Clause 55.2.2 applies and (b) AML Laws, to which Clause 55.5 (*AML Laws*)) applies), including, without limitation, labour laws.

55.2.2 The Charterers shall comply (and shall procure that each other Obligor and each Affiliate of any of them will comply) in all respects with all Sanctions.

55.2.3 The Charterers shall comply (and shall procure that each other Obligor and each Affiliate of any of them will comply) with anti-corruption best practices and maintain policies and procedures designed to promote and achieve such best practices.

55.3 **Environmental compliance**

The Charterers shall (and shall procure each other Obligor will):

55.3.1 comply with all Environmental Laws;

55.3.2 obtain, maintain and ensure compliance with all requisite Environmental Approvals; and

55.3.3 implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

55.4 **Environmental Claims**

The Charterers shall promptly upon becoming aware of the same, inform the Owners in writing of:

55.4.1 any Environmental Incident against the Vessel or the Related Vessels;

55.4.2 any Environmental Claim against any Obligors, any Affiliate of any Obligor, the Vessel or the Related Vessels which is current, pending or threatened; and

55.4.3 any facts or circumstances which are reasonably likely to result in any Environmental Claim being commenced or threatened against any Obligor, any Affiliate of the Obligor, the Vessel or the Related Vessels.

55.5 **AML Laws**

55.5.1 The Charterers shall not (and shall procure that no other Obligor or any Affiliate of any Obligor will) directly or indirectly use the proceeds of any Hire for any purpose which would breach AML Laws.

55.5.2    The Charterers shall (and shall procure that each other Obligor and each Affiliate of any of them will):

(a)    conduct its businesses in compliance with applicable anti-corruption laws; and

(b)    maintain policies and procedures designed to promote and achieve compliance with such laws.

## 55.6    Taxation

55.6.1    The Charterers shall (and shall procure that each other Obligor will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties.

55.6.2    The Charterers shall not (and shall procure that no other Obligor will) change its residence for Tax purposes.

## 55.7    Pari passu ranking

The Charterers shall (and shall procure that each other Obligor will) ensure that at all times any unsecured and unsubordinated claims of the Owners, the Owner Security Trustee or a Senior Finance Party against it under the Transaction Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

## 55.8    Negative pledge

In this Clause 55.8, "**Quasi-Security**" means an arrangement or transaction described in Clause 55.8.2.

55.8.1    The Charterers shall not (and shall procure that no other Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) will) create or permit to subsist any Security over any of its assets.

55.8.2    The Charterers shall not (and shall procure that no other Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) will):

(a)    sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by an Obligor or any of its Affiliates;

(b)    sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(c)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(d)    enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

55.8.3    Clauses 55.8.1 and 55.8.2 do not apply to any Security or (as the case may be) Quasi-Security which is a Permitted Security.

## 55.9    Disposals

55.9.1    The Charterers shall not (and shall procure that no other Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) will) enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset.

55.9.2    Clause 55.9.1 does not apply to any sale, lease, transfer or other disposal which is a Permitted Disposal.

## 55.10    Arm's length basis

55.10.1    Except as permitted under Clause 55.10.2, the Charterers shall not (and shall procure that no other Obligor will) enter into any transaction with any person except on arm's length terms and for full market value.

55.10.2    Any fees, costs and expenses payable under the Transaction Documents in the amounts set out in the Transaction Documents or otherwise agreed by the Owners shall not be a breach of this Clause 55.10.

## 55.11    Merger

The Charterers shall not (and shall procure that no other Obligor will) enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction **provided that** Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group may enter into an amalgamation, demerger, merger, consolidation or corporate reconstruction with the prior written consent of the Owners (such consent not to be unreasonably withheld).

## 55.12    Change of business

The Charterers shall not (and shall procure that no other Obligor will) make any substantial change to the general nature of its business from that carried on at the date of this Charter **provided that** Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group may make a substantial change to the general nature of its business from that carried on at the date of this Charter with the prior written consent of the Owners (such consent not to be unreasonably withheld).

## 55.13    No other business

The Charterers shall not engage in any business other than the operation, chartering and/or management of the Vessel. The Charterers shall procure that HoldCo shall not engage in any business other than acting as holding company for the Charterers and the Related Charterers.

55.14    **No acquisitions**

The Charterers shall not (and shall procure that no other Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) will) acquire a company or any shares or securities or a business or undertaking (or, in each case, any interest in any of them) or incorporate a company.

55.15    **No joint ventures**

The Charterers shall not (and shall procure that no other Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) will):

55.15.1    enter into, invest in or acquire (or agree to acquire) any shares, stocks, securities or other interest in any joint venture; or

55.15.2    transfer any assets or lend to or guarantee or give an indemnity for or give security for the obligations of a joint venture or maintain the solvency of or provide working capital to any joint venture (or agree to do any of the foregoing).

55.16    **No borrowings**

The Charterers shall not (and shall procure that no other Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) will) incur or allow to remain outstanding any Financial Indebtedness (except for any Permitted Financial Indebtedness).

55.17    **No substantial liabilities**

Except in the ordinary course of business, the Charterers shall not (and shall procure that no other Obligor will) incur any liability to any third party which is in the Owners' opinion of a substantial nature **provided that** Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group may incur an liability to a third party which is in the Owners' opinion of a substantial nature with the prior written consent of the Owners (such consent not to be unreasonably withheld).

55.18    **No loans or credit**

The Charterers shall not be (and the Charterers shall procure that no other Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) shall be) a creditor in respect of any Financial Indebtedness unless it is a loan made in the ordinary course of business in connection with the chartering, operation or repair of the Vessel.

55.19    **No guarantees or indemnities**

The Charterers shall not (and shall procure that no other Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) will) incur or allow to remain outstanding any guarantee in respect of any obligation of any person other than pursuant to a Transaction Document.

55.20    **No dividends**

55.20.1    Subject to Clause 55.20.2, the Charterers shall not (and shall procure that HoldCo will not):

(a)    declare, make or pay any dividend (including a Special Dividend), charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital);

(b)    repay or distribute any dividend or share premium reserve;

(c)    redeem, repurchase, defease, retire or repay any of its share capital or resolve to do so (the items referred to in this paragraph (c) and paragraphs (a) and (b) above, each a "**Dividend**");

(d)    issue any new shares in its share capital or resolve to do so; or

(e)    reduce its share capital.

55.20.2    The Charterers or HoldCo may pay or make a Dividend on after the date falling six months after the Actual Delivery Date if the following conditions will be satisfied upon and immediately after paying or making (i) that Dividend (ii) and any relevant prepayment required under this Clause 55.20.2:

(a)    the Consolidated Debt Service Coverage Ratio is at least 1.2:1;

(b)    the aggregate cash in HoldCo and the Charterers (including amounts standing to the credit of:

(i)    during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account; and

(ii)    during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account,

and the Minimum Liquidity Account but excluding any amounts paid or to be paid to the Dry Docking Reserve Account) following payment of such Dividend and any prepayment required to be made pursuant to this Clause is at least US$1,500,000;

(c)    the Dry Docking Reserve Account has been funded in accordance with Clause 53.4 (*Dry Docking Reserve Account*) and if the Dividend is to be paid on or before the date of the Vessel's next scheduled dry docking referred to in Clause 53.4.8 (*Dry Docking Reserve Account*), the amount standing to the credit of the Dry Docking Reserve Account is an amount equal to or greater the amount of the Dry Docking Reserve Budget;

(d)    the LTV is no more than 65%; and

(e)     no Termination Event or Potential Termination Event is continuing,

**and provided further that** if the LTV is 55% or more but equal to or less than 65% at the time of the making of the relevant Dividend, an amount at least equal to the amount of the Dividend shall be paid by way of a prepayment by the Charterers to the Owners, simultaneously with the making of the relevant Dividend.

55.20.3   Each prepayment under Clause 55.20.2 shall reduce the Termination Sum and the Lease Principal Outstanding as shown in Schedule 2 at the date of such prepayment on a dollar for dollar basis, provided that these amounts shall at all times be subject to a minimum floor of US$1.

55.20.4   Each prepayment made under Clause 55.20.2 shall be made together with payment any Prepayment Fee.

55.20.5   For the purposes of this Clause 55.20:

(a)     the Market Value of the Vessel and any Related Vessel shall be determined by reference to two Valuation Reports to be provided by Approved Shipbrokers selected by the Owners or the Senior Finance Parties, provided that if such two Valuation Reports differ by 10% or more a third Valuation Report will be provided by an Approved Shipbroker selected by the Owners or the Senior Finance Parties and the Market Value of the Vessel and any Related Vessel shall be the arithmetic average of those three Valuation Reports (and if an individual Approved Shipbroker provides a range of values for the Vessel and any Related Vessel, then the value of the Vessel or Related Vessel will be the mid-point of that range);

(b)     "**Consolidated Debt Service Coverage Ratio**" means the ratio of Forecast Net Revenues to Forecast Financing Costs, in each case in respect of HoldCo and its consolidated Subsidiaries for the relevant Testing Period;

(c)     "**Forecast Expenses**" means Operating Expenses, Overhead Expenses, maintenance capital expenditure and any other costs and expenses forecast to be incurred by HoldCo during a Testing Period;

(d)     "**Forecast Financing Costs**" means all Hire and Related Hire and cash payments of interest or principal on any indebtedness payable during a Testing Period;

(e)     "**Forecast Net Revenues**" means Forecast Revenues less Forecast Expenses calculated by HoldCo as may be adjusted by the Owners, acting reasonably, to take account of market conditions, HoldCo's track record and to correct for manifest error, with the final version approved by Owners being conclusive and binding on the Charterers;

(f)　　"**Forecast Revenues**" means in respect of any Testing Period, either (a) for any period where revenues are contracted, the contracted revenue rate, or (b) for any other period, time charter earnings taken from either Clarksons Valuations Limited or E.A. Gibson Shipbrokers Ltd at the election of the Owners for vessels of the same type as the Vessel and any Related Vessel, in each case taking into account the Owners' good faith forecast of any drydock or other off hire periods in respect of the Vessel and any Related Vessel;

(g)　　the "**LTV**" means the ratio (expressed as a percentage) of the aggregate of the then applicable Lease Principal Outstanding and the "Lease Principal Outstanding" (as defined in any Related Charter) divided by the aggregate Market Value of the Vessel and any Related Vessel as determined in accordance with paragraph (a) above;

(h)　　"**Testing Date**" means the date on which the Consolidated Debt Service Coverage Ratio is tested for the purpose of checking compliance with Clause 55.20.2(a) which shall not be earlier than the date falling two days prior to the date of the payment of the relevant Dividend; and

(i)　　"**Testing Period**" means the 12-month period starting on the day after the relevant Testing Date.

## 55.21　No change in Project Documents

The Charterers shall not (and shall procure that no other Obligor will) amend, vary, assign, novate, supplement, supersede, waive or terminate any term of, any Project Document, or any other document delivered to the Owners pursuant to Clause 41 (*Conditions to Charter and to delivery*) other than pursuant to a Transaction Document.

## 55.22　Sanctions undertaking

55.22.1　Without limiting Clause 55.2 (*Compliance with laws*), the Charterers shall procure:

(a)　　that no Obligor or any Affiliate of an Obligor nor any charterer of the Vessel is or will become a Prohibited Person or owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person and that none of such persons will own or control a Prohibited Person;

(b)　　that no Obligor or any Affiliate of an Obligor nor any charterer of the Vessel shall have a Prohibited Person serving as a director, officer or employee;

(c)　　that the Vessel shall not be made available, directly or indirectly for the benefit of a Prohibited Person or otherwise shall be, directly or indirectly, applied in a manner or for a purpose

prohibited by Sanctions to the extent that a person subject to the jurisdiction of the United States of America, European Union or United Kingdom would be prohibited by law from engaging in trade, business or other activities with such person or entity;

(d)     that the Vessel shall not be used in trading in any jurisdiction restricted by Sanctions or in any manner contrary to Sanctions to the extent this would cause any Obligor, the Owners or the charterers of the Vessel to be in breach of Sanctions;

(e)     that the Vessel shall not be traded in any manner which would trigger the operation of any sanctions limitation or exclusion clause (or similar) in the Insurances; and

(f)     that the Vessel shall not call at any port in a Sanctioned Country;

(g)     that all pool agreements and charter commitments (including any Sub-Charter) entered into by the Charterers or any sub-charterer contain a sanctions clause which requires the relevant charterer or pool manager to comply with Sanctions (regardless of whether or not the same are binding on such charterer or pool manager) and which permits refusal of employment or voyage orders if compliance with such orders would result in a breach of Sanctions by any person (regardless of whether or not the same are binding on such charterer or pool manager) or would require the Vessel to call at a port in a Sanctioned Country; and

(h)     the Vessel shall not be employed:

(i)      in carrying illicit or prohibited goods;

(ii)     in any manner whatsoever which may render it liable to condemnation, destruction, seizure or confiscation,

and the persons responsible for the operation of the Vessel shall take all necessary and proper precautions to ensure that this does not happen.

55.22.2    The Charterers will promptly notify the Owners if:

(a)     the Charterers or a Charter Guarantor becomes a Prohibited Person or the Vessel becomes subject to Sanctions;

(b)     the Charterers, a Charter Guarantor or the Vessel violates any Sanctions or applicable AML Laws;

(c)     the Charterers or a Charter Guarantor is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of a, Prohibited Person;

(d)     the Charterers or a Charter Guarantor owns or controls a Prohibited Person;

(e)     the Charterers or a Charter Guarantor has a Prohibited Person serving as a director, officer or employee;

(f)     the Charterers, a Charter Guarantor or the Vessel violates any undertakings set forth in this Clause 55.22.2;

(g)     any government authority brings any claim, action, suit, proceeding or investigation involving the Charterers, a Charter Guarantor or the Vessel related to Sanctions or applicable AML Laws; or

(h)     the Vessel calls at a port in a Sanctioned Country.

## 55.23   Sub-Charters

The Charterers undertake to comply with the terms of any Sub-Charter, including without limitation, any requirement to retain vetting approvals.

## 55.24   Change of Control Event

The Charterers shall (and shall procure that each Obligor will) procure that there is no Change of Control Event without the prior written consent of the Owners.

## 55.25   No off balance sheet obligations

The Charterers shall not (and shall procure that no other Obligor will) incur any off balance sheet commitments provided that HoldCo may make shareholder loans available to the Charterers provided that such shareholder loans are subordinated and assigned by way of security in favour of the Owner Security Trustee to the satisfaction of the Owners.

## 55.26   Corporate status

The Charterers shall (and shall procure that each other Obligor will) maintain its corporate existence as a body corporate duly organised and validly existing and in good standing under the laws of its jurisdiction of incorporation and provide evidence thereof if so requested by the Owners or a Senior Finance Party.

