Exhibit 9

**Manager's Undertaking**

To:    Fleetscape Suez Rajan, LLC
       Trust Company Complex
       Ajeltake Road, Ajeltake Island
       Majuro MH96960
       Marshall Islands
       as "**Owner**"

and

Fleetscape Suez Hans, LLC
Trust Company Complex
Ajeltake Road
Ajeltake Island
Majuro MH96960
Marshall Islands

as "**Owner Security Trustee**"

4 March    2021

Dear Sirs

**m.v. "SUEZ RAJAN" (the "Vessel")**

**1      BACKGROUND**

**1.1     Entry into Charter**

We, Empire Navigation Inc., refer to the bareboat charter in respect of the Vessel dated                3 March                2021 (the "**Bareboat Charter**") and made between (i) the Owner as owner and (ii) Suez Rajan Limited as bareboat charterer (the "**Charterer**"), as from time to time amended or supplemented pursuant to which the Owner has bareboat chartered the Vessel owned by it to the Charterer on the terms and conditions thereof.

**1.2     Entry into Letter of Undertaking**

We have been advised that it is a condition of the Bareboat Charter that we should give you this Letter of Undertaking in your capacity as the Owner and as the Owner Security Trustee.

**2      DEFINITIONS**

(a)    In this Letter of Undertaking:

(i)    "**Creditor Parties**" means the Owner, the Related Owners and the Owner Security Trustee and "**Creditor Party**" means any one of them; and

(ii)   "**Indebtedness**" means the aggregate from time to time of all sums of any nature (together with all accrued and unpaid interest

on any of those sums) which are owed or payable by the Obligors or any of them to any of the Creditor Parties under or in connection with the Transaction Documents; and

(iii)   "**Mortgage Period**" means such time during the Charter Period when a Mortgage is in force.

(b)   Unless otherwise specified in this Letter of Undertaking, or unless the context otherwise requires, all words and expressions defined or explained in the Bareboat Charter shall have the same meanings when used in this Letter of Undertaking.

## 3   CONFIRMATION OF APPOINTMENT, ETC.

### 3.1   Confirmation of appointment

We confirm that we have been appointed by the Charterer as the commercial and technical manager of the Vessel on the terms of a management agreement dated on or around the date of this Letter of Undertaking (the "**Management Agreement**") a copy of which is attached to this Letter of Undertaking at Appendix A.

### 3.2   Certification

We certify that the attached copy of the Management Agreement is true, correct, complete and in full force and effect and that no addenda or supplements to it exist as at the date of this Letter of Undertaking.

## 4   UNDERTAKINGS

In consideration of the Owner granting its approval to our appointment as the manager of the Vessel, we irrevocably and unconditionally undertake with the Owner as follows in this Clause 4 (*Undertakings*):

(a)   we will remain the commercial and technical managers of the Vessel and will not, without your prior written consent (such consent not to be unreasonably withheld or delayed), sub-contract or delegate the commercial and technical management of the Vessel to any third party;

(b)   we shall upon your reasonable written request from time to time provide you with such information and documents as you may reasonably require about the Vessel and its insurances, earnings, operation and maintenance (including without limitation cash flow analyses and details of the operating costs of the Vessel); and

(c)   we shall not do or omit to do, or cause to be done or omitted to be done, anything which may be contrary to or incompatible with the obligations in respect of the insurance, operation or maintenance of the Vessel undertaken by the Charterer under the Bareboat Charter or under any document executed by the Charterer pursuant to the Bareboat Charter.

## 5   ASSIGNMENT OF INSURANCES

(a)   In order to secure the payment of the Indebtedness and the performance by the Charterer of all its other obligations under or arising out of the

Transaction Documents, we, with full title guarantee, assign and agree to assign absolutely and unconditionally to the Owner Security Trustee all our right, title and interest, present and future, in and to the Insurances.

(b)     We warrant that we have not disposed of, nor created or permitted any Security or other third party right to arise on or over, any of the Insurances.

(c)     We further undertake:

(i)     immediately following the execution of this Letter of Undertaking and at any other time required by you during the Agreement Term, to give written notice (materially in the form set out in Part 1 of Appendix B (*Form of Notice of Assignment to Insurers (outside Mortgage Period)*) or in such other form as you may require) to the underwriters (or, in the case of entries in protection and indemnity or war risks associations or clubs, to the managers of those associations or clubs) of the assignment of the Insurances contained in this Letter of Undertaking; and

(ii)    at any time required by you on or after the Actual Delivery Date during a Mortgage Period, to give written notice (materially in the form set out in Part 2 of Appendix B (*Form of Notice of Assignment to Insurers (within Mortgage Period)*) or in such other form as you and the relevant Senior Finance Party may approve) to the underwriters (or, in the case of entries in protection and indemnity or war risks associations or clubs, to the managers of those associations or clubs) of the assignment of the Insurances contained in this Letter of Undertaking; and

(iii)   immediately following the commencement of a period falling on or after the Actual Delivery Date which is not a Mortgage Period to procure that a loss payable clause (materially in the form set out in Part 1 of Appendix C (*Form of Loss Payable Clause (outside Mortgage Period)* or in such other form as you may approve) or, in the case of entries in a protection and indemnity association, a note of your interest in such form as you may approve (acting reasonably and having regard to industry practice for the relevant market in which the cover is placed), shall be endorsed on or attached to the policies, cover notes or certificates of entry relating to the Insurances and that letters of undertaking in such form as you may approve shall be issued to you by the brokers through whom the Insurances are placed (or, in the case of entries in protection and indemnity or war risks associations, by their managers); and

(iv)    at all times on and after the Actual Delivery Date during a Mortgage Period, to procure that a loss payable clause (materially in the form set out in Part 2 of Appendix C *(Form of Loss Payable Clause (within Mortgage Period)* or in such other form as you and the relevant Senior Finance Party may approve) or, in the case of entries in a protection and indemnity association, a note of the

relevant Senior Finance Party's interest in such form as you and the relevant Senior Finance Party may approve, shall be endorsed on or attached to the policies, cover notes or certificates of entry relating to the Insurances and that letters of undertaking in such form as that Senior Finance Party may approve shall be issued to that Senior Finance Party by the brokers through whom the Insurances are placed (or, in the case of entries in protection and indemnity or war risks associations, by their managers).

(d)     The Owner Security Trustee shall, at the Charterer's cost and upon our request, re-assign to us all our right, title and interest in the Insurances upon the Indebtedness being paid and discharged in full to your satisfaction.

## 6      SUBORDINATION

We also agree and undertake with you that all claims of whatsoever nature which we have or may have at any time against the Charterer or any of its property or assets (including, but without limitation, the Vessel or any share or interest in the Vessel or in her earnings, insurances or requisition compensation) shall rank after and be in all respects subordinate to any and all claims, whether actual or contingent, which any of the Creditor Parties has or may have at any time against the Charterer or any of its property or assets and that we will not without your prior written consent:

(a)     demand payment in whole or in part of any moneys owing to us by the Charterer in relation to our appointment as manager of the Vessel or under any agreement entered into by us with the Charterer providing for such appointment;

(b)     (from such time that we are aware that a Termination Event is continuing under the Bareboat Charter and for so long as any moneys remain owing to the Owner under the Bareboat Charter) accept payment in whole or in part of any moneys owing to us by the Charterer in relation to our appointment as manager of the Vessel or under any agreement entered into by us with the Charterer providing for such appointment;

(c)     take any steps to enforce our rights to recover any moneys owing to us by the Charterer and more particularly (but without limitation) take or issue any judicial or other legal proceedings against the Charterer or any of its property or assets (including, but without limitation, the Vessel or any share or interest in the Vessel or in her earnings, insurances or requisition compensation); or

(d)     prove in the liquidation or other dissolution of the Charterer or in any proceedings in connection with the Vessel, her earnings, insurances or requisition compensation in competition with any of the Creditor Parties.

