# SHER TREMONTE LLP

April 20, 2022

**BY ECF**

The Honorable George B. Daniels
United States District Judge
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street
New York, NY 10007

The Honorable Valerie E. Caproni
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:   *In Re Terrorist Attacks on September 11, 2001,* Case No. 03-md-1570
(GBD)(SN); *Owens v. Taliban,* Case No. 22-cv-01949 (VEC)

Dear Judge Daniels, Judge Caproni, and Judge Netburn:

Today we filed a Class Action Complaint pursuant to Rule 23(b)(1)(B) (the "Complaint") seeking equitable distribution of the approximately $3.5 billion of assets on deposit at the Federal Reserve Bank of New York in the name of Da Afghanistan Bank (the "DAB Assets"). We also filed a Motion for Temporary Restraining Order and for Preliminary Injunction under the All Writs Act, 28 U.S.C. § 1651(a), seeking to enjoin all judgment enforcement proceedings in any court affecting the DAB Assets pending adjudication of the Complaint. These documents are attached and can also be found on the public docket of *In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank*, 22-cv-03228 (S.D.N.Y.).

Respectfully submitted,

*/s/ Theresa Trzaskoma*

Theresa Trzaskoma

Attachments

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank | ECF Case<br><br>Case No. 22-cv-03228 |

## CLASS ACTION COMPLAINT

Plaintiffs The Estate of Christopher Wodenshek, Anne Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek, by their attorneys Kreindler & Kreindler LLP, Sher Tremonte LLP, and Samuel Issacharoff, Esq., individually and on behalf of others similarly situated, and pursuant to Federal Rule of Civil Procedure 23, allege as follows:

## INTRODUCTION

1.      Individual plaintiffs The Estate of Christopher Wodenshek, Anne Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek (together, the "Wodensheks" or "Plaintiffs"), litigants against the Taliban whose claims arise directly out of the September 11, 2001 terrorist attacks (the "9/11 Attacks"), bring this action on behalf of themselves and a class of similarly situated claimants seeking the equitable distribution of approximately $3.5 billion of Taliban assets currently on deposit at the Federal Reserve Bank of New York ("FRBNY") in the name of Da Afghanistan Bank ("DAB").

2.      For the past two decades, Plaintiffs and thousands of other victims of the 9/11 Attacks have sought to hold the Taliban accountable for its role in sponsoring and facilitating the deadliest terrorist attack on U.S. soil. Plaintiffs and numerous others obtained liability judgments against the Taliban in 2006; other 9/11 victims obtained judgments against the Taliban years later. However, because the Taliban and its leadership are and have been subject to strict

economic sanctions by the United States and others (including the United Nations Security Council), Plaintiffs and other victims of Taliban-enabled terrorism had little to no hope of identifying any assets that could be used to satisfy their judgments against the Taliban.

3.      That changed on February 11, 2022, when President Joseph R. Biden signed Executive Order 14064 (the "Executive Order") concerning approximately $7 billion of assets held in the name of Afghanistan's central bank, DAB. The Executive Order followed a series of unprecedented and unforeseen historic events that resulted in the Taliban's takeover of Afghanistan and all of DAB's assets in August 2021.

4.      In recognition of the Taliban's control over DAB and its assets, the Executive Order and its accompanying "Fact Sheet" directed that all DAB assets in the United States be consolidated in a blocked account at the FRBNY.[1] They further directed that half of those assets (approximately $3.5 billion) be preserved for the benefit of U.S. victims of terrorism (the "DAB Assets"), and, through an Office of Foreign Asset Control license, the Administration has facilitated access to the other half (approximately $3.5 billion)[2] to provide humanitarian relief to the people of Afghanistan.

5.      The Executive Order sparked an uncoordinated race among those victims to collect from the limited DAB Assets. Claimants rushed to establish (or in any event, to not lose) "priority" under New York State's default judgment enforcement rules. This, in turn, led other

---

[1] Executive Order 14,064, 87 Fed. Reg. 8391 (2022); White House Fact Sheet, Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan, (Feb. 11, 2022) (hereinafter, the "Fact Sheet") (emphasis added), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/.

[2] Unless otherwise noted, the "DAB Assets" are defined as the approximately $3.5 billion in DAB funds that *were not* earmarked for Afghan humanitarian relief and *were* earmarked for U.S. victims of terrorism in the Executive Order.

victims of terrorism to join the race to claim "priority" to the DAB Assets. Consequently, the DAB Assets are now the subject of two writs of execution in the combined amount of approximately $2.2 billion, with briefing on turnover proceedings already under way, and a prejudgment order of attachment in excess of $4.7 billion. Meanwhile, Plaintiffs and hundreds of other victims of the 9/11 Attacks have pending motions to confirm damages awards of billions of dollars against the Taliban.

6.      The $3.5 billion in DAB Assets, which constitute the sum total of assets available to satisfy judgments against the Taliban, are insufficient to satisfy the writs of execution and attachment orders to which those assets are currently subject, let alone to satisfy other damages awards against the Taliban that have been or will soon be granted. Adjudication of any individual claim or groups of claims will be dispositive of—and will substantially impair the rights of— Plaintiffs and thousands of other terrorism victims. Indeed, if individual adjudications proceed under the "first in time is first in right" approach, a small number of claimants will likely take the entire $3.5 billion in DAB Assets for themselves, while Plaintiffs and thousands of other victims will likely recover nothing—a profoundly inequitable outcome.

7.      The DAB Assets thus constitute a classic limited fund for purposes of Rule 23(b)(1)(B), one in which:

> an adjudication as to one or more members of the class will necessarily be or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund meets the problem.[3]

---

[3] Fed. R. Civ. P. 23(b)(1)(B) Advisory Committee's Notes (1966).

8. Plaintiffs seek to ensure that the DAB Assets are distributed equitably, and to avoid a grossly unjust scenario in which a small handful of claimants obtain tens of millions of dollars each in compensation at the expense of thousands of other victims of Taliban-sponsored or Taliban-supported terrorist attacks who stand to receive nothing. Accordingly, Plaintiffs seek:

a) an immediate order in aid of the Court's jurisdiction enjoining any judgment enforcement proceeding in any court affecting the DAB Assets pending adjudication of Plaintiffs' Class Action Complaint;

b) certification of a mandatory class composed of all persons and/or estates with a compensatory damages claim against the Taliban on file in a U.S. court of record as of April 20, 2022, where such claim arises directly out of an act of terrorism, where the injuries suffered were proximately caused by that act of terrorism, and where the Taliban has been or likely will be adjudged liable for those injuries (the "Class");

c) a declaration that the DAB Assets are available to satisfy the Class members' judgments against the Taliban under Section 201 of the Terrorism Risk Insurance Act, Pub. L. No. 107-297, 116 Stat. 2322–2341 (2002) ("TRIA");

d) the imposition of a constructive trust over the DAB Assets; and

e) distribution of the DAB Assets on an equitable basis to all Class members.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the relief Plaintiffs seek includes a declaration of Class members' rights under TRIA, and the rights of the Class members to recover the compensatory damages at issue are defined by the Anti-Terrorism Act, 18 U.S.C. § 2333(a). The Court also has jurisdiction under the Air Transportation Safety and System Stabilization Act of 2001 (the "Air Stabilization Act"), 49

U.S.C. § 40101, Title IV, § 408(b)(3), which grants the Southern District of New York ("S.D.N.Y.") "original and exclusive jurisdiction over all actions brought for any claim . . . resulting from or relating to the terrorist-related aircraft crashes of" the 9/11 Attacks. This Court further has jurisdiction under 12 U.S.C. § 632, which grants federal courts original jurisdiction of all civil suits involving any Federal Reserve Bank.

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(f)(1) because the property that is the subject of this action is situated in this district, and pursuant to the Air Stabilization Act, which designates the S.D.N.Y. as the exclusive venue for all civil litigation arising out of or related to the 9/11 Attacks.

## **PARTIES**

11.     Plaintiff The Estate of Christopher Wodenshek is the successor of Christopher Wodenshek, a U.S. citizen killed in the 9/11 Attacks. One month before the 9/11 Attacks, the Wodenshek family moved from Connecticut to New Jersey so that Christopher, a broker at Cantor Fitzgerald, could shorten his commute and spend more time with his wife and five young children. The morning of September 11, 2001, two days after his eleventh wedding anniversary, Christopher went to work, arriving on the 105th floor of the World Trade Center's North Tower between 7:00 and 7:30 a.m. An hour later, at 8:46 a.m., the hijacked American Airlines Flight 11 slammed into the building between the ninety-third and ninety-ninth floors. Christopher was, along with many others, trapped and killed.

12.     Plaintiff Anne Wodenshek is the personal representative of The Estate of Christopher Wodenshek, and his surviving wife. A motion to confirm their compensatory damages awards of $14,738,118 and $12,500,000, respectively, against the Taliban is currently pending in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (S.D.N.Y.) (the "9/11 MDL"). To date, Christopher Wodenshek's estate and Anne Wodenshek have received

approximately $55,000 and approximately $48,000, respectively, from the government-funded U.S. Victims of State Sponsored Terrorism program (the "USVSST"), which has so far disbursed approximately $1.6 billion to 10,590 victims of the 9/11 Attacks.

13.     Plaintiffs Sarah, Haley, Mollie, William, and Zachary Wodenshek are Christopher Wodenshek's surviving children, who were ages nine, seven, six, four, and two on the day of the 9/11 Attacks. The motion to confirm their compensatory damages awards of $8,500,000 each against the Taliban is currently pending in the 9/11 MDL. To date, they have received approximately $32,000 each from the USVSST.

## FACTUAL ALLEGATIONS

### THE TALIBAN

14.     The Taliban was established by cleric Mullah Mohammad Omar ("Mullah Omar") in 1994, following the Soviet Union's withdrawal from Afghanistan and during the subsequent Afghan civil war.  Its original membership largely consisted of mujahedeen fighters, insurgent forces that fought against the Soviet occupation of Afghanistan from 1969–1989.  Among these mujahedeen was the Saudi-born Osama Bin Laden, who founded the international terrorist group known as al Qaeda in Afghanistan.

15.     By 1996, the Taliban had seized control of much of Afghanistan and established the Islamic Emirate of Afghanistan, with Mullah Omar serving as head of state.  The Taliban imposed strict Sharia law in the areas it controlled. That same year, the Taliban welcomed the return of Bin Laden from Sudan, after which he established al Qaeda's base of operations in Afghanistan. Because of its involvement in terrorist activity, discussed in more detail below, the Taliban has been subject to a wide-range of strict sanctions, blocking the organization and its leadership from transacting any business in the United States.

16.    At the time the Taliban ruled the Islamic Emirate of Afghanistan, it controlled and directed Afghanistan's central bank, DAB.[4] It continued to do so until late September 2001, when a U.S.-led coalition invaded Afghanistan following the 9/11 Attacks and removed the Taliban from power.

17.    After the Taliban's fall, a transitional government was formed under Hamid Karzai and it governed Afghanistan until 2003, when the people of Afghanistan ratified a new constitution and elected a civilian government recognized by the United States and the international community at large—the Islamic Republic of Afghanistan. However, the Taliban maintained a constant insurgency for the two decades following its 2001 deposition.

18.    In 2020, the United States entered an agreement to withdraw its troops from Afghanistan. Following that withdrawal in the summer of 2021, concluding the U.S. military's two-decade long military presence, the Taliban commenced a major offensive. On August 15, 2021, the Taliban captured the capital of Kabul and Afghanistan's then-leadership abdicated, disbanded and/or fled Afghanistan. Within a brief time, the Taliban gained control of the entire country.

---

[4] *See* H. DOC. NO. 106-268, at 4 (describing the Departments of State and Justice adding DAB to list of blocked entities under Executive Order 13129 in 1999); Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://home.treasury.gov/news/press-releases/po943 (describing unblocked DAB assets as having been "associated with the Taliban regime").

19.    In August 2021, as part of its complete takeover of Afghanistan and all of its state organs, the Taliban took control of DAB, installed senior Taliban leaders as DAB leadership,[5] and caused DAB to implement Taliban edicts.[6]

20.    Prior to the Taliban's 2021 takeover of Afghanistan, it had no tangible assets in the United States against which Plaintiffs or any other claimants could have enforced judgments.

**THE 1998 U.S. EMBASSY BOMBINGS IN KENYA AND TANZANIA**

21.    The following allegations are largely drawn from the March 8, 2022 complaint in *Owens v. Taliban*, 22-cv-1949 (S.D.N.Y.) (hereinafter cited as "*Owens* Compl."),[7] and are re-alleged below for purposes of contextualizing a known act of terrorism out of which claims against the Taliban arise.

---

[5] *See, e.g.*, Ian Talley, et al., *Sactioned Taliban Finance Leader Holds Leadership Post at Afghan Central Bank*, WALL ST. J. (Mar. 11, 2022), https://www.wsj.com/articles/sanctioned-taliban-financier-tapped-to-help-lead-afghan-central-bank-11647003720?mod=newsviewer_click (appointing Noor Ahmad Agha as DAB first deputy governor); Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief with Crisis Looking*, BLOOMBERG (Aug. 23, 2021), https://www.bloomberg.com/news/articles/2021-08-23/taliban-name-obscure-official-central-bank-chief-ascrisis-looms (appointing Haji Mohammed Idris DAB Acting Governor); Da Afghanistan Bank, *DAB Leadership Holds Meeting with the High Ranking Officials of Commercial Banks* (Sept. 11, 2021), https://www.dab.gov.af/dab-leadership-holds-meeting-high-ranking-officials-commercial-banks (announcing Taliban takeover of Da Afghanistan Bank).

[6] *See* James Mackenzie, Mohammad Yunus Yawar, *Afghan Central Bank Moves to Halt Currency Slide As Crisis Deepens*, REUTERS (Dec. 14, 2021), https://finance.yahoo.com/news/afghanistan-central-bank-says-acting-094556696.html (describing Taliban efforts to utilize DAB, among other entities, to stabilize Afghanistan's currency).

[7] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 9, 2022), ECF 1 (deficiently filed complaint), 7 (re-filed complaint).

22.     On August 7, 1998, the eighth anniversary of the United States' deployment of troops to Saudi Arabia, al Qaeda nearly simultaneously detonated bombs at the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania.[8]

23.     The Nairobi bombing was executed by Jihad Muhammed Ali ("Ali") and Mohammed Rashed Daoud al-Owhali ("al-Owhali").[9]

24.     Prior to the bombing, al-Owhali spent time at al Qaeda's camps in Afghanistan, where he was trained in explosives, hijacking, and kidnapping.  He personally requested a jihad mission from Bin Laden.  Al-Owhali was then sent to fight alongside the Taliban against an American-backed military group.  After he distinguished himself in battle with the Taliban, in or about late 1997 or early 1998, he was approached by an al Qaeda leader and offered a mission—the bombing of the U.S. Embassy in Nairobi—for which he received additional training in Afghanistan.[10]

25.     Ali detonated a truck bomb in front of the U.S. Embassy in Nairobi using a gas-enhanced explosive device at 10:30 a.m., killing himself and 213 people, including twelve Americans, and injuring more than 4,000 others.[11]

26.     Concurrently, in Dar es Salaam, two al Qaeda members detonated a truck bomb outside the U.S. Embassy.  One was killed in the blast.  The other, Khalfan Khamis Mohamed, had

---

[8] *Owens* Compl. ¶ 110.

[9] *Id.* ¶ 111.

