# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03 MD 1570 (GBD) (SN) |

**This document relates to**:

*Ashton et al. v. al Qaeda Islamic Army*, *et al.*, 02-cv-6977 (GBD)(SN)
*Havlish, et al. v. Bin Laden, et al.*, No. 03-cv-9848 (GBD)(SN)
*John Does 1 through 7 v. The Taliban et al.*, No. 20-mc-740 (GBD)(SN)

### *ASHTON* MEMORANDUM OF LAW IN OPPOSITION TO THE *HAVLISH* AND *DOE* CREDITORS' MOTIONS FOR PARTIAL TURNOVER OF ASSETS FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK AND IN SUPPORT OF A <u>MOTION FOR PROTECTIVE ORDER PURSUANT TO N.Y. CPLR § 5240</u>

**KREINDLER & KREINDLER LLP**

Megan Wolfe Benett
Noah H. Kushlefsky
485 Lexington Avenue, 28th Floor
New York, New York 10007
Telephone: (212) 687-8181
Facsimile: (212) 972-9432
mbenett@kreindler.com
nkushlefsky@kreindler.com

**SHER TREMONTE LLP**

Theresa Trzaskoma
Michael Tremonte
Max Tanner (*application for admission forthcoming*)
Kathryn E. Ghotbi
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com
mtanner@shertremonte.com
kghotbi@shertremonte.com

*Counsel for Ashton Plaintiffs*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 3

    *The Taliban* ........................................................................................................ 3

    *Litigation Against the Taliban* .......................................................................... 4

    *Efforts to Collect on Claims Against the Taliban* ............................................. 6

    *The Turnover Motions* ...................................................................................... 10

    *The Class Action Complaint* ........................................................................... 11

ARGUMENT ................................................................................................................ 12

I.     NO DISTRIBUTION OF DAB ASSETS SHOULD OCCUR OUTSIDE OF THE
      RULE 23(B)(1)(B) CLASS ACTION ............................................................. 12

II.    DISTRIBUTION OF THE DAB ASSETS SHOULD NOT BE DETERMINED BY
      "PRIORITY" .................................................................................................... 12

    A.    Priority Rules Cannot Apply to the DAB Assets .................................. 12

    B.    Even if Article 52 Applies, the *Ashton* Plaintiffs are Interested Persons Under
        CPLR § 5240 ......................................................................................... 13

    C.    CPLR § 5240 Allows the Court to Prevent Injustice in this Turnover
        Proceeding .............................................................................................. 14

    D.    The Court is Not Bound to Provide the Havlish or Doe Creditors with
        Priority Under New York Law ............................................................... 16

    E.    Alternatively, the Court Should Enter a Protective Order Under the
        All Writs Act to Ensure the Effective Administration of the 9/11 MDL.............. 18

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Borges v. Placeres*,
    111 N.Y.S.3d 517 (N.Y. Civ. Ct. 2018) ................................................................. 13, 14

*Cablevision Systems Corp. v. 45 Midland Enterprises*,
    858 F. Supp. 42 (S.D.N.Y. 1994) ....................................................................... 14, 15

*Cornell v. T. V. Dev. Corp.*,
    50 Misc. 2d 422 (Sup. Ct. 1966) ............................................................................... 11

*Cruz v. TD Bank, N.A.*,
    22 N.Y.3d 61 (2013) .......................................................................................... 14, 15

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*,
    879 F.3d 462 (2d Cir. 2018) ..................................................................................... 16

*Cutler v. 65 Sec. Plan*,
    831 F. Supp. 1008 (E.D.N.Y. 1993) ......................................................................... 20

*Golden State Bottling Co. Inc. v. National Labor Relations Board*,
    414 U.S. 168 (1973) .................................................................................................. 20

*Guardian Loan Co. v. Early*,
    47 N.Y.2d 515 (1979) ......................................................................................... 13, 14

*In re Zyprexa*,
    433 F. Supp. 2d 268 (E.D.N.Y. 2006) ...................................................................... 13

*Kantrowitz, Goldhamer & Graifman, P.C. v. Spivack*,
    170 A.D.3d 821 (2019) ............................................................................................. 15

*L.I. Head Start Child Dev. Services, Inc. v. Economic Opportunity Comm. of Nassau*,
    956 F. Supp. 2d 402 (E.D.N.Y. 2013) ..................................................................... 15

*Midlantic Nat. Bank v. Reif*,
    732 F. Supp. 354 (E.D.N.Y. 1990) ..................................................................... 14, 15

*Neuman v. Goldberg*,
    159 B.R. 681 (S.D.N.Y. 1993) ................................................................................. 19

*Pennsylvania Bureau of Correction v. United States Marshals Serv.*,
    474 U.S. 34 (1985) .................................................................................................... 20

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*,
    No. 73, 2021 WL 5926893 (N.Y. Dec. 16, 2021) ............................................................. 15

*S.E.C. v. Pentagon Capital Management PLC*,
    No. 08-CV-3324, 2013 WL 5815374 (S.D.N.Y. Oct. 29, 2013) ............................... 14, 15

*Sirotkin v. Jordan*,
    141 A.D. 3d 670 (2d Dep't 2016) .................................................................................... 15

*Townsend Farms, Inc. v. Goknur Gida Maddeleri Enerji Imalate Ithalat Ihracat Ticaret*,
    No. 20-mc-75 (RA) (RWL), 2020 WL 7260513 (S.D.N.Y. Dec. 9, 2020) ...................... 14

*United States v. Catoggio*,
    698 F.3d 64 (2d Cir. 2012) .............................................................................................. 18

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977) ........................................................................................................ 19

*United States v. State of Washington*,
    459 F. Supp. 1020 (W.D. Wash.) .................................................................................... 20

*Wandschneider v. Bekeny*,
    75 Misc. 2d 32 (Westchester Cnty. Sup. Ct. 1973) ........................................................ 14

*Yonkers Racing Corp. v. City of Yonkers*,
    858 F.2d 855 (2d Cir. 1988) ............................................................................................ 20

**Statutes**

28 U.S.C. § 517 ...................................................................................................................... 17

28 U.S.C. § 1407 .................................................................................................................... 17

28 U.S.C. § 1610 .................................................................................................................... 17

28 U.S.C. § 1651 .................................................................................................................... 18

28 U.S.C. § 3013 .................................................................................................................... 14

