**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON
      SEPTEMBER 11, 2001**

-----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___5/2/2022___
```

**03-MD-01570 (GBD)(SN)**

**REPORT &
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge:**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

> Ashton, et al. v. Al Qaeda, et al., No. 02-cv-06977
> Federal Ins. Co., et al. v. Al Qaida, et al., No. 03-cv-06978
> Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al., No. 03-cv-09849
> Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al., No. 04-cv-01922
> Cont'l Cas. Co., et al. v. Al Qaeda Islamic Army, et al., No. 04-cv-05970
> Estate of John P. O'Neill, Sr., et al. v. Republic of the Sudan, et al., No. 18-cv-12114
> Aronow, et al. v. Republic of Sudan, No. 20-cv-07733
> Betru, et al. v. The Republic of Sudan, No. 20-cv-10615
> Parker, et al. v. The Republic of Sudan, No. 20-cv-10657
> Nolan, et al. v. The Republic of Sudan, No. 20-cv-10720

      The Plaintiffs are people injured or killed in the September 11, 2001 terrorist attacks

("September 11 Attacks"), their families, commercial entities that suffered property damage, and

insurers who compensated the victims. O'Neill also alleges harms on behalf of a class. See

Estate of John P. O'Neill, Sr., et al. v. Republic of the Sudan, et al., No. 18-cv-12114

(GDB)(SN) (Dec. 12, 2018) ("O'Neill"). All Plaintiffs allege that the Republic of Sudan aided

the attack by providing crucial support to the al Qaeda terrorist network.

      Sudan moves to dismiss these complaints under Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6). ECF No. 6575. The Court recommends dismissing certain federal, state,

and international law claims but otherwise denying the motion.

# BACKGROUND

## I.      Factual Background

The Plaintiffs seek to hold Sudan liable for harms they suffered in the September 11

Attacks. They assert claims under the Anti-Terrorism Act (ATA), Foreign Sovereign Immunities

Act (FSIA), Justice Against State Sponsors of Terrorism Act (JASTA)[1], Alien Tort Statute

(ATS), and a set of state torts. As alleged, beginning in the early 1990s, Sudan knowingly

provided extensive support to al Qaeda and its operatives. ECF No. 6537 at ¶ 10, ECF No. 6539

at ¶ 16. [2] This aid transformed al Qaeda into the organization that executed the September 11

Attacks. ECF No. 6537 at ¶ 10, ECF No. 6539 at ¶¶ 15–17. The rest of the factual background is

covered in other opinions. In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 779

(S.D.N.Y. Jan. 18, 2005) ("Terrorist Attacks I").

## II.     Procedural Background

This case's general procedural background has received similarly comprehensive

treatment. In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 665–66 (2d Cir. 2013)

("Terrorist Attacks II"). The Court discusses only the additional background related to Sudan.

On September 4, 2002, a set of plaintiffs filed Ashton. See Ashton, et al., v. Al Qaeda

Islamic, et al., No. 02-cv-06977 (GBD)(SN) (S.D.N.Y. Sept. 4, 2002) ("Ashton"). This

complaint alleged claims against Sudan under an array of state torts, the ATA, the Torture

Victim Protection Act, and the Antiterrorism and Effective Death Penalty Act. The Ashton

plaintiffs filed a consolidated master complaint on March 6, 2003. Ashton, No. 02-cv-06977,

ECF No. 11. An affidavit with proof of service on Sudan in 2003 was filed on September 16,

---

[1] PL 144-222, 130 Stat. 852 (Sept. 28, 2016).
[2] Unless otherwise noted, ECF citations are to In Re Terrorist Attacks on September 11, 2001, No. 03-
   md-1570 (GBD)(SN) (S.D.N.Y. Dec. 10, 2003).

2005. <u>Ashton</u>, No. 02-cv-06977, ECF No. 358. The complaint was then amended several times and came to rest on the Sixth Consolidated Master Complaint ("Sixth Complaint"), filed on September 30, 2005.[3] ECF No. 1463. Sudan did not participate in this proceeding. The Clerk of the Court accordingly entered a default on December 22, 2011. ECF No. 2511.

As this was happening, other actions progressed. On August 15, 2002, another set of plaintiffs filed an action against Sudan for harms arising out of the September 11 Attacks. <u>Burnett, et al., v. Al Baraka Investment & Development Corp. et al.</u>, No. 02-cv-01616 (JR) (D.D.C. Aug. 15, 2002). This was amended for a third and last time on November 22, 2002, <u>Burnett</u>, No. 02-cv-01616, ECF No. 29, before being transferred as part of this multidistrict litigation ("MDL") on December 11, 2003. <u>Burnett v. Al Baraka Investment & Development Corp. et al.</u>, No. 03-cv-09849 (GBD)(SN) (S.D.N.Y. Dec. 11, 2003), ECF No. 1 ("<u>Burnett</u>"). Sudan, again, did not participate and the Clerk of the Court entered a default on March 15, 2012. ECF No. 2575.

On September 10, 2003, a collection of insurance companies filed a complaint against Sudan for harms suffered by their insured. <u>Federal Insurance, et al., v. Al Qaida, et al.</u>, No. 03-cv-06978 (GBD)(SN) (S.D.N.Y. Sept. 10, 2003) ("<u>Fed. Ins. Co.</u>"). Sudan did not act here either, and Plaintiffs say they possess a certificate of default signed by the Clerk of the Court on September 9, 2005.[4] ECF Nos. 6285 at 1, 6649 at 69 n.20.

---

[3] Per Case Management Order #2, this did not require new service. ECF No. 247 at ¶ 12.

[4] Original, signed Clerk's Certificates of Default are provided to the party. The Court has confirmed that, at the time the <u>Fed. Ins. Co.</u> certificate would have been issued, docketing these on ECF was not court practice. The Court thus lacks a way to verify the existence of this certificate. This is moot given the Court's determination that Sudan should be relieved of the <u>Fed. Ins. Co.</u> default.

Then, on September 1, 2004, six additional insurance companies filed another case. Cont'l Cas. Co. v. Al Qaeda Islamic Army, No. 04-cv-05970 (GBD)(SN) (S.D.N.Y. Sept. 1, 2004) ("Cont'l Cas.").

Finally, on March 10, 2004, a group of plaintiffs filed the O'Neill class action. This was updated with a new complaint in December 2018. O'Neill, No. 18-cv-12114, ECF No. 1. Thus, by the end of 2018, there were numerous cases and several defaults against Sudan. O'Neill, though, at last roused Sudan to action. It filed a motion to dismiss that complaint on February 3, 2020. ECF No. 5824.

With Sudan finally taking the field, a unified briefing schedule for all matters was set on August 21, 2020. ECF No. 6401. As a result, Sudan's motion to dismiss the O'Neill complaint was denied without prejudice. ECF No. 6402. The Court approved the filing of two new consolidated complaints for this matter: one covering Ashton, and one covering the rest of the plaintiffs. ECF No. 6401 at 1. The Ashton Amended Complaint was filed November 19, 2020. ECF No. 6537. The Amended Consolidated Complaint ("CAC") followed the next day. ECF No. 6539. Sudan filed this Motion to Dismiss on January 8, 2021.

## DISCUSSION

Sudan challenges the Court's subject matter and personal jurisdiction over this dispute and argues that the Plaintiffs fail to state a claim. It also argues that the filing of the Ashton Amended Complaint and CAC mooted the default judgments against it. Alternatively, it argues that there is good cause to set those defaults aside. The Court addresses these three arguments in that order.

## I.   FSIA § 1605A, § 1605(a)(7) (Repealed), and § 1605B Give the Court Subject Matter Jurisdiction

### A.  Standard of Review

A court reviewing challenges to its subject matter jurisdiction under Rule 12(b)(1) "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Id. The "plaintiff has the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists." Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003). "[A] district court may consider evidence outside the pleadings [as part of this review]." Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008).

### B.  Statutory Framework

Three sections of the FSIA provide the statutory framework for subject matter jurisdiction: § 1605A, its repealed predecessor § 1605(a)(7), and § 1605B.[5] "[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989). "Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).

The first exception, § 1605(a)(7), was relied upon for jurisdiction in earlier filings and remains relevant to several questions here. It waived sovereign immunity for cases:

> in which money damages are sought against a foreign state for
> personal injury or death that was caused by an act of . . .
> extrajudicial killing . . . or the provision of material support or
> resources . . . for such an act if such act or provision of material

---

[5] All of these sections are contained in Title 28. For brevity, they are referred to only by section.

> support is engaged in by an official, employee, or agent of such
> foreign state while acting within the scope of his or her office,
> employment. § 1605(a)(7) (version effective Oct. 6, 2006 to Jan.
> 27, 2008).

Section 1605(a)(7) proved to be a "cumbersome and tedious" method of adjudicating terror victims' claims. See Owens v. Republic of Sudan, 864 F.3d 751, 764 (D.C. Cir. 2017), certified question answered, 194 A.3d 38 (D.C. 2018), and vacated and remanded sub nom. Opati v. Republic of Sudan, 140 S. Ct. 1601 (2020).[6] So, in 2008, The National Defense Authorization Act for Fiscal Year 2008, PL 110-181 ("2008 NDAA"), repealed § 1605(a)(7) and replaced it with § 1605A, "Terrorism Exception to the Jurisdictional Immunity of a Foreign State." This "new exception withdrew immunity, granted jurisdiction, and authorized suits against state sponsors of terrorism for 'personal injury or death' arising from the same predicate acts" as § 1605(a)(7). Owens, 864 F.3d at 765. It also provided a private right of action against state sponsors of terror at § 1605A(c). If a claim is brought under § 1605A(c), then § 1605A(d) allows further actions for reasonably foreseeable property loss based on that same incident.

Lastly, in 2016, Congress enacted JASTA. This waives foreign sovereign immunity for "physical injury to person or property or death" caused by a combination of international terrorism and the tortious acts of foreign states or their officials. § 1605B(b). It also permits U.S. nationals to maintain ATA claims against foreign sovereigns. In re Terrorist Attacks on Sept. 11, 2001, 298 F. Supp. 3d 631, 642 n.6 (S.D.N.Y. 2018) ("Terrorist Attacks III").

Because Sudan is a foreign sovereign, ECF No. 6537 ¶ 2, one of these three exceptions must apply for the Court to have subject matter jurisdiction. Sudan contends that none do

---

[6] Given the centrality of Owens to this Report and Recommendation, a word about its vacatur is appropriate. Opati, which vacated Owens, dealt exclusively with availability of punitive damages. Opati, 140 S. Ct. at 1610. It expressly declined to "resolve matters outside that question . . . ." Id. Owens's treatment of matters outside the question of damages remains persuasive.

because (1) jurisdictional causation is deficient, (2) the jurisdictional allegations fail to allege the intent and official status required of tortfeasors, (3) the complaints are jurisdictionally time-barred, (4) jurisdiction is not viable over family member claims, and (5) jurisdiction is not viable over corporate claims. ECF No. 6575 at 2.

### C. Plaintiffs Have Demonstrated Proximate Jurisdictional Causation For § 1605A, § 1605(a)(7), and § 1605B

Plaintiffs have properly alleged jurisdictional causation. This determination requires first assessing the appropriate causal standard under § 1605(a)(7), § 1605A, and § 1605B. The law of the case doctrine in this MDL, supported by years of precedent, shows that only proximate, not but-for, causation is required. "The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) (quoting United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002)).

In this MDL, the law of the case is that § 1605(a)(7), § 1605A, and § 1605B require only proximate causation. In re Terrorist Attacks on September 11, 2001 held that "[t]he causation requirement under [§ 1605A] is satisfied by a showing of proximate cause." No. 03-md-1570 (GBD)(SN), 2011 WL 13244047, at *41 (S.D.N.Y. Dec. 22, 2011). This holding relied on prior cases finding that jurisdictional causation for § 1605(a)(7) was similarly satisfied by proximate causation. Id. (citing Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 66 (D.C.C. 2010)). Then, in 2018, Terrorist Attacks III held that "JASTA's [i.e., § 1605B's] "caused by" requirement did not incorporate principles of "but for" causation." 298 F. Supp. 3d at 645.

While the Court might depart from these holdings for compelling reasons, it finds none here. Two circuits considering the same question have come to the same conclusion. Kilburn v.

Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (jurisdictional causation in § 1605(a)(7) is satisfied by proximate causation); Rux v. Republic of Sudan, 461 F.3d 461, 473 (4th Cir. 2006) ("Rux I") ("[W]e agree that proximate cause is the appropriate standard to apply to" § 1605(a)(7)), Owens, 864 F.3d at 794 ("Because § 1605A(a) restates the predicate acts of § 1605(a)(7), it stands to reason that proximate cause remains the jurisdictional standard.") Conversely, the Court is not aware of any circuits that have adopted "but for" jurisdictional causation for these statutes. The Court thus finds no reason to depart from the law of the case: proximate cause satisfies the jurisdictional requirements of § 1605(a)(7), § 1605A, and § 1605B.

Normally, "simply stating that [a matter] requires proof of 'proximate cause' does not help much" since "[a] firm definition for the term 'proximate cause' has escaped judges, lawyers, and legal scholars for centuries." Kemper v. Deutsche Bank AG, 911 F.3d 383, 392 (7th Cir. 2018). Here, however, the law of the case provides the standard. Terrorist Attacks III determined that proximate causation required "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." 298 F. Supp. 3d at 645 (citing Owens, 864 F.3d at 794). This is a two-part inquiry: (1) whether a defendant's acts were a "substantial factor" leading to the injury and (2) whether the injury was a "reasonably foreseeable" or "natural consequence" of those actions. Terrorist Attacks III, 298 F. Supp. 3d at 645–46 (internal citations omitted).

Accepting every allegation as true, the Plaintiffs have shown proximate cause. Sudan does not argue that the plaintiffs' injuries were not caused by the September 11 Attacks, only that its conduct was not the cause of those attacks. At this stage, however, the Plaintiffs have adequately alleged that Sudan's sustained campaign of support for al Qaeda was a substantial

factor in the September 11 Attacks. It was also reasonably foreseeable that this support would lead to death and injury because al Qaeda would use it to launch terrorist strikes against the United States.

### 1. Sudan's Support for al Qaeda Was a Substantial Factor in the September 11 Attacks

As alleged, Sudan's support for al Qaeda was a substantial factor in building the organization that struck America on September 11. Substantiality is assessed by how much an entity contributes to terrorist group's operating capacity, rather than a direct link from the aid to a specific attack. The Court of Appeals for the D.C Circuit explained:

> A terrorist organization is supported by two foreign states. One [generally supports a terror group while the other] specifically instructs the organization to carry out an attack against a U.S. citizen. Can the state which only provides general support, but was not involved with the act giving rise to the suit, also be stripped of its immunity? Yes.

Owens, 864 F.3d at 799 (citing Kilburn, 376 F.3d at 1128). This is appropriate because "funds—and, in certain instances, arms and other support—are fungible." Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 368 (D.D.C. 2020). What matters is whether that support is important to terrorists' "operating capacity" and if, absent that backing, the group would be "substantially weakened." Id, 464 F. Supp. 3d at 368. As well, because "terrorist organizations can hardly be counted on to keep careful bookkeeping records," requiring plaintiffs to show that a specific passport, bullet, or dollar supported a specific attack would eviscerate material support liability. See Kilburn, 376 F.3d at 1130. The inquiry, therefore, is if Sudan's aid was a substantial factor in building al Qaeda into the group that was capable of launching the September 11 Attacks, not if any specific piece of support was itself a substantial factor in the specific attack.

