# SHER TREMONTE LLP

May 5, 2022

**BY ECF**

The Honorable George B. Daniels
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

*Re:*   *In re Terrorist Attacks on September 11, 2001*, Case No. 03-md-1570 (GBD)(SN)
*In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank*, Case No. 22-cv-03228 (GBD)

Dear Judge Daniels and Judge Netburn:

We write on behalf of our clients, the estates of 842 victims killed in the 9/11 Terror Attacks and their family members (the *Ashton* Plaintiffs)—nearly one-third of 9/11 victim families—who have not joined the "Framework Agreement," to address developments following the April 26, 2022 conference. At that conference, this Court on several occasions stated that it intends to proceed with any distribution of DAB Assets in an "equitable" manner, should those funds be available to satisfy judgments against the Taliban. Despite this, immediately following that conference, certain counsel continued to urge the Court to take actions necessary to effectuate their Framework Agreement, which would substantially and inequitably advantage the families of forty-seven victims of the 9/11 Terror Attacks (the *Havlish* Plaintiffs) and insurance companies (the *Federal Insurance* Plaintiffs) over the other 2,930 9/11 families. This proposal is not endorsed by the "vast majority of plaintiffs," as counsel for the *Havlish, Doe*, and *Federal Insurance* Plaintiffs incorrectly assert.[1] That is so because the Framework Agreement is unfair, inequitable, and shrouded in secrecy, and it puts these counsel—rather than the Court—in charge of determining what is fair. Whether the Court proceeds with an equitable distribution pursuant to the turnover proceedings or whether, as we have advocated, it were to do so in the context of an in rem action, we respectfully request that the availability of the DAB Assets be addressed first. Should the DAB Assets be available to satisfy judgments against the Taliban, and should the Court undertake the distribution of the DAB Assets, we ask that the process be overseen by a neutral special master,

---

[1] *See, e.g.*, *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (S.D.N.Y. Apr. 29, 2022), ECF No. 7937, at 1.

answerable to the Court, to avoid unfairly advantaging a very small number of families and insurance companies over all others, as the Framework Agreement currently does.

1. ***Havlish*, *Doe*, and *Federal Insurance* Continue to Advocate for a "First Come First Served" Approach**

The *Havlish* and *Doe* April 27 reply brief and the *Federal Insurance* April 29 joinder make clear that, even following the Court's statements that "an equitable distribution is [not] first come first served,"[2] the Framework Agreement's proponents maintain that the Court lacks the authority to undertake an equitable distribution. They instead argue the Court has no choice but to give the *Havlish* Plaintiffs and *Doe* Plaintiffs (seven victims of a 2016 Taliban-supported terrorist attack) approximately $2.22 billion of the total $3.5 billion—*i.e.*, more than two-thirds of the DAB Assets—and to give the *Federal Insurance* Plaintiffs the remainder.[3] They claim that this is in the best interests of all 9/11 families, but that is not so.

Prior to the April 26 conference, when this Court first expressed its commitment to an equitable distribution process, attorneys for some of the non-*Havlish* 9/11 families had endorsed the Framework Agreement. However, there is every reason to believe that this decision was motivated by fear that any potential distribution of the DAB Assets would occur on a "first come first served" basis and that the non-*Havlish* 9/11 families would recover nothing. In other words, our understanding is that many 9/11 families agreed to accept a disproportionately small share of the DAB Assets because they were explicitly threatened with zero recovery.[4] The *Ashton* Plaintiffs, representing a substantial portion of 9/11 families, opposed the lawyer-driven Framework Agreement not to be obstructionist or to gain any unfair advantage, but because of a well-founded belief that for all non-*Havlish* 9/11 families, the Framework Agreement is massively inequitable.

2. **The Framework Agreement is Highly Inequitable and *Not* Endorsed by a "Vast Majority" of 9/11 Families**

Indeed, the Framework Agreement depends on judicial action and endorsement because it requires this Court to give that handful of plaintiffs absolute priority, granting turnover of the entire $3.5 billion in DAB Assets to them, and thereby delegating to a small contingent of attorneys the

---

[2] *Id.*, Apr. 26, 2022 Hr'g Tr. at 5:8–9.

