**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) |
| | ECF Case |
| This document relates to: | 15-cv-9903 (GBD)(SN) |
| *Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran, et al.* | ECF Case |

## MEMORANDUM OF LAW FOR ENTRY OF PARTIAL FINAL DEFAULT JUDGMENTS ON BEHALF OF *BURNETT/IRAN* PERSONAL-INJURY PLAINTIFFS

### (*BURNETT / IRAN* PERSONAL INJURY 6)

For the reasons set forth below and in the accompanying declaration of John M. Eubanks ("Eubanks Declaration"), the Plaintiffs identified in Exhibit A to the Eubanks Declaration filed contemporaneously with this application, by and through their counsel, Motley Rice LLC, respectfully move this Court for an Order awarding them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases, which factored in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; (3) leave for the *Burnett/Iran* Personal-Injury Plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for any other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Plaintiffs sued The Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, "the Iran Defendants") in connection with the 9/11 Attacks.  On December 1, 2016, all Plaintiffs in the action *Thomas Burnett, Sr., et al. v. The Islamic Republic of Iran*, et al., Case No. 15-cv-9903 (GBD)(SN) ("*Burnett/Iran*"), moved for judgment as to liability only.  15-cv-9903 ECF Nos. 65, 66, amended on December 6, 2016, 15-cv-9903 ECF Nos. 68, 69.  On January 31, 2017, the Court granted Plaintiffs' application for judgment as to liability only. 15-cv-9903 ECF No. 85.  The Plaintiffs that are party to this application, as identified in Exhibit A, are a subset of the Plaintiffs who have been granted judgment as to liability only, and rely on that judgment as to liability only for their request for damages arising from the personal injuries they sustained in the Terrorist Attacks on September 11, 2001. The Plaintiffs identified in Exhibit A now request entry of partial final default judgment against the Iran Defendants as to their claims.

## I.        Procedural Background

### A.        Related Cases

Relying on evidence and arguments[1] submitted by Plaintiffs in *In re Terrorist Attacks on September 11, 2001*, the consolidated multidistrict litigation arising out of the 9/11 Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of the *Havlish, Ashton, O'Neill, Federal Insurance*, and *Hoglan* groups of plaintiffs against the Iran Defendants (*See* ECF Nos. 2516, 3014, 3016, 3020, 3020-23). After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* Plaintiffs and their decedents. Upon the submissions of the

---

[1] In each of the Orders of Judgment regarding Plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

*Havlish* Plaintiffs, on October 3, 2012, this Court found that "Plaintiffs may recover for [, inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4).  In such an action, . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).  This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4.  The Court has applied the same solatium values to claims of other solatium plaintiffs in the *Burnett/Iran* case (ECF No. 3666) and other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attack on September 11, 2001* multidistrict litigation. *See, e.g.,* ECF Nos. 3175 at 2; 3300 at 1; 3358 at 9; 3363 at 16; 3399; and 3977 at 7.

In that same decision in *Havlish,* this Court also found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5.  The Court has also applied that 3.44 multiplier to judgments in the *Ashton* case. *See* ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier).  The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett/Iran*.  ECF No. 3666.  However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the Plaintiffs' request for punitive damages be denied without prejudice.  ECF Nos. 3358 at 11-16 and 3363 at 28.  Judge

Daniels adopted Judge Netburn's Reports and Recommendations in their entirety. ECF Nos. 3383 at 2 and 3384 at 6.

### B.    *Burnett, et al. v. Iran Defendants*

The *Burnett/Iran* Plaintiffs filed suit on December 18, 2015, against the Iran Defendants. Service on the Central Bank was effectuated on March 18, 2016, and on Iran and the IRGC on September 14, 2016. 15-cv-9903, ECF No. 67 at ¶¶ 3-4.  At Plaintiffs' request, the Clerk of the Court issued a Certificate of Default as to the Iran Defendants on December 5, 2016. 15-cv-9903, ECF No. 67.  On December 1, 2016, Plaintiffs requested judgment as to liability against the Iran Defendants, (15-cv-9903 ECF Nos. 65, 66), whose application was amended on December 6, 2016 (15-cv-9903, ECF Nos. 68, 69), after the Clerk of the Court issued a Certificate of Default on December 5, 2016. ECF No. 67.  The Court granted judgment as to liability against the Iran Defendants in favor of all plaintiffs on January 31, 2017.  15-cv-9903, ECF No. 85.  On July 31, 2017, June 8, 2018, August 28, 2018, September 13, 2018, September 4, 2018, September 3, 2019, September 6, 2019, September 11, 2019, and December 13, 2019 (ECF Nos. 3666, 4023, 4126, 4175, 4146, 5061, 5062, 5087, 5138, and 5356), the Court granted orders of judgment to different subsets of *Burnett/Iran* Plaintiffs who filed for entry of partial final default judgments.

The *Burnett/Iran* Plaintiffs identified in Exhibit A now respectfully request that this Court grant them an Order awarding them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001

until the date of the judgment; (3) leave for the *Burnett/Iran* Personal-Injury Plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

## II.     Damages Under § 1605A

Section 1605A of the Foreign Sovereign Immunities Act (FSIA) creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," 28 U.S.C. § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).

