# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GSD)(SN)<br>ECF Case |
| This document relates to:<br>    *Burnett, et al. v. Islamic Rep. of Iran, et al.*, No. 15-cv-9903 (GBD)(SN);<br>    *Arias, et al. v. Islamic Rep of Iran*, No. 19-cv-41 (GBD)(SN) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF PARTIAL FINAL DEFAULT JUDGMENTS ON BEHALF OF *BURNETT/IRAN* AND *ARIAS* PLAINTIFFS IDENTIFIED AT EXHIBITS A-1 AND A-2 WHO WERE NOT IMMEDIATE FAMILY MEMBERS OF A 9/11 DECEDENT

### (BURNETT/IRAN XXV)

For the reasons set forth below and in the accompanying Declaration of John Eubanks ("Eubanks Declaration"), the Plaintiffs identified in Exhibit A-1[1] and A-2 to the Eubanks Declaration filed contemporaneously with this application, by and through their counsel, Motley Rice LLC, respectfully move the Court for an Order entering partial final default judgments against the Iran Defendants[2] and awarding the Plaintiffs identified in Exhibit A (1) solatium damages for the losses they suffered as functional equivalents of immediate family members of decedents killed on 9/11 (as indicated in Exhibits A-1 and A-2) in the same per plaintiff amounts previously awarded by this Court to other similarly situated plaintiffs in this multidistrict litigation; (2) prejudgment interest at the rate of 4.96 percent *per annum*, compounded annually, for the period from September 11, 2001 until the date of the judgment; and (3) permission for the *Burnett/Iran*

---

[1] The references throughout this document to Exhibits are to Exhibits to the Eubanks Declaration dated May 11, 2022, filed contemporaneously with this motion.

[2] Plaintiffs in *Burnett/Iran* sued, served, and subsequently obtained a default judgment as to liability against the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Central Bank of the Islamic Republic of Iran (collectively, "the Iran Defendants") in connection with the death of Plaintiffs' decedents in the 9/11 attacks. Plaintiffs in *Arias* sued, served, and subsequently obtained a default judgment as to liability against the Islamic Republic of Iran.

and *Arias* plaintiffs identified in Exhibits A-1 and A-2 to seek punitive damages, economic damages, or other damages at a later date, and for all other *Burnett/Iran* or *Arias* Plaintiffs not appearing on Exhibits A-1 or A-2, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

This motion is made on behalf of the *Burnett/Iran* claimants listed in Exhibit A-1 and the *Arias* claimant listed in Exhibit A-2 in light of this Court's previous orders granting permission to allow *Burnett/Iran* and *Arias* plaintiffs (collectively the "Burnett/Iran XXV Plaintiffs") whose damages judgments had not previously been awarded to move for this relief. *See e.g.* ECF Nos.[3] 3666, 4023, 4023, 4126, 4146, 4175, 5061, 5062, 5087. 5092. 5104, 5136, 5138, 5151, 5356, 5848, 5918, 5946, 5948, 5949, 5951, 5955, 5957, 5969, 5975, 5979, 6034, 6035, 6037, 6038, 6039, 7188, 7287, and 7494. The solatium claimants for whom relief is presently sought each have the functional equivalence of an "immediate family member" relationship to decedents who died in the September 11, 2001 terrorist attacks, and the intimate nature of their emotional connection with their lost loved ones and the anguish and grief they have suffered as result of the attacks is detailed in the declarations included as Exhibits B through P to the Eubanks Declaration. Because these claimants' relationships to their loved ones were functionally equivalent to the biological relationships that this Court has previously found formed the basis for damages awards, the Burnett/Iran XXV Plaintiffs should be awarded solatium damages under the Foreign Sovereign Immunities Act, applicable case law, and the law of the case.

Plaintiffs in *Burnett/Iran* sued the Iran Defendants in connection with the deaths of plaintiffs' decedents in the 9/11 attacks whereas Plaintiffs in *Arias* sued only the Islamic Republic of Iran. On December 1, 2016, all plaintiffs in the action *Burnett, et al. v. Islamic Rep. of Iran, et*

---

[3] Unless otherwise noted, ECF references herein pertain to ECF numbers applied in *In re Terrorist Attacks on Sept. 11, 2001*, 03 MDL 1570 (GBD)(SN) (S.D.N.Y.)

2

*al.,* No. 15-cv-9903 (GBD)(SN) ("*Burnett/Iran*"), moved for judgment as to liability only. *See* 15-cv-9903, ECF Nos. 65, 66 (amended on December 6, 2016, *see* 15-cv-9903, ECF Nos 68, 69). On January 31, 2017, the Court granted the *Burnett/Iran* Plaintiffs' application for judgment as to liability only. *See* 15-cv-9903, ECF No. 85. On September 5, 2019, all plaintiffs in the action *Arias, et al v. Islamic Rep. of Iran*, No. 19-cv-41 (GBD)(SN) ("*Arias*"), moved for judgment as to liability against the Islamic Republic of Iran.  *See* ECF No. 5081. On September 9, 2019, the Court granted the *Arias* Plaintiffs' application for judgment as to liability.  *See* ECF No. 5104. The plaintiffs that are party to this application, as identified in Exhibits A-1 and A-2, are a subset of the plaintiffs who have been granted judgment as to liability only, and rely on that judgment as to liability only for their request for default judgment as to solatium damages. Other subsets of plaintiffs in the *Burnett/Iran* and *Arias* cases previously requested and were granted similar judgments. *See* ECF Nos. 3666, 4023, 4023, 4126, 4146, 4175, 5061, 5062, 5087. 5092. 5104, 5136, 5138, 5151, 5356, 5848, 5918, 5946, 5948, 5949, 5951, 5955, 5957, 5969, 5975, 5979, 6034, 6035, 6037, 6038, 6039, 7188, 7287, and 7494. The plaintiffs identified in Exhibit A-1 now request entry of partial final default judgment against the Iran Defendants as to their claims in the amounts indicated in Exhibit A-1, and the plaintiff identified in Exhibit A-2 now requests entry of partial final default judgment against the Islamic Republic of Iran as to her claims in the amount indicated in Exhibit A-2.

