UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br><br>ECF Case |
| --- | --- |

*This document relates to:-*

*Burnett, et al, v. The Islamic Republic of Iran, et al.,* No. 15-cv-9903 (GBD(SN)

## DECLARATION OF MICHELLE A. STABILE

I, MICHELLE A. STABILE, hereby declare under penalty of perjury as follows:

1.   I am 59 years of age and reside in North Massapequa, New York.

2.   I was the fiancé of Frank J. Koestner who was killed in the September 11, 2001 terrorist attacks at the World Trade Center in New York, where he worked as a Stock Trader for Cantor Fitgerald.

3.   At the time of his death on September 11, 2001, I had been engaged to Frank for over nine months; he had proposed to me on January 1, 2001 and I immediately accepted his proposal. Frank and I first met each other on July 2, 1999 and began dating each other exclusively after that.

4.   Immediately after becoming engaged, Frank and I began arranging for a traditional wedding ceremony and reception. We booked the venue site and entered a contract for catering services for a minimum of 90 guests; we booked limousine service for the wedding party; we purchased the dress I was to wear; we engaged a florist; we contracted with a printer for invitations; we engaged a travel agent who booked airline and hotel reservations for our planned honeymoon to Saint Lucia in the Caribbean. *See* Exhibits A, B, and C, attached hereto.

5.   Our wedding was scheduled to take place on October 28, 2001 at Saint Paul's Episcopal Church in Glen Cove, New York. In anticipation of exchanging our wedding vows, Frank and I began meeting with the Rev. Douglas W. Hutchings, Rector of Saint Paul's to prepare us for our life together as husband and wife. *See* Exhibit D, attached hereto.

6.   On Saturday, September 8, 2001, just three days before his death on September 11, 2001, a bridal shower was held at which members of Frank's family as well as my own attended.

7.      Anticipating our new life together, on August 8, 2001, Frank and I contracted for the sale of a house in Massapequa, New York. Frank and I each contributed our own separate funds as earnest money as part of the Residential Contract of Sale. Following the events of 9/11, the seller agreed to rescind the contract and our earnest money was refunded in full. *See* Exhibits E and F, attached hereto.

8.      Over the 2001 Labor Day weekend, weeks before Frank was killed, we purchased an automobile. At the time, Frank and I each had our own car. Because it was less expensive to insure the new car on Long Island where I lived at the time than it was to insure it in Queens where he lived at the time, we decided to insure our new car under my Allstate policy using my Long Island address. Once we moved into our new home in Massapequa, our plan was to insure all our cars there. Pursuant to that plan, I notified Allstate on August 31, 2001 that effective September 1, 2001, I wanted Frank added as an additional insured on my existing Allstate automobile policy. *See* Exhibit G, attached hereto.

9.      Frank had a daughter, Carolyn, from a previous marriage. Carolyn was three years old when Frank and I became engaged and she would stay with him every other weekend pursuant to the custody arrangements. I have a niece and nephew who are both close in age to Carolyn, and the three children would come to my house when Carolyn was staying with Frank and the three children would all play together under Frank and my supervision. Frank and I engaged them on endless activities; picnics in the park when the weather permitted; movies on a typical weekend; arts and crafts in my back yard.

10.     On the weekends when Frank did not have Carolyn, he and I enjoyed weekend trips together, shopping and exploring in the city. We both enjoyed antiquing and began purchasing items to furnish our new life together.

11.     As our wedding day approached, and as our weekends spent with Carolyn and my young niece and nephew filled us with familial bliss, Frank and I began to contemplate and discuss when we would begin having our own children. It was never a matter of if; it was simply a matter of when. We both were very excited about our future together.

12.     After Frank's death on September 11, 2001, I joined a fiancé support group for those who were engaged to 9/11 victims. It helped me understand my grief from others who were experiencing the same pain.

13.     The trajectory of my life was forever altered on 9/11 and my life will never be the same. There is now a void in my life which will never be filled.

I declare under penalty of perjury the foregoing is true and correct.

Date  3/22/2021

Michelle A. Stabile



Restaurant & Caterers

7725 Jericho Turnpike
Woodbury NY 11797

516 921-1415

Michelle Stabile

██████████████
██████████████

Dear Michelle & Frank,

    As your special day draws near, we are looking forward to meeting with you to plan the details of your affair. Your appointment has been scheduled for Thursday September 6, 2001 at 7:00 PM. At this meeting, you will be discussing and making decisions about your important day with one of our banquet managers; coordinating your cocktail hour and dinner selections, linen color, approximate number of guests and seating arrangements. You will also be given a floor plan customized to your affair, place cards and all the lists and instructions regarding a return date and final payment.

To insure that our meeting will be as informative and enjoyable as possible, it would be appreciated if you would review the menu prior to our appointment.

Attached is a list of possible additional menu items that are most popular and asked for by our customers. We include this list so you can plan your budget accordingly and to make you aware of their availability. We have also included our rehearsal dinner menu for your convenience.

If you are unable to make your appointment, please call as soon as possible to reschedule at (516) 921-1415.

Thank you for allowing us to be a part of your special day and we look forward to assisting you in the planning of this celebration.

