**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |

| | |
|---|---|
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*, | Case No. 03-cv-9848 (GBD)(SN) |
|       Creditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|       Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|       Garnishee. | |

| | |
|---|---|
| JOHN DOES 1 THROUGH 7, | Case No. 20-mc-0740 (GBD)(SN) |
|       Creditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|       Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|       Garnishee. | |

**HAVLISH AND DOE CREDITORS' JOINT REPLY TO THE BRIEFS OF**
***AMICI CURIAE* CONCERNING THEIR MOTIONS FOR TURNOVER OF ASSETS**
**FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK**

## **TABLE OF CONTENTS**

I.   Introduction.................................................................................................................1

II.  Argument ...................................................................................................................5

    A.   Straightforward Application Of TRIA Mandates Turnover ...............................5

    B.   TRIA Removes Obstacles To The Execution Of The Joint Creditors' Judgments, Including Sovereign Immunity ...........................................................................6

        1.   TRIA Supersedes The FSIA, Which Is The Sole Source Of Foreign Sovereign Immunity In U.S. Courts ..............................................................7

        2.   TRIA's "Or For Which" Clause Does Not Reincorporate The FSIA Into TRIA ......9

        3.   There Is No Authority Suggesting The FSIA Applies In A TRIA Proceeding........11

        4.   The Joint Creditors Hold Valid Underlying Judgments ...........................................12

    C.   DAB's Status As An Agency And Instrumentality Of The Taliban Makes Its Assets Subject To Execution ...........................................................................13

    D.   DAB's Agency Or Instrumentality Status Is Evaluated As Of The Date The Turnover Motions Were Filed ........................................................................18

    E.   The Court Must Defer To The Political Branches' Determinations That Terror Victims Be Permitted To Pursue The DAB Assets .........................................21

III.  Conclusion ...............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank Markazi v. Peterson,*
  578 U.S. 212 (2016) ...........................................................................................7

*Caballero v. FARC,*
  No. 20-CV-7602, 2021 WL 6135758 (C.D. Cal. Dec. 29, 2021) ...........................9

*Calderon-Cardona v. Bank of N.Y. Mellon,*
  770 F.3d 993 (2d Cir. 2014) ..............................................................................14

*Cisneros v. Alpine Ridge Grp.,*
  508 U.S. 10 (1993) ...............................................................................................9

*Connecticut Nat'l Bank v. Germain,*
  503 U.S. 249 (1992) ...........................................................................................10

*Chicago & S. Air Lines v. Waterman S. S. Corp.,*
  333 U.S. 103 (1948) ...........................................................................................22

*CSX Transp., Inc. v. Island Rail Terminal, Inc.,*
  879 F.3d 462 (2d Cir. 2018) .........................................................................19, 20

*Dole Food Co. v. Patrickson,*
  538 U.S. 468 (2003) ...........................................................................................20

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,*
  582 F.3d 393 (2d Cir. 2009) ..............................................................................17

*Gates v. Syrian Arab Republic,*
  No. 11-CV-8715, 2013 WL 1337223 (N.D. Ill. Mar. 29, 2013),
  *aff'd,* 755 F.3d 568 (7th Cir. 2014) .....................................................................7

*Hausler v. JP Morgan Chase Bank, N.A.,*
  770 F.3d 207 (2d Cir. 2014) .....................................................................8, 14, 15

*Hausler v. JP Morgan Chase Bank, N.A.,*
  127 F. Supp. 3d 17 (S.D.N.Y. 2015) ..............................................................14, 17

*Heiser v. Islamic Republic of Iran,*
  735 F.3d 934 (D.C. Cir. 2013) ................................................................14, 15, 16

*Hill v. Republic of Iraq,*
  No. 99-CV-3346, 2003 WL 21057173 (D.D.C. Mar. 11, 2003) .............................8

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) ................................................................................22

*Jerez v. Republic of Cuba*,
    777 F. Supp. 2d 6 (D.D.C. 2011) .............................................................10

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    313 F.3d 70 (2d Cir. 2002) .......................................................................14

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
    830 F.3d 107 (2d Cir. 2016), *abrogated on other grounds by*
    *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ............................. *passim*

*Kirschenbaum v. 650 Fifth Ave.*,
    257 F. Supp. 3d 463 (S.D.N.Y. 2017) ...............................................19–20

*Kirschenbaum v. Assa Corp.*,
    934 F.3d 191 (2d Cir. 2019) ..........................................................15, 16, 17

*Levin v. Bank of N.Y. Mellon*,
    No. 09-CV-5900, 2013 WL 5312502 (S.D.N.Y. Sept. 23, 2013) .............................7

*MacArthur Area Citizens Ass'n v. Republic of Peru*,
    809 F.2d 918 (D.C. Cir. 1987) ...................................................................8

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*,
    556 U.S. 366 (2009) ..................................................................................11

*Peterson v. Islamic Republic of Iran*,
    No. 10-CV-4518, 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013) ...........................7, 9, 17, 18

*Peterson v. Islamic Republic of Iran*,
    758 F.3d 185 (2d Cir. 2014) ....................................................................12

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ...............................................................17–18

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ....................................................................................8

*Smith v. Federal Rsrv. Bank of N.Y.*,
    280 F. Supp. 2d 314 (S.D.N.Y. 2003) .......................................................8

*Smith v. Federal Rsrv. Bank of N.Y.*,
    346 F.3d 264 (2d Cir. 2003) ................................................................8, 11

*United States v. Holy Land Found. for Relief & Dev.*,
    722 F.3d 677 (5th Cir. 2013) .....................................................................11

*United States v. Santos*,
    553 U.S. 507 (2008) (plurality opinion) .................................................................6

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013)......................................................................................6

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
    946 F.3d 120 (2d Cir. 2019)..................................................................................12

*Vera v. Republic of Cuba*,
    867 F.3d 310 (2d Cir. 2017)..................................................................................12

*Vimar Seguors y Reaseguros, S.A. v. M/V Sky Reefer*,
    515 U.S. 528 (1995)................................................................................................9

*Weininger v. Castro*,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006)........................................................ *passim*

*Weinstein v. Islamic Republic of Iran*,
    609 F.3d 43 (2d Cir. 2010)..................................................................8, 9, 12, 13

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012).........................................................................................23–24

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)..................................................................................................18

**STATUTES AND RULES**

Foreign Sovereign Immunities Act of 1976,
    Pub L. No. 94–583, 90 Stat. 2891 (codified at 28 U.S.C. § 1602 *et seq.*) ...................... *passim*

International Emergency Economic Powers Act,
    Pub. L. No. 95–223, 91 Stat. 1625 (codified at 50 U.S.C. § 1701 *et seq.*) ......................11, 22

Terrorism Risk Insurance Act of 2002 § 201,
    Pub. L. No. 107–297, 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note) .................... *passim*

28 U.S.C. § 1611.............................................................................................7, 9, 17

**LEGISLATIVE MATERIALS**

148 Cong. Rec. H6134 (daily ed., Sept. 10, 2002) .......................................................24

148 Cong. Rec. H6136 (daily ed., Sept. 10, 2002) ..................................................24–25

H. REP. NO. 94-1487 (1976)..........................................................................................8

H. REP. NO. 107-779 (2002) (Conf. Rep.) ..................................................................12

*Terrorist Financing and the Islamic State: Hearing Before the H. Comm. on Financial Services* (Nov. 13, 2014)
  (statement of David Cohen, Under Secretary of the Treasury) .............................................24

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

31 C.F.R. § 594.201 .........................................................................................................22

31 C.F.R. § 594.310 .........................................................................................................22

Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002).........................................22

Exec. Order No. 14,064, 87 Fed. Reg 8391 (Feb. 11, 2022) ....................................4, 17

