**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re Terrorist Attacks on September 11, 2001 | Case No. 03-md-1570 (GBD) (SN) |
| Federal Insurance Company, et al.,<br><br>　　　Creditors,<br><br>v.<br><br>The Taliban, et al.,<br><br>　　　Debtors,<br><br>Federal Reserve Bank of New York,<br><br>　　　Garnishee. | Case No. 03-cv-6978 (GBD) (SN) |

**MEMORANDUM OF LAW IN SUPPORT OF THE**
***FEDERAL INSURANCE* CREDITORS' RESPONSE TO THE LIMITED MOTION TO**
**INTERVENE OF *JAMES OWENS, ET AL.*, AND CROSS-MOTION TO VACATE THE**
***OWENS EX PARTE* PROVISIONAL PREJUDGMENT ATTACHMENT**

May 27, 2022

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

II.     BACKGROUND ............................................................................................................ 4

  A.   The Turnover Proceedings And Executive Order 14064 ..................................................... 4

  B.   The *Owens* Plaintiffs' Unlawful Prejudgment Attachment Efforts .................................... 5

III.    ARGUMENT .................................................................................................................. 8

  A.   This Court Has Jurisdiction To Vacate The *Owen*s Plaintiffs' Unlawful
       Prejudgment Attachment ............................................................................................ 8

  B.   The International Economic Powers Act And Executive Order 14064 Prohibit
       And Nullify The *Owens* Plaintiffs' Prejudgment Order Of Attachment ........................ 10

    1.   The Governing Statutory and Regulatory Framework..................................................... 11

    2.   IEEPA and Executive Order 14064 Expressly Prohibit and Preempt Unlicensed
         Prejudgment Attachments Against Blocked Property..................................................... 13

    3.   The *Owens* Plaintiffs' Arguments That the Blocking Order Does Not Prohibit
         Their Prejudgment Attachment are Meritless ............................................................. 14

  C.   The *Owens* Plaintiffs Are Not Eligible For TRIA, Which Provides The Exclusive
       Remedy For Attaching Blocked Property.......................................................................... 17

  D.   The Order Of Attachment Must Be Vacated Because It Was Granted Solely To
       Gain Priority Over Other Creditors, And For No Other Legally Valid Reason .............. 19

  E.   The *Owens* Plaintiffs Cannot Establish Priority Based Solely On A Provisional
       Unconfirmed Ex Parte Prejudgment Order Of Attachment............................................. 21

IV.     CONCLUSION................................................................................................................ 22

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ames v. Clifford,*
    863 F. Supp. 175 (S.D.N.Y. 1994) .........................................................................20

*Bank of China, New York Branch v. NBM L.L.C.,*
    192 F. Supp. 2d 183 (S.D.N.Y. 2002).....................................................................22

*Chas T. Main Int'l v. Khuzestan Water & Power Auth.,*
    651 F.2d 800 (1st Cir. 1981).................................................................................14

*Chevron Corp. v. Donziger,*
    2011 WL 2150450 (S.D.N.Y. May 31, 2011) ........................................................10

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981)..............................................................................12, 14, 16

*Doe v. J.P. Morgan Chase Bank, N.A.,*
    899 F.3d 152 (2d Cir. 2018).............................................................................2, 3, 14

*First Small Bus. Inv. Corp. v. Zaretsky,*
    259 N.Y.S.2d 700 (Sup. Ct. 1965)...........................................................................9

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ,*
    919 F. Supp. 2d 411 (S.D.N.Y. 2013).....................................................................11

*J.V.W. Inv. Ltd. v. Kelleher,*
    41 A.D.3d 233 (1st Dept. 2007)........................................................................20, 21

*Koehler v. Bank of Bermuda Ltd.,*
    12 N.Y.3d 533 (2009) ............................................................................................20

*Levin v. Bank of N.Y.,*
    2022 WL 523901 (S.D.N.Y Feb. 22, 2022)...........................................................13

*Ministry of Def. & Support for the Armed Forces of the Republic of Iran v. Cubic
    Def. Sys., Inc.,* 984 F. Supp. 2d 1070 (S.D. Cal. 2013).........................................18

*Ministry of Def. & Support for the Armed Forces of the Republic of Iran v. Elahi,*
    556 U.S. 366 (2009).........................................................................................14, 17

*Mobil Oil Corp. v. Doe,*
    1981 U.S. Dist. LEXIS 9437 (S.D.N.Y. Feb. 6, 1981)...........................................10

*Neshewat v. Salem*,
   365 F. Supp. 2d 508 (S.D.N.Y. 2005)..................................................................................9

*New England Merchants Nat'l Bank v. Iran Power Generation & Trans. Co.*,
   502 F. Supp. 120 (S.D.N.Y. 1980) ....................................................................................17

*Peterson v. Islamic Republic of Iran*,
   627 F.3d 1117 (9thh Cir. 2010) .......................................................................................13

*Rafferty v. Taylor Rafferty Associates, Inc.*,
   2010 WL 2639225 (Sup. Ct. N.Y. June 21, 2010)..............................................................20

*Regan v. Wald*,
   468 U.S. 222 (1984)........................................................................................................12

*Rothman v. Rogers*,
   221 A.D.2d 330 (2d Dept. 1995) .....................................................................................22

*Rubin v. Islamic Republic of Iran*,
   709 F.3d 49 (1st Cir. 2013)..............................................................................................11

*S&S Mach. Co. v. Masinexportimport*,
   706 F.2d 411 (2d Cir. 1983)............................................................................................13

*Smith ex. rel. v. Est. of Smith v. Fed. Rsrv. Bank of New York*,
   346 F.3d 264 (2d Cir. 2003).................................................................................3, 18, 22

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
   560 F. Supp. 3d 81 (D.D.C. Aug. 12, 2021) ......................................................................12

*U.S. Commodity Futures Trading Comm'n v. Effosman*,
   2010 WL 2510338 (S.D.N.Y. June 26, 2012) ....................................................................10

*United States v. Holy Land Found. For Relief & Dev.*,
   722 F.3d 677 (5th Cir. 2013) ...........................................................................................18

*Weinstein v. Islamic Republic of Iran*,
   299 F. Supp. 2d 63 (S.D.N.Y 2004)........................................................................12, 14, 15

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
   750 F. Supp. 2d 150 (D.D.C. 2010) ..................................................................................12

## Statutes and Rules

Fed. R. Civ. P. 64(a) ...............................................................................................................10

Foreign Sovereign Immunities Act of 1976,
   Pub L. No. 94–583, 90 Stat. 2891 (codified at 28 U.S.C. § 1602 *et seq.*) ..........................6, 13

