# EXHIBIT Q

## POLICY

# Treasury Secretary Looks to Get Global Tax Deal on Track

**FROM FIRST BUSINESS PAGE**

ready delayed its timeline for putting the tax changes in place by a year and progress has been halted over objections by Poland, which last month vetoed a plan to enact the new tax rate by the end of next year. Despite initially signing on to the deal, Poland has voiced reservations, including whether the minimum tax will ac-

> 'Having multiple countries put the same rules in place is a new concept in tax.'
>
> Barbara Angus, the global tax policy leader at Ernst & Young.

tually prevent big tech companies from seeking out lower-tax jurisdictions. Polish officials have also expressed concern that the two parts of the tax agreement are moving ahead at different paces, as well as trepidation about the impact that raising its tax rate will have on its economy at a time when the country is absorbing waves of Ukrainian refugees.

In meetings in Warsaw on Monday, Ms. Yellen pressed top Polish officials to let the process move ahead, making clear that the tax deal continues to be a priority of the United States. She met with Poland's prime minister, Mateusz Morawiecki, and the finance minister, Magdalena Rzeczkowska.

Ms. Yellen, speaking after the meetings, described the conversations as "frank" and said she told her counterparts that the United States believes that the tax agreement is in Poland's economic interests.

"We strongly believe it's in the interest of Poland to be part of this," Ms. Yellen said, explaining that there continue to be technical differences that need to be worked out. "We're hopeful that they will come on board and be able to see their way clear in the not too distant future with the deal."

She added: "Certainly there's interest and they're thinking very hard about it."

The meetings come at the beginning of a weeklong trip that also includes stops in Brussels and Bonn, Germany, which is hosting the Group of 7 finance ministers' summit. Ms. Yellen will be focusing on coordinating sanctions against Russia with European allies and addressing growing concerns about how disruptions to energy and food supplies could affect the global economy.

The tax agreement has been one of Ms. Yellen's top priories as Treasury secretary. Gaining Poland's support is critical because the European Union requires consensus among its member states to enact the tax changes.

"I think the reality of turning a political commitment into binding domestic legislation is a lot more complex," said Manal Corwin, a Treasury official in the Obama administration who now heads the Washington national tax practice at KPMG. "The E.U. has moved and gotten over most of the objections, but they still have Poland and it's not clear whether they're going to be able to get the last vote."

With President Emmanuel Macron of France heading the European Union's rotating presidency until June, his administration was eager to get a deal implemented. But at a meeting of European finance ministers in early April, Poland became the sole holdout, saying there were no ironclad guaran-





SARAHBETH MANEY/THE NEW YORK TIMES

RADEK PIETRUSZKA/EPA, VIA SHUTTERSTOCK

ANNA MONEYMAKER/GETTY IMAGES

On Monday, Treasury Secretary Janet L. Yellen, top, met with Poland's finance minister, Magdalena Rzeczkowska, above left. Rep. Kevin Brady of Texas, above right, has led the Republican opposition to the plan.

tees that big multinational companies wouldn't still be able to take advantage of low-tax jurisdictions if the two parts of the agreement did not move ahead in tandem, undercutting the global effort to avoid a race to the bottom when it comes to corporate taxation.

Poland's stance was sharply criticized by European officials, particularly France, whose finance minister, Bruno Le Maire, suggested that Warsaw was instead holding up a final accord in retaliation for a Europe-wide political dispute. Poland has threatened to veto measures requiring unanimous E.U. votes because of an earlier decision by Brussels to block pandemic recovery funds for Poland.

The European Union had refused to disburse billions in aid to Poland since late last year, citing separate concerns over Warsaw's interference with the independence of its judicial system. Last week, on the eve of Ms. Yellen's visit to Poland, the European Commission came up with an 11th-hour deal unlocking 36 billion euros in pandemic recovery funds for Poland, which pledged to meet certain milestones such as judiciary and economic reforms, in return for the money.

Negotiators from around the world have been working to resolve technical details of the agreement, such as what kinds of income would be subject to the new taxes and how the deal would be enforced. Failure to finalize the agreement would likely mean the further proliferation of the digital services taxes that European countries have imposed on American technology giants, much to the dismay of those firms and the Biden administration.

"It's fluid, it's moving, it's a moving target," Pascal Saint-Amans, the director of the center for tax policy and administration at the Organization for Economic Cooperation and Development, said of the negotiations at the D.C. Bar's annual tax conference this month. "There is an extremely ambitious timeline."

