**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: Terrorist Attacks on September 11, 2021 | Civil Action No. 03-md-1570 (GBD) (SN) |
| Federal Insurance Company, et al., <br><br> *Creditors,* <br><br> *v.* <br><br> The Taliban, et al., <br><br> *Debtors,* <br><br> Federal Reserve Bank of New York, <br><br> *Garnishee.* | Civil Action No. 03-cv-6978 (GBD) (SN) |

**REPLY IN SUPPORT OF
LIMITED MOTION TO INTERVENE BY JAMES OWENS, *ET AL.*,
AND OPPOSITION TO THE *FEDERAL INSURANCE* CREDITORS'
<u>CROSS-MOTION TO VACATE THE *OWENS* PREJUDGMENT ATTACHMENT</u>**

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

    I.    This Court Cannot and Should Not Review the Validity of Judge Caproni's
        Order of Attachment. ............................................................................................. 3

        A.    This Court Lacks Authority to Vacate Judge Caproni's Order of
               Attachment. ................................................................................................. 3

        B.    Even if This Court Had Authority, It Would Be Highly Improper to
               Overrule Judge Caproni's Order of Attachment. ...................................... 7

        C.    This Court Should Adjudicate Only Whether Proposed Intervenors Have
               Priority. ...................................................................................................... 12

    II.    Proposed Intervenors Have Priority to the DAB Funds Under CPLR § 6226........... 14

    III.    The *Federal Insurance* Creditors' Attacks on the Validity of Judge Caproni's
        Order of Attachment Fail. ..................................................................................... 17

        A.    Federal Law Does Not Preclude Prejudgment Attachment. .............................. 17

        B.    The Order of Attachment Was Granted for a Legally Valid Reason................. 24

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ames v. Clifford*,
863 F. Supp. 175 (S.D.N.Y. 1994) ...................................................................25

*B.Z. Chiropractic, P.C. v. Allstate Ins. Co.*,
152 N.Y.S.3d 46 (N.Y. App. Div. 2021) .............................................................7

*Bolin v. Story*,
225 F.3d 1234 (11th Cir. 2000) .........................................................................6

*In re Brown*,
346 F.2d 903 (5th Cir. 1965) ...........................................................................10

*Burrows for Interactive AIDS Counseling Servs., Inc. v. Reno*,
1993 WL 213017 (S.D.N.Y. June 17, 1993) .....................................................12

*Cap. Ventures Int'l v. Republic of Arg.*,
443 F.3d 214 (2d Cir. 2006) .............................................................................25

*Cap. Ventures Int'l v. Republic of Arg.*,
652 F.3d 266 (2d Cir. 2011) .............................................................................15

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995) .......................................................................................5, 6

*Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*,
651 F.2d 800 (1st Cir. 1981) ............................................................................21

*Chevron Corp. v. Donziger*,
2011 WL 2150450 (S.D.N.Y. May 31, 2011) ....................................................7

*Cir. City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) .........................................................................................18

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) .........................................................................18

*Covington Indus., Inc. v. Resintex A.G.*,
629 F.2d 730 (2d Cir. 1980) .............................................................................11

*CSX Transp., Inc. v. Emjay Env't Recycling, LTD*,
2016 WL 755630 (E.D.N.Y. Feb. 25, 2016) .......................................................8

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ....................................................................................21, 22

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Daniels v. Baldwin,*
  2021 WL 1222190 (S.D. Ill. Apr. 1, 2021)................................................................4

*Dhalluin v. McKibben,*
  682 F. Supp. 1096 (D. Nev. 1988).........................................................................4

*Dictograph Prods. Co. v. Sonotone Corp.,*
  230 F.2d 131 (2d Cir. 1956)...........................................................................10, 11

*DLJ Mortg. Cap., Inc. v. Kontogiannis,*
  2013 WL 6409960 (N.Y. Sup. Ct. Dec. 6, 2013) ..................................................15

*Doe v. JPMorgan Chase Bank, N.A.,*
  899 F.3d 152 (2d Cir. 2018)...............................................................................21

*Ex parte Endo,*
  323 U.S. 283 (1944).........................................................................................17

*First Small Bus. Inv. Corp. v. Zaretsky,*
  259 N.Y.S.2d 700 (N.Y. Sup. Ct. 1965) ...............................................................8

*Freightliner Corp. v. Myrick,*
  514 U.S. 280 (1995).........................................................................................24

*Hands v. U.S. Dist. Ct. for S. Dist. of Ala.,*
  2005 WL 8158728 (S.D. Ala. June 3, 2005) .........................................................6

*In re Hines,*
  88 F.2d 423 (2d Cir. 1937).............................................................................10, 12

*Holzsager v. Valley Hosp.,*
  482 F. Supp. 629 (S.D.N.Y. 1979) ......................................................................10

*J.V.W. Investment Ltd. v. Kelleher,*
  837 N.Y.S.2d 650 (N.Y. App. Div. 2007) ............................................................25

*Klayman v. Judicial Watch, Inc.,*
  851 F. App'x 222 (D.C. Cir. 2021)........................................................................6

*Levin v. Bank of N.Y.,*
  2022 WL 523901 (S.D.N.Y. Feb. 22, 2022)..........................................................24

*Lewis v. Green,*
  629 F. Supp. 546 (D.D.C. 1986) ...........................................................................6

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Matthews v. FBI,*
   2021 WL 2823124 (D.D.C. July 7, 2021).................................................................6

*Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.,*
   397 F.3d 77 (2d Cir. 2005)........................................................................................10

*In re McBryde,*
   117 F.3d 208 (5th Cir. 1997) ..............................................................................4, 6

*McKoy v. Potter,*
   2006 WL 1676475 (S.D.N.Y. June 15, 2006) ...........................................................4

*Mfrs. & Traders Trust Co. v. Lowenstein,*
   458 N.Y.S.2d 117 (N.Y. App. Div. 1982) ...............................................................13

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran*
   *v. Elahi,* 556 U.S. 366 (2009) ................................................................................23

*Mullis v. U.S. Bankr. Ct. for Dist. of Nev.,*
   828 F.2d 1385 (9th Cir. 1987) ...................................................................................6

*Neshewat v. Salem,*
   365 F. Supp. 2d 508 (S.D.N.Y. 2005)........................................................................9

*Owens v. Taliban,*
   2022 WL 1090618 (S.D.N.Y. Apr. 11, 2022)..........................................................17

*Perrin v. United States,*
   444 U.S. 37 (1979).....................................................................................................18

*In re Pusser,*
   123 F. Supp. 164 (E.D.S.C. 1954) .............................................................................6

*Seale v. Hoffman,*
   306 F. Supp. 330 (N.D. Ill. 1969) .............................................................................4

*Smalls v. United States,*
   471 F.3d 186 (D.C. Cir. 2006) ...................................................................................6

*Smith ex rel. v. Est. of Smith v. Fed. Rsrv. Bank of New York,*
   346 F.3d 264 (2d Cir. 2003)...............................................................................22, 24

*Stanley v. United States,*
   2009 WL 2498212 (S.D. Ill. Aug. 14, 2009) .............................................................4

iv

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Sterling Nat'l Bank v. Freidman*,
   163 N.Y.S.3d 33 (N.Y. App. Div. 2022) ............................................................................13

*TAGC Mgmt., LLC v. Lehman*,
   842 F. Supp. 2d 575 (S.D.N.Y. 2012) ...............................................................................25

*Theroux v. Reilly*,
   803 N.E.2d 364 (N.Y. 2003) ..............................................................................................17

*Third Nat'l Bank in Nashville v. Impac Ltd.*,
   432 U.S. 312 (1977) ...........................................................................................................18

*Thornapple Assocs., Inc. v. Sahagen*,
   2007 WL 747861 (S.D.N.Y. Mar. 12, 2007) .....................................................................25

*Torquay Corp. v. Radio Corp. of Am.*,
   2 F. Supp. 841 (S.D.N.Y. 1932).........................................................................................9

*Torres v. United States*,
   833 F.3d 164 (2d Cir. 2016)................................................................................................11

*United States v. Johnson*,
   56 F.3d 947 (8th Cir. 1995) ................................................................................................22

