# Exhibit 18



**The New York Times**
620 8TH AVENUE • NEW YORK, NY 10018

# PROOF OF PUBLICATION

Jun-06, 20**22**

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of *The New York Times*, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of *The New York Times* on the following date or dates, to wit on

June 6, 2022, NYT & Natl, pg B4

Sworn to me this 6th day of June, 2022

*Ellen Herb*
Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

**PUBLIC NOTICE**
**To the Taliban and Da Afghanistan Bank**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN, 03-CV-6978-GBD-SN, Judgment Creditors Federal Insurance Co., et al. ("the Federal Insurance Creditors") have filed a motion seeking a turnover of assets of Da Afghanistan Bank (DAB) held in the Federal Reserve Bank of New York (FRBNY). The Federal Insurance Creditors seek these assets to satisfy the final judgment entered by the Court on April 20, 2022 against the Taliban in connection with the terrorist attacks of September 11, 2001. Pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. Sections 5225(b) and 5227, and Section 201(a) of the Terrorism Risk Insurance Act of 2002, the Federal Insurance Creditors' motion seeks to compel FRBNY to turn over the blocked assets of DAB in an amount sufficient to satisfy the outstanding amount of their award of compensatory damages as of the date the motion was filed, namely $14,672,806,120.64.

This is a notice that the motion has been filed. The motion papers are available in both English and Pashto at the following website: www.DABturnover.com

**TRIPPED UP**

# Help! What Can I Do If an Airline Switched My Booked Flight Plan?

Dear Tripped Up,

My question is about airlines switching itineraries, a huge frustration for me since returning to travel after a pandemic pause. I will book a direct flight at a good time and then get an email days or weeks later with an inconvenient time change or an added layover or both. The worst was when I was planning a trip with my daughter to Tampa, Fla. In January, I booked a direct flight on Southwest Airlines that left Hartford, Conn., at 12:30 p.m. on April 17 and arrived in Tampa three hours later. Perfect. But on Feb. 15, Southwest emailed that they had moved me onto a 6:15 p.m. flight with a nearly three-hour layover in Nashville, getting me to Tampa at 1:10 a.m.! Why is this OK? It's like I bought a nice Subaru Forester and they delivered a dilapidated and rusty Trans Am and told me it was the only option.

*Phoebe, Massachusetts*



MIGUEL PORLAN

Dear Phoebe,

Leave it to airlines to make car dealerships seem transparent by comparison. While you could certainly sue your fictional dealer for breach of contract, the real Southwest was within their contractual rights to cancel your original flight and put you on that midnight plane from Nashville.

There's no law against an airline unilaterally changing your itinerary, and in such cases, the main rule the U.S. government requires the airlines to follow is a flimsy one. If a carrier imposes a new itinerary on a customer that would result in a "significant delay," the company must offer you a refund, in your case $264 each for two "Wanna Get Away" fares, Southwest's equivalent of economy class.

They did, but as you told me over Zoom, canceling the trip wouldn't do: You wanted to go to Florida, and had already arranged lodging. The airline gave you another option, saying you could search for an alternative Southwest itinerary, then make the change online or through customer service (which you did, painfully, as we'll get to later).

Dan Landson, a Southwest spokesman, said that though he could not go into detail on your individual case, "there was nothing out of the ordinary that occurred."

In fact, it was all too ordinary: From other readers, friends and members of my own family, I've received multiple similar tales of woe recently. But it's hard to pin down figures on flights that change more than a week before departure. The federal government's Bureau of Transportation Statistics does not collect such data, according to the bureau's Ramond Robinson, nor does FlightAware, the go-to site for statistics on airline delays and cancellations, according to a company spokeswoman, Kathleen Bangs.

The six airlines (American, Delta, United, Southwest, Alaska, JetBlue) I asked would not provide specific data. To be fair, such figures would be very complicated, since many airlines schedule flights 330 days in advance that are "essentially placeholders," said Suresh Acharya, a professor at the University of Maryland's Robert H. Smith School of Business who has worked on airline optimization systems for two decades. The schedules solidify 90 to 180 days in advance, he said, and many changes — like a switch to a larger aircraft — are barely noticeable to customers.

But Morgan Durrant, a Delta spokesman, did say that in early 2021 "there were a lot of schedule changes, beyond anything we had seen before" as the carrier added more flights and made other adjustments to its existing schedule. That wouldn't be surprising for Delta and other carriers during the pandemic, considering the unpredictability not only of customer demand but of crew retirements and illnesses and delays in delivering new aircraft because of supply chain disruptions.

When schedule changes do happen, said Southwest's Mr. Landson, "we accommodate all our customers onto the next available flight. In some situations that could involve a much later flight than originally planned. It's something that we don't like to happen, but from time to time it does."

