# Exhibit 19



# PROOF OF PUBLICATION

Jun-13, **20**22

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

June 13, 2022, NYT & Natl, pg B3

Sworn to me this 13th day of June, 2022

Ellen Herb

Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

**PUBLIC NOTICE**
**To the Taliban and Da Afghanistan Bank**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN, 03-CV-6978-GBD-SN, Judgment Creditors Federal Insurance Co., et al. ("the Federal Insurance Creditors") have filed a motion seeking a turnover of assets of Da Afghanistan Bank (DAB) held in the Federal Reserve Bank of New York (FRBNY). The Federal Insurance Creditors seek these assets to satisfy the final judgment entered by the Court on April 20, 2022 against the Taliban in connection with the terrorist attacks of September 11, 2001. Pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. Sections 5225(b) and 5227, and Section 201(a) of the Terrorism Risk Insurance Act of 2002, the Federal Insurance Creditors' motion seeks to compel FRBNY to turn over the blocked assets of DAB in an amount sufficient to satisfy the outstanding amount of their award of compensatory damages as of the date the motion was filed, namely $14,672,806,120.64.

This is a notice that the motion has been filed. The motion papers are available in both English and Pashto at the following website: www.DABturnover.com

**INTERNATIONAL**

# Food Export Bans In Asia Raise Fears Of More Embargoes

FROM FIRST BUSINESS PAGE

"Switching to a new menu also means entering into a new market that we are unsure of," Ms. Lee, 30, said in a Facebook message.

Global food supplies have been disrupted by not only the war in Ukraine, but also by the coronavirus pandemic, recent bouts of extreme weather, and rising energy and fertilizer prices. In the Asia Pacific region, those pressures threaten hundreds of millions of poor people who spend a high percentage of their incomes on basic commodities like rice and wheat.

In April, Indonesia, the world's largest producer of palm oil, suspended exports of the crop to try to ease rising prices of cooking oil at home. Prices of vegetable oils globally had surged after the war caused Ukraine's sunflower oil exports to crater. The Indonesian government reversed its ban less than a month later.

Last month, India banned wheat exports, with some exceptions, in the wake of an extraordinary heat wave that had severely damaged the domestic wheat harvest. The Commerce Ministry said the ban was necessary because a spike in the crop's price, "arising out of many factors," was threatening India's food security.

This month, Malaysia suspended chicken exports, much of which go to Singapore. Officials said last month it was an effort to give domestic prices and farmers' production costs — which had been driven up by the price rise in corn and soybeans — a chance to stabilize.

"The government's priority is our own people," Prime Minister Ismail Sabri Yaakob of Malaysia said at the time.

Such export bans sometimes help reduce domestic prices of the commodities in question, analysts say. They may also make political sense to leaders concerned about the public backlash from price surges that pinch the budgets of low-income city dwellers.

But the bans also have clear downsides, and it's not clear that they help in the long run. One obvious risk is that export bans by countries that rely heavily on food imports could prompt neighbors to retaliate, analysts say. Another is that a country that imposes an export ban could be blocking domestic farmers from accessing lucrative export markets.

India's wheat ban, for example, was welcomed by urban consumers as a check on rising food prices, but was unpopular with farmers who lost the opportunity to cash in further on record-high wheat prices, according to a recent analysis by Cullen S. Hendrix, a professor of international studies at the University of Denver.

In Indonesia, President Joko Widodo is almost certainly aware that the price of cooking oil has figured prominently in public surveys of his performance, said Bhima Yudhistira Adinegara, the director of the Center of Economic and Law Studies, a think tank in the capital, Jakarta. So his export ban made sense for "political reasons."

"The government has to do something or it will be seen as dysfunctional," he said.

Still, the ban was widely seen as misguided and ineffective, and it did not calm prices, as Mr. Joko's government had promised it would.

Eceu Titi, 50, a street vendor in Jakarta, said that the price of cooking oil in her neighborhood was about 14,000 Indonesian rupiah, or about 96 cents, per liter before the export ban took effect, and has been nearly double that ever since, even though the ban ended last month.

Ms. Eceu has raised the prices of her fried snacks as a result, and she tries to make the same amount of oil last longer in her fryer, she said. But when some customers complained about her recent price increase, she agreed to reinstate her old price for them, at a loss.

