**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- x
                        )
                        )
In re Terrorist Attacks on September 11, 2001 )
                        )
                        )
                        )
                        )
                        )
-------------------------------------------------- x

No. 03 MDL 1570 (GBD/SN)

ECF Case

**ORAL ARGUMENT REQUESTED**

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**DUBAI ISLAMIC BANK'S MOTION FOR SUMMARY JUDGMENT AND**
**RENEWED MOTION FOR DISMISSAL FOR LACK OF PERSONAL JURISDICTION**

## TABLE OF CONTENTS

**Page**

**TABLE OF EXHIBITS** ........................................................................... ii

**TABLE OF AUTHORITIES** .................................................................. iv

**INTRODUCTION** .................................................................................. 1

**BACKGROUND** ..................................................................................... 3

    A.    Dubai Islamic Bank ............................................................. 3

    B.    This Litigation And The Initial Ruling On Personal Jurisdiction In 2010 ........... 4

    C.    Discovery Developed No Support For Plaintiffs' Allegations ............................. 5

    D.    Plaintiffs' Responses To Requests For Admission Underscore The Absence Of Evidence ......................................................... 10

**ARGUMENT** ........................................................................................ 13

I.    THIS COURT LACKS SPECIFIC JURISDICTION BECAUSE DIB DID NOT PURPOSEFULLY DIRECT ITS FOREIGN CONDUCT AT THE US ........................ 14

    A.    Plaintiffs' Purposeful Direction Allegations Found No Factual Support ........... 15

    B.    Discovery Confirmed That DIB Had *No Suit-Related Conduct* Directed At The US ......................................................................... 19

    C.    Discovery Confirmed That DIB Had *No Intention* To Attack The US .............. 20

    D.    The Decisions Of The Second Circuit And This Court Confirm This Court Lacks Personal Jurisdiction Over DIB .............................. 21

    E.    The Declassified Files Provide No Support For Purposeful Direction ............... 23

II.    THIS COURT LACKS SPECIFIC JURISDICTION BECAUSE DIB HAS NO US-LINKED CONDUCT RELATED TO PLAINTIFFS' CLAIMS ............................. 29

III.    EXERCISING SPECIFIC JURISDICTION OVER DIB WOULD BE UNREASONABLE UNDER THE FEDERAL DUE PROCESS CLAUSE .................. 29

IV.    THERE IS NO STATUTORY BASIS FOR SPECIFIC JURISDICTION .................... 30

**CONCLUSION** .................................................................................... 30

**TABLE OF EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Decl. of Mohamed Saeed Al Sharif, with Decl. Exs. A & B |
| Exhibit 2 | Certified English translation of the Arabic text in Decl. Ex. A to Ex. 1 |
| Exhibit 3 | Decl. Ex. B to Ex. 1 including certified English translation of pages containing Arabic text |
| Exhibit 4 | Decl. of Haroun Dharsey |
| Exhibit 5 | Dep. Tr. of Dr. Hussein Hamid Hassan (excerpts) |
| Exhibit 6 | Dep. Tr. of Judge Alan Fine (excerpts) |
| Exhibit 7 | Dep. Exs. 271 (excerpts), 272, & 276 to Ex. 6 |
| Exhibit 8 | Decl. of Abdulrahman Mohamed Al Ansari, with Decl. Exs. A, B, C, & D |
| Exhibit 9 | Decl. Ex. A to Ex. 8 including certified English translation of pages containing Arabic text |
| Exhibit 10 | Decl. Ex. B to Ex. 8 including certified English translation of pages containing Arabic text |
| Exhibit 11 | Certified English translation of the Arabic text in Decl. Ex. D to Ex. 8 |
| Exhibit 12 | Decl. of Amr Abou El Maaty, with Decl. Ex. A |
| Exhibit 13 | Certified English translation of the Arabic text in Decl. Ex. A to Ex. 12 |
| Exhibit 14 | Decl. of Bader Ibrahim Abdullah Al Maazmi, with Decl. Exs. A, B, & C |
| Exhibit 15 | Certified English translation of the Arabic text in Decl. Ex. A to Ex. 14 |
| Exhibit 16 | Certified English translation of the Arabic text in Decl. Ex. B to Ex. 14 |
| Exhibit 17 | Certified English translation of the Arabic text in Decl. Ex. C to Ex. 14 |
| Exhibit 18 | Certified English translation of the Arabic text in Fayez Rashid Ahmed Hassan Al Qadi's account statements at DIB |
| Exhibit 19 | Pls.' Resps. & Objs. to Def. Dubai Islamic Bank's First Set of Reqs. for Admis. (Mar. 23, 2020) |

| Exhibit 20 | Pls.' Suppl. Resps. to Def. Dubai Islamic Bank's Second Set of Reqs. for Admis. (May 27, 2021) (excerpts) |
|---|---|
| Exhibit 21 | Pls.' Resps. & Objs. to Def. Dubai Islamic Bank's Third Set of Reqs. for Admis. (Aug. 5, 2021) (excerpts) |
| Exhibit 22 | Pls.' Second Suppl. Resps. to Def. Dubai Islamic Bank's Second Set of Reqs. for Admis. (Apr. 23, 2022) (excerpts) |
| Exhibit 23 | Pls.' Suppl. Resps. & Objs. to Def. Dubai Islamic Bank's Third Set of Reqs. for Admis. (Apr. 23, 2022) (excerpts) |
| Exhibit 24 | "Document 3" as received from counsel for Plaintiffs |
| Exhibit 25 | "Document 17" as received from counsel for Plaintiffs |
| Exhibit 26 | "Document 31" as received from counsel for Plaintiffs |
| Exhibit 27a | "Document 55" (part 1) as received from counsel for Plaintiffs (split because of ECF size limitations) |
| Exhibit 27b | "Document 55" (part 2) as received from counsel for Plaintiffs (split because of ECF size limitations) |

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alwand Vahan Jewelry, Ltd. v. Lustour, Inc.*,
  2021 WL 3604517 (S.D.N.Y. Aug. 13, 2021) ...................................................................30

*Bridgeway Corp. v. Citibank*,
  201 F.3d 134 (2d Cir. 2000) ...............................................................................................27, 28

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
  137 S. Ct. 1773 (2017) .......................................................................................................29

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ...........................................................................................................15

*Charles Schwab Corp. v. Bank of Am.*,
  883 F.3d 68 (2d Cir. 2018) .................................................................................................14, 15

*Chrysler Cap. Corp. v. Century Power Corp.*,
  778 F. Supp. 1260 (S.D.N.Y. 1991) ...................................................................................30

*City of N.Y. v. Pullman Inc.*,
  662 F.2d 910 (2d Cir. 1981) ...............................................................................................27

*Coughlin v. Tailhook Ass'n*,
  1994 WL 780904 (D. Nev. Sept. 2, 1994) .........................................................................28

*Dorchester Fin. Sec. v. Banco BRJ*,
  722 F.3d 81 (2d Cir. 2013) .................................................................................................14, 30

*Ferguson v. Valero Energy Corp.*,
  2010 WL 11550025 (E.D. Pa. Feb. 16, 2010) ...................................................................27, 28

*Fisher v. Clark Aiken Matik, Inc.*,
  2005 WL 6182823 (M.D. Pa. Sept. 26, 2005) ...................................................................28

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
  141 S. Ct. 1017 (2021) .......................................................................................................13, 14, 29, 30

*Grant v. Lockett*,
  2021 WL 5816245 (2d Cir. Dec. 8, 2021) .........................................................................28

*Hines v. Brandon Steel Decks, Inc.*,
  886 F.2d 299 (11th Cir. 1989) ...........................................................................................28

*In re Sept. 11 Litig.*,
  621 F. Supp. 2d 131 (S.D.N.Y. 2009) ...............................................................................27, 28

*In re Terrorist Attacks on Sept. 11, 2001*,
  295 F. Supp. 3d 416 (S.D.N.Y. 2018) ...............................................................................17, 22, 26

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013) ..................................................................................... *passim*

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Terrorist Attacks on Sept. 11, 2001*,
  718 F. Supp. 2d 456 (S.D.N.Y. 2010)..............................................................................*passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
  538 F.3d 71 (2d Cir. 2008)..............................................................................................*passim*

*Katz v. Goodyear Tire & Rubber Co.*,
  737 F.2d 238 (2d Cir. 1984)....................................................................................................30

*Lakah v. UBS AG*,
  996 F. Supp. 2d 250 (S.D.N.Y. 2014)......................................................................................28

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999)..................................................................................................................13

*Sullivan v. Dollar Tree Stores, Inc.*,
  623 F.3d 770 (9th Cir. 2010) ...................................................................................................27

*United States v. El-Mezain*,
  664 F.3d 467 (5th Cir. 2011) ...................................................................................................27

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
  477 F. Supp. 3d 241 (S.D.N.Y. 2020)......................................................................................26

*Walden v. Fiore*,
  571 U.S. 277 (2014).........................................................................................................*passim*

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016)..............................................................................................22, 30

*Zurich Am. Life Ins. Co. v. Nagel*,
  2021 WL 5225947 (S.D.N.Y. Nov. 10, 2021) .........................................................................29

**OTHER AUTHORITIES**

*9/11 Comm'n Rep.* (2004).............................................................................................................23, 28

NY CPLR 302....................................................................................................................................30

Fed. R. Civ. P. 4........................................................................................................................13, 30

Fed. R. Civ. P. 12...................................................................................................................1, 14, 26

Fed. R. Civ. P. 56.......................................................................................................................14, 26

Fed. R. Evid. 803...............................................................................................................................27

J. Risen & B. Weiser, *U.S. Officials Say Aid for Terrorists Came Through Two
  Persian Gulf Nations*, N.Y. Times (July 8, 1999) .....................................................................5

## INTRODUCTION

Defendant Dubai Islamic Bank ("DIB" or "Bank") seeks summary judgment (or, alternatively, dismissal on a renewed Rule 12 motion) on the ground that this Court lacks personal jurisdiction over it. *See* MDL ECF 7160, 7929. DIB is a leading Middle East financial institution and one of the largest banks in the United Arab Emirates ("UAE"). DIB condemns terrorism and the tragic attacks on September 11, 2001 ("9/11"), and the victims deserve justice. But the facts are clear that DIB never assisted or intended those attacks.

