UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                          )   No. 03 MDL 1570 (GBD/SN)

In re Terrorist Attacks on September 11, 2001 )   ECF Case

                                                          )   **ORAL ARGUMENT REQUESTED**
------------------------------------------------------- x

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279


**RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT
DUBAI ISLAMIC BANK'S MOTION FOR SUMMARY JUDGMENT AND
RENEWED MOTION FOR DISMISSAL FOR LACK OF PERSONAL JURISDICTION)**

In accordance with Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendant Dubai Islamic Bank ("DIB" or "the Bank") submits the following statement of material facts,[1] as to all of which there is no genuine issue to be tried:

**Bank Operations**

1. DIB is a publicly traded banking company organized under the laws of the United Arab Emirates ("UAE"). (Ex. 1, Sharif Decl. ¶ 13.)

2. DIB has always been headquartered in Dubai, UAE, and has always maintained its principal place of business in Dubai. (Ex. 1, Sharif Decl. ¶ 13.)

3. The corporate entity DIB has always conducted all its business from Dubai or its other Middle Eastern offices. (Ex. 1, Sharif Decl. ¶ 14.)

4. DIB has never been qualified to do its banking business in the United States or sought such qualification. (Ex. 1, Sharif Decl. ¶ 15.)

5. DIB has never had offices or affiliates in the United States or provided services there. (Ex. 1, Sharif Decl. ¶ 16.)

6. Apart from holding correspondent banking accounts, neither DIB nor any of its subsidiaries and affiliates have conducted any banking business in the United States. (Ex. 1, Sharif Decl. ¶¶ 14–17.)

7. DIB processed 7,137,666 transactions in 1999; 8,343,935 transactions in 2000; and 10,048,210 transaction in 2001. DIB had at least 314,100 local currency customer accounts in 1999; 371,686 local currency customer accounts in 2000; and 421,184 local currency customer accounts in 2001. DIB had at least 203,821 different customers in 1999; 216,547 different customers in 2000; and 247,207 different customers in 2001. (Ex. 4, Dharsey Decl. ¶¶ 10–12.)

---

[1] Numbered exhibits cited herein refer to the numbered exhibits to the Declaration of Steven T. Cottreau filed in support of this motion.

**Osama bin Laden**

8. Osama bin Laden was never an accountholder at Dubai Islamic Bank. (Ex. 1, Sharif Decl. ¶¶ 20–26, 43 and Ex. B thereto at 15–41 (certified English translation of the Arabic text in Ex. B available at Ex. 3); Ex. 6, Fine Dep. at 25:18–21, 26:23–27:4, 92:1–11, 102:17–104:11, 110:2–7, 15–19, 121:2–7, 125:9–126:6; DIB_000001–5640.)

9. Dubai Islamic Bank has never maintained bank accounts for a customer with the name of Osama bin Laden. (Ex. 1, Sharif Decl. Ex. B at 15–41 (certified English translation of the Arabic text in Ex. B available at Ex. 3); Fine Dep. at 25:18–21, 26:23–27:4, 92:1–11, 102:17–104:11, 110:2–7, 15–19, 121:2–7, 125:9–126:6.)

10. Osama bin Laden never transferred funds using Dubai Islamic Bank. (Ex. 6, Fine Dep. at 25:18–21.)

11. Before September 11, 2001 ("9/11"), DIB searched its records for accounts and wire transfers in Osama bin Laden's name (including spelling variations), and found no accounts or wire transfers for bin Laden. (Ex. 1, Sharif Decl. ¶¶ 20–26; Ex. 6, Fine Dep. at 25:18–21, 26:23–27:4, 92:1–11, 102:17–104:11, 110:2–7, 15–19, 121:2–7, 125:9–126:6.)

