# EXHIBIT 20

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | ) 03 MDL 1570 (GBD)(SN)<br>) ECF Case |

This document relates to:
*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-cv-06978
*Thomas Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.*, Case No. 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-07065
*Euro Brokers, Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-07279

**PLAINTIFFS' SUPPLEMENTAL RESPONSES TO DEFENDANT DUBAI ISLAMIC BANK'S SECOND SET OF REQUESTS FOR ADMISSION**

Plaintiffs in all of the above-captioned related actions, by their undersigned attorneys, subject to all previously stated general and specific objections, supplement their responses pursuant to Rule 36 of the Federal Rules of Civil Procedure, to Defendant Dubai Islamic Bank's ("DIB") Second Set of Request for Admission to Plaintiffs as follows:

**SUPPLEMENTAL RESPONSES**

**REQUEST NO. 1:**

Admit that there is no evidence that Ali Abdul Aziz Ali's account at DIB was used to fund the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 1:**

Subject to the explanation that follows, the plaintiffs admit that they are not in possession of evidence that money was withdrawn from Ali Abdul Aziz Ali's DIB account to support the 9/11 hijackers or other 9/11 plot principles in carrying out the 9/11 operation nor evidence that Ali withdrew funds prior to the 9/11 attacks in support of his own activities. However, evidence exists to indicate the funds were available in the account for use in the event that they may have been needed and that the funds were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape.

The 9/11 Commission Report concluded that Khalid Sheikh Mohammed, Ali Abdul Aziz Ali's uncle and one of the architects of 9/11, ordered the hijackers to travel "through the UAE en route to the United States," where they were primarily assisted by two al Qaeda operatives, one of which was Ali. *See* 9/11 Commission Report at p. 236. It also describes Ali as an "important facilitator in the plot" who "used [a hijacker's] credit card to order a Boeing 747-400 flight simulator program and a Boeing 767 flight deck video, together with attendant literature[.]" p. 168. *See also* Indictment, *U.S. v Khalid Sheikh Mohammed, et al.*, Case No. (S14) 93 Cr. 180 (KTD) (S.D.N.Y.), April 4, 2011, ¶¶ 57-58. In addition, the flight training of the Hamburg operatives was paid for "primarily with funds wired from Dubai by [Ali]" totaling $114,500. The 9/11 Commission Report at p. 224. On or about August 8, 2000, during the same period he was carrying out orders for Khalid Sheikh Mohammed, Ali opened an account at the Dubai Islamic Bank. *See* Department of Defense Unclassified Summary of Evidence for Combatant Status Review Tribunal – Al Baluchi, Ammar [ECF No. 2973-16], ¶ 3(c). Khalid Sheikh Mohammed admitted that $81,000, provided to three of the hijackers for flight training, was transferred through Ali and the transfers to the hijackers primarily originated in the UAE. Substitution of

Testimony of Khalid Sheikh Mohammed, *U.S. v. Moussaoui*, Cr. No. 01-465-A, Defendant's Exhibit 941, [ECF No. 2973-10], ¶¶ 42, 68, 73. On April 16, 2000, Ali wired $5,000 to a bank in California from Dubai, on June 29, 2000, Ali transferred $5,000 to a hijacker in the Manhattan, New York from Dubai, on July 18, 2000, Ali wired $10,000 from Dubai to a Florida bank account shared by two hijackers, on August 5, 2000, Ali transferred $9,500 from Dubai to the Florida bank account, on August 29, 2000, Ali transferred $20,000 from Dubai into the Florida bank account, and on September 17, 2000, Ali made a transfer from Dubai to the Florida bank account in the amount of $70,000. *See* Indictment, *U.S. v Khalid Sheikh Mohammed, et al.*, Case No. (S14) 93 Cr. 180 (KTD) (S.D.N.Y.), April 4, 2011, ¶¶ 75, 78, 79, 81, 82 83. Institutions in the UAE played a key role in moving resources to the 9/11 planners and hijackers. *See* DIB_001168, NATO Parliamentary Assembly, The Economic Consequences of September 11, 2001 and the Economic Dimension of Anti-Terrorism General Report, p. 8. However, the UAE did not enforce tighter restrictions on its banking system until after September 11, 2001 and al – Qaeda did use "banks that operate according to Islamic principles, such as the Bank of Dubai." *See* DIB_000792, Al-Qaeda: The Many Faces of an Islamist Extremist Threat, Report of the House Permanent Select Committee on Intelligence, June 2006 (p. 11). Ali was able to use an alias or partial name and show no identification for five of six identified transfers. *See* DIB_001045, National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing, Staff Report to the Commission, p. 40. On September 10, 2001, Ali withdrew nearly all of the money from two bank accounts in the UAE and flew from Dubai to Karachi, Pakistan on a one-way ticket. *See* Indictment, *U.S. v Khalid Sheikh Mohammed, et al.*, Case No. (S14) 93 Cr. 180 (KTD) (S.D.N.Y.), April 4, 2011, ¶ 163. The funds in Ali's DIB account were available for funding of the September 11th Attacks and Ali did, in fact, fund his

escape from the UAE the day before the September 11th Attacks using significant funds withdrawn from his DIB account.

