# EXHIBIT 27a

# DOCUMENT 55

CIA_000719

C05432020





## Intelligence Report

*Office of Transnational Issues*

# Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions

*A Research Paper*

C05432020





## Intelligence Report
*Office of Transnational Issues*

# Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions

*A Research Paper*

CIA_000721

C05432020

## Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions

**Key Findings**

*Information available as of 20 November 1997 was used in this report.*

Several Islamic financial institutions—those that ascribe to the Koran's principles against the payment of interest—regularly serve as financial conduits and sources of financial support for a range of Islamic extremist groups, organizations, and political parties. Some of these extremists have been involved in terrorist activities. Our study of ░░░░ ░░░░ on some 130 Islamic financial entities has revealed that Bank Al Taqwa and Dubai Islamic Bank demonstrate especially close financial and personal ties to Algeria's Islamic Salvation Front (FIS), Egypt's Gama'at al Islamiyya (IG), the Palestinian Islamic Resistance Movement (HAMAS), Saudi exile Usama Bin Ladin's terrorist Islamic Army, and other Muslim Brotherhood–backed groups ░░░░░░░░░░░░ ░░░░░░░ extremist ties to the Saudi-owned Dar Al Maal Al Islami and Dallah Al Baraka bank groups and Al Rajhi Banking & Investment Company, ░░░░░░░░░░░░░ Specifically:

- Bank Al Taqwa, based in Nassau, is one of the most important financial conduits for the International Muslim Brotherhood (MB), ░░░░░ ░░░░░░. Along with its affiliate in Geneva, the bank has been a source of financial support for the Afghan and Bosnian Mujahaddin, the IG, FIS, and Tunisia's banned An Nahda movement. The bank's president has been a top MB financial officer in Europe since at least the mid-1980s, ░░░░░░. Its board of directors also includes a notable financial supporter of the IG and a prominent radical cleric based in Qatar.

- Dubai Islamic Bank (DIB) is a key financial conduit for Usama Bin Ladin's Islamic Army, HAMAS, and Oman's Muslim Brotherhood, ░░░░░░. The bank's chairman, Saeed Ahmed Lootah, is a member of the MB and a close friend of Bin Ladin's, ░░░░░ ░░░░░ Bin Ladin and his Sudan-based companies maintain several accounts at DIB. The bank also is used by such nongovernment humanitarian organizations (NGOs) as Human Appeal International—an alleged financial conduit for HAMAS—and the Dar al-Birr Society, which has financed the Bosnian Mujahaddin.

- Dar Al Maal Al Islami Trust (DMI), a Nassau-based holding company for about a dozen Islamic banks founded by Saudi Prince Muhammad Al Faisal Al Saud, has strong links to the ruling Sudanese National Islamic

iii

CIA_000722

C05432020



Front (NIF).  Six NIF members have been identified as directors or share-holders of DMI's Khartoum subsidiary, Faisal Islamic Bank of Sudan (FIBS); NIF leader Hasan al-Turabi is a past DMI board member, according to bank annual reports,  In addition, ██████████ Istanbul-based Faisal Finance Institution and Faisal Islamic Bank of Egypt in Cairo—both DMI subsidiaries—are key conduits for funding Turkey's recently ousted Refah Party and Egypt's Muslim Brotherhood, both of which are relatively moderate Islamic political parties.

- The Dallah Al Baraka Group owns several banking subsidiaries used extensively by extremists.  Albaraka Bank (Sudan) is a financial conduit for the NIF and is used by the Islamic Army, ██████████

- The religiously ultraconservative Al Rajhi family—owners of the Al Rajhi Banking & Investment Company, with $8.6 billion of total assets—appears to be a key financial backer of the Afghan Mujahaddin, ██████████  The family and the bank purportedly also support NGOs who help finance the Bosnian Mujahaddin, HAMAS, and other extremists.

Arab Albanian Islamic Bank, Bahrain Islamic Bank, the Islamic Bank of Yemen for Finance & Investment, and Qatar International Islamic Bank maintain financial ties to radical extremist groups and suspect Islamic NGOs, ██████████

In addition to providing the ability to bank in accordance with their religious beliefs, Islamic activists—and militants—are attracted to Islamic banks for two other reasons:

- Top management affiliations with the MB, HAMAS, and the NIF make Islamic banks a safehaven for extremist funds. ██████████

In addition, low-level bank employees at Islamic institutions—who are

CIA_000723

C05432020



often hired on the basis of commitment to Islam—may turn a blind eye to money movements by extremist groups. Finally, a general lack of local regulatory scrutiny—as compared with regulation at conventional institutions—may offer additional confidence to extremists that their financial activities will not be closely examined.

- Islamic banks share profits with Islamic political groups and sometimes benefit Islamic sectors of the economy—through loans and employment—at the expense of non-Islamic communities. Islamic financial institutions in Sudan have been key financial supporters of the NIF, and those in Egypt generate income for the MB, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ Istanbul-based subsidiaries of Dallah Al Baraka, DMI, and the Kuwait Finance House have financially supported Islamic movements in Turkey. ▮▮▮▮

Because of a significant amount of cross-ownership among Islamic financial institutions, Islamic bank boards of directors and management teams share common personnel that may result in influence over bank policy with regard to dealings with extremists. Approximately 60 of the Islamic financial institutions examined were capitalized by Sheikh Kamel's Dallah Al Baraka Group and Prince Muhammad's Dar Al Maal Al Islami Trust, according to the financial press and bank annual reports, which affords them representation on numerous Islamic bank boards. In addition, MB member and DIB Chairman Lootah is a director of four Islamic banks in Bahrain and Bangladesh, and Bank Al Taqwa adviser Sheikh Youssef Al Qaradawi is director or religious supervisor of Islamic financial institutions in Egypt, Kuwait, Malaysia, and Qatar. ▮▮▮▮



CIA_000724

C05432020

vi

C05432020



## Contents

| | Page |
|---|---|
| Key Findings | iii |
| Scope Note | ix |
| Islamic Financial Institutions: Ties to Extremist Groups | 1 |
| Bank Al Taqwa | 1 |
| Dubai Islamic Bank | 7 |
| Dar Al Maal Al Islami Group | 11 |
| Dallah Al Baraka Group | 14 |
| Al Rajhi Banking & Investment Company | 16 |
| Suspect Financial Activities at Other Islamic Banks | 18 |
| Motivations for Using Islamic Banks  (U) | 19 |
| Financial Safehaven | 19 |
| Ability To Bank in Accordance With Religious Beliefs | 21 |
| Profit Sharing and Financing | 21 |
| Common Ownership and Management of Islamic Financial Institutions  (U) | 22 |
| | 23 |
| | 23 |
| | 27 |

**Appendix**
| | |
|---|---|
| Islamic Financial Institutions Worldwide (U) | 29 |

*Reverse Blank*

CIA_000726

C05432020

**Scope Note**

This paper analyzes the financial and personal ties of Islamic radical movements to Islamic financial institutions ████████████████████████ ████████████. It is not intended to suggest that most Islamic finance houses knowingly conduct dealings with terrorists or that Islamic militants use Islamic banks exclusively to conduct financial dealings. Indeed, Islamic banks engage in a myriad of legitimate development projects, trade finance arrangements, and commercial partnerships. Moreover, Islamic extremist groups have been observed using conventional banks, couriers, business fronts, and other entities worldwide to move funds. A handful of Islamic banks, however, appear to be actively engaged in financing militant groups, and some bank executives have personal ties to Islamic extremists and activists. The purpose of this paper is to document reporting on this particular avenue for the financing of radical Islam and Islamic extremists and to assess its vulnerabilities. ████

*Reverse Blank*

CIA_000727

C05432020

## Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions

### Islamic Financial Institutions: Ties to Extremist Groups

Our review ▮▮▮▮ suggests that Islamic extremist groups—some of which have undertaken extensive terrorist operations—make regular use of Islamic banks to maintain accounts and transfer funds (see insets on Islamic banking and terrorist groups).[1] ▮▮▮▮ Islamic nongovernment humanitarian organizations (NGOs) that are suspected of serving as fronts for Islamic radicals make extensive use of Islamic banks to channel financial support. Of the roughly 130 Islamic financial entities examined, ▮▮▮▮ Bank Al Taqwa and Dubai Islamic Bank stand out from other Islamic financial institutions because of their management's apparently witting involvement in the financial activities of Egypt's Gama'at al Islamiyya (IG), the Palestinian Islamic Resistance Movement (HAMAS), Usama Bin Ladin's Islamic Army, as well as numerous Muslim Brotherhood factions that are bent on establishing Islamic states.[2]

radical Islamic financial links of the Saudi-owned Dar Al Maal Al Islami and Dallah Al Baraka banking groups, and the Al Rajhi Banking & Investment Company;

