UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re Terrorist Attacks on September 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |
| Federal Insurance Company, et al.,<br><br>    Creditors,<br><br>v.<br><br>The Taliban, et al.,<br><br>    Debtors,<br><br>Federal Reserve Bank of New York,<br><br>    Garnishee. | Case No. 03-cv-6978 (GBD)(SN) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE
*FEDERAL INSURANCE* CREDITORS' CROSS-MOTION TO VACATE THE
*OWENS EX PARTE* PROVISIONAL PREJUDGMENT ATTACHMENT**

June 22, 2022

# TABLE OF CONTENTS

**Page**

I. LEGAL ARGUMENT ................................................................................................... 1

    A. This Court Has Jurisdiction to Vacate the Prejudgment Attachment ..................... 1

    B. The Prejudgment Attachment is Prohibited as a Matter of Law and Cannot Support the *Owens* Plaintiffs' Claims of Priority ..................................................... 5

        1. The Executive Order Blocking the Assets Prohibits the *Owens* Plaintiffs' Prejudgment Attachment. ............................................................................ 5

        2. TRIA Does Not Authorize Prejudgment Attachments ............................... 9

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*,
   651 F.2d 800 (1st Cir. 1981) ................................................................................................... 9

*Botany Mills v. United States*,
   278 U.S. 282 (1929) ............................................................................................................. 10

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) .......................................................................................................... 9, 10

*Disney Enters. v. Finanz St. Honore, BV.*,
   2020 U.S. Dist. LEXIS 15960 (S.D.N.Y. 2020) .................................................................... 2

*Kidd v. Thomson Reuters Corp.*,
   925 F.3d 99 (2d Cir. 2019) ..................................................................................................... 7

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
   414 U.S. 453 (1973) ............................................................................................................. 10

*In re New York City Policing During Summer 2020 Demonstrations*,
   548 F. Supp. 3d 383 (S.D.N.Y. 2021) .................................................................................... 7

*Pangea Capital Mgmt., LLC v. Lakian*,
   2017 WL 4081911 (S.D.N.Y. Sept. 13, 2017) ....................................................................... 2

*Santoro v. State Farm Mut. Auto. Ins. Co.*,
   2020 WL 6586630 (S.D.N.Y. Nov. 9, 2020) ......................................................................... 8

*SEC v. Elliott*,
   180 F. Supp. 3d 230 (S.D.N.Y. 2016) .................................................................................... 2

*United States v. Woods*,
   571 U.S. 31 (2013) ................................................................................................................. 8

*Smith ex. rel. v. Est. of Smith v. Fed. Rsrv. Bank of New York*,
   346 F.3d 264 (2d Cir. 2003) ................................................................................................. 10

*Zittman v. McGrath*,
   341 U.S. 446 (1951) ........................................................................................................... 8, 9

**Statutes and Rules**

Fed. R. Civ. P. 69(a)(1) ...................................................................................................1

Terrorism Risk Insurance Act of 2002 § 201 ("TRIA"),
　Pub. L. No. 107-297, 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note) .................4, 9, 10

N.Y. C.P.L.R. § 5225 ..................................................................................................1, 2

N.Y. C.P.L.R. § 5239 ..................................................................................................1, 2

**Executive Materials and Other Authorities**

Exec. Order No. 14064, 87 Fed. Reg. 8391 (Feb. 11, 2022) ......................................5, 6

David D. Siegel, *New York Practice*, § 521 (6th Ed.) ...................................................2

The *Federal Insurance* Creditors, along with the Framework Agreement Plaintiffs, respectfully submit this reply in further support of their Cross Motion to Vacate the *Owens*' Provisional and Unconfirmed Prejudgment Attachment.

