**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |
| --- | --- |
| | |

This document relates to:

*Marinella Hemenway, et al. v. Islamic Republic of Iran*, No. 1:18-cv-12277 (GBD) (SN)
*BNY Mellon, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11767 (GBD) (SN)

### THE MOVING PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL FINAL JUDGMENT AS TO DAMAGES

ANDERSON KILL P.C.

Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Hon. Ethan Greenberg (Ret.)
Alexander Greene, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 278-1000
Fax: (212) 278-1733
Email:  jgoldman@andersonkill.com
         bstrong@andersonkill.com
         egreenberg@andersonkill.com
         agreene@andersonkill.com
*Attorneys for Plaintiffs*

Dated:    New York, New York
          June 30, 2022

## <u>TABLE OF CONTENTS</u>

Page

Introduction ............................................................................................................... 1

I.   Procedural Background .................................................................................... 3

    A.   Applicable Orders ................................................................................. 3

    B.   Related Cases ....................................................................................... 4

    C.   *O'Neill* Plaintiffs Herein - Liability .................................................. 6

    D.   Iran Was Properly Served. ................................................................... 7

        1.   Service by Mail Was Not Successful ....................................... 7

        2.   Iran Was Served Via Diplomatic Means ................................. 8

    E.   The Clerk Properly Entered Default Against Iran. ............................. 11

    F.   Notices of Amendment ....................................................................... 12

        1.   Individuals Not Named in the Original Complaint Are Entitled to Solatium Damages (Notices of Amendment) ........................... 12

II.  Damages – Governing Law ............................................................................ 13

    A.   Background ......................................................................................... 13

    B.   Solatium Damages ............................................................................. 14

        1.   Functional Equivalents of Immediate Family Members .......... 16

    C.   Punitive Damages .............................................................................. 24

    D.   Prejudgment Interest .......................................................................... 25

III. Conclusion ..................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Socialist People's Libyan Arab Jamahirya*,
  775 F. Supp. 2d 48 (D.D.C. 2011) ..................................................................25

*Belkin v. Islamic Republic of Iran*,
  667 F. Supp. 2d 8 (D.D.C. 2009) ...................................................................14

*Dammarell v. Islamic Republic of Iran*,
  281 F. Supp. 2d 105 (D.D.C. 2003), *vacated on other grounds*, 404 F. Supp.
  2d 261 (D.D.C. 2005) .....................................................................................14

*Est. of Bland v. Islamic Republic of Iran*,
  831 F. Supp. 2d 150 (D.D.C. 2011) ...............................................................15

*Est. of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006) .............................................................4, 15

*Reed v. Islamic Republic of Iran*,
  845 F. Supp. 2d 204 (D.D.C. 2012) ...............................................................10

*In re Sept. 11 Litig.*,
  802 F.3d 314 (2d Cir. 2015).............................................................................26

*Surette v. Islamic Republic of Iran*,
  231 F. Supp. 2d 260 (D.D.C. 2002) ...............................................................14

*Valore v. Islamic Republic of Iran*,
  700 F. Supp. 2d 52 (D.D.C. 2010) ...............................................................7, 15

**Statutes**

28 U.S.C. § 1602 ................................................................................................9

28 U.S.C. § 1605A ...............................................................................4, 13, 24

28 U.S.C. § 1608 .......................................................................................*passim*

Air Transportation Safety and System Stabilization Act ("ATSSSA"), Pub. L. No.
107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101) .................................26

**Other Authorities**

F.R.C.P. 55(a) .................................................................................................11

docs-100500859.1

## INTRODUCTION

For the reasons set forth below, the statements contained in the Declaration of Jerry S. Goldman, Esq., with Exhibits appended thereto ("Goldman Declaration"), which is being filed contemporaneously with this Memorandum of Law, as well as those set forth in prior motions for damages made on behalf of other *O'Neill* wrongful death plaintiffs, certain plaintiffs in the above-captioned matters who are identified in annexed Exhibits A-1 to A-2 (collectively, "Exhibits A") to the Goldman Declaration (the Plaintiffs identified in annexed Exhibits A are collectively referred to herein as the "Moving Plaintiffs") by and through their counsel, Anderson Kill P.C., respectfully move this Court for an Order:

    (1)    determining that service of process in the above-captioned matter was properly effected upon Defendant Islamic Republic of Iran ("Iran") in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants;[1] AND,

    (2)    awarding the Plaintiffs identified in annexed Exhibits A judgments as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *O'Neill, Burnett, Havlish*, *Ashton*, *Bauer*, and other cases; AND,

    (3)    Determining that:

        a.  Joseph Dixon is the functional equivalent of a parent of DaJuan Hodges, who died in the Terrorist Attacks on September 11, 2001; AND,

---

[1] This only applies for the plaintiff in this motion in the above-referenced 2018 matter.

      b.  Eric Johnson is the functional equivalent of a spouse of Janice Brown, who died in the Terrorist Attacks on September 11, 2001; AND,

      c.  Brian Wilkes is the functional equivalent of a spouse of Lorraine Antigua, who died in the terrorist attacks on September 11, 2001; AND,

(4)     awarding solatium damages to the Moving Plaintiffs in the amounts of $12,500,000 per spouse and $8,500,000 per parent, as set forth in annexed Exhibits A; AND,

(5)     awarding the Moving Plaintiffs prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

(6)     granting the Moving Plaintiffs permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

(7)     granting permission for all other Plaintiffs in these actions not appearing in annexed Exhibits A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed;[2, 3] AND,

(8)     granting to the Moving Plaintiffs such other and further relief as this Honorable Court deems just and proper.

