# Exhibit 1

This is a reproduction of a library book that was digitized by Google as part of an ongoing effort to preserve the information in books and make it universally accessible.

Google™ books

https://books.google.com



Am35²

S3.31/5:
AM 35/2
FED
DOCS

STANFORD
LIBRARIES



Docket Nos. 504, 173, and 540

# Before the Mixed Claims Commission, United States and Germany, Organized Under the Agreement of August 10, 1922, Between the United States and Germany

THE UNITED STATES OF AMERICA ON BEHALF OF
AMERICAN CONGO COMPANY, H. HERRMANN MANU-
FACTURING COMPANY, A. KLIPSTEIN AND COM-
PANY, CLAIMANTS,

*v.*

GERMANY

REPLY BRIEF OF THE UNITED STATES ON THE
QUESTION OF THE RIGHT OF AN AMERICAN COR-
PORATION TO RECOVER FULL COMPENSATION FOR
LOSSES SUSTAINED BY IT REGARDLESS OF THE
NATIONALITY OF THE OWNERS OF A MAJORITY
OR ALL OF THE CAPITAL STOCK OF THE COR-
PORATION

ROBERT W. BONYNGE,
*Agent of the United States.*

WASHINGTON : GOVERNMENT PRINTING OFFICE : 1924



S3.31/5:
AM 35/2
FED
DOCS

STANFORD
LIBRARIES



Docket Nos. 504, 173, and 540

# Before the Mixed Claims Commission, United States and Germany, Organized Under the Agreement of August 10, 1922, Between the United States and Germany

THE UNITED STATES OF AMERICA ON BEHALF OF AMERICAN CONGO COMPANY, H. HERRMANN MANUFACTURING COMPANY, A. KLIPSTEIN AND COMPANY, CLAIMANTS,

*v.*

GERMANY

REPLY BRIEF OF THE UNITED STATES ON THE QUESTION OF THE RIGHT OF AN AMERICAN CORPORATION TO RECOVER FULL COMPENSATION FOR LOSSES SUSTAINED BY IT REGARDLESS OF THE NATIONALITY OF THE OWNERS OF A MAJORITY OR ALL OF THE CAPITAL STOCK OF THE CORPORATION

ROBERT W. BONYNGE,
*Agent of the United States.*

WASHINGTON : GOVERNMENT PRINTING OFFICE : 1924

Digitized by Google

**Before the Mixed Claims Commission, United States and Germany, Organized Under the Agreement of August 10, 1922, Between the United States and Germany**

| | |
|---|---|
| THE UNITED STATES OF AMERICA on behalf of American Congo Company, H. Herrmann Manufacturing Co., A. Klipstein & Company, claimants, *v.* GERMANY | List No. 3029, Docket No. 504; List No. 2287, Docket No. 173; List Nos. 11852 and 12372, Docket No. 540 |

**REPLY BRIEF OF THE UNITED STATES ON THE QUESTION OF THE RIGHT OF AN AMERICAN CORPORATION TO RECOVER FULL COMPENSATION FOR LOSSES SUSTAINED BY IT REGARDLESS OF THE NATIONALITY OF THE OWNERS OF A MAJORITY OR ALL OF THE CAPITAL STOCK OF THE CORPORATION**

### I. THE ATTITUDE OF GERMANY ON THE QUESTION INVOLVED

In the brief filed herein by the German Agent the position is taken by Germany that the "property of American corporations, as such, is not protected by the Treaties of Berlin and Versailles."

This attitude of Germany differs from that which the Agent of the United States understood to be the

2174—24——1

2

position of Germany on the question of the right of the United States to present claims on behalf of American corporations and of the jurisdiction of this Commission to enter awards in favor of the United States on behalf of American corporations as claimants.

At the time the opening brief was filed herein by the Agent of the United States it was his understanding that Germany contended that American corporations were only entitled to an award for an amount proportionate to the interests of American citizens in such corporations, and further, in the event the record disclosed that the major part of the stock of an American corporation was held and owned by aliens, such corporation was not entitled to an award herein as an American national.

