UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |
|---|---|

This document relates to:

*Ashton et al. v. al Qaeda Islamic Army*, *et al.*, 02-cv-6977 (GBD)(SN)

## The *Ashton 24* Wrongful Death Plaintiffs' Motion for Final Judgments

For the reasons set forth below, and the statements contained in the declaration of James P. Kreindler, Esq. ("Kreindler Declaration") and exhibits thereto, those *Ashton* Plaintiffs set forth in Exhibits A, B and C to the Kreindler Declaration ("*Ashton 24*"),[1] by and through their counsel, Kreindler & Kreindler LLP, respectfully move this Court for an Order:

1) Awarding those Plaintiffs set forth on Exhibit A to the Kreindler Declaration economic loss to damages as supported by the expert analysis and reports attached to the Kreindler Declaration;

2) Awarding those Plaintiffs set forth on Exhibits B and C to the Kreindler Declaration solatium damages for the losses they suffered as a result of the deaths of their immediate family members (Exhibit B) or functional equivalents (Exhibit C) in the September 11, 2001 terrorist attacks in the amounts previously awarded by this Court;

3) Awarding the *Ashton 24* Plaintiffs pre-judgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages;

---

[1] Prior motions were delineated by roman numerals, but that led to certain numbers being inadvertently repeated. To try to avoid this error, we have now shifted to the use of Arabic numbers to identify each group of movants.

1

    4)     Granting the *Ashton 24* permission to seek punitive damages and any other appropriate damages at a later date;

    5)     Finding that service of process was properly effected upon the Islamic Republic of Iran ("Iran") in accordance with 28 U.S.C. § 1608(a) for sovereign defendants; and,

    6)     Granting permission for all other plaintiffs in this action not appearing on Exhibits A, B or C to the Kreindler Declaration to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

This motion is made on behalf of the claimants listed in Exhibits A, B and C attached to the Kreindler Declaration (*Ashton 24* Plaintiffs), in light of this Court's previous order granting permission to allow remaining plaintiffs in the case to move for this relief. *See* ECF No. 3300.[2]

As the awards set forth in the proposed order represent the only direct recovery against Iran on behalf of the *Ashton 24* Plaintiffs listed in Exhibit A to the Kreindler Declaration, the proposed order will constitute final awards and judgments against Iran for those plaintiffs listed in Exhibit A to the Kreindler Declaration.

## I.    Procedural Background

On September 4, 2002, the *Ashton* Plaintiffs filed their first complaint against the sponsors of the September 11, 2001 terrorist attacks, which included allegations against Iran. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 1. Plaintiffs, both United States nationals and non-nationals, asserted federal jurisdiction pursuant to, among other things, the Alien Tort Statute (28 U.S.C. § 1350) ("ATS"), the Foreign Sovereign Immunities Act (28 U.S.C. § 1605(a)) ("FSIA") and the Torture Victim Protection Act (28 U.S.C. § 1350 note) ("TVPA"). *Id.* at 28, 39 – 40, 43, 48. Iran

---

[2] References to the 03-md-1570 docket entries will be noted only by the ECF document number. Any reference to a prior Order or filing on a different docket will include that docket number as well as the ECF document number.

was listed as a named defendant in the *Ashton* Plaintiffs' Consolidated Amended Complaint, filed on March 6, 2003, with the same jurisdictional assertions. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 11-2 at 17, ECF No. 11-5 at 45 - 49.  This Consolidated Amended Complaint (the "CAC") was served in compliance with FSIA requirements through diplomatic channels, but Iran has never answered. *See* 02-cv-6977 (S.D.N.Y.), ECF No. 424 at 2; *see also* 02-cv-6977 (S.D.N.Y.) ECF No. 358.  The *Ashton* Plaintiffs moved for a Certificate of Default, which the Clerk of the Court issued. *See* 02-cv-6977 (S.D.N.Y.), ECF No. 651.

