Exhibit 2

## SUBLEASE

This Sublease Agreement is made as of the 10th day of April 2019, (hereinafter referred to as "Sublease") by and between Oaktree Capital Management, L.P. (successor in interest to Highstar Capital LP), a Delaware limited partnership (hereinafter referred to as "Sublandlord") and Pierce Bainbridge Beck Price & Hecht LLP, a California limited liability partnership (hereinafter referred to as "Subtenant") with regard to the following facts:

A.    Sublandlord is the present subtenant under that certain Amended and Restated Sublease dated February ___, 2019 between PineBridge Investments Holdings US LLC (f/k/a PineBridge Global Investments LLC) ("PineBridge") and Highstar Capital LP, as sublandlord, as amended by First Amendment to Sublease dated as of April 29, 2011 (as amended, the "Highstar Sublease") (a copy of which Highstar Sublease is attached hereto as Exhibit A and by this reference made a part hereof) concerning approximately 23,889 rentable square feet ("RSF") of office space (hereinafter referred to as the "Premises") comprising the entire rentable area of the 45th floor of the building (hereinafter referred to as the "Building") located at 277 Park Avenue, New York, New York.

B.    PineBridge is the Subtenant under that certain Sub-Sublease Agreement, dated as of January 6, 2010, between AIG Global Asset Management Holdings Corp. ("AIGGAMHC"), as sublandlord, and PineBridge as subtenant (hereinafter referred to as the "Pine Bridge Sublease") (a copy of which PineBridge Sublease is attached hereto as Exhibit B and by this reference made a part hereof) concerning approximately 71,543 RSF of office space located on the entire 42nd, 43rd, and 45th floors of the Building.

C.    AIGGAMHC is the Subtenant under that certain Agreement of Sublease, dated April 16, 2007, between JPMorgan Chase Bank, National Association (hereinafter referred to as the "Landlord"), as sublandlord, and AIGGAMHC, as subtenant, as modified by a Letter dated April 27, 2008 between PineBridge and AIGAMHC (hereinafter collectively referred to as the "Master Sublease") (a copy of which Master Sublease is attached hereto as Exhibit C and by this reference made a part hereof) concerning approximately 142,841 RSF of office space (hereinafter referred to as the "Master Premises") located on the entire 41st, 42nd, 43rd, 44th, 45th and 46th floors of the Building.

D.    Landlord is the tenant under that certain Lease, dated as of April 1, 2002, by and between 277 Park Avenue, LLC ("Master Landlord"), as landlord and Landlord, as tenant, as amended by a First Amendment of Agreement of Lease and Memorandum of First Amendment of Lease dated April 29, 2003 (the "First Amendment") and as it may hereafter be amended (collectively, the "Prime Lease") concerning certain space in the Building as more particularly described in the Prime Lease, including the Master Premises.

E.    Subtenant desires to sublease from Sublandlord the Premises (which for purposes of this Sublease shall be hereinafter referred to as the "Subleased Premises"), and Sublandlord has agreed to sublease the Subleased Premises to Subtenant upon the terms, covenants and conditions herein set forth.

## AGREEMENT

In consideration of the mutual covenants contained herein, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.     **Sublease** Sublandlord hereby subleases and demises to Subtenant and Subtenant hereby hires and takes from Sublandlord the Subleased Premises. Subtenant has inspected and is familiar with the condition of the Subleased Premises.

2.     **Term**

2.1     The term of this Sublease (hereinafter referred to as the "Term") shall commence on the latest date (hereinafter referred to as the "Sublease Commencement Date") to occur of all of the following: (i) execution and delivery of this Sublease by Sublandlord and Subtenant, (ii) written consent of Master Landlord and Landlord received, (iii) written consents of Pinebridge and AIGGAMHC received, (iv) payment of first month's rent and security deposit, and (v) receipt of Certificate of Insurance, and shall end, unless sooner terminated in accordance with the terms hereof, on December 29, 2020 (the "Sublease Expiration Date").

Within thirty (30) days after the Sublease Commencement Date, Subtenant and Sublandlord shall execute a Sublease Commencement Date Agreement confirming the Sublease Commencement Date.

