**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11. 2001 | 03 MDL 1570 (GBD)(SN)<br>ECF Case |
|---|---|
| This document relates to:<br><br>*Faulkner v. Bin Laden, et al.* | 09-cv-7055 (GBD)(SN)<br><br>ECF Case |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST**
**THE ISLAMIC EMIRATE OF AFGHANISTAN**

JUDICIAL WATCH, INC.
James F. Peterson
425 Third Street SW, Suite 800
Washington, DC  20024
Tel:  (202) 646-5175
Fax:  (202) 646-5199
Email:  jpeterson@judicialwatch.org

*Attorneys for Plaintiff Lynn Faulkner*

July 14, 2022

# TABLE OF CONTENTS

I.      Introduction.............................................................................................................1

II.     Procedural Background.........................................................................................1

III.    Factual Background ...............................................................................................3

        A.  The Parties. ................................................................................................3

        B.  Afghanistan and Its Role in the 9/11 Attacks. ........................................4

IV.     The Court Has Subject Matter Jurisdiction.......................................................7

        A.  Actions of the Taliban Regime Are Attributable to Afghanistan Under Well-
            Established Law .........................................................................................9

        B.  Diplomatic Recognition Does Not Alter a State's Rights
            and Liabilities...........................................................................................11

        C.  Afghanistan's Actions Were Not "Discretionary"..................................13

V.      Plaintiff Is Entitled to Entry of a Default Judgment Against Afghanistan .................14

        A.  Legal Standard for Entry of Default Judgment.......................................14

        B.  Choice of Law .........................................................................................15

        C.  Conspiracy and Wrongful Death .............................................................16

VI.     Plaintiff's Damages..............................................................................................18

        A.  Economic Damages ..................................................................................19

        B.  Pain and Suffering...................................................................................19

        C.  Loss of Solatium .....................................................................................20

        D.  Prejudgment Interest ...............................................................................21

VII.    Conclusion .............................................................................................................21

i

# TABLE OF AUTHORITIES

## **Cases**

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519 (6th Cir. 2000)................................16

*Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*,
    600 F.3d 171 (2d Cir. 2010)...................................................................................7

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) . ...............................7

*Baker v. Elcona Homes Corp.*, 588 F.2d 551 (6th Cir. 1978) ........................................................3

*Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) ...........................................15

*Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2d Cir. 1994) .......................................15

*Dammarell v. Islamic Republic of Iran*, No. 01-2224,
    2005 U.S. Dist. LEXIS 5343 (D.D.C. Mar. 29, 2005)......................................................16

*Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011)...........................................................................2, 8

*Doe v. Bin Laden*, 580 F. Supp. 2d 93 (D.D.C. 2008) ..................................................................2

*Gosden v. Louis*, 687 N.E.2d 481 (Ohio Ct. App. 1996)..............................................................16

*Guar. Trust Co. v. United States*, 304 U.S. 126 (1938) ...............................................................11

*Havlish v. Bin Laden* (*In re Terrorist Attacks on September 11, 2001*),
    Civil Action No. 03 MDL 1570 (GBD),
    2011 U.S. Dist. LEXIS 155899 (S.D.N.Y 2011) ..................................................................3

*Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31 (D.C. 1989) ................................................16

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*,
    131 F. Supp. 2d 248 (D.D.C. 2001) ...................................................................................15

*Kenty v. Transamerican Premium Ins. Co.*, 650 N.E.2d 863 (Ohio 1995)...................................16

*LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640 (Ohio 1987)...................................16

*Lehigh Valley R. Co. v. State of Russia*, 21 F.2d 396 (2d Cir. 1927)...........................................11

*Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980)..............................................13, 14

*Liu v. Republic of China*, 642 F. Supp. 297 (N.D. Cal. 1986)......................................................13

*Melville v. American Home Assurance Co.*, 443 F. Supp. 1064 (E.D. Pa. 1977),
    *rev'd on other grounds*, 584 F.3d 1306 (3d Cir. 1978)........................................................3

*Menowitz v, Brown*, 991 F.2d 36 (2d Cir. 1993)..........................................................................15

*Republic of Iraq v. ABB AG*, 768 F.3d 145 (2d Cir. 2014)............................................................12

*Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517 (S.D.N.Y. 2013)....................................11, 12

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003) ..............................................14

*Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181 (D.D.C. 2008) .....................................15

*The Sapphire*, 78 U.S. (1 Wall.) 164 (1870)......................................................................9, 10, 11

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)..................................................................................7

*In re September 11 Litig.*, 2009 U.S. Dist. LEXIS 40295 (S.D.N.Y. 2009)...................................3

*Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217 (S.D.N.Y. 2003) .................14, 20

*Surrette v. Islamic Republic of Iran,* 231 F. Supp. 2d 260 (D.D.C. 2002) ...................................20

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
    731 F. Supp. 619 (S.D.N.Y. 1990). ..........................................................................9, 10

*Underhill v. Hernandez*, 65 F. 577 (2d Cir. 1895), *aff'd*, 168 U.S. 250 (1897). ..........................12

*Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002) ..................................14, 15

*United States v. American Tel. & Tel. Co.*, 498 F. Supp. 353 (D.D.C. 1980) ................................3

*United States ex rel. Kessler v. Watkins*, 163 F.2d 140 (2d Cir.),
    *cert. denied*, 332 U.S. 838 (1947). .......................................................................................9

*United States v. Nat'l City Bank of N.Y.*, 90 F. Supp. 448 (S.D.N.Y. 1950). ...............................10

*Universal Coach, Inc. v. New York City Transit Auth.*, Inc.,
    65 N.E.2d 28 (Ohio Ct. App. 1993)....................................................................................16

*Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101 (D.D.C. 2007) ................................15, 18

*Wagner v. Islamic Republic of Iran,* 172 F. Supp. 2d 128 (D.D.C. 2001) ....................................20

*Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002) ...................................15

*World Trade Ctr. Props. LLC v. Am. Airlines, Inc.*, 905 F. Supp. 2d 547 (S.D.N.Y. 2012) ...........3

*Ziegler v. Findlay Indus.*, 380 F. Supp. 2d 909 (N.D. Ohio 2005) ................................................17

**Statutes**

28 U.S.C. § 1367(a) ...........................................................................................................................7

28 U.S.C. § 1602, *et seq*. ......................................................................................................... *passim*

28 U.S.C. § 1608(a)(4) ......................................................................................................................1

28 U.S.C. § 1605(a)(2) ......................................................................................................................8

28 U.S.C. § 1605(a)(5) ..................................................................................................................1, 8

28 U.S.C. § 1606 .............................................................................................................................19

28 U.S.C. § 1608(e) ..................................................................................................................14, 15

Ohio Rev. Code Ann. § 2125.01 (2021). ................................................................................17, 18

Ohio Rev. Code Ann. § 2125.02 (2021). ................................................................................17, 18

**Other Authorities**

Federal Rule of Civil Procedure 50(a) ............................................................................................14

Fed. R. Evid. Rule 803(8) ................................................................................................................3

Final Report of the National Commission on Terrorist Attacks
    Upon the United States ...................................................................................... *passim*

Restatement (Third) of Foreign Relations Law of the United States § 208 (1987) ..................9, 10

Restatement (Third) of Foreign Relations Law § 402 (1987) ........................................................16

Plaintiff Lynn Faulkner, by counsel and pursuant to Rule 55 of the FRCP and 28 U.S.C. § 1608(e), respectfully submits this Memorandum of Law in support of his Motion for Entry of Default Judgment Against Defendant Islamic Emirate of Afghanistan.

## I.    Introduction.

This action arises from the September 11, 2001 terrorist attacks, during which Plaintiff Lynn Faulkner's wife tragically perished.  Plaintiff brings this action personally and as the executor and personal representative of his wife against the Islamic Emirate of Afghanistan (a/k/a, the Islamic State of Afghanistan) (hereafter "Afghanistan"), the Taliban, Bin Laden, Al Qaeda, and the Republic of Iran.  Plaintiff sues Defendant Afghanistan for conspiring with the other defendants to commit multiple unlawful acts leading up to the September 11, 2001 attacks and for wrongful death.

## II.    Procedural background.

In December 2001, Plaintiff, proceeding at that time as "John Doe," filed suit in the U.S. District Court for the District of Columbia, in his role as executor of the estate and personal representative of his wife Wendy Faulkner who perished in the attacks of September 11, 2001, as well as in his individual capacity.  *Doe v. Bin Laden*, No. 01-2516 (D.D.C.)  Plaintiff brought claims against Afghanistan and other defendants for conspiracy and wrongful death under the noncommercial tort exception of the FSIA.  28 U.S.C. § 1605(a)(5).  Plaintiff properly served process on Afghanistan through diplomatic channels as permitted by 28 U.S.C. § 1608(a)(4) and, when Afghanistan failed to timely answer, a default was entered by the clerk on January 29, 2003.  *See Doe*, No. 01-2516 (D.D.C.) (ECF No. 16).  Afghanistan eventually entered an appearance and moved to vacate the default and dismiss the complaint.  Plaintiff moved for entry of a default judgment.

The district court subsequently denied without prejudice Afghanistan's motion to dismiss the case for lack of subject matter jurisdiction. *Doe v. Bin Laden*, 580 F. Supp. 2d 93 (D.D.C. 2008). The court noted that the non-commercial tort exception applied to "all tort actions for money damages" and "seems facially to apply to Doe's factual allegations." *Id*. at 97. The court further stated that if Plaintiff were precluded from bringing a claim under § 1605(a)(5), then no U.S. citizen would be able to assert "tort claims against any foreign state arising from acts of terrorism other than the handful designated as state sponsors of terrorism." *Id*. The court observed that such an interpretation would be "peculiar" and lead to an "absurd" result Congress could not have intended. *Id*. The District Court then concluded that the noncommercial tort exception of the FSIA applied to Plaintiff's tort claims against Afghanistan. *Id*. at 99.

Subsequently, Afghanistan filed a notice of appeal with the U.S. Court of Appeals for the D.C. Circuit. On November 29, 2009, the D.C. Circuit transferred this case to the U.S. Court of Appeals for the Second Circuit.

The Second Circuit ruled that Plaintiff's suit could proceed under the noncommercial tort exception of the FSIA, while ordering that jurisdictional discovery should proceed on two factual issues raised by Afghanistan: (1) whether the Taliban acted as the nation of Afghanistan when it entered into the alleged conspiracy and (2) whether any such action was "discretionary" under 1605(a)(5)(A). *Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011). Following jurisdictional discovery, Afghanistan moved for summary judgment and briefing was completed on May 21, 2021. No. 09-7055, ECF Nos. 164, 181. Following collapse of the Afghanistan government in August 2021 and the return of the Taliban regime, counsel representing Afghanistan withdrew and the pending motion for summary judgment was denied as moot. No. 09-7055, ECF No. 224.

