UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |
| This document relates to:<br>*Ashton et al. v. al Qaeda Islamic Army*, et al., | 02-cv-6977 (GBD)(SN)<br>ECF Case |

# THE ASHTON/PERSONAL INJURY 2 PLAINTIFFS' MOTION FOR FINAL JUDGMENTS

For the reasons set forth below and in the accompanying declaration of James P. Kreindler ("Kreindler Declaration") and exhibits thereto, those *Ashton* Personal Injury Plaintiffs set forth in Exhibit A to the Kreindler Declaration ("*Ashton* Personal Injury 2"),[1] by and through their counsel, Kreindler & Kreindler LLP, respectfully move this Court for an Order:

1) Awarding those Plaintiffs set forth on Exhibit A to the Kreindler Declaration damages as supported by the sworn declarations of the individuals physically injured on September 11, 2001 in the 9/11 Terrorist Attacks;

2) Awarding the *Ashton* Personal Injury 2 Plaintiffs pre-judgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages;

3) Granting the *Ashton* Personal Injury 2 Plaintiffs permission to seek punitive damages and any other appropriate damages at a later date;

4) Finding that service of process was properly effected upon the Islamic Republic of Iran ("Iran") in accordance with 28 U.S.C. § 1608(a) for sovereign defendants; and,

---

[1] Prior motions were delineated by roman numerals, but that led to certain numbers being inadvertently repeated. To try to avoid this error, we have now shifted to the use of Arabic numbers to identify each group of movants.

5) Granting permission for all other plaintiffs in this action not appearing on Exhibit A to the Kreindler Declaration to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

This motion is made on behalf of the claimants listed in Exhibit A attached to the Kreindler Declaration (*Ashton* Personal Injury 2 Plaintiffs), in light of this Court's previous order granting permission to allow remaining plaintiffs in the case to move for this relief. *See* ECF No. 3300.[2] The framework for assessment of personal injury damages for individuals who were physically injured on September 11, 2001 in the Terrorist Attacks and survived to pursue damages against the terrorist-sponsor defendants was previously set forth by this Court and the proposed damages awards here are intended to follow that framework. *See* ECF No. 5879.

As the awards set forth in the proposed order represent the only direct recovery against Iran on behalf of the *Ashton* Personal Injury 2 Plaintiffs listed in Exhibit A to the Kreindler Declaration, the proposed order will constitute final awards and judgments against Iran for those plaintiffs listed in Exhibit A to the Kreindler Declaration.

I.      **Procedural Background**

On September 4, 2002, the *Ashton* Plaintiffs filed their first complaint against the sponsors of the September 11, 2001 terrorist attacks, which included allegations against Iran. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 1. Plaintiffs, both United States nationals and non-nationals, asserted federal jurisdiction pursuant to, among other things, the Alien Tort Statute (28 U.S.C. § 1350) ("ATS"), the Foreign Sovereign Immunities Act (28 U.S.C. § 1605(a)) ("FSIA") and the Torture Victim Protection Act (28 U.S.C. § 1350 note) ("TVPA"). *Id.* at 28, 39 – 40, 43, 48. Iran

---

[2] References to the 03-md-1570 docket entries will be noted only by the ECF document number. Any reference to a prior Order or filing on a different docket will include that docket number as well as the ECF document number.

was listed as a named defendant in the *Ashton* Plaintiffs' Consolidated Amended Complaint, filed on March 6, 2003, with the same jurisdictional assertions. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 11-2 at 17, ECF No. 11-5 at 45 - 49.[3]  This Consolidated Amended Complaint (the "CAC") was served in compliance with FSIA requirements through diplomatic channels, but Iran has never answered. *See* 02-cv-6977 (S.D.N.Y.), ECF No. 424 at 2; *see also* 02-cv-6977 (S.D.N.Y.) ECF No. 358.  The *Ashton* Plaintiffs moved for a Certificate of Default, which the Clerk of the Court issued. *See* 02-cv-6977 (S.D.N.Y.), ECF No. 651.

