```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:                                                              03-MD-01570 (GBD)(SN)

    TERRORIST ATTACKS ON                                            REPORT &
    SEPTEMBER 11, 2001                                              RECOMMENDATION

-----------------------------------------------------------------X
```

**SARAH NETBURN, United States Magistrate Judge:**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

> Hemenway, et al., v. Islamic Republic of Iran, No. 18-cv-12277
> BNY Mellon, et al., v. Islamic Republic of Iran, No. 19-cv-11767
> Bodner, et al., v. Islamic Republic of Iran, No. 19-cv-11776
> Bernaerts, et al., v. Islamic Republic of Iran, No. 19-cv-11865
> Aron, et al., v. Islamic Republic of Iran, No. 20-cv-09376
> Hargrave, et al., v. Islamic Republic of Iran, No. 20-cv-09387
> Bianco, et al., v. Islamic Republic of Iran, No. 20-cv-10902

Fifteen plaintiffs in seven cases move for default judgments against the Islamic Republic of Iran. ECF No. 7589. They also ask that the Court find that they are functionally family members ("functional equivalents") of people killed in the September 11, 2001, terrorist attacks and thus entitled to solatium damages. While not the immediate family of the victims, these Plaintiffs urge that their close relationship with the victim merits awarding damages. The Court recommends that this Motion be granted in part as described in this Report and Recommendation.

## DISCUSSION

The Court assumes familiarity with the general background of this case. The procedural history of the Plaintiffs' Motion is addressed as part of the discussion on service of Iran.

**I. Iran Is Liable to These Plaintiffs and Was Properly Served**

Iran is liable to these Plaintiffs and was properly served. Service on a foreign sovereign must be achieved by one of the four means in 28 U.S.C. § 1605(a)(1)–(4), in descending order of preference from 28 U.S.C. § 1605(a)(1) to 28 U.S.C. § 1605(a)(4). Iran may not be served under 28 U.S.C. § 1605(a)(1) or 28 U.S.C. § 1605(a)(2) because there is no special arrangement between the United States and Iran and no international convention applies. The Plaintiffs attempted service through a mailing by the Clerk of the Court as required by 28 U.S.C. § 1605(a)(3), which failed when Iran rejected the mailing. Service was thus achieved by diplomatic means. The U.S. State Department transmitted service papers to the Swiss Government, which presented them to Iran. Iran, which has never appeared in this case, defaulted in each case and a Clerk's Certificate of Default was issued, followed by a default liability judgment. The ECF numbers associated with the filings for each of these steps are collected in Table 1.

| | Affidavit of Service | Clerk's Certificate of Default | Default Liability Judgment |
|---|---|---|---|
| **Table 1: Service, Default, and Liability** *All numbers are the ECF No. of the relevant filing* | | | |
| Hemenway, et al. v. Islamic Republic of Iran, No. 18-cv-12277 | 4694 | 4814 | 5054 |
| BNY Mellon, et al. v. Islamic Republic of Iran, No. 19-cv-11767 | 6899 | 6935 | 7522 |
| Bodner, et al. v. Islamic Republic of Iran, No. 19-cv-11776 | 6897 | 6934 | 7522 |
| Bernaerts, et al. v. Islamic Republic of Iran, No. 19-cv-11865 | 6895 | 6933 | 7522 |
| Aron, et al. v. Islamic Republic of Iran, No. 20-cv-09376 | 6894 | 6937 | 7522 |
| Hargrave, et al. v. Islamic Republic of Iran, No. 20-cv-09387 | 6911 | 6922 | 7522 |
| Bianco, et al. v. Islamic Republic of Iran, No. 20-cv-10902 | 6896 | 6936 | 7522 |

Iran thus is liable to the Plaintiffs. The only outstanding question is their damages.

## II.     Functional Equivalent Family Members

The Plaintiffs seek solatium damages for the loss of their loved ones in the September 11 Attacks. These damages are generally restricted to the immediate family members of victims killed in a terrorist attack. In limited circumstances, however, damages have been awarded to non-immediate family members who are the "functional equivalent" of immediate family.

