```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
```

In re:

      TERRORIST ATTACKS ON
      SEPTEMBER 11, 2001

```
-----------------------------------------------------------------X
```

03-MD-01570 (GBD)(SN)

**REPORT &
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge:**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

    Hemenway, et al. v. Islamic Republic of Iran, No. 18-cv-12277
    BNY Mellon, et al. v. Islamic Republic of Iran, No. 19-cv-11767

    Three plaintiffs in two cases move for default judgments against the Islamic Republic of Iran. ECF No. 8164. They also ask that the Court find that they are functionally family members ("functional equivalents") of people killed in the September 11, 2001, terrorist attacks and thus entitled to solatium damages. While not the immediate family of the victims, these Plaintiffs urge that their close relationship with the victim merits awarding damages. The Court recommends that this Motion be granted in part as described in this Report and Recommendation.

## DISCUSSION

    The Court assumes familiarity with the general background of this case. The procedural history of the Plaintiffs' Motion is addressed as part of the discussion of service on Iran.

**I.    Iran Is Liable to These Plaintiffs and Was Properly Served**

    Iran is liable to these Plaintiffs and was properly served. Service on a foreign sovereign must be achieved by one of the four means in 28 U.S.C. § 1605(a)(1)–(4), in descending order of preference from 28 U.S.C. § 1605(a)(1) to 28 U.S.C. § 1605(a)(4). Iran may not be served under

28 U.S.C. § 1605(a)(1) or 28 U.S.C. § 1605(a)(2) because there is no special arrangement between the United States and Iran and no international convention applies. The Plaintiffs attempted service through a mailing by the Clerk of the Court as required by 28 U.S.C. § 1605(a)(3), which failed when Iran rejected the mailing. Service was thus achieved by diplomatic means. The U.S. State Department transmitted service papers to the Swiss Government, which presented them to Iran. Iran, which has never appeared in this case, defaulted in each case and a Clerk's Certificate of Default was issued, followed by a default liability judgment. The ECF numbers associated with the filings for each of these steps are collected in Table 1.

| Table 1: Service, Default, and Liability | | | |
| --- | --- | --- | --- |
| *All numbers are the ECF No. of the relevant filing* | | | |
|  | Affidavit of Service | Clerk's Certificate of Default | Default Liability Judgment |
| Hemenway, No. 18-cv-12277 | 4694 | 4814 | 5054 |
| BNY Mellon, No. 19-cv-11767 | 6899 | 6935 | 7522 |

Iran thus is liable to the Plaintiffs. The only outstanding question is their damages.

II.  **Functional Equivalent Family Members**

The Plaintiffs seek solatium damages for the loss of their loved ones in the September 11 Attacks. These damages are generally restricted to the immediate family members of victims killed in a terrorist attack. In limited circumstances, however, damages have been awarded to non-immediate family members who are the "functional equivalent" of immediate family.

The Court first defined the framework for determining functional equivalence in a report and recommendation issued on October 14, 2016. ECF No. 3363, adopted at ECF No. 3384. ("Hoglan II.") It refined this framework in "Hoglan IV," issued on August 8, 2017. ECF No.

2

3676, adopted at ECF No. 3795.[1] The Hoglan IV framework has been the basis for four subsequent decisions on motions for damages based on functional equivalence. ECF Nos. 4175, 5154, 5387 adopted at 5950, 5483 adopted at 5950.

Solatium awards for family members are similarly well-established. Judge Maas recommended, and Judge Daniels adopted, a framework under which spouses of victims generally receive $12,500,000 in solatium damages, parents and children receive $8,500,000, and siblings receive $4,250,000. ECF Nos. 2618, adopted at 2623. This framework has been the basis for thousands of awards to family members, see, e.g., ECF Nos. 3358 at 9, adopted at 3383, 3666, 4023, 4146, 5062, 5087, 5138, and functional equivalent family members. See, e.g., ECF Nos. 3363 at 16, 4175 at 7, 5154 at 4, 5483 at 21–23. This award has been reduced where a functional equivalent relationship is found but is not fully comparable to a familial relationship. See, e.g., ECF Nos. 3363 at 22 (recommending a stepmother receive half of the normal award where she entered the decedent's life when he was 11), 5387 at 7 (recommending a stepsibling receive half the normal award where he began living with the decedent at 14). The Court therefore evaluates this Motion under the Hoglan IV framework, and the damages framework set out by Judge Maas.

1. **Joseph Dixon**

Joseph Dixon met Pamela Hodges in 1975, when her son DaJuan was just three years old. ECF No. 8165-4 at ¶ 2. DaJuan sometimes saw his biological father in the neighborhood or at occasional home visits, but his biological father played virtually no financial or emotional role in his life. Id. at ¶¶ 4–6. Mr. Dixon and Ms. Hodges (later Dixon) moved in together shortly after they began dating and were married in 1978—DaJuan was the ring-bearer. Id. at ¶ 7. Both before

---

[1] Hoglan I involved solatium claims for immediate family members, ECF No. 3358, and Hoglan III concerned non-U.S. nationals. ECF No. 3374.

they were married and in the 44 years they were married after, Mr. Dixon treated DaJuan as his son. Id. The family, which later grew to include Sherard, another child, always had dinner together and the parents switched off helping the children with their homework. Id. at ¶ 10. Mr. Dixon and DaJuan shared a birthday and always enjoyed celebrating together. Eventually, when DaJuan got older, Mr. Dixon would take DaJuan and his friends to the park on Sundays to play football. Id.

