UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

In re:

       TERRORIST ATTACKS ON
       SEPTEMBER 11, 2001

------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___7/26/2022___
```

03-MD-01570 (GBD)(SN)

REPORT &
RECOMMENDATION

**SARAH NETBURN, United States Magistrate Judge:**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

      Burnett, et al., v. Islamic Republic of Iran, No. 15-cv-9903
      Arias, et al., v. Islamic Republic of Iran, No. 19-cv-0041

      Fifteen plaintiffs in two cases move for default judgments against the Islamic Republic of

Iran. ECF No. 8010. They also ask that the Court find that they are functionally family members

("functional equivalents") of people killed in the September 11, 2001, terrorist attacks and thus

entitled to solatium damages. While not the immediate family of the victims, these Plaintiffs urge

that their close relationship with the victim merits awarding damages. The Court recommends

that this Motion be granted in part as described in this Report and Recommendation.

## DISCUSSION

      The Court assumes familiarity with the general background of this case. The procedural

history of the Plaintiffs' Motion is addressed as part of the discussion of service on Iran.

**I.    Iran Is Liable to These Plaintiffs and Was Properly Served**

      Iran is liable to these Plaintiffs and was properly served. Service on a foreign sovereign

must be achieved by one of the four means in 28 U.S.C. § 1605(a)(1)–(4), in descending order of

preference from 28 U.S.C. § 1605(a)(1) to 28 U.S.C. § 1605(a)(4). Iran may not be served under

28 U.S.C. § 1605(a)(1) or 28 U.S.C. § 1605(a)(2) because there is no special arrangement between the United States and Iran and no international convention applies. The Plaintiffs attempted service through a mailing by the Clerk of the Court as required by 28 U.S.C. § 1605(a)(3), which failed when Iran rejected the mailing. Service was thus achieved by diplomatic means. The U.S. State Department transmitted service papers to the Swiss Government, which presented them to Iran. Iran, which has never appeared in this case, defaulted in each case and a Clerk's Certificate of Default was issued, followed by a default liability judgment. The ECF numbers associated with the filings for each of these steps are collected in Table 1.

| Table 1: Service, Default, and Liability | | | |
| *All numbers are the ECF No. of the relevant filing on the member case docket* | | | |
| | Affidavit of Service | Clerk's Certificate of Default | Default Liability Judgment |
| <u>Burnett, et al. v. Islamic Republic of Iran, et al.</u>, No. 15-cv-9903 | 64 | 67 | 85 |
| <u>Arias, et al., v. Islamic Republic of Iran, et al.</u>, No. 19-cv-11767 | 21 | 25 | 5104 (main MDL docket) |

The complaints in these matters were amended several times to add additional plaintiffs not named in the original complaint to the action in accordance with the procedure approved by the Court in its order at ECF No. 5234. The specific pleading adding a plaintiff to the relevant action is noted as part of the Court's consideration of each plaintiffs' application below. Iran thus is liable to the Plaintiffs. The only outstanding question is their damages.

## II.     Functional Equivalent Family Members

The Plaintiffs seek solatium damages for the loss of their loved ones in the September 11 Attacks. These damages are generally restricted to the immediate family members of victims

killed in a terrorist attack. In limited circumstances, however, damages have been awarded to non-immediate family members who are the "functional equivalent" of immediate family.

The Court first defined the framework for determining functional equivalence in a report and recommendation issued on October 14, 2016. ECF No. 3363, adopted at ECF No. 3384. ("Hoglan II.") It refined this framework in "Hoglan IV," issued on August 8, 2017. ECF No. 3676, adopted at ECF No. 3795.[1] The Hoglan IV framework has been the basis for four subsequent decisions on motions for damages based on functional equivalence. ECF Nos. 4175, 5154, 5387 adopted at 5950, 5483 adopted at 5950.

