# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST ATTACKS      )                 03-MDL-1570 (GBD) (SN)

ON SEPTEMBER 11, 2001        )

                                         )

---

## SUPPLEMENTARY EXPERT REPORT OF JONATHAN M. WINER

---

1. **Introduction**

1.1.    I have been asked by the law firm of Motley Rice to address in this Supplementary Expert Report two questions in connection with new evidence provided to the Plaintiffs by the Central Intelligence Agency ("CIA") on March 29, 2022 and April 1, 2022 pursuant to Executive Order No 14040 ("EO 14040"), which contains information regarding the relationship of the defendant, Dubai Islamic Bank ("DIB") and certain of its senior officers to Osama Bin Ladin ("Bin Ladin"), businesses owned or controlled by Bin Ladin, and the use of DIB to fund Bin Ladin, his global terrorist organization, Al Qaeda, and Al Qaeda's terrorist attacks on the United States on September 11, 2002.

1.2.    The new evidence contains extensive information that was not previously available to me, as it has only now been made public for the first time as a result of the declassification review required by EO 14040 from material previously maintained as classified by the CIA and the FBI.

1.3.    I have been asked to respond to two questions:

1.3.1.    Is there evidence that DIB knowingly aided and abetted Bin Ladin and Al Qaeda to support terrorism, which culminated in the 9/11 terrorist attacks on the United States?

1.3.2.    Is there evidence that DIB's senior management supported or were aligned with Bin Ladin and Al Qaeda's global jihad against the United States?

1.4.    *Methodology.* To respond to those questions, I have applied an all-source analysis methodology as I employed during my many years of work for the U.S. government and in my previous experience as an expert. All-source analysis is terminology used in the Intelligence Community for the methodology for collection and analysis of information from multiple sources and disciplines but is essentially interchangeable with the term comparative analysis used in other contexts outside of the Intelligence Community. Starting with the inquiry to be addressed, I work to collect information available to me regarding the subject area of the inquiry. Using my experience and education, I then consider, analyze, compare, and weigh the whole body of the sources to systematically build out a response to the inquiries based on the available record. In the process, I consider a mixture of primary source information; information that can be a combination of primary and secondary; academic and analytic research, government reports; scholarly literature, and other available information, together with my own experience and education, and human reason.

1.4.1.    Specific to responding to the inquiries identified above, I have reviewed EO 14040 issued by President Biden on September 3, 2021 and the full production of the documents provided by the CIA in response to EO 14040, as well as documents provided by the FBI in response to EO 14040 that reference information relating to DIB. To place this new evidence in context and properly assess it, I have also reviewed and considered the RICO Statement filed in MDL 1570 applicable to DIB; the Plaintiffs' Discovery Responses to DIB and relevant Exhibits to those responses; documents produced by DIB; communications regarding document production by DIB from attorneys for the defendants to attorneys for the plaintiffs; information set forth in the report of the 9/11 Commission; information cited in my Expert Report, the depositions of Dr. Hussein Hamid Hassan ("Dr. Hassan") of August 1, 2 and August 3, 2017, and of Judge Alan Fine

("Fine") of October 4, 2019, and exhibits to those depositions. To clarify a linguistic issue – namely, whether the Islamic Army referred to in pre-1999 CIA documents is the same organization as Al Qaeda, I consulted a CIA online world factbook, which is reflected with a citation, and a State Department reference as to the date of Al Qaeda's designation as a terrorist organization, which is similarly reflected with a citation. Finally, I have reviewed a 2002 Los Angeles Times newspaper article regarding the state of financial regulation in the Emirates prior to 9/11, written by a journalist who contacted and quoted me on that issue, as is also reflected with a citation.

1.5.    My opinions, which I hold to a reasonable degree of certainty, are based on this review supplementing my previous review of the information I considered and disclosed in connection with my Expert Report of March 10, 2020 and my Rebuttal Report of February 2, 2021. I continue to reserve the right to respond further to any and all critiques or criticisms made by the defendants' experts regarding my Expert Report, my previous Rebuttal Report, my opinions, qualifications, methodology, findings, or relating to any other issue addressed in my Expert Report, the Rebuttal Report, or this Supplementary Report.

## 2.    Executive Order 14040

2.1.    On September 3, 2021, President Biden issued EO 14040, requiring a declassification review of certain documents concerning the terrorist attacks of September 11, 2001, ordering the Attorney General and the heads of other executive departments and agencies to review information developed during the United States government's investigation of the 9/11 terrorist attacks on the United States. EO 14040 stated that the "American people deserve to have a fuller picture of what their Government knows about those attacks," and stated that it was "therefore critical to ensure that the United States Government maximizes transparency" about what it had learned, "relying on classification only when narrowly tailored and necessary." In a Presidential Statement accompanying the issuance of the EO, President Biden emphasized that the declassification effort was intended to address "the enduring pain of the families and loved ones of the 2,977 innocent people who were killed during the worst terrorist attack on America in our history" by helping ensure them "transparency" through the declassification of the documents.

2.2.    EO 14040 required the Attorney General to release the documents declassified as a result of that review within six months from September 3, 2021. By an email dated March 29, 2022, Sarah S. Normand, Deputy Chief of the Civil Division of the US Attorney's Office of the Southern District of New York, provided to attorneys for the Plaintiffs access to "copies of documents that the CIA is releasing pursuant to section 2(b) of Executive Order 14040, along with an index that specifies which documents are responsive to specific requests in the subpoena," to be followed by a public posting on its website ("CIA Documents").  By an email dated April 1, 2022, Ms. Normand provided access to an additional CIA document and revised index.

3.  **The CIA Documents**

3.1.  The CIA Documents consist of 864 pages of material that previously had been maintained as classified, and which while now declassified, still contain the caption of "Top Secret," including pages which remain redacted, that is, with material blacked-out. Despite the redactions, the newly declassified information set forth in the CIA documents provides important, newly public, information on Bin Ladin's financial and business activities. This information includes newly declassified finished intelligence summarizing information about Bin Ladin's and Al Qaeda's relationship with DIB and its senior management.

3.2.  Finished intelligence created and issued by the CIA represents a different category of information from "raw intelligence," on which it is based. Finished intelligence consists of analytic assessments by career intelligence officials, produced by experts in the areas covered by the finished intelligence product. Thus, it constitutes an authoritative source of the CIA's assessment of facts, situation, events, persons, institutions, and issues covered in a finished intelligence report. This understanding is built upon both various types of raw intelligence, such as information for human sources ("humint)", information gathered electronically from telephonic or other communications that is transmitted electronically ("signals intelligence" or "sigint"), open-source intelligence ("osint"), from sources outside the United States government or which is otherwise public, and intelligence from imagery, such as that collected by satellites and drones ("imint"), among others. Career intelligence analysts from different intelligence agencies then interpret the data and use their existing expertise to evaluate it and to reach the assessments that are shared with others in the United States government, starting with the President and his senior staff at the White House and National Security Council ("NSC"), and senior national security officials in other agencies such as the U.S. Department of State ("State Department") and U.S. Department of Defense ("Defense Department"). Normally, multiple sources of raw intelligence, as well as the knowledge and expertise of multiple layers of CIA analysts, are relied on to produce a finished intelligence report.

3.3.  The scope of information covered by the 864 pages of CIA Documents regarding Bin Ladin is broad both as to time, and to its scope of coverage of Bin Ladin's activities, networks, operations, and associates in the period leading up to the 9/11 attacks on the United States. The information in the documents was distributed to senior U.S. government officials at the White House, State Department, Defense Department, and Justice Department, among others.

3.4.  These documents include reports on such topics as "How Bin Ladin Commands a Global Terrorist Network," dated January 27, 1999; "Bin Ladin's Terrorist Operations: Meticulous and Adaptable," dated November 2, 2000; "Al-Qai'da in Sudan, 1992-96: Old School Ties Lead Down Dangerous Paths," dated March 10, 2003; and a report by the Director of Central Intelligence provided to the 9/11 Commission, "DCI Report: The Rise of UBL and Al-Qa'ida And the Intelligence Community Response," dated March 19, 2004, which reviewed earlier finished intelligence and found four analytic reports prior to the 9/11 attacks that warned of Al Qaeda's preparation for "spectacular attacks resulting in numerous casualties," which could include "one

or more terrorist attacks at any time."[1] Notably, this March 10, 2003 report described these advisories as "the fruit of painstaking analytic work." It also summarized the knowledge of the intelligence community as concluding "that in Bin Ladin we were dealing with more than a "terrorist financier" and that in al-Qa'ida we were dealing with a sophisticated and determined global terrorist organization that represented a serious threat to the security of Americans at home and abroad."[2]

3.5.     The CIA Documents include two pieces of finished intelligence written prior to the 9/11 attacks which directly address the role of DIB in support of Bin Ladin and Al Qaeda.[3]

3.6.     The finished intelligence set forth in Document 17, dated November 17, 1998, is entitled "Usama Bin Ladin s Finances: Some Estimates of Wealth, Income and Expenditures." The finished intelligence describes the role that DIB's Chairman, Saeed Ahmed Lootah, played in facilitating fund movements for Bin Ladin through personally authorizing, stamping, and signing, "some of Bin Ladin's letters of credit."[4]  That report also states definitively: "Dubai Islamic [B]ank (DIB) has served as a key financial conduit for Al-Qa'ida and for Bin Lad[i]n's· companies in Sudan," and further stated that "Bin Ladin and his companies maintained [redacted] accounts at DIB" and that "DI[B] Chairman Saeed Ahmed Lootah is a close friend of Bin Ladin's."[5]

3.7.     This November 17, 1998 report names Bin Ladin's chief financial officer at the time as Madani Al-Tayyib, and states that he "and other Al-Qaida members held numerous accounts at Dubai Islamic Bank because of Bin Ladin's reported friendship with DIB Chairman, Saeed Ahmed Lootah."[6]

3.8.     This report also contains an Appendix, entitled "Islamic Banks Possibly Harboring Bin Ladin's Wealth." It states that: "Of some 180 Islamic banks operating worldwide, [redacted] a handful may house Bin Ladin-linked accounts." The first such bank it lists is DIB. The Appendix states that DIB "has served as a key financial conduit for Al-Qa'ida and for Bin Ladin's companies in Sudan, [redacted] Bin Ladin and his companies maintained [redacted] accounts at DIB [redacted] DIB Chairman Saeed Ahmed Lootah is a close friend of Bin Ladin's."[7]

3.9.     The second piece of finished intelligence written prior to the 9/11 attacks and directly addressing the role of DIB and its management's support of Bin Ladin and Al Qaeda is provided

_____

[1] CIA_000108.

