UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------ x
                                                       )      No. 03 MDL 1570 (GBD/SN)
                                                       )
In re Terrorist Attacks on September 11, 2001          )      ECF Case
                                                       )
                                                       )
                                                       )
                                                       )
                                                       )
                                                       )
------------------------------------------------------ x
```

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
DUBAI ISLAMIC BANK'S MOTION TO EXCLUDE THE
"SUPPLEMENTARY EXPERT REPORT" OF JONATHAN WINER**

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ................................................................................................. ii

**INTRODUCTION** ............................................................................................................... 1

**BACKGROUND** ................................................................................................................. 3

**ARGUMENT** ...................................................................................................................... 7

I.      The Court Should Exclude Mr. Winer's "Supplementary" Report Because
It Is Not Timely And Not A Proper Supplement .................................................. 7

II.     Plaintiffs Have Not Justified And Cannot Justify The Untimeliness Of The
Third Report ........................................................................................................ 11

       A.      The Third Report Should Be Excluded Under This Court's Equitable Factors ........ 11

       B.      The Equitable Analysis Is Underscored By The Patent Impropriety Of The
Third Report .............................................................................................. 17

III.     Should This Court Allow The Third Report, DIB Requests Additional
Expert Discovery As A Matter Of Fairness ....................................................... 24

**CONCLUSION** ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*,
301 F.R.D. 31 (S.D.N.Y. 2014) ..................................................................8, 15, 24

*Barter House, Inc. v. Infinity Spirits LCC*,
2021 WL 289347 (S.D.N.Y. Jan. 28, 2021) ...........................................................24

*Beller ex rel. Beller v. United States*,
221 F.R.D. 689 (D.N.M. 2003) ...............................................................................14

*Bozick v. Conagra Foods, Inc.*,
2021 WL 1198320 (S.D.N.Y. Mar. 30, 2021) ................................................8, 9, 14

*Design Strategy, Inc. v. Davis*,
469 F.3d 284 (2d Cir. 2006)..............................................................................15, 24

*Every v. Makita U.S.A., Inc.*,
2005 WL 2757952 (S.D.N.Y. Oct. 24, 2005) .........................................................16

*Fleming v. Verizon N.Y., Inc.*,
2006 WL 2709766 (S.D.N.Y. Sept. 22, 2006)....................................................7, 16

*Geiserman v. MacDonald*,
893 F.2d 787 (5th Cir. 1990) ..................................................................................14

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)...........................................................................................19, 21

*Henderson v. Nat'l R.R. Passenger Corp.*,
412 F. App'x 74 (10th Cir. 2011) ...........................................................................16

*Hernandez v. Leichliter*,
2016 WL 684038 (S.D.N.Y. Feb. 18, 2016) ..........................................................18

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018).....................................................................21

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
982 F.3d 113 (2d Cir. 2020)....................................................................................20

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018).....................................................................18

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016)....................................................................................22

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)...............................................................19, 22

*Lidle v. Cirrus Design Corp.*,
2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) ....................................9, 11, 15, 24

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Linde v. Arab Bank, PLC*,
    922 F. Supp. 2d 316 (E.D.N.Y. 2013) ...................................................................19

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)..................................................................................19

*Millenium Expressions, Inc. v. Chauss Mktg., Ltd.*,
    2006 WL 288353 (S.D.N.Y. Feb. 6, 2006)..........................................................24

*Montefiore Med. Ctr. v. Am. Prot. Ins. Co.*,
    226 F. Supp. 2d 470 (S.D.N.Y. 2002).....................................................................8

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)..................................................................................23

*Outley v. City of New York*,
    837 F.2d 587 (2d Cir. 1988)..................................................................................17

*Palazzetti Imp./Exp., Inc. v. Morson*,
    2001 WL 793322 (S.D.N.Y. July 13, 2001).........................................................18

*Phoenix Light SF Ltd. v. Bank of New York Mellon*,
    2019 WL 5957221 (S.D.N.Y. Nov. 13, 2019)......................................................11

*Point Prods. A.G. v. Sony Music Ent., Inc.*,
    2004 WL 345551 (S.D.N.Y. Feb. 23, 2004)...........................................................8

*Sandata Techs., Inc. v. Infocrossing, Inc.*,
    2007 WL 4157163 (S.D.N.Y. Nov. 16, 2007).....................................................8, 9

*Schiller v. City of New York*,
    2008 WL 4525341 (S.D.N.Y. Oct. 9, 2008)...........................................................7

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ............................................................................19

*Shea v. Royal Enters., Inc.*,
    2011 WL 2436709 (S.D.N.Y. June 16, 2011) ......................................................14

*Sims v. Great Am. Life Ins. Co.*,
    469 F.3d 870 (10th Cir. 2006) ..............................................................................14

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*,
    118 F.3d 955 (2d Cir. 1997)..............................................................11, 14, 15, 16

*Spotnana, Inc. v. Am. Talent Agency, Inc.*,
    2010 WL 3341837 (S.D.N.Y. Aug. 17, 2010).....................................................15

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    2010 WL 11597882 (S.D.N.Y. Aug. 26, 2010)......................................8, 14, 16, 24

- iii -

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined No. of Cans of Rainbow Foam Paint*,
34 F.3d 91 (2d Cir. 1994) ..........................................................................................19

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2003)..........................................................................................17

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008)........................................................................................17

*United States v. Tin Yat Chin*,
371 F.3d 31 (2d Cir. 2004)..........................................................................................23

*Wiener v. AXA Equitable Life Ins. Co.*,
2019 WL 1228074 (S.D.N.Y. Mar. 15, 2019) .........................................................15

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 .......................................................................................................7, 8

Fed. R. Civ. P. 37 .......................................................................................................1, 7

J. Risen & B. Weiser, *U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations*, N.Y. Times (July 8, 1999) .....................................................9

**INTRODUCTION**

Defendant Dubai Islamic Bank ("DIB") moves to exclude the "supplementary" report of Plaintiffs' expert Jonathan Winer (attached as Ex. A).  On June 17, 2022, Plaintiffs served a third "expert" report of Mr. Winer ("Third Report")—sixteen months after the deadline for reports, ten months after the close of expert discovery, and only as DIB was filing its renewed motion for summary judgment in accordance with the Court's scheduling order (ECF 7929).  The Court should exclude it as procedurally improper under Federal Rule of Civil Procedure 37.

Plaintiffs will seek to justify the filing of the Third Report based upon four CIA documents made available to them in March 2022.  But those documents provide no excuse to either (1) serve a new expert report without seeking this Court's permission or (2) to reopen discovery, because the issues addressed the CIA documents have long been issues in this litigation—whether DIB aided al Qaeda, whether it did so knowingly based upon its former Chairman's purported relationship with al Qaeda, and whether certain DIB employees or agents were motivated by religious views.

