**Exhibit F**

**Nicholas John D'Errico**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                                        03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------X    **AFFIDAVIT OF**
MICHELLE YVETTE AMIN, et al.,                               **NICHOLAS JOHN D'ERRICO**

                                    Plaintiffs,             20-CV-00412 (GBD)(SN)

                    v.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
------------------------------------------------------------X
STATE OF NEW YORK      )
                       : SS.:
COUNTY OF KINGS        )

NICHOLAS JOHN D'ERRICO, being duly sworn, deposes and says:

1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 66 Sherman Street, Brooklyn, New York 11215.

2.      I am currently 33 years old, having been born on April 7, 1989.

3.      I am the son of Nicholas D'Errico, upon whose death my claim is based, and submit this Affidavit in connection with the pending motion for a default judgment and in support of my solatium claim.

4.      My father passed away from bladder cancer on February 8, 2015. It was medically determined by the World Trade Center Health Program that this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks.

5.      My father worked a lot, but we had a good relationship, and he was always there for me. We worked on cars and did work around the house together. We would always joke around and do father-son activities together.

6.      My dad worked as an audio engineer for NBC News and responded to the World Trade Center on 9/11 to perform news coverage duties. He was outside for about seventeen

hours per day as he worked, and he began responding on 9/11. He continued working at the World Trade Center site each day for months after, assisting in the reporting on rescue, recovery, and clean-up.

7.      Years later, I was home with my father when he confided in me that he was peeing blood. I made a doctor's appointment for him, and soon after, the doctors diagnosed him with bladder cancer. From the day he was diagnosed until he died, I helped take care of him. I attended all his doctor's appointments and treatments and would take days off work to help take care of my father. I monitored my father, making sure that he ate. I paid for all of his meals and any other costs he needed. Because my father lost his income due to his illness, I paid for the majority of my parents' needs.

8.      His illness had a huge emotional impact on my life. He was the rock of our family, so to see him sick was extremely hard. He went through many chemotherapy treatments, and it was painful to see him lying in bed, too ill to get up. Since my father's passing, he has missed many significant milestones in my life. I got married, and my parents weren't there to walk me down the aisle. My father hasn't been there for every significant life achievement of mine.

9.      To this day, I try to emulate my dad. He was so generous and loved. He was one of the most loved people at NBC Universal. NBC even chartered a bus to take dozens of their employees to my father's funeral from the office. My father always put his family first. Even when he didn't have money, he prioritized others before himself. I try to live up to his standard in my own life, knowing I'd make him proud.

NICHOLAS JOHN D'ERRICO

Sworn to before me this
29ᵗʰ day of June, 2022

Notary Public

JOANNE E. LAGNESE
Notary Public, State of New York
No. 01LA6119278
Qualified in Queens County
Commission Expires Nov. 29, 2024

2

# June D'Errico

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                              03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------X    **AFFIDAVIT OF**
MICHELLE YVETTE AMIN, et al.,                      **MICHAEL ANTHONY**
                                                  **D'ERRICO ON BEHALF OF**
                                                  **THE ESTATE OF JUNE**
                                                  **D'ERRICO**

                              Plaintiffs,          20-CV-00412 (GBD)(SN)

                    v.

ISLAMIC REPUBLIC OF IRAN,

                              Defendant.
-------------------------------------------------------------X
STATE OF FLORIDA        )
                        : SS.:
COUNTY OF LAKE          )

MICHAEL ANTHONY D'ERRICO, being duly sworn, deposes and says:

1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 2422
Woodward Hill, Clermont, Florida 34711.

2.      I am the son of Nicholas D'Errico, upon whose death my claim is based. My
mother, June D'Errico, wife of Nicholas D'Errico, died on March 27, 2019, prior to the
commencement of this action.

3.      On June 17, 2019, I was appointed the personal representative of my mother's
estate, having been issued Letters of Administration by the Circuit Court for Sumter County,
Florida, Probate Division.

4.      I submit this affidavit on behalf of my mother June D'Errico's estate in
connection with the pending motion for a default judgment and in support of her solatium claim.

5.      June's husband, Nicholas D'Errico, passed away from bladder cancer on
February 8, 2015. It was medically determined by the World Trade Center Health Program that

this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks.

6.      My parents had a very loving relationship. They knew each other since they were fifteen years old and moved in together at seventeen years old. They loved camping, playing paddleball and handball, and taking family trips. They were very family-oriented and focused on raising my brother and me together. Before my father became ill, they planned to retire and move down to Florida. They were involved in each other's lives in every way possible. They made all their life decisions together and fully supported each other in every way. My mother was diagnosed with cancer only two months after my father was diagnosed with cancer. It was devastating for both of them, but they continued to support each other. They truly had a warm and loving relationship.

7.      My father was an audio engineer for NBC, and he responded to the World Trade Center site as the 9/11 attacks were happening. In the weeks and months after 9/11, he worked 15-to-17-hour days covering the news. I remember him coming home from work covered in ash and dust. He witnessed many horrific things, like the collapse of 7 WTC. He would tell my mother and me about the smoke rising from the crash site for months on end.

