UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**

---------------------------------------------------------------X

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____ │
│ DATE FILED: __8/26/2022___  │
└─────────────────────────────┘
```

**03-MD-01570 (GBD)(SN)**

**REPORT &
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge:**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

      Smith v. The Islamic Emirate of Afghanistan, et al., No. 01-cv-10132
      Havlish, et al. v. Bin Laden, et al., No. 03-cv-9848
      Fed. Ins. Co. et. al. v. Al Qaida, et al., No. 03-cv-6978
      John Does 1 Through 7 v. The Taliban et al., No. 20-mc-740

In November 2001, an Afghan-American coalition drove the Taliban from the Afghan capital of Kabul. Almost two decades later, the Taliban returned, retook Kabul, and destroyed the Islamic Republic of Afghanistan (the "Republic") that this coalition had established. Afghanistan now lies in disarray. It has no internationally recognized government, its people face a humanitarian crisis of catastrophic proportions, and while the Taliban is not the recognized government, it has *de facto* control over the country.

This has made Afghanistan's assets a target for the Taliban's victims. While the Republic is gone, Afghanistan's central bank, Da Afghanistan Bank ("DAB"), remains. It holds several billion dollars (the "DAB Funds") in assets in the Federal Reserve Bank of New York (the "FRBNY").

Four groups of judgment creditors (the "Judgment Creditors") seek to satisfy their judgments against the Taliban with these funds: Smith v. The Islamic Emirate of Afghanistan, et

al., No. 01-cv-10132 (the "Smith Creditors"), Havlish, et al. v. Bin Laden, et al., No. 03-cv-9848

(the "Havlish Creditors"), Fed. Ins. Co. et. al. v. Al Qaida, et al., No. 03-cv-6978 (the "Federal

Insurance Creditors"), and John Does 1 Through 7 v. The Taliban et al., No. 20-mc-740 (the

"Doe" and the "Doe Creditors"). These creditors hold judgments against the Taliban for its role

in the September 11 Terrorist Attacks or other terrorist acts. They move under § 201(a) of the

Terrorism Risk Insurance Act of 2002 ("TRIA") for a turnover of the DAB Funds to satisfy these

judgments.

The Court recommends denying these motions for three reasons. First, DAB is immune

to this Court's jurisdiction. It is the central bank of a foreign state. This means it is entitled to

immunity from jurisdiction and its property is entitled to immunity from execution. TRIA may

overcome DAB's execution immunity, but not its jurisdictional immunity. Second, even if there

was jurisdiction, the Court is constitutionally restrained from making the finding that TRIA

requires to authorize the turnover. Only the President may recognize the government of a foreign

sovereign nation. Courts may not do so directly or by implication. Authorizing the parties to

satisfy the Taliban's judgments with Afghanistan's central bank funds unavoidably

acknowledges the Taliban as the Afghan government. Third, even if that were not the case, TRIA

§ 201(a) requires an agency relationship in order to execute on an entity's assets. This

relationship requires a manifestation of consent that is not present where the Taliban has seized

DAB by force.

## BACKGROUND

The Court assumes familiarity with the broader procedural and factual background of this

litigation. It discusses only those elements relevant to the Judgment Creditors' turnover motions.

# I.   Factual Background

## A.  The Fall of the Republic

These motions have their origins in the fall of the Republic. A full accounting of this tragedy is beyond the scope of this Report and Recommendation. The Court recounts only the broad outlines.

After the devastation of the September 11 Terrorist Attacks, the United States invaded Afghanistan to force the Taliban from power. The United States never recognized the Taliban as the *de jure* government of Afghanistan but it had ruled the country since capturing Kabul in September 1996. In October 2001, a coalition of U.S. and Afghan forces attacked the Taliban, evicting it from Kabul in November 2001. Clayton Thomas, Cong. Rsch. Serv., Taliban Government in Afghanistan: Background and Issues for Congress 7–8 (2021) (the "Taliban Report").[1] The Republic was then established.

By 2020, the Taliban was ascendant again. In February 2020, the United States and the Taliban agreed that the U.S. would withdraw all its troops by April 2021. As American forces withdrew, the Republic's position deteriorated. The crisis reached a head in August 2021. Taliban forces made a series of rapid advances throughout Afghanistan ending in the second capture of Kabul on August 15, 2021. While Afghan leaders attempted to establish a resistance in the Panjshir province, that area fell by September 2021. Taliban Report at 11–15. The fall of Panjshir left the Taliban in even more complete control of Afghanistan than it was in 1990s. Id.

---

[1] This document was appended as an exhibit in Smith, No. 01-cv-10132, ECF No. 63-3. It has also been cited by the other Judgment Creditors, ECF Nos. 7764 at 14 n.29 (Havlish Creditors); 7769 at 13 n.31 (Doe Creditors); 7937 at 14 n.25 (Federal Insurance Creditors).

at 18. As before, the United States has not recognized the Taliban as the *de jure* government of Afghanistan. ECF No. 7661 at 34.[2]

The fall of the Republic has been an unmitigated disaster for the Afghan people. Food, water, and shelter are all in critically short supply. ECF No. 7896 at 17. By the end of 2022, as many as 97 percent of Afghans could be living in poverty. More than a million children are at risk of dying of starvation. ECF No. 7932 at 10–11. The society-wide deprivation is so severe that some families are selling their children or organs to escape starvation. ECF Nos. 7896 at 17, 7932 at 11. The Taliban has also begun a brutal crackdown on women, religious and ethnic minorities, former Republic officials, and many civil society organizations. ECF No. 7896 at 18. More Afghans may eventually die from these society-wide convulsions than perished in the last two decades of war. ECF Nos. 7896 at 17, 7932 at 11.

### B. Da Afghanistan Bank

The Republic's collapse made DAB's assets a target. DAB has been the central bank of Afghanistan since its founding in 1939. ECF No. 7766 at ¶ 16. When the Republic fell, DAB held approximately $7 billion in assets at the FRBNY. ECF No. 7764 at 11. Most of this appears to have come from international donors or the savings of Afghan citizens. ECF No. 7932 at 27 n.18. The U.S. Treasury Department blocked these assets the same day that the Taliban entered Kabul. Taliban Report at 45. Amici report that the decision to freeze Afghan assets has further exacerbated the country's humanitarian crisis because "banks were unable to lend money and citizens unable to withdraw their own funds." ECF No. 7896 at 17.

Six months later President Biden addressed the use of these assets with Executive Order 14064. Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 15, 2022) ("E.O. 14,064"). This order

---

[2] Unless otherwise noted, all ECF citation are to In re Terrorist Attacks, 03-md-1570.

determined that "the widespread humanitarian crisis in Afghanistan — including the urgent

needs of the people of Afghanistan for food security, livelihoods support, water, sanitation,

health, hygiene, shelter and settlement assistance, and COVID-19-related assistance, among

other basic human needs" was an "unusual and extraordinary threat to the national security and

foreign policy of the United States." Id. It further stated that "the preservation of certain property

of Da Afghanistan Bank (DAB) held in the United States by United States financial institutions

is of the utmost importance to addressing this national emergency and the welfare of the people

of Afghanistan." Id.

Accordingly, E.O. 14,064 provided that "[a]ll property and interests in property of DAB

that are held, as of the date of this order, in the United States by any United States financial

institution, including the Federal Reserve Bank of New York, are blocked . . . ." Id. at § 1(a).

This order was implemented when the U.S. Treasury's Office of Foreign Assets Control

("OFAC") issued License No. DABRESERVES-EO-2022-886895-1. See ECF No. 7661-2 (the

"OFAC License"). With this license, the United States sought to transfer $3.5 billion, or

approximately half of DAB's assets, "for the benefit of the people of Afghanistan, including to

an international financing mechanism (in which the United States is a member) holding and

disbursing funds for the benefit of the people of Afghanistan, or to a United Nations fund,

programme, specialized agency, or other entity or body for the benefit of the people of

Afghanistan." Id. at § 1(b). The remaining $3.5 billion was retained in the FRBNY.

The United States reported that this license could not take effect without the Court

modifying the writs of execution obtained by the Judgment Creditors or otherwise confirming

that the writs did not restrain the $3.5 billion the license sought to transfer. ECF No. 7661 at 10–

11. The Court granted this request with the parties' consent on February 25, 2022. ECF Nos. 7700, 7701. The FRBNY hold the remaining DAB Funds.

## II.   Procedural Background

After the fall of the Republic, the Judgment Creditors filed their turnover motions. Four amici and the United States also filed briefs. No Judgment Creditor has a judgment against the nation of Afghanistan or DAB. No representative for Afghanistan, DAB, or the Taliban has appeared in this case. The FRBNY has submitted only a single non-substantive letter. ECF No. 8040.

### A.   The Havlish Motion

The Havlish Creditors are family members and estates of Americans killed in the September 11 Attacks. They secured a default liability judgment against the Taliban for its role in this attack on December 22, 2011. ECF No. 2516. They were awarded compensatory damages, punitive damages, and prejudgment interest on their non-economic compensatory damages. ECF No. 2618, adopted at ECF No. 2623. Their total outstanding compensatory damages are $2,086,386,669. ECF No. 7765 at 3–4.

