## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- x

                           )

                           )

In re Terrorist Attacks on September 11, 2001 )

                           )

                           )

                           )

                           )

                           )

--------------------------------------------------- x

No. 03 MDL 1570 (GBD/SN)

ECF Case

**ORAL ARGUMENT REQUESTED**

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279

## REPLY IN SUPPORT OF DEFENDANT
## DUBAI ISLAMIC BANK'S MOTION FOR SUMMARY JUDGMENT AND
## RENEWED MOTION FOR DISMISSAL FOR LACK OF PERSONAL JURISDICTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.   DIB DID NOT PURPOSEFULLY DIRECT ANY CONDUCT AT THE
     UNITED STATES ....................................................................................................... 2

     A.   No Facts Show That *DIB's Conduct* Targeted The US Or Was
          Related To 9/11 ................................................................................................... 4

     B.   No Facts Show That *DIB Specifically Intended* To Target The US ................. 8

II.  THE DECLASSIFIED FILES ARE INADMISSIBLE AND UNRELIABLE ............... 11

     A.   The Declassified Files Are Inadmissible ........................................................ 11

     B.   Confirming the Files' Inadmissibility As Untrustworthy,
          They Are Also Wrong ....................................................................................... 12

III. PLAINTIFFS' NEWFOUND ALTERNATIVE TO PURPOSEFUL
     DIRECTION, "CONSPIRACY JURISDICTION," LIKEWISE FAILS .......................... 13

IV.  PLAINTIFFS HAVE NOT SHOWN THE REMAINING ELEMENTS FOR
     PERSONAL JURISDICTION ..................................................................................... 14

     A.   Plaintiffs Have Not Shown That Jurisdiction Over DIB
          Would Be Reasonable ....................................................................................... 14

     B.   Plaintiffs Have Not Shown A Statutory Basis For Jurisdiction ....................... 15

V.   PLAINTIFFS' LAW OF THE CASE ARGUMENT IS WITHOUT MERIT ................. 15

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank Leumi USA v. Ehrlich,*
    98 F. Supp. 3d 637 (S.D.N.Y. 2015).................................................................15

*Charles Schwab Corp. v. Bank of Am.,*
    883 F.3d 68 (2d Cir. 2018)...............................................................................14

*Contant v. Bank of Am.,*
    385 F. Supp. 3d 284 (S.D.N.Y. 2019)..............................................................14

*Cosmopolitan Shipping Co. v. Cont'l Ins. Co.,*
    514 F. Supp. 3d 614 (S.D.N.Y. 2021)..............................................................13

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,*
    722 F.3d 81 (2d Cir. 2013).................................................................................2

*Drew v. Oakland Cnty.,*
    831 F.2d 294 (6th Cir. 1987) ...........................................................................13

*In re Arcapita Bank B.S.C.(C),*
    640 B.R. 604 (S.D.N.Y. 2022)..........................................................................15

*In re PCH Assocs.,*
    949 F.2d 585 (2d Cir. 1991).............................................................................15

*In re Platinum & Palladium Antitrust Litig.,*
    449 F. Supp. 3d 290 (S.D.N.Y. 2020)..............................................................15

*In re S. African Apartheid Litig.,*
    643 F. Supp. 2d 423 (S.D.N.Y. 2009)..............................................................15

*In re Sept. 11 Litig.,*
    621 F. Supp. 2d 131 (S.D.N.Y. 2009)..............................................................11

*In re Terrorist Attacks on Sept. 11, 2001,*
    295 F. Supp. 3d at 422 ........................................................................3, 4, 7, 14

*In re Terrorist Attacks on Sept. 11, 2001,*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)..............................................................15

*In re Terrorist Attacks on Sept. 11, 2001,*
    538 F.3d 71 (2d Cir. 2008)...........................................................................4, 14

*In re Terrorist Attacks on Sept. 11, 2001,*
    714 F.3d 659 (2d Cir. 2013).......................................................................passim

*In re Terrorist Attacks on Sept. 11, 2001,*
    718 F. Supp. 2d 456 (S.D.N.Y. 2010)...........................................................3, 4, 8

*Lamont v. DOJ,*
    475 F. Supp. 761 (S.D.N.Y. 1979)...................................................................12

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Moss v. Ole S. Real Est., Inc.,*
   933 F.2d 1300 (5th Cir. 1991) ...................................................................................13

*Owens v. Republic of Sudan,*
   864 F.3d 751 (D.C. Cir. 2017)...................................................................................12

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank,*
   779 F. App'x 66 (2d Cir. 2019) ..................................................................................3

*Vasquez v. Hong Kong & Shanghai Banking Corp.,*
   477 F. Supp. 3d 241 (S.D.N.Y. 2020)...................................................................2, 15

*Walden v. Fiore,*
   571 U.S. 277 (2014)...........................................................................................2, 4, 8, 14

*Waldman v. PLO,*
   835 F.3d 317 (2d Cir. 2016)..............................................................................4, 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 4 ..........................................................................................................15

