# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |
|---|---|

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.,* 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.,* 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.,* 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 04-cv-07279

**DEFENDANT DUBAI ISLAMIC BANK'S
RESPONSE TO PLAINTIFFS' AVERMENT OF FACTS AND
<u>RULE 56.1 COUNTERSTATEMENT OF FACTS</u>**

Defendant Dubai Islamic Bank ("DIB" or "the Bank") submits this response to Plaintiffs' Averment of Facts and Rule 56.1 Counterstatement of Facts Pursuant to Rule 56.1, ECF 8317-1, which Plaintiffs filed in opposition to DIB's motion for summary judgment and renewed motion for dismissal for lack of personal jurisdiction, and separately from Plaintiffs' Response to DIB's Rule 56.1 Statement of Material Facts, ECF 8316.  *See Kamrass v. Jefferies LLC*, 2020 WL 6807352, at *1 (S.D.N.Y. Nov. 19, 2020) (Daniels, J.) (citing response to plaintiff's Rule 56.1 statement of additional material facts).

Local Rule 56.1 (b), (d) provides that parties opposing a motion for summary judgment, "if necessary," shall include "additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried," and further requires that "each statement … must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Plaintiffs' statements here are not material to any of DIB's undisputed facts for purposes of Rule 56 nor to Plaintiffs' required showing of personal jurisdiction under Rule 12, they are not followed by citation to supporting or admissible evidence, and/or they constitute legal argument rather than short, concise statements of fact.  *See* Fed. R. Civ. P. 56; *Dorchester Fin. Sec. v. Banco BRJ*, 722 F.3d 81, 84–85 (2d Cir. 2013); *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 250–51 (S.D.N.Y. 2020); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 393–97 (S.D.N.Y. 2015).  The Court may "simply disregard" such statements.  *SEC v. Gallison*, --F. Supp.3d--, 2022 WL 604258, at *1 n.1 (S.D.N.Y. Mar. 1, 2022) (Daniels, J.).

68.     On September 3, 2021, President Biden issued Executive Order 14040 ("EO 14040"), requiring declassification reviews of certain documents concerning the terrorist attacks of September 11, 2001.  Among other requirements, EO 14040 mandated that federal agencies

1

conduct declassification reviews of "records that previously were withheld as classified, in full or in part, during discovery in *In re Terrorist Attacks on September 11, 2001*."  *See* EO 14040 at Sec. 2(b)(i).

**RESPONSE:** Immaterial.

69.     On March 29, 2022, the Central Intelligence Agency ("CIA"), through the Department of Justice ("DOJ"), provided "copies of documents that the CIA is releasing pursuant to section 2(b) of Executive Order 14040, along with an index that specifies which documents are responsive to specific requests in the subpoena," to be followed by a public posting on its website ("CIA Documents").  On April 1, 2022, the DOJ released an additional CIA document and revised index.  *See* June 16, 2022 Supplementary Expert Report of Jonathan M. Winer ¶ 1.1 (hereinafter "Winer Testimony") (citing March 29, 2022 and April 1, 2022 productions pursuant to EO 14040 enclosing CIA Documents), and July 29, 2002 Declaration of Jonathan Winer.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates the September 11, 2001, attacks ("9/11"). The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether Daubert challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.

I.      **THE CIA DOCUMENTS CONFIRM DUBAI ISLAMIC BANK'S EXTENSIVE AND WITTING SUPPORT FOR AL QAEDA WITH THE INTENT TO ADVANCE ITS TARGETING OF THE UNITED STATES**

70.     The CIA Documents consist of 864 pages of material that previously had been maintained as classified.  The CIA Documents include newly declassified finished intelligence about Osama bin Laden's and al Qaeda's relationships with DIB, members of DIB's senior management, and related parties.  *See e.g.*, CIA_000045, 320, 322, 326, 337, 363, 426, 510–511, 722, 724, 728, 734-38, 746-47, 749; Winer Testimony ¶¶ 3.1-3.16.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

71.     Finished intelligence created and issued by the CIA represents a different category of information from "raw intelligence," on which it is based.  Finished intelligence consists of analytic assessments by career intelligence officials, produced by experts in the areas covered by the finished intelligence product.  Thus, it constitutes an authoritative source of the CIA's assessment of facts, situations, events, persons, institutions, and issues covered in a finished intelligence report.  *See* Winer Testimony ¶ 3.2.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

72.     Finished CIA intelligence assessments are built upon both various types of raw intelligence, such as information for human sources ("humint"), information gathered electronically from telephonic or other communications that is transmitted electronically ("signals intelligence" or "sigint"), open-source intelligence ("osint"), from sources outside the United States government or which is otherwise public, and intelligence from imagery, such as that collected by satellites and drones ("imint"), among others.  *Id.*

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

73.     Career intelligence analysts from different intelligence agencies then interpret the data and use their existing expertise to evaluate it and to reach the assessments that are shared with others in the United States government, starting with the President and his senior staff at the White House and National Security Council ("NSC"), and senior national security officials in other agencies such as the U.S. Department of State ("State Department") and U.S. Department of Defense ("Defense Department").  *Id.*

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

74.     Normally, multiple sources of raw intelligence, as well as the knowledge and expertise of multiple layers of CIA analysts, are relied on to produce a finished intelligence

report.  *Id.*

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

75.     The scope of information covered by the 864 pages of CIA Documents regarding bin Laden and al Qaeda is broad both as to time, and to its scope of coverage of bin Laden's activities, networks, operations, and associates in the period leading up to the 9/11 attacks on the United States.  *See* Winer Testimony ¶ 3.3.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

76.     The CIA Documents include finished intelligence assessments that were distributed to senior U.S. government officials at the White House, State Department, Defense Department, and Justice Department, among others.  *Id.*

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

77.     These documents include reports on topics such as How Bin Ladin Commands a Global Terrorist Network, dated January 27, 1999; Bin Ladin's Terrorist Operations: Meticulous and Adaptable, dated November 2, 2000; Al-Qa'ida in Sudan, 1992-96: Old School Ties Lead Down Dangerous Paths, dated March 10, 2003; and a report by the Director of Central Intelligence provided to the 9/11 Commission, DCI Report: The Rise of UBL and Al-Qa'ida And the Intelligence Community Response, dated March 19, 2004, which reviewed earlier finished intelligence and found four analytic reports prior to the 9/11 attacks that warned of al Qaeda's preparation for "spectacular attacks resulting in numerous casualties," which could include "one or more terrorist attacks at any time." See Winer Testimony ¶ 3.4 (citing CIA_000108); see also CIA_000002-16, 18-36, 38-52, 64-141. Notably, this March 10, 2003 report described these advisories as "the fruit of painstaking analytic work." See CIA_000108. It also summarized the knowledge of the intelligence community as concluding

"that in Bin Ladin we were dealing with more than a 'terrorist financier' and that "in al-Qa'ida we were dealing with a sophisticated and determined global terrorist organization that represented a serious threat to the security of Americans at home and abroad." See CIA_000109.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.  Additionally, the phrase "the fruit of painstaking analytical work" does not refer to the "four analytic reports."

78.     The CIA Documents include two pieces of finished intelligence written prior to the 9/11 attacks which directly address the role of DIB in support of bin Ladin and al Qaeda. *See* Winer Testimony ¶ 3.5; CIA_000316-338, 721-804.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

79.     The finished intelligence set forth in CIA_000317-338, dated November 17, 1998, is entitled *Usama Bin Ladin's Finances:  Some Estimates of Wealth, Income and Expenditures*.  The finished intelligence describes the role that DIB's Chairman, Saeed Ahmed Lootah, played in facilitating fund movements for Bin Ladin through personally authorizing, stamping, and signing, "some of Bin Ladin's letters of credit." *See* Winer Testimony ¶ 3.6 (citing CIA_000326).  That report also states definitively:  "*Dubai Islamic Bank (DIB*) has served as a key financial conduit for Al-Qa'ida and for Bin Lad[i]n's companies in Sudan," and further stated that "Bin Ladin and his companies maintained [REDACTED] accounts at DIB" and that "DI[B] Chairman Saeed Ahmed Lootah is a close friend of Bin Ladin's." *Id.*; *see also* CIA_000337.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly

"to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether Daubert challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

80.     This November 17, 1998 report names bin Ladin's chief financial officer at the time as Madani Al-Tayyib, and states that he "and other Al-Qaida members held numerous accounts at Dubai Islamic Bank because of Bin Ladin's reported friendship with DIB Chairman, Saeed Ahmed Lootah." *See* Winer Testimony ¶ 3.5; CIA_000322, 337.[1]

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  DIB Reply Br. 6–8, 10–12.  Plaintiffs' own sources state that Madani Al-Tayyib was arrested in 1997.  *Supra* n.1.  Further immaterial because Madani Al-Tayyib's DIB accounts undisputedly were not used to fund 9/11 or al Qaeda, and he undisputedly was not designated as a terrorist before 9/11.  SUF Resp. ¶¶ 49, 64–67.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6 n.4.

81.     This report also contains an Appendix, entitled *Islamic Banks Possibly Harboring Bin Ladin's Wealth*.  It states that:  "Of some 180 Islamic banks operating worldwide, [REDACTED] a handful may house Bin Ladin-linked accounts."  The first such bank it lists is DIB.  The Appendix states that DIB "has served as a key financial conduit for Al-Qa'ida and for Bin Ladin's companies in Sudan, [REDACTED] Bin Ladin and his companies maintained [REDACTED] accounts at DIB [REDACTED] DIB Chairman Saeed Ahmed Lootah is a close friend of Bin Ladin's." *See* Winer Testimony ¶ 3.8; CIA_000337.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise

---

[1] There is later confirmation of the U.S. government's assessment of Tayyib's role as playing a major financial role for al Qaeda. See, for example, the 9/11 Commission statement that "Several officials told us, in particular, that the United States could not get direct access to an important al Qaeda financial official, Madani al Tayyib, who had been detained by the Saudi government in 1997." Chapter 4.3 of the 9/11 Commission Report written by the National Commission on the Terrorist Attacks Upon the United States ("9/11 Commission"), at https://9-11commission.gov/report/911Report_Ch4.htm. See Winer Testimony ¶ 3.7, n.6.

describe does not relate to and significantly predates 9/11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.

82.     The second piece of finished intelligence written prior to the 9/11 attacks and directly addressing the role of DIB and its management's support of bin Ladin and al Qaeda is CIA_000721-804, an 84-page Intelligence Report, entitled *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions, A Research Paper*, which states its *Key Findings* as based on information available as of November 20, 1997.  *See* Winer Testimony ¶ 3.9.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12  & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

83.     Those "Key Findings" specifically address the role DIB played in funding and supporting Al Qaeda.  The Key Findings, and the information on which they are based, are specific, concrete, and detailed.  *See* Winer Testimony ¶ 3.10.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are

inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

84.    With regard to DIB, the CIA finished intelligence report entitled *Funding Islamic Extremist Movements:  The Role of Islamic Financial Institutions, A Research Paper*, sets forth the following facts and findings:

*Excerpts from Key Findings Section*

a)    "Several Islamic financial institutions – those that ascribe to the Koran's principles against the payment of interest – regularly serve as financial conduits and sources of financial support for a range of Islamic extremist groups, organizations and political parties.  Some of these extremists have been involved in terrorist activities.  Our study of [REDACTED] on some 130 Islamic financial entities has revealed that Bank Al Taqwa and Dubai Islamic Bank demonstrate especially close financial and personal ties to Algeria's Islamic Salvation Front (FIS), Egypt's Gama'at al Islamiyya (IB), the Palestinian Islamic Resistance Movement (HAMAS), Saudi exile Usama bin Ladin's terrorist Islamic Army, and other Muslim Brotherhood-backed groups [redacted] extremist ties to the Saudi-owned Dar Al Maal Al Islami and Dallah Al Baraka bank groups and Al Rajhi Banking & Investment Company, [REDACTED].  Specifically:"

b)    "Dubai Islamic Bank (DIB) is a key financial conduit for Usama Bin Ladin's Islamic Army, HAMAS, and Oman's Muslim Brotherhood, [REDACTED].  The bank's chairman, Saeed Ahmed Lootah, is a member of the MB and a close friend of Bin Ladin's, [REDACTED] Bin Ladin and his Sudan-based companies maintain several accounts at DIB.  The bank also is used by such nongovernment humanitarian organizations (NGOs) as Human Appeal International – an alleged financial conduit for HAMAS – and the Dar al-Birr Society, which has financed the Bosnian Mujahaddin." *See* CIA_000722.[2]

c)    "In addition to providing the ability to bank in accordance with their religious beliefs, Islamic activists – and militants – are attracted to Islamic banks for two other reasons:

---

[2] In the 1990's, the United States government and bin Ladin both used the term "Islamic Army" to designate his international terrorist group dedicated to opposing non-Islamic governments with force and violence, particularly during the period bin Ladin was located in Sudan from 1992-1996, in addition to the term "Al Qaeda," which bin Ladin used from 1989 forward. The CIA World Factbook reference guide for terrorist groups currently uses the following as the different names of this organization: al-Qa'ida (AQ), aka – al-Qa'eda; al-Qaeda; Qa'idat al-Jihad (The Base for Jihad); formerly Qa'idat Ansar Allah (The Base of the Supporters of God); the Islamic Army; Islamic Salvation Foundation; The Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; the World Islamic Front for Jihad Against Jews and Crusaders; the Usama Bin Ladin Network; the Usama Bin Ladin Organization; al-Jihad; the Jihad Group; Egyptian al-Jihad; Egyptian Islamic Jihad; New Jihad. https://www.cia.gov/the-world-factbook/references/terrorist-organizations/. See Winer Testimony ¶ 3.10.1, n.8.

