# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113

TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

VIA CM/ECF                                                        September 19, 2022

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

    Re:    *In re Terrorist Attacks of September 11, 2001*, 03 MDL 1570 (S.D.N.Y) (GBD) (SN)

Dear Judge Netburn:

    Plaintiffs' latest motion to compel is a procedurally inappropriate and untimely attempt to relitigate discovery issues that have been present in this case for over a decade. Plaintiffs mischaracterize their motion as involving a Rule 26(e) obligation to supplement—but they fail to point to any prior document requests or specific Court-ordered obligations to which DIB must supplement prior responses. For this reason alone, Plaintiffs motion should be denied. Additionally, the disclosure of files pursuant to Executive Order 14040 ("Declassified Files") does not justify a reopening of discovery because those Files simply mirror allegations that Plaintiffs have long made and pursued in discovery beginning almost 12 years ago. Plaintiffs' newfound urgency pairs poorly with Plaintiffs' lackadaisical approach in discovery—Saeed Ahmed Lootah has long been a central character in Plaintiffs' narrative, but they could not be bothered to depose him after naming him as a witness. And most of the hearsay allegations in the Declassified Files have no relationship to the tragic events of 9/11.

## 1.    BACKGROUND

    Plaintiffs lead with their narrative of a U.S. government intervention "aimed at closing the backchannel to Bin Laden at DIB." MTC 1. A decade of discovery has left that narrative in tatters. Like other well-intentioned banks (including many banks operating in the U.S.), DIB unwittingly maintained accounts for people who were later identified as members or supporters of al Qaeda. As this Court knows, al Qaeda operated covertly and fooled even the U.S. government (which admitted the hijackers to this country). DIB continuously cooperated with government officials to help stop terrorist financing, and there is no evidence that DIB sought to promote terrorist attacks. For example, after the publication of a 1999 New York Times article reporting possible use of DIB by Osama Bin Laden, DIB's outside counsel (now Judge) Alan Fine contacted the State Department with the message from DIB, "we want to cooperate." Ex. 2 at 120:13 (deposition). Although the State Department fielded questions about the article, the State Department offered Mr. Fine no information—"he didn't give me any name, he didn't give me an account number, he didn't give me a date," *id.* at 114:9—and never followed up in response to Mr. Fine's request: "If you learn of anything or become willing to share anything, please call." *Id.* at 115:3. DIB had no names of al Qaeda members, but searched its records for accounts and records for Osama Bin

Laden and found nothing. *Id.* at 25:18-21. DIB has produced all documents created during the investigation in its and Mr. Fine's possession. Plaintiffs' implication that there should be more is speculation that was long ago debunked by Mr. Fine's sworn testimony. Furthermore, Plaintiffs mischaracterize U.S. officials' statement that Dubai had taken steps to "clean up" DIB—which was a reference to a fraud against DIB that required its recapitalization (largely by the Dubai government), not support for terrorism. *See* DIB Mot. Excl., ECF 8344 at 21.

Plaintiffs now rely on the release of the Declassified Files, which they claim show "extensive and witting sponsorship of al Qaeda." MTC 2. But the actual speculations in the Files show no such thing. *See* DIB PJ Reply, ECF 8532 at 6-7. The Files allege (without offering factual support) only that Bin Laden and associates opened letters of credit at the Bank and that various known and unknown al Qaeda personnel held accounts at the Bank. MTC 3-4. The Files do not allege that any money from any DIB accounts were connected to terrorism or violence or even that transactions were suspicious. Nor do the Files allege that DIB knew that any of its customers were terrorists or involved with violence—and the Files provide no indication that DIB was even warned of any relationships and failed to take action. Had DIB known of any such allegations, it would have investigated and cooperated, just as it did after the 1999 Times article.

## 2.   PLAINTIFFS IDENTIFY NO FAILURE TO SUPPLEMENT

Plaintiffs motion is premised upon one proposition: they claim DIB has wrongfully failed to supplement discovery responses under Rule 26(e). Supplementation under Rule 26(e) is required only when a prior disclosure is "incomplete or incorrect." DIB's prior disclosures, however, remain fulsome and complete.

Most tellingly, Plaintiffs' motion never does what a Rule 26(e) motion should do: ***identify each prior discovery request*** and any narrowing as a result of objections or Court orders, and then explain why the responding party failed to properly meet the language of those obligations. For this reason alone, Plaintiffs' motion—which relies upon a purported violation of the duty to supplement—should be denied as failing to identify the duties purportedly violated.

