# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|   |   |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF CASE |

This document relates to:
*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-cv-06978
*Thomas E. Burnett, Sr. et al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 04-cv-07279

**DECLARATION OF BADER IBRAHIM ABDULLAH AL MAAZMI**

I, Bader Ibrahim Abdullah al Maazmi, declare that I am over the age of eighteen years and of sound mind to make this declaration. I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify to the statements and facts contained herein, all of which are true and accurate to the best of my knowledge and belief:

**Background**

1. I am the Assistant Vice President of the Government Regulatory Affairs Unit in Dubai Islamic Bank's ("DIB" or "the Bank") Legal Department. Prior to that, I was the Manager of that the Government Regulatory Affairs Unit from 2012 until 2021. The Government Regulatory Affairs Unit was previously named the Central Bank and Governmental Bodies Report Unit until 2019 but its responsibilities have remained the same. This Unit largely handles responding to court case notices from the United Arab Emirates

("UAE") Central Bank. The court notices often request an account status check on an individual or list of individuals related to a matter before the court.

2. I obtained my specialist diploma in Trade and Transportation from the Higher Colleges of Technology in Dubai in 1998.

3. I began working at DIB in July 2001 as a senior clerk in the Support Service Unit's Salary and Internal Transfer Department within the Central Operations Department. In early 2002, I transferred to the Central Operation Department's Anti-Money Laundering ("AML") and Suspicious Accounts Unit. In 2002, I became an officer in the AML and Suspicious Accounts Unit. In 2006, I became Assistant Manager in the AML and Suspicious Cases Unit.

4. In the AML and Suspicious Cases Unit, I was primarily responsible for responding to Federal or Dubai court case requests. While working in the AML and Suspicious Cases Unit, I assisted DIB's AML Compliance Officer, Mr. Zohair al Rabii, to help conduct account searches and respond to UAE Central Bank requests related to account searches and freezes.

**Anti-Money Laundering and Suspicious Cases Unit**

5. DIB's AML and Suspicious Cases Unit was headed by DIB's AML Compliance Officer, Zohair al Rabii, whom DIB had appointed as that officer in February 2001.

6. Mr. al Rabii was one of the first Association of Certified Anti-Money Laundering Specialists ("ACAMs") certified persons in the UAE. As his Deputy, I worked closely with Mr. al Rabii and I am familiar with his work at DIB. Mr. al Rabii took seriously his responsibilities as DIB's AML Compliance Officer. Mr. al Rabii retired from DIB in 2018.

7. As Head of DIB's AML and Suspicious Cases Unit, Mr. al Rabii was primarily responsible for implementing the UAE Central Bank's AML Circular 24/2000, which the UAE Central Bank issued to UAE banks, including DIB, in November 2000. As Head of DIB's

AML and Suspicious Cases Unit, Mr. al Rabii was responsible for creating AML policies and procedures to comply with UAE Central Bank regulations, drafting quarterly AML reports detailing the money laundering efforts at DIB, and acting as the liaison officer with the UAE Central Bank on money laundering issues.

8.  Shortly after I joined the AML and Suspicious Cases Unit, Mr. al Rabii provided my AML training, which included a presentation and oral training. I continued to be trained on the job working under Mr. al Rabii. I also later supplemented my AML knowledge by attending trainings offered by the Emirates Institute for Banking and Financial Studies.

9.  Mr. al Rabii provided internal AML training to employees at DIB. As part of DIB's internal AML training, Mr. al Rabii traveled to each of DIB's branches to train their Branch Compliance Officers and hosted internal trainings at the Central Operations Department. After being trained by Mr. al Rabii, the Branch Compliance Officers also trained other branch employees on AML policies and any updates to those policies.

10. Branch Compliance Officers served as branch-level AML compliance personnel and coordinated with Mr. al Rabii. At the time I joined the AML and Suspicious Cases Unit, each DIB branch already had trained Branch Compliance Officers who monitored for potential money laundering issues.

11. When I joined DIB's AML and Suspicious Cases Unit in 2002, DIB was conducting daily reviews of transactions reports to detect any potential suspicious activity. Mr. al Rabii and the Branch Compliance Officers were primarily responsible for reviewing daily transaction reports. Whenever Mr. al Rabii was out on leave, I was responsible for checking daily transaction reports for suspicious activity. I reviewed dozens of potential suspicious activity cases from 2002-2007. Aside from checking the daily transaction report, my suspicious activity reviews included random account and transaction checks, reviewing transactions flagged by the Branch Compliance Officers, and checking for abnormal names.

