# EXHIBIT 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:
*Federal Insurance Co. v. Al Qaida*, Case No. 03-cv-06978
*Thomas E. Burnett, Sr. v. Al Baraka Inv. & Dev. Corp.*, Case No. 03-cv-09849
*Estate of John P. O'Neill, Sr. v. Al Baraka Inv. & Dev. Corp.*, Case No. 04-cv-01923
*Continental Casualty Co. v. Al Qaeda*, Case No. 04-cv-05970
*Cantor Fitzgerald & Co.. v. Akida Bank Private Ltd.*, Case No. 04-cv-07065
*Euro Brokers Inc. v. Al Baraka Inv. & Dev. Corp.*, Case No. 04-cv-07279

## DECLARATION OF ABDULRAHMAN MOHAMED AL ANSARI

I, Abdulrahman Mohamed Al Ansari, declare that I am over the age of eighteen years and of sound mind to make this declaration. I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify to the statements and facts contained herein, all of which are true and accurate to the best of my knowledge and belief:

**Background**

1. I am the Senior Vice President of General Banking Operations at Dubai Islamic Bank ("DIB" or "the Bank") in the United Arab Emirates ("UAE").

2. I began working at DIB in 1982 as a clerk in DIB's Main Branch. My responsibilities as a clerk involved reviewing transactions and helping open new accounts for customers. In 1982, I also spent several months in DIB's Clearance Section. At that time, DIB had only two branches.

3. In 1985, I transferred to DIB's Al Ain branch in Abu Dhabi to continue working while studying at the UAE University in Al Ain. I earned a degree in law in 1990 from the UAE University in Al Ain.

- 1 -

4. In approximately 1988, I was promoted to Assistant Head of Current Accounts of DIB's Al Ain branch. As Assistant Head of Current Accounts of DIB's Al Ain branch, I ensured that all checks were paid to customers, approved payments over the teller limit, and reviewed account opening forms and materials. I later became Head of Current Accounts at DIB's Al Ain branch, which included signatory authority to sign on behalf of DIB.

5. In approximately 1991, I became Assistant Branch Manager and later Branch Manager of DIB's Al Ain branch. As Branch Manager of DIB's Al Ain branch, I attended meetings with other branch managers, ensured instructions from DIB's Main Office were carried out at the Al Ain branch, checked the cash balance in the vault at the beginning of the day, trained employees in the branch, and made job recommendations for open positions.

6. In late January 1995, I became Head of DIB's Administrative Affairs Department, which handled DIB's administrative and human resources tasks. My duties also initially included occasionally working at other DIB branches when other branch managers became unavailable or were out of the office. In 1995, DIB had eight branches.

7. In November 2002, I was transferred as a Manager to DIB's Consumer Department for a few months. In April 2003, I became the Manager of DIB's Ijarah Department, which specialized in a type of financing of lease contracts. The Ijarah Department later became part of DIB's Retail Asset Operations Department. I became the Head of DIB's Retail Asset Operations Department in 2004.

8. I became the Vice President of the General Banking Operations Department in 2011 and was promoted to Senior Vice President in 2016.

**Dubai Islamic Bank**

9. During my nearly four decades at DIB from 1982 to present, I have never become aware of any facts that suggested in any way that DIB supports or supported al Qaeda or any other



terrorist organization. From 1982 until present, I have never heard anyone at DIB express any support for al Qaeda or any other terrorist organization.

10. I have never been asked by anyone at DIB to support terrorism, and I would never support terrorism.

11. DIB has never forbidden or restricted me from any business activity or personal relationship based on religious considerations. I have never been forbidden from or restricted in interacting with non-Muslims. Since I began at the Bank in 1982, DIB has never barred non-Muslims from being employed by or opening accounts at the Bank. For example, DIB's former Head of IT in the 1990s, Chandra Shekar, was not Muslim.

12. I have enjoyed my multiple visits to the United States of America. I lived in Houston, Texas for a year while my son received life-saving medical treatment. I would never work at a company that sought to harm the United States.

**Distribution of OFAC lists**

13. In the 1990s, DIB's Administrative Affairs Department distributed administrative decisions, UAE Central Bank directives, and any other notices or documents to relevant departments at DIB. Other DIB departments also used the Administrative Affairs Department to distribute their notices or documents to other departments at the Bank.

