**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |
| | ECF Case |

This document relates to:

*Fiona Havlish, et al. v. Bin Laden, et al.*, Case No. 03-cv-09848
*John Does 1 Through 7 v. The Taliban, et al.*, Case No. 20-mc-00740
*Federal Insurance Co. v. Al Qaida, et al.*, Case No. 03-cv-06978
*Estate of Smith, et al. v. The Islamic Republic of Iraq, et al.*, Case No. 01-cv-10132

**MEMORANDUM OF LAW IN SUPPORT OF THE JOINT TALIBAN CREDITORS'**
**MOTION FOR POST-JUDGMENT ATTACHMENT**

September 30, 2022

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     PROCEDURAL BACKGROUND.......................................................................4

III.    SUMMARY OF ARGUMENT ...........................................................................6

IV.     ARGUMENT .......................................................................................................7

     A.      TRIA Mandates Relief, And The Joint Taliban Creditors Are Entitled To
        Post-Judgment Attachment Under The CPLR ..........................................7

     B.      The Joint Taliban Creditors Have Valid Causes Of Action...................10

     C.      The Joint Taliban Creditors Have Established A Likelihood Of Success
        On The Merits Within The Meaning Of CPLR § 6212(a)....................10

     D.      The Joint Taliban Creditors' Final Judgments Establish Grounds For
        Attachment Pursuant To CPLR § 6201(5)..............................................12

     E.      The Joint Taliban Creditors Are Not Required To Show A Need For The
        Attachments ............................................................................................13

     F.      The Joint Taliban Creditors Have A Need For The Attachments.........14

V.      CONCLUSION...................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Astrea United Invs., L.P. v. Onitiri*,
  1992 WL 346353 (S.D.N.Y November 18, 1992)............................................................10, 13

*Em Ltd. v. Republic of Argentina*,
  2009 WL 2568433 (S.D.N.Y. Aug. 18, 2009), aff'd, 389 F. App'x 38 (2d Cir.
  2010) ......................................................................................................................7, 8

*Levinson v. Kuwait Fin. House (Malaysia) Berhad*,
  44 F.4th 91 (2d Cir. 2022) ............................................................ *passim*

*N. Mariana Islands v. Millard*,
  287 F.R.D. 204 (S.D.N.Y. 2012) ..................................................................14, 15

*Pantheon Properties, Inc. v. Houston*,
  2022 WL 785168 (S.D.N.Y. Mar. 14, 2022) ....................................................9

*Ross v. Thomas*,
  2011 WL 2207550 (S.D.N.Y. June 6, 2011) .........................................................8

*Sequa Capital Corp. v. Nave*,
  921 F. Supp. 1072 (S.D.N.Y. 1996).........................................................8

**Statutes and Rules**

28 U.S.C. § 636...........................................................................................5

Fed. R. Civ. P. 64.........................................................................................7, 8, 9

Fed. R. Civ. P. 69.........................................................................................5, 7

Fed. R. Civ. P. 72.........................................................................................5

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107–297, 116 Stat. 2322
  (codified at 28 U.S.C. § 1610 note) ....................................................... *passim*

N.Y. C.P.L.R. Article 62...............................................................................9, 11

N. Y. C.P.L.R. § 5225...................................................................................5, 10

N. Y. C.P.L.R. § 5227...................................................................................5, 10

N. Y. C.P.L.R. § 5229...................................................................................8

N.Y. C.P.L.R. § 6101 ................................................................................................................14

N.Y. C.P.L.R. § 6201 ........................................................................................................ *passim*

N.Y. C.P.L.R. § 6205 ................................................................................................................10

N.Y. C.P.L.R. § 6212 ..............................................................................................8, 9, 10, 12

## I.      INTRODUCTION

Judgment Creditors *Fiona Havlish, et al.* (the "*Havlish* Creditors"), *John Does 1 through 7* (the "*Doe* Creditors"), *Federal Insurance Co., et al.* (the "*Federal Insurance* Creditors"), and *Estate of Smith, et al.* (the "*Smith* Creditors") (collectively the "Joint Taliban Creditors"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in support of their Motion for Post-Judgment Attachment.

The Joint Taliban Creditors are filing the instant motion out of an abundance of caution, and reserving all rights, in order to maintain the status quo and avoid additional and unnecessary complications in the turnover proceedings, while the Joint Taliban Creditors pursue their rights to object to the Report and Recommendation ("Report") issued by Magistrate Judge Netburn on August 26, 2022, which recommended denial of their turnover motions. *See* MDL ECF No. 8463.

