**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |

This document relates to:
*Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq, et al.*, 04-cv-1076 (GBD)(SN)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**PARTIAL FINAL DAMAGES JUDGMENTS AGAINST THE TALIBAN**
**FOR PERSONAL INJURY PLAINTIFFS**

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
Ethan Greenberg, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 278-1000
Fax: (212) 278-1733
Email:  jgoldman@andersonkill.com
          bstrong@andersonkill.com
          agreene@andersonkill.com
          egreenberg@andersonkill.com
*Attorneys for Plaintiffs*

Dated:    New York, New York
            September 30, 2022

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.  INTRODUCTION ................................................................................................ 1

II. PROCEDURAL BACKGROUND .................................................................... 4

    **A.**    Applicable Orders ..................................................................................... 5

    **B.**    Related Cases ............................................................................................ 6

    **C.**    Personal Injury Plaintiffs ......................................................................... 8

III. LIABILITY JUDGMENTS FOR MEMBERS OF THE O'NEILL FAMILY at ECF No. 3067 SHOULD BE EXTENDED TO PERSONAL INJURY PLAINTIFFS ........................ 9

    **A.**    The Complaint Was Duly Served ............................................................. 9

    **B.**    Liability Was Determined As To Members of the O'Neill Family at ECF No. 3067 .................................................................................................. 9

    **C.**    The Determination of Liability as to the Taliban Should Be Extended to Personal Injury Plaintiffs ....................................................................... 10

IV. DAMAGES SHOULD BE AWARDED AGAINST THE TALIBAN JOINTLY AND SEVERALLY ............................................................................................... 10

    **A.**    Background ............................................................................................. 10

        **1.**    Common Law Liability is Established for the Non-U.S. National Plaintiff 11

            **a.**    Choice-of-law Principles Dictate the Application of New York Law to the Common Law Claims at Issue Here. ................................................... 12

    **B.**    Non-U.S. National Plaintiff with Claims Arising Under the Common Law Seek Application of Uniform Damages Principles as Those Employed Under the ATA. ................................................................................................... 15

        **1.**    Personal Injury Damages - Pain and Suffering ......................... 15

            - Pain and Suffering - ............................................................... 15

V.  THE MEASURE OF DAMAGES ..................................................................... 1

        **1.**    Economic Damages .................................................................. 17

    **B.**    The Personal Injury Plaintiffs Claims for Personal Injury and Economic Damages ................................................................................................. 19

        **1.**    P.A.P.D. Officer William "Will" Jimeno .................................. 19

            - Jimeno's Life Before 9/11 - .................................................. 20

            - September 11 - ....................................................................... 22

            - The Hospital Saves Will's Life - ........................................... 30

            - Physical Rehabilitation - ........................................................ 32

**TABLE OF CONTENTS**
*(continued)*

**Page(s)**

- Jimeno's Continuing Physical Disability - ................................................. 33

- Psychological Effects - ................................................................................ 34

- The Court Should Award P.O. Jimeno *Twenty-Five Million Dollars* in Personal Injury Damages - ........................................................................ 36

- Economic Damages in the Amount of *$3,181,931* Should be Awarded to Plaintiff Jimeno - ................................................................................ 38

    2.    P.A.P.D. Sergeant John McLoughlin ......................................................... 39

- John McLoughlin's Life Before 9/11 – ..................................................... 40

- September 11 - ............................................................................................ 42

- The Hospital Saves John's Life - .............................................................. 48

- Outpatient Treatment - ............................................................................... 51

- John's Continuing Disability - .................................................................. 52

- Psychological Effects - .............................................................................. 54

- The Court Should Award Sergeant McLoughlin  Twenty-Eight Million Dollars in Personal Injury Damages - ....................................................... 55

- Economic Damages in the Amount of *$2,660,711* Should be Awarded to Plaintiff McLoughlin - ........................................................................... 57

    3.    Manu Dhingra ........................................................................................... 57

- Dhingra's Life Before 9/11 - ..................................................................... 58

- September 11 - ............................................................................................ 59

- The Doctors Save Manu's Life - ............................................................... 62

- Manu's Partial Recovery - ......................................................................... 64

- Psychological Impacts - ............................................................................. 64

- The Court Should Award Manu Dhingra *Twelve Million Dollars* in Personal Injury Damages - ........................................................................ 66

- Economic Damages in the Amount of *$255,582* Should be Awarded to Plaintiff Dhingra - ................................................................................ 68

**C.**    Treble Damages ............................................................................................... 68

**D.**    Punitive Damages ............................................................................................ 68

**E.**    Prejudgment Interest ....................................................................................... 69

CONCLUSION ................................................................................................................ 71

docs-100521842.5

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Armstead v. National RR Passenger Corp.*,
    954 F. Supp. 111 (S.D.N.Y. 1997)........................................................................11

*Ashton v. al Qaeda Islamic Army*,
    02-CV-6977 (GBD)(SN) ............................................................................. *passim*

*Baker v. Socialist People's Libyan Arab Jamahirya*,
    775 F. Supp. 2d 48 (D.D.C. 2011) .......................................................................68

*Bauer v. Al Qaeda Islamic Army*,
    02-CV-7236 (GBD)(SN) ...........................................................................4, 6, 68

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    No. 20-1566, 2022 WL 1177497 (U.S. Apr. 21, 2022) ..........................................11

*Copley v. Bactolac Pharm., Inc.*,
    No. 18-CV-575 (FB) (PK), 2021 WL 918313 (E.D.N.Y. Mar. 10, 2021) ..............11

*Emmet & Co., Inc. v. Catholic Health East*,
    37 Misc. 3d 854 (Sup 2012), *aff'd*, 114 A.D.3d 605 (1st Dep't 2014)..................11

*Est. of Heiser v. Islamic Republic of Iran*,
    466 F. Supp. 2d 229 (D.D.C. 2006) ........................................................................5

*Flatow v. Islamic Republic of Iran*,
    999 F. Supp. 1 (D.D.C. 1998)...............................................................................65

*Estate of Heiser v. Islamic Rep. of Iran*,
    659 F. Supp. 2d 20 (D.D.C. 2009) ........................................................................14

*Jenco v. Islamic Rep. of Iran*,
    154 F. Supp. 2d 27 (D.D.C. 2001) ........................................................................13

*Lelchook v. Commerzbank AG*,
    2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011) ..........................................................9

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ..................................................................12

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ......................................................................9

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

*O'Brien v. Islamic Republic of Iran,*
    853 F. Supp. 2d 44 (D.D.C. 2012) ...................................................................34

*O'Neill, et al., v The Republic of Iraq, et al,*
    04-CV-1076 ...............................................................................................5, 7, 8

*Roth v. Islamic Republic of Iran,*
    78 F. Supp. 3d 379 (D.D.C. 2015) ...................................................................66

*In re Sept. 11 Litig.,*
    802 F.3d 314 (2d Cir. 2015)............................................................................69

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan,*
    262 F. Supp. 2d 217 (S.D.N.Y. 2003)...............................................................9

*SNS Bank, N.V. v. Citibank, N.A.,*
    7 A.D.3d 352 (1st Dep't 2004) .......................................................................11

*Stansell v. Revolutionary Armed Forces of Columbia,*
    16-MC-00405 (LGS) (SN), ECF No. 443 (March 29, 2022) ............................65

*Stethem v. Islamic Rep. of Iran,*
    201 F. Supp. 2d 78 (D.D.C. 2002) ...................................................................13

*Ests. of Ungar ex rel. Strachman v. Palestinian Auth.,*
    304 F. Supp. 2d 232 (D.R.I. 2004)................................................................9, 65

*United States v. Kahn,*
    5 F.4th 167 (2d Cir. 2021) ..............................................................................64

*Valore v. Islamic Republic of Iran,*
    700 F. Supp. 2d 52 (D.D.C. 2010) ................................................................9, 65

## Statutes

28 U.S.C. § 1605A(c)(4)....................................................................................5

49 U.S.C. § 40101.............................................................................................69

Anti-Terrorism Act, 18 U.S.C. 2333............................................................ *passim*

Pub. L. No. 107-42, 115 Stat. 230 (2001)........................................................69

docs-100521842.5

## I.    INTRODUCTION

This action arises out of the events of September 11, 2001, during which members of the al Qaeda[1] terrorist network hijacked four commercial airliners and used those planes as weapons in coordinated terrorist attacks upon the United States (the "September 11th Attacks").    The overwhelming majority of the plaintiffs in the above-captioned case are personal representatives and eligible family members of individuals killed in the September 11th Attacks. The present motion, however, is made by three brave survivors of the September 11th Attacks – John McLoughlin, William Jimeno and Manu Dhingra (hereinafter collectively, "the Personal Injury Plaintiffs") – who now seek partial damage judgments against the Taliban for the grave physical injuries they sustained on September 11, 2001.

In briefest form, Manu Dhingra was a supervisor of equities traders who worked at the World Trade Center on September 11; over 35 percent of his body surface (including his face) was badly burned by a wave of unbelievably intense heat produced by jet fuel that ignited in an elevator shaft just as he stepped off the elevator to go to work that day.  Port Authority Police Department ("PAPD") Sergeant John McLoughlin and P.A.P.D. Officer William Jimeno went into the World Trade Center on September 11 in order to rescue people there.  Each of the Towers in essence collapsed on the two men, and they were trapped for many long hours in a dark fiery pit deep below the surface, as huge slabs of concrete pinned them down and slowly and painfully nearly crushed the life out of their bodies.  Sergeant McLoughlin and Officer Jimeno were among the very last people rescued alive from the World Trade Center site.

For the reasons set forth below and in the accompanying Declarations of Jerry S. Goldman (the "Goldman Declaration") and of John McLoughlin, William Jimeno and Manu Dhingra, with

---

[1] Arabic words and names are spelled differently in various sources. Plaintiffs have strived for consistency as much as possible, but original spellings are maintained in quoted sources.

exhibits, the Personal Injury Plaintiffs by and through their counsel, now respectfully move this Court for the relief outlined below.

Specifically, the non-U.S national plaintiff identified in Exhibit A-1, Manu Dhingra ("Non-U.S. Personal Injury Plaintiff") and the two plaintiffs identified in Exhibit A-2, John McLouglin and William Jimeno, who were U.S. nationals on September 11, 2001 ("U.S. National Personal Injury Plaintiffs") (the Non-U.S. National Personal Injury Plaintiff and the U.S. National Personal Injury Plaintiffs collectively are referred to herein as the "Personal Injury Plaintiffs"),[2] to the Goldman Declaration, by and through their counsel, Anderson Kill P.C., submit this Memorandum of Law in support of their Motion for Final Judgment as to Liability for Partial Final Judgment as to Damages against the Taliban.

The Non-U.S. Personal Injury Plaintiff, Manu Dhingra, by and through undersigned counsel, respectfully moves this Court for an Order:

(1)     extending the Court's Order at ECF No. 3067 granting a judgment as to liability for the members of the O'Neill family to Manu Dhingra, the Non-U.S. Personal Injury Plaintiff; AND,

(2)     granting Manu Dhingra, the Non-U.S. Personal Injury Plaintiff's motion for entry of default judgment as to liability against the Taliban; AND,

(3)     determining that service of process in the above-captioned matter was properly effected upon the Taliban for Manu Dhingra, the Non-U.S. Personal Injury Plaintiff; AND,

(4)     determining that this Court possesses personal jurisdiction over the Taliban for Manu Dhingra, the Non-U.S. Personal Injury Plaintiff; AND,

---

[2] The Personal Injury Plaintiffs were not previously granted judgments against the Islamic Republic of Iran ("Iran") for the damages sought herein and do not have a pending judgment motion against Iran.

(5)     determining that this Court has subject-matter jurisdiction over the Taliban under the common law for actions arising out of wrongful death, assault, battery, and intentional infliction of emotional distress based on the intentional acts of international terrorism perpetrated on September 11, 2001 that intentionally targeted innocent civilians resulting in death, personal injury, and significant grief sustained by family members of those killed in the attacks.[3]

The Personal Injury Plaintiffs, by and through undersigned counsel, respectfully moves this Court for an Order:[4]

(1)     finding the Taliban jointly and severally liable with Iran and awarding compensatory damages to the Personal Injury Plaintiffs against the Taliban for pain and suffering commensurate with the injuries sustained during the September 11, 2001 terrorist attacks, in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases (and factoring in an upward departure on damages values based on the indelible impact of the September 11, 2001 terrorist attacks); AND,

(2)     awarding the Personal Injury Plaintiffs economic damages in the amounts set forth in Exhibit A-1 and Exhibit A-2; AND,

(3)     awarding treble damages against the Taliban pursuant to the Anti-Terrorism Act, 18 U.S.C. §2333(a), for economic and personal injury/pain and suffering damages,

---

[3] Plaintiffs' prior request for an order of liability, *see* ECF No. 8455 (August 25, 2022), included the Non-U.S. Personal Injury Plaintiff on Exhibit A-1. However, because the Non-U.S. Personal Injury Plaintiff on Exhibit A-1 was not a U.S. citizen on September 11, 2001, the Non-U.S. Personal Injury Plaintiff on Exhibit A-1 seeks a determination of liability for his common law claims.
[4] Our request for an order of liability for all plaintiffs in the judgment motion at ECF No. 8455 (August 25, 2022) included the U.S. National Personal Injury Plaintiffs, as set forth on Exhibit A-2. The relief requested herein is contingent on the granting of the motion at ECF No. 8455.

3

only for John McLoughlin and William Jimeno, the U.S. National Personal Injury Plaintiffs, and in the amounts set forth in Exhibit A-2; AND,

(4)     finding that the treble damages awarded are compensatory in nature and not punitive; AND

(5)     awarding prejudgment interest against the Taliban at the rate of 4.96 percent per annum, compounded annually, for the period of September 11, 2001 until the date of judgment; AND,

(6)     granting leave for the Personal Injury Plaintiffs to seek punitive damages and other appropriate damages at a later date; AND

(7)     granting permission for all other O'Neill Plaintiffs in this action not appearing in Exhibit A-1 and Exhibit A-2 to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND

(8)     granting to the Personal Injury Plaintiffs such other and further relief as this honorable court deems just and proper under the circumstances.

The awards set forth in the Proposed Order represent the only direct recovery against the Taliban on behalf of the Moving Plaintiffs for the claims herein and will constitute final awards and judgments against the Taliban for the Moving Plaintiffs.

## II.     PROCEDURAL BACKGROUND

On October 13, 2015, this Court granted to Plaintiffs John P. O'Neill, Jr., Christine Irene O'Neill, Carol O'Neill and the Estate of John Patrick O'Neill, Sr. (and on behalf of all survivors and legally entitled beneficiaries and family members of John Patrick O'Neill, Sr.) a liability judgment against the Taliban for its role in the September 11th Attacks. ECF 8607. See also ECF Nos. 3163 and 3043-1.

In February of this year (2022), the O'Neill Plaintiffs moved to add approximately 3000 parties identified in ECF 7660-1 as additional Plaintiffs in this action against the Taliban. Those proposed additional plaintiffs included John McLoughlin, William Jimeno and Manu Dhingra – the moving parties on the instant motion.  In May of this year, this court issued an Order (ECF 7949) granting that motion. An amended complaint was filed.

On August 25 of this year, the Plaintiffs brought a motion (ECF 8455) seeking an Order extending this Court's October 13, 2015 Order (ECF 8607) (that had adjudicated the Taliban liable to the O'Neill Plaintiffs) to the newly added plaintiffs – including the three moving Plaintiffs on the instant motion. That motion is still pending.

The instant motion is a motion for a final partial default judgment for personal injury damages by Plaintiffs McLoughlin, Jimeno and Dhingra against the Taliban.  Their individualized claims for damages are detailed below.

