**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MDL-01570 (GBD) (SN)

This document relates to: *All Actions*

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION BY PROPOSED ORDER TO SHOW CAUSE FOR STAY**
**PENDING RESOLUTION OF RULE 72(a) OBJECTIONS**

Emily Kirsch
Paul Niehaus
KIRSCH & NIEHAUS PLLC
950 Third Avenue, 19th floor
New York, NY 10022
(212) 832-0170
emily.kirsch@kirschniehaus.com

Edward M. Spiro
MORVILLO ABRAMOWITZ GRAND
 IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
espiro@maglaw.com

*Counsel for Movant Kreindler & Kreindler LLP*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 3

      A.     K&K has played the central leadership role for two decades in representing thousands of victims and families of the 9/11 terrorist attacks ............................. 3

      B.     John Fawcett, a researcher for K&K, confessed to leaking the deposition transcript of Musaed al Jarrah, in violation of the protective orders, and took extraordinary steps to hide and lie about his actions. ............................................ 5

      C.     K&K submits declarations as directed by the Magistrate Judge as part of her investigation. ........................................................................................................... 7

      D.     Fawcett confesses to K&K who immediately advises the Magistrate Judge of the leak and how it occurred. ............................................................................. 7

      E.     The Magistrate Judge holds an evidentiary hearing on November 1 and  2, 2021 ..................................................................................................... 8

      F.     The Magistrate Judge issues an Opinion & Order on September 21, 2022, "immediately" removing K&K from the PEC. ................................................... 10

ARGUMENT ...................................................................................................................... 11

I.     The Court should stay the Magistrate Judge's Order "immediately" removing K&K from the Plaintiffs' Executive Committee, until K&K's Rule 72 objections are resolved ................................................................................................................ 11

      A.     Rule 37(b) does not authorize sanctions against a law firm. ............................... 13

      B.     The immediate nonmonetary sanction has upended a decades-long status quo, threatening irreparable harm to plaintiffs, before K&K's objections are resolved. ........................................................................................................... 20

CONCLUSION................................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Alvarez v. Larose*,
   2020 WL 5632659 (S.D. Cal. Sept. 21, 2020)......................................................................... 11

*Apex Oil Co. v. Belcher Co. of New York*,
   855 F.2d 1009 (2d Cir. 1988)............................................................................................ 13, 14

*Bloom v. Azar*,
   976 F.3d 157 (2d Cir. 2020)..................................................................................................... 16

*Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*,
   498 U.S. 533 (1991).................................................................................................................. 12

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*,
   128 F.3d 99 (2d Cir. 1997)....................................................................................................... 17

*Hassoun v. Searls*,
   968 F.3d 190 (2d Cir. 2020)..................................................................................................... 12

*In re NTL Inc. Sec. Litig.*,
   2006 WL 1167848 (S.D.N.Y. May 3, 2006) ........................................................................... 11

*In re World Trade Ctr. Disaster Site Litig.*,
   503 F.3d 167 (2d Cir. 2007)..................................................................................................... 12

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
   925 F.2d 556 (2d Cir. 1991)............................................................................................... 12, 23

*LEG Q LLC v. RSR Corp.*,
   2017 WL 4222690 (N.D. Tex. Sept. 22, 2017)....................................................................... 11

*Markus v. Rozhkov*,
   615 B.R. 679 (S.D.N.Y. 2020)................................................................................................. 17

*Nken v. Holder*,
   556 U.S. 418 (2009).................................................................................................... 12, 20, 23

*NPF Franchising, LLC v. SY Dawgs, LLC*,
   37 F.4th 369 (6th Cir. 2022) .................................................................................................... 16

*Pablovich v. Rooms to Go Louisiana Corp.*,
   2021 WL 928030 (E.D. La. Mar. 11, 2021) ............................................................................ 11

*Pavelic & LeFlore v. Marvel Ent. Grp.*,
  493 U.S. 120 (1989) ........................................................................................ 17

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
  685 F.3d 486 (5th Cir. 2012) ......................................................................... 17

*S. New England Tele. Co. v. Global NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010)............................................................................ 17

*United States v. Zapatero*,
  961 F.3d 123 (2d Cir. 2020)............................................................................ 12

*Williams v. Beemiller, Inc.*,
  527 F.3d 259 (2d Cir. 2008)............................................................................ 12

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
  564 F.3d 110 (2d Cir. 2009)............................................................................ 18

*Yukos Cap. S.A.R.L. v. Feldman*,
  977 F.3d 216 (2d Cir. 2020)...................................................................... 17, 18

## <u>Rules</u>

Fed. R. Civ. P. 11(c) ............................................................................................ 13, 15

Fed. R. Civ. P. 37(a) ................................................................................................... 15

Fed. R. Civ. P. 37(b) ............................................................................................. *passim*

Fed. R. Civ. P. 37(c) ............................................................................................. 13, 14

Fed. R. Civ. P. 37(d) ............................................................................................. 15, 16

Fed. R. Civ. P. 72(a) ............................................................................................. *passim*

## <u>Other Authorities</u>

Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.............................. 16

Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment.............................. 16

Manual for Complex Litigation § 10.154 (4th ed. 2004)............................................. 22

Michael Isikoff, *FBI tried to flip Saudi official in 9/11 investigation*, YAHOO! NEWS (July 15, 2021), https://news.yahoo.com/fbi-tried-to-flip-saudi-official-in-911-investigation-090041290.html ................................................................................................................. 5

Wright & Miller, Federal Practice and Procedure § 2290 (3d ed.) ................................................ 14

## PRELIMINARY STATEMENT

Kreindler & Kreindler LLP ("K&K") moves this Court to stay that portion of the Opinion & Order of Magistrate Judge Sarah Netburn, dated September 21, 2022 (the "Order"), which removes K&K from Plaintiffs' Executive Committee for Death and Injury Claims ("PEC" or "Committee"), so that this Court may properly hear and resolve K&K's Rule 72(a) legal and factual objections to the Magistrate Judge's Order without seriously upsetting the existing status quo in this litigation and threatening immediate and irreparable injury, loss, or damage to the 9/11 death and injury plaintiffs.

