# Exhibit 2

LB1H9111

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In re Terrorist Attacks on          03 MD 1570 (GBD)(SN)
     September 11, 2001
 4                                       Hearing
     ------------------------------x
 5                                       New York, N.Y.
                                         November 1, 2021
 6                                       10:10 a.m.

 7   Before:

 8                     HON. SARAH NETBURN,

 9                                       U.S. Magistrate Judge

10                     APPEARANCES

11   LANKLER SIFFERT & WOHL LLP
          Attorneys for Nonparty Fawcett
12   BY:  MICHAEL GERBER
          HELEN GREDD
13        GABRIELLE FRIEDMAN

14   KIRSCH & NIEHAUS PLLC
          Attorneys for Kreindler & Kreindler and all witnesses
15   BY:  EMILY KIRSCH
          LISA FREY
16        -and-
     KREINDLER & KREINDLER LLP
17   BY:  MEGAN WOLFE BENETT
          -and-
18   EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
     BY:  HAL R. LIEBERMAN
19

20   KELLOGG, HUBER, HANSEN, TODD FIGEL & FREDERICK, PLLC
          Attorneys for Defendant Kingdom of Saudi Arabia
21   BY:  MICHAEL KELLOG
          MARK C. HANSEN
22        GREGORY G. RAPAWY
          ANDREW C. SHEN
23        CHRISTOPHER YOUNG

24

25
```

LB1H9111

1              (Pages 2 through 11 SEALED)

2              (In open court)

3              THE DEPUTY CLERK:  Your Honor, this is in the matter

4   of In Re Terrorist Attacks on September 11, 2001, case number

5   is 03MD1570.

6              Starting with counsel for Mr. Fawcett, would you

7   please state your appearance for the record.

8              MR. GERBER:  Good morning, your Honor.  Michael

9   Gerber, Helen Gredd, and Gabrielle Friedman, from Lankler

10  Siffert & Wohl on behalf of Mr. Fawcett.

11             THE COURT:  Good morning.

12             THE DEPUTY CLERK:  Counsel for Kreindler & Kreindler.

13             MS. KIRSCH:  Emily Kirsch from Kirsch & Niehaus, for

14  Kreindler & Kreindler and the witnesses.  With me is Ms. Frey.

15  This is Ms. Benett, of course, from Kreindler & Kreindler, and

16  Hal Lieberman, who is cocounsel with me on this matter from the

17  firm of Emery Celli and also consulting on ethics issues.

18             THE COURT:  OK.

19             THE DEPUTY CLERK:  Thank you.

20             For the Kingdom of Saudi Arabia.

21             MR. KELLOGG:  Good morning, your Honor.  Michael

22  Kellogg, on behalf of Saudi Arabia.  With me are Mark Hansen,

23  Gregory Rapawy, Andrew Shen, and Christopher Young.

24             THE COURT:  Thank you.

25             Let me begin by acknowledging Mr. Lieberman's

1   presence.  I didn't realize he would be here.  I was a partner

2   at the law firm of Emery Celli Brinckerhoff Abady.  I left the

3   firm in 2010.  Mr. Lieberman was not a partner of the firm at

4   that time, although our firm did consult with him on ethics

5   matters during the course of my time at that firm.  I don't see

6   any issue, but I did want to raise that since it was news to

7   me.

8          Anyone wish to be heard?  Anyone have any questions?

9          MR. GERBER:  No, your Honor.

10         THE COURT:  All right.  So good morning to everybody.

11         We're here for the hearing on the issue related to the

12  breach of the protective order and are going to take testimony

13  this morning.  As I ordered previously, the declarations that

14  were submitted in connection with this breach issue have

15  already been admitted as the direct testimony, and so we will

16  begin with cross-examination, and then we'll have an

17  opportunity for redirect.

18         I think we also discussed that we were not going to

19  have any opening arguments.  I'll allow post-hearing briefing.

20  We can discuss schedules for that when we conclude with our

21  proceedings.  So I think, unless there's any reason to delay, I

22  will turn to the Kingdom and ask which witness they anticipate

23  calling first.

24         MR. HANSEN:  Good morning, your Honor.  Mark Hansen

25  for defendant, the Kingdom.  We'd like to proceed with the

LB1H9111

1    examination of James Kreindler.

2              THE COURT:  OK.  Can I ask Ms. Kirsch or Ms. Benett if

3    you could bring Mr. Kreindler, just let him know.

4              MS. BENETT:  I'll bring him in.

5              THE COURT:  That would be great.

6              While Ms. Benett is getting the witness, we took the

7    biggest courtroom we could find given all of the

8    COVID-compliance issues.  We don't have a HEPA filter for the

9    witness here, so my understanding of the court's protocol under

10   our COVID Response Team is that the witness needs to keep his

11   or her mask on during the proceeding.  So I think, Mr. Hansen,

12   I think the protocol for the court -- I apologize.  I wish it

13   were otherwise, but I don't want to be in violation of a court

14   order.  So I think we need to all have our masks on, given that

15   this room is a little bit smaller than what we would like and

16   given that we don't have a HEPA filter here for the witness.

17             MR. HANSEN:  Of course, your Honor.

18             THE COURT:  Thank you.

19             MR. HANSEN:  Your Honor, with your permission, we've

20   provided an exhibit binder to the witness on the witness stand

21   and also to counsel.

22             THE COURT:  OK.

23             MR. HANSEN:  Those are the exhibits we may be using in

24   today's examination.

25             THE COURT:  Thank you.

LB1H9111

1           MS. KIRSCH:  Your Honor, just a quick housekeeping

2    matter, if I may?

3           THE COURT:  Yes.

4           MS. KIRSCH:  As your Honor knows, we had requested a

5    copy of these exhibits at the same time that they were

6    delivered to the Court on Friday, and counsel did not

7    accommodate our request, and then they were delivered just as

8    we were in the robing room a moment ago.  So in the moment I

9    had to flip through them, it appears that a lot of them are

10   quite irrelevant and go way beyond the scope of this hearing.

11   I guess I'll apologize in advance that I'll need a moment to

12   look at each document as they try to introduce them, but I do

13   expect we will have many objections to the relevance and scope

14   of these documents.

15          THE COURT:  My hope is that we can proceed with this

16   hearing as smoothly as possible, with giving everybody every

17   opportunity to be heard.  Obviously, this is a bench hearing,

18   and so objections as to relevance may also be better raised in

19   post-trial briefings, but, certainly, you have every

20   opportunity to be heard.

21          MS. KIRSCH:  Thank you, your Honor.

22          The issue really is the incredible sweeping scope that

23   this is, as we understand it from your October 4 order and

24   subsequent orders, that we are investigating this breach to

25   understand whether any of the other Kreindler attorneys, or

LB1H9111

1    anybody else, was involved with Mr. Fawcett's actions or had

2    knowledge.  So a lot of these documents, which date back to

3    2002, 2003, we will have objections that it's not in any way

4    related to the issues of this hearing.

5              THE COURT:  Thank you.

6              Mr. Kreindler.

7              THE WITNESS:  Yes.

8              THE COURT:  Come forward.

9              Good morning, Mr. Kreindler.

10             THE WITNESS:  Good morning, your Honor.

11             THE COURT:  I was explaining to everyone before you

12   arrived that I'm afraid you'll have to keep your mask on during

13   the proceeding.

14             THE WITNESS:  OK.  OK.

15             THE COURT:  Ms. Slusher, would you swear in the

16   witness.

17   JAMES PAUL KREINDLER,

18        called as a witness by the Defendant,

19        having been duly sworn, testified as follows:

20             THE WITNESS:  James Paul Kreindler.

21             THE COURT:  Thank you.

22             You may be seated.

23             THE WITNESS:  Thank you.

24             THE COURT:  Counsel, you may begin.

25             MR. HANSEN:  Thank you, your Honor.

LB1H9111                     Kreindler - Cross

1   CROSS-EXAMINATION

2   BY MR. HANSEN:

3   Q.  Mr. Kreindler, good morning.

4   A.  Good morning.

5   Q.  You agree that court orders are entitled to respect, don't

6   you?

7   A.  Yes.

8   Q.  You agree that deliberate violations of court orders is a

9   serious matter, don't you?

10  A.  Yes.

11  Q.  So serious that it may result in criminal sanctions?

12  A.  Yes.

13  Q.  We're here today because of the deliberate violation of two

14  court orders, are we not?

15          MS. KIRSCH:  Objection, your Honor.  I'm not sure that

16  there is a violation of the FBI order, so I object to the

17  question.

18          THE COURT:  I believe that the -- why don't we proceed

19  with respect to the MDL protective order, which I think

20  everybody admits has been breached.

21          MR. HANSEN:  Your Honor, in fairness, there's no

22  question that the MDL -- the MDL and the FBI had been breached

23  because the FBI had 30 days after the receipt of the transcript

24  to object, and until such time has passed, the entire

25  transcript is protected by the FBI protective order.  So I

LB1H9111                      Kreindler - Cross

1    believe it's --

2              THE COURT:  That's true.  That's true.  Proceed.

3    BY MR. HANSEN:

4    Q.  So do you want my question back, Mr. Kreindler?

5    A.  Your question was, do I agree that two court orders were

6    breached?

7    Q.  OK.

8    A.  The first court order was breached.  I did not recall the

9    30-day window you referred to, but in that's the case, then,

10   yes, both were.

11   Q.  Wait a second, Mr. Kreindler, you're cochairman of the

12   plaintiffs' executive committee in this MDL case, aren't you?

13   A.  Yes.

14   Q.  And you are telling us even today, as we sit here going

15   through serious violations of protective orders, you're not

16   even familiar with the terms of the FBI protective order?

17   A.  I'm very familiar with the terms.

18   Q.  SO you're not familiar with the 30-day window for the FBI

19   to object?

20   A.  I did not remember it now, whether it was 30 days or a

21   different period.  My focus was on the breach of the first

22   court order.

23   Q.  You're telling us you didn't even read the FBI protective

24   order before coming here to testify today?

25   A.  I read it when I signed it, but I did not read it recently.

LB1H9111                        Kreindler – Cross

1    Q.  So, Mr. Kreindler, continuing on, your firm has admitted

2    that these violations of two court orders were committed by

3    Kreindler & Kreindler, correct?

4    A.  Yes.

5                (Continued on next page)

LB189112                    Kreindler – Cross

1  BY MR. HANSEN:

2  Q.  Your researcher, John Fawcett, leaked a confidential

3  transcript to Michael Isikoff of Politico, according to

4  Kreindler & Kreindler, correct?

5  A.  I don't think Michael Isikoff was in Politico.

6  Q.  You're absolutely right.  I apologize.  Bad question.  Let

7  me rephrase that.

8          Your firm Kreindler & Kreindler has told the court

9  that your researcher, John Fawcett, leaked a confidential

10  transcript to Michael Isikoff of Yahoo?

11  A.  Yes.

12  Q.  Isn't it true that Mr. Fawcett did that because you wanted

13  him to do that?

14  A.  No, that is not true at all.

15  Q.  So, let's get into some basics about you and your firm and

16  how we came to be here today, Mr. Kreindler.

17          You are the partner in charge of the 9/11 case at

18  Kreindler & Kreindler?

19  A.  Yes.

20  Q.  And I believe we mentioned a minute ago you are the co-lead

21  of the Plaintiffs' Executive Committee in this case?

22  A.  Yes.

23  Q.  You have a team of Kreindler & Kreindler professionals

24  working with you?

25  A.  Yes.

1    Q.   That includes Mr. Fawcett?

2    A.   Yes.

3    Q.   The team is about ten or so in size?

4    A.   No.  I could tell you the members of the team.

5    Q.   Sure.  Please do.

6    A.   So, Andrew Maloney, who we all call Duke, has been working

7    on the case for many years.  Steve Pounian joined the team when

8    JASTA was passed.  And about the same time Megan Benett has

9    also joined the team.  And John has been working on 9/11 for

10   almost 20 years, John Fawcett.

11   Q.   Was Ms. or Mr. Simpson also part of your team?

12   A.   Recently Gavin Simpson, yes, in the last couple of months.

13   Q.   Ms. or Mr. Pagan?

14   A.   She is a paralegal that we asked to help out, but fairly

15   recently.

16   Q.   Mr. or Ms. Sienski?

17   A.   Yes.  Julia is client liaison.

18   Q.   And Mr. or Ms. Ranieri?

19   A.   Lisa Ranieri has been a secretary to the firm for probably

20   three decades, and is Steve Pounian's secretary.

21   Q.   So, the team members on the 9/11 case all worked for you,

22   didn't they, Mr. Kreindler?

23   A.   Well, that's not how I'd put it.  For example, Lisa is

24   Steve's secretary, so when Steve needed secretarial work he

25   would ask his secretary to do it.  I had very few occasions to

LB189112                     Kreindler – Cross

1    ask Steve's secretary to do something.  I might ask my

2    secretary.

3    Q.  Good qualification.  Putting aside assistants, isn't it

4    true that all of the professionals at Kreindler & Kreindler

5    working on the 9/11 case were under your supervision?

6    A.  Yes.

7    Q.  And you are responsible for supervising that team, aren't

8    you?

9    A.  Yes.

10   Q.  Is it fair to say you set an example for your team?

11   A.  Yes.

12   Q.  Is it fair to say they watch what you say and do?

13   A.  I hope so.

14   Q.  And they follow your lead?

15   A.  I believe so.

16   Q.  So, Mr. Kreindler, you believe there is a lot of money at

17   stake in this case, don't you?

18   A.  There is, undoubtedly.

19   Q.  And your firm represents your clients on a contingency

20   basis, isn't that true?

21   A.  Yes.

22   Q.  And you have told the press in one of your many press

23   statements that you believe this case is -- and I am quoting

24   here -- the biggest case ever.  Do you recall saying that?

25   A.  Yes.

LB189112                    Kreindler – Cross

1   Q.  And you would like to have a settlement in this case,

2   wouldn't you?

3   A.  Yes.

4   Q.  Because a settlement would produce a substantial amount of

5   money for your clients, but also for the lawyers working on the

6   case, correct?

7   A.  It would.

8   Q.  How much of any settlement would the legal team get in

9   total, roughly, a third?

10  A.  No.  Our retainer fees are significantly less than a third.

11  They are 15 percent retainer fees.  Many of the cases, other

12  local lawyers who brought the cases to us will receive a

13  portion of that 15 percent.

14  Q.  We agree, do we not, there could be a lot of money at stake

15  for Kreindler & Kreindler.

16      MS. KIRSCH:  I would like to put an objection here.

17  We are a little bit away from the scope, but also any more

18  specific terms of retainer agreements should be subject to

19  privilege.  So I would just caution the witness not to give too

20  much detail into those arrangements.

21      MR. HANSEN:  Your Honor, I am moving on.

22      THE COURT:  Very well.

23  BY MR. HANSEN:

24  Q.  Just to conclude on that topic, Mr. Kreindler, we can all

25  agree there could be a lot of money in this for Kreindler &

1   Kreindler, right?

2   A.  For all of the lawyers, sure.

3   Q.  So, Mr. Kreindler, you have been making public statements

4   about this case for years to put settlement pressure on the

5   defendants, haven't you?

6       MS. KIRSCH:  I am going to object one more time.  We

7   can stipulate right here and now that Mr. Kreindler talks to

8   the press.  That's not related to whether there would be any

9   motive or opportunity or anything of the kind to violate a

10  court order.

11      So if we can just cut through a lot of this, we can

12  stipulate Mr. Kreindler talks to the press about the case.

13  It's a matter of great public importance.  He is the face of

14  the case.  That happens.  That has nothing to do with why

15  somebody would or would not violate the court order.  It's not

16  relevant.

17      MR. HANSEN:  It has everything to do with the case.

18  As I believe we will demonstrate, Mr. Kreindler's press

19  strategy is exactly the reason why we have protective order

20  violations, and I expect to be able to demonstrate that.  It's

21  cross-examination, your Honor.

22      THE COURT:  The objection is overruled.  I think that

23  this goes to motive as well as modus operandi.

24      MR. HANSEN:  I am not sure there was an answer to my

25  last question.  Can the reporter let me know if there was an

LB189112                    Kreindler – Cross

1    answer and read it back, please.

2             (Record read)

3    A.  I would say to put pressure on the defendant Saudi Arabia,

4    yes.  The form of a resolution may or may not be what we

5    traditionally think of as a settlement.

6    Q.  Mr. Kreindler, I am not going to go into this in detail.

7             Mr. Kreindler, you speak on the record for attribution

8    to reporters, correct?

9    A.  Yes, I do.

10   Q.  You also speak to reporters about this case off the record,

11   correct?

12   A.  I don't think so.  I don't recall a time when I have ever

13   said to a reporter, I am speaking to you off the record.

14   Whether I am quoted by that reporter is up to the reporter.

15   Q.  So, you're telling us here today under oath that you never,

16   in the past 20 years, have spoken to any reporter off the

17   record about the 9/11 case?

18   A.  I don't recall ever doing so, and that's not the way I

19   would deal with the press.  I tend to say things that are

20   public, and I'm glad to have them public.

21   Q.  Mr. Kreindler, obviously, you make these statements about

22   the 9/11 case to the press because you think they are helpful

23   to the case or you wouldn't make them, correct?

24   A.  Of course.

25   Q.  Now, let's talk about the lines you know you're not

1    supposed to cross in litigating your case in the press.

2            You are bound by two separate court orders not to

3    reveal or disclose the contents of protected material, correct?

4    A.  That's correct.

5    Q.  The first is the MDL protective order issued by Judge Casey

6    in 2006?

7    A.  Yes.

8    Q.  I would like to put up Exhibit 2 on the screen so we can

9    get oriented.

10           It's in your binder at Exhibit 2, Mr. Kreindler.

11   A.  Is it the same thing that's on the screen?

12   Q.  Yes.

13   A.  I will look at it right there.

14   Q.  You are familiar with that order?

15   A.  I am, yes.

16   Q.  You read it?

17   A.  I certainly read it when I signed it many, many years ago.

18   Q.  Under this order, you cannot disclose or talk to the press

19   about anything that's been designated confidential, correct?

20   A.  Correct.

21   Q.  Let's go to the second protective order in the case.

22           There was a second protective order entered by the

23   Honorable Sarah Netburn in 2018 relating to the FBI production

24   of materials, correct?

25   A.  Yes.

LB189112                    Kreindler - Cross

1    Q.  I will put that up on the screen as Exhibit 15.

2             You're familiar with that order, correct?

3    A.  Yes.

4    Q.  That was an order requested by our United States Federal

5    Bureau of Investigation to cover information that the FBI has

6    decided cannot be disclosed because disclosure would harm the

7    U.S. public interest, correct?

8    A.  I think it was requested by the Department of Justice, not

9    the FBI directly.

10   Q.  Thank you for that clarification.

11            The Department of Justice has made that representation

12   to the court, correct?

13   A.  Yes.

14   Q.  And this order means that you cannot disclose or talk to

15   the press about anything that's been designated confidential

16   under the terms of this protective order, correct?

17   A.  Yes.

18   Q.  And just to be clear, and I know we had a little bit of

19   confusion about this earlier, all 600-plus pages of the

20   al-Jarrah deposition transcript was confidential both under the

21   MDL protective order and the FBI protective order, correct?

22   A.  I don't recall the number of pages in the deposition, and I

23   don't recall if there was any small portion that wasn't

24   confidential, but certainly all of the substance was marked

25   that way.

1        MR. HANSEN:  I am having a hard time hearing.  Can we

2   read back the answer.

3        (Record read)

4   Q.  Mr. Kreindler, I am a little curious.  This is a very

5   serious matter, the proceeding we are on here today, and you

6   are telling us you don't know sitting here today whether the

7   al-Jarrah deposition transcript was confidential under both

8   orders?

9   A.  I said I knew all of the substance was confidential, but I

10  didn't remember at the time whether there was something

11  innocuous that wasn't confidential.

12  Q.  If it was designated confidential, who decides whether it's

13  innocuous so that it wouldn't be covered by the order?

14  A.  There is a misunderstanding.  I knew that the deposition

15  was certainly by and large confidential.  There might have been

16  a page or two that wasn't confidential.  That's all I'm saying.

17  I knew -- the deposition was confidential.  Whether there was

18  some innocuous page or two of background that wasn't, I didn't

19  recall.  But I checked on that.

20  Q.  Did you check?

21  A.  Yes.

22  Q.  So you know it's all confidential, right?

23  A.  Yes.

24  Q.  So part of your press strategy, Mr. Kreindler, is to tell

25  reporters that these two court orders that you told us a few

LB189112                    Kreindler - Cross

1   minutes ago were entitled respect, are -- and I am quoting your

2   words here -- "gag orders," in quotes, and "disgusting," in

3   quotes, isn't that right?

4   A.  Yes.

5   Q.  It's part of your stump speech, isn't it?

6   A.  I would not call it a stump speech.  I would call it my

7   heartfelt belief.

8   Q.  Let's get some of the statements.  Then I am going to ask

9   you what you think your team learns from your statements.

10          You have called the courts' orders "these disgusting

11  protective orders imposed upon us by the Department of Justice

12  with the blessing of the court," correct?

13  A.  Yes.

14  Q.  You have talked about this "hated protective order" and

15  "these protective orders that we hate," correct?

16  A.  I remember the first quote.  I don't remember that quote,

17  but I would agree with that.

18  Q.  You have said "you are angered and disgusted with the

19  protective orders that the FBI and Saudi Arabia have insisted

20  on," correct?

21  A.  Yes.

22  Q.  And just recently, in a podcast of Mr. Isikoff, you called

23  the protective orders "a damn gag order imposed on us by the

24  Saudis, our Department of Justice, and the court," correct?

25  A.  Yes.

LB189112                     Kreindler – Cross

1   Q.  Would it be fair to say, Mr. Kreindler, that every member

2   of your team is aware of the contempt you have for these court

3   orders?

4        MS. KIRSCH:  I am going to object, your Honor, to

5   that, and ask Mr. Hansen to rephrase the question.  Obviously,

6   contempt has a legal implication.  It's an improper question.

7        THE COURT:  You may rephrase the question.

8        MR. HANSEN:  Sure.

9   Q.  Mr. Kreindler, would it be fair to say your statements

10  reflect contempt for the courts' orders?

11       MS. KIRSCH:  Same objection.

12       THE COURT:  Counsel, can you ask the question without

13  using the word "contempt."

14       MR. HANSEN:  Sure.

15  Q.  Mr. Kreindler, would you agree with me that these orders

16  communicate to your team and everybody else that you lack

17  respect for these court orders?

18  A.  It's not a -- I would not say I lack respect.  I would say

19  that every lawyer representing the victims dislikes the fact

20  that we are under these orders and looks forward to these

21  orders being lifted, or largely lifted.  But I would not use

22  the word lack of respect.  It is the court orders that we have

23  to live with until they are changed.

24  Q.  What kind of message do you think is sent to your team to

25  have the leader of the team call two court orders disgusting

1   gag orders?

2   A.   The message is very clear.  We all hate the orders, but we

3   have to live with them until they are lifted soon, and

4   hopefully soon is very soon.

5   Q.   Let's talk about that.

6        In truth, Mr. Kreindler, you use these court orders as

7   a tactical weapon in your press strategy, don't you?

8   A.   I would not say I use it as a tactical weapon.  I am

9   offering my view of the orders that we wish we didn't have.

10  Q.   Let me make my question a little clearer.

11       Your modus operandi, if you will, is to hint to the

12  press that there is this great evidence that you have but can't

13  fully reveal, correct?

14  A.   Not hint.  I say it outright.  There is important evidence

15  of Saudi government involvement with al Qaeda that I am not

16  permitted to share with our clients, the family members, the

17  press or the public.

18  Q.   And you hint at what that evidence is and no one can

19  correct you because the evidence is all sealed, correct?

20  A.   Incorrect.  I don't hint at it at all.  I am always clear

21  in saying there is, I believe, very important, very dramatic

22  evidence of what Saudi government officials did, but until

23  these orders are lifted, I can't tell the families what that

24  is, the press or the public.

25  Q.   Let's see what you have actually told the press and the

1    public and whether you have done what you have said.

2           Going back a minute, you say you want to have these

3    orders lifted, correct?

4    A.   Correct.

5    Q.   The MDL order has been in place since 2006, correct?

6    A.   That's right.

7    Q.   The FBI protective order has been in place since 2018,

8    correct?

9    A.   Yes.

10   Q.   And you have made numerous statements saying you were going

11   to get these orders lifted so you can get all this evidence to

12   the world, correct?

13   A.   Yes.  Exactly what Joe Biden did a month ago.

14   Q.   In fact, Mr. Kreindler, let me be very clear about this,

15   you have never, not once, filed one single motion with this

16   court to lift either the MDL order or the FBI order, isn't that

17   true?

18   A.   Yes, that's absolutely true.

19   Q.   Isn't it true, Mr. Kreindler, that you sought the entry of

20   the FBI protective order?

21   A.   We sought the entry of it?

22   Q.   Let's put up Exhibit 14.  Didn't your firm tell the court

23   that you supported the entry of the FBI protective order?

24           Take as long as you want to look at it.

25   A.   I only see the caption here.

LB189112                     Kreindler - Cross

1   Q.  If you want to look at the whole document, it's Exhibit 14.

2              We can go to the last page which cuts to the chase.

3              "For all of the foregoing reasons, the PECs

4   respectfully submit that the Court should overrule Dallah

5   Avco's objection to the proposed protective order, and promptly

6   enter the protective order in the form submitted jointly by the

7   United States and PECs, so that the FBI production can proceed

8   without delay."

9              Here is my question.

10             Are you aware, Mr. Kreindler, that your partner

11  Mr. Maloney signed this letter to the court requesting that the

12  court enter this hated, disgusting protective order?

13             MS. KIRSCH:  Your Honor, I have an objection here.

14  This goes to the legal strategy of how this case is being

15  litigated, not even only by Mr. Hansen but by other partners at

16  his firm, and also the other PECs.  The steps that are taken,

17  the motions that are taken, all of that is the subject of work

18  order and strategy, and delving into why decisions were made is

19  entirely improper in this hearing.

20             THE COURT:  Your objection is overruled.

21  A.  Can I answer the question?

22             THE COURT:  Yes, please.

23  A.  The operative phrase is "so that the FBI production can --"

24  Q.  Can you please answer my question?  You can explain when

25  your counsel examines you.

1              Didn't you ask the court to enter this protective

2     order, yes or no?

3              MS. KIRSCH:  I am going to make the same objection

4     here, your Honor.

5              THE COURT:  Your objection remains overruled.

6     Q.  Yes or no, Mr. Kreindler?

7     A.  Yes.  That's exactly what the document says.

8     Q.  OK, Mr. Kreindler.

9              You'd rather make inflammatory and misleading

10    statements to the press about protected information, when your

11    statements can't be proved false, isn't that right?

12    A.  Absolutely wrong.  I have never made incorrect or

13    inflammatory statements.  I have done my best to say truthfully

14    what I am permitted to say, my honest opinion, and not reveal

15    anything I am not permitted to reveal until such time as I am

16    permitted to reveal it.

17    Q.  We know, do we not, Mr. Kreindler, that you violated the

18    protective order in 2017 doing exactly the opposite, right?

19    A.  That I personally did?  I personally did not.  There was a

20    violation found two and a half years ago by the court.

21    Q.  You didn't read the court's October 21 order that says, in

22    these very words, James Kreindler violated the protective order

23    in 2017?  You didn't bother to read the court's order?

24    A.  Which order?

25    Q.  A recent order in this case, October 21, just a few days

LB189112                         Kreindler - Cross

1    ago, in a court order issued by this court, the court said,

2    James Kreindler violated the protective order.

3             MS. KIRSCH:  Your Honor, the record stands on its own.

4    I don't think this is an appropriate line of questioning.  The

5    2017 transcript says what it says.  Your Honor's October 21st

6    order says what it says.

7             THE COURT:  I agree.  Let's move on.

8    Q.  The court warned you, Mr. Kreindler, in 2017 that it was

9    really -- I am quoting here -- "really unfair to the parties,

10   who will be turning over a lot of confidential and personal

11   information, to have those documents portrayed in the light

12   that has a particular viewpoint."

13            That's the transcript of the 2017 hearing at page 9.

14   Were you in court and heard that warning?

15            MS. KIRSCH:  Your Honor, again, first of all, it says

16   what it says, and it's a transcript of this court's proceeding.

17   It's not appropriate and that objection was just sustained.

18            Second of all, if Mr. Hansen would like to read

19   something into the record, we would respectfully request that

20   he point us to the document and show it to Mr. Kreindler.

21            THE COURT:  I am going to allow Mr. Hansen to ask some

22   questions related to prior instances where the court has found

23   that there have been breaches of the protective order.  I don't

24   want this entire hearing to be about the events of the past.

25            To the extent, Mr. Hansen, you have a copy of the

LB189112                    Kreindler - Cross

1    transcript.

2              MR. HANSEN:  I do.  It's Exhibit 10.  We will put it

3    up on the screen.

4    BY MR. HANSEN:

5    Q.  Do you recall being present and hearing that warning from

6    the court, Mr. Kreindler?

7    A.  Yes.

8    Q.  That's what you were doing in 2017 when you and Mr.

9    Fawcett, in a tag-team fashion, violated the court's protective

10   order?

11   A.  No, that's incorrect.

12   Q.  Let's see what happened in 2017 and whether it bears a

13   remarkable similarity to what happened this past summer.

14             In early 2017, you gave an interview to a journalist

15   named Caleb Hannan of Politico Magazine, correct?

16             MS. KIRSCH:  I object again, your Honor.  That was in

17   2017.  The scope of this hearing is whether there was any

18   involvement in this breach, that Mr. Fawcett leaked the

19   transcript in connection with a July 15th article.  What

20   happened in 2017 was obviously fully litigated.  We obviously

21   have a decision as to what happened, and quite frankly, I think

22   this is an improper line.

23             THE COURT:  I am going to allow this line of

24   questioning.  I do think it lays a reasonable foundation for

25   the issues that are presented here.

LB189112                      Kreindler - Cross

1        I will ask, Mr. Hansen, to move with some alacrity.

2        MR. HANSEN:  I am trying, your Honor, but I believe

3    these long talking objections are going to take a lot of our

4    time up.  I will try and move quickly to make the point.

5    BY MR. HANSEN:

6    Q.  Mr. Hannan in 2017, in his article, described in detail the

7    confidential document that had been produced by a party in this

8    litigation subject to confidentiality protection, correct?

9    A.  No, incorrect.

10   Q.  Let's take a look at it.  In the article, at Exhibit 11,

11   the top of page 8 -- by the way, this is an article you

12   reported in repeatedly?

13   A.  Yes.

14   Q.  Mr. Hannan describes -- first he talks about how you looked

15   at thousands and thousands of pages of these confidential

16   documents from the Bayoumi organization.  And he writes,

17   "There, at the top of the single page, it found a note from

18   Khaleid Sowailem written on official letterhead from the

19   ministry.  On that note was Sowailem's phone number at the

20   Saudi Embassy in Washington, D.C."

21        Do you see that?

22   A.  Yes.

23   Q.  You provided that information to Mr. Hannan, didn't you?

24   A.  I did not, no.

25   Q.  You did it by directing John Fawcett to provide that

LB189112                    Kreindler – Cross

1    information to Mr. Hannan, didn't you?

2    A.  No.

3    Q.  The only people from Kreindler & Kreindler who talked to

4    Caleb Hannan were you and John Fawcett, correct?

5    A.  That's correct.

6    Q.  So, if he got that information, he had to have gotten it

7    either from you or John Fawcett, correct?

8    A.  Yes.

9    Q.  Now, after the court found a violation of the protective

10   order in 2017, you didn't fire John Fawcett, did you?

11   A.  Correct.

12   Q.  You didn't discipline him in any way, correct?

13   A.  I spoke to him about what happened.

14   Q.  Did you discipline him in any way?

15   A.  Discipline him?  I really don't know what you mean.  We did

16   not fire him, and I certainly didn't spank him.  We talked

17   about it and how to make sure that that sort of thing doesn't

18   happen again.

19   Q.  You consider that discipline?

20   A.  It's your word.  That's not a word I would pick.

21   Q.  You didn't cut off Mr. Fawcett's employee log-in access to

22   every single confidential document in the 9/11 case, which he

23   had at that point, correct?

24   A.  Correct.

25   Q.  By the way, up until September 27th of this year, John

LB189112                    Kreindler - Cross

1   Fawcett had employee log-in privileges that gave him full and

2   unfettered access to every single 9/11 case document, correct?

3   A.  Yes.  He is at the heart of the documents.

4   Q.  In fact, not only that, he continued up until September of

5   this year to be the Kreindler & Kreindler professional

6   responsible for managing the entire document collection of

7   confidential documents at Kreindler & Kreindler, correct?

8           MS. KIRSCH:  I am going to object.  It's a leading

9   question, obviously, but this is attorney work product.  I

10  don't think this is a proper line of questioning either.  It

11  has nothing to do with what happened, that we know what

12  happened with Mr. Fawcett, and how Kreindler & Kreindler

13  manages its internal work is not relevant here.

14          THE COURT:  I don't think the responsibilities of Mr.

15  Fawcett fall within the parameters of work product.  And,

16  certainly, the role that Mr. Fawcett played at the firm, his

17  responsibilities, his access to information, is at the core of

18  this hearing.  So I am going to allow this line of questioning.

19          MS. KIRSCH:  Just to be clear, we stipulate that he

20  had access to all of the confidential information.  That's not

21  a matter that's in dispute.

22          THE COURT:  Thank you.

23  BY MR. HANSEN:

24  Q.  I am sorry.  Did you have a chance to answer the question,

25  Mr. Kreindler?

LB189112                     Kreindler – Cross

1  A.  I think your question was, did John have access to all the

2  information?

3  Q.  I am sorry.  Before the objection I had a different

4  question.  You agreed he had access to all information.

5          My next question was, up until and possibly beyond

6  September 27, 2021, John Fawcett was the Kreindler & Kreindler

7  professional responsible for managing the entire 9/11 case

8  document collection, wasn't he?

9  A.  Yes.

10  Q.  Even while you were doing an investigation of him for

11  potentially leaking the transcript, right?

12  A.  No, that's not right, not on September 17.

13  Q.  We will get into the investigation in a minute.

14          So you never investigated John Fawcett at any time

15  between July 15 and September 27, more than two months later?

16  A.  Investigate him?  No, I did not investigate him.  I spoke

17  to him.

18  Q.  OK.  We will get to that in a minute.

19          After the 2017 protective order violation, you didn't

20  even direct Mr. Fawcett to stop talking to the press, did you?

21  A.  No.

22  Q.  And he did talk to the press as part of his Kreindler &

23  Kreindler duties, correct?

24  A.  Yes.

25  Q.  And he billed for his time doing that, correct?

LB189112                    Kreindler - Cross

1    A.  I don't know.  That I don't know.

2    Q.  Well, he put in billing records, like your associates do,

3    for the time he spent working on the case, and got paid for it,

4    correct?

5    A.  I think so, yeah.

6    Q.  Do you think he also included all his press duties as part

7    of his billable time?

8           MS. KIRSCH:  Objection.  Calls for speculation.  He

9    just said he didn't look at the time records.

10   A.  I don't know.

11          THE COURT:  Sustained.

12   Q.  In fact, you knew that he was, among other things,

13   entertaining reporters at the Kreindler & Kreindler offices,

14   correct?

15   A.  He was not entertaining reporters.  He would speak to

16   reporters on occasion when I asked him to.

17   Q.  And he did that at the Kreindler offices?

18   A.  Yes.

19   Q.  And he provided reporters with documents, correct?

20   A.  Over 20 years, he made sure that if he provided a document

21   to a reporter, it was not under either of the orders we have

22   been talking about.  In other words, if a reporter wanted

23   information, he would go through material and provide only that

24   which he is permitted to provide.

25   Q.  Well, we know that's not true because, according to you, he

1  provided a sealed transcript to reporters.  Would you like to

2  retract your prior answer?

3  A.  I thought you were talking about up until this past

4  September.

5  Q.  Let me clarify.

6         You have agreed that he does, as part of this

7  Kreindler & Kreindler duties, talk to reporters and provide

8  documents to reporters?  And exactly what the documents are we

9  will get into in a minute.  Correct?

10  A.  Not correct fully.  He provides material when I or one of

11  my partners would ask him to provide material that is public.

12  Q.  So, for example, in June of this year, he invited NPR

13  reporter Laura Sullivan to come to the Kreindler offices so he

14  could brief her in advance of you giving quotes to the reporter

15  for a story, correct?

16  A.  No, you have the chronology wrong.

17         MR. HANSEN:  I am going to put up Exhibit 12, your

18  Honor, which I believe has been produced in this matter.

19  Q.  Do you know who Laura Sullivan is?

20  A.  I do, yes.

21  Q.  Who is she?

22  A.  Laura Sullivan is an NPR reporter who I first met in

23  Washington, D.C. and gave her a pretty lengthy interview.

24  Q.  Were you aware that in June of this year, Mr. Fawcett was

25  inviting Ms. Sullivan to come to the Kreindler offices so that

LB189112                    Kreindler - Cross

1    he could have discussions with her?

2              MS. KIRSCH:  Your Honor, could I have a moment to read

3    the document, please?  I didn't get this previously.

4              THE COURT:  Sure.  Let me know when you're ready.

5    A.  May I answer now?

6    Q.  Yes.

7    A.  John did not invite her.  I told her that, as a follow-up

8    to my talk with her, she should contact John to see the

9    documents that we are permitted to show her and members of the

10   press.  And then you have this e-mail about the time she would

11   be at the office.  But John is not doing this of his own

12   volition, his own initiative.

13   Q.  This is in June of 2021.  Are you aware that Mr. Fawcett

14   was doing this, as indicated in this chat, in June of this

15   year?

16   A.  Yeah.  I put the two of them in contact so she could follow

17   up and see public documents after the interview I did with her.

18   Q.  Mr. Fawcett did it again in September of this year, less

19   than two months ago, after the leak of the confidential

20   transcript, correct?

21             I am directing you still to Exhibit 12.

22             MS. KIRSCH:  I don't know what is meant by "did it

23   again."

24             MR. HANSEN:  I will rephrase the question.

25   Q.  Were you aware -- and directing your attention to Exhibit

1    12 -- that Mr. Fawcett had further discussions with

2    Ms. Sullivan about the 9/11 case?  And I am directing you to

3    the September entries on page 4.

4    A.  Is that what I have in front of me now?

5    Q.  We will put it up on the screen.

6    A.  OK.  I was aware that Laura Sullivan was coming back to see

7    more documents that we were permitted to show, yes.

8    Q.  So he was doing this at your direction?

9    A.  Yeah.

10   Q.  If you look down toward the bottom of the page, there is a

11   reference to, "Megan says no problem for those two documents"?

12   A.  Yes.

13   Q.  So, would it be fair to say that Mr. Fawcett followed the

14   practice of checking with a Kreindler & Kreindler partner

15   before he released documents to a reporter?

16   A.  He certainly did here.  Over 20 years, I can't say that

17   that was the procedure for every time John would show public

18   documents to a reporter, but he certainly did here.  And what I

19   am trying to get at is, particularly after the 2017 violation

20   that the court found, we always went to great pains to make

21   doubly sure that every document we are showing one of the

22   family members or a reporter was the public version and not the

23   prohibited version.  So that's what happened here.

24   Q.  Just to be clear, you just made a reference to the 2017

25   violation.  You were aware, were you not, that the court gave

1   you a warning in 2017 and said -- we will put it up, Exhibit

2   10, page 9.  The court wrote, after not imposing a sanction,

3   the court wrote, "Going forward, Mr. Kreindler, to the extent

4   you are going to be continuing to speak to the press, or any

5   other lawyer in this case, I expect the parties to hew much

6   more closely to the confidentiality order and to be exceedingly

7   discreet in the information they reveal."

8           You were present in court and heard that warning,

9   didn't you?

10  A.  Yes.

11  Q.  But you kept right on talking to the press about the case

12  after that, didn't you?

13  A.  Of course.

14  Q.  When you did speak, you were not discreet at all, were you?

15  A.  I disagree with that.

16  Q.  Let's look at some of the speeches you made in public after

17  you got that warning.

18          Were you exceedingly discreet in your public

19  statements at Dartmouth College in 2019?

20          MS. KIRSCH:  Your Honor, I object to this line of

21  questioning.  We know that Mr. Kreindler speaks to the press.

22  We have stipulated to that.  If there was something that was

23  leaked, it has been brought to this Court, it has been

24  discussed.  If there was something inappropriate, it has been

25  brought to the Court's attention.  It's not relevant to this

1  breach.  And this is not an opportunity to relitigate matters

2  that have been annoying to the Kingdom in the past.

3       THE COURT:  I would object then to the concept of it

4  being annoying to the Kingdom.  It's a violation of the court

5  orders.  It is a violation of the court orders when these

6  protective orders are breached.  It's not the Kingdom that is

7  annoyed; it's the court whose orders are being violated.  So,

8  first, I would not consider this to be something about what is

9  annoying the Kingdom.

10       With respect to the historical facts, I have limited

11  discovery on these issues.  I do think that we are making a

12  foundation here.  I am going to allow Mr. Hansen to continue

13  this line of questioning, as I have already indicated.  I am

14  watching the time.  I am hoping that we are going to get to the

15  heart of the matter shortly, but I do think this line of

16  questioning is appropriate and lays a reasonable foundation for

17  the heart of the issues.

18       MS. KIRSCH:  Your Honor, just to clarify, I agree a

19  hundred percent that violation of the court order is a very

20  serious matter.  I was referring to Mr. Kreindler's Dartmouth

21  speech, which was not a violation of the court order, and

22  that's why I said what I said.  I was not trying to minimize

23  that we are here on this breach of this court order, and it is

24  a very serious matter.

25       THE COURT:  Thank you.

1  BY MR. HANSEN:

2  Q.  Mr. Kreindler, my question before your counsel's objection

3  was about whether you believed you were exceedingly discreet in

4  your public statements at Dartmouth College.  Do you believe

5  you were?

6  A.  I believe I was exceedingly appropriate.

7  Q.  No, no.  The question was exceedingly discreet.  Will you

8  answer my question?  It's a yes or no question.

9  A.  If we understand discreet the same way, yes.

10  Q.  Let's play some of your statements to Dartmouth College on

11  the screen, and we will talk about whether you have violated

12  the protective order there and whether these were discreet

13  comments.

14          (Audio played)

15          MS. KIRSCH:  Your Honor, I have another objection.  No

16  exhibits were provided to us prior to this hearing.  It is

17  entirely inappropriate to launch into a multimedia presentation

18  when I have no idea what is about to go up on the screen,

19  number one.

20          Number two, I renew my objection that anything that

21  happened in the Dartmouth speech has already been litigated in

22  this court and the findings are what they are, and this is not

23  an opportunity to go over old ground.  That's already been

24  done.  It's not relevant to this hearing.

25          THE COURT:  To facilitate the proceeding, I note your

1    objection to matters of conduct that happened before the breach

2    this summer.  I am overruling those objections for the reasons

3    that I have stated, but I will accept your general objection to

4    this line of questioning.

5         I don't know if we have other video that we are going

6    to play, if you can give counsel a heads-up.  Obviously, this

7    is Mr. Kreindler's speech, and this issue I think is reasonably

8    within the bounds of the subject matter.

9         Mr. Hansen, I don't know how much longer until you

10   want to start talking about the breach this summer.  It's now

11   11:30.  I am hoping we can move to that in the next five to ten

12   minutes.

13        MR. HANSEN:  Just a couple of questions about this,

14   and then I will move exactly to that.

15        THE COURT:  Thank you.

16        MR. HANSEN:  I think it's important, your Honor, and I

17   do want to just get Mr. Kreindler's testimony on this important

18   point.

19   BY MR. HANSEN:

20   Q.  What we just played, Mr. Kreindler, was you purporting to

21   summarize the contents of a document that had been provided by

22   the FBI under confidentiality, correct?

23   A.  Wrong.  Absolutely wrong.

24   Q.  That's what our FBI told the court, didn't they?

25   A.  No.  You are wrong.

LB189112                        Kreindler - Cross

1    Q.  Our government came to this court and said, in a filing,

2    that you were improperly and misleadingly describing the

3    contents of the confidential FBI document, isn't that true?

4    A.  It is not true because what I was talking about is the

5    public 2012 review.

6    Q.  Wait.  I am asking you a question about what the FBI

7    represented to this court, not what you think it is.

8              MS. KIRSCH:  And if that was the question, your Honor,

9    I have an objection.  Mr. Hansen is an experienced trial

10   lawyer.  I am sure he knows very well how to present the

11   document to the witness and ask the witness to take a look and

12   then identify it, whether he recognizes it, and then we can

13   talk about what the FBI did or didn't say.

14             MR. HANSEN:  We will take the time.

15             I just asked the question, did Mr. Kreindler know one

16   way or the other whether the FBI, or the Department of Justice

17   on behalf of the FBI, came to this court and said that you,

18   James Kreindler, in your Dartmouth College speech, had

19   misleadingly and improperly purported to describe the contents

20   of a protected document?  Do you know?

21             MS. KIRSCH:  We can look at the document, your Honor.

22             THE COURT:  Mr. Kreindler, do you recall that

23   submission?

24             THE WITNESS:  No, I don't.

25             THE COURT:  Let's move on.

LB189112                    Kreindler - Cross

1  BY MR. HANSEN:

2  Q.  We can all agree that whatever you did at Dartmouth you did

3  after you got the first warning from the court, correct?

4  A.  Yes, absolutely.

5  Q.  Let's get to the heart of the matter, as the court informed

6  us.

7       Three months ago you went on Michael Isikoff's podcast

8  to talk about the sealed al-Jarrah deposition, correct?

9  A.  That was not the only topic, no.

10  Q.  It was one of the topics, wasn't it?

11  A.  It's a topic I said I wish I could talk about, but I can't.

12  Q.  Let's see in a minute whether you talked about it.

13       Certainly you know Mr. Isikoff, don't you?

14  A.  I know who he is, and I have spoken to him over the years.

15  Q.  For how long have you known him?

16  A.  A long time.  I can't -- for 20 years, there is maybe a

17  dozen reporters who have followed the 9/11 Saudi involvement

18  story, and he is one of them.  But I can't remember the first

19  time I ever spoke to him.

20  Q.  How often do you speak to Mr. Isikoff?

21  A.  It isn't on a regular basis.  There tends to be a lot more

22  media interest as we approach the anniversaries, or something

23  happens, like Joe Biden's Executive Order.  So I might talk to

24  him frequently at one point in time and then not again for

25  years.

1    Q.   In the sworn declaration you filed with the court in

2    September, you said you recalled two telephone conversations

3    within the relevant period, correct?

4    A.   Yes, I do.

5    Q.   In fact, now that we have the record, we see there are

6    actually three conversations, correct?

7    A.   I just remember two.

8    Q.   Submitting sworn testimony to the court is a pretty serious

9    matter, isn't it?

10   A.   Of course.

11   Q.   Did you check your cell phone, office phone, or other phone

12   records to see how many calls you had with Mr. Isikoff?

13   A.   I have no such phone records.  I remember two phone calls

14   with Mike Isikoff.

15   Q.   Wait a second.  You say there are no phone records you can

16   check to see your calls with Mr. Isikoff?

17   A.   There might be, but I would not know how to check phone

18   records.  I wasn't in the office at all because of COVID.  On

19   my cell phone I can scroll through texts, but I don't know how

20   to look at my cell phone and find all calls.

21   Q.   Whether you can do it or not, you have a very capable

22   staff.  My question is, Mr. Kreindler, is, before submitting

23   sworn testimony to the court about a subject that's objectively

24   determinable, such as how many phone calls you had with the key

25   reporter in this matter, are you telling us you didn't even

1  bother to check or have someone check for you what the record

2  showed about your calls?

3  A.   What I am telling you is I distinctly remember two phone

4  calls with Mike Isikoff.

5  Q.   I know you said that.  Did you check the records or have

6  someone check the records?

7  A.   There are two different questions.

8  Q.   My question is, did you check the records or have someone

9  check the records?  That's the question.

10  A.   Someone may have checked the records.  I did not check the

11  records.

12  Q.   If someone had checked the records, you couldn't have put

13  in a truthful statement that there were only two, could you?

14  A.   As far as I know, there were only two phone calls.  You're

15  alluding to a third phone call that I'm not aware of or don't

16  remember.

17  Q.   OK.

18          THE COURT:  Mr. Kreindler, could I ask, when you

19  submitted in your declaration, I recall having two phone calls

20  with Mr. Isikoff, did you submit this declaration and did you

21  prepare this declaration based solely on your recollection or

22  did you look at any documents to refresh your recollection?

23          THE WITNESS:  Solely on my recollection.  That's why I

24  said I recall two phone calls with Mike Isikoff, I am pretty

25  sure on a Monday and a Wednesday.

1            THE COURT:  Thank you.

2            MR. HANSEN:  In the interest of time, I will ask

3     counsel for Kreindler & Kreindler to stipulate there were

4     actually three calls, according to the records they produced.

5     But if we don't have the stipulation, I will show Mr. Kreindler

6     the records.

7            MS. KIRSCH:  If you direct me to the document, I will

8     take a look.

9            MR. HANSEN:  Sure.  Exhibit 122.

10           MS. KIRSCH:  This would have been much easier to do in

11    advance of the hearing, which is why we asked to see the

12    documents.

13           MR. HANSEN:  There are three entries.  It shouldn't

14    take that long to look.

15           Maybe it will go quicker if I put the exhibit up.  Why

16    don't we put up Exhibit 142, please.

17    BY MR. HANSEN:

18    Q.  Mr. Isikoff's phone number is 258-2535, area code 202,

19    correct?

20    A.  I don't remember, but if you say so, sure.

21    Q.  And you have a phone number 914 and starting with a 589

22    prefix?

23           MS. KIRSCH:  I am sorry.  Did we continue?  I was

24    still looking at the phone records.

25           THE COURT:  He was pulling them up for you.  Would you

1  like to wait?  Have you seen these?

2          MS. KIRSCH:  We were trying to look through.

3          I am going to renew my standing objection that to put

4  this binder in front of me while the hearing has just begun is

5  a very inappropriate way to proceed, and if it takes me time to

6  look at the documents, it takes me time to look at the

7  documents.

8          MR. HANSEN:  With all respect, your Honor --

9          MS. KIRSCH:  I request that counsel not proceed with

10 questioning when he sees that I am looking at a document.

11         MR. HANSEN:  Your Honor, never --

12         THE COURT:  It's impossible for the court reporter to

13 do her job when everybody is speaking.

14         So, Ms. Kirsch, take your moment, look at the exhibit.

15         Mr. Hansen, please sit tight, and as soon as Ms.

16 Kirsch tells you that she is ready, you can proceed.

17         MS. KIRSCH:  Document 142 reflects three phone calls

18 incoming from Mr. Isikoff's phone number to Mr. Kreindler in

19 June, correct.  If they want to talk about the time or the

20 date, you will still have to show Mr. Kreindler the document

21 himself so that he can see it.

22         THE COURT:  Thank you.

23         MR. HANSEN:  Could we have a stipulation there were

24 three calls?

25         THE COURT:  Yes.  She agrees there are three calls.

1    BY MR. HANSEN:

2    Q.  So, Mr. Kreindler, you also had text messages with

3    Mr. Isikoff, correct?

4    A.  A couple, yes.

5    Q.  Did you check those before submitting your sworn testimony?

6    A.  Yes.

7    Q.  So why didn't you tell us about those?

8    A.  I thought you were asking me about phone calls.

9    Q.  Well, I am sorry if I was unclear.  Your declaration talks

10   about recalling two phone calls.  In fact, we now know there

11   are three.  Your declaration doesn't say anything about text

12   messages.  Were there text messages in addition to phone calls

13   that you did not put in your sworn declaration?

14   A.  My declaration was about my talking to Mike Isikoff.  I

15   later found some, practically nothing text messages, which I

16   guess you have.

17   Q.  That's just not my question, Mr. Kreindler.  I will try one

18   more time.

19   A.  Sure.

20   Q.  When filing a sworn declaration with your court about your

21   contacts with Mr. Isikoff on September 27, were you aware that

22   in addition to phone calls, you also had text messages with

23   him?

24   A.  Sorry.  You know, I don't remember when we found the text

25   messages.  We had a procedure where we had to turn over all of

1   our phones, but I don't remember whether -- I think that was

2   after the declaration.

3   Q.  Did you do a search of your text messages before September

4   27 so you could provide truthful testimony to the court?

5   A.  First of all, my testimony is truthful.  I stated what I

6   recall, and I recalled those two phone calls with Mike Isikoff.

7   Q.  Not my question.  Please listen carefully.

8           Before submitting your sworn declaration, which dealt

9   with the subject of communications with Mr. Isikoff, did you

10  conduct a search or have anyone working for you conduct a

11  search of your text messages, yes or no?

12  A.  I don't think I did.

13  Q.  So, in addition to telephone calls and text messages with

14  Mr. Isikoff, you also e-mailed Mr. Isikoff in July 2021,

15  correct?

16  A.  I don't remember.

17          MS. KIRSCH:  Your Honor, once again, would you like to

18  show Mr. Kreindler a document?  This is not a memory test.

19          THE COURT:  Is there a particular e-mail you would

20  like to ask Mr. Kreindler about or are you just asking whether

21  he recalls having e-mail communication during the relevant

22  period?

23          MR. HANSEN:  The latter, your honor.  I am just

24  establishing the fact that he knew.

25          THE COURT:  Do you have a recollection of having sent

1  e-mails to Mr. Isikoff during the relevant period?

2          THE WITNESS:  I don't recall, and I am happy to look

3  at it, and if there is one, I can say something about it.  As I

4  sit here now, I don't recall e-mails with Mike Isikoff.  I

5  recalled the phone conversations.

6  BY MR. HANSEN:

7  Q.  Mr. Kreindler, before submitting your sworn testimony about

8  your communications with Mr. Isikoff on September 27, did you,

9  yourself, or anybody working under your direction undertake a

10  search of your e-mails with Mr. Isikoff?

11          MS. KIRSCH:  I am going to object to that question as

12  well.  The declaration says what it says.  He hasn't

13  established that there is anything untruthful, and

14  characterizing the declaration and implying what Mr. Kreindler

15  should or should not have done is an improper question.  He can

16  give him the declaration.  He can ask if it's true.  Counsel is

17  testifying and making misleading questions.

18          THE COURT:  One of the subject matters before the

19  court is whether or not anybody submitted false statements to

20  the court, and the inquiry that Mr. Kreindler is responding to

21  in the September 27 declaration asks to identify all

22  communications, whether oral or written.  And Mr. Kreindler

23  prepared his declaration based, it sounds like, on his

24  recollection and reported two phone calls.  I think Mr. Hansen

25  is entitled to ask questions about whether there were any other

1  oral or written communications that he failed to include in

2  this declaration.

3          You can proceed.

4  BY MR. HANSEN:

5  Q.  Do you recall, Mr. Kreindler, that there were a number of

6  e-mails between you and Mr. Isikoff in July?

7  A.  Yes, there were some e-mails.  When we found out about the

8  leak, my partner Duke undertook --

9  Q.  We will get there, Mr. Kreindler.  I am just asking you a

10 simple question.

11         Were you aware before September 27 that there as many

12 as nine different e-mails between you and Mr. Isikoff?  That's

13 a yes or no question.

14         MS. KIRSCH:  Your Honor, can we please put Mr.

15 Kreindler's declaration in front of him so he can read it?

16         MR. HANSEN:  I am asking about the subjects.  I am not

17 even asking about the declaration right now.

18         THE COURT:  Let's move on to another area of

19 questioning.  I think we have established what we need to

20 establish.  To the extent you want to move to the e-mails,

21 let's move to the e-mails.

22         MR. HANSEN:  Thank you.

23 BY MR. HANSEN:

24 Q.  You would agree, Mr. Kreindler, that e-mails from the

25 Kreindler & Kreindler e-mail address are readily detectable and

1    investigable by members of your staff, correct?

2              MS. KIRSCH:  With all due respect, his declaration

3    does reference e-mails.  There is an impression being created

4    that his declaration does not reference e-mails.  He is

5    cleverly not presenting the declaration so we can all take a

6    look at it.  These questions are inappropriate.

7              THE COURT:  Mr. Kreindler, I will refresh your

8    recollection.  You said in your declaration, "I exchanged

9    several e-mails with Isikoff, all of which are attached to the

10   accompanying declaration of John Hartney."  That is what is in

11   the declaration.

12             Mr. Hansen, you can proceed.

13   BY MR. HANSEN:

14   Q.  So my question is, e-mails can be readily searched and

15   found on your system, correct?

16   A.  I think so, but I think you should ask John Hartney about

17   that.  The computer system is not my specialty.

18   Q.  Let's talk about the lead-up to the leak.

19             You were consulting with Mr. Fawcett at the very same

20   time you were working with Mr. Isikoff on his podcast episode

21   that aired on July 10, 2021, correct?

22   A.  I work with John Fawcett every day.  So, by definition,

23   sure.

24   Q.  Let's just look at the call record you had with him.

25             You spoke to Mr. Isikoff at 1:42, page 3.

LB189112                    Kreindler – Cross

1          THE COURT:  Can you give Ms. Kirsch an opportunity to

2    review?

3          MR. HANSEN:  Of course, your Honor.

4          Exhibit 142, page 3, a single entry.

5          MS. KIRSCH:  OK.

6    Q.  Mr. Kreindler, it looks like 6/28/21, that's July 28,

7    Mr. Isikoff's number.

8          THE COURT:  6/28 would be June.

9          MR. HANSEN:  Sorry.

10   Q.  Seven minutes.

11         Do you recall what you were speaking to Mr. Isikoff

12   about on June 28?

13   A.  Yeah.  That was a Monday, right?

14   Q.  I don't remember.

15   A.  As I said, I remember speaking to him on a Monday and a

16   Wednesday after the Jarrah deposition.  And the Monday

17   conversation was much longer, so I assume this is the Monday

18   conversation.  Yes.  And I remember it well.

19   Q.  What were you speaking with him about?

20   A.  So he called me up.  He, other reporters in the world knew

21   the schedule for the depositions of the Saudi government

22   officials who we were deposing.  He called me up and said, You

23   guys deposed Jarrah at the end of last week, didn't you?  I

24   said, Yeah, my partner, Megan Benett, took Jarrah's deposition.

25   Then he said, What can you tell me about it?  And I said, Mike,

1    I wish I could tell you everything about it, I would love to be

2    able to tell you everything about it, but I can't.  The only

3    thing I can say is, we were very, very happy, we were delighted

4    with how the deposition went and what it revealed.  And then he

5    was fishing for some more information, and I said, I'm sorry,

6    I'm sorry, I wish I could.  Let me get back to the team and see

7    if there is any part of the deposition that was not marked

8    confidential that we could share.

9            Then the second call I think was on the Wednesday.

10   Q.  We are on the first call.

11   A.  I'm just telling you the story.

12   Q.  So, after you spoke to Mr. Isikoff on the 28th, almost

13   right after, at 12:23 -- I am going to let your attorney look

14   at Exhibit 134, and the references I will be asking about are

15   at the bottom of page 1 and the top of page 2.

16   A.  Yeah.  That's 12:22 or 12:23.  One minute, yes.

17           MR. HANSEN:  Let me know when you're ready to proceed.

18           MS. KIRSCH:  Go ahead.

19   Q.  So we established the call with Isikoff was around 11:36 in

20   the morning.  It lasted seven minutes.  And here you are

21   speaking with Mr. Fawcett at 12:22 and 12:23.  And in those

22   calls, you are directing Mr. Fawcett to get 9/11 case materials

23   to Mr. Isikoff, aren't you?

24   A.  These are calls with John?  No, I don't think so.

25           First of all, that's not what I asked John.  I asked

LB189112                    Kreindler - Cross

1   John, is there any part of the Jarrah deposition not marked

2   confidential that we could share?  And he said, No, it's all

3   confidential.  That's why the whole call is a minute.

4   Q.  So you specifically directed Mr. Fawcett not to share any

5   information with the reporter?

6   A.  The topic -- I told you exactly what that one-minute call

7   was.  John, is there any part of the Jarrah deposition not

8   confidential under these orders that we could share with

9   Isikoff who is asking about the deposition?  And John said no.

10          MR. HANSEN:  Your Honor, the next thing I am going to

11  ask Mr. Kreindler about is a podcast excerpt, which we could

12  play the audio of, but I know you have instructed us to give

13  time for Kreindler counsel to listen to it.  We have a

14  transcript.  I don't know if this is a good time to have a

15  break.

16          THE COURT:  I was just going to raise that.  Let's

17  take a quick five-minute break.  You can give Ms. Kirsch an

18  opportunity.

19          Thank you.  We are briefly adjourned.

20          (Continued on next page)

21

22

23

24

25

1          THE COURT:  Just for some housekeeping matters, we're

2     going to break at 1:00 for lunch.  I'd like the lawyers to

3     start coming back in at 1:45 so that we can really begin at

4     2:00.  So for the court reporter, back at 2:00, but I want at

5     2 o'clock start questioning the witness again.  So we've got an

6     hour now.

7          Go ahead, Mr. Hansen.

8          MR. HANSEN:  Thank you, your Honor.

9     BY MR. HANSEN:

10    Q.  Mr. Kreindler, I'm going to play part of your podcast with

11    Mr. Isikoff, Exhibit 39, and ask you some questions about it.

12         (Audio played)

13         I'll play another excerpt where you purport to

14    summarize the contents of these depositions.

15         (Audio played)

16         Mr. Kreindler, that's you talking to the press,

17    telling the press, about the contents of sealed depositions,

18    isn't it?

19    A.  No.

20    Q.  So you're telling this Court under oath that when you say

21    witnesses and sworn testimony inculpated every Saudi official,

22    that's not revealing or purporting to reveal the contents of

23    those depositions?

24    A.  No, it is not.

25    Q.  After the taping on -- the taping was on July 1, is that

LB1H9113                         Kreindler - Cross

1    correct?

2    A.  I think so.

3    Q.  The next day you had a call with Mr. Fawcett.  Do you

4    recall that?

5    A.  Not specifically, no.

6    Q.  Let's look at Exhibit 134, page 1.  If you look at the

7    yellow highlighting, it's an 18-minute call between you and

8    Mr. Fawcett.

9    A.  OK.

10   Q.  In that call, following up on your podcast taping with

11   Mr. Isikoff, you told Mr. Fawcett to disclose transcript

12   material to Mr. Isikoff, didn't you?

13   A.  No, absolutely not.

14   Q.  What did you tell him about?

15   A.  I don't know, but I didn't and never would ever, ever, ever

16   do that.

17   Q.  Mr. Fawcett reached out to Mr. Isikoff the very next day in

18   a call that we've highlighted.  You see those?  Actually,

19   there's four calls.  That's Mr. Isikoff's number.

20        Why is it that Mr. Fawcett is reaching out to

21   Mr. Isikoff the very day after you spoke to him following the

22   podcast?

23   A.  I don't know.  I don't remember.

24   Q.  In fact, that's about the time Mr. Fawcett leaked the

25   sealed transcript, the Al Jarrah deposition, to Mr. Isikoff,

LB1H9113                        Kreindler - Cross

1    isn't it?

2    A.  How would I know that?

3    Q.  The Isikoff podcast was broadcast on July 10, correct?

4    A.  I think so.

5    Q.  We just listened to it, and we listened to your comments

6    attacking the FBI protective order.  And I want to direct you

7    to two days later to an email on your system that was sent by

8    Mr. Fawcett to Mr. Isikoff.

9           If you could pull up 56F at page 13.  This was an

10   email that was disclosed only after multiple court orders.

11          MS. KIRSCH:  Your Honor, I'd like a minute to look at

12   the document.

13          THE COURT:  Sure.  This was submitted, I believe, by

14   Mr. Hartney, is that correct?

15          MR. HANSEN:  It was attached to the Hartney

16   declaration in September 27, I believe, your Honor.

17          MS. KIRSCH:  OK.  That's fine.

18          THE COURT:  You can proceed.

19   BY MR. HANSEN:

20   Q.  OK.  So just to get you oriented, Mr. Kreindler, we're

21   looking at an e-mail from John Fawcett of Kreindler & Kreindler

22   to Michael Isikoff dated July 12.  There's an attachment of an

23   unclassified privilege log, and there's no discussion.  It's an

24   empty message.  But if we go on and look at the documents, I

25   believe we can show you that this is the FBI's privilege log

LB1H9113                    Kreindler - Cross

1  indicating which documents the FBI was not turning over because

2  of its concerns about the public interest.

3           So my question to you, sir, is were you aware that

4  Mr. Fawcett was providing this document to Mr. Isikoff on or

5  about July 12?

6  A.  I was aware that John gave him the list of -- the public

7  list of documents the FBI was withholding.  I don't recall the

8  date.

9  Q.  Did you know he'd done it by email?

10 A.  I don't know how else he would do it.

11 Q.  Did you know, even if you don't recall exactly, was it

12 approximately around the time of the broadcasting of your

13 podcast with Mr. Isikoff?

14 A.  More or less, perhaps.  I just don't -- I don't recall when

15 he did it.  I do recall at some point we gave Mike -- John gave

16 Mike Isikoff the public list of the documents that the DOJ was

17 withholding, and -- I'll stop there.  I can say more if you'd

18 like.

19 Q.  And he did that at your instruction, correct?

20 A.  Probably.  I don't recall a specific moment on what day I

21 said, John, can you send the privilege log to Mike Isikoff.

22 Q.  So the next day, on July 13, Mr. Isikoff emails you.  And

23 we'll put up Exhibit 56F, page 24.  It's an email from Michael

24 Isikoff to Jim Kreindler checking in.

25 A.  Right.

LB1H9113                    Kreindler - Cross

1   Q.  And Mr. Isikoff writes -- and this, by the way, is the day

2   after Mr. Fawcett sends the FBI privilege log -- "Hi, Jim,

3   where do you stand on your request to DOJ to lift the state

4   secrets privilege and gag order?"

5        Do you recall getting that email?

6   A.  Yes, I do.

7   Q.  This also related to what Mr. Fawcett had sent to

8   Mr. Isikoff, correct?  This is further discussion about these

9   documents the FBI is holding back, right?

10  A.  Yes.

11  Q.  OK.  Are you speaking with Mr. Isikoff around July 13?

12  A.  I don't recall.  I just remember those two conversations

13  that I told you about.

14  Q.  Surely at some point Mr. Isikoff calls you and says, in

15  substance:  Hey, Jim, I've got the Al Jarrah transcript.  You

16  care to comment on it?

17  A.  That never, ever, ever happened.

18  Q.  Why would he not?  If he'd gotten the transcript from some

19  other source, it would be a perfectly natural thing for a

20  reporter to call a willing source like you to see if you had a

21  comment on it, wouldn't it?

22  A.  No.

23        MS. KIRSCH:  That calls for speculation as to what

24  Mr. Isikoff was or wasn't thinking.  It's an improper question,

25  and it's also argumentative.

LB1H9113                         Kreindler - Cross

1          THE COURT:  The question is -- the objection is

2    sustained with respect to what Mr. Isikoff was thinking, but I

3    don't think it's argumentative.  So it's overruled on that

4    ground.

5    Q.  I'm not asking you what Mr. Isikoff was thinking, but

6    didn't reporters, including Mr. Isikoff, call you pretty

7    routinely for comments on materials that they had obtained from

8    other sources?

9    A.  It may have happened.  As I think about it, I can't

10   remember a specific -- I don't remember that ever happening,

11   but it could have.

12   Q.  Reporters always try to get quotes from sources, don't

13   they?

14   A.  I can't speak to what all reporters always do.

15   Q.  Do you think the reason why Mr. Isikoff did not reach out

16   to you for comment on the transcript was because he knew that

17   your firm had provided it to him in violation of the court

18   order, and he didn't want to compromise you?

19          MS. KIRSCH:  Calls for speculation.

20          THE COURT:  Sustained.

21   Q.  Did you ever wonder why Mr. Isikoff had never asked you

22   about this transcript?

23   A.  No.  We only found out about it on September 27.

24   Q.  Well, you knew about the leak long before September 27,

25   correct?

LB1H9113                    Kreindler - Cross

1    A.  I knew about the leak when I read Mike Isikoff's article

2    the day it was published in Yahoo! News.

3    Q.  That's just where we're going next.

4           So you did see the story on the day it was published,

5    correct?

6    A.  Yes.

7    Q.  And you knew that the transcript that the reporter had was

8    a confidential transcript, correct?

9    A.  All I knew was what the story said, and my recollection is

10   Mike Isikoff's story said I've -- I've obtained pages of the

11   Jarrah deposition.

12   Q.  Well, that's not my question.

13          Did you know it was a confidential transcript that

14   Mr. Isikoff had obtained?

15   A.  I knew the transcript was confidential.  I didn't know what

16   really happened.  All I knew was what Mike Isikoff said in his

17   piece.

18   Q.  And you knew on July 15 that your firm was a likely source

19   of the leak, didn't you?

20   A.  No, absolutely not.  I had an idea who the likely source

21   was, but I absolutely believed it was no one from our firm.

22   Q.  So let's look at Exhibit 56A at paragraph 5, which is your

23   declaration, and we'll go to paragraph 5.  You wrote in your

24   declaration filed September 27 that you asked Mr. Maloney, your

25   partner, to conduct an internal investigation, and that was

LB1H9113                    Kreindler – Cross

1  right after getting off the telephone call on or about July 15,

2  correct?

3  A.  I'm sorry.  You lost me.  Which telephone call on July 15?

4  Q.  Let's go up a paragraph.  Let's go up to four.

5          You say on the 15th you had a conference call with

6  other members of the PEC?

7  A.  Yes.

8  Q.  And was that on July 15?

9  A.  I think so.

10  Q.  So now let's go to five.

11  A.  Yeah.

12  Q.  After the call, so is this on the 15th as well?

13  A.  Yes.

14  Q.  You say you asked Mr. Maloney "to conduct an internal

15  investigation to determine whether anyone at Kreindler was

16  responsible for providing the information to Isikoff," correct?

17  A.  Yeah, that's exactly what it says.

18  Q.  And all of the people on your team who had access,

19  according to you, to the Al Jarrah transcript were suspects in

20  that investigation, weren't they?

21  A.  No, none were suspects.

22  Q.  Well, then who were you investigating?

23  A.  We had to do an internal investigation.  We talked about it

24  first, obviously.

25  Q.  Wait, wait, wait.  It's a "who" question.  Who were you

LB1H9113                    Kreindler - Cross

1    investigating when you tell Mr. Maloney to conduct an internal

2    investigation?

3    A.   I -- OK.

4            MS. KIRSCH:  Mischaracterizes the witness' testimony,

5    but he can testify now.

6    A.   Sure.  I was asking Duke to work with John Hartney on our

7    computer system to search all communications with Isikoff, the

8    Jarrah deposition to see if -- if there's anything on our

9    system that would indicate anyone at the firm sent it, because

10   it was my absolute belief that no one did or would, but we had

11   to prove it by going through the whole computer system.

12   Q.   Can I ask my question one more time?

13   A.   Sure.

14   Q.   Who were you investigating?  Anybody?

15           MS. KIRSCH:  Objection.

16   A.   No one.

17   Q.   So Mr. --

18           THE COURT:  Objection's sustained.

19   A.   It was blanket.

20           THE COURT:  Sorry.  I think we're getting a little

21   caught up on the terms "investigation" and "investigating."  I

22   don't think, Mr. Hansen -- the Court is not interrupting it as

23   a loaded word.  There's an investigation.

24           I think the question, Mr. Kreindler, that Hansen is

25   asking is did you give any direction or have any conversation

LB1H9113                     Kreindler – Cross

1   with Mr. Maloney about who he should speak with or whose files

2   he should look to as part of this internal investigation that

3   he was leading?

4           THE WITNESS:  Yes, I did.

5           THE COURT:  OK.  I think Mr. Hansen would like to know

6   who you suggested should be part of that search and review.

7           THE WITNESS:  I -- I or Duke said:  Why don't you,

8   Duke, work with John Hartney to run through the whole computer

9   system to make sure that there was nothing about the Jarrah

10  deposition transcript to Isikoff.

11  BY MR. HANSEN:

12  Q.  And that's it?  Nothing more?

13  A.  That was it.

14  Q.  Well, we know from Mr. Hartney now that there's no way

15  looking at your computer system would tell you anything about

16  who had downloaded the transcript, who had printed it out, and

17  who had given it to Mr. Isikoff, correct?

18          MS. KIRSCH:  That's actually not an accurate statement

19  of Mr. Hartney's declaration.

20          MR. HANSEN:  Let me rephrase, then.

21  Q.  Do you understand that anyone with Kreindler & Kreindler

22  employee login access can get access to the sealed materials on

23  the Kreindler system or could before September 27?

24  A.  No, I think not everyone could do that, only people who had

25  signed the protective order.

LB1H9113                    Kreindler - Cross

1   Q.  Is that because there was a policy of that, or was there

2   anything in the computer that prevented them from getting it?

3   A.  I can't answer how the computer works.  I can tell you that

4   from the time we had to deal with the first order through the

5   second DOJ order, we made sure that no one in the firm who

6   hadn't, as I did, gave my word to follow these orders could

7   look at -- could see the material.

8   Q.  How did you do that technologically?

9   A.  I have no idea.  That's -- you're asking the wrong person

10  on computer systems and technology.

11  Q.  In fact, there was nothing technologically that prevented

12  anyone with Kreindler & Kreindler employee access from getting

13  that transcript, printing it off, and leaving it on a bus for

14  Mr. Isikoff?

15          MS. KIRSCH:  Objection.  Mr. Kreindler just said he's

16  not the guy who knows how the system works.  That was actually

17  in this statement of what's in the record, and that's

18  inappropriate.

19          THE COURT:  The objection is sustained.

20          Mr. Kreindler, if you want to look at confidential

21  material on your system --

22          THE WITNESS:  Yes.

23          THE COURT:  -- can you describe for me generally what

24  you have to do to access that information.

25          THE WITNESS:  I only did one thing.  If I wanted to

1    see material, I would ask John, can you send me one of the

2    documents we're talking about?  So I'm trying not to use

3    anybody's names, but if I wanted to see --

4              THE COURT:  Document X.

5              THE WITNESS:  -- document X on Jarrah, I would just

6    call John --

7              THE COURT:  John Fawcett.

8              THE WITNESS:  -- John Fawcett, yeah, and say, Can you

9    show me this document.

10             THE COURT:  So you personally, in preparing for a

11   deposition or a motion or whatever, would never enter the

12   server yourself and look for documents?  You would rely only on

13   Fawcett to provide it?

14             THE WITNESS:  I never entered the search for myself.

15             THE COURT:  OK.

16             THE WITNESS:  I confess to that complete limitation.

17   I don't know how the server works.  A dozen of my partners are

18   here to confirm how frustrating it is because I need to ask

19   someone like John, can you send me a particular document.

20             THE COURT:  So I think the witness has established

21   that he is not competent to answer questions about how the

22   server works or how access is provided, so let's move on from

23   that topic of conversation.

24             MR. HANSEN:  Your Honor, of course, but I will return

25   to it when I get to Mr. Kreindler's declaration later when he

LB1H9113                    Kreindler - Cross

1   talks about who had access to the transcript because I believe

2   that's a fair question, but I'm not going to do it now.

3   BY MR. HANSEN:

4   Q.  All right.  So let's talk about this investigation.  You

5   could have assigned other lawyers in your firm who had no

6   involvement in the 9/11 case or access, in your words, to the

7   9/11 transcripts to do the investigation, correct?

8   A.  Anything is possible, but that would make no sense.

9   Q.  Well, you would agree with me, would you not, that in any

10  investigation to actually try to get to the facts, it would be

11  important to move quickly, correct?

12  A.  Of course.  No one wants to move slowly.

13  Q.  Well, one thing you'd want to do is keep evidence from

14  being destroyed, wouldn't you?

15  A.  No one wants to destroy evidence, or I certainly don't want

16  to destroy any evidence anytime.

17  Q.  Well, that's not my question, Mr. Kreindler.

18          You've told us in your sworn testimony that you

19  directed your colleague to do an internal investigation.  I

20  think you've agreed that it should be done quickly, and I'm

21  asking you were you aware, when you gave this instruction, of

22  the need to move quickly in order to prevent the destruction of

23  evidence?

24  A.  It never dawned on me that anybody would destroy evidence,

25  so I did not have that in my mind.  And I also have to say it

LB1H9113                    Kreindler - Cross

1    wasn't my directive or order to Duke to do it.  We talked about

2    it, and Duke said, I'll work with John Hartney and run through

3    our whole system to make sure that no one here had anything to

4    do with it.

5    Q.  In fact, if Mr. Fawcett is to be believed, evidence was

6    destroyed here, wasn't it?

7    A.  That's what John said later.

8    Q.  So as part of this internal investigation, again, only if

9    you know, were all of the Kreindler & Kreindler professionals

10   who you believed had access to the Al Jarrah transcript

11   immediately questioned?

12   A.  I think we were all there.

13   Q.  What do you mean you "were all there"?

14   A.  OK.  I am struggling with your question because it doesn't

15   reflect the actual discussions we had as soon as we got

16   together and talked about it.

17   Q.  So who got together and talked about it?

18   A.  Here's what I remember.  I read the article when I was at

19   home.  I came to the office, I think, later that day.  I

20   believe Steve Pounian was taking a deposition that day.  When I

21   got to the office, I spoke to John, John Fawcett, Duke, Andrew

22   Maloney, and said, we also -- oh, my God, I mean, where, you

23   know, did this come from?  Where did Isikoff get it?  And we

24   had -- we were talking about it kind of mystified, and I said

25   there's only one source that I could think of who would have

1   given it to Mike Isikoff now.  I can tell you what I said, if

2   you want to know or ask me later.

3   Q.  So other than that meeting that you've described, did you

4   give Mr. Maloney any directive to actually interview witnesses,

5   including all the members of the team who had access to the

6   transcript?

7   A.  It was at that meeting, that discussion, that Duke said I

8   will work with John Hartney.  I think Megan was in her office,

9   and I recall speaking to her later.  If I'm remembering

10  correctly, Steve was doing a deposition or preparing for a

11  deposition, so whatever I said to Steve later in the day was

12  very brief.  And then there was some internal discussion.  We

13  set up a PEC call to see -- talk about this and see if anybody

14  had any idea how Isikoff got it.

15  Q.  So if I'm hearing your answer correctly, and correct me if

16  I'm wrong, you did not give Mr. Maloney any instruction to

17  actually interview witnesses, did you?

18  A.  Interview?  I don't know who the witnesses you're talking

19  about are.

20  Q.  How about all the people who had the transcript who might

21  have leaked it?

22  A.  We all were -- all the lawyers working on the case, the

23  four of us and John, were part of this discussion.  Duke

24  volunteered to head up the -- you're calling it an

25  investigation -- to go through the system and make sure that no

1    one at the firm had anything to do with it.

2    Q.  OK.  I think you've answered my question.  Let me just ask

3    another question.

4            You worked very closely with John Fawcett.  Did you

5    personally ask John Fawcett:  John, did you leak this

6    transcript?

7    A.  I -- I did not do it as a Q & A.  I spoke to John.  I

8    didn't do it.  I know you didn't do it.  I have no idea who

9    could have done it.  The only party I could think of that would

10   have leaked this to Isikoff now was somebody on the Saudi side.

11   Q.  Now, Mr. Kreindler, let me just ask you to focus on my

12   question, please.

13           At any point, at any time, did you ever ask John

14   Fawcett whether he had provided the confidential transcript to

15   Mr. Isikoff?

16           MS. KIRSCH:  That was asked and answered, your Honor.

17           THE COURT:  I don't think it was answered, so you can

18   answer the question.

19   A.  I talked to John --

20   Q.  No, no, no, I don't want "talked to."  It's a simple

21   question.  I'd like a direct answer.

22           At any point in time, did you ever ask John Fawcett,

23   in words or substance, John, did you provide the Al Jarrah

24   transcript to Mr. Isikoff?

25   A.  No.

LB1H9113                      Kreindler - Cross

1    Q.  Did you direct anyone else to ask Mr. Fawcett that

2    question?

3    A.  No.  We just -- we talked about it.

4    Q.  The question is not what you talked about, with all

5    respect.

6              So since you started an investigation on July 15, when

7    was it that all of the firm's outgoing emails to Mr. Isikoff

8    were pulled and reviewed?

9              MS. KIRSCH:  Objection.  I think we've already talked

10   about the fact that Mr. Kreindler was not running that part of

11   the investigation and the technology piece was not something

12   that he was intimately involved with.

13             THE COURT:  Did you ever learn when the emails were

14   pulled in order to search for communications with Isikoff?

15             THE WITNESS:  More or less.  I don't remember the

16   date, but relatively quickly Duke, you know, spoke to John

17   Hartney and said, we've got to go through the whole system to

18   see if anyone emailed or had some way of sending the deposition

19   transcripts.  My recollection is Duke did that with John

20   Hartney pretty soon.  I just can't tell you the day or time

21   when he said to me, Jim, it's done, and there was nothing

22   there.

23             THE COURT:  OK.

24   BY MR. HANSEN:

25   Q.  So, Mr. Kreindler, based on your testimony, were you made

LB1H9113                    Kreindler - Cross

1    aware within a few days after July 15 that this email search

2    had pulled up the fact that Mr. Fawcett was in email

3    communication with Mr. Isikoff during the month of July?

4    A.  I knew John had some email --

5    Q.  No, no, this is about the email.

6          Were you made aware that they'd done a search; the

7    search had found an email from July 12 from Mr. Fawcett to

8    Mr. Isikoff sending case materials?  Were you aware of that?

9    A.  I was aware of the privilege log, if that's what you're

10   referring to.

11   Q.  Were you aware of the email sending the privilege log?

12   A.  I must have been.  I don't know how else he'd send the

13   privilege log to Mike Isikoff.

14   Q.  So when did you first become aware of the email sending the

15   privilege log from Fawcett to Isikoff?

16   A.  I don't know.

17   Q.  Was it before the leak was disclosed -- I'm sorry.  I'm

18   sorry.

19          Was it within a few days of July 15?

20   A.  I just don't remember when I saw the email from John to

21   Isikoff saying, here's the privilege log.

22   Q.  Again, I'm just asking whether you know.  You may or may

23   not.  When were the phones, the computer, cell phones, and

24   other devices of the Kreindler & Kreindler 9/11 case team

25   secured so they could be evaluated for evidence?

LB1H9113                    Kreindler - Cross

1  A.   Recently, with our lawyer Emily Kirsch, we had a whole

2  technological issue, and I was without my cell phone, my one

3  means of communication, for about four or five hours, which I

4  didn't particularly like, but managed.

5  Q.   I'm sorry.  Just so I'm clear, that was in October

6  sometime, wasn't it?

7  A.   That's the only time I gave my cell phone to tech people to

8  do whatever alchemy they did to pull information or the system

9  out of it.

10 Q.   As far as you're aware, no one else was asked to provide

11 devices, records, or other evidence prior to us asking for it

12 and the Court ordering it in October of this year?

13 A.   I'm not aware of anyone else turning over their cell phones

14 or computers until we went through this technological search

15 fairly recently.

16 Q.   Just before we leave this topic of your investigation,

17 according to your conversation with Mr. Maloney, your

18 expectation was the investigation was going to be Mr. Hartney

19 looking for evidence in your computer system that someone had

20 from your computer system provided the Al Jarrah transcript to

21 Mr. Isikoff, correct?

22        MS. KIRSCH:  Again, Mr. Kreindler was not involved in

23 the details of this so-called investigation.  That was

24 something that was tasked to Mr. Maloney.  He's not the right

25 witness for this topic.  This is a waste of time.

LB1H9113                    Kreindler - Cross

1          THE COURT:  I think he's testified, though, as to the

2    conversation he had with Mr. Maloney about what was expected,

3    so I think he can answer those questions.  I recognize he has

4    demonstrated he doesn't know the details of that investigation.

5    Q.  So can you answer my question?

6    A.  I've lost it by now.

7    Q.  Let's read it back to you.

8          (Record read)

9    A.  I think it was broader than that, that Duke would say I'll

10   check on all communications between anyone here and Mike

11   Isikoff in that time period.  But, you know, you'll be asking

12   him later today, I assume.

13   Q.  So what did you understand "all communications" to mean?

14   Phone calls?  Email?  Texts?  What?

15   A.  Whatever the system would show.  Certainly, I had in mind

16   emails.  If someone sent a text from a personal phone, I don't

17   know that that would be reflected anywhere in our computer

18   system.

19   Q.  So let's go to --

20   A.  I just don't know.

21   Q.  OK.  Let's go to July 21.  It's a few days after the

22   publication of Mr. Isikoff's story describing the confidential

23   transcript that was leaked to him.  Were you aware on July 21

24   that lawyers for the Kingdom requested that the PEC agree to go

25   to the court for a court-ordered investigation into the leak?

LB1H9113                         Kreindler - Cross

1   A.  I don't remember the day, but, certainly, I remember us

2   saying to the Court at around that time we, too, want to do

3   whatever we can to see who gave this prohibited information to

4   Mike Isikoff.

5   Q.  Well, let me give you little more specifics here.  Let's

6   pull up Exhibit 42 at page 3.

7   A.  OK.

8   Q.  This is an email that was sent to you, correct?

9   A.  Yeah.  Well, looks like an email sent to Steve, me, and

10  Duke.

11  Q.  And in the email, counsel for Saudi Arabia asks whether you

12  would consent to a motion requesting that the court direct all

13  entities or individuals to submit declarations, and so on.  Do

14  you recall getting that?

15  A.  Just generally.  I don't specifically recall this email,

16  but --

17  Q.  And that's --

18  A.  -- I do recall it generally.

19  Q.  That put you on notice that there was going to be a serious

20  problem, didn't it?

21  A.  No.

22  Q.  Well --

23  A.  It did not.

24  Q.  -- let's look at the phone records, then.  If we go to

25  Exhibit 135, the very next morning, after the Kingdom is asking

LB1H9113                         Kreindler - Cross

1    for a court-ordered investigation, you and Mr. Fawcett have a

2    phone call at 9:17.

3              Do you recall having that phone call with Mr. Fawcett

4    the morning after you got this communication from counsel for

5    Saudi Arabia saying that they're going to go to the court on

6    this?

7    A.  No.  I remember -- I don't remember what this phone call

8    was about.

9    Q.  It's a pretty long call, isn't it, 46 minutes?

10   A.  Yeah, it's 46 minutes.

11   Q.  You talked about the leak, didn't you?

12   A.  No.

13   Q.  You talked about the fact that the Court might order an

14   investigation, didn't you?

15   A.  Maybe, but I don't remember what this phone call was about.

16   It might have been the executive order.

17   Q.  You talked about the need for Mr. Fawcett to get a criminal

18   defense counsel, didn't you?

19   A.  No, absolutely not.  That would never have crossed my mind.

20   Q.  Who's Liz Crotty?

21   A.  Liz Crotty worked in our office as an associate.

22   Q.  And then she left your firm to go become a white-collar

23   defense lawyer, correct?

24   A.  I think so.

25   Q.  So explain for us why it was that immediately after your

LB1H9113                    Kreindler - Cross

1    call with Mr. Fawcett, he calls Liz Crotty and talks to her for

2    22 minutes?

3    A.  I have no idea why John called Liz Crotty.  I don't think

4    I've spoken to her for years.

5    Q.  Did you give Mr. Fawcett her information?

6    A.  No.

7    Q.  Do you know if they're friends?

8    A.  I know he knew her, as we all did, because she worked in

9    the office.

10   Q.  But the only reason he'd be calling Liz Crotty after your

11   46-minute phone call would be his concern that there was going

12   to be a big problem based on what you all had done with this

13   sealed transcript, right?

14         MS. KIRSCH:  Objection.

15   A.  Wrong.

16         MS. KIRSCH:  Objection.  All of this calls for

17   speculation.  There's no foundation why Mr. Fawcett made any

18   call that he did.

19         THE COURT:  Sustained.

20   Q.  Do you have any explanation for this call sequence,

21   Mr. Kreindler?

22   A.  I don't see it as a sequence.  I have no idea why John

23   called Liz Crotty then, absolutely none.

24   Q.  How about why did John call you back immediately after

25   hanging up with Ms. Crotty?

LB1H9113                    Kreindler – Cross

1    MS. KIRSCH:  Objection.  More speculation.

2    THE COURT:  Overruled.

3    You can answer.

4  A.  I have no idea.  I don't remember what we were talking

5  about then.  Given the time period, I think it was more likely

6  moving toward Joe Biden's executive order than anything we're

7  discussing today.

8  Q.  Do you remember anything about your five-minute call with

9  Mr. Fawcett that followed his 22-minute call with Ms. Crotty?

10  A.  I don't remember anything about this call, but as I've told

11  you before, probably not a day goes by that I'm not talking to

12  John Fawcett about our case and how we can move it forward.

13  Q.  Well, on the 23rd of July, the Kingdom of Saudi Arabia did

14  indeed go to court and request a thorough court investigation,

15  correct?

16  A.  I can't remember the date, but I remember that that's what

17  Saudi Arabia did, and there was a brouhaha.  We suggested a

18  meet-and-confer, and that never happened.  They moved.  There

19  was the limited meet and confer.  The order resulted.

20  Q.  Kreindler & Kreindler, alone among all firms in this case,

21  resisted a court-ordered investigation, isn't that the truth?

22    MS. KIRSCH:  Objection.

23  A.  No.

24    MS. KIRSCH:  It's both false and it mischaracterizes

25  the facts.

LB1H9113                    Kreindler - Cross

1          THE COURT:  Overruled.

2          You can answer the question.

3   A.  No.

4   Q.  All right.  Let's look at what your colleague Mr. Pounian

5   wrote on July 23 at Exhibit 43A, pages 4 to 5.

6          MR. ROBERTS:  Counsel, that has an MDL protective

7   order.  Should I just leave it?

8          THE COURT:  Is there an application?

9          MR. HANSEN:  Your Honor, I think he's being careful to

10  make sure that they have a chance to object before we put up

11  the document.

12         MS. KIRSCH:  Thank you.  I would like to take a moment

13  to read the document.

14         Kreindler & Kreindler does not have an objection.  I

15  don't know whether the other PECs do.

16         THE COURT:  I don't know that they are here or have an

17  argument to be made.  I see --

18         MR. CARTER:  Your Honor, this is Sean Carter, for the

19  PECs.  We're here, but we do not have a copy of the exhibit

20  binder, so I don't know what it contains.

21         MR. MIGLIORI:  Don Migliori from Motley Rice also on

22  behalf of the PECs.  I do not have a copy either.

23         MR. HANSEN:  Well, I don't want to slow things up, so

24  why don't I just ask Mr. Kreindler to look at it for himself.

25  I won't show it on the screen.

LB1H9113                    Kreindler - Cross

1   Q.  If you'd look at Exhibit 43A, pages 4 and 5, in that

2   exhibit binder.

3   A.  43A?

4   Q.  The A behind the tab 43.

5   A.  I see a 43, but not a 43A.  Oh, I see it.  OK.  Yes.

6   Q.  So my question, sir, is isn't it true that your colleague,

7   on behalf of your firm, said you weren't consenting to a

8   court-ordered investigation?

9   A.  No, I don't think that's what -- no, it's not true.

10  Q.  In fact, Mr. Pounian communicated that the Kreindler firm

11  had completed an internal review of the handling of the Jarrah

12  transcript and the conduct of Michael Isikoff and had

13  determined that it hadn't been the leaker, right?

14  A.  I'm looking for Steve's email.  Sorry.

15  Q.  Take your time.  Read as much as you'd like.

16  A.  Are you talking about Steve's email Friday, the 23rd, at

17  3 o'clock to Greg Rapawy?

18  Q.  If you look at page 4 of 5 of that -- I wish I could show

19  it on the screen for you, but I'm not going to -- pages 4 to 5,

20  there will be emails from your colleague to opposing counsel.

21  A.  OK.  At the top of page 4, yeah.

22  Q.  Isn't it true that your colleague represented to opposing

23  counsel that Kreindler & Kreindler had completed its own

24  internal review, and it had determined that the transcript

25  wasn't released by Kreindler & Kreindler?

LB1H9113                    Kreindler - Cross

1   A.  I may be looking at the wrong place, but I believe that's

2   true.

3            Oh, yeah, I see it.  Each firm has determined that the

4   transcript was not released through our firms or others working

5   with our firms and are prepared to document the facts if

6   necessary.  So that's exactly what Steve said.

7   Q.  Did you approve this email before it went out?

8   A.  No, Steve handled it.  He's my partner.

9   Q.  Were you copied on it?

10  A.  Let me see.  It looks that way, yeah.

11  Q.  So we're talking about six business days after the July 15

12  leak, correct?

13  A.  That's when this email went out, yes.

14  Q.  So what had Kreindler & Kreindler done between the 15th and

15  this date, the 23rd, so that it could make this representation

16  that it had determined it wasn't the leak?

17           MS. KIRSCH:  I'll just renew my objection that the

18  details of the investigation were not Mr. Kreindler's

19  responsibility.

20           THE COURT:  Understood.  You can answer, to the extent

21  you have information to answer.

22  A.  I don't.  Duke and Steve were working on it.

23  Q.  OK.  Let's just cut ahead to July 27.  After Saudi Arabia

24  applied to the court, your firm and the other firms went back

25  to the court and submitted a letter in which you again stated

LB1H9113                    Kreindler - Cross

1   that each of the lead PEC firms was confident it was not the

2   source of the leak.  Did you approve that letter before it went

3   out?

4   A.  I don't know which letter you're --

5   Q.  I'm sorry, Exhibit 43.

6           I don't know if there's an objection to -- if anybody

7   wants to object to us putting it up.

8           MS. KIRSCH:  The Kreindler firm has no objection, but

9   again, I don't know if the other PECs do.

10          MR. MIGLIORI:  Your Honor, Donald Migliori.

11  Obviously, without the document, we don't know what's being

12  shared.  I think the way it was handled just recently protects

13  any potential disclosure of work product or communications

14  within the plaintiffs.  So as long as the questions are limited

15  to the conduct of the Kreindler law firm and not disclosing

16  communications, we would object to any public disclosure of the

17  document or questions that go outside the scope of that narrow

18  language.

19          THE COURT:  I believe this is a July 27 letter filed

20  to the court that I believe is currently under seal, but it may

21  not be under seal at some point in the future, but it's

22  currently under seal and subject to the MDL protective order.

23          MR. HANSEN:  Well, your Honor, I don't want to take

24  more time than we need.  It certainly would be better if we

25  could show Mr. Kreindler what we're talking about, but I'll try

LB1H9113                         Kreindler - Cross

1    and do it another way.

2    BY MR. HANSEN:

3    Q.  So, Mr. Kreindler, take a look --

4            THE COURT:  You want to take a minute and show counsel

5    briefly?

6            MR. HANSEN:  I'll just show Mr. Kreindler.  I don't

7    think he objects to me showing Mr. Kreindler without showing it

8    on the screen.  I don't really want to take the time.

9            THE COURT:  OK.

10   Q.  Mr. Kreindler, take a look at Exhibit 43.

11   A.  OK.

12   Q.  It's a letter.  Did you review that letter before it was

13   filed with the court?

14   A.  No.  Steve did.

15   Q.  As the cochairman of the PEC, do you not at least review

16   letters filed with the court by the PEC?

17   A.  Sometimes, but I also rely upon my partners.

18   Q.  So, once again, this time in an official document sent to

19   the court, Kreindler & Kreindler is signing on to a letter in

20   which it is saying it's finished its internal investigation,

21   and it's confident that Kreindler & Kreindler didn't do it,

22   isn't that correct?

23   A.  If we're looking at the same thing, this July 27 letter

24   signed by Steve, Bob Haefele, and Sean Carter says we've done

25   investigations, and we're confident that these firms did not

LB1H9113                    Kreindler - Cross

1   have anything to do with the leak.

2   Q.  Just in the interest of completeness, I'll ask you again,

3   if you know, what investigation actually had been done by

4   Kreindler & Kreindler prior to July 27 in order to make this

5   representation to the court?

6            MS. KIRSCH:  Objection.

7            THE COURT:  You can answer the question.

8   A.  I can't tell you anything in addition to what I've said

9   already, that Duke headed up this effort to make sure that, as

10  far as we knew, no one at the firm gave Jarrah portions to Mike

11  Isikoff.

12  Q.  As the leader of your firm's team, as the cochairman of the

13  Executive Committee, wouldn't you want to satisfy yourself

14  about the accuracy and basis for any factual representation

15  being made to this Court?

16  A.   In this case, with the millions of letters, there are many

17  times when I've relied upon my co-lead counsel at Motley or

18  Cozen or my partners Steve, Megan, or Duke.  We do not -- it

19  would be impossible for every lawyer to review every document.

20  We'd never get anything out the door.

21  Q.  So let's go to July 29.

22            THE COURT:  May I ask a question on this exhibit, if

23  you don't mind?

24            MR. HANSEN:  Of course.

25            THE COURT:  Mr. Kreindler, I'm just curious on the

LB1H9113                    Kreindler - Cross

1   signature line of this letter submission, it lists Mr. Pounian,

2   who appears to be the signer of the letter, and Mr. Maloney and

3   Ms. Benett.  Was there a deliberate decision for you not to

4   sign this letter?

5              THE WITNESS:  No.

6              THE COURT:  Typically, all the firms are listed -- all

7   the lawyers, excuse me, are listed under your firm name.

8              THE WITNESS:  No, there was no deliberate decision.

9   What I can tell you is it was Duke who was doing the

10  investigation, later Megan prepared the declarations.

11             THE COURT:  Could you be sure to speak into the

12  microphone.

13             THE WITNESS:  I'm sorry.

14             THE COURT:  That's OK.  Duke prepared the

15  investigation.

16             THE WITNESS:  With the mask, it's even more difficult.

17             To answer the question is those were my three partners

18  who were really handling the details of this.  And to put it in

19  context so you know where I was and what I was doing, my

20  principal focus this last -- or a principal focus, the very end

21  of July and August was getting the 26 team review publicly

22  released, as Joe Biden did on 9/11, and getting a process under

23  way for declassification of the FBI documents.  So we had a

24  division of labor.

25             I had the discussion with Duke and John and Steve and

1   Megan about the leak, and since I had no idea and was confident

2   no one at the firm was doing it, this matter of communicating

3   with your Honor and providing information, other additional

4   information, you wanted was really being handled by Duke,

5   Steve, and Megan, and my focus was seeing that the FBI

6   documents would begin to come out in a public way by 9/11.

7          THE COURT:  So you don't have a specific recollection

8   of electing not to be on this letter?

9          THE WITNESS:  Correct.

10          THE COURT:  OK.  You can proceed.

11   BY MR. HANSEN:

12   Q.  So if we go to July 29, Mr. Kreindler, on that date two of

13   the four Plaintiffs' Executive Committee firms, without court

14   order, put in detailed proof, including sworn statements from

15   everybody at their firms who had access to the transcript, and

16   they described their internal investigations.  And I'm

17   referring specifically to Cozen, O'Connor and Motley Rice.

18   Were you aware they had done that?

19   A.  Yes.

20   Q.  Why didn't you do it?

21   A.  Our approach and the approach of some the other firms was

22   to provide the information that the Court requested.  If the

23   Court wanted more information, we would provide it.  But in the

24   history of this case, I can tell you that oftentimes, maybe on

25   a daily basis, we'll have disagreements in the committee about

1    how to respond to any of the 12 balls that were up in the air.

2    So half the committee said, we're going to do more than the

3    judge wanted; the other half said, let's give the judge what

4    she wants.  If she wants more, we'll provide it.  It was just a

5    difference in approach.

6    Q.  Actually, the third firm, Anderson Kill, went ahead and did

7    the same as the other two firms on August 13, and they

8    announced they were doing this voluntarily and not in response

9    to a court order.  You recall that?

10   A.  Yes.

11   Q.  So three of the four firms wanted their names cleared.  Why

12   didn't you want your name cleared?

13         MS. KIRSCH:  Your Honor, I'm sorry if I missed a

14   moment.  Of course, the order for declarations came down on

15   August 12, which is prior to Anderson Kill's submission, so the

16   record should be clarified.

17         MR. HANSEN:  No, the record shouldn't be clarified.

18   She's not testifying.  In fact, they put their thing in, and

19   they said they weren't doing it in response to the court order.

20   And he knew that and testified.  Now his lawyer wants to change

21   the testimony.  This is improper, your Honor.

22         THE COURT:  I think the record here is clear.  So to

23   the extent that is an objection, it's overruled.

24   BY MR. HANSEN:

25   Q.  OK.  Mr. Kreindler, why don't you answer my question.

LB1H9113                    Kreindler - Cross

1  A.  I'm sorry.  So what's the question?

2  Q.  Three of the four firms in the Plaintiffs' Executive

3  Committee welcomed an investigation and provided extensive

4  proof of their noninvolvement?

5          THE COURT:  Mr. Hansen, I wouldn't characterize how

6  the other firms -- whether they were welcoming it or not.  They

7  made their filings.  The record reflects that.

8          MR. HANSEN:  Thank you, your Honor.  I'll rephrase.

9  Q.  Three of the four firms submitted sworn testimony from

10  every person at the firm who had the Al Jarrah transcript and a

11  sworn declaration describing their internal investigation.

12  A.  Uh-huh.

13  Q.  Why wouldn't you also want to prove that you had nothing to

14  hide here?

15          MS. KIRSCH:  Objection.  That's just not true.  The

16  declarations and the description were filed in response to the

17  court order.

18          THE COURT:  I don't think that was the question.  But

19  can you rephrase your question, and then I think in five

20  minutes we're going to break.  So find an appropriate place for

21  a break.

22          MR. HANSEN:  I'll make my question nice and simple.

23  Q.  With all of your colleagues submitting sworn testimony from

24  every person who had access to the transcript and sworn

25  testimony about what they had done to investigate, what

LB1H9113                    Kreindler - Cross

1   possible reason was there for Kreindler & Kreindler to not

2   provide that proof other than Kreindler & Kreindler had

3   something to hide?

4        MS. KIRSCH:  Asked and answered.

5        THE COURT:  You can answer it.

6   A.  Sure.  It has nothing to do with having something to hide

7   because we had nothing to hide.

8        The short answer is the way we operate -- I operated,

9   my dad, most of the partners -- is kind of the KISS principle.

10  The judge asked for something narrow.  We all gave our word

11  that we had nothing to do with it.  We had Duke do an internal

12  investigation, and I'm -- we decided, let's keep it simple.  If

13  the Court wanted more information like some other of the other

14  firms were providing, or anything else, we'd comply.  But we

15  were doing what the Court asked and keeping it simple.  It had

16  nothing to do with trying to hide anything, because there is

17  nothing to hide.

18  Q.  Wait a second.  Your answer just a minute ago you said we

19  had all "given our word" that we had nothing to do with it, but

20  you answered my prior question saying you're not aware of

21  anybody ever directly asking Mr. Fawcett whether he leaked the

22  transcript.  How do you reconcile those two statements?

23       MS. KIRSCH:  Objection.

24       THE COURT:  What's the objection?

25       MS. KIRSCH:  It's a compound question, it

1   mischaracterizes prior testimony, and it's misleading.

2              THE COURT:  Overruled.

3   A.  Because in everything John said to me, I was certain that

4   he had nothing to do with it.  And for him to -- it never would

5   be possible, in my mind, for him to have something to do with

6   it.  And that's why we were talking about the only conceivable

7   party who might have wanted this to get out was Saudi Arabia

8   months before the attention of 9/11.

9   Q.  On August 12 the Court orders you to provide sworn

10  testimony because the circumstantial evidence suggests

11  Kreindler & Kreindler is the leak.  Do you recall that order?

12  A.  I recall the order.

13  Q.  And the Court ordered, at a minimum, that you provide

14  declarations from four named attorneys.  Remember that?

15  A.  Yes.

16  Q.  It didn't limit you to four attorneys, did it?

17  A.  I don't think there was any limitation.  It just said

18  provide declarations from myself, Steve, Megan, and Duke.

19  Q.  And you were perfectly free to provide additional

20  declarations from people who had the transcript, weren't you?

21  A.  I'm not aware of who else had the transcript.

22  Q.  How about Mr. Fawcett?

23  A.  Oh, from John?  OK.  So what -- I'm sorry.  I don't

24  understand what your question is.

25  Q.  You had every right to not do the bare minimum, but to

1    provide full declarations from everyone at Kreindler &

2    Kreindler who you know had access to the Al Jarrah deposition

3    transcript, correct?

4    A.  I guess we could provide unlimited depositions from

5    everybody if we wanted to.

6    Q.  That's not my question, but I think you understand the

7    point.

8            On August 16 --

9    A.  Can I respond to that comment?

10   Q.  On August 16, Mr. Kreindler, what you submitted --

11           THE COURT:  You'll have an opportunity on redirect.

12   Q.  -- was bare one-and-a-half-page boilerplate denials from

13   you, Mr. Pounian, Mr. Maloney, and Ms. Benett, correct?

14   A.  I would not call it bare boilerplate.  I would say we

15   answered the question that the judge asked truthfully.  You're

16   the one who's calling it bare boilerplate.

17   Q.  You didn't provide any IT declaration, did you?

18   A.  I don't think so, no.

19   Q.  You didn't provide any description of whatever internal

20   investigation you'd supposedly done?

21   A.  I don't think we did.

22   Q.  You didn't disclose to the Court that everybody with

23   employee login access could have gotten that transcript?

24   A.  It is probably dozens of people who could have gotten the

25   transcript, from translators, all the tech people doing the

1  video depositions.

2  Q.  I'm talking about Kreindler & Kreindler employees.

3  A.  OK.

4  Q.  You didn't disclose to the Court on August 16 that anybody

5  with employee login credentials could have accessed the

6  Al Jarrah transcripts, right?

7  A.  All I can tell you is we provided the information that the

8  Court asked for.

9         MR. HANSEN:  Your Honor, would now be a good time to

10  break?  I know you wanted to break at 1:00.

11         THE COURT:  OK.  Let's take a break.  As I indicated,

12  I'd like counsel back in the room by 1:45 so we can begin

13  questioning again at 2 o'clock.

14         MR. HANSEN:  Thank you, your Honor.

15         MR. GERBER:  Your Honor, a quick procedural question.

16         THE COURT:  Yes.

17         MR. GERBER:  Is it permissible for the attorneys here

18  in the courtroom to have lunch with our client?  Obviously, we

19  will not be discussing the substance of the testimony.  We just

20  want to get clarity from the Court on --

21         THE COURT:  I don't mind you having lunch with your

22  clients, but not to discuss the subject of the testimony.

23         MR. GERBER:  All right.  Thank you, your Honor.

24         THE COURT:  Enjoy your lunch, everybody.  We'll see

25  you back here at 1:59.  (Lunch recess)

1                          AFTERNOON SESSION

2                              2:00 p.m.

3              THE COURT:  Good afternoon, everybody.  Please be

4      seated.

5              I hope everybody had some lunch, even if it wasn't a

6      great lunch.

7              Mr. Kreindler, I will remind you that you are still

8      under oath.

9              THE WITNESS:  Yes, your Honor.

10             THE COURT:  Mr. Hansen, your witness.

11     BY MR. HANSEN:

12     Q.  Mr. Kreindler, on August 30, the court issued an order.

13     Did you read that order?

14     A.  I read all the court's orders, yes.

15     Q.  So, you learned on August 30 that Kreindler & Kreindler was

16     going to have to put in a sworn declaration from John Fawcett,

17     didn't you?

18     A.  Yes.  Offhand, I don't remember the date, but that's right.

19     Q.  If the order provided on August 30, you read it on August

20     30, right?

21     A.  Correct.

22     Q.  You didn't wait days to read court orders?

23     A.  No.

24     Q.  So you knew on August 30 you had to get a Fawcett sworn

25     statement.  Did you go to him on August 30 and ask him to sign

1   a sworn statement?

2   A.  I did not.

3   Q.  Did you ever ask him to do so?

4   A.  No.  I said, as I mentioned earlier, Megan and Steve and

5   Duke were handling it.

6   Q.  Well, we have evidence that other members of your team were

7   asked to sign, and did sign, sworn declarations as early as

8   September 2nd.  And I would ask you to look at Exhibit 62B.

9   A.  Hang on a second.

10  Q.  62B.

11  A.  Sorry.  It's a big book.

12  Q.  62B, as in boy.

13  A.  OK.

14  Q.  I am just interested in the signature page and the date.

15          THE COURT:  I will just remind Mr. Kreindler that the

16  person who signed this is known as Consultant-1 in the public

17  record.

18          THE WITNESS:  Yeah.  What I have in front of me does

19  not have a signature page.  It's blacked out.

20          THE COURT:  OK.

21  Q.  But there is a date of September 2, 2021, right?

22  A.  On the one I have, the date is partly blacked out.  It

23  could be September 2nd.

24  Q.  And it was for a person identified as Consultant-A?

25          THE COURT:  I believe it was Consultant-1.

1    MR. HANSEN:  I'm sorry, your Honor.

2    Q.  Consultant-1, Mr. Kreindler?

3    A.  I don't see Consultant-1 on here.  Maybe I am looking at

4    the wrong page.  62B, it's declaration of blank redacted.

5    Q.  Well, that's not important.  It's a declaration for use in

6    this proceeding about the transcript leak, isn't it?

7    A.  Yeah.

8    Q.  It's got a date of September 2, 2021, doesn't it?

9    A.  I'm not being difficult with you, but on this page the date

10   is partly blacked out.

11   Q.  It's a single digit, how about that?

12         MS. KIRSCH:  Your Honor, this is not Mr. Kreindler's

13   declaration.  There is no foundation that he had any experience

14   with this document.

15         THE COURT:  Well, it's a declaration that was filed by

16   the law firm in response to the court's order.

17         MS. KIRSCH:  Correct.

18         THE COURT:  So I think Mr. Hansen is just asking a

19   question about what is on this declaration.  And if Mr.

20   Kreindler can't identify it because of a redacted version, I

21   don't know if we have an unredacted version or whether the

22   parties can stipulate to the date of this.

23         MS. KIRSCH:  Your Honor, I understand that this was

24   filed by the law firm, but that's a different matter from

25   whether Mr. Kreindler was involved in the process of obtaining

LB189114                    Kreindler – Cross

1    the declaration itself.  There is no indication that he would

2    know anything about this document.

3              MR. HANSEN:  That's what I am trying to figure out.

4              THE COURT:  Can we stipulate that this declaration is

5    signed September 2, 2021?

6              MR. HANSEN:  I hope so.

7              MS. KIRSCH:  Yes, I will stipulate to that.

8              THE COURT:  Mr. Kreindler, it's signed.  I know it's

9    blacked out partially, but the date that you could partially

10   see is September 2, 2021.

11             THE WITNESS:  OK.

12   BY MR. HANSEN:

13   Q.  So the question, Mr. Kreindler, if you know, is whether a

14   similar declaration was prepared for Mr. Fawcett on or about

15   September 2, 2021?

16   A.  I don't know.

17   Q.  Why would it be prepared for one member of your team and

18   signed on September 2 and not for Mr. Fawcett?

19             MS. KIRSCH:  Objection.

20   Q.  If you know.

21   A.  I don't know.  I'm not even sure whose declaration this is.

22   Q.  When, to your knowledge, was Mr. Fawcett first asked to

23   give a sworn statement in response to the court's order

24   requiring him to do so, dated August 30, 2021?

25   A.  I don't know.

LB189114                        Kreindler - Cross

1   Q.  Did you ever go to him and say, John, we are going to need

2   a sworn declaration from you, let's get it done?

3   A.  No.

4   Q.  Did you ever talk to him about it?

5   A.  I talked to him about the Isikoff article the day we saw

6   it.

7   Q.  I am talking about a sworn statement.

8   A.  No, I never talked to him about a sworn statement.

9   Q.  As the team leader, didn't you think it was important, in

10  response to the August 30 court order, to go to everyone

11  covered by that order and make clear that they were going to

12  have to submit sworn testimony in this proceeding?

13  A.  It's important, but that doesn't mean I am going to be

14  doing everything; we divied up responsibilities.

15  Q.  Mr. Kreindler, after the court's August 30 order, which is

16  going to reveal the evidence we now know today, Yahoo News

17  filed a motion with the court to either stop or substantially

18  limit the court's investigation into what happened.  Do you

19  recall that?

20  A.  Yes.

21  Q.  You personally supported that motion, didn't you?

22  A.  I really had very little to do with it, but I thought sure.

23  Q.  Let's put on the screen Exhibit 51.  This letter you did

24  sign.  You didn't delegate it to one of your subordinates.

25  September 9, 2021.  Let's go to the second page.  That's your

1   electronic signature, right?

2   A.  Yes, it is.

3   Q.  Let's go to the first page.  Isn't the substance of this

4   letter you supporting Yahoo News' motion?

5   A.  Let me just see it for a second.

6           Yes.  This is our letter saying we think the order

7   should be modified.

8   Q.  You're supporting Yahoo News' motion, correct?

9   A.  To modify the court's order, yes.

10  Q.  And this one you think is important to sign yourself,

11  right?

12  A.  Sure.

13  Q.  In this one, you again make your statement that materials

14  shouldn't be covered by these protective orders, which you have

15  otherwise called disgusting in other places?

16  A.  I'm sorry.  What are you pointing out to me in this letter?

17  Q.  Don't you also say in this letter that you think materials

18  covered by the protective order shouldn't be covered?

19  A.  I say exactly what you say.  We have argued in favor of

20  public access to all judicial materials.

21  Q.  And you again disparage the two protective orders, don't

22  you?

23  A.  In this letter, no.

24  Q.  But the Yahoo -- by the way, which other of your

25  plaintiffs' firms joined you in this request to squash or

LB189114                    Kreindler - Cross

1    limit, the Yahoo News' motion, the court's investigation?

2    A.  I don't know from memory.

3    Q.  The answer is zero, right?

4    A.  If you say so.

5    Q.  Well, do you remember any other firm joining you in support

6    of Yahoo News' motion to try and obfuscate or obstruct the

7    court's investigation?

8            MS. KIRSCH:  Objection.

9            THE COURT:  Overruled.

10   A.  I don't.  And I will tell you exactly why my --

11   Q.  I don't need why.  It's a "what" question.  Did anybody

12   else join you in your efforts to support the Yahoo News motion?

13   A.  Not that I recall.

14   Q.  So another couple of questions and we will be done.

15           You submitted a declaration as demanded by the court

16   in its August 30 order.  It's at 56A, and I will get that up in

17   front of you.

18           We have talked at some length this morning about what

19   you did and didn't do to try and be accurate in what you were

20   submitting to the court, but isn't it true, Mr. Kreindler, that

21   this declaration is false or misleading?

22   A.  I do not believe it's false and misleading.  If there is

23   something that concerns you, please point it out to me.

24   Q.  Let's go to page 3.

25           You say, underlined, "I never discussed the content of

LB189114                    Kreindler - Cross

1   the Jarrah deposition with Isikoff or anyone acting on his

2   behalf."

3              Do you see that?

4   A.  Not yet.  Oh, yes, I see it now.

5   Q.  Those are your words, correct?

6   A.  Yes.  Correct.

7   Q.  In fact, you talked with Mr. Isikoff on his podcast about

8   what he characterizes as three principles, including Bayoumi,

9   Thumairy, and Jarrah by name, correct?

10  A.  Are you asking me if he referred to Jarrah, Bayoumi, and

11  Thumairy by name?

12  Q.  Yes.

13  A.  I think so.  I don't specifically remember it.

14  Q.  And you claimed, again in the podcast, and we played the

15  podcast, I am quoting here, you claimed you "exposed all kinds

16  of lies" in the sworn and sealed testimony.

17             Do you recall saying that?

18  A.  Yes.

19  Q.  In fact, that's content of depositions, isn't it?

20  A.  No.  It's my characterization, my opinion of what we

21  accomplished during the deposition.

22  Q.  It's not an opinion, it's what the witnesses supposedly

23  said, isn't it?

24  A.  Not supposedly, what they did say.

25  Q.  I see.  Now you're communicating the truth about these

LB189114                    Kreindler - Cross

1    sworn depositions.  And that's what you do, Mr. Kreindler, you

2    decide what is OK to communicate, even though you are

3    purporting to communicate things that you are not allowed by

4    order to try and communicate, correct?

5              MS. KIRSCH:  Objection.  It's argumentative.  It

6    misstates facts and six other things.

7              THE COURT:  Sustained.

8              Rephrase the question, Mr. Hansen.

9    Q.  I will just ask it very simply, Mr. Kreindler.

10             When you say that you exposed all kinds of lies, in

11   the sworn sealed testimony, are you telling this court under

12   oath that this isn't purporting to communicate content from the

13   depositions?

14   A.  It is not communicating the content of what anyone said.

15   It is me saying to Mike Isikoff that we accomplished what we

16   hoped to accomplish, and pointing out -- now I am struggling

17   because there are things I can't say, but it is me

18   communicating to Mike Isikoff that the depositions were a

19   success because we got witnesses to contradict each other,

20   lies, etc.  It is my absolute belief that I said nothing about

21   the content of what any of the witnesses said because I wasn't

22   allowed to.

23   Q.  How about when you said to Mr. Isikoff on the air, "One

24   witness will contradict another."  That was content too, wasn't

25   it?

1          MS. KIRSCH:  Objection.

2          THE COURT:  Basis.

3          MS. KIRSCH:  Asked and answered.

4          THE COURT:  Overruled.

5          You can answer it.

6   A.  I do not believe that's content.  That's characterization,

7   in my opinion.

8   Q.  How about when you said, "Each person wants to minimize

9   their own role and point fingers at others."  That was content

10  too, wasn't it?

11  A.  No.

12  Q.  How about when you claimed you had a "smoking gun or guns,"

13  that's content too, right?

14  A.  No.

15  Q.  How about when you said Mr. Isikoff said it sounded like "a

16  confession," but then you responded by saying, "No, not a

17  confession," but it was still "damning dramatic."  That's not

18  content either?

19  A.  No.  It's a characterization that it's damning and

20  dramatic.  It is not the content because I am not allowed to

21  talk about the content.

22  Q.  Let's look at another part of your declaration.  You said

23  in your declaration under oath that no one other than people at

24  your firm who had submitted sworn statements on the 27th of

25  September had access to the deposition transcripts, correct?

1  A.  That's what I said in my declaration?

2  Q.  Let's put it on the screen so we are all looking at the

3  same thing.  56A, pages 3, 4.

4         THE COURT:  Mr. Hansen, to the extent you are going to

5  read anything, can I remind you to speak more slowly, please.

6         MR. HANSEN:  I apologize for my speed.

7         Let's get to the right place.  This is the last page

8  carry-over.  I am going to discipline myself to try not to

9  rush.

10  Q.  It says, "State every person that they know had access to

11  the deposition transcripts who has not already supplied a

12  declaration in this investigation."  And you answered "none."

13         Do you see that?

14  A.  Yes.

15  Q.  Now, I don't want to go back and do all the questions we

16  did this morning, but I think we established this morning that

17  you had no idea who within Kreindler & Kreindler had access to

18  the deposition transcripts.  Isn't that true?

19         MS. KIRSCH:  Objection.  He can point to the testimony

20  if that's what he wants to do.  I don't know what he is talking

21  about.

22         THE COURT:  You don't know?

23         MS. KIRSCH:  He is purporting to quote earlier

24  testimony.  If he wants to purport to quote earlier testimony

25  of Mr. Kreindler, he can show us the earlier testimony.

1              THE COURT:  Overruled.

2              You can continue.

3    A.  I'm sorry.  Your question is?

4    Q.  I will ask it again so we are not confused.  And I won't

5    characterize your prior testimony.

6              What was your basis, your basis for giving a sworn

7    statement that no one other than the people from Kreindler &

8    Kreindler, who had provided sworn declarations on September 27,

9    had, quote, access to the deposition transcripts?

10   A.  Again, I am relying upon my partners who were working on

11   this.

12   Q.  Who told you that?

13   A.  We had a -- we talked about the declarations.  Duke told

14   everyone about his --

15   Q.  Who told you that the only people at Kreindler & Kreindler

16   who had access to deposition transcripts were those that

17   submitted declarations?  Real simple.

18             MS. KIRSCH:  Objection.  Mr. Hansen is respectfully

19   misreading the sentence.  If he wants to go back and read the

20   sentence in Mr. Kreindler's declaration, he can do that, but

21   let's not skip words, let's read the whole sentence.

22             MR. HANSEN:  Can you put it up again?

23             THE COURT:  The "they" here is the firm Kreindler &

24   Kreindler?

25             MR. HANSEN:  It's Mr. Kreindler responding to this.

1          MS. KIRSCH:  Respectfully, your Honor, the "they" is

2    not the firm.  This is for each person to answer these

3    questions.

4          MR. HANSEN:  He is the affiant here.  It goes to his

5    knowledge.

6          THE COURT:  The "they" is the affiant.

7          MR. HANSEN:  It's got to be.

8          MS. KIRSCH:  "They" is the affiant.

9          MR. HANSEN:  They can't be an affiant.

10          MS. KIRSCH:  Actually, nowadays it is.

11    BY MR. HANSEN:

12    Q.  Mr. Kreindler, did you understand yourself to be giving an

13    affidavit here in this sworn statement?

14    A.  Yes.

15    Q.  Were you answering this as to your own personal knowledge?

16    A.  Yes.

17    Q.  In response to my prior question, you said someone told you

18    the information that gave you the basis to answer this last

19    question the way you answered it.  The last question is, who

20    was the person who told you that?

21    A.  Now looking at it, I understand it.  "They," in this case,

22    being me.  I read the question asking me, state every person

23    who they, Jim Kreindler, shared the deposition transcript with.

24    Q.  Wrong question.  They had access.  The question was about

25    access.

LB189114                    Kreindler - Cross

1   A.  I'm saying, from my personal knowledge, I didn't know that

2   someone had access other than my partners who we have been

3   talking about.

4   Q.  That's still not answering my question.  In response to my

5   earlier question, you said someone had provided you information

6   that gave you what you considered to be a valid basis for

7   giving this answer.  So who is the someone?

8   A.  Now we have got to -- I am looking at the question now.

9   Let me answer it as I see it and understand it now.

10          State every person that I knew had access to the

11  deposition transcript who has not already supplied a

12  declaration.  I didn't know of anyone who had access other than

13  my partners who were supplying declarations.

14  Q.  What did you do to inform yourself as to who actually did

15  have access before you provided this sworn testimony to the

16  court?

17  A.  We are talking in circles because I understand this to mean

18  who did I personally know had access, and I didn't know of

19  anyone else.

20  Q.  Did you ask Mr. Hartney if this was an accurate statement?

21  A.  No, because I am answering from my personal knowledge.

22  Q.  I will give you a hypothetical, Mr. Kreindler.  If you had

23  been told by Mr. Hartney before submitting this that, in fact,

24  everybody with employee log-in credentials at Kreindler &

25  Kreindler had at least access to these transcripts, would you

1   answer this question this way?

2          MS. KIRSCH:  Objection.  It's an improper

3   hypothetical.

4          THE COURT:  Overruled.

5   A.  I think I would have tried one way or another to get it

6   clarified so that I can answer the question properly.  So if

7   someone came to me and said, John Hartney knows that everybody

8   in the firm had access to the deposition, when looking at this,

9   I would have discussed it with my partners and tried to figure

10  out if we should seek clarification or I should answer it the

11  way I understand it, so that there is no mistake or

12  misunderstanding.

13  Q.  So one last question on this topic.

14         What, if anything, did you do to inform yourself about

15  who actually did have access before you gave this sworn

16  statement to the court?

17  A.  Since I understood this question to refer to my personal

18  knowledge, I didn't do anything to find out if people who I

19  didn't know about had access.

20  Q.  All right.  Just some wrap-up questions, Mr. Kreindler.

21         You have already said in your declaration that you

22  never instructed anyone, including Mr. Fawcett, to turn over

23  the sealed transcript to Mr. Isikoff or anyone else.  But given

24  your press strategy, your corrosive statements about protective

25  orders being disgusting and your own personal violation of

LB189114                    Kreindler – Cross

1   protective orders in 2017, as well as what we have shown today,

2   there is substantial reason to doubt your word on that, isn't

3   there?

4   A.  None whatsoever.  And your question contains statements

5   that are not true.

6   Q.  You still dispute that you were found guilty of a

7   protective order violation in 2017?

8           MS. KIRSCH:  Objection.

9           THE COURT:  He doesn't need to answer the question.

10  Q.  You didn't even need to give an express instruction to Mr.

11  Fawcett to make this leak happen, did you?

12  A.  That's nonsense.  I have no idea the leak could happen, and

13  the leak was antithetical to what we were trying to proceed.

14  Q.  According to your testimony, you didn't have an idea about

15  a lot of what was happening, correct?

16          MS. KIRSCH:  Objection.

17          THE COURT:  Sustained.

18  Q.  Mr. Fawcett knew what you wanted, and he did what you

19  wanted, and that's why we are here today, isn't that right?

20  A.  No.

21          MS. KIRSCH:  Objection.

22          THE COURT:  Overruled.

23  A.  That is absolutely 100 percent false and has no relation to

24  reality.

25          MR. HANSEN:  No further questions, your Honor.

1          THE COURT:  Thank you.

2          Ms. Kirsch, are you ready or would you like a moment?

3          MS. KIRSCH:  I would like a moment.

4          THE COURT:  We will take a quick two-minute recess.

5          (Recess)

6          THE COURT:  Ms. Kirsch, your witness.

7   REDIRECT EXAMINATION

8   BY MS. KIRSCH:

9   Q.  Mr. Kreindler, good afternoon.

10         There was some discussion earlier about the protective

11  orders in this case, correct?

12  A.  Yes.

13  Q.  You were asked, or the point was made that you personally

14  have not made a motion to lift those protective orders.  Can

15  you tell me, have you ever considered making such a motion?

16  A.  Yes.  More than considered it.  We had it drafted and under

17  discussion for really quite some time, as we, the committee,

18  tried to formulate the best motion to bring.  We never filed

19  it, actually, because at the time we were ready to file, in the

20  lead up to 9/11, we knew that there was going to be an

21  Executive Order, which, in fact, Joe Biden issued on September

22  4th.  And, as you know, that Executive Order mandated that the

23  2016 review be given to us and the public, mooting any orders

24  from DOJ as to that, and providing for declassification of

25  other 9/11 documents, which is going to happen tomorrow.

LB189114                    Kreindler – Redirect

1          Now, tomorrow we don't know what will be released and

2    whether there will be redactions or how many, but tomorrow we

3    expect a lot of what we have and have had to keep secret to be

4    made public.  I should also add that I talked to a number of

5    people in the Administration about this to suggest that they do

6    it on their own.

7    Q.  So I wanted to turn your attention briefly, there should be

8    a witness book of exhibits by the Kreindler firm, not that big

9    book.

10   A.  This is the only one up here now.

11          MS. KIRSCH:  Your Honor, may I approach?

12          THE COURT:  Yes.

13   A.  Thank you.  OK.

14   Q.  I am going to ask you to flip all the way to the back, if

15   you would, to Exhibit 102.

16   A.  Yes.

17   Q.  Do you see that this is the July 23rd motion filed by the

18   Kingdom of Saudi Arabia in relation to getting some discovery

19   and looking into the Isikoff leak.  Do you see that?

20   A.  Yes.

21   Q.  If you turn a few more pages, there is a document that is

22   the declaration of Michael Kellogg, Exhibit D3 to that filing.

23   Do you see that?

24   A.  Yes.

25   Q.  And then I am going to turn you to what looks like Exhibit

LB189114                    Kreindler – Redirect

1  D3-A, which is an e-mail from Mr. Isikoff to Mr. Kellogg.  Do

2  you see that?

3  A.  Yes.

4  Q.  I am going to give you a moment to look at that e-mail and

5  ask you whether you recognize the quotation that Mr. Kellogg is

6  being asked to comment on, the quotation that is attributed to

7  you.

8  A.  Yes.

9  Q.  Is that a quotation that you said on the podcast?

10  A.  Yes.

11  Q.  We actually just heard the podcast with you saying these

12  very words?

13  A.  Right.

14  Q.  And that podcast aired on July 10, correct?

15  A.  Yes.

16  Q.  This was filed on July 23, is that correct?

17  A.  Yes.

18  Q.  So if you look back, the previous page of Mr. Kellogg's

19  declaration filed in support of his motion, you will see the

20  very last sentence says, "A true and correct copy of a July 5,

21  2021 e-mail from Mr. Isikoff to me is attached as Exhibit A."

22          Do you see that?

23  A.  Yes.

24  Q.  And does Mr. Kellogg in his statement to the court advise

25  the court that this is a publicly made statement?

1  A.  No.

2  Q.  Does Mr. Kellogg advise the court that this was a podcast

3  that had aired two weeks prior that Mr. Kellogg was offered the

4  opportunity to comment on?

5  A.  No, he does not.

6  Q.  Does Mr. Kellogg provide in his declaration to the court

7  any context about this e-mail whatsoever to help the court

8  understand what it is?

9  A.  No.

10 Q.  I wanted you now, can we just flip to what is Exhibit 29 in

11 our book?

12 A.  Sure.  OK.

13 Q.  By the way, Mr. Kreindler, do you think it would have been

14 helpful to the court to understand that Mr. Isikoff is asking

15 Mr. Kellogg to comment on a publicly made statement as opposed

16 to something that may have been said privately?

17 A.  Yes.

18 Q.  If we look at Exhibit 29, that cover page, this is the

19 August 16 filing made by the Kreindler firm in response to the

20 court's order.  Do you see that?

21 A.  Yes.

22 Q.  And your declaration, Mr. Kreindler, is the second one.

23 It's labeled page 5 of 10 at the top.  If we could take a look

24 at that.

25 A.  Yes.

1   Q.   Now, the two introductory paragraphs we are going to skip

2   over.

3             Paragraph 3.  "I obtained a copy of the rough

4   transcript of the Jarrah deposition at the end of each day that

5   he was deposed and a final copy of the transcript from both

6   days of the Jarrah deposition on June 28 from Golkow Litigation

7   Services, both in unredacted and a redacted copy."

8             Do you see that?

9   A.   Yes.

10  Q.   Is that a true and accurate statement, Mr. Kreindler?

11  A.   Yes.

12  Q.   Paragraph 4.  "On July 7, Golkow Litigation Services sent

13  an e-mail with links to the video of the Jarrah deposition."

14            Is that a true statement, Mr. Kreindler?

15  A.   Yes.

16  Q.   "At no time did I share the Jarrah deposition transcript or

17  videos with anyone unauthorized to see it under the protective

18  order and the FBI protective order."

19            Is that a true statement?

20  A.   Yes, it is.

21  Q.   "At no time did I direct anyone to share the Jarrah

22  deposition transcript or videos with anyone unauthorized to see

23  it under the protective order and the FBI protective order."

24            Is that a true statement?

25  A.   Yes.

1    Q.  "To my knowledge, no one with the Kreindler firm or anyone

2    acting on its direction shared the Jarrah deposition transcript

3    with anyone unauthorized by the protective order in the FBI

4    protective order."

5           Is that true statement?

6    A.  Yes.

7    Q.  In your opinion, Mr. Kreindler, is there anything about

8    this that is misleading?

9    A.  No.

10   Q.  Is there anything in this declaration that is incomplete?

11   A.  No.

12   Q.  Is it your opinion that this is what the court had asked

13   for the declarations to opine on?

14   A.  Yes.

15   Q.  If you could flip to Exhibit 87 in our book also, Mr.

16   Kreindler.

17   A.  Sure.

18   Q.  This is the September 27 filing that was made by the

19   Kreindler firm.  Do you see this?

20   A.  Yes.

21   Q.  We spent some time on this on your cross-examination, or

22   Mr. Hansen did.

23          If you look at page 3 of 53 through 6 of 53.

24   A.  OK.

25   Q.  That's your declaration, is that true?

1    A.  Yes.

2    Q.  If you would start with paragraph 5 which refers -- let's

3    go back to paragraph 4.

4            "I learned on July 15th."  So you learned the day the

5    article came out, you learned that there had been a leak of the

6    Jarrah transcript, is that right?

7    A.  Yes.

8    Q.  And that was discussed with others from the Kreindler firm

9    working on the 9/11 litigation, correct?

10   A.  Yes.

11   Q.  On that call, Mr. Kreindler, was there a discussion of

12   whether any of the participants of that call, the Kreindler

13   9/11 team, was there a discussion as to whether any of you had

14   any knowledge of how the Jarrah transcript was transmitted to

15   Mr. Isikoff?

16   A.  Yes.

17   Q.  Can you tell me what that discussion entailed?

18   A.  Sure.  It was each of us saying, I have no idea how this

19   could have happened, does anybody have any ideas?  And going

20   around in the group saying the same thing.  Where did this come

21   from?  And this is not good for us.  Any clue?

22   Q.  If you look at paragraph 5 -- well, let me just finish that

23   question.  I assume the takeaway was that everyone indicated

24   that they had no knowledge, is that true?

25   A.  Yes.  We all had no knowledge, and then there was some

1   speculation as to who might have done it.  Is it possible for

2   somebody in the technical group to do it?  I volunteered, I

3   said, the only entity that might have done it that would make

4   sense would be the Saudis, to get it out now before 9/11 when

5   there is great media attention, if it's going to come out

6   anyway.  But other than that guess, speculation, no one had any

7   idea where it could have come from.

8   Q.  Mr. Kreindler, was Mr. Fawcett on that call?

9   A.  I think so.

10  Q.  Was it your takeaway that Mr. Fawcett was one of the many

11  who said he had no idea how this could have happened?

12  A.  Yeah.  What I distinctly remember more than the call was

13  our in-person discussion in the office.  But, yeah, John, to me

14  seemed as surprised as everyone.

15          THE COURT:  Who was involved in that in-person

16  discussion?

17          THE WITNESS:  The sequence, your Honor, I read it at

18  home, got to the office later.  The first people I spoke to

19  were Duke and John.  And I think, we can check the dates, that

20  Steve was doing a deposition that day.  I'm not positive, but I

21  remember him being tied up and I think then later talked to

22  Megan.  And in an earlier call, we decided that, as of that

23  moment, Duke would lead the investigation into all the computer

24  stuff and who could have had access or e-mailed Mike Isikoff.

25          Then, later that day we had a call with the whole PEC.

LB189114                    Kreindler – Redirect

1  First, we had an internal Kreindler call and then a PEC call a

2  little later that day.  The specific question, I don't

3  distinctly remember John being on the PEC, but he might have.

4  I just don't remember.  But I do remember the personal

5  discussions with him in the office face-to-face.

6          THE COURT:  Thank you.

7  BY MS. KIRSCH:

8  Q.  Mr. Kreindler, when you pulled together this declaration

9  that was filed on September 27, did you make your best efforts

10  to ensure that every statement here was accurate and not

11  misleading?

12  A.  Of course.

13  Q.  In your opinion, sitting here today, is any of it

14  inaccurate?

15  A.  No.

16  Q.  Or misleading?

17  A.  No, not at all.

18  Q.  It says on page 6 of 53, at paragraph 7, "For the first

19  time today" -- which is September 27 -- "I learned the

20  information set forth in the declaration of John Fawcett."

21          Is that a true statement?

22  A.  It is.  Later that afternoon.

23  Q.  Mr. Kreindler, as a general matter, how often did you

24  communicate with Mr. Fawcett in the course of your work on this

25  case?

LB189114                    Kreindler – Redirect

1   A.   Probably more than I talked to my wife.  9/11 is all I do,

2   what John was working on.  There were times when John's

3   attention was needed by one of my partners, getting ready for a

4   deposition, but I would talk to John all day.  I can't say I

5   spoke to him every single day, but constantly.

6   Q.   Would you say you spoke to him most days?

7   A.   Oh, sure.  Many times at night, I would wake up at 3 in the

8   morning with an idea, shoot him a message.  And sometimes it's

9   still dark when I hear from John, get your first cup of coffee,

10  and we would talk about something.  But it's constant.  We were

11  working on the Saudi case all the time, every day.

12  Q.   Did you communicate with Mr. Fawcett about the protective

13  orders in this case?

14  A.   Yes.  Sure.

15  Q.   What was the nature of those communications?

16  A.   They were really two-fold.  We would often talk about our

17  efforts to get these orders lifted, the motion we were working

18  on.  But even long before that, I talked about these orders

19  with Kirsten Gillibrand, Chuck Schumer, Dick Blumenthal, all

20  the time, Tony Blinken, Brian McKeon, later with Jonathan

21  Cedarbaum in the NSA, DOJ people.  And in talking to them about

22  our need for the FBI documents so the whole story can come out,

23  and our need once we have documents to be able to share them

24  with the families and the public so everyone can know and we

25  could really talk to our clients, I would always talk to John

LB189114                    Kreindler – Redirect

1    and say, hey, can you dig up something or other that I might

2    refer to in these communications with people in our government.

3              The other distinct area where I talked to him was what

4    we talked about before, 2017, with the phone number in the

5    letterhead of the Saudi Embassy, and that was found to be a

6    violation.  And John and I -- John would deal with protective

7    stuff every day for 20 years.  And that brought home to us,

8    even if we are not revealing content, you can't show a page,

9    even if it's in Arabic and no content can be communicated,

10   particularly something that's public like you could get the

11   phone number from the yellow pages.

12             So, John and I had that discussion in 2017 so that, to

13   the extent humanly possible, there would never be any violation

14   of these court orders.  That was a discreet discussion.  The

15   other discussion about how we can, number one, and most

16   importantly, get the documents, and that stuff I raised with

17   President Trump and others, that has been constant for these

18   last four years.

19   Q.  So, is it fair to say that in the course of these different

20   types of discussions, Mr. Fawcett indicated that he understood

21   his obligations under these protective orders?

22   A.  Absolutely.  What we tried to do is often, if you have the

23   two versions side by side and you look at it, it's hard to tell

24   because a word is hidden in one and not the other, so before

25   sending anything public to anyone, even if I had the document

LB189114                    Kreindler - Redirect

1  in front of me on my phone, I would say, John, please send me

2  the public one to be doubly sure that we are not making a

3  mistake and passing on one that we can't.

4          So John was involved in helping me try and live with

5  this procedure that everyone knows is a lot of work with the

6  two versions, in the public or not, to make sure there was no

7  mistake.

8  Q.  Did Mr. Fawcett ever give any indication that he did not

9  intend to abide by his obligations under the protective orders?

10 A.  Not at all.

11 Q.  Did Mr. Fawcett ever act in an unprofessional manner in any

12 respect?

13 A.  No.  John, for almost 20 years, it will be 20 years in

14 February, John is one of the most committed -- I'm sorry -- and

15 honest and trustworthy people I ever met.

16         I'm sorry for getting emotional.  I have told you this

17 story.  It's neither here nor there.  But I believe John came

18 to work for us the day after my dad died, and my dad died when

19 we were settling the Pan Am 103 case with Libya.  We were

20 almost done, and it's like Moses dying when he is bringing home

21 the Ten Commandments.  And John got to me through a high school

22 classmate, and John has been so central to the families and has

23 this unique ability to uncover and handle information.  In my

24 entire life, I have never met anyone who I think of as a more

25 honest and noble person than John, with one exception, my

LB189114                         Kreindler – Redirect

1   father.

2          We would not be here today, and we would not be

3   getting FBI documents tomorrow, and this coming out, if it

4   wasn't for John.  And truthfully, it breaks my heart for us, to

5   the families who he has devoted 20 years of his life to, I wish

6   it didn't happen, it was a mistake, but he is such a good

7   person and so important to thousands of people.  And when this

8   is over, when the whole case is over, and hopefully sooner

9   rather than later, and we all are where we want to be, he just

10  deserves so much credit for what he has done and what he has

11  given.

12         I know I am violating in talking so much, but this has

13  been my life for 20 years, and his.  I had to say it.  I

14  apologize for being emotional, and I apologize for diverting

15  from the specific question, but I think it just needs to be

16  said.  So I'm sorry for talking too much.

17  Q.  I just have a couple more questions, Mr. Kreindler.

18  A.  Sure.

19  Q.  Did you order or direct Mr. Fawcett to send the copy of the

20  Jarrah transcript to Mr. Isikoff?

21  A.  No.

22  Q.  Did you know that Mr. Fawcett was going to send the Jarrah

23  transcript to Mr. Isikoff?

24  A.  No.

25  Q.  Did you know at any time prior to September 27 that Mr.

1   Fawcett had sent the transcript to Mr. Isikoff?

2   A.  No.  I had no idea at all until I heard that afternoon.

3   Q.  Did you ever have any reason to suspect that Mr. Fawcett

4   would send the Jarrah transcript to Mr. Isikoff?

5   A.  None whatsoever.

6           MS. KIRSCH:  I have no further questions.

7           THE COURT:  Yes, Mr. Hansen.

8           MR. HANSEN:  No more questions for Mr. Kreindler, your

9   Honor.

10          THE COURT:  I just have one question for you, Mr.

11  Kreindler.  Did you ever reach out to Mr. Isikoff and ask him

12  how he received the transcript?

13          THE WITNESS:  No, I didn't.  Once I saw the story, I

14  didn't say anything to anyone until we got to the office and

15  talked about what we are going to do with this revelation.  But

16  I thought, we all thought that none of us should be calling

17  Mike Isikoff.

18  Q.  Did anyone on the PEC side ask you, given your relationship

19  with Mr. Isikoff, to reach out to him to find out how he got

20  the transcript?

21  A.  No, that never came up.  And we all expect that if he was

22  ever asked, I am not going to reveal my sources.

23          THE COURT:  Thank you.

24          You are excused.

25          THE WITNESS:  Thank you, your Honor.

1          Can I stay in the courtroom now?

2          THE COURT:  Yes, you may.  In fact, you should.

3          (Witness excused)

4          THE COURT:  Who is your next witness?

5          MR. SHEN:  Saudi Arabia calls John Hartney.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB1H9115                    Hartney – Cross

1           THE COURT:  Mr. Shen, while we're waiting, do you have

2     an estimate of how long we'll need this witness time-wise?

3           MR. SHEN:  For Mr. Hartney?

4           THE COURT:  Yes.

5           MR. SHEN:  Maybe an hour and a half.

6           THE COURT:  Maybe an hour and a half.  It's nearly

7     3 o'clock.  Maybe in a half-hour, we can take a five-minute leg

8     stretch.

9           MR. SHEN:  Yes, your Honor.

10           THE COURT:  Hello, sir.  Have a seat here.  Stay

11     standing for a second.

12     JOHN HARTNEY,

13         called as a witness by the Defendants,

14         having been duly sworn, testified as follows:

15           THE WITNESS:  John Hartney.

16           THE COURT:  Thank you, sir.

17     CROSS-EXAMINATION

18     BY MR. SHEN:

19     Q.  Good afternoon, Mr. Hartney.

20     A.  Good afternoon.

21     Q.  Are you currently employed for Kreindler & Kreindler?

22     A.  Yes.

23           MR. SHEN:  And can we show Exhibit 74, please.

24     Q.  Do you recognize this as your profile in the Kreindler

25     website?

1          MS. KIRSCH:  I'm sorry.  Can I have a moment to look

2     at the document, please?

3          THE COURT:  Sure.

4          MR. SHEN:  We can do it without the document.

5          THE COURT:  It's the signature line on the website.

6          MS. KIRSCH:  I'm sure it is.

7     BY MR. SHEN:

8     Q.   Is your title LAN administrator?

9     A.   Correct.  Yes.

10    Q.   Sir, does "LAN" stand for local area network?

11    A.   Yes.

12    Q.   And how long have you had that title, sir?

13    A.   Since I've been at Kreindler.

14    Q.   And when did you start at the firm?

15    A.   April 1991.

16    Q.   Sir, do you report to Javier Cisneros?

17    A.   No.

18    Q.   Who's your direct supervisor, sir?

19    A.   I'd say the partnership.

20    Q.   The attorneys at the firm?

21    A.   Yeah.

22    Q.   Now, sir, you signed a declaration in this case, correct?

23    A.   Yes.

24    Q.   Can we see the declaration at 56F.

25         You have a binder of exhibits that are in front of

1   you.  Sir, you did not draft this declaration, correct?

2   A.  No.

3   Q.  The lawyers at the firm drafted it for you?

4   A.  Yes.

5   Q.  And that was Mr. Maloney, correct?

6   A.  The first one, yes.

7   Q.  And Ms. Benett --

8   A.  Yes.

9   Q.  -- correct?

10          And Mr. Pounian also drafted the language in your

11  declaration, correct?

12  A.  I believe so, yes.

13  Q.  Now, sir, the lawyers at the firm, you said that you report

14  to them.  They're generally in a position of authority over

15  you?

16  A.  I report to the partnership.

17  Q.  The partners are in a position of authority over you, sir?

18  A.  Yes.

19  Q.  And generally speaking, if one of those partners asked you

20  to do something, you do it, right?

21  A.  Well, it matters what they're asking me to do.

22  Q.  All right.  Well, they asked you to sign a declaration.  So

23  you reviewed the declaration, and you signed it, correct?

24  A.  They asked me to sign the declaration that I felt was

25  truthful.

LB1H9115                       Hartney – Cross

1   Q.   Now, sir, you're generally familiar with the fact that

2   Kreindler & Kreindler is representing the plaintiffs in the

3   9/11 litigation?

4   A.   Correct.

5   Q.   And you're generally familiar with the fact that certain

6   material, such as documents and deposition transcripts, are

7   governed by protective orders in this action, correct?

8   A.   Yes.

9   Q.   Have you reviewed the MDL protective order?

10  A.   No.

11  Q.   You've never looked at it?

12  A.   Not that I recall, no.

13  Q.   Have you looked at the FBI protective order?

14  A.   No.

15  Q.   You've never looked at it?

16  A.   No.

17  Q.   You've never signed it?

18  A.   No.

19  Q.   You never agreed to abide by it?

20  A.   No.

21  Q.   Did the Kreindler firm maintain a list of the individuals

22  who had signed each of the protective orders?

23          MS. KIRSCH:  Objection.  Foundation.

24          THE COURT:  If you know the answer, you can answer it,

25  sir.

LB1H9115                         Hartney - Cross

1            THE WITNESS:  Say that again.

2            THE COURT:  You can answer the question if you are

3    able.

4    A.  No, I do not.

5    Q.  Did the IT department maintain a list of the individuals

6    who had signed the MDL and FBI protective order?

7    A.  No.

8    Q.  So you have no idea who at the firm had signed the MDL or

9    the FBI protective order, correct?

10   A.  Correct.

11   Q.  Now, sir, prior to September 27 of 2021, the protected

12   confidential material relating to the 9/11 case, they were

13   saved in electronic form in various places at the Kreindler

14   firm, correct?

15   A.  Can you repeat that question?

16   Q.  Sure.  I'm referring to the confidential and protected

17   material relating to the 9/11 case.  Those were saved in

18   various location at the Kreindler firm.  I'm talking

19   electronically.

20   A.  Are you saying that every document that was classified was

21   saved in different locations or --

22   Q.  Classified documents were saved in different locations,

23   correct?

24   A.  What do you mean by "locations"?

25   Q.  One of those locations was an internal proprietary server

1    that the Kreindler firm maintained?

2    A.  Yes.

3    Q.  One of those locations was a cloud-based storage system,

4    correct?

5    A.  Correct.

6    Q.  Some of that protected information was also saved as

7    attachments to emails and were discussed in Kreindler firm

8    emails, correct?

9    A.  Correct.

10   Q.  They were also saved on firm or home computers used by the

11   Kreindler attorneys, correct?

12   A.  I don't know.

13   Q.  You don't know one way or the other?

14   A.  What do you mean "one way or the other"?  Of what?

15   Q.  You have no idea whether any of the Kreindler attorneys

16   kept protected confidential information on their home

17   computers --

18   A.  No.

19   Q.  -- or on their devices, their phones?  You have no idea?

20   A.  No.

21   Q.  You were never asked to investigate that issue?

22   A.  No.

23   Q.  Now, you testified that one of the places that protected

24   information is stored is on the Kreindler firm's internal

25   proprietary server.  What's that server called?

LB1H9115                         Hartney – Cross

1    A.  The main server?  The exact name, it's NYFS1.

2    Q.  What do you refer to it as?

3    A.  Well, there's a share on that network called Case Media.

4    Q.  You refer to it as Case Media?

5    A.  And there's other shares also.

6    Q.  Was the 9/11 protected material stored in Case Media?

7    A.  Yes.

8    Q.  That includes -- well, do you know whether that includes

9    MDL-protected information as well as FBI-protected information?

10   A.  I don't know.

11   Q.  You just know that it's confidential, protected information

12   was stored in the Case Media server, correct?

13   A.  Correct.

14   Q.  Now, prior to September 27 of 2021, anybody who worked at

15   the Kreindler firm had access to the Case Media server,

16   correct?

17   A.  Could you repeat that.

18   Q.  Prior to September 27 of 2021, anybody who worked at the

19   Kreindler firm had access to Case Media where the protected

20   information relating to the 9/11 case was saved, correct?

21   A.  Yes.

22   Q.  That's all of the lawyers who worked at the Kreindler firm?

23   A.  Yes.

24   Q.  That's all of the staff at the Kreindler firm?

25   A.  Yes.

1    Q.  That is individuals like John Fawcett as well?

2    A.  Yes.

3    Q.  So long as you had a Kreindler login, you could access that

4    Case Media, correct?

5    A.  Yes.

6    Q.  So that includes people who did not work on the 9/11 case,

7    right?

8    A.  Correct.

9    Q.  That includes people who had never seen the FBI or the MDL

10   protective order, correct?

11   A.  Can you repeat that question.

12   Q.  That includes people who had never seen the protective

13   orders in this case.  They had access to Case Media, too?

14   A.  You mean the users that have login credentials that have

15   never seen that information?

16   Q.  People who have not signed the protective orders in this

17   case, they had access to the Case Media server, too, correct?

18        MS. KIRSCH:  Objection.  He doesn't know who did or

19   didn't sign, so how can he answer that question?

20        THE COURT:  I think the testimony is that everybody

21   who has access to the server has access to this file.  Is that

22   correct, sir?

23        THE WITNESS:  Correct.

24        THE COURT:  OK.

25   Q.  And the firm has no ability to track who actually accessed

LB1H9115                         Hartney – Cross

1    any of the confidential and protected material saved in Case

2    Media, correct?

3    A.  Correct.

4    Q.  So you have no idea, for instance, whether Jim Kreindler

5    accessed the Al Jarrah transcript, correct?

6    A.  On.

7    Q.  On Case Media?

8    A.  Correct.

9    Q.  Or anybody else at the firm.  You just have no idea?

10   A.  Correct.

11   Q.  So sitting here today, throughout the history of this case,

12   you couldn't tell the Court who accessed any confidential

13   document relating to the 9/11 case, is that correct?

14   A.  That was on Case Media, correct.

15   Q.  And that's where the Al Jarrah transcript was saved,

16   correct?

17   A.  Correct.

18   Q.  All right.  Let's look at your declaration, 56F, please,

19   and I'm looking at paragraph 5.

20            Now, sir, in paragraph 5 you stated that only

21   individuals given Kreindler login credentials have access to

22   Kreindler's server.  Do you see that?

23   A.  Yes.

24   Q.  You're referring to Case Media there?

25   A.  Yes.

1   Q.   When you say only individuals given Kreindler login

2   credentials, that's everybody at the firm, correct?

3   A.   Yes.

4   Q.   And then you say, "I created a directory on a network share

5   drive where the 9/11 litigation materials are saved," and then

6   you say that the Al Jarrah transcripts were saved there.

7              Do you see that?

8   A.   Yes.

9   Q.   Then you go on to say:   I was told the following had been

10   able to access the Jarrah transcripts, and then you list a

11   number of individuals.

12              Do you see that?

13   A.   Yes.

14   Q.   Who told you that?

15   A.   Well, I guess somebody along the way of the litigation had

16   told me that these certain individuals worked on the case.

17   Q.   Who told you that only those individuals had access to the

18   Jarrah transcript?

19              MS. KIRSCH:   I'm sorry.   Mr. Shen needs -- if he's

20   going to ask him about the words of the declaration, please

21   quote them properly.   That was --

22              THE COURT:   I think the word "only" is not there.

23              MS. KIRSCH:   I'm sure it was an accident.

24   BY MR. SHEN:

25   Q.   "I was told the following had been able to access the

LB1H9115                         Hartney - Cross

1  Jarrah transcripts."  Those are your words, correct?

2  A.  Correct.

3  Q.  Actually, someone else drafted that language for you,

4  correct?

5  A.  Yes.

6  Q.  But you signed it under penalty of perjury?

7  A.  Correct.

8  Q.  Who told you the following had been able to access the

9  Jarrah transcript?  Who told you that?

10  A.  In particular, one particular person?  I guess it would be

11  Megan Benett.

12  Q.  Your best recollection is Ms. Benett told you that, is that

13  right?

14  A.  Yes.

15  Q.  Now, when you drafted -- before you signed this

16  declaration, you told Ms. Benett and the other attorneys that

17  everybody at the Kreindler firm had access to the Case Media

18  where the Jarrah transcript was saved, correct?

19  A.  Correct.

20  Q.  And, nonetheless, they urged you, and actually drafted the

21  language in your declaration, so you don't disclose that,

22  correct?

23            MS. KIRSCH:  Objection.

24            THE COURT:  What's the objection?

25  A.  The word "urge" I wouldn't say.  I signed the document that

1   was truthful in that the only people that should be saving

2   documents and accessing documents in that -- in that directory

3   were these individuals listed.

4   Q.  Sir, you told Ms. Benett that everybody at the Kreindler

5   firm had access to everything in Case Media, correct?

6   A.  Correct.

7   Q.  That doesn't appear anywhere in your declaration, does it?

8   A.  No.

9   Q.  All right.  Ms. Benett drafted your declaration, right?

10  A.  Correct.

11  Q.  Did she tell you that she didn't want to disclose that to

12  the court?

13  A.  Yes.  Well --

14  Q.  Let's look, sir, at Exhibit --

15          THE COURT:  Sorry.  Can I ask a question, follow-up

16  question on this section before we move on?

17          MR. SHEN:  Absolutely.

18          THE COURT:  Would you mind putting the declaration

19  back up.

20          I was confused by a statement there.  The last at the

21  same time of this paragraph 5 says:  "I did not find any

22  evidence that the Jarrah transcripts had been downloaded,

23  printed, or emailed by anyone else."

24          I confess to not being the most technologically savvy

25  person, but my understanding of your declaration was that you

1    couldn't tell whether anyone had downloaded, printed, or

2    emailed the transcript.  So one question I have is, is there

3    evidence that the people in the sentence preceding that last

4    line -- there is evidence that they had downloaded, printed, or

5    emailed the transcript?

6              THE WITNESS:  I'm not sure what you're saying.

7              THE COURT:  Your last sentence says:  "I did not find

8    any evidence that the Jarrah transcripts had been downloaded,

9    printed, or emailed by anyone else."  I read that to say that

10   the people in the line above, namely, Jim Kreindler, Steven

11   Pounian, all the way through to John Fawcett, that there was

12   evidence that they had either downloaded, printed, or emailed

13   the declaration.

14             THE WITNESS:  I meant that anybody other than those

15   people did not download.

16             THE COURT:  Anybody other than those people what?

17             THE WITNESS:  Yeah, did not download, print it, or

18   email.

19             THE COURT:  So you were able to see that those people

20   did, in fact, download, print, or email?

21             THE WITNESS:  We don't keep track of downloading and

22   printing or emailing.

23             THE COURT:  What does this sentence mean, "I did not

24   find any evidence that the Jarrah transcripts had been

25   downloaded, printed, or emailed by anyone else"?  I don't know

1    what that means.

2              THE WITNESS:  I guess what I'm trying to say there is

3    that I didn't really find any real solid evidence that anybody

4    other than those people downloaded, printed, or emailed.

5              THE COURT:  The transcript?  But you did have evidence

6    that those people did download, print, or --

7              THE WITNESS:  I had evidence that they -- two of them

8    emailed.

9              THE COURT:  Evidence that two of them had emailed it?

10             THE WITNESS:  Yeah.

11             THE COURT:  And those two people were?

12             THE WITNESS:  Were Debra Pagan and John Fawcett.

13             THE COURT:  Debra Pagan and John Fawcett.

14             So your system does allow you to see who downloaded,

15    printed, or emailed?

16             THE WITNESS:  I can only see the tracking of email.

17    We don't track downloading, printing.  But I guess I maybe

18    should have elaborated more and said that we don't track

19    downloading.

20             THE COURT:  So there would never be any evidence that

21    anybody downloaded or printed the transcript?

22             THE WITNESS:  No.

23             THE COURT:  OK.

24             THE WITNESS:  I mean, the downloading, that might

25    pertain to the downloading of it on the cloud server also.

1               THE COURT:  Downloading it from the cloud?

2               THE WITNESS:  Yes, that's being kept track.

3               THE COURT:  Right.  I think you go on to talk about

4    that in the next paragraph.

5               THE WITNESS:  Yeah.

6               THE COURT:  But this is the proprietary server.

7               THE WITNESS:  Yeah, OK.  Yes.

8               THE COURT:  So with respect to the proprietary server,

9    you cannot tell if anybody downloaded or printed?

10              THE WITNESS:  No, no, you cannot tell.

11              THE COURT:  So when you listed that there's no

12   evidence that the Jarrah transcript had been downloaded,

13   printed, or emailed by anyone else, what you're saying is you

14   know two people emailed it because you can track the email?

15              THE WITNESS:  Yeah.

16              THE COURT:  But you can't see if anybody downloaded it

17   or printed it?

18              THE WITNESS:  Yes.

19              THE COURT:  OK.  Thank you.  Sorry.

20              MR. SHEN:  Sure.

21   BY MR. SHEN:

22   Q.  Mr. Hartney, you said that Ms. Benett didn't want to tell

23   the Court that anyone at the Kreindler firm had access to all

24   of the protected 9/11 material.  What other attorneys told you

25   that they didn't want to tell that to the Court?

LB1H9115                         Hartney - Cross

1    A.  No other.

2    Q.  Only Ms. Benett?

3    A.  Correct.

4    Q.  Is that right?

5    A.  Yes.

6    Q.  Did you discuss that issue with Mr. Maloney?

7    A.  No.

8    Q.  Did you discuss that issue with Mr. Pounian?

9    A.  No.

10   Q.  Did you ever discuss access issues at all with

11   Mr. Kreindler?

12   A.  No.

13   Q.  Can we look at paragraph 6 of your declaration in front of

14   you.

15            Paragraph 6 discusses the cloud-based storage system.

16   Do you see that?

17   A.  I don't see it yet.  It's not on the screen.  Yes, now it

18   is.

19   Q.  Do you see that?

20   A.  Yes, I see that.

21   Q.  Sir, the cloud-based system, is that called share file?

22   A.  Citrix share file, C-i-t-r-i-x.

23   Q.  And certain FBI and other protected information were saved

24   on that Citrix share file, is that right?

25   A.  My understanding, only thing I saw saved on it was the

LB1H9115                        Hartney – Cross

1   depositions that recall.

2   Q.  Particular depositions or many depositions?

3   A.  Many depositions.

4   Q.  All right.  Now, consultants, experts, and others could

5   access this cloud-based system if they were provided login

6   access.  That's what you write, correct?

7   A.  Correct.

8   Q.  But Mr. Fawcett, he was provided access to the internal

9   proprietary server, correct?

10  A.  Correct.

11  Q.  The firm actually considered Mr. Fawcett to be staff,

12  correct?

13  A.  I can't answer that question.

14  Q.  From an IT perspective, did you treat Mr. Fawcett any

15  differently from any other employee at the firm?

16  A.  You mean through access, login access?

17  Q.  Sure.

18  A.  Yes, we gave him login access and we gave him email access.

19  Q.  The question was did you treat him any differently than any

20  other employee at the firm?

21  A.  Did I treat him differently?  I guess not, no.

22  Q.  You were aware he had a phone at the firm?

23  A.  I was aware he had a phone.

24  Q.  Sorry?

25  A.  You mean a telephone, a desk phone?

LB1H9115                    Hartney - Cross

1    Q.  A desk phone, yes, sir.

2    A.  Yes.

3    Q.  All right.  And did he have his own email from the firm?

4    A.  Yes.

5    Q.  He had an office at the firm, correct?

6    A.  Yes.

7    Q.  Now, to view documents that were saved on this cloud-based

8    server, the user would actually have to download them, and so

9    you have a record of that, is that right?

10   A.  Yes.

11   Q.  That's the only location where documents were actually

12   stored on a server that keeps a record of who downloads them,

13   is that right?

14   A.  Can you -- when you mean "download," you mean download from

15   outside the office or do you mean download --

16   Q.  Just accesses the documents.

17   A.  Access the documents, yes.

18   Q.  That's the only system that tracks access to the documents?

19        (Discussion off the record)

20   A.  Yes.

21   Q.  You state in paragraph 6 that you reviewed the user history

22   of this cloud-based share file system on July 29, 2021.  Do you

23   see that?

24   A.  Yes.

25   Q.  And that's the first time that you did that, correct?

LB1H9115                    Hartney – Cross

1    A.   First time I ever reviewed it, I believe so, yes.

2    Q.   You were instructed to review it on July 29, correct?

3    A.   Correct.

4    Q.   Now, are you aware that Mr. Fawcett actually managed and

5    maintained confidential, protected materials on other

6    cloud-based systems?

7    A.   No.

8    Q.   Are you aware that he had a Dropbox account that he managed

9    that contained protected material?

10   A.   I know he had a Dropbox account.

11   Q.   Did you know that it contained protected material on it?

12   A.   No.

13   Q.   That's not something that you investigated?

14   A.   I wasn't asked to investigate that.

15   Q.   All right.  No one at the Kreindler firm asked you to

16   investigate any other cloud-based systems that contained

17   protected information, correct?

18   A.   Correct.

19   Q.   All right.  Now, let's show Exhibit 68, please.  Now, this

20   is a screenshot of a Dropbox account.  If we zoom in on the

21   right-hand side, it says that John Fawcett is the owner of the

22   account.

23        Now, you had no idea that Mr. Fawcett was saving

24   confidential and protected materials to this Dropbox account,

25   correct?

LB1H9115                          Hartney – Cross

1          MS. KIRSCH:  Objection.  This is a screenshot without

2    a date on it, without any context.

3          MR. SHEN:  There is a date on the document.

4          MS. KIRSCH:  Where is the date?

5          MR. SHEN:  It's in the bottom right-hand side,

6    October 15, 2021.

7          MS. KIRSCH:  OK.

8    BY MR. SHEN:

9    Q.  Sir, the question is did you have any idea that Mr. Fawcett

10   was saving protected material on other cloud-based servers such

11   as this Dropbox account?

12   A.  No.

13   Q.  Did you ever take any actions to limit his access after the

14   breach of the protective order?

15   A.  Yes.

16   Q.  -- to --

17   A.  I'm sorry.  Sorry.

18   Q.  -- to other cloud-based systems that he had, such as this

19   Dropbox account?

20   A.  Can you repeat the question.

21   Q.  Yeah.  Let me ask a cleaner question.

22          Sir, you had no idea that he maintained this Dropbox

23   account, right?

24   A.  I know he had the Dropbox.

25   Q.  You had no idea he had protected information on this

1   account, right?

2   A.   Correct.

3   Q.   Did you undertake actions to limit his access to the

4   Dropbox account?

5   A.   After what time?

6   Q.   After the breach.

7   A.   Yes.

8   Q.   When?

9   A.   I don't recall the exact date, to tell the truth.  I'm

10  sorry.

11  Q.   Was it in October?

12  A.   I believe so, yes.

13          MR. SHEN:  All right.  Let's show Exhibit 67, please.

14  Q.   Exhibit 67 is an email from an attorney at my firm to

15  counsel for Kreindler & Kreindler identifying this particular

16  Dropbox account containing protected information.  It's dated

17  October 15.

18          Do you recall that after October 15 is when you

19  actually stopped Mr. Fawcett's access to that material?

20  A.   Can you repeat the question.

21  Q.   The email is dated October 15.  Do you see that?

22  A.   Yes.

23          THE COURT:  If you want to take a look over that

24  email, you can.

25          THE WITNESS:  OK.  OK.

LB1H9115                        Hartney - Cross

1    Q.  Sir, my question to you is, was it after October 15 that

2    you stopped Mr. Fawcett's access to that Dropbox account?

3    A.  I don't recall.

4    Q.  You don't know one way or another?

5    A.  I cannot tell you the exact date.

6    Q.  Sir, did you know that Mr. Fawcett maintained a cloud

7    platform called Tresorit that had MDL-protected information on

8    it?

9    A.  No.

10          MS. KIRSCH:  I'm going to object here.  I really don't

11   know where these lines of questions are going, but to the

12   extent it goes to our work product, and -- this could be

13   something that we would have an issue with this being discussed

14   in any depth publicly.  I don't know.

15          MR. SHEN:  This goes to the reasonableness of the

16   investigation and where protected materials were actually

17   saved.

18          THE COURT:  All right.  Thus far I don't see any issue

19   with work product, but if we get close, please raise an

20   objection.

21   BY MR. SHEN:

22   Q.  Now, sir, the question was did you know that Mr. Fawcett

23   was maintaining protected material on a cloud platform called

24   Tresorit?

25   A.  No.

1  Q.  Did you ever stop Mr. Fawcett's access to a cloud platform

2  called Tresorit?

3  A.  No.

4          THE COURT:  Can I ask a clarifying question.  The

5  Dropbox account, was that a Kreindler & Kreindler account or

6  was that a Fawcett personal account?

7          THE WITNESS:  I can't tell from the screenshot where

8  that was coming from, whether it was from his personal account.

9  We did maintain an account for him.

10          THE COURT:  You maintained a Dropbox account for him?

11          THE WITNESS:  Yes, but I don't know from that

12  screenshot whether he had his own Dropbox account.

13          THE COURT:  Understood.  Thank you.

14          THE WITNESS:  I can't say either way.  It's possible.

15  BY MR. SHEN:

16  Q.  Sir, in the investigation that Mr. Maloney instructed you

17  to do pertaining to the breach, did you do any investigation of

18  Dropbox or Tresorit?

19  A.  No.

20          MR. SHEN:  I'm going to show an Exhibit 23, but before

21  I do that, I want to give Mr. Fawcett's counsel a chance to

22  comment on confidentiality.

23          THE COURT:  Sorry, Mr. Shen, you said Exhibit 23?

24          MR. SHEN:  Yes, your Honor.

25          (Counsel confer)

1           MR. SHEN:  Could we put up Exhibit 23, please.

2   Q.  This is a letter that counsel for Mr. Fawcett has written

3   to me.  If we could show the second page, there is a discussion

4   of a Tresorit-encrypted storage platform.  Do you see that?

5   A.  Yes.

6   Q.  Do you even know what that Tresorit platform is?

7   A.  I've never used it.

8   Q.  And you had no idea that Mr. Fawcett was using it?

9   A.  No.

10  Q.  Now, we discussed that confidential documents are also --

11  can be saved on the email server if they're attachments to

12  emails or they're discussed in the body of emails, correct?

13  A.  Can you say that one more time.  Repeat that.

14  Q.  Sure.  Confidential, protected documents, they could also

15  be attached to emails that are sent around.  If they are, then

16  they're saved on the email server, is that right?

17  A.  Yes.

18  Q.  Now, part of your responsibilities is managing the

19  Kreindler email system, is that right?

20  A.  Correct.

21  Q.  Now, the Kreindler firm, in connection with the 9/11 cases,

22  has hired a number of investigators, former FBI agents.

23  They're all disclosed on the public record.  Do you give

24  Kreindler email accounts to those investigators?

25  A.  No.

LB1H9115                          Hartney - Cross

1    Q.  All right.  Now, you have administrative access to the

2    email server, so you can search that server, is that right?

3    A.  Correct.

4    Q.  And you can monitor the email activity at the firm, right?

5    A.  What do you mean by monitoring?

6    Q.  If you wanted to search for particular content on the email

7    server, you could do that, right?

8    A.  Yeah, I can search for content.  I don't see content

9    moving, watching it where it's going to and from, but I can do

10   a search from where it's going to and from.

11   Q.  Can we look at your declaration, 56F, again, paragraph 8.

12          Now, sir, in paragraph 8 of your declaration, you

13   described the search of the Kreindler email system that you

14   conducted, is that right?

15   A.  Correct.

16   Q.  You say that you searched for incoming and outgoing

17   messages to three -- or four email addresses relating to Mike

18   Isikoff from June 1, 2021, to August 1, 2021, is that right?

19   A.  Yes.

20   Q.  Did you search for any deleted messages?

21   A.  It would search -- my understanding was Office 365 that it

22   saves 30 days and stays under the purged directory.

23   Q.  So if a user manually deletes an email, it goes into a

24   purge file and Office 365 will search that purge file and can

25   locate that deleted email?

1  A.  Yes, I believe so.

2  Q.  What if it's gone past 30 days?

3  A.  Then I don't know.

4  Q.  Is that email gone forever?

5  A.  I believe so, yes.

6  Q.  All right.  So you say that you conducted this search.  The

7  search parameters were June 1 to August 1, 2021.  That means

8  that you necessarily conducted that search after August 1,

9  right?

10  A.  Yes.

11  Q.  All right.  So if the user had deleted a document in June

12  and manually deleted that document, your search would not have

13  located that document, is that right?

14  A.  I should say I don't really know.

15  Q.  Did you search for emails that were saved on the hard

16  drives of any of the attorneys or staff?

17  A.  No.

18  Q.  Did you conduct a search of any home computers, laptops,

19  devices?

20  A.  No.

21  Q.  Did you search any text messages?

22  A.  No.

23  Q.  Phone logs?

24  A.  Phone logs for what?

25  Q.  Did you search any phone records?

1   A.  Phone records, yes.

2   Q.  You did search phone records?

3   A.  Phone records for certain phone calls, I -- yes.

4   Q.  Let me ask a clean question.

5   A.  Yes, not exactly sure.

6   Q.  Did you look through Kreindler & Kreindler's phone records?

7   A.  I didn't personally look through Kreindler & Kreindler.

8   Q.  Did you pull them?

9   A.  I had them.  I had the counsel for our -- our phone vendor,

10  our phone provider.

11  Q.  This was after Ms. Kirsch had been retained?

12  A.  Correct, yes, yes.

13  Q.  Correct.

14          But in connection with what you're describing as the

15  investigation in your declaration, did you pull any phone

16  records?

17  A.  No, no, no.

18  Q.  Now, if the user does not delete an email, does that email

19  get purged automatically from the Kreindler system?

20  A.  My understanding, we used a default Office 365, which is

21  30-day window.

22  Q.  30-day default?

23  A.  Yes.

24  Q.  So if an email is in an inbox and it's now been 31 days,

25  that email is deleted off the server?

1    A.  Oh, no, no.  I misunderstood your question.

2    Q.  OK.

3    A.  Nobody -- unless it's deleted by the user.

4    Q.  But is there an automatic purging of emails if the user

5    does not delete it?

6    A.  No.

7    Q.  All right.  So if someone had an email from five years ago

8    that they didn't delete, it would still be in the inbox?

9    A.  Correct.

10   Q.  Now, paragraph 9, you describe another email search, is

11   that right?

12   A.  Correct.

13   Q.  You say that you searched the email server for outgoing,

14   incoming, saved, and deleted messages containing the names

15   Jarrah or Isikoff or the name that the court reporter had given

16   to the transcript.  You see that?

17   A.  Yes.

18   Q.  And, again, the same search period -- well, strike that.

19        Did you do that after August 1, or did you do it

20   before?

21   A.  Well, that's a good question.  It had to be after August 1,

22   I believe.  I can't -- yeah, actually, yes, I can -- it was

23   done -- I've done multiple searches to make sure that it was a

24   thorough investigation of our email system, and so I performed

25   the searches two or three, maybe even four, five times.  I had

LB1H9115                         Hartney – Cross

1    redone that search either if it was before or after.

2    Q.  You did that search several times?

3    A.  Yes.

4    Q.  The same search, searching for Jarrah or searching for

5    Isikoff or the name in the transcript?

6    A.  Yes.

7    Q.  You did that several times, and you say that the only

8    emails that resulted are attached at Exhibit 1 of your

9    declaration.  You see that?

10   A.  Yeah.

11   Q.  That's in paragraph 10.

12   A.  I see that.

13   Q.  And you attached several emails in Exhibit 1.  You see

14   that?

15   A.  I'm supposed to be looking at the exhibits, the emails

16   or --

17   Q.  Yes.  Can we look at Exhibit 1, and we'll look in

18   particular at page 6.  This is one of the emails that you cite

19   in your declaration.  You with me?

20   A.  Yes.

21   Q.  And this particular email is one from Jim Kreindler to Mark

22   Seman of Yahoo! News, and it's discussing Mr. Kreindler's

23   appearance on the *Conspiracyland* podcast.  Do you see that?

24   A.  Yes.

25   Q.  And you see that Mr. Kreindler is actually sending the

LB1H9115                        Hartney - Cross

1  email from his personal device, right?

2  A.  Yes, I believe so.

3  Q.  It says "sent from my iPhone."  You see that?  You see

4  that?  You have to say yes or no.

5  A.  Yes.

6  Q.  Sir, you see that of all of the emails that you've attached

7  in your exhibits, I will represent to you that this is the one

8  earliest in time.  This is the earliest email, June 28 of 2021.

9           Now, given the fact that Mr. Kreindler is being sent

10  details on when to appear on the *Conspiracyland* podcast, it

11  certainly stands to reason that he had earlier communications

12  with Mr. Isikoff, right?

13          MS. KIRSCH:  I'm going to object to that.  I'm not

14  really sure why this witness should be opining on what the

15  pattern of communications should or should not have been.

16          THE COURT:  Sustained.

17  Q.  Sir, did you search for any emails prior to June 28, after

18  you saw this email?

19  A.  You're asking is this search --

20  Q.  Let me ask --

21  A.  -- June 1?

22  Q.  When you saw this email June 28 coming from

23  Mr. Kreindler's iPhone setting up an appointment to appear on

24  the podcast, did anyone ask you to determine whether there were

25  earlier communications?

LB1H9115                          Hartney - Cross

1  A.  No.

2  Q.  Sir, you never asked for Mr. Kreindler's personal devices

3  or his personal emails, is that right?

4  A.  What do you mean by "personal email"?

5  Q.  Like if he has a Yahoo! account or Gmail account, you never

6  asked for access to those?

7  A.  No.

8  Q.  And even after Ms. Kirsch got involved in this case, do you

9  know if Kreindler ever searched the personal emails of any of

10  its attorneys?

11  A.  Do I know?  No, I don't know.

12  Q.  If you could look at page 13 of your declaration -- of the

13  exhibits to your declaration.  Page 13 is an email from

14  Mr. Fawcett to Mr. Isikoff dated July 12, 2021, is that right?

15  A.  Yes.

16  Q.  And this email attaches a privilege log, but there's no

17  actual content in the body of the email, correct?

18  A.  I believe that's true.  I'm not sure.  I can't remember.

19          THE COURT:  Sir, can you put the microphone just

20  closer to you so the court reporter can hear you.

21          THE WITNESS:  Oh, I'm sorry.

22  Q.  This email certainly suggests that there were earlier

23  communications with Mr. Fawcett.  Did anyone ask you to search

24  for those communications?

25          MS. KIRSCH:  I'm sorry.  I'm going to object to what

LB1H9115                    Hartney - Cross

1   this document does or doesn't imply.

2           THE COURT:  OK.  He can answer the question, though,

3   as to whether or not anyone asked him to follow up.  I'll

4   accept your objection as to its implications, but Mr. Shen can

5   ask the question.

6   A.  No.

7   Q.  Now, sir, because the firm has the ability to monitor its

8   firm emails, it's certainly the case that if someone were to

9   leak confidential information, it wouldn't make any sense to

10  leak it over firm email, correct?

11  A.  It's my opinion you're asking?

12  Q.  Yes.

13  A.  My opinion -- can you repeat the question.

14  Q.  Sure.  The firm has the ability to monitor firm email.  You

15  testified to that, correct?

16  A.  Correct.

17  Q.  Now, because it has that ability, if someone were to leak

18  confidential information, it would make no sense to do that

19  over firm email, correct?

20          MS. KIRSCH:  I'm going to object to that.  Who knows

21  what monitoring there is or isn't?  It's a ridiculous question

22  for this witness.

23          THE COURT:  Sustained.  You can ask a different

24  question, please.

25  Q.  Now, paragraph 10 of your declaration discusses -- it

LB1H9115                     Hartney - Cross

1    states that all of the results of your searches are attached

2    to -- in Exhibit 1.  Do you see that?

3    A.  Yes.

4    Q.  The exact language is "the only" emails returned are in

5    Exhibit 1.  Do you see that?

6    A.  Yes.

7    Q.  If you could, there's a binder to your right.  It might be

8    easier to flip through that.

9            THE COURT:  It's going to be the larger one, sir.

10   I'll take this one.

11           THE WITNESS:  Not that one?

12           THE COURT:  You're going to want that one.

13   A.  OK.  What number?

14   Q.  Now, sir, Exhibit 1, I'm going to represent to you, doesn't

15   contain any of the emails from the court reporter with the

16   Jarrah transcript, and you can confirm that.

17   A.  Where would I find it?

18   Q.  56F, please.

19   A.  Can you -- which document are you talking about?  Can you

20   show me the document?

21   Q.  Sure.  It's 56F.  It's Exhibit 1.  It's on page 5.

22   A.  OK.

23   Q.  Behind page 5 are what you describe in your deposition as

24   the only emails returned as a result of the searches you

25   conducted, and specifically, the searches you conducted are

1    described as a search of emails for Jarrah, Isikoff, or the

2    name of the transcript.

3    A.  Yes.

4    Q.  All right.  So you don't see any email from the court

5    reporter providing the transcript, correct?

6    A.  Can you repeat that.

7    Q.  You don't see an email from the court reporter providing

8    the transcript in Exhibit 1?

9    A.  I'm not sure.  I'm sorry.  I'm not following you.

10   Q.  All right.  I'm going to make a representation to you.

11   Exhibit 1 does not contain any transmission from the court

12   reporter to anyone at the Kreindler firm containing the Jarrah

13   transcript.

14   A.  The court reporter?

15   Q.  The court reporter who actually took down the transcript of

16   the deposition and then sent the transcript to the Kreindler

17   firm by email.

18   A.  So you're saying that there's -- I'm not following you.

19   I'm sorry.  Can you just --

20   Q.  Sure.  All right.  Let's take a step back.

21   A.  OK.

22   Q.  Your declaration says that all of the emails that you

23   located in your search are contained in Exhibit 1, right?

24   A.  That's only one email.

25   Q.  Paragraph 10 says:  "The only emails returned as a result

LB1H9115                        Hartney – Cross

1  of the searches I conducted are in Exhibit 1."  That's what it

2  says, right?

3  A.  I don't think it's showing all the emails.

4  Q.  So Exhibit 1 does not contain all the emails that you

5  located?

6  A.  No, there's more emails than that.

7  Q.  Can you speak into the microphone.

8  A.  Oh, I'm sorry.  Yes, there's more emails.

9  Q.  There's more emails than are in Exhibit 1?

10  A.  Yes.

11  Q.  What happened to those emails?

12  A.  I thought they were all part of the exhibits.

13  Q.  All right.  But what we know is that the actual statement

14  in paragraph 10 of your declaration is false?

15  A.  I don't understand why all the other emails wouldn't be in

16  there.

17  Q.  OK.

18  A.  I don't know.

19  Q.  Sir --

20  A.  I don't think it's our --

21  Q.  Did you actually do a search through all of the emails for

22  the name Jarrah or Isikoff?

23  A.  I don't recall the exact search.  I think it would be both

24  one or the other, yes, not for both.

25  Q.  One or the other?

LB1H9115                         Hartney - Cross

1    A.  Yes.

2    Q.  OK.  The term "Jarrah," you would agree, would come up with

3    dozens and dozens and dozens of hits, correct?

4    A.  Yes, I believe so, yes.

5    Q.  How many hits came up when you did that search?

6    A.  I don't recall.

7    Q.  Did you provide those documents to Mr. Maloney?

8    A.  The -- no, I reviewed them myself.

9    Q.  You reviewed them yourself?

10   A.  Yeah.

11   Q.  But what we know from your declaration is that when you

12   state that all of the results of your searches are listed in

13   Exhibit 1, that's not a correct statement?

14   A.  Well, for some reason, I don't -- well, the only emails

15   returned -- there is an email.  So this is only one email.  Are

16   there two emails?  There was a couple of emails between --

17            THE COURT:  Why don't you spend two minutes and just

18   flip through.

19            THE WITNESS:  I'm sorry.

20            THE COURT:  That's OK.  Because there are a handful of

21   emails in that attachment.  Why don't you spend just a minute

22   to flip through it so you can see.

23   A.  Oh, it's this part.  I'm sorry, because I'm going back and

24   forth to the screen.

25            So all this is part of Exhibit 1.  In between here

LB1H9115                          Hartney - Cross

1   is -- I'm not understanding it.  So everything in between --

2   I'm sorry, all the emails are.  I was thinking -- confused

3   because it came up to this document.  Why is this --

4   Q.  Take a minute to review the emails that are in Exhibit 1,

5   sir.

6   A.  Okay.  I thought Exhibit 1 ended here because it had this.

7        Yes, I didn't --

8   Q.  OK.

9   A.  -- I thought the exhibit list ended when it hit this letter

10  here.

11  Q.  All right.  Sir, I've counted a total of ten emails.  I can

12  make that representation to you, sir.

13  A.  I wish there were more.  Yes, these are all the emails.

14  Q.  All right.  Did you actually do a search for all emails for

15  the term "Jarrah"?

16  A.  Say that again.  Sorry.

17  Q.  Did you actually do a search of the email server for the

18  term "Jarrah"?

19  A.  No.

20  Q.  What did you do an email search of?

21  A.  Sorry, emails.  I'm sorry.  When you said "search," I

22  apologize, I thought you meant network search.  Email server.

23  Q.  Did you do a search for just the term "Jarrah"?

24  A.  Yes.

25  Q.  And all of the searches that came up are in these ten

1  emails attached as Exhibit 1?

2  A.  Yes.

3  Q.  Did you --

4  A.  I'm sorry.  I'm sorry.  Say that again.  All the emails

5  that had Jarrah in it?

6  Q.  Yes.

7  A.  Are in these emails?

8  Q.  Yes.

9  A.  There would be more emails because it was discussed, yes.

10 Q.  How many more emails?

11 A.  I don't know.

12 Q.  Did you review those emails?

13 A.  Yes.

14 Q.  Was it hundreds of emails?

15 A.  I don't remember.

16 Q.  All right.  But what we do know is that the statement in

17 your declaration saying all of the emails that hit upon your

18 searches are contained in Exhibit 1, that's not a true

19 statement?

20     MS. KIRSCH:  I'm sorry.

21 A.  That's --

22     MS. KIRSCH:  Could I have the question read back?  I

23 think I have an objection.  I don't think that states his

24 testimony, but I could be mistaken.

25     THE COURT:  Can you read the question.

LB1H9115                         Hartney – Cross

1          (Record read)

2          MS. KIRSCH:  That's fine.

3          THE COURT:  OK.  You can answer it.

4          THE WITNESS:  Can you repeat that again.  I'm reading

5     what I wrote here.

6          (Record read)

7     A.  No, all the searches -- no, the only -- they talk about --

8     what I'm talking about is emails with the portion of the Jarrah

9     deposition transcript in it.

10    Q.  That's not what your declaration says, sir.  Paragraph 9 of

11    your declaration says --

12    A.  I'm sorry.  I'm looking at 10.  I also searched -- I have

13    10 up on my --

14    Q.  Can we show paragraph 9.

15         Paragraph 9 says that you searched emails for Jarrah

16    or Isikoff or the name of the transcript.

17    A.  Yes.

18    Q.  Did you do that search?

19    A.  Yes, I did that search.

20    Q.  All right.  Were there hundreds of emails that came up with

21    just the term "Jarrah" in it?

22    A.  I can't recall.

23    Q.  There were more than ten, right?

24    A.  Yes.

25    Q.  And your Exhibit 1 attaches only ten emails?

LB1H9115                          Hartney - Cross

1   A.  Because on my -- the only emails return results conducted

2   are attached, because I was referring to that didn't have the

3   Jarrah deposition.

4   Q.  Say that again, sir.

5   A.  I was referring to that didn't discuss -- that didn't have

6   any Jarrah deposition transcripts attached to them, so --

7   Q.  You're only referring to the emails that didn't have Jarrah

8   deposition transcripts attached to them?

9   A.  Yes.

10          MR. SHEN:  All right.  Let's show Exhibit 31, please.

11  Q.  Exhibit 31 is an email that my colleague sent to a number

12  of attorneys at the Kreindler firm.  It has the term "Jarrah"

13  in it.  It's not attached as Exhibit 1 to your declaration.

14  A.  No, but I was referring to anything that has to do with the

15  Jarrah transcript.  Any text of Jarrah transcript, that's what

16  I was referring to.

17  Q.  Just so the record is clear, what is in Exhibit 1?

18  A.  It's the emails.  It is just the emails that are between

19  Isikoff and Jim Kreindler.

20  Q.  All right.  Sir, we're going to move on from this point.

21          These paragraphs, were they drafted by Ms. Benett?

22  A.  Correct.

23  Q.  Did she pull together the documents for this declaration?

24  A.  I believe so, yes.

25  Q.  All right.  Are you aware, sir, that on July 21 my firm

LB1H9115                          Hartney - Cross

1   informed the Kreindler firm that we were aware of the leak and

2   that we were going to move the Court for certain discovery

3   pertaining to the leak?

4   A.  Say that again.  Can you?

5   Q.  Were you aware, sir, that on July 21 my firm reached out to

6   the Kreindler firm and told the Kreindler firm that we were

7   aware of the leak of the transcript, and we were going to move

8   the Court for certain relief pertaining to the leak?

9   A.  No, I wasn't.

10  Q.  Are you aware that the Kreindler firm wrote to the Court on

11  July 27 and took the position that there should not be

12  discovery?

13  A.  No.

14  Q.  On July 27 -- I'm not going to show you on the screen, but

15  I will read it to you.  It says that plaintiffs advised

16  Saudi Arabia that each of the lead PEC firms had already

17  conducted internal investigations into the handling of the

18  Jarrah transcripts and communications with Mr. Isikoff.  That

19  was on July 27.

20          For the Court's reference, that's Exhibit 43.

21          When those representations were made by the Kreindler

22  firm, you had not, in fact, done any search of the cloud-based

23  server, correct?  That was done on July 29, as we discussed?

24  A.  I believe so, yes.

25  Q.  On July 27, you had not done any review of the Case Media

1    proprietary internal server, correct?

2            MS. KIRSCH:  I'm sorry.  What's the foundation for

3    that question?

4            MR. SHEN:  I'm asking, as of that date, whether

5    Mr. Hartney had done the search.

6            MS. KIRSCH:  Objection.  I don't know what the

7    foundation is for that date.

8            THE WITNESS:  Yeah, I don't --

9            THE COURT:  The date is the date of a letter that was

10   filed with the court.  I believe the -- Mr. Shen is asking

11   about a letter that was filed with the court by the Plaintiffs'

12   Executive Committee on July 27, and I think Mr. Shen is asking

13   about what investigation had been conducted at that point in

14   time.

15           MS. KIRSCH:  I understood Mr. Shen to say, Isn't it

16   true that your investigation did not happen by July 27? which

17   struck me as an inappropriate.  We have no foundation for when

18   Mr. Hartney's searches took place.  That was the basis of my

19   objection.

20   BY MR. SHEN:

21   Q.  Let me ask the question.  July 27, the Kreindler firm

22   writes to the court saying that the investigation is complete.

23   As of that date, had you done an investigation of the Case

24   Media internal proprietary server?

25   A.  Only to the fact that we found that document in Case Media,

1  but no.

2  Q.  OK.  Only the fact that it was stored on that media server,

3  but no other investigation, correct?

4  A.  Yeah.

5  Q.  And as of that date, you knew that anyone at the Kreindler

6  firm had access to everything on that server, correct?

7  A.  Correct.

8  Q.  Now, as of July 27, you knew that there were email

9  communications between Mr. Kreindler and Mr. Isikoff, as well

10  as email communications between Mr. Fawcett and Mr. Isikoff, is

11  that right?  Those are attached as Exhibit 1 to your

12  declaration.

13  A.  Yes.

14  Q.  And you knew that some of those email communications came

15  from Mr. Kreindler's personal device, correct?  We saw --

16  A.  Yes.

17  Q.  -- that it was sent from his iPhone, and no one asked you

18  to search for his iPhone, right?

19  A.  Correct.

20  Q.  Or his personal email?

21  A.  That came up on the Kreindler email.

22  Q.  No one asked you to reach out to Jim Kreindler and provide

23  his personal email, correct?

24  A.  Correct.

25  Q.  So it's certainly the case by July 27 that you could not

LB1H9115                    Hartney – Cross

1   have concluded that no one at the Kreindler firm was the source

2   of the leak, right?

3   A.   Yeah, I believe so.

4   Q.   Let's look at Exhibit 49.  This is the August 30 order from

5   the court.  On page 2 of that order, it says that the Kreindler

6   firm is required to provide a declaration from the head of the

7   law firm's information technology group that should demonstrate

8   that a forensic analysis was done to identify who accessed the

9   deposition transcripts and determine the dates of that access.

10           You see that?

11  A.   Yeah.

12  Q.   And you knew it was impossible for you to conduct any

13  forensic analysis of who had actually accessed the Jarrah

14  transcripts on the Case Media server, correct?

15  A.   I was never asked to do one.

16  Q.   You were never asked to do one?

17  A.   I don't recall, no.  I mean, in the sense that we don't

18  keep any tracking of that information.

19  Q.   All right.  So no one asked you to do a forensic analysis,

20  correct?

21  A.   Correct.

22  Q.   Now, are you aware, sir, that on September 27 the Kreindler

23  firm informed the court that John Fawcett had leaked the Jarrah

24  transcript to Michael Isikoff?

25  A.   Can you repeat that.

LB1H9115                          Hartney – Cross

1   Q.  Are you aware that the Kreindler firm on September 27

2   informed the court that John Fawcett had leaked the Jarrah

3   transcript to Michael Isikoff?

4   A.  One more time.  What date?

5   Q.  September 27.

6   A.  Correct, yes.

7   Q.  And after that disclosure, were you asked to conduct any

8   forensic investigation of anybody's computer to determine

9   whether they knew of that leak or directed it?

10  A.  Was -- no.

11  Q.  After that disclosure and before Ms. Kirsch got involved in

12  October, were you asked to search personal devices, text

13  messages, personal emails?

14  A.  No.

15  Q.  Were you asked to search phone records?

16  A.  After the --

17  Q.  After the leak but before Ms. Kirsch got involved.

18  A.  No.

19  Q.  All right.  So as you sit here today, you have no ability

20  to conclude that no one at the Kreindler firm had directed the

21  leak or had knowledge of it, correct?

22  A.  I was just directed to do what the --

23  Q.  And you just did what the attorneys told you?

24  A.  Well, and we all discussed a -- a -- you know, a way of,

25  you know, doing searches on emails to see if it went out from

LB1H9115                          Hartney – Cross

1   the Kreindler.

2   Q.  You're referring to searches of the Kreindler email server?

3   A.  Yes.

4   Q.  And that's it, that's the only search you did, right?

5   A.  Yes.

6          THE COURT:  I don't want to interrupt you, Mr. Shen,

7   but I think, for the court reporter's sake, we're going to take

8   a break at some point, but you tell me if you think you're

9   getting close or if you want to take a break.  I don't know how

10   much longer you've got.

11          MR. SHEN:  Five to ten minutes, and I'll be done.

12          THE COURT:  OK.  So let's finish this witness for you,

13   and then we'll take a break and then Ms. Kirsch will go.

14   BY MR. SHEN:

15   Q.  If we could look at Mr. Fawcett's declaration, Exhibit 59,

16   from September 30 and paragraph 3.  Mr. Fawcett says -- first

17   of all, have you seen this declaration before?

18   A.  No.

19   Q.  No.  So this is your first time looking at it?

20   A.  Correct.

21   Q.  Now, Mr. Fawcett says that "I privately communicated with

22   Michael Isikoff several times between June 1 and August 1 of

23   this year."

24          After September 27, did anyone ask you to look at the

25   firm's phone records for Mr. Fawcett's communications with

LB1H9115                         Hartney – Cross

1    Mr. Isikoff or with anyone else?

2    A.  Yes.

3    Q.  Was that after Ms. Kirsch got involved?

4    A.  Correct.

5    Q.  But not before that, correct?

6    A.  Correct.

7    Q.  Now, are you currently in the process of installing an

8    internal proprietary server that actually restricts access to

9    who can access the 9/11 materials?

10   A.  Yes, that's in place.

11   Q.  It's already in place?

12   A.  Yes.

13   Q.  And you did that after September 28, correct?

14   A.  I can't recall the date I did it.

15   Q.  But it was after the disclosure of the leak?

16   A.  Yes.

17   Q.  And are you currently installing or have you installed a

18   system that tracks who actually accessed proprietary material?

19   A.  Yes.

20   Q.  All right.  Are you aware that that type of software is

21   routinely available and used by law firms to keep protected

22   information actually protected?

23   A.  Yes.

24   Q.  Now, paragraph 7 of Mr. Fawcett's declaration says that he

25   used a ProtonMail account to send the transcript to

LB1H9115                              Hartney – Cross

1  Mr. Isikoff.  Do you see that?

2  A.  Yeah.

3  Q.  Anyone ever ask you to get Mr. Fawcett's ProtonMail

4  account?

5  A.  No.

6  Q.  And you never did any investigation of that ProtonMail

7  account, correct?

8  A.  Correct.

9  Q.  You never reached out to ProtonMail to determine whether

10  any of the messages Mr. Fawcett had sent to Mr. Isikoff were

11  still available?

12  A.  Correct.

13  Q.  Did you ever, after the disclosure that Mr. Fawcett was the

14  source of the leak, seek the return of his home computer to the

15  firm, his personal computer?

16  A.  No.

17  Q.  No one asked you to do that?

18  A.  No.

19  Q.  Do you have any idea what protected and confidential

20  material is on that computer?

21      MS. KIRSCH:  I'm going to object here.  There's

22  implications in these questions that are inappropriate.

23  Mr. Fawcett was an outside consultant.  He had his own personal

24  laptop.  This line of questioning has no foundation and is not

25  relevant, and it's misleading, as Mr. Shen well knows.

LB1H9115                      Hartney – Cross

1          MR. SHEN:  I'm asking the witness whether he

2    personally engaged in certain conduct, and the question here is

3    whether he sought the return of devices that held protected and

4    confidential material.

5          MS. KIRSCH:  And I object to the use of the word

6    "return" because if it's his own personal computer, there's

7    nothing to return.  It's a misleading question, and Mr. Shen

8    knows it.

9          THE COURT:  The objection is overruled.  You can

10   answer the question.

11         THE WITNESS:  Say it again.

12         THE COURT:  You can answer the question.

13   A.  OK.  Can you repeat the question?

14   Q.  Yeah.  Did you ever ask or did anyone ever ask you to get

15   Mr. Fawcett's laptop and inspect it?

16   A.  No.

17   Q.  Did anyone ever ask you to get Mr. Fawcett's cell phones

18   and inspect it?

19   A.  No.

20         MR. SHEN:  No further questions.  Thank you very much.

21         THE COURT:  OK.  We'll take a very quick recess, and

22   we'll be back in five minutes.

23         (Recess)

24

25

1    THE COURT:  Ms. Kirsch, you may proceed.

2    REDIRECT EXAMINATION

3    BY MS. KIRSCH:

4    Q.  Good afternoon, Mr. Hartney.

5    A.  Good afternoon.

6    Q.  Mr. Hartney, we just spent a fair amount of time talking

7    about the searches that you performed and what you were

8    directed to perform over the summer.

9    So there is a book that's not that big yellow one.

10   It's a slightly smaller one that has tabs in it.  We are going

11   to look at some of the documents in that book.

12   A.  Sure.

13   Q.  So let me turn your attention, to begin with, right to

14   Exhibit 2, tab 2.  If you look down at the bottom, which is the

15   first e-mail in this thread, it seems to be Mr. Maloney sending

16   you a note on July 21st saying "any questions?"  Do you see

17   that?

18   A.  Yes.

19   Q.  And then, if we go up to the next e-mail, you are reporting

20   on what it is you have done on the e-mails called "Jarrah

21   search."  Do you see that?

22   A.  Correct.

23   Q.  Now, can you tell me what your search, looking at this

24   e-mail, what did you do and what turned up as a result of this

25   search?

1    A.  It was a pretty broad search in the beginning.  So it

2    turned out a good number of hits, like I said, but I don't know

3    exactly how many hits.

4    Q.  I am going to ask you if you could please get a little

5    closer to the microphone.  That's just me personally.  I don't

6    hear so well.

7         I see the last line you write, "I did not see any

8    e-mails going out of anyone's e-mail box with that particular

9    transcript."

10        Do you remember why you wrote that line or what you

11   meant by that?

12   A.  I meant that I didn't find the Jarrah transcript being

13   e-mailed out by anybody at Kreindler.

14   Q.  Was that the first thing you were looking for as of July

15   21st?

16   A.  Yes.

17   Q.  Then the next two e-mails suggests that you and Mr. Maloney

18   are looking to speak by phone.  Do you recall that?

19   A.  The conversation?

20   Q.  Yes.

21   A.  Yes.

22   Q.  Do you remember what you discussed on that phone call?

23   A.  It was to narrow the search down with particular search

24   terms and e-mail addresses.

25   Q.  Then, if you turn to Exhibit 4, this document appears to be

1   a text message exchanged on July 22nd between you and Mr.

2   Maloney.  Do you see that?

3   A.  Yes.

4   Q.  And Mr. Maloney appears to say to you, "Please finish your

5   second search on Isikoff ASAP and let me know tomorrow before

6   noon if possible."  Do you see that?

7   A.  Yes.

8   Q.  Do you remember what that second search was on July 22nd

9   that you were asked to perform?

10  A.  The exact search, no.  But it was for the e-mail -- adding

11  more e-mail addresses that Isikoff used and using the name of

12  the deposition.  It was a developing search criteria that we

13  were gathering each time we would find it.

14  Q.  So, prior to July 22nd, you had done a first immediate

15  search that turned up some results, is that right?

16  A.  Yes.

17  Q.  And then as more search terms became available, or more

18  targeted search terms, you went back at Mr. Maloney's direction

19  to do a second search, is that my understanding?

20  A.  Yes.

21  Q.  So, if you look then at tab 5, can you read me -- so this

22  appears to be another text on July 22nd.  Would you read that

23  text message that you sent to Mr. Maloney here?

24  A.  "Performed search on Isikoff name and e-mail address and

25  found no one sent him the transcript.  There was e-mail

1  communication with Jim discussing lifting of the gag order and

2  Isikoff writing an article."

3  Q.  So, can you just tell us, reading that, what exactly you

4  had been asked to do and what that turned up?

5  A.  That was –– we performed the search on Isikoff's name and

6  additional e-mail addresses.

7  Q.  And specifically what were you looking for with those

8  searches?

9  A.  We were looking for whether the transcript was sent out by

10  anybody in Kreindler.

11  Q.  So, if you look now at tab 8, this is something that you,

12  Mr. Hartney, are forwarding to Mr. Maloney on July 22nd.  Is

13  this one of the e-mails that you found in your search?

14  A.  Yes.

15  Q.  And you were sending it to Mr. Maloney for his review?

16  A.  Yes.

17  Q.  And if you look at tab 9, Mr. Hartney, is this also an

18  e-mail that you had found by July 22nd responsive to your

19  search that you're sending to Mr. Maloney?

20  A.  Yes.

21  Q.  What does Mr. Maloney respond to you, up at the top?

22  A.  "Thank you.  Is this all there is?"

23  Q.  Do you remember if that was all there is?

24  A.  I can't recall.  I think there were some other e-mails.

25  Q.  OK.

1    A.  I can't recall.  I'm sorry.

2    Q.  If we turn to Exhibit 14, would you take a look at this

3    document Exhibit 14, and can you just tell me what it is,

4    please?

5    A.  This is the users that have access to the deposition files

6    that were shared on the shared file system.

7    Q.  Can you walk me through this chart and tell me what it

8    reflects?  There's check boxes and names.  Can you explain it

9    to the Court, please?

10   A.  It's hard to see, but it looks like the first one is

11   view/download.  So any check mark would be, you would be able

12   to view or download the transcript.

13        The other one is download alerts, that you would

14   receive an alert if anybody had downloaded any documents from

15   the system.

16   Q.  Is it fair to say that these boxes reflect different

17   permissions or different actions?

18   A.  Correct.

19        THE COURT:  I'm sorry.  This was on the Citrix system?

20        THE WITNESS:  Yes.

21        THE COURT:  Which is the same or different from the

22   cloud system?

23        THE WITNESS:  That is the cloud system.

24        THE COURT:  That is the cloud system.

25   Q.  Do you remember why you were asked to forward this

1  screenshot or this document to Mr. Maloney?

2  A.  I think he initially wanted to -- he wanted to know who had

3  access to these files.

4  Q.  So you were performing one set of searches on the shared

5  file and another set of searches through the servers, do I

6  understand that?

7  A.  You mean the e-mail server?

8  Q.  Correct.

9  A.  We did one set of searches on the e-mail server, and we

10  reviewed the documents on the shared server, cloud server.

11  Q.  So then let's turn to tab 20, please.

12      If you look at the second e-mail here, this is dated

13  July 29 from you to Mr. Maloney.  Do you see that?

14  A.  Yes.

15  Q.  Can you tell me what this e-mail represents?

16  A.  This represents searches that were performed on these

17  users' mailboxes, and if anybody had e-mailed the Jarrah

18  deposition transcript outside of the office and inside.

19  Q.  I'm sorry?

20  A.  And internally, too.

21  Q.  So does this reflect the records of where the Jarrah

22  transcript went by e-mail?

23  A.  Yes.

24  Q.  Did you discuss this summary document with Mr. Maloney at

25  all or did you just forward it to him for him to do whatever

LB189116                     Hartney – Redirect

1  work he needed to do with it?

2  A.  I forwarded it to him and he did the work.

3  Q.  Was that the case with most of the searches, you performed

4  the searches, provided the information to Mr. Maloney, and he

5  took it from there?

6  A.  Correct.

7  Q.  Let's look at tab 34, if you would.

8         THE COURT:  Can I ask a clarifying question on this

9  document?

10        MS. KIRSCH:  Yes.

11        THE COURT:  I want to make sure that I understand.

12        On this document, if you can go back at what we were

13  looking at.

14        THE WITNESS:  Which one is that?

15        THE COURT:  20.  Where we just were.

16        THE WITNESS:  I'm there.

17        THE COURT:  Sometime before you sent this July 29th

18  e-mail, you performed searches on the e-mail boxes to see if

19  anyone e-mailed the deposition transcript, and this list are

20  your results?

21        THE WITNESS:  Right.

22        THE COURT:  It indicates that Debra Pagan e-mailed it

23  to John Fawcett, is that correct?

24        THE WITNESS:  Correct.

25        THE COURT:  We also know that John Fawcett e-mailed it

LB189116                    Hartney – Redirect

1  to somebody, but we don't know who that is, is that correct?

2            THE WITNESS:  Correct.

3            THE COURT:  Then, are these e-mails part of Exhibit 1

4  of your declaration?

5            THE WITNESS:  These e-mails, I don't think they were

6  included.

7            THE COURT:  Thank you.  Sorry.

8  BY MS. KIRSCH:

9  Q.  So, Mr. Hartney, let's turn to tab 34.

10           If you go down to the bottom there, there is an e-mail

11  on August 30th from Mr. Maloney to you that says, "Here is my

12  first draft, please review for accuracy."

13           Do you know what he is referring to there, Mr.

14  Hartney?

15  A.  My declaration.

16  Q.  Then, if you go up, the next day you write back to Mr.

17  Maloney, presumably after you have reviewed the declaration,

18  and you say, "I would like to redo the searches on the

19  journalist e-mail addresses.  I don't feel confident I searched

20  both e-mail addresses.  Can you send me the two e-mails

21  addresses?"

22           Do you see that?

23  A.  Yes.

24  Q.  Do you recall sitting here today why you weren't feeling

25  confident?

LB189116                    Hartney – Redirect

1   A.  Well, the court had ordered the declarations and

2   specifically the search of the Isikoff e-mails, and any other

3   e-mails that he may be associated with.  Then Duke sent me the

4   declaration and I didn't want to sign it until I was confident

5   enough.  So I redid the searches and re-reviewed the searches

6   just to be confident enough that what I was saying was truthful

7   in the declaration.

8   Q.  As you're getting ready to prepare this declaration on

9   August 31st, you are redoing the searches for the journalist's

10  e-mail addresses, Mr. Isikoff?

11  A.  Correct.

12  Q.  But you didn't at this point redo the full panoply of

13  searches for the name Jarrah, correct?

14  A.  I did everything.

15  Q.  You did everything?

16  A.  Yeah.  I did all the searches again and re-reviewed just to

17  make sure that I wasn't missing anything.

18  Q.  OK.  And then when you're double-checking and doing

19  everything, you also looked to confirm with Mr. Maloney what

20  was the date range.  Do you see that?

21  A.  Yes.

22  Q.  And then Mr. Maloney responds to you that the court

23  actually asked us to cover June 1 to August 1.

24          Do you know what you did after you received Mr.

25  Maloney's e-mail there?

LB189116                    Hartney - Redirect

1  A.  I corrected the dates on the searches and reran them and

2  re-reviewed all the results.

3  Q.  With these Isikoff e-mail addresses, did anything new turn

4  up when you expanded the date range?

5  A.  I don't recall.  I don't think so.

6  Q.  You don't recall or you don't think so?

7  A.  I think there was one e-mail to John Fawcett that talked

8  about some privilege log.  I don't know if I got that before

9  the searches or after the searches.  That would have been the

10  only thing I could think of.

11  Q.  Now, if you can turn to Exhibit 66.  The date of this

12  e-mail is September 26.  And this is from Ms. Benett to you.

13  She writes, "Just confirming.  I need all incoming and outgoing

14  and in any delete folders of the following e-mail addresses

15  between June 1 and August 1:"  And then there is a bunch of

16  e-mail addresses, four addresses for Mr. Isikoff.  Do you see

17  that?

18  A.  Yes.

19  Q.  Did you rerun the search again at that time?

20  A.  Yes.  I would have reran the search, yes.

21  Q.  Do you know whether this turned up anything new that you

22  hadn't found earlier?

23  A.  No, it didn't.

24  Q.  It was the same?

25  A.  The same, yeah.

1   Q.  But Ms. Benett is not asking you here for all of the e-mail

2   addresses that hit on the word "Jarrah," is she?

3   A.  No.

4   Q.  And she is not asking you to rerun the searches that hit on

5   the name of the transcript file?

6   A.  No, she is not.

7   Q.  It's just the incoming and outgoing with Mr. Isikoff,

8   correct?

9   A.  Correct.

10  Q.  So let's take a look at Exhibit 87.

11        If you look, your declaration, the September 27

12  declaration, begins, if you look at the bottom right-hand

13  corner, at 19 of 53.

14  A.  Wait.  You said 87?

15  Q.  Yes.  Tab 87, page 19 of 53.

16  A.  OK.

17  Q.  Do you see this is your declaration that you were just

18  looking at with Mr. Shen a few minutes ago?

19  A.  Correct.

20  Q.  Now, if we look at the third page of your declaration,

21  which is actually page 21 of 53, I want to focus your attention

22  for a minute on paragraphs 8, 9 and 10.

23  A.  Correct.

24  Q.  In light of the fact that we just looked at the e-mail

25  where Ms. Benett, who was helping you with this declaration,

LB189116                    Hartney - Redirect

1    asked for all of the e-mails responsive to the search described

2    in paragraph 8, do you think it's possible that there was an

3    error and that paragraphs 9 and 10 are reversed?  In other

4    words, that paragraph 10 was intended to refer to the results

5    of the searches described in paragraph 8 as opposed to the

6    results of the searches described in paragraph 9?

7              Is that too confusing a question?

8    A.  No.  I believe so.  Because the only e-mail results found,

9    it was my understanding, was the searches on the e-mail

10   addresses.  And that's what confused me.

11   Q.  So, despite what the words say, which is undoubtedly

12   confusing here, was it your intention that you were attaching

13   only the e-mails that hit on the Isikoff e-mail addresses,

14   incoming and outgoing and deleted?

15   A.  Yes.

16   Q.  Mr. Hartney, something else came up.  In connection with

17   preparing your declaration with Ms. Benett, did Ms. Benett

18   force you to sign anything that you thought was not truthful?

19   A.  No.

20   Q.  Can you tell me what your discussions with Ms. Benett about

21   your declaration were?

22   A.  Basically, it was to describe where the location of the

23   document was found on our internal network server, and also to

24   determine where the location was of the transcripts that were

25   classified, and searching of the e-mail.

LB189116                    Hartney – Redirect

1  Q.  Did Ms. Benett pressure you to write your declaration in

2  any particular way that you were not comfortable with?

3  A.  No.

4  Q.  Is it your opinion that Ms. Benett would ever pressure you

5  to do something you were not comfortable with?

6  A.  No.

7  Q.  Did you discuss the language with Ms. Benett and why things

8  were drafted the way they were?

9  A.  Yes.

10  Q.  Did Ms. Benett provide you good explanations for any

11  questions that you had about the drafting?

12  A.  Absolutely.

13  Q.  When you signed the declaration, were you comfortable that

14  it was complete and accurate and not something that Ms. Benett

15  was asking you to sign that you were not comfortable with?

16  A.  Yes.

17  Q.  I would like to ask you also, there was a discussion about

18  a Dropbox account that Mr. Fawcett had?

19  A.  Yes.

20  Q.  Do you recall that that Dropbox account was assigned to Mr.

21  Fawcett's Kreindler e-mail address?

22  A.  Yes.

23  Q.  And do you recall that when Mr. Fawcett's Kreindler e-mail

24  address was shut down, that you were comfortable that he would

25  no longer be able to access that Dropbox account?

LB189116                    Hartney – Recross

1   A.  Yes.

2   Q.  In fact, that's true, once he lost his e-mail credentials,

3   he could not access that Dropbox account on the screenshot we

4   were looking at, isn't that true?

5   A.  I believe so.

6           MS. KIRSCH:  I have no further questions.

7           THE COURT:  Thank you.

8           MR. SHEN:  Just a few questions, your Honor.

9   RECROSS EXAMINATION

10  BY MR. SHEN:

11  Q.  Mr. Hartney, you were asked questions about your

12  declaration.  And if you have it in front of you, our Exhibit

13  56F, but it's in the binder that you went over with Ms. Kirsch

14  as well.

15          You were asked questions about whether paragraph 9 and

16  paragraph 10 may have been switched in your declaration.  Do

17  you recall that?

18  A.  Yes.

19  Q.  Now, paragraph 10, if you move it up, that would describe

20  the search reference in paragraph 8, right?

21  A.  I believe so, yes.

22  Q.  And paragraph 9 describes a search for Jarrah, Isikoff, or

23  the name of the Jarrah transcript, right?

24  A.  Correct.

25  Q.  Then there is no discussion at all as to what that search

1    revealed in your declaration, correct?

2    A.  Yes.

3    Q.  And that wouldn't make any sense for you to just put a

4    search in but not describe what it showed, right?

5    A.  I guess, yeah.

6    Q.  Now, Ms. Kirsch asked you about the preparation of your

7    declaration and your discussions with Ms. Benett.  Do you

8    recall that?

9    A.  Yes.

10   Q.  Let's look at Exhibit 115.

11   A.  You said 115?

12   Q.  It's on the screen in front of you as well.

13         Now, Exhibit 115 is a document that's been

14   produced --

15   A.  It's not on the screen.

16         THE COURT:  The witness's screen has gone black.

17   Q.  Do you have the document in front of you, Exhibit 115?

18   A.  I believe so.

19   Q.  Now, Exhibit 115 is an e-mail produced by the Kreindler

20   firm just this week.

21         Sir, you see at the bottom e-mail from Ms. Benett,

22   dated September 27, 2021, Ms. Benett is sending you a draft of

23   your declaration.  Do you see that?

24   A.  Yes.

25   Q.  And you write back to Ms. Benett on the 27th at 10:27 a.m.

LB189116

1   Do you see that?

2   A.  Yes.

3   Q.  And you identify an issue with the statement that the

4   shared drive is for use only by the Kreindler attorneys and

5   staff involved in this litigation, right?

6   A.  Yes.

7   Q.  And you actually highlight it in the e-mail, correct?

8   A.  Yes.

9   Q.  And you tell Ms. Benett that, I don't think it is truthful,

10  correct?

11  A.  Correct.

12  Q.  And that's because everyone at Kreindler has access to

13  everything on the Case Media server; that's what you write in

14  the e-mail, right?

15  A.  Yes.

16  Q.  Then Ms. Benett insists on not including that language in

17  the declaration, right?  She doesn't want to tell the court

18  that everyone has access to everything, correct?

19  A.  Yes.

20           MR. SHEN:  No further questions.

21           THE COURT:  Thank you, sir.

22           You may step down.

23           (Witness excused)

24           THE COURT:  I think we should keep going because we

25  are taking a lot of time here.  I would like to call our next

LB189116

1    witness and press through at least for another 20 minutes.  I

2    think we are going to start early tomorrow because I really

3    want to finish tomorrow, but let's call a witness now.

4              MR. SHEN:  Saudi Arabia calls Andrew Maloney.

5              MS. KIRSCH:  Does Mr. Hartney have to stay in the

6    courtroom per your order as the others do?

7              THE COURT:  Any objection to Mr. Hartney being

8    dismissed from the hearing for good?

9              MR. KELLOGG:  No, your Honor.

10             THE COURT:  And he doesn't have to come back tomorrow?

11             MR. KELLOGG:  No, your Honor.

12             THE COURT:  Mr. Hartney, thank you for your service.

13   You are excused and you don't have to return tomorrow.

14             My hope is we can do 20 to 30 minutes of this witness

15   and then break and then start, hopefully, at 9 tomorrow

16   morning.

17             MR. SHEN:  Yes, your Honor.

18             THE COURT:  You may end up not being able to use the

19   monitor right now.

20             Unfortunately, there is not a HEPA filter and

21   therefore under our court protocols you need to keep your mask

22   on.  Second, we are having some IT problems.  Ordinarily the

23   screen in front of you might reveal a document.  We are on the

24   phone trying to get someone to come up now so maybe we will

25   have somebody.

1       THE WITNESS:  I will roll with it.

2       THE COURT:  Until then, you have a very large binder

3  to your right and Mr. Shen may ask you to look at exhibits in

4  that binder.

5   ANDREW J. MALONEY III,

6       called as a witness by the defendants,

7       having been duly sworn, testified as follows:

8       THE DEPUTY CLERK:  Please state your full name for the

9  record.

10       THE WITNESS:  Andrew J. Maloney III.

11       THE COURT:  Thank you, sir.

12  CROSS-EXAMINATION

13  CROSS-EXAMINATION

14  BY MR. SHEN:

15  Q.  Good afternoon, Mr. Maloney.

16  A.  Good afternoon.

17  Q.  Mr. Maloney, you attended the Jarrah deposition on June 17

18  and June 18, correct?

19  A.  Remotely, correct.

20  Q.  A number of your colleagues at the Kreindler firm attended

21  as well, particularly, Steve Pounian, Megan Benett, and Jim

22  Kreindler, those were the attorneys that attended?

23  A.  I was not at their location, but I believe they were all on

24  the line.

25  Q.  And a consultant for the firm named Catherine Hunt attended

LB189116                         Maloney – Cross

1   the deposition as well, correct?

2   A.   I don't know.  I don't remember seeing her on the screen so

3   I can't tell you.

4   Q.   I can represent to you that she is on the appearance sheet.

5   If we had the screen working I can show you, but it is also at

6   Exhibit 32.

7            Now, you know from attending the depositions that

8   there is a real-time feed of the deposition transcript,

9   correct?

10  A.   Yes.

11  Q.   And you can view that real-time feed on your own home

12  computer as you're watching the deposition, right?

13  A.   Yes.

14  Q.   And the link to that real-time feed, that's in a chat box

15  of the Zoom application that we used for remote depositions,

16  right?

17  A.   I think there was a link in the chat box.  When I did it, I

18  usually had a separate laptop that I would use the link to the

19  court reporters real-time, and I would use my other computer to

20  watch the screen of the witness or exhibits displayed.  On the

21  Jarrah deposition, I didn't do that because I was in Kansas

22  City.

23  Q.   You were the individual who conducted the investigation of

24  the leak at the Kreindler firm once the July 15 Isikoff article

25  came out, right?

LB189116                    Maloney - Cross

1   A.  Yes.

2   Q.  Did you ever contact Catherine Hunt to interview her?

3   A.  I did not.  I don't believe she ever got a copy of the

4   transcript.

5   Q.  You never asked her whether she downloaded the real-time

6   transcript?

7   A.  I would have known if she had downloaded the transcript.  I

8   didn't need to ask her.

9   Q.  The real-time transcript?

10  A.  I'm not aware that you can do that, but I did not ask her

11  that.

12  Q.  Now, sir, you read the July 15 Isikoff article when it came

13  out, correct?

14  A.  Yes.

15  Q.  And you know that Mr. Isikoff stated that he had a copy of

16  the Jarrah transcript, right?

17  A.  Yes.

18  Q.  And you know that that article also describes what happened

19  at the Bayoumi and the Thumairy depositions as well, right?

20  A.  I don't recall specifically.  There may have been a general

21  reference that we had deposed Bayoumi and Thumairy.  I don't

22  know if there was a description.

23  Q.  Do you recall that there is a discussion about invocation

24  of the Vienna Convention privilege at the Jarrah transcript,

25  and then Mr. Isikoff said that, "The families' lawyers also got

1  an equally frustrating lack of response in their closed-door

2  video depositions last month with Thumairy and Bayoumi"?

3          MS. KIRSCH:  I object.  Mr. Maloney just said he

4  doesn't recall the article verbatim.  I think it would be

5  better to put the article in front of him.

6          MR. SHEN:  I am just refreshing his recollection.

7  A.  I don't recall the details of the article except for the

8  reference to -- I remember the title was something about FBI

9  attempting to flip Mr. Jarrah.  And I remember the thing that

10 stood out in my mind immediately was his reference to the

11 transcript itself, that he claimed to have a copy of the

12 transcript itself.

13         THE COURT:  Mr. Shen, can I interrupt you for one

14 second.  We have AV here.  Is it worth spending a minute fixing

15 it?

16 Q.  Let's look at Exhibit --

17         THE COURT:  Hold on.  I think we need to have AV

18 interrupt you is the question.

19         Do you want to take a quick look?

20         Thank you so much.

21 BY MR. SHEN:

22 Q.  Exhibit 40 in front of you is the July 15 article by

23 Mr. Isikoff.  If we could just scroll down --

24 A.  Hold on.

25         Exhibit?  Sorry.

LB189116                      Maloney – Cross

1   Q.  It's Exhibit 40.

2          Do you recognize this, July 15, 2021?

3   A.  Yes.  I don't think I saw it in color, but yeah.

4   Q.  Now, sir, you said that what struck you about this article

5   is that there is a reference to someone had given Mr. Isikoff

6   the transcript, correct?

7   A.  Yes.  That he had obtained one, yes.

8   Q.  And you understood that to be a serious violation of the

9   protective orders in this case, right?

10  A.  Yes.

11  Q.  Now, at that time, had you had any discussions with

12  Mr. Isikoff?

13  A.  No.

14  Q.  Are you aware of any discussions that Mr. Pounian or Ms.

15  Benett of your firm had with Mr. Isikoff?

16  A.  Am I aware?  I am not aware of any.  I think that I at one

17  time would have asked him, and I was told no.

18  Q.  Now, you're certainly aware that Mr. Kreindler had

19  discussions with Mr. Isikoff, correct?

20  A.  He has had discussions with him at various times over the

21  last few years, as well as probably two dozen other

22  journalists.

23  Q.  But he has known Mr. Isikoff for a long time and he

24  frequently speaks with him, right?

25  A.  I would not characterize it that way.  I don't think that's

1   accurate.

2   Q.  You knew that Mr. Kreindler had spoken to Mr. Isikoff over

3   a number of years, correct?

4   A.  Well, as I said, Mr. Kreindler spoke to a number of

5   journalists, including Mr. Isikoff.

6   Q.  That's not my question.  My question is, did you know that

7   Mr. Kreindler was speaking with Mr. Isikoff over a number of

8   years?

9   A.  I would say, no, I didn't know that.  I know from time to

10  time he spoke to him.  If you are asking me the first time I

11  became aware he spoke to him, was it a few years earlier,

12  possibly.

13  Q.  Look at Exhibit 79 in your binder, please.

14          Sir, on page 2 --

15  A.  Hold on.

16          I'm with you.

17  Q.  Sir, on page 2 of this article about Mr. Isikoff, he

18  describes an interview that James Kreindler gave to him.  Do

19  you see that?

20  A.  Two thirds of the way down?  Yes.

21  Q.  And this is, for the record, a March 1, 2021 article.

22          Were you aware that Mr. Kreindler had spoken to

23  Mr. Isikoff in connection with this article?

24  A.  I can't recall.

25  Q.  Were you aware that Mr. Kreindler had appeared on the

1  Conspiracyland podcast?

2  A.  I was not aware at the time.  I found out when we did our

3  investigation of the leak.

4  Q.  Did you become aware on or about July 15 right after the

5  Isikoff article came out?

6  A.  I don't think it was day one, but it was within the first

7  two weeks, probably.  There are numerous searches that we did

8  during the course of the investigation.  The first one was to

9  see if there was any transmission of the Jarrah transcript to

10  Mr. Isikoff or anyone at Yahoo News.  That's what we looked for

11  initially and then we expanded the search later.

12  Q.  Just so I understand your testimony, when the July 15

13  Isikoff article came out, you never asked Mr. Kreindler whether

14  he had been in recent contact with Mr. Isikoff?

15  A.  I asked him if he knew anything about the transcript that

16  Mr. Isikoff referred to in the article, and he told me he had

17  no idea.

18  Q.  But you never asked him whether he had been in contact with

19  Mr. Isikoff?

20  A.  I don't think I put it that way.  I was interested in

21  whether or not he knew anything about the transcript getting to

22  Isikoff.

23  Q.  I am just asking whether you asked him whether he had been

24  in contact with Mr. Isikoff.  Did you ask him that question?

25  A.  Not on the first day, no.

1   Q.  When did you ask him that question, if at all?

2   A.  Probably within my first week or two of the investigation.

3   Q.  Do you specifically recall that?

4   A.  I do because we found, when I had the IT, head of IT John

5   Hartney do the search, we eventually found e-mails from Mr.

6   Kreindler to Mr. Isikoff.  So I asked him about those.

7   Q.  So, when you found out that Mr. Kreindler had appeared on

8   the Isikoff podcast, did you listen to that podcast?

9   A.  No, I did not.

10  Q.  Have you listened to it to this day?

11  A.  I have not.

12  Q.  You don't know what Mr. Kreindler said on that podcast?

13  A.  I do not.

14  Q.  Now, were you aware that Ms. Hunt also had contacts with

15  Mr. Isikoff?

16  A.  I can't recall that.  It's possible I knew at one time, but

17  I don't recall as I sit here.

18  Q.  Do you know that Ms. Hunt appeared on the exact same

19  podcast that Mr. Kreindler appeared on with Mr. Isikoff?

20  A.  I was not aware, but I knew that Ali Soufan had appeared,

21  or at least that's what the e-mail traffic showed.

22  Q.  Let's look at Exhibit 38, please.

23      Exhibit 38 is a printout of the specific

24  Conspiracyland podcast.  You will see it describes who appears

25  on this particular podcast.  You see that Ms. Catherine Hunt

LB189116                    Maloney - Cross

1    and Jim Kreindler appeared on it?

2    A.  Are you in -- I am trying to find it here.

3          THE COURT:  At the bottom in the black box.

4    Q.  It's the second-to-last line in the black box, sir.

5    A.  Yes, I see her name there.

6    Q.  And sitting here today, this is the first time that you are

7    realizing that Catherine Hunt, an investigator for your firm,

8    appeared on the same podcast that Mr. Kreindler appeared on?

9    A.  Yeah.  I had never seen this document before.

10   Q.  It's not something that you discovered in the course of

11   your, quote, investigation here?

12   A.  No.  It wasn't relevant to the investigation.

13   Q.  You never spoke to Ms. Hunt, you never asked whether she

14   had any discussions with Mr. Isikoff about the Jarrah

15   transcript?

16   A.  I did not.

17   Q.  Now, when you first saw the July 15 article by Mr. Isikoff,

18   were you aware that Mr. Fawcett had also had contacts with

19   Mr. Isikoff?

20   A.  On July 15 was I aware?  No.

21   Q.  On or about July 15.

22   A.  On or about could mean a lot of things.

23   Q.  July 15 or prior, did you know that Mr. Fawcett was talking

24   with Mr. Isikoff?

25   A.  I did not.

1   Q.  On or around July 15, did you ask Mr. Kreindler if he knew

2   whether Mr. Fawcett was in discussions with Mr. Isikoff?

3   A.  I don't recall.  If I did, it probably wasn't July 15.  It

4   was probably within the first two weeks when we got more

5   information.

6   Q.  Did you ever ask that question?

7   A.  I may have asked that question, but I don't recall.

8   Q.  You don't remember one way or the other?

9   A.  I don't.

10  Q.  When, to the best of your recollection, when is the first

11  time you learned that Mr. Fawcett had contacts with

12  Mr. Isikoff?

13  A.  I think sometime late July, I want to say between July 22

14  and 29, Mr. Hartney told me about e-mails from Mr. Kreindler,

15  to and from Mr. Kreindler and Mr. Isikoff, and one from John

16  Fawcett, and naturally I asked him, did it have anything about

17  Jarrah?  And he said no.  I later asked to see a copy of each

18  and every one of those e-mails, and there was no mention of

19  Jarrah or the Jarrah transcript.

20  Q.  So, the first time you actually learned Mr. Fawcett was in

21  communications with Mr. Isikoff is after Mr. Hartney did the

22  e-mail searches that you directed him to do?

23  A.  Well, if you're asking for my memory today, it's the first

24  time I remember, certainly in connection with this.  If he had

25  spoken with Mr. Jarrah a year or two before, I wouldn't

LB189116                          Maloney – Cross

1    necessarily remember that even if I knew it at the time.

2              THE COURT:  You mean Mr. Isikoff.

3    A.  I wasn't keeping track of every person who spoke to every

4    journalist necessarily.  It's possible I knew he spoke to or

5    had contact with Mr. Isikoff at some other time, but not as I

6    remember it in July.

7    Q.  You knew that Mr. Kreindler and Mr. Fawcett were speaking

8    with dozens of journalists concerning 9/11?

9    A.  I don't think Mr. Fawcett was.  I knew Mr. Kreindler was.

10   I was as well.

11   Q.  Did you know that Mr. Fawcett was also speaking to

12   journalists?

13   A.  No.  I should say I know from time to time he was asked to

14   provide a nonconfidential document or something.  We often

15   asked Mr. Fawcett to provide us information, and it's possible

16   on occasions I knew that he had said something to a person we

17   had asked him to do or something like that.  It was obviously

18   clear every time we always checked to make sure it was not

19   confidential or protected material.

20   Q.  So, Mr. Kreindler and yourself, you're the face of the firm

21   and you speak to the press about the 9/11 case, right?

22   A.  I do on occasion.

23   Q.  And when you need to provide documents to the press, you

24   enlist Mr. Fawcett to provide those documents, right?

25   A.  Yeah.  Usually I would have him give me the document.  I

LB189116                    Maloney — Cross

1    would look it over and determine whether it is something we can

2    make available.

3    Q.  Before Mr. Fawcett actually provides the document, he seeks

4    the approval of the attorneys at the firm?

5    A.  Yes.

6    Q.  Now, you're certainly aware of Mr. Kreindler's history of

7    violating the protective order in this case, right?

8            MS. KIRSCH:  Objection.

9            THE COURT:  Overruled.

10           You can answer it.

11   A.  I am aware of the Dartmouth speech.  I think I was actually

12   in the court when Judge Netburn admonished him for saying

13   something.

14   Q.  You're also aware he violated the protective order in

15   connection with the 2017 Politico article by Caleb Hanan.  Are

16   you aware of that?

17   A.  Vaguely.  I do remember some of that.  I don't remember the

18   details.

19   Q.  So, you're aware of multiple times that Mr. Kreindler had

20   violated the protective order, correct?

21           MS. KIRSCH:  I am going to object.  That misstates the

22   record.

23           THE COURT:  Sustained.

24           Continue.

25   Q.  Sir, you're aware and you have heard Mr. Kreindler express

LB189116                    Maloney – Cross

1   his disdain for the protective orders in this case, right?

2   A.  I have heard many people say that, including Mr. Kreindler.

3   Q.  You have heard him call the protective orders damn gag

4   orders?

5   A.  Yeah, I have probably heard him say that.  I have heard

6   that from almost every one of our clients.

7   Q.  You heard him say those orders are disgusting, you have

8   heard that, right?

9   A.  I never heard it.  I think I read that in one of the

10  articles.

11  Q.  You have heard him say that he hates the protective orders

12  in this case?

13  A.  We all do, every client and every lawyer on the plaintiffs'

14  side.

15  Q.  So every lawyer on the Kreindler side, yourself included,

16  Ms. Benett, who is sitting at counsel table, you hate the

17  protective orders that the court has entered in this case.  Is

18  that your testimony?

19  A.  My testimony is that I can tell you I have never been

20  involved in a case where everything is kept secret from our own

21  clients.

22  Q.  You just testified that you and all the lawyers at the

23  Kreindler firm hate the protective orders, right?

24  A.  That was your words, Mr. Shen.

25          MS. KIRSCH:  I am going do object.  That misstates his

LB189116                          Maloney – Cross

1   testimony.

2   Q.  Sir, when the July 15 --

3        MR. SHEN:  I am going to move on and withdraw the

4   question.

5   Q.  Sir, when the July 15 Isikoff article came out and it

6   stated that he had a copy of the Jarrah transcript, which was

7   leaked to him, were you concerned, given Mr. Kreindler's

8   extensive violations of the protective order and his disdain

9   for the protective order, that he was the source of the leak?

10       MS. KIRSCH:  I would like to object one more time.  I

11  don't know how many times Mr. Shen is going to misstate the

12  record.  I don't know what he is talking about with "extensive

13  violations," but it makes a very messy record to bake that into

14  a question that Mr. Maloney could possibly otherwise answer.

15       MR. SHEN:  Mr. Maloney testified to two violations of

16  the protective order, the Dartmouth speech and the 2017 order.

17  A.  I didn't say they were violations of the protective order.

18  I said I was aware of two or three occasions where that issue

19  was discussed.

20  Q.  Now, sir, given those issues and given the disdain that Mr.

21  Kreindler has expressed with the protective order, were you

22  concerned at the time that he was the source of the leak?

23  A.  I was not.

24  Q.  Did you have any concern that anyone at Kreindler was the

25  source of the leak?

1    A.  I was not.  I asked everyone and then I did my own

2    investigation to confirm that.

3    Q.  But before you conducted the investigation, were you

4    confident that Kreindler wasn't the source of the leak?

5    A.  Yes.

6    Q.  So, before doing anything, in your mind, you said it

7    couldn't have come from this firm, correct?

8    A.  In my own mind, before I spoke to him, I would have been

9    very surprised if it came from the firm.  Then I started to ask

10   people that had access to the transcript and I was told they

11   had nothing to do with it and didn't know anything about.  And

12   then I started the e-mail investigation with IT.

13   Q.  You submitted two declarations in this case?

14   A.  Yes.

15   Q.  There is the August 16 declaration that's at 48.C in the

16   binder.

17   A.  I recall.

18   Q.  The September 27 declaration, for the record, that's at

19   Exhibit 56B.

20           Now, you're aware, sir, that the August 16 declaration

21   in this case, it doesn't describe any investigation that was

22   conducted, right?

23   A.  We were not asked by the court to describe it.  We gave the

24   court what the court asked for.

25   Q.  So, after the leak occurred, you took the initiative to do

LB189116                        Maloney - Cross

1   the investigation?

2   A.  Yes.

3   Q.  That was you and Mr. Hartney?

4   A.  Yes.

5   Q.  Anyone else involved in that investigation?

6   A.  I don't think so.  I asked everybody else.  I told

7   everybody else what I was doing after I had begun it.  I don't

8   think they were involved.  I think Ms. Benett later got

9   involved when we did another sweep, probably a triple check,

10  I'd say, much later in the process.  But the first month it was

11  myself and Mr. Hartney.

12  Q.  So Ms. Benett might have gotten involved when you were

13  submitting the September 27 declaration, but certainly not the

14  August 16 declaration?

15  A.  I'm not sure when she got involved, but I know the initial

16  part of the investigation, for the first few weeks, was just

17  myself and Mr. Hartney.

18  Q.  Let's look at the actual declaration, 56B.

19          Let's look at paragraph 4.

20  A.  Paragraph 4?

21  Q.  Paragraph 4.

22  A.  Yes.  My declaration.

23  Q.  It says that "I learned on July 15," and it talks about the

24  article, right?

25  A.  Yes.

LB189116                    Maloney - Cross

1   Q.  Then it says, "That day I discussed the article with others

2   at Kreindler working on the 9/11 litigation."  Do you see that?

3   A.  Yes.

4   Q.  And who did you actually discuss that article with on the

5   15th?

6   A.  I believe Jim Kreindler, Steve Pounian, possibly Megan

7   Benett and John Fawcett, and I think that was it, and myself.

8   Q.  Did you discuss it with them in person?

9   A.  No.  I did discuss it with Mr. Fawcett in person because I

10  think he was in the office and I was in the office that day,

11  and I think the others were not in the office that day.

12  Q.  Did you say you did discuss it with Mr. Fawcett in person?

13  A.  Yes, I believe so.

14  Q.  And the two of you were the only ones in the office that

15  day?

16  A.  No.  But in terms of the terror group that had access, he

17  and I were in there.  I don't think anybody else was.  It's

18  possible Ms. Benett was, but I don't recall speaking to her in

19  person, but I remember we had a phone call.

20  Q.  You don't recall Mr. Pounian being there in person?

21  A.  I don't believe he was, but I can't recall.  I don't

22  believe he was.

23  Q.  You don't recall Mr. Kreindler being there in person?

24  A.  He was not.

25  Q.  Now, in these discussions with your colleagues at the

1  Kreindler group -- and these were the core members of the 9/11

2  team, right?

3  A.  Yes.

4  Q.  So Mr. Fawcett is included in that core group that

5  litigates this case?

6  A.  He is not a lawyer litigating it, but he is part of the

7  team, yes.

8  Q.  He is the only nonlawyer in that group, right?

9  A.  Well, no, we have other nonlawyers that are part of the

10  team.  I think they have been identified, and we have

11  paralegals, and we have a lot of consultants and investigators.

12  Q.  My question to you is just Mr. Fawcett was a core member of

13  the 9/11 team?

14  A.  Can you define core?

15  Q.  Key member, very important member.

16  A.  Certainly.

17  Q.  Now, in these discussions on July 15, did you ask whether

18  the other core members of your team had discussions with

19  Michael Isikoff?

20  A.  I asked if any of them knew anything about how Mr. Isikoff

21  got the Jarrah transcript.

22  Q.  If you could answer my question, please.

23  A.  I think I did.

24  Q.  Did you ask whether they had contact with Mr. Isikoff?

25  A.  I didn't put the question that way.  I asked them the way I

1   just told you.

2   Q.  You asked each member of the team, is that your testimony?

3   A.  We had a conversation about it.

4   Q.  You asked Ms. Benett, for instance?

5   A.  I think on the call I said, does anybody know how

6   Mr. Isikoff got a copy of the Jarrah transcript?  Everyone

7   said, No, no idea.  I have no idea how he got it, it didn't

8   come from me, words to that effect.

9   Q.  You posed a question to the entire group and you got

10  negative responses in general?

11  A.  Correct.

12  Q.  But you never sat down one-on-one with each of the lawyers

13  and asked them?

14  A.  On that first day I didn't.  We had multiple conversations.

15  Q.  Sir, did you ever do that?

16  A.  Face-to-face?

17  Q.  One-on-one, face-to-face.

18  A.  With several of them I did.  Some of them it was, again,

19  phone calls.  Mr. Kreindler in particular was probably phone

20  calls.  Ms. Benett was probably in person at one time or

21  another.  Mr. Pounian in person at one time or another.  Mr.

22  Fawcett.  Probably the only one I didn't have a face-to-face

23  with was Mr. Kreindler.

24  Q.  So I understand your testimony, you sat down face-to-face

25  with Mr. Fawcett, asked him whether he leaked the transcript to

LB189116                          Maloney – Cross

1   Mr. Isikoff, and he told you he had not?

2   A.   Correct.  I didn't sit down; I was standing.

3   Q.   So he lied to your face?

4   A.   He did not tell me the truth.

5   Q.   That's lying to you, right?

6   A.   Yeah.  He didn't tell me the truth.

7   Q.   How many times did he lie to you about that?

8   A.   Throughout the next several weeks it was a topic of

9   conversation for all of us.  At one point I asked him, and

10  everyone else, if you didn't send it to Mr. Isikoff, did you

11  send it to anybody?  So I asked that of Mr. Fawcett.

12  Q.   And he said he didn't send it to anybody?

13  A.   That's not correct.

14  Q.   What did he say?

15  A.   He said he sent it to one of our consultants who is

16  identified as Consultant-1.  He told me that either the first

17  day or second.

18  Q.   How many times did he tell you that he did not send the

19  transcript to Mr. Isikoff?

20  A.   Well, I would say, it depends on how -- if you want those

21  exact words, probably only once.  But there was certainly a

22  clear indication when I said, did you send it to anyone or

23  anyone else, or things like that, and the answers I got to me

24  were consistent that he was claiming he didn't send it to

25  Isikoff or didn't know how Isikoff got it.  So it wasn't quite

LB189116                         Maloney – Cross

1   the same words that you used, but it was the same conclusion.

2   Q.  Each and every one of those interactions you had with him

3   he lied to you, is that right?

4   A.  Yeah.  He wasn't candid.  He didn't tell me or anyone, to

5   my knowledge, that he had sent Mr. Isikoff the Jarrah

6   transcript.

7                 (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  All right.  Let's look at paragraph 5 of your declaration,

2   sir.

3           THE COURT:  Mr. Shen, let's just be sensitive to the

4   time, when you think it's an appropriate time to take a break

5   for the day.

6           MR. SHEN:  Whenever you want.  I don't have a watch.

7           THE WITNESS:  They took mine at security.

8           THE COURT:  It's ten past 5:00.  You want to go for

9   another five or ten minutes, or you want to wrap up?

10          THE WITNESS:  I'd rather go as long as Mr. Shen

11  and the --

12          THE COURT:  I know, but we have the court reporters.

13          MR. SHEN:  Let's go for another five minutes or so,

14  and then we'll wrap up.

15          THE COURT:  OK.  Thank you.

16  BY MR. SHEN:

17  Q.  Paragraph 5 of your declaration discusses conferring with

18  Mr. Hartney on July 16.  Do you see that?

19  A.  Yes.

20  Q.  And, sir, you're a former prosecutor?

21  A.  Yes.

22  Q.  At the S.D.N.Y.?

23  A.  Yes.

24  Q.  So you have experience investigating these types of issues?

25  A.  Yes.

LB1H9117                    Maloney – Cross

1   Q.  And you understood here that the goal was to conduct an

2   objective and comprehensive investigation to determine whether

3   anyone at the Kreindler firm was the source of the leak, right?

4   A.  Yes.

5   Q.  And if someone was, in fact, the source, the goal was to

6   investigate whether anyone had knowledge of it or directed

7   Mr. -- or whoever did it to do it, right?

8   A.  Well, yeah, that would be part of the investigation.

9   Q.  OK.  Now let's look at Exhibit 100, please.

10  A.  My copy, the print is extremely small, Mr. Shen.

11  Q.  I apologize for that.  That's just the way it was produced

12  to us.  Is your screen working?

13  A.  Nope.

14  Q.  All right.  Now, on Exhibit 100, this is an email chain

15  between you and Mr. Hartney.  Do you see that?  And it's on

16  July 16?

17  A.  I have -- there's a couple email strands here.  So there's

18  one on June 28 and then there's a July 16 and a September 24.

19  Q.  Let's put it in context.

20          The June 28, that is an email from the court reporter

21  forwarding on the transcript for the Jarrah deposition, right?

22  A.  Yes, correct.

23  Q.  And then on July 16, in the bottom paragraph, you're asking

24  Mr. Hartney to do a review, correct?

25  A.  Yes.

LB1H9117                    Maloney – Cross

1    Q.   Specifically, you're asking him if it's possible to do a

2    search of the outgoing emails on the K and K –- that's

3    Kreindler & Kreindler, right?

4    A.   Yes.

5    Q.   –- server on June 28 that contains the Jarrah transcript.

6    And then you say you can limit that search, if you'd like, to

7    the following individuals, and it lists eight individuals.  Do

8    you see that?

9    A.   Yes.

10   Q.   And that's the search that you're describing in paragraph 5

11   of your declaration when you say:  On July 16, I conferred with

12   Mr. Hartney and asked him to do a search, right?

13   A.   Yes.

14   Q.   OK.  This particular search, you asked him to do just a

15   search of the outgoing emails, not a search of the entire email

16   server, correct?

17   A.   Correct.

18        I should point out, to your last question on my

19   declaration, which is August 16, we did subsequent searches

20   after this initial search.

21   Q.   We'll get there.

22   A.   OK.  I didn't want –- I didn't want you to be confused or

23   have the record confused that this was the only search I had

24   him do, but the one to begin the search on July 16, that was

25   what I sent to him.

1  Q.  You're asking him to do a search only of outgoing emails.

2  You're not asking him to search for incoming emails, right?

3  A.  Correct.

4  Q.  And you're asking him to do a search only of particular

5  custodians, not of everybody at Kreindler & Kreindler, right?

6  A.  Yeah, nobody else had access to the transcript that I was

7  aware of at Kreindler.

8  Q.  OK.  Sir, do you know, for instance -- well, strike that.

9          You're not asking him to search for any personal

10  devices, personal laptops, personal email accounts, none of

11  that, right?

12  A.  No.  I think the email server at the firm would have

13  detected if somebody sent an email to --

14  Q.  From a firm email?

15  A.  From a firm email, yeah.

16  Q.  But not from a personal email?

17  A.  You asked me about telephones.  I don't know how -- I'm not

18  tech savvy, but I don't think you can do that.

19  Q.  My question to you is just did you direct Mr. Hartney to

20  search personal --

21  A.  Personal.

22  Q.  -- laptops?

23  A.  Of everybody at the firm or everybody on the terror team?

24  Q.  Yes, sir.

25  A.  No.

1   Q.  And you never asked him to do that, right?

2   A.  No.

3   Q.  Let's look at Exhibit 84.

4           Now, you discussed, Mr. Maloney, that there were some

5   subsequent searches that you asked Mr. Hartney to do, right?

6   A.  Yes.

7   Q.  This is an email on July 21 to you and the "terror team,"

8   right?

9   A.  Yes.

10  Q.  So it discusses two searches.  The first email talks about

11  the outgoing email boxes for the Jarrah transcripts.  That's

12  what we saw you asked him to do on July 16, right?

13  A.  Yes.

14  Q.  And then you asked him to search for any emails to Mike

15  Isikoff in the last month, and he says he'll finish that search

16  tomorrow, right, so by the 22nd?

17  A.  Yes.

18  Q.  All right.  And, again, in this second search, this is just

19  of the firm email server, right?  This isn't any personal

20  emails or personal devices?

21  A.  I had no reason to believe that anybody used a personal

22  device to communicate with Mr. Isikoff.

23  Q.  OK.

24  A.  And certainly not to be able to export a transcript.

25  Q.  You know, sir, that the firm email accounts are monitored,

1   right?  The IT department has the ability to search them?

2   A.  Yes.

3   Q.  You're actually asking the IT department to search them

4   here?

5   A.  That's exactly what I was doing.

6   Q.  If someone were to leak the transcript and didn't want to

7   get caught, wouldn't it stand to reason they would do so over a

8   personal account and not firm account?

9            MS. KIRSCH:  Objection.

10  Q.  Asking for your opinion.

11  A.  You're asking me to speculate in terms of what I believed.

12  Q.  Yeah.  I'm not asking you to speculate.  I'm asking what

13  you believe.

14  A.  Ask your question.

15  Q.  So you know the email accounts at the firm are monitored?

16  A.  Yes.

17  Q.  People can search them, right?

18  A.  Yes.

19  Q.  If someone wanted to leak the transcript, doesn't it stand

20  to reason that they wouldn't do it over a medium that could be

21  easily monitored and discovered?

22  A.  Listen, if somebody had access to the transcript and wanted

23  to hide the fact that they were going to leak it, I guess there

24  are -- there may be infinite ways to do it, but, typically, I

25  would have thought if they -- the transcript was only available

LB1H9117                    Maloney – Cross

1   on the Kreindler server, they would email it to themselves,

2   maybe their laptop or a different email address, and we would

3   have picked that up.

4   Q.  When you say "different email address," you mean a

5   different email address, personal email address?

6   A.  Any email address we would have picked up.

7   Q.  And, sir, we discussed this, but you're a former federal

8   prosecutor, right?

9   A.  Yes, you've asked me that.

10  Q.  You know how to do these investigations?

11  A.  I've never investigated a leak, but I've done plenty of

12  investigations.

13  Q.  And as a former prosecutor, in your mind, it wasn't

14  reasonable for you to conclude that you needed to search the

15  personal emails and the personal devices of the terror team and

16  anyone else who had access?

17  A.  That's not a reasonable request, no.

18  Q.  OK.  Now let's look at Exhibit 86.  86 is a text message

19  between you and Mr. Hartney, right?

20  A.  Yes.

21  Q.  And it's dated July 22, 2021, right?

22  A.  Yep.

23  Q.  So you're communicating with Mr. Hartney over text message,

24  right?

25  A.  Yes.

1  Q.  On your personal device?

2  A.  Yeah.

3  Q.  Not over firm emails.  Your firm email search wouldn't pick

4  this up, right?

5  A.  No, the firm email would not pick this up, no.

6  Q.  And you actually do business over text.  You text a lot of

7  people for work, right?

8  A.  Not very many.  There's only basically office people, and

9  it's usually if I'm not in the office and I'm not at my

10  desktop.  If, let's say, I'm somewhere else, I may text them to

11  get their attention.

12  Q.  But you're doing that here, right?

13  A.  Yeah, I did that here.

14  Q.  And this is a message that would not have been found

15  through a search of the email server, right?

16  A.  Correct.

17  Q.  All right.  And Mr. Hartney's actually telling you what the

18  results of his search are in this text message, right?

19  A.  Yes.

20  Q.  And he says that, well, we found communications between

21  Mr. Kreindler and Mr. Isikoff discussing "lifting of gag order

22  and Isikoff writing an article," right?

23  A.  Yeah, I see that.

24  Q.  So at this point, July 22, you know for sure that

25  Mr. Kreindler and Mr. Isikoff are having discussions, right?

LB1H9117                    Maloney - Cross

1  A.  Yeah, I think I testified to that.

2  Q.  Right.  You also know, and you testified before, that at

3  around this time you also knew that Mr. Fawcett was having

4  discussions with Mr. Isikoff?

5  A.  I think in a subsequent communication or conversation with

6  Mr. Hartney, I did learn that, probably within days of this, if

7  not that day, certainly that week, I think.  I think I

8  testified somewhere between July 22 and 29th.

9          MR. SHEN:  OK.  Is it a good time to stop, your Honor?

10          THE COURT:  I think so.

11          MR. SHEN:  All right.

12          THE COURT:  All right.  Given the pace, I think we

13  should start earlier tomorrow.  And I confirmed with the court

14  reporters that they can start as early as 9:00, so unless

15  anyone has a reason why they can't be here at 9:00, I'd like to

16  start at 9:00.  We'll finish tomorrow.  So if we need to start

17  pacing folks, we will, but I'll ask the lawyers to please be

18  sensitive to the time.  So we'll start here directly at 9:00.

19          Sir, you will remain under oath.  The direction not to

20  discuss the nature of your testimony or the underlying issues

21  remains.  You're not to speak with the witnesses who testified

22  or the witnesses who have not testified about the nature of

23  your testimony or their testimony, and then you'll come back

24  here at 9 a.m. tomorrow.

25          THE WITNESS:  Am I allowed to speak to my counsel, or

LB1H9117                    Maloney – Cross

1   no?

2              THE COURT:  Yes, of course.

3              Anything further from anyone?

4              MS. KIRSCH:  I just wanted to raise it appears

5   Ms. Benett has a commitment that would make her not able to be

6   here at 9:00.  We can certainly start without her if that's

7   fine.  I just wanted to make sure that if it was 9:30, that

8   your Honor didn't think she was just being late.

9              THE COURT:  Do you mind if we begin at 9:00 and you

10  join us at 9:30, Ms. Benett?

11             MS. BENETT:  No, that's fine.  I just have to drop my

12  son at school.  I will be here right after that.

13             THE COURT:  Sorry for the inconvenience.

14             MR. KELLOGG:  Your Honor, just for my understanding of

15  the rules, counsel cannot talk to the remaining witnesses that

16  have not appeared yet about what happened in court today or the

17  exhibits on cross.

18             THE COURT:  Correct.  You can speak to your counsel,

19  but you can't reveal the nature of the testimony from today.

20             All right.  You're excused.  We'll see you tomorrow

21  morning at 9:00.

22             Thank you, everybody.

23             (Adjourned to November 2, 2021, at 9:00 a.m.)

24

25

1                          INDEX OF EXAMINATION

2     Examination of:                                Page

3     JAMES PAUL KREINDLER

4     Cross By Mr. Hansen  . . . . . . . . . . . . .17

5     Redirect By Ms. Kirsch . . . . . . . . . . . 117

6     JOHN HARTNEY

7     Cross By Mr. Shen  . . . . . . . . . . . . . . 132

8     Redirect By Ms. Kirsch . . . . . . . . . . . 181

9     Recross By Mr. Shen  . . . . . . . . . . . . 194

10     ANDREW J. MALONEY III

11     Cross By Mr. Shen  . . . . . . . . . . . . . . 198

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB289111

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    In re Terrorist Attacks on            03 MD 1570 (GBD)(SN)
     September 11, 2001
4                                          Hearing
     ------------------------------x
5                                          New York, N.Y.
                                           November 2, 2021
6                                          9:00 a.m.

7    Before:

8                      HON. SARAH NETBURN,

9                                         U.S. Magistrate Judge

10                            APPEARANCES

11   LANKLER SIFFERT & WOHL LLP
          Attorneys for Nonparty Fawcett
12   BY:  MICHAEL GERBER
          HELEN GREDD
13        GABRIELLE FRIEDMAN

14   KIRSCH & NIEHAUS PLLC
          Attorneys for Kreindler & Kreindler and all witnesses
15   BY:  EMILY KIRSCH
          LISA FREY
16        -and-
     KREINDLER & KREINDLER LLP
17   BY:  MEGAN WOLFE BENETT
          -and-
18   EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
     BY:  HAL R. LIEBERMAN
19
     KELLOGG, HUBER, HANSEN, TODD FIGEL & FREDERICK, PLLC
20        Attorneys for Defendant Kingdom of Saudi Arabia
     BY:  MICHAEL KELLOGG
21        MARK C. HANSEN
          GREGORY G. RAPAWY
22        ANDREW C. SHEN
          CHRISTOPHER YOUNG
23

24

25
```

LB289111

1          (Hearing resumed)

2          THE COURT:  Good morning, everybody.

3          A few quick housekeeping matters.  Because we switched

4     the start time to 9, the phone call-in line is not available

5     until 9:30.  The press is here and listening both, I think,

6     some in the room, as well as in the press media room of the

7     courthouse.  We have an overflow room in courtroom 15A.

8     Obviously, this courtroom is open to the courtroom.  We are

9     doing the best we can to give full access as much as possible,

10    but we won't have the AT&T line available to the public until

11    9:30.

12         On that point, around 9:30 I am going to ask the

13    lawyers to literally give a 60-second break.  Ms. Slusher is

14    going to patch in the AT&T line while I will hear it over the

15    speakers that it's happening.  We just need 60 seconds to do

16    that.  So around 9:30, I will ask you to take a quick moment to

17    patch us in.

18         I think that's the end of the housekeeping.  You can

19    begin.

20         Mr. Maloney, I will remind that you already took an

21    oath to tell the truth.  You remain under that oath.

22         THE WITNESS:  Yes, your Honor.

23         THE COURT:  Mr. Shen, you may begin.

24         (Continued on next page)

25

1   ANDREW J. MALONEY III, resumed.

2   CROSS-EXAMINATION (Cont'd)

3   BY MR. SHEN:

4   Q.  Good morning, Mr. Maloney.

5   A.  Good morning.

6   Q.  Yesterday when we had paused for the day you had testified

7   about the e-mail searches that you had conducted and that you

8   had directed Mr. Hartney to conduct, correct?

9   A.  Yes.

10  Q.  Now, you testified that you did not search any personal

11  e-mails, you didn't search any texts, you didn't search any

12  personal devices, correct?

13  A.  Correct.  I don't think your firm did either.

14  Q.  If you could just answer the question.

15         THE COURT:  Mr. Maloney, please answer the question.

16  A.  I did not.

17  Q.  You did not tell Mr. Hartney to search any of that

18  information, correct?

19  A.  I did not.

20         MR. SHEN:  Can we show Exhibit 150 on the screen,

21  please.

22  Q.  Sir, Exhibit 150 is a text message chain that Mr. Fawcett's

23  counsel has produced to us this week.  This is a text message

24  chain with Mr. Isikoff and it shows numerous communications

25  between Mr. Fawcett and Mr. Isikoff.

LB289111                    Maloney – Cross

1              If you could, please, turn to the second page, and you

2       will see that on July 24th of 2021, Mr. Fawcett writes to

3       Mr. Isikoff and says, "FYI, there is a witch-hunt for the

4       source of your Jarrah story."

5              Do you see that?

6       A.  Yes.

7       Q.  If you had actually searched personal devices and asked for

8       messages, it would have been clear as day that Mr. Fawcett was

9       the source of the leak, correct?

10      A.  No.

11             MS. KIRSCH:  Objection.  First of all, that's a

12      hypothetical.  Second of all, I don't know why Mr. Maloney is

13      being asked about a document that he has never seen.

14             THE COURT:  I think it's in connection with the nature

15      of the investigation that was conducted.

16             You can continue.

17      Q.  So your testimony is, no, it would not have been clear as

18      day?

19      A.  No.  It's clear there is communication here.  It doesn't

20      indicate in this text that Mr. Fawcett sent Mr. Isikoff the

21      Jarrah transcript.  It doesn't state that here.

22      Q.  Sir, your testimony is that it would not have been

23      reasonable to conduct any of those searches, that was your

24      testimony, right?

25      A.  That is my testimony for the third time.

1    Q.  And you're standing by that testimony?

2    A.  I am.

3    Q.  Let's look at Exhibit 56.F, please.

4          56.F is the declaration that you submitted in this

5    case.

6    A.  That's Mr. Hartney's.

7    Q.  We discussed the e-mail searches that you directed Mr.

8    Hartney to conduct.  Exhibit 1 of his declaration sets out the

9    e-mails that were located in that search, correct?

10   A.  I don't know how to scroll on the computer here.

11   Q.  It's in the binder next to you as well.  Just take 30 or 45

12   seconds just to scroll through those e-mails.

13         THE WITNESS:  Is there a way for me to control it on

14   the screen?

15         THE COURT:  No.

16         THE WITNESS:  Sorry.

17   A.  Remind of the exhibit number, Mr. Shen.

18   Q.  56.F.  We are looking at Exhibit 1 of 56.F.

19   A.  OK.

20   Q.  Mr. Hartney showed you these e-mails after the search,

21   correct?

22   A.  Yeah.  The e-mails that we are looking right here in this

23   exhibit are from Jim Kreindler or to Jim Kreindler -- between

24   Mr. Kreindler and Mr. Isikoff.

25   Q.  And there are some other e-mails in here as well, including

LB289111                    Maloney - Cross

1    an e-mail from Mr. Fawcett to Mr. Isikoff, if you continue

2    scrolling through.

3              We will take you through some of those e-mails.

4              If you could look, please, at the bottom, there is a

5    page number, look at page 6.

6    A.  6 of 27.  Yes.

7    Q.  You see this is an e-mail from Mr. Kreindler to

8    Mr. Isikoff?

9    A.  Yes.

10   Q.  You see that he sent it from his personal device, his

11   iPhone?

12   A.  Yes.

13   Q.  And you see that this is a communication about the podcast

14   that Mr. Kreindler is going to appear on.  Do you see that on

15   July 1?

16   A.  Yes.

17   Q.  Now, sir, this is the earliest communication that we have

18   between Mr. Kreindler and Mr. Isikoff.

19             It certainly stands to reason that there were earlier

20   communications between the two of them, correct?

21   A.  I don't know that.

22   Q.  That's not something that you deduced during your

23   investigation?

24   A.  Well, I asked Mr. Kreindler about this e-mail, and he told

25   me that there was a program that he and Ali Soufan were on

LB289111                    Maloney – Cross

1   called Conspiracyland.  And I asked him if there was any

2   discussion about Jarrah's deposition, and he said no.

3   Q.  That's not the question, sir.

4   A.  Well, you asked me a question about my state of mind.  So I

5   am telling you my state of mind based on what I see here.

6   Q.  Looking at this e-mail, did you deduce that there must have

7   been earlier communications between Mr. Kreindler and

8   Mr. Isikoff?

9   A.  I didn't deduce one way or the other.  But I asked Mr.

10  Kreindler about this e-mail.

11  Q.  Did you ask him if there were earlier communications?

12  A.  I asked Mr. Kreindler if he ever discussed the Jarrah

13  deposition.  That was the nature.

14  Q.  That's not the question.

15  A.  Repeat your question.

16  Q.  Did you ask if there were earlier communications?

17  A.  I didn't.

18  Q.  Please look at page 27, please.

19       Do you see that this is a communication between Mr.

20  Kreindler and Mr. Isikoff where Mr. Isikoff is asking about the

21  status of a motion to lift the states secrets privilege and

22  the, quote, gag order?

23  A.  I see that.

24  Q.  And so, at this point in time, you knew that Mr. Kreindler

25  and Mr. Isikoff were discussing that issue, correct?

LB289111                    Maloney - Cross

1   A.  Yes.  I learned this sometime in late July when I got these

2   e-mails that he had asked about that.

3   Q.  If you could, please, let's look at page 13.

4          Mr. Hartney showed you this e-mail, which is an e-mail

5   from Mr. Fawcett to Mr. Isikoff, July 12, 2021.  Do you see

6   that?

7   A.  Yes.

8   Q.  And it attaches a priv log, but there is nothing at all in

9   the body of the e-mail.  Do you see that?

10  A.  Yes.  I think I saw the attachment at some point.

11  Q.  And you testified that within a few days of Mr. Hartney

12  conducting the search that found Mr. Kreindler's e-mails to Mr.

13  Isikoff you saw this e-mail, correct?

14  A.  Yes.

15  Q.  Now, this e-mail, where there is nothing in the body of the

16  e-mail, certainly indicates that there must have been other

17  communications between Mr. Fawcett and Mr. Isikoff?

18  A.  Why are you assuming that?

19  Q.  There is nothing in the body.  He is just sending a priv

20  log out of nowhere?

21         Mr. Maloney, you think that unsolicited Mr. Fawcett

22  just out of nowhere sent a privilege log to Mr. Isikoff?

23  A.  I don't know one way or the other.  I am just telling you.

24  Q.  Did you ask him?

25  A.  Yes, I did ask him.

LB289111                    Maloney - Cross

1   Q.  What did he say?

2   A.  He said Mr. Isikoff wanted to confirm the existence of the

3   2016 FBI summary, and he gave him the privilege log that had it

4   listed right there.

5   Q.  Did you ask him whether there were other communications?

6   A.  I asked him if he talked to Mr. Isikoff about the Jarrah

7   deposition.

8   Q.  Not the question.  Did you ask him if there were earlier

9   communications?

10  A.  I probably did because I wanted to know the context, as you

11  just indicated, of why he sent him a privilege log, so yes.

12  Q.  You're testifying under oath.  Did you or did you not ask

13  him about earlier communications?

14  A.  I must have asked him why did you send this, and he must

15  have told me he asked for it.  Obviously, there was a prior

16  communication about that, either with Mr. Fawcett and

17  Mr. Isikoff, or maybe Steve Pounian or Megan Benett or Jim

18  Kreindler or a client.  There is a lot of possibilities here.

19  You're making an assumption that he got the request directly

20  from Mr. Isikoff.

21  Q.  Now, sir, you knew that Mr. Kreindler, and we saw the

22  e-mail on page 27, the date of that e-mail is July 13, 2021,

23  Mr. Kreindler and Mr. Isikoff are discussing lifting the states

24  secrets privilege.

25          On July 12, 2021, Mr. Fawcett sends a privilege log

LB289111                    Maloney – Cross

1    listing the documents that are subject to the states secrets

2    privilege.  Do you see that?

3    A.  Yes.

4    Q.  Now, it's certainly the case that Mr. Fawcett was doing

5    that at Mr. Kreindler's direction, right?

6           MS. KIRSCH:  Objection.  That mischaracterizes prior

7    testimony.  It's assuming a fact that's not in the record and

8    it's kind of badgering the witness.  It's misleading.

9    A.  I actually answered that question.

10          THE COURT:  Please let me respond to your lawyer's

11   objections first.

12          I don't think it assumes facts because I think it was

13   an open question.  I think a hypothetical is OK.  But I will

14   ask Mr. Shen to ask the question more directly, please.

15   Q.  Sir, at the time that you looked at this e-mail, did you

16   deduce that Mr. Fawcett was instructed by Mr. Kreindler to send

17   this privilege log to Mr. Isikoff?

18          MS. KIRSCH:  Asked and answered.

19          THE COURT:  Overruled.

20   A.  I asked Mr. Fawcett why he sent the privilege log, and he

21   told me that Mr. Isikoff was looking for corroboration for

22   existence of the 2016 report.  I didn't cross-examine him and

23   say, Did Jim Kreindler ask you to do that, or did Mr. Isikoff

24   ask for that from you directly?  I didn't ask that part.  But I

25   did ask, Did you discuss anything about the Jarrah deposition?

1    And he said no.

2    Q.  Just to be clear, you never asked Mr. Fawcett if Mr.

3    Kreindler asked him to do that?

4    A.  I may have.  I don't recall.  But the import of the

5    conversation was that there was a request by Mr. Isikoff for

6    corroboration of the existence of the 2016 report.  And he

7    provided the document, and as you see, there is no

8    communication other than a transmission of the document here.

9    And after I questioned Mr. Fawcett, I was satisfied that there

10   was no reason to believe that they discussed the Jarrah

11   deposition, or forwarded it.  In fact, these e-mails and

12   these -- these e-mails in front of me seem to confirm that

13   there was no communication about the Jarrah deposition.

14   Q.  Sir, at the time, you were not able to connect the dots in

15   your own head that Mr. Kreindler had directed Mr. Fawcett to

16   provide this to Mr. Isikoff?

17   A.  I didn't make that assumption.

18   Q.  So at this point, we are talking shortly after July 22

19   where Mr. Hartney has provided you with all of these e-mails,

20   you knew that multiple members at your firm were in discussions

21   with Mr. Isikoff, correct?

22   A.  Well, there's, I think, three e-mails from and to Jim

23   Kreindler, one about the gag order, which we covered --

24   Q.  Just answer my question, please.

25   A.  I am trying to answer your question, Mr. Shen.  When you

LB289111                    Maloney – Cross

1    say multiple, I am saying there are three from Jim Kreindler

2    and one from John Fawcett.  I am being exact and precise rather

3    than the sweeping generalizations you make.

4              THE COURT:  Sir, you're not helping yourself.  Please

5    just answer the questions.

6    Q.  Sir, at this point in time, you knew multiple members of

7    your firm had been in contact with Mr. Isikoff?

8    A.  I knew that Mr. Kreindler had and Mr. Fawcett.

9    Q.  And Ms. Hunt, too, because she appeared on the podcast,

10   right?

11   A.  I did not know that.

12   Q.  It did not come up in your investigation?

13   A.  No.

14   Q.  So you knew that Mr. Kreindler and Mr. Fawcett had also

15   attended the Jarrah deposition and knew exactly what transpired

16   at that deposition, right?

17   A.  Yes.

18   Q.  You also knew that they had access to that deposition?

19   A.  Yes.

20   Q.  You also knew that they attended the Thumairy and Bayoumi

21   deposition?

22   A.  Yes.

23   Q.  You also knew they had access to that deposition, right?

24   A.  Yes.

25   Q.  And you knew that Mr. Isikoff had written about what

LB289111                     Maloney - Cross

1    happened at the Bayoumi and Thumairy depositions?

2    A.  I don't recall.

3    Q.  We went over this yesterday.

4    A.  I didn't read the entire article.  You directed me to the

5    portions you wanted me to.  Everybody knew that Mr. Bayoumi and

6    Thumairy were being deposed.  There was nothing that stood out

7    about that.

8    Q.  So on July 15, you didn't read the entire article written

9    by Mr. Isikoff, is that your testimony?

10   A.  No, that's not my testimony.

11          THE COURT:  Mr. Shen, may I remind you to speak a

12   little more slowly so the court reporter can get it.

13          MR. SHEN:  Yes, your Honor.

14   Q.  You also knew that Mr. Kreindler had been communicating

15   with Mr. Isikoff through his personal device, correct?

16   A.  I didn't know that until recently when we downloaded

17   everybody's cell phone.

18   Q.  But you knew that because he was e-mailing from his iPhone?

19   A.  I think I saw the e-mails.  The text messages I don't think

20   I had.

21   Q.  I am not asking about the text messages.  I am asking about

22   the e-mails.  It said they were sent from his iPhone.

23   A.  But that's using the Kreindler server.  That's how we found

24   his e-mails.  When you send an e-mail from your phone, it's as

25   if you're sitting at your desk so I saw them.

LB289111                    Maloney - Cross

1    Q.  But on your phone you also have your personal e-mail,

2    right?

3    A.  Yeah.  I have a Gmail account.

4    Q.  That you can access on your personal phone?

5    A.  Yes.

6    Q.  If someone sends an e-mail message to you on your Kreindler

7    account, you can forward that from your Gmail account, right?

8    A.  I would have to forward it from my Kreindler account to my

9    Gmail account.

10   Q.  You're sure about that?

11   A.  No, but that's what my understanding is.

12   Q.  But the fact of the matter is you never asked for Mr.

13   Kreindler's personal phone, right?

14   A.  Fourth time, I did not.

15   Q.  Or anybody else's?

16   A.  Fifth time, I did not.

17   Q.  Sir, if anyone at the Kreindler firm had leaked the

18   transcript, the prime suspects must have been Mr. Kreindler and

19   Mr. Fawcett, right?

20   A.  Not correct.

21   Q.  They were the ones who had communications with Mr. Isikoff?

22   A.  That's right.  None of those communications showed any

23   evidence that there was a discussion about the Jarrah

24   deposition or the forwarding of the transcript.

25   Q.  Now, at this time, did you attempt to screen Mr. Kreindler

LB289111                    Maloney - Cross

1  and Mr. Fawcett off from the investigation?

2  A.  I don't know that I screened anybody off, but I conducted

3  the investigation --

4  Q.  So the answer is no, correct?

5  A.  When you say "screen," please define it.

6  Q.  You were updating them on the investigation?

7  A.  Yes.  But they weren't part of the investigation, so I gave

8  them the results as they were unfolding.

9  Q.  They were the subject, or they should have been the

10  subject, right?

11  A.  I made everybody who had access to that deposition

12  transcript the subject of the IT investigation we were

13  conducting, including myself.

14  Q.  At this point, was anyone at the Kreindler firm instructed

15  to retain all relevant documents pertaining to this leak?

16  A.  I don't recall, but I knew that if they used the Kreindler

17  server, even if they deleted it, we could find it.

18  Q.  That's not the question.  The question is, did you send out

19  a retention notice?

20  A.  I don't believe I did that in July.

21  Q.  Was any retention notice ever sent out about personal

22  devices?

23  A.  At some point there was.

24  Q.  When?

25  A.  I think it was much later.

LB289111                     Maloney – Cross

1    Q.  It was after your counsel had made an appearance?

2    A.  I believe so.  I don't recall the date.

3             THE COURT:  Mr. Shen, can we take a 60-second break?

4             MR. SHEN:  Yes.

5             (Pause)

6             THE COURT:  All right, Mr. Shen.  You can continue.

7    BY MR. SHEN:

8    Q.  Mr. Maloney, take a look at 56B, which is your sworn

9    declaration submitted in this case.  And paragraph 5, please.

10            Now, paragraph 5 says that, "The rough and final

11   Jarrah transcripts are saved in a directory within a network

12   share drive along with materials relating to the lawsuit."

13            Do you see that?

14   A.  Yes.

15   Q.  Now, that share drive is on Kreindler's internal network

16   server, is that right?

17   A.  Correct.

18   Q.  And it's called Case Media, is that right?

19   A.  Yes.

20   Q.  Then you state in your declaration that "only individuals

21   with the Kreindler log-in credentials can access that

22   directory."

23            Do you see that?

24   A.  Yes.

25   Q.  And that would be everybody who works at the Kreindler

LB289111                      Maloney - Cross

1    firm, correct?

2    A.  As a technical matter, yes, that is correct.

3    Q.  So anybody who works at the Kreindler firm simply enters in

4    their Windows log-in and has access to that directory?

5    A.  Not exactly.

6    Q.  When do they enter in their log-in?

7    A.  When you log on to your computer, you're logged into the

8    system.  But you would have to know where to go to find

9    materials for the 9/11 case.  And everybody at the firm was

10   told you can't have access, you're not permitted, unless you

11   sign a protective order and have a reason to do so.

12   Q.  That's what you're claiming now is the firm's policy.  But

13   as a technological matter, anyone at the firm can just simply

14   get through, right?

15              MS. KIRSCH:  I am just going to object to the first

16   preamble of the question where Mr. Shen is trying to put some

17   twisted testimony in the record.  It's not appropriate.

18              THE COURT:  This is cross-examination.  The question

19   is fine.

20   A.  I think as a technical matter, you may be correct.  As a

21   practical matter, it's not correct.

22   Q.  Now, sir, the Kreindler firm has no ability whatsoever to

23   track who actually accessed any of the confidential and

24   protected information for the 9/11 case, right?

25   A.  From the Kreindler server for a Kreindler employee?

1   Q.  That's right.  For the Case Media.

2   A.  No, we don't have the ability to track.  So, for example,

3   if I went into Case Media and looked at it, no one would know

4   that I looked at the document.

5   Q.  And you would have no idea if any member who wasn't part of

6   your team looked at that document, right?

7   A.  That's true.

8   Q.  Even if they didn't sign the protective orders, you would

9   have no way of knowing, right?

10  A.  I suppose technically that's true.  As a practical matter,

11  that did not happen.

12  Q.  Before this whole leak issue came out and you had outside

13  counsel come in, had you made any efforts as a technological

14  matter to limit access to confidential protected information to

15  only individuals who had actually signed the protective order

16  and were working on the case?

17  A.  Well, as a practical matter, no.  As a technical matter,

18  anybody who was working on the case signed the protective

19  order, nobody who wasn't working on the case sought to gain

20  access to it.  I don't understand why you --

21  Q.  You don't know that, do you?

22  A.  I do know that.  I do know that.

23          It's true that I don't know if other people accessed

24  it and then lied about it, but I could tell you nobody else at

25  the firm accessed it.

LB289111                    Maloney - Cross

1   Q.  When you click into that server, is there a warning that

2   comes up that says, don't access this unless you have looked at

3   the FBI protective order or the MDL protective order?

4          MS. KIRSCH:  I am going to object once again.

5          First of all, Mr. Shen is arguing and yelling at the

6   witness.  Second of all, we all understand that Mr. Fawcett had

7   complete access.  This is a little bit of a sideshow, and I

8   think it's taking up a lot of time.  Mr. Fawcett had access to

9   the system irrespective of whether Mr. Maloney is correct or

10  not.

11         MR. SHEN:  Ms. Kirsch is not here to testify.

12         MS. KIRSCH:  We have now spent 20 minutes arguing with

13  Mr. Maloney about something that is not relevant to the issues

14  of this hearing, which is Mr. Fawcett's breach.

15         THE COURT:  I disagree because what is relevant is the

16  thoroughness of the investigation, which includes whether or

17  not the systems that were in place by the firm at the outset

18  were sufficient to protect this material.  So I disagree with

19  your position that this is not relevant.

20         As to both questioner and answerer, we need to tone

21  down the temperature because we don't need to have a screaming

22  match.  It's also not helpful to the court reporter.  So

23  everybody is here to cooperate, and we need to bring down the

24  temperature a little bit.

25         Please continue.

1        MR. SHEN:  Yes, your Honor.

2    BY MR. SHEN:

3    Q.  Can I have an answer to that question?

4    A.  I don't recall the question, but we could have had Fort

5    Knox and Mr. Fawcett was given keys, as the rest of us were.

6    Q.  The question is, when somebody logs into the Case Media

7    server, is there a warning screen that comes up that says you

8    can only access this if you signed the protective orders or

9    agreed to abide by them?

10   A.  There is no warning screen that says that.

11   Q.  So the record is clear, after the leak issues come up and

12   after you have retained outside counsel, you have now put in

13   place a system that restricts access, is that right?

14   A.  I believe that's either underway or was done.

15   Q.  Now, sir, in paragraph 5, you tell the court, in the last

16   sentence, "Only the following individuals at Kreindler log-in

17   were provided access to the Jarrah transcript."

18        Do you see that?

19   A.  Where are you?

20   Q.  Last sentence.

21   A.  Yes.

22   Q.  And, sir, as you just testified, in fact, everybody at

23   Kreindler had access to those transcripts?

24   A.  They were not provided access.  As a technical matter, we

25   have covered, yes, they could probably get in there if they

LB289111                     Maloney - Cross

1    knew how to do it and where to find it.  They were instructed

2    not to do that, and during the investigation we confirmed that

3    nobody had access.

4    Q.  You don't know that?

5    A.  They could have all lied to me, Mr. Shen.  It's true.

6    Q.  You have no ability to track them so you don't know who had

7    access?

8    A.  I don't have the ability to corroborate whether they told

9    the truth or not about accessing the 9/11 files.

10   Q.  And, Mr. Maloney, you carefully crafted the language in

11   your declaration so that you wouldn't disclose to the court

12   that everyone at the Kreindler firm had access?

13   A.  That's not correct.

14   Q.  Why didn't you tell the court everyone had access?

15   A.  We gave the court what the court asked for.  I knew who had

16   access to the Jarrah transcript.  Those people were

17   investigated; they were all subjects of the investigation,

18   including myself.  And I had the IT guy in charge, who had the

19   technical, logical know-how to do it, conduct the

20   investigation.

21   Q.  You think the court didn't want to know that everyone had

22   access to the transcript, is that your testimony?

23   A.  I think the court asked us who had access to the Jarrah

24   transcript, and we told the court who had access to the Jarrah

25   transcript.

LB289111                    Maloney - Cross

1   Q.  So sitting here today, you still believe that that

2   statement in your declaration was truthful?

3   A.  Nobody else at the firm had accessed the transcript, to my

4   knowledge.

5   Q.  OK.  Paragraph 6.  You say, "Shortly after conferring with

6   Mr. Hartney, I asked each of the individuals listed above if

7   they had sent any portion of the Jarrah transcript to Isikoff

8   or anyone working on his behalf."

9            Do you see that?

10  A.  Yes.

11  Q.  Now, did you sit down in the room with those individuals

12  and ask them?

13  A.  I think we covered this yesterday, but I will go over it

14  again if you would like.  Some of them I did speak to

15  face-to-face and others were on the phone and probably e-mails.

16  This was during the summer.  We hadn't fully staffed back up

17  after the pandemic, so a lot of people were in and out of the

18  office.  So some of them were in person and some of them were

19  probably over the phone.

20  Q.  You said some were over the e-mail?

21  A.  I don't recall.

22  Q.  Did you use a script?

23  A.  No.

24  Q.  Did you take notes?

25  A.  No.

LB289111                    Maloney – Cross

1    Q.  Now, your testimony is that you actually specifically sat

2    down with Mr. Fawcett, looked him in the eye, and he told you

3    that he didn't send the transcript to Mr. Isikoff, is that

4    right?

5    A.  I don't think I sat down, but I was in his office and I

6    asked him.

7    Q.  And he lied to you, is that your testimony?

8    A.  We covered this yesterday.

9    Q.  He lied to you?

10   A.  He did not tell me the truth.

11   Q.  Sir, you're aware that Mr. Fawcett submitted a declaration

12   on September 27?

13   A.  Yes.

14   Q.  And you're aware that Ms. Benett and Mr. Pounian actually

15   drafted the language of that declaration, right?

16          MS. KIRSCH:  Objection.

17          MR. SHEN:  I am asking if he is aware.

18          MS. KIRSCH:  I object because that's an incorrect

19   statement of facts, and I don't even know where he gets it

20   from.  And it's wrong, as the evidence will show.

21          THE COURT:  Why don't you ask if he knew who drafted

22   it.

23   BY MR. SHEN:

24   Q.  Do you know who drafted it?

25   A.  No.

LB289111                    Maloney – Cross

1   Q.  Do you know who modified the language of the declaration?

2   A.  Well, it's my understanding Mr. Fawcett drafted his own

3   declaration and Ms. Benett also finished it so it could be

4   submitted to the court.

5   Q.  Do you know whether or not there were drafts traded back

6   and forth where Ms. Benett and Mr. Pounian were, quote,

7   polishing off the declaration?

8   A.  I do not know.  I was not involved in that.

9   Q.  Let's look at Exhibit 120, please.

10          Now, Exhibit 120 is an e-mail from -- a Mr. Pounian

11  e-mail chain between Mr. Pounian, Mr. Fawcett, and Ms. Benett,

12  and it attaches at 121 the actual declaration with redlines.

13  Do you see that?

14          MS. KIRSCH:  Objection.  There is no foundation that

15  the witness ever saw or knows anything about this document.

16          MR. SHEN:  I haven't asked the question.

17          THE COURT:  I don't think that's a basis of an

18  objection.  He can ask questions about the document.

19  A.  Yeah.  Mr. Shen, what is your question?  Do I see it on the

20  paper?  Yes, I see it.

21  Q.  So you see that Mr. Fawcett is sending redlines to his

22  declaration that he submitted on September 27 to Mr. Pounian,

23  and that's at 7:34 p.m.?

24  A.  I don't see anything about redlines.  I am reading what is

25  on the screen here.  There is no reference to a redline.

LB289111                    Maloney – Cross

1   Q.  Do you see that there is an attachment?

2   A.  Yes.

3   Q.  If you go to 121, sir, I will represent to you that this is

4   the attachment that was produced out of the Kreindler &

5   Kreindler system.

6           MS. KIRSCH:  I don't want to interrupt Mr. Shen's

7   questioning so I will just put a standing objection that this

8   witness was not involved in any of this correspondence, as

9   these documents show.  The witnesses who were involved are

10  here; they can testify as to this whole process.  And I think

11  that this is inappropriate.  There is more than just the

12  documents that Mr. Shen is showing Mr. Maloney, and if he is

13  using that to establish a fact, that's not proper.  So I will

14  make my standing objection.

15          THE COURT:  It is noted.  It is overruled.  You will

16  have an opportunity to redirect the witness.

17  BY MR. SHEN:

18  Q.  Mr. Maloney, looking at Exhibit 121, you actually see the

19  redlines in that document, right?

20  A.  I think the document speaks for itself.  There are

21  redlines.

22  Q.  In paragraph 3, there is a redline where Mr. Fawcett takes

23  out the sentence, "Until today, I had told Kreindler &

24  Kreindler that I did not know how Michael Isikoff had obtained

25  the transcript."

LB289111                    Maloney - Cross

1    A.  How am I supposed to know who deleted that?

2    Q.  Because it's Mr. Fawcett's redline that he sent back.

3    A.  I don't know that.

4    Q.  Let me make sure I understand your testimony, sir.

5           Looking at this e-mail chain that Mr. Fawcett is

6    sending back to Mr. Pounian with his redlines and saying how

7    about this, you cannot deduce that these are Mr. Fawcett's

8    actual redlines?

9    A.  Mr. Shen, seriously, you have prepared dozens, if not

10   hundreds of declarations and affidavits, and I am sure there

11   has been back and forth between you and the declarant.

12   Q.  Would you answer the question, please?

13   A.  I can't answer that question.  I told you I can't answer

14   that question.  I was not involved in it.

15          THE COURT:  Mr. Maloney does not understand what

16   happened with this declaration, and he can't answer any

17   questions about who was involved in its drafting or editing.

18   Q.  Sir, were you aware that Mr. Fawcett was willing to submit

19   a declaration admitting to his breach of the protective order,

20   but he wasn't willing to say that he had told the Kreindler

21   firm that he did not know how Michael Isikoff got the

22   transcript?  Did you know that?

23   A.  I knew the first part.  I didn't know the second part.  I

24   knew that he was willing to issue a declaration saying that he

25   was the one who transmitted the transcript.

LB289111                    Maloney – Cross

1   Q.  You didn't know the second part?

2   A.  The second part, where he deleted this line in the

3   declaration, which I have never seen, I did not know.

4   Q.  Sir, the truth is, you never asked Mr. Fawcett whether he

5   sent the transcript to Mr. Isikoff, right?

6   A.  That is not correct.

7        MS. KIRSCH:  Objection.  Asked and answered.

8   Q.  You never asked Mr. Kreindler either?

9   A.  I answered that question five times between yesterday and

10  today.

11       THE COURT:  Mr. Shen, move on, please.

12  Q.  Sir, go back to your declaration, Exhibit 56F.  We are

13  looking at paragraph 6.

14       Paragraph 6 of the declaration --

15  A.  Hold on.  56F?

16  Q.  Yes.

17       This describes the cloud-based server?

18  A.  This is Mr. Hartney's declaration?

19  Q.  Mr. Hartney's declaration.  It describes the cloud-based

20  server?

21  A.  Yes.

22  Q.  Mr. Hartney says, "On July 29, 2021, I reviewed the user

23  history of that cloud-based server," right?

24  A.  What paragraph?

25  Q.  Paragraph 6.

LB289111                         Maloney - Cross

1    A.   Yes.

2    Q.   And that was the first time that Mr. Hartney reviewed the

3    cloud-based server, right?

4    A.   I don't know, but I asked him to do that.  I asked him to

5    look at the cloud-based server so we can determine if any of

6    our consultants accessed the Jarrah transcript.

7    Q.   Let's just establish a timeline here.  If we can look at

8    Exhibit 93.

9              It's going to be on your screen, Mr. Maloney.

10             93 is July 29, an e-mail from you to Mr. Hartney?

11   A.   Yes.

12   Q.   At the bottom you asked him to look at the file share

13   server, right?

14   A.   Yes.

15   Q.   And who had access?

16   A.   Yes.

17   Q.   So, this is a July 29th e-mail.  That's the first time you

18   asked Mr. Hartney to look at this?

19   A.   I don't know if this is the first time.  I didn't have the

20   answers at this point in time, so I asked him to prioritize

21   this with some urgency.  It may be that I asked him prior to

22   this and this was a reminder.  You can see here, on the very

23   first line, I was asking him to make this a high priority.

24   Q.   But certainly, as of July 29, you didn't have answers as to

25   who had access to the cloud-based server?

1   A.  I did not have a full understanding at that point.

2   Q.  But you are aware that Saudi Arabia filed a letter with the

3   court -- I will represent to you it's on July 23 -- in which

4   Saudi Arabia asked for certain discovery relating to the leak?

5   A.  I don't remember the date, but I remember them doing that,

6   yes.

7   Q.  If you can look at Exhibit 43, please.  This is PEC's

8   letter to the court responding to Saudi Arabia's letter.

9           Just before we put it on the screen, I think we

10  confirmed that this is a public document.

11          MR. RAPAWY:  We discussed this with the PECs when we

12  were talking about redactions, and they did not request any

13  redactions to this document.

14          THE COURT:  Thank you.

15          MR. SHEN:  Let's display the document, please.

16  BY MR. SHEN:

17  Q.  Sir, this is a letter that the PECs put in.  If you go to

18  the last page, you will see your signature block?

19  A.  Yes.

20  Q.  You certainly reviewed this document before it went in

21  under you signature block?

22  A.  Yes.

23  Q.  If we cull out the language before Saudi Arabia filed its

24  motion, it says, "Plaintiffs advised Saudi Arabia that each of

25  the lead PEC firms had already conducted internal

1   investigations into the handling of the Jarrah transcript and

2   communications with Mr. Isikoff and that as a result of those

3   investigations, the lead PEC firms was confident that it was

4   not the source of the leak to Mr. Isikoff."

5          Do you see that language?

6   A.  Yes.

7   Q.  Now, you didn't tell the court that the Kreindler firm had

8   multiple contacts with Mr. Isikoff, right?

9   A.  No.  The question was if we had discovered that the

10  transcript had been sent from Kreindler to Mr. Isikoff.  That

11  was the focus -- the initial focus of the investigation was on

12  just that.

13  Q.  Did you make the decision not to disclose those multiple

14  contacts to the court?

15  A.  The status -- the question for the investigation was

16  whether or not anybody at Kreindler sent him the transcript,

17  sent Mr. Isikoff the transcript, not whether or not anybody had

18  ever spoken to Mr. Isikoff.

19  Q.  I am just asking who made the decision not to disclose that

20  report?

21  A.  I don't know.  It was not directly relevant.

22  Q.  You didn't tell the court that, in the course of your

23  investigation, no personal devices, no personal e-mails were

24  searched, correct?

25  A.  No.  Again, first of all, I didn't do that, as we have

1    already discussed.  And no, it wasn't directly relevant.

2    Q.  You didn't tell the court that every single person at the

3    Kreindler firm had access to the transcript, and you had no

4    idea who actually looked at it or accessed it, right?

5    A.  Well, we didn't tell the court a lot of things that were

6    not directly relevant to the question, which was who sent the

7    transcript to Mr. Isikoff.

8    Q.  You don't think that's relevant to the question of what the

9    already conducted internal investigation is?

10   A.  No.  What was most relevant in the first week or two was to

11   determine whether or not the Jarrah transcript, which had very

12   limited access at our firm, had been e-mailed to anybody --

13   initially just to Mr. Isikoff, and then had a subsequent search

14   on any movement of that transcript.

15   Q.  Now, at this point in time, July 27, you had done no

16   investigation at all on the cloud-based server either, which

17   held the Jarrah transcript?

18   A.  I can't tell you, as I indicated a few minutes ago, if Mr.

19   Hartney had already been doing that.  But I can tell you, as of

20   the e-mail we just covered, I did not know the answers to that

21   search.

22   Q.  So, at the time that you wrote this letter, when you told

23   the court that you had already conducted your investigation,

24   you actually didn't know who had access at all to the

25   cloud-based server and the Jarrah transcript on the server?

LB289111                    Maloney - Cross

1    A.  That's not correct.

2    Q.  You don't know who accessed it?

3    A.  We do.

4    Q.  You just told me on July 27 that you didn't have the

5    answers?

6    A.  You put it in the present tense.  I am telling you right

7    after that e-mail, I did look at the cloud-based platform and

8    nobody accessed the Jarrah transcript.

9    Q.  That was on July 29, right?

10   A.  Let me back up for a second.  The cloud-based platform is

11   for consultants that had signed protective order.  They were

12   authorized to see it.  And I wanted to know if anybody actually

13   accessed it.  I got that answer, and the answer was negative.

14   Q.  The question I am asking you, Mr. Maloney, is at the time

15   that the Kreindler firm submitted this letter to the court, it

16   didn't know the results of the investigation on the cloud-based

17   server, right?

18   A.  I did not personally know the results.

19   Q.  And all you had done is ask Mr. Hartney to do the two

20   e-mail searches that we have already discussed, right, at this

21   time?

22   A.  Yeah.  Right.

23   Q.  Now, you're aware that on July 29, other members of the

24   PEC, the Cozen O'Connor firm and the Motley Rice firm, they

25   voluntarily submitted full declarations, those declarations

1    came from anyone who had access to the transcript, and from

2    their IT director describing the search that was conducted?

3    A.  Yes.  Two of those plaintiffs' firms of many had accessed

4    the transcript.  I don't remember the date, but you say July

5    29.

6    Q.  Who at the Kreindler firm decided at that point in time

7    that it wasn't a good idea to submit declarations to the court?

8    A.  I don't know if it was any one person.  We generally do

9    things by consensus and the consensus was we would wait to see

10   what the court asked us to do.

11   Q.  So it was a consensus decision among all of the lawyers at

12   the Kreindler firm?

13   A.  Correct.  I think we had a meet-and-confer with your firm.

14   There was some disagreement.  And we decided to wait until we

15   got instructions from the court.

16   Q.  Now, as of July 29, when the other PEC firms had submitted

17   full and forthcoming declarations, were any declarations

18   drafted for Mr. Fawcett as to that date?

19   A.  I don't recall.

20   Q.  Were any declarations drafted for Mr. Kreindler?

21   A.  Not by me, so I don't know.

22   Q.  When is the first time that the Kreindler firm drafted a

23   declaration for Mr. Fawcett?

24   A.  I don't know because I wasn't involved in that.  But I know

25   that there was one that was done on September 27.

LB289111                     Maloney - Cross

1    Q.  But you don't know when the first draft was presented to
2    him?
3    A.  I do not.
4    Q.  Do you know if a draft was presented to him that said, I,
5    Mr. Fawcett, did not send the transcript to Mr. Isikoff, and I
6    have no idea who did?
7    A.  Mr. Shen, I don't know how many times I can tell you.  I
8    was not involved in drafting Mr. Fawcett's declaration at any
9    time.
10   Q.  So, after this letter to the court on July 27, where you
11   say that the investigation is done and you're confident that
12   the Kreindler firm isn't the source of the leak, you weren't
13   involved after that?
14   A.  No, I stayed involved.  We had additional search terms.  We
15   continued to do more searches.
16   Q.  You were involved in the search, but you weren't involved
17   in the preparation of the declarations?
18   A.  I was involved in the preparation of my own declaration,
19   and I thought maybe we might need one from John Hartney at some
20   point, so I started to think about that.  But that was it.  I
21   did not prepare declarations for anybody else.
22   Q.  Let's look at Exhibit 49, please.
23        Exhibit 49 is the August 30, 2021 order from the
24   court.
25        Now, just to put this in context, the Kreindler firm

LB289111                    Maloney - Cross

1    had submitted declarations to the court on August 16, and the

2    court ordered the Kreindler firm to submit additional

3    information in declarations, correct?

4    A.   Yes.

5    Q.   And the court orders the four attorneys at Kreindler --

6    yourself, Mr. Pounian, Ms. Benett and Mr. Kreindler -- to

7    identify all communications with Michael Isikoff, or anyone

8    acting on his behalf, whether oral or written.  Do you see

9    that?

10   A.   Yes.

11   Q.   Now, at that point in time, did you ask anybody, we need

12   all of your text messages, we need all of your personal

13   e-mails, the court's order said all communications?

14   A.   We may have.  I don't remember at this point if we

15   collected the cell phone data, but we did ask everybody if they

16   had any communications.

17   Q.   Did you collect it or not?

18   A.   On August 30?  Sometime in September we did.

19   Q.   After August 30, before the September 27 declarations that

20   went in, did you collect it, or was it after Ms. Kirsch got

21   involved?

22   A.   I know after Ms. Kirsch got involved, they were collected.

23   Before that, I think everybody was asked to determine whether

24   or not there was any messages, cell phone or personal or

25   anything to Mr. Isikoff.

LB289111                    Maloney - Cross

1   Q.  Did you go through and look at the call logs from the firm?

2   A.  No.  It wouldn't have shown me anything.

3   Q.  Did you ask anyone for them?

4   A.  No.

5   Q.  Did you ask to see, well, let's see how many calls Mr.

6   Kreindler had with Mr. Isikoff?

7   A.  No.

8   Q.  You are aware that that information is available, right?

9   A.  On the firm's -- sure, any time you make a phone call,

10   there is a recording of it.  It has been the subject of our

11   9/11 case.

12   Q.  It was produced to us this week by your counsel.  But you

13   never looked at it as part of your investigation?

14   A.  No.

15   Q.  You never looked at in preparation for preparing

16   declarations that the court ordered after you had submitted the

17   initial declarations?

18   A.  Each of us were instructed to go back and determine whether

19   or not any of us, anybody at the firm, had any communications

20   with Mr. Isikoff.

21   Q.  Let's look at the second page of the court's order.

22       The court orders the declaration from the head of the

23   firm's information technical group.  And it says that that

24   declaration should demonstrate that a forensic analysis was

25   done to identify who accessed the deposition transcripts and

LB289111                    Maloney - Cross

1    determine the dates of any access.

2              Do you see that?

3    A.  Yes.

4    Q.  Now, you knew at the time that that was impossible to do

5    from the Case Media server, right?

6    A.  No, I don't agree with that.  He did a forensic analysis to

7    determine if anybody transmitted the Jarrah transcript to

8    anybody outside the firm.

9    Q.  That's not the question.

10   A.  It's part of the question, it is.

11   Q.  The court's order says do a forensic analysis to determine

12   who accessed the transcript; not who sent the transcript, who

13   accessed the transcript.  You see that, right?

14   A.  I see that.

15   Q.  You knew at the time that that was impossible to do, based

16   on the technology you were using?

17   A.  Well, from Case Media, we have already covered you can't

18   tell the date that somebody looked at a document, but you can

19   tell if it was sent.

20   Q.  You can't tell who accessed it, right?

21   A.  True.

22   Q.  So this is a problem for the Kreindler firm, right?

23   A.  I don't know that I would call it a problem.  The law firm

24   that's working on the 9/11 case is permitted to have access to

25   the documents.  Nobody at the firm outside of the terror team

LB289111                    Maloney – Cross

1    had permission to access the documents, and to my knowledge, no

2    one ever did, nor would they know how to find it.

3    Q.  Sir, did anyone who submitted declarations on September

4    27th tell the court that it was impossible to do the forensic

5    analysis that the court required?

6    A.  There was a forensic analysis done.  If your quibble is it

7    wasn't good enough, we can debate that.

8    Q.  It's not a quibble.  I am asking you if anyone told the

9    court that you could not do an analysis to determine who

10   accessed the deposition transcripts?

11   A.  No.  We told the court we did a forensic analysis of who,

12   if anyone, sent the transcript outside the firm.

13   Q.  Who made the decision on the Kreindler side not to tell the

14   court that they couldn't do the analysis that the court ordered

15   on August 30?

16   A.  I don't recall there was ever a decision made about that

17   one way or the other.  We wanted to answer the court as fully

18   as we could who, if anyone, sent that transcript to anyone.

19   Q.  It was a consensus decision among the partners?

20   A.  Probably.  But I don't recall that specific conversation

21   taking place.  We wanted to inform the court everything we knew

22   about whether or not that transcript came from our firm,

23   Kreindler & Kreindler, to Mr. Isikoff or Yahoo! News.  And then

24   we did a subsequent search to determine if it was ever e-mailed

25   anywhere to anybody.

LB289111                    Maloney - Cross

1    Q.  After this August 30 order, do you know when the first time
2    that Mr. Fawcett was presented with the declaration?
3    A.  I don't know.  All I know is it was on September 27, he was
4    asked to sign a declaration.  My understanding is he couldn't
5    sign the declaration because he admitted on that day that he is
6    the person who transmitted the transcript.
7    Q.  Did you learn at some point in time that Mr. Fawcett was
8    represented by counsel Liz Crotty?
9    A.  I don't know that to ever be the case.
10   Q.  Sitting here today that's the first time you have heard
11   that?
12   A.  You're telling me he was represented by Ms. Crotty?
13   Q.  I am asking, is this the first time that you have heard
14   that?
15   A.  I am hearing it from you that he is represented by Ms.
16   Crotty.  That's the first time I heard that.  I don't know that
17   he was ever represented.  Are you representing that he was
18   represented by Ms. Crotty or not?
19   Q.  All I know is that there were communications with Ms.
20   Crotty that were marked as attorney-client privilege.
21   A.  Do you know who Ms. Crotty is?
22   Q.  I know who Mr. Crotty is.
23   A.  You know she worked at our firm on this case and that she
24   has remained friends with all of us at the firm?  Do you know
25   she was running for assistant district attorney?

1           THE COURT:  Mr. Maloney, you are not asking the

2      questions.

3           THE WITNESS:  He is asking me if I know, and I said I

4      don't know.

5      Q.  Let me ask a new question.  Did you know that Mr. Fawcett

6      was consulting with Ms. Crotty around the issues of the leak of

7      the transcript?

8      A.  I have no knowledge of that.

9      Q.  This is the first time you have heard that?

10     A.  Yes.

11     Q.  Sir, your testimony is that on September 27, you learned

12     for the first time that Mr. Fawcett was the source of the leak?

13     A.  Yes.

14     Q.  Who told you?

15     A.  I assume I can testify to hearsay, but --

16     Q.  I am just asking who told you.

17     A.  Megan Benett.

18     Q.  Was that in a phone call or over an e-mail?

19     A.  Phone call.

20     Q.  What was your reaction?

21     A.  Stunned, sad, angry.

22     Q.  Did you call Mr. Fawcett?

23     A.  No.

24     Q.  Did you talk to him about the leak ever?

25     A.  No, I have never spoken to him since that day, even a few

LB289111                    Maloney – Cross

1    days leading up to that.

2    Q.  At that point he was persona non grata?

3    A.  You want me to characterize why I didn't call him?  I knew

4    that there was now a separation between us.  No, I wouldn't say

5    persona non grata.  He made a very bad mistake.  I haven't

6    spoken to him since then.

7    Q.  So after you learned that Mr. Fawcett had leaked the

8    transcript, did you do an investigation to determine whether

9    anyone at the Kreindler firm knew about the leak?

10   A.  I had done that investigation already, and I again asked

11   everybody afterwards if -- and they all said this is the first

12   time they were aware of it on the 27th.  So the answer is yes.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LB2H9112                         Maloney - Cross

1    Q.  All right.  What you're saying is that you asked everybody

2    afterwards whether they were aware of it?

3    A.  Yes.

4    Q.  All right.

5    A.  I had already asked that multiple times in the two months

6    prior as well, but yes.  When now -- when the revelation now

7    came out on the 27th, we had a conversation, and everybody was

8    just as shocked as I was.

9    Q.  Did you ask for emails?

10   A.  Emails of what?

11   Q.  Did you do any email searches?

12   A.  For what?

13   Q.  To determine whether anyone had knowledge of the leak.

14   A.  We covered that.  For two months --

15   Q.  After September 27 did you do any additional email

16   searches?

17   A.  No.

18   Q.  All right.  After September 27 did you ask at that point

19   for any personal devices or personal emails?

20   A.  No, Mr. Shen.  There's a good reason for that.  I did not.

21   Q.  After that point, September 27, you knew that Mr. Fawcett

22   had leaked the transcript from his personal computer.  Did the

23   firm demand that he return that personal computer?

24   A.  Yes.

25   Q.  When?

LB2H9112                    Maloney – Cross

1    A.  I think that he was sent a letter, if I recall -- actually,

2    the Court asked for the computer, and we sent a letter to him

3    to make sure that the computer was either delivered to us or to

4    the Court because we --

5    Q.  But it was only after the Court issued an order, correct?

6    A.  I think it was within a couple of days of that.  I don't

7    remember the date, but it was literally the same week, I think.

8    Q.  It was after the Court issued the order?

9    A.  Probably, but I don't remember.  I know that -- I know that

10   once we'd found out what he had done that we knew that we

11   should no longer speak to him, and we had to, you know, make

12   sure that he no longer had access to our server and system.

13   You got to -- you got to understand, the first two days we're

14   trying to figure out what had just happened.  The Court's order

15   came in about the laptop, and we advised Mr. Fawcett he needed

16   to turn over the laptop.  And we wanted to make it as

17   expeditious as possible, either have him deliver it right to

18   the court or give it to us, and we'd deliver it to the court.

19   Q.  Did you at that point, after September 27, search through

20   in phone logs at the firm?

21   A.  No.

22           MR. SHEN:  I have no further questions.  Thank you,

23   Mr. Maloney.

24           THE COURT:  Ms. Kirsch, are you ready, or do you need

25   a minute?

LB2H9112                     Maloney - Redirect

1          MS. KIRSCH:  I would like a minute, your Honor.

2          THE COURT:  Let's take a quick recess, two or three

3     minutes, please.

4          (Recess)

5          MS. KIRSCH:  Thank you, your Honor.

6     REDIRECT EXAMINATION

7     BY MS. KIRSCH:

8     Q.  Good morning, Mr. Maloney.

9     A.  Good morning.

10    Q.  When did you join the Kreindler firm?

11    A.  June of 1994.

12    Q.  Have you been working there ever since?

13    A.  Yes.

14    Q.  When did you first meet Jim Kreindler?

15    A.  Probably spring of 1994.

16    Q.  What about Ms. Benett?  When did you first meet Ms. Benett?

17    A.  I don't remember the year.  When she was interviewing with

18    the firm and started working with the firm, that was the first

19    time we met.  I don't remember the year she started.  Been

20    there so long, time compresses.  I really don't remember the

21    year.

22    Q.  That's OK.

23          Does 2006 sound about right?

24    A.  Yeah.

25    Q.  What about Mr. Pounian?  When did you first meet

LB2H9112                    Maloney - Redirect

1   Mr. Pounian?

2   A.  Spring of 1994.

3   Q.  '94.

4           What about John Fawcett?  When did you first meet John

5   Fawcett?

6   A.  I think either late 2001 or early 2002.  It was after 9/11.

7   Obviously, he came in to start working on the case.  So

8   certainly by early 2002, maybe even earlier, but after 9/11.

9   Q.  You've been working continuously with each of those people

10  since the time that you first met each one of them?

11  A.  Yes.

12  Q.  Can you describe a little bit about what the working

13  relationship is with that group, that you have with that group.

14  A.  Well, Mr. Fawcett, it was primarily on 9/11.  There were

15  some other matters or some other terrorism cases or some other

16  non-9/11 matters that I worked with him on as well, but it was

17  primarily 9/11.

18          Do you want me to describe the day to day over the

19  last 20 years?  I'm not sure.  I can come back to that.

20          But with Ms. Benett, it was more, and Mr. Pounian, it

21  was more ad hoc.  Mr. Pounian, probably not for many years.

22  There was a time where he was a partner, then of counsel, and

23  then came back.  So I didn't have a lot of work with

24  Mr. Pounian directly until probably 2015, as it relates to

25  9/11.

LB2H9112                    Maloney – Redirect

1          And with Ms. Benett, you know, I worked with her on a

2     variety of matters at the firm, including the terror case.  So

3     there was –– it was definitely more varied with Ms. Benett.

4     She has a general practice; I also have a general practice.

5     Q.  Focusing, then, on the 9/11 case, can you just describe how

6     often you all communicate, what the collaborative working

7     process is like.  Just give us a little sense of how that

8     works.

9     A.  So I would probably focus the time frame from, say, 2016

10    when JASTA was passed to current, because that's been a much

11    more intense time period, and that's the part that focused on

12    the case against the Kingdom of Saudi Arabia.  From that point

13    on, from 2016 to today, it's been a regular interaction, almost

14    on a daily basis.

15    Q.  And has any of the individuals that I've just mentioned,

16    have any of them ever lied to you before?

17    A.  No, not to my knowledge.

18    Q.  Do you have any reason to suspect that any of those

19    individuals have ever lied to you before?

20    A.  Nope.  You come to know people after 20 years of working

21    with them, or 15 years.  You have a good relationship.  And,

22    you know, their integrity is something that would certainly be

23    supported by all the work they've done and all the interactions

24    I've had, and I had no reason to think that anybody would lie

25    to me at the firm.

1    Q.  So has Mr. Kreindler -- let's just be specific --

2    Mr. Kreindler ever lied to you in all of the years you've known

3    him?

4    A.  No, certainly not that I'm aware.

5    Q.  Have you ever been aware that Ms. Benett has lied to you in

6    all the years you've known her?

7    A.  Never.

8    Q.  Have you ever been aware that Mr. Pounian had lied to you

9    in all of the years that you've known him?

10   A.  No.

11   Q.  Prior to this one incident about the leak, had you ever

12   been aware that Mr. Fawcett had lied to you?

13   A.  Never.

14   Q.  How many partners are there, roughly, at the Kreindler

15   firm?

16   A.  Somewhere around ten.  It's approximately eight to ten, I

17   think.  I can sit here and count them, if you'd like.

18   Q.  Is it a reasonably close partnership?

19   A.  Yes.  We have one partner in Boston.  The rest are in

20   New York.  There was a time we had two partners in Los Angeles,

21   but they're no longer part of the firm.  Everybody else is in

22   New York.

23   Q.  So if we go back, can you just recall when you first heard

24   about the leak that led to Mr. Isikoff's article?

25   A.  When I read the article on July 15.

LB2H9112                      Maloney - Redirect

1   Q.  Do you remember how you learned of it?

2   A.  We get forwarded news articles having to do with the 9/11

3   litigation by our PR group that essentially tracks stuff, and I

4   think the Isikoff article was sent to all of us.  I know that I

5   got it.  Pretty sure that's the source I got it from.  And I

6   don't think it was the only article that was attached, but I

7   don't recall for sure, but I opened it and read it that day.

8   Q.  What was your reaction?

9   A.  I was very surprised, particularly the last sentence where

10  Mr. Isikoff says he had a copy of the redacted transcript.  And

11  I knew immediately for him to have that, somebody had to leak

12  it and that that was a violation of the protective order.  So I

13  recognized immediately that was a serious issue.

14  Q.  If we could use the smaller binder that's up there, it has

15  a cover sheet that says "Kreindler & Kreindler."

16  A.  I only have the massive --

17          THE COURT:  I have the Kingdom's binder.

18  A.  -- binder from Mr. Shen.

19          MS. FREY:  Your Honor, may I approach?

20  Q.  OK.  Mr. Maloney, can you take a look at tab 1, please.

21  A.  Got it.

22  Q.  Can you identify this document?

23  A.  Appears to be a text message from me to John Fawcett, Megan

24  Benett, Steve Pounian.  I can't tell if there's other names on

25  there, but those names appear in the chat participants.

LB2H9112                    Maloney - Redirect

1          MS. KIRSCH:  I'd like to move this document into

2     evidence.

3          THE COURT:  Accepted.  It's accepted.

4          MS. KIRSCH:  Oh, thanks.

5          (Kreindler Exhibit 1 received in evidence)

6     BY MS. KIRSCH:

7     Q.  Mr. Maloney, what is the text that you're sending around to

8     the group?

9     A.  So this is on July 15.  The time, I think, is UTC time, so

10    it's sometime in the afternoon on July 15.  After I'd read the

11    Isikoff article, I texted the group because not everybody was

12    in the office, and I said, can we have a call this afternoon to

13    discuss the Yahoo! -- or discuss Yahoo!  That's the article

14    that Mr. Isikoff wrote that came out that day.

15    Q.  Do you recall whether that call took place?

16    A.  I believe it did.

17    Q.  What was discussed on that call?

18    A.  Whether anybody knew anything about how Mr. Isikoff had got

19    the transcript, whether anybody at Kreindler had sent the

20    transcript to him or told Mr. Isikoff about the Jarrah

21    deposition, the substance of the Jarrah deposition.

22    Q.  What was the takeaway from the call?

23    A.  That no one had.  No one had sent him the transcript and no

24    one knew how he got it.

25    Q.  Was it right after this call that you undertook to lead up

1    an investigation?

2    A.   Yes.

3    Q.   And why did you lead an investigation if everyone said that

4    they did not leak it?

5    A.   It's the old Ronald Reagan phrase, "trust but verify."  I

6    trusted everybody in the office and on that call, but I wanted

7    to verify.  I assumed at some point we might be asked whether

8    or not we had done anything to confirm it.  So the following

9    day, I asked our head of IT, John Hartney, to begin a search of

10   all the emails of people that had access to the transcript.

11   Q.   Before that discussion with Mr. Hartney, did you have a

12   face-to-face conversation with any of the members of the terror

13   team about this issue?

14   A.   Yeah.  I believe I spoke face-to-face with Mr. Fawcett that

15   same day, July 15.  If it wasn't July 15, it would have been

16   July 16.  But he was in the office that day and I was in the

17   office that day.  I went into the place where he sits and asked

18   him directly about whether or not he had sent this transcript

19   to Mr. Isikoff or if he knew anything about it, and he told me

20   he did not.

21   Q.   Did you speak with anyone else personally on that first

22   day?

23   A.   On that phone call.  It was the same day.

24   Q.   OK.

25   A.   That phone call also included Mr. Fawcett, but it also

LB2H9112                    Maloney - Redirect

1   included Ms. Benett, Mr. Pounian.  I thought Jim Kreindler was

2   also on the call, but I don't see his name here.  So I can't --

3   I can't verify that, but I'm pretty sure Jim got on a call with

4   us.

5   Q.  Can you take a look at tab 2, please.

6   A.  Yep.

7   Q.  Can you identify this document?

8   A.  It's an email chain.  So the first email is -- it looks

9   like it's from me at the bottom there, July 21, to Mr. Hartney:

10  "Any questions?"

11          And then this is in relation to the search he was

12  performing.  He sent me an email back later that day saying

13  that he performed a search on Lisa, that's Lisa Ranieri, she's

14  a secretary, I think Ms. Benett's secretary; Deb, Debby Pagan

15  who's a paralegal on the 9/11 case; Jim Kreindler; John

16  Fawcett; Steve Pounian; and my, which here denotes me.

17          And said:  I got a good number of results.  Do you

18  plan coming into the office so we can go over it or discuss it

19  on the phone?  I did not see any emails going out of anyone

20  email box with that particular transcript.  I tried calling

21  Mr. Hartney.  I must not have been in the office that day, and

22  he said he would call me back.

23          MS. KIRSCH:  I'd like to offer this into evidence,

24  please.

25          THE COURT:  It's accepted.

1       (Kreindler Exhibit 2 received in evidence)

2           THE COURT:  I think there's no objection to the

3    admission of any of the exhibits, is that correct?

4           MS. KIRSCH:  We would have objection to some of the

5    documents that previously were not moved into evidence, I

6    believe.

7           THE COURT:  My understanding is that the parties were

8    submitting these exhibits and that they were being admitted.

9           MS. KIRSCH:  No, your Honor.  That was one of the

10   reasons that the Kreindler firm had asked for an exchange of

11   exhibits ahead of time, so that we could look at them and see

12   whether we did, in fact, have objections.  We do have objection

13   to a number of the documents in the binder.  We would not

14   stipulate to admit that entire binder into evidence, absolutely

15   not.

16          THE COURT:  All right.  Well, I think on a

17   going-forward basis, then, you need to raise any objections.

18   And to the extent there are objections to be raised for

19   documents that were presented during the course of prior

20   examinations, then we'll have to deal with those objections

21   after the fact during the post-hearing briefing.

22          MS. KIRSCH:  Your Honor, there were many documents

23   that were just thrown up on the screen with no foundation laid

24   of any sort.  I don't -- if it was aiding in the testimony,

25   there was no motion to get them into evidence, I would have

LB2H9112                    Maloney – Redirect

1    raised the objection on a step-by-step basis.  Are we supposed

2    to be briefing all of that?  I had no idea that there was an

3    idea that they would be trying to move them into evidence.

4             THE COURT:  What's the foundation objection generally?

5    Aren't the majority of these documents documents that your firm

6    produced in the course of discovery?

7             MS. KIRSCH:  Well, I will have objections to

8    questioning Mr. Maloney about a document that he's actually

9    never seen before, even if that document may have come.  If

10   they want to get it in through one of the witnesses that can

11   lay a foundation and talk intelligently about it, that would be

12   a different matter.

13            THE COURT:  All right.  I'm not quite sure that

14   foundational objections are going to be well placed given that

15   the volume of the documents are either documents submitted in

16   court, either issued by the court or submitted to the court or

17   documents that were produced by the Kreindler firm as part of

18   the investigation here, but I guess maybe we'll address this at

19   a recess at some point.  So why don't you proceed.

20   BY MS. KIRSCH:

21   Q.  Mr. Maloney, looking at document No. 2, do you recall

22   whether you did have a conversation with Mr. Hartney after this

23   original exchange?

24   A.  I don't recall, but I most likely did.

25   Q.  Do you have a recollection of having a conversation to go

LB2H9112                    Maloney - Redirect

1   over this good number of results that Mr. Hartney's search

2   turned back?

3   A.  Yeah.

4   Q.  Do you have any recollection of what that discussion --

5   A.  Yeah.

6   Q.  -- sum and substance?

7   A.  Yeah, the results, at least at this point in time, were

8   not -- they weren't indicative of the Jarrah transcript or the

9   Jarrah deposition.  And then probably sometime that same week,

10  as I see this is July 21, I think by July -- between July 22

11  and 29th, I'd learn about the three emails that we covered on

12  cross-examination between Jim and Mr. Isikoff and the one from

13  John Fawcett forwarding the privilege log.

14  Q.  Can you take a look tab No. 3, please.

15  A.  Yep.

16  Q.  Can you identify that document?

17  A.  It's an email from me on July 21 to Jim Kreindler, Steve

18  Pounian, Megan Benett, and the subject line is "Jarrah."

19              MS. KIRSCH:  I'd move this into evidence.

20              THE COURT:  Any objection?

21              MR. SHEN:  No objection.

22              THE COURT:  Accepted.

23              (Kreindler Exhibit 3 received in evidence)

24  BY MS. KIRSCH:

25  Q.  Mr. Maloney, can you just sort of explain to me what the

LB2H9112                    Maloney - Redirect

1  purpose of this email to your partners is?

2  A.  Yeah.  This is me informing my partners that I had asked

3  John Hartney to search the outgoing email boxes of the

4  Kreindler 9/11 team from the date we received the transcript on

5  June 28 to see if anybody had sent the transcript to anyone

6  outside the firm, and I asked them to look specifically at Jim,

7  myself -- your Honor, I'm known as Duke -- Steve, as in

8  Pounian, John Fawcett, Megan Benett, Julia Sienski, Deb Pagan,

9  Lisa Ranieri, and Izabela.

10  Q.  Would you take a look at tab 4, please.

11          Do you recognize this document or recognize what it

12  is?

13  A.  Yeah.  I mean, I've only seen it recently.  It appears to

14  be a text message from -- let me see who it's from.  Yeah, it's

15  a text message from me to John Hartney on July 22.

16          MS. KIRSCH:  OK.  I move this into evidence, please.

17          THE COURT:  Any objection?

18          MR. SHEN:  No objection.

19          THE COURT:  It's accepted.

20          (Kreindler Exhibit 4 received in evidence)

21  BY MS. KIRSCH:

22  Q.  Can you explain to me, please, what's going on in this text

23  message.

24  A.  Yeah.  It's me telling John Hartney that Saudis made a

25  motion requesting information.  They made a motion to the

LB2H9112                    Maloney - Redirect

1    Court.  Prior to that, there had been, I think, a letter to us
2    or a meet-and-confer concerning the Jarrah leak, and I told --
3    I was updating Mr. Hartney about the fact that they'd made a
4    motion.  And I was trying to convey to him this is, obviously,
5    very important, and it should be top of your to-do list.
6    Finish the second search of Mr. Isikoff as soon as possible.
7    Let me know the results by tomorrow.
8            The second search, I think, was broader than the first
9    one, and I believe I asked him to determine whether or not the
10   Jarrah transcript had been emailed to anyone.  The first search
11   he had done was a little bit more narrow.  It was on searching
12   whether or not anybody had sent it to Mr. Isikoff or Yahoo!
13   News.  I had added some more.  I had him do another search,
14   another sweep, and this time to determine if there was an email
15   to anybody outside of the Kreindler firm.
16   Q.  And was that normal in the course of this investigation
17   that you would go back to Mr. Hartney for additional searches,
18   terms, changing the breadth?
19   A.  Yeah, I did it several times over the next several weeks.
20   Q.  Can you take a look tab No. 5, please.
21   A.  Yes.
22   Q.  Can you identify this document?
23   A.  It looks like -- this looks like a text from John Hartney.
24   Is it from him?  Yeah, it's from John Hartney.  It's unclear to
25   me if this is a text to me.  I don't see my number, so I don't

LB2H9112                    Maloney – Redirect

1   know if he's sending this to me or not.  I assume he was, but

2   it appears to be a text from John Hartney on July 22.

3              MS. KIRSCH:  I'll move this into evidence.

4              THE COURT:  Any objection?

5              MR. SHEN:  No objection.

6              THE COURT:  Admitted.

7              (Kreindler Exhibit 5 received in evidence)

8              THE WITNESS:  And this is when Mr. Hartney is telling

9   me he did find an email communication with Jim and Mr. Isikoff

10  discussing the gag order.

11  BY MS. KIRSCH:

12  Q.  What was your reaction to that information?

13  A.  I think I followed up with Mr. Hartney, and I said, was

14  there anything there regarding the Jarrah deposition?  And he

15  told me no, and I asked to see all the emails, I don't know,

16  the same day or within a day or two so I could review them

17  myself.

18  Q.  Why don't you take a look at tab No. 8, please.

19  A.  OK.

20  Q.  Do you recognize this?

21  A.  Yeah.  Looks like an email chain.  This is John Hartney

22  sending me on July 22 -- he forwarded me the email.  This is

23  the next day from that text we just covered, exactly what I was

24  recalling.  That he sent me copies of the emails between

25  Mr. Kreindler and Mr. Isikoff.

LB2H9112                        Maloney - Redirect

1            MS. KIRSCH:  I'll move this tab 8 into evidence.

2            MR. SHEN:  No objection.

3            THE COURT:  Thank you.  It's accepted.

4            (Kreindler Exhibit 8 received in evidence)

5    BY MS. KIRSCH:

6    Q.  Mr. Maloney, what was your reaction, if any, when you saw

7    this email as part of your investigation?

8    A.  Well, my initial reaction was, OK, he didn't mention Jarrah

9    at all in the email communication and there's no attachment, so

10   he didn't forward the transcript.  I still had some questions,

11   and so I asked Mr. Kreindler about it.

12   Q.  What was the sum and substance of this discussion with

13   Mr. Kreindler?

14   A.  I said, Did you speak to Mr. Isikoff about the Jarrah

15   deposition?  And he said no.

16   Q.  Can you take a look tab No. 9.  Can you identify this

17   document for me.

18   A.  It looks like a Zoom invite email chain forwarded to me

19   from John Hartney.  This would be yet another one of the emails

20   that Mr. Hartney found between Jim Kreindler and Mike Isikoff,

21   and this one is an invitation to a Zoom -- I guess a podcast or

22   a Zoom meeting with Jim and Ali Soufan.

23           MS. KIRSCH:  I'll move this document into evidence.

24           MR. SHEN:  No objection.

25           THE COURT:  Accepted.

1        (Kreindler Exhibit 9 received in evidence)

2        THE WITNESS:  I should point out, I was asked about if

3    I knew about this on cross-examination.  There's no indication

4    that I saw here about Catherine Hunt's involvement, so I

5    learned about that from Mr. Shen during cross.

6    BY MS. KIRSCH:

7    Q.  At the top here, when you write back to Mr. Hartney:

8    "Thank you.  Is that all there is?"

9        What are you asking Mr. Hartney about?

10   A.  He was sending emails to me, I guess one at a time, and I

11   wanted to make sure I had them all.

12   Q.  We're going to skip ahead.  I asked you after the previous

13   exhibit about your discussion with Mr. Kreindler.  I just want

14   to make sure, did you discuss this email with Mr. Kreindler as

15   well in that conversation?

16   A.  I believe I did.  I never listened to this podcast or Zoom

17   conference.  It's entitled -- I think this is the

18   *Conspiracyland* thing.  And I asked him generally what it was

19   about, and I specifically asked him, did you discuss the

20   substance of the Jarrah deposition?  And he told me no.

21   Q.  What did Mr. Kreindler say to you, to the best your

22   recollection?

23   A.  He did not discuss the substance of the Jarrah deposition.

24   Q.  All right.  Can you take a look tab 18.  Can you identify

25   this document, please.

LB2H9112                    Maloney – Redirect

1    A.   Yeah, it's an email.  The bottom portion is an email from

2    John Hartney to me on July 29.  So this is –– and I forwarded

3    it eventually to –– same day I forwarded it to Jim Kreindler,

4    Jim Pounian, Megan Benett, John Fawcett, Steve Pagan.  It

5    concerns the Jarrah transcript.

6         Again, as indicated earlier, I had Mr. Hartney perform

7    multiple searches of our server, and I wanted to make sure that

8    we covered all the bases.  If you look at some of those prior

9    emails, there was an email address for Mr. Isikoff at a

10   Verizon.net, I think, and I asked Mr. Hartney to make sure he

11   used the word "Isikoff" to make sure that that would be

12   captured no matter what the email address was, and obviously

13   use the word "Jarrah" in the search.

14        So there was some back and forth.  I wanted to make

15   sure Mr. Hartney, when he was repeating searches and expanding

16   the scope of the search, he was using the right search terms.

17   And I actually forwarded Mr. Hartney the Golkow email that

18   contained all the Jarrah transcripts.  That's the rough draft,

19   I believe, the final draft, both redacted and unredacted

20   versions.  Because sometimes a PDF has a code number associated

21   with it.  It doesn't say "Jarrah" in the email byline.  Email

22   from Golkow would say "Jarrah," but the PDF attached has serial

23   numbers sometimes, and I wanted to make sure he had that so he

24   could also plug that in as a search term so that in case

25   someone had emailed the Jarrah transcript and didn't use the

LB2H9112                    Maloney – Redirect

1   word "Jarrah," he would find that, too.  And that's what he's

2   indicating here in this email to me on July 29, that he'd

3   looked at that, and there was a serial number attached.

4                MS. KIRSCH:  I'd like to move that into evidence,

5   please.

6                MR. SHEN:  No objection.

7                THE COURT:  Accepted.

8                (Kreindler Exhibit 18 received in evidence)

9                MS. FREY:  Give the number.

10               THE COURT:  I think it's tab 18.

11               MS. KIRSCH:  Tab 18.

12               THE WITNESS:  Yeah, it's tab 18.

13               MS. KIRSCH:  Sorry, sorry.

14               THE WITNESS:  And just to complete what's on this

15   document, he's telling –– Mr. Hartney's telling me the search

16   results for all the people listed there as to who sent the

17   Jarrah transcript anywhere, not just to Mr. Isikoff, but to

18   anywhere.  And you can see there the very first one he caught

19   is the email that I sent to John Hartney which I just told you

20   about.  The paralegal, Deb Pagan, sent it to one of our

21   cocounsel who's authorized, has access, at the Baumeister

22   Samuels firm.  You can see their email extension there.  I

23   think they're on the cc.

24               And John Fawcett sent it to one of our consultants.

25   The name is redacted.  And then the rest was not sent to –– I

LB2H9112                        Maloney - Redirect

1    guess Megan Benett's secretary sent it to Megan.  She already

2    had it, in any event.

3    Q.  Mr. Maloney, did you have a conversation with that

4    consultant who was the recipient of the transcript?

5    A.  I did.

6    Q.  What was the sum and substance of that conversation?

7    A.  I asked him, first, did he receive the transcript.  He said

8    yes.  And how did he get it?  He got it from John Fawcett.  I

9    said, did you -- what did you do with that transcript?  He

10   said, I don't -- I didn't even read it yet.  I said, Did you

11   send it anywhere?  He said no.  I said, You know, it's

12   protected material.  You can't send it anywhere.  Did you send

13   it to Mike Isikoff or speak to anybody at Yahoo! News?  And he

14   said no, and he said he knew that it was protected and that he

15   couldn't share it with anybody who was not authorized and that

16   Mr. Fawcett had actually reminded him of that.  So I told the

17   consultant, you may be asked to submit an affidavit on that.

18   He said, no problem.

19   Q.  Was that consultant aware at the time that there had been a

20   leak, to your knowledge?

21   A.  I think I told him in that communication I had with him,

22   conversation, yeah.  I don't know if he was aware of it before,

23   but he was aware during the phone call because I told him.

24   Q.  Did you ask the consultant whether he knew anything at all

25   about how that transcript may have been leaked?

LB2H9112                    Maloney – Redirect

1   A.  I did.

2   Q.  What did the consultant say to you?

3   A.  He said he had no idea, and he said, It wasn't me.  I

4   didn't send it anywhere.  I don't know how he got it.

5   Q.  Take a look tab 34.  Can you identify this document for us.

6   A.  It's a series of emails, an email chain between Mr. Hartney

7   and myself.  So --

8           MS. KIRSCH:  That's OK.  I'd like to just move tab 34

9   into evidence.

10           MR. SHEN:  No objection.

11           THE COURT:  It's accepted.

12           (Kreindler Exhibit 34 received in evidence)

13   BY MS. KIRSCH:

14   Q.  Can you tell us what's going on in this email exchange,

15   Mr. Maloney.

16   A.  Yeah.  I started out on August 30 -- at that point we knew

17   we had to get a declaration from Mr. Hartney as the head of our

18   IT, and so I drafted -- I think I drafted a declaration for

19   Mr. Hartney, and I think I wanted him to take a look at it and

20   make sure it was accurate and ask questions.  As a result of

21   that, Mr. Hartney, you know, wanted to make sure he crossed the

22   Ts and dotted the I's, and he wanted to redo the searches.

23   This would have been probably the fifth search or maybe sixth

24   search at this point in time on August 30.

25           But we were given at that point new email addresses

1    from the court for Mr. Isikoff.  One was a Yahoo!/Inc.com, and

2    the other one was an oath.com.  I made sure that Hartney had

3    those, so we had a total of three email addresses for Isikoff.

4    But I also made sure that Mr. Hartney searched just the word

5    "Isikoff" because it would come up in regard -- if Isikoff was

6    in the email address.  It wouldn't matter what the extension

7    was, so he would find that.

8            And I also told him we needed to expand the date

9    range, because prior to the Court's order, I had him look at

10   the time frame from when we received the deposition transcript

11   to the time the Isikoff article -- I think that was June 28

12   when we received it, if I'm not mistaken, and the article came

13   out on July 15.  So I asked him initially to search for email

14   traffic and communications with Mr. Isikoff about the Jarrah

15   transcript in that time period.

16           The Kingdom insisted that the scope and duration be

17   expanded.  I didn't quite understand the rationale for going

18   back to June 1 when the deposition hadn't even taken place

19   then.  But when the Court ordered that, we complied, and this

20   is what I asked Mr. Hartney to do, to expand the scope and

21   duration of the time frame to look at email traffic in and out,

22   so starting with June 1 to August 1.

23   Q.  Mr. Maloney, earlier on cross-examination there was some

24   conversation about whether you searched people's personal

25   devices.  Do you remember that?

LB2H9112                    Maloney – Redirect

A.  Yeah, I remember that.

Q.  In your opinion, was it reasonable not to require a

forensic search of people's personal devices?

A.  Yeah.  I think not only was it reasonable, I think it would

have been insulting to the staff to say I want all your cell

phones and laptops.  I also noticed that none of the other

declarations that had been filed, including the Kingdom's,

included searches of personal laptops and cell phones, which --

and none of the other plaintiffs firms and nobody else that was

putting in declarations.  So I didn't consider that to be a

reasonable request.  It wasn't something that even entered my

mind at the time.

Q.  So you just made mention to -- you reviewed the

declarations that were filed by the Cozen O'Connor firm, is

that right?

A.  I did.

Q.  Did I understand you to say that they didn't include any

searches of personal devices in their searches?

A.  My memory is that they had performed an IT search similar

to the one that Mr. Hartney did at our firm to look at who had

access to the transcript and if it was ever sent anywhere.  I

don't recall any declaration, whether it was Cozen O'Connor,

Motley Rice, the Kellog Hansen firm, there were a number of

firms, Anderson Kill -- there were a lot of firms that were at

that Jarrah deposition that had access to the transcript, and I

LB2H9112                    Maloney - Redirect

1   did look at a number of declarations as they came in at various

2   times.  I don't recall any of them saying that they looked at

3   personal cell phones and personal laptops.

4   Q.  So other than searching the firm's servers and interviewing

5   each one of the individuals who was known to handle the

6   transcript, you didn't feel that anybody rose to the level of

7   being a suspect that you needed to image or forensically image

8   their personal devices, is that right?

9   A.  Yeah.  The information I found did not create any

10  additional cause for concern or increased suspicion.  Even the

11  emails to Mr. Isikoff seemed benign to me.  We had

12  communications with a number of journalists.  Keep in mind, the

13  summer of 2021 was the lead-up to the 20th anniversary, and

14  there was a lot of media attention and focus and interest on

15  the case and on the families.  And families were being

16  interviewed.  The firm was being contacted.  So the Isikoff --

17  the fact that there were three emails between Mr. Isikoff and

18  Mr. Kreindler and one from John Fawcett was probably -- that's

19  one or -- one of the three or four out of probably 30 or 40

20  during that same time period with other journalists.  So that

21  did not stand out to me.  It would have certainly raised a red

22  flag if there was something about Jarrah in those emails, but

23  there was not.

24          So it was just the opposite.  To me it allayed any

25  suspicion when I saw that email traffic.  I knew, however, that

LB2H9112                    Maloney – Redirect

1     Mr. Shen and Mr. Kellogg would seize upon any communication

2     with Mr. Isikoff as something sinister.  That's not the case.

3     Q.  Take a look at tab 35, if you would.  Can you identify this

4     document for me.

5     A.  It's an email chain.  I think it's between me and

6     Mr. Hartney in August, August 30 and 31, of this year.

7               MS. KIRSCH:  I'd like to move this into evidence.

8               MR. SHEN:  No objection.

9               THE COURT:  It's accepted.  35.

10              THE WITNESS:  35.

11              THE COURT:  35.

12              (Kreindler Exhibit 35 received in evidence)

13    BY MS. KIRSCH:

14    Q.  If you look at the top couple of emails, can you just

15    explain to me what's going on in this exchange about searching

16    for the word "Isikoff"?

17    A.  Yeah.

18    Q.  What are you discussing here?

19    A.  Yeah.  Mr. Hartney is a very intelligent guy.  He's a very

20    IT guy, but he's a little bit of a Nervous Nellie.  Now that he

21    was being asked to swear out a declaration, he wanted to make

22    sure he had everything right and crossed his Ts and dotted his

23    I's.  And when I told him about the new email addresses, he

24    said, Well, I didn't have those email addresses before when he

25    did his prior searches.  I said, OK.  Well, that's all right.

LB2H9112                    Maloney – Redirect

1    Do it now.

2              Secondly, I said, Wouldn't your initial search have

3    discovered those despite not having the email full address

4    because it contained the word "Isikoff"?  And he responded,

5    Yes, you're right, it would have caught those.  In fact, when

6    he did another search, there was nothing additional.

7    Q.  So let's look at tab 36, if we could.

8    A.  OK.

9    Q.  Do you recognize this document?

10   A.  Yes.  This is Mr. Hartney forwarding to me the email that

11   he discovered between John Fawcett and Mr. Isikoff that was

12   July 12.

13             MS. KIRSCH:  I'd like to move this into evidence.

14             MR. SHEN:  No objection.

15             THE COURT:  It's accepted.

16             (Kreindler Exhibit 36 received in evidence)

17   BY MS. KIRSCH:

18   Q.  What's going on in this discussion with Mr. Fawcett?

19   A.  So after Mr. Hartney found this email, I contacted

20   Mr. Fawcett, and I think I had a conversation before this.  I

21   can see that the date of the email at the top is September 1,

22   but I'm fairly certain I actually spoke to Mr. Fawcett about

23   why he was in communication with Mr. Isikoff, did he discuss

24   Jarrah.  Again, the same questions again, but I said why did

25   you send him this privilege log?  Was this privilege log ever

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB2H9112                    Maloney - Redirect

1   filed on the public docket?  Because the copy I had, at least

2   the one that was easily accessible to me, didn't have the

3   ECF filing at the top.  But it was not marked confidential, and

4   that's what Mr. Fawcett confirmed for me, but I looked myself

5   to confirm it.

6   Q.  Let's take a look at tab 41.

7   A.  OK.  Another series of emails between myself and

8   Mr. Hartney.  And as you can see, the dates are -- this chain

9   started on July 29, but there's an intervening one, and then it

10  ends at the top of the page at September 2.

11            MS. KIRSCH:  I'd like to move this into evidence.

12            MR. SHEN:  No objection.

13            THE COURT:  It's accepted.

14            (Kreindler Exhibit 41 received in evidence)

15            MS. KIRSCH:  OK.

16            THE WITNESS:  And this one, I don't know if you want

17  me to tell you, explain what I'm seeing here.

18  BY MS. KIRSCH:

19  Q.  Sure.

20  A.  This is with regards to the cloud-based server which is

21  available to a certain number of authorized consultants to be

22  able to look at materials that we post there for them with --

23  it's password protected, and we can tell who, if anyone, looks

24  at any particular document and when they did that.  I think I

25  asked -- we covered this a little bit on cross-examination, and

LB2H9112                    Maloney – Redirect

1    I didn't have all the answers, at least I wasn't understanding

2    it correctly on July 29.  And this is -- I got answers soon

3    after July 29.

4              But, again, on September 2 when Mr. Hartney was told

5    he needed to do a declaration, I wanted to make sure I

6    understood and he understood what searches had been performed,

7    and he showed me that there were only these five deposition

8    transcripts that were actually viewed by anybody.  And as you

9    can see, it's Muhanna, Mersal, Freeman, Mana, and Olivier.

10   Nobody looked at Jarrah.

11   Q.  Thank you.  Let's look at tab 43.

12             Can you identify this document.

13   A.  This is an email from John Fawcett.  I'm trying to

14   understand.  He sent from the Kreindler server a message, I

15   think, to the consultant that you can't email these around to

16   people that haven't signed the protective order, and the

17   attachment at the top indicates it was the Qattan transcript,

18   the Jarrah deposition transcript.  And I asked John about this,

19   and this was, in fact, the same consultant we've been talking

20   about that was authorized to receive the transcript who I

21   followed up with myself personally.

22             MS. KIRSCH:  I'd like to move this into evidence.

23             MR. SHEN:  No objection.

24             THE COURT:  Accepted.

25             (Kreindler Exhibit 43 received in evidence)

LB2H9112                    Maloney – Redirect

1   BY MS. KIRSCH:

2   Q.  Mr. Maloney, when you saw Mr. Fawcett's email to the

3   consultant, does this reinforce your understanding that

4   Mr. Fawcett understands the obligations under the protective

5   orders?

6   A.  Yes.  He was reminding the consultant that he couldn't

7   share this.  That these were protected documents, and they

8   couldn't be shared.  In fact, the consultant told me

9   Mr. Fawcett had reminded him of that when he sent them.  And I

10  should also point out Mr. Fawcett told me he sent it to this

11  consultant on the first day or second day, either July 15 or

12  16.

13          THE COURT:  Can I just ask a clarifying question,

14  Mr. Maloney?

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  I'm confused.  So there's a July 6 email

17  from Fawcett.

18          THE WITNESS:  Yes.

19          THE COURT:  From his Kreindler email address.

20          THE WITNESS:  Correct.

21          THE COURT:  And he writes, "You can't email these

22  around to people that haven't signed the protective order."

23          THE WITNESS:  Yes.

24          THE COURT:  How do we know to whom that July 6 email

25  is being sent?  I see there's something redacted above.

LB2H9112                    Maloney - Redirect

1          THE WITNESS:  Yes, it's redacted, your Honor.

2          THE COURT:  Is that --

3          THE WITNESS:  That's the consultant number one.

4          THE COURT:  There's another -- I'm confused.  Maybe

5    you can't answer it because it's confusing to you, too.

6          It appears that there's the July 6 email from Fawcett.

7    It's not clear to whom he's sending it.  Then there's an email,

8    I'm assuming it's from redacted to you, on September 1.

9          THE WITNESS:  Yeah.  I believe --

10         THE COURT:  And that something's being sent from the

11   ProtonMail.

12         THE WITNESS:  Yeah.

13         THE COURT:  I'm confused who's sending what.  I see

14   there's three possible emails, one on July 6, one on

15   September 1, one on September 2.

16         THE WITNESS:  My best recollection is that the

17   consultant emailed me on his ProtonMail server the original

18   email he got from John Fawcett, which is what you see at the

19   bottom.  I asked the consultant to forward me John's email, and

20   he did.  That's what this is.

21         THE COURT:  I see.  Thank you.

22   BY MS. KIRSCH:

23   Q.  Mr. Maloney, there was a discussion, I think, yesterday

24   that the consultant actually signed his declaration on -- as

25   early as September 2, even though others were not asked to sign

LB2H9112                      Maloney – Redirect

1   their declarations until the end of September.  Do you know why

2   it was that the consultant was asked to sign a declaration that

3   early?

4   A.   That was by me.  I wanted to find out -- I knew that he had

5   received a copy of the transcript, whereas others had not, and

6   I wanted to make sure we nailed down all the facts on how he

7   got it, when he got it, what he did with it.  And as soon as I

8   had that communication with him, I said, You know, we're going

9   to need you to do a declaration.  He goes, No problem.  I may

10   be traveling soon.  Let's get it now.  He got it right away.

11   Q.   As a general matter, Mr. Maloney, how often would you say

12   you communicate with Mr. Fawcett?

13   A.   On a near daily basis.  In fact, in the summer of 2021,

14   probably almost every day.  Maybe not weekends, but sometimes

15   on weekends, too.

16   Q.   To what extent were you aware of Mr. Fawcett's physical

17   whereabouts as a general matter?

18   A.   Well, obviously, if we were both in the office, I would see

19   him in the office.  But, again, not everybody was going to the

20   office every day during the pandemic in the summer, so there

21   were times where we were working out of our homes.  But

22   Mr. Fawcett was clearly working from home.  He said he was

23   working from home.  He was available from home, and he had a

24   computer there that he would have access to the Kreindler

25   server as if he was sitting at his desk, just like the rest of

LB2H9112                    Maloney – Redirect

1    us.  There were times where he was on Zoom where I could see

2    the background in his apartment.  Growing some tomato plants or

3    something like that.

4    Q.  Did you communicate with Mr. Fawcett about the protective

5    orders?

6    A.  Multiple times, yeah.  I mean, all the time, all the time

7    because anytime we would get a new production, say, from the

8    FBI, we knew that they would have to be protected.  And there

9    were times we'd have to ask the Justice Department whether or

10   not we could use a particular document at a deposition.  There

11   was constant conversations about what was protected, what's

12   not, what's confidential.  There's, obviously, a separate order

13   that governs the Kingdom's documents different than the MDL

14   order, and they're actually completed a little differently, but

15   we treated them pretty much the same.  None of those documents

16   should ever be available through the public domain.  You can't

17   file them on the docket unless they're under seal or redacted.

18   We can't even share them with our own clients.

19   Q.  In the 20 years you worked with Mr. Fawcett, did you ever

20   get any indication that Mr. Fawcett did not understand his

21   obligations under the protective orders?

22   A.  He understood them.  And for 20 years we didn't have any

23   issue or problems with Mr. Fawcett with any confidential

24   documents.

25   Q.  Mr. Fawcett never indicated in any way that he did not

1    intend to honor his obligations under the protective orders?

2    A.   Never said that.  In fact, the office where he and Steve

3    worked and stored documents, we called it the 9/11 war room,

4    that was locked every night.  We had hard copies.  Nowadays we

5    of a new office, and there are very few hard copies.  But up

6    until earlier this year, we were in the office building next

7    door.  The office where the documents were kept, any hard

8    copies, the files, locked, and only Mr. Pounian, I think

9    Mr. Fawcett, and the mailroom guy.  I didn't even have a key to

10   that office.  They were locked every night.  When anyone was

11   not there, the room was locked.

12   Q.   In fact, Mr. Pounian and Mr. Fawcett shared an office

13   space, is that right?

14   A.   Yeah.

15   Q.   Did you ever order or direct Mr. Fawcett to send the Jarrah

16   transcript to Mr. Isikoff?

17   A.   Never.  Did not.

18   Q.   Were you aware before September 27 that Mr. Fawcett had

19   sent the Jarrah transcript to Mr. Isikoff?

20   A.   I was not aware until midday on the 27th of September.

21   Q.   Did you ever approve or condone of Mr. Fawcett sending the

22   Jarrah transcript to Mr. Isikoff?

23   A.   No.

24   Q.   Did you ever have any reason to suspect that Mr. Fawcett

25   sent the Jarrah transcript to Mr. Isikoff?

LB2H9112                    Maloney - Recross

1    A.  I had no reason to suspect it.  And when I did the internal

2    investigation, I was able to corroborate, in my mind, that

3    nobody at Kreindler had sent the Jarrah transcript to Yahoo!

4    News or Isikoff.

5               MS. KIRSCH:  I have no further questions.

6               THE COURT:  Thank you.

7               MR. SHEN:  Your Honor, just five minutes.

8               THE COURT:  Sure.

9               THE WITNESS:  Mr. Shen, I need the book back --

10              MR. SHEN:  We can do it without it.

11              THE WITNESS:  -- the big one?

12   RECROSS EXAMINATION

13   BY MR. SHEN:

14   Q.  Now, Mr. Maloney, counsel for the Kreindler firm asked you

15   some questions about sending the Jarrah transcripts to

16   consultant A?

17   A.  Yes.  And we've called him consultant one, but I'm not

18   going to quibble, yes.

19   Q.  Sure.  Let's look at Exhibit 97, please.

20   A.  In the Kreindler book?

21   Q.  No, it will be on your screen.

22   A.  Oh.

23   Q.  Exhibit 97, as it's coming up, this is an email chain from

24   Mr. Hartney to yourself, and he's telling you that he's been

25   looking for the email that Mr. Fawcett sent to the consultant

LB2H9112                    Maloney - Recross

1   with the transcript?

2   A.  Yeah.

3   Q.  And he can't find it, correct?

4   A.  Yeah.  I can explain that, yeah.

5            THE COURT:  Mr. Shen, do you want to move this?  Given

6   Ms. Kirsch's position, do you want to move this into evidence?

7            MR. SHEN:  Well, your Honor, I think it's most

8   efficient if we address all these issues after the hearing.

9            THE COURT:  I was going to ask that the parties meet

10  and confer about that, but I wonder if on a going-forward

11  basis -- Ms. Kirsch, I don't know what your position is going

12  to be.  Do you want to do this on every document going forward?

13           MS. KIRSCH:  I think it's more efficient to move this

14  into evidence as we go.  We can meet and confer on the other

15  ones.  Again, that was something that would have been the most

16  efficient had we done it in advance of the trial, but I think

17  it's probably easier to make sure that we just move them in as

18  we go.

19           THE COURT:  Any objection as to this document?

20           MS. KIRSCH:  None.

21           THE COURT:  It's accepted.

22           (KSA Exhibit 97 received in evidence)

23  BY MR. SHEN:

24  Q.  Mr. Hartney's telling you on August 31 that he can't find

25  that email, correct?

LB2H9112                    Maloney - Recross

1   A.  He did.  But we had a conversation about this.  Turns out

2   that was incorrect.

3   Q.  Let's take a look at Exhibit 98.  Can we just get rid of

4   the call out, please.

5         At the bottom of the email, September 1, you were

6   asking Mr. Fawcett to send you a copy of the transcript, right,

7   or send a copy of the email that he sent to consultant one?

8   A.  Yes.

9   Q.  And he writes back and says, If Mr. Hartney can't find it,

10  how am I supposed to find it?  And this whole process is

11  creeping me out.  Do you see that?

12  A.  Yes.

13  Q.  This was actually on September 1, the day after the Court

14  issues its August 30 order requiring additional declarations,

15  right?

16  A.  Yeah, that's the date.

17  Q.  So you're telling Mr. Fawcett, well, it's really important

18  that we know the answer, and we need to get this actual email,

19  right?

20  A.  Yes.

21  Q.  All right.  Let's go to Exhibit --

22         THE COURT:  Sorry, Mr. Shen.  I want to try and

23  minimize the work on the back end.

24         Any objections to admitting this document?

25         MS. KIRSCH:  No, no objection.

LB2H9112                    Maloney - Recross

1          THE COURT:  OK.  It's accepted.

2          (KSA Exhibit 98 received in evidence)

3   BY MR. SHEN:

4   Q.  Let's look at Exhibit 99.  This has already been admitted

5   into evidence.  Ms. Kirsch showed you this document.  In fact,

6   what happens here is you have to go to the consultant to ask

7   the consultant to send you the email that Mr. Fawcett had sent

8   to him, correct?

9   A.  Well, ultimately, I need to explain.  I can't answer that

10  with a yes or no.  May I?

11  Q.  Sure.

12  A.  OK.  So, yes, I asked the consultant to send the email.  It

13  turns out there was a miscommunication between Mr. Hartney and

14  I in terms of who the consultant was.  I gave him the name of

15  the consultant.  I didn't know the consultant's email address

16  at the time.  He actually found -- prior to that he had already

17  found Mr. Fawcett's email to that consultant, but it was under

18  a different email address.  There's -- it's not encrypted, but

19  it was something that I didn't recognize.  So I asked

20  Mr. Hartney a few times, Did you find the email to so-and-so by

21  name?  And he said, No, I didn't find that.  I can't find that.

22  And I was puzzled by that because Mr. Fawcett had told me from

23  the very beginning he, in fact, sent the Jarrah transcript to

24  that consultant.

25          So I said, well, let's look at this another way.  Let

LB2H9112                    Maloney - Recross

1    me contact the consultant and find out if that email exists,

2    and that's what you see here, the consultant sending me the

3    email that he got from John Fawcett.  Then I showed that to

4    Mr. Hartney, and he says, Oh, I've had that all along.  This is

5    the same consultant I told you about back in July.  He just

6    hadn't -- he didn't put the connection together between the

7    name of the consultant and the email address that popped up in

8    his initial search.

9          So, really, it was a miscommunication in terms of

10   myself and Mr. Hartney on what he had found.  He had found that

11   from the very beginning.  So it turned out when I got this, it

12   just confirmed what I just told you.

13   Q.  Thank you.

14         Mr. Maloney, did you ask Mr. Fawcett why he was

15   creeped out when you were asking him to search for things?

16   A.  No, I didn't talk to him about it.

17         MR. SHEN:  All right.  No further questions.  Thank

18   you.

19         THE COURT:  All right.  Thank you, Mr. Maloney.  You

20   are done.  You can stay in the courtroom now.

21         THE WITNESS:  Thank you.

22         (Witness excused)

23         MR. SHEN:  Your Honor, Saudi Arabia calls Megan

24   Benett.

25   MEGAN WOLFE BENETT,

1         called as a witness by the Defendant,

2         having been duly sworn, testified as follows:

3    CROSS-EXAMINATION

4    BY MR. SHEN:

5    Q.  Good morning, Ms. Benett.  You took the Jarrah deposition

6    on June 17 and 18, correct?

7    A.  I did.

8              THE COURT:  Ms. Benett, sorry.  Can I ask you to sit

9    closer to the microphone so everyone can hear you.

10   Q.  And that's one of the depositions you took in the case.

11   Mr. Pounian took most of them?

12   A.  That's right.  Between June and January -- sorry, January

13   and June, Steve Pounian led probably 30-some depositions.  I

14   was lead on Jarrah, and I also took the Zeinab Affifi

15   deposition, and I defended a couple of the other depositions

16   that the Kingdom had noticed.

17   Q.  Now, Mr. Fawcett also attended the Jarrah deposition,

18   correct?

19   A.  So that deposition was by Zoom.  I was in a room by myself

20   in the office.  There were people who were attending who were

21   in a conference room, but given the nature of the documents and

22   sort of the many things you have to manage when conducting a

23   deposition by Zoom, my focus was primarily on getting to my

24   questions, getting the testimony that I was seeking.  I believe

25   John was there.  I may have seen him in and out, but he

LB2H9112                          Benett - Cross

1   certainly wasn't in the room with me.

2   Q.  But you know he attended the deposition, and he heard what

3   happened during the deposition, correct?

4   A.  I saw his name on the transcript.  I don't know how much --

5   I'm assuming he attended the entire deposition, but I was not

6   with him for that.

7   Q.  Mr. Fawcett manages all the discovery material in this

8   case, correct?

9   A.  So he, up until September 27, had access to all of the

10  discovery material.  A lot of people relied on him.  I, for

11  example, know where the materials are and did not necessarily

12  need to rely on him, although I would sometimes ask him to help

13  direct me to information.  We have a paralegal on the case who

14  does some of the document management.  We had another paralegal

15  who we brought in for the depositions who was helping to manage

16  things like deposition exhibits.  Getting ready for the

17  deposition was an enormous process because we had to go through

18  and prepare all of those -- the documents we thought we might

19  use as exhibits during the deposition, and we had several

20  people who were involved in that.

21  Q.  And Mr. Fawcett was one of them, correct?

22  A.  So I don't -- he may have been involved in pulling things.

23  I mean, there was a whole team that was working together.  He

24  was not -- I don't think he was lead on putting together the

25  deposition exhibit files.

LB2H9112                         Benett - Cross

1   Q.  Mr. Fawcett worked as an investigator and researcher on all

2   aspects of the 9/11 case for the Kreindler firm, correct?

3   A.  That's a correct statement.

4   Q.  Did Mr. Fawcett assist you in preparing for the Jarrah

5   deposition?

6   A.  So my preparation for Musaed Al Jarrah was I worked a lot

7   with Steve on that.  I worked a lot with Julia in our office on

8   the exhibits.  John was certainly involved.  So he was one of

9   the team.  Duke was probably involved also.

10  Q.  Ms. Benett, if you could just focus on answering my

11  question.

12          The question was did Mr. Fawcett assist you, and I

13  believe the answer was yes, correct?

14  A.  He was one of the people who assisted me, yes.

15  Q.  Did he see a copy of your deposition outline before the

16  deposition?

17  A.  I don't recall.

18  Q.  He certainly assisted in identifying and preparing

19  exhibits, correct?

20  A.  He would respond to my requests is your -- I guess what do

21  you mean by "assisted"?

22  Q.  Did he know which exhibits you were going to use at the

23  deposition?

24  A.  To be honest, I didn't know until partway through all the

25  exhibits I would be using.  It was an on-the-go process with

LB2H9112                    Benett - Cross

1   some of them.

2   Q.  Certainly, you had assembled a collection of exhibits you

3   may use.  Was he aware of what you might use?

4   A.  Well, you're asking me a question about his state of mind.

5   I don't think I can answer that.

6   Q.  I'm asking for your knowledge.  Did he assist in putting

7   together that collection of exhibits?

8   A.  He helped me out in preparing for the deposition.  I feel

9   like your question is did he know what my exhibits were going

10  into the deposition, and I don't know the answer to that.

11  Q.  Now, Mr. Fawcett knew what topics you were going to explore

12  at that deposition, correct?

13  A.  I feel like these are questions better for Mr. Fawcett, and

14  I don't -- I assume he did.

15  Q.  I want to be very careful here not to compound the

16  Kreindler firm's violation of the protective order by airing

17  confidential information at this hearing, so I'll ask you to

18  answer these questions without disclosing the specific content

19  of what occurred at the deposition.

20  A.  So, Andy, I'm going to answer the questions, and I'm going

21  to let my lawyer object to your grandstanding.

22          THE COURT:  Ms. Benett, please, your lawyer can stand

23  up and object as necessary.  I'm not sure that was

24  grandstanding.  He's just simply trying to make sure that

25  everybody is being sensitive to this subject matter, as we

LB2H9112                    Benett - Cross

1    discussed before this hearing began.

2              So, Ms. Kirsch, I'll hear you.

3              MS. KIRSCH:  I was just going to refer back to your

4    Honor's ruling, which was fairly narrow, but I would also -- I

5    would say that Ms. Benett should be able to answer -- we're

6    here in an open courtroom.  She should be able to answer the

7    question fully.  I think she is mindful, but you could give

8    again, of the instruction with respect to not revealing the

9    actual content, but that everything else is a topic that's

10   appropriate for the courtroom.

11             THE COURT:  Ms. Benett, I assume you're familiar with

12   the order I issued yesterday.  We're not going to discuss the

13   content of the deposition that happened other than the basis

14   that Mr. Fawcett relied on as his explanation for why he

15   disclosed the transcript.

16             Do you understand the scope of my ruling?

17             THE WITNESS:  I think so.  So my takeaway from the

18   order was that we're not going to discuss the actual exchange

19   during the deposition.

20             THE COURT:  That's correct.

21             THE WITNESS:  But that to the extent information

22   elicited during the deposition formed the basis of John

23   Fawcett's explanation for why he did what he did, that -- I

24   mean, I just -- is that not the --

25             THE COURT:  We're going to talk about the fact that

LB2H9112                    Benett - Cross

1    Mr. Fawcett said that allegations that Jarrah had child

2    pornography on his computer is why he felt compelled to

3    disclose it.  So that is what we're going to talk about, but

4    we're not going to talk about anything about questions that

5    were asked, what was elicited during the deposition, what was

6    introduced as an exhibit.  That is all off limits.

7              THE WITNESS:  OK.  Understood.

8    BY MR. SHEN:

9    Q.  Now, Ms. Benett, during the deposition you asked Mr. Jarrah

10   about the event that the judge just referenced, correct?

11   A.  About the possession of child pornography?

12   Q.  Yes, ma'am.

13   A.  Yes.

14   Q.  And that issue was not publicly disclosed prior to the

15   deposition.  That wasn't public information, correct?

16   A.  I don't know the answer to that.

17   Q.  Well, this is an event that Mr. Fawcett cites as a

18   rationale for violating the protective order and leaking the

19   transcript to Michael Isikoff, correct?

20   A.  OK.

21   Q.  You understand that, right?

22   A.  Yes, I saw the declaration.

23   Q.  Now, the Kreindler firm has retained a number of FBI agents

24   to assist in this case.  That's correct, right?

25   A.  There have -- yes, we have several former FBI agents who

LB2H9112                    Benett - Cross

1   have -- who are working with the families in this case.

2   Q.  And let's listen to what Jim Kreindler has to say about

3   these former FBI agents.

4               MS. KIRSCH:  What are we doing now?

5               MR. SHEN:  It's on your screen.

6               MS. KIRSCH:  Is this a question for Ms. Benett?  Is

7   this something that I should be reviewing before I get to --

8               THE COURT:  I assume there's going to be a question.

9   That's what we're doing here.  If you want to review, do we

10  have a transcript that Ms. Kirsch can review before we air the

11  video?

12              MR. SHEN:  Is it Exhibit 18, reference 31:14.  These

13  are all public statements made by Mr. Kreindler.

14              MS. KIRSCH:  OK.  What's the reference?

15              MR. SHEN:  34:14.

16              MS. KIRSCH:  And what is this a transcript of,

17  Mr. Shen?

18              MR. SHEN:  This is a transcript of Mr. Kreindler's

19  public statements at Dartmouth University.

20              MS. KIRSCH:  I'm sorry.  Public statements when and

21  where?

22              MR. SHEN:  At Dartmouth University.

23              MS. KIRSCH:  I'll just take a moment and read it,

24  please, your Honor.

25              THE COURT:  Mr. Shen, you're going 34:14 to?

1          MR. SHEN:  To 52.  I'm sorry.  It starts at 31:14.

2     I'm sorry if I misspoke.

3          THE COURT:  Ms. Kirsch, did you hear that?

4          MS. KIRSCH:  I did.

5          MR. SHEN:  31:14 to 31:52.  Apologies.

6          MS. KIRSCH:  OK.  So this is from the 2019 speech at

7     Dartmouth, is that right?

8          MR. SHEN:  It's the same speech that we played

9     yesterday.

10         MS. KIRSCH:  Which was in 2019?

11         MR. SHEN:  I don't know offhand.  Yes.

12         THE COURT:  I don't think there's a dispute.

13         MR. SHEN:  2019.

14         THE COURT:  2019.

15         MS. KIRSCH:  OK.  That's fine.  No problem playing

16    Mr. Kreindler's speech.

17         MR. SHEN:  It will be on the screen in front of you.

18         (Audio played)

19    BY MR. SHEN:

20    Q.  Now, Ms. Benett, is Mr. Kreindler being truthful here that

21    FBI agents have told him and the other attorneys at the firm

22    what they know concerning their 9/11 investigation?

23    A.  I can't speak to what anybody has told Jim.  I mean, I

24    don't -- the agents that I've -- the folks who come on to work

25    with the families that I've spoken with, I guess I wouldn't --

LB2H9112                     Benett – Cross

1    I don't know if I would characterize my conversations with them

2    that way, but my role and my relationship with them is

3    different than Jim's, but I can't say -- I certainly couldn't

4    opine as to whether Jim is being truthful or not about that

5    statement.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB2H9112                    Benett - Cross

LB289113                    Benett - Cross

BY MR. SHEN:

Q.  Let me ask you a more specific question.

        Ms. Benett, the reason you know about the event that you asked Mr. Jarrah at his deposition is because an investigator who works at the firm who is a former FBI agent told you about that event, correct?

        MS. KIRSCH:  I want to say here, your Honor, that the document information that related to this breach were compelled, produced, and we produced them, and under the law, your Honor gave us an order that does not waive any work product.  This is not of the same nature, and so I want to caution the witness to answer as best she can, but this is getting close to the area of work product, and we do have a concern about airing that in a public court.

        THE COURT:  OK.  Thank you.  And I did issue the order that you just referenced.

        Mr. Shen, if you could just be careful.

        THE WITNESS:  Can the court reporter repeat the question?

        (Record read)

A.  I don't think that's a correct statement.

Q.  Ms. Benett, when did you learn about that event that you asked Mr. Jarrah about?

A.  I had heard rumors about it from sort of the periphery of

1    our work, not through anybody working with us or working with

2    the families, maybe a year or a year and a half.  I guess what

3    I would call sort of some chatter.

4    Q.  You said a year or a year and a half ago before the

5    deposition?

6    A.  I will confess that COVID has sort of -- it was certainly

7    before the deposition, but I don't remember if it was --

8    probably a year and a half before I think was the first time

9    that I had heard rumors of that.

10   Q.  That would have been at the beginning of 2020, roughly?

11   A.  I really am uncomfortable with the date.

12   Q.  We are just talking general time frames.  Roughly,

13   beginning of 2020?

14   A.  I don't know.

15   Q.  You said you had heard rumors.  Who had you heard rumors

16   from?

17           MS. KIRSCH:  So that's the same objection.  Maybe you

18   can describe generally the nature of the people from whom you

19   heard this, to the extent you can, but don't reveal any work

20   product.

21   Q.  Let me ask a new question.  Had you heard those, quote,

22   rumors from FBI agents who were working at the Kreindler firm?

23   That's a yes or no answer.

24   A.  Not from agents who were working at the Kreindler firm, no.

25   Q.  From agents who were working elsewhere?

LB2H9112                    Benett - Cross

1   A.   So, I did at one point hear that from a former FBI agent

2   who does not work at the Kreindler firm, but had come on board

3   to help with the families at one point, but that is not the

4   first place that I had heard this.

5   Q.   Where is the first place you heard it?

6   A.   It was in the course of our investigation, there were a

7   couple of people who came in the office and it was from them

8   that I had heard this.

9           THE COURT:   You don't need to give names, but I think

10   you can describe generally if these were staff people, if these

11   were people you had hired as consultants.

12           THE WITNESS:   They were outside people who had come

13   and asked and volunteered for a meeting with us.

14   Q.   Did they have documents about this event?   That's just a

15   yes or no question.

16           MS. KIRSCH:   It really isn't.   This case is all about

17   the investigation that the Kreindler firm has been doing in

18   order to build its case.   The absolute purpose that this

19   hearing ought not to serve is to allow the Kingdom to start

20   walking around into the work product processes and how they

21   conduct their investigation.

22           MR. SHEN:   That's not what we are intending to do,

23   your Honor.   This line of questioning goes directly to Mr.

24   Fawcett's stated basis for the leak, and when he found out

25   about that leak and when the firm knew about this information,

LB2H9112                    Benett - Cross

1   when the firm knew about it, is directly relevant to that.

2           MS. KIRSCH:  I would disagree that.  Perhaps there is

3   some relevance when Mr. Fawcett learned that information.

4   Those are questions that could be directed to Mr. Fawcett.  But

5   the Kreindler firm's work product, the people that they work

6   with in order to build their factual investigation, that is

7   just not appropriate for the adversary's counsel to put counsel

8   up on the stand and ask those questions.  That is very

9   irregular and it's inappropriate.

10          THE COURT:  What I do think is relevant is when the

11  firm had the information and who knew it at the time.  So I am

12  not going to require Ms. Benett to answer questions about who

13  provided that information or describe those people, but I do

14  think it is relevant, for the purpose of today's hearing, to

15  know when it was provided and whether or not there was a

16  document that might be on the firm's server that corroborates

17  the allegation.  So I do think that those two facts are

18  relevant for the purposes of the hearing.

19          MS. KIRSCH:  This is just me being not that smart.

20  What is the relevance of a document being on the server that

21  corroborates, and I think you mean the allegation against

22  Mr. Jarrah?

23          THE COURT:  Yes.  You're asking me?

24          MS. KIRSCH:  I was.  But I shouldn't, your Honor.  I

25  apologize.

LB2H9112                          Benett - Cross

1              THE WITNESS:  Given the colloquy, maybe I can

2        volunteer a response and see if that fits within the scope of

3        what the Court is --

4              THE COURT:  Sure.

5              THE WITNESS:  So, sometime shortly before the -- not

6        shortly, but sometime -- there were so many depositions that we

7        were managing and leading, especially up until the end of June.

8        At some point there was a former FBI agent who had been

9        involved and supervised the search of Musaed Al Jarrah's

10       computer, during which time his two agents recovered multiple

11       sexual images of minors that they believed had been saved on

12       the computer, and that they believed constituted knowing

13       possession of child pornography, that they then sent to the

14       National Center for Missing and Exploited Children because of,

15       apparently, a preexisting relationship between the Bureau and

16       the National Center when that sort of imagery is recovered

17       during the course of an investigation.  And I was told that

18       those agents had approached Mr. Jarrah in public with copies of

19       the images that they told him they had taken from his computer.

20             THE COURT:  I think the line of questioning is when

21       did you learn this information.  So I think you had said it was

22       about a year and a half before.  So these agents told you this

23       information about a year and a half ago?

24             THE WITNESS:  I'm sorry.  To be clear, the chatter,

25       the rumor, was maybe a year and a half ago, and that was not

LB2H9112                    Benett - Cross

1    from an FBI agent.  Then subsequently and shortly before the

2    deposition is when I learned this information that came from an

3    FBI special agent who had supervised the investigation into

4    Jarrah and specifically supervised the two agents who had

5    obtained the child pornography from his hard drive.

6             THE COURT:  Mr. Shen.

7    BY MR. SHEN:

8    Q.  You said that you had spoken directly to this agent?

9    A.  I have definitely spoken with this agent, yes.

10   Q.  That was before the Jarrah deposition, about these images?

11   A.  So, that actually may have been the day of the deposition.

12   It was -- I'm not sure if it was before or -- it was a two-day

13   deposition.  I don't know if it was before or maybe it was

14   during day one or day two.

15   Q.  But you had spoken to this agent before the deposition, is

16   that right?

17   A.  I don't know that that's right.

18   Q.  I am just asking for the best of your recollection.

19   A.  Then I will say I don't remember.  I don't think so.

20   Q.  And this agent, was he retained by the Kreindler firm, he

21   or she?

22   A.  The agent has done some work for the 9/11 families.  I

23   don't think this piece was connected to the work that agent had

24   done, but --

25             THE COURT:  When you say worked for the 9/11 families,

LB2H9112                        Benett - Cross

1   does that mean that the firm is paying him?

2           THE WITNESS:  Yes, of course.  Has worked with us on

3   behalf of the 9/11 families.  And I guess I should add, I am

4   saying that because he was interested in working with the

5   families; he had asked to work with the families.

6   Q.  When did this agent work for the Kreindler firm?

7   A.  I would have to, you know -- I am actually not -- I am

8   going to ask for the court's direction here because I do

9   feel -- I understand the importance with respect to Jarrah and

10  these images, but I'm not sure how much of this is within or

11  beyond, if it gets into work product about our investigation.

12          THE COURT:  I have already said that you can answer

13  questions related to when you or anyone else at the firm

14  learned this information.  And I think that's the nature of the

15  questions that Mr. Shen is asking.

16          THE WITNESS:  Could I hear the question back from the

17  court reporter?

18  BY MR. SHEN:

19  Q.  The question is, when did this former FBI agent work for

20  the Kreindler firm?

21          MS. KIRSCH:  With all due respect, I don't think

22  that's the same question.

23          MR. SHEN:  If it was before or after the deposition,

24  was he an employee to the Kreindler firm?

25          MS. KIRSCH:  I'm sorry.  I thought we just clarified

LB2H9112                    Benett - Cross

1     that what is relevant is when the Kreindler firm learned the

2     information, and when Ms. Benett learned the information, and

3     then perhaps if there is documentation.  But who is retained,

4     how they work with consultants, how they do their research, how

5     they pay them, when they paid them, that is work product, it is

6     not appropriate.

7              THE COURT:  Let's narrow in on when the firm received

8     the information.  To the extent there needs to be questions

9     about the nature of the firm's relationship at the time that it

10    learned this information, we can address that later.  But let's

11    focus now on when the firm learned the information.

12    BY MR. SHEN:

13    Q.  Ms. Benett, you said that a year to a year and a half prior

14    to the deposition you had heard rumors.  When had you first

15    heard more concrete evidence of the events that you asked

16    Mr. Jarrah about?

17    A.  So it was either shortly before or in the course of the

18    Jarrah deposition.

19    Q.  Were you shown documents?

20    A.  I was not.

21    Q.  Was anyone at the Kreindler firm shown documents?

22    A.  I wasn't shown documents.  I don't know if anybody else

23    was.

24    Q.  Was Mr. Fawcett, to your knowledge, aware of these rumors a

25    year or a year and a half ago before the deposition?

LB2H9112                    Benett - Cross

1    A.  I don't know.

2    Q.  Did you have discussions with him about it?

3    A.  Certainly, in the context of the Jarrah deposition, when I

4    had the information about the photographs, I do remember it was

5    in the middle of that deposition when the images themselves

6    were described to me.  I do think John Fawcett was around for

7    that.

8    Q.  So --

9    A.  I don't know.  He may have known before.  I just don't

10   know.

11   Q.  My question pertains to what you actually know.

12          Is it your testimony that the first time the images

13   were described to you were actually in the course of the

14   deposition?

15   A.  Yes.  So I had -- there was some sort of general suspicion

16   that this was a thing prior, a year and a half before that or

17   so.  Then there was more specific information that I learned.

18   I can't say that John Fawcett, when he did or didn't learn it.

19   But I learned in the course of the deposition, I was -- the

20   nature of the actual depictions of the child pornography taken

21   from Jarrah's computer were described to me.

22   Q.  So the FBI agent was actually in the Kreindler offices at

23   the time?

24   A.  I had got a message that described to me what those images

25   looked like.

1   Q.  Did the FBI agent know that you were in the process of

2   taking a deposition?

3           MS. KIRSCH:  And why is that relevant, your Honor?  I

4   am going to object to that.

5           THE COURT:  Sustained.

6   Q.  Was this FBI agent actually attending this deposition?

7           MS. KIRSCH:  I am going to object to that as well.

8           MR. SHEN:  What is the objection?  If we have somebody

9   who has not entered an appearance on the sheet listening in on

10  a confidential deposition.

11          THE COURT:  I think that that is relevant.  I will

12  allow it.

13          MS. KIRSCH:  OK.

14  A.  So there was, in the office next -- I was taking the Zoom

15  deposition in a room in our office by myself.  In that wing,

16  there were people who were walking, not in the office, not in

17  the Zoom room, not where the deposition was happening.  He was

18  one person who was there during that time, generally in the

19  office.  There were a number of other people, it was a weekday.

20  Certainly, nobody was in the Zoom room with me.

21  Q.  So you were in a separate Zoom room.  People were in

22  another room listening to the deposition, correct?

23  A.  What I am saying is that when I spoke with him, he was not

24  watching a deposition.  He was -- there is a corridor, there

25  are workstations.  I stepped out.  I had not met him before.  I

1    don't think I met him before.  He told me information.

2    Q.  But you don't know if he was watching the deposition in the

3    other room because you're taking a deposition by yourself?

4    A.  Right.

5    Q.  You don't know whether he is in the other room watching or

6    not, is that your testimony?

7         Let me ask you this.  Do you know whether he attended

8    that deposition and watched that deposition?

9    A.  I wouldn't be surprised if he did.  I was in a room taking

10   the deposition by myself.  How could I know where he was at the

11   very time that I am in that room?  I don't have any reason -- I

12   guess I don't have any reason to think that he didn't, but I

13   can't tell you that I was in there with him during the

14   deposition because I was taking the deposition in a room by

15   myself.

16   Q.  Does this person appear on the appearance sheet?

17   A.  I don't know.

18        MR. SHEN:  Let's put up the appearance sheet, please.

19   Exhibit 32.

20   Q.  We are on page 2.  That lists the attorneys from the

21   Kreindler firm.  Do you see that?

22   A.  Yes.

23        MR. SHEN:  Keep scrolling.  Keep going.  Keep going,

24   please.

25   Q.  There is also present.  Is this individual listed here?

LB2H9112                    Benett - Cross

1    A.  I do not see his name there.

2    Q.  Was it the practice of the Kreindler firm to have people

3    who did not actually make an appearance at these confidential

4    depositions to listen in on the depositions?

5    A.  Was it the practice to have them listen in on depositions?

6    Q.  Yes, ma'am.

7    A.  So, I mean, I don't think it was a practice to do that.  I

8    don't see his name there.

9    Q.  Did this person sign the FBI protective order?

10   A.  We have a chart of everybody who signed the protective

11   order, and we confirm before we give documents to them that

12   they have signed it.  If he sat in the deposition, he would

13   have had to sign it as well.

14   Q.  Not he would have had to.  Did he sign it, do you know?

15   A.  Andy, how can I know that?

16   Q.  You didn't check?

17   A.  Until today, you're telling me that he was sitting in the

18   deposition.

19   Q.  First of all, I didn't know he was sitting in the

20   deposition.  You testified --

21        MS. KIRSCH:  May I object for a moment?  There is a

22   confusion here.  Ms. Benett testified she was in a room by

23   herself.  Mr. Shen keeps asking questions about whether this

24   individual was in the deposition.  We haven't established that

25   he was or he wasn't.  Ms. Benett doesn't know.  I don't

1   understand why we are continuing this.  She doesn't know if he

2   was there.

3            MR. SHEN:  She testified it would not be surprising if

4   this individual was watching the deposition at the offices.

5   A.  My point is, if he was, he would have signed the protective

6   order.  You're saying, how could I not know if he signed the

7   protective order?  Andy, I don't know if he was in the room.

8   If he was in the room, he signed the protective order.

9            THE COURT:  All right.  I think Ms. Benett has

10  indicated, I believe she has testified that he spoke with her

11  or communicated with her somehow during the deposition in order

12  to provide this information.  But she doesn't know whether he

13  was actually listening to the deposition, and it would be the

14  practice of the firm that he would have signed the MDL order,

15  but he did not make an appearance at the deposition.  I think

16  those are the facts we have established.

17  BY MR. SHEN:

18  Q.  Let me just make sure I understand.

19  A.  Can I just to Judge Netburn's --

20           THE COURT:  No.

21  Q.  Sitting here today, you don't know whether he signed the

22  FBI protective order, correct?

23  A.  I have recently looked at them.  It is true I cannot

24  remember.  I have looked recently at the entire file of

25  everybody who has signed the FBI protective orders.  I believe

LB2H9112                    Benett - Cross

1   he has, but I can't say with absolute certainty, without

2   looking at that file, sitting here on the stand right now.

3   Q.  And you don't know sitting here today whether he agreed to

4   abide by the MDL protective orders, correct?

5   A.  If he had access to any MDL protected information, he

6   absolutely would have had to review and agree to the MDL

7   protective order.

8   Q.  That's not my question.  The question is, do you know

9   sitting here today?

10  A.  So, just to be clear, your question is, irrespective of

11  whether he looked at protected material, did he review the

12  protective order?

13  Q.  Do you know whether he looked at and agreed to abide by the

14  MDL protective order?

15  A.  If he was given MDL protected materials, yes.

16  Q.  But you don't know that, correct?

17  A.  I mean --

18  Q.  I am asking if you know if he looked at and agreed to abide

19  by it.  Do you know if he did that?

20  A.  If he was given MDL protected materials, he looked at it

21  and agreed to abide by it because that was our practice.

22  Q.  But you don't know one way or another whether he did?

23  A.  I know with 100 percent certainty that if he looked at MDL

24  protected materials, he reviewed and agreed to abide by the MDL

25  protected material because that is what our practice was.

LB2H9112                    Benett - Cross

1    Q.  Ms. Benett, did you discuss the content of the deposition,

2    the Al Jarrah deposition, with this individual during the

3    course of the deposition?

4    A.  I did not.

5    Q.  You didn't discuss any portion where you were asking

6    Mr. Jarrah about the content of images found on his computer?

7           MS. KIRSCH:  Objection.  I don't think there has been

8    any testimony that Ms. Benett asked about the content.  Ms.

9    Benett said she was told about the content.

10          THE COURT:  Well, we know that she asked Al Jarrah

11   about the content.

12          MS. KIRSCH:  I am talking about the agent at the time.

13   The question said, did you -- you can read it back.  I believe

14   the question was, Ms. Benett, when you were asking the agent

15   for information, did you reveal the content of the Jarrah

16   deposition?  It was a misstatement of the testimony that we had

17   so far, and I object to it.

18          MR. SHEN:  Ms. Benett testified shortly before the

19   deposition, or at the deposition, she discussed the specific

20   issue with the FBI agent, and the FBI agent described to her

21   the specific images on the computer.  That's her testimony.

22          MS. KIRSCH:  And my objection is Ms. Benett should be

23   giving the testimony, not Mr. Shen.  It would be a lot easier,

24   particularly since I don't have realtime here.

25          THE COURT:  Well, I believe that Ms. Benett has

LB2H9112                   Benett - Cross

1    testified that either just before the deposition or during the

2    deposition this individual provided her with this information.

3    And Mr. Shen's question was, did you discuss with this

4    individual the content of the Al Jarrah deposition?

5            MS. KIRSCH:  Which was answered.

6    A.  I was approached and was told about the descriptions of the

7    images in the middle of the deposition.  It was not a response

8    to a question from me.

9    Q.  That wasn't my question.  Did you discuss the content of

10   the Al Jarrah deposition with this individual during the course

11   of the deposition?

12   A.  I did not.

13   Q.  Did you discuss the content of the deposition with him

14   after the deposition?

15   A.  We certainly discussed the child pornography.  We

16   discussed -- I had questions about how they got the computer,

17   the basis of the search, sending the images to the National

18   Center for Missing and Exploited Children.  So we had certainly

19   spoken about the sexual images of minors on Jarrah's computer

20   after the deposition.

21   Q.  That wasn't the question, Ms. Benett.  Did you discuss what

22   Mr. Jarrah testified to with this individual after the

23   deposition?

24   A.  It's a little hard to parse out because all of my

25   conversations with him have been about the child pornography.

LB2H9112                    Benett - Cross

1    Q.  So you may or you may not, you just don't know sitting here
2    today, is that your answer?
3    A.  We certainly have had follow-up conversations about the
4    child pornography on Jarrah's computer, and what the steps
5    were, ordinary practice were, etc., that may well have
6    implicated some of the testimony.  I don't want to say no, but
7    I know that my conversations have been primarily focused on
8    what he knew and what he was volunteering.
9    Q.  At the time, was he an employee or retained by the
10   Kreindler firm?
11   A.  I don't know if he -- I don't know if he was right then.
12   I'm not sure.
13   Q.  Now I am going to switch to a different topic, Ms. Benett.
14          You're aware that after the leak to Mr. Isikoff, the
15   Kingdom of Saudi Arabia filed a request with the court to see
16   certain discovery pertaining to that leak, correct?
17   A.  Yes, I am aware of that.
18   Q.  And you're aware that the PECs responded to that letter,
19   correct?
20   A.  Yes.
21   Q.  And you have been in the courtroom while we discussed the
22   response with other witnesses.
23          My question for you is, did you do any investigation
24   of the leak prior to the initial response on July 29?
25   A.  Me, personally?

LB2H9112                    Benett - Cross

1    Q.   You, personally.

2    A.   I was out of town.  I was on the West Coast at that time.

3    I was on the phone calls, internal phone calls, and PEC's phone

4    calls, but my role in the investigation wasn't really

5    until -- I helped with the declarations initially, obviously,

6    but then not until September.

7    Q.   So, in submitting the July 29 letter to the court, the

8    Kreindler firm relied upon the investigation that was done by

9    Mr. Hartney and by Mr. Maloney, is that correct?

10   A.   I think that's fair to say.

11   Q.   Now, as of that July 29 letter, had anyone asked Mr.

12   Fawcett to submit a declaration to the court?

13   A.   No.  We, in fact, as you know, the Kreindler team itself

14   didn't submit declarations at that time.  We thought that it

15   was frankly not -- we were waiting for the court to provide

16   guidance.  We did not think it was appropriate for opposing

17   counsel, for the Kingdom to be directing the process.  We were

18   concerned that it would inevitably turn into an opportunity to

19   dig through our files and to get into our work product.  We did

20   not prepare declarations for anyone, and we wanted to wait for

21   the court to issue an order to guide the process.

22   Q.   When is the first time that the Kreindler firm prepared a

23   declaration for Mr. Fawcett?

24   A.   So probably it would be when I became involved or more

25   involved.  There was the August 30 order that wanted the

LB2H9112                    Benett - Cross

1   supplemental declarations.  So certainly at that point I would

2   have been putting them in place.

3   Q.  Let me pause there.  So prior to August 30, no one had gone

4   to Mr. Fawcett and asked him to submit a declaration and

5   presented him with a draft declaration, to your knowledge?

6   A.  I hadn't.

7   Q.  After August 30, when is the first time that someone went

8   to Mr. Fawcett and presented him with a draft declaration?

9   A.  So from August 30 up until September, the court had issued

10  an order.  So there is the Yahoo! News motion to intervene that

11  stayed the August 30 date.  I had started declarations as of

12  the August 30 order and then things were on hold.  And then I

13  went back to it, with the court's Thursday, September 23 order.

14          So I don't know exactly when within that time frame I

15  would have started, but I certainly -- I think right around

16  August 30 I had conversations with everybody about the fact

17  that we would be preparing declarations.

18  Q.  Did you have conversations with Mr. Fawcett on August 30?

19  A.  I believe so.  My recollection is that what I did was to

20  talk to everybody who would be filing declarations

21  individually.

22  Q.  Did you ask him at the time whether he had sent the

23  transcript to Mr. Isikoff?

24  A.  I went through what the questions were that we would have

25  to be responding to, and that I was asking if -- I said,

LB2H9112                     Benett - Cross

1   essentially, based on our prior investigation, here is the

2   question that I am going to put in there and here is the

3   answer, is that correct?

4   Q.  And he said it was correct that he had not leaked the

5   transcript to Mr. Isikoff?

6   A.  So, I don't know that he said that expressly.  I know that

7   by the time I presented him with the declaration that was what

8   it said and he had it.

9   Q.  You don't recall him around that time actually telling you

10  he had not sent the transcript to Mr. Isikoff?

11  A.  I don't recall that.

12  Q.  So, do you actually recall when the first time you

13  presented a declaration to Mr. Fawcett?

14  A.  I don't recall if this was the first time.  I recall the

15  sequence of September 24th to the 27th -- sorry, 23rd.  I think

16  the order on Yahoo! News was Thursday, September 23rd, that

17  then said the August 30 declarations had to be submitted by

18  Monday, September 27.  So either that night or maybe the next

19  morning I sent an e-mail to everybody, we are going to have to

20  provide the declarations, here is what we worked on, here is

21  everybody's draft.  You have the e-mail.  You know what it

22  says.  It has to be 100 percent accurate under penalties of

23  perjury.  Give me any edits, I will call you to discuss.  Some

24  of them had to be wet signatures because they were nonlawyers.

25            I was home because I had a teenager who tested

LB2H9112                    Benett - Cross

1    positive for COVID and I had an unvaccinated younger kid who

2    had to quarantine for 14 days, so I couldn't go to the office.

3    Anyway, the Thursday or Friday communication was, we have to

4    make sure we can get this all done over the weekend and submit

5    it on Monday.

6    Q.  Just so I understand the sequence of events, the court

7    issues an order denying Yahoo! News' motion to limit the scope

8    of the declarations.  After that order comes out, you prepare

9    the declarations, and it's between that date and the 27th when

10   you first approach Mr. Fawcett and show him the draft

11   declaration?

12   A.  I don't think that's entirely correct because I had started

13   declarations prior to the September 23rd order.

14   Q.  All I am trying to figure out is when you first showed Mr.

15   Fawcett the declaration.

16   A.  No.  I just said that I had started the declarations.  I

17   don't know that that is the same time that I showed Fawcett his

18   declaration.

19   Q.  Fair enough.  The first time you showed Mr. Fawcett a

20   declaration was after the court denied Yahoo! News' motion?

21   A.  I can't recall.  I know by that time everybody had what I

22   thought would be a final declaration in hand.  So from August

23   30 on, I knew we would be preparing these declarations.  I

24   talked to everybody.  I worked on the declarations.  I don't

25   know if I had all of them drafted before the 23rd, but I

LB2H9112                    Benett - Cross

1    certainly didn't start on the 23rd.  I don't recall if I gave

2    John Fawcett a draft of his before the 23rd or not.  Certainly,

3    by September 24th, I would have sent it to him.

4    Q.  But prior to September 23rd, you don't recall sitting here

5    today actually presenting a draft to Mr. Fawcett and Mr.

6    Fawcett saying that he would sign a declaration saying that he

7    had not sent the transcript to Mr. Isikoff?

8    A.  That's correct.  I do not recall that conversation.

9    Obviously, everybody knew before that, because of the August 30

10   order, we would be doing declarations.  I spoke to everybody

11   about their declarations.  I had no reason to believe prior to

12   that that John Fawcett was not going to sign his declaration.

13   He gave me no indication that he had any concern about the

14   declaration I was preparing for him.

15   Q.  After you showed him the declaration that you prepared,

16   which actually said that he did not send the transcript to

17   Mr. Isikoff, did he tell you that he would sign that

18   declaration?

19   A.  So, on September 27th, I had called John a couple of times

20   over the weekend because I had most of the signed declarations

21   back already.  I did not yet have his.  Like I said, I had a

22   seven-year-old in remote school, a quarantined teenager.  I did

23   not want to wait for Monday morning.  So my recollection is

24   that I contacted John over the weekend to try to get the signed

25   declaration.  I know I did not hear from him about that.

1  Q.  He just never responded to your calls?

2  A.  I don't remember if it was a text or a call or if it was

3  more than one call.  I feel like I called him twice and got his

4  voice mail.  He has a voice mail and when it picks up, it

5  sounds like he is there on the phone.  It says, Hey, it's John,

6  and then you start talking and it's a voice mail.  I know that

7  I got that voice mail at least once, maybe twice.  I left

8  messages.  I know the message was, let me know if you have any

9  concerns or changes.  I just need to get this done before

10  Monday.

11          On Monday morning --

12  Q.  This is the 27th?

13  A.  The 27th.  I had prepared a cover letter to cover all the

14  declarations.  I had wanted to at the time address some of what

15  I had felt were unfair suggestions that the Kreindler firm was

16  behind the leak.  I had for two and a half months been

17  confident that we had nothing to do with it.  I was putting all

18  the documents together.  I was working with my secretary who I

19  think was remote that day as well.  And I got a call around 10

20  or 10:30 in the morning from John Fawcett who said to me, I

21  can't sign my declaration.

22  Q.  Now, before he called you at 10:30 in the morning saying he

23  can't sign the declaration, had he ever told you before that

24  that he would sign the declaration?

25  A.  I don't know if he used those words.  I certainly had no

LB2H9112                    Benett - Cross

1    reason to -- he never gave me any indication that he wouldn't.

2    From August 30 on, we knew that we had to submit a declaration,

3    including one from him.  He knew that I was preparing them.  I

4    had spoken to him about preparing them.  He never did anything

5    to suggest to me that he would do anything other than sign and

6    return it.  I think I even made sure he had a printer at home

7    because he would have to do a wet signature.  I even made sure

8    he had a printer at home so that he could print it and scan it

9    and send it back to me.

10   Q.  OK.  So you just don't remember whether he told you

11   beforehand that he explicitly told you that he would not sign

12   the declaration?

13   A.  I can tell you --

14   Q.  You have an impression, but you don't remember

15   specifically?

16   A.  He never told me he would not sign the declaration until

17   10:15 on Monday, September 27th.  Up until then, he may not

18   have said, yes, I will sign it.  I feel like we probably had a

19   conversation where he said no problem.  I don't know what he

20   was thinking that weekend.  I don't know what he was thinking

21   for the last two months.  I don't know what was going through

22   his mind.  But every indication, leading up to 10:15 on Monday

23   September 27th, was that I was getting a signed declaration

24   from John Fawcett that said, not only I didn't leak it, but I

25   have no idea who leaked it.  Because we didn't know until that

LB2H9112                      Benett - Cross

1  Monday that it had come from John Fawcett.

2  Q.  Did he tell you how he sent it to John Isikoff?

3  A.  He did eventually, yes.

4  Q.  Did he tell you on the 27th?

5  A.  He did not.

6  Q.  Did you ask him?

7  A.  The 27th --

8  Q.  If you can answer my question.  Did you ask him?

9  A.  Let me think about it for a moment.  Because the 27th was a

10 very wild day, trying to go back and make sure that we hadn't

11 missed something, completely reversing our position with the

12 court, to which we now knew we had to that day, and as quickly

13 as possible, bring to her attention that the breach had come

14 from John Fawcett.  I was busy changing everybody's declaration

15 because I could no longer have anybody say that we didn't know

16 who sent the declaration.  I was worried we might have missed

17 something so I was talking to other folks about the search that

18 we had done.  I was --

19 Q.  Can you just focus on my question, please?  Did you ask him

20 how he sent it?

21 A.  I don't think I asked him that day, but given everything

22 else that was going on, I don't recall.  I feel like if I had

23 asked him that day, it would have been in what I submitted that

24 day.

25 Q.  So sitting here today, you don't recall doing that?

LB2H9112                     Benett - Cross

1    A.  I don't recall if it was that day.  I know that on

2    September 30, I had a long conversation with him about how he

3    did it.

4    Q.  Did you ask him whether he had disclosed to Mr. Isikoff

5    other information, including what happened at the Bayoumi and

6    Thumairy deposition?

7    A.  He told me on the 27th that he had never done anything like

8    that before.

9    Q.  Did you ask him about the specific reference in

10   Mr. Isikoff's article about the Bayoumi and Thumairy deposition

11   and what occurred?

12   A.  I did not.

13   Q.  Did you ask at that point whether he had conferred with

14   counsel?

15   A.  I don't think I did.

16   Q.  Did you learn that he had conferred with Liz Crotty at some

17   point about this issue?

18   A.  The first time I learned that he had spoken to Liz Crotty

19   over the course of that summer was when I looked at the call

20   logs.

21   Q.  When did you look at the call logs?

22   A.  Whenever they were produced in the context of this.

23   Q.  So sometime this week was the first time?

24   A.  Well, I mean, I guess it would have been last week.

25   Q.  This week?

LB2H9112                     Benett - Cross

1   A.  Today is Tuesday.

2   Q.  You're right.  I think it was last week.

3           So on the 27th you did not know that Mr. Fawcett had

4   not disclosed to you that he had been conferring with legal

5   counsel?

6   A.  I did not.  I'm assuming from the privilege log and your

7   description.  I shouldn't say confer with counsel.  I didn't

8   know that he had a call with Liz Crotty.

9   Q.  When is the last time you spoke with Liz Crotty?

10  A.  There is a weekend in October, I was out in Oregon where my

11  family is, and I got a call from Liz, who I am friendly with,

12  and I had not spoken with her since the primary election.  She

13  called me.  I wished her my condolences on the loss.  We

14  happened to know several other people who were candidates for

15  the DA's election so we had a conversation about that.  Then

16  she asked me -- she told me that John had reached out to her,

17  and she asked me if I thought she had a conflict of interest in

18  representing him.  I said, I really can't talk to you about

19  that.  I suggested she call Emily, and I don't know if she did.

20  Q.  You said that was in October that you ran into her?

21  A.  I didn't run into her.  It was a phone call, and it would

22  have been whatever that fall holiday weekend.

23  Q.  Say that again.

24  A.  It would have been that fall holiday weekend.

25  Q.  In early October?

LB2H9112                          Benett - Cross

1    A.   Whatever the three-day weekend is in October.

2    Q.   She told you at that point in time that Mr. Fawcett had

3    reached out to her about legal advice?

4    A.   So, as soon as she said John's name, I told her I couldn't

5    talk with her about it.  She said all she wanted to know if I

6    thought she had a conflict of interest.  I said, I can't talk

7    to you about that.  I don't know if she called Emily.  I don't

8    know if she spoke with anybody else.

9    Q.   Let's look at 56J.  This is Mr. Fawcett's declaration.

10          Now, Ms. Benett, you and Mr. Pounian actually drafted

11   this declaration, correct?

12   A.   I formated this.  September 27, John had the declaration

13   that I had drafted.

14   Q.   Can you say that again?

15   A.   September 27, that morning, John had the declaration I had

16   drafted.  After he called me, obviously, we could not submit

17   what I had drafted for him.  He sent me a document that he

18   wrote, as far as I know.  I certainly wasn't involved in

19   writing it.

20   Q.   I don't need the chronology now.  I am just asking you, did

21   you draft his declaration in front of you?

22   A.   I formated it.  I did not write the words.

23   Q.   Did Mr. Pounian write the words?

24   A.   I don't know.

25   Q.   Let's take a look at Exhibit 108, please.

1              Exhibit 108 is an e-mail.  I will represent to you

2    that the metadata says that it's from Mr. Kreindler to yourself

3    and Ms. Benett on September 27, 2021, at 12:20.

4              MS. KIRSCH:  I am sorry.  You may have misspoke.

5    Mr. Shen may have misspoke.  What does the metadata say?

6              MR. SHEN:  It's from Mr. Fawcett.  I'm sorry if I

7    misspoke.  It's from Mr. Fawcett.

8              MS. KIRSCH:  I will just state for the record I don't

9    know what the metadata says.  We have produced another version

10   of this document that has the "from" line.  I don't know why

11   that came up the way it did.

12             THE COURT:  OK.

13             MR. SHEN:  We are going to move this into evidence.

14             THE COURT:  Any objection?

15             MS. KIRSCH:  I don't have an objection.  There is

16   another copy of this that is a complete document.

17             THE COURT:  Accepted.

18             (KSA Exhibit 108 received in evidence)

19   Q.  This is an e-mail to you and Mr. Pounian.  108A is the

20   attachment that is referenced at that declaration.

21             Is this the declaration that Mr. Fawcett had drafted

22   and sent to you and Mr. Pounian?

23   A.  I don't see 108A.

24             THE COURT:  Can you put up A.

25             There we go.

LB2H9112                    Benett - Cross

1    Q.  Do you recognize this as the declaration that Mr. Fawcett

2    drafted himself and sent to you?

3    A.  Yes, that looks like it.

4    Q.  If we focus on the first paragraph there, he says that he

5    had sent a redacted portion of the transcript to Mr. Isikoff.

6    Do you see that?

7    A.  Yes.

8    Q.  And he says that the redacted portions relate to the

9    sections of the deposition which were taken subject to the FBI

10   protective order.  Do you see that?

11   A.  Yes.

12   Q.  So he says that he sent essentially the entire transcript,

13   except for portions which were redacted for the FBI protective

14   order, correct?

15   A.  I don't know.

16   Q.  I am just asking what the language says.

17   A.  The language says the redacted portions related to the

18   sections of the deposition which were taken subject to the FBI

19   protective order, and irrelevant to the issue at hand, evidence

20   of Jarrah's use of child pornography.

21   Q.  Ms. Benett, there is nothing in this -- if we can look at

22   the entire screen -- there is nothing in this draft declaration

23   that he sent you stating his personal motivations, his family

24   motivations, for the leak, correct?

25   A.  No, I don't see any of that there.

LB2H9112                      Benett - Cross

1    Q.  Let's look at Exhibit 109.  This is an e-mail from Mr.

2    Pounian to yourself, September 27, 1:41 p.m.

3            109A is the attachment, which we will show on the

4    screen in a minute.

5            MR. SHEN:  We are going to move this into evidence as

6    well.

7            THE COURT:  Any objection?

8            MS. KIRSCH:  No objection.

9            THE COURT:  Admitted.

10           (KSA Exhibit 109 received in evidence)

11   Q.  If we focus on 109A, did Mr. Pounian completely rewrite the

12   declaration?

13   A.  I don't know.

14   Q.  Do you know if he starts from scratch and wrote on a new

15   Word document what is appearing on 109?

16   A.  I don't even know if Steve wrote this.  All I know is that

17   he sent it to me.

18   Q.  You didn't ask him?

19   A.  I talked to John after I got the final draft.

20   Q.  My question is, did you ask Steve Pounian if he wrote this?

21   A.  No.

22   Q.  Now, you received the declaration that Mr. Fawcett had sent

23   you earlier in the day, correct?

24   A.  Yes.

25   Q.  And you read it, correct?

1    A.   Yes.

2    Q.   Then you read this declaration that Mr. Pounian had sent

3    you, correct?

4    A.   Yes.

5    Q.   Did it appear to you at that point that Mr. Pounian had

6    drafted the entire declaration from scratch?

7    A.   I don't know.  I don't know if Steve drafted it.  I don't

8    know if John worked on it.  I don't know if John talked to

9    other people and then redrafted it.  I just don't know how this

10   all unfolded.  I don't think it looks like Steve completely

11   redrafted it.

12   Q.   Let's look at the draft that Mr. Pounian sent to you and to

13   nobody else.

14        He writes here in the first paragraph that the

15   redacted portions of the deposition I sent to Michael Isikoff

16   were limited to Jarrah's possession of child pornography.

17        Do you see that?

18   A.   Yes.

19   Q.   That's not what Mr. Fawcett said in his declaration that he

20   drafted, right?

21   A.   I guess then that, since we obviously didn't know what had

22   gone to Isikoff, maybe that was something -- I think that we

23   had believed that it was from the article.

24        Anyway, what was the question?

25   Q.   The question is, Mr. Pounian had changed the language in

1   the declaration and he now says that the transcript that was

2   sent was limited to those images, correct?

3   A.  I just don't know that Steve did this.  You can ask him.

4   Q.  You didn't ask him why that language is so dramatically

5   different than the version Mr. Fawcett sent over?

6   A.  I did not.

7   Q.  And Mr. Pounian's version that he sent you at the bottom

8   talks about a personal interest because Mr. Musaed Al Jarrah,

9   it says that he was a diplomat in Morocco.

10           Do you see that?

11  A.  Yes.

12  Q.  And that personal interest doesn't appear in Mr. Fawcett's

13  declaration that he drafted, correct?

14  A.  It doesn't.  I mean, I knew that John was --

15  Q.  If you could just answer the question, Ms. Benett.

16           Did you know that Mr. Pounian had inserted and drafted

17  that language?

18  A.  I don't know that Steve did that.

19  Q.  We can look at Exhibit 110, please.

20           This is an e-mail chain between yourself and Mr.

21  Pounian, 1:47 p.m.  You are responding to the prior draft that

22  Mr. Pounian has sent you.  110A is the actual exhibit.

23           MR. SHEN:  I am going to move this into evidence.

24           THE COURT:  Any objection?

25           MS. KIRSCH:  No objection.

1           THE COURT:  It's accepted.

2           (KSA Exhibit 110 received in evidence)

3   Q.  You actually write back to Mr. Pounian and say "it's good,"

4   right?

5   A.  It was totally consistent with what I knew John's concerns

6   had been about Jarrah.

7   Q.  I am just asking you what the document says.  You write

8   back to him and says "it's good," right?

9   A.  I thought it was a good reflection of what I knew John's

10  concerns had been, yes.

11  Q.  And then you say, "I have also made some edits to the

12  declaration.  See the attached."  Right?

13  A.  Yes.

14  Q.  If we look at the attachment, you have elaborated on Mr.

15  Fawcett's personal interest in why he leaked the transcript.

16  That's your language that you inserted there, right?

17  A.  Well, I have to see it first.

18           Oh, you know what --

19  Q.  Is that your language that you inserted?

20  A.  Andy, I typed the words.  It's not really my language

21  because I knew from my conversations with John that his concern

22  with Jarrah being in Morocco was based in part on his

23  background in global humanitarian work.

24  Q.  I am not asking if it's true or not.  I am just asking if

25  you drafted the language.

LB2H9112                     Benett - Cross

1    A.  You asked me if it was my words.  I did type them, but I do

2    believe that I took that based on what I had learned from John.

3    Q.  Now, we know Mr. Fawcett's declaration that he sent over

4    had nothing about his personal interests.  And then you and Mr.

5    Pounian are exchanging drafts where you try to justify his

6    leak, correct?

7    A.  So, over the course of September 27, there were many

8    conversations with John.  The first was the one that I

9    described where I learned --

10   Q.  If you could just answer my question, Ms. Benett.  Were you

11   trying to justify Mr. Fawcett's leak to Isikoff by drafting the

12   language in his declaration stating that he had a personal

13   interest?

14   A.  First of all, there is no justification for the leak.

15   There was no effort to justify this.  It was an explanation.  I

16   couldn't understand why he would have done it.  And this to me,

17   when I had further conversations with John that day, it in no

18   way excuses what he did, but it provided context to me to

19   understand what he believed he had to do.

20   Q.  That may be the case, but you are actually inserting that

21   purported context in a declaration that is going to be

22   submitted to the court, right?

23   A.  I was working with John and trying to get it finalized for

24   the court on Monday, September 27.

25   Q.  Let's look at Exhibit 112, please.

LB2H9112                    Benett - Cross

1          Exhibit 112 is an e-mail from you to Justin Green at

2    the Kreindler firm.  It's dated September 27 at 2:15.  It

3    attaches a draft of the Jarrah declaration.

4          Who is Mr. Green?

5    A.  Justin is sitting there to your left.

6    Q.  Who is he?

7    A.  He is a partner at my law firm.

8    Q.  Is he a managing partner?

9    A.  Well, he would like to think so.

10   Q.  Was he consulted on this leak issue?

11   A.  As soon as I found out -- sorry, Noah.  As soon as I found

12   out about the leak, I called Justin and I alerted the partners.

13   Q.  Did you tell Mr. Green that you and Mr. Pounian were

14   drafting the language of Mr. Fawcett's declaration that would

15   be submitted to the court?

16   A.  I disagree with that because I wouldn't say that we were

17   drafting the language.

18   Q.  Hold on.  You told us that you didn't know if Mr. Pounian

19   drafted the language, right?  That's what your testimony was?

20   A.  Could you read back the other question?  The question you

21   asked, Andy, that I am trying to answer is, did I tell Justin

22   that Steve and I were drafting this language.

23   Q.  That's a yes or no question.  Did you tell him that?

24   A.  No.

25   Q.  Did you tell Mr. Green that you had drafted the portion of

LB2H9112                    Benett - Cross

1   the language attempting to justify the breach of the protective

2   order?

3           MS. KIRSCH:  Objection.  We already had testimony that

4   she says there is no justification.  Mr. Shen is trying to put

5   words back in her mouth again.  It's inappropriate.

6           THE COURT:  Mr. Shen, can you rephrase the question,

7   please?

8   Q.  Did you tell Mr. Green that you had drafted the portion of

9   the declaration that attempts to explain why Mr. Fawcett had a

10  personal interest in the leak?

11  A.  I told Justin what I learned that day about John's

12  motivations.  I told Justin --

13  Q.  That's not the question.  Did you tell him you drafted that

14  portion of the declaration?

15  A.  I don't really agree with the characterization.  But since

16  the answer is I don't know, or I don't recall, I will just go

17  with I don't recall.

18  Q.  Did Mr. Green provide you edits to the declaration?

19  A.  No.

20  Q.  Did he provide any commentary?

21  A.  I mean, honestly, I am -- obviously, I did send it to

22  Justin.  I think I sent it to him so the partnership knew what

23  was going to be submitted.

24  Q.  You don't recall if Mr. Green gave you any comments?

25  A.  I can't imagine we would get into that.

LB2H9112                    Benett - Cross

1   Q.  Did he sign off on the fact that it was OK to submit this

2   declaration to the court?

3   A.  I don't think I asked for permission.

4   Q.  Exhibit 118, please.

5          Exhibit 118 is an e-mail between you, Mr. Fawcett, and

6   Mr. Pounian.  Mr. Pounian is sending back a draft of the

7   declaration at 6:53 p.m.  The attachment is at 118A.

8          Do you see that?

9   A.  I don't see the attachment.

10  Q.  Now, do you recall that after you and Mr. Pounian had gone

11  through and drafted portions or revised portions of the

12  declaration, you then sent that draft back to Mr. Fawcett?

13  A.  Yes.  Obviously, what John sent me initially I had to

14  format in any event.  Certainly, we would have sent it to him.

15  We had to get back his signature.

16          MR. SHEN:  I am going to move this document in

17  evidence.

18          MS. KIRSCH:  No objection.

19          THE COURT:  Accepted.

20          (KSA Exhibit 118 received in evidence)

21          MR. SHEN:  Can we look at Exhibit 121.

22          I'm sorry.  Exhibit 120, please.

23  Q.  Exhibit 120, at 7:34 p.m. Mr. Fawcett sends an e-mail back

24  to you -- back to Mr. Pounian and attaches a declaration with a

25  few redlines.  I notice that you're not on the top e-mail here.

LB2H9112                    Benett – Cross

1          Did you receive a copy of the edits that Mr. Fawcett

2    had made to the declaration?

3          If we can look at 121, that's the attachment.

4    A.  I don't recall, but this looks like the final version so I

5    must have.

6          MR. SHEN:  I am going to move these two exhibits into

7    evidence.

8          THE COURT:  Any objection?

9          MS. KIRSCH:  122 and 122A?

10         MR. SHEN:  It's 120 and 121.

11         MS. KIRSCH:  No objection.

12         THE COURT:  It's admitted.

13         (KSA Exhibits 120 and 121 received in evidence)

14   Q.  Focusing on the actual redlines that Mr. Fawcett sent back,

15   he takes out language that says, "Until today, I told Kreindler

16   & Kreindler that I did not know how Mr. Isikoff had obtained

17   the transcript."

18         Do you see that?

19   A.  Yes.

20   Q.  Did you ever ask him why he took out that language?

21   A.  I don't know if I talked to him again.  I told him we

22   needed the computer, but I am not sure that I even spoke with

23   him again.  What time was that e-mail?

24   Q.  This was at 7:34 p.m.

25   A.  I probably didn't even speak with him again.

LB2H9112                    Benett - Cross

1    Q.  Is it curious to you that Mr. Fawcett didn't want to tell

2    the court that, I had told Kreindler & Kreindler that I did not

3    know how Michael Isikoff had obtained the transcript?

4    A.  I don't know if he took that out.  I know that I asked

5    Steve and Duke to confirm that he had been -- that Fawcett had

6    been asked directly and that that was an accurate statement.

7    And we believed that was an accurate statement.  I guess

8    Fawcett took it out.  I don't know why.

9    Q.  You're not aware of anybody asking Mr. Fawcett why he took

10   out that language?

11   A.  I don't think I did.  I don't know if anybody else did.

12   Q.  You didn't talk to Mr. Pounian about this edit?

13   A.  I don't know if we talked about that edit.  We definitely

14   talked about Steve -- I know back in -- I had a conversation

15   with Steve who was working closely with John.  I had a

16   conversation with Steve in July, and I was on the West Coast,

17   about asking John directly.  He told me he asked John if he had

18   released the transcript.  John told him, no.  So when this came

19   out, I may have said to Steve, am I remembering this correctly?

20   Didn't John tell us directly that he didn't provide the

21   transcript and he didn't know how Mr. Isikoff had gotten the

22   transcript?  My recollection is that Steve had confirmed what I

23   understood Fawcett to have said before, so I don't know why he

24   would have taken that out.

25   Q.  You don't know if Mr. Pounian asked Mr. Fawcett?

1  A.  I don't know.  I don't recall if we talked about whether

2  Steve was talking about that with John.  I imagine they had

3  talked about that, but I don't recall.

4  Q.  If we can just scroll down to paragraph 4.  You see that

5  there is language that says, "I had a personal interest."

6          Do you see that?

7  A.  Yes.

8  Q.  That's the language that we looked at in the prior exhibits

9  that you and Mr. Pounian had drafted, correct?

10  A.  What we looked at in the prior Fawcett draft, yes.

11  Q.  That's the language that was ultimately submitted to the

12  court, correct?

13  A.  It looks like it.

14  Q.  Now, let's look at Exhibit 58, please.  This is your

15  September 30, 2021 letter to the court.

16          You drafted this letter, correct?

17  A.  Yes.  This is the September 30 letter, yes.

18          MR. SHEN:  We are going to move this document into

19  evidence as well.

20          MS. KIRSCH:  No objection.

21          THE COURT:  Admitted.

22          (KSA Exhibit 58 received in evidence)

23  Q.  This letter actually attaches another declaration from Mr.

24  Fawcett, correct?

25  A.  I believe so.

LB2H9112                    Benett - Cross

1    Q.  Did you and Mr. Pounian draft the second declaration that

2    Mr. Fawcett had prepared?

3    A.  My recollection of the September 30th one is that I was on

4    the phone with John Fawcett who walked me through what he had

5    done.  I don't have the declaration in front of me, if you're

6    going to ask me questions about it.  My recollection is that I

7    was in the office that day.  I was on the phone, I believe I

8    was on the phone with John Fawcett.  He walked me through what

9    he had done.  I typed up that supplemental declaration and sent

10   it to him to look at.

11   Q.  You were the one who actually drafted the declaration, you

12   drafted the language in the declaration, correct?

13   A.  I disagree with that.  I literally on the phone had it on

14   speaker so I could type what he was telling me.  Yes, I typed

15   it, but I didn't know anything about how he had done this.  He

16   gave me the language.  He told me what he did.  I had questions

17   and I asked him things like -- I didn't even know about

18   ProtonMail before September 30.  It was a long call to try to

19   understand what he did.  And, yes, I typed it.

20   Q.  Did you or anyone else at the Kreindler firm purport to

21   give Mr. Fawcett any legal advice with respect to his September

22   27 declaration or his September 30 declaration?

23   A.  No.

24   Q.  Did you suggest to him at any point in time that he should

25   retain counsel in connection with those two declarations, not

1   later, but just in connection with those two?

2   A.  I don't recall doing so.  My answer is no.

3   Q.  Did you explain to Mr. Fawcett at the time that his

4   interest and the firm's interest may not be aligned?

5   A.  There was a conversation where he was apologizing and

6   deeply upset.  I did not have that sort of formal conversation

7   with him.  It wasn't until the court's October 4 order that I

8   said to him, you should get your own lawyer.

9   Q.  You had no discussions with him at all about any potential

10  conflicts of the firm's interest versus his interest, correct?

11  A.  I guess the reason I bring up the conversation where he was

12  upset and apologizing, in response to your question, is that it

13  felt to me like a real understanding on everybody's part that

14  not only was this a really big deal, but that this now

15  potentially irrevocably would change the relationship we had

16  with an individual who had been working on the case with the

17  firm for the families for the last 20 years.  And that to me,

18  to me that conversation was about how our paths were branching

19  differently.

20  Q.  My question to you was just, did you explain that there was

21  a conflict of interest and that he may be hurting his own

22  interest in supporting the firm's interest in submitting these

23  declarations?

24  A.  We did not have a conversation about that.

25  Q.  Did you discuss with him the court's prior actions in

LB2H9112                    Benett - Cross

1    connection with the firm's breaches of the protective orders?

2    A.   Are you referring to the October 17 -- I'm sorry, the 2017?

3    Q.   I am referring to any time that someone has brought to the

4    court's attention an alleged breach of the protective order by

5    the Kreindler firm, did you discuss with Mr. Fawcett what the

6    court did in connection with those?

7    A.   To be clear, I want to make sure I am not missing something

8    the court might have done.  My understanding is there was one

9    finding of a breach in this case.

10   Q.   I am just asking if you discussed that with Mr. Fawcett?

11   A.   What the court had done in 2017?

12   Q.   Let's start there.  Did you discuss that with Mr. Fawcett?

13   A.   I did not.

14   Q.   Did you discuss with Mr. Fawcett that the Department of

15   Justice had made the assertion that Mr. Kreindler had violated

16   the protective order in connection with his speech at Dartmouth

17   and what the court's reaction to that was?

18   A.   Did I discuss that with John Fawcett between September 27

19   and September 30?  No, I did not.

20   Q.   Mr. Fawcett agreed to submit a declaration on the 27th,

21   where he admitted to being the source of the leak and to

22   violating the protective order.  Why did he agree to submit a

23   second declaration?

24        MS. KIRSCH:  Objection.  That calls for speculation.

25   Q.   Let me ask a new question.  Did you urge Mr. Fawcett to

LB2H9112                    Benett - Cross

1    submit a second declaration?

2    A.   I just want to go back to, you said that he had agreed to

3    submit a declaration.  On September 27, I did say to him that

4    he had to decide what to do.  It was clear that there were

5    serious -- there were going to be serious ramifications about

6    this after our first conversation.  I didn't know whether he

7    would give us a declaration or not.  I actually for some period

8    that morning was figuring out what and how to tell the court

9    what had happened without being able to give a declaration from

10   Fawcett.

11           So, in the course of that September 27, one of those

12   September 27 conversations, I think that probably there was a

13   part of the conversation with John that was, if you sign a

14   declaration, there is going to be fallout.  I didn't want -- I

15   couldn't tell him not to sign the declaration, but I also

16   needed to make sure that he understood the seriousness,

17   obviously the seriousness of what he had done already, but the

18   seriousness of what was going to happen next.

19   Q.   What did you tell him the fallout would be?

20   A.   I think I said, this is a really big deal, and if you sign

21   the declaration, you have to accept the court is going to do

22   something.

23   Q.   Do you know why he agreed to sign the second declaration?

24   A.   So, the first declaration he gave me sua sponte.  The

25   second declaration, in our September 27 letter, we told the

1  court -- it was a crazy day.  We couldn't do everything we

2  wanted to do by the end of September 27.  In the letter we said

3  that we would provide the court with an update shortly about

4  the next steps.  I don't think there was an order -- maybe

5  there was -- from the court at that point to describe how he

6  had done it.  One of the things that we had to do was to

7  reconstruct what had happened in leaking that transcript and

8  why we hadn't captured it during our search.  Because we felt

9  confident up until September 27, given our firm's practices,

10 given what we were able to determine from our systems, given

11 the statements that everybody who had worked with us for

12 anywhere from five to 20 years and had never done anything like

13 this before, until 10 a.m. on September 27 we believed it was

14 not from us.  And it came from Fawcett, and we needed to figure

15 out how he could have done that without us ever having known.

16 Q.  Ms. Benett, did you make any promises to Mr. Fawcett if he

17 submitted the declaration?

18 A.  No.

19 Q.  Did you tell him that you would pay for his lawyer?

20 A.  No.

21 Q.  Is the firm in fact paying for his lawyer?

22 A.  I don't know.

23 Q.  Did you tell him that you would write to the court and

24 stick up for him for all the great work he did in the 9/11

25 case?

LB2H9112                    Benett – Cross

1    A.  I didn't say that to him.  There is no question about his

2    responsibility and the seriousness of his breach here.  It was

3    hard to also at the same time not feel like he needed -- who he

4    was needed to be explained in some way, and the work he had

5    done in the case for 20 years, and the fact that he had never

6    done anything like this before.  I definitely didn't say we are

7    going to write and we are going to stick up for you to the

8    court.  There was a letter that we wrote, and I don't remember

9    if it was the September 27 letter or the later letter, but it

10   did feel incumbent to me to recognize, not to minimize his

11   violation of the protective order, but to recognize the

12   substantial work that he had done for our clients, for the 9/11

13   family members, from 2002 until 2021.  And that was important

14   for us to say because he --

15                   (Continued on next page)

16

17

18

19

20

21

22

23

24

25

LB2H9114                    Benett - Redirect

1   Q.  And so, Ms. Benett, you stuck up for Mr. Fawcett in the

2   letter you submitted to the Court on September 30, right?

3   A.  We felt like we needed to say who he was.

4   Q.  Right.  And you're sticking up for him again here as you're

5   testifying, correct?

6   A.  He breached a protective order.  He's the subject of -- one

7   of the subjects of the Court's investigation.  I mean, not sure

8   what you mean by -- I will say, he's been a tireless advocate

9   for the family members.  He was on phone calls every single

10  week with them.  He did so much work in building this case and

11  developing the evidence against the Kingdom of Saudi Arabia, it

12  would not be fair for his entire life to be reduced to this

13  mistake no matter how egregious it is.

14  Q.  And you were here yesterday when Mr. Kreindler gave his

15  emotional testimony about Mr. Fawcett and he stuck up for him

16  then as well, correct?

17  A.  I was -- I was here, and I did listen to Mr. Kreindler.

18         MR. SHEN:  I have no further questions.  Thank you.

19  REDIRECT EXAMINATION

20  BY MS. KIRSCH:

21  Q.  Good afternoon, Ms. Benett.

22         Sorry.  I just need one minute, your Honor.

23         THE COURT:  That's fine.

24  Q.  Can you take the Kreindler book and put that in front of

25  you, Ms. Benett.  We'll do some of this in reverse

LB2H9114                    Benett - Redirect

1   chronological order, but we'll just stick with what we were

2   just talking about.

3          Can you turn to tab 52.  Can you tell me, can you

4   identify this document?

5   A.  Yeah.  It's an email chain that starts from me.  It goes to

6   several people at the Kreindler firm.  And then above that is

7   an email from Steve Pounian to me.

8          MS. KIRSCH:  I'd like to move this into evidence.

9          THE COURT:  Any objection?

10         MR. SHEN:  No objection.

11         THE COURT:  Admitted.

12         MS. KIRSCH:  OK.  That's tab 51.

13         THE COURT:  I think that was tab 52.

14         THE WITNESS:  Yeah, I'm sorry.  I was on 52.

15         THE COURT:  I think you had asked us to turn to 52.

16         (Kreindler Exhibit 52 received in evidence)

17         MS. KIRSCH:  Oh, sorry.

18  BY MS. KIRSCH:

19  Q.  OK.  Can you explain to me --

20         THE COURT:  Ms. Kirsch, sorry, just so we are clear,

21  were you asking all of us to look at 52 or 51?

22         MS. KIRSCH:  51.

23         THE COURT:  I think we all were looking at 52.

24         MS. KIRSCH:  I'm sorry, 51.

25         THE COURT:  That's OK.  Are you at 51 now?

1           Mr. Shen, any objection to admitting 51?

2           MR. SHEN:  No objection.

3           THE COURT:  OK.  It's admitted as well.

4           (Kreindler Exhibit 51 received in evidence)

5    BY MS. KIRSCH:

6    Q.  Ms. Benett, can you tell me what's going on in this email

7    which is midday on Friday, September 24?

8    A.  Yeah.  So this was after the September 23 order directing

9    that our declarations be filed by Monday, and I was circulating

10   to everybody who had been told they would need to do -- sign a

11   declaration.  The language of the Court's order shows what the

12   declarations would contain and making sure everybody would be

13   available to review, finalize review, sign, and get back to me.

14   Q.  At this point was it primarily your responsibility to

15   prepare these declarations to be filed in response to the

16   Court's order?

17   A.  Yes.

18   Q.  Did you take any steps at this time to satisfy yourself

19   that the declarations that would be submitted by all of these

20   individuals were complete and accurate?

21   A.  Yes.

22   Q.  Can you describe what you did.

23   A.  Sure.  So I had spoken to everybody individually previously

24   to describe generally what the content of the declarations

25   would have to say -- state.  I -- especially for the

LB2H9114                    Benett - Redirect

1    nonlawyers, I discussed what it meant to sign under penalty of

2    perjury.  I had told them that I'd try to get them -- that I

3    would -- I asked them questions to make sure that I knew the

4    correct answers to the Court's direction.  And then with John

5    Hartney, I had a longer conversation with Hartney because his

6    was going to have to focus on the Kreindler systems and stuff

7    that I wasn't necessarily as familiar with.

8    Q.  Why did you have a longer conversation with Mr. Hartney?

9    A.  Because I wanted to make sure that I could -- that he and I

10   could work on his declaration to accurately describe the firm's

11   practices and also the tech side, and it felt -- so in my

12   communications with John, that was just more efficient and

13   effective to do in person.

14   Q.  Then let's take a look at tab 52, please.  Can you identify

15   that document?

16   A.  Yeah.  That's a response from Steve Pounian to me to the

17   email at tab 51.

18            MS. KIRSCH:  I'd move that into evidence.

19            THE COURT:  I think we just did that because we had a

20   mix-up.

21            MS. KIRSCH:  You're right.  You're right.  You're

22   right.  I apologize.

23            THE COURT:  That's all right.

24   BY MS. KIRSCH:

25   Q.  Can you explain here what -- Mr. Pounian is offering to

1    help you with these declarations, is that correct?

2    A.  Yes.

3    Q.  Did you have any reaction to -- it's the second to last

4    sentence, he says:  I'm also concerned about sharing what's

5    redacted name with KSA since he is living abroad.  Are we

6    planning to file his declaration with the Court only *ex parte*?

7            Can you explain what your reaction to that statement

8    from Mr. Pounian was?

9    A.  Well, I understood what his -- I understood his concern

10   both from the work product perspective but also from just the

11   witness safety perspective.  I mean, that's what I understood

12   that to be addressing.  Is that what your question is?

13   Q.  Yes.

14   A.  OK.  So, yes, we were -- that consultant was living in a

15   place where we had concerns about his safety if we were to

16   reveal his name to anybody but the court -- or at least reveal

17   his name to the defendants.

18   Q.  Can you expound a little bit on what the work product

19   concern was.  You said there were two types of concerns.

20   A.  Right.  So the work product was both producing his name and

21   his identity and the -- you know, the fact of his -- where he

22   was also, to the extent that that could bear on work that he

23   was doing in connection with the case and thereby reveal work

24   product.

25   Q.  Is it fair to say that the Kreindler firm has taken the

LB2H9114                    Benett - Redirect

1    lead in the factual investigation portion of the case against

2    KSA?

3    A.  That is definitely fair to say.  It was our investigators

4    who had developed most of the facts in interviews and located

5    the witnesses that were not those folks that the Kingdom

6    produced.  For example, the plaintiffs' witnesses were

7    individuals that our investigators were able to track down,

8    talk to, and have agreed to come and testify, for example.

9    Q.  And is that part of the reason that the Kreindler firm was

10   focused on answering the Court's questions but not voluntarily

11   revealing more information than it absolutely needed to for the

12   KSA?

13   A.  We had -- we had genuine concerns because we, even as we

14   speak, have people who are working on the case, and we were --

15   wanted to take every precaution possible to protect our active

16   work product.  We had -- you know, we had concerns.  I don't

17   want to sound histrionic, but the Jamal Khashoggi incident was

18   something that made us worried.  He had approached one of our

19   team members and expressed an interest in working with

20   Kreindler and the 9/11 family members.  And that day, as I

21   understand it, he spoke with Mohammad bin Salman's brother, who

22   was the ambassador in D.C. at the time, and was thereafter

23   obviously murdered.  I don't know if that would have had

24   anything to do with his agreeing to be a witness in our case,

25   but it was certainly something that we were mindful of, whether

LB2H9114                    Benett - Redirect

1    it was a question of physical safety of our investigators or

2    our witnesses or whether it was just a question of making them

3    no longer as willing to meet with us and speak with us.

4    Q.  Is it fair to say that in the beginning of this process,

5    when some of the other plaintiffs firms came forward

6    voluntarily with declarations, that the Kreindler firm felt it

7    was in a slightly different position in that regard?

8    A.  Yes, that is fair to say.  We were -- we knew that the

9    other firms had a different approach.  We felt like it wasn't

10   appropriate.  We also -- we felt confident at the time that

11   there was -- that this hadn't come from our firm, and we wanted

12   to be led by the Court and not by the Kingdom on what we had to

13   provide, and we also wanted to limit our responses to what was

14   asked for.  We trusted that if there was more information that

15   the Court needed, we would have a subsequent order.

16   Q.  So it's fair to say also that the Kreindler firm has an

17   enormous amount of highly sensitive, highly confidential

18   information of its own that it's handling on a day-to-day

19   basis, is that right?

20   A.  That's correct.

21   Q.  We've talked a little bit at this hearing about the

22   document management system, and so forth.  Can you explain the

23   steps that the firm takes and why it is that you're comfortable

24   that the confidential information that's being handled is, in

25   fact, safe?

LB2H9114                    Benett - Redirect

1    A.   Yeah.  So I'll talk first specifically about the management

2    of information in the 9/11 case.  The system that people have

3    heard about over the course of the hearing is called Case

4    Media.  The firm has in all -- almost, if not all, of our other

5    cases migrated over the course of the lifetime of this case to

6    it through at least two new software document management

7    systems.  We did not migrate the 9/11 case onto those new

8    systems for a variety of reasons.  One being that it is -- it

9    is old enough and big enough and we are familiar enough with

10   the way that those documents are managed within Case Media that

11   it would have been fairly disruptive to do so, especially

12   because our newest system was being built out, being trained on

13   it literally in the months leading up to and during the

14   deposition.  But even the one that we had before that postdated

15   the development of our document management system on Case

16   Media.

17        Case Media is, I would say, more or less required for

18   all other purposes.  So I don't know if there are even any

19   other active cases that have documents that are managed on Case

20   Media.  The only individuals who are told how -- again, this is

21   not -- this is not to suggest that as a technical matter, but

22   as a realistic matter, the only people who are directed to the

23   location where the 9/11 materials are maintained are people who

24   were working on the case and who have signed the FBI -- read

25   and signed the FBI protective order and reviewed the MDL

LB2H9114                    Benett - Redirect

1   protective order, and we keep a log of those people.  My

2   secretary maintains a file with the names of those people.

3   Q.  Thank you.

4          In that Case Media system, there are documents that go

5   to and from and are about some of these consultants and sources

6   that the Kreindler firm works with that are treated with the

7   highest sensitivity, is that correct?

8   A.  That's correct, yes.

9   Q.  So fair to say that this highly sensitive information of

10  yours is given the same protection as the highly sensitive

11  information or -- yeah, the highly sensitive information that

12  you're receiving from the KSA?

13  A.  Yeah, and from the FBI.

14  Q.  And from the FBI.  OK.

15         So if we go back to tab 52, what did you respond to

16  Mr. Pounian when he offered to give you some help with these

17  declarations over the weekend?

18  A.  I don't -- I don't remember if I wrote back to that email.

19  Q.  As a general matter, did you accept his offer?

20  A.  I think -- yes, I did.  I did send him, I think, what I

21  believed were sort of the close to final drafts.

22  Q.  Did you take steps at this point to reaffirm that whatever

23  was going to go into this filing to the Court on the 27th would

24  be accurate and complete?

25  A.  Yes.  So I spent a lot of that weekend with Hartney making

1    sure -- since I was -- since I sort of jumped in on this, I

2    knew that Duke had gotten all the emails, but they were not

3    saved in a single place that was easy for me to access.  So I

4    worked with Hartney to make sure -- and in their native format.

5    I didn't want them coming like a forward from September 24 a

6    September 23 email.  I wanted the actual original native format

7    emails.  I worked with John to put them all in a folder.  I

8    looked through all of them.  I compared them to what I had seen

9    before.  If there was anything -- I think there was at one

10   point I thought that there was an original email that hadn't

11   come up during the search.  There was like a reply, reply,

12   original, and I had only the reply and the reply.  I was on the

13   phone with John to make sure that I hadn't missed that.

14          So, yes, I was working with John Hartney over the

15   course of the weekend to make sure that all of the

16   communications that were going to go into the exhibit that

17   would be an exhibit to his declaration that would be in

18   response to the Court's direction to produce all communications

19   with Isikoff were in a single place.

20   Q.  So let's look at tab 53.

21          So this appears to be an email from Mr. Maloney to you

22   forwarding a bunch of these emails that had been found in the

23   earlier search, is that right?

24   A.  Yes.

25          MS. KIRSCH:  I'd move this into evidence.

LB2H9114                         Benett - Redirect

1              MR. SHEN:  No objection.

2              THE COURT:  Accepted.

3              (Kreindler Exhibit 53 received in evidence)

4    BY MS. KIRSCH:

5    Q.  So can you explain to me what's happening here.

6    A.  So this is probably in response to me saying to Duke, you

7    know, I need all the emails.  And then I think after this is

8    when I decided I wanted to go back to Hartney and get the

9    native ones directly from the system, not just the forwards to

10   me.

11   Q.  So let's look at tab 54.  Can you identify this document?

12   A.  Yes.  So this is -- this is, again, Duke forwarding other

13   emails to me that Hartney had found during the course of his

14   investigation.

15             MS. KIRSCH:  I'd move this into evidence.

16             MR. SHEN:  No objection.

17             THE COURT:  It's accepted.

18             (Kreindler Exhibit 54 received in evidence)

19             MS. KIRSCH:  OK.

20   Q.  Also, tab 55, another one of these emails on September 24,

21   can you identify this?

22   A.  Yeah.  That is another forward from Duke to me of an email

23   that Hartney had filed during his July -- during his original

24   search.

25   Q.  OK.

LB2H9114                    Benett - Redirect

1   A.   During one of his searches.

2   Q.   And tab 56 -- I move, sorry, move 55 into evidence.

3            MR. SHEN:  No objection.

4            THE COURT:  It's accepted.

5            MS. KIRSCH:  Thanks.

6            (Kreindler Exhibit 55 received in evidence)

7            THE WITNESS:  56, I had asked you to just send me any

8   correspondence you had with John about the systems and

9   generally.

10           MS. KIRSCH:  OK.  I move 56 into evidence.

11           THE COURT:  Any objection?  It's accepted.

12           (Kreindler Exhibit 56 received in evidence)

13  BY MS. KIRSCH:

14  Q.   OK.  Let's look at tab 57.  Can you explain this?

15  A.   This is, again, Duke sending to me -- and I was on the

16  original email, but just to have it top of my inbox -- several

17  of the emails that were produced in the course of the

18  investigation.

19           MS. KIRSCH:  I'd move 57 into evidence.

20           MR. SHEN:  No objection.

21           THE COURT:  It's accepted.

22           (Kreindler Exhibit 57 received in evidence)

23  BY MS. KIRSCH:

24  Q.   Let's look at tab 58.  Can you identify this document?

25  A.   Yeah.  Yes.  This is a cover email from me to Hartney with

LB2H9114                    Benett - Redirect

1    the draft of his declaration -- sorry, about a draft, yeah.  So

2    I think initially he was just checking in, and then I sent him

3    the draft, and then I sent him a different version.

4             MS. KIRSCH:  I'd move 58 into evidence.

5             MR. SHEN:  No objection.

6             THE COURT:  It's accepted.

7             (Kreindler Exhibit 58 received in evidence)

8    BY MS. KIRSCH:

9    Q.  Let's look at tab 61.  Do you recognize this document,

10   Ms. Benett?

11   A.  I do.  This is an email exchange between Steve Pounian and

12   myself on changes to his declaration, and I can --

13            MS. KIRSCH:  I'll move 61 into evidence.

14            THE COURT:  Any objection?

15            MR. SHEN:  No objection.

16            (Kreindler Exhibit 61 received in evidence)

17   BY MS. KIRSCH:

18   Q.  Let's look at it for a moment.  Mr. Pounian says to you:

19   "Can't everyone say I have no idea how Michael Isikoff got the

20   transcript?"  And then you respond up top.

21            Can you explain to us what's going on with your -- the

22   first sentence of your response?

23   A.  Sure.  Well, first of all, we couldn't, of course, say that

24   because as of then it was our understanding that nobody would

25   have known -- that nobody did know how Mr. Isikoff got the

1   transcript.  I wasn't sure about adding that because I had

2   genuinely felt like we were being punished for having

3   previously provided what the Court had ordered and that we were

4   being scolded for not doing more, and I will confess that I

5   felt frustrated by that.  But it did seem to me, on balance, it

6   was worth adding, since we believed that to be true on

7   Saturday, September 25.

8   Q.  If you look at the third paragraph, you write:  "I left JF

9   a voice mail earlier to ask him the same things you emailed

10  about."

11          Are those the voice mails or one of the possibly two

12  voice mails you left for Mr. Fawcett over that weekend that you

13  testified about recently?

14  A.  Yes.

15  Q.  Do you recall again whether you heard back from Mr. Fawcett

16  over that weekend?

17  A.  I didn't -- I did not hear back from Fawcett over the

18  weekend.

19  Q.  Then you say:  "We also need to find out from JPK how many

20  times he talked to Isikoff, if he can recall when, and what

21  they discussed."

22          Do you see that?

23  A.  Yes.

24  Q.  And you were here in the room when Mr. Maloney testified

25  that he had previously had discussions about that with

LB2H9114                     Benett - Redirect

1    Mr. Kreindler, correct?

2    A.  Yes.

3    Q.  And so why is it that you're saying here we also need to

4    find out from JPK those things?

5    A.  I just wanted to be sure before filing this declaration

6    that we -- I wanted to be totally comfortable with what we were

7    filing, and I wanted to be -- I wanted to make sure everybody

8    had reviewed it repeatedly.  We were -- although, as is evident

9    in the email, though perhaps irritated, I also took it very

10   seriously, and I did not want to miss, for example, an Isikoff

11   call or email that might have been out there.

12   Q.  Then let's look at tab 62.  Can you identify this document

13   for us?

14   A.  Yes.  This is a series of emails about the draft

15   declarations and then the draft declarations behind it.

16           MS. KIRSCH:  I'd move this into evidence.

17           MR. SHEN:  No objection.

18           THE COURT:  It's accepted.

19           (Kreindler Exhibit 62 received in evidence)

20   BY MS. KIRSCH:

21   Q.  Now, it says here again on Saturday, up at the top, "Let's

22   talk to Fawcett and Jim tomorrow if possible."

23           Do you see that?

24   A.  Yes.

25   Q.  So that suggests that you still haven't made contact with

LB2H9114                    Benett - Redirect

1    them about the open issues, is that right?

2    A.   Correct.

3    Q.   Then let's just turn the page to -- the first declaration

4    draft attached is yours, and I'm going to just draw your

5    attention to paragraph 4.  Is that the sentence that

6    Mr. Pounian suggested got added in?

7    A.   Yes.

8    Q.   So here in the draft declarations that everyone's prepared

9    to sign on Saturday is that -- that paragraph 4 appears in your

10   declaration and it appears in this draft declaration of

11   Mr. Fawcett?

12   A.   Yes.

13          MR. SHEN:  Sorry, Ms. Kirsch, which exhibit are you

14   in?

15          MS. KIRSCH:  62.

16          THE COURT:  62.  I think there was a new 62 I

17   received.

18          MS. FREY:  Your Honor, can I explain something to

19   Mr. Shen just a second that has to do with just the

20   attachments?

21          MS. KIRSCH:  Is this the attachments?

22          MS. FREY:  I gave the attachments to someone

23   yesterday.  You don't have it in your book at all?  Do you need

24   another copy?

25          (Counsel confer)

LB2H9114                        Benett - Redirect

1            MR. SHEN:  I'm sorry.

2            THE COURT:  That's OK.  I received a new Exhibit 62.

3    It was put in my binder.

4            MS. KIRSCH:  Yes, your Honor.  We had given them one

5    as well, but the binder that they're looking at now isn't the

6    one that the new exhibit went into.  So we're looking to see if

7    we can get another set.

8            MS. FREY:  I can get it now.

9            MR. SHEN:  Ms. Kirsch may proceed.

10           THE COURT:  OK.

11   BY MS. KIRSCH:

12   Q.  All right.  So if you look at the next declaration --

13           THE COURT:  Sorry.  I don't think we actually admitted

14   the document.  I take it, no objection?

15           MR. SHEN:  No objection.

16           THE COURT:  OK.  So it's admitted.

17           Go ahead.

18           (Kreindler Exhibit 62 received in evidence)

19           MS. KIRSCH:  Thank you.

20   BY MS. KIRSCH:

21   Q.  Starting at the Bates No. KK1436 is Mr. Fawcett's

22   declaration, and you've put in his draft declaration that same

23   paragraph 4?

24   A.  Yes.

25   Q.  And is that because that was what you believed to be the

LB2H9114                    Benett - Redirect

1    truth at the time?

2    A.  That is correct.

3    Q.  Let's look at tab 63.  Do you recognize that document?

4    A.  Yes.

5    Q.  Can you tell me what it is.

6    A.  Yep.  This is an exchange over that weekend before our

7    September 27 filing.  I'd been on the phone a bunch with

8    Hartney to make sure -- I think I had a list of all the emails,

9    but I wanted to make sure I had each of them in the original

10   format for purposes of the exhibits.

11             MS. KIRSCH:  I'll move this into evidence, tab 63.

12             MR. SHEN:  No objection.

13             THE COURT:  It's admitted.

14             (Kreindler Exhibit 63 received in evidence)

15   BY MS. KIRSCH:

16   Q.  Tab 64, can you look at that and tell me what this document

17   is, Ms. Benett.

18   A.  This is -- so this is the email that I'd asked Hartney for

19   in the -- previously at tab 63, and I didn't want it as -- I

20   think he sent me a PDF of the attachment, and I just wanted it

21   in email with that document attached to the email.

22             MS. KIRSCH:  OK.  I'll move tab 64 into evidence.

23             MR. SHEN:  No objection.

24             THE COURT:  It's admitted.

25             (Kreindler Exhibit 64 received in evidence)

LB2H9114                    Benett - Redirect

1  BY MS. KIRSCH:

2  Q.  Tab 65, Ms. Benett, what's going on here?  This is

3  Sunday --

4  A.  Right.

5  Q.  -- September 26?

6  A.  So this was -- I had thought that this was the email that I

7  thought had been missing from the folder that I was compiling

8  for the exhibit.  And it was an exchange with either Isikoff or

9  Isikoff's producer and Jim, and I had just been -- this is

10  where I had been worried that there was something that had been

11  left out because I had the response but not the original email,

12  but I then had it.

13          MS. KIRSCH:  I'd move tab 65 into evidence.

14          MR. SHEN:  No objection.

15          THE COURT:  It's accepted.

16          (Kreindler Exhibit 65 received in evidence)

17  BY MS. KIRSCH:

18  Q.  So, Ms. Benett, fair to say over the weekend you were

19  reviewing with a fresh eye all of the work that had previously

20  been done in the investigation in order to get the filing on

21  the Monday as accurate as possible, is that right?

22  A.  Yes, yeah.

23  Q.  Is that something that commonly happens at the firm, that

24  more than one of the partners might go back over something and

25  look at it to make sure it is 100 percent accurate?

LB2H9114                    Benett - Redirect

1   A.  Yeah, just -- yes, yes, especially -- certainly with the

2   judicial filing and certainly in this case, but as an ordinary

3   practice, yes, I would have somebody take a fresh set of eyes

4   at something like this.

5   Q.  So let's look at tab 66.  Can you tell me what this

6   document is, please.

7   A.  Right.  So this is me -- I had believed that all of the

8   deleted folders had also been checked, but I wanted to confirm

9   that the search encompassed incoming, outgoing, as well delete

10  folders.

11          MS. KIRSCH:  I'll move tab 66 into evidence.

12          MR. SHEN:  No objection.

13          THE COURT:  Accepted.

14          (Kreindler Exhibit 66 received in evidence)

15  BY MS. KIRSCH:

16  Q.  Ms. Benett, when you redid all of these steps of the search

17  or went over everything with your fresh eyes, did anything

18  occur to you had been missed in the search that Mr. Maloney had

19  presided over?

20  A.  I didn't find anything new.

21  Q.  So let's look at tab 68.  It's now 8:23 a.m. on Monday,

22  September 27.  Can you identify this document, please.

23  A.  My tab 68 is a 9:07 email.

24  Q.  And when you look -- well, I'll move tab 67 into evidence.

25          THE COURT:  Oh you're at 67 or 68?

LB2H9114                    Benett - Redirect

1                   MS. KIRSCH:  I'm sorry.  Did I do that again?  67.

2                   THE COURT:  67, yes, I see it.

3                   MS. KIRSCH:  I apologize.

4                   THE COURT:  Yes, this is again a new 67, so it's

5      possible that the Kingdom doesn't have a copy of it.

6                   MS. FREY:  I have given it to both counsel.

7                   THE COURT:  OK.  Good.  Any objection, counselor?

8                   MR. SHEN:  Can you just --

9                   THE COURT:  67.

10                  MR. SHEN:  What's the date of that email, please?

11                  THE COURT:  Monday, September 27, at 8:23 is the top

12     email.

13                  MR. SHEN:  No objection.

14                  THE COURT:  Accepted.

15                  (Kreindler Exhibit 67 received in evidence)

16                  THE WITNESS:  This is an email exchange between me and

17     Steve with, I think, just Jim's draft declaration.

18     BY MS. KIRSCH:

19     Q.   OK.

20     A.   I think I had talked to Jim to go over it with him one last

21     time before filing.

22     Q.   Do you remember what the conversation with Mr. Kreindler

23     was about the privilege log?

24     A.   I asked him, because there was the one email from -- the

25     one email from Fawcett to Isikoff that had that privilege log,

LB2H9114                    Benett - Redirect

1    I asked Jim.  He didn't know what I was talking about with

2    respect to that email.

3    Q.  Mr. Kreindler was not aware -- Mr. Kreindler told you that

4    he was not aware that Fawcett had sent the privilege log back

5    in July, is that true?

6    A.  That's right.  That's right.

7    Q.  OK.

8    A.  And I still had not heard back from John Fawcett at this

9    point.

10   Q.  Right.  Let's look at tab 69.  Can you identify this

11   document for me.

12   A.  This is the covering email and the declaration for Julia

13   Sienski from our office.

14          MS. KIRSCH:  OK.  I'd move tab 69 into evidence.

15          MR. SHEN:  No objection.

16          THE COURT:  It's admitted.

17          (Kreindler Exhibit 69 received in evidence)

18   BY MS. KIRSCH:

19   Q.  Ms. Benett, who is Julia Sienski?

20   A.  She is -- she has the role of client liaison.  She also

21   functions also as a paralegal on this case.  So she is first

22   point of contact for many of the family members, and she also

23   manages a lot of the documents in the case.

24   Q.  Is this an example of the steps that you took when you were

25   working with the various declarants to get their declarations

LB2H9114                    Benett - Redirect

1    ready for filing?

2    A.  Yes, and I know that I work with Julia a lot, and she's

3    perfect.  I know that I spoke with her in person about this

4    also, but I just want to -- I did not -- she's super-busy, and

5    I did not want to -- in addition to the conversation, I wanted

6    to make sure she saw in her email, not just on the declaration,

7    that she has signing under penalty of perjury.  It has to be

8    accurate, and that we can make any changes that she wanted.

9    Q.  Let's turn to tab 73.

10           All right.  Can you identify this document,

11   Ms. Benett?

12   A.  This looks like the statement that John Fawcett sent to me

13   on Monday, September 27.

14           MS. KIRSCH:  I'll move this into evidence.

15           MR. SHEN:  No objection.

16           THE COURT:  Admitted.

17           (Kreindler Exhibit 73 received in evidence)

18   BY MS. KIRSCH:

19   Q.  So can you again just recall for us what led up to the

20   receipt of this document on the morning of September 27 or the

21   afternoon, I guess, to the best of your recollection?

22   A.  Right.  So this is 0the timestamp is 12:23, so I am fairly

23   confident that the time that I got the call from Jim was

24   between -- sorry, from John Fawcett was between 10:00 and 10:30

25   in the morning.  My first conversation with John was, I

LB2H9114                    Benett - Redirect

1    believe, relatively brief.  It was the -- I mean, he just said,

2    Megan, I can't sign my declaration, and I was, I think,

3    probably silent for some time and said, OK.  I'm going to need

4    to think about this.  Let's talk in a little bit is more or

5    less how the first call unfolded.

6              I called Justin Green to let him know for the

7    partnership about this.  I called Steve Pounian to let him know

8    about this.  There were -- I don't know if I talked before this

9    email.  I don't know -- I was on the phone a lot.  I don't know

10   if it was with more than those two people, but there was a --

11   there were a series of phone calls trying to figure out how

12   this happened.  There was some conversation, should we ask the

13   Court for more time so we can do more of an investigation?

14   There was a decision that we needed to get this in to the Court

15   immediately that day.  I think some of the other partners in

16   our office were looped in on some of those calls, and this

17   email came -- the whole day was sort of like that.  This email

18   came partway through that process.

19   Q.  So if we look at the attachment, it's that single-spaced

20   declaration that we looked at earlier, and this email, of

21   course, comes from Mr. Fawcett.  Is this document something

22   that Mr. Fawcett wrote?

23   A.  I believe so.  It sounds like it, and it's certainly what

24   he sent me.

25   Q.  You did not write this?

LB2H9114                    Benett - Redirect

1   A.  No, I didn't write it.

2   Q.  And this just came in from Mr. Fawcett?

3   A.  Yeah.

4   Q.  Did you understand this to be his first crack at what he

5   would put in a declaration?

6   A.  Yes.  I mean, he sent it to me unsigned.  I had not -- I

7   don't think -- I mean, I know I had not asked him to send me a

8   declaration.  I don't think I necessarily even knew that he was

9   even drafting one before I got this.

10  Q.  So let me direct your attention to the fourth paragraph of

11  this declaration.

12  A.  Yeah.

13  Q.  He writes -- so Mr. Fawcett writes:  "No one at Kreindler &

14  Kreindler instructed me to send the transcripts to Michael

15  Isikoff.  Nor did anyone at Kreindler & Kreindler have any

16  knowledge of my sending it to Mr. Isikoff."

17         Ms. Benett, you didn't tell Mr. Fawcett to write those

18  words, did you?

19  A.  No.

20  Q.  "Nor did any consultant or anyone else have any knowledge

21  of my sending the transcript to Mr. Isikoff."

22         Those are Mr. Fawcett's words, correct, Ms. Benett?

23  A.  Yes, they are.

24  Q.  And you didn't tell him to write those words, did you?

25  A.  No.

LB2H9114                    Benett - Redirect

1   Q.  "Until today, no one aside from myself and Michael Isikoff

2   was aware that I sent the Jarrah transcript to him."

3            Do you see that?

4   A.  I do.

5   Q.  To the best of your recollection, much of those -- much of

6   that language shows up in his final declaration, isn't that

7   true?

8   A.  Yes.

9   Q.  He goes on to say:  "I sent the transcripts to Mr. Isikoff

10  via a non-Kreindler email address."

11           You didn't tell him to write that, Ms. Benett?

12  A.  No, I didn't even know he had a non-Kreindler email

13  address.

14  Q.  He writes:  "I did so to prevent the partners and staff of

15  Kreindler & Kreindler from knowing about my intended action and

16  to prevent them from stopping me should they wish to do so."

17           Did you write that, Ms. Benett, or did Mr. Fawcett?

18  A.  That was Mr. Fawcett.

19  Q.  Much of that language shows up in the final declaration,

20  isn't that true?

21  A.  Yes.

22  Q.  Or it might be the September 30 declaration.

23  A.  One or the other, yeah.

24  Q.  Mr. Shen asked you some questions about the fact that he

25  doesn't expound on his motives here in this first draft.  Do

LB2H9114                    Benett - Redirect

1    you feel that he should have?

2    A.  I -- I think, ultimately, it was important -- I mean, it

3    was important for me to understand why he would do something

4    this grave.  I thought it was important for him to provide that

5    information to the Court.  I knew that he was deeply troubled

6    by the Jarrah child pornography images.  I did not have any

7    sense that he was so upset about it that he was behind the leak

8    to Isikoff, but once I had the information about his -- you

9    know, his -- not just his sense of righteousness about the

10   child pornography itself but also his, what seemed to me,

11   genuine and heartfelt concerns about the fact that Jarrah was

12   in Morocco, that he believed it was a place where children were

13   routinely trafficked for sexual purposes, and I knew a little

14   bit more about his personal background, it did seem to me that

15   that was really important context.

16   Q.  Did Mr. Fawcett tell you during one of those conversations

17   on September 27 how strongly he felt about the crime of child

18   pornography?

19   A.  He did, and I should add also -- he did, and he was very

20   scared to put anything in his declaration about his own

21   children, and he did not -- we had a conversation about -- I

22   understood that that was part of what influenced his decision

23   here.  He didn't -- he was worried about his kids.  He was

24   worried about whether -- he was worried about their -- them

25   being part of this, him discussing them, their safety, but he

1  was clearly -- his reaction was very much informed by his

2  strong feelings about somebody that he believed was not only

3  trafficking in sexual images of minors but was deliberately

4  living in a place where he would have easy access to minor

5  children for sexual purposes.

6  Q.  Can you explain that last bit a little more clearly that --

7  I take it Mr. Fawcett told you that he was concerned that

8  Mr. Jarrah was specifically living where he could continue to

9  consume or traffic child pornography?

10  A.  John Fawcett -- my understanding from my conversations with

11  John Fawcett was that he believed that Jarrah was intentionally

12  in Morocco in order -- I don't know if he thought this was the

13  only reason, but at least in part -- in order to not only

14  traffic in the disturbing imaginary but to also have ready

15  access to minors, children, for sexual acts.

16  Q.  There were some questions, Ms. Benett, about whether -- in

17  any of those conversations with Mr. Fawcett about whether you

18  advised him to get a lawyer or not.  Do you remember that

19  conversation on cross?

20  A.  Yes.

21  Q.  You don't represent Mr. Fawcett, of course, correct?

22  A.  Correct.

23  Q.  Did Mr. Fawcett ever come to you for legal advice?

24  A.  Not that I recall.

25  Q.  Did Mr. Fawcett come to you and ask for legal advice on

LB2H9114                    Benett - Redirect

1    this matter?

2    A.   No.

3    Q.   Did Mr. Fawcett ever ask you if you thought he needed

4    representation?

5    A.   No.

6    Q.   Prior to the October 4 order, were you focused on whether

7    there was a conflict of interest between the firm and

8    Mr. Fawcett?

9    A.   I was not.  I was not at all thinking about that.  I was

10   focused on sort of dealing with what we would have to look at

11   in light of Fawcett being the source of the leak, figuring

12   out -- getting him off the system, closing his access to any

13   materials, trying to sort of move him -- get back our work

14   product that he had, find some orderly transition to proceeding

15   in the case without his involvement.  But until the October 4

16   order with the language about potential referral for criminal

17   investigation, I -- I recognized that there was exposure for

18   violating the protective orders.  I did not -- I had not been

19   viewing it as something where his interests would diverge from

20   the firm's prior to that.

21   Q.   Fair to say on the 27th of September, your primary goal was

22   to get the facts in front of the Court as a first step?

23   A.   Yes, yes.

24   Q.   And also beginning on the 27th of September, you made sure

25   to take steps that Mr. Fawcett's access to the Kreindler

LB2H9114                    Benett - Redirect

1   servers was shut down, is that correct?

2   A.  Yes.

3   Q.  Did you make clear to Mr. Fawcett in those early days that

4   he was not to be working on the case until you had an

5   opportunity to sort out the next steps?

6   A.  Yes.

7           MS. KIRSCH:  Your Honor, could I take a moment just to

8   go over my notes to make sure everything's done?  I can do it

9   right here while people are waiting, or I could take five

10  minutes.  Whatever's easiest.

11          THE COURT:  If you think you're going to be wrapping

12  up, then let's take a couple of minutes.

13          MS. KIRSCH:  I'm sure I have a couple more questions,

14  but I will be wrapping up quickly.

15          THE COURT:  OK.  Let's just take a two-minute pause.

16          (Recess)

17  BY MS. KIRSCH:

18  Q.  Just a few more minutes.

19          Ms. Benett, I did just want to follow up on one

20  question on September 27 when we were talking about just

21  getting Mr. Fawcett's declaration done.  Your primary

22  obligation, of course, was to the Court at that time, is that

23  right?

24  A.  Yes.

25  Q.  Can you look at -- and I'm sorry to do this switch.

LB2H9114                    Benett - Redirect

1   There's a document that's in the Kingdom's binder, which is

2   that great big one, marked --

3              THE COURT:  It's right here.

4   Q.  -- tab 115.

5              THE COURT:  So this is KSA 115.  Got it.

6   Q.  Do you recall this email exchange with Mr. Hartney?

7   A.  I do.

8   Q.  This is happening on Monday, September 27, am right?

9   A.  Yes.

10  Q.  Can you tell me what's going on in this email exchange and

11  what conversations may have ensued.

12  A.  Sure.  So I had talked with John Hartney initially before

13  starting to work on his declaration about the systems and the

14  search and the systems management, and I was -- I wanted to

15  make sure, obviously, that his declaration was accurate.  I

16  understood that the Case Media system where the documents,

17  including the Jarrah deposition, were saved did not have

18  restricted access, meaning that it was available theoretical to

19  anybody at the firm.

20             He and I went back and forth because he didn't -- not

21  only did I not want to include language that suggested that

22  there was restricted access, but he also flagged I can't say

23  that there was restricted access.  Because of the nature of our

24  document management system in every other case versus the 9/11

25  case, the reality is that in order for somebody to know how to

LB2H9114                    Benett - Redirect

get to the 9/11 documents, including Jarrah, they would have to
come to the 9/11 team, to me or to one of the other attorneys.
We would then get them read in on the protective orders and
direct them as to how to access the materials saved in that
drive.

So we went through a number of different words that we
thought about using. I was concerned that saying "permission"
sounded too much like technical permissions, but at the same
time, I think in -- I coordinated it eventually with Hartney
and with Duke, and we used the language "able to access"
because it was true that you, as a firm policy, would not have
been -- and I didn't want to use "permissions" because I felt
like that sounded technical, but you would not have been
permitted to go to these files and to look at these materials
without reviewing and agreeing to be bound by the terms of the
protective orders. So John and I talked about that. I think
the email -- you see my email at 10:40 was trying to figure
out -- was trying to explain to him that it was -- that I
didn't want it to say it was restricted use, and then I just
felt like it was better to -- I mean, we talked that through.

I think "also need to discuss something with you, can
I call you in five" was both about working on that language,
but then also advising him about the -- about the leak and
about needing to get Fawcett off the systems.
Q.  Understood.

1           So let's just talk generally for one more minute.

2    Since you began to work -- when did you first meet John

3    Fawcett?

4    A.  I started at the Kreindler firm in October of 2006, so I

5    would have met him around then.

6    Q.  Can you describe how closely you worked with Mr. Fawcett

7    since then and through today, or through September 27.

8    A.  I've worked -- most of my work with him has been on the

9    9/11 case, which I joined that effort in 2016 to 2017.  So it's

10   not -- that's not the only -- I do have other matters that John

11   isn't involved with, but in terms of my work on the 9/11 case,

12   I would work with him on a daily or near daily basis.

13   Q.  How often do you communicate -- did you communicate with

14   Mr. Fawcett?

15   A.  Every day if we were both in the office; otherwise,

16   sometimes by phone.  I would say, if we weren't in the office,

17   maybe on a weekly basis.

18   Q.  To what extent were you aware of Mr. Fawcett's physical

19   whereabouts?

20   A.  I mean, if he was in the office, I knew he was there, but

21   otherwise I wouldn't know where he was if he wasn't in the

22   office.

23   Q.  To what extent were you aware of Mr. Fawcett's activities

24   for the firm either at the goal level or the task level?

25   A.  So, I mean, at the top level, he was a member of the team

LB2H9114                    Benett - Redirect

1    of lawyers who were working on the 9/11 case.  I mean he was a

2    member of the team that includes the lawyers who were working

3    on the 9/11 case, and we were all -- are all unified in our

4    effort to get the information that we believe will establish

5    the role of Saudi officials in the 9/11 attacks.

6            On a daily basis he was sort of a liaison with some of

7    our -- with a consultant or with investigators.  He did a lot

8    of review of the material, the discovery that was produced.  He

9    did independent investigation, for example, that might lead an

10   inquiry of ours in a new direction that was not necessarily

11   revealed in Kingdom materials or FBI materials.  He did a lot

12   of FOIA requests that started to develop some of our leads in

13   the case.

14   Q.  Did you ever communicate with Mr. Fawcett about the

15   protective orders in this case?

16   A.  Yes.

17   Q.  Can you describe those communications.

18   A.  So, I mean, I put them in kind of two categories:  One,

19   there were conversations of, yes, I know we are frustrated by

20   the protective orders and we have to abide by them, and there

21   was -- until September 27 I didn't believe that anybody was

22   knowingly going to violate the protective orders, but there

23   were several conversations about the fact that protective

24   orders were in place; they were orders of the court; we had to

25   comply with them.

LB2H9114                    Benett - Redirect

1          There was a sort of parallel conversation that

2     revolved around efforts to be relieved from the protective

3     orders.  There were several motions in 2019, maybe 2018, but

4     2018, '19, into 2020 about what the families or the plaintiffs

5     felt like was an over-designation by the Kingdom of Saudi

6     Arabia of its materials.  There was -- I don't know if there

7     were any, certainly not many, I'm not sure any, documents that

8     the Kingdom produced that weren't produced subject to the MDL

9     protective order.  We felt like that was an over-designation.

10    We felt like the process that Judge Casey had in place was

11    being -- that the Kingdom was using it to its own strategic

12    advantage, and we did not think it was consistent with the

13    letter of the original Casey order, ECF 1900.

14         So there was some motion practice on that that we did

15    not prevail on, but certainly it came up in the context of the

16    protective orders are what they are.  You have to abide by

17    them.  They came up also in connection with the FBI protective

18    order.  We had -- we agreed voluntarily to sign the protective

19    order because otherwise we wouldn't have had access to any of

20    the FBI materials.

21         At the same time, as materials were produced, we had

22    serious questions about the need, any legitimate need, to

23    maintain those materials under the protective order.  We had

24    talked, sort of caucused amongst ourselves and with other firms

25    on the Plaintiffs' Executive Committee, about ultimately moving

LB2H9114                    Benett - Redirect

1  to lift the FBI protective order.  There was not unanimity

2  among the Plaintiffs' Executive Committee firms to do so.  It

3  was certainly something that we talked about a lot internally,

4  and along with the conversation that unless and until this

5  protective order is lifted, either by the Department of Justice

6  or after motions practice, we must live with it.

7  Q.  Ms. Benett, there's been some suggestion that because

8  Mr. Kreindler has publicly said that he does not believe these

9  protective orders should be in place, do you think that that

10  created an environment in the Kreindler firm that made people

11  feel as though they need not respect the protective orders?

12  A.  I would say that, if anything, those public statements

13  are -- reinforce internally that we might not -- we might be

14  frustrated by the protective orders, it may restrict us from

15  what we can say to our clients or what we could say publicly,

16  and we have to abide by the public orders.  They are in place.

17  The Court has not lifted them.  If we don't like it, we live

18  with it.  If the time is right or if the Department of Justice

19  decides otherwise, we will proceed differently, but we are

20  bound by those protective orders.  And Jim's -- to my mind,

21  Jim's public comments about them, although not the language

22  that I would use, reflect an understanding that we are bound by

23  them.

24  Q.  Mr. Fawcett never gave you any indication that he would not

25  respect the protective orders, did he?

LB2H9114                    Benett - Redirect

1   A.  Never.

2   Q.  Ms. Benett, did you ever order or direct Mr. Fawcett to

3   send a copy of the Jarrah transcript to Mr. Isikoff?

4   A.  Never.

5   Q.  Were you aware at any time prior to September 27 that it

6   was Mr. Fawcett who sent a copy of the Jarrah transcript to

7   Mr. Isikoff?

8   A.  I was not aware of that until the morning of September 27.

9   Q.  And when you found out for the first time that Mr. Fawcett

10  was the source of the leak of the Jarrah transcript to

11  Mr. Isikoff, what was the first thing that you did?

12  A.  I just don't remember if it was -- well --

13  Q.  The most important thing that you did.  That was a bad

14  question.

15  A.  I changed all of our declarations.  I pulled John's

16  declaration, and I removed from all of our declarations that we

17  didn't know who the source of the Isikoff leak was.

18  Q.  So you did not in any way ratify Mr. Fawcett's sending of

19  the Jarrah transcript to Mr. Isikoff?

20  A.  No.

21          MS. KIRSCH:  I have no further questions.

22          THE COURT:  Thank you.

23          MR. SHEN:  No questions, your Honor.

24          THE COURT:  Ms. Benett, you're done.  You can go back

25  to counsel's table.

LB2H9114                         Benett - Redirect

1          (Witness excused)

2          THE COURT:  We're going to finish today, so we're

3    going to take a half-hour brunch -- brunch, half-hour lunch.

4    Be back here at 2 o'clock.

5          If I can also just ask -- sorry.  I do want to deal

6    with this exhibit issue.  I don't know if there is a list from

7    the Kingdom side about the exhibits that were discussed

8    yesterday, if we can reach some agreement so we can just move

9    everything in at the end of the hearing, but I'll ask while

10   you're eating sandwiches to think about that, too.

11         Thank you.  See you in a half an hour.

12         (Lunch recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

LB289115                    Pounian - Cross

1            THE COURT:  Mr. Shen.

2            MR. SHEN:  Saudi Arabia calls Steven Pounian.

3            THE COURT:  Good afternoon, Mr. Pounian.

4     STEVEN POUNIAN,

5         called as a witness by the Kingdom,

6         having been duly sworn, testified as follows:

7            THE DEPUTY CLERK:  State your full name for the

8     record.

9            THE WITNESS:  Steven R. Pounian, P-O-U-N-I-A-N.

10           THE COURT:  Mr. Pounian, one, you have to keep your

11    mask on, I'm afraid.  Two, make sure you speak directly into

12    the microphone.  And three, during the questioning by the

13    Kingdom, they are going to put exhibits on the computer in

14    front of you, but this is their binder.

15           Mr. Shen, you may begin.

16    CROSS-EXAMINATION

17    BY MR. SHEN:

18    Q.  Good afternoon, Mr. Pounian.

19    A.  Good afternoon.

20    Q.  If you would look at Exhibit 43 in the binder in front of

21    you.  It also will appear on your screen.

22           Sir, Exhibit 43 is a letter that the Plaintiffs'

23    Executive Committee submitted to the court on July 27 in

24    response to a request by the Kingdom for certain discovery

25    pertaining to the leak to Michael Isikoff.  Do you see that?

1    A.  I do.

2    Q.  There is a statement in the letter which says, "Each of the

3    lead PEC firms has already conducted internal investigations."

4           MR. SHEN:  Can we highlight that language for Mr.

5    Pounian.

6           It's at the top of the second page.

7    Q.  Sir, this letter was submitted under your signature,

8    correct?

9    A.  It was.

10   Q.  Now, the investigation that is being referred to in this

11   paragraph, was that conducted by Mr. Maloney?

12   A.  The firm had conducted an investigation, and I had

13   personally also conducted an investigation.

14   Q.  You had individually, in your personal capacity, conducted

15   an investigation as well?

16   A.  I did, yes.

17   Q.  What personal investigation did you conduct?

18   A.  Well, I wanted to check to make certain that the -- I

19   wanted to know exactly what had happened and how the transcript

20   had been handled by the law firm.

21   Q.  What investigation did you personally do independent of

22   what Mr. Maloney did?

23   A.  I don't know if it was independent.  It was probably

24   concurrent with what he was doing.  I got the information from

25   Mr. Hartney, the IT person, and I may have also contacted Julia

1  Sienski at the firm to sort of determine where the transcript

2  had gone.  I was very concerned about nailing down exactly what

3  had happened with the transcript.

4  Q.  Now, Mr. Hartney had done the search of the firm's e-mail

5  records, is that correct?

6  A.  He had done the search, yes.

7  Q.  He provided the search results to Mr. Maloney and to

8  yourself?

9  A.  I don't recall him providing the results to myself.  I was

10  focused on the transcript and if the transcript had left the

11  law firm and to track that.

12  Q.  Did you ask Mr. Hartney to do an e-mail search?

13  A.  Well, to the extent that we were tracking the transcript, I

14  guess that would be included in an e-mail search -- an e-mail

15  search would be included in that.

16  Q.  The question is, did you ask Mr. Hartney to conduct a

17  search of the e-mail system?

18  A.  I don't remember specifically asking him that, no.

19  Q.  You said that you spoke to Ms. Sienski and the focus of

20  that was to determine where the transcript was saved and who

21  had received it?

22  A.  I honestly don't remember if I spoke to Ms. Sienski, but I

23  do know that I wanted to determine if the transcript had left

24  the law firm in any way, shape or form.  And that's what I

25  tried to do.

LB289115                     Pounian – Cross

1   Q.  Is it fair to say, Mr. Pounian, that in making this

2   representation in this letter, that you were relying upon the

3   investigation that Mr. Maloney and Mr. Hartney had conducted?

4   A.  And the things that were represented that I understood from

5   my conversations with the people at the law firm about that.

6   Q.  Did you ask Mr. Fawcett specifically whether he had sent

7   the transcript to Mr. Isikoff?

8   A.  I asked Mr. Fawcett if he knew anything about how

9   Mr. Isikoff got the transcript.

10  Q.  When did you ask him that?

11  A.  I think about a week after the article.

12  Q.  So before this letter went into the court?

13  A.  It was before this letter.

14  Q.  He told you to your face he knew nothing about it?

15  A.  That is correct.

16  Q.  That was a lie, correct?

17  A.  That is correct.

18  Q.  How many times did Mr. Fawcett lie to your face about

19  sending the transcript to Mr. Isikoff?

20  A.  It was one time we had that conversation.  At the same

21  time, I was looking at where the transcript had gone.

22  Q.  And that was it, just that one time?

23  A.  It was at one time because I was trying to -- I had found

24  out he had sent the transcript to a consultant, and that's what

25  I was really tracking down.  I had found out that the

LB289115                     Pounian - Cross

1   transcript left the office and went to a consultant.

2   Q.  My question to you is, how many times did Mr. Fawcett tell

3   you that he did not send the transcript to Mr. Isikoff?

4   A.  It was once.

5   Q.  If you could turn, please, to Exhibit 108 in your binder.

6           Now, Mr. Pounian, you were involved in drafting the

7   September 27 declaration that Mr. Fawcett submitted to the

8   court, correct?

9   A.  He drafted the declaration and sent me and Megan a draft.

10  Q.  But the final declaration that was submitted, you were the

11  one who drafted it, correct?

12  A.  I put it into the system and sent it back and forth with

13  Mr. Fawcett to finalize it for the court.

14  Q.  So, Exhibit 108, this is an e-mail.  The top part is

15  apparently cut off, but it's from Mr. Fawcett to yourself and

16  to Ms. Benett.  108A contains the declaration that Mr. Fawcett

17  drafted and sent you, is that correct?

18          MR. SHEN:  If we can show 108A, please.

19  A.  Yes, that's it.

20  Q.  This is the language that Mr. Fawcett drafted, correct?

21  A.  That is correct.

22  Q.  If you could turn, please, to 109.

23          THE COURT:  Can I ask one clarifying question, back to

24  108?  This e-mail doesn't have the "from" header, and I am just

25  wondering if we know the "from" e-mail.  There is an indication

1   that it is not a Kreindler e-mail.

2            MR. SHEN:  I believe that this e-mail was produced at

3   another location with a from --

4            MS. KIRSCH:  If it's helpful, the same e-mail is

5   Exhibit 73 in our book.

6            THE COURT:  That just says John Fawcett.

7            In any event, sorry to interrupt.

8   BY MR. SHEN:

9   Q.  Now, if we could look at Exhibit 109, please.

10           This is an e-mail, September 27, at 1:41 p.m., from

11  yourself to Ms. Benett, attaching a declaration 1.docx.

12           Do you see that?

13  A.  I see the header.

14  Q.  Let's look at the exhibit.  It's at 109A.

15           This contains a new version of Mr. Fawcett's

16  declaration.

17           Did you prepare this version that's attached at 109A?

18  A.  Yes, I prepared it, based on Mr. Fawcett's original draft.

19  Q.  So Mr. Fawcett sent you the draft that we looked at in the

20  prior exhibit, and then you created this new document and sent

21  it to Ms. Benett, is that right?

22  A.  That is correct.

23           MR. SHEN:  I have no further questions.

24           MS. KIRSCH:  If I could just have a moment.

25           THE COURT:  Sure.

LB289115                    Pounian - Redirect

1  REDIRECT EXAMINATION

2  BY MS. KIRSCH:

3  Q.  Good afternoon, Mr. Pounian.

4  A.  Good afternoon.

5  Q.  Just to finish up on the topic that we were just

6  discussing, can you just tell us in your own words how your

7  draft of the declaration for Mr. Fawcett came to be.  Just the

8  events of September 27, if you could just walk us through what

9  you recall happening on that day.

10 A.  Sure.  We were preparing to finalize the papers for the

11 court, and we had prepared drafts of everyone's declaration.

12 And I know that Megan was trying to get ahold of John to get a

13 signature on his declaration.  And that morning Megan called me

14 and told me that she finally did get ahold of John, and that he

15 had told her that he had leaked the transcript to Mr. Isikoff.

16         After that, we had conversations, and we decided that

17 we needed to prepare the filings and get a declaration from

18 John to present the facts to the court, and we proceeded to do

19 that.  John sent a draft, and we worked with him on the draft

20 and filed it along with the papers.  And we had to obviously,

21 of course, change all the declarations that we had prepared for

22 ourselves because we now knew how the leak had occurred, and we

23 then edited all of our declarations and filed them with the

24 court that evening.

25 Q.  Mr. Pounian, how long have you known Mr. Fawcett?

1  A.  We have worked together for four years at the firm, and I

2  have known him since 2002, 2003.

3  Q.  As you have been working on this case, how often did you

4  communicate with Mr. Fawcett?

5  A.  We communicated typically over the past three years almost

6  every day.  He was handling the facts in the case, and we would

7  be in touch constantly all the time.

8  Q.  To what extent were you aware of his physical whereabouts

9  on a day-to-day basis?

10  A.  Well, we shared an office at the law firm when I was

11  working at the firm, when I was physically there.  So I saw him

12  whenever I was in the office.  And I would communicate with him

13  practically every day.  So I was aware of where he was and what

14  he was doing.

15  Q.  So to what extent were you aware of Mr. Fawcett's

16  activities for the firm at the goal level, at the task level,

17  would you say?

18  A.  Well, I would talk to John about what his assignments were

19  on the case and what he was supposed to be doing on the case.

20  I did that regularly.  It was a nonstop kind of back-and-forth

21  activity between the two of us.  I knew what he was doing.  I

22  knew what his assignments were on the case.

23  Q.  Do you consider Mr. Fawcett to be a professional?

24  A.  Definitely.  He is a long-standing researcher,

25  investigator.  He was someone that we trusted as a

1    professional.  He was someone who was a colleague and a peer to

2    all of us at the firm.

3    Q.  Did you communicate with Mr. Fawcett about the protective

4    orders in this case?

5    A.  Yes, of course.  We worked with the protective orders

6    almost constantly on the case, and we were always

7    drafting -- every time we submitted something to the court,

8    every time we had any kind of hearing with the court, we were

9    working with the protective orders to make certain that we were

10   not revealing any protected information.

11   Q.  There was some testimony that you were not privy to about

12   Mr. Kreindler and his media presence and his public statements

13   that he dislikes the protective orders in this case.  Did you

14   ever find that Mr. Kreindler's public statements about the

15   protective orders suggested within the office that they need

16   not be adhered to?

17   A.  Never, no.  The orders were a source of frustration in that

18   we couldn't share certain information with our clients, but we

19   adhered to them strictly and it was something we obeyed all the

20   time.  There was no question about it.

21   Q.  Did Mr. Fawcett ever indicate to you in any way his

22   awareness of his obligations under the protective orders?

23   A.  Yes.

24   Q.  How did he do that?

25   A.  Well, as I said before, it was a matter, we were working

1  together on various projects and were always discussing the

2  protective orders and how they applied to certain documents we

3  were filing, or certain communications we were having.  It was

4  just a given in everything that we were doing.

5  Q.  So did Mr. Fawcett ever give you any reason to suspect that

6  he would not be honoring his obligations under the protective

7  orders?

8  A.  Never.

9  Q.  Are you aware of any complaints about Mr. Fawcett, by the

10  clients or by others, in all the years that you have worked

11  with him?

12  A.  I never heard any complaints about Mr. Fawcett, never.

13  Q.  Have you ever heard anyone accuse Mr. Fawcett of behaving

14  in an unprofessional manner?

15  A.  Never.

16  Q.  Is it your view that Mr. Fawcett is irresponsible or

17  unprofessional in any way?

18  A.  I have never known him to be that way, and this was the

19  first time I had ever known him to do anything that was

20  out-of-bounds, and it was a shock when it happened.

21  Q.  Did you order or direct Mr. Fawcett to share the transcript

22  of Mr. Jarrah's deposition with Mr. Isikoff?

23  A.  No.

24  Q.  Were you aware at any time prior to September 27 that it

25  was Mr. Fawcett who shared the Jarrah transcript with

1    Mr. Isikoff?

2    A.   No.

3    Q.   As we discussed, you never had any reason to suspect that

4    it was Mr. Fawcett who shared the Jarrah transcript with

5    Mr. Isikoff, is that correct?

6    A.   I didn't have any reason to suspect that he did that.

7              MS. KIRSCH:  I have no further questions.

8              THE COURT:  Thank you.

9              MR. SHEN:  No questions.

10             THE COURT:  You win the award for the shortest

11   witness.

12             Thank you, sir.

13             (Witness excused)

14             THE COURT:  Counsel.

15             MR. HANSEN:  Your Honor, we call Mr. Fawcett.

16             MS. KIRSCH:  Your Honor, I know your Honor has

17   indicated we should finish today, which we wholeheartedly agree

18   with.  I don't know if there is some way to apportion time to

19   ensure that if there is any need for the Kreindler firm to have

20   an opportunity to question Mr. Fawcett as well.  I don't know

21   how your Honor wants to proceed.

22             THE COURT:  Fair and good question.  Let's go about an

23   hour and see where we are, but I will make sure you have an

24   opportunity.

25             (Continued on next page)

1    JOHN FAWCETT,

2         called as a witness by the Kingdom,

3         having been duly sworn, testified as follows:

4              THE DEPUTY CLERK:  Would you please state your full

5    name for the record.

6              THE WITNESS:  John Fawcett.

7              THE COURT:  Mr. Fawcett, you can be seated.  We are

8    going to ask you to keep your mask on.  I am afraid that's our

9    court requirement for COVID protocols.

10             I am also going to ask you to hand me that binder, and

11   I am going to give you this big binder.  Those are the Kingdom

12   exhibits.  They will likely show you exhibits on the monitor.

13   You will also be able to see those in the binder.

14             Just move close to the microphone so everyone can hear

15   you clearly, especially the court reporter.

16   CROSS-EXAMINATION

17   BY MR. HANSEN:

18   Q.  Good afternoon, Mr. Fawcett.

19   A.  Good afternoon.

20   Q.  If you would speak up, I would appreciate it.

21             Mr. Fawcett, you are here today represented by

22   counsel?

23   A.  Yes, I am.

24   Q.  That's these folks sitting here to the left?

25   A.  Yes.

LB289115                         Fawcett - Cross

1    Q.  Are they counsel paid for by Kreindler & Kreindler?

2    A.  I believe so, yes.

3    Q.  Mr. Fawcett, you have worked for Kreindler & Kreindler for

4    almost 20 years?

5    A.  Yes.

6    Q.  You have worked directly under the supervision of James

7    Kreindler, correct?

8    A.  Amongst others, yes.

9    Q.  And pretty much the total source of your income over those

10   close to 20 years has come from Kreindler & Kreindler?

11   A.  80 to 90 percent.

12   Q.  Your work at Kreindler & Kreindler includes managing all

13   discovery material in the 9/11 case, right?

14   A.  Yes, in part.

15   Q.  I'm sorry?

16   A.  In part, yes.

17   Q.  But you do that?

18   A.  Yes, I do.

19   Q.  You did it through September 27th of this year?

20   A.  Yes, I did.

21   Q.  Would it also be fair to say dealing with the press on the

22   9/11 case is also part of your job at Kreindler & Kreindler?

23   A.  Yes, on occasion.

24   Q.  When you do that, do you bill for your time?

25   A.  Sometimes.

1  Q.  When do you not do it?

2  A.  When I'm doing it, it's kind of more background research

3  than work.

4  Q.  But when you are briefing reporters on a subject that Mr.

5  Kreindler is also talking to reporters about, is that part of

6  your duties for which you seek compensation and bill?

7  A.  I am not sure if I billed directly for that.  I don't

8  recall in my time records putting that.

9  Q.  You record your hours every day when you're working on the

10  case?

11  A.  Yes, I do.

12  Q.  Do you include within those hours time spent dealing with

13  press matters?

14  A.  Not very often.

15  Q.  Would you say, Mr. Fawcett, that you have a certain amount

16  of loyalty for Mr. Kreindler as a result of your long work

17  together?

18  A.  Yes.

19  Q.  So, I am going to ask you some questions about your state

20  of mind at the time that you provided these sworn declarations

21  to the court on September 27 and September 30.

22        Were you aware at the time you provided those

23  declarations that what you were claiming in your declarations

24  could subject you to criminal prosecution?

25  A.  Not now I wasn't.

LB289115                         Fawcett - Cross

1  Q.  Had anyone at Kreindler & Kreindler, before you submitted

2  those declarations, ever said to you, in words or substance,

3  John, you're basically admitting to a crime here, you ought to

4  seek counsel?

5  A.  No, I don't think so.

6  Q.  Were you aware when you gave those declarations that

7  deliberately violating a court order could be a crime?

8  A.  No, I didn't realize that at the time.

9  Q.  When you submitted those sworn declarations, were you aware

10 that destroying evidence that might be needed in a proceeding

11 could subject you to obstruction of justice charges, also a

12 crime?

13 A.  No, I hadn't considered that.

14 Q.  When you submitted your declarations, were you aware that

15 submitting false declarations could subject you to perjury

16 charges?

17 A.  Yes, I did.

18 Q.  Are you aware sitting here today that any false testimony

19 you give today could likewise subject you to perjury charges?

20 A.  Yes, I am aware.

21 Q.  If you had known the full extent of the criminal

22 consequences of submitting your sworn declarations, Mr.

23 Fawcett, would you have submitted those declarations on

24 September 27 and September 30?

25 A.  I don't know, really.

LB289115                    Fawcett – Cross

1   Q.  Let's talk for a minute about the protective orders.

2              You're aware that there are two such orders in this

3   case?

4   A.  That's right.

5   Q.  The MDL protective order and the FBI protective order?

6   A.  Correct.

7   Q.  Before you did any work under those orders, you studied

8   them and understood them?

9   A.  I wouldn't say I studied them.  I had read them.

10  Q.  You're hesitating.

11  A.  Well, studied implies a lot of understanding.

12  Q.  I will start with the MDL order.  That was issued in 2006

13  by Judge Casey, correct?

14  A.  I believe so, yes.

15  Q.  Did you read that order?

16  A.  Yes, I did.

17  Q.  You're hesitating.

18  A.  Well, I don't remember the exact point, but I would have

19  read it at the time, yes.

20  Q.  When you read it, do you remember that you understood every

21  piece of it?

22  A.  No, I didn't.

23  Q.  Let's go to the FBI protective order.

24              Are you familiar with that order?

25  A.  Yes, I am.

LB289115                     Fawcett – Cross

1    Q.  Is that yes, ma'am?

2    A.  Yes, I am.

3    Q.  Were you aware that's an order that was entered by this

4    court in 2018?

5    A.  Yes.

6    Q.  Did you read every line of that?

7    A.  Yes, I would have at the time.

8    Q.  Did you understand every line of that order?

9    A.  No, I didn't.

10   Q.  Why are you giving me that answer?

11   A.  Because things were pointed out to me after my

12   declarations.

13           MR. GERBER:  Your Honor, I think we are getting close

14   to some privileged communications, if you could instruct the

15   witness.

16           THE COURT:  To the extent you are answering based on

17   discussions you have had with your lawyer, you shouldn't answer

18   those questions.  To the extent, when you read the protective

19   order, that you had questions or didn't understand it, you can

20   answer that question.

21           THE WITNESS:  OK.

22   BY MR. HANSEN:

23   Q.  Putting aside anything your lawyer told you, Mr. Fawcett,

24   what was it about the protective order that you didn't

25   understand?

1   A.  I'm a little confused as to whether I should answer this or

2   not.

3           MR. GERBER:  Your Honor --

4           THE COURT:  Sir, when you read the protective order,

5   did you understand what it meant?

6           THE WITNESS:  I did at the time, but things were

7   pointed out later that I realized I didn't understand it.  I

8   thought I understood at the time, but in hindsight there were

9   some aspects that I did not understand.

10          MR. HANSEN:  Let me try a different way, your Honor.

11  Q.  You're not a lawyer, are you, Mr. Fawcett?

12  A.  No, I'm not.

13  Q.  You were working with a number of lawyers at Kreindler &

14  Kreindler, were you not?

15  A.  Yes, I was.

16  Q.  Did any of the lawyers at Kreindler & Kreindler explain to

17  you the various provisions of the FBI protective order so you

18  could be sure you understood it?

19  A.  We would have discussed both protective orders

20  occasionally.  I don't remember going through it line by line.

21  Q.  No one ever gave you a full briefing of every provision of

22  the FBI protective order?

23  A.  No, I don't think so.

24  Q.  From your understanding, and I don't want to get what your

25  able counsel has told you, what does the FBI protective order

LB289115                    Fawcett – Cross

1    provide in terms of a deposition transcript that has not been

2    reviewed by the FBI?

3              MR. GERBER:  Objection.  If we could just get clarity.

4    Is he asking the witness for his understanding in an earlier

5    period or his understanding now?  I think the timing is going

6    to matter here, your Honor.

7              MR. HANSEN:  Let me back up.

8    Q.  Before you hired current counsel, at the time you submitted

9    your declarations, tell us what you understood the FBI

10   protective order provided in terms of a deposition transcript

11   in this case that had not yet been fully reviewed by the FBI.

12   A.  What comes to mind is that the material -- the portions of

13   the transcript based on the FBI protected material was FBI

14   protected.  That's the way I was viewing it.

15   Q.  Did you ever actually read the order?

16   A.  Yes, I have read the order.

17   Q.  Let's look at it together for a minute.

18             MR. HANSEN:  Let's get up on the screen the order in

19   this case.  This is Exhibit 15, which I don't believe we have

20   to offer it into evidence because it's a court filing.  If

21   counsel disagrees, we can have that dispute now.

22             MR. GERBER:  No objection.

23             THE COURT:  Thank you.

24             This is KSA 15.

25             MR. HANSEN:  Let's highlight paragraph 10, please.

1  BY MR. HANSEN:

2  Q.  You see here it says, "Pending review of the deposition

3  transcript by the FBI, any deposition transcripts containing

4  such questions and testimony shall be automatically subject, in

5  their entirety, to the same protections and precautions as the

6  protected information.  Upon receipt of the deposition

7  transcript, a copy shall be served on the FBI by the PECs.  The

8  FBI will have 30 days to review and designate the portions of

9  the transcript that contain protected information."

10         Had you read that language, Mr. Fawcett?

11  A.  I read it, but this is the piece that I didn't appreciate

12  until later.

13  Q.  You were handling all the depositions in this case as part

14  of your job supervising the discovery material for Kreindler &

15  Kreindler, correct?

16  A.  I'm not sure I understand what you mean.

17  Q.  No one at Kreindler & Kreindler informed you that you

18  needed to treat all these deposition transcripts as fully

19  confidential under the FBI order until such time as this had

20  been complied with, right?

21  A.  I believe we did protect them.

22  Q.  The Al Jarrah testimony?

23  A.  With that exception.

24  Q.  How can you say that when you didn't even know what the

25  rule provided?

LB289115                      Fawcett - Cross

1   A.  We just generally protected all material.  It was not

2   readily available.

3   Q.  You didn't even understand the order, did you?

4   A.  This clause I did not, I admit.

5   Q.  I am going to ask you just a few questions about the

6   protective order violation found by this court in 2017.

7            Were you aware that --

8            MR. GERBER:  Objection, your Honor.  We understand, of

9   course, that the court has found a waiver of the Fifth

10  Amendment with regard to the subject matter of the

11  declarations.  This goes far beyond that, literally years back.

12  We respectfully submit that is not covered by the finding of

13  waiver by the court, and we would advise our client not to

14  answer questions regarding that other subject matter based on

15  his Fifth Amendment privilege against self-incrimination.

16           THE COURT:  Are you permitting your client to answer

17  questions about his knowledge of those events in the court's

18  findings or in its entirety?

19           MR. GERBER:  Fair enough.  To the extent that the

20  question is about the court's findings, yes, fair, he can get

21  into that.  I do want to make clear our position, to the extent

22  he is going to be asked questions regarding his own conduct.

23           THE COURT:  His involvement.  Then he asserts the

24  Fifth.

25           MR. GERBER:  Yes, your Honor.

1          THE COURT:  So, counsel and sir, if you want to ask

2    questions about what Mr. Fawcett knew about those allegations,

3    the court record, etc., those are questions that you may

4    answer.  To the extent you intend to ask questions of Mr.

5    Fawcett about his involvement in those allegations, where the

6    court found breach or where the FBI made an allegation of

7    breach, your lawyer is advising you to take the Fifth Amendment

8    and decline to answer those questions.

9          Do you understand that?

10         THE WITNESS:  No, I don't entirely.

11         MR. HANSEN:  Can I just ask the questions?  I think

12   the questions will sort this out.

13         THE COURT:  You can proceed, and counsel and I will

14   both watch carefully.

15   BY MR. HANSEN:

16   Q.  I am going to ask about your state of mind, Mr. Fawcett.

17         Were you aware in 2017 that this court entered a

18   finding of a protective order violation by Kreindler &

19   Kreindler?

20   A.  Yes.

21   Q.  Who did you understand the court to have found to have

22   violated the protective order?

23   A.  I don't really recall.

24   Q.  Do you know whether it was you or Mr. Kreindler himself?

25   A.  I believe they found Jim responsible.

```
 1    Q.  Both you and Mr. Kreindler had talked to Caleb Hanan,

 2    correct?

 3              MR. GERBER:  Objection, your Honor.

 4              THE COURT:  I think the witness is going to take the

 5    Fifth to that question.

 6    Q.  Are you going to follow your counsel's advice and invoke

 7    your Fifth Amendment privilege against self-incrimination and

 8    refuse to answer my last question?

 9    A.  I would like to assert my Fifth Amendment privilege.

10              MR. HANSEN:  I couldn't hear the answer, your Honor.

11              THE COURT:  He said yes.

12    Q.  All right, Mr. Fawcett.  As a result of your

13    awareness -- actually, let me back up.

14              Were you aware that the court in 2017 also issued an

15    instruction to counsel to be exceedingly discreet in dealing

16    with protected material in the future?

17    A.  I don't remember sitting here today the order.

18    Q.  Were you aware in 2017 that the court had issued no

19    particular sanction against the violator of the protective

20    order?

21    A.  I don't remember exactly.

22    Q.  Were you present in the courtroom during the hearing on

23    that particular violation?

24    A.  No.

25    Q.  Did you read the transcript of that hearing?
```

1   A.  I may have read it at the time.  I don't recall it right

2   now.

3   Q.  You think you likely did?

4   A.  Yeah, I likely did.

5   Q.  So you would have seen that the court gave a warning,

6   called it a first warning, that violations would be dealt with

7   differently in the future, correct?

8   A.  I don't remember it at the moment, no.

9   Q.  So let's move forward in time to 2021.

10          You are aware, are you not, Mr. Fawcett, that your

11   boss, Mr. Kreindler, gave an interview to Michael Isikoff for

12   his podcast on July 1, 2021, correct?

13   A.  I don't recall the date, but in that time frame, yes.

14   Q.  I will represent to you that we have evidence in the record

15   of that, just to anchor you in time.

16          Mr. Kreindler was speaking to the reporter,

17   Mr. Isikoff, at that time with your knowledge, correct?

18   A.  Right.

19   Q.  And you were likewise speaking to the same reporter,

20   Mr. Isikoff, in the same time period, correct?

21   A.  Right.

22   Q.  In fact, you had a number of telephone calls and text

23   messages with Mr. Isikoff in the days immediately after July 1,

24   did you not?

25   A.  Yes, I believe so.

LB289115                    Fawcett - Cross

1    Q.  In fact, let's go to another exhibit, if we could.  This is

2    Exhibit 134.

3              MR. HANSEN:  I am going to offer them into evidence.

4    They were records produced by Mr. Fawcett in response to a

5    court order.

6              We offer them.

7              MR. GERBER:  No objection, your Honor.

8              THE COURT:  KSA 134 is admitted.

9              (KSA Exhibit 134 received in evidence)

10   Q.  So, these are your phone records for your personal cell

11   phone, Mr. Fawcett?

12   A.  Yes.

13   Q.  If you look at the top of the page, we will highlight it,

14   we have four entries for a number 202-258-2535.

15             You recognize that to be Michael Isikoff's telephone

16   number, don't you?

17   A.  Yes, I do.

18   Q.  One of the calls is for 22 minutes?

19   A.  Yes.

20   Q.  And you were talking to Mr. Isikoff about the 9/11 cases,

21   correct?

22   A.  Yes, I was.

23   Q.  And you were talking to Mr. Isikoff about leaking the Al

24   Jarrah deposition transcript to Mr. Isikoff, weren't you?

25   A.  We were talking about the Jarrah deposition.

1   Q.  Did you tell him in those calls, in words or substance,

2   that you were going to give him the Al Jarrah deposition

3   testimony?

4   A.  I'm not entirely sure if it was in that conversation we

5   would have been discussing the deposition.

6   Q.  Mr. Fawcett, jumping a little ahead in time, just for

7   purposes of the next few questions, you are aware that the

8   court ordered you on August 30 to both provide a declaration

9   and to provide any and all communications you had with

10  Mr. Isikoff, correct?

11  A.  Yes.

12  Q.  Isn't it true, sir, that none of these calls I am showing

13  you to you were ever disclosed to the court until we got a

14  court order to provide further discovery?

15  A.  I guess I don't understand.

16  Q.  OK.  These calls were not disclosed in your September 27

17  declaration, were they?

18  A.  No, I don't think so.

19  Q.  These calls were not disclosed in your September 30

20  declaration, were they?

21  A.  No, I don't believe so.

22  Q.  In addition to calls, you also had a number of texts with

23  Mr. Isikoff, did you not?

24  A.  If I could maybe correct that, I believe the declarations

25  did include discussion of the calls, or reference to calls.

1   Q.  I'm sorry.  You believe there was reference?

2   A.  Yes, I believe so.

3   Q.  You think there was one in your September 27 declaration?

4   A.  I'm not sure which one it is, or both of them.

5   Q.  Well, you could take a look at both of them.

6            I will represent to you there is some references to

7   phone calls in your September 30 declaration.  So let's go to

8   that.  That's Exhibit 59.

9            You're familiar with this declaration?

10  A.  Yes, I am.

11  Q.  You say in here, in paragraph 3, you privately communicated

12  with Michael Isikoff several times, correct?

13  A.  Yes.

14  Q.  Let's go further on down.  Go to the next page, please.

15  There is a reference to your first call.  Let's see where we

16  can find that.

17           MR. HANSEN:  It's a little further down.

18           Can we keep going, please?

19  Q.  There is a reference in paragraph 8 to a second phone call?

20  A.  Yes.

21  Q.  Let's go back to paragraph 3.  I didn't see it.

22           There are three calls.

23           MR. HANSEN:  Paragraph 3, please, Geoff.

24  Q.  Paragraph 3.  You believe the first time was in early July,

25  correct?

LB289115                    Fawcett – Cross

1    A.  Correct.

2    Q.  Now, let's go to paragraph 8.

3          You had a second call with him about the timing?

4    A.  Right.

5    Q.  When was that?

6    A.  This would have been after the first call but prior to the

7    publication.

8    Q.  It's not July 3, is it?

9    A.  No.  My understanding is the first call would be July 3.

10   Q.  How about the third call you reference here?

11         MR. HANSEN:  Take that down and go to the third call

12   in paragraph 10.

13   Q.  The third call, when was that?

14   A.  Well, before the publication.

15   Q.  That's not these calls we were just looking at, was it?

16   A.  No.  I believe July 3rd is the first call.

17   Q.  So you didn't disclose at least some of these calls, and

18   there were others, were there not, that you didn't disclose?

19   A.  I don't believe so.

20   Q.  Let's look at your records then.

21         MR. HANSEN:  If we can put up Exhibit 138.

22         We offer 138.

23         THE COURT:  Any objection, counselor?

24         MR. GERBER:  No, your Honor.

25         THE COURT:  We will admit KSA 138.

LB289115                          Fawcett - Cross

1          (KSA Exhibit 138 received in evidence)

2     Q.   These are your records.  If you look at the top of the

3     page, there is one to Mr. Isikoff on July 12; there is a second

4     one on July 12; there is a third one on July 12; and then there

5     are two more entries for August 2nd.

6          So is it fair to say, Mr. Fawcett, that you did not

7     disclose to the court all of the contacts you had with

8     Mr. Isikoff by phone in either of your declarations?

9     A.   No.  I think those are the calls.

10    Q.   Your declaration talks about three calls, and we have just

11    shown you about ten.  All of them weren't disclosed, were they?

12    A.   Well, for instance, the way I kind of read this, there are

13    two calls on June 12, one is a call coming in and one is a call

14    going out.  I consider those one call.  Either he is calling me

15    or I'm calling him, and the other person is not answering and

16    so they return the call five minutes later.  That's one call.

17    Q.   The record will be what the record is.

18         Do you believe you disclosed all of your calls with

19    Mr. Isikoff in your sworn declaration?

20    A.   I believe so.

21    Q.   Even though you only referenced three calls?

22    A.   The July 3rd calls are essentially one call.

23    Q.   I see.

24         How about texts, were you aware that you were supposed

25    to tell the court about text messages as well?

1  A.  I don't recall.

2  Q.  Did you read the court's August 30 order about what you

3  were required to disclose?

4  A.  I'm sure I did.

5  Q.  The court ordered you to disclose all communications with

6  Mr. Isikoff, correct?

7  A.  I don't have it in front of me.  I don't know.

8  Q.  Do you consider text messages communications?

9  A.  Yes, I would.

10  Q.  You had multiple text messages with Mr. Isikoff, didn't

11  you?

12  A.  I don't recall how many I had.

13  Q.  Let's look at, for example, Exhibit 82.  These are signal

14  messages between you and Mr. Isikoff.

15          MR. HANSEN:  I am offering this also, by the way,

16  Exhibit 82.

17          THE COURT:  Any objection?

18          MR. GERBER:  No, your Honor.

19          THE COURT:  KSA 82 is admitted.

20          (KSA Exhibit 82 received in evidence)

21  Q.  So, you also communicated with Mr. Isikoff by the signal

22  channel, correct?

23  A.  Yes, because the phone was not working, something is not

24  working.

25  Q.  Were you aware that you had these communications with

LB289115                          Fawcett – Cross

1   Mr. Isikoff at the time that you submitted your sworn

2   declarations on September 27 and September 30?

3   A.  I'm not sure I really looked through my signal messages.

4   Q.  Why would you not look if you were trying to be accurate

5   for the court?

6   A.  I don't know.  I don't have an answer to that.  I was just

7   talking about the phone calls relating to the transcript.

8   Q.  Actually, these are very significant texts, aren't they,

9   because they help us date when somebody provided the transcript

10  to Mr. Isikoff.

11          Let's go down to the bottom of this signal call chain,

12  the very last entry.  This is on the 5th of July.  This is four

13  days after Mr. Kreindler does his podcast, correct?

14  A.  Correct.

15  Q.  And you have been speaking with him by phone during this

16  period, correct?

17  A.  Yes, I have.

18  Q.  And Mr. Isikoff asks you, "Did Thumairy also invoke Vienna

19  Convention?"

20          Do you see that?

21  A.  Yes.

22  Q.  So we know from this text message that by July 5,

23  Mr. Isikoff has the Al Jarrah transcript, because Al Jarrah in

24  that transcript, which Mr. Isikoff then publishes about, had

25  invoked the Vienna Convention, correct?

1    A.  I don't know that for sure.

2    Q.  Well, do you know any other reason why Mr. Isikoff would

3    know about Al Jarrah invoking the Vienna Convention?

4    A.  If we had discussed it on the 3rd, yes.

5    Q.  So in addition to sending the transcript, you also

6    disclosed the contents of depositions orally to Mr. Isikoff in

7    your calls, is that what you're telling us?

8    A.  I remember talking about certain aspects of the deposition.

9    Q.  Let's look at what Mr. Isikoff wrote after you talked to

10   him and apparently provided him with the transcript.

11              MR. HANSEN:  Exhibit 40, please.

12   Q.  This is his story, dated July 15.

13              MR. HANSEN:  We offer Exhibit 40.

14              MR. GERBER:  No objection.

15              THE COURT:  KSA 40 is admitted.

16              (KSA Exhibit 40 received in evidence)

17              MR. HANSEN:  Let's go to page 4, please.  If we could

18   highlight the penultimate paragraph.

19   Q.  Here, Mr. Isikoff writes that there was a reference to an

20   instruction not to answer on the grounds of Vienna Convention.

21   He is talking about the Al Jarrah deposition, correct?

22   A.  Correct.

23   Q.  And you had provided him with that information, correct?

24   A.  It's in the transcript.

25   Q.  And he is asking you about it as early as July 5.  So can

LB289115                    Fawcett - Cross

1   we conclude that you probably gave him the transcript by July

2   5?

3   A.  I don't have any disagreement with that.  I did give him

4   the transcript.  I don't remember the exact date, but July 5

5   sounds about right.

6   Q.  Let's go to July 15.  This is the article that alerts

7   everyone that someone has violated the protective order by

8   giving a transcript to Mr. Isikoff.

9        Were you aware of Mr. Isikoff's article on July 15?

10  A.  Yes, I was.

11  Q.  I just want to be very clear about these questions.

12       Did anyone from Kreindler & Kreindler, on July 15 or

13  at any time prior to September 27, ask you directly, in words

14  or substance, John Fawcett, did you disclose the Al Jarrah

15  testimony to Michael Isikoff?

16  A.  I don't recall directly, but in substance, yes, they would

17  have asked in substance.

18  Q.  Why are you hesitating?  Did Jim Kreindler ever come to you

19  and say, John Fawcett, did you disclose the transcript to

20  Michael Isikoff?

21  A.  Not in those exact words, no.

22  Q.  Did you lie to Jim Kreindler?

23  A.  I misled him.

24  Q.  How about Andrew Maloney, did Andrew Maloney ever come to

25  you and ask you, in words or substance, Mr. Fawcett, did you

LB289115                        Fawcett - Cross

1    disclose the transcript to Michael Isikoff?

2    A.   I don't remember him specifically saying that.

3    Q.   At any point?

4    A.   I don't remember that, no.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB2H9116                    Fawcett - Cross

1   Q.  How about Megan Benett?  Did Megan Benett at any point come

2   to you, in words or substance:  John Fawcett, did you give the

3   Al Jarrah transcript to Michael Isikoff?

4   A.  When you say "in substance," it implies there's other --

5   it's not direct, in other words, asking me directly, did you do

6   that?  I don't remember them saying that, but in substance.

7   Q.  When did she do that, whatever it was that was -- you're

8   referring to?

9   A.  Well, I would say it's -- it was much more -- at that

10  period of time, it was much more Maloney's role.

11  Q.  Let's back up.  I want to make sure we're very clear about

12  that.  With Mr. Kreindler you say you misled?

13  A.  Yes.

14  Q.  When did this happen?

15  A.  I think between the time the investigation began and

16  September 27.

17  Q.  How did you mislead him?

18  A.  By not -- by not openly telling them that I was the source

19  of the leak.

20  Q.  OK.  Let's distinguish a couple of things.

21          You didn't tell them you were the source of the leak,

22  correct?

23  A.  Correct.

24  Q.  Did he ask you if you were the source of the leak?

25  A.  Not directly, but I knew the investigation was ongoing.

LB2H9116                        Fawcett - Cross

1   Q.  But my question is does he come to you and say, ask you the

2   question, did you disclose this transcript?

3   A.  I don't remember that, no.

4   Q.  Did Megan Benett come to you and say, did you disclose this

5   transcript?

6   A.  No, I don't recall that.

7   Q.  Did Andrew Maloney come to you and say, did you disclose

8   the transcript?

9   A.  I don't recall that.

10  Q.  Did Steven Pounian come to you and say, did you disclose

11  the transcript?

12  A.  No, I don't recall that.

13  Q.  And by the way, you put in your own declaration that you

14  destroyed evidence, correct?

15  A.  Yes, I did.

16  Q.  And you knew at the time you destroyed this evidence that

17  this court proceeding, this MDL proceeding, was in progress,

18  correct?

19  A.  What do you mean the "proceeding"?  The investigation?

20  Q.  The case.

21  A.  The case was in progress.

22          THE COURT:  He's referring to --

23  A.  The 9/11 case?

24          THE COURT:  Yes, he's referring to the 9/11 case.

25  A.  The 9/11 case, certainly.

LB2H9116                          Fawcett - Cross

1    Q.  You knew if there was any disclosure of a protective order

2    violation, the court would have an investigation?

3    A.  I wasn't -- I wasn't thinking about an investigation, no.

4    Q.  It was obvious, wasn't it?

5    A.  Well, it was not to me.

6    Q.  Let's talk about your destruction for a minute.  When did

7    you destroy the email that communicated the transcript to

8    Mr. Isikoff?

9    A.  If I recall correctly, it was set on auto-destruct.

10   Q.  When did you make that setting on your computer?

11   A.  When I would have sent it to him.

12   Q.  As early as the initial sending of the transcript, you set

13   the auto-destruct to destroy the email?

14   A.  Yes.

15   Q.  You're pretty sure of that?

16   A.  Yes.

17   Q.  How about the thumb drive on which you downloaded the

18   transcript --

19   A.  Right.

20   Q.  -- from the Kreindler system?  You destroyed that, too, did

21   not you?

22   A.  Yes, I did.

23   Q.  When did you destroy that?

24   A.  I don't recall when it was destroyed.  I had a group of

25   thumb drives.  I had four or five thumb drives.  I destroyed

LB2H9116                        Fawcett – Cross

1   them all at once.

2   Q.  Well, this is pretty consequential, isn't it?  It might

3   matter quite a lot when you destroyed it.  Can you do your best

4   to tell us when you destroyed this information.

5   A.  I really -- I thought about this, and I don't remember

6   destroying it in the sense of destroying the transcript.  I was

7   getting rid of the four or five thumb drives on my desk at

8   home.

9   Q.  So there's no connection between your destruction of the

10  thumb drive of this evidence and your being discovered?

11  A.  No.  I had a lot of thumb drive that were all -- every time

12  I was using them, they were coming up with error messages, so I

13  just --

14  Q.  So it's possible that you destroyed this thumb drive after,

15  say, July 21, 2021?

16  A.  I don't really remember when it was.  It was sometime in

17  the summer.

18  Q.  Is it possible you destroyed that thumb drive after the

19  Court issued its first orders in this matter about

20  investigations?

21  A.  I don't remember which date that is.

22  Q.  So you have no idea?  It could have been anytime in the

23  summer?

24  A.  I think it's anytime in the summer.  It -- when it

25  started -- sorry.

LB2H9116                    Fawcett - Cross

1   Q.  All the way to Labor Day?

2   A.  Yeah, I suppose that's correct.

3   Q.  How did you destroy the thumb drive?

4   A.  First I tried -- I had four or five of them.  I tried to

5   open them.  I was going -- fed up with them because they

6   weren't working, and I like to have one to take back and forth

7   to the office.

8   Q.  Did you break it in two?  Did you throw it in the trash?

9   A.  No, I threw it in the trash.

10  Q.  And I should have asked you this before, but when I was

11  asking about your being interrogated by Kreindler, they asked

12  you to sign a declaration, did they not, saying that you had

13  lied to them, and you refused to do it?

14  A.  No, I don't recall.

15  Q.  Let's look at a document that's already in evidence, which

16  is Exhibit -- sorry, here.  I'll get it right for you.  121, I

17  believe.  Yeah.

18          Do you recall being sent a draft in an email for you

19  by either Mr. Pounian or Ms. Benett that you then edited to

20  take out the words "until today I had told/Kreindler &

21  Kreindler that I did not know how Michael Isikoff had obtained

22  the transcript"?

23          MR. GERBER:  Objection.  This is an attachment.  Can

24  he see the cover email to this document?

25          THE COURT:  Sure.  Mr. Hansen, can you just show the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    email that this draft is attached to --

2              MR. HANSEN:  Yep.

3              THE COURT:  -- or direct the witness.  He can just

4    look at the hard copy.  Here we go.

5    BY MR. HANSEN:

6    Q.  There you go.  That's the cover.  Let me know when you're

7    ready to answer questions.

8    A.  OK.

9    Q.  OK.  Can we go back to the text.

10             Is that edit -- I don't have to read it again.  Is the

11   edit I just referenced an edit you made to this document?

12   A.  Let me see the whole page.

13   Q.  Sure.

14             THE COURT:  It's in that binder at Exhibit 121 if you

15   want to look at a piece of paper.

16             THE WITNESS:  I can see it.

17   Q.  You can tell me you don't know.  You can tell me yes.  You

18   can tell me no.

19   A.  I'm sorry.  What is the question?

20   Q.  Well, I'll repeat it.

21             I'm asking if you, John Fawcett, made the edit to this

22   document that's indicated in the redline in the second and

23   third lines of paragraph 3?

24   A.  The edit meaning the -- the deletion with the red line?

25   Q.  Yes.

LB2H9116                    Fawcett - Cross

1    A.  I'm not sure.  If it's -- if this is an email from me, then
2    I would have made it.  If this is an email coming back, then --
3    Q.  But do you recall being presented with a declaration that
4    said you'd lied to Kreindler & Kreindler and you crossing that
5    out because you hadn't done that?
6    A.  No, I don't -- I'm -- not quite understood that.
7    Q.  Did you tell anyone at Kreindler & Kreindler that the text
8    of this particular document was inaccurate in lines 2 and 3 of
9    Exhibit 121?
10           MR. GERBER:  Lines 2 and 3?
11           MR. HANSEN:  Lines 2 and 3 of paragraph 3,
12   Exhibit 121.
13   A.  I mean, I was very clear with them that I -- that the first
14   time they had heard about it was the day I signed this
15   declaration.
16   Q.  I'm not asking you about that.
17           Do you have any knowledge of why this was struck out
18   in this draft?
19   A.  I think because it -- maybe it doesn't just -- just doesn't
20   flow well.  It's --
21   Q.  Bad grammar?
22   A.  Yeah, I think it's --
23   Q.  Oh, please.
24           Mr. Fawcett, I'll move on to a different subject,
25   July 21.  You were aware on July 21 that the defendant

LB2H9116                    Fawcett - Cross

1    Saudi Arabia had told the Plaintiffs' Executive Committee it

2    was going to ask the Court for a court-ordered investigation of

3    this protective order violation, correct?

4    A.  I don't recall.

5    Q.  Well, the very next morning, according to records produced

6    in this case, you had a long phone call with Jim Kreindler,

7    didn't you?

8    A.  I'll take -- I'll take your word.  I don't know.

9    Q.  Well, let's show you the document, the reference.

10   A.  All right.

11            MR. HANSEN:  If we could put up on the screen

12   Exhibit 135, Exhibit 135.  These are your phone records, and I

13   will offer Exhibit 135 if it's not already in evidence.

14            MR. GERBER:  No objection.

15            THE COURT:  All right.  KSA 135 is admitted.

16            (KSA Exhibit 135 received in evidence)

17   BY MR. HANSEN:

18   Q.  If we go to the entry of 9:17 a.m., you see that on pretty

19   much first thing in the morning on the 22nd -- and I will

20   represent to you that lawyers for Saudi Arabia had sent an

21   email the day before to the Plaintiffs' Executive Committee

22   saying they were going to ask for an investigation.  On the

23   22nd, you have a 46-minute call with Jim Kreindler, correct?

24   A.  Yes.

25   Q.  In that call you talked about the fact that you had

LB2H9116                        Fawcett – Cross

1    provided the Al Jarrah transcript to Michael Isikoff, correct?

2    A.  No.

3    Q.  You strategized with Mr. Kreindler as to how you were going

4    to deal with this problem, didn't you?

5    A.  No, that's not correct.

6    Q.  You talked about what you would need to do to protect

7    yourself, correct?

8    A.  No, that's not correct.

9    Q.  What did you talk about in this 46-minute call?

10   A.  I -- I don't know.  That might have been a conference call

11   with others.  There may have been -- I talked with Jim often.

12   Forty-six minutes is a long call.  That tends to tell me it's

13   a -- it's more than one person.  But I never discussed the

14   Jarrah transcript or my leaking of the Jarrah transcript with

15   anyone.

16   Q.  How many times in July did you have a 46-minute call with

17   Jim Kreindler one on one?

18   A.  I don't know.  That's why that tends to tell me that it's,

19   you know -- we often had conference calls amongst the --

20   amongst all the people working on the case.

21   Q.  Do you remember anything about what was said by you or him

22   in that call?

23   A.  I don't remember, no.

24   Q.  Anything of the subject?

25   A.  Aside from it would not have been relating to the leak to

LB2H9116                        Fawcett - Cross

1    the Jarrah transcript.

2    Q.  What, if anything, in this call gave you concern about your

3    own criminal exposure?

4    A.  I -- I don't recall anything from that call.

5    Q.  Do you know a woman named Liz Crotty?

6    A.  Yes, I do.

7    Q.  Ms. Crotty is a criminal defense lawyer?

8    A.  Yes, she is.

9    Q.  Is she a personal friend of yours?

10   A.  Yes, she is.

11   Q.  You called Ms. Crotty, according to these records, almost

12   immediately after hanging up with Mr. Kreindler.  You see that

13   right above the Kreindler call?

14   A.  Yes.

15   Q.  Why did you call Ms. Crotty?

16   A.  She's my attorney, or she was my attorney.

17   Q.  Getting legal advice from her?

18   A.  I don't recall what I was doing on that, but I may very

19   well have been.

20   Q.  Were you paying her from your own pocket for this work?

21   A.  I didn't.  I had retained her years ago.

22   Q.  Who paid her fees?

23   A.  She didn't charge me any fees.  Aside from the day I

24   retained her, she charged me one dollar.

25   Q.  I recognize that your counsel's not going to want to get

LB2H9116                    Fawcett - Cross

1  you into privileged information, but I'll represent that you've

2  asserted privilege over your communications with Ms. Crotty.

3  But can you tell me at least the subject matter of this

4  communication?

5           MR. GERBER:  Your Honor, I would just ask the Court to

6  listen very carefully just to avoid any privilege waiver here.

7           MR. HANSEN:  I believe the subject of the

8  communications is not privileged.

9           MR. GERBER:  Your Honor, I agree that he can even

10  speak at a very high level to the subject matter.  I just want

11  to be careful the witness makes sure he understands what he can

12  and cannot get into in responding to that question.

13          THE COURT:  Do you hear your lawyer, sir?

14          THE WITNESS:  Sorry.  I was trying to remember what we

15  were talking about.

16          THE COURT:  Your lawyer said you can answer the

17  question only insofar as you can talk about the general subject

18  matter, what you were speaking with Ms. Crotty about.

19          THE WITNESS:  OK.

20          THE COURT:  Can you answer that question?

21          THE WITNESS:  I'm not -- I don't remember this call.

22  At one point in July I had made her aware that I wanted to talk

23  to her on an attorney-client basis.  I don't believe this was

24  actually -- I don't believe it was this call.

25  BY MR. HANSEN:

LB2H9116                     Fawcett – Cross

1   Q.  So somehow help me with the subject matter.  Was the

2   subject matter having to do with the 9/11 case?

3   A.  I don't -- actually, I don't think so.  However, I believe

4   there's an email from me to Ms. Crotty which we produced.

5            MR. GERBER:  Your Honor, again, to be clear, as the

6   Court said, we have asserted privilege with regard to those

7   communications.

8            THE WITNESS:  Right.

9            MR. GERBER:  I would ask the Court to direct my client

10  not to speak about the substance of his communications, whether

11  on the call or an email with Ms. Crotty.

12           THE COURT:  OK.  But, again, he can answer the

13  question about the general subject matter?

14           MR. GERBER:  Yes, your Honor.  Yes, your Honor.

15           THE COURT:  OK.  Sir.

16           THE WITNESS:  I do remember a call with Liz in the

17  summer in which we talked about her having run for District

18  Attorney, and she was telling me about how she felt about it

19  afterwards and having lost, and I remember that being quite a

20  long conversation.  And that's what I think --

21  BY MR. HANSEN:

22  Q.  Well, that's not privileged.

23  A.  -- this call was.

24  Q.  That would have nothing to do with attorney-client

25  privilege if she's talking about her race for District

1  Attorney.  I'm asking you -- look, I don't want to waste a ton

2  of everybody's time, Mr. Fawcett.  You know what I'm asking.

3  If you don't want to answer it, I guess we'll just have to

4  leave --

5          MR. GERBER:  Objection.

6  Q.  Here's the question.  No, seriously, here's the question:

7  What was the subject matter of your call with Ms. Crotty

8  immediately after hanging up with Mr. Kreindler?

9  A.  I do believe that this call was about her having run for

10  office, and we're just catching up because I had been following

11  that.

12  Q.  And yet you've asserted privilege over this call?

13  A.  Well, that's -- I remember there was a long call in which

14  that's what we talked about.

15  Q.  I'm going to ask you again.  You've asserted in good faith

16  attorney-client privilege over a call which the only thing you

17  discussed with Liz Crotty was her race for District Attorney

18  and how things were going with --

19  A.  That's why I remember why it took 22 minutes, because we

20  were talking quite a bit about her running for office.

21  Q.  Are you going to stand by that answer, Mr. Fawcett?

22  A.  Yes.

23  Q.  Recognizing the penalties of perjury are sitting here on

24  your shoulders today?

25  A.  Yes.

LB2H9116                        Fawcett - Cross

1    Q.  Recognizing that your attorney's asserted privilege over

2    this communication?

3    A.  Well, yes.

4    Q.  So were you calling Mr. Kreindler almost immediately after

5    hanging up with Mr. -- with Ms. Crotty at 10:19 a.m. in order

6    to fill him in on the personal doings of Ms. Crotty and her

7    family?

8    A.  No.

9    Q.  You have a four-minute call with him.  What are you talking

10   to Mr. Kreindler about immediately after you hang up with

11   Ms. Crotty?

12   A.  I'm not sure which one you're talking about.

13   Q.  I'm sorry.  Let's see if we can highlight it.  It's two up

14   above the 12:56 -- no, it's actually right here.  You see the

15   sequence, 9:17 Kreindler, 10:41 Crotty, 12:56 Kreindler, five

16   minutes, immediately after hanging up with Ms. Crotty.

17   A.  Well, it's about two hours after.

18   Q.  It's your very next telephone call?

19   A.  Yes, that's true.

20   Q.  What are you talking to Mr. Kreindler about?

21   A.  I don't know.

22   Q.  About Ms. Crotty's family doings?

23   A.  No.

24   Q.  OK.  Let's talk about August 30.  Court issued an order on

25   August 30.  Did you receive that order on August 30?

1   A.  Yes, I believe so.

2   Q.  Did you read it?

3   A.  Yes, I'm sure I did.

4   Q.  Did you realize you would have to submit a declaration, a

5   sworn declaration?

6   A.  Yes, I did.

7   Q.  Did you realize you were going to have to turn over all of

8   your communications with Mr. Isikoff, telephone, text, emails?

9   A.  If that's what the order said.  I don't remember exactly

10  what the order said.

11  Q.  But you realized you were going to have to do that,

12  correct?

13  A.  If that's what the order said, yes.

14  Q.  You didn't do it, did you?

15  A.  I did.  I turned over -- at least my declaration I

16  described the call.

17  Q.  You want to take a look at your declaration and find me a

18  text message?

19  A.  No.

20  Q.  Want to take the time?  We can take ten minutes here in

21  court.  You can look through all five pages, but you're not

22  going to find a single text message, are you, Mr. Fawcett?

23  A.  No.

24  Q.  You held that information back from the court, correct?

25  A.  Not deliberately.  I just -- it didn't occur to me that it

LB2H9116                        Fawcett - Cross

1    was --

2    Q.  Pretty important to have a text message where the

3    reporter's asking you about invoking the Vienna Convention,

4    which is clearly evidence of a disclosure, isn't it?

5    A.  I don't know.  I didn't -- frankly, I just didn't recall.

6    Q.  Well, after August 30, when was the first time that anyone

7    from Kreindler & Kreindler asked you directly, John Fawcett,

8    you will need to give a declaration denying your complicity in

9    the leak of the transcript to Mr. Isikoff?

10   A.  Repeat the question.

11   Q.  Sure.  After the Court issued its order on August 30, when

12   was the first time that anyone from Kreindler told you that you

13   would have to issue -- sign a sworn declaration saying you

14   hadn't leaked the transcript?

15   A.  Almost immediately.  If not the same day, the day after.

16   Q.  Who asked you?

17   A.  It would have been either Duke and/or Megan.  Those were

18   the two that were involved.

19   Q.  What did Duke and/or Megan say to you at this time?

20   A.  I think they just said everybody that's had access to this

21   transcript's going to have to issue a declaration.

22   Q.  Did you say you'd be willing to do so?

23   A.  I don't think I responded.

24   Q.  You did not respond?

25   A.  I think I avoided it.

1   Q.  OK.  Going from August 30 to September 27, tell us the

2   first time that anyone from Kreindler & Kreindler forced the

3   issue, in other words, said, John Fawcett, you're going to have

4   to sign your declaration right now?

5   A.  Well, the order had been stayed, and once that had run out,

6   then the order was live again.  That's when they reached out,

7   which would have been two or three days before I signed my

8   declaration.

9   Q.  So just let me make sure I'm understanding your answer.

10          The Court ordered that its prior order be enforced on

11  September 23.  You signed your first declaration on

12  September 27.  Are you telling us that it wasn't until two or

13  three days before September 27 that anyone from Kreindler &

14  Kreindler actually said you have to sign a declaration now?

15  A.  I think the same day the order came out, the 23rd, they

16  would have -- I believe that would have been Megan who sent --

17  Q.  And did you say, did you lie to your colleagues and say,

18  oh, sure, I'll give you a declaration saying I didn't do

19  anything?

20  A.  No.

21  Q.  Did you say anything?

22  A.  No.

23  Q.  So I'm really puzzled.  The leak's on July 15.  Kreindler &

24  Kreindler says they're going to do an investigation starting

25  July 15.  In the two months following July 15, not a single

LB2H9116                    Fawcett - Cross

1   person from Kreindler & Kreindler ever insisted that you give a

2   sworn declaration about whether you knew anything about the

3   leak?

4   A.  I don't think there was any call for a declaration from me

5   until later.  There was an investigation.

6   Q.  Sir, can you answer my question?

7   A.  Yeah.

8   Q.  I'm not asking whether there was a call for it.  Can you

9   answer my question?

10  A.  Yes.

11  Q.  Do you understand my question?

12  A.  Well, if you can please repeat it.

13  Q.  In the two-month-plus period from July 15 until

14  September 23, according to what you've just told us, no one

15  from Kreindler & Kreindler insisted that you give a sworn

16  declaration?

17  A.  I think that's correct, yes.

18  Q.  All right.  So now I just want to finish up on your

19  declarations.  Your declarations are false, aren't they,

20  Mr. Fawcett?

21  A.  They were not false at the time.  There are some things in

22  there now that I realize are incorrect.

23  Q.  False, right?  False?

24          MR. GERBER:  Your Honor, is there a question?

25  Q.  Your declarations are false, not just not well worded.  You

LB2H9116                    Fawcett – Cross

1  gave false testimony, didn't you, Mr. Fawcett?

2  A.  Not at the time.

3  Q.  It's either true or it's false.  Is it false or is it true,

4  your testimony?

5  A.  At the time I gave those, I thought they were true, and now

6  realize some of it is not true.

7  Q.  Well, let's actually unpack some of that.  We're going to

8  talk, first, about your September 27 declaration.

9          You actually prepared a draft of the declaration for

10  yourself, which is Exhibit, if I can get it in front of me,

11  108A.  So let's put that one up.

12          Do you recognize this document?

13  A.  Yes, I do.

14  Q.  You drafted this, didn't you?

15  A.  I did.

16  Q.  On your own computer?

17  A.  Yes, I did.

18  Q.  In your own words?

19  A.  Yes.

20  Q.  Did you think it was accurate when you wrote it?

21  A.  Yes.

22  Q.  You weren't trying to lie to anybody when you wrote this

23  declaration, were you?

24  A.  No, I wasn't.

25  Q.  So what you say in this declaration that you wrote, without

1   any help from Kreindler & Kreindler, is, and I'm going to the

2   first paragraph:

3            "I sent a redacted version of the transcript of the

4   deposition of Musaed Al Jarrah to Michael Isikoff in early

5   July 2021.  The redacted portions related to the sections of

6   the deposition which were taken subject to the FBI protective

7   order and irrelevant to the issue at hand."

8            So what you're saying there is the reactions were

9   redactions were done by the court reporter and had been taken

10  out of the transcript, correct?

11  A.  Yeah, that's right.

12  Q.  So what you're telling us in your declaration here is that

13  you've sent the whole transcript to Mr. Isikoff, correct?

14  A.  With the -- with the FBI material redacted, yes.

15  Q.  That was done by the court reporter for those questions and

16  answers, right?

17  A.  Yes, that's right.

18  Q.  But you didn't send portions of the 610-page transcript,

19  did you?

20  A.  Was a portion, yes.  It was all of it except for the

21  material subject to the FBI.

22  Q.  It was the entire transcript with blackouts on some of the

23  pages, correct?

24  A.  Yeah, it was quite a lot of blackouts because --

25  Q.  But there were pages.  The entire transcript was sent by

LB2H9116                     Fawcett - Cross

1    you to Mr. Isikoff, correct?

2    A.   Right, without the FBI-protected material.

3    Q.   So now I want to look -- the first thing I want to focus on

4    is whether your declaration is true or false.  If you go to

5    62A, which I believe was part of your direct testimony, it was

6    admitted by the Court.  We go to paragraph 2, you say:  "I sent

7    a redacted version of the transcript to Michael Isikoff.  The

8    redacted portions of the deposition I sent to Michael Isikoff

9    were focused on Musaed Al Jarrah's testimony about his

10   possession of" something.

11            Is that a true statement?

12   A.   Actually, that sentence doesn't really make any sense.

13   Q.   It's your declaration.

14   A.   I realize.

15   Q.   You signed it.

16   A.   I realize.

17   Q.   Did you read it?

18   A.   Yes.

19   Q.   Not hard to read, is it?

20   A.   It's a sentence that makes no sense.  It's tough to read it

21   now.

22   Q.   Ms. Benett and Mr. Pounian wrote it, didn't they?

23   A.   They took my declaration, my draft, and edited it, yes,

24   into this.

25   Q.   These aren't your words, they're their words, aren't they?

1    A.  It looks to me like that sentence makes no sense.  It's

2    like something that was cut out of here.

3    Q.  Makes plenty of sense, plenty of sense.  This sentence

4    discloses to the court that you didn't send the whole

5    transcript, all 610 pages, you sent only the 30 pages that had

6    to do with the child issue, right?

7    A.  No, no, the sentence makes no sense, the redacted portions.

8    Q.  The portions of the deposition I spent to Michael Isikoff

9    were focused on, so that suggests to the reader that you sent

10   only portions of the transcript, and they were portions that

11   were focused on a particular issue, isn't that right?

12   A.  No, it doesn't make any sense.  The redacted portions are

13   not Musaed Al Jarrah's testimony about child pornography.

14   Q.  How many of the 610 pages --

15   A.  Redacted portions were the FBI material.  That's why this

16   sentence doesn't make any sense.

17   Q.  It makes plenty of sense, and what you're saying here is

18   trying to minimize what you did.  And that's Mr. Pounian and

19   Ms. Benett are trying to do, aren't they?

20   A.  No, I think in the pace of doing this, I've got a very poor

21   sentence in my --

22   Q.  There were 610 pages in the deposition transcript, correct?

23   A.  I don't recall the number.

24   Q.  Can you give me a ballpark figure?

25   A.  It would be something like that, yes.

LB2H9116                      Fawcett - Cross

1    Q.  The number of pages that dealt with the photo issue, by our

2    count, it was roughly about 30.  Does that sound right to you?

3    A.  No, that -- that portion of the deposition needs to be read

4    in conjunction with other portions.

5    Q.  That part of the deposition has nothing to do with how many

6    times a witness invoked "I don't know," does it?

7    A.  I don't know.

8    Q.  Mr. Fawcett, please, if the only issue you were concerned

9    about was the images on someone's computer, you could and would

10   have sent the pages from the deposition that dealt specifically

11   with that issue, couldn't you?

12              THE WITNESS:  Your Honor, to -- to answer that

13   correctly, I need to talk about other --

14   Q.  I'm not asking for your attorney advice.  I'm asking could

15   you --

16              THE COURT:  Out of other portions of the deposition?

17              THE WITNESS:  Yes, I would need to relate it to the

18   issue of child pornography to other portions of the deposition.

19              THE COURT:  I think I know what the witness is

20   referring to, but do you want to have a sidebar?

21              MR. HANSEN:  I think I can make the question

22   completely innocuous.

23   BY MR. HANSEN:

24   Q.  There were questions on the record at the deposition about

25   images on the witness' computer, correct?

LB2H9116                          Fawcett - Cross

1    A.   Yes.

2    Q.   Those questions consumed no more than 30 pages of the

3    transcript, correct?

4    A.   No, they related to previous portions of the transcript as

5    well.

6    Q.   I'm just asking you weren't the portions about that subject

7    about 30 pages?

8              MR. GERBER:   Objection.   Asked and answered.

9              MR. HANSEN:   He hasn't answered it yet.

10             MR. GERBER:   Yes, he has.

11             THE COURT:   You can answer the question.

12   A.   They related to other portions of the transcript as well.

13   Q.   I'm not asking you -- so let's just be clear.   We're

14   talking about you sitting here having admitted to criminal

15   conduct and facing another possible perjury charge.   Are you

16   telling this Court you had to send every one of these 610 pages

17   because every one of those 610 pages dealt with the images on

18   Mr. Al Jarrah's computer?

19   A.   No.

20   Q.   But you sent all 610 pages, didn't you?

21   A.   Yes, I sent the complete transcript without the FBI

22   material.

23   Q.   So let's look at some other things that are false here.

24             Next sentence down, paragraph 2:   "I did not send any

25   FBI protected portions of the deposition to Michael Isikoff."

1    That too was false, wasn't it?

2    A.  I now realize that's correct, that's now false.

3    Q.  Did you think that maybe before you sent a sworn statement

4    to a court in a matter as serious as this, you'd go check the

5    protective order to see whether you were right?

6    A.  In hindsight, yes, I should have done that.

7    Q.  How about all these nice lawyers at Kreindler & Kreindler?

8    How many different lawyers were you talking to during this

9    time?

10   A.  During which time?

11   Q.  Sorry?

12   A.  I'm sorry, during which time?  What are we talking about?

13   Q.  The time you're working on this sworn statement of yours.

14   A.  Just Megan and Steve.

15   Q.  They're experienced lawyers?

16   A.  Yes.

17   Q.  Do you think maybe they understood the protective order?

18   A.  I don't know what --

19   Q.  Did either Megan Benett or Steve Pounian say to you, John

20   Fawcett, you can't say this in your deposition -- in your

21   declaration because it's not true.  This transcript was all

22   covered by the FBI protective order?

23   A.  I don't -- I don't recall that, no.

24   Q.  They didn't warn you one bit, did they?

25   A.  Well, I think they were -- they were -- I shouldn't say

LB2H9116                    Fawcett - Cross

1    what they were thinking.  I don't really know what they were

2    thinking.

3    Q.  They didn't understand the protective order either, is that

4    what you're trying to tell me?

5    A.  No, that's not what I'm saying.

6    Q.  It's either one of two things:  Either they're clueless

7    about the protective order, in which case they shouldn't be

8    practicing in this court, or they knew about the protective

9    order, and they deliberately let you put in false testimony,

10   isn't that true?

11             MR. GERBER:  Objection, your Honor.

12             THE COURT:  What's the objection?

13             MR. GERBER:  Your Honor, several things:  One, the

14   question's incredibly confusing.  Second, he's asking him to

15   speak about the state of mind or knowledge of third parties.  I

16   don't see how he could possibly answer this question.

17             THE COURT:  All right.  I'll sustain the objection.

18             MR. HANSEN:  All right.  Let me rephrase it, because I

19   think it's an important question, and it's a clear question.

20   Q.  It's one of two things, isn't it, Mr. Fawcett:  Either

21   these lawyers themselves didn't understand the protective order

22   or they understood it and knew what you were writing was wrong

23   and let you do it anyways, isn't that true?

24   A.  I don't know.

25   Q.  Let's go to another falsehood in your statement.

LB2H9116                     Fawcett - Cross

1  Paragraphs 3, you write:  Until today, no one other than

2  Michael Isikoff and I knew that the redacted transcript -- knew

3  that I sent the transcript.

4          Hadn't you told your criminal defense attorney, Liz

5  Crotty, that you'd sent this transcript long before you filed

6  this?

7          MR. GERBER:  Objection, your Honor.  This is getting

8  into privileged information.

9          MR. HANSEN:  I don't think you can commit perjury

10 under the shield of privilege.  He's put in a sworn statement.

11 He's opened the door to that.

12         MR. GERBER:  Your Honor, the factual question --

13 counsel is asking the witness to describe what information he

14 provided to Ms. Crotty.  That's privileged.

15         THE COURT:  I think your witness' -- your client's

16 testimony to date has been that he did not discuss any of this

17 with Ms. Crotty.  I know you've asserted his Fifth Amendment

18 privilege on his behalf, but he has testified so far under oath

19 that he did not discuss with Ms. Crotty anything beyond her

20 election campaign.

21         MR. GERBER:  Your Honor, he was asked about a single

22 phone call, and he gave that testimony about that phone call.

23 I think it's not disputed that there were other communications

24 with Ms. Crotty.  I don't think that's -- the question here is

25 not being limited to that particular phone call.  He's being

LB2H9116                    Fawcett - Cross

1   asked more generally if he spoke with counsel, if he told

2   counsel particular information.  It would just --

3           THE COURT:  I think he can answer the question, did

4   you tell anyone other than Michael Isikoff that you had sent

5   the transcript to Michael Isikoff, and if so, who?

6           MR. GERBER:  Yes, your Honor.

7           THE COURT:  OK.

8   BY MR. HANSEN:

9   Q.  Did you hear that question, Mr. Fawcett?

10  A.  No, I didn't quite understand.

11  Q.  Did you tell anyone other than Michael Isikoff -- did you

12  communicate to any human being prior to filing this sworn

13  statement that you had sent the redacted transcript to Michael

14  Isikoff, attorneys included?

15  A.  Not prior to that date.

16  Q.  Not prior to September 27?

17  A.  Not prior to, that's what I remember.

18  Q.  OK.  Let's wrap up here.

19          In the declaration that you wrote, you said nothing

20  about your supposed personal interest in the Al Jarrah

21  material, right?

22  A.  I'm not sure what you mean.

23  Q.  Well, you give a long -- or your friends at Kreindler &

24  Kreindler give a long story in the declaration about why you

25  thought you had to violate the protective order and smear

LB2H9116                      Fawcett - Cross

1    Mr. Al Jarrah's reputation.  Remember that?

2    A.  I don't think anybody asked me to smear Mr. Al Jarrah.

3    Q.  That's what you did, isn't it?

4    A.  No, that's not what I did.

5    Q.  OK.  Well, let's look at your version of your statement.

6    It's at 108A.  We'll put it up.

7           Do you see any reference in there to your supposed

8    personal interest in taking this action?

9    A.  I'm not sure what you mean by "personal interest."

10   Q.  I'm not sure either.  Let's go to what Mr. Pounian and

11   Ms. Benett wrote for you in Exhibit 62A, fourth paragraph, very

12   end.  62A, you write:  "I had a personal interest because."  Is

13   that your wording?

14   A.  Yes.

15   Q.  So you said to me a minute ago you didn't know what

16   "personal interest" meant, and yet you used this very phrase in

17   this declaration, right?

18   A.  Yes.

19   Q.  And that wasn't in your version of your declaration, was

20   it?

21   A.  No, it wasn't.

22   Q.  That was added by Mr. Pounian or Ms. Benett, correct?

23   A.  I believe we talked about it on the phone.

24   Q.  But it was written in there by Mr. Pounian or Ms. Benett,

25   correct?

LB2H9116                    Fawcett - Cross

1    A.  They put -- they forwarded this draft to me after -- after

2    maybe two phone calls, two long phone calls.

3    Q.  And you signed it just like you signed other things that

4    you now realize were incorrect, right?

5            MR. GERBER:  Objection to the form, your Honor.  I

6    want to be clear.  I want to make sure the witness understands

7    the question.  I think the form is confusing.  I would ask the

8    counsel to rephrase.

9            THE COURT:  Sustained.

10           Can you rephrase the question?

11           MR. HANSEN:  Of course, your Honor.

12   Q.  You signed what Mr. Pounian and Ms. Benett wrote for you,

13   correct?

14   A.  No, I signed what I believed to be a correct declaration at

15   the time.

16   Q.  Well, actually, you've already told us you didn't.  Earlier

17   in your testimony, you told us that you signed things you now

18   look at and say were either wrong or you don't even understand.

19   A.  At the time I signed them, I felt that was my declaration.

20   Q.  And this was written, prepared on a Kreindler & Kreindler

21   computer system, correct, the one you signed?

22   A.  I don't recall if they -- I believe they sent me a Word

23   file, and I think I converted it into a PDF possibly on my

24   computer.  I'm not quite sure.

25   Q.  Don't remember, is that right?

LB2H9116                         Fawcett - Cross

1    A.  Yeah.

2    Q.  And you say, at least in the version that they prepared,

3    these things about your motivation.  Let's go through that, and

4    then we'll be done.

5            The information about this child issue was 20-year-old

6    information, wasn't it?

7    A.  I'm not sure what we're talking about.

8    Q.  The information about what was found on the witness'

9    computer was 20 years old, wasn't it?

10   A.  It was about 15 years old.  The way I understand, it was

11   found on the computer about 2004, 2005, something like.

12   Q.  Well, 2004 is 17 years ago, right?

13   A.  Yes.

14   Q.  And you knew about that information long before the

15   Al Jarrah testimony, correct, because you helped Ms. Benett

16   prepare for it and had that questioning prepared?

17   A.  Correct.

18   Q.  So when did you first learn about this?

19            MR. GERBER:  Objection, just to clarify what the

20   "this" is.

21   Q.  I'm sorry.  The information that you claimed to be so

22   concerning to you, when did you first learn about it in

23   reference to the deposition itself?

24   A.  Maybe six to eight months prior to the deposition.

25   Q.  And you talked to Ms. Benett about it during the eight

LB2H9116                       Fawcett - Cross

1   months preceding the deposition, correct?

2   A.  Mostly in the few weeks before the deposition.

3   Q.  But how about before the week?  Did she also know this

4   information was out there?

5   A.  I don't recall when I first told Megan.

6   Q.  But certainly was before the deposition itself, wasn't it?

7   A.  Yes, it was.

8   Q.  And in those six or eight months when you have this

9   information you claim caused you so much concern, you took no

10  action to warn anybody, did you?

11  A.  It was unconfirmed.  It was rumor.  I didn't -- I didn't

12  know it.  I had been told it.

13  Q.  You took no action, correct?

14  A.  I tried to confirm it.

15  Q.  Did you take any action?

16  A.  Yeah, that's action.

17  Q.  So who confirmed it?  Did someone confirm it for you?

18  A.  I didn't get -- I didn't get more confirmation than from

19  the source that had told me about it.

20  Q.  Who's the source?

21          MS. KIRSCH:  Objection, your Honor.

22          THE COURT:  Sustained.

23  Q.  So you're telling us it was just an idle rumor before the

24  deposition?

25  A.  I wouldn't call it an idle rumor.  It was --

LB2H9116                    Fawcett - Cross

1   Q.  Was it enough to concern you?

2   A.  Absolutely.

3   Q.  So why didn't you take action before the deposition?

4   A.  I had nothing to back it up.

5   Q.  So this 20-year-old, 17-year-old information was

6   information that the United States government had, correct?

7   A.  Yes, that's correct.

8   Q.  So you, John Fawcett, are not a law enforcement officer,

9   are you?

10  A.  No, I'm not.

11  Q.  You don't have the power of the United States government,

12  do you?

13  A.  No, I don't.

14  Q.  The United States government has full power to protect

15  anybody who's in danger through its own offices, doesn't it?

16  A.  I don't -- I don't understand what you mean.

17  Q.  Well, if the government thinks there's a threat or concern,

18  the government can take action, can't it?

19  A.  Presumably, yes.

20  Q.  Did you ask our government to take any action after the

21  Al Jarrah deposition?

22  A.  No, I didn't.

23  Q.  The country you claim you were worried about is a U.S.

24  ally, correct?

25  A.  We're talking about Saudi Arabia?

LB2H9116                    Fawcett - Cross

1    Q.  How about Morocco?

2    A.  About Morocco?  Yeah, I suppose.

3    Q.  They have an embassy in this country?

4    A.  Yes, they do.

5    Q.  So when did you first go to the Moroccan embassy to

6    register your complaint?

7    A.  I didn't.

8    Q.  The country of Morocco has law enforcement, too, doesn't

9    it?

10   A.  I'm sure it does.

11   Q.  They cooperate with our law enforcement authorities, don't

12   they?

13   A.  I presume they do.

14   Q.  When did you first go to Moroccan law enforcement

15   authorities to register your concerns?

16   A.  I didn't.

17   Q.  No, what you did instead was this, Mr. Fawcett.  You took

18   doubly protected confidential information, leaked it to a

19   reporter as part of Jim Kreindler's press campaign to pressure

20   the government of Saudi Arabia and smear witnesses who wouldn't

21   confirm his libelous story.  That's what you did, isn't it,

22   Mr. Fawcett?

23           MR. GERBER:  Objection, your Honor.

24           THE COURT:  Hold on.

25           MS. KIRSCH:  This is not television.  Objection.

LB2H9116                    Fawcett - Cross

1              THE COURT:  All right.  Let's rephrase the question,

2     please, sir.

3     Q.  What you did, instead of all the things we just went

4     through, Mr. Fawcett, is you leaked the entire 610-page

5     transcript to a U.S.-language reporter for publication,

6     correct?

7     A.  I didn't expect him to public -- to make the transcript

8     public, no.

9     Q.  So what assurances did you have that he wouldn't?

10    A.  We talked about what I thought was important in the

11    transcript, which was the child pornography.

12    Q.  Did you --

13    A.  And he agreed with me that was an important topic, and he

14    wanted to write about the child pornography and the FBI's use

15    of that child pornography.

16    Q.  Wait, wait, wait, wait.  Did you make a deal with

17    Mr. Isikoff that he would only publish part of this transcript

18    you gave him?

19    A.  He told me that's what he was going to do his story on.  I

20    trusted him.  I know he's a legitimate, valid journalist.  And

21    that's what he did.

22    Q.  So we see various emails and messages from you to

23    Mr. Isikoff after the publication.  When did you complain to

24    Mr. Isikoff that he breached your agreement?

25    A.  He didn't breach my agreement.

LB2H9116                    Fawcett - Cross

1  Q.  What you did, Mr. Fawcett, was smear a witness who had

2  refused to confirm your law firm's story in this case, and you

3  were doing it as a message to other witnesses that if they did

4  the same thing, they'd be smeared, too.  Isn't that what you

5  were doing?

6          MS. KIRSCH:  Your Honor, I'm going to object to the

7  question, but I'd also just like to note for the record that

8  it's actually Mr. Hansen who's talked extensively about the

9  content of the --

10         MR. HANSEN:  Oh, that's not true.  You've been -- all

11 over the map, Ms. Kirsch.

12         MS. KIRSCH:  I'm sorry.

13         MR. HANSEN:  I'm not going to listen to that.

14         THE COURT:  Hold on, Mr. Hansen.

15         MS. KIRSCH:  The understanding was, I think your

16 Honor's order was, that we could talk about the issue of child

17 pornography; that we shouldn't be discussing exactly what is or

18 is not in the Jarrah transcript.  This is about the third time

19 now that there's been a discussion by Mr. Hansen about what may

20 be or may not be in the Jarrah transcript.  So it's the Kingdom

21 that's actually not following your Honor's order, and I think

22 that it seems like it's waived.  That we could talk about the

23 content if we wanted to.

24         MR. HANSEN:  Completely false.  I haven't said a thing

25 about it other than it's images on the guy's computer, and

1    they've gone far beyond.  Ms. Benett this morning went in

2    graphic details.  I'm just asking him if what he did was smear

3    a witness who'd been uncooperative, and I didn't say a word

4    about --

5            THE COURT:  I don't think Mr. Hansen has crossed the

6    line as to my prior order, and this is, obviously, the subject

7    of the article, which is what brings us all to this court here

8    today.  So I don't --

9            MS. KIRSCH:  Your Honor --

10           THE COURT:  I don't think -- nor do I think that he is

11   past the bounds of what's relevance.  I'm not sure what you

12   mean by you want to open it up and start talking about the

13   deposition.

14           MS. KIRSCH:  Well, your Honor, I would say this:  That

15   question was just packed with information that what Mr. Fawcett

16   did amount to smearing a witness because the allegations that

17   the witness denied that he had those images on his computer.

18   So if we're going to talk about the witnesses' denial, that's

19   the content of the deposition as opposed to that which is

20   relevant for Mr. Fawcett's motivation.

21           MR. HANSEN:  Convoluted beyond belief.

22           MS. KIRSCH:  I don't think so, your Honor.  I think

23   it's quite clear.

24           MR. HANSEN:  I'm asking what he is doing.  He's free

25   to deny it.  What he was doing was smearing a witness, whether

LB2H9116                        Fawcett - Cross

1    true or not.

2            THE COURT:  I think Mr. Hansen is free to ask about

3    the witness' motivation, which he has put in the record by

4    saying that he had a motive when he released the transcript,

5    and I think Mr. Hansen is free to ask what that motive was.

6            MS. KIRSCH:  I understand, your Honor, but if we are

7    precluded from discussing what Mr. Jarrah may have said in

8    response to the questions --

9            MR. HANSEN:  Doesn't matter whether it's true or not.

10   It's still a smear.

11           MS. KIRSCH:  -- I don't think Mr. Hansen should be

12   permitted to acknowledge or to say that there was a denial.  We

13   need to be able to discuss both sides of that, and the order --

14           MR. HANSEN:  I'm --

15           THE COURT REPORTER:  I'm sorry, Judge.  I cannot do

16   this.

17           MS. KIRSCH:  That's because Mr. Hansen's not letting

18   me finish.

19           MR. HANSEN:  Well, she's not --

20           THE COURT:  I will give everybody an opportunity to be

21   heard in my court.

22           Ms. Kirsch.

23           MS. KIRSCH:  Thank you.

24           There has been -- there have been representations in

25   the questions by Mr. Hansen about what Mr. Jarrah did or did

LB2H9116                    Fawcett - Cross

1   not say in answer to the questions about the child pornography

2   on his computer.  Therefore, I would say that that's not in

3   compliance with your Honor's order and that we should be able

4   to respond to that because we don't think that's an accurate

5   representation, and there's more to the story than that.

6          So we were ordered not to talk about the content of

7   the transcript, and we kept to that.  We hardly even talked

8   about child pornography at all, but we certainly didn't talk

9   about what was said on the transcript or what was not said on

10  the transcript.  Mr. Hansen is making -- is having that

11  discussion.

12          THE COURT:  Mr. Hansen.

13          MR. HANSEN:  My turn?

14          THE COURT:  Yes.

15          MR. HANSEN:  I haven't said one word about what she

16  says that I said.  I asked him about his motivation.  I did not

17  ask about what Mr. Jarrah said or didn't say.  I asked him if

18  contrary to what his motivation in his sworn statement was, he

19  was really just trying to smear the witness, and that's a fair

20  question, as your Honor has ruled.  And I think Ms. Kirsch

21  ought to actually abide by the rulings instead of making

22  20-minute objections at every legitimate question here.

23          Go ahead.  Look at me that way.  That's fine.

24          THE COURT:  Go ahead, Ms. Kirsch.

25          MS. KIRSCH:  I'm just waiting for a ruling.

1              THE COURT:  Go ahead.  Oh, a ruling.

2              Yes, I think that whether it's true or not that the

3    witness had this on his computer, whether he saw these images

4    or not is not the purpose of today's hearing, and so we're not

5    going to have collateral litigation about what the witness has

6    said or didn't say in response to deposition questions.

7              What Mr. Fawcett has put squarely in the court's --

8    the center of this court hearing is his own motivations, which

9    he has indicated were because of his concerns about the

10   children in Morocco, and I think Mr. Hansen is fair game to ask

11   questions about whether he had other motives than the motives

12   of protecting the children.  So I think this line of

13   questioning is reasonable, so I'll allow it.

14             Go ahead, Mr. Hansen.

15             MR. HANSEN:  Ms. Kirsch is still standing, so I want

16   to make sure she gets a chance to talk all she wants.

17             THE COURT:  Mr. Hansen, focus on the witness, please.

18   BY MR. HANSEN:

19   Q.  Can you answer the question, Mr. Fawcett?  I'm done if

20   there's an answer to that question.

21   A.  Could you repeat the question?

22             THE COURT:  Madam Court Reporter, do you think you

23   could find it?

24             MR. HANSEN:  It's probably so far back, your Honor,

25   I'll spare our poor, tired court reporter and just ask it

LB2H9116                    Fawcett - Cross

1   again.

2   Q.  Mr. Fawcett, wasn't your real motivation in releasing the

3   entire Al Jarrah transcript to Mr. Isikoff to smear a witness

4   who had been uncooperative with you?

5   A.  No, that's not correct.

6           MR. HANSEN:  If I could have five minutes, your Honor,

7   I think I may be done.

8           THE COURT:  OK.  Take a quick five-minute recess, and

9   then, Mr. Gerber, you'll be next, so if you also want to use

10  this opportunity to prepare any redirect.

11          MR. GERBER:  Thank you, your Honor.

12          (Recess)

13          THE COURT:  Mr. Hansen.

14          MR. HANSEN:  Your Honor, we've concluded our

15  examination.

16          THE COURT:  OK.  Thank you.

17          THE WITNESS:  Your Honor, may I correct an answer?

18          THE COURT:  Sure.

19          THE WITNESS:  While I was sitting here, I recalled

20  something.

21          THE COURT:  Mr. Hansen, would you like to stand up?

22  He'd like to correct an answer.

23          MR. HANSEN:  I'm sorry, your Honor, because I have a

24  cold, I can't hear.

25          THE COURT:  Mr. Fawcett would like to correct an

LB2H9116                     Fawcett - Cross

1   answer that he gave you previously.

2           MR. HANSEN:  Actually, he can do that with his own

3   counsel.  I don't think you get to correct answers after

4   they've been given.  I think his cross-examination's done.  His

5   own counsel can elicit from him what he wants to tell us.

6           THE COURT:  OK.  Fair enough.

7           All right.  Mr. Gerber -- oh, you're going to go

8   first?

9           MR. GERBER:  Your Honor, in light of our position

10  regarding the Fifth Amendment and our standing objection to the

11  direct examination of the witness regarding -- or

12  cross-examination of the witness regarding the declarations, we

13  are not going to redirect the witness.

14          THE COURT:  OK.  Do you want to deal with the issue he

15  just raised, or you want Ms. --

16          MR. GERBER:  Yes, your Honor, I do think however the

17  Court wants to do it, to the extent the witness wants to

18  correct the record, he should have opportunity to do so.  Your

19  Honor, we don't want to waive our Fifth Amendment position, as

20  the Court understands, I'm sure.

21          THE COURT:  I do understand.

22          All right.  Why don't I give the witness an

23  opportunity to say what he wants to say.

24          And, Mr. Hansen, you'll have an opportunity to ask any

25  follow-up questions at the end.  Is that satisfactory to you?

1           MR. HANSEN:  Yes, your Honor.  Thank you.

2           THE COURT:  OK.  Mr. Fawcett, what would you like to

3    correct?

4           THE WITNESS:  Thank you.

5           During the break there, I recalled the conversation

6    with Liz Crotty in July.  I remember calling her after the

7    Court's order had come out, so I was calling her about this

8    Court's order.  And I remember telling her on the phone:  I'd

9    like to come see you, Liz, about an issue.  And she said:

10   Well, I'm not going to be here.  I'm leaving.  I'll be back in

11   a couple of weeks.

12          And then we -- I didn't tell her why I wanted to talk

13   to her on the phone, and then the rest of the conversation was

14   about her campaign.  So it was correct that I had originally

15   called her about attorney-client -- attorney-client relations

16   because I saw the court order.  Had nothing to do with the call

17   to Jim Kreindler.

18          THE COURT:  It had nothing to do with?

19          THE WITNESS:  The call to Jim Kreindler that I had

20   just done previously.  It was because the order had come out

21   the day before, and I was --

22          THE COURT:  OK.  Thank you.

23          MR. HANSEN:  I'm sorry, your Honor.  Should I -- can I

24   follow-up?

25              (Continued on next page)

LB789117                     Fawcett – Cross

1           THE COURT:  Sure.

2    BY MR. HANSEN:

3    Q.  So this has nothing to do with your call on the 22nd to Ms.

4    Crotty, some subsequent call?

5    A.  No.  That's the call I'm talking about.

6    Q.  The subject matter of your call on the 22nd is you want to

7    come get legal advice because of the position you're in because

8    of leaking the transcript?

9    A.  Correct.

10   Q.  And you are making that call after 44 minutes with Mr.

11   Kreindler, where you talked about the leak issue?

12           MR. GERBER:  Your Honor, the way that counsel is

13   characterizing the witness's testimony I think is not accurate,

14   and I think it's actually quite important.  Because counsel

15   described it as the witness saying he had told Ms. Crotty the

16   substance regarding the leak.  I actually don't think that's

17   what the witness --

18           MR. HANSEN:  He can't testify.  The witness just

19   testified.

20           THE COURT:  I think the witness did testify that he

21   wanted to speak with her about possible defense issues or

22   retention, but I think the witness did not testify that he told

23   her that he had leaked the transcript.

24           MR. HANSEN:  The question I asked was, was the subject

25   matter of your conversation about the leak issue?  Not about

1    whether he leaked, but that was the subject matter for his

2    wanting to see her.  And he said yes.  And I think that's fair

3    testimony.

4              THE COURT:  Are you done?

5    BY MR. HANSEN:

6    Q.  Your concern about this issue was prompted by your 44

7    minutes with Jim Kreindler immediately before calling Liz

8    Crotty, correct?

9    A.  No, that's not correct.

10             MR. HANSEN:  No further questions.

11             THE COURT:  Thank you.

12             Ms. Kirsch, your witness.

13   REDIRECT EXAMINATION

14   BY MS. KIRSCH:

15   Q.  Good afternoon, Mr. Fawcett.  I am Emily Kirsch.  I am

16   counsel for Kreindler & Kreindler.  I am just going to ask you

17   a few questions, if that's all right with you.

18             Before I ask the very few questions that I have, could

19   you tell us a little bit just about your professional

20   background so we understand what it is that you do and who you

21   are?

22             MR. HANSEN:  I object.  This has nothing to do with

23   the cross-examination, nothing to do with his direct

24   examination.  This is redirect examination on a new subject.

25   We have been here a long time.  We don't want a human interest

1  story.

2  THE COURT:  She said she is going to be quick.  I will

3  allow her to ask background questions about Mr. Fawcett's

4  professional experience.

5  BY MS. KIRSCH:

6  Q.  Mr. Fawcett, would you tell us a little bit about your

7  professional background?  And the second part of that question

8  will be, even in your declaration, you mention that you have

9  worked for the 9/11 families for a long time.  So if you could

10  tell us a little bit about your professional background prior

11  to working for the 9/11 families and then describe your work

12  for the 9/11 families.  Just briefly so we have some grounding.

13  A.  I worked approximately ten years in oil exploration in the

14  Middle East, in Turkey.  I worked for a humanitarian aid

15  organization in Iraq, and in former Yugoslavia, and some other

16  countries, including Pakistan, Afghanistan.  Then I worked more

17  in the human rights field, particularly focused on financing

18  and dictators.  That was prior to coming to Kreindler.

19  Q.  The work that you do with the 9/11 families, or that you

20  have done for the past 20 years, can you describe that

21  generally, please?

22  A.  I consider myself largely a researcher.  I don't think I am

23  an investigator.  I look at documents.  So I'm part of the

24  whole analysis of the discovery material gathered.  In

25  addition, I spent a lot of time engaging with the families and

1   essentially educating them about the progress of the case.

2   Q.  So, Mr. Fawcett, have you ever heard Mr. Kreindler talk

3   about the protective orders in this case, particularly the fact

4   that he doesn't like them?

5   A.  Yes.

6   Q.  Did Mr. Kreindler ever suggest to you any way, either

7   directly or tacitly or indirectly, that the orders should not

8   be followed because he doesn't like them?

9   A.  No.

10  Q.  Can you describe what sense you got from Mr. Kreindler

11  about the importance of the protective orders and following

12  them?

13  A.  We had to follow them.  Everyone in the case had to follow

14  him.  It wasn't just Jim, it was the Kreindler firm.  At the

15  same time, I know that they didn't like having to hide

16  material, withhold material from their clients.  That was a

17  very, very difficult thing for them to do, for all of us to do.

18  Q.  Did anybody at the Kreindler firm, Mr. Kreindler or anyone

19  else, ever suggest that there would ever be a time when it

20  would be OK to violate the protective orders?

21  A.  No.

22  Q.  Did you ever have any reason to believe that Mr. Kreindler

23  would not object to your sending the Jarrah transcript to

24  Mr. Isikoff?

25  A.  I'm not quite sure.

1    Q.  Let me give you a better question.  Let me start at the

2    beginning.

3            Did Mr. Kreindler suggest to you that you should send

4    the Jarrah transcript to Mr. Isikoff?

5    A.  No, he did not.

6    Q.  Did Mr. Kreindler ever suggest to you in some sort of

7    indirect or tacit way that you should send the Jarrah

8    transcript to Mr. Isikoff?

9    A.  No.  No, never.

10   Q.  Did Mr. Kreindler give you any reason to believe that he

11   would condone your sending the Jarrah transcript to

12   Mr. Isikoff?

13   A.  No.

14   Q.  Did you ever believe that Mr. Kreindler might condone your

15   sending of the Jarrah transcript to Mr. Isikoff?

16   A.  No.

17   Q.  Did you ever believe that any of the Kreindler & Kreindler

18   lawyers would condone your sending of the Jarrah transcript to

19   Mr. Isikoff?

20   A.  No.  It would be the opposite.  They would tell me not to

21   do it.  That was my opinion.

22   Q.  Is that the reason you took steps to hide it from them,

23   because you knew they would tell you not to?

24   A.  Yes, that's right.

25   Q.  There was some discussion about exactly what the words were

LB789117                    Fawcett - Redirect

1    when the Kreindler & Kreindler lawyers, either Mr. Maloney, Mr.

2    Pounian or others, asked you about this leak.

3             Is it fair to say, Mr. Fawcett, that you think you

4    misled them with respect to what you knew about who sent the

5    Jarrah transcript to Mr. Isikoff?

6             MR. HANSEN:  Your Honor, I have been letting Ms.

7    Kirsch go on with her leading questions for two days.  Really,

8    there ought to be an end.  She should ask nonleading questions.

9    It's her witness.  She is just replowing the same ground they

10   plowed in the original declarations.  If she is going to do

11   something, it should be proper examination with direct

12   questions.  This is not cross-examination.  She hasn't asked a

13   nonleading question yet.

14            THE COURT:  I don't believe that Mr. Fawcett is her

15   witness.  He is represented by Mr. Gerber.  And we are here at

16   a bench trial, essentially.  So I will allow Ms. Kirsch to

17   continue with that line of questioning.

18   BY MS. KIRSCH:

19   Q.  I am not sure if we got an answer to my last question.

20   A.  Can you repeat the question?

21   Q.  Sure.  Did you mislead the Kreindler lawyers with respect

22   to what you might have known about who leaked the Jarrah

23   transcript?

24   A.  I don't know if that's the right word.  I certainly

25   prevaricated and dissembled and avoided letting them know.

LB789117                    Fawcett - Redirect

1   Q.  Mr. Fawcett, Mr. Hansen had asked you a series of questions

2   about, if you had known about Mr. Jarrah's child pornography

3   for so long, why did you not take action sooner?

4            My question is, at any time before the Jarrah

5   deposition, did you have confirmation that Mr. Jarrah was in

6   fact consuming and possibly trafficking child pornography?

7   A.  No.

8   Q.  So it was at the deposition, just to be very clear, that

9   you received the confirmation that Mr. Jarrah was consuming and

10  possibly trafficking in child pornography?

11           MR. HANSEN:  We have been over this issue multiple

12  times.  Can we have her stop this?

13           THE COURT:  I think that line of questioning is

14  improper based on my prior ruling.  We are not asking whether

15  it was true or not what was said during the deposition.  We

16  know that Mr. Fawcett has indicated that that was his

17  motivation.  We know that the topic is out.  We are not going

18  to talk about confirmations at depositions or answers that were

19  given.

20  BY MS. KIRSCH:

21  Q.  Just the last question, Mr. Fawcett.  You knew that your

22  acts and words had the effect of misleading the Kreindler

23  lawyers with respect to your leaking of the Jarrah transcript,

24  isn't that true?

25  A.  I'm not sure which acts and words you're referring to.

LB789117                      Fawcett - Redirect

```
 1   Q.  Whatever acts and words there were that related to the
 2   topic.
 3   A.  I'm not quite sure how to answer that one.
 4   Q.  I am just asking whether you were aware that you were
 5   misleading the Kreindler lawyers by your words, whether they
 6   were dissembling or prevaricating, or any of the other words
 7   that you used?
 8            MR. HANSEN:  Objection.  Asked and answered.  It's
 9   putting words in the witness's mouth when he won't give the
10   answer she wants.
11            THE COURT:  You can answer it.
12   A.  I was not being honest with them.
13            MS. KIRSCH:  Thank you very much, Mr. Fawcett.
14            MR. HANSEN:  No further questions.
15            THE COURT:  Mr. Fawcett, I have just a couple of
16   questions to clarify for my mind.
17            One question I have is, in your initial declaration
18   that you submitted to, I believe Mr. Pounian and Ms. Benett,
19   you indicated that you had sent the transcript via a
20   non-Kreindler e-mail address.  What did you mean by that?
21            THE WITNESS:  That's the ProtonMail.
22            THE COURT:  Did they ask you what that e-mail address
23   was or what e-mail you used at that time?
24            THE WITNESS:  Sorry?
25            THE COURT:  Did either Ms. Benett or Mr. Pounian ask
```

LB789117

1   you, when you told them that you sent it via a non-Kreindler

2   e-mail address, did they ask you what that e-mail address was?

3           THE WITNESS:  Yeah, I believe they did.

4           THE COURT:  And did you explain to them what that

5   e-mail address was?

6           THE WITNESS:  I think we put it into either the first

7   or second declaration.

8           THE COURT:  I don't believe it's in the first

9   declaration.  That's why I am asking.

10           THE WITNESS:  Maybe it was in the second then.

11           THE COURT:  Then I have a question that I hate to ask,

12   but since it's been made an issue.  Can you tell me the age of

13   your children?

14           THE WITNESS:  21.

15           THE COURT:  You have just one child?

16           THE WITNESS:  They are twins.

17           THE COURT:  Thank you.  Anything further?

18           Mr. Fawcett, thank you very much.  You are excused.

19           MR. RAPAWY:  Your Honor, very briefly.

20           Your Honor, you asked us to meet and confer previously

21   on the subject of the previous exhibits, which I don't think

22   has been resolved yet.

23           THE COURT:  Is Mr. Fawcett done?

24           Mr. Fawcett, you are excused.

25           (Witness excused)

LB789117

1          THE COURT:  I did ask about the exhibit issue.  Was

2     that you, Mr. Rapawy?

3          MR. RAPAWY:  We have agreed to meet and confer and

4     exchange a list and get something to the court in the next

5     couple of days.  At least based on my understanding of our

6     conversations, I think we should be able to resolve the issue

7     of the exhibits that went in before we started formally moving

8     for admission.  If that's not the case, we can come back to the

9     court.

10         THE COURT:  The court reporters, who are trying to do

11    their best job, have indicated that there is some confusion in

12    the record.  I actually think it's a confusion that we all

13    could solve, but each lawyer said things like, turn to exhibit

14    tab 12, and you both have exhibit tab 12.  I think we all know

15    what you're referring to.  The court reporters are concerned

16    because they are good at their job, and they don't want to

17    submit a transcript that is unclear.  But I am not sure we need

18    to burden them to try and match up what we were just calling

19    tab 7, and we know whether it's a Kreindler tab 7 or a KSA tab

20    7, and have them sort of redo the transcript.  I think they

21    would like to get you a transcript.  I think you have all

22    ordered it on an expedited basis.  I don't know whether you

23    want to hold up the transcript creation in order to resolve

24    this issue and have the court reporters go back into the record

25    to correct or whether we can live with a transcript that may be

LB789117

1     more clear to us in the reading than it might be to the public.

2              MS. KIRSCH:  For what it's worth, I think one process

3     could be, if they wanted to give us a rough transcript, we

4     could use that as a basis to both meet and confer on the

5     documents, and we could clean it up ourselves and make the

6     edits, if that's helpful.  So we could give proper numbers or

7     tabs or do a better job of identifying the exhibits.  We could

8     work off the rough so that we can do our meet-and-confer about

9     the documents that were offered.

10             THE COURT:  I think that's fine.  So long as the court

11    reporter doesn't feel like she has to go into the rough now and

12    try and recreate.  We don't want her to have to do that.

13             MS. KIRSCH:  We could take the rough and then we could

14    just provide the edits for better marking the exhibits.  We can

15    do that for them.

16             THE COURT:  OK.

17             Next question.  Post-hearing briefing.  I don't know

18    if you all want to meet and confer and discuss an appropriate

19    schedule.  I don't know if you have thought about it already.

20    I think everybody's goal is to get proposed findings of fact

21    and conclusions of law to the court as quickly as possible.

22    It's my practice that when it's fresh it's best.  I don't know

23    if you have thought about a proposed schedule.  If you would

24    like to discuss that and get back to me later this week on a

25    proposal, I am happy to hear from you then, but I am happy to

LB789117

1   hear from you now.

2           MS. KIRSCH:  Does your Honor contemplate just

3   simultaneous one brief from each side?

4           THE COURT:  To be candid, I haven't contemplated so

5   much, only that it will happen.  There is an argument that

6   having it be simultaneous makes sense.  I suppose there is an

7   argument for having one side go first.  I would like to try to

8   avoid having multiple rounds of briefings.  I am happy to give

9   you all time to speak.

10          Mr. Kellogg, do you have a perspective?

11          MR. KELLOGG:  Yes.  Our thought was simultaneous

12   submissions in three weeks.

13          THE COURT:  Ms. Kirsch, how does that sound?

14          MS. KIRSCH:  That sounds fine.

15          THE COURT:  That means everybody gets it in before

16   Thanksgiving.

17          MR. HAEFELE:  Robert Haefele on behalf of the PEC.  I

18   anticipate being as actively involved in the findings of fact

19   as we have been over the past few days, which means very

20   little.  But I think the PEC would like to see findings of fact

21   before it's finalized.

22          THE COURT:  Why don't we do the following.  Why don't

23   we set the deadline for filing on Wednesday, the 24th of

24   November, which is the Wednesday before Thanksgiving.  So

25   everybody can work really hard and then eat a lot of turkey.

LB789117

1    And I will ask that the parties coordinate with the PEC to at

2    least give them 48 hours to do a quick review to make sure

3    there are no issues.  I don't anticipate there being issues.

4           MR. HAEFELE:  I don't either, your Honor, but that

5    will be perfect for us.

6           THE COURT:  So coordinate with the PEC, please.  But

7    given the way the testimony has gone in, I don't anticipate

8    there being real issues here.

9           MR. KELLOGG:  Your Honor, we would strongly object to

10   giving our submissions to the PEC before the filing with the

11   court.

12          THE COURT:  Could you provide anything?  I don't even

13   know what would be in there that would actually be PEC's work

14   product.

15          MR. KELLOGG:  He can review them after each side

16   files.  If they have concerns, they can submit them to the

17   court.  It would be fundamentally unfair for us to have to

18   share our pleadings with them before we file.

19          MR. HAEFELE:  I don't understand what the objection

20   would be.  If there is some problem with the findings of fact

21   that are proposed that may be binding on this litigation, I

22   think the Plaintiffs' Executive Committee should have an

23   opportunity to make sure.  Given how the testimony has gone in,

24   I don't anticipate there being any issue.

25          THE COURT:  Why don't we do the following.  Sorry to

LB789117

1   cut you off, sir.  I do think it's a fair point, because if

2   their strategy is revealed, then the other side can counter it

3   in their filings.  But what if we did something like the

4   following.  That the parties exchange their final documents on

5   the 24th, and file them with the court sometime, maybe December

6   1st.  So they are final copies, but if there are any redactions

7   that need to be raised, we can deal with it in that way.  I

8   think that might protect everybody's interests.  So the

9   exchange of the final documents Wednesday before Thanksgiving,

10  but I won't see them, which means everyone's Thanksgiving is

11  protected, and then we will file it with the court with any

12  redactions.

13         MR. KELLOGG:  Can we file them under seal with the

14  court and then they can review them and propose redactions to

15  the court?

16         THE COURT:  I think that's fine.  I think that's

17  materially the same concept.

18         MR. GERBER:  If I may?

19         THE COURT:  Yes.

20         MR. GERBER:  Mr. Fawcett obviously is not a party, but

21  we would like the opportunity to respond to the proposed

22  findings of fact and conclusions before the court issues its

23  final findings and conclusions.  I am just not sure what the

24  court is envisioning in terms of our role in the briefing.

25         THE COURT:  Let me take it under advisement and think

LB789117

1    about it and see what makes the most sense.

2                MR. GERBER:  Just to be clear, the stakes for our

3    client are incredibly high, and before the court issues its

4    ruling, we would just like an opportunity in some way to have

5    input here, to be heard.

6                THE COURT:  Why don't you think you could do that with

7    everybody else's filings?

8                MR. GERBER:  I am sorry, your Honor.

9                Your Honor, I am envisioning in some form advocating

10   for our client.

11               THE COURT:  I am wondering why that can't happen on

12   the 24th.

13               MR. GERBER:  It certainly can.  We are not a party.  I

14   think the court referred to the parties' submissions.  I don't

15   know if you were envisioning a simultaneous submission from us

16   as well.

17               THE COURT:  If you want to be heard, I think that

18   would be the time to be heard.

19               Anything further from anyone?

20               MS. KIRSCH:  No, your Honor.

21               THE COURT:  All right.  Well, on a personal matter, I

22   hope everybody is doing OK in COVID times.  I know I see all of

23   you often, and we haven't seen you in a long time.  I am sorry

24   for the reason that we are here, but I hope everybody is safe

25   and their family is safe.  And I hope everybody felt like the

LB789117

1    court did a good job with respect to our COVID protocols.  I

2    know we have been really careful and we are trying to be sort

3    of a leader in the federal system on this, so I hope everyone

4    felt like they were well taken care of.

5              With that, we are done.

6              MS. KIRSCH:  Just to clarify, we are going to do one

7    set of briefs simultaneously, filing under seal on November 24,

8    and allowing the PECs to have a look for any redactions by

9    December 1st.  And that's all the briefing that we are doing.

10             THE COURT:  Correct.

11             MS. KIRSCH:  OK.

12             THE COURT:  Thank you, everybody.  We are adjourned.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25

1                      INDEX OF EXAMINATION

2     Examination of:                          Page

3      ANDREW J. MALONEY III

4     Cross By Mr. Shen  . . . . . . . . . . . . . 232

5     Redirect By Ms. Kirsch . . . . . . . . . . . 273

6     Recross By Mr. Shen  . . . . . . . . . . . . 305

7      MEGAN WOLFE BENETT

8     Cross By Mr. Shen  . . . . . . . . . . . . . 310

9     Redirect By Ms. Kirsch . . . . . . . . . . . 366

10     STEVEN POUNIAN

11    Cross By Mr. Shen  . . . . . . . . . . . . . 404

12    Redirect By Ms. Kirsch . . . . . . . . . . . 410

13     JOHN FAWCETT

14    Cross By Mr. Hansen  . . . . . . . . . . . . 415

15    Redirect By Ms. Kirsch . . . . . . . . . . . 482

16                      KREINDLER EXHIBITS

17    Exhibit No.                             Received

18    1   . . . . . . . . . . . . . . . . . . . . 278

19    2   . . . . . . . . . . . . . . . . . . . . 281

20    3   . . . . . . . . . . . . . . . . . . . . 283

21    4   . . . . . . . . . . . . . . . . . . . . 284

22    5   . . . . . . . . . . . . . . . . . . . . 286

23    8   . . . . . . . . . . . . . . . . . . . . 287

24    9   . . . . . . . . . . . . . . . . . . . . 288

25    18  . . . . . . . . . . . . . . . . . . . . 290

1    34  . . . . . . . . . . . . . . . . . . 292

2    35  . . . . . . . . . . . . . . . . . . 296

3    36  . . . . . . . . . . . . . . . . . . 297

4    41  . . . . . . . . . . . . . . . . . . 298

5    43  . . . . . . . . . . . . . . . . . . 299

6    52  . . . . . . . . . . . . . . . . . . 367

7    51  . . . . . . . . . . . . . . . . . . 368

8    53  . . . . . . . . . . . . . . . . . . 376

9    54  . . . . . . . . . . . . . . . . . . 376

10   55  . . . . . . . . . . . . . . . . . . 377

11   56  . . . . . . . . . . . . . . . . . . 377

12   57  . . . . . . . . . . . . . . . . . . 377

13   58  . . . . . . . . . . . . . . . . . . 378

14   61  . . . . . . . . . . . . . . . . . . 378

15   62  . . . . . . . . . . . . . . . . . . 380

16   62  . . . . . . . . . . . . . . . . . . 382

17   63  . . . . . . . . . . . . . . . . . . 383

18   64  . . . . . . . . . . . . . . . . . . 383

19   65  . . . . . . . . . . . . . . . . . . 384

20   66  . . . . . . . . . . . . . . . . . . 385

21   67  . . . . . . . . . . . . . . . . . . 386

22   69  . . . . . . . . . . . . . . . . . . 387

23   73  . . . . . . . . . . . . . . . . . . 388

24

25

```
 1                          KSA EXHIBITS

 2    Exhibit No.                              Received

 3    97    . . . . . . . . . . . . . . . . 306

 4    98    . . . . . . . . . . . . . . . . 308

 5    108   . . . . . . . . . . . . . . . . 347

 6    109   . . . . . . . . . . . . . . . . 349

 7    110   . . . . . . . . . . . . . . . . 352

 8    118   . . . . . . . . . . . . . . . . 356

 9    120 and 121   . . . . . . . . . . . . 357

10    58    . . . . . . . . . . . . . . . . 359

11    134   . . . . . . . . . . . . . . . . 428

12    138   . . . . . . . . . . . . . . . . 432

13    82    . . . . . . . . . . . . . . . . 433

14    40    . . . . . . . . . . . . . . . . 435

15    135   . . . . . . . . . . . . . . . . 445

16

17

18

19

20

21

22

23

24

25
```