# Exhibit 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**

-----------------------------------------------------------------X

| USDC SDNY |
| :--- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: ___9/21/2022___ |

**03-MD-01570 (GBD)(SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

In federal multidistrict litigation, district courts regularly appoint attorneys to manage the litigation and coordinate pretrial proceedings. These executive committees centralize the leadership and daily management of litigation in a single body. They provide a forum to share resources, resolve or limit internal disputes, and put forward a unified litigation position. Leadership in such a committee is thus a role of immense responsibility and trust. The benefits of centralized leadership evaporate when the court cannot depend on a committee member's professionalism, ethics, and honesty.

In this sprawling litigation, the Court established two Plaintiffs' Executive Committees ("PECs") in 2004 and named lawyers from the law firm of Kreindler & Kreindler to leadership positions. Kreindler & Kreindler plays a major role in advocating for the 9/11 families. In addition to representing its clients in court, it lobbies Congress and the Executive branch and aggressively promotes its litigation narrative in the press. All of this is permissible so long as the firm complies with judicial orders and, when called upon, speaks with candor to the Court.

On July 15, 2021, reporter Michael Isikoff of Yahoo! News published an article about the deposition of Musaed Al Jarrah, a non-party in this case.[1] The article claimed that Yahoo! News

---

[1] Counsel for Saudi Arabia also represents nonparty Al Jarrah. ECF No. 7066.

had successfully obtained a copy of the deposition transcript (the "Al Jarrah Transcript"). That transcript, however, was protected by two protective orders (the "Protective Orders").

Faced with a flagrant breach of its orders, the Court initiated an investigation. Most firms willingly aided the effort. Kreindler & Kreindler did not. Instead, it dragged its feet, submitted incomplete responses to the Court's inquiries, and obstructed the investigation. Eventually, the reason for its reticence became apparent. One of its consultants, John Fawcett, confessed to deliberately leaking the transcript.

The Court ordered further discovery to determine the extent of this breach. After conducting an investigation, which included a two-day evidentiary hearing, it became apparent that Fawcett leaked the transcript as part of Kreindler & Kreindler's long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into a settlement, and that he did so with the knowledge or at least tacit consent of lead attorney James Kreindler. Other attorneys at the firm were, at best, willfully blind to the leak as evidenced by their paltry investigation and knowingly misleading statements to the Court.

Kreindler & Kreindler served on the PECs for nearly two decades. Given its willful breach of the Protective Orders and its conduct during the investigation, the Court has lost faith in the firm's ability to comply with court orders or appear before the Court on behalf of all the September 11 victims. Kreindler & Kreindler is therefore removed from the PECs effective immediately. Fawcett is stripped of his access to any documents designated as confidential and barred from any further participation in the case.

## DISCUSSION

The background to this Opinion and Order is bound up with the facts of the breach and the parties' conduct during the Court's investigation. The Court therefore discusses this history

2

as part of its Findings of Fact. It assumes familiarity with the broader background of this

multidistrict litigation ("MDL"), which arises from the terrorist attacks on September 11, 2001.

## I.     Findings of Fact

The Court makes these findings based on the evidentiary hearing held on November 1

and 2, 2021 ("Hearing Tr."),[2] the parties' submissions at ECF Nos. 7386 (Kreindler &

Kreindler), 7387 (Fawcett), 7389 (Saudi Arabia), and the supporting exhibits provided by

Kreindler & Kreindler ("K&K"), Fawcett, and Saudi Arabia ("KSAX").[3] It also takes judicial

notice of its own orders and records. Rosado-Acha v. Red Bull Gmbh, No. 15-cv-7620 (KPF),

2016 WL 3636672, at *7 (S.D.N.Y. June 29, 2016) (a court may "take judicial notice of its own

orders and its own records") (cleaned up) (internal citations omitted).

### A.  The Protective Orders

Since 2006, discovery materials in this MDL have been protected by one or more

protective orders designed to facilitate the unique discovery challenges of this case. The first of

these (the "General Protective Order") was entered on October 3, 2006, under Rule 26(c) of the

Federal Rules of Civil Procedure. KSAX-0002, ECF No. 1900. In entering the General

Protective Order, Judge Casey recognized that the defendants in this MDL "are accused of either

committing the terrorist acts of September 11, 2001 or providing material support to those who

did." These "defendants will be asked to turn over a vast array of private and confidential

information during discovery, much of which will have little or no bearing on the resolution of

---

[2] The transcripts for November 1 and 2 are located at ECF Nos. 7347 and 7349 respectively.

[3] The exhibits presented by the parties are largely duplicative. Many are also contained on the main MDL docket, No. 03-md-1570. In the interest of balancing simplicity, transparency, and accessibility, the Court has used Saudi Arabia's exhibits for citations where possible as its filings were the most voluminous. Where the filing corresponds to a document on ECF, the Court has included that document in the first instance. Unless otherwise noted, all ECF citations are to the main MDL docket.

these actions but will be subject to widespread public scrutiny with prejudicial effects in the absence of a protective order." Id. at 5.

Accordingly, the General Protective Order creates a set of safeguards for confidential discovery material. It defines "Confidential Information or Material" and "Protected Material" as any disclosure or discovery material designated as confidential by a party under its terms. Id. at 7. Materials so designated may be used only in the defense or prosecution of this MDL. Id. at 8. The General Protective Order also covers deposition transcripts involving confidential information. These transcripts are treated as confidential for 30 days from when a party receives them from the court reporter. Id. at 10–11.

This Order also limits who can access protected material (primarily attorneys in this litigation and their staff) and requires that it be stored securely. Id. at 11–12. Violations of the Order are "punishable by money damages caused by the violation, including, but not limited to, all attorneys' fees, court costs, exhibit costs, expert witness fees, travel expenses, all related litigation costs, and actual damages incurred by the other Party, equitable relief, injunctive relief, sanctions or any other remedy as the Court deems appropriate." Id. at 15.

On November 14, 2018, a second order (the "FBI Protective Order") was entered specifically covering the use of information produced by the FBI. KSAX-0015, ECF No. 4255. Like the General Protective Order, the FBI Protective Order limits the use of protected material produced by the FBI to prosecuting or defending this matter and prohibits its dissemination to the public. Id. at 2, 5. It also limits the disclosure of protected FBI materials to select parties including attorneys and their staff. Id. at 2–3. If a transcript involves material subject to the FBI Protective Order, the whole transcript is treated as confidential for 30 days. Id. at 5.

These orders have been the target of frequent public attack by Kreindler & Kreindler attorneys. James Kreindler ("Kreindler"), the attorney supervising the firm's work on this case, Hearing Tr. at 22:3–15, has been particularly vociferous. He has publicly described the Protective Orders as "gag orders," "disgusting," the "hated protective order," "these disgusting protective orders imposed upon us by the Department of Justice with the blessing of the court," and "a damn gag order imposed on us by the Saudis, our Department of Justice, and the court." Id. at 29:1–25. He has also stated publicly that he is "angered and disgusted with the protective orders that the FBI and Saudi Arabia have insisted on." Id. at 29:18–21. Other Kreindler & Kreindler attorneys agree. Andrew Maloney, a Kreindler & Kreindler partner, stated that the entire Kreindler & Kreindler team hates the Protective Orders. Id. at 210:7–14.

### B. Kreindler & Kreindler's 2017 Breach of the Protective Orders

The firm's attorneys have not merely criticized the Protective Orders—in 2017 they breached them. KSAX-0010 at 9:6–7, ECF No. 3619. The incident stemmed from a Politico Magazine article describing a confidential discovery document. Hearing Tr. at 37:6–38:8; KSAX-0011 at 7–8 (article). Both Fawcett and Kreindler were involved in this breach. Fawcett described to a reporter how Kreindler & Kreindler used that document and a phone number in it to advance its investigation. KSAX-0010 at 4:2–5:1. He and Kreindler were the only ones to talk to the reporter for that article. Hearing Tr. at 38:3–8.

This specific description of a confidential document breached the General Protective Order. KSAX-0010 at 9:6–7. The Court did not order sanctions but used the breach as an opportunity to issue a "first warning" against further such conduct. Id. at 10:2. It also urged Kreindler to "be more careful as you continue to litigate this case, including given that you are an executive member of the plaintiffs' executive committee . . . ." Id. at 13:12–15. While Fawcett and Kreindler discussed the breach, no disciplinary action was taken against Fawcett and his

access to confidential materials was not limited. Hearing Tr. at 38:12–24.[4] Fawcett was not restricted from speaking to the press going forward either. Id. at 40:19–24.

## C. Fawcett Leaks the Al Jarrah Transcript to Isikoff

In July 2021, Fawcett leaked the Al Jarrah Transcript to Isikoff, a reporter for Yahoo! News. Isikoff has a symbiotic relationship with Kreindler on issues related to the September 11 Attacks. Hearing Tr. at 50:15–19. Kreindler & Kreindler, under Kreindler's leadership, has made press appeals and outreach to reporters like Isikoff a central part of its litigation strategy against Saudi Arabia. Fawcett has been instrumental in those efforts in the years leading up to the breach.

### 1. Fawcett, Kreindler, and Isikoff

Kreindler talks to the press because he believes this will "pressure" Saudi Arabia into resolving this case. Id. at 25:3–5, 25:21–24. The firm operates on a contingency basis and Kreindler expects that the firm will reap a substantial recovery if it prevails. Id. at 23:1–24:2. Maloney has spoken to the press as well. Id. at 208:20–22.

Fawcett helped execute this press strategy. He also talked to the press on the firm's behalf. Id. at 40:22–24, 41:12–18. At the request of Kreindler or other attorneys, he provided

---

[4] Saudi Arabia suggests that Kreindler's July 10, 2021, appearance on Isikoff's podcast, *Conspiracyland*, is further breach of the Protective Orders. ECF No. 7389 at ¶¶ 39–41. On that show, Kreindler made several generic assertions about the depositions. For example, he suggested that Congress might declare war if it knew everything he knew about the Saudi role in the September 11 Attacks, KSAX-0039 at 6, and that the depositions "have exposed all kinds of lies." Id. at 11. This is not relevant here, and the Court has not considered it in formulating this Opinion and Order. The statements made by Kreindler in 2017 disclosed specific information about a document. His *Conspiracyland* statements were generic. He did not even identify which deponents he had in mind. Such remarks lack the specificity necessary to breach the Protective Orders. Similarly, Saudi Arabia suggests that Kreindler breached the Protective Orders in a 2019 speech at Dartmouth. ECF No. 7389 at ¶¶ 37–38. The FBI also asserted in a letter that this speech violated the FBI Protective Order. KSAX-0020 at 3. Following that speech, the Court directed the parties to "be operating, at counsels' table, with heightened sensitivity." ECF No. 5334 at 36:6–7. The Court did not, however, specifically target that critique at Kreindler, Kreindler & Kreindler, or anyone else associated with the firm. Thus, as with the *Conspiracyland* podcast, the Court does not find it appropriate to consider this speech in its evaluation of this breach or the appropriate response.

documents to reporters. Id. at 41:19–24, 208:23–25. For example, in June 2021, he provided materials and a briefing to a reporter for National Public Radio. Id. at 42:12–43:12. He gave her further materials in September 2021. Id. at 43:18–44:7, KSAX-0012 at 4. Before doing so, however, he sought approval from a Kreindler & Kreindler partner. Hearing Tr. at 44:8–18. This was standard procedure: Fawcett sought approval from senior Kreindler & Kreindler personnel before providing materials to reporters. Id. at 209:3–5.

Fawcett's press work for Kreindler & Kreindler included contacts with Isikoff. Kreindler had spoken to Isikoff about this case sporadically over the years, id. at 50:20–25, including in an interview that Isikoff discussed in a March 1, 2021 article. KSAX-0079 at 2. On July 1, 2021, Kreindler had an interview with Isikoff on Isikoff's podcast, which aired on July 10. Fawcett was in contact with Isikoff during this period. Hearing Tr. at 427:10–21.

Fawcett's role went beyond press management. For more than 20 years, he supported all aspects of the firm's work on this case as a researcher and investigator. Id. at 312:1–3, 416:3–5. In particular, he was responsible for managing discovery materials and other documents for the firm. Id. at 40:5–9, 416:12–18. He had a Kreindler & Kreindler email address, phone, and office and the same email and login privileges as any employee. Id. at 148:14–149:6. He also had access to Kreindler & Kreindler's proprietary internal server. Id. at 148:8–10. His work for the firm accounted for 80 to 90 percent of his income. Id. at 416:9–11.

Given this record, it is perhaps unsurprising that there is substantial loyalty between Fawcett, Kreindler, and the rest of the firm. Fawcett was loyal to Kreindler considering their long work together. Id. at 417:15–18. Kreindler reciprocated the feeling. Even after Fawcett admitted to the leak, Kreindler described Fawcett as "one of the most committed . . . and honest and trustworthy people I ever met." Id. at 128:14–15. Continuing, Kreindler said that he had never

met "a more honest and noble person . . . ." Id. at 128:25. Indeed, in a tearful moment at the evidentiary hearing, Kreindler said that only his own father could surpass Fawcett for honestly and nobility. Id. at 128:24–129:1.

Other Kreindler & Kreindler attorneys held Fawcett in similar regard and testified to their respect for him at the evidentiary hearing. Steven Pounian described Fawcett as "a colleague and a peer," id. at 411:23–412:2, who had never been the subject of a single complaint. Id. at 413:9–15. Maloney considered Fawcett an essential part of the litigation team. Id. at 215:12–16. Megan Benett, another Kreindler & Kreindler partner, called him a "tireless advocate for the family members" victimized by the September 11 Attacks. Id. at 366:8–9. Indeed, despite Fawcett's admitted violation of the Protective Orders, the firm apparently paid for his defense counsel for these proceedings. Id. at 415:21–416:2.

### 2. The Leak

Benett deposed Al Jarrah on Thursday and Friday, June 17 and 18, 2021. Id. at 310: 5–7. Table 1 shows that the next business day after that deposition, Kreindler communicated with Isikoff and Fawcett several times.

| Table 1: Post-Deposition Communications June 21–28 | | | | |
|---|---|---|---|---|
| **Date** | **Sender** | **Recipient** | **Communication** | **Duration** |
| Mon., June 21, 10:41 a.m. | Isikoff | Kreindler | Phone Call | 18 Minutes |
| Fri., June 25, 10:53 a.m. | Isikoff | Kreindler | Phone Call | 10 Minutes |
| Mon., June 28, 11:36 a.m. | Isikoff | Kreindler | Phone Call | 7 Minutes |
| Mon., June 28, 12:22 p.m. | Fawcett | Kreindler | Phone Call | 1 Minute |
| Mon., June 28, 12:23 p.m. | Fawcett | Kreindler | Phone Call | 1 Minute |
| See KSAX-0142 (Kreindler-Isikoff)[5]; KSAX-0134 (Kreindler-Fawcett). | | | | |

---

[5] The phone number interacting with Kreindler on this call log corresponds to Isikoff's cellphone number. KSAX-0041A at 10.