## 55.27   Unlawfulness, invalidity and ranking; Security imperilled

The Charterers shall not, and shall procure that no other Obligor will, do (or fail to do) or cause or permit another person to do (or omit to do) anything which is likely to:

55.27.1     make it unlawful for an Obligor to perform any of its obligations under the Transaction Documents;

55.27.2     cause any obligation of the Obligors under the Transaction Documents to cease to be legal, valid, binding or enforceable;

55.27.3     cause any Transaction Document to cease to be in full force and effect;

55.27.4    cause any Security Document to rank after, or lose its priority to, any other Security; or

55.27.5    imperil or jeopardise the Security Documents.

55.28    **Subsidiaries**

The Charterers shall not establish or acquire (and shall procure that no Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) shall establish or acquire) a company or other entity other than the establishment of any of the Related Charterers or the Sellers by HoldCo.

55.29    **Performance of Transaction Documents**

The Charterers shall duly and punctually observe and perform all conditions and obligations imposed on it by the Transaction Documents to which it is a party.

55.30    **No amendments to constitutional documents**

The Charterers shall not (and shall procure that HoldCo will not) amend its constitutional documents without the prior written consent of the Owners (such consent not to be unreasonably withheld) unless such amendment is immaterial to the Charter and the other Transaction Documents and **provided always that** the Charterers shall promptly provide to the Owners a certified copy of the amended constitutional documents.

55.31    **No employee arrangements or pension exposure**

The Charterers shall not (and shall procure that no other Obligor (other than Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group) will) have any employees or be liable to contribute funds to any form of pension scheme or similar arrangement (other than a scheme or arrangement where the benefits conferred by it on its members are calculated solely by reference to a payment or payments made by the relevant member or by any other person in respect of that member).

55.32    **No change in auditors**

The Charterers shall not (and shall procure that no other Obligor will) change its auditors **provided that** Myrtle, VFS and any of the Approved Technical Managers that are a member of the Group may change their auditors with the prior written consent of the Owners (such consent not to be unreasonably withheld).

55.33    **US Tax Obligor**

The Charterers shall not (and shall procure that no other Obligor will) become a US Tax Obligor.

55.34    **Further assurance**

55.34.1    Each Party shall make all applications and execute all other documents and do all other acts and things as may be necessary to implement and to carry out their obligations under, and the intent of, this Charter.

55.34.2 The Parties shall act in good faith to each other in respect of any dealings or matters under, or in connection with, this Charter.

55.34.3 The Charterers shall (and shall procure that each other Obligor will) promptly (and in any event within five Business Days, or such other period of time agreed between the Owners, the Charterers and the Senior Finance Parties, of demand) do all such acts or execute all such documents (including assignments, novations, transfers, mortgages, charges, notices and instructions) or provide all such information as the Owners or a Senior Finance Party may reasonably specify (and in such form as the Owners or the relevant Senior Finance Party may reasonably require in favour of the Owners or the relevant Senior Finance Party as the case may be):

(a) to perfect any Transaction Security (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the Security Assets) or for the exercise of any rights, powers and remedies of the Owners or a Senior Finance Party provided by or pursuant to the Transaction Documents or the Senior Finance Documents or by law;

(b) to confer on the Owners or any Senior Finance Party a Security over any property and assets of the Charterers (or that other Obligor as the case may be) located in any jurisdiction equivalent or similar to the relevant Transaction Security; and/or

(c) to facilitate the realisation of the Security Assets.

## 56   Insurance undertakings

### 56.1   Maintenance and amounts of Obligatory Insurances

56.1.1 The Charterers covenant to ensure that from the Actual Delivery Date and throughout the remainder of the Agreement Term, the Vessel shall be and shall remain insured at its expense against:

(a) fire and all usual marine risks (including hull and machinery and excess risks) and war risks (including terrorism, piracy and confiscation and the London Blocking and Trapping addendum or similar arrangement) on an agreed value basis for an amount which is the greater from time to time of:

(i) her Market Value; and

(ii) an amount which equals 120% of the Lease Principal Outstanding at the relevant time;

(b) protection and indemnity risks and liabilities (including, without limitation, protection and indemnity war risks (including terrorism, piracy and confiscation and the London Blocking and Trapping addendum or similar arrangement)) for the highest

amount then available in the insurance market for vessels of similar age, size and type as the Vessel;

(c)     oil pollution caused by the Vessel for such amounts as the Owners and the Senior Finance Parties may from time to time approve (but for an amount of not less than $1,000,000,000) unless that risk is covered to the satisfaction of the Owners and the Senior Finance Parties by the Vessel's protection and indemnity entry or insurance;

(d)     loss of hire insurance on a 10/90/90 (number of deductible days/number of days covered per casualty/number of days covered in all during the insurance period) basis; and

(e)     any other risks against which the Owners or a Senior Finance Party considers, having regard to practices and other circumstances prevailing at the relevant time, it would be reasonable for the Charterers to insure and which are notified to the Charterers by the Owners.

56.1.2    The Owners agree that, if and for so long as the Vessel may be laid up with the approval of the Owners, the Charterers may at their own expense take out port risk insurance on the Vessel in place of hull and machinery insurance.

## 56.2    **Further terms**

56.2.1    The Charterers undertake to place the Obligatory Insurances with Approved Insurance Brokers and Approved Insurers and in such markets, in such currency and on such terms and conditions as the Owners and any Senior Finance Party shall have previously approved in writing.

56.2.2    The Charterers shall not alter the terms of any of the Obligatory Insurances or waive any right relating to any of the Obligatory Insurances without the prior written consent of the Owners (such consent not to be unreasonably withheld **provided that** the Owners may reasonably withhold such consent if the Senior Finance Parties do not give their consent).

56.2.3    The Charterers shall not allow any person to be co-assured under any of the Obligatory Insurances without the prior written consent of the Owners (such consent not to be unreasonably withheld **provided that** the Owners may reasonably withhold such consent if the Senior Finance Parties do not give their consent), except for the Owners, the Approved Managers, any crewing agents and any Senior Finance Party (each a "**Permitted Co-Assured**").

56.2.4    The Charterers shall procure that any Permitted Co-Assured shall, if so required by the Owners or any Senior Finance Party:

(a)     either:

(i)     assign its rights under the Insurances in favour of the Owners or any Senior Finance Party; or

(ii)    sign a letter of subordination in favour of the Owners or any Senior Finance Party in a form acceptable to the Owners or that Senior Finance Party as the case may be; and

(b)    agree to a policy endorsement stating that it shall have no claim in respect of the loss or damage of the Vessel.

56.2.5    The Charterers shall procure that the Owners or any Senior Finance Party are named as loss payee with such directions for payment as the Owners or that Senior Finance Party as the case may be may specify.

56.2.6    The Charterers shall supply the Owners and any Senior Finance Party from time to time on request with such information as the Owners or that Senior Finance Party may in their discretion require with regard to the Obligatory Insurances, the Approved Insurance Brokers and the Approved Insurers through or with which the Obligatory Insurances are placed.

56.2.7    The deductible in respect of the hull and machinery insurance shall not be higher than $250,000 in respect of the Vessel and $500,000 in aggregate in respect of all of the vessels under the technical management of Empire.

56.2.8    The Charterers shall reimburse the Owners on demand for all costs and expenses incurred by the Owners or a Senior Finance Party in obtaining from time to time a report on the adequacy of the Obligatory Insurances from an insurance adviser instructed by the Owners or a Senior Finance Party.

56.3    **Payment of premiums; protection and indemnity guarantees**

56.3.1    The Charterers undertake:

(a)    duly and punctually to pay all premiums, calls and contributions, and all other sums at any time payable in connection with the Obligatory Insurances; and

(b)    at their own expense, to arrange and provide any guarantees from time to time required by any protection and indemnity or war risks association.

56.3.2    From time to time at the Owners' or any Senior Finance Party's request, the Charterers will provide the Owners or that Senior Finance Party as the case may be with evidence satisfactory to the Owners or that Senior Finance Party as the case may be that:

(a)    such premiums, calls, contributions and other sums have been duly and punctually paid;

(b)     any such guarantees have been duly given; and

(c)     all declarations and notices required by the terms of any of the Obligatory Insurances to be made or given by or on behalf of the Charterers to brokers, underwriters or associations have been duly and punctually made or given.

## 56.4   Compliance with terms of Obligatory Insurances

56.4.1   The Charterers will comply in all respects with all terms and conditions of the Obligatory Insurances and will make all such declarations to brokers, underwriters and associations as may be required to enable the Vessel to operate in accordance with the terms and conditions of the Obligatory Insurances.

56.4.2   The Charterers will not do, nor permit to be done, any act, nor make, nor permit to be made, any omission, as a result of which any of the Obligatory Insurances may become liable to be suspended, cancelled or avoided, or may become unenforceable, or as a result of which any sums payable under or in connection with any of the Obligatory Insurances may be reduced or become liable to be repaid in whole or in part or may cease to be payable in whole or in part.

56.4.3   The Charterers will not permit the Vessel to be employed other than in conformity with the Obligatory Insurances without first taking out additional insurance cover in respect of that employment in all respects to the satisfaction of the Owners and any Senior Finance Party.

56.4.4   The Charterers will ensure that the Obligatory Insurances are not made subject to any exclusions or qualifications to which the Owners or, if applicable, the Senior Finance Parties have not given their prior approval.

## 56.5   Renewal of Obligatory Insurances

The Charterers will, no later than 15 Business Days before the expiry of any of the Obligatory Insurances, renew them and shall immediately give the Owners such details of those renewals as the Owners or any Senior Finance Party may require.

## 56.6   Mortgagees' Insurances

56.6.1   Any Senior Finance Party shall be at liberty to take out Mortgagees' Insurances in relation to the Vessel for 120% of the amount of the relevant Senior Loan then outstanding and any potential liabilities under any hedging agreements in relation to that Senior Loan for early termination or close-out at the relevant time, on such terms and conditions, through such insurers and generally in such manner as that Senior Finance Party may from time to time decide.

56.6.2   The Charterers shall from time to time on demand reimburse the Owners for all costs, premiums and expenses paid or incurred by the Owners or that Senior Finance Party in connection with any Mortgagees' Insurances.

56.6.3   For the purpose of this Clause 56.6, "**Mortgagees' Insurances**" means, collectively, all policies and contracts of mortgagees' interest insurance, mortgagees' additional perils (oil pollution) insurance and any other insurance from time to time taken out by any Senior Finance Party in relation to the Vessel.

56.7   **Freight, demurrage and defence cover**

56.7.1   The Owners shall be at liberty to, in relation to the Vessel, take out freight, demurrage and defence cover on such terms and conditions as the Owners may from time to time decide.

56.7.2   The Charterers shall from time to time upon the Owners' demand reimburse the Owners for all costs, premiums and expenses paid or incurred by the Owners in connection with such cover.

56.8   **Innocent Owners' Interest Insurances**

The Owners shall be at liberty to, in relation to the Vessel, take out Innocent Owners' Interest Insurance on such terms and conditions as the Owners may approve, in an amount of not less than 120% of the Lease Principal Outstanding at any time. The Charterers shall pay within three Business Days of demand all direct and documented costs, premiums and expenses paid or incurred by the Owners in connection with such Innocent Owners' Interest Insurance.

56.9   **Copies of policies, certificates of entry and letters of undertaking**

56.9.1   The Charterers shall deliver to the Owners copies of all policies, certificates of entry and other documents relating to the Insurances relating to the Vessel (including, without limitation, receipts for premiums, calls or contributions).

56.9.2   The Charterers shall ensure that all policies relating to the Insurances effected by them are deposited with the Approved Insurance Brokers through which the Insurances are effected or renewed.

56.9.3   The Charterers shall procure that letters of undertaking in such forms as the Owners or any Senior Finance Party may approve (having regard to general insurance market practice and law at the time of issue of such letters of undertaking) shall be issued to the Owners or that Senior Finance Party as the case may be by the Approved Insurance Brokers through which they have placed such Insurances (or, in the case of protection and indemnity or war risks associations, by their managers).

56.9.4   If the Vessel is at any time during the Charter Period insured under any form of fleet cover, the Charterers shall procure that the relevant letters of undertaking contain confirmations that:

(a)   the brokers, underwriters or association (as the case may be) will not set off claims relating to the Vessel against premiums, calls or contributions in respect of any other vessel or other insurance; and

(b)    the insurance cover of the Vessel will not be cancelled by reason of non-payment of premiums, calls or contributions relating to any other vessel or other insurance.

Failing receipt of those confirmations, the Charterers will instruct the brokers, underwriters or association concerned to issue a separate policy or certificate for the Vessel in the sole name of the Charterers or of the relevant Approved Insurance Brokers as agents for the Charterers.

## 56.10    Notification of certain insurance-related events

The Charterers shall promptly notify the Owners of:

56.10.1    any new requirement imposed by any broker, underwriter or association in relation to any of the Obligatory Insurances;

56.10.2    any casualty or other accident or damage to the Vessel the cost of which to repair may exceed the Major Casualty Amount (and shall promptly provide the Owners with full information regarding such casualty or other accident or damage); and

56.10.3    any occurrence as a result of which the Vessel has become or is, by the passing of time or otherwise, likely to become a Total Loss.

## 56.11    Owners' and any Senior Finance Party's powers

56.11.1    The Charterers agree that, on and at any time after the occurrence of a Termination Event which is continuing, the Owners or any Senior Finance Party shall be entitled to:

(a)    collect, sue for, recover and give a good discharge for all claims in respect of any of the Insurances;

(b)    pay collecting brokers the customary commission on all sums collected in respect of those claims;

(c)    compromise all such claims or refer them to arbitration or any other form of judicial or non-judicial determination; and

(d)    otherwise deal with such claims in such manner as the Owners or that Senior Finance Party shall in their discretion think fit.

56.11.2    In the event of any claim in respect of any of the Insurances (other than in respect of a Total Loss), if the Charterers shall fail to reach agreement with any of the brokers, underwriters or associations for the immediate restoration of the Vessel, or for payment to third parties, within such time as the Owners or any Senior Finance Party may stipulate, the Owners or that Senior Finance Party as the case may be shall be entitled to require payment to themselves.

56.11.3    In the event of any dispute arising between the Charterers and any broker, underwriter or association with respect to any obligation to make any payment to the Charterers or to the Owners or any Senior Finance Party under or in connection with any of the Insurances, or with respect

to the amount of any such payment, the Owners or that Senior Finance Party as the case may be shall be entitled to settle that dispute directly with the broker, underwriter or association concerned. Any such settlement shall be binding on the Charterers.