## 7      NOTICES

Any notice to be sent to us in connection with this Letter of Undertaking should be sent to us at Empire Navigation Inc., 88 Vouliagmenis Avenue, 16777 Elliniko, Greece (email: vkoutsolakos@empirenavigation.com / attention: Mr. Vasileios Koutsolakos).

**8**      **LAW AND JURISDICTION**

(a)      This Letter of Undertaking and any non-contractual obligations arising from or in connection with it shall be governed by and construed in accordance with English law and for the exclusive benefit of the Creditor Parties we hereby submit to the exclusive jurisdiction of the English courts in connection with any dispute arising.

(b)      A person who is not a party to this Letter of Undertaking has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Letter of Undertaking.

(c)      Without prejudice to any other mode of service allowed under any relevant law, we:

         (i)      irrevocably appoint Empire Navigation (UK) Limited currently of 61 Brompton Road, 1st Floor, Knightsbridge, London SW3 1DP as our agent for service of process in relation to any proceedings before the English courts; and

     (ii)      agree that failure by a process agent to notify us of the process will not invalidate the proceedings concerned.

If any person approved as an agent for service of process is unable for any reason to act as agent for service of process, we must immediately (and in any event within five days of such event taking place) appoint another agent on terms acceptable to you. Failing this, you may appoint another agent for this purpose.

This Letter of Undertaking has been executed as a Deed and delivered on the date stated at the beginning of the Letter of Undertaking.

**EXECUTION PAGE**

| | |
|---|---|
| **EXECUTED AND DELIVERED AS A DEED** | ) |
| by **Empire Navigation Inc.** | ) |
| acting by _Effie P. Paraskevopoulou_ | ) |
| being | ) |
| in the presence of: _Director_ | ) |
| | ) |
| | ) |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: **KYRIAKOS SPILIOPOULOS** | ) |
| **13, II MERARCHIAS STREET** | |
| **PIRAEUS 185 35** | |

| | |
|---|---|
| **EXECUTED AND DELIVERED AS A DEED** | ) |
| by **Fleetscape Suez Rajan, LLC** ) | |
| acting by | ) |
| being an attorney-in-fact | ) |
| in the presence of: | ) |
| | ) |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

| | |
|---|---|
| **EXECUTED AND DELIVERED AS A DEED** | ) |
| by **Fleetscape Suez Hans, LLC** | ) |
| acting by | ) |
| being an attorney-in-fact | ) |
| in the presence of: | ) |
| | ) |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

## EXECUTION PAGE

**EXECUTED AND DELIVERED AS A DEED**    )
by **Empire Navigation Inc.**    )
acting by    )
being    )
in the presence of:    )
    )
    )
Witness' signature:    )
Witness' name:    )
Witness' address:    )

**EXECUTED AND DELIVERED AS A DEED**    )
by **Fleetscape Suez Rajan, LLC**    )
acting by    )
being an attorney-in-fact    )
in the presence of:    )
    )
    )
Witness' signature: S C    )
Witness' name: 514 Barnacres Road    )
Witness' address:    )
    Hemel Hempstead
    Hertfordshire
    HP3 8BW

Jennifer Ashford
Attorney in fact

**EXECUTED AND DELIVERED AS A DEED**    )
by **Fleetscape Suez Hans, LLC**    )
acting by    )
being an attorney-in-fact    )
in the presence of:    )
    )
    )
Witness' signature: S C    )
Witness' name: STUART CHILD    )
Witness' address:    )
    514 Barnacres Road
    Hemel Hempstead
    Hertfordshire
    HP3 8BW

Jennifer Ashford
Attorney in fact

**Appendix A**
**Management Agreement**



# SHIPMAN 2009

**STANDARD
SHIP MANAGEMENT AGREEMENT**      **PART I**

| | |
|---|---|
| **1.** Place and date of Agreement<br>ATHENS, GREECE<br>3rd March 2021 | **2.** Date of commencement of Agreement (Cl. 2, 12, 21 and 25)<br>3rd March 2021 |
| **3.** Owners (name, place of registered office and law of registry) (Cl. 1)<br>(i) SUEZ RAJAN LIMITED<br>(ii) Place of registered office: Majuro, Marshall Islands<br>(iii) Law of registry: Marshall Islands | **4.** Managers (name, place of registered office and law of registry) (Cl. 1)<br>(i) Name: EMPIRE NAVIGATION INC.<br>(ii) Place of registered office: 88, Vouliagmenis Ave, Elliniko, 167 77, Greece<br>(iii) Law of registry: Greece |
| **5.** The Company (with reference to the ISM/ISPS Codes) (state name and IMO Unique Company Identification number. If the Company is a third party then also state registered office and principal place of business) (Cl. 1 and 9(c)(i))<br>(i) Name: Empire EMPIRE NAVIGATION INC.<br>(ii)IMO Unique Company Identification number: 5489554<br>(iii) Place of registered office: 88, Vouliagmenis Ave, Elliniko, 167 77, Greece<br>(iv) Principal place of business: GREECE | **6.** Technical Management (state "yes" or "no" as agreed) (Cl. 4)<br>YES |
| | **7.** Crew Management (state "yes" or "no" as agreed) (Cl. 5(a))<br>*GLOBAL SEAWAYS S.A.* |
| | **8.** Commercial Management (state "yes" or "no" as agreed) (Cl. 6)<br>YES |
| **9.** Chartering Services period (only to be filled in if "yes" stated in Box 8) (Cl.6(a))<br>60 months | **10.** Crew Insurance arrangements (state "yes" or "no" as agreed)<br>(i) Crew Insurances* (Cl. 5(b)): YES<br>(ii) Insurance for persons proceeding to sea onboard (Cl. 5(b)(i)): YES<br>*only to apply if Crew Management (Cl. 5(a)) agreed (see Box 7) |
| **11.** Insurance arrangements (state "yes" or "no" as agreed) (Cl. 7)<br>YES | **12.** Optional insurances (state optional insurance(s) as agreed, such as piracy, kidnap and ransom, loss of hire and FD&D) (Cl. 10(a)(iv))<br>Piracy, kidnap & ransom and FD&D |
| **13.** Interest (state rate of interest to apply after due date to outstanding sums) (Cl. 9(a))<br>2% per annum | **14.** Annual management fee (state annual amount) (Cl. 12(a))<br>United States Dollars Five Hundred (US$500), 2% inflation on each anniversary date of the agreement |
| **15.** Manager's nominated account (Cl.12(a))<br>Bank Name : CREDIT SUISSE AG<br>Account name : Empire Navigation Inc<br>Account Number: 1505806-42-2<br>IBAN Number: CH5304866150580642002<br>SWIFT Code: CRESCHZHXXX<br><br>USD CORRESPONDENT BANK : THE BANK OF NEW YORK MELLON<br>SWIFT : IRVTUS3NXXX | **16.** Daily rate (state rate for days in excess of those agreed in budget) (Cl. 12(c))<br>In case attendances on board exceed 25 days per year (including days for travelling), the daily rate is $400 per day plus travelling and accommodation expenses charged at cost. |
| | **17.** Lay-up period / number of months (Cl.12(d))<br>6 |
| **18.** Minimum contract period (state number of months) (Cl. 21(a))<br>60 months | **19.** Management fee on termination (state number of months to apply) (Cl. 22(g))<br>90 days |
| **20.** Severance Costs (state maximum amount) (Cl. 22(h)(ii))<br>Based on actual, according to officers' contracts and crews' collective bargaining agreements | **21.** Dispute Resolution (state alternative Cl. 23(a), 23(b) or 23(c); if Cl. 23(c) is agreed, place of arbitration must be stated) (Cl. 23)<br>Clause 23(a) |