[10] *Id.* ¶ 112.

[11] *Id.* ¶ 113.

previously received explosives training in an al Qaeda training camp in Afghanistan.  Eleven people were killed, and eighty-five were injured.[12]

27.      The U.S. government immediately linked the U.S. Embassy bombings to al Qaeda and the Taliban.[13]

a)  On August 20, 1998, President William J. Clinton signed Executive Order 13099, which froze all assets of al Qaeda and Bin Laden in the United States, banned the import of Afghan goods, and prohibited the sale of goods and services to the Taliban.

b)  President Clinton ordered airstrikes on terrorist training camps throughout Taliban-controlled territory in Afghanistan.  The strikes began on August 20, 1998, and were intended to persuade the Taliban to hand over Bin Laden.  The initial strikes killed twenty to thirty people but missed Bin Laden by a few hours.

c)  The United States issued a formal warning to the Taliban, vowing to hold it responsible for any attacks on Americans carried out by al Qaeda.

d)  U.S. diplomats unsuccessfully attempted to convince the Taliban to surrender Bin Laden. Mullah Omar refused to do so and vowed to protect Bin Laden "at any cost."[14]

---

[12] *Id.* ¶ 114.

[13] *Id.* ¶ 115.

[14] *Taliban Vows to Protect Suspect in U.S. Embassy Blasts 'At Any Cost'*, HOUSTON CHRONICLE, Nov. 6, 1998.

e) On October 8, 1999, the U.S. Secretary of State designated al Qaeda as a Foreign Terrorist Organization in accordance with section 219 of the Immigration and Nationality Act, as amended.

**THE 9/11 ATTACKS**

28.     On September 11, 2001, five al Qaeda members hijacked American Airlines Flight 11 carrying ninety-two persons, bound from Boston to Los Angeles, and at approximately 8:46 a.m., crashed the plane into the North Tower of the World Trade Center in New York.

29.     On September 11, 2001, five other al Qaeda members hijacked United Airlines Flight 175 carrying sixty-five persons, bound from Boston to Los Angeles, and at approximately 9:02 a.m., crashed the plane into the South Tower of the World Trade Center in New York.

30.     On September 11, 2001, five other al Qaeda members hijacked American Airlines Flight 77 carrying sixty-four persons, bound from Virginia to Los Angeles, and at approximately 9:37 a.m., crashed the plane into the Pentagon.

31.     On September 11, 2001, four other al Qaeda members hijacked United Airlines Flight 93 carrying forty-five persons, bound from Newark to San Francisco with the intention of crashing the plane into a target in Washington, D.C., such as the White House or the Capitol. At approximately 10:10 a.m., because of the heroic intervention of Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

32.     At approximately 9:50 a.m. and 10:29 a.m., the South and North Towers of the World Trade Center, respectively, collapsed.

33.     The hijackings and resulting suicide attacks—the 9/11 Attacks—were the culmination of a conspiracy among a number of parties, including, among others, al Qaeda, the Kingdom of Saudi Arabia, and the Taliban, to attack the United States and murder U.S. citizens.

## LITIGATION AGAINST THE TALIBAN

34.     In September 2002, the Wodensheks and certain other victims of the 9/11 Attacks and their families filed a complaint against numerous defendants responsible for the 9/11 Attacks, including the Taliban.[15] The Wodensheks' right to relief is based upon the Taliban's support of al Qaeda and its leader, Bin Laden, perpetrators of the 9/11 Attacks, and the 9/11 Attacks' support network.[16] That complaint was subsequently consolidated and amended several times.[17]

35.     This was one of multiple actions commenced in the S.D.N.Y. and in the District of Columbia beginning in 2002, which were eventually consolidated by the Judicial Panel for Multi-District Litigation into the 9/11 MDL.[18]

36.     On June 16, 2004, the 9/11 MDL court designated Jim Kreindler of Kreindler & Kreindler LLP, counsel for the Wodensheks, and Ronald Motley, counsel for plaintiffs in *Burnett et al v. Al Baraka Investment and Development Co.*, 03-cv-9849 (S.D.N.Y.) (the "*Burnett* Plaintiffs"), as co-chairs of the Plaintiffs' Executive Committee for Personal Injury and Death

---

[15] The Wodensheks asserted federal jurisdiction over the Taliban pursuant to, among other things, the Alien Tort Statute (28 U.S.C. § 1350), the Foreign Sovereign Immunities Act (28 U.S.C. § 1605(a)(7) and the Torture Victim Protection Act (28 U.S.C. § 1350 note), and made claims for damages under those provisions as well as under the Anti-Terrorism Act (18 U.S.C. § 2333) and state law for the deaths, injuries, and losses suffered in the 9/11 Attacks.

[16] *See Ashton v. Al Qaeda Islamic Army et al.*, 02-cv-6977 (S.D.N.Y. Sept. 10, 2002), ECF 2 (asserting federal jurisdiction over the Taliban pursuant to, among other things, the Alien Tort Statute (28 U.S.C. § 1350), the Foreign Sovereign Immunities Act (28 U.S.C. § 1605(a)(7)) and the Torture Victim Protection Act (28 U.S.C. § 1350 note), and claiming damages under those provisions as well as under the Anti-Terrorism Act (18 U.S.C. § 2333) and state law for the deaths, injuries, and losses suffered in the 9/11 Attacks).

[17] *See*, *e.g.*, 02-cv-6977 (S.D.N.Y. Mar. 6, 2003), ECF 11; *id*. (Aug. 1, 2003), ECF 32; *id*. (Aug. 13, 2003), ECF 38; *id*. (Sept. 5, 2003), ECF 111; *id*. (Sept. 30, 2005), ECF 465.

[18] *See*, *e.g.*, *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2004), ECF 247 at 12 (consolidating *Ashton v. Al Qaeda*, among other actions, into the 9/11 MDL).

Claims (the "Wrongful Death PEC"), and Elliot Feldman and Sean Carter of Cozen O'Connor P.C. as co-chairs of the Plaintiffs' Executive Committee for Commercial Claims (the "Commercial Claims PEC").[19] The Wrongful Death and Commercial Claims PECs were instructed to work together whenever possible to promote the orderly and efficient administration of the litigation and promote judicial economy.[20]

37.     Among counsel named to the Wrongful Death PEC were Dennis Pantazis of Wiggins Childs Pantazis Fisher Goldfarb PLLC and Richard Hailey of Ramey & Hailey,[21] counsel for estates and survivors of forty-seven individuals killed in the 9/11 Attacks in *Havlish v. bin Laden*, 03-cv-9848 (S.D.N.Y.) (the "*Havlish* Plaintiffs"), actions consolidated within the 9/11 MDL.

38.     On September 15, 2004, the 9/11 MDL court authorized plaintiffs in *Ashton*, 02-cv-6977 (S.D.N.Y), *Burnett*, 03-cv-9849 (S.D.N.Y.) and *Federal Insurance Co. v. al Qaida*, 03-cv-6978 (S.D.N.Y.) to serve certain foreign defendants, including the Taliban, via appropriately designated media publications.[22] Plaintiffs in *O'Neill v. Al Baraka Investment and Development Co.*, 04-cv-1923 (S.D.N.Y.) were subsequently added to this publication service group on October 31, 2004.[23] The Taliban did not respond, and in 2006, the 9/11 MDL court

---

[19] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2004), ECF 248-2 ¶¶ 4–7.

[20] *See, e.g.*, *id.* (June 16, 2004) ¶ 3.

[21] *Id.* (June 16, 2004) ¶ 6

[22] *In re Terrorist Attacks*, 03-cv-1570 (S.D.N.Y. Sept. 16, 2004), ECF 445.

[23]  *In re Terrorist Attacks*, 03-cv-1570 (S.D.N.Y. Oct. 31, 2014), ECF 2908.

granted motions for default liability in favor of the *Ashton, Burnett, O'Neill* and *Federal Insurance* Plaintiffs.[24]

39.     Between 2008 and 2011, the *Havlish* Plaintiffs' counsel separately sought default judgments against foreign sovereign defendant Islamic Republic of Iran ("Iran") and other defendants, including a number of non-sovereign defendants such as the Taliban. The *Havlish* Plaintiffs presented no facts or arguments concerning the role of non-sovereign defendant the Taliban in the 9/11 Attacks, as was required in the default judgment effort against sovereign defendant Iran, instead relying entirely on the fact of the Taliban's default. As it had done six years prior for the *Ashton* Plaintiffs and others, the 9/11 MDL court granted default judgments in favor of the *Havlish* Plaintiffs and granted motions for final damages judgments as against certain foreign sovereign Iranian entities and numerous other non-sovereign defendants, including the Taliban.[25]

40.     In 2015, the *Ashton*, *Burnett*, *O'Neil* and *Federal* Plaintiffs obtained default judgments against Iran, and the 9/11 MDL court began issuing final damages judgments on a rolling basis, beginning on March 8, 2016.[26] The 9/11 MDL court issued individual damage awards for economic losses in each of those cases, and $2,000,000 for conscious pain and suffering of each of the *Ashton* Plaintiffs' decedents killed in the 9/11 Attacks.[27] The 9/11 MDL

---

[24] *See, e.g.*, *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 27, 2006), ECF 1782, *et seq.*; *id.* (May 12, 2006) ECF 1797 (referring to the individual defendants listed in Exhibit B to the *Ashton* Plaintiffs' motion, including the Taliban). The *Ashton* Plaintiffs' default liability judgment was issued on May 12, 2006, and applies to all claims, plaintiffs and defendants included up to and through the Sixth Amended Complaint. *Id*.

[25] *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Oct. 3, 2012), ECF 2623.

[26] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 8, 2016), ECF 3226.

[27] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 8, 2016), ECF 3226.

court next awarded solatium damages under the Anti-Terrorism Act, 18 U.S.C. § 2333, to immediate surviving family members, to include surviving spouses, children, parents, siblings and/or their functional equivalents.[28] The 9/11 MDL court determined those damages values to be $12,500,000 for a spouse; $8,500,000 for a child or parent; and $4,250,000 for a sibling.[29] Despite those substantial judgments, no claimant has recovered close to the full amounts, with nearly all of the families victimized in the 9/11 Attacks receiving no more than 5% of their judgments, and spouses and dependents of decedents generally receiving less than 0.76% of their judgments.[30]

**EFFORTS TO COLLECT ON CLAIMS AGAINST THE TALIBAN**

41.     Nearly contemporaneously with the Taliban's takeover of Afghanistan and the DAB in the summer of 2021, two plaintiff groups obtained and served writs of execution on the FRBNY as to Taliban assets.[31] On September 13, 2021, the *Havlish* Plaintiffs served their writ on the FRBNY in the amount of $7,045,632,402.79.[32] The *Havlish* Plaintiffs did not publicly docket their writ of execution against the Taliban in the 9/11 MDL or otherwise notify other parties to the 9/11 MDL about their plan, despite the fact that two of their attorneys sit on the

---

[28] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2016), ECF 3300.

[29] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2016), ECF 3300 at 4 (Ex. A).

[30] *See* USVSST Special Master Reports to Congress published August 2017, February 2019 and June 2020, available at http://www.usvsst.com/news.php (last accessed Apr. 18, 2022).

[31] The *Havlish* Plaintiffs are currently represented by, among others, an attorney who, until January 2022, served as special counsel to the National Security Council advising the Biden Administration in connection with legal efforts to resettle Afghan evacuees.

[32] *Havlish*, 03-cv-9848 (S.D.N.Y.), ECF 527 at 1.

Wrongful Death PEC.[33] On September 27, 2021, a group of seven anonymous non-9/11 MDL plaintiffs known as the "*Doe* Plaintiffs" served their writ in the amount of $138,418,741.[34]

42.     The U.S. government, through the Department of Justice ("DOJ"), promptly intervened and the *Havlish* and *Doe* courts granted stays of any judicial enforcement of the respective writs of execution.[35] During the pendency of those stays, beginning in December 2021, the *Ashton* Plaintiffs moved for final judgments for damages against Iran's co-tortfeasor, the Taliban, seeking to extend to the Taliban the same damages awards ordered against Iran.[36] The cumulative final damages awards sought in the *Ashton* Plaintiffs' motions cited herein—which remain pending as of this filing—are nearly $30 billion. Other 9/11 MDL plaintiffs also have pending motions for damages awards.[37]

---

[33] The non-*Havlish* Plaintiffs learned of the writ only because DOJ attached the writ as an exhibit to a letter it filed with the 9/11 MDL court after the writ had already been served. *Havlish*, 03-cv-9848 (S.D.N.Y. Sep. 16, 2021), ECF 526, 526-1; *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Sep. 20, 2021), ECF 7120.

[34] *Does v. The Taliban*, 20-mc-740 (S.D.N.Y. Aug. 26, 2021), ECF 15; *id.* (Aug. 30, 2021), ECF 19; *id.* (Sep. 23, 2021), ECF 26; *id.* (Oct. 14, 2021), ECF 30. The *Doe* Plaintiffs are seven anonymous U.S. contractors injured in a 2016 suicide bombing in Afghanistan who obtained a final default judgment against the Taliban in November 2020. *See Doe 1 v. Al-Qaeda*, 4:20-cv-605 (N.D. Tex. Mar. 20, 2020), ECF 1 (complaint); *id.* (Nov. 5, 2020), ECF 22 (final default judgment).

[35] *See Havlish*, 03-cv-09848 (S.D.N.Y. Sep. 20, 2021), ECF 527 at 3; *Does*, 20-cv-740 (S.D.N.Y. Sep. 23, 2021), ECF 26 at 2.

[36] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Dec. 20, 2021), ECF 7489–91; *id.* (Dec. 31, 2021), ECF 7516–18; *id.* (Jan. 13, 2022), ECF 7594; *id.* (Jan. 28, 2022), ECF 7634.

[37] *See, e.g.*, *Burnett v. Al Baraka Investment & Development Corp, et al*, 03-cv-9849 (S.D.N.Y. Apr. 7–8, 2022), ECF 962–65.

43. The stays of the *Havlish* and *Doe* Plaintiffs' writs were extended pending the filing of a Statement of Interest by the United States, which was ultimately filed on February 11, 2022, the same day President Biden signed the Executive Order.[38]

44. As described in the U.S. Statement of Interest, the Executive Order

> addresses the property and interests in property of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), that are held in the United States by any U.S. financial institution, including the Federal Reserve Bank of New York ("FRBNY"), as of February 11, 2022 . . . . In recognition of the "unusual and extraordinary threat to the national security and foreign policy of the United States" posed by the "widespread humanitarian crisis in Afghanistan," the E.O. blocks the DAB [funds], providing that such assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in," except as specified by the Executive Order.[39]

In effect, the Executive Order obligated U.S. financial institutions holding DAB funds, including the FRBNY, to transfer those funds to the FRBNY for consolidation in a blocked account.[40] The Executive Order explicitly states that the President signed it in part to benefit all victims of terrorism with claims against the Taliban: "I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order."[41]

---

[38] *Havlish*, 03-cv-9848 (S.D.N.Y. Feb. 11, 2022), ECF 563; *Does*, 20-cv-740 (S.D.N.Y. Feb. 11, 2022), ECF 49.

[39] *Havlish*, 03-cv-9848 (S.D.N.Y. Feb. 11, 2022), ECF 563 at 1.

[40] Executive Order.