50 U.S.C. §§ 1601–51, 1701–06 ............................................................................................ 17

**Regulations**

Exec. Order 13224, 3 C.F.R. 13224 (2002) ........................................................................... 17

Exec. Order 14,064, 87 Fed. Reg. 8391 (2022) ............................................................. 1, 7, 12

**Rules**

CPLR § 5234..................................................................................................... 15, 16

CPLR § 5239..................................................................................................... 11

CPLR § 5240..................................................................................................... *passim*

Federal Rule of Civil Procedure 69(a) ............................................................ 17

**Other Authorities**

3A West's McKinney's Forms Civil Practice Law and Rules § 8:431 ........................................ 13

David D. Siegel and Patrick M. Connors, New York Practice § 521 (6th Ed. 2021).................... 14

Legislative Studies and Reports, C.P.L.R. § 5240 ....................................................... 14

Third Preliminary Report of the Advisory Comm. on Practice and Procedure (1959) ............... 14

USVSST Special Master Reports to Congress published August 2017, February 2019 and June 2020, available at http://www.usvsst.com/news.php (last accessed Apr. 18, 2022)........... 5

White House Fact Sheet, Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan ........................................ 7

Plaintiffs in *Ashton v. al Qaeda Islamic Army*, 02-cv-6977 (the "*Ashton* Plaintiffs"), approximately 830 9/11 victims and their families, submit this Memorandum of Law in Opposition to the *Havlish* and *Doe* Creditors' Motions for Partial Turnover of Assets from Garnishee Federal Reserve Bank of New York (the "Turnover Motions") and in Support of a Motion for a Protective Order Pursuant to New York Civil Practice Law & Rules ("CPLR") § 5240. As set forth below, the Court should deny the Turnover Motions and either defer to the pending class action regarding the assets on deposit at the Federal Reserve Bank of New York ("FRBNY") in the Name of Da Afghanistan Bank ("DAB") (the "DAB Assets") or grant a protective order to modify the enforcement procedures and ensure that the DAB Assets are equitably distributed.[1]

## PRELIMINARY STATEMENT

For two decades, 9/11 victims and their families have pursued justice through this federal MDL. They have worked cooperatively within the MDL framework, including through two Plaintiffs' Executive Committees, to strive for the common good. Thousands of 9/11 victims and their surviving family members obtained and hold liability judgments against the Taliban. Beginning last summer, after the U.S. military withdrew from Afghanistan and the Taliban suddenly retook the country and seized control of DAB, it appeared that there may be an avenue to collect on these long-held judgments. Ultimately, on February 11, 2022, President Biden issued his Executive Order directing that the DAB Assets be blocked and made available to U.S. victims of terrorism, including the thousands of members of this MDL.

The *Havlish* and *Doe* Plaintiffs seek turnover of the DAB Assets to satisfy compensatory damages awards of more than $2.2 billion. In addition, this Court recently granted entered

---

[1] Capitalized terms not otherwise defined in this Memorandum of Law shall have the meanings ascribed to them in the Turnover Motions.

$3,117,082,655 in compensatory damages awards against the Taliban in favor the *Federal Insurance* Plaintiffs and authorized them to "execute on and enforce the judgment immediately."[2] If the Turnover Motions are granted, fifty-four plaintiffs, constituting less than 2% of all 9/11 victims with claims on file against the Taliban, will collect more than 62% of the DAB Assets. And, if normal priority rules apply, commercial insurers stand to collect much of the rest, leaving the hundreds of *Ashton* Plaintiffs – also victims of heinous Taliban terrorism – to recover nothing.

Such an outcome is intolerable. Although the *Havlish* and *Federal Insurance* Plaintiffs have attempted to ameliorate the unfairness by negotiating a resolution with other 9/11 victims, that proposed settlement is unacceptable. Not only does it require a *grossly* inequitable distribution of the DAB Assets among claimants, but it also depends on the *Federal Insurance* Plaintiffs being able to invalidate the prejudgment attachment that plaintiffs in *Owens* recently obtained.[3] For this reason, counsel for the *Ashton* Plaintiffs today filed a class action complaint pursuant to Rule 23(b)(1)(B), seeking an equitable distribution of the DAB Assets.[4] This "limited fund" class action is the appropriate procedural mechanism to ensure that all victims of Taliban terrorism and all constituents of this MDL are treated fairly, and this Court should defer to that equitable process.

The Turnover Motions, by contrast, are an affront to equity and the MDL process. The motions have pitted terrorism victim against terrorism victim and have retraumatized 9/11 families, compelling some to consent to a patently inequitable deal just to avoid a zero-payout scenario. The notion that ordinary New York creditor priority rules apply strictly even in these extraordinary circumstances is incorrect. There is no case or statute that requires an MDL court to turnover more

---

[2] *In re Terrorist Attacks*, 03 md 1570 (S.D.N.Y. Apr. 20, 2022), ECF 7888.

[3] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 21, 2022), ECF 33.

[4] *In re Approximately $3.5 Billion of Assets on Deposit at the Federal Bank of New York in the Name of Da Afghanistan Bank*, 22-cv-3228 (S.D.N.Y. Apr. 20, 2022).

than $2.3 billion in limited fund assets to a small handful of plaintiffs; there is no case or statute that requires an MDL court to leave thousands of similarly situated terrorism victims without recourse to any of those limited fund assets; and there is no case or statute that requires this Court to countenance the highly unfair deal that the *Havlish* and *Federal Insurance* Plaintiffs offer as an alternative.

Instead, this Court has the authority and discretion to reject the Turnover Motions, and to either defer to the class action process or to enter a protective order, under CPLR 5240 or the All Writs Act, limiting the application of ordinary New York priority rules in these exceptional circumstances. Regardless, this Court must exercise its authority and discretion to avoid the unprecedented, harsh, and unjust outcome that will result if turnover is granted.

## BACKGROUND

*The Taliban*

In 2020, the United States entered an agreement to withdraw its troops from Afghanistan. Following that withdrawal in the summer of 2021, concluding the U.S. military's two-decades-long military presence, the Taliban commenced a major offensive. On August 15, 2021, the Taliban captured the capital of Kabul. Within a brief time, the Taliban gained control of all of Afghanistan and its state organs, including DAB, by installing senior Taliban leaders as DAB leadership, and causing DAB to implement Taliban edicts.[5] Prior to the Taliban's 2021 ascent to power, it had no tangible assets in the United States against which Plaintiffs or any other claimants could have enforced judgments against the Taliban.