Against this background, the Court assesses Sudan's alleged conduct. In 1989, Hassan al Turabi, founder of the National Islamic Front (NIF), joined forces with Omar al Bashir, a

Sudanese army general. ECF No. 6539 at ¶¶ 30–34. The two installed Bashir as President of Sudan in a *coup d'état*. Id. at 34. Within weeks, representatives of the new government reached out to al Qaeda and invited Osama bin Laden's nascent terror group to relocate to Sudan. Al Qaeda accepted. ECF No. 6537 at ¶¶ 13–15. By the end of 1990, Sudan was working with al Qaeda operatives to prepare for the relocation. ECF No. 6537 at ¶ 13. The move was complete by 1992: al Qaeda's leadership and base of operations moved to the Sudanese capital of Khartoum. ECF No. 6539 at ¶ 58.

This relocation was vital. After the withdrawal of Soviet troops from Afghanistan in 1989, al Qaeda's fighters found themselves unwelcome either there or in Pakistan. ECF No. 6539 at ¶ 46. Bin Laden himself was "expelled [from Saudi Arabia] in 1990 for his continued support of terrorism." Rux v. Republic of Sudan, 495 F. Supp. 2d 541, 549 (E.D. Va. 2007) ("Rux II"). "Sudan's invitation . . . allowed al Qaeda to extricate itself from a war-torn Afghanistan and organize its terrorist enterprise in a stable safe haven." Owens, 864 F.3d at 797.

After the move, Sudan mobilized its sovereign might to protect this fledgling terror group. Sudanese intelligence services provided personal security for bin Laden when he arrived in Sudan. ECF No. 6539 at ¶ 66. Sudan "assigned 15 to 20 uniformed soldiers to act as personal bodyguards for bin Laden and other al Qaeda members." Owens, 864 F.3d at 783. "Sudanese intelligence even foiled an assassination attempt against bin Laden in Khartoum" and a separate "plot against al Qaeda's second-in-command, Ayman al-Zawahiri." Id. Sudanese security services also worked with al Qaeda to vet potential recruits. ECF No. 6539 at ¶ 69. Finally, al Qaeda operated six training camps in Sudan. ECF No. 6539 at ¶ 137. These camps were protected from local police by Sudanese intelligence. ECF No. 6539 at ¶ 139.

Sudanese support helped al Qaeda operatives travel and thwarted international counterterrorism efforts. For internal travel, President Bashir provided official documents that let terrorists bypass security screenings. ECF No. 6537 at ¶ 65, ECF No. 6539 at ¶ 72. For external travel, al Qaeda operatives were given Sudanese citizenship, passports, and diplomatic papers. ECF No. 6537 at ¶ 57, ECF No. 6539 at ¶ 70. When other countries became aware of this collaboration, Sudan tried to frustrate their counterterrorism efforts. It escorted terrorists past customs and immigration officials, ECF No. 6539 at ¶ 71, and "establish[ed] a special customs service for al Qaeda operatives to avoid having Sudanese stamps placed in their passports." ECF No. 6537 at ¶ 58.

Al Qaeda also used Sudanese backing to build its resources. The country's government-run airline ferried weapons and equipment from Afghanistan to Sudan. ECF No. 6539 at ¶ 73. The Sudanese Army planned to manufacture chemical weapons with al Qaeda. ECF No. 6537 at ¶ 67. On at least one occasion, al Qaeda operatives and Sudanese military figures discussed the possibility of securing uranium for bombs. ECF No. 6539 at ¶ 154.

Sudan and bin Laden benefited from a mutually profitable business relationship too. Bin Laden completed civil infrastructure projects and started numerous enterprises with wealthy NIF members. ECF No. 6537 at ¶¶ 32–36, ECF No. 6539 at ¶¶ 123–24. These ventures included banks that allowed al Qaeda to access the international monetary system. ECF No. 6537 at ¶¶ 29–30, ECF No. 6539 at ¶ 126. Critically, this meant that "Sudan allowed its banking institutions to be used by Al Qaeda to launder money." Rux II, 495 F. Supp. 2d at 549.

In addition to banks, Sudan and al Qaeda set up agricultural enterprises that maintained a near-monopoly over key exports, ECF No. 6537 at ¶ 31, ECF No. 6539 at ¶ 133, front charities to generate revenue and cover operatives' movements, ECF No. 6537 at ¶ 38–46, ECF No. 6539

at ¶¶ 141–42, and a host of other enterprises that gave al Qaeda and its operatives access to cash and jobs. ECF No. 6539 at ¶ 134.

Sudan also gave al Qaeda the training and connections needed to maximize the use of these resources. In 1991, Turabi set up meetings between the NIF, al Qaeda, and Iran. ECF No. 6539 at ¶¶ 75, 77. That same year, he also organized the first "Popular Arab and Islamic Conference" (PAIC). This connected al Qaeda to a rogue's gallery of terror groups including Hamas and Abu Sayyaf. ECF No. 6539 at ¶ 79. As part of these contacts, Sudan brokered an agreement with Iran and Hezbollah to transfer their vast terrorist expertise to al Qaeda. ECF No. 6539 at ¶ 81, 82. In the years after PAIC, al Qaeda repeatedly sent operatives to Lebanon and Iran at Hezbollah and Iran's invitation to receive training in explosives, intelligence, and security techniques. ECF No. 6539 at ¶¶ 84, 85.

Sudan's support from 1990 to 1996 transformed al Qaeda. Before the move to Sudan, it had roughly 60 members operating out of a tenuous base on the Afghanistan-Pakistan border. ECF No. 6539 at ¶ 45. By the early 1990s, its ranks had swelled to around two thousand. Id. at ¶ 57. The CIA similarly concluded that "[w]hile based in Sudan from 1992-1996, al-Qaida, was transformed from an only partially realized idea to an international organization ready to operate on its own." ECF No. 6539 at ¶ 44. It was during this period (in 1993) that the U.S. designated Sudan a state sponsor of terrorism. ECF No. 6539 at ¶ 39. In making this determination, Secretary of State Warren Christopher announced that "Sudan is a county which has repeatedly provided support for acts of international terrorism." ECF No. 6649 at 19 n.6. That designation was not removed until 2020. ECF No. 6575 at 61.

After 1996, facing mounting international pressure, Sudan and bin Laden agreed he could no longer remain in the country. ECF No. 6539 at ¶¶ 179–80. But the State Department found

that the NIF likely wanted "an amicable separation," which might have included an arrangement to allow bin Laden to continue running his Sudanese enterprises through intermediaries. ECF No. 6537 at ¶ 80. One State Department report written after 1996 suggested that "Sudan was trying to give the impression that they were changing without surrendering Islamic radicals. They were trying to have it both ways." ECF No. 6537 at ¶ 116. A Congressional Research Service report stated, "that after Bin Laden left Sudan, Hassan al Turabi, '[c]ontinue[d] to be politically and ideologically close to Usama Bin Laden . . . .'" Id. at ¶ 19.

Certainly, bin Laden's 1996 departure did not interrupt Sudan's regular appearance in government reports. In 1998, the State Department's *Patterns of Global Terrorism* report stated that "Sudan continued to serve as a meeting place, safehaven, and training hub for a number of international terrorist groups, *particularly Usama Bin Ladin's al-Qaida organization*." ECF No. 6539 at ¶ 41 (emphasis added). The 1999, 2000, and 2001 editions of that report continued to describe Sudan as an al Qaeda sanctuary. ECF No. 6537 at ¶ 118, ECF No. 6539 at ¶ 41. Other court proceedings note that as "early as 1998, Sudan provided Al Qaeda members with Sudanese diplomatic passports as well as regular Sudanese travel documentation that facilitated the movement of Al Qaeda operatives in and out of Sudan." Rux II, 495 F. Supp. 2d at 550.

The business infrastructure developed in the early 1990s may also have endured. Sudan reports that bin Laden was left with nothing following his departure because the government took all his assets. ECF No. 6575 at 15 (citing Nat'l Comm'n on Terrorist Attacks Upon the United States, The 9/11 Commission Report 63, 170 (2004), http://govinfo.library.unt.edu/911/report/911Report.pdf) ("9/11 Commission Report"). Yet State Department reports suggest that several of bin Laden's businesses continued to operate by June

2000 and that the Sudanese government may have worked to conceal bin Laden's ties to these enterprises. ECF No. 6539 at ¶ 135.

Finally—most dramatically—the United States launched cruise missile strikes on terrorist targets in Sudan in 1998, two years after bin Laden's departure. ECF No. 6537 at ¶ 85. Thus, evidence indicates that "Sudan's support to Al Qaeda continued even after Bin Laden's expulsion from the country in 1996 . . . ." Rux II, 495 F. Supp. 2d at 551.

From this sanctuary, al Qaeda began developing the tactics that culminated in the September 11 Attacks. Al Qaeda had been working to weaponize planes since 1993 when Ihab Mohammed Ali was sent from Sudan to the U.S. for flight training. ECF No. 6539 at ¶ 157. In 1994, a second operative was sent from Sudan to obtain flight training. Id. at ¶ 158. Later, Sudan hosted the first meeting between Khalid Sheik Mohammed, mastermind of the September 11 Attacks, and Mohammed Atef, al Qaeda's military chief. Id. at ¶ 164.

Entities founded and supported by Sudan may have contributed too. The Islamic African Relief Agency (IARA) was a Khartoum-based charity whose branches were staffed with senior Sudanese intelligence officers. Id. at ¶ 142. In 2001, a raid on the Dublin branch of IARA's office uncovered evidence of financial links to Mustafa al Hawsawi, who provided funds to the September 11 hijackers. Id. Banks and companies owned by the NIF and the government of Sudan are alleged to have actively participated in a 1999-2000 money laundering plot to help bin Laden move between $26 and $28 million out of Sudan. ECF No. 6537 at ¶¶ 106–111.

Given all this, the Court agrees with its peers: "Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network." Rux II, 495 F. Supp. 2d at 553. "Although the expulsion of bin Laden may

have marked a temporary setback for Al Qaeda, on balance, the organization benefited greatly from Sudan's aid during the 1990s." <u>Owens</u>, 864 F.3d at 797. That assistance was a substantial factor in transforming a ragtag, stateless huddle of 60 fighters into the sophisticated global terrorist organization that struck America on September 11.

### 2. The Deaths and Injuries Caused By The September 11 Attacks Were a Reasonably Foreseeable Outcome of This Support

It was reasonably foreseeable that Sudan's support for al Qaeda would cause death and injury in the United States. The key question is if it is reasonably foreseeable that harm would befall the United States based on Sudan's support. It does not have to be reasonably foreseeable that this support would lead to the September 11 Attacks specifically. This question has already been considered in the context of personal jurisdiction." <u>In re Terrorist Attacks on Sept. 11, 2001</u>, found that harm was foreseeable if activities are performed "to support some future attack to be planned by al Qaeda against the United States, reasonably anticipating that the brunt of the injuries will be felt there." 718 F. Supp. 2d 456, 481 (S.D.N.Y. 2010). But "the defendant need not know that the *support provided is specifically for the 9/11 attacks.*" <u>Id.</u> (emphasis added).

Given the nature of terrorism, this is sensible. "A defendant, who knowingly provides aid to support an attack against the United States cannot escape . . . by simply remaining safely within the shadows . . . unenlightened as to the specific means by which such harm will be inflicted." <u>Id.</u> at 481.

It was reasonably foreseeable that Sudan's alleged support for al Qaeda would bring tragedy for America. For Sudan, this was not merely foreseeable, but desired. Turabi preached a radical brand of fundamentalism that sought to unify Sunni and Shia terrorist organizations against the United States. ECF No. 6539 at ¶ 30. Both he and Bashir considered the United States an enemy of Sudan. ECF No. 6539 at ¶ 35.

In this, al Qaeda was a fellow traveler. It issued fatwas calling for attacks on the United States in 1991, 1992, and 1993. ECF No. 6537 at ¶ 70. In the 1992 fatwa, for example, "Bin Laden . . . stated that U.S. forces stationed in the Arabian Peninsula, where Yemen is located, should be attacked." Rux II, 495 F. Supp. 2d at 551. The 1993 fatwa, which Sudan's intelligence service supported, called for violence against Americans in Somalia. ECF No. 6537 at ¶ 73. Bin Laden issued further statements declaring his intentions to drive America out of the Middle East and kill Americans in 1996 and 1998. Rux II, 495 F. Supp. 2d at 552, ECF No. 6537 at ¶ 81.

Bonded by this shared outlook, Sudan and al Qaeda are alleged to have agreed to create a united front against the United States. Initial meetings between Sudanese and al Qaeda operatives confirmed that they shared a common strategic goal: using Sudanese support to build a global terrorist network that could strike the United States. ECF No. 6539 at ¶¶ 50–52. The 1991 agreement between al Qaeda, Iran, and Sudan's NIF further suggests the existence of a terrorist coalition bound together by a desire to strike the United States. CIA reports suggest that the NIF, al Qaeda, and Iran agreed to "form a tripartite front against their common enemies . . . ." Id. at ¶ 82. "The primary goal of this collaboration was to confront Israel and the United States . . . ." Id.

Sudan and al Qaeda backed up these words with action. In 1993, al Qaeda terrorists, with NIF support, were dispatched to Somalia to attack U.S. service members stationed there. ECF No. 6537 at ¶ 75, ECF No. 6539 at ¶ 101. They also began training Somali warlords battling U.S. forces. Id. at ¶ 103. These operatives were able to safely live in Sudan then use Sudanese passports to travel to Somalia. Id. at ¶ 104.

Then, in 1998, Sudan helped al Qaeda bomb U.S. embassies in Kenya and Tanzania, killing over 224 people. ECF No. 6537 at ¶ 82. Id. As in Somalia, al Qaeda operatives used

Sudan as a home base and Sudanese authorities assisted them in traveling freely across borders. Id. at ¶ 83.

Two years later, al Qaeda operatives who trained in Sudan struck the U.S.S. Cole. Id. at ¶ 90. A U.S. court found that Sudanese support was crucial to this attack, with several experts testifying that the attack would have been challenging to execute otherwise. Rux II, 495 F. Supp. 2d at 553. This occurred just 11 months before September 11, 2001. ECF No. 6537 at ¶ 96.

Not satisfied with striking U.S. targets abroad, Sudan and al Qaeda are alleged to have collaborated on the 1993 "Landmark Attacks." In this plot, a Sudanese cell in New York was to execute follow-up attacks to the 1993 World Trade Center Bombing. ECF No. 6537 at ¶¶ 77–78, ECF No. 6539 at ¶ 115. This scheme led the United States to brand Sudan a state sponsor of terrorism. Id. at ¶ 116.

All this shows that it was reasonably foreseeable that Sudan's support for al Qaeda would lead to American injuries and deaths through terrorist strikes like the September 11 Attacks. Indeed, in the Landmark Attacks plot, Sudan is alleged to have supported al Qaeda's prior strike against the World Trade Centers, a key target on September 11.

Sudan offers two defenses. First, it suggests that bin Laden's 1996 departure broke any causal link between Sudan's support for al Qaeda and the September 11 Attacks. ECF No. 6575 at 14. But Plaintiffs have plausibly alleged that Sudan still supported al Qaeda after bin Laden's departure. Government reports from after 1996 continued to describe the country as a terrorist sanctuary. ECF No. 6537 at ¶ 118, ECF No. 6539 at ¶ 41. Court proceedings have also found that Sudan supported al Qaeda terror attacks well into 2000. Rux II, 495 F. Supp. 2d at 551. Finally, the 1998 missile strikes are arresting evidence that the U.S. did not consider Sudan's break with al Qaeda two years earlier to be particularly clean. ECF No. 6537 at ¶ 85.

Second, Sudan argues that its support cannot be directly connected to the September 11 Attacks. ECF No. 6575 at 27–30. For example, it suggests that Sudanese assistance in the early 1990s vetting al Qaeda recruits and sheltering operatives does not suggest that any of those terrorists were the ones who executed the September 11 Attacks. Id. at 28. It also notes that there is no evidence that specific pieces of material support can be directly connected to the attack. Id. at 29. As a last example, it suggests that prior Sudanese support for attacks on U.S. soldiers does not evidence a connection to the September 11 Attacks. Id. at 28.