[3] *Id.* (Apr. 27, 2022), ECF No. 7928, at 2 ("[A]s a matter of governing law, the Havlish Creditors are entitled to satisfy their compensatory damages before other creditors . . . ."); *id.* (Apr. 29, 2022), ECF No. 7937, at 24–25 (requesting the Court turn over to the *Federal Insurance* Plaintiffs "any DAB Assets not deemed subject to turnover" to the *Havlish* and *Doe* Plaintiffs). Of course, whether any of the DAB Assets remain, and whether the Framework Agreement is viable at all, depends on the *Owens* Plaintiffs failing to maintain their right to approximately $1.3 billion. In this regard, we note that the *Owens* Plaintiffs recently moved to confirm their attachment. *Owens v. Taliban*, 22-cv-1949 (S.D.N.Y. May 2, 2022), ECF Nos. 47–51.

[4] *See In re Terrorist Attacks* (Mar. 22, 2022), ECF No. 7792, at 2 ("It has come to our attention . . . that the attorneys representing these plaintiffs may seek to divide this money in a way that does not consider the fair and equitable distribution of these limited funds to all the 9/11 victims and their families.").

authority to distribute the DAB Assets as they see fit.[5] Notably, the agreement's formal terms remain undisclosed, but our understanding is that under the Framework Agreement:

- the forty-seven *Havlish* families and the seven *Doe* Plaintiffs will receive <u>close to the full value of their judgments</u> (*i.e.*, around $36 million per family), consuming a total of nearly $1.8 billion of the $3.5 billion of DAB Assets;

- the commercial insurers constituting the *Federal Insurance* Plaintiffs will receive nearly $600 million of DAB Assets (or <u>nearly twenty percent of the full value</u> of their compensatory damages judgments); and

- the families of the 2,930 other victims of the 9/11 Terror Attacks will receive **<u>only one percent</u>** of what each of the forty-seven *Havlish* families stand to receive (and, as appears likely, that small amount may be further divided up amongst all family members of the victims, including spouses, children, parents, and siblings).[6]

That is, contrary to this Court's statement that its "main goal is to make sure that all plaintiffs can recover as much of the available funds as possible in an equitable way,"[7] counsel for the *Havlish*, *Doe*, and *Federal Insurance* Plaintiffs ask the Court to make it so that the DAB Assets are available to 2,930 9/11 families only if they agree to participate in a private Framework Agreement with highly inequitable terms and forgo any judicial oversight of distribution decisions. This private agreement can <u>only</u> proceed if this Court accepts the priority arguments.[8]

Contrary to claims made to this Court in recent filings, the 9/11 families do not overwhelmingly support the Framework Agreement.[9] Instead, the nearly one-third of 9/11 families comprising the *Ashton* Plaintiffs have consistently argued for equity. And if given the choice between an equitable distribution of the DAB Assets and the Framework Agreement, we are confident that most, if not all, of the families of the 2,930 non-*Havlish* 9/11 victims would reject the Framework Agreement. Simply put, the Framework Agreement is at odds with the Court's stated intention to distribute the DAB Assets equitably.

---

[5] *See id.* (Apr. 27, 2022), ECF No. 7928, at 2 ("To implement the Framework Agreement, it is necessary that the Court grant the Havlish Creditors' turnover motion. That motion should be granted not only because the implementation of the Framework Agreement will lead to an equitable and fair result . . . ."); *id* (Apr. 29, 2022), ECF No. 7937, at 25 ("The turnover of these assets will be distributed pursuant to the Framework Agreement, in order to provide broad relief to the 9/11 Community, a manifestly fair and equitable result.").

[6] Insofar as these may not be the Framework Agreement's current terms, it is the secrecy surrounding the Agreement that makes it difficult, if not impossible, to describe its terms with absolute accuracy.

[7] *See id.*, Apr. 26, 2022 Hr'g Tr. at 36:19–21.