### A.     Personal-Injury Damages

The Plaintiffs identified in Exhibit A include individuals who were either on site at the time of the terrorist attacks in New York, New York (at the World Trade Center complex or surrounding area); Arlington, Virginia (in or around the Pentagon); or who were among those who entered the premises in the vicinity of the World Trade Center and were injured on September 11, 2001.  The injuries of individuals who were injured on September 11, 2001 range from smoke inhalation and broken bones to devastating burns and loss of limbs.  One injury that accompanies the vast majority of these physical injuries is the onset of post-traumatic stress disorder for most of the individuals who were caught in the horror of the attacks on September 11, 2001.  Under the FSIA, these

injuries are all compensable, and given that these injuries occurred either as a direct result of the attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of attempting to assist or render aid to the injured or endangered or to flee from the scene, the proximate causation of these injuries is not in question.

This Court has previously examined personal-injury damages in the context of the terrorist attacks on September 11, 2001.  In the first Report and Recommendation issued by Magistrate Judge Netburn addressing personal-injury damages in this context (which was affirmed by Judge Daniels without objection), the Court found that an upward departure from prior D.C. Circuit precedent was appropriate where "personal injury plaintiffs cannot escape the memory of 9/11." *See* ECF No. 5879 at 5.  This accorded with Magistrate Judge Maas' determination in 2012 that the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day" and "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested."  *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y. July 30, 2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)).

This Court then established "a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million for personal-injury damages for pain and suffering arising from injuries sustained on September 11, 2001.  The Court, however, reserved its discretion to award further upward departures in exceptional cases." *Id.* at 6. The Court divided the categories of injuries into three classifications:

1. "Significant" injuries (presumptively $5 million for pain and suffering): "single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in

dust or debris; significant respiratory ailments including nasal irritations, chest pain, and asthmas from inhalation of smoke, soot and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery. This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries." *Id.* at 6-7.

2. "Severe" injuries (presumptively $7 million for pain and suffering): "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas." *Id.* at 7.

3. "Devastating" injuries (presumptively $10 million for pain and suffering): "loss of limbs or multiple digits; severe pulmonary traumas; strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic trauma. Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category." *Id.* at 8.

The Court issued upward or downward departures based on the facts of each case presented. For example, in the case of Plaintiff Lauren Manning, this Court granted an upward departure and found that Manning was entitled to a $25,000,000 judgment, noting that Manning's injuries were "beyond devastating." *See* ECF No. 5955 at 3-4.

**B.   Punitive Damages**

Under the FSIA, Plaintiffs are also entitled to punitive damages. *See* 28 U.S.C. §1605A(c)(4). In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." (ECF No. ECF 2619, at 13, citing *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory) (ECF No. 2623). The Court has applied that ratio to awards for plaintiffs in other related cases. *See, e.g.*, ECF No. 3175, at 3 (Magistrate Judge Maas Report and

Recommendation to apply 3.44 punitive multiplier); ECF No. 3229, at 1 (Judge Daniels adopting in its entirety Judge Maas' Report and Recommendation to apply 3.44 multiplier); ECF No. 3300, at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the Plaintiffs' request for punitive damages be denied without prejudice.  ECF No. 3363, at 28.  Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the Plaintiffs' request for punitive damages.  ECF No. 3384, at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request leave to address the issue of punitive damages at a later date. *See, e.g.*, ECF No. 3666 (Judge Daniels order in *Burnett/Iran*, authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### C.    Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* Plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment (ECF 2619 at 13-14).  This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* Plaintiffs' expert.

After the *Havlish* award, Plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  *World Trade Farmers Market, Inc. v. American Airlines, Inc*. (*In Re: September 11th Litigation*), 2015 U.S. App. LEXIS 16619, *66 (2d Cir. Sept. 17, 2015). In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id*. Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the Plaintiffs' 9/11 claims. *Id*.

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. ECF No. 3384 at 6.

In light of the Court's decision in the *Hoglan* matter, applying the 4.96 percent rate to prejudgment interest, the *Burnett/Iran* Plaintiffs identified in Exhibit A respectfully request that

9

the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## III.   Individualized Case Assessments

While Plaintiffs' motion addresses 10 personal injury claims that cross multiple categories, all of these Plaintiffs were injured at or within close proximity to the World Trade Center or the Pentagon.  What follows is a summary of the attached proofs.[2]

### A.   Douglas W. Anderson
###   Injury Category[3]:  Pulmonary Trauma
###   Severity:  Significant

On September 11, 2001, Douglas W. Anderson worked as a firefighter for the Fire Department of New York (FDNY) as part of Ladder 2.  *See* Burnett Decl., Exh. B, Decl. of Douglas W. Anderson at ¶ 3.  Although Mr. Anderson had not been scheduled to work with Ladder 2 on the morning of 9/11, he immediately drove towards his assigned firehouse to assist when he learned

---

[2] These are arranged alphabetically.