## I.      Procedural Background

Addressing the availability of solatium damages to non-immediate family members, this Court has previously addressed the criteria necessary to establish that a claimant had the requisite "functional equivalent" relationship with a 9/11 decedent to be treated the same as an immediate family member for purposes of solatium damages. *See* ECF Nos. 3363 and 3676. The factors considered by the Court for determining whether domestic partners and fiancées were functional equivalents of a spouse included duration of the relationship, the degree of mutual financial

dependence and investments in a common life together, the duration of cohabitation, and the presence or absence of a formal engagement. *See id*. at 14-15. The factors considered by the Court for determining whether stepsiblings or stepparents were functional equivalents of a decedent included the age of the decedent at the time when the stepsibling or stepparent became part of the family, whether the stepsibling or stepparent continuously cohabited with the decedent, and whether the stepsibling or stepparent established that he or she otherwise had a close and longstanding relationship. *See id. at* 15-16; *see also* ECF No. 3676 at 13-14. For stepsiblings or stepparents who became part of the same family when the decedent (and stepsibling) were in their early childhood (roughly birth through age eight), and who lived together for at least two years, the Court deemed them fully functional equivalent to biological siblings and found them entitled to full solatium damages. *See* ECF No. 3363 at 15; *see also* ECF No. 3676 at 13-14. For stepsiblings or stepparents who became part of the same family after the decedent reached early childhood but while still living in the family home (roughly ages nine through 17), the Court would award solatium damages reduced by one-half. *Id.* If the decedent was aged 18 or above, then the stepsiblings or stepparents would not be entitled to solatium damages. The analysis for stepchildren followed this same pattern of when the stepchild joined the family: birth through age eight (full solatium); age nine through age 17 (half solatium); age 18 and older (no solatium). ECF No. 3363 at 16.

## II.       The *Burnett/Iran* and *Arias* Plaintiffs

The *Burnett/Iran* plaintiffs filed suit on December 18, 2015, against the Iran Defendants. Service on the Central Bank of Iran was effectuated on March 18, 2016, and on Iran and the IRGC on September 14, 2016. *See* 15-cv-9903, ECF No. 67 at ¶¶ 3-4. At Plaintiffs' request, the Clerk of the Court issued a Certificate of Default as to the Iran Defendants on December 5, 2016. *See* 15-cv-9903, ECF No. 67. On December 1, 2016, Plaintiffs requested judgment as to liability against

the Iran Defendants. *See* 15-cv-9903, ECF Nos. 65, 66. That application was amended on December 6, 2016 after the Clerk of the Court issued a Certificate of Default on December 5, 2016. *See* ECF Nos. 68, 69. The Court granted judgment as to liability against the Iran defendants in favor of all plaintiffs on January 31, 2017. *See* 15-cv-9903, ECF No. 85.

The *Arias* plaintiffs filed suit on January 2, 2019, against the Islamic Republic of Iran. Service on the Islamic Republic of Iran was effectuated on July 3, 2019.  *See* 19-cv-41, ECF No. 21 at ¶ 2.  The Clerk of Court issued a Certificate of Default as to the Islamic Republic of Iran on September 3, 2019.  *See* 19-cv-41, ECF No. 25.   On September 5, 2019, Plaintiffs requested judgment as to liability against the Islamic Republic of Iran.  *See* ECF No. 5081. The Court granted judgment as to liability against the Islamic Republic of Iran on September 9, 2019.  *See* ECF No. 5104.

Between July 26, 2017 and the present, numerous other subsets of the plaintiffs in *Burnett/Iran* and *Arias* filed for entry of partial final default judgments which the Court subsequently granted. *See* ECF Nos. 3666, 4023, 4023, 4126, 4146, 4175, 5061, 5062, 5087. 5092. 5104, 5136, 5138, 5151, 5356, 5848, 5918, 5946, 5948, 5949, 5951, 5955, 5957, 5969, 5975, 5979, 6034, 6035, 6037, 6038, 6039, 7188, 7287, and 7494. In each of the judgments entered for plaintiffs in the *Burnett/Iran* and *Arias* cases, the Court has applied the same dollar values for solatium awards for family members that the Court initially applied in *Havlish* and applied an interest rate of 4.96 percent per annum, compounded annually. *See id.*

For the reasons below as well as those set forth in the prior motions for judgment for solatium damages made on behalf of other *Burnett/Iran* and *Arias* wrongful death plaintiffs, the *Burnett/Iran* plaintiffs identified in Exhibit A-1 and the *Arias* plaintiff identified in Exhibit A-2 now respectfully request that this Court grant the proposed Order, filed with this motion, awarding

them: (1) solatium damages for the losses they suffered as non-immediate family members of their decedents killed on 9/11 (as indicated in Exhibits A-1 and A-2) in the same per plaintiff amounts previously awarded by this Court to various similarly situated plaintiffs in this multidistrict litigation; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually, for the period from September 11, 2001 until the date of the judgment; and (3) permission for the *Burnett/Iran* plaintiffs identified in Exhibit A-1 and the *Arias* plaintiff identified in Exhibit A-2 to seek punitive damages, economic damages, or other damages at a later date, and for all other *Burnett/Iran* and *Arias* Plaintiffs not appearing on Exhibits A-1 or A-2, to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

## III.    Damages Under § 1605A

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA") creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1). Under 28 U.S.C. § 1605A ("Section 1605A"), which applies to the claims against Iran, damages are available under the federal law and include money damages "for personal injury or death." *See* 28 U.S.C. §1605A(a)(1) and (c)(4). The damages available to plaintiffs in a Section 1605A action include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). Courts addressing the damages available under the statute have held that, among other damages recoverable, "estates of those who [died] can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

6

Accordingly, Plaintiffs identified in Exhibit A, who are (as indicated below) functional equivalents of family members of decedents killed on 9/11, are each entitled to solatium damages based on this Court's previous determinations in the amounts as previously established and applied by this Court in this and other related cases arising from the 9/11 Attacks. Moreover, as indicated below, Plaintiffs identified in Exhibit A are also entitled to prejudgment interest of 4.96% per annum, compounding annually, on the solatium awards running from September 11, 2001 until the date of judgment.

### A.   Solatium Damages

Section 1605A specifically provides for solatium damages. Under that provision, family members of the decedents may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of Iran,* 281 F.Supp. 2d 105, 196 (D.D.C. 2003), *vacated on other grounds,* 404 F.Supp. 2d 261 (D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 22 (D.D.C. 2009). In cases brought under this exception to the FSIA, solatium claims have therefore been treated as comparable to claims for intentional infliction of emotional distress, in which the immediate family members of the decedent are treated as direct victims. *See, e.g. Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005)("[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."); *Surette v. Islamic Republic of Iran,* 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "'indistinguishable' from the claim of intentional infliction of emotional distress.") (quoting *Wagner v. Islamic Republic of Iran,* 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)). Accordingly,

7

this Court has previously awarded solatium damages to "immediate family members" who, though not physically present at the site of the terrorist attacks, were nevertheless intended victims of the terrorist activities. *See e.g.* ECF. Nos. 3358, 3300.