Sincerely,

Jennifer Nazarian
Fox Hollow

Today's Date: _____

7725 Jericho Turnpike
Woodbury, New York 11797
(516) 921-1415

**CONTRACT**

Securing Lease of Specified Premises and Catering Facilities

| Day | of Function | Date | Type of Affair | Time of Affair | Min. Amount of Guests Guaranteed |
|-----|-------------|------|----------------|----------------|----------------------------------|
| | | | | | |

Name: _____   Groom's Name: _____

Address: _____   Address: _____

City: _____   City: _____

Telephone: H: _____ W: _____   Telephone: H: _____ W: _____

Chapel: _____ Cktl. Rm.: _____ Dinner: _____   Price per Guest: _____

| Services | |
|----------|--|
| Bartenders | |
| Waiters | |
| Check Room | |
| Decorative Cake | |
| Guest Cards | |
| Parking Facilities | |
| Colored Linen | |
| Liquor Service | |
| Overtime Per Hour | |
| Chapel & Flowers | |
| Clergy | |
| Floral Dec-House Recommended Florist to be used on premises only. | |

Cocktail Reception _____

Type _____

Menu _____

| Schedule of Payments | Amount | Date Due | Date Rec. | Chk | Cash | Rec By | TOTAL TO DATE |
|----------------------|--------|----------|-----------|-----|------|--------|---------------|
| 1st Down Payment | | | | | | | |
| 2nd Down Payment | | | | | | | |
| 3rd Down Payment | | | | | | | |
| 4th Down Payment | | | | | | | |
| 5th Down Payment | | | | | | | |
| Balance Payable 1 Week Prior To Affair With Certified Check, Cash or Money Order. Credit Cards Not Accepted. | | | | | | | |

New York State Taxes Will Be Added

Authorized Mgr. Fox Hollow

x _____
(Lessee)

The patron understands and agrees that the full contract price is due and payable at the time of the execution of the contract, but at the patron's request the caterer has agreed to accept installment payments as herein indicated, which acceptance shall in no way operate as a waiver of the caterer's rights to full payment.

In the event the Patron shall fail to make the installment payments when due, and should said failure continue after notice of default given by caterer, with ten (10) days opportunity to cure, the caterer shall have the right to declare all payments (the 'balance') immediately due hereunder, by notice given to the patron. In the event the balance shall not be paid in full within five (5) days, the caterer shall have the right to declare the contract cancelled by the patron. All notices shall be in writing, sent by certified mail, return receipt requested and shall be deemed given as of the third day after mailing.

The patron further agrees that not later than 1 week prior to the function, the undersigned shall inform the Caterer as to the exact number of persons attending which, if it exceeds the original number indicated, thereupon shall become the guaranteed number-otherwise original guarantee shall stand.

Caterer reserves the right to make reasonable additional charges, for affairs running beyond the time agreed upon; based on his charge for additional liquors served, gratuities, and overtime labor involved.

The caterer reserves the right to refuse to serve alcoholic beverages to any person who is intoxicated.

In the event patron cancels or otherwise breaches this agreement, the down payments made by patron shall be retained by caterer on account of his damages. Caterer's damage shall in no event be deemed to be less than the down payments. Such retention of down payments shall not relieve patron of any additional liability to caterer under this contract.

It is understood by both Caterer and Lessee, that a breach of this contract making the reservation untenable by this or another substitute party, constitutes a substantial loss to the caterer, primarily in his holding the reservations for the lessee and refusing other parties that were ready to reserve the premises and services.

It is agreed that the caterer shall have the right to make substitutions in the menu for any item or items which shall not be reasonably and readily obtainable in the open market.

# Fox Hollow

**7725 Jericho Turnpike
Woodbury, L.I., N.Y. 11797
(516) 921-1415**

Michelle Stabile

Wednesday, March 14, 2001

Dear Michelle Stabile:

As the date of your affair draws near, we at the FOX HOLLOW would like to once again thank you for choosing us to cater your special day. As is our policy, at this time an additional payment of $ 1,000.00 is required. For your convenience and ours, please detach the bottom portion of this letter and enclose it with your check or money order in the pre-addressed envelope.

We look forward to seeing you soon,

Sincerely

Catering Director

P.S. If your check is in the mail, please disregard this letter

---

|  | Amount Due: | 1,000.00 |
|---|---|---|
|  | PAYMENT |  |
| 04/01/2001 |  | 1,000.00 |

Name:   Michelle Stabile
Date of Affair:   10/28/2001
Time:   07:00 PM -- 12:30 AM
Room:   WINTERGARD.PAVILLON

If any of the above information is incorrect, please contact us at (516) 333-8777



**7725 Jericho Turnpike**
**Woodbury, L.I., N.Y. 11797**
**(516) 921-1415**

Michelle Stabile

████████████

Wednesday, June 13, 2001

Dear Michelle Stabile:

As the date of your affair draws near, we at the FOX HOLLOW would like to once again thank you for choosing us to cater your special day. As is our policy, at this time an additional payment of $ 1,500.00 is required. For your convenience and ours, please detach the bottom portion of this letter and enclose it with your check or money order in the pre-addressed envelope.