U.S. Department of State, Country Reports on Terrorism 2020: Afghanistan (Dec. 16, 2021), https://www.state.gov/country-reports-on-terrorism-2/.....................................3, 25

Fact Sheet: Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/ ..................................4, 18, 23

## OTHER AUTHORITIES

Barbara Marcolini, Sanjar Sohail, and Alexander Stockton, *The Taliban Promised Them Amnesty. Then They Executed Them.*, N.Y. Times (April 12, 2022), https://www.nytimes.com/interactive/2022/04/12/opinion/taliban-afghanistan-revenge.html ............................................................................3

Brief of the United States,
  *In re Fifth Avenue & Related Props.*, No. 17-3258(L),
  (2d Cir. Aug. 31, 2018), 2018 WL 4193437..........................................................11

Siegel, *New York Practice*, § 510 (6th ed.)...................................................................20

UN Security Council, Twenty-ninth report of the Analytical Support and Sanctions Monitoring Team, U.N. Doc. S/2022/83 (Feb. 3, 2022) ....................................3, 25

## I.     Introduction

Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–

297, 116 Stat. 2322, is not a complicated provision of law. It says:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C.] section 1605A or 1605(a)(7) . . . , the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

The Havlish and Doe Creditors (collectively, the "Joint Creditors") have "judgments against a

terrorist party," the Taliban, "on a claim based upon an act of terrorism," namely the September

11, 2001 attacks (for the Havlish Creditors) and a January 4, 2016 attack in Kabul, Afghanistan

(for the Doe Creditors). *See* Dkt. 7764 ("Havlish Mot."); Dkt. 7769 ("Doe Mot."). Because the

Joint Creditors satisfy these conditions, the statute directs that "the blocked assets of" the Taliban,

which Congress has specifically defined as "including the blocked assets of any agency or

instrumentality of" the Taliban, "***shall*** be subject to execution . . . in order to satisfy such judgment

to the extent of any compensatory damages for which [the Taliban] has been adjudged liable."

(emphasis added). And perhaps most importantly, TRIA expressly states that this mandatory result

must be obtained "[n]otwithstanding any other provision of law[.]"

Neither DAB nor the Taliban have appeared in this proceeding to contest the inevitable

conclusion of this analysis. Nor has the Federal Reserve Bank of New York, which has been duly

served in its capacity as garnishee. However, several well-meaning *amici curiae* have filed briefs

taking issue with the result the law requires.[1] But none of the legal arguments *amici* advance provide the Court any basis to depart from the result that TRIA demands. *Amici* contend that sovereign immunity bars execution against the DAB Assets. But the plain text of TRIA and an unbroken line of case law makes clear that whenever sovereign immunity poses an obstacle to execution of a terrorism judgment, terror victims' rights to execute against blocked assets must prevail. *Amici* also wrongly assert that these turnover proceedings cannot reach the DAB Assets because the Taliban does not own them. Yet TRIA expressly provides that property of agencies and instrumentalities of terrorist parties can be executed upon in satisfaction of eligible judgments. And the Joint Creditors easily satisfy the time of filing rule raised by Mr. Faiq because DAB was an agency or instrumentality of the Taliban at the time their turnover motions were filed.

It is unfortunate that the Joint Creditors—the victims of terrorist attacks facilitated by and perpetrated with the material support of the Taliban—now find themselves at legal odds with other victims of the second Taliban takeover of Afghanistan. But that unfortunate situation does not change the facts that (1) DAB is now fully controlled by a designated terrorist group that this Court already adjudged to be liable for the murder of thousands of American citizens; and (2) the political branches of the federal government—through both executive actions and statutory law—have, as a consequence, deliberately made half of the DAB Assets subject to turnover to terror victims, after having made the other half available for humanitarian relief to the Afghan people.

The Taliban is already using Afghan institutions, including DAB, to reimpose its reign of terror over the Afghan people. *Amici* minimize what the Taliban's control over Afghanistan (and DAB) means. The United States, on the other hand, continues to view the Taliban, as it did prior

---

[1] *Amicus* Brief of Afghan Civil Society Organizations ("Civil Society Br."), Dkt. 7896-1; Amended *Amicus* Brief of Naseer Faiq ("Faiq Br."), Dkt. 7932-1; *Amicus* Brief of Unfreeze Afghanistan ("Unfreeze Br."), Havlish Dkt. 617; *Amicus Brief* of Women's Forum on Afghanistan, Dkt. 7823.

to 9/11, as a terrorist entity with close ties to al Qaeda whose control over Afghan territory and DAB risks the establishment of safe havens for terrorists and a never-ending source of financing for them.[2] The Taliban is also reverting to form in other ways, subjecting Afghanistan to its radical extremist rule and carrying out a brutal campaign of reprisals.[3]

*Amici curiae* come forward with complaints, observations, and proposals concerning the $3.5 billion in frozen assets of DAB that the President has determined should be subject to these turnover proceedings by terror victims. *Amici* variously complain, for example, that "the U.S. government's decision to freeze the Afghan Assets has [had] serious and widespread effects," and assert that the assets should instead be "used for the people of Afghanistan to prevent further deterioration of the economic, humanitarian, and human rights circumstances of Afghan civilians," Civil Society Br. vi, 5;  that the assets should be "kept as sovereign reserves to maintain the value of the Afghan currency," *id*. at 1;  that they should be "releas[ed] in a limited, monitored, and conditional way" for the purpose of "restoring liquidity," Unfreeze Br. 8-9; that they should be "safeguard[ed] . . . presumably to recapitalize a central bank, whenever and however that can be done," Faiq Br. 8; or that they should, like the other half of DAB's U.S.-based assets, be allocated

---

[2] *See* Havlish Mot. 19-20; Expert Declaration of Alex Zerden, Dkt. 7766 ("Zerden Decl.") ¶¶ 40-43 (discussing the Taliban's continued "close contacts" with al Qaeda and the U.S. Government's assessment that the Taliban's takeover of Afghanistan raises "the possibility of terrorist safe havens re-emerging"); UN Security Council, Twenty-ninth report of the Analytical Support and Sanctions Monitoring Team, U.N. Doc. S/2022/83 (Feb. 3, 2022), at 5, 6, 15, 16, 21 (highlighting Taliban-al Qaeda ties and noting that since the Taliban takeover, "terrorist groups enjoy greater freedom [in Afghanistan] than at any time in recent history"); U.S. Department of State, Country Reports on Terrorism 2020: Afghanistan (Dec. 16, 2021), https://www.state.gov/country-reports-on-terrorism-2/ ("In 2020, the Taliban and the affiliated [Haqqani Network] continued attacks targeting Afghan civilians and government officials," and "relations between al-Qa'ida and the Taliban remained close.").

[3] *See* Barbara Marcolini, Sanjar Sohail, and Alexander Stockton, *The Taliban Promised Them Amnesty. Then They Executed Them.*, N.Y. Times (April 12, 2022), https://www.nytimes.com/interactive/2022/04/12/opinion/taliban-afghanistan-revenge.html; *see also* Civil Society Br. 6 ("The Taliban has escalated a severe human rights crackdown against the Afghan people[,] engag[ing] in the systematic persecution of religious and ethnic minorities, women and girls, human rights defenders, journalists and media personnel, and former government officials and security forces, among others."); Faiq Br. 1 ("The Taliban['s] hostile occupation has terrorized Afghanistan[.]").