International Emergency Economic Powers Act,
Pub. L. No. 95–223, 91 Stat. 1625 (codified at 50 U.S.C. § 1701 *et seq.*) ...................... *passim*

N.Y. C.P.L.R. § 5225 ......................................................................................................8, 9

N.Y. C.P.L.R. § 5239 ......................................................................................................8, 9

N.Y. C.P.L.R. § 6201 ................................................................................................6, 19, 20

N.Y. C.P.L.R. § 6205 ........................................................................................................13

N.Y. C.P.L.R. § 6211 ..........................................................................................................6

N.Y. C.P.L.R. § 6212 ..........................................................................................................6

Terrorism Risk Insurance Act of 2002 § 201,
Pub. L. No. 107–297, 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note) .................... *passim*

**Administrative and Executive Materials**

31 CFR § 501.801 .............................................................................................................11

31 CFR § 535.310 .............................................................................................................15

31 CFR § 541.309 .............................................................................................................15

31 CFR § 542.317 .............................................................................................................15

31 CFR § 546.309 .............................................................................................................15

31 CFR § 547.309 .............................................................................................................15

31 CFR § 548.309 .............................................................................................................15

31 CFR § 549.309 .............................................................................................................15

31 CFR § 550.314 .............................................................................................................15

31 CFR § 551.314 .............................................................................................................15

31 CFR § 552.311 .............................................................................................................15

31 CFR § 562.308 .............................................................................................................15

31 CFR § 569.311 .............................................................................................................15

31 CFR § 570.310 .............................................................................................................15

31 CFR § 582.311 ...................................................................................................15

31 CFR § 591.310 ...................................................................................................15

31 CFR § 594.202 ...............................................................................................2, 11

31 CFR § 594.312 ...............................................................................................2, 15

31 CFR § 597.317 ...............................................................................2, 11, 15, 16

44 Fed. Reg. 67,617 (1979) ..................................................................................17

44 Fed. Reg. 75,353 (1979) ..................................................................................17

Exec. Order 14064, 87 Fed. Reg. 8391 (Feb. 11, 2022) ....................... *passim*

**Other Authorities**

Siegel, *New York Practice*, § 316 (6th ed.) ......................................................21

Judgment Creditors *Federal Insurance Co., et al.* (the "*Federal Insurance* Creditors")[1] respectfully submit this memorandum of law in response to the Limited Motion to Intervene of James Owens, et al., and in support of the *Federal Insurance* Creditors' Cross-Motion to Vacate the *Ex Parte* Prejudgment Attachment issued on March 21, 2022 in *Owens, et al. v. Taliban, et al.,* No. 1:22-cv-01949-VEC (S.D.N.Y.).

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

On May 13, 2022, plaintiffs in *Owens v. Taliban,* No. 1:22-cv-01949-VEC (S.D.N.Y.) (the "*Owens* plaintiffs") moved to intervene in the ongoing turnover proceedings of the *Federal Insurance* Creditors before this Court, "for the limited purpose of opposing the *Federal Insurance* creditors' Motion for Partial Turnover" and "asserting their priority to the funds at issue." ECF No. 8020 at 1. The *Owens* plaintiffs claim that a provisional, unconfirmed, *ex parte* prejudgment order of attachment issued by Judge Caproni as to certain blocked Da Afghanistan Bank ("DAB") funds held at the Federal Reserve Bank of New York ("FRBNY"), issued before they even served their complaint, establishes their priority over the *Federal Insurance* Creditors as to the funds at issue. *Id.* It cannot do so, because that attachment is "null and void" pursuant to an executive order of the President of the United States.

The *Owens* plaintiffs further claim that this Court is not the appropriate forum "adjudicate the validity of [their] order of attachment against the blocked DAB funds," *id.* at 2*,* even though this Court is presiding over the turnover proceedings and despite the fact that their claims of priority depend entirely on the validity of their *ex parte* prejudgment attachment. That

---

[1] The *Owens* plaintiffs' opposition to the *Federal Insurance* Creditors' turnover request is directly adverse to the interests of all plaintiffs who have joined the Framework Agreement. *See* ECF Nos. 7790 and 7937 at 1-2. Accordingly, the *Burnett*, *O'Neill*, *Havlish*, *Hoglan*, *Grazioso*, *Ray*, and *Ryan* plaintiffs join in this response and cross-motion to vacate.

is wrong; as Judge Daniels repeatedly emphasized last month,[2] this Court is the *only* appropriate forum for adjudicating issues relating to the turnover of the blocked DAB funds (including the *Owens* plaintiffs' misguided claims of priority). In exercising that authority, it is both appropriate and necessary for this Court to evaluate the validity of the *ex parte* (and unconfirmed) prejudgment attachment which forms the sole basis of their challenge to the *Federal Insurance* Creditors' turnover.

Because that prejudgment attachment is squarely prohibited by governing federal law and binding Second Circuit precedent—and amounts to an unlawful interference with the President's foreign policy and national security powers—it has no effect and can pose no hurdle to these turnover proceedings.

This conclusion flows inevitably from the fact that the DAB funds are "blocked" pursuant to Executive Order 14064, and cannot be attached, restrained, "transferred," or "otherwise dealt in" in any way. *See* Executive Order 14064, "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan," 87 Fed. Reg. 8391 (Feb. 11, 2022) (hereinafter "E.O. 14064"). For decades, the President of the United States has issued orders using identical terminology in order to bar any judicial attachment of blocked assets. *See* 31 CFR §§ 594.202, 594.312, and 597.317 (prohibiting attachment of "blocked" assets); chart of Office of Foreign Assets Control ("OFAC") regulations defining the term "transfer" at Exhibit A hereto. Courts have long recognized the same. *Doe v. J.P. Morgan Chase Bank*, 899 F.3d 152,

---

[2] *See* April 26, 2022 Conference Transcript ("Tr.") at 3:6-12 ("My intent is to resolve whatever issues need to be resolved in the current turnover proceedings … because this is where we're going to decide this issue."); 19:12-14 ("The appropriate place to resolve those issues and understand how we were ultimately going to proceed is in this forum, in this courtroom."); Tr. 39:14-21 ("Remember, this is the forum that we're going to resolve these issues. That's the bottom line of this proceeding. We're going to resolve it here, not before Judge Caproni, not before some other judge in this court, not in some other duplicative proceeding that is to address the same issues that we are already addressing here. Regardless of what any party believes, it is a more efficient, effective and advantageous way for us to proceed.").