Countries like Ireland, with a historically low corporate tax rate, have been wary of increasing their rates if others do not follow suit, so it has been important to ensure that there is a common understanding of the new tax rules to avoid opening the door to new loopholes.

"The idea of having multiple countries put the same rules in place is a new concept in tax," said Barbara Angus, the global tax policy leader at Ernst & Young and a former chief tax counsel on the House Ways and Means Committee. She added that it was important to have a multilateral forum so countries could agree on how to interpret and apply the levies.

Yet, while Ms. Yellen is pushing foreign nations to adopt the tax agreement, it remains unclear whether the United States will be able to pass its own legislation to come into compliance.

An earlier effort by House Democrats to adopt a tax plan that would satisfy terms of the agreement fell apart in the Senate, where Democrats continue to disagree over the scope and cost of a tax and spending bill that President Biden has proposed.

Republicans in Congress have made clear that they are unlikely to support any agreement that the Biden administration has brokered and called on the Treasury Department to consult with them before trying to move ahead.

"As it is, there's very little chance of a global minimum tax agreement — there is already resistance to approval at the E.U., which should be the easiest part of these discussions, and it will only get harder going forward," said Representative Kevin Brady of Texas, the top Republican on the House Ways and Means Committee. "Meanwhile, here in the U.S., there's little political support for an agreement that makes the U.S. less competitive and takes a big bite out of our tax base."

Ms. Yellen is expected to convey to her counterparts this week that the agreement is still a priority for the Biden administration and that she hopes that the United States can make the tax changes needed to comply with the agreement in a small spending package later this year, according to a person familiar with the negotiations.

---

# Fed's Leader During 2008 Crisis Says U.S. May Face 'Stagflation'

**By ANDREW ROSS SORKIN**

Standing in his kitchen one morning in Washington, D.C., and drinking a glass of lightly flavored water, Ben Bernanke is wearing a gray suit, a button-down shirt, no tie and a pair of Brooks running sneakers. He looks a far cry from his time at the Federal Reserve, where he presided as chair for eight years during what was — until recently — considered the most precarious financial moment of the past half-century.

But the coronavirus pandemic and its economic impact — the overnight pullback in employment coupled with an infusion of money not seen in history and now, seemingly, runaway inflation — have had Mr. Bernanke thinking. And writing. Mr. Bernanke has been in a self-imposed quarantine of sorts writing a book, "21st Century Monetary Policy: The Federal Reserve From the Great Inflation to Covid-19," which will be published on Tuesday.

Mr. Bernanke describes the book as "academic," but at this particular moment, it may be a uniquely practical book as the public tries to better understand the powers of the Federal Reserve and Congress to juice or slow our economy amid a supply-chain crunch and sky-high demand. The former chair's book itself is an example of the crosscurrents playing out in our economy: "Given supply-chain disruptions, this book took six months to go from final manuscript to appearing in the store," he said.

Mr. Bernanke, who wrote the book "when it became evident that I was not going to be traveling a lot and that we were home for a while" amid the early days of the pandemic, provides a history of the Federal Reserve — his own graduate thesis was on the crash of 1929 and its aftermath, which he says provided valuable lessons for how he responded to the recession in 2008. His focus this time, however, is not on 2008 but on how the Federal Reserve has reacted to various economic scenarios over more than a century, touring readers though the reins of different Fed chairs like Alan Greenspan. Readers will very likely be particularly focused on Mr. Bernanke's analysis of the 1970s, which may be the closest analogue to what's happening in today's economy.

He is hopeful that Jerome H. Powell, the current Fed chair, can help tame inflation without having to put in place the extreme measures that the Fed chair Paul Volcker did in the 1970s or send the economy into recession.

But he also suggests it is possible the nation could be in for a period of "stagflation," a word Mr. Bernanke says was invented in the 1970s. "Even under the benign scenario, we should have a slowing economy," he said. "And inflation's still too high but coming down. So there should be a period in the next year or two where growth is low, unemployment is at least up a little bit and inflation is still high," he predicted. "So you could call that stagflation."

He is particularly aware that runaway inflation can quickly become a political issue — possibly putting the Fed in the cross hairs of the public — in a way that even unemployment doesn't evoke. "The difference between inflation and unemployment is that inflation affects just everybody," he said. "Unemployment affects some people a lot, but most people don't respond too much to unemployment because they're not personally unemployed. Inflation has a social-wide kind of impact."