*Walker v. Birmingham*,
   388 U.S. 307 (1967)............................................................................................................5

*Weininger v. Castro*,
   462 F. Supp. 2d 457 (S.D.N.Y. 2006).................................................................................23

*Westenberg v. Schmidt*,
   181 F. Supp. 61 (S.D.N.Y. 1959) .......................................................................................9

*Zambrana v. Califano*,
   651 F.2d 842 (2d Cir. 1981)................................................................................................9

*Zittman v. McGrath*,
   341 U.S. 446 (1951)............................................................................................................19, 20

**Statutes**

28 U.S.C. § 1253............................................................................................................................4

28 U.S.C. § 1254............................................................................................................................4

# TABLE OF AUTHORITIES
**(continued)**

Page(s)

28 U.S.C. § 1291 .................................................................................................................4

28 U.S.C. § 1292 .................................................................................................................4

28 U.S.C. § 1609 ...............................................................................................................22

28 U.S.C. § 1611 .........................................................................................................22, 23

**Rules**

Fed. R. Civ. P. 60 .............................................................................................................11

Fed. R. Civ. P. 64 .......................................................................................................17, 24

CPLR § 5234 ...............................................................................................................15, 17

CPLR § 5239 ...........................................................................................................7, 8, 13

CPLR § 6211 .........................................................................................................12, 15, 16

CPLR § 6221 ...............................................................................................................12, 13

CPLR § 6223 .........................................................................................................12, 13, 14

CPLR § 6226 ...............................................................................................................15, 16

**Regulations**

31 C.F.R. § 510.101 ..........................................................................................................20

31 C.F.R. § 515.101 ..........................................................................................................20

31 C.F.R. § 525.101 ..........................................................................................................20

31 C.F.R. § 535.101 ..........................................................................................................20

31 C.F.R. § 536.101 ..........................................................................................................20

31 C.F.R. § 541.101 ..........................................................................................................20

31 C.F.R. § 542.101 ..........................................................................................................20

31 C.F.R. § 544.101 ..........................................................................................................20

31 C.F.R. § 546.101 ..........................................................................................................20

**TABLE OF AUTHORITIES**
(continued)

Page(s)

31 C.F.R. § 547.101 ..................................................................................................20

31 C.F.R. § 548.101 ..................................................................................................20

31 C.F.R. § 549.101 ..................................................................................................20

31 C.F.R. § 550.101 ..................................................................................................20

31 C.F.R. § 551.101 ..................................................................................................20

31 C.F.R. § 552.101 ..................................................................................................20

31 C.F.R. § 553.101 ..................................................................................................20

31 C.F.R. § 555.101 ..................................................................................................20

31 C.F.R. § 558.101 ..................................................................................................20

31 C.F.R. § 560.101 ..................................................................................................20

31 C.F.R. § 562.101 ..................................................................................................20

31 C.F.R. § 569.101 ..................................................................................................20

31 C.F.R. § 570.101 ..................................................................................................20

31 C.F.R. § 576.101 ..................................................................................................20

31 C.F.R. § 578.101 ..................................................................................................20

31 C.F.R. § 579.101 ..................................................................................................20

31 C.F.R. § 582.101 ..................................................................................................20

31 C.F.R. § 583.101 ..................................................................................................20

31 C.F.R. § 584.101 ..................................................................................................20

31 C.F.R. § 585.101 ..................................................................................................20

31 C.F.R. § 587.101 ..................................................................................................20

31 C.F.R. § 588.101 ..................................................................................................20

31 C.F.R. § 589.101 ..................................................................................................20

# TABLE OF AUTHORITIES
**(continued)**

Page(s)

31 C.F.R. § 590.101 .................................................................................................20

31 C.F.R. § 591.101 .................................................................................................20

31 C.F.R. § 594.101 .................................................................................................20

31 C.F.R. § 597.101 .................................................................................................20

31 C.F.R. § 598.101 .................................................................................................20

**Executive Orders**

Exec. Order No. 14,064 ...............................................................................18, 20, 21

Exec. Order No. 8389 ..............................................................................................19

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)...................................................................18

Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english ...................18, 19

Merriam-Webster, https://www.merriam-webster.com ..............................................18

73 N.Y. Jur. 2d Judgments.........................................................................................7

Richard C. Reilly, Practice Commentaries to McKinney's CPLR § 5234 ..................16

David D. Siegel, N.Y. Prac. (6th ed.) ...........................................................8, 13, 16

## INTRODUCTION

The *Federal Insurance* creditors do not dispute that Proposed Intervenors should be permitted to intervene in this multidistrict litigation ("MDL").  Nor do the *Federal Insurance* creditors mount any serious opposition to the narrow issue on which Proposed Intervenors seek to intervene—their priority over the *Federal Insurance* creditors with respect to the blocked funds held in the name of Da Afghanistan Bank ("DAB") at the Federal Reserve Bank of New York ("FRBNY").  Instead, although Proposed Intervenors have not yet been granted intervention, the *Federal Insurance* creditors present a full-blown motion and brief arguing that this Court should sit as an appellate court and vacate the Order of Attachment issued by Judge Caproni in Proposed Intervenors' lawsuit against the Taliban—blatantly trying to skirt her jurisdiction.  *See Owens v. Taliban*, 22-cv-1949-VEC (S.D.N.Y.), Dkt. 33, at 2.  The Court should reject that premature, extraordinary, and wholly improper invitation.

Judge Caproni issued her Order of Attachment in *Owens* on March 21, 2022.  *Owens*, Dkt. 33.  That order was delivered to the U.S. Marshals Service on March 22, creating a lien, and was subsequently levied upon the DAB funds.  *See id.*, Dkt. 49, ¶¶ 4, 6.  A month later, the *Federal Insurance* creditors obtained a writ of execution, which was levied upon the same DAB funds.  Dkt. 7937, at 9.  On April 29, 2022, the *Federal Insurance* creditors filed their turnover motion in this MDL, which incorrectly asserted priority over Proposed Intervenors with respect to the DAB funds at issue.  *Id.* at 25.  Forced to correct that error, Proposed Intervenors moved to intervene in this MDL for the limited purpose of opposing the *Federal Insurance* creditors' turnover motion on the basis of their priority to the blocked DAB funds.  Dkt. 8018.  Meanwhile, Proposed Intervenors timely moved to confirm Judge Caproni's Order of Attachment on May 2, 2022.  *See Owens*, Dkt. 48.

Even though Proposed Intervenors moved for prejudgment attachment three months ago, and even though Proposed Intervenors' confirmation motion has now been pending for over a month, the *Federal Insurance* creditors have not attempted to intervene in the *Owens* action to contest Proposed Intervenors' entitlement to prejudgment attachment. Instead, in a transparent effort to avoid Judge Caproni, following up on their earlier attempt to transfer the *Owens* suit into the MDL—which this Court swiftly denied—they filed their cross-motion in the MDL. Dkt. 8056 ("Cross-Mot."). The *Federal Insurance* creditors now ask this Court to snatch the pending confirmation motion out of Judge Caproni's hands and vacate her Order of Attachment.

That request must be rejected. It is well established that a federal district court has no authority to review—much less vacate—an order of a coordinate federal judge in a separate pending action. Any interference with the judicial proceedings of a coordinate federal judge is contrary to principles of comity, efficiency, and the orderly administration of justice.

And determining the issue of priority in no way *requires* this Court to adjudicate the validity of Judge Caproni's Order of Attachment. Under New York law, the priority of property interests is distinct from the underlying validity of those property interests. Unsurprisingly, the *Federal Insurance* creditors cite no case in which a court determining priority under New York law vacated an order issued by a different court in a separate action.

Moreover, doing so here would be highly inefficient and impractical. This Court already rejected consolidation of the *Owens* suit with this MDL, even though Proposed Intervenors' attachment motion was pending at the time. The Court should certainly not seize the *Owens* attachment issue now that Judge Caproni has granted Proposed Intervenors' motion and has confirmation proceedings pending before her. The *Federal Insurance* creditors would have this Court effectively wipe out Judge Caproni's time and work on that issue. The efficient and orderly

path is to leave the attachment issue to Judge Caproni, and for this Court to adjudicate the priority question.