If you're annoyed now, Phoebe, you're not going like this next bit at all. You were most likely the victim of industrywide policies that discriminate against a specific kind of customer — let's call them "normal" — who choose the cheapest airfare they can find, no matter what airline it's on.

That matters because, according to Professor Acharya, airline algorithms rank passengers in order of importance, based on variables that might include fare class, loyalty status, whether you paid in miles or dollars, how big your group is and whether you're an airline employee.

As you told me, Phoebe, you were able to find two other options on the Southwest website that worked better for you. The best was a midday flight from just-as-convenient (for you) Providence that almost precisely matched your original itinerary, the other a direct evening flight from Hartford on your desired travel date. You were dismayed when the site would not let you on the Providence flight, and in a vexing, eight-hour, on-and-off Twitter conversation with Southwest the next day, you learned it was because Providence and Hartford were not "co-terminals" — a frustrating piece of jargon meaning that the airline did not consider them interchangeable. But you ultimately rebooked that evening flight from Hartford.

That's annoying, but the big mystery to me is why weren't you automatically rebooked on that evening flight. Mr. Landson surmised that by the time your number came up in the seat reassignment process, others had filled in the open seats on the flight, but spots opened up by the time you looked.

When I presented that answer to Professor Acharya, he warned that there might also be a "shady" possibility. Airlines sometimes tweak algorithms to give weight to revenue considerations over customer satisfaction, he said, and it was theoretically possible Southwest held some of those Hartford to Tampa seats open to maximize revenue by selling later. Mr. Landson objected to that, saying in cases like this one Southwest always books passengers on the next available flight if there is enough room for their group.

Going forward, you and other readers can take measures to minimize such frustrations, though in most cases they will cost time, money or maybe both.

One option is to simply book closer to the flight date. As Professor Acharya said, schedules become much more settled by 90 days out, so the later you book after that, the lower the chance of changes. Of course this doesn't help in the case of weather problems and Covid spikes that knock out crews, and you may miss out on early bird prices.

Another option, one that I am now considering for myself, is to abandon the "cheapest fare wins" strategy. Favor the airline that flies most on routes you frequent, spending $20 or even $50 extra as you work your way toward loyalty status. (Airline-branded credit cards can help, although they have their own issues.) Status also helps when flights are canceled last minute as well.

Third, and possibly only worth it when you have a narrow window in which you must arrive for a wedding or another important event, is what George Hobica, founder of airfarewatchdog.com, suggests: buy a second, fully refundable seat on a different airline at around the same time. Refundable flights are more expensive, but you can cancel and receive your money back anytime before your scheduled departure. So if your original ticket is changed to an unacceptable time, you get a refund on that one and fly your backup; if your original does not change, you cancel your refundable backup.

Of course, the line between corporate greed and customer satisfaction is hidden deep within secret airline algorithms. But it struck me that we could solve at least part of the problem if airlines thought we'd be willing to pay more across the board for them to build more slack into the system. I mentioned that to Ms. Bangs of FlightAware.

"We have a system like that," she joked. "It's called private aviation."

*-SETH KUGEL*

---

# A Test for Workplace Devotion Has Emerged from the Back-to-Office Debate

**By VIVIAN GIANG**

As long as work has existed, employers have tried to size up their employees' commitment to their jobs. Are you on the fast track? The mommy track? The leadership track?

Now, if some corporate leaders have their way, there will be a new test for workplace devotion — and anyone who opts for remote work gets a failing grade. But can C.E.O.s really claw their way back to 2019?

This past week, Elon Musk issued an ultimatum to Tesla and SpaceX employees requiring them to return to the office for at least 40 hours per week — or lose their jobs. Mr. Musk, who is known for having camped out for weeks at Tesla factories, thinks remote work is an affront to productivity and personal commitment. Last month, he praised Chinese workers for "burning the 3 a.m. oil," comparing them with American workers who, he said, are "trying to avoid going to work at all."

Jamie Dimon said last month that working from home isn't for people who want "to hustle." The bank has been criticized for tracking employees' ID badge swipes to monitor how often they were coming to the office, along with similar policing by rivals like Goldman Sachs.

Mr. Dimon believes JPMorgan's work setup "will look just like it did before" by September or October. But he also admitted in a letter to shareholders that remote work "will become more permanent in American business."



AN RONG XU FOR THE NEW YORK TIMES

Goldman Sachs is among the companies tracking the time workers spend in the office. Corporate America's resistance to remote work has many facets.

"Although the pandemic changed the way we work in many ways, for the most part it only accelerated ongoing trends," Mr. Dimon wrote. As my colleague Lananh Nguyen reported, he didn't sound particularly happy about it, ticking off the "serious weaknesses" of virtual work, including slowed decision-making and a lack of "spontaneous learning and creativity."