SAM PANTHAKY/AGENCE FRANCE-PRESSE — GETTY IMAGES

Wheat at a seaport in Kandla, India. The country has mostly banned wheat exports after a heat wave damaged crops.

FAZRY ISMAIL/EPA, VIA SHUTTERSTOCK

Chickens for sale in Kuala Lumpur, Malaysia. The country's chicken export ban is affecting its neighbor Singapore.

"I don't have the heart to insist on selling at the new price," she said. "We are in this together, and they are my regulars."

Now a primary concern is that the region's food export restrictions will multiply and spill over into other commodities, including rice, the food stock of the world's poor. Some say the current situation carries echoes of 2008, a year when some of the world's largest rice exporters, including India and Vietnam, restricted their exports, sending consumers panicking and prices soaring.

**'I don't have the heart to insist on selling at the new price. We are in this together, and they are my regulars.'**

Eceu Titi, a street food vendor in Jakarta who charges more because of the climbing cost of cooking oil, but gives some customers a break.

That crisis, which followed spikes in wheat, corn and other major agricultural commodities, had not been caused by a rice crop failure or even a shortage of the grain. Still, for a few weeks, it prompted fears of civil unrest. At one point, President Gloria Macapagal Arroyo of the Philippines, Asia's leading rice importer at the time, deployed armed soldiers to supervise government rice sales.

Peter Timmer, an emeritus professor of development studies at Harvard University who helped the United States government respond to the 2008 crisis, said he worried that the current shortages of wheat and corn would push India and Vietnam to reprise their rice restrictions.

Last month, a spokesman for the Thai government, Thanakorn Wangboonkongchana, told Reuters that Thailand and Vietnam "aim to raise rice prices, increase farmer income and increase bargaining power" in the global rice market. The chairman of the Vietnam Food Association, Nguyen Ngoc Nam, told the news agency that the two countries would meet in June but did not aim to control prices.

Whatever happens, Mr. Timmer said, it's clear that the current pressures on food supply chains, which include energy and fertilizer shortages, are already far more complex than they were 14 years ago.

"But what is common to the 2008 situation is that we can make this really complicated, difficult situation much, much worse if countries start putting up the trade barriers," he said.

Muktita Suhartono contributed reporting.

# *Despite a Robust Economy, India's Job Market Remains Stagnant for Millions*

FROM FIRST BUSINESS PAGE

try into the $5 trillion-or-more club alongside the United States, China and Japan.

The government reported late last month that the economy had expanded 8.7 percent in the last year, to $3.3 trillion. But with domestic investment lackluster, and government hiring slowing, India has turned to subsidized fuel, food and housing for the poorest to address the widespread joblessness. Free grains now reach two-thirds of the country's more than 1.3 billion people.

Those handouts, by some calculations, have pushed inequality in India to its lowest level in decades. Still, critics of the Indian government say that subsidies cannot be used forever to paper over inadequate job creation. This is especially true as tens of millions of Indians — new college graduates, farmers looking to leave the fields and women taking on work — are expected to seek to flood the nonfarm work force in the coming years.

"There is a historical disconnect in the Indian growth story, where growth essentially happens without a corresponding increase in employment," said Mahesh Vyas, the chief executive of the Center for Monitoring Indian Economy, a data research firm.

Among the job seekers despairing over the lack of opportunities is Sweety Sinha, who lives in Haryana, a northern state where unemployment was a staggering 34.5 percent in April.

As a child, Ms. Sinha liked to pretend to be a teacher, standing in front of her village classroom with fake eyeglasses and a wooden baton, to fellow students' great amusement.

Her ambition came true years later when she got a job teaching math at a private school. But the coronavirus upended her dreams, as the Indian economy contracted 7.3 percent in the 2020-21 fiscal year. Within months of starting, she and several other teachers were laid off because so many students had dropped out.

Ms. Sinha, 30, is again in the market for a job. In November, she joined thousands of applicants vying for much-coveted work in the government. She has also traveled across Haryana seeking jobs, but turned them down because of the meager pay — less than $400 a month.

"Sometimes, during nights, I really get scared: What if I am not able to get anything?" she said.

"All of my friends are suffering because of unemployment."

But for Indian politicians, a high unemployment rate "is not a showstopper," said Mr. Vyas, the economist, adding that they were far more concerned with inflation, which affects all voters.