DIB has no presence in the United States and had none on 9/11. Nevertheless, this Court over a decade ago, without the benefit of discovery, denied DIB's motion to dismiss for lack of personal jurisdiction, inferring from Plaintiffs' allegations that DIB had purposefully directed its activities at the US and that Plaintiffs' injuries were related to those activities. The Court emphasized ***allegations*** that DIB intentionally provided banking services "directly to Osama bin Laden and al Qaeda" and was "directly involved in helping to fund" 9/11. 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010) (ECF 2252). In particular, the Court inferred from the allegations that (i) DIB had a relationship with and intentionally laundered money for bin Laden, despite government warnings in 1999; and (ii) bin Laden's chief financial officer, Mustafa Ahmed al-Hisawi, had a DIB account that he used to transfer funds to 9/11 hijackers in the US.

After over a decade of discovery, those critical allegations have proven false: Bin Laden had ***no*** relationship with DIB, and neither his CFO nor anyone else used ***any*** DIB account to transfer funds to any hijacker in the US. Moreover, DIB sought to combat terrorism, not to support it. After a July 1999 press report ("July 1999 Article") suggested a relationship between DIB and bin Laden, DIB immediately investigated and found none. As part of that effort, DIB's US counsel promptly contacted the US State Department to offer DIB's full cooperation and seek additional information to investigate. The US government, however, never provided any names or account

numbers, or otherwise requested additional cooperation from DIB.  Far from knowingly *assisting* al Qaeda, DIB offered help to the US government's efforts *against* al Qaeda.

Indeed, document discovery was devastating to Plaintiffs' allegations, and they essentially abandoned further discovery.  They chose to take **only one fact witness deposition** from among the **37** purported witnesses they identified against DIB.  That deposition of Judge Alan Fine— DIB's prior US counsel—only **confirmed the failure** of Plaintiffs' allegations.  Plaintiffs deposed **none** of DIB's seven expert witnesses.

Even document discovery beyond Plaintiffs' initial allegations failed to yield any other factual basis for personal jurisdiction.  Based on, among other things, DIB's searching of its electronic banking records of its hundreds of thousands of customers for 629 names provided by Plaintiffs, the Parties identified just ten DIB accountholders who might have had links to al Qaeda.  And in responses to requests for admission served after document discovery closed, Plaintiffs admitted these key points about those ten customers:

- **No funding**.  Plaintiffs admitted "that they are not in possession of evidence" that any of the relevant accountholders used DIB accounts for funding "the 9/11 operation" or even "funding al Qaeda" more generally.  Ex. 20, Nos. 1–20.

- **No designation**.  Plaintiffs did "not contend that, prior to September 11, 2001," any of the accountholders "was designated by that name as the subject of sanctions administered by the U.S. Office of Foreign Assets Control or the United Nations Security Council."  Ex. 19.

- **No knowledge**.  Plaintiffs admitted they had "insufficient" information to "admit or deny that there is no evidence that DIB had any knowledge or awareness, prior to [9/11], of any involvement in Al Qaeda by its customer[s]" or that any DIB accounts were used "by Al Qaeda" or "for Al Qaeda's purposes."  Ex. 21, Nos. 1–20.

DIB filed the original iteration of this motion in December 2021.  ECF 7420.  However, after the US government disclosed to Plaintiffs certain files that Plaintiffs presented as declassified Central Intelligence Agency ("CIA") files ("Declassified Files"), Plaintiffs amended some of these admission responses.  They made no changes in substance as to **funding**, and made no changes at

all as to **designation**, but now deny the absence of evidence as to **knowledge**, purportedly "[i]n light of" the Declassified Files. Ex. 23 at 1 & Nos. 1–20. Those files, however, provided no basis for Plaintiffs' change: Even the purportedly relevant portions concern only alleged actions three years or more before 9/11, not directed at the US, and not done by DIB itself but rather by its founder and one-time chairman—who, tellingly, was among the 37 purported witnesses against DIB whom Plaintiffs identified but *declined to depose*. The files also are, in any event, inadmissible. The undisputed facts remain that no DIB financial services *had* any connection to 9/11 and that DIB never *sought* to promote terrorism or assist a US attack. The requisite conduct and intent for personal jurisdiction are lacking. This Court should dismiss the claims against DIB.

## BACKGROUND

### A. Dubai Islamic Bank

DIB is a publicly traded banking company incorporated under UAE law and headquartered in Dubai. Ex. 1 ¶ 13. The corporation has always conducted all its business from Dubai or its other Middle Eastern offices. *Id.* ¶ 14; *see id.* ¶¶ 15–17.

Founded in 1975, DIB is one of the oldest continuously functioning Islamic banks in the world. Ex. 5 at 53:7–14, 58:19–21, 198:10–15. Islamic banks offer traditional banking services but use methods that comply with Islamic principles, such as the prohibition on paying or receiving interest and the importance of fairness and transparency. *Id.* at 186:2–191:11; *see In re Terrorist Attacks*, 538 F.3d 71, 77, 95–96 (2d Cir. 2008) ("*9/11 III*") (describing Islamic banking), *abrogated in part on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).

In the years 1999 through 2001, DIB had over 200,000 different customers and over 300,000 customer accounts, completing 7 to 10 million transactions per year. Ex. 4 ¶¶ 10–12.

In 1998 and 1999, the Dubai government and UAE Central Bank "closely supervised" DIB in response to a $200 million fraud against DIB (unrelated to terrorism or bin Laden). Ex. 6 at

28:1–20, 29:15–18, 89:4–7; Ex. 8 ¶ 25; Ex. 1 ¶¶ 18–19, 22.  The Bank was, "in effect, intervened in, and the government was calling the shots."  Ex. 6 at 28:1–7, 30:4–5, 32:2–15, 47:11–18; *see* Ex. 1 ¶¶ 18–19.  The Dubai government increased its ownership of DIB to 30%; approved hiring an investigator to investigate the fraud; and installed new senior leadership—appointing in March 1998 a new Executive Committee "to oversee DIB's operations" and "run the Bank," displacing the Board of Directors.  Ex. 1 ¶ 18; Ex. 8 ¶¶ 26, 28–30, 32 & Ex. C; Ex. 6 at 27:1–28:7, 69:10–14, 88:10–22.  As DIB's largest shareholder after the fraud, the Dubai government "had the most influence over determining who served on" the new Board installed in 1999.  Ex. 1 ¶ 19.  The Central Bank, which regulates UAE banks, also audited DIB daily for months, and DIB hired outside auditors to help prevent future frauds, in addition to suing the fraudster, a Mali-based man external to DIB, whom the US government indicted for other crimes.  Ex. 6 at 29:15–18, 48:1–17.

**B.  <u>This Litigation And The Initial Ruling On Personal Jurisdiction In 2010</u>**

In the six cases remaining against DIB in this MDL, Plaintiffs claim that DIB is liable because it allegedly knowingly provided financial services to al Qaeda in connection with 9/11.  In 2005, DIB moved to dismiss for lack of personal jurisdiction, among other grounds.  ECF 954-2.[1]  In 2010, before discovery, the Court determined that Plaintiffs' allegations sufficed for a *prima facie* showing of specific personal jurisdiction.  718 F. Supp. 2d at 489–90 ("*9/11 IV*"), *rev'd in part on other grounds*, 714 F.3d 659 (2d Cir. 2013) ("*9/11 VII*").  Taking the allegations as true, the Court concluded that DIB "allegedly purposely directed its activity at the United States and its residents" and thus had "the requisite minimal contacts for specific jurisdiction"; that "plaintiffs' claimed injuries are related to DIB's alleged tortious conduct"; and that exercising jurisdiction was reasonable.  *Id.*  In reaching its conclusion, the Court surveyed four sets of allegations:

---

[1] ECF citations are of the MDL docket unless otherwise indicated.