12. After 9/11, DIB again searched its records for accounts for Osama bin Laden, including all name variations provided by the US Treasury Department's Office of Foreign Assets Control ("OFAC") in September and October 2001, and found no accounts for bin Laden. (Ex. 1, Sharif Decl. ¶ 43 and Ex. B thereto at 15–41 (certified English translation of the Arabic text in Ex. B available at Ex. 3).)

13. In response to Plaintiffs' discovery requests, DIB searched its records and found no accounts for any companies of Osama bin Laden that Plaintiffs identified. *E.g.*, ECF 3791-6, nos. 247–60; ECF 3791-11, App. A, nos. 103–05, 109–10, 150–51, 170, 374–76, 390–92; Letter from

S. Cottreau to S. Carter (Sept. 10, 2018); DIB_000001–5640; *see also* ECF 3788 at 2–5, ECF 3791, 3791-3 to 3791-5, 3791-7.

**Mustafa Ahmed al-Hisawi**

14.  Mustafa Ahmed al-Hisawi has never been an accountholder at Dubai Islamic Bank.  (Ex. 4, Dharsey Decl. ¶ 14.)

15.  For example, DIB has searched its records and found no accounts for Mustafa Ahmed al-Hisawi, including any of 17 name variations provided by Plaintiffs.  (Ex. 4, Dharsey Decl. ¶ 14.)

**Oversight of DIB**

16.  The UAE Central Bank did not have concerns about DIB and money laundering or terrorist financing in 1999.  (Ex. 1, Sharif Decl. ¶¶ 4–5, 10–12.)

17.  The UAE Central Bank prior to 9/11 never sanctioned or issued a citation against DIB due to money-laundering or terrorist-financing concerns.  (Ex. 1, Sharif Decl. ¶ 33.)

18.  The Dubai government and UAE Central Bank closely supervised DIB in 1998 and 1999, following the discovery of a fraud against DIB in March 1998.  (Ex. 1, Sharif Decl. ¶¶ 18, 22; Ex. 6, Fine Dep. at 28:1–20, 29:15–18; Ex. 8 ¶ 25.)

19.  The Dubai government intervened in DIB following the discovery of a fraud against DIB in March 1998, including approving the hiring of DIB's investigator (whose mandate was to investigate the fraud) and, in conjunction with the UAE Central Bank, installing new senior leadership, appointing a new Executive Committee in March 1998 to oversee DIB's operations and run the Bank, displacing the Board of Directors. (Ex. 1, Sharif Decl. ¶ 18–19; Ex. 8, Ansari Decl. ¶ 26, 28–29, 32 and Ex. C thereto; Ex. 6, Fine Dep. at 27:1–28:20, 29:15–18, 30:4–5, 32:2–15, 47:11–18, 69:10–14, 88:10–22, 89:4–7.)

20. A new permanent Board of Directors was appointed for DIB by early 1999. (Ex. 8, Ansari Decl. ¶ 29.)

21. As DIB's largest shareholder after the fraud, the Dubai government "had the most influence over determining who served on" that Board of Directors, the chairman of which was Mr. Mohammed Khalfan bin Kharbash, the UAE Minister of Financial Affairs and Industry at that time. (Ex. 1, Sharif Decl. ¶ 19; Ex. 8, Ansari Decl. ¶ 29.)

22. Following the discovery of the fraud against DIB in 1998, the UAE Central Bank audited DIB daily for months, and DIB employed outside auditors to diagnose what "needed to be cleaned up" to prevent future frauds. (Ex. 6, Fine Dep. at 29:15–18, 48:1–17.)

23. The fraud against DIB discovered in 1998 had nothing to do with al Qaeda or terrorism. (Ex. 6, Fine Dep. at 89:4–7.)

**Response to 1999 Article**

24. In response to a July 8, 1999 New York Times article (hereinafter, "July 1999 Article") reporting a DIB relationship with bin Laden, DIB gave instructions to Mr. Alan Fine, DIB's outside US counsel at the time as a result of his retention in 1998 in connection with the fraud against DIB. (Ex. 1, Sharif Decl. ¶¶ 20, 22; Ex. 6, Fine Dep. at 23:7–13, 87, 96–98, 102:17–104:11, 110:2–7, 15–19, 112:2–115:12, 119:24–120:19.)