On March 22, 2005, in a letter from the Central Bank to DIB's Chief Executive, Butti Khalifa bin Darwiah al Falasi, the Central Bank advises that a U.S. Embassy official will visit DIB to obtain a "Certification of Business Records" for "documents relating to one of your clients and/or transactions conducted via your bank on behalf of one of your clients previously provided to us." The letter adds that the "certificate will be used by the concerned US authorities in an upcoming trial in the Eastern District of Virginia —United States of America." *See* DIB03444-3446. On April 26, 2005, a letter from the head of DIB's Anti-Money Laundering Division, Zohair Said al Rabii, responds to the March 22 letter, informing the Central Bank that DIB attached "Certification of Business Records" for Account No. xx-xxx-xxxxx63-01 held in the name of Ali Abdul Aziz Ali. *See* DIB03464-66 (provided to Plaintiffs in discovery without attachment despite letter referencing "records attached hereto").

**REQUEST NO. 2:**

Admit that there is no evidence that Fayez Rashid Ahmed Hassan Al-Qadi's account at DIB was used to fund the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 2:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Fayez Rashid Hassan Al Qadi's account at DIB to particular operational expenditures he incurred in carrying out the 9/11 operation. However, Plaintiffs were provided 13 pages of bank statements from Al-Qadi's account with dates ranging from January 1996 at the earliest to December 31, 2000 at the latest. *See* DIB_003367 to

DIB_003379. These statements show that the funds in this account were available to Al-Qadi during the period of preparation for the September 11th Attacks.

**REQUEST NO. 3:**

Admit that there is no evidence that Khalid Amer Salim Ballayth's account at DIB was used to fund the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 3:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Khaled Amer Salim Ballayth's account at DIB to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation. However, account statements for the period 1992-2004 for Khaled Amer Ballaith, Sharjah, P.O. Box 1033, prove his ownership of DIB Account No. xxxxxxxxxx6601. DIB_005024 – DIB_005051, The funds in this account were available for use in the period of planning for September 11th. Ballayth was the director of the Sana Trading Establishment the holding company of the Binjad Establishment. KADI0015570. Ballayth was found to be a close associate of Osama bin Laden who transferred between $200,000 and $250,000 to the Muwaqaf Foundation through the account of the Binjad establishment RICO Statement Applicable to Talal M. Badkook, Exhibit "A", RICO Statement Question #2, MDL 1570 – *Federal Insurance Co. v. al Qaida*, 03 CV 06978; *See also* KADI0015570 (described by Swiss authorities as a "close associate of Osama Bin Laden"). The Binjad Establishment ordered vehicles for the Muwaqaf Foundation which operated closely with the International Islamic Relief Organization. An August 17, 1995 check was written from Ballaith's above-described DIB account in the amount of 138,249.20 DH to Mohammed A. Bin Mahfouz. KADI0106547.

Mohammed Ahmed Obaid Bin Mahfouz, the brother of Khalid Bin Mahfouz, is an associate of Executive Order 13224 designee Yassin al Qadi and was responsible for overseeing the operations of the Muwafaq Foundation's branch office in Islamabad, Pakistan. According to the U.S. Treasury Department, the Muwafaq Foundation merged with al Qaeda prior to the September 11th Attacks. *See* November 29, 2001 letter from David D. Aufhauser, Department of the Treasury General Counsel, to Switzerland's M. Claude Nicati, Substitute du Procureur General. KADI0106547 demonstrates Ballayth's association with Mahfouz and the transfer of funds to an individual who was operating a front for al Qaeda's financial activities in the years prior to the September 11th attacks.

**REQUEST NO. 4:**

Admit that there is no evidence that Mamdoh Mahmoud Salim Ahmed's accounts at DIB were used fund the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 4:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Mamdoh Mahmoud Salim Ahmed's account at DIB to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation. However, when Ahmed, a founding member of al Qaeda responsible for managing terrorist training camps in Afghanistan and Pakistan and undertaking efforts to obtain nuclear weapons for al Qaeda, was arrested on September 16, 1998 by German authorities for his role in the 1998 Embassy bombings, the following were found in his possession: (1) "VISA Card Dubai Islamic Bank fur Mamdoh M S Ahmed, Nr. xxxx 1013;" (2) "Bank Card Dubai Islamic Bank fur Mamdoh M.S. Ahmed, Nr. xxxx 2362;" (3) "Card Dubai

Islamic Bank Nr. xxx4008; and (4) "1 Zettel Dubai Islamic Bank" *See, e.g.,* KADI0030668 - KADI0030678 at KADI0030672 and 675. Ahmed had access to funds in DIB accounts which were available to fund terrorist operations, including the 1998 Embassy bombings, in the years prior to the September 11th Attacks.