▮▮▮▮ For a detailed list of Islamic financial institutions, their key officers, ownership, holdings, and links to Islamic political entities, see the appendix. ▮▮▮▮

### Bank Al Taqwa

Established in Nassau in 1988, Bank Al Taqwa (Piety Bank) has been described as the single-most-important financial conduit for the International Muslim Brotherhood (MB)[3]

---

[1] Islamic groups also use conventional banks as needed. Cells of Islamic organizations operating in Europe and the Americas, for example, use Western banks because of the lack of conventional and Islamic banks to deter security forces watching for terrorist-related transactions. It is interesting to note that Middle Eastern terrorist groups whose primary goal is the destruction of Israel rather than the establishment of Islamic states—the Abu Nidal organization, the Popular Front for the Liberation of Palestine–General Command (PFLP-GC), the PFLP, and the like—overwhelmingly use conventional financial institutions and make use of Islamic banks on an infrequent basis. ▮▮▮▮

[2] According to the International Association of Islamic Banks (IAIB), approximately 180 Islamic financial institutions operate worldwide. The number of Islamic financial institutions in this paper differs from the number reported by the IAIB because our analysis focused on those establishments that are, in large part, privately owned and that specifically were established with Islamic charters. In this regard, we have excluded the 10 government-owned financial institutions operating under Iran's Islamic regime; some 40 banks in Pakistan and 20 in Sudan that adopted Islamic banking principles under government law; and another 20 entities in Malaysia that are IAIB members but do not appear to be deposit-taking and lending institutions. Included here are an additional 40 Islamic financial institutions and investment companies ▮▮▮▮ that apparently are not IAIB members. ▮▮▮▮

[3] The term "International Muslim Brotherhood" is generally used to refer to a political movement that promotes the use of Islamic law within the existing political systems of Muslim states. It does not exist as a formal or recognized organization; indeed the Muslim Brotherhood, as a formal political organization, is outlawed in every Middle Eastern country except Kuwait. Nevertheless, illegal or unrecognized factions operate in almost every Muslim country. In addition, significant qualitative differences exist among these movements. The Egyptian Muslim Brotherhood, for example, operates largely as a peaceful, political force under a government that significantly represses its activities. Extremist Muslim Brotherhood factions—such as Algeria's Armed Islamic Group and Egypt's Al Gama'at al Islamiyya—seek to overthrow their secular governments and impose Islamic law. ▮▮▮▮

CIA_000728

C05432020

## A Profile of Islamic Banking  (U)

O ye who believe! Fear God and give up what remains of your demand for usury if ye are indeed believers. If ye do it not, take notice of war from God and his Apostle. But if ye turn back, ye shall have your capital sums. Deal not unjustly, and ye shall not be dealt with unjustly.

Sura II - Al-Baqarah
Verses 278-279, The Koran (U)

Islamic banking is a financial system that conforms to the principles of Islamic law (shari'a), which forbids the payment of interest and other guaranteed returns on loans and investments.[a] It began to flourish during the latter 1970s when prominent Muslim scholars from oil-rich states began to actively promote a conservative interpretation of the shari'a in relation to politics, economics, and finance. Although some teach that the prohibition of interest affects only exploitative or exorbitant charges, most scholars in the Arabian Peninsula and Sudan believe in eliminating interest in all dealings on the basis that lenders, like borrowers, must share in the risk of an enterprise. In lieu of interest, Islamic banks earn income by sharing in the profits on loaned capital provided to business—viewing themselves as business partners that share in the returns of a project. On the other hand, the lending institution also shares in the risk of losses and may not be able to recover the principal from a failed project. During the

past two decades, the number of Islamic banks has increased markedly.[b] This growth coincided with—and probably was favorably affected by—the adoption of Islamic banking systems in Iran, Pakistan, and Sudan, and the general rise of Islamic fundamentalism throughout the Middle East. (U)

Several basic lending structures are used in Islamic financing, each of which describes particular partnerships between the bank and the customer:

- **Murabaha**—the most widely used Islamic financial product—is often used in international trade in place of letters of credit. In this arrangement, the bank purchases goods and resells them to the borrower at a higher price. The borrower might pay for the goods in a lump sum or installments.

- **Mudaraba**, or "speculation in partnership," involves bank financing of an entire investment project in return for a share of the profits. The client contributes management, labor, and technical skill. Such financing resembles the raising of venture capital in the West, although the borrower usually is well known to the Islamic bank, which may help lower the credit risk.

[a] The overriding principles of Islamic economics are justice and equity and the prohibition of anything exploitative or burdensome. In Islamic banking, interest is a guaranteed (riskless) return that is to be paid regardless of whether the borrower's venture is successful. Islamic law contends that interest payments should not be borne by unfortunate borrowers whose projects fail. A corollary offered by conventional bankers, on the other hand, is that highly successful borrowers face the prospect of paying Islamic banks far more in shared profits than they would to a conventional bank, which demands the payment of a usually lower, fixed return. (U)

[b] Despite the increase in the number of Islamic financial institutions operating worldwide, the Islamic banking sector represents a tiny slice of the international financial system. According to the financial press, the industry controls about $100 billion of assets—which is equivalent to roughly half of the total assets of Citibank NA in New York. (U)

CIA_000729

C05432020

### A Profile of Islamic Banking  (U) (continued)

- **Al-Qard Al-Hasan** *is a no-interest loan primarily for use in the initial phases of one of the above arrangements to help the borrower establish his operation.* (U)

*Depositors can earn returns from Islamic bank-financed projects by placing funds in participatory profit and loss accounts (PPLA). PPLAs are similar to Western mutual funds because returns may be positive or negative—depending on the profitability of the underlying investment projects. Other deposit accounts yield no return under Islamic law. Small savers who desired to adhere to Islamic principals initially were the major source of Islamic deposits, although wealthy individuals increasingly are using Islamic banks to manage their portfolios*



*Islamic banks have religious supervisory boards composed of clerics that oversee borrowing and lending activities. The board ensures that financial activities are in line with the shari'a by making certain that bank funds are not used to promote businesses such as those dealing in alcoholic beverages, gambling, pork production, and pornography. In addition, religious boards enforce prohibitions governing Islamic investment in businesses that earn income from interest-based debt instruments. Religious boards further ensure that the bank's balance sheet is liquid out of concern that depositors may demand their funds; Islamic banks cannot cover a run on deposits, as conventional banks can, by readily borrowing from other banks.[d] Finally, the boards ensure that banks pay zakat, a tax usually amounting to 2.5 percent of profits that is distributed to charities.* (U)

---

[d] *Islamic banks are cut off from conventional capital markets because of restrictions on interest, which has limited their investment opportunities. The problem has resulted in surplus liquidity in the industry because Islamic banks are unable to structure their investment portfolios over longer terms.* (U)

---

3

C05432020

### Profiles of Some Key Islamic Extremist Groups (U)

**Al Gama'at al Islamiyya (IG)**
An indigenous Egyptian Islamic extremist group active since the late 1970s, the IG seeks to overthrow the government of President Hosni Mubarak and replace it with an Islamic state. The IG has led armed attacks against Egyptian security and other government officials, Christians, and Egyptian opponents of Islamic extremism. Apparently, the IG has lost some of its leadership during the past several years. IG leader Tallat Fuad Kassem purportedly has not been seen since his arrest and extradition to Egypt in 1995. IG spiritual leader Sheikh Umar Abd Al-Rahman, also known as the Blind Sheikh, is in US prison for his role in conspiring to bomb the World Trade Center in New York.

**Armed Islamic Group (GIA)**
GIA began its violent activities nine months after Algiers voided the victory of the Islamic Salvation Front (FIS) in the December 1991 legislative elections. GIA members, who number several hundred to several thousand, seek to overthrow the secular Algerian regime and replace it with an Islamic state. GIA's terrorist campaign against foreigners living in Algeria began in September 1993 and has resulted in the killing of about 100 expatriates to date through assassinations, bombings, and slitting the throats of kidnap victims. (U)

**Islamic Resistance Movement (HAMAS)**
Formed in late 1987, HAMAS is an outgrowth of the Palestinian branch of the Muslim Brotherhood concentrated in the Gaza Strip and a few areas of the West Bank. Various elements of HAMAS have used both political and violent means—including terrorism—to pursue the goal of establishing an Islamic Palestinian state in place of Israel. HAMAS is loosely structured, with some elements working openly through mosques and social service institutions to recruit members, raise money, organize activities, and distribute propaganda. [redacted] HAMAS maintains maximum secrecy and discretion in moving funds to and from the occupied territory, using a diverse network of charities, educational organizations, money couriers, and Islamic and conventional financial institutions.