## I.  LEGAL ARGUMENT

### A.  This Court Has Jurisdiction to Vacate the Prejudgment Attachment

Relying primarily on cases that have nothing to do with a priority dispute under the CPLR, the *Owens* plaintiffs argue at length that it is "blackletter law" that federal courts possess "limited jurisdiction," and on that basis claim that this Court lacks jurisdiction to vacate their unconfirmed prejudgment attachment. Tellingly, the *Owens* plaintiffs' arguments in this regard fail to address the express authority and jurisdiction conferred upon this Court under the CPLR, triggered here by the *Owens* plaintiffs' own intervention in the present turnover proceeding. The *Owens* plaintiffs also flatly disregard this Court's express recognition, informed by discussions with Judge Caproni, that this Court is the appropriate forum for adjudicating issues relating to the turnover of the blocked Da Afghanistan Bank ("DAB") funds. *See* April 26, 2022 Hearing Transcript ("Tr.") 14:24. In addition, their arguments seeking to evade this Court's review mischaracterize the procedural status of their prejudgment attachment efforts, and the nature of the principal issues the *Federal Insurance* Creditors ask this Court to decide, which were not addressed by Judge Caproni in the context of the preliminary, *ex parte* proceeding in *Owens*.

The Federal Rules of Civil Procedure mandate that this Court follow New York procedural law in execution and turnover proceedings. FED. R. CIV. P. 69(a)(1). CPLR § 5225 provides that "[t]he court may permit any adverse claimant to intervene in the proceeding and may determine his rights in accordance with section 5239." Section 5239 explicitly addresses the determination of adverse claims, and provides that the court "may vacate the execution or order, void the levy, direct the disposition of the property or debt, or direct that damages be awarded." Thus, by

1

intervening in this turnover proceeding pursuant to the CPLR, the *Owens* plaintiffs have subjected themselves to the jurisdiction of this Court with respect to the attachment and priority issues, including its authority to determine the validity of the attachment itself. *See Disney Enters. v. Finanz St. Honore, BV.,* 2020 U.S. Dist. LEXIS 15960, *6-7 (S.D.N.Y. 2020) (collecting cases); *SEC v. Elliott,* 180 F. Supp. 3d 230, 233 (S.D.N.Y. 2016) (recognize turnover judge's power to adjudicate interest in subject property); *see also Pangea Capital Mgmt., LLC v. Lakian*, 2017 WL 4081911 (S.D.N.Y. Sept. 13, 2017) (under the CPLR the turnover court has jurisdiction over and authority to vacate previously issued prejudgment attachments). As the CPLR practice commentaries state, "'[t]he intervention of other claimants converts the proceeding into a plenary test of who has the highest right to disputed money or property.'" *Id.* at 7 (quoting CPLR § 5225, cmt 5225:5 (practice commentary)).

The legislative history confirms that the purpose of enacting and broadening CPLR § 5239 was to create a single forum for the resolution of all claims. *See* CPLR § 5239, cmt 5239:1 (practice commentary) ("As broadened by the Legislature in 1965, the section is the path to the courthouse for a claimant who wants to have a priority or lien or other dispute with another claimant ironed out."). As stated by David D. Siegel, who is recognized by the *Owens* plaintiffs as an authority on these matters, ECF No. 8091 at 8, 13, 16, the turnover court's role is to decide all rights to the property and in furtherance of that goal, the turnover court is empowered to vacate any order. David D. Siegel, *N.Y. Practice*, § 521 (6th Ed.) ("The court's ultimate goal is to determine who shall finally have the disputed property. In conjunction with that, it can declare the priority of all claimed liens and incidentally vacate *any order, execution, or levy*.") (emphasis added).

The *Owens* plaintiffs' arguments that the *Federal Insurance* Creditors seek to have this Court "snatch" the attachment issues from Judge Caproni and undertake an appellate review of

Judge Caproni's rulings ignore this framework established by the CPLR[1], and also misstate the procedural status of their own attachment efforts and the nature of the issues the *Federal Insurance* Creditors seek to have decided. *See* ECF No. 8091 at 10. In point of fact, the principal issues the *Federal Insurance* Creditors seek to have determined by this Court have not been addressed by Judge Caproni at all, precisely because there has been no full adjudication of the propriety of the *Owens* plaintiffs' proposed prejudgment attachment. Contrary to the *Owens* plaintiffs' efforts to cast their attachment proceedings before Judge Caproni as well-advanced, the reality is that they have merely obtained a provisional prejudgment attachment in the context of a non-adversarial *ex parte* proceeding, which has not been confirmed.