---

[2] The plaintiffs listed in annexed Exhibits A are the relatives of a 9/11 decedent, which includes individuals who are not named in the complaint but are entitled to receive judgments for solatium based on their relationship to the 9/11 decedent.

[3] Annexed Exhibits A only include plaintiffs who will be submitting U.S. Victims of State Sponsored Terrorism Fund applications for the next tranche in which they are eligible to participate. The remaining plaintiffs have either already filed a motion for damages or intend to file a similar motion seeking damages at a later date.

docs-100500859.1

This motion is made only on behalf of the Moving Plaintiffs, all of whom, it is respectively submitted, are the functional equivalents of a parent or a spouse of a person killed in the terrorist attacks on September 11, 2001.

As the awards set forth in the attached Proposed Order represent the only direct recovery against Iran on behalf of the Moving Plaintiffs for the claims herein, any award issued to those individuals will constitute final awards and judgments against Iran for the Moving Plaintiffs.

## I.     PROCEDURAL BACKGROUND

### A.     Applicable Orders

This motion is being submitted in accordance with various procedural orders entered by this Court, and the form of this motion and the relief requested herein are intended to comply with various orders of this Court, including the following:

    a.    The Court's January 24, 2017 Order, ECF No. 3435,[4] requiring that "[a]ll further motions for final judgment against any defaulting defendant shall be accompanied by a sworn declaration attesting that the attorney has (1) complied with the due diligence safeguards [referenced in Section II.D. of the January 23, 2017 letter from the Plaintiffs' Executive Committee (ECF No. 3433)] and (2) personally verified that no relief has previously been awarded to any plaintiff included in the judgment (or, if relief has been awarded, the nature of that relief)."

    b.    The Court's October 14, 2016 Order, ECF No. 3363, concerning the amounts of solatium damage awards.

    c.    The Court's October 14, 2016 Order, ECF No. 3362, related to *Bauer v. Al Qaeda Islamic Army*, 02-CV-7236 (GBD)(SN) and *Ashton v. al Qaeda Islamic Army*, 02-CV-6977 (GBD)(SN).

    d.    The Court's October 28, 2019 Order, ECF No. 5234, setting forth updated procedural rules.

    e.    The Court's December 6, 2019 Order, ECF No. 5338, setting forth the scheduling order.

---

[4] All ECF numbers are to the MDL docket unless stated otherwise.

    f.  The Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports submitted in support of default judgments.

**B.**  **Related Cases**

Relying on evidence and arguments[5] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570, the consolidated multidistrict litigation arising out of the September 11th attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of certain of the *O'Neill*, *Havlish*, *Ashton*, *Federal Insurance*, and *Hoglan* groups of plaintiffs against Iran (*See* e.g., ECF Nos. 2516, 3014, 3016, 3020-23).  Subsequently, other liability findings were made for additional *O'Neill* plaintiffs.  After granting *Havlish* plaintiffs' Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents.  Upon the *Havlish* plaintiffs' submissions, on October 3, 2012 this Court found, among other things, that "Plaintiffs may recover for [, inter alia,] solatium…in an action under Section 1605A.  28 U.S.C. § 1605A(c)(4).  In such an action, …family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).  This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |

---

[5] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4.

The Court has applied the same solatium values to claims of other solatium plaintiffs in *Burnett* (ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5138, and 5356) and other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attack on September 11, 2001* multidistrict litigation. *See*, e.g., ECF Nos. 3175 at 2, 3300 at 1, 3358 at 9, 3363 at 16, 3399, and 3977 at 7.

In that same decision in *Havlish*, this Court also found that Plaintiffs are entitled to punitive damages under the Foreign Sovereign Immunities Act ("FSIA") in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5. The Court has applied that 3.44 multiplier also to judgments in *Ashton*. *See* ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier). The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett*. ECF No. 3666. However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF Nos. 3358 at 11-16, 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report and Recommendation in its entirety. ECF Nos. 3383 at 2, 3384 at 6.

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages. ECF No. 2623 at 5. The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and

docs-100500859.1

Judge Daniels adopted (ECF No. 2623 at 5).  In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest.  ECF No. 3175 at 7-8.  Judge Daniels adopted the magistrate judge's report and recommendation and applied the nine percent interest rate in multiple instances in *Ashton* and *Bauer*.  *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.  However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all solatium claims.  ECF Nos. 3358 at 17-20; 3363 at 28-29.  Judge Daniels adopted Judge Netburn's *Hoglan* Report and Recommendation in its entirety and applied an interest rate of 4.96 percent per annum, compounded annually.  ECF Nos. 3383 at 2, 3384 at 6.  The Court applied that interest rate, 4.96 percent per annum, to other plaintiffs' awards in *Burnett*.