The German Agent now boldly challenges the *jurisdiction* of this Commission to entertain a claim presented by the United States on behalf of *any* American corporation on the ground that the jurisdiction of this Commission is confined to claims presented on behalf of "natural persons, citizens of the United States," for the reason that the Treaties of Berlin and Versailles "protect exclusively the property of natural persons, citizens of the United States."

The suggestion made by the German Agent that "for reasons of expediency" claims may be presented and awards entered in favor of the United States on behalf of American corporations "for the

Digitized by Google

3

proportionate part of the loss sustained representing the stock continuously owned by American stockholders from the time of loss until the presentation of the claim" can not be entertained as it is beyond the power of the German Agent, or of the Agents of the United States and Germany, by stipulation or agreement, to extend in the slightest degree the jurisdiction of this honorable Commission.

If the contention of the German Agent be sound then it follows that all awards heretofore entered in favor of the United States on behalf of American corporations are void and the question of jurisdiction may be raised by Germany at any time. Moreover, the Government of the United States does not desire to present a claim on behalf of an American corporation, as such, as a "matter of expediency." The Government of the United States asserts the right to present a claim on behalf of American corporations, as such, on the ground that such corporations are American nationals and that their property is fully protected by the Treaty of Berlin.

The Agent of the United States therefore presents the claims of American corporations as a matter of right and respectfully asks the consideration of such claims by this honorable Commission on that basis and only on that basis.

Digitized by Google

4

## II. THE JURISDICTION OF INTERNATIONAL TRIBUNALS OVER CLAIMS PRESENTED ON BEHALF OF CORPORATIONS

The Agent of the United States recognizes that the right of the United States to present a claim on behalf of a corporation, as such, is in the final analysis dependent upon the applicable provisions of the Treaties of Berlin and Versailles as understood by the high contracting parties and as construed in accordance with established rules and precedents.

It is doubted whether a more concise and at the same time comprehensive statement of the jurisdiction of international tribunals of claims on behalf of corporations can be found than in Professor Edwin M. Borchard's work entitled "Diplomatic Protection of Citizens Abroad," from which work the German Agent has also quoted with approval.

Professor Borchard, at page 623 of his work, states the rule in the following language:

> International tribunals which have passed upon the matter have held in many cases that the nationality of the corporation and not of its stockholders governs the jurisdiction of the Commission. On the other hand, citizens of the claimant government, stockholders in, or representing as liquidator a solvent corporation formed under the laws of the defendant government, were denied standing before arbitral Commissions when attempting to enforce a corporate claim. That the nationality of the corporation rather than that of the stockholders must control the jurisdiction of inter-

Digitized by Google

5

national tribunals in claims growing out of corporate losses appears evident from the fact that the corporation, the trustee, possesses the entire legal and equitable title to a claim as a part of the assets of the corporation, whereas the stockholder possesses only an equitable right, enforceable in a court of equity, to an accounting and to compel the proper management of the Company by its directors. The stockholder, therefore, having no legal title to the corporate property of a solvent corporation, can hardly be recognized by an arbitral tribunal, acting under the usual form of protocol as a proper party claimant, and only under exceptional protocols, as will presently be noticed, has this been done. While it is possible for a government, therefore, to prosecute the claim of a national corporation from which foreign stockholders will indirectly derive a benefit, "the inconvenience on the one hand," as was said by the Supreme Court (*U. S.* v. *Northwestern Express Co.*, 164 U. S. 686), "is completely destroyed by the overwhelming preponderance of inconvenience which would exist on the other; for, doubtless, whilst the alien corporator may be an exception, the corporator who is both a citizen of the state and a citizen of the United States, is the rule. To follow the argument, therefore, would make the exception dominate and destroy the rule."

The general rule, as stated by Professor Borchard, is fully supported by the authorities cited by him and numerous other authorities.

Digitized by Google

6

This general rule is also clearly stated in the *Baasch and Romer* case before the Venezuelan Mixed Claims Commission in the following terse language:

> The jurisdiction of an international claims commission over the claims of a corporation is controlled by the nationality of the corporation and not by the nationality of the stockholders. (Venezuelan Arbitrations of 1903, Ralston's Report, page 906.)