At the time that the CAC was first filed against Iran, the FSIA functioned as a pass-through statute, denying immunity for claims arising from certain acts of terrorism or material support for terrorism if the United States had designated the foreign sovereign a state sponsor of terrorism, thus allowing a plaintiff to pursue a claim in the federal courts in suits against a nation-state that had been officially designated a state-sponsor of terrorism, such as Iran. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221(a), 110 Stat. 1214, 1241.  The substantive causes of action detailed in the CAC were for common-law wrongful death based on intentional murder, survival damages and injuries and assault and battery; violation of the Anti-Terrorism Act (18 U.S.C. § 2333); violation of the TVPA; and violation of the FSIA. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 11-5 at 245 – 50.

Based on evidence and arguments submitted by various plaintiffs in this consolidated multi-district litigation arising out of the September 11, 2001 terror attacks, the *Ashton* Plaintiffs moved for a judgment of liability against Iran for claims arising out of the deaths of the plaintiffs' decedents. ECF No. 3008.  In their motion for a liability default judgment, the *Ashton* Plaintiffs relied on the Certificate of Default entered in the *Ashton* case, which was premised on the CAC that Iran had never answered. ECF No. 2970 at 2.  They then moved for a default

judgment of liability against Iran only as to those causes of action established under the FSIA. ECF No. 2970 at 2, 10 – 18. This Court granted that motion for a default judgment of liability. ECF No. 3014.[3]

Thereafter, the *Ashton* Plaintiffs moved for partial summary judgment for the conscious pain and suffering that victims murdered on September 11, 2001 suffered before death, which this Court granted, and certain *Ashton* Plaintiffs moved for default judgments on economic damages suffered as a result of their decedents' wrongful deaths as well. This Court granted those motions. *See* ECF No. 3229 (adopting December 28, 2015 Report and Recommendation awarding damages for conscious pain and suffering) and No. 3356 (awarding damages for economic loss). In addition, certain *Ashton* Plaintiffs moved for solatium damages suffered by immediate family members and those non-immediate family members who were the "functional equivalent" of immediate family members eligible to recover under the terrorism exception to the FSIA as well as for the economic loss suffered on behalf of the estates of some of those killed on September 11, 2001. *See, e.g.*, ECF Nos. 3295 (Motion for Final Judgment for *Ashton I* claimants including claims for solatium damages); 4058 (Motion for Final Judgment for *Ashton V* claimants, the "functional equivalent" of immediate family members, solely for solatium damages); 5535 (Motion for Final Judgment for *Ashton XVII* and *Betru VI* claimants seeking economic damages and final judgments for estates).

---

[3] The *Ashton* Plaintiffs at the same time also moved for permission to file an Amended Consolidated Complaint against Iran, asserting the same jurisdictional allegations as in the prior complaints, adding a claim based on the new provision of the FSIA enacted subsequent to the filing of the original suits against Iran and adopting and incorporating by reference the prior *Ashton* allegations against Iran. ECF Nos. 2968, 2968-1 at 1 - 2 (adding allegations under 28 U.S.C. § 1605A). The Court issued an Opinion and Order that allowed the *Ashton* Plaintiffs to amend their pleadings as to Iran without requiring service of the amended pleadings. ECF No. 3227. Plaintiffs thereafter filed the Amended Consolidated Complaint on the docket. ECF. No. 3237.

This Court granted these motions, finding that an award to the immediate family members (or functional equivalent) of each decedent was proper, that economic damages and final judgments for estates were warranted and that prejudgment interest on the solatium loss amounts was warranted. *See, e.g.,* ECF Nos. 3300; 4106; 5926.

For the reasons below as well as those set forth in the prior motions for summary judgment on liability and prior motions for judgment for conscious pain and suffering and economic loss made on behalf of other *Ashton* wrongful death plaintiffs, the *Ashton 24* Plaintiffs listed in Exhibits A, B and C to the Kreindler Declaration now move this Court to grant the proposed Order awarding them economic loss damages combined with the previously granted compensatory awards for the conscious pain and suffering experienced by those individuals killed on September 11, 2001 (Exhibit A), solatium damages in the same amounts previously awarded to other plaintiffs with the same relationships to those killed in the September 11, 2001 Terrorist Attacks, directing that pre-judgment interest be assessed at 4.96 percent per annum and finding that service of process was properly effected on Iran pursuant to the FSIA (28 U.S.C. § 1608(a)). The *Ashton* Plaintiffs also ask for permission to continue to submit applications in subsequent stages on behalf of those claimants not included in the exhibits attached to the Kreindler Declaration, should any other applications be warranted.