3.     **Operating Expenses / Real Estate Taxes** Sublandlord shall pay any operating expenses and real estate taxes otherwise payable by Subtenant as a result of its leasing of the Subleased Premises hereunder; provided, however, Subtenant shall be liable for any New York City Commercial Rent tax payable as a result of Subtenant's lease of the Subleased Premises contemplated hereby, limited to taxes relating to the amount of the rental subject to such tax that Subtenant is paying to Sublandlord and not on the rental that Sublandlord or any other party might be paying under any lease or other sublease. To the extent Sublandlord fails to pay any utilities or taxes required to be paid by Sublandlord in respect of the Subleased Premises so that Subtenant may enjoy quiet occupancy of the Subleased Premises, then Subtenant may pay such amounts on Sublandlord's behalf and offset any such payments against amounts otherwise due and payable hereunder.

4.     **Utilities.**

4.1     **Electricity; HVAC** Subtenant shall reimburse Sublandlord for the electricity charges with respect to the Subleased Premises that Sublandlord is required to pay to PineBridge during the Term.  Subtenant shall pay for its use of overtime HVAC and overtime or special services with respect to the Subleased Premises requested by Subtenant in accordance with the provisions of the Prime Lease.

4.2     **Telecommunications** Subject to the terms and provisions of the Master Sublease, PineBridge Sublease and Highstar Sublease, Sublandlord will permit Subtenant to make its own arrangements for all telecommunications services required by it connection with its business conducted from the Subleased Premises, and for related human resource functions, all

of which shall be for the account of Subtenant, without any obligation or liability on the part of Sublandlord.

5.    **Rent**  Subtenant shall pay base rent ("Base Rent") during the Term of this Sublease in an amount equal to $883,893 per annum ($73,657.75 per month), except that Subtenant shall receive an abatement of the Base Rent payable for the first month of the Term. Such Base Rent shall be payable monthly in advance on the first day of each month. In the event that the Term of this Sublease shall begin or end on a date which is not the first day of a month, Base Rent shall be prorated as of such date.

Concurrent with Subtenant's execution of this Sublease, Subtenant shall deliver to Sublandlord the second month's Base Rent in the amount of $73,657.75.

6.    **Security Deposit**    6.1    Simultaneously with the execution and delivery of this Sublease by Subtenant, Subtenant shall deposit with Sublandlord the amount of $220,973.25 ("Security Deposit") by cash or a letter of credit in the form required pursuant to Section 6.2 hereof as security for the faithful performance and observance by Subtenant of the terms, provisions, covenants and conditions of this Sublease. In the event Subtenant defaults in respect of any of the terms, provisions, covenants and conditions of this Sublease after all applicable notice and cure periods have passed, including, but not limited to, the payment of Rent, Sublandlord may use, apply or retain the whole or any part of the Security Deposit to the extent required for the payment of any Rent and any other sum as to which Subtenant is in default or for any sum which Sublandlord may expend or may be required to expend by reason of Subtenant's default in respect of any of the terms, provisions, covenants and conditions of this Sublease, including but not limited to, any damages or deficiency accrued before or after summary proceedings or other re-entry by Sublandlord. In the event that Subtenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Sublease, the Security Deposit shall be returned to Subtenant as soon as reasonably practicable at the end of this Sublease (or the earlier termination thereof) and after delivery of entire possession of the Subleased Premises to Sublandlord.

6.2    Any letter of credit shall be in the form of an irrevocable letter of credit (which shall be maintained by Subtenant in effect at all times during the term hereof), in form and substance reasonably satisfactory to Sublandlord, issued by a financial institution reasonably satisfactory to Sublandlord and having its principal place of business or its duly licensed branch or agency in the City of New York (or which shall provide that it can be drawn by facsimile or overnight courier). Such letter of credit shall have an expiration date no earlier than the first anniversary of the date of issuance thereof and shall be automatically renewable from year to year unless terminated by the issuer thereof by notice to Sublandlord given not less than 30 days prior to the expiration thereof. The outside expiration date of the letter of credit shall be not less than 30 days after the expiration of this Sublease. Except as otherwise provided herein, Subtenant shall, throughout the term of this Sublease, deliver to Sublandlord, in the event of the termination of any such letter of credit, replacement letters of credit in lieu thereof no later than 30 days prior to the expiration date of the preceding letter of credit. If Subtenant shall fail to obtain any replacement of a letter of credit within the time limits set forth in this Section 6.2, Sublandlord may draw down the full amount of the existing letter of credit and retain the same as security hereunder.