The Court directed that the case move forward according to FSIA's default judgment procedure, including an assessment of the Court's subject matter jurisdiction over Afghanistan. *Id.*

### III.    Factual Background.

#### A. The Parties.

Plaintiff Lynn Faulkner had been married to his wife Wendy for 20 years when she was a victim of the 9/11 attacks.  Wendy Faulkner was 47 years old.  *See* attached Declaration of James F. Peterson, Exhibit 1 (Declaration of Lynn Faulkner (submitted in support of Plaintiff's prior motion for default judgment) ("Faulkner Decl.")).  Mrs. Faulkner also had two daughters, Loren and Ashley Faulkner.  While Plaintiff and Mrs. Faulkner were residents of Ohio, Mrs. Faulkner was attending a one-day meeting on the 104th floor of the South Tower when it was struck by Flight 175 several floors below.  Faulkner Decl. at 5, 11.  Based on an account subsequently provided by a colleague of Mrs. Faulkner who escaped the South Tower, Mrs. Faulkner survived the crash of the airliner into the Tower.  *Id.*  The colleague recalls seeing Mrs. Faulkner unsuccessfully trying to board an over-crowded elevator in the minutes following the crash.  *Id.* At approximately 9:58am, just short of one hour after being struck by the hijacked airliner, the South Tower collapsed, killing all inside, including Mrs. Faulkner.  Faulkner Decl. at 11; s*ee* Exh. 2 to Peterson Decl. (Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Rep.") at 305-06).[1]

---

[1]      The 9/11 Commission Report, formally named Final Report of the National Commission on Terrorist Attacks Upon the United States, is the official report of the events leading up to the September 11, 2001 terrorist attacks. It was prepared by the National Commission on Terrorist Attacks Upon the United States (informally sometimes known as the "9/11 Commission" or the "Kean/Hamilton Commission") at the request of United States president George W. Bush and Congress.

The 9/11 Commission Report is admissible under Rule 803(8), Fed. R. Evid. (providing for admission into evidence of the records, reports and statements of official agencies as an exception to the hearsay rule).  The language of the rule and advisory notes establish that

Defendant Afghanistan is a foreign sovereign located in central Asia, and shares borders with Iran, Turkmenistan, Uzbekistan, Tajikistan, and Pakistan. The Taliban regime controlled a large portion of territory of Afghanistan from approximately 1996 until after September 11, 2001, and has re-established that control since August 2021 to the present. At the time of the September 11, 2001 terrorist attacks, the Taliban was headquartered in Kandahar, Afghanistan and had declared itself to be the legitimate government of Defendant Afghanistan. 9/11 Rep. at 111, 122, 124.

### B. Afghanistan's Role in the 9/11 Attacks.

Beginning in 1996, Bin Laden and Al Qaeda received support and assistance from Afghanistan, by and through officials, agents, and/or employees of the Taliban regime, in carrying out terrorist attacks against the United States. 9/11 Rep. at 63-67; 123-25; 156-60, 165-71, 369. As summarized in the 9/11 Report, "Afghanistan was the incubator for al Qaeda and for the 9/11 attacks." *Id*. at 369. The Taliban regime allowed Al Qaeda and Bin Laden to operate

---

"official reports are presumptively admissible unless the circumstances indicate a lack of trustworthiness." *United States v. American Tel. & Tel. Co*., 498 F. Supp. 353, 359 (D.D.C. 1980) (quoting *Melville v. American Home Assurance Co.*, 443 F. Supp. 1064, 1115 n.75 (E.D. Pa. 1977), *rev'd on other grounds*, 584 F.3d 1306 (3d Cir. 1978). "[C]ourts have been liberal in determining admissibility under Rule 803(8)." *Id*. (citing *Baker v. Elcona Homes Corp*., 588 F.2d 551, 557 (6th Cir. 1978)). "[Public] records or reports, by virtue of their being based on legal duty and authority, contain sufficient circumstantial guarantees of trustworthiness to justify their use at trial." *Id*. at 360 (quoting *Melville*, 443 F. Supp. at 1112).

    The 9/11 Commission was authorized and directed under Section 604 of Public Law 107-306 to investigate and report on the facts and causes relating to the terrorist attacks on September 11, 2001. *See* 9/11 at xv-xviii (Preface). The commission interviewed over 1,200 people in 10 countries and reviewed over two and a half million pages of documents, including some closely guarded classified national security documents. The report constitutes the official findings of the 9/11 Commission's investigation and has been relied on by this Court and other courts in lawsuits arising from the September 11, 2001 attacks. *See Havlish v. Bin Laden* (*In re Terrorist Attacks on September 11, 2001*), Civil Action No. 03 MDL 1570 (GBD), 2011 U.S. Dist. LEXIS 155899 (S.D.N.Y 2011); *In re September 11 Litig*., 2009 U.S. Dist. LEXIS 40295 (S.D.N.Y. 2009); *World Trade Ctr. Props. LLC v. Am. Airlines, Inc.*, 905 F. Supp. 2d 547 (S.D.N.Y. 2012).

training camps inside Afghanistan from which Al Qaeda and Bin Laden sifted recruits and

planned, trained for, and carried out terrorist attacks against the United States, including the

September 11, 2001 attacks. *Id*. at 63-67, 123-25, 156-60, 165-71, 369. The Taliban regime

essentially "open[ed] the doors to all who wanted to come to Afghanistan to train in camps." *Id*.

at 66. This sanctuary provided by Afghanistan allowed Al Qaeda to "train and indoctrinate

fighters and terrorists, import weapons, forge ties with other jihad groups and leaders, and plot

and staff terrorist schemes." *Id*. at 66. According to U.S. intelligence estimates, between 10,000

to 20,000 persons underwent instruction in these camps in Afghanistan from 1996 through

September 2001. *Id*. at 67.

Many of the 19 hijackers from the September 11 attacks were trained at camps inside

Afghanistan run by Al Qaeda and Bin Laden. 9/11 Rep. at 156-59, 233-36. In addition to more

general training in firearms and withstanding psychological pressure, Al Qaeda provided

specialized instruction on how to conduct hijackings, disarm air marshals, and take over an

airplane cockpit. *Id*. at 236.