At the time that the CAC was first filed against Iran, the FSIA functioned as a pass-through statute, denying immunity for claims arising from certain acts of terrorism or material support for terrorism if the United States had designated the foreign sovereign a state sponsor of terrorism, thus allowing a plaintiff to pursue a claim in the federal courts in suits against a nation-state that had been officially designated a state-sponsor of terrorism, such as Iran. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221(a), 110 Stat. 1214, 1241.  The substantive causes of action detailed in the CAC included, among other things and as relevant here, common-law wrongful assault and battery and personal injuries arising from violations of the Anti-Terrorism Act (18 U.S.C. § 2333) and the FSIA. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 11-5 at 245 – 50.

Based on evidence and arguments submitted by various plaintiffs in this consolidated multi-district litigation arising out of the September 11, 2001 terror attacks, the *Ashton* Plaintiffs moved for a judgment of liability against Iran for claims arising out of the deaths of the

---

[3] The *Ashton* Personal Injury 2 Plaintiffs set forth on Exhibit A to the Kreindler Declaration were both named in the initial complaint as well as the Consolidated Amended Complaint and are both United States nationals. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 1-2 at 23 and ECF No. 11 at 24-25; Kreindler Decl. at ¶ 4.

3

plaintiffs' decedents. ECF No. 3008. In their motion for a liability default judgment, the *Ashton* Plaintiffs relied on the Certificate of Default entered in the *Ashton* case, which was premised on the CAC that Iran had never answered. ECF No. 2970 at 2. They then moved for a default judgment of liability against Iran only as to those causes of action established under the FSIA. ECF No. 2970 at 2, 10 – 18. This Court granted that motion for a default judgment of liability. ECF No. 3014.[4]

Thereafter, the *Ashton* Plaintiffs moved for partial summary judgment for the conscious pain and suffering that victims murdered on September 11, 2001 suffered before death, which this Court granted, and certain *Ashton* Plaintiffs moved for default judgments on economic damages suffered as a result of their decedents' wrongful deaths as well. This Court granted those motions. *See* ECF No. 3229 (adopting December 28, 2015 Report and Recommendation awarding damages for conscious pain and suffering) and No. 3356 (awarding damages for economic loss). In addition, certain *Ashton* Plaintiffs moved for solatium damages suffered by immediate family members and those non-immediate family members who were the "functional equivalent" of immediate family members eligible to recover under the terrorism exception to the FSIA as well as for the economic loss suffered on behalf of the estates of some of those killed on September 11, 2001. *See, e.g.,* ECF Nos. 3295 (Motion for Final Judgment for *Ashton I* claimants including claims for solatium damages); 4058 (Motion for Final Judgment for *Ashton*

---

[4] The *Ashton* Plaintiffs at the same time also moved for permission to file an Amended Consolidated Complaint against Iran, asserting the same jurisdictional allegations as in the prior complaints, adding a claim based on the new provision of the FSIA enacted subsequent to the filing of the original suits against Iran and adopting and incorporating by reference the prior *Ashton* allegations against Iran. ECF Nos. 2968, 2968-1 at 1 - 2 (adding allegations under 28 U.S.C. § 1605A). The Court issued an Opinion and Order that allowed the *Ashton* Plaintiffs to amend their pleadings as to Iran without requiring service of the amended pleadings. ECF No. 3227. Plaintiffs thereafter filed the Amended Consolidated Complaint on the docket. ECF. No. 3237.

*V* claimants, the "functional equivalent" of immediate family members, solely for solatium damages); 5535 (Motion for Final Judgment for *Ashton XVII* and *Betru VI* claimants seeking economic damages and final judgments for estates). Further, some plaintiffs, including the *Ashton* group, moved for compensatory damages relating to the physical injuries they suffered on September 11, 2001 during the Terrorist Attacks. *See, e.g.* ECF No 5792.

This Court granted these motions, finding that an award to the immediate family members (or functional equivalent) of each decedent was proper, that economic damages and final judgments for estates were warranted, that personal injury damages were warranted and that prejudgment interest was warranted.