The Court first defined the framework for determining functional equivalence in a report and recommendation issued on October 14, 2016. ECF No. 3363, adopted at ECF No. 3384. ("Hoglan II.") It refined this framework in "Hoglan IV," issued on August 8, 2017. ECF No. 3676, adopted at ECF No. 3795.[1] The Hoglan IV framework has been the basis for four subsequent decisions on motions for damages based on functional equivalence. ECF Nos. 4175, 5154, 5387 adopted at 5950, 5483 adopted at 5950.

Solatium awards for family members are similarly well-established. Judge Maas recommended, and Judge Daniels adopted, a framework under which spouses of victims generally receive $12,500,000 in solatium damages, parents and children receive $8,500,000, and siblings receive $4,250,000. ECF Nos. 2618, adopted at 2623. This framework has been the basis for thousands of awards to family members, see, e.g., ECF Nos. 3358 at 9, adopted at 3383, 3666, 4023, 4146, 5062, 5087, 5138, and functional equivalent family members. See, e.g., ECF Nos. 3363 at 16, 4175 at 7, 5154 at 4, 5483 at 21–23. This award has been reduced where a functional equivalent relationship is found but is not fully comparable to a familial relationship. See, e.g., ECF Nos. 3363 at 22 (recommending a stepmother receive half of the normal award

---

[1] Hoglan I involved solatium claims for immediate family members, ECF No. 3358, and Hoglan III concerned non-U.S. nationals. ECF No. 3374.

where she entered the decedent's life when he was 11), 5387 at 7 (recommending a stepsibling receive half the normal award where he began living with the decedent at 14). The Court therefore evaluates this Motion under the <u>Hoglan IV</u> framework, and the damages framework set out by Judge Maas.

### 1. Joan Ruth Puwalski

Joan Ruth Puwalski began dating Steven J. Bates, a New York firefighter, in 1992. ECF No. 7592-4 at 2. In 1994, she moved into his home in Glendale, New York, where the two lived together until Mr. Bates's death in the September 11 Attacks. <u>Id.</u> They supported each other financially, raised two dogs together, and enjoyed frequent vacations and celebratory dinners. <u>Id.</u> at 2–3. Mr. Bates was welcomed into Ms. Puwalski's family and she, in turn, received his Fire Department benefits and pension, as well as support from numerous charitable groups, after his tragic death. <u>Id.</u> at 3–4, 17–32.

Given Ms. Puwalski's almost decade-long relationship with Mr. Bates, their six years living together as a couple, and their mutual financial support, the Court recommends that she be awarded $12,500,000, the full amount paid to unmarried partners of victims of the September 11 Attacks.

### 2. Laura Nogaj

Laura Nogaj and Steven Philip Morris began dating in October 1998. ECF No. 7592-5 at 1. A little more than a year later, they moved in together, splitting their time between Ms. Nogaj's house in Ormond Beach, Florida, and Mr. Morris's apartment in Atlanta, Georgia. They later moved to Ormond Beach together. <u>Id.</u> The couple traveled throughout Europe and the United States, supported each other financially, and shared many nights at Atlanta's Punchline Comedy Club. <u>Id.</u> at 3. They were engaged in July 2001, <u>id.</u> at 3, 23, and after his death, Ms.

Nogaj's entire family attended his funeral. Id. at 4. Mr. Morris's parents also paid off his car and gave it to her, and she received financial support from numerous organizations to assist with the challenges of his passing. Id. at 4, 87–105.

Given Ms. Nogaj's and Mr. Morris's almost three-year relationship, engagement, and mutual financial support, the Court recommends that Ms. Nogaj be awarded $12,500,000, the full amount paid to unmarried partners of victims of the September 11 Attacks.

### 3. Jude Monteserrato

Jude Monteserrato began dating John Michael Sbarbaro in 1986 when they met while working for Chase Manhattan Bank. ECF No. 7592-6 at 2. In 1992, they moved in together and lived in Brooklyn, New York until Mr. Sbarbaro was killed. They both contributed financially to their life together, id. at 2, and while they were never formally engaged, Mr. Sbarbaro, who held title to their condominium, wrote a letter saying that it should go to Ms. Monteserrato, the "love of [his] life" if he passed away. Id. at 2, 12. Mr. Sbarbaro's mother honored that wish and gave the property to Ms. Monteserrato. Id. at 2, 14–17. The couple supported each other through the grief of losing family members and took numerous trips together. Mr. Sbarbaro even organized a surprise trip for her after secretly enlisting her boss's help. Id. at 3. After his death, numerous community groups came to her support, and Mr. Sbarbaro's employer paid for her health insurance for 10 years. Id. at 4.