Mr. Dixon was a continuous parental presence in DaJuan's life from the time DaJuan was three. He supported him emotionally, developmentally and financially, while DaJuan's biological father was almost entirely absent. Accordingly, the Court recommends that he be awarded $8,500,000, the full amount paid to stepparents of victims of the September 11 Attacks.

### 2. Eric Johnson

Eric Johnson and Janice Brown had known each other since high school but went their separate ways to attend college. They began dating when Ms. Brown returned from Syracuse University. ECF No. 8165-5 at ¶ 2. The couple soon moved in together, and in 1990, welcomed their son Justin Johnson into the world. Id. at ¶ 3. Eight years later, they took over care of Kyle, Ms. Brown's sister's son. Mr. Johnson continued to care for both Kyle and Justin after Ms. Brown's death on September 11. Id. at ¶ 4. While the couple was never married, they lived together, shared their finances, and attended holidays and special occasions with each other and with each other's family. Id. at ¶ 6. They also had frequent trips to the zoo and to the beach at Riis Park with their boys. Id. at ¶ 7.

For more than a decade, Mr. Johnson and Ms. Brown lived together, had one child together, raised another, and shared their home and finances. The Court finds this sufficient to recommend that Mr. Johnson be awarded $12,500,000, the full amount paid to unmarried partners of victims of the September 11 Attacks.

4

### 3. Brian Wilkes

Brian Wilkes began dating Lorraine Antigua by May 1999, after they met at Mr. Wilkes's going-away party. ECF No. 8165-6 at ¶ 2. While he left for North Carolina, he and Ms. Antigua kept up their relationship with the couple traveling between North Carolina and Ms. Antigua's home in New Jersey. Id. They were engaged in October 2000 when Mr. Wilkes proposed with a washer from a hose as a ring (he followed up with a diamond bracelet a year later). Id. at ¶ 4. Initially, it was unclear who would move, but Mr. Wilkes ultimately resigned his management position at General Electric to return to New Jersey in April 2001 and live with Ms. Antigua and her children. Id. at ¶ 3. The couple supported each other financially, id. at ¶¶ 5–6 , and Mr. Wilkes helped raise her children. Id. at ¶¶ 6, 8. They also took numerous trips together. Id. at ¶ 8. After her tragic death, Mr. Wilkes lived with her mother and stepfather in New Jersey for a year. Id. at ¶ 9.

Mr. Wilkes and Ms. Antigua had a two-year relationship and cohabitated for several months before her untimely death. They were also formally engaged, which, per Hoglan IV, is a critical factor in assessing functional equivalence for spouses. Hoglan IV at 12. Accordingly, the Court recommends that Mr. Wilkes be awarded $12,500,000, the full amount paid to unmarried partners of victims of the September 11 Attacks.

## CONCLUSION

The Court recommends finding that service was achieved on Iran and that the Plaintiffs who have been identified as functional equivalents of family members be granted solatium damages as follows in Table 2:

| Table 2: Solatium Awards | | | | |
|---|---|---|---|---|
| **Plaintiff** | **Decedent** | **Relationship** | **Functional Equivalent** | **Solatium Damages** |
| Joseph Dixon | DaJuan Hodges | Stepfather | Parent | $8,500,000 |
| Eric Johnson | Janice Brown | Life Partner | Spouse | $12,500,000 |
| Brian Wilkes | Lorraine Antigua | Fiancé | Spouse | $12,500,000 |

The Court further recommends that Plaintiffs be awarded prejudgment interest on these damages from September 11, 2001, to the date of judgment, at a rate of 4.96 percent per annum, compounded annually. ECF No. 3358, adopted at ECF No. 3383.

Plaintiffs may apply for punitive, economic, and other damages at a later date and in a manner consistent with any applicable future Court rulings on the issue. Additionally, any plaintiffs in these two cases not appearing in this Motion who were not previously awarded damages may still submit applications for damages awards in later stages. In light of the August 1, 2022 deadline to file with the United States Victims of State Sponsored Terrorism Fund, parties are encouraged to notify the Court as soon as possible if any objections will be filed. Upon resolution of these motions, the Court may terminate the motion at ECF No. 8164, and the related motions in Hemenway, No. 18-cv-12277, ECF No. 167 and BNY Mellon, No. 19-cv-11767, ECF No. 90.

_____
SARAH NETBURN
United States Magistrate Judge

Dated: July 26, 2022
       New York, New York

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of

Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). These objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).