Solatium awards for family members are similarly well-established. Judge Maas recommended, and Judge Daniels adopted, a framework under which spouses of victims generally receive $12,500,000 in solatium damages, parents and children receive $8,500,000, and siblings receive $4,250,000. ECF Nos. 2618, adopted at 2623. This framework has been the basis for thousands of awards to family members, see, e.g., ECF Nos. 3358 at 9, adopted at 3383, 3666, 4023, 4146, 5062, 5087, 5138, and functional equivalent family members. See, e.g., ECF Nos. 3363 at 16, 4175 at 7, 5154 at 4, 5483 at 21–23. This award has been reduced where a functional equivalent relationship is found but is not fully comparable to a familial relationship. See, e.g., ECF Nos. 3363 at 22 (recommending a stepmother receive half of the normal award where she entered the decedent's life when he was 11), 5387 at 7 (recommending a stepsibling receive half the normal award where he began living with the decedent at 14). The Court therefore evaluates this Motion under the Hoglan IV framework, and the damages framework set out by Judge Maas.

---

[1] Hoglan I involved solatium claims for immediate family members, ECF No. 3358, and Hoglan III concerned non-U.S. nationals. ECF No. 3374.

1. **Davina (<u>Burnett</u>, ECF No. 467) and Karim Aryeh (<u>Burnett</u>, ECF No. 432)**

Davina and Karim Aryeh[2] are the stepchildren of Kevin P. Connors, who married their mother in 1993. ECF Nos. 8012-3 at ¶¶ 3–4, 8012-4 at ¶¶ 3–4. When the family began living together, Davina was 11 and Karim was 13. ECF Nos. 8012-3 at ¶ 3, 8012-4 at ¶ 3. Mr. Connors supported both children along with his own children from a prior marriage. ECF Nos. 8012-3 at ¶ 6, 8012-4 at ¶ 6. The family ate dinner together every night, and Mr. Connors made sure the family was able to vacation together. ECF Nos. 8012-3 at ¶¶ 9–10, 8012-4 at ¶¶ 9–10. He played basketball with Karim and taught him how to drive. ECF No. 8012-4 at ¶¶ 12–13. He also shared his love of finance with Karim and got him his first internship. Karim later followed him into that industry. ECF No. 8012-4 at ¶ 14. For Davina, Mr. Connors taught her to ride a bike, to sail, and to rock climb. ECF No. 8012-3 at ¶ 15, while encouraging her to explore the heritage of her blended family. <u>Id.</u> ¶ at 17. When Ms. Aryeh got internships in New York City where Mr. Connors also worked, the two commuted and had lunch together. <u>Id.</u> ¶ at 18.

Davina, Karim, and Mr. Connors clearly had a close connection, but only began their parent-child relationship when Davina and Karim were 11 and 13. When a stepchild and parent begin their relationship around or after the child turns nine, the Court has recommended half the normal solatium award given to children of September 11 victims. <u>See, e.g.</u>, ECF No. 5483 at 15–16; <u>see also</u> ECF No. 3676 at 13 (setting age nine as the cutoff for early childhood). It does so again here, recommending that Davina and Karim each be awarded $4.25 million.

2. **Daniella Peters-Nylen (<u>Burnett</u>, ECF No. 432)**

When Daniella Peters-Nylen was five, her mother and two siblings moved into Kevin P. Connors's home in Miami Beach, Florida. ECF Nos. 8012-13 at ¶ 4. He and her mother married

---

[2] Because Davina and Karim Aryeh share a last name, the Court refers to them by their first names for clarity.

in 1993, id., and by September 11, she had been living with Mr. Connors for ten years. Id. at ¶ 3. Her biological father divorced her mother when she was an infant and lived abroad so he did not play a major role in her life. Id. at ¶ 5. Mr. Connors supported the family, id. at ¶ 6, paid for Ms. Peters-Nylen's education, id. at ¶ 8, and attended all of her soccer matches. Id. at ¶ 9. He taught her to rock climb as well and the two spent their family vacations in Maine climbing together. Id. at ¶ 10. They also shared tastes in movies, and movie nights were another opportunity for the two to bond. Id. ¶ 11. The night before he was killed, Mr. Connors gave her a check for the cost of driving lessons. It would be several months before she was eligible to take lessons, but he knew how excited she was to drive and wanted to support her. Id. at ¶ 13.