[2] CIA_000109.

[3] CIA_000316-338 and CIA_000719-804.

[4] CIA_000326.

[5] COA_000337.

[6] CIA_000322 and CIA_000337. There is later confirmation of the U.S. government's assessment of al Tayyib's role as playing a major financial role for Al Qaeda. See, for example, the 9/11 Commission statement that "Several officials told us, in particular, that the United States could not get direct access to an important al Qaeda financial official, Madani al Tayyib, who had been detained by the Saudi government in 1997." Chapter 4.3 of the 9/11 Report written by the National Commission on the Terrorist Attacks Upon the United States ("9/11 Commission"), at https://9-11commission.gov/report/911Report_Ch4.htm

[7] CIA_000337.

as Document 55 in an 84-page Intelligence Report, entitled "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions, A Research Paper," which states its Key Findings as based on information available as of November 20, 1997.

3.10.    Those "Key Findings" specifically address the role DIB played in funding and supporting Al Qaeda. The Key Findings, and the information on which they are based, are specific, concrete, detailed, and while undated, appear to have been written nearly four years prior to the 9/11 attacks. With regard to DIB, they include the following material that I found of particular relevance to the questions I have been asked to answer in this Supplementary Report:

*Excerpts From the Key Findings*

3.10.1.   "Several Islamic financial institutions – those that ascribe to the Koran's principles against the payment of interest – regularly serve as financial conduits and sources of financial support for a range of Islamic extremist groups, organizations and political parties. Some of these extremists have been involved in terrorist activities. Our study of [redacted] on some 130 Islamic financial entities has revealed that Bank Al Taqwa and Dubai Islamic Bank demonstrate especially close financial and personal ties to Algeria's Islamic Salvation Front (FIS), Egypt's Gama'at al Islamiyya (IB), the Palestinian Islamic Resistance Movement (HAMAS), Saudi exile Usama bin Ladin's terrorist Islamic Army, and other Muslim Brotherhood-backed groups [redacted] extremist ties to the Saudi-owned Dar Al Maal Al Islami and Dallah Al Baraka bank groups and Al Rajhi Banking & Investment Company, [redacted]. Specifically:

    •   "Dubai Islamic Bank (DIB) is a key financial conduit for Usama Bin Ladin's Islamic Army, HAMAS, and Oman's Muslim Brotherhood, [redacted]. The bank's chairman, Saeed Ahmed Lootah, is a member of the MB and a close friend of Bin Ladin's, [redacted] Bin Ladin and his Sudan-based companies maintain several accounts at DIB. The bank also is used by such nongovernment humanitarian organizations (NGOs) as Human Appeal International – an alleged financial conduit for HAMAS – and the Dar al-Birr Society, which has financed the Bosnian Mujaheddin."[8]

"In addition to providing the ability to bank in accordance with their religious beliefs, Islamic activists – and militants – are attracted to Islamic banks for two other reasons:

    •   Top management affiliations with the MB, HAMAS, and the NIF make Islamic banks a safehaven for extremist funds. [redacted] In addition, low-level bank

---

[8] CIA_000722. In the 1990's, the United States government and Bin Ladin both used the term "Islamic Army" to designate his international terrorist group dedicated to opposing non-Islamic governments with force and violence, particularly during the period bin Ladin was located in Sudan from 1992-1996, in addition to the term "Al Qaeda" which Bin Ladin used from 1989 forward. The CIA World Factbook reference guide for terrorist groups currently uses the following as the different names of this organization: al-Qa'ida (AQ), aka – al-Qa'eda; al-Qaeda; Qa'idat al-Jihad (The Base for Jihad); formerly Qa'idat Ansar Allah (The Base of the Supporters of God); the Islamic Army; Islamic Salvation Foundation; The Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; the World Islamic Front for Jihad Against Jews and Crusaders; the Usama Bin Ladin Network; the Usama Bin Ladin Organization; al-Jihad; the Jihad Group; Egyptian al-Jihad; Egyptian Islamic Jihad; New Jihad. https://www.cia.gov/the-world-factbook/references/terrorist-organizations/

employees at Islamic institutions – who are often hired on the basis of commitment to Islam – may turn a blind eye to money movements by extremist groups. Finally, a general lack of local regulatory scrutiny – as compared with regulation at conventional institutions – may offer additional confidence to extremists that their financial activities will not be closely examined."[9]

"Because of a significant amount of cross-ownership among Islamic financial institutions, Islamic bank boards of directors and management teams share common personnel that may result in influence over bank policy with regard to dealing with extremists. Approximately 60 of the Islamic financial institutions examined were capitalized by Sheikh Kamel's Dallah Al Baraka Group and Prince Mohammad's Dar Al Maal Al Islami Trust according to the financial press and bank annual reports, which affords them representation on numerous Islamic bank boards. In addition, MB member and DIB Chairman Lootah is a director of four Islamic banks in Bahrain and Bangladesh…"[10]

*Excerpts from the Scope Note*

3.10.2. "This paper analyzes the financial and personal ties of Islamic radical movements to Islamic financial institutions [redacted]. It is not intended to suggest that most Islamic finance houses knowingly conduct dealings with terrorists or that Islamic militants use Islamic banks exclusively to conduct financial dealings. . . . A handful of Islamic banks, however, appears to be actively engaged in financial militant groups, and some bank executives have personal ties to Islamic extremists and activists. The purpose of this paper is to document reporting on this particular avenue for the financing of radical Islam and Islamic extremists and to assess its vulnerabilities."[11]

*Excerpts from Body of Report: "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions.*

3.10.3. "Our review [redacted] suggests that Islamic extremist groups—some of which have undertaken extensive terrorist operations – make regular use of Islamic banks to maintain accounts and transfer funds. . . . Of the roughly 130 Islamic financial entities examined, [redacted] Bank Al Taqwa and Dubai Islamic Bank stand out from other Islamic financial institutions because of their management's apparently witting involvement in the financial activities of Egypt's Gama-'at al Islamiyya (IG), the Palestinian Islamic Resistance Movement (HAMAS), Usama Bin Ladin's Islamic Army, as well as numerous Muslim Brotherhood factions that are bent on establishing Islamic states."[12]

3.10.4. "Dubai Islamic Bank"

---

[9] CIA_000723-724.
[10] CIA_000724.
[11] CIA_000727.
[12] CIA_000728.

"Dubai Islamic Bank (DIB) is a financial conduit for Usama Bin Ladin's Islamic Army and HAMAS, [redacted] ties of the banks and its directors to several NGOs that allegedly remit funds to HAMAS and militant-Afghani and Bosnian extremist groups. Saeed Ahmed Lootah, DIB's chairman (*see* figure 1), is anti-Western – ascribing to various conspiracy theories regarding the intentions of the United States and other Western countries to control the Islamic world [redacted] He also is known for deep religious conservatism and strong support – financial and otherwise—for Islamic political causes. [redacted]. Lootah (*see* figure 2) also has ties to Bank Al Taqwa adviser Sheikh Youssef Al Qaradawi, Usama Bin Ladin, and NIF leader Turabi. His religious conservatism apparently extends to DIB's personnel policy; bank employees are forbidden to be involved in outside business activities, nor are they to associate with non-Muslims, [redacted].[13]"

"*Financial Links to Usama Bin Ladin and the Islamic Army.* [redacted] Lootah is a close friend and business associate of Usama Bin Ladin's, head of the Islamic Army – a pan-Islamic militant group established during the Afghan war (*see* insert). Its goal is to bring about the return of the Caliphate – the office held by a successor to the prophet Muhammad who serves as the spiritual leader of Islam. [redacted] that Bin Ladin's Sudan-based companies are customers of DIB.[14]"

"Lootah and DIB have alleged ties to other Dubai-based individuals and firms that maintain financial links to Bin Ladin:"[15]

"Bin Ladin's choice of financial institutions in Sudan and abroad probably is based on personal contacts as well as the banks and security concerns. NIF cadre dominate bank boards and the top management positions at the Islamic banks in Sudan and probably are business associates or sympathizers to Bin Ladin's cause. [redacted] His use of Dubai Islamic Bank probably stems from his purported friendship with DIB Chairman Lootah:[16]

"*Financial Links to Oman's Muslim Brotherhood.* Lootah was one of the principal financial supporters of the Omani Muslim Brotherhood (OMB) as of late 1994, [redacted]. He purportedly aided Hami Al Ghazali – a leader of a group of Islamic extremists in Oman – who controlled and directed the OMB's sizable portfolio of investments at that time. In addition to DIB, an important repository for OMB investments was Abrar Investments in the United States. [redacted]. Muscat arrested hundreds of OMB members in 1994 for plotting to overthrow the government. [redacted][17]"

"*Ties to Radical NGOs.* DIB and Lootah have connections to several Islamic NGOs that purportedly fund militant causes. A principal connection probably is through DIB board member Sheikh Yousif Jassim Al Haji – an important leader in Kuwait's extensive network of private charities. Al Haji is chairman of the Kuwait-based International Islamic Charities Organization (IICO), an NGO that oversees 150 member organizations

---

[13] CIA_000734.
[14] CIA_000735.
[15] CIA_000735.
[16] CIA_000736.
[17] CIA_000737.

worldwide. [redacted], the IICO was established in 1986 as a cover entity for the safe and efficient management of MB [Muslim Brotherhood] finances. [redacted] the IICO sends funds [redacted] to the Peshawar, Pakistan-based Maktab-ul Khedamat, an NGO that coordinates activities of militant Afghanis and supports the Bosnian Mujaheddin. . . Al Haji's position as DIB director suggests that some of the Kuwaiti ownership in DIB is held by IICO and that some of DIB's annual zakat payments (charitable donations) are channeled to the IICO and IDO."[18]