First, the Third Report is untimely because expert discovery is closed.  Plaintiffs should have sought—but did not—this Court's approval to reopen expert discovery.  They did not even confer with DIB before serving the report.  And the Third Report is in no way a proper supplementary expert report:  It supplements none of Mr. Winer's earlier opinions.  In his prior two expert reports and deposition testimony, Mr. Winer offered *zero* opinions about DIB.

Second, the CIA documents do not permit Plaintiffs to reopen expert discovery.  The allegations in those documents merely echo those that Plaintiffs have been making against DIB throughout the litigation (in part based upon allegations in a 1999 New York Times article): that DIB had banking relationships with al Qaeda, that DIB's former Chairman knew senior leadership of al Qaeda, and that other bank officials were purportedly motivated by religious views regarding

violence.  None of this is new—and Plaintiffs could have (but did not) offer an expert to address those topics while expert discovery was ongoing.  Indeed, most of the sources cited by Mr. Winer in his Third Report were known to Plaintiffs before expert discovery began.  Indeed, it appears that 36 of the 48 sources he cites (plus DIB's document production) were available before the close of expert discovery.  In fact, Winer relied upon many of these same sources for his first expert report served in March 2020—but that report failed to provide any opinions about DIB.  In fact, Plaintiffs' own expert disclosures served in January 2020 included the following anticipated topics for Jonathan Winer: "[T]he significance and import of the U.S. government's engagements with Emirati officials concerning Dubai Islamic Bank prior to 9/11 and State Department spokesman James Foley's statements relating to those engagements, and the significance and import of the investigations and account closures described in the testimony of Alan Fine."  Pls' Executive Committee's Expert Disclosure (Jan. 17, 2020) (attached as Ex. C).  Thus, Plaintiffs had planned to have Winer opine on DIB's supposed involvement in 9/11.  They however, abandoned that plan and now seek to re-do that decision.  The availability of additional support for positions Plaintiffs have been advancing throughout this litigation is not a valid basis for reopening discovery.

Moreover, Plaintiffs cannot meet the standard for excusing an untimely report here because the Third Report is improper on its face: Mr. Winer seeks to give his opinion that there is "evidence" that DIB "knowingly aided and abetted" al Qaeda's terrorism and that DIB's management "supported" or was "aligned with" al Qaeda.  These opinions suffer from many of the flaws riddling Mr. Winer's earlier reports and testimony in this MDL (Defendants' challenge to those reports remains pending) and the same flaws as his declaration in support of those reports (of which the Court already has struck substantial portions).  In his Third Report, Mr. Winer simply parrots hearsay without analysis; his conclusions lack factual basis, contain impermissible

speculation as to mental state, and trespass on the jury's responsibility to apply legal standards; and he does not draw upon any expertise he may possess. Because the so-called expert work is wholly inappropriate on its face, Plaintiffs cannot show cause for this untimely report.

Third, if the Court nevertheless permits Plaintiffs to submit and rely upon Mr. Winer's Third Report, DIB respectfully requests that it be given the ordinary, fair procedural protections under such circumstance. DIB should be permitted to depose him about his new opinions, including obtaining in advance any sources upon which he relies. Additionally, DIB should be permitted to submit new expert reports regarding the same subject matters and/or additional information that has become available since the close of expert discovery. Finally, DIB should be permitted—after deposing Mr. Winer on his new opinions—to raise *Daubert* challenges to the Third Report.

## BACKGROUND

1.     The parties engaged in a decade of fact discovery in Plaintiffs' cases against DIB. After extensive document discovery concluded in 2018, Plaintiffs essentially abandoned discovery against DIB. Of the 37 fact witnesses they named against DIB, they initiated only *one* fact witness deposition in their cases against DIB.

That one fact witness deposition was of Florida state-court Judge Alan Fine (who in private practice represented DIB). Plaintiffs questioned him for less than two hours. ECF 8127, DIB PJ Br. 10–11. Judge Fine discussed, in detail, a newspaper story published in July 1999 ("July 1999 Article"), which claimed an association between DIB and Osama Bin Laden. That article immediately prompted DIB to thoroughly investigate and offer its full cooperation to the US government. *Id.* at 5–6. Other than that, Plaintiffs participated in only one deposition in their cases against DIB: that of Dr. Hussein Hamid Hassan, which DIB initiated to preserve his testimony as his health deteriorated. *Id.* at 11 & n.2.

After fact discovery closed, Plaintiffs admitted (and continue to admit) that none of the ten DIB accountholders identified in discovery as of interest used their accounts to fund 9/11 or al Qaeda. *Id.* at 10–12. They similarly admitted (and continue to admit) that none of those accountholders was designated before 9/11 by either the United States or the United Nations. *Id.*

**2.** Plaintiffs were even less diligent as to DIB during expert discovery. None of Plaintiffs' six experts even opined on DIB—including Jonathan Winer—despite having initially designated Jonathan Winer to offer opinions on DIB in January 2020 *and* Mr. Winer's reliance upon existing information regarding DIB prior in connection with his first expert report, including both Judge Fine and Dr. Hassan's deposition testimony. And Plaintiffs neglected to depose ***any*** of DIB's seven expert witnesses.

In March 2020, Mr. Winer submitted an expert report ("Initial Report"), and in February 2021 a rebuttal report ("Rebuttal Report"). They totaled over 200 pages, but neither ever mentioned DIB or its leadership (or its founder, Saeed Lootah)—or Judge Fine, or the July 1999 Article, or Dr. Hassan. In July 2021, Defendants deposed Mr. Winer for over twelve hours. Again, he never opined on DIB.

**3.** The opportunity to submit expert reports expired on February 2, 2021, when rebuttal reports were due. Expert depositions ended in August 2021. Per this Court's direction, Defendants in November filed a bellwether *Daubert* motion, in which they sought to exclude Mr. Winer's expert testimony, as well as that of another expert. ECF 7343. That motion challenged Mr. Winer's reports on numerous grounds, including his lack of expertise in many of the subjects on which he opined, lack of factual basis or consistently applied methodology for many of his opinions, impermissible legal conclusions usurping the jury's role, improper speculation as to mental state, and blatant parroting of hearsay without analysis. That motion remains pending.

In opposing Defendants' bellwether motion in January 2022, Plaintiffs attached a "Declaration" from Mr. Winer, which this Court struck in part.  Order, ECF 7647; *see* ECF 7627. The Court held that his declaration improperly "offer[ed] both legal conclusions and other arguments" that "belong[ed] in a memorandum of law, not a declaration."  ECF 7647 at 2–3.

4.      With discovery complete, DIB moved in December 2021, in accordance with this Court's scheduling orders, for summary judgment (or alternatively, dismissal) based on lack of personal jurisdiction.  ECF 7420.  At the Parties' request, the Court repeatedly extended Plaintiffs' deadline to respond, due to the Parties' confidential negotiations that they "expect[ed] w[ould] obviate the need for the Court to decide the issues raised by DIB's motion."  ECF 7586.