8.      When my father first became sick, my mother was one of the first to know. She saw blood in his underwear in the laundry, and he told her that he was having trouble urinating and had blood in his urine. My mother was with my father at the doctor's office when he was diagnosed with bladder cancer.

9.      My mother saw her entire life turned upside down when my father got cancer. She would say it ruined her life. She suffered greatly, and she became more and more distressed each day by my father's deterioration. She did everything for him. She would prepare meals for my father and coordinate all his appointments and treatments. She kept notes on all his doctors' appointments. Anything he needed, she was there. Even when my father was sick, they would take trips to spend time together, despite my father needing a catheter and being extremely frail.

10.     The financial impact of my father's illness on my mother was huge. My parents did anything and everything to help treat my father's cancer, which incurred some serious medical expenses. They lost a quarter of a million dollars from their retirement fund trying to treat my father. My dad did not have a pension, so he planned to continue working to support

2

my mother and our family rather than completely retire. However, he could not continue working once he fell ill.

11.     It was almost a tragic tale what happened between them. My mother greatly feared losing my father. You could see the anxiety and depression in her eyes once he got sick. My mother was lying right next to him as he passed away. She would tell me that her life and home were not the same after he died. My mother was greatly saddened when she had to move down to Florida alone. That had never been the plan. She told me that his passing was the end of her life. She lived for more than four years after my father died, during which time she suffered greatly from the loss of her husband.

                                        _____
                                        MICHAEL ANTHONY D'ERRICO
                                        on behalf of the Estate of JUNE D'ERRICO

Sworn to before me this
2nd  day of June, 2022
_____
        Notary Public

Jacob DeGrechie
Notary Public
State of Florida
Comm# HH030843
Expires 8/31/2024

3

**Susan A. Sangiorgi**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                                03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------X      **AFFIDAVIT OF**
MICHELLE YVETTE AMIN, et al.,                       **SUSAN A. SANGIORGI**

                                  Plaintiffs,        20-CV-00412 (GBD)(SN)

              v.

ISLAMIC REPUBLIC OF IRAN,

                                  Defendant.
-------------------------------------------------------------X
STATE OF NEW JERSEY    )
                       : SS.:
COUNTY OF OCEAN        )

SUSAN A. SANGIORGI, being duly sworn, deposes and says:

1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 215
Orlando Boulevard, Toms River, New Jersey 08757.

2.      I am currently 60 years old, having been born on April 26, 1962.

3.      I am the sister of Nicholas D'Errico, upon whose death my claim is based, and
submit this Affidavit in connection with the pending motion for a default judgment and in
support of my solatium claim.

4.      My brother passed away from bladder cancer on February 8, 2015. It was
medically determined by the World Trade Center Health Program that this illness was causally
connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks.

5.      My brother was like a second father to me. We were very close and had dinner
together every Sunday. We took care of our aging parents together. We would talk on the phone
for hours at a time. I could count on Nicholas for anything. From day one until he couldn't be
anymore, he was always there for me.

6.      Nicholas worked for NBC News. He was at the World Trade Center on 9/11, covering the attacks. He worked for months at Ground Zero, working 15-to-17-hours per day. He was pretty quiet about what he saw. Obviously, it was too devastating to talk about.

7.      Years later, around Christmastime, I received a call from my sister-in-law telling me that Nicholas was having difficulty urinating. She also said that he was finding blood in his urine. In February of the following year, he visited the doctor, who diagnosed him with bladder cancer. I had never seen my brother sick. He had always been a very healthy person. He was very emotionally and mentally strong. Nicholas and I had lost our sister earlier in life, so he was the only sibling I had left. The thought of something happening to him truly upset me.

8.      At the beginning of Nicholas's illness, I had a brain tumor, so I couldn't be there to care for him. After having the tumor removed and I recovered, I visited him once per week and called him two to three times per day. I accompanied him to some of his doctor's visits and procedures.

9.      Watching Nicholas deteriorate was highly emotional for me. Losing him rocked me—it was like losing my father for a second time. Now that he's gone, there's a massive hole in my heart and our family's hearts. Not having him here anymore is such a significant loss.

SUSAN A. SANGIORGI

Sworn to before me this
28th day of June, 2022

Notary Public

LISA E TILTON
Notary Public - State of New Jersey
My Commission Expires Feb 26, 2025

# John Patrick Dillon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                                        03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------X   **AFFIDAVIT OF**
MICHELLE YVETTE AMIN, et al.,                               **PATRICIA DILLON ON**
                                                            **BEHALF OF JOHN PATRICK**
                                                            **DILLON**

                                    Plaintiffs,             20-CV-00412 (GBD)(SN)

                    v.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
------------------------------------------------------------X
STATE OF NEW YORK      )
                       : SS.:
COUNTY OF SUFFOLK      )

        PATRICIA DILLON, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 46
Genevieve Court, Amityville, New York 11701.