On August 27, 2021, shortly after the fall of the Republic, the Havlish Creditors obtained a writ of execution (the "Havlish Writ") targeting the DAB Funds held at FRBNY. In re Terrorist Attacks, No. 03-md-1570, Minute Entry, August 27, 2021. Marshals attached the DAB Funds by serving the writ on the FRBNY on September 14, 2021. ECF No. 7765-3 (service of process receipt).

The enforcement of this writ was stayed on September 16, 2021, at the request of the United States, which was deciding whether to file a Statement of Interest. Havlish, No. 03-cv-9848, ECF No. 526. The Court granted that request and three extensions. ECF Nos. 7120, 7269,

6

7402, 7631. It also extended the duration of the <u>Havlish</u> Writ beyond the 90-day period normally afforded for execution to accommodate these extensions. ECF No. 7447. The United States filed its Statement of Interest in <u>Havlish</u> and other related cases on February 11, 2022. ECF No. 7661.

The stay of enforcement was then lifted. ECF No. 7717. The <u>Havlish</u> Creditors promptly filed their motion for the turnover of the DAB assets pursuant to Rule 69(a), N.Y. CPLR §§ 5225(b) and 5227, and TRIA § 201. ECF No. 7763.

### B. The <u>Federal Insurance</u> Motion

The <u>Federal Insurance</u> Creditors are insurance companies who made payments because of the September 11 Attacks. They obtained a default judgment of liability against the Taliban, Al Qaeda, and Hezbollah in April 2006. ECF No. 1755. The Court awarded them $9,351,247,965.99 as to Al Qaeda. ECF No. 2502. Just less than a decade later, the <u>Federal Insurance</u> Creditors requested that this award be extended against the Taliban. ECF No. 7790. The Court granted this partial default judgment and extended this award against the Taliban. ECF No. 7833. It also waived the automatic 60-day stay of execution provided for by Rule 62(a). <u>Id.</u> at 3.

The <u>Federal Insurance</u> Creditors obtained their writ of execution on April 20, 2022. <u>Fed. Ins. Co. et al.</u>, No. 03-cv-6978, Minute Entry, April 20, 2022. The DAB Funds at the FRBNY were attached a day later. ECF No. 7938-2 at 1. The <u>Federal Insurance</u> Creditors promptly moved for a turnover order.

### C. The <u>Smith</u> Motion[3]

The <u>Smith</u> Creditors also brought suit against the Taliban for losses suffered on September 11. <u>Smith</u>, No. 01-cv-10132, ECF No. 63 at 5. Judge Harold Baer found in their favor on May 7, 2003, awarding economic damages, solatium damages, and compensation for their decedents' pain and suffering. <u>Id.</u> at ECF No. 25.[4] A final judgment was entered two months later. <u>Id.</u> at ECF No. 28. Almost nineteen years later, the <u>Smith</u> Creditors served their writ of execution on the FRBNY, also seeking to satisfy their judgments with the DAB Funds. <u>Id.</u> at ECF No. 41. They moved for a turnover order on May 18, 2022. <u>Id.</u> at ECF Nos. 62, 63 at 6–7.

### D. The <u>Doe</u> Motion

The <u>Doe</u> Creditors' injuries arose from a 2016 attack by the Taliban and other terror groups. Their operatives crashed a truck laden with explosives into the gates of a contractor compound located in Afghanistan.[5] The <u>Doe</u> Creditors obtained a default judgment against the Taliban, Al Qaeda, and the Haqqani Network in the Northern District of Texas on November 5, 2020. <u>Doe</u>, 20-mc-740, ECF No. 1 at 2–4. They were awarded compensatory damages and post-judgment interest. ECF No. 7770 at ¶ 2. The <u>Doe</u> Creditors collected some of this award from an Al Qaeda instrumentality. ECF No. 7769 at 10. As of March 21, 2022, however, most of their judgment remains unsatisfied. ECF No. 7770 at ¶ 4. They registered that judgment in this District about a month after obtaining the award. <u>Doe</u>, 20-mc-740, ECF No. 1.

---

[3] <u>Smith</u> was not initially a part of this case but was accepted as a related case on June 6, 2022. <u>Smith</u>, No. 01-cv-10132, Minute Entry, June 6, 2022.

[4] A copy of this opinion is not on ECF but is available under the following citation: <u>Smith ex rel. Smith v. Islamic Emirate of Afghanistan</u>, 262 F. Supp. 2d 217 (S.D.N.Y. 2003), <u>amended sub nom.</u> <u>Smith ex rel. Est. of Smith v. Islamic Emirate of Afghanistan</u>, No. 01-cv-10132 (HB), 2003 WL 23324214 (S.D.N.Y. May 19, 2003).

[5] A copy of this complaint is available at <u>Doe</u>, 20-mc-740, ECF No. 8-2.

The <u>Doe</u> Creditors sought an emergency writ of execution on August 26, 2021. <u>Id.</u> at ECF No. 15. As in <u>Havlish</u>, the United States requested that a ruling on this motion be delayed as it decided whether to file a Statement of Interest. <u>Id.</u> at ECF No. 18. While this decision was pending, the <u>Doe</u> Creditors secured a writ of execution targeting the DAB Funds. The Court stayed enforcement of this writ pending the United States' Statement of Interest decision. <u>Id.</u> at ECF No. 26. The writ was served on FRBNY in the meanwhile. <u>Id.</u> at ECF No. 67. As with the <u>Havlish</u> Writ, the Court directed that this writ not expire absent further action. <u>Id.</u> at ECF No. 41. <u>Doe</u> was then transferred to this multidistrict litigation given the common issues presented by the DAB Funds. <u>Id.</u> at ECF No. 54.

The stays of the <u>Doe</u> and <u>Havlish</u> writs were lifted at the same time. ECF No. 7717. The <u>Doe</u> Creditors moved for turnover of the assets on the same day as the <u>Havlish</u> Creditors. ECF No. 7767.

### E. United States' Statement of Interest

The Statement of Interest asserted that "[t]he United States has significant interests in the disposition of these [turnover] proceedings." ECF No. 7661 at 10. Some of these interests related to the speedy resolution of the issues associated with the OFAC License. Beyond this, the United States asserted "a strong interest in the President's constitutional authority to make decisions with respect to the recognition of foreign governments and . . . in ensuring the proper construction of TRIA and the Foreign Sovereign Immunities Act." <u>Id.</u> at 11. At the same time, the United States recognized "a compelling interest in permitting victims of terrorism to obtain compensation to the greatest degree permitted under the law." <u>Id.</u> at 27.

While it acknowledged these interests, the United States took no position on whether the Judgement Creditors had satisfied TRIA's requirements. <u>Id.</u> at 27–28. Instead, it raised a series

of considerations for the Court's attention. It noted that "determinations of ownership for purposes of TRIA implicate significant issues of foreign policy that sound in federal law, both as pertains to the governance of the international banking system and the prerogative of the President to recognize and to conduct diplomacy with foreign states . . . ." Id. at 28. In particular, it noted that exceptions to immunity that a foreign sovereign's property enjoys must be construed narrowly and "be measured against a benchmark that accounts for the risk of reciprocal challenges to American property abroad." Id. at 35. It also stated that, to prevail, the Judgement Creditors "must establish a theory of ownership by the Taliban that would not require this Court—either expressly or by implication—to make its own determination as to the identity of Afghanistan's government" because such a determination would infringe on the President's constitutional prerogatives to conduct foreign relations. Id.

The Statement of Interest also put forward several factual positions. The United States stated that it had not recognized the Taliban or any other entity as the government of the state of Afghanistan. Id. at 34. It also confirmed that DAB is the central bank of Afghanistan. Id. at 16.

## F. Amicus Briefs

The Court accepted four amicus briefs on these turnover motions. The first is a letter submitted by the Women's Forum on Afghanistan signed by several women who held prominent civil positions in the Republic before its fall. ECF No. 7823. The second is from the Center for Constitutional Rights on behalf of four Afghan civil organizations: Global Advocates for Afghanistan, The Afghan Network for Advocacy and Resources, Afghans for A Better Tomorrow, and the Afghan-American Community Organization. ECF No. 7896-1. The third brief is submitted by Unfreeze Afghanistan, a woman-led non-governmental organization advocating for the release of the DAB Funds. Havlish, No. 03-cv-9848, ECF No. 617. The final

brief is from the Open Society Justice Initiative, submitted on behalf of Naseer A. Faiq, the *Chargé de Affaires* of the Permanent Mission of the Islamic Republic of Afghanistan. ECF No. 7932-1. These briefs describe the devastating effects that the Taliban's takeover has had on Afghan civil society and on the Afghan people. They also raised several legal arguments against the Judgment Creditors' turnover motions.

The Court accepted each of these briefs after finding that they provided unique information that would not create or enlarge the issues presented by the turnover motions. ECF Nos. 7823 at 1–2, 7925 at 2–3. It rejected two amicus briefs from groups that included members already represented in this case. ECF Nos. 7925, 7941.