Fed. R. Civ. P. 12 ....................................................................................................2, 15

Fed. R. Civ. P. 37 .........................................................................................................6

Fed. R. Civ. P. 56 ....................................................................................................2, 15

Fed. R. Evid. 803 ........................................................................................................12

Fed. R. Evid. 807 ..................................................................................................12, 13

J. Margulies, *The Right to a Fair Trial in the War on Terror,*
   10 Gonz. J. Int'l L. 57 (2007) ....................................................................................12

## INTRODUCTION

In its initial brief, Dubai Islamic Bank demonstrated that the undisputed facts show the lack of personal jurisdiction.  Providing routine banking services to persons the Bank later learned were involved in al Qaeda—as many banks did before 9/11 revealed their customers' terrorism affiliations—is not purposeful direction and even Plaintiffs admit that none of the transactions at DIB is related to 9/11.  This Court denied DIB's initial motion to dismiss because Plaintiffs' allegations indicated that DIB expressly aimed intentional, tortious conduct at the US by directly funding Osama bin Laden and 9/11, intending to further al Qaeda's US attacks.  Now, discovery has disproven those allegations, leaving no basis for jurisdiction.

At bottom, Plaintiffs try to dispute that conclusion by pointing to the Declassified Files the CIA purportedly assembled.  The Files are lengthy, but really say very little.  Ostensibly, DIB's former chairman Saeed Ahmed Lootah knew bin Laden in the mid-1990s, which led his Sudan companies and al Qaeda members to bank at DIB before 1998.

*First*, such facts, even if true, are insufficient for personal jurisdiction.  Three key flaws remain.  **1.** Plaintiffs continue to admit that no financial services provided by DIB funded al Qaeda's operations, much less 9/11.  **2.** The Files never establish that either DIB or even Lootah knew of, let alone intended, bin Laden's later aspirations to attack the US.  **3.** And the Files concern only events many years before 9/11.  Bin Laden approved the 9/11 plot in early 1999 (as Plaintiffs' own expert admits)—well after Lootah left his role at DIB in 1998 and ceased his involvement in its day-to-day operations at least since 1995.  Neither the Files nor the discovery record shows conduct related to Plaintiffs' injuries or purposeful direction at the US.

*Second*, even if the Files did establish such necessary facts, Plaintiffs must counter DIB's motion with admissible evidence.  The Files are inadmissible hearsay, partly because they are patently untrustworthy.  As such, even if their content mattered to personal jurisdiction (which it

does not), they cannot help Plaintiffs establish jurisdiction.  This Court should grant DIB's motion.

**ARGUMENT**

Plaintiffs have failed to identify a genuine dispute of fact material to personal jurisdiction, based on material they could present as admissible evidence.  FRCP 56(c).  Similarly, Plaintiffs have failed to defeat DIB's alternative renewed FRCP 12(b)(2) motion, as they have not established jurisdiction with facts based on admissible evidence.  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013); *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 250–51 (S.D.N.Y. 2020); *contra* Opp. 20.[1]

## I.   DIB DID NOT PURPOSEFULLY DIRECT ANY CONDUCT AT THE UNITED STATES

A foreign defendant's own, "suit-related conduct" must "create a substantial connection with the forum."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).  For purposeful direction, Plaintiffs must identify evidence that (1) ***DIB*** took "***intentional*** … allegedly tortious, ***actions*** … expressly ***aimed at the [US]***," and (2) Plaintiffs' injuries "***arise out of or relate to*** those activities."  *In re Terrorist Attacks on Sept. 11, 2001* ("*9/11 VII*"), 714 F.3d 659, 674 (2d Cir. 2013) (emphases added) (internal quotation marks omitted).

The facts here fail to even approximate those in cases that the Second Circuit has repeatedly said are insufficient for personal jurisdiction.  For example, ***it is not enough even if a bank "(1) knowingly maintained bank accounts for individuals associated with al Qaeda as well as for purported front charities," and "(2) those accounts were used for al Qaeda operations***."  *Id.* at 676 (emphases added).  Nor is it enough "that they ***provided financial services*** to clients that

---

[1] DIB maintains its request for an evidentiary hearing should the Court deem any material fact disputed.  MSJ 30.  In a sentence, Plaintiffs assert that personal jurisdiction is "intertwined with the merits."  Opp. 10 n.4.  But this is not "the unusual situation" where the Seventh Amendment might bar the Court from deciding jurisdictional facts.  *Dorchester*, 722 F.3d at 87.  Indeed, *Dorchester*'s only illustrations involved *subject matter* jurisdiction, where jurisdictional and merits questions can turn on the same elements.  That is not the case here for personal jurisdiction.