Top management affiliations with the MB, HAMAS, and the NIF make Islamic banks a safehaven for extremist funds. [REDACTED] In addition, low-level bank employees at Islamic institutions – who are often hired on the basis of commitment to Islam – may turn a blind eye to money movements by extremist groups. Finally, a general lack of local regulatory scrutiny – as compared with regulation at conventional institutions – may offer additional confidence to extremists that their financial activities will not be closely examined." See CIA_000723-724.

d)      "Because of a significant amount of cross-ownership among Islamic financial institutions, Islamic bank boards of directors and management teams share common personnel that may result in influence over bank policy with regard to dealing with extremists.  Approximately 60 of the Islamic financial institutions examined were capitalized by Sheikh Kamel's Dallah Al Baraka Group and Prince Muhammad's Dar Al Maal Al Islami Trust, according to the financial press and bank annual reports, which affords them representation on numerous Islamic bank boards.  In addition, MB member and DIB Chairman Lootah is a director of four Islamic banks in Bahrain and Bangladesh..." *See* CIA_000724.

*Excerpts from the Scope Note*

e)      "This paper analyzes the financial and personal ties of Islamic radical movements to Islamic financial institutions [REDACTED].  It is not intended to suggest that most Islamic finance houses knowingly conduct dealings with terrorists or that Islamic militants use Islamic banks exclusively to conduct financial dealings. . . . A handful of Islamic banks, however, appear[] to be actively engaged in financial militant groups, and some bank executives have personal ties to Islamic extremists and activists.  The purpose of this paper is to document reporting on this particular avenue for the financing of radical Islam and Islamic extremists and to assess its vulnerabilities." *See* CIA_000727.

*Excerpts from Body of Report:  "Funding Islamic Extremist Movements:  The Role of Islamic Financial Institutions.*

f)      "Our review [REDACTED] suggests that Islamic extremist groups—some of which have undertaken extensive terrorist operations – make regular use of Islamic banks to maintain accounts and transfer funds. . . .  Of the roughly 130 Islamic financial entities examined, [REDACTED] Bank Al Taqwa and Dubai Islamic Bank stand out from other Islamic financial institutions because of their management's apparently witting involvement in the financial activities of Egypt's Gama-'at al Islamiyya (IG), the Palestinian Islamic Resistance Movement (HAMAS), Usama Bin Ladin's Islamic Army, as well as numerous Muslim Brotherhood factions that are bent on establishing Islamic states." *See* CIA_000728.

g)      "Dubai Islamic Bank"

"Dubai Islamic Bank (DIB) is a financial conduit for Usama Bin Ladin's Islamic Army and HAMAS, [REDACTED] ties of the banks and its directors to several NGOs that allegedly remit funds to HAMAS and militant-Afghani and Bosnian extremist groups.  Saeed Ahmed Lootah, DIB's chairman (*see* figure 1), is anti-Western – ascribing to various conspiracy theories regarding the intentions of the United States and other Western countries to control the Islamic world [REDCATED] He also is known for deep religious conservatism and strong support – financial and otherwise—for Islamic political causes.  [REDACTED].  Lootah (*see* figure 2) also has ties to Bank Al Taqwa adviser Sheikh Youssef Al Qaradawi, Usama Bin Ladin, and NIF leader Turabi.  His religious conservatism apparently extends to DIB's personnel policy; bank employees are forbidden to be involved in outside business activities, nor are they to associate with non-Muslims, [REDACTED]."  *See* CIA_000734.

"***Financial Links to Usama Bin Ladin and the Islamic Army.*** [REDACTED] Lootah is a close friend and business associate of Usama Bin Ladin's, head of the Islamic Army – a pan-Islamic militant group established during the Afghan war (*see* insert).  Its goal is to bring about the return of the Caliphate – the office held by a successor to the prophet Muhammad who serves as the spiritual leader of Islam.  [REDACTED] that Bin Ladin's Sudan-based companies are customers of DIB."  *See* CIA_000735.

"Lootah and DIB have alleged ties to other Dubai-based individuals and firms that maintain financial links to Bin Ladin."  *See* CIA_000735.

"Bin Ladin's … use of Dubai Islamic Bank probably stems from his purported friendship with DIB Chairman Lootah."  *See* CIA_000736.

"***Financial Links to Oman's Muslim Brotherhood.***  Lootah was one of the principal financial supporters of the Omani Muslim Brotherhood (OMB) as of late 1994, [REDACTED].  He purportedly aided Hami Al Ghazali – a leader of a group of Islamic extremists in Oman – who controlled and directed the OMB's sizable portfolio of investments at that time.  In addition to DIB, an important repository for OMB investments was Abrar Investments in the United States.  [REDACTED].  Muscat arrested hundreds of OMB members in 1994 for plotting to overthrow the government.  [REDACTED]."  *See* CIA_000737.

"***Ties to Radical NGOs.***  DIB and Lootah have connections to several Islamic NGOs that purportedly fund militant causes.  A principal connection probably is through DIB board member Sheikh Yousif Jassim Al Haji – an important leader in Kuwait's extensive network of private

charities.  Al Haji is chairman of the Kuwait-based International Islamic Charities Organization (IICO), an NGO that oversees 150 member organizations worldwide.  [REDACTED], the IICO was established in 1986 as a cover entity for the safe and efficient management of MB [Muslim Brotherhood] finances.  [REDACTED] the IICO sends funds [REDACTED] to the Peshawar, Pakistan-based Maktab-ul Khedamat, an NGO that coordinates activities of militant Afghanis and supports the Bosnian Mujaheddin. . .  Al Haji's position as DIB director suggests that some of the Kuwaiti ownership in DIB is held by IICO and that some of DIB's annual zakat payments (charitable donations) are channeled to the IICO and IDO."  *See* CIA_000737.[3]

"Lootah actively participates in the UAE-based Jama'iyah Al-Isiah Ad-Diny (Association for Religious Reform), which collects donations throughout the UAE to support MB causes worldwide."  *See* CIA_000738.

"DIB Chairman Lootah personally authorized, stamped, and signed some letters of credit opened by Bin Ladin's companies in Khartoum through DIB.  [REDACTED] It may be the case that Lootah routinely authorizes all letters of credit beyond a particular monetary value that require confirmation by DIB; however, Lootah's purported friendship with Bin Ladin suggest greater personal service for this customer.  [REDACTED]. *See* CIA_000747, CIA_000326.[4]

**"Common Ownership and Management of Islamic Financial Institutions"**

"Ownership and top management of Islamic banks are close-knit, with capital essentially provided from a relatively small population of wealthy, religious individuals in Gulf countries. . .  several Islamic bank directors identifiable with the Muslim Brotherhood raise concern over their influence in more benign institutions:"

"Dubai Islamic Bank (DIB) Chairman Saeed Ahmed Lootah is a Director of Albaraka Islamic Investment Bank in Bahrain, Bahrain Islamic Bank, Bahrain Islamic Investment company, and Islami Bank Bangladesh, according to various annual reports.  Lootah also may wield influence

---

[3] Footnote 15 to this section of the CIA report states that the Maktab-ul Khademat (MK) [sic] "serves as a coordinating organization for the Majahhadin [sic]in Afghanistan and Pakistan and, despite its involvement in legitimate charitable activities, its primary aim is the prosecution of jihad (holy war) against those who oppress Muslims. Employees of MK have been implicated in several terrorist incidents, including the World Trade Center Bombing." See Winer Testimony ¶ 3.10.4, n.18.

[4] See also CIA_000426. In addition to working with bin Ladin's companies in Sudan, DIB Chairman Lootah and his businesses worked with an al Qaeda company in Jabal Ali, UAE, managed by Abu Khalifa al Omani, an al Qaeda member who "handles Bin Ladin's money in the Gulf under Madani Al-((Tayyib))'s supervision." As further found in CIA_000426, the al Qaeda company was providing money to "Saudi and Yemeni" groups, while working with Lootah's businesses, "which in turn cooperate with Bin Ladin's companies." See Winer Testimony ¶ 3.10.4, n.20.

through DIB's shareholding in Al Baraka Turkish Finance House and Tadamon Islamic Bank." *See* CIA_000749.

*See* Winer Testimony ¶¶ 3.10-3.10.4.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  Further immaterial in light of the fact that Plaintiffs elsewhere do not dispute that the Dubai government "initiated changes to the bank's management and leadership" in 1998, nor that "a new Board of Directors was appointed in early 1999."  *Id.* ¶¶ 19–21.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

85.     The CIA finished intelligence report of November 20, 1997 contains a 49-page Appendix in the form of a chart organized alphabetically by country entitled, *Islamic Financial Institutions Worldwide*.  *See* CIA_000755-000804.  Page 42 of that Appendix provides an entry on DIB.  *See* Winer Testimony ¶ 3.10-5.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6–8, 10–12 & 6 n.4.

86.     The entry provides information on DIB's country of origin (U.A.E.), its home office, year established, branches, locations and assets, subsidiaries, affiliates, other holdings, its ownership, its directors and top management, its links to "Islamic Fundamentalists," the Muslim Brotherhood and "Islamic Extremist," and "Other Information and Analytical Comments.  *See* Winer Testimony ¶ 3.10-5; CIA_000797.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

87.     The section on DIB's branches lists eight foreign branches, two of which are specified:  one in Faisalabad, Pakistan; and a second in Turkmenistan.  *See* Winer Testimony ¶ 3.10-6; CIA_000797.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6–8, 10–12 & 6 n.4.

88.     The section on DIB's ownership lists the Dubai Government as its largest shareholder, at 20%, and the Government of Kuwait and the Board of Directors of DIB as the next largest shareholders at 10% each.  The directors and top management were listed as Saeed Ahmed Lootah, as "C" and "MD," which the Appendix specifies to mean chairman and managing director, with most of the other directors, including the "DC," the deputy chairman, and three other board members to have the same last name of Lootah, suggesting they are members of the chairman's family, giving the Lootah family a majority of the total nine seats on the DIB board.  It also lists Yousif Jassim al Haji on the Board, whom the report separately describes as heading the IICO, which handled finances for the Muslim brotherhood, including for the Maktab-ul Khedamat [sic], which as stated above, is described as "an NGO that coordinates activities of militant Afghanis and supports the Bosnian Muhjahddin."  *See* Winer Testimony ¶ 3.10-7; CIA_000797.

**RESPONSE:** Plaintiffs elsewhere do not dispute that DIB's largest shareholder is the Dubai government, nor that the Dubai government "initiated changes to the bank's management and leadership" in 1998, nor that "a new Board of Directors was appointed in early 1999."  SUF Resp. ¶¶ 19–21.  Otherwise, immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

89.     The section on *Links to Islamic Fundamentalists, the Muslim Brotherhood and Islamic Extremists*, states that "Lootah is a close friend and business associate of extremist financier Usama Bin Ladin, whose companies are active customers of DIB.  The bank maintains accounts for several NGOs which are suspected of financing radical Islamic groups; it appears for example, to be one of the principal banks for Human Appeal International, an NGO that funds HAMAS.  Former Kuwaiti Minister of Awaqf, Yusif Jassim al Haji, an Egyptian, heads the Kuwait Joint Relief Committees, Kuwait's International [sic] Islamic Charities Organization (IICO), and is a board member of Sudan's Islamic Dawa Organization, [REDACTED]."  *See* Winer Testimony ¶ 3.10-8; CIA_000797.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.

90.     The section on *Other Information and Analytic Comments* states that "Youssif Jassim Al Haji's position as a DIB Director suggests the IICO owns a stake in the bank.  Lootah was one of the original founders of Faisal Islamic Bank of Sudan."  *See* Winer Testimony ¶ 3.10-9; CIA_000797.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial because Plaintiffs elsewhere do not dispute that the Dubai government "initiated changes to the bank's management and leadership" in 1998, nor that "a new Board of Directors was appointed in early 1999."  SUF Resp. ¶¶ 19–21.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.

91.     The CIA Documents also contain a finished intelligence report written after the 9/11 attacks, dated March 10, 2003, entitled *Al-Qa'ida in Sudan, 1992-96:  Old School Ties Lead Down Dangerous Paths*.  The Key Findings of this report state that the Sudan period enabled Al Qaeda to transform "from an only partially realized idea to an international organization ready to operate on its own."  To do this, "Al Qaeda received funding from wealthy backers of the Sudanese regime and the international jihad they supported.  *See* Winer Testimony ¶ 3.11; CIA_000039.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

92.     This 2003 report states that during this critical period of incubation for al Qaeda's ability to conduct "international jihad," bin Ladin forged and used financial relationships he had developed with DIB and Lootah.  Here, two years after 9/11, the CIA again concluded that "Bin Ladin's Sudan-based companies and his financial officers opened bank accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah."  *See* Winer Testimony ¶ 3.12; CIA_000045.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise

14

describe does not relate to and significantly predates 9/11. Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35. It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37. The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6–8, 10–12 & 6 n.4. The characterization of the CIA Documents is not a fact, but conclusory legal argument. Further, Plaintiffs' reference to "international jihad" is taken out of context, and in fact does not appear at CIA_00045, which never states that there was any "financial relationship[]" between DIB and bin Laden.