In a sleight of hand, Plaintiffs try to use the ruse of supplementation to attempt to relitigate the search term methodology to which they agreed in the summer of 2011, that Judge Maas ordered in 2016, and that Your Honor re-adopted in 2018. This Court summarized this search term methodology in its 2018 Order when Plaintiffs sought to expand their search terms beyond what Judge Maas had ordered. *See* Ex. 1 (order at ECF 4046) at 2-10; Ex. 3 (brief at ECF 3788) at 2-5.

From the very outset of discovery, the parties agreed on a search term methodology looking for matches of the full name field of DIB's legacy electronic banking system. In October 2010, Plaintiffs served 108 discovery requests on DIB seeking, *inter alia*, information on a scattershot of individuals and entities, including ***all members of Al Qaeda***. *See* Ex. 1 at 2. During the following six months, the parties negotiated DIB's discovery obligations, including a search term methodology for DIB's legacy banking records system. *See* Ex. 4 (brief at ECF 3057) at 2. The parties agreed that DIB would produce certain records for customers identified by searching "for exact matches on the search term in the full name accountholder field in DIB's electronic account

record keeping system." Ex. 5 (Sept. 8, 2011 Letter) at 2-3. DIB told Plaintiffs to "include on that list (a) names in Arabic because many records are not in English and (b) alternative spellings of both English and Arabic names that it would like searched." Ex. 6 (July 7, 2011 Letter) at 4. Plaintiffs' confirmed their understanding and forwarded a list of over 2,900 terms. *E.g.* Ex. 7 (July 15, 2011 Email) (sending list of terms "per your client's agreement to conduct a search of its records systems using both English and Arabic names, as well as alternative spellings").

That approach was adopted for two key reasons. <u>First</u>, as we explained to Judge Maas, "we are a bank, we are not experts in who are members of the Taliban and al Qaeda." Ex. 8 (Hr'g Tr.) at 24. That difficulty was compounded by al Qaeda members' extensive efforts to remain secret and their use of aliases. *Id.* at 34. Thus, the Parties' agreement appropriately put the burden on Plaintiffs to initially identify names of persons and entities they believed were relevant.

<u>Second</u>, searching an extensive banking electronic database presents myriad difficult issues—including (i) what to do with customers who have the same name as al Qaeda members, but who are not actually the target of the search; and (ii) otherwise producing records only for persons actually relevant to the litigation and not for those who are false positive hits, which can take extensive and unduly burdensome efforts to even attempt to resolve. Because many names are common (especially Arabic names), wildcard searches would simply not work. For example, one of the individuals mentioned by Plaintiffs is Sulaiman Ali (MTC 3)—but using wildcards to search the full name field in DIB's legacy system for all entries containing "Ali" returns a staggering number of false positives with 42,618 customers hitting on that search. *See* Ex. 9 (Third Dharsey Decl.). DIB's own employees even queried that legacy system using an exact match methodology. Ex. 10 (Maazmi Decl.) at 4.

As a result, the parties negotiated—and this Court has twice adopted—this matching methodology. For each name match, DIB produced as required by this Court "opening and closing statements, periodic statements, and other electronic information for any accounts that are located using those searches." Ex. 1 at 12. Plaintiffs offer no alternative and should not be allowed to relitigate Court rulings under the guise of Rule 26(e) supplementation.

## 3.    PLAINTIFFS' NEW DISCOVERY REQUESTS ARE UNWARRANTED

Without seeking Court permission, Plaintiffs actually seek to reopen long-closed document discovery. That attempt ignores this Court's discovery deadlines, never seeks to justify a reopening, and thus is procedurally improper. Moreover, Plaintiffs' requests (if properly made on motion to reopen) are without merit because they seek additional discovery on the ***same topics*** that have long been at issue in this case. Plaintiffs' dissatisfaction is attributable to their own failure to pursue those topics with diligence and to make effective use of the more than 500 search terms under this Court's prior orders (which DIB voluntarily expanded to 629 search terms). Ex. 1 at 9. Plaintiffs appear to make six requests: five on page 5 ("Requests I-V") and an additional request concerning Sulaiman Ali on page 3 ("Request VI").

<u>**Request I**</u> concerns "letters of credit in favor of" Bin Laden, his Sudan businesses, and Saidi Madani al Tayyib (aka "Abu Khalifa al Omani," *see* MTC 2) ("OBL Parties"). Plaintiffs'

request suffers three primary flaws.  First, Plaintiffs did not even know what records that DIB had produced concerning Tayyib.  They recently misrepresented to this Court that DIB did not produce any Tayyib records (Winer Resp., ECF 8471 at 11 ("none of [Tayyib's] accounts were produced by DIB")), but now try to salvage their misrepresentation by complaining that DIB's disclosure was "very limited" (MTC at 4) after DIB noted that it had produced all the records it was required to produce by Judge Maas (Winer Reply, ECF 8503 at 1).