12. In my experience, no Branch Compliance Officers or Branch Managers ever flagged any suspected terrorist financing concerns to the AML and Suspicious Cases Unit.

**UAE Central Bank Requests**

13. After the September 11, 2001 Terrorist Attacks, the UAE Central Bank began to send to UAE banks search and freeze requests for names of suspected terrorists.

14. Mr. al Rabii was responsible for directing DIB's search efforts in response to requests from the UAE Central Bank and drafting related responses to the UAE Central Bank when I joined the AML and Suspicious Cases Unit. I helped Mr. al Rabii to respond to requests from the UAE Central Bank by performing name searches and placing freezes on any accounts identified.

15. Until 2008, DIB conducted name searches in response to UAE Central Bank requests in DIB's electronic bank records system, Tandem. Tandem searches could be conducted both in Arabic and English, but Tandem only identified results that were "direct hits." To hit on a name, searches in Tandem needed to include full names (first, second, third, and family name) in the exact order and spelling as stored in Tandem. DIB's AML and Suspicious Cases Unit used its best, good-faith efforts to search alternative spellings and variations of names when searching Tandem.

16. DIB's AML and Suspicious Cases Unit conducted searches of both the English and Arabic names given in UAE Central Bank notices.

17. The Tandem system was also capable of searching passport numbers.

18. DIB informed the UAE Central Bank of our search results, whether the results were a direct name hit, hits on similar name variations, or no hits on any relevant accountholders.

19. In my experience, DIB always used its best, good-faith efforts to comply with instructions of the Central Bank.

20. Attached as Exhibit A (DIB_003414-3466 and DIB_005526-5557) are true and correct copies of DIB's correspondences with the UAE Central Bank regarding UAE Central Bank Notices 2/361/2002, 1879/2002, 13-7/809/2003, 13-7/351/2005.

21. Attached as Exhibit B (DIB_003393-3408) are true and correct copies of DIB's correspondences with the UAE Central Bank regarding UAE Central Bank Notices 1347/2003 and 13-7/962/2003.

22. Attached as Exhibit C (DIB_003262-3311) is a true and correct copy of DIB's correspondence to the UAE Central Bank in August 2004 regarding Central Bank Notice 2/355/01.

23. In the regular course of its business, DIB's AML and Suspicious Accounts Unit regularly prepared and filed (at or near the time of receiving or sending) the Bank's correspondences (including the correspondences in Exhibits A, B, and C) with the UAE Central Bank in correspondence binders maintained by that Unit. Exhibits A, B, and C have been maintained by DIB in those binders.

24. DIB informed the UAE Central Bank of any non-hits in response to search requests from the Central Bank and of DIB's technical search limitations. DIB sometimes requested additional information from the UAE Central Bank, such as full names or passport copies, to help improve its ability to identify and freeze accounts of suspected terrorists.

25. DIB reported to the UAE Central Bank any accounts that DIB identified related to suspected terrorists, and DIB never hid accounts from the UAE Central Bank.

26. To freeze an account, Mr. al Rabii or I instructed the Support Services Unit in the Central Operations Department to block the account. I confirmed that accounts we requested to be blocked were in fact blocked on Tandem, DIB's electronic banking system.

27.     DIB added all names provided by the UAE Central Bank to its own internal black list and sent the UAE Central Bank circulars to all of DIB's branches to ensure no suspected terrorists could open accounts or perform transactions at DIB.

28.     To my knowledge, the UAE Central Bank never stated that DIB's responses to its search requests were incorrect or insufficient.

**Terrorist Financing**

29.     I have never been asked by anyone at DIB to support terrorism, and I would never support terrorism.

30.     I have never heard anyone at DIB express any support for al Qaeda or any terrorist organization. I have never learned any facts suggesting in any way that DIB supports or supported al Qaeda or any other terrorist organization.

31.     Before September 11, 2001, I was unaware of any accountholder's having any alleged involvement with al Qaeda or any intention to participate in or aid any terrorist attack. I am unaware of information suggesting that DIB had any intention to participate in or aid any terrorist attack. I am not aware of any information suggesting that DIB ever knowingly provided financial services to a customer with links to al Qaeda.

32.     In my experience at DIB since July 2001, I believe that DIB then and now would promptly terminate any customer relationship and report the customer to the UAE government if DIB believed the customer was funding or otherwise involved in terrorist activity.

Pursuant to 28 U.S.C. §1746, I, BADER IBRAHIM ABDULLAH AL MAAZMI, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 10, 2021.