14. In the 1990s, DIB's International Division relied on DIB's Administrative Affairs Department to distribute notices and materials received from DIB's international clients and correspondent banks to other relevant departments at the Bank.

15. As head of DIB's Administrative Affairs Department from 1995 to 2001, I ensured that any materials from the International Division, including notices or sanctions lists from the United States Government's Office of Foreign Assets Control ("OFAC"), were distributed throughout the Bank when requested.



16. On approximately October 21 and November 4 of 1999, I received two requests from DIB's International Division to circulate two OFAC notices that added names to its Specially Designated Nationals and Blocked Persons List ("SDN") on October 12, 1999 and October 22, 1999 ("two 1999 OFAC SDN Lists"). Upon receipt of these two 1999 OFAC SDN Lists, I ensured that DIB's Administrative Affairs Department distributed these lists to the heads of all departments, branches, and divisions of DIB. The two 1999 OFAC SDN Lists were distributed to each section of DIB where accounts could be opened or transactions could be conducted, to ensure that DIB did not conduct any business with any party named on these two 1999 OFAC SDN Lists.

17. At my request, my secretary prepared the signature form that accompanied the circulation of the two 1999 OFAC SDN Lists to all departments, branches, and divisions of DIB.

18. Attached as Exhibit A (DIB_005577-5582) and Exhibit B (DIB_005583-5587) are true and correct copies of the distribution in October and November of 1999 of two 1999 OFAC SDN Lists to all departments, branches, and divisions of DIB. My handwritten requests to my secretary to prepare the signature notice for the two 1999 OFAC SDN Lists distribution appear on the first page of each of these exhibits.

19. In 1999, most of DIB's departments, including the Administrative Affairs Department, and its main branch were located in DIB's headquarters in Dubai. For recipients located in DIB's headquarters, the two 1999 OFAC SDN Lists were hand delivered and a signature confirmation of receipt was recorded on the signature page located on the last page of Exhibits A and B.

20. The two 1999 OFAC SDN Lists were faxed to departments and branches located outside DIB's headquarters. The signature pages located on the last page of Exhibits A and B contain signed stamps from DIB's Administrative Affairs Department confirming the two 1999



OFAC SDN Lists were faxed to DIB's departments and branches located outside DIB's headquarters.

21. DIB took the distribution of the two 1999 OFAC SDN Lists very seriously. DIB employees were required to check the two 1999 OFAC SDN Lists when opening accounts and conducting transactions. DIB's branches kept copies of the two 1999 OFAC SDN Lists to refer to them when opening accounts to ensure no accounts were opened for any individuals on the list.

22. Before September 11, 2001, I was unaware of any accountholder's having any alleged involvement with al Qaeda or any intention to participate in or aid any terrorist attack. I am unaware of information suggesting that DIB had any intention to participate in or aid any terrorist attack. I am not aware of any information suggesting that DIB ever knowingly provided financial services to a customer with links to al Qaeda.

23. In my experience at DIB since 1982, I believe that DIB then and now would promptly terminate any customer relationship and report the customer to the UAE government if DIB believed the customer was funding or otherwise involved in terrorist activity.

**DIB's Board and Bank Structure**

24. Due to my lengthy work experience at DIB, I have personal knowledge of the general development of DIB's organizational structure and its changes in management in the 1990s.

25. In March 1998, a fraud on DIB was uncovered that was unrelated to terrorism or Osama bin Laden. DIB quickly notified and worked with both the UAE Central Bank and Dubai Government regarding the fraud.

26. Following the discovery of the fraud against the Bank in 1998, the Dubai Government increased the capitalization of the bank (thereby increasing its ownership in DIB) and, with the UAE Central Bank, appointed a new Executive Committee to oversee DIB's operations.



27. In 1998, I was DIB's Head of Administrative Affairs when I learned of the fraud committed against the Bank and was thereafter involved in the Bank's initial investigation that followed the discovery of the fraud.