As this Court is aware, all of the Joint Taliban Creditors have existing writs of execution against the blocked funds held in the name of Da Afghanistan Bank ("DAB") at the Federal Reserve Bank of New York ("FRBNY").

Recently, however, the Second Circuit vacated a writ of execution in a Terrorism Risk Insurance Act ("TRIA") proceeding, holding that it was legal error for the district court to grant a motion for a writ of execution without first finding that the assets were blocked and that the party whose assets were to be restrained by the execution was an agency or instrumentality of the judgment debtor, when that party argued that it was not. *See Levinson v. Kuwait Fin. House (Malaysia) Berhad*, 44 F.4th 91 (2d Cir. 2022). The Second Circuit suggested that instead of proceeding by way of a writ of execution, the judgment creditors could have achieved the same outcome by seeking a post-judgment order of attachment pursuant to N.Y. CPLR § 6201(5). *Id.* at 98. As the *Levinson* court stated, a proceeding to enforce a money judgment under TRIA involves a "cause of action" that is "based on a judgment," such that "pre-execution attachment" is available

1

as an "interim remedy" to prevent the dissipation of the judgment debtor's assets during the pendency of the turnover proceeding. *Id.*

As the Joint Taliban Creditors have explained in previous filings with the Court, their writs remain valid for a number of reasons, and are not susceptible to the deficiencies that were at issue in *Levinson*. *See* MDL ECF Nos. 8399, 8419.

First, in *Levinson*, the most basic requirement for a TRIA writ – that the assets in fact be "blocked assets" – was not met; this most basic requirement is undeniably met here. Before the *Havlish* and *Doe* Creditors' writs issued, the United States had restrained the DAB assets precisely to prevent the Taliban from using its control over DAB to access the blocked funds. Furthermore, in connection with Executive Order 14,064, the Executive Branch specifically recognized the validity of the *Havlish* and *Doe* writs as part of the arrangements to facilitate the release of $3.5 billion of the blocked funds for humanitarian relief in Afghanistan. *See* MDL ECF No. 7701. Significantly, the *Federal Insurance* and *Smith* Creditors' writs were issued after President Biden had promulgated Executive Order 14,064, which explicitly and officially blocked the already frozen DAB assets and set aside approximately $3.5 billion for victims of the Taliban's terrorism.

Second, in contrast to *Levinson*, where there was no examination into the bank's relationship to Iran before a writ of execution issued, the Executive Branch in this case has conducted such an examination and has, as a result of the conclusions it reached, undertaken significant actions related to DAB's assets. As a result and as noted above: it froze and then officially blocked the assets precisely because the Taliban controlled DAB.[1]

Notwithstanding the Joint Taliban Creditors' contention that their writs do not exhibit the

---

[1] The U.S. Government previously determined that DAB was an agency or instrumentality of the Taliban during the 1996-2001 time period when the Taliban was similarly in de facto control of Afghanistan and DAB. *See* MDL ECF No. 7764 at 20, MDL ECF No. 7766 at ¶¶ 25-27.

*Levinson* deficiencies, the turnover proceedings have witnessed extraordinary efforts by certain parties to upend the normal operation of the execution and attachment rules and block the Framework Agreement, which was negotiated and agreed to by the substantial majority of the relevant plaintiffs in this MDL and would benefit over 10,000 individual MDL plaintiffs, in the event the court concludes that DAB's blocked assets are subject to turnover. Though not controlling here, *Levinson*, probably unintentionally, introduced possible ways in which those parties might attempt to disrupt the turnover proceedings to create uncertainty concerning the sequence of steps in a TRIA execution proceeding that targets the assets of a terrorist party's alleged agency and instrumentality. *See* Report at 11, n.6 ("if the Judgment Creditors were to prevail, there is a question of whether given the effect of *Levinson* on their writs, they would be required to seek new writs of execution to permit the enforcement of their judgments"). The potential for uncertainty is augmented because *Levinson* departs from procedures this Court has long used for restraining assets and then initiating, pursuing, and adjudicating the enforcement of terrorism judgments under TRIA. This uncertainty could lead to possible claims that the blocked DAB assets are not effectively restrained against all potential contingencies, upending the expectations of approximately 10,000 members of the 9/11 Community in the event the Court concludes that DAB's blocked assets are subject to turnover.[2]