In addition, it should be noted that Plaintiff Manu Dhingra – unlike John McLoughlin and William Jimeno – is a non-U.S. citizen.  Because Mr. Dhingra is a non-U.S. citizen, he is not pursuing a claim under the Anti-Terrorism Act.[5]

Accordingly, in an abundance of caution, in addition to requesting a damages judgment, this motion also requests a separate determination that this Court's October 13, 2015 (ECF 8607) liability judgment against the Taliban also extends to Mr. Dhingra.

### A.    Applicable Orders

This motion is being submitted in accordance with various procedural orders entered by this Court, and the form of this motion and the relief requested herein are intended to comply with various orders of this Court, including the following:

---

[5] The liability determinations for Messrs. McLoughlin and Jimeno are presently pending.

(a)     The Court's January 24, 2017 Order, ECF No. 3435, requiring that "[a]ll further motions for final judgment against any defaulting defendant shall be accompanied by a sworn declaration attesting that the attorney has (1) complied with the due diligence safeguards [referenced in Section II.D. of the January 23, 2017 letter from the Plaintiffs' Executive Committee, ECF No. 3433] and (2) personally verified that no relief has previously been awarded to any plaintiff included in the judgment (or, if relief has been awarded, the nature of that relief)."

(b)     Magistrate Judge Maas' July 30, 2012 Report & Recommendation, ECF No. 2618, and this Court's October 3, 2012 Order, ECF No. 2623, adopting the Report & Recommendation in its entirety concerning the award of damages;

(c)     The Court's October 14, 2016 Order, ECF No. 3363, concerning the amounts of solatium damage awards.

(d)     The Court's October 14, 2016 Order, ECF No. 3362, related to *Bauer v. Al Qaeda Islamic Army*, 02-CV-7236 (GBD)(SN) and *Ashton v. al Qaeda Islamic Army*, 02-CV-6977 (GBD)(SN).

(e)     The Court's October 28, 2019 Order, ECF No. 5234, setting forth updated procedural rules.

(f)     The Court's December 6, 2019 Order, ECF No. 5338, setting forth the scheduling order.

(g)     The Court's April 11, 2022 Order, ECF No. 7870, setting forth specific procedures regarding seeking judgments for damages as to the Taliban.

(h)     The Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports submitted in support of default judgments.

(i)     The Court's July 11, 2022 Order, ECF No. 8198 setting forth requirements for motions for defaults against non-sovereign defendants.

(j)     The Court's September 20, 2022 Order, ECF No. 8541, setting forth procedures for filing expert reports submitted in support of default judgments.

## B.     Related Cases

Relying on evidence and arguments submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570, the consolidated multidistrict litigation arising out of the September 11th Attacks, this Court, on April 7, 2006, May 12, 2006, December 22, 2011, and on October 13, 2015, granted Orders of Judgment on Liability in favor of certain of the *Federal Insurance*, *Burnett, Ashton*, *Havlish*, and *O'Neill* groups of plaintiffs against the Taliban (*see* ECF

Nos. 1754-56, 1782-97, 2516, 3067).  This Court also considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents. Upon the *Havlish* plaintiffs' submissions, on October 3, 2012 this Court found, among other things, that "Plaintiffs may recover for…their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010). This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006):

In that same decision in *Havlish*, this Court also found that plaintiffs are entitled to punitive damages under the Foreign Sovereign Immunities Act ("FSIA") in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5. The Court has applied that 3.44 multiplier also to judgments in *Ashton*. *See* ECF No. 3175 at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier). The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett*. ECF No. 3666. However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF Nos. 3358 at 11-16, 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report and Recommendation in its entirety. ECF Nos. 3383 at 2, 3384 at 6.

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the plaintiffs' solatium damages. ECF No. 2623 at 5.  The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5). In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest.

ECF No. 3175 at 7-8.  Judge Daniels adopted the magistrate judge's report and recommendation and applied the nine percent interest rate in multiple instances in *Ashton* and *Bauer*. *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1. However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all solatium claims. ECF Nos. 3358 at 17-20, 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report and Recommendation in its entirety and applied an interest rate of 4.96 percent per annum, compounded annually. ECF Nos. 3383 at 2, 3384 at 6.  The Court applied that interest rate, 4.96 percent per annum, to other plaintiffs' awards in *Burnett*.

### C.    Personal Injury Plaintiffs

Pursuant to the Orders entered at ECF Nos. 7949, 8111, 8150, and 8473, Plaintiffs were granted leave to add additional plaintiffs to the complaint in *O'Neill, et al., v The Republic of Iraq, et al*,  04-CV-1076 (GBD-SN). The Orders specifically provide that (i) the amendments supplement but do not displace the underlying complaint; (ii) prior rulings, orders and judgments entered in this case remain in effect as to all parties; and (iii) that further service on the Taliban is not required as a result of the amendments; and (iv) that prior service orders applied.

The Personal Injury Plaintiffs were added via the First Amended First Consolidated Complaint, ECF No. 8017 (May 13, 2022).

III.    **LIABILITY JUDGMENTS FOR MEMBERS OF THE O'NEILL FAMILY at ECF No. 3067 SHOULD BE EXTENDED TO PERSONAL INJURY PLAINTIFFS**

A.      **The Complaint Was Duly Served**

Members of the O'Neill family, in the above-captioned action, filed suit on August 20, 2003 and duly served the Taliban pursuant to publication orders, previously filed as of record, under ECF Nos. 445 and 488.  *See* Affidavit of Jerry S. Goldman, ECF No. 3043 (September 21, 2015); *see also* ECF No. 3163 (December 11, 2015) (citing ECF No. 3043-1). Goldman Declaration at ¶ 17.

Pursuant to this Court's Orders, Personal Injury Plaintiffs do not need to re-serve the Taliban.  *See* Orders at ECF Nos. 7949, 8111, 8150, and 8473 ("[f]urther service on the Taliban is not required as a result of this amendment, and prior service orders apply, including the Court's order on service by publication at ECF Nos. 445, 488").

B.      **Liability Was Determined As To Members of the O'Neill Family at ECF No. 3067**

The Clerk's Office previously issued a Clerk's Certificates of Default in the above-captioned matter. *See* ECF No. 3043-4.

As set forth below, members of the O'Neill family filed a motion for default judgments against the Taliban for liability.  Such motion was granted, with leave to seek a determination of damages at a later date.

**NAME OF CASE:**   *Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq, et al.*

| | |
|---|---|
| CASE NO: | 04-cv-1076 |
| DATE MOTION FOR LIABILITY FILED: | 09/21/2015 |
| ECF NO. OF MOTION FOR LIABILITY: | ECF No. 3042 |
| DATE ORDER DETERMINING LIABILITY: | 10/13/2015 |
| ECF NO. OF ORDER DETERMINING LIABILITY: | ECF No. 3067 (*see also* ECF Nos. 3163, 3043-1) |

9

C.   **The Determination of Liability as to the Taliban Should Be Extended to Personal Injury Plaintiffs**

For the reasons set forth in the motion seeking an entry of a default judgment against the Publication Defendants (including the Taliban) (ECF Nos. 3042, 3043, 3043-1), Personal Injury Plaintiffs respectfully request that the Order entered at ECF No. 3067 be extended to Personal Injury Plaintiffs.

For the reasons set forth in the motion seeking an entry of a default judgment against the Publication Defendants (including the Taliban) (ECF Nos. 3042, 3043, 3043-1), and as discussed *infra* at pages 9-10, Moving Plaintiffs respectfully request that the Order entered at ECF No. 3067 be extended to include Moving Plaintiffs under applicable common law principles.[6],[7]

Further, for the reasons set forth in this Court's Order at ECF No. 3163, and in this Court's Orders regarding Personal Injury Plaintiffs at ECF Nos. 7949, 8111, 8150, and 8473, the Taliban has been properly served, and this Court has personal jurisdiction over the Taliban and subject-matter jurisdiction.

IV.   **DAMAGES SHOULD BE AWARDED AGAINST THE TALIBAN JOINTLY AND SEVERALLY**

By way of the instant motion, Personal Injury Plaintiffs respectfully request that partial final judgments for damages be entered in their favor and against the Taliban jointly and severally.

A.   **Background**

According to the caselaw governing terrorism litigation, the "estates of those who [died] can recover economic losses stemming from wrongful death of the decedent; family members can

---

[6] In light of this Court's prior Orders, the motion for the extension of the liability judgments against the Talban to Moving Plaintiffs may not be necessary.  *See* ECF Nos. 7949, 8111, 8150, and 8473 ("[p]rior rulings, orders, and judgments entered in this case remain in effect as to all parties").  Out of an abundance of caution, we are now requesting a liability determination under applicable common law for Moving Plaintiffs.

[7] Contemporaneously with the submission of this motion, O'Neill Plaintiffs are filing a motion on behalf of the other non-U.S. national plaintiffs (death and solatium) named on the Amended Complaint.

recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 83 (D.D.C. 2010) (concerning damages under FSIA); *Ests. of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 267 (D.R.I. 2004) (finding that under ATA plaintiffs can recover "both pecuniary damages … and also for non-economic damages, including loss of companionship, society, and mental anguish experienced by the victim's surviving family members, including his siblings … ."); *see also Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 41 (E.D.N.Y. 2019) (ruling that plaintiffs were entitled to solatium damages under the ATA); *Lelchook v. Commerzbank AG*, 2011 WL 4087448, at *2 (S.D.N.Y. Aug. 2, 2011) (allowing plaintiffs to pursue claims for solatium damages is consistent with Congress's incorporation of traditional tort-law principles, under which such damages are available, into the ATA.); *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 240 (S.D.N.Y. 2003) (while punitive damages are not available under ATA, its civil action provision "provides for treble damages").

### B. Common Law Liability is Established for the Non-U.S. National Plaintiff

As the Court is aware, the victims of the terrorist attacks on September 11, 2001 were not solely United States nationals; however, relief under the Anti-Terrorism Act, 18 U.S.C. 2333(a) ("ATA") is limited to U.S. nationals or immediate family members (or functional equivalents) of U.S.-national decedents. Nevertheless, this Court's jurisdiction reaches the claims of these non-nationals who were injured or killed and their family members by virtue of the fact that the terrorist attacks took place on U.S. soil with the largest number of victims being injured or killed only blocks from this courthouse at the World Trade Center complex in lower Manhattan. The Non-U.S. Personal Injury Plaintiff was not a U.S. national on September 11, 2001.

The terrorists who carried out the attacks on September 11, 2001 did not differentiate their victims by nationality. Individuals working in the North Tower of the World Trade Center when

11

it was hit were not somehow sequestered based on their citizenship status. The terrorists attacked the United States, and while the vast majority of those who were killed in the orchestrated attacks against the United States were U.S. nationals, a significant percentage of the victims were not. This does not mean that they were treated differently by the terrorists or that their loved ones did not experience the grief and loss that U.S. nationals did. This disparity between U.S. nationals and foreign nationals is reflected in the two statutes addressing the provision of support by foreign sovereigns acts of terrorism. As such, the Non-U.S. Personal Injury Plaintiff seeks a determination from the Court that he is entitled to the same level of damages as U.S.-national plaintiffs with claims against the Taliban.

### 1.    Choice-of-law Principles Dictate the Application of New York Law to the Common Law Claims at Issue Here.

Because the terrorist attacks on September 11, 2001 took place in three different locations (New York, Pennsylvania, and Virginia), it is necessary to conduct a choice-of-law determination regarding the application of common-law principles to these claims. Federal courts apply the choice-of-law rules of the state in which they sit. *Armstead v. National RR Passenger Corp.*, 954 F. Supp. 111, 112 (S.D.N.Y. 1997) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). In this instance, this Court should apply *lex loci delicti*. *See Armstead*, 954 F. Supp. At 112-13 (stating "if…the tort did not occur in the domicile of either party, the "*lex loci delicti*"— law of the situs of the tort—will normally apply, unless displacing it [with another relevant jurisdiction's law] 'will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.'"). Following *Armstead*, Plaintiffs' common-law claims would be analyzed under the laws of New York, Pennsylvania, and Virginia as the situses of the tort. However, as is the case here, when the laws of different states (or the federal common law) are substantially the same, there is no conflict,

12

and the forum State's law prevails.[8] As to wrongful death, each state's law is substantially similar, and in many cases indistinguishable. Further, the claims made under New York, Pennsylvania, and Virginia law are substantially identical and arise from a common scheme born of the same plot, the September 11th Attacks. Plaintiffs brought timely claims against Defendants based on their material support and sponsorship of Al Qaeda leading up to September 11, 2001, support that enabled Al Qaeda to carry out the terrorist attacks.[9] These facts and allegations are identical among all Plaintiffs irrespective of their citizenship. Thus, because Plaintiffs' allegations arise from identical questions of law and fact, New York law should apply.

This Court has previously addressed the claims of plaintiffs in this MDL under New York common law. In an October 12, 2016 Report and Recommendation issued by Magistrate Judge Netburn (and adopted by Judge Daniels), while addressing the appropriate rate of prejudgment interest, the Court provided a discussion of "common law wrongful death actions" in New York and stating that only pecuniary damages—like those sought for the estates of 9/11-decedent estates in this case under both the ATA and FSIA—are to be awarded in a wrongful-death action in New York which "does not permit recovery for, inter alia, the grief of survivors, the loss of their decedent's love, companionship and society, or loss of consortium." ECF No. 3358 at 18. But within the context of the claims against Iran, and in the same Report and Recommendation, this Court held, "[b]ecause of the extreme and outrageous conduct inherent in acts of terrorism, courts

---

[8] *See, e.g.*, 19A N.Y. Jur. 2d Conflict of Laws § 2; *Copley v. Bactolac Pharm., Inc*., No. 18-CV-575 (FB) (PK), 2021 WL 918313, at *3 (E.D.N.Y. Mar. 10, 2021); *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352 (1st Dep't 2004); *Emmet & Co., Inc. v. Catholic Health East*, 37 Misc. 3d 854, 951 N.Y.S.2d 846 (Sup 2012), *aff'd*, 114 A.D.3d 605 (1st Dep't 2014); *Cassirer v. Thyssen-Bornemisza Collection Found*., No. 20-1566, 2022 WL 1177497 (U.S. Apr. 21, 2022) (finding that, in an FSIA case, use forum state's choice-of-law rules, not a rule deriving from federal common law, to determine the substantive law).

[9] Courts in the Second Circuit have also recognized common schemes as a basis for liability against an aider and abettor of terrorism. *See Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 585 (E.D.N.Y. 2005) ("The factual allegations of the complaints sufficiently support an inference that Arab Bank and the terrorist organizations were participants in a common plan under which Arab Bank would supply necessary financial services to the organizations which would themselves perform the violent acts.").

have held that solatium claims in FSIA terrorism cases are 'indistinguishable' from claims of intentional infliction of emotional distress." ECF No. 3358 at 8 (citing *Surette v. Islamic Rep. of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (quoting *Wagner v. Islamic Rep. of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)). Specific to the terrorist attacks on September 11, 2001, the Court continued:

> Terrorist attacks, by their very nature, are meant to inflict severe emotional distress upon society as a whole, but the loved ones of their victims bear a burden which is unquestionably heavier. As the September 11 attacks have left deep scars in the consciousness of this city and this nation, family members of the decedents are left with constant and stark reminders of their tragic losses.