On July 15, 2021, a reporter for Yahoo! News published an article about the deposition of Musaed al Jarrah, a non-party in this case.  Following news of the article, it was K&K that discovered who breached this Court's protective orders by disclosing Jarrah's deposition transcript, and it was K&K who disclosed its finding the same day that the culprit was identified, September 27, 2021.  A consultant hired by K&K, John Fawcett, admitted in declarations and subsequent hearing testimony that he acted alone, that he betrayed his duties to K&K and this Court by leaking the deposition transcript to the reporter, and that he actively took steps to hide his misconduct from K&K for over two months.  Four K&K attorneys – James Kreindler, Andrew J. Maloney, III, Steven Pounian, and Megan Benett – each testified under oath that no attorney or staff member at K&K had any knowledge of or anything to do with Fawcett's decision to leak the transcript.  The documents and testimony at the extraordinary two-day hearing in November 2021 – during which K&K attorneys were sequestered; subjected to cross-examination by attorneys for Defendant Kingdom of Saudi Arabia ("Saudi Arabia" or "Kingdom"); and denied the opportunity to review Saudi Arabia's proposed exhibits before being confronted with them on the stand – revealed no involvement by K&K's attorneys in Fawcett's wrongful acts.

1

Over ten months later, the Magistrate Judge erroneously invoked Rule 37(b)(2)(A) as the legal basis for removing K&K from the PEC. But that rule only imposes sanctions based on the conduct of "*a party*" and does not authorize sanctions – let alone such a sweeping nonmonetary sanction – against a *law firm*. The Magistrate Judge expressly declined to invoke her inherent power to impose the nonmonetary sanction of removing the K&K firm from the PEC. Use of inherent powers would have required specific findings of bad faith by clear and convincing evidence and other heightened standard requirements not met – or even discussed – in the Order.

As detailed in the accompanying declaration of Mr. Maloney, K&K's attorneys have played the lead role on the PEC in prosecuting the claims of the death and injury plaintiffs in the litigation against Saudi Arabia and handled nearly every aspect of this complex case over the past five years. It is K&K attorneys that hired and, over the past five years, built trusted relationships with the former Federal Bureau of Investigation agents who have located and interviewed key witnesses who have revealed Saudi complicity in the attacks. It is K&K attorneys who prepared and argued the critical legal and discovery motions in the case against Saudi Arabia. It is K&K attorneys that located key non-party witnesses and obtained their statements and testimony. It is K&K attorneys who deposed all fact and expert witnesses in the case against Saudi Arabia. It is K&K attorneys that worked diligently for nearly a year to obtain crucial discovery from the United Kingdom's Metropolitan Police Service. And it is K&K attorneys that, over the past two years, identified potential experts, hired them, and obtained six out of the seven expert reports, preparing those experts for depositions and defending their depositions. It is also K&K attorneys who deposed the three experts retained by Saudi Arabia. No other law firm meaningfully participated in that work, which remains active and ongoing. Immediate removal of K&K from the PEC will

only serve to harm 9/11 death and injury plaintiffs before K&K's (likely successful) objections are resolved.

This Court should order a stay to preserve K&K's key role and the existing status quo on the PEC until this Court has had a proper opportunity to review K&K's pending Rule 72(a) objections to the Magistrate Judge's Order.  Counsel at Motley Rice LLP and Cozen O'Connor took no position as to this motion for a stay, while counsel for Defendant Kingdom of Saudi Arabia opposes it.

## BACKGROUND

**A.      K&K has played the central leadership role for two decades in representing thousands of victims and families of the 9/11 terrorist attacks.**

As detailed in the accompanying declaration of Andrew Maloney ("Maloney Decl."), K&K along with its co-counsel represents more than 830 of the estates of those killed on September 11, 2001, as well as over 2,000 immediate family members of those victims and more than 10,000 personal injury clients.  Maloney Decl. ¶ 2.  K&K has been working on behalf of the 9/11 victims for two decades.  In 2004, Judge Casey appointed Mr. Maloney to the PEC and appointed James Kreindler as co-chair of the death and injury PEC alongside Ron Motley.  *Id.* ¶ 5  & Ex 1.[1]

The case against Saudi Arabia began in earnest after Congress passed the Justice Against Sponsors of Terrorism Act in September 2016.  *Id.* ¶ 9.  Plaintiffs alleging death or injury as a result of the 9/11 attacks filed their claims in essentially two groups: plaintiffs represented by K&K are under the umbrella of the *Ashton* Complaint, while plaintiffs represented by Motley Rice are under the Consolidated Amended Complaint that they filed with the Federal Insurance Plaintiffs. *Id.* ¶ 9.  Notwithstanding the essentially bifurcated pleadings, the K&K attorneys have performed

---

[1] For clarity, "PEC" or "Committee" refers only to the Plaintiffs' Executive Committee for Death and Injury Claims, not the Plaintiffs' Executive Committee for Commercial Claims.

nearly all of the substantial work on behalf of all death and injury plaintiffs.  *Id.* ¶¶ 3, 10-18.  For example, in January 2018, Mr. Pounian handled the briefing and argued the opposition to Saudi Arabia's motion to dismiss on behalf of not just the *Ashton* plaintiffs, but all death and injury plaintiffs.  No other attorney argued that motion on behalf of the death and injury plaintiffs.  *Id.* ¶ 11.

With respect to discovery, K&K has almost singlehandedly advanced the factual investigation and development.  K&K has hired former FBI and Joint Terrorism Task Force agents to investigate the support network established by Saudi government officials for the 9/11 hijackers, locate key witnesses, collect information, and identify evidence held by other parties, including the FBI and Saudi Arabia.  *Id.* ¶ 12.  Declarations from agents retained by K&K were submitted before the Court to obtain further discovery.  *Id.* ¶ 12.