Kreindler testified that on June 28 he spoke with Isikoff about the Al Jarrah deposition. He testified that he told Isikoff that he would ask the team if any portion of the transcript could be disclosed. Then, the same day, he allegedly asked Fawcett if any part of the Al Jarrah deposition transcript could be provided to Isikoff and was told no. Hearing Tr. at 61:19–62:9. The Court does not find this testimony credible. It is not reasonable that Kreindler would suspect that any portion of the deposition of a Saudi official would not be under seal just ten days after the deposition. This would be even more obvious given that it involved sensitive interactions with the FBI. As noted, both Protective Orders require that deposition transcripts containing Confidential Information be kept confidential for at least 30 days. KSAX-0002 at 10–11; KSAX-0015 at 5.

There are other reasons to doubt this testimony. Given the extreme reciprocal loyalty between Fawcett and Kreindler, Hearing Tr. at 128:11–129:16, 417:15–18, the Court does not believe that Fawcett would betray his friend and long-time employer by leaking the transcript to Isikoff a little more than a week after a call where he and Kreindler allegedly agreed that the transcript could not be sent to Isikoff.

Five days after the June 28 call between Fawcett and Kreindler, there was a burst of communication between Fawcett and Isikoff, which ended July 5. Table 2. This was their only apparent communication in the months around the Al Jarrah deposition and leak.

9

| Table 2: Fawcett-Isikoff Communications | | | | |
|---|---|---|---|---|
| **Date** | **Sender** | **Recipient** | **Communication** | **Duration** |
| Sat., July 3, 1:53 p.m. | Fawcett | Isikoff | Phone Call | 22 Minutes |
| Sat., July 3, 2:13 p.m. | Isikoff | Fawcett | Phone Call | 1 Minute |
| Sat., July 3, 2:15 p.m. | Isikoff | Fawcett | Phone Call | 3 Minutes |
| Sat., July 3, 2:35 p.m. | Fawcett | Isikoff | Phone Call | 1 Minute |
| Sat., July 3, 7:14 p.m. | Isikoff | Fawcett | Signal Message | 1 Message |
| Sat., July 3, 7:15 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:16 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:17 p.m. | Isikoff | Fawcett | Signal Message | 1 Message |
| Sat., July 3, 7:18 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:19 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:19 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:19 p.m. | Isikoff | Fawcett | Signal Call | Unknown (Missed) |
| Sat., July 3, 7:19 p.m. | Fawcett | Isikoff | Signal Message | 1 Message |
| Sat., July 3, 7:21 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:23 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Mon., July 5, 1:46 p.m. | Isikoff | Fawcett | Signal Call | Unknown |
| Mon., July 5, 4:22 p.m. | Isikoff | Fawcett | Signal Message | 1 Message |
| See KSAX-0082 at 1–3 (Signal); KSAX-0134 (Phone). | | | | |

The first phone call between Fawcett and Isikoff is the afternoon of July 3. It lasts 22 minutes. Those calls are followed by a few short calls. Then, later that day at 7:14 p.m., Isikoff writes to Fawcett using the messaging app Signal: "Try calling me – it's not going through on signal." KSAX-0082 at 1. That message is followed by a series of calls on Signal. In the last communication on July 5, Isikoff asked Fawcett on Signal whether another witness who had been deposed "also invoke[d] the Vienna convention?" Id. at 3; Hearing Tr. at 435:19–24. The specificity of that question suggests that by July 5, Isikoff had the transcript in hand. Fawcett did not recall the exact date he sent the transcript to Isikoff but suggested that it would have been around July 5, 2021. Hearing Tr. at 436:3–5. None of these communications was located during Kreindler & Kreindler's internal investigation of the leak. They were uncovered only when the firm retained outside counsel following Fawcett's confession.

10

Both Kreindler and Fawcett continued to communicate with Isikoff after July 5 and before the July 15 publication. On July 12, 2021, Fawcett emailed Isikoff a copy of the FBI privilege log listing documents that had been withheld by DOJ on privilege grounds, with nothing in the body of the email. KSAX-0056F at 13–23. [6] On July 13, Kreindler and Isikoff exchanged multiple emails regarding Plaintiffs' "request to DOJ to lift the state secrets privilege and gag order." Id. at 24–27. Kreindler testified that he knew that Fawcett sent Isikoff the privilege log and that Fawcett "[p]robably did so at his direction." Hearing Tr.at 66:3-21. Benett testified that on September 27, 2021, Kreindler had told her that he was "not aware that Fawcett had sent the privilege log back in July." Id. at 387:3–6.

Isikoff published his article, "FBI Tried to Flip Saudi Official in 9/11 Investigation," on Yahoo! News on July 15, 2021. KSAX-0040. The article stated that "a copy of the [Al Jarrah] deposition – with some redactions for law-enforcement sensitive material – was obtained exclusively by Yahoo News." Id. at 1. Before the article was published, on July 5, Isikoff emailed Michael Kellogg, counsel for Saudi Arabia, to ask if he wanted to give any "comments . . . in response to what Jim Kreindler had to say about where things stand – and how the depositions went." KSAX-0041A at 10, ECF No. 6981-4.

## D. Kreindler & Kreindler's Investigation

While Kreindler & Kreindler purported to conduct an internal investigation after Isikoff's article was published, that investigation suffered from numerous deficiencies. These inadequacies were particularly noticeable where Fawcett was concerned.

---

[6] The exhibits identified with the prefix "KSAX-0056" are at ECF No. 7147. Additionally, KSAX-0056J, KSAX-0062A, and ECF No. 7147-11, and ECF No. 7166-1 all reference the same document: Fawcett's original September 27 declaration admitting to his role in the breach. The Court cites this document as KSAX-0062A.

The initial investigation was headed by Maloney, a former federal prosecutor from the Southern District of New York with experience conducting such investigations. Hearing Tr. at 212:25–213:6, 219:20–25. It supposedly ran from July 15, id. at 69:24–70:13, when the Yahoo! News article was published until about July 29, when the firm's LAN Administrator John Hartney was instructed to conduct several follow-up searches. Id. at 172:14–24.

Maloney began the investigation confident that Kreindler & Kreindler was not the source of the leak, id. at 212:3–5, and his inquiries were neither professional nor comprehensive. He began by informally asking a group of people associated with the case collectively if they knew who leaked the transcript. He did not ask anyone whether they had any contact with Isikoff. Id. at 215:17–25. Later, he spoke to some people one-on-one; he spoke with Kreindler only by phone. Id. at 216:2–23. Maloney did not work from a set of prepared questions to ensure a comprehensive inquiry. There was no witness list or systematic effort to determine who had access to the transcript and who should be interviewed.

Maloney did not probe Kreindler's interactions with Isikoff during these initial conversations, only sometime in the following two weeks. Id. at 204:12–205:6. Catherine Hunt, a Kreindler & Kreindler consultant who both participated in the Al Jarrah deposition, id. at 198:25–199:6; KSAX-0032 at 6, and appeared on the July 10 podcast with Isikoff and Kreindler, Hearing Tr. at 205:14–206:5, was never interviewed. Id. at 206:3–16. Indeed, Maloney was still unaware that Hunt was on the podcast when he testified at the Court's investigation in November. Id. at 206:6–12.

Fawcett was never meaningfully investigated despite his central role managing documents and his involvement in the prior breach. While Pounian, id. at 407:6–21, and

Maloney, id. at 216:24–217:6, testified that they questioned Fawcett directly about the breach,

Fawcett does not recall being questioned by anyone:

> Q. But my question is does [Kreindler] come to you and say, ask
> you the question, did you disclose this transcript?
> A. I don't remember that, no.
> Q. Did Megan Benett come to you and say, did you disclose this
> transcript?
> A. No, I don't recall that.
> Q. Did Andrew Maloney come to you and say, did you disclose
> the transcript?
> A. I don't recall that.
> Q. Did Steven Pounian come to you and say, did you disclose
> the transcript?
> A. No, I don't recall that.

Id. at 439:1–12.

The Court credits Fawcett's testimony over the testimony of Pounian and Maloney. First,

given Fawcett's guilt, it makes sense that he would recall whether he was ever asked if he was

the culprit. Whereas Maloney and Pounian both approached the investigation confident that their

firm was not the source. Second, Pounian did not object when Fawcett removed from a draft

declaration language that would have stated that he "told Kreindler & Kreindler that [he] did not

know how Michael Isikoff had obtained the transcript." KSAX-0121 at 1. Although Fawcett has

admitted to violating the Protective Orders, he was apparently unwilling to sign a perjurious

declaration.

Other members of the firm operated with a similar blind spot where Fawcett was

concerned. Kreindler testified that he never asked Fawcett if he leaked the transcript even though

he testified that he asked Fawcett about the transcript and Isikoff's interest in it. He testified, "I

spoke to John. I didn't do it. I know you didn't do it. I have no idea who could have done it." Id.

at 78:7–9. The following colloquy ensured:

13

> Q:   At any point in time, did you ever ask John Fawcett, in words or substance, John, did you provide the Al Jarrah transcript to Mr. Isikoff?
>
> A.   No.
>
> Q.   Did you direct anyone else to ask Mr. Fawcett that question?
>
> A.   No.

Id. at 78:22–79:3. Kreindler described Fawcett as being "at the heart of the documents" in the firm's case management. Id. at 39:3. It is telling that despite this, no one in the firm ever seriously investigated him in connection with the document leak.

The firm failed to investigate Fawcett in other ways as well. Even though he stored protected materials on the Dropbox cloud storage system, KSAX-0067 at 1, there is no indication that Maloney's investigation sought to assess what role such storage systems might have played in the breach. Hartney did not investigate Dropbox, even though he knew Fawcett maintained a Dropbox account. Hearing Tr. at 150:8–14.

Fawcett also used his personal devices to save and send information when he breached the Protective Orders. See KSAX-0059 at ¶ 7, ECF No. 7162-2 (describing how Fawcett used his laptop and personal thumb drive during the breach). Maloney did not review personal devices of Kreindler & Kreindler staff, Hearing Tr. at 157:18–20; 222:8–25, or firm phone records, id. at 157:23–158:17, which he insisted would have been an unreasonable investigative step. Id. at 233:22–25. The firm eventually reviewed Fawcett's phone records after Fawcett admitted to the breach and the firm retained outside counsel. Hearing Tr. at 158:2–17. Those records revealed his July 3-5 communications with Isikoff and other suspicious communications.

The investigation had numerous deficiencies beyond its inexplicably cursory review of the firm's key document manager. Firm staff saved material covered by the Protective Orders in at least three locations: (1) an internal proprietary server called "Case Media," Id. at 136:25–137:2, 137:23–138:7, 140:11–17; (2) a cloud-based system called Citrix ShareFile, id. at 137:3–

14

5, 147:21–22; and (3) the Kreindler & Kreindler email system. Id. at 137:6–9. Maloney's investigation did virtually nothing to account for or investigate people's ability to access the Al Jarrah Transcript using these systems.

Case Media stored protected material, including the Al Jarrah Transcript. Id. at 138:6–7, 140:11–17. Before September 27, 2021, anyone who worked at Kreindler & Kreindler could access this system. Id. at 138:18–139:8. Even though anyone with access to the Kreindler & Kreindler system could access Case Media, Maloney did not take any steps to account for this broad access. Hartney was never instructed to carry out a forensic investigation of who accessed the Al Jarrah Transcript in Kreindler & Kreindler's systems. Id. at 175:4–21. This may be because the firm had no ability to track who accessed material saved in Case Media. Id. at 139:25–140:17. Despite this, the firm stated to the Court that it had reviewed its systems and affirmed that no one had sent the transcript to Isikoff based on that review. See, e.g., KSAX-0048A at ¶¶ 8–9, ECF No. 7016 ("[O]ur firm conducted a review of the handling of the Jarrah deposition transcript . . . including searches performed by the firm's information technology director of all outgoing email. Based on that review . . . no one with the firm . . . shared the Jarrah deposition transcript").[7]

The email searches that Maloney directed to investigate the leak were also deficient. Initially, he ordered just two searches of Kreindler & Kreindler's email system: one for outgoing emails from eight individuals that could have contained the Al Jarrah Transcript, and one for emails to Isikoff. Hearing Tr. at 221:1–222:17, 223:10–17; KSAX-0084 at 1. While the search revealed communications between Isikoff and Kreindler in June that implied the existence of earlier communications, Maloney did not expand his search to determine if any such

---

[7] KSAX-0048 includes four further separate exhibits, KSAX-0048A–D, which are included as a single document at ECF No. 7016.

communications existed. Hearing Tr. at 235:17–236:17. Similarly, the search revealed communications between Fawcett and Isikoff that suggested that there might be earlier emails not found in the initial search. Id. at 237:3–238:11. Despite this, Maloney did not have Hartney expand the search for these additional communications either. Id. at 162:12–163:6.

Other investigative steps were delayed. The firm was aware of the breach by July 15 but Hartney was not instructed to review ShareFile until July 29. Id. at 149:21–150:3. This was two days after Kreindler & Kreindler reported to the Court that its investigation was complete. Id. at 172:14–24; KSAX-043 at 2, ECF No. 6988.

Finally, Maloney never directed Fawcett, Kreindler, or anyone else at the firm to retain documents relevant to the breach. Retention orders were sent out in early October 2021 and only after Kreindler & Kreindler's outside counsel for the investigation noticed an appearance. Hearing Tr. at 244:14–245:2. In short, the firm failed to take basic investigative steps in an investigation that conspicuously failed to consider Fawcett in any meaningful way.