56.11.4　If the Charterers fail to effect or keep in force the Obligatory Insurances, the Owners and any Senior Finance Party may (but shall not be obliged to) effect and/or keep in force such insurances and such entries in protection and indemnity or war risks associations as the Owners or that Senior Finance Party in their discretion consider desirable, and the Owners or that Senior Finance Party may (but shall not be obliged to) pay any unpaid premiums, calls or contributions. The Charterers shall reimburse the Owners from time to time on demand for all such premiums, calls or contributions paid by the Owners or any Senior Finance Party, together with interest at the rate calculated in accordance with Clause 43.7 (*Default charter rate*) (on the basis that such premiums, calls or contributions paid by the Owners shall constitute an Unpaid Sum) from the date of payment by the Owners until the date of reimbursement.

## 56.12　Application of Total Loss Proceeds

Whether or not a Termination Event shall have occurred or be continuing, the Charterers:

56.12.1　shall procure that all Total Loss Proceeds shall be paid to the Owners; and

56.12.2　acknowledge and confirm that the Owners may apply all Total Loss Proceeds in accordance with Clause 44.4 (*Application of sale or Total* Loss Proceeds).

## 56.13　No settlement of claims

The Charterers shall not settle, compromise or abandon any claim under or in connection with any of the Insurances (other than a claim of less than the Major Casualty Amount arising other than from a Total Loss) without the prior written consent of the Owners (such consent not to be unreasonably withheld or delayed) or the Senior Finance Parties.

## 56.14　Compliance with the United States Oil Pollution Act 1990

The Charterers shall comply strictly with the requirements of any legislation relating to pollution or protection of the environment which may from time to time be applicable to the Vessel in any jurisdiction in which the Vessel shall trade, and in particular the Charterers shall comply strictly with the requirements of the United States Oil Pollution Act 1990 (the "**Act**") if the Vessel is to trade in the United States of America and Exclusive Economic Zone (as defined in the Act). Before any such trade is commenced and during the entire period during which such trade is carried on, the Charterers shall:

56.14.1    pay any additional premiums required to maintain protection and indemnity cover for oil pollution up to the limit available to the Charterers for the Vessel in the market;

56.14.2    make all such quarterly or other voyage declarations as may from time to time be required by the Vessel's protection and indemnity association in order to maintain such cover, and promptly deliver to the Owners copies of such declarations;

56.14.3    submit the Vessel to such additional periodic, classification, structural or other surveys which may be required by the Vessel's protection and indemnity insurers to maintain cover for such trade and promptly deliver to the Owners, and, if applicable, the Senior Finance Parties copies of reports made in respect of such surveys and if any recommendations are made in such a report they shall be complied with in the way and by the time recommended in the report;

56.14.4    implement any recommendations contained in the reports issued following the surveys referred to in Clause 56.14.3 within the relevant time limits, and provide evidence satisfactory to the Owners that the protection and indemnity insurers are satisfied that this has been done;

56.14.5    do all things necessary and promptly provide all documents, evidence and information to enable to Owners or the relevant Senior Finance Party to collect or recover any moneys which at the time become payable in respect of the Obligatory Insurances; and

56.14.6    in addition to the foregoing (if such trade is in the United States of America and Exclusive Economic Zone):

(a)    obtain and retain a certificate of financial responsibility and vessel response plan under the Act in form and substance satisfactory to the United States Coast Guard and provide the Owners with evidence of the same;

(b)    procure that the protection and indemnity insurances do not contain a US Trading Exclusion Clause or any other analogous provision and provide the Owners with evidence that this is so; and

(c)    comply strictly with any operational or structural regulations issued from time to time by any relevant authorities under the Act so that at all times the Vessel falls within the provisions which limit strict liability under the Act for oil pollution.

56.15    **Application of recoveries**

All sums paid under the Insurances to anyone other than the Owner or a Senior Finance Party shall be applied in repairing the damage and/or in discharging the liability in respect of which they have been paid except to the extent that the repairs have already been paid for and/or the liability already discharged.

**57      Vessel undertakings**

The Charterers covenant as follows from the Actual Delivery Date (unless a contrary indication appears) and throughout the remainder of the Agreement Term.

57.1    **Seaworthiness**

The Charterers shall keep the Vessel seaworthy and in a state of complete repair. The quality of workmanship and materials used to repair the Vessel or replace any damaged, worn or lost parts or equipment shall be sufficient to ensure that the Vessel's value is not reduced (fair wear and tear excepted).

57.2    **Registration**

The Charterers covenant:

57.2.1    to maintain the registration of the Vessel under her current flag;

57.2.2    not to cause nor permit to be done any act or omission as a result of which the registration of the Vessel might be suspended, defeated or imperilled; and

57.2.3    not to enter into any dual flagging arrangements in respect of the Vessel other than with the Bareboat Charter Registry referred to in Box 29 of Part I of this Charter.

57.3    **Classification and compliance with class**

57.3.1    The Charterers shall maintain the Vessel in a condition entitling the Vessel to maintain the classification of the Vessel at the Actual Delivery Date (or its equivalent) with the relevant Approved Classification Society free of recommendations and qualifications.

57.3.2    The Charterers shall not make any changes relating to the classification or an Approved Classification Society of the Vessel.

57.3.3    The Charterers shall:

(a)    comply with all requirements from time to time of the Vessel's Approved Classification Society including, without limitation, submitting the Vessel for surveys required by the relevant Approved Classification Society;

(b)    give to the Owners from time to time during the Charter Period on request copies of all classification certificates of the Vessel and reports of surveys required by the relevant Approved Classification Society (**it being further understood that** the Charterers, by their execution of this Charter, irrevocably authorise the Owners to obtain such information and documents from each relevant Approved Classification Society as the Owners may from time to time require); and

(c)    provide to the Owners a class status report in respect of the Vessel within ten Business Days of the end of each financial half

year of the Charterers, such class status report to have been issued by the Approved Classification Society not more than 8 Business Days prior to it being provided to the Owners.

57.4    **Additional good commercial maintenance practice requirements**

Without prejudice to any other provision of this Charter, the good commercial maintenance practice under Clause 10 (*Maintenance and Operation*) (Part II) of this Charter shall be deemed to include:

57.4.1    the maintenance and operation of the Vessel by the Charterers in accordance with:

(a)    the relevant regulations, requirements and recommendations of the country and flag of the Vessel's registry;

(b)    any applicable IMO regulations (including but not limited to the ISM Code, the ISPS Code and MARPOL);

(c)    all other applicable regulations, requirements and recommendations; and

(d)    the operations and maintenance manuals of the Charterers or of the relevant Sub-Charterers;

57.4.2    the maintenance and operation of the Vessel by the Charterers taking into account:

(a)    engine manufacturers' recommended maintenance and service schedules; and

(b)    builder's operations and maintenance manuals; and

(c)    recommended maintenance and service schedules of all installed equipment and pipework;

57.4.3    the installation and maintenance onboard the Vessel of:

(a)    an auditable computerised planned maintenance system; and

(b)    an auditable record of any software upgrades that take place on all equipment, such record shall be made available to the Owners at any time and becomes the property, together with the latest installed software of the Owners at redelivery; and

57.4.4    the arrangement of online access to class records for the Owners and each Senior Finance Party as available to the Charterers.

57.5    **Owners' consent for structural changes and alterations**

The Charterers may, without in each case obtaining the Owners' consent, repair the Vessel, make structural changes to the Vessel or make changes to the machinery, engines, appurtenances or spare parts of the Vessel or equipment installed on the Vessel **if and only if** such changes:

57.5.1    are required by the relevant Approved Classification Society or any applicable laws or regulations; or

57.5.2    do not and will not, in the opinion of the Owners:

(a)    have a material adverse effect on the Vessel's certification or the Vessel's fitness for purpose;

(b)    diminish the value of the Vessel and/or have a material adverse effect on the safety, performance, value or marketability of the Vessel; and

(c)    materially alter the structure, type or performance characteristics of the Vessel.

## 57.6    Restoration of Vessel

At the end of the Charter Period, provided the Charterers do not purchase and take over the Vessel in accordance with Clause 66 (*Transfer of title*), the Charterers shall at their expense restore the Vessel to its former condition unless the changes made are carried out:

57.6.1    with the prior written consent of the Owners;

57.6.2    to improve the performance, operation or marketability of the Vessel;

57.6.3    as a result of the compliance of any applicable laws or regulations; or

57.6.4    in accordance with Clause 57.5 (*Owners' consent for structural changes and alterations*).

## 57.7    Improvement costs for Charterers' account

57.7.1    Any improvement, structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation shall be for the Charterers' account and the Charterers shall not have any right to recover from the Owners any part of the cost for such improvements, changes or new equipment either during the Charter Period or, to the extent that Clause 58 (*Redelivery*) applies, at redelivery of the Vessel.

57.7.2    The Charterers shall give written notice to the Owners of any such improvement, structural changes or new equipment.

## 57.8    Equipment

57.8.1    Any equipment that is found not to be required on board as a result of regulation or operational experience is either to be removed at the Charterers' expense or to be maintained in operable condition.

57.8.2    Any equipment owned by a third party (other than the personal effects of the crew) shall not be installed on the Vessel if it cannot be removed without risk or causing damage to the structure or fabric of the Vessel or incurring significant expense.

57.8.3    The title to all or any part of an equipment:

(a)    placed on board as a result of operational requirements of the Charterers shall automatically be deemed to belong to the Owners (unless hired from a third party) immediately upon such placement, and such equipment may only be removed: (i) with the Owners' prior written consent, (ii) at the Charterers' own expense, and (iii) without damage to the Vessel; and

(b)    replaced, renewed or substituted shall remain with the Owners until the part or equipment which replaced it or the new or substitute part or equipment becomes property of the Owners.

57.9    **Inspection**

57.9.1    The Charterers will permit suitably qualified vessel surveyors appointed by the Owners and, if applicable, the relevant Senior Finance Party to board the Vessel at all reasonable times (upon at least ten Business Days' prior written notice being served by the Owners or, if applicable, the relevant Senior Finance Party as the case may be and provided that such inspection shall not delay or interfere with the Vessel's operation and/or trading and/or loading or unloading) to inspect its condition or to satisfy themselves about proposed or executed repairs and shall afford all proper facilities for such inspections. The reasonable and documented costs of one such inspection per calendar year shall be borne by the Charterers unless a Termination Event is continuing following which the Charterers shall be liable for the costs of all inspections. At all other times the Owners and, if applicable, the relevant Senior Finance Party may conduct inspections at their own cost and expense in accordance with Clause 14 and this Clause.

57.9.2    A copy of any Inspection Report may be shared by the Owners and, if applicable, the relevant Senior Finance Party with an Approved Shipbroker for the purposes of informing a valuation to be provided pursuant to Clause 54.1 (*Valuation Reports*) for the purpose of testing compliance with Clause 54.2 (*Asset coverage and assessment of Market Value*). The Owners shall share any Inspection Report they receive from the relevant Senior Finance Party with the Charterers.

57.10    **Release of arrest**

The Charterers shall cause the Vessel to be released from arrest or detention as quickly as possible, and in any event within ten Business Days from the date of arrest or detention (or such longer period as may be approved by Owners).

57.11    **No claims of master and crew**

The Charterers shall, from time to time on request of the Owners, produce to the Owners written evidence satisfactory to the Owners confirming that the master and crew of the Vessel have no claims for wages beyond the ordinary arrears and that the master has no claim for disbursements other than those properly incurred by

him/her in the ordinary course of trading of the Vessel on the voyage then in progress.

### 57.12 Change of name

Provided that the prior written consent has been given by the Owners (such consent not to be unreasonably withheld):

57.12.1   the name of the Vessel may be chosen by the Charterers; and

57.12.2   the Vessel may be painted in the colours, display the funnel insignia and fly the house flag as required by the Charterers.

### 57.13 Laying-up and de-activation

The Charterers shall not, during the Charter Period, lay-up or de-activate the Vessel without the prior written consent of the Owners.

### 57.14 Requisition or seizure

In the event of any requisition or seizure of the Vessel, the Charterers shall take all lawful steps to recover possession of the Vessel as soon as they are entitled to do so.

### 57.15 Provision of information

The Charterers shall promptly provide to the Owners from time to time during the Charter Period on request:

57.15.1   such information as the Owners may require with regard to the Vessel's employment, use or operation, position and state of repair including details of towages and salvages;

57.15.2   copies of all charterparties and other contracts of employment relating to the Vessel;

57.15.3   copies of the Vessel's deck and engine logs; and

57.15.4   such information as the Owners or a Senior Finance Party may require for the purpose of obtaining a Valuation Report.

### 57.16 Restrictions on employment and sub-chartering

57.16.1   The Charterers shall not, during hostilities (whether or not a state of war shall formally have been declared and including, without limitation, any civil war):

(a)   permit the Vessel to be employed in carrying any goods which may be declared to be contraband of war or which may render the Vessel liable to confiscation, seizure, detention or destruction;

(b)   permit the Vessel to enter any area which is declared a war zone by any governmental authority or by the Vessel's insurers; nor

(c)      permit the Vessel to enter any zone which is declared a "listed" or "excluded" area by any relevant insurer (or any other area in respect of which additional war risk premium is payable),

unless that employment or voyage is either (i) consented to in advance and in writing by the underwriters of the Vessel's war risks insurances and fully covered by those insurances, or (ii) (to the extent not covered by those insurances) covered by additional insurance taken out by the Charterers at their expense, which additional insurance shall be deemed to be part of the Insurances and be subject to the Transaction Security. The Charterers shall comply, with BMP5 (or its successor) at all times when the Vessel is in such areas.

57.16.2   The Charterers shall not:

(a)      without the prior written consent of the Owners (such approval not to be unreasonably withheld) (except pursuant to this Charter or the Time Charter), let the Vessel on any demise charter or on any time charter, consecutive voyage charter or other contract of employment which (inclusive of any extension option) is capable of exceeding 12 months nor to employ the Vessel in any way which might impair any Transaction Security;

(b)      when a Termination Event is continuing, let the Vessel on charter or renew or extend any charter or other contract of employment of the Vessel, nor agree to do so, without the prior written consent of the Owners; or

(c)      charter-in any vessel.

57.16.3   The Charterers shall not, without the prior written consent of the Owners, enter into any agreement or arrangement for sharing the Earnings.

57.16.4   The Charterers shall duly perform (unless prevented by force majeure), and take all necessary steps to enforce the performance by shippers of all their contracts of employment and all bills of lading and other contracts relating to the Vessel.

## 57.17   Use of Vessel against Sanctions

The Charterers shall not permit or authorise, and shall prevent the Vessel from being used, in each case directly or indirectly:

57.17.1   by or on behalf of any Prohibited Person; and/or

57.17.2   in any trade which could expose the Vessel, any Obligor, any Secured Party, any Approved Manager, any Senior Finance Party, any crew or insurers to enforcement proceedings or any other consequences whatsoever arising from Sanctions.