| 22. Notices (state full style contact details for serving notice and communication to the Owners) (Cl. 24) | 23. Notices (state full style contact details for serving notice and communication to the Managers) Cl. 24) |
|---|---|
| **OWNER: SUEZ RAJAN SHIPPING LIMITED** | |
| **c/o EMPIRE NAVIGATION INC.** | **EMPIRE NAVIGATION INC.** |
| **88 Vouliagmenis Avenue** | **88 Vouliagmenis Avenue** |
| **Elliniko 167 77** | **Elliniko 167 77** |
| **GREECE** | **GREECE** |
| **E-mail address:** | **E-mail address:** |
| vkoutsolakos@empirenavigation.com | vkoutsolakos@empirenavigation.com |
| **Telephone No:  +30 211 10 24 000** | **Telephone No:  +30 211 10 24 000** |
| **Fax No:   +30 210 96 04 210** | **Fax No:   +30 210 96 04 210** |

It is mutually agreed between the party stated in Box 3 and the party stated in Box 4 that this Agreement consisting of PART I and PART II as well as Annexes "A" (Details of Vessel or Vessels), "B" (Details of Crew), "C" (Budget), "D" (Associated Vessels) and "E" (Fee Schedule) attached hereto, shall be performed subject to the conditions contained herein. In the event of a conflict of conditions, the provisions of PART I and Annexes "A", "B", "C", "D" and "E" shall prevail over those of PART II to the extent of such conflict but no further.

| Signature(s) (Owners) | Signature(s) (Managers) |
|---|---|
| EFFIE P. PARASKEVOPOULOU | VASILEIOS KOUTSOLAKOS |

Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).

PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

**SECTION 1 – Basis of the Agreement**

1. **Definitions**

   In this Agreement save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them:

   "Company" (with reference to the ISM Code and the ISPS Code) means the organization identified in Box 5 or any replacement organization appointed by the Owners from time to time (see Sub-clauses 9(b)(i) or 9(c)(ii), whichever is applicable).

   "Crew" means the personnel of the numbers, rank and nationality specified in Annex "B" hereto.

   "Crew Insurances" means insurance of liabilities in respect of crew risks which shall include but not be limited to death, permanent disability, sickness, injury, repatriation, shipwreck unemployment indemnity and loss of personal effects (see Sub-clause 5(b) (Crew Insurances) and Clause 7 (Insurance Arrangements) and Clause 10 (Insurance Policies) and Boxes 10 and 11).

   "Crew Support Costs" means all expenses of a general nature which are not particularly referable to any individual vessel for the time being managed by the Managers and which are incurred by the Managers for the purpose of providing an efficient and economic management service and, without prejudice to the generality of the foregoing, shall include the cost of crew standby pay, training schemes for officers and ratings, cadet training schemes, sick pay, study pay, recruitment and interviews.

   "Flag State" means the State whose flag the Vessel is flying.

   "ISM Code" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention and any amendment thereto or substitution therefor.

   "ISPS Code" means the International Code for the Security of Ships and Port Facilities and the relevant amendments to Chapter XI of SOLAS and any amendment thereto or substitution therefor.

   "Managers" means the party identified in Box 4.

   "Management Services" means the services specified in SECTION 2 - Services (Clauses 4 through 7) as indicated affirmatively in Boxes 6 through 8, 10 and 11, and all other functions performed by the Managers under the terms of this Agreement.

   "Owners" means the party identified in Box 3.

   "Severance Costs" means the costs which are legally required to be paid to the Crew as a result of the early termination of any contracts for service on the Vessel.

   "SMS" means the Safety Management System (as defined by the ISM Code).

   "STCW 95" means the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 and any amendment thereto or substitution therefor.

   "Vessel" means the vessel or vessels details of which are set out in Annex "A" attached hereto.

2. **Commencement and Appointment**

   With effect from the date stated in Box 2 for the commencement of the Management Services and continuing unless and until terminated as provided herein, the Owners hereby appoint the Managers and the Managers hereby agree to act as the Managers of the Vessel in respect of the Management Services.

Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009.
Approved by the International Ship Managers' Association (InterManager).

NIOLOS LAW FIRM REF. NUM.: 1.514.543

1



PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

3.    **Authority of the Managers**

Subject to the terms and conditions herein provided, during the period of this Agreement the Managers shall carry out the Management Services in respect of the Vessel as agents for and on behalf of the Owners. The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform the Management Services in accordance with sound ship management practice, including but not limited to compliance with all relevant rules and regulations.

**SECTION 2 – Services**

4.    **Technical Management**

(only applicable if agreed according to Box 6).

The Managers shall provide technical management which includes, but is not limited to, the following services:

(a)   ensuring that the Vessel complies with the requirements of the law of the Flag State;

(b)   ensuring compliance with the ISM Code;

(c)   ensuring compliance with the ISPS Code;

(d)   providing competent personnel to supervise the maintenance and general efficiency of the Vessel;

(e)   arranging and supervising dry dockings, repairs, alterations and the maintenance of the Vessel to the standards agreed with the Owners provided that the Managers shall be entitled to incur the necessary expenditure to ensure that the Vessel will comply with all requirements and recommendations of the classification society, and with the law of the Flag State and of the places where the Vessel is required to trade;

(f)   arranging the supply of necessary stores, spares and lubricating oil;

(g)   appointing surveyors and technical consultants as the Managers may consider from time to time to be necessary;

(h)   in accordance with the Owners' instructions, supervising the sale and physical delivery of the Vessel under the sale agreement. However services under this Sub-clause 4(h) shall not include negotiation of the sale agreement or transfer of ownership of the Vessel;

(i)   arranging for the supply of provisions unless provided by the Owners; and

(j)   arranging for the sampling and testing of bunkers.