[41] *Id.*

45.    In furtherance of this explanation, the Administration issued that same day a "Fact Sheet" concerning the Executive Order, making clear that the DAB Assets are earmarked for "U.S. victims of terrorism":[42]

> Many U.S. victims of terrorism, including relatives of victims who died in the September 11, 2001 terrorist attacks, have brought claims against the Taliban and are pursuing DAB [funds] in federal court. Because some of these plaintiffs currently have writs of execution against the DAB [funds], the court will need to issue a further decision regarding the scope of those writs. Even if funds are transferred for the benefit of the Afghan people, <u>more than $3.5 billion in DAB [funds] would remain in the United States and are subject to ongoing litigation by U.S. victims of terrorism. Plaintiffs will have a full opportunity to have their claims heard in court.</u>[43]

46.    Upon the filing of the Statement of Interest, the *Havlish* and *Doe* Plaintiffs requested the stays be lifted. On February 22, 2022, the 9/11 MDL court held a hearing at which counsel for the United States and the *Havlish*, *Doe*, *Ashton, O'Neill*, and *Federal Insurance* Plaintiffs, among others, apprised the court of their respective positions on lifting the stays.[44] Counsel for the *Ashton* Plaintiffs urged the court to exercise its equitable powers to ensure fair treatment of all plaintiffs in the 9/11 MDL.[45]

---

[42] The availability of the DAB Assets under Section 201 of TRIA remains unresolved, although it is the subject of briefing in the *Havlish* and *Doe* Plaintiffs' turnover motions. *See Havlish*, 03-cv-9848 (S.D.N.Y. Mar. 20, 2022), ECF 598; *Does*, 20-mc-740 (S.D.N.Y. Mar. 20, 2022), ECF 80. Certain female Afghan leaders have written to the 9/11 MDL court to contend that the DAB Assets "are owned by the State of Afghanistan" rather than the Taliban. *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 31, 2022), ECF 7823 at 4. Any determination as to the DAB Assets' ownership and availability under Section 201 of TRIA necessarily bear on all Class members as claimants who have or will have compensatory damages judgments against the Taliban.

[43] Fact Sheet (emphasis added).

[44] *Ashton v. Al Qaeda Islamic Army et al.*, 02-cv-6977 (S.D.N.Y. Feb. 22, 2022), ECF 1614.

[45] *See id.* at 27:9–10.

47.    Ultimately, the stays were lifted on March 2, 2022,[46] triggering a flurry of activity as disparate plaintiff groups competed for priority over the DAB Assets.

48.    On March 20, 2022, the *Havlish* and *Doe* Plaintiffs filed motions for partial turnover as to the DAB Assets in amounts sufficient to satisfy their respective compensatory damages awards of $2,086,386,669 and $138,284,213.26.[47] Oppositions to those turnover motions are due to be filed on April 20, 2022.

49.    In addition, yet another group of plaintiffs—this time unrelated to the 9/11 Attacks and the 9/11 MDL—emerged to claim the remaining DAB Assets. Specifically, on March 8, 2022, more than twenty-three years after al Qaeda's August 7, 1998 bombings of the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, individuals allegedly injured or killed in those bombings (or their estates) and their family members (together, the "*Owens* Plaintiffs") filed a complaint, solely against the Taliban, seeking compensatory and punitive damages.[48] As they filed their complaint, the *Owens* Plaintiffs also moved on an emergency basis (citing the *Havlish* and *Doe* Plaintiffs' September 2021 service of writs of execution against the DAB Assets) for a prejudgment order of attachment against the DAB Assets for an amount in excess of $4,669,011,012.21.[49] A stated purpose of this emergency application for attachment was to obtain priority over other plaintiffs with claims against the Taliban.

---

[46] *See, e.g.*, *Does*, 20-mc-740 (S.D.N.Y. Mar. 2, 2022), ECF 68.

[47] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 20, 2022), ECF 7763–71. As to at least the *Havlish* motion, the actual judgment underlying the writ includes punitive damages, which cannot be recovered under the TRIA, which is the basis for obtaining the DAB Assets, and the interest calculation may be incorrect.

[48] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 8, 2022), ECF 1 (deficiently filed complaint); *id.* (Mar. 9, 2022), ECF 7 (re-filed complaint).

[49] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 8, 2022), ECF 4–6.

50.     On March 21, 2022, the *Owens* court granted a prejudgment attachment as to $1,373,761,042.95 of the DAB Assets (reflecting the compensatory damages portion of the $4,669,011,012.21 the *Owens* Plaintiffs claim in damages).[50] In a subsequent Opinion and Order, the *Owens* court explicitly recognized that the limited DAB Assets are insufficient to satisfy all deserving victims of terrorism with claims against the Taliban and that New York State's default judgment enforcement rules have incentivized this inequitable "run" on the DAB Assets.

> The unfortunate reality that the numerous victims of acts of terror perpetrated by the Taliban may not collect on judgments is not lost on the Court, and the Court does not seek to engage in gamesmanship over which victims are more deserving to collect on the <u>limited funds</u> available. New York law contemplates that pre-judgment attachment provides priority among creditors.[51]

51.     Also on March 22, 2022, counsel for the *Federal Insurance* Plaintiffs in the 9/11 MDL and co-chair of its Commercial Claims PEC, submitted a letter (the "Priority Settlement Letter") apprising the 9/11 MDL court that the *Federal Insurance* Plaintiffs and certain other groups of plaintiffs, including the *Havlish* and *Doe* Plaintiffs (together, the "Settling MDL Plaintiffs"), had "reached agreement in principle" effectively allocating priority among themselves over the DAB Assets subject to attachment by the *Owens* Plaintiffs (the "Priority Settlement").[52]

52.     On March 22 and 23, 2022, the *Bauer* Plaintiffs and *Schneider* Plaintiffs voiced objections to the Priority Settlement on the basis that the Priority Settlement is inequitable and

---

[50] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 21, 2022), ECF 33.

[51] *Owens*, 22-cv-1949 (S.D.N.Y. Apr. 11, 2022), ECF 38 (emphasis added).

[52] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 22, 2022), ECF 7790 at 1.

conflicts with the explicit motivation of the Executive Order—to compensate victims of terrorism with claims against the Taliban equitably.[53]

53.    Plaintiffs (and many others) declined to participate in the Priority Settlement because, if allowed, it will still result in a highly inequitable distribution of the DAB Assets, such that a relatively small number of claimants will receive an outsized portion of the funds, and most other claimants will receive, if anything, only a tiny fraction of that recovery.[54]

54.    On April 6, 2022, the 9/11 MDL court granted the *Federal Insurance* Plaintiffs' motion for a partial final default judgment against the Taliban, for a total award, excluding prejudgment interest, of $9,351,247,965.99 (approximately $3.1 billion of which is for compensatory damages).[55] In granting the motion, the 9/11 MDL court noted that there are more than a dozen motions for default judgment against the Taliban pending on the MDL, including the *Ashton* Plaintiffs' motions which (encompassing the Wodensheks' claims) seek damages in excess of nearly $30 billion.[56] The 9/11 MDL court directed "all plaintiffs to continue to meet and propose strategies for an efficient and fair process to adjudicate pending default judgment

---

[53] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 22, 2022), ECF 7792 at 3 ("It was not, and could never be, the position of the Biden Administration, that some 9/11 family members would receive compensation for their losses for these blocked assets than others do measured merely by the date they received their final judgments."); *id.* (Mar. 23, 2022), ECF 7793 (joining in the Baumeister letter and requesting the appointment of a Special Master to oversee distribution of the DAB Assets).

[54] *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 30, 2022), ECF 7810 at 2.

[55] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833.

[56] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Dec. 20, 2021), ECF 7489–91; *id.* (Dec. 31, 2021), ECF 7516–18; *id.* (Jan. 13, 2022), ECF 7594; *id.* (Jan. 28, 2022), ECF 7634.

motions."[57] It also noted that the *Federal Insurance* Plaintiffs "may execute on and enforce the[ir] judgment immediately."[58]

55.     Accordingly, the DAB Assets are currently subject to two writs of execution and a prejudgment attachment order. And the *Federal Insurance* Plaintiffs may execute on their damages judgment any day.[59] The dollar amounts contemplated by the writs and attachment order alone exceed the $3.5 billion in DAB Assets, and they concern only a tiny fraction of claimants against the Taliban, to say nothing of the *Federal Insurance*, *Ashton*, and other plaintiffs who have received or expected to soon receive damages awards. Thus, absent the relief sought in this Class Action Complaint, thousands of terror victims with claims against the Taliban who are not members of the *Havlish*, *Doe*, and *Owens* Plaintiffs (or the Settling MDL Plaintiffs, should the *Owens* Plaintiffs be unable to execute) are all but guaranteed to recover either very little or nothing from the DAB Assets.

---

[57] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833.

[58] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833.

[59] On April 20, 2022, the 9/11 MDL court affirmed the *Federal Insurance* Plaintiffs' prejudgment interest calculation, enabling their Final Judgment to issue. *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 20, 2022), ECF 7888.

**Compensatory Damages Exhausting the $3.5 Billion DAB Assets**

| Arguable Priority | Plaintiffs | Compensatory Damages |
| --- | --- | --- |
| 1 | *Havlish* | $2,086,386,669 |
| 2 | *Doe* | $138,285,213.26 |
| 3 | *Owens* | $1,373,761,042.95 |
| TBD | *Federal Insurance* | $3,117,082,655.33 |
| TBD | *Ashton* (including Plaintiffs) | [nearly $30 billion][60] |

## CLASS ACTION ALLEGATIONS

56.     The series of separate lawsuits against the Taliban brought (1) in the 9/11 MDL on behalf of victims of the 9/11 Attacks and their surviving family members, (2) by the *Doe* Plaintiffs , and (3) by the *Owens* Plaintiffs has led to a race among Class members to win priority regarding the DAB Assets. In the absence of this class action, under the default New York state priority rules, family members of forty-seven of the 2,977 individuals killed in the 9/11 Attacks (the *Havlish* Plaintiffs) would be poised to deplete nearly two thirds of the limited DAB Assets. And a small number of other victims (the *Doe* and either the *Owens* Plaintiffs or the Settling MDL Plaintiffs) stand to absorb the remainder. This profoundly inequitable result would leave thousands of victims of the 9/11 Attacks and other terrorism victims with claims on file against the Taliban—including those like the Wodensheks who have a liability judgment in hand and a pending motion seeking to confirm almost $70 million in compensatory damages—to receive very little or even nothing.

57.     To ensure a just and fair distribution of the DAB Assets among all Class members, Plaintiffs bring this action individually and on behalf of all others similarly situated, seeking to

---

[60] Confirmation of the *Ashton* Plaintiffs' cumulative compensatory damages award is pending.

certify and maintain as a class action pursuant to Rule 23(a) and 23(b)(1)(B) on behalf of the following:

> all persons and/or estates with a compensatory damages claim against the Taliban on file in a U.S. court of record as of April 20, 2022, where such claim arises directly out of an act of terrorism and the injuries suffered were proximately caused by that act of terrorism and the Taliban has been or likely will be adjudged liable for those injuries.

The members of the Class, thousands of victims of the Taliban's terrorism, are so numerous and geographically dispersed that joinder of each is impracticable. As such, Rule 23(a)(1) is satisfied.

58.     This case presents questions of law and fact common to the claims of all members of the Class that will require common answers, including whether the DAB Assets are available to satisfy judgments against the Taliban under Section 201 of TRIA, whether Class members' claims exceed the value of the collectable DAB Assets, whether the Court should impose a constructive trust on the DAB Assets, and whether and how the DAB Assets as a limited fund should be equitably distributed among Class members. As such, Rule 23(a)(2) is satisfied.

59.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other members of the Class, the Wodensheks are the estate and surviving immediate family members of a victim of terrorism with compensatory damages claims on file against the Taliban arising directly out of the Taliban's facilitation of an act of terrorism. They are among the "U.S. victims of terrorism" who "have brought claims against the Taliban" that are intended as beneficiaries of the Executive Order.[61] Further, they currently hold liability judgments and have pending motions for damages judgments, which the 9/11 MDL court is in the process of adjudicating. And,

---

[61] Fact Sheet.

accordingly, like all other members of the Class, they have an interest in the DAB Assets. As such, Rule 23(a)(3) is satisfied.

60.     Plaintiffs will fairly and adequately protect the interests of the Class as a whole rather than the narrow interests of any single member or group of members of the Class. Indeed, Plaintiffs' desire for fairness and to protect the interests of other similarly situated terrorism victims with respect to the DAB Assets is what motivates this action. Plaintiffs' counsel are experienced in aggregate and mass tort litigation, class actions, and other complex litigation. Counsel from Kreindler & Kreindler LLP have extensive experience representing victims in aviation disaster litigation and they have represented Plaintiffs (and numerous other plaintiffs among the *Ashton* Plaintiffs) in connection with the 9/11 MDL for nearly twenty years. Plaintiffs' counsel also have significant experience in matters involving equitable distributions in federal courts, such as bankruptcy proceedings and SEC receiverships. Indeed, Plaintiffs' counsel includes Samuel Issacharoff, a leading authority in class and other complex litigation who has served, among other roles, as a Reporter for the American Law Institute's *Principles of the Law of Aggregate Litigation*. As such, Rule 23(a)(4) is satisfied.

61.     The DAB Assets valued at approximately $3.5 billion have been earmarked for U.S. victims of terrorism pursuant to the Executive Order. The value of compensatory damages awards held (and expected to soon be held) by members of the Class far exceeds this $3.5 billion. The *Havlish* and *Doe* Plaintiffs seek turnover of a combined $2,224,671,882.26, the *Owens* Plaintiffs have obtained an order of attachment as to $1,373,761,042.95, and the *Federal Insurance* Plaintiffs' "may execute on and enforce [their $9,351,247,965.99] judgment immediately."[62] Further, the *Ashton* Plaintiffs' pending motions for final judgment on damages

---

[62] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833 at 3.

alone seek compensatory damages awards of nearly $30 billion, without calculation of prejudgment interest. Even without consideration of other similarly situated Class members, those judgments alone would dissipate the DAB Assets in their entirety. Consequently, the DAB Assets constitute a limited fund to satisfy the claims of all members of the Class.

62.     Adjudications concerning this limited fund with respect to individual Class members would, as a practical matter, be dispositive of the interests of the other Class members and would substantially impair or impede their ability to protect their interests. In circumstances such as this, equity requires that a mandatory class be certified to determine the rights of all Class members and the Class falls within the ambit of a Rule 23(b)(1)(B) "limited fund" class. Unless the Class is certified, some members of the Class will be able to collect a disproportionate share of the limited fund relative to their compensatory damages judgments while others with identical rights and interests will receive very little or even nothing.  Accordingly, the requirements of Rule 23(b)(1)(B) are satisfied.

**COUNT I**
**INJUNCTIVE AND DECLARATORY RELIEF**
**PURSUANT TO 28 U.S.C. §§ 2201 AND 2202**

63.     Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if fully set forth herein.

64.     28 U.S.C. § 2201 provides in relevant part that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree. "

65.     28 U.S.C. § 2202 permits "[f]urther necessary or proper relief" to be awarded "based on a declaratory judgment or decree . . . against any adverse party whose rights have been determined by such judgment."

66.     The DAB is an instrumentality of the Taliban and the DAB Assets, which have been consolidated in a blocked account at the FRBNY pursuant to the Executive Order, are available to satisfy judgments against the Taliban under Section 201 of TRIA.