---

[5] *See Havlish*, 03-cv-9848 (S.D.N.Y Mar. 20, 2022), ECF 597.

*Litigation Against the Taliban*

The Turnover Motions are the latest in two decades of litigation against the Taliban. As this Court is aware, the *Ashton* Plaintiffs' case—first filed in 2002—was one of multiple 9/11-related actions consolidated into this 9/11 MDL. On June 16, 2004, this 9/11 MDL Court designated Jim Kreindler of Kreindler & Kreindler LLP and Ronald Motley as co-chairs of the Plaintiffs' Executive Committee for Personal Injury and Death Claims (the "Wrongful Death PEC"), and Elliot Feldman and Sean Carter of Cozen O'Connor P.C. as co-chairs of the Plaintiffs' Executive Committee for Commercial Claims (the "Commercial Claims PEC").[6] Among those named to the Wrongful Death PEC were counsel for the *Havlish* Plaintiffs.[7] The Wrongful Death and Commercial Claims PECs were instructed to work together whenever possible to promote the orderly and efficient administration of the litigation and promote judicial economy.[8]

On September 15, 2004, this 9/11 MDL court authorized the *Ashton* Plaintiffs and others to serve certain foreign defendants, including the Taliban, by media publication.[9] The Taliban did not respond, and in 2006, this 9/11 MDL court granted motions for default liability in favor of the *Ashton*, *Burnett*, *O'Neill*, and *Federal Insurance* Plaintiffs.[10] Thus, the *Ashton*, *Burnett*, *O'Neill*, and *Federal Insurance* Plaintiffs have had liability judgments against the Taliban for more than fifteen years.

Between 2008 and 2011, the *Havlish* Plaintiffs separately sought default judgments against foreign sovereign defendant Islamic Republic of Iran ("Iran") and others, including non-sovereign

---

[6] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2004), ECF 248-2 ¶¶ 4–7.

[7] *Id.* ¶ 6

[8] *See, e.g., id.* ¶ 3.

[9] *In re Terrorist Attacks*, 03-cv-1570 (S.D.N.Y. Sept. 16, 2004), ECF 445.

[10] *See, e.g., In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 27, 2006), ECF 1782, *et seq.*; *id.*, (May 12, 2006) ECF 1797.

defendants such as the Taliban. The *Havlish* Plaintiffs presented no facts or arguments concerning the Taliban's role in the 9/11 Attacks, as was required in the default judgment effort against sovereign defendant Iran, instead relying entirely on the Taliban's default. As it had done six years prior for the *Ashton* Plaintiffs and others, this Court granted default judgments in favor of the *Havlish* Plaintiffs and granted motions for final damages judgments as against certain foreign sovereign Iranian entities and numerous other non-sovereign defendants, including the Taliban.[11]

In 2015, the *Ashton*, *Burnett*, *O'Neill*, and *Federal Insurance* Plaintiffs obtained default judgments against Iran, and this Court began issuing final damages judgments on a rolling basis, beginning on March 8, 2016.[12] This Court issued individual damage awards for economic losses in each of those cases, and $2,000,000 for conscious pain and suffering of each of the *Ashton* Plaintiffs' decedents killed in the 9/11 Attacks.[13] This Court next awarded solatium damages to immediate surviving family members, to include surviving spouses, children, parents, siblings and/or their functional equivalents.[14] Those damages are $12,500,000 for a spouse; $8,500,000 for a child or parent; and $4,250,000 for a sibling.[15] Despite those substantial judgments, no claimant has recovered close to the full amounts, with nearly all of the families victimized in the 9/11 Attacks receiving no more than 5% of their judgments, and spouses and dependents of decedents have generally receiving less than 0.76% of their judgments.[16]

---

[11] *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Oct. 3, 2012), ECF 2623.

[12] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 8, 2016), ECF 3226.

[13] *Id.*

[14] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2016), ECF 3300.

[15] *Id.* at 4 (Ex. A).

[16] *See* USVSST Special Master Reports to Congress published August 2017, February 2019 and June 2020, available at http://www.usvsst.com/news.php (last accessed Apr. 18, 2022).

Many years later, in March 2020, the *Doe* Plaintiffs, seven anonymous U.S. contractors injured in a 2016 suicide bombing in Afghanistan, brought a complaint against the Taliban in the Northern District of Texas and obtained a final default judgment against the Taliban in November 2020.[17] In December 2020, the *Doe* Plaintiffs registered that default judgment in the Southern District of New York. On February 10, 2021, the *Doe* court issued an abstract of judgment against the Taliban in the combined amount of $138,418,741.[18]

### *Efforts to Collect on Claims Against the Taliban*

On September 13, 2021, the *Havlish* Plaintiffs served a recently obtained writ on the FRBNY in the amount of $7,045,632,402.79 without publicly docketing it in the 9/11 MDL or otherwise notifying other 9/11 MDL parties, despite the fact that two of their attorneys sit on the Wrongful Death PEC.[19] On September 27, 2021, the *Doe* Plaintiffs served a similarly recently obtained writ on the FRBNY in the amount of $138,418,741.[20] The U.S. government, through the Department of Justice ("DOJ"), promptly intervened and the *Havlish* and *Doe* courts granted stays of any judicial enforcement of the respective writs of execution.[21] During the pendency of those

---

[17] *See Doe 1 v. Al-Qaeda*, 4:20-cv-605 (N.D. Tex. Mar. 20, 2020), ECF 1 (complaint); *id.* (Nov. 5, 2020), ECF 22 (final default judgment).

[18] Abstract of Judgment Issued, *Does*, 20-mc-740 (S.D.N.Y Feb. 10, 2021).

[19] *Havlish*, 03-cv-9848 (S.D.N.Y. Sept. 20, 2021), ECF 527 at 1. Further, the *Havlish* Plaintiffs are currently represented by, among others, an attorney who, until January 2022, served as special counsel to the National Security Council advising the Biden Administration in connection with legal efforts to resettle Afghan evacuees.

[20] *Does*, 20-mc-740 (S.D.N.Y. Aug. 26, 2021), ECF 15; *id.* (Aug. 30, 2021), ECF 19; *id.* (Sep. 23, 2021), ECF 26; *id.* (Oct. 14, 2021), ECF 30.