Sudan has made this argument unsuccessfully before other courts. It fails here for the same reason: it "ignores the broader context of [Sudan's] actions." Owens, 864 F.3d at 797. Once a terrorism supporter is aware that an organization intends to strike at America, the specific target their support bankrolls matters little. For example, in Owens, the Court found that "Sudan's claimed ignorance of al Qaeda's specific aim to bomb American embassies focuses too narrowly upon those events; Sudan could not help but foresee that al Qaeda would attack American interests wherever it could find them." 864 F.3d at 798.

The Court of Appeals for the Fourth Circuit also dismissed this narrow view. It found that it was "not fatal for purposes of jurisdictional causation" that allegations against Sudan did not "chart a direct and unbroken factual line." Rux, 461 F.3d at 474. What matters is that the allegations and "reasonable inferences drawn therefrom, demonstrate a reasonable connection between Sudan's actions" and the terrorist act. Id. Here, too, what matters is not that Sudan sheltered a specific terrorist or created a particular hijacker's passport. Rather, what matters is that it is likely that the organization that struck America on September 11 would not have existed without Sudan's decade long campaign of support.

The September 11 Attacks required incredible resources and a sophisticated organization. ECF No. 6539 at ¶ 27. It also required the time and safe space to plan, the ability to select and train operatives, funding, and an elaborate logistics and communication network. ECF No. 6539 at ¶ 27. This organizational expertise is more important to a complex attack than any specific man or dollar.

Al Qaeda's organizational expertise existed because of Sudan. For years, it was a safe harbor as al Qaeda devised plans to attack civil aviation. It introduced al Qaeda to Iranian and Hezbollah contacts who trained al Qaeda's agents. It gave terrorists papers to foil international counterterrorism efforts. Finally, it supported repeated al Qaeda attacks on Americans at home and abroad.

These allegations make Sudan different in kind from the charities and non-governmental groups that have found to be causally unconnected to the September 11 Attacks. The allegations against the Saudi High Commission for Relief in Bosnia and Herzegovina (SHC), for example, concerned material support to al Qaeda primarily for attacks far afield in Bosnia. See Terrorist Attacks III, 298 F. Supp. 3d at 647. Allegations against a set of Saudi-linked charities were similarly too tenuous to support jurisdiction, in no small part because if support from these entities reached al Qaeda, it did so indirectly and through intermediaries. Id. at 659.

The differences are stark. Sudan was not several steps removed from al Qaeda. It worked directly with the organization and actively sought to forge connections with its leadership. Sudan aided operations directly against the U.S. homeland and U.S. personnel overseas rather than against other nations. Finally, Sudanese support was not limited to cash or arms. Year after year, it put the might of a sovereign nation's security services and diplomatic privileges into al

Qaeda's growth. The scale of this investment in al Qaeda overcomes any concerns about attenuation at this stage of the proceeding.

In sum, Plaintiffs have shown enough to infer jurisdictional causation. If a nation takes in a group of terrorists because it wants them to attack the United States, listens approvingly as they talk about attacking the United States, helps them fund attacks on the United States, trains them in the skills needed to attack the United States, and supports them in other terrorist attacks on the United States, then that nation is a substantial factor in the reasonably foreseeable outcome of those terrorists injuring and killing people when they again attack the United States.

### D.  The Amended Complaints Satisfy the Other Jurisdictional Requirements of the Terrorism Related Exceptions of § 1605(a)(7), § 1605A, and § 1605B

Turning to the remaining issues, Sudan argues that the complaints fail to allege: (1) that Sudan provided material support as required by § 1605(a)(7) and § 1605A; (2) the requisite intent for § 1605B; or (3) that tortious acts were carried out by Sudanese officials in the course of their duties as required by § 1605B. ECF No. 6575 at 34–36. The Court finds that the CAC and Ashton Amended Complaint satisfy the requirements associated with the terrorism exceptions of § 1605(a)(7), § 1605A, and § 1605B.

First, the complaints allege material support by Sudan and its agents. Both § 1605(a)(7) and § 1605A(a)(1) provide an exception to foreign sovereign immunity for a foreign state that provides "material support or resources" for terrorist acts. Both statutes use or used the definition of material support in 18 U.S.C. § 2339A(b)(1):

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation . . . .

Sudan is alleged to have provided significant material support to al Qaeda. President Bashir and other Sudanese government officials gave al Qaeda operatives official travel documents and special customs access. ECF No. 6537 at ¶¶ 57–58, 65, ECF No. 6539 at ¶¶ 70–72. They brokered contacts between al Qaeda and other international terrorist groups to help train al Qaeda operatives. ECF No. 6539 at ¶¶ 75–85. Sudanese troops and intelligence services provided security for bin Laden, his second in command, and al Qaeda training camps. Id. at ¶¶ 66, 69, 139; Owens, 864 F.3d at 783. Sudanese-al Qaeda joint venture banks provided the terror group financial services. ECF No. 6537 at ¶¶ 29–30, ECF No. 6539 at ¶¶ 126–129. This type of aid can count as material support. See, e.g., Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 151 (D.D.C. 2011) (finding that Sudan providing "safe haven for Bin Laden and al Qaeda" and "inauthentic passports" qualified as "material support")

Second, the complaints demonstrate the intent § 1605B requires. This statute preserves foreign sovereign immunity for "a tortious act or acts that constitute mere negligence." § 1605B(d). Furthermore, in this MDL, the Court has found, for example, that liability under the ATA (the cause for action under § 1605B) requires that the tortious conduct be done either knowingly or with deliberate indifference. In re Terrorists Attacks on Sept. 11, 2001, 740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010) ("Terrorist Attacks IV").

Sudan, as alleged, acted knowingly. This question has been considered at the highest levels of the U.S. government. As part of Sudan's 1993 state sponsor of terror designation, Secretary of State Christopher determined that "Sudan is a county which has repeatedly provided support for acts of international terrorism." ECF No. 6649 at 19 n.6. Four years later, President Clinton issued Executive Order 13067. ECF No. 6649 at 19. This declared "that the polices and actions of the Government of Sudan, include continued support for international terrorism." Id.

The complaints also allege that Sudan invited al Qaeda to their country and sheltered it precisely to form a united front against the United States. ECF No. 6537 at ¶¶ 53–54, ECF No. 6539 at ¶ 38, 42, 75–77, 82. Sudan then aided al Qaeda in doing precisely that. ECF No. 6539 at ¶¶ 41, 43, 50–52, 82. The allegations thus demonstrate the required knowing conduct.

Third, the complaints allege that the tortious acts were carried out by Sudanese employees. High level officials, including President Bashir, acting within the scope of their duties allegedly carried out the tortious acts. This is different in-kind from the purported undeclared employees and agents of the Saudi government carrying out private acts that were insufficient to support liability in Terrorist Attacks III, 298 F. Supp. 3d at 652. Here, President Bashir was a Sudanese government representative. See, e.g., Rux, 461 F.3d at 471–72 ("President Bashir was 'an official, employee, or agent' of Sudan by virtue of his elected position and the broad governmental authority he wielded under the constitution of Sudan in force at the time." (citing Constitution of the Republic of Sudan (repealed 2005), available at http:// www.sudan.net/government/constitution/english.html.)) Also, as noted, evidence of material support through official government acts supports an inference of official activity that private activity does not. See, e.g., Rux, 461 F.3d at 472 n.5 ("[P]ermitting the use of diplomatic pouches . . . allowing the establishment and operation of terrorist training camps and establishing financial joint ventures between Sudan and Al-Qaeda, could only be carried out by government officials acting within the scope of their offices.")

Turabi is a Sudanese official too. Sudan makes much of the allegations that Turabi was only a "de facto leader" and head of a political party rather than a formal government official. ECF No. 6575 at 35–36. Yet the complaints allege that Turabi wielded substantial formal political power. It was his power over Sudan's security and military services that facilitated the

coup. ECF No. 6539 at ¶¶ 33–34. Afterwards, he is alleged to have shared power with President

Bashir until his ouster in 1999. Id. at ¶ 36. During this period, he used government resources to

help connect al Qaeda to other terror groups. Id. at ¶¶ 78–82.

Most importantly, during the 1993 Landmark Attacks, Turabi is alleged to have issued

commands to senior Sundanese diplomatic officials and provided support for an attempted terror

attack by Sudanese intelligence officers. ECF No. 6539 at ¶ 115. Allegations that Turabi was

able to give orders to senior diplomatic personnel provide enough of a basis to infer that he was a

government official.

### E.  Plaintiffs' Actions are Timely as Related Actions Under § 1605A(b) and § 1083(c)(3)

The Court next turns to whether these actions are timely under § 1605A(b) and finds that

they are.[7] The relevant statutes guiding this determination are § 1605A(b) and the statutory note

at § 1083(c) of the 2008 NDAA ("§ 1083(c)"). In assessing timeliness under § 1605A, the Court

"interpret[s] its ambiguities flexibly and capaciously," Van Beneden v. Al-Sanusi, 709 F.3d

1165, 1167 (D.C. Cir. 2013) (citing Doe v. Bin Laden, 663 F.3d 64, 70 (2d Cir. 2011)), because

the goal of the statute is "to lighten the jurisdictional burdens borne by victims of terrorism

seeking judicial redress." Van Beneden, 709 F.3d at 1167 n.4.

Section 1605A(b) allows an action to be "brought or maintained . . . if the action is

commenced, or a related action was commenced under section 1605(a)(7) . . . not later than the

latter of" April 24, 2006, or 10 years after the relevant cause of action, i.e., September 11, 2011.

ECF Nos. 6575 at 32, 6649 at 37. Thus, "a § 1605A action can either be timely in its own right

or timely by virtue of a 'related action.'" Sheikh v. Republic of Sudan, 172 F. Supp. 3d 124, 131

---

[7] Whether § 1605A(b)'s time limits are jurisdictional is an open question. At least one circuit has found
that they are not. Owens, 864 F.3d at 804 ("We therefore hold that the limitation period in § 1605A(b)
is not jurisdictional.") Because the Court finds this action to be timely, it need not address the
jurisdictional question.

(D.D.C. 2016). "The 'related action' concept is elaborated in § 1083(c)(3) of the 2008 NDAA." Id.

The Plaintiffs' § 1605A actions were brought *after* April 24, 2006, and September 11, 2011, and so are untimely on their own. ECF No. 6575 at 32. The § 1605(a)(7) actions, however, were timely, ECF No. 6649 at 37, so the question is whether the timely § 1605(a)(7) actions can rescue the untimely § 1605A actions as "related actions." The Plaintiffs argue they can either because § 1605A actions may be maintained by virtue of the existence of a § 1605(a)(7) action, or, alternatively, because their § 1605A actions may be maintained as related actions under § 1083(c). The former argument is unavailing, but these actions are timely under § 1083(c)'s related action provision.

Turning to the first argument, a § 1605(a)(7) action, without some act by a plaintiff, cannot just become or be maintained as a § 1605A action. Finding otherwise would negate Congress's system for managing the transition from § 1605(a)(7) to § 1605A. The 2008 NDAA provided a scheme at § 1083(c) for bringing existing actions into the new statutory framework. Section 1083(c)(2) provided that "a pending action brought under § 1605(a)(7) could be converted into a § 1605A action if the original action 'relied upon' § 1605(a)(7) for a cause of action and was 'adversely affected' by the statute's failure to provide one." Van Beneden, 709 F.3d at 1166. This conversion, though, requires a "motion made by plaintiffs . . . ." § 1083(c). This provision would be unnecessary if the 2008 NDAA automatically converted pending § 1605(a)(7) actions into § 1605A actions. That would violate "the cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute . . . ." Williams v. Taylor, 529 U.S. 362, 364 (2000).

The Court of the Appeals for the D.C. Circuit reached the same conclusion, albeit for different reasons in Simon v. Republic of Iraq, 529 F.3d 1187, 1192 (D.C. Cir. 2008), rev'd for other reasons sub nom. Republic of Iraq v. Beaty, 556 U.S. 848, 3 (2009), and vacated, 330 F. App'x 3 (D.C. Cir. 2009) (noting that "the plaintiff in a case pending under § 1605(a)(7) may not maintain that action based upon the jurisdiction conferred by § 1605A; in order to claim the benefits of § 1605A, the plaintiff must file a new action under that new provision.")

This automatic conversion, however, is unnecessary since these cases may be brought as related actions under § 1083(c)(3). Both the Ashton Amended Complaint, ECF No. 6537 at ¶ 123, and the CAC, ECF No. 6539 at ¶ 214, proffer § 1083(c)(3) as the basis for their new complaints, and these complaints are timely under this provision.

Section 1083(c)(3) provides that:

> If an action arising out of an act or incident has been timely commenced under [§ 1605(a)(7)] . . . any other action arising out of the same act or incident may be brought under [§ 1605A] if the action is commenced not later than the latter of 60 days after— (A) the date of the entry of judgment in the original action; or (B) the date of the enactment of this Act.

This ensured that while "the NDAA rang the knell for § 1605(a)(7) suits, it promised a slow burial." Van Beneden, 709 F.3d at 1166. Because no judgment has been entered in the Plaintiffs' § 1605(a)(7) actions, the time to bring a related action has not elapsed. While this outcome may appear an unusual mechanism for extending the statute of limitations to such an extreme degree, a substantial body of precedent in the D.C. Circuit, which hears most terrorism cases, approves this interpretation: long after the passage of the 2008 NDAA, plaintiffs have used § 1083(c)(3) to bring § 1605A actions where a related § 1605(a)(7) action was not merely at the judgment stage but still pending. See, e.g., Van Beneden, 709 F.3d at 1167 ("It is undisputed that Buonocore [a pending action] was timely filed and that [a plaintiffs' § 1605A] suit would be

timely filed under § 1083(c)(3) if <u>Buonocore</u> is in fact a related action"); <u>Goldstein v. Islamic</u>
<u>Republic of Iran</u>, No. 16-cv-2507 (CRC), 2018 WL 6329452, at *3 (D.D.C. Dec. 4, 2018)
(finding that a § 1605A suit was timely where the plaintiffs "filed suit three months *before* final
judgment was entered" in the related case); <u>Anderson v. The Islamic Republic of Iran</u>, 753 F.
Supp. 2d 68, 81 (D.D.C. 2010) ("Judgment was issued in the related <u>Valore</u> case on March 31,
2010 . . . . This action was filed in March of 2008—well before 60 days after entry of judgment .
. . .") (internal citations omitted); <u>Murphy v. Islamic Republic of Iran</u>, 740 F. Supp. 2d 51, 57
(D.D.C. 2010) (permitting a related case to proceed under § 1083(c)(3) where plaintiffs had filed
before the entry of judgment); <u>see also</u> <u>Simon</u>, 529 F.3d at 1193 ("[T]he 60–day period in §
1083(c)(3) may run from 'the date of the entry of judgment' in the 'related action,' which could
be well after the enactment of the NDAA.")

Indeed, plaintiffs have used § 1083(c)(3) to refile functionally identical § 1605(a)(7)
pleadings under § 1605A. For example, in <u>Wyatt v. Syrian Arab Republic</u>, where a judgment had
not yet issued, the court noted that a party could "bring a separate, related action under § 1605A
if that action 'aris[es] out of the same action or incident' as an earlier action that was timely filed
under § 1605(a)(7). 736 F. Supp. 2d 106, 111 (D.D.C. 2010) (citing § 1083(c)(3)). <u>Wyatt</u> further
noted that "[t]here is no statutory requirement that a related action be distinct from the prior
action in any way." <u>Id</u>.

The Court acknowledges that opinion here is not uniform. <u>Khaliq v. Republic of Sudan</u>
found that "[b]y its plain language, § 1083(c)(3) does not apply in situations where . . . plaintiffs
amend their complaint in a case already before a court" because this reading would make another
section of the 2008 NDAA, § 1083(c)(2), superfluous. No. 04-cv-1536 (JDB), 2009 WL
10736793, at *1 (D.D.C. Oct. 26, 2009).