[8] This Court noted at the April 26, 2022 conference that it was not "even aware of what the agreement is" and that the "appropriate place to resolve those issues and understand how we [are] ultimately going to proceed is in this forum, in this courtroom." *Id.* at 19:9–14. Given the need for judicial action to proceed with the Agreement, we respectfully ask that the formal terms of the proposal be placed on the record.

[9] *See, e.g.*, *id.* (Apr. 29, 2022), ECF No. 7937, at 1.

### 3. Under These Circumstances, Addressing Threshold Legal Questions Before Distribution Decisions Would be Most Efficient

Moreover, the question of how to distribute the assets depends on this Court's determination of the threshold question whether the assets are even available to pay judgments against the Taliban. Accordingly, we respectfully request, consistent with the Court's statement at the April 26 conference that it is still considering the threshold question of the DAB Assets' availability, that this determinative legal question be answered <u>before</u> the Court undertakes any secondary determination as to how the DAB Assets should be distributed.[10]

### 4. A Special Master to Oversee Equitable Distribution Would Ensure Neutrality and Transparency

In addition, we respectfully request the Court grant the *Ashton* Plaintiffs' pending motions for liquidated damages (and others that are ripe for determination) so that all plaintiffs' claims are ready for equitable distribution.[11] We would also support the Court's suggestion of appointing a special master with whom the parties and the Court can work to ensure that the DAB Assets are indeed distributed equitably (even including the *Owens* claims in this process, given their recent motion to confirm their attachment before Judge Caproni; an issue that may present a continuing

---

[10] *See id.*, Apr. 26, 2022 Hr'g Tr. at 4:23–5:1. In their turnover reply, the *Havlish* and *Doe* Plaintiffs argue that their choice "not to participate in the" United States Victims of State Sponsored Terrorism (USVSST) Fund should be a factor weighing in favor of strict application of priority rules. *See id.*, ECF No. 7928, at 9–10. The fact is, however, that the estates, spouses, and dependents of those killed in the 9/11 Terror Attacks have generally received only 0.76% of the value of their judgments from the USVSST Fund. To the extent that the *Havlish* or *Doe* Plaintiffs should receive an incrementally greater distribution of any DAB Assets to achieve parity with victims who accepted USVSST distributions, that is not accomplished by granting them priority for payment of all or most of their judgments to the great cost of all other 9/11 families. Rather, equity counsels in favor of determining a common percentage of the judgments <u>all</u> 9/11 Families should receive in order to ensure that each person is treated fairly. In this regard, a special master would be helpful to address <u>all</u> plaintiffs' concerns about what constitutes "equity" under the circumstances here.

[11] In December 2021, the *Ashton* Plaintiffs filed motions seeking to extend to the Taliban the same damages awards ordered against Iran. *See id.* (Dec. 20, 2021), ECF No. 7489, *et seq.* And this Court has "encourage[d] all plaintiffs to continue to meet and propose strategies for an efficient and fair process to adjudicate pending default damages motions." *Id.* (Apr. 6, 2022), ECF No. 7833, at 2. Because, however, the *Havlish*, *Doe*, and *Federal Insurance* Plaintiffs now have liquidated damages judgments that, they contend, would consume the entirety of the DAB Assets, the coercive pressure on all others to accede to the opaque Framework Agreement, or risk receiving nothing (should the Court ultimately credit the *Havlish*, *Doe*, and *Federal Insurance* Plaintiffs' contention that priority controls, without regard to equity) has increased.

obstacle to this Court fairly and equitably resolving all claims in the context of the current turnover proceedings).[12]

Respectfully submitted,

| KREINDLER & KREINDLER LLP | SHER TREMONTE LLP |
|---|---|
| */s/ Megan Benett* | */s/ Theresa Trzaskoma* |
| Megan Benett | Theresa Trzaskoma |

---

[12] To be clear, we continue to believe that the Wodensheks' Rule 23(b)(1)(B) in rem action is the best mechanism for fashioning an equitable distribution. For that reason, they are appealing the Court's dismissal of the in rem action and the request for preliminary injunctive relief. Should the DAB Assets face imminent dissipation pursuant to the turnover proceedings or otherwise, they intend to move expeditiously for a stay of any such dissipation from this Court and the Second Circuit.