[3] The categories cited are those categories set forth in the January 10, 2020 letter submitted by the Plaintiffs' Executive Committee for Personal Injury and Death Claims. *See* ECF No. 5484 at 13-14.  Those categories include the following:

1)      IMPACT INJURY
Persons physically injured by the impact of the aircraft hitting the WTC I, WTC II, Pentagon, and WTC Marriot (jet fuel burns or blast injuries, jet fuel exposure and damage, broken backs/necks/limbs, paraplegics, orthopedic trauma);

2)      ESCAPE INJURY
Persons physically injured during the escape from the buildings (those injured descending the long dark staircases, those injured in elevators (i.e. during free falls), those who were trampled while escaping, those who fell and were injured while the Pentagon or WTC were under attack, resulting in broken bones, crushed limbs, trauma lacerations, bruising, etc.);

3)      BUILDING COLLAPSE INJURY
Persons physically injured in either the WTC I or II buildings or Marriot WTC collapse at and around Ground Zero (explosion-like injuries, being buried in rubble, eye or ear damage, head injuries, crushed limbs, multi-system acute traumas, shrapnel like injuries from glass or metal, etc.);

4)      FALLING DEBRIS INJURY
Persons injured at Ground Zero or Pentagon by falling debris (TBIs, concussions, crushed limbs, variety of physical injuries and traumas);

5)      PULMONARY TRAUMA INJURY
Persons who breathed in large quantities of smoke, debris, chemicals, WTC Dust, jet fuel or related toxins at Ground Zero, Pentagon, or Shanksville, PA and whose lungs were burned, damaged and injured on 9/11; and

6)      LATENT INJURIES (CANCERS)
These cases are not contemplated at this time.

that the first passenger jet had struck the North Tower.  *Id*. at ¶ 4.  Moments before the South Tower collapsed and while en route to his firehouse, Mr. Anderson encountered Port Authority officers at the entrance to the Battery Tunnel.  While Mr. Anderson spoke with the officers, a large cloud of dust and building debris came out of the Brooklyn side of the Battery Tunnel and surrounded him.  He inhaled large quantities of these toxins into his lungs and air passages.  *Id*. at ¶ 5.  He saw several people walking out of the Battery Tunnel who were in severe medical distress from the events at the World Trade Center, so he provided medical treatment to these victims. Despite his own inhalation injuries, Mr. Anderson then caught a ride with a group of firefighters who were headed over the Brooklyn Bridge.  *Id*. at ¶ 6.  He arrived at his midtown firehouse to gather his gear, and he traveled in an FDNY van to an area just north of the World Trade Center. By this time, the North Tower had collapsed, but Mr. Anderson's team of firefighters entered the area at Ground Zero to rescue as many people as possible.  Despite his injuries, Mr. Anderson worked in the area until after midnight to assist with the recovery of 9/11 victims.  *Id*. at ¶ 7.  As a result of these terrorist attacks, Mr. Anderson suffered significant inhalation injuries due to the large quantities of dust and debris that he inhaled near the World Trade Center, including an upper respiratory disease, obstructive airway disease, GERD, chronic rhinosinusitis, obstructive sleep apnea, chronic tracheitis, dyspnea, a chronic cough, asthma, COPD, chronic sinusitis, a deviated septum, and bronchitis.  *Id*. at ¶ 8.

**B.    Desiret Carvache**
       **Injury Category:  Escape**
       **Severity:  Significant**

On September 11, 2001, Desiret Carvache worked as a Financial Manager at the Citigroup Corporation located at 5 World Trade Center (WTC).  *See* Burnett Decl., Exh. C, Decl. of Desiret Carvache at ¶ 3.  When the first passenger jet struck the upper section of the North Tower, Mrs. Carvache had been in her office on the third floor of 5 WTC.  She decided to evacuate her office

building by going down the escalator.  *Id*. at ¶ 4.  As Mrs. Carvache stepped off of the escalator, she saw a woman on the level above her who needed help, so she started back up the escalator. She tripped and fell on the metal part of the escalator steps and injured both of her knees.  While bleeding from her knees, she approached the woman to help her escape the area.  *Id*. at ¶ 5.  As Mrs. Carvache and the woman exited the building, they were immediately struck by building debris, and Mrs. Carvache injured her back, neck, and the right side of her midsection.  A large cloud of dust and building debris surrounded Mrs. Carvache and she inhaled these toxins.  *Id*. at ¶ 6.  As she attempted to escape from the area, the ground began trembling.  A powerful cloud of hot air blew Mrs. Carvache off of her feet and towards a fire hydrant.  She struck the concrete, felt pain in the area of her stomach, and twisted her ankle on a sewer grate.  Another piece of debris struck Mrs. Carvache in the head and the impact removed a chunk of her hair.  She felt a snap in her neck and passed out while choking on the dust and debris.  Mrs. Carvache later woke up in New Jersey at the Christ City Hospital.  *Id*. at ¶ 7.  She suffered numerous injuries during the events of 9/11, including bilateral knee sprains, injuries to her left ankle, neck and back, a hernia, serious ingestion and inhalation injuries, and post-traumatic stress disorder.  *Id*. at ¶ 8.

C. **Jose M. Contes Rosado**
   **Injury Category:  Escape**
   **Severity:  Severe**

Jose Manuel Contes Rosado worked as a landscaper/groundskeeper for American Building Maintenance located at One World Trade Center.  *See* Eubanks Decl., Exh. D, Decl. of Jose Manuel Contes Rosado at ¶ 3.  At the time of the initial attack on the North Tower, Mr. Contes had been working in the basement of that building.  Startled by the sound of the explosion, Mr. Contes immediately received instructions to evacuate the building.  When he exited the North Tower, he saw the second passenger jet, United Airlines Flight 175, strike the upper section of the South Tower.  *Id*. at ¶ 4.  As he attempted to run out of the building to safety, he watched in horror

as people jumped from the windows of the North and South Towers.  *Id*. at ¶ 5.  As the South Tower began to collapse, a huge cloud of smoke and building debris quickly covered the area.  As Mr. Contes ran through the cloud of dust and building debris, he slammed into a large concrete planter and he suffered injuries to his right shoulder, back, and right knee.  *Id*. at ¶ 6.  Mr. Contes waited for the debris cloud to settle and then he stumbled away from Ground Zero and to the safety of his sister's house.  Due to his shoulder and knee injuries, Mr. Contes underwent two surgeries in 2002 to repair the damage to those joints caused by the events of 9/11.  *Id*. at ¶ 7.  Additionally, Mr. Contes suffered and continues to suffer from symptoms of severe emotional distress related to the horror and tragic events that he lived through and witnessed on 9/11.  *Id*. at ¶ 8.