### 1.     Nature of the Relationship — "Functional Equivalent" of Immediate Family Members

In defining those family members eligible to make a claim for solatium damages, this Court previously determined that spouses, parents, children and siblings who survived the September 11, 2001 deaths of their loved ones were entitled to recover for their solatium losses, and also set forth a framework for other familial relationships that fell outside of those four categories. *See* ECF Nos. 3363, 3676. In this Court's October 14, 2016 Report and Recommendation, adopted in pertinent part by Judge Daniels (ECF No. 3384), the Court recognized that, in addition to awarding damages to individuals considered traditional "family members," the Court may also award damages to non-immediate family members who meet certain criteria establishing that she or he had the "functional equivalent" of an immediate family member relationship with a September 11, 2001 decedent. These categories of non-immediate family members included fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews, and cousins. *See* ECF No. 3363.

In that Report, the Court identified factors the Court would consider as relevant for determining whether, for awarding damages, a domestic partner would be considered the "functional equivalent" of a spouse and whether a stepsibling would be considered the "functional equivalent" of a sibling. The factors that the Court identified as relevant in the context of domestic partnership are "the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement." *Id*. at 14-15. The framework that the Court adopted in the context of step-relations is this: "… stepsiblings who became part of the family when the decedent was in

early childhood (roughly birth through age eight) may be deemed fully functional equivalent to biological parents or siblings and shall be entitled to full solatium damages and stepchildren who were in the same range when the decedent became part of their family shall be deemed fully equivalent to biological children," ". . . stepsiblings who became part of the family when the decedent had passed early childhood but was still living in the family home and undergoing secondary education (roughly ages 9 through 17) may be entitled to solatium damages reduced by one-half, and stepchildren who were in this age range when the decedent who became part of the family shall receive half damages as well," and ". . . stepsiblings who became part of the decedent's family when the decedent had nearly finished his secondary education (roughly age 18 and above) and/or did not cohabit with the decedent for a significant period of time will likely not be deemed functional equivalents of immediate family members and shall not be illegible for solatium awards, with the same being true for stepchildren who were this age when the decedent became part of their family. In all cases, the Court will recommend solatium awards only for those step-relatives that cohabited with the decedent and establish that they otherwise had a close and longstanding relationship." *Id*. at 15-16.

The information in the accompanying declarations of the individuals for whom solatium damages are sought in this motion confirms that the claimants listed in Exhibits A-1 and A-2 had the "functional equivalent" of a biological relationship and they are therefore each entitled to an award for solatium damages.

### 2. Quantum of Damages

To fashion a solatium award adequately compensating the surviving family members in the litigation against Iran, this Court previously recognized that the immediate family members of those killed in the September 11 terrorist attacks suffered and continue to suffer profound agony and grief and, "[w]orse yet, ... are faced with frequent reminders of the events of

that day." *See* ECF Nos. 2623, 2618 at 10-12. Given the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families," The Court ordered that solatium damages in the following amounts would be awarded to the immediate family members of those individuals killed on September 11, 2001:

| Relationship to Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 4.

As indicated above, the Court concluded that the damages framework above would be used when assessing solatium damages awards for qualifying non-immediate family members, except that the value for step-relatives would be dependent on the age of the two step-relatives at the time the relationship began. See ECF Nos. 3363 at 16; 3676 at 13-14.

The losses claimed in this motion are legally and factually comparable to those suffered by other claimants previously awarded solatium damages in this litigation. The deaths here were sudden and unexpected and were the result of the terrorism defendants' extreme acts of malice. The decedents were civilians whose deaths were intended to create an environment of fear and terror. The claimants here were not attenuated victims — they had intimate relationships with the decedents and were directly and irrevocably harmed by the terrorist acts and consequences. Accordingly, the presumptive values for solatium damages previously adopted by the Court for spouses and siblings in the other *Burnett/Iran* and *Arias* judgments as well as the other claimants involved in this litigation should apply equally to the Burnett/Iran XXV Plaintiffs.

The relationships between the decedents and the Burnett/Iran XXV Plaintiffs are set forth below and in more detail in the statements from the surviving family members submitted as Exhibits B through P. The Burnett/Iran XXV Plaintiffs identified below have the sort of intimate relationships previously recognized as qualifying for solatium damages; they survived the deaths of their loved ones on September 11, 2001; and they have verified under penalty of perjury the nature of the relationships with their deceased loved ones.

The Burnett/Iran XXV Plaintiffs respectfully request that this Court issue a partial final judgment ordering payment of solatium damages to the Burnett/Iran XXV Plaintiffs in the amounts set forth below and in Exhibits A-1 and A-2:

> **a.     Burnett/Iran** *Plaintiff Davina Aryeh*
> *Stepdaughter of 9/11 decedent Kevin P. Connors*
> **Presumptive Award:  $8.5 million**
> **Requested Award:    $4.25 million**

Kevin P. Connors was at work as a Senior Vice President with Euro Brokers, Inc. in the World Trade Center south tower when he was killed in the 9/11 attacks. Kevin, who had two children from a previous marriage, married Davina's mother in 1993 when Davina was eleven years old. *See* Exhibit B, Dec. of Davina Aryeh at ¶3. As his stepdaughter, Davina resided in the same family home with Kevin, her mother, her siblings and stepsiblings until he was killed on September 11, 2001. *See id.* at ¶¶3, 6 and 8. After divorcing her mother when Davina was just two years old, Davina's biological father lived abroad for most of her life. *Id.* at ¶4. Kevin Connors served the role of a father in Davina's life: he was the breadwinner for the two blended families, provided moral guidance, organized family vacations, instilled American values in the children, and presided over the nightly meal which was attended by the entire extended family. *Id.* at ¶¶5, 7, 9-21. As Davina states in her Declaration, "He did everything with me that a father would do." *Id.* at ¶16. He assisted her with obtaining internships while she was in college and subsequent jobs.