We look forward to seeing you soon,

Sincerely

Catering Director

P.S. If your check is in the mail, please disregard this letter

paid 6/21/01
$1,500
ck 1382

Exhibit B

# Special Day Limousine

315 Franklin Avenue, Franklin Square, N.Y. 11010 (516) 326 9100 Fax (516) 326-9366

Sunday DATE 10 / 23 / 01

## BRIDE
Time 3 00 AM/PM

Michello

██████████████████████

Telephone Number          Cross Street

831 10 Pass Mercedes
Limos New Style

## GROOM
Time ___ AM/PM

Frank Koestner
Name

Street Address

██████████████████████

Telephone Number          Cross Street

Limos

TOTAL NO. OF: BRIDAL PARTY 8     TOTAL NO. LIMOS 1

## CHURCH
Time 3 30 AM/PM

Name

Street Address

Town

Civil ☐ Jewish ☐ Regular Service ☐ Mass ☐

## STUDIO
Time ___ AM/PM

Will Info A
Name

Street Address

Town

## RECEPTION HALL
Time 7 00 AM/PM

Fox Hollow
Name

Street Address

Town

TYPE OF LIMOUSINES/INSTRUCTIONS:

| | START | FINISH | O.T. | | | | |
|---|---|---|---|---|---|---|---|
| CAR 1 | 2pm | 7pm | 12 | 20% | open bar | (Champagne, Run | |
| CAR 2 | | | | | + Malanti | | |
| CAR 3 | | | | | | | |

**TERMS:**
All Limousines are for 4 hours.
All contracts require 20% non-refundable deposit.
Any cancellation of this contract within 30 days of job require payment of contract in full.
Final payment must be made when limo arrives at Bride's home in CASH or CERTIFIED CHECK only.
We reserve the right to substitute limo in the event of breakdown, with refund of difference. Not responsible for any items left in vehicle.

CUSTOMER SIGNATURE _____ Koestner _____ DATE 5/21

SPECIAL DAY REP. SIGNATURE _____ MANNY _____ DATE

| | |
|---|---|
| LIMOUSINES | $ 600 |
| RUNNER | $ |
| MISCELLANEOUS | $ |
| 20% GRATUITY | $ |
| SUBTOTAL | $ 600 |
| DEPOSIT | $ - 120 |
| BALANCE | $ 480 |
| IN CASH ONLY | $ |

#1372

Check

Exhibit C

AUG 29 '01 15:34   FROM N

# LIBERTY TRAVEL®
### Client Itinerary and Cancellation Form

**Date** 8/29/01

**Name/s** Stabile, Michelle          **Name/s** _____

**Name/s** Koestner, Frank            **Name/s** _____

**Number of Adults** 2          **Number of Children** _____   **Ages** _____

FLIGHT ITINERARY: Please see attached for all flight arrangements.

TRAVEL ARRANGEMENTS INCLUDE:   HOTEL ☒   CRUISE ☐   TOUR ☐   CAR RENTAL ☐   TRAVEL PROTECTION ☐

1) Hotel Name Hyatt St. Lucia          Phone# _____   **From** 10/30 **To** 11/06 Room Type Oceanview

Your Hotel reservations include the following:   Hotel Tax ☒   Hotel Gratuities ☒   Airport Transfers ☒   Meals Daily ____   All Inclusive ☒

2) Hotel Name _____   Phone# _____   **From** _____ **To** _____ Room Type _____

Your Hotel reservations include the following:   Hotel Tax ☐   Hotel Gratuities ☐   Airport Transfers ☐   Meals Daily ____   All Inclusive ☐

3) Hotel Name _____   Phone# _____   **From** _____ **To** _____ Room Type _____

Your Hotel reservations include the following:   Hotel Tax ☐   Hotel Gratuities ☐   Airport Transfers ☐   Meals Daily ____   All Inclusive ☐

Cruise Line _____   Ship _____   Sailing Date _____   Category _____   Cabin # _____

Tour Operator _____   Tour Name _____   Departure Date _____

Other Included Features:   None ☐   Listed Below ☐
1) _____   2) _____   3) _____

Car Rental Information:   None ☐   Listed Below ☐

Company _____   **From** _____ **To** _____ Size Car _____ # of Days _____ Renter Over 25 ☐ Yes ☐ No

* Please note that the car rental rates do not include local taxes and fees, optional collision insurance, fuel surcharges, or additional driver charges. These are costs to be paid locally. You must present either a credit card or cash deposit and a valid drivers license upon pickup of the car. All drivers under 25 must notify their Liberty Travel agent prior to reserving a rental car.

PRICING INFORMATION: Total Package Price $ ~~4937.00~~ 4,465.20          **Final Payment Due Dates:** 9/30/01   ~~4637.00~~ 4,165.20

## ABOUT OUR SERVICES

The following are Liberty Travel's payment, revision, and cancellation policies imposed within our fee structure. Change fee's may apply.