"for the benefit of the Afghan people."[4]

*Amici*'s sentiments are understandable. But achieving their preferred outcomes would require alternative foreign policy determinations that can be made only in the White House and Congress, not by an Article III court. And many of these policy considerations have already been weighed and considered. In fact, after more than five months of deliberations "at the highest levels of government" (which necessitated two extensions of the government-sought stay of these proceedings), Dkt. 7629, President Biden determined on February 11, 2022 that terror victims may seek to satisfy their judgments against the Taliban by executing on half of DAB's assets at the FRBNY, subject to the Court's determination that such execution comports with the law. Those executive actions confirm the Court's authority to make that legal determination.

The political branches made these policy decisions in light (or in anticipation) of all relevant facts. The President used authority granted to him by Congress to block all DAB assets in the United States. The Government then licensed half of those funds so that they could be used for "the benefit of the Afghan people." Executive Order 14,064 ensures that the other half remains blocked, so the Taliban is never allowed to use its control over DAB to deploy those funds in furtherance of its terrorist ends.[5] That is the key reason those funds are not accessible to DAB today.[6] And the President took these actions knowing that, through TRIA, Congress had ensured

---

[4] *See* Women's Forum Br. ("We do not understand why this protection sought should not extend to the full $7 billion that have been frozen."); *see also* Fact Sheet: Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/ ("Feb. 11 Fact Sheet").

[5] 87 Fed. Reg 8391 (Feb. 11, 2022). Even absent Executive Order 14,064, it would have likely been determined that the funds were blocked under Executive Orders 13,224 and 13,268, which continue to apply to "all property and interests in property" in which the Taliban has an interest. Havlish Mot. 10–11.

[6] Indeed, even the Court's decision to deny the pending turnover motions would not bring about the "unfreezing" of the assets sought by *amici*, nor effectuate the various other proposals *amici* have made.

that in situations like this, where the President has blocked the property of a terrorist party's agency or instrumentality to prevent it from being accessed by terrorists, that property would instead be available to the terrorists' victims—notwithstanding any other law.

In other words, the turnover order required by the law in this case is the result of a careful balance of difficult policy decisions made by the political branches. Those political branches weighed the importance of permitting victims of terrorism to recover on duly-entered judgments against other U.S. foreign policy concerns—and determined the balance between those priorities favored the judgment holders.[7] *Amici* ask this Court to step in and upset that careful balance by imposing an alternative equitable calculation of its own devise. The Court must instead defer to the judgment of the political branches on this fundamental question of policy.

For all of these reasons, notwithstanding the novelty of this situation, a straightforward application of settled legal principles leads inexorably to the conclusion that turnover is both appropriate and required by TRIA.

## II.    Argument

### A.    Straightforward Application Of TRIA Mandates Turnover

While *amici* raise several issues, one argument is notable in its absence: none dispute that DAB is now an agency or instrumentality of the Taliban under a straightforward application of the *Kirschenbaum* factors—the Second Circuit's test for whether turnover defendants "are 'agencies

---

[7] *See Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 134 (2d Cir. 2016) ("Congress enacted TRIA § 201 to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." (internal quotation marks omitted)), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018); *see also* H. REP. NO. 107-779, at 27 (2002) (Conf. Rep.) ("It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced.").

or instrumentalities' of a terrorist party under the TRIA." *Kirschenbaum*, 830 F.3d at 135.[8] *Amici* do not meaningfully dispute that DAB is a means through which the Taliban accomplishes its functions, that DAB provides material service to the Taliban, or that DAB is controlled and directed by the Taliban. *See* Havlish Mot. 18–21. Indeed, additional evidence demonstrating this reality continues to mount.[9]

*Amici* argue that this Court must not apply that test because the Second Circuit did not anticipate its application in this specific case. Civil Society Br. 16–17, 19 n.26. This Court, however, must apply the law as it has been interpreted. "The meaning of words in a statute cannot change with the statute's application." *United States v. Santos*, 553 U.S. 507, 522–23 (2008) (plurality opinion); *see also United States v. Vilar*, 729 F.3d 62, 75 (2d Cir. 2013) (a statute, once interpreted "in unmistakable terms," must be given the same meaning "in every case"). *Amici*'s arguments boil down to a belief that either the *en banc* Second Circuit or the Supreme Court should change the meaning assigned to the statutory text by the *Kirschenbaum* panel. That is unlikely to happen because the panel's analytical framework is sound and can lead to no other result regardless of context. *See* 830 F.3d at 132–35. But that belief certainly has no power here, where litigants must grapple with binding authority rather than asserting that binding authority ought not bind.

**B.    TRIA Removes Obstacles To The Execution Of The Joint Creditors' Judgments, Including Sovereign Immunity**

*Amici* focus significantly on an issue that is legally irrelevant: the potential implications of foreign sovereign immunity on this action. That issue is irrelevant because, where any provision of the Foreign Sovereign Immunities Act ("FSIA") poses an obstacle to the execution of a

---

[8] The Unfreeze Brief asserts in conclusory fashion that the *Kirschenbaum* factors are not satisfied, Br. at 6, but does not refute any of the facts established in the Joint Creditors' turnover papers.

[9] *See* Expert Declarations of Peter Piatetsky and Michael Templeton, *Owens v. Taliban*, No. 22-CV-1949-VEC (SDNY), Dkts. 50 & 51 (finding that "the Taliban directs and controls DAB" and uses it to "finance terrorism").

judgment under TRIA, that conflict "must be resolved in favor of the TRIA." *Gates v. Syrian Arab Republic*, No. 11-CV-8715, 2013 WL 1337223, at \*6 (N.D. Ill. Mar. 29, 2013), *aff'd,* 755 F.3d 568 (7th Cir. 2014); *see also* U.S. Statement 24 ("Under TRIA, the FSIA's immunities and exemptions are inapplicable[.]"). This is as true for the central bank immunity conferred by FSIA Section 1611(b) as it is for any other form of sovereign immunity conferred by the FSIA, as the Supreme Court itself has said. *See Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016) (While "the FSIA's central-bank immunity provision limits" execution through other mechanisms of law, it does "not [limit] the TRIA" because TRIA "take[s] precedence over 'any other provision of law[.]'"); *Peterson v. Islamic Republic of Iran*, No. 10-CV-4518, 2013 WL 1155576, at \*25 (S.D.N.Y. Mar. 13, 2013) ("TRIA's 'notwithstanding' clause . . . preempts central bank immunity to the extent it would apply."); *Levin v. Bank of N.Y. Mellon*, No. 09-CV-5900, 2013 WL 5312502, at \*15–16 (S.D.N.Y. Sept. 23, 2013) ("Even if [central bank]'s assets did fall under the protection of FSIA § 1611(b)(1), that immunity is overridden by the subsequently enacted TRIA § 201(a). . . . The language of TRIA, the purpose of its enactment, and its subsequent enactment to § 1611(b)(1), all indicate that the TRIA waiver of immunity must control when the two provisions are in conflict.").[10]

### 1.    TRIA Supersedes The FSIA, Which Is The Sole Source Of Foreign Sovereign Immunity In U.S. Courts

The FSIA sets forth "the sole and exclusive standards to be used in resolving questions of

---

[10] Certain *amici* also raise the looming specter that an application of TRIA would threaten confidence in the United States as the global reserve banker, which they assert is dependent on recognition of central bank immunity. *See* Faiq Br. 6–7, 12; Civil Society Br. 15. (Notably, the FRBNY has yet to raise this concern in this case.) *Amici*'s desire to reframe a legal question as a policy issue is an untenable basis on which to premise a decision. Their policy conjecture is also unsupported. It is unlikely that any foreign government will rethink its decision to deposit assets at the Fed out of fear that it will someday be toppled by designated terrorists—an event which has happened twice in modern history, both times by the Taliban in Afghanistan—and that its central bank's assets might, as a result, be made available to those terrorists' victims by application of TRIA.

sovereign immunity raised by foreign states before Federal and State courts in the United States."
*MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 919 (D.C. Cir. 1987) (quoting
H. REP. NO. 94-1487 (1976)).[11] "After the enactment of the FSIA, the Act—and not the pre-
existing common law—indisputably governs the determination of whether a foreign state is
entitled to sovereign immunity." *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010).