156 (2d Cir. 2018) ("blocked" assets cannot be attached, except pursuant to § 201(a) of the Terrorism Risk Insurance Act). While Congress enacted Section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA") to allow parties (like the *Federal Insurance* Creditors) who have actual judgments against terrorists to attach the terrorists' blocked assets, the Second Circuit has unambiguously held that this remedy is wholly unavailable to the *Owens* plaintiffs precisely because they do not have a judgment. *Smith ex. rel. v. Est. of Smith v. Fed. Rsrv. Bank of New York*, 346 F.3d 264, 270-71 (2d Cir. 2003) (§201(a) permits judgment holders to execute against blocked assets, but confers no rights upon those who have not yet obtained judgments). The *Owens* plaintiffs' prejudgment attachment is thus precluded by federal law and must be vacated.

For the last several months, the *Owens* plaintiffs have been engaged in an extraordinary and improper effort to claim priority to the assets of a defendant they chose not to sue for 23 years, and that they have not yet even served with a complaint, predicated upon an *ex parte* state law prejudgment attachment remedy that is precluded by governing federal law. This gambit is without merit and has needlessly complicated both the actual turnover proceedings of actual judgment holders before this Court as well as the efforts of the 9/11 Community to implement the fair and equitable distribution of any funds eligible for turnover pursuant to the Framework Agreement between and among them. *See* ECF No. 7937 at 1-2. Indeed, the *Ashton* plaintiffs have cited the *Owens* plaintiffs' claims to priority as a principal justification for their "wholly inappropriate" class action. ECF No. 7912 at 3; *see also* April 26, 2022 Conference Transcript ("Tr.") at 11:7-14. This Court has jurisdiction and authority to put an end to the *Owens* plaintiffs' manifestly unlawful efforts to establish an interest in and restrain the blocked DAB funds

3

without a judgment and should do so by vacating their prejudgment attachment without further delay.

## II.   BACKGROUND

### A.   The Turnover Proceedings And Executive Order 14064

In late summer 2021, plaintiffs in *Havlish v. The Taliban,* No. 1:03-cv-09848 (GBD) (SN) (the "Havlish Creditors"), and *Doe v. The Taliban*, No. 1:20-mc-00740 (GBD) (SN) (the "*Doe* Creditors"), levied writs of execution against assets held at the FBRNY in the name of DAB pursuant to judgments against the Taliban. ECF Nos. 7764 at 9, 7769 at 8-9.  The United States thereafter requested a stay of the *Havlish* and *Doe* writs to allow the government an opportunity to evaluate whether to file a Statement of Interest. *Havlish* Dkt. 526 at 2.

On February 11, 2022, the deadline set by the Court for the United States to file its Statement of Interest, President Biden issued E.O. 14064, "blocking" the approximately $7 billion dollars of DAB funds at the FRBNY. 87 Fed. Reg. 8391 (February 11, 2022) (DAB assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in"). That same day, and pursuant to the President's express authorization in E.O. 14064, the Department of the Treasury issued a license authorizing the transfer of $3.5 billion of the DAB assets for aid to Afghanistan. As the government explained in its Statement of Interest, the remaining DAB funds remain blocked, and as a result "[a]ny other transactions involving any property or account blocked pursuant to the E.O. … are prohibited." Statement of Interest of the United States of America ("Statement of Interest"), ECF No. 7661 at 13. Indeed, the "[b]locking [of the DAB funds] immediately imposes an across-the-board prohibition against transfers *or dealings of any kind* with regard to the property."  *Id.* at 7 (quoting OFAC FAQs No. 9 ("What do you mean by 'blocking?'"), *available at* https://home.treasury.gov/policy-issues/financial-sanctions/faqs/9 (emphasis supplied)). As a result, the United States has indicated that this Court's analysis of the

validity of any attempt to attach the blocked DAB funds must be governed by the "statutory framework Congress enacted in [section 201 of the Terrorism Risk Insurance Act]," *id.* at 5, which permits *judgment* holders to attach blocked assets of terrorist parties in certain circumstances.

This Court thereafter lifted its stay, and on March 20, 2022, the *Havlish* and *Doe* Creditors moved for partial turnover of the blocked DAB funds, relying exclusively on the rights conferred upon them as judgment holders pursuant to section 201 of TRIA. ECF Nos. 7763-67, 7769-71. On April 20, 2022, the Court entered final judgment in favor of the *Federal Insurance* Creditors and against the Taliban, ECF No. 7888, and the *Federal Insurance* Creditors then also moved for partial turnover of certain DAB assets pursuant to their final judgment and TRIA, joining the already ongoing turnover proceedings of the *Havlish* and *Doe* Creditors. ECF Nos. 7936-38.

As discussed in the *Federal Insurance* Creditors' brief in support of their motion for partial turnover, ECF No. 7937, funds turned over pursuant to their motion and that of the *Havlish* Creditors will be distributed in accordance with the Framework Agreement described at ECF No. 7790, providing broad and equitable compensation to thousands of 9/11 community members who have been pursuing claims and judgments against the Taliban for nearly two decades. Through their unlawful prejudgment attachment efforts, the *Owens* plaintiffs seek to interfere with and prevent this just and equitable outcome.

### B.    The *Owens* Plaintiffs' Unlawful Prejudgment Attachment Efforts

On March 8, 2022, the *Owens* plaintiffs sued the Taliban for the first time, more than 23 years after the 1998 Embassy attacks giving rise to their injuries. *Owens v. Taliban,* No. 1:22-cv-01949-VEC (S.D.N.Y March 8, 2022) ("*Owens* Dkt." 1). On the same day, the *Owens* plaintiffs filed an emergency motion seeking an *ex parte* prejudgment attachment against the assets of the

"Central Bank of Afghanistan—Da Afghanistan Bank, or 'DAB'… held in DAB's name by the Federal Reserve Bank of New York," and blocked by E.O. 14064.  *Owens* Dkt. 5 at 2.  In support of their *ex parte* prejudgment attachment request, the *Owens* plaintiffs relied (and continue to rely) exclusively on state law prejudgment attachment remedies pursuant to CPLR § 6212(a) and CPLR § 6201, and their *ex parte* motion did not address prohibitions on any such prejudgment attachment based on the Executive Order or the associated federal law regime governing blocked property.