Mr. Bernanke appears to be somewhat concerned about the credibility of the Federal Reserve in the public consciousness, especially given the aggressive approach that he took in 2008 and that Mr. Powell continued during the pandemic. "I had this fantasy conversation in my head between Jay Powell and William McChesney Martin, where I think Martin probably would have had apoplexy or something because of the different things that intervening

> Predicting an overlap of high inflation and high unemployment.

chairs have done," he said, referring to Mr. Martin, the chair of the Federal Reserve from 1951 to 1970.

In the book, Mr. Bernanke discusses how he sought to enhance the reputation of the Federal Reserve's independence by making it more transparent, including holding news conferences.

"In everyday life, we judge the credibility of promises more by the reputations of the promise-makers than by the exact words they use," he said. "The same principle applies to central bank promises. Central-bank credibility depends in part on the personal reputations and communication skills of key policymakers, but since policymakers cannot irrevocably bind themselves or their successors, institutional reputation is important, as well. Because of concerns about institutional reputation, policymakers have an incentive to follow through on promises, even those made by their predecessors."

Mr. Bernanke left the Fed as chair in 2014, but he has remained in Washington, where he is a fellow at the Brookings Institution and a senior adviser to the investment firm Pimco. He said he preferred not having to make the decisions that Mr. Powell now confronts, or endure the hours of congressional testimony in which his decisions were questioned.

Instead, he prefers to think about the role with a slight remove and the ability to pontificate on political issues he used to avoid.

Asked whether he believes student debt should be forgiven, his trademark pause has disappeared: "It would be very unfair to eliminate. Many of the people who have large amounts of student debt are professionals who are going to go on and make lots of money in their lifetime. So why would we be favoring them over somebody who didn't go to college, for example?"

Or what about the Federal Reserve changing its inflation target? No pause either. "Inflation targets should not be used as a short-run tool, you know? If you raise the inflation target to 3 percent for some short-term purpose, then why not 4 percent, or why not 3.5 percent, or why not create a band, or whatever?"

The good news is that Mr. Bernanke isn't worried about a 2008-style crisis. He is concerned about housing prices, saying they have "risen a lot, like 30 percent in the last two years."

"That's something that needs to be watched," he said, but unlike in 2008, "the mortgages that are being lent to buy these houses are generally much higher quality than the subprime mortgages of 15 years ago."

CHRISTOPHER ALUKA BERRY/REUTERS

A new book by Ben Bernanke, a former Fed chair, may help people understand the Fed's powers.

---

**PUBLIC NOTICE**
**To the Taliban and Doe Afghanistan Bank**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN, 03-CV-9848-GBD-SN, and 20-MC-740-GBD-SN, Judgment Creditors Fiona Havlish et al. ("the Havlish Creditors") and John Does 1 through 7 ("the Doe Creditors") have each filed a motion seeking a turnover of assets of Do Afghanistan Bank (DAB) held in the Federal Reserve Bank of New York (FRBNY). The Havlish Creditors seek these assets to satisfy the final judgment entered by the Court on October 16, 2012 against the Taliban, among others, in connection with the terrorist attacks of September 11, 2001. The Doe Creditors seek these assets to satisfy a final judgment entered in the Northern District of Texas on November 5, 2020 against the Taliban, among others, in connection with a terrorist attack in Kabul, Afghanistan on January 4, 2016. Pursuant to Federal Rule of Civil Procedure 69(a), N.Y.C.P.L.R. Sections 5225(b) and 5227, and Section 201(a) of the Terrorism Risk Insurance Act of 2002, the Havlish Creditors' and the Doe Creditors' motions seek to compel FRBNY to turn over the blocked assets of DAB in amount sufficient to satisfy the outstanding amounts of their awards of compensatory damages as of the date the motions were filed, namely $2,086,386,669 and $138,418,741, respectively.

This is a notice that the motions have been filed. The motion papers are available in both English and Pashto at the following website: **www.DABTurnover.com**



**The New York Times**

**Announcing Announcements**

Celebrate births, engagements, weddings, anniversaries and more in The Times. Call 1-800-238-4637.