As for priority—the relevant issue for this Court—the *Federal Insurance* creditors offer only two paragraphs and next-to-no legal authority attempting to rebut Proposed Intervenors' clear priority to the blocked DAB funds. They entirely ignore the relevant New York authorities, which make clear that priority as between an attachment order—including an *ex parte* order—and a writ of execution turns on the order in which they were delivered to the sheriff.

Although the Court need not—and should not—address them, the *Federal Insurance* creditors' attacks on the validity of Judge Caproni's Order of Attachment also fail across the board. No source of federal law precludes prejudgment attachment of the DAB funds. The *Federal Insurance* creditors' arguments to the contrary rest on an atextual reading of Executive Order 14064, inapplicable federal regulations, and basic misunderstandings of the Foreign Sovereign Immunities Act ("FSIA") and Terrorism Risk Insurance Act ("TRIA").

The Court should grant Proposed Intervenors' limited motion to intervene and deny the *Federal Insurance* creditors' cross-motion to vacate Judge Caproni's Order of Attachment.

## <u>ARGUMENT</u>

## I. This Court Cannot and Should Not Review the Validity of Judge Caproni's Order of Attachment.

### A. This Court Lacks Authority to Vacate Judge Caproni's Order of Attachment.

Under Judge Caproni's Order of Attachment, Proposed Intervenors have an interest in the blocked DAB funds that has clear priority over the *Federal Insurance* creditors' later-attached interest in those same funds. Having made no attempt to intervene in the *Owens* action before Judge Caproni, and unable to seriously dispute the Proposed Intervenors' priority, *see infra*, at 14–17, the *Federal Insurance* creditors instead take the extraordinary step of asking *this* Court to reach

into Judge Caproni's courtroom and "vacat[e]" *her* Order of Attachment entered in that separate action, Cross-Mot. 22.  In effect, the *Federal Insurance* creditors ask this Court to assume the appellate review functions of the Second Circuit.

Not only is the *Federal Insurance* creditors' cross-motion entirely premature—Proposed Intervenors have not even been granted leave to intervene in the MDL—this Court is "totally devoid of any authority under the Constitution o[f] the United States or under any act of Congress to sit as an appellate court and review the conduct of another federal trial court."  *Seale v. Hoffman*, 306 F. Supp. 330, 332 (N.D. Ill. 1969); *see also Stanley v. United States*, 2009 WL 2498212, at *3 (S.D. Ill. Aug. 14, 2009) ("This Court does not sit as an appellate court to review decisions of another district judge[.]").  This Court thus has no authority to review—much less vacate—Judge Caproni's Order of Attachment.

It is blackletter law that "[f]ederal district courts are courts of limited jurisdiction and have only such jurisdiction as Congress, by statute, confers upon them."  *Seale*, 306 F. Supp. at 331–32.  No statute authorizes "one judge of a district court to rule directly on the legality of another district judge's judicial acts or to deny another district judge his or her lawful jurisdiction." *Dhalluin v. McKibben*, 682 F. Supp. 1096, 1097 (D. Nev. 1988).  Instead, Congress has authorized only the federal courts of appeals (and the Supreme Court in certain circumstances) to review orders of federal district courts.  *See* 28 U.S.C. §§ 1253, 1254(1), 1291, 1292.  Not even the chief judge of a district court has "the power of appellate review over his fellow district court judges." *In re McBryde*, 117 F.3d 208, 223 (5th Cir. 1997); *see also McKoy v. Potter*, 2006 WL 1676475, at *2 (S.D.N.Y. June 15, 2006) ("[Plaintiff] cannot 'appeal' Judge Stein's order . . . by filing a new lawsuit in this Court.  I do not have jurisdiction, in this context, to review an order of another judge of this Court."); *Daniels v. Baldwin*, 2021 WL 1222190, at *2 (S.D. Ill. Apr. 1, 2021) ("orders by"

magistrate judges presiding by consent "are not reviewable by other judges in this district").

The Supreme Court has underscored the paramount importance of these bedrock principles. In *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995), a federal bankruptcy court in Florida "issued an injunction prohibiting respondents from executing on [a supersedeas] bond." *Id.* at 301–02. "Despite the Bankruptcy Court's . . . [i]njunction," a federal district court in Texas "allowed respondents to execute on the [supersedeas] bond." *Id.* at 304. The Fifth Circuit affirmed because it "disagreed with the merits of the Bankruptcy Court's . . . [i]njunction." *Id.* at 305. In reversing the Fifth Circuit, the Supreme Court found that it "need not . . . address whether the Bankruptcy Court acted properly in issuing the . . . [i]njunction" because "[i]t is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected." *Id.* at 312–13 (second brackets in original) (quoting *Walker v. City of Birmingham*, 388 U.S. 307, 314 (1967)). "If respondents believed the . . . [i]njunction was improper," it should have been "challenged . . . in the Bankruptcy Court." *Id.* at 313. Then, if respondents were still "dissatisfied with the Bankruptcy Court's ultimate decision," they could appeal to the appropriate higher courts. *Id.* What respondents "c[ould not] be permitted to do" was "to collaterally attack the Bankruptcy Court's . . . [i]njunction in the federal courts in Texas," as this "seriously undercu[t] the orderly process of law." *Id.* In *Celotex*, the respondents asked the federal district court to ignore the bankruptcy court's injunction and allow what it forbade. Here, the *Federal Insurance* creditors do not merely ask this Court to ignore Judge Caproni's Order of Attachment; they ask this Court to vacate her order. *A fortiori*, that relief "cannot be permitted." *Id.*

Following the Supreme Court, federal courts around the country hold that federal district judges lack the authority to vacate, enjoin, or otherwise undo orders of another federal judge in a

separate action.  *See Klayman v. Judicial Watch, Inc.*, 851 F. App'x 222, 222 (D.C. Cir. 2021) ("The district court correctly concluded that it lacks jurisdiction to vacate prior orders of another district court." (citing *Celotex*, 514 U.S. at 313)); *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006) ("A federal district court lacks jurisdiction to review decisions of other federal courts."); *Bolin v. Story*, 225 F.3d 1234, 1240 (11th Cir. 2000) ("to allow injunctive relief against federal judges would be to permit" an improper "'horizontal appeal' from one district court to another"); *Mullis v. U.S. Bankr. Ct. for Dist. of Nev.*, 828 F.2d 1385, 1392–93 (9th Cir. 1987) (a "'horizontal appeal' from one district court to another" is an "improper" "collateral attac[k] on the judgments, orders, decrees or decisions of federal courts"); *id.* at 1393 ("A district court lacks authority to issue a writ of mandamus to another district court."); *Matthews v. FBI*, 2021 WL 2823124, at *4 (D.D.C. July 7, 2021) ("Neither inherent nor equitable powers allow the Court . . . to vacate the judgment of another district court."); *Hands v. U.S. Dist. Ct. for S. Dist. of Ala.*, 2005 WL 8158728, at *3 (S.D. Ala. June 3, 2005) ("To the extent that [plaintiff] is asking this Court to overrule, reverse, modify or invalidate Judge Butler's ruling, this Court plainly lacks the legal authority to do so."); *Lewis v. Green*, 629 F. Supp. 546, 553 (D.D.C. 1986) ("Challenges to rulings made during the course of judicial proceedings should be made by appeal in those cases. . . .  This Court . . . lacks authority to issue such orders [vacating the decisions of another district court judge.]"); *In re Pusser*, 123 F. Supp. 164, 167 (E.D.S.C. 1954) ("I have no power or authority to amend, modify or revoke an order of another United States District Judge.").

In *In re McBryde*, for example, a chief district judge "entered orders vacating" orders of another district judge in two cases and reassigning those cases to himself.  117 F.3d at 215.  In issuing a writ of mandamus, the Fifth Circuit explained that it is "antithetical to and incompatible with the structure of the federal judicial system" for a chief judge to "reassig[n] cases to himself

where he disagrees with the substance of a ruling made by the presiding judge." *Id.* at 225. Here, the *Federal Insurance* creditors are asking this Court effectively to reassign to itself the action pending before Judge Caproni and vacate an order she has entered in that case. This Court has no authority to take that action.