The resistance to remote work has many facets, including the bottom line: Many organizations have made pricey investments in office real estate, which has led to the creation of vast economic systems that are ultimately reliant on having workers at their desks.

"I'm trying to fill up office buildings, and I'm telling JPMorgan, Goldman Sachs, I'm telling all of them, 'Listen, I need your people back into office so we can build the ecosystem,'" Mayor Eric Adams of New York City said last week. The city, which is heavily reliant on tax revenue from massive Midtown offices, recently announced a strict policy of in-person work for city employees.

"How does that look that city employees are home while I'm telling everyone else it's time to get back to work?" Mr. Adams added. "City employees should be leading the charge of saying, 'New York can be back.'"

Beyond the bottom line, the back-to-office debate is about what kind of culture will prevail as the business world emerges from the pandemic. And for all of the power wielded by Mr. Musk, Mr. Dimon and Mr. Adams, they may be fighting a shift that is larger than any single company or city.

If the pandemic's two-plus years of remote work experimentation have taught us anything, it's that many people can be productive outside the office, and quite a few are happier doing so. That's especially true for people with young children or long commutes and minority workers who have a tougher time fitting in with the standard office culture.

"We still are struggling to let go of the ideal worker stereotype — even though that person, for a lot of people and occupations and demographic groups in the U.S., never really existed," said Colleen Ammerman, the director of the Gender Initiative at Harvard Business School. "I think with remote work, and hybrid, we have the potential to truly move away from that and really rethink about what it means to be on a leadership track, what it means to be a high performer, and get away from that being associated with being in the office at all hours."

Even as the pandemic has changed course, there are signs that the work-from-home trend is actually accelerating. One recent survey published in the National Bureau of Economic Research found that employers are now saying they will allow employees to work from home an average of 2.3 days per week, up from 1.5 days in the summer of 2020.

It's not just the office — it's also the commute. The Wall Street Journal reported last week that almost all of the major cities with the biggest drops in office occupancy during the pandemic had an average one-way commute of more than 30 minutes; and most cities with the smallest drops had shorter commutes.

And Americans are increasingly booking stays for longer than 30 days on Airbnb, Vrbo and Booking.com, according to Vered Raviv Schwarz, the president and chief operating officer of Guesty, a software management tool for short-term rentals. At first, industry experts thought the extended stays might be a pandemic blip. But it's gone on for long enough that it may signal workers with jobs that can be done remotely are doubling down on working outside of the normal commute-to-work patterns.

At its heart, the battle over remote work is a test of corporate America's definition of an ideal worker. For decades or even longer, that has been a person who prioritizes their job above all else and has no outside commitments.

It's "an incredibly powerful story," said Brigid Schulte, the director of the Better Life Lab program at the think tank New America. "It's part of our culture. It's part of our DNA."

It's probably not shocking that people who are lower on the org chart tend to be less enthusiastic about returning to the office than the senior leaders and executives who thrived in the in-person Before Times.

"For many C.E.O.s and managers, that's how they worked. That's how they succeeded and that's the only way they know," Ms. Schulte said. "All of this was completely false; it was totally a fake story we've been telling ourselves."

> ### 'It's part of our culture. It's part of our DNA.'
>
> Brigid Schulte, the director of the Better Life Lab program at the think tank New America, about the concept that an ideal worker prioritizes their job above all else.

### DealBook/

DealBook helps you make sense of the day's most important business and policy headlines. Sign up for the newsletter at
**nytimes.com/dealbook**

What do you think? Let us know: dealbook@nytimes.com

**PUBLIC NOTICE**
**To the Taliban and Da Afghanistan Bank**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN, 03-CV-6978-GBD-SN, Judgment Creditors Federal Insurance Co., et al. ("the Federal Insurance Creditors") have filed a motion seeking a turnover of assets of Da Afghanistan Bank (DAB) held in the Federal Reserve Bank of New York (FRBNY). The Federal Insurance Creditors seek these assets to satisfy the final judgment entered by the Court on April 20, 2022 against the Taliban in connection with the terrorist attacks of September 11, 2001. Pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. Sections 5225(b) and 5227, and Section 201(a) of the Terrorism Risk Insurance Act of 2002, the Federal Insurance Creditors' motion seeks to compel FRBNY to turn over the blocked assets of DAB in an amount sufficient to satisfy the outstanding amount of their award of compensatory damages as of the date the motion was filed, namely $14,672,806,120.64.

This is a notice that the motion has been filed. The motion papers are available in both English and Pashto at the following website: www.DABturnover.com