India's reserve bank and finance ministry have tried to tackle inflation, which is battering many countries because of pandemic-related supply chain problems and the war in Ukraine, by restricting exports of wheat and sugar, raising interest rates and cutting taxes on fuel.

The bank, after raising borrowing rates in May for the first time in two years, increased them again on Wednesday, to 4.9 percent. As it did so, it forecast that inflation would reach 6.7 percent over the next three quarters.

**8.7%**

The country's economic growth in the last year, to $3.3 trillion.

**34.5%**

The unemployment rate in the northern state of Haryana.

Reserve bank officials have also employed an array of fiscal and monetary tactics to continue supporting growth, which cooled in the first quarter of 2022, falling to 4.1 percent. Household consumption, a major driver of India's economy, has dropped in the last few months.

"We are committed to containing inflation," said the bank's governor, Shaktikanta Das. "At the same time, we have to keep in mind the requirements of growth. It can't be a situation where the operation is successful and the patient is dead."

While the Bank of England and the Federal Reserve in the United States have said their countries need to accept lower growth rates because of high commodity prices, India's reserve bank is not in that camp, said Priyanka Kishore, an analyst at Oxford Economics. "Growth matters a lot for India," she said. "There's a political agenda."

The ban on food exports is a sharp turnabout for Mr. Modi. In response to Russia's blockade on Ukrainian ports, which has led to a global shortage of grains, he had said in April that Indian farmers could help feed the world. Instead, with the global wheat shortfalls driving up prices, the Indian government imposed an export ban to keep domestic prices low.

Temporary interventions like these are easier than addressing the fundamental problem of large-scale unemployment.

"You have wheat in your godowns and you can ship it out to households and get instant gratification," Mr. Vyas said, referring to storage facilities, "whereas trying certain policies for employment is far more protracted and intangible."

Those policies, analysts say, could include greater efforts to build up India's underdeveloped manufacturing sector. They also say that India should ease regulations that often make it difficult to do business, as well as reducing tariffs so manufacturers have an easier time securing components not made in India.

Exports have been a source of strength for the Indian economy, and the rupee has depreciated by about 4 percent against the U.S. dollar since the beginning of the year, which would normally boost exports.

But inflation in the United States and war in Europe have started to affect sales for Indian-made clothes, said Raja M. Shanmugam, the president of a trade association in Tiruppur, a textile hub in the state of Tamil Nadu.

"All the input cost is increasing. Even earlier this industry worked on wafer-thin margins, but now we are working on loss," he said. "So a situation which is normally a happy situation for the exporters is not so anymore."

The struggles of working-class Indians, and the millions of unemployed, may eventually cause a drag on growth, economists say.

Zia Ullah, who drives an autorickshaw in Tumakuru, an industrial city in the southern Indian state of Karnataka, said his income was still only about a quarter of what it was before the pandemic.

The $20 he used to earn daily was enough to cover household expenses for his family of five, and school fees for his three children.

"Customers are preferring to walk," he said. "No one seems to have money these days to take an auto."

Mr. Ullah, 55, said the cost of food had climbed so much that he had to cut down on meals and take two of his children out of school.

"Only one, the elder daughter, goes to school now," Mr. Ullah said. "The rest look around for work in the area."

Hari Kumar contributed reporting.

IDREES MOHAMMED/EPA, VIA SHUTTERSTOCK

A job fair in Chennai in May. The struggles of working-class Indians, and the millions of jobless, may eventually cause a drag on growth, economists say.

Watch The Times.
NYTimes.com/Video.

**PUBLIC NOTICE**
**To the Taliban and Da Afghanistan Bank**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN, 03-CV-6978-GBD-SN, Judgment Creditors Federal Insurance Co., et al. ("the Federal Insurance Creditors") have filed a motion seeking a turnover of assets of Da Afghanistan Bank (DAB) held in the Federal Reserve Bank of New York (FRBNY). The Federal Insurance Creditors seek these assets to satisfy the final judgment entered by the Court on April 20, 2022 against the Taliban in connection with the terrorist attacks of September 11, 2001. Pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. Sections 5225(b) and 5227, and Section 201(a) of the Terrorism Risk Insurance Act of 2002, the Federal Insurance Creditors' motion seeks to compel FRBNY to turn over the blocked assets of DAB in an amount sufficient to satisfy the outstanding amount of their award of compensatory damages as of the date the motion was filed, namely $14,672,806,120.64.