**[1.]** Plaintiffs allege that, in 1999, the United States government announced that DIB was laundering money for Osama bin Laden. United States intelligence officials had allegedly obtained evidence that ***Osama bin Laden had a financial relationship with DIB***, which was believed to have been arranged with the approval of the officials who control the bank. Plaintiffs further allege that, in 1999, United States officials visited the United Arab Emirates to put a halt to such a relationship by demanding the government end its purported lax supervision of the bank. **[2.]** ***DIB allegedly continued to knowingly provide financial and other forms of material aid to Osama bin Laden and al Qaeda, while disregarding the warnings and refusing to adhere to even minimal banking industry standards*** designed to thwart the support of terrorist networks through anti-terrorist and money laundering safeguards, and "know your customer" regulations.

**[3.]** Plaintiffs claim that, in addition to bin Laden being allowed to funnel money through the bank, ***al Qaeda operatives used their bank accounts at DIB to send money to suspect charities***. **[4.]** Plaintiffs further allege that ***DIB itself provided direct financial services and support for the attacks against the United States on 9/11***. Specifically, plaintiffs allege that the bank account of Osama bin Laden's Chief Financial Officer[, Mustafa Ahmed al-Hisawi,] was the source of thousands of dollars of money transfers from DIB to two of the hijackers. The sole purpose of those fund transfers was allegedly to pay for the hijacker's training, including flight lessons, and other expenses incurred in preparing for the 9/11 terrorist attacks.

*Id*. at 488–89 (brackets and emphases added); *see* ECF 1064 at 4 (Pls.' Opp., identifying Hisawi).

The Court emphasized the first, second, and fourth sets of allegations. *See* 718 F. Supp. 2d at 488–89 & n.13; *cf. id.* at 492–93.

## C. Discovery Developed No Support For Plaintiffs' Allegations

Thereafter, more than a decade of discovery ensued, with DIB's document productions ending in 2018. The resulting factual record reveals that every one of the ***four sets*** of allegations on which the Court relied in 2010 has ***no factual support***:

### 1. *There was no DIB account for or "financial relationship with" bin Laden.* When this

Court ruled, the only basis for suspecting DIB may have had some financial relationship with bin Laden was the July 1999 Article. J. Risen & B. Weiser, *U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations*, N.Y. Times (July 8, 1999). DIB thoroughly and immediately investigated that claim then, searching its records for accounts and transfers in bin Laden's name

and finding none.  Ex. 1 ¶¶ 20–26, 32; Ex. 6 at 25:18–21, 26:23–27:4, 92:1–11, 102:17–104:11,
110:2–7, 15–19, 121:2–7, 125:9–126:6.  As part of the investigation, DIB—through its then-US
counsel *Alan Fine* (now a Florida state-court judge), hired in 1998 in connection with the fraud
against DIB—tried "to find out if there were any facts to support the allegations … and to get
information that would assist the bank in continuing its investigation" of them; Mr. Fine quickly
contacted the US State Department with DIB's "offer of cooperation."  *Id.* at 76–78, 82, 85, 87,
96–98, 102:17–104:11, 112:2–115:12, 119:24–120:19; Ex. 1 ¶ 22.  (The State Department had
fielded questions about the July 1999 Article at a briefing on the day it appeared.  Ex. 6 at 108:23–
109:7.)  Mr. Fine informed a public-affairs official that "[w]e wanted to know if they had any
information that could help identify any facts related to the allegations"—because DIB "had
conducted a search for anything in Osama bin Laden's name," "came up with nothing," and "had
no idea where this was coming from."  *Id.* at 105:17–24, 110:2–7, 15–19.

　　　Mr. Fine was directed to "the person who would have the most knowledge regarding any
facts that could possibly substantiate the allegations": the State Department's Middle East
counterterrorism expert, Steve Kashkett.  *Id.* at 23:7–13, 106:16–107:2.  Mr. Fine told him that
DIB had investigated whether bin Laden "had an account at the bank or was the sender or recipient
of any wire transfer," and "wanted to work with the government … and if there was information
to be gotten, to deal with it appropriately."  *Id.* at 112:9–12, 113:4–11.  But the State Department
did not offer "any name," "account number," "date," or "any information about when the
transactions that might have been under investigation occurred," and never followed-up, despite
Mr. Fine's request to "please call" with any information to be investigated.  *Id.* at 113:12–115:12;
*see id.* at 115:6–12 ("Q. And at any time during your engagement for [DIB], did anyone at the U.S.
government ever call you with any concerns about any accounts at [DIB] related to Osama bin

Laden or terrorism generally? A. No."). Having discovered no links with bin Laden, DIB sought a retraction from the newspaper. *Id.* at 115:13–116:14, 124:4–23; Ex. 1 ¶¶ 26–30.

There is also no evidence that US officials, on account of a "financial relationship" between DIB and bin Laden, visited the UAE in 1999 to urge the government to end "lax supervision" of DIB. *9/11 IV*, 718 F. Supp. 2d at 488–89. Indeed, the individual who, to August 1999, was the UAE Central Bank official "responsible for overseeing all examiners who inspected banks"—who thus "should have been alerted about any US or UAE government concerns about money laundering or terrorist financing at banks operating in the UAE"—is "not aware of any meetings between the US government and the UAE Central Bank or other parts of the UAE government concerning terrorist financing concerns at DIB." Ex. 1 ¶¶ 4–5, 10–11. Nor, while at the Central Bank, was he ever "aware of any concerns of any alleged involvement by DIB in terrorist financing or money laundering." *Id.* ¶ 12. And in discovery, DIB searched its records for evidence of any US-UAE meeting in or around July 1999 concerning bin Laden, but none of the resulting documents indicates any such meeting about DIB.

**2. *DIB did not "continue" a relationship with bin Laden or "disregard" warnings, but rather acted diligently*.** Because DIB never had an account or knowingly conducted transactions for bin Laden, there was nothing that might have "continued" (718 F. Supp. 2d at 489) after 1999. Ex. 1 ¶¶ 25–26, 43; Ex. 6 at 25:18–21, 103:3–21. And because there was also no government warning about such a relationship, there was nothing DIB might have "disregard[ed]" (718 F. Supp. 2d at 489). In any event, DIB acted diligently. After the July 1999 Article, the Bank—even though lacking a US presence—had distinguished US counsel contact the US government for additional information and to offer DIB's full cooperation. Also, before 9/11, the UAE Central Bank never cited or sanctioned DIB for terrorist-financing or money-laundering concerns. Ex. 1

¶ 33.  DIB used its best efforts to comply with the Central Bank's rules and directions.  Ex. 12 ¶ 29; Ex. 14 ¶¶ 13, 18–19.  And there is no evidence DIB's practices were inconsistent with applicable law or industry standards.  *See* Ex. 12 ¶¶ 9–26; S. Nassar Expert Rep. at 16–24.  In particular, DIB's internal audit programs before 9/11 incorporated Central Bank standards, and its auditors reviewed DIB branches and departments to ensure they followed Central Bank circulars; DIB also, in early 2001, appointed an Anti-Money-Laundering Compliance Officer as part of implementing a new Central Bank circular on that subject.  Ex. 12 ¶¶ 6–13; *see* Ex. 14 ¶¶ 5–10.

Further, as part of DIB's account-opening procedures in 1999 to 2001, employees checked potential accountholders' names against the Central Bank's black list, DIB's own black list and list of existing customers, and any other sanctions lists distributed to DIB's branches, including any from the US Treasury Department's Office of Foreign Assets Control ("OFAC").  Ex. 12 ¶ 18. "An account could not be opened for any person" on a black list.  *Id.* ¶ 19.

In 1999, a few months after the July 1999 Article, DIB distributed two OFAC lists to every section of the Bank "where accounts could be opened or transactions could be conducted, to ensure that DIB did not conduct any business with any party named"—which included al Qaeda, bin Laden's Islamic Army, the "Usama Bin Laden Organization," and the "Usama Bin Laden Network."  Ex. 8 ¶ 16 & Exs. A, B.  "DIB's branches kept copies of [those] Lists to refer to them when opening accounts to ensure no accounts were opened for any individuals on the list," and DIB required employees to check those lists "when opening accounts and conducting transactions."  *Id.* ¶ 21.  Indeed, far from ***ignoring*** any governmental guidance (as Plaintiffs alleged), DIB in this period was ***specially supervised by*** the Dubai government and UAE Central Bank due to the fraud it had suffered.  *Supra* at I.A.

There is also no evidence that DIB sought to promote terrorism.  Senior DIB employees whose employment began prior to 9/11 have never been aware of any facts suggesting that DIB (i) intended to aid a terrorist attack, (ii) supported al Qaeda; or (iii) "ever knowingly provided financial services to a customer with links to al Qaeda"—and all believe that, if DIB thought a customer was involved in terrorist activity, DIB would terminate the relationship and notify the authorities. Ex. 8 ¶¶ 9–10, 22–23; Ex. 12 ¶¶ 26–32; Ex. 1 ¶¶ 32, 34–39; Ex. 14 ¶¶ 29–32; *see* Ex. 4 ¶ 7; Ex. 6 at 130:20–131:11.  The late 23-year chairman of the DIB board that reviews bank products for consistency with Islamic law also confirmed that he never heard that DIB "wanted to promote terrorism" or "should help terrorists."  Ex. 5 at 175:5–18, 179:13–18, 180:4–8, 192:3–194:5, 196:8–198:9; *see id.* at 172:10–18 (saying 9/11 was "The most criminal act").