25. Following the June 1999 Article's publication, Mr. Fine contacted the US State Department in July 1999, seeking additional information to investigate about any suspected relationship with Osama bin Laden and offering DIB's full cooperation. (Ex. 1, Sharif Decl. ¶¶ 20, 22; Ex. 6, Fine Dep. at 23:7–13, 96–98, 102:17–104:11, 110:2–7, 15–19, 112:2–115:12, 119:24–120:19.)

26. In response to Mr. Alan Fine's conversations with the US State Department in July 1999, the US government provided no names, dates, or account numbers to search, and no one from the

US government ever followed-up with Mr. Fine, despite his request to "please call" with any information. (Ex. 6, Fine Dep. at 113:12–115:12.)

27. After concluding its investigation in response to the July 1999 Article, DIB sought a retraction from the New York Times, which published the July 1999 Article. (Ex. 1, Sharif Decl. ¶¶ 26–30; Ex. 6, Fine Dep. at 115:13–116:14, 124:4–23 and Ex. 7 thereto at 6–7 (retraction request).)

**Saeed Ahmed Lootah**

28. From at least 1995 onwards, Saeed Ahmed Lootah was not involved in DIB's day-to-day operations. (Ex. 8, Ansari Decl. ¶¶ 34.)

29. From at least 1995 onwards, Saeed Ahmed Lootah lacked an office at DIB. (Ex. 1, Sharif Decl. ¶ 21; Ex. 8, Ansari Decl. ¶¶ 34.)

30. From at least 1982 onwards, Saeed Ahmed Lootah never instructed any employee to open any bank accounts for or provide banking services to any particular customer. (Ex. 8, Ansari Decl. ¶¶ 33.)

31. From at least 1995 onwards, Saeed Ahmed Lootah did not serve on any of the Committees that ran DIB prior to 1998. (Ex. 8, Ansari Decl. ¶ 31.)

32. Following the discovery of fraud against DIB in March 1998, the Dubai government and UAE Central Bank intervened in DIB, appointing a new Executive Committee to run the Bank and leading to the installation of a new board of directors. (Ex. 1, Sharif Decl. ¶¶ 18–19; Ex. 8, Ansari Decl. ¶¶ 26, 28–29, 32 & Ex. C thereto; Ex. 6, Fine Dep. at 27:1–28:20, 29:15–18, 30:4–5, 32:2–15, 47:11–18, 69:10–14, 88:10–22, 89:4–7.)

33. Following changes to the management and board of directors after the discovery of fraud against DIB in March 1998, Saeed Ahmed Lootah lacked any authority at DIB.  (Ex. 1, Sharif Decl. ¶ 21; Ex. 8, Ansari Decl. ¶ 32.)

34. Osama bin Laden gave the go ahead for the 9/11 plot after late 1998 or early 1999.  (ECF 7344-3 at 23; Jenkins Dep. Tr. 72:18-73:12; M. Crenshaw Expert Rep. at 20–21; D. Lormel Expert Rep. at 7.)

**Counter-Terrorism Financing**

35. In the fall of 1999, DIB distributed two sanctions lists from OFAC ("Two OFAC Lists") to each section of the Bank where accounts could be opened or transactions could be conducted, to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the "Usama Bin Laden Organization," and the "Usama Bin Laden Network."  (Ex. 8, Ansari Decl. ¶ 16 and Exs. A, B thereto at 8–20 (certified translation of pages containing Arabic text in Exs. A, B available at Exs. 9, 10.)

36. Beginning in the fall of 1999, DIB's branches kept copies of the Two OFAC Lists to ensure no accounts were opened for any of the parties named on those lists.  (Ex. 8, Ansari Decl. ¶ 21.)