**REQUEST NO. 5:**

Admit that there is no evidence that Ahmed Ali Jumale's account at DIB was used to fund the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 5:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Ahmed Ali Jumale's account at DIB to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation. However, Jumale, who was designated by the U.S. Treasury Department on November 7, 2001 for his close ties to Osama Bin Laden, held accounts at DIB and, according to Treasury officials, Jumale used the Al Barakaat group of companies "to transmit funds, intelligence and instructions" to al Qaeda and other terrorist organizations" *See* Josh Meyer and Sebastian Rotella, "U.S. Coalition Freezes Assets in Terror War" Los Angeles Times, November 8, 2001 [ECF No. 2973-12]. *See also* DIB_001075-DIB_001085, National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing, Staff Report to the Commission, pp. 70-80. Jumale held personal accounts at DIB as evidenced by his personal and VISA DIB Account Nos. xxx1192 and xxx-xxx-xxx-960 which were seized pursuant to the instructions of the Central Bank of the UAE "in conjunction with the International efforts to fight terrorism." DIB 3251-3259. Jumale had access to the funds in his

personal DIB accounts and the ability to transmit these funds in the years prior to the September 11th Attacks.

**REQUEST NO. 6:**

Admit that there is no evidence that Barakaat Bank of Somalia's account at DIB was used to fund the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 6:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Barakaat Bank of Somalia's account at DIB to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation. However, Al Barakaat "has used its global money-transfer business to help terrorist ship large caches of weapons from one country to another, paid for through money transfers that the company indicated was for the use of blankets." Josh Meyer and Sebastian Rotella, "U.S. Coalition Freezes Assets in Terror War" Los Angeles Times, November 8, 2001 [ECF No. 2973-12]. Barakaat Bank of Somalia Account Nos. xxx339 and xx-xxx-xx-x13-01 were seized pursuant to the instructions of the Central Bank of the UAE "in conjunction with the International efforts to fight terrorism." DIB 3251-3259. Barakaat Bank of Somalia had access to the funds in these DIB accounts and the ability to transmit these funds in the years prior to the September 11th Attacks.

**REQUEST NO. 7:**

Admit that there is no evidence that Al Baraka Exchange LLC's account at DIB was used to fund the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 7:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Al Baraka Exchange LLC's account at DIB to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation. *See, e.g.,* Josh Meyer and Sebastian Rotella, "U.S. Coalition Freezes Assets in Terror War" Los Angeles Times, November 8, 2001 [ECF No. 2973-12]. However, Al Baraka Exchange Account Nos. xxx7440 and xxx7483 were seized pursuant to the instructions of the Central Bank of the UAE "in conjunction with the International efforts to fight terrorism." *See* DIB 3251-3259. In addition, an Al Baraka Exchange account statement covering the year 1998 reflects five very large credits and transfer transactions in account no. 01520626744001 totaling exactly two million in UAE Dirham credits and two million in transfers to two separate accounts which appear to also be DIB accounts (particulars of transfers are 981.030.00 to "60029" and 1,018,970.00 to "60030"). DIB_003535. This statement evidences large, unexplained transfers through a DIB account owned by the Al Baraka Exchange in the years prior to the September 11th Attacks and highly unusual activity in that these large transfers were made within an account reflecting only five total transactions over a period of twelve months.

**REQUEST NO. 8:**

Admit that there is no evidence that International Islamic Relief Organization's account at DIB was used to fund the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 8:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from the International Islamic Relief Organization's account at DIB to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation. However, according to the U.S. government, "Usama bin Laden used the entire IIRO network for its terrorist activities. *See* FED-PEC 220501-220502. *See also* BUR-PEC014984-14987 (stating that "the Sharja affiliation of the Saudi 'International Islamic Relief Organization' and the 'Human Appeal International' established the 'Special Chechen Refugees Assistance Fund' (account number 01520483656101 in the 'Islamic Bank of Dubai.'")); FED-PEC 202110-212112 (August 3, 2006 Executive Order designation of the IIRO branch offices in the Philippines and Indonesia and the Executive Director of the IIRO's Eastern Province Branch, Abd al Hamd Sulaiman al Mujil, "for facilitating fundraising for al Qaida and affiliated terrorist groups."). In the years prior to the September 11th Attacks, IIRO maintained an account at DIB during a period when high-level officials of the organization were facilitating fundraising for al Qaeda and affiliated terrorist groups.

**REQUEST NO. 9:**

Admit that there is no evidence that Seedi Al Madani Al-Ghazi Mustafa Al Tayyib's accounts at DIB were used to fund the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 9:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Seedi Al Madani Al Ghazi Mustafa Al Tayyib's account at DIB to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation. However, Tayyib, a "key financial aid to Osama Bin Laden" was detained by Saudi Arabia in 1997 by which time, the U.S. intelligence community was already familiar with his status as financial overseer for al Qaeda during the organization's operations in Sudan. *See* Risen, James. "State of War: The Secret History of the C.I.A. and the Bush Administration," (2006). p.181. Jamal al Fadl admitted a relationship between Tayyib and Saeed Ahmed Lootah., *See* FBI 302 Interviews with Cooperating Witness Jamal al Fadl, SNY101-0092 - SNY101-0105 [ECF No. 2973-6]. Lootah is a founder, shareholder, and former member of DIB. Al-Fadl further indicated that (1) "Al-Tayyib became a secretary (in a high ranking manner) in al-Qaida and was now in charge of most of Osama bin Laden's money, including the money located outside of Sudan;" (2) "Al-Tayyib controlled and monitored Osama bin Laden's money and kept portions of the money in banks under his (Al-Tayyib) own name and in other names;" (3) "Al-Tayyib basically became the man in charge of most of the finances for the Islamic Army and attended nightly meetings with Osama bin Laden to discuss monetary issues;" (4) "Osama bin Laden would often designate separate accounts for different terrorist groups" and "al-Tayyib controlled the flow of money to the groups on behalf of Osama bin Laden;" and (5) "Money donated to Islamic causes, i.e. from wealthy individuals in the Gulf area, money collected in Europe, and money collected from groups, was sent to Osama bin Laden.... This money came to Osama bin Laden and was subsequently controlled by al-Tayyib." Al Fadl's admission infers that Lootah's relationship with Tayyib, during the years