**Islamic Salvation Front (FIS)**
This Algerian Islamic fundamentalist movement was banned in March 1992 after winning the December 1991 elections. The official FIS leadership was imprisoned in Algeria, and many other officials went into exile throughout the Middle East and Europe following the regime crackdown on the movement. Since 1992, Algerian Government forces have made substantial progress against the military wing of the FIS, although some militant offshoots of the group continue to operate in Algeria and abroad. (U)

**Jihad Group**
Also known as Al-Jihad, Islamic Jihad, and Vanguards of Conquest, the Egyptian Islamic extremist group has been active since the 1970s. The various Jihad factions regard "Blind Sheikh" Umar Abd Al-Rahman as their spiritual leader. The goal of Al-Jihad is to replace the secular Egyptian Government with an Islamic state. It specializes in armed attacks against Egyptian Government officials, unlike the IG, which targets low-level security personnel, tourists, and Coptic Christians. (U)

CIA_000731

C05432020





ATMO and the Governments of Iran and Kuwait.

- The French press raised allegations in 1995 that ATMO finances Algeria's Islamic Salvation Front (FIS) and the Armed Islamic Group (AIG).
  [5] In addition, the article identified Khaldoun Dia-Eddine as an ATMO employee who also represents the Swiss office of the Irish charity, Mercy International—an NGO that has supported the Bosnian Mujahaddin and Somalia's Al Ittihad Al Islamiyya. [6]

- leaders of the outlawed Hisb al Tahrir al Islami (Islamic Liberation Party), an anti-Jordanian-Government group, are funded by donations from

*Key Bank Officials.* Bank President Youssef Nada is an Egyptian-born, naturalized Italian citizen who is an engineer by profession. Nada has a long history as a financial officer for the MB. Nada was the top MB officer in Europe and was entrusted to invest MB funds under the cover of personal and business-related investments.

Al Taqwa's president also heads Nada International Anstalt, in Vaduz, Liechtenstein, and Youssef M. Nada & Company GmbH, in Vienna; these are apparently

---

[6] Khaldoun Dia-Eddine is secretary of the Islamic Community Center in the canton of Ticino in Switzerland, according to a Swiss business database. Ahmed Idriss Nasreddin and Ali Ghaleb Himmat are president and vice president, respectively, of the center. Dia-Eddine also operates Dia-Eddine & Company in Zug, Switzerland, according to Dunn & Bradstreet.



CIA_000732

C05432020

affiliates in the Al Taqwa group.[8]

Ali Ghaleb Himmat—the senior officer of the bank—is a Tunisian national and long-time MB member, ████████████. Like Nada, Himmat is also a naturalized Italian citizen and a director of Nada International Anstalt, in Vaduz. (S NF OC)

Wealthy international businessman Ahmed Idriss Nasreddin plays a key, though unspecified, role in the Al Taqwa Group. He is a prominent IG financial supporter ████████████

████████████[9]

advisers to the bank include Sheikh Youssef Al Qaradawi, a radical Islamic cleric based in Qatar, and Syrian MB member Abdul Fattah Abou Ghodda. Qaradawi is an exiled Egyptian national who purportedly supports closer ties to Egypt's IG. He has called publicly for the overthrow of the Mubarak government, ████████████. He has had past contact with Gama'at spiritual leader Sheikh Umar Abd Al-Rahman—the "Blind Sheikh"—who was convicted of conspiracy in the World Trade Center bombing.[10] ████████ Qaradawi helped form the Omani Muslim Brotherhood (OMB) during the early 1980s, ████████████

Professor Khurshid Ahmad, a senator in the Pakistani legislature representing the Jamaat-i-Islami (Pakistan's MB), also may be affiliated with the bank. An expert in Islamic economics, Ahmad has personal and financial ties to Nasreddin. ████████

***Operations.*** Bank Al Taqwa was incorporated in The Bahamas ████████████ The bank and its affiliates apparently operate on a secretive level, making little known about their specific financial dealings. ████████████

---

[8] Corporate records of Nada International indicate that until 1983 Jamal Al Barzinji, Hisham Altalib, and Muhammad Shamma were directors of the Liechtenstein firm. Barzinji and Altalib currently are directors of a US affiliate of a Saudi charitable foundation. This US affiliate, based in Virginia, is headed by Saudi national Ahmed Totonji, who is a major financier of Islamic extremist organizations throughout Europe. ████████████ ████████████. Muhammad Shamma probably is identical to the senior HAMAS political leader ████████

[9] The Nasreddin family has extensive corporate and financial interests emanating from The Bahamas. Ahmed Idriss Nasreddin and his family control a worldwide network of companies engaged in commodities trading and real estate through The Bahama's-registered holding company, Nasreddin Group International. In addition, he probably established the Al Akida Islamic Bank, also registered in Nassan, ████████████

[10] ████████████ Qaradawi has gained increasing stature as an MB cleric and scholar throughout the Gulf region. ████████ In 1994, Saudi Arabia awarded Qaradawi the King Faisal International Prize for his research and writings on Islamic law, and, ████████ Qaradawi has been a paid religious affairs adviser to Qatari Emir Khalifa bin Hamad al-Thani for several years.

CIA_000733

C05432020

Although Bank Al Taqwa's capital clearly was provided from MB coffers, ████████████. The French press reported in 1995, for example, that the Saudi-owned Dallah Al Baraka Islamic banking group was a part owner of the bank

████████████████████ US press reports cite the existence of a branch of the bank in Algeria; ████████████

████████████ Finally, the Turkish press reported in 1990 that Turkish Refah Party hardliners Oguhzan Asilturk and Recai Kutan were among seven founders of the bank.[11]

### Dubai Islamic Bank
Dubai Islamic Bank (DIB) is a financial conduit for Usama Bin Ladin's Islamic Army and HAMAS, ████████████████████ ties of the bank and its directors to several NGOs that

[11] Asilturk is a key adviser to recently ousted Turkish Prime Minister Necmettin Erbakan, and Kutan was his Minister of Energy and Natural Resources. The allegations of Turkish Refah Party capitalization of Bank Al Taqwa may have some merit, given longstanding ties of Refah's leadership to the MB.



Figure 1. Dubai Islamic Bank Chairman Saeed Ahmed Lootah, friend and banker to terrorist financier Usama Bin Ladin, also has ties to several charities that support HAMAS, the Bosnian Mujahaddin, and Muslim Brotherhood causes worldwide. The photograph is taken from the 1994 Albaraka Islamic Investment Bank B.S.C. Annual Report. ████

allegedly remit funds to HAMAS and militant Afghani and Bosnian extremist groups. Saeed Ahmed Lootah, DIB's chairman (see figure 1), is anti-Western—ascribing to various conspiracy theories regarding the intentions of the United States and other Western countries to control the Islamic world ████ He also is known for deep religious conservatism and strong support—financial and otherwise—for Islamic political causes.

████████████████████ Lootah (see figure 2) also has ties to Bank Al Taqwa adviser Sheikh Youssef Al Qaradawi, Usama Bin Ladin, and NIF leader Turabi. His religious conservatism apparently extends to DIB's personnel policy; bank employees are forbidden to be involved in outside business activities, nor are they to associate with non-Muslims, ████████████. The Lootah family lives in the isolated community of Medinat Al Lootah, located outside Dubai and the "corrupting influences of the city,"

7

CIA_000734

C05432020



*Figure 2. Chairman Lootah (center) hosts Bank Al Taqwa adviser and radical Qatar-based Muslim Brotherhood member Sheikh Youssef Al Qaradawi (right) and Egyptian journalist Fahmi Howaidy at Dubai Islamic Bank headquarters sometime in 1995. Qaradawi also is a significant backer of Oman's Muslim Brotherhood. Howaidy is a well-respected columnist for several Egyptian and Gulf newspapers.*

▮ *The photograph is taken from the 1995 Dubai Islamic Bank Annual Report.* ▮

**Financial Links to Usama Bin Ladin and the Islamic Army.** ▮▮▮▮ Lootah is a close friend and business associate of Usama Bin Ladin's, head of the Islamic Army—a pan-Islamic militant group established during the Afghan war (see inset). Its goal is to bring about the return of the Caliphate—the office held by a successor to the prophet Muhammad who serves as the spiritual leader of Islam. ▮▮▮▮ that Bin Ladin's Sudan-based companies are customers of DIB.[12]

Lootah and DIB have alleged ties to other Dubai-based individuals and firms that maintain financial links to Bin Ladin:

- Hisham Ihsan Koprulu, the General Manager of Koprulu Trading Company in Dubai, is a DIB customer who has had regular business and financial dealings with Bin Ladin, his Al-Hijra company, and Islamic Army members. ▮▮▮▮

[12] Until around 1996, Bin Ladin controlled some 20 companies in Sudan that are registered in the names of trusted Islamic Army members ▮▮▮▮ He was to have sold the firms in 1996 when he departed Sudan, ultimately for Afghanistan. Although some have been liquidated or are winding down operations, Bin Ladin purportedly retains control of others.