As the Federal Reserve Bank of New York ("FRBNY") made clear in the brief it filed in *Owens*, the assessment as to whether the *Owens* plaintiffs' prejudgment attachment can be confirmed at all would require consideration of the "numerous legal questions" raised by "the *Federal Insurance* plaintiffs, who have moved to vacate the *Ex Parte* Attachment Order," as well as the additional FSIA issues raised by the FRBNY itself. *Owens* Dkt. No. 61 at 1, 8; *see also* ECF No. 8056 at 6 (discussing range of issues the *Owens* plaintiffs' own confirmation filings acknowledge were not addressed in the preliminary, *ex parte* proceeding). Thus, the *Federal Insurance* Creditors are not asking this Court to sit in appellate review of Judge Caproni's provisional ruling, but instead to exercise jurisdiction conferred on it by CPLR Article 52 as to matters not yet considered and still requiring judicial review, and to vacate the provisional order because those unaddressed legal questions establish that it cannot be confirmed.[2]

---

[1] The *Owens* plaintiffs make a feeble attempt to draw parallels between this case and a multitude of other cases, none of which involve the type of preliminary and provisional attachment at issue here. The cases cited by the *Owens* plaintiffs largely arise in other jurisdictions and address situations where one court allows the parties to skirt appellate procedure by disregarding another court's judgment, or permitting a collateral attack on a bankruptcy court's injunction, and do not involve attachment or priority disputes under the CPLR. *See* ECF No. 8091 at 5-7.

[2] SDNY Local Rule 14 provides for the transfer of "any part of any case" on a judge's docket to any consenting judge. Pursuant to that Rule, Judge Caproni may formally transfer the attachment and priority issues raised by the *Owens*

3

Relatedly, there is no merit to the *Owens* plaintiffs' suggestion that judicial economy would be served by proceeding piecemeal, ECF No. 8091 at 9-10, with the *Owens* plaintiffs' attachment issue before Judge Caproni and the priority issue before this Court. This Court is exercising jurisdiction over all other pending attachment proceedings as to the blocked assets, including challenges to claims of priority. Those proceedings require this Court to address many of the unresolved issues raised by the *Owens* plaintiffs' attachment efforts, including the scope and import of the Executive Order blocking the assets, applicability and exclusivity of TRIA's attachment remedy, applicability (if any) of the FSIA, and related challenges to the turnover motions. Having two courts separately address those common issues in parallel would be manifestly inefficient, and present a risk of inconsistent rulings and rationales. Judicial efficiency thus plainly favors resolution of all of these issues by the turnover court, which is precisely what the CPLR contemplates.

Finally on this point, Judge Daniels advised that he had spoken with Judge Caproni on these issues, and that the two judges are in agreement that this turnover proceeding would be the forum for resolving these issues. Judge Daniels therefore directed that "[a]nyone who believes they have any interest, who are a part of the MDL or not part of the MDL, in these funds, if they're not already here in this proceeding, should seek to intervene, because this is where we're going to decide this issue." Tr. at 3:8-12. Judge Daniels further stated that "I don't anticipate that Judge Caproni is going to take any action in that infant case [referring to *Owens*] to interfere with a determination that all of you are going to have an opportunity to participate in and will be resolved

---

plaintiffs to this Court for resolution as part of the turnover proceeding, while retaining all other aspects of the *Owens* case. That would effectively mirror what has occurred already in *Doe* and *Smith*, both of which are now before this Court solely as to attachment and priority issue relating to the DAB funds. This Court's prior decision declining to accept the *Owens* action into the MDL on a wholesale basis did not address the more narrow issue of this Court accepting jurisdiction solely as to the attachment and priority issues, which are now ripe in light of the *Owens* plaintiffs' intervention and priority claim.

4

here and resolved with the availability and the distribution of those funds, if those funds are available to distribute to those parties." Tr. at 15:1-7. [3]

In sum, the CPLR framework governing the *Owens* plaintiffs' own voluntary intervention in this turnover proceeding vests this Court with both the authority to evaluate the validity of their unconfirmed prejudgment attachment.