### C.    *O'Neill* Plaintiffs Herein - Liability

Plaintiffs herein filed suit and duly served Iran.  The Clerk's Office, upon Plaintiffs' applications, issued Clerk's Certificates of Default.

As set forth below, the Moving Plaintiffs filed motions for default judgments against Iran for liability.  Such motions were granted, with leave to seek a determination of damages at a later date, as specifically described in the table below.

| | |
|---|---|
| **NAME OF CASE:** | *Marinella Hemenway, et al. v. Islamic Republic of Iran* |
| | CASE NO: No. 1:18-cv-12277 (GBD) (SN) |
| | DATE MOTION FOR LIABILITY FILED: 08/14/2019 |
| | ECF NO. OF MOTION FOR LIABILITY: ECF No. 4856 |
| | DATE ORDER DETERMINING LIABILITY: 09/03/2019 |
| | ECF NO. OF ORDER DETERMINING LIABILITY: ECF No. 5054 |
| **NAME OF CASE:** | *BNY Mellon, et al. v. Islamic Republic of Iran* |
| | CASE NO: No. 1:19-cv-11767 (GBD) (SN) |
| | DATE MOTION FOR LIABILITY FILED: 11/12/2021 |
| | ECF NO. OF MOTION FOR LIABILITY: ECF No. 7329 |
| | DATE ORDER DETERMINING LIABILITY: 01/04/2022 |

6

| ECF NO. OF ORDER DETERMINING LIABILITY: | ECF No. 7522 |
|---|---|

Service was effectuated as set forth below.[6]

**D.      Iran Was Properly Served.**

**1.      Service by Mail Was Not Successful**

Service on Iran could not be effected under 28 U.S.C. § 1608(a)(1) because the United States and Iran do not have any special arrangement for service of process, nor is service permitted by any applicable international convention under the provisions of subsection (2). *See Valore*, 700 F. Supp. 2d at 70.

Accordingly, the Moving Plaintiffs first attempted to serve Iran in accordance with Section 1608(a)(3) of the FSIA.  Section 1608(a)(3) provides that:

> if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned.

The Southern District of New York's Clerk's Office Foreign Mailing Instructions provide plaintiffs with instructions for service by U.S. Postal Service ("USPS"), FedEx, or DHL.  *See* United States District Court for the Southern District of New York Clerk's Office Foreign Mailing Instructions at 2.

On the date set forth in the table below, the instant Plaintiffs attempted to utilize DHL or USPS for service under § 1608(a)(3).[7] Pursuant to the Southern District of New York's Clerk's Office Foreign Mailing Instructions, plaintiffs prepared an envelope along with the requisite

---

[6] We only discuss service for the 2018 case that is part of this motion.

[7] FedEx was not delivering packages to Iran at the time service was effectuated.

service documents for the Clerk of the District Court as prescribed, and delivered a Service

Packet[8] to the Clerk.  The Clerk of Court, in accordance with the Southern District of New

York's Clerk's Office Foreign Mailing Instructions and 28 U.S.C. § 1608(a)(3), attempted to

serve the Service Packet on Iran via DHL or USPS.[9]  As set forth in Jerry S. Goldman's

Affidavits in Support of Requests for Clerk's Default (the "Goldman Default Affidavits"), Iran

refused to accept the Service Packet.  Because service by mail could not be effected within 30

days, Plaintiffs proceeded to effect service by diplomatic channels pursuant to §1608(a)(4).  *See*

Jerry S. Goldman's Affidavits of Service (the "Goldman Affidavits of Service"); *see also*

Goldman Default Affidavits; *see also* Clerk's Certificates of Mailing, all as identified in the

following table:

| CASE NAME: | *Marinella Hemenway, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
| | DATE OF ATTEMPTED SERVICE BY MAIL: | 02/20/2019 |
| | CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 10 (docket for individual case) |
| | GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 4694 |
| | GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4801 |

### 2.   Iran Was Served Via Diplomatic Means

Under 28 U.S.C. § 1608(a)(4), if service cannot be made within 30 days under paragraph

(3), by sending two copies of the summons and complaint and a notice of suit, together with a

translation of each into the official language of the foreign state, by any form of mail requiring a

signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State

---

[8] The Service Packet, in addition to pre-paid postage, contained an envelope, two copies of the summons and complaint and notice of suit, together with a translation in the official language of the foreign state (Farsi), and a certification of same.

[9] We used DHL early in the litigation to expedite the process. As a result of the reimposition of sanctions, we were compelled to use USPS as DHL was unavailable.

in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

Therefore, pursuant to 28 U.S.C. § 1608(a)(4), after service by mail was rejected, the instant Plaintiffs delivered to the Clerk of the Court for the U.S. District Court for the Southern District of New York the following items: cover letter, a cashier's check in the amount of $2,275.00 payable to the U.S. Embassy Bern, copies of the Complaint in English, copies of the Complaint in Farsi, Notice of Suit in English, Notice of Suit in Farsi, Summons in English, Summons in Farsi, Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602, Civil Cover Sheet, Affidavits from translators, and a U.S. Airbill (from FedEx) (collectively, "Service Documents").[10]  The Clerk was requested to transmit these documents to the United States State Department in Washington, D.C.  *Id.*  In accordance with the statute and the protocol of the Department of State, it would, in turn, transmit one copy of the papers through diplomatic channels to the foreign state and send the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.  Plaintiffs met all of those requirements in this case.  *See* Goldman Default Affidavits and Goldman Affidavits of Service.