Mr. Charles Cheney Hyde in his work entitled "International Law Chiefly as Interpreted and Applied by the United States," at page 486, Section 278, expresses the same rule in the following language:

> It is declared to be well established that a government may intervene in behalf of a company incorporated under its laws, or under the laws of a constituent state or province. In such case the act of incorporation is considered as clothing the artificial person thereby created with the nationality of its creator, without regard to the citizenship of the individuals by whom the securities of the company may be owned.

### III. RULES GOVERNING THE CONSTRUCTION AND INTERPRETATION OF TREATIES

In order to ascertain the intention of the high contracting parties to a treaty, it frequently becomes necessary to construe the provisions of a treaty and to interpret particular terms used therein. For the guidance of those charged with such responsibility certain rules of construction and interpretation have

Digitized by Google

7

become well established. Among such rules may be mentioned the following:

(a) In general it may be said that the same rules are adopted for the construction of treaties as are applicable in the construction of statutes, contracts, and written instruments generally. (Taylor, International Public Law, page 395.)

(b) As the primary object of all construction is to discover the common thought in which the minds of the contracting parties met, the entire instrument containing the agreement, no matter whether a contract between individuals or a treaty between nations, must be taken as a whole and considered according to the fair and reasonable acceptance of the terms in which it is expressed. (Taylor International Public Law, page 396.)

(c) A treaty should be interpreted in the spirit of *uberrima fides* and in a manner to carry out its manifest purpose. (*Tucker* v. *Alexandroff*, 183 U. S. 424.)

(d) Where a treaty admits of two constructions, one restrictive as to the rights that may be claimed under it and the other liberal, the latter is to be preferred. (*Hauenstein* v. *Lynham*, 100 U. S. 483.)

(e) It is taken for granted that the contracting parties intend something reasonable, something adequate for the purpose of the treaty, and something not inconsistent with generally recognized principles of international law and with previous treaty obligations towards third States. (Oppenheim International Law, Vol. 1, page 702.)

Digitized by Google

8

(*f*) It is to be taken for granted that the parties intend the stipulations of a treaty to have a certain effect and not to be meaningless. Therefore, an interpretation is not admissible which would make a stipulation meaningless or ineffective. (Oppenheim International Law, Vol. 1, p. 702.)

### IV. THE TREATIES OF BERLIN AND VERSAILLES CONSTRUED AND INTERPRETED IN THE LIGHT OF ESTABLISHED PRECEDENTS AND RULES

It is contended by the Agent of the United States that a fair and reasonable construction of the provisions of the Treaty of Berlin make it manifest that it was the purpose of the high contracting parties that the Government of Germany should be financially obligated for all damage done to the property of the "nationals" of the Allied and Associated Powers. It would not be possible otherwise to interpret the Treaty in the spirit of *uberrima fides* and in a manner to carry out its manifest purpose. Any other interpretation of the language used in certain provisions of the Treaty, as will later be demonstrated, would make such provisions meaningless and ineffective.

### (*a*) *Section 5 of the Knox-Porter Resolution*

Accepting as correct the statement regarding the persons protected by Section 5 of the Knox-Porter Resolution as made by the German Agent at page 24 of his brief, which is as follows: "all persons, wheresoever domiciled, who owe permanent allegiance to the United States of America," and construing that language in the light of established

9

rules and precedents, the American Agent submits that the properties of American corporations are protected thereby and that American corporations, as such, may present claims and have awards made to the United States in their favor.

"Persons" include natural persons and artificial persons. A corporation is an artificial person.

Blackstone defines persons as follows: "Persons are divided by law into natural persons or artificial. Natural persons are such as the God of nature formed us. Artificial are such as are created and devised by human laws for the purpose of society and government and are called corporations or bodies politic." (1 Blackstone Com., 23.)