**II.     Damages**

Under 28 U.S.C. § 1605A ("Section 1605A"), which, among other claims, applies to the suit against Iran, available damages include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(a)(1) and (c)(4). That is, the "estates of those who [died] can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive

5

damages." *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 83 (D.D.C. 2010).  While a claim under Section 1605A is available only to a "claimant or … victim [who] was … a national of the United States; a member of the armed forces; or otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment," under the Alien Tort Statute, district courts have jurisdiction over claims brought by non-United States nationals who do not fit the Section 1605A categories. *See* 28 U.S.C. § 1350.

Those *Ashton 24* Plaintiffs set forth in Exhibit A to the Kreindler Declaration are all representatives of the estates of victims who were murdered on September 11, 2001 ("9/11 Decedents"), claims on behalf of the 9/11 Decedents are asserted by those estate representatives and those 9/11 Decedents and/or estate representatives are all United States nationals.  Those *Ashton 24* Plaintiffs set forth on Exhibit B to the Kreindler Declaration are all immediate family members of the 9/11 Decedent listed on Exhibit B and they or the 9/11 Decedent was a United States national as of September 11, 2001 and they therefore are entitled to compensation under 28 U.S.C. § 1605A for the solatium losses suffered as a result of the wrongful death of each of their decedents.  The *Ashton* 24 Plaintiff set forth on Exhibit C to the Kreindler Declaration is the functional equivalent of an immediate family member of the 9/11 Decedent listed on Exhibit C and was a United States national as of September 11, 2001 and she therefore is entitled to compensation under 28 U.S.C. § 1605A for the solatium losses suffered as a result of the wrongful death of her decedent pursuant to the framework this Court previously established, as addressed below.

As liability has been established in this matter, each moving plaintiff is now entitled to damages in the amounts set forth on Exhibits A, B and C attached to the Kreindler Declaration

which reflect (1) the damage amounts previously awarded by this Court for the conscious pain and suffering suffered by the 9/11 Decedents and the economic loss supported by the expert economic analysis and reports submitted herewith (Exhibit A) and (2) the damages amounts previously awarded by this Court for solatium damages for equivalent relationships (Exhibits B and C).

### A. Economic Damages

Economic damages are specifically contemplated in a suit against an officially designated state-sponsor of terrorism such as Iran. *See* 28 U.S.C. § 1605A(c). The economic damages provision is "designed to compensate [a] decedent's heirs-at-law for economic losses which result from [the] decedent's premature death." *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 27 (D.D.C. 1998). Accordingly, "the beneficiaries of each decedent's estate [are] … entitled to recover the present value of economic damages, including lost wages that the decedents might reasonably have been expected to earn but for their wrongful deaths." *Valore,* 700 F. Supp. 2d at 81-82, citing *Heiser v. Islamic Republic of Iran,* 466 F.Supp.2d 229 (D.D.C. 2006.) Thus, for example, United States District Court Royce C. Lambreth of the District of Columbia, in a series of decisions issuing final judgments against Iran, has held Iran "liable for the economic damages caused to decedents' estates." *Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379, 399-400 (D.D.C. 2015), quoting *Valore,* 700 F.Supp.2d at 78.[4]

Previously, this Court awarded economic damages in prior claims against Iran for the "economic losses stemming from the wrongful death of the decedent[.]" ECF No. 2623 at 2-3.

---

[4] In adopting this estate-accumulations calculation, Judge Lambreth recognized that case law under the FSIA was "develop[ing] … a federal standard" and looked to the law of the District of Columbia, which it concluded was "an appropriate model" to adopt and which calculated economic damages as the loss of accretions to the decedent's estate. *Roth,* 78 F.Supp.3d at 82.

In doing so, it adopted the economic loss calculations set forth in the plaintiffs' economic expert reports.  For those 9/11 Decedents on Exhibit A attached to the Kreindler Declaration for whom economic damages are sought, the economic loss amount was calculated based on updated, present-value figures of either the economic damages calculation previously provided by an economic expert or generated by the September 11 Victim Compensation Fund ("VCF").