6.3    In the event that Subtenant defaults in respect of any of the terms, provisions, covenants and conditions of the Sublease after all applicable notice and cure periods have passed, and Sublandlord utilizes all or any part of the security represented by the Security Deposit, Sublandlord may, in addition to terminating this Sublease and exercising any other rights and remedies that Sublandlord may have under the Lease, or at law or in equity, draw upon and use, apply or retain the whole or any part of the Security Deposit to the extent required for payment of Rent, additional rent, or any other sum as to which Subtenant is in default (after all applicable notice and cure periods set forth herein have passed) or for any sum which Sublandlord may expend or be required to expend by reason of Subtenant's default in respect of any of the terms, covenants, and conditions of this Sublease (after all applicable notice and cure periods set forth herein have passed). In the event Sublandlord, in accordance with the terms of this Sublease, draws upon, applies or retains any portion or all of the Security Deposit delivered hereunder, Subtenant shall forthwith restore the amount so applied or retained so that at all times the amount deposited shall be equal to the security required by Section 6.1.

7.    **Use** Subtenant covenants and agrees to use the Subleased Premises in accordance with the provisions of the Highstar Sublease and for no other purpose.

8.    **Highstar Sublease**    As applied to this Sublease, the words "Sublandlord" and "Subtenant" as used in the PineBridge Sublease shall be deemed to refer to Sublandlord and Subtenant hereunder, respectively. Subtenant and this Sublease shall be subject in all respects to the terms of, and the rights of the Sublandlord under, the Highstar Sublease. Except as otherwise expressly provided in Section 9 hereof, the covenants, agreements, terms, provisions and conditions of the Highstar Sublease insofar as they relate to the Subleased Premises and insofar as they are not inconsistent with the terms of this Sublease or inapplicable to the Subleased Premises are made a part of and incorporated into this Sublease as if recited herein in full, and the rights and obligations of the Sublandlord and the Subtenant under the Highstar Sublease shall be deemed the rights and obligations of Sublandlord and Subtenant respectively hereunder and shall be binding upon and inure to the benefit of Sublandlord and Subtenant respectively. The time limits contained in the Highstar Sublease for the giving of notices, making of demands or performing of any act, condition or covenant on the part of the tenant thereunder, or for the exercise by the tenant thereunder of any right, remedy or option, except for the failure to pay any installment of Base Rent and additional rent which shall not be so changed, are changed for the purposes of incorporation herein by reference by shortening the same in each instance by five (5) business days, so that in each instance Subtenant shall have five (5) business days less time to observe or perform hereunder than Sublandlord has as the tenant under the Highstar Sublease. As between the parties hereto only, in the event of a conflict between the terms of the Highstar Sublease and the terms of this Sublease, such conflict shall be resolved in every instance in favor of the provisions of this Sublease. Subtenant hereby assumes and agrees to observe and perform fully and promptly all of the terms, covenants, conditions and obligations provided in the Highstar Sublease (to the extent incorporated herein by reference) intended to bind and/or be observed and/or performed by Sublandlord, as Tenant, thereunder with respect to Subtenant's use and occupancy of the Subleased Premises in accordance with the terms of this Sublease.

9.    **Variations from Highstar Sublease** The following covenants, agreements, terms, provisions and conditions of the Highstar Sublease are hereby modified or not incorporated herein:

9.1     Notwithstanding anything to the contrary set forth in Sections **2**, **3** and **5** of the Highstar Sublease, the Base Rent, operating expenses and real estate taxes payable under this Sublease and the Term of this Sublease shall be as set forth in Sections **2**, **3** and **5,** above.

9.2     The parties hereto represent and warrant to each other that neither party dealt with any broker or finder in connection with the consummation of this Sublease, other than CBRE, Inc. and Newmark Knight Frank (collectively, "Broker"), and each party agrees to indemnify, hold and save the other party harmless from and against any and all claims for brokerage commissions or finder's fees arising out of either of their acts in connection with this Sublease, except that Subtenant's indemnification shall not include the claims of the Broker. Landlord shall pay the Broker pursuant to separate agreements. The provisions of this Section **9.2** shall survive the expiration or earlier termination of this Sublease.