Afghanistan, by and through officials, agents and/or employees of the Taliban regime,

also facilitated meetings and travel for those involved in the September 11, 2001 plot. 9/11 Rep.

at 66, 165-69, 235. This included various schemes to falsify passports, visas, and identification

cards. *Id*. at 169. These operations were institutionalized to such an extent that Al Qaeda even

operated a passport office at the airport in Kandahar, Afghanistan, which would add or erase

entry or exit stamps to create "false trails" in passports. *Id*. at 169, 235.

Afghanistan, by and through officials, agents and/or employees of the Taliban regime,

was the sole source of financing for Bin Laden when he arrived in Afghanistan, until Bin Laden

was able to reconstitute his fundraising efforts. *Id*. at 171. Eventually, Bin Laden provided $10-

20 million per year to the Taliban regime in return for safe haven inside Afghanistan.  *Id*. at 171.

Afghanistan, by and through officials, agents and/or employees of the Taliban, provided

additional support by allowing agents and operatives of Al Qaeda to "travel freely within the

country, enter and exit it without visas or any immigration procedures, purchase and import

vehicles and weapons, and enjoy the use of official Afghan Ministry of Defense license plates."

*Id*. at 66.  The state-owned airline of Afghanistan, Ariana Airlines, was used to courier money

into the country for Al Qaeda.  *Id*.

At all relevant times, Afghanistan, by and through officials, agents and/or employees of

the Taliban, was fully aware of the intention of Bin Laden and Al Qaeda to attack the United

States.  9/11 Rep. at 65-66; 250-52.  Despite numerous requests from the United States and

others, the Taliban refused to expel Al Qaeda and Bin Laden from Afghanistan.  *Id*. at 121-22,

125, 176, 182-83, 185, 205.

In 1999, the U.S. Government declared that the Taliban regime had allowed Al Qaeda

and Bin Laden to use Afghanistan "as a safe haven and base of operations" from which to carry

out terrorist attacks on the United States.  Specifically, President William J. Clinton declared:

> I, William Jefferson Clinton, President of the United States of America, find that
> the actions and policies of the Taliban in Afghanistan, in allowing territory under
> its control in Afghanistan to be used as a safe haven and base of operations for
> Usama Bin Laden and the al-Qaeda organization who have committed and
> threaten to continue to commit acts of violence against the United States and its
> nationals, constitute an unusual and extraordinary threat to the national security
> and foreign policy of the United States, and hereby declare a national emergency
> to deal with the threat.

Executive Order 13129 (July 4, 1999).  President Clinton renewed this declaration the following

year.  *See* Presidential Notice of June 30, 2000.  President George W. Bush also renewed this

same declaration in June 2001.  *See* Presidential Notice of June 30, 2001.

While it was never recognized as the "legitimate" government of Afghanistan by the United States and most of the international community, the Taliban regime effectively controlled Afghanistan and was the de facto government from 1996 through December 2001. As summarized by Plaintiff's expert, "[e]xcept for parts of north-eastern Afghanistan and a few pockets of opposition spread around the country, despite their relative poverty of means and their unsophisticated structure, the Taliban proved remarkably successful in controlling the country and imposing a *Pax Talibana*." *See* attached Expert Report of Antonio Giustozzi at ¶ 38 and generally (attached as Exh. 3 to Peterson Decl.).

**IV.    The Court Has Subject Matter Jurisdiction.**

The Court has subject matter jurisdiction over Plaintiff's conspiracy and wrongful claims against Afghanistan. Pursuant to 28 U.S.C. § 1330(a), the district courts of the United States have original jurisdiction over civil actions against foreign states not entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.* The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 174-75 (2d Cir. 2010), quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). In addition, the Court has supplemental jurisdiction over Plaintiff's claims against Afghanistan pursuant to 28 U.S.C. § 1367(a), as these claims are so related to Plaintiff's Anti-Terrorism Act claims against Defendants Taliban, Al Qaeda, and Bin Laden that they form part of the same case or controversy under Article III of the U.S. Constitution.

7

As previously recognized in this case by the district court in the District of Columbia and the Second Circuit Court of Appeals, Plaintiff has stated viable claims against Afghanistan under the noncommercial tort exception of the FSIA.  Afghanistan engaged in a conspiracy that resulted in harm in the United States.  "Therefore, at the pleading stage, the claim appears to fit within the noncommercial tort exception."  *Doe v. Bin Laden*, 663 F.3d at 67.   Plaintiff is therefore entitled to proceed under the noncommercial tort exception.  28 U.S.C. § 1605(a)(5).[2] Defendant Afghanistan is not entitled to immunity under the "tortious act or omission" exception to the FSIA.

Plaintiff's claims clearly do not fall within the "commercial activity" exception to the FSIA, 28 U.S.C. § 1605(a)(2).  Mrs. Faulkner was killed in the United States as a result of the tortious acts of Defendant Afghanistan, namely, conspiring with Defendants Taliban, Al Qaeda, and Bin Laden to commit multiple unlawful acts, including assault and battery, false imprisonment, intentional infliction of emotional distress, and violations of the Anti-Terrorism Act, in the course of the September 11, 2001 attacks.

As discussed herein, despite the changes in government, Afghanistan remains liable for the actions of the Taliban regime.  That most countries did not diplomatically recognize the Taliban regime does not alter Afghanistan's liability.  Moreover, Afghanistan's actions do not fall within the "discretionary function" exception of the FSIA.