For the reasons below as well as those set forth in the prior motions for summary judgment on liability and prior motions for judgment for damages, the *Ashton* Personal Injury 2 Plaintiffs listed in Exhibit A to the Kreindler Declaration now move this Court to grant the proposed Order awarding them damages consistent with the personal injury framework this Court previously adopted, directing that pre-judgment interest be assessed at 4.96 percent per annum and finding that service of process was properly effected on Iran pursuant to the FSIA (28 U.S.C. § 1608(a)). The *Ashton* Plaintiffs also ask for permission to continue to submit applications in subsequent stages on behalf of those claimants not included in the exhibits attached to the Kreindler Declaration, should any other applications be warranted.

**II.     Damages**

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA") creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1).

The statute specifies that damages are available "for personal injury or death," 28 U.S.C. § 1605A(a)(1) and (c)(4), and includes "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4).

### A. Personal Injury Damages

The plaintiffs identified in Exhibit A include individuals who were on site at the time of the terrorist attacks in New York, New York (at the World Trade Center complex or surrounding area) or who were among those who entered the premises in the vicinity of the World Trade Center and were injured on September 11, 2001 by subsequent damage resulting from the attacks. The injuries suffered by the *Ashton* Personal Injury 2 Plaintiffs range from broken bones to chronic pain to serious neurological injuries. One non-physical injury that accompanies nearly all of these physical injuries is acute post-traumatic stress disorder for those who were on the site of the September 11, 2001 Terrorist Attacks and, somehow, survived. Under the FSIA, these injuries are all compensable, and given that these injuries occurred on September 11, 2001 as a direct result of the attacks – suffered by individuals either in the Twin Towers when the terrorists flew jetliners into the buildings or who entered the premises immediately after the attack to try and extricate victims – the proximate causation of these injuries is clearly established.

This Court has previously looked to precedent in the U.S. District Courts for the District of Columbia for guidance in addressing damages resulting from claims arising pursuant to 28 U.S.C. § 1605A. Well-established caselaw exists in the D.C. District Court regarding the measurement of pain and suffering damages in personal-injury cases such as this one. In *Cohen v. The Islamic Republic of Iran*, 268 F. Supp. 3d 19 (D.D.C. 2017), the court acknowledged that it had "adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million

in compensatory damages." 268 F. Supp. 3d at 24; *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007).

This Court has previously examined personal-injury damages in the context of the terrorist attacks on September 11, 2001. In the first Report and Recommendation issued by Magistrate Judge Netburn addressing personal injury damages in this context (which was affirmed by Judge Daniels without objection), the Court found that an upward departure from prior D.C. Circuit precedent was appropriate where "personal injury plaintiffs cannot escape the memory of 9/11." See ECF No. 5879 at 5. This accorded with Magistrate Judge Maas' determination in 2012 that the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day" and "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." ECF No. 2618 at 11 (Report and Recommendation); ECF No. 2623 (Order adopting Report and Recommendation).

This Court then established "a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million for personal-injury damages for pain and suffering arising from injuries sustained on September 11, 2001. The Court, however, reserved its discretion to award further upward departures in exceptional cases." ECF No. 5879 at 6. The Court divided the categories of injuries into three classifications:

1. "Significant" injuries (presumptively $5 million for pain and suffering): "single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in dust or

7

debris; significant respiratory ailments including nasal irritations, chest pain, and asthmas from inhalation of smoke, soot and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery. This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries." ECF No. 5879 at 6-7.

2. "Severe" injuries (presumptively $7 million for pain and suffering): "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas." ECF No. 5879 at 7.

3. "Devastating" injuries (presumptively $10 million for pain and suffering): "loss of limbs or multiple digits; severe pulmonary traumas; strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic trauma. Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category." ECF No. 5879 at 8.

The Court issued upward or downward departures based on the facts of each case presented. *See, e.g,* ECF No. 5955 at 3-4 (granting upward departure and awarding $25,000,000 for injuries that were "beyond devastating.")

As set forth below, the *Ashton* Personal Injury 2 Plaintiffs move for compensatory damages consistent with this framework that this Court previously established.