Ms. Monteserrato and Mr. Sbarbaro's enduring close relationship and mutual financial support are sufficient for the Court to recommend that Ms. Monteserrato be awarded $12,500,000, the full amount paid to unmarried partners of victims of the September 11 Attacks.

### 4. Janice Dukes[2]

Janice Dukes met Donnie Taylor in 1988, but they did not start dating until February 1994. Five months later, they moved in and lived together until Mr. Taylor's death. ECF No. 7592-7 at 2. They shared household expenses and frequented Rosa's, their favorite restaurant. Id. at 2–3. They were engaged in February 2001, and Mr. Taylor bought her a ring in August. Id. at 2. If not for the September 11 Attacks, they would have been married in 2002. *The New York Times* later wrote about Ms. Dukes's struggles after Mr. Taylor's passing. Id. at 24.

Based on Ms. Dukes's and Mr. Taylor's six years of cohabitation, their shared finances, engagement, and pending wedding, the Court recommends that Ms. Dukes be awarded $12,500,000, the full amount paid to unmarried partners of victims of the September 11 Attacks.

### 5. Jesse Kemp and Nicholas Kemp

Jesse and Nicholas Kemp are the stepchildren of Timothy Haviland. When Mr. Haviland began dating their mother in 1997, they were eight and ten, respectively. ECF No. 7592-8 at 2 (Jesse), ECF No. 7592-9 at 2 (Nicholas).[3] Mr. Haviland soon moved in, and he and their mother bought a house together. The two got engaged in 1998 and married in 1999. Id. The Kemp brothers were not close to their biological father and saw him only sporadically after their parents' divorce. ECF No. 7592-8 at 3, ECF No. 7592-9 at 3. Mr. Haviland filled this gap. He supported the family financially, cooked dinners, and supervised the children's homework. ECF No. 7592-8 at 2–3, ECF No. 7592-9 at 2–3. He taught Jesse to roller-skate, ECF No. 7592-8 at 3, and Nicholas how to build a computer. ECF No. 7592-9 at 3.

---

[2] Janice Dukes was listed in the original Bernaerts complaint as "John Doe 75." She was substituted in on December 29, 2021. ECF No. 7511.

[3] Because the Kemps share a last name, the Court refers to them by their first names for clarity.

Mr. Haviland is properly deemed Jesse and Nicholas Kemps' parent. He entered their lives during or just after early childhood, then supported them emotionally and financially until his tragic passing. Under Hoglan IV, however, their claims must be treated differently. Hoglan IV directs that full solatium damages be awarded when a decedent enters a stepchild's life in early childhood, meaning before age nine. ECF No. 3676 at 13. From age nine on, the award is reduced to half the total solatium award. Id. Jesse and Nicholas Kemp fall on either side of this divide, being eight and ten when Mr. Haviland entered their lives. Accordingly, the Court recommends that Jesse Kemp be granted the full solatium award granted to biological children who parents were killed in the September 11 Attacks, $8,500,000, and that Nicholas Kemp be awarded half this sum, $4,250,000.

### 6. Maureen Sullivan

Maureen Sullivan began dating Derek O. Sword in Spring 1999 after they met at the New York Athletic Club. ECF No. 7592-10 at 2. In Fall 2000, they moved to New York's Upper East Side, where they lived until his death. Id. The couple shared expenses and other financial connections: Mr. Sword paid the rent and Ms. Sullivan paid the utilities and phone bill. Both made the other their life insurance beneficiary. Id. They also traveled the world together, seeing Lake George, Boston, St. Barts, Ireland, Scotland, England, South Africa, Canada, and Italy. He taught her to play squash, and a New York Athletic Club's squash court has been renamed in his memory. Id. at 3. They were engaged in February 2001, and the wedding was set for December 7, 2002. Id. at 2. Given this couple's more than two-year relationship, cohabitation for approximately a year, history of shared expenses, engagement, and pending wedding, the Court recommends that Ms. Sullivan be awarded $12,500,000, the full amount paid to unmarried partners of September 11 Attacks victims.