Mr. Connors entered Ms. Peters-Nylen's life in early childhood and supported her continuously until his death. The Court therefore recommends awarding her $8,500,000 in solatium damages.

**3.  Troy M. Barrett (<u>Burnett</u>, ECF No. 467)**

Troy Michael Barrett lived with Brian Cummins for about two or three years. His mother began living with Mr. Cummins sometime in 1999 when Mr. Barrett was 13. ECF No. 8012-5 at ¶ 5. He was 15 when Mr. Cummins died on September 11. Id. at ¶ 3. While his mother and Mr. Cummins were engaged, they were not married at the time of Mr. Cummins's death. Id. Mr. Barrett had no relationship with his biological father. Id. at ¶ 4.

While the Court is sympathetic to Mr. Barrett's loss, his relationship with Mr. Cummins cannot support the finding of a functional equivalent relationship. Mr. Barrett's mother and Mr. Cummins were not married and so Mr. Cummins was not Mr. Barrett's stepparent. Where a decedent is not a child's stepparent or does not otherwise have a formal custodial relationship with the child, it is extremely difficult to demonstrate functional equivalence. See, e.g., ECF No.

5387 at 3 ("While the Court does not require a legal custodian relationship as existed in <u>Sullivan</u> as a *sine qua non* of demonstrating functional equivalence [aunts and uncles seeking to be compensated as parents], only in the rarest cases will such a plaintiff be able to demonstrate functional equivalence absent one.") (citing <u>Sullivan v. Ford Motor Co.</u>, No. 97-cv-0593 (RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000)). Absent that relationship "[s]uch a showing could be made where both parents were wholly absent from the decedent's life, such that the relevant individual fulfilled the entirety of the parental role." ECF No. 5387 at 3. That is not the case here. Mr. Cummins entered Mr. Barrett's life in his teenage years and was tragically there for only two or three years. Mr. Barrett's mother was also present for that whole period. Given this short period of cohabitation, the lack of any evidence of a custodial relationship, and the fact that Mr. Cummins had not married Mr. Barrett's mother, the Court cannot recommend awarding Mr. Barrett damages.

### 4. Christian C. Croner (<u>Burnett</u>, ECF No. 482)

Christian Croner's mother married Joseph Flounders in 1979 when Mr. Croner was seven. ECF No. 8012-6 at ¶ 3. The group lived together as a family for the next 14 years. <u>Id.</u> Mr. Croner's mother divorced his biological father when Mr. Croner was two. He has no memory of his father prior to meeting him when Mr. Croner was 30. His biological father played no role in his upbringing. <u>Id.</u> at ¶ 4. Mr. Flounders supported Mr. Croner financially. <u>Id.</u> at ¶¶ 5, 12. While Mr. Flounders was not a sports fan, he supported Mr. Croner's interest in athletics, surprising him with tickets to various sporting events. <u>Id.</u> at ¶ 13. He also taught Mr. Croner mathematics, drawing on his own experience as a broker. <u>Id.</u> at ¶ 11. The traumatic effects of losing his father continued after September 11: less than three months after Mr. Flounders died, Mr. Croner's mother took her own life out of grief. <u>Id.</u> at ¶ 15.

Given Mr. Flounders and Mr. Croner's relationship, along with the financial and emotional support Mr. Flounders provided, the Court recommends an award of $8.5 million, the full sum awarded to children of September 11 victims.

### 5. Dawn M. Curry (<u>Arias</u>, ECF No. 61)

Stephen F. Masi started living with Dawn Curry and her mother when she was two years old. ECF No. 8012-7 at ¶ 3. Her father was absent and saw her only once when she was six weeks old. <u>Id.</u> at ¶ 4. Mr. Masi married Ms. Curry's mother when Ms. Curry was a senior in high school. <u>Id.</u> at ¶ 3. During that time, Mr. Masi supported her financially, <u>id.</u> at ¶ 7, and attended her parent-teacher conferences, choral concerts, and gymnastics events. <u>Id.</u> at ¶ 10. He also taught her to bike, swim and drive, and on the weekends, he took her on swimming excursions at the South Hampton beach. <u>Id.</u> at ¶ 10–11. When she started driving, Mr. Masi insisted that she use his Buick because it would keep her safe on the roads. <u>Id.</u> at ¶ 11. He was also an active and involved grandfather to Ms. Curry's three grandchildren. <u>Id.</u> at ¶ 13.