- "Lootah actively participates in the UAE-based Jama'iyah Al-Isiah Ad-Diny (Association for Religious Reform), which collects donations throughout the UAE to support MB causes worldwide."[19]

- "DIB Chairman Lootah personally authorized, stamped, and signed some letters of credit opened by Bin Ladin's companies in Khartoum through DIB. [redacted] It may be the case that Lootah routinely authorizes all letters of credit beyond a particular monetary value that require confirmation by DIB; however, Lootah's purported friendship with Bin Ladin suggest greater personal service for this customer. [redacted]"[20]

*"Common Ownership and Management of Islamic Financial Institutions*

"Ownership and top management of Islamic banks are close-knit, with capital essentially provided from a relatively small population of wealthy, religious individuals in Gulf countries. . . several Islamic bank directors identifiable with the Muslim Brotherhood raise concern over their influence in more benign institutions:"

- "Dubai Islamic Bank (DIB) Chairman Saeed Ahmed Lootah is a Director of Albaraka Islamic Investment Bank in Bahrain, Bahrain Islamic Bank, Bahrain Islamic Investment company, and Islami Bank Bangladesh, according to various annual reports. Lootah also may wield influence through DIB's shareholding in Al Baraka Turkish Finance House and Tadamon Islamic Bank."[21]

3.10.5.  The CIA finished intelligence report of November 20, 1997 contained a 49-page Appendix in the form of a chart organized alphabetically by country entitled, "Islamic Financial Institutions Worldwide."[22] Page 42 of that Appendix provides an entry on DIB.

---

[18] CIA_000737. Footnote 15 to this section of the CIA report states that the Maktab-ul Khademat (MK) [sic] "serves as a coordinating organization for the Majahhadin [sic]in Afghanistan and Pakistan and, despite its involvement in legitimate charitable activities, its primary aim is the prosecution of *jihad* (holy war) against those who oppress Muslims. Employees of MK have been implicated in several terrorist incidents, including the World Trade Center Bombing."

[19] CIA_000738.

[20] CIA_000747, CIA_000326. *See also* CIA_000426.  In addition to working with Bin Ladin's companies in Sudan, DIB Chairman Lootah and his businesses worked with an al Qaeda company in Jabal Ali, UAE, managed by Abu Khalifa al Omani, an al Qaeda member who "handles Bin Ladin's money in the Gulf under Madani Al-((Tayyib))'s supervision." As further found in CIA_000426, the al Qaeda company was providing money to "Saudi and Yemeni" groups, while working with Lootah's businesses, "which in turn cooperate with Bin Ladin's companies."

[21] CIA_000749.

[22] CIA_000755-000804.

9

The entry provides information on its country of origin (UAE), its home office, year established, branches, locations and assets, subsidiaries, affiliates, and other holdings, its ownership, its directors and top management, its links to "Islamic Fundamentalists," the Muslim Brotherhood and "Islamic Extremist," and "Other Information and Analytical Comments.[23]

3.10.6.   The section on DIB's branches shows it to have eight foreign branches, two of which are specified: one in Faisalabad, Pakistan; and a second in Turkmenistan.[24]

3.10.7.   The section on DIB's ownership lists the Dubai Government as its largest shareholder, at 20%, and the Government of Kuwait and the Board of Directors of DIB as the next largest shareholders at 10% each. The directors and top management were listed as Saeed Ahmed Lootah, as "C" and "MD," which the Appendix specifies to mean chairman and managing director, with most of the other directors, including the "DC," the deputy chairman, and three other board members to have the same last name of Lootah, suggesting they are members of the chairman's family, giving the Lootah family a majority of the total nine seats on the DIB board. It also lists Yousif Jassim al Haji on the Board, who the report separately describes as heading the IICO, which handled finances for the Muslim brotherhood, including for the Maktab-ul Khedamat [sic], which as stated above, is described as "an NGO that coordinates activities of militant Afghanis and supports the Bosnian Muhjahddin."[25]

3.10.8.   The section on "Links to Islamic Fundamentalists, the Muslim Brotherhood and Islamic Extremists," states the following information, which I provide in full: "Lootah is a close friend and business associate of extremist financier Usama Bin Ladin, whose companies are active customers of DIB. The bank maintains accounts for several NGOs which are suspected of financing radical Islamic groups; it appears for example, to be one of the principal banks for Human Appeal International, an NGO that funds HAMAS. Former Kuwaiti Minister of Awaqf, Yusif Jassim al Haji, an Egyptian, heads the Kuwait Joint Relief Committees, Kuwait's International [sic] Islamic Charities Organization (IICO), and is a board member of Sudan's Islamic Dawa Organization, [redacted]."[26]

3.10.9.   The section on "Other Information and Analytic Comments" states that "Youssif Jassim Al Haji's position as a DIB Director suggests the IICO owns a stake in the bank. Lootah was one of the original founders of Faisal Islamic Bank of Sudan."[27]

3.11.   The CIA Documents also contain a finished intelligence report written after the 9/11 attacks, Document 3, dated March 10, 2003 that reconstructed what the CIA knew about Bin Ladin's financial network during his Sudan period, entitled "Al-Qa-ida in Sudan, 1992-96: Old School Ties Lead Down Dangerous Paths." The Key Findings of this report stated that the Sudan period enabled Al Qaeda to transform "from an only partially realized idea to an international organization ready to operate on its own." To do this, "Al Qaeda received funding from wealthy

---

[23] CIA_000797.
[24] Id.
[25] Id.
[26] Id.
[27] Id.

backers of the Sudanese regime and the international jihad they supported.[28]

3.12.   This 2003 report states that during this critical period of incubation for Al Qaeda's ability to conduct "international jihad," Bin Ladin forged and used financial relationships he had developed with DIB and Lootah. Here, two years after 9/11, the CIA again concluded that "Bin Ladin's Sudan-based companies and his financial officers opened bank accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah."[29]

3.13.   The date of this finished intelligence report is significant, because it is evidence that, two years after the 9/11 attack on the United States, the CIA continued to assess that DIB and its management had provided support to Bin Ladin and Al Qaeda during the period it found to be critical to the latter's development of its global strike capability, including its capability to attack the United States.

3.14.   The CIA documents include a retrospective review of "The Rise of UBL and Al-Qa'ida and the Intelligence Community Response," dated March 19, 2004, to the 9/11 Commission.[30] This review found that during Bin Ladin's 1992-1996 period in Sudan, Islamic extremists who bombed a hotel housing U.S. servicemen in Aden, Yemen, said Bin Ladin financed their group, "according to all source reporting,"[31] that "Bin Ladin business interests had funneled money to Egyptian extremists," who used the funds to buy weapons (among other purposes), and that Bin Ladin during this period became "the key financier" for a terrorist training camp in Afghanistan, which provided terrorist training to terrorist groups, including one that carried out an effort to assassinate Egypt's President. This CIA report said that during this period Bin Ladin was also working on plans to develop methods "to deliver poisonous gases in an explosive that could be fired at US troops in Saudi Arabia and tried to develop cyanide gas bombs."[32]

3.15.   Based on my experience in reading finished intelligence, I believe that the redacted portions of these documents likely include information on the sources and methods that provide the underlying facts on which the CIA based its finished intelligence assessments. Such raw intelligence could include human intelligence from persons with direct knowledge of Bin Ladin and Al Qaeda and their financial and business activities, signals intelligence, involving intercepted telephone communications, and open source intelligence, such as banking or corporate records, for example, which might include letters from those involved, checks, evidence of wire transfers, records of transactions in bank accounts, and similar information, or records of communications such as emails.

3.16.   Although I do not know the precise raw intelligence upon which the CIA relied in producing its finished intelligence reports containing its assessments that DIB was a principal conduit for financial services for Bin Ladin and Al Qaeda, I have reviewed references to such raw intelligence concerning the use of DIB in connection with support for Al Qaeda, including in relation to the terrorist attack on the United States on 9/11. These include the Summary of Evidence for

---

[28] CIA_000039.
[29] CIA_000045.
[30] CIA_00064-00141.
[31] CIA_000068.
[32] CIA_000069.

Combatant Status Review Tribunal of Al Baluchi, Ammar, dated March 28, 2007;[33] and the interview of Jamal Al-Fadl by the Federal Bureau of Investigation ("FBI"), transcription dated 2/4/98, regarding the activities of Madani Al-Tayyib in carrying out various support activities for Bin Ladin and Al Qaeda including collecting funds for Al Qaeda, and his emergence as "Emir of finances for AL-QAIDA." This latter document states that "Al-TAYYIB had a relationship with AHMED LOOTAH from the United Arab Emirates."[34] The information in this raw intelligence is consistent with the findings in the finished intelligence regarding DIB's and Lootah's support for Al Qaeda.

4.   **Other Information Regarding Dubai Islamic Bank and its Relationship to Al Qaeda**

4.1.   Following the August 7, 1998 bombings of U.S. Embassies in Kenya and in Tanzania, U.S. government focus on Al Qaeda and Bin Ladin was intensive. In the course of that focus, the White House maintained centralized oversight over counter-terrorism efforts regarding Bin Ladin and Al Qaeda, which included regular meetings at the NSC, typically directed by then White House counter-terrorism czar Richard Clarke.[35] Arising out of that process, the U.S. government undertook interagency diplomatic efforts with the United Arab Emirates concerning Bin Ladin's relationship with Dubai Islamic Bank,[36] as reflected in contemporaneous media reports entered into the record in the referenced deposition of Dr. Hussein Hassan ("Dr. Hassan") in this litigation.[37]

4.2.   One of these articles provide information about the focus of the U.S. government on the Bin Ladin-DIB relationship in the period prior to the 9/11 terrorist attacks on the United States. On July 8, 1999, the New York Times published an article entitled, "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations," which described a diplomatic mission from the U.S. to the United Arab Emirates ("UAE") "to lobby for a halt to a suspected financial relationship between a Government-controlled bank and Osama bin Laden, the Saudi exile charged in the bombings of United States embassies in Africa last year." According to the article, "The Central Intelligence Agency has obtained evidence that Mr. bin Laden has been allowed to funnel money through the Dubai Islamic Bank on Dubai, which the United Arab Emirates Government effectively controls." The article also stated that "United States intelligence officials

---

[33] Summary of Evidence for Combatant Status Review Tribunal – Al Baluchi, Ammar, to Personal Representative from OIC, CSRT (28 Mar 07), entered into the record of Case 1:03-md-01570-GBD-FM as Document 2973, Filed 07/14/15, Page 2 of 4.