On March 29 and April 1, 2022, the US government gave Plaintiffs access to declassified documents that appear to have originated within the CIA ("Declassified Files").  *See* DIB PJ Br. 12.  Those documents mention alleged actions not near the time of 9/11, but three years or more before.  *See id.* at 23–25.  Plaintiffs ended negotiations, and the Parties sought a new briefing schedule, which the Court entered.  ECF 7929.  Plaintiffs then, notwithstanding the long-passed close of fact discovery and the absence of Court approval to re-open it, served new discovery requests on DIB, prompting the Parties to seek another extension so that they might first seek to resolve the requests.  This Court denied the further extension, citing concerns of excessive delay. ECF 8096.  (The Parties continue to negotiate Plaintiffs' discovery requests.)

At no time during this process, however, did Plaintiffs ever suggest to counsel for DIB or to this Court that it sought to reopen expert discovery.  DIB accordingly filed a renewed motion for summary judgment (or alternatively, dismissal) for lack of jurisdiction.  It argued among other things that the Declassified Files are both immaterial and inadmissible, so change nothing

compared to DIB's initial summary-judgment motion on jurisdiction.  *See* DIB PJ Br. 12–13, 23–28.

On June 17, after DIB's personal-jurisdiction motion was filed on the MDL docket, Plaintiffs served Mr. Winer's Third Report, styled a "[s]upplementary" report and purportedly occasioned by the "new evidence provided to the Plaintiffs by the Central Intelligence Agency" eleven weeks before.  Ex. A ¶ 1.1.  Although this report came sixteen months after the close of the period for expert reports and ten months after the period for expert testimony had closed, Plaintiffs gave no prior notice to DIB and did not seek Court approval.  The Third Report block quotes chunks of the Declassified Files, but it also draws heavily on long-available items from discovery—Judge Fine's testimony, the July 1999 Article (and other newspaper articles from that period), and Dr. Hassan's testimony.  Plaintiffs "asked" Mr. Winer "to address" two questions: (1) "Is there evidence that DIB knowingly aided and abetted Bin Ladin and Al Qaeda to support terrorism which culminated in the 9/11 terrorist attacks on the United States?"; and (2) "Is there evidence that DIB's senior management supported or were aligned with Bin Ladin and Al Qaeda's global jihad against the United States?"  *Id.* ¶¶ 1.1–1.3.

The Parties met and conferred, but Plaintiffs refused to withdraw the report.  Plaintiffs have said they may ask Mr. Winer to further supplement his "supplementary report" to address future evidence or any materials DIB produces in response to Plaintiffs' new discovery requests.  *See* Pls' Cover Letter to S. Cottreau attaching Third Report (June 17, 2022) (attached as Ex. B). Plaintiffs' response to DIB's personal jurisdiction motion is due August 3, and DIB's reply is due September 16.

**ARGUMENT**

I.      **The Court Should Exclude Mr. Winer's "Supplementary" Report Because It Is Not Timely And Not A Proper Supplement.**

The Third Report should be barred because time to submit expert reports on new issues has long since passed, Plaintiffs failed to seek an extension from this Court, and the Third Report is not actually a supplementary report (for multiple reasons set forth below).

The Federal Rules require "complete" written statements by all expert witnesses, including "the facts or data considered."   Fed. R. Civ. P. 26(a)(2)(B) ("FRCP").   That report must be disclosed "at the times and in the sequence that the court orders."  FRCP 26(a)(2)(D).  Failure to comply carries the initial sanction of exclusion:  Parties may not use expert reports that they failed to provide "as required by Rule 26(a)," unless "the failure [to do so] was substantially justified or is harmless."   FRCP 37(c)(1); *see Fleming v. Verizon N.Y., Inc.*, 2006 WL 2709766, at *7 (S.D.N.Y. Sept. 22, 2006) ("This preclusionary rule applies on motions for summary judgment.")*.* The obligation "to prove substantial justification or harmlessness rests with the dilatory party," *Schiller v. City of New York*, 2008 WL 4525341, at *3 (S.D.N.Y. Oct. 9, 2008), and turns on equitable considerations, *infra* Arg. II.  After excluding, a court may, "on motion," "impose other appropriate sanctions," such as "payment of the reasonable expenses" caused by violation of the scheduling order.  FRCP 37(c)(1)(A), (C).

Plaintiffs served Mr. Winer's Third Report well after the deadlines for Plaintiffs' affirmative and rebuttal expert reports set by the Court of March 10, 2020, and February 2, 2021. In neither his opening report (in March 2020) nor his rebuttal (in February 2021) did he so much as mention (let alone opine on) DIB, despite the availability, and indeed prior reliance upon, long-existing materials regarding DIB.  Nor, when he was deposed (in July 2021), did he opine on DIB. The "supplementary" report came almost a full year after Mr. Winer's deposition and nearly a

year-and-a-half after his rebuttal report.  Plaintiffs served it without leave of this Court and without advance notice to DIB.  And they did so without mention of the passed deadline for submitting new expert reports.

In certain cases, a party has a duty to file a supplementary expert report when it learns of material errors or omissions in a prior report.  FRCP 26(e)(2).  But even then, a supplement must be disclosed "in a timely manner." FRCP 26(e)(1)(A); *see Montefiore Med. Ctr. v. Am. Prot. Ins. Co.*, 226 F. Supp. 2d 470, 473 (S.D.N.Y. 2002) (noting that the timeliness requirement applies to expert reports).

The Third Report does not qualify as a supplementary report in the first place.  To meet that definition, a party must conclude that (1) "information previously provided in an initial report [has proven] inaccurate or misleading," based on (2) the expert's having learned "information that was previously unknown or unavailable."  *Sandata Techs., Inc. v. Infocrossing, Inc.*, 2007 WL 4157163, at *4 (S.D.N.Y. Nov. 16, 2007).  Here, neither condition is satisfied.

*First*, the Third Report does not supplement Mr. Winer's two reports in any way.  He seeks to offer wholly new opinions regarding DIB—a party that he never addressed in his prior reports or deposition.  In fact, Mr. Winer nowhere contends that any of the "opinions expressed in [the] original Report have [actually] changed."  *Bozick v. Conagra Foods, Inc.*, 2021 WL 1198320, at *3 (S.D.N.Y. Mar. 30, 2021).  Thus, there was nothing in his "prior opinion that is admitted to be 'incomplete' or 'incorrect.'"  *Id.*; *see Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 2010 WL 11597882, at *2 (S.D.N.Y. Aug. 26, 2010) (similar).  Indeed, the Third Report is not even the type of impermissible effort to fill the "significant and logical gap[s]" in the prior reports that courts have disallowed.  *Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*, 301 F.R.D. 31, 40 (S.D.N.Y. 2014) (quoting *Point Prods. A.G. v. Sony Music Ent., Inc.*, 2004 WL 345551, at *9 (S.D.N.Y. Feb.