        2.      I am the wife of John Charles Dillon, upon whose death my claim is based. My
son, John Patrick Dillon, was also a plaintiff in the within action and was pursuing his own
solatium claim based on the death of his father, John Charles Dillon. John Patrick Dillon passed
away on February 20, 2022, and I submit this Affidavit on his behalf in connection with the
pending motion for a default judgment and in support of his solatium claim.

        3.      John Charles Dillon passed away from metastatic bladder cancer on May 5, 2010,
at 58 years old. It was medically determined that this illness was causally connected to his
exposure to the toxins resulting from the September 11, 2001, terrorist attacks.

        4.      There was nothing John and his father loved more than the New York Rangers.
Their favorite activity was going to games together or watching them play on TV. John's father
gave up his tickets to the 1994 Stanley Cup Finals to watch the Rangers win it all with both of

his kids. John also loved to go fishing with his father. They had a great relationship. John's father coached his soccer team and always encouraged him to do his best. They were always goofing around together, doing funny things, like walking around the house with socks on their ears, pretending to be cocker spaniels. John's father took a lot of pride in John's scholastics and was so proud when John decided to go to law school. John learned a lot from his father. His father taught him how to carry himself, dress, and, most importantly, work hard.

5.      John was aware of his father's exposure on 9/11. His father was on his way to work at the New York Stock Exchange that morning but never made it. He was coming out of the doors of the North Tower when the first plane struck. He evacuated the city along with many others and witnessed horrors along the way. He saw people jumping from the towers to their deaths. He was caught up in the dust cloud produced by the buildings collapsing. He reluctantly returned to work once the air was declared safe to breathe and continued to work at the NYSE until he retired.

6.      John learned of his father's illness the week of his first-year law school finals. His father and I called him to tell him about the bladder cancer diagnosis. John was upbeat after the diagnosis and believed wholeheartedly that his father would beat it. John was very supportive of his father throughout his illness.

7.      John was in law school throughout his father's illness. He still made the time to be there for his father. Despite living in Manhattan, John would come home as often as possible to support his father and me. John lived at home with us in the summer of 2007 to help with his father's care. Throughout 2008 and 2009, John would frequently come home despite the pressures of attending law school. Once his father's condition deteriorated, John came home every weekend to help us. He took his father to doctor's appointments, chemotherapy treatments, and MRIs whenever he could. He always made sure there was food in the house. He would text his father to offer support and talk to him about the Rangers.

8.      John was devastated by his father's illness and death. He believed his father was going to be okay. Once his father passed away, John stepped into his father's shoes and took care of everything for me, including my finances. John's law school graduation should have been one of the best days of his life. Instead, a dark cloud hung over the day. John knew seeing

2

him graduate would have been his father's proudest moment. He was very emotional over that. John missed his father terribly up until his own death.

_Patricia Dillon_

PATRICIA DILLON, on behalf of
JOHN PATRICK DILLON

Sworn to before me this
2ᵗʰ day of June, 2022

_____
Notary Public

ANGELO MAGOULAS
Notary Public - State of New York
NO. 01MA6427433
Qualified in Suffolk County
My Commission Expires Dec 27, 2025

3

# Patricia Dillon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                                    03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------X      **AFFIDAVIT OF**
MICHELLE YVETTE AMIN, et al.,                           **PATRICIA DILLON**

                                        Plaintiffs,            20-CV-00412 (GBD)(SN)

                        v.

ISLAMIC REPUBLIC OF IRAN,

                                        Defendant.
-------------------------------------------------------------X

STATE OF NEW YORK          )
                           : SS.:
COUNTY OF SUFFOLK          )

      PATRICIA DILLON, being duly sworn, deposes and says:

      1.     I am a plaintiff in the within action, am over 18 years of age, and reside at 46 Genevieve Court, Amityville, New York 11701.

      2.     I am currently 69 years old, having been born on March 17, 1953.

      3.     I am the wife of John Charles Dillon, upon whose death my claim is based, and submit this Affidavit in connection with the pending motion for a default judgment and in support of my solatium claim.

      4.     My husband passed away from metastatic bladder cancer on May 5, 2010, at the age of 58. It was medically determined that this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks.

      5.     Before 9/11, my husband and I had a beautiful marriage. We met when I was 19 years old, and he was 21. We married the April after I graduated college. Our life was one of fun and luxury. We traveled a lot together and were fortunate enough to see much of this world. We were a truly happy couple. John was always the life of the party and a lot of fun to be around. Our home was always the party spot. John and I loved to host gatherings, and I did a lot

of the cooking. When our children were born, our traveling slowed down. Our lives became about our children. We settled in Massapequa Park and raised our children there. Our home was still known as the post-game hangout spot.