## DISCUSSION

The Judgment Creditors' motions must be denied for three reasons. First, the Court lacks subject matter jurisdiction over DAB under the Foreign Sovereign Immunities Act ("FSIA"). Second, even if the Court has jurisdiction, it may not constitutionally render the findings required by TRIA. For the Judgment Creditors to prevail, the Court must be able to find that DAB is a Taliban agency or instrumentality. Finding that the Taliban controls DAB or can use it to advance its goals implies that the Taliban is Afghanistan's government. The Constitution vests the authority to recognize governments in the President alone. Third, TRIA requires an agency relationship based on consent to find that an entity is the agency or instrumentality of a terrorist group. That relationship is plainly not present where the Taliban has seized DAB by force.

This determination is not affected by Levinson v. Kuwait Fin. House (Malaysia) Berhad, which was decided while this turnover motion was pending. No. 21-2043, 2022 WL 3269083 (2d Cir. July 21, 2022). Under Levinson, "[t]o be entitled to attachment or execution under TRIA, a plaintiff must first establish defendant's status as an agency or instrumentality." Id. at *4. No

determination was made as to DAB's agency or instrumentality status before these writs of execution were issued.

A creditor, however, need not obtain a writ of execution before seeking a turnover under N.Y. CPLR §§ 5225(b) and 5227. <u>Garland D. Cox & Assocs., Inc. v. Koffman</u>, 400 N.E.2d 302 (N.Y. 1979) ("There is no requirement that a judgment creditor obtain priority by way of execution before he resorts to one of the other enforcement devices provided by CPLR article 52 . . . "); <u>see also</u> <u>CSX Transportation, Inc. v. Island Rail Terminal, Inc.</u>, 879 F.3d 462, 472–73 (2d Cir. 2018) ("<u>CSX I</u>") ("[A] judgment creditor must take additional steps—such as securing a turnover order or an execution levy—to prevent intervening parties from attaining higher priority.") Thus, regardless of the validity of the parties' writs of execution, they are entitled to make the motions for turnover under N.Y. CPLR §§ 5225(b) and 5227 that are the predicate for this Report and Recommendation.[6]

## I.   The Court Lacks Subject Matter Jurisdiction Over the Turnover Motions Under the FSIA

The Court lacks subject matter jurisdiction over DAB and by extension over these turnover motions. This analysis begins with the critical and uncontroverted fact that DAB is the central bank of Afghanistan. As an instrumentality of a foreign state, it enjoys immunity from jurisdiction under the FSIA. The Judgment Creditors propose to overcome this immunity through TRIA § 201. This statute defeats the immunity from execution that the property of sovereign

---

[6] Rule 69(a) provides that "[a] money judgment is enforced by a writ of execution . . . ." Thus, if the Judgment Creditors were to prevail, there is a question of whether given the effect of <u>Levinson</u> on their writs, they would be required to seek new writs of execution to permit the enforcement of their judgments. As the Court recommends that they do not prevail on these turnover motions, it need not reach this question. Here, the only question is if the absence of a writ of execution bars the Court from hearing the Judgment Creditors' turnover motions. The answer is no. Rule 69(a) provides that procedures in aid of judgment or execution must accord with state law. New York state law does not require a writ of execution as a prerequisite to a turnover motion.

states and their instrumentalities normally enjoy. Sovereign states and instrumentalities, however, possess immunity from both jurisdiction and execution on their property. Both immunities must be independently overcome. In limited circumstances, TRIA can overcome jurisdictional immunity. Those circumstances are not present here. DAB therefore retains its jurisdictional immunity.

## A.  The FSIA and the Sovereign's Two Immunities

Under the FSIA, a foreign sovereign state and its agencies and instrumentalities possess two immunities: immunity from jurisdiction and immunity from the execution on property. Recognizing the "Supreme Court's emphatic and oft-repeated declaration in Amerada Hess . . . the FSIA is the 'sole basis for obtaining jurisdiction over a foreign state in our courts . . . .'" Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 113 (2d Cir. 2017) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)).[7] Thus, the FSIA "must be applied by the District Courts in every action against a foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity . . . ." Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 (1983). Because the FSIA implicates the Court's subject matter

---

[7] A narrow exception to this rule exists for *in rem* actions. "The FSIA does not create jurisdiction over, and does not immunize a foreign state's property from, in rem civil-forfeiture actions." United States v. Assa Co., 934 F.3d 185, 190 (2d Cir. 2019). In drafting the FSIA, however, "Congress sought to clamp down on *quasi in rem* suits because they 'caused significant irritation to many foreign governments' and could potentially 'give rise to serious friction in United States' foreign relations.'" Assa Co., 934 F.3d at 190 (quoting H.R. Rep. No. 94–1487, at 27 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6626). Absent this *in rem* exception, the Court heeds the general requirement that all actions against foreign sovereigns and their instrumentalities must satisfy the FSIA's requirements.

jurisdiction, a court must consider its applicability even *sua sponte* if necessary. See, e.g., Walters v. Indus. & Com. Bank of China, Ltd., 651 F.3d 280, 287 (2d Cir. 2011).[8]

The FSIA does not define a "foreign state" but provides that it "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). "An 'agency or instrumentality of a foreign state' means any entity --

(1)   which is a separate legal person, corporate or otherwise, and
(2)   which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
(3)   which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b)(1)–(3).

Foreign states and instrumentalities that meet these criteria have "two types of foreign sovereign immunity [under the FSIA] —immunity from jurisdiction and immunity from attachment and execution of the sovereign's property." Vera v. Banco Bilbao Vizcaya Argentaria, S.A., 946 F.3d 120, 133 (2d Cir. 2019) ("Vera II"). Section § 1604 of the FSIA renders foreign sovereigns and their instrumentalities immune from jurisdiction unless an exception under 28 U.S.C. §§ 1605 to 1607 applies. Section § 1609 of the FSIA renders the property of foreign sovereigns immune from attachment or execution unless there is an exception under 28 U.S.C. §§ 1610 or 1611.

---

[8] Where a sovereign defendant appears and invokes sovereign immunity, that defense is analyzed under a burden-shifting framework. Rukoro v. Fed. Republic of Germany, 976 F.3d 218, 224 (2d Cir. 2020) (describing this framework). This accords with "the FSIA's legislative history suggest[ing] that jurisdictional immunity is 'an affirmative defense which must be specially pleaded' by the foreign sovereign." Walters, 651 F.3d at 287. Nonetheless, as immunity from jurisdiction goes to a court's subject matter jurisdiction, "even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the [FSIA]." Verlinden B.V., 461 U.S. at 494 n.20.

Central banks enjoy heightened protection from execution. Section 1611(b)(1) of the FSIA provides that, notwithstanding the normal exceptions permitting execution on a foreign sovereign's assets, "the property . . . of a foreign central bank or monetary authority held for its own account" is immune to attachment or execution. Sound reasons exist for extending additional protections to assets held by foreign central banks used exclusively for central banking. Congress recognized that "[i]f execution could be levied on such funds without an explicit waiver, deposit of foreign funds in the United States might be discouraged. Moreover, execution against the reserves of foreign states could cause significant foreign relations problems." EM Ltd. v. Republic of Argentina, 473 F.3d 463, 473 (2d Cir. 2007) (quoting H.R.Rep. No. 94–1487 at 31, as reprinted in 1976 U.S.C.C.A.N. 6604, 6630) (internal quotations omitted).

These two immunities, jurisdictional and execution-based, generally "operate independently." Walters, 651 F.3d at 288. "[A] waiver of immunity from suit does not imply a waiver of immunity from attachment of property, and a waiver of immunity from attachment of property does not imply a waiver of immunity from suit." Id. (quoting Restatement (Third) of Foreign Relations Law of the United States, § 456(1)(b) (1987)). Thus, a party seeking to attach the central bank assets of a foreign sovereign must overcome both immunities.

## B. TRIA

TRIA § 201 is an exception provided under the FSIA to a sovereign's immunity to attachment and execution.[9] Hausler v. JP Morgan Chase Bank, N.A., 770 F.3d 207, 211 (2d Cir.

---

[9] The relevant section of TRIA was first passed as part of Pub. L. 107–297, Title II, § 201(a), (b), (d), Nov. 26, 2002, 116 Stat. 2337. It was then amended by Pub. L. 112–158, Title V, § 502(e)(2), Aug. 10, 2012, 126 Stat. 1260. For simplicity, the Court refers to the relevant section of Pub. L. 107–297 as amended by Pub. L. 112–158 as "TRIA" with additional clarification on which section of TRIA the Court references as needed.

2014) ("Congress . . . has created terrorism-related exceptions to immunity under FSIA . . . One such exception is TRIA's authorization of the attachment of the property of terrorist parties and that of their agencies or instrumentalities.") In certain limited circumstances, it also provides subject matter jurisdiction over instrumentalities where there was a valid underlying judgment against the sovereign. TRIA § 201(a) is codified as a note to 28 U.S.C. § 1610, which sets out other exceptions to sovereign property immunity:

> Notwithstanding any other provision of law . . . every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605A or 28 U.S.C. § 1605(a)(7)(repealed)] the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a). This provides a broad waiver of the immunity from execution that foreign sovereigns' property enjoys. This includes even the immunity of central bank assets provided by 28 U.S.C. § 1611. Bank Markazi v. Peterson, 578 U.S. 212, 217 n.2 (2016) (the "FSIA's central-bank immunity provision" does not limit the availability of assets under TRIA).