purportedly were associated with al Qaeda, **and thereby aided al Qaeda**." *Id.* (emphases added). One of the dismissed banks was allegedly a "'conduit' for financing al Qaeda," *id.* at 669–71, providing funds and services to its fundraisers, funneling funds to bin Laden, and being "one of al Qaeda's preferred banks," *In re Terrorist Attacks on Sept. 11, 2001* ("*In re 9/11*"), 295 F. Supp. 3d 416, 421, 427 (S.D.N.Y. 2018), *rev'd on other grounds sub nom. Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66, 69 (2d Cir. 2019).  Others dismissed were allegedly money-laundering organizations that "**conspired with Osama bin Laden** … to support and finance … terrorist activities, including … [9/11]," *9/11 VII*, 714 F.3d at 670–71 (emphasis added).  Still others, in which bin Laden himself allegedly held shares and "invested millions," ostensibly "helped al Qaeda to grow, in its early years," via "funding, banking services and the financial infrastructure … that [bin Laden] *employed to … carry out terrorist attacks* against the United States"; were "substantially involved in other banks and organizations actively supporting al Qaeda"; and "manag[ed] and h[eld] bank accounts of individuals and entities involved in al Qaeda's plot." *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 486–87 (S.D.N.Y. 2010) (dismissing Sudanese banks); *9/11 VII*, 714 F.3d at 668, 676 (affirming).

Although Plaintiffs assert that DIB "ignores or mischaracterizes" these cases (Opp. 13), they never meaningfully engage with DIB's discussion of them (MSJ 21–23).  Instead, they press inapposite decisions.  But it does not help Plaintiffs that allegations against Al Rajhi Bank merited discovery.  *Underwriting Members*, 779 F. App'x at 69.  Plaintiffs must identify admissible facts at this stage.  Further, the allegations there included that *9/11 hijackers used ARB* accounts or credit cards while preparing for 9/11, and that ARB served "known extremist operatives" "with the specific intent to further al Qaeda's terrorism against the [US]." *Id.* at 68; *In re 9/11*, 295 F. Supp. 3d at 422.  Here, Plaintiffs lack evidence DIB intended to target the US.  And Plaintiffs

admit they *lack evidence* "that funds in any account at [DIB] *were used by the 9/11 hijackers or other 9/11 plot principals* in carrying out the 9/11 terrorist attacks," or that "funds from the DIB accounts of any of the ten accountholders *were used to fund Al Qaeda through specific transactions*." ECF 8316, Resp. to 56.1 Statement ("SUF Resp.") ¶¶ 66-67 (emphases added).

Plaintiffs also try to distinguish *Waldman v. PLO*, 835 F.3d 317 (2d Cir. 2016), as involving foreign attacks (Opp. 16–17), but this Court previously rejected that argument, as 9/11's location is not a "constitutionally sufficient connection" for jurisdiction. *In re 9/11*, 295 F. Supp. 3d at 429. And neither of the ATA cases Plaintiffs cite (Opp. 14 & 15 n.6) discusses personal jurisdiction.

### A. <u>No Facts Show That *DIB's Conduct* Targeted The US Or Was Related To 9/11</u>

For purposeful direction, the defendant's "own … intentional conduct" is the touchstone. *Walden*, 571 U.S. at 285–86. Thus, the "random, fortuitous, or attenuated" US connections that DIB may have made "by interacting with other persons" who themselves had US connections are not enough. *Id.* That is true even if "a third party" "unilateral[ly]" aimed its conduct at the US, *id.* at 291, and the defendant knowingly supported it, *9/11 VII*, 714 F.3d at 668, 676 (applying *In re Terrorist Attacks on Sept. 11, 2001* ("*9/11 III*"), 538 F.3d 71, 95–96 (2d Cir. 2008)). That is true, specifically, where "*third parties* use[] [a bank] to transfer money to al Qaeda." *In re 9/11*, 295 F. Supp. 3d at 427. Further, the plaintiff's injuries must "relate to" the defendant's intentional, US-aimed "activities." *9/11 VII*, 714 F.3d at 674; MSJ 29. This Court denied DIB's prior motion due to its allegation-dependent conclusion that "DIB *itself* provided *direct* financial services and support" for and was "*directly involved* in" funding 9/11. 718 F. Supp. 2d at 489 (emphases added). But Plaintiffs now admit that none of DIB's financial services financed the 9/11 attacks.

#### 1. <u>The Discovery Record Proves That DIB's Conduct Did Not Target The US Or Relate To 9/11</u>

DIB has shown that, contrary to Plaintiffs' allegations, the undisputed facts are that there

was no DIB conduct targeting the US or relating to 9/11.  As such, there is no purposeful direction.

**First**, despite Hisawi's centrality to Plaintiffs' 2010 allegations, they now admit it is ***undisputed*** that he "has never been an accountholder at Dubai Islamic Bank."  SUF Resp. ¶¶ 14–15.  That means he did not use a DIB account to aid 9/11 hijackers, as Plaintiffs previously alleged.