93.     Thus, two years after the 9/11 attack on the United States, the CIA continued to assess that DIB and its management had provided support to bin Ladin and al Qaeda during the period it found to be critical to the latter's development of its global strike capability, including its capability to attack the United States.

**RESPONSE:** Supported by no evidence. The statement is not a fact, but conclusory legal argument.

94.     The CIA Documents include a retrospective review of *The Rise of UBL and Al-Qa'ida and the Intelligence Community Response*, dated March 19, 2004, provided to the 9/11 Commission. *See* Winer Testimony ¶ 3.14; CIA_00064-141.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11. The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6–8, 10–12 & 6 n.4. The characterization of the CIA Documents is not a fact, but conclusory legal argument.

95.     This review found that during bin Ladin's 1992-1996 period in Sudan, Islamic extremists who bombed a hotel housing U.S. servicemen in Aden, Yemen, said bin Ladin financed their group, "according to all source reporting," that "Bin Ladin business interests had funneled money to Egyptian extremists," who used the funds to buy weapons (among other purposes), and that bin Ladin during this period became "the key financier" for a terrorist training camp in Afghanistan, which provided terrorist training to terrorist groups, including one that carried out an effort to assassinate Egypt's President. *See* Winer Testimony ¶ 3.14; CIA_000068-69.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11. The CIA Documents are inadmissible

for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject
of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37
motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.  The characterization of the CIA Documents is not a
fact, but conclusory legal argument.

96.     This CIA report said that during this period bin Ladin was also working on plans
to develop methods "to deliver poisonous gases in an explosive that could be fired at US troops
in Saudi Arabia and tried to develop cyanide gas bombs."  *See* Winer Testimony ¶ 3.14;
CIA_000069.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct,
knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise
describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible
for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject
of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37
motion.  DIB Reply Br. 6–8, 10–12 & 6 n.4.

97.     In addition to the finished intelligence reports discussed above, evidence of DIB's
role in supporting al Qaeda also appears in the Summary of Evidence for Combatant Status
Review Tribunal of Al Baluchi, Ammar, dated March 28, 2007.  *See* Winer Testimony ¶ 3.16;
ECF No. 2973-16 at 1-2 (Summary of Evidence for Combatant Status Review Tribunal – Al
Baluchi, Ammar, to Personal Representative from OIC, CSRT (28 Mar 07)).

**RESPONSE:** The cited material is inadmissible for among other reasons, including that it is
inadmissible  hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and
his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.  Plaintiffs
mischaracterize the CIA Documents, as well as the cited material, setting forth not a fact, but
conclusory legal argument.  The CSRT Summary states that Al Baluchi, also known as Aziz Ali,
opened a DIB account in 2000, which is immaterial in light of the undisputed fact that there is no
evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot
principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery
"were used to fund Al Qaeda through specific transactions."  SUF Resp. ¶¶ 66–67; *see also id.* ¶¶
52–65.  Further immaterial in light of the undisputed fact that there is no evidence that Aziz Ali
"withdrew funds before the 9/11 attacks in support of his own activities," nor that he was not
designated as a terrorist before 9/11.  *Id.* ¶¶ 49 (disputing latter only "on relevance grounds"), 52.
Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed
sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with
any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama
Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  *Id.* ¶ 35.  It is undisputed that
DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties
named," and that "DIB required employees to check [them] when opening accounts and
conducting transactions."  *Id.* ¶¶ 36–37.

98.     Evidence of DIB's support for al Qaeda is further described in the interview of
Jamal al Fadl by the Federal Bureau of Investigation ("FBI"), transcription dated 2/4/98,
regarding the activities of Madani al Tayyib in carrying out various support activities for bin
Ladin and al Qaeda including collecting funds for al Qaeda, and his emergence as "Emir of

finances for AL-QAIDA." *See* Winer Testimony ¶ 3.16; FED-PEC0202133-202146.

**RESPONSE:** Immaterial, because FED-PEC0202133-202146 does not refer to DIB.  Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1.  DIB Reply Br. 6–8, 10–11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  FED-PEC0202133-202146 is inadmissible for among other reasons, including that it is inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.  Plaintiffs mischaracterize the CSRT Summary, as well as the cited material, setting forth not a fact, but conclusory legal argument.

99.     This latter document states that "Al-TAYYIB had a relationship with AHMED LOOTAH from the United Arab Emirates."  The information in this raw intelligence is consistent with the findings in the finished intelligence regarding DIB's and Lootah's support for al Qaeda.  *See* Winer Testimony ¶ 3.16; FED-PEC0202138.

**RESPONSE:** Immaterial, because FED-PEC0202133-202146 does not refer to DIB.  Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1.  DIB Reply Br. 6–8, 10–12.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  FED-PEC0202133-202146 is inadmissible for among other reasons, including that it is inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.  Plaintiffs mischaracterize the CIA Documents, as well as the cited material, setting forth not a fact, but conclusory legal argument.

## II.     **BIN LADEN'S SUDANESE BUSINESSES WERE PART OF AL QAEDA ITSELF AND PLAYED A CRITICAL ROLE IN SUSTAINING AL QAEDA'S SYMBIOTIC RELATIONSHIP WITH THE NATIONAL ISLAMIC FRONT**

100.     Bin Laden's Sudanese business that were supported by DIB through the direct involvement of its Chairman Saeed Lootah were part of al Qaeda itself, and played a critical role in sustaining al Qaeda's symbiotic relationship with the National Islamic Front ("NIF").

**RESPONSE:** Supported by no evidence.  The statement is not a fact, but conclusory legal argument.

101.    As determined by the CIA, "During his five-year residence in Sudan, Bin Ladin combined business with *jihad* under the umbrella of al Qaeda."  *See* CIA_000068.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12.

102.    Pursuant to this model, bin Laden's businesses were used to fund al Qaeda operations, including the travel of extremists to Sudan for training and the funding of al Qaeda camps, and "worked with Sudanese military officials to transport, provision, and train Islamic extremists in Sudan."  *Id.*; *see also* FED-PEC0003739-3895, Indictment, *U.S. v. Usama bin Laden*, Case No. 98-cr-1023, at 13 ("These companies were operated to provide income to support al Qaeda and to provide cover for the procurement of explosives, weapons and chemicals and for the travel of al Qaeda operatives.").

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents and FED-PEC0003739-3895 are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12.  Plaintiffs' characterization is not a fact, but conclusory legal argument.

103.    Bin Laden's business also carried out projects and provided funding to the NIF, and in exchange the NIF provided land for al Qaeda training camps and training critical to al Qaeda's development into a sophisticated terrorist organization.  *See* CIA_000043 ("Al-Qaida also contributed money, labor, and material to building up Sudan's physical infrastructure."); CIA_000375 (Bin Laden's company Wadi al Aqiq constructed the road between Damazin and Kurmuk for the NIF); CIA_000376 ("Bin Laden agreed to provide funding for the Sudanese Civil Defense and to build the 'Challenge Road' from Khartoum to Port Sudan in exchange for land on which to establish a camp.").

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12.

104.    The businesses also provided cover for NIF intelligence activity, while also providing cover for al Qaeda operatives.  *See* PEC-FOIA047957-47958, January 22, 1996 U.S. Department of State, Bureau of Intelligence and Research, Intelligence Assessment, *Terrorism: Bin Ladin's Network*, at 1.

**RESPONSE:** Immaterial, because the statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11. The cited material is inadmissible for among other reasons, including that it is inadmissible hearsay. DIB Reply Br. 6–8, 10–12.

105.    Thus, bin Laden's businesses were financial and operational arms of al Qaeda itself.

**RESPONSE:** Supported by no evidence. The statement is not a fact, but conclusory legal argument that does not refer to DIB.

## III.    AL QAEDA'S FINANCIAL CHIEF SAIDI MADANI AL TAYYIB USED ACCOUNTS AT DIB FOR CORE AL QAEDA OPERATIONS

106.    As indicated above, senior al Qaeda member and financial chief Saidi Madani al Tayyib maintained accounts at DIB during his tenure as al Qaeda's financial chief, based on bin Laden's relationship with DIB Chairman Saeed Ahmed Lootah.

**RESPONSE:** Supported by no evidence. The statement is not a fact, but improper, conclusory legal argument. Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1. DIB Reply Br. 6–8, 10–12.

107.    Jamal al Fadl, a former al Qaeda member who became a cooperating witness for the United States, provided the FBI with key details regarding Tayyib's role as bin Laden's advisor and financial chief, including but not limited to the following:

    a)    "Al-Tayyib became a secretary (in a high ranking manner) in al-Qaida and was now in charge of most of Osama bin Ladin's money, including the money located outside of Sudan." *See* FED-PEC0202133-202146 at 202136; *see also* 9/11 Commission Final Report at pp. 68, 122 (describing Tayyib as the "head of al Qaeda's finance committee" and "an important al Qaeda financial official");[5] CIA_000320 (identifying Tayyib as "the chief financial officer of the Al-Qa'ida organization"); CIA_000510 ("Until early 1997, al-Qa'ida's senior financial officer was Saudi national Sidi al-Ghazi Madani al-Tayyib – Bin Ladin's brother-in-law. Tayyib headed the financial and administrative committee, which supervised al-Qa'ida's overall finances and audited al-Qa'ida members.").

    b)    "Al-Tayyib controlled and monitored Osama bin Ladin's money and kept portions of the money in banks under his (Al-Tayyib) own name and in other names such as Abu Amjed, Abu Mahdi, and Abu Khalifah al Omani." *See* FED-PEC0202137.

---

[5] The 9/11 Commission Report is available at https://www.9-11commission.gov/report/911Report.pdf.

c)   "[W]hen Osama bin Ladin went to the Sudan, the Islamic Army grew.  As it grew [Jamal al Fadl] advised that it became closer with other terrorist groups and a formal Shura Council was formed.  [Al Fadl] advised that Al-Tayyib was part of this Shura Council from the very beginning.  At this time, Al-Tayyib basically became the man in charge of most of the finances for the Islamic Army and attended nightly meetings with Osama bin Ladin to discuss monetary issues.  [Al Fadl] advised that no one, except Osama bin Ladin, could make any decisions regarding money without an order coming from al-Tayyib."  *See* FED-PEC0202139.

d)   "[Al Fadl] advised that Osama bin Ladin would often designate separate accounts for different terrorist groups and that al-Tayyib controlled the flow of money to the groups on behalf of Osama bin Ladin."  *See* FED-PEC0202142.

e)   [M]oney donated to Islamic causes, i.e. from wealthy individuals in the Gulf area, money collected in Europe, and money collected from groups, was sent to Osama bin Ladin instead of the groups themselves."  "This money came to Osama bin Ladin and was subsequently controlled by al- Tayyib."  *See* FED-PEC0202142.

f)   Tayyib would distribute certain amounts to two individuals who "were in charge of salary, travel, and health benefits for al-Qaida."  *See* FED-PEC0202135.

g)   Al Fadl further advised the FBI "that al Tayyib had a relationship with Ahmed Lootah from the United Arab Emirates."  *See* FED-PEC0202138; Winer Testimony ¶ 3.16.

**RESPONSE:** Immaterial, because the FED-PEC pages do not refer to DIB.  Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1.  DIB Reply Br. 6–8, 10–12.  The FED-PEC pages are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.  Plaintiffs' characterization of the cited material is not a fact, but conclusory legal argument.

108.   Tayyib's relationship with DIB Chairman Saeed Ahmed Lootah and the bank has been corroborated by the CIA:

a)   "[REDACTED] Bin Ladin, financial officer Madani Al-Tayyib, and other Al-Qa'ida members held numerous accounts at Dubai Islamic Bank because of Bin Ladin's reported personal friendship with DIB Chairman, Saeed Ahmed Lootah."  *See* CIA_000322.

b)   "Bin Ladin also made financial and commercial connections in

Dubai.  For example, Bin Ladin's Sudan-based companies and his financial officers opened bank accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah."  *See* CIA_000045.

c)   "(Unidentified) business located in Jabal Ali, United Arab Emirates (UAE) – the company is managed by ((Abu Khalifa Al-Omani)).  Abu Khalifa handles Bin Ladin's money in the Gulf under Madani Al-((Tayyib))'s supervision.  The company provides money to Saudi and Yemeni groups.  It also works with Sa'id Ahmad ((Lootah's)) businesses (NFI), which in turn cooperate with Bin Ladin's companies.  Lootah is the one authorizes (stamps and signs) some of Bin Ladin's letters of credit."  *See* CIA_000426.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further not material in light of the undisputed fact that Tayyib's DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1.  DIB Reply Br. 6–8, 10–12. Further immaterial in light of the undisputed fact that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions."  SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether Daubert challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

109.   As al Qaeda's financial chief, Tayyib held at least two bank accounts at DIB during the time period that Osama bin Laden was in Sudan building al Qaeda into a sophisticated terrorist organization with the capabilities to carry our large-scale global attacks.

**RESPONSE:** Supported by no evidence.  The statement is not a fact, but conclusory legal argument.  Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1.  DIB Reply Br. 6–8, 10–11.

110.   To date, DIB has failed to produce a full and complete set of banking records relating to the two accounts, but the few account statements it has produced for the 1993-1996 timeframe show that Tayyib was handling significantly large sums of money and using the accounts for critical al Qaeda operations.