Second, Plaintiffs do not understand letters of credit and thus misrepresent the Declassified Files' allegations and mis-formulate their request.  A letter of credit is a letter promising payment by a bank that is opened by one party (the applicant) in favor of the party who will receive payment (the beneficiary).  To justify their request of a search for "letters of credit in favor of" the OBL Parties, Plaintiffs point to the Declassified Files.  But those Files allege the OBL Parties "opened … letters of credit" (MTC Ex. 6 at CIA_000045) and thus were applicants—not letter of credit beneficiaries (which Plaintiffs' language "in favor of" denotes).

Third, and critically, Plaintiffs have already had discovery that indicates that none of the OBL Parties opened any letters of credit as the Declassified Files allege.  Only DIB's customers could open letters of credit.  See Ex. 11 (Second Dharsey Decl.) at 1.  And Plaintiffs have already had discovery into whether the OBL Parties were DIB customers.  Only Tayyib was a customer— and he did not open any letters of credit.  See id. at 2; DIB PJ Reply, ECF 8532 at 13.  Thus, Plaintiffs already have had discovery on this issue—they just do not understand what they have already sought and received.

**Requests II and IV** concern purported "cooperation" between DIB's former chairman Saeed Ahmad Lootah and "bin Laden's companies" and "relationships" between Lootah and "bin Laden or his Sudanese Businesses; (2) [Tayyib] and companies associated with him; (3) Hassan al Turabi or the NIF; and (4) Hisham Ihsan Koprulu of [sic] his companies."  MTC 5.

First, the allegations regarding Lootah are attenuated and do not justify reopening discovery because the uncontroverted evidence shows he had no involvement in the Bank's day-to-day operations from "at least 1995" onward and was off DIB's board of directors in 1998.  DIB PJ Br., ECF 8127 at 24-26; DIB PJ Reply, ECF 8532 at 7-8.  The plotting of 9/11 did not even begin until spring of 1999, at the earliest, as Plaintiffs' own expert confirmed.  Ex. 12 (Jenkins Dep.) at 72-73, 193-195.

Second, Plaintiffs' sweeping requests are disconnected from the allegations in the Declassified Files.  The key allegation in the Files regarding Lootah's activity at DIB is his alleged authorization of letters of credit ordered by Bin Laden's companies or financial officers.  MTC Ex. 5 at CIA_000747.  But Plaintiffs already had discovery into this issue—as addressed above.

Third, from the outset of this case, Plaintiffs have long alleged that Lootah had connections with al Qaeda.  See 2015 MTC, ECF 2973 at 7; 2015 MTC Ex. L, ECF 2973-13 at 14-15.  Plaintiffs have had the chance to pursue whatever discovery they wanted.  Plaintiffs' own motion acknowledges that they dedicated one or more search terms to Lootah, Bin Laden, his businesses, and Tayyib, pursuant to the parties' agreement and Judge Maas's order.  MTC 2 n.3.  And DIB

has produced documentation for nine DIB accountholders, including **two accounts** for Tayyib, and confirmed it has no accounts for Osama Bin Laden or his Sudan companies. DIB SUMF, ECF 8128 at 3, 9 n.2. The Declassified Files do not prove any insufficiency of these results, and any dissatisfaction with the production results should have been raised long ago.

Fourth, Plaintiffs want to re-do their lackadaisical approach to discovery on these topics. Plaintiffs named Lootah and Tayyib as witnesses in 2010, *see* Ex. 13 (Pls.' Disclosures) at 92-93, and confirmed their desire to depose Lootah in a status letter to the Court in November 2018, *see* Ex. 14 (Pls.' Discovery Chart) at 12. But Plaintiffs never approached DIB about a deposition of Lootah or Tayyib (or any other fact witness aside from Alan Fine), and Lootah passed away in June 2020. Ex. 15 (Y. Lootah Decl.) at 3.

Last, Plaintiffs have also long been aware of Turabi and National Islamic Front—both named as defendants in the MDL. If Plaintiffs wanted to seek discovery on either, they should have done so a decade ago. And the Declassified Files do not allege that either had any accounts or relationships with DIB—so nothing justifies Plaintiffs' belated efforts now.