28. In March 1998, DIB received an official resolution from the UAE Central Bank authorizing a new Executive Committee to run the Bank. Attached as Exhibit C is a copy of a December 1998 announcement from that new Executive Committee to all of DIB's correspondents, citing the Central Bank resolution appointing it. The members of that Executive Committee were Mohammed Bin Ali Bin Zayed (Chairman), Sultan Saeed Nasir Al Mansouri, Yousif Abdul Latif Al Sirkal, and Ibrahim Fayez Humeid.

29. Starting in 1998, the Executive Committee ran DIB. By early 1999, a new permanent Board of Directors was appointed to oversee the management of DIB, and the contemplation of this appointment was memorialized in the December 1998 announcement attached as Exhibit C. The new Board of Directors included the four-member Executive Committee and was led by a new Chairman of the Board, Mr. Mohammed Khalfan bin Kharbash, the UAE Minister of Financial Affairs and Industry at that time.

30. The change in management of DIB in 1998 also led to an organizational restructuring of DIB, which was officially approved in February 1999. The 1999 organizational restructuring is detailed in DIB's Administrative Decision No. 21 and related Organizational Chart, attached as Exhibit D (DIB 2399-2405).

**Saeed Ahmed Lootah**

31. Prior to 1998, the bank was run on a day-to-day basis by the Assistant Managing Director, Mohammed Ayoub Mohammed, with help of four committees: (1) Takaful Committee Zakat and Good Loans Fund; (2) Human Resources Affairs Committee; (3) Investment and Finance Committee; and (4) Management by Objectives and Results Committee. I served as the secretary for the Human Resources Affairs Committee from 1995

to 1998. Though Saeed Ahmed Lootah was named the official Chairman of all four committees, he did not serve on any of the four Committees that ran the Bank prior to 1998.

32. After receipt of the March 1998 UAE Central Bank directive, DIB's Board of Directors at that time, which included Saeed Ahmed Lootah, was disempowered. After the new Executive Committee was appointed in March 1998, I never saw Saeed Ahmed Lootah at DIB, and he never exercised any authority at the Bank.

33. From the beginning of my employment at DIB in 1982, Saeed Ahmed Lootah never asked me to open any bank accounts for or provide banking services to any particular customers. I have never heard of Saeed Ahmed Lootah instructing any other DIB employee to open any bank accounts for or provide banking services for particular customers.

34. Since at least 1995 when I became the Head of the Administrative Affairs Department Saeed Ahmed Lootah was not involved in the day-to-day operations of the Bank and did not have an office at the Bank.

35. I had very limited interactions with Saeed Ahmed Lootah in my role as the Head of Administrative Affairs beginning in 1995. My official meetings as a Department leader before 1998 were primarily with executive management led by Mr. Mohammed Ayoub Mohammed and did not include Saeed Ahmed Lootah. The very few official meetings which Saeed Ahmed Lootah attended were only with respect to DIB's opening of a Training Center for bank employees.

36. I never heard Saeed Ahmed Lootah express any support for violence, terrorism, Osama bin Laden, al Qaeda, or any form of extremism. I have never heard any other DIB employee state that Saeed Ahmed Lootah expressed any support for violence, terrorism, Osama bin Laden, al Qaeda, or any form of extremism.

37. I never heard any member of DIB's Board of Directors express any support for violence, terrorism, Osama bin Laden, al Qaeda, or any form of extremism. I have never heard

any other DIB employee state that any member of DIB's Board of Directors expressed any support for violence, terrorism, Osama bin Laden, al Qaeda, or any form of extremism.

**DIB's Fatwa & Sharia Supervisory Board**

38. DIB's Fatwa & Sharia Supervisory Board has always been an independent entity within DIB's organizational structure.

39. DIB's Fatwa & Sharia Supervisory Board has never been involved with DIB's daily operations, including at the branch level.

40. I have never received instructions from DIB's Fatwa & Sharia Supervisory Board or its members related to opening accounts or processing transactions for specific customers.

41. I have never heard that DIB's Fatwa & Sharia Supervisory Board or any of its members ever issued any instructions related to opening accounts or processing transactions for specific customers.

42. I have never heard that DIB's Fatwa & Sharia Supervisory Board or any of its members encouraged or supported violence or terrorism in any way.

Pursuant to 28 U.S.C. §1746, I, ABDULRAHMAN MOHAMED AL ANSARI, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 16, 2022.