As discussed below, the issuance of post-judgment attachments in favor of the Joint Taliban Creditors will minimize the risk of further legal maneuvering by parties seeking to engage in end-runs around the turnover regime of the CPLR, preserve the status quo, and protect the

---

[2] The *Owens* Plaintiffs are proceeding before a different court and have a pending motion for entry of default judgments against the Taliban. In the event they receive judgments, it is likely that they will seek post-judgment attachments and assert claims to the entirety of the blocked DAB funds. In addition, other MDL plaintiffs' groups, including plaintiffs who are not currently part of the Framework Agreement, have now re-filed their motions for default judgments against the Taliban.

interests of all of the Framework Agreement participants.

Most importantly, judgment creditors are entitled to attachment as well as execution, and certainly are entitled to attachment if they are not entitled to execution at this time. TRIA specifically provides blocked assets "*shall* be subject to execution *or attachment in aid of execution* . . .". TRIA § 201(a) (emphasis added). If the assets are not subject to execution at this time, they are subject to attachment. TRIA unequivocally mandates the issuance of attachment to aid the judgment creditors in their execution.[3]

## II.   PROCEDURAL BACKGROUND

This Court is familiar with the turnover efforts of the Joint Taliban Creditors directed at blocked assets held in the name of DAB at the FRBNY, and the Joint Taliban Creditors will not restate the history of those efforts at length here. Briefly, the Joint Taliban Creditors are terrorist victims with final monetary judgments against the Taliban. Report at 2-3. All of the Joint Taliban Creditors have served writs of execution against blocked assets held in the name of DAB at the FRBNY, *id.* at 6-9, which remain in force.

---

[3] As the Court will recall, the Joint Taliban Creditors previously submitted a letter opposing the *Ashton* Plaintiffs' request for an attachment pursuant to CPLR § 6201(5). *See* MDL ECF No. 8419.  Because the *Ashton* Plaintiffs do not have final monetary judgments against the Taliban, that letter correctly urged that they may not rely on TRIA to attach the blocked assets, and that, absent an ability to rely on TRIA, their attempt to attach the assets was prohibited by federal law. The Joint Taliban Creditors' letter also argued that the *Ashton* Plaintiffs' motion for attachment was offered for an improper purpose, because there was no risk of dissipation of the assets owing to the fact that they were: (1) restrained by the Joint Taliban Creditors' writs of execution; and (2) blocked by the President's Executive Order. The Joint Taliban Creditors believe that their writs continue to restrain the blocked assets, but should the Court disagree with that assessment, a potential for dissipation would exist. For instance, the U.S. Government could issue a license to another party asserting a claim to the assets, for payment of an outstanding debt. This motion should therefore be understood as an argument in the alternative: that if the Court is inclined to disagree with the Joint Taliban Creditors' position and conclude that the assets are not restrained by their writs of execution, the Joint Taliban Creditors should be entitled to an order of attachment, as they are the only parties with final, enforceable judgments against the Taliban, and thus are the only parties who can invoke TRIA's unique provisions that make the blocked assets of terrorist judgment debtors' assets subject to execution or attachment, and as they have already moved for turnover of the funds.

On February 11, 2022, the President of the United States took a series of coordinated actions with respect to the assets held in the name of DAB at the FRBNY, which were intended to benefit the "welfare of the people of Afghanistan" and to clear a legal path for the resolution of legal claims by U.S. victims of terrorism against the Taliban, including in particular the turnover efforts of the Joint Taliban Creditors. Among other things, the steps taken that day formally blocked the property of DAB that the FRBNY had frozen, leaving no doubt that the property is subject to execution under the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322. On that same day, the U.S. Government filed a Statement of Interest acknowledging that Section 201of TRIA provides the relevant framework for determining whether the blocked DAB funds are subject to turnover. The Government's Statement of Interest expressly acknowledged the effect of the *Havlish* and *Doe* writs, even requesting that the Court review the scope of those writs as a prerequisite for releasing $3.5 billion of the blocked assets for humanitarian relief in Afghanistan, pursuant to a license issued by the Treasury Department's Office of Foreign Assets Control ("OFAC").  MDL ECF No. 7661.