*Id.* This Court has held that "the common law of intentional infliction of emotional distress governs questions of who is entitled to recover damages.... This is necessarily so because of the 'interest in promoting uniformity of determinations with respect to [state sponsored terrorist acts' and the fact that ' generally accepted legal standards of the states provide the only steady foundation for the rules of decision." ECF No. 3363 at 2 (emphasis added) (quoting *Estate of Heiser v. Islamic Rep. of Iran*, 659 F. Supp. 2d 20, 24-25 (D.D.C. 2009)). In fact, the courts addressing solatium damages have relied on the Restatement (Second) of Torts § 46 (1965), which is the precise source of the law in each of New York, Virginia, and Pennsylvania. *Id.* at 3. While physical proximity to the incident giving rise to the emotional distress is typically a required element of international infliction of emotional distress claims, "courts have uniformly held that a terrorist attack—by its nature—is directed not *only at the victims but also at the victims' families." Id. (*quoting *Salazar v. Islamic Rep. of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005)); *Jenco v. Islamic Rep. of Iran*, 154 F. Supp. 2d 27, 35 (D.D.C. 2001). Acts of terrorism are, by their very definition, extreme and outrageous and intended to cause the highest degree of emotional distress. *Stethem v. Islamic Rep. of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002). This Court has previously found that "[t]he

14

9/11 terrorist attacks are contrary to the guarantees 'recognized as indispensable by civilized peoples.'" ECF No. 2515 at 50. As these Plaintiffs' intentional infliction of emotional distress claims mirror those of the solatium claims actionable under the ATA for U.S.-national plaintiffs in claims arising from the same nexus of events, the Plaintiffs' recovery here under the common law should be identical to the solatium damages framework established by this Court against Iran and applied to the claims under the ATA against the Taliban. In the FSIA context, this Court has emphasized the "interest in promoting uniformity of determinations with respect to [state sponsored terrorist acts]", but the Court's citation to *Estate of Heiser* goes on to explain that this uniformity is achieved through "well-established standards of state common law." *See* ECF No. 3363 at 2 (quoting *Estate of Heiser*, 659 F. Supp. 2d 20, 24-25 (D.D.C. 2009)). Such uniformity in outcome between plaintiffs who sustained injury arising from the same terrorist attacks should be simple given the application of "well-established standards of state common law" which is the undergirding of the claims of the Non-U.S. Personal Injury Plaintiff who lack standing to assert claims under the ATA.

      C.      **Non-U.S. National Plaintiff with Claims Arising Under the Common Law Seek Application of Uniform Damages Principles as Those Employed Under the ATA.**

To promote the uniformity discussed above, Moving Plaintiffs asserting claims under the common law seek damages equal to those of their co-plaintiffs asserting claims under the Anti-Terrorism Act ("ATA"), as described below.

      D.      **Personal Injury Damages - Pain and Suffering**

This Court has carefully crafted a framework for personal injury damages awards for pain and suffering for plaintiffs who sustained injuries during the September 11, 2001 terrorist attacks. *See* Magistrate Judge Netburn's February 7, 2020 Report and Recommendation, ECF No. 5879, adopted by Judge Daniels' Memorandum Decision and Order, ECF 5946.  The chief factors to be

considered include "the severity of the pain immediately following the injury, the length of hospitalization and the extent of impairment that will remain with the victim for the rest of his or her life."  ECF 5879, at 3, *quoting O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012).

In briefest form, the Court has defined and categorized what kind of injuries will typically be considered to be:  a)" significant"; b) "severe"; or c) "devastating," as follows:

1. "Significant" injuries include: "single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in dust or debris; significant respiratory ailments including nasal irritations, chest pain, and asthmas from inhalation of smoke, soot and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery.  This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries."  ECF 5879 at 6-7.

2. "Severe" injuries include: "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas." *Id.* at 7.

3. "Devastating" injuries  include: "loss of limbs or multiple digits; severe pulmonary traumas; strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic trauma.  Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category." *Id.* at 8.

This Court then established "a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million for personal-injury damages for pain and suffering arising from injuries sustained on September 11, 2001. The Court, however, reserved its discretion to award further upward departures in exceptional cases." *See* ECF No. 5879 at 6; ECF No. 5955 at 3.

The Court has also reserved discretion to award further upward departures in exceptional circumstances – as where, for example, plaintiffs Grace and Edwin Rivera, a wife and husband

16

who were *together* on September 11, were awarded *twelve* million dollars in damages each in light of the fact that they were each devastatingly injured and each "suffered through the experience together."  *See* Memorandum Decision and Order, February 14, 2020, ECF No. 5955, 1-3.  *See also* ECF No. 5955, at 3-4 (awarding *twenty-five* million dollars in damages for injuries that were "beyond devastating" in the case of Lauren Manning, who was burned over eighty-five percent of her body and who requires around-the-clock care to this day.  ECF No. 5909, 11-13.)

### E. Economic Damages

Economic damages are specifically contemplated in terrorism litigation, whether under the FSIA, the ATA or otherwise.  The economic damages provision is "designed to compensate [a] decedent's heirs-at-law for economic losses which result from [the] decedent's premature death." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998); *see also Ungar*, 304 F. Supp. 2d at 264-65 (its legislative history "indicates that the ATA was to be construed broadly" and giving weight to its co-sponsor's statement that the ATA "'empowers victims with all the weapons available in civil litigation,'" suggesting "that Congress intended that the full range of damages should be available to persons entitled to bring actions pursuant to § 2333(a)."). Accordingly, "the beneficiaries of each decedent's estate [are] … entitled to recover the present value of economic damages, including lost wages that the decedents might reasonably have been expected to earn but for their wrongful deaths." *Valore*, 700 F. Supp. 2d at 81-82 (citing *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006)). Thus, sponsors of terrorist attacks that kill victims are routinely "liable for the economic damages caused to decedents' estates." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 399-400 (D.D.C. 2015) (quoting *Valore*, 700 F.Supp. 2d at 78).

Previously, this Court awarded economic damages in Iran and Taliban cases for the "economic losses stemming from the wrongful death of the decedent[.]" *See, e.g.*, ECF No. 2623

at 2-3. In doing so, it adopted the economic loss calculations set forth in the plaintiffs' economic expert reports.

The Personal Injury Plaintiffs, set forth in Exhibit A-1 and Exhibit A-2, and who provided economic expert reports, transmitted to the Court in the Goldman Declaration, seek economic damages, similar to the plaintiffs in the prior Taliban and Iran cases in this Court under the standards set in the District of Columbia cases cited herein.  Goldman Declaration at ¶¶ 21-28.

As described at length in the Goldman Declaration, Moving Plaintiffs retained the services of John F. Beauzile, an expert who possesses a Master's Degree in Actuarial Science from Columbia University ("Expert"), to evaluate the economic losses resulting from decedents' death as a result of the September 11th Attacks.  Goldman Declaration at ¶¶ 21-28.

As described in more detail in the Goldman Declaration, and the Expert's Declaration attached as Exhibit D thereto, we obtained, generally through a Freedom of Information Act ("FOIA") request, entire September 11th Victim Compensation Fund ("VCF") files for a substantial number of 9/11 decedents represented by undersigned counsel.  Those files, along with other materials provided by the clients, contained various economic expert reports, VCF applications, VCF work papers and distribution plans, VCF determinations, underlying economic documents, and the like.  Using methodology and assumptions described in his declaration, relying on earlier expert reports, determinations by the VCF, and other documents, the Expert prepared up-to-date economic loss expert reports, copies of which are deemed appended to the Expert's Declaration (Exhibit D) and being filed on ECF with access restricted to the Court pursuant to the Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports in support of default judgments.

Based on the foregoing, the Personal Injury Plaintiffs respectfully ask that this Court award them economic damages in the amounts set forth in Exhibit A-1 and Exhibit A-2, as supported by the expert reports.

**F.     The Personal Injury Plaintiffs Specific Claims for Personal Injury and Economic Damages**

     **1.     P.A.P.D. Officer William "Will" Jimeno**

When terrorists struck the World Trade Center with jet planes, new Port Authority Police Department ("PAPD") Officer (and new father) Will Jimeno volunteered to help save people from the burning Towers.  But the South Tower suddenly collapsed on Will Jimeno and his team of PAPD Officers, and Will was trapped – buried alive in a dark pit full of rubble.  Will was pinned down by a huge slab of concrete that was slowly but surely crushing the life out of his body, and that caused him continuous, almost unbearable, pain.  A short time later, Will's good friend and fellow Officer Dominick Pezzulo was killed at Will's side when the North Tower also collapsed on Will's team.  For the next thirteen hours Will remained immobilized beneath the wreckage of the two Towers – surrounded by fire, smoke and explosions, crushed by a huge slab of concrete, afraid that he would never be found, and in terrible pain all the while.

Ultimately, former Marines who were searching for survivors found Will, and he was saved after a grueling three hour rescue operation.  (Officer Jimeo was the third to last person to be rescued alive from the World Trade Center site.)  But Will had suffered massive crush injuries.  He was rushed to the hospital.  There he "flatlined" twice, but survived.  He was hospitalized for three months, and endured eight separate surgeries (and multiple skin grafts) on his legs.  Upon his release from the hospital, Will had to go through nearly another year of full-time rehabilitation on an outpatient basis.  It took that long for Will to learn to walk (after a fashion) again.

Will's left leg suffered permanent muscle loss and nerve damage, and it is badly deformed. He will have to wear a brace for the rest of his life. He can neither walk nor stand for an extended period of time. Prior to 9/11, Will was something of an athlete who enjoyed soccer and the martial arts. But now Will must use a motorized scooter just to get around, because his left leg still collapses on him from time to time. He cannot feel anything on certain parts of his left leg; yet other parts of his leg are still so sensitive that a mere touch can cause him to pass out from the resulting pain. He cannot work, and he struggles with PTSD to this day.

For the reasons detailed below, plaintiff Jimeno submits that his injuries should be placed in the category of "beyond devastating," and that he should be awarded damages for his extraordinary (indeed, almost unique) pain and suffering in the amount of twenty-five million dollars.

### - Jimeno's Life Before 9/11 -

William ("Will") Jimeno was born in 1967 in Barranquilla, Colombia. When he was a small boy his family came to the United States seeking a better life. They settled in Hackensack, New Jersey. Will was raised in Hackensack, and attended school there from kindergarten through high school. His father was a welder, and his mother was a beautician. Will's parents made a point of telling Will that America was the greatest county in the world, and they stressed the importance of patriotism.[10]

---

[10] *See* the accompanying Declaration of William Jimeno dated July 29, 2022, ¶ 1. References to "Jimeno Dec." are to Officer Jimeno's July 29, 2022 Declaration, References to "*Sunrise*" are to Officer Jimeno's book *Sunrise Through Darkness: A Survivor's Account of Learning How to Live Beyond 9/11.* (Colorado Springs, Co., University Professors Press, 2021.)

Will grew up wanting to make a difference and to contribute to the country that had given his family so much.  So, after he finished high school, Will enlisted in the U.S. Navy, and served on the U.S.S. *Tripoli* as a gunner's mate from 1986 to 1990.[11]

After completing his military service, Will moved back to Hackensack and enrolled at Bergen Community College.  He studied criminal justice and took various law enforcement civil service tests.  Will's dream was to become a police officer in order to protect and serve his community.  He also worked part-time as a store security officer while in school.[12]

In August of the year 2000, Will Jimeno was accepted into the Port Authority Police Department ("PAPD") Academy.  He successfully completed the Academy and graduated in the 100th PAPD class.  The graduation ceremony was conducted on January 19, 2001 at the Marriott World Trade Center.  In his spare time, Will liked to play soccer and participated in the martial arts too.  He also liked to hunt with a bow and arrow, and he enjoyed athletic activities in general.[13]

In 1992, Will met his future wife, Allison, at Steinbach's Department Store (where Will was working as a Security Guard.)  Will and Allison were married in 1995, and their first daughter Bianca was born in 1997.  They bought a new home in Clifton, New Jersey in the summer of 2001.  Allison was expecting their second daughter that fall.[14]

In short, on September 10, 2001, Will Jimeno was thirty-three years old and in good health, a PAPD officer doing the job that he had always wanted to do, and a happy family man.[15]

---

[11] Jimeno Dec. ¶ 2.
[12] Jimeno Dec. ¶ 3.
[13] Jimeno Dec. ¶ 4.
[14] Jimeno Dec. ¶ 5.
[15] Jimeno Dec. ¶ 6.

## - September 11 -

September 11, 2001 started much like any other day for Will.  He woke up very early, kissed his wife Allison (and her pregnant belly) and his daughter Bianca goodbye.  Then Will left for work.  Will was scheduled to work a day shift from 7:00 a.m. until 3:00 p.m. at the Port Authority Bus Terminal in Manhattan that day.[16]

Will was stationed at 42nd Street and 8th Avenue that morning.  While Will was out on patrol, his Sergeant (Sergeant Ross) pointed into the air and followed an object with his finger.  Will looked up and saw a very large shadow that covered up the intersection below.  (Only later did Will realize that this had been the shadow of American Airlines Flight 11.)[17]

A few minutes later a command was given over PAPD radio ordering all PAPD Officers in the area to report back to the Port Authority Bus Terminal.  Will and his fellow Officers congregated in the reserve room to await further instructions.  Will saw Antonio Rodrigues and Dominick Pezzulo.  Antonio (or "A-Rod") and Dominick (or "Dom") were Will's friends and fellow PAPD officers with whom he had graduated in the 100th class.  The television news was on and it showed the North Tower of the World Trade Center on fire.  There was a gaping black hole in the Tower and thick smoke coming from the building.  Sergeant Ross told the assembled Officers that terrorists had attacked the United States.  Will immediately called his wife to let her know that he was okay; he did not want her to worry.  Inspector Fields informed Will and his fellow Officers that the PAPD had commandeered a bus on 9th Avenue to transport Officers to the World Trade Center.  Will Jimeno was called to assist at the scene, along with Sergeant John McLoughlin, Antonio, Dominick, and many others.[18]

---

[16] Jimeno Dec. ¶ 7.
[17] Jimeno Dec. ¶ 8.
[18] Jimeno Dec. ¶ 9.

Will's bus unloaded on West Broadway in downtown Manhattan sometime after the South Tower was hit. The scene looked like a war zone. Debris from the World Trade Center reached for several blocks from the Towers. People were running away from the World Trade Center as fast as they could, with a look of terror on their faces that Will had never seen before. Will saw people jump from the burning buildings to their death, and he saw severed body parts on the ground. Even worse – if that is possible – Will saw several people on the ground killed when struck by people jumping from the Towers.[19]

Sergeant McLoughlin asked for volunteers who knew how to use Scott Air Packs. (The Scott Air Pack is a breathing apparatus used by PAPD Officers when fighting fires.) Dominick, Antonio, and Will answered the Sergeant's call and volunteered to help. Together they ran up Vesey Street to the side of Building 5. Sergeant McLoughlin, Dominick, Antonio, and Will entered the Main Concourse area of the World Trade Center. Civilians were evacuating the building single file. Will looked out into the center of the World Trade Center complex, and he heard and saw more people leaping to their certain deaths from the burning Towers and then hitting the ground below.[20]

Sergeant McLoughlin, Dominick, Antonio, and Will hurried towards the South Tower. They ran into fellow PAPD officer Christopher Amoroso there, and he asked to join the group. When Will looked into the lobby of the South Tower, he saw more dead bodies and injured people. He also heard gunshots and saw police officers shooting out the windows so that more people could escape the buildings. Will Jimeno was terrified. He was also determined to stay close to Sergeant McLoughlin because Will (and the others) respected McLoughlin's experience and

---

[19] Jimeno Dec. ¶ 9, *Sunrise*, pp. 10-11, 15.
[20] Jimeno Dec. ¶ 10.

leadership and believed that McLoughlin knew best how to deal with the chaos unfolding all around and stay safe.[21]

As Will's small team of PAPD Officers were standing in the Concourse between the North Tower and the South Tower, Will heard a loud "boom" and he saw a fireball about the size of his own house enter the lobby of the South Tower. Will was thrown on to his back, and then it seemed to him that everything just went black. He frantically yelled "8-13" (police code for "Officer down") into his radio, but something knocked the radio out of his hand. Concrete and other debris were raining down all around Will. An object knocked his helmet off his head. The South Tower had collapsed at 9:59 a.m., and (although Will did not fully understand what was happening at the time) the remains of the Tower were now falling down on top of Will and his colleagues.[22] (Attached as Exhibit A to the accompanying Declaration of William Jimeno is a map of the World Trade Center which notes Will's location at the time of the collapse.)