Mr. Pounian, Ms. Benett and Mr. Maloney handled over 30 fact depositions.  *Id.* ¶ 15.  During the first six months of 2021, Mr. Pounian and Ms. Benett were lead plaintiffs' counsel for all of the liability depositions of all Saudi government personnel.  *Id.* ¶ 15.  The K&K attorneys also were responsible for locating non-party witnesses, obtaining their statements, and handling their depositions in the case.  *Id.* ¶ 15.  K&K conducted a search for, retained, and obtained reports from six highly qualified experts to offer opinions in the case.  *Id.* ¶ 17.

K&K then defended the depositions of those experts.  *Id.* ¶ 17.  The Motley Rice firm obtained the report of only one expert, and no other firm was involved in the aforementioned investigatory and expert work. K&K has been carrying out this work for over five years.  *Id.* ¶ 18.

K&K developed relationships of trust with the investigators and experts, gained detailed knowledge of their efforts and the facts, and incurred all the expenses for this work.  *Id.* ¶ 18.  No other firm, including Motley Rice, was involved in this work or paid any portion of the expenses

for this work. *Id.* ¶ 9.

**B.** **John Fawcett, a researcher for K&K, confessed to leaking the deposition transcript of Musaed al Jarrah, in violation of the protective orders, and took extraordinary steps to hide and lie about his actions.**

On June 17 and 18, 2021, Ms. Bennett took the deposition of Saudi official Musaed al-Jarrah.  The transcript of Jarrah's deposition (the "Jarrah Transcript") was designated confidential by Saudi Arabia pursuant to the October 3, 2006 protective order entered by Judge Casey in this matter (the "MDL Protective Order").  ECF 1900.  The Jarrah Transcript was also presumptively confidential for 30 days from the date of the deposition pursuant to the November 14, 2018 Privacy Act Order and Protective Order for FBI Documents ("FBI Protective Order," and together with the MDL Protective Order, the "Protective Orders").  ECF 4255.

But on July 15, 2021, journalist Michael Isikoff published an article in Yahoo! News entitled "FBI Tried to Flip Saudi Official in 9/11 Investigation."[2]  The article states that "[a] copy of the [Jarrah] deposition – with some redactions for law-enforcement sensitive material – was obtained exclusively by Yahoo! News."  If true, it was immediately apparent that Yahoo! News could only have obtained even a redacted copy of the Jarrah Transcript through a leak, in violation of the Protective Orders.

Immediately that same day, K&K initiated an internal investigation to determine whether the firm was the source of the leak.   Mr. Maloney convened a conference call with the K&K team working on the 9/11 case (the "K&K 9/11 Team") to discuss this serious leak.  *Id.* ¶ 4; Ex. 2

---

[2] Michael Isikoff, *FBI tried to flip Saudi official in 9/11 investigation*, Yᴀʜᴏᴏ! Nᴇᴡs (July 15, 2021), https://news.yahoo.com/fbi-tried-to-flip-saudi-official-in-911-investigation-090041290.html.

(Maloney, Tr. 278:7-16).[3]   On that July 15 call, the K&K 9/11 team – including Fawcett – all discussed "whether anyone knew how Isikoff had obtained the transcript, whether anybody at K&K had sent the transcript to him or told Mr. Isikoff anything about the Jarrah deposition, the substance of the Jarrah deposition." Ex. 2 (Maloney, Tr. 278:18-21).   The K&K lawyers testified that the takeaway from that K&K 9/11 Team call was that "no one had sent the transcript and no one knew how [Isikoff] got it" – including Fawcett.   Ex. 2 (Maloney, Tr. 216:5-11; 278:22-2; Kreindler, 123:18-21).

K&K nevertheless undertook an internal investigation to further confirm that it was not the source of the leak, beginning with searches of email and documents servers to track any movement of the Jarrah transcript.   Ex. 2 (Maloney, Tr. 278:25-13; Hartney, 185:2-186:10).   On multiple occasions between July 15 and September 27, K&K lawyers asked Fawcett whether he was the source of the leak, or whether he knew anything at all about how the leak could have happened. Mr. Pounian testified that he asked Fawcett if he knew anything about how Mr. Isikoff got the transcript and that he was told no.   He further testified when the Kingdom's counsel followed up:

> Q:     [Fawcett] told you to your face he knew nothing about it?
> A:     That is correct.
> Q:     That was a lie, correct?
> A:     That is correct.

Ex. 2 (Pounian, Tr. 407:8-408:4).   Similarly, Mr. Maloney testified that he asked Fawcett about the leak on several occasions.   For example:

> Q:     Now, your testimony is that you actually specifically sat down with Mr. Fawcett, looked him in the eye, and he told you that he didn't send the transcript to Mr. Isikoff, is that right?
> A:     I don't think I sat down, but I was in his office and I asked him.
> Q:     And he lied to you, is that your testimony?
> A:     We covered this yesterday.

---

[3] References to the transcript of the November 1-2, 2021 hearing are referred to by witness's name and page and line. The transcripts of the hearing are attached as Exhibit 2 to the accompanying Declaration of Andrew Maloney.

Q:      He lied to you?

A:      He did not tell me the truth.

Ex. 2 (Maloney, Tr. 252:2-10).  Fawcett himself testified that during the investigation period, he "prevaricated," "dissembled," and "was not being honest with [the K&K lawyers]" when they asked him in substance whether he was the source of the leak, or whether he knew anything about it.  Ex. 2 (Fawcett, Tr. 486:21-487:7; 488:12).

### C.      K&K submits declarations as directed by the Magistrate Judge as part of her investigation.

On August 12, the Magistrate Judge issued an order requiring K&K to submit declarations confirming certain facts regarding the leak.  ECF 7011.  On August 16, K&K timely submitted declarations from the four lawyers required by the order, testifying in good faith to the facts requested and that they believed that K&K was not the source of the leak.  ECF 7016.  The Magistrate Judge ordered supplemental declarations from K&K and from other parties that would ultimately be due on September 27.  ECF 7082, 7134.