### E. Saudi Arabia's Investigation Request and the July 22 Calls

On July 21, 2021, six days after the article was published, Saudi Arabia sent an email to the PECs, including Kreindler & Kreindler, stating that it would ask the Court to investigate the breach. KSAX-0042 at 3–4. The email was sent at 9:14 p.m. Fawcett was not copied on this communication. See generally KSAX-0042. Starting early the next morning, Fawcett had a series of suspicious communications. None of these communications was uncovered as part of the firm's internal investigation. See Table 3.

| Table 3: Fawcett July 22 Communications |||||
|---|---|---|---|---|
| **Date** | **Sender** | **Recipient** | **Communication** | **Duration** |
| July 22, 8:18 a.m. | John Fawcett | Liz Crotty | Text Message | 1 Message |
| July 22, 9:17 a.m. | John Fawcett | Jim Kreindler | Phone Call | 46 Minutes |
| July 22, 10:41 a.m. | John Fawcett | Liz Crotty | Phone Call | 22 Minutes |
| July 22, 12:07 p.m. | John Fawcett | Liz Crotty | Email | Unknown |
| July 22, 12:56 p.m. | John Fawcett | Jim Kreindler | Phone Call | 5 Minutes |
| See KSAX-0135 at 3; KSAX-0151 at 1, ECF No. 7327-3. |||||

First, at 8:18 a.m., Fawcett sent a text message to Elizabeth Crotty requesting legal advice. KSAX-0151 at 1. Elizabeth Crotty is a former Kreindler & Kreindler attorney who currently works as a criminal defense lawyer. Hearing Tr. at 84:20–24, 447:5–8. Then, at 9:17 a.m., Fawcett had a 46-minute phone call with Kreindler. KSAX-0135 at 3.

Fawcett and Kreindler insist they cannot recall the purpose of the 9:17 a.m. call except to assert with absolute confidence that it was not about the leak. Hearing Tr. at 84:3–19 (Kreindler), 445:25–446:2 (Fawcett).[8] Fawcett suggested that it may have been a work-related conference call. Id. at 445:18–447:1. But his phone log indicates that the call was with "Jim Kreindler." Unlike numerous other entries in his phone log, this call was not labeled "ATTORNEY WORK PRODUCT – KREINDLER," undermining the suggestion that this was a work-related call. See generally KSAX-0135.

---

[8] After the hearing, Pounian submitted a declaration stating that that call and another call made that day were not about Fawcett's leak of the deposition, ECF No. 7359-1 at ¶ 5, but did include a discussion of coordinating the firm's response to an email sent the prior evening by Saudi Arabian counsel Gregory Rapawy. Id. at ¶ 4. While Pounian was questioned at the hearing, his testimony did not touch on these calls. See generally Hearing Tr. at 404–414. His declaration also offers little clarity. Rapawy's email was about Saudi Arabia's intent to move the Court to investigate the breach of the Protective Orders. KSAX-0042 at 3–4. Thus, Pounian's statement would seem to undercut Kreindler's testimony that the leak was not discussed on the call, Hearing Tr. at 84:11–12, even if it also confirms Fawcett's statement that the call might have been a conference call. Thus, this declaration does little to illuminate what was discussed in the 9:17 a.m. call. It is also inadmissible hearsay since it is proffered for the truth. Fed. R. Evid. 801(c), 802. Given its marginal value and inadmissible nature, the Court has not relied on this declaration in rendering its Opinion and Order.

Fawcett next had a 22-minute call with Crotty beginning at 10:41 a.m. Id. at 3. After the call, Fawcett sent an email to Crotty requesting legal advice at 12:07 p.m. KSAX-0151 at 1. That email was followed by a five-minute call with Kreindler at 12:56 p.m. KSAX-0135 at 3.[9] These communications with Crotty were Fawcett's only apparent communication to her for legal advice in July. The next legal communication between them does not occur until September 24, the day after the Court issued an order directing further disclosures in its investigation of the breach. KSAX-0151 at 1.

During discovery, Fawcett asserted the attorney-client privilege over his July 22 communications with Crotty. Hearing Tr. at 449:5–11. Initially, at the hearing, however, he stated that the call was only about Crotty's recent run for district attorney. Id. at 449:16–20. He was then challenged about asserting privilege over a personal call. Id. at 449:21–451:4. After the conclusion of cross-examination and a recess, Fawcett asked to correct his testimony. He said that he talked to Crotty because he "saw the court order," id. at 480:16, and wanted to get legal advice because of the position he was in after leaking the transcript. Id. at 481:6–9. This cannot be true: the Court had not issued any order relating to the breach as of July 22. Indeed, Saudi Arabia would not even move for discovery until July 23. KSAX-0041, ECF No. 6981. The only activity related to the breach was Saudi Arabia's non-public 9:14 p.m. email. KSAX-0042. Fawcett was not included on that communication although Kreindler, Pounian, Benett, and Maloney were. Thus, sometime between this 9:14 p.m. email and Fawcett's text message to Liz Crotty at 8:18 a.m. the next day, someone informed Fawcett that an investigation was likely enough that he decided to seek legal counsel.

---

[9] Pounian's declaration, discussed in note 8, says that this call was similarly not about the transcript leak. ECF No. 7359-1 at ¶¶ 3–4. For the reasons discussed in note 8, the Court declines to rely on this declaration.

This also makes it even less credible that Fawcett and Kreindler's 9:17 a.m. call was a work-related conference call. Fawcett's 8:18 a.m. text and subsequent call to Crotty were explicitly for legal advice relating to the breach. Hearing Tr. at 480:5–481:9. To find Fawcett and Kreindler's testimony about these July 22 calls credible would require the Court to accept that, despite his long friendship with Kreindler, Fawcett reached out to a defense attorney about betraying Kreindler, had a normal, extended call with Kreindler, switched back to talking to his attorney about betraying Kreindler, and then talked to Kreindler again, all apparently without revealing a hint of his guilt. Having witnessed Fawcett on the stand, heard tributes to his loyalty, and knowing that he confessed instantly when forced to sign a sworn statement, the Court does not find it credible that Fawcett could manage this kind of duplicity. It is all the more unlikely given Fawcett and Kreindler's prior breach of the Protective Orders in 2017.

### F. The Court's Initial Investigation: July 23 to August 16

On July 23, 2021, Saudi Arabia moved for discovery into the breach of the Protective Orders. KSAX-0041. It suggested that the Court investigate by ordering declarations from every party who had access to the Al Jarrah Transcript as a precursor to implementing sanctions under Rule 37 and the Court's inherent powers. Id. at 4. It also supplied 27 declarations from its attorneys and staff. KSAX-0041A. Each of these stated that the declarant had not disclosed the Al Jarrah Transcript, did not know who did, and either had no interactions with Isikoff or had been contacted by him for a comment but had not communicated with him. Id.

On July 27, the PECs opposed Saudi Arabia's motion in a letter signed by PECs representatives from Kreindler & Kreindler, Cozen O'Connor, and Motley Rice LLC. KSAX-043 at 2. The letter stated that "each of the lead PEC firms had already conducted internal investigations into the handling of the Jarrah transcript and communications with Mr. Isikoff . . . ." It further stated that "as a result of those investigations, each of the lead PEC firms [is]

19

confident that it was not the source of the leak to Mr. Isikoff." Id. Hartney would later agree that

by July 27, he "could not have concluded that no one at the Kreindler firm was the source of the

leak." Hearing Tr. at 174:25–175:3.

Despite this letter, Cozen O'Connor and Motley Rice voluntarily submitted declarations

distancing themselves from the breach two days later. KSAX-0044, ECF No. 6991 (Cozen

O'Connor); KSAX-0045, ECF No. 6992 (Motley Rice). Cozen O'Conner submitted five

declarations. Two of these came from senior attorneys stating that they had neither shared the

transcript with Isikoff, not communicated with him since at least June 2021. KSAX-0044 at 3–

10. Two came from paralegals who also denied sharing the transcript. Id. at 14–17. The final

declaration came from the firm's "Director of User Support." That declaration described the

investigative steps that the firm took to assess how it received the Al Jarrah Transcript, what

databases it stored that transcript on, and who accessed those databases. It also described a

review of the firm's email system taken as part of that investigation. Id. at 11–13. Based on that,

Cozen O'Conner confirmed that access to the transcript was limited exclusively to the employees

who had signed declarations stating that they did not leak the transcript and that the firm email

had not been used to leak the transcript. Id. at 1.

Motley Rice submitted seven similarly thorough declarations. KSAX-0045. That

submission included declarations from four lawyers, id. at 3–17, and two paralegals, id. at 18–21.

All of these declarations stated that the declarant had not communicated with Isikoff and did not

know anyone at the firm who had. Motley Rice also submitted a declaration from a "Compliance

and Security Specialist" stating that no firm emails had been sent to any known emails for Isikoff

and that there had been no unusual traffic to the secure storage site for the transcript. Id. at 22–

24.

With those submissions in hand, the Court turned to Kreindler & Kreindler. Even at this early stage, several circumstantial factors suggested that it might be the source of the leak. These included Kreindler's known relationship with Isikoff, Isikoff's outreach to Kellogg noting Kreindler's cooperation, and the firm's prior breach of the Protective Orders. Despite this, Maloney stated that it was a "consensus decision" by Kreindler & Kreindler not to file anything until directed by the Court. Hearing Tr. at 262:6–15.

On August 12, 2021, the Court directed Kreindler & Kreindler "to follow the lead of Cozen O'Conner and Motely Rice and to file declarations, under penalty of perjury, as to whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by the Protective Order and the FBI Protective Order." ECF No. 7011 at 2. While the Court did not specify who had to file declarations, it required, "[a]t a minimum," that Kreindler, Pounian, Maloney, and Benett submit one. Those declarations were due August 16. Id.

In the intervening period, a third major PECs firm, Anderson Kill, voluntarily filed five declarations. KSAX-0047, ECF No. 7013. This submission included declarations from three attorneys, ECF Nos. 7013-1, 7013-2, 7013-3, and one paralegal. ECF No. 7013-4. All of these attested that no one at the firm had shared the Al Jarrah Transcript with Isikoff or indeed, communicated with him in any way. Anderson Kill also included a declaration from the director of its IT department. ECF No. 7013-5. That declaration stated that no one at the firm had accessed the secure folder in which the Al Jarrah Transcript was stored, id. at ¶ 8, and that no emails had been sent to Isikoff from the Anderson Kill email system. Id. at ¶ 10. That submission left Kreindler & Kreindler as the only major PECs firm not to have made a voluntary submission.

21

Pursuant to the Court's order, Kreindler & Kreindler submitted its first set of declarations on August 16 (the "August 16 Declarations"). This submission consisted of declarations from only the four attorneys identified as the minimum by the Court. KSAX-0048. The firm did not ask Fawcett to submit a declaration or include a declaration from IT or other legal support staff. Although Maloney testified at the evidentiary hearing that he headed the initial internal investigation, Maloney did not mention any such efforts in this declaration. KSAX-0048C at 7–8. His declaration was a near verbatim copy of the Kreindler and Pounian declarations, each of which stated generically that they received the transcript, did not share it with anyone unauthorized to see it, and did not direct anyone to share it.

These declarations were also substantially vaguer and less comprehensive than the declarations submitted by the other PEC firms. The most prominent difference was that the Kreindler & Kreindler declarants did not state that they did not communicate with Isikoff, only that neither the declarant nor, to their knowledge, anyone in the firm had shared the transcript "with anyone unauthorized to see it." See, e.g., KSAX-0048A at ¶ 6. The declarations also provided virtually no detail about the investigation conducted to reach these conclusions. Only Benett—who testified that she was not involved in the initial investigation, Hearing Tr. at 335:23–336:10—stated that the "firm conducted a review of the handling of the Jarrah deposition transcript" and mentioned that the firm's information technology director searched "all outgoing email." KSAX-0048A at ¶ 8.

## G. The Court's August 30 Order and the Oath Intervention

The deficiencies in the August 16 Declarations led the Court to issue a second order two weeks later (the "August 30 Order"). KSAX-0049, ECF No. 7082. That Order had two components. First, the Court ordered additional submissions from Kreindler & Kreindler. The

four attorneys who submitted the initial declarations were required to identify their communications with Isikoff and identify everyone with whom they shared the transcript, or who had access to the transcript that had not already supplied a declaration. Id. at 1. One of those declarations also had to describe the investigative steps the firm took in response to the breach of the Protective Orders. As part of this, the firm was required to submit any written communications with Isikoff between June 1 and August 1, 2021, to the Court. Id. Additionally, any person named in the four attorneys' supplemental declarations had to submit declarations themselves stating whether they had shared the Al Jarrah Transcript or otherwise communicated with Isikoff. Finally, the head of Kreindler & Kreindler's IT group or a comparable figure was required to submit a declaration demonstrating that a "forensic analysis" had been completed to determine who had access to the Al Jarrah Transcript. Id. at 2.

Second, the Court required declarations from the court reporter service that took the Al Jarrah deposition, as well as other law firms who attended. These declarations required these firms to state whether they shared the declaration transcript with Isikoff or otherwise communicated with him. All declarations were due by September 10, 2021. Id. at 2–3.

Before these could be filed though, Oath, Inc., which offers Yahoo! News, intervened to request that the August 30 Order be modified on First Amendment grounds. ECF Nos. 7094–95. The Court stayed the August 30 Order to permit briefing on this motion. ECF No. 7098. Kreindler & Kreindler, unique among the PEC firms, filed a brief supporting Oath's position. KSAX-0051, ECF No. 7103.

On September 23, the Court held that Oath's motion was without merit. KSAX-0055, ECF No. 7134. It ordered the declarations required by the August 30 Order to be filed by September 27, 2021. Id. at 24.

23

### H.  The Remaining Attorneys File Declarations

While Oath's motion was pending, and notwithstanding that the August 30 Order had been stayed, the remaining plaintiffs' firms filed declarations distancing themselves from the breach. ECF No. 7106. Indeed, certain plaintiffs' counsel not covered by that Order joined in the submission voluntarily. Id. at 1. In all, nine additional attorneys from eight firms submitted declarations. All of these stated that they had not shared the Al Jarrah Transcript. On September 27, similar submissions were received from the defense-side firms and the court reporters for the Al Jarrah deposition. ECF No. 7145.

### I.  The Kreindler & Kreindler Declarations

While Oath's motion was pending, Kreindler & Kreindler obtained one exculpatory declaration from a consultant, who stated that he had not been in touch with Isikoff or shared the Al Jarrah Transcript with any unauthorized parties. That declaration is signed September 2, 2021, just days after the August 30 Order. KSAX-0062B, ECF No. 7166-2. Fawcett, however, testified that he was not even asked to prepare a declaration until September 23, 2021. Hearing Tr. at 454:9-455:20 ("[I]n the two-month period from July 15 until September 23 . . . no one from Kreindler & Kreindler insisted that I give a sworn declaration.")

Kreindler & Kreindler submitted its declarations on September 27 (the "September 27 Declarations"). These declarations contained numerous misleading or false statements. Benett was primarily responsible for creating these declarations, with assistance from Pounian. See K&K Ex. 51; K&K Ex. 52; K&K Ex. 62; Hearing Tr. at 368:14–17, 369:25–370:2.