## 57.18   Notification of certain operational events

The Charterers shall notify the Owners immediately in writing by email of any:

57.18.1   intended dry docking of the Vessel (whether in accordance with Clause 10(g) (Part II) and whether routine or emergency);

57.18.2   requirement or recommendation imposed by the Vessel's insurers, the Vessel's Approved Classification Society or any competent authority which is not immediately complied with;

57.18.3   damage to the Vessel where the cost of the resulting repairs is likely to exceed $1,000,000;

57.18.4   actual or threatened withdrawal, suspension, cancellation or modification of:

    (a)   the SMC of the Vessel;

    (b)   the DOC of the ISM Company;

    (c)   the ISSC of the Vessel; or

    (d)   the IAPPC of the Vessel;

57.18.5   claim for breach of the ISM Code or the ISPS Code being made against the Charterers, the ISM Company, any Approved Managers or otherwise in connection with the Vessel;

57.18.6   arrest or detention of the Vessel, and the release of the Vessel following such arrest or detention;

57.18.7   exercise or purported exercise of any lien on the Vessel or her Earnings;

57.18.8   requisition or seizure of the Vessel;

57.18.9   fire requiring the use of fixed fire systems or collision / grounding;

57.18.10   death or serious injury on board; or

57.18.11   the entry into any Sub-Charter

57.19   **Management**

The Charterers shall not, without the prior written consent of the Owners:

57.19.1   appoint anyone as commercial or technical managers of the Vessel unless such person: (a) is an Approved Manager and (b) has executed the relevant Managers' Undertaking;

57.19.2   terminate or materially vary any Management Agreement or other arrangements for the commercial or technical management of the Vessel;

57.19.3   permit the commercial or technical management of the Vessel to be sub-contracted or delegated to any third party; or

57.19.4   increase the fees of any of the Approved Managers.

57.20   **Compliance with laws, anti-drug legislation, ISM Code and ISPS Code**

57.20.1   Without prejudice to Clause 55.2 (*Compliance with laws*) and Clause 55.3 (*Environmental compliance*), the Charterers shall comply with all laws, conventions and regulations applicable to the Charterers or the Vessel, the Charterers shall carry onboard the Vessel all certificates and other documents which may from time to time be required to evidence such compliance and the Charterers shall not employ the Vessel nor allow its employment, operation or management in any manner contrary to any applicable law or regulations (including but not limited to Sanctions).

57.20.2   The Charterers shall take all reasonable precautions to prevent any infringements of any anti-drug legislation in any jurisdiction in which the Vessel shall trade and in particular (if the Vessel is to trade in the United States of America) to take all reasonable precautions to prevent any infringements of the Anti-Drug Abuse Act of 1986 of the United States of America.

57.20.3   The Charterers shall comply with the ISM Code or any replacement of the ISM Code and shall in particular, without limitation:

(a)   procure that the Vessel is and remains for the duration of the Charter Period subject to a safety management system developed and implemented in accordance with the ISM Code; and

(b)   maintain for the Vessel throughout the Charter Period a valid and current SMC and provide a copy to the Owners; and

(c)   procure that the ISM Company maintains throughout the Charter Period a valid and current DOC and provide a copy to the Owners.

57.20.4   The Charterers shall comply, in relation to the Vessel, with the ISPS Code or any replacement of the ISPS Code and shall in particular, without limitation:

(a)   procure that the Vessel and the company responsible for the Vessel's compliance with the ISPS Code comply with the ISPS Code; and

(b)   maintain for the Vessel throughout the Charter Period a valid and current ISSC and provide a copy to the Owners.

57.20.5   The Charterers shall, in respect of the Vessel, comply with Annex VI or any replacement of Annex VI and shall in particular, without limitation:

(a)   procure that the Vessel's master and crew are familiar with, and that the Vessel complies with, Annex VI; and

(b)   maintain for the Vessel throughout the Charter Period a valid and current IAPPC and provide a copy to the Owners.

57.21   **Bunkers, unused lubricating and hydraulic oils at delivery**

At delivery the Charterers shall take over all bunkers, lubricating oil, hydraulic oil, greases, water and unbroached stores and provisions in the Vessel without cost since these have remained the property of the Charterers (as sellers) under the Sale Agreement.

57.22   **Bunkers, unused lubricating and hydraulic oils at redelivery**

57.22.1   To the extent that Clause 58 (*Redelivery*) applies, at redelivery the Owners shall take over all bunkers, unused lubricating oil, water and unbroached provisions and other consumable stores in the Vessel at cost.

57.22.2   For the avoidance of doubt, the Charterers acknowledge and agree that the Owners may set-off the value of any bunkers, unused lubricating oil, hydraulic oil, greases, water and unbroached provisions and other consumable stores in the said Vessel referred to in Clause 57.22.1 against any amount due to the Owners from the Charterers.

57.23   **Green passport**

The Charterers shall procure that the Vessel maintains a Green Passport (or equivalent document) acceptable to the Owners and, if applicable, any Senior Finance Party.

57.24   **Green scrapping**

The Charterers shall (and shall procure each Obligor will) procure that if the Vessel is sold for scrapping it shall be dismantled in accordance with the Hong Kong International Convention for the Safe and Environmentally Sound Recycling of Ships (whether or not such convention is in force) in a safe, sustainable and socially and environmentally responsible way.

57.25   **Material obligations**

The Charterers shall promptly discharge when due:

57.25.1   all liabilities which give or may give rise to maritime or possessory liens on or claims enforceable against the Vessel, its Earnings or its Insurances;

57.25.2   all Taxes, dues and other amounts charged in respect of the Vessel, its Earnings or its Insurances; and

57.25.3   all other outgoings whatsoever in respect of the Vessel, its Earnings or its Insurances.

57.26   **Books and records**

The Charterers shall (and shall procure that each Obligor will) maintain proper books and records and the Charterers shall (and shall procure that each Obligor will) when reasonably required by the Owners make such books available for inspection on behalf of the Owners together with satisfactory evidence that:

(a)  the wages and allotments of the Vessel's crew are being promptly and regularly paid; and

(b)  the Vessel's master has no claim for disbursements other than those incurred by him and outstanding in the ordinary course of trading.

## 57.27  DSSAS

The Charterers shall give the Owners direct access to the Ship Security Alert System on board the Vessel including the relevant log-in details and shall not change such log-in details without first giving the new log-in details to the Owners.

## 57.28  Ballast water management

The Vessel shall at all times comply, at a minimum, with the BWM Convention and if the Vessel trades in jurisdictional waters that are subject to higher standards of ballast water regulation than the BWM Convention the Vessel shall comply with such higher standards.

## 57.29  Repairer's lien

Except with approval of the Owners and the Senior Finance Parties (such approval not to be unreasonably withheld or delayed), the Vessel shall not be put into any other person's possession for work to be done on the Vessel if the cost of that work will exceed or is likely to exceed the Major Casualty Amount unless (a) that person gives the Owners and the relevant Senior Finance Parties a written undertaking in approved terms not to exercise any lien on the Vessel or its Earnings for any of the cost of such work; or (b) the Owners and the relevant Senior Finance Parties receive evidence in the form and substance satisfactory to them that the Charterers have sufficient cash or insurance cover to cover the cost of such work.

## 58  Redelivery

While a Termination Event is continuing, if the Owners decide to retake possession of the Vessel pursuant to Clause 63.6 (*Owners' right to withdraw or retake possession*), then the Charterers shall, at their own cost and expense, redeliver or cause to be redelivered the Vessel to the Owners in Singapore or in such other location worldwide as Charterers may nominate **provided that** such location is acceptable to the Owners having regard to tax consequences, market requirements for sale or redeployment of the Vessel, crew and management change and availability of professional expertise to assist in the redelivery, in accordance with Clauses 15 (*Redelivery*) (Part II), 59 (*Redelivery conditions*) and 60 (*Diver's inspection at redelivery*).

## 59  Redelivery conditions

## 59.1  Redelivery conditions generally

In addition to what has been agreed in Clauses 15 (*Redelivery*) (Part II) and 58 (*Redelivery*), the condition of the Vessel shall at redelivery be the same or as good a structure, state, condition and class as that in which she was delivered, fair wear and tear excepted, subject as follows:

59.1.1    the Vessel shall be free of any class and statutory recommendations affecting its trading certificates;

59.1.2    the Vessel must be redelivered with all equipment and spares or replacement items listed in the delivery inventory carried out pursuant to Clause 9 (*Inventories, Oil and Stores*) (Part II) and any spare parts on board or on order for any equipment installed on the Vessel following delivery (provided that any such items which are on lease or hire purchase shall be replaced with items of an equivalent standard and condition fair wear and tear excepted); all records, logs, plans, operating manuals and drawings, spare parts onboard shall be included at the time of redelivery in connection with a transfer of the Vessel or such other items as are then in the possession of the Charterers shall be delivered to the Owners;

59.1.3    the Vessel must be redelivered with all national and international trading certificates and hull/machinery survey positions for both class and statutory surveys free of any overdue recommendation and qualifications valid and un-extended for a period of at least three months beyond the redelivery date;

59.1.4    all of the Vessel's ballast tank coatings to be maintained in "Fair" (as such term (or its equivalent) may be defined and/or interpreted in the relevant survey report) condition as appropriate for the Vessel's age at the time of redelivery, fair wear and tear excepted;

59.1.5    the Vessel shall have passed any flag or class surveys or inspections due within three months after the date of redelivery and have its continuous survey system up to date;

59.1.6    the Vessel must be re-delivered with accommodation and common spaces for crew and officers substantially in the same condition as at the Actual Delivery Date, free of damage over and above fair wear and tear, clean and free of infestation and odours; with cargo spaces generally fit to carry the cargoes originally designed and intended for the Vessel; with main propulsion equipment, auxiliary equipment, cargo handling equipment, navigational equipment, etc., in such operating condition as provided for in this Charter;

59.1.7    all refuse shall be removed ashore;

59.1.8    the Vessel shall be free and clear of all liens other than Permitted Security;

59.1.9    the condition of the cargo holds to be in accordance with the maintenance regime undertaken by the Charterers during the Charter Period since delivery with allowance for legitimate cargoes carried since the last major maintenance programme;

59.1.10   the cargo holds shall be clean and the cargo holds and the engine room shall be free of bilge water;

59.1.11    the contents of all oil residue slop tanks and bilge water holding tanks shall be pumped ashore and delivered in an empty condition;

59.1.12    a final joint report from the surveyors appointed by the Owners and the Charterers respectively shall be carried out as to the condition of the Vessel and a list of agreed deficiencies if any shall be drawn up;

59.1.13    the anti-fouling coating system applied at the last scheduled dry-docking shall be in accordance with prevailing regulations at the time of application;

59.1.14    the funnel markings and name (unless being maintained by the Owner following redelivery) shall be painted out by the Charterers; and

59.1.15    recently taken lubricating oil samples for all major machinery shall be made available within one week of redelivery and results forwarded to Owners' technical management for review.

59.2    **Performance levels at redelivery**

At redelivery, the Charterers shall ensure that the Vessel shall meet the following performance levels (which where relevant shall be determined by reference to the Vessel's log books):

59.2.1    all equipment controlling the habitability of the accommodation and service areas to be in proper working order, fair wear and tear excepted; and

59.2.2    available deadweight to be within 1% of that achieved at delivery (as the same may be adjusted as a result of any upgrading of the Vessel carried out in accordance with this Charter (such adjustment to be agreed between the Owners and Charterers at the time such upgrading work is to be undertaken)).

59.3    **Surveyors and deficiencies**

59.3.1    The Owners and Charterers shall each appoint (at their own expense) surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at redelivery.

59.3.2    If the Vessel is not in the condition or does not meet the performance criteria required by this Clause 59, a list of deficiencies together with the costs of repairing/remedying such deficiencies shall be agreed by the respective surveyors.

59.3.3    The Charterers shall be obliged to repair any class items restricting the operation or trading of the Vessel before redelivery.

59.3.4    The Charterers shall be obliged to repair/remedy all such other deficiencies as are necessary to put the Vessel into the return condition required by this Clause 59.

59.3.5    The cost of making any repairs/remedial work referred to in Clause 59.3.4 shall be agreed between the Owners' and the Charterers'

respective surveyors or, if such agreement is not reached, on the basis of estimates received from competent repair yards for the work.

59.3.6    Until such time as any compensatory amount in respect of any repairs/remedial work outstanding as at redelivery has been paid in accordance with the terms of this Charter and the Vessel has been redelivered, the Charterers shall continue to pay Hire in accordance with the terms of this Charter.

## 60    Diver's inspection at redelivery

### 60.1    Application

For the avoidance of doubt, the requirements of this Clause 60 will not apply if:

60.1.1    after the occurrence of a Termination Event, the Charterers have paid the Termination Sum and any other amounts due under this Charter;

60.1.2    after the occurrence of a Total Loss, the Charterers have paid to the Owners the applicable Termination Sum on or prior to the relevant Mandatory Prepayment Event Settlement Date in accordance with Clause 44.3 (*Mandatory Prepayment Event – Total Loss*);

60.1.3    the Charterers have paid the Purchase Option Price and the Vessel has been redelivered to the Charterer pursuant to Clauses 64 (*Purchase Option*) and 66 (*Transfer of title*); or

60.1.4    the Charterers have paid the Put Option Price and the Vessel has been redelivered to the Charterer pursuant to Clauses 65 (*Put option*) and 66 (*Transfer of title*).

### 60.2    Diver's inspection

60.2.1    Unless the Vessel is returned in dry-dock, a diver's inspection is required to be performed at the time of redelivery.

60.2.2    The Charterers shall, at the written request of the Owners, arrange at the Charterers' expense for an underwater inspection by a diver approved by the relevant Approved Classification Society immediately before the redelivery.

60.2.3    A video film of the inspection shall be made. The extent of the inspection and the conditions under which it is performed shall be to the satisfaction of the relevant Approved Classification Society.

60.2.4    If damage to the underwater parts is found, the Charterers shall arrange, at their time and costs, for the Vessel to be dry-docked and repairs carried out to the satisfaction of the relevant Approved Classification Society.

60.2.5    If the conditions at the port of redelivery are unsuitable for such diver's inspection, the Charterers shall take the Vessel (in Owners' time but at Charterers' expense) to a suitable alternative place nearest to the redelivery port unless an alternative solution is agreed.

60.2.6    Without limiting the generality of Clause 49.3 (*Run-off indemnities*), all costs relating to any diver's inspection shall be borne by the Charterers.

## 61    Transport documents

The Charterers shall use their standard documents, waybills and conditions of carriage in the carriage of goods. Such documents, waybills and standard conditions shall comply with compulsory applicable legislation.

## 62    Termination Events

Each of the following events shall constitute a Termination Event:

### 62.1    Non-payment

An Obligor does not pay on the due date any amount payable pursuant to a Transaction Document at the place and in the currency in which it is expressed to be payable unless:

62.1.1    its failure to pay is caused by:

(a)    administrative or technical error; or

(b)    a Disruption Event; and

62.1.2    payment is made within three Business Days of its due date.