5.    **Crew Management and Crew Insurances**

(a)   Crew Management

(only applicable if agreed according to Box 7)

The Managers shall provide suitably qualified Crew who shall comply with the requirements of STCW 95. The provision of such crew management services includes, but is not limited to, the following services:

(i) selecting, engaging and providing for the administration of the Crew, including, as applicable, payroll arrangements, pension arrangements, tax, social security contributions and other mandatory dues related to their employment payable in each Crew member's country of domicile;

(ii) ensuring that the applicable requirements of the law of the Flag State in respect of rank, qualification and certification of the Crew and employment regulations, such as Crew's tax and social insurance, are satisfied;

VIOLOS LAW FIRM SH. num: 279164-A   Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).

PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

(iii) ensuring that all Crew have passed a medical examination with a qualified doctor certifying that they are fit for the duties for which they are engaged and are in possession of valid medical certificates issued in accordance with appropriate Flag State requirements or such higher standard of medical examination as may be agreed with the Owners. In the absence of applicable Flag State requirements the medical certificate shall be valid at the time when the respective Crew member arrives on board the Vessel and shall be maintained for the duration of the service on board the Vessel;

(iv) ensuring that the Crew shall have a common working language and a command of the English language of a sufficient standard to enable them to perform their duties safely;

(v) arranging transportation of the Crew, including repatriation;

(vi) training of the Crew;

(vii) conducting union negotiations; and

(viii) if the Managers are the Company, ensuring that the Crew, on joining the Vessel, are given proper familiarisation with their duties in relation to the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

(ix) If the Managers are not the Company:

(1)    ensuring that the Crew, before joining the Vessel, are given proper familiarisation with their duties in relation to the ISM Code; and

(2)    instructing the Crew to obey all reasonable orders of the Company in connection with the operation of the SMS.

(x) Where Managers are not providing technical management services in accordance with Clause 4 (Technical Management):

(1)    ensuring that no person connected to the provision and the performance of the crew management services shall proceed to sea on board the Vessel without the prior consent of the Owners (such consent not to be unreasonably withheld); and

(2)    ensuring that in the event that the Owners' drug and alcohol policy requires measures to be taken prior to the Crew joining the Vessel, implementing such measures;

(b)    Crew Insurances

(only applicable if Sub-clause 5(a) applies and if agreed according to Box 10)

The Managers shall throughout the period of this Agreement provide the following services:

(i)    arranging Crew Insurances in accordance with the best practice of prudent managers of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations. Insurances for any other persons proceeding to sea onboard the Vessel may be separately agreed by the Owners and the Managers (see Box 10);

(ii)    ensuring that the Owners are aware of the terms, conditions, exceptions and limits of liability of the insurances in Sub-clause 5(b)(i);

(iii)    ensuring that all premiums or calls in respect of the insurances in Sub-clause 5(b)(i) are paid by their due date;

(iv)    if obtainable at no additional cost, ensuring that insurances in Sub-clause 5(b)(i) name the Owners as a joint assured with full cover and, unless otherwise agreed, on terms such that Owners shall be under no liability in respect of premiums or calls arising in connection with such insurances.

(v)    providing written evidence, to the reasonable satisfaction of the Owners, of the Managers' compliance

NIOLOS LAW FIRM — RULE 45.3.3.1    Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).



PART II
**SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT**

with their obligations under Sub-clauses 5(b)(ii) and 5(b)(iii) within a reasonable time of the commencement of this Agreement, and of each renewal date and, if specifically requested, of each payment date of the insurances in Sub-clause 5(b)(i).

6. **Commercial Management**

(only applicable if agreed according to Box 8).

The Managers shall provide the following services for the Vessel in accordance with the Owners' instructions, which shall include but not be limited to:

(a) seeking and negotiating employment for the Vessel and the conclusion (including the execution thereof) of charter parties or other contracts relating to the employment of the Vessel. If such a contract exceeds the period stated in Box 9, consent thereto in writing shall first be obtained from the Owners;

(b) arranging for the provision of bunker fuels of the quality specified by the Owners as required for the Vessel's trade;

(c) voyage estimating and accounting and calculation of hire, freights, demurrage and/or despatch monies due from or due to the charterers of the Vessel; assisting in the collection of any sums due to the Owners related to the commercial operation of the Vessel in accordance with Clause 11 (Income Collected and Expenses Paid on Behalf of Owners);

If any of the services under Sub-clauses 6(a), 6(b) and 6(c) are to be excluded from the Management Fee, remuneration for these services must be stated in Annex E (Fee Schedule). See Sub-clause 12(e).

(d) issuing voyage instructions;

(e) appointing agents;

(f) appointing stevedores; and

(g) arranging surveys associated with the commercial operation of the Vessel.

7. **Insurance Arrangements**

(only applicable if agreed according to Box 11).

The Managers shall arrange insurances in accordance with Clause 10 (Insurance Policies), on such terms as the Owners shall have instructed or agreed, in particular regarding conditions, insured values, deductibles, franchises and limits of liability.

**SECTION 3 – Obligations**

8. **Managers' Obligations**

(a) The Managers undertake to use their best endeavours to provide the Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services hereunder.

Provided however, that in the performance of their management responsibilities under this Agreement, the Managers shall be entitled to have regard to their overall responsibility in relation to all vessels as may from time to time be entrusted to their management and in particular, but without prejudice to the generality of the foregoing, the Managers shall be entitled to allocate available supplies, manpower and services in such manner as in the prevailing circumstances the Managers in their absolute discretion consider to be fair and reasonable.

(b) Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), they shall procure that the requirements of the Flag State are satisfied and they shall agree to be appointed as the Company, assuming the responsibility for the operation of the Vessel and taking over the duties

VIOLOS Law Firm Ltd. Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).

PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT
and responsibilities imposed by the ISM Code and the ISPS Code, if applicable.

9.   **Owners' Obligations**

(a)   The Owners shall pay all sums due to the Managers punctually in accordance with the terms of this Agreement. In the event of payment after the due date of any outstanding sums the Manager shall be entitled to charge interest at the rate stated in Box 13.

(b)   Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

(i) report (or where the Owners are not the registered owners of the Vessel procure that the registered owners report) to the Flag State administration the details of the Managers as the Company as required to comply with the ISM and ISPS Codes;

(ii) procure that any officers and ratings supplied by them or on their behalf comply with the requirements of STCW 95; and

(iii) instruct such officers and ratings to obey all reasonable orders of the Managers (in their capacity as the Company) in connection with the operation of the Managers' safety management system.

(c)   Where the Managers are not providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

(i) procure that the requirements of the Flag State are satisfied and notify the Managers upon execution of this Agreement of the name and contact details of the organization that will be the Company by completing Box 5;

(ii) if the Company changes at any time during this Agreement, notify the Managers in a timely manner of the name and contact details of the new organization;

(iii) procure that the details of the Company, including any change thereof, are reported to the Flag State administration as required to comply with the ISM and ISPS Codes. The Owners shall advise the Managers in a timely manner when the Flag State administration has approved the Company; and

(iv) unless otherwise agreed, arrange for the supply of provisions at their own expense.