67.     The DAB Assets are the only known collectible Taliban assets in the United States (or elsewhere). The value of existing judgments against the Taliban, including claims by plaintiffs in the 9/11 MDL and in *Owens*, already far exceeds the value of the DAB Assets. As a result, the DAB Assets are a limited fund pursuant to Rule 23(b)(1)(B).

68.     In circumstances in which a limited fund exists, equity requires that absent parties be represented, joinder being impractical, where individual claims to be satisfied from the one asset would, as a practical matter, prejudice the rights of absent claimants against a fund inadequate to pay them all.

69.     All persons and/or estates with a compensatory damages claim against the Taliban on file in a U.S. court of record as of April 20, 2022, where such claim arises directly out of an act of terrorism and the injuries suffered were proximately caused by that act of terrorism and the Taliban has been or likely will be adjudged liable for those injuries have sought or will seek to enforce judgments on said claims. Members of the Class who have not yet obtained judgments against the Taliban, will almost certainly obtain those judgments and seek to enforce them. As a result, all members of the Class have an equitable interest in the DAB Assets.

70.     Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the Court issue an immediate order in aid of the Court's jurisdiction enjoining any judgment enforcement proceeding in any court affecting the DAB Assets pending adjudication of Plaintiffs' Class Action Complaint. Plaintiffs further request that the Court certify the mandatory Class, declare that the DAB Assets are available under TRIA to satisfy Class

members' judgments against the Taliban, establish a constructive trust over the DAB Assets for the benefit of all Class members, and distribute the DAB Assets on an equitable basis to all Class members.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for the following relief:

A.      Because this is a national mandatory class action pursuant to Rule 23(b)(1)(B), superseding all litigation concerning the enforcement of judgments against the DAB Assets in state and federal forums, an immediate order in aid of the Court's jurisdiction enjoining any judgment enforcement proceeding in any court affecting the DAB Assets pending adjudication of Plaintiffs' Class Action Complaint;

B.      An order certifying the mandatory Class and declaring that the value of the existing and likely future judgments against the Taliban for claims arising directly out of acts of terrorism far exceeds the value of the DAB Assets, and, as a result, the DAB Assets comprise a limited fund pursuant to Rule 23(b)(1)(B);

C.      A declaration that the DAB Assets are available under Section 201 of TRIA to satisfy Class members' judgments against the Taliban;

D.      A declaration that all members of the Class have an interest in the DAB Assets and such assets constitute, and shall be held as, a constructive trust for the benefit of all Class members;

E.      The equitable distribution of the DAB Assets to all members of the Class at a time and in a manner to be determined by the Court; and

F.      All other available and appropriate relief.

Dated:  April 20, 2022
     New York, New York

**KREINDLER & KREINDLER LLP**

Megan Wolfe Benett
Noah H. Kushlefsky
485 Lexington Avenue, 28th Floor
New York, New York 10007
Telephone: (212) 687-8181
Facsimile: (212) 972-9432
mbenett@kreindler.com
nkushlefsky@kreindler.com

**SHER TREMONTE LLP**

By:  _/s/ Theresa Trzaskoma_____
    Theresa Trzaskoma
    Michael Tremonte
    Max Tanner (*application for admission forthcoming*)
    Kathryn E. Ghotbi
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com
mtanner@shertremonte.com
kghotbi@shertremonte.com

-and-

Samuel Issacharoff, Esq. (*pro hac vice application forthcoming*)
40 Washington Square South
New York, New York 10012
Telephone: (212) 988-6580
si13@nyu.edu

*Counsel for Plaintiffs The Estate of Christopher Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek*

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank | |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
|---|---|
| Theresa Trzaskoma, Michael Tremonte, Max Tanner, and Kathryn E. Gholbi, Sher Tremonte LLP, 90 Broad St., 23rd Fl., New York, NY 10004, (212) 202-2600; Megan Wolfe Benett and Noah H. Kushlefsky, Kreindler & Kreindler LLP, 485 Lexington Ave., 28th Fl., New York, NY 10007, (212) 687-8181; Samuel Issacharoff, 40 Washington Sq. S., New York, NY 10012, (212) 988-6580 | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Injunctive and Declaratory Relief Pursuant to 28 U.S.C. §§ 2201 AND 2202.

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No ☐ Yes ☑    Judge Previously Assigned

If yes, was this case  Vol.☐ Invol.☐  Dismissed. No ☐ Yes ☐   If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE?    No ☒    Yes ☐

(PLACE AN [x] IN ONE BOX ONLY)    NATURE OF SUIT

### TORTS

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**

[x] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY
[ ] 362 PERSONAL INJURY - MED MALPRACTICE

**PERSONAL INJURY**
[ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING

[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**
[ ] 463 ALIEN DETAINEE
[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER

**PRISONER CIVIL RIGHTS**
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION
[ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT

**FORFEITURE/PENALTY**
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690 OTHER

**PROPERTY RIGHTS**
[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION
[ ] 840 TRADEMARK

**LABOR**
[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 740 RAILWAY LABOR ACT
[ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT (ERISA)

**IMMIGRATION**
[ ] 462 NATURALIZATION APPLICATION
[ ] 465 OTHER IMMIGRATION ACTIONS

### ACTIONS UNDER STATUTES

**BANKRUPTCY**
[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

[ ] 880 DEFEND TRADE SECRETS ACT

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**
[ ] 375 FALSE CLAIMS
[ ] 376 QUI TAM
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 485 TELEPHONE CONSUMER PROTECTION ACT
[ ] 490 CABLE/SATELLITE TV
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 896 ARBITRATION
[ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

### ACTIONS UNDER STATUTES

**CIVIL RIGHTS**
[ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ ACCOMMODATIONS
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 448 EDUCATION

### REAL PROPERTY

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

Check if demanded in complaint:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ N/A    OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.
AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE Valerie E. Caproni    DOCKET NUMBER 22-cv-01949

Check YES only if demanded in complaint
JURY DEMAND: ☐ YES ☒ NO

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

(PLACE AN x IN ONE BOX ONLY)

## ORIGIN

| x 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from (Specify District) | 6 Multidistrict Litigation (Transferred) | 7 Appeal to District Judge from Magistrate Judge |
|---|---|---|---|---|---|---|

☐ a. all parties represented

☐ 8 Multidistrict Litigation (Direct File)

☐ b. At least one party is pro se.

(PLACE AN x IN ONE BOX ONLY)

## BASIS OF JURISDICTION

*IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

☐ 1 U.S. PLAINTIFF ☐ 2 U.S. DEFENDANT ☒ 3 FEDERAL QUESTION (U.S. NOT A PARTY) ☐ 4 DIVERSITY

## CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS UNKNOWN

REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

## COURTHOUSE ASSIGNMENT

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one: THIS ACTION SHOULD BE ASSIGNED TO: ☐ WHITE PLAINS ☒ MANHATTAN

DATE 4/20/2022

/s/ Theresa Trzaskoma

SIGNATURE OF ATTORNEY OF RECORD

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[✓] YES (DATE ADMITTED Mo. April Yr. 2000 )
Attorney Bar Code # TT 4175

RECEIPT #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

# United States District Court
## for the
# Southern District of New York
## Related Case Statement

### Full Caption of Later Filed Case:

In re Approximately $3.5 Billion of Assets
on Deposit at the Federal Reserve Bank of
New York in the Name of Da Afghanistan
Bank

| Plaintiff | Case Number |
|---|---|
| vs. | 22-cv-03228 |

Defendant

### Full Caption of Earlier Filed Case:

(including in bankruptcy appeals the relevant adversary proceeding)

James Owens, et al.,

| Plaintiff | Case Number |
|---|---|
| vs. | 22-cv-1949-VEC |
| Taliban a/k/a Islamic Emirate of Afghanistan, | |

Defendant

Status of Earlier Filed Case:

Closed    (If so, set forth the procedure which resulted in closure, e.g., voluntary dismissal, settlement, court decision. Also, state whether there is an appeal pending.)

Open    (If so, set forth procedural status and summarize any court rulings.)

See description below.

Explain in detail the reasons for your position that the newly filed case is related to the earlier filed case.

Plaintiffs, a 9/11 family who have judgments against the Taliban arising out of the 9/11 Attacks, bring this In rem class action pursuant to Rule 23(b)(1)(B) seeking equitable distribution of approximately $3.5 billion of blocked assets on deposit at the Federal Reserve Bank of New York in the name of Da Afghanistan Bank (the "DAB Assets"). This limited fund class action is related to Owens v. Taliban, 22-cv-1949 (S.D.N.Y.) because on March 21, 2022, the Owens court granted a prejudgment order of attachment against the same DAB Assets, and confirmed that order of attachment of the DAB Assets in an April 11, 2022 Opinion and Order. Owens, 22 cv 1949 (S.D.N.Y. Apr. 11, 2022), ECF 38.

Signature: **/s/ Theresa Trzaskoma**    Date: April 20, 2022

Sher Tremonte LLP

Firm:

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank | Case No. 22-cv-03228 |
|---|---|

## ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION

Upon the Memorandum of Law In Support of Plaintiffs' Motion for Temporary Restraining Order and for Preliminary Injunction, the accompanying Declaration of Megan W. Benett, and the accompanying exhibits, it is:

**ORDERED**, that all parties with an interest in the approximately $3.5 billion of assets on deposit at the Federal Reserve Bank of New York in the name of Da Afghanistan Bank (the "DAB Assets") show cause before a motion term of this Court, at Room ___, United States Courthouse, 500 Pearl Street, in the City, County, and State of New York, on _____ __, at _____ o'clock in the ____noon thereof, or as soon thereafter as counsel may be heard, why an order should not be issued pursuant to the All Writs Act, 28 U.S.C. § 1651(a) to enjoin all judgment enforcement proceedings in any court affecting the DAB Assets pending adjudication of Plaintiffs' Class Action Complaint; it is further

**ORDERED**, that sufficient reason having been shown, pending the hearing of Plaintiffs' application for a preliminary injunction, all judgment enforcement proceedings in any court affecting the DAB Assets are temporarily restrained and enjoined; it is further

**ORDERED**, that notice of Plaintiffs' Complaint, the Memorandum of Law In Support of Plaintiffs' Motion for Temporary Restraining Order and for Preliminary Injunction, the accompanying Declaration of Megan W. Benett, and the accompanying exhibits shall have been

provided to known Taliban judgment holders and other interested parties contemporaneously with the filing of the above-captioned action by the filing of letters on the dockets of *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (S.D.N.Y.) and *Owens v. Taliban*, 22-cv-01949 (S.D.N.Y.), and upon the Federal Reserve Bank of New York and its General Counsel, Michael Held, via Federal Express, at 33 Liberty Street, New York, NY 10045; and it is further

**ORDERED**, that service of a copy of this order upon known Taliban judgment holders and other interested parties by the filings of letters attaching this order on the dockets of *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (S.D.N.Y.) and *Owens v. Taliban*, 22-cv-01949 (S.D.N.Y.), and upon  the Federal Reserve Bank of New York and its General Counsel, Michael Held, via Federal Express, at 33 Liberty Street, New York, NY 10045, on or before _____ o'clock in the _____noon, _____ ____, _____, shall be deemed good and sufficient service thereof.

Dated: New York, New York
         April __, 2022

                              SO ORDERED:


                              _____
                              U.S.D.J.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank | Case No. 22-cv-03228 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION

**KREINDLER & KREINDLER LLP**

Megan Wolfe Benett
Noah H. Kushlefsky
485 Lexington Avenue, 28th Floor
New York, New York 10007
Telephone: (212) 687-8181
Facsimile: (212) 972-9432
mbenett@kreindler.com
nkushlefsky@kreindler.com

**SHER TREMONTE LLP**

Theresa Trzaskoma
Michael Tremonte
Max Tanner (*application for admission forthcoming*)
Kathryn E. Ghotbi
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com
mtanner@shertremonte.com
kghotbi@shertremonte.com

-and-

Samuel Issacharoff, Esq. (*pro hac vice application forthcoming*)
40 Washington Square South
New York, New York 10012
Telephone: (212) 988-6580
si13@nyu.edu

*Counsel for Plaintiffs The Estate of Christopher Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 4

A.    Plaintiffs and the 9/11 MDL .............................................................................. 4

B.    The DAB Assets ................................................................................................ 7

C.    The Race for the DAB Assets ............................................................................ 9

D.    The Limited Fund Class Action ....................................................................... 12

ARGUMENT ............................................................................................................... 13

A.    The Court Has Subject Matter Jurisdiction and Plaintiffs Are Likely to Succeed on Their Claim .................................................................... 14

        1.    The DAB Assets Are a Limited Fund Amenable to a Rule 23(b)(1)(B) Class Action ......................................................................... 14

        2.    TRIA Authorizes Class Members to Execute on the DAB Assets ...................... 15

B.    An Injunction Is Necessary to Protect the Court's Jurisdiction and to Prevent Irreparable Harm ......................................................... 19

C.    The Balance of Hardships and the Public Interest Weigh Heavily in Favor of an Injunction ........................................................... 21

CONCLUSION ............................................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Basank v. Decker*,
 449 F. Supp. 3d 205 (S.D.N.Y. 2020) .............................................................................. 14

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
 784 F.3d 887 (2d Cir. 2015) .............................................................................................. 14

*Bionpharma Inc. v. CoreRx, Inc.*,
 21-cv-10656, 2022 WL 246742 (S.D.N.Y. Jan. 27, 2022) ............................................. 21

*Brenntag Int'l Chemicals, Inc. v. Bank of India*,
 175 F.3d 245 (2d Cir. 1999) .............................................................................................. 21

*Geiss v. Weinstein Company Holdings, LLC*,
 474 F. Supp. 3d 628 (S.D.N.Y. 2020) ............................................................................... 17

*In re Baldwin-United Corp.*,
 770 F.2d 328 (2d Cir. 1985) .............................................................................................. 13

*In re Joint E. & S. Dist. Asbestos Litig.*,
 14 F.3d 726 (2d Cir. 1993) ................................................................................................ 20

*In re Joint Eastern and Southern Districts Asbestos Litigation*,
 No. CV 93-2129, 1993 WL 604077 (E.D.N.Y. & S.D.N.Y. July 1, 1993) ..................... 20

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
 596 F.2d 70 (2d Cir. 1979) ................................................................................................ 21

*Kane v. De Blasio*,
 19 F.4th 152 (2d Cir. 2021) .............................................................................................. 13

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
 830 F.3d 107 (2d Cir. 2016) ........................................................................................ 18, 19

*New York v. Nuclear Regulatory Comm'n*,
 550 F.2d 745 (2d Cir. 1977) .............................................................................................. 13

*Ortiz v. Fibreboard Corp.*,
 527 U.S. 815 (1999) ..................................................................................... 15, 16, 17, 18

*Salinger v. Colting*,
 607 F.3d 68 (2d Cir. 2010) ................................................................................................ 14

Sampson v. Murray,
    415 U.S. 61 (1974)...................................................................................... 20

Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,
    559 U.S. 393 (2010).................................................................................... 16

Weininger v. Castro,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006)........................................................ 18

Yang v. Kellner,
    458 F. Supp. 3d 199 (S.D.N.Y. 2020)........................................................ 21

**Statutes**

28 U.S.C. § 1651........................................................................................... 1, 13

**Rules**

CPLR § 5240..................................................................................................... 16

Fed. R. Civ. P. 23(b)(1)(B) ....................................................................... *passim*