[21] *See Havlish*, 03-cv-09848 (S.D.N.Y. Sep. 20, 2021), ECF 527 at 3; *Does*, 20-cv-740 (S.D.N.Y. Sep. 23, 2021), ECF 26 at 2. Indeed, the non-*Havlish* Plaintiffs learned of the writ only because DOJ attached the writ as an exhibit to a letter filed with the 9/11 MDL court after the writ had already been served. *Havlish*, 03-cv-9848 (S.D.N.Y. Sep. 16, 2021), ECF 526, 526-1; *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Sep. 20, 2021), ECF 7120.

stays, beginning in December 2021, the *Ashton* Plaintiffs moved in stages for final judgments for damages against Iran's co-tortfeasor, the Taliban for nearly $30 billion.[22]

On February 11, 2022, President Biden signed the Executive Order, which is explicitly intended, at least in part, to benefit all victims of terrorism with claims against the Taliban: "I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order."[23] In furtherance of this explanation, the Administration issued that same day a "Fact Sheet" concerning the Executive Order, making clear that the DAB Assets are earmarked for "U.S. victims of terrorism":

> Many U.S. victims of terrorism, including relatives of victims who died in the September 11, 2001 terrorist attacks, have brought claims against the Taliban and are pursuing DAB [funds] in federal court. Because some of these plaintiffs currently have writs of execution against the DAB [funds], the court will need to issue a further decision regarding the scope of those writs. Even if funds are transferred for the benefit of the Afghan people, *more than $3.5 billion in DAB [funds] would remain in the United States and are subject to ongoing litigation by U.S. victims of terrorism. Plaintiffs will have a full opportunity to have their claims heard in court.*[24]

Upon the filing of the Statement of Interest, the *Havlish* and *Doe* Plaintiffs requested the stays be lifted. On February 22, 2022, this Court held a hearing at which counsel for the United States and the *Havlish*, *Doe*, *Ashton, O'Neill*, and *Federal Insurance* Plaintiffs, among others, apprised the

---

[22] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Dec. 20, 2021), ECF 7489–91; *id.* (Dec. 31, 2021), ECF 7516–18; *id.* (Jan. 13, 2022), ECF 7594; *id.* (Jan. 28, 2022), ECF 7634; *id.* (Feb. 17, 2022), ECF 7678; *id.* (Feb. 17, 2022), ECF 7683; *id.* (Feb. 18, 2022), ECF 7685.

[23] Executive Order 14,064, 87 Fed. Reg. 8391 (2022).

[24] White House Fact Sheet, Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan (emphasis added).

court of their respective positions on lifting the stays.[25] Counsel for the *Ashton* Plaintiffs urged the Court to ensure fair treatment of all plaintiffs in the 9/11 MDL.[26]

Ultimately, the Court lifted the stay on March 2, 2022, triggering a flurry of activity as disparate plaintiff groups in this MDL competed to establish their own rights to a portion of the DAB Assets. Dozens of motions and amendments regarding the Taliban have been filed on the 9/11 MDL docket since February 11, 2022, as parties have sought to ensure their judgments and claims are on file with the Court.

In addition, yet another group of plaintiffs—this time unrelated to the 9/11 Attacks and the 9/11 MDL—emerged to lay their own claim to the DAB Assets.[27] On March 8, 2022, more than twenty-three years after al Qaeda's August 7, 1998 bombings of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, individuals allegedly injured or killed in those bombings (or their estates) and their family members (together, the "*Owens* Plaintiffs") filed a complaint, solely against the Taliban, seeking compensatory and punitive damages.[28] As they filed their complaint, the *Owens* Plaintiffs also moved on an emergency basis (citing the *Havlish* and *Doe* Plaintiffs' September 2021 service of writs of execution against the DAB Assets) for a prejudgment order of attachment against the DAB Assets for an amount in excess of $4,669,011,012.21.[29]

On March 21, 2022, the *Owens* court granted a prejudgment attachment as to $1,373,761,042.95 of the DAB Assets (reflecting the compensatory damages portion of the

---

[25] *Ashton*, 02-cv-6977 (S.D.N.Y. Feb. 22, 2022), ECF 1614.

[26] *See id.* at 27:9–10.

[27] *See, e.g.*, *Does*, 20-mc-740 (S.D.N.Y. Mar. 2, 2022), ECF 68.

[28] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 8, 2022), ECF 1 (deficiently filed complaint); *id.* (Mar. 9, 2022), ECF 7 (re-filed complaint).

[29] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 8, 2022), ECF 4–6.

$4,669,011,012.21 the *Owens* Plaintiffs claim in damages).[30] In a subsequent Opinion and Order, the *Owens* court explicitly recognized that the limited DAB Assets are insufficient to satisfy all deserving victims of terrorism with claims against the Taliban and that New York State's default judgment enforcement rules have incentivized this inequitable race for the DAB Assets.

> The unfortunate reality that the numerous victims of acts of terror perpetrated by the Taliban may not collect on judgments is not lost on the Court, and the Court does not seek to engage in gamesmanship over which victims are more deserving to collect on the *limited funds* available. New York law contemplates that pre-judgment attachment provides priority among creditors.[31]

On March 22, 2022, counsel for the *Federal Insurance* Plaintiffs and co-chair of the Commercial Claims PEC, submitted a letter apprising this Court that the *Federal Insurance* Plaintiffs and certain other groups of plaintiffs, including the *Havlish* and *Doe* Plaintiffs, had "reached agreement in principle" effectively allocating priority among themselves over the DAB Assets, including those subject to attachment by the *Owens* Plaintiffs (the "Priority Settlement").[32] The *Ashton* Plaintiffs (and many others[33]) declined to participate in the Priority Settlement because, if allowed, it will still result in a highly inequitable distribution of the DAB Assets, such that a relatively small number of claimants will receive an outsized portion of the funds, and most other claimants will receive, if anything, only a tiny fraction of that recovery.[34]

---

[30] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 21, 2022), ECF 33.

[31] *Owens*, 22-cv-1949 (S.D.N.Y. Apr. 11, 2022), ECF 38 (emphasis added).

[32] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 22, 2022), ECF 7790 at 1.