The Court respectfully disagrees for two reasons. First, allowing cases to be brought through § 1083(c)(3) does not make § 1083(c)(2) superfluous. Section 1083(c)(2) only permitted motions for 60 days after the enactment of the 2008 NDAA. § 1083(c)(2)(C)(ii). That window has closed. It also provided special protection for these motions by waiving defenses of "res judicata, collateral estoppel, and limitation period . . . ." § 1083(c)(2)(B). Basically, it was a separate procedural tract with special protections and is now inoperative. Allowing actions to proceed along a *different* procedural track with lesser protections now that § 1083(c)(2) is defunct does not render that clause "inoperative or superfluous, void or insignificant." Hibbs v. Winn, 542 U.S. 88, 101 (2004).

Second, holding otherwise would invite illogical and inefficient results. As Van Beneden demonstrates, other plaintiffs suffering harms from the September 11 Attacks could bring claims against Sudan using the Plaintiffs' § 1605(a)(7) actions as § 1083(c)'s tether.[8] See 709 F.3d at 1169. Sudan's reading would thus create an irrational world where § 1083(c) renders the original plaintiffs here less able to prosecute their action than related parties filing almost two decades later. Alternatively, it would create unnecessary inefficiency by forcing plaintiffs to file entirely duplicative new cases whose sole difference is that they are brought under § 1605A rather than § 1605(a)(7). Basically, it would require accepting that Congress created a provision whose only practical effect is to create unnecessary duplicative filings while extracting further filing fees from terror victims. This reading is entirely inconsistent with the requirement to read § 1605A's "ambiguities flexibly and capaciously." Van Beneden, 709 F.3d at 1167.

---

[8] Or, at least they could have until the filing of the CAC and Ashton Amended Complaint rendered the prior complaints (and their § 1605(a)(7) actions) inoperative and transformed those actions into § 1605A actions. The end of those pending actions is one more act in § 1605(a)(7)'s "long burial."

The inefficiency of this latter route is particularly salient here. This MDL has endured for almost two decades, and parties continue to file new cases that increase the case's management challenges. Judge Daniels has thus strongly discouraged parties from filing new case that are duplicative of other actions. See, e.g., ECF No. 7932 at 2. Forcing the Plaintiffs to file completely distinct cases purely for the sake of form would violate this sound management principle.

None of the cases Sudan cites challenges this interpretation. Knowland v. Great Socialist People's Libyan Arab Jamahiriya *undermines* Sudan's point because it suggests that related cases may be brought as timely where judgment was not entered in the other action. No. 08-cv-1309 (RMC), 2010 WL 11424122, at *3 (D.D.C. Oct. 8, 2010) ("If Buonocore, a case that is currently pending without judgment, were actually a 'related action,' Plaintiff's Complaint would be timely because he would be within the 'sixty days after judgment' timeframe required under § 1083(c)(3)."). Rimkus v. Islamic Republic of Iran is inapposite because there was an entry of judgment guiding the application of § 1083(c)(3). 750 F. Supp. 2d 163, 181 (D.D.C. 2010). Finally, Simon's holding speaks to whether courts retain jurisdiction over § 1605(a)(7) actions pending at the 2008 NDAA's enactment, not how those actions may be converted through § 1083(c). 529 F.3d at 1192.

Thus, § 1083(c)(3) permits Plaintiffs to timely bring these former § 1605(a)(7) actions as § 1605A actions so long as they are related. Whether they are "related" in turn depends on if they arise out of the same "act or incident." Van Beneden, 709 F.3d at1166; see also In re Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d 31, 65 (D.D.C. 2009) (describing "a related case" as "any other pending action that was timely commenced under § 1605(a)(7) and based on the same terrorist act or incident") These actions are related: the Ashton Amended Complaint,

ECF No. 6537 at 1–2, and CAC, ECF No. 6539 at 1, are amended versions of complaints previously filed all stemming from the September 11, 2001 Attacks. Plaintiffs' actions are therefore timely under § 1605A(b) as related actions under § 1083(c)(3).

**F. The Court Has Subject Matter Jurisdiction Over Family Member Claims Under § 1605A(a) and § 1605B(b)**

Sudan next argues that the Court lacks subject matter jurisdiction over the claims of family members who lost relatives in the September 11 Attacks. Two circuit courts have considered and rejected similar arguments. The argument has also been rejected during this MDL and the Court rejects it here too.

Sudan's argument rests on the structure of 28 U.S.C. § 1605A, which has two relevant parts. The first, § 1605A(a)(2)(A)(ii), gives jurisdiction and withdraws sovereign immunity where the "claimant or the victim" satisfied certain criteria. The second, § 1605A(c)(4), provides a private right of action for a "legal representative" of a U.S. national. Sudan contends that these sections must be read together to avoid redundancy. This would mean that foreign sovereign immunity would only be withdrawn for people who can bring claims under § 1605A(c)(4). ECF No. 6575 at 37–38.

As the Courts of Appeal for the Seventh and D.C. Circuits, and proceedings in this MDL have found, this is inconsistent with the text, structure, and purpose of the FSIA for two reasons. First, as Judge Daniels noted in this MDL, the plain meaning of the jurisdictional and private cause of action sections do not make them coterminous:

> While similarly worded, the jurisdictional section and private cause of action sections are plainly not identical. "[T]he plain text and plain meaning of § 1605A(a)(2)(A)(ii) extends jurisdiction to cases where either 'the claimant or the victim was, at the time of the [terrorist] act' a United States citizen. The claimant and victim need not both be American citizens." Leibovitch v. Islamic Republic of Iran, 697 F.3d 561, 570 (7th Cir. 2012). By contrast, the private federal cause of action is available only to claimants who are U.S.

nationals, armed forces members, or government employees. Therefore, the ineluctable conclusion is that "Congress ... established a private right of action principally for American *claimants* while waiving sovereign immunity in a broader set of cases also involving American *victims*."). Id. at 571 (emphasis in original).

In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-1570 (GBD)(SN), 2016 WL 11270527, at

*2 (S.D.N.Y. Oct. 24, 2016), aff'd sub nom. Hoglan v. Rafsanjani, 759 F. App'x 99 (2d Cir.

2019). The Court of Appeals for the D.C. Circuit reached a similar conclusion. Owens, 864 F.3d

at 807 ("[B]y its plain text, the FSIA terrorism exception grants a court jurisdiction to hear a

claim brought by a third-party claimant who is not the legal representative of a victim physically

injured by a terrorist attack.") In doing so, it also rejected Sudan's claim that this reading would

make "victim" and "claimant" redundant. Id. at 806 ("the use of both [claimant and victim]

affords jurisdiction when 'either the claimant or the victim is a national of the United States' or

is within one of the other three groups identified in the statute")

Second, Sudan's interpretation is inconsistent with the purpose of the FSIA's terrorism

exception. As Leibovitch notes, "there is no indication that [Congress passed § 1605A(c)] in

order to narrow the original scope of jurisdiction." 697 F.3d at 571. Rather, the point was "to

extend punitive damages to foreign nations sponsoring terrorism and thereby allow the massive

liability judgments the original drafters hoped would deter state support for terrorism." Id. It

would contravene Congress's intention and the FSIA's purpose if a section designed to *expand*

the reach of punitive damages against state sponsors of terrorism instead *limited* jurisdiction over

those same bad actors. This, and the law of the case doctrine, Johnson, 564 F.3d at 99, counsel

the Court to adhere to the interpretation of § 1605A(a) and (c) that is already operative in the

MDL.

Alternatively, Sudan argues that subject matter jurisdiction is deficient under § 1605B because "[n]one of the family-member Plaintiffs here has alleged any physical injury arising out of the 9/11 Attacks." ECF No. 6575 at 38. Accepting this would require the Court to ignore the text and purpose of § 1605B.[9]

JASTA's § 1605B(b) waives sovereign immunity when "money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States" caused by international terrorism. The statute's goal is to "to allow the families of the 9/11 tragedy to seek justice in our courts of law." 162 Cong. Rec. S2845 (daily ed. May 17, 2016) (statement of Sen. John Cornyn).

The Ashton Amended Complaint states that "[p]laintiffs are the surviving spouses, children, parents, siblings and estate representatives of the victims murdered in the September 11, 2001 terrorist attacks." ECF No. 6537 at ¶ 1; see also id. at ¶ 151 (discussing harms suffered and damages sought by family members). The fourth paragraph of the CAC states that "[p]laintiffs in these consolidated actions include the estates of thousands of individuals murdered in the terrorist attacks of September 11, 2001 . . . [and] several thousand family members of those victims." ECF No. 6539 at ¶ 4. Thus, while the Plaintiffs are not alleging *physical injury,* they are seeking "money damages" for "death occurring in the United States"— precisely the harm that Congress designed JASTA to address.

---

[9] Sudan argues that Plaintiffs waived this issue by not responding to it in their opposition. ECF No. 6713 at 21. As this challenge concerns subject matter jurisdiction the Court must examine it regardless. "[F]ederal courts are under an independent obligation to examine their own jurisdiction, and standing." FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990). Accordingly, a court may "examine subject matter jurisdiction, *sua sponte,* at any stage of the proceeding." F.D.I.C. v. Four Star Holding Co., 178 F.3d 97, 100 (2d Cir. 1999).

### G. The Court Has Subject Matter Jurisdiction Over Corporate Claims Under § 1605A(a) and § 1605B

The Court next considers whether it has subject matter jurisdiction over the claims of the Fed. Ins. Co. and Cont'l Cas. plaintiffs under § 1605A(a) and § 1605B. It concludes that has jurisdiction over these plaintiffs' § 1605A claims because they are derived from U.S. nationals. It also has jurisdiction over the § 1605B claims because that statute does not make U.S. national status a prerequisite.

#### 1. Section 1605A(a) Gives the Court Subject Matter Jurisdiction Over Insurer Claims Derived from U.S. Nationals

The Court has subject matter jurisdiction over the Fed. Ins. Co. and Cont'l Cas. claims stemming from payments to policyholders. Section 1605A(a)(2)(A)(ii) waives sovereign immunity for specific acts by foreign sovereigns against U.S. nationals. Section 1605A(c) provides a provide right of action for these claims. U.S. nationals are defined by § 101(a)(22) of the Immigration and Nationality Act (INA). See 8 U.S.C. § 1101(a)(22).[10] This defines a "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22). This does not include corporations. See, e.g., Marquez-Almanzar v. I.N.S., 418 F.3d 210, 217–18 (2d Cir. 2005) (discussing the definition of a U.S. national with reference to individual personhood and birth).

Section 1605A(d), however, provides that once an action is brought under § 1605A(c), "actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies." Courts have thus found that they have jurisdiction over insurers' § 1605A(d) claims. Certain

---

[10] Section 1605(a)(7)(B)(ii) (repealed) similarly retained sovereign immunity and prevented suit where "neither the claimant nor the victim was a national of the United States" as defined by INA.

Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya, 811 F.
Supp. 2d 53, 71 (D.D.C. 2011).

Furthermore, several decisions in this MDL have confirmed that insurance companies
may bring claims derived from policyholders they compensated. In re Terrorist Attacks on Sept.
11, 2001, No. 03-md-1570 (GBD)(FM), 2015 WL 9468813, at *2 (S.D.N.Y. Dec. 28, 2015); In
re Terrorist Attacks on Sept. 11, 2001, No. 03-md-1570 (GBD)(SN), 2017 WL 10398956, at *3
(S.D.N.Y. Nov. 27, 2017). Nothing in Sudan's papers offers a compelling reason to abandon
these holdings.

Therefore, if Fed. Ins. Co. and Cont'l Cas. claims are derived from U.S. nationals'
insurance claims, the Court has jurisdiction over them. Plaintiffs adequately alleged that they are.
The CAC incorporated by reference several additional complaints demonstrating that insurer
claims are derived from those of U.S. nationals. ECF No. 6539 at 2 n.1. The Court thus finds that
it has subject matter jurisdiction over these insurer claims under § 1605A(d).

## 2. Corporate Status Does Not Deprive the Court of § 1605B Jurisdiction

The Fed. Ins. Co. and Cont'l Cas. plaintiffs' corporate status does not deprive the Court
of subject matter jurisdiction under § 1605B. Section 1605B(b) waives sovereign immunity for
acts of international terrorism in the U.S. caused by the tortious acts of foreign states, their
agents, or employees. Section 1605B(c) permits a U.S. national to bring ATA claims against
foreign states whose immunity is waived by § 1605B(b). These ATA claims, which permit the
recovery of treble damages, § 18 U.S.C. 2333(a), were previously barred by § 18 U.S.C. §
2337(2)'s ban on suit against foreign sovereigns. Terrorist Attacks III, 298 F. Supp. 3d at 642
("Pre–JASTA, the ATA had explicitly barred claims brought thereunder from being asserted
against foreign states.")

Sudan suggests that § 1605B(b) and (c) must be read together, so that only U.S. nationals who can bring § 1605B(c) claims benefit from the jurisdictional grant of § 1605B(b). ECF No. 6575 at 38–39. This is inconsistent with JASTA's text and purpose.

Nothing in § 1605B(b)'s text suggests that the jurisdictional grant is limited to "U.S. nationals"—the phrase does not even appear in the subsection. The contrast between this and §§ 1605A(a)(2) and (c) is instructive. Both §§ 1605A(a)(2) and (c) explicitly restrict who may bring claims to discrete classes of individuals including "U.S. nationals." The comparison of these two closely related statutes demonstrates that Congress knows how to restrict waivers of sovereign immunity and grant private rights of action to U.S. nationals and has not chosen to do so in § 1605B(b). See, e.g., Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176 (1994) ("Congress knew how to impose [a particular liability regime] when it chose to do so.")

This means that § 1605B(b) and § 1605B(c) do different things. Section 1605B(b) provides a broad grant of jurisdiction for a wide range of entities to bring claims against state sponsors of terror previously barred by foreign sovereign immunity. Section 1605B(c) provides further relief just for U.S. nationals by letting them bring previously barred ATA claims for treble damages.

This interpretation finds support in JASTA's purpose. Congress passed this statute after finding that "[t]he United States has a vital interest in providing persons and *entities* injured as a result of terrorist attacks committed within the United States with full access to the court system." JASTA, PL 114-222, 130 Stat 852 §2(a)(7) (emphasis added). Accordingly, the "purpose of [JASTA] is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief" from foreign states and entities who support

34

acts of international terror. Id. at §2(b). Sudan's contention that § 1605B(c) was intended to make the ATA "the exclusive causes of action available under § 1605B" (and so exclude corporate entities), ECF No. 6713 at 22, thwarts this purpose. Accordingly, § 1605B(b) grants the Court jurisdiction over the corporate plaintiffs' claims.

## H. The Court Lacks Subject-Matter Jurisdiction Under the Noncommercial Tort Exception § 1605(a)(5)

Finally, the Court finds that it lacks subject matter jurisdiction under the noncommercial tort exception of 28 U.S.C. § 1605(a)(5). This provision grants a court jurisdiction and removes sovereign immunity where:

> money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

For this exception to apply, "the 'entire tort' must be committed in the United States." Terrorist Attacks II, 714 F.3d at 115. This makes sense because "Congress' primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents . . . ." Amerada Hess Shipping Corp., 488 U.S. at 439. Just alleging injuries inside the U.S. is insufficient. Terrorist Attacks II, 714 F.3d at 115. at 116. For example, Terrorist Attacks II found that § 1605(a)(5) was not satisfied by allegations that two charities "contribut[ed] financial and other resources to support Osama Bin Laden and al Qaeda," who then carried out the attack. Id. at 116.

Plaintiffs cannot invoke § 1605(a)(5) because they do not allege that the entire tort took place in the United States. Indeed, they compellingly allege the opposite—many of Sudan's most substantial acts of support for al Qaeda occurred overseas. Plaintiffs do not seriously contest this, merely noting that "[t]o the extent § 1605(a)(5) requires a tortious act in the U.S. in addition to

the injury, the September 11th attacks and attributable acts of the al Qaeda terrorists who committed them satisfy it." Terrorist Attacks II held otherwise. 714 F.3d at 116–17. Accordingly, the Court lacks subject matter jurisdiction under this exception. Since, however, the Court has subject matter jurisdiction under other provisions, this does not prevent the Court from adjudicating this dispute.