> **D.     Enrique Cruz**
> **Injury Category: Escape**
> **Severity:  Significant**

On September 11, 2001, Enrique Cruz worked as an Elevator Starter for American Building Maintenance in the World Trade Center's South Tower.  *See* Burnett Decl., Exh. E, Decl. of Enrique Cruz at ¶ 3.  When the second passenger jet struck the upper section of the South Tower, Mr. Cruz heard a loud explosion as he worked at his desk in the sky lobby of the 78th floor.  He saw everyone around him begin to panic and scream, and he attempted to help people who were caught in the chaos.  As the panic on the 78th floor increased, Mr. Cruz took the last elevator down to the lobby area to escape from the building.  *Id*. at ¶ 4.  As he exited the elevator into the lobby of the South Tower, he saw people screaming and running in all directions.  During his escape from the South Tower, Mr. Cruz fell several times as people pushed him out of the way and several people trampled over him.  He suffered injuries to his knees, left elbow, right foot, and back during his escape.  *Id*. at ¶ 5.  As Mr. Cruz tried to escape from the falling debris outside of the South Tower, he turned and saw the South Tower collapse behind him.   A cloud of dust and building debris surrounded him, and he inhaled large quantities of these toxins into his lungs and air passages.  *Id*.

at ¶ 6.   Mr. Cruz stumbled into a building in the darkness, but he continued to have trouble breathing from all of the dust and debris that had filled his lungs and airways.  He covered his face with his jacket and walked towards Manhattan, eventually arriving at the Montefiore Hospital Emergency Room where he received initial treatment for his 9/11 injuries.  *Id*. at ¶ 8.  As a result of these terrorist attacks, Mr. Cruz suffered injuries to his right eye, knees, left elbow, back, and right foot.  He also experienced headaches and serious inhalation injuries due to the large quantities of dust and debris that he inhaled during his escape from the World Trade Center area.  *Id*. at ¶ 9.

      E.     **Juan Alberto Cruz-Santiago**
           **Injury Category:  Impact/Escape**
           **Severity:  Devastating – Upward Departure Sought**

On September 11, 2001, Juan Alberto Cruz-Santiago was present in the E Ring of the Pentagon when American Airlines Flight 77, hijacked and piloted by terrorists, plunged into the west wall and tore through the building.  *See* Burnett Decl., Exh. F, Decl. of Juan Alberto Cruz-Santiago, at ¶ 3.  Mr. Cruz-Santiago, the Chief of the Managerial Accounting Division, Resource Services Washington for the Department of Defense, Army Division, had been in his office at the time of impact.  The blast caused the room to fill with smoke, fire, jet fuel, and building debris.  Mr. Cruz-Santiago received massive burns to his upper and lower extremities, and he inhaled large quantities of debris and smoke into his lungs and airways.  *Id*. at ¶ 5.  As he tried to escape from the debris in the area and exit from the building, he noticed that his sleeve had been engulfed in flames.  Mr. Cruz-Santiago passed out due to pain, and he does not know how he was rescued.  *Id.* at ¶ 6.  He awoke as emergency personnel lifted him into a helicopter and transported him to Washington Hospital Center for the care and treatment of his burn and inhalation injuries.  *Id.* at ¶ 7.  Mr. Cruz-Santiago spent eighty-eight days in Washington Hospital Center's Burn Intensive Care Unit and the Burn Rehabilitation Unit.  During most of his stay in the hospital, Mr. Cruz-Santiago was intubated and unable to speak.  Further, his doctors stitched his eyelids shut to aid in the healing

process, so he was unable to see.   Mr. Cruz-Santiago endured thirty surgeries for excision, debridement, and skin grafting.   His ten fingertips were amputated, and he endured multiple surgeries on his corneas and eye lids.   *Id.* at ¶ 8.   As a result of the terrorist attack on the Pentagon, Mr. Cruz-Santiago suffered massive third degree burns to over 70% of his body, he lost vision in his right eye, and he now only has partial vision in his left eye.   Due to the smoke and debris he inhaled, he suffered and continues to suffer from a chronic cough, restrictive lung disease, and obstructive sleep apnea.   Mr. Cruz-Santiago has been diagnosed as having permanent impairment to 80% of his body.   *Id.* at ¶¶ 9-10. Based upon his permanent and debilitating injuries, Plaintiffs submit that Mr. Cruz-Santiago should be granted an upward departure from any baseline damages award for the injuries he sustained on September 11, 2001.