11

*Id.* at 16. Kevin Connors was present and active in Davina's life during her formative years from the age of eleven until his death on September 11, 2001, when she was twenty years old. She has experienced a void in her life since his death.  *Id.* at ¶22.  Davina meets the criteria for a stepchild to be considered the functional equivalent of a biological child, but because she did not move in with Kevin Connors until she was 11 years old, she should be granted half of the presumptive solatium award for a biological child as this Court has directed.

### b. Burnett/Iran *Plaintiff Karim Aryeh*
### *Stepson of 9/11 decedent Kevin P. Connors*
**Presumptive Award: $8.5 million**
**Requested Award: $4.25 million**

Kevin P. Connors was at work as a Senior Vice President with Euro Brokers, Inc. in the World Trade Center south tower when he was killed in the 9/11 attacks. Kevin, who had two children from a previous marriage, married Karim's mother in 1993 when Karim was thirteen years old. *See* Exhibit C, Dec. of Karim Aryeh at ¶3.  As his stepson, Karim resided in the family home with Kevin, his mother, his siblings and stepsiblings until Kevin was killed on September 11, 2001. *See id.* at ¶¶3, 7 and 9. After divorcing his mother when Karim was four years old, Karim's biological father lived abroad most of his life. *Id.* at ¶4. Kevin Connors was the father figure in Karim's life: he was the breadwinner for the blended family, provided financial and moral support, organized family vacations, instilled American values in the children, and presided over the nightly meal which was attended by the entire extended family. *Id.* at ¶¶5-17. Kevin was "not only a father, but also a friend, mentor, and role model" to Karim. *Id.* at ¶15. As such, the two grew incredibly close while Kevin nurtured Karim's interest in finance by literally mentoring him in that subject and allowing Karim to visit his office in the World Trade Center as he taught him the world of finance and helped Karim obtain his first internship with a financial interest and, following in Kevin's footsteps, Karim works in finance today. *Id.* at ¶14. Kevin Connors was

12

present and active in Karim's daily life during his formative years from the age of thirteen until Kevin's death on September 11, 2001, when Karim was twenty-two years old. Karim meets the criteria for a stepchild to be considered the functional equivalent of a biological child, but because he did not move in with Kevin Connors until he was 13 years old, he should be granted half of the presumptive solatium award for a biological child as this Court has directed.

> **c.    Burnett/Iran** *Plaintiff Troy M. Barrett*
> ***Stepson of 9/11 decedent Brian T. Cummins***
> **Presumptive Award:** **$8.5 million**
> **Requested Award:    $4.25 million**

Brian T. Cummins was an equity market maker and partner with Cantor Fitzgerald in the World Trade Center when he was killed in the 9/11 attacks. *See* Exhibit D, Dec. of Troy M. Barrett at ¶2. At the time of his death, Mr. Cummins had been living with Troy Barrett and Troy's mother, to whom he was engaged to be married, for approximately three years. *See id.* at ¶3. While Troy never met his biological father, Mr. Cummins was the father figure in Troy's life and had assumed all the responsibilities of raising Troy since he was approximately thirteen years old when he and his mother began living with Mr. Cummins. *Id.* at ¶¶ 4-9. Mr. Cummins came into Troy's life at a time when Troy was going through his awkward adolescent years, and helped Troy navigate through that period. *Id.* at ¶8. As Troy states, "He provided advice on manhood that I could never discuss with my mother. Brian made me feel better about the emotions I was experiencing then by assuring me it was normal to feel the way I did…" *Id.* Given the lack of a role of his biological father, and the fatherly role that Brian Cummins played at a critical time in his adolescent life, Plaintiffs submit that Troy M. Barrett is entitled to treatment as the functional equivalent of a child of Brian T. Cummins, but because this relationship commenced only when he was 13 years old, he should be granted half of presumptive solatium award for a biological child as this Court has directed.

13

**d.      Burnett/Iran** *Plaintiff Christian C. Croner*
        *Stepson of Joseph W. Flounders*
**Presumptive Award:** $8.5 million
**Requested Award:    $8.5 million**

Joseph W. Flounders was a broker with Euro Brokers, Inc. in the World Trade Center when he was killed in the 9/11 attacks. *See* Exhibit E, Dec. of Christian C. Croner at ¶2. Christian C. Croner was seven years old when his mother and Mr. Flounders were married in 1979 and they began living together as a family. *Id.* at ¶3. He continued to reside in the family home with his mother and Mr. Flounders until he left the family home in 1993 when he himself married. *Id.* at ¶3. Christian's biological father played no role at all in his life. *Id.* at ¶4. Instead, Joseph Flounders was not only the primary breadwinner of the family, but "provided the moral, emotional and spiritual guidance" that shaped who Christian is today. *Id.* at ¶5. Throughout the fourteen years Christian lived in the same family home with him, Mr. Flounders sheltered him, fed him, clothed him, protected him and kept him safe. Christian was completely dependent on Joseph Flounders. *Id.* at ¶¶ 6-7. After Mr. Flounders married Christian's mother, Christian referred to Joseph as his father, and was treated by Joseph's immediate family as if he was Christian's biological father. *Id.* at ¶8. Mr. Flounders paid for Christian's primary education at two private schools in the greater New York City area. *Id.* at ¶12. Like all good fathers, Joseph helped guide Christian through the formative though awkward adolescent period of his life. *Id.* at ¶14. Pursuant to this Court's prior determinations, given that Christian Croner resided with Joseph Flounders in a father-son relationship from age 7 until age 21, he should be entitled to the presumptive judgment amount for a biological child of a 9/11 decedent.

    e.     **Arias** *Plaintiff Dawn M. Curry*
                 *Stepdaughter of 9/11 Decedent Stephen F. Masi*
**Presumptive Award: $8.5 million**
**Requested Award:   $8.5 million**

Stephen F. Masi was a senior service technician at Cantor Fitzgerald and was killed at his office in the World Trade Center in the 9/11 attacks. *See* Exhibit F, Dec. of Dawn M. Curry at ¶2. Dawn Curry never knew her biological father, and he only saw her one time when she was 6 weeks old. *Id.* at ¶4. While Dawn's mother and Mr. Masi did not get married until Dawn was a senior in high school, she cohabitated with Mr. Masi for nearly 18 years until she left home at age 20 to have her first child. *Id.* at ¶3 and ¶9. While growing up, Mr. Masi was Dawn's father and provided her with financial and emotional support, and all the other things fathers do for their adolescent children: he attended parent-teacher conferences, cheered her on at gymnastic meets and would attend her chorus concerts. He taught Dawn how to ride a bike, how to swim and, when she was old enough, how to drive a car. Like many families, theirs had a tradition of sitting down to dinner together on Friday nights to discuss what was going on in their daily lives. *Id.* at ¶¶5 – 12. Not only was Mr. Masi a loving father, after Dawn left home and had children of her own, Mr. Masi continued to be a doting grandfather. *Id.* at ¶13. In short, Mr. Masi was the only father Dawn has ever known, and Plaintiffs submit she should be entitled to the full presumptive award of $8,500,000 for a biological child of a 9/11 decedent.

    f.     **Burnett/Iran** *Plaintiff Doreen Gray*

                 *Stepmother of 9/11 Decedent James M. Gray*
                 **Presumptive Award:  $8.5 million**
                 **Requested Award:   $4.25 million**

James M. Gray was a firefighter with the Fire Department of New York and died on 9/11 in the line of duty while responding to the terrorist attacks that day. *See* Exhibit G, Dec. of Doreen Gray at ¶2. When James was 12 years old, his biological mother abandoned James and his siblings.