**DEPOSITS** - All reservations require a deposit.

**FULL PAYMENT** - Payment in full may be required at the time of your booking.
Payments made 14 days or less prior to the departure date must be in the form of cash, credit card, bank check or certified check.
In order to make payment by credit card, the actual card and card holder must be present in one of our Liberty Travel locations.
Refunds must come from Liberty Travel Headquarters in New Jersey and are not generated from the store.
There will be a $25.00 charge for any returned checks.
Airline seats are on a request basis only. Liberty Travel understands the importance of seat selection and will do all to fill your request, however, we cannot always guarantee a specific seat.
A bill is not sent to you to remind you of your payment in full date, however it is listed above.

## CANCELLATION CHARGES AND PENALTIES:

Liberty Travel: $25.00 per person once trip is confirmed  plus:

Hotels ☒   Cruise Lines ☐   Tour Operators ☐

| | |
|---|---|
| 1 charge if cxld/revised 3 days or less prior to departure | No Show |
| 1 charge if cxld/revised ____ days or less prior to departure | |
| ____ charge if cxld/revised ____ days or less prior to departure | |

NON-REFUNDABLE

##   Airlines ☒  (Airline charges are in addition to increase in airfare)

| |
|---|
| ## ____ charge if cxld/revised ____ days or less prior to departure |
| ## ____ charge if cxld/revised ____ days or less prior to departure |
| ## ____ charge if cxld/revised ____ days or less prior to departure |
| ## ☒ NON-REFUNDABLE Change fee If air is cancelled $100.00 per person plus fare difference |

The following proof of citizenship or identification is required of US citizens

PASSPORT ☒   or US BIRTH CERTIFICATE WITH RAISED SEAL ☒   PHOTO ID ☒   VISA ☐

* Non US citizens should consult the consulate of the country you are visiting to verify entry requirements.*
** Minors should consult with their Liberty Travel consultant regarding any restrictions or documentation required for travel.**

TRAVEL PROTECTION WAIVER - At Liberty Travel it is our responsibility to make you aware of Travel Protection Insurance that is available to US citizens. Unexpected emergencies can occur that could affect your vacation or business trip. Travel Protection Insurance should be purchased in order to make certain that assistance is available in the event an emergency arises. If you choose to waive the purchase of Travel Protection Insurance please sign below.

CLIENT SIGNATURE ☒ Waived insur. please sign ☒ Michelle Stabile

I have read all of the details above and agree to their accuracy. It is my sole responsibility to inform all others on my party of the above details, including trip protection and proof of citizenship requirements, including correct spelling of names and travel dates. Any travel protection must be enrolled in and paid for by the final payment date.

**CLIENT SIGNATURE** Michelle Stabile          **AGENT SIGNATURE** Cecily Whibble

**FILE NUMBER** 089 14          MV-0110

# Saint Paul's Episcopal Church

### Twenty-Eight Highland Road, Glen Cove, New York 11542

December 26, 2002

TO WHOM IT MAY CONCERN:

This letter is to confirm that Frank Joseph Koestner and Michelle Ann Stabile were to be united in Holy Matrimony at Saint Paul's Episcopal Church in Glen Cove, New York, on October 28, 2001. The marriage did not take place due to the tragic death of Mr. Koestner in the destruction of the World Trade Center on September 11, 2001.

Frank and Michelle began their preparation for marriage when they met with me for counseling in August of 2001. We met on several occasions to prepare them for marriage and to plan the wedding ceremony.

At that time, Frank lived at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and Michelle lived at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ where she still resides. Frank was then employed as an Autex Operator for Cantor Fitzgerald.

The wedding of Frank Koestner and Michelle Stabile would have taken place on October 28, 2001, if Frank had not have been killed in the destruction of the World Trade Center. If you have any questions, please contact me at 516-759-3584.

Thank you for any consideration you might give to Michelle.

Sincerely,

The Rev. Douglas W. Hutchings, Rector

Exhibit E

WARNING: NO REPRESENTATION IS MADE THAT THIS FORM OF CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE
COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS LAW ("PLAIN LANGUAGE").

# RESIDENTIAL CONTRACT OF SALE
## THIS IS A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD,
## WE RECOMMEND ALL PARTIES TO THE CONTRACT CONSULT AN ATTORNEY
## BEFORE SIGNING.

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION**
This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different
provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and
casualty loss upon taking possession of the Premises before the title closing.

**Contract of Sale** made as of *AUGUST* 2001, BETWEEN
███████████, as surviving tenant by the entirety
Address: ██
Social Security Number/Fed. I. D. No(s):                    hereinafter called "Seller" and

FRANK KOESTNER and MICHELLE STABILE
Address: ██████████████████████
Social Security Number/Fed. I. D. No(s):                    hereinafter called "Purchaser."

**The parties hereby agree as follows:**

1. **Premises.** Seller shall sell and convey and Purchaser shall purchase the property, together with all
buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page
marked "Schedule A," annexed hereto and made a part hereof and also known as:
Street Address: ██

Tax Map Designation: █████████████

Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened
or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid
award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change
of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as
hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for
the conveyance of such title and the assignment and collection of such award or damages.