As the United States pointed out in its Statement of Interest, "[u]nder TRIA, the FSIA's
immunities and exemptions are inapplicable[.]" U.S. Statement 24; *see also Hausler v. JP Morgan
Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014) ("Congress . . . has created terrorism-related
exceptions to immunity under FSIA. One such exception is TRIA's authorization of the attachment
of the property of terrorist parties and that of their agencies or instrumentalities to satisfy certain
judgments issued against them." (citation omitted)); *Hill v. Republic of Iraq*, No. 99-CV-3346,
2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) ("[B]y its plain terms, the TRIA overrides any
immunity from execution that blocked [terrorist party] property might otherwise enjoy under . . .
the FSIA"); *Smith v. Fed. Rsrv. Bank of New York*, 280 F. Supp. 2d 314, 319 (S.D.N.Y.)
(same), *aff'd* 346 F.3d 264 (2d Cir. 2003). If the FSIA is the sole source of foreign sovereign
immunity in U.S. courts (and it is), and if TRIA makes the FSIA inapplicable to this case (which
it does), the Court can draw only one logical conclusion: foreign sovereign immunity can have no
bearing on the outcome of this proceeding.[12]

---

[11] Some *amici* acknowledge this reality. Unfreeze Br. 7 ("[I]n the United States the rules of sovereign immunity
have, since 1976, been codified in the FSIA. . . . We understand that in the U.S. courts U.S. legislation will
always take precedence over conflicting international legal norms.").

[12] *Amici*'s references to customary international law and treaty law are equally inapposite. *See, e.g.*, Civil Society
Br. 11–13. The sole operative source of sovereign immunity for state assets in U.S. courts is the FSIA, and TRIA
nullifies the FSIA in this context. References to treaty law are particularly inapposite given binding precedent
that TRIA preempts treaty obligations. *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 53 (2d Cir. 2010). To
the extent *amici* rely on statutory canons suggesting that ambiguous laws should be interpreted in consonance
with international law or pre-TRIA principles from the *Restatement (Third) of Foreign Relations Law*, they are

It does not matter whether the superseded immunities are styled as jurisdictional or execution immunities. Faiq Br. 13–17. As Mr. Faiq concedes, both immunities flow from, and are comprehensively governed by, the FSIA. *Id.* at 13 ("[T]hrough the FSIA," Congress has immunized DAB from jurisdiction and attachment); *see also id.* at 14 (assets are immune from attachment "under section 1611 of the FSIA"). Both are thus abrogated by TRIA's supersession of the FSIA. *See Weininger v. Castro*, 462 F. Supp. 2d 457, 488 (S.D.N.Y. 2006) ("[T]he 'notwithstanding any other provision of law' language in TRIA operates as an exception to immunity *from both jurisdiction and execution* [under the FSIA]." (emphasis added)). Indeed, TRIA itself is an independent source of subject matter jurisdiction in cases (like this one) where its conditions are met—even if jurisdiction is asserted over assets of an agency or instrumentality "not itself named in the [underlying] judgment." *Weinstein*, 609 F.3d at 50 (It is "clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor[.]"); *accord Caballero v. FARC*, No. 20-CV-7602, 2021 WL 6135758, at *9 (C.D. Cal. Dec. 29, 2021). There is thus no question that this Court has jurisdiction over the blocked DAB assets—that jurisdiction is conferred by TRIA itself.

### 2. TRIA's "Or For Which" Clause Does Not Reincorporate The FSIA Into TRIA

Mr. Faiq urges the Court to revive the FSIA's displaced immunities because Section 201(a) of TRIA mentions two provisions of the FSIA. But he misunderstands the purpose of these references. Faiq Br. 15–16. The relevant portion of TRIA says: "Notwithstanding any other

---

mistaken: the operative language of TRIA is not ambiguous. "As the Supreme Court has observed, 'a clearer statement' of intent to supersede all other laws than a 'notwithstanding clause' is 'difficult to imagine.'" *Peterson*, 2013 WL 1155576, at *25 (first citing *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 554 (1995), and then citing *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993)).

provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7)," blocked assets of the terrorist party and its agencies or instrumentalities must be available for execution. TRIA § 201(a). Mr. Faiq contends that because the quoted "or for which" clause references 28 U.S.C. § 1605A and the former § 1605(a)(7), which are part of the FSIA, Congress "could not have intended" to dispense with the FSIA's immunities.

That is wrong. The relevant language identifies *which judgments* are eligible for execution under TRIA. The blocked assets of every terrorist party are subject to execution "in every case in which a person has obtained a judgment against [that] terrorist party on a claim based upon an act of terrorism[.]" This operates as a blanket waiver of sovereign immunity for judgments (like the Joint Creditors') premised on all such claims. The next clause, "or for which a terrorist party is not immune under section 1605A or 1605(a)(7)," which refers to the FSIA, is set off by the word "or" and further expands the set of judgments on which TRIA enables execution.[13] TRIA directs that execution shall be available "in every case" where a person has obtained a judgement in one of

---

[13] Mr. Faiq suggests it would render the second clause mere surplusage to interpret the first clause as abrogating jurisdictional immunity. Faiq Br. 15. Not so. Multiple courts have suggested that TRIA's first clause may operate to remove obstacles to execution of judgments against non-state actors (like the Joint Creditors' judgments against the Taliban) even if it does not include judgments against state actors (despite the clear definition of "terrorist party" that sweeps in both). *See, e.g., Jerez v. Republic of Cuba*, 777 F. Supp. 2d 6, 28 (D.D.C. 2011); *Weininger*, 462 F. Supp. 2d at 480. And *Jerez* suggested that not all acts of state-backed torture may qualify as "act[s] of terrorism" for purposes of TRIA's first clause. 777 F. Supp. 2d at 29 ("[T]his Court finds that the acts perpetrated against Plaintiff, albeit egregious, do not constitute 'acts of terrorism' for purposes of TRIA[.]"). That means that the second clause operates to extend enforcement jurisdiction over additional judgments against state sponsors of terror not encompassed by the first clause. The clause could also be construed to permit execution against assets of states designated as sponsors of terrorism at the time the relevant judgment was entered but which were later removed from that list before the assets were executed upon.

In any event, the plain text of the first clause so clearly sweeps in the Joint Creditors' judgments that resort to any other canon of interpretation is improper. "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (internal citations and quotation marks omitted).

these two categories. And TRIA's "notwithstanding" clause abrogates all otherwise applicable immunities with respect to both categories of judgments.

### 3.   There Is No Authority Suggesting The FSIA Applies In A TRIA Proceeding

None of the cases *amici* cite for the proposition that the FSIA's immunities continue to apply in a TRIA execution proceeding actually support that point. In fact, none of those cases concerned the FSIA at all. *Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009) did not concern the FSIA—the Supreme Court there rejected an argument that TRIA's notwithstanding clause did not abrogate another provision of TRIA itself. In *Smith v. Federal Rsrv. Bank of New York*, 346 F.3d 264 (2d Cir. 2003), the Second Circuit held that TRIA did not abrogate the President's ability to confiscate assets under Section 1702(a)(1)(C) of IEEPA before the terror victims even obtained a judgment. In *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 688-89 (5th Cir. 2013), the Fifth Circuit held that TRIA did not bar the Justice Department from collecting blocked property under the general criminal forfeiture statute—and the same statute was at issue in the United States' brief in *In re Fifth Avenue & Related Props.*, No. 17-3258(L)*,* (2d Cir. Aug. 31, 2018), 2018 WL 4193437, at *307-09 [hereinafter "U.S. *Fifth Ave.* Br."].