On March 21, 2022, relying on the selective legal authority presented to it *ex parte* by the *Owens* plaintiffs and in the undemanding setting of the preliminary motion before it, the *Owens* court granted a provisional prejudgment order of attachment (the "Prejudgment Order of Attachment" at *Owens* Dkt. 33). The Prejudgment Order of Attachment indisputably "dealt in" the blocked DAB funds by (1) granting a security interest in those funds in favor of the *Owens* plaintiffs; and (2) restraining $1,373,761,042.95 of those blocked funds. The *Owens* court's decision explaining its reasoning for granting the *ex parte* Prejudgment Order of Attachment, issued on March 21, 2022, focuses exclusively on the procedural requirements of CPLR §§ 6201, 6211, and 6212, and contains no discussion of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §1701 *et seq.,* the Terrorism Risk Insurance Act of 2002 ("TRIA"), 28 U.S.C. § 1610, note, the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §1602 *et seq.*, or the broader federal statutory regime governing transactions involving blocked property. *Owens* Dkt. 38. All of these federal laws were implicated by the *Owens* plaintiffs' motion, but the *Owens* plaintiffs either ignored or glossed over them in their *ex parte* motion papers.

Pursuant to the CPLR, an *ex parte* prejudgment attachment must be confirmed, and on May 2, 2022, the *Owens* plaintiffs filed their motion attempting to do so. *Owens* Dkt. 47-51. In that motion, the *Owens* plaintiffs belatedly and unsuccessfully attempted to address several of the aforementioned federal laws for the first time, *Owens* Dkt. 48 at 23-25, thereby reinforcing the incomplete and selective treatment of relevant legal authorities in their original *ex parte* motion, which served as the sole basis for the court's Prejudgment Order of Attachment.  The *Owens* plaintiffs' confirmation submissions thus acknowledge that significant legal issues bearing on the validity of their request for a Prejudgment Order of Attachment have not yet been addressed.

Contemporaneous with the filing of their confirmation motion, the *Owens* plaintiffs moved for an extension of time to serve that motion, and for approval to serve their complaint by alternative means. *Owens* Dkt. 43-45. Based on the projected timelines for completing those processes, they requested an adjournment of the Rule 16 initial conference in their case until August 12, 2022, which the *Owens* court granted. *Owens* Dkt. 55. Apparently recognizing that the turnover proceedings before this Court may very well be concluded before then, the *Owens* plaintiffs filed the instant motion to intervene in the *Federal Insurance* Creditors' turnover action, claiming priority to the funds at issue on the basis of their provisional, *ex parte*, and unconfirmed Prejudgment Order of Attachment (entered in a case in which they have yet to even serve the defendant), and asserting that this Court may not consider the validity of their Prejudgment Order of Attachment in evaluating that claim of priority. ECF No. 8020 at 2. In other words, they ask this Court to grant them priority over the *Federal Insurance* Creditors, while simultaneously demanding that the *Federal Insurance* Creditors be precluded from responding with the very arguments that establish that the *Owens* plaintiffs' claim of priority is

invalid as a matter of law. Not surprisingly, that is not how it works under either the Federal
Rules or the CPLR.

## III.   ARGUMENT

### A.   This Court Has Jurisdiction To Vacate The *Owens* Plaintiffs' Unlawful Prejudgment Attachment

The *Owens* plaintiffs' effort to avoid this Court's scrutiny of the validity of their

Prejudgment Order of Attachment is entirely meritless. This Court is presiding over all turnover

proceedings as to the blocked DAB funds, including claims of priority and challenges to same.

*See e.g.*, No. 1:22-cv-03228-GBD, Dkt. 7 (*Ashton* brief challenging priority). Consistent with its

role in overseeing the turnover proceedings, this Court has made absolutely clear that all issues

bearing on the turnover or distribution of the blocked DAB funds will be decided before this

Court, and that any party "who believes they have any interest, who are a part of the MDL or not

part of the MDL, in these funds, if they're not already here in this proceeding, should seek to

intervene, because this is where we're going to decide this issue." April 26, 2022 Conference

Transcript ("Tr.") at 3:8-12.[3]

This Court's directives are in accord with the CPLR, which specifically contemplates that

disputes like the present one should be decided in the turnover proceeding. Pursuant to CPLR §

5225(b) "[t]he court may permit any adverse claimant to intervene in the proceeding and may

determine his rights in accordance with section 5239." Section 5239 provides, in turn, that at any

---

[3] Addressing the *Owens* plaintiffs' gambit to secure priority in particular, this Court emphasized its ongoing coordination with Judge Caproni, stating that "I don't anticipate that Judge Caproni is going to take any action in that infant case to interfere with a determination that all of you are going to have an opportunity to participate in and will be resolved here and resolved with the availability and the distribution of those funds, if those funds are available to distribute to the parties." Tr. 15:1-7. "If the Owens plaintiffs want to come in and they think they've got an interest and they want to participate in the turnover proceeding, they can. But we intend to move forward and resolve this issues expeditiously, step by step, giving everyone an opportunity to be heard. There's no reason to believe that there's any concern that these issues are going to be resolved somewhere else before they're resolved here." Tr. 14:8-15.

time prior to turnover, "any interested person may commence a special proceeding against the

judgment creditor or other person with whom a dispute exists to determine rights in the property

or debt."[4] NY CPLR § 5239.  The Court in such a proceeding "may vacate the execution or

order." This statutory authorization to determine the rights of the adverse claimants in the

turnover proceeding necessarily authorizes the court to determine the legitimacy of the

claimant's entitlement to the funds. *See First Small Bus. Inv. Corp. v. Zaretsky*, 259 N.Y.S.2d

700, 702 (Sup. Ct. 1965) ("The last sentence has been added to [5225] subd. (b) to indicate that it

is intended that the rights of all claimants can be determined on this proceeding." (quoting Sixth

Report to the Legislature by the Senate Finance Committee Relative to the Revision of the Civil

Practice Act )); *see also Neshewat v. Salem*, 365 F. Supp. 2d 508, 524 (S.D.N.Y.

2005), aff'd, 194 F. App'x 24 (2d Cir. 2006) (declining to give priority to an adverse claimant

because it determined that claimant's interest was obtained through a fraudulent transfer).

By moving to intervene to oppose the *Federal Insurance* Creditors' turnover, the *Owens*

plaintiffs have placed the validity of their Prejudgment Order of Attachment at the heart of the

issues to be decided by this Court. Indeed, the *Owens* plaintiffs' opposition to the *Federal

Insurance* Creditors' turnover rests entirely on their claim that their Prejudgment Order of

Attachment gives them priority. The fact that the Prejudgment Order of Attachment is null and

void under federal law is, in turn, central to the *Federal Insurance* Creditors' arguments that the

*Owens* plaintiffs do not have priority, and have no basis to oppose the *Federal Insurance*

Creditors' turnover motion. Pursuant to the framework established by the CPLR, this Court can

---

[4] Pursuant to this authority, the *Federal Insurance* Creditors are cross-moving to vacate the *Owens* plaintiffs'
Prejudgment Order of Attachment, making all the more clear this Court's jurisdiction to resolve the present contest
in full.

and must resolve those issues in order to issue its determination as to the *Federal Insurance*
Creditors' turnover motion.