**On campus. Out in the world.**
Provide faculty and students at your school with digital access to The Times.
Learn more at nytimes.com/oncampus

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

In re: CYPRESS ENVIRONMENTAL ) Chapter 11
PARTNERS, L.P., et al. ) Case No. 22-90039 (MI)
Debtors. ) (Jointly Administered)

**NOTICE OF DEADLINES FOR FILING PROOFS OF CLAIM**
**THE GOVERNMENTAL CLAIMS BAR DATE IS NOVEMBER 4, 2022.**
**PLEASE TAKE NOTICE OF THE FOLLOWING:**

**Deadlines for Filing Proofs of Claim.** On May 11, 2022, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order (Docket No. 65) (the "Order") establishing certain deadlines for the filing of proofs of claim (each, a "Proof of Claim"), in the chapter 11 cases of the following debtors and debtors in possession (collectively, the "Debtors"): **Debtor, Case No.:** Cypress Environmental Partners, L.P., 22-90039; Cypress Municipal Water Services, LLC, 22-90036; Cypress Environmental Partners, LLC, 22-90038; Cypress Brown Integrity, LLC, 22-90037; Cypress Energy Partners - 1804 SWD, LLC, 22-90040; Cypress Energy Partners - Bakken, LLC, 22-90041; Cypress Energy Partners - Grassy Butte SWD, LLC, 22-90042; Cypress Energy Partners - Green River SWD, LLC, 22-90043; Cypress Energy Partners - Manning SWD, LLC, 22-90044; Cypress Energy Partners - Mork SWD, LLC, 22-90045; Cypress Energy Partners - Mountrail SWD, LLC, 22-90046; Cypress Energy Partners - Tioga SWD, LLC, 22-90047; Cypress Energy Partners - Williams SWD, LLC, 22-90048; Cypress Environmental - PUC, LLC, 22-90049; Cypress Environmental Management, LLC, 22-90050; Cypress Inspection Resources - TIR, LLC, 22-90051; Tulsa Inspection Resources - PUC, LLC, 22-90052; Tulsa Inspection Resources, LLC, 22-90053.

**Deadlines to File Proofs of Claim**

**General Bar Date.** Please take notice that the last date and time for all persons and entities (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) that assert a claim against any of the Debtors, including, without limitation, secured, unsecured, and priority claims, which arose prior to the Petition Date, to file proofs of such claim is **June 13, 2022** (the "General Bar Date").

**Governmental Bar Date.** Please take notice that the last date and time for all "governmental units" (as defined in section 101(27)) of the Bankruptcy Code) that assert a claim against any of the Debtors, including, without limitation, secured, unsecured, and priority claims, which arose prior to the Petition Date, to file proofs of such claim is **November 4, 2022** (the "Governmental Bar Date").

**Rejection Bar Date.** Please take notice that the last date and time for any person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) who asserts a claim that arises out of the Court-approved rejection of an executory contract or unexpired lease in accordance with section 365 of the Bankruptcy Code to file a Proof of Claim is the **later of** (i) **June 13, 2022** or (ii) the date that is **28 days after entry of an order approving the rejection of the executory contract or unexpired lease to which the person or entity asserting the rejection damage claim is a party** (the "Rejection Bar Date," and together with the General Bar Date and the Governmental Bar Date, collectively, the "Bar Dates").

**Persons and Entities Not Required to File Proofs of Claim or Administrative Claim Requests by the Applicable Bar Date:**
The following persons and entities need not file Proofs of Claim on or before the applicable Bar Date:
(i) any person or entity whose claim is listed on the Schedules of Assets and Liabilities (the "Schedules") and (a) whose claim is not described thereon as "disputed," "contingent," or "unliquidated"; (b) who does not dispute the amount or classification of the claim set forth in the Schedules, and (c) who does not dispute that the claim is an obligation of the specific Debtor against which the Claim is listed on the Schedules;
(ii) any person or entity whose claim has been paid in full by the Debtors in accordance with an order of the Court;
(iii) a current employee of the Debtors, if an order of the Court authorized the Debtors to honor such Claim in the ordinary course of business as a wage, commission, or benefit; provided that a current employee must submit a Proof of Claim by the General Bar Date for all other claims arising before the Petition Date, including claims for wrongful termination, discrimination, harassment, hostile work environment, and/or retaliation;
(iv) any Debtor having a claim against another Debtor; and
(v) any current officer, director, or employee for Claims based on indemnification, contribution, or reimbursement.