The *Federal Insurance* creditors argue that the Court "retains flexibility over the scope of [Proposed Intervenors'] intervention, and [can] subject [Proposed Intervenors] . . . to all relevant areas of dispute between the parties bearing on th[e] issue" of who has priority to the DAB funds. Cross-Mot. 10. Certainly, a court has "flexibility over the scope of intervention." *Chevron Corp. v. Donziger*, 2011 WL 2150450, at *7 (S.D.N.Y. May 31, 2011). But the *Federal Insurance* creditors cite no case in which intervention permitted the presiding district judge to review and vacate an order of a coordinate district judge. In short, however broad a district court's discretion over intervention, it has no discretion to decide an issue that would be improper for it to reach even if Proposed Intervenors were full participants in the MDL.

### B. Even if This Court Had Authority, It Would Be Highly Improper to Overrule Judge Caproni's Order of Attachment.

The *Federal Insurance* creditors do not grapple with any of this precedent regarding the limited scope of federal court jurisdiction. Instead, they argue that the Court has authority under New York state law—namely CPLR §§ 5225(b), 5239—to vacate the Order of Attachment. *See* Cross-Mot. 8–9 ("The Court in such a proceeding 'may vacate the execution or order.'"). But the *Federal Insurance* creditors also do not grapple with New York law that recognizes similar limits on a court's authority to review or disturb orders of a coordinate court. *See* 73 N.Y. Jur. 2d Judgments § 275 (a court's "judgment is conclusive until reversed on appeal or set aside" and is "not open to collateral attack on grounds of mere errors and irregularities"); *B.Z. Chiropractic, P.C. v. Allstate Ins. Co.*, 152 N.Y.S.3d 46, 68 (N.Y. App. Div. 2021) (Connolly, J., concurring in

part and dissenting in part) ("[A] court of original jurisdiction should not entertain an action for a declaration that another court's determination as to a particular controversy was incorrect."); *see also CSX Transp., Inc. v. Emjay Env't Recycling, LTD*, 2016 WL 755630, at *5 (E.D.N.Y. Feb. 25, 2016) (rejecting interpretation of CPLR § 5222 that would "allow one court to dissolve the order of another court").

Typically, in CPLR § 5225(b) and § 5239 proceedings, a court hears challenges from adverse claimants to the validity of a writ of execution issued by that court to a judgment creditor. *See, e.g.*, David D. Siegel, N.Y. Prac. § 521 (6th ed.) (explaining that "creditors of various stripes and with diverse claims of lien will be competing with judgment creditors to get at the assets of the judgment debtor"); CPLR § 5225(b) ("Upon a special proceeding commenced by the judgment creditor . . . [t]he court may permit any adverse claimant to intervene"); CPLR § 5239 ("[A]ny interested person may commence a special proceeding against the judgment creditor . . . . The court may vacate the execution or order[.]"); *cf. CSX Transp.*, 2016 WL 755630, at *5 (holding that "the court" that may lift a restraining order under CPLR § 5222 refers only to "the court that issued the judgment").[1]

Tellingly, the *Federal Insurance* creditors cite no case in which a court conducting a turnover proceeding under CPLR § 5225(b) vacated an attachment order issued by a different court in a different action. In *First Small Business Investment Corp. v. Zaretsky*, 259 N.Y.S.2d 700, 702 (N.Y. Sup. Ct. 1965), on which the *Federal Insurance* creditors rely, the petitioner—a purported judgment creditor—sought to have his rights to the funds at issue adjudicated in the first instance under CPLR § 5225(b). The question was whether his claims could be adjudicated in a CPLR

---

[1] *But see* Siegel, N.Y. Prac. § 521 (suggesting that a state court, when declaring "priority of all claimed liens," may "*incidentally* vacate any order, execution, or levy," but not addressing whether a vacated order must have been originally issued by the same state court, or considering the question with respect to a federal court (emphasis added)).

§ 5225(b) proceeding or needed a separate plenary action.  The court held that "a plenary action" was not "necessary" for the adjudication of any "factual disputes" regarding "the right to possession of the property."  *Id.* at 701–04.  Here, in contrast, Judge Caproni already held that Proposed Intervenors have a right to the funds at issue when she granted the Order of Attachment.

The *Federal Insurance* creditors' other case, *Neshewat v. Salem*, 365 F. Supp. 2d 508 (S.D.N.Y. 2005), also is inapposite.  There, a nonparty sought to intervene in a proceeding under § 5225(b), claiming that it had "bought a one-half interest in the property [at issue]."  *Id.* at 524. The court denied the motion to intervene, concluding that the nonparty in fact "d[id] not have any real interest in the property" because the court had already held that the nonparty's interest was the product of a fraudulent transfer.  *Id.* at 524–25.  That determination involved no review of another court's order—rather, the plaintiff had moved for summary judgment on that issue, and the court granted the plaintiff summary judgment on the fraudulent transfer question in the same order in which it denied the nonparty's motion to intervene.  *Id.* at 518–21, 524.

But even if, *arguendo*, the Court has authority under the CPLR that overrides the normal bounds of federal court jurisdiction and allows it to vacate an attachment order issued by a different court, it would be highly improper and contrary to precedent to do so here.  "Generally, principles of comity and judicial economy make courts reluctant to exercise jurisdiction over claims involving the orders of coordinate courts."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981); *e.g.*, *Westenberg v. Schmidt*, 181 F. Supp. 61, 62 (S.D.N.Y. 1959) ("One court of equity will not annul the decree and proceedings of another court of equity in a pending cause.  For this court of equity to assume to interpose would be most unseemly and an intolerable interference with the orderly administration of justice."); *Torquay Corp. v. Radio Corp. of Am.*, 2 F. Supp. 841, 844 (S.D.N.Y. 1932) ("Assuming for the moment that this court has jurisdiction of the present suit,

it is clear, as a matter of comity and of the orderly administration of justice, that this court should refuse to exercise its jurisdiction to interfere with the operation of a decree of another federal court.").

These principles carry even more force where, as here, another judge is already considering the same issues in another proceeding. Indeed, in the Second Circuit, "[t]here can be no doubt" that this exact scenario—"where [a] second judge . . . decide[s] a point that was already pending undecided in a separate proceeding, taking the decision, so to say, out of the first judge's lap"—is improper. *Dictograph Prods. Co. v. Sonotone Corp.*, 230 F.2d 131, 135 (2d Cir. 1956) (Hand, J.); *see also In re Brown*, 346 F.2d 903, 910 (5th Cir. 1965) ("[o]rderly procedure, of course, forbade Judge Cox to interfere with the handling of a case assigned to Judge Mize" in a manner that would "affect the decision to be made in" Judge Mize's case). For example, in *In re Hines*, 88 F.2d 423 (2d Cir. 1937), a party petitioned for leave to foreclose on a mortgage, but before the judge had ruled on the petition, the party "moved before another district judge for an order granting leave to foreclose the mortgage," and the second judge granted the motion. *Id.* at 424. The Second Circuit reversed, holding that it was "wholly unwarranted" for the party "to submit the same controversy to a different district judge." *Id.* at 425. "To permit another judge to rush in and snatch [the] decision from [the first judge's] mouth is not to be tolerated; it is a breach of comity which, if sanctioned, could only lead to unseemly conflicts of decision and to protracting the litigation." *Id.*

Similarly, "[u]nder the 'law of the case' doctrine, 'courts are understandably reluctant to reopen a ruling once made,' especially 'when one judge or court is asked to consider the ruling of a *different* judge or court.'" *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005) (emphasis added); *accord Holzsager v. Valley Hosp.*, 482 F. Supp. 629, 633 (S.D.N.Y. 1979) ("'a judge should not ordinarily disturb previous rulings of another judge in the

same case'"").  Though this doctrine is not always mandatory, *see Dictograph Prods Co.*, 230 F.2d at 134–36, the principle that federal judges ordinarily should not disturb prior rulings of a different judge in the *same* case reinforces the stark impropriety of the more extreme act of vacating an order of a different judge in a *different* case.[2]

This case is a paradigmatic example of why comity, efficiency, and orderly administration of justice demand noninterference with coordinate proceedings.  The *Owens* action is separate from this MDL, and always has been.  Soon after Proposed Intervenors filed suit, the Plaintiffs' Executive Committees in this MDL sought to have *Owens* consolidated here as a related case.  *See* Dkt. 7751.  Judge Netburn rejected that request, finding that the only similarity between the cases was that the "parties in both . . . have either attached the same [DAB] assets . . . to satisfy judgments against the Taliban, or have filed motions to attach those assets." Dkt. 7754, at 1.  Judge Netburn thus recognized that, absent consolidation, Judge Caproni would be adjudicating Proposed Intervenors' attachment motion, but nonetheless concluded that "there [we]re no efficiencies to be gained through their consolidation."  *Id.* at 2.  Now that Judge Caproni has already adjudicated that attachment motion—hearing oral argument and issuing multiple orders and a 12-page opinion—the *Federal Insurance* creditors' request that this Court re-adjudicate the attachment motion affirmatively *undermines* efficiency.