This is a notice that the motion has been filed. The motion papers are available in both English and Pashto at the following website: www.DABturnover.com

**UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE**

In re: CHARMING CHARLIE HOLDINGS INC., *et al.*,[1] Debtors. ) Chapter 11 ) Case No. 19-11534 (MFW) ) (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

**PLEASE TAKE NOTICE THAT** on June 8, 2022, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. 1366] (the "Disclosure Statement Order")[2]: (i) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Charming Charlie Holdings Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Disclosure Statement"); (ii) establishing procedures for soliciting, receiving, and tabulating votes on the *Amended Joint Chapter 11 Plan of Liquidation of Charming Charlie Holdings Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"); (iii) scheduling a hearing on the confirmation of the Plan; and (iv) approving notice procedures relating thereto.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **July 20, 2022, at 2:00 p.m. (prevailing Eastern Time)**, before the Honorable Judge Mary F. Walrath, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 5th Floor, Wilmington, Delaware 19801.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **July 11, 2022, at 4:00 p.m. (prevailing Eastern Time)** (the "Plan Objection Deadline"). All objections to the relief sought at the Confirmation Hearing ***must***: (i) be in writing, (ii) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the court, (iii) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection, and (iv) be filed with the court (contemporaneously with a proof of service) and served upon the following parties so as to be ***actually received*** on or before the Plan Objection Deadline: (a) counsel to the Debtors, Paul Hastings LLP, 71 South Wacker Drive, Suite 4500, Chicago, Illinois 60606, Attn: Matthew Murphy and Matthew Smart; (b) co-counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti, Michael W. Yurkewicz, and Sally E. Veghte; (c) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer, Esq.; (d) counsel to the Committee, Cooley LLP, 55 Hudson Yards, New York, New York 10001, Attn: Cullen D. Speckhart and Summer McKee; and (e) co-counsel to the Committee, Potter Anderson & Corroon LLP, 1313 N. Market Street, 6th Floor, Wilmington, Delaware 19801, Attn: Christopher M. Samis, L. Katherine Good, and Aaron H. Stulman.

**PLEASE BE ADVISED**: THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date**. The voting record date is June 7, 2022, which is the date for determining which holders of Claims in Class 3 and Class 4 are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **July 11, 2022, at 4:00 p.m., (prevailing Eastern Time)** (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you must: (i) follow the instructions carefully, (ii) complete all of the required information on the ballot, and (iii) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is actually received by the Debtors' notice and claims agent, Kroll Restructuring Administration LLC (the "Solicitation Agent") on or before the Voting Deadline. A failure to follow such instructions may disqualify your vote.

**RELEASES, EXCULPATIONS, AND INJUNCTIONS**

**ARTICLE IX** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE 9.2 CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

Please be advised that the Plan contains certain releases, injunctions, and exculpation provisions, as set forth in the Plan and below:

**Relevant Definitions**

"***Exculpated Parties***" means, collectively, in each case in its capacity as such and to the extent they are estate fiduciaries: the Debtors; each of the Debtors' respective directors and officers serving after the Petition Date through the Effective Date of the Plan; the Committee; each of the members of the Committee, solely in their capacity as a member of the Committee; and each of the Debtors' and Committee's attorneys, financial advisors, investment bankers, and other professional advisors (each in their capacity as such) retained in the Chapter 11 Cases.

"***Released Parties***" means, collectively, the Debtors; the Term Loan Lenders; the Term Loan Agent; the Vendor Facility Lenders; the Vendor Facility Agent; the Holders of Interests in Holdings; the Committee and its members; and with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, direct and indirect subsidiaries, affiliates, current and former directors, principals, shareholders, employees, managers, officers, members, agents, financial advisors, attorneys, accountants, investment bankers, insurers, consultants, affiliates, representatives, board members, and other professionals, each in their capacity as such; *provided* that, solely with respect to any Claim of a Releasing Party against such Releasing Party's insurer or surety, such insurer and surety shall not constitute a Released Party as to such Releasing Party; *provided*, *however*, that any Holder of a Claim or Interest who would otherwise be a Released Party that does not affirmatively elect to "opt in" to being a Releasing Party shall not be a "Released Party."