**3.  _No DIB accounts were used to "funnel money" to "suspect charities" to promote terrorism._**  Although at the pleadings stage this Court mentioned charity-related allegations involving DIB, its reliance on those allegations seemed limited at best.  *See* 718 F. Supp. 2d at 489.  In any event, discovery has not shown that DIB accounts were used to promote terrorism (much less a US attack) via charities, or that DIB knew before 9/11 that it was providing services to anyone linked to al Qaeda (including the single charity customer identified in discovery as of possible interest).  In fact, as explained below, Plaintiffs admit they lack evidence that **_any_** DIB accounts identified in discovery funded 9/11 or al Qaeda.  Ex. 22, Nos. 1–20; *see infra* at 20.

**4.  _DIB never provided "financial services and support" for 9/11._**  As this Court noted at the pleadings stage, Plaintiffs alleged that Hisawi "was the source of thousands of dollars of money transfers from DIB to two of the hijackers" to "pay for the hijacker's training, including flight lessons, and other expenses."  718 F. Supp. 2d at 489.  But **_Hisawi never even had an account_** at

DIB.  DIB searched its records for accounts in Hisawi's name—using 17 name variations that Plaintiffs provided—and found none.  Ex. 4 ¶ 14.

Further, Plaintiffs were able to and did pursue extensive discovery beyond the allegations that formed the basis of this Court's decision.  DIB responded to more than 150 document requests and searched its electronic account database for 629 names of potential accountholders (provided by Plaintiffs).  This encompassed, for example, searches for accounts of any companies of bin Laden that Plaintiffs identified—and DIB found no accounts.  *See* ECF 3788 at 2–5; ECF 3791, 3791-3 to 3791-7, 3791-11; Letter from S. Cottreau to S. Carter (Sept. 10, 2018); DIB_000001–5640.

Discovery did yield ten accountholders of potential interest.  *See* Ex. 19, Nos. 1–10.  Two were involved in 9/11: Ali Abdul Aziz Ali, a facilitator of the plot; and Fayez Rashid Ahmed Hassan Al Qadi, a muscle hijacker.  But their accounts, like the others, had no connection to 9/11: Account statements confirm that Aziz Ali ***never transferred or withdrew any funds*** from his DIB account while facilitating the hijackers' preparations—his first withdrawal was the day before 9/11, after completing his assistance to them.  *See* Ex. 15 at 3457t–3458t; Ex. 22, No. 1.  Qadi ***ceased using*** his low-value DIB account over a year before 9/11; there is no evidence it was used for 9/11.  *See, e.g.*, Ex. 18.  And before 9/11, neither of them used their DIB accounts for any transactions "that involved the United States."  Ex. 4 ¶ 15.  In any event, there is no evidence that DIB knew before 9/11 that these customers had any connection to al Qaeda or to terrorism generally.

### D. Plaintiffs' Responses To Requests For Admission Underscore The Absence Of Evidence

Discovery was thus devastating to Plaintiffs' allegations.  Indeed, following document discovery, despite having named 37 fact witnesses against DIB (ECF 3925), plus unknown persons

falling within various categories, and being entitled to depose up to 75 fact-witnesses against the relevant defendant-group (ECF 3894), Plaintiffs initiated **only one deposition** in their cases against DIB—that of now-Judge Fine, discussed above.[2]  *Supra* at 6.  Plaintiffs questioned him for less than two hours.  After fact discovery closed, Plaintiffs themselves reported the state of the record as to all ten accountholders as follows:

    **1.**  *No Funding of 9/11 or Al Qaeda from DIB Accounts.*  As to Qadi, Plaintiffs "admit that they are not in possession of evidence tracing the use of specific funds from [his] account at DIB to particular operational expenditures he incurred in carrying out the 9/11 operation."  Ex. 20, No. 2.  As to Aziz Ali, Plaintiffs went even further, admitting they had no "evidence that money was withdrawn from [his] DIB account to support the 9/11 hijackers or other 9/11 plot principles [sic] in carrying out the 9/11 operation nor evidence that Ali withdrew funds prior to the 9/11 attacks in support of his own activities."  *Id.*, No. 1.  And as to the remaining eight accountholders, Plaintiffs admitted lacking "evidence tracing the use of specific funds from [their DIB account(s)] to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals" in 9/11.  *Id.*, Nos. 3–10.  Beyond 9/11 in particular, Plaintiffs also "admit that they are not in possession of evidence tracing the use of specific funds from [the ten accountholders' DIB account(s)] to funding al Qaeda through specific transactions."  *Id.*, Nos. 11–20.

    **2.**  *No Designations of DIB Accountholders Before 9/11.*  Plaintiffs further admitted that they "do not contend that, prior to September 11, 2001, [the ten accountholders were] designated by that name as the subject of sanctions administered by [OFAC] or the United Nations Security Council."  Ex. 19, Nos. 1–10.

---

[2] Plaintiffs deposed Defendant Yassin Kadi, whom they had also named as a witness for their claims against DIB, but asked no questions related to DIB.  Additionally, the Parties deposed Dr. Hussein Hamid Hassan, *see* Ex. 5, but DIB initiated that to preserve his testimony in 2017 in the face of health challenges, *see* ECF 3524.

**3.** **_No DIB Awareness of Any Accountholder Involvement in Al Qaeda or Use of Accounts for Al Qaeda._**  DIB asked Plaintiffs to admit "that there is no evidence that DIB had any knowledge or awareness, prior to the September 11 Attacks, of any involvement in Al Qaeda by [the ten accountholders]" or of "any use" of their accounts "by Al Qaeda or for Al Qaeda's purposes."  Ex. 21, Nos. 1–20.  Plaintiffs admitted that "the information known or available to Plaintiffs is insufficient to enable Plaintiffs to admit or deny" the lack of such evidence.  *Id.*

**4.** **_No Material Changes After Disclosure of Declassified Files._**  After discovery closed, DIB in December 2021 moved for summary judgment (or, alternatively, dismissal) on the ground that this Court lacks personal jurisdiction.  ECF 7420.  At the Parties' request, this Court repeatedly extended Plaintiffs' deadline to respond, due to the Parties' confidential negotiations that they "expect[ed would] obviate the need for the Court to decide the issues raised by DIB's motion."  ECF 7586.  DIB sought these extensions in good faith and thanks the Court immensely for its patience.  On March 29 and April 1, 2022, the US government gave Plaintiffs access to the Declassified Files.  Plaintiffs ended negotiations and amended some of these admission responses.

Plaintiffs, however, continue to admit the *absence* (a) of evidence that the ten accountholders' accounts **_funded_** 9/11 or al Qaeda and (b) of **_designations_** of any of DIB's customers.  Ex. 22, Nos. 1–20.  But as to DIB's **_knowledge_** before 9/11 of any involvement in al Qaeda by the accountholders or any use of their accounts for al Qaeda, Plaintiffs now deny the lack of evidence—purportedly "[i]n light of" the Declassified Files, which apparently originated within the CIA.  Ex. 23 at 1 & Nos. 1–20.  As explained below, however, these files have no bearing on DIB's knowledge as to these accountholders and accounts—nor, for that matter, its knowledge as to any kind of support for al Qaeda.  Moreover, the files say nothing about DIB's

conduct—only the alleged conduct of third parties, more than three years before 9/11.  In any event, the files are inadmissible.

Notwithstanding the long-passed close of discovery, the Plaintiffs, after receiving access to the Declassified Files, and after the Parties agreed on a revised briefing schedule that the Court entered (ECF 7929), issued new discovery requests.  The Court denied the Parties' motion to further extend briefing while they resolved Plaintiffs' untimely and unwarranted requests.  ECF 8096.  Accordingly, DIB now files this renewed motion challenging personal jurisdiction.

## ARGUMENT

On the developed factual record, this Court should recognize the failure of Plaintiffs' allegations and dismiss DIB for lack of jurisdiction.  The requirements for personal jurisdiction are a "bedrock[]" and "a matter of individual liberty."  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–84 (1999) (quotation marks omitted).  Both a statutory basis and compliance with due process are necessary.  718 F. Supp. 2d at 468–69; *see* Fed. R. Civ. P. 4(k) ("FRCP").  Due process makes a court's power over a defendant depend on "the nature and extent of the defendant's relationship to the forum," the touchstone being "treating defendants fairly."  *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021) (quotation marks omitted).

To satisfy that constitutional standard, the defendant's relationship with the forum must meet one of two benchmarks.  The defendant could be subject to general jurisdiction, by being "essentially at home" there, through incorporation or its principal place of business.  *Id.* at 1024 (quotation marks omitted).  Or a defendant could be subject to specific jurisdiction, which depends on whether a plaintiff's claims "arise out of or relate to the defendant's contacts with the forum"; the foreign defendant's own, "suit-related conduct" must "create a substantial connection with the forum."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).  The defendant's contacts must be its "own choice," not "random, isolated, or fortuitous."  *Ford*, 141 S. Ct. at 1025 (quotation marks omitted).