37. Beginning in the fall of 1999, DIB required employees to check the Two OFAC Lists when opening accounts and conducting transactions.  (Ex. 8, Ansari Decl. ¶ 21.)

38. DIB's banking practices before 9/11 were consistent with applicable law and industry standards.  (Ex. 12, Maaty Decl. ¶¶ 6–26, 29; Ex. 14, Maazmi Decl. ¶¶ 5–10; S. Nassar Expert Rep. at 16–24.)

39. DIB's internal audit programs before 9/11 incorporated UAE Central Bank standards, and DIB always used its best efforts to comply with the Central Bank's rules and directions.  (Ex. 12, Maaty Decl. ¶¶ 6–9, 29; Ex. 14, Maazmi Decl. ¶ 19.)

40. DIB's auditors reviewed DIB branches and departments to ensure that they followed Central Bank circulars—including the Anti-Money Laundering Circular 24/2000 issued in late 2000.  (Ex. 12, Maaty Decl. ¶¶ 6–13; Ex. 14, Maazmi Decl. ¶ 7.)

41. As part of implementing the UAE Central Bank's Anti-Money Laundering Circular 24/2000, DIB in early 2001 appointed an Anti-Money-Laundering Compliance Officer, who developed policies and procedures, prepared reports, provided training, and communicated with the Central Bank.  (Ex. 14, Maazmi Decl. ¶¶ 5–10.)

42. Accounts at DIB could not be opened for any person on the UAE Central Bank's black list, other sanctions lists distributed to DIB's branches, or DIB's own black list.  (Ex. 12, Maaty Decl. ¶¶ 14–24.)

43. Before 9/11 and now, DIB would promptly terminate any customer relationship and report the customer to the UAE government if DIB believed the customer was funding or otherwise involved in terrorist activity.  (Ex. 1, Sharif Decl. ¶¶ 32, 39; Ex. 14, Maazmi Decl. ¶ 32, Ex. 12, Maaty Decl. ¶ 28; Ex. 8, Ansari Decl. ¶ 23.)

44. DIB has never supported al Qaeda.  (Ex. 1, Sharif Decl. ¶ 36; Ex. 4, Dharsey Decl. ¶ 7; Ex. 8 ¶ 9; Ex. 12 ¶ 32; Ex. 14 ¶ 30.)

45. DIB never intended to aid a terrorist attack.  (Ex. 1, Sharif Decl. ¶¶ 32, 34–39; Ex. 8, Ansari Decl. ¶¶ 9–10, 22–23; Ex. 12, Maaty Decl.¶¶ 26–32; Ex. 14, Maazmi Decl. ¶¶ 29–32; Ex. 4, Dharsey Decl. ¶¶ 7–8; Ex. 5, Hassan Dep. at 175:5–18, 198:2–9.)

46. DIB never intended to support al Qaeda.  (Ex. 1, Sharif Decl. ¶¶ 32, 34–39; Ex. 8, Ansari Decl. ¶¶ 9–10, 22–23; Ex. 12, Maaty Decl. ¶¶ 26–32; Ex. 14, Maazmi Decl. ¶¶ 29–32; Ex. 4, Dharsey Decl. ¶¶ 7–8; Ex. 5, Hassan Dep. at 175:5–18, 198:2–9.)

47. DIB never provided financial services to a customer while knowing the customer had links to al Qaeda. (Ex. 1, Sharif Decl. ¶¶ 32, 38–39; Ex. 8, Ansari Decl. ¶¶ 22–23; Ex. 12, Maaty Decl. ¶¶ 27–28; Ex. 14, Maazmi Decl. ¶¶ 31–32; Ex. 4, Dharsey Decl. ¶ 7.)

**Ten Accountholders**[2]

48. Before 9/11, all ten accountholders of interest were provided only financial services available to all customers in the ordinary course of business. (Ex. 4, Dharsey Decl. ¶ 16.)