prior to the September 11th Attacks, was significant with regard to the use of DIB by Tayyib in funding Bin Laden's operations during the period prior to the September 11th Attacks when Bin Laden was operating in Sudan and funding various terrorist groups. Moreover, his DIB accounts were in existence during the time period Tayyib was in control of Bin Laden's affairs.

**REQUEST NO. 10:**

Admit that there is no evidence that Ali Saleh Mohammad Kahla Al-Marri's account at DIB was used to fund the September 11 Attacks.

**SUPPLEMETNAL RESPONSE TO REQUEST NO. 10:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Ali Saleh Mohammad Kahla Al Marri's account at DIB to particular operational expenditures incurred by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 operation. However, DIB Account No. xx-xxxxxxxx-580-7 belonged to al-Marri and was evidently opened just prior to the September 11th Attacks on August 18, 2001 with statements provided up to March 7, 2008. *See* DIB_003380 to DIB_003392. Marri was an al Qaeda member who attended training camps between 1998 and 2001 and was instructed by Khalid Sheikh Mohammed to enter the United States no later than September 10, 2001. Prior to traveling to the U.S., al Marri went to Dubai to meet with Mustafa Hawsawi pursuant to Mohammed's instructions; Hawsawi provided al-Marri with $10,000 for his mission. *See, e.g.,* Ali Saleh Kahlah al-Marri Plea Agreement and Stipulation of Facts [ECF 2973-11]. Al-Marri had access to funds in his DIB account during the period in which he was operating on the instructions of Khalid Sheikh Mohammed and the purpose of those funds was to

further the operations surrounding the September 11th Attacks in which al-Marri was a participant as a member of al Qaeda.

**REQUEST NO. 11:**

Admit that there is no evidence that Ali Abdul Aziz Ali's account at DIB was used to fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 11:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the specific use of Ali Abdul Aziz Ali's account at DIB to for funding Al Qaeda through specific transactions, however, consistent with the principle that money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they may have been needed and that the funds were available, withdrawn, and used immediately before the September 11 Attacks to fund Ali's escape following Ali's funding and facilitation of al Qaeda's 9/11 plot.

The 9/11 Commission Report concluded that Khalid Sheikh Mohammed, Ali Abdul Aziz Ali's uncle and one of the architects of 9/11, ordered the hijackers to travel "through the UAE en route to the United States," where they were primarily assisted by two al Qaeda operatives, one of which was Ali. *See* 9/11 Commission Report at p. 236. It also describes Ali as an "important facilitator in the plot" who "used [a hijacker's] credit card to order a Boeing 747-400 flight simulator program and a Boeing 767 flight deck video, together with attendant literature[.]" p. 168. *See also* Indictment, *U.S. v Khalid Sheikh Mohammed, et al.*, Case No. (S14) 93 Cr. 180 (KTD) (S.D.N.Y.), April 4, 2011, ¶¶ 57-58. In addition, the flight training of the Hamburg

operatives was paid for "primarily with funds wired from Dubai by [Ali]" totaling $114,500. The 9/11 Commission Report at p. 224. On or about August 8, 2000, during the same period he was carrying out orders for Khalid Sheikh Mohammed, Ali opened an account at the Dubai Islamic Bank. *See* Department of Defense Unclassified Summary of Evidence for Combatant Status Review Tribunal – Al Baluchi, Ammar [ECF No. 2973-16], ¶ 3(c). Khalid Sheikh Mohammed admitted that $81,000, provided to three of the hijackers for flight training, was transferred through Ali and the transfers to the hijackers primarily originated in the UAE. Substitution of Testimony of Khalid Sheikh Mohammed, *U.S. v. Moussaoui*, Cr. No. 01-465-A, Defendant's Exhibit 941, [ECF No. 2973-10], ¶¶ 42, 68, 73. On April 16, 2000, Ali wired $5,000 to a bank in California from Dubai, on June 29, 2000, Ali transferred $5,000 to a hijacker in the Manhattan, New York from Dubai, on July 18, 2000, Ali wired $10,000 from Dubai to a Florida bank account shared by two hijackers, on August 5, 2000, Ali transferred $9,500 from Dubai to the Florida bank account, on August 29, 2000, Ali transferred $20,000 from Dubai into the Florida bank account, and on September 17, 2000, Ali made a transfer from Dubai to the Florida bank account in the amount of $70,000. *See* Indictment, *U.S. v Khalid Sheikh Mohammed, et al.*, Case No. (S14) 93 Cr. 180 (KTD) (S.D.N.Y.), April 4, 2011, ¶¶ 75, 78, 79, 81, 82 83. Institutions in the UAE played a key role in moving resources to the 9/11 planners and hijackers. *See* DIB_001168, NATO Parliamentary Assembly, The Economic Consequences of September 11, 2001 and the Economic Dimension of Anti-Terrorism General Report, p. 8. However, the UAE did not enforce tighter restrictions on its banking system until after September 11, 2001 and al – Qaeda did use "banks that operate according to Islamic principles, such as the Bank of Dubai." *See* DIB_000792, Al-Qaeda: The Many Faces of an Islamist Extremist Threat, Report of the House Permanent Select Committee on Intelligence, June 2006 (p. 11). Ali was able to use an