CIA_000735

C05432020

### Terrorist Financier Usama Bin Ladin: Background and Islamic Financial Ties (U)

*Saudi exile Usama bin Muhammad bin Awad Bin Ladin is arguably one of the most significant financial sponsors of Islamic extremists in the world today. One of 24 sons of Saudi construction magnate Muhammad Bin Ladin—founder of the Kingdom's Bin Ladin Group business empire—Usama joined the Afghan resistance movement almost immediately after the December 1979 Soviet invasion of Afghanistan. He gained prominence during the Afghan war for his role in financing the recruitment, transportation, and training of Arab nationals who volunteered to fight alongside the Afghan Mujahaddin. By 1985, Bin Ladin had drawn on his family's wealth and donations from sympathetic Gulf merchants to organize the Islamic Army, or al-Qaida, to fight in Afghanistan. His experiences there cemented his dedication to militant Islamic causes. Bin Ladin relocated to Sudan in 1991, where he was welcomed by ruling National Islamic Front (NIF) leader Hasan al-Turabi. During his five-year stay in Sudan, Bin Ladin had a close association with Sudan's Islamic banks:*



Usama Bin Ladin (U)

*Mohamed Bin Ladin is a director of the Dar Al Maal Al Islami Group (DMI).* ▮▮▮▮▮▮

- *Bin Ladin provided $50 million toward the capital of Al Shamal Islamic Bank, according to press reports.* ▮▮▮▮▮▮▮▮▮▮▮▮

- *Bin Ladin possibly owned a third each of the Animal Resources Bank (ARB) and the Farmers Bank for Investment & Rural Development,* ▮▮▮▮ *ARB helps facilitate the flow of funds to various Islamic groups in Sudan from abroad.*

- *Bin Ladin's companies and the Islamic Army conducted substantial business through Albaraka Bank (Sudan), Al Shamal Islamic Bank, Faisal Islamic Bank of Sudan (FIBS), and Tadamon Islamic Bank.* ▮▮▮▮▮▮▮

*The late Salim Bin Ladin, Usama's half-brother, was among the original investors in FIBS* ▮▮▮▮▮ *, and half-brother Haydar*

*Bin Ladin's choice of financial institutions in Sudan and abroad probably is based on personal contacts at the banks and security concerns. NIF cadre dominate bank boards and the top management positions at the Islamic banks in Sudan and probably are business associates or sympathizers to Bin Ladin's cause.*

▮▮▮▮▮▮▮▮▮▮ *His use of Dubai Islamic Bank probably stems from his purported friendship with DIB Chairman Lootah:*

- *Because Islamic institutions are limited in number and have little or no presence in many developed countries, Bin Ladin purportedly is forced to maintain accounts at conventional banks throughout the world.* ▮▮▮▮▮ *to adhere to Islamic principals, a fatwa (religious opinion) was issued to allow Bin Ladin to keep funds in non-Islamic banks.* ▮▮▮▮▮ *Bin Ladin donates any interest he earns on these accounts to charitable causes.*

CIA_000736

C05432020

***Financial Links to Oman's Muslim Brotherhood.***
Lootah was one of the principal financial supporters of
the Omani Muslim Brotherhood (OMB) as of late
1994, ██████████████████████████████. He
purportedly aided Hamid Al Ghazali—a leader of a
group of Islamic extremists in Oman—who controlled
and directed the OMB's sizable portfolio of invest-
ments at that time. In addition to DIB, an important
repository for OMB investments was Abrar Invest-
ments in the United States.[13]

██████████████████ Muscat arrested hundreds of OMB
members in 1994 for plotting to overthrow the gov-
ernment. ████████

***Ties to Radical NGOs.*** DIB and Lootah have connec-
tions to several Islamic NGOs that purportedly fund
militant causes. A principal connection probably is
through DIB board member Sheikh Yousif Jassim Al
Haji—an important leader in Kuwait's extensive net-
work of private charities. Al Haji is chairman of the
Kuwait-based International Islamic Charities Organi-
zation (IICO), an NGO that oversees 150 member
organizations worldwide. ███████████████
████████████, the IICO was established in 1986 as a
cover entity for the safe and efficient management of

---

[13] Abrar was established in the United States in 1990 by Malaysian
national Wan Muhamad Hasni Wan Sulaiman and has grown into
one of the largest Islamic investment vehicles in the world, ██████
████████. Its holding company, Abrar Group Interna-
tional, was subsequently established in Kuala Lumpur in 1992. (U)

---

MB finances ████[15]
████ the IICO sends funds ████████ to the Peshawar,
Pakistan-based Maktab-ul Khedamat, an NGO that
coordinates activities of militant Afghanis and sup-
ports the Bosnian Mujahaddin.[16] In addition, Al Haji
is an executive board member of the Khartoum-based
Islamic Dawa Organization (IDO)—which is, ███████
████████████████████████ an NGO controlled
by the NIF. Al Haji's position as DIB director suggests
that some of the Kuwati ownership in DIB is held by
IICO and that some of DIB's annual *zakat* payments
(charitable donations) are channeled to the IICO and
IDO. In addition:



---

[15] In April 1995, according to Kuwaiti press reports, Egyptian ter-
rorist Ashraf Abdul-Halim Abdul Gaffar attended three days of
meetings held by the IICO General Assembly. Gaffar reportedly
kept a low profile; it is not clear how he entered Kuwait or why he
attended the meetings. ████
[16] Maktab-ul Khedamat (MK) was established in 1985 in Pakistan
by a member of the Jordanian MB. It serves as a coordinating orga-
nization for the Mujahaddin in Afghanistan and Pakistan and,
despite its involvement in legitimate charitable activities, its pri-
mary aim is the prosecution of *jihad* (holy war) against those who
oppress Muslims. Employees of MK have been implicated in sev-
eral terrorist incidents, including the World Trade Center bombing.
████

10

CIA_000737

C05432020



*Figure 3. The banks owned by Dar Al Maal Al Islami Chairman Prince Muhammad Al Faisal Al Saud provide significant financial support for the Egyptian Muslim Brotherhood, Sudan's National Islamic Front, and Turkey's Refah Party. The photograph is taken from the 1994 Faysal Islamic Bank of Bahrain Annual Report. (s NF)*

dozen Islamic bank subsidiaries. ▮▮▮ DMI acts as a financial conduit for various Islamic extremist groups, MB factions, and Islamic political parties ▮▮ DMI has strong financial links to Sudan's NIF, ▮▮▮▮▮. NIF leader Hasan al-Turabi, a onetime member of DMI's board of directors, is a personal friend of DMI Chairman and founder Prince Muhammad Al Faisal Al Saud—a Saudi royal family member (see figure 3) who has provided the NIF significant funding, ▮▮▮▮▮ Turabi has attended DMI shareholder meetings with Prince Muhammad in Geneva. According to bank directories and annual reports, other members of DMI's board of directors include:

- Radical Qatar-based cleric and Bank Al Taqwa adviser Sheikh Youssef Al Qaradawi, who is on DMI's religious supervisory board.

- Saudi businessman Abdullah Othman Abdurrahman Al-Hussaini, President of the Saudi-based Al-Waqf Al-Islami Foundation. ▮▮▮▮▮ Al-Waqf Al-Islami is a charity that supports Egypt's IG. Through its Dutch office, the NGO is affiliated with Rachid Nafih, an IG-linked religious leader in the Netherlands.

- ▮▮▮▮▮ Lootah actively participates in the UAE-based Jama'iyah Al-Islah Ad-Diny (Association for Religious Reform), which collects donations throughout the UAE to support MB causes worldwide.

## Dar Al Maal Al Islami Group
Registered in Nassau in 1981 and administered from Geneva, Dar Al Maal Al Islami (DMI)—the House of Islamic Funds—is the holding company for roughly a

CIA_000738

C05432020

board of directors, according to bank directories.

in the DMI network promote fundamentalist movements by financing Islamic businesses and charities through the various Faisal Islamic Banks. the DMI network is a financial conduit for the Afghan Mujahaddin, Algeria's FIS, Tunisia's banned An Nahda movement, and extremists operating in Egypt, Morocco, and the United States.