### B. The Prejudgment Attachment is Prohibited as a Matter of Law and Cannot Support the *Owens* Plaintiffs' Claims of Priority

#### 1. *The Executive Order Blocking the Assets Prohibits the Owens Plaintiffs' Prejudgment Attachment.*

The *Owens* plaintiffs claim that the *Federal Insurance* Creditors neglect to address the "actual issue" before the Court, which they narrowly characterize as their claim to priority. *See* ECF No. 8091 at 14. But their claim to priority is predicated on the false presumption that their provisional prejudgment attachment is valid and can be confirmed, and their equally misguided theory that this Court lacks jurisdiction to consider those questions in assessing their claims of priority. As demonstrated above, this Court does have authority to consider the validity of the *Owens* plaintiffs' prejudgment attachment efforts, and the governing legal framework plainly establishes that their proposed prejudgment attachment is prohibited by law.

Pursuant to Executive Order 14064, the President declared that the DAB assets at issue are "blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." In its

---

[3] It is not at all credible for the *Owens* plaintiffs to criticize the *Federal Insurance* Creditors under the theory that they "inexplicably chose not to attempt to participate in the confirmation proceedings or otherwise intervene in the suit before [Judge Caproni]." ECF No. 8091 at 11. Beyond the fact that the *Federal Insurance* Creditors were not served with the *Owens* plaintiffs' confirmation papers and are permitted under the CPLR to challenge their prejudgment attachment at any time prior to turnover (and have already done so here), Judge Daniels explicitly stated that no further filings should be made in any other court without leave of this Court. *See* Tr. at 7:8-12. To the extent that it would be necessary and appropriate for the *Federal Insurance* Creditors to intervene in the proceeding before Judge Caproni to avoid any prejudice to their turnover claims, the *Federal Insurance* Creditors are willing to do so if directed by this Court, but have understandably refrained from doing so to this point, given the MDL Court's directives and the framework established by the CPLR, which authorizes them to move before this Court for an order vacating the *Owens* plaintiffs' provisional and unconfirmed prejudgment attachment.

5

Statement of Interest filed on the same day the Executive Order issued, the United States expressly affirmed that the blocking order imposed an "across-the-board prohibition against transfers *or dealings of any kind* with regard to the property." U.S. Statement of Interest at p. 7 (emphasis supplied) (internal citations omitted). That unambiguous statement concerning the blocking order issued against the broader backdrop of related sanctions regimes, which universally prohibit unlicensed transactions involving blocked property, including prejudgment attachments, is based on terminology identical to that used by the President in E.O. 14064. The terms of art used in the blocking order and the government's clear statement concerning its scope thus plainly establish that the *Owens* plaintiffs' proposed prejudgment attachment is prohibited as a matter of law.

In their effort to evade the unambiguous scope of the blocking order and government's declaration that it prohibits "transfers or dealings of any kind" in the DAB assets, the *Owens* plaintiffs offer two principal (and equally flawed) textual arguments. First, they claim that the words "transferred, paid, exported, withdrawn" connote "movement," and on that basis urge that the Order should be read as merely prohibiting transactions that result in the physical movement of the blocked funds. ECF No. 8091 at 18. Second, they propose that the additional language providing that the funds may not be "or otherwise dealt in" should be accorded a similar meaning to the words that precede it, and thus also read to merely prohibit movement of the funds. *Id*. Neither argument, both of which are essential to the *Owens* plaintiffs' position, is remotely credible.

As an initial matter, the *Owens* plaintiffs' textual arguments ignore the unambiguous statement of the United States that the blocking order imposed "an across-the-board prohibition against transfers *or dealings of any kind* with regard to the property." U.S. Statement of Interest at 7 (emphasis supplied). That unequivocal statement concerning the blocking order's expansive

6

scope and prohibition against "dealings of any kind," which is entitled to deference (given that it comes from the same branch of government that issued the Executive Order), precludes the *Owens* plaintiffs' novel theory that the order should be read to merely prohibit physical movement of the funds. For this reason alone, the *Owens* plaintiffs' textual arguments must fail.