As set forth in the below table, the Clerk of the Court transmitted the Service Documents to the Secretary of State, Director of Consular Services, Office of Policy Review and Inter-Agency Liaison, United States Department of State for service on Iran under 28 U.S.C. § 1608(a)(4).  *See* Goldman Default Affidavits and Goldman Affidavits of Service.

---

[10] Also included were United States Airbills from the State Department to the Embassy in Bern and back, and to the Southern District of New York Clerk.

9

As evidenced by letter from Jared Hess, Attorney Advisor, Overseas Citizens Services, Office of Legal Affairs, United States Department of State, to Ruby J. Krajick, Clerk of Court, service was effectuated on Iran as set forth in the below table, when the U.S. Department of State, assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran, delivered the Service Documents to the Iranian Ministry of Foreign Affairs under cover of diplomatic notes, whose number is in the below table. Pursuant to 28 U.S.C. § 1608(c)(1), in instances of service under § 1608(a)(4), service shall be deemed to have been made "as of the date of transmittal indicated in the certified copy of the diplomatic note." *See* Goldman Default Affidavits, Goldman Affidavits of Service, Clerk's Certificates, and Diplomatic Notes.

| | |
|---|---|
| **CASE NAME:** | *Marinella Hemenway, et al. v. Islamic Republic of Iran* |
| CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
| DATE OF DELIVERY OF THE DIPLOMATIC NOTE AND SERVICE DOCUMENTS: | 06/11/2019 |
| DIPLOMATIC NOTE NO: | 1045-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 12 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 4694 |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4801 |

Based on the foregoing, Plaintiffs filed an Affidavit of Service confirming service was effected on Iran on the date of the diplomatic note as set forth above.

Because service upon Iran was proper, and Section 1605A of the FSIA provides subject matter jurisdiction for the Plaintiffs' claims against Iran, this Court has personal jurisdiction over Iran. *Shapiro*, 930 F.2d at 1020; *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 209 (D.D.C. 2012). *See* Goldman Declaration at ¶ 17.

### E.      The Clerk Properly Entered Default Against Iran.

Iran did not file any responsive pleading or otherwise defend the suit.  Rule 55(a) of the

Federal Rules of Civil Procedure, provides that "[w]hen a party against whom a judgment for

affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by

affidavit or otherwise, the clerk must enter the party's default." *Id*.

The within Plaintiffs requested, on the dates set forth in the following table, that the Clerk

enter default against Iran because:

- Iran was obligated to "serve an answer or other responsive pleading to the complaint within sixty days after service [was effectuated]." 28 U.S.C. § 1608(d);

- Iran was served on the dates set forth in the table; and

- More than sixty (60) days elapsed since service, and Iran failed to file an answer or other responsive pleading, or take any other steps to defend this action.

Upon the Moving Plaintiffs' application, the Clerk issued a Certificate of Default as set

forth below.

As Iran failed to timely answer or move in response to the duly served summons and

complaint, the Clerk of the Court properly issued a Certificate of Default.

| CASE NAME: | *Marinella Hemenway, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
| | DATE OF SERVICE: | 06/11/2019 |
| | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4800 |
| | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4814 |

F.      **Notices of Amendment**

1.      **Individuals Not Named in the Original Complaint Are Entitled to Solatium Damages (Notices of Amendment)**

Certain of the Plaintiffs herein have been added pursuant to a Notice of Amendment as set forth in Exhibits A and Exhibits C-1 to C-2 (collectively, "Exhibits C") to the Goldman Declaration, which includes the MDL docket numbers and dates of the Notices of Amendment pursuant to which those plaintiffs were added.

Pursuant to paragraph 5 of Section II(D) of the Plaintiffs' Executive Committee January 23, 2017 letter, ECF No. 3433, which was adopted by the Court through its January 25, 2017 Order, ECF No. 3435, individuals who are not named in the complaint, but are otherwise a member of the 9/11 decedent's family, are entitled to receive a judgment for solatium based upon their relationship to the 9/11 decedent and where there is a pending claim by the personal representative of that decedent's estate.  The letter provides "[i]n instances where a default judgment is sought by a personal representative in favor of a solatium claimant who is not a named plaintiff in the action in which the award is sought, counsel requesting the judgment will be asked to confirm that: (1) the personal representative has requested that a judgment be sought in favor of the solatium claimant; (2) the solatium claimant has been contacted and affirmed that he or she authorized the personal representative to seek the judgment in his or her favor; and (3) counsel has confirmed that the solatium claimant in favor of whom the judgment is being sought has not retained other counsel or been named in any other action or, if he or she has, that counsel has communicated with the claimant's counsel and received authorization to seek the judgment via the estate's representative."  ECF No. 3433 at 7; *see also* ECF No. 5234 (October 28, 2019).