A corporation has a domicile. The domicile of a corporation is the place, city, town, or district where its principal office or place of business is located. (*Ex Parte Schollenberger*, 96 U. S. 369; *Galveston H. & S. A. Rway. Co.* v. *Gonzales*, 151 U. S. 496; *Fairbanks* v. *Wills*, 240 U. S. 642.)

The domicile of a corporation under American law is the place or principal office of the company as established by its charter. This also appears to be the German law. In Young's "Foreign Companies and Other Corporations" a chapter is devoted to the subject of "The Nationality and Domicile of Corporations," and on page 148 the author makes the following statement: "The opinion has been maintained, especially by German jurists, that the domicile of a juristic person may be fixed once and for

Digitized by Google

10

all by the constituting documents and that the place therein named remains its domicile wherever its scene of operations or its centre of administrative business may afterwards come to be."

A corporation is not only a person having a domicile but it owes allegiance to the state that created it. It would be anomalous to hold that a corporation did not owe allegiance to its creator.

Mr. Justice Story in *Inglis* v. *Sailors Snug Harbour*, 3 Pet. 155, defined allegiance to be "nothing more than the tie or duty of obedience of a subject to the sovereign under whose protection he is." That a corporation is a subject or citizen of the state that created it and owes obedience to its laws will hardly be disputed.

The duty of allegiance can not be held to be the duty of bearing arms or the right to vote. The duty of bearing arms is only imposed upon a limited number of the citizens of any country. Old and infirm persons are always exempt from such duty. The right to vote is conferred upon such citizens as each nation may determine to be for its own interests.

The corporation owes obedience to the laws of the nation creating it exactly as an individual owes allegiance to the country of his birth. If a corporation violates the laws of the state that created it, it is subject to have its life forfeited by the annulment of its charter. It pays taxes to the support of the government that created it for the protection that it receives from such government.

Digitized by Google

11

In the case of *Hale* v. *Henkel*, 201 U. S. 43, at page
74, the United States Supreme Court said:

> Upon the other hand, a corporation is a
> creature of the State. It is presumed to be
> incorporated for the benefit of the public. It
> receives certain privileges and franchises and
> holds them subject to the laws of the State
> and the limitations of its charter. Its powers
> are limited by law. It can make no contract
> not authorized by its charter. Its rights to
> operate as a corporation are only preserved to
> it as long as it obeys the laws of its creation.

In this case it was also held that although a cor-
poration is organized under the laws of a particular
state of the Union, it is also subject to the laws of
the United States. The Court said:

> Being subject to this dual sovereignty, the
> General Government possesses the same right
> to see that its own laws are respected as the
> State would have with respect to the special
> franchises vested in it by the laws of the State.

Thus a corporation is a person having a domicile
and owing allegiance to the state that created it,
and its property is protected under the language of
Section 5 of the Knox-Porter Resolution.

### (b) *Section 2 of the Knox-Porter Resolution*

Section 5 of the Knox-Porter Resolution is not the
only section of that Resolution that is applicable to
the question under consideration. The whole Reso-
lution must be construed in order to interpret any
part of it.

Digitized by Google

12

Section 2 of said Resolution, which is incorporated in the Treaty of Berlin, reads as follows:

> That in making this declaration, and as a part of it, there are expressly reserved to the United States of America and its nationals any and all rights, privileges, indemnities, reparations, or advantages, together with the right to enforce the same, to which it or they have become entitled under the terms of the armistice signed November 11, 1918, or any extensions or modifications thereof; or which were acquired by or are in the possession of the United States of America by reason of its participation in the war or to which its nationals have thereby become rightfully entitled; or which, under the treaty of Versailles, have been stipulated for its or their benefit; or to which it is entitled as one of the principal allied and associated powers; or to which it is entitled by virtue of any Act or Acts of Congress, or otherwise.

It would be difficult to frame language that would be more sweeping or inclusive to reserve and protect the rights of American nationals. The rights of American nationals to reparations and indemnities, together with the right to enforce the same, are expressly reserved to American nationals by the language of Section 2.