In this case, the *Ashton* Plaintiffs retained the services of John E. Beauzile, who has a Master's Degree in Actuarial Science from Columbia University and expertise in mathematics, economics, accounting, applied statistics, financial and economic modeling as well as models for life contingencies, among other things, to evaluate the present value of the previously-calculated economic losses resulting from decedent's death as a result of the September 11, 2001 terrorist attacks.  Kreindler Decl., Exhibit D, Declaration of John E. Beauzile, at ¶¶ 3-9.

As described in more detail in Mr. Beauzile's declaration (Exhibit D to the Kreindler Decl.), relying on materials provided by plaintiffs, economic expert reports, VCF applications, VCF work-papers and distribution plans, VCF determinations, underlying economic documents, VCF valuation files, tax submissions and other earnings information, and applying the methodologies and assumptions described in Mr. Beauzile's declaration, the economic damages amounts set forth in Exhibit A are accurate to a reasonable degree of accounting and actuarial certainty. Kreindler Decl., Exhibit D (Beauzile Decl.) at ¶ 9.  The updated reports are provided as Exhibit E to the Kreindler Declaration, submitted separately under seal. Kreindler Decl. at ¶ 11.

Accordingly, the *Ashton* Plaintiffs now respectfully request that this Court order economic loss awards to those 9/11 Decedents listed in Exhibit A of the Kreindler Declaration in the amounts set forth therein.

### B. Conscious Pain and Suffering

Plaintiffs identified in Exhibit A attached to the Kreindler Declaration are all estates of 9/11 Decedents, who suffered through the September 11, 2001 terrorist attacks and were murdered on that day. This Court has previously assessed claims for the extraordinary conscious pain and suffering experienced by those who lost their lives on September 11, 2001, including for those 9/11 Decedents identified on Exhibit A. *See* ECF No. 3226 (entries 198, 309, 356, 476, 533, 551, 628). Accordingly, the *Ashton* Plaintiffs now respectfully request that this Court grant those 9/11 Decedents whose estates are set forth in Exhibit A total compensatory damages judgment that reflects both the economic losses listed in Exhibit A as well as the previously awarded $2,000,000 for each 9/11 Decedent. That total final damages amount for each 9/11 Decedent is listed in Exhibit A.

### C. Solatium Damages

The Foreign Sovereign Immunities Act (28 U.S.C. § 1605A) specifically provides for solatium damages. Under that provision, family members of the decedents may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), *vacated on other grounds*, 404 F. Supp. 2d 261 (D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). Given that, in FSIA cases solatium claims have been treated as comparable to claims for intentional infliction of emotional distress, in which the immediate family members of the decedent are treated as direct victims. *See, e.g* Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005)("[c]ourts have

uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "'indistinguishable' from the claim of intentional infliction of emotional distress.") (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)).  Thus, this Court has previously awarded solatium damages to "immediate family members" who, though not physically present at the site of the terrorist attacks, were nevertheless intended victims of the terrorist activities. *See* ECF 3358; *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570 (GBD)(SN), 2015 WL 9468813 (S.D.N.Y. Dec. 28, 2015); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570 (GBD)(SN), 2012 WL 4711407 (S.D.N.Y. Oct. 3, 2012).

In defining those family members eligible to make a claim for solatium damages, this Court previously determined that spouses, parents, children and siblings who survived a victim killed in the September 11 terrorist attacks were entitled to recover for their losses, and set forth a framework for other family relationships that fell outside of those four categories, such as intimate partners, aunts and uncles and step-relationships, who, based on the particular factual circumstances in each case, may be considered the functional equivalent of immediate family members. *See* ECF No. 3363 (Report & Recommendation).  The four established categories of family relationships – spouses, parents, children and siblings – do not require any additional showing of the nature of the underlying relationship.  Demonstrating a relationship was the functional equivalent of an immediate family member requires an analysis of the facts in each case.