9.3     Notwithstanding anything contained in the Highstar Sublease to the contrary, as between Sublandlord and Subtenant only, all insurance proceeds or condemnation awards received by Sublandlord under the Highstar Sublease shall be deemed to be the property of Sublandlord. Subtenant shall be entitled to receive any insurance proceeds or condemnation awards, as its interest may appear, relating to Subtenant's personal property, fixtures and improvements.

9.4     Any notice which may or shall be given by either party hereunder shall be either delivered personally, sent by certified mail, return receipt requested, or by overnight express delivery, addressed to the party for whom it is intended at the Subleased Premises (if to the Subtenant), or to Sublandlord at 1301 Avenue of the Americas, New York, New York 10019, Attn: Odette Rose, or to such other address as may have been designated in a notice given in accordance with the provisions of this Section 9.4.

9.5     All amounts payable hereunder by Subtenant shall be payable directly to Sublandlord by wire transfer, as follows:

|  |  |
|---|---|
| Wire to: | Wells Fargo Bank |
| Routing Number: | 121000248 |
| Beneficiary Name: | Oaktree Capital Management, LP |
| Beneficiary Account Number: | 4945060853 |

9.6     The provisions of Sections 2, 3, 4, 5, 9, 10 and 13 of the Highstar Sublease shall not apply to this Sublease.

9.7     Sublandlord has delivered and Subtenant has accepted the Subleased Premises in their presently existing, "AS-IS, WITH ALL FAULTS" condition. Sublandlord has had and shall have no obligation to do any work in order to make the Subleased Premises suitable and ready for occupancy and use by Subtenant. Notwithstanding anything else in this Sublease to the contrary, Sublandlord will deliver the Subleased Premises in broom clean condition (other than the existence of the FF&E) with lights and bulbs working and with electrical plugs working.

9.8     Subtenant shall not have the right, without the prior written consent of Sublandlord, which consent shall not be unreasonably withheld, to alter and construct improvements in the Subleased Premises and any such right shall be subject to the consents of (i) PineBridge under the Highstar Sublease, (ii) AIGGAMHC under the terms of Section **9.8** of the PineBridge Sublease and (iii) Landlord under the provisions of Section **9** of the Master Sublease. Any and all alterations or improvements must comply with all Federal, State, Local, Municipal, Laws, Ordinances and Regulations, including ADA.

9.9     Subtenant, at its sole cost and expense, shall remove any Subtenant improvements installed or made by Subtenant in the Subleased Premises and restore the Subleased Premises to the same condition existing on the date of Sublandlord's delivery of the Subleased Premises to Subtenant as of the date hereof, upon the expiration of the Term hereof, to the extent required by Landlord or AIGGAMHC. Subtenant shall have no obligation to remove any improvements existing in the Subleased Premises as of the date of the delivery of the Subleased Premises to Subtenant. At the expiration or earlier termination of this Sublease, Subtenant shall remove all of Subtenant's personal property, equipment and trade fixtures and work stations from the Subleased Premises.

9.10    Subtenant shall comply with all insurance requirements as required under Section **11** in the Master Sublease and shall name Sublandlord, PineBridge, AIGGAMHC and its agents as additional insureds; provided, however, notwithstanding the terms of the Master Sublease or the Prime Lease (as such term is defined in the Master Sublease), the amount of commercial general liability insurance (including coverage Subtenant may have under any umbrella policies) Subtenant shall be required to obtain shall be only $10,000,000.

9.11    In the event Subtenant holds over at the expiration or earlier termination of this Sublease without Sublandlord's, PineBridge's, AIGGAMHC's and Landlord's consent, Subtenant shall indemnify, defend and hold Sublandlord free and harmless from and against all costs, liabilities, damages, claims and expenses, including without limitation, reasonable attorney's fees and expenses, arising from any claim made by such parties as a result of any holdover under this Sublease. Nothing contained in this Sublease shall be deemed a consent to the holding over by Subtenant, nor a waiver of any remedy which may be available to Sublandlord or Landlord. The provisions of this Section **9.11** shall survive the expiration or earlier termination of this Sublease.