---

[2]     On September 28, 2016, Congress enacted the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), which provides an additional ground for jurisdiction and liability against Afghanistan.  *See id.* § 3.  However, because an application for default judgment as to Plaintiff's claims under JASTA would potentially raise issues not previously addressed by the Court, Plaintiff is not seeking judgment in reliance on JASTA, but reserves the right to do so in the future, if necessary.

### A.     The Actions of the Taliban Regime Are Attributable to Afghanistan Under Well-Established Law.

The state of Afghanistan is liable for the actions of the previous Taliban government.  A change in regime has no effect on the liabilities and responsibilities of the state of Afghanistan, and Afghanistan cannot separate itself from the legal consequences arising from a prior government's actions.  *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 208 ("RESTATEMENT").  "It is generally accepted that a change in government, regime or ideology has no effect on that state's international rights and obligations because the state continues to exist despite the change . . ."  *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 731 F. Supp. 619, 621 (S.D.N.Y. 1990).  Moreover, the absence of diplomatic recognition does not interrupt this continuous chain of legal responsibility.

The U.S. Supreme Court and courts in this Circuit have long held that "the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it."  *Guar. Trust Co. v. United States*, 304 U.S. 126, 137 (1938); *see also* RESTATEMENT § 208 cmt a (Under international law, the capacities, rights, and duties [of a state] appertain to the state, not to the government which represents it [and] are not affected by a mere change in the regime or in the form of government or its ideology.").  Accordingly, a change in governing regimes works no corresponding change in the rights and duties appertaining to the state.  *See The Sapphire*, 78 U.S. (1 Wall.) 164, 168 (1870) ("The reigning Emperor, or National Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty.  A change in such representative works no change in the national sovereignty or its rights.").  When a foreign "government changes, the nation remains, with rights and obligations unimpaired."  *United States ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 332 U.S. 838 (1947).  Just as the rights

of a state continue despite regime change, so too do the state's liabilities. *See, e.g., United States v. Nat'l City Bank of N.Y.*, 90 F. Supp. 448, 452 (S.D.N.Y. 1950) (post-revolutionary Communist-controlled Russia liable on treasury notes issued by a provisional government of pre-revolutionary Russia).

Indeed, it is a fundamental principle of the law that a state's rights and liabilities survive even dramatic regime changes. The Republic of France, for example, was liable for the acts of Emperor Napoleon's government even though he was removed from power by Prussia during an invasion and occupation. *See The Sapphire*, 78 U.S. (11 Wall) at 167. Similarly, the Soviet government was treated as an "uninterrupted extension of the empire of the Czars" despite "the cataclysmic character of the Bolshevik revolution." *Nat'l City Bank of N.Y.*, 90 F. Supp. at 454. And Sudan "has been only one state" despite having undergone several fundamental regime changes:

> a civilian paramilitary government, which lasted until November 1958; a military regime, which . . . continued in office until it was overthrown by a civilian coup in October 1964, a second civilian regime, which was then installed and lasted until May 1969  . . ., a 12-month transitional military regime, ushered in by the coup of April 1985 . . ., a civilian coalition government which followed the general election of April 1986; and the present military regime which overthrew the civilian administration on 30 June 1989.

*Trans-Orient Marine Corp.*, 731 F. Supp. at 622-23 (quotations and emphasis omitted).

Only when an entirely new state is created – *i.e.*, "state succession" as opposed to mere transfers of power between "governments" – do existing rights and liabilities sometimes disappear. *Trans-Orient Marine*, 731 F. Supp. at 621. But state succession occurs only in the limited circumstances where the territory or population of a nation undergoes fundamental change. *See* RESTATEMENT § 208 cmt. B ("successor state" is "a state that wholly absorbs another state, that takes over part of a territory of another state, that becomes independent of

10

another state of which it had formed a part, or that arises because of the dismemberment of the state of which it had been a part"). Accordingly, the rights, duties, and responsibilities flowing to Afghanistan because of the Taliban regime's prior control of the Afghan state are attributable to Afghanistan.

### B.   Diplomatic Recognition Does Not Alter a State's Rights and Liabilities.

International recognition does not affect whether the Taliban regime's actions may be attributed to Afghanistan. Courts have long attributed conduct of allegedly unlawful regimes to the states they purported to represent. *See, e.g.*, *The Sapphire*, 78 U.S. (11 Wall) 164, 167, 20 L. Ed. 127 (1870) (Napoleonic France); *Guar. Trust Co. v. United States*, 304 U.S. 126, 137 (1938) (Provisional Government of Russia). And attribution operates independently of diplomatic recognition. "[A] state is responsible for the conduct of its effective government, whether or not that government was recognized by other states." *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 541 (S.D.N.Y. 2013) (citing Restatement (Third) of Foreign Relations Law of the United States § 207 cmt. b). Rather than diplomatic recognition, "[w]hat matters is control." *Id.*

As the Second Circuit has plainly stated:

> The granting or refusal of recognition has nothing to do with the recognition of the state itself. If a foreign state refuses the recognition of a change in the form of government of an old state, this latter does not thereby lose its recognition as an international person. Oppenheim, International Law, p. 120; Moore, Digest of International Law, vol. 1, p. 298. The suit did not abate by the change in the form of government in Russia; the state is perpetual, and survives the form of its government. *The Sapphire, supra*. The recognized government may carry on the suit, at least until the new government becomes accredited here by recognition.

*Lehigh Valley R. Co. v. State of Russia*, 21 F.2d 396, 401 (2d Cir. 1927).