B.     **Punitive Damages**

Plaintiffs are also entitled to punitive damages. *See* 28 U.S.C. § 1605A(c)(4). Previously in this case, one magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory). ECF No. 2623 at 2. The Court has applied that ratio to awards for plaintiffs in other related cases. *See, e.g.*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, a different magistrate judge recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF No. 3363 at 28. Judge Daniels adopted that recommendation, denying without prejudice the plaintiffs' request for punitive damages. ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, the *Ashton* Plaintiffs request permission to address the issue of punitive damages at a later date. *See, e.g.*, ECF No. 3666 (Judge Daniels' order authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### C. Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). In light of the Court's prior orders granting motions for damages for the deaths and injuries suffered on September 11, 2001 in the Terrorist Attacks which applied the 4.96 percent rate to prejudgment interest, the *Ashton/Iran* Plaintiffs identified in Exhibit A respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## III. Individualized Case Assessments

Plaintiffs have attempted to identify the category for the Court for each of these injury plaintiffs in accord with the letter submitted to the Court on January 10, 2020 in an effort to assist the Court in addressing these claims in an efficient manner. *See* ECF No. 5484 at 13-14.[5]

---

[5] Here, the injuries fall into only the following categories set forth in that letter:
1) IMPACT INJURY
Persons physically injured by the impact of the aircraft hitting the WTC I, WTC II, Pentagon, and WTC Marriot (jet fuel burns or blast injuries, jet fuel exposure and damage, broken backs/necks/limbs, paraplegics, orthopedic trauma);
2) ESCAPE INJURY
Persons physically injured during the escape from the buildings (those injured descending the long dark staircases, those injured in elevators (i.e. during free falls), those who were trampled while escaping, those who fell and were injured while the Pentagon or WTC, resulting in broken bones, crushed limbs, trauma lacerations, bruising, etc.);
3) BUILDING COLLAPSE INJURY
Persons physically injured in either the WTC I or II buildings or Marriot WTC collapse at and around Ground Zero (explosion-like injuries, being buried in rubble, eye or ear damage, head injuries, crushed limbs, multi-system acute traumas, shrapnel like injuries from glass or metal, etc.);
4) FALLING DEBRIS INJURY
Persons injured at Ground Zero or Pentagon by falling debris (TBIs, concussions, crushed limbs, variety of physical injuries and traumas.

A.  Timothy "Tim" Frolich
    Injury Category: Impact, Escape, Building Collapse, Falling Debris Injuries
    Proposed Severity: Devastating

On September 11, 2001, Tim Frolich, an assistant treasurer for Fuji Bank, was working on the 80th floor of the South Tower of the World Trade Center. When the first plane hit the North Tower, Tim, a volunteer fire warden for floors 79 through 82, coordinated with the other wardens to try to evacuate co-workers from the building, despite being told by the Port Authority that everyone in the South Tower should remain at their work stations and await instructions. Kreindler Decl., Exhibit B, Declaration of Timothy Frolich ("Frolich Decl.") at ¶¶ 5, 6. As Tim ushered his colleagues down the stairwell, following them from the rear, he stopped to rest in an office space on the 70th floor when the hijackers flew United Airlines Flight 175 into the South Tower, just eight flights above where Tim was catching his breath and two floors below his office. Frolich Decl. at ¶¶ 8, 9. Had Tim remained at his work space, he would have been trapped and died in the South Tower.

When Flight 175 hit the Twin Towers, the force threw Tim across the room several feet. Frolich Decl. at ¶ 9. He turned and started to crawl back to the stairwell, watching as another man in the same room jumped out a shattered window. Frolich Decl. at ¶ 10. Tim was able to get to the stairs despite the smoke filling the room, though he had to crawl on the floor to do so. Frolich Decl. at ¶ 11. As he then made his way down the stairwell, he witnessed other victims with gaping wounds and open cuts. Frolich Decl. at ¶ 11. As they all approached the 50th floor, the crowd slowed and panic set in. Frolich Decl. at ¶ 11.

Somewhere between the 25th and 30th floors, Tim came across a woman suffering from an asthma attack. Frolich Decl. at ¶ 11. She did not believe she could make it down the stairs, but Tim told her he would not go on without her and walked the woman safely down the rest of the

11

stairs. Frolich Decl. at ¶ 11, 12.  Soon after they exited the building, while only a few hundred yards out, the South Tower began to rumble and Tim tried to run away from the site but was consumed by the cloud of debris, which he describes as "midnight blackness." Frolich Decl. at ¶ 12.  He "stood in the pitch black cloud waiting to die." Frolich Decl. at ¶ 12.