### 7. Karen Carlucci

Karen Carlucci met Peter Frank through a mutual friend who worked with him at Bear Sterns. ECF No. 7592-11 at 2. After dating for about four years, they moved to the West Village, and got engaged a little less than a year later. Id. Their wedding date was set for October 19, 2001, id., and the wedding invitations had been made. Id. at 4, 12. As a couple, they supported each other financially, and attended events with each other's family. Even after Mr. Frank's death, Ms. Carlucci remained closed with his family, and they spent the 20th anniversary of the September 11 Attacks together. Id. at 3–4. Though she canceled the other wedding arrangements, Ms. Carlucci kept the ring that he would have married her with. Id. at 31–32. Their five-year relationship—two of it spent cohabitating—mutual financial support, engagement, and impending wedding is sufficient for the Court to recommend that Ms. Carlucci be awarded $12,500,000, the full amount paid to unmarried partners of victims of the September 11 Attacks.

### 8. Lucy Aita

Lucy Aita and Paul Innella began dating in August 2000. ECF No. 7592-13 at 2. He moved into her parents' house in October and proposed in November. Their wedding was initially set for the summer of 2001 but was moved to April 2002. Id. For the eleven months he lived with Ms. Aita and her parents, Mr. Innella supported the family, and paid for various improvements to the house. He prepared a will designed to care for Ms. Aita, which he would have signed the Saturday after the September 11 Attacks. Id. at 3, 49. He also forged a strong bond with her son. After his death, Ms. Aita began suffering from anxiety and depression and remains disabled as of today. ECF No. 7592-13 at 5, ECF No. 7592-14 at 82.

Ms. Aita's case is challenging. The Court has no doubt that she and Mr. Innella loved each other deeply and that he played an important role in her son's life. "[L]ove, empathy, support, and attachment to the deceased victim," however, is not the touchstone for evaluating

8

functional equivalence. Hoglan IV, at 6–7. Rather, in the case of unmarried couples, the factors are "(1) the duration of the relationship; (2) the degree of mutual financial dependence and investments in a common life together; (3) the duration of cohabitation; and (4) the presence or absence of a formal engagement." Id. at 11. Hoglan IV further holds that "the presence or absence of a formal engagement is virtually dispositive for any fiancée claim where no legal barrier would have impeded the couple from getting married." Id. at 12.

Mr. Innella and Ms. Aita were formally engaged, and he had begun supporting her financially. They also comingled their finances in other ways, such as by making each other the beneficiary of their life insurance policies and starting to plan their taxes as a couple. ECF No. 7592-13 at 3, ECF No. 7592-14 at 45, 47. The durational factors weigh against Ms. Aita as she and Mr. Innella were a couple for just 13 months and cohabitated for less than a year. Given their formal engagement, however, the Court finds that Ms. Aita is properly identified as the function equivalent of a spouse. It therefore recommends that she receive an award of $12,500,000.

9. **Cristal Barragan and Katherin Pleitez**[4]

Cristal Barragan and Katherin Pleitez are the stepchildren of Moises Rivas, who entered their lives when they were five and nine, respectively. ECF No. 7592-15 at 2 (Ms. Barragan), ECF No. 7592-16 at 2 (Ms. Pleitez). Mr. Rivas married their mother on May 15, 1996, and the group lived together as a family until his death. Id. He was their only father figure because their biological father passed away when Ms. Barragan and Ms. Pleitez were three and six, respectively. ECF No. 7592-15 at 4 (Ms. Barragan), ECF No. 7592-16 at 3 (Ms. Pleitez).

---

[4] Cristal Barragan and Katherin Pleitez were added to Bernaerts by amendment on October 7, 2021. ECF No. 7224.

Mr. Rivas was deeply involved in both of their lives. In addition to supporting the family financially, he taught Ms. Barragan to play the guitar, ECF No. 7592-15 at 3, and got Ms. Pleitez a ticket to see the band NSYNC perform at Madison Square Garden. ECF No. 7592-16 at 3. He taught both women Spanish while they helped him with English. ECF No. 7592-15 at 3, ECF No. 7592-16 at 3.