Given the long-standing parental and financial support he provided, Mr. Masi is properly treated as the functional equivalent of Ms. Curry's father. Accordingly, the Court recommends that Ms. Curry be awarded $8.5 million.

### 6. Doreen J. Gray (<u>Burnett</u>, ECF No. 433)

Doreen Gray is the stepmother of James Gray, an FDNY firefighter who was killed in the September 11 Attacks. ECF No. 8012-8 at ¶ 2. Mr. Gray's mother left him in 1978 when he was 12 years old and was not a part of his life thereafter. <u>Id.</u> at ¶ 4. Instead, Ms. Gray raised Mr. Gray from age 14 onward after she and his father married—they shared a home for ten years. <u>Id.</u> at ¶ 3. During that time, Ms. Gray supported her stepson's love of football, attending his games as often as possible and getting him into football camps whenever she could. <u>Id.</u> at ¶ 7. She helped pick out his car when he started driving, <u>id.</u> at ¶ 9, and helped plan his wedding, <u>id.</u> at ¶ 13,

where they shared a dance to "The Summer Wind." Id. at ¶ 14. They also took several trips to the Disney and Universal theme parks together.

Ms. Gray's relationship with Mr. Gray fulfills most of the requirements to be deemed the functional equivalent of his mother. She came into his life, however, during his teenage years. When a stepparent enters a child's life after their early childhood years, the Court has awarded half the solatium award normally granted. See, e.g., ECF No. 3363 at 22, 24 (awarding half the normal solatium award in two cases where a stepmother entered the decedent's life after early childhood and during their teenage years). The Court does so here as well and recommends that Ms. Gray be awarded $4,250,000.

### 7. Bianca I. Jerez (Burnett, ECF No. 238)

Robert D. Cirri, Sr. was a lieutenant with the Port Authority of New York and New Jersey. He and four other officers were killed in the North Tower collapse on September 11 as they tried to carry a woman to safety. ECF No. 8012-9 at ¶ 2. He left behind his stepdaughter, Bianca Jerez. Mr. Cirri began living with Ms. Jerez when she was about seven years old and did so for about eight years in total. Id. at ¶ 3. He married her mother in 1999. Id. Her biological father and mother separated when she was three and her biological father was not part of her life after. Id. at ¶ 4. Mr. Cirri supported the whole family, including Ms. Jerez, and while they were not normally able to take vacations, he surprised the family with a trip to Disney World in early 2001. Id. at ¶ 9. He was also able to be involved in her daily life because their schedules aligned. While Ms. Jerez's mother was an ER nurse whose schedule keep her out of the house before and after school, Mr. Cirri "was always there." Id. at ¶ 10. The two enjoyed watching wrestling together, id. at ¶ 12, and he took her to her flute and Scottish dance lessons. Id. at ¶ 11. He cared for her in sickness, id. at ¶ 15, and through awkward teenage moments. Id. at ¶ 14.

Given this long and supportive relationship the Court recommends awarding Ms. Jerez the full solatium award for children of September 11 victims: $8,500,000.