[34] SNY101-0093-0105.

[35] Clarke appears to have been the person in the U.S. government who tasked the CIA to undertake the finished intelligence report, "Usama Bin Ladin's Finances," dated November 17, 1998, which concluded that DIB was a "key financial conduit," for Al Qaeda. CIA_00317, "This paper was prepared at the request of Richard [redacted] Global Is [sic] and Multilateral Affairs, NSC." That office, later known as the "Office of Transnational Threats," was directed at the time by Clarke.

[36] *See* Stephen Braun, "Emirates Looked Other Way While Al Qaeda Funds Flowed, LA Times," January 20, 2002 (reporting that following the U.S. Embassy bombings, U.S. officials pressed UAE officials to implement tighter banking controls and specifically asked "that some Taliban accounts be closed at Dubai Islamic Bank."). https://www.latimes.com/archives/la-xpm-2002-jan-20-mn-23789-story.html

[37] In his Deposition, Dr. Hassan identifies himself as Chairman of the Shariah Board of the DIB from 1998 through the date of the Deposition, August 1, 2017, p. 47 and p. 180.

said they had evidence that Mr. Bin Ladin had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank.[38]

4.3.    After the New York Times published the article referring to Bin Ladin's relationship with and use of DIB, the State Department's spokesperson, James Foley, confirmed that he had read the article, and confirmed that the U.S. government was working with the United Arab Emirates ("UAE") to strengthen cooperation against terrorism, including terrorist finance, and was told by the UAE government that the Dubai Emirati government "has taken steps to clean up the bank, the Dubai Islamic Bank, and to restore its reputation." In the questions and answers which followed, the reporter asked, "So, if they are taking steps to clean it up, that implies that something had been amiss in the past, at some time in the past?" In response, Foley stated, "It does imply that, yes," and then added, "I can't get into the details of it. I think what I said is significant enough, however."[39]

4.4.    After the 9/11 attacks, the Los Angeles Times reported on January 20, 2002 that the U.S government had asked the authorities in the United Arab Emirates to close Taliban accounts at DIB, at a time when the bank's chairman, Mohammed Khalifan bin Kharbash, was the UAE minister for financial and industrial affairs. According to the article, DIB promptly closed the Taliban accounts in response to the U.S. request.[40]

4.5.    In his deposition, Dr. Hassan testified that at no time during his tenure in his position at DIB as chairman of the Fatwa and Shariah Oversight Board of the bank had he become aware of the New York Times article, of the statements by Foley regarding DIB's involvement in terrorist finance, or of allegations that the CIA had evidence that Bin Ladin had used DIB to funnel money. He stated that, as he was unaware of the allegations, he took no action. He stated that if he had been aware, he would "ask the legal department to defend itself . . . because I am against terrorism all my life, I dedicated my life to this mission."[41] Dr. Hassan then stated that he had learned three or four years earlier (that is, roughly 2013-2014), that DIB had engaged outside lawyers to "deal with this case" but was not familiar with details.[42] He also testified that he was unaware of either the presence, or closure, of Taliban accounts at DIB as reported in the Los Angeles Times article, and did not know whether the UAE had closed Taliban accounts at DIB, or whether DIB had ever maintained such accounts on behalf of the Taliban.[43]

4.6.    In a separate deposition in this matter, Fine, formerly a commercial attorney in Florida and currently a Florida state court judge, testified that in connection with an investigation of fraud and embezzlement of over than $200 million in which he was retained on behalf of DIB in his capacity as an attorney, he learned in the summer of 1999 about the New York Times allegations that the CIA had found evidence of Bin Ladin's funneling of money through DIB, as well as of the statements of Foley regarding DIB's involvement in terrorist finance, and was asked to make

---

[38] Exhibit 11, Deposition of Dr. Hassan, PEC-DIB000839, "U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations," New York Times, July 8, 1999.

[39] Exhibit 13, Deposition of Dr. Hassan, State Department Briefing, July 8, 1999, PEC-DIB00804.

[40] Exhibit 15, Deposition of Dr. Hassan, "Response to Terror, Sunday Report, Los Angeles Times, January 20, 2002, PEC-DIB001015-1026.

[41] Deposition, Dr. Hassan, pp. 98-100 and p. 133. See also pp. 237-239.

[42] Deposition, Dr. Hassan p. 102.

[43] Deposition, Dr. Hassan, pp. 107-109 and p. 133.

inquiries of U.S. officials regarding the allegations to explore a potential defamation claim and to try to correct information which DIB believed to be false.[44]

4.7.     Exhibit 271 to the Fine Deposition contains correspondence between Rob Ellison, identified by Fine as the consultant retained by DIB to oversee the recovery of funds from the $200 million fraud against DIB, dated July 8, 1999, on DIB letterhead, from DIB's Head Office, regarding "News Reports." The faxed letter from Ellison to Fine, states:

   4.7.1.   "I understand that stories to the effect that DIB banks for bin Ladin have penetrated as far as Florida; the attached appeared in the London Times last Friday. The bank has no customer by the name of Bin Ladin and, apparently, never has. The visit by US Government representatives was prior to the Cruise missile attack on Sudan and Afghanistan, which must now be nearly 12 months ago. I checked the facts with the Rule's Office today. DIB was not specifically mentioned. As you know, we have been in regular touch with US Customs and with the Justice Department and no mention has been made of any of these issues. Of course, if any suspicion still lurks, then no doubt arrangements can be made for any US official to review the bank's records." The letter from Ellison to Fine also states that over the previous year DIB had been audited by the UAE Central Bank, and that KPMG had conducted audits as well for two periods in 1998, with the assessment that: "Particular attention was paid to the whole area of transfers (bolted horse, so see to the stable door), but particularly to transfers for non-customers."[45]

   4.7.2.   The second page of Exhibit 271 to the Fine deposition contains an undated article which from the context, appears to constitute the London Times article referenced by Ellison. The article is entitled "US traces bin Laden funds to UAE bank." Its first four paragraphs state:

   "OSAMA BIN LADEN, the world's most wanted terrorist, has been funneling money through a bank in the United Arab Emirates, a senior Clinton administration official said yesterday.

   "A team was sent from Washington to the UAE, an American ally in the Gulf, to plead for the account to be shut down. The official said the UAE had been "responsive."

   "The account was seen as hampering America's efforts to halt the extensive network of bin Laden, who Is suspected of masterminding the bombings of American embassies in Kenya and Tanzania last year."

   "The account was reportedly at the Dubai Islamic Bank in Dubai, which is under the effective control of the UAE Government.[46]

4.8.     At the request of Ellison on behalf of DIB, Fine contacted the State Department in July 1999, eventually discussing the allegations regarding Bin Ladin having accounts at DIB with Steve

---

[44] Deposition, Fine, October 4, 2019, pp. 19-22.
[45] Exhibit 271, Deposition, Fine, DIB_003159.
[46] DIB_003160.

Kashkett, then the Middle East chief of the State Department counterterrorism section. Fine testified that he was told that DIB "wouldn't find anything in the name of Osama bin Laden and that it would not be in any international wire transfers, that it was either in domestic wire transfers or withdrawals from accounts, through other names." He testified that he could not determine whether the State Department official (Kashkett) did not know who the names were, or was declining to provide the information.[47]

4.9.    Fine then drafted a letter on behalf of DIB to the New York Times dated July 27, 1999 entitled "False Statements About Dubai Islamic Bank in July 8, 1999 Article re: Osama Bin Laden," threatening a defamation ("false light") action against the New York Times, and stating "DIB has never dealt directly with Osada [sic] bin Laden, and had no knowledge or reason to believe that anyone acting on Bin Laden's behalf had been laundering his money through DIB."[48] The letter also stated that the New York Times' allegations regarding the CIA having obtained "evidence that Mr. Bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls," and the remainder of the allegations in that article regarding DIB have a relationship with Bin Ladin, were false. The letter stated, "Taken as a whole, the article conveys the message that DIB knowingly assisted a terrorist in laundering money. This message is utterly and completely false."

4.10.   The draft letter from DIB's attorneys to the New York Times to demand a retraction of the article linking DIB to terrorist finance was then submitted by Ellison to the DIB Executive Committee to approve the transmission of the letter to the New York Times demanding the newspaper retract the allegations and threatening the defamation action.[49] A handwritten note to an approval request from Ellison to DIB's Executive Committee states: "Mr. Rob Ellison. I have discussed this matter with Mr. Ebrahim Fayez and okayed the action Mohamed Al Sharif 13/11/99.[50] A final version of the letter, correcting the typo on Bin Ladin's first name, was transmitted to the New York Times on January 4, 2000.[51]

4.11.   On January 14, 2000, the New York Times legal department responded to the letter from Fine that he transmitted to the newspaper on behalf of DIB, captioned "Dubai Islamic Bank Correction Demand." The response stated that "We have reviewed your letter with care and have concluded that no correction is warranted here. The article accurately reported the statements of United States government officials. Your letter misreads the article in one respect. It did not say that money was laundered through the Dubai Islamic Bank but only that the bank did business with Osama Bin Laden. We believed this to be true when we published it, and we believe it to be true now." The letter then addressed the statements by the State Department's spokesperson, Foley, as follows: "You appear to be unaware that the State Department confirmed and perhaps even expanded on the relevant portion of the article in a public briefing on the day it was published. In the context of a discussion of, in the State Department

---

[47] Deposition, Fine, p. 25.
[48] Exhibit 271, Deposition, Fine, DIB_003164.
[49] DIB_003174.
[50] DIB_003174. Online media reports confirm that a person with the name of Ebrahim Fayez served as Chief Executive Officer of DIB and a merged successor bank, Emirates Islamic Bank, until May 18, 2011, when he resigned the position. See, e.g., http://www.tradearabia.com/news/BANK_198825.html and Emirates Islamic CEO resigns - Business - Economy and Finance - Emirates24|7 (emirates247.com).
[51] DIB_003213-003214.

spokesman's words, "terrorist money laundering," the spokesman stated that 'the government of the United Arab Emirates has told us the Dubai Emirate government has taken steps to clean up the bank, the Dubai Islamic Bank, and restore its reputation.' For these reasons we decline to correct the article."[52]

4.12.   Fine testified that he was told by Ellison that two accounts at DIB were in fact closed "in relation to terrorism," based on information provided to DIB by the U.S. government, either directly to DIB "or more likely through the Central Bank," which led to DIB closing the two accounts.[53] The fact that DIB closed those terrorist-related accounts in response to requests by the United States government to government authorities in the UAE government was later also reported in the January 20, 2002 article in the Los Angeles Times.