23, 2004)); *see Bozick*, 2021 WL 1198320, at *3 (similar).  In short, the Third Report is not permissible supplementation.

**Second**, the Third Report is not based on "information that was previously unknown or unavailable."  A party cannot "serve a deficient opening report and then remedy the deficiency through the expedient of a 'supplementary' report."  *Lidle v. Cirrus Design Corp.*, 2009 WL 4907201, at *5 (S.D.N.Y. Dec. 18, 2009).  Nor are experts "free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon" for the purpose of "supplement[ing] their opinions"—"[i]f that were the case, there would never be any closure to expert discovery, and parties would need to depose the same expert multiple times." *Sandata Techs., Inc.*, 2007 WL 4157163, at *6.

Here, even though Mr. Winer may not previously have had access to the Declassified Files, other materials repeating the very same baseless allegations against DIB had "always been available" to and indeed relied upon by him for his first expert report.  *Lidle*, 2009 WL 4907201, at *6.  Plaintiffs have long pressed virtually identical allegations against DIB, citing the July 1999 Article, and this Court relied on those allegations in denying DIB's initial motion to dismiss for lack of jurisdiction—over a decade ago.  *See* DIB PJ Br. 23–24.  That article alleged, among other things, that bin Laden was "allowed to funnel money through the Dubai Islamic Bank," that he "had a relationship with the bank," and that the relationship was "arranged with the approval of the officials who control the bank."  J. Risen & B. Weiser, *U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations*, N.Y. Times (July 8, 1999).  That article's allegations, and their subsequent debunking, were then extensively discussed in the deposition of Judge Fine— in 2019, before Mr. Winer submitted even his Initial Report.  *See* DIB PJ Br. 23–24; *id.* at 5.

Yet despite Plaintiffs' January 2020 disclosure indicating Mr. Winer would provide opinions on these types of allegations (*see supra* p. 2) and Mr. Winer's *own reliance* upon evidence regarding DIB for his Initial Report (including the July 1999 Article and Judge Fine and Dr. Hussein Hamid Hassan's deposition testimony and related exhibits), Mr. Winer failed to opine on DIB in any way in his Initial Report and his Rebuttal Report.  Nonetheless, Plaintiffs now seek to have Mr. Winer opine about DIB in a Third Report despite his repeated reliance upon materials that were available during expert discovery.[1]  *See* Ex. A ¶¶ 4.1–4.14.  Those sources include The 9/11 Commission Report,[2] RICO statements against DIB,[3] prior filings and correspondences between counsel related to DIB,[4] a number of press articles from twenty or more years ago,[5] and supposed "raw intelligence concerning the use of DIB in connection with support for Al Qaeda"— including two items that have been discussed in the record for years.[6]  *Cf.* DIB PJ Br. 23.  If Plaintiffs had wanted Mr. Winer to opine on DIB's supposed involvement in 9/11, they could have done so—and indeed contemplated doing so—in his prior reports based entirely on *already existing* information.  He cannot file a "supplementary" report merely because the Declassified Files echoed incorrect statements about DIB of which he was already aware.

---

[1] Mr. Winer also relied upon 13 other DIB-specific sources in connection with his Initial Expert Report that he does not revisit for the Third Report.

[2] *See* Ex. A ¶ 3.7 & n.6 (citing 9/*11 Comm'n Rep.* (2004)).

[3] *See* Ex. A ¶ 1.4.1. (indicating that he reviewed "[t]he RICO Statement filed in MDL 1570 applicable to DIB").  Note that there are several RICO statements "applicable to DIB"; it is unclear which of them Mr. Winer reviewed.

[4] *See* Ex. A ¶ 5.7 & n.73 (citing Letter, Katie Barlow, on behalf of DIB, to Scott Tarbutton, Esq., and Sean Carter, Esq., Cozen O'Connor (available electronically at 1:03-md-01570-GBD-SN, ECF 3789-12 (Nov. 13, 2017)); *id.* ¶ 5.8 & n.74 (citing Letter, Steven T. Cottreau, on Behalf of DIB, to Scott Tarbutton, Esq., and Sean Carter, Esq, Cozen O'Connor (Sept. 10, 2018)).

[5] *See* Ex. A ¶ 4.1 & n.36 (citing S. Braun, *Emirates Looked Other Way While Al Qaeda Funds Flowed*, L.A. Times (Jan. 20, 2002)); *id.* ¶ 4.2 & n.38 (citing J. Risen & B. Weiser, *U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations*, N.Y. Times (July 8, 1999)); *id.* ¶ 4.4 & n.40 (citing *Response to Terror*, L.A. Times (Jan. 20, 2002)).

[6] *See* Ex. A ¶ 3.16 & n.33 (citing *Summary of Evidence for Combatant Status Review Tribunal—Al Baluchi, Ammar, to Personal Representative from OIC*, CSRT (Mar. 28, 2007) (filed at ECF 2973, No. 03-md-01570 (July 14, 2015))); *id.* ¶ 3.16 & n.34 (citing *FBI 302 Memorandum for Interview of Jamal al Fadl* (Feb. 4, 1998) (filed at ECF 2973-6 (July 14, 2015)).

## II.     Plaintiffs Have Not Justified And Cannot Justify The Untimeliness Of The Third Report.

Even if Plaintiffs had not simply ignored this Court's expert-discovery deadlines and had sought an extension, they could not meet their burden to justify this new Third Report.  Each of the relevant equitable factors cuts against allowing it.  And that is particularly apparent given that the Third Report is—even on initial review, and without the benefit of additional depositions or discovery—entirely improper on its face.

### A.     The Third Report Should Be Excluded Under This Court's Equitable Factors.

When determining whether to preclude an out-of-time report (supplementary or otherwise), this Circuit particularly considers "(1) the explanation for the delay in providing the evidence; (2) the importance of the new evidence; (3) the potential prejudice to the opposing party; and (4) whether a continuance is more appropriate." *Phoenix Light SF Ltd. v. Bank of New York Mellon*, 2019 WL 5957221, at *1 (S.D.N.Y. Nov. 13, 2019) (synthesizing factors outlined in *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)); *see also Lidle*, 2009 WL 4907201, at *6 (collecting cases applying the *Softel* factors).  Each factor spells the Third Report's exclusion.

First, Plaintiffs cannot justify their delay.  As noted above, Plaintiffs have long made the allegations addressed in Winer's report: alleging that DIB knowingly assisted al Qaeda, that al Qaeda members had bank accounts with DIB, that DIB's former Chairman (Saeed Ahmed Lootah) had a relationship with al Qaeda's leadership, and that bank officials were purportedly motivated to support terrorism by their religious views.  From day one, Plaintiffs have asserted that DIB "allowed itself to be used by [al Qaeda operatives] to launder money," *Cantor Fitzgerald* Compl.