6.      September 11, 2001 was the day that changed John forever. It started out as a typical day for him, as it did for many others. John left for work at the New York Stock Exchange, but he never made it. He had just gotten off the train in the lower level of the North Tower and was walking out the doors to the street when the first plane hit the tower. He saw the second plane strike the South Tower. John told me about witnessing several people jumping to their deaths from the buildings. He was still in the vicinity when the towers collapsed and had become engulfed in the ash and dust that resulted from the collapse. As a result of that day, John was a changed man. The events that occurred and the things he witnessed traumatized him. He had a deep-rooted fear in him. John was petrified at the thought of having to go back to work in lower Manhattan. On the morning he was scheduled to return to work, he spent much of the morning in the bathroom, vomiting in fear. As much as he did not want to go back, he returned to work to support our family. John continued working at the NYSE until his retirement many years later.

7.      It was evident that John had PTSD from the moment he arrived home on 9/11. He would watch every TV show and news coverage about 9/11 and sob the entire time uncontrollably. Terrible dreams haunted him. John began drinking to cope with his trauma. Unfortunately, John's PTSD, combined with his alcoholism, led him to become verbally abusive towards me and eventually physically abusive. John's drinking and abuse would continue on and off for the remainder of his life. He went to rehab, which didn't work. We went to marriage counseling, which didn't work. He couldn't stop. Despite John's battle with PTSD and alcoholism, he remained a great father to our children.

8.      John's physical illness began in January 2004. His doctor discovered a breast tumor, which resulted in him having a mastectomy. By the end of the summer of 2004, a tumor was found in his other breast, and John underwent another mastectomy. His depression was so deep that he developed an eating disorder that caused him to lose so much weight that he required a walker to ambulate and a course of physical therapy to regain full ambulation. After

2

that, John seemed healthy despite his ongoing battle with PTSD and alcoholism. He managed to stay sober from August 2007 until August 2008.

9.        In April of 2009, I had gone into the bathroom after John. He forgot to flush, and I noticed blood in his urine. I asked how long that had been happening. He told me he did not want to worry me since, at the time, I was recovering from my own health issues. John and I went to the doctor together, and he was diagnosed with a UTI and given antibiotics. The antibiotics cleared John's problem for a short period, but it reoccurred. There were several more trips to the doctors and several more UTI diagnoses before his doctors decided to do further testing. In early June 2009, John was diagnosed with bladder cancer. We received that news together.

10.        John's health was a roller coaster after 9/11. I helped him through it all. I was there for him during both of his mastectomies in 2004 and helped care for him. I tried to keep many dark times and destructive behaviors from my children, all stemming from his depression. Our daughter is still unaware of how dark things were for him to this day. John was a stubborn man and refused to see a psychologist unless it was a male Irishman. I managed to find the only male Irish psychologist in the greater Long Island area. I was at every subsequent doctor's visit, medical treatment, and emergency room trip. I sat in the hospital every minute of the 13-hour surgery John underwent to remove his bladder so that he would have a familiar face to wake up to. John was ashamed of his urostomy bag and refused even to acknowledge it. I learned how to clean and maintain the bag and did so for John until he passed away, despite his behavior towards me.

9.        I loved John with my entire heart. Watching him become a changed man was the hardest thing I ever experienced. He was such a fun-loving and kind man before 9/11. I never blamed him once for what he became. The trauma he suffered changed him. I still loved him with all my being. I miss him greatly to this day. I went from living in a large, beautiful home

surrounded by family to one John once deemed not good enough. His suffering and loss changed my life forever. 9/11 changed our lives forever.

_Patricia Dillon_
PATRICIA DILLON

Sworn to before me this
29 day of June, 2022

_____
Notary Public

ANGELO MAGOULAS
Notary Public - State of New York
NO. 01MA6427433
Qualified in Suffolk County
My Commission Expires Dec 27, 2025

4

Joanna Sanford

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                               03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------------X    **AFFIDAVIT OF**
MICHELLE YVETTE AMIN, et al.,                           **JOANNA SANFORD**

                                        Plaintiffs,        20-CV-00412 (GBD)(SN)

                    v.

ISLAMIC REPUBLIC OF IRAN,

                                        Defendant.
------------------------------------------------------------------X
STATE OF NEW YORK        )
                                          : SS.:
COUNTY OF SUFFOLK       )

JOANNA SANFORD, being duly sworn, deposes and says:

1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 123 Washington Boulevard, Commack, New York 11725.

2.      I am currently 40 years old, having been born on August 4, 1981.

3.      I am the daughter of John Charles Dillon, upon whose death my claim is based, and submit this Affidavit in connection with the pending motion for a default judgment and in support of my solatium claim.

4.      My father passed away from metastatic bladder cancer on May 5, 2010. It was medically determined that this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks.

5.      I have always considered myself a daddy's girl throughout my life. My father was always around and very involved in my life. He attended all of my soccer games and tournaments. He would leave work early to be there for me. We would go to hockey and baseball games together. We loved bonding over sports. Even as I grew and stopped playing sports, my dad made sure to stay active in my life. When I became a teacher, my father would

make sure to attend every event I sponsored and every school activity I was involved with.