In certain circumstances, TRIA § 201(a) also provides "subject matter jurisdiction over post-judgment execution and attachment proceedings involving blocked assets." Vera II, 946 F.3d at 133. This was established in Weinstein v. Islamic Republic of Iran, 609 F.3d 43 (2d Cir. 2010). There, plaintiffs obtained a default judgment against the Islamic Republic of Iran. They then initiated execution proceedings against frozen assets held by a separate entity, Bank Melli. It was uncontested that there was a valid underlying judgment against Iran for which its jurisdictional immunity was waived under the FSIA. It was also uncontested that Bank Melli was

16

an instrumentality of Iran. Id. at 48. Nonetheless, Bank Melli claimed that the district court lacked jurisdiction over it because it was not named in the original judgment.

The Court of Appeals rejected this argument. It found that TRIA § 201(a) provided subject matter jurisdiction over an instrumentality not named in that original judgment if there was a valid judgment against the underlying sovereign. Id. at 50. The analysis turned on the need to avoid surplusage in the line: "the blocked assets of that terrorist party *(including the blocked assets of any agency or instrumentality of that terrorist party)* . . . ." TRIA § 201(a) (emphasis added). Weinstein noted that, if a party was required to obtain jurisdiction independently via a judgment against both the foreign sovereign and its agency or instrumentality, the agency and instrumentality language would be rendered superfluous "since the agency or instrumentality would itself have been a "terrorist party" against which the underlying judgment had been obtained." Weinstein, 609 F.3d at 49.

Thus, Weinstein addressed a specific scenario: one in which a court may maintain jurisdiction over an execution against a foreign sovereign instrumentality where the foreign sovereign's jurisdictional immunity was already overcome as part of an underlying judgment. The court specifically noted that original jurisdiction under the FSIA was not an issue in the case before it. Id. at 52 ("The TRIA provides jurisdiction for execution and attachment proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA (which is not challenged here) if certain statutory elements are satisfied.")

Subsequent decisions reaffirmed that TRIA § 201 "provides for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign . . . *only* where 'a valid judgment has been entered' against the sovereign." Vera II, 946 F.3d at 133 (citing Vera v. Republic of Cuba, 867 F.3d 310, 321 (2d Cir. 2017) ("Vera I")) (emphasis

17

added); see also Kirschenbaum v. 650 Fifth Ave. & Related Properties, 830 F.3d 107, 131 (2d

Cir. 2016) ("Kirschenbaum I"), abrogated on other grounds by Rubin v. Islamic Republic of Iran,

138 S. Ct. 816 (2018) ("The TRIA provides jurisdiction for execution and attachment

proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA if

certain statutory elements are satisfied."); Weininger v. Castro, 462 F. Supp. 2d 457, 487

(S.D.N.Y. 2006) ("[I]n the plain language of TRIA and its legislative history there is such a clear

expression to make the instrumentalities substantively liable for the debts of their related foreign

governments . . . .")[10]

In effect, the sovereign's loss of jurisdictional immunity in the underlying judgment

flows through to the instrumentality in the attachment proceeding. Weinstein did not address the

treatment of jurisdictional immunity where the underlying judgment is not against a foreign

sovereign and so original jurisdiction against a sovereign entity under the FSIA was never

obtained.

### C. Judgment Creditors Lack an Original Judgment That May Overcome DAB's Immunity and Grant This Court Subject Matter Jurisdiction

There has been no waiver of jurisdictional immunity against DAB or Afghanistan in any

of the Judgment Creditors' underlying judgments. Without this original waiver of jurisdictional

immunity, TRIA § 201(a) does not provide a freestanding mechanism for waiving a foreign

---

[10] One court in this Circuit initially granted post-judgment execution under TRIA § 201(a) against a state instrumentality on the basis that it was also the instrumentality of a non-state terrorist organization. See Caballero v. Fuerzas Armadas Revolucionarias De Coloumbia, et al., 20-mc-0040 (W.D.N.Y. Sept. 10, 2020), ECF No. 15. That execution, however, was obtained *ex parte*. This instrumentality has since appeared and filed a motion to vacate. Id. at ECF No. 85. The United States has since also appeared and stated  that it intends to file a statement of interest. See id. at ECF No. 118. As the Caballero court did not have the benefit of full adversarial briefing in rendering its initial decision, the Court declines to reference that decision in the resolution of these motions.

sovereign instrumentality's immunity to jurisdiction. Accordingly, the Court lacks jurisdiction over DAB and its assets.

### 1. DAB is a Central Bank Under the FSIA

DAB is the instrumentality of a foreign state, and specifically, a central bank. An entity must have three attributes to be a foreign instrumentality: separate legal personhood, not being a U.S. citizen or third-party legal entity, and being an "organ" of a foreign state. 28 U.S.C. § 1603(b)(1)-(3) While these factors are sometimes sharply disputed, that is not the case here.

Central banks are "the paradigm of a state agency or instrumentality." S & S Mach. Co. v. Masinexportimport, 706 F.2d 411, 414 (2d Cir. 1983), and all parties agree that DAB is the central bank of Afghanistan. While the United States has not yet recognized any entity as the government of Afghanistan, it agrees that DAB is Afghanistan's central bank. ECF No. 7661 at 9, 16, 23. The Havlish Creditor's expert states that "DAB is the central bank of Afghanistan and has been since its formation in 1939." ECF No. 7766 at ¶ 16. The Doe and Federal Insurance Creditors both rely on this expert's declaration in support of their own motions. ECF Nos. 7771-1 (Doe Creditors), 7938 at ¶ 10 (Federal Insurance Creditors). The Smith Creditors have their own expert who also states that "DAB is the central bank of Afghanistan . . . and its main tasks, as described on DAB's website, are those commonly associated with a central bank." Smith, No. 01-cv-10132, ECF No. 64 at ¶ 33.

Because DAB is Afghanistan's central bank, it is immune from the jurisdiction of this Court under 28 U.S.C. § 1604 unless an exception to jurisdictional immunity applies. The Judgment Creditors do not identify one. The Court has not either. They acknowledge that they do not have a judgment against either the state of Afghanistan or DAB for which immunity under the FSIA was waived. All of their turnover motions are based on judgments against the Taliban. See ECF No. 7764 at 9 n.7 (Havlish Creditors), ECF No. 7769 at 9 n.7 (Doe Creditors), ECF No.

7937 at 9 (<u>Federal Insurance</u> Creditors), <u>Smith</u>, No. 01-cv-10132, ECF No. 63 at 5 (<u>Smith</u> Creditors).

In fact, TRIA § 201(a) could not be wielded against Afghanistan or its instrumentalities independently. The statute defines a "terrorist party" whose assets may be targeted as "a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 . . . or section 620A of the Foreign Assistance Act of 1961 . . . ." TRIA § 201(d)(4). Alternatively, it may be employed to collect on judgments for acts for which a terrorist party lacks immunity under 28 U.S.C. § 1605A. Section 1605A similarly requires that a state be designated a state sponsor of terrorism. 28 U.S.C. § 1605A(a)(2)(A)(i)(I), (c). Afghanistan is not and has never been designated a state sponsor of terrorism, ECF Nos. 7661 at 17 n.2, 7764 at 9 n.7, so it could not be a "terrorist party" or a nation liable for acts of terrorism under 28 U.S.C. § 1605A.

### 2. DAB's Assets May Not Be Attached Under TRIA Based on a Judgment Against the Taliban

To overcome DAB's immunities, the Judgment Creditors proffer TRIA's "agency and instrumentality" language as a backdoor exception to jurisdictional immunity that could not be obtained otherwise. Lacking a judgment against either Afghanistan or DAB, the Judgment Creditors propose to take their judgments against the non-sovereign Taliban, have DAB declared a Taliban instrumentality, and obtain a waiver of both DAB's immunities under TRIA § 201(a). The text and history of the FSIA and TRIA foreclose this.

The lynchpin of the Judgment Debtor's case is TRIA's broad language. It applies "[n]otwithstanding any other provision of law . . . ." TRIA § 201(a). The Judgment Creditors argue that this is sufficient to overcome any barrier to execution posed by DAB's immunities to jurisdiction and execution.

A "notwithstanding clause," however, is not a bulldozer that clears every possible legal obstacle between a litigant and their goal. A court may not handwave away requirements of jurisdiction, service, liability, judgment, or execution simply because some law the suit touches includes a "notwithstanding" clause. Rather, when confronted with a "notwithstanding" clause, a court must determine its scope. Laws that fall within that scope yield to the statute with the "notwithstanding" clause.