**Second**, Plaintiffs admit that there ***undisputedly*** is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out" 9/11.  *Id.* ¶¶ 66–67 (emphasis added); *see also id.* ¶¶ 52–65.  They likewise admit that there ***undisputedly*** is no evidence that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions."  *Id.*  That includes the account of 9/11 facilitator Aziz Ali.  *Id.*  Further, Aziz Ali never transferred or withdrew funds from his account while facilitating the hijackers' preparations.  *Id.* ¶ 52.  Thus, Plaintiffs' statements that "it is unclear whether funds were transferred from Ali's DIB account prior to the attacks" and that funds "were available, withdrawn, and used immediately before [9/11] to fund Ali's escape" are both misleading and wrong.  Opp. 6.  He simply had no withdrawals or transfers until the day before 9/11 and there is no evidence he ever used any DIB money to fund an "escape."

Similarly, Plaintiffs' observation that Aziz Ali and another al Qaeda member Tayyib (plus unidentified "other[s]") had DIB accounts (*id.* at 4–5) is immaterial, given Plaintiffs' admission there ***undisputedly*** is no evidence that any DIB accounts were used for 9/11 or al Qaeda.[2]  Nor does Plaintiffs' observation suffice to dispute the fact that the ten accountholders received only financial services available in the ordinary course.  SUF Resp. ¶ 48.[3]

---

[2] The same is true of Plaintiffs' Counterstatement rehashing these same persons' involvement in al Qaeda.  ECF 8317-1, Pls.' Averment of Facts and Counterstatement of Facts Pursuant to Rule 56.1, ¶¶ 97–99, 107, 109–16, 130–39.

[3] Plaintiffs assert that DIB's witnesses lack personal knowledge and their statements lack foundation.  Each witness's credentials and background are described at length in his declaration or deposition, and each testified within the scope of his personal knowledge.  *See, e.g.*, ECF 8129-4, Dharsey Decl., ¶¶ 13, 16.

**Third**, despite the allegations about bin Laden, Plaintiffs **do not claim** that DIB had an account for him. They only suggest that he had an account or transfers in another name, or that DIB's services somehow "benefit[ed]" him—speculation none of their citations supports. *Id.* ¶¶ 8–12.[4] As such, the recycled allegation that DIB intentionally "provid[ed] … services to al Qaeda which allowed for direct funding of" 9/11 simply lacks factual support. Opp. 1.

## 2. The Declassified Files' Allegations Do Not Show That DIB's Conduct Targeted The US Or Was Related To 9/11

Plaintiffs nevertheless assert that bin Laden, his companies, and al Qaeda members had some "relationship" with DIB based upon allegations in the Declassified Files. Those Files are both inadmissible and unreliable (*see* Arg.II below), but even if they were proper evidence, they still fail to show intentional conduct related to 9/11. The Files focus on allegations regarding bin Laden's ostensible relationship with Mr. Lootah in the early 1990s and on purported letters of credit that Osama bin Laden or his companies ordered at DIB. *E.g.*, MSJ Ex. 26 at -422, -426 (describing letters of credit as of "early 1996"); MSJ Ex. 27a at -747 (implying Sudan period).

The allegations in the Declassified Files, however, do not relate to the 9/11 attacks.

**a. *The Files Show No Financing Of 9/11*.** The Declassified Files do nothing to change the fact that the ten accountholders at DIB who may have been connected to al Qaeda never used their accounts to fund 9/11 or even for al Qaeda's purposes—as Plaintiffs continue to admit (*supra* p.5). Moreover, Bin Laden's Sudan companies (about which Plaintiffs propounded discovery) never had accounts at DIB. SUF Resp. ¶ 13. Based on the Files, Plaintiffs do claim that bin Laden's unspecified companies or officers "opened … letters of credit" through DIB from 1992–

---

[4] For example, Plaintiffs invoke the "[s]upplementary" report of their proposed expert Jonathan Winer. SUF Resp. ¶¶ 11–13. He is the subject of a joint bellwether *Daubert* challenge, ECF 7343, and his untimely "supplementary" report is the subject of a FRCP 37 motion, ECF 8344. Regardless, his speculation about the accuracy of DIB's searches *in 1999 and 2001* cannot create a dispute of fact, as it rests only on further speculation about the accuracy of DIB's searches *in discovery*, years later, for accounts in the name of a *different person*. ECF 8503, DIB Winer Reply, at 4.

1996 (*e.g.*, Opp. 4–5), but Plaintiffs never identify any beneficiary of such a letter[5] or explain how a payment for an unknown transaction might relate to 9/11 (which was not even planned until 1999). Merely providing financial services to someone who used them for terrorism is insufficient (*supra* pp.2–4), and here, Plaintiffs admittedly lack evidence even of that. The Files simply do not provide evidence that DIB expressly aimed its conduct at the US, and certainly do not allege conduct related to 9/11. MSJ 23–26.