**RESPONSE:** Supported by no evidence.  The statement is not a fact, but conclusory legal argument.  Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11.  DIB Reply Br. 6–8, 10–11.  Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1.

111.    For instance, the 1993 annual statement for DIB Account No. xx-xxxxxxx-520-1 indicates that Tayyib deposited 621,230.90 U.A.E. Dirham ("AED") (approx. $171,279.54) into that account, with withdrawals totaling 587,474.00 AED (approx. $161,972.43).  *See* DIB_003540-3541,  3519.[6]

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11. DIB Reply Br. 6–8, 10–11.  Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1.  The footnoted source is inadmissible for among other reasons, including that it is inadmissible hearsay.

112.    In transactions dated April 22, 1993, Tayyib deposited 450,003.36 AED (approx. $124,070.41) into the account, and then quickly withdrew 450,000.00 AED (approx. $124,069.48) that same day.  *Id.*

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11. DIB Reply Br. 6–8, 10–11.  Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1.  Plaintiffs' characterization of the withdrawal is not a fact, but conclusory legal argument.

113.    In 1994, that same account experienced in increase in deposits to 1,061,775.30 AED (approx. $289,312.07), and withdraws totaling 1,073,663.80 AED (approx. $292,552.44).  *See* DIB_003518, 3543-3544.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11. DIB Reply Br. 6–8, 10–11.  Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he

---

[6] For converting U.A.E. Dirham to U.S. Dollars in 1993-1995, see U.S. Treasury Reporting Rates of Exchange available at https://www.govinfo.gov/content/pkg/GOVPUB-T63_100-e1e0d8a95bbb49f3372a0560770e65cd/pdf/GOVPUB- T63_100-e1e0d8a95bbb49f3372a0560770e65cd.pdf; https://www.govinfo.gov/content/pkg/GOVPUB-T63_100- d76dceb12c3da467a628389acb709b6b/pdf/GOVPUB-T63_100-d76dceb12c3da467a628389acb709b6b.pdf; https://www.govinfo.gov/content/pkg/GOVPUB-T63_100- 42e0f41eb43b88d1c2cac00261c88ec9/pdf/GOVPUB-T63_100- 42e0f41eb43b88d1c2cac00261c88ec9.pdf.

was arrested in 1997, *supra* n.1.

114.     Those transactions included a number of large deposits (*e.g.*, 366,800.00, 128,345.00, 109,950.00, 93,800.00, 85,028.00, 57,980.30, 55,020.00, and 44,902.00 AED) (approx. $99,945.50, $34,971.39, $29,959.13, $25,558.58, $23,168.39, $15,798.37, $14,991.83, and $12,234.88 respectively), with much of that money exiting Tayyib's account the same day as the deposit. For example:

>    a)     On September 6, 1994, Tayyib deposited 109,950.00 AED (approx. $29,959.13) into DIB Account No. xx-xxxxxxx-520-1, and withdrew 110,100.00 AED (approx. $30,000.00) the same day. *See* DIB_003518.

>    b)     On September 17, 1994, Tayyib deposited 44,902.00 AED (approx. $12,234.88) into DIB Account No. xx-xxxxxxx-520-1, and withdrew 45,000.00 AED (approx. $12,261.58) the same day. *See* DIB_003518.

>    c)     On September 19, 1994, Tayyib deposited 109,950.00 AED (approx. $29,959.13) into DIB Account No. xx-xxxxxxx-520-1, and withdrew 109,950.00 AED (approx. $29,959.13) the same day. *See* DIB_003518.

>    d)     On October 1, 1994, Tayyib deposited 128,345.00 AED (approx. $34,971.39) into DIB Account No. xx-xxxxxxx-520-1, and withdrew 121,500.00 AED (approx. $33,106.27) the same day. *See* DIB_003543.

>    e)     On December 1, 1994, Tayyib deposited 57,980.30 AED (approx. $15,798.45) into DIB Account No. xx-xxxxxxx-520-1, and withdrew 58,131.00 AED (approx. $15,839.51) the same day. *See* DIB_003543.

>    f)     On December 27, 1994, Tayyib deposited 85,028.00 AED (approx. $23,168.39) into DIB Account No. xx-xxxxxxx-520-1, and withdrew 85,722.50 AED (approx. $23,357.63) the same day. *See* DIB_003543.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11. DIB Reply Br. 6–8, 10–11. Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1. Plaintiffs' characterization of the deposits is not a fact, but conclusory legal argument.

115.     Annual account statements for Tayyib's DIB Account No. xx-xxxx543-2 for the 1993-1995 timeframe similarly detail very large deposits by Tayyib (e.g., 300,000.00, 299,050.00, 114,950.00, 85,213.60, 57,200,00, 38,583.15 AED), and comparable withdraws from the account the same day as, or within a few days of, the deposits. *See* DIB_003545-3548. For example, on January 2, 1995, Tayyib deposited 300,000.00 AED (approx. $81,743.87) into DIB Account No. xx-xxxx543-2, and withdrew that same amount two days later on January 4, 1995. *See* DIB_003548.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11. DIB Reply Br. 6–8, 10–11. Madani Al-Tayyib is further not material in light of the undisputed fact that his DIB accounts were not used to fund 9/11 or al Qaeda, he undisputedly was not designated as a terrorist before 9/11, SUF Resp. ¶¶ 49, 64–67, and Plaintiffs' sources state that he was arrested in 1997, *supra* n.1. Plaintiffs' characterization of the deposits and withdrawals is not a fact, but conclusory legal argument.

116.    All of these transactions carried out through Tayyib's DIB accounts occurred while he was serving as al Qaeda's financial chief and responsible for disbursements and transactions essential to al Qaeda's core operations.

**RESPONSE:** Supported by no evidence. The statement is not a fact, but conclusory legal argument.

IV.    **AL QAEDA WAS TRANSFORMED INTO AN INTERNATIONAL TERRORIST ORGANIZATION CAPABLE OF CARRYING OUT SOPHISTICATED TERRORIST ATTACKS WHILE IN SUDAN**

117.    As the conclusions and assessments presented in the CIA Documents establish, "al-Qa'ida was transformed from an only partially realized idea to an international organization ready to operate on its own," while in Sudan and receiving critical support from DIB. *See* CIA_000039-40.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11. Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35. It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37. The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay. DIB Reply Br. 6–8, 10–12. The characterization of the CIA Documents is not a fact, but conclusory legal argument. Moreover, Plaintiffs mischaracterize CIA_00039-40, which does not refer to DIB or state that it was providing support to al Qaeda.

118.    "With the help of the NIF, al-Qa'ida solidified its formal structure, learned or enhanced key skills, and made the contacts necessary to become a self-sufficient international terrorist organization." *See* CIA_000043.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11. Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly

"to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12.  The cited page does not refer to DIB.

119.   "[T]he connections and capabilities al-Qa'ida developed in Sudan remained strong after they moved to Afghanistan." *See* CIA_000048.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12.  The cited page does not refer to DIB.

120.   DIB was actively supporting, aiding and abetting, and conspiring with bin Laden, his companies, and al Qaeda during this period.  *See supra* ¶¶ 79, 81, 84, 91, 92, 96, 96, 98-116.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

## V.   U.S. COUNTERTERRORISM ENGAGEMENTS WITH THE U.A.E. CONFIRM THAT DUBAI ISLAMIC BANK'S SUPPORT FOR AL QAEDA REMAINED ACTIVE DURING THE 9/11 OPERATION

121.   Following the August 7, 1998 bombings of U.S. Embassies in Kenya and in Tanzania, U.S. government focus on al Qaeda and bin Ladin was intensive.  *See* Winer Testimony ¶ 4.1.

**RESPONSE:** Immaterial. The statement does not refer to DIB. Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6 n.4.

122. In the course of that focus, the White House maintained centralized oversight over counter-terrorism efforts regarding bin Ladin and al Qaeda, which included regular meetings at the NSC, typically directed by then White House counter-terrorism czar Richard Clarke. *Id.*[7]

**RESPONSE:** Immaterial. The statement does not refer to DIB. The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6–8, 10–12 & 6 n.4. The characterization of the CIA Documents is not a fact, but conclusory legal argument.

123. Within the context of that process, the U.S. government undertook interagency diplomatic efforts with the U.A.E. concerning bin Ladin's relationship with Dubai Islamic Bank, as reflected in contemporaneous media reports and statements by U.S. officials. *Id.*; *see also* FED-PEC0212914-212919, Stephen Braun, *Emirates Looked Other Way While Al Qaeda Funds Flowed*, Los Angeles Times, January 20, 2002 (reporting that following the U.S. Embassy bombings, U.S. officials pressed U.A.E. officials to implement tighter banking controls and specifically asked "that some Taliban accounts be closed at Dubai Islamic Bank," at a time when the bank's chairman, Mohammed Khalifan bin Kharbash, was also the U.A.E. minister for financial and industrial affairs.). *See also* Exhibit 14, PEC-DIB001015-1026, August 1-3, 2017 Deposition of Dr. Hussein Hamid Hassan.

**RESPONSE:** Plaintiffs' statement mischaracterizes all sources cited, setting forth not a fact, but conclusory legal argument. FED-PEC0212914-212919, duplicated at Exhibit 14, PEC-DIB001015-1026, does not mention bin Ladin or al Qaeda in connection with DIB, and the allegation regarding Taliban accounts is immaterial, as there undisputedly is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions." SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65. Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" *Id.* ¶ 35. It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37. The cited article is inadmissible for among other reasons, including that it is inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6 n.4.

---

[7] Clarke appears to have been the person in the U.S. government who tasked the CIA to undertake the finished intelligence report, Usama Bin Ladin's Finances, dated November 17, 1998, which concluded that DIB was a "key financial conduit," for al Qaeda. See CIA_000317 ("This paper was prepared at the request of Richard REDACTED] Global Is [sic] and Multilateral Affairs, NSC."). That office, later known as the "Office of Transnational Threats," was directed at the time by Clarke. See Winer Testimony ¶ 4.1, n.35.

124.     One of these articles provided information about the focus of the U.S. government on the bin Ladin-DIB relationship in the period prior to the 9/11 terrorist attacks on the United States.  *See* Winer Testimony ¶ 4.2.

**RESPONSE:** Plaintiffs' characterization of the article is not a fact, but conclusory legal argument.  Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.

125.     On July 8, 1999, the New York Times published an article entitled, *U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations*, which described a diplomatic mission from the U.S. to the United Arab Emirates ("UAE") "to lobby for a halt to a suspected financial relationship between a Government-controlled bank and Osama bin Laden, the Saudi exile charged in the bombings of United States embassies in Africa last year."  *See* Winer Testimony ¶ 4.2; PEC-DIB000813-815; *see also* October 4, 2019 Deposition Testimony Transcript ("Tr.") of Judge Alan Fine at 33-37 (discussing the July 8, 1999 New York Times article).

**RESPONSE:** PEC-DIB000813-815 is inadmissible for among other reasons, including that it is inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.

126.     According to the article, "The Central Intelligence Agency has obtained evidence that Mr. bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls."  The article also stated that "United States intelligence officials said they had evidence that Mr. Bin Ladin had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank." *See* Winer Testimony ¶ 4.2; PEC-DIB000813-814; *see also* October 4, 2019 Tr. at 35-37.

**RESPONSE:** PEC-DIB000813-815 is inadmissible for among other reasons, including that it is inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.

127.     After the New York Times published the article referring to bin Ladin's relationship with, and use of, DIB, the State Department's spokesperson, James Foley, confirmed that he had read the article, and confirmed that the U.S. government was working with the United Arab Emirates ("UAE") to strengthen cooperation against terrorism, including terrorist finance, and was told by the UAE government that the Dubai Emirati government "has taken steps to clean up the bank, the Dubai Islamic Bank, and to restore its reputation." *See* Winer Testimony ¶ 4.3; October 4, 2019 Tr. at 24, 63-64; *see also* Exhibit Fine 270 at PEC-DIB000804.

**RESPONSE:** PEC-DIB000804 is inadmissible for among other reasons, including that it is inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.  Plaintiffs' characterization of the article and Foley's statements is not a fact, but conclusory legal argument.  Plaintiffs

mischaracterize the statement to the extent they omit Judge Fine's testimony that "cleaning up the Bank" referred to the government's reaction to a fraud against the Bank, which undisputedly had nothing to do with al Qaeda or terrorism. SUF Resp. ¶ 23; *see* Br. in Supp. of DIB's Mot. to Exclude Supplementary Rep. of J. Winer, ECF 8344, at 21. As such, immaterial.

128.     A reporter then asked, "So, if they are taking steps to clean it up, that implies that something had been amiss in the past, at some time in the past?" In response, Foley stated, "It does imply that, yes," and then added, "I can't get into the details of it. I think what I said is significant enough, however." *See* Winer Testimony ¶ 4.3; Exhibit Fine 270 at PEC-DIB000804.

**RESPONSE:** PEC-DIB000804 is inadmissible for among other reasons, including that it is inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6 n.4. Plaintiffs' characterization of the article and Foley's statements is not a fact, but conclusory legal argument. Plaintiffs mischaracterize the statement to the extent they omit Judge Fine's testimony that "cleaning up the Bank" referred to the government's reaction to a fraud against the Bank, which undisputedly had nothing to do with al Qaeda or terrorism. SUF Resp. ¶ 23; *see* Br. in Supp. of DIB's Mot. to Exclude Supplementary Rep. of J. Winer, ECF 8344, at 21. As such, immaterial.