**Request III**, seeking "all available account and transaction information" for Hisham Ihsan Koprulu and Koprulu Trading Company, is immaterial. The Declassified Files do not allege that Koprulu had any transactions through DIB with al Qaeda. To the extent that they suggest a financial relationship between Lootah and Koprulu, as explained, Plaintiffs had the chance to pursue discovery regarding Lootah's alleged relationships with people affiliated with al Qaeda— and they largely did not pursue such discovery. Further, nothing suggests that Koprulu assisted the 9/11 attacks—and he and his company have never been listed by OFAC. Thus, he is at best tangential and does not warrant reopening discovery, especially given Plaintiffs' failure to pursue related discovery.

**Request V** concerns Sheikh Yousif Jassim al Haji and should also be rejected. The Declassified Files allege that he was a member of DIB's Board of Directors prior to 1998. MTC Ex. 5 at CIA_000722, 737; Ex. 16 (A. Ansari Decl.) at ¶¶ 26-30. They do not allege that Haji nor his related charities such as International Islamic Charitable Organization ("IICO") had any connection to 9/11 or al Qaeda—much less any connection to al Qaeda involving DIB. Further, Plaintiffs abandoned prior discovery on Haji. Plaintiffs included his name as a search term in a list proposed prior to the 2017 motion to compel. Ex. 17 (Oct. 2016 Letter) at 25 ("Yusuf Jasim al Hijji"). But his name was then dropped during the parties' negotiations. Half a decade later, Plaintiffs want to redo that decision regarding a figure having nothing to do with 9/11.[1] This is not a valid basis warranting discovery reopening.

**Request VI** concerns accounts for Sulaiman al Ali (MTC 3). But Plaintiffs have already had their opportunity to seek discovery regarding him—and essentially decided he was not worth pursuing. Plaintiffs proposed just **one search term** for "Sulaiman al Ali"—despite DIB's instruction to include alternative spellings and aliases in both English and "Arabic because many records are not in English." Ex. 3 (brief at ECF 3788) at 2; Ex. 18 (July

---

[1] Plaintiffs tried to include IICO as an additional search term above its limit of 500 terms, but this Court denied Plaintiffs' request as being beyond the number of terms Judge Maas permitted. Ex. 1 (order at ECF 4046) at 9.

29, 2022 Letter) at 2-3.  This was in stark contrast to other individuals, where Plaintiffs proposed upwards of 17 search terms, including different spellings and aliases.  *E.g.*, Ex. 19 (First Dharsey Decl.) at 3.  Nor do the Declassified Files make Ali material—Plaintiffs have ***never*** averred that DIB is somehow wittingly connected to the allegations that Saudi Arabian agents assisted the hijackers.  Neither Ali nor Bayoumi were designated by OFAC, Plaintiffs never claim that DIB even knew who they were, and nothing suggests DIB processed the transfer to assist an attack. And the allegation that Ali wired a de minimis transfer of $190 from a DIB account to Omar al Bayoumi falls well short of materiality.  MTC Ex. 3 at 4.  Especially given Plaintiffs' lack of diligence in discovery, reopening is unjustified.

\* \* \*

For the forgoing reasons, Plaintiffs' motion to compel for the failure of proper supplementation should be denied.[2]

Sincerely yours,
*/s/ Steven T. Cottreau*
Steven T. Cottreau
*Counsel for Defendant Dubai Islamic Bank*

cc: All counsel by ECF

---

[2] For the reasons set forth above, DIB has fully satisfied its discovery obligations and nothing justifies reopening discovery.  If, however, this Court disagrees, any further discovery should be limited to the use of search terms using the same methodology to search the full name field of DIB's legacy electronic banking system, and for any customer matches, DIB should be required to produce account statements, account opening files, and electronic transaction data from January 1, 1992, to December 31, 2004—as it has previously done in this case when searching for customers. Hisham Koprulu and Koprulu Trading Company are the only topics in the Declassified Files that have never been the subject of prior discovery—but neither have been connected to 9/11.  Moreover, Lootah has been a topic since the inception of this case, but Plaintiffs never diligently pursued him or his companies in discovery.  Plaintiffs' bid for a re-do regarding Lootah should be rejected for the reasons described above.  If, however, the Court believes Plaintiffs are entitled to discovery on Plaintiffs' misreading of the Declassified Files, it should be limited to the electronic data available in DIB's legacy electronic banking system on letters of credit issued by Lootah or his companies for which Bin Laden, his Sudan businesses, or Saidi Madani al Tayyib (aka "Abu Khalifa al Omani," see MTC 2), are beneficiaries.  In order to identify Lootah's companies, Plaintiffs should be required to provide search terms, which DIB will search according to the parties' agreed methodology.  This search term process is necessary because DIB did not maintain a list of all of Lootah's companies, and DIB's legacy electronic records system contained "no list of owners or ultimate beneficial owners" of each corporate customer.  *See* Ex. 9 (H. Dharsey Third Declaration) at 2.