*[signature]*
16/6/2022

# EXHIBIT C

# Dubai Islamic Bank
Public Joint Stock Company
( Incorporated in U.A.E. )

Head Office

IFRL/266/98



بنك دبي الإسلامي
شركة مساهمة عامة
(تأسس في دولة الإمارات العربية المتحدة)

المركز الرئيسي
28-Dec-98

إلى جميع المراسلين

## TO ALL CORRESPONDENTS

**Subject : Administrative Resolution Regarding Granting of Sole Signatory Powers to the Chairman of the Executive Committee of Dubai Islamic Bank**

الموضوع : قرار إداري بمنح صلاحيات التوقيع المنفرد لرئيس اللجنة التنفيذية لبنك دبي الإسلامي

We, the undersigned, members of the Executive Committee for Dubai Islamic Bank appointed pursuant to resolution of the UAE Central Bank No. 13/652/98 dated 30/3/98 and resolution No. 13/1143/98 dated 24/5/98 which has been empowered to assume the powers of the Board of Directors pursuant to the resolution of the Extra Ordinary General Meeting held on 29/11/98 until the election of a new Board of Directors by the Ordinary General Meeting to be held during the first quarter of 1999. By virtue of the powers vested on us we resolved :-

نحن الموقعون أدناه أعضاء اللجنة التنفيذية لبنك دبي الإسلامي المشكلة بموجب قراري مصرف الإمارات العربية المتحدة المركزي رقم ٩٨/٦٥٢/١٣ الصادر بتاريخ ١٩٩٨/٣/٣٠م، ورقم ٩٨/١١٤٣/١٣ الصادر بتاريخ ١٩٩٨/٥/٢٤م، والمكلفة بتولي صلاحيات مجلس الإدارة بمقتضى قرار الجمعية العمومية غير العادية في اجتماعها بتاريخ ١٩٩٨/١١/٢٩م، وحتى انتخاب مجلس إدارة جديد للبنك بواسطة الجمعية العمومية العادية المقرر انعقادها في الربع الأول من عام ١٩٩٩م، بموجب الصلاحيات المخولة لنا قررنا الآتي :-

**First :**
To grant Sole Signatory Powers on behalf of the bank to Mr. Mohammed Bin Ali Bin Zayed - Chairman of the Executive Committee, which include delegation and cancellation of signing powers, whose specimen signature appended herebelow :
Mr. Mohammed Bin Ali Bin Zayed

أولا :
منح صلاحيات التوقيع المنفرد نيابة عن البنك للسيد/ محمد بن علي بن زايد - رئيس اللجنة التنفيذية للبنك بما في ذلك تخويل وإلغاء التوقيعات المعتمدة ونموذج توقيعه كما يلي :
السيد/ محمد بن علي بن زايد

**Second :**
This resolution comes into force with effect from this date.

ثانيا :
يسري مفعول هذا القرار اعتبارا من تاريخه.

Issued on this day the 28th December of the year One Thousand Nine Hundred Ninety Eight by the Executive Committee in its meeting which was attended by all members as follows :-

صدر هذا اليوم ٢٨ من شهر ديسمبر سنة ثمانية وتسعين وتسعمائة وألف بواسطة اللجنة التنفيذية لبنك دبي الإسلامي المنعقدة بكامل هيئتها بحضور الآتي أسمائهم :

| Name | Signature | التوقيع | الاسم |
|---|---|---|---|
| (1) Mohammed Bin Ali Bin Zayed | | | (١) محمد بن علي بن زايد |
| (2) Sultan Saeed Nasir Al Mansouri | | | (٢) سلطان سعيد ناصر المنصوري |
| (3) Youssif Abdul Latif Al Sirkal | | | (٣) يوسف عبد اللطيف السركال |
| (4) Ibrahim Fayez Humeid | | | (٤) إبراهيم فايز حميد |

P.O. Box: 1080 DUBAI, Tel: 214888 , Fax: 237243, Tlx: 45889/48772 ISLAMI EM, SWIFT: DUIBAEAD

ص.ب: ١٠٨٠ دبي ، هاتف: ٢١٤٨٨٨ ، فاكس: ٢٣٧٢٤٣ ، تلكس: ٤٨٧٧٢/٤٥٨٨٩ ISLAMI EM ، سويفت: DUIBAEAD