Following the President's actions, this Court lifted its stay, and the Joint Creditors thereafter filed, pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. §§ 5225(b) and 5227, and Section 201 of TRIA, for orders compelling the FRBNY to turn over to the Joint Creditors those blocked assets in its possession held in the name of DAB, to satisfy, in whole or in part, the compensatory damages for which the Taliban has been adjudged liable to the Joint Creditors.

In the August 26, 2022 Report, Judge Netburn recommended against granting the Joint Creditors' motions for turnover.  *See* MDL ECF 8463.  Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the Joint Taliban Creditors plan to object to the

August 26, 2022 Report and, if necessary, to appeal to the United States Court of Appeals for the Second Circuit.

## III.   SUMMARY OF ARGUMENT

During the period that the Joint Taliban Creditors are exercising their rights to seek further judicial review of their turnover motions, other parties who have not yet secured judgments against the Taliban are certain to continue their relentless efforts to create further complications in the turnover proceedings, through novel efforts aimed at displacing the Joint Taliban Creditors from their senior lien positions and upending the Framework Agreement benefiting the substantial majority of the 9/11 Community. Indeed, the *Owens* and *Wodenshek* Plaintiffs already have undertaken dubious steps, in violation of the President's blocking order, aimed at achieving an end run around TRIA and the execution regime of the CPLR.[4] Those plaintiffs have made clear their intention to exploit any sliver of perceived opportunity, no matter how suspect, to disrupt what should have been a straightforward turnover process. Unfortunately, the Joint Taliban Creditors anticipate that those parties will (wrongly) perceive the current procedural posture as creating such an opportunity, leading to further unnecessary litigation before this Court. Such legal maneuvering will unduly complicate further proceedings before this Court and any potential appeals, and severely prejudice all of the Framework Agreement Plaintiffs, including by delaying recoveries to which they would be entitled under the Framework Agreement, should a court of competent review conclude that the blocked assets are subject to turnover. Many of the plaintiffs who are participating in the Framework Agreement face real and present financial hardships, as well as

---

[4] Again, the *Owens* and *Wodenshek* Plaintiffs do not have final monetary judgments against the Taliban, and as a result their actions directed at restraining and otherwise "dealing in" the DAB funds are prohibited by the President's blocking order. The *Ashton* Plaintiffs' motion for an attachment pursuant to CPLR § 6201(5) was improper for this same reason. *See* MDL ECF No. 8419.

age-related uncertainties, making it all the more important to avoid any unnecessary complications or delays.

The issuance of attachment orders in favor of the Joint Taliban Creditors, while ultimately a "belts and suspenders" precaution as a pure legal matter, will serve to close any perceived window to exploit the Report while further judicial review is ongoing. Further, the issuance of post-judgment attachments is consistent with the *Levinson* decision, which contemplates the issuance of such attachments in order to protect the interests of judgment holders seeking attachment of blocked assets under TRIA while agency and instrumentality questions under TRIA are being resolved. While Judge Netburn has issued a Report recommending that turnover be denied, that Report remains subject to review and Judge Daniels has not yet ruled on the Report. The issuance of the Report thus does not, in and of itself, impede the issuance of attachments in accordance with *Levinson*.

Accordingly, pursuant to CPLR § 6201(5), and out of an abundance of caution and reserving all rights, the Joint Taliban Creditors move for post-judgment attachments against the DAB assets, in order to protect their rights and those of the other Framework Agreement participants, and preserve the status quo, during the pendency of judicial review of the Report.

## IV.   ARGUMENT

### A.   TRIA Mandates Relief, And The Joint Taliban Creditors Are Entitled To Post-Judgment Attachment Under The CPLR

"Under the Federal Rules of Civil Procedure, a federal court employs the attachment and execution procedures provided by the law of the state in which the court sits. *See* Fed. R. Civ. P. 64 (referring to state law for pre-judgment attachment procedures); Fed. R. Civ. P. 69 (referring to state law for post-judgment execution procedures). The New York Civil Practice Law and Rules ("CPLR") therefore govern the attachment and restraint of assets." *EM Ltd. v. Republic of*

*Argentina*, No. 03 CIV. 2507 (TPG), 2009 WL 2568433, at *3 (S.D.N.Y. Aug. 18, 2009), aff'd, 389 F. App'x 38 (2d Cir. 2010).