Will found himself buried deep underground below a huge mound of debris created by the collapse of the South Tower, lying down on his back. Will's Scott Air Pack was beneath him, and it propped Will up to an approximately forty-five-degree angle. A large piece of concrete had fallen across Will's chest and down his left side, pinning him down. The concrete was crushing Will. He tried to move his body, but all he could do was move his right arm and (to a limited extent) his left arm. Will tried to lift the concrete off his body and escape, but he was trapped. No matter how hard he tried, he could not get the concrete to budge. When Will looked up, he saw a hole with light coming through it approximately thirty feet above him. He thought he was going to die.[23]

---

[21] Jimeno Dec. ¶ 11; *Sunrise*, p. 13.
[22] Jimeno Dec. ¶ 12.
[23] Jimeno Dec. ¶ 14.

Will looked to his left and saw Dominick not more than a foot away. Dominick was in a pushup position, buried face down on his chest. Sergeant McLoughlin was buried in a fetal position near Will's feet, but out of sight because there was so much rubble between the two men.[24]

Sergeant McLoughlin shouted, "Sound off!" to see who had survived. Will responded, "Jimeno." Dominick responded, "Pezzulo." And then Will heard silence. Antonio and Chris did not answer. (They had been killed by the same shower of concrete and debris from the collapse of the South Tower that had trapped the Sergeant, Dominick and Will.) Will realized that Chris and Antonio were probably dead. Dominick (who had previously been a New York City public school teacher) said they were in a better place, and that they were great fathers, friends, and Americans.[25]

Dominick told Sergeant McLoughlin that Dominick thought he could maneuver out of his position. Eventually, Dominick did manage to free himself. At that point, Dominick said that he could leave and go get help. But Sergeant McLoughlin ordered Dominick to stay and to try to rescue Will instead. Dominick crawled over Will's face into a small area on Will's right side to try to free Will from the concrete. Will had been in a state of physical shock. But now that shock was wearing off, and he began to experience excruciating pain on the left side of his body. His left side was being crushed by what felt to Will like the weight of three hundred SUV's. Dominick tried to get the concrete off Will for about fifteen minutes, but Dominick was unable to do so. And each time Dominick tried to move the concrete it fell back against Will and caused him even greater pain; Will kidded his friend (using rough language) Dominick that Dominick was beating him up. Finally, Dominick told Will that he could not get Will out.[26]

---

[24] Jimeno Dec. ¶ 15.
[25] Jimeno Dec. ¶ 15; *Sunrise*, p. 5.
[26] Jimeno Dec. ¶ 16; *Sunrise*, pp. 20-21.

A moment later, Will heard another loud explosion, and concrete and debris started raining down on the three men all over again.  This was the collapse of the North Tower at 10:28 a.m. Will felt himself getting crushed.  He looked to his right, and he saw Dominick get hit in the middle of his body and knocked down by a large slab of concrete.[27]

Will thought he was going to die within the next few seconds.  So he made the "I love you" sign language sign.  He had often made that sign with his wife and daughter.  Will thought was that if he were found dead with this sign across his chest, then his wife and daughter would know that he had thought of them in his last moments.[28]

After the noise stopped, Will looked to his right.  He saw Dominick bleeding profusely, with blood pouring out of Dominick's mouth.  Dominick exclaimed that he was dying.  (Dominick addressed Will by his childhood nickname "Willy" because the two friends were so close; very few people outside of Will's family knew or used this nickname.)  Will urged his friend Dominick to try and hold on.  Dominick turned to Will and asked that Will never let anyone forget that Dominick was killed while trying to save Will.  Will promised Dominick that Will would never let anyone forget that.  Dominick grabbed his firearm and fired one round into the air in a last-ditch effort to call for help.  Then Will's friend Dominick died – killed while trying to save Will. Will told Sergeant McLoughlin that Dominick was dead.  Sergeant Mcloughlin told Will to compose himself and to keep trying to get free.[29]

Will kept yelling out, "PAPD Officers down!" so as to let anyone who might be up above know that he and Sergeant McLoughlin were still there - alive and buried deep underneath the rubble.  At some point, a man somewhere above them shouted in their direction, and the man asked

---

[27] Jimeno Dec. ¶ 17.
[28] Jimeno Dec. ¶ 18.
[29] Jimeno Dec. ¶ 19; *Sunrise*, p. 6.

for someone by name.  Will responded, saying said that the person the man had named was not

there; but Will pleaded with the man to help rescue Will and McLoughlin, because they were badly

hurt and three members of their group had already died.  Apparently, the man moved on; Will did

not hear his voice again.  Will felt abandoned, and for a time he gave up hope that he and

McLoughlin would ever be found and saved.  Sergeant McLoughlin calmed Will down, and

suggested that the man they had heard might be hurt or in shock himself.[30]

At some point, fireballs started falling into the hole where the Sergeant and Will were

buried and trapped.  Will felt his arm burning.  As a former Navy man, he knew that he smelled

jet fuel, and he feared that he would burn to death if his uniform caught fire.[31]

Then Will saw sparks above him and he heard a loud bang.  He looked over and saw

Dominick's weapon was now discharging on its own because of the intense heat.  The gun was

pointed in Will's direction.  Will covered his face and heard the gun fire off fifteen rounds.  It

seemed like a miracle to Will that he did not get hit by any of the bullets.[32]

Later that awful day, Will heard what sounded like yet another large explosion in the

distance.  This was the collapse of Building 7 at 5:21 p.m.[33]

Time crawled by.  Sergeant McLoughlin and Will tried to keep each other awake by talking

with each other.  McLoughlin (a former paramedic) correctly opined said that the two men were

suffering from compartment syndrome and that they would die if they were not rescued by

morning.  (Compartment syndrome is usually caused by crush injuries.  Pressure builds up within

the body which causes great pain and can ultimately kill a person.)  Will was in terrible pain, and

thought he would die.  He thanked God for his years with his wife, daughter, and parents.  Will

---

[30] Jimeno Dec. ¶ 20.
[31] Jimeno Dec. ¶ 21.
[32] Jimeno Dec. ¶ 21.
[33] Jimeno Dec. ¶ 22.

pleaded with God to let him see his second baby be born; and Will asked God for a glass of water because he was dying of thirst.[34]

Will saw a vision of Jesus, and then he suddenly woke up, determined once again to fight for his life. He vowed that he would not let the terrorists win. He did not want to give up on his Sergeant, his family, his country, or himself. Will made a private vow that, if he had to die, then it would at least be on his own terms. He would die while fighting to survive.[35]

Will noticed a piece of pipe a foot or two above him that appeared to contain a few drops of water. He reached for the pipe, but that process took nearly twenty minutes because Will's arm and hand had become so badly swollen. The pipe did not contain water, but it did make a loud banging sound when Will pulled on it. Sergeant McLoughlin heard the sound and urged Will to keep pulling on the pipe in the hope that the noise might draw someone's notice. Will did so, but it took him about twenty minutes to reach the pipe each time he tried.[36]

At about eight in the evening of September 11, 2001 – that is about ten hours after Will was first pinned helpless underground by a huge slab of concrete that was slowly crushing him – Will heard someone shout, "U.S. Marine Corps," and ask for anyone who heard to yell back. Will shouted back that PAPD Officers were down. Will was hearing the voices of two former Marines, Jason Thomas and David Karnes, and of a civilian. They were at the scene searching for survivors to rescue. They pointed a flashlight down into the hole and in Will's direction for several minutes. But Will was surrounded by so much concrete and dust that they could not see him. Finally, Will mustered enough saliva to spit on to his left hand. This caused his hand to shine a little in the flashlight's glare, and the rescue workers finally spotted Will.[37]

---

[34] Jimeno Dec. ¶ 22; *Sunrise*, p. 24.
[35] Jimeno Dec. ¶ 23.
[36] Jimeno Dec. ¶ 24.
[37] Jimeno Dec. ¶ 25.

A short time later rescue workers from New York City Emergency Services descended into the rubble.  They came in from Will's right side and dug a hole in the debris to get to him.  All this time, an encroaching fire was coming in from above.  All the men were in danger of being burned to death soon.  And, each time the rescuers moved, the rubble shifted; the rescue workers were therefore deeply concerned that the hole could collapse and that they too could be buried and killed.[38]

Sergeant McLoughlin did not speak as the rescuers tried to dig Will out.  Will told the rescuers to get his partner out first.  But for some reason Will used the word "partner" instead of "Sergeant."  As a result, the rescue workers thought that Will was talking about Dominick, who was right next to Will and already dead.[39]

The rescue workers took turns crawling down into the rubble to try to dig Will out.  The process of digging caused the rubble to shift, which in turn caused Will even greater excruciating pain.  When his rescuers had difficulty getting Will's left leg out, Will told them to cut it off so they could save both Will and McLoughlin.  But the rescuers refused to do so.[40]

Finally, the rescuers freed Will's left ankle.  Will shouted to Sergeant McLoughlin to hold on.  McLoughlin responded by asking how everything was going.  The rescue workers then realized that McLoughlin was the "partner" to whom Will had been referring, and that McLoughlin was still alive. [41]

It took approximately three hours altogether for the rescue workers to dig Will out from under the rubble.  All the men were engulfed by heat and smoke the entire time, and Will

---

[38] Jimeno Dec. ¶ 25; *Sunrise*, pp. 41-2.
[39] Jimeno Dec. ¶ 25.
[40] Jimeno Dec. ¶ 26.
[41] Jimeno Dec. ¶ 26.

experienced terrible pain throughout.  Most of the work had to be done by hand, and there was constant danger that the men could all be killed – either by fire, or by the pile collapsing.[42]

All in all, Will Jimeno was buried under the rubble of the World Trade Center for approximately thirteen hours.  Once Will was lifted out of the rubble, he looked up and asked where everything was.  A firefighter told Will that it was all gone.  Until then, Will did not fully understand that commercial jet planes had hit the Towers.  He had thought that perhaps a car bomb had gone off.  Now Will realized that both Towers had completely collapsed and disintegrated, and that many, many people must have been killed.  So, Will Jimeno wept.[43]

Will Jimeno was one of a team of five men from the PAPD who ran into the Concourse on the morning of September 11 to aid in evacuating the World Trade Center.  Of those five, Antonio Rodrigues and Chris Amoroso were killed when the South Tower fell on the group.  Dominick Pezzulo, Sergeant McLoughlin, and Will survived the collapse of the South Tower, but were buried alive.  Dominick managed to free himself briefly, but he was then killed when the North Tower fell on the group too.  Will was pulled out of the rubble after thirteen hours.  And, eight hours after that, on the following morning, Sergeant McLoughlin was finally pulled out too, still alive.

### - The Hospital Saves Will's Life -

Will was taken by ambulance to Bellevue Hospital.  Once he got to the emergency room, he "flatlined" twice.  The doctors brought him back to life each time.  They also cut Will open from his upper left thigh all the way down to his left ankle in order to relieve the pressure in his leg.  (Will's left leg had quadrupled in size.) He was placed under general anesthesia.  Will needed

---

[42] *Sunrise*, pp. 24-44.
[43] Jimeno Dec. ¶ 27.

to be intubated and he could not speak for several days.  His hands were so badly swollen that he could not write or use sign-language either.[44]

Will had pulverized concrete and gravel in his head and neck.  The doctors explained that in addition, due to the compression of the concrete, his body had in essence released toxins and poisoned itself.  As a result, Will suffered severe nerve and tissue damage and his left leg contained significant quantities of dead and dying muscle tissue.  Will's kidney and liver were also not functioning properly.  (Attached as Exhibit B to Officer Jimeno's Declaration is a true and correct copy of Officer Jimeno's medical records.)[45]

Will had eight debridement surgeries over the next thirteen days to remove dead tissue from his leg.  (Attached as Exhibit C to the Jimeno Declaration are photos of Jimeno's leg. WARNING: THESE PHOTOS ARE VERY GRAPHIC).  Will had surgery every other day because the doctors wanted his leg to rest and heal between surgeries; that way, they would not remove tissue that might recover on its own.[46]

Skin grafts were performed in order to close the wounds to Will's left leg.  Doctors took the skin for the grafts from Will's upper right thigh.  After the skin grafts were performed, Will was brought back to the operating room and the doctors manipulated his leg because it had been immobilized for too long.  This caused the most excruciating pain Will has ever known.  But, then again, in Will's view every night in the hospital was a "horror show" due to the pain that he was experiencing.  Morphine did not help to ease his suffering.  He could not sleep because everything hurt so badly.  Even simply being moved to take x-rays caused Will to cry from pain.[47]

---

[44] Jimeno Dec. ¶ 29.
[45] Jimeno Dec. ¶ 30.
[46] Jimeno Dec. ¶ 31.
[47] Jimeno Dec. ¶ 32.

On September 13, 2001, doctors used a suction instrument to remove gravel from Will's lungs. The doctors asked Will's wife if he was a smoker, and they were surprised when she said no. The doctors explained that (as a result of breathing the smoky and super-heated air at the World Trade Center site) Will's lungs looked as if he had smoked for thirty years. Will could not consume whole foods for several weeks, and needed to be given liquid food intravenously. Will also developed blood clots while at Bellevue Hospital. He was therefore put on blood thinners in order to prevent an embolism.[48]

### - Physical Rehabilitation -

After more than a month at Bellevue Hospital, on or around October 19, 2001, Will was transferred to Kessler Rehabilitation Institute in West Orange, New Jersey. He stayed there as an inpatient until he was discharged on the Friday before Thanksgiving of 2001. Will's wife Allison gave birth the Monday after that Thanksgiving to a beautiful baby girl, named Olivia. Will was (and is) grateful to God that he had somehow lived to see the birth of his second daughter.[49]

After Will returned home, he continued his treatment at Kessler Rehabilitation Institute in Saddle Brook, New Jersey on an outpatient basis. Will was transported there by ambulance daily. The PAPD assigned an Officer to stay with Will throughout his rehabilitation – five days per week, for nine more months. Will endured a long and painful recovery. Throughout his outpatient treatment, his skin grafts were still healing, and he experienced terrible pain. He had to use a wheelchair for a long time. Slowly, he worked his way up to a walker, then crutches, and then finally to a cane. Will could not walk by himself until the summer of 2002. All in all, Officer Jimeno spent approximately one year in outpatient rehabilitation. He undertook physical therapy, occupational therapy, and multiple sessions with a scar tissue specialist to break up hard parts of

---

[48] Jimeno Dec. ¶ 33.
[49] Jimeno Dec. ¶ 34.

his skin grafts.  He learned how to live as a disabled person, including how to dress himself, shower, and enter a car.[50]

### - Jimeno's Continuing Physical Disability -

Will's injuries forced him to retire from the PAPD in 2004.  He was promoted to Detective just before his last roll call in November of 2004.  He has not been able to work since.  Will still cannot walk or stand for very long, and on what seem like random occasions his left leg still sometimes just stop working altogether.  The New York Pension Board immediately approved Officer's Jimeno's request for disability pay.  But Will's family has struggled financially since September 11 due to his inability to work.[51]

Will's leg is disfigured and deformed, and he is permanently disabled as a result of the injuries he sustained on September 11th.  His left leg looks like a "great white shark took a bite out of it;" there is a hole in Will's leg that is about as big around as a quarter and around a half an inch deep.  The hole in Will's leg is still terribly sensitive on the inside.  The muscles in Will's left leg have not grown back and his leg has not recovered its strength.  It is severely atrophied and looks completely different than Will's right leg due to the extensive removal and loss of muscle and tissue.[52]

Will has extreme sensitivity on certain parts of his left leg.  As a result, he needs to be very, very cautious.  If an object brushes against Will anywhere from his left kneecap down to his calf, the pain will bring Will to his knees, and he may pass out.  For example, Will once accidentally brushed this area of his left leg against a corner of his coffee table.  Will was knocked unconscious by the pain.[53]

---

[50] Jimeno Dec. ¶ 35.
[51] Jimeno Dec. ¶¶ 36-38.
[52] Jimeno Dec. ¶ 39.
[53] Jimeno Dec. ¶ 40.