### D.      Fawcett confesses to K&K who immediately advises the Magistrate Judge of the leak and how it occurred.

It was then not until September 27 – the day Fawcett was to provide his signature on the draft declaration claiming innocence he had in his possession for days – that Fawcett confessed. He admitted for the first time to K&K that, despite his earlier denials, he was the source of the leak of the Jarrah Transcript to Mr. Isikoff.  His contemporaneous declarations confess that he is responsible, admitting his liability and exculpating the lawyers.  *See* Ex. 5 (Tr. 11).  Fawcett's September 27 declaration states, among other things, "that no-one from Kreindler & Kreindler even knew about what I had done, even as they were responding to the Court's Orders."  Ex. 8 (Order at 28 (citing Fawcett's declaration – KSAX 62A – which was entered into evidence by

Saudi Arabia at the November 2021 hearing)).[4]  In a later declaration sworn to on September 30, 2021, Fawcett provided additional detail about the specific steps he took to hide the leak from any one at K&K.  *See* Ex. 8 (Order at 30 (citing Fawcett's second declaration – KSAX 59 – which was entered into evidence by Saudi Arabia)).

Fawcett's September 27, 2021 declaration was attached to a three-page letter to the Magistrate Judge explaining how the K&K lawyers learned that day that Fawcett was the source of the leak, and that they were "immediately taking steps to preventing this happening again and [have] denied access to all confidential documents on our system to [Fawcett]."  ECF 7147.  K&K submitted 11 supporting declarations that day, including from each of the lawyers previously identified by the Court, who all specifically testified:  "For the first time today I learned the information set forth in the declaration of John Fawcett."  ECF 7147.

### E.      The Magistrate Judge holds an evidentiary hearing on November 1 and 2, 2021

On October 4, the Magistrate Judge issued an order that she would conduct a "hearing regarding the breach of the protective orders by Kreindler & Kreindler."  Ex. 3; *see also* ECF 7167.  More specifically, the Magistrate Judge wrote on October 21, that "Kreindler & Kreindler investigator John Fawcett admitted that he is responsible for the breach and claimed that he acted on his own for certain reasons unrelated to the September 11 attacks.  Other Kreindler lawyers swore they learned of his actions only on September 27.  The Court has scheduled a hearing to determine whether anyone other Fawcett participated in the breach (including by directing it or helping to cover it up), how the breach was carried out, and whether any party submitted to the Court false or knowingly misleading statements as part of its inquiry.   The Court intends to issue findings of fact and *recommend remedies to District Judge Daniels*."  Ex. 4 at 1 (ECF 7277)

---

[4] Because the Fawcett declaration is not publicly available on the Court's docket, out of an abundance of caution, K&K references only those portions of the declaration discussed publicly.

(emphasis added).

The Magistrate Judge ordered six witnesses to appear, including four K&K attorneys.  She deemed the declarations that she had ordered admitted "as their direct testimony."  Ex. 3 at 2 (ECF 7167).  But she also ordered that "[l]awyers for the Kingdom of Saudi Arabia will be permitted to cross-examine the witnesses but shall not be limited in scope by their direct testimony."  *Id.* Fawcett sought to assert his Fifth Amendment right against self-incrimination at the Hearing, but his application was denied first by the Magistrate Judge and also by this Court as of October 29, 2021.  Ex. 5 (Tr. 48).

The Magistrate Judge denied, without explanation, K&K's request for the parties to exchange proposed exhibits on the Friday prior to the Monday hearing, even though the Magistrate Judge required that the parties provide exhibits to the Court.  Ex. 7 at 3 (ECF 7310).  The Magistrate further ordered that witnesses be sequestered throughout the hearing so that none could hear the testimony of others, ostensibly to avoid coordination of testimony.  *Id.*

At no time prior to the September 21, 2022 Order did the Magistrate Judge suggest that this highly unusual hearing purported to be held under the auspices of Federal Rule of Civil Procedure 37 or any other federal rule.  To the contrary, the Magistrate Judge referred to it as the "the contempt hearing."  *Id.*

The Hearing proceeded for two full days in accordance with these *sui generis* and prejudicial procedures, over K&K's objections.[5]  Nevertheless, the Hearing revealed no new material evidence and revealed no evidence at all that K&K knew of, participated in, suggested, encouraged, condoned, ratified, or covered up any aspect of the leak of the Jarrah Transcript by Fawcett.  The

---

[5] K&K's forthcoming Rule 72(a) objections will detail the ways in which procedures at the Hearing were unfairly prejudicial to K&K.

evidence was all to the contrary. *See, e.g.*, Ex. 2 (Kreindler, Tr. 129:19-130:5; Maloney, Tr. 304:18-305:4; Benett, Tr. 358:13-124; 402:5-8; Pounian, Tr. 413:24-414:6; Fawcett, Tr. 485:17-486:25). Nor did any evidence adduced at the Hearing indicate that K&K – or any of its attorneys – had any reason to suspect that Fawcett had anything to do with the leak prior to September 27, 2021. The evidence was all to the contrary. *See, e.g.*, Ex. 2 (Kreindler, Tr. 129:19-130:5; Maloney, Tr. 304:18-305:4; Benett, Tr. 340:11-342:9; 358:13-124; 402:5-8; Pounian, Tr. 413:24-414:6). Fawcett reaffirmed his declaration testimony that until September 27, 2021, no one other than Mr. Isikoff and Fawcett knew that it was Fawcett who was the source of the leak, and that he was very clear with Ms. Benett and Mr. Pounian in preparing his September 27 declaration "that the first time [any of the K&K lawyers] had heard about it was the day he signed the declaration." Ex. 2 (Fawcett, Tr. 444:13-15). On cross-examination Fawcett testified that prior to September 27 he did not "communicate to any human being . . . that [he] had sent the redacted transcript to Michael Isikoff, attorneys included." Ex. 2 (Fawcett, Tr. 465:11-17).[6]