## 1. The Hartney Declaration

Hartney's Declaration (the "Hartney Declaration"), KSAX-0056F, made several material misleading statements.[10] He states that a directory in Case Media "is for use only by individual Kreindler attorneys and staff involved in this litigation and one consultant to Kreindler, John Fawcett." Id. at ¶ 5. This implies that this directory is restricted to a limited set of people. That is false. Anyone employed by Kreindler & Kreindler could access this directory. Hearing Tr. at 138:18–25. Hartney raised this precise issue to Benett in an email on September 27:

> I have an issue with this statement "That share drive is for use only by Kreindler attorneys and staff involved in the litigation." I don't think it is truthful because it was saved in the case media share and not on the terror share (which is restricted) and everyone at Kreindler has access to everything in casemedia.

KSAX-0115.

Benett replied shortly after that this "language is drafted carefully, and it does not say that it was restricted, in fact I was careful NOT to say that." Id. As Hartney explained, Benett drafted the statement this way because she did not want to disclose to the Court that everyone at Kreindler & Kreindler could access materials on Case Media. Hearing Tr. at 143:4–13; 196:3–19.

Hartney also states that he "did not find any evidence that the Jarrah transcripts had been downloaded, printed, or emailed, by anyone else." KSAX-0056F at ¶ 5. This is misleading. It implies that Kreindler & Kreindler investigated if the Al Jarrah Transcript was downloaded and determined that it was not. But this was impossible because the firm could not track downloading or printing. Hearing Tr. at 145:14–22. Given this, it is questionable whether the firm would even

---

[10] The exhibits identified with the prefix "KSAX-0056" are at ECF No. 7147. Additionally, KSAX-0056J, KSAX-0062A, and ECF No. 7147-11, and ECF No. 7166-1 all reference the same document: Fawcett's original September 27 declaration admitting to his role in the breach. The Court cites this document as KSAX-0062A.

have been able to carry out the forensic analysis expected by the August 30 Order. KSAX-0049 at 2. Even if it would have been possible with the firm's technology, Hartney was never asked to do so. Hearing Tr. at 175:4–21.

### 2. The Fawcett Declaration

Fawcett's declaration underwent substantial modification at the hands of Pounian and Benett before it was submitted to the Court. Fawcett purportedly told Kreindler & Kreindler attorneys for the first time that he leaked the transcript on the morning of September 27, sometime between 10:00 a.m. and 10:30 a.m. Hearing Tr. at 388:19–25. About two hours later, at 12:20 p.m., Fawcett emailed Pounian and Benett a statement that he had drafted himself. Id. at 456:7–15; KSAX-108. He wrote this in his own words and believed it was accurate. Hearing Tr. at 456:18–21.

The original declaration, KSAX-108A, differed substantially from the version that was filed with the Court. See KSAX-0062A. In this original declaration, Fawcett said was troubled by "evidence of Jarrah's use of child pornography." KSAX-108A at 1. He also said that "[t]he protective order should not be used to cover up evidence of a crime that is not being adjudicated." Id. He went on to state that "[i]f the Saudi government, the FBI, and the Federal Court of the Southern District of New York continue to protect Musaed Al Jarrah rather than prosecute him, then the public must at least be forewarned in order to have a chance to protect themselves." Id. He then asserted that "[t]he only venue for such a warning is the media." Id. As Benett acknowledged, this initial draft makes no mention of any personal familial motivation for the breach. Hearing Tr. at 348:21–25. Finally, Fawcett said that he "sent a redacted version of the transcript of the deposition of Musaed Al Jarrah to Michael Isikoff" and does not deny that he sent FBI protected material by sending that transcript. KSAX-108A at 1.

Both Pounian and Benett edited Fawcett's original statement. Hearing Tr. at 458:22–24. At 1:41 p.m., Pounian emailed a new draft to Benett. KSAX-0109; KSAX-0109A. This new draft differed from Fawcett's original declarations in two important ways. First, the declaration now stated that "the redacted portions of the deposition [Fawcett] sent to Michael Isikoff were limited to Jarrah's possession of child pornography." KSAX-0109A at 1. It also said that Fawcett "did not send any other portions of the deposition to Isikoff." <u>Id.</u> These statements give the impression that Fawcett sent only portions of the deposition transcript to Isikoff, when in fact, he sent the whole transcript. Second, this draft added that Fawcett had a "personal interest" in this issue because Al Jarrah worked in Morocco as a diplomat and Fawcett's children were from that country.[11]

At 1:47 p.m., Benett wrote back to Pounian that this draft was "good" but made one further addition. KSAX-0110. She added that Fawcett knew from his "background in global humanitarian work … that Morocco is a country with a history of child sex trafficking." KSAX-0110A at 1. While Benett stated at the hearing that she "formatted it" but did not "write the words," <u>id.</u> at 346:20–22, there was no evidence at the hearing or in Fawcett's phone records that he participated in these additions. Pounian and Benett circulated these drafts between 1:41 p.m. and 1:47 p.m. Fawcett's call log shows no evidence of calls to or from Pounian or Benett from 11:51 a.m., when he calls Pounian, until 3:11 p.m., when he calls Benett. KSAX-0136 at 2–3.

Pounian emailed Fawcett revised drafts at 6:53 p.m., KSAX-0118; KSAX-0118A, and 7:06 p.m. KSAX-0119. In that latter email exchange, Fawcett emails back edits. KSAX-0120; Hearing Tr. at 443:21–444:2. First, as noted above, he deleted "Until today, I had told Kreindler & Kreindler that I did not know how Michael Isikoff, had obtained the transcript" and replaced it

---

[11] This information is redacted in KSAX-0109A but is contained in substantially the same form in a sealed filing at ECF No. 7166-1.

with "No one from Kreindler & Kreindler even knew about what I had done, even while they were responding to the Court's Orders." KSAX-0121 at 1. Second, he changed the line "redacted portions of the deposition I sent to Michael Isikoff were *limited to* Musaed Al Jarrah's testimony about his possession of child pornography" to "were *focused on* Musaed Al Jarrah's testimony about his possession of child pornography . . . ." KSAX-0121 at 1 (emphases added). Regardless of the framing, the statement was misleading. Fawcett sent the whole deposition transcript, with certain redactions, to Isikoff. Hearing Tr. at 461:6–22.

Fawcett's alleged motive for disclosing the transcript—to protect the children of Morocco—was fabricated and intended to make Fawcett appear more sympathetic. There are also reasons to doubt its genuineness. The alleged conduct occurred 17 years ago, and Fawcett had learned about the information related to Al Jarrah, at least on an unconfirmed basis, about six to eight months before the deposition. Hearing Tr. at 468:8–24. The deposition did not appear to shed much new light on what happened: Isikoff describes the deposition as containing neither "smoking guns" nor "dramatic confessions"— the FBI tried to confront Al Jarrah, he rebuffed them, and that was the end of it. KSAX-0040 at 2. Despite his purported concerns, aside from leaking the transcript to a single reporter that is friendly to the firm, Fawcett did not alert anyone in the U.S. or Moroccan governments about his concerns. Hearing Tr. at 470:5–471:16. His "children" referenced in his declaration were at least 21 by the time of the leak. Id. at 489:11–14.

### 3. The Maloney, Pounian, and Benett Declarations

The Maloney, Pounian, and Benett Declarations also contain misleading statements. The August 30 Order required Kreindler & Kreindler attorneys to "state every person they know had access to the deposition transcripts who has not already supplied a declaration in this investigation." KSAX-0049 at 1. Each of these lawyers reported in their declaration that no other individuals with access to the transcript had failed to submit declarations. KSAX-0056B at ¶ 9

(Maloney); KSAX-0056D at ¶ 4 (Pounian); KSAX-0056C at ¶ 5 (Benett). This was false. At least Benett, through her interaction with Hartney, KSAX-0115, and Maloney, Hearing Tr. at 245:15–247:11, were aware that anyone with a Kreindler & Kreindler employee login had "access" to Case Media and, by extension, the Al Jarrah Transcript.

### 4. The Kreindler Declaration

Kreindler's declaration understates his contacts with Isikoff and lacks supporting materials required by the August 30 Order. In his declaration, Kreindler recalled communicating with Isikoff and his producer "several times" including two phone calls and several emails. KSAX-0056A at ¶ 6. At the hearing, however, it was stipulated that Kreindler had three calls with Isikoff. Hearing Tr. at 54:17–25. He also had text message exchanges with Isikoff, id. at 55:2–56:12, which were not produced as part of the September 27 Declarations. Kreindler testified that his declaration was based "[s]olely on his recollection," id. at 52:23–25, and that he did not check any of his records before it was prepared. Id. at 51:15–52:11. Kreindler did not explain why he took so little effort to verify his sworn statements before filing them with a federal court investigating his firm for deliberate breaches of protective orders.

Kreindler, like others, reported that he knew of no one with access to the Al Jarrah Transcript who had not submitted a declaration. KSAX-0056A at ¶ 6. Again, this is misleading given the unrestricted access to the file.

### J. Fawcett Confesses

Kreindler & Kreindler filed the declarations required by the August 30 Order on September 27, 2021. KSAX-0056. In that filing, Fawcett provided a signed declaration admitting that he had deliberately leaked the Al Jarrah Transcript to Isikoff. KSAX-62A. Three days later, Kreindler & Kreindler submitted an additional update. KSAX-0057, ECF No. 7153. It reported that "it has moved all 9/11 case protected materials into a separate file on its computer system."

29

Id. at 1. The firm was "also in the process of setting up a new system that will automatically track the viewing and download of all documents on the system . . . ." Id.

### K. The September 30 Fawcett Declaration

Three days later, Fawcett filed a second declaration. KSAX-0059, ECF No. 7162-2. It provided additional details about both Fawcett's communication with Isikoff, KSAX-0059 at ¶¶ 3, 8, 10, and more information about how he leaked the transcript. Id. at ¶ 7. The August 30 Order, however, required that copies of any communications with Isikoff discussed or identified in responsive declarations be provided as part of those declarations. KSAX-0049 at 2. Despite this, neither of Fawcett's declarations attached communications with Isikoff, though both disclosed that Fawcett had communicated with him. See, e.g., KSAX-0062A at ¶ 3; KSAX-0059 at ¶¶ 3, 8, 10. Indeed, beyond searching the Kreindler & Kreindler email system, no effort was made to locate or obtain copies of Fawcett's various communications with Isikoff until the Court ordered further discovery. Hearing Tr. at 177:21–178:6, 178:24–180:19.

### L. Evidentiary Hearing

Faced with the inadequacies of Kreindler & Kreindler's declarations and unconvinced that the breach was solely the responsibility of a rogue consultant, the Court ordered a hearing. ECF No. 7167. It informed the parties that "[t]he purpose of the hearing is to render findings of fact in connection with the breach and to determine the appropriate remedies." Id. at 1. It further informed the parties that potential remedies would include "removal from the Plaintiffs' Executive Committees, monetary sanctions, a referral for professional discipline to the Committee on Grievances for the Southern District of New York, and a criminal referral to the U.S. Attorney's Office for the Southern District of New York." Id. The Court designated six witnesses to participate in the hearing: Kreindler, Maloney, Benett, Pounian, Hartney, and Fawcett. Id. at 1–2. Counsel for Saudi Arabia was directed to perform the cross-examination.

The hearing took place November 1 and 2, 2021. On several occasions, it devolved into contentious exchanges between counsel for Saudi Arabia and either counsel for Kreindler & Kreindler or Kreindler & Kreindler witnesses. See, e.g., Hearing Tr. at 53:2–54:16, 240:18– 241:5, 248:1–25, 268:19–269:2, 475:2–21.

Kreindler & Kreindler attorneys also used the hearing to continue their efforts to inject embarrassing and irrelevant information targeting Saudi Arabia into this proceeding. Benett, in particular, went out of her way in her testimony to discuss how Fawcett's reaction "was very much informed by his strong feelings about somebody that he believed was not only trafficking in sexual images of minors but was deliberately living in a place where he would have easy access to minor children for sexual purposes." Id. at 393:1–5. This extension of Fawcett's motivation and additional gratuitous attack on Al Jarrah was nowhere in the original declaration Fawcett drafted, KSAX-0108A, the declaration prepared after Benett and Pounian's tinkering, KSAX-0062A, or the follow-up declaration Fawcett provided. KSAX-0059. No such charge can be inferred from Isikoff's article either. KSAX-0040.

## M. Further Breaches of the Protective Order

The evidentiary hearing revealed two further breaches of the Protective Orders by Kreindler & Kreindler, one related to their treatment of protected material, and one related to unauthorized participation in depositions.[12]

### 1. Kreindler & Kreindler's Protection of Protected Material

The Protective Orders require that protected material be stored "in a secure manner that ensures that access is limited to the persons authorized" to see the material. KSAX-0002 at 11. Kreindler & Kreindler's data systems do not satisfy this criteria. Even though Case Media stored

---

[12] Saudi Arabia made three post-hearing motions. ECF Nos. 7322, 7327, 7328. The Court addressed these in a single omnibus order. ECF No. 7369.

protected materials like the Al Jarrah Transcript, Hearing Tr. at 138:6–7, 140:15–17, anyone who worked at Kreindler & Kreindler could access these files regardless of whether they were assigned to the case. Id. at 138:18–139:8. These system did not track who accessed protected materials, id. at 139:25–140:14, and did not warn people that they were about to access confidential data restricted to specific personnel. Id. at 249: 6–10. While the firm considered migrating the Case Media files to a new system before the breach, it determined that this move would be too disruptive. Id. at 373:1–16.

## 2. Unauthorized Deposition Participation by Brian Weidener

The evidentiary hearing and subsequent submissions revealed that certain Kreindler & Kreindler personnel had improperly participated in the Al Jarrah deposition. Depositions are governed by a protocol proposed by the parties, ECF No. 6002–04, and adopted by the Court. ECF No. 6204 (the "Deposition Protocol"). Under the Deposition Protocol, "depositions may be attended (either in person or remotely) only by the witness, counsel for the witness, attorneys of record in the MDL Proceeding and their staff, court reporters, videographers, translators, and the Parties' in-house counsel." ECF No. 6002-1 at ¶ 31. "All persons in attendance (either in person or remotely) must be noted on the deposition record." Id.