### 62.2    Specific obligations

An Obligor fails duly to perform or comply with any of the obligations expressed to be assumed by or procured by the Charterers under Clauses 44 (*Illegality, prepayment and Total Loss*), 51.25.6 (*Sanctions*), 53.2 (*Charterers' Cash Collection Account and HoldCo Cash Collection Account*), 53.4 (*Dry Docking Reserve Account*), 54.2 (*Asset coverage and assessment of Market Value*), 55.2.2 (*Compliance with laws*), 55.5 (*AML Laws*), 55.8 (*Negative pledge*), 55.9 (*Disposals*), 55.20.1(e) (*No dividends*), 55.22 (*Sanctions undertaking*), 55.27 (*Unlawfulness, invalidity and ranking; Security imperiled*), 56 (*Insurance undertakings*), 57.2 (*Registration*), 57.13 (*Laying-up and de-activation*), 57.16 (*Restrictions on employment and sub-chartering*) and 57.19 (*Management*).

### 62.3    Other obligations

62.3.1    An Obligor does not comply with any provision of the Transaction Documents (other than those referred to in Clauses 62.1 (*Non-payment*) and 62.2 (*Specific obligations*)).

62.3.2    No Termination Event under this Clause 62.3 will occur if the failure to comply is capable of remedy and is remedied within 10 days of the earlier of (a) the Owners giving notice to the Charterers, and (b) the Charterers becoming aware of the failure to comply.

62.4    **Misrepresentation**

Any representation or statement made or deemed to be made by an Obligor in the Transaction Documents or any other document delivered by or on behalf of any Obligor under or in connection with any Transaction Document is or proves to have been incorrect or misleading when made or deemed to be made.

62.5    **Cross default**

62.5.1    Any Financial Indebtedness of an Obligor is not paid when due nor within any originally applicable grace period.

62.5.2    Any Financial Indebtedness of an Obligor is declared to be, or otherwise becomes, due and payable before its specified maturity as a result of an event of default (however described).

62.5.3    Any commitment for any Financial Indebtedness of an Obligor is cancelled or suspended by a creditor of an Obligor as a result of an event of default (however described).

62.5.4    Any creditor of an Obligor becomes entitled to declare any Financial Indebtedness of an Obligor due and payable before its specified maturity as a result of an event of default (however described).

62.5.5    No Termination Event will occur under this Clause 62.5 if the amount of Financial Indebtedness or commitment for Financial Indebtedness falling within Clauses 62.5.1 to 62.5.4 is less than US$500,000 (or its equivalent in any other currency or currencies).

62.6    **Insolvency**

62.6.1    An Obligor:

(a)    is unable or admits inability to pay its debts as they fall due;

(b)    suspends or threatens to suspend making payments on any of its debts; or

(c)    by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness.

62.6.2    The value of the assets of an Obligor is less than its liabilities (taking into account contingent and prospective liabilities).

62.6.3    A moratorium is declared in respect of any indebtedness of an Obligor. If a moratorium occurs, the ending of the moratorium will not remedy any Termination Event caused by that moratorium.

62.7    **Insolvency proceedings**

62.7.1    Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(a)     the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, bankruptcy or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of an Obligor;

(b)     a composition, compromise, assignment or arrangement with any creditor of an Obligor;

(c)     the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, trustee or other similar officer in respect of an Obligor or any of its assets; or

(d)     enforcement of any Security over any assets of an Obligor,

or any analogous procedure or step is taken in any jurisdiction.

62.7.2   Clause 62.7.1 shall not apply to (a) any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 14 days of commencement, or (b) any arrest or detention of the Vessel from which the Vessel is released within ten days from the date of that arrest or detention.

## 62.8    Creditors' process

Any expropriation, attachment, sequestration, distress or execution (or any analogous process in any jurisdiction) affects any asset or assets of an Obligor and is not discharged within 14 days.

## 62.9    Unlawfulness and invalidity

62.9.1   It is or becomes unlawful for an Obligor to perform any of its obligations under the Transaction Documents or any Transaction Security ceases to be effective.

62.9.2   Any obligation or obligations of any Obligor under any Transaction Documents are not or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Owners under the Transaction Documents.

62.9.3   Any Transaction Document ceases to be in full force and effect or any Transaction Security ceases to be legal, valid, binding, enforceable or effective or is alleged by a party to it (other than the Owners) to be ineffective.

## 62.10   Cessation of business

An Obligor ceases, or threatens to cease, to carry on all or a substantial part of its business.

## 62.11   Expropriation

The authority or ability of an Obligor to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention,

restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to an Obligor or any of its assets.

62.12   **Repudiation and rescission of agreements**

62.12.1   An Obligor rescinds or purports to rescind or repudiates or purports to repudiate a Transaction Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Transaction Document or any of the Transaction Security.

62.12.2   Any party to the Sale Agreement or a Management Agreement rescinds or purports to rescind or repudiates or purports to repudiate the Sale Agreement or Management Agreement in whole or in part where to do so has or is, in the reasonable opinion of the Owners, likely to have a material adverse effect on the interests of the Owners under the Transaction Documents.

62.12.3   Any Sub-Charter (other than the Time Charter) or Sub-Charter Guarantee (other  than any Sub-Charter Guarantee in respect of the Time Charter) is terminated, cancelled or otherwise ceases to remain in full force and effect at any time before its contractual expiry date and is not replaced within 15 days of that Sub-Charter (other than the Time Charter) or Sub-Charter Guarantee (other  than any Sub-Charter Guarantee in respect of the Time Charter) being terminated or cancelled or ceasing to remain in full force and effect by a similar agreement in form and substance satisfactory to the Owners.

62.13   **Revocation or modification of Authorisation**

Any Authorisation of any governmental, judicial or other public body or authority which is now, or which at any time during the Agreement Term becomes, necessary to enable any of the Obligors or any other person to comply with any of their obligations under any Transaction Document or Project Document:

62.13.1   is not obtained, revoked, suspended, withdrawn or withheld;

62.13.2   is modified in a manner which the Owners consider is, or may be, prejudicial to the interests of the Owners; or

62.13.3   ceases to remain in full force and effect.

62.14   **Challenge to registration**

The registration of the Vessel or a Related Vessel is contested or becomes void or voidable or liable to cancellation or termination.

62.15   **War**

The country of registration of the Vessel or a Related Vessel becomes involved in war (whether or not declared) or civil war or is occupied by any other power and the Owners consider that, as a result, any Transaction Security is materially prejudiced.

62.16 **Litigation**

Any litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body, arbitral tribunal or agency are started or threatened, or any judgment or order of a court, arbitral body, arbitral tribunal, agency or other tribunal or any order or sanction of any governmental or other regulatory body is made, in relation to the Transaction Documents or the transactions contemplated in the Transaction Documents or against an Obligor or its assets which in the case of all Obligors have, or has, or are, or is, reasonably likely to have a Material Adverse Effect.

62.17 **Material adverse change**

Any event or circumstance occurs which the Owners reasonably believe has or is reasonably likely to have a Material Adverse Effect.

62.18 **Insolvency of Approved Managers or Sub-Charterers**

Any of the circumstances described in Clauses 62.6 (*Insolvency*), 62.7.1 or 62.8 (*Creditors' process*) arises (mutatis mutandis) in relation to any Approved Managers or the Time Charterers and the relevant Approved Managers or the Time Charterers as the case may be are not replaced within 30 days of the occurrence of any of the circumstances described in Clauses 62.6 (*Insolvency*), 62.7.1 or 62.8 (*Creditors' process*) with a party acceptable to the Owners.

62.19 **Conditions subsequent**

Any of the conditions referred to in Clauses 41.4 (*Delivery conditions subsequent*) and 41.5 (*Waiver of conditions precedent and conditions subsequent*) is not satisfied within the specified time.

62.20 **Notice of determination**

If any of the Charter Guarantors gives notice to the Owners to determine its respective obligations under its Charter Guarantee.

62.21 **Withdrawal of classification certificate; overdue recommendations or conditions of class**

The relevant Approved Classification Society withdraws the Vessel's classification certificate or there is any overdue recommendation or condition of the Approved Classification Society and either such withdrawal, recommendation or condition (i) is not remedied within 10 days or (ii) materially adversely affects of otherwise invalidates the Vessel's insurance cover.

62.22 **Change of Control Event**

A Change of Control Event has occurred.

62.23 **Breach of Senior Finance Document**

An Obligor is in breach of its obligations under any Senior Finance Document to which it is a party.

62.24    **Related Charter Termination Event**

There occurs any Related Charter Termination Event.

62.25    **Breach of redelivery conditions**

The Charterers are in breach of their obligations pursuant to Clause 59 (*Redelivery conditions*).

62.26    **HoldCo Accounts Charge Period**

The HoldCo Accounts Charge Period has not expired within 30 days of the Actual Delivery Date (or such later date as may be agreed by the Owners in their discretion).

**63**    **Consequences of Termination Event**

63.1    **Nature of Termination Event**

A Termination Event shall constitute (as the case may be) either a repudiatory breach of, or breach of condition by the Charterers under, this Charter or an agreed terminating event the occurrence of which will (in any such case) entitle the Owners to exercise all or any of the remedies set out below in this Clause 63.

63.2    **Owners' option after Termination Event**

At any time a Termination Event is continuing, the Owners may at their option:

63.2.1    by delivering to the Charterers a written notice (the "**Termination Notice**"), terminate this Charter with immediate effect or on the date specified in such Termination Notice and withdraw the Vessel from the service of the Charterers without noting any protest and without interference by any court or any other formality whatsoever, whereupon the Vessel shall no longer be in the possession of the Charterers with the consent of the Owners, and the Charterers shall redeliver the Vessel to the Owners in accordance with Clauses 58 (*Redelivery*) and 59 (*Redelivery conditions*);

63.2.2    apply any amount then standing to the credit of:

(a)    during the HoldCo Accounts Charge Period, the HoldCo Cash Collection Account; and

(b)    during the Charterers' Accounts Charge Period, the Charterers' Cash Collection Account,

against any Unpaid Sum or such other amounts which the Owners or other Obligors may owe under the Transaction Documents;

63.2.3    (without prejudice to Clause 63.2.2) enforce any Transaction Security; and/or

63.2.4    withdraw their consent to the registration of the Vessel with the Bareboat Charter Registry referred to in Box 29 of Part I of this Charter.

63.3    **Payment of Termination Sum**

On the Termination Payment Date in respect of any Default Termination, the Charterers shall pay to the Owners an amount equal to the Termination Sum.

63.4    **Application of Termination Sum**

Following any termination to which this Clause 63 applies, all sums payable in accordance with Clause 63.3 (*Payment of Termination Sum*) shall be paid to such account or accounts as the Owners may direct and shall be applied towards settlement of the Termination Sum (or a part of the Termination Sum) and any other sums due and payable under the Transaction Documents. To the extent that there is any surplus after such application and **provided further that** there are no other amounts outstanding under any Related Transaction Document, such surplus shall be paid to the Charterers.

63.5    **Effect of payment of Termination Sum**

If the chartering of the Vessel or, as the case may be, the obligation of the Owners to deliver and charter the Vessel to the Charterers is terminated in accordance with the terms of this Charter, and once the Charterers have made the payment pursuant to Clause 63.3 (*Payment of Termination Sum*) to the satisfaction of the Owners, then:

63.5.1    the obligation of the Charterers to pay Hire shall cease; and

63.5.2    the Owners shall, as soon as reasonably practicable afterwards, arrange for title of the Vessel to be transferred to the Charterers in accordance with Clause 66 (*Transfer of title*) unless to do so would result in a breach of Sanctions by the Owners.

63.6    **Owners' right to withdraw or retake possession**

Without prejudice to the forgoing or to any other rights of the Owners under the Charter, at any time after a Termination Notice is served under Clause 63.2 (*Owners' option after Termination Event*), the Owners may, acting in their sole discretion:

63.6.1    withdraw the Vessel from the service of the Charterers without noting any protest and without interference by any court or any other formality whatsoever, whereupon the Vessel shall no longer be in the possession of the Charterers with the consent of the Owners, and the Charterers shall redeliver the Vessel to the Owners in accordance with Clauses 58 (*Redelivery*) and 59 (*Redelivery conditions*);

63.6.2    without prejudice to the Charterers' obligations under Clause 59 (*Redelivery conditions*), retake possession of the Vessel and, the Charterers agree that the Owners, for such purpose, may put into force and exercise all their rights and entitlements at law and may enter upon any premises belonging to or in the occupation or under the control of the Charterers where the Vessel may be located as well as giving instructions to the Charterers' servants or agents for this purpose; and/or

63.6.3    enforce any Transaction Security.

63.7    **Owners' right to sell**

Following any termination to which this Clause 62.25 applies, if the Charterers have not paid to the Owners the Termination Sum by the applicable Termination Payment Date (and consequently the Owners have not transferred title to the Vessel to the Charterers (or its nominee) in accordance with Clause 63.5 (*Effect of payment of Termination Sum*)), then the Owners shall be free to sell the Vessel and apply the relevant Net Sale Proceeds against the Termination Sum and claim from the Charterers for any shortfall.

63.8    **Refund**

Upon completion of the sale the Vessel in accordance with Clause 63.7 (*Owners' right to sell*):

63.8.1    if:

(a)    the Charterers have not paid to the Owners the Termination Sum in full at the time when the Owners have received in full of such Net Sale Proceeds; and

(b)    the Net Sale Proceeds are greater than the Termination Sum,

then the Owners shall, after applying the Net Sale Proceeds against the Termination Sum and **provided further that** there are no other amounts outstanding under any Related Transaction Document, refund to the Charterers the residual amount (net of any bank transfer fees or equivalent charges); or

63.8.2    if the Charterers have paid to the Owners the Termination Sum in full at the time when the Owners have received in full the Net Sale Proceeds and **provided further that** there are no other amounts outstanding under any Related Transaction Document, the Owners shall refund to the Charterers the Net Sale Proceeds (net of any bank transfer fees or equivalent charges).

63.9    **Charterers' obligations unaffected**

For the avoidance of doubt, the Charterers' obligation to pay the Termination Sum (and any of their other obligations under the Transaction Documents) shall not be affected irrespective of the Owners' ability to complete the sale of the Vessel referred to in Clause 63.7 (*Owners' right to sell*).

63.10    **Charterers have no other right to terminate**

Save as otherwise expressly provided in this Charter, the Charterers shall not have the right to terminate this Charter any time before the expiration of the Agreement Term.

63.11    **Owners' rights cumulative**

The rights conferred upon the Owners by the provisions of this Clause 63 are cumulative and in addition to any rights which they may otherwise have in law or in equity or by virtue of the provisions of this Charter.