(d)   Where the Managers are providing crew management services in accordance with Sub-clause 5(a) the Owners shall:

(i) inform the Managers prior to ordering the Vessel to any excluded or additional premium area under any of the Owners' Insurances by reason of war risks and/or piracy or like perils and pay whatever additional costs may properly be incurred by the Managers as a consequence of such orders including, if necessary, the costs of replacing any member of the Crew. Any delays resulting from negotiation with or replacement of any member of the Crew as a result of the Vessel being ordered to such an area shall be for the Owners' account. Should the Vessel be within an area which becomes an excluded or additional premium area the above provisions relating to cost and delay shall apply;

(ii) agree with the Managers prior to any change of flag of the Vessel and pay whatever additional costs may properly be incurred by the Managers as a consequence of such change. If agreement cannot be reached then either party may terminate this Agreement in accordance with Sub-clause 22(e); and

(iii) provide, at no cost to the Managers, in accordance with the requirements of the law of the Flag State, or higher standard, as mutually agreed, adequate Crew accommodation and living standards.

(e)   Where the Managers are not the Company, the Owners shall ensure that Crew are properly familiarised with their duties in accordance with the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

NIOLOS Law Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).

PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

**SECTION 4 – Insurance, Budgets, Income, Expenses and Fees**

10. **Insurance Policies**

The Owners shall procure, whether by instructing the Managers under Clause 7 (Insurance Arrangements) or otherwise, that throughout the period of this Agreement:

(a) at the Owners' expense, the Vessel is insured for not less than its sound market value or entered for its full gross tonnage, as the case may be for:

(i) hull and machinery marine risks (including but not limited to crew negligence) and excess liabilities;

(ii) protection and indemnity risks (including but not limited to pollution risks, diversion expenses and, except to the extent insured separately by the Managers in accordance with Sub-clause 5(b)(i), Crew Insurances);

NOTE: If the Managers are not providing crew management services under Sub-clause 5(a) (Crew Management) or have agreed not to provide Crew Insurances separately in accordance with Sub-clause 5(b)(i), then such insurances must be included in the protection and indemnity risks cover for the Vessel (see Sub-clause 10(a)(ii) above).

(iii) war risks (including but not limited to blocking and trapping, protection and indemnity, terrorism and crew risks); and

(iv) such optional insurances as may be agreed (such as piracy, kidnap and ransom, loss of hire and FD & D) (see Box 12)

Sub-clauses 10(a)(i) through 10(a)(iv) all in accordance with the best practice of prudent owners of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations ("the Owners' Insurances");

(b) all premiums and calls on the Owners' Insurances are paid by their due date;

(c) the Owners' Insurances name the Managers and, subject to underwriters' agreement, any third party designated by the Managers as a joint assured, with full cover. It is understood that in some cases, such as protection and indemnity, the normal terms for such cover may impose on the Managers and any such third party a liability in respect of premiums or calls arising in connection with the Owners' Insurances.

If obtainable at no additional cost, however, the Owners shall procure such insurances on terms such that neither the Managers nor any such third party shall be under any liability in respect of premiums or calls arising in connection with the Owners' Insurances. In any event, on termination of this Agreement in accordance with Clause 21 (Duration of the Agreement) and Clause 22 (Termination), the Owners shall procure that the Managers and any third party designated by the Managers as joint assured shall cease to be joint assured and, if reasonably achievable, that they shall be released from any and all liability for premiums and calls that may arise in relation to the period of this Agreement; and

(d) written evidence is provided, to the reasonable satisfaction of the Managers, of the Owners' compliance with their obligations under this Clause 10 within a reasonable time of the commencement of the Agreement, and of each renewal date and, if specifically requested, of each payment date of the Owners' Insurances.

11. **Income Collected and Expenses Paid on Behalf of Owners**

(a) Except as provided in Sub-clause 11(c) all monies collected by the Managers under the terms of this Agreement (other than monies payable by the Owners to the Managers) and any interest thereon shall be held to the credit of the Owners in a separate bank account.

(b) All expenses incurred by the Managers under the terms of this Agreement on behalf of the Owners (including expenses as provided in Clause 12(c)) may be debited against the Owners in the account referred to under Sub-clause 11(a) but shall in any event remain payable by the Owners to the Managers on demand.

VIOLOS Law Group, LLC. Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).

PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

(c)     All monies collected by the Managers under Clause 6 (Commercial Management) shall be paid into a bank account in the name of the Owners or as may be otherwise advised by the Owners in writing.

**12.     Management Fee and Expenses**

(a)     The Owners shall pay to the Managers an annual management fee as stated in Box 14 for their services as Managers under this Agreement, which shall be payable in equal monthly instalments in advance, the first instalment (pro rata if appropriate) being payable on the commencement of this Agreement (see Clause 2 (Commencement and Appointment) and Box 2) and subsequent instalments being payable at the beginning of every calendar month. The management fee shall be payable to the Managers' nominated account stated in Box 15.

(b)     The management fee shall be subject to an annual review and the proposed fee shall be presented in the annual budget in accordance with Sub-clause 13(a).

(c)     The Managers shall, at no extra cost to the Owners, provide their own office accommodation, office staff, facilities and stationery. Without limiting the generality of this Clause 12 (Management Fee and Expenses) the Owners shall reimburse the Managers for postage and communication expenses, travelling expenses, and other out of pocket expenses properly incurred by the Managers in pursuance of the Management Services.

Any days used by the Managers' personnel travelling to or from or attending on the Vessel or otherwise used in connection with the Management Services in excess of those agreed in the budget shall be charged at the daily rate stated in Box 16.

(d)     If the Owners decide to layup the Vessel and such layup lasts for more than the number of months stated in Box 17, an appropriate reduction of the Management Fee for the period exceeding such period until one month before the Vessel is again put into service shall be mutually agreed between the parties. If the Managers are providing crew management services in accordance with Sub-clause 5(a), consequential costs of reduction and reinstatement of the Crew shall be for the Owners' account. If agreement cannot be reached then either party may terminate this Agreement in accordance with Sub-clause 22(e).

(e)     Save as otherwise provided in this Agreement, all discounts and commissions obtained by the Managers in the course of the performance of the Management Services shall be credited to the Owners.

**13.     Budgets and Management of Funds**

(a)     The Managers' initial budget is set out in Annex "C" hereto. Subsequent budgets shall be for twelve month periods and shall be prepared by the Managers and presented to the Owners not less than three months before the end of the budget year.

(b)     The Owners shall state to the Managers in a timely manner, but in any event within one month of presentation, whether or not they agree to each proposed annual budget. The parties shall negotiate in good faith and if they fail to agree on the annual budget, including the management fee, either party may terminate this Agreement in accordance with Sub-clause 22(e).

(c)     Following the agreement of the budget, the Managers shall prepare and present to the Owners their estimate of the working capital requirement for the Vessel and shall each month request the Owners in writing to pay the funds required to run the Vessel for the ensuing month, including the payment of any occasional or extraordinary item of expenditure, such as emergency repair costs, additional insurance premiums, bunkers or provisions. Such funds shall be received by the Managers within ten running days after the receipt by the Owners of the Managers' written request and shall be held to the credit of the Owners in a separate bank account.

(d)     The Managers shall at all times maintain and keep true and correct accounts in respect of the Management Services in accordance with the relevant International Financial Reporting Standards or such other standard as the parties may agree, including records of all costs and expenditure incurred, and produce a comparison between budgeted and actual income and expenditure of the Vessel in such form and at such intervals as shall be mutually agreed.