**Regulations**

31 C.F.R. §§ 594.310, 594.311 (2016) ............................................................ 18

Exec. Order No. 13268, 3 C.F.R. 13268 (2002) ............................................. 18

Exec. Order No. 14064, 87 Fed. Reg. 8391 (2022) ................................ *passim*

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322–2341
    (2002).................................................................................................. *passim*

**Other Authorities**

1 McLaughlin on Class Actions § 5:8 (18th ed.) .............................................. 3

Da Afghanistan Bank, *DAB Leadership Holds Meeting with the High Ranking Officials of
    Commercial Banks* (Sept. 11, 2021), https://www.dab.gov.af/dab-leadership-holds-
    meeting-high-ranking-officials-commercial-banks ......................................... 19

Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action*, 92 N.Y.U. L. REV.
    846 (2017)....................................................................................................... 4

Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief with Crisis Looking*,
    BLOOMBERG (Aug. 23, 2021), https://www.bloomberg.com/news/articles/2021-08-
    23/taliban-name-obscure-official-central-bank-chief-ascrisis-looms .............. 19

Fed. R. Civ. P. 23(b)(1)(B) Advisory Committee's Notes (1966) ................................................ 15

Ian Talley, et al., *Sactioned Taliban Finance Leader Holds Leadership Post at Afghan Central Bank*, WALL ST. J. (Mar. 11, 2022), https://www.wsj.com/articles/sanctioned-taliban-financier-tapped-to-help-lead-afghan-central-bank-11647003720?mod=newsviewer_click .................................................................................................................................. 19

James Mackenzie and Mohammad Yunus Yawar, *Afghan Central Bank Moves to Halt Currency Slide As Crisis Deepens*, REUTERS (Dec. 14, 2021), https://www.reuters.com/markets/currencies/afghanistan-central-bank-says-it-is-acting-halt-currency-slide-2021-12-14/ ................................................................................... 19

White House Fact Sheet, Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/ ............................. 1, 2, 17

Plaintiffs The Estate of Christopher Wodenshek, Anne Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek (together, the "Wodensheks" or "Plaintiffs"), by their attorneys Kreindler & Kreindler LLP, Sher Tremonte LLP, and Samuel Issacharoff, Esq., individually and on behalf of others similarly situated, submit this memorandum of law in support of their motion for injunctive relief pursuant to the All Writs Act, 28 U.S.C. § 1651(a), to, in aid of the Court's jurisdiction, enjoin any judgment enforcement proceedings in any court affecting approximately $3.5 billion of Taliban assets on deposit at the Federal Reserve Bank of New York ("FRBNY") in the name of Da Afghanistan Bank ("DAB") (the "DAB Assets") pending adjudication of Plaintiffs' Class Action Complaint (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

For nearly 20 years, Plaintiffs and thousands of other victims of the September 11, 2001 terrorist attacks (the "9/11 Attacks") have sought to hold the Taliban accountable for its role in sponsoring and facilitating the deadliest terrorist attack on U.S. soil, including by litigating civil claims in the context of a multidistrict litigation. Yet, despite obtaining judgments, victims of the 9/11 Attacks and their families had little hope of recovery against the Taliban, not the least because, since 1998, that terrorist organization and its leadership have been subject to severe economic sanctions preventing them from transacting business or otherwise maintaining assets in the United States.

That changed on February 11, 2022, when President Joseph R. Biden signed Executive Order 14064 (the "Executive Order") concerning approximately $7 billion of assets held in the name of Afghanistan's central bank, DAB. The Executive Order and its accompanying "Fact Sheet" directed that all DAB assets in the United States be consolidated in a blocked account at

the FRBNY and earmarked approximately half ($3.5 billion)[1] of those assets—the DAB Assets—
to benefit U.S. victims of terrorism.[2] The Executive Order followed a series of unprecedented and
unforeseen historical events that resulted in the Taliban's takeover of Afghanistan and the DAB
Assets in August 2021.

The Executive Order sparked an uncoordinated race among victims of terrorism to collect
from the limited DAB Assets. Claimants rushed to establish (or in any event, to not lose) "priority"
under New York State's default judgment enforcement rules. This, in turn, led other victims of
terrorism to join the race to claim "priority" to the DAB Assets. Consequently, the DAB Assets
are now the subject of two writs of execution in the combined amount of approximately $2.2
billion, with briefing on turnover proceedings already under way, and a prejudgment order of
attachment in excess of $4.7 billion. Meanwhile, Plaintiffs and hundreds of other victims of the
9/11 Attacks have pending motions to confirm damages awards of billions of dollars against the
Taliban.

The $3.5 billion in DAB Assets, which constitute the sum total of assets available to satisfy
judgments against the Taliban, are insufficient to satisfy the writs of execution and attachment
order to which those assets are currently subject, let alone to satisfy other damages awards against
the Taliban that have been or will soon be granted. Adjudication of any individual claim or groups
of claims will be dispositive of—and will substantially impair the rights of—Plaintiffs and

---

[1] Unless otherwise noted, the "DAB Assets" are defined as the approximately $3.5 billion in DAB
funds that *were not* earmarked for Afghan humanitarian relief and *were* effectively earmarked for
U.S. victims of terrorism in the Executive Order.

[2] White House Fact Sheet, Executive Order to Preserve Certain Afghanistan Central Bank Assets
for    the    People    of    Afghanistan    (Feb.    11,    2022)    (emphasis    added),
https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-
order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/.

thousands of other terrorism victims. Indeed, if individual adjudications proceed under the "first in time is first in right" approach, a small number of claimants will likely take the entire $3.5 billion in DAB Assets for themselves, while Plaintiffs and thousands of other victims will likely recover nothing—a profoundly inequitable outcome.

The DAB Assets are a paradigmatic "limited fund" that is not remotely sufficient to satisfy all claimants. In place of the current chaotic competition for these finite funds, Plaintiffs are asking this Court to certify a class pursuant to Rule 23(b)(1)(B) composed of all persons and/or estates with a compensatory damages claim against the Taliban on file in a U.S. court of record as of April 20, 2022, where such claim arises directly out of an act of terrorism, where the injuries suffered were proximately caused by that act of terrorism, and where the Taliban has been or likely will be adjudged liable for those injuries, to declare that the DAB Assets are available to satisfy the Class members' judgments against the Taliban pursuant to Section 201 of the Terrorism Risk Insurance Act,[3] to hold the DAB Assets as a constructive trust for the benefit of *all* Class members, and to establish and oversee an equitable distribution of the DAB Assets. A Rule 23(b)(1)(B) mandatory limited fund class action is necessary here because it will ensure the "preservation and equitable distribution of finite assets among competing claimants, thereby preventing the depletion of available funds on a race-to-judgment basis." Rule 23(b)(1)(B)—Overview, 1 McLaughlin on Class Actions § 5:8 (18th ed.).

Consistent with this effort to ensure an equitable distribution of the DAB Assets to U.S. victims of Taliban terrorism, Plaintiffs respectfully request that the Court issue a temporary restraining order and preliminary injunction in aid of the Court's jurisdiction immediately

---

[3] Terrorism Risk Insurance Act, Pub. L. No. 107-297, 116 Stat. 2322–2341 (2002) (hereafter "TRIA").

enjoining any judgment enforcement proceeding in any court affecting the DAB Assets pending adjudication of Plaintiffs' Complaint.[4] The All Writs Act ("AWA") authorizes the Court use such an injunction to preserve its jurisdiction to adjudicate the claims in the Complaint, to prevent a limited fund subject to a Rule 23(b)(1)(B) class action from being irreparably depleted during the pendency of the proceedings, and to preserve the DAB Assets for the benefit of the entire proposed Class.

## **FACTUAL BACKGROUND**

### A.    Plaintiffs and the 9/11 MDL

As set forth more fully in the Complaint, Plaintiffs are The Estate of Christopher Wodenshek, Anne Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek, (together, the "Wodensheks" or "Plaintiffs"). Compl. ¶¶ 1, 11–13. Plaintiffs are the estate of Christopher Wodenshek, a thirty-five-year-old victim of the 9/11 Attacks, and his surviving wife and five children, who were between the ages of nine and two when their father was killed. Compl. ¶¶ 1, 11–13.

In September 2002, the Wodensheks and certain other victims of the 9/11 Attacks and their families filed a complaint against numerous defendants responsible for the 9/11 Attacks, including the Taliban. Compl. ¶ 34. They and their fellow plaintiffs are represented by various counsel, including leadership and members of the Plaintiffs' Executive Committee ("PEC") for Personal

---

[4] Plaintiffs seek to enjoin only judgment enforcement proceedings against the DAB Assets, including in particular the *Havlish* and *Doe* turnover proceedings, but do not otherwise seek to enjoin litigation seeking judgments against the Taliban as those underlying judgments will be necessary for membership in the proposed Class and for recovery under TRIA. In this respect, the Complaint involves a "participatory class action," one arising out of existing litigations and involving Class members who are individually represented by their own counsel. *See* Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action*, 92 N.Y.U. L. REV. 846 (2017).

Injury and Wrongful Death Claims (the "Wrongful Death PEC") in the multi-district litigation

proceeding in which 9/11 Attacks-related claims have been consolidated. Compl. ¶¶ 2, 35.[5]

Among those named to the Wrongful Death PEC were counsel for a group of forty-seven

9/11 wrongful death and injury plaintiffs known as the "*Havlish* Plaintiffs,"[6] whose actions were

also consolidated within the 9/11 MDL. Compl. ¶ 37.[7] As co-chairs of the PEC for Commercial

Claims (the "Commercial Claims PEC"), the 9/11 MDL court appointed counsel for a group of

insurance carriers known as the "*Federal Insurance* Plaintiffs." Compl. ¶ 36. The Wrongful Death

and Commercial Claims PECs were instructed to work together whenever possible to promote the

orderly and efficient administration of the litigation and promote judicial economy. Compl. ¶ 36.[8]

On September 15, 2004, the 9/11 MDL court authorized Plaintiffs and plaintiffs in several

other 9/11 MDL member-actions,[9] to serve certain foreign defendants, including the Taliban, via

media publications. Compl. ¶ 38.[10] The Taliban did not respond, and, in 2006, Plaintiffs, along

---

[5] *See also In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y.); *Ashton v. Al Qaeda Islamic Army*, 02-cv-6977 (S.D.N.Y. Sept. 10, 2002), ECF 2.

[6] *Havlish v. Iran*, 03-cv-9848 (S.D.N.Y.).

[7] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2004), ECF 248-2 ¶ 6.

[8] *See also In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2004), ECF 248-2 ¶ 3.

[9] *Burnett v. Al Baraka Investment and Development Co*., 03-cv-9849 (S.D.N.Y.) (the *Burnett* Plaintiffs) and *Federal Insurance Co. v. al Qaida*, 03-cv-6978 (S.D.N.Y.) (the *Federal Insurance* Plaintiffs). Plaintiffs in *O'Neill v. Al Baraka Investment and Development Co*., 04-cv-1923 (S.D.N.Y.) (the *O'Neill* Plaintiffs) were subsequently added to this publication service group on October 31, 2004. Compl. ¶ 41; *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Oct. 31, 2014), ECF 2908.

[10] *In re Terrorist Attacks*, 03-cv-1570 (S.D.N.Y.), ECF 445.

with *Burnett*, *O'Neill*, and *Federal Insurance* Plaintiffs, obtained default liability judgments against several defendants, including the Taliban, for their roles in the 9/11 Attacks. Compl. ¶ 38.[11]

Between 2008 and 2011, the *Havlish* Plaintiffs separately sought default judgments against foreign sovereign defendant Islamic Republic of Iran ("Iran") and other defendants, including a number of non-sovereign defendants, such as the Taliban. Compl ¶ 39. The 9/11 MDL court granted default judgments in favor of the *Havlish* Plaintiffs and subsequently granted motions for final damages judgments against the Taliban and other sovereign and non-sovereign defendants. Compl. ¶ 39.

In 2015, Plaintiffs obtained default judgments against Iran, and the 9/11 MDL court began issuing final damages judgments on a rolling basis, with Plaintiffs receiving theirs on March 8, 2016. Compl. ¶ 40.[12] The 9/11 MDL court issued individual damages awards for economic losses in each of those cases, and $2,000,000 for conscious pain and suffering of each of the *Ashton* Plaintiffs' decedents killed in the 9/11 Attacks. Compl. ¶ 40.[13] The 9/11 MDL court next awarded solatium damages to immediate surviving family members, to include surviving spouses, children, parents, siblings and/or their functional equivalents. Compl. ¶ 40. [14] The 9/11 MDL court determined those damages values to be $12,500,000 for a spouse; $8,500,000 for a child or parent; and $4,250,000 for a sibling. Compl. ¶ 40; *see also id.* 11–13 (identifying the amounts each of the

---

[11] *See also Ashton v. Al Qaeda Islamic Army*, 02-cv-06977 (S.D.N.Y.), ECF 528; *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 27, 2006), ECF 1782, *et seq.*; *id.* (May 12, 2006) ECF 1797. The *Ashton* Plaintiffs' default liability judgment was issued on May 12, 2006, and applies to all claims, plaintiffs and defendants included up to and through the Sixth Amended Complaint. *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. May 12, 2006), ECF 1797.

[12] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 8, 2016), ECF 3226.

[13] *Id.*

[14] *Id.*, 03-md-1570 (S.D.N.Y. June 16, 2016), ECF 3300.

Wodensheks has received from the from the government-funded U.S. Victims of State Sponsored Terrorism program).[15] Despite those substantial judgments, no claimant has recovered close to the full amounts, with nearly all of the families victimized in the 9/11 Attacks receiving no more than 5% of their judgments, and spouses and dependents of decedents generally receiving less than 0.76% of their judgments.[16]

### B. The DAB Assets

In 2020, the United States entered an agreement to withdraw its troops from Afghanistan. Compl. ¶ 18. Following that withdrawal in the summer of 2021, the Taliban commenced a major offensive and on August 15, 2021, the Taliban captured the capital of Kabul and Afghanistan's then-leadership abdicated, disbanded and/or fled Afghanistan. Compl. ¶ 18. Within a brief time, the Taliban gained control of the entire country, including its central bank, DAB, and all of its assets. Compl. ¶ 19. Since then, the Taliban has installed senior Taliban leaders as DAB leadership and caused DAB to implement Taliban edicts. Compl. ¶ 19.

Nearly contemporaneously with the Taliban's takeover of Afghanistan and DAB, two plaintiff groups obtained and served writs of execution on the FRBNY as to Taliban assets. Compl. ¶ 41. On August 27, 2021, the *Havlish* Plaintiffs obtained an order of execution and on September 13, 2021 served a writ of execution on the FRBNY in the amount of $7,045,632,402.79.[17] At no time did the *Havlish* Plaintiffs publicly docket their proposed or signed order of execution or their writ against the Taliban in the 9/11 MDL or otherwise notify other parties to the 9/11 MDL about

---

[15] *Id.*, ECF 3300 at Ex. A.

[16] *See* USVSST Special Master Reports to Congress published August 2017, February 2019 and June 2020, available at http://www.usvsst.com/news.php (last accessed Apr. 18, 2022).

[17] *Havlish*, 03-cv-09848 (S.D.N.Y. Sept. 20, 2021), ECF 527 at 1.

their plan, despite the fact that two of their attorneys sit on the Wrongful Death PEC. Compl. ¶ 41. On September 27, 2021, a group of seven anonymous non-9/11 MDL plaintiffs known as the "*Doe* Plaintiffs*" served their writ in the amount of $138,418,741. Compl. ¶ 41.