[33] *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 22, 2022), ECF 7792 at 3 ("It was not, and could never be, the position of the Biden Administration, that some 9/11 family members would receive compensation for their losses for these blocked assets than others do measured merely by the date they received their final judgments."); *id.* (Mar. 23, 2022), ECF 7793 (joining in the Baumeister letter and requesting the appointment of a Special Master to oversee distribution of the DAB Assets).

[34] *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 30, 2022), ECF 7810 at 2.

On April 6, 2022, this Court granted the *Federal Insurance* Plaintiffs' motion for a partial

final default judgment against the Taliban for a total award, including prejudgment interest, of

$9,351,247,965.99 (approximately $3.1 billion of which is for compensatory damages which, with

interest, comes to a total of over $8.4 billion).[35] In granting the motion, the Court noted that there

were more than a dozen motions for default judgment against the Taliban pending on the MDL,

including the *Ashton* Plaintiffs' combined motions which seek damages of nearly $30 billion on

behalf of approximately 830 plaintiffs.[36] The Court directed "all plaintiffs to continue to meet and

propose strategies for an efficient and fair process to adjudicate pending default judgment motions"

and noted that the *Federal Insurance* Plaintiffs "may execute on and enforce the[ir] judgment

immediately."[37]

Accordingly, the DAB Assets are currently subject to two writs of execution and a

prejudgment attachment order. And the *Federal Insurance* Plaintiffs may execute on their damages

judgment any day.[38] The dollar amounts contemplated by the writs and attachment order alone

exceed the $3.5 billion in DAB Assets, and they concern only a tiny fraction of claimants against

the Taliban, to say nothing of the *Federal Insurance*, *Ashton*, and other plaintiffs who have

received or expect to soon receive damages awards.

***The Turnover Motions***

On March 20, 2022, the *Havlish* and *Doe* Plaintiffs filed these Turnover Motions in

amounts sufficient to satisfy their respective compensatory damages awards of $2,086,386,669

---

[35] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833.

[36] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Dec. 20, 2021), ECF 7489–91; *id.* (Dec. 31, 2021), ECF 7516–18; *id.* (Jan. 13, 2022), ECF 7594; *id.* (Jan. 28, 2022), ECF 7634; *id.* (Feb. 17, 2022), ECF 7678; *id.* (Feb. 17, 2022), ECF 7683; *id.* (Feb. 18, 2022), ECF 7685.

[37] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833.

[38] On April 20, 2022, this Court affirmed the Federal Insurance Plaintiffs' prejudgment interest calculation, enabling their Final Judgment to issue. *See In re Terrorist Attacks*, 03 md 1570 (S.D.N.Y. Apr. 20, 2022), ECF 7888.

and $138,284,213.26,[39] which, together represent nearly two-thirds of the DAB Assets. As stated in the *Havlish* Plaintiffs' motion, they were the first to deliver their writ of execution to the U.S. Marshal and the first to levy upon the DAB Assets.[40] The *Doe* Plaintiffs followed shortly thereafter.[41] These facts are what they claim grant them immutable priority.

### The Class Action Complaint

To avert the inequitable outcome all but assured should this Court grant the Turnover motions, on April 20, 2022, the Wodenshek family—members of the *Ashton* Plaintiffs—filed a class action complaint pursuant to Rule 23(b)(1)(B) seeking certification of a class of similarly situated victims of terrorism and seeking equitable distribution of the DAB Assets.[42] Such relief is necessary since the DAB Assets constitute a limited fund that is not remotely sufficient to satisfy the billions of dollars in judgments already obtained or being sought in this MDL alone. The Wodenshek family is also seeking a temporary restraining order and preliminary injunction against judgment collection proceedings like these Turnover Motions.[43]

---

[39] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 20, 2022), ECF 7763–71. As to at least the *Havlish* motion, the actual judgment underlying the writ includes punitive damages, which cannot be recovered under TRIA, which is the basis for obtaining the DAB Assets, and the interest calculation may be incorrect. Additionally, if the operative complaint of the *Havlish* Plaintiffs is the Third Amended Complaint, filed in 2010, it appears not to contain a cause of action that would warrant an award of solatium damages. *See Havlish*, 03-cv-9848 (S.D.N.Y.), ECF 214 at 15, 142–43 (Second Amended Complaint refers to Anti-Terrorism Act only for purposes of jurisdiction and in connection with request for treble damages). If that is the case, then the compensatory damages awards that they can seek to satisfy with the DAB Assets is substantially less than they have asserted in their turnover proceeding. Should the Court think this creates a defect in the *Havlish* writ, the Court may authorize a special proceeding under CPLR § 5239 to vacate any execution issued in this action. *See, e.g., Cornell v. T. V. Dev. Corp.*, 50 Misc. 2d 422, 422 (Sup. Ct. 1966).

[40] *See Havlish*, 03-cv-9848 (S.D.N.Y. Mar 20, 2022), ECF 598 at 25.

[41] *See Does*, 20-mc-740 (S.D.N.Y. Mar. 20, 2022), ECF 80 at 24.

[42] *In re Approximately $3.5 Billion of Assets on Deposit at the Federal Bank of New York in the Name of Da Afghanistan Bank*, 22-cv-3228 (S.D.N.Y. Apr. 20, 2022), ECF 1.

[43] *In re Approximately $3.5 Billion of Assets on Deposit at the Federal Bank of New York in the Name of Da Afghanistan Bank*, 22-cv-3228 (S.D.N.Y. Apr. 20, 2022), ECF 6–9.

## ARGUMENT

### I.   NO DISTRIBUTION OF DAB ASSETS SHOULD OCCUR OUTSIDE OF THE RULE 23(B)(1)(B) CLASS ACTION

This Court should not distribute assets or take any action that would dissipate the DAB Assets. To do so would infringe upon the class action court's jurisdiction to adjudicate the claims in that proceeding. The Rule 23(b)(1)(B) limited fund class action framework will provide an equitable process for distributing the DAB Assets—including among the *Havlish* and *Doe* Creditors, who are encompassed under the proposed class definition.