## II.   The Court Has Personal Jurisdiction Over Sudan

Personal jurisdiction exists. This requires an applicable exception to sovereign immunity, subject matter jurisdiction, and service of process. 28 U.S.C. § 1330(b), § 1608. As discussed, the Court has subject matter jurisdiction under § 1605A and § 1605B. "Sudan [also] concedes that it has been properly served." ECF No. 6649 at 41. The criteria for personal jurisdiction are satisfied.

Sudan's remaining argument is that the Due Process Clause entitles it to a minimum contacts analysis. This, as it acknowledges, is unavailing under Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393, 399 (2d Cir. 2009).

## III.   Plaintiffs Have Stated Plausible Claims that Allow This Action to be Maintained

Having resolved the question of subject-matter jurisdiction, the Court turns to whether Plaintiffs have stated viable claims. Plaintiffs allege federal claims under § 1605A(c) & (d), the ATA, the ATS[11], and civil RICO. They also allege state law torts and international law claims. Briefly, the Plaintiffs' § 1605A(c) & (d), ATS, and civil RICO claims survive in full. The bulk of their ATA claims may be sustained, though some are time-barred. Many of the Plaintiffs' state

---

[11] Both the CAC, ECF No. 6539 at 79, and Ashton complaint, ECF No. 6537 at 43, refer to 28 U.S.C. § 1350 as the "Alien Tort Claims Act." The convention in this Circuit is to refer to 28 U.S.C. § 1350 as the "Alien Tort Statute" or "ATS." The Court follows that convention. See, e.g., Nahl v. Jaoude, 968 F.3d 173, 176 (2d Cir. 2020) ("The Alien Tort Statute ('ATS') is a jurisdictional statute authorizing foreign nationals to bring suit in federal court for torts committed in violation of international law.")

law claims are adequately stated but certain claims sounding in conspiracy, aiding and abetting, assault, battery, intentional infliction of emotional distress and negligence must be dismissed. Finally, the Plaintiffs' international law claims must be dismissed.

## A. Standard of Review

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). For this assessment, a court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." Austin v. Town of Farmington, 826 F.3d 622, 625 (2d Cir. 2016).

## B. Plaintiffs have Stated a Claim Under § 1605A(c) and (d)

Plaintiffs have stated the necessary elements for § 1605A(c) and (d). Section 1605A(c) gives U.S. nationals and certain other parties a private right of action if those claims are authorized by § 1605A(a). Once a § 1605A(c) action is brought, § 1605A(d) permits additional actions for "reasonably foreseeable property loss." Sudan argues that Plaintiffs fail to state a claim under this scheme because they do not meet the jurisdictional and causal requirements or pled the requisite U.S. nationality. ECF No. 6575 at 41–42. The Court has already addressed the jurisdictional and causal arguments.

The U.S. nationality of plaintiffs is also alleged through information from previous complaints incorporated by reference. See ECF No. 1463 at ¶ 1, ECF No. 1569 at ¶¶ 18–23, see also Burnett et al. v. Al Baraka Investment and Development Corporation et al., No. 02-cv-1616, ECF No. 29 at 201; Nolan et al. v. The Republic of the Sudan, No. 20-cv-10720 (GBD)(SN) (S.D.N.Y., Dec. 12, 2020), ECF No. 1 at 9–10; Parker, et al. v. The Republic of the Sudan, No. 20-cv-10657 (GBD)(SN) (S.D.N.Y., Dec. 17, 2020), ECF No. 1 at 7; Betru, et al. v. The

Republic of Sudan, No. 20-cv-10615 (GBD)(SN) (S.D.N.Y., Dec. 16, 2020), ECF No. 1 at 8-11;

Aronow, et al. v. Republic of Sudan, No. 20-cv-07733 (GBD)(SN) (S.D.N.Y., Sept. 18, 2020),

ECF No. 1 at 3–6. Similarly, the Fed. Ins. Co. and Cont'l Cas. claims may proceed because, as

discussed, they are based on U.S. nationals' claims.

### C. Plaintiffs Have Pleaded Primary and Secondary ATA Liability Claims

Next, the Court addresses the Plaintiffs' ATA claims. The ATA provides a cause of

action for U.S. nationals whose person, property, or business was injured by an act of

international terrorism. 18 U.S.C. § 2333. Plaintiffs allege both primary claims stemming from

direct Sudanese support for al Qaeda, and secondary claims for conspiring with al Qaeda and

aiding and abetting its conduct.

### 1. Plaintiffs Have Alleged Primary Liability Claims Under the ATA

Plaintiffs have stated a claim for primary liability under the ATA. These claims have

three elements: (1) predicate unlawful action, (2) the proper mental state, and (3) causation.

Waldman v. Palestine Liberation Org., 835 F.3d 317, 335 (2d Cir. 2016). Proximate causation is

sufficient, Terrorist Attacks II, 714 F.3d at 124, so as discussed, causation is satisfied.

To show unlawful action, a plaintiff must demonstrate that injuries resulted from a

predicate act of "international terrorism" as defined by 18 U.S.C. § 2331(1). This means "violent

acts or acts dangerous to human life that are a violation of the criminal laws of the United States

or of any State, or that would be a criminal violation if committed within the jurisdiction of the

United States or of any State." 18 U.S.C. § 2331(1)(A). The act must also "appear to be intended

. . . to intimidate or coerce a civilian population; to influence the policy of a government by

intimidation or coercion; or to affect the conduct of a government by mass destruction,

assassination, or kidnapping." 18 U.S.C. § 2331(1)(B).

Plaintiffs allege numerous predicate violations of state and federal law. These include providing material support to terrorists, 18 U.S.C. § 2339A, and providing material support or resources to designated foreign terrorist organizations, 18 U.S.C. § 2339B.[12] ECF No. 6537 at ¶ 139, ECF No. 6539 at ¶ 248. Material support, at the time for both statutes, meant "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets." 18 U.S.C. § 2339A (version effective from Oct. 11, 1996 to Oct. 25, 2001).

On September 11, 2001, both § 2339A and § 2339B prohibited providing material support within the United States. 18 U.S.C. § 2339A (version effective from Oct. 11, 1996 to Oct. 25, 2001), 18 U.S.C. § 2339B (version effective from Oct. 11, 1996 to Oct. 25, 2001). This would seem to foreclose liability because Sudan is not alleged to have operated from within the United States. But 18 U.S.C. § 2339B also provided for liability for those "subject to the jurisdiction of the United States" and provided for "extraterritorial Federal jurisdiction over an offense under this section." 18 U.S.C. § 2339B(d). As discussed above, there would have been jurisdiction over Sudan under the original 28 U.S.C. § 1605(7) terrorism exception.

Alternatively, 18 U.S.C. § 2331(1)(A) defines terrorism as acts that "would be a criminal violation if committed within the jurisdiction of the United States." 18 U.S.C. § 2331(1)(A) thus assumes the jurisdiction that 18 U.S.C. § 2339B requires. Accordingly, 18 U.S.C. § 2339B's

---

[12] Plaintiffs also allege violations of 18 U.S.C. § 2339C. This hook is unavailing because the statute was not in effect on September 11, 2001. Weiss v. Nat'l Westminster Bank PLC, 278 F. Supp. 3d 636, 650 (E.D.N.Y. 2017) (finding that claims based on § 2339C should be dismissed because the statute was not in effect at the time of the relevant terrorist attack). Allegations that Sudan violated 18 U.S.C. § 2332d(a) are similarly unavailable because, at the time, that statute applied only to "United States person[s]," which does not include Sudan. 18 U.S.C. § 2332d(b) (version effective from Apr. 24, 1996 to Nov. 1, 2002).

material support provisions as existed on September 11, 2001, apply to Sudan. Similarly, because 18 U.S.C. § 2333 assumes jurisdiction, 18 U.S.C. § 2339A also applies. Indeed, plaintiffs have used the version of 18 U.S.C. § 2339A active on September 11, 2001, to state claims for material support of terrorist organizations outside the United States. See, e.g., Ests. of Ungar ex rel. Strachman v. Palestinian Auth., 153 F. Supp. 2d 76, 98 (D.R.I. 2001) (finding plaintiffs had stated a claim under 18 U.S.C. § 2333 for acts of material support under 18 U.S.C. § 2339A that took place outside of the United States.)

As Plaintiffs have alleged that Sudan provided material support like false documents, transportation services, and sanctuary for al Qaeda and its operatives, they may use 18 U.S.C. § 2339A and § 2339B as predicate acts.

These acts of material support were dangerous to human life and intended to intimidate the American people. Giving "material support to a terrorist organization does not invariably equate to an act of international terrorism," particularly when the material support is not dangerous. Linde v. Arab Bank, PLC, 882 F.3d 314, 326 (2d Cir. 2018). But Sudan's objectives in supporting al Qaeda elevate that support to an act of terror. Al Qaeda's goal was "staging high profile terrorist attacks against America and its citizens." ECF No. 6539 at ¶ 24. Beyond the destruction these attacks would cause, "Bin Laden firmly believed that such attacks would serve to demonstrate that America was nothing more than a paper tiger, and rally Muslims throughout the world to al Qaeda's cause." Id. Thus, the attacks were intended to "create a multi-national Islamic army to challenge the perceived domination of the democratic West." Id. at ¶ 22. Sudan shared this goal and worked with al Qaeda to achieve it. Id. at ¶ 48–52. Thus, the September 11 Attacks that Sudan supported were acts of terror designed to intimidate the United States and its people as part of a broader extremist challenge to Western democracies.

Sudan's acts were also dangerous to human life. The degree to which giving material support to a terrorist group is dangerous to human life depends on the nature and scale of the support. Thus, in Boim v. Holy Land Found. for Relief & Dev., the Court of Appeals for the Seventh Circuit found that giving money to Hamas was dangerous to human life because it was like "giving a loaded gun to a child." 549 F.3d 685, 690 (7th Cir. 2008). Conversely, the Court of Appeals for the Second Circuit, found that simply providing routine banking services to a terrorist organization was not a sufficiently dangerous act. Linde, 882 F.3d at 327.

Sudan's support is closer to, and indeed beyond the support given in Boim, where cash was knowingly provided to a terrorist group, than it is to Linde, where a bank provided routine financial services to terrorist leaders. Sudan provided al Qaeda not only money, but sanctuary, training diplomatic papers, and sovereign protection. Providing such extensive support to an organization bent on targeting Americans is clearly a dangerous act. As noted, Sudan's argument that Plaintiffs must allege that this support is specifically connected to the September 11 Attacks is unsupportable. Plaintiffs have thus alleged the predicate unlawful action.

Finally, Plaintiffs allege the necessary mental state. The required mental state in ATA claims is that of the predicate violation. See, e.g., Weiss v. Nat'l Westminster Bank PLC, 768 F.3d 202, 207 (2d Cir. 2014) ("While § 2333(a) does not include a mental state requirement on its face, it incorporates the knowledge requirement from § 2339B(a)(1) . . . .") Thus, for example, "to fulfill § 2339B(a)(1)'s scienter requirement, incorporated into § 2333(a), [a p]laintiff] must show that [the one providing material support] both knew that it was providing material support to [a terror group] and knew that [the group] engaged in terrorist activity." Id. at 208. Sudan's conduct meets this test. It knew it was providing material support to a terrorist

group. Indeed, it gave al Qaeda protection, diplomatic cover, and economic access precisely because it sought to cultivate al Qaeda as an anti-American proxy. ECF No.6539 at ¶¶ 52, 76.

### 2. Plaintiffs Allege Secondary Liability Claims Under the ATA

Moving to the Plaintiffs' secondary liability claims, the Court must resolve three issues. First, it must determine if secondary liability ATA claims lie against foreign sovereigns. Second, it must determine if these claims are time barred. If these claims may lie and are not time-barred, the Court must finally address whether Plaintiffs pleaded the necessary elements for their secondary liability aiding and abetting or conspiracy claims. In sum, these claims are available against foreign sovereigns. Secondary claims are thus available for the Ashton and O'Neill plaintiffs. The rest are time-barred. For the viable claims, the Plaintiffs have adequately pleaded the necessary elements.

### i. Secondary Liability Claims Are Available Against Foreign Sovereigns

Section 1605B makes foreign states secondarily liable for acts of international terror. Sudan argues otherwise because § 1605B(c) authorizes claims only in accordance with the ATA. That, in turn, creates secondary liability for "any *person* who aids and abets" acts of terrorism. 18 U.S.C. § 2333(d)(2) (emphasis added). It also defines a person according to the Dictionary Act (i.e. "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.") 18 U.S.C. § 2333(d)(1) (citing 1 U.S.C. § 1). Foreign states are not on this list so, reasons Sudan, JASTA did not intend secondary liability to reach them.

The retort lies in the very first line of the Dictionary Act. This provides definitions "unless the context indicates otherwise." 1 U.S.C. § 1. Thus, while foreign states are not "persons" in some contexts, see, e.g., Sturdza v. United Arab Emirates, 281 F.3d 1287, 1307 (D.C. Cir. 2002) (holding that a foreign sovereign is not a "person" under 45 U.S.C. § 1985), they are in others, see, e.g., Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 318 (1978) (foreign

sovereigns are "persons" under the Sherman Act). Here, both the text and purpose of these statutes demonstrate that Congress intended "person" to include foreign sovereigns.

JASTA's text explicitly contemplates suit against foreign states. Section 1605B(c) states that "a national of the United States may bring a claim against a *foreign state* in accordance with section 2333 [of the ATA]." 28 U.S.C. § 1605B (emphasis added). Congress thus drafted JASTA to make the range of ATA claims available against foreign states.

The purpose and policy of both JASTA and the ATA further show that "person" includes foreign states. JASTA is exclusively concerned with foreign states and is designed to provide the broadest possibility basis for bringing claims against those that support terrorist acts in the U.S. Weiss v. Nat'l Westminster Bank, PLC., 993 F.3d 144 (2d Cir. 2021). Similarly, "Congress' clearly expressed intent [for the ATA is] to cut off the flow of money to terrorists at every point along the causal chain of violence." Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev., 291 F.3d 1000, 1021 (7th Cir. 2002). Expanding on this, the Court of Appeals for the Seventh Circuit noted that "the organizations, businesses *and nations* that support and encourage terrorist acts are likely to have reachable assets that they wish to protect." Id. (emphasis added). So, "[t]he only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." Id. This includes sovereign states.

Finally, the very name of the section "Responsibility of *foreign states* for international terrorism against the United States" cements the conclusion that Congress meant for JASTA to reach conspiracies to commit terrorist acts executed by foreign sovereigns. See, e.g., Mead Corp. v. Tilley, 490 U.S. 714, 723 (1989) (using a statute's title to resolve ambiguities in

interpretation.) In sum, the text and purpose of both the ATA and JASTA demonstrate that "person" includes foreign sovereigns, who may be held secondarily liable under § 2333(d).

### ii.   Secondary Liability Claims Under the ATA Are Time-Barred for Specific Plaintiffs

Secondary liability claims are timely for the Ashton and O'Neill plaintiffs. The rest are time-barred. The relevant statute of limitations is contained in the National Defense Authorization Act for Fiscal Year 2013, PL 112-239, January 2, 2013, 126 Stat 1632, 18 U.S.C.A. § 2333 Note. This provides that a civil suit under 18 U.S.C. § 2333 arising out of an act that occurred between September 11, 2001, and four years before the passage of the law (*i.e.*, January 2, 2009) could be maintained up to six years *after* enactment (*i.e.*, January 2, 2019). As Sudan notes, ECF No. 6575 at 47, and the Plaintiffs do not seriously contest, only the amended O'Neill complaint was filed within this time period. Barring some relief, other plaintiffs' secondary liability claims are time-barred.