> **F.      Cynthia A. Delancey**
> **Injury Category: Escape**
> **Severity: Significant**

On September 11, 2001, Cynthia A. Delancey worked as a billing processor for Empire Blue Cross/Blue Shield in the basement of the South Tower at Level B3.   *See* Burnett Decl., Exh. G, Decl. of Cynthia A. Delancey at ¶ 3.   Mrs. Delancey arrived at work at 7:45 a.m. on the morning of 9/11.   After the first passenger jet, American Airlines Flight 11, struck the North Tower, a security guard escorted Mrs. Delancey out of the building through the garage area and to the ground level.   *Id.* at ¶ 4.   As she stood near the South Tower, Mrs. Delancey watched in horror as the second passenger jet, United Airlines Flight 175, slammed into the upper section of the South Tower.   The sky became black with smoke and building debris.   Everyone began to panic, and Mrs. Delancey ran towards the revolving doors of a building entrance.   She fell and people started trampling over her.   The South Tower then began to collapse.   In the panic that ensued, Mrs. Delancey sought refuge beneath a parked car.   A tremendous wave of dust, toxins, and building debris fell around her, and she became covered in rubble and dust.   Mrs. Delancey received

numerous lacerations to her face and arms and she inhaled large quantities of dust and debris into her lungs and airways.  *Id*. at ¶ 7.  When she emerged from the rubble and debris several minutes later, Mrs. Delancey saw dead bodies, body parts, and building debris from the South Tower. Emergency personnel then escorted her away from the area.  After waiting for a period of time, Mrs. Delancey walked home to Queens (a twelve hour journey) while in a state of shock and confusion. *Id*. at ¶ 9.  Due to the 9/11 attacks, Mrs. Delancey suffered lacerations to her face and arms, headaches, lower back pain, asthma, obstructive airway disease, a chronic cough, and GERD. *Id*. at ¶ 10.  She also suffers from PTSD due to her experience on 9/11.  *Id*. at ¶ 11.

**G.    Patricia A. Farrar**
**Injury Category:  Escape/Pulmonary Trauma**
**Severity: Significant**

On September 11, 2001, Patricia A. Farrar worked for Kelly Services, a temp agency, and she had been assigned to work as a collections clerk in Dunn & Bradstreet's offices located in the North Tower of the World Trade Center.  *See* Burnett Decl., Exh. H, Decl. of Patricia A. Farrar, at ¶ 3.  When the first passenger jet, American Airlines Flight 11, struck the upper section of the North Tower, Mrs. Farrar was at her desk on the 14th Floor.  After feeling the building shake, Mrs. Farrar decided to leave the office by way of the nearest stairwell.  *Id*. at ¶ 4.  Mrs. Farrar encountered a chaotic scene in the stairwell, and she fell down the steps several times and sustained numerous cuts and bruises.  She also began to bleed from her nose and ears.  *Id*. at ¶ 5.  Upon exiting the North Tower onto the street level, Mrs. Farrar saw the second passenger jet plunge into the upper section of the South Tower. *Id*. at ¶ 6.  As the South Tower began to collapse, Mrs. Farrar ran to escape the area. Becoming engulfed in a huge cloud of smoke, dust, and building debris, she inhaled large quantities of these toxins into her lungs and airways.  Mrs. Farrar eventually made her way to New Jersey, and she immediately received treatment for her 9/11 injuries.  *Id*. at ¶¶ 7-8.  Mrs. Farrar sustained significant injuries on 9/11, including bronchitis, a respiratory airway

disorder, allergic rhinitis, asthma, chronic sinusitis, a chronic sore throat, back pain, bleeding from her nose and ears, multiple contusions, gastroesophageal reflux disease (GERD), and sleep disturbances.  *Id.* at ¶ 9.

> **H.     Charles M. Freeman, Jr.**
> **Injury Category:  Impact/Escape**
> **Severity:  Significant**

On September 11, 2001, Charles M. Freeman, Jr. worked at the World Trade Center for American Building Maintenance as a Janitorial Worker.  *See* Burnett Decl., Exh. I, Decl. of Charles M. Freeman, Jr., at ¶ 3.  While performing his usual job duties of ensuring that litter and other trash were removed from the area around the base of the North Tower, Mr. Freeman watched in disbelief as American Airlines Flight 11 plunged into the upper section of the building.  *Id.* at ¶ 4. Building debris and dust began to rain down around him, and he saw people screaming and running to avoid the falling debris.  Mr. Freeman attempted to run into the lobby of the North Tower.  *Id.* at ¶ 5.  As he entered the North Tower lobby, concrete, metal and other building debris began to fall inside.  A massive explosion then erupted inside the North Tower, and Mr. Freeman was blown backwards and out of the building by the force of the blast.  He slammed onto the concrete area outside of the North Tower, causing injury to his left knee and right wrist.  Additionally, Mr. Freeman suffered crush injuries to his right thumb and elbow.  *Id.* at ¶ 6.  Emergency personnel arrived on the scene, and they transported Mr. Freeman to Harlem Hospital, where he received initial treatment for his injuries.  Due to the extent of his right hand crush injury, Mr. Freeman's doctors later sent him to Kings County Hospital.  *Id.* at ¶ 7.  Mr. Freeman sustained significant injuries on September 11, 2001, including the derangement of his left knee, a right wrist injury, a crush injury and fracture of his right thumb, an injury to his right elbow, and bruising to his arms and legs.  *Id.* at ¶ 8.