*Id.* at ¶4. Since marrying James' father two years later when James was 14 years old, Doreen Gray assumed the role of mother in his life. Doreen and James resided together in the family home for the next ten years until he left home to get married. *Id.* at ¶3. Doreen and James' father supported him financially and provided for his day-to-day needs until he moved from the family home. Even after James married and moved out of the family home, Doreen continued to be the mother figure in James's life and she and his father continued to offer financial support whenever needed. *Id.* at ¶¶5-6. Doreen, whom James referred to as "Mama," suffered emotionally after being abandoned by his biological mother. Doreen made sure James knew she was always available to listen and to provide a shoulder to cry on whenever he was going through a tough emotional period. *Id.* at ¶¶ 10-11. When James asked Doreen for her help in planning his wedding, she did so, and helped him pick out what he would wear on his wedding day. *Id.* at ¶13. Doreen was the mother figure in James' life from the time he was 14 years old until he was killed on September 11, 2001, and should be entitled to half the full presumptive award for a biological parent of a 9/11 decedent based on the law of the case.

> **g.      Burnett/Iran *Plaintiff Bianca I. Jerez***
> ***Stepdaughter of 9/11 Decedent Robert D. Cirri, Sr.***
> **Presumptive Award: $8.5 million**
> **Requested Award:    $8.5 million**

Robert D. Cirri, Sr., was a lieutenant with the Port Authority of New York and New Jersey who was killed in the 9/11 attacks while he and four other officers attempted to carry a woman to safety when the North Tower of the World Trade Center collapsed. *See* Exhibit H, Dec. of Bianca I. Jerez at ¶2. Bianca I. Jerez had resided in the same home with Mr. Cirri for nearly eight years from the time she was approximately seven years old even though Bianca's mother and Mr. Cirri did not marry until 1999. *Id.* at ¶3. "Robert D. Cirri, Sr. never treated my sisters and me any differently than my stepsiblings. He raised all of us as if we were all his biological children." *Id.*

16

at ¶6. Robert Cirri was a father in all respects and did those things a father typically does for a child: in addition to being home when Bianca would return from school, he attended student-teacher conferences; he would get Bianca and her sisters ready for school and bring them to extracurricular activities; he would cook for them almost every night; he would drive Bianca to her dance and flute lessons, as well as attend her recitals. *Id.* at ¶¶7-11. As she states in her Declaration, Bianca grew "incredibly close with Robert D. Cirri, Sr. because he was the parental figure who was always at home with my sisters and me." *Id.* at ¶13. When Bianca was sick, she would "always go to him instead of her mother. He would make sure I took my medicine, cook for me, and care for me until I was better." *Id.* at ¶13 and ¶15. Given the length of cohabitation, the lack of her biological father in her life, and the fatherly role Robert D. Cirri, Sr. assumed in Bianca's life, Plaintiffs submit that Bianca I. Jerez is entitled to the presumptive judgment as a functional equivalent of a biological child to Robert D. Sirri, Sr.

> **h.   Burnett/Iran *Plaintiff Jordan A. Lyles***
> ***Stepson of 9/11 decedent CeeCee L. Lyles***
> **Presumptive Award: $8.5 million**
> **Requested Award:    $8.5 million**

CeeCee L. Lyles was a Flight Attendant on United Airlines Flight 93 and was killed when the aircraft was highjacked and crashed into a field in Somerset County, Pennsylvania on the morning of September 11, 2001. *See* Exhibit I, Dec. of Jordan A. Lyles at ¶2. Jordan Lyles' father and CeeCee Lyles began dating in 1998 when Jordan was only six years old. *Id.* at ¶5. Jordan's biological mother played no role in his upbringing. *Id.* at ¶4. He began residing in the same home with CeeCee Lyles prior to her marrying his father on May 1, 2020, and they cohabitated for approximately two years before she was killed on September 11, 2001. *Id.* at ¶¶3, 6. CeeCee Lyles treated Jordan and his brother Justin the same as her biological children, and she "was the only woman who ever did things for me" and "was the mother figure in my life" who attended to

his emotional and material needs and ensured that he knew that she loved him.  *Id.* at ¶¶8-9. CeeCee Lyles was the only mother figure that Jordan Lyles had, and given his young age when she entered his life, he is entitled to treatment as the functional equivalent of a biological child and the full value of presumptive award for that relationship.

> **i.    Burnett/Iran** *Plaintiff Justin A. Lyles*
> *Stepson of 9/11 decedent CeeCee L. Lyles*
> **Presumptive Award: $8.5 million**
> **Requested Award:    $8.5 million**

CeeCee L. Lyles was a Flight Attendant on United Airlines Flight 93 and was killed when the aircraft was highjacked and crashed into a field in Somerset County, Pennsylvania on the morning of September 11, 2001. *See* Exhibit J, Dec. of Justin A. Lyles at ¶2.  Like his brother Jordan, their father and CeeCee began dating in 1998 when Justin was seven or eight years old, and their biological mother played no role in their upbringing.  *Id.* at ¶¶4-5. Justin and his brother began residing in the same home with CeeCee Lyles prior to her marrying their father on May 1, 2020, and Justin experienced CeeCee Lyles standing up for him—even with her own biological son—and being the mother that Justin never had.  *Id.* at ¶¶6-8. Her death left a void in Justin's life as the only mother he had known was no longer there despite his knowledge that she loved him. *Id.* at ¶¶8-9.  CeeCee Lyles was the only mother figure that Justin Lyles had, and given his young age when she entered his life, he is entitled to treatment as the functional equivalent of a biological child and the full value of the presumptive award for that relationship.