2. **Personal Property.** This sale also includes all fixtures and articles of personal property now attached
or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at
Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any
existing mortgage to which this sale may be subject. They include, but are not limited to:

| | |
|---|---|
| Above ground pool (no ladder) | Refrigerator |
| Air Conditioning Equipment and Installation (1 wall unit) | Screens |
| Bathroom and Kitchen Cabinets | Shades |
| Clothes Dryer | Shrubbery |
| Dishwasher | Storm Doors |
| Fencing | Storm Windows |
| Heating/Lighting/Cooking Fixtures | Switch Plates and Door Hardware |
| Mail Box | Tool Shed |
| Microwave Oven | Venetian Blinds |

3. **Purchase Price.** The purchase price is
payable as follows:                                                                                                    $ 423,000.00
    (a)  on the signing of this contract, by Purchaser's check payable to
the Escrowee (as hereinafter defined), subject to collection, the receipt of
which is hereby acknowledged, to be held in escrow pursuant to paragraph 6
of this contract (the "Downpayment"):                                                                   $ 30,000.00
    (b)  by allowance for the principal amount unpaid on the existing mortgage
on the date hereof, payment of which Purchaser shall assume by joinder in the deed:     $ ___,___
    (c)  by a purchase money note and mortgage from Purchaser to Seller:             $ ___,___
    (d)  balance at Closing in accordance with paragraph 7:                                 $393,000.00

4. **Existing Mortgage.** *Intentionally Deleted*

5. **Purchase Money Mortgage.** *Intentionally Deleted*

6. **Downpayment in Escrow.** (a) Seller's attorney ("Escrowee") shall hold the Downpayment for Seller's account in escrow in a segregated bank account at Bank of New York IOLA until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall (*not*) (*Delete if inapplicable*) hold the Downpayment in an interest-bearing account for the benefit of the parties. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.
    (b)  The parties acknowledge that, although Escrowee is holding the Downpayment for Seller's account, for all other purposes Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally agree to defend, indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.
    (c)  Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.
    (d)  Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(c)  As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $500.00; and

(d)  As otherwise agreed to in writing by Seller or Seller's attorney.

**8. Mortgage Contingency.** (*Delete if inapplicable*) (a) The obligations of Purchaser hereunder are conditioned upon issuance on or before      ✳       (the "Commitment Date") of a written commitment from any Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $211,500.00 or such lesser sum as Purchaser shall be willing to accept, at the prevailing fixed rate of interest or initial adjustable rate of interest for a term of at least 25/30 years and on other customary commitment terms, whether or not conditional upon any factors other than an appraisal satisfactory to the Institutional Lender. For purposes of this contract, the term "Institutional Lender" shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state; foreign banking corporation licensed by the Superintendent of Banks of New York or the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans. Purchaser shall (i) make prompt application to an Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, (v) cooperate in good faith with such Institutional Lender to obtain such commitment and (vi) promptly give Notice to Seller of the name and address of each Institutional Lender to which Purchaser has made such application. Purchaser shall comply with all requirements of such commitment (or any other commitment accepted by Purchaser) and shall furnish Seller with a copy thereof promptly after receipt thereof. If such commitment is not issued on or before the Commitment Date, then, unless Purchaser has accepted a commitment that does not comply with the requirements set forth above, Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, in which case this contract shall be deemed cancelled and thereafter neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27. If Purchaser fails to give notice of cancellation or if Purchaser shall accept a commitment that does not comply with the terms set forth above, then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph. (*Delete if inapplicable*) (b) Purchaser and Seller agree that the submission of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the terms and conditions set forth in paragraph 8(a)(i) of this contract, and that Purchaser's cooperation in good faith with such Mortgage Broker to obtain a commitment from an Institutional Lender (together with Purchaser's cooperation in good faith with any Institutional Lender to which Purchaser's application has been submitted by such Mortgage Broker), and the prompt giving of Notice by Purchaser to Seller of the name and address of each Mortgage Broker to which Purchaser has submitted such an application shall constitute full compliance with the terms and conditions set forth in paragraph 8(a)(v) and (vi) of this contract. ✳ 30 DAYS FROM THE DATE  PURCHASER'S ATTORNEY RECEIVES  A FULLY EXECUTED CONTRACT  FROM SELLER.

**9.  Permitted Exceptions.** The Premises are sold and shall be conveyed subject to:

(a)  Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b)  Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c)  Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

**11. Seller's Representations.** (a) Seller represents and warrants to Purchaser that:

(i) The Premises abut or have a right of access to a public road;

(ii) Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii) Seller is not a "foreign person," as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

(iv) The Premises are not affected by any exemptions or abatements of taxes;

(v) Seller has been known by no other name for the past ten years, except

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**12. Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of closing (except as otherwise set forth in paragraph 16(f)), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**13. Insurable Title.** Seller shall give and Purchaser shall accept such title as any reputable title insurance company licensed in the State of New York shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

**14. Closing, Deed and Title.** (a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale with covenants against grantor's acts deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

**15. Closing Date and Place.** Closing shall take place at the office of Peter C. Cotelidis, Esq., 200 Old Country Road, Suite 190, Mineola, NY 11501 at 10:00 A.M. on or about September 30 2001 or, upon reasonable notice (by telephone or otherwise) by Purchaser, at the office of the lending institution