*Amici* have not cited to a single case where any court has said that the immunities conferred by the FSIA restrict the execution of a judgment under TRIA. The reason is because no such case exists. The Joint Creditors have no quarrel with the uncontroversial proposition that TRIA does not "lay waste to all other statutes that might have some *effect* within [its] realm." Faiq Br. 16 (quoting U.S. *Fifth Ave*. Br., 2018 WL 4193437, at *307 (emphasis in original)). But what TRIA's "notwithstanding" clause does do is "resolve conflicting legal principles that dictate irreconcilable legal outcomes." *Id*. *Amici* assert that the outcome required by TRIA is barred by conflicting legal

principles of sovereign immunity. That is precisely the situation in which the courts (including the Second Circuit) have said the "notwithstanding" clause does its work and removes the conflict. *See Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 190 n.2 (2d Cir. 2014) ("TRIA . . . contains a broad provision stating that it applies 'notwithstanding any other provision of law,' and 'the Courts of Appeals have regularly interpreted such 'notwithstanding' provisions 'to supersede all other laws[.]'" (quoting *Weinstein,* 609 F.3d at 53)).

### 4.     The Joint Creditors Hold Valid Underlying Judgments

Mr. Faiq alternatively suggests that TRIA cannot confer jurisdiction over these proceedings unless the Creditors' underlying judgments satisfy the FSIA, citing *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.* ("*Vera II*"), 946 F.3d 120 (2d Cir. 2019), and *Kirschenbaum*. Faiq Br. 16–17.

Mr. Faiq misconstrues the case law. Those decisions (and those on which they are based) stand for the uncontroversial proposition that a court may not authorize post-judgment execution proceedings unless the judgment on the merits underlying the enforcement proceeding was validly entered. *See Vera v. Republic of Cuba* ("*Vera I*"), 867 F.3d 310, 312 (2d Cir. 2017) (post-judgment enforcement void where district court "lacked subject matter jurisdiction to enter judgment" in the first instance). In *Vera II*, the Second Circuit dismissed the judgment creditors' enforcement proceeding solely on the basis that their underlying state court judgments were invalid (because the courts lacked jurisdiction to enter them in the first instance). 946 F.3d at 142. The court expressly noted that TRIA "would [have] provide[d] the District Court . . . a jurisdictional basis for enforcing those state judgments" if said judgments were "valid." *Id.* at 125. And in *Kirschenbaum*, the court merely noted in dicta that the validity of the underlying judgments (there, multiple judgments under the FSIA) was not in question. 830 F.3d at 131. In this case, because there is no question that the underlying judgments are valid, the Court should enforce them.

12

### C.     DAB's Status As An Agency And Instrumentality Of The Taliban Makes Its Assets Subject To Execution

Mr. Faiq and the Civil Society *amici* next argue that the DAB Assets cannot be available to satisfy the Joint Creditors' judgments against the Taliban because the Taliban does not "actually own[]" them, insisting instead that the assets are the property of the Afghan people or the Afghan state. Faiq Br. 18; Civil Society Br. 1-2. This argument disregards the text of TRIA, which could not be clearer: the "blocked assets of [a] terrorist party" are subject to execution to satisfy judgments against that terrorist party, and a terrorist party's blocked assets specifically "includ[e] the blocked assets of any agency or instrumentality of that terrorist party." TRIA § 201(a). Accordingly, as the Second Circuit has repeatedly held, TRIA authorizes execution against property of an "an agency or instrumentality of [a] terrorist party, even if the agency or instrumentality is not itself named in the judgment." *Kirschenbaum*, 830 F.3d at 132; *see also Weinstein*, 609 F.3d at 49-50 (rejecting argument that would have "rendered superfluous" TRIA's "any agency or instrumentality" provision).

It is plain, then, that the Joint Creditors need not show that the DAB Assets are "actually own[ed]" by the Taliban itself.[14] All that need be shown to satisfy the requirement embodied in TRIA's "assets of" language is that (a) DAB has a property interest in the blocked assets; and (b) DAB is an agency or instrumentality of the Taliban. *See Weininger*, 462 F. Supp. 2d at 479 ("[B]y its terms[,] § 201 provides that the blocked assets that may be executed upon are those of *either* the 'terrorist party' *or* 'any agency or instrumentality of that terrorist party[.]'" (emphasis added)). The Joint Creditors have conclusively established both requirements, and neither

---

[14] In any case, the Civil Society *amici* are doubly wrong where they assert that "nowhere in their Turnover Motions do Plaintiff-Creditors make the assertion that the DAB Assets are the assets 'of' the Taliban." Br. 17. The Joint Creditors each argue in the alternative that the DAB Assets are assets "of" the Taliban because DAB is so controlled by the Taliban that the two parties are alter egos of each another. Havlish Mot. 24; Doe Mot. 23.

conclusion is affected by the argument that the assets belong to the Afghan people or state.

It cannot be meaningfully disputed that DAB has a property interest recognized by New York law[15] in the blocked assets, which are held in an account at FRBNY in DAB's name. *See* Mot. 17-18; Mitchell Decl. ¶¶ 5, 7–8 & Exs. 4, 6; *see also* U.S. Statement 8. A party holding funds in a bank account is presumed to own those assets. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 86 (2d Cir. 2002); *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 49 (S.D.N.Y. 2015) ("There is no question that under New York law, the account holder of accounts containing assets belonging to the account holder has a property interest in those assets.").

This case is thus a far cry from *Heiser v. Islamic Republic of Iran*, 735 F.3d 934 (D.C. Cir. 2013) and *Hausler*, 770 F.3d 207, each cited in Mr. Faiq's brief. *See* Faiq Br. 18-20. To begin with, those cases clearly do not suggest that TRIA only subjects the assets of a judgment debtor itself to attachment; turnover was denied in those cases because "no terrorist party *or agency or instrumentality thereof* ha[d] a property interest in" the assets. *Hausler*, 770 F.3d at 212 (emphasis added). Rather, those cases concerned what type of an interest in property is sufficient to make that property the "assets of" a terrorist party *or its agency or instrumentality* and thus subject to attachment under TRIA. In both cases, although certain Electronic Fund Transfers ("EFTs") were sufficiently connected to Iran and Cuba to be blocked midstream under the applicable sanctions regimes, the Iranian and Cuban judgment debtors (including their agencies and instrumentalities) lacked a sufficient property interest in the EFTs while they were held by an intermediary financial

---

[15] New York property law governs determinations of ownership here. *See Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014) (internal citations and quotation marks omitted) (where Congress "attaches consequences, federally defined, to rights created under state law," courts "look to state law to define the rights the judgment debtor has in the property the creditor seeks to reach").

institution.[16] Here, of course, none of these complicated questions exist: The blocked assets are "assets of" DAB because *they are, and remain, in DAB's bank account*. Therefore, so long as the Court finds that DAB is an agency or instrumentality of the Taliban, DAB's interest in the assets is sufficient under TRIA to make those assets subject to execution in satisfaction of eligible judgments against the Taliban. *See Weininger*, 462 F. Supp. 2d at 479.

And DAB is indeed an agency or instrumentality of the Taliban under binding Second Circuit precedent. None of the *amici* dispute the facts, exhaustively demonstrated in the Joint Creditors' motions and the Zerden Declaration, that DAB is dominated by the Taliban and is being used as a tool to advance its illicit agenda.[17] These facts are more than sufficient. *See Kirschenbaum*, 830 F.3d at 135 (an entity is an agency or instrumentality under TRIA if it "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party"). Mr. Faiq's contention that "[t]he degree to which the Taliban might control" DAB is "irrelevant" is simply incorrect—in fact, under *Kirschenbaum*, it is the central factual question on which these turnover proceedings hinge.