The decision in *U.S. Commodity Futures Trading Comm'n v. Effosman*, 2010 WL
2510338 (S.D.N.Y. June 26, 2012), cited by the *Owens* plaintiffs in support of their effort to
evade this Court's scrutiny of their prohibited Prejudgment Order of Attachment, does not
support the "limited" intervention they propose. That ruling, and others cited by the *Owens*
plaintiffs, merely endorse the unremarkable proposition that a party may intervene for purposes
of litigating a particular issue or claim, without becoming a party to the case generally. ECF No.
8020 at 11. But as to the claim a party elects to intervene to litigate, the *Owens* plaintiffs must
recognize that the Court retains flexibility over the scope of the intervention, and to subject that
party to the jurisdiction of the Court as to all relevant areas of dispute between the parties
bearing on that issue. *See, e.g.*, *Mobil Oil Corp. v. Doe*, 1981 U.S. Dist. LEXIS 9437 (S.D.N.Y.
Feb. 6, 1981) (to voluntarily intervene is to subject to jurisdiction for "a complete adjudication
by the Court of all issues between it and the adverse parties"); *Chevron Corp. v. Donziger*, 2011
WL 2150450, *7 (S.D.N.Y. May 31, 2011) (recognizing court's "flexibility over the scope of
intervention").

### B. The International Economic Powers Act And Executive Order 14064 Prohibit And Nullify The *Owens* Plaintiffs' Prejudgment Order Of Attachment

Pursuant to Fed. R. Civ. P. 64(a) "[a]t the commencement of and throughout an action,
every remedy is available that, under the law of the state where the court is located, provides for
seizing a person or property to secure satisfaction of the potential judgment. *But a federal statute
governs to the extent it applies*." Fed. R. Civ. P. 64(a) (emphasis supplied). Because the funds at
issue here are blocked, any attempt to attach or otherwise deal in those funds directly conflicts
with the International Emergency Economic Powers Act ("IEEPA") and President Biden's E.O.

14064. As demonstrated below, those federal laws apply to and plainly prohibit and preempt the *Owens* plaintiffs' Prejudgment Order of Attachment.

### 1.    The Governing Statutory and Regulatory Framework

IEEPA, 50 U.S.C. §§ 1701-1706, is the primary statutory authority for the United States' economic sanctions programs in furtherance of national security and foreign policy interests. IEEPA gives the President authority to take certain actions to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). To address declared emergencies and threats, the President may, *inter alia*, "regulate, direct and compel, nullify, void, prevent, or prohibit" transactions involving "any property in which any foreign country or a national thereof has any interest," *id.* § 1702(a)(1)(B), which is typically effected via issuance of an Executive Order. *See, e.g.*, *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ*, 919 F. Supp. 2d 411, 417 (S.D.N.Y. 2013) (identifying several Executive Orders issued pursuant to IEEPA). The President (through his designee, typically the Department of the Treasury's Office of Foreign Assets Control (OFAC)) may also "regulate" assets by licensing transactions, including by the owners or authorized agents of the assets, that would otherwise be prohibited. *See* 31 C.F.R. § 501.801 (describing OFAC's licensing authority).[5]

---

[5] OFAC "administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States." https://home.treasury.gov/policy-issues/office-of-foreign-assets-control-sanctions-programs-and-informationhttps://home.treasury.gov/policy-issues/office-of-foreign-assets-control-sanctions-programs-and-information. *See also Rubin v. Islamic Republic of Iran,* 709 F.3d 49, 55 (1st Cir. 2013) ("OFAC is responsible for administering sanctions imposed" by the President.). Among other sanctions programs, OFAC administers the Global Terrorism Sanctions Regulations (the "GTSR"), 31 CFR part 594, and the Foreign Terrorist Organizations Sanctions Regulations (the "FTOSR"), 31 CFR part 597.

Of particular importance here is the President's authority to "block" assets within the United States that belong to foreign parties, in this case the Taliban. "Blocking immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property." *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63, 75 (S.D.N.Y 2004) (quoting U.S. Treasury Dep't Office Foreign Assets Control Regulations for the Financial Community, at p. 4 (Dec. 27, 2002)[6]; Statement of Interest (ECF No. 7761 at 7) ("Blocking immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property."). The blocking and licensing powers stem from the President's long-recognized discretion and authority in the arena of foreign policy, *see, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 678-80 (1981), and have been expressly confirmed by Congress. In view of the President's constitutional authority, courts have accorded significant deference to the Executive's conduct of foreign policy via blocking and licensing actions. *See, e.g.*, *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) (quoting *Regan v. Wald*, 468 U.S. 222, 242 (1984) (opining that "courts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders" and citing cases); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 94 (D.D.C. Aug. 12, 2021) ("Deference for agency decision-making is heightened in the context of executive blocking decisions, which lie at the intersection of national security, foreign policy, and administrative law." (citation omitted)).

On February 11, 2022, pursuant to his statutory powers under IEEPA, President Biden issued E.O. 14064, which in relevant part provides:

> **Section 1**. (a) All property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York are *blocked* and may not be

---

[6] The OFAC definition of "blocked" remains the same today.  https://home.treasury.gov/system/files/126/facbk.pdf.

*transferred,* paid, exported, withdrawn, *or otherwise dealt in*, except as set forth in subsections (b) and (c) of this section.. . .

(c) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order…

**Sec. 3** (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

E.O. 14064, 87 Fed. Reg. 8391 (Feb. 11, 2022) (emphasis supplied).