Please take notice that any claimant exempted from filing a Proof of Claim pursuant to the preceding paragraph must still properly and timely file a Proof of Claim for any other claim that does not fall within the exemptions provided by the preceding paragraph.

**Consequences of Failure to File Timely Proof Of Claim.** Any person, entity, or governmental unit not excepted from filing a Proof of Claim that fails to do so by the applicable Bar Date may not be permitted to participate in any distribution in these chapter 11 cases on account of such claim.

**Reservation of Rights.** The Debtors reserve the right to dispute, assert offsets or defenses to, or object to any claim or Proof of Claim filed in these chapter 11 cases, as to amount, liability, characterization or otherwise. Nothing contained in this notice shall preclude the Debtors from objecting to any claim, whether scheduled or filed or unfiled, on any grounds.

**Procedures for Filing Proofs of Claim.** A Proof of Claim shall be deemed timely filed only if the Proof of Claim is mailed or delivered by hand, courier, or overnight service so as to be actually received by the Claims Agent on or before the applicable deadline at the following address: Cypress Claims Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245.

Alternatively, claimants may submit a Proof of Claim electronically, on or before the applicable deadline, through the electronic claims-filing system available at www.kccllc.net/cypress.

Proofs of Claim may not be sent by facsimile, telecopy, or electronic mail.

**Additional Information.** Questions concerning the contents of this notice and requests for Proof of Claim forms should be directed to the Debtors' notice and claims agent, Kurtzman Carson Consultants LLC (the "Claims Agent"), by (i) submitting an inquiry on the case website, www.kccllc.net/cypress, (ii) calling (866) 967-1785 (U.S./Canada) or (310) 751-2685 (International), or (iii) sending an electronic mail message to cypressinfo@kccllc.com with "Cypress" in the subject line. Please note that the Claims Agent's staff is not permitted to give legal advice. You should consult with your own attorney for assistance regarding any other inquiries, such as questions concerning the completion or filing of a Proof of Claim.

**BY ORDER OF THE COURT**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

In re: SUNGARD AS NEW ) Chapter 11
HOLDINGS, LLC, et al.,[1] ) Case No. 22-90018 (DRJ)
Debtors. ) (Jointly Administered)

**NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENT PURSUANT TO SECTION 503(b)(9) OF THE BANKRUPTCY CODE**
**THE GENERAL CLAIMS BAR DATE IS WEDNESDAY, JUNE 22, 2022**
**PLEASE TAKE NOTICE OF THE FOLLOWING:**

**Deadlines for Filing Proofs of Claim.** On May 11, 2022, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order (Docket No. 218) (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code (collectively, "Proofs of Claim"), in the chapter 11 cases of the following debtors and debtors in possession (collectively, the "Debtors"): **DEBTOR, CASE NO.:** SUNGARD AVAILABILITY SERVICES, LP, 22-90017; SUNGARD AS NEW HOLDINGS, LLC, 22-90018; SUNGARD AVAILABILITY NETWORK SOLUTIONS INC., 22-90019; SUNGARD SERVICES DE CONTINUITE DES AFFAIRES (CANADA) LTD./SUNGARD AVAILABILITY SERVICES HOLDINGS (CANADA), INC., 22-90020; INFLOW LLC, 22-90021; SUNGARD AS NEW HOLDINGS III, LLC, 22-90022; SUNGARD AVAILABILITY NETWORK SOLUTIONS INC., 22-90023; SUNGARD AS NEW HOLDINGS II, LLC, 22-90024; SUNGARD AVAILABILITY SERVICES HOLDINGS (EUROPE), INC., 22-90025; SUNGARD AVAILABILITY SERVICES HOLDINGS, LLC, 22-90026; SUNGARD AVAILABILITY SERVICES TECHNOLOGY, LLC, 22-90027; SUNGARD AVAILABILITY SERVICES, LTD., 22-90028.