Not only has Judge Caproni already devoted significant time to Proposed Intervenors' original attachment motion, the confirmation proceedings on her Order of Attachment were

---

[2]  Though in some limited circumstances Federal Rule of Civil Procedure 60 may allow a court to "relieve a party or its legal representative from a final judgment, order, or proceeding" of another court, Fed. R. Civ. P. 60(b), Rule 60 does not aid the *Federal Insurance* creditors here.  Though a Rule 60(b) motion "is generally brought in the district court rendering judgment," a party may seek relief from a default judgment in the court in which it registers the judgment.  *Covington Indus., Inc. v. Resintex A.G.*, 629 F.2d 730, 732–34 (2d Cir. 1980).  The Order of Attachment is not a default judgment, nor could the *Federal Insurance* creditors bring a Rule 60 motion in this context.  They can in no sense obtain "relie[f]" from an Order of Attachment to which they are not a party.  Fed. R. Civ. P. 60(b), (d).  Nor is the Order of Attachment a final order, and Rules 60(b) and 60(d) apply only to final orders.  *See Torres v. United States*, 833 F.3d 164, 165 (2d Cir. 2016).

pending in her court *before* the *Federal Insurance* creditors filed their improper motion to vacate. *See Owens*, Dkt. 47 (filed May 2, 2022).  The *Federal Insurance* creditors themselves recognize that the very issues they wish to address—TRIA, the FSIA, and Executive Order 14064—are already in front of Judge Caproni in the confirmation motion proceedings.  *See* Cross-Mot. 7.  Yet, even though the CPLR provides multiple potential avenues for the *Federal Insurance* creditors to raise their concerns before Judge Caproni, *see* CPLR §§ 6211(b), 6221, 6223, they inexplicably chose not to attempt to participate in the confirmation proceedings or otherwise intervene in the suit before her.  Instead, they have asked this Court to undermine the authority and jurisdiction of a coordinate federal judge, negate months-long proceedings in Judge Caproni's courtroom, and "snatch [the] decision" from Judge Caproni.  *In re Hines*, 88 F.2d at 425.  "If this Court were to consider [the *Federal Insurance* creditors'] claims at this juncture, it would . . . duplicat[e] and possibly contradic[t] the orders of another court of equal authority and comparable jurisdiction." *Burrows for Interactive AIDS Counseling Servs., Inc. v. Reno*, 1993 WL 213017, at *3 (S.D.N.Y. June 17, 1993).  Not only is this a serious affront to comity, this Court would need to spend time and resources familiarizing itself with issues that have already been presented to Judge Caproni and are before her again.  That is not the efficient, orderly, or appropriate way to proceed.

### C.    This Court Should Adjudicate Only Whether Proposed Intervenors Have Priority.

Because the *Owens* suit addresses separate issues, and Proposed Intervenors are not now seeking turnover of the DAB funds, they saw no need to inject themselves into the turnover proceedings in this litigation until the *Federal Insurance* creditors entirely failed to acknowledge Proposed Intervenors' clear priority to the DAB funds in their turnover motion.  As a result, Proposed Intervenors have now accepted the Court's invitation to intervene.  *See* Apr. 26, 2022 Tr. 8–10 ("[I]f the Owens plaintiffs want to come in and they think they've got an interest and they

12

want to participate in the turnover proceedings, they can.").  But out of respect for Judge Caproni—and the bedrock principles of jurisdiction, comity, and judicial efficiency—they appropriately limited and tailored their request for intervention to the narrow issue of their superior priority over the *Federal Insurance* creditors with respect to the blocked DAB funds.

CPLR § 5225(b) supplies exactly such a "priority-determining proceedin[g]."  Siegel, N.Y. Prac. § 521.  And, notably, the question of priority is distinct from the question of whether Proposed Intervenors' Order of Attachment is valid.  For example, in *Manufacturers & Traders Trust Co. v. Lowenstein*, 458 N.Y.S.2d 117, 118 (N.Y. App. Div. 1982), the plaintiff moved to confirm its attachment order, while judgment creditors moved to vacate that attachment order under CPLR § 6223.  The trial court denied the motion to vacate, and the judgment creditors argued on appeal that the court "should have granted their motion to vacate, because their execution . . . ha[d] priority."  *Id.*  The Appellate Division rejected this argument, reasoning that "'[a]n order of attachment may be vacated . . . only upon a determination that it was illegally or improperly issued,'" and "[i]t is neither illegal nor improper to grant an order of attachment to one creditor simply because another creditor claims a priority."  *Id.*  In other words, priority is a separate issue from the propriety of the attachment.  "Once [a] plaintiff has its order of attachment," the court observed, "then it or any other creditor may commence a special proceeding to determine whose right is superior."  *Id.* (citing CPLR §§ 5239, 6221).  But "even if the [judgment creditors'] . . . right [was] superior, they would still not be entitled to have [the] order of attachment vacated."  *Id.*; *see also Sterling Nat'l Bank v. Freidman*, 163 N.Y.S.3d 33, 34 (N.Y. App. Div. 2022) (observing that petitioner "sought . . . a determination that [an] interest in its collateral took priority," but "did not seek to void the creditors' liens," and noting that "the validity of [those] attachment liens [wa]s currently the subject of [a separate] action, in which petitioner

ha[d] intervened").

Given the clear line that these cases draw between the priority of competing property interests and the validity of those interests, it is entirely appropriate under New York law for this Court to adjudicate the sole issue on which Proposed Intervenors seek intervention—priority—while leaving the validity of their Order of Attachment to Judge Caproni, as jurisdiction and comity dictate.[3]  It is also efficient, and it follows the path that was set in motion by this Court's refusal to consolidate *Owens* into this MDL.[4]

## II.   Proposed Intervenors Have Priority to the DAB Funds Under CPLR § 6226.

On the actual issue for which Proposed Intervenors sought intervention—priority—the *Federal Insurance* creditors have remarkably little to say.  In their proposed opposition to the *Federal Insurance* creditors' turnover motion, Proposed Intervenors conclusively demonstrated they have priority to the DAB funds under the governing statutory provisions, authoritative case law, and leading treatises on New York law.  Dkt. 8020-1, at 4–9.  The *Federal Insurance* creditors ignore all of these authorities in their response.  *See* Cross-Mot. 21–22.  Instead, they offer two paragraphs arguing without legal support—because there is none—that Judge Caproni's Order of Attachment cannot be used to establish priority over the DAB funds.  They are incorrect.

The CPLR provides unambiguous instructions about how to allocate priority among attachment orders and writs of execution—instructions that the *Federal Insurance* creditors

---

[3]  This Court should deny the *Federal Insurance* creditors' cross-motion outright for the reasons stated.  In the alternative, if it was restyled, the Court could consider transferring the cross-motion to the *Owens* action.  *See* CPLR § 6223.