"***Releasing Parties***" means, collectively, (a) the Term Loan Lenders; (b) the Term Loan Agent; (c) the Vendor Facility Lenders; (d) the Vendor Facility Agent; (e) the Holders of Interests in Holdings; (f) the Committee and its members, solely in their capacity as members of the Committee; (g) all Holders of Claims or Interests that affirmatively elect to "opt in" to being a Releasing Party on such Holder's Ballot; and (h) with respect to each of the foregoing entities, any party who could claim derivatively by and through them.

**Debtor Release. Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released by each of the Debtors and their Estates, jointly and severally, from any and all Causes of Action, whether known or unknown, including, without limitation, any derivative claims asserted on behalf of the Debtors that any of the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating directly or indirectly to, or in any manner arising from, in whole or in part, any of the Debtors, the Debtors' or their Estates' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, this Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the pursuit of entry of the Confirmation Order, the pursuit of consummation of this Plan, the administration and implementation of this Plan, including the Distribution of property under this Plan or any other related agreement, or based on or relating, directly or indirectly, to any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that, notwithstanding the foregoing, the Debtors shall not release any Claims that are determined in a Final Order to have constituted fraud, intentional misconduct, or gross negligence, whether known or unknown. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan and do not release any right to enforce this Plan or Confirmation Order.**

**Third-Party Release. As of the Effective Date, each Releasing Party is deemed to have released each Released Party from any and all Causes of Action, whether known or unknown, including, without limitation, any derivative claims asserted on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating, directly or indirectly to, or in any manner arising from, in whole or in part, any of the Debtors, the Debtors' or their Estates' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, this Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the pursuit of entry of the Confirmation Order, the pursuit of consummation of this Plan, the administration and implementation of this Plan, including the distribution of property under this Plan or any other related agreement. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan and do not release any right to enforce this Plan or Confirmation Order.**

**Exculpation. To the fullest extent permissible under applicable law and without affecting or limiting the Debtor Release, except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Exculpated Claim, obligation, cause of action, or liability for any Exculpated Claim, except for fraud, gross negligence, or willful misconduct. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of the Plan and the distributions contemplated pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Injunction. Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been compromised, settled, or released, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials), please feel free to contact the Solicitation Agent, by: (i) calling the Debtors' restructuring hotline at (877) 473-6628 (US/Canada, toll-free) or (917) 994-8418 (international, toll); (ii) visiting the Debtors' restructuring website at: https://cases.ra.kroll.com/charmingcharlie; (iii) writing to Charming Charlie Ballot Processing, c/o Kroll Restructuring Administration LLC (f/k/a Prime Clerk LLC), 850 Third Avenue, Suite 412, Brooklyn, New York 11232; and/ or (iv) emailing charmingcharlieinfo@ra.kroll.com. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://ecf.deb.uscourts.gov. Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may not advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**. The Debtors will file the Plan Supplement (as defined in the Plan) pursuant to the terms of the Plan, and will serve notice on all holders of Claims entitled to vote on the Plan, among others, which will: (i) inform parties that the Debtors filed the Plan Supplement, (ii) list the information contained in the Plan Supplement, and (iii) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN. IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

Dated: June 8, 2022, Wilmington, Delaware

*/s/ Domenic E. Pacitti* , Domenic E. Pacitti (DE Bar No. 3989), Michael W. Yurkewicz (DE Bar No. 4165), Sally E. Veghte (DE Bar No. 4762), **KLEHR HARRISON HARVEY BRANZBURG LLP,** 919 N. Market Street, Suite 1000, Wilmington, Delaware 19801, Telephone: (302) 426-1189, Facsimile: (302) 426-9193 -and- Matt Murphy (admitted *pro hac vice*), Matthew Smart (admitted *pro hac vice*), **PAUL HASTINGS LLP,** 71 South Wacker Drive, Suite 4500, Chicago, Illinois 60606, Telephone: (312) 499-6036, Facsimile: (312) 499-6100, *Co-Counsel for the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Charming Charlie Canada LLC (0693); Charming Charlie Holdings Inc. (6139); Charming Charlie International LLC (5887); Charming Charlie LLC (0263); Charming Charlie Manhattan LLC (7408); Charming Charlie USA, Inc. (3973); and Poseidon Partners CMS, Inc. (3302). The location of the Debtors' headquarters is: Charming Charlie, c/o WeWork, 1725 Hughes Landing Blvd., The Woodlands, Texas 77380.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Order.