Where all this is so, the defendant "has clear notice of its exposure … to suits." *Id.* at 1027. Plaintiffs have the burden to establish for each claim that a defendant's relationship with the US satisfies the Constitution. *Charles Schwab Corp. v. Bank of Am.*, 883 F.3d 68, 83 (2d Cir. 2018).

Here, at the pleadings stage 12 years ago, Plaintiffs did not assert general jurisdiction, and any belated attempt would fail. 718 F. Supp. 2d at 478 & n.11; *see supra* at 3. As to specific jurisdiction, Plaintiffs made only a *prima facie* showing based upon mere allegations, and no jurisdictional discovery occurred before this Court's 2010 ruling. *Dorchester Fin. Sec. v. Banco BRJ*, 722 F.3d 81, 84–85 (2d Cir. 2013) (explaining the showings required before and after discovery). But now, after discovery, Plaintiffs' "showing must be factually supported." *Id.*[3] DIB accordingly brings this "Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction." *Id.* at 85 (quotation marks omitted). Those material, undisputed facts resoundingly foreclose any conclusion that (i) DIB's services were connected to 9/11 or that (ii) DIB purposefully directed its activities at the US. Plaintiffs have failed, on four distinct grounds discussed below, to carry their burden.

## I.    THIS COURT LACKS SPECIFIC JURISDICTION BECAUSE DIB DID NOT PURPOSEFULLY DIRECT ITS FOREIGN CONDUCT AT THE US

Specific jurisdiction fails the federal Due Process Clause because there is ***no evidence that DIB purposefully directed its conduct at the US.*** Each allegation on which this Court relied has failed to find support, and the evidence actually shows the lack of purposeful direction.

In this MDL, the Second Circuit has explained that a defendant must have "purposefully directed [its] activities" at forum residents or, "[p]ut another way, … t[aken] intentional, and allegedly tortious, actions … expressly aimed at the forum." *9/11 VII*, 714 F.3d at 674 (quotation

---

[3] The same is true on a renewed motion under FRCP 12(b)(2), which DIB thus makes in the alternative. *Supra* at 1.

marks omitted); *see Schwab*, 883 F.3d at 87 (this theory of jurisdiction "is typically invoked" where exclusively foreign conduct has in-forum effects).  The "fair warning requirement is satisfied" by such intentional conduct, provided the plaintiff's injuries are sufficiently related to it. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (quotation marks omitted); *see Walden*, 571 U.S. at 289 (foreseeability of causing harm in forum insufficient).  Thus, purposeful direction requires Plaintiffs to show both that the (i) allegedly ***tortious conduct*** is sufficiently ***related*** to the injuries at issue and (ii) "crucial[ly]" done with the "***specific intent to target*** the United States."  Order, ECF 7378, at 4, 6 (emphasis added).  Plaintiffs cannot show either.

### A. Plaintiffs' Purposeful Direction Allegations Found No Factual Support

In the 2010 opinion denying DIB's motion to dismiss, this Court concluded that, if conduct were "***intended* to *directly aid*** in the commission of a terrorist act, ***with knowledge*** that the brunt of the injuries will be felt in the United States," it would satisfy the purposeful-direction standard. 718 F. Supp. 2d at 480 (emphases added).  And in finding that Plaintiffs' allegations met that threshold, the Court "inferred, from the allegations pled," that DIB was *not* "a *passive* conduit through which monies were *indirectly* channeled to and from al Qaeda." *Id.* at 489 (emphases added).  There were two key parts to that conclusion.

First, some allegations (Nos. 1 & 4, *supra* at 5) indicated to the Court that DIB's financial services "allowed for ***direct funding of terrorist attacks***"—DIB allegedly "provide[d] banking and other financial services ***directly*** to Osama bin Laden and al Qaeda," and so "became ***directly*** involved in helping to fund the execution of the terrorist attacks of 9/11, carrying out financial services and transactions to aid the hijackers in preparing for those attacks." *Id.* (emphases added); *see id.* at 488 ("direct sponsorship of al Qaeda").  On this basis, this Court distinguished DIB from the 37 defendants it dismissed for lack of personal jurisdiction, noting that DIB's "alleged wrongdoing … has a direct relationship to" 9/11. *Id.* at 488 n.13.

Second, the Court credited allegations (No. 2, *supra* at 5) that DIB "**intentionally**" did all this "**in aid of al Qaeda's plan" to attack** the US, permitting the case to go forward in part because of inferences from allegations that DIB "continued" to provide services after ignoring the US government's concerns and because its services violated "accepted international banking standards adopted to prevent the illicit movement of funds to terrorists." *Id.* at 489 (emphases added).

On the undisputed facts, all of Plaintiffs' allegations that led the Court to reach those direct-support and specific-intent conclusions are false.

### 1.   Discovery Showed That DIB Did Not Provide Services In Support Of 9/11

The Court relied on Plaintiffs' allegations that DIB laundered money directly for bin Laden, who purportedly had a financial relationship with DIB.  But he did not: Plaintiffs have identified no evidence bin Laden had any relationship with DIB.  *Supra* at 5–8.  Likewise, this Court relied on the allegation that bin Laden's CFO (Hisawi) transferred funds from his DIB account to two hijackers—"transactions" that Plaintiffs told the Court "violat[ed] … international standards adopted to prevent money laundering."  ECF 1064 at 4.  Indeed, it was on this basis that Plaintiffs said, in opposing DIB's 2005 motion to dismiss, that "DIB was directly involved in financing" 9/11.  *Id.*  But Hisawi too never banked with DIB.  *Supra* at 9–10.

Discovery also dispensed with the vague allegation that "al Qaeda operatives used their bank accounts at DIB to send money to suspect charities."  718 F. Supp. 2d at 489; *see also 9/11 VII*, 714 F.3d at 676.  Only one charity (Defendant IIRO) was among the accountholders discovery identified as of potential interest, and Plaintiffs admit lacking evidence that IIRO's account funded 9/11 or al Qaeda.  Ex. 22, Nos. 8, 18.  (As discussed, Plaintiffs admit the same about all of the ten accountholders identified during discovery.  *See supra* at 11; *infra* at 20.)

On these facts, personal jurisdiction fails.  The "random, fortuitous, or attenuated contacts [a defendant] makes by interacting with other persons affiliated with the [forum]"—such as a

"relationship with a … third party"—are not enough for jurisdiction.  *Walden*, 571 U.S. at 286 (quotation marks omitted).  As this Court has recognized since *Walden*, the key issue is the defendant's "own conduct" and whether it amounts to purposeful direction or express aiming.  *In re 9/11*, 295 F. Supp. 3d 416, 426–27 (S.D.N.Y. 2018), *rev'd on other grounds sub nom. Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66 (2d Cir. 2019).  Here, that an accountholder became a terrorist who attacked the US is just the kind of third-party "unilateral activity" that is a categorically insufficient link for purposeful direction.  *Walden*, 571 U.S. at 285–86, 291; *9/11 VII*, 714 F.3d at 676 ("[W]e decline to say that the provision of financial services to an entity that carries out a terrorist attack on United States citizens could" result in jurisdiction under the circumstances) (quoting *9/11 III*, 538 F.3d at 96 (ellipsis omitted)).  ***Critically***, there also is no evidence that those third parties actually used DIB's services for al Qaeda, let alone 9/11.  Even before *Walden*, at the pleadings stage it was imperative to this Court that, unlike the defendants it dismissed for lack of personal jurisdiction, "DIB *itself* provided *direct* financial services and support" for 9/11—so Plaintiffs alleged.  718 F. Supp. 2d at 489 (emphases added).  Over a decade later, the evidence shows that Plaintiffs' allegations were untrue.

### 2. <u>Discovery Showed That DIB Had No Specific Intent To Assist 9/11</u>

A second foundational allegation for this Court's *prima facie* finding of personal jurisdiction was DIB's purported ***intent*** to aid an attack on the US.  Plaintiffs alleged that US officials visited the UAE in 1999 to halt DIB's alleged "financial relationship" with bin Laden and end "lax supervision" of DIB, yet DIB defied these "warnings" by continuing to intentionally assist al Qaeda.  718 F. Supp. 2d at 488–89.  Just as there is no evidence DIB had a financial relationship with bin Laden, so also is there is no evidence DIB had any intent to assist any act of terrorism.  On the contrary, the evidence manifests the Bank's revulsion for terrorist financing and its

eagerness to cooperate with both the US and its own government to avoid any inadvertent connection to terrorism.

First, DIB employees who began working at DIB before 9/11 all have explained that DIB never "knowingly provided financial services to a customer with links to al Qaeda," never intended to aid a terrorist attack, and never supported al Qaeda—and all believe DIB would have terminated any customer linked to terrorism and notified the authorities. *Supra* at 9.