49. None of the ten accountholders were, before 9/11, "designated by that name as the subject of sanctions administered by the U.S. Office of Foreign Assets Control or the United Nations Security Council." (Ex. 19, Pls.' Resps. & Objs. to Def. DIB's First Set of Reqs. for Admis. Nos. 1–10 (Mar. 23, 2020).)

50. DIB did not have any knowledge or awareness, prior to the September 11 Attacks, of any involvement in Al Qaeda by any of the ten accountholders. (Ex. 8, Ansari Decl. ¶¶ 9–10, 22–23; Ex. 12, Maaty Decl. ¶¶ 26–32, 31–32; Ex. 1, Sharif Decl. ¶¶ 32, 34–39; Ex. 14, Maazmi Decl. ¶¶ 29–32; Ex. 4, Dharsey ¶ 7; Ex. 5, Hassan Dep. at 175:5–18, 198:2–9; Ex. 6, Fine Dep. at 116:6–14, 130:20–131:11.)

51. DIB did not have any knowledge or awareness, prior to the September 11 Attacks, of any use of any of the ten accountholders' DIB accounts by al Qaeda or for al Qaeda's purposes. (Ex. 8, Ansari Decl. ¶¶ 9–10, 22–23; Ex. 12, Maaty Decl. ¶¶ 26–32, 31–32; Ex. 1, Sharif Decl. ¶¶ 32, 34–39; Ex. 14, Maazmi Decl. ¶¶ 29–32; Ex. 4, Dharsey ¶ 7; Ex. 5, Hassan Dep. at 175:5–18, 198:2–9; Ex. 6, Fine Dep. at 116:6–14, 130:20–131:11.)

---

[2] Ali Abdul Aziz Ali, Fayez Rashid Ahmed Hassan Al Qadi, Ali Saleh Mohammad Kahla Al-Marri, Seedi Al Madani Al-Ghazi Mustafa Al Tayyib, Mamdoh Mahmoud Salim Ahmed, Ahmed Ali Jumale, Barakaat Bank of Somalia, Al Baraka Exchange LLC, Khalid Amer Salim Ballayth, and International Islamic Relief Organization (referred to, collectively, as the ten accountholders throughout these related filings).

52. Plaintiffs have no evidence that money was withdrawn from Ali Abdul Aziz Ali's DIB account to support the 9/11 hijackers or other 9/11 plot principals who carried out the 9/11 operation nor evidence that Ali withdrew funds before the 9/11 attacks in support of his own activities.  (Ex. 14, Maazmi Decl. Ex. A at 3457–3458 (account statement) (certified English translation of the Arabic text in Ex. A available at Ex. 15); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 1 (Apr. 23, 2022).)

53. No money was withdrawn or transferred from Ali Abdul Aziz Ali's DIB account to support the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks.  (Ex. 14, Maazmi Decl. Ex. A at 3457–3458 (account statement) (certified English translation of the Arabic text in Ex. A available at Ex. 15); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 1 (Apr. 23, 2022).)

54. Ali Abdul Aziz Ali withdrew or transferred no funds from DIB prior to September 10, 2001.  (Ex. 14, Maazmi Decl. Ex. A at 3457–3458 (account statement) (certified English translation of the Arabic text in Ex. A available at Ex. 15); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 1 (Apr. 23, 2022).)

55. Plaintiffs have no evidence "tracing the specific use of Ali Abdul Aziz Ali's account at DIB" to "funding al Qaeda through specific transactions."  (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 11 (Apr. 23, 2022).)

56. Aziz Ali's account at DIB was not used to fund Al Qaeda through specific transactions.  (Ex. 14a at 3457t–3458t (account statement); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 11 (Apr. 23, 2022).)

57. Plaintiffs have no evidence "tracing the use of specific funds from Fayez Rashid Hassan Al Qadi's account at DIB to specific operational expenditures incurred in carrying out the 9/11

operation." (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 2 (Apr. 23, 2022).)