alias or partial name and show no identification for five of six identified transfers. *See* DIB_001045, National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing, Staff Report to the Commission, p. 40. On September 10, 2001, Ali withdrew nearly all of the money from two bank accounts in the UAE and flew from Dubai to Karachi, Pakistan on a one-way ticket. *See* Indictment, *U.S. v Khalid Sheikh Mohammed, et al.*, Case No. (S14) 93 Cr. 180 (KTD) (S.D.N.Y.), April 4, 2011, ¶ 163. The funds in Ali's DIB account were available for funding of the September 11th Attacks and Ali did, in fact, fund his escape from the UAE the day before the September 11th Attacks using significant funds withdrawn from his DIB account following Ali's funding and facilitation of al Qaeda's 9/11 plot.

On March 22, 2005, in a letter from the Central Bank to DIB's Chief Executive, Butti Khalifa bin Darwiah al Falasi, the Central Bank advises that a U.S. Embassy official will visit DIB to obtain a "Certification of Business Records" for "documents relating to one of your clients and/or transactions conducted via your bank on behalf of one of your clients previously provided to us." The letter adds that the "certificate will be used by the concerned US authorities in an upcoming trial in the Eastern District of Virginia —United States of America." *See* DIB03444-3446. On April 26, 2005, a letter from the head of DIB's Anti-Money Laundering Division, Zohair Said al Rabii, responds to the March 22 letter, informing the Central Bank that DIB attached "Certification of Business Records" for Account No. xx-xxx-xxxxx63-01 held in the name of Ali Abdul Aziz Ali. *See* DIB03464-66 (provided to Plaintiffs in discovery without attachment despite letter referencing "records attached hereto").

**REQUEST NO. 12:**

Admit that there is no evidence that Fayez Rashid Ahmed Hassan Al-Qadi's account at DIB was used to fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 12:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Fayez Rashid Hassan Al Qadi's account at DIB to funding Al Qaeda through specific transactions, however, consistent with the principle that money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they would have been needed to further al Qaeda's 9/11 plot in which Al Qadi was an active participant. Plaintiffs were provided 13 pages of bank statements from Al-Qadi's account with dates ranging from January 1996 at the earliest to December 31, 2000 at the latest. *See* DIB_003367 to DIB_003379. These statements show that the funds in this account were available to Al-Qadi during al Qaeda's period of preparation for the September 11th Attacks.

**REQUEST NO. 13:**

Admit that there is no evidence that Khalid Amer Salim Ballayth's account at DIB was used to fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 13:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Khalid Amer Salim Ballayth's account at DIB to funding Al Qaeda through specific transactions, however, consistent with the principle that

money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they would have been needed to fund al Qaeda's operations. Account statements for the period 1992-2004 for Khaled Amer Ballaith, Sharjah, P.O. Box 1033, prove his ownership of DIB Account No. xxxxxxxxxx6601. DIB_005024 – DIB_005051, The funds in this account were available for use in the period of planning for September 11th. Ballayth was the director of the Sana Trading Establishment the holding company of the Binjad Establishment. KADI0015570. Ballayth was found to be a close associate of Osama bin Laden who transferred between $200,000 and $250,000 to the Muwafaq Foundation through the account of the Binjad establishment RICO Statement Applicable to Talal M. Badkook, Exhibit "A", RICO Statement Question #2, MDL 1570 – *Federal Insurance Co. v. al Qaida*, 03 CV 06978; *See also* KADI0015570 (described by Swiss authorities as a "close associate of Osama Bin Laden"). The Binjad Establishment ordered vehicles for the Muwaqaf Foundation which operated closely with the International Islamic Relief Organization. An August 17, 1995 check was written from Ballaith's above-described DIB account in the amount of 138,249.20 DH to Mohammed A. Bin Mahfouz. KADI0106547. Mohammed Ahmed Obaid Bin Mahfouz, the brother of Khalid Bin Mahfouz, is an associate of Executive Order 13224 designee Yassin al Qadi and was responsible for overseeing the operations of the Muwafaq Foundation's branch office in Islamabad, Pakistan. According to the U.S. Treasury Department, the Muwafaq Foundation merged with al Qaeda prior to the September 11th Attacks. *See* November 29, 2001 letter from David D. Aufhauser, Department of the Treasury General Counsel, to Switzerland's M. Claude Nicati, Substitute du Procureur General. KADI0106547 demonstrates Ballayth's

association with Mahfouz and the transfer of funds to an individual who was operating a front for al Qaeda's financial activities in the years prior to the September 11th attacks.