*Faisal Islamic Bank of Sudan (FIBS).* This DMI subsidiary stands out as a financial and logistic hub for the NIF and apparently is under its virtual control. At least six FIBS directors and shareholders are top-level NIF members or financial backers of the government:

- London-based FIBS director and shareholder El Nur Zarroug has been described as one of the top financial supporters of the NIF in Europe,

  El Tayeb Mohamed El Nous, and Hashim Hago—all FIBS shareholders—are among key NIF financial supporters.

- Religious Supervisor Ahmed Mahjoub Haj Nour is among the most radical members of the NIF,

FIBS branches are used regularly to channel financial support, obtained largely from the Gulf states, to the NIF.

- FIBS is closely affiliated with several NIF-controlled charities, such as the Sudanese chapter of the IDO, which provides financial and political support for subversive Islamic causes. key individual contributors to the IDO have included Prince Muhammad and Dallah Al Baraka Chairman Sheikh Saleh Kamel, both of whom supported the NIF in taking control of the organization.[19] The IDO generates revenue from

the IDO's 60-member executive board is a virtual who's who of Islamic bank and NGO directors. Sudanese nationals—composing the bulk of the IDO board—are NIF cadre; foreign members have strong ties to the NIF or have been otherwise described as among the most militant members of the MB. Top Islamic bank managers on the IDO executive committee include IDO National Committee President Eissa Mohamed al Khalifa, chairman of Bahrain Islamic Investment Company; Sheikh Abdul Rahman bin Abdulla al Mahmoud, chairman of Qatar Islamic Bank; Dr. Othman Abdul Wahab, chairman of Sudan's Al Shamal Islamic Bank and manager of the Islamic Insurance Company—an FIBS subsidiary firm; Sheikh Ahmed Sa'ed al Jaser, chairman of the International Investment Group in Kuwait; Ibrahim Khalifa Ali al Khalifa, a director of DMI and Faisal Islamic Bank of Bahrain (FIBB); Ahmed Salah Jamjoom, a director of FIBB and FIBS; Sheikh Yousif Jassim Al Haji, head of Kuwait's IICO and a director of DIB; Sheikh Youssef Al Qaradawi, an adviser to Al Thqwa Bank and religious supervisor of DMI, Faisal Islamic Bank of Egypt, Qatar International Islamic Bank, Kuwait's Majestic Global Investments, and Commerce MCI in Kuala Lampur; Dr. Salah Abu al Naja, general manager of Sudan's Tadamon Islamic Bank; Sheikh Abdul Basit Ali, a shareholder in Tadamon Islamic Bank; Mohamed Abduh Yamani, a director of the Dallah Al Baraka Group and various Al Baraka subsidiaries; Sheikh Mohamed Othman Khalifa, a manager of the Sudanese Islamic Bank; Dr. Abdulla Omer Nasif, secretary general of the Muslim World League (MWL) and an FIBS director; Amin Aqil Attaa, MWL assistant general secretary and an FIBS director; Sheikh Muhamad Abdallah Al Dabbagh, head of the Qatar Charitable Society, a director of Qatar Islamic Bank, and the Qatar Islamic Insurance Company; and Saudi "businessman" Ahmed Totonji, a director of a US affiliate of a Saudi foundation and alleged financier of extremist organizations. In addition to accounts at five Islamic banks in Sudan, the IDO maintains one or more accounts at Bahrain Islamic Bank, Dubai Islamic Bank, the Islamic Investment Company of the Gulf in Manama, Kuwait Finance House, and Qatar Islamic Bank.

12

CIA_000739

C05432020

its commercial arm—the Danfodio Charitable Trust—a shareholder in FIBS and Sudan's Al Shamal Islamic Bank.

***Faisal Finance Institution (FFI).*** A DMI subsidiary based in Istanbul, FFI

Turkish national          who is a close friend of DMI Chairman Prince Muhammad's          was on FFI's Executive Committee as of 1993, according to the 1993 Telerate Bank Directory and,          is a founder of the Saudi-based Muslim World League (MWL).

***Faisal Islamic Bank of Egypt (FIBE).*** This DMI subsidiary has been affiliated with Egypt's MB since the mid-1980s,          FIBE general manager          was senior MB member Ahmad Ali Kamal, who was a close friend of DMI and FIBE Chairman Prince Muhammad's and who was second-in-command of the MB's secret military wing during the 1950s. The chairman also was a close friend and business partner of senior

Egyptian MB member Tawfiq al Shawi—who became an adviser to DMI. Although the Egyptian MB operates as a political group and actively opposes violence, Cairo has sought to deny it direct political power out of concern that it poses a threat to civil unrest. In May 1993, President Mubarak informed Saudi Arabia's King Fahd that violent Islamic groups in Egypt are financed through FIBE branches, according to press reports, although some of his concern probably stems from the secular government's anxiety over even Islamic groups that seek to advance through mainstream political and legal channels. Nevertheless,          FIBE may serve as a source of financial support for some of Egypt's less moderate Islamists.          FIBE is one of the few entities still supporting radical Egyptian exile Salem Azzem—a onetime supporter of Egypt's Islamic Jihad and the Blind Sheikh. In addition:



- FIBE probably maintains accounts for the Ansar Al Sunna, a strict Islamic fundamentalist sect that, until recently, maintained close ties to Sudan's NIF.

- In 1991,          , the IG hung posters in Cairo and Alexandria calling for Egyptians to finance the Palestinian uprising in the occupied territory by depositing funds into specific FIBE accounts. In addition,          Faten Mohamed Shoaeb, the wife of the "Blind Sheikh" Umar Abd Al-Rahman, maintained US dollar and sterling accounts at FIBE purportedly to support the Jihad Organization.

13

C05432020





*Figure 4. Subsidiaries under the control of Dallah Al Baraka Chairman Sheikh Saleh Abdullah Kamel profit and serve as financial conduits for the Jordanian Muslim Brotherhood, Sudan's National Islamic Front, and Turkey's Refah Party.*

*The photograph is taken from the 1994 Al Baraka Bank Bangladesh LTD Annual Report.*

***Faysal Islamic Bank of Bahrain (FIBB).*** This DMI subsidiary maintains a branch in Lahore, Pakistan,



### Dallah Al Baraka Group

A few banking subsidiaries of Sheikh Saleh Abdullah Kamel's $4.5 billion Al Baraka Investment & Development Company in Jeddah—generally known as the Dallah Al Baraka Group—have links to Islamic extremists (see figure 4). ████████, Albaraka Bank (Sudan) is another NIF-controlled financial institution whose board of directors once included NIF leader Hasan al-Turabi and currently includes several high-ranking NIF members; Dallah Al Baraka Chairman Kamel has been a key financier of the NIF. In addition, ████████ branches of Albaraka Bank (Sudan)—especially the Al-Burg branch—have been used by firms owned by Usama Bin Ladin and members of his Islamic Army ████████ Bin Ladin maintained an account at Albaraka Bank (Sudan) in his own name ████████ the Al-Burg branch is a base of operation for the Al Ikhlas International Company—a firm that operates as a front for Bin Ladin's money:

• ████████ the NIF finances Islamic groups in Djibouti through accounts with Banque Albaraka

Djibouti, as well as through three other banks operating locally. The NIF uses Djibouti as a base to recruit students for military training in Sudan and to support security forces in Ethiopia and Somalia; NIF cadre work with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization. ████████ Islamic deposits are tightly controlled at Banque Albaraka Djibouti, and the bank will accept deposits only if a name is accompanying the money; otherwise, the deposit will be returned to the remitter. ████████ Albaraka would prefer not to handle individual Islamic deposits because of the money's potential links to terrorists. ████████ Banque Albaraka Djibouti purposely created administrative problems for the Sudanese Embassy in March 1994 that forced the NIF to use another bank.

Al Baraka director Mohammad Abduh Yamani (see figure 5)—a former Saudi Minister of Information and Kamel's brother-in-law—apparently has close ties to the NIF as evidenced by his membership on the executive board of Sudan's IDO, ████████

CIA_000741

C05432020



*Figure S. Mohamed Abduh Yamani, former Saudi Minister of Information and Sheikh Kamel's brother-in-law, is a director of several Dallah Al Baraka subsidiaries. Yamani is on the executive board of the NIF-controlled Islamic Dawa Organization*

The photograph is taken from the 1994 Albaraka Islamic Investment Bank B.S.C. Annual Report



***Beit Al Mal Al Philistini.*** Sheikh Kamel is a founder and financial backer of Beit Al Mal Al Philistini (Palestinian Treasury) in Ramallah on the West Bank





Several financial organizations named "beit al mal" (treasury) operate worldwide.