Moreover, the *Owens* plaintiffs' proposed reading of the text runs afoul of the cardinal rule of statutory construction relevant here, requiring that terms of art employed in an Executive Order must be accorded their specialized legal meaning. *See In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 415 (S.D.N.Y. 2021) (holding term "essential worker" as used in executive order was not vague where it "was and is a term of art during the pandemic state of emergency"); *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99 (2d Cir. 2019) ("[W]hen Congress uses in a statute a term of art with a long history of judicial interpretation, we must presume that Congress intends to use that word in its technical sense.") (citations omitted). As noted in the *Federal Insurance* Creditors' prior brief, the term "transfer" is a term of art in the economic sanctions arena, which is universally defined and understood to prohibit an expansive range of transactions and dealings in blocked property, including prejudgment attachments. ECF No. 8056 at 15. The President is presumed to have incorporated that meaning of the term "transfer" in the blocking order, as further confirmed by the government's declaration that the blocking order prohibits dealings of any kind in the DAB funds.

The *Owens* plaintiffs fare no better in their efforts to read the language prohibiting the funds from being "otherwise dealt in" out of the blocking order altogether, by implausibly claiming that it should also be read to merely prohibit "movement" of the blocked funds. Even beyond the fact that the technical term "transfer" does not merely prohibit movement of the funds, the *Owens* plaintiffs ignore that the phrase "otherwise dealt in" is preceded by the disjunctive word "or."

7

Where, as here, "the operative terms are connected by the conjunction 'or.' . . . [That term's] ordinary use is almost always disjunctive, that is, the words it connects are to 'be given separate meanings.'" *United States v. Woods*, 571 U.S. 31, 45 (2013); *Santoro v. State Farm Mut. Auto. Ins. Co.,* 2020 WL 6586630, *14-15 (S.D.N.Y. Nov. 9. 2020) (collecting cases). The inclusion of the disjunctive "or" before the phrase "otherwise dealt in" thus renders the *noscitur a sociis* concept invoked by the *Owens* plaintiffs inapplicable, and confirms the prohibition against "otherwise deal[ing] in" the funds has independent meaning from the phrases that precede it.[4]

The cases cited by the *Owens* plaintiffs involving earlier executive actions, *see* ECF No. 8091 at 19-21 only further undermine, rather than support, their position. As authority for their claim that the present blocking order should be read to allow prejudgment attachments, the *Owens* plaintiffs principally rely on *Zittman v. McGrath*, 341 U.S. 446 (1951), a case involving a nearly century-old executive order that pre-dates the authority Congress granted the President under IEEPA and that employs different language that did not "block" the assets in question, but merely prohibited transfers of that property. Beyond the fact that the executive order addressed in *Zittman* issued years before the term "transfer" acquired its present specialized meaning within the context of current sanctions practice, the Court's ruling in that case turned on the fact that the Treasury Department's and Department of Justice's applicable administrative policies and representations in several courts authorized the contingent execution attachment at issue. The Court concluded that the Alien Property Custodian's subsequent assertion, years later, that the attachments were prohibited "transfers" was "irreconcilable with the admitted administrative practice and the position urged upon the New York courts" by the Treasury Department and Department of Justice.

---

[4] The dictionary definition of "otherwise" is "in a different way or manner," https://www.merriam-webster.com/dictionary/otherwise, and "deal in" means "to use or be involved in (something)," https://www.merriam-webster.com/dictionary/deal%20in. This language thus imposes an expansive prohibition against being "involved in" the blocked funds in any way not captured by the terms that precede it.

8

*Id.* at 459. *Zittman* thus merely indicates that an executive order will not preclude transactions that are specifically authorized, which is not the case here.[5]

And contrary to the *Owens* plaintiffs' spurious efforts to claim otherwise, *Dames & Moore v. Regan,* 453 U.S. 654, 663 (1981) and *Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800 (1st Cir. 1981), thoroughly undermine their position. In this regard, the *Owens* plaintiffs conspicuously fail to acknowledge that the attachments at issue in those cases were authorized by licenses issued by the Executive. *See Dames & Moore,* 453 U.S. at 663 (1981) (discussing general license granted by President authorizing certain judicial proceedings against Iran, which explicitly authorized pre-judgment attachments); *Khuzestan Water*, 651 F.2d at 803 (discussing "special license" to "initiate and prosecute judicial proceedings" and to obtain "preliminary relief against Iranian property"). Both decisions thus support the *Federal Insurance* Creditors' position that blocking orders prohibit prejudgment attachments, unless the Executive has expressly authorized them through a license. Tellingly, nowhere do the *Owens* Plaintiffs claim to have, or even to have sought, a license authorizing them to attach the blocked assets.