Such individuals are identified and the compliance with such procedure is described in Goldman Declaration at ¶¶ 15-16 and annexed Exhibits C to the Goldman Declaration.

Accordingly, judgment should be entered in such Plaintiff's favor as if they were named plaintiffs, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in prior proceedings in this MDL.

## II.  DAMAGES – GOVERNING LAW

### A.  Background

Section 1605A of the FSIA permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1).  The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4).  Courts addressing the damages available under the statute have held that, among other damages recoverable, "family members [or the functional equivalents of such family members] can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages."  ECF No. 2623 at 2-3 (quoting *Valore*, 700 F. Supp. 2d at 83).

Plaintiffs identified in annexed Exhibits A are the functional equivalents of immediate family members of those killed on 9/11, as demonstrated by documentary evidence of their familial relationship to a 9/11 decedent, as discussed in Section II(B)(1) of this Memorandum of Law and Goldman Declaration at ¶¶ 20-25 (including accompanying exhibits), which attest to a familial relationship eligible for recovery.[11]  *See* Goldman Declaration at ¶¶ 4-14, 18-19, 20-25.

---

[11] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF No. 4045.

As liability has been established in these matters, each Moving Plaintiff is now entitled to damages in the amounts set forth in annexed Exhibits A, which reflect the damage amounts previously established and applied by this Court in this and other related cases arising from the terrorists attacks on September 11, 2001 (the "9/11 Attacks") or based upon expert economic reports submitted herewith.  In accordance with the terms of the FSIA, the Moving Plaintiffs are entitled to compensation under Section 1605A for their solatium, pain and suffering, and are also entitled to prejudgment interest.

### B.      Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005).  Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress. *See*, e.g., *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "'indistinguishable' from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001))).

When previously awarding solatium damages in other cases related to the 9/11 Attacks, such as those noted above, this Court looked at the framework established by District Court

Judge Royce C. Lamberth in *Heiser*, 466 F. Supp. 2d at 229, where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million.  *Id.*  This formula, however, may be adjusted upward or downward when circumstances warrant.  *See*, e.g., *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lamberth's framework in *Heiser* was appropriate because the decedents' immediate family members suffered, and continue to suffer "profound agony and grief" and "[w]orse yet, …are faced with frequent reminders of the events of that day."  ECF No. 2618 at 10-12.  Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families . . ."  *Id.* at 11.  In that Report and Recommendation, with which this Court later agreed, Magistrate Judge Maas recommended that solatium damages be awarded to the immediate family members of the victims of the 9/11 Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
| --- | --- |
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

15

These exact amounts were adopted by this Court in its October 3, 2012 Order, ECF No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of certain of the *Ashton* Plaintiffs, ECF No. 3300, in the September 12, 2016 Order pertaining to plaintiffs in *Bauer*, ECF No. 3341, in the October 14, 2016 Report and Recommendation, ECF No. 3363, and in the October 31, 2016 Order in *Hoglan*, ECF No. 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order relating to the claims of additional *Ashton* plaintiffs, ECF No. 3977 at 6–7.  The same amounts were adopted in the Court's June 8, 2018 (Corrected) Order of Partial Final Default Judgment in the matter known as "*Burnett/Iran II*," No. 15-cv-09903, ECF No. 101.[12]

The solatium losses suffered by the Exhibits A Plaintiffs before the Court in this application are legally and factually comparable to those suffered by the plaintiffs in *O'Neill*, *Havlish*, *Ashton*, *Bauer*, *Hoglan*, and *Burnett*.  As such, Plaintiffs identified in annexed Exhibits A respectfully request that the Court grant awards of solatium to the functional equivalents of immediate family members identified in annexed Exhibits A in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan*, *O'Neill*, and *Burnett* cases.

1.    **Functional Equivalents of Immediate Family Members**

The *Hoglan II* October 14, 2016 Report and Recommendation, ECF No. 3363, *adopted by* Mem. Decision and Order dated October 31, 2017, ECF No. 3384, recommended that in addition to those individuals who are considered traditional "family members," damages could

---

[12] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's July 31, 2017 Order, ECF No. 3666, are in later filings of the *Burnett*, *Ashton*, and *O'Neill* plaintiffs.

also be awarded to non-immediate family members who met certain criteria establishing that she

or he had a relationship with the 9/11 decedent that was the "functional equivalent" to that of an

immediate family member.  *See, Hoglan IV* Report and Recommendation, dated August 8, 2017,

ECF No. 3676, Adapted by Mem. Decision and Order dated November 17, 2017, ECF No. 3795.

These categories of non-immediate family members included fiancées and domestic partners,

step-relatives (including step-children), aunts, uncles, nieces, nephews and cousins.  *See* ECF

No. 3363.