That the nationality of a corporation is that of the government under whose laws it is created, it is submitted, has been abundantly established by the authorities hereinbefore cited. It appears to be ad-

Digitized by Google

13

mitted by the German Agent that this is the Anglo-American law.

In J. W. Scobell Armstrong's work on "War and Treaty Legislation," on page 10, the following statement is made of Germany's attitude on this question in its war legislation:

> The nationality of a limited company, or other association constituting a juridical person under German Law, depended for the purposes of this legislation not upon the ownership of the shares but upon the country in which the association was incorporated and had its head office. If it was incorporated in an enemy country, it was treated as an enemy national, even if the shares were entirely in neutral hands. If, on the other hand, it was incorporated in a neutral country, then, even though the whole of its shares were in enemy hands, it was treated as a nonenemy national, and its property in Germany was neither notifiable nor under embargo.

Thus it would appear that both high contracting parties to the treaty regarded a corporation as having the nationality of the State under whose laws it was incorporated.

*(c) Subdivision 9 of Annex I of Article 232 of the Treaty of Versailles*

By this section of the Treaty compensation may be claimed from Germany in respect of "damage of all property, wherever situated, belonging to any of the Allied or Associated Powers or their nationals," etc.

2174—24——3

Digitized by Google

14

By this section of the Treaty the specific right is given to the Allied and Associated Powers to demand compensation in favor of the nationals of any such Powers whose property has been damaged or destroyed by an act for which Germany is financially obligated.

The German Agent, in his brief on page 31, makes the following statement in reference to this section: "Unfortunately, the Treaty fails to give a definition of what, unless analyzed, might be deemed the ambiguous term 'national' either generally or with regard to the provisions here under consideration, but seems to presume that this term has a uniform generally acknowledged significance."

If the term "national," as used in this section, can be construed as ambiguous, it would be the duty of the Commission, in accordance with the general rules of interpretation, as has been shown herein, to give the word a liberal interpretation and, if the provisions of the Treaty referred to were capable of two constructions, one restrictive as to the rights that might be claimed under it and the other liberal, the latter should be preferred.

The quotations from the Treaty of Versailles by the German Agent on page 31 of his brief demonstrate that wherever the word "national" was intended to have a restrictive meaning some words were used to indicate the restriction, such as "over eighteen years of age," or else it is clear from the text that the word is to be given a restrictive meaning. The Agent of the United States contends that,

Digitized by Google

15

applying the established rules of interpretation to the word "national," it is to be given a broad and liberal interpretation except in cases where the text shows that a restrictive meaning was intended or where there are some words used in connection with the word "national" indicating that only nationals of a certain class are to be included.

*(d) Paragraph 4 of the Annex following Article 297 of the Treaty of Versailles*

This paragraph subjects the property of German "nationals" and the proceeds thereof to the payment of amounts due in respect of claims of the "nationals" of the Allied and Associated Powers. Again the word "national" is used in its broad and comprehensive sense. There is nothing either in the text of this paragraph or in its language to indicate that it was intended to have a restrictive meaning.

It is argued by the German Agent that the clause "including companies and associations in which they are interested" and the similar phrase used in other sections of the Treaty demonstrate that "the framers of the Treaty of Versailles thought it necessary to protect the investments of Allied and Associated citizens in corporations, which would have been superfluous (at least with regard to Allied and Associated corporations) if corporations, as such, were covered by the term "nationals."

The fact that the Treaty of Versailles gives the right to the stockholders of a corporation, as such,

Digitized by Google

16

to make claim for their individual loss, in addition
to the right that the corporation has to make claim
for damage to its property, can not be held in any
sense to take away the right that the corporation has,
as a national of the claimant government, under the
terms of the Treaty.

The right of a stockholder to make claim for the
loss he has sustained by reason of damage done to
the property of a corporation in which he is inter-
ested as a stockholder will be later discussed.

The phrase "including any company or associa-
tion in which they are interested" was evidently
placed in the Treaty for the purpose, as stated by the
German-English Mixed Arbitral Tribunal in the case
of *Weiss-Biheller and Brooks, Ltd.*, v. *Germany* (cited
by the German Agent), to protect the rights of an
Allied or Associated stockholder or debenture holder
in any corporation which might be technically con-
sidered as a German national.