    **i.  Immediate Family Members**

To fashion a solatium award adequately compensating the surviving immediate family members in the litigation against Iran, this Court previously looked to the analysis undertaken by District Court Judge Royce Lambert in the case of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). There, Judge Lamberth concluded that solatium damages should be awarded to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million. *Id.*[5]

Magistrate Judge Frank Maas previously recognized that the immediate family members of those killed in the September 11 terrorist attacks suffered and continue to suffer "profound agony and grief" and, "[w]orse yet, … are faced with frequent reminders of the events of that day." *See* ECF No. 2618 at 10 – 12. Given the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families," Magistrate Judge Maas in his Report and Recommendation concluded that an upward departure from the *Heiser* framework was appropriate and recommended solatium damages in the following amounts:

| Relationship to Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

---

[5] This formula may be adjusted upward or downward when circumstances warrant. *See, e.g., Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Subsequently, Magistrate Judge Maas and then Magistrate Judge Sarah Netburn issued orders awarding solatium damages in the amounts set forth above to various groups of plaintiffs.

The losses claimed in this motion are legally and factually comparable to those suffered by the prior *Ashton* claimants, and the other claimants involved in this litigation. Each of the deaths in this case were sudden and unexpected and were the result of the terrorism defendants' extreme acts of malice. The decedents were civilians whose deaths were intended to create an environment of fear and terror. The claimants here were not attenuated victims but the immediate family members of the decedents and were directly and irrevocably harmed by the terrorist acts and consequences. Many family members can visit no private cemetery plot or gravestone to visit their loved ones but are instead resigned to never have the closure that might otherwise be expected after the death of an immediate family member. The amount of solatium damages previously adopted by the District Court in the other *Ashton* cases as well as the other claimants involved in this litigation should apply equally to the *Ashton 24* Plaintiffs set forth on Exhibit B to the Kreindler Declaration.

The relationships between the decedent and the *Ashton 24* Plaintiffs are identified on Exhibit B accompanying the Kreindler Declaration. As described in the Kreindler Declaration, all of the *Ashton 24* Plaintiffs have direct relationships previously recognized as being presumptively qualified for solatium damages; the relationships between the *Ashton 24* Plaintiffs and their immediate family members, who were killed in the September 11, 2001 terrorist attacks, have been verified; all of the *Ashton 24* Plaintiffs survived the death of their immediate family member on September 11, 2001; and none of the *Ashton 24* Plaintiffs has another known claim pending before this Court for compensation against Iran. The *Ashton* Plaintiffs therefore respectfully request that this Court issue a final judgment ordering payment of solatium damages

to the *Ashton 24* Plaintiffs, listed in Exhibit B, in the same amounts set forth above, based on their relationship with their decedent and as described in the Kreindler Declaration and set forth in Exhibit B.

### ii. Solatium Damages – Functional Equivalent Relationship

In identifying those family members eligible to make a claim for solatium damages, the October 14, 2016 Report and Recommendation previously found that in addition to those individuals who are considered traditional "family members," damages could also be awarded to non-immediate family members who met certain criteria establishing that she or he had the "functional equivalent" of an immediate family member relationship with the September 11, 2001 decedent. These categories of non-immediate family members included fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews and cousins. ECF No. 3363.

In that Report and Recommendation, three factors were identified as especially relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of a traditional immediate family member. Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the decedent's life or vice versa; and 3) whether the biological family member whose role the "functional equivalent" individual played was absent from the family life (*i.e.* did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member). *Id.* At 10-12. In weighing these different factors, the Court stated it would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together. *Id*. In previous cases, the Court relied on the statements

from the claimant about the nature and quality of the relationship with decedents. *Id*. at 17-28. The information in the declaration of the individual for whom solatium damages are sought in this motion (submitted as Exhibit F to the Kreindler Declaration) confirms that the plaintiff listed in Exhibit C to the Kreindler Declaration had the "functional equivalent" of a biological relationship and she is therefore entitled to an award for solatium damages.

> ### iii. Claimant Shenan Bradshaw – Stepdaughter of 9/11 Decedent Sandra "Sandy" Bradshaw
> **Presumptive Award: $8.5 million**
> **Requested Award: $8.5 million**

In addressing the category of stepparents, stepchildren and stepsiblings, this Court adopted a particular framework. Stepchildren who were in early childhood ("roughly birth through age eight") when the stepparent became part of the family "may be deemed fully functional equivalent" to the biological equivalent. ECF No. 3363 at 15. This depended, however, "[i]n all cases" on the stepchild having "cohabited with the decedent" and the stepchild also "establish[ing] that they otherwise had a close and longstanding relationship." *Id.* At 16. Plaintiff Shenan Bradshaw has satisfied all of those requirements and should be awarded the full solatium damages amount otherwise awarded to children whose parents were killed in the September 11, 2001 terrorist attacks.