9.12    Subtenant shall have the right during the Term of this Sublease to use (and during such term Sublandlord will not remove) the furniture, fixtures, cabinets, and equipment (including without limitation, all existing conference room, pantry appliances, and similar equipment, but excluding, for the avoidance of doubt, desktop computers, desktop printers, laptops, blackberrys, PBX, monitors, network printers, printer/fax/scanners, projectors, copiers, shredders, video conference and similar movable equipment to the extent owned by Sublandlord), located in the Subleased Premises as of the date of this Sublease and set forth in Exhibit D annexed hereto (hereinafter referred to as "FF&E", provided that the term FF&E shall exclude any such items and personal property now or hereafter purchased by Subtenant). Title to all such FF& E will remain with Sublandlord until the Expiration Date and thereafter the FF&E shall be conveyed to Subtenant. Subtenant shall remove the FF&E from the Subleased Premises at the end of the Term. Sublandlord is providing the FF&E and Subtenant hereby accepts the

FF&E in its "as is, where is" condition including any and all faults. Sublandlord makes no representation or warranty that the FF&E is fit for any particular purpose, and is providing the FF&E for use by the Subtenant without representation or warranty of any kind, express, implied or statutory. Subtenant shall be responsible for maintaining the FF&E and shall maintain the FF&E in good condition during the term of this Sublease, reasonable wear and tear excepted. Subtenant shall be responsible for any replacement, maintenance, insurance and any other costs of the FF&E, and shall maintain insurance for the FF&E covering its full replacement value and insuring against claims and liability arising out of any use of the FF&E by Subtenant and its employees, officers, directors and invitees. Subtenant and Sublandlord will cooperate with Subtenant's efforts to conform any such existing FF&E comprising conference room technology to its reasonable specifications, subject in all regards to underlying licenses granted by the manufacture of such FF&E technology.

9.13   Subtenant shall be permitted to display any signage in the Subleased Premises permitted by Landlord.

## 10.   **Tenant's Performance Under Subleases**

10.1   Subtenant recognizes that Sublandlord is not in a position nor obligated to render any of the services or to perform any of the obligations required of Landlord under the Master Sublease with respect to the furnishing of any services or utilities to the Subleased Premises or the maintenance, repair or restoration of the Subleased Premises. Therefore, Subtenant shall rely upon and look solely to the Landlord for the performance of such obligations under the Master Sublease and Sublandlord shall not be liable to Subtenant for any default of the Landlord under the Master Sublease and/or default of AIGGAMHC under the PineBridge Sublease and/or default of PineBridge under the Highstar Sublease. Subtenant shall not have any claim against Sublandlord by reason of the Landlord's failure or refusal to comply with any of the provisions of the Master Sublease and/or AIGGAMHC's failure or refusal to comply with any of the provisions of the PineBridge Sublease and/or Pinebridge's failure or refusal to comply with any of the provisions of the Highstar Sublease, unless such failure or refusal is a result of Sublandlord's act or failure to act. This Sublease shall remain in full force and effect notwithstanding the Landlord's failure or refusal to comply with any such provision of such subleases and Subtenant shall pay the Base Rent and additional rent and all other charges provided for herein without any abatement, deduction or setoff whatsoever. Notwithstanding the foregoing, if Landlord defaults in any of its obligations under the Master Sublease, Subtenant shall be entitled to participate with Sublandlord in any action undertaken by Sublandlord in the enforcement of Sublandlord's rights against Landlord. In addition, if PineBridge has abated any of the base rent payable by Sublandlord as subtenant under the Highstar Sublease, then Sublandlord shall (x) promptly provide written notice of such abatement to Subtenant which such notice shall contain reasonable evidence of the amount, date and terms of such abatement, and (y) correspondingly abate the Base Rent payable under this Sublease as to all or part of the Subleased Premises, as applicable under the Highstar Sublease, as to which rent is abated under the Highstar Sublease and for so long as such abatement, offset or reduction shall continue under the Highstar Sublease. If Sublandlord elects not to take action, whether legal action or otherwise, for the enforcement of Sublandlord's rights against Landlord, Subtenant shall have the right to take such action in its own name and, for that purpose and only to such extent, all the rights of Sublandlord under the Highstar Sublease with respect to the Subleased Premises shall be and are