Here, Plaintiff has alleged, and the evidence confirms, that the Taliban regime was in "de facto" control of Afghanistan from 1996 through December 2001. This control had legal

significance.   The Second Circuit has examined what it means to have "de facto control" of a nation.  *Republic of Iraq v. ABB AG*, 768 F.3d 145 (2d Cir. 2014).   In that case, the successor Iraqi government argued that although the Saddam Hussein regime "was in de facto control" of Iraq, it was not a "de jure or legitimate government."  *Id.* at 164.  It alleged that the Hussein regime assumed and retained power in contravention of domestic laws, and committed vile and genocidal acts, thereby making the Regime "[il]legitimate" from domestic and international perspectives.  *Id.*  The Second Circuit affirmed that a foreign government's actions are attributed to the state regardless of whether they are "legal under the municipal law of the foreign state" and whether they "are done by the authority of a de jure or titular, or of a de facto, government." *Id.* (citing *Underhill v. Hernandez*, 65 F. 577, 582 (2d Cir. 1895), *aff'd*, 168 U.S. 250 (1897). Thus, while the Hussein regime had been recognized by other governments, that recognition was not determinative of whether actions of the Hussein regime could be attributed to Iraq.  *See Underhill v. Hernandez*, 65 F. at 582 ("Upon principle, it cannot be important whether the acts of military authorities, when called in question, are done by the authority of a de jure or titular, or of a de facto, government. In either case, if they are done in the legitimate exercise of belligerent powers, they are not ordinarily attended with civil responsibility.").  The principle that actions of a regime – whether de jure or de facto – are attributed to a nation applies here.

The political question doctrine similarly is not relevant to the issue of diplomatic recognition.  A similar invocation of the political question doctrine was rejected by this Court in *Republic of Iraq v. ABB AG*.  920 F. Supp. 2d 517, 534-35.  The Court clearly held that the political question doctrine was not applicable because "it need not decide whether or not to recognize the Republic of Iraq as a sovereign state."  *Id.* at 535.

12

The Taliban regime was the de facto government of Afghanistan from 1996 through December 2001.  As the Taliban regime was the de facto government of Afghanistan, the heinous actions of the Taliban are properly attributable to Afghanistan.

### C.  Afghanistan's Actions Were Not "Discretionary."

Finally, conspiring to commit a terrorist act simply does not fall within the "discretionary function" exception of the FSIA.  Simply put, no court has found that murder – or a conspiracy to commit murder – is a "discretionary" act under the FSIA.

Two courts have examined the question whether state-ordered murders could constitute discretionary acts that allowed the foreign government to retain sovereign immunity under the statutory scheme of the FSIA.  In *Liu v. Republic of China*, 642 F. Supp. 297 (N.D. Cal. 1986), the court denied a motion to dismiss under the FSIA's discretionary function exception in a lawsuit where the plaintiff's representative alleged that the plaintiff was killed in California at the direction of Chinese officials.  *Id*. at 305. The court held that "planning and conducting the murder of Henry Liu could not have been a discretionary function as defined by the FSIA" because the "killing of Americans residing in the United States is not a policy option available to foreign countries."  *Id*.  In short, China "and its agents simply did not have the discretion to commit the acts alleged."  *Id*.

Similarly, in *Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980), the court found that the discretionary function exception did not bar a suit against Chile stemming from its alleged participation in the assassination of a Chilean official in Washington, D.C. because "there is no discretion to commit, or to have one's officers or agents commit, an illegal act."  *Id*. at 673.  As explained by the court: "Whatever policy options may exist for a foreign country, it has no 'discretion' to perpetrate conduct designed to result in the assassination of an individual

13

or individuals, action that is clearly contrary to the precepts of humanity as recognized in both

national and international law." *Id*.

The same is true here. The Taliban regime undisputedly engaged in a murderous

conspiracy with Bin Laden and Al Qaeda, knowingly giving safe haven and the means to carry

out the September 11, 2001 attacks. Engaging in a murderous conspiracy is not a discretionary

act under the FSIA. The Court has subject matter jurisdiction over Plaintiff's claims.

**V.     Plaintiff Is Entitled to Entry of a Default Judgment Against Afghanistan.**

**A.  Legal Standard for Entry of Default Judgment.**

Under the FSIA, "[n]o judgment by default shall be entered by a court of the United

States or of a state against a foreign state . . . unless the claimant established his claim or right to

relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Reed*, 845 F. Supp. 2d

at 211 (considering evidence presented by plaintiffs after satisfaction of jurisdictional

requirements); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The

court still has an obligation to satisfy itself that plaintiffs have established a right to relief."). To

prevail in a FSIA default proceeding, a plaintiff must present a "legally sufficient evidentiary

basis for a reasonable jury to find for plaintiff." *Ungar v. Islamic Republic of Iran*, 211 F. Supp.

2d 91, 98 (D.D.C. 2002). This standard is the same standard used for granting judgment as a

matter of law pursuant to Federal Rule of Civil Procedure 50(a). *See, e.g., Smith v. Islamic

Emirate of Afghanistan*, 262 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (adopting standard used in

*Ungar* and finding Iraq liable for September 11, 2001 terrorist acts).

Courts within the Second Circuit have noted that the proper standard for establishing

liability under the FSIA should be "less than normally required," *id*. at 223, and that a plaintiff

need merely demonstrate a prima facie case to obtain a judgment of liability in a FSIA case. *See*

14

*Ungar*, 211 F. Supp. 2d at 98.  A plaintiff meets its burden of proof by affidavit or similar

evidence, *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002), and a

court considering entry of default judgment may "accept plaintiffs' uncontroverted evidence as

true." *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 193 (D.D.C. 2008); *Valore v.

Islamic Republic of Iran*, 478 F. Supp. 2d 101, 106 (D.D.C. 2007).