Another person came to Tim's rescue, yanking him into another building where he fell down a flight of stairs. Frolich Decl. at ¶ 13.  His left foot snapped and broke. Frolich Decl. at ¶ 13.  Tim found himself again in total darkness, now badly hurt, "petrified" about going back outside and unable to walk on his broken foot. Frolich Decl. at ¶ 14.  Eventually, a firefighter arrived, splinted Tim's foot and carried him to an area with other survivors, including the woman that Tim had escorted down the final twenty-five flights of stairs. Frolich Decl. at ¶ 14.

As paramedics placed Tim in an ambulance along with two women with burns so severe that their skin had turned "completely black and was peeling off." Frolich Decl. at ¶ 15.  As the ambulance drove off, a member of the emergency, medical team shouted that the North Tower was collapsing. Frolich Decl. at ¶ 15.  Tim passed out from panic, awaking in St. Vincent's Hospital. Frolich Decl. at ¶¶ 15, 16.

Initially, Tim was told that he merely sprained his ankle, but as it turns out he had dislocated the talar navicular joint in his left foot, severely sprained his left knee and had an effusion along the lateral joint of his left leg. Frolich Decl. at ¶ 17.  He required emergency surgery after which he was told that he would likely experience severe traumatic arthritis and would need future surgery. Frolich Decl. at ¶ 18.  Follow up treatment showed that Tim was suffering from reflex sympathetic dystrophy ("RSD") in his left foot. Frolich Decl. at ¶ 21; Kreindler Decl., Exhibit C, Frolich Medical Records ("Frolich Records") at 2-5.  RSD is a disorder of the sympathetic nervous system characterized by severe, chronic pain, and can lead to

a cycle of intractable pain, swelling, temperature changes and bluish color change in the skin, with later causing the pain to spread to other regions of the body. Frolich Decl. at ¶ 21.  Indeed, Tim needed multiple epidurals, nerve blocks, pain medications and physical therapy to try to treat the "excruciating and unrelenting pain" in his foot and ankle. Frolich Decl. at ¶ 22. Unfortunately, none of that adequately remedied the injuries and, to this day, he continues to suffer from that pain. Frolich Decl. at ¶ 24.  He was classified as having a permanent disability due to the foot and ankle pain in September 2003. Frolich Decl. at ¶ 23; Frolich Records at 5. The RSD continues to cause him daily physical pain that has restricted his ability to engage in social activities. Frolich Decl. at ¶ 24; Frolich Records at 4, 5.

The physical pain also serves as a continual reminder of the September 11th Terrorist Attacks, causing Tim's anxiety and depression to continue despite long-term therapy and counseling. Frolich Decl. at ¶ 22; Frolich Records at 7.  He suffers from post-traumatic stress disorder, anxiety, depression and flashbacks. Frolich Decl. at ¶ 23; Frolich Records at 7.  He also has suffered serious side effects from the medication he took for his pain and for his mental health, which led to him developing esophagitis, gastritis, duodenitis and hemorrhoids. Frolich Decl. at ¶ 22.  Tim can no longer help with household work and chores and has found it impossible to participate in the leisure activities that used to give him joy, such as sports and exercising. Frolich Decl. at ¶ 24.

As Tim says, he is "unlikely to ever fully recover from the physical injuries" he "sustained on 9/11m and will always carry with [him] the PTSD and other mental impacts of that day." Frolich Decl. at ¶ 24.

Based on his permanent and debilitating injuries and his loss coupled with the related and ongoing mental, psychological and emotional anguish, Tim Frolich should be granted an upward

departure from any baseline damages award for the injuries he sustained on September 11, 2001.[6]

  **B. John F. Jermyn**
    **Injury Category: Building Collapse, Falling Debris Injuries**
    **Proposed Severity: Severe**

John F. Jermyn was an 18-year veteran of the New York City Fire Department ("FDNY") on September 11, 2001. Kreindler Decl., Exhibit D, Declaration of John Jermyn ("Jermyn Decl.") at ¶ 4.[7] He had been present for the 1993 bombing of the World Trade Center and, at the time of the September 11th Terrorist Attacks, was working on light duty due to a work-related injury to his back. Jermyn Decl. at ¶ 5. He was part of the education unit at the New York City Fire Museum on Spring Street when, stepping out of the subway the morning of September 11, 2001, he saw the first plane hit the North Tower. Jermyn Decl. at ¶ 5. John immediately called FDNY dispatch and learned that some members of his former Engine Company were on their way to the World Trade Center. Jermyn Decl. at ¶ 5. Though cleared only for light duty, John went to join and assist his former Engine Company. Jermyn Decl. at ¶ 5.