Moises's constant parental presence, financial support, and emotional investment in these women's lives from 1995 until his death in the September 11 Attacks is sufficient to deem him their parent, particularly given the early death of their biological father. Like the Kemp brothers, Ms. Barragan and Ms. Pleitez fall on either side of the age range in Hoglan IV governing the award of full or partial solatium damages. Accordingly, the Court recommends that Ms. Barragan be granted the full solatium award granted to biological children whose parents were killed in the September 11 Attacks, $8,500,000, and that Ms. Pleitez be awarded half this sum, or $4,250,000.

### 10. Denyse Betcher and Danny Marino[5]

Denyse Betcher and Danny Marino are the stepchildren of Paul Ruback. Mr. Ruback came into their lives when Ms. Betcher was 10 and Mr. Marino was around 12 or 13. ECF No. 7592-17 at 2 (Ms. Betcher), ECF No. 7592-18 at 2 (Mr. Marino). He moved in and married their mother soon after. The family bought a house in Newburgh, where they lived together. Id. Mr. Ruback supported the family financially and treated them to dishes that he learned to cook at the Ladder 25 firehouse. Id. Music bonded the group together. He bought Ms. Betcher a guitar and on one memorable trip, they roamed the streets of Rochester singing for an hour. ECF No. 7592-

---

[5] Mr. Marino's name is spelled "Morino" in the original complaint. Hargrave, et al. v. Islamic Republic of Iran, No. 20-cv-09387, ECF No. 1 at 16. The documents supporting his declaration confirm that "Marino" is the proper spelling. ECF No. 7592-18 at 18.

17 at 3. He also bought Mr. Marino his first album: Pink Floyd's The Wall. ECF No. 7592-18 at 3. At Christmas, they all attended parties at the firehouse. ECF No. 7592-17 at 3, ECF No. 7592-18 at 3.

While Mr. Ruback played an important role in Ms. Betcher and Mr. Marino's lives, their biological father remained a part of their lives as well. ECF No. 7592-17 at 3–4, ECF No. 7592-18 at 3–4. Ms. Betcher felt her biological father was "great," called him "Dad" and stayed with him every other weekend. ECF No. 7592-17 at 3–4. Mr. Marino maintained a relationship with him as well. ECF No. 7592-17 at 3. Weekend visitation by a biological parent is not a total barrier to recovery. See ECF No. 4175 at 3–4 (awarding full solatium despite a biological parent maintaining weekend visitation schedule), but the Court may consider it, particularly when a stepchild's relationship with the decedent begins after early childhood (*i.e.*, after age eight) and the stepchild maintains at least some contact with their biological parents on an ongoing basis. In these circumstances, the Court has awarded half the normal solatium damages. See, e.g., ECF No. 3363 at 22, (awarding half solatium damages where the stepparent entered a child's life at age 11 and the biological parent maintained limited contact), ECF No. 5483 at 15–16 (awarding half solatium damages where the stepparent entered a child's life at age 10 and the biological parent maintained limited contact).

Ms. Betcher and Mr. Marino's relationship with Mr. Ruback began after early childhood, when both were at least ten years old, and they maintained a relationship with their biological father. The Court therefore recommends that they each be awarded $4,250,000, half the award granted to biological children whose parents were killed in the September 11 Attacks.

### 11. Natalie Pollack

Natalie Pollack is the stepdaughter of Louis F. Aversano, Jr. Mr. Aversano entered Ms. Pollack's life when she was around five years old and married her mother shortly after. From

then on, they lived together until Ms. Pollack left for college at 18. ECF No. 7592-19 at 2. Throughout this period, Ms. Pollack's biological father was not a significant figure in her life, and years would pass without them seeing each other. Id. at 3. Mr. Aversano supported her financially, helped her with homework (math was his specialty), taught her to ride a bike, and took her to his parents' home for dinner every Sunday. Id. at 2–3. For Mr. Aversano and her mother's 25th anniversary, Ms. Pollack and her husband paid for the two to take a trip to Florida. Id. at 4.

Mr. Aversano raised Ms. Pollack and provided for her in all the ways a parent might from the time she was five years old. Her biological father was effectively absent. The Court has found in similar circumstances that a stepparent is functionally equivalent to a parent. See, e.g., ECF No. 5483 at 20–21. The same is true here. The Court recommends awarding Ms. Pollack $8,500,000, the full amount paid to the biological or adopted children of victims of the September 11 Attacks.