**8. Jordan A. Lyles and Justin A. Lyles (<u>Burnett</u>, ECF No. 251)**

Jordan and Justin Lyles[3] are the stepsons of CeeCee L. Lyles, who was a flight attendant on the hijacked Flight 93 that crashed into Pennsylvania. ECF Nos. 8012-10 at ¶ 2, 8012-11 at ¶ 2. She began dating their father in 1998, ECF Nos. 8012-10 at ¶ 5, 8012-11 at ¶ 5, and in April 2000, the two boys, their father, Ms. Lyles and her two children moved in together. ECF Nos. 8012-10 at ¶ 6, 8012-11 at ¶ 6. At the time, Jordan was eight and Justin was nine. <u>Id.</u> One month later, their father married Ms. Lyles. <u>Id.</u> Their biological mother was not present in their lives after their parents divorced: while she had child support obligations, she moved away and their father did not pursue her for those obligations. ECF Nos. 8012-10 at ¶ 4, 8012-11 at ¶ 4. Ms. Lyles was the sole maternal figure in both boys' lives. She planned elaborate all-day birthday parties for Jordan, ECF No. 8012-10 at ¶ 8, and protected Justin from bullies. ECF Nos. 8012-11 at ¶ 7.

Ms. Lyles entered Jordan and Justin's lives in early childhood after parental abandonment by their mother. She married their father and raised them as her own children. She is properly recognized as the functional equivalent of their parent. Under <u>Hoglan IV</u>, however, their claims must be treated differently. <u>Hoglan IV</u> directs that full solatium damages be awarded when a decedent enters a stepchild's life in early childhood, meaning before age nine. ECF No. 3676 at 13. From age nine on, the award is reduced to half the total solatium award. <u>Id.</u> Jordan and Justin Lyles fall on either side of this divide, being eight nine ten when Ms. Lyles entered their lives. Accordingly, the Court recommends that Jordan Lyles be granted the full solatium award granted

---

[3] Because Jordan and Justin Lyles share a last name, the Court refers to them by their first names for clarity.

to biological children who parents were killed in the September 11 Attacks, $8,500,000, and that Justin Lyles be awarded half this sum, $4,250,000.

### 9. Bryant T. Mitchell (<u>Burnett</u>, ECF No. 435)

Bryant Mitchell and Richard Stadelberger lived together from the time Mr. Mitchell was 12 years old. ECF Nos. 8012-12 at ¶ 3. Mr. Stadelberger married Mr. Mitchell's mother in 1982. <u>Id.</u> Mr. Mitchell's biological father left when he was four months old and did not play a role in his life. <u>Id.</u> at ¶ 4. Mr. Stadelberger filled that gap: he paid for Mr. Mitchell's education, <u>id.</u> at ¶ 6, and cheered him on at cross-county and track meets. <u>Id.</u> at ¶ 10. They doggedly watched the Mets together no matter the team's fortunes, <u>id.</u> at ¶ 12, and after college they enjoyed motorcycle rides together. <u>Id.</u> at ¶ 13. Later, Mr. Stadelberger convinced Mr. Mitchell to become a Little League umpire with him. They connected further over this new expression of their shared love of baseball. <u>Id.</u> at ¶ 14.

Mr. Stadelberger entered Mr. Mitchell's life when he was 12, after early childhood. In similar circumstances, the court has consistently awarded stepchildren half solatium damages. *Supra* § II.5. The Court therefore recommends that Mr. Mitchell be awarded $4,250,000.

### 10. Michelle A. Stabile (<u>Burnett</u>, ECF No. 482)

Michelle Stabile and Frank Koestner met on July 2, 1999, and began dating shortly after. ECF No. 8012-14 at ¶ 3. On January 1, 2001, he proposed and she accepted. <u>Id.</u> The wedding was set for October 28, 2001. <u>Id.</u> at ¶ 5. Ms. Stabile had already purchased her dress and planned their honeymoon in St. Lucia. <u>Id.</u> at ¶ 4. The couple had gone into contract on a house together and purchased a shared car. <u>Id.</u> at ¶¶ 7–8. Ms. Stabile also enjoyed the company of Mr. Koestner's daughter Carolyn, whom she introduced to her two nieces for arts and crafts weekends in her backyard. <u>Id.</u> at ¶ 9. When they did not have the children, the couple enjoyed

exploring New York City together and antiquing. Id. ¶ 10. It does not appear that the couple lived together before Mr. Koestner's death.