4.13.   Fine testified that DIB then decided not to sue the New York Times, stating that the primary reason was reputational risk, even if the bank won.[54]

4.14.   Fine testified that he had not undertaken any investigation himself regarding the underlying allegations in the New York Times story, and had relied solely on the information conveyed to him by Ellison on behalf of DIB that the New York Times article's statements about DIB's relationship with Bin Ladin were untrue.[55]

5.   **Other Information Regarding Dubai Islamic Bank and its Relationship to Financial Support for the 9/11 Attackers**

5.1.   Pursuant to EO 14040, the FBI declassified and produced documents referencing an investigation it undertook after the 9/11 attacks, of a Saudi national, Omar Ahmed Al-Bayoumi ("Bayoumi"), who was determined by its San Diego division to be "of investigative interest."[56] The FBI's interest in Bayoumi, as someone who had contact with two of the 9/11 hijackers, had previously been described in Chapter 7.1 of the 9/11 Commission's report, in the section headed "The Attack Looms."[57]

5.2.   The 9/11 Commission had concluded that it Bayoumi was "an unlikely candidate" for knowing involvement with extremists, but the newly declassified information from the FBI paints a different picture of his contacts with them, as well as having received money ($190.40) from a DIB account that was apparently held in the name of Sulaiman El Ali,[58] which the FBI felt important to investigate, given Bayoumi's relationship with the two hijackers.

5.3.   The newly declassified FBI investigative material regarding Bayoumi includes the following statements by the FBI's San Diego office in a document dated July 1, 2002 with the title,

---

[52] New York Times letter to Alan S. Fine, Esq, Re: Dubai Islamic Bank Correction demand, January 14 2000, DIB_003215-003216.
[53] Deposition, Fine, p. 70 and p. 119.
[54] Deposition, Fine, p. 55.
[55] Deposition of Fine, p. 57-62.
[56] EO14040-000779.
[57] 9/11 Commission Report, p. 217-219.
[58] EO14040-002929.

"PENTBOMB MAJOR CASE," regarding "The results of searches on OMAR AHMED ALBAYOUMI."[59]

- "While living in San Diego, California, terrorist highjackers [sic] Nawaf Al-Hazmi and Khalid Al-Midhhar were closely associated with OMAR AHMED Al-BAYOUMI."[60]

- "AL-BAYOUMI came to the attention of the FBI when his apartment manager complained that she was notified by the Postal Inspector that AL-BAYOUMI had received a suspicious package from the Middle East on 03/03/98. The package was broken open and was observed packed full of different wires."[61]

- "AL-BAYOUMI is suspected of aiding and abetting terrorist highjackers [sic] Nawaf Al-Hazmi and Khalid Al-Midhar."[62]

- "[redacted] asked about Albayoumi's arrest, Bassnan replied he was arrested because he knew highjackers [sic] Nawaf AlHazmi [sic] and Khalid AlMidhar [sic]from the terrorist attacks."[63]

- "ALBAYOUMI almost daily taking telephone calls [redacted] The Emir from the Ministry of Defense, who was in charge of the Air Traffic Control would frequently call ALBAYOUMI."[64]

- "ALBAYOUMI registered in school for immigration purposes and to meet new students from the Middle East. ALBAYOUMI had a Bank of America checking account and Visa credit card. It is believed BAYOUMI paid $250,000 for a building in El Cajon that was converted into a mosque. ALBAYOUMI [redacted] was going to Los Angeles to pickup some visitors. Within a day or two after returning from Los Angeles ALBAYOUMI introduced [redacted] Nawaf Alhamzi and Khalid AlMadhdar."[65]

- "ALBAYOUMI contacted Dawa (ph.) (related to Civil Aviation) at the Saudi Arabian Consulate every two or three months when he traveled to Washington D.C. ALBAYOUMI traveled to Saudi Arabia annually for several weeks."[66]

- "Doctor Suleiman Ali, a Saudi national is a close associate of OMAR BAYOUMI. Both Ali and BAYOUMI are believed to be working for Saudi Intelligence in San Diego."[67]

---

[59] EO14040-000779.

[60] EO14040-000779.

[61] EO14040-000780.

[62] EO14040-000782. Another FBI document released under E014040 states that Al Bayoumi cosigned for the apartment in which the two 9/11 hijackers lived while they were in San Diego, and was "suspected" of providing them "financial support." EO14040-022167.

[63] EO14040-000784.

[64] EO04040-000785

[65] EO14040-000785.

[66] EO14040-000786.

[67] EO14040-000786.

5.4.     Another newly declassified FBI Report dated October 17, 2001, entitled "PENTTBOMB; MAJOR CASE #182," provides information described as "Set lead for Legat [redacted] to obtain bank records associated with Omar Al-Bayoumi."[68] This document states that the bank records are needed because Bayoumi "is suspected of providing direct financial support" for two of the 9/11 hijackers, Khalid Almihdhar and Nawaf Alhamzi, and had "received numerous wire transfers into his Bank of America account from financial institutions located in Saudi Arabia."[69]  These included one wire transfer from DIB in the amount of $190.50 on November 4, 1999.[70] The FBI report stated that this wire transfer needed to be investigated to identify the originating DIB account associated with the transfer, and provided a possible account number, which was redacted from the document. The document further stated that for the same lead, "Lead 4," the FBI legal attaché ("legat"), needed to "obtain any and all Dubai Islamic Bank account records associated with this account and/or any and all Dubai Islamic Bank accounts belonging to Sulaiman El Ali."[71]

5.5.     I understand this report to mean that the FBI had identified a transfer to Bayoumi with some relationship to Sulaiman El Ali through DIB, and was seeking further information on all accounts the latter had at DIB, and was asking the FBI legat responsible for handling law enforcement cooperation with the United Arab Emirates to work with authorities in that country to obtain that information.

5.6.     The FBI's effort to secure further information on Bayoumi's sources of funding, including the wire transfer from DIB prior to 9/11, during a period in which two of the 9/11 terrorist attackers "were closely associated with" Bayoumi, is evidence that the FBI assessed DIB's handling of funds for Bayoumi as important to its criminal investigation of the 9/11 terrorist attacks.

5.7.     Pursuant to an Opinion and Order of Judge Netburn dated July 11, 2018, DIB was ordered to search its electronic legacy account database for relevant banking and financial records for certain search terms, individuals, entities, and accountants  totaling 629 search terms in all.[72] The terms to be searched in the DIB account records included the name "Sulaiman al Ali," number "583" of the search terms listed in Appendix B of a letter signed by Katie Barlow, a lawyer representing DIB, dated March 22, 2017.[73]

5.8.     On September 10, 2018, Steven T. Cottreau, an attorney representing DIB, signed a letter "Re In re Terrorist Attacks  of September 11, 2001, 03 MDL 1570," advising lawyers for the plaintiffs that pursuant to the July 11, 2018 court order, DIB had undertaken a search of the 629 terms identified in the Order and did not identify any additional responding information.[74]

---

[68] EO14040-002926-2933.
[69] EO14040-002927.
[70] EO14040-002929.
[71] Id.
[72] Opinion and Order, Judge Magistrate Netburn, July 11, 2018, Case 1:03-md-01570-GBD-SN Document 4046.
[73] Letter, Katie Barlow, on behalf of DIB, to Scott Tarbutton, Esq and Sean Carter, Esq., Cozen O'Connor, representing the plaintiffs in this matter, March 22, 2017, Appendix B, page 24, Case 1:03-md-01570-GBD-SN Document 3789-12, filed November 13, 2017.
[74] Letter, Steven T. Cottreau, on behalf of DIB, to Scott Tarbutton, Esq and Sean Carter, Esq., Cozen O'Connor, September 10, 2018.

6. **Information Regarding the Ideological Beliefs of DIB's Board of Directors in Relation to the Support Terrorism Against Civilians**

6.1.   The deposition of Dr. Hassan contains information regarding his own contacts with extremists and his own views that Islam provides a religious basis for carrying out armed attacks, including, according to his writings, "non-combatants" when conditions are "abnormal" and doing so is necessary for Muslims to win a conflict. I discuss these views, as expressed in an article he wrote after the 9/11 attacks, below.

6.2.   Dr. Hassan's contacts with Islamic extremists took place as early as 1982 or 1983, when Dr. Hassan was teaching at the International Islamic University in Saudi Arabia. In the 1982-1983 period, Dr. Hassan knew Abdullah Azzam, who I have described in my Export Report as follows: "a foundational figure for terrorist jihad generally and for al Qaeda specifically. One could properly think of him as the godfather of pan-Islamic foreign fighters. In the words of Thomas Hegghammer: 'Azzam is known in the Islamist community as the spiritual father of the Arab Afghans, and the contemporary historical evidence supports this reputation. He arrived in Pakistan in 1981, produced recruitment literature from 1982 onward, gave talks about Afghanistan in the Arab world from 1983 onward, and established the foreign fighter logistics office known as the Services Bureau in Peshawar in late 1984. The significance of these initiatives is evidenced by the fact that most of the fighters who went to Peshawar before 1986 seem to have been inspired by Azzam's writings or helped by the Services Bureau, or both.'"[75]

6.3.   As indicated in the Hegghammer excerpt provided above, the period during which Dr. Hassan had contact with Azzam was the very period that Azzam was developing the foundations for the work he undertook in Pakistan to train Muslim men as jihadists to undertake armed conflict with non-Muslims and during which Azzam developed close working relations with Bin Ladin to carry out the work of recruiting and training foreign (that is, non-Afghani) fighters to participate in the war, as I discuss in further detail in Section 13.9 of my Expert Report.