- 11 -

¶ 138, ECF 5, 04-cv-7065 (S.D.N.Y) (Sept. 10, 2004)[7]; and that al Qaeda members, including al Qaeda CFO Mustafa Ahmed al-Hisawi, had bank accounts with DIB, *see Burnett* Compl. ¶ 118, ECF 29, 02-cv-1616 (D.D.C.) (Nov. 22, 2002).[8]   Both issues have been extensively explored through years of fact and expert discovery, which yielded no evidence of the Bank's knowing involvement with al Qaeda and demonstrated that Hisawi did not have an account at the Bank.[9] Plaintiffs have also had years to investigate their long-claimed allegations of connections between DIB's former Chairman and Seedi Madani al Tayyib, and that DIB's Sharia Board was populated by radical Islamic clerics. *See* Pltfs.' Mot. to Compel, ECF 2973 at 2–3, 7 (July 14, 2015).[10]

Many of the sources now relied upon by Mr. Winer in his Third Report contain allegations virtually identical to those found in the Declassified Files.   With those long available materials, he could have addressed DIB in either his Initial Report or Rebuttal Report.   In fact, at least 36 sources[11] (plus DIB's entire production, which Winer apparently considered, Ex. A ¶ 1.4.1) of the

---

[7] *See also Euro Brokers* Compl. ¶ 123, ECF 1, 04-cv-7279 (S.D.N.Y.) (Sept. 10, 2004); *Burnett* Compl. ¶¶ 113–14, ECF 29, 02-cv-1616 (D.D.C.) (Nov. 22, 2002); *Federal Insurance* First Am. Compl. with Incorporated More Definite Statements, RICO Statements, and Rule 15(d) Supplemental Pleadings ¶¶ 346–47, filed in paper in MDL (Sept. 30, 2005), MDL ECF 1380 (*Federal Insurance* non-consolidated First Am. Compl. also available electronically at MDL ECF 111, (Mar. 10, 2004)) (hereinafter "*Federal Insurance* First Am. Compl."); *O'Neill* First Consolidated Compl. ¶ 55, MDL ECF 1570 (Sept. 30, 2005); *O'Neill* More Definitive Statement as to DIB ¶¶ 24-25, 31, MDL ECF 1334 (Sept. 30, 2005); *Federal Insurance*, RICO Statement as Applicable to DIB at 7–8, MDL ECF 856 (Apr. 29, 2005); *Cantor Fitzgerald*, RICO Statement as Applicable to DIB at 1, MDL ECF 854 (Apr. 29, 2005); *Euro Brokers*, RICO Statement as Applicable to DIB at 8–9, MDL ECF 860 (Apr. 29, 2005); *Continental Casualty*, RICO Statement as Applicable to DIB at 6–7, MDL ECF 871 (May 2, 2005); *O'Neill* Am. RICO Statement as Applicable to DIB at 13-15, MDL ECF No. 1096 (Sept. 29, 2005).

[8] *See also Federal Insurance* First Am. Compl. ¶ 345; *O'Neill* First Consolidated Compl. ¶ 56, MDL ECF 1570; *O'Neill* More Definitive Statement as to DIB ¶ 27, MDL ECF 1334; *Federal Insurance*, RICO Statement as Applicable to DIB at 7–8, MDL  ECF 856; *O'Neill*, Am. RICO Statement as Applicable to DIB at 14, MDL ECF 1096; *Euro Brokers*, RICO Statement as Applicable to DIB at 8, MDL ECF 860; *Continental Casualty*, RICO Statement as Applicable to DIB at 6–7, MDL ECF 871. *See generally* Pltfs.' Mot. to Compel (July 14, 2015), ECF 2973 (discussing various accounts at DIB).

[9] *See* DIB PJ Br., ECF 8127 at 9–12.

[10] *See also* Dr. Hussein Hamid Hassan Dep. Tr. 258: 4–259:1; 264:7–265:17; 267:6–10; 282:12–25; 283–289; 290: 2–12 (Aug. 3, 2017) (Plaintiffs' questioning of views of Dr. Hassan and other Sharia Board members).

[11] *See supra* p. 10, nn.2–6 & p. 12, nn.7–8 (listing 14 sources); RICO statements of 2 dismissed Complaints (MDL ECF 857, 859); Ex. A ¶¶ 1.4.1, 4.1–4.14, 6.1–6.10.2 (citing depositions of Dr. Hussein Hamid Hassan (and 4 exhibits thereto) and Judge Alan Fine (and 6 documents attached as an exhibit thereto) (consisting of 12 documents in total)); Ex. A ¶ 6.6.1 & n.81 (citing 3 fatwas purportedly published by Dr. Ali Mohi al Din Al Qaradaghi and Dr. Ajeel Jaseem Nashmi, previously filed at MDL ECF 2973-3, 2793-4, 2793-5); Ex. A ¶¶ 1.4.1, 7.3 & n.97 (citing State Department

48 sources that Winer relies upon in his Third Report[12] were available to Plaintiffs during the expert discovery period.

Indeed, Plaintiffs had initially planned to have Mr. Winer opine on issues related to their claims against DIB.  In January 2020, Plaintiffs disclosed that they anticipated that Winer would opine on "[T]he significance and import of the U.S. government's engagements with Emirati officials concerning Dubai Islamic Bank prior to 9/11 and State Department spokesman James Foley's statements relating to those engagements, and the significance and import of the investigations and account closures described in the testimony of Alan Fine."  *See* Pls' Expert Disclosures at pgs. 3-4 attached at Ex. C.

Plaintiffs then abandoned their plan to have Mr. Winer address DIB.  Plaintiffs now seek a do-over.  But nothing in the Declassified Files departs so dramatically from previously available materials as to justify Plaintiffs' failure to raise any issues related to DIB.  Indeed, those files simply address arguments that Plaintiffs have been making all along: whether DIB aided al Qaeda, whether it did so knowingly based upon its former Chairman's purported relationship with al Qaeda, and whether certain DIB employees or agents were motivated by religious views.  If Plaintiffs could supplement their experts' reports every time a new report on the 9/11 attacks came out, "preliminary reports could [*always*] be followed by supplementary reports and there would be no finality to expert reports," "interfer[ing] with the Court's ability to set case management deadlines" and to steer the case towards resolution.  *Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003).

---

designation of Foreign Terrorist Organizations from 1997 and 1999); Ex. A ¶ 4.10 & n.50 (citing 2 online media reports regarding the 2011 resignation of Ebrahim Fayez); Ex. A ¶¶ 1.4.1, 3.10.1 & n.8 (citing CIA Online World Factbook); and Ex. A ¶ 5.7 (citing Opinion and Order, Magistrate Judge Netburn, July 11, 2018, MDL ECF 4046).