6.      I was living in the dorms at Hofstra University when the events of 9/11 took place. My friend called to tell me what was happening. My first thought was my dad. I had no idea where he was or the city's layout, but I knew he was in the area. The rest of my day was chaos. Due to what was happening, it was not easy to get a ride home from Hofstra or to reach anyone to get information. It was devastating having no idea what was going on. Eventually, I made it home that night, and thankfully, so did my dad. When he arrived, he was covered from head to toe in soot. It is an image that will always stay with me. He told me of his experiences and what he had seen. My father witnessed people jumping from the towers. He lost friends. He fought his way through the chaos in downtown Manhattan. My father returned to work at the NYSE a few weeks later despite his obvious fears. It was sad to witness the fear in him. He told me about the nightmares he had been experiencing since the attacks—hands reaching up from the concrete streets, trying to grab and pull him under. Between the nightmares and the actual horrors that he witnessed that day, it was difficult for him to sleep for the remainder of his life.

7.      My father began experiencing PTSD immediately after the events of 9/11. His physical illness did not start until later on. In 2009, he began experiencing symptoms similar to a urinary tract infection. He visited his primary care physician, who diagnosed my father with a UTI and prescribed him antibiotics. The antibiotics were ineffective, and my father scheduled a follow-up visit. This was the visit where his cancer was diagnosed. My parents called to tell me shortly after they received the diagnosis. It was May of 2009.

8.      I was determined to help take care of my father as much as possible. I applied for FMLA at work to take intermittent days off to care for my dad. I would sit through his 5-hour chemotherapy treatments with him and be his patient advocate. I went with him to all the doctor visits and treatments I could. I took the summer of 2009 off from summer school and tutoring to be there for my dad. By the fall of 2009, my father had his bladder removed, and a urostomy bag put in its place. I again took off from work to be there for his surgery and learn to help him with his urostomy bag. I was still taking my father to doctor's visits in early 2010 when he started to experience severe nose bleeds. The doctors ran tests and discovered that his cancer had metastasized to his brain. The progression of my father's cancer led me to decide to move back home. Finally, on May 5, 2010, my father passed away. The speed at which everything

took place was a lot to handle and process.

9.      My father's illness caused a total role reversal in our relationship. The man who had taken care of me my whole life now relied on me to be his nurse and primary caregiver. It was difficult to watch someone who had a larger-than-life personality dwindle and fade out. All aspects of life became more challenging. Going to work and maintaining a happy persona for my students was a struggle. Juggling all of my responsibilities became harder. Visiting him in the hospital after work and then driving home afterward always weighed on me. His illness was a defining struggle in my life. Along with the loss of my father was the loss of future plans. I no longer had my father to walk me down the aisle at my wedding or meet my future children. My father's sun would have risen and set with his grandkids. I was robbed of the things I always envisioned for my future.

10.      My father was a person who was always the center of any party. He was larger than life. He was incredibly generous with his friendship and his money. He was such a beautiful presence. The outpouring of people who wanted to pay their respects to him at his wake was amazing. He was a loss to his community and the NYSE, but mostly to his family. His loss created many ripple effects that can still be felt today.

Joanna Sanford
JOANNA SANFORD

State of NY, County of Suffolk
Sworn to before me this
27th day of June, 2022

Notary Public

WENDY JOHNSON
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01JO6408800
Qualified in Suffolk County
Commission Expires September 14, 2024

# Klavdiya Drobchinskaya

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                                    03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------X          **AFFIDAVIT OF**
MICHELLE YVETTE AMIN, et al.,                           **KLAVDIYA DROBCHINSKAYA**


                                    Plaintiffs,          20-CV-00412 (GBD)(SN)

                    v.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
------------------------------------------------------------X
STATE OF NEW YORK       )
                        : SS.:
COUNTY OF KINGS         )

KLAVDIYA DROBCHINSKAYA, being duly sworn, deposes and says:

1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 2701 Cropsey Avenue, Apartment 2-B, Brooklyn, New York 11214.

2.      I am currently 66 years old, having been born on February 2, 1956.

3.      I am the wife of Aleksandr Drobchinskiy, upon whose death my claim is based, and submit this Affidavit in connection with the pending motion for a default judgment and in support of my solatium claim.

4.      My husband passed away from melanoma on October 3, 2013, at 59 years old. It was medically determined that this illness was causally connected to his exposure to the toxins resulting from the September 11, 2001, terrorist attacks.

5.      Aleksandr and I married at a young age and were together for 38 years. We raised our daughter, Nelly, together. We emigrated together from Ukraine to the United States. It was a difficult process adapting to a new culture, new language, and a new way of doing things. We got through it together. Aleksandr worked hard as a laborer to support us while I pursued my education. I helped him improve his English enough so that he could get a better job. After a

while, I got my degree, and Aleksandr got a job with the Metropolitan Transit Authority (MTA). When Aleksandr wasn't working, we enjoyed going on walks, going to the beach and parks, and playing volleyball. We were helping our daughter raise her children before my husband passed away. We were a happy family.