Kucana v. Holder is instructive. 558 U.S. 233 (2010). There, the Court assessed the operation of 8 U.S.C. § 1252(a)(2)(B), which stripped courts of jurisdiction over certain immigration issues. It provides that "[n]otwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to review" an enumerated array of actions. 8 U.S.C. § 1252(a)(2)(B). As Kucana noted, that "introductory clause . . . does not define the scope of [the enumerated action's] jurisdictional bar. It simply informs that once the scope of the bar is determined, jurisdiction is precluded regardless of what any other provision or source of law might say." 558 U.S. at 238 n.1. Accordingly, to understand what laws are overcome by a statute with a "notwithstanding" clause, a court must first determine that statute's scope.

Courts in this District have already applied this principle to TRIA § 201(a). Smith v. Fed. Rsrv. Bank of New York addressed execution on Iraqi assets held in the FRBNY. 280 F. Supp. 2d 314 (S.D.N.Y.), aff'd, 75 F. App'x 860 (2d Cir. 2003), and aff'd sub nom. Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York, 346 F.3d 264 (2d Cir. 2003). Those assets, however, were confiscated by President Bush under the International Emergency Economic Powers Act ("IEEPA") and delivered to the U.S. Treasury. The defendants argued that this put the funds beyond the reach of TRIA. The plaintiffs retorted that TRIA's "notwithstanding" clause trumped the IEEPA. Id. at 317–18.

Smith rejected such an expansive scope of TRIA's "notwithstanding" clause. The court noted that "[a]lthough the 'notwithstanding' language Congress used in the TRIA was broad, it necessarily has a scope and that scope depends on the substance of the provision to which it is attached." Id. at 319. Where TRIA's terms conflict with the terms of another law, that law yields to TRIA. The IEEPA, however, merely authorized the President to do something that negatively affected the Plaintiffs. It did not conflict with TRIA's execution provisions. Because "TRIA and the relevant provision of the IEEPA coexist with no conflict," TRIA's notwithstanding clause did not permit the Plaintiffs to execute on assets seized by the President under the IEEPA. Id. at 319–20.

The first step then is to identify TRIA's scope. "[C]ourts must be careful when interpreting the scope of the FSIA's exceptions . . . Too restrictive a reading, and foreign sovereigns could avoid accountability even where Congress dictated otherwise. Too expansive, and the exceptions could result in a flood of suits against foreign states, prompting those nations to reciprocate in foreign suits against the United States." Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse, 999 F.3d 808, 819 (2d Cir. 2021) (internal citations omitted); see also Rubin v. Islamic Republic of Iran, 830 F.3d 470, 480 (7th Cir. 2016), aff'd, 138 S. Ct. 816 (2018) ("Seizing a foreign state's property is a serious affront to its sovereignty . . . Correspondingly, judicial seizure of a foreign state's property carries potentially far-reaching implications for American property abroad.")

Courts must be even more cautious about "weakening the immunity from suit or attachment traditionally enjoyed by the instrumentalities of foreign states" because this "could lead foreign central banks, in particular, to withdraw their reserves from the United States and place them in other countries. Any significant withdrawal of these reserves could have an

immediate and adverse impact on the U.S. economy and the global financial system." EM Ltd. v. Banco Cent. De La Republica Argentina, 800 F.3d 78, 98 (2d Cir. 2015) (internal citations and quotations omitted).

"TRIA . . . [is] an execution statute." Weininger, 462 F. Supp. 2d at 480. It is silent on jurisdiction. This is readily apparent when it is compared to 28 U.S.C. §§ 1605 to 1607, the sections that 28 U.S.C. § 1604 expressly identifies as providing exceptions to jurisdictional immunity. ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.") Three of these sections, 28 U.S.C. § 1605, § 1605A, and § 1605B, begin their jurisdictional immunity waiving provisions with virtually the same words. See 28 U.S.C. § 1605(a) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . ."); 28 U.S.C. § 1605(b) ("A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case . . . ."); 28 U.S.C. § 1605(d) ("A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action . . . ."); 28 U.S.C. § 1605A(a)(1) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . ."); 28 U.S.C. § 1605B(b) ("A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case . . . .") The last section, § 1607, which deals exclusively with counterclaims, provides that a "foreign state shall not be accorded immunity with respect to any counterclaim . . . ."

Similarly, each exception to attachment and immunity identified in 28 U.S.C. § 1609 and set out at 28 U.S.C. §§ 1610 and 1611, including TRIA § 201(a), references the waiver or scope of immunity specifically with respect to attachment or execution. See, e.g., 28 U.S.C. § 1610(a) ("The property in the United States of a foreign state . . . used for a commercial activity in the

United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment . . . ."); 28 U.S.C. § 1610(b) ("[A]ny property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State"); 28 U.S.C. § 1610(d) ("The property of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment . . . ."), 28 U.S.C. § 1610(g)(1) ("the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity . . . is subject to attachment in aid of execution, and execution . . . ."); 28 U.S.C. § 1611(b) ("Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if . . . ."). TRIA § 201(a) similarly says that "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) *shall be subject to execution or attachment in aid of execution* . . . ." (emphasis added).

The consistent use of language in the jurisdictional exceptions on the one hand and the execution exceptions on the other reflects that "the FSIA preserves a common law distinction between . . . jurisdictional immunity from actions brought in United States courts and immunity from attachment or execution of the foreign sovereign's property." Weininger, 462 F. Supp. 2d at 481. Where Congress sought to target jurisdictional immunity, the statute references jurisdiction, and in all but one instance, does so with virtually identical language. Where Congress sought to target execution, it does so by explicitly stating what property is "subject to attachment in aid of

execution" or what property "shall not be immune from attachment in aid of execution, or from execution."

Comparing these statutes shows that Congress knows how to draft a statute to waive immunity from either jurisdiction or execution and what language accomplishes each goal. TRIA § 201(a) uses the language of execution waivers, not jurisdictional waivers, a topic on which it says nothing. "The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation has full force here. The silence of Congress is strident." Comm'r of Internal Revenue v. Beck's Est., 129 F.2d 243, 245 (2d Cir. 1942); see also, e.g., Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1617 (2018) ("Telling, too, is the fact that when Congress wants to mandate particular dispute resolution procedures it knows exactly how to do so . . . .")

Because TRIA is an execution statute, there is generally no conflict between it and those parts of the FSIA that deal with jurisdictional immunity. Immunities from jurisdiction and execution operate independently. Walters, 651 F.3d at 288. A conflict would arise if the Judgment Creditors sought to execute on TRIA's assets and were prevented from doing so by an immunity to execution contained in 28 U.S.C. § 1610, 28 U.S.C. §1611, or some other statute. Only in that case would TRIA prevail.

Additionally, when, like in Weinstein, jurisdictional immunity has already been overcome against the sovereign, TRIA pulls that jurisdictional waiver through to the sovereign's instrumentalities, since an alternative reading would render parts of TRIA superfluous. 609 F.3d at 49. But this is a limited rule that "provides for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign . . . only where 'a valid judgment has been entered' against the sovereign." Vera II, 946 F.3d at 133.

TRIA's legislative history further confirms that its scope is execution, not jurisdiction. Its passage was the culmination of an extended battle between Congress and the President over the extent to which foreign sovereigns' property could be subject to execution by plaintiffs. In 1998, Congress modified the FSIA's exceptions to execution immunity in 28 U.S.C. § 1610, by adding a new section, § 1610(f). This waived execution immunity for blocked assets of foreign states that had judgments against them for acts of terrorism. Pub. L. No. 105–277 § 117, October 21, 1998, 112 Stat 2681. This subsection could be waived by the President in the interest of national security. President Clinton waived this section the same day he signed the law. 1998 U.S.C.C.A.N. 576, 581, 1998 WL 971395.

Two years later, Congress modified the section, but again authorized the President to waive this section in the interest of national security. Pub. L. No. 106–386 § 2002, October 28, 2000, 114 Stat 1464. Again, President Clinton waived § 1610(f) the same day he signed the bill into law. Statement by the President on HR 3244 10/28/00 (Oct. 28, 2000), 2000 WL 1617225, at *5. No President has rescinded these waivers, and 28 U.S.C. § 1610(f) has never taken effect. Rubin v. Islamic Republic of Iran, 138 S. Ct. 816, 826 n.6 (2018).

Congress responded with TRIA, where it "placed the 'notwithstanding' clause in § 201(a) . . . to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment." Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi, 556 U.S. 366, 386 (2009). The floor statements of Senator Harkin confirm this:

> Let there be no doubt on this point. Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution by making the blocked assets of that terrorist state, including the blocked assets of any of its agencies or instrumentalities, *available for attachment and/or execution of a judgment issued against that terrorist state*. Thus, *for purposes of*

> *enforcing a judgment against a terrorist state*, title II does not recognize any juridical distinction between a terrorist state and its agencies or instrumentalities.

148 Cong. Rec. S11524-01 at S11528, 2002 WL 31600115 (Nov. 19, 2002) (statement of Sen. Harkin) (emphases added)).

Senator Harkin's references to execution and attachment, rather than jurisdiction confirms that TRIA is an execution statute intended to aid in the enforcement of judgments already issued against terrorist states. It does not waive jurisdictional immunity for a sovereign state or instrumentality that would not otherwise be viable. Senator Harkin's statements cannot be given controlling effect, but because they are consistent with TRIA's text, they provide further evidence of Congress' intent that TRIA not provide a basis to obtain jurisdiction over a sovereign without an underlying judgment for which immunity under the FSIA was already defeated. See, e.g., Brock v. Pierce Cnty., 476 U.S. 253, 263 (1986) ("[S]tatements by individual legislators should not be given controlling effect, but when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent.")