       **b.** *Even* **Mr. Lootah's** *purported actions are immaterial because they do not amount to purposeful direction.* The Files do not state that Mr. Lootah performed any services that would not have been routine and lawful at the time, let alone any related to 9/11. They certainly do not indicate that Mr. Lootah took any "tortious, actions … expressly aimed" at the US. *9/11 VII*, 714 F.3d at 674.

       **c.** *Mr. Lootah's purported conduct is immaterial because it occurred before the 9/11 plot even began.* Plaintiffs never engage with this MDL's decisions emphasizing the importance of temporal proximity to 9/11. *See* MSJ 24–25; Opp. 17. The allegations regarding letters of credit appear based on information provided in "early 1996." MSJ Ex. 26, at -422, -426; *see In re 9/11*, 295 F. Supp. 3d at 430 (funding bin Laden in Sudan in 1990s too removed for jurisdiction). And DIB's leadership changed in March 1998: Mr. Lootah lacked any authority at DIB thereafter, as Plaintiffs effectively acknowledge. *See* SUF Resp. ¶ 33; Opp. 3.[6] So his alleged conduct predated, among other material events, bin Laden's approval of the 9/11 plot, which was undisputedly after late 1998 or early 1999, SUF Resp. ¶ 34; and DIB's undisputed internal distribution and ongoing

---

[5] A letter of credit is often used in trade finance and usually involves two key parties—(i) an ordering party (or "applicant"), who opens a letter of credit by requesting that its bank make a guaranteed payment, and (ii) a beneficiary who will receive that payment.

[6] Plaintiffs fail to cite *anything* disputing the displacing of DIB's Board of Directors after 1998. SUF Resp. ¶¶ 19–20.

use of US OFAC circulars in 1999 to ensure it did *not* "conduct any business with" al Qaeda, the Islamic Army, the "Usama Bin Laden Organization," or the "Usama Bin Laden Network," *id.* ¶¶ 35–37. This belies Plaintiffs' claim that DIB's "support" for al Qaeda "remained ongoing while the 9/11 operation was underway." Opp. 17. They identify no supposed support except Mr. Lootah's, based solely on the Files, which do not allege any such conduct at that time. The *only* evidence of the state of affairs then—in 1999, 2000, and 2001—shows that DIB found **no accounts or transfers for bin Laden** and was diligently guarding against ever doing business with al Qaeda.

        **d. *The Declassified Files are immaterial because about* Mr. Lootah's *purported actions, not DIB's.*** The Files' references to letters of credit mention Mr. Lootah alone. It is established, as DIB discussed (MSJ 26) *and Plaintiffs never address*, that one person's actions cannot be the basis for jurisdiction over his organization absent evidence of its authorization.

        **B.  <u>No Facts Show That *DIB Specifically Intended* To Target The US</u>**

        Even were there evidence of direct conduct by DIB targeting the US (i.e., facts showing conduct assisting US attacks), it is "crucial" to purposeful direction that it was done with "***specific intent.***" Order, ECF 7378, at 4, 6 (Nov. 22, 2021) (emphasis added). There must be conduct "**intended to directly aid** in … a terrorist act, with knowledge that the brunt of the injuries will be felt in the [US]." 718 F. Supp. 2d at 480 (emphasis added). It is not enough if a defendant acted merely **foreseeing** harm there. *See Walden*, 571 U.S. at 289. Even where a bank "*knowingly* maintain[s]" accounts for al Qaeda-associated individuals and fronts, or *knowingly* assists a third party foreseeing that its aid will result in "violence committed against … the [US]," it is insufficient for the requisite "intentional conduct expressly aimed at the [US]." *9/11 VII*, 714 F.3d at 668, 675–76 (internal quotation marks omitted). This Court initially found purposeful direction because it inferred from allegations that DIB "*intentionally … aid[ed] … al Qaeda's plan*" to attack the US. 718 F. Supp. 2d at 489. That conclusion's underlying allegations lack evidentiary

support.

### 1.   The Discovery Record Proves That DIB Did Not Intend To Aid 9/11

DIB has shown that the undisputed facts are that DIB did not intend to aid any US attack.

**First**, there is no evidence that any DIB employee intended an attack on the US.  All employees who are witnesses have disclaimed any goal of DIB to aid terrorism.  SUF Resp. ¶ 45.

**Second**, in the wake of the allegations in the press in 1999 regarding a possible connection between DIB and al Qaeda, DIB searched for bin Laden accounts and transfers and immediately contacted the US government (through now-Judge Fine) to offer its full cooperation.  Plaintiffs ***do not dispute*** any of the facts about that investigation or DIB's intent to help.  *Id.* ¶¶ 24–27.[7]

**Third**, as noted above, Plaintiffs do not dispute that in 1999 DIB distributed OFAC lists targeting al Qaeda and do not dispute that it did so "***to ensure that DIB did not conduct any business with any party named on those lists***."  *Id.* ¶ 35 (emphasis added).  Nor do Plaintiffs dispute that DIB "required employees" to check those lists "when opening accounts and conducting transactions."  *Id.* ¶¶ 36–37.  Plaintiffs cannot admit all this and then—based on legal argument alone—point to a material dispute about DIB's intent.