129.     The U.S. government's high level engagements with Emirati officials in 1999, focused on lobbying for a halt to DIB's supportive relationships with al Qaeda and bin Laden, necessarily indicate that the U.S. government regarded those supportive relationships to remain in place at that time.

**RESPONSE:** Supported by no evidence. Plaintiffs' assumption that the uncited hearsay of the New York Times article and Foley statements is true, and interpretation of that information, is not a fact, but conclusory legal argument.

## VI.    ADDITIONAL AL QAEDA MEMBERS AND 9/11 PLOT PARTICIPANTS CONTINUED TO USE DIB THROUGH SEPTEMBER 11, 2001

130.     Additional al Qaeda members also had accounts at DIB. Ali Abdul Aziz Ali (a/k/a Ammar al Baluchi), Khalid Sheikh Mohammed's nephew, opened an account at DIB (Account No. xx-xxx-xxxxx63-01) on August 8, 2000, during the same period he was carrying out orders for his uncle. *See* Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission, Supplemental Responses to Request Nos. 1, 11 (hereinafter "Second Supp. Response to Second RFA"); Plaintiffs' Supplemental Responses and Objections to Defendant Dubai Islamic Bank's Third Set of Requests for Admission, Supplemental Responses to Request Nos. 1, 11 (hereinafter "Supp. Response to Third RFA"); s*ee also* ECF Nos. 2973 at 8-9, 2973-16 at 1-2; PEC-DIB000836-838.

**RESPONSE:** Immaterial in light of the undisputed facts that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions." SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65. Further, there

undisputedly is no evidence that Aziz Ali "withdrew funds before the 9/11 attacks in support of his own activities," nor that he was not designated as a terrorist before 9/11.  *Id.* ¶¶ 49, 52.  To the extent supported by material other than or cited within Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission, supported by inadmissible material for among other reasons, including that it is inadmissible hearsay.

131.    According to the 9/11 Commission, the 9/11 "hijackers received assistance in financing their activities from two facilitators based in the United Arab Emirates: Ali Abdul Aziz Ali, a.k.a Ammar al Baluchi (Ali), and Mustafa al Hawsawi."  *See* 9/11 Commission, Monograph on Terrorist Financing at 133;[8] *see also* 9/11 Commission Report at 236 ("From Pakistan, the operatives transited through the UAE en route to the United States.  In the Emirates they were assisted primarily by al Qaeda operatives Ali Abdul Aziz Ali and Mustafa al Hawsawi.  Ali apparently assisted nine future hijackers between April and June 2001 as they came through Dubai.  He helped them with plane tickets, traveler's checks, and hotel reservations.").

**RESPONSE:**  Immaterial, as the cited material does not refer to DIB.  Further immaterial in light of the undisputed facts that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions."  SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65.  Further, there undisputedly is no evidence that Aziz Ali "withdrew funds before the 9/11 attacks in support of his own activities," nor that he was not designated as a terrorist before 9/11.  *Id.* ¶¶ 49, 52.  It is further undisputed that Hawsawi did not have a DIB account.  *Id.* ¶¶ 14–15.  Supported by inadmissible material for among other reasons, including that it is inadmissible hearsay.

132.    On September 10, 2001, Ali Abdul Aziz Ali withdrew nearly all the money from two bank accounts in the U.A.E., including his DIB account, funding his escape from Dubai to Karachi, Pakistan on a one-way airline ticket. *See* FED-PEC0213342-213422, Indictment, *U.S. v Khalid Sheikh Mohammed, et al.,* Case No. (S14) 93 Cr. 180 (KTD) (S.D.N.Y.), April 4, 2011, ¶¶ 162-164; *see also* Second Supp. Response to Second RFA Request Nos. 1, 11.

**RESPONSE:** Immaterial, as FED-PEC0213342-213422 does not refer to DIB in connection with the withdrawals, and further immaterial in light of the undisputed facts that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions."  SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65.  Further, there undisputedly is no evidence that Aziz Ali "withdrew funds before the 9/11 attacks in support of his own activities," nor that he was not designated as a terrorist before 9/11. *Id.* ¶¶ 49, 52.  To the extent supported by material other than or cited within Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission, supported by inadmissible material for among other reasons, including that it is inadmissible hearsay.

133.    Mamdouh Mahmoud Salem Ahmed, a founding member of Al Qaeda responsible for managing terrorist training camps in Afghanistan and Pakistan and attempting to obtain

---

[8] Available at https://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf.

nuclear weapons for the terror group, was arrested by German authorities for his role in the 1998 Embassy bombings while in possession of multiple cards related to DIB accounts in his name: (i) "VISA Card Dubai Islamic Bank fur Mamdoh M S Ahmed, Nr. xxxx xxxx xxxx 1013;" (ii) "Bank Card Dubai Islamic Bank fur Mamdoh M. S. Ahmed, Nr. xxxx xxxx xxxx 2362;" and (iii) "Card Dubai Islamic Bank Nr. xxx4008." *See* Second Supp. Response to Second RFA Request Nos. 4, 14, 22; *see also* ECF Nos. 2973 at 3, 2973-7 (KADI0030668-30678 at KADI0030672 and 30675).

**RESPONSE:** Immaterial in light of the undisputed fact that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions." SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65. Plaintiffs' characterization is not a fact, but improper, conclusory legal argument. To the extent supported by material other than or cited within Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission, supported by inadmissible material for among other reasons, including that it is inadmissible hearsay.

134.    DIB also maintained and serviced a jihad account for Abdallah Azzam, bin Laden's spiritual mentor and co-founder of al Qaeda. In his book, *Ayyat al Rahman fee Jihad al-Afghan*, ("God's Signs in the Afghan Jihad"), Azzam directs monetary donations for the Afghan mujahideen be sent to DIB Account No. 1335. *See* ECF No. 2973 at 2-3.

**RESPONSE:** Plaintiffs' characterization is not a fact, but improper, conclusory legal argument. The inadmissible source is Plaintiffs' own, unsupported statement in a brief. The book in question (also inadmissible hearsay) does not claim that the purported account aided al Qaeda or 9/11, that DIB knew of the account or intended to aid al Qaeda or 9/11, or that the account belonged to Azzam. As such, immaterial and supported by inadmissible material for among other reasons, including that it is inadmissible hearsay.

135.    Khalid Amer Salem Ballayth, described by the Swiss government as "a close associate of Osama Bin Laden," also held an account at DIB (Account No. xx-xxx-xxxxx66-01) in the years preceding the 9/11 attacks. *See* Second Supp. Response to Second RFA Request Nos. 3, 13 and 21.

**RESPONSE:** Immaterial in light of the undisputed fact that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions." SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65. Further, there undisputedly is no evidence that Khalid Amer Salem Ballayth was not designated as a terrorist before 9/11. *Id.* ¶ 49. To the extent supported by documents cited within Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission, supported by inadmissible material for among other reasons, including that it is inadmissible hearsay.

136.    Executive Order 13224 SDGT Ahmed Nur Ali Jumale used his network of Al Barakaat companies, including SDGTs Barakaat Bank of Somalia and Al Baraka Exchange, "to

transmit funds, intelligence and instructions" to al Qaeda and associated terror groups.  *See* Second Supp. Response to Second RFA Request Nos. 5, 6, 7, 15, 16, 17, 23, 24, and 25; *see also* ECF Nos. 2973 at 5, 2973-12.  Several DIB accounts associated with Jumale were seized pursuant to the directive of the U.A.E. Central Bank, including Jumale's personal and VISA accounts (Account Nos. xxx1192 and xxx-xxx-xxx-960 respectively), and accounts for Al Barakah Exchange (Account Nos. xxx7440 and xxx7483), and Al Barakaat Bank of Somalia (Account Nos. xxx339 and xx-xxx-xx-x13-01).  *Id.* at Second Supp. Response to Second RFA Request Nos. 5, 6, 7, 15, 16, 17, 23, 24, and 25.

**RESPONSE:** Immaterial in light of the undisputed fact that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions."  SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65.  Further, there undisputedly is no evidence that Ahmed Nur Ali Jumale, Al Barakaat Bank of Somalia, and Al Barakah Exchange were not designated as terrorists before 9/11.  *Id.* ¶ 49.  Further, ECF 2973-12 does not mention DIB.  To the extent supported by documents other than or cited within Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission, supported by inadmissible material for among other reasons, including that it is inadmissible hearsay.

137.    Al Qaeda charity front International Islamic Relief Organization ("IIRO") had at least one account at DIB (Account No. xxx0278), and was a party to establishing the special Chechen Refugee Assistance Fund at DIB.  *Id.* at Second Supp. Response to Second RFA Request Nos. 8 and 18; *see also* ECF No. 2973 at 5; FED-PEC0220501-220502.  According to the U.S. government, "Usama bin Ladin used the entire IIRO network for his terrorist activities." *See* ECF No. 3775 at 8; *see also* CIA_000525 (identifying the IIRO as one of the Islamic charities supporting al Qaeda).

**RESPONSE:** Plaintiffs' characterization of IIRO and IIRO's account is not a fact, but conclusory legal argument.  Immaterial in light of the undisputed fact that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery "were used to fund Al Qaeda through specific transactions."  SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65. Further, there undisputedly is no evidence that IIRO was not designated as a terrorist before 9/11.  *Id.* ¶ 49.  To the extent supported by documents other than or cited within Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission, supported by inadmissible material for among other reasons, including that it is inadmissible hearsay.  In particular, the CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 10–12.

138.    September 11th hijacker Fayez Rashid Ahmed Hassan al Qadi, one of the al Qaeda terrorists who boarded United Airlines Flight 175, held an account at DIB (Account No. xx-xxxxxxx-x20-06) during the period of preparation for the attacks.  *See* Second Supp. Response to Second RFA Request Nos. 2 and 12.  Al Qaeda member Ali Saleh Mohammad Kahlah Al Marri, who attended al Qaeda terrorist training camps and was instructed by 9/11 mastermind Khalid Sheikh Mohammed "to enter the United States no later than September 10, 2001," also held an account at DIB (Account No. xx-xxxxxxx-580-7).  *See* Second Supp. Response to Second RFA

Request Nos. 10, 20; *see also* ECF Nos. 2973 at 4, 2973-11 at 11.

**RESPONSE:** Immaterial in light of the undisputed fact that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery, including Qadi's and al-Marri's, "were used to fund Al Qaeda through specific transactions." SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65. Additionally, Qadi undisputedly "never used his account at DIB for operational expenditures incurred in carrying out the 9/11 attacks," and "ceased using his DIB account over a year before the 9/11 attacks." *Id.* ¶¶ 58–59. Further, there undisputedly is no evidence that Qadi and al-Marri were not designated as terrorists before 9/11. *Id.* ¶ 49. Further, ECF 2973-11, containing the Sheikh Mohammed quote, does not refer to DIB. To the extent supported by documents other than or cited within Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission, supported by inadmissible material for among other reasons, including that they are inadmissible hearsay.

139.     The decision by bin Ladin and members of al Qaeda to use DIB's banking and financial services to manage bin Ladin's and the terrorist organization's money and move funds globally was not by happenstance, but rather a witting product of a longstanding collaboration between DIB and al Qaeda, established through DIB Founder and long-term Chairman Saeed Ahmed Lootah's "personal friendship" with Osama bin Ladin. *See* Second Supp. Response to Second RFA Request No. 1; *see also* CIA_000326, 736.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11. Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'" SUF Resp. ¶ 35. It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions." *Id.* ¶¶ 36–37. To the extent supported by documents other than or cited within Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission, supported by inadmissible material for among other reasons, including that they are inadmissible hearsay. In particular, the CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay. DIB Reply Br. 6–8, 10–12. The characterization of the CIA Documents is not a fact, but conclusory legal argument.

## VII.   RADICALS WHO SUPPORTED TERRORISM HAD A BROAD PRESENCE AT DUBAI ISLAMIC BANK

140.     The CIA documents and other evidence adduced in discovery establish that radicals who supported terrorism had a broad presence at DIB, making DIB's partnership with bin Laden and al Qaeda durable.

**RESPONSE:** Supported by no evidence. Plaintiffs' statement is not a fact, but conclusory legal argument.

141.    Initially, the CIA concluded that Saeed Lootah's extremism extended "to DIB's personnel policy; bank employees are forbidden to be involved in outside business activities, nor are they to associate with non-Muslims." *See* CIA_000734.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12. Plaintiffs' characterization is not a fact, but conclusory legal argument.

142.    The CIA further found that "Top management affiliations with the MB, HAMAS, and the NIF make Islamic banks a safehaven for extremist funds. [REDACTED] In addition, low-level bank employees at Islamic institutions – who are often hired on the basis of commitment to Islam – may turn a blind eye to money movements by extremist groups." *See* CIA_000723-724.

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Additionally, the quotations do not refer to DIB, al Qaeda, or 9/11, and the CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12.  Plaintiffs' characterization is not a fact, but conclusory legal argument.