While state procedure governs the *method* by which the Court exercises its powers to effectuate this TRIA collection, whether the Court is empowered (and compelled) to do so is governed by federal law. *See e.g.*, *Ross v. Thomas*, 2011 WL 2207550, at *5 (S.D.N.Y. June 6, 2011) (holding that whether a court can exercise equitable power to appoint a receiver is governed by federal law). Here, there is an animating federal law: TRIA specifically provides blocked assets "*shall* be subject to execution *or attachment in aid of execution . . .*". TRIA § 201(a) (emphasis added). TRIA, not only empowers, but mandates the issuance of attachment to aid the judgment creditors in execution.

Rule 64 has been interpreted to allow federal courts to make broad use of New York procedure to craft remedies that effectuate the purpose of securing judgments through attachment. For example, in *Sequa Capital Corp. v. Nave*, 921 F. Supp. 1072, 1076 (S.D.N.Y. 1996) the Southern District of New York held that an injunction pursuant to N.Y. C.P.L.R. § 5229 was available because it "is designed to 'secure satisfaction of the judgment ultimately to be entered in the action' as provided for in FRCP 64" and that it "has substantially the same effect as an attachment." Thus, clearly the instant writs pursuant to N.Y. C.P.L.R. § 5229, travelling through F.R.C.P. 64, can serve as attachment. But in case the Court sees *Levinson* as precluding that, then, as the Second Circuit instructed in *Levinson*, Rule 64 also provides the conduit for the issuance of the TRIA-mandated attachment pursuant to N.Y. C.P.L.R. § 6201(5), based on the fact that there is a federal judgment at issue. *See Levinson*, 44 F.4th at 91.

CPLR § 6212(a) provides that a party may secure an attachment if the moving party establishes four elements: (1) there is a cause of action; (2) that it is probable that he or she will

prevail on the merits; (3) that one or more grounds exist for the attachment provided in CPLR §6201; and (4) that the amount demanded from the defendant exceeds all known counter-claims. *See* CPLR § 6212(a); *see also Pantheon Properties, Inc. v. Houston*, No. 20-CV-03241 (ALC) (SN), 2022 WL 785168, at *2 (S.D.N.Y. Mar. 14, 2022).

Article 62 procedures for attachment are often invoked pre-judgment, rather than in a situation, like this one, where judgment creditors are seeking to enforce already obtained final judgments. In *Levinson*, however, the Second Circuit indicated that Section 6201(5) is applicable in a TRIA proceeding to enforce a money judgment, and that an order of attachment may restrain property pending final adjudication of a turnover proceeding.

As the Second Circuit observed.

> The Levinsons were . . . entitled to pursue pre-execution attachment procedures if they chose to do so. Under New York law, which governs attachment proceedings here, *see* Fed. R. Civ. P. 64, "an order of attachment may be granted in any action ... when ... the cause of action is based on a judgment, decree or order of a court of the United States." CPLR § 6201(5). Of course, the Levinsons possessed just such an order—a money judgment against Iran. Accordingly, state law permitted them to pursue attachment procedures to, as the Levinsons have put it, "prevent the dissipation of" KFH Malaysia's assets. Joint App'x at 39. Thus, attachment is a possible remedy, among other interim remedies, available to the Levinsons, provided that they meet the applicable requirements.

*Levinson*, 44 F.4th at 98. The Second Circuit thus indicated that a post-judgment attachment pursuant to CPLR § 6201(5) is an appropriate remedy to protect the interests of a final judgment holder seeking turnover of blocked assets pursuant to TRIA, while any questions of agency or instrumentality status under TRIA are being resolved.

Here, as in *Levinson*, attachment is a "possible remedy" for the same reasons. The Joint Taliban Creditors are in possession of final money judgments against the Taliban that make the blocked assets of the Taliban's instrumentalities subject to attachment. They have the same "cause of action" as the plaintiffs in *Levinson*—namely, a proceeding to enforce their judgments under

TRIA against the assets of an agency or instrumentality of a terrorist party. And they are entitled to pursue attachment pending enforcement of the judgment upon showing probability of success on the merits.

**B.    The Joint Taliban Creditors Have Valid Causes Of Action**

The first requirement for an attachment pursuant to CPLR § 6212(a) is simply that a cause of action exists. Here, all of the Joint Taliban Creditors have final monetary judgments against the Taliban, establishing as a matter of law that a cause of action exists. All of them are actively pursuing turnover of the subject assets in the federal equivalent of a state court special proceeding under CPLR §§ 5225 and 5227. Thus, it is indisputable that the first requirement of § 6212(a) is satisfied.