Will has extensive skin grafts and scars all over his leg.  The peroneal nerve in Will's left leg, which permits the foot to point up and down, is severed.  He will therefore need to wear a brace on his left leg for the rest of his life in order to keep his foot from "flopping around."  Will also has permanent nerve damage, and cannot feel the front part of his left foot and leg that extends from the top of his toes to the top of his shin.[54]

Officer Jimeno has changed his entire life in order to accommodate his physical disabilities.  His family was forced moved to a new house for better accessibility.  Some days the pain in Will's leg is so bad that he simply cannot walk.  For safety reasons, he continues to need to rent motorized seated scooters when traveling, because he cannot stand or walk for an extended period of time.  He needs to be careful when walking without a brace.  Will tries not to go out during snowstorms or when there is ice on the ground, because a fall for him could be catastrophic.  He needs to hold on to bannisters with both hands, or else he can easily fall down stairs.  It is also dangerous for Will simply to take a shower because his left foot and leg can give out at any moment.[55]

### - Psychological Effects -

Will has suffered, and continues to suffer, severe emotional distress as a result of the events of 9/11.  To this day, he tries to avoid going into New York City because it makes him think of 9/11 and leaves him feeling uneasy.  Will has been diagnosed with and treated for Post-Traumatic Stress Disorder ("PTSD") that came about because of what he experienced and witnessed on September 11, 2001.  He has nightmares regularly, and experiences bad memories that he cannot control.  In particular, the memory of seeing his friend Dominick die haunts Will to this day.[56]

---

[54] Jimeno Dec. ¶ 41.
[55] Jimeno Dec. ¶ 42.
[56] Jimeno Dec. ¶ 43.

34

Perhaps worst of all, Will's PTSD made him develop anger issues, and his wife and children have had to suffer as a result.  Will found that he was often irrational, angry and cruel with them or around them.  He could not control his persistent mood swings.[57]

Ultimately, Will sought professional help because he did not want to be a bad father and husband.  He saw a PAPD therapist from 2002 to 2004.  He also saw a psychologist through his labor union.  Later, he began working with a private therapist, and with her help Will came to understand more fully that PTSD is a lifelong condition.  It cannot be "cured."  Will and his family will have to find ways to live with it and deal with it for the rest of his life.[58]

Will Jimeno is now fifty-four years old, and he continues to struggle with the fact that he is permanently disabled.  At times, he does not "feel like a man" because he is unable to work, and because he often needs help just to get through some of the simplest activities of daily life.  It also hurts Will to know that he cannot run around with his children, or even show them how to kick a soccer ball.  Will was once a physically active man.  He played soccer and enjoyed participating in the martial arts.  But he has had to give up all those hobbies.  In Will's view, he is still not even close to being the same person that he was before September 11.[59]

Officer Jimeno has written two books: a children's book entitled, *Immigrant, American, Survivor: A Little Boy Who Grew Up To Be All Three*, and a book for adults entitled *Sunrise Through the Darkness: A Survivor's Account of Learning How to Live Again Beyond 9/11*.  (Will's *Sunrise* book gives a far more detailed narrative of the events recounted here in brief.  Will's story has also been featured extensively in the media.  The ordeal that Will and Sergeant McLoughlin endured is portrayed in the movie *World Trade Center*.  Attached as Exhibit D to his Declaration

---

[57] Jimeno Dec. ¶ 44.
[58] Jimeno Dec. ¶ 45.
[59] Jimeno Dec. ¶ 46.

are some articles about Will's experiences.)  Will sometimes give talks to various groups about his experiences on 9/11.  He hopes that his books and public speaking will help other people who are struggling with PTSD.[60]

### - The Court Should Award P.O. Jimeno
### *Twenty-Five Million Dollars* in Personal Injury Damages -

The criteria established by this Court for "devastating" injury include "acute systemic trauma, injuries causing lasting physical effects limiting victims' mobility and activity … when claimants consciously suffered for nearly one month after the attack or were rehospitalized or placed in rehabilitation … and permanent nerve damage."  ECF No. 5879, 8.

In addition, plaintiffs whose injuries are categorized as "devastating" have "typically suffered from emotional and psychological injuries, such as Post Traumatic Stress Disorder ("PTSD"), insomnia, mood swings, and nightmares … [and] also include those who suffered a concussion or lost consciousness for approximately one week."  ECF No. 5879, 9.

Measured against these standards, Officer Will Jimeno's injuries should be categorized as "beyond devastating" for a number of reasons.

First, as a result of permanent nerve and muscle damage to Will's left leg, Will is permanently disabled.  He cannot walk or even stand for any extended period of time, and on seemingly random occasions his left leg will sometimes simply give out altogether.  He therefore uses a motorized scooter to get around.  Because the peroneal nerve in Will's left leg is severed, he must wear a brace for the rest of his life.  Moreover, because of further nerve damage, Will cannot feel the front of his left leg from the shin on down; yet, conversely, other parts of his leg are still so sensitive that if they are even lightly touched Will may pass out from the resulting excruciating pain.

---

[60] Jimeno Dec. ¶ 47.

Second, Will is also permanently disfigured. His left leg is severely atrophied and looks completely different than his right leg. He bears the scars of multiple surgeries and skin grafts. Moreover, there is a permanent hole in Will's left leg (about the size of a quarter) that (in Will's words) looks as if a shark had taken a bite out of him.

Third, Will was hospitalized for three months after September 11, and then undertook outpatient rehabilitation – five days a week, eight hours a day – for nearly a year after 9/11. While hospitalized, Will "flatlined" twice before being revived by his doctors, and he underwent eight separate surgeries, as well as skin graft procedures.

Fourth, Will suffers from PTSD as a result of his horrific experiences on September 11. To this day he suffers from nightmares and memories that he cannot control. In particular, Will is haunted by the memory of being pinned helplessly beneath a huge slab of concrete and watching his good friend and classmate Dominick Pezzulo be struck by falling debris and then die an agonizing death at Will's feet, all because Dominick was trying to rescue Will.

Will's PTSD has also impacted his family's life negatively, because Will developed anger issues that caused him to be cruel to and around his long-suffering wife and children.

Fifth, and perhaps most obviously, Will's experiences on September 11 were almost unimaginably painful and terrifying. In essence, both Towers of the World Trade Center fell on Will, one at a time; and then Will was trapped for thirteen hours in a hellish dark pit full of fire, smoke, rubble, gunshots, pain, and fear – and all the while a huge slab of concrete was slowly but surely crushing the life out of his body.

All these factors place Will's injuries in the category of "beyond devastating." In terms of the "severity of the pain immediately following the injury," *O'Brien v. Islamic Republic of Iran*, *supra*, Will Jimeno's experience (and that of Sergeant McLoughlin) were almost uniquely *painful*

in that Will was not "injured" at a single stroke, but rather was crushed *continuously* by what felt like the weight of "three hundred" SUV's worth of concrete for nearly *thirteen hours*.

And Officer Jimeno's experiences were also almost uniquely *terrifying* in that for thirteen straight hours Will faced one circumstance after another – including the fall of each Tower, gunshots rattling around his head, fire spreading into the pit where Will was trapped, the concern that no one would ever find him, the possible collapse of the pit, and the constant worsening toll that his injuries were taking on his body – each of which led Will to fear (with very good reason) that he was about to die a terrible death.

Plaintiff Jimeno further respectfully submits that – much as in the case of Edwin and Grace Rivera, *supra* – an upward departure beyond the presumptive award for "devastating" injuries is also appropriate for Officer Will Jimeno because Will's experience was a *shared* one.  Will suffered not only his own pain and fear.  He also suffered because:  a) his friends and fellow Officers Antonio Rodriquez and Christopher Amoroso were killed close by Will when the North Tower collapsed; b) his good friend and classmate Officer Dominick Pezzulo was killed right by Will's side by the collapse of the South Tower while Dominick was trying to dig Will out of the rubble; and c) his Sergeant and valued mentor, John McLoughlin, was also buried near Will's feet and was in imminent danger of dying throughout Will's thirteen hour ordeal (and beyond).

For all these reasons, plaintiff PAPD Officer William Jimeno respectfully submits that he should be awarded damages for his personal injuries in the amount of twenty-five million dollars.

**- Economic Damages in the Amount of *$3,181,931* Should be Awarded to Plaintiff Jimeno -**

Plaintiff Jimeno further respectfully submits that for the reasons set forth in the accompanying Expert Report of John Beauzille, Plaintiff Jimeno should be awarded $3,181,931 in economic damages.

2.     **P.A.P.D. Sergeant John McLoughlin**

John McLoughlin was a veteran PAPD Sergeant and the father of four young children on September 11, 2001. He led a team of young PAPD Officers (including Will Jimeno) into the burning Towers to try to save civilians there. But first the North Tower, and then the South Tower, collapsed on Sergeant McLoughlin and his team. John McLoughlin was trapped deep underground beneath the remains of the two Towers in a pit full of rubble. He was pinned down by huge pieces of broken concrete for nearly twenty-four hours, unable to move any part of his body except for his left hand. He was surrounded the entire time by darkness, smoke, explosions, and fire, and he did not know whether he would ever be found. And, all the while, the concrete was slowly crushing his body, causing him continuous agonizing pain.

Finally, after nearly twenty four hours, John was pulled from the pit by rescue workers. He was the last uniformed officer (and the second to last person) to be rescued from the World Trade Center site alive. He was rushed to the hospital and placed in a medically induced coma for six weeks, while the doctors struggled to keep him alive and to treat his massive crush injuries. The doctors performed twenty seven separate surgeries on John, as well as multiple skin grafts, while he was at Bellevue Hospital. The abductor muscles in John's hips, and other muscles in his back, hips and legs, were removed.

All in all, John was hospitalized on an inpatient basis for four months, and he undertook intensive full time rehabilitation treatment as an outpatient for the following three years. He was confined to his bed and wheelchair for the first two years, and then slowly learned to walk again. He has required seven more surgeries over the years. Even so, the doctors have never been able to close the large, terrible-looking surgical wounds on John's hips. Those wounds remain open and must be dressed twice every day. They have also been the source of several life-threatening infections over the years.

39

John has permanent nerve damage and muscle loss. He cannot feel anything in either leg from the knee on down (other than occasional flares of excruciating phantom pain in his feet). His legs and back are so weak from the removal of muscle that performing even simple tasks can leave him bed-ridden. Once a vigorous, athletic man (able, for example, to rappel down one hundred and ten floors of the World Trade Center as part of his counter-terrorism training), John is now permanently disabled and dependent on his family for assistance with simple life tasks. He also suffers from PTSD.

For the reasons detailed below, plaintiff McLoughlin submits that his injuries should be classified by this Court as "beyond devastating" and that he should be awarded twenty-eight million dollars in damages for his extraordinary pain and suffering.

### – John McLoughlin's Life Before 9/11 –

John McLoughlin was born in Brooklyn and raised in Massapequa, Long Island. He went to college at Oswego State College and earned a degree in business administration. After graduating college, he became a banker at Dry Dock Savings Bank where he worked from 1975 to 1980. But John always wanted to do something more for his community. So, while he was working at the bank, he also joined the Volunteer Fire Department in Massapequa in 1975. He served as a paramedic there until 1982.[61]

In John's view, bank work was "fine," but he still had the desire to do more. Finally, in 1980, he gave up his job with the bank and he enrolled in the Port Authority Police Department ("PAPD") Academy. He graduated that July and became a full-time PAPD Officer.[62]

---

[61] *See* the accompanying Declaration of John McLoughlin dated July 29, 2022, ¶ 1. References to "McLoughlin Dec." are to Sergeant McLoughlin's July 29, 2022 Declaration.
[62] McLoughlin Dec. ¶ 2.

John was assigned to the World Trade Center in 1988.  He was not working at the World Trade Center on the day of the 1993 World Trade Center bombing, but he drove a police car to the scene from the George Washington Bridge (where he was working overtime) to assist injured people that day.[63]

McLoughlin was made the Emergency Equipment Officer at the World Trade Center after the 1993 World Trade Center bombing.  He worked continuously at the World Trade from 1988 until 2000, when he was promoted to Sergeant.[64]

After his promotion, Sergeant McLoughlin was assigned to the Port Authority Bus Terminal in midtown.  Even after twenty-two years on the job, he still enjoyed working for the PAPD and looked forward to going to work every day.[65]

John married his wife Donna in 1989.  They had four children who were fifteen, eleven, nine, and four years old respectively as of September of 2001.[66]

Before 9/11, John McLoughlin was (by his own estimate) a "pretty good weekend athlete."  He ran and lifted weights.  He enjoyed walking on the beach and swimming with his family.  He coached Little League sports for all his children and was very active as a Boy Scout leader.  (Each summer he spent a week as a Boy Scout leader at Scout Camp in the Adirondacks; John was the only adult who finished the one-mile swim there.)  John also kept in shape by doing chores around the house (including plumbing and carpentry) and through his antiterrorism training at work.  (For example, as part of his training John rappelled one hundred and ten stories down an elevator shaft at the World Trade Center using a single rope.)[67]

---

[63] McLoughlin Dec. ¶ 3.
[64] McLoughlin Dec. ¶ 4.
[65] McLoughlin Dec. ¶ 5.
[66] McLoughlin Dec. ¶ 6.
[67] McLoughlin Dec. ¶ 7.

In short, on September 10, 2001, Sergeant John McLoughlin was forty-eight years old and in very good health, a proud member of the PAPD, and the head of a happy household.[68]

### - September 11 -

On September 11, 2001, Sergeant McLoughlin was a Police Supervisor on patrol at the Port Authority Bus Terminal when a plane flew into the North Tower of the World Trade Center. Inspector Fields, John's commanding officer, called everyone who was out on patrol to return to the Police Desk at the Bus Terminal after the North Tower was hit.  John and fellow PAPD Officers went to the reserve room, and they watched the news on TV.  They saw smoke and fire pouring out of the North Tower.  Inspector Fields asked Sergeant McLoughlin to mobilize Officers from the command to assist at the World Trade Center.  They commandeered a city bus to transport PAPD Officers to the scene.  John escorted the bus in a police Suburban.[69]

John exited his car at the intersection of Church Street and Vesey Street.  He saw aircraft landing gear from a major airplane lying on the ground, but he did not register the significance of this at the time.  John also saw huge clouds of dust and debris pouring out of the buildings, and people frantically running in all directions.  And – most horrifying of all – John saw with his own eyes people jumping out of the burning World Trade Center Towers from great heights and falling to their deaths.[70]

He ran up to West Broadway where the bus that the PAPD had commandeered was parked, and he asked for volunteers who had experience using Scott Air Packs to help with search and rescue.  PAPD officers Will Jimeno, Dominick Pezzulo, and Antonio Rodrigues volunteered. They hurried together to the World Trade Center and entered Building 5 at Vesey Street.[71]

---

[68] McLoughlin Dec. ¶ 8.
[69] McLoughlin Dec. ¶ 9.
[70] McLoughlin Dec. ¶ 10.
[71] McLoughlin Dec. ¶ 11.