### F. The Magistrate Judge issues an Opinion & Order on September 21, 2022, "immediately" removing K&K from the PEC.

On September 21, 2022 the Magistrate Judge issued her Order. The Magistrate Judge found that "it became apparent that Fawcett leaked the transcript as part of Kreindler & Kreindler's long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into a settlement, and that he did so with the knowledge or at least tacit consent of lead attorney James Kreindler. Other attorneys at the firm were, at best, willfully blind to the leak as evidenced by their paltry investigation and knowingly misleading statements to the Court." Ex. 8 (Order at 2). The Magistrate Judge concluded that K&K, as a firm, had "willfully breached the Protective Orders"

---

[6] In addition to a lack of evidence that any K&K attorney knew of or participated in the leak, all affirmative evidence corroborates those facts. K&K will detail this evidence in its forthcoming Rule 72(a) objections.

in the case and as a result, she has "lost faith in the firm's ability to comply with court orders or appear before the Court on behalf of all the September 11 victims." *Id.* at 2.

Having conducted her investigation pursuant to her inherent powers, never invoking or referring to Rule 37 in any pre-Hearing order or statement, and referring to the evidentiary hearing as a contempt hearing, the Magistrate Judge suddenly pivoted in the Order to conclude that:

> [Jim] Kreindler, Fawcett and Kreindler & Kreindler violated the Protective Orders. The appropriate remedy under Rule 37(b) is to remove Kreindler & Kreindler from the PECs, to require it to pay the attorneys' fees and costs expended by Saudi Arabia in response to this breach, and to bar Fawcett from further participation in this case.

*Id.* at 34.

## ARGUMENT

**I.      The Court should stay the Magistrate Judge's Order "immediately" removing K&K from the Plaintiffs' Executive Committee, until K&K's Rule 72 objections are resolved.**

The Magistrate Judge's order removing the K&K firm from the PEC was not authorized by Federal Rule of Civil Procedure 37 and immediately upturned a nearly twenty-year status quo of K&K attorneys leading this multidistrict litigation on behalf of the 9/11 families as critical members of the PEC.  This Court should stay the Magistrate Judge's order – preserving the status quo – until K&K's Rule 72 objections are resolved.

To stay a magistrate judge's order pending Rule 72 objections, courts apply the four-factor test used for a stay pending appeal.  *See, e.g., Pablovich v. Rooms to Go Louisiana Corp.*, 2021 WL 928030, at *2 (E.D. La. Mar. 11, 2021); *Alvarez v. Larose*, 2020 WL 5632659, at *2 (S.D. Cal. Sept. 21, 2020); *LEG Q LLC v. RSR Corp.*, 2017 WL 4222690, at *2 (N.D. Tex. Sept. 22, 2017); *accord In re NTL Inc. Sec. Litig.*, 2006 WL 1167848, at *2 (S.D.N.Y. May 3, 2006).

The four factors are:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009); *Hassoun v. Searls*, 968 F.3d 190, 195 (2d Cir. 2020) (applying the *Nken* factors).

The first and second factors – likelihood of success on the merits and irreparable injury absent a stay – are "the most critical." *Nken*, 556 U.S. at 434. But "the degree to which a factor must be present varies with the strength of the other factors." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007). In other words, "more of one factor excuses less of the other." *Id.* (alteration adopted; quotation marks omitted). A court ultimately should issue a stay "when it is necessary to preserve the status quo pending the appeal." *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 565 (2d Cir. 1991).[7]

Interpretations of the Federal Rules of Civil Procedure are reviewed de novo. *Williams v. Beemiller, Inc.*, 527 F.3d 259, 264 (2d Cir. 2008). Where, as here, the text of a federal rule is clear and unambiguous, the analysis begins and ends with the plain text. *Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 498 U.S. 533, 540-41 (1991); *United States v. Zapatero*, 961 F.3d 123, 127 (2d Cir. 2020).

---

[7] Factors three and four – whether a stay will substantially injure other parties and where the public interest lies – heavily favor K&K. Given K&K's central role on the PEC for nearly two decades, maintaining the status quo until K&K's Rule 72 objections are resolved will serve the public interest by promoting a more efficient resolution of this matter through avoiding significant disruptions to the internal structure of the PEC. As detailed in section A above and section I.B below, the only remaining members of the PEC do not have the necessary depth of knowledge and experience with the facts and experts on their own. No party will be "substantially injured" by maintaining a decades-long status quo until K&K's Rule 72 objections are resolved. *See Nken*, 556 U.S. at 434.

### A.    Rule 37(b) does not authorize sanctions against a law firm.

Despite every indication that the Magistrate Judge scheduled an "evidentiary hearing" pursuant to the court's inherent powers, the Magistrate Judge without notice issued the sanctions order pursuant to Rule 37(b), "immediately" stripping K&K of its leadership position on the PEC after nearly 20 years.  Ex. 8 (Order at 36 n.15 & 64).  The Magistrate Judge expressly declined to invoke the Court's inherent powers as the basis to impose sanctions, relying on Rule 37(b) as the sole legal basis for the sanctions imposed against K&K.  *Id.* (Order at 36 n.15).

Rule 37(b), however, does not authorize a court to issue sanctions against a law firm.  As the text of the rule makes clear, only the misconduct of "a party" or "a party's" corporate official is sanctionable under the provision.  Fed. R. Civ. P. 37(b)(2)(A).  This matter does not involve any alleged misconduct by a party or its corporate officials.  Neither the text of Rule 37(b) – nor any other provision of the rule – even mentions a law firm.  The exclusion of law-firm sanctions under Rule 37(b) stands in stark contrast to Rule 11(c), which expressly authorizes sanctions against "any attorney, law firm, or party" for impermissible documents submitted to the court.   Both longstanding Supreme Court and Second Circuit precedent, and recent caselaw of other federal courts of appeals, reinforce this conclusion.  In sanctioning K&K under Rule 37(b), the Magistrate Judge overstepped the court's authority under the Federal Rules of Civil Procedure and issued an order "contrary to law."  *See* Fed. R. Civ. P. 72(a).