Benett's testimony suggested that a firm consultant had participated in the deposition without being noted on the record. Hearing Tr. at 328:6–330:1. To investigate this, Kreindler & Kreindler was ordered to produce a declaration from this party describing his role and participation in the Al Jarrah deposition as well as evidence that this individual had agreed to be bound by the Protective Orders. ECF No. 7369 at 3.

Kreindler & Kreindler initially produced that declaration on November 22, 2021. ECF No. 7379. It revealed that a retired FBI special agent, Brian Weidener, had participated without declaring himself on the record. He "entered a conference room where [he] saw portions of the

Jarrah deposition." ECF No. 7384-1 at ¶ 4. Weidener "did not watch the deposition in its entirety, and [he] was not in the conference room at the beginning of it." Id. When Benett, who was conducting the deposition, took a break, he provided her with additional information about Al Jarrah's meeting with two FBI special agents. Id. at ¶ 5. In violation of the deposition protocol, he was not listed on the appearance sheet for the deposition. Hearing Tr. at 329:25–330:1.

Weidener also stated that he "understood his obligations under the MDL and FBI protective orders . . . [and] have abided by them since reviewing them and signing the FBI acknowledgment page over a year ago . . . ." ECF No. 7384-1 at ¶ 5. He also provided an acknowledgement, dated November 13, 2020, agreeing to be bound the FBI Protective Order. Id. at 6. The declaration does not include any similar records demonstrating that Weidener agreed to be bound by the General Protective Order, which requires that an attorney who permits someone to access the confidential material "create and retain records indicating that the person receiving Confidential Information or material agreed to be bound by the terms and restrictions of this Order." KSAX-0002 at 12–13.

Beyond responding to the Court's order, Kreindler & Kreindler tried to use this declaration to inject "gratuitous and irrelevant information about Al Jarrah's interactions with the FBI" into the proceedings. ECF No. 7381 at 1. Accordingly, it was sealed on the Court's motion. Kreindler & Kreindler then produced a version with the offending material redacted. ECF No. 7384.

### N. The MPS Violation

While the resolution of the breach investigation was pending, Kreindler & Kreindler violated the General Protective Order in a separate incident (the "MPS Violation"). By the end of March 2022, the firm had received a substantial volume of discovery material from the United

Kingdom's Metropolitan Police Service (the "MPS Materials"). This was subject to the General Protective Order because it was produced pursuant to this Court's discovery powers, specifically a letters rogatory request. ECF No. 8066 at 5. The General Protective Order requires that such materials be used only for the defense or prosecution of this case. KSAX-0002 at 8.

Kreindler & Kreindler posted the entire cache of MPS Materials on a publicly accessible website. As they acknowledge, at least one of their reasons for doing so was not the defense or prosecution of this case but public outreach. ECF No. 7996-1 at ¶ 25. They also issued a press release about the material and CBS ran a news story about it. ECF No. 7952-4 at 6. Divulging an entire tranche of discovery materials violated the General Protective Order. ECF No. 8066 at 9. The parties were ordered not to republish the MPS Material and to determine if any of it was confidential and subject to further protections under the terms of the General Protective Order.

Because this investigation was still pending when the Court addressed the MPS Violation, and because iterative sanctions would have been inefficient, the Court reserved future action on this for the resolution of the present investigation. Kreindler & Kreindler's objections to this order are pending. ECF No. 8114.

## II.    Conclusions of Law

Kreindler, Fawcett and Kreindler & Kreindler violated the Protective Orders. The appropriate remedy under Rule 37(b) is to remove Kreindler & Kreindler from the PECs, to require it to pay the attorneys' fees and costs expended by Saudi Arabia in response to this breach, and to bar Fawcett from further participation in this case.

### A.  Notice

In a footnote, Kreindler & Kreindler's counsel has questioned the adequacy of the notice the firm received in this proceeding before the imposition of sanctions. ECF No. 7386 at 41 n.6 ("Any other issues raised by the Kingdom are those for which Kreindler & Kreindler has not

been provided with proper notice and are therefore not addressed here.") It is unclear about what issues counsel believes the firm received inadequate notice, but the Court is satisfied that Kreindler & Kreindler had full notice of the scope of the investigation, the Court's authorities to impose sanctions, and the possible penalties it faces. See ECF No. 7167 at 1 ("The Court will conduct a hearing regarding the breach of the protective orders by Kreindler & Kreindler." Later, "remedies may include, among other possible remedies, removal from the Plaintiffs' Executive Committees, monetary sanctions, a referral for professional discipline to the Committee on Grievances for the Southern District of New York, and a criminal referral to the U.S. Attorney's Office for the Southern District of New York.")

"Due process requires that courts provide notice and opportunity to be heard before imposing any kind of sanctions." In re 60 E. 80th St. Equities, Inc., 218 F.3d 109, 117 (2d Cir. 2000) (quoting Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 96 (2d Cir. 1997)) (cleaned up). To the extent the firm is referring to non-leak breaches of the Protective Orders, Kreindler & Kreindler was plainly on notice that those issues had been raised by Saudi Arabia in its initial letters and follow-up requests for further investigation. See, e.g., Margo v. Weiss, 213 F.3d 55, 64 (2d Cir. 2000) ("[T]he district court was not required to give appellants notice of grounds for sanctions that were clearly expressed in defendants' Rule 11 motion papers."); Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc., 38 F.3d 1279, 1286 (2d Cir. 1994) ("Appellants thus had notice from [the opponent's] motion, and an opportunity to be heard by opposing the motion . . . .")

Finally, Kreindler & Kreindler may file Rule 72(a) objections to this Opinion and Order, which will cure any possible notice issues.[13] See, e.g., Thomas E. Hoar, Inc. v. Sara Lee Corp.,

---

[13] No sanction under this Opinion and Order is dispositive. See, e.g., Cunningham v. Hamilton Cty., Ohio, 527 U.S. 198, 209 (1999) (an attorney disqualification sanction is not a final dispositive order); Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Rsch., 768 F. App'x 141, 142 (2d Cir. 2019) (order imposing Rule 37 monetary sanctions in the form of attorneys' fees is not dispositive). Discovery

900 F.2d 522, 527 (2d Cir. 1990) (finding a due process objection to sanctions based on a lack of notice meritless, where, among other things, a magistrate judge issues a report and recommendation to which a party makes objections, followed by a final review by the district judge).

### B.  Sanctions Against Kreindler & Kreindler Under Rule 37(b) Are Appropriate

Kreindler & Kreindler, through Fawcett and Kreindler, breached the Protective Orders by carrying out a deliberate scheme to leak the Al Jarrah Transcript to Isikoff. Under Federal Rule of Civil Procedure 37(b)(2) "[i]f a party or a party's officer . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders."[14] Thus, "[t]he failure to abide by a protective order is sanctionable under Rule 37." City of Almaty, Kazakhstan v. Ablyazov, No. 15-cv-05345 (AJN)(KHP), 2018 WL 1229730, at *4 (S.D.N.Y. Mar. 5, 2018). For a court to issue sanctions under this Rule, "there must be a valid court order in force . . . ." Id. Where such an order exists and is violated, "[d]istrict courts have wide discretion in selecting appropriate sanctions." Id.[15]

---

sanctions under Rule 37 moreover, fall within the broad authority granted to magistrate judges to manage discovery. See, e.g., Kiobel v. Millson, 592 F.3d 78, 88 (2d Cir. 2010) (Cabranes, J., conc.) ("[I]t is the broad scope of a magistrate judge's authority over discovery disputes that provides the source of his authority to impose sanctions for the violation of discovery orders.") Accordingly, an Opinion and Order, and not a Report and Recommendation, is appropriate.

[14] While the language of Rule 37(b) refers to a "party's" failure to obey an order, this includes misconduct by the party's attorney. For example, in Fonar Corp. v. Magnetic Resonance Plus, Inc., the Court of Appeals upheld a contempt sanction and fine imposed on an attorney pursuant to the Rule 37(b) for that attorney's specific role in violating a court order separate from that of the client. 128 F.3d 99, 102–03 (2d Cir. 1997); see also Markus v. Rozhkov, 615 B.R. 679, 701 (S.D.N.Y. 2020) (affirming sanctions against an attorney for discovery misconduct pursuant to Rule 37(b)). Other circuits have similarly found that "[p]ursuant to Rule 37(b), the court is authorized to impose sanctions against parties or counsel . . . ." Smith & Fuller, P.A. v. Cooper Tire & Rubber Co., 685 F.3d 486, 490 (5th Cir. 2012).

[15] The Court declines to invoke its inherent powers to address this breach. "Inherent power sanctions are . . . not a primary mechanism by which a party can obtain relief for a discovery abuse: They should serve only as a useful backstop against discovery abuses that do not clearly violate Rule[] . . . 37." Yukos Cap. S.A.R.L. v. Feldman, 977 F.3d 216, 236 (2d Cir. 2020). Moreover, "imposing sanctions under a court's

There is no dispute that at the time of the deposition leak, two valid court orders were in effect, and the leak of the transcript violated those orders. The only question is who is culpable. The clear answer is Kreindler & Kreindler, through the actions of at least Fawcett and Kreindler. Although some of the evidence of this coordinated campaign is circumstantial, it is compelling. Circumstantial evidence is not a bar to finding that they breached the order. Even in the criminal context, where the standard of proof is "beyond a reasonable doubt," "[t]he existence of—and a particular defendant's participation in—a conspiracy may be established entirely by circumstantial evidence." United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997). "Moreover, the conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement . . . ." Id.

Fawcett, Kreindler, and Kreindler & Kreindler have amply demonstrated their motive for the leak. The firm's litigation strategy is to use press attention to force Saudi Arabia into a settlement. Hearing Tr. at 25:3–5, 21–24. If this strategy is successful the firm will reap a substantial benefit. Id. at 23:24–24:2. Firm personnel, and Kreindler in particular, have also repeatedly criticized the Protective Orders in vitriolic terms. Id. at 29:1–25, 210: 7–14.

Kreindler & Kreindler rely on the coordinated efforts of Kreindler and Fawcett to implement this press strategy. Kreindler or another attorney works with journalists to lay the groundwork for stories that will put pressure on Saudi Arabia. Fawcett follows up with supporting documents. Id. at 24:3–25:9, 41:12–24, 208:20–209:2. It is this tag-team between

---

inherent power can be 'needless and confusing [] when a particular rule directly applies to the specific problem confronting the district court.'" Automated Mgmt. Sys., Inc. v. Rappaport Hertz Cherson Rosenthal, P.C., No. 16-cv-04762 (LTS)(KNF), 2021 WL 2983240, at *9 (S.D.N.Y. July 14, 2021) (quoting S. New England Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 144 n.7 (2d Cir. 2010) (alterations in original).

Kreindler and Fawcett that resulted in the 2017 breach. Hearing Tr. at 38:3–8; KSAX-0010 at 4:20–5:1.

Kreindler and Fawcett also had a series of suspicious communications with Isikoff for which they have provided no credible explanation. The weeks after the Al Jarrah deposition saw a flurry of communications, first between Kreindler and Isikoff, KSAX-0142, then between Kreindler and Fawcett, KSAX-0134 at 1–2, and, at last, between Fawcett and Isikoff. KSAX-0082 at 1–2; KSAX-0134 at 1; Hearing Tr. at 428:1–25, 433:10–24. Only in early July, after these exchanges of communications between Kreindler, Isikoff, and Fawcett, did Fawcett leak the transcript. Hearing Tr. at 436:3–5

Kreindler testified that when he spoke with Fawcett in the days before the leak, he was not directing Fawcett to leak the transcript but asking whether it could be provided to Isikoff. Id. at 61:19–62:9. The Court does not credit this testimony: it would require Kreindler to be completely ignorant of the requirements of the Protective Orders and for Fawcett to be willing to betray his friend and employer by leaking the transcript just a week after allegedly telling Kreindler that it could not be shared. As discussed, Fawcett's alleged motivation appears to have been fabricated by firm attorneys as a way to open another front in their campaign against Al Jarrah and Saudi Arabia.

Similarly, Saudi Arabia's July 21 email informing the PECs of its intention to alert the Court of the breach triggered a burst of communications between Fawcett, Kreindler, and Crotty. First, there was a text between Fawcett and Crotty at 8:18 a.m, hours after the Kingdom's email. KSAX-0151 at 1. Then, Fawcett and Kreindler had a 9:17 a.m. call. KSAX-0135 at 3. This was followed by a call between Fawcett and Crotty at 10:41 a.m. Id. Finally, Fawcett and Kreindler had a call at 12:56 p.m. Id. Their explanations for these calls are not credible. They have not

38

explained why they had a 9:17 a.m. conference call purportedly about the MDL that they did not assert privilege over, as was their practice with other work product calls. Moreover, having witnessed Fawcett on the stand, the Court does not find it credible that Fawcett would have a 46-minute call with Kreindler while simultaneously seeking legal advice about a blatant breach of his duty and loyalty.

Fawcett's explanation for what triggered these communications to Crotty is also suspect. He states that he reached out to her on July 22 because he "saw the court order," Hearing Tr. at 480:16, and wanted to get legal advice about his exposure due to the breach. Id. at 481:6–9. But no order existed as of July 22. Saudi Arabia's late-night July 21 email to Kreindler & Kreindler and the rest of the PECs (but not including Fawcett) was the only activity related to the breach during this period. Kreindler & Kreindler attorneys were on that email. Fawcett was not. KSAX-0042. Yet inexplicably, 11 hours after Saudi Arabia's email, Fawcett sought legal advice about the breach. Putting these pieces together, the reasonable inference is that the calls between Kreindler, Fawcett, and Isikoff were discussions about how to get the Al Jarrah Transcript into Isikoff's hands in violation of the Protective Orders. When Saudi Arabia decided to press the issue, someone inside the firm alerted Fawcett to the impending threat.

After the breach, the conduct of the firm lawyers reflects, at best, efforts to remain willfully unaware of what Kreindler and Fawcett did, and at worst, active collusion in a cover-up. Maloney conducted a facially deficient investigation with a clear blind spot for Fawcett. He prejudged the inquiry's outcome and was confident that his firm was not the source. Id. at 212:3–5. He did not direct anyone to retain documents. Id. at 244:14–245:2. There was no systematic interview process. Some people were interviewed in person, others over the phone. Id. at 216:2–23. Some, like Hunt, were not interviewed at all despite participating in both the deposition and

interviews with Isikoff. Id. at 198:25–199:6, 205:14–206:16; KSAX-0032 at 6 (deposition appearance sheet listing Hunt).