63.12   **Termination Events caused by an Approved Manager**

If any of the events or circumstances set out in Clause 62 (*Termination Events*) is caused by an Approved Manager (the "**Defaulting Manager**") it shall not be a Termination Event if within thirty (30) days of the occurrence of such event or circumstances each of the following occurs:

63.12.1   the Defaulting Manager is replaced by an alternative Approved Manager (the "**Substitute Manager**"); and

63.12.2   such Substitute Manager enters into a replacement Management Agreement and Managers' Undertaking, each in a form approved by the Owners and, if applicable, the Senior Finance Parties (such approval not to be unreasonably withheld or delayed).

**64      Purchase Option**

64.1    **Purchase Option Notice and Purchase Option Date**

The Charterers may, subject to satisfaction of all the conditions in Clause 64.2 (*Purchase Option conditions*), notify the Owners by serving a written notice (such notice shall hereinafter be referred to as the "**Purchase Option Notice**" which, once served, shall be irrevocable) of the Charterers' intention to:

64.1.1   exercise the Purchase Option and purchase the Vessel from the Owners for the applicable Purchase Option Price; and

64.1.2   thereafter terminate this Charter on the date to be specified in such Purchase Option Notice (such date being the "**Purchase Option Date**").

64.2    **Purchase Option conditions**

The Charterers may only exercise the Purchase Option if all of the following conditions are satisfied:

64.2.1   the Charterers may only complete the exercise the Purchase Option during the Purchase Option Period;

64.2.2   no Mandatory Prepayment Event having occurred;

64.2.3   no Termination Event is continuing or would occur as a result of such Purchase Option or early termination;

64.2.4   there must be a period of at least 30 days between the date of the Purchase Option Notice and the proposed Purchase Option Date; and

64.2.5   the Purchase Option Date occurs on or after the third anniversary of the Actual Delivery Date and within 90 days of the date of the Purchase Option Notice.

64.3    **Title transfer in exchange for Purchase Option Price**

In exchange for the Charterers' payment of the Purchase Option Price on the Purchase Option Date, the Owners shall arrange for title of the Vessel to be transferred to the Charterers in accordance with Clause 66 (*Transfer of title*).

**65      Put option**

If no Purchase Option has been declared by the end of the Charter Period or on any earlier Termination which has occurred then the Owners shall have the option to sell the Vessel "as is, where is" to the Charterers or their nominee for the Put Option Price (subject to Owners' satisfactory completion of their "know your customer" or other similar checks under all applicable laws and regulations).  The Owners shall deliver a Put Option Notice to the Charterers at least 30 days prior to the date on which they require the Charterers to take delivery of the Vessel following the end of the Charter Period.  If however this Charter has been terminated earlier due to a Termination Event then the Owners may deliver a Put Option Notice requiring the Charterers to complete the purchase of the Vessel at such time and in such location as the Owners shall notify the Charterers in the Put Option Notice.

**66      Transfer of title**

66.1    **Title transfer in exchange of payment**

In exchange for the full payment of (i) (in each case as applicable) the applicable Purchase Option Price (in the case of the circumstances described in Clause 64 (*Purchase Option*)), the applicable Put Option Price (in the case of the circumstances described in Clause 65 (*Put option*)) or if applicable the applicable Termination Sum, and (ii) all sums due and payable to the Owners under the Transaction Documents and subject to compliance with the other conditions set out in this Clause, the Owners shall (in each case at the Charterers' costs, time and expenses):

66.1.1    transfer title to and ownership of the Vessel to the Charterers (or their nominee) by delivering to the Charterers or their nominee:

(a)      a duly executed and notarised, legalised and/or apostilled (as applicable) bill of sale; and

(b)      the Title Transfer PDA; and

(c)      such other documents as the Charterers may reasonably require to effect the registration of transfer of title to the Vessel;

66.1.2    (subject to the prior written consent of any Senior Finance Party or its agent or permitted assigns and transferees or its financiers (in each case as applicable)) use best endeavours to procure the deletion of any mortgage or prior Security created or expressed to be created by the Owners in relation to the Vessel,

**provided always** that before such transfer or deletion (as the case may be), the Owners shall have received the letter of indemnity as referred to in Clause 66.4 (*Letter of indemnity*) from the Charterers, and the Charterers shall have performed all their obligations in connection herewith and with the Vessel, including without

limitation the full payment of all Unpaid Sums, taxes, charges, duties, costs and disbursements (including legal fees) in relation to the Vessel.

66.2    **Basis of title transfer**

The transfer in accordance with Clause 66.1 (*Title transfer in exchange of payment*) shall be made in all respects at the Charterers' expense on an "as is, where is" basis and the Owners shall give the Charterers (or their nominee) no representations, warranties (other than a warranty that the Vessel shall be free from all Security other than those created by the Owners), agreements or guarantees whatsoever concerning or in connection with the Vessel, the Insurances, the Vessel's condition, state or class or anything related to the Vessel, expressed or implied, statutory or otherwise.

66.3    **Form of bill of sale**

Provided that the Charterers have notified the Owners of the form of the bill of sale referred to in Clause 66.1 (*Title transfer in exchange of payment*) that will be necessary to ensure the bill of sale is recordable in the Charterers' nominated flag state, the Owners shall use reasonable endeavours to ensure that the bill of sale shall be in such prescribed form.

66.4    **Letter of indemnity**

The Charterers shall, immediately before the receipt of the bill of sale, furnish the Owners with a letter of indemnity (in a form satisfactory to the Owners) whereby the Charterers and the Charter Guarantors shall state that, among other things:

66.4.1    the Owners have and will have no interest, concern or connection with the Vessel after the date of such letter; and

66.4.2    the Charterers the Charter Guarantors shall indemnify the Owners and keep the Owners indemnified forever against any claims made by any person arising in connection with the Vessel (other than any claims which are brought or may arise as a result of the Owners' gross negligence or wilful misconduct).

66.5    **Impediment against title transfer**

In addition to Clause 66.3 (*Form of bill of sale*), if the transfer referred to in Clause 66.1 (*Title transfer in exchange of payment*) is not or cannot be made by the Owners by reason of:

66.5.1    any action taken or improperly omitted by or any breach by any Senior Finance Party under or in connection with any of the Senior Finance Documents (including, without limitation, any failure by any Senior Finance Party to release any Security constituted by any Senior Finance Document in circumstances where they are or any of them is obliged to do so);

66.5.2    any Termination Event; or

66.5.3    Sanctions (except for as a result any violation of Sanctions by the Owners),

the Owners shall have no liability to the Charterers arising out of such failure to transfer.  As soon as such transfer is no longer prevented by such or any other action or omission, such transfer shall be made in accordance with the relevant provisions of this Charter.

## 67    Owners' Security

### 67.1    Charterers' acknowledgement, consent and undertaking

The Charterers:

67.1.1    acknowledge that, on the basis that the Owners will use reasonable endeavours to procure the issuance of the relevant Senior Finance Party Quiet Enjoyment Agreement, the Owners are entitled and do intend to enter or have entered into certain funding arrangements with the Senior Finance Parties, which funding arrangements may be secured, inter alia, by ship mortgages over the Vessel and (along with other related matters) the relevant Senior Finance Documents;

67.1.2    irrevocably consent to the Owners' granting or creation of any Security in favour of the Senior Finance Parties (pursuant to the relevant Senior Finance Documents) in the Owners' rights in and to any Transaction Document;

67.1.3    without limiting the generality of Clause 55.22.1 (*Sanctions undertaking*), undertake to execute, provide or procure the execution or provision (as the case may be) of such further information or document as in the reasonable opinion of the Owners and/or the Senior Finance Parties are necessary to effect, confer or perfect any Security referred to in Clause 67.1.2 including, without limitation:

(a)    any changes to the Transaction Documents;

(b)    notices of assignment and (procure) acknowledgements of such notices and evidence that all necessary corporate, shareholder and other action has been taken by the Charterers to authorise the execution delivery and performance of such documents; and

(c)    the execution and delivery of the documents listed in Schedule 6 (*Senior Finance Documents Conditions Precedent*);

67.1.4    agree that, if as a result of a request made by the Charterers under a Transaction Document the Owners are required to obtain the Senior Finance Parties' approval of that request pursuant to the terms of the Senior Finance Documents and the Senior Finance Parties withhold their approval of that request in accordance with the terms of the Senior Finance Documents, the Owners may reasonably refuse the Charterers' request; and

67.1.5    acknowledge that the Owners are entitled and do intend to enter or have entered into certain interest rate hedging in relation to the financing of the Vessel **provided that** the costs and expenses in connection with such interest rate hedging shall be for the account of the Owners.

67.2    **No assignment by Obligors**

The Charterers shall not (and shall ensure that no other Obligor will) assign or transfer any of their rights or obligations under the Transaction Documents.

67.3    **Owners' right of transfer**

Without prejudice to the foregoing:

67.3.1    subject to Clause 67.3.2, the Owners may not assign, transfer or novate their rights and, in the case of a novation, obligations under this Charter without the prior written consent of the Charterers provided that no consent shall be required from the Charterers (x) if a Termination Event is continuing,  (y) after the expiration of the Charter Period unless the Charterers comply with their obligations under Clause 65 (*Put option*) or (z) if the assignment, transfer or novation is effected in accordance with any Multipartite Agreement; and

67.3.2    the Owners may assign their rights under this Charter to one or more of the Senior Finance Parties as security for the Owners' obligations under the Senior Finance Documents.

67.4    **Owners' right to sell the Vessel**

67.4.1    Other than in accordance with Clause 67.4.2, Clause 67.4.3, Clause 64 (*Purchase Option*), Clause 65 (*Put option*), Clause 63.2 (*Owners' option after Termination Event*), Clause 63.7 (*Owners' right to sell*) or any Multipartite Agreement, the Owners shall not sell the Vessel or transfer the title to the Vessel to any person.

67.4.2    The Owners are entitled to sell the Vessel and transfer the title to the Vessel to any bank, financial institution, trust, fund, leasing company or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (each a "**Permitted Purchaser**").

67.4.3    In connection with the sale of the Vessel or the transfer of the title to the Vessel to a Permitted Purchaser referred to in Clause 67.4.2, either (A) this Charter and the other relevant Transaction Documents will be novated so that the Owners' rights and obligations under this Charter and those Transaction Documents are transferred to that Permitted Purchaser or (B) this Charter and the other relevant Transaction Documents will be terminated and a new charter and other documents will be entered into between that Permitted Purchaser and the Charterers on the substantially the same terms and conditions as those contained in this Charter and the other relevant Transaction Documents, or on such other terms and conditions as may be acceptable to that Permitted Purchaser and the

Charterers. The Charterers shall (and shall procure that the other Obligors shall) cooperate in a timely fashion in respect of any such documentation and the execution of the same, and shall also provide such supporting documentation including corporate authorisations as the Owners may reasonably request.

67.4.4 All expenses resulting from the Owners' sale of the Vessel or transfer of the title to the Vessel (other than under Clause 64 (*Purchase Option*) or Clause 65 (*Put option*) or where a Termination Event has occurred) will be borne by the Owners.

67.5 **Notice of mortgage**

At any time a mortgage is in effect over the Vessel, the Charterers shall carry on board the Vessel with its papers a certified copy of any mortgage over the Vessel in favour of the relevant Senior Finance Party and be shown to anyone having business with the Vessel which might create or imply any commitment or Security over or in respect of the Vessel (other than a lien for crew's wages and salvage) and to any representative of a Senior Finance Party and place and maintain in a conspicuous place in the navigation room and the master's cabin of the Vessel a framed printed notice in plain type reading as follows:

"**NOTICE OF MORTGAGE**

This Ship is covered by a First Preferred Mortgage granted by FLEETSCAPE SUEZ RAJAN, LLC in favour of OXANE PARTNERS LIMITED, as security agent and trustee, pursuant to Title 21 of the Liberian Code of Laws of 1956 as amended. Under the terms of the said Mortgage neither the Owner nor any charterer nor the Master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien, commitments or encumbrances whatsoever other than for crew's wages and salvage"

68 **Senior Finance Party Quiet Enjoyment Agreement**

The Charterers shall, on demand, indemnify the Owners against any direct and documented cost, loss or liability incurred by the Owners as a consequence of any breach of any Senior Finance Party Quiet Enjoyment Agreement by the Charterers or any sub-charterer of the Charterers, or any agent or representative of any of them.

69 **Cumulative rights**

The rights, powers and remedies provided in this Charter are cumulative and not exclusive of any rights, powers or remedies at law or in equity unless specifically otherwise stated.

70 **No waiver**

No delay, failure or forbearance by a Party to exercise (in whole or in part) any right, power or remedy under, or in connection with, this Charter will operate as a waiver. No waiver of any breach of any provision of this Charter will be effective unless that waiver is in writing and signed by the Party against whom that waiver is claimed. No waiver of any breach will be, or be deemed to be, a waiver of any other or subsequent breach.

**71      Entire agreement**

71.1    This Charter contains all the understandings and agreements of whatsoever kind and nature existing between the Parties in respect of this Charter, the rights, interests, undertakings agreements and obligations of the Parties and shall supersede all previous and contemporaneous negotiations and agreements.

71.2    This Charter may not be amended, altered or modified except by a written instrument executed by the Parties.

**72      No partnership**

Nothing in this Charter creates, constitutes or evidences any partnership, joint venture, agency, trust or employer/employee relationship between the Parties, and neither Party may make, or allow to be made any representation that any such relationship exists between the Parties. Neither Party shall have the authority to act for, or incur any obligation on behalf of, the other Party, except as expressly provided in this Charter.

**73      Set-off**

The Owners may set-off any matured obligation due from the Charterers under the Transaction Documents (to the extent beneficially owned by the Owners) against any obligation (whether matured or not) owed by the Owners to the Charterers, regardless of the place of payment or currency of either obligation. If the obligations are in different currencies, the Owners may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

**74      Notices**

74.1    **Communications in writing**

Any communication to be made under or in connection with the Transaction Documents shall be made in writing and, unless otherwise stated, may be made by letter, fax or email.

74.2    **Addresses**

The address, fax number and email address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Transaction Documents is:

74.2.1    in the case of the Charterers:

Suez Rajan Limited

| Address: | 88 | Vouliagmenis | Avenue |
| | 16777 | | Elliniko |
| | Greece | | |

| Email: | vkoutsolakos@empirenavigation.com |

| Attention: | Mr. Vasileios Koutsolakos |

or any substitute address, email address, fax number, or department or officer as the Charterers may notify the Owners by not less than five Business Days' notice; and

74.2.2    in the case of the Owners:

Fleetscape Suez Rajan, LLC

Address:        c/o Oaktree Capital Management, L.P., 333 South Grand Avenue, Los Angeles, CA 90071, United States of America

with a copy to: Oaktree Capital Management (Europe) LLP of Verde, 10 Bressenden Place, London, England, SW1E 5DH

Email:          info@fleetscape.com

or any substitute address, email address, fax number, or department or officer as the Owners may notify the Charterers by not less than five Business Days' notice.