The Managers shall make such accounts available for inspection and auditing by the Owners and/or their

VIOLOS Law Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).

PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

representatives in the Managers' offices or by electronic means, provided reasonable notice is given by the Owners.

(e)   Notwithstanding anything contained herein, the Managers shall in no circumstances be required to use or commit their own funds to finance the provision of the Management Services.

## SECTION 5 – Legal, General and Duration of Agreement

**14.   Trading Restrictions**

If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners and the Managers will, prior to the commencement of this Agreement, agree on any trading restrictions to the Vessel that may result from the terms and conditions of the Crew's employment.

**15.   Replacement**

If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners may require the replacement, at their own expense, at the next reasonable opportunity, of any member of the Crew found on reasonable grounds to be unsuitable for service. If the Managers have failed to fulfil their obligations in providing suitable qualified Crew within the meaning of Sub-clause 5(a) (Crew Management), then such replacement shall be at the Managers' expense.

**16.   Managers' Right to Sub-Contract**

The Managers shall not subcontract any of their obligations hereunder without the prior written consent of the Owners which shall not be unreasonably withheld. In the event of such a sub-contract the Managers shall remain fully liable for the due performance of their obligations under this Agreement.

**17.   Responsibilities**

(a)   Force Majeure

Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent that the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Agreement, provided they have made all reasonable efforts to avoid, minimise or prevent the effect of such events and/or conditions:

(i) acts of God;

(ii) any Government requisition, control, intervention, requirement or interference;

(iii) any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;

(iv) riots, civil commotion, blockades or embargoes;

(v) epidemics;

(vi) earthquakes, landslides, floods or other extraordinary weather conditions;

(vii) strikes, lockouts or other industrial action, unless limited to the employees (which shall not include the Crew) of the party seeking to invoke force majeure;

(viii) fire, accident, explosion except where caused by negligence of the party seeking to invoke force majeure; and

(ix) any other similar cause beyond the reasonable control of either party.

(b)   Liability to Owners

VIOLOS Law Firm   Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).



PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

(i) Without prejudice to Sub-clause 17(a), the Managers shall be under no liability whatsoever to the Owners for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect, (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Vessel) and howsoever arising in the course of performance of the Management Services UNLESS same is proved to have resulted solely from the negligence, gross negligence or wilful default of the Managers or their employees or agents, or sub-contractors employed by them in connection with the Vessel, in which case (save where loss, damage, delay or expense has resulted from the Managers' personal act or omission committed with the intent to cause same or recklessly and with knowledge that such loss, damage, delay or expense would probably result) the Managers' liability for each incident or series of incidents giving rise to a claim or claims shall never exceed a total of ten (10) times the annual management fee payable hereunder.

(ii) Acts or omissions of the Crew - Notwithstanding anything that may appear to the contrary in this Agreement, the Managers shall not be liable for any acts or omissions of the Crew, even if such acts or omissions are negligent, grossly negligent or wilful, except only to the extent that they are shown to have resulted from a failure by the Managers to discharge their obligations under Clause 5(a) (Crew Management), in which case their liability shall be limited in accordance with the terms of this Clause 17 (Responsibilities).

(c)     Indemnity

Except to the extent and solely for the amount therein set out that the Managers would be liable under Sub-clause 17(b), the Owners hereby undertake to keep the Managers and their employees, agents and sub-contractors indemnified and to hold them harmless against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them or incurred or suffered by them arising out of or in connection with the performance of this Agreement, and against and in respect of all costs, loss, damages and expenses (including legal costs and expenses on a full indemnity basis) which the Managers may suffer or incur (either directly or indirectly) in the course of the performance of this Agreement.

(d)     "Himalaya"

It is hereby expressly agreed that no employee or agent of the Managers (including every sub-contractor from time to time employed by the Managers) shall in any circumstances whatsoever be under any liability whatsoever to the Owners for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment and, without prejudice to the generality of the foregoing provisions in this Clause 17 (Responsibilities), every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defence and immunity of whatsoever nature applicable to the Managers or to which the Managers are entitled hereunder shall also be available and shall extend to protect every such employee or agent of the Managers acting as aforesaid and for the purpose of all the foregoing provisions of this Clause 17 (Responsibilities) the Managers are or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be their servants or agents from time to time (including sub-contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this Agreement.

18.     General Administration

(a)     The Managers shall keep the Owners and, if appropriate, the Company informed in a timely manner of any incident of which the Managers become aware which gives or may give rise to delay to the Vessel or claims or disputes involving third parties.

(b)     The Managers shall handle and settle all claims and disputes arising out of the Management Services hereunder, unless the Owners instruct the Managers otherwise. The Managers shall keep the Owners appropriately informed in a timely manner throughout the handling of such claims and disputes.

(c)     The Owners may request the Managers to bring or defend other actions, suits or proceedings related to the Management Services, on terms to be agreed.

(d)     The Managers shall have power to obtain appropriate legal or technical or other outside expert advice in relation to the handling and settlement of claims in relation to Sub-clauses 18(a) and 18(b) and disputes and any other matters affecting the interests of the Owners in respect of the Vessel, unless the Owners instruct the Managers

VIOLOS Law Firm...
Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).

otherwise.

(e)     On giving reasonable notice, the Owners may request, and the Managers shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement either related to mandatory rules or regulations or other obligations applying to the Owners in respect of the Vessel (including but not limited to STCW 95, the ISM Code and ISPS Code) to the extent permitted by relevant legislation.

On giving reasonable notice, the Managers may request, and the Owners shall in a timely manner make available, all documentation, information and records reasonably required by the Managers to enable them to perform the Management Services.

(f)     The Owners shall arrange for the provision of any necessary guarantee bond or other security.

(g)     Any costs incurred by the Managers in carrying out their obligations according to this Clause 18 (General Administration) shall be reimbursed by the Owners.

19.     **Inspection of Vessel**

The Owners may at any time after giving reasonable notice to the Managers inspect the Vessel for any reason they consider necessary.

20.     **Compliance with Laws and Regulations**

The parties will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Flag State, or of the places where the Vessel trades.

21.     **Duration of the Agreement**

(a)     This Agreement shall come into effect at the date stated in Box 2 and shall continue until terminated by either party by giving notice to the other; in which event this Agreement shall terminate upon the expiration of the later of the number of months stated in Box 18 or a period of two (2) months from the date on which such notice is received, unless terminated earlier in accordance with Clause 22 (Termination).

(b)     Where the Vessel is not at a mutually convenient port or place on the expiry of such period, this Agreement shall terminate on the subsequent arrival of the Vessel at the next mutually convenient port or place.

22.     **Termination**

(a)     Owners' or Managers' default

If either party fails to meet their obligations under this Agreement, the other party may give notice to the party in default requiring them to remedy it. In the event that the party in default fails to remedy it within a reasonable time to the reasonable satisfaction of the other party, that party shall be entitled to terminate this Agreement with immediate effect by giving notice to the party in default.

(b)     Notwithstanding Sub-clause 22(a):

(i) The Managers shall be entitled to terminate the Agreement with immediate effect by giving notice to the Owners if any monies payable by the Owners and/or the owners of any associated vessel, details of which are listed in Annex "D", shall not have been received in the Managers' nominated account within ten (10) days of receipt by the Owners of the Managers' written request, or if the Vessel is repossessed by the Mortgagee(s).