The United States promptly intervened and the *Havlish* and *Doe* courts granted stays of any judicial enforcement of the respective writs of execution. Compl. ¶ 42. During the pendency of those stays, the *Ashton* Plaintiffs moved for final judgments for damages against Iran's co-tortfeasor, the Taliban, seeking to extend to the Taliban the same damages awards ordered against Iran. Compl. ¶ 42. The cumulative final damages awards sought in the *Ashton* Plaintiffs' motions—which remain pending as of this filing—are nearly $30 billion. Compl. ¶ 42. Other 9/11 MDL plaintiffs also have pending motions for damages awards. Compl. ¶ 42.

The stays of the *Havlish* and *Doe* Plaintiffs' writs were extended pending the filing of a Statement of Interest by the United States, which was ultimately filed on February 11, 2022, the same day President Biden signed the Executive Order. Compl. ¶ 43. In effect, the Executive Order obligated U.S. financial institutions to transfer all DAB funds to the FRBNY for consolidation in a blocked account. Compl. ¶ 44. The Executive Order explicitly states that the President signed it in part to benefit all victims of terrorism with claims against the Taliban: "I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order." Compl. ¶ 44.[18]

---

[18] Exec. Order No. 14064, 87 Fed. Reg. 8391 (2022) (acknowledging that victims' claims were in the midst of litigation; the Executive Order does not reflect an intent to earmark all $3.5 billion to the then-current writholders).

### C.     The Race for the DAB Assets

Upon the filing of the U.S. Statement of Interest, the *Havlish* and *Doe* Plaintiffs requested the stays be lifted. Compl. ¶ 46. On February 22, 2022, the 9/11 MDL court held a hearing at which counsel for the United States and the *Havlish*, *Doe*, *Ashton, O'Neill*, and *Federal Insurance* Plaintiffs, among others, apprised the court of their respective positions on lifting the stays. Compl. ¶ 46. Counsel for the *Ashton* Plaintiffs urged the court to ensure fair treatment of all plaintiffs in the 9/11 MDL with respect to the DAB Assets. Compl. ¶ 46. Ultimately, the stays were lifted on March 2, 2022, triggering a flurry of activity as disparate plaintiff groups competed for priority over the DAB Assets. Compl. ¶ 47.

On March 20, 2022, the *Havlish* and *Doe* Plaintiffs filed motions for partial turnover as to the DAB Assets in amounts sufficient to satisfy their respective compensatory damages awards of $2,086,386,669 and $138,285,213.26. Compl. ¶ 48. Oppositions to those turnover motions are due to be filed today, April 20, 2022. Compl. ¶ 48. If turnover is granted, the DAB Assets will be diminished by nearly two-thirds.

Further, on March 8, 2022, more than twenty-three years after al Qaeda's August 7, 1998 bombings of the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, individuals allegedly injured or killed in the bombings (or their estates) and their family members (together, the "*Owens* Plaintiffs") filed a complaint, solely against the Taliban, seeking compensatory and punitive damages. Compl. ¶ 49. The *Owens* Plaintiffs also moved on an emergency basis (citing the *Havlish* and *Doe* Plaintiffs' September 2021 service of writs of execution against the DAB Assets) for a prejudgment order of attachment against the DAB Assets for an amount in excess of $4,669,011,012.21. Compl. ¶ 49. A stated purpose of this emergency application for attachment was to obtain priority over other plaintiffs with claims against the Taliban. Compl. ¶ 49.

On March 22, 2022, the *Owens* court granted a prejudgment attachment as to $1,373,761,042.95 of the DAB Assets (reflecting the compensatory damages portion of the $4,669,011,012.21 the *Owens* Plaintiffs claim in damages). Compl. ¶ 50. In a subsequent Opinion and Order, the *Owens* court explicitly recognized that the limited DAB Assets are insufficient to satisfy all deserving victims of terrorism with claims against the Taliban and that New York State's default judgment enforcement rules have incentivized this inequitable race-to-judgment in pursuit of the DAB Assets. Compl. ¶ 50.

> The unfortunate reality that the numerous victims of acts of terror perpetrated by the Taliban may not collect on judgments is not lost on the Court, and the Court does not seek to engage in gamesmanship over which victims are more deserving to collect on the underlined_funds available. New York law contemplates that pre-judgment attachment provides priority among creditors.[19]

Also on March 22, 2022, counsel for the above-referenced *Federal Insurance* Plaintiffs in the 9/11 MDL, and co-chair of its Commercial Claims PEC, filed a letter (the "Priority Settlement Letter") apprising the 9/11 MDL court that the *Federal Insurance* Plaintiffs and certain other groups of plaintiffs, including the *Havlish* and *Doe* Plaintiffs (together, the "Settling MDL Plaintiffs"), had "reached agreement in principle" effectively allocating priority among themselves over the DAB Assets, including that portion subject to attachment by the *Owens* Plaintiffs (the "Priority Settlement"). Compl. ¶ 51.

On March 22 and 23, 2022, the *Bauer* Plaintiffs and *Schneider* Plaintiffs voiced objections to the Priority Settlement on the basis that this proposed resolution is inequitable and conflicts with the explicit motivation of the Executive Order—to compensate all U.S. victims of terrorism with claims against the Taliban. Compl. ¶ 52. Plaintiffs (and many others) declined to participate in the

---

[19] *Owens*, 22-cv-01949 (S.D.N.Y. April 11, 2022), ECF 38 (emphasis added).

Priority Settlement because, if allowed, it will result in a highly inequitable distribution of the DAB Assets, such that a relatively small number of claimants will receive an outsized portion of the funds, and most other claimants will receive only a tiny fraction of that recovery. Compl. ¶ 53.

On April 6, 2022, the 9/11 MDL court granted the *Federal Insurance* Plaintiffs' motion for a partial final default judgment against the Taliban, for a total award, excluding prejudgment interest, of $9,351,247,965.99 (approximately $3.1 billion of which is for compensatory damages). Compl. ¶ 54. In granting the motion, the 9/11 MDL court noted that there were more than a dozen motions for default judgment against the Taliban pending on the MDL, including the *Ashton* Plaintiffs' motion which (encompassing the Wodensheks' claims) seeks damages of nearly $30 billion. Compl. ¶ 54. Although the 9/11 MDL court directed "all plaintiffs to continue to meet and propose strategies for an efficient and fair process to adjudicate pending default judgment motions," it also authorized the *Federal Insurance* Plaintiffs to "execute on and enforce the[ir] judgment immediately." Compl. ¶ 54.[20] Since then, the 9/11 MDL court has been reviewing other plaintiffs' pending motions for damages judgments against the Taliban.

Accordingly, the DAB Assets are currently subject to two writs of execution and a prejudgment attachment order. Compl. ¶ 55. And the *Federal Insurance* Plaintiffs are likely to execute on their damages judgment any day. Compl. ¶ 55. The dollar amounts contemplated by the writs and attachment order alone well exceed the $3.5 billion in DAB Assets, and they reflect only a tiny fraction of those who have obtained or who will obtain judgments against the Taliban based on acts of terrorism. Compl. ¶ 55. Thus, absent the relief Plaintiffs seek—including, but not limited to, through this motion—thousands of terror victims with claims against the Taliban who are not members of the *Havlish*, *Doe*, and *Owens* Plaintiffs (or the Settling MDL Plaintiffs, should

---

[20] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833.

the *Owens* Plaintiffs be unable to execute) are all but guaranteed to recover either very little or nothing from the DAB Assets. Compl. ¶ 55.

### D. The Limited Fund Class Action

Plaintiffs filed their Complaint seeking certification of a "limited fund" Rule 23(b)(1)(B) class in order to end the uncoordinated and inequitable race to win priority regarding the DAB Assets under New York State's default judgment enforcement rules. Pursuant to their Complaint, Plaintiffs seek:

a) an immediate order in aid of the Court's jurisdiction enjoining any judgment enforcement proceeding in any court affecting the DAB Assets pending adjudication of Plaintiffs' Complaint;

b) certification of a mandatory class composed of all persons and/or estates with a compensatory damages claim against the Taliban on file in a U.S. court of record as of April 20, 2022, where such claim arises directly out of an act of terrorism, where the injuries suffered were proximately caused by that act of terrorism, and where the Taliban has been or likely will be adjudged liable for those injuries;

c) a declaration that the DAB Assets are available to satisfy the Class members' judgments against the Taliban under Section 201 of TRIA;

d) the imposition of a constructive trust over the DAB Assets for the benefit of all Class members; and

e) distribution of the DAB Assets on an equitable basis to all Class members.

The express purpose of this proposed Class Action is to create an orderly and equitable distribution of the DAB Assets to all victims of acts of terrorism who have obtained or who will obtain a judgment for compensatory damages against the Taliban.

## **ARGUMENT**

The All Writs Act empowers this Court to stay all pending proceedings that would undermine the Court's jurisdiction to decide Plaintiffs' request for Rule 23(b)(1)(B) Class certification. 28 U.S.C. § 1651 (1988) (empowering federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions").[21] Such jurisdiction-threatening judgment enforcement litigation includes the pending *Havlish* and *Doe* turnover proceedings.

Plaintiffs' requested relief is in complete accord with the "purpose" of a preliminary injunction: "to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (quoting *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 754 (2d Cir. 1977)). Allowing any of the pending judgment collection actions to proceed "would substantially impair or impede the interests of other" claimants "and would significantly deplete the assets available to resolve all pending and future cases." *Id.* "The need to end this drain of [defendant's] assets is especially acute" where, as here, the rate at which judgments will be satisfied threatens dissipation of a limited fund. *Id.*

As set forth further below, an injunction is appropriate under the AWA because it is necessary to preserve the Court's jurisdiction over the DAB Assets and the Court's ability to adjudicate the Complaint. It is also appropriate because Plaintiffs can demonstrate: "(1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation . . .; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that 'the balance of hardships tips in [favor of injunctive relief]; and (4) that the

---

[21] Federal courts can issue such injunctions "even before a federal judgment is reached[.]" *In re Baldwin-United Corp.*, 770 F.2d 328, 335 (2d Cir. 1985).

public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (first alteration in original) (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)) (internal quotation marks omitted).[22]

**A.      The Court Has Subject Matter Jurisdiction and Plaintiffs Are Likely to Succeed on Their Claim**

There is no question that this Court has subject matter jurisdiction to adjudicate the claim raised in the Complaint. Numerous federal questions are at issue, including under the Anti-Terrorism Act and TRIA. In addition, this Court has jurisdiction under the Air Stabilization Act, which confers original jurisdiction over claims "resulting from or relating to" the 9/11 Attacks. Compl. ¶ 9.

In addition, Plaintiffs are likely to succeed on the merits of their claim in two important respects. First, a Rule 23(b)(1)(B) class is likely to be certified. Second, that Class is likely to prevail in obtaining a declaration that the DAB Assets are available under TRIA to satisfy judgments against the Taliban based on acts of terrorism.

**1.      The DAB Assets Are a Limited Fund Amenable to a Rule 23(b)(1)(B) Class Action**

A Rule 23(b)(1)(B) class may be maintained if: (1) prosecuting separate actions by or against individual class members would create a risk of: . . . (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede

---

[22] The standard for an entry of a temporary restraining order is "the same as for a preliminary injunction." *Basank v. Decker*, 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020).

their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). The Rule's drafters discussed as a "classic" Rule 23(b)(1)(B) case one in which

> an adjudication as to one or more members of the class will necessarily be or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund meets the problem.

Fed. R. Civ. P. 23(b)(1)(B) Advisory Committee's Notes (1966). In such a scenario, "[t]he vice of an individual action would lie in the fact that the other members of the class, thus practically concluded, would have no representation in the suit." *Id.* Certification of the "limited fund" class captures all claimants to the limited fund and recoveries on the claims are reduced to ensure equitable distributions of the fund among all class members.

In general, a "limited fund" class action under Rule 23(b)(1)(B) requires: (1) "a fund with a definitely ascertained limit," (2) "all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability," (3) "by an equitable, pro rata distribution." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 838–41 (1999) (internal quotation marks omitted). The DAB assets are plainly amenable to a Rule 23(b)(1)(B) class action.

*First*, the DAB Assets are a paradigmatic "limited fund." This clearly ascertainable pool of funds constitutes the only assets available to satisfy judgments against the Taliban; it was created by Executive fiat not by agreement of the parties. Nor are the parties responsible for the fact that there are no identifiable Taliban funds other than the DAB Assets. Rather, that is the result of longstanding sanctions against the Taliban that bar it and its leadership from transacting business or otherwise possessing property within the United States. Further, the Taliban's ability to lay claim to the DAB Assets, and thus the availability of those assets to satisfy judgments against

the Taliban, is a function of unanticipated, unprecedented historical circumstances that will not be repeated.

This limited fund is insufficient to satisfy all claimants. "The concept driving this type of [Rule 23(b)(1)(B)] suit was insufficiency, which alone justified the limit on an early feast to avoid a later famine." *Ortiz*, 527 U.S. at 838. The approximately $3.5 billion in DAB Assets are already the subject of two writs of execution in the combined amount of approximately $2.2 billion, with briefing on turnover proceedings already underway, and a prejudgment order of attachment in excess of $4.7 billion. Further, the *Federal Insurance* Plaintiffs may execute on their $9.4 billion damages at any time,[23] and there are many more plaintiffs expected to soon receive damages awards, including the *Ashton* Plaintiffs group of which Plaintiffs are part, who are seeking confirmation of more than $30 billion in compensatory damages. The DAB assets will not satisfy even existing compensatory damages judgments against the Taliban, let alone be sufficient to satisfy judgments that will come in the near future. Unless the DAB Assets are treated as a limited fund, they are likely to be depleted in their entirety by a small handful of individual litigants, to the detriment of thousands of other terrorism victims.[24]

---

[23] On April 20, 2022, the 9/11 MDL court affirmed the *Federal Insurance* Plaintiffs' prejudgment interest calculation, enabling their Final Judgment to issue. *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 20, 2022), ECF 7888.

[24] Further, equitable distribution of the DAB Assets as a Rule 23(b)(1)(B) limited fund would not be inconsistent with New York's judgment enforcement rules, which pursuant to CPLR § 5240 grant courts broad discretion in "denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure." CPLR § 5240. Application of Rule 23(b)(1)(B) would simply make mandatory what is within the court's discretion under the CPLR. But even if there were some conflict between New York law and this limited fund class action under Rule 23(b)(1)(B), the federal class action prevails. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 401 (2010) (holding that Rule 23 governs even when the maintenance of a class action collides with state law).

*Second*, a determination by the Court that the DAB Assets constitute a limited fund inures solely to the benefit of the numerous Class members with claims against the Taliban, rather than the Taliban itself. *Cf. Geiss v. Weinstein Co.*, 474 F. Supp. 3d 628, 635 (S.D.N.Y. 2020) ("Put simply, a fund is not limited just because the parties say so."). As described in *Ortiz*, "The limited fund cases thus ensured that the class as a whole was given the best deal; they did not give a defendant a better deal than *seriatim* litigation would have produced." 527 U.S. at 839.