### II.   DISTRIBUTION OF THE DAB ASSETS SHOULD NOT BE DETERMINED BY "PRIORITY"

#### A.   Priority Rules Cannot Apply to the DAB Assets

The concept of "priority" should not govern distribution of the DAB Assets made available by the Executive Order. To allow for turnover of the DAB Assets in the amounts requested would introduce grave and immeasurable inequities into these proceedings. The thousands of individuals who have been litigating for decades in the MDL are all alike in one indelible feature: that they suffered great, unimaginable harms on September 11, 2001 and have diligently sought justice for that suffering through orderly processes controlled by this Court. The Executive Order granted all these victims with an unanticipated opportunity to execute their longstanding judgments against heretofore unavailable assets of a terrorist party. But having served a writ of execution on these DAB Assets before other victims had the opportunity to do so does not make the *Havlish* or *Doe* Creditors any more deserving of just recompense than any other victims. And the law does not mandate that distinction. Rather, when complicated matters arise in the administration of large aggregations of claims such as a mass tort MDL, "the primary

goal of the court is to ensure that similarly situated individuals receive equal fairness protections regardless of how the courts aggregated the litigation."[44]

### B.   Even if Article 52 Applies, the *Ashton* Plaintiffs are Interested Persons Under CPLR § 5240

CPLR § 5240 grants "substantial authority to order equitable relief" by providing courts with broad, discretionary powers to control and regulate enforcement of money judgments.[45] The statute specifically provides that "[t]he court may at any time, on its own initiative or the motion of any interested person, and upon such notice as it may require, make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure."[46] Relief under CPLR § 5240 may be obtained by any "interested person" who has been affected by the use of any enforcement procedure under CPLR Art. 52.[47]

The *Ashton* Plaintiffs hold liability judgments against the Taliban and currently have motions for damages judgments pending before this Court.[48] The Court recently granted *Federal Insurance* Plaintiffs' motion for compensatory damages and the *Ashton* Plaintiffs are confident that theirs should be granted shortly as well. For these reasons, the *Ashton* Plaintiffs are interested persons under CPLR § 5240 and are entitled to seek relief under this provision.

---

[44] *In re Zyprexa*, 433 F. Supp. 2d 268, 272 (E.D.N.Y. 2006) (internal quotation marks omitted).

[45] *See Borges v. Placeres*, 111 N.Y.S.3d 517 (N.Y. Civ. Ct. 2018) (citation omitted); *Guardian Loan Co. v. Early*, 47 N.Y.2d 515, 519 (1979).

[46] N.Y. C.P.L.R. § 5240.

[47] *See* 3A West's McKinney's Forms Civil Practice Law and Rules § 8:431.

[48] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Dec. 20, 2021), ECF 7489–91; *id.* (Dec. 31, 2021), ECF 7516–18; *id.* (Jan. 13, 2022), ECF 7594; *id.* (Jan. 28, 2022), ECF 7634; *id.* (Feb. 17, 2022), ECF 7678; *id.* (Feb. 17, 2022), ECF 7683; *id.* (Feb. 18, 2022), ECF 7685

### C.    CPLR § 5240 Allows the Court to Prevent Injustice in this Turnover Proceeding

CPLR § 5240 applies to both state and federal judgments,[49] and grants authority in an appropriate case to modify an execution.[50] Federal courts have employed CPLR § 5240 in cases under New York law "to prevent harsh or unjust results."[51] That provision sets no limitation on the court's discretion to modify enforcement procedures.[52] In fact, the Court can invoke the equitable protections of CPLR § 5240 sua sponte.[53]  CPLR § 5240 is purposefully "stated as broadly as possible" and was enacted to "replace the diverse, overlapping, overly technical and inconsistent provisions relating to the manner in which enforcement procedures may be modified, vacated and regulated."[54] In whatever situation it is used, CPLR § 5240 is intended to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or to the courts.[55] The broad purpose of this provision is to provide courts with the authority to address unforeseeable inequities that may arise in the course of routine enforcements of money

---

[49] *See Wandschneider v. Bekeny*, 75 Misc. 2d 32, 39 (Westchester Cnty. Sup. Ct. 1973).

[50] *Midlantic Nat. Bank v. Reif*, 732 F. Supp. 354, 356–57 (E.D.N.Y. 1990); *see also Cablevision Systems Corp. v. 45 Midland Enterprises*, 858 F. Supp. 42, 43 (S.D.N.Y. 1994) (equating CPLR § 5240 with 28 U.S.C. § 3013 as conferring upon the District Court the power "as a court of equity to take whatever action may be necessary to protect the rights of the [creditor], debtors, and third parties.")

[51] *S.E.C. v. Pentagon Capital Management PLC*, No. 08-CV-3324, 2013 WL 5815374, at *5 (S.D.N.Y. Oct. 29, 2013); *Townsend Farms, Inc. v. Goknur Gida Maddeleri Enerji Imalate Ithalat Ihracat Ticaret*, No. 20-mc-75 (RA) (RWL), 2020 WL 7260513, at *3 (S.D.N.Y. Dec. 9, 2020) (employing CPLR § 5240 "to prevent undue prejudice and disadvantage").

[52] *See id.*; *see also Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 76 n.4 (2013) ("There is no concrete temporal limitation on initiation of a CPLR § 5240 proceeding, which is largely equitable in nature.").

[53] N.Y. C.P.L.R. § 5240 ("The court may at any time, on its own initiative[. . .]"); David D. Siegel and Patrick M. Connors, New York Practice § 521 (6th Ed. 2021).

[54] *See* Legislative Studies and Reports, C.P.L.R. § 5240; *Borges*, 111 N.Y.S.3d 517.

[55] *See Guardian Loan*, 47 N.Y.2d at 519 (citing Third Preliminary Report of the Advisory Comm. on Practice and Procedure (1959) at 314).

judgments. For this reason, courts have exercised their discretion under CPLR § 5240 in a variety of circumstances to prevent a wide range of inequities.[56]

There can scarcely be a situation where the need to prevent "unreasonable disadvantage or prejudice to any person" arising from Article 52 procedures is stronger than it is in the present case. Unless this Court uses its broad discretionary powers under CPLR § 5240 to limit or condition the *Havlish* and *Doe* Creditors' use of the execution procedures provided for by the CPLR, a small handful of plaintiffs stand to collect tens of millions of dollars each, while thousands of other victims will receive substantially less, if anything at all. That gross "disadvantage or prejudice" will have nothing to do with the merits of their cases or the extent of their damages relative to the *Havlish* and *Doe* Creditors. It will instead arise chiefly because the *Havlish* Creditors raced to the courthouse faster than others while simultaneously not sharing that maneuvering – indeed, failing to publicly docket their efforts or otherwise provide notice to other 9/11 victims.