One path to safety lies through Rule 15(c). This "governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations." Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 541 (2010). Whether a complaint that does not add new parties relates back is based on if "adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations 'by the general fact situation alleged in the original pleading.'" Stevelman v. Alias Rsch. Inc., 174 F.3d 79, 86 (2d Cir. 1999) (quoting Rosenberg v. Martin, 478 F.2d 520, 526 (2d Cir.1973)). "The purpose of Rule 15 'is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities.'" Siegel v. Converters Transp., Inc., 714 F.2d 213, 216 (2d Cir. 1983) (quoting 6 C. Wright & A. Miller, Federal Practice and Procedure, § 1471, at 359 (1971)).

44

If the complaint adds parties however, the matter is more fraught. This triggers Rule 15(c)(1)(C)(ii), which allows amendment only if a party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Based on this, Levy v. U.S. Gen. Acct. Off. held that new plaintiffs can be added under the relation back rule only if they would have been added but for some mistake. 175 F.3d 254, 255 (2d Cir. 1999). Thus, "the weight of authority in this Circuit . . . indicates that relation back of an amended complaint adding new plaintiffs is permitted only where the omission of the subsequently-added plaintiffs from the timely-[filed] complaint was the result of a mistake." Wilder v. News Corp., No. 11-cv-4947 (PGG), 2015 WL 5853763, at *16 (S.D.N.Y. Oct. 7, 2015) (collecting cases).

Putting the pieces together, this means that, besides the O'Neill Plaintiffs, the Ashton Plaintiffs retain their secondary liability claims. The Ashton Amended Complaint identifies its plaintiffs as the same ones in the Sixth Complaint. ECF No. 6537 at 2. Because the Ashton Amended Complaint does not add plaintiffs, the only other question is whether the general fact situation of the original complaint gave Sudan enough notice. It does. Both the Sixth Complaint and the current Ashton complaint allege harms arising out of the September 11 Attacks based on Sudan's support for al Qaeda. The incident in the amended complaint is exactly the same, even if the legal theories have changed. That is enough under this Circuit's precedents. See, e.g., Andujar v. Rogowski, 113 F.R.D. 151, 159 (S.D.N.Y. 1986) (amended complaint related back where "claims ar[ose] from the same incident . . . .")

Sudan's remaining argument that the Court lacks subject matter jurisdiction over these claims cannot be sustained. "[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine

jurisdiction." Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473–74 (2007). As discussed, the Court has subject matter jurisdiction over this claim.

If the O'Neill class is not certified, their claims are preserved as well by the equitable tolling provisions of Am. Pipe & Const. Co. v. Utah, 414 U.S. 538 (1974). Am. Pipe held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554.

While equitable tolling does not apply to jurisdictional time bars, United States v. Kwai Fun Wong, 575 U.S. 402, 409 (2015), this time bar is not jurisdictional. Sudan asserts otherwise because the secondary liability cause of § 2333(d) is 'inextricably intertwined" with the "jurisdictional predicate in §1605B." ECF No. 6713 at 29. Yet while § 1605B provides jurisdiction for some of these claims, a § 2333(d) claim need not rely on that jurisdiction when it proceeds against a non-sovereign like a bank. See, e.g., Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S., 495 F. Supp. 3d 144, 154 (E.D.N.Y. 2020), motion to certify appeal granted, No. 19-cv-5394 (BMC), 2020 WL 6700121 (E.D.N.Y. Nov. 13, 2020) (allowing an § 2333(d) claim to proceed against a non-sovereign bank).

Absent this close connection, the Court adheres to the rule that "most time bars are nonjurisdictional." Kwai Fun Wong, 575 U.S. at 410. "Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional . . . ." Id. It has not done so. Thus, once O'Neill was filed in 2018, it tolled the statute of limitations for all O'Neill putative class members.[13]

---

[13]The O'Neill putative class is "all spouses, children, parents, or siblings of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001" and "all legal representatives (including executors, estate administrators and trustees) entitled to bring legal

The remaining plaintiffs, however, run afoul of Rule 15(c)(1)(C)(ii)'s rule that additional plaintiffs can be added only if their prior omission was a mistake. Plaintiffs do not allege that the many new plaintiffs who have joined were omitted because of a mistake. Thus, their secondary liability claims under 18 U.S.C. § 2333(d) should be dismissed.

Having addressed the viability of these claims against sovereigns and the time-bar issue, the Court moves to whether the Plaintiffs have pleaded the necessary elements for their conspiracy and aiding and abetting claims.

### iii.   Secondary Liability Claims May Stand Absent Direct Aid to Individual Attackers

Before addressing the sufficiency of the Plaintiffs' aiding and abetting and conspiracy claims, Court addresses Sudan's claim that neither secondary claim can stand without assistance to the September 11 hijackers themselves. ECF No. 6575 at 48. Sudan cites Crosby v. Twitter, Inc., 921 F.3d 617, 627 (6th Cir. 2019), for the principle that claims must allege assistance to the individual humans carrying out the plot. But for the ATA, "'person' [is] defined to include individuals and other entities . . . ." Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854 (2d Cir. 2021) (citing 18 U.S.C. § 2333(d)(1)). This includes al Qaeda.

Crosby does not undercut this. There, the plaintiffs alleged that Twitter supported the ISIS terrorist group but did not allege that ISIS was responsible for the terrorist attack. It was a lone attacker "by himself and without ISIS's help . . . ." 921 F.3d at 627. The issue in Crosby thus was that the individual who carried out the attack and the organization aided were completely separate. No one here has suggested that the September 11 attackers operated independently of al Qaeda, so Crosby is inapposite.

---

action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001…" O'Neill, 18-cv-12114 (GBD)(SN), ECF No. 1 at ¶ 4.

### iv.   Plaintiffs Have Alleged Secondary Aiding and Abetting Liability Under the ATA

Plaintiffs have satisfactorily alleged secondary ATA liability on an aiding and abetting theory. The claim has three elements:

> (1) 'the party whom the defendant aids must perform a wrongful act that causes an injury,' (2) 'the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance,' and (3) 'the defendant must knowingly and substantially assist the principal violation.'

Linde, 882 F.3d at 329 (quoting Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983)).

The first element "is satisfied when the party whom the defendant directly or indirectly aided performed the injury-causing act." Honickman v. BLOM Bank SAL, 6 F.4th 487, 495 (2d Cir. 2021). This element is not in doubt: al Qaeda performed a wrongful act. Death on a massive scale resulted.

The complaints adequately allege the second and third elements as well. Awareness requires that a country aiding terrorist conduct know that it is generally contributing to acts of terror. This is a forgiving level of knowledge since "generally aware," as opposed to "aware," has "a connotation of something less than full, or fully focused, recognition." Kaplan, 999 F.3d at 863. Thus, "[t]he defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable." Honickman, 6 F.4th at 495. Linde further confirmed that "awareness [does not] require proof that [an aider and abettor] knew of *the specific attacks* at issue when it" aided terrorists. 882 F.3d at 329 (emphasis added). Rather, an abettor need only be "'generally aware' that it was . . . playing a 'role' in [a terrorist organization's] violent or life-endangering activities." Id. This means that "general awareness" functions primarily to shield those who aid terrorists innocently or inadvertently,

rather than those intentional abettors who lack only knowledge of the specific target. See, e.g., Kaplan, 999 F.3d at 864.

So, for example, just providing routine services like banking to a terror group is not enough to show general awareness. Freeman v. HSBC Holdings PLC, 465 F. Supp. 3d 220, 233 (E.D.N.Y. 2020). But laundering money through terrorist intermediaries could be. Kaplan, 999 F.3d at 865.

As alleged, Sudan was generally aware of its role in al Qaeda's terrorist schemes. Unlike the Freeman defendant, 465 F. Supp. 3d at 233, Sudan is alleged to be more than a mere banker whose services terrorists happened to use. It sheltered al Qaeda and introduced it to other terror groups that would help al Qaeda execute attacks on America. It used sovereign resources and prerogatives including troops, intelligence personnel, and customs access to facilitate al Qaeda's schemes. It supported strikes against American targets years after bin Laden's 1996 departure. It was foreseeable that support of this magnitude would help al Qaeda attempt or execute serious terror attacks against the United States.

This is different from merely providing banking services recklessly. Indeed, even banking organizations may be liable when they are, as Sudan was, directly dealing with a terrorist organization. See, e.g., Est. of Henkin, 495 F. Supp. 3d at 159. ("Where [a court] could excuse [a bank's] ignorance of its customer's customers, a different standard should apply when a defendant-bank is dealing directly with a known terrorist organization.") At this stage of the proceedings, this is enough to infer that Sudan was aware that it was aiding al Qaeda in violent acts.

Turning to the third element, as alleged, Sudan knowingly and substantially assisted in the September 11 Attacks. Assistance is judged by six factors originally enumerated in

49

Halberstam, 705 F.2d 472, which JASTA adopted as the test for aiding and abetting liability. JASTA, PL 114-222, 130 Stat 852 §2(a)(5). These factors are: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." Linde, 882 F.3d at 329. While both "knowing" and "substantial" assistance are required, the "knowing" component does not impose a higher *mens rea* standard than required by the "general awareness" element. See Honickman, 6 F.4th at 498. In effect, showing general awareness is sufficient to support knowing, and the only question for the third element is whether the assistance was substantial as judged by the six Halberstam factors.

Sudan's alleged conduct weighs against it on every count but actual presence. Briefly re-applying the facts alleged to these factors: (1) the September 11 Attacks Sudan abetted are one of most devastating ever carried out against the United States; (2) Sudan's assistance was substantial, bringing the might and privileges of a sovereign nation to bear on al Qaeda's behalf, (3) there was a close and enduring relationship between al Qaeda's leadership and the highest levels of Sudanese government, (4) Sudan knowingly assisted with al Qaeda's schemes; and (5) the collaboration lasted from 1990 to at least 2000. The only factor in Sudan's favor is that it was not physically present at the September 11 Attacks.

This is not enough: counterbalancing the sustained Sudanese support for al Qaeda requires more than Sudan being elsewhere that fatal day. Just knowingly providing money laundering services for intermediaries who then aided terrorists can show substantial assistance in an aiding and abetting claim. See, e.g., Kaplan, 999 F.3d at 866 ("[A] JASTA claim for aiding and abetting an FTO is available even when the defendant has given assistance only indirectly"

by providing banking services to parties who then aided Hezbollah). If laundering money for intermediaries can show substantial assistance for an an aiding and abetting ATA claim, then the wide range of support Sudan is alleged to have provided directly to al Qaeda can hardly fall short. Thus, the Plaintiffs have shown the elements necessary to sustain their ATA aiding and abetting claim.

> **v.   Plaintiffs Have Alleged Secondary ATA Conspiracy Liability**

Plaintiffs have also alleged secondary liability under the ATA on a conspiracy theory. Here, again, JASTA made <u>Halberstam</u> the framework for assessing civil conspiracy. JASTA, PL 114-222, 130 Stat 852 §2(a)(5). The elements of civil conspiracy are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." <u>Halberstam</u>, 705 F.2d at 477.

Applying this to the ATA, § 2333(d) provides for liability with those who "conspire[] with the person who committed . . . an act of international terrorism." Acts of terror, in turn, involve dangerous or violent acts designed to intimidate civilians and influence government policy. 18 US.C. § 2331(1). Sudan and al Qaeda must therefore have agreed to commit terrorist acts to intimidate civilians and influence U.S. policy.

The law of conspiracy does not require agreement on the precise target or timing of the attacks. To state a claim for ATA conspiracy liability, "[p]laintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." <u>Terrorist Attacks I</u>, 349 F. Supp. 2d at 829.

Plaintiffs have pleaded enough to infer a conspiracy to commit international acts of terror against the United States. As alleged, Sudan and al Qaeda came together because they considered

the United States a common enemy. Sudan guided and supported al Qaeda so that it could target the United States with acts of terrorism designed to intimidate the American people. It hosted meetings between al Qaeda and other terrorists to build al Qaeda's capacity to strike America. At this stage, that is enough to infer Sudan knew that al Qaeda wanted to commit terrorist acts against the United States, agreed to assist in that endeavor, and then took steps to do so.

Having found that both primary and secondary liability claims under the ATA are viable, the Court turns to whether corporate plaintiffs may bring such claims.

### 3. Subrogation Gives Corporate Plaintiffs Standing to Bring ATA Claims

The <u>Fed. Ins. Co.</u> and <u>Cont'l Cas.</u> Plaintiffs state ATA claims under a subrogation theory. In this MDL, it has been determined that "[t]o the extent that the Plaintiffs seek to recover amounts paid to their insureds, they unquestionably are subrogated to their insureds' ATA claims." <u>In re Terrorist Attacks on Sept. 11, 2001</u>, No. 03-md-1570 (GBD)(FM), 2011 WL 4903584, at *2 (S.D.N.Y. Oct. 14, 2011). Absent compelling a reason, the law of the case commands a similar result here. <u>Johnson</u>, 564 F.3d at 99.

No compelling reason exists. Sudan cites <u>Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.</u> to say that Congress can eliminate subrogation rights without an express command if the statute evidences a clear intent to do so. 710 F.3d 946, 960 (9th Cir. 2013). True, but that intent is absent here. In <u>Chubb Custom Ins. Co.</u>, for example, the court found that subrogation rights would have robbed statutory words of their operative effect, 710 F.3d at 959, undermined the remedial scheme envisioned by Congress, <u>id.</u> at 962, undercut the broader statutory framework of the relevant statute, <u>id.</u> at 966, and been contrary to public policy, <u>id.</u> at 967.

In short, <u>Chubb</u> exhaustively analyzed the statute before eliminating subrogation. Sudan merely notes that, "unlike other terrorism statutes . . . [the ATA] contains no reference to insurers or indemnity claims." ECF No. 6575 at 53. It does not have to. Congress knows that "courts may

take it as given that Congress has legislated with an expectation that [a well-established common law] principle will apply. <u>Astoria Fed. Sav. & Loan Ass'n v. Solimino</u>, 501 U.S. 104, 108 (1991). Subrogation is one of these principles. <u>Am. Sur. Co. of New York v. Bethlehem Nat. Bank of Bethlehem, Pa.</u>, 314 U.S. 314, 317 (1941). The Court will not excise it from the ATA simply because Congress was silent.

### D. Plaintiffs Pleaded State Law Claims for Assault, Battery and Trespass but Not Conspiracy, Aiding and Abetting, Punitive Damages, Intentional Infliction of Emotional Distress or Claims Sounding in Negligence

Plaintiffs' state law claims are not preempted by federal law, but some must be dismissed.

#### 1. Sections 1605A and 1605B Do Not Preempt Plaintiffs' State Law Claims

Plaintiffs' state law causes of action have not been preempted. Sudan argues that the passage of § 1605A and § 1605B preempts these claims and makes these statutes the exclusive source of relief against state sponsors of terrorism. ECF No. 6575 at 53–54. In this framing, before the passage of § 1605A, 28 U.S.C. § 1606 provided a "gateway" for state law claims by making foreign sovereigns stripped of their immunity under §1605 "liable in the same manner and to the same extent as a private individual." ECF No. 6575 at 54. Because § 1606 applies only to cases brought under § 1605, and not § 1605A or § 1605B, Sudan argues that this gateway has been closed.

Two circuit courts have dismissed this argument. The Court of Appeals for the D.C. Circuit rejected "Sudan's strained 'gateway' argument," noting that a more reasonable interpretation is that § 1606 only limits punitive damages for claims brought under § 1605. <u>Owens</u>, 864 F.3d at 809. Section 1606 did not affect the substantive law choices available to plaintiffs so state law "remains viable to effectuate the intent of the Congress to secure recoveries for other plaintiffs harmed by a terrorist attack." <u>Id</u>.