I.       **Racquel K. Kelley**
         **Injury Category:  Impact/Escape**
         **Severity:  Severe**

On September 11, 2001, Racquel K. Kelley, worked at the Pentagon as an Information Technology (IT) Specialist intern for the United States Army's Information Management Support Center (IMCEN).  *See* Burnett Decl., Exh. J, Decl. of Racquel K. Kelley, at ¶ 3.  At the time of Flight 77's impact with the Pentagon building in Washington, D.C., Ms. Kelley had been working on IT assignments with her coworkers in her office (located in section 1D520).  As the passenger jet collided with the building, Ms. Kelley (in an office located less than seven hundred feet away from the point of impact) heard a loud explosion, and her office filled with smoke, building debris, jet fuel, and fire.  *Id*. at ¶ 5.  The force of the blast caused her to lose consciousness, and she woke up a short time later with her clothes on fire and her office filled with smoke, fire, and building debris. *Id*. at ¶ 6.  As a result of the blast, Ms. Kelley received burns to her hands and feet, and she inhaled large quantities of debris and smoke into her lungs and airways.  She crawled under the remnants of her office desk as building debris began to fall from above, and she noted that her shoes had been severely burned and were actually stuck to her feet.  *Id*. at ¶¶ 7-8.

Ms. Kelley's coworkers pulled her out of the building rubble and they followed voices to escape the burning building.  She climbed over piles of debris and human body parts as she tried to escape.  As Ms. Kelley escaped from the building, she stopped breathing due to all of the dust and smoke that she had inhaled.  Emergency personnel resuscitated Ms. Kelley and transported her to Washington Hospital Center.  *Id*. at ¶¶ 9-10.  Ms. Kelley suffered second degree burns to her hands and feet, multiple cuts and abrasions, and severe injuries to her lungs and airways due to the large quantities of debris and toxins that she inhaled.  Lastly, she has been diagnosed with post-traumatic stress disorder due to the horrific events that she experienced on 9/11.  *Id*. at ¶ 11.

**J.** **Emanuel A. Lipscomb**
**Injury Category: Escape/Pulmonary Trauma**
**Severity: Severe**

On September 11, 2001, Emanuel A. Lipscomb, a local businessman, had arrived for a business meeting at a condominium building within close proximity to the World Trade Center Towers (WTC). *See* Burnett Decl., Exh. K, Decl. of Emanuel A. Lipscomb, at ¶ 3. Mr. Lipscomb heard a loud noise, and he looked up to see that the upper section of the North Tower of the WTC had exploded. He then heard another explosion, and saw that a second passenger jet, United Airlines Flight 175, had struck the upper section of the South Tower. *Id*. at ¶ 4. Mr. Lipscomb joined a group of people assisting victims escaping from the debris falling from the North and South Towers. He led a group of people through a building exit while instructing them to head for the nearby riverbank to escape the area. *Id*. at ¶ 6. The South Tower then collapsed, and Mr. Lipscomb jumped into a hole in the side of a building to escape the cloud of debris and toxins. *Id*. at ¶ 7. The area around him became pitch black, and Mr. Lipscomb became covered in dust and building debris. He inhaled large quantities of these toxins into his lungs and airways. *Id.* at ¶ 8. Seeking to escape from the debris, Mr. Lipscomb felt his way along several buildings until he found refuge in the lobby area of a building. Mr. Lipscomb then heard another rumble as the North Tower collapsed. *Id.* at ¶¶ 9-10. Rescue personnel arrived and escorted Mr. Lipscomb to a boat near the river. He traveled by boat to New Jersey, where he received initial treatment for his injuries. During the events of 9/11 and prior to his escape from the area, Mr. Lipscomb also experienced slurred speech, memory loss, headaches, and hot and cold sweats. Mr. Lipscomb's doctors later informed him that he had suffered a mild stroke during the events of 9/11. *Id.* at ¶ 11. Mr. Lipscomb sustained severe injuries on 9/11, including a significant respiratory injury, a mild stroke, hypersensitivity lung disease, two collapsed lungs, dyspnea, sinusitis, a persistent cough,

headaches, chest pains, chest tightness, hyperarousal syndrome, neurovegetative symptoms, and finally, mood and cognitive disturbances.  *Id*. at ¶ 12.

**K.     David Moriarty**
**Injury Category:  Collapse/Falling Debris**
**Severity: Significant**

On September 11, 2001, David Moriarty worked as a firefighter with the Fire Department of New York (FDNY), assigned to an engine company located in the Bronx.  *See* Burnett Decl., Exh. L, Decl. of David Moriarty at ¶ 3.  After the second passenger jet, United Airlines Flight 175, struck the South Tower, Mr. Moriarty's engine company responded to the World Trade Center area.  Prior to his arrival in the area, the South Tower had collapsed.  *Id* at ¶ 4.  Mr. Moriarty reported to the FDNY command post in the lobby of the North Tower.  *Id*. at ¶ 5.  As he began walking towards the North Tower, the building began to collapse.  To escape the falling building debris, Mr. Moriarty took refuge underneath an ambulance next to another firefighter.  As he was unable to reach his oxygen mask, he inhaled large quantities of debris into his lungs and airways. *Id*. at ¶ 6.  After a period of time, Mr. Moriarty left the refuge of the underside of the ambulance. He worked with other firefighters to search for survivors on several floors of the nearby New York Telephone Company building (located adjacent to the WTC area).  Mr. Moriarty sought medical attention for his injuries shortly after the attacks of 9/11.  He sustained significant injuries, including airway hyperactivity, chronic sinusitis, nasal polyps, biapical scarring of both lungs, chronic rhinitis, GERD, asthma, chronic trachealis, nasal deviation, hearing loss, and eye irritation. *Id*. at ¶ 8.