> **j.    Burnett/Iran** *Plaintiff Bryant Mitchell*
> *Stepson of 9/11 decedent Richard Stadelberger*
> **Presumptive Award: $8.5 million**
> **Requested Award:    $8.5 million**

Richard Stadelberger was a broker and vice president with Fiduciary Trust Company International and was killed at his office in the World Trade Center in the 9/11 attacks. *See* Exhibit K, Dec. of Bryant Mitchell at ¶2. Bryant Mitchell began living with his mother and Richard

Stadelberger when Bryant was only 12 years old, and he continually resided with Richard Stadelberger until after college when Bryant moved only about 20 minutes away. *Id.* at ¶¶3, 11. From the time Mr. Stadelberger married Bryant Mitchell's mother and moved into their home with them, Mr. Stadelberger was the father figure in Bryant's life, and assumed all the responsibilities of a father to him. *Id.* at ¶3 and ¶18. Bryant's biological father left him and his mother when Bryant was a four-month old infant and has never had any contact with Bryant. *Id.* at ¶4. Richard Stadelberger provided financial, moral and emotional support to Bryant in the manner any loving father would provide his children. In addition to paying for Bryant's everyday needs, including health insurance, he paid for his extracurricular activities as he matured out of pre-adolescence into a teenager. *Id.* at ¶6. The two shared a love of baseball, and no matter how bad the Mets played during any given season, they always watched the games together. *Id.* at ¶12. When Richard served as president of Bryant's younger brother's baseball league, he convinced Bryant to become an umpire for the games so it would provide another "way we would spend time together and bond over our love of baseball. *Id.* at ¶12 and ¶14. When Bryant was in high school, Richard would attend his cross-country track meets to cheer him on and the two would thereafter enjoy "going on runs together." *Id.* at ¶10 and ¶13. Richard also paid for Bryant to receive a Catholic education. *Id.* at ¶6. "I always knew I could talk to Richard Stadelberger about anything going on in my life. He was my daily emotional support. He was there no matter what." *Id.* at ¶17. While Bryant Mitchell only began residing with Richard Stadelberger when he was twelve years old, the nature of their father/son relationship was deep and endured until the day Richard was killed on 9/11. Plaintiffs submit that Bryant should be entitled to the full presumptive award of $8,500,000.00 as the functional equivalent of a child of Richard Stadelberger notwithstanding the Court's prior determinations regarding the age of the stepchild factoring into the value of the award.

**k.      Burnett/Iran** *Plaintiff Daniella Peters-Nylen*
*Stepdaughter of 9/11 Decedent Kevin P. Connors*
**Presumptive Award: $8.5 million**
**Requested Award:    $8.5 million**

Kevin P. Connors was a senior vice president for Euro Brokers, Inc. when he was killed in the World Trade Center as part of the 9/11 attacks. *See* Exhibit L, Dec. of Daniella Peters-Nylen at ¶2. Prior to her mother's marriage to Mr. Connors in 1993, Daniella began living in the same home as Kevin Connors when she was approximately five years old. *Id.* at ¶4. When Mr. Connors was killed, Daniella Peters-Nylen was 15 years old and had been living with Mr. Connors and her family for approximately ten years. *Id.* at ¶3. Kevin Connors "was the father in my life and undertook to do all those things for me that a father does for his children." *Id.* Daniella was an infant when her mother and biological father divorced and he moved abroad where he continues to reside today. *Id.* at ¶5. Daniella completely depended on Kevin Connors as the breadwinner for their family, and Kevin kept Daniella and her siblings "fed, clothed, sheltered, healthy and safe." *Id.* at ¶6. As became their daily routine, the family shared evening meals together during which Kevin led discussions about events in the personal lives of family members, as well as outside events occurring in the world. *Id.* at ¶7. Kevin Connors instilled in all the children in his home the importance of an education and hard work. To that end, he took on all the costs of providing a good education for Daniella and her siblings, attended parent-teacher conferences and other school-related events on a regular basis, and "set an example that I follow with my own children to this day." *Id.* at ¶8. Kevin Connors also stressed the importance of leading an active lifestyle as part of his emphasis on a good education and a hard work ethic. "He always made time to attend my soccer and tennis matches when I was in school. *Id.* at ¶9. Kevin taught Daniella how to ride a bike and the two of them rode bikes together as she grew up. He introduced her to rock climbing and the two of them shared that activity on family vacations when they would "find a face" to

climb together. *Id.* at ¶10. Theirs is a Catholic family that attended mass on a regular basis. Another routine the family developed: after Sunday mass Kevin would treat the family to dinner out followed by a movie, oftentimes splitting into groups based on individual movie tastes. As fondly recalled by Daniella, "I will always treasure my memories of "movie night" when [Kevin] and I were the only two who opted for a particular movie… It gave me the opportunity to spend time with him one-on-one." *Id.* at ¶11. The important role Kevin played in Daniella's early life cannot be better stated than as she put it in her Declaration: "From the day he came into my life when I was a little girl, until the day he died on September 11, 2001, Kevin Connors was my father. He not only assumed all the financial responsibility of providing for me, he demonstrated everyday how a moral and ethical family-centered life was to be lived. I am the mother I am today because of the father Kevin was for me." *Id.* at ¶16. Plaintiffs submit that Daniella Peters-Nylen should be considered the functional equivalent of a daughter to Kevin Connors and is entitled to the presumptive judgment of $8,500,000.00.