Law of the State of New York and the Regulations promulgated thereunder, as the same may be amended from time to time (collectively the "Gains Tax Law"); or if such sale shall not be exempt under the Gains Tax Law, Seller and Purchaser agree to comply in a timely manner with the requirements of the Gains Tax Law and, at Closing, Seller shall deliver to Purchaser (i) an official return showing no tax due, or (ii) an official return accompanied by a certified or official bank check drawn on a New York State banking institution payable to the order of the New York State Department of Taxation and Finance in the amount of the tax shown to be due thereon. Seller shall (x) pay promptly any additional tax that may become due under the Gains Tax Law, together with interest and penalties thereon, if any, which may be assessed or become due after Closing, and/or execute any other documents that may be required in respect thereof, and (y) indemnify, defend and save Purchaser harmless from and against any of the foregoing and any damage, liability, cost or expense (including reasonable attorneys' fees) which may be suffered or incurred by Purchaser by reason of the nonpayment thereof. The provisions of this subparagraph (c) shall survive Closing.

(d)  The delivery by Seller to Purchaser of a certification stating that Seller is not a foreign person, which certification shall be in the form then required by FIRPTA. If Seller fails to deliver the aforesaid certification or if Purchaser is not entitled under FIRPTA to rely on such certification, Purchaser shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(e)  The delivery of the Premises and all buildings(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(f)  All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the buildings(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing. *AND ROOF FREE OF LEAKS.*

(g)  If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(h)  The delivery by the parties of any other affidavits required as a condition of recording the deed.

**17.  Deed Transfer and Recording Taxes.** At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**18. Apportionments and Other Adjustments; Water Meter and Installment Assessments.** (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing: *

(i)  taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.

(b)  If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c)  If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d)  If at the date of Closing the premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e)  Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

* OR POSSESSION, WHICHEVER IS LATER.

the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon notice (by telephone or otherwise), given not less than 3 business days before Closing, Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**21. Title Examination; Seller's Inability to Convey; Limitations of Liability.** (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b)(i)   If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c)   If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

**22. Affidavit as to Judgments, Bankruptcies, etc.** If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**23. Defaults and Remedies.** (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b)   If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

the Escrowee pursuant to this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered.

**26. No Assignment.** This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**27. Broker.** Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than Fitzgerald Properties ("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

**28. Miscellaneous.** (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.

(e) This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

**29. Rider.** See attached rider to Contract of Sale.

IN WITNESS WHEREOF, this contract has been duly executed by the parties hereto.

FRANK KOESTNER, *Purchaser*

█████████  ████████████████████

*SCHEDULE A*

All that certain plot, piece or parcel of land, with the buildings and improvements thereon
erected, situate, lying and being at Massapequa, Town of Oyster Bay, County of Nassau and
State of New York, known and designated as and by the ██████████████████
████████████████ ███████████ ████████████ █████████████
██████████████ █████████████████████ █████████
██████████████ █████████████████████████ ██████████████
████████████████ ████████████████ which said Lot is more particularly
bounded and described, according to said map as follows:



RIDER TO CONTRACT OF SALE BETWEEN ███████ AND FRANK KOESTNER
and MICHELLE STABILE
PREMISES: ███████         ███████

1.      The Seller has not made and does not make any representation as to the physical
condition, permissible occupancy or use, or any other matter or thing affecting or relating to the
aforesaid premises, except as herein specifically set forth. The Purchaser hereby acknowledges that
no such̲OTHER̲representations have been made. The Purchaser has inspected the premises and agrees to
take the premises, fixtures and personalty "as is" in their present physical condition, subject only to
reasonable wear and tear. The Seller shall not be liable or bound in any way for the representations
of any other person unless the same have been specifically set forth herein. Seller represents that
the plumbing, heating, electrical systems and appliances shall be in working order at the time of
closing or possession, whichever is later, in the same state that they were upon contract execution,
normal wear and tear excepted, and that the roof shall be leak free. Acceptance of the deed shall
terminate the existence of any representation specifically set forth herein.

2.

A)      Supplementing the provisions contained in Paragraph "8" of this Contract and
notwithstanding any provision therein provided to the contrary, should Purchaser have failed
to obtain a mortgage commitment by the date above provided, Seller reserves the right at
Seller's sole option to extend the period of time within which Purchaser must obtain such
commitment for an additional period of time to be determined by Seller but not to exceed
30 days. Seller, through Seller's attorney, shall notify Purchaser's attorney, in writing, by
ordinary first class mail of any such extension. In the event the Purchaser's mortgage
commitment is conditioned upon the sale of the Purchaser's present home, it shall be deemed
that such commitment is unconditional and shall be accepted by the Purchaser.

B)      Purchaser represents that:

1)      Purchaser has sufficient creditworthiness, income, assets and
resources to qualify for the aforesaid mortgage and to complete this
transaction pursuant to the terms contained herein;

2)      Purchaser has no liens, tax warrants or judgments against him and
anticipates no such liens, warrants or judgments against him;

3)      Purchaser has never filed a voluntary petition in bankruptcy nor has
an involuntary bankruptcy petition ever been filed against Purchaser;

4)      Purchaser acknowledges that Seller is relying upon such represen-
tations as an inducement to entering into this contract.