Nor does DAB in any way resemble the hypothetical "innocent owner" discussed by the Second Circuit in *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 199 & nn. 8–9 (2d Cir. 2019)

---

[16] *See Heiser*, 735 F.3d at 936-937 (explaining that Iranian entities were neither the originators nor beneficiaries of the funds transfers, and the EFTs were blocked only because "Iranian banks would have had a contingent future possessory interest in the funds"); *Hausler*, 770 F.3d at 212 (Cuban entities lacked property interest in midstream EFTs where "no Cuban entity transmitted any of the blocked EFTs . . . directly to the blocking bank").

[17] *See supra* Part II.A; Havlish Mot. 18-21; Doe Mot. 17-20. After taking over Afghanistan in 2021, the Taliban asserted complete control over DAB, including by, among other things, installing sanctioned terrorists without relevant qualifications to oversee its operations, Zerden Decl. ¶¶ 54–84, and issuing edicts from senior Taliban leadership for DAB to implement, *id.* ¶¶ 92–95. The Taliban has also materially benefited from its control of DAB by, among other things, gaining access to nonpublic information about the Afghan economy and financial system that has allowed it to consolidate power in Afghanistan and generate additional illicit revenue, including from the narcotics trade. *Id.* ¶¶ 146–59.

15

("*Assa*"), or the "innocent third party[]" discussed by the D.C. Circuit in *Heiser*, 735 F.3d at 939. *See* Faiq Br. 20 & n.19. *Assa* and *Heiser* raised the possibility that a party with an "incidental and perhaps unintentional involvement with a terrorist party" could be unfairly made to pay the judgments of that terrorist party. *Assa*, 934 F.3d at 199; *see also Heiser*, 735 F.3d at 939 (if "the debtor does not own" the assets in question, "then someone else must," and that person might be "an innocent person who then unjustly bears the costs of the debtor's wrong"). For purposes of this case, TRIA itself answers those concerns: the blocked assets of a terrorist party "includ[e] the blocked assets of any agency or instrumentality of that terrorist party," TRIA § 201(a), so an agency or instrumentality is not a third party, much less an innocent one. And even if *Assa* leaves open the question whether TRIA might give a terrorist party's agency or instrumentality an "innocent ownership" or "ignorance" defense to execution if it did not know that it was benefiting or controlled by the terrorist party, no such defense could apply here. DAB's top three officials were installed by the Taliban, and two of them are sanctioned for terrorist activities undertaken as members of the Taliban. Zerden Decl. ¶¶ 59-82. The Taliban Council of Ministers directs DAB policy, and the Taliban's Deputy Prime Minister has chaired DAB meetings. *Id*. ¶¶ 92-95, 139. The Taliban flag quite literally hangs over those meetings. *Id.* ¶¶ 72, 95, 116, 118, 119. Whatever "ignorance" or "innocent owner" defenses might be available under TRIA, they would have no applicability here. As in *Assa¸* it is "abundantly clear from the record" that DAB knows of these relevant and derogatory facts. *Assa*, 934 F.3d at 199 & n.9.

Amici's primary objection to the above analysis is that the account at the Fed contains funds that belong exclusively to the Afghan people and state. Faiq Br. 19; Civil Society Br. 1; Unfreeze

Br. 4.[18] But *amici* simply do not address the motions' straightforward argument that DAB, as the account holder, owns the assets under New York law. They instead argue the *Taliban* has no such property interest, ignoring that TRIA clearly and unmistakably makes subject to execution not just "the blocked assets of [a] terrorist party" but also "the blocked assets of any agency or instrumentality of that terrorist party."

Moreover, even if *amici* were correct that the DAB Assets are assets "of" the Afghan state, fundamental principles of property law—as well as E.O. 14,064, the FSIA, and applicable New York law—confirm that the DAB Assets are also "assets of" DAB. *See Peterson*, 2013 WL 1155576, at *31 ("There simply is no other possible owner of the interests here other than" Iran's central bank); *see also* Exec. Order No. 14,064 (referring to the DAB Assets as "Property of Da Afghanistan Bank"); 28 U.S.C. § 1611(b)(1) (referring to "property . . . of a foreign central bank"); *Hausler*, 127 F. Supp. 3d at 49 (under New York law, an account holder owns the assets in the account).[19] Because the assets in DAB's account at the Fed are plainly the "assets of" DAB, and because DAB is an agency or instrumentality of the Taliban, the assets are subject to execution, regardless of whether the Afghan state also has an interest in them.[20] For purposes of TRIA, which

---

[18] The Joint Creditors maintain that the Court need not address "whether DAB is or is not an active central bank of any particular state," as they have clearly demonstrated (a) Taliban control of DAB and (b) DAB ownership of the assets, which is all that TRIA requires. Havlish Mot. 21-22. And because any otherwise applicable immunities are rendered irrelevant here by TRIA, the Court need not weigh in on questions related to DAB's status or other issues which might implicate sensitive areas of executive competency. *Id*. The Joint Creditors nevertheless engage with *amici*'s argument on its own terms to demonstrate its inadequacy.

[19] Mr. Faiq's brief argues in passing that even if DAB (as an instrumentality of the Taliban) has a *joint* interest with the State of Afghanistan in the DAB Assets, Afghanistan's "innocent owner" defense would prevent turnover. Faiq Br. 20, n.19. But Mr. Faiq's citation to *Assa*, which merely speculated that an innocent owner defense might exist, does not support the proposition that a TRIA action cannot be maintained against a terrorist instrumentality that knows of its terrorist control (like DAB) merely because an additional "innocent" party might have some kind of interest in the instrumentality's assets.

[20] As noted above, the Afghan state's immunity has been abrogated, and the property of sovereign states is not protected by the Due Process Clause of the Constitution, leaving no barrier to execution. *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 399-400 (2d Cir. 2009); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 99 (D.C. Cir. 2002) ("[N]othing in the Constitution

applies here, these two factors are dispositive notwithstanding any other provision of law, and defeat *amici*'s arguments.

Finally, some *amici* suggest that the Court cannot allow for execution without implicitly and impermissibly recognizing that the Taliban now constitutes the government of Afghanistan. *See, e.g.*, Civil Society Br. 3; *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015) (the recognition power "resides in the President alone"). But granting turnover would do no such thing. The Joint Creditors have made plain that they are *not* claiming that the DAB Assets are the Taliban's "by virtue of its claim to be the government of Afghanistan." Havlish Mot. 21. Instead, the motions treat the Taliban as a terrorist party that forcibly seized Afghan territory and institutions, including DAB. Making the obvious factual finding that the Taliban now controls DAB and its assets in no way implies the legal or diplomatic conclusion that the Taliban is now the recognized government of Afghanistan. Just as the White House in dealing with these same issues has publicly acknowledged the fact that the Taliban has achieved a "forced takeover of the country" without extending it recognition, *see* Feb. 11 Fact Sheet, *supra* n.4, the Court can acknowledge the Taliban's "forced takeover" of DAB (and the legal conclusions it compels) without suggesting that the Taliban has the status of Afghanistan's recognized government.

**D.     DAB's Agency Or Instrumentality Status Is Evaluated As Of The Date The Turnover Motions Were Filed**

Finally, Mr. Faiq argues that DAB's agency and instrumentality status should be measured as of the date the "underlying complaints" were filed, meaning, in this case, the 2002 lawsuit

---

limits congressional authority to modify or remove" foreign sovereign immunity, and foreign states are not protected by the Due Process Clause, in part because the alternative would limit "the power of Congress and the President to freeze the assets of foreign nations, or to impose economic sanctions on them.").