### 2.    IEEPA and Executive Order 14064 Expressly Prohibit and Preempt Unlicensed Prejudgment Attachments Against Blocked Property

The federal statutory framework of the IEEPA and E.O. 14064 preempts conflicting state laws on attachment and execution. *See Levin v. Bank of N.Y.,* 2022 WL 523901, *4 (S.D.N.Y Feb. 22, 2022) (to the extent that CPLR Article 52, addressing execution of judgments, conflicts with TRIA and the FSIA, it is preempted) (citing *Peterson v. Islamic Republic of Iran,* 627 F.3d 1117, 1130 (9th Cir. 2010) ("California law on the enforcement of judgments applies to this suit insofar as it does not conflict with the FSIA")). Accordingly, the Prejudgment Order of Attachment must be vacated because federal law applies and precludes prejudgment attachment of blocked assets[7]

The *Owens* plaintiffs concede that the DAB funds are blocked and that E.O. 14064 expressly "blocks any further transactions involving those assets absent a license from the Executive Branch." *Owens* Dkt. 5 at 8-9. Property that is lawfully blocked under IEEPA is

---

[7] In their *ex parte* motion for prejudgment attachment, the *Owens* plaintiffs represented that the funds at issue were assets of the "Central Bank of Afghanistan." *Owens* Dkt. 5 at 8-9. While the *Owens* plaintiffs have since moved away from this view, *Owens* Dkt. 48 at 23-24, the position stated in their original motion precluded the prejudgment attachment they were requesting in that motion. This is because the assets of a foreign state bank are immune from attachment under the FSIA. *See S&S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983). ("State-owned central banks indisputably are included in the §1603(b) definition of 'agency or instrumentality.'"). *See also* CPLR § 6205 (authorizing attachment against foreign states and their agencies only in aid of execution and not prejudgment). The fact that the issue was not even addressed in their papers or the Court's decision underscores the essentially pro forma nature of the *ex parte* process. TRIA overcomes these immunities from attachment, but only where the plaintiff seeking to attach the funds has a judgment.

"impervious to judicial attachment" without an OFAC license or statutory right of attachment pursuant to TRIA. *Chas T. Main Int'l v. Khuzestan Water & Power Auth.,* 651 F.2d 800, 806 (1st Cir. 1981); *see also Dames & Moore,* 453 U.S. at 673 (licensed prejudgment attachment against blocked funds is null and void as President has right to revoke license at any time); *Ministry of Def. & Support for the Armed Forces of the Republic of Iran v. Elahi,* 556 U.S. 366, 369 (2009) (TRIA is the sole mechanism to "attach…assets that the United States has '*blocked.'*") (emphasis in the original); *Doe v. JP Morgan Chase Bank, N.A.,* 899 F.3d 152, 156 (2d Cir. 2018) ("Unless a judgment creditor acquires a license from the OFAC, the creditor is typically barred from attaching blocked assets."). The *Owens* plaintiffs' own admission thus establishes that the Prejudgment Order of Attachment must be vacated, because the blocking of property under IEEPA operates as an "across–the–board prohibition against any transfers or transaction of any kind with regard to the property." *Weinstein*, 299 F. Supp. 2d at 75 (quoting U.S. Treasury Dep't Office Foreign Assets Control Regulations for the Financial Community, at p. 4 (Dec. 27, 2002); U.S. Statement of Interest at p. 7 (same).

The *Owens* plaintiffs have never suggested that they have a license from OFAC authorizing the prejudgment attachment of the DAB funds, and they certainly do not. Thus, their Prejudgment Order of Attachment is directly prohibited by the President's order blocking the DAB funds and must be vacated.

### 3.    The *Owens* Plaintiffs' Arguments That the Blocking Order Does Not Prohibit Their Prejudgment Attachment are Meritless

In their brief in support of their motion to confirm, the *Owens* plaintiffs briefly contend that their prejudgment attachment does not violate the terms of the President's blocking order, under the theory that it does not amount to a transfer of ownership. *Owens* Dkt. 48 at 25, n.10. In support of this meritless position, they rely almost exclusively on the definition of the word

"transfer" in Merriam-Webster's Dictionary, and urge that it should govern the interpretation of the blocking order. *Id.* The *Owens* plaintiffs further assert that OFAC regulations[8] that define the term "transfer" as including any "attachment" are all somehow irrelevant here, because OFAC has not yet formally promulgated regulations pursuant to the February 11 Executive Order. *Id.* at 25, n.10. These arguments are nonsensical for at least three reasons.

First, the *Owens* plaintiffs conspicuously ignore the fact that the President did not merely prohibit the "transfer" of the DAB funds, but instead directed that the funds are "blocked" and may not be "otherwise dealt in." E.O. 14064. Again, the blocking of the property imposes an across-the-board prohibition on "any transaction of any kind" involving the property. *Weinstein*, 299 F. Supp. at 75. And the express prohibition against "otherwise deal[ing] in" the assets makes even more clear that the President's order does not merely preclude the transfer of the funds to a new owner, but instead bars any attempt whatsoever to engage with, restrain, or pursue an interest in the assets.

Second, the term "transfer" as used in the Executive Order is a term of art within the federal sanctions regimes. In that context, the Executive Branch and OFAC uniformly define the term "transfer" to include (and prohibit) any attachment. For example, OFAC's terrorism sanctions regulations provide, in relevant part, that:

> [t]he term transfer means any actual or purported act or transaction, with the purpose, intent, or effect of which is to create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property and, without limitation upon the foregoing, shall include…the issuance, docketing, filing, or levy of or under any judgment, decree,

---

[8] In addition to 31 CFR §§ 594.312 and 597.317, *supra*, a host of OFAC sanctions regulations (that is, more than two dozen) similarly define a "transfer" so as to include an "attachment," using language either identical, or virtually identical, to §§ 594.312 and 597.317.  *See e.g.*, 31 CFR §§ 535.310 and 562.308 (for purposes of Iranian sanctions, definition of "transfer" includes "attachment"); § 541.309 (same for Zimbabwe sanctions); §§ 542.317 and 569.311 (same for Syria sanctions); § 546.309 (same for Darfur sanctions); § 547.309 (same for Congo); § 548.309 (same for Belarus); § 549.309 (same for Lebanon); § 550.314 (same for Ethiopia); § 551.314 (same for Somalia); § 552.311 (same for Yemen); § 570.30 (same for Libya); § 582.311 (Nicaragua); and § 591.310 (Venezuela), among others.

attachment**,** injunction, execution, or other judicial or administrative
process or order, or the service of any garnishment.

31 CFR § 597.317. All extant blocking sanctions programs include identical or similar language

and have done so for the last *sixty years*. *See* OFAC regulations defining the term "transfer" at

Exhibit A. Given this decades-long practice, the President's use of the term "transfer" in E.O.

14064 most certainly incorporated the expansive definition of that term used across the federal

sanctions regimes, and the *Owens* plaintiffs offer no credible argument to support their claim that

the Court should shun that legal definition and supplant it with a dictionary definition.

Third, the *Owens* plaintiffs' suggestion that the Court should adopt an exceedingly

narrow view of the universe of transactions prohibited by the blocking order is deeply contrary to

the President's near plenary authority to control blocked assets (subject to TRIA), and the

deference due the President in this area. Once again, the President's blocking and licensing

power stems from his authority to conduct U.S. foreign policy. In furtherance of the exercise of

that Constitutional authority, "the congressional purpose in authorizing blocking orders [such as

IEEPA] is 'to put control of foreign assets in the hands of the President…'", *Dames and Moore,*

453 U.S at 673. There is no room for state law to constrain or interfere with the President's vast

economic and sanction powers in this area. Here, the *Owens* plaintiffs have admitted that they

have sought the Prejudgment Order of Attachment to restrain the President from licensing or

otherwise dispersing the assets in furtherance of our nation's foreign affairs, *Owens* Dkt. 38 at

11, and the language of the Order does in fact purport to do so. It thus plainly amounts to an

unlawful interference with the President's foreign policy powers.