**The Bar Dates.** Pursuant to the Bar Date Order, all persons and entities that have a claim or potential claim against the Debtors that arose prior to April 11, 2022, no matter how remote or contingent such right to payment or equitable remedy may be, **including** requests for payment under section 503(b)(9) of the Bankruptcy Code, MUST FILE A PROOF OF CLAIM on or before **Wednesday, June 22, 2022** (the "General Bar Date"). All governmental units that have a claim or potential claim against the Debtors that arose prior to April 11, 2022, no matter how remote or contingent such right to payment or equitable remedy may be MUST FILE A PROOF OF CLAIM on or before **Monday, October 10, 2022** (the "Governmental Bar Date"). All persons and entities holding claims arising from the Debtors' rejection of executory contracts and unexpired leases are required to file Proofs of Claim by **the later of** (a) **the General Bar Date or Governmental Bar Date**, as applicable, and (b) on the date that is thirty (30) days following entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease (the "Rejection Damages Bar Date"). All persons and entities holding claims affected by an amendment to the Debtors' schedules are required to file Proofs of Claim by **the later of** (a) **the General Bar Date or Governmental Bar Date**, as applicable, and (b) on the date that is thirty (30) days from the date on which the Debtors mail notice of the amendment to the Schedules (the "Amended Schedules Bar Date"). For the avoidance of doubt, there is no separate claims process for creditors of Sungard Availability Services (Canada) Ltd./Sungard Services de Continuite des Affaires (Canada) Line ("Sungard AS Canada"). Creditors of Sungard AS Canada, including any Canadian-based creditors, ARE NOT exempt from the Bar Dates Order.

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE, ON OR BEFORE THE APPLICABLE BAR DATE SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

**Filing a Proof of Claim.** Each Proof of Claim must be filed, including supporting documentation, so as to be **actually received** by the Debtors' claims and noticing agent, Kroll Corporate Restructuring, LLC ("Kroll"), on or before the General Bar Date (or, where applicable, on or before any other Bar Dates as set forth herein or by order of the Court) either: (i) electronically via the interface through PACER (Public Access to Court Electronic Records at http://ecf.txsb.uscourts.gov) or with Kroll at https://cases.ra.kroll.com/SungardAS/; or (ii) by first class U.S. mail, overnight U.S. mail, or other hand delivery method at the following address: Sungard AS New Holdings, LLC Claims Processing Center, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232.

**Contents of Proof of Claim.** Each Proof of Claim must: (i) be written in legible English; (2) include a claim amount denominated in United States dollars; (3) clearly identify the Debtor against which the claim is asserted; (4) conform substantially with the Proof of Claim form provided by the Debtors or Official Form 410; (5) be signed by the claimant or by an authorized agent or legal representative of the claimant on behalf of the claimant, whether such signature is an electronic signature or is ink; and (6) include as attachments any and all supporting documentation on which the claim is based. **Please note** that each Proof of Claim must state a claim against only one Debtor and clearly indicate the specific Debtor against which the claim is asserted. To the extent more than one Debtor is listed on the Proof of Claim, the Proof of Claim may be treated as if filed only against Sungard Availability Services, LP ("Sungard AS LP") or if a Proof of Claim is otherwise filed without identifying a specific Debtor, the Proof of Claim may be deemed as filed only against Sungard AS LP.

**Electronic Signatures Permitted.** Proofs of Claim signed electronically by the claimant or an authorized agent or legal representative of the claimant may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim, or Proofs of Claim sent by facsimile or electronic mail will not be accepted. Unless otherwise ordered by the Court, any original document containing the original signature of any party other than the party that files the Proof of Claim must be retained by the filing party for a period of not less than five (5) years after the Debtors' cases are closed, and upon request, such original document must be provided to the Court or other parties for review, pursuant to the Administrative Procedures for the Filing, Signing, and Verifying of Documents by Electronic Means in Texas Bankruptcy Courts.

**Additional Information.** If you have any questions regarding the claims process and/or you wish to obtain a copy of the Bar Date Notice, a proof of claim form or related documents you may do so by: (i) calling Kroll at (844) 224-1140 (Toll Free) or (646) 979-4408 (International); or (ii) visiting https://cases.ra.kroll.com/SungardAS/.

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' tax identification numbers, are: InFlow LLC (9489); Sungard AS States dollars; (3) clearly identify the Debtor against which the claim is asserted; (4) conform substantially with the Proof of Claim form provided by the Debtors or Official Form 410; (5) be signed by the claimant or by an AS New Holdings III, LLC (1503); Sungard Availability Network Solutions Holdings (Europe), Inc. (2190); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (0718); Sungard Availability Services, LP (6195); and Sungard Availability Services, Ltd. (4711). The location of the Debtors' service address for purposes of these chapter 11 cases is: 565 E Swedesford Road, Suite 320, Wayne, PA 19087.