[4]  The *Ashton* Plaintiffs "do not object to intervention by the *Owens* Plaintiffs," but they reiterate their already-rejected "request . . . that this Court take unified control over the disposition of the DAB Assets—including the claims of the *Smith* Plaintiffs—in order to achieve an equitable distribution."  Dkt. 8064, at 1–2.  The *Ashton* Plaintiffs previously tried to achieve such consolidation by filing a class action complaint designated as related to the *Owens* action before Judge Caproni, which this Court deemed "wholly inappropriate," Apr. 26, 2022 Tr. 4:2–3, and quickly dismissed, *see* Dkt. 7923.  Their request should again be rejected.  The various suits against the Taliban remain in "different procedural postures" and are unsuited to consolidation.  Dkt. 7754, at 2.

notably fail to mention.  CPLR § 6226 straightforwardly states that "[t]he priority between an *order of attachment and an execution*" "is set forth in section 5234."  (emphasis added).  CPLR § 5234(b) explains that "[w]here two or more *executions or orders of attachment* are issued against the same judgment debtor . . . and delivered to the same enforcement officer . . . they shall be satisfied . . . in the order in which they were delivered."  (emphasis added).  The *Federal Insurance* creditors do not and cannot dispute that they delivered their writ of execution to the U.S. Marshals Service nearly one month after Proposed Intervenors delivered their Order of Attachment.  So under the clear text of the CPLR, which governs these turnover proceedings under Federal Rule of Civil Procedure 64, *see Cap. Ventures Int'l v. Republic of Argentina*, 652 F.3d 266, 269 (2d Cir. 2011), Proposed Intervenors have priority over the *Federal Insurance* creditors.

Rather than address these dispositive authorities, the *Federal Insurance* creditors insist that an unconfirmed attachment order cannot be used to establish priority.  Cross-Mot. 21.  They cite no CPLR provisions or New York cases to support that proposition.  *See id.* at 21–22.  In actuality, the priority provisions in CPLR §§ 6226 and 5234 refer to "an order of attachment"—which plainly includes an "[o]rder of attachment without notice" issued under CPLR § 6211.  And none of the relevant CPLR provisions, cases, or treatises distinguishes between "confirmed" and "unconfirmed" attachment orders for purposes of priority.

Although the *Federal Insurance* creditors suggest it would be "inappropriate" for an *ex parte* prejudgment attachment order to "defeat the priority of an actual judgment holder," Cross-Mot. 21, that is precisely what New York law contemplates.  Regardless of the type of attachment, New York law firmly establishes that priority is decided upon delivery of the order or writ to the enforcement officer.  CPLR § 5234(b); *see DLJ Mortg. Cap., Inc. v. Kontogiannis*, 2013 WL 6409960, at *9 (N.Y. Sup. Ct. Dec. 6, 2013) ("[A] pre-judgment attachment creditor . . . can

15

achieve priority over a judgment creditor with respect to a debtor's property, if the attachment creditor actually levied upon the property, and/or delivers the execution or attachment order to the appropriate enforcement officer, first."); Richard C. Reilly, Practice Commentaries to McKinney's CPLR § 5234(b) ("When the competition is among judgment creditors who have issued executions, or plaintiffs who have obtained attachments under Article 62 of the CPLR, or any mixture of the two, and all deliver their executions or attachment orders to the same enforcement officer, priority is in the order of delivery."); Siegel, N.Y. Prac. § 520 n.1 ("Since a prejudgment order of attachment can seize property to the credit of the attaching plaintiff, a timely attachment will prevail over later levies of post-judgment execution[.]").

Importantly, the rules governing *ex parte* attachment orders make clear that such orders *must be delivered* to the enforcement officer and levied before they can be confirmed. *See* CPLR § 6211(b). Thus, under a straightforward application of New York law, which bases priority on delivery, an *ex parte* attachment order delivered first necessarily obtains priority before it is confirmed. No CPLR provision requires the plaintiff to deliver the attachment order to the enforcement officer *again* after confirmation. If the *Federal Insurance* creditors were correct that only confirmed orders can establish priority, then there would either be an unwritten requirement that plaintiffs resend their confirmed attachment orders to the enforcement officer, or some other unspecified means, apart from such delivery, by which confirmed attachment orders secure priority. *But see* CPLR § 6226. Neither result is consistent with New York law or common sense.

With nothing else to fall back on, the *Federal Insurance* creditors suggest that it would be contrary to the "spirit and intent of the CPLR" to allow Proposed Intervenors' Order of Attachment to have priority over their writ of execution. Cross-Mot. 22. Not so. The "best evidence" of the CPLR's intent is its text, *Theroux v. Reilly*, 803 N.E.2d 364, 366 (N.Y. 2003), which expressly

permits prejudgment attachment orders to obtain priority over postjudgment writs of execution, *see* CPLR § 5234(b).  While the *Federal Insurance* creditors extol the virtue of "diligence in seeking judgments and collecting on [them]," Cross-Mot. 22 n.10, it is they who failed to secure their rights to the DAB funds at an earlier date (by making their own prejudgment attachment motion, for example).  Insofar as New York "seems to favor the fleetest of foot," *Owens v. Taliban*, 2022 WL 1090618, at *5 n.8 (S.D.N.Y. Apr. 11, 2022), the *Federal Insurance* creditors would defy the "spirit and intent of the CPLR" by punishing victims of terrorist attacks who lawfully obtained priority before them.

### III.   The *Federal Insurance* Creditors' Attacks on the Validity of Judge Caproni's Order of Attachment Fail.

As discussed, it would be highly improper for this Court to re-adjudicate the merits of Judge Caproni's Order of Attachment, and this Court should decline that invitation.  But in any event, the *Federal Insurance* creditors' attacks on that order are without merit.

#### A.   Federal Law Does Not Preclude Prejudgment Attachment.

Under the Federal Rules of Civil Procedure, "every remedy is available" for "seizing . . . property to secure satisfaction of the potential judgment" "under the law of the state where the court is located," unless "a federal statute governs."  Fed. R. Civ. P. 64(a).  But nothing in Executive Order 14064—which implements the President's powers under the International Emergency Economic Powers Act ("IEEPA")—the FSIA, or TRIA "governs" prejudgment attachment of the blocked DAB assets.  Thus, prejudgment attachment remains available under New York law, and Proposed Intervenors have shown that they are entitled to that remedy.

**1. Executive Order No. 14064.**  Executive orders are interpreted like statutes.  *Ex parte Endo*, 323 U.S. 283, 298 (1944).  Accordingly, "the interpretation of an Executive Order begins with its text," *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018)

(citation omitted), and "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning," *Perrin v. United States*, 444 U.S. 37, 42 (1979).

The *Federal Insurance* creditors cannot seriously dispute that the ordinary meaning of "transfer" in Executive Order 14064 does not cover prejudgment attachment. *See* Exec. Order No. 14,064, 87 Fed. Reg. 8391, 8391 § 1(a) (Feb. 11, 2022) (funds "may not be transferred, paid, exported, withdrawn, or otherwise dealt in"). To "transfer" means "to convey from one person . . . to another: MOVE". Merriam-Webster, https://www.merriam-webster.com/ dictionary/transfer. That meaning is well accepted. *See, e.g.*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/transfer (defining "transfer" as "to move . . . something from one . . . person, or group[,] to another"; "to make something the legal property of another"); Black's Law Dictionary (11th ed. 2019) ("To convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of."). As a matter of common usage, no one would suggest that an asset has been "transferred" merely because a lien has been placed on the asset.

Alternatively, the *Federal Insurance* creditors contend that prejudgment attachment is barred by the catch-all phrase in Executive Order 14064 "otherwise dealt in." Cross-Mot. 15. But it is an established canon of interpretation that "words grouped in a list should be given related meaning[s]," *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977), and a catch-all phrase must "be controlled and defined by reference to the enumerated categories . . . which are recited just before it," *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). Here, the residual phrase "otherwise dealt in" immediately follows the list "transferred, paid, exported, withdrawn"—each of which involves *movement* of assets from one set of hands to another. Exec. Order 14,064, 87 Fed. Reg. at 8391 § 1(a). To construe "dealt in" to mean the creation of any legal

18

interest that merely *concerns* the blocked assets would render the preceding list superfluous; the phrase is far more naturally understood to refer to acts akin to "buy[ing] and sell[ing]."  Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/deal-in-sth (defining "deal in [something]" as "to buy and sell a particular product").  A writ of prejudgment attachment does not move the blocked assets and thus does not fit the residual phrase.