Second, there is no support for the allegation that US officials visited the UAE in 1999 to discuss "lax supervision" of DIB. The UAE Central Bank official (now a DIB employee) who then should have known of such a visit was aware of no such visit nor of any terrorist-financing or money-laundering concerns about DIB. *Supra* at 7. No facts in discovery support this purported US government visit.

Third, far from allowing "lax supervision," both the Dubai government and the UAE Central Bank were "closely supervis[ing]" DIB in 1998 and 1999 in response to a fraud against the Bank. Indeed, these governmental bodies, among other things, replaced the Bank's senior leadership and audited the Bank daily following a fraud discovered in March 1998. *Supra* at 4. Yet DIB received no sanction or citation related to terrorism financing. Ex. 1 ¶¶ 33, 37; *cf.* Ex. 6 at 89:4–7 (the fraud against DIB did not have "anything to do whatsoever with terrorism").

Fourth, when the July 1999 Article reporting US officials' purported concerns appeared, DIB demonstrated the opposite of an intent to aid al Qaeda: It "conducted an investigation to ensure that the bank was not assisting Osama bin Laden in any way," swiftly searching its records, and found no evidence of any such relationship. Ex. 1 ¶¶ 20–22; *supra* at 5–7. The DIB executive who came to oversee the Bank's investigation—at the request of a UAE official who served as DIB's chairman—explained that, had DIB found such evidence as to "bin Laden or any other

terrorists," it "would have reported these terrorist financing issues to the UAE government and worked to close or freeze any accounts tied to terrorists." Ex. 1 ¶¶ 20, 32. DIB did not stop there: Within days of the July 1999 Article's release, DIB's counsel offered DIB's full cooperation and pressed the US State Department for any additional information to investigate. *Supra* at 6.

Fifth, no evidence shows that DIB was "refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networks through anti-terrorist and money laundering safeguards, and 'know your customer' regulations." 718 F. Supp. 2d at 489. The only specific examples that Plaintiffs offered at the pleadings stage were allegedly laundering money for bin Laden and transferring funds between Hisawi's purported DIB account and 9/11 hijackers (*see* ECF 1064 at 2, 4). Neither occurred, and there is nothing else—no evidence shows that DIB's practices in the years before 9/11 were inconsistent with applicable law or industry standards. Instead, DIB used its best efforts to comply with the Central Bank's instructions, and prohibited opening accounts for anyone on a black list. Indeed, in 1999, when DIB was sent the US OFAC lists naming al Qaeda, bin Laden's Islamic Army, the "Usama Bin Laden Organization," and the "Usama Bin Laden Network," DIB acted "to ensure" no accounts were opened and no transactions were conducted for those entities. *Supra* at 8.

**B. Discovery Confirmed That DIB Had *No Suit-Related Conduct* Directed At The US**

Just as Plaintiffs' allegations undergirding this Court's 2010 ruling fell flat in discovery, so too does any ***other*** argument for purposeful direction. Most starkly, on the question whether, as this Court put it, any ***conduct*** of DIB actually "help[ed] to fund the execution of" the 9/11 attacks, 718 F. Supp. 2d at 489, the answer is a simple and resounding ***No***.

As detailed above, Plaintiffs in discovery ***continue to admit*** that ***none*** of the ten accountholders used DIB to carry out 9/11 or even to fund al Qaeda. *Supra* at 11. Only two of those ten (facilitator Aziz Ali and hijacker Qadi) were involved in 9/11, and the evidence regarding

their accounts shows no use relevant to 9/11 and (in any event) no transaction involving the US. *Supra* at 10. And, again, contrary to Plaintiffs' allegations, neither bin Laden nor CFO Hisawi even had an account at DIB. *Supra* at 5–7, 9–10.

### C. Discovery Confirmed That DIB Had *No Intention* To Attack The US

Similarly, discovery also left no support for the additional requirement that even if DIB did have conduct related to 9/11, it acted ***intentionally***—or as this Court put it, that DIB "***intended*** to directly aid in the commission of a terrorist act, ***with knowledge*** that the brunt of the injuries will be felt in the United States." 718 F. Supp. 2d at 480 (emphases added).

Here too the answer is a simple and resounding ***No***: <u>First</u>, as to all ten accountholders identified in discovery as being of potential interest, including Aziz Ali and Qadi, Plaintiffs ***continue to admit*** that before 9/11 not one was designated by OFAC or the United Nations. *Supra* at 11. While DIB provided them "only financial services … that were available to all customers in the ordinary course of business," DIB lacked the key pre-9/11 means by which a bank might have identified customers as suspected terrorists. Ex. 4 ¶ 16.

<u>Second</u>, Plaintiffs also have failed to point to any other means by which (they claim) DIB before 9/11 identified these customers as affiliated with terrorists intent on striking the US. Rather, Plaintiffs after the close of discovery acknowledged, as to all ten accountholders, that "the information known or available to Plaintiffs ***is insufficient*** to enable Plaintiffs ***to admit or deny*** that there is no evidence that DIB had any knowledge or awareness, prior to [9/11]" either of the accountholders' involvement in al Qaeda or of their account(s)' use for al Qaeda. Ex. 21, Nos. 1–20 (emphases added). In essence, after discovery, Plaintiffs had to admit that DIB did not know that any customer was connected to al Qaeda or the 9/11 attacks.

Although Plaintiffs have amended these discovery responses to deny this lack of evidence of DIB awareness based purportedly on the Declassified Files (*supra* at 12), those files contain no

suggestion *that DIB knew anything* about any involvement any of the ten accountholders may have had in al Qaeda nor any use of their accounts for al Qaeda—and certainly say nothing about DIB knowledge of an attack on the US.  *See also infra* at I.E (discussing broader irrelevance, and inadmissibility, of files).  Indeed, given that, as noted in Argument I.B, Plaintiffs continue to admit that *none of the ten accounts were ever used* to fund 9/11 in particular or even al Qaeda in general, their newfound suggestion that DIB *intended to assist* its attacks is incoherent on its own terms.

### D. The Decisions Of The Second Circuit And This Court Confirm This Court Lacks Personal Jurisdiction Over DIB

The failure of Plaintiffs' four sets of allegations on which this Court relied in 2010, and the broader state of the record after discovery, leave Plaintiffs with the following: evidence that two of DIB's hundreds of thousands of accountholders were involved in 9/11, but no evidence that (i) accounts at DIB actually *funded* 9/11 or any other DIB service did so, or that (ii) DIB *knew about or intended* a US attack.  On this record, DIB cannot have purposefully directed its conduct at the US.  Specific jurisdiction "must be based on *intentional* conduct *by the defendant*," and there is none here.  *Walden*, 571 U.S. at 286 (emphases added).

Indeed, the Second Circuit has found personal jurisdiction lacking in cases with many more facts supporting jurisdiction.  For example, that court found jurisdiction lacking where plaintiffs "rel[ied] on a causal chain to argue a concerted action theory of liability" in which the defendants allegedly supported charities "knowing that their money would be diverted to al Qaeda, which then used the money to finance" 9/11.  *9/11 III*, 538 F.3d at 94.  The court noted that the plaintiffs did not allege that the defendants "directed" 9/11 "or commanded an agent (or authorized al Qaeda) to commit [it]."  *Id.*  In a subsequent case, the Second Circuit concluded that "even if" a defendant knowingly "donated money to various purported al Qaeda fronts," there was no jurisdiction.  *9/11 VII*, 714 F.3d at 676.  This Court then similarly found it insufficient that, allegedly, "*third parties*

used [defendant National Commercial Bank] to transfer money to al Qaeda," where that bank was not alleged to have itself funded al Qaeda but allegedly was a preferred option for al Qaeda and knowingly provided services to its front charities.  *In re 9/11*, 295 F. Supp. 3d at 427.

The Second Circuit has also held that it is insufficient for purposeful direction if defendants "***did*** foresee" that the ***intended, known*** ultimate recipients of their contributions to intermediary organizations—which they ***knew*** had already declared war on the US—"***would*** attack targets" there.  *9/11 III*, 538 F.3d at 94–95 (emphases added); *see also Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 337–38 (2d Cir. 2016) (after *Walden*, holding that perpetrating foreign terrorist attacks was not expressly aimed at US because American casualties were "random and fortuitous," even if defendants knew Americans might be killed and were "continuously").

Moreover, the Second Circuit has held that it was "not enough" for purposeful direction at the US that several banks allegedly *knowingly, intentionally maintained accounts for al Qaeda-associated individuals and fronts*, which accounts were used for al Qaeda's operations.  *9/11 VII*, 714 F.3d at 668, 676 (applying *9/11 III*, 538 F.3d at 95–96); *see Waldman*, 835 F.3d at 339–40 & n.13 (directly, knowingly supporting US-designated terrorists not necessarily enough, alone, for express aiming at US); Order, ECF 7378 at 4, 6 ("specific intent to target" US is "crucial" to express aiming, whether defendant directly or indirectly supported terrorists).  That court "decline[d] to say that the provision of financial services to an entity that carries out a terrorist attack" on US citizens could result in jurisdiction in such circumstances.  *9/11 VII*, 714 F.3d at 676 (quotation and alteration omitted).  On this ground, it affirmed the dismissal of eight financial institutions—including banks that bin Laden himself allegedly held shares in, invested millions in, and used for terrorism.  *Id.* at 668, 676; *see* 718 F. Supp. 2d at 486–87.