58. Fayez Rashid Hassan Al Qadi never used his account at DIB for operational expenditures incurred in carrying out the 9/11 attacks. (Ex. 18 (certified English translation of the Arabic text in account statement); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 2 (Apr. 23, 2022).)

59. Fayez Rashid Hassan Al Qadi ceased using his DIB account over a year before the 9/11 attacks. (Ex. 18 (certified English translation of the Arabic text in account statement).)

60. Plaintiffs have no evidence "tracing the use of specific funds from Fayez Rashid Hassan Al Qadi's account at DIB to funding al Qaeda through specific transactions." (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 12 (Apr. 23, 2022).)

61. Fayez Rashid Hassan Al Qadi's account at DIB was not used to fund Al Qaeda through specific transactions. (Ex. 18 (certified English translation of the Arabic text in account statement); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. No. 12 (Apr. 23, 2022).)

62. Fayez Rashid Hassan Al Qadi ceased using his DIB account before he moved to the US to commit the 9/11 attacks. (Ex. 18 (certified English translation of the Arabic text in account statement); ECF 7344-3 at 32; D. Lormel Expert Rep. at 19–20.)

63. Neither Ali Abdul Aziz Ali nor Fayez Rashid Hassan Al Qadi had any transactions that made use of DIB's correspondent banking accounts in the United States or otherwise had transactions to or through the United States. (Ex. 4, Dharsey ¶ 15.)

64. Plaintiffs have no evidence "tracing the use of specific funds from" the other eight accountholders' accounts[3] "at DIB to particular operational expenditures incurred in carrying out the 9/11 operation." (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. Nos. 3–10 (Apr. 23, 2022).)

65. Plaintiffs have no evidence "tracing the use of specific funds from" any of the DIB accounts of the ten accountholders "to funding al Qaeda through specific transactions." (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. Nos. 11–20 (Apr. 23, 2022).)

66. No funds from the DIB accounts of any of the ten accountholders were used to fund Al Qaeda through specific transactions. (Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. Nos. 11–20 (Apr. 23, 2022).)

67. No funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks. (Ex. 14, Maazmi Decl. Ex. A at 3457–3458 (account statement) (certified English translation of the Arabic text in Ex. A available at Ex. 15); Ex. 18 (certified English translation of the Arabic text in account statement); Ex. 22, Pls.' Second Suppl. Resps. & Objs. to Def. DIB's Second Set of Reqs. for Admis. Nos. 1–10 (Apr. 23, 2022).)

---

[3] Ali Saleh Mohammad Kahla Al-Marri, Seedi Al Madani Al-Ghazi Mustafa Al Tayyib, Mamdoh Mahmoud Salim Ahmed, Ahmed Ali Jumale, Barakaat Bank of Somalia, Al Baraka Exchange LLC, Khalid Amer Salim Ballayth, and International Islamic Relief Organization.

Dated: June 17, 2022                    Respectfully submitted,


                                        By: */s/ Steven T. Cottreau*
                                            Steven T. Cottreau
                                            C. Kevin Marshall (admitted *pro hac vice*)
                                            Gabrielle E. Pritsker
                                            Audrey Beck (admitted *pro hac vice*)
                                            JONES DAY
                                            51 Louisiana Avenue, N.W.
                                            Washington, D.C. 20001
                                            Telephone: (202) 879-3939
                                            Email: scottreau@jonesday.com
                                            Email: ckmarshall@jonesday.com
                                            Email: gpritsker@jonesday.com
                                            Email: abeck@jonesday.com

                                            Juan P. Morillo (admitted *pro hac vice*)
                                            QUINN EMANUEL URQUHART & SULLIVAN LLP
                                            777 Sixth St., N.W.
                                            Washington, D.C. 20001
                                            Telephone: (202) 538-8174
                                            Email: juanmorillo@quinnemanuel.com

                                            *Counsel for Defendant Dubai Islamic Bank*