**REQUEST NO. 14:**

Admit that there is no evidence that Mamdoh Mahmoud Salim Ahmed's accounts at DIB were used fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 14:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Mamdoh Mahmoud Salim Ahmed's account at DIB to funding Al Qaeda through specific transactions, however, consistent with the principle that money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they would have been needed to fund al Qaeda's operations. When Ahmed, a founding member of al Qaeda responsible for managing terrorist training camps in Afghanistan and Pakistan and undertaking efforts to obtain nuclear weapons for al Qaeda, was arrested on September 16, 1998 by German authorities for his role in the 1998 Embassy bombings, the following were found in his possession: (1) "VISA Card Dubai Islamic Bank fur Mamdoh M S Ahmed, Nr. xxxx xxxx xxxx 1013;" (2) "Bank Card Dubai Islamic Bank fur Mamdoh M.S. Ahmed, Nr. xxxx xxxx xxxx 2362;" (3) "Card Dubai Islamic Bank Nr. xxx4008; and (4) "1 Zettel Dubai Islamic Bank" *See, e.g.,* KADI0030668 - KADI0030678 at KADI0030672 and 675. Ahmed had access to funds in DIB accounts which were available to fund terrorist operations, including the 1998 Embassy bombings (attributable to an al Qaeda plot), in the years prior to the September 11th Attacks.

**REQUEST NO. 15:**

Admit that there is no evidence that Ahmed Ali Jumale's account at DIB was used to fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 15:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Ahmed Ali Jumale's account at DIB to funding Al Qaeda through specific transactions, however, consistent with the principle that money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they would have been needed to fund al Qaeda's operations. Jumale, who was designated by the U.S. Treasury Department on November 7, 2001 for his close ties to Osama Bin Laden, held accounts at DIB and, according to Treasury officials, Jumale used the Al Barakaat group of companies "to transmit funds, intelligence and instructions" to al Qaeda and other terrorist organizations" *See* Josh Meyer and Sebastian Rotella, "U.S. Coalition Freezes Assets in Terror War" Los Angeles Times, November 8, 2001 [ECF No. 2973-12]. *See also* DIB_001075-DIB_001085, National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing, Staff Report to the Commission, pp. 70-80. Jumale held personal accounts at DIB as evidenced by his personal and VISA DIB Account Nos. xxx1192 and xxx-xxx-xxx-960 which were seized pursuant to the instructions of the Central Bank of the UAE "in conjunction with the International efforts to fight terrorism." DIB 3251-3259. Jumale had access to the funds in his personal DIB accounts and the ability to transmit these funds in the years prior to the September 11th Attacks.

**REQUEST NO. 16:**

Admit that there is no evidence that Barakaat Bank of Somalia's account at DIB was used to fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 16:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Barakaat Bank of Somalia's account at DIB to funding Al Qaeda through specific transactions, however, consistent with the principle that money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they would have been needed to fund al Qaeda's operations. Al Barakaat "has used its global money-transfer business to help terrorist ship large caches of weapons from one country to another, paid for through money transfers that the company indicated was for the use of blankets." Josh Meyer and Sebastian Rotella, "U.S. Coalition Freezes Assets in Terror War" Los Angeles Times, November 8, 2001 [ECF No. 2973-12]. Barakaat Bank of Somalia Account Nos. xxx339 and xx-xxx-xx-x13-01 were seized pursuant to the instructions of the Central Bank of the UAE "in conjunction with the International efforts to fight terrorism." DIB 3251-3259. Barakaat Bank of Somalia had access to the funds in these DIB accounts and the ability to transmit these funds in the years prior to al Qaeda's 9/11 plot.

**REQUEST NO. 17:**

Admit that there is no evidence that Al Baraka Exchange LLC's account at DIB was used to fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 17:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Al Baraka Exchange LLC's account at DIB to funding Al Qaeda through specific transactions, however, consistent with the principle that money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they would have been needed to fund al Qaeda's operations. *See, e.g.,* Josh Meyer and Sebastian Rotella, "U.S. Coalition Freezes Assets in Terror War" Los Angeles Times, November 8, 2001 [ECF No. 2973-12]. Al Baraka Exchange Account Nos. xxx7440 and xxx7483 were seized pursuant to the instructions of the Central Bank of the UAE "in conjunction with the International efforts to fight terrorism." *See* DIB 3251-3259. In addition, an Al Baraka Exchange account statement covering the year 1998 reflects five very large credits and transfer transactions in account no. 01520626744001 totaling exactly two million in UAE Dirham credits and two million in transfers to two separate accounts which appear to also be DIB accounts (particulars of transfers are 981.030.00 to "60029" and 1,018,970.00 to "60030"). DIB_003535. This statement evidences large, unexplained transfers through a DIB account owned by the Al Baraka Exchange in the years prior to the September 11th Attacks and highly unusual activity in that these large transfers were made within an account reflecting only five total transactions over a period of twelve months.