In addition, Beit Al-Mal Al-Islam is registered in London as a religious trust.

[20] Al Baraka and Yamani have a potential commercial tie to the MB through ownership in a Malaysian firm. Dallah Al Baraka owns roughly a third of the Joint Arab Malaysian Investment (JAMI) Company, an investment, holding, and trading company based in Kuala Lumpur. Kamel controls another 4 percent of JAMI through the Jeddah-based Iqra Charitable Foundation, which he and Yamani established. Corporate records indicate that other JAMI investors include Fahad Suleiman al Rajhi (33 percent), a director of Al Rajhi Banking & Investment Company; the Virginia affiliate of a radical Saudi charitable foundation (14 percent); Saudi businessman Ibrahim al Afandi, who has been invited to the NIF-dominated Popular Arab and Islamic Conference in Khartoum; and Sheikhs Abdul Rahman bin Aqeel and Fouad al Khateeb, Saudi nationals who have been described as militant MB members.

Beit Al-Mal Al-Islam is a repository for funds for the London-based Muslim Institute, an anti-West, pan-Islamic political movement established by the late Kalim Siddiqui. Virulently pro-Iranian, Siddiqui fully supported Tehran's *fatwa* against Salman Rushdie and traveled extensively to Iran, according to press reports. A 1996 report from the US Embassy in Pretoria alleges that Siddiqui's institute was used to channel Iranian funds for extremist purposes.

15

CIA_000742

C05432020



the Al Rajhi family and ARBIC documents their financial support for the Afghan Mujahaddin in Pakistan via humanitarian organizations. ▓▓▓▓▓ Suleiman Al Rajhi is the Kingdom's largest payer of *zakat* (charitable donations); he reportedly maintains a staff of 20 to manage his unpublicized charitable endeavors:

- ▓▓▓▓ 1997, ▓▓▓▓ a "Sheikh Rajhi" deposited ▓▓▓▓ into ▓▓▓▓ bank accounts held by the director of Maktab-al Khedamat (MK)[24] and another NGO ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ In addition, an unspecified member of the Al Rajhi family is charged with overseeing financial support to the Afghan Mujahaddin along with the IIRO Director in Kabul, ▓▓▓▓▓

- In 1995, Islamic activist Sulayman Agbariyah admitted ▓▓▓▓▓ that he held shares in Beit Al Mal. Agbariyah is deputy mayor of Umm al Fahm, an Arab city in Israel bordering the West Bank, and involved in disbursing aid to Palestinians.

- ARBIC apparently has been a conduit for funding the Mujahaddin since the early 1990s. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Al Rajhi Banking & Investment Company**
Riyadh-based ARBIC, with some $8.6 billion in assets—is 80-percent owned by the secretive and religiously ultraconservative Al Rajhi family, ▓▓▓▓ The most compelling ▓▓▓ information on Islamic extremist links to

Al Rajhi financial support for several other Saudi NGOs that purportedly divert funds to Islamic extremists:

[24] See footnote 16. (U)

16

CIA_000743

C05432020



...the Al Rajhis were routinely contacted by officials of the World Assembly of Muslim Youth (WAMY)—a Saudi NGO whose personnel often pursue an extremist agenda, ▇▇▇▇▇▇▇▇▇ WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia. In some cases, WAMY puts foreigners requesting aid in direct contact with Saudi donors who are looking for worthwhile Islamic causes; WAMY sometimes will broker requests with potential donors if the NGO has an ideological interest.



- The use of ARBIC by extremists in some of these cases probably denotes convenience rather than Al Rajhi family involvement in financing radical groups. The bank's dominance of the foreign remittance business, coupled with strong financial links to Africa and the Asian subcontinent, probably make ARBIC the only choice for transferring funds to some regions. ▇▇▇▇▇▇ ▇▇▇, for example, that ARBIC was the only bank in the Kingdom authorized to remit funds to banks in Jordan and the West Bank and, therefore, was a primary conduit for funds transfers by Palestinians. ▇▇▇▇▇▇

The Saudi Government undoubtedly is aware of Al Rajhi's role in providing support to Muslim groups and probably even sanctions some of the support.[25] ▇

[25] Saudi Arabia, as well as other Gulf states, has long been a source of financial support for Islamic causes; at least some of these funds are diverted to militants and terrorists. Riyadh provides official funding to various groups to promote Sunni Islam and to counter regional Iranian influence; other funding emanates from semiofficial charities, such as the Muslim World League and IIRO, and from private donations that are often difficult to track. Funds collected from individuals are often made in cash and disguised as religious offerings; NGO funds, on the other hand, are usually diverted by unregulated offices located abroad. The difficulty of supervising overseas operations offers Riyadh a plausible defense when NGO links to radical groups are brought to light.



...Al Rajhi financial ties to Islamists is inconclusive.

17

CIA_000744

C05432020



........., AAIB has been financing the military and terrorist training of an Islamic group under the direction of the Bosnian Mujahaddin. The group plans to attack institutions in Kosovar if Serbian President Milosevic's reneges on promises of greater independence for the region.

- Riyadh, on the other hand, apparently has attempted to stifle some funding of militant groups.

### Suspect Financial Activities at Other Islamic Banks

A few other Islamic banks ........... as conduits for suspect Islamic NGOs and Islamic extremist groups, for example:

- *Arab Albanian Islamic Bank (AAIB)*, established in 1994, is used by several humanitarian organizations that probably finance radical groups, including Sudan's Islamic African Relief Agency and Third-World Relief Agency; the Qatar Charitable Society; and the Saudi-based World Assembly of Muslim Youth, ........... the Saudi-based IIRO owns a stake in the bank.

- *Bahrain Islamic Bank (BIB)* is a key correspondent of Dubai Islamic Bank and Faisal Islamic Bank of Sudan; ........... As of early 1992, ........... BIB employed fundamentalist members of the Islamic Association of Bahrain and used the bank for its financial dealings. The Islamic Association has no history of violence; however, its members tend to be affiliated with the MB and are anti-Western. ........... public addresses by senior Islamic Association members have adhered to the principle that any form of government that is not theocratic and Islamic must be impious and corrupt.

- *Qatar International Islamic Bank (QIIB)* ........... QIIB is one of the five Islamic financial institutions that radical Sheikh Youssef Al Qaradawi serves as religious supervisor.

- The *Islamic Bank of Yemen for Finance & Investment*, in Sanaa, established in June 1996, finances Yemen's radical Islamic Reform (Islah) Party........... Islah Party leader Abdul Majid al Zindani owns 1 percent of the bank and is a member of its board of directors. Despite the nominal

18

CIA_000745

C05432020

shareholding, Zindani's place on the board raises concern over the integrity of the bank. Zindani has close ties to Iran, Sudan, and Usama Bin Ladin and has been involved in the training of Arab extremists, ▮▮▮▮▮ the bank helps provide Zindani an independent base of financial support and is critical to his success and influence. ▮ ▮ 1996, Zindani hosted an international conference on Islamic banking in Sanaa that was attended in large part by MB members, ▮▮ ▮▮ ▮▮ The most important recommendation made by the conference was that Islamic bank capital be directed to Sudan to help overcome the effects of economic sanctions. ▮ ▮ The 20-percent foreign ownership in the Islamic Bank of Yemen is split among Dallah Al Baraka, the Islamic Development Bank, Jordan Islamic Bank for Finance & Investment, and Qatar Islamic Bank. ▮▮

## Motivations for Using Islamic Banks  (U)

Drug traffickers and other criminals seek out financial institutions that they believe will turn a blind eye to their financial activities or become discreet partners in their dealings. Such banks often are located in off-shore centers known for bank secrecy or in countries with weak regulation of the financial sector. ▮ Islamic militants similarly bank with financial institutions that provide assurance that their deposits and financial activities will not be scrutinized by government or enforcement authorities. Islamic banks in many countries apparently provide such confidence. In addition, these banks offer financial services that are in line with religious beliefs and, sometimes, significant financial support for local Islamic movements. ▮

### Financial Safehaven

Top management affiliations with the MB, HAMAS, and the NIF almost certainly help attract customers with similar backgrounds to Bank Al Taqwa, Dubai Islamic Bank, Beit Al Mal Al Philistini in the West Bank, and Islamic banks operating in Sudan. The overwhelming Islamic management and personnel in

*The Islamic Development Bank*  (U)