        2.    *TRIA Does Not Authorize Prejudgment Attachments*.

The *Owens* plaintiffs' arguments relating to the interaction between TRIA and the FSIA largely take aim at strawmen. Indeed, the *Federal Insurance* Creditors' prior brief did not take a position as to whether the FSIA would impede the *Owens* plaintiffs' proposed prejudgment attachment of the blocked funds, although the FRBNY did indicate the issue would need to be resolved if the attachment were not deemed to be precluded by the blocking order itself. *See Owens* Dkt. No. 61 at 8. Instead, the *Federal Insurance* Creditors' point related to TRIA is that the delicate balance Congress struck through TRIA provides an additional reason to conclude that

---

[5] In stark contrast to the circumstances at issue in *Zittman*, the government's Statement of Interest in this case indicates that the blocking order imposes an across-the-board prohibition on dealings of any kind.

9

President Biden's Executive Order precludes the proposed prejudgment restraint of the blocked funds.

In enacting TRIA, Congress correctly recognized that restraints or attachments of any kind interfere with the President's plenary power to control blocked assets in order to use them as a bargaining chip in the conduct of foreign relations. *See Dames & Moore,* 453 U.S. at 673-74. Congress, therefore, expressly required the existence of a final judgment as a precondition to attachment of blocked assets by terrorism victims. This requirement of a judgment indicates that other restraints, such as the unlicensed prejudgment attachment sought by the *Owens* plaintiffs, represent an intolerable and impermissible interference with the President's constitutional authority. This makes sense, as a prejudgment attachment could restrain blocked funds for years while the plaintiff litigates its uncertain claim, rendering the President powerless to take appropriate action relating to the funds to advance U.S. interests.[6] *Id; see also Smith ex. rel. v. Est. of Smith v. Fed. Rsrv. Bank of New York*, 346 F.3d 264, 271 (2d Cir. 2003) ("[TRIA] confers no entitlement on victims who have not yet obtained judgments. Neither does it guarantee that any blocked assets will in fact be available when a particular victim seeks to execute on a judgment."); *see also Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers,* 414 U.S. 453, 458 (1973) ("'when a statute limits a thing to be done in a particular mode it includes the negative of any other mode'") (quoting *Botany Mills v. United States,* 278 U.S. 282, 289 (1929)). Because TRIA provides the sole statutory vehicle to attach blocked assets of terrorist parties, the *Owens* plaintiffs' efforts to claim priority must fail.

---

[6] The suggestion that the President's statement that the blocking of the funds would preserve them for legal claims by certain terrorism victims somehow supports their prejudgment attachment is nonsensical. Both the E.O. and government's statement of interest refer only to claims reflected in public filings as of the date of the E.O., and thus could not have concerned the *Owens* plaintiffs' still unfiled and time barred claims. In any case, the government has made clear that blocking merely affords claimants an opportunity to be heard in court, and that any claim to an interest in the blocked funds must accord with governing law, including the restrictions of the blocking order and TRIA.

Dated: June 22, 2022               Respectfully submitted,

                                                COZEN O'CONNOR
                                                By: */s/ Sean P. Carter*
                                                Sean P. Carter, Esq.
                                                Stephen A. Cozen, Esq.
                                                J. Scott Tarbutton, Esq.
                                                1650 Market Street
                                                Philadelphia, PA 19103
                                                Tel: (215) 665-2105
                                                scarter1@cozen.com

                                                Attorneys for *Federal Insurance* Creditors

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Reply Memorandum of Law in Further Support of the *Federal Insurance* Creditors' Cross-Motion to Vacate the *Owens Ex-Parte* Provisional Prejudgment Attachment, was electronically filed this 22nd day of June 2022. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

*/s/ J. Scott Tarbutton*

J. Scott Tarbutton, Esq.

LEGAL\58408051\2