In the October, 2016 Report and Recommendation, ECF No. 3363, three (3) factors were

identified by the Court as relevant to the determination of whether a close non-immediate family

member was the "functional equivalent" of an immediate family member.  Those factors are: 1)

long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate

family member ever played a guardian or custodian-like role in the 9/11 decedent's life or vice

versa; and 3) whether the biological family member whose role the "functional equivalent"

individual played was absent from the family life (i.e. did the non-immediate family member

step in to play a "functionally equivalent" role because of the death or long-term absence of the

biological family member).  *Id*. at 10-12.  In weighing these different factors, the Court stated it

would consider whether the non-immediate family member supported the decedent financially

and emotionally, or vice versa, and whether the decedent and claimant shared in typical family

activities like doing homework, eating dinner and vacationing together.  *Id*.  With respect to

same-sex domestic partners, the Court noted that "[i]n determining which partners qualify as

being functionally equivalent to a spouse, the Court has considered the duration of the

relationship, the degree of mutual financial dependence and investments in a common life

together, the duration of cohabitation and the presence or absence of a formal engagement as

17

important factors." *Id*. at 14-15.  In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents.  *Id*. at 17-28.

This motion relates to three (3) requests for damage judgments submitted on behalf of two (2) men who became widows before they had the opportunity to become grooms, and one (1) man who volunteered to become the father of a child from an early age.  Their claims are all unique, yet are common in the love that they express.

The information in the declarations of the individuals for whom solatium damages are sought in this motion confirms that all functional equivalent plaintiffs, as reflected in annexed Exhibits D, E and F[13] to the Goldman Declaration.  *See* Goldman Declaration at ¶¶ 20-25.

> **(a)**     ***Joseph Dixon, Parent Equivalent of DaJuan Hodges***
> **Presumptive Award: $8.5 Million**
> **Requested Award: $8.5 Million**

Joseph Dixon ("Joseph") is married to Pamela (Hodges) Dixon, the mother of DaJuan Hodges. Joseph was for all intents and purposes DaJuan's father from the time DaJuan was three years old until DaJuan was killed at the World Trade Center at age 29.  For the reasons set forth below and in Joseph's accompanying Declaration annexed as Exhibit D to the Goldman Declaration, Plaintiffs submit that Joseph should be deemed the functional equivalent of DaJuan's father.

Joseph Dixon met DaJuan Hodges' mother Pamela Hodges (now Pamela Dixon) ("Pam or "Pamela") in 1975 when Joseph was 21 and Pamela's son DaJuan Hodges ("DaJuan") was three years old.  Joseph's father told Joseph at that time that if Joseph was serious about the girl

---

[13] References to an exhibit denominated by a letter followed by a number refer to exhibits attached to the respective declarations.

(Pamela) then Joseph had to be serious about her son (DaJuan) too.  And so it was for all the years to come. Ex. D, ¶ 2.

Joseph and Pam moved in together shortly after they met, and they got married in 1978. DaJuan was the ring bearer at their wedding.  They have been happily married for 44 years now. Joseph always treated and regarded DaJuan as his son, and DaJuan always treated and regarded Joseph as his Dad.  Ex. D, ¶ 7.

About a year after Pam and Joseph got married, their son Sherard was born.  Sherard was DaJuan's younger (by seven years) brother.  Joseph, Pam, DaJuan and Sherard lived together as a family and did everything together.  Ex. D, ¶ 8, and annexed Exhibits A-E to Joseph's Declaration, which are photographs.  Once Joseph and Pam met, Joseph's family became DaJuan's family too.  Joseph's father was still alive when DaJuan was a small boy, and he and DaJuan loved to spend time together.  Often after DaJuan had visited with Joseph's father for a weekend, Joseph's father would ask – only half-kidding – "Can I just keep him [DaJuan]?"  Ex. D, ¶ 9.

Joseph and Pam each worked hard to provide their boys DaJuan and Sherard with a good home and all they needed to grow and learn.  Joseph worked in construction, and Pam worked for 29 years at Marsh & McLennon, Inc. (the professional services firm) prior to her retirement. Ex. D, ¶¶ 2, 8.

The Dixons shared a warm and happy family life.  For example, by coincidence Joseph and DaJuan have the same birthday.  So every year they would share their birthday party, and for many years when DaJuan was young, he insisted that he and Joseph were the same age.  When DaJuan got a little older, every Sunday, Joseph would take DaJuan and his friends to the park to play football while Pam made the family Sunday dinner.  Later on, Sherard made a career as a

rap artist (called "Posta Boy") and DaJuan could be seen in the background when Sherard made television appearances.  Ex. D, ¶¶ 10-11.

DaJuan's biological father, Roger Shepard, played almost no part in DaJuan's life.  He had a drug problem and no job.  He lived in Pam's mom's neighborhood.  Occasionally DaJuan would bump into Mr. Shepard by accident on the street there.  (When that happened, Mr. Shepard would often ask DaJuan for money.)  Mr. Shepard never spent any time with DaJuan and never contributed a penny to his support.  DaJuan call Mr. Shepard "Roger"; DaJuan called Joseph Dixon "Daddy" and (when he grew a little older) "Dad."  Ex. D, ¶¶ 4-6.

When DaJuan was in high school, he worked part-time with his father in construction, and he worked at Colgate-Palmolive too.  Once he was out of school, DaJuan got a full time job with his mother's firm, Marsh & McLennan, at the World Trade Center.  That is where DaJuan was working when he was killed on 9/11.  Ex. D, ¶¶ 13-14.