During the war, owing to the great growth of
corporations and the diversified national ownership
of the stock of large corporations, it was found neces-
sary in framing legislation designed to capture the
property of enemies to provide that the stock of
such corporations owned by enemies could be cap-
tured irrespective of the nationality of the corpora-
tion. The individual stockholder in such companies
had an interest which could be reached, although the
entire property of the corporation might not be
subject to capture and it was recognized that it
might be, and frequently was, the case that the

Digitized by Google

17

stock of a corporation organized under the laws of the capturing State was owned by an enemy and was therefore subject to seizure.

This is an entirely different question from that which is presented by the claims under consideration. This is the question of the right of a claimant government to present a claim in behalf of a corporation organized under its laws and, therefore, one of its nationals. Each nation, it will be admitted, has a right to determine for itself what claims it will espouse. It might well be that a government, for reasons of its own, would not care to espouse a claim of a corporation organized under its laws. This is a matter that rests entirely within the discretion of each state or nation. It might thus happen that a corporation of an Allied or Associated Power might have a just claim against Germany under the terms of the Treaty which one of the Allied or Associated Powers, in the exercise of its discretion, did not care to espouse. At the same time, it is entirely possible that individual stockholders, nationals of the Allied or Associated Power under whose laws such corporation was organized, had a just claim for the losses they individually sustained and which their government was willing to espouse in their behalf. This apparently is the reason why there is given to stockholders the additional right to present claims in their own behalf, but the giving of this right to the stockholders can not be held to take away any right that the corporation, as such, had.

Digitized by Google

18

*(e) The word "national" as used in Section 296 of the Treaty of Versailles has been interpreted to include corporations*

The case of *Chamberlain and Hookham, Limited, v. Solar Zahlerwerke G. M. B. H.* (Recueil Des Decisions des Tribunaux Arbitraux Mixtes, vol. I, p. 722) was a case in which the creditors sought to recover a balance due in respect of goods sold to the debtor company. The creditors held the whole capital of the debtor company. It was argued on behalf of the latter that the creditors and debtors being in reality the same persons could not claim against each other, and that since the creditors had created the debtor company for the sale of their products in Germany, controlling its operation and receiving the profits thereof, the debtor company could not be considered as a German national although it was in fact a registered German corporation. The case of the *Société du Chemin de Fer de Demas-Hamah* v. *the Compagnie du Chemin de Fer de Bagdad* (Franco-German Mixed Arbitral Tribunal) was cited in support of this contention.

Held:

> (*a*) That the debtor company was a separate juridical entity, a view which was confirmed by the fact that if it had been liquidated the creditors could not have been made liable for its debts, whereas they would, on the other hand, have been admitted as its creditors;

Digitized by Google

19

(*b*) That, although the doctrine which attributes to a juridical person the nationality of the state under whose laws it is created and within whose territory it has its seat might have been shaken during the War, the intention of the High Contracting Parties had clearly been to affirm that doctrine and to include in the term "nationals" of a state, for the purposes of Article 296, companies incorporated under the laws of such state, a fact which was evidenced by paragraph 2 of the Treaty of Peace Order and Article 5 of the Anmeldungsbekanntmachung zum Reichsausgleichsgesetz of 30th April, 1920 (1);

(*c*) That the debtor company must therefore be considered as a German national and that the creditors were entitled to recover.

The note (1) referred to reads as follows:

The following shall also for the purposes of this Decree be treated as German nationals: juridical persons under private or public law, and trading associations of other kinds which have their place of business within the territory of the Empire, and are constituted under the law of the Empire or under the law of a German State.

The following shall also for the purposes of this Decree be treated as nationals of the respective States specified in Article I: juridical persons under private or public law and trading associations of other kinds which have their place of business within the territory of any such State and are constituted under

Digitized by Google

20

the law of any such State (with the exception of the said States themselves).