Shenan Bradshaw was only two years old when her biological parents divorced; met Sandy Bradshaw when she was about three years old; and was four years old when her biological father and Sandy married. Kreindler Decl., Exhibit F ("Bradshaw Decl.") at ¶¶ 2, 4. Shenan's father was a commercial airline captain and Sandy was a flight attendant when Sandy was killed while working on Flight 93 on the morning of September 11, 2001. *Id.* at ¶¶ 1, 6; *Husband and daughter remember Sandy Bradshaw, flight attendant killed on United Flight 93, ahead of 9/11 anniversary*, aired Sept. 7, 2021 and updated Sept. 12, 2021, available at

myfox8.com/remembering-9-11/husband-and-daughter-remember-sandy-bradshaw-flight-attendant-killed-on-united-flight-93-ahead-of-9-11-anniversary/, last accessed July 6, 2022 (hereinafter "*Husband and daughter remember Sandy Bradshaw*.")  Sandy was one of the group of passengers and flight attendants who attempted to stop the hijackers and prevented Flight 93 from flying into the United States Capitol building.

More than a decade before the September 11, 2001 terrorist attacks, however, Sandy entered into Shenan Bradshaw's life. Kreindler Decl., Exh. F (Bradshaw Decl.) at ¶¶ 2,4 Shenan's biological parents' relationship was fraught and the two "treated each other with disdain and flat-out hatred." *Id.* at ¶ 3.  While suffering through her biological parents' "constant emotional warfare," Shenan recalls that Sandy was "the one constant calming presence" in her life who functioned as Shenan's "peace-keeper, … distractor" the person who would "shield" Shenan from the "battles" between her biological parents. *Id.* at ¶ 6.

Shenan cohabited for substantial periods of time with her stepmother Sandy, spending every weekend, three months in the summer and every other holiday with her biological father and Sandy. *Id.* at ¶ 5.  Shenan would also find as many other opportunities to go to be with her father and Sandy and could do so easily because her biological mother's house was only about an hour away. *Id.*  On average, Shenan spent at least as many days and nights with her father and Sandy as she did at her biological mother's house – if not more, considering the summers, weekends and holidays as well as other stretches of time she spent there. Shenan had a room in her father and Sandy's home where she kept clothes, shoes and toys and had her own desk – a spot for homework, arts or daydreaming. *Id.*  Shenan did chores and earned an allowance from Sandy and her father. *Id.* Sandy would supervise Shenan's homework, arrange playdates and sleepovers and took care of Shenan's personal health and hygiene. *Id.* at ¶ 10.

Having Sandy play such a maternal role in her life was especially important to Shenan because her biological mother's mental state was unstable and the two had little if any relationship. *Id.* at ¶ 7. The "void" that Shenan felt from her mother's "emotional absen[ce]" was filled by Sandy, who would take Shenan shopping, brush her hair, take her on vacations and more. *Id.* "Sandy was the calm, consistent mothering presence and strong female role model every young girl deserves." *Id.* at ¶ 9. "For all intents and purposes, Sandy was a mother" to Shenan. *Id.* at ¶ 7. And Sandy's family was Shenan's family. When the Bradshaws would join Sandy's relatives at the beach for a week every summer, Shenan understood that she was with her "grandparents, aunts & uncles, and cousins – not … 'step' relatives." *Id.* The same was true for Christmas dinners, which were always spent with Sandy's mother's house. *Id.*

In 1998, Sandy and Shenan's father had a daughter and Shenan "became an older sister[.]" *Id.* at ¶ 8. Shenan "immediately took to the role" of "big sister" – changing diapers, dressing the baby, feeing her and babysitting her. *Id.* When Sandy and Shenan's father had their second child in September 2000, Shenan "was as happy to be a big sister" to her new brother and she had been when her sister was born. *Id.*