hereby conferred upon and assigned to Subtenant, and Subtenant shall be subrogated to such rights to the extent they apply to the Subleased Premises. If any such action in Subtenant's name against Landlord be barred by reason of lack of privity, non-assignability or otherwise. Sublandlord agrees that Subtenant may take such action in Sublandlord's name, and Sublandlord agrees to cooperate with Subtenant in connection therewith, provided the taking of such action is without cost to Sublandlord. Subtenant shall protect, defend, indemnify and hold Sublandlord harmless from all claims, costs and liabilities, including attorneys' fees and costs, arising out of or in connection with any such action by Subtenant. Subtenant covenants and warrants that it fully understands and agrees to be subject to and bound by all of the covenants, agreements, terms, provisions and conditions of the Highstar Sublease, except as modified herein. Furthermore, Subtenant and Sublandlord further covenant not to take any action or do or perform any act or fail to perform any act which would result in the failure or breach of any of the covenants, agreements, terms, provisions or conditions of the Highstar Sublease on the part of the subtenant thereunder.

10.2    Whenever the consent of Landlord and/or AIGGAMHC and/or PineBridge shall be required by, or Landlord or AIGGAMHC or PineBridge shall fail to perform their obligations under the Master Sublease and/or PineBridge Sublease, and/or Highstar Sublease, as applicable, Sublandlord agrees to use its reasonable efforts to obtain, at Subtenant's sole cost and expense, such consent and/or performance on behalf of Subtenant. Subtenant shall reimburse Sublandlord for Sublandlord's actual out-of-pocket costs incurred in obtaining such consent and/or performance on behalf of Subtenant. In addition, Subtenant shall reimburse Sublandlord actual out-of-pocket costs associated with Landlord's and AIGGAMHC's and PineBridge's review of Subtenant's plans and specifications for improvements in the Subleased Premises and all costs incurred by Sublandlord in obtaining the required consent with respect to any amendments to this Sublease, if and to the extent the consent of Landlord and/or AIGGAMHC and/or PineBridge is required for the same.

In addition to the foregoing, any and all fees incurred to obtain Landlord's and/or AIGGAMHC's and/or PineBridge's consent to a further assignment or subletting of the Subleased Premises shall be borne solely by Subtenant.

10.3    Sublandlord represents and warrants to Subtenant that the Highstar Sublease is in full force and effect and there are no uncured defaults thereunder.

## 11.    Indemnity and Release

11.1    Subtenant hereby agrees to protect, defend, indemnify and hold Sublandlord harmless from and against any and all liabilities, claims expenses, losses and damages, including, without limitation, reasonable attorneys' fees and disbursements, which may at any time be asserted against Sublandlord by (a) the Landlord and/or AIGGAMHC and/or PineBridge for failure of Subtenant to perform any of the covenants, agreements, terms, provisions or conditions contained in the Highstar Sublease which by reason of the provisions of this Sublease, Subtenant is obligated to perform, or (b) any person by reason of Subtenant's use and/or occupancy of the Subleased Premises or negligent or intentional acts in or about the Building. The provisions of this Section **11.1** shall survive the expiration or earlier termination of the Highstar Sublease and/or this Sublease.

11.2    Sublandlord hereby agrees to protect, defend, indemnify and hold Subtenant harmless from and against any and all actual costs, expenses, losses and damages, including, without limitation, reasonable attorneys' fees and disbursements, which may at any time be incurred by Subtenant that are caused by the termination of the Highstar Sublease prior to its original expiration date by reason of the default of Sublandlord to perform any of the covenants, agreements, terms, provisions or conditions contained in the Highstar Sublease, provided however, that such termination was not the result of any action or inaction by Subtenant and Subtenant is not otherwise in default of this Sublease beyond the expiration date of any applicable cure period at the time of such termination of the Highstar Sublease, and under no circumstances shall Sublandlord be liable for any consequential, punitive or special damages. The provisions of this Section **11.2** shall survive the expiration or earlier termination of the Highstar Sublease and/or this Sublease.