Section 1608(e) does not require a new evidentiary hearing to establish liability when a

foreign sovereign is in default.  *See Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242

(2d Cir. 1994) (finding evidence in form of affidavits and exhibits sufficient to satisfy §1608(e));

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 262

(D.D.C. 2001) (accepting as true plaintiffs' uncontroverted factual allegations supported by

documentary and affidavit evidence without evidentiary hearing).  Plaintiff relies on his

own declaration, the official findings of the 9/11 Report, and the expert report of Dr. Antonio

Giustozzi to satisfy this evidentiary standard.

### B.  Choice of Law.

Because Plaintiff's claims against Afghanistan are state law claims, it is necessary to

determine which state's law applies.  An MDL transferee court "applies the substantive state law,

including choice-of-law rules, of the jurisdiction in which the action was filed." *Menowitz v,

Brown*, 991 F.2d 36, 40 (2d Cir. 1993).  Because Plaintiff filed this case in the United States

District Court for the District of Columbia, that court's choice-of-law rules apply.

Under District of Columbia choice of law rules, courts employ a modified government

interest analysis under which they "evaluate the governmental policies underlying the applicable

laws and determine which jurisdiction's policy would be most advanced by having its law

applied to the facts of the case under review." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d

40, 54 (D.D.C. 2006) (citing *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989)) (citations and internal quotations omitted). Generally, application of this governmental interest test points to the law of plaintiff's domicile as having the greatest interest in providing redress to its citizens. *Dammarell v. Islamic Republic of Iran*, No. 01-2224, 2005 U.S. Dist. LEXIS 5343, at *63 (D.D.C. Mar. 29, 2005) (citing Restatement (Third) of Foreign Relations Law § 402(3) (1987) (recognizing that the United States has an interest in projecting its laws overseas for "certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests")). Accordingly, Plaintiff's claims are governed by the law of his domicile and Mrs. Faulkner's domicile at the time of the 9/11 attacks – the State of Ohio. *See* Faulker Decl. at 5.

### C.  Conspiracy and Wrongful Death.

Under Ohio law, Plaintiff is entitled to entry of default judgment on both his conspiracy and wrongful death claims. A civil conspiracy claim enlarges the pool of potential defendants from whom a plaintiff may recover damages. *Gosden v. Louis*, 687 N.E.2d 481, 497-98 (Ohio Ct. App. 1996). The Supreme Court of Ohio defines civil conspiracy as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerican Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995); *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987); *Aetna Cas. &Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000). In order to establish a claim of civil conspiracy, a plaintiff must establish the following four elements: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy. *Universal Coach, Inc. v. New York City Transit Auth.*, Inc., 65 N.E.2d 28, 33 (Ohio Ct. App. 1993).

Damages are recoverable if "caused by a tort committed in furtherance of the conspiracy."

*Ziegler v. Findlay Indus.*, 380 F. Supp. 2d 909, 914 (N.D. Ohio 2005).

Furthermore, an action for wrongful death under Ohio law is governed by Ohio's

wrongful death statute.  The statute provides in relevant part:

> When the death of a person is caused by wrongful act, neglect, or default which
> would have entitled the party injured to maintain an action and recover damages if
> death had not ensued, the person who would have been liable if death had not
> ensued, or the administrator or executor of the estate of such person, as such
> administrator or executor, shall be liable to an action for damages,
> notwithstanding the death of the person injured and although the death was caused
> under circumstances which make it aggravated murder, murder, or manslaughter.

*See* Ohio Rev. Code Ann. ("ORCA") § 2125.01 (2021).  A civil action under this statute may be

brought "in the name of the personal representative of the decedent for the exclusive benefit of

the surviving spouse, the children, . . . [as well as] the other next of kin of the decedent."  ORCA

§ 2125.02)(A)(1).  Available compensatory damages for a wrongful death action include

pecuniary damages, loss of support, services, society and prospective inheritance, as well as pain

and suffering incurred by the bereaved plaintiff.  ORCA § 2125.02(B).  The surviving spouse

and children of the decedent are "rebuttably presumed to have suffered damages by reason of

wrongful death."  ORCA § 2125(A)(1).

The elements of civil conspiracy are met here.  Plaintiff has demonstrated that

Afghanistan provided material support of and engaged in conspiratorial efforts with the Taliban,

Bin Laden and Al Qaeda.  As discussed above, the evidence of Afghanistan's involvement is

overwhelming.  Beginning in 1996, Bin Laden and Al Qaeda received material support and

assistance from Afghanistan, by and through officials, agents and/or employees of the Taliban in

carrying out terrorist attacks against the United States, including the September 11, 2001 attacks.

9/11 Rep. at 66, 67, 123, 125, 156-57, 165-66, 168-71, 365-66, 369.  Many of the 19 hijackers

received training at camps in Afghanistan run by Bin Laden and Al Qaeda. *Id*. at 156-57, 233-36. Afghanistan, by and through officials, agents and/or employees of the Taliban, facilitated meetings and travel for those involved in the September 11, 2001 plot. *Id*. at 66, 165-66, 168-69, 235. Despite numerous requests from the United States and others, Afghanistan, by and through officials, agents and/or employees of the Taliban, refused to expel Bin Laden and Al Qaeda from Afghanistan. *Id*. at 121-22, 125, 176, 182-83, 185, 205.

Similarly, there can be no question that Plaintiff, as personal representative of the estate of his deceased wife, has demonstrated a claim for wrongful death under ORCA § 2125.02. Afghanistan, the Taliban, Al Qaeda, and Bin Laden orchestrated and carried out the attack on the South Tower of the World Trade Center, which directly caused the death of Mrs. Faulkner. Accordingly, Afghanistan is liable to Plaintiff, in his capacity as personal representative of the estate of Mrs. Faulkner, for the damages Plaintiff and his and Mrs. Faulkner's children suffered as a result of Mrs. Faulkner's death.