When John and his team were about to enter the South Tower, the building collapsed. John was pummeled with debris and his head, neck and shoulders were hit with parts of the building. Jermyn Decl. at ¶ 6. He was engulfed by the dust cloud and fell repeatedly as he tried to excavate himself from the wreckage. Jermyn Decl. at ¶ 6. As he tried to get out, he fell into a

---

[6] Tim previously received an award from the 9/11 Victim Compensation Fund. Kreindler Decl. at ¶7.

[7] Victim John F. Jermyn died on December 24, 2019 and his son John Jermyn was duly appointed the personal representative of the Estate of John F. Jermyn. *See* Exhibit E to Kreindler Decl. (Estate Appointment). Prior to John F. Jermyn's death, he described his experiences on September 11, 2001 to his son. Jermyn Decl. at ¶ 2. The injuries described here are also supported by his medical records. Jermyn Decl., Exhibit A, Jermyn Medical Records ("Jermyn Records") at 8-10.

pit, twisting his knees in an unnatural direction and injuring his foot. Jermyn Decl. at ¶ 6. Then, after clearing himself from that rubble, John joined his former Engine Company and assisted with a large hose used to try to put out fires in buildings along the water, John suffered extreme lower back pain that travelled down his left leg, causing him to fall to the ground with pain. Jermyn Decl. at ¶ 7.

That same day, upon returning to his home borough of Staten Island, John went to University Hospital where he was briefly evaluated and prescribed pain medications. Jermyn Decl. at ¶ 8. One month later, with the pain from the injuries he suffered on September 11, 2001 not abating, John returned to visit a physician. Jermyn Decl. at ¶ 9. John had severe loss of motion in his back and shoulder and feeling in his lower legs. Jermyn Decl. at ¶ 9. A subsequent MRI showed that John had suffered a herniated disc. Jermyn Decl. at ¶ 10. John was given fully disabled status by the FDNY and retired from the FDNY in late November 2002. Jermyn Decl. at ¶ 11. He never fully regained his range of motion and lived with chronic pain from the injuries he suffered on September 11, 2001 until his death in 2019. Jermyn Decl. at ¶ 13. He experienced pain from a herniated disc and disc bulge in his back caused by the injuries he suffered on September 11, 2001, and also suffered from degenerative disc desiccation. Jermyn Decl. at ¶ 12. Following the September 11, 2001 Terrorist Attacks, John was never able to fully participate in the daily activities he had engaged in previously. Jermyn Decl. at ¶ 13. Additionally, he suffered from the mental aftermath of living through the September 11, 2001 Terrorist Attacks, even without an official diagnosis. Jermyn Decl. at ¶ 14.

## IV. Conclusion

For all of the reasons herein, as well as those set forth in the submissions of the other plaintiffs in this case and plaintiffs in the other 9/11 related cases in the *In re Terrorist Attacks on*

*September 11, 2001* multidistrict litigation, the *Ashton* Personal Injury 2 Plaintiffs identified in Exhibit A respectfully request that this Court award them (1) compensatory damages for pain and suffering in amounts commensurate with the injuries these individuals sustained during the Terrorist Attacks on September 11, 2001 and in accordance with the framework this Court previously adopted; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the *Ashton* Personal Injury 2 Plaintiffs to seek punitive damages, economic damages, or other damages at a later date; and (4) for all other *Ashton* Plaintiffs not appearing on Exhibit A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated: July 15, 2022                                     Respectfully submitted,

                                                         /s/  James P. Kreindler
                                                         James P. Kreindler, Esq.

                                                         Attorneys for the *Ashton/Iran* Plaintiffs