**12. Jamielah Persol[6]**

In 1992, Jamielah Persol began dating DaJuan Hodges after they met at work. ECF No. 7592-20 at 2. They later had a baby girl and, in 1993, they moved in together. At first, they lived together with Mr. Hodges's mother. Sometime after 1996, they moved into their own apartment in the Bronx. Id. They were engaged in the summer of 2001 when Mr. Hodges surprised her with a ring hidden in a pharmacy bag. Id. Throughout their relationship, they shared household expenses. Id. at 3. This history, including eight years of living together with shared expenses, a formal engagement, and a child is sufficient for the Court to recommend that Ms. Persol be

---

[6] Jamielah Persol was listed in the original Hemenway complaint as "John Doe 28." She was substituted in on December 6, 2021. ECF No. 7430.

awarded $12,500,000, the full amount paid to unmarried partners of September 11 Attacks victims.

## CONCLUSION

The Court recommends finding that service was achieved on Iran and that the Plaintiffs who have been identified as functional equivalents of family members be granted solatium damages as follows in Table 2:

| Table 2: Solatium Awards | | | | |
|---|---|---|---|---|
| **Plaintiff** | **Decedent** | **Relationship** | **Functional Equivalent** | **Solatium Damages** |
| Joan Ruth Puwalski | Steven J. Bates | Life Partner | Spouse | $12,500,000 |
| Laura Nogaj | Stephen Philip Morris | Fiancé | Spouse | $12,500,000 |
| Jude Monteserrato | John Michael Sbarbaro | Life Partner | Spouse | $12,500,000 |
| Janice Dukes | Donnie Taylor | Fiancé | Spouse | $12,500,000 |
| Jesse Kemp | Timothy Haviland | Stepchild | Parent | $8,500,000 |
| Nicholas Kemp | Timothy Haviland | Stepchild | Parent | $4,250,000 |
| Maureen Sullivan | Derek O. Sword | Fiancé | Spouse | $12,500,000 |
| Karen Carlucci | Peter Frank | Fiancé | Spouse | $12,500,000 |
| Lucy Aita | Paul Innella | Fiancé | Spouse | $12,500,000 |
| Cristal Barragan | Moises Rivas | Stepchild | Parent | $8,500,000 |
| Katherin Pleitez | Moises Rivas | Stepchild | Parent | $4,250,000 |
| Denyse Betcher | Paul Ruback | Stepchild | Parent | $4,250,000 |
| Danny Marino | Paul Ruback | Stepchild | Parent | $4,250,000 |
| Natalie Pollack | Louis F. Aversano, Jr. | Stepchild | Child | $8,500,000 |
| Jamielah Persol | DaJuan Hodges | Fiancé | Spouse | $12,500,000 |

The Court further recommends that Plaintiffs be awarded prejudgment interest on these damages from September 11, 2001, to the date of judgment, at a rate of 4.96 percent per annum, compounded annually. ECF No. 3358, adopted at ECF No. 3383.

Plaintiffs may apply for punitive, economic, and other damages at a later date and in a manner consistent with any applicable future Court rulings on the issue. Additionally, any plaintiffs in these seven cases not appearing in this Motion who were not previously awarded

13

damages may still submit applications for damages awards in later stages. In light of the August 1, 2022 deadline to file with the United States Victims of State Sponsored Terrorism Fund, parties are encouraged to notify the Court as soon as possible if any objections will be filed. Upon resolution of these motions, the Court may terminate the motion at ECF No. 7589, and the related motions in Hemenway, No. 18-cv-12277, ECF No. 167; BNY Mellon, No. 19-cv-11767, ECF No. 90; Bodner, No. 19-cv-11776, ECF No. 85; Bernaerts, No. 19-cv-11865, ECF No. 98; Aron, No. 20-cv-09376, ECF No. 89; Hargrave, No. 20-cv-09387, ECF No. 82; and Bianco, No. 20-cv-10902, ECF No. 73.

Dated: July 26, 2022
New York, New York

SARAH NETBURN
United States Magistrate Judge

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). These objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).