The Court recommends that Ms. Stabile receive the full solatium award for married partners of September 11 victims. For unmarried couples, the <u>Hoglan IV</u> factors for assessing functional equivalence are "(1) the duration of the relationship; (2) the degree of mutual financial dependence and investments in a common life together; (3) the duration of cohabitation; and (4) the presence or absence of a formal engagement." <u>Hoglan IV</u> at 11. <u>Hoglan IV</u> further holds that "the presence or absence of a formal engagement is virtually dispositive for any fiancée claim where no legal barrier would have impeded the couple from getting married. <u>Id.</u> at 12.

The overall length of Ms. Stabile's relationship weighs somewhat in her favor, as does the comingling of her finances. There is no evidence of cohabitation, and while <u>Hoglan IV</u> recognizes that couples may have personal or religious reasons for not cohabitating prior to marriage, <u>id.</u> at 11, nothing in Ms. Stabile's supporting documents suggests such reasons were present. The decisive factor is thus her engagement. The Court accordingly recommends an award of $12,500,000 but expects that Ms. Stabile's case will likely be the outer boundary of when an engaged but non-cohabitating fiancé may be deemed the functional equivalent of a spouse.

### 11. Doreen N. Wheeler (<u>Burnett</u>, ECF No. 468)

Doreen Wheeler and Kevin Prior meet in 1996 and began dating about a year later. ECF Nos. 8012-15 at ¶ 3. Mr. Prior was a FDNY firefighter who died responding to a rescue call when the North Tower collapsed. <u>Id.</u> at ¶ 2. Sometime in 2000, the couple began living together, and Mr. Prior supported Ms. Wheeler financially while she studied to become a teacher. Just a few weeks before he died, he helped her set up her first classroom. <u>Id.</u> at ¶ 5. The couple was engaged on May 12, 2001, on the four-year anniversary of their first date. <u>Id.</u> at ¶ 6. The wedding

was set for July 12, 2002. Id. at ¶ 7. About a month before his death, Mr. Prior had suggested that the couple legally wed before the ceremony so that he could provide for Ms. Wheeler's health insurance, but she asked to do both the legal and ceremonial weddings at the same time. Id. at ¶ 9. She was later deemed Mr. Prior's unregistered domestic partner under New York state law. Id. at ¶ 11.

Given Ms. Wheeler's approximately four-year relationship with Mr. Prior, including more than a year living together, and their formal engagement, the Court recommends an award of $12,500,000.

### 12. Joseph N. Shontere (Burnett, ECF No. 482)

Joseph Shontere is the stepfather of Angela Houtz, who died in the September 11 Attacks. He had known Ms. Houtz since she was in the fourth grade because she was best friends with his daughter, Tina Marie. ECF Nos. 8012-16 at ¶ 3. When Ms. Houtz was nine, her mother and Mr. Shontere began dating. Id. at ¶ 4. The couple married a year after they started dating and the whole family started living together. Id. at ¶ 5. Her biological father was not a stable or consistent presence. While he had child support obligations, he did not pay them voluntarily and her mother eventually stopped trying to enforce them. Id. at ¶ 7. Ms. Houtz's paternal support thus came from Mr. Shontere. He took her to Mass, id. at ¶ 9, and the family worked together to help maintain a nearby piece of church property. Id. at ¶ 10.

Mr. Shontere became Ms. Houtz's stepfather when she was ten and so entered her life after the early childhood years. As noted *supra* at § II.5, § II.9, under these circumstances, a recommendation of half the normal solatium award is appropriate. Accordingly, the Court recommends awarding Mr. Shontere $4,250,000.

**13. Tina Marie Wasielewski (<u>Burnett</u>, ECF No. 482)**

Tina Marie Wasielewski and Ms. Houtz were best friends throughout grade school. ECF Nos. 8012-17 at ¶¶ 3, 4. When her father divorced her mother, her mother was initially awarded primary custody and Ms. Wasielewski resided with her during the week and with her father on weekends and extended holidays. <u>Id.</u> at ¶ 5. Ms. Wasielewski's father began living with Ms. Houtz's mother when Ms. Wasielewski was ten. <u>Id.</u> at ¶ 4. A year later, their parents married, and they became stepsisters. <u>Id.</u> at ¶ 6. In high school, she began living with her biological father and Ms. Houtz permanently. <u>Id.</u> at ¶ 7. The sisters were co-captains of their high school flag team, served in their church's youth group together, <u>id.</u> at ¶ 8, and shared a car, which might have been a challenge for two teenagers except that the two "were best friends and did everything together." <u>Id.</u> at ¶ 9. After they both left home for college, the two remained in daily contact. <u>Id.</u> at ¶ 12. In 1998, Ms. Houtz was a bridesmaid at Ms. Wasielewski's wedding. <u>Id.</u> at ¶ 17.