6.4.   During this period, Azzam produced a foundational book that guided the recruitment of foreign fighters to conduct jihad or holy war in Afghanistan and elsewhere, entitled "Defense of the Muslim Lands." In his deposition, Dr. Hassan states that he is not familiar with this book. But as set forth in his deposition, the book in English translation states expressly that Azzam stated that he showed the "fatwa" in it, which includes six questions, to a person named "Dr. Hassin Hamid Hissan," in an apparent reference to Dr. Hassan.[76] Dr. Hassan confirmed that this alternate spelling of his name from the Arabic is also correct.[77]

6.5.   Azzam's book, referenced in the deposition of Dr. Hassan, is essentially a call to armed action (to "fight jihad") to retake all Muslim lands, with explicit reference to the need to do this in Afghanistan and Palestine.  It expressly references language calling on Muslims to "Expel all Jews and Christians from the Arab Peninsula," to "1 - Fight, even if alone, and 2- Incite the believers," and states that "Fighting alone pleases Allah." It describes jihad as both an individual and a collective responsibility, that can be met both by physically fighting on behalf of Muslims and by

---

[75] Winer Expert Report, Section 13.9.
[76] Deposition, Dr. Hassan p. 111-112.
[77] Deposition, Dr. Hassan, p. 310.

providing money for jihad ("jihad by wealth"), which Azzam states is "obligatory."[78]

6.6.     Two other persons who served for a number of years as Islamic scholars on DIB's Shariah Board during Dr. Hassan's tenure there, ultimately resigned from that board, having previously expressed views advocating assistance to terrorist organizations and "encouraging one to bomb himself."[79] They were Ali Mohi al Din Al Qaradaghi ("Qaradaghi") and Dr. Ajeel Jaseem Nashmi ("Nashmi").[80]

6.6.1.   As stated by Dr. Hassan in his deposition, these two DIB Shariah Board members "issued articles that what I came to know from here, they issued an article encouraging one to bomb himself and to assist terrorist organization. That is what I came to know from this preparation, now, after I have seen their articles."[81] Dr. Hassan stated if he had known at the time what he now knew about their views advocating violence, he would asked "the appointing authority" at DIB to dismiss them.[82] He stated Qaradaghi served on DIB's Shariah Board from 1998 for five, six, or eight years (that is, until 2003, 2004, or 2006), but he was uncertain about the exact period. Dr. Hassan stated Nashmi was appointed to DIB's Shariah Board sometime in 2002 or 2003.[83]

_____

[78] Exhibit 15, Deposition, Dr. Hassan, "Defense of the Muslim Lands," Abdullah Azzam, section entitled "Fourth Question," pp. 39-40. The reference to funding jihad as obligatory is at p. 31. Azzam's book contains a number of examples of when killing another person is justified. An example: "The Almighty the Majestic says: 'The recompense of those who wage war against Allah and His messenger and do mischief in the land is only that they shall be killed or crucified or their hands and feet be cut off from the opposite sides, or exiled from the land.  That is their disgrace in this world, and a great torment is theirs in the hereafter.' This is the ruling applied on the one who wages war from among the Muslims.  He spreads distress and corruption in the land and he infringes upon wealth and 'Ard.  This is the ruling which the Messenger of Allah (saw) carried out upon the sick Bedouins who turned apostate as has been reported in the Sahihs. What should be the treatment of the Kaffir nation that brings calamity upon the people, their religion, their wealth and their 'Ard?  Is not the first obligation upon the Muslims to fight them?" p. 21.
[79] Deposition, Dr. Hassan, p. 285.
[80] Deposition, Dr. Hassan, p. 87.
[81] Deposition, Dr. Hassan, p. 285. In a fatwa published on his official website titled "Is it Permissible to Send Money to Hamas at This Time," dated February 21, 2010, Dr. Qaradaghi stated that "jihad today is a mandatory obligation to everyone who is capable to do so, by using money, the body, the media, the pen, and all means of jihad."  Dr. Qaradaghi further urged Muslims to engage in violent jihad in Palestine, which he described as "the best type of jihad ever."  According to Dr. Qaradaghi, "Brothers and sisters, haste to aid your brethren in Palestine using all that you have.  This might be a unique chance by sacrificing money, yourselves, and everything that is expensive and precious for the sake of the blessed land."  Dr. Nashmi similarly issued a fatwa on his official website, dated December 9, 2005, titled "Martyrdom Operations," endorsing the actions of a "young man who kills himself through an explosive belt, a car, or any means."  According to Dr. Nashmi, "[i]f his intention behind killing himself through these means is to kill and torment the enemy and elevate the word of Allah, then he is not considered a suicide.  Rather, he is considered a martyr."  In another fatwa titled "Paying Zakat to Those Who Work to Restore the Shar'a of Allah," Dr. Nashmi argues in support of jihad and states that it is permissible to pay zakat funds to those Islamic groups that wish to "restore Islamic life, erase Kufr regimes, and replace them with the Sharia'a of Allah."
[82] Deposition, Dr. Hassan, p. 283.
[83] Deposition, Dr. Hassan, p. 282-287, p. 296.

6.6.2.   The DIB Board of Directors is responsible for electing members of DIB's Shariah Board, who are to be selected for their knowledge of Islamic jurisprudence.[84]

6.6.3.   Dr. Hassan stated he did not believe the DIB Board of Directors had knowingly appointed Shariah Board members who support terrorists, but "we may appoint someone but we didn't know that he something in his heart, and he can express some views supporting terrorists."[85] Dr. Hassan said that "of course I would advise the Dubai Islamic Bank for sure now to be very careful, to make much more due diligence when appointing someone in the Shariah Board or any employee, because this is Islamic bank," and according to Dr. Hassan, "Islam is against terrorists supporting even expressing the opinion to support terrorism."[86]

6.7.   As referenced in Exhibit 17 of his deposition, while serving as head of DIB's Shariah Board, Dr. Hassan personally wrote about the parameters of permissible holy war or jihad under Islamic law in a study he presented to the Conference on International Relations between Islam and the Current Civilization held by the World Islamic League in Mecca on May 13-22, 2002. The study was entitled "The Rules of Contact between Muslims and Others in Time of War." Dr. Hassan's study assessing when Muslims may attack non-Muslims considers a range of situations, such as the justification for Muslims to engage in war "to rid the world of corruption," and to engage in armed combat to counter against aggression against Muslims "both actual and expected," thus justifying potential engagement in pre-emptive attacks on those deemed to threaten Muslims.[87]

6.7.1.   In his study, Dr. Hassan sets forth a number of rules for fighting jihad, which he defines as "armed struggle," based on his readings of Islamic religious texts and commentaries. He states that Islam authorizes armed struggle to fight in defensive wars, to remove oppression, and to stop aggression, to protect human rights and to allow believers to practice their religion as they wish.

6.8.   I have considered Dr. Hassan's statements in his deposition that "Islam does not permit, does not allow any kind of violence. It prohibits killing, hurting any human being, insulting any human being. This is well known as general rules of Islam, known not only to scholars but also the normal people who know Islam. . . . To kill civilians, even non-Muslim civilians, is equal to kill a Muslim. No difference."[88]

6.8.1.   These statements by Dr. Hassan in his deposition are not consistent with statements he makes within the text of his 30-page study on "The Rules of Contact Between Muslims and Non-Muslims in Time of War," which describes the circumstances in which Dr. Hassan views Islam to authorize violence, including killing, and when "necessity permits" to engage in actions such as killing civilians that would be forbidden in other situations.

---

[84] Deposition, Dr. Hassan, p. 291 and pp. 292-296.

[85] Deposition, Dr. Hassan, p. 288.

[86] Deposition, Dr. Hassan, p. 288.

[87] Exhibit 17, Deposition, Dr. Hassan, "The Rules of Contact between Muslims and Non-Muslims in Time of War," presented to the Conference "International Relations Between Islam and The Current Civilization," held by the World Islamic League in Mecca May 13-22, 20002, prepared by Hussain Hamid Hassan, PhD.

[88] Deposition, Dr. Hassan, pp. 166-167.

6.8.2.   In his study, Dr. Hassan states that while war is an exception to peaceful relations, it is justified in response to "oppression, aggression, or fitna in religion." He then identifies "fitna" as religious persecution, and the right to fight for religious freedom by any Muslim who is not living "under the authority of the Islamic State."

6.8.3.   He further states that "fighting is legal to achieve the noble goal" until non-believers "no longer seduce the believer away from his religion and torture and persecute him because of his faith."

6.8.4.   Dr. Hassan's study finds a number of grounds in Islamic law to justify religiously-based armed struggle ("jihad"), including:

- Killing disbelievers who violate "the freedoms of belief, thought and choice;"

- Defending Muslims against oppression.

- Repelling aggression against Muslims.

- Preserving the balance of power, protecting values, and protecting holy sites.

- Ending the revolt {"fitna"] of believers against their religion.[89]

6.8.5.   In this study, Dr. Hassan states that as a general rule, fighting by Muslims is restricted to those who fight Muslims, and not against non-belligerents, explicitly stating that "it is permissible to kill those of the disbelievers who violate the freedoms of belief, thought and choice, through the force of weapons." He then specifies that this right to kill such disbelievers does not include killing young children, the mentally ill, a dying elderly, or a peaceful woman who isn't participating in the conflict, and he makes this point several times, before, in the final section of his study, contradicting it in the section of the study entitled "The Necessity of Fighting" by citing an exception to the general rule of it not being permissible to intentionally kill noncombatants.