[12] The 12 newly available sources relied upon by Winer consist of Executive Order 14040 and President Biden's statement on the same, as well as 7 CIA files (only 4 of which discuss DIB or its Chairman) and 3 FBI files (only 1 of which discusses DIB) disclosed in connection with that Executive Order.  *See* Ex. A ¶¶ 2.1–2.2; 3–3.16; 5.1–5.7.

Plaintiffs' delay is especially striking in view of the sheer length of time that has elapsed. This Court has granted "numerous extensions of the discovery deadline." *Shea v. Royal Enters., Inc.*, 2011 WL 2436709, at *8 (S.D.N.Y. June 16, 2011). Years of discovery, including expert discovery, closed in August 2021 with the final expert deposition (the final expert reports having been served six months earlier). This Court authorized DIB, upon the Parties' agreement, to file a second motion for summary judgment, one that addressed the Declassified Files, and then refused to further extend that briefing schedule so that the Parties might negotiate Plaintiffs' new discovery requests. Yet only as DIB was filing its second iteration of its summary-judgment motion did Plaintiffs serve Mr. Winer's Third Report. The time comes for "discovery to end and for this case to go forward on the theories that Plaintiff[s have already] disclosed." *Bozick*, 2021 WL 1198320, at *4.

Plaintiffs have also not explained their failure to even ***communicate*** about the Third Report they commissioned. They received the Declassified Files nearly four months ago. At any point thereafter, they could have taken the procedural steps to try to properly file an out-of-time supplementary report: "formally request[ing] a continuance from the court" or "request[ing] an amendment to the scheduling order" prior to filing. *See Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990) (the former); *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 895 (10th Cir. 2006) (the latter). They did not. For that matter, they did not even send DIB or the Court a ***courtesy email or letter*** warning them a new report would be coming. Because Plaintiffs "could have notified the court and the defendant" of the proposed Third Report much "earlier than [they] did," this Court should exclude it as unjustifiably untimely. *Softel*, 118 F.3d at 961; *see Teva Pharms. USA, Inc.*, 2010 WL 11597882, at *2 (finding impermissible a "lag of nearly six weeks" between "when [an expert] was deposed and when [that party] served his supplementary report").

- 14 -

Second, the Third Report is not important, because it is inappropriate on its face. *See, e.g.*, *Wiener v. AXA Equitable Life Ins. Co.*, 2019 WL 1228074, at *11 (S.D.N.Y. Mar. 15, 2019) (excluding a report on a topic that a witness would ultimately "not testify on"). And here, as DIB details below (Arg. II.B), the content of the Third Report is so self-evidently improper that—even without all the information necessary for a full *Daubert* challenge—this Court should find that any attempt to use it would be futile. Moreover, as already explained (*supra* Arg. I), none of the information in the Declassified Files was necessary for Mr. Winer to both have reason to and be able to speak to DIB's potential involvement in the 9/11 attacks. Nothing in the Declassified Files departs so dramatically from previously available materials as to justify his failure to raise issues related to DIB when given serial opportunities to do so.

Third, the Third Report causes DIB ***layers*** of prejudice. As this case demonstrates, late-breaking expert reports all-too-often "redraw[] the boundaries of the case." *Softel*, 118 F.3d at 962. Because expert discovery has closed, DIB has no occasion to cross-examine Mr. Winer as to the conclusions in the Third Report. And as his prior reports and deposition *did not mention DIB*, it had no occasion to prepare on-point expert reports or pursue discovery in its own defense. Thus, admitting this report means "discovery [would have to be] re-opened in order to provide [DIB] with an opportunity to explore [Mr. Winer's] new 'revelations.'" *Advanced Analytics, Inc.*, 301 F.R.D. at 41; *see Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006) (noting that "discovery would have had to be reopened"); *Spotnana, Inc. v. Am. Talent Agency, Inc.*, 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010) (similar). That would "require [DIB's] redeposing" Mr. Winer, causing "substantial" prejudice in the form of wasted time and resources. *Lidle*, 2009 WL 4907201, at *7; *see Teva Pharms. USA, Inc.*, 2010 WL 11597882, at *2 (finding "severe[]" prejudice" because a supplementary report would require a party to "depos[e] both [opposing

experts] again"); *Every v. Makita U.S.A., Inc.*, 2005 WL 2757952, at *6 (S.D.N.Y. Oct. 24, 2005) (similar); *see also infra* Arg. III (detailing expert discovery that would be needed).  Nor is this "supplementary report" necessarily the last:  Plaintiffs themselves have already suggested that Winer may further "supplement" his report in light of as-yet-unknown evidence and any DIB responses to Plaintiffs' new discovery requests.  *See* Ex. B.  As such supplements would also demand depositions and answering expert opinions, this "supplementary report" from Mr. Winer may be only the tip of the iceberg.

Compounding the prejudice, Plaintiffs—without advance notice—submitted the Third Report "on the same date that [DIB] moved for summary judgment."  *Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74, 83 (10th Cir. 2011).  Indeed, the first DIB heard of the Third Report was while it was filing its renewed personal-jurisdiction motion.  This indisputably "prejudiced" DIB, because DIB "made its motion for summary judgment based on what it thought to be all of the evidence accumulated in discovery."  *Fleming*, 2006 WL 2709766, at *8.  Plaintiffs' delay deprived DIB of the opportunity to respond to Winer's new allegations in its opening brief.

Fourth, the "enormous length of every step of the proceedings in this case militate[s] against any more continuances."  *Softel*, 118 F.3d at 963.  This case has spanned nearly two decades and involved numerous extensions.  Thus, this Court recently refused a proposal to modify the scheduling order so the Parties could negotiate the additional discovery Plaintiffs have sought (notwithstanding discovery's long-passed ending).  *See* ECF 8096.  Yet Plaintiffs anticipate asking Mr. Winer to issue even more supplements in light of any such discovery.  Given these facts and this prospect, the Court should simply exclude the Third Report.

**B.** **The Equitable Analysis Is Underscored By The Patent Impropriety Of The Third Report.**

These equitable considerations—especially lack of importance—are reinforced by the stunning impropriety of Mr. Winer's Third Report.  On top of the Report's flunking of the traditional equitable factors, the Court has "considerable discretion" to exclude untimely expert reports for any other equitable reason.  *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988).  Here, without deposing Mr. Winer on these opinions and engaging in responsive expert discovery, it would be impossible for DIB to identify the full range of factual and legal deficiencies in the Third Report.  (DIB therefore requests below the opportunity—if the Court denies this motion—to conduct such discovery and then file a revised bellwether motion, or other *Daubert* motion as the Court directs, challenging the Report under the Rules of Evidence.  *Infra* Arg. III.)  However, the Court need not even start down that road.  It should exclude the Report now as a matter of equity because it is so clearly beyond the pale of a permissible expert report.  Indeed, any attempt to use it would prove futile:  Mr. Winer primarily and unhelpfully echoes inadmissible hearsay; he reaches multiple conclusions prohibited by the Rules and devoid of support in the record that he only selectively addresses; and lacks authority to opine on the matters he raises.