6.      On 9/11, my husband was in the city working for the MTA out of their base of operations on Chambers Street. He was assigned there to fix a communications issue in the area. After the attacks took place, he walked home from downtown Manhattan to our home in Brooklyn. When he arrived home, he was covered in ash and soot. I wanted to wash his clothes, but Aleksandr insisted it was better to throw them out. He didn't tell me much about his experiences that day but shared how sad it was and how hard it was to breathe. He returned to the Chambers Street location a week later when the air was declared safe to breathe. He continued to work there for a few months until the job was complete, and he was assigned to another location.

7.      My son-in-law was the first person to notice a weird marking on my husband's face. After asking some questions, my son-in-law suggested that Aleksandr see a dermatologist. We followed his advice and scheduled an appointment. The dermatologist discovered another concerning spot on Aleksandr's chest. Both were biopsied, which revealed that Aleksandr had two advanced melanomas. We were told to consult a surgeon to see if the two melanomas needed to be removed. We saw a surgeon who determined that the melanomas would need to be removed to stop them from spreading. After the surgery, Aleksandr was informed that he would need to be monitored every three months to ensure that the melanoma did not spread. Three months later, at the monitoring visit, another melanoma was found inside Aleksandr's ear canal that needed to be removed.

8.      I took my husband to every hospital in New York to ensure that he got the best treatment possible. I never left my husband alone. I would take days off from work to attend every hospital visit, doctor's appointment, and treatment session. Most of my husband's treatments and visits were covered under insurance, but there were times we would have to pay out of pocket.

9.      My husband's illness took away our joy. It took away our normal lives. I often worried for my husband, both physically and mentally. I was afraid that he would harm himself.

He would often wake up in the middle of the night, constantly worrying about his family. I tried to comfort him, but he knew it was bad. He was afraid of dying. It is bad when you're sick. It is even worse when someone close to you is ill, and you're helpless to do anything other than pray. It was horrible to see my healthy and fit husband become so limited. It is terrible how quickly cancer spreads. Soon, Aleksandr became weak and couldn't do anything for himself. I had to assist him with even basic things.  It was stressful, but I never gave up faith that he would get better. My husband's illness affected me and my daughter and granddaughter as well. It's difficult to explain to your young grandchildren why they do not have a grandfather like other kids do.

10.     Our lives changed. My life changed. My daughter's life changed. We couldn't live normally after Aleksandr's illness and death. Life stopped, and I was clueless about what to do. My husband took care of everything for us. He was very handy and would fix everything around the house. He would do the food shopping and take care of our finances. Once he died, it all fell on me. I was stressed because I had never had to do these things before. For the first year after his death, I could not sleep. I hadn't slept alone in 38 years. It felt strange. It was just as hard on my daughter. She was a daddy's little girl. He spent so much time with her, and they were very close. He would go to our daughter's house before work to help her take care of our grandchildren. It's a tragedy. Aleksandr was a good person. I wasn't the only one affected – our family and friends were too. Anytime anyone needed something, he was the first one running to help. They say time is healing, but that's not true. Time just teaches you how to live with the pain.

KLAVDIYA DROBCHINSKAYA

Sworn to before me this
30 day of June, 2022

Notary Public

Dominga A. Acosta
Notary Public, State of New York
NO. 01AC6183450
Qualified in Kings County
Commission Expires March 17, 2024

3

# Nelly Yakutelov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                              03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------X    **AFFIDAVIT OF**
MICHELLE YVETTE AMIN, et al.,                     **NELLY YAKUTELOV**


                                    Plaintiffs,       20-CV-00412 (GBD)(SN)


                       v.


ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
-------------------------------------------------------------X
STATE OF NEW YORK          )
                          : SS.:
COUNTY OF KINGS            )

NELLY YAKUTELOV, being duly sworn, deposes and says:

1.       I am a plaintiff in the within action, am over 18 years of age, and reside at 2736
Ocean Avenue, Apartment 5A, Brooklyn, New York 11229.

2.       I am currently 43 years old, having been born on August 25, 1978.

3.       I am the daughter of Aleksandr Drobchinskiy, upon whose death my claim is
based, and submit this Affidavit in connection with the pending motion for a default judgment
and in support of my solatium claim.

4.       My father passed away from melanoma on October 3, 2013, at the age of 59. It
was medically determined that this illness was causally connected to his exposure to the toxins
resulting from the September 11, 2001, terrorist attacks.

5.       My father and I were very close. He was the best father ever. My father was
always helping me with my children and grew close with them. We enjoyed taking my children
on bike rides and going to the park. As his illness progressed, he could no longer do these things
with my children and me.

6.     On 9/11, my father was in the city working for the MTA out of their base of operations on Chambers Street. He was assigned there to fix a communications issue in the area. After the attacks took place, he walked all the way home from downtown Manhattan to our home in Brooklyn. When he arrived home, he was covered in ash and soot. My mother wanted to wash his clothes, but my father insisted it was better to throw them out. He didn't tell me much about his experience that day but shared how sad it was and how hard it was to breathe. He returned to work on Chambers Street a week later after the air was declared safe to breathe. He continued to work downtown for a few months until the job was complete, and he was reassigned to a new location.