TRIA § 201(a) does not overcome DAB's jurisdictional immunity under 28 U.S.C. § 1604. The Court, therefore recommends finding that there is no jurisdiction over DAB or, by extension, these turnover motions.

## II.   The Court is Constitutionally Restrained from Making the Finding TRIA Requires to Attach DAB's Assets

Even if the Court had jurisdiction, it is constitutionally restrained from making the findings that are required by TRIA § 201 to authorize execution. The Constitution vests the President with the sole power to recognize foreign governments. Courts may not extend such recognition either directly or by implication. Yet such recognition would be inescapably implied if this Court found that the DAB is being controlled and used by the Taliban such that the

Taliban may use DAB's assets (ultimately the assets of the sovereign state of Afghanistan) to pay its legal bills. The Constitution thus restrains the Court from making the finding necessary to attach DAB's assets.

### A. Framework for the Turnover Motions

These turnover motions are governed by Rule 69, CPLR §§ 5225(b) and 5227, and TRIA § 201. Rule 69 provides the procedure for enforcing money judgments. Under Rule 69(a), judgments are enforced through a writ of execution. Execution procedures are governed by the laws of the state where the court is located unless a federal law applies. In New York, CPLR §§ 5225(b) and 5227 govern turnover proceedings. CSX I, 879 F.3d at 468. These statutes are "essentially interchangeable," CSX Transportation, Inc. v. Emjay Env't Recycling, LTD., No. 12-cv-1865 (JS)(AKT), 2016 WL 755630, at *3 (E.D.N.Y. Feb. 25, 2016) (quoting LaBarbera v. Audax Constr. Corp., 971 F. Supp. 2d 273, 278 (E.D.N.Y. 2013)), so the Court analyzes the turnover motions under CPLR §§ 5225(b) for simplicity.

Section 5225(b) permits judgment creditors to initiate:

> a special proceeding . . . against a person in possession or custody of money . . . in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property . . . .

The Federal Rules have no equivalent to a "special proceeding" so parties may seek a turnover under these provisions by motion. CSX I, 879 F.3d at 470.

CPLR § 5225(b) "requires a two-part showing before the Court can order the third party to turn over the money to the judgment creditor." Hyegate, LLC v. Boghossian, No. 21-cv-1450 (JGK), 2022 WL 1488171, at *2 (S.D.N.Y. May 11, 2022) (Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A., 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019)). The judgment creditor must show that the judgment debtor has an interest in the property the creditor is

targeting, and that the judgment creditor is entitled to that property or has rights superior to the party possessing the property. Id.

A judgment creditor must also satisfy the requirements of TRIA § 201(a) if they seek a turnover on those grounds. A party seeking to execute against assets using TRIA § 201(a) must show that: (1) they have obtained a judgment against a terrorist party, (2) on a claim based on an act of terrorism or an act for which a terrorist party is not immune under 28 U.S.C. § 1605A or 28 U.S.C. § 1605(a)(7), which they seek to satisfy with the (3) blocked assets, (4) of that terrorist, terrorist party, or their agency or instrumentality, (5) to the extent of only their compensatory damages.

The Judgment Creditors easily show all but one element. They all possess judgments against the Taliban, a terrorist group, for the September 11 Terrorist Attacks or other acts of terrorist violence. TRIA § 201(d)(4) defines a terrorist party by reference to 8 U.S.C. § 1182(a)(3)(B)(vi). This describes a terrorist group as one involved in activities such as hijacking, assassination, and the use of explosives to threaten individuals and property. 8 U.S.C. § 1182(a)(3)(B)(iii), (vi). All of the judgments the parties possess against the Taliban are based on its role in the September 11 Attacks, ECF Nos. 1755 (Federal Insurance Creditors), 2516 (Havlish Creditors), Smith, No. 01-cv-10132, ECF No. 25 (Smith Creditors), or separate acts in which explosives were used to attack Americans, Doe, No. 20-mc-740, ECF Nos. 1, 8-2 (Doe Creditors).

The DAB Funds are "blocked assets." TRIA § 201(d)(2)(A) defines blocked assets as "any asset seized or frozen by the United States . . . under sections 202 and 203 of the [IEEPA] (50 U.S.C. 1701; 1702) . . . ." E.O. 14,064 blocks the DAB Funds pursuant to the IEEPA.

All the parties seek compensatory damages only. See ECF Nos. 7765 at ¶¶ 10–11 (Havlish Creditors); 7770 at ¶ 4 (Doe Creditors); 7938 at ¶ 9 (Federal Insurance Creditors); Smith, No. 01-cv-10132, ECF Nos. 25, 63 at 7 (Smith Creditors). The only question is whether the blocked DAB Funds are the assets of an agency or instrumentality of the Taliban.

**B.   The Constitution Prevents the Court From Declaring DAB a Taliban Agency or Instrumentality**

Declaring DAB an agency or instrumentality of the Taliban inescapably implies that the Taliban is the government of Afghanistan. Only the President may make such a determination. The Court is thus constitutionally restrained from finding that DAB is a Taliban agency or instrumentality as TRIA § 201(a) requires.

"TRIA, unfortunately, does not" define what it means to be an "agency or instrumentality" of a terrorist party. Kirschenbaum I, 830 F.3d at 132. "Because the terms 'agency or instrumentality' are undefined under the TRIA," the Court of Appeals "construe[d] these words according to their ordinary meanings." Id. at 135.

Drawing on several dictionary definitions, the Court of Appeals determined that an entity is an agency or instrumentality of a terrorist group if it "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party." Id.

The Court cannot find that that DAB was owned, controlled, or directed by the Taliban or that it provided the Taliban with materials services and functionality without recognizing the Taliban as the government of Afghanistan. The Constitution forbids this. "[T]he power to recognize foreign states and governments . . . is exclusive to the Presidency." Zivotofsky ex rel.

Zivotofsky v. Kerry, 576 U.S. 1, 28 (2015). This is true whether recognition is direct or by implication.

Zivotofsky, for example, dealt with a conflict between the Foreign Relations Authorization Act, Fiscal Year 2003 (the "FRAA"), and the U.S. State Department's Foreign Affairs Manual (the "FAM"). At the time of Zivotofsky, presidential policy was to refuse to acknowledge any nation's sovereignty over the city of Jerusalem. The FAM thus required that when the State Department issued passports to people born in Jerusalem, the passport list their place of birth as "Jerusalem" rather than "Israel." The FRAA permitted (though did not require) people born in Jerusalem to list their place of birth as "Israel" on their passports. Id. at 5–8. Even though this amounted to little more than a requirement that the President accommodate private citizens' requests on their passports, the Supreme Court held that this accommodation was unconstitutional because it was "a mandate that the Executive contradict his prior recognition determination in an official document issued by the Secretary of State." Id. at 30.

Applying this to DAB, the government of a foreign sovereign state exercises some manner of control or authority over the central bank. This is apparent from 28 U.S.C. § 1611 of the FSIA which specifically addresses central banks and their assets. This makes the property of a central bank immune from attachment and execution "unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution . . . ." 28 U.S.C. § 1611(b)(1). The use of "parent" implies a degree of supervision by the foreign government over the central bank. See, e.g., Parent Corporation, Black's Law Dictionary (11th ed. 2019) ("A corporation that has a controlling interest in another corporation."). Further confirming that a government exercises some control over the central

bank, 28 U.S.C. § 1611(b)(1) permits a foreign government to waive the immunity of their central bank's property to attachment and execution.

The Judgment Creditors allege the Taliban is exercising control over DAB. The Havlish Creditors' expert reports that the Taliban has appointed loyalists to key leadership positions. ECF No. 7766 at ¶ 54. This includes DAB's Acting Governor, id. at ¶ 55, First Deputy Governor, id. at ¶ 59, Second Deputy Governor, id. at ¶ 73, and personnel throughout the organization. Id. at ¶¶ 85–91. Numerous former DAB leaders and employees have fled the institution because they will not work for the Taliban. Id. at ¶¶ 52–53. Senior personnel and experts have joined the exodus or are trying to leave. Id. at ¶¶ 88, 102. Women have been forced to leave DAB jobs, id. at ¶ 90, and those DAB personnel that remain appear to be doing so only because of Taliban coercion. Id. at ¶ 89. The Smith Creditor's expert similarly notes that numerous Taliban loyalists have been appointed to senior leadership positions in DAB. Smith, No. 01-cv-10132, ECF No. 64 at ¶¶ 40–41. Non-Taliban personnel in leadership positions are reportedly little more than figureheads subject to Taliban control. Id. at ¶¶ 42–43.

The Taliban is using its control of DAB through these senior positions to set monetary policy. It has tried to use DAB "to halt the local currency's depreciation." ECF No. 7766 at ¶ 92. Through DAB, it is supervising the entire Afghan financial sector, id. at ¶ 98, and its appointees make statements about the country's banking policies. Id. at ¶ 128.