**Fourth**, Plaintiffs ***admitted*** in discovery that the ten accountholders were not designated before 9/11 and Plaintiffs now "[d]ispute[]" the fact only on "relevance" grounds.  *Id.* ¶ 49.  But Plaintiffs fail to show any facts as to how DIB knew who any of the 9/11 plotters were.

**Fifth**, there was no "lax supervision" of DIB in 1999 about which the US could have warned the UAE.  Plaintiffs respond to the facts (MSJ 7) with just cryptic hearsay (SUF Resp. ¶ 16).  And Plaintiffs ***admit*** that the Dubai government "assumed oversight of DIB in 1998," *id.*

---

[7] Instead, they coyly state that these facts are "Disputed to the extent DIB seeks to rely on this statement to support the notion that it conducted a thorough investigation into allegations of terror financing."  SUF Resp. ¶¶ 24–27. Plaintiffs are improperly substituting legal argument for counter-evidence (which they require but lack).

¶ 18, and ***admit*** that the precipitating, substantial fraud against DIB "had nothing to do with al Qaeda or terrorism," *id.* ¶ 23.  While Plaintiffs try to dispute that "DIB's banking practices before 9/11 were consistent with applicable law and industry standards," *id.* ¶ 38, their citations do not support a dispute, and they give no reasoned objection to DIB's evidence.[8]

The discovery record thus devastates any effort to show that DIB had the requisite specific intent to aid attacks on the US.  Plaintiffs pivot from the facts, pointing to ostensibly "extremist" individuals affiliated with DIB at various times (Opp. 8–9), as though the mere affiliation proves DIB's intent: a board member from before the government's displacing of the board, *see* MSJ Ex. 27a at -737 (using 1997 information), and three former members of the board that advises on bank products' consistency with Islamic law and has never been involved in DIB's daily operations. MSJ Ex. 5 at 191–93; MSJ Ex. 8 ¶ 39.  But Plaintiffs do not contend that even *they* intended to aid al Qaeda's plan, only that they favored or were tied to extremist causes.  Even a defendant's *own* knowing support for US-designated terrorists is not necessarily enough to demonstrate the requisite intent.  *Waldman*, 835 F.3d at 339–40 & n.13.  Further, Plaintiffs largely support these accusations with inadmissible, post-9/11 hearsay statements.

### 2.   The Declassified Files' Allegations Do Not Show That DIB Intended To Aid 9/11

Again, Plaintiffs fall back on the Declassified Files, which are immaterial as to 9/11.

Their ***only*** comment on DIB's mental state is the following: DIB stood out "because of [its] management's *apparently witting involvement* in the financial activities of … Usama Bin Ladin's Islamic Army" (MSJ Ex. 27a at -728).  That single, openly agnostic and speculative line about the Bank in the early to mid-1990s—hardly hazarding any position on whether DIB intended

---

[8] Plaintiffs did not depose DIB's expert witness or employ a rebuttal expert.  SUF Resp. ¶ 38.  Their objections to DIB's fact witnesses regarding the pre-9/11 period on the ground that they only address certain pre-9/11 periods cannot ground a genuine dispute, especially where Plaintiffs offer no contrary evidence.  *Id.* ¶¶ 38–40.

to target the US (the material point here)—does not create a genuine dispute of fact.  Again, the Files allege that Mr. Lootah was involved in unnamed transactions for bin Laden, but that conduct cannot imply DIB's intent to assist attacks in the US—attacks planned after Lootah left DIB.

The Files' allegations are also immaterial because they do not even show that Mr. Lootah had the requisite intent.  They do not state that Mr. Lootah himself, ostensibly acting before bin Laden's designation by the US or his approval of the 9/11 plot, knew of bin Laden's ambitions to target the US.  Even the Files themselves admit uncertainty as to the meaning of Mr. Lootah's supposed conduct.  *See id.* at -747 ("[it]t may be … that Lootah routinely" provided described services involving certain amounts, regardless of customer).  They certainly do not indicate that he specifically intended to aid attacks on the US.

## II.    THE DECLASSIFIED FILES ARE INADMISSIBLE AND UNRELIABLE

The Declassified Files are immaterial and insufficient on their face to establish personal jurisdiction.  In any event, they are also inadmissible hearsay and unreliable.

### A.    The Declassified Files Are Inadmissible

As explained (MSJ 26–28), the Declassified Files flunk the requirements of the public-records exception, which Plaintiffs largely ignore.  That includes ignoring Judge Hellerstein's exclusion of 9/11 Commission staff monographs and statements.  As explained (*id.* at 27), he found them inadmissible because they were only "initial" "findings and judgments" of Commission staff, "not a public office or agency," intended merely to "inform" the Commission's own report.  *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 155 (S.D.N.Y. 2009).  The latter constituted the agency's findings, *id.*, but the monographs and statements did "not necessarily reflect [the Commission's] views," as they were "written by a handful of investigators" and "not approved or endorsed by the Commissioners," *id.* at 153.  That was so even though the Commissioners appointed those investigators, *id.*, and their work informed the Commission.  Plaintiffs do not explain how the

heavily redacted Files, prepared by unknown employees to inform unknown projects, not purporting to represent the *CIA's* final position, could fare better.