143.    In addition to Lootah himself, the CIA Documents indicate that DIB's board of directors included Sheikh Yousif Jassim al Haji, whose extensive involvement in militant extremism included his role as head of the International Islamic Charities Organization ("IICO"), an organization responsible for the funding and coordination of numerous terrorist and extremist entities. *See* CIA_000737.  The CIA further assessed that Haji's status as a member of the DIB board likely indicated that the IICO itself held an ownership interest in DIB. *Id.*

**RESPONSE:** Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  Further immaterial because the discussion of Haji does not refer to al Qaeda or 9/11, and Plaintiffs elsewhere do not dispute that the Dubai government "initiated changes to the bank's management and leadership" in 1998, nor that "a new Board of Directors was appointed in early 1999." SUF Resp. ¶¶ 19–21.  Plaintiffs' characterization is not a fact, but improper, conclusory legal argument.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12.

144.    In his deposition and trial testimony in this matter, Dr. Hussein Hamid al Hassan, Chairman of DIB's Fatwa and Shariah Supervisory Board ("Shariah Board"), confirmed that DIB's Shariah Board included Islamic scholars who had openly advocated assistance to terrorist organizations and "encouraging one to bomb himself." *See* August 3, 2017 Deposition Trial Testimony Transcript ("Tr.") of Dr. Hussein Hamid Hassan at 285:5-11.  They were Ali Muhyiddin al Qaradaghi ("Qaradaghi") and Dr. Ajeel Jaseem Nashmi ("Nashmi"). *Id.* at Tr.

282:12-20; *see also* August 1, 2017 Deposition Testimony Transcript of Dr. Hussein Hamid
Hassan at 86:25-87:2-25.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or
intent to DIB, the Board at issue has never been involved in DIB's daily operations, and the
Qaradaghi and Nashmi statements at issue occurred after 9/11 (or are undated), by Plaintiffs'
account.  *Infra* n.9.  *See* DIB Reply Br. 6–8, 10–11. Plaintiffs' characterization is not a fact, but
conclusory legal argument, and their statement mischaracterizes the deposition testimony of Dr.
Hassan insofar as Plaintiffs assert that Qaradaghi and Nashmi "openly advocated" assistance to
terrorist organizations.  Dr. Hassan testified that he was not aware of the writings at the relevant
time.  *Infra* No. 145.  The statements themselves are inadmissible for among other reasons,
including that they are inadmissible hearsay.

145.    According to Dr. Hassan, these two DIB Shariah Board members "issued articles,
articles that what I came to know from here, they issued an article encouraging one to bomb
himself and to assist terrorist organization.  That is what I came to know from this preparation,
now, after I have seen their articles." *See* August 3, 2017 Tr. at 285:5-11.[9]

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or
intent to DIB, the Board at issue has never been involved in DIB's daily operations, and the
Qaradaghi and Nashmi statements at issue occurred after 9/11 (or are undated), by Plaintiffs'
account.  *Infra* n.9.  *See* DIB Reply Br. 6–8, 10–11.  *Infra* n.9.  The statements themselves are
inadmissible for among other reasons, including that they are inadmissible hearsay, Mr. Winer is the
subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule
37 motion.  DIB Reply Br. 6 n.4.

146.    Dr. Hassan further testified that Qaradaghi served on DIB's Shariah Board
beginning in 1998 and then for five, six, or eight years (that is, until 2003, 2004, or 2006), but he
was uncertain about the exact period.  *See* August 3, 2017 Tr. at 285:12-21.  Dr. Hassan stated
Nashmi was appointed to DIB's Shariah Board sometime in 2002 or 2003.  *Id.* at 285:22-25;
287:7-14.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or
intent to DIB, the Board at issue has never been involved in DIB's daily operations, and the
Qaradaghi and Nashmi statements at issue occurred after 9/11 (or are undated), by Plaintiffs'

---

[9] In a fatwa published on his official website titled Is it Permissible to Send Money to Hamas at This Time, dated
February 21, 2010, Dr. Qaradaghi stated that "jihad today is a mandatory obligation to everyone who is capable to do
so, by using money, the body, the media, the pen, and all means of jihad." Dr. Qaradaghi further urged Muslims to
engage in violent jihad in Palestine, which he described as "the best type of jihad ever." According to Dr.
Qaradaghi, "Brothers and sisters, haste to aid your brethren in Palestine using all that you have. This might be a unique
chance by sacrificing money, yourselves, and everything that is expensive and precious for the sake of the blessed
land." Dr. Nashmi similarly issued a fatwa on his official website, dated December 9, 2005, titled Martyrdom
Operations, endorsing the actions of a "young man who kills himself through an explosive belt, a car, or any means."
According to Dr. Nashmi, "[i]f his intention behind killing himself through these means is to kill and torment the
enemy and elevate the word of Allah, then he is not considered a suicide. Rather, he is considered a martyr." In another
fatwa titled Paying Zakat to Those Who Work to Restore the Shar'a of Allah, Dr. Nashmi argues in support of jihad
and states that it is permissible to pay zakat funds to those Islamic groups that wish to "restore Islamic life, erase Kufr
regimes, and replace them with the Sharia'a of Allah." See Winer Testimony ¶ 6.6.1, n.81.

account.  *Infra* n.9.  *See* DIB Reply Br. 6–8, 10–11.

147.   Dr. Hassan further testified that DIB's Board of Directors was responsible for selecting and appointing scholars to the Shariah Board, and that their selection was required to be based on their scholarship as to Islamic matters in general, and not more narrowly on their knowledge of financial and banking matters.  According to Dr. Hassan:

> Q. Is Article 77 the provision that provides that the Board of Directors is responsible for appointing the Shariah Board?
>
> A. Yes.
>
> Q. And Article 78 says that:  "Members of the Fatwa and Shariah Supervisory Board shall be elected from scholars specialized in Islamic Jurisprudence in general, and financial transactions in particular, preferably having knowledge of economic, legal and banking systems."  Do you see that?
>
> A. Yes.
>
> Q. Is that your correct understanding of the baseline qualifications that a member of the Board should have?
>
> A. Yes…. Yes. The case that no one will be specialized in economics or in banking transactions, unless he is a scholar of the general Islamic jurisprudence, by nature, because he should study basics, fairness -- this is general, common Islamic jurisprudence. And after that he is specialized in one branch of that. Means for any scholar to be specialized in transactions, law, for example, it is after he passed the general education of the Islamic general jurisprudence. Like in any other branch, like in medical school, he should study a few years all medical subjects and then for heart, children, eyes, specialized after that. It means everyone who is specialized in the law of transactions, he should be -- I mean should study, should have been qualified for general Islamic jurisprudence.

*See* August 3, 2017 Tr. at 292:10-25, 293:13-25, 294:2-6.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, the Board at issue has never been involved in DIB's daily operations, and the Qaradaghi and Nashmi statements at issue occurred after 9/11 (or are undated), by Plaintiffs' account.  *Infra* n.9.  *See* DIB Reply Br. 6–8, 10–11.

148.   Based on the requirements and rules of DIB's bylaws governing the selection and appointment of scholars to serve on DIB's Shariah Board, Dr. Hassan testified that, to the extent the Board of Directors was doing its job, it must have concluded that Qaradaghi and Nashmi were well qualified Islamic scholars.  *Id.* at 294:7-12.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, the Board at issue has never been involved in DIB's daily operations, and the Qaradaghi and Nashmi statements at issue occurred after 9/11 (or are undated), by Plaintiffs' account. *Infra* n.9. *See* DIB Reply Br. 6–8, 10–11.

149.    Dr. Hassan further testified that DIB promoted the members of the Shariah Board as distinguished scholars, and when asked whether "it is reasonable to expect that employees and managers of the bank will look up to the members of the Shariah Board as prominent scholars," Dr. Hassan testified "Yes." *Id.* at 295:3-7.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, the Board at issue has never been involved in DIB's daily operations, and the Qaradaghi and Nashmi statements at issue occurred after 9/11 (or are undated), by Plaintiffs' account. *Infra* n.9. *See* DIB Reply Br. 6–8, 10–11.

150.    The rules and requirements governing the selection of scholars to serve on DIB's Shariah Board, timing of the appointments to and tenures of Dr. Qaradaghi and Nashmi on the Shariah Board, and public nature of Qaradaghi's and Nashmi's endorsements of terrorism and suicide bombings, collectively indicate that DIB's Board of Directors continued to embrace extremists who supported terrorism for prominent and influential roles at DIB, even after the African Embassy Bombings, the public reporting concerning U.S. engagements with Emirati officials concerning DIB's involvement in terrorism, and the 9/11 attacks themselves. *Id.* at 285-287.

**RESPONSE:** Not supported by the source cited, which does not speak to the "public nature" of the statements, nor what is "indicate[d]" by what Plaintiffs recite. Plaintiffs' statement is thus supported by no evidence. Further, their characterization is not a fact, but improper, conclusory legal argument. Immaterial, as the Board at issue has never been involved in DIB's daily operations, and the Qaradaghi and Nashmi statements at issue occurred after 9/11 (or are undated), by Plaintiffs' account. *Infra* n.9. *See* DIB Reply Br. 6–8, 10–11.

151.    Indeed, the record indicates that Dr. Hassan, whom DIB affirmatively offered as a witness and long-served as Chairman of DIB's Shariah Board, had his own significant connections to extremists and terrorists, including Abdullah Azzam.

**RESPONSE:** Supported by no evidence. Plaintiffs' statement is not a fact, but conclusory legal argument.

152.    Dr. Hassan first met Abdullah Azzam as early as 1982 or 1983, when Dr. Hassan was teaching at the International Islamic University in Saudi Arabia. *See* August 1, 2017 Tr. at 24-26.[10]

---

[10] In his August 3, 2017 trial testimony, Dr. Hassan provided a different estimate of the timing, indicating that they likely met in 1985 or 1986. See August 3, 2017 Tr. at 305.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, the Board on which Dr. Hassan served has never been involved in DIB's daily operations, and what the statement otherwise describes does not relate to and significantly predates 9/11.  DIB Reply Br. 6–8, 10–11.

153.    As Plaintiffs' Expert Jonathan Winer describes in his 2020 Expert Report, Abdullah Azzam was "a foundational figure for terrorist jihad generally and for al Qaeda specifically.  One could properly think of him as the godfather of pan-Islamic foreign fighters.  In the words of Thomas Hegghammer:  'Azzam is known in the Islamist community as the spiritual father of the Arab Afghans, and the contemporary historical evidence supports this reputation.  He arrived in Pakistan in 1981, produced recruitment literature from 1982 onward, gave talks about Afghanistan in the Arab world from 1983 onward, and established the foreign fighter logistics office known as the Services Bureau in Peshawar in late 1984.  The significance of these initiatives is evidenced by the fact that most of the fighters who went to Peshawar before 1986 seem to have been inspired by Azzam's writings or helped by the Services Bureau, or both.'"  *See* March 10, 2020 Expert Report of Jonathan M. Winer ¶ 12.16.1; *see also* 9/11 Commission Report at 55-56 (describing Azzam's influence on bin Laden and their joint efforts to create Mektab al Khidmat, or MAK).

**RESPONSE:** Immaterial, because the statement not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11.  DIB Reply Br. 6–8, 10–11.  Further, the sources do not refer to DIB.  Supported by inadmissible material for among other reasons, including that it is inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.

154.    The period during which Dr. Hassan had contact with Azzam was the very period that Azzam was developing the foundations for the work he undertook in Pakistan to train Muslim men as jihadists to undertake armed conflict with non-Muslims and during which Azzam developed close working relations with bin Ladin to carry out the work of recruiting and training foreign (that is, non-Afghani) fighters to participate in the war.  *See* Winer Testimony ¶ 6.3; *see also* 9/11 Commission Report at 55-56.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, the Board on which Dr. Hassan served has never been involved in DIB's daily operations, and what the statement otherwise describes does not relate to and significantly predates 9/11.  DIB Reply Br. 6–8, 10–11.  Supported by inadmissible for among other reasons, including that it is inadmissible hearsay, Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.  Plaintiffs' use of "contact" is a characterization, not a fact supported by their sources.

155.    During this period, Azzam produced a foundational book that guided the recruitment of foreign fighters to conduct jihad or holy war in Afghanistan and elsewhere, entitled *Defense of the Muslim Lands*.  *See* Winer Testimony ¶ 6.4.  In his deposition, Dr. Hassan claimed that he was not familiar with this book, despite his status as a preeminent Islamic scholar and the work's seminal importance and notoriety.  *See* August 1, 2017 Tr. at 111.  But as set forth in his deposition, the book in English translation states expressly that Azzam stated that he

showed the "fatwa" in it, which includes six questions, to a person named "Dr. Hassin Hamid Hissan," in an apparent reference to Dr. Hassan. *Id.* at 111-112. While Dr. Hassan initially questioned whether the citation in the English version referred to him, citing a discrepancy in the transliteration of his name, he later confirmed that the spelling of his name in the original Arabic version was correct. *See* August 3, 2017 Tr. at 309-310.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, the Board on which Dr. Hassan served has never been involved in DIB's daily operations, and what the statement otherwise describes does not relate to and significantly predates 9/11. DIB Reply Br. 6–8, 10–11. Mr. Winer is the subject of a pending bellwether *Daubert* challenge, his report the subject of a pending Rule 37 motion, and the book itself is inadmissible for among other reasons, including that it is inadmissible hearsay, and is contradicted by admissible evidence. DIB Reply Br. 6 n.4. Plaintiffs' characterization of the book, and insinuation that Dr. Hassan's testimony was false, is not a fact, but conclusory legal argument. Plaintiffs also mischaracterize the sources cited to the extent their statement suggests that Azzam claimed that he showed the fatwa's six questions to the person he named in the book. *See* August 3, 2017 Tr. at 112 ("In the first full paragraph there is a statement: 'I showed this fatwa, without the six questions at the end, ….'").