**C.    The Joint Taliban Creditors Have Established A Likelihood Of Success On The Merits Within The Meaning Of CPLR § 6212(a)**

The second element of CPLR § 6212(a) requires a showing of a probability of success on the merits. The Joint Taliban Creditors submit that this inquiry focuses on the likelihood of success on the merits of the plaintiff's claim against the defendant itself and, where the targeted assets are held in the name of an instrumentality, whether the plaintiff has offered plausible facts or evidence that the defendant or its instrumentality has an interest in that property, or in this TRIA collection, the judgment debtor's instrumentality's interest in the property. *See Astrea United Invs., L.P. v. Onitiri*, No. 92 CIV. 0581 (MBM), 1992 WL 346353, at *8-9 (S.D.N.Y. Nov. 18, 1992) (in order to confirm a post-judgment attachment under CPLR § 6205(5) a plaintiff need only establish that it "appears" the defendant has an interest in the funds held by third parties).

Here, the Joint Taliban Creditors have final monetary judgments against the Taliban, establishing that they have meritorious claims against the Taliban. Further, the Report acknowledged that there was "little reason to doubt that much or all" of the Joint Taliban Creditors'

extensive evidentiary proffer concerning the Taliban's control of DAB "is factually true, and that the Taliban is using their control of DAB to advance their aims." Report at 33. And, there is no dispute that the deposited funds are DAB's. This confirms the baseline plausibility of the Joint Taliban Creditors' showing of the relevant party's interest in the property. Those showings are all that is necessary for issuance of the requested post-judgment attachments, while other legal questions raised by the Report are being reviewed.

The *Levinson* decision underscores this conclusion and demonstrates that this Court need not (and indeed ought not) decide the ultimate issue of whether the Joint Taliban Creditors are ultimately entitled to execute against the DAB assets in order to grant the requested attachments. *Levinson,* 44 F.4th at 98. In *Levinson,* the Second Circuit held that in order to execute against assets under TRIA and CPLR Article 62, a plaintiff must first establish the target property holder's status as an agency or instrumentality of the terrorist party "before ordering assets to be seized under TRIA." *Id.* at 97. But recognizing the risk that even blocked assets might be dissipated while the court adjudicates the target's agency or instrumentality status, the Second Circuit suggested that post-judgment attachment under CPLR § 6201(5) in aid of execution under TRIA could be granted while the underlying question is decided. *Id.* at 98. Thus, CPLR § 6201(5) is "a possible remedy, among other interim remedies," available under TRIA in aid of execution. *Id.* It would make no sense to require a movant to prove that the target is an agency or instrumentality of a terrorist party in order to obtain interim relief pending the Court's evaluation of whether the target is an agency or instrumentality of a terrorist party. To do so would merge the interim and final relief, essentially rendering that bifurcated inquiry pointless. It would also allow state procedural requirements to prevent the enjoyment of a federal substantive right to "attachment in aid of

execution." Where state procedure conflicts with the federal mandate, the state procedure must yield.

Thus, consistent with the holding in *Levinson* and TRIA's substantive right to attachment in aid of execution, a post-judgment attachment under CPLR § 6201(5) does not require an ultimate showing that the funds at issue belong to the terrorist party, or an agency or instrumentality of a terrorist party in this case, precisely because post-judgment attachment in aid of execution is a provisional, temporary remedy designed to prevent dissipation of assets while other proceedings are pending.[5]

### D.  The Joint Taliban Creditors' Final Judgments Establish Grounds For Attachment Pursuant To CPLR § 6201(5)

The analysis of the third condition for attachment under CPLR § 6212(a) – that one or more grounds exists under CPLR § 6201 to grant an attachment – is equally straightforward. In relevant part, CPLR § 6201 provides:

> § 6201. Grounds for attachment. An order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants, when:

* * *

---

[5] However, in the event that the Court concludes that a demonstration of likely success on the merits requires an inquiry into the underlying turnover motion, the Joint Creditors note that Judge Netburn concluded that the movants satisfy four of TRIA's five prongs. Report at 29-30. As to the fifth—DAB's agency or instrumentality status—we respectfully submit that the Report's conclusions are erroneous on all three of the issues it raises, and we will so argue in our forthcoming Objections. First, the Court has subject matter jurisdiction to adjudicate their turnover motions because whether TRIA applies is a federal question, and thus TRIA confers an independent basis for subject matter jurisdiction, and because no immunity from jurisdiction applies in this case, where neither Afghanistan nor any of its state agencies or instrumentalities have been named as parties. Second, granting the turnover motions requires only a determination of agency or instrumentality status under the statutory language of TRIA and does not require the Court to make any formal recognition determination. Third, the Report's novel conclusion that TRIA does not reach unwilling instrumentalities of terrorist parties is in direct conflict with both the statutory language and with decisions of the Eleventh Circuit and other judges in this District.