The four men attempted to pick up rescue equipment in the lobby of Building 5, but all the equipment was gone.  They then hurried to the Police Desk upstairs on the Plaza Level from Vesey Street Entrance.  There they did find some equipment.  They also found an empty unused canvas mail cart that they intended to use in order to hold spare air bottles and helmets.  They went from the Police Desk to the Concourse Level, and then headed from the Vesey side to Building Two in order to get more equipment.[72]

On their way to the South Tower they unexpectedly met PAPD Officer Chris Amoroso, and he joined them on the way to the South Tower.  A large number of civilians were exiting the World Trade Center on the Concourse Level.  John still recalls that at this time he saw a Police Officer "covered in the blood of a jumper" from one of the buildings.[73]

As the team walked from the South Tower towards the North Tower, Sergeant McLoughlin heard a huge explosion.  This was the collapse of the South Tower.  When he looked over, John saw the lobby of Building Two filled with a huge mass of brown debris and dust that was now rolling towards him like a gigantic landslide.  John thought that he and his team were going to die, and he was terrified.  But John knew from his many years of being stationed at the World Trade Center that there was a freight elevator nearby, and he yelled for everyone to run towards the elevator shaft.[74]

John was hit with heavy debris.  He curled up in a ball to minimize the blows that he was taking to his body.  Then he heard nothing - silence.  He thought he had died.[75]

John found himself in a fetal position, lying on his right side and buried underground beneath a huge mound of broken concrete and other debris.  His entire body from the hips on down

---

[72] McLoughlin Dec. ¶ 12.
[73] McLoughlin Dec. ¶ 13.
[74] McLoughlin Dec. ¶ 14.
[75] McLoughlin Dec. ¶ 15.

was covered by pieces of concrete and rubble.  His helmet was caught in the debris in such a way that he could not move his head.  When he looked down, all he could see was concrete.  He could not move any part of his body except for his left arm.[76]

Sergeant McLoughlin shouted "Sound Off!" in order to try to locate the members of his team.  Dominick Pezzulo and Will Jimeno answered back and identified themselves.  But John did not hear the others.  He thought that the other Officers had gotten separated.  But in fact Antonio Rodrigues and Chris Amoroso had been killed, likely instantly, by the collapse of the South Tower.[77]

Dominick was able to pull himself free of the debris, but Will was stuck.  Dominick offered to go get help.  But John directed Dominick to free Will first, and that once Will was free, then the two of them could rescue John.  Dominick started to help Will.[78]

But then John heard another terrible rumble.  This was the collapse of the North Tower.  It sounded to John like another huge explosion.  Concrete and other debris started raining down on the three men again.  The concrete around John shifted so that it started to crush his hips and knees.  He was in terrible, terrible pain, and John thought he would not make it home to his family alive.[79]

There was a hole in the debris far above the three men, but John could not see that hole from where he was trapped.  He could still hear Will and Dominick.  Will said that Dominick had been hit by falling concrete and was now badly hurt.  John heard Dominick say that John and Will should always remember that Dominick had done his best to try to get Will and John out.[80]

---

[76] McLoughlin Dec. ¶ 16.
[77] McLoughlin Dec. ¶ 17.
[78] McLoughlin Dec. ¶ 18.
[79] McLoughlin Dec. ¶ 19.
[80] McLoughlin Dec. ¶ 20.

44

Dominick then fired his weapon up into the air in the direction of the opening in the debris in a last-ditch effort to alert someone to come rescue the three men.  A short time later, Dominick died – trapped in the rubble near John.  John (and Will) heard Dominick take his very last breaths.[81]

At some point, flames from burning debris started coming down into the hole where Will and John were trapped.  John expected to burn to death.  Then Dominick's weapon started firing by itself because of the fire and intense heat.  John felt sure that one of the bullets was bound to hit him in the head.  But somehow they all missed.  A short time later, John heard gunshots in the distance.  He surmised that City Emergency Services Officers were engaged in a gun fight with terrorists.  But in fact ammunition in the Federal Shooting Range in Building 6 of the Trade Center was also firing off by itself due to the fire and heat.[82]

Time dragged on.  Will and John were pinned down by concrete and could not move; and they couldn't see each other either, because there was too much rubble between them .  But they continued to talk with each other in order to try to stay awake and stay alive.[83]

John was extremely dehydrated.  He was scared, and he was in severe pain.  Based on his experience as a paramedic, John understood that he was suffering from compartment syndrome caused by his crush injuries, and that Will probably was suffering from compartment syndrome too.  As the night went on, it seemed to John less and less likely that John and Will would survive.[84]

At some point John heard Will talking to someone.  But whoever it was walked away and never came back.  To this day, John does not know if that person (or those people) walked away by choice, or if instead they were killed by debris or fire.[85]

---

[81] McLoughlin Dec. ¶ 21.
[82] McLoughlin Dec. ¶ 22.
[83] McLoughlin Dec. ¶ 23.
[84] McLoughlin Dec. ¶ 24.
[85] McLoughlin Dec. ¶ 25.

Later in the evening, John heard a man shout, "United States Marines," and the man yelled for people to call out for help. Will shouted back that PAPD officers were down, and he begged the Marine not to walk away. The Marine told Will that he would not leave. John felt a surge of hope – maybe he would live to see his family after all. There were three individuals helping Will and John — two former Marines and one civilian. The civilian went to find more help. He brought New York City Emergency Service Police Officers to where the Marines were standing, outside the hole under which John and Will were trapped. Then the rescue started in earnest.[86]

The rescue workers said that the space was too tight with debris to reach John, so they needed to get Will out first. (John was now buried about twenty feet below Will.) John was happy that Will would be rescued. At one point Will felt that his rescue was going too slowly and that it was too dangerous to leave John trapped much longer. Will told the rescue workers that they should amputate Will's leg so that they could then get to John more quickly. Thankfully, Will was rescued without the rescuers having to resort to that option.[87]

It took about three hours for the rescue workers to dig Will out. The rescue workers had to take turns crawling down to where Will was trapped. There was heat and dust and fire all around, and John was in terrible pain the whole time.[88]

After Will was rescued, the rescue workers started trying to save John. An Emergency Services Unit Officer treated John for compartment syndrome—an extremely painful condition that is associated with crush injuries and that can kill a person if not treated promptly – by giving John fluids through an IV. John was given water to drink, but he was so desperately thirsty that he drank the water too fast and vomited the water back up.[89]

---

[86] McLoughlin Dec. ¶ 26.
[87] McLoughlin Dec. ¶ 27.
[88] McLoughlin Dec. ¶ 28.
[89] McLoughlin Dec. ¶ 29.

46

Once Will was rescued, it took an additional seven to eight hours for the rescue workers to get the debris off of Sergeant McLoughlin and free him. There was a lot of fire and smoke in the area where John was trapped. The rescue workers worked in shifts because it was too difficult to be surrounded by fire and smoke for a prolonged period of time. They had to come down to John's location one at a time by crawling through the debris, and then they needed to crawl over John on their stomachs in order to work on getting the debris off his legs. Each time the rescuers moved there was danger that the hole might collapse and kill them all. There was also a risk that fire might burn everyone to death. And whenever the rubble shifted against John's body, it caused John even greater pain.[90]

John was offered morphine to help with the pain, but he refused out of fear that it would weaken him and cause him to die. John later learned that the rescue workers developed a plan to amputate both of John's legs at the thigh in case that was necessary in order to free John in time to save his life. (Later on, when John was in his medically induced coma at Bellevue Hospital, the doctors there again considered amputating both his legs.) To this day, John cries when he thinks about how his legs were almost amputated.[91]

After being buried under the rubble for approximately twenty-two hours, John was finally pulled from the rubble at approximately 8:30 on the morning of September 12, 2001. Rescue workers manually pulled John up out of the hole with a rope, and then placed him on a "Stokes Stretcher" made out of metal and plastic. The rescue workers constructed a series of bridges made

---

[90] McLoughlin Dec. ¶ 30.
[91] McLoughlin Dec. ¶ 31. *See also* B. Raynovich, "Crushed", *Journal of Emergency Medical Services*, Aug. 31. 2006 (included within Ex. A to McLoughlin Dec.). (Notably, as set forth in the "Crushed" article, while Sergeant McLoughlin does not recall receiving morphine while trapped in the rubble, the physician and EMT who attempted to treat him at that time report that they did administer morphine, and they further detail the plans they made to amputate the Sergeant's legs if necessary to free him).

47

out of plywood and slid John down the pile of rubble out to the street.  An ambulance was waiting there to take him to Bellevue Hospital. [92]

John had been in excruciating pain from the time the North Tower collapsed until he was rescued the following morning.  He was given morphine in the ambulance, and then he lost consciousness.[93]

Five men from the PAPD – Will Jimeno, Antonio Rodrigues, Dominick Pezzulo, Chris Amoroso and Sergeant McLoughlin himself – ran into the Concourse on September 11, trying to save people's lives.  Of those five men, Antonio and Chris were killed when the South Tower fell. Dominick, Will and McLoughlin survived the collapse of the South Tower, but they were trapped – buried alive under a huge mountain of rubble created by the remains of the South Tower. Dominick was able to briefly free himself.  But then he was too killed while trying to save Will when the North Tower fell on the men as well.  Will was rescued on the evening of September 11. And, finally, Sergeant McLoughlin was rescued on the morning of September 12, after enduring the unendurable for nearly twenty-four hours.  Sergeant John McLoughlin was the last uniformed officer, and the second to last person, to be rescued alive from the World Trade Center.[94]

### - The Hospital Saves John's Life -

When John first arrived at Bellevue Hospital, his organs were failing due to the injuries he had sustained in the attacks.  He was suffering from massive crush injuries.[95]

The doctors told John's wife that they did not know whether he would survive.  They put John into a medically induced coma, during which John was placed on a ventilator in the intensive

---

[92] McLoughlin Dec. ¶ 32.  Attached as Exhibit A to the accompanying Declaration of John McLoughlin are several news articles about Sergeant McLoughlin's experiences.
[93] McLoughlin Dec. ¶ 33.
[94] McLoughlin Dec. ¶ 34.
[95] McLoughlin Dec. ¶ 35.

care unit ("ICU").  John's wife and children did not know whether he would live or die.  Once, when things looked particularly grim, he was given last rites and the doctors told John's wife to bring his children to see him one last time.  John remained in his medically induced coma for six weeks.[96]

John had a total of twenty-seven surgeries while at Bellevue, as well as numerous blood transfusions.  He had multiple debridement surgeries to remove dead tissue from his body.  The doctors removed the abductor muscles on both of John's hips, as well as other muscle tissue from his back, hips and legs.  The doctors also placed skin grafts on major areas of John's back and legs, from the hip down to the ankle.  An artery in John's left calf burst, necessitating reconstructive surgery for that calf.[97]

The doctors in the hospital consulted with retired military doctors (who had experience closing battle wounds) concerning their efforts to close John's leg wounds.  Yet, to this day, the doctors have not been able to close all John's wounds.  He still has large open surgical wounds on both hips.[98]

John finally woke up from his medically induced coma right before Halloween of 2001.  He had survived.  But he was still in horrible pain.  Changing the dressing on his wounds was particularly agonizing.[99]

While he was at Bellevue, Sergeant McLoughlin was diagnosed with and treated for:

- crush injuries to bilateral lower extremities and bilateral buttocks,

- bilateral gluteal compartment syndromes,

---

[96] McLoughlin Dec. ¶ 36.
[97] McLoughlin Dec. ¶¶ 37-38.
[98] McLoughlin Dec. ¶ 39.
[99] McLoughlin Dec. ¶ 40.

- rhabdomyolysis secondary to crush injury to bilateral lower extremities, and bilateral buttocks and bilateral gluteal compartment syndromes,

- acute tubular necrosis/acute renal failure secondary to rhabdomyolysis, secondary to crush injury to bilateral lower extremities and bilateral buttocks and bilateral gluteal compartment syndromes,

- pseudomonas septicemia and septic shock,

- acute respiratory failure and ventilatory dependence,

- myonecrosis secondary to crush injury to bilateral lower extremities and bilateral buttocks and bilateral gluteal compartment syndromes,

- bilateral sciatic nerve palsies,

- coagulopathy including thrombocytopenia secondary to pseudomonas septicemia and septic shock,

- bacterial pneumonia, and

- anemia.[100]

On November 30, 2001, John was transferred from Bellevue to the Helen Hayes Hospital in West Haverstraw, New York, so that his hospital treatment could continue at a location more convenient to his family and because Helen Hayes is an especially good hospital for occupational and physical therapy.  He remained hospitalized as an inpatient at Helen Hayes until the second week of January 2002.[101]

---

[100] McLoughlin Dec. ¶ 41.
[101] McLoughlin Dec. ¶ 42.

**- Outpatient Treatment -**

Next, John underwent outpatient treatment at Helen Hayes Hospital – five eight-hour days per week, for three years.[102]

At Helen Hayes, John undertook occupational therapy, physical therapy, and wound care. The first step in John's rehabilitation was to teach him how to sit up again. This was a considerable struggle that lasted several months. Over time, among other things, the therapists taught John how to perform daily tasks as a disabled person, how to treat his wounds, and how to break down scar tissue in his body so as to increase his flexibility.[103]

John was confined to his bed and to a wheelchair for the first two years of his outpatient treatment. He needed to be driven to his treatments by a PAPD Officer. This saddened John because he was accustomed to being "independent and providing for [his] family." During the final year of his outpatient treatment, John walked with a cane and then, at the end of that third year, he was able to walk without assistance.[104]

John has had seven surgeries since he left Bellevue during which the doctors have attempted to close the wounds on both his hips. Unfortunately, these surgeries have been only partially successful. To this day, John has large open surgical wounds on both hips. He performs dressing changes to those wounds twice each day.[105]

Because of the open wounds on his hips, John also developed bone infections in both his left femur and right hip. He needed to see an infectious disease specialist for treatment of those bone infections for several years. On two occasions he was required to undertake intravenous

---

[102] McLoughlin Dec. ¶ 43.
[103] McLoughlin Dec. ¶ 44.
[104] McLoughlin Dec. ¶ 45.
[105] McLoughlin Dec. ¶ 46.

51

infusions of antibiotics at the hospital in order to treat those infections – seven days a week, for six weeks at a time on each occasion.[106]

John has also developed chronic rhinosinusitis as a result of the attacks and his exposure to fire, smoke and dust on September 11. This condition causes John to cough, choke and gag to the point of almost blacking out at times. He has had two sinus operations, and he has seen a sinus specialist on a continuous basis since 2017 to deal with his rhinosinusitis. (Attached as Exhibit B to Sergeant McLoughlin's Declaration are true and correct copies of medical records related to injuries that John sustained in the attacks.)[107]

### - John's Continuing Disability -

John's legs and back are disfigured and deformed as a result of the injuries he sustained on September 11th. His legs and lower back are badly scarred from numerous skin grafts and surgeries. And his legs and back have not recovered or regained their original strength (or anything close to it) because so much muscle tissue was removed. (Attached as Exhibit C to the McLoughlin Declaration are true and correct copies of photos of John's legs and back. WARNING: THESE PHOTOS ARE VERY GRAPHIC. In particular, these photos show how bad the open wounds on John's hips look and how his back appears to be missing pieces.)[108]

John has permanent nerve damage, and as a result he has no feeling in either leg from the knee on down. He needs to wear plastic braces on both his legs. He cannot either sit down or stand for long periods of time. Bending is extremely difficult and painful for John. It requires a lot of energy and leaves him exhausted.[109]

---

[106] McLoughlin Dec. ¶ 47.
[107] McLoughlin Dec. ¶ 48.
[108] McLoughlin Dec. ¶ 50.
[109] McLoughlin Dec. ¶¶ 51-53.