Although the Second Circuit has yet to address whether a court may sanction a law firm under Rule 37(b), the Court decision in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988), is instructive.  There, the Court was asked to resolve whether then Rule 37(c), which provided sanctions for impermissibly failing to admit the truth of matters contained in a request for admission, authorized such sanctions against a party's attorney.  Rejecting the suggestion that the Court should "construe Rule 37(c) broadly in order to fill a so-called 'gap' in

the federal rules," the Court found that by its express terms, Rule 37(c) only applies to "a party" – not a party's attorney. *Id.* at 1013-14.[8] The Court, moreover, concluded that it "must infer from the other subsections of Rule 37," which "expressly provid[ed] for the imposition of sanctions against a party's attorney," "that the drafters intended to omit attorneys from the coverage of subsection (c)." *Id.* at 1014. The Court therefore held that then Rule 37(c) did not authorize sanctions against a party's attorney. *Id.* at 1013-14.

So too here. The express terms of Rule 37(b) simply do not authorize nonmonetary sanctions against a law firm where the firm is the purported offender. The text of the rule is clear:

> If a *party* or a *party's* officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.

Fed. R. Civ. P. 37(b)(2)(A) (emphasis added). In other words, a court may issue sanctions under Rule 37(b) only where a party (*i.e.*, a plaintiff or defendant) or a party's corporate official violates a discovery order. *Cf.* Wright & Miller, Fed. Prac. & Proc. Civ. § 2290 (3d ed.) ("Since [Rule 37(c)] specifically authorizes an award only against the party, it does not permit sanctions against the party's attorney.").

No such violation occurred here. In this action, neither a plaintiff nor a plaintiff's corporate official has violated a discovery order. The allegations are quite the opposite. According to the

---

[8] The text of then Rule 37(c) provided in relevant part:

> If *a party* fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the court for an order requiring *the other party* to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

Fed. R. Civ. P. 37(c) (1988) (emphasis added).

Magistrate Judge,  K&K and one of its consultants breached protective orders to purportedly "embarrass Saudi Arabia and gain an advantage in this case."  Ex. 8 (Order at 64).  Based on the evidence presented at the hearing, that finding was wrong for a myriad of reasons, which K&K will detail in its forthcoming objections.  But even assuming a law firm breached the terms of a discovery order, a law firm's conduct does not violate the express terms of Rule 37(b) unless the law firm is "a party" to the action.

The conclusion that a law firm's conduct does not fall within Rule 37(b) and that, accordingly, Rule 37(b) does not authorize broad sanctions against a law firm is only reinforced by other provisions of Rule 37, which authorize *monetary* sanctions against *individual* attorneys advising the disobedient *party*.  If a court finds that a party or its corporate official violated a discovery order under Rule 37(b)(2)(A), Rule 37(b)(2)(C) authorizes the court to impose monetary sanctions on "the *disobedient party*, the *attorney* advising that party, or both" by requiring payment of reasonable expenses caused by the party's failure to obey a discovery order.  Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).  Likewise, Rule 37(d)(3) authorizes the court to require "the *party failing to act*, the *attorney* advising that party, or both to pay the reasonable expenses*" caused by the party's failure to engage in discovery.  Fed. R. Civ. P. 37(d)(3) (emphasis added).  And, if opposing counsel successfully moves to compel discovery, Rule 37(a)(5)(A) authorizes a court to "require the *party* or *deponent* whose conduct necessitated the motion, the *party* or *attorney* advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion."  Fed. R. Civ. P. 37(a)(5)(A) (emphasis added).  Accordingly, it is clear that Rule 37 authorizes – at most – *monetary* sanctions against the *individual* attorney advising the disobedient *party*.  And even the monetary sanction against an individual is only derivative of the wrongdoing of a party.

The drafter's decision to limit Rule 37's scope to the conduct of a party was intentional, as other Federal Rules of Civil Procedure clearly authorize sanctions against law firms. An earlier version of Rule 11, which concerned representations to a court by "the person who signed" an offending document submitted to the court, similarly made no mention of a party's law firm. In 1993, however, Rule 11 was amended to expressly allow sanctions against law firms:

> [T]he court may impose an appropriate sanction on any *attorney*, *law firm*, or *party* that violated the rule or is responsible for the violation. Absent exceptional circumstances, a *law firm must be held jointly responsible for a violation committed by its partner, associate, or employee*.

Fed. R. Civ. P. 11(c)(1); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. That same year, the drafters amended Rule 37 but did not similarly authorize sanctions against a law firm. *See generally* Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment. Then and now, Rule 37 makes no mention of sanctions against a law firm, let alone sanctions against a law firm based on the actions of an individual attorney or employee. *Cf. Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) ("the interpretive canon, expressio unius est exclusio alterius, expressing one item of an associated group or series excludes another left unmentioned," applies when "it is fair to suppose that [drafters] considered the unnamed possibility and meant to say no to it." (quotation marks omitted; alteration adopted)).

The Sixth Circuit reached this very conclusion when faced with an identical issue of statutory interpretation of Rule 37. In *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 373 (6th Cir. 2022), the lower court sanctioned a law firm pursuant to Rule 37(d) for its failure to produce documents, among other discovery abuses. On appeal, the Sixth Circuit reversed. In a decision in lockstep with the above analysis, the Sixth Circuit gave dispositive weight to the fact that "Rule 37 makes no mention of a party's law firm but explicitly lists a party and a party's attorney." *Id.* at 383. It therefore concluded that Rule 37(d) simply "does not allow for sanctions

16

against a law firm, unless it is a party." *Id.*; *see also Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 122 (1989) (holding that an earlier version of Rule 11, which only authorized sanctions against "the person who signed" an offending document, did not permit sanctions against an attorney's law firm).