The investigation did nothing to account for the fact that all Kreindler & Kreindler staff could access the transcript through Case Media, did not examine firm phone records or personal devices and did not explore non-firm cloud-based systems like Dropbox even though Hartney knew Fawcett used them. Hearing Tr. at 150:8–18, 157:18–158:17, 222:8–223:2. Hartney was never instructed to carry out any kind of forensic investigation. Rather, by July 27, when Kreindler & Kreindler was reporting to the Court that its investigation was complete, electronic search efforts amounted to just a few searches for messages on the firm's email system and confirmation of where the Al Jarrah Transcript was stored. Id. at 173:21–176:18.

But the most telling flaw in this investigation was how completely it passed over Fawcett. Fawcett, in Kreindler's words, was "at the heart of the documents" in this case, id. at 39:3, and was involved in the prior breach. Despite this, Fawcett reports that he was not directly questioned about his role in the breach until September 27, long after the firm had reported its investigation was complete. Id. at 436:11–439:12. The Court does not credit contrary testimony by Pounian and Maloney, particularly since in Fawcett's declaration, he removed language that would have explicitly stated that he had told Kreindler & Kreindler that he did not know how Isikoff obtained the transcript. KSAX-0121. Despite the firm obtaining an exculpatory declaration from another consultant days after the Court's August 30 Order, Fawcett was not asked to sign a declaration until the absolute deadline, and he confessed immediately.

This investigation was then presented to the Court in misleading terms. On July 27, the PECs reported to the Court that "each of the lead PEC firms [*i.e.*, Kreindler & Kreindler among others] had already conducted internal investigations into the handling of the Jarrah transcript

and communications with Mr. Isikoff, and that as a result of those investigations, each of the lead PEC firms was confident that it was not the source of the leak to Mr. Isikoff." KSAX-0043 at 2. But, by that point, Kreindler & Kreindler had not even investigated ShareFile and had done nothing with Case Media but confirm that the Al Jarrah Transcript was stored there. It would not seriously investigate these systems for another two days. Hearing Tr. at 149:21–150:3, 172:25–174:4. Thus, Kreindler & Kreindler had not even completed its paltry investigative efforts by the time it was confidently reporting that it was not the source of the breach.

Then, when the Court's investigation began, Kreindler & Kreindler sought to frustrate it. It was the only major plaintiffs' firm that refused to submit voluntary declarations. Two of its peers submitted comprehensive declarations almost immediately. KSAX-0044; KSAX-0045. After the Court ordered declarations from Kreindler & Kreindler, Anderson Kill, another leading firm, followed suit voluntarily. KSAX-0047. Later, despite the stay of the August 30 Order, other plaintiffs' firms, including ones not necessarily covered by that Order, filed their own declarations. KSAX-0053.[16]

Kreindler & Kreindler failed to participate voluntarily in any aspect of the investigation. It provided its first round of declarations only under court order. ECF No. 7011. The firm's declarations were less comprehensive and vaguer than the ones provided by its peers, and they failed to include any information about whether it had truly investigated its information technology systems. The Court thus was forced to enter a second order to supplement these declarations. KSAX-0049. When the Court stayed that order because of Oath's intervention, Kreindler & Kreindler was the only firm to support this meritless effort to derail the

---

[16] While Anderson Kill and these firms did not submit declarations immediately, no credible comparison can be drawn between these firms and Kreindler & Kreindler. These firms had limited involvement with the Al Jarrah deposition. None had interacted with Isikoff or previously violated the Protective Orders.

investigation. KSAX-0051. Other firms volunteered their declarations despite the stay. KSAX-0053. Kreindler & Kreindler resisted until it had no option but to comply.

The resulting September 27 Declarations were misleading. Two misrepresentations are particularly noteworthy. First, Kreindler & Kreindler fabricated Fawcett's motive. The motive Fawcett proffered in his filed declaration was a desire to protect children from Al Jarrah. KSAX-0062A at ¶ 4. Fawcett's declaration suggested that he had personal motivations since his children were from Morocco. Id. This narrative has been revealed to be primarily an invention of Pounian and Benett. They added the personal elements as part of their revisions to Fawcett's original declaration. KSAX-0109; KSAX-0109A; KSAX-0110; KSAX-0110A. Fawcett's original declaration did not offer any familial motivation. KSAX-0108A.

Second, Benett deliberately structured Hartney's declaration to convey the impression that access to Case Media was far more limited than it was, even after Hartney alerted Benett that the language was not "truthful." KSAX-0115. The resulting declaration was explicitly designed to avoid alerting the Court to Kreindler & Kreindler's deficient protection of confidential materials. Hearing Tr. at 143:4–13, 196:3–19. These are not the only misleading statements in the September 27 Declarations, merely the most glaring. See Section I.I.

The firm also tried to use the Court's investigation as a forum to compound the damage caused by the breach. During the evidentiary hearing, Hearing Tr. at 393:1–15, and in the Weidener Declaration, ECF Nos. 7379, 7381 at 1, Kreindler & Kreindler introduced gratuitous and irrelevant material to disparage Saudi Arabian personnel. In short, Kreindler & Kreindler repeatedly sought to foil the investigation and engage in the very type of disclosures created by the breach in the first place.

The Court does not credit Kreindler & Kreindler's attempts to write this off as the actions of a rogue employee. For almost two decades, Fawcett has loyally supported Kreindler & Kreindler's efforts in this case. Hearing Tr. at 416:3–5. He professed loyalty to Kreindler, id. at 417:15–18, and Kreindler, despite Fawcett's admitted betrayal, offered emotional testimony lauding Fawcett's character. Id. at 128:13–129:1. Other attorneys were similarly complimentary. Id. at 366:4–13, 411:23–412:2. Moreover, Fawcett consistently sought approval from Kreindler & Kreindler attorneys before sharing documents, particularly after the 2017 breach. Id. at 44:16–23, 209: 3–5. The only time he was involved with the breach of a protective order was when he and Kreindler collaborated on placing stories with a reporter.

Similarly, the Court does not credit the firm's attempt to explain Fawcett's actions as those of a man with such a blinding hatred for child pornography that he would betray his long-time employer and friends by disclosing confidential material they had a duty to protect. By his own admission, he had already heard unconfirmed reports about Al Jarrah's FBI interaction for at least six months. During this time he took no action beyond attempting to confirm what he had heard. Id. at 468:21–24, 469:8–16. Yet, though the deposition produced "no smoking guns or dramatic confessions," KSAX-0040 at 2, he claims he was suddenly compelled to act.

But even that asserted motivation does not square with what Fawcett did with the deposition transcript. He never alerted anyone in the United States or Moroccan governments to register or publicize his concern. Hearing Tr. at 470:5–471:16. Despite a background in humanitarian work, KSAX-0062A at ¶ 4, he did not provide the information to a non-governmental group that might have been able to aid Moroccan children. All he did was covertly leak the entire deposition transcript to a single friendly journalist who had recently hosted Kreindler to discuss this case. He also turned to Crotty, a former Kreindler & Kreindler attorney,

for legal advice on the breach. This is consistent with the motivation of a person supporting the firm's press strategy, not one embarked on a crusade against child pornography.

The Court is left with two possible conclusions. The first is that, after twenty years of unwavering service, Fawcett decided to betray his firm and friends over an unproven 17-year-old allegation of possession of child pornography.

The second is that Kreindler & Kreindler has decided to litigate this case in the press. Part of that press strategy involves repeatedly distributing disparaging information about people connected to Saudi Arabia to pressure it into a resolution. Like in the 2017 breach, Fawcett takes his direction from Kreindler and leaks confidential material to a friendly journalist. The firm then demonstrates its reciprocal loyalty to Fawcett by resisting the Court's investigation of the breach through misleading declarations and a lackadaisical internal investigation. The evidence overwhelmingly proves this latter conclusion.

Fawcett and Kreindler's conduct in this breach is thus properly imputed to Kreindler & Kreindler. When an entity, even a non-party, acts on behalf of an organization, the actions of that entity may be imputed to the organization as part of the Rule 37(b) analysis. S. New England Tel. Co. v. Glob. NAPs Inc., is instructive. 624 F.3d 123 (2d Cir. 2010). There, the Court of Appeals considered sanctions imposed on a company in part based on the actions of that entity's bookkeeper. The bookkeeper, who had previously worked for the sanctioned company, used a computer application to destroy relevant files. In imposing a default judgment sanction, the district court found this (along with other behavior) to be a willful violation of its discovery orders. Id. at 142–43. The company appealed, arguing that the "district court erred in imposing sanctions . . . based on the actions of . . . [the bookkeeper], a non-party." Id. at 146. The Court of

44

Appeals dismissed this argument, noting that "the evidence supported a conclusion that [the bookkeeper] acted on the defendants' behalf." Id. at 148 n.10.

The problem, moreover, goes beyond Kreindler and Fawcett. While they were the key players, several other firm attorneys were, at best, willfully blind to their scheme and willing to obstruct the Court's efforts to uncover it. Maloney, a former federal prosecutor for this District, ran an investigation almost designed to avoid implicating Fawcett. Pounian and Benett then drafted a series of declarations intended to conceal the firm's failings and distance it from the breach. Later, Benett sought to further the very litigation strategy that drove the breach by injecting further gratuitously irrelevant information into the record. The breach is not the result of a rogue attorney or consultant. It is the result of the firm's litigation strategy and a culture that is determined to resist and evade the Protective Orders to further its goal.

### C. The Appropriate Sanctions As to Kreindler & Kreindler Are Removal From the PECs and Payment of Attorneys' Fees and Costs Related to the Breach

The appropriate sanction for the breach of the Protective Orders is for Kreindler & Kreindler to be removed from the PECs and to pay Saudi Arabia attorneys' fees and costs related to the breach. Sanctions under Rule 37(b) "must be 'just'; and . . . must relate to the particular claim to which the discovery order was addressed." Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1366 (2d Cir. 1991). Four factors guide the Court's determination of proper sanctions: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance. "World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp., 694 F.3d 155, 159 (2d Cir. 2012) (quoting Agiwal v. Mid Island Mortg. Corp., 555 F.3d 298, 302 (2d Cir.2009)) (alterations in original).

"Because the text of the rule requires only that the district court's orders be 'just,' however, and because the district court has 'wide discretion in imposing sanctions under Rule 37,' these factors are not exclusive, and they need not each be resolved against the party" facing sanction. S. New England Tel. Co., 624 F.3d at 144 (quoting Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 135 (2d Cir. 2007)). Finally, "[t]he district court is free to consider 'the full record in the case in order to select the appropriate sanction.'" S. New England Tel. Co., 624 F.3d at 144 (quoting Nieves v. City of New York, 208 F.R.D. 531, 535 (S.D.N.Y.2002)).

Thus, willfulness is important to the determination of *what* sanction is appropriate, but not to *whether* sanctions may be employed. "For purposes of subdivision (b)(2) of Rule 37 . . . a party 'refuses to obey' simply by failing to comply with an order." Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U.S. 197, 208 (1958). "[T]he willfulness or good faith of [party targeted for sanctions], can hardly affect the fact of noncompliance and are relevant only to the path which the District Court might follow in dealing with petitioner's failure to comply." Id. Based on these factors, Kreindler & Kreindler is removed from the PECs and will be required to pay attorneys' fees and costs sought by Saudi Arabia in connection with the breach.

### 1. Kreindler & Kreindler's Breach Was Willful and Committed to Obtain Litigation Advantage

Kreindler & Kreindler's breach was willful. The leak of the Al Jarrah Transcript did not occur by accident or negligence. It was the result of deliberate coordination between Fawcett and Kreindler. Once the breach occurred, the rest of the firm was, at best, willfully blind to this strategy. This coordinated plan was executed as part of the firm's longstanding effort to extract a favorable settlement from Saudi Arabia by placing damaging stories about it in the public eye, a

46

strategy the firm continued to pursue in the evidentiary hearing, through the Weidener Declaration, and in the mass dissemination of the MPS materials.

The problem is not that Kreindler & Kreindler has chosen to make an aggressive press campaign part of its litigation strategy. The Court has repeatedly affirmed that the parties may talk to the press. See, e.g., KSAX-0010 at 9:10–11 ("I'm certainly not going to prohibit anyone from speaking to the press . . . ."); KSAX-0055 at 16 ("[T]he Court has affirmed that parties may talk to Isikoff or any other member of the press so long as they do not violate the Protective Orders."); ECF No. 8066 at 8 ("The Court has repeatedly confirmed that parties may talk to the press about this case . . . It does so again here."). Where Kreindler & Kreindler's press activities do not run afoul of these limits, the Court has not responded with sanctions, even where the FBI has urged the Court to act. Supra n. 4, see also KSAX-0020 at 3–5. The problem is that Kreindler & Kreindler is apparently unwilling to execute this strategy without doing the one thing it may not do: leak information subject to the Protective Orders.

Having held an evidentiary hearing and determined that Kreindler & Kreindler's breach was willful, the Court may factor that willfulness into its determination of sanctions. Jay v. Spectrum Brands Holdings, Inc., No. 13-cv-8137 (LTS)(DF), 2015 WL 6437581, at *6 (S.D.N.Y. Oct. 20, 2015) ("Only where the court imposes sanctions that require a finding of willfulness is an evidentiary hearing required.")

### 2.  Lesser Sanctions Would Be Ineffective

Lesser sanctions will be ineffective at curbing Kreindler & Kreindler's discovery abuses. Expulsion from the PECs is a severe, but not the most severe, sanction that can be imposed. More severe measures would likely require dispositive sanctions and would unfairly penalize Kreindler & Kreindler's blameless clients. See, e.g., Fed. R. Civ. P. 37(b)(2)(v), (vi) (authorizing dispositive sanctions).

47

Removing Kreindler & Kreindler from the PECs is a severe sanction. The Manual for Complex Litigation notes that removing an attorney from a leadership role "may disrupt the litigation, may cause significant harm to the client's case and the reputation of the attorney or law firm, and can conflict with a party's right to counsel of its choosing." § 10.154 (4th ed. 2004). Lesser sanctions, however, are not viable. As the 2017 breach demonstrates, admonishment has not deterred Kreindler & Kreindler from abusing the Protective Orders.

Direct financial penalties, another alternative, are frequently ineffective in cases involving protective order breaches. See, e.g., Ablyazov, 2018 WL 1229730, at *7 (finding, where material was leaked in violation of a protective order, that a financial sanction "would be insufficient punishment for the breach because it would enable the [party at fault] to simply pay for breaches of court orders and transform compliance with them into a mere financial calculation.") This is particularly true where the potential awards are vast. For example, on June 10, 2022, a partial default judgment for only compensatory and solatium damages was entered for just 78 plaintiffs in this case. ECF No. 7580. The value of the award for this tiny slice of the MDL was $512,500,000. Id. Six days earlier, another partial final default judgment was granted for 40 plaintiffs, again limited to solatium, economic, and compensatory damages. ECF No. 7523. The total award was $290,207,405. Id. Thus, this is a case where even "small" partial judgments yield nine-figure awards. If Kreindler & Kreindler prevails against Saudi Arabia, the resulting award will likely be worth billions of dollars. Financial sanctions alone are simply not viable where this much money is at stake.