74.3    **Delivery**

74.3.1    Any communication or document made or delivered by one person to another under or in connection with the Senior Finance Documents will only be effective:

(a)        if by way of fax or email, when received in legible form; or

(b)        if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 74.2 (*Addresses*), if addressed to that department or officer.

74.3.2    Any communication or document to be made or delivered to the Owners will be effective only when actually received by the Owners and then only if it is expressly marked for the attention of the department or officer identified with the Owners in accordance with Clause 74.2 (*Addresses*) (or any substitute department or officer as the Owners shall specify for this purpose).

74.3.3    Any communication or document which becomes effective, in accordance with this Clause 74.3, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

74.4    **English language**

Any notice given under or in connection with any Transaction Document must be in English. All other documents provided under or in connection with any Transaction Document must be:

74.4.1    in English; or

74.4.2    if not in English, and if so required by the Owners, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 75    Calculations and certificates

### 75.1    Accounts

In any litigation or arbitration proceedings arising out of or in connection with a Transaction Document, the entries made in the accounts maintained by a Senior Finance Party are prima facie evidence of the matters to which they relate.

### 75.2    Certificates and determinations

Any certification or determination by the Owners of a rate or amount under any Transaction Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

### 75.3    Day count convention

Any interest, commission or fee accruing under a Transaction Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days.

## 76    Partial invalidity

If, at any time, any provision of a Transaction Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 77    Remedies and Waivers

No failure to exercise, nor any delay in exercising, on the part of the Owners, any right or remedy under a Transaction Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Transaction Document. No election to affirm any Transaction Document on the part of the Owners shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Transaction Document are cumulative and not exclusive of any rights or remedies provided by law.

## 78    Conflicts

Unless stated otherwise, in the event of there being any conflict between the provisions of Clauses 1 (*Definitions*) (Part II) to 31 (*Notices*) (Part II) and the provisions of Clauses 39 (*Definitions and interpretations*) to 83 (*Waiver of immunity*), the provisions of Clauses 39 (*Definitions and interpretations*) to 83 (*Waiver of immunity*) shall prevail.

**79      Survival of Charterers' obligations**

The termination of this Charter for any cause whatsoever shall not affect the right of the Owners to recover from the Charterers any money due to the Owners on or before the termination in consequence thereof and all other rights of the Owners (including but not limited to any rights, benefits or indemnities which are expressly provided to continue after the termination of this Charter) are reserved under this Charter.

**80      Confidentiality**

**80.1    Generality duty of confidentiality**

The Parties shall keep the negotiations regarding this Charter, the contents of this Charter, any information (not in the public domain) that they may have received at any time in relation to the business, strategies or financial affairs of the other Party and the information provided in connection with the Transaction Documents in the strictest confidence and agree to disclose to no person other than:

80.1.1    its board of directors, employees (only on a need to know basis), shareholders, professional advisors (including the legal and accounting advisors and auditors) and rating agencies;

80.1.2    as may be required to be disclosed under applicable law or regulations or for the purpose of legal proceedings;

80.1.3    in the case of the Owners, to any Senior Finance Party or other actual or potential financier providing funding for the acquisition or refinancing of the Vessel (provided the same have entered into similar confidentiality arrangements);

80.1.4    in the case of the Charterers, to any Sub-Charterers (but subject always to Clause 80.2 (*Permitted disclosure*)) in respect of obtaining any consent required under the terms of any relevant Sub-Charter; and

80.1.5    any Approved Commercial Managers, any Approved Technical Managers, any Approved Classification Society and flag authorities, in each case as may be necessary in connection with the transactions contemplated under this Charter.

**80.2    Permitted disclosure**

Any other disclosure by each Party shall be subject to the prior written consent of the other Party.

**81      Counterparts**

This Charter may be executed in any number of counterparts and any single counterpart or set of counterparts signed, in either case, by the Parties shall be deemed to constitute a full and original agreement for all purposes.

**82**     **Law and arbitration**

82.1    This Charter and any non-contractual obligations arising from or in connection with it are in all respects governed by and shall be interpreted in accordance with English law.

82.2    Any dispute, controversy, difference or claim arising out of or relating to this Charter, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof, save to the extent necessary to give effect to the provisions of this Clause.

82.3    The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

82.4    The seat of the arbitration shall be England, even where any hearing takes place outside England.

82.5    The reference shall be to three arbitrators, one to be appointed by each party and the third, subject to the provisions of the LMAA Terms, by the two so appointed.  A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified in the notice, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both Parties as if the sole arbitrator had been appointed by agreement.

82.6    Nothing herein shall prevent the Parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

82.7    The language of any and all arbitration proceedings shall be English.

82.8    The law governing this Clause 82 (*Law and arbitration*) shall be English law.

82.9    Notwithstanding this Clause 82 (*Law and arbitration*), it is agreed that in the event of any dispute or difference of opinion of a technical nature arising in regard to the technical operation and maintenance of the Vessel, her machinery and equipment, such dispute may, by mutual agreement at that time, be referred to the Approved Classification Society of the Vessel and in this case the opinion of the Approved Classification Society shall be final and binding on the Parties.

**83**     **Waiver of immunity**

83.1    To the extent that the Charterers may in any jurisdiction claim for themselves or their assets or revenues immunity from any proceedings, suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process

and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Charterers or their assets or revenues, the Charterers agree not to claim and irrevocably waive such immunity to the full extent permitted by the laws of such jurisdiction.

83.2    The Charterers consent generally in respect of any proceedings to the giving of any relief and the issue of any process in connection with such proceedings including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which is made or given in such proceedings. The Charterers agree that in any proceedings in England this waiver shall have the fullest scope permitted by the English State Immunity Act 1978 and that this waiver is intended to be irrevocable for the purposes of such Act.

**Schedule 1**

**Conditions precedent and subsequent**

**Part I**

**Conditions precedent to Charter**

| 1 | **Obligors** |
| --- | --- |

| (a) | **Constitutional documents** |

Copies of the constitutional documents (including any shareholder agreement) of each Obligor together with such other evidence as the Owners may reasonably require that each Obligor is duly incorporated in its country of incorporation and remains in existence with power to enter into, and perform its obligations under, the Transaction Documents to which it is or is to become a party.

| (b) | **Certificates of good standing** |

A certificate of good standing in respect of each Obligor (if such a certificate can be obtained).

| (c) | **Board resolutions** |

A copy of a resolution of the board of directors of each Obligor:

| (i) | approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party and resolving that it execute those Transaction Documents; and |

| (ii) | authorising a specified person or persons to execute those Transaction Documents (and all documents and notices to be signed and/or dispatched under those documents) on its behalf. |

| (d) | **Specimen signatures and passports copies** |

A specimen of the signature and a copy of the passport of each person actually executing any of the Transaction Documents pursuant to the resolutions referred to in paragraph (d) above.

| (e) | **Shareholder resolutions** |

If required for the purposes of any legal opinion to be delivered to the Owners or the Senior Finance Parties, a copy of a resolution signed by all the holders of the issued shares in each Obligor (other than an Approved Manager), approving the terms of, and the transactions contemplated by, the Transaction Documents (in the case of the Charterers only which are entered prior to the Actual Delivery Date) to which that Obligor is a party.

| (f) | **Officer's certificates** |

An original certificate of a duly authorised officer of each Obligor:

(i) certifying that each copy document relating to it specified in this Part I of Schedule 1 is correct, complete and in full force and effect; and

(ii) setting out the names of the directors, officers and shareholders of that Obligor and the proportion of shares held by each shareholder; and

(iii) confirming that guaranteeing or securing, as applicable or appropriate, the Secured Indebtedness would not cause any borrowing, guarantee, security or similar limit binding on that Obligor to be exceeded.

(g) **Powers of attorney**

The original power of attorney of each Obligor, notarially attested and legalised if required by the Owners, under which the Transaction Documents to which it is or is to become a party are to be executed or transactions undertaken by that Obligor.

**2      Transaction Documents and Project Documents**

(a) An original of each of the following:

(i) the duly executed MOA;

(ii) the duly executed Charter; and

(iii) each duly executed Security Document (except the Charterers' Assignment and any Managers' Undertakings), together with all notices, consents, acknowledgements, letters and other documents required to be received.

(b) A copy of each of Project Document.

**3      Insurance, vessel-related documents and Accounts**

(a) **Evidence of insurance**

Evidence that the Vessel is insured in the manner required by Clause 56 (*Insurance undertakings*) and that letters of undertaking will be issued in the manner required by the Security Documents, together with the written approval of the Insurances by an insurance adviser appointed by the Owners.

(b) **Technical documents**

A copy of each of the following:

(i) each duly executed Management Agreement;

(ii) the Vessel's current SMC;

(iii) the relevant Approved Managers' current DOC;

(iv)    the Vessel's Certificate of Confirmation of Class evidencing that it is free of all recommendations and requirements from the relevant Approved Classification Society;

(v)    Valuation Reports evidencing that the aggregate Market Value of the Vessel and the Related Vessels is not less than the aggregate of the Actual Owners' Cost and each Related Actual Owners' Cost to the satisfaction of the Owners which shall be dated no earlier than 15 Business Days before the Actual Delivery Date;

(vi)    the international tonnage certificate of the Vessel;

(vii)    if applicable, the Vessel's certificate of financial responsibility and vessel response plan;

(viii)    the Vessel's current ISSC; and

(ix)    the Vessel's current IAPPC,

in each case together with all addenda, amendments or supplements.

(c)    **Accounts**

(i)    Evidence that each Account (other than the Charterers' Cash Collection Account) has been or will be opened with the relevant Account Bank.

(ii)    Evidence that the Owners have received online viewing rights in respect of the HoldCo Cash Collection Account.

(d)    **Inspection report**

A report by a surveyor instructed by the Owners to inspect the Vessel confirming that the condition of the Vessel is in all respects acceptable to the Owners.

**4    Other documents and evidence**

(a)    **Process agent**

Evidence that any process agent appointed under any Transaction Document has accepted its appointment.

(b)    **Authorisations**

A copy of any other Authorisation or other document, opinion or assurance which the Owners consider to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by any Transaction Document or for the validity and enforceability of any Transaction Document.

(c)    **Original Financial Statements**

A copy of each Original Financial Statement.

(d)　　**Fees**

The Fee Letter duly executed and evidence that the fees, costs and expenses then due from the Charterers under Clauses 46 (*Fees*) and 49.3 (*Run-off indemnities*) have been paid or will be paid by the date of this Charter.

(e)　　**"Know your customer" documents**

Such documentation and other evidence as is reasonably requested by the Owners and the Senior Finance Parties in order for the Owners and the Senior Finance Parties to comply with all necessary "know your customer" or similar identification procedures in relation to the transactions contemplated in the Transaction Documents.

(f)　　**Approved Budget**

The Approved Budget.

(g)　　**Funds flow statement**

A funds flow statement in respect of the Charterers and HoldCo evidencing any equity contributions made in the Charterers or HoldCo.

**Part II**
**Conditions precedent to delivery**

1       **Obligors**

   (a)     **Shareholder resolutions**

           If required for the purposes of any legal opinion to be delivered to the
           Owners or the Senior Finance Parties, a copy of a resolution signed by all
           the holders of the issued shares in the Charterers, approving the terms of,
           and the transactions contemplated by, the Transaction Documents entered
           into on or after the Actual Delivery Date to which the Charterers are a party.

   (b)     **Officer's certificates**

           An original certificate of a duly authorised officer of each Obligor:

           (i)      certifying that each copy document relating to it specified in Part I
                    and this Part II of Schedule 1 is correct, complete and in full force
                    and effect; and

           (ii)     setting out the names of the directors, officers and shareholders of
                    that Obligor and the proportion of shares held by each shareholder;
                    and

           (iii)    confirming that guaranteeing or securing, as applicable or
                    appropriate, the Secured Indebtedness would not cause any
                    borrowing, guarantee, security or similar limit binding on that
                    Obligor to be exceeded.

2       **Transaction Documents and Project Documents**

   (a)     An original of the Charterers' Assignment and any Managers' Undertakings,
           together with all notices, consents, acknowledgements, letters and other
           documents required to be received;

   (b)     Copies of all documents deliverable under the Sale Agreement.

3       **Accounts**

   (a)     Evidence that the Minimum Liquidity Amount has been or will be credited
           into the Minimum Liquidity Account on or before the Actual Delivery Date.

   (b)     Evidence that the DDRA Amount has been or will be credited into the Dry
           Docking Reserve Account on or before the Actual Delivery Date.

   (c)     Evidence that the Initial Minimum Working Capital Amount has been or will
           be credited into the HoldCo Cash Collection Account on or before the Actual
           Delivery Date.

   (d)     Evidence that the Time Charter Deposit has been or will be transferred to
           the Owners' Earnings Account on or before the Actual Delivery Date.

4        **Legal opinions**

The following legal opinions, each addressed to the Owners and substantially in the form distributed to the Owners before the Actual Delivery Date, or confirmation satisfactory to the Owners that such opinions will be given:

(a)      a legal opinion of Stephenson Harwood LLP, legal advisers to the Owners as to English law; and

(b)      a legal opinion of the following legal advisers to the Owners:

      (i)      Poles, Tublin, Stratakis & Gonzalez LLP as to Marshall Islands law; and

      (ii)     Heuking Kühn Lüer Wojtek as to German law.

5        **Other documents and evidence**

(a)      **Fees**

Evidence that the fees, costs and expenses then due from the Charterers under Clauses 46 (*Fees*) and 49.3 (*Run-off indemnities*) have been paid or will be paid by the Actual Delivery Date.

(b)      **Existing Indebtedness and Existing Security**

Evidence that any Existing Financial Indebtedness and any Existing Security has been unconditionally and irrevocably discharged and that any Existing Security has been deregistered from all relevant official or public registries.

(c)      **Transfer of shares**

A copy of a stock transfer form or other evidence acceptable to the Owners that 100% of the shares in the Charterers have been transferred to HoldCo on the Actual Delivery Date.

(d)      **Indemnified Costs**

Evidence that any amounts then due from Myrtle and VFS to Fleetscape Finance I, Inc. ("**Fleetscape Finance I**") pursuant to the indemnity letter dated 4 February 2021 entered into between Myrtle, VFS and Fleetscape Finance I have been paid or will be paid by the Actual Delivery Date.

**Part III**
**Delivery conditions subsequent**

**1          Letters of undertaking**

Within 14 days after the Actual Delivery Date, letters of undertaking in respect of the Insurances as required by the Security Documents together with copies of the relevant policies or cover notes or entry certificates duly endorsed with the interest of the Owners.