(ii) If the Owners proceed with the employment of or continue to employ the Vessel in the carriage of contraband, blockade running, or in an unlawful trade, or on a voyage which in the reasonable opinion of the Managers is unduly hazardous or improper, the Managers may give notice of the default to the Owners, requiring them to remedy it as soon as practically possible. In the event that the Owners fail to remedy it within a reasonable time to the satisfaction of the Managers, the Managers shall be entitled to terminate the Agreement with immediate effect by notice.

(iii) If either party fails to meet their respective obligations under Sub-clause 5(b) (Crew Insurances) and Clause

VIOLOS LAW copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).

PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

10 (Insurance Policies), the other party may give notice to the party in default requiring them to remedy it within ten (10) days, failing which the other party may terminate this Agreement with immediate effect by giving notice to the party in default.

(c)    Extraordinary Termination

This Agreement shall be deemed to be terminated in the case of the sale of the Vessel or, if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss or is requisitioned or has been declared missing or, if bareboat chartered, unless otherwise agreed, when the bareboat charter comes to an end.

(d)    For the purpose of Sub-clause 22(c) hereof:

(i) the date upon which the Vessel is to be treated as having been sold or otherwise disposed of shall be the date on which the Vessel's owners cease to be the registered owners of the Vessel;

(ii) the Vessel shall be deemed to be lost either when it has become an actual total loss or agreement has been reached with the Vessel's underwriters in respect of its constructive total loss or if such agreement with the Vessel's underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred; and

(iii) the date upon which the Vessel is to be treated as declared missing shall be ten (10) days after the Vessel was last reported or when the Vessel is recorded as missing by the Vessel's underwriters, whichever occurs first. A missing vessel shall be deemed lost in accordance with the provisions of Sub-clause 22(d)(ii).

(e)    In the event the parties fail to agree the annual budget in accordance with Sub-clause 13(b), or to agree a change of flag in accordance with Sub-clause 9(d)(ii), or to agree to a reduction in the Management Fee in accordance with Sub-clause 12(d), either party may terminate this Agreement by giving the other party not less than one month's notice, the result of which will be the expiry of the Agreement at the end of the current budget period or on expiry of the notice period, whichever is the later.

(f)    This Agreement shall terminate forthwith in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver or administrator is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.

(g)    In the event of the termination of this Agreement for any reason other than default by the Managers the management fee payable to the Managers according to the provisions of Clause 12 (Management Fee and Expenses) shall continue to be payable for a further period of the number of months stated in Box 19 as from the effective date of termination. If Box 19 is left blank then ninety (90) days shall apply.

(h)    In addition, where the Managers provide Crew for the Vessel in accordance with Clause 5(a) (Crew Management):

(i) the Owners shall continue to pay Crew Support Costs during the said further period of the number of months stated in Box 19; and

(ii) the Owners shall pay an equitable proportion of any Severance Costs which may be incurred, not exceeding the amount stated in Box 20. The Managers shall use their reasonable endeavours to minimise such Severance Costs.

(i)    On the termination, for whatever reason, of this Agreement, the Managers shall release to the Owners, if so requested, the originals where possible, or otherwise certified copies, of all accounts and all documents specifically relating to the Vessel and its operation.

(j)    The termination of this Agreement shall be without prejudice to all rights accrued due between the parties prior to the date of termination.

23.    **BIMCO Dispute Resolution Clause**

(a) *   This Agreement shall be governed by and construed in accordance with English law and any dispute arising out

VIOLOS Law Firm Res. num. 1.374/02. Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).



PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) * This Agreement shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Agreement shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

In cases where neither the claim nor any counterclaim exceeds the sum of USD50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.

(c) * This Agreement shall be governed by and construed in accordance with the laws of the place mutually agreed by the parties and any dispute arising out of or in connection with this Agreement shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.

(d) Notwithstanding Sub-clauses 23(a), 23(b) or 23(c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Agreement.

(i) In the case of a dispute in respect of which arbitration has been commenced under Sub-clauses 23(a), 23(b) or 23(c) above, the following shall apply:

(ii) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(iii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iv) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

VIOLOS LAW Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).



PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

(v) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(vi) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vii) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(viii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)

(e)     If Box 21 in Part I is not appropriately filled in, Sub-clause 23(a) of this Clause shall apply.

*Note: Sub-clauses 23(a), 23(b) and 23(c) are alternatives; indicate alternative agreed in Box 21. Sub-clause 23(d) shall apply in all cases.

24.     **Notices**

(a)     All notices given by either party or their agents to the other party or their agents in accordance with the provisions of this Agreement shall be in writing and shall, unless specifically provided in this Agreement to the contrary, be sent to the address for that other party as set out in Boxes 22 and 23 or as appropriate or to such other address as the other party may designate in writing.

        A notice may be sent by registered or recorded mail, facsimile, electronically or delivered by hand in accordance with this Sub-clause 24(a).

(b)     Any notice given under this Agreement shall take effect on receipt by the other party and shall be deemed to have been received:

        (i) if posted, on the seventh (7th) day after posting;

        (ii) if sent by facsimile or electronically, on the day of transmission; and

        (iii) if delivered by hand, on the day of delivery.

        And in each case proof of posting, handing in or transmission shall be proof that notice has been given, unless proven to the contrary.

25.     **Entire Agreement**

        This Agreement constitutes the entire agreement between the parties and no promise, undertaking, representation, warranty or statement by either party prior to the date stated in Box 2 shall affect this Agreement. Any modification of this Agreement shall not be of any effect unless in writing signed by or on behalf of the parties.

26.     **Third Party Rights**

        Except to the extent provided in Sub-clauses 17(c) (Indemnity) and 17(d) (Himalaya), no third parties may enforce any term of this Agreement.

27.     **Partial Validity**

        If any provision of this Agreement is or becomes or is held by any arbitrator or other competent body to be illegal, invalid or unenforceable in any respect under any law or jurisdiction, the provision shall be deemed to be amended to the extent necessary to avoid such illegality, invalidity or unenforceability, or, if such amendment is

VIOLOS LAW FIRM Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).



PART II
SHIPMAN 2009 STANDARD SHIP MANAGEMENT AGREEMENT

not possible, the provision shall be deemed to be deleted from this Agreement to the extent of such illegality, invalidity or unenforceability, and the remaining provisions shall continue in full force and effect and shall not in any way be affected or impaired thereby.

**28.**    **Interpretation**

In this Agreement:

(a)    Singular/Plural

The singular includes the plural and vice versa as the context admits or requires.

(b)    Headings

The index and headings to the clauses and appendices to this Agreement are for convenience only and shall not affect its construction or interpretation.

(c)    Day

"Day" means a calendar day unless expressly stated to the contrary.

VIOLOS LAW... Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009. Approved by the International Ship Managers' Association (InterManager).



ANNEX "A" (DETAILS OF VESSEL OR VESSELS)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME: SHIPMAN 2009

Date of Agreement:

Name of Vessel(s):       SUEZ RAJAN
IMO NO:                  9524475

Particulars of Vessel(s): Oil Tanker
Flag:                    Marshall Islands
Year / Place Built:      2011 / Korea
GT:                      81,282
NT:                      52,295


VIOLOS LOW FIRM. REF: NUM-, 1534541
Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009.

Approved by the International Ship Managers' Association (InterManager).


**ANNEX "B" (DETAILS OF CREW)**
**TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT**
**CODE NAME: SHIPMAN 2009**

Date of Agreement:

Details of Crew:

Numbers                Rank          Nationality

VIOLOS LAW FIRM REF: MUR.C_1.1314.5154    Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009.
Approved by the International Ship Managers' Association (InterManager).




ANNEX "C" (BUDGET)
**TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT**
**CODE NAME: SHIPMAN 2009**

Date of Agreement:

Managers´ initial budget with effect from the commencement date of this Agreement (see Box 2):

VIOLOS LAW FIRM REF: WORG, 1-1514.54.12

Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009.

Approved by the International Ship Managers' Association (InterManager).

**ANNEX "D" (ASSOCIATED VESSELS)***
**TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT**
**CODE NAME: SHIPMAN 2009**

*NOTE: PARTIES SHOULD BE AWARE THAT BY COMPLETING THIS ANNEX "D" THEY WILL BE SUBJECT TO THE PROVISIONS OF SUB-CLAUSE 22(b)(i) OF THIS AGREEMENT.

Date of Agreement:

Details of Associated Vessels:

VIOLOS Law Partner: Ref.: no.: 1-3141-9-. Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009.
Approved by the International Ship Managers' Association (InterManager).

ANNEX "E" (FEE SCHEDULE)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME: SHIPMAN 2009

VIOLOS LAW    Copyright © 2009 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. Explanatory notes are available from BIMCO at www.bimco.org. First published 1988, revised 1998 and 2009.
Approved by the International Ship Managers' Association (InterManager).



**Appendix B**
**Notice of Assignment**

**Part 1 – Form of Notice of Assignment to Insurers (outside Mortgage Period)**

(For attachment by way of endorsement to all policies, contracts and cover notes)

We, Empire Navigation Inc. of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands, the manager of the m.v. "SUEZ RAJAN" (the "**Vessel**") **give notice** that, by an assignment in writing dated                          2021, we assigned to Fleetscape Suez Hans, LLC, of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (as security trustee for itself and others) all our right, title and interest in and to all insurances effected or to be effected in respect of the Vessel, including the insurances constituted by the policy on which this notice is endorsed, and including all money payable and to become payable thereunder or in connection therewith (including return of premiums).

Signed:_____

For and on behalf of
**Empire Navigation Inc.**

Dated:                              2021

**Part 2 - Form of Notice of Assignment to Insurers (within Mortgage Period)**

(For attachment by way of endorsement to all policies, contracts and cover notes)

Empire Navigation Inc. of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands, (the "**Manager**"), as manager of the m.v. "SUEZ RAJAN" (the "**Vessel**") has entered into a management agreement with Suez Rajan Limited, the bareboat charterer of the Vessel.

The Manager **gives notice** that, by an assignment in writing dated                    2021, and executed by the Manager in favour of Fleetscape Suez Hans, LLC, of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (as security trustee for itself and others) (the "**Security Trustee**"), the Manager assigned to the Security Trustee all of the Manager's right, title and interest in and to all insurances effected or to be effected in respect of the Vessel, including the insurances constituted by the policy on which this notice is endorsed, and including all money payable and to become payable thereunder or in connection therewith (including return of premiums) (the "**Manager's Insurances**").

The Security Trustee **gives notice** that, by an assignment in writing dated                    2021 and executed by the Security Trustee in favour of Oxane Partners Limited of Suite 541, Jubilee House, 197-213 Oxford Street, London W1D 2LF (the "**Mortgagee**"), the Security Trustee assigned to the Mortgagee the Manager's Insurances.

This notice may be executed in any number of counterparts each of which shall be original but which shall together constitute the same notice.

Signed:_____

For and on behalf of
**Empire Navigation Inc. as the Manager**

Dated:                              2021

Signed:_____

For and on behalf of

**Fleetscape Suez Hans, LLC as the Security Trustee**

Dated:                    2021

**Appendix C**
**Loss Payable Clause**

**Part 1 - Form of Loss Payable Clause (outside Mortgage Period)**

It is noted that, by an assignment in writing Empire Navigation Inc. of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (the "**Manager**"), as manager of the m.v. "SUEZ RAJAN" (the "**Vessel**") bareboat chartered by Suez Rajan Limited of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (the "**Charterer**") pursuant to a bareboat charterparty dated                    2021 (the "**Charter**"), assigned absolutely to Fleetscape Suez Hans, LLC of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (as security trustee for itself and others, the "**Security Trustee**") all its interest in this policy and all benefits of this policy, including all claims of any nature (including return of premiums) under this policy.

Except as provided below, all sums payable under this policy shall be paid to the Security Trustee.

The exceptions are that, unless and until the Security Trustee gives written notice to the contrary:

1    any sum payable in relation to a casualty to the vessel named "SUEZ RAJAN" in respect of which the claim or the aggregate of claims against all insurers before adjustment for any relevant franchise or deductible which does not exceed US$500,000 shall be paid to the Charterer; and

2    any sum payable under insurances against protection and indemnity risks shall be paid direct to the person who incurred the liability to which such sum relates (or to the Charterer in reimbursement to it of moneys expended to discharge that liability).

**Part 2 - Form of Loss Payable Clause (within Mortgage Period)**

It is noted that, by an assignment in writing, Empire Navigation Inc. of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (the "**Manager**"), as manager of the m.v. "SUEZ RAJAN" (the "**Vessel**") bareboat chartered by Suez Rajan Limited of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (the "**Charterer**") pursuant to a bareboat charterparty dated                          2021 (the "**Charter**"), assigned absolutely to Fleetscape Suez Hans, LLC of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (as security trustee for itself and others, the "**Security Trustee**") all its interest in this policy and all benefits of this policy, including all claims of any nature (including return of premiums) under this policy (the "**Charterer's Interest**").

It is also noted that, by an assignment in writing dated                          2021, the Security Trustee assigned absolutely to Oxane Partners Limited acting through its office at Suite 541, Jubilee House, 197-213 Oxford Street, London W1D 2LF (the "**Mortgagee**") all the Charterer's Interest (which was assigned by the Assignor to the Security Trustee as set out above).

It is further noted that, by an assignment in writing collateral to a first preferred mortgage dated                          2021 (the "**Mortgage**"), Fleetscape Suez Hans, LLC assigned absolutely to the Mortgagee all its interest in this policy and all benefits of this policy, including all claims of any nature (including return of premiums) under this policy.

Except as provided below, all sums payable under this policy shall be paid to the Mortgagee.

The exceptions are that, unless and until the Mortgagee gives written notice to the contrary:

1       any sum payable in relation to a casualty to the Vessel in respect of which the claim or the aggregate of claims against all insurers before adjustment for any relevant franchise or deductible which does not exceed US$500,000 shall be paid to the Charterer; and

2       any sum payable under insurances against protection and indemnity risks shall be paid direct to the person who incurred the liability to which such sum relates (or to the Charterer in reimbursement to it of moneys expended to discharge that liability).