The DAB Assets are available to satisfy claims against the Taliban only as a result of a confluence of unforeseen occurrences—the U.S. military's departure from Afghanistan and the Taliban's takeover of Afghanistan and all of its state organs, including DAB—and the Executive Order consolidating the DAB Assets. *Seriatim* litigation will not result in the identification of additional assets available to satisfy judgments against the Taliban—there are no such amounts available. Indeed, although thousands of plaintiffs in the 9/11 MDL have held judgments against the Taliban for more than fifteen years, there were no judgment enforcement efforts until recent events provided a basis for executing on the DAB Assets.

*Third*, Plaintiffs seek an equitable distribution of the DAB Assets in accordance with *Ortiz*, which contemplated limited fund classes "compris[ing] everyone who might state a claim on a single or repeated set of facts, invoking a common theory of recovery, to be satisfied from the limited fund as the source of payment." 527 U.S. at 839. The proposed Class is drawn narrowly enough to track the language of the Executive Order "Fact Sheet" ("U.S. victims of terrorism, including relatives of victims who died in the September 11, 2001 terrorist attacks")[25] and broadly

---

[25] White House Fact Sheet, Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/.

enough to encompass all existing plaintiffs with claims on file against the Taliban who may be eligible to recover the DAB Assets under Section 201 of TRIA. It does not exclude "anyone whose claim shared the common theory of liability and would contribute to the calculated shortfall of recovery." *Ortiz*, 527 U.S. at 840.

## 2. TRIA Authorizes Class Members to Execute on the DAB Assets

Class members are entitled to enforce judgments under TRIA upon satisfaction of four elements: (1) possession of a "judgment against a terrorist party"; (2) arising from an act of terrorism; (3) seeking to execute against "blocked assets" within the meaning of TRIA (*i.e.*, blocked assets of that terrorist party or an agency or instrumentality of that terrorist party); (4) to the extent of their "compensatory damages." *Weininger v. Castro*, 462 F. Supp. 2d 457, 479 (S.D.N.Y. 2006). Class members will be able to satisfy all four TRIA elements.

As defined, the Class consists of those "with a compensatory damages claim against the Taliban. . . where such claim arises directly out of an act of terrorism" and "where the Taliban has been or likely will be adjudged liable." The Taliban is unquestionably a "terrorist party" within the meaning of TRIA,[26] and Section 201 of TRIA permits judgment creditors to execute against property belonging to "an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment." *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 132 (2d Cir. 2016). The DAB Assets are indeed the property of DAB; they are held at FRBNY in an account under DAB's name and are identified as such in the Executive Order, which directed that "[a]ll property and interest in property of DAB that are held as of the date of this order" be consolidated in the blocked FRBNY account. Executive Order § 1(a)–(b). And Class members will be able to demonstrate that DAB is an agency or instrumentality of the

---

[26] Exec. Order No. 13268, 3 C.F.R. 13268 § 1 (2002); 31 C.F.R. §§ 594.310, 594.311 (2016).

Taliban, which has installed senior Taliban leaders as DAB leadership,[27] and caused DAB to implement Taliban edicts.[28] *Kirschenbaum*, 830 F.3d. at 135 (deeming an entity an agency or instrumentality if it is "a means through which a material function of the terrorist party is accomplished," if it provides "material services to, on behalf of, or in support of the terrorist party," or if it is "owned, controlled, or directed by the terrorist party"). Finally, pursuant to the Executive Order the DAB Assets are "blocked assets."

Accordingly, Plaintiffs are likely to succeed on the merits in their Rule 23(b)(1)(B) action.

### B. An Injunction Is Necessary to Protect the Court's Jurisdiction and to Prevent Irreparable Harm

The DAB Assets are already subject to writs of execution served by the *Havlish* and *Doe* Plaintiffs, both of which filed motions for partial turnover as to the DAB Assets on March 20, 2022, in amounts sufficient to satisfy their respective compensatory damages awards of $2,086,386,669 and $138,285,213.26.[29] And pursuant to their prejudgment attachment order, the *Owens* Plaintiffs' claim to have effectively secured the remainder of the DAB Assets. Should the

---

[27] *See, e.g.*, Ian Talley, et al., *Sactioned Taliban Finance Leader Holds Leadership Post at Afghan Central Bank*, WALL ST. J. (Mar. 11, 2022), https://www.wsj.com/articles/sanctioned-taliban-financier-tapped-to-help-lead-afghan-central-bank-11647003720?mod=newsviewer_click (appointing Noor Ahmad Agha as DAB first deputy governor); Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief with Crisis Looking*, BLOOMBERG (Aug. 23, 2021), https://www.bloomberg.com/news/articles/2021-08-23/taliban-name-obscure-official-central-bank-chief-ascrisis-looms (appointing Haji Mohammed Idris DAB Acting Governor); Da Afghanistan Bank, *DAB Leadership Holds Meeting with the High Ranking Officials of Commercial Banks* (Sept. 11, 2021), https://www.dab.gov.af/dab-leadership-holds-meeting-high-ranking-officials-commercial-banks (announcing Taliban takeover of Da Afghanistan Bank).

[28] *See* James Mackenzie and Mohammad Yunus Yawar, *Afghan Central Bank Moves to Halt Currency Slide As Crisis Deepens*, REUTERS (Dec. 14, 2021), https://www.reuters.com/markets/currencies/afghanistan-central-bank-says-it-is-acting-halt-currency-slide-2021-12-14/ (describing Taliban efforts to utilize the DAB, among other entities, to stabilize Afghanistan's currency).

[29] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 20, 2022), ECF 7763–71.

*Havlish* and *Doe* Plaintiffs' turnover motions be granted, the DAB Assets will be permanently dissipated, reducing the available Taliban assets from which Class members can seek recovery and irreparably harming each such member.

If this limited fund of DAB Assets is dissipated, not only will Plaintiffs and other members of the Class be irreparably harmed because they will not be able to collect on their own judgments against the Taliban, but the Court will not be able to adjudicate on the merits the claims in the Complaint. An injunction is necessary, therefore, "to preserve this Court's jurisdiction over the proposed class action and over the limited fund, and to protect any judgment issued [t]herein." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 729 (2d Cir. 1993).

As for the harm to the Class, "[t]he key word" when analyzing this factor is "irreparable." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Id*. But more is at stake in his case given the nature of the DAB Assets and the unprecedented circumstances that led to the creation of this limited fund. In *In re Joint Eastern and Southern Districts Asbestos Litigation*, for example, defendant The Keene Corporation sought "a temporary restraining order staying all asbestos litigation then pending and thereafter commenced in which it was a defendant." No. CV 93-2129, 1993 WL 604077, at *1 (E.D.N.Y. & S.D.N.Y. July 1, 1993). The restraining order was issued after the special master's preliminary statement identified an "*immediate and irreparable* harm to th[e] fund should Keene be required to make further payments to asbestos claimants." *Id.* (emphasis added). A comparably immediate and irreparable harm will occur should the DAB Assets be depleted on an ad hoc basis in satisfaction of individual judgments. Indeed, if the *Havlish* and *Doe* Plaintiffs are successful in seeking turnover, more than

two-thirds of the DAB Assets will be dissipated before the Court can even consider whether to certify a limited fund class.

Although, in general, monetary injury is not a basis for a finding of irreparable harm, *see Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979), here the dissipation of the DAB Assets itself interferes with the Court's ability to adjudicate Plaintiffs' Complaint. Further, in analogous circumstances, the Second Circuit has found an "insolvency exception" to the general rule which holds that irreparable harm is present where assets will be permanently dissipated absent injunctive relief. *See Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (stating that the insolvency exception occurs when "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied").

Accordingly, irreparable harm will unquestionably result in the absence of injunctive relief.

### C. The Balance of Hardships and the Public Interest Weigh Heavily in Favor of an Injunction

"In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction.'" *Bionpharma Inc. v. CoreRx, Inc.*, 21-cv-10656, 2022 WL 246742, at *8 (S.D.N.Y. Jan. 27, 2022) (quoting *Yang v. Kellner*, 458 F. Supp. 3d 199, 216 (S.D.N.Y. 2020), *aff'd sub nom, Yang v. Kosinski*, 805 F. App'x 63 (2d Cir. 2020), and *aff'd sub nom*, *Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020)).

In this instance, the hardships are solely those of Plaintiffs and other members of the Class. In the absence of the requested injunction, small groups—the *Havlish*, *Doe*, and *Owens* Plaintiffs,

members of the proposed Class in their own right—stand to claim the DAB Assets in their entirety and, in so doing, deprive all other members of the Class, including Plaintiffs, of the opportunity to be heard as to their entitlement to these funds. By contrast, Plaintiffs' requested injunction would do no harm to the *Havlish*, *Doe*, and *Owens* Plaintiffs. It would merely maintain the status quo pending certification (or not) of the Class. The injunction would neither upset the *Havlish*, *Doe*, and *Owens* attachments to the DAB Assets, nor would it preclude them from seeking turnover of the DAB Assets should the Court ultimately decline to certify the Class.

Finally, the public interest is unquestionably best served by the requested injunction. The 9/11 Attacks were the most lethal terrorist attack in history and thousands of victims and their families have litigated claims against the Taliban in the 9/11 MDL for nearly two decades. Victims of other terrorist attacks too, such as the *Owens* Plaintiffs, also have claims against the Taliban. Any turnover or other dissipation of the DAB Assets would irreversibly diminish the only Taliban assets available in the United States to satisfy such claims against the Taliban.

Plaintiffs' express intention in filing their Complaint is for the DAB Assets to be made available to *all* Class members, and not *just* the *Havlish*, *Doe* and *Owens* Plaintiffs (or even the Settling MDL Plaintiffs). Plaintiffs have no interest in depriving the *Havlish*, *Doe*, and *Owens* Plaintiffs of opportunities for recovery, and the issuance of the requested injunction would have no such effect. Plaintiffs simply ask the Court to oversee a process by which those plaintiffs are treated the same as all other similarly situated victims of the Taliban with claims on file. The requested injunctive relief would ensure the apportionment of these funds pursuant to a well-considered process rather than a race to the courthouse, and would uphold fairness, ensure the directive of the Executive Order is upheld, and allow all claimants to be heard. This is squarely in the public interest, and consistent with Rule 23(b)(1)(B).

Accordingly, the balance of hardships and the public interest weigh decidedly in favor of injunctive relief.

## CONCLUSION

For the above stated reasons, Plaintiffs respectfully request that the Court enter a temporary restraining order and preliminary injunction enjoining any judgment enforcement proceedings in any court affecting the approximately $3.5 billion of Taliban assets on deposit at the Federal Reserve Bank of New York in the name of Da Afghanistan Bank pending adjudication of Plaintiffs' Complaint.[30]

---

[30] Plaintiffs are providing notice of the Complaint and this Motion to potentially interested parties by attaching the filings to letters submitted to the 9/11 MDL and *Owens* courts. Plaintiffs also are providing notice to FRBNY by delivering copies by express mail to the office of the General Counsel.

Dated: New York, New York
     April 20, 2022

**KREINDLER & KREINDLER LLP**

Megan Wolfe Benett
Noah H. Kushlefsky
485 Lexington Avenue, 28th Floor
New York, New York 10007
Telephone: (212) 687-8181
Facsimile: (212) 972-9432
mbenett@kreindler.com
nkushlefsky@kreindler.com

**SHER TREMONTE LLP**

By: _/s/ Theresa Trzaskoma_
    Theresa Trzaskoma
    Michael Tremonte
    Max Tanner (*application for admission forthcoming*)
    Kathryn E. Ghotbi
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com
mtanner@shertremonte.com
kghotbi@shertremonte.com

-and-

Samuel Issacharoff, Esq. (*pro hac vice application forthcoming*)
40 Washington Square South
New York, New York 10012
Telephone: (212) 988-6580
si13@nyu.edu

*Counsel for Plaintiffs The Estate of Christopher Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank | Case No. 22-cv-03228 |
|---|---|

## DECLARATION OF MEGAN WOLFE BENETT

I, MEGAN WOLFE BENETT, Esq., pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

1.      I am a partner at the law firm of Kreindler & Kreindler LLP ("Kreindler & Kreindler"), in New York, NY. I represent Plaintiffs[1] (the Wodensheks) in the above-captioned action and, along with numerous other victims of the 9/11 Attacks, in connection with *Ashton v. Al Qaeda Islamic Army*, 02-cv-6977 (S.D.N.Y.). I make this declaration in support of Plaintiffs' Motion for Temporary Restraining Order and for Preliminary Injunction.

2.      Plaintiffs in this action are the Estate of Christopher Wodenshek, a thirty-five-year-old victim of the 9/11 Attacks, his surviving wife Anne Wodenshek, and his five children, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek, who were between the ages of nine and two at the time of their father's murder.

3.      In September 2002, the Wodensheks and certain other victims of the 9/11 Attacks and their families filed a complaint against numerous defendants responsible for the 9/11 Attacks, including the Taliban, under the caption *Ashton v. Al Qaeda Islamic Army*, 02-cv-6977

---

[1] All capitalized terms not otherwise defined in this Declaration have the meanings ascribed to them in the accompanying Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order and for Preliminary Injunction.

(S.D.N.Y.).[2] Theirs was one of multiple actions commenced in the S.D.N.Y. and in the District of Columbia beginning in 2002, which were eventually consolidated by the Judicial Panel for Multi-District Litigation into the 9/11 MDL.

4.       The *Ashton* Plaintiffs (which include the Wodensheks) are represented by various counsel in the 9/11 MDL, including myself and leadership and members of the 9/11 MDL's Wrongful Death PEC. In the 9/11 MDL, Plaintiffs have diligently pursued claims related to Christopher Wodenshek's murder through all the complexities attendant to the prosecution of terrorism-related litigation. They have pursued multiple avenues for relief against multiple 9/11 Attacks conspirators, sometimes in coordination with other plaintiffs groups. At all times since the 9/11 MDL's inception, Plaintiffs and their counsel have worked within its framework to support and advance an equitable judgment enforcement process to ensure that all similarly situated victims of the 9/11 Attacks receive the relief to which they are entitled.

5.       On September 15, 2004, the 9/11 MDL court authorized the *Ashton* Plaintiffs and plaintiffs in several other 9/11 MDL member-actions, to serve certain foreign defendants, including the Taliban, via media publications. The Taliban did not respond, and, in 2006, the 9/11 MDL court granted motions for default liability in favor of the *Ashton*, *Burnett*, *O'Neill*, and *Federal Insurance* Plaintiffs.[3] Between 2008 and 2011, the *Havlish* Plaintiffs' counsel sought default judgments against a number of defendants, including the Taliban, which were subsequently

---

[2] Plaintiffs were first named in the *Ashton* Plaintiffs' First Amended Complaint, 02-cv-6977 (S.D.N.Y. Sept. 10, 2002), ECF 2.

[3] The *Ashton* Plaintiffs' default liability judgment was issued on May 12, 2006, and applies to all claims, plaintiffs and defendants included up to and through the Sixth Amended Complaint. 02-cv-6977 (S.D.N.Y. May 12, 2006), ECF 528.

granted. The 9/11 MDL court also granted motions for final damages judgments against the Taliban (among other sovereign and non-sovereign defendants) for the *Havlish* Plaintiffs.

6.      In 2015, the *Ashton*, *Burnett*, *O'Neil*, and *Federal Insurance* Plaintiffs obtained default judgments against Iran, and on March 8, 2016, the 9/11 MDL court issued final damages judgments for the *Ashton* Plaintiffs. Subsequently, the *Burnett*, *O'Neil*, and *Federal Insurance* Plaintiffs received final damages judgments against Iran as well.

7.      To my knowledge, prior to September 2021, none of the litigants in the 9/11 MDL sought to enforce their judgments against the Taliban. I believe this is so because, among other reasons, as far as anyone knew there were no identifiable Taliban assets available to satisfy the judgments.

8.      Following the fall of the Islamic Republic of Afghanistan and the Taliban's seizing control of Afghanistan and its state organs, including DAB, on August 27, 2021 the Havlish Plaintiffs obtained an order of execution and served a writ of execution on the FRBNY on September 13, 2021, laying claim to $7,045,632,402.79 in DAB Assets. The Havlish Plaintiffs did not file their proposed or signed order of execution or their writ in the 9/11 MDL docket and we did not become aware of it until September 16, 2021, when the United States government sought a stay of enforcement.

9.      In December 2021, the *Ashton* Plaintiffs moved for final judgments for damages against Iran's co-tortfeasor, the Taliban, seeking the same damages awards previously ordered against Iran. The cumulative final compensatory damages awards sought in these motions—which remain pending as of this filing—are nearly $30 billion. Plaintiffs—the Wodensheks—account for nearly $70 million of those compensatory damages sought. Various other 9/11 MDL plaintiffs also have pending motions for damages awards.

3

10.     Shortly after the *Havlish* and *Doe* Plaintiffs served their writs of execution on the FRBNY in September 2021, the United States intervened and the *Havlish* and *Doe* courts granted stays of any judicial enforcement of the respective writs of execution. These stays were extended until February 11, 2022, when the United States filed its Statement of Interest. That same day, President Biden issued the Executive Order.

11.     The Executive Order, which came as a surprise to me and my firm, suddenly created a limited fund of assets that could be used to satisfy judgments against the Taliban. Attached as Exhibit 1 to this declaration is a true and correct copy of Executive Order 14064, *Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan*. The Administration also issued a "Fact Sheet" concerning the Executive Order, making clear that the DAB Assets are earmarked for "U.S. victims of terrorism." Attached as Exhibit 2 to this declaration is the Executive Order's accompanying White House "Fact Sheet."

12.     On February 22, 2022, the 9/11 MDL court held a hearing at which counsel for the United States and the *Havlish*, *Doe*, *Ashton*, *O'Neill*, and *Federal Insurance* Plaintiffs, among others, apprised the court of their respective positions on lifting the stays. Counsel for the *Ashton* Plaintiffs, including myself, urged the court to ensure that *all* plaintiffs in the 9/11 MDL are treated equitably with respect to the DAB Assets.

13.     Separately, on March 8, 2022, the *Owens* Plaintiffs, victims of al Qaeda's August 7, 1998 bombings of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, filed a complaint against the Taliban seeking compensatory and punitive damages. Simultaneously, the *Owens* Plaintiffs sought priority over 9/11 MDL plaintiffs and other claimants against the Taliban by moving the court on an emergency basis for a prejudgment order of attachment against the DAB Assets for an amount in excess of $4,669,011,012.21. And on March 22, 2022, the *Owens* court

granted the *Owens* Plaintiffs' attachment motion as to $1,373,761,042.95 (reflecting the compensatory component of the *Owens* Plaintiffs' damages award). In a subsequent Opinion and Order, the *Owens* court recognized that the limited DAB Assets are insufficient to satisfy all deserving victims of terrorism with claims against the Taliban and that New York State's default judgment enforcement rules have incentivized the ongoing race to collect against the DAB Assets.[4]

14.     On March 20, 2022, the *Havlish* and *Doe* Plaintiffs filed motions for partial turnover in amounts sufficient to satisfy their respective compensatory damages awards of $2,086,386,669 and $138,285,213.26. Oppositions to those turnover motions are due on April 20, 2022. Should turnover be granted, the majority of DAB Assets will be consumed by a very small number of claimants, likely leaving the *Ashton* Plaintiffs (including the Wodensheks) without any recourse against the DAB Assets.

15.     On same day the *Owens* order of attachment was issued, counsel for the *Federal Insurance* Plaintiffs in the 9/11 MDL and co-chair of its Commercial Claims PEC submitted the Priority Settlement Letter apprising the 9/11 MDL court that the *Federal Insurance* Plaintiffs and certain other groups of plaintiffs, including the *Havlish* and *Doe* Plaintiffs—the Settling MDL Plaintiffs—had "reached agreement in principle" effectively allocating priority among themselves over the DAB Assets subject to attachment by the *Owens* Plaintiffs. This letter asked the 9/11 MDL court to grant the *Federal Insurance* Plaintiffs' pending motion for final judgment in order to enable the *Federal Insurance* Plaintiffs to seek attachment and obtain priority over that limited portion of the DAB Assets not already subject to writs of execution by the *Havlish* and *Doe* Plaintiffs. This portion would then be divided amongst the Settling MDL Plaintiffs.

---

[4] *Owens v. Taliban*, 22-cv-01949 (S.D.N.Y. Apr. 11, 2022), ECF 38.

16.     The *Ashton* Plaintiffs have declined to participate in this Priority Settlement because, if allowed, it will still result in a highly inequitable distribution of the DAB Assets, such that a relatively small number of claimants will receive an outsized portion of the funds, and most other claimants will receive, if anything, only a tiny fraction of that recovery. The *Ashton* Plaintiffs believe that such a settlement is not fair, equitable, or aligned with the directive of the Executive Order. In fact, counsel for the *Ashton* Plaintiffs have consistently advocated for equitable distribution of these assets from the moment the Executive Order made these funds available.

17.     On April 6, 2022, the 9/11 MDL court granted the *Federal Insurance* Plaintiffs' motion for a partial final default judgment against the Taliban, for a total award of $9,351,247,965.99 (approximately $3.1 billion of which is for compensatory damages). In the order, the 9/11 MDL court noted that there are more than a dozen motions for default judgment against the Taliban pending in the MDL, directed "all plaintiffs to continue to meet and propose strategies for an efficient and fair process to adjudicate pending default judgment motions." It also noted that the *Federal Insurance* Plaintiffs "may execute on and enforce the judgment immediately."[5]

18.     Unfortunately, if normal New York judgment collection priority rules are applied, as the *Havlish* and *Doe* Plaintiffs are advocating, there will be nothing left of the DAB Assets for Plaintiffs or thousands of others similarly situated.

---

[5] Before the Clerk of the Court may issue *Federal Insurance* Plaintiffs' Final Judgment against the Taliban, the Court must approve the proposed calculation of prejudgment interest. *See In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (S.D.N.Y. Apr. 11, 2022), ECF 7857.

19.     On April 19, 2022, Plaintiffs filed a Class Action Complaint seeking certification of a "limited fund" Rule 23(b)(1)(B) class. Class Plaintiffs seek:

   a.   the subject of this motion—an immediate order in aid of the Court's jurisdiction enjoining any judgment enforcement proceeding in any court affecting the DAB Assets pending adjudication of Plaintiffs' Class Action Complaint;

   b.   certification of a class composed of all persons and/or estates with a compensatory damages claim against the Taliban on file in a U.S. court of record as of April 20, 2022, where such claim arises directly out of an act of terrorism, where the injuries suffered were proximately caused by that act of terrorism, and where the Taliban has been or likely will be adjudged liable for those injuries;

   c.   a declaration that the DAB Assets are available to satisfy the Class members' judgments against the Taliban under Section 201 of the Terrorism Risk Insurance Act ("TRIA");

   d.   the imposition of a constructive trust over the DAB Assets for the benefit of all Class members; and

   e.   distribution of the DAB Assets on an equitable basis to all Class members.

20.     Plaintiffs have made no prior request for the relief sought in the accompanying Motion for Temporary Restraining Order and for Preliminary Injunction, namely the issuance of an injunction against any judgment enforcement proceeding in any court affecting the DAB Assets.

21.     An immediate order enjoining judgment enforcement proceedings affecting the DAB Assets is critical to protecting the Court's jurisdiction and to ensuring the availability of the equitable process sought by Plaintiffs. There is good reason to believe that the DAB Assets may

be distributed and/or claimed by other Taliban claimants, including, but not limited to, pursuant to the ongoing turnover proceedings before the *Havlish* and *Doe* courts. Absent the injunctive relief Plaintiffs seek, the Court will not be able to adjudicate the Class claims and Plaintiffs and proposed Class members will be forced to litigate across the multiple courts in which proceedings affecting the DAB Assets are underway. And more efforts to enforce judgments against the DAB Assets are all but certain to come. Most importantly, absent Plaintiffs' requested relief, a small number of claimants may seize the entire limited fund of DAB Assets, leaving Plaintiffs, the *Ashton* Plaintiffs more broadly, and numerous other victims of the 9/11 Attacks without any way to satisfy their own substantial judgments. Such an unfair and unjust outcome would shock the conscience.

22.     Accordingly, on behalf of the *Ashton* Plaintiffs, I respectfully urge the Court to grant the emergency and preliminary injunctive relief sought by Plaintiffs.

Dated: April 20, 2022
      New York, New York

                                         */s/ Megan Wolfe Benett*
                                         Megan Wolfe Benett

# Exhibit 1



Federal Register

Vol. 87, No. 31

Tuesday, February 15, 2022

# Presidential Documents

Title 3—

The President

Executive Order 14064 of February 11, 2022

## Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), and section 301 of title 3, United States Code,

I, JOSEPH R. BIDEN JR., President of the United States of America, find that the widespread humanitarian crisis in Afghanistan—including the urgent needs of the people of Afghanistan for food security, livelihoods support, water, sanitation, health, hygiene, shelter and settlement assistance, and COVID–19-related assistance, among other basic human needs—and the potential for a deepening economic collapse in Afghanistan constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. I hereby declare a national emergency to deal with that threat. In addition, I find that the preservation of certain property of Da Afghanistan Bank (DAB) held in the United States by United States financial institutions is of the utmost importance to addressing this national emergency and the welfare of the people of Afghanistan. I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order.

Accordingly, I hereby order:

**Section 1**. (a) All property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, except as set forth in subsections (b) and (c) of this section.

(b) United States financial institutions shall promptly transfer the blocked property described in subsection (a) of this section into a consolidated account held at the Federal Reserve Bank of New York.

(c) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

**Sec. 2**. This order and actions taken pursuant to this order shall apply notwithstanding any previously issued Executive Order to the extent such order blocks, regulates, or otherwise affects the property and interests in property identified in section 1(a) of this order. This order and actions taken pursuant to this order shall supersede any previously issued Executive Order to the extent such order blocks, regulates, or otherwise affects the property and interests in property identified in section 1(a) of this order.

**Sec. 3**. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 4.** For the purposes of this order:

(a) the term ''Da Afghanistan Bank'' or ''DAB'' means the Central Bank of Afghanistan;

(b) the term ''entity'' means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization; and

(c) the term ''person'' means an individual or entity.

**Sec. 5.** For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds and other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of the blocking of property and interests in property set forth in section 1(a) of this order.

**Sec. 6.** The Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, is authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may, consistent with applicable law, redelegate any of these functions within the Department of the Treasury. All executive departments and agencies of the United States shall take all appropriate measures within their authority to implement this order.

**Sec. 7.** Nothing in this order shall prohibit transactions for the conduct of the official business of the Federal Government by employees, grantees, and contractors thereof.

**Sec. 8.** The Secretary of the Treasury, in consultation with the Secretary of State, is authorized to submit recurring and final reports to the Congress on the national emergency declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

**Sec. 9.** (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 11, 2022.*

[FR Doc. 2022–03346
Filed 2–14–22; 8:45 am]
Billing code 3395–F2–P

# Exhibit 2

BRIEFING ROOM

# Executive Order on Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan

FEBRUARY 11, 2022 • PRESIDENTIAL ACTIONS

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), and section 301 of title 3, United States Code,

I, JOSEPH R. BIDEN JR., President of the United States of America, find that the widespread humanitarian crisis in Afghanistan — including the urgent needs of the people of Afghanistan for food security, livelihoods support, water, sanitation, health, hygiene, shelter and settlement assistance, and COVID-19-related assistance, among other basic human needs — and the potential for a deepening economic collapse in Afghanistan constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. I hereby declare a national emergency to deal with that threat. In addition, I find that the preservation of certain property of Da Afghanistan Bank (DAB) held in the United States by United States financial institutions is of the utmost importance to addressing this national emergency and the welfare of the people of Afghanistan. I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order.

Accordingly, I hereby order:

Section 1. (a) All property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, except as set forth in subsections (b) and (c) of this section.

(b) United States financial institutions shall promptly transfer the blocked property described in subsection (a) of this section into a consolidated account held at the Federal Reserve Bank of New York.

(c)  The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

Sec. 2.  This order and actions taken pursuant to this order shall apply notwithstanding any previously issued Executive Order to the extent such order blocks, regulates, or otherwise affects the property and interests in property identified in section 1(a) of this order.  This order and actions taken pursuant to this order shall supersede any previously issued Executive Order to the extent such order blocks, regulates, or otherwise affects the property and interests in property identified in section 1(a) of this order.

Sec. 3.  (a)  Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b)  Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 4.  For the purposes of this order:

(a)  the term "Da Afghanistan Bank" or "DAB" means the Central Bank of Afghanistan;

(b)  the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization; and

(c)  the term "person" means an individual or entity.

Sec. 5.  For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds and other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual.  I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of the blocking of property and interests in property set forth in section 1(a) of this order.

Sec. 6.  The Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, is authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order.  The Secretary of the Treasury may, consistent with applicable law, redelegate any of these functions within the Department of the Treasury.  All executive departments and agencies of the United States shall take all appropriate measures within their authority to implement this order.

<u>Sec. 7.</u>  Nothing in this order shall prohibit transactions for the conduct of the official business of the Federal Government by employees, grantees, and contractors thereof.

<u>Sec. 8.</u>  The Secretary of the Treasury, in consultation with the Secretary of State, is authorized to submit recurring and final reports to the Congress on the national emergency declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

<u>Sec. 9.</u>  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

JOSEPH R. BIDEN JR.

The White House,

February 11, 2022.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank | Case No. 22-cv-03228 |

## [PROPOSED] ORDER GRANTING
## PRELIMINARY INJUNCTION

This matter is before the Court on Plaintiffs' Motion for Temporary Restraining Order and for Preliminary Injunction. Upon consideration of Plaintiffs' motion and supporting papers, all responsive submissions thereto, and all other materials submitted, the Court makes the following findings:

**WHEREAS**, Plaintiffs have moved Order to Show Cause for an order pursuant to the All Writs Act, 28 U.S.C. § 1651(a), preliminarily enjoining all judgment enforcement proceedings affecting the approximately $3.5 billion of assets currently on deposit at the Federal Reserve Bank of New York in the name of Da Afghanistan Bank (the "DAB Assets") pending adjudication of Plaintiffs' Class Action Complaint;

**WHEREAS**, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), this Court finds that a preliminary injunction is necessary to protect the Court's jurisdiction so that it can adjudicate Plaintiffs' Class Action Complaint under Rule 23(b)(1)(B) and determine whether the DAB Assets should be distributed equitably to all Class members;

**IT IS HEREBY ORDERED THAT** all judgment enforcement proceedings in any court affecting the DAB Assets are enjoined pending adjudication of Plaintiffs' Class Action Complaint.

**IT IS FURTHER ORDERED THAT** this Court shall retain jurisdiction to monitor and

enforce this Order, and to modify and amend it as justice requires to achieve its purposes.

Dated: New York, New York
         April __, 2022

                              SO ORDERED:


                              _____
                              U.S.D.J.