Thus, the Court should deny the turnover motions of the *Havlish* and *Doe* Creditors and invoke its broad powers under CPLR § 5240 to modify the enforcement procedures set forth in CPLR § 5234 (b) and (c) in all enforcements of judgments against the DAB Assets to establish an orderly and equitable distribution rather than one governed by priority rules that do not contemplate the situation here and that would result in an irreversible injustice.

---

[56] *See, e.g.*, *Kantrowitz, Goldhamer & Graifman, P.C. v. Spivack*, 170 A.D.3d 821 (2019) (judgment creditor denied power to enforce judgment against non-exempt assets of debtor so long as debtor continued to make bi-weekly payments); *Sirotkin v. Jordan*, 141 A.D. 3d 670 (2d Dep't 2016) (court denied judgment debtor's seeking assignment of membership interest in LLC, on condition that debtors LLC interest be charged with payment of unsatisfied amount of debt); *L.I. Head Start Child Dev. Services, Inc. v. Economic Opportunity Comm. of Nassau*, 956 F. Supp. 2d 402, 413–15 (E.D.N.Y. 2013) (pursuant to CPLR § 5240 dispensing with argument that creditor institute § 5227 special proceeding where judgment debtor is a defunct entity); *S.E.C. v. Pentagon Capital Mgmt. PLC*, 08-cv-3324 (RWS), 2013 WL 5815374 (S.D.N.Y. 2013) (pursuant to CPLR § 5240 modifying restraining order to permit payment of legal fees); *Cruz v. TD Bank N.A.*, 22 N.Y. 3d 61, 74 (2013); *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, No. 73, 2021 WL 5926893 (N.Y. Dec. 16, 2021); *Midlantic Nat. Bank v. Reif*, 732 F. Supp. 354, 356–57 (E.D.N.Y. 1990); *Cablevision Systems Corp.*, 858 F. Supp. at 42, *et seq.*

**D.     The Court is Not Bound to Provide the *Havlish* or *Doe* Creditors with Priority Under New York Law**

In their respective motions for turnover, the *Havlish* and *Doe* Creditors deal with the issue of priority only summarily—devoting a combined total of three sentences to this critical issue.[57] But the issue of whether normal priority rules will or should apply has immense and far-reaching consequences for the Court to consider. Neither the CPLR nor any binding caselaw compels a conclusion that the *Havlish* Creditors are entitled "absolute priority" over all other creditors.[58]

Among other issues, there is no law that establishes that such priority is "absolute" or immutable, and neither the *Havlish* nor *Doe* Creditors cite to any. The lone case that the *Havlish* and *Doe* Creditors have ever cited in support of their priority claims is *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018).[59] But *CSX* simply describes the normal priority rules under New York law; it does not foreclose the use of CPLR § 5240 (or the All Writs Act) to modify the normal rules and certainly does not compel an MDL court to apply normal New York priority rules strictly in an unprecedented situation like this, particularly when doing so would lead to such an unfathomably harsh result. Rather, CPLR § 5240 endows the Court with authority to prevent unjust and inequitable results that may arise in debtor-creditor proceedings.

Moreover, the policies underlying the normal rules of priority are inapplicable to the circumstances here. While New York's priority rule "benefits judgment creditors that are more diligent in their enforcement efforts than others; and disfavors judgment creditors that sit back and let others do the work,"[60] here the *Havlish* Plaintiffs took a damages judgment obtained on the sole

---

[57] *See Havlish*, 03-cv-9848 (S.D.N.Y. Mar 20, 2022), ECF 598 at 25; *Does*, 20-mc-740 (S.D.N.Y. Mar. 20, 2022), ECF 80 at 24.

[58] *See Havlish*, 03-cv-9848 (S.D.N.Y. Mar 20, 2022), ECF 598 at 25.

[59] *See id.* at 13, 25.; *Does*, 20-mc-740 (S.D.N.Y. Mar. 20, 2022), ECF 80 at 13.

[60] CPLR § 5234.

basis of a default – and no evidentiary proof against the Taliban – and served a writ that was based solely on a two-paragraph speculative description of the DAB Assets.[61]

*First*, this MDL involves thousands of plaintiffs—each of whom was victimized by the same act of terrorism and each of whom has been pursuing numerous avenues of relief against numerous perpetrators of the 9/11 Attacks. Any disparities with respect to diligence and commitment to pursuing and enforcing judgments against the Taliban *over the past two decades* are on the margins. No one sat back "and let others do the work." Indeed, the *Ashton* Plaintiffs obtained their initial liability judgments against the Taliban five years before the *Havlish* Plaintiffs did and more than a decade before the *Doe* Plaintiffs did.[62]

*Second*, the PEC members have obligations to the common interests of the MDL. To pit plaintiff against plaintiff, as the *Havlish* Plaintiffs seek, puts the PEC leadership at a disadvantage. This is because the PEC leadership, including counsel for the *Ashton* Plaintiffs, is obligated to protect the MDL process as a whole, usually acting, as here, for the common benefit of all MDL litigants. This important feature of MDL proceedings directly conflicts with, and should supersede, the policies underlying New York debtor-creditor priority rules, which encourage and reward competition and a race to benefit individual plaintiffs.[63]

---

[61] *See Havlish*, 03-cv-9848 (S.D.N.Y. Sept. 16, 2021), ECF 526-1 at 12–13.

[62] That the *Ashton* Plaintiffs did not at the time obtain damages judgments is readily explained by the fact that there were no Taliban assets that could have been used to satisfy damages judgments. In fact, the *Havlish* Plaintiffs obtained their damages judgments against a group of non-sovereign defendants, including the Taliban, only because they did so simultaneous with their efforts to obtain damages against sovereign Iranian defendants, essentially as tag-along motions, but made no effort to serve their judgments on the Taliban before the turnover proceeding.

[63] Federal Rule of Civil Procedure 69(a) provides that state law only applies to judgment enforcement proceedings to the extent a federal statute does not apply. Here, several federal laws potentially govern. They include the MDL statute, 28 U.S.C. § 1407, the Statement of Interest statute, 28 U.S.C. § 517, TRIA, 28 U.S.C. § 1610 note, and the entire OFAC federal licensing regime created through various federal statutes, 50 U.S.C. §§ 1601–51, 1701–06, and implementing licenses and executive orders. *See* Exec. Order 13224, 3 C.F.R. 13224 (2002) (designating the Taliban as a SDTG); *see also In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Feb. 11, 2022), ECF 7661-1–2. The Court, therefore, is not bound to accept the conclusion that New York priority rules apply.

*Third*, dozens of motions for damages judgments are pending before this Court. It is because of this feature of the MDL, and the element of randomness it has brought to this process, that some plaintiffs have obtained writs and others have not. By enforcing priority rules, the Court would not be rewarding the "diligent," but rather the fortuitous. While the *Ashton* Plaintiffs' motions for damages were filed starting in December 2021, because no judgments have issued yet they are arguably behind the *Owens* order of pre-judgment attachment, allowing *Owens* to argue that it now has the third priority after *Doe* and *Havlish*.

So far as the *Ashton* Plaintiffs are aware, there is not a single case that obligates this Court to enforce standard rules of priority in the context of a mass terroristic event in which thousands of similarly situated plaintiffs, who suffered similar injuries caused by the same defendant, have been litigating for decades to achieve recompense for their unspeakable harms. Further, there is no case which establishes that normal priority rules apply in the context of a multi-district litigation structure, where Plaintiffs' Executive Committees are obligated to manage the litigation pursuant to the common good. Contrary to the *Havlish* and *Does* Creditors' positions, by enforcing normal rules of priority, the Court would be creating precedent, not following it.

**E.  Alternatively, the Court Should Enter a Protective Order Under the All Writs Act to Ensure the Effective Administration of the 9/11 MDL**

As the Second Circuit has explained, "[t]he All Writs Act enables federal courts to 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'"[64] The Act allows a federal court to "avail itself of all auxiliary writs as aids in the performance of its duties, when the use of such historic aids is calculated in its sound

---

[64] *United States v. Catoggio*, 698 F.3d 64, 67 (2d Cir. 2012) (quoting 28 U.S.C. § 1651(a)).

judgment to achieve the ends of justice entrusted to it."[65] It also provides "federal courts sweeping authority to preserve their jurisdiction over complex, ongoing litigation."[66]

The foundational principles underlying Case Management Order No. 3, which established the PEC structures that effectuate this MDL, are cooperation, coordination, and efficient administration.[67] These principles continue to imbue the goals and orders issued in the MDL to this day.[68] Endorsing this race undermines the MDL structure and encourages PEC members to abandon cooperation and coordination and instead pursue the interests of only their individual clients at the direct expense of other MDL plaintiffs. It would run directly counter to these clearly articulated and consistently implemented policies to allow the inequitable process that turnover would present if it were to proceed pursuant to priority rules. These orders, and many others issued throughout the duration of this MDL, demonstrate that the Court never intended to create irreversible priority amongst a small subset of plaintiffs simply by the times at which it has granted judgments. Such an unintended result would conflict with decades of administration and would place an MDL court in the position of picking winners and losers in any case venued in a state with priority rules. Thus, the complex, ongoing nature of the 9/11 MDL, and the goals set forth by the judges overseeing the years of litigation would be frustrated entirely should the *Havlish* and *Doe* Creditors be permitted to inequitably take millions for themselves while thousands of others are left unable to execute their judgments.

---

[65] *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172–73 (1977).

[66] *Neuman v. Goldberg*, 159 B.R. 681, 685 (S.D.N.Y. 1993).

[67] *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2004), ECF 248 (J. Casey directing the PECs to "coordinate," "avoid duplicative filings," and "promote the orderly and efficient conduct of this litigation").

[68] *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. April 6, 2022), ECF 7833 (J. Daniels encouraging "all plaintiffs to continue to meet and propose strategies for a fair process to adjudicate pending default judgment motions").

The All Writs Act "may be invoked to fashion extraordinary remedies when the need arises."[69] "Where the public interest and large numbers of people are involved, courts may go even farther to fashion broad remedies."[70] This case involves the type of extraordinary situation contemplated by the All Writs Act. The legitimacy of the 9/11 MDL and the years of work and waiting of these plaintiffs hangs in the balance. To hold that the *Havlish* and *Doe* writs are entitled to priority over all others would be to disregard the two decades of labor and cooperation in this coordinated proceeding. In order to prevent an infringement on this Court's jurisdiction and mandate to oversee the effective administration of the MDL, the Court can and should issue a protective order to fashion an equitable distribution of these assets pursuant to its authority under the AWA.

## <u>CONCLUSION</u>

This Court has the authority to protect against a grossly inequitable outcome and it should do so by deferring to the class action or by issuing a protective order to limit turnover or establish an equitable distribution of these DAB Assets pursuant to either the Court's "substantial authority" under CPLR § 5240 "to prevent harsh or unjust results," or pursuant to the All Writs Act to preserve its "jurisdiction over complex, ongoing litigation," and uphold the goals of the federal MDL statute.

---

[69] *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 863 (2d Cir. 1988) (quoting *Pennsylvania Bureau of Correction v. United States Marshals Serv.*, 474 U.S. 34, 43 (1985)) (internal quotation marks omitted).

[70] *Cutler v. 65 Sec. Plan*, 831 F. Supp. 1008, 1013 (E.D.N.Y. 1993) (citing *Golden State Bottling Co. Inc. v. National Labor Relations Board*, 414 U.S. 168, 179 (1973); *United States v. State of Washington*, 459 F. Supp. 1020, 1115 (W.D. Wash.), *appeal dismissed*, 573 F.2d 1117 (9th Cir.1978)).

Dated: April 20, 2022
New York, New York

**KREINDLER & KREINDLER LLP**

Megan Wolfe Benett
Noah H. Kushlefsky
485 Lexington Avenue, 28th Floor
New York, New York 10007
Telephone: (212) 687-8181
Facsimile: (212) 972-9432
mbenett@kreindler.com
nkushlefsky@kreindler.com

**SHER TREMONTE LLP**

By:  _/s/ Theresa Trzaskoma_
     Theresa Trzaskoma
     Michael Tremonte
     Max Tanner (*application for admission forthcoming*)
     Kathryn E. Ghotbi
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com
mtanner@shertremonte.com
kghotbi@shertremonte.com