The Court of Appeals for the Seventh Circuit similarly concluded that "although § 1605A created a new cause of action, it did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity." Leibovitch, 697 F.3d at 572 (citing Estate of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1, 20 (D.D.C. 2011)). These circuits' considered analysis of § 1605, § 1605A and § 1606 shows that the same outcome is appropriate here.

Beyond these textually grounded arguments, the preemption doctrine strongly urges against finding that § 1605A or § 1605B preempt state tort law. "[B]ecause the States are independent sovereigns in our federal system, [the Supreme Court has] long presumed that Congress does not cavalierly pre-empt state-law causes of action." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996). Thus, courts expect to see a "clear and manifest purpose of Congress" to find preemption. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). Where Congress has not explicitly preempted state law, a court must determine if preemption is implied. The signs of implied preemption are (1) a pervasive regulatory scheme that leaves "no room for the states to supplement," (2) regulation in an area where federal law predominates, or (3) a state scheme that would frustrate the federal scheme. Santa Fe Elevator Corp., 331 U.S. at 230.

None of these signs is present. Sections 1605A and 1605B do not pervasively regulate the field of terrorism-related suits. As the Courts of Appeal for the D.C. and Seventh Circuits noted, family members of foreign nationals cannot use § 1605A or § 1605B. Owens, 864 F.3d at 809, Leibovitch, 697 F.3d at 572. State tort law fills this gap in the federal terrorism-liability scheme. Too, tort law, which implicates a state's police power, is not an area of historically dominant federal interest. Quite the opposite: it is a core state interest. Medtronic, Inc., 518 U.S. at 475; see also Geier v. Am. Honda Motor Co., 529 U.S. 861, 894 (2000) (Stevens, J., dissenting) ("[W]e

have long presumed that state laws—particularly those, such as the provision of tort remedies . . . are within the scope of the States' historic police powers . . . .")

Finally, preempting state law claims would frustrate Congress's objectives. The goal of the terrorism exceptions is to "permit[] massive judgments of civil liability against nations that sponsor terrorism." Leibovitch, 697 F.3d at 571. As well, JASTA's purpose was to provide the broadest basis for civil liability the Constitution can bear. JASTA, PL 114-222, 130 Stat. 852 §2(b). This purpose would be thwarted if JASTA *reduced* liability for foreign sponsors of terror.

In sum, no evidence suggests that Congress intended § 1605A or § 1605B to preempt state law, much less had a "clear and manifest purpose" to do so. Accordingly, the Plaintiffs' state law claims are not preempted.

### 2.  Plaintiffs Have Pleaded Certain Assault, Battery, and Trespass Claims, But Punitive Damages, Conspiracy, Aiding and Abetting, Intentional Infliction of Emotional Distress and Negligence Claims Must Be Dismissed as Must Assault and Battery Claims for Certain Classes of Plaintiffs

Next, the Court turns to the adequacy of Plaintiffs' state law claims.[14] Sudan presents five arguments against the Plaintiffs' state law claims. First, it argues that Plaintiffs have not shown proximate causation for these claims. ECF No. 6575 at 55. Second, it argues that Plaintiffs' conspiracy and aiding and abetting claims fail for the same reason their ATA claims fail. Id. at 56. Third, it states that Plaintiffs have failed to show the required intent for their intentional tort

---

[14] The parties have not briefed the question of which state's law applies here. Sudan's briefing assumes New York law, see, e.g., ECF No. 6575 at 55, and the Plaintiffs do not suggest otherwise. New York law has been the touchstone in this matter for adjudicating state law claims. See Terrorist Attacks I, 349 F. Supp. 2d at 829–31 (assessing state law claims with reference to New York law); Terrorist Attacks IV, 740 F. Supp. 2d at 514 n.6 (same). The Court of Appeals for the Second Circuit has approved this. See Terrorist Attacks II, 714 F.3d at 126 (approving the district court's New York law analysis). Other courts addressing claims from the September 11 Attacks have proceeded similarly. See, e.g., Burnett, 274 F. Supp. 2d at 108 ("[M]ovants stated that they did not feel that any differences between New York law and the laws of Virginia and Pennsylvania bear on these motions to dismiss [claims stemming from the September 11 Attacks]." This Report and Recommendation follows suit and addresses the common law claims under New York law.

claims of assault and battery, trespass, and intentional infliction of emotional distress claims. Id. at 55. Fourth, it says that § 1605B precludes the negligence and negligent infliction of emotional distress claims. Id. Finally, it argues that regardless, Plaintiffs' negligent supervision and hiring claims must fail because those claims are available only for employees acting outside the scope of their duties. Id. The outcome of these challenges is that certain plaintiffs may maintain assault, battery, and trespass claims. All punitive damages, conspiracy, aiding and abetting, intentional infliction of emotional distress and negligence claims must be dismissed.

Sudan's arguments on causation have been denied in the context of the ATA and subject matter jurisdiction and are denied here for the same reasons. But, the common law punitive damages, conspiracy, and aiding and abetting claims should be dismissed because New York law does not recognize these causes of action. Terrorist Attacks IV, 740 F. Supp. 2d at 514 (S.D.N.Y. 2010) ("Since no independent cause of action exists for punitive damages, conspiracy, or aiding and abetting, those purported causes of action are dismissed"). See also Alexander & Alexander of New York, Inc. v. Fritzen, 68 N.Y.2d 968, 970 (1986) ("as we long ago held, 'a mere conspiracy to commit a [tort] is never of itself a cause of action'")(second alteration in original); Randi A.J. v. Long Island Surgi-Ctr., 46 A.D.3d 74, 80 (2d Dep't 2007) ("New York does not recognize an independent cause of action for punitive damages." (citing Rocanova v Equitable Life Assur. Socy. of U.S., 83 N.Y.2d 603, 616 (1994)).

Plaintiffs have shown the necessary intent for their intentional tort claims of assault, battery, and trespass. Assault requires that the tortfeasor intend to put "another person in fear of imminent harmful or offensive contact." Green v. City of New York, 465 F.3d 65, 86 (2d Cir. 2006) (citing Charkhy v. Altman, 252 A.D.2d 413 (1st Dep't 1998) (analyzing the mental state for assault)). Battery needs an intention to make "wrongful physical contact with another person

without consent." <u>Charkhy</u>, 252 A.D.2d at 414 (analyzing the mental state for battery). Finally, trespass means intentionally invading another's property. <u>Scribner v. Summers</u>, 84 F.3d 554, 557 (2d Cir. 1996) (analyzing the mental state for trespass).

Presented with a similar question in this proceeding, Judge Casey determined that if "Plaintiffs plead that Defendants here acted in concert with the September 11 hijackers, they will have stated a claim for relief for trespass." <u>Terrorist Attacks I</u>, 392 F. Supp. 2d at 566. This analysis applies to the assault and battery claims as well. New York law permits liability for assault and battery where parties act in concert to commit the act. <u>See, e.g.</u>, <u>Scollo v. Nunez</u>, 60 A.D.3d 840, 840 (2d Dep't 2009) ("there are triable issues of fact as to whether the appellants acted tortiously pursuant to a tacit agreement to assault or batter the plaintiffs") This "[c]oncerted action liability rests upon the principle that '[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it . . . are equally liable . . . .'" <u>Bichler v. Eli Lilly & Co.</u>, 55 N.Y.2d 571, 580 (1982) (quoting Prosser, Torts (4th ed.) § 46). Plaintiffs have adequately alleged knowing support in other contexts. This is also sufficient for the intentional concerted action required for trespass, assault, and battery claims.

This is not the end of the analysis though. As previously held, "[t]he statute of limitations for assault and battery . . . is one year." <u>Terrorist Attacks I</u>, 349 F. Supp. 2d at 829, <u>Terrorist Attacks IV</u>, 740 F. Supp. 2d at 514 ("Finally, the causes of action for . . . assault and battery, pled in the <u>Federal</u> complaint, are dismissed as time-barred.") Additionally, under New York law, "[c]laims in . . . trespass . . . are governed by the three-year limitations period set forth in C.P.L.R. § 214(4)." <u>Herrington v. Verrilli</u>, 151 F. Supp. 2d 449, 460 (S.D.N.Y. 2001). For the <u>Ashton</u> and <u>Burnett</u> plaintiffs, who brought claims within one year of September 11, 2001, this is not a problem, but the assault and battery claims must be dismissed for all plaintiffs who brought

claims after September 11, 2002, and the trespass claims must be dismissed for all plaintiffs who brought claims after September 11, 2004.

The intentional infliction of emotional distress claims should also be dismissed. "[A]n intentional infliction tort may 'be invoked only as a last resort,'. . . 'to provide relief in those circumstances where traditional theories of recovery do not . . . .'" Salmon v. Blesser, 802 F.3d 249, 256 (2d Cir. 2015) (internal citations omitted); Rich v. Fox News Network, LLC, 939 F.3d 112, 122 (2d Cir. 2019) (same). Here, claims are actionable under other federal and state causes of action, so intentional infliction of emotional distress is not available.[15]

The Court next turns to the Plaintiffs' negligence claims, which must also be dismissed. Section 1605B(d) provides that "a foreign state shall not be subject to the jurisdiction of the courts of the United States . . . on the basis of an omission or a tortious act or acts that constitute mere negligence." Plaintiffs do not contest this and indeed, affirmatively cite § 1605B(d) as evidence that JASTA was not otherwise intended to preempt their tort claims. ECF No. 6649 at 57. Accordingly, Plaintiffs' negligence and negligent infliction of emotional distress claims should be dismissed.

Even if not barred by § 1605B(d), Plaintiffs' negligent hiring and supervision claims must be dismissed for precisely the reason that their terrorism claims endure. Plaintiffs allege liability for the negligent hiring and retention of Omar al Bashir and others under the Second

---

[15] The Court appreciates that this conflicts with Terrorist Attacks I, which found that an intentional infliction of emotional distress claim was available. 349 F. Supp. 2d at 830. Since then, circuit decisions and holdings in this case have clarified that intentional infliction of emotional distress is not available where other tort claims are viable. As this Court noted in In re Terrorist Attacks on Sept. 11, 2001, while "[s]olatium claims in FSIA terrorism cases are 'indistinguishable' from common-law claims for intentional infliction of emotional distress," they "arise under a federal cause of action, 28 U.S.C. § 1605A(c)." No. 03-md-1570 (GBD)(SN), 2016 WL 8711419, at *1 (S.D.N.Y. Oct. 14, 2016), report and recommendation adopted sub nom. In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-1570 (GBD)(SN), 2016 WL 6465922 (S.D.N.Y. Oct. 31, 2016) (quoting Estate of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 27 n.4 (D.D.C. 2009)).

Restatement of Torts § 317 and Third Restatement of Agency §7.05. But, under New York law, "[i]f the employee acted within the scope of her employment, the employer and the employee's supervisors may be held liable for the employee's negligence only under a theory of respondeat superior." Velez v. City of New York, 730 F.3d 128, 137 (2d Cir. 2013). The Restatement (Second) of Torts similarly notes that "[a] master is under a duty to exercise reasonable care so to control his servant while acting *outside the scope of his employment* . . . ." § 317 (1965) (emphasis added).

Plaintiffs do not allege that President Bashir and others were acting outside the scope of their employment. It is doubtful they could have given their allegations that that "[f]rom the onset, the new Sudanese government established by Turabi and Bashir considered the American government to be an enemy of their movement and Sudan." ECF No. 6539 at ¶ 35. Accordingly, the "arrangement between bin Laden and the Sudanese regime specifically contemplated that bin Laden would use the . . . *support of the Sudanese government* to build al Qaeda into a global terrorist organization dedicate[ed] to attacking the United States . . . ." Id. at ¶ 52 (emphasis added). Because Plaintiffs have plausibly alleged that it was Sudanese officials carrying out government policy that caused the September 11 Attacks, they do not plausibly allege that Sudanese employees acted outside the scope of their employment when they executed that policy. See, e.g., Terrorist Attacks IV, 740 F. Supp. 2d at 514 ("Dismissal is also warranted with regard to the negligence claim [because t]he moving defendants are alleged to have acted knowingly and intentionally in providing material support to al Qaeda.")

In sum, Plaintiffs' claims for conspiracy, intentional infliction of emotional distress and all claims sounding in negligence should be dismissed. The assault, battery, and trespass claims for all plaintiffs but the Ashton and Burnett Plaintiffs should also be dismissed.

**E.  Plaintiffs Have Stated Claims Under the Alien Tort Statute and Civil RICO But Not for Violations of International Law**

Finally, the Court turns to the ATS, civil RICO, and violation of international law claims. The ATS and civil RICO claims survive. The international law claims should be dismissed.

**1.  Plaintiffs Have Pleaded Alien Tort Statute Claims**

Plaintiffs have stated ATS claims. The ATS gives "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Thus, it "confers federal subject-matter jurisdiction when . . . three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations." Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir. 1995)

"[N]o universal norm against 'terrorism' existed under customary international law (i.e., the 'law of nations') as of September 11, 2001." Terrorist Attacks II, 714 F.3d at 125. Aircraft hijacking, though, is a violation of customary international law. Terrorist Attacks I, 349 F. Supp. 2d at 826 ("The Court finds that 'aircraft hijacking is generally recognized as a violation of international law.'") (quoting Burnett v. Al Baraka Inv. & Dev. Corp., 274 F. Supp. 2d 86, 99 (D.D.C. 2003)).[16] In Terrorist Attacks I, the court also determined that aiding, abetting, and conspiracy to provide material support claims for the hijacking could be brought under the ATS. Terrorist Attacks I, 349 F. Supp. 2d at 826.

Plaintiffs thus satisfy all three ATS conditions. The CAC and Ashton Amended Complaint assert ATS claims for plaintiffs alleged to be aliens. ECF No. 6537 at ¶ 167, ECF No. 6539 at ¶ 271, see also ECF No. 1463 at ¶ 480 (clarifying that ATS claims are asserted only on

---

[16] Aircraft hijacking or "air piracy," see, e.g., 49 U.S.C. § 46502, is so firmly within the bounds of the ATS that a claim would likely survive even the very narrow scope Justice Thomas recently proposed in Nestle USA, Inc. v. Doe, 141 S. Ct. 1931, 1939 (2021) ("[F]ederal courts should not recognize private rights of action for violations of international law beyond the three historical torts identified in Sosa [violation of safe conducts, infringement of the rights of ambassadors, and piracy].")

behalf of non-national plaintiffs). The complaints also allege "air piracy" (i.e. hijacking), ECF No. 6539 at ¶ 272, a crime against the law of nations.

### 2. Plaintiffs have Pleaded Civil RICO Claims

Sudan states in a single line that civil RICO liability is foreclosed by <u>Terrorist Attacks IV</u>, 740 F. Supp. 2d at 515. That case found plaintiffs' civil RICO claims deficient for "fail[ure] to allege any injury arising from the defendants' investment of the racketeering income," an inability to show that "any moving defendant took some part in directing the affairs of the al Qaeda enterprise," and a lack of "conscious agreement, among the defendants, to commit two predicate acts in furtherance of the common purpose of the RICO enterprise . . . ." <u>Id</u>. This was a fact-bound determination based on those specific claims, not a blanket rule against civil RICO claims. Sudan presents no similar, fact-driven argument here and it would be improper for the Court to build it. <u>Aiello v. Stamford Hosp.</u>, 487 F. App'x 677, 678 (2d Cir. 2012) ("The premise of our adversarial system is that [federal] courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." (citing <u>Coalition on W. Valley Nuclear Wastes v. Chu</u>, 592 F.3d 306, 314 (2d Cir. 2009)) (alterations in original)).

### 3. No Claim is Available for Violations of International Law

Finally, the Court addresses the Plaintiffs' claims for violations of international law. ECF No. 6539 at ¶ 334. These must be dismissed. Plaintiffs assert, without authority, that "[i]t is long settled that the law of nations is part of federal common law, and that federal courts are empowered to address claims against those that commit, aid, or abet violations of international law." ECF No. 6539 at ¶ 333.

The Supreme Court counsels otherwise. There, the trend has been towards *restricting* rather than *expanding* the migration of international law into federal common law. In Jesner v. Arab Bank, PLC, Justice Gorsuch directly undercut the Plaintiffs' argument, noting that international law is "'part of the so-called general common law,' but *not part of federal law*." 138 S. Ct. 1386, 1417 (2018) (Gorsuch, J. concurring) (emphasis added). Justice Scalia, in Sosa v. Alvarez-Machain, put it even more bluntly: "creating a federal command (federal common law) out of 'international norms,' and then constructing a cause of action to enforce that command through the purely jurisdictional grant of the ATS, is nonsense upon stilts." 542 U.S. 692, 743 (2004) (Scalia, J. concurring).

Sosa, at least, had the ATS's jurisdictional grant as an anchor for private rights. In the absence of this grant, "the decision to create a private right of action is one better left to legislative judgment in the great majority of cases." Id. at 727. See also Alexander v. Sandoval, 532 U.S. 275, 286 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress.")

Congress has already created private rights of action to address hijacking supported by foreign powers: § 1605A, § 1605B and the ATA. The Supreme Court has counseled against replacing this detailed legislative scheme with common law structures. See, e.g., Jesner, 138 S. Ct. at 1405 ("The Anti-Terrorism Act . . . is part of a comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing. . . . It would be inappropriate for courts to displace this considered statutory and regulatory structure by holding banks subject to common-law liability in actions filed under the ATS.")

All this counsels against the free form creation of private rights of action in international law. Plaintiffs have failed to identify any authority for this private right, and those claims should be dismissed.

**IV.   Plaintiffs' Amended Complaints Mooted the Prior Entries of Default and Good Cause Exists to Relieve Sudan from those Defaults**

In its November 4, 2020 Order governing these proceedings, ECF No. 6521, the Court directed the parties to address the effect, if any, of the amended complaints on the prior entries of default against Sudan. The Court determines that the amended complaints mooted the prior entries of default. Even if they had not, good cause exists to relieve Sudan from those defaults under Rule 55(c).

**A.   Plaintiffs' Amended Complaints Mooted the Entries of Default**

Filing the amended complaints mooted the entries of default. In determining this, the Court must first determine whether the CAC and Ashton filings are "master complaints" that operate as new filings, or administrative summaries without legal effect. The Court determines that they are the former.

There are two ways to treat a consolidated complaint in an MDL. First, it may be a "master complaint . . . which supersede[s] prior individual pleadings." Gelboim v. Bank of Am. Corp., 574 U.S. 405, 413 n.3 (2015) (internal quotations omitted). Alternatively, it may be "a pleading with[out] legal effect . . . [which is] only an administrative summary of the claims brought by all the plaintiffs." Id. (quoting In re Refrigerant Compressors Antitrust Litigation, 731 F.3d 586, 590 (6th Cir. 2013)). In theory, "the dangers of ambiguity can be avoided if the court and the parties decide explicitly, from the beginning, the legal status of the consolidated complaint(s)." Bell v. Publix Super Markets, Inc., 982 F.3d 468, 490 (7th Cir. 2020).

In practice, despite a court's best efforts, it seems that it is not unusual for the "two different types of pleadings [to] lead[] to confusion." In re Refrigerant Compressors Antitrust Litig., 731 F.3d at 591. In determining the status of the pleadings, courts look to:

> (1) how the plaintiffs labeled the new complaint, (2) whether the plaintiffs served the defendants with the new complaint instead of the original pleadings, (3) whether key deadlines were set in relation to the new complaint, (4) whether the court entertained motions to dismiss the consolidated complaint, and (5) whether the parties and the court looked solely to the allegations in the consolidated complaint when arguing and deciding such motions.

Bell, 982 F.3d at 490. The last of these factors is most important. Id.

Here, the Court said that the Ashton complaint and CAC were to be the operative pleadings. As it noted in the August 5, 2020 conference setting the schedule for this motion, the Court "authorize[d] the filing of the amended complaints and direct[ed] that the defendants file a consolidated motion to dismiss those complaints." ECF No. 6393 at 45: 22–24. This would have been improper had the Court not intended that the CAC and Ashton Amended Complaint become the operative documents. See, e.g., In re Nuvaring Prod. Liab. Litig., No. 08-md-1964 (RWS), 2009 WL 2425391, at *2 (E.D. Mo. Aug. 6, 2009) (finding that Rule 12(b) motion practice is inappropriate where a "master consolidated complaint" is not the operative pleading).

The briefing schedule for this motion was set based on the filing of the amended complaints. ECF No. 6399. The Court has considered Sudan's motion by referencing the legal theories of the amended complaints. Indeed, key causes of action and jurisdictional waivers in this matter—§ 1605A, § 1605B, and the related action provisions of the 2008 NDAA— did not exist when many of the prior complaints were filed.

Adding to this, while filing an administrative summary is permissible in an MDL, the Court is aware of no authority permitting the use of an administrative summary to *add* new legal claims or factual allegations to prior complaints, particularly where the complaints address

jurisdiction differently. As the Court of Appeals for the Sixth Circuit noted: "[h]ow odd it would be to write an opinion that talks about one complaint in the jurisdiction section and another in the merits section." In re Refrigerant Compressors Antitrust Litig., 731 F.3d at 591. This oddity (and difficulty) would be compounded where "the [new] consolidated complaint added new claims, or worse still new parties, never mentioned in the [prior] individual complaints." Id. at 591–92.

Against all this are lines in the CAC, EFC No. 6539 at ¶ 2, and Ashton Amended Complaint, ECF No. 6537 at 2, stating that they are not intended to replace prior operative pleadings. This is not enough. It suggests that, at best, one of the six factors in Bell, labeling, cuts the Plaintiffs' way. Even this, though, is mixed because both documents bear the "consolidated" label that is generally associated with operative complaints. See, e.g., In re Refrigerant Compressors Antitrust Litig., 731 F.3d at 591 (recommending the "use [of] 'consolidated complaint' . . . for pleadings meant to have legal effect.")

The rest of the factors demonstrate, as the Court intended, that the CAC and Ashton Amended Complaint are the operative documents. These filings triggered the deadlines, were the subjects of Sudan's motion to dismiss, and guided the Court's analysis of that motion.

Having determined that the CAC and Ashton filings are the operative complaints, it follows that they superseded the prior complaints and mooted the defaults. "It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977). Thus, courts in this Circuit consistently find that when an amended complaint becomes operative[17] entries of default

---

[17] Courts disagree on whether the prior complaint is superseded when the complaint is served or filed. Benavidez v. Piramides Mayas Inc., No. 09-cv-5076 (KNF), 2013 WL 2357527, at *6 (S.D.N.Y. May 24, 2013). The Court need not address that here where the operative complaints have been filed, ECF Nos. 6537, 6539, and Sudan has consented to service of these amended complaints by ECF. ECF No. 6393 at 33: 12–13, 34:4–5. This means that the dates of service and filing are the same.

predicated on the original complaint are mooted. See, e.g., City of Almaty v. Sater, No. 19-cv-2645 (AJN), 2020 U.S. Dist. LEXIS 36510, at *2 (S.D.N.Y. Mar. 3, 2020) ("[W]hen Plaintiffs filed the First Amended Complaint, they rendered the entry of default . . . moot"); Allstate Ins. Co. v. Yadgarov, No. 11-cv-6187 (PKC) (VMS), 2014 WL 860019, at *8 (E.D.N.Y. Mar. 5, 2014) ("[A]s the Clerk's entries of default . . . are premised on a Complaint that is now a legal nullity, Plaintiffs' motion is moot"); Lemon Tree Dev. LLC v. Philopatyr Corp., No. 10-cv-5228 (ARR), 2011 WL 6396624, at *1 (E.D.N.Y. Dec. 20, 2011) ("Once an amended complaint is filed and served, the original complaint is of no legal consequence . . . Thus, any motion for default judgment on the original complaint would likewise be of no legal consequence."); Gladstone v. Health Career Acad., No. 15-cv-00517 (CSH), 2016 WL 81789, at *2 (D. Conn. Jan. 7, 2016) ("[T]he Court's granting of Plaintiff's motion to amend her complaint renders moot both her motion for default judgment [and] the Clerk of Court's earlier entry of default . . . .")

This is sensible because "a party's default is deemed to constitute a concession of all well pleaded allegations of liability." Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). Accordingly, "which particular pleading has been defaulted on is significant . . . ." Rock v. AM. Exp. Travel Related Servs. Co., No. 08-cv-0853 (GTS), 2008 WL 5382340, at *1 (N.D.N.Y. Dec. 17, 2008).

Here, the Clerk's Certificates of Default were signed for Ashton on December 22, 2011, ECF. No. 2511, and for Burnett on March 13, 2012. ECF No. 2575. The Court has not identified any Certificate of Default associated with Fed. Ins. Co. but the parties' briefs suggest that one may have been signed on September 9, 2005. ECF Nos. 6285 at 1, 6649 at 69 n.20. After this, the Ashton Amended Complaint was filed on November 19, 2020. ECF Nos. 6537. The CAC

was filed on November 20, 2020. ECF No. 6539. These amended complaints mooted those defaults.

Plaintiffs' reliance on cases stemming from Iranian defaults is misplaced. Each of these cases addresses *service* requirements for an amended complaint, not the impact of amendment on a default. Dammarell v. Islamic Republic of Iran, 370 F. Supp. 2d 218, 225 (D.D.C. 2005); In re Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d at 107; Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 20 (D.D.C. 2009). Moreover, in each case, Iran did not participate in the proceedings. Dammarell, 370 F. Supp. 2d at 220; In re Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d at 43 n.5; Belkin, 667 F. Supp. 2d at 11. Thus, while these decisions' effect may have been to allow a plaintiff to proceed to default judgment on an amended complaint, they do not suggest that a court may press on over the protests of an actively participating defendant. Rather, the amended complaints filed here moot the defaults.

## B. Good Cause Exists to Set Aside the Entries of Default

Good cause exists to set aside the entries of default regardless. A "court may set aside an entry of default for good cause . . . ." Rule 55(c). This is a "lenient standard," assessed based on "whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981), "A defendant's failure to meet one of these factors will not defeat a motion to vacate default if other factors weigh in favor of setting aside the default." Strulowitz v. Flavor Boutique 796 Inc., No. 18-cv-8382 (AJN), 2020 WL 2749564, at *2 (S.D.N.Y. May 26, 2020). "[W]hen doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993)

Two further considerations guide this assessment. First, "defaults are generally disfavored and are reserved for rare occasions." Enron Oil Corp., 10 F.3d at 96. Second, "default judgments are disfavored, especially . . . against foreign sovereigns." First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda--Permanent Mission, 877 F.2d 189, 196 (2d Cir. 1989). With this background, the Court finds good cause to set aside the entries of default against Sudan even if they were not rendered moot by the filing of the amended pleadings.

### 1.  Sudan's Conduct Was Willful

Sudan's conduct errs toward willfulness. Willfulness in default proceedings means "something more than mere negligence" —usually gross negligence or bad faith. See Am. All. Ins. Co. v. Eagle Ins. Co., 92 F.3d 57, 60 (2d Cir. 1996).

Sudan was at least grossly negligent. It was served with complaints in this MDL in 2004, ECF Nos. 112–14, 547, 2005, ECF No. 764, and 2013, ECF No. 2793. The original Ashton complaint, before consolidation in this MDL, was served on Sudan through diplomatic channels in 2003. Ashton, 02-cv-06977, ECF No. 13. In short, Sudan was aware of this matter for many years. Yet Sudan did not enter an appearance until February 2020. ECF No. 5820. Sudan is also an experienced litigant not only in the U.S. court system, but in this very type of FSIA case. See, e.g., Flanagan v. Islamic Republic of Iran, 190 F. Supp. 3d 138, 158 (D.D.C. 2016) (detailing Sudan's extensive history of FSIA litigation in U.S. courts).

### 2.  Plaintiffs Are Not Prejudiced

Sudan's conduct has not prejudiced the Plaintiffs. Prejudice is assessed based on whether a "delay will 'result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.'" Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983)

(citing 10 C. Wright, A. Miller and M. Kane, Federal Practice and Procedure: Civil, § 2693 at 536–37 (1983)).

Plaintiffs face no prejudice. The only argument they offer is the factual findings of prejudice made by the Flanagan court against Sudan in connection with a case stemming from the 2000 bombing of the U.S.S. Cole. 190 F. Supp. 3d at 145. While Flanagan is a comprehensive indictment of Sudan's conduct there, it does not show prejudice here. There must be some evidence of lost evidence or hampered discovery specific to this case and the papers before the Court do not show that.

Wasted costs to the plaintiff and burdens on witnesses are also a factor. For example, in Flanagan, a default judgment proceeding had already been conducted. 190 F. Supp. 3d at 160. Vacating the default judgment would thus have wasted the considerable efforts plaintiffs had invested in the hearing. Id. It would also have opened emotional wounds for witnesses forced to testify about their suffering a second time. Id. Conversely, where a proceeding is in its early stages, the prejudice is diminished. See, e.g., Acree v. Republic of Iraq, 658 F. Supp. 2d 124, 129 (D.D.C. 2009) (finding no prejudice where the matter was in preliminary stages as the plaintiffs had only secured an entry of default and discovery had not begun).

Here, even after more than two decades since the attacks, the circumstances more closely resemble Acree than Flanagan. While there have been some entries of default against Sudan, there have been no default judgments. Several matters are not in default at all. There has not even been a motion for default judgment or any of the evidentiary proceedings that would be required under 28 U.S.C. § 1608(e)[18] to secure a judgment against Sudan. Vacating the default

---

[18] "No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."

wastes none of the Plaintiffs' efforts and burdens no witnesses. Accordingly, the Court finds that vacatur of the defaults will not prejudice the Plaintiffs.

### 3. Sudan Has Meritorious Defenses

Sudan also has meritorious defenses. A meritorious defense need only have enough of a legal basis to be "good at law" or "to give the factfinder some determination to make." Am. All. Ins. Co., 92 F.3d at 61 (citing Anilina Fabrique de Colorants v. Aakash Chemicals and Dyestuffs, Inc., 856 F.2d 873, 879 (7th Cir. 1988)). Sudan's defenses meet this low bar. It has raised legally sufficient (and in some cases successful) subject matter jurisdiction and failure to state a claim defenses that should be adjudicated rather than relinquished in a default. See, e.g., Keegel v. Key W. & Caribbean Trading Co., 627 F.2d 372, 374 (D.C. Cir. 1980) (finding that a defense of lack of subject matter jurisdiction, even if "somewhat broad and conclusory . . . adequately [met] the meritorious defense criterion . . . .")

In sum, while Sudan's default appears to have likely been willful, no serious prejudice has resulted to the Plaintiffs and upholding the defaults would discard meritorious defenses. Moreover, the standard for setting aside default entries is lenient and the preference against defaults is strong, particularly for sovereign nations. The Court thus finds good cause to set aside the entries of default for the Ashton, Burnett, and Fed. Ins. Co. matters even if those defaults had not been mooted by the amended complaints.

## CONCLUSION

The Court recommends denying Sudan's motion to dismiss except as regards specific claims. In particular, it recommends granting Sudan's motion to dismiss for the Plaintiffs' state law claims for punitive damages, conspiracy, aiding and abetting, intentional infliction of emotional distress, claims sounding in negligence, and assault and battery claims brought after

September 11, 2002. It also recommends granting the dismissal of the international law claims. Finally, it recommends granting the dismissal of secondary ATA claims for all plaintiffs but the Ashton plaintiffs and the O'Neill plaintiffs in the event those plaintiffs are not certified as a class.

The Court also recommends directing the Clerk of Court to vacate the Certificates of Default at ECF Nos. 2511 and 2575. If a Certificate of Default exists for the Fed. Ins. Co., the Court recommends that default be vacated as well.

SARAH NETBURN
United States Magistrate Judge

Dated: May 2, 2022
New York, New York

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Rule 72(b)(2). These objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Rule 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Rule 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).