**L.     Victor D. Panzella, Jr.**
**Injury Category:  Escape/Falling Debris**
**Severity:  Severe**

On September 11, 2001, Victor D. Panzella, Jr., worked as the Chief of Ambulance Services at St. Vincent's Medical Center on Staten Island.  *See* Burnett Decl., Exh. M, Decl. of Victor D.

Panzella, Jr., at ¶ 3.  He responded to the WTC area as part of an emergency response team at approximately 9:45 a.m.  Upon his arrival, the South Tower had already collapsed.  *Id*. at ¶¶ 2-3. When the building located at 7 WTC collapsed, Mr. Panzella and a crowd of people began to run to escape the falling debris.  Mr. Panzella ran towards an area where many had gathered to escape the falling debris, but he fell and severely injured his left knee.  He became engulfed in a large cloud of dust and building debris, and he inhaled large amounts of these toxins into his airways. *Id*. at ¶ 5.  After the 9/11 attacks had ended, Mr. Panzella went to St. Vincent's Medical Center to receive treatment for his injuries.   Mr. Panzella sustained significant injuries during the aforementioned events, including a left knee injury that later required surgery to repair, chronic obstructive pulmonary disease, allergic rhinitis, asthma, a respiratory airway disorder, eye irritation, throat irritation, chronic obstructive bronchitis, and finally, World Trade Center Syndrome.  *Id*. at ¶ 7.

       **M.**      **Wilston L. Parris**
              **Injury Category: Escape/Falling Debris**
              **Severity:  Severe**

On September 11, 2001, Wilston L. Parris worked as a server at the Greenhouse Restaurant in the New York Marriott World Trade Center Hotel located at Three WTC.  *See* Burnett Decl., Exh. N, Decl. of Wilston L. Parris at ¶ 3.  When the first passenger jet struck the North Tower, Mr. Parris had been handling his server duties for various customers in and around the breakfast buffet area of the restaurant.  He then watched in horror as building debris crashed through the glass ceiling of the restaurant.  *Id*. at ¶ 4.  The debris landed near Mr. Parris and two of his restaurant customers were killed during the impact.  Everyone inside of the restaurant began to scream and panic, and the restaurant immediately caught fire.  As more debris fell from above, Mr. Parris covered his head with a chair to avoid being struck.  He fell to the ground after being struck by falling debris and glass, and he suffered injuries to his right hand, neck, back, and right knee.  Mr.

Parris crawled to the exit door of the restaurant and he tried to escape the area.  *Id*. at ¶ 5.  He saw a second passenger jet, United Airlines Flight 175, slam into the South Tower.  Additional building debris began to fall all around Mr. Parris.  *Id*. at ¶ 6.  The South Tower collapsed and a massive cloud of dust and building debris surrounded him.  Mr. Parris inhaled large quantities of hazardous substances into his lungs and airways.  *Id*. at ¶ 7.  He crawled through the debris cloud and a security officer guided him into a bank building.  A police officer then transported Mr. Parris to New York University Hospital for treatment. *Id*. at ¶¶ 8-9.   As a result of these terrorist attacks, Mr. Parris suffered severe injuries, including prostate cancer that required radiation treatment, chronic rhinitis, asthma, an upper respiratory disease, obstructive airway disease, GERD, and injuries to his right knee, left shoulder, neck, back, and right hand.  Lastly, Mr. Parris has been diagnosed with post-traumatic stress disorder due to his experience on 9/11.  *Id*. at ¶ 10.

> ### N.   Filomena Roman
> ### Injury Category:  Escape
> ### Severity:  Significant

On September 11, 2001, Filomena Roman worked as a Career Advancement Specialist at the Center for Employment Opportunities.  *See* Burnett Decl., Exh. O, Decl. of Filomena Roman at ¶ 3.  When the passenger jets struck the North and South Towers of the World Trade Center (WTC), Mrs. Roman had been at her desk in her office building located in close proximity to the WTC.  After the collapse of the South Tower, the New York Police Department ordered the evacuation of the building.  As Mrs. Roman exited the building, the atmosphere was dark and thick with ash and dust, and she inhaled large quantities of building debris and dust into her lungs and airways.  *Id.* at ¶ 4.  Mrs. Roman slipped as she fled the area and she heard a loud snap in her left foot.  Despite her foot pain, Mrs. Roman began to run away from the WTC area as quickly as possible to escape the chaos and carnage caused by the collapse of the Towers.  She limped away in the direction of the Brooklyn Bridge, moving then to the Queens Bridge.  Mrs. Roman became

covered in ash and debris as she escaped on foot, which caused her face to burn and itch.  She had difficulty breathing, and her left foot continued to ache.  *Id.* at ¶ 5.  Mrs. Roman made her way to Queens and entered North Shore Hospital's Emergency Room to receive initial treatment for her injuries.  *Id.* at ¶ 6.  Mrs. Roman sustained significant injuries on September 11, 2001, including a fractured left foot, a sprained left ankle, arthralgia, "Reflex Sympathetic Dystrophy", nerve injuries to her legs, back pain, cervical spine pain, asthma, reactive airway disease, shortness of breath, acute sinusitis, headaches, blurred vision, ataxia, lightheadedness, dizziness, acid reflux symptoms, and GERD.  *Id.* at ¶ 7.

      **O.**    **Robert ("Bobby") Senn**
             **Injury Category:  Escape/Collapse**
             **Severity:  Severe**

On September 11, 2001, Robert ("Bobby") Senn, along with his firefighting unit, responded to a call for assistance at the World Trade Center (WTC).  His unit arrived before the collapse of the North and South Towers but after both passenger jets had struck the buildings.  *See* Burnett Decl., Exh. P, Decl. of Robert ("Bobby") Senn, at ¶ 4.  When the South Tower collapsed, Mr. Senn was in the lobby area of the North Tower.  The windows and doors of the lobby exploded inward when the South Tower collapsed.  The blast threw Mr. Senn fifty feet through the air and into a solid wall, knocking him unconscious, burying him under a pile of building debris, and causing injuries to his right hand and shoulder.  *Id.* at ¶ 6.  Over the next several minutes, Mr. Senn inhaled large quantities of building dust, smoke, and chemicals into his lungs and airways.  *Id.* at ¶ 7.  Mr. Senn managed to crawl out from under the pile of building debris.  He crawled to a set of stairs and found other firefighters, some of whom were alive and some of whom were dead.  *Id.* at ¶ 8.  Mr. Senn made his way to a walkway where he was able to exit the building.  He saw people running in all directions, and the area was filled with smoke and building debris.  *Id.* at ¶ 9.  The North Tower then collapsed.  The force of this collapse blew Mr. Senn again off of his feet, burying

him under a second pile of building debris.  After climbing out from under the debris pile, Mr. Senn crawled several blocks.  Someone found him on the sidewalk and pulled him into a building.  *Id.* at ¶ 10.  After leaving the safety of the building, Mr. Senn wanted to try and rescue more victims. Due to Mr. Senn's significant injuries, other firefighters ordered him to leave the area and receive treatment.  *Id.* at ¶ 11.  Mr. Senn sustained severe injuries on September 11, 2001, including a right hand fracture, a right shoulder injury that required surgery to repair, an injury to the cornea of his right eye, reactive airway disease, chronic rhinitis, chronic sinusitis that required two surgeries to repair, chronic obstructive pulmonary disease, and gastroesophageal reflux disease.  *Id.* at ¶ 13.

### P.   Christopher L. Young
Injury Category:  Escape/Collapse
Severity:  Significant

On September 11, 2001, Christopher L. Young worked as a police officer with the New York Police Department (NYPD) Traffic Division.  *See* Burnett Decl., Exh. Q, Decl. of Christopher L. Young at ¶ 3.  When the first passenger jet struck the North Tower, Officer Young had been on patrol in his squad car.  He immediately drove to the World Trade Center (WTC) area with instructions from the NYPD Command Center to assist with evacuation and traffic control duties. *Id.* at ¶ 4.  Arriving at the concourse area of the North Tower on foot, Officer Young heard an incredibly loud explosion, and the ground began to shake.  He watched in horror as the second passenger jet, United Airlines Flight 175, slammed into the upper section of the South Tower.  *Id.* at ¶ 5.  The scene was like a war zone.  Officer Young saw people jumping from the Twin Towers and plunging to their deaths.  Some of these victims landed close to Officer Young as he continued to assist the injured and those fleeing the carnage.  *Id.* at ¶ 6.  He helped people in the area take shelter from the falling debris in various store entrances.  The South Tower collapsed as Officer Young assisted victims near the base of the North Tower, and he became engulfed in a thick cloud of smoke, chemicals and building debris.  He inhaled these toxins into his lungs and his eyes

burned from the exposure.  *Id.* at ¶ 7.  Continuing to help survivors escape the area, Officer Young

heard a second horrible rumble and watched in disbelief as the North Tower began to collapse.  As

the North Tower collapsed, a large piece of building debris struck Officer Young.  He injured his

leg and suffered small cuts around his eyes.  *Id.* at ¶ 8.  A fellow police officer lifted Officer Young

to his feet and helped him to escape the area.  An ambulance then transported him to Beth Israel

Hospital.  *Id.* at ¶ 9.  As a result of these terrorist attacks, Officer Young sustained significant

physical and emotional injuries, including asthma, shortness of breath, GERD, bronchitis,

lacerations to both of his eyes, a leg injury, peripheral neuropathy, PTSD, and an anxiety disorder.

*Id.* at ¶¶ 10-11.

## IV.    Conclusion

For all of the reasons herein, as well as those set forth in the submissions of the other

Plaintiffs in this case and Plaintiffs in the other 9/11 related cases in the *In re Terrorist Attacks on*

*September 11, 2001* multidistrict litigation, the *Burnett/Iran* Plaintiffs identified in Exhibit A

respectfully request that this Court award them (1) compensatory damages for pain and suffering

in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks

on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the

District of Columbia in similar cases factoring in an upward departure on damages values based

on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at

the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001

until the date of the judgment; (3) leave for the *Burnett/Iran* Personal-Injury Plaintiffs identified

in Exhibit A to seek punitive damages, economic damages, or other damages at a later date; and

(4) for all other *Burnett/Iran* Personal-Injury Plaintiffs not appearing on Exhibit A, to submit

applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated:  May 9, 2022

Respectfully submitted,

**/s/** John M. Eubanks
John M. Eubanks, Esq.
Jodi Westbrook Flowers, Esq.
Robert T. Haefele, Esq.
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
Email: jeubanks@motleyrice.com
Email: jflowers@motleyrice.com
Email: rhaefele@motleyrice.com

Attorneys for the *Burnett/Iran* Plaintiffs