> **l.    Burnett/Iran *Plaintiff Michelle A. Stabile***
> ***Fiancé of 9/11 decedent Frank J. Koestner***
> **Presumptive Award: $12.5 million**
> **Requested Award:     $12.5 million**

Frank J. Koestner was a stock trader with Cantor Fitzgerald when he was killed in the World Trade Center as part of the 9/11 attacks. *See* Exhibit M, Dec. of Michelle A. Stabile at ¶2. Frank Koestner proposed marriage to Michelle Stabile on January 1, 2001 approximately 18 months after they met on July 2, 1999, and they were scheduled to be married on October 28, 2001 at Saint Paul's Episcopal Church in Glen Cove, New York where they had begun meeting with Rev. Douglas W. Hutchings to prepare for their life together. *Id.* at ¶¶3, 5.  In anticipation of their big day, they arranged for a traditional wedding and reception and had booked the venue site, entered a catering contract, contracted for limousine services for the wedding party, engaged a

printer for wedding invitations and a florist for flowers, purchased Michelle's wedding dress, engaged a travel agent, and booked airline and hotel reservations for their planned honeymoon. *Id.* at ¶4. Planning beyond their wedding day, on August 8, 2001, just a month before Frank's death, he and Michelle signed a contract for the purchase of the house they were to move into together. *Id.* at ¶7. Over the 2001 Labor Day weekend, just weeks before Frank was killed, he and Michelle purchased an automobile. *Id.* at ¶8. On September 8, 2001, three days before Frank died, a bridal shower was held for Frank and Michelle at which family and friends interacted to celebrate their upcoming wedding. *Id.* at ¶6. Throughout their courtship and subsequent engagement, Michelle grew closer and closer to Frank's three-year-old daughter from a previous marriage, Carolyn. On weekends Michelle would invite her niece and nephew, who were close in age to Carolyn, over for backyard adventures, picnics in the park when weather permitted, movies, and other familial activities. *Id.* at ¶¶9-10. As they interacted with the children, Frank and Michelle began discussing having their own children together. As Michelle put it: "it was never a matter of if; it was simply a matter of when" they would have children together. *Id.* at ¶11. Based on their demonstrated commitment to, and investment in, a common life together, and their formal engagement and concrete plans to be married, Plaintiffs submit that Michelle A. Stabile should be considered the functional equivalent of a spouse to Frank J. Koestner and should be entitled to the presumptive judgment amount of $12,500,000.00 for a spouse of a 9/11 decedent.

> **m.** **Burnett/Iran** *Plaintiff Doreen Noone Wheeler*
> *Domestic Partner of 9/11 decedent Kevin M. Prior*
> **Presumptive Award: $12.5 million**
> **Requested Award:    $12.5 million**

Kevin M. Prior was a firefighter with the New York Fire Department and was killed in the 9/11 terrorist attacks when the North Tower of the World Trade Center collapsed as he was

ascending a stairway located therein in response to a mayday call. *See* Exhibit N, Dec. of Doreen

Noone Wheeler at ¶2.  At the time of his death, Doreen had been engaged to Kevin for four months,

after having dated each other exclusively for approximately 4 years. *Id.* at ¶3. Sometime in 2000,

Kevin and Doreen began cohabitating and planning their future together. As part of those plans,

Kevin provided the financial support to allow Doreen to finish her education to become a teacher.

During this period, Doreen was completely dependent on Kevin financially. In May of 2001, four

months before 9/11, Doreen was awarded her bachelor's degree. In late August of 2001, weeks

before he was killed on 9/11, Kevin helped Doreen set up the classroom of her first teaching job.

*Id.* at ¶5. Their plans together also included buying a home and raising a family. *Id.* at ¶5. Their

wedding was scheduled to take place on July 2, 2002, at the St. Killian Club in Farmington, New

York, with a reception to follow at the Crescent Beach Club in Bayville, New York, and contracts

were entered to secure those venues. *Id.* at ¶7. Both Kevin and Doreen had extended family in

Ireland and, shortly after they became engaged, they travelled there for a month-long vacation to

introduce each other to their respective family members. *Id.* at ¶8. Approximately one month

before 9/11, Kevin suggested that he and Doreen go to a local courthouse to get married before

their scheduled formal wedding ceremony the following year, so that Kevin could include Doreen

as his spouse on his employer-provided health insurance plan. Regretting her decision ever since

9/11, Doreen told him she wanted to wait for their special day. *Id.* at ¶9. Just three days before he

was killed on 9/11, Kevin added Doreen to his MNBA Visa account. *Id.* at ¶10. On June 17, 2002,

the New York State Senate passed legislation that made domestic partners of certain firefighters

who lost their lives in the line of duty on September 11, 2001 eligible for special accidental death

benefits, among other benefits. The legislation applied to registered and unregistered domestic

partners of specific New York City firefighters, including Kevin Prior. As such, Doreen Wheeler

was deemed the domestic partner of Kevin and was awarded the special death benefit provided by that legislation. *Id.* at ¶11. In addition, on November 12, 2002, the Commissioner of the Department of Taxation and Finance for the State of New York notified Doreen that as the domestic partner of Kevin Prior, she was awarded a sum certain from the New York State World Trade Center Relief Fund. *Id.* at ¶12. Based on their demonstrated commitment to, and investment in, a common life together, their formal engagement to be married, and recognition by the state of New York of their domestic partner relationship, Plaintiffs submit that Doreen Noone Wheeler is entitled to the presumptive judgment of $12,500,000.00 for a spouse of a 9/11 decedent.

### n.    **Burnett/Iran** *Plaintiff Joseph N. Shontere*
### *Stepparent of 9/11 decedent Angela Marie Houtz*
**Presumptive Award: $8.5 million**
**Requested Award: $8.5 million**

Angela "Angie" Marie Houtz was a civilian analyst in the Office of Naval Intelligence and was killed on 9/11 when terrorist seized control of American Airlines Flight 77 and crashed it into the Pentagon where she was working. *See* Exhibit O, Declaration of Joseph N. Shontere at ¶2. Joseph had known Angie since she was in fourth grade. *Id.* at ¶3. The two began living in the same household as part of a bigger family unit a year before her mother and Joseph married. *Id.* at ¶4. In 1985, when Angie was ten years old, Joseph became her stepparent when he married Angie's mother. *Id.* at ¶5. Since 1984, when Angie's mother and Joseph moved in together, Joseph and Angie resided in the same household until Angie graduated from college in 1996 and left the family home to start her career. *Id.* at ¶5. Throughout that entire period, until she was killed on 9/11, Joseph was the father figure in Angie's life and provided her with the financial, emotional, and moral support any loving father would. *Id.* at ¶6. As set out in his declaration, it was clear to Joseph that Angie's biological father was not going to voluntarily undertake to do any of these things, and shortly after divorcing Angie's mother, he stopped playing any role in Angie's life. *Id.* at ¶7. Joseph

24

and Angie's mother provided Angie and her sister, Tina Marie, with a stable home environment in which to grow up. In his declaration, Joseph describes some of the regular family activities they engaged in, along with attending Catholic Mass together on a regular basis. *Id.* at ¶¶9-10. In addition to providing food, clothing, and a safe place to live, Joseph also provided health insurance coverage for Angie and included her as a dependent on his individual income tax returns. *Id.* at ¶8. After starting her career with the Office of Naval Intelligence, Angie named her mother and Joseph as the beneficiaries of an employer-provided life insurance policy. *Id.* at ¶11. Plaintiffs submit that Joseph N. Shontere should be considered the functional equivalent of a parent to Angela Marie Houtz, based on the role he fulfilled in her life, and is entitled to the presumptive judgment of $8,500,000.

> o.   **Burnett/Iran *Plaintiff Tina Marie Wasielewski***
> ***Stepsibling of 9/11 decedent Angela Marie Houtz***
> **Presumptive Award: $4.25 million**
> **Requeseted Award: $4.25 million**

Angela "Angie" Marie Houtz was a civilian analyst in the Office of Naval Intelligence and was killed on 9/11 when terrorist seized control of American Airlines Flight 77 and crashed it into the Pentagon where she was working.  *See* Exhibit P, Dec. of Tina Marie Wasielewski at ¶2. Tina Marie Wasielewski first met Angie in 1980 when the two girls were six years old and began the first grade together at the same school, in the same classroom, taught by the same teacher. *Id.* at ¶3. Their relationship only grew stronger as they grew older, and only ended on 9/11. *Id.* In 1984, when Angie and Tina were ten years old and inseparable best friends, Tina's biological father, Joseph N. Shontere, began living with Angie's biological mother. *Id.* at ¶4. Because Tina's biological mother was awarded primary custody of Tina as part of her biological parents' divorce, Tina continued to reside with her biological mother, going back and forth between her biological mother's home and her biological father's home. On weekends and extended holidays when she

stayed with her biological father, Angie and Tina shared a bedroom together. *Id.* at ¶¶5-6. In 1989, when Angie and Tina started high school, Tina began living permanently with her biological father, her stepmother (Angie's biological mother), Angie, and Angie's sister (Tina's stepsister), Jamie, in the family home. *Id.* at ¶7. Throughout their high school years, Tina and Angie served as co-captains of their school's flag team, and continued to serve in their church's youth group, which they began doing together in 1984. *Id.* at ¶8. They shared a car together during their high school years which required careful coordination of their respective schedules, but this was not difficult because they were best friends who did everything together and even had part-time jobs in high school across the street from one another to accommodate their shared vehicle. *Id.* at ¶9. During their high school years, Tina and Angie spent summer days lounging about the pool in their back yard, imagining and talking about the endless possibilities ahead for their future lives. *Id.* at ¶10. As the two young women lived out their high school years living together as sisters and best friends, their family continued to attend church together and helped maintain a piece of property owned by the Catholic church near their home. The property, surrounded by farmland, is located along the Potomac River and the two would swim and boat in the river, hike the surrounding trails, and Tina's father (Angie's stepfather) taught them both to ride 4-wheelers on the property. *Id.* at ¶11. Following their graduation from the same high school in 1992, Angie and Tina started their respective college careers at different colleges located only 20 minutes apart. *Id.* at 12. They continued to speak every day, vacationed together, when Angie began working for the Office of Naval Intelligence, Tina would attend "Family Day" celebrations where she was introduced by Angie as her sister, and Angie was a bridesmaid in Tina's wedding in 1998. *Id.* at ¶¶13-17. Their life-long relationship which began with two six-year-olds in first grade becoming best friends in 1980, then becoming stepsisters in 1985, was cut short by the events on 9/11. One regret which

Tina laments to this day is that Angie did not live to meet her children, in whom Tina believes Angie would have seen a bit of herself. *Id.* at ¶19. Tina Marie Wasielewski and Angela Marie Houtz were sisters in every way and by any measure of that term, and Plaintiffs believe Tina Marie Wasielewski should be considered the functional equivalent of a sister and should be entitled to the full presumptive award of $4,250,000.

Based on the facts set forth above and in Exhibits B through P to the Eubanks Declaration, Plaintiffs respectfully submit that solatium damages for these individuals be awarded in the amounts set forth on Exhibits A-1 and A-2 to the Eubanks Declaration for each individual.

### B.      Punitive Damages

Under the FSIA, plaintiffs are also entitled to punitive damages. *See* 28 U.S.C. §1605A(c)(4). In prior circumstances within this MDL, the Court has adopted a ratio of 3.44 (punitive) to 1 (compensatory). *See* ECF No. 2623. However, more recently within this MDL, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. *See* ECF No. 3363 at 28. This recommendation was adopted by the Court. *See* ECF No.3384 at 6.

In light of the Court's decision in related cases within this MDL to defer determination of punitive damages issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date. *See, e.g.,* ECF No. 3666 (Judge Daniels's order in *Burnett/Iran*, authorizing other plaintiffs to make application for punitive damages at a later date consistent with any future rulings of the Court).

### C.      Prejudgment Interest

As in prior applications, the Burnett/Iran XXV Plaintiffs ask that this Court direct that prejudgment interest of 4.96% *per annum*, compounded annually, on the solatium awards running from September 11, 2001 until the date of judgment to the extent that their injuries arose in New

York be assessed, as was done previously in other judgments issued for *Burnett/Iran* plaintiffs, as well as for other plaintiffs in this consolidated litigation.

## IV.     Conclusion

For all the reasons set forth herein, as well as those set forth in the previous submissions of the *Burnett/Iran* and *Arias* plaintiffs and other plaintiffs, the Burnett/Iran XXV Plaintiffs respectfully request that this Court grant the proposed order included with this motion: (1) awarding solatium damages as set forth in the attached Exhibits A-1 and A-2; (2) awarding prejudgment interest of 4.96% *per annum*, compounded annually, on the solatium awards running from September 11, 2001 until the date the judgment is entered; and (3) permitting the Burnett/Iran XXV Plaintiffs to seek punitive damages, economic damages, and/or other damages at a later date, and for all other *Burnett/Iran* and *Arias* Plaintiffs not appearing on Exhibits A-1 or A-2, to submit applications for damages awards in later stages to the extent such awards have not been previously addressed.

Dated: May 12, 2022

Respectfully Submitted,

MOTLEY RICE LLC

BY:     /s/ John M. Eubanks _
        John M. Eubanks, Esq.
        Jodi Westbrook Flowers, Esq.
        Robert T. Haefele, Esq.
        John C. Duane, Esq.
        28 Bridgeside Blvd.
        Mount Pleasant, SC 29464
        Tel: 843-216-9218
        Fax: 843-216-9450
        Email: jeubanks@motleyrice.com

*Attorneys for the Burnett/Iran and Arias*
*    Plaintiffs*