RIDER TO CONTRACT OF SALE BETWEEN ▮▮▮▮▮ AND FRANK KOESTNER
and MICHELLE STABILE
PREMISES: ▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮

herein shall be construed to require the Seller to bring any action or proceeding, or to incur any expenses in order to render Seller's title marketable or to cure any other defect or objection.

4.     The Purchaser shall have the right to have the premises inspected for the purpose of determining the existence of live termite or other wood destroying insect infestation, or wood damage resulting therefrom.  The cost of said inspection shall be borne by the Purchaser.  In the event such infestation or damage be found, a copy of the report issued by the termite company, including the cost of repairing the damage if any, and eliminating the infestation, shall be postmarked and served upon the Seller's attorney within TEN (10) days from the date  ✳     Upon receipt of such notice by the Seller's attorney, the Seller may do one of the following:

✳ PURCHASER'S ATTORNEY RECEIVES A FULLY EXECUTED CONTRACT FROM SELLER.

a.     Prior to closing, treat the termite or wood destroying insect condition and repair any damage resulting therefrom at Seller's choice, or by allowing the Purchaser a credit on closing for the amount necessary for repairing the damage or infestation, or

b.     Terminate this contract by refunding the sums paid hereunder by the Purchaser, except that the Purchaser shall have the right to complete the sale by taking the premises in "as is" condition.

Notice of the Seller's intent to exercise either option shall be served upon Purchaser's attorney within SEVEN (7) days after receipt of the termite report.  In the event the Purchaser shall fail to have the premises inspected or fail to serve said written notice postmarked no later than TEN (10) days from the date  ✳   the Purchaser shall be deemed to have waived the provisions of this paragraph and this contract shall remain in full force and effect.

A finding of "evidence of infestation" or "evidence of previous infestation", without an affirmative finding of there being present "live activity", shall be deemed to be a finding of no infestation for purposes of this Agreement.

✳ PURCHASER'S ATTORNEY RECEIVES A FULLY EXECUTED CONTRACT FROM SELLER.

5.     Premises shall be delivered broom clean and vacant at closing of title or within FIVE (5) days thereafter upon deposit of $1,000.00 to be held in escrow by the Seller's attorney to assure possession.  It is understood that such escrow deposit is solely for possession and shall not inure to the benefit of the Purchaser for any other purpose.  If possession is not delivered within FIVE (5), days after closing, the Seller shall pay $100.00 per day thereafter as liquidated damages (inclusive of any adjustment[s]), and may be evicted as a vendor in possession without consent of

RIDER TO CONTRACT OF SALE BETWEEN ▬▬▬▬ AND FRANK KOESTNER
and MICHELLE STABILE
PREMISES: ▬▬▬▬ ▬▬▬▬▬

7.     Supplementing paragraph "9" of this Contract, the premises herein are sold and are to be conveyed subject to the following:

a.     Such state of facts which an accurate survey may show, provided same does not render title unmarketable;

b.     Variations between fences, shrubbery, hedges and record lines;

c.     Covenants, restrictions, agreements and easements of record, if any, provided they are not violated by the existing structure. The violation of any of the aforesaid by existing improvements shall not be deemed an objection to title provided the title company insuring title agrees to insure that such improvements may remain in their present location as long as they shall stand.

8.     The Purchaser represents and warrants that Fitzgerald Properties is the sole broker who brought about this transaction. The Purchaser therefore agrees that if any claim be made for brokerage commissions by anyone else whomsoever through or on account of any action by the Purchaser or Purchaser's representatives, or by reason of the breach of the aforesaid representation and warranty, the Purchaser shall defend (at Purchaser's sole cost and expense), indemnify and hold the Seller free and harmless from and against any and all expenses, costs, fees (including reasonable attorney's fees) resulting therefrom, and of any obligation to pay such claim. The provisions of this paragraph shall survive the execution and delivery of the deed.

9.     It is specifically understood and agreed that this contract is a single, indivisible contract, and that the delivery and acceptance of the deed shall be considered full compliance with all of the terms of this contract by the Seller, and none of the terms shall survive the delivery and acceptance of the deed, except those provisions which this contract expressly states shall survive such delivery.

10.    Seller represents the premises to be a legal one-family dwelling. Notwithstanding anything herein to the contrary, in the event Seller a) shall not be able to deliver a certificate of occupancy or the equivalent thereof for the dwelling and any other improvements upon the premises, or b) should a variance be required, or c) should the reasonable cost of obtaining such certificate or equivalent thereof exceed the sum of $1,500.00 including permit and architectural fees, as well as construction costs, then Seller may cancel this contract, whereupon the Purchaser's down payment,

RIDER TO CONTRACT OF SALE BETWEEN ▮▮▮▮▮▮ AND FRANK KOESTNER
and MICHELLE STABILE
PREMISES: ▮▮▮▮▮▮▮▮▮▮▮▮

12.    Seller shall have no obligation to deliver a Certificate of Occupancy or the equivalent
thereof, for the maintenance of any shed, ~~above ground pool or deck~~ located on the premises and
Purchaser agrees to accept same "as is". If same is an impediment to closing, Seller shall have the
option to remove same *OR RELOCATE*

13.    **WARNING STATEMENT: RESIDENTIAL LEAD-BASED PAINT HAZARD
REDUCTION ACT OF 1992** *"Every Purchaser of any interest-in residential real property on
which a residential dwelling was built prior to 1978, is notified that such property may present
exposure to lead from lead-based paint that may place young children at risk of developing lead
poisoning.  Lead poisoning in young children may produce permanent neurological damage,
including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired
memory.  Lead poisoning also poses a particular risk in pregnant women.  The Seller of any interest
in residential real property is required to provide the Buyer with any information on lead-based
paint hazards from risk assessments or inspections in the Seller's possession and notify the Buyer
of any known lead-based paint hazards.  A risk assessment or inspection for possible lead based
paint hazards is recommended prior to purchase."*

 While Seller has no knowledge of and/or reports of lead-based paint and/or lead-based paint
hazards in the house, Seller assumes that the premises contains lead-based paint since lead-based
paint was commonly used before and during the period of time they owned the premises. Purchaser
shall have the right to have the premises inspected by a certified firm that conducts inspections to
ascertain the risk of a lead-based paint hazard; said inspection must be conducted within ten (10)
days of the date Purchaser's attorney receives a fully executed copy of the Contract. A written report
prepared by said certified inspection company, which sets forth either the presence or non-presence
of a lead-based paint hazard, shall be sent to the Seller's attorney by Federal Express or other
overnight personal delivery within ten (10) days of the date Purchaser's attorney receives a fully
executed copy of the Contract. In the event Seller's attorney is not given notice as required herein,
Purchaser shall be deemed to have waived their right to conduct the inspection and terminate the
Contract.

If said inspection report indicates a finding of a lead-based paint hazard, both the Seller and the

**Attorney for Seller:**

**Attorney for Purchaser:**

Receipt of the Downpayment is acknowledged and the
undersigned agrees to act in accordance with the
provisions of paragraph 6 above.

## Contract of Sale

Title No.

TO

FRANK KOESTNER
and
MICHELLE STABILE

County or Town :   MASSAPEQUA, NEW YORK
Street Number Address:

**EPA AND HUD Lead Paint Regulations:** Owners of pre-1978 housing must disclose known lead-based paint
hazards to purchasers.

RIDER TO CONTRACT OF SALE BETWEEN ██████████ AND FRANK KOESTNER
and MICHELLE STABILE
PREMISES: █ ████████████████████████████████

Purchaser hereby acknowledges having received from Seller a copy of the pamphlet developed by
the U.S. Environmental Protection Agency and U.S. Consumer Product Safety Commission entitled
"*Protect Your Family from Lead in Your Home*".


_____          ████████████████████████████
FRANK KOESTNER, Purchaser                 ████████████████████████████
                                          ████████████████████████████
Social Security Number _____      Social Security Number _____


_____
MICHELLE STABILE, Purchaser

Social Security Number _____

Exhibit F

# PETER C. COTELIDIS

*Attorney at Law**

200 OLD COUNTRY ROAD
SUITE 190
MINEOLA, NEW YORK 11501

———

(516) 484-3111
FACSIMILE (516) 484-0201

ANTHONE R. DAMIANAKIS
Of Counsel

* MEMBER OF NEW YORK AND CALIFORNIA BARS

September 26, 2001

Bernard Helldorfer, Esq.
69-64 Grand Avenue
Maspeth, NY 11378

Re:        ████████ to Koestner and Stabile

Dear Mr. Helldorfer:

Both my client and I were deeply saddened to learn that Mr. Koestner is among the missing and presumed dead victims of the World Trade Center tragedy.

I enclose herewith my IOLA checks in the sum of $10,000.00 payable to the order of Michelle Stabile and $20,000.00 payable to the order of the Estate of Frank J. Koestner representing a full refund of the contract downpayment which are being delivered to you in consideration of the mutual rescission and cancellation of the Contract of Sale in the referenced matter.

Please extend our sympathies to Ms. Stabile and to Mr. Koestner's family.

Very truly yours,

Peter C. Cotelidis
PCC:zmp

Enclosures
c: Julie Knight

2778.Helldorfer.ltr.wpd

E x h i b i t   G



                        Print Key Output                              Page   1
   5769SS1 V4R5M0 000526              A4000077            01/02/03  15:03:04

   Display Device  . . . . . :  QPADEV01ML
   User  . . . . . . . . . :  S302721

  Insured: MICHELLE A STABILE                    Pol. No.: ▮▮▮▮▮         06/05
  Home:* ▮▮▮▮▮▮▮ ▪ ▮▮▮   **ACTIVITY HISTORY**

  Event Number: 028        Effective Date: 9/01/01        Process Date: 8/31/01

     ADD OPERATOR    # 2
  Name: FRANK     KOESTNER
  Sex: M  Relation to Ins: FR  Birth: 08/24/1953 Date Lic:08/1973 Marital St: SI
  Occup/Desc: EM TRADER        Lic No: ▮▮▮▮▮               State Lic: NY
                                                     Resident of HH: Y

  (ENTER) CONTINUE {      }  (F1) HELP   (F3) QUIT  (F4) BACK SCREEN        MORE

R2853-1