To the extent *amici* are arguing that the funds are the "property of the Afghan *people*," Faiq Br. 19, as distinct from the Afghan *state*, that argument fails. The "Afghan people" are not a juridical entity capable of holding property, and courts routinely recognize that central banks—which are separate juridical entities capable of holding property—hold legal title to assets in their account. *See*, *e.g.*, *Peterson*, 2013 WL 1155576, at *31.

through which the Havlish Creditors obtained their judgments against the Taliban or the 2020 lawsuit through which the Doe Creditors obtained theirs. As authority for this rule, Mr. Faiq points to *Kirschenbaum*, which asked "whether [the agency or instrumentality] was so owned, controlled, or directed [by the terrorist party] at the time Plaintiffs' complaints were filed." 830 F.3d at 136.

Kirschenbaum itself made clear, however, that the operative "complaints" for purposes of this inquiry were not the underlying actions by which the plaintiffs obtained their judgments against Iran, but instead their turnover actions by which they sought to satisfy those judgments. The only complaints mentioned anywhere in the *Kirschenbaum* opinion were the turnover complaints.[21] The opinion's procedural history section begins, "Plaintiffs began filing these turnover actions in December 2008," 830 F.3d at 121, although the underlying lawsuits had been filed years before. *See, e.g., Kirschenbaum v. Islamic Republic of* Iran, No. 03-cv-1708 (D.D.C.) (2003); *Rubin v. Islamic Republic of Iran*, No. 01-cv-1565 (D.D.C.) (2001). Indeed, in assessing whether the Alavi Foundation was controlled by Iran "at the time Plaintiffs' complaints were filed," the *Kirschenbaum* court considered evidence and testimony regarding the agency/instrumentality relationship in 2005 and 2007—information that would be irrelevant if the proper inquiry looked only to the time of the *underlying* complaint. *Kirschenbaum*, 830 F.3d at 136-137.

The meaning of the Second Circuit's decision was clear to the district court, which noted on remand that "instrumentality status should be determined . . . under TRIA . . . as of the time a proceeding is commenced to attach property in aid of execution on that judgment." *Kirschenbaum*

---

[21] Although, as was done here, a turnover proceeding against a third-party garnishee may be commenced in federal court by the mere filing of a motion, *see CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018), a turnover action may also be commenced, as in *Kirschenbaum*, by the filing of a separate proceeding (*i.e.*, by the filing of a new complaint). *See, e.g.*, Compl., *Miller et al. v. Alavi Foundation et al.*, No. 09-CV-10934 (S.D.N.Y.), Dkt. 1.

*v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 518 & n.60 (S.D.N.Y. 2017) (emphasis added), *vacated and remanded on other grounds sub nom. In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147 (2d Cir. 2019), and *rev'd and remanded on other grounds sub nom. Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019). The district court then proceeded to perform that analysis, noting that "the first of the relevant complaints here was filed in 2009," years after the underlying liability complaints were filed, and finding that the defendants were instrumentalities of Iran "throughout the time each of the *Judgment Creditor complaints* was filed." *Id*. at 522 (emphasis added). *Kirschenbaum* thus provides no support for Mr. Faiq's proposed rule. Here, as in *Kirschenbaum*, the relevant moment in time to assess whether DAB was an agency or instrumentality of the Taliban is March 2022, when the Joint Creditors filed their turnover motions.[22]

It would defy logic to measure DAB's agency or instrumentality status, for the purpose of this turnover proceeding, as of the time of the "underlying" complaints. *Kirschenbaum* derived its rule from an FSIA case, *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), which explained that because "jurisdiction . . . depends upon the state of things at the time . . . the action [is] brought," *id*. at 478 (internal quotation marks omitted), an entity's instrumentality status under the FSIA "is determined at the time of the filing of the complaint," *id*. at 480. In other words, to hold a foreign state's agency or instrumentality liable under the FSIA, jurisdiction over that entity must exist at the time the complaint is filed. Here, of course, the Havlish Plaintiffs did not sue DAB in 2002 nor did the Doe Plaintiffs in 2020. Therefore, there was no reason for the courts to exercise jurisdiction over DAB at those times. In the 2022 turnover proceeding, the basis for jurisdiction over DAB is

---

[22] A turnover motion filed in federal court is the equivalent of a separate "special proceeding" under New York law. *See supra* n.21; *CSX Transp., Inc.*, 879 F.3d at 468; *see also* Havlish Mot. 13 & n.34; Doe Mot. 13, n.35; Dkt. 7650 (Letter of Feb. 10, 2022) ("[U]nder governing law, the Havlish Creditors' forthcoming motion for turnover is appropriately treated as equivalent to a new, separate civil action to enforce their judgment."); Siegel, *New York Practice*, § 510 (6th ed.) ("[T]he procedure for seeking [turnover] from a third person is a special proceeding.").

TRIA itself, which "confers an independent basis for subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment." *Kirschenbaum*, 830 F.3d at 132. Whether a court has jurisdiction over post-judgment execution proceedings must be assessed when the post-judgment proceedings are commenced. Mr. Faiq's policy concerns about the attachability of DAB's assets being able to "vary over time" are thus unfounded. Agency and instrumentality status is measured as of a clear date in time, *i.e.*, the date judgment creditors seek to satisfy their judgments against the judgment debtor by seeking turnover of the agency or instrumentalities' blocked assets.

### E.      The Court Must Defer To The Political Branches' Determinations That Terror Victims Be Permitted To Pursue The DAB Assets

Finally, each *amicus* brief raises a set of policy arguments concerning potential purported consequences for the Afghan people of the DAB Assets either remaining frozen or being used to satisfy the judgments of American terror victims. They note the difficulties ordinary Afghans are experiencing in the wake of the Taliban's takeover and in particular the dire state of the Afghan economy. And they argue that Afghanistan's economic plight could further undermine "regional and global stability and . . . the national security interests of the United States." Unfreeze Br. 2; *see also* Civil Society Br. 4-6; Faiq Br. 12-13.

The Joint Creditors have no quarrel with the people of Afghanistan, and certainly do not minimize the enormous hardships they have endured for decades. Furthermore, the Joint Creditors appreciate the various statements by *amici* empathizing with the suffering inflicted upon 9/11 victims and their loved ones. *See* Unfreeze Br. 3; Faiq Br. 4; Civil Society Br. 1.

Far from providing the Court a basis to deny the Joint Creditors' turnover motions, however, the observations of the various *amici* serve only to highlight the complicated web of

political, strategic, and moral questions implicated by these proceedings. How ought the United States combat and deter terrorism? How can the United States balance the importance of compensating terrorism victims against other foreign policy priorities when they are in tension? What does the United States owe the Afghan people? On what terms ought the United States engage with foreign actors when they harbor opposing worldviews, goals, or global terrorists?

These questions cannot and should not be answered by courts. As the Supreme Court has wisely admonished,

> [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948). Similar principles continue to guide courts to this day. *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018) ("The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns.").

Here, the political branches have spoken: Congress gave the President the authority to impose sanctions that block the assets of terrorists subject to U.S. jurisdiction.[23] The President designated the Taliban as a terrorist entity.[24] Congress enacted TRIA to remove obstacles preventing victims of terrorism from enforcing their judgments in cases where a terrorism judgment debtor's assets are blocked.[25] On February 11, 2022, the President issued Executive

---

[23] International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*

[24] Exec. Order No. 13,268 § 1, 67 Fed. Reg. 44,751 (July 2, 2002); 31 C.F.R. §§ 594.201(a), 594.310.

[25] *See Weininger*, 462 F. Supp. 2d at 483.

Order 14,064, which blocked DAB's U.S.-based assets; announced the administration's intent to facilitate the use of $3.5 billion of DAB's blocked U.S.-based assets for the benefit of the Afghan people "while keeping them out of the hands of the Taliban and malicious actors"; and determined that the other $3.5 billion of DAB's U.S.-based assets would remain "subject to ongoing litigation by U.S. victims of terrorism," in which "Plaintiffs will have a full opportunity to have their claims heard in court."[26] President Biden thus specifically determined that terror victims may seek to satisfy their judgments against the Taliban by executing on the remaining DAB Assets, subject to the Court's determination that such execution comports with the applicable legal principles.

Against the backdrop of these choices by the political branches—each of which struck a balance or resolved a tension between competing policy priorities—the Court's role is significant but circumscribed. President Biden's February 11, 2022 decisions and the accompanying U.S. Statement of Interest filed in this case make clear that the Executive Branch expects this Court to resolve the judgment holders' motions under TRIA on the merits, and has confirmed the Court's authority to do so. *See* Feb. 11 Fact Sheet, *supra* n.4; U.S. Statement 5 ("The Court should afford the Judgment Plaintiffs a full opportunity [to] . . . [set] forth their arguments regarding the attachability of the unlicensed DAB Assets . . . [and then] evaluate the Judgment Plaintiffs' claims in light of settled legal principles, described herein, and against the backdrop of the President's prerogatives to conduct the Nation's foreign policy."). There is thus no cause for concern that, in exercising its authority to evaluate the specific legal issues presented by the turnover motions, the Court will invade upon questions reserved exclusively for the political branches. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).

---

[26] *See* Feb. 11 Fact Sheet, *supra* n.4. The set of decisions unveiled by the President on February 11 were the result of months of deliberation requiring "the significant involvement of numerous senior officials and executive agencies" at "the highest levels of Government." Dkt. 7390. *See also* Dkts. 7268, 7629, 7661 (explaining the Government's deliberations between October 2021 and February 2022).

But at the same time, the Court's role is limited. It is not to "supplant a foreign policy decision of the political branches with [its] own unmoored determination of what United States policy toward [Afghanistan] should be," but rather to determine whether it can "enforce a specific statutory right." *Id.* That is, the Court's role is to decide whether, under TRIA and "settled legal principles," U.S. Statement 5, the Joint Creditors may satisfy their judgments against the Taliban by executing on DAB's blocked assets in the United States.

It nonetheless bears noting that granting the Joint Creditors' turnover motions would be entirely consistent with longstanding policy determinations of the political branches. In the decades since the September 11 attacks, the United States has aimed powerful financial weapons at terrorist organizations and their supporters, "reflecting the recognition that one way to forestall terrorist attacks is to deprive terrorist organizations of money."[27] Blocking the assets of terrorist organizations like the Taliban prevents them from using those resources to cause harm. Further, as Congress understood in passing TRIA, allowing terror victims the chance to satisfy their judgments against the blocked assets of terrorist organizations makes such deprivation permanent, further deterring terrorist activity.[28] By allowing attachment of assets that previously would be

---

[27] *Terrorist Financing and the Islamic State: Hearing Before the H. Comm. on Financial Services* (Nov. 13, 2014) (statement of David Cohen, Under Secretary of the Treasury).

[28] 148 Cong. Rec. H6134 (daily ed., Sept. 10, 2002) (statement of Rep. Vito Fossella) ("At present, terrorism is a cheap way to pursue war against Americans. Unless America finds ways to make it more costly, terrorists and those states that sponsor terrorism have no economic incentive to stop. By imposing a direct and immediate cost, this provision represents one effective financial tool, one of many, against terrorists and those who help them, and this will seek to help the victims."); *id.* (statement of Rep. Chris Cannon) ("Unless the U.S. finds ways to make it more costly, terrorists and states which sponsor terrorism have less economic incentive to stop. By imposing a direct and immediate cost, this language represents one effective financial tool against terrorists and also helps their victims."); *id.* at H6136 (statement of Rep. Mel Watt) ("Compensating victims will not end terrorism as we know it, but it does raise the price, and it sends a message to terrorist organizations and the states that sponsor them, we will not stand for the murder of innocent Americans. Those who target Americans will be punished and not only will you be punished criminally, you will be punished financially as a result of this language. *Using terrorists' assets to compensate victims punishes terrorists and deters future acts of violence*[.]") (emphasis added).

24

entitled to sovereign immunity, TRIA significantly reduces the incentives for a terrorist entity to violently seize the machinery of a state and turn its resources into tools of terror—a circumstance with which Congress was intimately familiar when it enacted TRIA in 2002. *See* Havlish Mot. 23.

The freezing of DAB's assets in August 2021 reflected the United States' and the international community's continued understanding that the Taliban is a dangerous, sanctions-designated organization. The Taliban's return to control in Afghanistan risks repeating the history of the late 1990s, when the Taliban used its dominance over Afghan territory and institutions (including DAB) to materially support al Qaeda, paving the way for the deadliest terrorist attacks in modern history. *See* Zerden Decl. ¶ 40. Today's Taliban has seized the same territory and the same institutions (including DAB), installed sanctioned terrorists throughout (including in DAB's leadership), and continues to maintain "close ties" to al Qaeda.[29] The current array of terrorism sanctions imposed on the Taliban, and the United States' decision to block the DAB Assets so that they cannot be made available to the Taliban, is a reflection of the political branches' clear-eyed assessment that the Taliban would use those assets for malign purposes. Because of Congress's decision that such blocked assets should be provided to terror victims rather than held in indefinite limbo, those assets must be turned over to the Joint Creditors.

## III.  Conclusion

For the foregoing reasons, the Havlish and Doe Creditors' motions for turnover should be granted.

---

[29] *See* U.N. Doc. S/2022/83, *supra* n.2, at 5-6, 15 (noting that "Al-Qaida . . . received a significant boost following the Taliban takeover of Afghanistan in August 2021, as some of its closest sympathizers within the Taliban now occupy senior positions in the new de facto Afghan administration," and further noting that after the Taliban takeover, "terrorist groups enjoy greater freedom [in Afghanistan] than any time in recent history"); State Department Report, *supra* n.2 (the Taliban and al Qaeda "remain[] close").

Dated: May 13, 2022

*/s/ Lee S. Wolosky*
Lee S. Wolosky
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1628
lwolosky@jenner.com

Douglass A. Mitchell *(pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6090
dmitchell@jenner.com

Dennis G. Pantazis
(AL Bar No. ASB-2216-A59D)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB, LLC (Lead Counsel)
301 19th Street North
Birmingham, AL 35203
(205) 314-0500

Timothy B. Fleming (DC Bar No 351114)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB PLLC
2202 18th Street, NW, #110
Washington, DC 20009-1813
(202) 467-4489

Richard D. Hailey (IN Bar No. 7375-49)
RAMEY & HAILEY
P.O. Box 40849
Indianapolis, IN 46260
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
FOOTE, MIELKE,
CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
(630) 232-7450

Stuart H. Singer (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Phone 954 356 0011
Fax 954 356 0022

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Phone 212 446 2300

*Counsel for the Havlish Creditors*

*/s/ Orlando do Campo* .
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
Phone 305 358 6600
Email od@dandtlaw.com

John Thornton (*pro hac vice*)
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
Phone 305 358 6600
Email jt@dandtlaw.com

Daniela Jaramillo (*pro hac vice*)
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
Phone 305 358 6600
Email dj@dandtlaw.com

*Counsel for the Doe Creditors*