This conclusion is all the more clear in light of the government's Statement of Interest

specifically affirming that the blocking of the assets dictates that any effort to attach them must

run exclusively through TRIA. ECF No. 7661 at 19. Again, courts accord the Executive Branch

considerable deference in relation to Presidential blocking actions, and that deference plainly favors an expansive reading of the scope of transactions prohibited by the blocking order and conclusion that TRIA provides the only path for terrorism victims to pursue attachment of those blocked funds. The scope of the President's authority to control blocked assets and principles of deference afforded the Executive in this context thus provide an additional bases for repudiating the *Owens* plaintiffs' efforts to evade the blocking order and TRIA, and further underscore that their Prejudgment Order of Attachment must be vacated.

Finally on this point, the *Owens* plaintiffs' reliance in their confirmation brief on the pre-TRIA decision in *New England Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.,* 502 F. Supp. 120, 131 (S.D.N.Y. 1980), for the principle that blocking orders "do not inexorably foreclose prejudgment attachment," is equally misguided. *Owens* Dkt. 48 at 25, n.10. Unlike here, in *New England Merchants,* the Treasury Department specifically issued regulations authorizing judicial proceedings against the assets, and expressly authorized pre-judgment attachment under those judicial proceedings. 44 Fed. Reg. 67,617 (1979); 44 Fed. Reg. 75,353 (1979). When the President later revoked those regulations, the attachments issued thereunder were dissolved. Far from supporting the *Owens* plaintiffs' actions here, *New England Merchants* demonstrates that prejudgment attachments (and for that matter any attachments) of blocked assets are prohibited absent a specific and express statutory or regulatory authorization.

**C.    The *Owens* Plaintiffs Are Not Eligible For TRIA, Which Provides The Exclusive Remedy For Attaching Blocked Property**

Congress enacted TRIA as the sole mechanism to attach blocked assets of terrorist parties without a license from OFAC. *See Elahi,* 556 U.S. at 369 (TRIA is the sole mechanism to "attach…assets that the United States has *blocked."*) (emphasis in the original). But TRIA

provides no basis for the *Owens* plaintiffs to attach the DAB funds because the *Owens* plaintiffs have no judgment. As the Second Circuit has explained:

> [section 201] states simply that blocked assets "shall be the subject to execution or attachment in aid of execution." . . . We believe that the plain meaning of that language is to give terrorist victims who *actually receive favorable judgments* a right to execute against assets that would otherwise be blocked. Thus, *although the statute applies broadly to* "*every case in which a person has obtained a judgment,*" *it confers no entitlement in victims who have not yet obtained judgments.*

*Smith,* 346 F.3d at 270-71; *see also United States v. Holy Land Found. For Relief & Dev.*, 722 F.3d 677, 688 (5th Cir. 2013) (terrorist victims have no rights in blocked assets until they receive a judgment because the only rights they have to blocked assets derive from TRIA and TRIA requires a judgment); *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.,* 984 F. Supp. 2d 1070, 1093 (S.D. Cal. 2013) ("TRIA's attachment remedy is available to those who hold judgments.").

The *Owens* plaintiffs argue that TRIA applies only to post-judgment attachments and should be deemed irrelevant to prejudgment attachment efforts directed at blocked assets. They are correct, but that only further demonstrates the legal impossibility of their attachment. TRIA was enacted to deal "comprehensively" with the attachment of blocked assets by terrorism victims, and in striking the delicate balance between the compensation interests of terrorism victims and the President's power to block and license property in furtherance of U.S. foreign policy, Congress expressly required a judgment as a precondition to attaching blocked assets. *See Smith,* 346 F.3d at 271. Consistent with this requirement, the government in its Statement of Interest has made clear that any effort to attach the blocked DAB funds must run through TRIA. ECF No. 7661. Because the *Owens* plaintiffs do not satisfy the one essential condition for relief

through TRIA—possession of an eligible judgment—there is no mechanism available for them to reach blocked assets.

### D.    The Order Of Attachment Must Be Vacated Because It Was Granted Solely To Gain Priority Over Other Creditors, And For No Other Legally Valid Reason

Although this Court need not address the issue given that the Prejudgment Order of Attachment is plainly prohibited by federal law, the *Federal Insurance* Creditors respectfully submit that the *Owens* plaintiffs also cannot sustain their burden to establish valid grounds for a prejudgment attachment under CPLR § 6201(1). In their *ex parte* motion, the *Owens* plaintiffs argued (and the *Owens* court provisionally agreed) that prejudgment attachment was necessary because the DAB funds could be dissipated, and a prejudgment restraint was warranted to prevent such dissipation. According to the *Owens* court, "[a]llowing plaintiffs who have not obtained a judgment to jump the line cannot be the reason for granting the pre-judgment attachment; but, by the same token, the Second Circuit has held that the fact that granting a motion for pre-judgment attachment establishes priority also cannot be a reason not to grant pre-judgment attachment." *Owens* Dkt. 38 at 11. The *Owens* court went on to conclude that "[w]hile establishing priority over other potential creditors is clearly a motivating factor behind the [*Owens*] Plaintiffs' motion … the nature of the Taliban's limited assets in the United States and the potential disbursal of the funds … prevents this Court from finding anything other than the statutory ground has been met." *Id.* at 12.

The *Federal Insurance* Creditors respectfully submit that this conclusion would not survive the more demanding scrutiny applicable in a confirmation proceeding or motion to vacate, given the blocked status of the funds and the limited purposes for which a prejudgment attachment is warranted. In this regard, the proper purpose of a prejudgment attachment is to wrest control of the asset to be attached *from the debtor*, so that the *debtor* cannot frustrate the

attaching party's ability to collect on whatever judgment the attaching party may ultimately

obtain. *See Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 538 (2009). Prejudgment

attachment is *not* intended to be used as a means by which one creditor may secure priority over

another creditor. *See Ames v. Clifford*, 863 F. Supp. 175, 178 (S.D.N.Y. 1994); *accord J.V.W.*

*Inv. Ltd. v. Kelleher*, 41 A.D.3d 233, 234 (1st Dept. 2007) (remedy of prejudgment attachment

not intended to give a plaintiff priority over other creditors of the defendant); *Rafferty v. Taylor*

*Rafferty Associates*, Inc., 2010 WL 2639225 (Sup. Ct. N.Y. Co. June 21, 2010) (same).

Application of these principles to the present facts confirms that the *Owens* plaintiffs

have no legitimate grounds to obtain a prejudgment attachment. To begin with, the funds are

blocked and there is thus no risk that the judgment debtor – here, the Taliban – will remove the

assets from the jurisdiction.[9] And to the extent the *Owens* plaintiffs' prejudgment attachment was

sought to prevent the President from moving the funds – as they indicated at the time, *Owens*

Dkt. 38 at 11 – that is a manifestly improper purpose and represents an unlawful interference

with the President's foreign policy powers. *See supra* at 16.

The only potential remaining justification for the *Owens* plaintiffs' prejudgment

attachment is to establish their priority over other creditors, and they effectively acknowledge

that is their true objective. *See* Memorandum of Law in Support of Plaintiffs' *Ex Parte*

Emergency Motion for Order of Attachment, *Owens* Dkt. 5 at 22 ("Plaintiffs simply wish to

ensure that their rights are fully protected, and that they are not foreclosed *by other creditors*

from obtaining recovery.") (emphasis supplied). To secure priority *over other claimants* is *not*,

however, a proper use of CPLR § 6201 (*see Ames,* 863 F. Supp. at 178 and *J.V.W. Inv. Ltd.*, 41

---

[9] Further still, the entire pool of blocked funds has been restrained by the *Havlish* and *Doe* writs since late last summer, and remained so at the time the *Owens* plaintiffs sought their prejudgment attachment. *See John Does 1 Through 7 v. Taliban,* No. 4:20-CV-00605 (N.D. Tex.), Dkt. No. 27; *Havlish* Dkt. 526.

A.D.3d at 234, *supra*). The *Owens* plaintiffs' attempt to use it for that purpose here is especially inappropriate, as their "need" for a prejudgment attachment arises principally from their failure to sue the Taliban for 23 years following the attack giving rise to their injuries, which has not surprisingly placed them well behind the 9/11 judgment holders who have been pursuing their claims and judgments for two decades. The prejudgment attachment remedy plainly is not intended to compensate for such a lack of diligence, or to enable parties who have slept on their rights to disadvantage creditors who pursued timely claims in earnest. For these additional reasons, the Prejudgment Order of Attachment cannot be sustained.

E.     **The *Owens* Plaintiffs Cannot Establish Priority Based Solely On A Provisional Unconfirmed *Ex Parte* Prejudgment Order Of Attachment**

Relying on the general proposition that the first to deliver an attachment to the judicial officer for levy gains priority, the *Owens* plaintiffs assert that, because they delivered their unconfirmed, *ex parte* prejudgment attachment to the Marshal before the *Federal Insurance* Creditors were able to do so, they are entitled to priority. ECF No. 8020 at 1, 2, 10. Significantly, the *Owens* plaintiffs fail to cite any cases in which a court held that service of an unconfirmed, *ex parte* prejudgment attachment alone – which has not been confirmed or perfected by securing an actual judgment – establishes priority over an actual post-judgment execution attachment. The very fact that an *ex parte* attachment must be confirmed underscores its provisional nature, and why it would be inappropriate to allow a party to use such an unconfirmed order obtained through a non-adversarial preliminary motion to effectively stay a turnover proceeding and defeat the priority of an actual judgment holder. *See* Siegel, N.Y. Prac. § 316 (6th ed.), Applying for the Attachment ("The plaintiff has the burden of proof . . ., not a very difficult burden when the application is ex parte—there is no one to deny anything—but one that becomes quite important on the post-levy motion to confirm or on any motion the defendant may make to

21

vacate or modify the attachment."); *see also Bank of China, New York Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 186 (S.D.N.Y. 2002) (plaintiff bears burden to demonstrate in confirmation hearing that prejudgment attachment is proper); *Rothman v. Rogers*, 221 A.D.2d 330 (2d Dept. 1995) (court has broad discretion to vacate prejudgment attachment). Indeed, such a result would be deeply contrary to the spirit and intent of the CPLR.[10]

The text and purpose of TRIA reinforce this conclusion in the present context. Through TRIA, Congress authorized terrorist victims who secure *judgments*, such as the *Federal Insurance* Creditors, to attach blocked assets in aid of execution of those judgments. Granting priority to the *Owens* plaintiffs' inchoate lien over the *Federal Insurance* Creditors' perfected lien would violate this purpose as specifically recognized by the Second Circuit in *Smith*: "TRIA does not "guarantee that any blocked assets will in fact be available when a particular victim seeks *to execute on a judgment*" because such assets "may become unblocked or confiscated [or] they may also be *depleted by the claims of other victims*." 346 F.3d at n.6 (emphasis added). Thus, to the extent that CLPR can even be interpreted to grant priority to plaintiffs who merely have unconfirmed *ex parte* prejudgment attachments over those who are executing on judgments, such a result is foreclosed by TRIA as interpreted by *Smith.*

## IV.   CONCLUSION

Based on the facts and authorities set forth above, the unlicensed, prejudgment attachment of the DAB funds is a nullity that must be vacated, and this Court should deny the *Owens* plaintiffs' opposition to the *Federal Insurance* Creditors' turnover.

---

[10] The purpose of the CPLR's priority rules is to award diligence in seeking judgments and collecting on those judgements. Turning those purposes on their head, the *Owens* plaintiffs ask this Court to delay the turnover proceedings indefinitely to provide them with time so that they can first confirm their *ex parte*, prejudgment attachment (which they will not be able to do) and then litigate their claims against the Taliban, processes that could take months if not years. This result would pervert the CPLR's fundamental purposes by rewarding delay and punishing diligence.

Dated:  May 27, 2022

Respectfully submitted,

COZEN O'CONNOR

By:   _/s/  Sean P. Carter_
    Sean P. Carter, Esq.
    Stephen A. Cozen, Esq.
    J. Scott Tarbutton, Esq.
    1650 Market Street
    Philadelphia, PA 19103
    Tel: (215) 665-2105
    scarter1@cozen.com

Attorneys for *Federal Insurance* Creditors

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the Memorandum of Law in Support of the *Federal Insurance* Creditors' Response to the Limited Motion to Intervene of *James Owens, et al.*, and Cross-Motion to Vacate the *Owens Ex Parte* Provisional Prejudgment Attachment, was electronically filed this 27th day of May 2022.  Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.


_____
J. Scott Tarbutton, Esq.

LEGAL\58112496\1

24