Supreme Court authority confirms both of these points.  As here, *Zittman v. McGrath*, 341 U.S. 446 (1951), concerned whether writs of prejudgment attachment obtained on New York bank accounts under New York law were valid under a presidential blocking order.  *Id.* at 447–48. Issued under the Trading With the Enemy Act, IEEPA's predecessor statute, the executive order there—like Executive Order 14064—"forb[ade] 'transactions' in the assets of blocked nationals, including all 'transfers' of such funds," and "dealings in" those funds.  *Id.* at 448 & n.5 (quoting Exec. Order 8389, as amended).  The Supreme Court rejected the very position the *Federal Insurance* creditors press here—that the prejudgment attachment levies were "transfers" or improper "dealings" "forbidden by" the executive order.  *Id.* at 449.  "*Execution*, if issued, would require a transfer of . . . funds," the Court reasoned, "but this step has not been taken," and "[a]lthough *the provisional remedy of attachment* . . . has served to . . . creat[e] a lien to secure satisfaction of the judgment, it is clear that it has neither attempted nor accomplished any transfer of possession."  *Id.* at 451 (emphases added).  The attachment created only a lien on the property, and the accounts "would be freed of the lien" "[i]f the judgment debtors chose to satisfy the judgments by other means, or to substitute an undertaking for the property attached."  *Id.*  Nothing about permitting prejudgment attachment "purported to frustrate the purposes of the federal freezing program," and the attachments were therefore valid.  *Id.* at 462–63.  So too here.

Unable to contest the ordinary meaning of the phrase "transferred," the *Federal Insurance*

creditors contend that the definitions of "transfer" in *other* OFAC regulations implementing *other* IEEPA orders apply.  Cross-Mot. 15–16, 15 n.8.  But the broader definitions of "transfer" in these regulations are *expressly* limited to the "part" of the Code of Federal Regulations in which they appear, because "[d]iffering foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter."  31 C.F.R. § 594.101 (Global Terrorism Sanctions) ("This part is separate from, and independent of, the other parts of this chapter[.]").[5]  Against that unbroken practice of expressly disclaiming the incorporation of definitions across different sanctions regimes, there is no merit to the *Federal Insurance* creditors' suggestion that the President "certainly incorporated" a broader definition of "transfer" in Executive Order 14064.  Cross-Mot. 16.  Unless and until OFAC issues regulations otherwise, the term "transfer" bears its ordinary meaning, which does not cover prejudgment attachment.

If anything, "foreign policy" considerations favor an ordinary-meaning construction of "transfer."  In addition to keeping the assets "out of the hands of the Taliban," *Owens*, Dkt. 6-25, at 1, Executive Order 14064 specifically was issued to "preserv[e]" the blocked assets for victims of terrorism who "inten[ded] to make" claims against the Taliban, Exec. Order 14,064, 87 Fed. Reg. at 8391.  Given this unique purpose, it makes little sense to construe Executive Order 14064 to forbid prejudgment attachment.  Certainly, there is "no suggestion that these attachment proceedings could in any manner benefit the enemy."  *Zittman*, 341 U.S. at 463.

The *Federal Insurance* creditors' remaining textual arguments are makeweight.  The term "blocked" in Executive Order 14064 does not preclude prejudgment attachment of its own force.

---

[5]   Indeed, *each* of the regulations that the *Federal Insurance* creditors cite in their exhibit, Dkt. 8057-1, contains the same limiting language ("This part is separate from, and independent of, the other parts of this chapter . . . .").  *See* 31 C.F.R. §§ 510.101; 515.101(a); 525.101; 535.101(a); 536.101(a); 541.101; 542.101; 544.101; 546.101; 547.101; 548.101; 549.101; 550.101; 551.101; 552.101; 553.101; 555.101; 558.101; 560.101; 562.101; 569.101; 570.101; 576.101; 578.101; 579.101; 582.101; 583.101; 584.101; 585.101; 587.101; 588.101; 589.101; 590.101; 591.101; 594.101; 597.101(a); 598.101(a).

*Contra* Cross-Mot. 13–14.  That term simply describes the legal status of the assets; it is not among the operative prohibitions on transferring, paying, exporting, withdrawing, or otherwise dealing in the assets—none of which applies here.  *See* Exec. Order 14,064, 87 Fed. Reg. at 8391 § 1(a).  In arguing otherwise, the *Federal Insurance* creditors badly misconstrue their cited cases, which merely describe the effect of "blocking" under particular sanctions regimes and regulations.  *See, e.g.*, *Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152, 156 (2d Cir. 2018) (citing Global Terrorism Sanctions regulations, which prohibit "transfers" as defined by the regulations).

And even the *Federal Insurance* creditors' preferred authorities make clear that an executive order under IEEPA does not inexorably preclude prejudgment attachment.  *See, e.g.*, *Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 809 n.12 (1st Cir. 1981) (recognizing that attachment is not always precluded by IEEPA blocking orders).  The decisions in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), and *Khuzestan*, 651 F.2d at 806, well illustrate the *Federal Insurance* creditors' basic error.  Both concerned the blocking of Iranian assets under the Iranian Assets Control regulations.  And both recognized that prejudgment attachments were *valid* when obtained, notwithstanding executive blocking orders that prohibited transfer of the assets; the questions presented concerned the President's authority to nullify those attachments under later-issued executive orders.  *See Khuzestan*, 651 F.2d at 807 (analogizing to *Zittman*, where "litigants were entitled to obtain prejudgment attachments," but noting that without a license, such attachments were ultimately "ineffectual as against" the President's "power to transfer, vest, and dispose of the assets"); *Dames & Moore*, 453 U.S. at 663 (noting regulation permitting prejudgment attachment under executive blocking orders, but holding that the President could later nullify such attachments).  If anything, these cases *reject* the principle that prejudgment

21

attachment is unavailable merely because assets are "blocked."[6]

Finally, the *Federal Insurance* creditors' invocation of "the President's near plenary authority to control blocked assets" is a red herring.  Cross-Mot. 16.  No one disputes that the President *may* prohibit prejudgment attachment under IEEPA and his constitutional authority over foreign affairs.  But the plain text and purposes of Executive Order 14064 strongly indicate that the President has not done so here.  *Cf. United States v. Johnson*, 56 F.3d 947, 957 (8th Cir. 1995) ("[I]t is axiomatic that Congress need not legislate to the full extent of its constitutional authority whenever it enacts a statute." (alteration in original) (citation omitted)).

**2. FSIA and TRIA.**  Citing a series of out-of-context statements, the *Federal Insurance* creditors separately contend that TRIA "comprehensively" covers the field of "attachment of blocked assets by terrorism victims"—to the exclusion of New York state law prejudgment attachment remedies.  Cross-Mot. 18.[7]  That is not the law.[8]

The *Federal Insurance* creditors fundamentally misunderstand the interplay between the FSIA and TRIA.  Under the FSIA, a foreign sovereign's property in the United States is generally immune from attachment and execution.  *See* 28 U.S.C. §§ 1609, 1611.  Plaintiffs seeking to recover against foreign sovereigns must therefore invoke "an exception to the principle of

---

[6]  The *Federal Insurance* creditors' suggestion (Cross-Mot. 17) that the Iranian Assets Control regulations show that prejudgment attachment is "prohibited absent" a "regulatory authorization" rests on a misunderstanding of how these regulations were implemented.  The Treasury Department there *first* affirmatively issued a regulation rendering "any attachment, judgment, decree, lien, execution, garnishment, or other judicial process . . . null and void" with respect to blocked property, *Dames & Moore*, 453 U.S. at 663, and later issued a second regulation crafting an exception to the first for *prejudgment* attachment, *id.*  The second regulation was thus made necessary by the first—not by the executive order itself.

[7]  The *Federal Insurance* creditors cite *Smith ex rel. v. Estate of Smith v. Federal Reserve Bank of New York*, 346 F.3d 264, 271 (2d Cir. 2003), but the word "comprehensively" appears nowhere in that opinion.

[8]  Nothing in the U.S. Statement of Interest supports the *Federal Insurance* creditors' position.  Its statements about TRIA were made in the context of addressing two "writs of *execution* on the DAB Assets," on the understanding that those plaintiffs would "assert" claims under TRIA.  Dkt. 7661, U.S. Statement of Interest 2 (emphasis added).  In that context, the United States' discussion of TRIA hardly "ma[k]e[s] clear that *any effort* to attach the blocked DAB funds must run through TRIA."  Cross-Mot. 18 (emphasis added).

sovereign immunity." *Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 368–69 (2009). TRIA provides such an exception—as its codification as a note to 28 U.S.C. § 1610 highlights—permitting attachment of property where it might otherwise be precluded by the FSIA. *Weininger v. Castro*, 462 F. Supp. 2d 457, 499 (S.D.N.Y. 2006) (TRIA "overrides the immunity conferred in [28 U.S.C.] § 1611"). But TRIA is by no means a field-preemptive statute on the law of attachment of foreign assets. *See Elahi*, 556 U.S. at 368–69 (noting that exception to sovereign immunity is required because "Iran is a sovereign nation," and "*[a]s the case reaches us*," TRIA "provides the sole possible exception" to sovereign immunity (emphasis added)).

Here, as Proposed Intervenors explained in their confirmation motion, no exception to foreign sovereign immunity—and hence no resort to TRIA—is necessary because the Taliban is not a recognized foreign government; the FSIA simply does not apply. *See Owens*, Dkt. 48, at 23–25. The FSIA provides that "the property of a foreign state" is immune from attachment, and property of a central bank is immune if "held for its own account." 28 U.S.C. § 1611(b)(1). The DAB assets here are neither assets of "a foreign state," nor assets of a central bank "held for its own account." Despite its formal legal structure, DAB today is an instrumentality of the Taliban, a non-state actor—not an organ of the state of Afghanistan—and overwhelming evidence shows that the blocked assets are not used for central banking functions. *Owens*, Dkt. 48, at 23–25.[9]

The *Federal Insurance* creditors also are wrong to suggest that TRIA's application to only "post-judgment attachments" renders *prejudgment* attachment "legal[ly] impossib[le]." Cross-

---

[9]   The *Federal Insurance* creditors relegate their discussion of the FSIA to a footnote, inexplicably asserting that Proposed Intervenors conceded that FSIA immunity applies by describing the assets at issue as those of "Central Bank of Afghanistan" in their initial attachment motion. Cross-Mot. 13 n.7. The quoted snippet appears in a sentence describing DAB's role before the Taliban takeover—not to whom ownership of the assets may now properly be attributed. *See Owens*, Dkt. 5, at 8; *compare with id.* at 2, 20, 25 (consistently describing assets as "held in DAB's name").

Mot. 18.  Federal law's application to one set of circumstances does not ordinarily preclude state law's application to another.  *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (where federal and state law do not expressly conflict, the scope of the federal statute must "indicat[e] that Congress intended federal law to occupy a field exclusively").  Indeed, it is telling that the *Federal Insurance* creditors' leading case addresses the application of the FSIA and TRIA to a *post*judgment execution action under CPLR Article 52—not prejudgment attachment under Article 62.  *See* Cross-Mot. 13 (citing *Levin v. Bank of N.Y.*, 2022 WL 523901, at *4 (S.D.N.Y. Feb. 22, 2022)).  And ultimately, the *Federal Insurance* creditors can cite only cases stating the truism that TRIA's remedy is limited to postjudgment attachment.  For example, the *Federal Insurance* creditors rely on *Smith*, 346 F.3d 264.  *See* Cross-Mot. 22.  But *Smith* simply explains that TRIA itself does not provide for prejudgment attachment.  346 F.3d at 271.  *Smith* nowhere holds that TRIA's remedy for judgment creditors comes at the exclusion of other available remedies, such as prejudgment attachment under the CPLR.  *See id.*  Because Executive Order 14064 does not preclude prejudgment attachment, *see supra* at 17–22, and no exception to sovereign immunity is required, ordinary state law prejudgment attachment remains available, *see* Fed. R. Civ. P. 64(a).

## B.    The Order of Attachment Was Granted for a Legally Valid Reason.

The *Federal Insurance* creditors' sole state-law rebuttal—that Proposed Intervenors sought prejudgment attachment for an improper "purpose," Cross-Mot. 19—fares no better.  Though they were not parties, the Plaintiffs' Executive Committees raised these arguments before Judge Caproni, who repudiated them when granting her Order of Attachment.  *Owens*, Dkt. 38, at 11–12.  This direct attack on Judge Caproni's opinion must be rejected outright.  *See supra* at 3–12.

As Judge Caproni explained, prejudgment attachment is warranted when the statutory criteria in CPLR § 6212 are satisfied, and a plaintiff has a "reasonable" "fear that the judgment" against an out-of-state defendant "will not be satisfied."  *TAGC Mgmt., LLC v. Lehman*, 842 F.

Supp. 2d 575, 586–87 (S.D.N.Y. 2012) (citation omitted); *see Owens*, Dkt. 38, at 10.  Nothing requires a plaintiff to justify attachment by proving that *the defendant* may attempt to move assets to frustrate a judgment.   Under CPLR § 6201(1), when the defendant is a nondomiciliary, its insolvency alone is enough.  *See, e.g.*, *Thornapple Assocs., Inc. v. Sahagen*, 2007 WL 747861, at *5 (S.D.N.Y. Mar. 12, 2007) (collecting cases).

That is true regardless of the existence of other judgment creditors.  In fact, the existence of other creditors with unpaid judgments tends only to demonstrate the insolvency of the would-be judgment debtor.  *See Owens*, Dkt. 5, at 21–22 (collecting cases).  As Judge Caproni rightly concluded, Proposed Intervenors need an attachment to secure the Taliban's assets for judgment.  *See id.*, Dkt. 38, at 12.   Much like Argentina in *Capital Ventures International v. Republic of Argentina*, 443 F.3d 214 (2d Cir. 2006), the Taliban has limited assets in the United States, it already owes significant judgments to other creditors, and it has expressed no willingness to pay judgments issued by U.S. courts.   And the United States' blocking action—even assuming it remains in effect indefinitely—does not diminish at all Proposed Intervenors' need for security here.  A levy on the DAB assets is the only way for Proposed Intervenors to secure the ability to collect on a judgment against the Taliban.[10]

## CONCLUSION

Proposed Intervenors respectfully request that the Court grant their limited motion to intervene and deny the *Federal Insurance* creditors' cross-motion to vacate Judge Caproni's Order of Attachment.

---

[10]  The authorities cited by the *Federal Insurance* creditors in support of their state-law argument are inapposite.  In *Ames v. Clifford*, 863 F. Supp. 175 (S.D.N.Y. 1994), and *J.V.W. Investment Ltd. v. Kelleher*, 837 N.Y.S.2d 650 (N.Y. App. Div. 2007), the plaintiffs could not show that the "defendant's financial position" "pose[d] a real risk to the enforceability of a future judgment," *Ames*, 863 F. Supp. at 177; *see also Kelleher*, 837 N.Y.S.2d at 651 (security not needed where assets were already subject to liquidation proceedings before a Bahamian court).

Dated:  June 10, 2022

Respectfully submitted,

/s/ Matthew D. McGill

Rebecca Monck Ricigliano
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Telephone:  (212) 895-4000
Facsimile:  (212) 223-4134
rricigliano@crowell.com

John L. Murino
(*pro hac vice* application forthcoming)
Stuart H. Newberger
(*pro hac vice* application forthcoming)
Emily M. Alban
(*pro hac vice* application forthcoming)
CROWELL & MORING LLP
1001 Pennsylvania Ave. NW
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

Caragh Glenn Fay
(*pro hac vice* application forthcoming)
Amanda Fox Perry
(*pro hac vice* application forthcoming)
FAY LAW GROUP, P.A.
6205 Executive Boulevard
Rockville, MD 20852
Telephone:  (202) 589-1300
Facsimile: (202) 216-0298

Jane Carol Norman
(*pro hac vice* application forthcoming)
BOND & NORMAN LAW, PC
6205 Executive Blvd.
Rockville, MD 20852
Telephone:  (202) 682-4100
Facsimile: (202) 207-1041
jnorman425@icloud.com

Matthew D. McGill
Jessica L. Wagner
(*pro hac vice* application forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 530-9522
mmcgill@gibsondunn.com

Robert L. Weigel
Jason W. Myatt
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 351-4000
Facsimile: (212) 351-5236
rweigel@gibsondunn.com
jmyatt@gibsondunn.com

*Counsel for Proposed Intervenors*

26