Thus, it is no surprise that nearly every bank defendant has been dismissed from this MDL. DIB initially was not, based upon broad allegations. But those allegations found no factual support and the *factual* case against DIB may be the weakest of all. Nothing like the other circumstances deemed insufficient for jurisdiction is present here. DIB's own conduct and knowledge are what matter, and it simply provided normal banking services to a handful of non-watchlisted customers in the UAE (among its over 200,000 customers). Ex. 4 ¶¶ 10–12. Plaintiffs concede those accounts have no connection to the 9/11 attacks. And no evidence supports that DIB knew at the time that its customers had any connection to al Qaeda or terrorism, let alone that DIB specifically intended to aid US attacks. For all these reasons, personal jurisdiction is lacking.

### E.  The Declassified Files Provide No Support For Purposeful Direction

Plaintiffs likely will invoke, as they did in revising their admission responses, the newly Declassified Files. But nothing in those files changes the undisputed facts that prompted DIB's first iteration of this motion. Most pertinently, the four files mentioning DIB or its founder (Exs. 24–27b) contain, sprinkled amid voluminous redactions, various statements alleging or speculating about a relationship between DIB and bin Laden, purportedly facilitated at an unspecified time by DIB's founder and one-time chairman, Saeed Ahmed Lootah. It is no news that these files existed: The 9/11 Commission Report, in 2004, cited all four of them in footnotes. *9/11 Comm'n Rep.* ch. 2 nn.30, 35–37, 44, 55, 76, 80; ch. 4 n.3; ch. 5 n.127; ch. 6 n.84 (2004), https://tinyurl.com/ynr8e4me. And while it had nothing to say about DIB or Mr. Lootah in those footnotes or their accompanying text (*id.* at 57–61, 109, 171, 185), the files' content is also not new: Their gist appears to underlay the July 1999 Article that was the basis for the allegations in Plaintiffs' complaints. As this Court described those allegations: US "intelligence officials had allegedly obtained evidence that Osama bin Laden had a financial relationship with DIB, which was believed to have been arranged with the approval of the officials who control the bank." 718

F. Supp. 2d at 488–89.  But DIB thoroughly, repeatedly investigated that notion before 9/11 with the help of US counsel—and again soon after 9/11—and Plaintiffs probed those same allegations in extensive document discovery.  Those allegations found no factual support.  Ex. 1 ¶ 43; *supra* at 5–7.  The Declassified Files have no bearing on this motion and are inadmissible in any event.

### 1.   <u>The Declassified Files Do Not Establish Purposeful Direction</u>

The Declassified Files do not establish purposeful direction for at least three reasons.

<u>First</u>, at bottom, the reports speculate (without basis) that Mr. Lootah knew bin Laden and assisted him at DIB, which drew other al Qaeda members to bank with DIB.  *See* Ex. 23, Nos. 1–20.  Even if this were correct, these activities do not support personal jurisdiction due to their *timing*:  Those undated allegations appear to concern purported conduct in the early to mid-1990s.  Both the Second Circuit and this Court have recognized the jurisdictional importance of temporal proximity to 9/11.  *9/11 VII*, 714 F.3d at 676 (affirming dismissal of defendant whose alleged support for bin Laden in early 1990s was not "connected in any meaningful way" to 9/11); 718 F. Supp. 2d at 483 (bin Laden's brothers' alleged support to al Qaeda "in the early 1990's … in the Sudan, is too remote" to 9/11 for jurisdiction), *aff'd*, *9/11 VII*, 714 F.3d at 677; *id.* at 482 (same for allegations of *directly* supporting al Qaeda "until *at least the late 1990's*," which lack inference of "temporal … connection, or proximity to" 9/11 (emphasis added)), *aff'd*, *9/11 VII*, 714 F.3d at 676; *cf. 9/11 III*, 538 F.3d at 94–95 (being "aware of" bin Laden's anti-US jihad and Embassy Bombings, "foresee[ing] … violence" against US when indirectly funding al Qaeda, "does not constitute [the requisite] intentional conduct"); R&R, ECF 7942 at 9–15, 17 (May 2, 2022) (Sudan's alleged aid to al Qaeda proximately caused 9/11 for FSIA subject-matter jurisdiction, in part because it purportedly "continued even after … 1996" and "well into 2000").

In fact, the uncontroverted evidence is that Mr. Lootah from "at least 1995" on was not involved in the Bank's day-to-day operations; "he did not serve on any of the four Committees

that ran the Bank prior to 1998"; a DIB employee since 1982 has "never heard" of Mr. Lootah's instructing any employee "to open any bank accounts for or provide banking services to any particular customer"; and Mr. Lootah even lacked an office at the Bank.  Ex. 8 ¶¶ 31, 33–34. Further, from 1998 onwards, Mr. Lootah had ***no authority at DIB***—because the Dubai government and UAE Central Bank changed DIB's senior leadership in March 1998 when they intervened in the Bank, resulting in his removal, along with the rest of the Board.  *Id.* ¶¶ 26, 28–29, 32 & Ex. C; Ex. 1 ¶¶ 18–19, 21; *supra* at 3–4.  Thus, even the activities the Declassified Files allege predated 9/11 by *three years or more.*  So the alleged conduct also predated (1) the US Embassy Bombings; (2) the US government's designating of bin Laden as a specially designated terrorist and al Qaeda as a foreign terrorist organization; (3) the earliest arguable date for bin Laden's greenlighting of the 9/11 plot, which according to Plaintiffs' own expert occurred "[]after" "late 1998 or early 1999" (ECF 7344-3 at 23; *see* Jenkins Dep. at 72:18–73:12 ("accept[ing] … the account by the 9/11 Commission" that bin Laden did so in March or April 1999); M. Crenshaw Expert Rep. at 20–21; Lormel Expert Rep. at 7); and (4) DIB's 1999 investigation of the July 1999 Article's allegations (Ex. 1 ¶ 21).  Perhaps all of this is why Plaintiffs, despite listing Mr. Lootah as a witness, did not even bother to depose him.  (He then passed away in 2020.)

Second, the Declassified Files do not even indicate that Mr. Lootah's alleged actions were intended to or did serve the purpose of an attack on the US (much less 9/11 itself), as purposeful direction requires.  Indeed, they do not state that Mr. Lootah even knew of bin Laden's terrorist activities or intentions.  "Generalized allegations that [Mr. Lootah] provided financial or other material support to al Qaeda" or of his "alleged role as an al Qaeda sponsor … do[] not demonstrate that that ***he himself*** expressly aimed tortious conduct at the United States."  718 F. Supp. 2d at 482–83 (emphasis added); *see 9/11 VII*, 714 F.3d at 678–79 (remanding for jurisdictional

discovery, noting uncertainty whether alleged direct support for al Qaeda, known to be targeting the US, "was 'earmarked' for use in specific schemes or attacks not directed" there); *In re 9/11*, 295 F. Supp. 3d at 423 n.9 (no jurisdiction over bin Laden family business in which bin Laden had shares, held by his brother, where plaintiffs did not allege that brother's investments in designated entity "were used to help finance, or otherwise facilitate," 9/11), *aff'd*, *9/11 VII*, 714 F.3d at 676–77 (pre-1993 distributions to bin Laden "as a shareholder," or per contracts in Sudan, not "'expressly aimed' at the United States or … connected in any meaningful way" to 9/11).

Third, more generally, purported conduct by Mr. Lootah does not establish that *DIB* was "directly involved" in 9/11.  An employee's actions "cannot be the basis to exercise jurisdiction over a foreign corporation, absent a showing that the subject acts were authorized and performed in furtherance of the employer's business."  718 F. Supp. 2d at 485, *vacated on other grounds by 9/11 VII*, 714 F.3d at 679.  This Court has already held that it is not enough for personal jurisdiction that there are "alleged connections between individuals affiliated with" a bank defendant and al Qaeda or its fronts.  *In re 9/11*, 295 F. Supp. 3d at 427 (concerning defendant National Commercial Bank); *see also 9/11 III*, 538 F.3d at 95–96 (recognizing distinction between Islamic banks that may have "actively sponsored" al Qaeda, and banks' managers).  The Declassified Files provide no support for the notion that *DIB* was involved in or even knew of Mr. Lootah's purported friendship or activities—a possibility belied by his non-involvement in the Bank's day-to-day operations from at least 1995, even before his 1998 official removal.  *See supra* at 24–25.

### 2.   The Declassified Files Are Inadmissible Hearsay

In any event, Plaintiffs must establish jurisdiction with admissible evidence.  *See, e.g.*, FRCP 56(c); *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 251 (S.D.N.Y. 2020) (same for Rule 12(b)(2) motions after discovery).  The Declassified Files are hearsay and lack foundation.  Plaintiffs might seek to rely upon the public-records exception for

"factual findings" issued by a "public office" absent any "circumstances indicat[ing] a lack of trustworthiness." Fed. R. Evid. 803(8) ("FRE"). Such a gambit, however, would fail.

First, the files do not set out "factual findings" of any "public office." *Id.* The Second Circuit distinguishes "final report[s]" of a "government agency" from "interim report[s]" prepared by staff or subdivisions, which remain subject to review and may not reflect the agency's final position. *City of N.Y. v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981). Thus, Judge Hellerstein excluded monographs and statements prepared by known 9/11 Commission staff and provided to (and relied upon by) the Commission. *In re 9/11 Litig.*, 621 F. Supp. 2d 131, 155 (S.D.N.Y. 2009). Similarly, the files here were apparently ***prepared by unknown CIA staff*** and do not even purport to be the final position of the agency itself, nor do they indicate what the CIA did with them.

Second, these files "lack [any] trustworthiness." FRE 803(8). Trustworthiness particularly turns on "the special skill or experience of the [investigating] official"; "possible motivation problems"; "whether a hearing was held"; and "the timeliness of the investigation." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000). The Declassified Files flunk every factor. At the threshold, these "report[s] do[] not fall within the exception for public records because the name[s] of the investigator[s are] unknown." *Ferguson v. Valero Energy Corp.*, 2010 WL 11550025, at *2 (E.D. Pa. Feb. 16, 2010). When a report's "author is unidentified," it becomes "*impossible* to assess the author's skill or experience," *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 778 (9th Cir. 2010) (emphasis added), "the circumstances under which [the documents] were created, the duty of the author[] to prepare [them], [and] the procedures and methods used to reach the stated conclusions," *United States v. El-Mezain*, 664 F.3d 467, 499 (5th Cir. 2011).

The anonymous authorship by itself should be conclusive here, but other aspects compound unreliability. One is the inherent motivation problem: CIA staff cannot be expected to neutrally

"report on an avowed enemy," especially in a classified document not subject to public scrutiny. *Bridgeway*, 201 F.3d at 144 n.4.   In the present context in particular, the CIA suffered from a "culture of the newsroom," cranking out reports at an "ever faster pace" while paying "declining attention to the craft of strategic analysis." *9/11 Comm'n Rep.* ch. 3.4.   The anonymous authors also did not profess personal knowledge of the matters discussed, instead relying on multiple levels of hearsay, speculation, and the undated statements of "unidentified individuals," *Coughlin v. Tailhook Ass'n*, 1994 WL 780904, at *1 (D. Nev. Sept. 2, 1994)—some of whom concededly intended to influence the CIA, *e.g.*, Ex. 26 at 422, and all of whom communicated in unknown and potentially unreliable circumstances, such as "questionable investigative techniques," *In re 9/11 Litig.*, 621 F. Supp. 2d at 156.   The CIA held no public hearings into its collections of "unsworn statements," which seemingly "were neither memorialized nor subject to cross examination." *Grant v. Lockett*, 2021 WL 5816245, at *2 n.3 (2d Cir. Dec. 8, 2021); *see Hines v. Brandon Steel Decks, Inc*., 886 F.2d 299, 303 (11th Cir. 1989) (weighing "inability to cross-examine" authors); *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 256 (S.D.N.Y. 2014) (rejecting report where "no hearings occurred").   Moreover, the files' "substantial redactions" risk "substantial prejudice" because, among other things, DIB cannot investigate "aspects of [them] that may be favorable." *Fisher v. Clark Aiken Matik, Inc.*, 2005 WL 6182823, at *2 (M.D. Pa. Sept. 26, 2005); *see Ferguson*, 2010 WL 11550025, at *2 (cannot evaluate trustworthiness where report is partly redacted).   Nor is there any way to tell when they were first circulated, whether they have been edited, or whether any "investigation" into their contents was close in time to the reported events.

Inadmissible rumors and speculation may have some place in intelligence gathering, but such methods are inherently untrustworthy and cannot satisfy Plaintiffs' burden.   There remains no evidence bin Laden was "allowed to funnel money through" DIB.   718 F. Supp. 2d at 489.

## II.   THIS COURT LACKS SPECIFIC JURISDICTION BECAUSE DIB HAS NO US-LINKED CONDUCT RELATED TO PLAINTIFFS' CLAIMS

Specific personal jurisdiction also fails because the record shows no US-linked conduct by DIB *related to* Plaintiffs' claims.  Even if a defendant's conduct forms a "substantial connection with the forum," it only suffices for specific jurisdiction under the federal Due Process Clause if "suit-related."  *Walden*, 571 U.S. at 284.  While there need not be "a strict causal relationship," this nexus requirement "incorporates real limits."  *Ford*, 141 S. Ct. at 1026.  The connection "must be … less than trivial" or, put differently, "more than remote[]."  *Zurich Am. Life Ins. Co. v. Nagel*, 2021 WL 5225947, at *6 (S.D.N.Y. Nov. 10, 2021).

Plaintiffs' injuries from 9/11 do not arise from or relate to DIB's US activities.  On the undisputed facts, the only connection is that two individuals involved in 9/11 had accounts with DIB in Dubai.  As discussed above, Plaintiffs admit they lack evidence that those accounts funded either 9/11 specifically or al Qaeda more generally.  Plaintiffs have adduced no evidence that either account ever transferred money to the US in aid of the 9/11 plot.  Moreover, as noted above, no evidence suggests that DIB ever knew about or intended any attack in the US.  Thus, there is no "strong relationship" among DIB, the US, and Plaintiffs' claims.  *Ford*, 141 S. Ct. at 1028.

## III.   EXERCISING SPECIFIC JURISDICTION OVER DIB WOULD BE UNREASONABLE UNDER THE FEDERAL DUE PROCESS CLAUSE

The exercise of personal jurisdiction over DIB also would not be "reasonable" but rather would "offend traditional notions of fair play and substantial justice."  *Ford*, 141 S. Ct. at 1024 (quotation marks omitted).  That standard's "primary concern is the burden on the defendant."  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017) (quotation marks omitted); *Walden*, 571 U.S. at 284.  Jurisdiction is reasonable where it is "predictable," giving "fair warning" allowing defendants to avoid connections that may yield foreign litigation.  *Ford*, 141 S. Ct. at 1025, 1028 n.4, 1030 (quotation marks omitted).

This Court, in assessing the reasonableness of jurisdiction over DIB at the pleadings stage, drew upon its purposeful-direction finding.  718 F. Supp. 2d at 490.  As the undisputed facts have disproven the allegations supporting that finding, and no other basis has appeared, jurisdiction would not be reasonable.  *See Ford*, 141 S. Ct. at 1025 & n.2, 1028.

## IV.   THERE IS NO STATUTORY BASIS FOR SPECIFIC JURISDICTION

Plaintiffs also lack any statutory foundation for jurisdiction.  *Waldman*, 835 F.3d at 327; FRCP 4(k).  Plaintiffs pled reliance on New York's long-arm statute, CPLR 302(a)(2).  *See* ECF 1064 at 8 n.8.  It authorizes jurisdiction where the defendant or its agent committed a tortious act in New York, and the "cause of action aris[es] from … the act."  DIB itself of course committed no such act.  Nor is there evidence that any al Qaeda member was DIB's agent or that DIB in any way agreed with al Qaeda to attack the US—let alone requested, directed, or benefited from al Qaeda's acts in New York.  *See Chrysler Cap. Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267–69 (S.D.N.Y. 1991).  The undisputed facts rule out jurisdiction under the long-arm statute for much the same reasons they rule it out under the Constitution.  Indeed, the CPLR allows jurisdiction in "narrower" circumstances than does the Constitution.  *Alwand Vahan Jewelry, Ltd. v. Lustour, Inc.*, 2021 WL 3604517, at *3 (S.D.N.Y. Aug. 13, 2021).

## CONCLUSION

The Court should grant DIB's motion because the undisputed facts demonstrate the lack of jurisdiction.  If, however, the Court deems any material fact disputed, DIB requests that the Court, the finder of jurisdictional facts, hold an evidentiary hearing.  *See Dorchester*, 722 F.3d at 85–87; *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 242 n.2 (2d Cir. 1984).  DIB notes its right to seek summary judgment on other grounds if this motion is denied.  *See* ECF 7160; ECF 7096 at 3.

Dated: June 17, 2022                    Respectfully submitted,


By: */s/ Steven T. Cottreau*
    Steven T. Cottreau
    C. Kevin Marshall (admitted *pro hac vice*)
    Gabrielle E. Pritsker
    Audrey Beck (admitted *pro hac vice*)
    JONES DAY
    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001
    Telephone: (202) 879-3939
    Email: scottreau@jonesday.com
    Email: ckmarshall@jonesday.com
    Email: gpritsker@jonesday.com
    Email: abeck@jonesday.com

    Juan P. Morillo (admitted *pro hac vice*)
    QUINN EMANUEL URQUHART & SULLIVAN LLP
    777 Sixth St., N.W.
    Washington, D.C. 20001
    Telephone: (202) 538-8174
    Email: juanmorillo@quinnemanuel.com

    *Counsel for Defendant Dubai Islamic Bank*