**REQUEST NO. 18:**

Admit that there is no evidence that International Islamic Relief Organization's account at DIB was used to fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 18:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from International Islamic Relief Organization's account at DIB to funding Al Qaeda through specific transactions, however, consistent with the principle that money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they would have been needed to fund al Qaeda's operations. According to the U.S. government, "Usama bin Laden used the entire IIRO network for its terrorist activities. *See* FED-PEC 220501-220502. *See also* BUR-PEC014984-14987 (stating that "the Sharja affiliation of the Saudi 'International Islamic Relief Organization' and the 'Human Appeal International' established the 'Special Chechen Refugees Assistance Fund' (account number 01520483656101 in the 'Islamic Bank of Dubai.'")); FED-PEC 202110-212112 (August 3, 2006 Executive Order designation of the IIRO branch offices in the Philippines and Indonesia and the Executive Director of the IIRO's Eastern Province Branch, Abd al Hamd Sulaiman al Mujil, "for facilitating fundraising for al Qaida and affiliated terrorist groups."). In the years prior to the September 11th Attacks, IIRO maintained an account at DIB during a period when high-level officials of the organization were facilitating fundraising for al Qaeda and affiliated terrorist groups.

**REQUEST NO. 19:**

Admit that there is no evidence that Seedi Al Madani Al-Ghazi Mustafa Al Tayyib's accounts at DIB were used to fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 19:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Seedi Al Madani Al-Ghazi Mustafa Al Tayyib's account at DIB to funding Al Qaeda through specific transactions, however, consistent with the principle that money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they would have been needed to fund al Qaeda's operations. Tayyib, a "key financial aid to Osama Bin Laden" was detained by Saudi Arabia in 1997 by which time, the U.S. intelligence community was already familiar with his status as financial overseer for al Qaeda during the organization's operations in Sudan. *See* Risen, James. "State of War: The Secret History of the C.I.A. and the Bush Administration," (2006). p.181. Jamal al Fadl admitted a relationship between Tayyib and Saeed Ahmed Lootah., *See* FBI 302 Interviews with Cooperating Witness Jamal al Fadl, SNY101-0092 - SNY101-0105 [ECF No. 2973-6]. Lootah is a founder, shareholder, and former member of DIB.Al-Fadl further indicated that (1) "Al-Tayyib became a secretary (in a high ranking manner) in al-Qaida and was now in charge of most of Osama bin Laden's money, including the money located outside of Sudan;" (2) "Al-Tayyib controlled and monitored Osama bin Laden's money and kept portions of the money in banks under his (Al-Tayyib) own name and in other names;" (3) "Al-Tayyib basically became the man in charge of most of the finances for the Islamic Army and attended nightly meetings with Osama bin Laden to discuss monetary issues;" (4) "Osama bin Laden would often designate separate accounts for different terrorist groups" and "al-Tayyib controlled the flow of money to the groups on behalf of Osama bin Laden;" and (5) "Money donated to Islamic causes, i.e. from wealthy individuals in the Gulf area, money collected in Europe, and money collected from

groups, was sent to Osama bin Laden.... This money came to Osama bin Laden and was subsequently controlled by al-Tayyib." Al Fadl's admission infers that Lootah's relationship with Tayyib, during the years prior to the September 11th Attacks, was significant with regard to the use of DIB by Tayyib in funding Bin Laden's operations during the period prior to the September 11th Attacks when Bin Laden was operating in Sudan and funding various terrorist groups including al Qaeda operatives who carried out the 1998 Embassy Bombings. Moreover, his DIB accounts were in existence during the time period Tayyib was in control of Bin Laden's affairs.

**REQUEST NO. 20:**

Admit that there is no evidence that Ali Saleh Mohammad Kahla Al-Marri's account at DIB was used to fund Al Qaeda.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 20:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from Ali Saleh Mohammad Kahla Al-Marri's account at DIB to funding Al Qaeda through specific transactions, however, consistent with the principle that money is fungible, and recognizing that al Qaeda relied on its entire infrastructure in order to plan and carry out the 9/11 attacks, evidence exists to indicate that the funds were available in the account for use in the event that they would have been needed to fund al Qaeda's operations. DIB Account No. xx-xxxxxxxx-580-7 belonged to al-Marri and was evidently opened just prior to the September 11th Attacks on August 18, 2001 with statements provided up to March 7, 2008. *See* DIB_003380 to DIB_003392. Al Marri was an al Qaeda member who attended training

camps between 1998 and 2001 and was instructed by Khalid Sheikh Mohammed to enter the United States no later than September 10, 2001. Prior to traveling to the U.S., al Marri went to Dubai to meet with Mustafa Hawsawi pursuant to Mohammed's instructions; Hawsawi provided al-Marri with $10,000 for his mission. *See, e.g.,* Ali Saleh Kahlah al-Marri Plea Agreement and Stipulation of Facts [ECF 2973-11]. Al-Marri had access to funds in his DIB account during the period in which he was operating on the instructions of Khalid Sheikh Mohammed and the purpose of those funds was to further the operations surrounding the September 11th Attacks in which al-Marri was a participant as a member of al Qaeda.

**REQUEST NO. 21:**

Admit that there is no evidence that DIB's Customer, Khalid Amer Salim Ballayth, participated in the planning, funding, or execution of the September 11 Attacks.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 21:**

Subject to the explanation that follows, plaintiffs admit that they are not in possession of evidence directly connecting Khaled Amer Salim Ballayth to the planning, funding, or execution of the September 11 Attacks. However, account statements for the period 1992-2004 for Khaled Amer Ballaith, Sharjah, P.O. Box 1033, prove his ownership of DIB Account No. xxxxxxxxxx6601. DIB_005024 – DIB_005051, The funds in this account were available for use in the period of planning for September 11th. However, Ballayth was the director of the Sana Trading Establishment the holding company of the Binjad Establishment. KADI0015570. Ballayth was found to be a close associate of Osama bin Laden who transferred between $200,000 and $250,000 to the Muwafaq Foundation through the account of the Binjad establishment RICO Statement Applicable to Talal M. Badkook, Exhibit "A", RICO Statement

* * * *

[pages omitted]

DATED: May 27, 2021

Respectfully Submitted

MOTLEY RICE LLC

By: /s/ ____________________

Jodi Westbrook Flowers
Donald A. Migliori
Robert T. Haefele
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: jflowers@motleyrice.com
Email: dmigliori@motleyrice.com
Email: rhaefele@motleyrice.com

ANDERSON KILL

By: /s/ ____________________

Jerry S. Goldman
Bruce E. Strong
ANDERSON KILL
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 278-1000
Fax: (212) 278-1733
Email: jgoldman@andersonkill.com
Email: bstrong@andersonkill.com

*For the Personal Injury and Wrongful Death Plaintiffs*

COZEN O'CONNOR

By: /s/ ____________________

Sean P. Carter
Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com
Email: starbutton@cozen.com

*For the Commercial Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | ) 03 MDL 1570 (GBD)(SN)<br>) ECF Case |

This document relates to:
*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-cv-06978
*Thomas Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.*, Case No. 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-07065
*Euro Brokers, Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-07279

## CERTIFICATE OF SERVICE

I, Jade A. Haileselassie, hereby certify that I have this 27th day of May, 2021 caused to be served a true and correct copy of the foregoing document upon named plaintiffs and defendants in the above-captioned actions by sending the documents by electronic means, upon:

Steven T. Cottreau
Gabrielle Pritsker
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001
Tel: (202) 879-5572
Email: scottreau@jonesday.com
Email: gpritsker@jonesday.com

*Counsel for Defendant Dubai Islamic Bank*

Juan P. Morillo
Quinn Emanuel Urquhart & Sullivan LLP
777 Sixth St. NW
Washington, DC 20001
Tel: (202) 538-8174
Email: juanmorillo@quinnemanuel.com

Alan Kabat
Bernabei & Kabat PLLC
1400 16th St. NW #500
Washington, DC 20036-2223
Tel: (202) 745-1942
Fax: (202) 745-2627
Email: kabat@bernabeiPLLC.com

*Defendants' Liaison Counsel in 03-MDL-1570*

Jayne Conroy
Simmons Hanly Conroy
112 Madison Avenue
New York, NY 10016
Tel: (212) 784-6402
Fax: (212) 784-6400
Email: jconroy@simmonsfirm.com

James P. Kreindler
Andrew J. Maloney, III
Mark S. Moller
Justin T. Green
Kreindler & Kreindler, LLP
750 Third Avenue
New York, NY 10017
Tel: (212) 973-3440
Fax: (212) 972-9432
Email: jkreindler@kreindler.com
Email: amaloney@kreindler.com
Email: jgreen@kreindler.com

Michel Baumeister
Dorothea Capone
Baumeister & Samuels, P.C.
140 Broadway, 46th Floor
New York, NY 10005
Tel: (212) 363-1200
Fax: (212) 363-1346
Email: mbaumeister@baumeisterlaw.com
Email: tcapone@baumeisterlaw.com

Edward M. Pinter
Catherine B. Altier
Ford Marrin Esposito
Witmeyer & Gleser, L.L.P.
Wall Street Plaza
New York, NY 10005
Tel: (212)-269-4900
Fax: (212) 344-4294
Email: cbaltier@FMEW.com
Email: empinter@FMEW.com

Jack Cordray
Cordray Law Frim
Post Office Drawer 22857
Charleston, SC 29413
Tel: (843) 577-9761
Fax: (843) 853-6330
Email: jack@cordraylawfirm.com

Ken Nolan
Frank Granito, III
Speiser Krause Nolan & Granito
800 Westchester Ave., Ste. S-608
Rye Brook, NY 10573
Tel: (914) 220-5333
Fax: (914) 220-5334
Email: spn@speiserkrause.com
Email: f3g@speiserkrause.com

Dennis G. Pantazis
Wiggins, Childs, Wuinn and Pantazis LLC
201 18th St. North
Birmingham, AL 35203
Email: dgp@wigginschilds.com

*Counsel for Plaintiffs in Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.; Euro Brokers, Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.; Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.; Continental Casualty Co., et al. v. Al Qaeda, et al.; Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.; and/or Plaintiffs' Liaison Counsel in 03-MDL-1570*

*/s/ Jade A. Haileselassie*
Jade A. Haileselassie