*The Jeddah-based Islamic Development Bank (IDB) is an international financial institution whose purpose is to "foster the economic development and social progress of member countries and Muslim communities . . . in accordance with the principles of Islamic law," according to the 1995 IDB Annual Report. In its capacity as a development institution, the IDB functions much like the World Bank or International Monetary Fund. Its capital is provided by 48 member countries, all of whom must be members of the Organization of Islamic Conference. According to the annual report, Iran, Kuwait, Libya, Saudi Arabia, Turkey, and the UAE provided some 75 percent of the capital. ▮*

*The IDB cooperates closely with privately owned Islamic banks, according to the annual report. For example, the Islamic Banks' Portfolio for Investment and Development is an independent fund set up by the IDB and 21 Islamic banks to channel excess liquidity of the Islamic financial sector into productive trade and investment opportunities. During 1995, the fund financed $300 million worth of projects throughout the Muslim world. In addition, the IDB has minority ownership stakes in nine Islamic banks,* ▮▮▮▮  (U)

▮▮▮ *a few countries have leveled charges that the IDB has funded extremist organizations.* ▮▮▮▮ *The Bank finances development projects in many regions engaged in conflict, such as Bosnia, Kashmir, and Lebanon, and some financial aid might be siphoned off by radicals, unwitting to the bank.* ▮▮▮▮ *, IDB President Ahmed Mohammad Ali is a capable and principled administrator. Except for a two-year stint with the Muslim World League (MWL), Dr. Ali has been at the helm of the bank since it was established in 1975.* ▮▮ *he had an unhappy tenure at MWL because he found it difficult to deal with fundamentalist clerics who dominated the high council.* ▮

CIA_000746

C05432020

the banks probably helps assure Islamic activists and extremists that their financial affairs will not be scrutinized or their assets seized. Indeed, some of these banks may seek out questionable Islamic clientele who wish to avoid scrutiny of their financial affairs.

- DIB Chairman Lootah personally authorized, stamped, and signed some letters of credit opened by Bin Ladin's companies in Khartoum through DIB, ▆▆▆ It may be the case that Lootah routinely authorizes all letters of credit beyond a particular monetary value that require confirmation by DIB; however, Lootah's purported friendship with Bin Ladin suggests greater personal service for this customer.

- In early 1994, senior bank management at Al Shamal Islamic Bank in Khartoum implemented security procedures related to the accounts of Usama Bin Ladin in reaction to US press reports documenting Bin Ladin's role in terrorist activities. ▆▆▆ Al Shamal's management feared the bank's assets would be frozen if word leaked that it was an accessory in Bin Ladin's financial dealings. The new procedures required that Bin Ladin's banking with Al Shamal be handled only by top staff. By ▆▆▆ 1994, ▆▆▆ Al Shamal General Manager Hassan Satti had taken a personal interest in Bin Ladin's accounts and restricted access of Al Shamal's computer system to NIF members.

▆▆▆ Islamic banks serve as a safehaven for the assets of Turkey's Islamic Refah Party.



low-level bank personnel may tend to "look the other way" when dealing with Islamic extremists groups and NGOs. ▆▆▆ a prospective employee's dedication to Islam often is essential to gaining employment at an Islamic financial institution. Indeed, ▆▆▆ Islamic banks prohibit the hiring of non-Muslims except for executive positions requiring specialized banking experience; such positions probably require minimal direct dealings with customers or individual accounts:

- According to Middle East press reports from early 1995, the Saudi Government arrested some 250 Sudanese in an effort to ferret out individuals linked to extremist networks. The article noted that most were employed by relief agencies and Islamic financial institutions specializing in insurance and banking. ▆▆▆

A general lack of regulatory control over Islamic banks may lend additional confidence to Islamic extremists that their financial dealings will not be scrutinized by government authorities. Although bank oversight of financial institutions in many Muslim states is often lacking compared to those in the West, Islamic banks historically have fallen under even less local regulatory control than their conventional counterparts because of the types of financial products they market. Islamic bank deposits are similar to mutual funds, where depositors knowingly face the risk of losses; thus, central banks do not have to guarantee their safety and, in turn, make more cursory

20

C05432020

inspections.[27] In addition, bank regulators have been better grounded in ascertaining the creditworthiness of borrowers and interest-rate risk at conventional banks rather than the soundness of various Islamic bank partnerships covering numerous types of goods or businesses. As a result, central banks in most countries have not yet compiled a uniform set of standards for Islamic institutions. A banker in Turkey once complained █████████ that he might have the Ministry of Finance, Central Bank, or Treasury arrive at his bank at any time but that Islamic banks are not subject to these intrusions and controls.[28]

████

### Ability To Bank in Accordance With Religious Beliefs

Islamic extremist groups are certainly attracted to Islamic banks because the institutions offer the ability to bank in accordance with religious beliefs. ██████████, since the mid-1980s, Muslim clerics and MB officials throughout the Middle East increasingly have called on Muslims to use Islamic banks at the expense of interest-based financial institutions. Several years before his imprisonment in late 1994, for example, radical Saudi cleric Salman al Awdah preached that the Al Rajhi Banking & Investment Company was the only financial institution in Saudi Arabia that followed Islamic guidelines and, therefore, the only bank worthy of Muslim deposits. ████████ the sermon was distributed throughout the country on tape, and the Al Rajhi family subsequently became a major financial supporter of

[27] Nevertheless, the degree of oversight varies across countries. Bank regulators in Egypt, for example, pay close attention to the financial dealings of Islamic banks. In addition to believing that they serve as financial havens for terrorist groups, Cairo saw its financial system jolted by the failure of several large Islamic investment companies in the late 1980s. The firms operated essentially as pyramid schemes—luring deposits with the promise of high returns and paying existing depositors with new funds. Egyptian press reports from that time indicate that customers were doubly appalled when the companies failed because they not only lost their savings but also were exploited by con men willing to sink low enough to use Islam as part of their fraud. Although deposits in Islamic banks potentially face the risk of loss, regulators generally contend that they would not let Islamic institutions in their countries fail, according to the financial press. ████

[28] The lack of regulation may have its drawbacks. Press reports from 1996 indicate that Moody's assigned the balance sheet of Kuwait Finance House a low rating on the basis that it operates as an investment company under the more lenient auspices of the Commerce and Industry Ministry, rather than under the rigid regulations imposed by Kuwait's Central Bank. (U)

Awdah. In early 1997, Russia's press reported that Islamic political candidates in Chechnya advocated the transformation of the republic into a state whose laws were in accordance with Islamic tenets. In this vein, former Information Minister Movladi Udugov called for the creation of an Islamic bank and the prohibition of interest payments. ████████

### Profit Sharing and Financing

██████████ Islamic institutions in some countries have turned over bank profits to Islamic political parties and benefited the Islamic political and economic sectors with loans and employment, sometimes at the expense of non-Islamic groups:

- Islamic banks in Sudan have been among the most important businesses financially supporting the NIF, its charities, and businesses. ████████ ██████████ Faisal Islamic Bank of Sudan (FIBS), Albaraka Bank (Sudan), Tadamon Islamic Bank, the Islamic Bank of Western Sudan, Al Shamal Islamic Bank, and the Sudanese Islamic Bank routinely remit a portion of their profits to the ruling party. The banks also bring hard currency into the country because bank capital provided by foreign shareholders has usually been paid in US dollars, although Sudanese nationals purchase shares in local currency. In forging a symbiotic relationship with the NIF, FIBS and Albaraka were used to help influence the election outcome in favor of the NIF by suspending loans to local businesses until after the election, ████ The suspension served to maintain reserves at the banks for the NIF's use in buying votes as well as signaling to local businesses that they should support the party if they expect to receive loans from the banks in the future. In return, the NIF manipulated Islamic banking laws to enable Islamic banks to acquire sizable cash reserves and gain advantages over non-Islamic competitors.

- The subsidiaries of Dallah Al Baraka, Dar Al Maal Al Islami, and the Kuwait Finance House have been sources of financial support and employment opportunities for the Refah Party and rival Islamic political parties in Turkey, ██████████

21

C05432020

- Faisal Islamic Bank of Egypt and the Islamic International Bank for Investment & Development are run by and profit the Egyptian MB ███████



## Common Ownership and Management of Islamic Financial Institutions  (U)

Ownership and top management of Islamic banks are close-knit, with capital essentially provided from a relatively small population of wealthy, religious individuals in Gulf countries. About 60 of the 130 financial institutions examined are subsidiaries of the Dallah Al Baraka and Dar Al Maal Al Islami (DMI) banking groups, and some 25 others are joint ventures between two or more Islamic banks.[29] Cross ownership, in turn, has created interlocking executive boards and managerial teams that share personnel from other banks. While some interbank ownership is common among Western banks, shareholdings in the Islamic financial sector appear to be more concentrated, relative to its size, probably for a couple of reasons:

- Islamic finance remains in its infancy compared to the centuries-old interest-based banking system and, despite growing numbers of Islamic financial institutions, only a small core of wealthy individuals, Islamic holding companies, or conventional banks are willing to risk capital in the Islamic financial arena.

- The *shari'a* (Islamic law) prohibits many financial arrangements that can be undertaken with conventional banks; therefore, Islamic banks usually look to each other when seeking investors for new ventures ███████

[29] This figure is probably higher because many of these banks provide little detail on minority shareholders. The lack of detailed reporting on ownership is common among Islamic and conventional banks in the Middle East. (U)

Cross ownership and management of Islamic financial institutions possibly results in some degree of influence over bank policy with regard to dealings with extremist groups. ███████ several Islamic bank directors identifiable with the Muslim Brotherhood raise concern over their influence in more benign institutions:

- Dubai Islamic Bank (DIB) Chairman Saeed Ahmed Lootah is a Director of Albaraka Islamic Investment Bank in Bahrain, Bahrain Islamic Bank, Bahrain Islamic Investment Company, and Islami Bank Bangladesh, according to various annual reports. Lootah also may wield influence through DIB's shareholding in Al Baraka Turkish Finance House and Tadamon Islamic Bank.

- Bank Al Taqwa adviser Sheikh Youssef Al Qaradawi is a director of Faisal Islamic Bank of Egypt and serves as religious supervisor of Dar Al Maal Al Islami. Qaradawi also is chairman of the religious supervisory boards of Commerce MGI in Kuala Lampur, Majestic Global Investments in Kuwait, and Qatar International Islamic Bank.

- DMI shareholder and director Ahmed Salah Jamjoom is on the boards of three DMI subsidiaries, including the chairmanship at Faisal Bank Limited, in Lahore, Pakistan. Jamjoom also is a director of Islami Bank Bangladesh, although he does not represent DMI in this position. The Jamjoom family is a financial supporter of the NIF, ███████ ███████, and Ahmed Salah Jamjoom is on the executive board of Sudan's Islamic Dawa Organization (IDO), ███████. extensive commercial ties between Jamjoom's Jeddah-based firms and the Danfodio Charitable Trust—the commercial arm of the IDO and a shareholder in Faisal Islamic Bank of Sudan. Jamjoom's vehicle company has even established a joint venture with Danfodio.

22

C05432020

23

CIA_000750

C05432020

### Islamic Financial Systems Worldwide: No Interest? (U)

Since the mid-1980s, Iran, Malaysia, Pakistan, and Sudan have implemented Islamic financial systems in which interest generally has been abolished in favor of profit-sharing financial arrangements between banks and customers. Each country has had different experiences in establishing its own system, and, of particular interest, none of the countries have completely abandoned "usury."

At the direction of the late Ayatollah Ruhollah Khomeini, Iran's parliament passed Islamic banking laws in 1983, and the country's banks fully converted to an Islamic financial system in March 1984.° Domestically, Iranian banks engage only in interest-free financial arrangements. The Iranian Government also finances its public debt on an interest-free basis through borrowings from commercial banks. Foreign branches of Iranian banks, however, have remained on an interest-based system.

[redacted] Iranian religious leaders who helped transform Iran into an Islamic economy also held pragmatic views on the country's need to conduct dealings with Western banks. The transition to Islamic banking in Iran met stiff resistance,

[redacted] even though all 10 of Iran's commercial banks had been nationalized since the 1979 revolution.

Pakistan converted to an Islamic financial system in mid-1985 after completing a detailed study initiated in 1979 by the Council of Islamic Ideology (CII). According to the Encyclopedia of Islamic Banking & Insurance, the study "suggested an alternative mechanism for domestic commercial banking transactions with the realization that a complete elimination of interest from international trade transactions cannot be achieved by the lone efforts of a single country." Pakistani banks and branches of foreign banks operating in Pakistan are required to apply profit- and loss-sharing arrangements to domestic deposit-taking and lending. As with Iran, however, Islamisation does not apply to foreign branches of Pakistani banks. In addition, the CII did not tackle the problem of public debt; Islamabad still pays interest on public borrowings. In recent years, an important issue emerged with the Federal Islamic (Shari'at) Court's 1994 ruling that payments of interest on foreign debt could be deemed un-Islamic and, therefore, unlawful. The judgment has yet to be seriously challenged, however, and [redacted] probably will be swept under the rug for a considerable period of time. The financial sector's transformation to Islamic banking did not cause the upheaval that some exp[redacted]ough there were [redacted]e[redacted]mps[redacted]d. [redacted] the overnmen had to protect the banks from de ault on existing loans from borrowers who claimed the interest-based loans were un-Islamic under the new system. [redacted]

24

CIA_000751

C05432020

*Islamic Financial Systems Worldwide: No Interest?* (U) *(continued)*

*In mid-1990, Sudan's National Islamic Front (NIF) revised the country's banking act to eliminate all articles related to interest, appoint a religious board to supervise the central bank, and instruct each financial institution to appoint its own religious board to ensure compliance with the shari'a (Islamic law). At that time, five Islamic banks—most of which were established with Gulf capital—already were in operation, along with approximately 15 conventional banks that had the shari'a imposed upon them.* ▮ ▮ *early on in Sudan's conversion to Islamic banking, conventional banks merely replaced the term "interest" with "profit" to placate the NIF.* ▮ *all banks in Sudan must follow the precepts of the shari'a when conducting financial transactions;* ▮ ▮ *the Encyclopedia of Islamic Banking & Insurance, indicate that the country still operates a dual system with Islamic banks operating alongside conventional banks. Those banks in Sudan truly operating with Islamic charters are among the country's most important financial institutions,* ▮ ▮ *and are looked upon most favorably by the NIF.* ▮ *the mismanagement of the banks at the hands of the NIF, however, raises questions over whether good favor under NIF control translates into good financial performance.*

*Since 1983, Malaysia has fostered the development of an Islamic banking system to serve its 8 million Muslims. Until the early 1990s, however, the industry remained a relatively small part of the financial system and was dominated by Bank Islam Malaysia Bhd, which remains the country's only true Islamic bank. At the direction of Prime Minister Mahathir bin Mohamad and Deputy Prime Minister Anwar*

*Ibrahim, the government has become determined to make Malaysia the center of Islamic finance in Asia. Beginning in March 1993 other financial institutions were permitted—and encouraged—to offer Islamic banking services through their existing branches. At present, 23 trading banks and 19 other financial institutions offer 25 types of products in compliance with the shari'a, along with conventional, interest-based banking services, according to Malaysian press reports.* ▮ ▮ *Malaysia was first to establish an Islamic interbank money market and check-clearing system. In 1996 it launched an Islamic index comprising the shares of 180 Malaysian companies whose core businesses are acceptable to Islamic principles. Malaysia ultimately hopes to develop a thriving Islamic capital market that all financial experts agree is necessary for the industry to expand and invest its excess liquidity.* ▮ ▮ *Islamic banking is a serious effort but, at the same time, is a tool being used to strengthen Mahathir's Islamic credentials. In addition, Mahathir and Ibrahim are pragmatic leaders who would not allow these institutions to usurp Western-oriented business practices or threaten Malaysia's attractive international investment climate. Because Malaysia's banks are allowed to offer both Islamic and conventional financial services, its version of an Islamic financial system clearly is the most liberal. According to the financial press, some Islamic economists based in Pakistan, India, and the Middle East have stated that Malaysia has not implemented a true Islamic financial system and claim that its parallel, interest-based system is heretical.* ▮

CIA_000752

C05432020



*Although Gulf states acknowledge the problem of financial support to extremist groups via Islamic banks, they probably will do little to tackle the problem in the near term:*

- Gulf states are not likely to scrutinize the financial activities of powerful and wealthy merchants and royal family members owning shares in Islamic banks and holding director positions on their boards.

*The proliferation of nonbank Islamic financial institutions creates additional regulatory problems:*

- Islamic trusts—which might be established as religious foundations, cultural endowments, or charitable organizations—operate in Europe and North America, where regulatory authorities largely prohibit Islamic bank operations.

*The expanding network of Islamic banks into new regions of the world creates additional avenues for channeling funds to foreign extremist groups.*

26

CIA_000753

C05432020

*Reverse Blank*

27

CIA_000754

C05432020

**Appendix**

**Islamic Financial Institutions
Worldwide (U)**

29

*Reverse Blank*

CIA_000755