DaJuan had a daughter named Jatair who is now 28 years old.  When Jatair was a baby, Jatair, DaJuan and Jatair's mother all lived with Joseph and Pamela for a time.  Joseph and Pamela were crazy to have a girl in the family and lavished affection on their granddaughter.

Joseph Dixon loved DaJuan Hodges.  He was proud that DaJuan was a good son who had become a good hard-working father to Jatair too.  Joseph Dixon was DaJuan Hodges' father, and DaJuan Hodges was Joseph Dixon's son, in every important sense of those words.  Joseph, Pam and Sherard feel the pain of losing DaJuan each and every day.  Ex. D, ¶¶ 16-17.

For all these reasons, Joseph Dixon should be awarded the full solatium award of $8.5 million otherwise awarded to parents of 9/11 decedents.

> **(b)    *Eric Johnson, Spouse Equivalent of Janice Brown***
>        **Presumptive Award: $12.5 Million**
>        **Requested Award: $12.5 Million**

Eric Johnson ("Eric") was the life partner of Janice J. Brown ("Janice"), and for the
reasons set forth below and in Eric's accompany Declaration annexed as Exhibit E to the
Goldman Declaration, Plaintiffs submit that Eric should be deemed the functional equivalent of
Janice's spouse.

Eric and Janice first met as classmates and friends in high school in Brooklyn.  Their
romance began when Janice returned to Brooklyn after college.  After a short time, Janice moved
in with Eric and in Eric's house on 38th Street in Brooklyn.  A few years later (in 1990) their son
Justin Johnson was born.  Ex. E, ¶¶ 1-3.

Eric worked as an electrician.  Janice worked as an accountant at Marsh & McLennan,
Inc. (the professional services firm).  Eric and Janice supported Justin and each other, and they
lived together as a happy family.  A few years later (in 1998) Janice's sister Dawn had a boy
named Kyle (Lewis).  Dawn was unable to care for Kyle because of her personal problems.  So
Eric and Janice took Kyle into their home and took care of Kyle as if he were their own son,
along with Justin.  Ex. E, ¶¶ 3-4.

After Janice's death on 9/11, Eric continued to care of both Justin and Kyle.  (Eric is also
the Administrator of Janice's estate.)  Today, Kyle is in the Navy, and Justin is a truck driver.
Ex. E, ¶ 4.

Although Eric and Janice did not get legally married, Eric called Janice his wife and
Janice called Eric her husband.  (When people had a special need to know, however, Janice or
Eric would explain that they were not legally married).  They sometimes spoke about having a
formal wedding, but still had not done so when Janice was killed.  They did everything a
husband and wife do.  They lived in the same home with their children.  They pooled their

finances.  They raised their boys together.  They spent their free time together, attended church together, and spent holidays and special occasions with each other's relatives.  Ex. E, ¶¶ 5-6.

The family specially enjoyed going together to the zoo, to amusement parks and to the beach at Riis Park.  A collection of family photographs is annexed as Exs. A-E to Ex. E.

Janice was the love of Eric's life and the mother of Eric's son, Justin.  Although not legally married, they regarded and treated each other as husband and wife.  They were fully committed to one another for life, and were married in every important sense.  Eric feels the pain of Janice's loss every day, and so do their boys, Justin and Kyle.

For all these reasons, Eric should be awarded the full spousal solatium damages award of $12.5 million otherwise awarded to spouses of September 11th decedents.

      (c)     ***Brian Wilkes, Spouse Equivalent of Lorraine Antigua***
                  **Presumptive Award: $12.5 Million**
                  **Requested Award: $12.5 Million**

Brian Wilkes was the fiancée and life partner of Lorraine Antigua ("Lorraine"), and for the reasons set forth below and in Brian's accompanying Declaration annexed as Exhibit F to the Goldman Declaration Plaintiffs submit that Brian should be deemed the functional equivalent of Lorraine's spouse.

Brian and Lorraine fell in love almost instantly.  They met in the spring of 1999 at, ironically enough, a going away party for Brian, who was moving from New Jersey to North Carolina.  They thought of themselves as engaged from the first night they met.  Ex. F., ¶¶ 2, 4.

Brian had intended to buy a home in North Carolina, but he put those plans on hold and rented a house because of his new relationship with Lorraine.  For a time, they visited each other in New Jersey and North Carolina.  Lorraine sometimes bought her children and her dog along to North Carolina.  Lorraine was reluctant to move to North Carolina full-time because she wanted her children to live in New Jersey near their father.  Because Lorraine found it difficult to move,

Brian resigned from his high-level position with General Electric in North Carolina and moved back to New Jersey in order to live with Lorraine and her children.  Brian believed this was the right thing to do because he and Lorraine planned to marry to have children and to grow old together.  Ex. F, ¶¶ 2-3.

Lorraine and Brian became officially engaged in October of 2000 and Brian gave Lorraine a diamond bracelet on their first anniversary.  All their friends and family were excited. They had not picked a wedding date by the time of Lorraine's death, but they knew it would be soon because Lorraine wanted to be done having children by the age of 35, which gave Brian and Lorraine three years.  Lorraine did not want to have a large wedding.  Brian and Lorraine planned instead to have a destination wedding in Las Vegas.  Ex. F, ¶¶ 3-4.

Brian moved into Lorraine's home and lived with Lorraine and her children as a happy family.  They shared household expenses and made financial decisions together.  Brian was close with Lorraine's children.  He took them to school and home again.  They walked the dogs together, grilled in the backyard together, watched movies, did household chores and celebrated Christmas and other holidays, all together as a family.  Ex. F, ¶¶ 5-6, 8. Lorraine and Brian were also close and visited each other's relatives.  Ex. F, ¶ 8.

Brian and Lorraine also enjoyed time together alone.  They vacationed together in Sandy Hook, the Outer Banks, and Cozumel, Mexico.  They enjoyed dining out and often went to What's Your Beef in Rumson, New Jersey.  Ex. F, ¶¶ 6-7.

Lorraine was working at Cantor Fitzgerald on September 11, 2001.  She called Brian and told him a plane had hit the building and that there was smoke and fire everywhere.  She promised to call again after she had left the building.  But the Tower collapsed.  Brian prayed that Loraine would be found alive, but that prayer went unanswered.  Ex. F, ¶ 9.

Following Lorraine's death, Brian received funds from Cantor Fitzgerald and the American Red Cross.  Family and friends also provided support.  For about a year after 9/11, Brian lived in Lorraine's house in New Jersey with Lorraine's mother and stepfather. Ex. F, ¶ 9.

On the morning of September 11, 2001, Brian Wilkes planned to marry and to have children with his life partner and the love of his life, Lorraine Antigua.  The terrorist attacks of September 11 killed Lorraine, destroyed Lorraine and Brian's happy life together, and laid waste to all those plans.  Lorraine was stolen away from Brian, and he feels the pain of her loss deep in his heart every day.  Brian and Lorraine shared their lives as committed partners and considered each other as family.  Ex. F, ¶¶ 9-11.

For all these reasons, Brian should be awarded the full spousal solatium damages award of $12.5 million otherwise awarded to spouses of September 11th decedents.

### C.     Punitive Damages

Plaintiffs are also entitled to punitive damages under the FSIA.  28 U.S.C. § 1605A(c)(4). In the *Havlish* Report and Recommendation on damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks."  ECF No. 2618 at 13 (quoting *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory).  ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See*, e.g., ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 and Exhibits A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

24

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF No. 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages. ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date. *See*, e.g., ECF No. 3666 (Judge Daniels' Order in *Burnett* authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### D.   Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001, until the date of judgment. ECF No. 2618 at 13-14. This Court, recognizing that prejudgment interest was appropriate in cases such as these cases, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used

in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *In re Sept. 11 Litig.*, 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks.  *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29.  Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims.  ECF No. 3384 at 6.  Thereafter, in *Burnett/Iran II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in *Hoglan* and *Burnett*, applying the 4.96 percent rate to prejudgment interest, the Moving Plaintiffs respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

III.     **CONCLUSION**

For all of the reasons herein, the Goldman Declaration, in the papers previously submitted to this Court in support of damages against Iran in this MDL, and as previously decided by this Court, the Plaintiffs respectfully request that this Honorable Court enter an Order:

(1)     determining that service of process by the Moving Plaintiffs was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants;[14] AND,

(2)     awarding the Moving Plaintiffs judgments as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *O'Neill*, *Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases;  AND,

(3)     Determining that:

a.  Joseph Dixon is the functional equivalent of a parent of DaJuan Hodges, who died in the Terrorist Attacks on September 11, 2001; AND,

b.  Eric Johnson is the functional equivalent of a spouse of Janice Brown, who died in the Terrorist Attacks on September 11, 2001; AND,

c.  Brian Wilkes is the functional equivalent of a spouse of Lorraine Antigua, who died in the terrorist attacks on September 11, 2001; AND,

---

[14] The service references and case information concerning service in this memorandum of law applies only for the plaintiff in this motion in the above-referenced 2018 matter.

(4)       awarding solatium damages to the Moving Plaintiffs in the amounts of $12,500,000 per spouse and $8,500,000 per parent, as set forth in annexed Exhibits A; AND,

(5)       awarding the Moving Plaintiffs pre-judgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

(6)       granting the Moving Plaintiffs permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

(7)       granting permission for all other Plaintiffs in these actions not appearing in annexed Exhibits A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

(8)       granting to the Moving Plaintiffs such other and further relief as this Honorable Court deems just and proper.

Dated:    New York, New York                Respectfully submitted,
          June 30, 2022

                                            /s/ Jerry S. Goldman
                                            ANDERSON KILL P.C.
                                            Jerry S. Goldman, Esq.
                                            Bruce E. Strong, Esq.
                                            Hon. Ethan Greenberg (Ret.)
                                            Alexander Greene, Esq.
                                            1251 Avenue of the Americas
                                            New York, NY 10020
                                            Tel: (212) 278-1000
                                            Fax: (212) 278-1733
                                            Email:  jgoldman@andersonkill.com
                                                    bstrong@andersonkill.com
                                                    egreenberg@andersonkill.com
                                                    agreene@andersonkill.com
                                            *Attorneys for Plaintiffs*

docs-100500859.1