The following shall be treated as resident within a territory for the purposes of this Decree: those natural persons who have their domicile in such territory or, in so far as regards claims or obligations which have arisen in the course of their trade, have their principal trading establishment within such territory, and likewise juridical persons or trading associations of other kinds which have their place of business within such territory * * *.

(f) *If the word " national" should be given the re-stricted meaning contended for by the German Agent, the provisions of Sections 2 and 5 of the Knox-Porter Resolution and of Subdivision 9 of Annex to Article 232 of the Treaty of Versailles, as well as of Para-graph 4 of the Annex following Article 297 of the Treaty of Versailles, would become ineffective in the case of large corporations having thousands and tens of thousands of stockholders*

It is said that there are one hundred thousand owners of the common stock of the United States Steel Corporation. Many other large American corporations have tens of thousands of stockholders. Following out logically the argument of the German Agent the result would be, in case the property of any of these large corporations was damaged by an act for which Germany is financially obligated, it would be necessary for each stockholder to file his individual claim, establish his American nationality,

Digitized by Google

21

and also establish the individual loss which he has
sustained. If the claim presented was small, an
individual stockholder, owning one or a few shares,
would be entitled to an award for an infinitesimal
fraction of a cent. It would thus become necessary
for this Commission to practically liquidate all such
corporations, because the Commission could not de-
termine the amount of the losses sustained by an
individual stockholder without ascertaining the finan-
cial condition of the company in which he was a
stockholder. This Commission can only determine
the damage done to an individual stockholder by
first ascertaining what his interest is in the corpora-
tion and that, in turn, can only be determined by
ascertaining the assets and the liabilities of the corpora-
tion. If the corporation's assets were not sufficient
to pay its debts, then the individual stockholder has
not sustained any loss, but the creditors of the com-
pany are the parties who have sustained the loss.
The right of an individual stockholder in the property
of a corporation is only to his proportionate part of
the surplus after the payment of debts. To con-
strue the provisions of the Treaty above referred to
in the manner contended for by the German Agent
would be to make those provisions "meaningless and
ineffective." It would lead to a "reductio ad ab-
surdum." "For," as said by the Supreme Court of
the United States in the case of the *United States* v.
*Northwestern Express Company*, supra, "as the legal
title to the property of a corporation is generally in

Digitized by Google

22

a corporation, claims for damages to such property could not be presented in the names of the several stockholders. To deny relief to such a corporation would be practically therefore to refuse redress to citizens of the United States."

The learned German Agent, apparently recognizing the impossibility of carrying his argument to its logical conclusion, proposes, contrary, it is submitted, to the terms of the Treaty, that the corporation may be permitted to present the claim in its own behalf, but only as trustee for the stockholders, thus attempting by stipulation to extend the jurisdiction of this Commission, which it is contended can not be done.

If the claim is presented by the corporation, then, according to the argument of the German Agent, the corporation is required to prove the American nationality of the owner of each share of its stock at the time the corporation sustained the losses for which the claim is filed and the continuous American ownership of such stock up to the time the claim is presented. This requirement would equally render the provisions of the Treaty above referred to "meaningless and ineffective." It would be an impossibility for the large American corporations to comply with such a requirement. The parties never could have contemplated that the Treaty would be so construed or interpreted. The Agent of the United States does not overlook the fact, as suggested by the German Agent, that the same requirements of proof must be made in regard to American stockholders in

Digitized by Google

23

foreign corporations.  It is not difficult for an individual stockholder in the rare case where he may, under special circumstances, present a claim in his own behalf, to prove his nationality and the ownership of his stock from the time the loss was sustained up to the time the claim is filed.  It is an entirely different proposition, however, for the corporation to prove the American ownership of each share of its stock at the time the corporation sustained the loss and up to the time the claim is filed.

### V. THE JURISDICTION OF THE COMMISSION OVER CLAIMS PRESENTED ON BEHALF OF STOCKHOLDERS IN CORPORATIONS

The right is given expressly by the terms of the Treaty of Berlin to stockholders in corporations to have their claims presented for them individually. This is an additional right to that which is given to the American corporation as an American national. It was given evidently to meet war legislation which in different countries authorized the seizure of the interest of a stockholder in a corporation.  It protects the rights of stockholders in foreign companies, as well as in American companies, in the event that the Government of the United States should for any reason determine not to espouse the claim of an American corporation.  This is a somewhat unusual provision, and it is recognized that it may be very difficult for individual stockholders, except in cases where one company owns the entire capital stock of another company, to establish the amount of the

Digitized by Google

24

loss sustained by them. Claims of this character have heretofore, only under exceptional circumstances, been considered by international tribunals. There are scarcely more than a half dozen such cases that can be cited and in each of them there was some peculiar circumstance which justified making the award to the individual stockholder, such as the dissolution of the company in which the individual held stock, or some other controlling consideration. In the case in which a stockholder was authorized to recover it was held that it was necessary for him to establish the extent of his loss, and if he failed to do so the tribunal was without authority to make an award in his favor. This was the result in the case of *Kunardt and Company*, decided by the Venezuelan Arbitration of 1903 (United States and Venezuelan Claims Commission, Morris Report, 1904, p. 199–200). In this case Commissioner Bainbridge held as follows:

> The value of the corporate shares and the extent of the shareholder's interest in the corporate property are absolutely dependent upon the relation which the assets of the corporation bear to its liabilities. The absence of such a showing in this case renders impossible the determination of Kunardt & Co.'s interest in the concession or the amount of loss they have sustained by its annulment. The claim must, therefore, be here disallowed, but without prejudice to the corporation, its creditors

25

and stockholders, or to the interests of these claimants therein.

The Spanish Treaty Claims Commission was not an international claims commission. It was a commission appointed by the United States for the purpose of adjudicating the claims of citizens of the United States against Spain, which the United States agreed to adjudicate and settle by the terms of the Seventh Article of the Treaty between Spain and the United States, dated December 10, 1898. In the corporation cases coming before that Commission the United States did contend that in the exercise of the equitable powers of the Commission it had the right and power to make such order as would protect the United States against liability to Spanish subjects whose claims were expressly released by their own Government. The Commission decided that a corporation might prosecute a claim to adjudication and reserved the right to determine on final consideration, in case a claim was established, whether any part of the award should inure to the benefit of a stockholder, who as an individual could not have prosecuted a claim to adjudication. Notwithstanding this contention of the Government of the United States and the decision of the Commission, no reduction was finally made from awards to American corporations because of the alien ownership of some of the shares of the stock of an American corporation. (Borchard's Diplomatic Protection of Citizens Abroad, p. 625.)

Digitized by Google

26

The right of stockholders in foreign or American corporations to have claims presented in their behalf individually is not directly involved in the claims now before this Commission and it is not necessary at this time to determine the quantum of proof that may be required in such claims before an award can be entered. It is enough for the present purpose to demonstrate, as it is considered has been done, that the right thus given to the American stockholders does not detract in any way from the right which American corporations have, as American nationals, to have their claims presented in their own name for the losses they have sustained to property to which they and they alone have title.

The Agent of the United States, therefore, respectfully submits that a fair and reasonable interpretation of the Treaties of Berlin and Versailles, including the provisions of the Knox-Porter Resolution therein incorporated, and to which reference has heretofore been made, demonstrates that it was the intention of the High Contracting Parties that the Government of Germany should make complete satisfaction for all claims of the "nationals" of the "Allied and Associated Powers" and that the word "national" as used in said Treaty (except where the text shows clearly a restrictive meaning was intended) should be interpreted to include corporations organized under the laws of the claimant government, regardless of the nationality of the stockholders of the company, and in accordance with the generally accepted rules and

Digitized by Google

27

precedents governing the interpretation of that term as used in treaties. In no other way can the Treaty be rendered effective to carry out the manifest intention of the High Contracting Parties.

Respectfully submitted.

ROBERT W. BONYNGE,
*Agent of the United States.*

O

Digitized by Google

Digitized by Google

Digitized by Google



Stanford University Libraries

3 6105 113 721 687