Shenan was 15 years when Sandy was killed in the September 11, 2001 terrorist attacks. Following that, Shenan made remarkably mature decisions to remain physically close to her younger siblings – just babies still when their mother was murdered. *Id.* at ¶ 11. Shenan made sure to go to their school plays, their elementary school "graduations", their birthday parties and every holiday. *Id.* Shenan even decided to attend college close to home so that she could regularly spend time with her sister and brother. *Id.* Indeed, as is evident from her younger sister's description of the family in *Husband and daughter remember Sandy Bradshaw*, Shenan was as much as daughter to Sandy as were Sandy's biological children. As Shenan says,

16

"[t]hough Sandy was not [m]y biological parent, that she was, by title, my 'step-mother' is only semantics. … Sandy was as much a mother as anyone possibly could be, and I feel the pain of her loss as deeply as any biological child who has lost a parent would." *Id*. at ¶ 12.

In light of the fact that Sandy entered Shenan's life when Shenan was just two years old, formally became her stepmother when Shenan was four years old; that Shenan cohabited for substantial periods of time with Sandy (at least half of each year prior to Sandy's death); that Sandy filled the maternal "void" that Shenan had given her mother's emotional instability; and all of the other indicia of an intimate, family relationship, we respectfully request that this Court order a solatium damages award in favor of Shenan in the full amount of $8.5 million, representing the loss of a parent in the September 11, 2001 terrorist attacks.

### D. Punitive Damages

Plaintiffs are also entitled to punitive damages. *See* 28 U.S.C. § 1605A(c)(4). Previously in this case, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory). ECF No. 2623 at 2. The Court has applied that ratio to awards for plaintiffs in other related cases. *See, e.g.*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, a different magistrate judge recommended that the plaintiffs' request for

17

punitive damages be denied without prejudice. ECF No. 3363 at 28. Judge Daniels adopted that recommendation, denying without prejudice the plaintiffs' request for punitive damages. ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, the *Ashton* Plaintiffs request permission to address the issue of punitive damages at a later date. *See, e.g.*, ECF No. 3666 (Judge Daniels' order authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### E. Prejudgment Interest

On the issue of prejudgment interest, a December 28, 2015 Report and Recommendation, adopted by this Court, concluded that to the extent the *Ashton* wrongful death plaintiffs' claims arose out of injuries in New York State, the rate of prejudgment interest was 9 percent per annum from September 11, 2001 until the date judgment was entered, and to the extent the injuries arose elsewhere, 4.96 percent interest per annum compounded annually was appropriate. *See* ECF No. 3175 at 1 – 2. Subsequently, however, this Court concluded that the rate of prejudgment interest of 4.96 percent was more appropriate. ECF No. 3384 at 6.

Accordingly, the *Ashton 24* Plaintiffs asks that this Court direct that prejudgment interest of 4.96 percent per annum on their awards running from September 11, 2001 until the date of judgment, as was done previously for other *Ashton* Plaintiffs, as well as for other plaintiffs in this consolidated litigation.

**III.     Conclusion**

For all of the reasons herein, as well as those set forth in the previous submissions of the *Ashton* Plaintiffs and other plaintiffs, the *Ashton 24* Plaintiffs respectfully request that this Court grant the proposed order and

1)     Award the Plaintiffs set forth on Exhibit A of the Kreindler Declaration economic loss to damages as supported by the expert analysis and reports attached as exhibits to the Kreindler Declaration and confirm the compensatory damages for conscious pain and suffering previously awarded by this Court;

2)     Award the Plaintiffs set forth on Exhibits B and C of the Kreindler Declaration solatium damages based on the deaths of their immediate family members or functional equivalents, all of whom were killed on September 11, 2001 in the terrorist attacks;

3)     Award them pre-judgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages;

4)     Grant them permission to seek punitive damages, economic damages (if not sought herein), and other appropriate damages at a later date;

5)     Find that service of process was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants; and,

6)     Grant permission for all other plaintiffs in this action not appearing on Exhibits A, B or C to the Kreindler Declaration to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated: New York, New York
       July 8, 2022

Respectfully submitted,

KREINDLER & KREINDLER LLP

BY: ___/s/ James P. Kreindler_____
James P. Kreindler, Esq.
485 Lexington Avenue, 28th Floor
New York, New York 10017
Tel: (212) 687-8181
*Counsel for Ashton Plaintiffs*