12.    **Certificates** Subtenant and Sublandlord shall at any time and from time to time as requested by the other party upon not less than ten (10) days' prior written notice, execute, acknowledge and deliver to the other party a statement in writing certifying that this Sublease is unmodified and in full force and effect (or if there have been modifications that the same is in full force and effect as modified and stating the modifications, if any) certifying the dates to which rent and any other charges have been paid and stating whether or not, to the knowledge of the person signing the certificate, the other party is in default beyond any applicable grace period provided herein in performance of any of its obligations under this Sublease, and if so, specifying each such default of which the party executing such certificate may have knowledge, it being intended that any such statement delivered pursuant hereto may be relied upon by others with whom the requesting party may be dealing.

13.    **Assignment or Subletting** Subject further to all of the rights of the Landlord under the Master Sublease and AIGGAMHC under the PineBridge Sublease and PineBridge under the Highstar Sublease, and the restrictions contained in the Master Sublease, PineBridge Sublease and Highstar Sublease, Subtenant shall not be entitled to assign this Sublease or to sublet all or any portion of the Subleased Premises without the prior written consent of Sublandlord, which consent may be withheld in Sublandlord's sole and absolute discretion.

Within twenty (20) business days after Subtenant provides Sublandlord of written notification of Subtenant's desire to sub-sublease the Subleased Premises or assign this Sublease, Sublandlord shall provide such written consent or disapproval to Subtenant. The written notification shall contain the following:

-    proposed terms and conditions of the sub-sublease or assignment;
-    identity of the proposed sub-Subtenant or assignee;
-    financial statements of proposed sub-Subtenant or assignee;
-    and any additional information Sublandlord, Landlord, AIGGAMHC or PineBridge may request.

Subtenant shall reimburse Sublandlord on written demand for all out-of-pocket costs (including, without limitation, all reasonable legal fees and disbursements, as well as the reasonable costs of making investigations as to the acceptability of the proposed subtenant) which may be incurred by Sublandlord in connection with a request by Subtenant that

Sublandlord consent to any proposed assignment or sublease, however, not to exceed $3,500 (plus the fees, if any, of Landlord, AIGGAMHC and PineBridge, as set forth in Section 10.2).

Any Excess Consideration associated with said sub-sublease or assignment which exceeds the Base Rent payable this Sublease shall be paid to Sublandlord and Sublandlord shall pay Landlord, AIGGAMHC and PineBridge their respective shares of such Excess Consideration, to the extent applicable.

14.    **Severability** If any term or provision of this Sublease or the application thereof to any person or circumstances shall, to any extent, be invalid and unenforceable, the remainder of this Sublease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term or provision of this Sublease shall be valid and be enforced to the fullest extent permitted by law.

15.    **Entire Agreement; Waiver** This Sublease contains the entire agreement between the parties hereto and shall be binding upon and inure to the benefit of their respective heirs, representatives, successors and permitted assigns. Any agreement hereinafter made shall be ineffective to change, modify, waive, release, discharge, terminate or effect an abandonment hereof, in whole or in part, unless such agreement is in writing and signed by the parties hereto.

16.    **Captions**    Captions to the Sections in this Sublease are included for convenience only are not intended and shall not be deemed to modify or explain any of the terms of this Sublease.

17.    **Further Assurances** The parties hereto agree that each of them, upon the request of the other party, shall execute and deliver, in recordable form if necessary, such further documents, instruments or agreements and shall take such further action that may be necessary or appropriate to effectuate the purposes of this Sublease.

18.    **Governing Law** This Sublease shall be governed by and in all respects construed in accordance with the internal laws of the State of New York.

19.    **Consent of Landlord** The validity of this Sublease shall be subject to (i) the Landlord's prior written consent hereto pursuant to the terms of the Master Sublease, (ii) AIGGAMHC's prior written consent hereto pursuant to the terms of the PineBridge Sublease and (iii) PineBridge's prior written consent pursuant to the terms of the Highstar Sublease.

IN WITNESS WHEREOF, the parties hereto have caused this Sublease to be executed as of the day and year first above written.

"Sublandlord"

OAKTREE CAPITAL MANAGEMENT, L.P., a
Delaware limited partnership

By: _____

           By: _____
                  Jay Wintrob
Henry Orren         Its: _____
Vice President             Chief Executive Officer

"Subtenant":

PIERCE BAINBRIDGE BECK PRICE & HECHT
LLP, a California limited liability partnership

_____

By: Jim Bainbridge
   Its: Co-Managing Partner

# EXHIBIT A

## HIGHSTAR SUBLEASE

**EXHIBIT B**

**PINEBRIDGE SUBLEASE**

## EXHIBIT C

## MASTER SUBLEASE

**EXHIBIT D**

**FF &E**

**277 Park Avenue**
**Audio-Visual Equipment**

Board Room
AV system XAP 800- Clear One
Extron switcher
Extron VGA interface
Crestron amplifier
Crestron touch panel
VC Camera - tandberg
hP Pavilion windows XP
Keyboard
Misc modem
Samsung DVD
Two sharp aquas television - 40"
NEC projector

Conf Room A
Crestron media controller
Extron audio switcher
Sharp Aquos 40" tv LCD
Samsung DVD VHS

Conf Room B
Crestron media controller
Extron audio switcher
Smart screen smart technologies Sympodium ID370
Crestron control panel
Sharp Aquos 40" tv LCD
Samsung DVD VHS

Conf Room C
Sharp Aquos 40" tv LCD
Samsung DVD VHS

Other Meeting Room
Crestron media controller

Server Room
APC Net Shelter
APC Smart UPS 2200 XL
APC Smart UPS RT 6000
APC Power Modules
Movin Cool Unit

17344043.3
225850-10002

## EXHIBIT D CONTINUED

### Furniture

| Item | | Quantity | Color | Type |
|---|---|---|---|---|
| Desk/Task Chairs | | 12 | Black | Leather |
| Guest Chairs | | 47 | Blue | Fabric |
| Sofa - Large | | 6 | Blue | Fabric |
| Sofa - Medium | | 1 | Blue | Fabric |
| Club Chair | | 8 | Blue | Fabric |
| | | | | |
| Bookshelf - 5 shelves | | 2 | Stained | wood |
| Bookshelf - 4 shelves | | 1 | Stained | wood |
| Bookshelf - 3 shelves | | 3 | Stained | wood |
| Bookshelf - 2 shelves | | 1 | Stained | wood |
| Wood Table- MISC | | 5 | Stained | wood |
| Glass Tables - large | | 3 | clear | glass |
| Glass Tables - Small | | 3 | clear | glass |
| Credenzas | | 3 | stained | wood |
| Laterals - 3 drawer | Built in | 21 | stained | wood |
| Laterals - 2 drawer | Built In | 52 | stained | wood |
| File Cabinets-4 high | File Room | 13 | off white | metal |
| File Cabinets-5 high | File Room | 1 | off white | metal |
| File Cabinets-5 high | Corridor | 8 | | |
| | | | | |
| Office Lamp | | 2 | N/A | floor and table |
| Lamps w/shades - MISC | | 2 | | |
| Shades - MISC | | 3 | | |

### Appliances

| | |
|---|---|
| Microwaves | 2 |
| Refrigerators | 2 |
| Dishwashers | 2 |
| Ice Makers | 2 |

### Mail/copy Room

| | |
|---|---|
| Table | 1 |
| Metal Sorters | Several |

17344043.3
225850-10002

## EXHIBIT D CONTINUED

**Reception**

| | | | |
|---|---|---|---|
| Desk | 1 | stained | wood |
| Credenza | 1 | stained | wood |
| Sofa - Large | 1 | blue | fabric |
| Sofa - Medium | 1 | blue | fabric |
| Club Chair | 2 | blue | fabric |
| Rug | 1 | Multicolor | N/A |
| Side Tables | 2 | Clear | Glass |
| Center Table | 1 | Clear | Glass |
| Lamps w/shades | 2 | N/A | N/A |

**Meetings Rooms**

| | | | |
|---|---|---|---|
| Chairs | 48 | black | leather |
| Credenza | 2 | stained | wood |
| Tables - various sizes | 6 | stained | wood |
| Round Office Mtg Table | 1 | stained | wood |
| Sofas | 1 | blue | fabric |
| Rug | 1 | multicolor | N/A |
| A/V cabinet | 1 | stained | wood |
| Podium | 1 | stained | wood |

**OTHER**

| | | | |
|---|---|---|---|
| White Boards | 15 | | various offices |
| Filing Shelves-6 shelves | 4 | gray | metal |