### VI. Plaintiff's Damages.

As a direct and proximate result of the intentional, willful, and malicious acts of terrorism by Afghanistan and the other Defendants on September 11, 2001, Plaintiff, Plaintiffs decedent wife, and Plaintiff's other family members suffered severe and permanent personal injuries, damages, and losses, as discussed more fully below. Courts have recognized that "estates of those who [died] can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010) (concerning damages under FSIA).

As a result of its wrongful conduct, Afghanistan is liable since a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.  Plaintiff, as an individual and in his capacity and as personal representative of the estate of Wendy Faulkner, is entitled to recover for economic loss, pain and suffering, and loss of solatium.

### A.  Economic Damages.

Plaintiff is entitled to economic damages, primarily lost earnings, in the amount of $3,967,999, as set forth in the updated economist's report attached to Peterson Decl. as Exhibit 4 (submitted and accepted in ECF No. 7358-2 at 25 (*Ber Barry Aron v. Islamic Republic of Iran*, No. 1:20-cv-09376(GBD)(SN)).  The original report, which was prepared in support of an application to the Victim Compensation Fund for victims of 9/11, calculates the value of the lost earnings of Wendy Faulkner.  *See* Faulkner Decl. ¶ 16.

### B.  Pain and Suffering.

In assessing non-economic damages, courts have been guided by prior decisions awarding damages for pain and suffering of victim of terrorism.  *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 160 (D.D.C. 2006) (a court "may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium."); *Haim*, 425 F. Supp. 2d at 71. Plaintiff, as personal representative of the estate, is entitled to recover for the pain and suffering endured by Wendy before and at her death.

As attested to in Plaintiff's declaration, credible evidence indicates that Wendy survived the initial impact of airplane into the World Trade Center's South Tower.  Faulkner Decl. ¶ 11. According to one her co-workers, Wendy was seen alive and was trying to get on to an elevator to exit the building.  *Id*.  Unfortunately, the elevator was full, preventing Wendy's escape.  *Id*.

Wendy likely died when the building collapsed, approximately 56 minutes after the crash. *Id.*; Compl. ¶ 16.

This Court has considered precisely these circumstances in assessing the appropriate award for pain and suffering for a 9/11 victim. *Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 217, 238-39 (S.D.N.Y. 2003). Because, like the victim in *Smith*, Wendy Faulkner similarly survived the impact and endured pain and suffering prior to her death, an award for her pain and suffering should be entered in the amount of $2,000,000.

### C. Loss of Solatium.

As a result of the unconscionable acts of Defendants, Plaintiff has suffered and will continue to suffer severe mental grief and loss of society and comfort. *See* Faulkner Decl. ¶¶ 12-15. Awards in similar cases again provide guidance as to the appropriate amount to award a Victim's relatives for a death caused by a terrorist act.

In cases involving acts of terrorism, a claim for solatium is the equivalent to a claim for intentional infliction of emotional distress. *Surrette v. Islamic Republic of Iran,* 231 F. Supp. 2d 260, 267 n. 5 (D.D.C. 2002) ("In the context of FSIA cases, this Court has recognized the claim of solatium as ... indistinguishable from the claim of intentional infliction of emotional distress."); *Wagner v. Islamic Republic of Iran,* 172 F. Supp. 2d 128, 135 n. 11 (D.D.C. 2001) (noting that, in an intentional homicide case, "solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress").

In cases before this Court, solatium damages have been awarded to spouses of victims of the September 11 attacks in the amount of $12,500,000 on multiple occasions. *See Havlish* (ECF No. 2618 at 10-12); *Ashton* (ECF No. 3300), *Bauer* (ECF No. 3341), *Hoglan* (ECF No. 3384), and *Burnett/Iran II* (No. 15-cv-09903, ECF No. 101). In another MDL matter before this Court seeking a default judgment against Iran, Plaintiff was awarded solatium damages in the amount of

$12,500,000.  *See* No. 03 MDL 1570 (ECF No. 7522 at 25) (*Ber Barry Aron v. Islamic Republic of Iran*, No. 1:20-cv-09376(GBD)(SN)).

Consistent with this precedent, Plaintiff likewise should be awarded $12.5 million for his loss of solatium.

> ### D.    Prejudgment Interest.

Consistent with rulings in other cases before the Court, Plaintiff asks that he be awarded prejudgment interest to his claims in the amount of 4.96 percent.  *See, e.g.*, *Hoglan, et al. v. Islamic Rep. of Iran, et al.*, 1:11-cv-07550-GBD (ECF No. 3384 at 6).

## VII.    Conclusion.

For the reasons set forth above, Plaintiff respectfully requests that a final default judgment be entered in his favor against Defendant Afghanistan as follows:

Economic Damages $3,967,999

Pain and Suffering $2,000,000

Loss of Solatium $12,500,000

Prejudgment Interest in amount of 4.96 percent compounded annually, running from September 11, 2001 until the date of judgment.

Hence, the Court should award in total $18,467,999 in damages against Afghanistan plus prejudgment interest.

July 14, 2022                                              Respectfully submitted,

JUDICIAL WATCH, INC.

/s/  *James F. Peterson*
James F. Peterson
425 Third Street, S.W., Suite 800
Washington, DC 20024
Tel: (202) 646-5175
Email:  jpeterson@judicialwatch.org

*Attorneys for Plaintiff Lynn Faulkner*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2022, a copy of the foregoing was filed via the Court's

CM/ECF filing system, which sent notification of such filing to counsel of record in this case.

/s/  *James F. Peterson*
James F. Peterson