When a person becomes a stepsibling after early childhood the Court has awarded half of the full solatium damages. <u>See, e.g.</u>, ECF Nos. 3363 at 22–23 (awarding half solatium damages to three stepsiblings who began living with the decedent at age 11); 5387 at 7 (awarding half solatium damages where stepsiblings began living together at age 14). Ms. Houtz and Ms. Wasielewski began living together intermittently at age 10 and did not begin living together full-time until they were in high school. Accordingly, the Court finds that an award of half solatium damages, or $2,125,000 is appropriate.

## CONCLUSION

The Court recommends finding that service was achieved on Iran and that the Plaintiffs who have been identified as functional equivalents of family members be granted solatium damages as follows in Table 2:

| Table 2: Solatium Awards | | | | |
|---|---|---|---|---|
| **Plaintiff** | **Decedent** | **Relationship** | **Functional Equivalent** | **Solatium Damages** |
| Davina Aryeh | Kevin P. Connors | Stepdaughter | Child | $4,250,000 |
| Karim Aryeh | Kevin P. Connors | Stepson | Child | $4,250,000 |
| Daniella Peters-Nylen | Kevin P. Connors | Stepdaughter | Child | $8,500,000 |
| Troy M. Barrett | Brian T. Cummins | Stepson | N/A | N/A |
| Christian C. Croner | Joseph W. Flounders | Stepson | Child | $8,500,000 |
| Dawn M. Curry | Stephen F. Masi | Stepdaughter | Child | $8,500,000 |
| Doreen Gray | James M. Gray | Stepmother | Parent | $4,250,000 |
| Bianca I. Jerez | Robert D. Cirri, Sr. | Stepdaughter | Child | $8,500,000 |
| Jordan A. Lyles | CeeCee L. Lyles | Stepson | Child | $4,250,000 |
| Justin A. Lyles | CeeCee L. Lyles | Stepson | Child | $8,500,000 |
| Bryant Mitchell | Richard Stadelberger | Stepson | Parent | $4,250,000 |
| Michelle A. Stabile | Frank J. Koestner | Fiancé | Spouse | $12,500,000 |
| Doreen Noone Wheeler | Kevin M. Prior | Fiancé | Spouse | $12,500,000 |
| Joseph N. Shontere | Angela Marie Houtz | Stepparent | Parent | $4,250,000 |
| Tina Marie Wasielewski | Angela Marie Houtz | Stepsibling | Sibling | $2,125,000 |

The Court further recommends that Plaintiffs be awarded prejudgment interest on these damages from September 11, 2001, to the date of judgment, at a rate of 4.96 percent per annum, compounded annually. ECF No. 3358, adopted at ECF No. 3383.

Plaintiffs may apply for punitive, economic, and other damages at a later date and in a manner consistent with any applicable future Court rulings on the issue. Additionally, any plaintiffs in these two cases not appearing in this Motion who were not previously awarded damages may still submit applications for damages awards in later stages.

In light of the August 1, 2022 deadline to file with the United States Victims of State Sponsored Terrorism Fund, parties are encouraged to notify the Court as soon as possible if any objections will be filed. Upon resolution of these motions, the Court may terminate the motion at ECF No. 8010, and the related motions in Burnett, No. 15-cv-9903, ECF No. 590 and Arias, No. 19-cv-0041, ECF No. 106.

SARAH NETBURN
United States Magistrate Judge

Dated: July 26, 2022
New York, New York

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). These objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).