6.8.6.   In this section, "The Necessity of Fighting," Dr. Hassan states that it is lawful for Muslims to direct attacks at civilians (noncombatants), should it become necessary to do this for the Muslims to win the conflict. I place his statements on this issue in bold-face for emphasis: **"We mentioned that sharia requires that belligerent acts not be directed at noncombatants, and that all manners of mutilation and burning of enemy soldiers is not permitted under the normal circumstance of war . . . however this rule like the rest of the sharia rules is subject to the rule of "necessity permits the forbidden," so these are forbidden acts under normal circumstances of war, but under abnormal circumstances, these acts may be permitted and the prohibition is restricted to the situation where there is a choice. Based on this, Muslim legal scholars decided to permit some of these behaviors if the necessity of war and fighting requires them such that not resorting to these forbidden acts would keep Muslims from realizing victory**

---

[89] Exhibit 17 to Deposition, Dr. Hassan, id.

and avoiding defeat."[90]

6.8.7.   These words come from the final paragraph of Dr. Hassan's 30-page (in English translation) study, and thus I see them as summarizing his views on when Islam authorizes wars to be fought and against whom.

6.9.   I understand these written statements by Dr. Hassan to be statements in which Dr. Hassan, after considering relevant Islamic texts, finds a religious justification under Islam for engaging in otherwise forbidden attacks on civilian noncombatants, including women, children, the mentally ill, and old people, when "necessity permits the forbidden," thus allowing attacks on noncombatants if they are necessary for Muslims to "realize victory" in any conflict.

6.9.1.   Some of the ideas expressed in Dr. Hassan's post-9/11 study, in particular, its section on "The Necessity of Fighting" are consistent with the thinking articulated by Azzam in his book, which listed Dr. Hassan as one of those he consulted with to review its ideas. The ideas in "The Necessity of Fighting" are constituent with the ideas Bin Ladin used to justify preparing for, funding, and overseeing the carrying out of the 9/11 attacks. Such an argument would start with the idea that Muslims would not win an armed conflict with non-Muslims without attacks on civilian noncombatants

6.10.   From 1998 through the dates of his deposition in 2018, Dr. Hassan served on the DIB Shariah Board, which had the responsibility of ensuring that DIB's activities were in compliance with Islamic law, and therefore would provide directives as whether a product or service was shariah compliant, and then was responsible for auditing compliance with those principles by the bank's management.[91] The Shariah Board is required to supervise the bank's shariah compliance, verify that compliance through audits, and then object to any transaction found not to be in compliance.[92] At the time Dr. Hassan expressed these views, based on the statements he made in his deposition, he was the head of DIB's Shariah Board. [93]

6.10.1.   The Shariah Board's oversight role over DIB is to issue "fatwas," or legal rulings based on Islamic law to guide the actions of the bank in relation to all of its banking relationships and transactions, and to ensure that its fatwas are enforced in practice.[94]

6.10.2.   The ideological and religious framework enunciated by Dr. Hasan in the study I have referenced above would all DIB, or any bank, to fund jihad, which could include attacks on civilian noncombatants, to use Dr. Hassan's own words, "if the necessity of war and fighting requires them such that not resorting to these forbidden acts would keep Muslims from realizing victory and avoiding defeat."

---

[90] Id.

[91] Deposition, Dr. Hassan, pp. 46-47.

[92] Deposition, Dr. Hassan, p. 67-68.

[93] Deposition, Dr. Hassan, p. 52, p. 180.

[94] Exhibit 10, Deposition, Dr. Hassan, "Sharia Oversight Section," of DIB, DIB002629-2538, pp. 42-43.

7.  **Findings**

7.1.  *Is there evidence to conclude that DIB knowingly aided and abetted Osama Bin Ladin and Al Qaeda to support terrorism, which culminated in the 9/11 terrorist attacks on the United States?*

7.2.  Yes. The newly public information in the CIA Documents declassified under EO 14040 provides substantial concrete and specific information describing DIB's knowledge, which the CIA assessed to be "apparently witting" by its senior management, and DIB's direct support of the terrorist activities of Bin Ladin and Al Qaeda, as well as other extremist organizations engaged in terrorism.

7.3.  The information contained in the declassified CIA Documents provides evidence that prior to the 9/11 attacks, the CIA had concluded, based on information it had in hand as of November 20, 1997, that DIB was:

- A key financial conduit for Bin Ladin's Islamic Army, the name used by the CIA at the time for the organization now commonly known as "Al Qaeda."[95]

- A key financial conduit for Al Qaeda (the organization named in the November 17, 1998 report, rather than the use of the term "Islamic Army"), and for Bin Ladin's companies in Sudan.[96]

- Had close financial and personal ties to Bin Ladin, his terrorist organization, referred to both as Al Qaeda and as the "Islamic Army," and to other terrorist groups engaged in armed insurgencies in efforts to overthrow governments in Algeria, Egypt, and Israel. Two of these groups, like Al Qaeda, were designated as terrorist organizations by the United States.[97]

- Was used by non-governmental organizations, that is, Islamic charities, alleged to be funding HAMAS and "the Bosnian Mujahaddin."[98]

- Maintained several accounts for Bin Ladin and his Sudan-based companies.[99]

- Handled banking requirements for Bin Ladin's companies as "active customers."[100]

- Provided letters of credit for Bin Ladin's companies.[101]

7.4.  This information was disseminated by the CIA to senior level U.S. government officials.

---

[95] CIA_000722.
[96] CIA_000337.
[97] Egypt's Gama'at al Islamiya and HAMAS were both among the first groups formally designated as foreign terrorist organizations by the United States, on October 8, 1997. Al Qaeda first designated two years later, on October 8, 1999. Foreign Terrorist Organizations - United States Department of State
[98] CIA_000722.
[99] CIA_000722.
[100] CIA_000797.
[101] CIA_000747.

7.5.   In apparent response to the information, the United States government undertook actions against DIB, sending U.S. officials to the United Arab Emirates to notify its government before July 1999 of DIB's support for terrorism, to ask it to close terrorist-related accounts at DIB, and to "clean up the bank," as reflected in statements made on July 8, 1999 by then U.S. State Department spokesperson James Foley.[102]

7.6.   The fact that the U.S. government sent officials to the UAE to ask that its government "clean up" DIB, more than two years prior to the 9/11 attacks, is evidence that the U.S. government found the CIA's assessment about DIB's involvement in terrorist finance, and its support for Bin Ladin and his terrorist organization to be not merely credible, but sufficiently reliable and important to justify the U.S taking action with the government that had an ownership interest in the bank, and where it was headquartered, to take action to stop it.

7.7.   Two years after 9/11, when the CIA undertook a retrospective analysis of Bin Ladin's Sudan period (1992-1996), it found both that that period was the critical time during which Al Qaeda developed into an international organization working with "every noteworthy Islamic extremist group,"[103] and that as it did this, it "opened bank accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah."[104]

7.8.   Notably, even DIB's own consultant, Ellison, tasked with reviewing the allegations of DIB's facilitation of terrorist finance, described DIB's remediation efforts in 1999 to be an example of "bolted horse, so see to the stable door,"[105] which I understand to mean that he understood DIB's remediation efforts to be a case of taking precautions after the damage has already been done – a reference to the old adage of locking a barn or stable door after the horse has bolted, and thus being too late to prevent the harm.

7.9.   I have considered the testimony provided by Dr. Hassan, DIB's long-time chairman of its Oversight Board from 1998 through to the time of his deposition on August 1, 2017, that at no time had he become aware of the allegations of terrorist finance at DIB, including the New York Times account on July 8, 1999, Foley's statement, and the remediation efforts detailed by Ellison and by Fine on behalf of DIB to address the issue. While I cannot know the extent of Dr. Hassan's personal knowledge of DIB's response to the U.S. government's public statements and actions regarding DIB, the substance of his testimony, if understood to represent the knowledge of DIB's response to the terrorist finance allegations, is incompatible with the record set forth in Fine's deposition. That record provides evidence that senior management at DIB were both aware of the allegations of DIB's provision of banking services to Bin Ladin, and knew that accounts at DIB had been closed in connection with allegations of terrorist finance, at the order of the government of the UAE in response to the provision to the UAE by the U.S. government of information about terrorist abuse of those accounts.[106] The knowledge of these allegations by senior officials of the bank was also confirmed in the notations to the memo written by Ellison to DIB's Executive Committee, referencing its chair, Ebrahim Fayez, having personally approved

---

[102] PEC-DIB00804.
[103] CIA_000039.
[104] CIA_000045.
[105] DIB_003159.
[106] See, e.g., Deposition, Fine, p. 19-22, p. 70, and p. 119 and DIB_003160, DIB 003174.

the transmission of the defamation demand by DIB to the New York Times.[107]

7.10.    There is additional information showing that the FBI was concerned about the use of DIB to fund the 9/11 attacks. The FBI found that a DIB account was used in at least one financial transaction with Bayoumi, who was under investigation by the FBI's San Diego office for providing financial support to two of the 9/11 hijackers, which the FBI sought to investigate through securing more bank records from DIB in Saudi Arabia from Bayoumi and an associate, Sulaiman al Ali, who based on the information newly disclosed under EO 14040, appears to have sent him funds from DIB.[108]

7.11.    I have also considered the absence of information provided by DIB in response to the court order to undertake a search of 629 terms which included the name of Sulaiman al Ali. There is a clear discrepancy between the report by DIB's attorneys that no information relating to Sulaiman al Ali or to any of the other 629 terms was found after an ostensibly proper search, and the information possessed by the FBI and provided under EO 14040.

    7.11.1.  In this information, the FBI refers to Sulaiman al Ali in relation to a transaction between Bayoumi from DIB to Bayoumi's U.S. bank account, and asks that Sulaiman al Ali's accounts at DIB be searched as part of the 9/11 investigation, given Bayoumi's relationship to two of the terrorists who participated in the 9/11 hijackings.[109]

    7.11.2.  The absence of any information being found by DIB to the plaintiffs in response to the court order regarding any electronic information relating to Sulaiman al Ali at DIB raises obvious questions about the methodology, thoroughness, and integrity of DIB's search, given its failure to produce information relating to the wire transfer from an account apparently associated with Sulaiman al Ali at DIB, as referenced in the FBI materials seeking financial information based on records it had obtained from Bayoumi's U.S. bank, Bank of America, showing the DIB transaction.

7.12.    *Is there evidence that DIB's senior management supported or were aligned with Bin Ladin and Al Qaeda's global jihad against the United States?*

7.13.    Yes. the information in the CIA Documents declassified under EO 14040 provides important new information detailing the specific support of DIB's senior management, and its alignment, with Al Qaeda's global jihad against the United States. This information is set forth specifically in two finished CIA intelligence reports I have cited in Section 3 of this Supplementary Report that were written prior to the 9/11 terrorist attacks, as well as reiterated in summary in the CIA retrospective finished intelligence report written two years after the 9/11 terrorist attacks.

    •   The new information in the declassified CIA Documents provides evidence that prior to the 9/11 attacks, the CIA had concluded, based on information it had in hand as of November 20, 1997, that DIB's senior management supported or were aligned with bin Ladin and Al

---

[107] DIB_003174.

[108] EO14040-002929. I make no findings at this time about the nature and implications of the relationships between Bayoumi and Sulaiman al Ali and Saudi government officials referred to in the newly-declassified documents produced by the FBI in response to EO 14040.

[109] EO14040-002929.

Qaeda's global jihad against the United States. This information included CIA assessments that DIB constituted one of the two Islamic banks most connected to Bin Ladin and to other terrorist groups and these connections were due to its management. The CIA found numerous data points showing the bank's management to have close and continuing ties to Bin Ladin, Bin Ladin's terrorist organization, and others engaged in armed conflict in Afghanistan, Bosnia, and in multiple locations in the Middle East and North Africa. The evidence of the relationship of the bank's management with Bin Ladin and his terrorist organization(s) included among other data points:

o   DIB Chairman Lootah was a "close friend" and "business associate" of Bin Ladin's.[110]

o   Bin Ladin and his Sudan-based companies maintained several accounts at DIB, and received letters of credit from DIB.[111]

o   The bank was used by Islamic charities who were an alleged financial conduit for HAMAS and for the Dar Birr Society, a financier of the Bosnian Mujahaddin.[112]

o   That together with Bank Al Taqwa, DIB stood out from other Islamic financial institutions because of its management's "apparently witting" involvement in the financial activities of terrorist groups, including Bin Ladin's Islamic Army, aka Al Qaeda.[113]

o   DIB Chairman Lootah personally authorized, signed, and stamped letters of credit opened by Bin Ladin's companies in Khartoum through DIB. The CIA finished intelligence report provided a caveat as to the implications of this fact, stating that "It may be the case that Lootah routinely authorizes all letters of credit beyond a particular monetary value that require confirmation by DIB." But the CIA then completed this limited caveat with the further observation, "however, Lootah's purported friendship with Bin Ladin suggests greater personal service for this customer." This assessment is followed by roughly nine to ten lines of redacted text, amounting to about an inch and a half of space on the column, of material which remains classified.[114]

o   DIB Chairman Lootah also was tied to other Dubai-based individuals and firms that maintained financial links to Bin Ladin, which included a company that was a DIB customer and which had regular business and financial dealings with Bin Ladin, his Al-Hijra company, and Islamic Army members.[115]

---

[110] CIA_000337, CIA_000722, CIA_000735, CIA_000797.
[111] CIA_000045, CIA_000722.
[112] Id.
[113] CIA_000728.
[114] CIA_000747.
[115] Id.

- o   At the time Lootah was linked to Bin Ladin and his "Islamic Army" the goal of that "militant group" was "to bring about the return of the Caliphate – the office held by a successor to the prophet Muhammad who serves as a spiritual leader of Islam.[116]

- o   The finished intelligence assessed that Bin Ladin's use of Dubai Islamic Bank "probably" stemmed from his purported friendship with DIB Chairman Lootah.[117]

- Data points showing the management of DIB to be involved with other terrorist groups and to support global jihad include:

  - o   The bank's directors were tied to several NGOs that allegedly remitted funds to HAMAS and to militant Afghani and Bosnian extremist groups.[118]

  - o   DIB Chairman Lootah was "anti-western- ascribing to various conspiracy theories about the United States and other Western countries to control the Islamic world [redacted]."[119]

  - o   Lootah was known for deep religious conservatism and strong support – financial and otherwise – for Islamic political causes.[120]

  - o   Lootah not only had ties to Bin Ladin personally and commercially, but was linked to an adviser to Bank Al Taqwa (also assessed to be involved in terrorist finance), Sheikh Youssef Al Qaradawi, and to Sudan's most prominent Islamic extremist, Hassan al-Turabi, the leader of Sudan's National Islamic Front (NIF).[121]

  - o   Lootah was one of the principal financial backers of the Omani Muslim Brotherhood as of late 1994. Muscat arrested hundreds of its members that year for plotting to overthrow the government.[122]

  - o   Lootah (and DIB itself) were connected to "several Islamic NGOs that purportedly funded militant causes," who the CIA found "probably" came to Lootah and DIB through DIB board member Sheikh Yousif Jassim Al Haji, "an important leader in Kuwait's extensive network of private charities," described as chairman of a Kuwait-based organization, the International Islamic Charities Organization ("IICO") that was "established in 1986 as a cover entity for the safe and efficient management of MB (Muslim Brotherhood) finances," and which sent funds to the Peshawar-Pakistan-based Maktab-ul Khedamat, an NGO that coordinates activities of militant Afghanis and supports the Bosnian Mujahaddin."[123]

---

[116] CIA_000735.
[117] CIA_000736.
[118] CIA_000734.
[119] Id.
[120] Id.
[121] Id.
[122] CIA_000737.
[123] Id.

- o   In footnote 16 to its research paper on "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," the CIA stated that Maktab-ul Khedamat (MK) "served as a coordinating organization for the Mujahaddin in Afghanistan and Pakistan and despite its involvement in legitimate, charitable activities, its primary aim [was] the prosecution of jihad (holy war) against those who oppress Muslims." The CIA finished intelligence report stated flatly that: "Employees of MK have been implicated in several terrorist incidents, including the World Trade Center Bombing," an apparent reference to the first such attack on that building in February 1993.[124]

- o   The CIA found that DIB Board Member Al Haji was also an executive board member of the Khartoum-based Islamic Dawa Organization, an NGO controlled by (Turabi's) NIF.[125]

- o   Members of DIB's Shariah Board, responsible for establishing compliance standards for the bank to ensure its alignment with Islamic law, included at least three people, its chair, Dr. Hassan; and two other Board members, Qaradaghi and Nashmi, who articulated views that Islam authorized violence. As Dr. Hassan acknowledged, these other two board members issued statements advocating support for terrorist organizations and suicide bombings. Dr. Hassan himself published an extended piece of prepared writing describing many cases in which Muslims had the religious obligation to engage in armed combat or jihad, stating that otherwise non-permissible attacks on civilians, such as women, the elderly, and children, could be undertaken by Muslims in cases of necessity to win a war.[126]

7.14.   DIB's Board of Directors selected these individuals as provide religious guidance on authorized activities with the bank. The evidence of the ideological orientation of these three people, as well as of the bank's founder and original owner, Lootah, to support violence by Muslims against those perceived to be opposed to Muslims, is consistent with the findings of the CIA regarding DIB's involvement in terrorist finance.

7.15.   These and related data-points in the newly-released and declassified CIA Documents describe the pervasive relationships between DIB's management and Bin Ladin and with like-minded organizations in the late 1980's to late 1990's who were engaged in the financial support of militant Islam, or holy jihad, against various governments, including, as reflected in the 1993 World Trade Center bombing, the United States.

7.16.   The CIA analysts tasked with assessing the role of Islamic financial institutions in funding Islamic extremist movements concluded on the basis of these data points that the management of DIB

---

[124] Id.

[125] Id.

[126] Deposition, Dr. Hassan, p. 282-287, p. 296, Exhibit 17, Deposition, Dr. Hassan, "The Rules of Contact between Muslims and Non-Muslims in Time of War, presented to the Conference "International Relations Between Islam and The Current Civilization," held by the World Islamic League in Mecca May 13-22, 20002, prepared by Hussain Hamid Hassan, PhD.

was "apparently witting" in providing financial services for multiple terrorist groups, including Bin Ladin's organization, HAMAS, and others.[127]

7.17.   The CIA's finding that DIB's management was "apparently witting" of DIB's provision of services to terrorist groups is not surprising given what the CIA's analysts had learned about DIB Chairman Lootah himself, as well as his associates in the bank. He was "anti-western—ascribing to various conspiracy theories about the United States and other Western countries to control the Islamic world," banker to Bin Ladin, banker to Bin Ladin's businesses, personally approving financial transactions for bin Ladin, linked to an advisor of Bank Al Taqwa, linked to Sudan's extreme Islamist Turabi, and headed a bank that forbid its employees to associate with non-Muslims.[128] He and his family lived in an isolated community located away from the "corrupting influences of the city." The CIA also found that DIB Chairman Lootah supported a variety of extremist Islamic groups in their efforts to overthrow various governments, extending to linkages to the first World Trade Center bombing in 1993.[129]

7.18.   Taken as a whole, the newly available information provided in the newly declassified CIA Documents, supported further in the newly declassified information from the FBI, provides substantial evidence of the support and alignment of DIB management with Bin Ladin and Al Qaeda's global jihad against the United States, made even more compelling when added to the existing record which shows the U.S. government asking the government of the United Arab Emirates to take action to clean the bank up and to close terrorist accounts there, as reflected in the more limited documentation previously available prior to the release on March 31-April 1, 2022, of the CIA Documents.

_Jonathan M. Winer_

Jonathan M. Winer

**Executed this 16th Day of June 2022**

---

[127] CIA_000728.
[128] CIA_000734.
[129] CIA_000722, CIA_000734, CIA_000737, CIA_000797.