**1.** **The Third Report Is A Blatant Attempt To Bolster Inadmissible Hearsay.**

In the Third Report, Mr. Winer acts as an impermissible conduit for hearsay, which makes his report unhelpful and thus unjustified.  While experts can base their opinions on inadmissible evidence, they must do more than "transmit … hearsay to the jury."  *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *see United States v. Dukagjini*, 326 F.3d 45, 58–59 (2d Cir. 2003) (noting that experts must form their own opinions from their "extensive experience and a reliable methodology").  An expert report may not merely "repeat[] hearsay evidence without applying [special] expertise."  *Dukagjini*, 326 F.3d at 59.  Expert reports must *help* the trier of fact

- 17 -

*understand* the evidence, and so cannot "merely repeat[] or recast[]" even *non-hearsay evidence* unless the source material is "beyond the ken of the average juror." *Hernandez v. Leichliter*, 2016 WL 684038, at \*2 (S.D.N.Y. Feb. 18, 2016); *Palazzetti Imp./Exp., Inc. v. Morson*, 2001 WL 793322, at \*3 (S.D.N.Y. July 13, 2001), respectively. Parroting information written in plain English "adds nothing … other than the use of [the witnesses's] credentials to bolster the credibility of [the source material] impermissibly." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 171 (S.D.N.Y. 2018).

The Third Report does precisely this, and only this. Virtually every page is littered with hearsay and other material that Mr. Winer repeats without analysis. Indeed, a simple review of his "Findings" (pp. 24–30) indicates that the purpose of the report is simply to attempt to bolster the credibility of the Declassified Files. Additionally, the discussion of the Declassified Files consists of seven pages of almost entirely block quotes. *See* Ex. A ¶¶ 3.1–3.16. The section covering the newly declassified information apparently from the FBI similarly relies on copying and pasting swaths of material. *See id.* ¶¶ 5.1–5.8. And, in keeping with this trend, the remainder of the document incorporates wholesale portions of Dr. Hassan's testimony and quotes heavily from news articles and other sources of information. *Id.* ¶¶ 4.1–4.14, 6.1–6.10. Conspicuously absent is any original analysis. It is entirely unclear how Mr. Winer is leveraging any special experience or expertise he may have. His purported "all-source analysis" methodology functions as a fig leaf for collecting unsworn and unexamined statements of others—often repeated verbatim. *Id.* ¶ 1.4. Such material could only tend to confuse rather than help the jury.

###    2.    The Third Report's Conclusions Lack Foundation And Address Impermissible Subject Matters.

Further, on those rare occasions where Mr. Winer does mingle his own analysis with the quoted hearsay, he reaches impermissible conclusions, dooming any attempt at justifying the Third

Report's untimeliness.  Experts may not "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016).  Thus, they may not "present testimony in the form of legal conclusions," even implicitly.  *United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined No. of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 322 (E.D.N.Y. 2013).  Similarly, experts must limit their commentary to matters they have knowledge of or insight into, as opinions "that are without factual basis and [that] are based on speculation or conjecture" are "inappropriate." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311–12 (2d Cir. 2008).  Before admitting expert testimony, courts must therefore consider the "analytical gap between the data and the opinion proffered" to make sure that the expert is speaking authoritatively. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  These rules give rise to another:  Experts may not ordinarily opine on the "intent or motive of parties or others," as such opinions are speculative and unhelpful, in addition to doubling as impermissible legal conclusions. *Scott*, 315 F.R.D. at 45–47.

The Third Report serially violates each of these principles.

<u>First</u>, Mr. Winer in the Third Report **both** provides impermissible legal conclusions and impermissibly opines on mental state.  His two new conclusions (in response to questions Plaintiffs "asked" him "to address," Ex. A ¶ 1.1) are that there is evidence "that DIB *knowingly aided and abetted*" bin Laden and al Qaeda "to *support* global terrorism, which culminated in the 9/11 terrorist attacks," and further that there is evidence "that DIB's senior management *supported* or were *aligned with*" bin Laden and al Qaeda.  *Id.* ¶¶ 7.1–7.2, 7.12–7.13 (emphases added).  These

(most obviously, "aided and abetted") are legal applications belonging to the jury.  All the worse, they speak in conclusory terms to DIB's mental state and that of its management (most obviously, "knowingly").  Mr. Winer's discussion in support of both conclusions repeats these errors again and again  *See id.* ¶¶ 7.2, 7.12.  Both of these "findings" dictate the resolution of disputed legal questions and impermissibly opine on the mental state of not one but ***multiple*** persons.  Those considerations alone require the Third Report's exclusion.

Second, Mr. Winer's opinions lack foundation because his own sources do not survive a "rigorous examination of the facts."  *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020).  As DIB detailed in its renewed summary-judgment motion, all the relevant purported actions discussed in the Declassified Files occurred ***at least three years prior*** to 9/11.  They were not done by DIB itself, but (purportedly) by its founder and former chairman, Saeed Ahmed Lootah, who in any event was not involved in DIB's day-to-day operations after 1995 and had no authority at DIB from 1998 on; moreover, the Declassified Files do not state that Lootah himself was knowingly aiding terrorism, let alone an attack on the US.  *See* DIB PJ Br. 23–26.  Plaintiffs could have asked Lootah about all this had they chosen to depose him; but the Declassified Files themselves, other than an unknown author's self-doubting speculation that DIB was "apparently witting," contain *no evidence that DIB knew* of his alleged actions.  Similarly, Mr. Winer relies heavily on Judge Fine's deposition without acknowledging its detailed report of DIB senior management's eagerness to investigate the allegations and cooperate with the US government to stop any terrorist support they found (and they found none).  As such, Mr. Winer's sources are insufficient to support his conclusions that there is evidence of DIB's knowing support of al Qaeda and its management's alignment with al Qaeda.

- 20 -

Third, Mr. Winer impermissibly "ignores evidence that is highly relevant to his conclusion." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018). For one thing, despite opining on the "align[ment]" of DIB's "senior management" with bin Laden, he ignores the uncontroverted and extensive evidence (all long available to him) that after DIB suffered a significant fraud, discovered in early 1998, the Dubai and UAE governments intervened in and thoroughly audited DIB, leading to an overhaul of DIB's senior management and the removal of Lootah himself. *See* DIB PJ Br. 3–4, 25. This fraud, which had nothing to do with terrorism (*id.* at 3–4), explains the State Department press officer's discussion of the Dubai government's efforts to "clean up" DIB, which Mr. Winer uses to smear DIB without analyzing this clarifying context long in the record, including in Judge Fine's deposition. *See* Ex. A ¶¶ 4.6, 7.5, 7.12. Mr. Winer fails to grapple with any of the evidence that is at odds with his conclusion, leaving a large "analytical gap" in his purported expert analysis. *Gen Elec. Co.*, 522 U.S. at 146.

Moreover, DIB assembled significant evidence that it never "knowingly provided financial services to a customer with links to al Qaeda." DIB PJ Br. 18. Indeed, it showed that when DIB was presented in 1999 (via the press) with allegations about Islamic extremists using its financial products, its management ordered the thorough investigation of those claims and offered full cooperation to the US State Department, actions hardly consistent with Mr. Winer's conclusions about DIB's management. Further, Plaintiffs themselves continue to admit that they lack any evidence that any of the DIB accounts identified in discovery—including those belonging to the subjects of the "raw intelligence" Mr. Winer cites (Ex. A ¶ 3.16 & n.33)—were used to fund either 9/11 or al Qaeda. *See* DIB PJ Br. 11–13. Although Mr. Winer claims to use an "all-source analysis," he selectively fails to grapple with the inconvenient facts of these sources. Ex. A ¶ 1.4;

*see* DIB PJ Br. 18–19.  His pattern of "pick[ing] and cho[o]s[ing]" suggests an impermissible "'analytical gap' between [his] stated methodology and the manner in which he assessed" the facts. *In re Rezulin*, 309 F. Supp. 2d at 563; *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016), respectively.

<u>Fourth</u>, other baseless statements lie throughout the Third Report.  As one example, Mr. Winer asserts "a clear discrepancy between the report by DIB's attorneys that no information relating to Sulaiman al Ali or to any of the other 629 terms was found after an ostensibly proper search, and the information possessed by the FBI and provided [by the CIA]."  Ex. A ¶ 7.11.  But *no* discrepancy exists.  Plaintiffs provided one spelling for an individual named "Sulaiman al Ali" (the same spelling that Mr. Winer himself primarily uses in apparently meaning to refer to the same person identified in certain FBI documents as "Suleiman Ali" ) for DIB's database search, after DIB made clear that the search process in a prior system required an exact match and therefore asked Plaintiffs for alternative spellings or Arabic iterations.  *Cf.* DIB PJ Br. 10 (noting that DIB used name variations for other searches, and searched 629 names, a count that includes variations, provided by Plaintiffs).  They declined to do so.  Thus, even if al Ali *did* have an account at DIB, it would not suggest a lack of diligence or transparency on DIB's part—nor would it in any way support the opinion of Mr. Winer's to which it ostensibly relates.  That such an account (assumedly) existed says nothing about whether DIB knowingly aided and abetted bin Laden's terrorism, culminating in 9/11.

### 3.     Mr. Winer Lacks The Requisite Experience To Offer Expert Testimony On The Issues He Newly Raised.

Finally, the Third Report should be precluded because Mr. Winer is opining on matters far outside his expertise.  Experts are not jacks-of-all-trades.  Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she

is qualified to express expert opinions as to other fields." *Nimely v. City of New York*, 414 F.3d 381, 399 & n.13 (2d Cir. 2005). To testify, an expert witness must demonstrate some nexus between "the area in which [he or she] has superior knowledge, education, experience, or skill [and] the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

Because no such nexus exists here, Plaintiffs cannot justify Mr. Winer's untimely opinions. He is a *lawyer* long working on *policy* aspects of financial regulation. He has no formal accounting experience. He is neither a CPA nor an auditor. He certainly has no forensic accounting experience or certification as a fraud examiner. And as to the financial system and banking rules and regulations of at least the Kingdom of Saudi Arabia, he has conceded he has a limited knowledge. He claims none regarding the UAE, the UAE Central Bank, or Dubai. So nothing positions him to opine as an expert on whether accounts at DIB contributed financial support to al Qaeda (and then what if anything that had to do with 9/11 or the United States), much less what that micro-level financial activity says about DIB and its leadership.

Additionally, the Third Report centers on files disclosed by the CIA and FBI. Mr. Winer has experience in the State Department, but has never been directly employed in either of those agencies. Nor do his opinions here draw from any experience with the intelligence community that he may claim. Instead, he appears no better positioned than a member of the general public to just read the materials he "analyzes"—all prepared in plain English and all, as Mr. Winer ventures to conclude, meaning what a commonsense reader would assume they mean.

**III.    Should This Court Allow The Third Report, DIB Requests Additional Expert Discovery As A Matter Of Fairness.**

For all the aforementioned reasons, this Court should simply exclude the Third Report altogether.  If, however, it declines to do so, DIB respectfully requests the full set of ordinary procedural protections.

Specifically, this Court first should permit DIB to obtain all sources on which Mr. Winer relies and to depose him on his brand-new opinions about DIB.  *See Lidle*, 2009 WL 4907201, at *7 (citing this as a reason not to admit an untimely report); *Teva Pharms. USA, Inc.*, 2010 WL 11597882, at *2 (same).  Second, the Court should reopen discovery to allow DIB to submit new expert reports of its own regarding the same subject matters and/or regarding new information that has become available since the close of expert discovery.  *See Design Strategy, Inc.*, 469 F.3d at 297 (noting that, to avoid "prejudice to the defendants … [that] would have been severe," "discovery would have … to be reopened"); *Advanced Analytics, Inc.*, 301 F.R.D. at 41 (similar); *Barter House, Inc. v. Infinity Spirits LCC*, 2021 WL 289347, at *1 (S.D.N.Y. Jan. 28, 2021) (noting that the late "submission of expert reports" would invite delay, as a defendant would be "obliged to call rebuttal expert witnesses").  Lastly, the Court should permit DIB to submit a motion under *Daubert* and the Rules of Evidence challenging the Third Report's admissibility.  *See Millenium Expressions, Inc. v. Chauss Mktg., Ltd.*, 2006 WL 288353, at *2 (S.D.N.Y. Feb. 6, 2006) (cautioning that defendants would "incur the trouble and expense of . . . moving to exclude [late expert] testimony").

These measures would be necessary to counteract the prejudicial effects of Plaintiffs' gambit.  The massive delay, cost, and hassle occasioned by the Third Report only underscore the gravity of Plaintiffs' procedural transgression.  They also demonstrate this Court's prudence in

strictly enforcing expert-discovery timelines.  To avoid needless delay, this Court should exclude the Third Report as untimely and improper.

## CONCLUSION

The Court should exclude Jonathan Winer's "Supplementary Report."  In the alternative, it should grant DIB the full measure of requested procedural relief.

Dated: August 15, 2022

Respectfully submitted,

By: */s/ Steven T. Cottreau*

Steven T. Cottreau
C. Kevin Marshall (admitted *pro hac vice*)
Gabrielle E. Pritsker
Audrey Beck (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Email: scottreau@jonesday.com
Email: ckmarshall@jonesday.com
Email: gpritsker@jonesday.com
Email: abeck@jonesday.com

Juan P. Morillo (admitted *pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN LLP
777 Sixth St., N.W.
Washington, D.C. 20001
Telephone: (202) 538-8174
Email: juanmorillo@quinnemanuel.com

*Counsel for Defendant Dubai Islamic Bank*