7.     My husband was the first one to notice a strange mole on my father's face. He encouraged my father to have it looked at. The dermatologist examined the mole and decided to have it biopsied. The biopsy revealed my father had multiple melanomas and would require surgery to have them removed. Although my mother was my father's primary caretaker, I provided my father with emotional support and was there for his surgery. My father went through terrible changes due to his cancer. He was afraid to leave the house for fear that other melanomas would be had. It was sad to see him like that.

8.     Losing my father was personally devastating. He was a huge part of my life and our family. My husband thought of my father as his own. It is scary knowing you can lose someone the way we lost my father. It has been almost nine years since he died, and I remember him every day. I cry from his loss every day. He was a huge figure in my children's lives. They miss him too. He was the best father and grandfather and a good man.

_____
NELLY YAKUTELOV

Sworn to before me this
29th day of June, 2022

_____
Notary Public

OLEG RYBAK
NOTARY PUBLIC State of New York
No. 02RY6207123
Qualified in Kings County
Commission Expires June 8, 2025

2

# Christopher George Eysser

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                         03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------X       **AFFIDAVIT OF**
                                                                      **CHRISTOPHER EYSSER**

MICHELLE YVETTE AMIN, et al


                                     Plaintiffs,         20-CV-00412 (GBD)(SN)
                      v.

ISLAMIC REPUBLIC OF IRAN,

                                     Defendant.
-------------------------------------------------------------X
STATE OF NEW YORK        )
                        : SS.:
COUNTY OF NASSAU        )

CHRISTOPHER EYSSER, being duly sworn, deposes and says:

1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 97 Candy
Lane, Syosset, NY 11791.

2.      My current age is 49, having been born on May 2, 1972.

3.      I am the son of George Eysser, upon whose death my claim is based, and submit
this Affidavit in connection with the pending motion for a default judgment and in support of
my solatium claim.

4.      My father passed away from lung cancer on June 13, 2015. It was determined by
the World Trade Center Health Program that this illness was causally connected to the toxins
resulting from the September 11, 2001 terrorist attacks.

5.      I spoke with my father every day. He was like my best friend. We of course had
the common bond of the fire department. We always talked about the FDNY. He was retired,
and I am an active duty firefighter. We talked about work and everything in life. I would see
him very often. We lived in the same town, and I would see him nearly every day.

now, even though its years later.

10.     My father was a great man. He was a good family man who took care of us and raised us well. We miss him a lot. The people who caused this should be held accountable. This was a devastating attack on our country with lasting effects on families. Those responsible for this horrific event should be held accountable.

CHRISTOPHER EYSSER

Sworn to before me this
23 day of April, 2022

Notary Public

KELLY N. EARLEY
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01EA6384339
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES 12/10/2022

3

# Terese Irons Haberland

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In Re:

TERRORIST ATTACKS ON                              03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------X          **AFFIDAVIT OF**
MICHELLE YVETTE AMIN, et al.,                     **TERESE IRONS HABERLAND**

                                    Plaintiffs,         20-CV-00412 (GBD)(SN)

                    v.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
-------------------------------------------------------------X
STATE OF ~~SOUTH DAKOTA~~        )
              New York            : SS.:
COUNTY OF ~~PENNINGTON~~         )
              Nassau

        TERESE IRONS HABERLAND, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 13254
Tomaha Ridge Road, Rapid City, South Dakota 55702.

        2.      I am currently 62 years old, having been born on December 18, 1959.

        3.      I am the wife of Wayne Kenneth Haberland, upon whose death my claim is based,
and submit this Affidavit in connection with the pending motion for a default judgment and in
support of my solatium claim.

        4.      My husband passed away from interstitial lung disease and leukemia on February
8, 2005, at the age of 49. It was determined that these illnesses were causally connected to his
exposure to the toxins resulting from the September 11, 2001 terrorist attacks.

        5.      Wayne was the most important person who has ever been, or will ever be, in my
life. We were married in 1997 but were together since 1991. He was the only man I dated after my
marriage to my college sweetheart ended. I never thought that I would find love again, but I found
true love with Wayne. He was the love of my life. He was strong, loving, and athletic. Wayne was
a brilliant and a hard worker. He led by example and never took the easy, expedient path. He lifted

others up and made them better, including me. He made me feel safe. Both of my parents were violent alcoholics, and I had a terrible childhood. After being granted an Order of Protection by Family Court, I became an emancipated minor. I thought I'd never be safe in my life. Wayne helped me understand that the pain I went through made me stronger. With Wayne, I was able to change how I viewed the world.

6.       On September 11, 2001, Wayne called me when he got to work, as he normally did. He worked for Syscore Solutions on Maiden Lane in lower Manhattan, less than two blocks from the WTC. As I was speaking with him on the phone, I heard what sounded like a huge explosion in the background. Wayne thought it might have been a Con Ed accident. I asked him to please stay on the phone because I had a feeling that something terrible had happened. Wayne said, "Don't worry, I'll call you right back," and he hung up the phone. I then turned on the TV, and knew the bad feeling I felt was real. Wayne came home that night. He returned to work the following week, on September 17th, as soon as Con Ed returned power to the Wall Street area. I begged Wayne not to go back to the office because I knew the air couldn't possibly be safe, despite what the public was being told. But he insisted. He worked there full-time through November 2001, commuting to the office every work day.

7.       In the early winter of 2001-2002, Wayne developed a cough that he couldn't shake. He also started to lose weight. By the spring of 2002, he had lost 45 pounds. It was scary. The cough became worse and worse, and he developed bronchitis and persistent sinusitis. Wayne never had any lung issues previous to this. He was a non-smoker and was very athletic, as he had over 20 years of training in Aikido Dojo (martial arts). In December 2002, Wayne went to see a Long Island pulmonologist, who diagnosed him with pneumonia. He was prescribed albuterol inhalers, Advair, steroids, and antibiotics. In Spring 2003, after endless sinus infections that resisted treatment, he was sent to see an ENT at New York Presbyterian Hospital (NYP). Wayne underwent a sinusotomy in June 2003 at NYP, and he almost died at home while recovering from the surgery. He went into heart failure, and his blood oxygen level dropped drastically. He was admitted to the Cardiac Care Unit at St. Joseph's Hospital from the emergency room.  After being discharged from the hospital, Wayne kept getting sick. By the winter of 2004, he had pneumonia again. In Spring 2004, Wayne's pulmonologist at NYP had him come into the hospital for an outpatient bronchoscopy and biopsy because Wayne had developed a mass, and a section of his lung had

2

died. He was emergently admitted to NYP because his heart was discovered to be full of fluid due to the infections in his lungs (severe pericardial effusion). After draining the fluid from his heart and stabilizing him for surgery, he was sent for cardio-thoracic surgery. The surgeon operated to remove the lung mass and open the pericardium and found that Wayne had atypical lymph nodes. These lymph nodes were discovered to be cancerous, and Wayne was diagnosed with Chronic Lymphocytic Leukemia (CLL) in July 2004. Wayne was discharged with a P.I.C.C. line for IV antibiotics. Wayne survived only one round of chemo before collapsing at home on February 4, 2005. His pericardial window had closed, and he suffered full cardiac arrest, collapsing on the bathroom floor of our home. He died at Saint Joseph's Hospital.

8.      Wayne's illness was devastating to me. He aged physically from a healthy, young man in his forties to an almost skeletal old man. He couldn't even get from the driveway into the house. Wayne lived a very clean life. No smoking. No drugs. He didn't even take prescription medications. I was so shocked and confused how these horrible illnesses could have happened to him. I was Wayne's primary caretaker from the time he got sick to the day he died. I drove Wayne to every doctor's appointment and stayed with him during every hospital stay. I even gave him CPR in our home when he went into cardiac arrest, until first responders arrived.

9.      My life became much more difficult in every way after Wayne's passing. Wayne was the breadwinner in our household, and he maintained our house. He did repairs around the house, maintained our cars, did lawn work, fixed the pool, and even did the plumbing and electric by himself. After his passing, I had to hire people to do all those things or figure out how to do them myself. I lost my best friend and the one person who understood me. Living alone as a widow was very different than living with Wayne, as I no longer had the sense of security that he gave me. Losing Wayne nearly killed me. I attempted suicide in August 2006. I had poisoned myself and then swam out into the Long Island Sound from the empty beach where I scattered Wayne's ashes in February, to join him. I was saved by a Suffolk County Police Officer, who swam out to rescue me when he saw me. I had no will to live without Wayne, and I could not bear the guilt of not being able to save him when he suffered from cardiac arrest in our home. After I recovered at Stony Brook University Hospital (a week in the ICU and then into ICU step down), I got the help that I needed in-patient for a month to get the

strength not to choose such a terrible course of action again. I am a very different person than I had been before February 2005. Many of the best parts of me died with Wayne.

10.    The people responsible for the September 11th attacks should be held accountable. I am participating in this lawsuit because I want to memorialize Wayne's name, and his death from 9/11, in history. He was a truly special person, and he was well-respected by friends and colleagues. He befriended everyone – from the guys who collected the trash in our neighborhood, to his Aikido Dojo friends, and up to the CEOs he worked with during his career. No amount of compensation or recognition can replace him. There will never be anyone like him. He shouldn't have to die in vain. His suffering should never be forgotten after all of us who knew and loved him are gone.

TERESE IRONS HABERLAND

Sworn to before me this
1st day of ~~May~~, 2022
June

Notary Public

ALLEN J. ROSNER
Notary Public, State of New York
No. 02RO6399204
Qualified in Nassau County
Commission Expires 10/15/2023

1