Finally, the Judgment Creditors suggest that the Taliban can use its control of DAB to advance its cause in numerous ways. It can cripple the central bank's anti-money laundering controls, id. at ¶¶ 155, 160, 165, generate revenue from the narcotics trade, id. at ¶¶ 155, 161, weaponize sensitive financial information against its enemies, id. at ¶ 159, and weaken oversight

of high-risk financial sectors (*e.g.*, *hawala*, an informal money exchange system) that are likely to fund terrorists, id. at ¶¶ 168–78.

The Smith Creditor's expert expands on this. He notes that beyond advancing its aims through monetary policy, one of the Taliban's goals in controlling DAB is "to show that they are capable of governing Afghanistan . . . ." Smith, No. 01-cv-10132, ECF No. 64 at ¶ 36. It appointed DAB leadership even before it announced the establishment of its caretaker "government." Id. at ¶ 35. To advance this effort and create the impression of a competent Taliban-run DAB, the Taliban has employed tactics like presenting credentialed non-Taliban technical experts as DAB personnel in external meetings while Taliban loyalists handle internal affairs. Id. at ¶ 36. Thus, for example, the Smith Creditor's expert reports that the current DAB Governor, Shakir Jalali, was "chosen for his credentials" but, despite being DAB's governor, he "acts in an advisory position without decision-making authority." Id. at ¶ 42. This governance structure "is designed to present DAB as a 'normal' central bank to outside observers, while simultaneously maintaining Taliban control over DAB strategy and funds." Id. at ¶ 44.

The Smith Creditor's expert also notes that part of the allure of controlling DAB is gaining control over its reserves. The Taliban claimed a right to that money "immediately," id. at ¶ 35, and reportedly sought to inspect the reserves just after gaining physical control of DAB's premises, Taliban Report at 45.

The Court has little doubt that much or all of this is factually true, and that the Taliban is using their control of DAB to advance their aims. In September 2021, Secretary of State Antony Blinken acknowledged that the Taliban was the "*de facto* government" of Afghanistan.[11] There

---

[11] Amanda Macias, Secretary of State Blinken calls Taliban 'the de facto government of Afghanistan', CNBC (last updated Mon. Sept. 13, 2021), https://www.cnbc.com/2021/09/13/secretary-of-state-blinken-calls-taliban-the-de-facto-government-of-afghanistan.html.

is no reason to think DAB has escaped this dominion. But, just as Secretary Blinken could acknowledge the Taliban's *de facto* dominance of Afghanistan even as the United States declines to formally recognize it as Afghanistan's government, the Court can acknowledge the facts on the ground while recognizing that those facts do not permit it to recognize the Taliban as the government of Afghanistan directly or by implication.

If the Court accepts the Judgment Creditors' argument, the implied recognition of the Taliban as Afghanistan's government is inescapable. The Judgment Creditors report that the Taliban has appointed leaders to the institution. It is advancing its goals through those leaders and by setting monetary policies like preventing currency depreciation. Promoting financial stability and managing foreign reserves are classic public and government functions performed by central banks. See, e.g., Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004); NML Cap., Ltd. v. Banco Cent. de la Republica Argentina, 652 F.3d 172, 195 (2d Cir. 2011). The Taliban directing DAB's governmental functions implies that the Taliban acts as a government.

Recognition would be further implied if the Court was prepared to give effect to the acts of those DAB "leaders" installed by the Taliban. A hypothetical involving waiver provisions of 28 U.S.C. § 1611(b)(1) illustrates the point. This section allows either the central bank or its parent government to waive immunity to execution on central bank resources. If the Taliban, through their appointed DAB leaders, proffered such a waiver to advance some objective, two outcomes are possible. A court could give effect to the waiver. In that case, Taliban-appointed leaders, on orders from the Taliban, would be issuing an order that controlled the disposition of Afghanistan's central bank reserves. If permitting a private citizen born in Jerusalem to choose "Israel" as his place of birth on his passport impermissibly encroaches on the President's prerogative to recognize governments, then handing over Afghanistan's reserves on the Taliban's

say-so must as well. Or, a court could refuse to credit the waiver because acknowledging that the Taliban can control DAB assets or policies in this way confers governmental recognition on the organization that is the sole constitutional prerogative of the President.

The Judgment Creditors' argument is only a less extreme version of this scenario. They suggest that DAB is an agency or instrumentality of the Taliban because it has appointed leaders and those leaders are promulgating policies or taking acts like the elimination of money-laundering controls that materially advance the Taliban's goals. But accepting that these leaders have actually been appointed to lead DAB or that, based on these appointments they may legitimately promulgate the policies and pronouncements that materially advance the Taliban's goals bestows governmental recognition on the Taliban that this Court may not constitutionally confer.

Other factors further confirm that permitting the turnover of the DAB Funds on the basis proffered by the Judgment Creditors implies recognition of the Taliban. The Judgment Creditors' expert declarations reference DAB's website as a credible source of information about the institution. See, e.g., ECF No. 7766 at ¶ 16 n.5, ¶ 55 n.39, ¶ 58 n.45, ¶ 58 n.46, ¶ 94 n.86, ¶ 126–35; Smith, No. 01-cv-10132, ECF No. 64 at ¶ 33 n.32. That website includes a section with the "Da Afghanistan Bank Law," which sets out the governance of the institution. See DAB, *Laws* (last visited August 26, 2022), available at https://dab.gov.af/laws. Article 11 of the Da Afghanistan Bank Law provides that "[t]he Governor, the First Deputy Governor and the other members of the Supreme Council shall be appointed by a decree of the President of Afghanistan." See DAB, *Da Afghanistan Bank Law* (last visited August 26, 2022), available at https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf.[12]

---

[12] The Unfreeze Afghanistan amicus brief similarly references this Afghanistan Bank Law. See Havlish, No. 03-cv-9848, ECF No. 617 at 5.

The laws of Afghanistan are doubtless in flux given the Republic's collapse but the legal authorities DAB proffers on its website still state that the President of Afghanistan is responsible for appointing DAB officials. The Judgment Creditors, meanwhile, point to the Taliban's appointment of these officials as evidence of its control over DAB. To credit those appointments as evidence of Taliban control would be to suggest that the group is wielding power that was until recently vested in the Afghan state and the Republic.

Accepting this argument is particularly ill-advised given the Smith Creditor's expert opinion that the Taliban sees its control over DAB as a means to demonstrate that it can competently govern Afghanistan. To find that DAB is an agency or instrumentality of the Taliban based on its control of it and use to advance its ends would thus effectively adopt the group's theory for why it is Afghanistan's legitimate government.

Finally, permitting the Taliban to pay its judgments with DAB's money implies an ownership that is only properly held by Afghanistan and its government. While "the funds of foreign central banks are managed through those banks' accounts in the United States, those funds are, in fact, the reserves of the foreign states themselves." NML Cap., Ltd., 652 F.3d at 189 (internal citations omitted) (cleaned up). The reserves are thus foreign state property and "a regime not recognized as the government of a state is not entitled to property belonging to that state located in the United States . . . ." Restatement (Third) of Foreign Relations Law § 205(2) (1987). If the Court nonetheless permitted the Taliban to pay its judgments with Afghan state money held in the United States, the reasonable interpretation given § 205(2) is that the Taliban is entitled to Afghanistan's property.

Zivotofsky recognized that the "[t]he Nation must 'speak . . . with one voice' regarding which governments are legitimate in the eyes of the United States and which are not . . . ." 576

36

U.S. at 2 (quoting <u>American Insurance Assn. v. Garamendi</u>, 539 U.S. 396, 424 (2003)). That would be impossible if, even as the President declines to accept the Taliban as the Afghan government, the Court permits these terrorists' judgments to be paid with Afghanistan's treasury. The Court thus recommends finding that it is constitutionally restrained from rendering the finding TRIA requires for the Judgment Creditor's turnover motions.

## III.   The Taliban's Nonconsensual Control Prevents DAB From Being an Agency or Instrumentality

Finally, even if the Court was not constitutionally restrained from finding that DAB is an agency or instrumentality of the Taliban, the Judgment Creditors cannot establish an agency relationship. "To be entitled to attachment or execution under TRIA, a plaintiff must first establish defendant's status as an agency or instrumentality." <u>Levinson</u>, 2022 WL 3269083, at *4. Consent is essential to an agency relationship. DAB has been violently occupied by the Taliban. It cannot not demonstrate the consent necessary to an agency relationship.

Because TRIA does not define an "agency or instrumentality," <u>Kirschenbaum I</u> defined these terms "according to their ordinary meanings," settling on the three possible tests noted above. 830 F.3d at 135. But <u>Kirschenbaum I</u> and its progeny acknowledged that this test was only a starting point that would necessarily be refined as new circumstances presented themselves. <u>Kirschenbaum I</u> specifically acknowledged that the decision did not address:

> whether, to satisfy the TRIA's definition of agency or instrumentality, Plaintiffs must here show that Defendants knew, or reasonably should have known, that they were functioning for, providing material services on behalf of, or being owned, controlled, or directed by the terrorist party (here, Iran). Nor have they addressed whether an innocent-owner-type defense would be available to a terrorist's agency or instrumentality.

830 F.3d at 136. Similarly, <u>Kirschenbaum v. Assa Corp.</u> acknowledged that "it is possible that, if broadly construed, <u>Kirschenbaum I</u>'s reading of TRIA could invite lawsuits against a third-party

institution, such as a bank, that had only incidental and perhaps unintentional involvement with a terrorist party. How TRIA balances these concerns is not an issue before us at this time . . . ." 934 F.3d 191, 199 (2d Cir. 2019) ("<u>Kirschenbaum II</u>"). Together, <u>Kirschenbaum I</u> and <u>Kirschenbaum II</u> acknowledge that the <u>Kirschenbaum I</u> test left unanswered the question of what level of knowledge and consent is required to be an agency or instrumentality.

That question is now squarely before the Court. As the Judgment Creditors acknowledge, the Taliban has seized DAB by force. The Havlish Creditors acknowledge that the Taliban has "forcibly seized Afghan territory and institutions, including DAB." ECF No. 8019 at 24. Thus, the Court must determine whether a bank robber can transform an unwilling bank into his agency or instrumentality.

The answer must be no. To determine this, the Court returns to <u>Kirschenbaum I</u>'s guidance that "agency or instrumentality" must be defined based on the ordinary meaning of those words. 830 F.3d at 135. It also considers that "Congress is understood to legislate against a background of common-law adjudicatory principles." <u>Astoria Fed. Sav. & Loan Ass'n v. Solimino</u>, 501 U.S. 104, 108 (1991). "Thus, where a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." <u>Id.</u> (internal citations and quotations omitted)."

With that background, the Court returns to TRIA § 201(a)'s text. The ordinary meanings of "agency or instrumentality" identified in <u>Kirschenbaum I</u> reflect the need for its definition to account for the traditional elements of an agency relationship. That an agency relationship is implied in the use of the term "agency" is apparent, but the definition of "instrumentality" put

forward in <u>Kirschenbaum I</u> similarly returns to the concept of agency as an essential element of being an instrumentality:

> "Instrumentality" is a means through which a function of another entity is accomplished, analogous to a branch of a governing body. See Black's Law Dictionary (10th ed. 2014) (defining "instrumentality" as "a means or *[a]gency* through which a function of another entity is accomplished, such as a branch of a governing body"); Webster's Third New International Dictionary 1172 (1993) (defining instrumentality as "something that serves as an intermediary or *agent* through which one or more functions of a controlling force are carried out: a part, organ, or subsidiary branch esp. of a governing body"); OED Online, Oxford University Press, June 2016 (defining instrumentality as "[t]hat which serves or is employed for some purpose or end; a means, an *agency*"); Merriam–Webster Collegiate Dictionary 22 (10th ed. 1993) (defining instrumentality as a "means" or an "*agency*").

830 F.3d at 135 (emphases added).

"Agency" is a well-defined common law concept. <u>See generally</u> Restatement (Third) of Agency (2006). The Court of Appeals has already resorted to agency principles in <u>Kirschenbaum II</u>, noting that "courts need not 'adhere blindly to the corporate form' [in TRIA actions] where doing so would ignore a foreign state's *principal-agent relationship* or lead to fraud or injustice. <u>Kirschenbaum II</u>, at 934 F.3d at 199 (quoting <u>First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba</u>, 462 U.S. 611, 632 (1983)). Thus, if Congress had intended to displace agency principles in a statute discussing agency, one would have expected explicit language like in 28 U.S.C. § 1603(b) where it provided a specific definition of "agency or instrumentality of a foreign state . . . ." Instead, it left the term undefined, and courts have filled the gap through the normal interpretive tools of ordinary usage and common law meaning. The need for an agency relationship between the terrorist party and its "agency or instrumentality" is thus apparent from TRIA § 201(a)'s text.

39

This also aligns with the Circuit and the District's existing TRIA jurisprudence. There has been no case invoking the Kirschenbaum I test where the entity alleged to be an agency or instrumentality was credibly alleged to be an unwilling or even unknowing pawn of the terrorists controlling them. See, e.g., Kirschenbaum II, 934 F.3d at 199 (2d Cir. 2019) (targeted entity was the "alter ego" of Iran), Levin v. Bank of New York Mellon, No. 09-cv-5900 (JPO), 2019 WL 564341, at *4 (S.D.N.Y. Feb. 12, 2019) (noting that a person was an instrumentality of Hezbollah where he contributed money to them and ran their front companies). Returning to agency principles thus comports with this Circuit's existing jurisprudence.

An agency requirement also aligns with Congress' purpose in passing TRIA. The Taliban may have defeated the Republic and occupied Afghanistan, but without presidential recognition, it has no legitimate authority to represent the Afghan state or the Afghan people. "To the extent innocent parties pay some part of a terrorist state's judgment debt, the terrorist state's liability is ultimately reduced. Congress could not have intended such a result." Heiser v. Islamic Republic of Iran, 735 F.3d 934, 940 (D.C. Cir. 2013). The same is true if a non-state terrorist group like the Taliban can drain an Afghan treasury built on international donations and Afghans' savings to reduce its own liability. An agency requirement ensures that only those who have agreed to aid terrorists are responsible for those terrorists' liabilities.

Because an agency relationship is required, that means the relationship between a terrorist and its agency or instrumentality must be consensual, or at least not adversarial. "New York common law provides that an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'" New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 122 (2d Cir. 2001) (quoting Meese v. Miller, 79 A.D.2d 237, 242 (4th Dep't 1981)); see

40

also Restatement (Third) of Agency § 1.01 cmt. d (2006) ("Under the common-law definition, agency is a consensual relationship. The definition requires that an agent-to-be and a principal-to-be consent to their association with each other.") [13]

DAB and the Taliban do not have a consensual relationship. The Taliban destroyed the Republic in battle and occupies its central bank by force. When DAB promulgates policies or aids in the Taliban's efforts, it does so with leadership that was illegitimately installed. The Court cannot credit these leaders' acts for the constitutional recognition reasons already identified. But, even if the Court had jurisdiction, and even if it was not constitutionally restrained from making the finding TRIA requires, it recommends finding that the Judgment Creditors cannot show that DAB has proffered the consent necessary to find DAB to be a Taliban agency or instrumentality.

---

[13] While this motion was pending, the Court of Appeals for the Eleventh Circuit decided Stansell v. FARC, No. 20-11736 (11th Cir. August 23, 2022). While not binding on this Court, Stansell addresses the requirements for an entity to be deemed an agency or instrumentality so a brief discussion here is appropriate. Stansell defined "agency or instrumentality" according to the legal definitions of those terms, rather than the common understanding, which it recognized was "largely synonymous." Id. at 20, 22. Thus, while "agency" required an agency relationship and the normal requirements associated with that relationship (i.e., consent), id. at 23–24, an "instrumentality" may be an unwitting "person or thing through which or by which some end or purpose is achieved." Id. at 24–25. The Court finds this unpersuasive for two reasons. First, the use of specifically legal definitions conflicts with Kirschenbaum I, which defined instrumentality by reference to common usage and general-purpose dictionaries. 830 F.3d at 135. As discussed, this common usage in this case requires an agency relationship where instrumentality is concerned. Alternatively, one could imagine a interpretation in which an "instrumentality" is an inanimate object such as a boat used by terrorists, and so seized by judgment creditors, where an agency relationship is then inapplicable. This would also eliminate concerns about construing "instrumentality" in a way that renders it surplusage since it would cover a category (inanimate objects and things that are not legal persons) not covered by "agency." The Court need not address this because that would be inapplicable to DAB. Second, Stansell's "instrumentality" definition would swallow its "agency" definition. Any agent is also a means of achieving some end so the Stansell "instrumentality" definition is basically the same as that of an "agency" but without additional consent requirements, rendering it surplusage.

**CONCLUSION**

The Taliban's victims have fought for years for justice, accountability, and compensation. They are entitled to no less. But the law limits what compensation the Court may authorize and those limits put the DAB's assets beyond its authority. Accordingly, the Court recommends dismissing these turnover motions. The Court lacks subject matter jurisdiction over the turnover motions because the Judgment Creditors have not overcome DAB's immunity from jurisdiction. And even if they had, the Court cannot find that DAB is an agency or instrumentality of the Taliban under TRIA § 201 without infringing on the President's constitutional recognition prerogative. Finally, if all that were not the case, the Judgment Creditors have not made the showing required by TRIA because they have not established that the relationship between the Taliban and DAB is the kind of consensual relationship required for an entity to be an "agency or instrumentality." Upon resolution of these motions, the Clerk of the Court may terminate the motions at ECF Nos. 7763, 7936, <u>Havlish</u>, No. 03-cv-09848, ECF No. 597, and <u>Smith</u>, No. 01-cv-10132, ECF No. 62.

Dated:  August 26, 2022  
      New York, New York

SARAH NETBURN  
United States Magistrate Judge

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS  
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Rule 72(b)(2). These objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the

United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. <u>See</u> 28 U.S.C. § 636(b)(1); Rule 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Rule 6(a), 6(d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).