Instead, Plaintiffs ask the Court to take them as gospel simply because they appear to have come from the CIA. They identify no case blessing the admissibility of any CIA or intelligence document. Such materials actually face unique trustworthiness problems. MSJ 27–28; *cf. Lamont v. DOJ*, 475 F. Supp. 761, 781 (S.D.N.Y. 1979) (suggesting "caution in dealing with unverified derogatory material within the files of an intelligence gathering agency"); J. Margulies, *The Right to a Fair Trial in the War on Terror*, 10 Gonz. J. Int'l L. 57, 59–60 (2007) (intelligence's goal is not "to solve an event that took place," but collect all possible information to aid prediction). While Plaintiffs cursorily cite *Owens v. Republic of Sudan*, it concerned unclassified State Department reports from a statutorily authorized investigation as to which the defendant forfeited and did not develop any untrustworthiness argument. 864 F.3d 751, 792–93 (D.C. Cir. 2017). Plaintiffs mention another MDL defendant's argument, but it concerned (1) disanalogous documents (CIA and FBI directors' formal, signed findings from a congressionally authorized, clearly identified inquiry) (2) whose admissibility this Court never addressed, as it found them unresponsive. *See* Order, ECF 3947 (Mar. 28, 2018).

Plaintiffs briefly invoke FRE 807 (Opp. 24), but it involves a *more* stringent test, requiring a showing of materiality and particular trustworthiness, which Plaintiffs do not try to make, just as they fail to engage DIB's showing of *un*trustworthiness, providing no illustrative case.

### B.  Confirming the Files' Inadmissibility As Untrustworthy, They Are Also Wrong[9]

While courts in determining under Rule 803 whether a document is trustworthy "should

---

[9] The Court may hold the Declassified Files inadmissible hearsay without resort to the evidence in this section, which DIB offers only should the Court find further material helpful to the inadmissibility inquiry.

not focus on questions regarding the accuracy … of [its] conclusions," *Moss v. Ole S. Real Est., Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991), "factual errors" may be reason to find a "report … not trustworthy," *Drew v. Oakland Cnty.*, 831 F.2d 294 (6th Cir. 1987); *see Cosmopolitan Shipping Co. v. Cont'l Ins. Co.*, 514 F. Supp. 3d 614, 624 (S.D.N.Y. 2021) (noting no one argued challenged documents were "untrustworthy or inaccurate"); FRE 807(a)(1).  Here, the Files are wrong on the main point for which Plaintiffs invoke them.  The Files say that bin Laden, his companies, and his financial officers opened DIB letters of credit.  But DIB issued no letters of credit for bin Laden or his companies—because only customers can order letters of credit (Ex. B ¶ 3) and they were not (*supra* p.6).  And, bin Laden financial officer Tayyib, who had accounts, never ordered any letters of credit.  Ex. B ¶ 4.  Lastly, Plaintiffs mistakenly suggest that bin Laden or his companies were the *beneficiaries* of letters of credit (Opp. 2 n.1, 15–16)—but the Files only describe them as *opening* letters—that is, they purportedly were the applicants, not beneficiaries.  *E.g.*, MSJ Ex. 27a at -747 ("letters of credit opened by Bin Ladin's companies").  Thus, the Files' only concrete allegation of aid to bin Laden, even if material, is wrong, underscoring their untrustworthiness.

The character accusations about Lootah are also wrong—the Files simply mis-portray him without any reliable basis.  Plaintiffs named Lootah as a witness, but then failed to take his deposition.  He is now deceased, and his son's declaration—which does offer admissible evidence—shows that the Files mischaracterize Lootah, his intentions, and his beliefs.  *See* Ex. C.

## III.   PLAINTIFFS' NEWFOUND ALTERNATIVE TO PURPOSEFUL DIRECTION, "CONSPIRACY JURISDICTION," LIKEWISE FAILS

Plaintiffs' brand-new "concerted action" theory of jurisdiction fails.  They identify no facts showing any conspiracy between DIB and al Qaeda.  Plaintiffs' invocation (Opp. 18) of an out-of-circuit case about aiding and abetting, not jurisdiction, does not square the circle.

Further, Plaintiffs are wrong that asserting concerted action relieves them from showing

that DIB "engaged in 'intentional, and allegedly tortious, actions … expressly aimed' at [US] residents." *9/11 III*, 538 F.3d at 94–95 (rejecting "concerted action theory," finding insufficient that defendants "*intended* to fund al Qaeda through their donations to Muslim charities," *knowing* of bin Laden's "jihad against the [US]," even if they "could and *did foresee*" that ultimate recipients "would attack targets in the [US]" (emphases added)); *9/11 VII*, 714 F.3d at 670–71 (allegations of "conspir[ing] with … bin Laden … to support and finance … [9/11]," insufficient).

The Supreme Court has expressly held that a "defendant's relationship with a … third party, standing alone," is "insufficient … for jurisdiction." *Walden*, 571 U.S. at 286. Nor did *Charles Schwab Corp. v. Bank of America*, 883 F.3d 68, 86–87 (2d Cir. 2018), suggest otherwise when acknowledging "a conspiracy theory of jurisdiction" in which a conspirator's forum contacts can be imputed to a defendant if pursuant to the conspiracy. *Schwab* was clear that, *consistent with* Supreme Court precedent, there is only purposeful direction "if the defendant expressly aimed *its conduct* at the forum." *Id.* at 87 (emphasis added). Courts applying *Schwab* have confirmed that "a plaintiff still must demonstrate that the defendant's conduct and connection with the forum is 'such that [it] should reasonably anticipate being haled into court there.'" *Contant v. Bank of Am.*, 385 F. Supp. 3d 284, 293 (S.D.N.Y. 2019). Plaintiffs have not done that.

## IV.    PLAINTIFFS HAVE NOT SHOWN THE REMAINING ELEMENTS FOR PERSONAL JURISDICTION

### A.    Plaintiffs Have Not Shown That Jurisdiction Over DIB Would Be Reasonable

This Court has already rejected Plaintiffs' stunning suggestion that JASTA's enactment could override the Constitution (Opp. 13, 14, 26), refusing to "consider as part of the due process analysis" the same JASTA finding Plaintiffs invoke now. *In re 9/11*, 295 F. Supp. 3d at 428. Plaintiffs' inapposite cases (Opp. 26–27) do not support the notion that constitutional requirements, *see Walden*, 571 U.S. at 284–88, somehow matter less in terrorism cases.

- 14 -

### B.  **Plaintiffs Have Not Shown A Statutory Basis For Jurisdiction**

Plaintiffs invoke CPLR "conspiracy jurisdiction," but do not satisfy its elements.  *See In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 323 n.24 (S.D.N.Y. 2020).  They alternatively invoke FRCP 4(k)(1)(C), which does not apply to defendants not served in the US, and 4(k)(2), which does not apply because the Constitution is unsatisfied and Plaintiffs continue to invoke the CPLR.  *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 807 (S.D.N.Y. 2005); *In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423, 435 (S.D.N.Y. 2009).  Further, they have not requested pendent jurisdiction for their state-law claims.

## V.    PLAINTIFFS' LAW OF THE CASE ARGUMENT IS WITHOUT MERIT

Plaintiffs contend that "law of the case" precludes this Court from examining jurisdiction on the facts.  That doctrine is discretionary, *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991), and does not apply when the prior decision concerned allegations and the court must resolve the same issue post-discovery, *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 647 (S.D.N.Y. 2015) (Rule 56 motion); *see Vasquez*, 477 F. Supp. 3d at 245 (granting post-discovery Rule 12(b)(2) motion, after having denied initial motion).  Further, as Plaintiffs admit, law of the case does not apply where there is an intervening change in the law or evidence.  *See* Opp. 11 n.5, 13.  There could be no greater change than that between pre-discovery allegations and post-discovery facts; none of Plaintiffs' cases involved such a change.  Additionally, the court in *In re Arcapita Bank B.S.C.(C)* was required to follow an earlier "appellate court" ruling in the case.  640 B.R. 604, 617 (S.D.N.Y. 2022).  That was why *Arcapita* distinguished *Bank Leumi*.  *Contra* Opp. 11 n.5.  Renewing a jurisdiction-testing motion after discovery is standard.  Plaintiffs do not actually argue otherwise or cite contrary authority.  *Id.*

### CONCLUSION

For the foregoing reasons, the Court should grant DIB's motion.

Dated: September 16, 2022

Respectfully submitted,

By:   */s/ Steven T. Cottreau*

      Steven T. Cottreau
      C. Kevin Marshall (admitted *pro hac vice*)
      Gabrielle E. Pritsker
      Audrey Beck (admitted *pro hac vice*)
      JONES DAY
      51 Louisiana Avenue, N.W.
      Washington, D.C. 20001
      Telephone: (202) 879-3939
      Email: scottreau@jonesday.com
      Email: ckmarshall@jonesday.com
      Email: gpritsker@jonesday.com
      Email: abeck@jonesday.com

      Juan P. Morillo (admitted *pro hac vice*)
      QUINN EMANUEL URQUHART & SULLIVAN LLP
      777 Sixth St., N.W.
      Washington, D.C. 20001
      Telephone: (202) 538-8174
      Email: juanmorillo@quinnemanuel.com

      *Counsel for Defendant Dubai Islamic Bank*