156.    Azzam's book, referenced in the deposition of Dr. Hassan, is essentially a call to armed action (to "fight jihad") to retake all Muslim lands, with explicit reference to the need to do this in Afghanistan and Palestine. It expressly references language calling on Muslims to "Expel all Jews and Christians from the Arab Peninsula," to "1 - Fight, even if alone, and 2- Incite the believers," and states that "Fighting alone pleases Allah." It describes jihad as both an individual and a collective responsibility, that can be met both by physically fighting on behalf of Muslims and by providing money for jihad ("jihad by wealth"), which Azzam states is "obligatory." *See* Exhibit 15, Deposition of Dr. Hussein Hamid Hassan, *Defense of the Muslim Lands*, Abdullah Azzam, section entitled "Fourth Question," at 39-40. *See id.* at 31 (stating that funding jihad is "obligatory").[11]

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11. DIB Reply Br. 6–8, 10–11. The book is inadmissible for among other reasons, including that it is inadmissible hearsay. Plaintiffs' characterization of the book is not a fact, but conclusory legal argument.

157.    The evidence of record also indicates that Dr. Hassan expressed extremist views and support for Hezbollah in an interview conducted in his capacity as Chair of the Assembly of Muslim Jurists of America of the United States in 2006, although he denied making the

---

[11] Azzam's book contains a number of examples of when killing another person is justified. An example: "The Almighty the Majestic says: 'The recompense of those who wage war against Allah and His messenger and do mischief in the land is only that they shall be killed or crucified or their hands and feet be cut off from the opposite sides, or exiled from the land. That is their disgrace in this world, and a great torment is theirs in the hereafter.' This is the ruling applied on the one who wages war from among the Muslims. He spreads distress and corruption in the land and he infringes upon wealth and 'Ard. This is the ruling which the Messenger of Allah (saw) carried out upon the sick Bedouins who turned apostate as has been reported in the Sahihs. What should be the treatment of the Kaffir nation that brings calamity upon the people, their religion, their wealth and their 'Ard? Is not the first obligation upon the Muslims to fight them?" See Exhibit 15, Defense of the Muslim Lands, at 21; Winer Testimony ¶ 6.5, n.78.

statements at his deposition and suggested the author of the article fabricated and falsely attributed them to him. *See* August 3, 2017 Tr. at 268-274.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, the Board on which Dr. Hassan served has never been involved in DIB's daily operations, and the statements at issue postdated 9/11. DIB Reply Br. 6–8, 10–11. Further, the alleged statements do not concern al Qaeda or 9/11 and allegedly occurred in Dr. Hassan's capacity as chair of an organization with no connection to DIB. Plaintiffs' characterization of Dr. Hassan's views and what "evidence … indicates" is not fact, but conclusory legal argument. The statements at issue are inadmissible for among others reasons, including that they are inadmissible hearsay and are contradicted by admissible evidence.

158.    In addition, Dr. Hassan published a study in 2002 in which he expressed extremist justifications for and views on armed jihad. See Exhibit 17, Deposition of Dr. Hussein Hamid Hassan, Study of the Rules of Contact between Muslims and Non-Muslims in Time of War, presented to the Conference, "International Relations Between Islam and The Current Civilization," held by the Muslim World League in Mecca, Saudi Arabia, May 13-22, 2002, prepared by Hussain Hamid Hassan, PhD. See Winer Testimony ¶¶ 6.7-6.9.

**RESPONSE:** Immaterial, as the statement does not ascribe relevant conduct, knowledge, or intent to DIB, the Board on which Dr. Hassan served has never been involved in DIB's daily operations, and the statements at issue postdated 9/11. DIB Reply Br. 6–8, 10–11. Further, the alleged statements do not concern al Qaeda or 9/11 and lack any apparent connection to Dr. Hassan's role at DIB. Plaintiffs' characterization of Dr. Hassan's views is not fact, but conclusory legal argument. The study itself is inadmissible for among other reasons, including that it is inadmissible hearsay, Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6 n.4.

## VIII.   SAEED LOOTAH AND DUBAI ISLAMIC BANK WERE EXPRESSLY AWARE AL QAEDA WAS TARGETING THE UNITED STATES AND INTENDED TO, AND DID IN FACT, ADVANCE THAT GOAL

159.    Throughout the time period that DIB was providing witting support to bin Laden and al Qaeda, al Qaeda was actively targeting the United States.

**RESPONSE:** Supported by no evidence. Plaintiffs' statement is not a fact, but improper, conclusory legal argument.

160.    From the inception of al Qaeda's work with the NIF, the "primary goal of this collaboration was to confront Israel and the United States." *See* CIA_000390.

**RESPONSE:** Immaterial. Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11. The cited page does not refer to DIB. The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay. DIB Reply Br. 6–8, 10–12.

161.    Consistent with this objective, "[i]n early 1992, the al Qaeda leadership issued a

fatwa calling for jihad against the Western 'occupation' of Islamic lands … singling out U.S. forces for attack." *See* 9/11 Commission Report at 59.

**RESPONSE:** Immaterial.  The statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11.  DIB Reply Br. 6–8, 10–11.  The cited page does not refer to DIB.  The cited source is inadmissible for among other reasons, including that it is inadmissible hearsay.  Plaintiffs' characterization of this quotation as "consistent" with the prior statement is not a fact, but conclusory legal argument.

162.    During this same period, bin Laden began giving an "often-repeated lecture on the need to cut off 'the head of the snake,'" referring to the United States.  *Id.*

**RESPONSE:** Immaterial.  The statement does not ascribe relevant conduct, knowledge, or intent to DIB, and what it otherwise describes does not relate to and significantly predates 9/11.  DIB Reply Br. 6–8, 10–11.  The cited page does not refer to DIB.  The cited source is inadmissible for among other reasons, including that it is inadmissible hearsay.

163.    In or around 1993, al Qaeda members "were sent to Somalia, with the NIF's knowledge and encouragement, in order to kill U.S. troops, [and] incite violence against U.S. personnel." *See* CIA_000349.

**RESPONSE:**  Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The cited page does not refer to DIB. The cited source is inadmissible for among other reasons, including that it is inadmissible  hearsay.  DIB Reply Br. 6–8, 10–12.  .

164.    The CIA's review of al Qaeda-Sudanese residency also found that during Bin Ladin's 1992-1996 period in Sudan, Islamic extremists who bombed a hotel housing U.S. servicemen in Aden, Yemen, said Bin Ladin financed their group, "according to all source reporting," that "Bin Ladin business interests had funneled money to Egyptian extremists," who used the funds to buy weapons (among other purposes), and that Bin Ladin during this period became "the key financier" for a terrorist training camp in Afghanistan, which provided terrorist training to terrorist groups, including one that carried out an effort to assassinate Egypt's President.  *See* CIA_000068-69.  This CIA report said that during this period Bin Ladin was also working on plans to develop methods "to deliver poisonous gases in an explosive that could be fired at US troops in Saudi Arabia and tried to develop cyanide gas bombs." *See* CIA_000069.

**RESPONSE:** Immaterial.  Immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  The cited pages do not refer to DIB.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay.  DIB Reply Br. 6–8, 10–12.  The characterization of the CIA Documents is not a fact, but conclusory legal argument.

165.    In 1996, bin Laden and al Qaeda issued a public fatwa calling for jihad against the United States.  *See* 9/11 Commission Report at 48.  In that same year, Khaled Sheikh

Mohammed presented the idea for his planes operation to bin Laden for consideration during a face-to-face meeting. *Id.* at 149.  Bin Laden thereafter formally authorized the planes operation in late 1998 or early 1999.  *Id.*

**RESPONSE:** Plaintiffs elsewhere have not disputed that bin Laden "gave the go ahead for the 9/11 plot *after* late 1998 or early 1999."  SUF Resp. ¶ 34 (emphasis added).  The other events described are not material, as they significantly predate 9/11 and do not relate to DIB.  DIB Reply Br. 6–8, 10–11.  Supported by inadmissible material for among other reasons, including that it is inadmissible hearsay.

166.    In 1998, al Qaeda issued another public fatwa calling for attacks against "any American, anywhere they can be found," *id.* at 147, but this "1998 declaration was only the latest in a long series of [bin Laden's] public and private calls since 1992 that singled out the United States for attack."  *Id.* at 148.

**RESPONSE:** Immaterial, as the statement does not refer to DIB.  The cited pages are inadmissible for among other reasons, including that they are inadmissible hearsay.

167.    In 1998, al Qaeda carried out terrorist attacks on U.S. Embassies in Kenya and Tanzania, the preparations for which began in 1993.  *Id.* at 68-70.

**RESPONSE:** Immaterial.  The statement does not refer to DIB.  The cited pages are inadmissible for among other reasons, including that they are inadmissible hearsay.

168.    In October 2000, al Qaeda carried out an attack on the U.S.S. Cole, the planning for which had begun in 1998.

**RESPONSE:** Supported by no evidence.

169.    The CIA Documents demonstrate that DIB and its Chairman Saeed Lootah were aware of al Qaeda's targeting of the United States from the outset.  Indeed, they confirm that DIB Chairman Lootah was a prominent member of the global Muslim Brotherhood, personal friend of Osama bin Laden, and associate of NIF leader Hassan al Turabi.  *See e.g.*, CIA000322, 337, 722, 724, 734-738.  The CIA found that Lootah "is anti-Western – ascribing to various conspiracy theories regarding the intentions of the United States," CIA_000734, had extensive ties to and involvement with militant causes and their associated support entities.  *See e.g.*, CIA_000722, 724, 737, 738.  The CIA further found that Lootah was personally involved in establishing the support network for al Qaeda and bin Laden at DIB.  *See e.g.*, CIA_000045, 322, 326, 426, 735, 747.

**RESPONSE:** The characterization of what the CIA Documents "demonstrate," "confirm," or "found" is not a fact, but conclusory legal argument.  The CIA Documents nowhere state what DIB or Mr. Lootah were "aware of" and nowhere describe DIB as hosting a "support network" for al Qaeda or bin Laden.  The CIA Documents are inadmissible for among other reasons, including that they are inadmissible hearsay, and immaterial, because the CIA Documents do not ascribe relevant conduct, knowledge, or intent to DIB, and what those CIA Documents on which

Plaintiffs rely otherwise describe does not relate to and significantly predates 9/11.  DIB Reply Br. 6–8, 10–12.  Further immaterial in light of the undisputed fact that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery, including all those for persons later revealed to be associated with al Qaeda, "were used to fund Al Qaeda through specific transactions."  SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  *Id.* ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions."  *Id.* ¶¶ 36–37.

170.    These facts demonstrate that DIB and Lootah were quintessential insiders who were expressly aware of al Qaeda's goal to target the United States from the outset, and provided witting support to al Qaeda with the specific intent to advance that agenda.  *See also* Winer Testimony at Section 7, "Findings."

**RESPONSE:** Plaintiffs' statement is not a fact, but conclusory legal argument as to what the CIA Documents "demonstrate."  Immaterial in light of the undisputed fact that there is no evidence that "funds in any account at [DIB] were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 attacks," nor that any DIB accounts identified in discovery, including all those for persons later revealed to be associated with al Qaeda, "were used to fund Al Qaeda through specific transactions."  SUF Resp. ¶¶ 66–67; *see also id.* ¶¶ 52–65.  Further immaterial in light of the undisputed fact that in 1999 DIB internally distributed sanctions lists from OFAC, undisputedly "to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  *Id.* ¶ 35.  It is undisputed that DIB's branches kept copies of the lists "to ensure no accounts were opened for any of the parties named," and that "DIB required employees to check [them] when opening accounts and conducting transactions."  *Id.* ¶¶ 36–37.  Mr. Winer's report is inadmissible, as Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.

IX.    **DIB'S RESPONSE TO THE U.S. ENGAGEMENTS CONCERNING ITS INVOLVEMENT IN SUPPORTING AL QAEDA WAS PERFUNCTORY AND UNSERIOUS**

171.    DIB's response to the 1999 New York Times article and statements of State Department spokesperson James Foley implicating DIB in supporting al Qaeda were perfunctory, unserious, and resulted in no action to disable the al Qaeda support structure at DIB.

**RESPONSE:** Supported by no evidence.  Plaintiffs' characterization of DIB's response, and statement that there was a "al Qaeda support structure at DIB" is not a fact, but conclusory legal argument.

172.    At the time of the New York Times article and statement of spokesperson Foley, DIB was under the control and supervision of the government of the U.A.E., which had intervened to oversee the bank in 1998.  *See* October 4, 2019 Deposition Testimony Transcript ("Tr.") of Judge Alan Fine at 29:1-23.

**RESPONSE:** DIB does not di**s**pute that the UAE Central Bank, in conjunction with the Dubai government, closely supervised DIB in 1998 and 1999, after the Dubai government intervened in DIB following the discovery of a fraud against DIB in 1998.  SUF Resp. ¶¶ 18–19.

173.    Thus, officials of the Emirati government were simultaneously participating in the high level discussions with senior U.S. officials discussed in the New York Times article and Foley statements, while senior Emirati officials were also directly overseeing DIB.

**RESPONSE:** Supported by no evidence and inadmissible.  Plaintiffs' assumption that the uncited hearsay of the New York Times article and Foley statements is true, and interpretation of that information, is not a fact, but conclusory legal argument.

174.    Despite this overlap, DIB has offered no evidence that officials of the Emirati government followed up with U.S. officials concerning the matters discussed in the New York Times article and Foley statements, or that DIB asked them to do so.

**RESPONSE:** Supported by no evidence.  Plaintiffs' assumption that the uncited hearsay of the New York Times article and Foley statements is true, and interpretation of that information, is not a fact, but conclusory legal argument.  Further, Plaintiffs mischaracterize the statement, as Mr. Foley reported that the UAE government had already been in contact with the US regarding "cleaning up the Bank," which Judge Fine testified referred to the government's imposition of new controls in the wake of a fraud against the Bank, which undisputedly had nothing to do with al Qaeda or terrorism.  SUF Resp. ¶ 23; *see* Br. in Supp. of DIB's Mot. to Exclude Supplementary Rep. of J. Winer, ECF 8344, at 21.

175.    Instead, DIB charged a lawyer and a consultant, Alan Fine and Rob Ellison respectively, who were working with DIB on a separate fraud matter, to conduct certain inquiries concerning the New York Times article and Foley statements.

**RESPONSE:** Supported by no evidence.  To the extent Plaintiffs suggest that DIB's actions were deficient, and that the fraud was not the explanation for Foley's statements, that is not a fact, but conclusory legal argument.

176.    Fine described his assignment as "Initially, to determine or try to get any information that the United States government was willing to provide to support the allegations that had been made in the newspaper articles, and then to consider a defamation action against The New York Times, including -- or by starting with a letter demanding a retraction." October 4, 2019 Tr. at 20:9-16.

**RESPONSE:** DIB does not dispute this statement, but Plaintiffs mischaracterize the statement to the extent they omit a full description of Judge Fine's assignment, which included contacting the US State Department "seeking additional information to investigate about any suspected

relationship with Osama bin Laden and offering DIB's full cooperation." SUF Resp. ¶ 25.

177.    Fine contacted the State Department in July 1999, eventually discussing the allegations regarding bin Ladin having accounts at DIB with Steve Kashkett, then the Middle East Chief of the State Department's counterterrorism section. Not surprisingly, Kashkett declined to share details of sensitive U.S. diplomatic discussions and intelligence findings with a private citizen, but Kashkett did tell Fine that DIB "wouldn't find anything in the name of Osama bin Laden and that it would not be in any international wire transfers, that it was either in domestic wire transfers or withdrawals from accounts, through other names." *See* Winer Testimony at ¶ 4.8; October 4, 2019 Tr. at 25:7-12. He testified that he could not determine whether the State Department official (Kashkett) did not know who the names were, or was declining to provide the information. *Id.* at 25:23-24-26:1.

**RESPONSE:** DIB does not dispute that this was Judge Fine's testimony regarding a portion of Judge Fine's conversation with Kashkett, but Plaintiffs' characterization of Kashkett's response is not a fact, but improper, conclusory legal argument. Further, Plaintiffs mischaracterize the statement to the extent they omit that Judge Fine asked Kashkett for names or account numbers to search. To the extent Plaintiffs rely on Mr. Winer's report, it is inadmissible, as Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion. DIB Reply Br. 6 n.4.

178.    Fine then drafted a letter on behalf of DIB to the New York Times dated July 27, 1999 entitled "False Statements About Dubai Islamic Bank in July 8, 1999 Article re: Osama Bin Laden," threatening a defamation ("false light") action against the New York Times, and stating "DIB has never dealt directly with Osada [sic] bin Laden, and had no knowledge or reason to believe that anyone acting on Bin Laden's behalf had been laundering his money through DIB." *See* Exhibit Fine 271, DIB_003164.

**RESPONSE:** DIB does not dispute this statement.

179.    The letter also stated that the New York Times' allegations regarding the CIA having obtained "evidence that Mr. Bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls," and the remainder of the allegations in that article regarding DIB have a relationship with Bin Ladin, were false. *Id.* at DIB_003164-3165. The letter stated, "Taken as a whole, the article conveys the message that DIB knowingly assisted a terrorist in laundering money. This message is utterly and completely false." *Id.* at DIB_003165.

**RESPONSE:** DIB does not dispute this statement.

180.    The draft letter from DIB's attorneys to the New York Times to demand a retraction of the article linking DIB to terrorist finance was then submitted by Ellison to the DIB Executive Committee to approve the transmission of the letter to the New York Times demanding the newspaper retract the allegations and threatening the defamation action. *Id.* at DIB_003174.

**RESPONSE:** DIB does not dispute this statement.

181.    A handwritten note to an approval request from Ellison to DIB's Executive Committee states:  "Mr. Rob Ellison.  I have discussed this matter with Mr.  Ebrahim Fayez and okayed the action Mohamed Al Sharif 13/11/99.  *See* Winer Testimony at ¶ 4.10; Exhibit Fine 271, DIB_003174.[12]  A final version of the letter, correcting the typo on Bin Ladin's first name, was transmitted to the New York Times on January 4, 2000.  *See* Winer Testimony at ¶ 4.10; Exhibit Fine 271, DIB_003213-3214.

**RESPONSE:**  DIB does not dispute this statement, but supported by inadmissible material, as Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.

182.    On January 14, 2000, the New York Times legal department responded to the letter from Fine that he transmitted to the newspaper on behalf of DIB, captioned "Dubai Islamic Bank Correction Demand."  *See* Winer Testimony at ¶ 4.11; Exhibit Fine 271, DIB_003215-3216.

**RESPONSE:**  DIB does not dispute this statement, but in any event immaterial, as the New York Times' publication of the article does not prove the article's contents or bear on DIB's conduct, knowledge, or intent.  Supported by inadmissible material, as Mr. Winer is the subject of a pending bellwether *Daubert* challenge, and his report the subject of a pending Rule 37 motion.  DIB Reply Br. 6 n.4.

183.    The response stated that "We have reviewed your letter with care and have concluded that no correction is warranted here.  The article accurately reported the statements of United States government officials.  Your letter misreads the article in one respect.  It did not say that money was laundered through the Dubai Islamic Bank but only that the bank did business with Osama Bin Laden.  We believed this to be true when we published it, and we believe it to be true now."  The letter then addressed the statements by the State Department's spokesperson, Foley, as follows:  "You appear to be unaware that the State Department confirmed and perhaps even expanded on the relevant portion of the article in a public briefing on the day it was published.  In the context of a discussion of, in the State Department spokesman's words, "terrorist money laundering," the spokesman stated that 'the government of the United Arab Emirates has told us the Dubai Emirate government has taken steps to clean up the bank, the Dubai Islamic Bank, and restore its reputation.' For these reasons we decline to correct the article."  *See id.*

**RESPONSE:** DIB does not dispute that this was the New York Times' response, but in any event immaterial, as the New York Times' publication of the article does not prove the article's contents or DIB's conduct, knowledge, or intent.

184.    Fine testified that DIB then decided not to sue the New York Times, stating that

---

[12] Online media reports confirm that a person with the name of Ebrahim Fayez served as Chief Executive Officer of DIB and a merged successor bank, Emirates Islamic Bank, until May 18, 2011, when he resigned the position. See, e.g., http://www.tradearabia.com/news/BANK_198825.html and https://www.emirates247.com/business/economy-finance/emirates-islamic-ceo-resigns-2011-05-18-1.394406. See Winer Testimony at ¶ 4.10, n.50.

the primary reason was reputational risk, even if the bank won. *See* October 4, 2019 Tr. at
55:19-24.

**RESPONSE:** Undisputed.

185.    As for Ellison, his due diligence reportedly involved conducting searches for
"Osama bin Laden" via a terminal connected to DIB's database. *Id.* at 27.

**RESPONSE:** DIB does not dispute this statement, but Plaintiffs' characterization as
"reportedly" is not a fact.  Further, Plaintiffs' statement mischaracterizes Judge Fine's testimony
by excerpting only one element of the due diligence performed by DIB.  Judge Fine testified as
follows:

> Q: When did the bank look to see if there were any accounts in
> the name of Osama bin Laden?
>
> A: It was in two parts.  In connection with the fraud and
> embezzlement, the bank had done an initial search to see if any
> of the monies had any connection to any Islamic institutions and
> whether or not they had any connection to Osama bin Laden. …
> And there were negative results, meaning there was no contact in
> any way, shape, or form with Osama bin laden then. And either
> at that time or both at that time and immediately after the article
> came out, Mr. Ellison conducted a search to see if there were any
> accounts in the name of Osama bin Laden ….

October 4, 2019 Tr. at 26:10-27:3.  Judge Fine further testified that "the bank had already done a
search for any accounts, any transfers from, any transfers to Osama bin Laden with negative
results, meaning there was nothing." *Id.* at 25:18–21.  Mr. Ellison conducted the search
personally, and not through subordinates, and "[a]ny assistance that he needed was provided.
That was my understanding at all times." *Id.* at 27:19-24.

186.    Fine testified that he was unaware of any other searches conducted by Ellison, *id.*
at 34-35, and that he had not undertaken any investigation himself regarding the underlying
allegations in the New York Times story, and had relied solely on the information conveyed to
him by Ellison on behalf of DIB that the New York Times article's statements about DIB's
relationship with bin Ladin were untrue. *Id.* at 57-62.

**RESPONSE:** Immaterial.  Plaintiffs' statement also mischaracterizes Judge Fine's testimony
insofar as it suggests that he was unaware of the fact that Mr. Ellison had searched for bin
Laden's "name in whatever variation of spellings it might be," or suggests that Judge Fine did
not investigate the allegations in the New York Times story by contacting the U.S. State
Department, though he did not personally visit Dubai to conduct investigations through DIB's
terminal.  *Id.* at 57:11-17, 103:16–18.

187.    Ellison passed away in 2002 and was unavailable to testify. *Id.* at 96:4-9.

**RESPONSE:** DIB does not dispute this statement, but in any event immaterial.

## X.   THE GOVERNMENT OF THE U.A.E. REFUSED TO PROVIDE ASSISTANCE ON TERRORISM FINANCING BEFORE 9/11 AND THE U.A.E. REMAINS A GREY ZONE FOR MONEY LAUNDERING AND COUNTERTERRORISM FINANCING TO THIS DAY

188.   Despite consistent and repeated efforts, U.S. officials were unable to "enlist the support of the UAE in its efforts to target terrorist financial networks."  *See* NATO Parliamentary Assembly, *The Economic Consequences of September 11, 2001 and the Economic Dimension of Anti-Terrorism*, ECF No. 2973-1 at ¶ 31 (FED-PEC0213608-213618).

**RESPONSE:** Immaterial.  The quotation does not refer to DIB and the source is inadmissible for among other reasons, including that it is inadmissible hearsay.  Further, Plaintiffs' characterization of US officials' efforts is not a fact, but improper, conclusory legal argument.

189.   According to the 9/11 Commission, the U.A.E. was a "persistent counterterrorism problem," noting that "[f]rom 1999 through early 2000, the United States, and President Clinton personally, pressed the UAE, one of the Taliban's only travel and financial outlets to the outside world, to break of its ties and enforce sanctions, especially those relating to flights to and from Afghanistan.[13]  These efforts achieved little before 9/11."  *See* 9/11 Commission Report at 138.

**RESPONSE:** Immaterial.  Neither the in-text quotation or the footnoted assertion refers to DIB and the source is inadmissible hearsay.  Moreover, Plaintiffs omit the beginning of the quotation, which states that the UAE was also "becoming … a valued counterterrorism ally of the United States."

190.   As recently as June 17 2022, the U.A.E. was included on the Financial Action Task Force's "Grey List," based on strategic deficiencies in its regime "to counter money laundering, terrorist financing, and proliferation financing." *See* https://www.fatf-gafi.org/publications/high-risk-and-other-monitored-jurisdictions/documents/increased-monitoring-june-2022.html.

**RESPONSE:** Immaterial, including because the assertion postdates 9/11 by decades, and is inadmissible, including because it includes inadmissible hearsay.  Moreover, Plaintiffs mischaracterize the statement, as the website cited describes the "high-level political commitment" of the UAE to strengthen the effectiveness of its AML/CFT regime, and describes the UAE's "significant progress" toward that end.

---

[13] Al Qaeda used the flights to and from Afghanistan to "courier money into the country," and U.A.E. cooperation on this front was important to interdicting al Qaeda's finances. See 9/11 Commission Report at 66; see also End Note 77 to Chapter 2 at 470.

Dated: September 16, 2022                      Respectfully submitted,

By: */s/ Steven T. Cottreau*

    Steven T. Cottreau
    C. Kevin Marshall (admitted *pro hac vice*)
    Gabrielle E. Pritsker
    Audrey Beck (admitted *pro hac vice*)
    JONES DAY
    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001
    Telephone: (202) 879-3939
    Email: scottreau@jonesday.com
    Email: ckmarshall@jonesday.com
    Email: gpritsker@jonesday.com
    Email: abeck@jonesday.com

    Juan P. Morillo (admitted *pro hac vice*)
    QUINN EMANUEL URQUHART & SULLIVAN LLP
    777 Sixth St., N.W.
    Washington, D.C. 20001
    Telephone: (202) 538-8174
    Email: juanmorillo@quinnemanuel.com

    *Counsel for Defendant Dubai Islamic Bank*