> 5. the cause of action is based on a judgment, decree or order of a court of the United States or of any other court which is entitled to full faith and credit in this state, or on a judgment which qualifies for recognition under the provisions of article 53.

CPLR § 6201(5).

Because all of the Joint Taliban Creditors have final monetary judgments issued by "a court of the United States," grounds for attachment exist. *See Levinson,* 44 F.4th at 98 (a plaintiff satisfying the final judgment requirement of TRIA may seek a post-judgment attachment of blocked assets pursuant to TRIA and CPLR § 6201(5), to protect its interest and prevent dissipation of those assets); *see also Astrea United Invs.*, at *1 (attachment under CPLR § 6201(5) is a remedy that may be used to enforce a judgment).

**E.    The Joint Taliban Creditors Are Not Required To Show A Need For The Attachments**

Unlike parties who seek a pre-judgment attachment, the Joint Taliban Creditors are seeking post-judgment attachments and do not have to establish a need for the attachments. *See* CPLR § 6201(5). Unlike other provisions of § 6201, the plain text of CPLR § 6201(5) conspicuously does not include language requiring a showing of need in order to secure an attachment. Nor does TRIA. In contrast, by way of example, CPLR § 6201(3) requires the movant to establish that "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." The omission of any such language from CPLR § 6201(5) makes clear that a party seeking an attachment under that provision need only have a judgment, and need not make an additional showing of "need."

F.       **The Joint Taliban Creditors Have A Need For The Attachments**

Even if the Joint Taliban Creditors were required to establish a need for the attachments notwithstanding the text of CPLR § 6201(5), they easily satisfy that requirement. As recognized by the Report, "if the Judgment Creditors were to prevail, there is a question of whether given the effect of *Levinson* on their writs, they would be required to seek new writs of execution to permit the enforcement of their judgments." Report at 11, n.6. *See also Ashton* Plaintiffs' Letter, MDL ECF No. 8339; *Owens v. Taliban,* No. 22-cv-1049-VEC, Dkt. 79. Thus, as the Report suggests, the Second Circuit's decision in *Levinson* has created uncertainty in the procedural steps judgment creditors must follow to enforce judgments under TRIA, potentially upsetting decades of settled practice in the Southern District of New York. This uncertainty raises the possibility that the blocked DAB assets may not be subject to any restraints, or may leave them subject to dissipation and attack by other potential creditors, including parties outside of this MDL (like the *Owens* Plaintiffs).

Had *Levinson* been decided at the time that the DAB assets were initially frozen in August 2021, there is no doubt that the Joint Taliban Creditors would have undertaken enforcement proceedings by seeking (and receiving) post-judgment attachments pursuant to CPLR § 6101(5) on the basis of the extensive factual record submitted in support of their turnover motions. It is thus entirely appropriate to issue them now. Stated simply, given this Court's own recognition in the Report that the writs of execution may be subject to attack under *Levinson*, post-judgment judicial restraints of the DAB assets in the form of attachments are appropriate to prevent further collateral attacks on and/or dissipation of the assets while the Joint Taliban Creditors exercise their due process rights to object to and appeal the Report. *See N. Mariana Islands v. Millard*, 287 F.R.D. 204, 215 (S.D.N.Y. 2012) (denying turnover but *sua sponte* entering an injunction pending appeal to preserve the status quo because the judgment creditor will "face irreparable injury should

14

the restraint dissolve, . . . continuing the restraint will not harm the interests of the [judgment debtor] in any way," and because the creditor's "argument[s] . . . have sufficient force amidst admittedly murky concepts to eventually have a fair chance of success on the merits").

Similar concerns exist here, and the appropriate method for preserving the status quo is the issuance of post-judgment attachment against the DAB funds and recognition of the current order of priority, which is reflected in the order in which the parties are listed in the Conclusion below.

## V.   CONCLUSION

For the reasons set forth above, the Joint Taliban Creditors respectfully request that the Court grant their motion for an order authorizing attachment of the assets held in the name of Da Afghanistan Bank at the Federal Reserve Bank of New York, and any and all other funds belonging to the Taliban in this District, as follows:

➢ On behalf of the *Havlish* Creditors in the amount of $2,086,386,669.00;

➢ On behalf of the *Doe* Creditors in the amount of $138,418,741.00;

➢ On behalf of Creditor *Vigilant Insurance Company* in the amount of $126,917,799.72;

➢ On behalf of Creditor *Chubb Custom Insurance Company* in the amount of $1,837,755.00;

➢ On behalf of Creditor *Chubb Indemnity Insurance* Company in the amount of $12,251,634.60;

➢ On behalf of Creditor *Federal Insurance Company* in the amount of $4,541,002,792.17;

➢ On behalf of Creditor *Chubb Insurance Company of New Jersey* in the amount of $1,238,045.13;

➢ On behalf of Creditor *Chubb Insurance Company of Canada* in the amount of $151,357,187.13;

➢ On behalf of Creditor *Pacific Indemnity Company* in the amount of $29,809,609.98;

➢ On behalf of Creditor *Great Northern Insurance* Company in the amount of $1,787,991,341.37;

➢ On behalf of Creditor *AXA Art Insurance Corp.* in the amount of $42,862,629.00;

➢ On behalf of Creditor *AXA Global Risks (UK) Ltd.* in the amount of $32,959,870.71;

➢ On behalf of Creditor *AXA CSA UK Branch* in the amount of $194,339,649.00;

➢ On behalf of Creditor *AXA Insurance Company* in the amount of $395,088,134.88;

➢ On behalf of Creditor *AXA Reinsurance Company* in the amount of $248,144,334.00;

➢ On behalf of Creditor *AXA RE* in the amount of $317,370,069.00;

➢ On behalf of Creditor *AXA RE Canadian Branch* in the amount of $78,415,221.33;

➢ On behalf of Creditor *AXA RE UK Plc* in the amount of $54,488,105.10;

➢ On behalf of Creditor *AXA Versicherung* in the amount of $2,769,159.00;

➢ On behalf of Creditor *SPS RE* in the amount of $252,915,480.00;

➢ On behalf of Creditor *American Alternative Insurance Company* in the amount of $11,768,346.21;

➢ On behalf of Creditor *Princeton Excess and Surplus Lines Insurance Company* in the amount of $11,388,877.50;

➢ On behalf of Creditor *Great Lakes UK Reinsurance Company* in the amount of $298,534,281.06;

➢ On behalf of Creditor *OneBeacon Insurance Company* in the amount of $529,544,956.20;

➢ On behalf of Creditor *TIG* in the amount of $228,252,687.90;

➢ On behalf of the *Smith* Creditors in the amount of $59,262,187.57.

Dated:  September 30, 2022                    Respectfully submitted,

By:  _/s/  Lee Wolosky_____
Lee Wolosky
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel:  (212) 891-1628
lwolosky@jenner.com

16

Douglass A. Mitchell
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001
Tel: (202) 639-6090
dmitchell@jenner.com

*Counsel for Judgment Creditors Fiona Havlish, et al.*

By: /s/ Orlando do Campo
Orlando do Campo
John Thornton
Daniela Jaramillo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
Tel: (305) 358-6600
od@danddtlaw.com

*Counsel for Judgment Creditors John Does 1-7*

By: /s/ Sean P. Carter
Sean P. Carter
Stephen A. Cozen
J. Scott Tarbutton
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: (215) 665-2105
scarter1@cozen.com

*Counsel for Judgment Creditors Federal Insurance Co., et al.*

By: /s/ James Edwin Beasley
James Edwin Beasley
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
Tel: (215) 592-1000
jbj@beasleyfirm.com

*Counsel for Judgment Creditors Estate of Smith, et al.*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the Memorandum of Law in Support of the Joint

Taliban Creditors' Motion for Post-Judgment Attachment was electronically filed this 30th day of

September 2022.  Notice of this filing will be served upon all parties in 03 MDL 1570 by

operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

_____

J. Scott Tarbutton, Esq.

LEGAL\59732641\1

18