Because so much muscle tissue was taken out of John's back, hip, and leg, it takes great effort for him to do even simple tasks. He needs to constantly stop and rest. A task that used to take John an hour to perform can take all day now. For example, after John runs a short errand (like going to the Post Office), he is often bed-ridden for the rest of the day. And (because skin grafts do not have sweat glands) John's body retains heat, which is very uncomfortable when the weather is hot.[110]

John cannot exercise. When he has attempted to use the elliptical machine, his wounds tore even further open. He experienced a hernia when he attempted an upper body workout. He can no longer walk on the beach, except with great difficulty. He cannot swim in a lake or in the ocean because that would likely re-infect his wounds and possibly kill him.[111]

John lives with constant pain in his legs and back, and that pain grows even worse whenever he attempts even minor daily tasks. And – although John has no feeling below his knees – because of the nerve damage he has suffered, on seemingly random occasions he still experiences what he terms "lightning bolts" of excruciating phantom pain in his feet.[112]

John's injuries from the attacks forced him to retire in 2004, and he has been unable to work since. He is classified as completely disabled, and receives a disability pension. John had taken the PAPD Lieutenant test prior to 9/11, and was on the promotion list at the time of the attacks. He was promoted in 2003, but that promotion did not come in time for John to receive top pension pay.[113]

John McLoughlin is now sixty-nine years old, and he continues to struggle with the fact that he is permanently disabled. Before 9/11, he worked hard at a job that he loved, and he was

---

[110] McLoughlin Dec. ¶ 54.
[111] McLoughlin Dec. ¶ 56.
[112] McLoughlin Dec. ¶ 57.
[113] McLoughlin Dec. ¶ 58.

able to provide for his family.  Ever since the attacks, his family has had to support John.  John's family continues to navigate the ways in which to help care for him.[114]

### - Psychological Effects -

John suffered, and continues to suffer, severe emotional distress as a result of the terrorist attacks.  At Helen Hayes Hospital he was diagnosed with Post-Traumatic Stress Disorder brought about by what he had experienced and witnessed on September 11, 2001.  At Bellevue Hospital, he needed to be tied down to his bed, because he had terrible nightmares.  He dreamed that people were trying kill him and he would wake up screaming.  To this day, he is haunted by memories of 9/11 that he cannot fully control.  He is troubled by the fact that his family nearly lost him, and that he almost lost his legs.  And he is in particular haunted by the circumstances leading to Officer Dominick Pezzulo's death.[115]

The most important effect that PTSD has had (and still has) on John is that it impacts his ability to control frustration and anger.  He often lashes out and his wife and children (and others), and they have had to suffer as a result.  John and his family do their best to manage his condition, understanding that PTSD is a lifelong condition that can be managed but never truly "cured."[116]

Before 9/11, John was a healthy, happy, vigorous and physically active man.  All that was completely changed by 9/11.  It has been challenging for John to live as a disabled man – hard for John to be unable to run around with his kids like he used to, and hard to know that he simply cannot do most of the things that he used to enjoy.  He feels that he no longer the same person that he was before September 11.[117]

---

[114] McLoughlin Dec. ¶ 59.
[115] McLoughlin Dec. ¶ 61.
[116] McLoughlin Dec. ¶ 62.
[117] McLoughlin Dec. ¶ 60.

**- The Court Should Award Sergeant McLoughlin**
***Twenty-Eight Million Dollars* in Personal Injury Damages -**

Consistent with the framework crafted by this Court for evaluating damage claims for personal injuries suffered as a result of the September 11 attacks, Sergeant McLoughlin's injuries can only be categorized as "beyond devastating" for at least five reasons.

First, John McLoughlin is permanently disabled.  His legs, back and hips have never recovered their strength.  He can neither sit down nor stand up for extended periods of time.  He has no feeling from his knees to his toes.  He will have to wear braces on his legs for the rest of his life.  He experiences constant pain in his legs and back.  The surgical wounds on his hips have never closed and must be dressed twice a day.  Even simple tasks are exhausting for John and often leave him bed ridden for the day.

Second, John is permanently disfigured by the large (and grotesque) open wounds on his hips and by the many scars and wounds he bears from multiple surgeries and skin grafts.  *See* McLoughlin Dec., Ex. C)

Third, John's partial recovery has required extensive – indeed, Herculean – medical treatment.  He was initially placed in a medically induced coma for six weeks.  He underwent a total of twenty-seven surgeries while at Bellevue, received extensive skin grafts there, and received numerous blood transfusions as well.

John was not released from the hospital for four months, and he then undertook outpatient hospital treatment – five eight-hour days per week – for three years.  He was confined to his bed and wheelchair for two years.  He endured seven more surgeries on his legs after leaving Bellevue, and developed serious bone infections because of his leg wounds.  He has also undergone two sinus surgeries to treat the extensive injuries to his sinuses caused by his exposure to fire, smoke and dust on September 11.

Fourth, Sergeant McLoughlin has suffered and continued to suffer from PTSD as a result of the September 11 attacks.  He struggles with the memories of his horrible experiences on that day.  John is in particular haunted by the death of Office Dominick Pezzulo who John had directed to stay with and to try to free Officer Will Jimeno from the rubble – rather than to go seek additional help – a decision that helped lead to Dominick's terrible and painful death.

Fifth (and almost self-evident), John McLoughlin's experiences on September 11 (and on into the morning of September 12, 2001) were perhaps uniquely terrifying and painful.  In essence, both Towers of the World Trade Center fell on John and on Will Jimeno, one at a time.  Then John was trapped for nearly twenty-four hours deep underground, under a huge pile of concrete and rubble.  For nearly an entire day and night, a huge slab of concrete was slowly crushing the life out of John McLoughlin.  He was beset by darkness, fire, smoke, gunshots and terrible pain throughout.  He was in great danger of being killed by fire or by the rubble collapsing at every moment.  And he did not know whether he would ever be found.

All these factors place Sergeant McLoughlin's injuries in the category of "beyond devastating."  In particular, Sergeant McLoughlin's ordeal was especially harrowing because (like Officer Jimeno) McLoughlin was not injured at a single stroke.  Rather, he was injured painfully and *continuously* for nearly twenty-four hours by a massive slab of concrete that was slowly and painfully crushing and killing him.  (And John McLoughlin's ordeal was eight hours longer than even Will Jimeno's.)  Sergeant McLoughlin was the last uniformed officer (and the second to last person) to be rescued alive from the World Trade Center, and the suffering he endured until he was rescued was virtually unparalleled.

Further, Sergeant McLoughlin's experience was almost uniquely terrifying because for nearly twenty-four hours, through one horror after another, John McLoughlin was *continuously* faced with the prospect of an imminent and horrible death.

Moreover, as with P.O. Jimeno (and as with Edwin and Grace Rivera, *supra*), John McLoughlin's experiences were also especially horrible because they were *shared*. Four younger PAPD Officers followed Sergeant McLoughlin into the World Trade Center that day, trusting in John's experience and leadership. Two of those Officers – Officers Rodriguez and Amoroso – were killed when the South Tower collapsed on the group. One Officer – Dominic Pezzulo – was killed, down beneath the rubble and just a few feet away from John, while obeying John's order to try to free Officer Jimeno. And one Officer – Will Jimeno – spent almost thirteen agonizing hours buried deep in the rubble close by Sergeant McLoughlin, as they struggled to keep each other awake and alive by talking with one another.

For all these reasons, Plaintiff John McLoughlin respectfully submits that the Court should award Sergeant McLoughlin twenty-eight million dollars in damages for his extraordinary pain and suffering and personal injuries.

### - Economic Damages in the Amount of *$2,660,711* Should be Awarded to Plaintiff McLoughlin -

Plaintiff McLoughlin further submits that for the reasons set forth in the accompany Expert Report of John Beauzille, Sergeant McLoughlin should be awarded $2,660,711 in economic damages.

### 3.    Manu Dhingra

On September 11, 2001 Manu Dhingra was a twenty seven year old supervisor of equities traders for a new firm headquartered in the World Trade Center's North Tower. As he stepped off the elevator and into his firm's offices that morning, Manu was enveloped for thirty to forty-five

seconds by wave of incredible heat that was produced by ignited jet fuel surging down the elevator shaft behind him.  Manu felt as if he were being cooked alive.  The pain was so intense that he wanted to die.  When he looked down, he saw that the skin on his arms had simply melted away.  In all, approximately thirty-five percent of Manu's body surface – including his face – was badly burned.

Friends cajoled the badly weakened Manu to walk down eighty three flights of stairs and to exit the World Trade Center before the Towers fell.  His face was charred black and swollen to the size of a basketball.  He was rushed to a hospital burn unit where he remained for three weeks.  Healthy skin was grafted onto Manu's hands, arms and right leg.  His treatments were almost unbearably painful.

Manu remains badly disfigured even after all these years.  He is painfully aware that people find it very hard to look at his face.  Once a busy single young Manhattan professional, Manu now lives an isolated existence in his parents' old house, and he ekes out a living selling jewelry from a kiosk at a Long Island mall.

Manu suffers from PTSD.  For ten years following the September 11 attacks, Manu entertained thoughts of suicide.  Psychiatric treatment and medication have helped Manu, but he still struggles with depression, and with the constant fear that somehow he may be attacked again.

For the reasons detailed below, plaintiff Dhingra respectfully submits that his injuries should be placed in the category of "beyond devastating," and that he should be awarded twelve million dollars in damages for his pain and suffering.

### - Dhingra's Life Before 9/11 -

Manu Dhingra was born on August 28, 1974, in New Delhi, India.  When he was eleven years old his family came to America and initially settled in Elmhurst, Queens.  They moved to Sayville, Long Island the following year.  Manu graduated from Sayville High School and earned

a bachelor's degree in advertising and marketing from the Fashion Institute of Technology.  During his senior year at F.I.T.  Manu was elected and served as Student Body President.[118]

After college, Manu moved into an apartment with a roommate in Gramercy Park.  He entered into and attended Home Depot's Management Training Program for a year.  Home Depot seemed promising to Manu; but this was the beginning of the Dot.com era, and Manu decided that he would try to build a career in business and finance.  He joined a firm called Andover Capital and became an equities trader.  Manu found this work very exciting.  He obtained his Series 7, 55, and 63 licenses, and then passed the Series 24 examination in June of 2001.[119]

In the summer of 2001, a number of people at Andover decided to break away and start their own new firm, called Navena.  Manu was invited to join them, and he accepted.  He supervised the equities traders at Navena, and the plan was for Manu to become a principal in the new firm.  Navena's new offices were located on the 83rd floor of the North Tower of the World Trade Center.  Manu found his new job rewarding.  He felt that his career in finance was off to a great start.  He was also enjoying life as young single professional in Manhattan.  Manu liked going out on the town, and he hoped to meet the right woman to marry and someday have kids with.  He was twenty-seven years old and in good health.  He felt like he was ready to take on the world.  And then everything changed.[120]

### - September 11 -

On September 11, 2001, Manu went to work like he did on any other day.  He took the subway to his office at the World Trade Center.  For some reason, Manu still clearly recalls that when he took the elevator up to his office that day, he caught the eye of a pretty young woman.

---

[118] *See* the accompanying Declaration of Manu Dhingra of July 25, 2022 ("Dhingra Dec.") ¶ 1.
[119] Dhingra Dec. ¶ 2.
[120] Dhingra Dec. ¶ 3.

She gave him a smile.  Manu remembers that he hoped to bump into her again and to get to know her.[121]

Manu got off the elevator on the 83rd floor of the North Tower.  Manu immediately sensed a very strong vibration and what felt like an incredible wave of heat.  (This was caused by American Airlines Flight 11 crashing into the North Tower, but Manu did not understand what was happening at the time.)[122]

Ignited jet fuel had surged down the elevator shaft just as Manu stepped off the elevator and the doors closed behind him.  As Manu began to step away from the elevator, he felt an incredible blast of heat – a blast that seemed to be thousands of degrees hot – going right through his body.[123]

Manu felt as if he were being cooked alive.  As a reflex, he covered his face with his hands. He felt piercing pain that was like nothing he had ever experienced before.  As Manu now puts it, he "would not wish that feeling on any living being."  When Manu looked down, he saw that his arms had no skin.  It had melted away.[124]

The extreme heat lasted for what seemed to Manu like thirty to forty-five seconds.  Manu thought he would die during each second, and part of him wanted to die so that the pain would stop. But Manu also thought about how his parents would be devastated if he, their eldest child, were killed, and how he would never get a chance to say goodbye.  The fear Manu experienced in those terrible moments haunts him to this day.[125]

---

[121] Dhingra Dec. ¶ 4.
[122] Dhingra Dec. ¶ 5.
[123] Dhingra Dec. ¶ 6.  See also ABC News article "Trade Center Burn Victim Released," Oct. 3, 2001 (included within Dhingra Dec. Ex. D), in which Mr. Dhingra's treating physician estimates that in fact Manu did experience a blast of heat of "thousands of degrees."
[124] Dhingra Dec. ¶ 7.
[125] Dhingra Dec. ¶ 8.

Manu hurried towards his office.  He did not know where else to go.  He fell on the floor from the pain as soon as he entered the room.  He thought that these were his last moments on earth.  Two friends rushed into Manu's office to see if he could walk.  Everyone else in his office was already hurrying towards the staircase in order to evacuate the building.[126]

Manu told his friends that he would try to walk with them.  They then went to the stairwell, which was very narrow, in order to exit the building.  One of Manu's friends walked in front of him and the other walked in back in order to protect him.[127]

People in the stairwell moved to the side and let Manu pass when they saw his condition.  Because he had severe burns on his hands which caused him great pain, he could not touch the railings.  He felt weak with exhaustion and needed to rest.  But his friends lied to Manu.  They kept telling Manu that there were only ten more flights of stairs to go before they reached the ground.  In fact, there were dozens of flights of stairs left.  Manu's friends saved Manu's life by fooling him into continuing to walk down the stairs toward safety.[128]

Manu made it to the lobby before either Tower had collapsed.  But he could not leave at first.  The main door was blocked by falling debris.  Through the windows Manu saw people jumping out of the Towers from high above and being killed when they landed on the pavement.  Manu and his friends knew they had to get out immediately.  They hurriedly climbed up to the Concourse Level.  There was a pool of water on the ground there (presumably produced by the building's sprinkler system).  The water exacerbated the terrible pain that Manu was already experiencing because of his burned feet.  It felt to Manu as if his feet were now blanching or boiling.[129]

---

[126] Dhingra Dec. ¶ 9.
[127] Dhingra Dec. ¶ 10.
[128] Dhingra Dec. ¶ 11.
[129] Dhingra Dec. ¶ 12.

When Manu looked around, he noticed he had been separated from one of his friends. But his other friend was still by his side. They finally exited the Trade Center safely near the Century 21 store on Church Street. Emergency Medical Technicians ("EMTs") saw Manu and immediately put him into a waiting ambulance. Before the ambulance doors closed, Manu asked his friend to call Manu's mother to let her know what had happened.[130]

### - The Doctors Save Manu's Life -

The ambulance took Manu to St. Vincent's Hospital. He was in critical condition and, but for the treatment he was given by the hospital's doctors, he would have quickly died. Shortly after his arrival, Manu asked a nurse if she had a mirror. He had not seen his own face since the attack. The nurse hesitated. She asked a superior if that was allowed. After being told that it was permitted, she handed Manu a mirror.[131]

As soon as Manu looked at his own face, he thought that he would rather be dead than to live looking like he did. His face was swollen to the size of a basketball and charred black. His hair was burned, his eyebrows were burned off, and his ears and lips were burned too.[132]

Manu's parents visited him that first night in the hospital. When his mother first saw Manu, she immediately had to flee the room, crying uncontrollably. Her reaction validated how bad Manu felt about how he looked.[133]

Manu suffered second-degree burns to his face, and third-degree burns to his back, upper extremities, and right leg. All in all, approximately 35% of Manu's body surface was badly burned.[134]

---

[130] Dhingra Dec. ¶ 13.
[131] Dhingra Dec. ¶ 14.
[132] Dhingra Dec. ¶ 15.
[133] Dhingra Dec. ¶ 16.
[134] Dhingra Dec. ¶ 17.

The next day, on September 12, 2001, Manu was transferred to the Burn Unit at Weill Cornell-New York Presbyterian Hospital.  He remained there until he was discharged on October 1, 2001.  He was in agonizing pain throughout his hospital stay even though he was given morphine.  (He also had to be fed through a feeding tube.)[135]

The doctors grafted healthy skin onto Manu's hands, arms, and right leg.  They took the skin from both of Manu's thighs.[136]

Manu had to take daily showers.  They were extremely painful.  Even worse, when the doctors removed the stiches from Manu's skin grafts, it felt to Manu as if he were being stabbed with a dagger each time a stitch was taken out.  After a few stiches were removed, Manu told the doctors to put him under general anesthesia before taking the stitches out, which they agreed to do.  The experience was simply too painful for Manu to endure while he was conscious.[137]

The skin on Manu's face and back peeled off at the hospital, and he lost pigmentation.  To this day, Manu's skin does not look like it did before 9/11.  (Attached as Exhibit A to the accompanying Declaration of Manu Dhingra is a true and correct copy of Manu's medical records.)[138]

Manu was shown a lot of love and support in the hospital.  He had frequent visits from coworkers, family, friends, and strangers.  (Attached as Exhibit B to Manu's Declaration is a photo of coworkers visiting Manu in the hospital.) He also received a lot of media attention both in the hospital and once he was discharged.  (Attached as Exhibit C to Manu's Declaration is a photo of him leaving the hospital.) He appeared on television's Oprah, Bill O'Reilly, and Larry King shows

---

[135] Dhingra Dec. ¶ 18.
[136] Dhingra Dec. ¶ 19.
[137] Dhingra Dec. ¶ 20.
[138] Dhingra Dec. ¶ 21.

with then-Senator Hillary Clinton, Senator Charles Schumer, and Queen Noor of Jordan. (Attached as Exhibit D to Manu's Declaration are select news articles about Manu's story.)[139]

### - Manu's Partial Recovery -

Manu returned to his Gramercy Park apartment upon first being discharged from the hospital.  But the physical and emotional pain from his injuries proved too much.  So he moved back to his parents' home in Sayville in the spring of 2002.  He did not even try to return to work. He was still (to use Manu's own words) "in bad shape".[140]

Manu was dealing with a great deal of pain.  He took prescription pain killers until early 2002.  He could not sleep on his back until the spring of 2002.  He had to wear mesh garments to flatten his skin grafts.  This was extremely uncomfortable, especially during hot weather.[141]

Manu's back, arms, thighs, and ankles are permanently disfigured due to his skin grafts. He has scars all over his body from the burns, and the pigmentation on his face still does not match his regular skin complexion.  He has permanent nerve damage due to the skin grafts.  His body also gets hot very quickly because he cannot sweat through the skin grafts.  And Manu's right "pinky" finger is also permanently disfigured.[142]

### - Psychological Impacts -

Manu has suffered, and continues to suffer, severe emotional distress as a result of the terrorist attacks.  He has been diagnosed with and has been treated for Post-Traumatic Stress Disorder ("PTSD") that was brought about by what he experienced and witnessed on September 11, 2001.[143]

---

[139] Dhingra Dec. ¶ 22.
[140] Dhingra Dec. ¶ 23.
[141] Dhingra Dec. ¶ 24.
[142] Dhingra Dec. ¶ 25.
[143] Dhingra Dec. ¶ 26.

The terror that Manu experienced on September 11, 2001, has never really gone away.  He thinks constantly of the attacks.  He is hyperaware of possible danger wherever he goes.  He always looks for exits in case he needs to escape in the event of an attack.  Manu was completely unable to get on an airplane for years after 9/11, and even now whenever he gets on a plane he is scared of crashing.[144]

For years after 9/11, Manu suffered from terrible insomnia.  Far worse, for about ten years after 9/11, Manu had constant thoughts of committing suicide.[145]

Finally, beginning in 2012, Manu sought help from a psychiatrist.  He now takes medication to help him concentrate and anti-depressants to deal with his depression.  He also sees his psychiatrist regularly.[146]

All this has been a great help to Manu.  But he recognizes that he is far from "cured" of PTSD.  He still lives in constant fear.  He still experiences severe mood swings.  He often feels sad or bleak out of the blue.  As Manu puts it, he "can't fully feel" his own emotions.  He has not been able to cry even once since 9/11.[147]

Manu suffers socially due to the physical and emotional injuries that he sustained on September 11.  People (understandably) stare at his burns and scars, and Manu (also understandably) feels terribly self-conscious.  Because of his emotional issues, Manu has trouble building friendships and romantic relationships.[148]

Before 9/11, Manu Dhingra was an outgoing, happy young man on the rise, without a real care in the world.  All that has changed.  His is now forty-seven years old and he lives with his

---

[144] Dhingra Dec. ¶ 27.
[145] Dhingra Dec. ¶ 28.
[146] Dhingra Dec. ¶ 29.
[147] Dhingra Dec. ¶ 30.
[148] Dhingra Dec. ¶ 31.

65

younger brother in his parents' old house.  He has been unable to meet someone with whom to settle down and start a family.  Indeed, for a long time, Manu had trouble motivating himself just to get out of bed.  And he still finds that he has trouble getting motivated to work and be productive.[149]

On 9/11, Manu was an equities trader who was building a serious career with the potential for substantial income.  Today, he makes a very modest living operating a jewelry kiosk at a mall on Long Island.  He makes enough to get by, but he believes this is far from the life he would have had but for the attacks on 9/11.  The pain, suffering, disfigurement, and terror Manu experienced on that tragic day has changed him forever.

### - The Court Should Award Manu Dhingra *Twelve Million Dollars* in Personal Injury Damages -

Manu Dhingra's injuries should also be characterized as "beyond devastating," for at least four reasons.[150]

First, Manu Dhingra is permanently and badly disfigured.  Approximately 35 percent of his body's surface was badly burned on September 11, including his face.  Manu has lost the pigmentation in his face and on much of the rest of the burned surfaces of his body, and he bears visible scars from multiple skin grafts.  To put it bluntly, people find it very hard simply to look at Manu Dhingra; and Manu knows it, and suffers terribly as a result.

Second, Manu has suffered great emotional and psychological damage as a result of the September 11 attacks.  Once a happy young equities trader on the rise, he is now beset by terrors, depression and loneliness.  He has been diagnosed with PTSD.  For many years after 9/11 he suffered from terrible insomnia, and for about ten years after 9/11 he entertained constant thoughts

---

[149] Dhingra Dec. ¶ 32.
[150] Dhingra Dec. ¶ 33.

of committing suicide.  His psychological condition is now improved, thanks to treatment and medication; but Manu still lives in constant fear.  He is hyperaware of potential danger wherever he goes, anticipating a possible attack.  He experiences severe mood swings and periods of profound melancholy.  He is also strangely detached from his own feelings; he has not been able to cry even once since September 11.

Third, Manu's medical treatment - like that of most serious burn victims - was especially grueling and painful.

Fourth, Manu's experience on September 11 itself was exceptionally painful and terrifying. He was engulfed for nearly a minute by jet fuel produced heat likely in the thousands of degrees - so very intense that his skin simply melted away, and so intense that Manu wanted to die rather than to continue to endure the pain.  Then Manu had to walk down eighty-three flights of stairs, in his weakened condition, all the while experiencing almost unspeakable suffering.

As in the case of Edwin Rivera, ECF 5909, at 9, Manu Dhingra's injuries should at a minimum be classified as "devastating" because they include "severe burns, disfigurement, and mental health trauma."  And (although such comparisons are unpleasant to draw) Manu's injuries should be considered to be significantly worse than those of Mr. Rivera and therefore as "beyond devastating."  Mr. Rivera was burned on 24 percent of his body's surface, compared to 35 percent for Manu Dhingra; and, perhaps more important, Manu Dhingra's *face* was burned and badly disfigured, while Mr. Rivera's face (thankfully) was not.  The burden of walking through life with disfigured face is (sadly) an especially heavy one for Manu to bear.

For all these reasons, plaintiff Manu Dhingra respectfully submits that he should be awarded personal injury damages for pain and suffering in the amount of twelve million dollars.

**- Economic Damages in the Amount of *$255,582* Should be Awarded to Plaintiff Dhingra -**

Plaintiff Manu Dhingra further respectfully submits that for the reasons set forth in the accompany Expert Report of John Beauzille he should be awarded economic damages of $255,582.

### G.    Treble Damages

The U.S. National Personal Injury Plaintiffs, as set forth on Exhibit A-2, submit that, under the express terms of the ATA, they "shall recover threefold the damages" awarded. *See* 18 U.S.C. § 2333(a) (emphasis added). The trebling of the damages award in these circumstances is mandated by the use of the word "shall." *See United States v. Kahn*, 5 F.4th 167, 174 (2d Cir. 2021) (holding "[t]he word 'shall,' in a statute, indicates a command; what follows the word 'shall' is 'mandatory, not precatory'"). Therefore, the U.S. National Personal Injury Plaintiffs submit that each of the values awarded for compensatory damages should be trebled to accord with the mandatory trebling language in the ATA, and further submit that under existing precedent, these trebled judgment amounts should also be considered compensatory damages. *See Stansell v. Revolutionary Armed Forces of Columbia*, 16-MC-00405 (LGS) (SN), ECF No. 443 (March 29, 2022) ("**The ATA's Treble Damages Provision is Compensatory**") (emphasis in original). A separate column is included on Exhibit A-2 indicating the final judgment after trebling of the damages values for the U.S. National Personal Injury Plaintiffs.[151]

### H.    Punitive Damages

The Personal Injury Plaintiffs are also entitled to punitive damages.  In the *Havlish* Report and Recommendation on damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks."  ECF No.

---

[151] The non-U.S. National Plaintiff is ineligible for treble damages.

2618 at 13 (quoting *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).   This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory).   ECF No. 2623 at 2.   The Court has applied that ratio to awards for plaintiffs in other related cases.   *See*, e.g., ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.   ECF No. 3363 at 28.   Judge Daniels adopted Magistrate Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.   ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Personal Injury Plaintiffs herein request permission to address the issue of punitive damages at a later date.   *See*, e.g., ECF No. 3666 (Judge Daniels' Order in *Burnett* authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### I.   Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.   *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).   This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001,

until the date of judgment.  ECF No. 2618 at 13-14.  This Court, recognizing that prejudgment interest was appropriate in cases such as these cases, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *In re Sept. 11 Litig.*, 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks.  *Id.*

However, subsequently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29.  Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the

claims.  ECF No. 3384 at 6.  Thereafter, in *Burnett/Iran II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in *Hoglan* and *Burnett*, applying the 4.96 percent rate to prejudgment interest, the Personal Injury Plaintiffs respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

## V.    LEAVE FOR OTHER O'NEILL PLAINTIFFS TO SUBMIT SUBSEQUENT APPLICATIONS

The O'Neill Plaintiffs with claims against the Taliban have, since August 2022 filed a series of motions seeking judgments against that Defendant – The O'Neill Family, those with judgments against Iran, those with pending motions against Iran, those without motions against Iran, non-U.S. national (death/solatium), etc.

There remain approximately 133 claims by individuals and estates (both 9/11 victims and family members who have passed away post 9/11) for whom we have insufficient information *at this time* to file a motion in accord with this Court's orders.

Additionally these are approximately 165 9/11 decedent estates for whom we presently still lack sufficient economic information to seek such claims principally as a result of delays by the Department of Justice.

Accordingly, we seek leave to file future damage motions.

### <u>CONCLUSION</u>

For the reasons set forth herein, the statements contained in the Goldman Declaration, as well as those set forth in prior motions for damages, Manu Dhingra, the Non-U.S. Personal Injury Plaintiff respectfully request that the Court grant an Order:

(1)    extending the Court's Order at ECF No. 3067 granting a judgment as to liability for the members of the O'Neill family to Manu Dhingra, the Non-U.S. Personal Injury Plaintiff; AND,

(2)    granting Manu Dhingra, the Non-U.S. Personal Injury Plaintiff's motion for entry of default judgment as to liability against the Taliban; AND,

(3)    determining that service of process in the above-captioned matter was properly effected upon the Taliban for Manu Dhingra, the Non-U.S. Personal Injury Plaintiff; AND,

(4)    determining that this Court possesses personal jurisdiction over the Taliban for Manu Dhingra, the Non-U.S. Personal Injury Plaintiff; AND,

(5)    determining that this Court has subject-matter jurisdiction over the Taliban under the common law for actions arising out of wrongful death, assault, battery, and intentional infliction of emotional distress based on the intentional acts of international terrorism perpetrated on September 11, 2001 that intentionally targeted innocent civilians resulting in death, personal injury, and significant grief sustained by family members of those killed in the attacks.[152]

Further, for the reasons set forth herein, the statements contained in the Goldman Declaration, as well as those set forth in prior motions for damages, the Personal Injury Plaintiffs respectfully request that the Court grant an Order:[153]

---

[152] Plaintiffs' prior request for an order of liability, *see* ECF No. 8455 (August 25, 2022), included the Non-U.S. Personal Injury Plaintiff on Exhibit A-1. However, because the Non-U.S. Personal Injury Plaintiff on Exhibit A-1 was not a U.S. citizen on September 11, 2001, the Non-U.S. Personal Injury Plaintiff on Exhibit A-1 seeks a determination of liability for his common law claims.

[153] Our request for an order of liability for all plaintiffs in the judgment motion at ECF No. 8455 (August 25, 2022) included the U.S. National Personal Injury Plaintiffs, as set forth on Exhibit A-2. The relief requested herein is contingent on the granting of the motion at ECF No. 8455.

(1)      finding the Taliban jointly and severally liable with Iran and awarding compensatory damages to the Personal Injury Plaintiffs against the Taliban for pain and suffering commensurate with the injuries sustained during the September 11, 2001 terrorist attacks, in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases (and factoring in an upward departure on damages values based on the indelible impact of the September 11, 2001 terrorist attacks); AND,

(2)      awarding the Personal Injury Plaintiffs economic damages in the amounts set forth in Exhibit A-1 and Exhibit A-2; AND,

(3)      awarding treble damages against the Taliban pursuant to the Anti-Terrorism Act, 18 U.S.C. §2333(a), for economic and personal  injury/pain and suffering damages, for John McLoughlin and William Jimeno, the U.S. National Plaintiffs, in the amounts as set forth in Exhibit A-2; AND,

(4)      finding that the treble damages awarded are compensatory in nature and not punitive; AND

(5)      awarding prejudgment interest against the Taliban at the rate of 4.96 percent per annum, compounded annually, for the period of September 11, 2001 until the date of judgment; AND,

(6)      granting leave for the Personal Injury Plaintiffs to seek punitive damages and other appropriate damages at a later date; AND,

(7)      granting permission for all other O'Neill Plaintiffs in this action not appearing in Exhibit A-1 and Exhibit A-2 to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

(8)   granting to the Personal Injury Plaintiffs such other and further relief as this

honorable court deems just and proper under the circumstances.

Dated:   New York, New York                  Respectfully submitted,
         September 30, 2022

                                             /s/ Jerry S. Goldman
                                             ANDERSON KILL P.C.
                                             Jerry S. Goldman, Esq.
                                             Bruce E. Strong, Esq.
                                             Hon. Ethan Greenberg (Ret.)
                                             Alexander Greene, Esq.
                                             1251 Avenue of the Americas
                                             New York, NY 10020
                                             Tel: (212) 278-1000
                                             Fax: (212) 278-1733
                                             Email:  jgoldman@andersonkill.com
                                                     bstrong@andersonkill.com
                                                     egreenberg@andersonkill.com
                                                     agreene@andersonkill.com
                                             *Attorneys for Plaintiffs*

docs-100521842.5