The Magistrate Judge's sanctions Order cites no caselaw to the contrary. *See* Ex. 8 (Order at 36 & n.14, 44). In *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99, 101 (2d Cir. 1997), the court upheld a small *monetary sanction* entered against an *individual attorney* for "his role in [the company president's] failure to appear for deposition." *Cf.* Fed. R. Civ. P. 37(b)(2)(C) (authorizing monetary sanctions against "the attorney advising" the disobedient party). In *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 147-48 & n.10 (2d Cir. 2010), the court imposed sanctions on *a party* for the actions of one of its bookkeepers. And in *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012), the court imposed *monetary* sanctions pursuant to the expenses provision of Rule 37(b)(2)(C) against an attorney and a law firm (which the firm failed to contest); *see also Markus v. Rozhkov*, 615 B.R. 679, 701 (S.D.N.Y. 2020) (imposing monetary sanction against an individual attorney). Nowhere do these cases discuss – let alone authorize – *non-monetary* sanctions against an entire *law firm*.

In cases such as this one, the Second Circuit has been clear that, when alleged discovery abuses "do not clearly violate" Rule 37, a court should issue any sanctions under its inherent authority. *See Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 236 (2d Cir. 2020). Indeed, Saudi Arabia itself argued to the Magistrate Judge she should invoke "authority of sufficient breadth" – *i.e.*, the court's inherent powers – to impose wide-ranging sanctions. *See* Saudi Arabia's Proposed Findings of Fact and Conclusions of Law at 90, ECF 7389.

The Magistrate Judge's decision to proceed under Rule 37 is no trivial matter; it directly affects K&K's due process rights. To award sanctions under the court's inherent powers, the court must find "*clear and convincing* evidence of *bad faith*" by the offender. *Yukos*, 977 F.3d at 235 (emphasis added). That heightened standard is significant here, as only a few examples show. As an initial matter, the Magistrate Judge's Order imposed sweeping sanctions against the entire K&K law firm, barring all K&K attorneys from positions on the PEC, without finding any clear and convincing evidence that each attorney operated in bad faith. In fact, the Order itself does not use the phrases "clear and convincing" or "bad faith" once. *Cf. Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) ("Imposition of sanctions under a court's inherent powers requires a specific finding that *an attorney* acted in bad faith. . . .  A finding of bad faith . . . must be supported by *a high degree of specificity* in the factual findings." (emphasis added)). And as a practical matter, the Order overlooks the fact that, in the Court's order establishing the PEC, former Judge Richard C. Casey appointed individual attorneys – not law firms – to the Committee. *See* Ex. 1 ¶¶ 4-7 (ECF 248). By erroneously invoking Rule 37(b)(2)(A), the Magistrate Judge did not make the heightened – and specific – finding required as to each K&K attorney.

Separate from the unwarranted breadth of the sanctions, the Order fails to engage with evidence this Court has suggested is significant to imposing any sanctions against K&K attorneys at all. In particular, the Magistrate Judge disregarded Fawcett's confessions that he acted on his own in sending the transcript to a reporter and then took precautions and lied to K&K to hide his act. At the hearing, Fawcett testified that he "certainly prevaricated and dissembled and avoided letting [the K&K attorneys] know" and that "I was not being honest with [the K&K attorneys]." Ex. 2 (Fawcett, Tr. 486:24-25; 488:12)  Despite the significance of this testimony, the Magistrate

Judge's Order does not credit – or even discuss – Fawcett's confessions.  The Magistrate Judge, moreover, disregarded proof of Fawcett's personal motives for the leak.  Fawcett averred in his September 27 and September 30, 2021 declarations that he decided to leak the testimony because of the revelations at Jarrah's deposition that "he was a child pornographer," along with the facts that Jarrah was living in Morocco, Fawcett had knowledge about child abuse in Morocco stemming from his prior international aid work, and Fawcett adopted his two children in Morocco.  Ex. 8 (Order at 28).  The Magistrate Judge had no contradictory testimony to disregard this declaration testimony and she even found that "Fawcett was unwilling to sign a perjurious declaration," which only bolsters his credibility.  *Id.* (Order at 13).  The Magistrate Judge also found without any basis that K&K attorneys "fabricated" Fawcett's motive and that Fawcett's declaration was the "invention" of two K&K lawyers.  *Id.* (Order at 42).  The Magistrate Judge disregarded Fawcett's testimony that the words in his declaration about his motives for releasing the transcript were his own and that he approved them.  *See* Ex. 2 (Fawcett, Tr. 467).

This Court, by contrast, previously expressed the view that Fawcett's confession merited not insignificant weight.  At a hearing addressing Fawcett's right to invoke his Fifth Amendment privilege, the Court made clear that Fawcett "handled [the violation of the protective order] as if this was the most serious conduct that he had ever engaged in in his life in terms of hiding it from the law firm, in terms of hiding it from the Court, in terms of how he destroyed the evidence."  Ex. 5 (Tr. ¶ 9).  The Court further stated that "it would be quite awkward for Magistrate Judge Netburn to say I'm going to disregard the declarations so therefore there is no evidence in this case whatsoever that supports the lawyers' assertions that they didn't know."  *Id.*(Tr. ¶ 23).

In short, as even this one example shows, the due process rights of K&K are heavily implicated by the Magistrate Judge's decision to impose sanctions under Rule 37(b), rather than address the heightened finding required under a court's inherent powers.

*   *   *

At bottom, the Magistrate Judge issued sanctions against the entire K&K firm without authority under Rule 37(b)(2)(A).  Because the Order was accordingly "contrary to law," Fed. R. Civ. P. 72(a), K&K is likely to succeed on the merits of its Rule 72(a) objection, *Nken*, 556 U.S. at 434.

### B.   The immediate nonmonetary sanction has upended a decades-long status quo, threatening irreparable harm to plaintiffs, before K&K's objections are resolved.

By "immediately" removing K&K from the PEC after nearly two decades at the helm, the Magistrate Judge upended a longstanding status quo in this massive and complex multidistrict litigation arising from the terrorist attacks on September 11, 2001.  *See* Ex. 8 (Order at 65).  This sweeping reformulation of the PEC—before the resolution of K&K's pending Rule 72(a) objections—threatens immediate and irreparable injury to the 9/11 death and injury plaintiffs.

K&K (along with co-counsel in some cases) represents more than 830 of the estates of those killed on September 11, 2001, as well as over 2,000 of their immediate surviving family members and more than 10,000 victims who suffered personal injury.  *See* Maloney Decl. ¶ 2. Since this Court's creation of the PEC in June 2004, James Kreindler of K&K and Ronald Motley (and after Mr. Motley's death, other partners of Motley Rice LLC) have served as the PEC's Co-Chairs.  *Id.* ¶ 6; ECF No. 248-2.  Despite turnover in the membership of the PEC over the years, which has included various K&K attorneys, *see* ECF No. 248-2, the shared leadership structure between K&K and Motely Rice has remained unchanged.  Maloney Decl. ¶ 7.

K&K's already outsized role on the PEC has expanded sharply over the past six years. After Congress passed the Justice Against Sponsors of Terrorism Act ("JASTA") in September 2016 and litigation commenced against Defendant Kingdom of Saudi Arabia, K&K effectively led all aspects of the litigation against Saudi Arabia on its own, despite the PEC's shared leadership structure remaining nominally in place.  *See id.* ¶¶ 3, 10-18.

K&K's attorneys have handled *nearly every* aspect of this complex case, including dispositive motions, investigation, discovery motions, depositions, witness interviews and statements, and experts.  *Id.* ¶ 3.  These attorneys work on the case against Saudi Arabia for death and injury plaintiffs on a daily, full-time basis.  *Id.*

As the leader of the litigation against Saudi Arabia, the disproportionate workload undertaken by K&K has been significant.  In addition to the multitude of daily tasks required to prosecute such a far-reaching and complex case against a foreign sovereign, K&K attorneys have:

- directed a wide-ranging investigation in the United States and around the world (carried out by former FBI and Joint Terrorism Task Force agents) that located and helped obtain key evidence and witness testimony, both domestically and internationally;

- identified key non-party witnesses and secured their necessary testimony;

- argued *all* of the substantive and discovery motions before this Court and the Magistrate Judge;

- conducted *all* of the non-party witness depositions;

- handled *all* of the depositions of Saudi government witnesses over a six-month period;

- located, hired, and obtained reports from six key experts with relevant experience in national security, terrorism, and other matters, and defended their depositions;

- deposed each of the three experts hired by Saudi Arabia.

*Id.* ¶¶ 10-18.  The work of K&K is continuing at this time.  *Id.* ¶ 3.  The wealth of knowledge and experience assembled by K&K over the past five years of litigation alone – along with its ready

access to the key experts, investigators, and proof – is indispensable to the proper representation of the death and injury plaintiffs.  With the except of the retention of a single expert by Motley Rice, *no other firm* representing death and injury plaintiffs was involved in the aforementioned investigatory and expert work, and motion practice.  *Id.* ¶¶ 17-18.

Nor is there any reason that K&K's removal from the PEC must occur "immediately."  The leak forming the primary basis for the Magistrate Judge's Order occurred more than fifteen months ago, and Fawcett was outed as the perpetrator more than a year ago.  Throughout that time, K&K attorneys have continued to diligently prosecute this case, expending thousands of hours, and achieving significant milestones, including the completion of the expert reports noted above.  The Order identifies no harm that would come from K&K continuing to serve on the PEC pending its Rule 72(a) objections.  To the contrary, the only harm that would occur is to the plaintiff victims in this matter, who would be deprived of the vigorous leadership and tireless effects K&K has exhibited on their behalf.

The Magistrate Judge's Order unnecessarily undermines the status quo and immediately threatens the ability of K&K and its attorneys to prosecute this case on behalf of death and injury plaintiffs—not to mention causes immediate significant harm to the reputation of K&K and its attorneys.  *See* Manual for Complex Litigation § 10.154 (4th ed. 2004) ("[Removal from a leadership position] may disrupt the litigation, may cause *significant harm to the client's case and the reputation of the attorney or law firm*, and can conflict with a party's right to counsel of its choosing." (emphasis added)).  And, adding insult to injury, such harm was not authorized by Rule 37(b).

**CONCLUSION**

Because the Magistrate Judge was not authorized under Rule 37(b) to impose nonmonetary sanctions against a law firm, K&K is likely to succeed on the merits of its pending Rule 72(a) objections. *Nken*, 556 U.S. at 434. Because the Magistrate Judge "immediately" imposed such sanctions, failure "to preserve the status quo pending" resolution of K&K Rule 72(a) objections will needlessly risk irreparable harm to the prosecution of Saudi Arabia and K&K's reputation. *Kidder*, 925 F.2d at 565. This Court should issue a stay the removal of K&K from the PEC until it has had an opportunity to review and resolve K&K's pending Rule 72 objections due October 21, 2022.

Dated: October 4, 2022
      New York, NY

                                           Respectfully submitted,

                                       */s/ Edward M. Spiro*

Emily Kirsch                              Edward M. Spiro
Paul Niehaus                            Morvillo Abramowitz Gran
Kirsch & Niehaus PLLC                 Iason & Anello P.C.
950 Third Avenue, 19th floor          565 Fifth Avenue
New York, NY 10022                  New York, NY 10017
(212) 832-0170                         (212) 856-9600
emily.kirsch@kirschniehaus.com       espiro@maglaw.com

23