Prohibiting the use of the Al Jarrah Transcript is also not sufficient. While that sanction has been deployed in cases where a protective order was breached, see, e.g., Ablyazov, 2018 WL 1229730, at *7 (precluding the use of a leaked transcript), it will not work here for three reasons.

48

First, such a sanction would unfairly harm Kreindler & Kreindler's clients. See, e.g., Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1069 (2d Cir. 1979) (Oakes, J. conc.) ("It would be with the greatest reluctance . . . that I would visit upon the client the sins of counsel, absent client's knowledge, condonation, compliance, or causation.") Second, it is not clear that the transcript is important enough to make its preclusion meaningful. Kreindler & Kreindler has accreted more than four years of discovery materials in the case against Saudi Arabia. It is unlikely that the loss of a single transcript will be so relevant that it will be a sanction commensurate with a willful breach of the Court's orders. Indeed, Isikoff's article does not suggest that the deposition was particularly revelatory. KSAX-0040 at 2. Third, this sanction, like a financial sanction, could play into Kreindler & Kreindler's litigation strategy. Materials that are not helpful to the case, but are nonetheless useful for press purposes could be leaked and sacrificed while still advancing the overall litigation strategy.

In considering the viability of lesser sanctions, the Court has also considered that removing Kreindler & Kreindler from the PECs will impact the many plaintiffs who have chosen Kreindler & Kreindler as their counsel. In contexts like attorney disqualification, a court "must be solicitous of a client's right freely to choose his counsel" while recognizing that this "right . . . must be balanced against the need to maintain the highest standards of the profession." Gov't of India v. Cook Indus., Inc., 569 F.2d 737, 739 (2d Cir. 1978).

While the Court is sensitive to these concerns, they are less salient here. Kreindler & Kreindler is not being barred entirely from the MDL, only from the PECs. This will dramatically reduce its role in the MDL but it may continue to represent its clients if they chose to remain with the firm. If clients chose new counsel, there are numerous sophisticated firms in this MDL who are familiar with the case and fully able to continue to litigate their clients. The danger that

49

a plaintiff will be prejudiced by the diminution of Kreindler & Kreindler's role is thus much mitigated.

More importantly, the Court cannot permit Kreindler & Kreindler to hide behind its clients to evade the consequences of its actions. Beyond removal there is no lesser sanction that can address the firm's repeated flouting of the Protective Orders and lack of candor before the Court. Ultimately, even the client's right to choose their counsel must yield where the integrity of the adversarial process is at stake. See, e.g., Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983) ("The objective of the disqualification rule is to 'preserve the integrity of the adversary process . . . . .'") (quoting Board of Education of the City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)).

Further demonstrating the need for strong sanctions, Kreindler & Kreindler's conduct in the Court's investigation shows that it will fight tooth and nail to avoid accountability for discovery violations, consuming both the Court and all parties' resources in the process. It took months to overcome Kreindler & Kreindler's obstruction. It will doubtless take months more to address objections. Another draining debacle is out of the question. Accordingly, having considered the full spectrum of sanctions available to it, the Court determines that removing Kreindler & Kreindler from the PECs is the least disruptive and least severe sanction that can credibly address the breach of the Protective Orders.

### 3. The Breach of the Protective Orders Is Permanent

In terms of the duration of noncompliance, the breach of the Protective Orders is effectively permanent. This situation is similar to that of Ablyazov, where, in violation of a protective order, confidential material was uploaded to a file-sharing website and then later discussed on a Russian news website. 2018 WL 1229730, at *3. As Ablyazov acknowledged in assessing the duration of non-compliance, "disclosures on the internet are potentially permanent,

50

as any number of people could have downloaded the Transcript and now have the ability to share it at any time in the future." <u>Id.</u> at *6.

That is the case here too. While the full transcript is not public, the article discussing its contents is. That article is readily found on the internet and will likely remain there forever. The breach of confidentiality is thus permanent. A "protective order issued under Rule 26(c)" plays a "vital function" in civil litigation "by encouraging full disclosure of all evidence that might conceivably be relevant." <u>Martindell v. Int'l Tel. & Tel. Corp.</u>, 594 F.2d 291, 295 (2d Cir. 1979). "Unless a valid Rule 26(c) protective order is to be fully and fairly enforceable, witnesses relying upon such orders will be inhibited from giving essential testimony in civil litigation, thus undermining a procedural system that has been successfully developed over the years for disposition of civil differences." <u>Id.</u>

These concerns are heightened because the subjects of discovery include material related to some of America's most sensitive national security investigations and foreign nations' diplomatic affairs. While the Court has sought to mitigate the damage caused by this breach through a rigorous investigation of its source, Isikoff's article has permanently damaged the credibility of the Protective Orders as a tool for encouraging fulsome disclosure.

### 4. Kreindler & Kreindler Has Been Warned About Violating the Protective Orders

The General Protective Order includes specific language warning about the consequences of violating it. It notes that "any violation of this Order is punishable by money damages caused by the violation, including, but not limited to, all attorneys' fees, court costs, exhibit costs, expert witness fees, travel expenses, all related litigation costs, and actual damages incurred by the other Party, equitable relief, injunctive relief, sanctions or any other remedy as the Court deems appropriate." KSAX-0002 at 15.

Moreover, Kreindler and his firm have been warned about violating the Protective Orders by disclosing confidential information to the press. In 2017, after the firm's first violation, the Court gave Kreindler a "first warning." KSAX-0010 at 10:2, and directed him to "be more careful as you continue to litigate this case, including given that you are an executive member of the plaintiffs' executive committee . . . ." Id. at 13:12–15. As present circumstances reflect, that warning was not effective.

### 5. Further Considerations

Beyond these four considerations, this investigation has revealed an almost complete lack of respect for the Court and its orders. The MPS Violation also shows that the firm will continue to violate the Protective Orders to advance its "press-first" litigation strategy even while an investigation against it is pending. Indeed, Kreindler & Kreindler is now accumulating violations of the Protective Orders at an increasing rate. The Court considers Kreindler & Kreindler's overall conduct given that "sanctions must be weighed in light of the full record in the case . . . ." Cine Forty-Second St. Theatre Corp., 602 F.2d at 1068.

The first indication of Kreindler & Kreindler's lack of respect for the Court is the sheer number of misrepresentations the firm made during the Court's investigation. These misstatements were made, moreover, in a clear effort to hinder the Court's investigation of the breach and cover-up other issues with the firm's adherence to the Protective Orders. "[T]he effect of and number of misrepresentations that a party makes are perfectly acceptable data points for a court to consider in determining whether – and, perhaps more importantly, what – sanctions are warranted." Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd., 991 F.3d 361, 369 (2d Cir. 2021).

52

The investigation has also revealed numerous issues with Kreindler & Kreindler's conduct beyond the initial breach. The General Protective Order requires that confidential material like the Al Jarrah Transcript be stored "in a secure manner that ensures that access is limited to the persons authorized" to see that material. KSAX-0002 at 11. Kreindler & Kreindler stored it on a system that anyone at their firm could access. That system does not track users' access or even alert them that they are about to review protected material. Hearing Tr. at 138:18– 140:14, 249: 6–10. The Deposition Protocol provides that "depositions may be attended (either in person or remotely) only by designated personnel and "all persons in attendance (either in person or remotely) must be noted on the deposition record." ECF No. 6002-1 at ¶ 31. Weidener attended parts of the Al Jarrah deposition, ECF No. 7384-1 at ¶ 4, and was not noted on the record. Hearing Tr. at 329:25–330:1. This violated the Deposition Protocol.[17]

The issues are not the violations themselves. This Court, like others to confront *de minimis* or technical violations of discovery orders, recognizes that, on occasion, there will not be strict adherence to the terms of complex orders. So long as the issue is addressed quickly, and the harm is minimal, judicial action is not necessary. See, e.g., In re Hornbeam Corp., No. 14-mc-424, 2022 WL 60313, at *5 (S.D.N.Y. Jan. 6, 2022) (declining to impose Rule 37 sanctions where "to the extent any violations did occur, they appear to be bare, technical violations that were remedied in due course and caused no harm.") Rather, each new issue is troubling because it reveals how little respect the firm has for the Court's efforts to manage this litigation. The firm has already made numerous comments disparaging the Protective Orders. These incidents further

---

[17] It is no defense, as Kreindler & Kreindler suggests, that *other* parties also violated this particular aspect of the Deposition Protocol. See ECF No. 7386 at 40 (suggesting that other parties' declarations reveal comparable violations of this aspect of the protocol). While this may speak to the severity of the breach and the appropriate remedy, that one party breached an order does not suddenly make it permissible for another party to breach it.

confirm its contempt for the Court's authority to manage this case.

The Court also considers that, given the MPS Violation, Kreindler & Kreindler is now accumulating violations of the Protective Orders at an increasing rate. As the Court noted at the time, the MPS Violation, standing alone, might well have been treated as a "minor incident." ECF No. 8066 at 7. As with Weidner's participation and the storage issues, there will be missteps in a long-running and heavily litigated case like this one. The issue is:

> the increasing rate at which violations of the protective orders are accruing. From 2006 to 2017, this was not a major issue. Beginning in 2017, with Kreindler's violation, however, conflicts have becoming increasingly common. The Court warned parties to be sensitive about their public commentary on this case again in 2019, after the Government raised concerns about speeches made by plaintiffs. ECF No. 5334 at 35:4–8. Then in 2021, protected material was deliberately leaked to a journalist. The parties are not quite halfway through 2022, and the present violation has already accrued.

Id. at 8.

The MPS Violation is also remarkable because it occurred while Kreindler & Kreindler was under investigation for the leak of the Al Jarrah Transcript. This was an incident where, even taking the facts in the light most favorable to them, one of their most trusted consultants deliberately violated the Protective Orders and the firm's security measures were inadequate to the detect the deceit. One might reasonably expect a firm to treat discovery materials more cautiously while it is actively being investigated for flaws in their document security. The MPS Violation is further evidence that Kreindler & Kreindler does not take its discovery obligations seriously and that, without serious sanctions, it will continue to accumulate discovery violations, prejudice defendants, and waste judicial resources.

### 6. Removal from the PECs

Given these factors, removal from the PECs is the appropriate sanction. In a less complicated matter, the combination of a financial sanction and the loss of access to confidential material might be a sufficient remedy. As noted though, a financial penalty alone will not be effective. Other common responses to breaches of protective orders include preventing the party from using disclosed material, see, e.g., Ablyazov, 2018 WL 1229730, at *7, or ending their access to confidential material entirely. See, e.g., CMC Telecom, Inc. v. Michigan Bell Tel. Co., No. 07-cv-319, 2012 WL 13185452, at *6 (W.D. Mich. June 29, 2012) (ordering a party that violated a protective order to "return all Confidential Information received . . . during the course of this lawsuit."); Grant Heilman Photography, Inc. v. Pearson Educ., Inc., No. 11-cv-4649, 2018 WL 2414984, at *4 (E.D. Pa. May 29, 2018) (directing a party to return or destroy confidential information following their breach of a protective order).

The former solution would be ineffective for the reasons discussed. The latter solution would seriously harm Kreindler & Kreindler's clients. While the Court has lost faith in the firm's ability to conduct this litigation responsibly and report honestly as a representative of all plaintiffs, hundreds of plaintiffs may continue to trust the firm to advocate for their claims. The firm will not be able to do so if it cannot use any of the confidential materials obtained in discovery. Some imposition on these clients is unavoidable given the scale of the firm's wrongdoing, but the Court will not void their right to select counsel by rendering Kreindler & Kreindler unable to represent them effectively. The Court is thus left to fashion a sanction under circumstances in which the traditional remedies for breaches of a protective order are unusable.

Because the normal remedies are not viable, the Court orders that Kreindler & Kreindler be removed from the PECs. This will have a corollary financial effect on their ability to seek compensation for work done as part of that body that is appropriately part of this sanction. The

Manual for Complex Litigation notes that demotion or removal of counsel is an appropriate sanction "for egregious circumstances." § 10.154. Thus, the Court of Appeals in Plaintiffs' Baycol Steering Comm. v. Bayer Corp. upheld an order removing an attorney from an MDL executive committee where the attorney "exhibited poor judgment and a profound lack of the appropriate forthrightness and candor necessary from a member of the [executive committee] . . . deliberately tried to cover-up his actions and mislead the Court and the parties . . . [and] failed to exercise due care regarding the handling of confidential documents." 419 F.3d 794, 807 (8th Cir. 2005).

Other courts, acting under different rubrics, have also removed attorneys or a law firm from a leadership position in a multidistrict litigation once the court determined that counsel could no longer effectively fill the role. For example, the law firm of Milberg Weiss Bershad & Schulman, LLP held or was seeking leadership roles in various cases across the country when it was indicted in a kickback scheme. As a result, various courts removed it from leadership positions in consolidated cases. See, e.g., In re New Motor Vehicles Canadian Exp. Antitrust Litig., 466 F. Supp. 2d 364, 371 (D. Me. 2006); In re Medtronic, Inc. Implantable Defibrillator Prod. Liab. Litig., 434 F. Supp. 2d 729, 732 (D. Minn. 2006).

The removal of Kreindler & Kreindler from the PECs is thus the kind of "just" order Rule 37(b)(2)(A) permits a court to impose. When "acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses . . . ." Reilly v. Natwest Markets Grp. Inc., 181 F.3d 253, 267 (2d Cir. 1999). The fact that several courts have demoted counsel from an executive committee when they lost faith in a firm's ability to perform the role, along with the Manual for Complex Litigation's approval of demotion as a sanction, confirms the propriety of removal as a remedy for this breach.

56

Appointment to the PECs places a law firm in a particular position of trust and responsibility. The Court must be confident that a firm has the expertise to manage and safeguard the immense volume of sensitive discovery material produced in this case. It also needs to know that the representations made by the PECs are candid. The PECs cannot efficiently perform their functions if the Court cannot trust their statements. With this episode, the Court has lost faith in Kreindler & Kreindler. It has demonstrated, not once, but twice, that it will leak confidential information to reporters as part of its litigation strategy. This time, when the Court was forced to investigate the breach, Kreindler & Kreindler made numerous misleading statements and dragged its heels in identifying the source—which, of course, proved to be its consultant.

This problem, moreover, is systemic. Numerous attorneys at the firm facilitated the obstruction of the Court's efforts to repair the breach so sanctioning a single attorney will not fix the problem. At this point, the firm's removal from the PECs is not only an appropriate sanction, but a necessary step to ensure that body's continuing efficacy and credibility.

As a consequence, in any future application to a common benefit fund or any similar fee sharing structure designed to compensate the PECs lawyers for work done on this case, Kreindler & Kreindler shall not be permitted to apply for compensation for work done after the date of the breach, *i.e.*, July 5, 2021. "[T]he reasonableness of a common fund fee award is governed by the [six] so-called Goldberger factors . . . ." Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007) (citing Goldberger v. Integrated Res., Inc., 209 F.3d 43, 121 (2d Cir. 2000). "Quality of representation" is one such factor, Goldberger, 209 F.3d at 50, and can "justify a decrease as well as an increase" in an award. In re Agent Orange Prod. Liab. Litig., 611 F. Supp. 1296, 1314 (E.D.N.Y. 1985), aff'd in part, rev'd in part on other grounds, 818 F.2d 226 (2d Cir. 1987).

In <u>Fears v. Wilhelmina Model Agency</u>, for example, the court awarded a substantial, but less than sought fee where it was concerned that counsel had not displayed adequate diligence in representing a class and had forced the court to take a more hands-on role in settlement negotiations. No. 02-cv-4911 (HB), 2009 WL 2958396, at *7 (S.D.N.Y. Sept. 16, 2009). It is undoubtably rare for the "quality of representation" factor to merit a downward departure. "Oftentimes, the quality of representation prong of the <u>Goldberger</u> test is utilized to praise plaintiffs' counsel, their administration of the case, their willingness to work with their adversary, and ability to recover a settlement on behalf of the plaintiffs." <u>Fears v. Wilhelmina Model Agency, Inc.</u>, No. 02-cv-4911(HB), 2005 WL 1041134, at *8 (S.D.N.Y. May 5, 2005) <u>aff'd in part, vacated in part, remanded sub nom.</u> <u>Masters</u>, 473 F.3d 423, <u>and aff'd in part, vacated in part, remanded sub nom.</u> <u>Fears v. Wilhelmina Model Agency, Inc.</u>, 315 F. App'x 333 (2d Cir. 2009). The scale of Kreindler & Kreindler's misconduct calls for a downward modification.

From July 5 onward, Kreindler & Kreindler impeded the efficacy of the PECs. Their actions diverted focus from their clients' case, injected false information into the PECs' communication with the Court, and forced other firms to spend time and resources on an investigation irrelevant to their clients' claims. While the Court offers no opinion on the quality of the Kreindler & Kreindler's representation before July 5, from that day forward, they cost the PECs more than they contributed. Accordingly, while Kreindler & Kreindler may seek an award from any common fund, the deficient quality of their representation after July 5 merits barring them from seeking an award for work done on the PECs after that date.

Accordingly, Kreindler & Kreindler is removed from the PECs. To the extent a common benefit fund is later established and members of the PECs seek an award for their service,

Kreindler & Kreindler is precluded from seeking any contribution for work performed from July 5, 2021, when it undermined the PECs by leaking the transcript.

### 7. Attorneys' Fees and Costs

Kreindler & Kreindler shall also pay attorneys' fees incurred due to its willful breach of the Protective Orders and its obstructionist conduct during the investigation, which unnecessarily increased its expense. Rule 37(b)(2)(C) provides that when a party fails to obey a discovery order "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." There is no justification, much less substantial justification, for a willful and premediated breach of the Protective Orders or for the firm's conduct thereafter. Accordingly, Kreindler & Kreindler shall pay Saudi Arabia reasonable attorneys' fees and costs associated with investigating and addressing the breach of the Protective Orders.

### D. Sanctions May Be Levied Against Fawcett Under Rule 37(b)

Fawcett is barred from further participation in this case. He has confessed to deliberately leaking the Al Jarrah Transcript in violation of the Protective Orders so even assuming the Court accepted his and Kreindler's statements at face value there is no question that he is a proper target for sanction. The only question is the proper authority. As a non-attorney agent, Fawcett is in a somewhat unusual position but ultimately, Rule 37(b) provides the proper framework for sanctions against him as well.

The principles behind Rule 37(b) support its application against the agents of parties and attorneys who violate protective orders. "Rule 37(b) provides comprehensively for sanctions for failure to obey discovery orders." 8B C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure § 2289, p. 531 (3d ed). The purpose of discovery sanctions under this comprehensive

regime is " (1) to ensure that a party will not benefit from its failure to comply; (2) to obtain compliance with the court's orders; and (3) to deter noncompliance, both in the particular case and in litigation in general." Anhui Konka Green Lighting Co. v. Green Logic Led Elec. Supply, Inc., No. 18-cv-12255 (MKV)(KHP), 2020 WL 5743518, at *4 (S.D.N.Y. Sept. 25, 2020); see also Cine Forty-Second St. Theatre Corp., 602 F.2d at 1066 (2d Cir. 1979).

Accordingly, parties, attorneys, firms, and their agents have been sanctioned under Rule 37(b). Court have a levied sanctions against entire law firms, see, e.g., Thomas E. Hoar, Inc., 900 F.2d at 528 (upholding Rule 37 sanctions on a firm), and individual attorneys. See, e.g., Dino Antolini v. Amy McCloskey, No. 19-cv-09038 (GBD)(SDA), 2021 WL 5411176, at *12 (S.D.N.Y. Nov. 19, 2021) (sanctioning an individual attorney). Courts have also levied sanctions jointly and severally against a party, a firm, and some of the firm's attorneys. See, e.g., Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16-cv-1318 (GBD)(BCM), 2017 WL 3671036, at *34 (S.D.N.Y. July 18, 2017), report and recommendation adopted, No. 16-cv-1318 (GBD)(BCM), 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017) (holding a plaintiff, a specific attorney, and that attorney's law firm jointly and severally liable for Rule 37 sanctions).

Most relevantly, courts in this District have barred experts employed by attorneys when those experts become a vehicle for attorneys' violations of protective orders. In Matter of Bouchard Transportation Co., Inc., No. 14-cv-0617 (PAC), 2018 WL 1581992, at *1 (S.D.N.Y. Mar. 28, 2018), attorneys disclosed "attorneys eyes only" material to an expert in violation of a protective order. The court responded by "striking the [expert's] report and disqualifying [the expert] from further involvement in this matter" as "an appropriate remedy under Federal Rule of Civil Procedure 37." Id. In support, the court drew on other cases precluding the participation of experts where attorneys had disclosed information to them in violation of a court order. Id.

(citing <u>Allergan, Inc. v. Sandoz Inc.</u>, No. 09-cv-182, 2011 WL 2563238, at *2–3 (E.D. Tex. June 28, 2011)). Given that Rule 37(b) has been used to sanction parties, law firms, and attorneys, and to preclude experts who will be a conduit for discovery abuse, it would be odd if a non-expert agent who aided a discovery abuse was unaccountably insulated from the otherwise comprehensive Rule 37(b) regime.

The suitability of Rule 37(b) is thrown into even sharper relief by cumbersome, restrictive, and heavy-handed tools to which a court would otherwise have to resort for conduct like Fawcett's. Civil or criminal contempt proceedings restrict the court's means of addressing a breach to fines or imprisonment. <u>See</u> 18 U.S.C. § 401 ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion . . . contempt of its authority . . . ."), <u>see also</u> <u>Phelan v. People of Territory of Guam</u>, 394 F.2d 293, 297 (9th Cir. 1968) ("[T]he only power of the court in contempt proceedings is to punish by fine or imprisonment.") Where a matter is proceeding before a magistrate judge these tools also delay and compound the costs of the breach since a magistrate judge may only certify the necessary facts to a district judge who must then hold further proceedings. 28 U.S.C. § 636(e)(6)(B) (discussing the certification process). Courts are thus encouraged to use tools besides contempt to address failures to comply with the litigation process. <u>See, e.g.</u>, <u>Int'l Union, United Mine Workers of Am. v. Bagwell</u>, 512 U.S. 821, 833 (1994) (citing Rule 37 and noting that "[c]ourts traditionally have broad authority through means other than contempt—such as by striking pleadings, assessing costs, excluding evidence, and entering default judgment—to penalize a party's failure to comply with the rules of conduct governing the litigation process.")

The use of a court's inherent powers is equally problematic. While courts possess inherent powers to enforce protective orders issued under Rule 26, <u>Hunt v. Enzo Biochem, Inc.</u>,

904 F. Supp. 2d 337, 344 (S.D.N.Y. 2012), "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991). Conversely, "Rule 37 is flexible. The court is directed to make such orders as are 'just' and is not limited in any case of disregard of the discovery rules or court orders under them to a stereotyped response." 8B C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure § 2284, p. 436 (3d ed). Because "a court should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future," Duncan v. Sullivan Cty., No. 18-cv-9269 (PMH)(PED), 2021 WL 6884505, at *18 (S.D.N.Y. Dec. 29, 2021) (quoting Silva v. Cofresi, No. 13-cv-3200 (CM)(JCF), 2014 WL 3809095, at *3 (S.D.N.Y. Aug. 1, 2014))(internal quotations omitted), this flexible sanction regime is a more appropriate way to respond to misconduct by attorney agents then resort to the Court's inherent power.

Undoubtably, sanctions against agents will rarely be merited because New York requires lawyers to supervise nonlawyers and renders lawyers responsible for the nonlawyers' conduct in appropriate circumstances. N.Y. Rule of Professional Conduct 5.3. Thus, sanctions targeting attorneys, their firm, or their clients will generally be adequate to ensure that neither client nor counsel will benefit from sanctionable conduct.

This case presents the rare circumstance where such sanctions are insufficient. This multidistrict litigation consists of thousands of clients employing dozens of lawyers. Sanctioning Kreindler & Kreindler alone or barring only their clients from employing Fawcett will be insufficient. Fawcett could easily offer his services to any of the other clients and firms in this case. Given his substantial knowledge of this case's subject matter, there would be considerable temptation for a party to avail themselves of his services. Moreover, this case is likely to continue for many years, providing numerous opportunities for Fawcett to return. Targeting

Kreindler & Kreindler thus does not guarantee that Fawcett will not eventually reemerge into this case. Considering the severity of his misconduct, that is unacceptable.

Barring Fawcett is necessary to ensure that he does not continue to serve as a means for further violations of the Protective Orders and that no party in this matter is able to benefit by employing an agent with a demonstrated willingness to deliberately violate court orders for litigation advantage. Thus, the Court finds that Fawcett may be properly subjected to sanctions under Rule 37.

Accordingly, as a "just order" under Rule 37(b)(2), Fawcett is barred from participating further in this multidistrict litigation or in any of its member cases in any capacity. He has confessed to deliberately violating the Protective Orders. KSAX-0062A at ¶ 2. Indeed, he agrees that barring his further participation in the MDL is an appropriate Rule 37(b) sanction, ECF No. 7387 at 41, and the Court does not find that any further or alternative sanctions would be appropriate. More importantly, while Fawcett carried out the leak, he was ultimately just a cats' paw for Kreindler & Kreindler. He is culpable, but his culpability is adequately addressed by barring his further participation from this case. One year after the entry of this Order, the PECs shall submit a letter to the Court certifying that they have conferred with plaintiffs' counsel and confirmed that Fawcett has not worked on this case for any plaintiff in the preceding year. The Court will determine if ongoing certification is necessary at that time.

### E. Implementation of This Opinion and Order

This Opinion and Order will be implemented as follows. Kreindler & Kreindler is removed from the PECs. Within two weeks of the entry of this Opinion and Order, the remaining members of the PECs shall file a letter with the Court confirming that the firm is no longer involved in any of that body's operations. If the PECs believe additional court action or

modification to the structure of the PECs is necessary as a result, they may raise those issues as part of this letter.

Within two weeks of the entry of this Opinion and Order, Kreindler & Kreindler shall file a letter with the Court confirming that Fawcett has been removed from any work on this MDL and describing the steps taken to ensure that he does not have access to MDL-related material in the firm's possession.

Kreindler & Kreindler and Saudi Arabia are ordered to meet and confer and reach agreement on a reasonable fee award. If the parties cannot reach agreement, any motion for attorneys' fees shall be filed within two weeks of the filing of this Order.

The Court does not find oral argument necessary to resolve this motion. It therefore denies Kreindler's & Kreindler's request for oral argument. ECF No. 7418. Because the firm is no longer part of the PECs, its request to add members to the Plaintiffs' Executive Committees at ECF No. 7153 is denied.

The Court recognizes that some material in this Opinion and Order may touch on sealed material. Out of an abundance of caution, the Court will permit the parties to make requests to redact material in this Opinion and Order by September 28, 2022. Given the importance of this decision to the MDL, however, the Court does not expect to accept any redaction requests that are not absolutely crucial. Accordingly, this Opinion and Order is sealed, with access restricted to the Plaintiffs' Executive Committees, Saudi Arabia, and the FBI. If Saudi Arabia believes Al Jarrah requires access, they may petition the Court accordingly.

## CONCLUSION

Kreindler & Kreindler and John Fawcett willfully breached the Court's protective orders to embarrass Saudi Arabia and gain an advantage in this case. When the Court tried to

investigate this breach, Kreindler & Kreindler engaged in a sustained campaign of delay and obstruction. Given this conduct, sanctions under Rule 37(b) are appropriate for both the firm and Fawcett. Fawcett is barred from further participating in this case in any capacity. Kreindler & Kreindler will be removed immediately from the Plaintiffs' Executive Committees and required to pay the attorneys' fees and costs for Saudi Arabia associated with this breach. One year after the entry of this Order, the PECs shall submit a letter to the Court certifying that they have checked with plaintiffs' counsel and confirmed that Fawcett has not worked on this case for any party in the preceding year. Kreindler & Kreindler's request to add members to the Plaintiffs' Executive Committees at ECF No. 7153 is denied.

The Court respectfully directs the Clerk of the Court to deny the motion for oral argument at ECF No. 7418. This Opinion and Order shall be SEALED with access restricted to the Plaintiffs' Executive Committees, Saudi Arabia, and the FBI. The parties shall make any requests to redact material in this Opinion and Order by September 28, 2022.

Dated: September 21, 2022
      New York, New York

_____
SARAH NETBURN
United States Magistrate Judge

65