**2          Acknowledgements of notices**

Within 14 days after the Actual Delivery Date (other than in respect of the Accounts Charge in respect of the Charterers' Cash Collection Account) and within 14 days after the date of the Accounts Charge in respect of the Charterers' Cash Collection Account, acknowledgements of all notices of assignment and/or charge given pursuant to any Security Documents.

**3          Legal opinions**

Within 14 days after the Actual Delivery Date, such of the legal opinions specified in Part I (*Delivery conditions precedent*) of this Schedule 1 as have not already been provided to the Owners **provided that** any legal opinion relating to the Accounts Charge in respect of the Charterers' Cash Collection Account may be provided within 14 days after the date of the Accounts Charge in respect of the Charterers' Cash Collection Account.

**4          Security and charges registration**

Evidence that the prescribed particulars of any Security Documents received by the Owners pursuant to Part I (*Delivery conditions precedent*) of this Schedule 1 have been delivered to the registrar of companies of the relevant Obligor's jurisdiction within the statutory time limit.

**5          Charterers' Cash Collection Account**

Within 14 days after the Actual Delivery Date, evidence that the Charterers' Cash Collection Account has been opened with the relevant Account Bank.

**Schedule 2**

**Termination Sum and Lease Principal Outstanding**[1]

| Period[2] | Termination Sum (US$) | Lease Principal Outstanding (US$) |
|---|---|---|
| The Actual Delivery Date until the end of the third Hire Period | 27,895,000 | 25,359,000 |
| The commencement of the fourth Hire Period until the end of the sixth Hire Period | 27,371,000 | 24,882,400 |
| The commencement of the seventh Hire Period until the end of the ninth Hire Period | 26,837,000 | 24,396,700 |
| The commencement of the tenth Hire Period until the end of the twelfth Hire Period | 26,293,000 | 23,902,000 |
| The commencement of the thirteenth Hire Period until the end of the fifteenth Hire Period | 24,568,000 | 23,398,000 |
| The commencement of the sixteenth Hire Period until the end of the eighteenth Hire Period | 24,029,000 | 22,884,600 |
| The commencement of the nineteenth Hire Period until the end of the twenty first Hire Period | 23,480,000 | 22,361,600 |
| The commencement of the twenty second Hire Period until the end of the twenty fourth Hire Period | 22,921,000 | 21,828,700 |

---

[1] The amounts of the Termination Sum and the Lease Principal Outstanding as set out in this Schedule 2 are subject to adjustment following the making of a prepayment made in accordance with this Charter subject to a floor of US$1.
[2] Each change in amount of the Termination Sum and the Lease Principal Outstanding at the commencement of each Period after the first Period set out in this Schedule 2 is conditional on the receipt by the Owners of all amounts due under the Transaction Documents on and prior to that date, failing which the Termination Sum and the Lease Principal Outstanding shall be adjusted by the amount actually received.

| Period[2] | Termination Sum (US$) | Lease Principal Outstanding (US$) |
|---|---|---|
| The commencement of the twenty fifth Hire Period until the end of the twenty seventh Hire Period | 21,925,000 | 21,285,900 |
| The commencement of the twenty eighth Hire Period until the end of the thirtieth Hire Period | 21,355,000 | 20,733,000 |
| The commencement of the thirty first Hire Period until the end of the thirty third Hire Period | 20,775,000 | 20,169,700 |
| The commencement of the thirty fourth Hire Period until the end of the thirty sixth Hire Period | 20,184,000 | 19,595,800 |
| The commencement of the thirty seventh Hire Period until the end of the thirty ninth Hire Period | 19,392,000 | 19,011,200 |
| The commencement of the fortieth Hire Period until the end of the forty second Hire Period | 18,784,000 | 18,415,700 |
| The commencement of the forty third Hire Period until the end of the forty fifth Hire Period | 18,166,000 | 17,809,000 |
| The commencement of the forty sixth Hire Period until the end of the forty eighth Hire Period | 17,535,000 | 17,190,900 |
| The commencement of the forty ninth Hire Period until the end of the fifty first Hire Period | 16,727,000 | 16,561,300 |

| Period[2] | Termination Sum (US$) | Lease Principal Outstanding (US$) |
|---|---|---|
| The commencement of the fifty second Hire Period until the end of the fifty fourth Hire Period | 16,080,000 | 15,920,000 |
| The commencement of the fifty fifth Hire Period until the end of the fifty seventh Hire Period | 15,420,000 | 15,266,500 |
| The commencement of the fifty eighth Hire Period until the end of the sixtieth Hire Period | 14,747,000 | 14,600,900 |
| The fifth anniversary of the Actual Delivery Date | 13,923,000 | 13,922,800 |

**Schedule 3**

**Form of Protocol of Delivery and Acceptance**

### PROTOCOL OF DELIVERY AND ACCEPTANCE

It is hereby certified that pursuant to a bareboat charter dated                              2021                      and made between **Fleetscape Suez Rajan, LLC** (the "**Owner**") as owner and **Suez Rajan Limited** (the "**Bareboat Charterer**") as bareboat charterer (as may be amended and supplemented from time to time, the "**Bareboat Charter**") in respect of one (1) motor vessel named "SUEZ RAJAN" and registered under the laws and flag of the Republic of Liberia with IMO number 9524475 (the "**Vessel**"), the Vessel is delivered for charter by the Owner to the Bareboat Charterer, and accepted by the Bareboat Charterer from the Owner at                      hours (London time) on the date hereof in accordance with the terms and conditions of the Bareboat Charter.

IN WITNESS WHEREOF, the Owner and the Bareboat Charterer have caused this PROTOCOL OF DELIVERY AND ACCEPTANCE to be executed by their duly authorised representative on this                day of                         2021 in                 .

**The Owner**

**Fleetscape Suez Rajan, LLC**

by:

| | |
|---|---|
| Name: | |

Name:

Title:

Date:

**The Bareboat Charterer**

**Suez Rajan Limited**

by:

Name:

Title:

Date:

**Schedule 4**

**Form of Title Transfer PDA**

**PROTOCOL OF DELIVERY AND ACCEPTANCE**

**"SUEZ RAJAN" (the "Vessel")**

Fleetscape Suez Rajan, LLC of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (the "**Owners**") deliver to Suez Rajan Limited of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (the "**Bareboat Charterers**") the Vessel described below and the Bareboat Charterers accept delivery of, title and risk to the Vessel pursuant to the terms and conditions of the bareboat charterer dated                2021 (as may be amended and supplemented from time to time) and made between (1) the Owners and (2) the Bareboat Charterers.

| | |
|---|---|
| Name of Vessel: | "SUEZ RAJAN" |
| Flag: | Liberia |
| Place of Registration: | Monrovia |
| IMO Number: | 9524475 |
| Gross Registered Tonnage: | 81,282 |
| Net Registered Tonnage: | 52,295 |
| Dated: | 202 |

At:          hours (London time)

Place of delivery:

| **The Owner** | **The Bareboat Charterer** |
|---|---|
| **Fleetscape Suez Rajan, LLC** | **Suez Rajan Limited** |
| by: | by: |

| | |
|---|---|
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

**Schedule 5**

**Form of KPI Report**

FLEETSC^PE                    **Facility: Monthly Information Request**

| | | Jan 2020 | Feb 2020 | Mar 2020 | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1** | **Net Earnings and Benchmarks** | | | | | | | | | | | | |
| a | eg. Net Earnings ($/day) and Benchmark used in TC1 | | | | | | | | | | | | |
| | Vessel 1 | | | | | | | | | | | | |
| | Vessel 2 | | | | | | | | | | | | |
| | Vessel 3 | | | | | | | | | | | | |
| | Vessel 4 | | | | | | | | | | | | |
| | Vessel 5 | | | | | | | | | | | | |
| | Vessel 6 | | | | | | | | | | | | |
| | Vessel 7 | | | | | | | | | | | | |
| | Vessel 8 | | | | | | | | | | | | |
| | Vessel 9 | | | | | | | | | | | | |
| | Vessel 10 | | | | | | | | | | | | |

Note: If the premium is derived by pool points please define pool earnings, points for individual vessel if applicable.

| | | Vessel 1 | Vessel 2 | Vessel 3 | Vessel 4 |
|---|---|---|---|---|---|
| **2** | **Employment** | | | | |
| a | Fixed Employment/Charterer Name | | | | |
| i | Duration | | | | |
| ii | Rate | | | | |
| iii | Options, floors, profit-shares | | | | |
| iv | Operating days over the last five years (breakdown by year) | | | | |
| b | Has the Company lost any contracts in the past 5yrs? If so then please explain the circumstances | | | | |
| c | Recent oil major approvals/inspection reports | | | | |

| | | Vessel 1 | Vessel 2 | Vessel 3 | Vessel 4 |
|---|---|---|---|---|---|
| **3** | **Account Balances** | | | | |
| a | i | Minimum liquidity | | | |
| | ii | Cash collection accounts | | | |
| | iii | DORA balance | | | |

| | | Vessel 1 | Vessel 2 | Vessel 3 | Vessel 4 |
|---|---|---|---|---|---|
| **4** | **Vessel Valuation** | | | | |
| a | i | Latest Fair Market Valuation | | | |

**Schedule 6        Senior Finance Documents Conditions Precedent**

1        **Corporate documents**

(a)        A copy of the constitutional documents of each Obligor (other than an Approved Manager).

(b)        A copy of a resolution of the board of directors of each Obligor (other than an Approved Manager):

    (i)        approving the terms of, and the transactions contemplated by, the Senior Finance Documents to which it is a party (including any Multipartite Agreement) and if required, an amendment agreement in respect of this Charter (its "**Relevant Documents**") and resolving that it execute, deliver and perform the Relevant Documents to which it is a party;

    (ii)        authorising a specified person or persons to execute its Relevant Documents on its behalf; and

    (iii)        authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with its Relevant Documents.

(c)        A specimen of the signature of each person who has signed, or shall sign, its Relevant Documents and related documents and who is authorised to do so by the relevant resolution referred to in paragraph (b) above.

(d)        (If required for the purposes of any legal opinion to be delivered to the Senior Finance Parties) a copy of a resolution signed by all the holders of the issued shares in each Obligor (other than an Approved Manager) approving the terms of, and the transactions contemplated by, its Relevant Documents.

(e)        (If required for the purposes of any legal opinion to be delivered to the Senior Finance Parties) a copy of a resolution of the board of directors of each corporate shareholder of each Obligor (other than an Approved Manager) approving the terms of the resolution referred to in paragraph (b) above.

(f)        A copy of any power of attorney under which any person is appointed by any Obligor (other than an Approved Manager) to execute any of its Relevant Documents on its behalf.

(g)        A certificate of an authorised signatory of each Obligor (other than an Approved Manager) certifying that each copy document relating to it specified in this Schedule 6 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of any facility agreement that is a Senior Finance Document and that any such resolutions or power of attorney have not been revoked.

(h)     A certificate of an authorised signatory of each Obligor (other than an Approved Manager) certifying that each copy document relating to it specified in this Schedule 6 remains correct, complete and in full force and effect as at a date no earlier than a date approved for this purpose and that any resolutions or power of attorney referred to in this Schedule 6 in relation to it have not been revoked or amended.

2     **Other documents and evidence**

(a)     If required, a duly executed amendment agreement in respect of this Charter.

(b)     A copy of any other Authorisation or other document, opinion or assurance which a Senior Finance Party considers to be necessary or desirable (if the Owners have notified the Charterers accordingly) in connection with the entry into and performance of the transactions contemplated by any Senior Finance Document or for the validity and enforceability of any Senior Finance Document.

(c)     The Original Financial Statements.

(d)     Evidence that any process agent appointed under any Senior Finance Document to which an Obligor is a party (including any Multipartite Agreement) has accepted its appointment.

3     **"Know your customer" information**

Such documentation and information as any Senior Finance Party may reasonably request to comply with "know your customer" or similar identification procedures under all laws and regulations applicable to that Senior Finance Party.

4     **Security**

(a)     The relevant Multipartite Agreement duly executed.

(b)     Any side letter or sub-manager's undertaking in respect of the Vessel duly executed by the relevant party named as an assured on the Vessel's insurance policies.

(c)     Duly executed notices of assignment and acknowledgements of those notices as required by any of the Senior Finance Documents.

5     **Vessel**

(a)     Evidence that the Vessel is classed with the Approved Classification free of all overdue requirements and recommendations of the relevant Approved Classification Society, by means of a Class Status Report or equivalent dated on the relevant Utilisation Date (as defined in the Senior Finance Documents).

(b)     Evidence that the Vessel is insured in the manner required by this Charter together with evidence that approved brokers, insurers and/or associations have issued or will issue letters of undertaking in favour of the Security

Agent (as defined in the Senior Finance Documents) in an approved form in relation to the Insurances.

(c)    The Declaration of Designated Person form in respect of the Vessel under the ISM Code.

(d)    The International Tonnage Certificate of the Vessel.

(e)    Valuations obtained not more than 15 Business Days before the relevant Utilisation Date (as defined in the Senior Finance Documents) evidencing that the LVR (as defined in the Senior Finance Documents) will be less than the Maximum LVR (as defined in the Senior Finance Documents) upon execution of the Senior Finance Documents.

(f)    Copies of the Vessel's certificate of financial responsibility and vessel response plan required under United States law and evidence of their approval by the appropriate United States government entity (if applicable).

6      **Intra Group Loan Assignment**

A copy, certified as a true and complete copy, by an approved person, of any loan agreement which is the subject of an Intra Group Loan Assignment.

**Schedule 7      List of Related Vessels and relevant information**

| Name of Vessel | IMO number | Related Owners | Related Charterers | Sub-Charterers | Flag |
|---|---|---|---|---|---|
| SUEZ RAJAN | 9524475 | Fleetscape Suez Rajan, LLC | Suez Rajan Limited | Tara Transport Corporation | Liberia |

**SIGNATURE PAGE**

**ADDITIONAL CLAUSES**

**TO BAREBOAT CHARTER FOR M.V. "SUEZ RAJAN"**

**THE OWNERS**

Fleetscape Suez Rajan, LLC

by:

**THE CHARTERERS**

Suez Rajan Limited

by:

Name:

Name: Effie P. Paraskevopoulou

Title:

Title: Director

Date:

Date:

**SIGNATURE PAGE**

**ADDITIONAL CLAUSES**

**TO BAREBOAT CHARTER FOR M.V. "SUEZ RAJAN"**

| | |
|---|---|
| **THE OWNERS** | **THE CHARTERERS** |
| Fleetscape Suez Rajan, LLC | Suez Rajan Limited |
| by: | by: |

Name:                              Name:

Title:    Jennifer Ashford          Title:

Date:    Attorney in fact          Date: