LB1H9111

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In re Terrorist Attacks on          03 MD 1570 (GBD)(SN)
     September 11, 2001
 4                                        Hearing
     ------------------------------x
 5                                        New York, N.Y.
                                          November 1, 2021
 6                                        10:10 a.m.

 7   Before:

 8                    HON. SARAH NETBURN,

 9                                  U.S. Magistrate Judge

10                     APPEARANCES

11   LANKLER SIFFERT & WOHL LLP
          Attorneys for Nonparty Fawcett
12   BY:  MICHAEL GERBER
          HELEN GREDD
13        GABRIELLE FRIEDMAN

14   KIRSCH & NIEHAUS PLLC
          Attorneys for Kreindler & Kreindler and all witnesses
15   BY:  EMILY KIRSCH
          LISA FREY
16        -and-
     KREINDLER & KREINDLER LLP
17   BY:  MEGAN WOLFE BENETT
          -and-
18   EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
     BY:  HAL R. LIEBERMAN
19

20   KELLOGG, HUBER, HANSEN, TODD FIGEL & FREDERICK, PLLC
          Attorneys for Defendant Kingdom of Saudi Arabia
21   BY:  MICHAEL KELLOG
          MARK C. HANSEN
22        GREGORY G. RAPAWY
          ANDREW C. SHEN
23        CHRISTOPHER YOUNG

24

25
```

LB1H9111

1              (Pages 2 through 11 SEALED)

2              (In open court)

3              THE DEPUTY CLERK:  Your Honor, this is in the matter

4    of In Re Terrorist Attacks on September 11, 2001, case number

5    is 03MD1570.

6              Starting with counsel for Mr. Fawcett, would you

7    please state your appearance for the record.

8              MR. GERBER:  Good morning, your Honor.  Michael

9    Gerber, Helen Gredd, and Gabrielle Friedman, from Lankler

10   Siffert & Wohl on behalf of Mr. Fawcett.

11             THE COURT:  Good morning.

12             THE DEPUTY CLERK:  Counsel for Kreindler & Kreindler.

13             MS. KIRSCH:  Emily Kirsch from Kirsch & Niehaus, for

14   Kreindler & Kreindler and the witnesses.  With me is Ms. Frey.

15   This is Ms. Benett, of course, from Kreindler & Kreindler, and

16   Hal Lieberman, who is cocounsel with me on this matter from the

17   firm of Emery Celli and also consulting on ethics issues.

18             THE COURT:  OK.

19             THE DEPUTY CLERK:  Thank you.

20             For the Kingdom of Saudi Arabia.

21             MR. KELLOGG:  Good morning, your Honor.  Michael

22   Kellogg, on behalf of Saudi Arabia.  With me are Mark Hansen,

23   Gregory Rapawy, Andrew Shen, and Christopher Young.

24             THE COURT:  Thank you.

25             Let me begin by acknowledging Mr. Lieberman's

LB1H9111

1    presence.  I didn't realize he would be here.  I was a partner

2    at the law firm of Emery Celli Brinckerhoff Abady.  I left the

3    firm in 2010.  Mr. Lieberman was not a partner of the firm at

4    that time, although our firm did consult with him on ethics

5    matters during the course of my time at that firm.  I don't see

6    any issue, but I did want to raise that since it was news to

7    me.

8                Anyone wish to be heard?  Anyone have any questions?

9                MR. GERBER:  No, your Honor.

10               THE COURT:  All right.  So good morning to everybody.

11               We're here for the hearing on the issue related to the

12   breach of the protective order and are going to take testimony

13   this morning.  As I ordered previously, the declarations that

14   were submitted in connection with this breach issue have

15   already been admitted as the direct testimony, and so we will

16   begin with cross-examination, and then we'll have an

17   opportunity for redirect.

18               I think we also discussed that we were not going to

19   have any opening arguments.  I'll allow post-hearing briefing.

20   We can discuss schedules for that when we conclude with our

21   proceedings.  So I think, unless there's any reason to delay, I

22   will turn to the Kingdom and ask which witness they anticipate

23   calling first.

24               MR. HANSEN:  Good morning, your Honor.  Mark Hansen

25   for defendant, the Kingdom.  We'd like to proceed with the

LB1H9111

1  examination of James Kreindler.

2          THE COURT:  OK.  Can I ask Ms. Kirsch or Ms. Benett if

3  you could bring Mr. Kreindler, just let him know.

4          MS. BENETT:  I'll bring him in.

5          THE COURT:  That would be great.

6          While Ms. Benett is getting the witness, we took the

7  biggest courtroom we could find given all of the

8  COVID-compliance issues.  We don't have a HEPA filter for the

9  witness here, so my understanding of the court's protocol under

10 our COVID Response Team is that the witness needs to keep his

11 or her mask on during the proceeding.  So I think, Mr. Hansen,

12 I think the protocol for the court -- I apologize.  I wish it

13 were otherwise, but I don't want to be in violation of a court

14 order.  So I think we need to all have our masks on, given that

15 this room is a little bit smaller than what we would like and

16 given that we don't have a HEPA filter here for the witness.

17         MR. HANSEN:  Of course, your Honor.

18         THE COURT:  Thank you.

19         MR. HANSEN:  Your Honor, with your permission, we've

20 provided an exhibit binder to the witness on the witness stand

21 and also to counsel.

22         THE COURT:  OK.

23         MR. HANSEN:  Those are the exhibits we may be using in

24 today's examination.

25         THE COURT:  Thank you.

LB1H9111

1          MS. KIRSCH:  Your Honor, just a quick housekeeping

2     matter, if I may?

3          THE COURT:  Yes.

4          MS. KIRSCH:  As your Honor knows, we had requested a

5     copy of these exhibits at the same time that they were

6     delivered to the Court on Friday, and counsel did not

7     accommodate our request, and then they were delivered just as

8     we were in the robing room a moment ago.  So in the moment I

9     had to flip through them, it appears that a lot of them are

10    quite irrelevant and go way beyond the scope of this hearing.

11    I guess I'll apologize in advance that I'll need a moment to

12    look at each document as they try to introduce them, but I do

13    expect we will have many objections to the relevance and scope

14    of these documents.

15         THE COURT:  My hope is that we can proceed with this

16    hearing as smoothly as possible, with giving everybody every

17    opportunity to be heard.  Obviously, this is a bench hearing,

18    and so objections as to relevance may also be better raised in

19    post-trial briefings, but, certainly, you have every

20    opportunity to be heard.

21         MS. KIRSCH:  Thank you, your Honor.

22         The issue really is the incredible sweeping scope that

23    this is, as we understand it from your October 4 order and

24    subsequent orders, that we are investigating this breach to

25    understand whether any of the other Kreindler attorneys, or

LB1H9111

1    anybody else, was involved with Mr. Fawcett's actions or had

2    knowledge.  So a lot of these documents, which date back to

3    2002, 2003, we will have objections that it's not in any way

4    related to the issues of this hearing.

5              THE COURT:  Thank you.

6              Mr. Kreindler.

7              THE WITNESS:  Yes.

8              THE COURT:  Come forward.

9              Good morning, Mr. Kreindler.

10             THE WITNESS:  Good morning, your Honor.

11             THE COURT:  I was explaining to everyone before you

12   arrived that I'm afraid you'll have to keep your mask on during

13   the proceeding.

14             THE WITNESS:  OK.  OK.

15             THE COURT:  Ms. Slusher, would you swear in the

16   witness.

17   JAMES PAUL KREINDLER,

18        called as a witness by the Defendant,

19        having been duly sworn, testified as follows:

20             THE WITNESS:  James Paul Kreindler.

21             THE COURT:  Thank you.

22             You may be seated.

23             THE WITNESS:  Thank you.

24             THE COURT:  Counsel, you may begin.

25             MR. HANSEN:  Thank you, your Honor.

LB1H9111                    Kreindler - Cross

1    CROSS-EXAMINATION

2    BY MR. HANSEN:

3    Q.  Mr. Kreindler, good morning.

4    A.  Good morning.

5    Q.  You agree that court orders are entitled to respect, don't

6    you?

7    A.  Yes.

8    Q.  You agree that deliberate violations of court orders is a

9    serious matter, don't you?

10   A.  Yes.

11   Q.  So serious that it may result in criminal sanctions?

12   A.  Yes.

13   Q.  We're here today because of the deliberate violation of two

14   court orders, are we not?

15          MS. KIRSCH:  Objection, your Honor.  I'm not sure that

16   there is a violation of the FBI order, so I object to the

17   question.

18          THE COURT:  I believe that the -- why don't we proceed

19   with respect to the MDL protective order, which I think

20   everybody admits has been breached.

21          MR. HANSEN:  Your Honor, in fairness, there's no

22   question that the MDL -- the MDL and the FBI had been breached

23   because the FBI had 30 days after the receipt of the transcript

24   to object, and until such time has passed, the entire

25   transcript is protected by the FBI protective order.  So I

1    believe it's --

2              THE COURT:  That's true.  That's true.  Proceed.

3    BY MR. HANSEN:

4    Q.  So do you want my question back, Mr. Kreindler?

5    A.  Your question was, do I agree that two court orders were

6    breached?

7    Q.  OK.

8    A.  The first court order was breached.  I did not recall the

9    30-day window you referred to, but in that's the case, then,

10   yes, both were.

11   Q.  Wait a second, Mr. Kreindler, you're cochairman of the

12   plaintiffs' executive committee in this MDL case, aren't you?

13   A.  Yes.

14   Q.  And you are telling us even today, as we sit here going

15   through serious violations of protective orders, you're not

16   even familiar with the terms of the FBI protective order?

17   A.  I'm very familiar with the terms.

18   Q.  SO you're not familiar with the 30-day window for the FBI

19   to object?

20   A.  I did not remember it now, whether it was 30 days or a

21   different period.  My focus was on the breach of the first

22   court order.

23   Q.  You're telling us you didn't even read the FBI protective

24   order before coming here to testify today?

25   A.  I read it when I signed it, but I did not read it recently.

LB1H9111                      Kreindler – Cross

1   Q.   So, Mr. Kreindler, continuing on, your firm has admitted

2   that these violations of two court orders were committed by

3   Kreindler & Kreindler, correct?

4   A.   Yes.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB189112                    Kreindler - Cross

1    BY MR. HANSEN:

2    Q.  Your researcher, John Fawcett, leaked a confidential

3    transcript to Michael Isikoff of Politico, according to

4    Kreindler & Kreindler, correct?

5    A.  I don't think Michael Isikoff was in Politico.

6    Q.  You're absolutely right.  I apologize.  Bad question.  Let

7    me rephrase that.

8            Your firm Kreindler & Kreindler has told the court

9    that your researcher, John Fawcett, leaked a confidential

10   transcript to Michael Isikoff of Yahoo?

11   A.  Yes.

12   Q.  Isn't it true that Mr. Fawcett did that because you wanted

13   him to do that?

14   A.  No, that is not true at all.

15   Q.  So, let's get into some basics about you and your firm and

16   how we came to be here today, Mr. Kreindler.

17           You are the partner in charge of the 9/11 case at

18   Kreindler & Kreindler?

19   A.  Yes.

20   Q.  And I believe we mentioned a minute ago you are the co-lead

21   of the Plaintiffs' Executive Committee in this case?

22   A.  Yes.

23   Q.  You have a team of Kreindler & Kreindler professionals

24   working with you?

25   A.  Yes.

LB189112                         Kreindler – Cross

1   Q.  That includes Mr. Fawcett?

2   A.  Yes.

3   Q.  The team is about ten or so in size?

4   A.  No.  I could tell you the members of the team.

5   Q.  Sure.  Please do.

6   A.  So, Andrew Maloney, who we all call Duke, has been working

7   on the case for many years.  Steve Pounian joined the team when

8   JASTA was passed.  And about the same time Megan Benett has

9   also joined the team.  And John has been working on 9/11 for

10  almost 20 years, John Fawcett.

11  Q.  Was Ms. or Mr. Simpson also part of your team?

12  A.  Recently Gavin Simpson, yes, in the last couple of months.

13  Q.  Ms. or Mr. Pagan?

14  A.  She is a paralegal that we asked to help out, but fairly

15  recently.

16  Q.  Mr. or Ms. Sienski?

17  A.  Yes.  Julia is client liaison.

18  Q.  And Mr. or Ms. Ranieri?

19  A.  Lisa Ranieri has been a secretary to the firm for probably

20  three decades, and is Steve Pounian's secretary.

21  Q.  So, the team members on the 9/11 case all worked for you,

22  didn't they, Mr. Kreindler?

23  A.  Well, that's not how I'd put it.  For example, Lisa is

24  Steve's secretary, so when Steve needed secretarial work he

25  would ask his secretary to do it.  I had very few occasions to

LB189112                    Kreindler – Cross

1    ask Steve's secretary to do something.  I might ask my

2    secretary.

3    Q.  Good qualification.  Putting aside assistants, isn't it

4    true that all of the professionals at Kreindler & Kreindler

5    working on the 9/11 case were under your supervision?

6    A.  Yes.

7    Q.  And you are responsible for supervising that team, aren't

8    you?

9    A.  Yes.

10   Q.  Is it fair to say you set an example for your team?

11   A.  Yes.

12   Q.  Is it fair to say they watch what you say and do?

13   A.  I hope so.

14   Q.  And they follow your lead?

15   A.  I believe so.

16   Q.  So, Mr. Kreindler, you believe there is a lot of money at

17   stake in this case, don't you?

18   A.  There is, undoubtedly.

19   Q.  And your firm represents your clients on a contingency

20   basis, isn't that true?

21   A.  Yes.

22   Q.  And you have told the press in one of your many press

23   statements that you believe this case is -- and I am quoting

24   here -- the biggest case ever.  Do you recall saying that?

25   A.  Yes.

LB189112                    Kreindler – Cross

1   Q.  And you would like to have a settlement in this case,

2   wouldn't you?

3   A.  Yes.

4   Q.  Because a settlement would produce a substantial amount of

5   money for your clients, but also for the lawyers working on the

6   case, correct?

7   A.  It would.

8   Q.  How much of any settlement would the legal team get in

9   total, roughly, a third?

10  A.  No.  Our retainer fees are significantly less than a third.

11  They are 15 percent retainer fees.  Many of the cases, other

12  local lawyers who brought the cases to us will receive a

13  portion of that 15 percent.

14  Q.  We agree, do we not, there could be a lot of money at stake

15  for Kreindler & Kreindler.

16      MS. KIRSCH:  I would like to put an objection here.

17  We are a little bit away from the scope, but also any more

18  specific terms of retainer agreements should be subject to

19  privilege.  So I would just caution the witness not to give too

20  much detail into those arrangements.

21      MR. HANSEN:  Your Honor, I am moving on.

22      THE COURT:  Very well.

23  BY MR. HANSEN:

24  Q.  Just to conclude on that topic, Mr. Kreindler, we can all

25  agree there could be a lot of money in this for Kreindler &

LB189112                    Kreindler - Cross

1  Kreindler, right?

2  A.  For all of the lawyers, sure.

3  Q.  So, Mr. Kreindler, you have been making public statements

4  about this case for years to put settlement pressure on the

5  defendants, haven't you?

6      MS. KIRSCH:  I am going to object one more time.  We

7  can stipulate right here and now that Mr. Kreindler talks to

8  the press.  That's not related to whether there would be any

9  motive or opportunity or anything of the kind to violate a

10  court order.

11      So if we can just cut through a lot of this, we can

12  stipulate Mr. Kreindler talks to the press about the case.

13  It's a matter of great public importance.  He is the face of

14  the case.  That happens.  That has nothing to do with why

15  somebody would or would not violate the court order.  It's not

16  relevant.

17      MR. HANSEN:  It has everything to do with the case.

18  As I believe we will demonstrate, Mr. Kreindler's press

19  strategy is exactly the reason why we have protective order

20  violations, and I expect to be able to demonstrate that.  It's

21  cross-examination, your Honor.

22      THE COURT:  The objection is overruled.  I think that

23  this goes to motive as well as modus operandi.

24      MR. HANSEN:  I am not sure there was an answer to my

25  last question.  Can the reporter let me know if there was an

LB189112                    Kreindler - Cross

1   answer and read it back, please.

2           (Record read)

3   A.  I would say to put pressure on the defendant Saudi Arabia,

4   yes.  The form of a resolution may or may not be what we

5   traditionally think of as a settlement.

6   Q.  Mr. Kreindler, I am not going to go into this in detail.

7           Mr. Kreindler, you speak on the record for attribution

8   to reporters, correct?

9   A.  Yes, I do.

10  Q.  You also speak to reporters about this case off the record,

11  correct?

12  A.  I don't think so.  I don't recall a time when I have ever

13  said to a reporter, I am speaking to you off the record.

14  Whether I am quoted by that reporter is up to the reporter.

15  Q.  So, you're telling us here today under oath that you never,

16  in the past 20 years, have spoken to any reporter off the

17  record about the 9/11 case?

18  A.  I don't recall ever doing so, and that's not the way I

19  would deal with the press.  I tend to say things that are

20  public, and I'm glad to have them public.

21  Q.  Mr. Kreindler, obviously, you make these statements about

22  the 9/11 case to the press because you think they are helpful

23  to the case or you wouldn't make them, correct?

24  A.  Of course.

25  Q.  Now, let's talk about the lines you know you're not

LB189112                    Kreindler – Cross

1  supposed to cross in litigating your case in the press.

2          You are bound by two separate court orders not to

3  reveal or disclose the contents of protected material, correct?

4  A.  That's correct.

5  Q.  The first is the MDL protective order issued by Judge Casey

6  in 2006?

7  A.  Yes.

8  Q.  I would like to put up Exhibit 2 on the screen so we can

9  get oriented.

10         It's in your binder at Exhibit 2, Mr. Kreindler.

11  A.  Is it the same thing that's on the screen?

12  Q.  Yes.

13  A.  I will look at it right there.

14  Q.  You are familiar with that order?

15  A.  I am, yes.

16  Q.  You read it?

17  A.  I certainly read it when I signed it many, many years ago.

18  Q.  Under this order, you cannot disclose or talk to the press

19  about anything that's been designated confidential, correct?

20  A.  Correct.

21  Q.  Let's go to the second protective order in the case.

22         There was a second protective order entered by the

23  Honorable Sarah Netburn in 2018 relating to the FBI production

24  of materials, correct?

25  A.  Yes.

LB189112                      Kreindler - Cross

1    Q.  I will put that up on the screen as Exhibit 15.

2              You're familiar with that order, correct?

3    A.  Yes.

4    Q.  That was an order requested by our United States Federal

5    Bureau of Investigation to cover information that the FBI has

6    decided cannot be disclosed because disclosure would harm the

7    U.S. public interest, correct?

8    A.  I think it was requested by the Department of Justice, not

9    the FBI directly.

10   Q.  Thank you for that clarification.

11             The Department of Justice has made that representation

12   to the court, correct?

13   A.  Yes.

14   Q.  And this order means that you cannot disclose or talk to

15   the press about anything that's been designated confidential

16   under the terms of this protective order, correct?

17   A.  Yes.

18   Q.  And just to be clear, and I know we had a little bit of

19   confusion about this earlier, all 600-plus pages of the

20   al-Jarrah deposition transcript was confidential both under the

21   MDL protective order and the FBI protective order, correct?

22   A.  I don't recall the number of pages in the deposition, and I

23   don't recall if there was any small portion that wasn't

24   confidential, but certainly all of the substance was marked

25   that way.

1          MR. HANSEN:  I am having a hard time hearing.  Can we

2    read back the answer.

3          (Record read)

4    Q.  Mr. Kreindler, I am a little curious.  This is a very

5    serious matter, the proceeding we are on here today, and you

6    are telling us you don't know sitting here today whether the

7    al-Jarrah deposition transcript was confidential under both

8    orders?

9    A.  I said I knew all of the substance was confidential, but I

10   didn't remember at the time whether there was something

11   innocuous that wasn't confidential.

12   Q.  If it was designated confidential, who decides whether it's

13   innocuous so that it wouldn't be covered by the order?

14   A.  There is a misunderstanding.  I knew that the deposition

15   was certainly by and large confidential.  There might have been

16   a page or two that wasn't confidential.  That's all I'm saying.

17   I knew -- the deposition was confidential.  Whether there was

18   some innocuous page or two of background that wasn't, I didn't

19   recall.  But I checked on that.

20   Q.  Did you check?

21   A.  Yes.

22   Q.  So you know it's all confidential, right?

23   A.  Yes.

24   Q.  So part of your press strategy, Mr. Kreindler, is to tell

25   reporters that these two court orders that you told us a few

LB189112                         Kreindler - Cross

1   minutes ago were entitled respect, are -- and I am quoting your

2   words here -- "gag orders," in quotes, and "disgusting," in

3   quotes, isn't that right?

4   A.  Yes.

5   Q.  It's part of your stump speech, isn't it?

6   A.  I would not call it a stump speech.  I would call it my

7   heartfelt belief.

8   Q.  Let's get some of the statements.  Then I am going to ask

9   you what you think your team learns from your statements.

10          You have called the courts' orders "these disgusting

11  protective orders imposed upon us by the Department of Justice

12  with the blessing of the court," correct?

13  A.  Yes.

14  Q.  You have talked about this "hated protective order" and

15  "these protective orders that we hate," correct?

16  A.  I remember the first quote.  I don't remember that quote,

17  but I would agree with that.

18  Q.  You have said "you are angered and disgusted with the

19  protective orders that the FBI and Saudi Arabia have insisted

20  on," correct?

21  A.  Yes.

22  Q.  And just recently, in a podcast of Mr. Isikoff, you called

23  the protective orders "a damn gag order imposed on us by the

24  Saudis, our Department of Justice, and the court," correct?

25  A.  Yes.

LB189112                    Kreindler - Cross

1    Q.  Would it be fair to say, Mr. Kreindler, that every member

2    of your team is aware of the contempt you have for these court

3    orders?

4              MS. KIRSCH:  I am going to object, your Honor, to

5    that, and ask Mr. Hansen to rephrase the question.  Obviously,

6    contempt has a legal implication.  It's an improper question.

7              THE COURT:  You may rephrase the question.

8              MR. HANSEN:  Sure.

9    Q.  Mr. Kreindler, would it be fair to say your statements

10   reflect contempt for the courts' orders?

11             MS. KIRSCH:  Same objection.

12             THE COURT:  Counsel, can you ask the question without

13   using the word "contempt."

14             MR. HANSEN:  Sure.

15   Q.  Mr. Kreindler, would you agree with me that these orders

16   communicate to your team and everybody else that you lack

17   respect for these court orders?

18   A.  It's not a -- I would not say I lack respect.  I would say

19   that every lawyer representing the victims dislikes the fact

20   that we are under these orders and looks forward to these

21   orders being lifted, or largely lifted.  But I would not use

22   the word lack of respect.  It is the court orders that we have

23   to live with until they are changed.

24   Q.  What kind of message do you think is sent to your team to

25   have the leader of the team call two court orders disgusting

LB189112                    Kreindler – Cross

1   gag orders?

2   A.   The message is very clear.  We all hate the orders, but we

3   have to live with them until they are lifted soon, and

4   hopefully soon is very soon.

5   Q.   Let's talk about that.

6             In truth, Mr. Kreindler, you use these court orders as

7   a tactical weapon in your press strategy, don't you?

8   A.   I would not say I use it as a tactical weapon.  I am

9   offering my view of the orders that we wish we didn't have.

10  Q.   Let me make my question a little clearer.

11            Your modus operandi, if you will, is to hint to the

12  press that there is this great evidence that you have but can't

13  fully reveal, correct?

14  A.   Not hint.  I say it outright.  There is important evidence

15  of Saudi government involvement with al Qaeda that I am not

16  permitted to share with our clients, the family members, the

17  press or the public.

18  Q.   And you hint at what that evidence is and no one can

19  correct you because the evidence is all sealed, correct?

20  A.   Incorrect.  I don't hint at it at all.  I am always clear

21  in saying there is, I believe, very important, very dramatic

22  evidence of what Saudi government officials did, but until

23  these orders are lifted, I can't tell the families what that

24  is, the press or the public.

25  Q.   Let's see what you have actually told the press and the

1    public and whether you have done what you have said.

2             Going back a minute, you say you want to have these

3    orders lifted, correct?

4    A.  Correct.

5    Q.  The MDL order has been in place since 2006, correct?

6    A.  That's right.

7    Q.  The FBI protective order has been in place since 2018,

8    correct?

9    A.  Yes.

10   Q.  And you have made numerous statements saying you were going

11   to get these orders lifted so you can get all this evidence to

12   the world, correct?

13   A.  Yes.  Exactly what Joe Biden did a month ago.

14   Q.  In fact, Mr. Kreindler, let me be very clear about this,

15   you have never, not once, filed one single motion with this

16   court to lift either the MDL order or the FBI order, isn't that

17   true?

18   A.  Yes, that's absolutely true.

19   Q.  Isn't it true, Mr. Kreindler, that you sought the entry of

20   the FBI protective order?

21   A.  We sought the entry of it?

22   Q.  Let's put up Exhibit 14.  Didn't your firm tell the court

23   that you supported the entry of the FBI protective order?

24             Take as long as you want to look at it.

25   A.  I only see the caption here.

LB189112                      Kreindler - Cross

1   Q.  If you want to look at the whole document, it's Exhibit 14.

2              We can go to the last page which cuts to the chase.

3              "For all of the foregoing reasons, the PECs

4   respectfully submit that the Court should overrule Dallah

5   Avco's objection to the proposed protective order, and promptly

6   enter the protective order in the form submitted jointly by the

7   United States and PECs, so that the FBI production can proceed

8   without delay."

9              Here is my question.

10             Are you aware, Mr. Kreindler, that your partner

11  Mr. Maloney signed this letter to the court requesting that the

12  court enter this hated, disgusting protective order?

13             MS. KIRSCH:  Your Honor, I have an objection here.

14  This goes to the legal strategy of how this case is being

15  litigated, not even only by Mr. Hansen but by other partners at

16  his firm, and also the other PECs.  The steps that are taken,

17  the motions that are taken, all of that is the subject of work

18  order and strategy, and delving into why decisions were made is

19  entirely improper in this hearing.

20             THE COURT:  Your objection is overruled.

21  A.  Can I answer the question?

22             THE COURT:  Yes, please.

23  A.  The operative phrase is "so that the FBI production can --"

24  Q.  Can you please answer my question?  You can explain when

25  your counsel examines you.

LB189112                    Kreindler - Cross

1        Didn't you ask the court to enter this protective

2    order, yes or no?

3        MS. KIRSCH:  I am going to make the same objection

4    here, your Honor.

5        THE COURT:  Your objection remains overruled.

6    Q.  Yes or no, Mr. Kreindler?

7    A.  Yes.  That's exactly what the document says.

8    Q.  OK, Mr. Kreindler.

9        You'd rather make inflammatory and misleading

10   statements to the press about protected information, when your

11   statements can't be proved false, isn't that right?

12   A.  Absolutely wrong.  I have never made incorrect or

13   inflammatory statements.  I have done my best to say truthfully

14   what I am permitted to say, my honest opinion, and not reveal

15   anything I am not permitted to reveal until such time as I am

16   permitted to reveal it.

17   Q.  We know, do we not, Mr. Kreindler, that you violated the

18   protective order in 2017 doing exactly the opposite, right?

19   A.  That I personally did?  I personally did not.  There was a

20   violation found two and a half years ago by the court.

21   Q.  You didn't read the court's October 21 order that says, in

22   these very words, James Kreindler violated the protective order

23   in 2017?  You didn't bother to read the court's order?

24   A.  Which order?

25   Q.  A recent order in this case, October 21, just a few days

1    ago, in a court order issued by this court, the court said,

2    James Kreindler violated the protective order.

3            MS. KIRSCH:  Your Honor, the record stands on its own.

4    I don't think this is an appropriate line of questioning.  The

5    2017 transcript says what it says.  Your Honor's October 21st

6    order says what it says.

7            THE COURT:  I agree.  Let's move on.

8    Q.  The court warned you, Mr. Kreindler, in 2017 that it was

9    really -- I am quoting here -- "really unfair to the parties,

10   who will be turning over a lot of confidential and personal

11   information, to have those documents portrayed in the light

12   that has a particular viewpoint."

13           That's the transcript of the 2017 hearing at page 9.

14   Were you in court and heard that warning?

15           MS. KIRSCH:  Your Honor, again, first of all, it says

16   what it says, and it's a transcript of this court's proceeding.

17   It's not appropriate and that objection was just sustained.

18           Second of all, if Mr. Hansen would like to read

19   something into the record, we would respectfully request that

20   he point us to the document and show it to Mr. Kreindler.

21           THE COURT:  I am going to allow Mr. Hansen to ask some

22   questions related to prior instances where the court has found

23   that there have been breaches of the protective order.  I don't

24   want this entire hearing to be about the events of the past.

25           To the extent, Mr. Hansen, you have a copy of the

LB189112                        Kreindler – Cross

1   transcript.

2            MR. HANSEN:  I do.  It's Exhibit 10.  We will put it

3   up on the screen.

4   BY MR. HANSEN:

5   Q.  Do you recall being present and hearing that warning from

6   the court, Mr. Kreindler?

7   A.  Yes.

8   Q.  That's what you were doing in 2017 when you and Mr.

9   Fawcett, in a tag-team fashion, violated the court's protective

10  order?

11  A.  No, that's incorrect.

12  Q.  Let's see what happened in 2017 and whether it bears a

13  remarkable similarity to what happened this past summer.

14           In early 2017, you gave an interview to a journalist

15  named Caleb Hannan of Politico Magazine, correct?

16           MS. KIRSCH:  I object again, your Honor.  That was in

17  2017.  The scope of this hearing is whether there was any

18  involvement in this breach, that Mr. Fawcett leaked the

19  transcript in connection with a July 15th article.  What

20  happened in 2017 was obviously fully litigated.  We obviously

21  have a decision as to what happened, and quite frankly, I think

22  this is an improper line.

23           THE COURT:  I am going to allow this line of

24  questioning.  I do think it lays a reasonable foundation for

25  the issues that are presented here.

LB189112                    Kreindler - Cross

1           I will ask, Mr. Hansen, to move with some alacrity.

2           MR. HANSEN:  I am trying, your Honor, but I believe

3      these long talking objections are going to take a lot of our

4      time up.  I will try and move quickly to make the point.

5      BY MR. HANSEN:

6      Q.  Mr. Hannan in 2017, in his article, described in detail the

7      confidential document that had been produced by a party in this

8      litigation subject to confidentiality protection, correct?

9      A.  No, incorrect.

10     Q.  Let's take a look at it.  In the article, at Exhibit 11,

11     the top of page 8 -- by the way, this is an article you

12     reported in repeatedly?

13     A.  Yes.

14     Q.  Mr. Hannan describes -- first he talks about how you looked

15     at thousands and thousands of pages of these confidential

16     documents from the Bayoumi organization.  And he writes,

17     "There, at the top of the single page, it found a note from

18     Khaleid Sowailem written on official letterhead from the

19     ministry.  On that note was Sowailem's phone number at the

20     Saudi Embassy in Washington, D.C."

21           Do you see that?

22     A.  Yes.

23     Q.  You provided that information to Mr. Hannan, didn't you?

24     A.  I did not, no.

25     Q.  You did it by directing John Fawcett to provide that

LB189112                          Kreindler - Cross

1   information to Mr. Hannan, didn't you?

2   A.   No.

3   Q.   The only people from Kreindler & Kreindler who talked to

4   Caleb Hannan were you and John Fawcett, correct?

5   A.   That's correct.

6   Q.   So, if he got that information, he had to have gotten it

7   either from you or John Fawcett, correct?

8   A.   Yes.

9   Q.   Now, after the court found a violation of the protective

10  order in 2017, you didn't fire John Fawcett, did you?

11  A.   Correct.

12  Q.   You didn't discipline him in any way, correct?

13  A.   I spoke to him about what happened.

14  Q.   Did you discipline him in any way?

15  A.   Discipline him?  I really don't know what you mean.  We did

16  not fire him, and I certainly didn't spank him.  We talked

17  about it and how to make sure that that sort of thing doesn't

18  happen again.

19  Q.   You consider that discipline?

20  A.   It's your word.  That's not a word I would pick.

21  Q.   You didn't cut off Mr. Fawcett's employee log-in access to

22  every single confidential document in the 9/11 case, which he

23  had at that point, correct?

24  A.   Correct.

25  Q.   By the way, up until September 27th of this year, John

LB189112                    Kreindler - Cross

1   Fawcett had employee log-in privileges that gave him full and

2   unfettered access to every single 9/11 case document, correct?

3   A.  Yes.  He is at the heart of the documents.

4   Q.  In fact, not only that, he continued up until September of

5   this year to be the Kreindler & Kreindler professional

6   responsible for managing the entire document collection of

7   confidential documents at Kreindler & Kreindler, correct?

8           MS. KIRSCH:  I am going to object.  It's a leading

9   question, obviously, but this is attorney work product.  I

10  don't think this is a proper line of questioning either.  It

11  has nothing to do with what happened, that we know what

12  happened with Mr. Fawcett, and how Kreindler & Kreindler

13  manages its internal work is not relevant here.

14          THE COURT:  I don't think the responsibilities of Mr.

15  Fawcett fall within the parameters of work product.  And,

16  certainly, the role that Mr. Fawcett played at the firm, his

17  responsibilities, his access to information, is at the core of

18  this hearing.  So I am going to allow this line of questioning.

19          MS. KIRSCH:  Just to be clear, we stipulate that he

20  had access to all of the confidential information.  That's not

21  a matter that's in dispute.

22          THE COURT:  Thank you.

23  BY MR. HANSEN:

24  Q.  I am sorry.  Did you have a chance to answer the question,

25  Mr. Kreindler?

LB189112                         Kreindler – Cross

1  A.  I think your question was, did John have access to all the
2  information?
3  Q.  I am sorry.  Before the objection I had a different
4  question.  You agreed he had access to all information.
5       My next question was, up until and possibly beyond
6  September 27, 2021, John Fawcett was the Kreindler & Kreindler
7  professional responsible for managing the entire 9/11 case
8  document collection, wasn't he?
9  A.  Yes.
10  Q.  Even while you were doing an investigation of him for
11  potentially leaking the transcript, right?
12  A.  No, that's not right, not on September 17.
13  Q.  We will get into the investigation in a minute.
14       So you never investigated John Fawcett at any time
15  between July 15 and September 27, more than two months later?
16  A.  Investigate him?  No, I did not investigate him.  I spoke
17  to him.
18  Q.  OK.  We will get to that in a minute.
19       After the 2017 protective order violation, you didn't
20  even direct Mr. Fawcett to stop talking to the press, did you?
21  A.  No.
22  Q.  And he did talk to the press as part of his Kreindler &
23  Kreindler duties, correct?
24  A.  Yes.
25  Q.  And he billed for his time doing that, correct?

LB189112                    Kreindler – Cross

1   A.  I don't know.  That I don't know.

2   Q.  Well, he put in billing records, like your associates do,

3   for the time he spent working on the case, and got paid for it,

4   correct?

5   A.  I think so, yeah.

6   Q.  Do you think he also included all his press duties as part

7   of his billable time?

8          MS. KIRSCH:  Objection.  Calls for speculation.  He

9   just said he didn't look at the time records.

10  A.  I don't know.

11         THE COURT:  Sustained.

12  Q.  In fact, you knew that he was, among other things,

13  entertaining reporters at the Kreindler & Kreindler offices,

14  correct?

15  A.  He was not entertaining reporters.  He would speak to

16  reporters on occasion when I asked him to.

17  Q.  And he did that at the Kreindler offices?

18  A.  Yes.

19  Q.  And he provided reporters with documents, correct?

20  A.  Over 20 years, he made sure that if he provided a document

21  to a reporter, it was not under either of the orders we have

22  been talking about.  In other words, if a reporter wanted

23  information, he would go through material and provide only that

24  which he is permitted to provide.

25  Q.  Well, we know that's not true because, according to you, he

LB189112                    Kreindler - Cross

1  provided a sealed transcript to reporters.  Would you like to

2  retract your prior answer?

3  A.  I thought you were talking about up until this past

4  September.

5  Q.  Let me clarify.

6       You have agreed that he does, as part of this

7  Kreindler & Kreindler duties, talk to reporters and provide

8  documents to reporters?  And exactly what the documents are we

9  will get into in a minute.  Correct?

10 A.  Not correct fully.  He provides material when I or one of

11 my partners would ask him to provide material that is public.

12 Q.  So, for example, in June of this year, he invited NPR

13 reporter Laura Sullivan to come to the Kreindler offices so he

14 could brief her in advance of you giving quotes to the reporter

15 for a story, correct?

16 A.  No, you have the chronology wrong.

17      MR. HANSEN:  I am going to put up Exhibit 12, your

18 Honor, which I believe has been produced in this matter.

19 Q.  Do you know who Laura Sullivan is?

20 A.  I do, yes.

21 Q.  Who is she?

22 A.  Laura Sullivan is an NPR reporter who I first met in

23 Washington, D.C. and gave her a pretty lengthy interview.

24 Q.  Were you aware that in June of this year, Mr. Fawcett was

25 inviting Ms. Sullivan to come to the Kreindler offices so that

LB189112                      Kreindler - Cross

1   he could have discussions with her?

2              MS. KIRSCH:  Your Honor, could I have a moment to read

3   the document, please?  I didn't get this previously.

4              THE COURT:  Sure.  Let me know when you're ready.

5   A.  May I answer now?

6   Q.  Yes.

7   A.  John did not invite her.  I told her that, as a follow-up

8   to my talk with her, she should contact John to see the

9   documents that we are permitted to show her and members of the

10  press.  And then you have this e-mail about the time she would

11  be at the office.  But John is not doing this of his own

12  volition, his own initiative.

13  Q.  This is in June of 2021.  Are you aware that Mr. Fawcett

14  was doing this, as indicated in this chat, in June of this

15  year?

16  A.  Yeah.  I put the two of them in contact so she could follow

17  up and see public documents after the interview I did with her.

18  Q.  Mr. Fawcett did it again in September of this year, less

19  than two months ago, after the leak of the confidential

20  transcript, correct?

21             I am directing you still to Exhibit 12.

22             MS. KIRSCH:  I don't know what is meant by "did it

23  again."

24             MR. HANSEN:  I will rephrase the question.

25  Q.  Were you aware -- and directing your attention to Exhibit

LB189112                    Kreindler – Cross

1    12 -- that Mr. Fawcett had further discussions with

2    Ms. Sullivan about the 9/11 case?  And I am directing you to

3    the September entries on page 4.

4    A.  Is that what I have in front of me now?

5    Q.  We will put it up on the screen.

6    A.  OK.  I was aware that Laura Sullivan was coming back to see

7    more documents that we were permitted to show, yes.

8    Q.  So he was doing this at your direction?

9    A.  Yeah.

10   Q.  If you look down toward the bottom of the page, there is a

11   reference to, "Megan says no problem for those two documents"?

12   A.  Yes.

13   Q.  So, would it be fair to say that Mr. Fawcett followed the

14   practice of checking with a Kreindler & Kreindler partner

15   before he released documents to a reporter?

16   A.  He certainly did here.  Over 20 years, I can't say that

17   that was the procedure for every time John would show public

18   documents to a reporter, but he certainly did here.  And what I

19   am trying to get at is, particularly after the 2017 violation

20   that the court found, we always went to great pains to make

21   doubly sure that every document we are showing one of the

22   family members or a reporter was the public version and not the

23   prohibited version.  So that's what happened here.

24   Q.  Just to be clear, you just made a reference to the 2017

25   violation.  You were aware, were you not, that the court gave

LB189112                     Kreindler - Cross

1    you a warning in 2017 and said -- we will put it up, Exhibit

2    10, page 9.  The court wrote, after not imposing a sanction,

3    the court wrote, "Going forward, Mr. Kreindler, to the extent

4    you are going to be continuing to speak to the press, or any

5    other lawyer in this case, I expect the parties to hew much

6    more closely to the confidentiality order and to be exceedingly

7    discreet in the information they reveal."

8            You were present in court and heard that warning,

9    didn't you?

10   A.  Yes.

11   Q.  But you kept right on talking to the press about the case

12   after that, didn't you?

13   A.  Of course.

14   Q.  When you did speak, you were not discreet at all, were you?

15   A.  I disagree with that.

16   Q.  Let's look at some of the speeches you made in public after

17   you got that warning.

18           Were you exceedingly discreet in your public

19   statements at Dartmouth College in 2019?

20           MS. KIRSCH:  Your Honor, I object to this line of

21   questioning.  We know that Mr. Kreindler speaks to the press.

22   We have stipulated to that.  If there was something that was

23   leaked, it has been brought to this Court, it has been

24   discussed.  If there was something inappropriate, it has been

25   brought to the Court's attention.  It's not relevant to this

LB189112                          Kreindler – Cross

1   breach.  And this is not an opportunity to relitigate matters

2   that have been annoying to the Kingdom in the past.

3           THE COURT:  I would object then to the concept of it

4   being annoying to the Kingdom.  It's a violation of the court

5   orders.  It is a violation of the court orders when these

6   protective orders are breached.  It's not the Kingdom that is

7   annoyed; it's the court whose orders are being violated.  So,

8   first, I would not consider this to be something about what is

9   annoying the Kingdom.

10          With respect to the historical facts, I have limited

11  discovery on these issues.  I do think that we are making a

12  foundation here.  I am going to allow Mr. Hansen to continue

13  this line of questioning, as I have already indicated.  I am

14  watching the time.  I am hoping that we are going to get to the

15  heart of the matter shortly, but I do think this line of

16  questioning is appropriate and lays a reasonable foundation for

17  the heart of the issues.

18          MS. KIRSCH:  Your Honor, just to clarify, I agree a

19  hundred percent that violation of the court order is a very

20  serious matter.  I was referring to Mr. Kreindler's Dartmouth

21  speech, which was not a violation of the court order, and

22  that's why I said what I said.  I was not trying to minimize

23  that we are here on this breach of this court order, and it is

24  a very serious matter.

25          THE COURT:  Thank you.

LB189112                    Kreindler - Cross

1  BY MR. HANSEN:

2  Q.  Mr. Kreindler, my question before your counsel's objection

3  was about whether you believed you were exceedingly discreet in

4  your public statements at Dartmouth College.  Do you believe

5  you were?

6  A.  I believe I was exceedingly appropriate.

7  Q.  No, no.  The question was exceedingly discreet.  Will you

8  answer my question?  It's a yes or no question.

9  A.  If we understand discreet the same way, yes.

10  Q.  Let's play some of your statements to Dartmouth College on

11  the screen, and we will talk about whether you have violated

12  the protective order there and whether these were discreet

13  comments.

14          (Audio played)

15          MS. KIRSCH:  Your Honor, I have another objection.  No

16  exhibits were provided to us prior to this hearing.  It is

17  entirely inappropriate to launch into a multimedia presentation

18  when I have no idea what is about to go up on the screen,

19  number one.

20          Number two, I renew my objection that anything that

21  happened in the Dartmouth speech has already been litigated in

22  this court and the findings are what they are, and this is not

23  an opportunity to go over old ground.  That's already been

24  done.  It's not relevant to this hearing.

25          THE COURT:  To facilitate the proceeding, I note your

LB189112                    Kreindler - Cross

1    objection to matters of conduct that happened before the breach

2    this summer.  I am overruling those objections for the reasons

3    that I have stated, but I will accept your general objection to

4    this line of questioning.

5            I don't know if we have other video that we are going

6    to play, if you can give counsel a heads-up.  Obviously, this

7    is Mr. Kreindler's speech, and this issue I think is reasonably

8    within the bounds of the subject matter.

9            Mr. Hansen, I don't know how much longer until you

10   want to start talking about the breach this summer.  It's now

11   11:30.  I am hoping we can move to that in the next five to ten

12   minutes.

13           MR. HANSEN:  Just a couple of questions about this,

14   and then I will move exactly to that.

15           THE COURT:  Thank you.

16           MR. HANSEN:  I think it's important, your Honor, and I

17   do want to just get Mr. Kreindler's testimony on this important

18   point.

19   BY MR. HANSEN:

20   Q.  What we just played, Mr. Kreindler, was you purporting to

21   summarize the contents of a document that had been provided by

22   the FBI under confidentiality, correct?

23   A.  Wrong.  Absolutely wrong.

24   Q.  That's what our FBI told the court, didn't they?

25   A.  No.  You are wrong.

LB189112                    Kreindler – Cross

1    Q.  Our government came to this court and said, in a filing,

2    that you were improperly and misleadingly describing the

3    contents of the confidential FBI document, isn't that true?

4    A.  It is not true because what I was talking about is the

5    public 2012 review.

6    Q.  Wait.  I am asking you a question about what the FBI

7    represented to this court, not what you think it is.

8           MS. KIRSCH:  And if that was the question, your Honor,

9    I have an objection.  Mr. Hansen is an experienced trial

10   lawyer.  I am sure he knows very well how to present the

11   document to the witness and ask the witness to take a look and

12   then identify it, whether he recognizes it, and then we can

13   talk about what the FBI did or didn't say.

14          MR. HANSEN:  We will take the time.

15          I just asked the question, did Mr. Kreindler know one

16   way or the other whether the FBI, or the Department of Justice

17   on behalf of the FBI, came to this court and said that you,

18   James Kreindler, in your Dartmouth College speech, had

19   misleadingly and improperly purported to describe the contents

20   of a protected document?  Do you know?

21          MS. KIRSCH:  We can look at the document, your Honor.

22          THE COURT:  Mr. Kreindler, do you recall that

23   submission?

24          THE WITNESS:  No, I don't.

25          THE COURT:  Let's move on.

LB189112                    Kreindler – Cross

1    BY MR. HANSEN:

2    Q.  We can all agree that whatever you did at Dartmouth you did

3    after you got the first warning from the court, correct?

4    A.  Yes, absolutely.

5    Q.  Let's get to the heart of the matter, as the court informed

6    us.

7         Three months ago you went on Michael Isikoff's podcast

8    to talk about the sealed al-Jarrah deposition, correct?

9    A.  That was not the only topic, no.

10   Q.  It was one of the topics, wasn't it?

11   A.  It's a topic I said I wish I could talk about, but I can't.

12   Q.  Let's see in a minute whether you talked about it.

13        Certainly you know Mr. Isikoff, don't you?

14   A.  I know who he is, and I have spoken to him over the years.

15   Q.  For how long have you known him?

16   A.  A long time.  I can't -- for 20 years, there is maybe a

17   dozen reporters who have followed the 9/11 Saudi involvement

18   story, and he is one of them.  But I can't remember the first

19   time I ever spoke to him.

20   Q.  How often do you speak to Mr. Isikoff?

21   A.  It isn't on a regular basis.  There tends to be a lot more

22   media interest as we approach the anniversaries, or something

23   happens, like Joe Biden's Executive Order.  So I might talk to

24   him frequently at one point in time and then not again for

25   years.

LB189112                    Kreindler - Cross

1  Q.  In the sworn declaration you filed with the court in

2  September, you said you recalled two telephone conversations

3  within the relevant period, correct?

4  A.  Yes, I do.

5  Q.  In fact, now that we have the record, we see there are

6  actually three conversations, correct?

7  A.  I just remember two.

8  Q.  Submitting sworn testimony to the court is a pretty serious

9  matter, isn't it?

10  A.  Of course.

11  Q.  Did you check your cell phone, office phone, or other phone

12  records to see how many calls you had with Mr. Isikoff?

13  A.  I have no such phone records.  I remember two phone calls

14  with Mike Isikoff.

15  Q.  Wait a second.  You say there are no phone records you can

16  check to see your calls with Mr. Isikoff?

17  A.  There might be, but I would not know how to check phone

18  records.  I wasn't in the office at all because of COVID.  On

19  my cell phone I can scroll through texts, but I don't know how

20  to look at my cell phone and find all calls.

21  Q.  Whether you can do it or not, you have a very capable

22  staff.  My question is, Mr. Kreindler, is, before submitting

23  sworn testimony to the court about a subject that's objectively

24  determinable, such as how many phone calls you had with the key

25  reporter in this matter, are you telling us you didn't even

LB189112                          Kreindler - Cross

1   bother to check or have someone check for you what the record

2   showed about your calls?

3   A.   What I am telling you is I distinctly remember two phone

4   calls with Mike Isikoff.

5   Q.   I know you said that.  Did you check the records or have

6   someone check the records?

7   A.   There are two different questions.

8   Q.   My question is, did you check the records or have someone

9   check the records?  That's the question.

10  A.   Someone may have checked the records.  I did not check the

11  records.

12  Q.   If someone had checked the records, you couldn't have put

13  in a truthful statement that there were only two, could you?

14  A.   As far as I know, there were only two phone calls.  You're

15  alluding to a third phone call that I'm not aware of or don't

16  remember.

17  Q.   OK.

18          THE COURT:  Mr. Kreindler, could I ask, when you

19  submitted in your declaration, I recall having two phone calls

20  with Mr. Isikoff, did you submit this declaration and did you

21  prepare this declaration based solely on your recollection or

22  did you look at any documents to refresh your recollection?

23          THE WITNESS:  Solely on my recollection.  That's why I

24  said I recall two phone calls with Mike Isikoff, I am pretty

25  sure on a Monday and a Wednesday.

LB189112                     Kreindler – Cross

1          THE COURT:  Thank you.

2          MR. HANSEN:  In the interest of time, I will ask

3   counsel for Kreindler & Kreindler to stipulate there were

4   actually three calls, according to the records they produced.

5   But if we don't have the stipulation, I will show Mr. Kreindler

6   the records.

7          MS. KIRSCH:  If you direct me to the document, I will

8   take a look.

9          MR. HANSEN:  Sure.  Exhibit 122.

10          MS. KIRSCH:  This would have been much easier to do in

11   advance of the hearing, which is why we asked to see the

12   documents.

13          MR. HANSEN:  There are three entries.  It shouldn't

14   take that long to look.

15          Maybe it will go quicker if I put the exhibit up.  Why

16   don't we put up Exhibit 142, please.

17   BY MR. HANSEN:

18   Q.  Mr. Isikoff's phone number is 258-2535, area code 202,

19   correct?

20   A.  I don't remember, but if you say so, sure.

21   Q.  And you have a phone number 914 and starting with a 589

22   prefix?

23          MS. KIRSCH:  I am sorry.  Did we continue?  I was

24   still looking at the phone records.

25          THE COURT:  He was pulling them up for you.  Would you

LB189112                        Kreindler – Cross

1   like to wait?  Have you seen these?

2              MS. KIRSCH:  We were trying to look through.

3              I am going to renew my standing objection that to put

4   this binder in front of me while the hearing has just begun is

5   a very inappropriate way to proceed, and if it takes me time to

6   look at the documents, it takes me time to look at the

7   documents.

8              MR. HANSEN:  With all respect, your Honor --

9              MS. KIRSCH:  I request that counsel not proceed with

10  questioning when he sees that I am looking at a document.

11             MR. HANSEN:  Your Honor, never --

12             THE COURT:  It's impossible for the court reporter to

13  do her job when everybody is speaking.

14             So, Ms. Kirsch, take your moment, look at the exhibit.

15             Mr. Hansen, please sit tight, and as soon as Ms.

16  Kirsch tells you that she is ready, you can proceed.

17             MS. KIRSCH:  Document 142 reflects three phone calls

18  incoming from Mr. Isikoff's phone number to Mr. Kreindler in

19  June, correct.  If they want to talk about the time or the

20  date, you will still have to show Mr. Kreindler the document

21  himself so that he can see it.

22             THE COURT:  Thank you.

23             MR. HANSEN:  Could we have a stipulation there were

24  three calls?

25             THE COURT:  Yes.  She agrees there are three calls.

LB189112                    Kreindler - Cross

1   BY MR. HANSEN:

2   Q.  So, Mr. Kreindler, you also had text messages with

3   Mr. Isikoff, correct?

4   A.  A couple, yes.

5   Q.  Did you check those before submitting your sworn testimony?

6   A.  Yes.

7   Q.  So why didn't you tell us about those?

8   A.  I thought you were asking me about phone calls.

9   Q.  Well, I am sorry if I was unclear.  Your declaration talks

10  about recalling two phone calls.  In fact, we now know there

11  are three.  Your declaration doesn't say anything about text

12  messages.  Were there text messages in addition to phone calls

13  that you did not put in your sworn declaration?

14  A.  My declaration was about my talking to Mike Isikoff.  I

15  later found some, practically nothing text messages, which I

16  guess you have.

17  Q.  That's just not my question, Mr. Kreindler.  I will try one

18  more time.

19  A.  Sure.

20  Q.  When filing a sworn declaration with your court about your

21  contacts with Mr. Isikoff on September 27, were you aware that

22  in addition to phone calls, you also had text messages with

23  him?

24  A.  Sorry.  You know, I don't remember when we found the text

25  messages.  We had a procedure where we had to turn over all of

LB189112                    Kreindler - Cross

1    our phones, but I don't remember whether -- I think that was

2    after the declaration.

3    Q.  Did you do a search of your text messages before September

4    27 so you could provide truthful testimony to the court?

5    A.  First of all, my testimony is truthful.  I stated what I

6    recall, and I recalled those two phone calls with Mike Isikoff.

7    Q.  Not my question.  Please listen carefully.

8         Before submitting your sworn declaration, which dealt

9    with the subject of communications with Mr. Isikoff, did you

10   conduct a search or have anyone working for you conduct a

11   search of your text messages, yes or no?

12   A.  I don't think I did.

13   Q.  So, in addition to telephone calls and text messages with

14   Mr. Isikoff, you also e-mailed Mr. Isikoff in July 2021,

15   correct?

16   A.  I don't remember.

17        MS. KIRSCH:  Your Honor, once again, would you like to

18   show Mr. Kreindler a document?  This is not a memory test.

19        THE COURT:  Is there a particular e-mail you would

20   like to ask Mr. Kreindler about or are you just asking whether

21   he recalls having e-mail communication during the relevant

22   period?

23        MR. HANSEN:  The latter, your honor.  I am just

24   establishing the fact that he knew.

25        THE COURT:  Do you have a recollection of having sent

LB189112                    Kreindler - Cross

1   e-mails to Mr. Isikoff during the relevant period?

2          THE WITNESS:  I don't recall, and I am happy to look

3   at it, and if there is one, I can say something about it.  As I

4   sit here now, I don't recall e-mails with Mike Isikoff.  I

5   recalled the phone conversations.

6   BY MR. HANSEN:

7   Q.  Mr. Kreindler, before submitting your sworn testimony about

8   your communications with Mr. Isikoff on September 27, did you,

9   yourself, or anybody working under your direction undertake a

10  search of your e-mails with Mr. Isikoff?

11         MS. KIRSCH:  I am going to object to that question as

12  well.  The declaration says what it says.  He hasn't

13  established that there is anything untruthful, and

14  characterizing the declaration and implying what Mr. Kreindler

15  should or should not have done is an improper question.  He can

16  give him the declaration.  He can ask if it's true.  Counsel is

17  testifying and making misleading questions.

18         THE COURT:  One of the subject matters before the

19  court is whether or not anybody submitted false statements to

20  the court, and the inquiry that Mr. Kreindler is responding to

21  in the September 27 declaration asks to identify all

22  communications, whether oral or written.  And Mr. Kreindler

23  prepared his declaration based, it sounds like, on his

24  recollection and reported two phone calls.  I think Mr. Hansen

25  is entitled to ask questions about whether there were any other

LB189112                    Kreindler - Cross

1    oral or written communications that he failed to include in

2    this declaration.

3           You can proceed.

4    BY MR. HANSEN:

5    Q.  Do you recall, Mr. Kreindler, that there were a number of

6    e-mails between you and Mr. Isikoff in July?

7    A.  Yes, there were some e-mails.  When we found out about the

8    leak, my partner Duke undertook --

9    Q.  We will get there, Mr. Kreindler.  I am just asking you a

10   simple question.

11          Were you aware before September 27 that there as many

12   as nine different e-mails between you and Mr. Isikoff?  That's

13   a yes or no question.

14          MS. KIRSCH:  Your Honor, can we please put Mr.

15   Kreindler's declaration in front of him so he can read it?

16          MR. HANSEN:  I am asking about the subjects.  I am not

17   even asking about the declaration right now.

18          THE COURT:  Let's move on to another area of

19   questioning.  I think we have established what we need to

20   establish.  To the extent you want to move to the e-mails,

21   let's move to the e-mails.

22          MR. HANSEN:  Thank you.

23   BY MR. HANSEN:

24   Q.  You would agree, Mr. Kreindler, that e-mails from the

25   Kreindler & Kreindler e-mail address are readily detectable and

1   investigable by members of your staff, correct?

2            MS. KIRSCH:  With all due respect, his declaration

3   does reference e-mails.  There is an impression being created

4   that his declaration does not reference e-mails.  He is

5   cleverly not presenting the declaration so we can all take a

6   look at it.  These questions are inappropriate.

7            THE COURT:  Mr. Kreindler, I will refresh your

8   recollection.  You said in your declaration, "I exchanged

9   several e-mails with Isikoff, all of which are attached to the

10  accompanying declaration of John Hartney."  That is what is in

11  the declaration.

12           Mr. Hansen, you can proceed.

13  BY MR. HANSEN:

14  Q.  So my question is, e-mails can be readily searched and

15  found on your system, correct?

16  A.  I think so, but I think you should ask John Hartney about

17  that.  The computer system is not my specialty.

18  Q.  Let's talk about the lead-up to the leak.

19           You were consulting with Mr. Fawcett at the very same

20  time you were working with Mr. Isikoff on his podcast episode

21  that aired on July 10, 2021, correct?

22  A.  I work with John Fawcett every day.  So, by definition,

23  sure.

24  Q.  Let's just look at the call record you had with him.

25           You spoke to Mr. Isikoff at 1:42, page 3.

LB189112                          Kreindler - Cross

1           THE COURT:  Can you give Ms. Kirsch an opportunity to

2    review?

3           MR. HANSEN:  Of course, your Honor.

4           Exhibit 142, page 3, a single entry.

5           MS. KIRSCH:  OK.

6    Q.  Mr. Kreindler, it looks like 6/28/21, that's July 28,

7    Mr. Isikoff's number.

8           THE COURT:  6/28 would be June.

9           MR. HANSEN:  Sorry.

10   Q.  Seven minutes.

11          Do you recall what you were speaking to Mr. Isikoff

12   about on June 28?

13   A.  Yeah.  That was a Monday, right?

14   Q.  I don't remember.

15   A.  As I said, I remember speaking to him on a Monday and a

16   Wednesday after the Jarrah deposition.  And the Monday

17   conversation was much longer, so I assume this is the Monday

18   conversation.  Yes.  And I remember it well.

19   Q.  What were you speaking with him about?

20   A.  So he called me up.  He, other reporters in the world knew

21   the schedule for the depositions of the Saudi government

22   officials who we were deposing.  He called me up and said, You

23   guys deposed Jarrah at the end of last week, didn't you?  I

24   said, Yeah, my partner, Megan Benett, took Jarrah's deposition.

25   Then he said, What can you tell me about it?  And I said, Mike,

LB189112                          Kreindler – Cross

1    I wish I could tell you everything about it, I would love to be
2    able to tell you everything about it, but I can't.  The only
3    thing I can say is, we were very, very happy, we were delighted
4    with how the deposition went and what it revealed.  And then he
5    was fishing for some more information, and I said, I'm sorry,
6    I'm sorry, I wish I could.  Let me get back to the team and see
7    if there is any part of the deposition that was not marked
8    confidential that we could share.
9              Then the second call I think was on the Wednesday.
10   Q.  We are on the first call.
11   A.  I'm just telling you the story.
12   Q.  So, after you spoke to Mr. Isikoff on the 28th, almost
13   right after, at 12:23 -- I am going to let your attorney look
14   at Exhibit 134, and the references I will be asking about are
15   at the bottom of page 1 and the top of page 2.
16   A.  Yeah.  That's 12:22 or 12:23.  One minute, yes.
17              MR. HANSEN:  Let me know when you're ready to proceed.
18              MS. KIRSCH:  Go ahead.
19   Q.  So we established the call with Isikoff was around 11:36 in
20   the morning.  It lasted seven minutes.  And here you are
21   speaking with Mr. Fawcett at 12:22 and 12:23.  And in those
22   calls, you are directing Mr. Fawcett to get 9/11 case materials
23   to Mr. Isikoff, aren't you?
24   A.  These are calls with John?  No, I don't think so.
25              First of all, that's not what I asked John.  I asked

LB189112                    Kreindler - Cross

1  John, is there any part of the Jarrah deposition not marked

2  confidential that we could share?  And he said, No, it's all

3  confidential.  That's why the whole call is a minute.

4  Q.  So you specifically directed Mr. Fawcett not to share any

5  information with the reporter?

6  A.  The topic -- I told you exactly what that one-minute call

7  was.  John, is there any part of the Jarrah deposition not

8  confidential under these orders that we could share with

9  Isikoff who is asking about the deposition?  And John said no.

10        MR. HANSEN:  Your Honor, the next thing I am going to

11  ask Mr. Kreindler about is a podcast excerpt, which we could

12  play the audio of, but I know you have instructed us to give

13  time for Kreindler counsel to listen to it.  We have a

14  transcript.  I don't know if this is a good time to have a

15  break.

16        THE COURT:  I was just going to raise that.  Let's

17  take a quick five-minute break.  You can give Ms. Kirsch an

18  opportunity.

19        Thank you.  We are briefly adjourned.

20        (Continued on next page)

21

22

23

24

25

LB1H9113                    Kreindler - Cross

1          THE COURT:  Just for some housekeeping matters, we're

2    going to break at 1:00 for lunch.  I'd like the lawyers to

3    start coming back in at 1:45 so that we can really begin at

4    2:00.  So for the court reporter, back at 2:00, but I want at

5    2 o'clock start questioning the witness again.  So we've got an

6    hour now.

7          Go ahead, Mr. Hansen.

8          MR. HANSEN:  Thank you, your Honor.

9    BY MR. HANSEN:

10   Q.  Mr. Kreindler, I'm going to play part of your podcast with

11   Mr. Isikoff, Exhibit 39, and ask you some questions about it.

12         (Audio played)

13         I'll play another excerpt where you purport to

14   summarize the contents of these depositions.

15         (Audio played)

16         Mr. Kreindler, that's you talking to the press,

17   telling the press, about the contents of sealed depositions,

18   isn't it?

19   A.  No.

20   Q.  So you're telling this Court under oath that when you say

21   witnesses and sworn testimony inculpated every Saudi official,

22   that's not revealing or purporting to reveal the contents of

23   those depositions?

24   A.  No, it is not.

25   Q.  After the taping on -- the taping was on July 1, is that

LB1H9113                         Kreindler - Cross

1   correct?

2   A.  I think so.

3   Q.  The next day you had a call with Mr. Fawcett.  Do you

4   recall that?

5   A.  Not specifically, no.

6   Q.  Let's look at Exhibit 134, page 1.  If you look at the

7   yellow highlighting, it's an 18-minute call between you and

8   Mr. Fawcett.

9   A.  OK.

10  Q.  In that call, following up on your podcast taping with

11  Mr. Isikoff, you told Mr. Fawcett to disclose transcript

12  material to Mr. Isikoff, didn't you?

13  A.  No, absolutely not.

14  Q.  What did you tell him about?

15  A.  I don't know, but I didn't and never would ever, ever, ever

16  do that.

17  Q.  Mr. Fawcett reached out to Mr. Isikoff the very next day in

18  a call that we've highlighted.  You see those?  Actually,

19  there's four calls.  That's Mr. Isikoff's number.

20          Why is it that Mr. Fawcett is reaching out to

21  Mr. Isikoff the very day after you spoke to him following the

22  podcast?

23  A.  I don't know.  I don't remember.

24  Q.  In fact, that's about the time Mr. Fawcett leaked the

25  sealed transcript, the Al Jarrah deposition, to Mr. Isikoff,

LB1H9113                          Kreindler - Cross

1    isn't it?

2    A.  How would I know that?

3    Q.  The Isikoff podcast was broadcast on July 10, correct?

4    A.  I think so.

5    Q.  We just listened to it, and we listened to your comments

6    attacking the FBI protective order.  And I want to direct you

7    to two days later to an email on your system that was sent by

8    Mr. Fawcett to Mr. Isikoff.

9           If you could pull up 56F at page 13.  This was an

10   email that was disclosed only after multiple court orders.

11          MS. KIRSCH:  Your Honor, I'd like a minute to look at

12   the document.

13          THE COURT:  Sure.  This was submitted, I believe, by

14   Mr. Hartney, is that correct?

15          MR. HANSEN:  It was attached to the Hartney

16   declaration in September 27, I believe, your Honor.

17          MS. KIRSCH:  OK.  That's fine.

18          THE COURT:  You can proceed.

19   BY MR. HANSEN:

20   Q.  OK.  So just to get you oriented, Mr. Kreindler, we're

21   looking at an e-mail from John Fawcett of Kreindler & Kreindler

22   to Michael Isikoff dated July 12.  There's an attachment of an

23   unclassified privilege log, and there's no discussion.  It's an

24   empty message.  But if we go on and look at the documents, I

25   believe we can show you that this is the FBI's privilege log

LB1H9113                    Kreindler - Cross

1  indicating which documents the FBI was not turning over because

2  of its concerns about the public interest.

3           So my question to you, sir, is were you aware that

4  Mr. Fawcett was providing this document to Mr. Isikoff on or

5  about July 12?

6  A.  I was aware that John gave him the list of -- the public

7  list of documents the FBI was withholding.  I don't recall the

8  date.

9  Q.  Did you know he'd done it by email?

10  A.  I don't know how else he would do it.

11  Q.  Did you know, even if you don't recall exactly, was it

12  approximately around the time of the broadcasting of your

13  podcast with Mr. Isikoff?

14  A.  More or less, perhaps.  I just don't -- I don't recall when

15  he did it.  I do recall at some point we gave Mike -- John gave

16  Mike Isikoff the public list of the documents that the DOJ was

17  withholding, and -- I'll stop there.  I can say more if you'd

18  like.

19  Q.  And he did that at your instruction, correct?

20  A.  Probably.  I don't recall a specific moment on what day I

21  said, John, can you send the privilege log to Mike Isikoff.

22  Q.  So the next day, on July 13, Mr. Isikoff emails you.  And

23  we'll put up Exhibit 56F, page 24.  It's an email from Michael

24  Isikoff to Jim Kreindler checking in.

25  A.  Right.

LB1H9113                    Kreindler - Cross

1   Q.  And Mr. Isikoff writes -- and this, by the way, is the day

2   after Mr. Fawcett sends the FBI privilege log -- "Hi, Jim,

3   where do you stand on your request to DOJ to lift the state

4   secrets privilege and gag order?"

5           Do you recall getting that email?

6   A.  Yes, I do.

7   Q.  This also related to what Mr. Fawcett had sent to

8   Mr. Isikoff, correct?  This is further discussion about these

9   documents the FBI is holding back, right?

10  A.  Yes.

11  Q.  OK.  Are you speaking with Mr. Isikoff around July 13?

12  A.  I don't recall.  I just remember those two conversations

13  that I told you about.

14  Q.  Surely at some point Mr. Isikoff calls you and says, in

15  substance:  Hey, Jim, I've got the Al Jarrah transcript.  You

16  care to comment on it?

17  A.  That never, ever, ever happened.

18  Q.  Why would he not?  If he'd gotten the transcript from some

19  other source, it would be a perfectly natural thing for a

20  reporter to call a willing source like you to see if you had a

21  comment on it, wouldn't it?

22  A.  No.

23          MS. KIRSCH:  That calls for speculation as to what

24  Mr. Isikoff was or wasn't thinking.  It's an improper question,

25  and it's also argumentative.

LB1H9113                        Kreindler - Cross

1        THE COURT:  The question is -- the objection is

2   sustained with respect to what Mr. Isikoff was thinking, but I

3   don't think it's argumentative.  So it's overruled on that

4   ground.

5   Q.  I'm not asking you what Mr. Isikoff was thinking, but

6   didn't reporters, including Mr. Isikoff, call you pretty

7   routinely for comments on materials that they had obtained from

8   other sources?

9   A.  It may have happened.  As I think about it, I can't

10  remember a specific -- I don't remember that ever happening,

11  but it could have.

12  Q.  Reporters always try to get quotes from sources, don't

13  they?

14  A.  I can't speak to what all reporters always do.

15  Q.  Do you think the reason why Mr. Isikoff did not reach out

16  to you for comment on the transcript was because he knew that

17  your firm had provided it to him in violation of the court

18  order, and he didn't want to compromise you?

19       MS. KIRSCH:  Calls for speculation.

20       THE COURT:  Sustained.

21  Q.  Did you ever wonder why Mr. Isikoff had never asked you

22  about this transcript?

23  A.  No.  We only found out about it on September 27.

24  Q.  Well, you knew about the leak long before September 27,

25  correct?

LB1H9113                    Kreindler - Cross

1   A.  I knew about the leak when I read Mike Isikoff's article

2   the day it was published in Yahoo! News.

3   Q.  That's just where we're going next.

4           So you did see the story on the day it was published,

5   correct?

6   A.  Yes.

7   Q.  And you knew that the transcript that the reporter had was

8   a confidential transcript, correct?

9   A.  All I knew was what the story said, and my recollection is

10  Mike Isikoff's story said I've -- I've obtained pages of the

11  Jarrah deposition.

12  Q.  Well, that's not my question.

13          Did you know it was a confidential transcript that

14  Mr. Isikoff had obtained?

15  A.  I knew the transcript was confidential.  I didn't know what

16  really happened.  All I knew was what Mike Isikoff said in his

17  piece.

18  Q.  And you knew on July 15 that your firm was a likely source

19  of the leak, didn't you?

20  A.  No, absolutely not.  I had an idea who the likely source

21  was, but I absolutely believed it was no one from our firm.

22  Q.  So let's look at Exhibit 56A at paragraph 5, which is your

23  declaration, and we'll go to paragraph 5.  You wrote in your

24  declaration filed September 27 that you asked Mr. Maloney, your

25  partner, to conduct an internal investigation, and that was

1    right after getting off the telephone call on or about July 15,

2    correct?

3    A.  I'm sorry.  You lost me.  Which telephone call on July 15?

4    Q.  Let's go up a paragraph.  Let's go up to four.

5            You say on the 15th you had a conference call with

6    other members of the PEC?

7    A.  Yes.

8    Q.  And was that on July 15?

9    A.  I think so.

10   Q.  So now let's go to five.

11   A.  Yeah.

12   Q.  After the call, so is this on the 15th as well?

13   A.  Yes.

14   Q.  You say you asked Mr. Maloney "to conduct an internal

15   investigation to determine whether anyone at Kreindler was

16   responsible for providing the information to Isikoff," correct?

17   A.  Yeah, that's exactly what it says.

18   Q.  And all of the people on your team who had access,

19   according to you, to the Al Jarrah transcript were suspects in

20   that investigation, weren't they?

21   A.  No, none were suspects.

22   Q.  Well, then who were you investigating?

23   A.  We had to do an internal investigation.  We talked about it

24   first, obviously.

25   Q.  Wait, wait, wait.  It's a "who" question.  Who were you

LB1H9113                        Kreindler - Cross

1   investigating when you tell Mr. Maloney to conduct an internal

2   investigation?

3   A.   I -- OK.

4          MS. KIRSCH:  Mischaracterizes the witness' testimony,

5   but he can testify now.

6   A.   Sure.  I was asking Duke to work with John Hartney on our

7   computer system to search all communications with Isikoff, the

8   Jarrah deposition to see if -- if there's anything on our

9   system that would indicate anyone at the firm sent it, because

10  it was my absolute belief that no one did or would, but we had

11  to prove it by going through the whole computer system.

12  Q.   Can I ask my question one more time?

13  A.   Sure.

14  Q.   Who were you investigating?  Anybody?

15         MS. KIRSCH:  Objection.

16  A.   No one.

17  Q.   So Mr. --

18         THE COURT:  Objection's sustained.

19  A.   It was blanket.

20         THE COURT:  Sorry.  I think we're getting a little

21  caught up on the terms "investigation" and "investigating."  I

22  don't think, Mr. Hansen -- the Court is not interrupting it as

23  a loaded word.  There's an investigation.

24         I think the question, Mr. Kreindler, that Hansen is

25  asking is did you give any direction or have any conversation

LB1H9113                        Kreindler – Cross

1   with Mr. Maloney about who he should speak with or whose files

2   he should look to as part of this internal investigation that

3   he was leading?

4                THE WITNESS:  Yes, I did.

5                THE COURT:  OK.  I think Mr. Hansen would like to know

6   who you suggested should be part of that search and review.

7                THE WITNESS:  I -- I or Duke said:  Why don't you,

8   Duke, work with John Hartney to run through the whole computer

9   system to make sure that there was nothing about the Jarrah

10  deposition transcript to Isikoff.

11  BY MR. HANSEN:

12  Q.   And that's it?  Nothing more?

13  A.   That was it.

14  Q.   Well, we know from Mr. Hartney now that there's no way

15  looking at your computer system would tell you anything about

16  who had downloaded the transcript, who had printed it out, and

17  who had given it to Mr. Isikoff, correct?

18               MS. KIRSCH:  That's actually not an accurate statement

19  of Mr. Hartney's declaration.

20               MR. HANSEN:  Let me rephrase, then.

21  Q.   Do you understand that anyone with Kreindler & Kreindler

22  employee login access can get access to the sealed materials on

23  the Kreindler system or could before September 27?

24  A.   No, I think not everyone could do that, only people who had

25  signed the protective order.

LB1H9113                    Kreindler - Cross

1   Q.  Is that because there was a policy of that, or was there

2   anything in the computer that prevented them from getting it?

3   A.  I can't answer how the computer works.  I can tell you that

4   from the time we had to deal with the first order through the

5   second DOJ order, we made sure that no one in the firm who

6   hadn't, as I did, gave my word to follow these orders could

7   look at -- could see the material.

8   Q.  How did you do that technologically?

9   A.  I have no idea.  That's -- you're asking the wrong person

10  on computer systems and technology.

11  Q.  In fact, there was nothing technologically that prevented

12  anyone with Kreindler & Kreindler employee access from getting

13  that transcript, printing it off, and leaving it on a bus for

14  Mr. Isikoff?

15          MS. KIRSCH:  Objection.  Mr. Kreindler just said he's

16  not the guy who knows how the system works.  That was actually

17  in this statement of what's in the record, and that's

18  inappropriate.

19          THE COURT:  The objection is sustained.

20          Mr. Kreindler, if you want to look at confidential

21  material on your system --

22          THE WITNESS:  Yes.

23          THE COURT:  -- can you describe for me generally what

24  you have to do to access that information.

25          THE WITNESS:  I only did one thing.  If I wanted to

LB1H9113                    Kreindler - Cross

1   see material, I would ask John, can you send me one of the

2   documents we're talking about?  So I'm trying not to use

3   anybody's names, but if I wanted to see --

4              THE COURT:  Document X.

5              THE WITNESS:  -- document X on Jarrah, I would just

6   call John --

7              THE COURT:  John Fawcett.

8              THE WITNESS:  -- John Fawcett, yeah, and say, Can you

9   show me this document.

10             THE COURT:  So you personally, in preparing for a

11  deposition or a motion or whatever, would never enter the

12  server yourself and look for documents?  You would rely only on

13  Fawcett to provide it?

14             THE WITNESS:  I never entered the search for myself.

15             THE COURT:  OK.

16             THE WITNESS:  I confess to that complete limitation.

17  I don't know how the server works.  A dozen of my partners are

18  here to confirm how frustrating it is because I need to ask

19  someone like John, can you send me a particular document.

20             THE COURT:  So I think the witness has established

21  that he is not competent to answer questions about how the

22  server works or how access is provided, so let's move on from

23  that topic of conversation.

24             MR. HANSEN:  Your Honor, of course, but I will return

25  to it when I get to Mr. Kreindler's declaration later when he

LB1H9113                          Kreindler - Cross

1    talks about who had access to the transcript because I believe
2    that's a fair question, but I'm not going to do it now.
3    BY MR. HANSEN:
4    Q.  All right.  So let's talk about this investigation.  You
5    could have assigned other lawyers in your firm who had no
6    involvement in the 9/11 case or access, in your words, to the
7    9/11 transcripts to do the investigation, correct?
8    A.  Anything is possible, but that would make no sense.
9    Q.  Well, you would agree with me, would you not, that in any
10   investigation to actually try to get to the facts, it would be
11   important to move quickly, correct?
12   A.  Of course.  No one wants to move slowly.
13   Q.  Well, one thing you'd want to do is keep evidence from
14   being destroyed, wouldn't you?
15   A.  No one wants to destroy evidence, or I certainly don't want
16   to destroy any evidence anytime.
17   Q.  Well, that's not my question, Mr. Kreindler.
18           You've told us in your sworn testimony that you
19   directed your colleague to do an internal investigation.  I
20   think you've agreed that it should be done quickly, and I'm
21   asking you were you aware, when you gave this instruction, of
22   the need to move quickly in order to prevent the destruction of
23   evidence?
24   A.  It never dawned on me that anybody would destroy evidence,
25   so I did not have that in my mind.  And I also have to say it

LB1H9113                    Kreindler - Cross

1  wasn't my directive or order to Duke to do it.  We talked about

2  it, and Duke said, I'll work with John Hartney and run through

3  our whole system to make sure that no one here had anything to

4  do with it.

5  Q.  In fact, if Mr. Fawcett is to be believed, evidence was

6  destroyed here, wasn't it?

7  A.  That's what John said later.

8  Q.  So as part of this internal investigation, again, only if

9  you know, were all of the Kreindler & Kreindler professionals

10  who you believed had access to the Al Jarrah transcript

11  immediately questioned?

12  A.  I think we were all there.

13  Q.  What do you mean you "were all there"?

14  A.  OK.  I am struggling with your question because it doesn't

15  reflect the actual discussions we had as soon as we got

16  together and talked about it.

17  Q.  So who got together and talked about it?

18  A.  Here's what I remember.  I read the article when I was at

19  home.  I came to the office, I think, later that day.  I

20  believe Steve Pounian was taking a deposition that day.  When I

21  got to the office, I spoke to John, John Fawcett, Duke, Andrew

22  Maloney, and said, we also -- oh, my God, I mean, where, you

23  know, did this come from?  Where did Isikoff get it?  And we

24  had -- we were talking about it kind of mystified, and I said

25  there's only one source that I could think of who would have

LB1H9113                       Kreindler - Cross

1   given it to Mike Isikoff now.  I can tell you what I said, if

2   you want to know or ask me later.

3   Q.  So other than that meeting that you've described, did you

4   give Mr. Maloney any directive to actually interview witnesses,

5   including all the members of the team who had access to the

6   transcript?

7   A.  It was at that meeting, that discussion, that Duke said I

8   will work with John Hartney.  I think Megan was in her office,

9   and I recall speaking to her later.  If I'm remembering

10  correctly, Steve was doing a deposition or preparing for a

11  deposition, so whatever I said to Steve later in the day was

12  very brief.  And then there was some internal discussion.  We

13  set up a PEC call to see -- talk about this and see if anybody

14  had any idea how Isikoff got it.

15  Q.  So if I'm hearing your answer correctly, and correct me if

16  I'm wrong, you did not give Mr. Maloney any instruction to

17  actually interview witnesses, did you?

18  A.  Interview?  I don't know who the witnesses you're talking

19  about are.

20  Q.  How about all the people who had the transcript who might

21  have leaked it?

22  A.  We all were -- all the lawyers working on the case, the

23  four of us and John, were part of this discussion.  Duke

24  volunteered to head up the -- you're calling it an

25  investigation -- to go through the system and make sure that no

LB1H9113                          Kreindler - Cross

1    one at the firm had anything to do with it.

2    Q.  OK.  I think you've answered my question.  Let me just ask

3    another question.

4           You worked very closely with John Fawcett.  Did you

5    personally ask John Fawcett:  John, did you leak this

6    transcript?

7    A.  I -- I did not do it as a Q & A.  I spoke to John.  I

8    didn't do it.  I know you didn't do it.  I have no idea who

9    could have done it.  The only party I could think of that would

10   have leaked this to Isikoff now was somebody on the Saudi side.

11   Q.  Now, Mr. Kreindler, let me just ask you to focus on my

12   question, please.

13          At any point, at any time, did you ever ask John

14   Fawcett whether he had provided the confidential transcript to

15   Mr. Isikoff?

16          MS. KIRSCH:  That was asked and answered, your Honor.

17          THE COURT:  I don't think it was answered, so you can

18   answer the question.

19   A.  I talked to John --

20   Q.  No, no, no, I don't want "talked to."  It's a simple

21   question.  I'd like a direct answer.

22          At any point in time, did you ever ask John Fawcett,

23   in words or substance, John, did you provide the Al Jarrah

24   transcript to Mr. Isikoff?

25   A.  No.

LB1H9113                      Kreindler - Cross

1   Q.  Did you direct anyone else to ask Mr. Fawcett that

2   question?

3   A.  No.  We just -- we talked about it.

4   Q.  The question is not what you talked about, with all

5   respect.

6          So since you started an investigation on July 15, when

7   was it that all of the firm's outgoing emails to Mr. Isikoff

8   were pulled and reviewed?

9          MS. KIRSCH:  Objection.  I think we've already talked

10  about the fact that Mr. Kreindler was not running that part of

11  the investigation and the technology piece was not something

12  that he was intimately involved with.

13         THE COURT:  Did you ever learn when the emails were

14  pulled in order to search for communications with Isikoff?

15         THE WITNESS:  More or less.  I don't remember the

16  date, but relatively quickly Duke, you know, spoke to John

17  Hartney and said, we've got to go through the whole system to

18  see if anyone emailed or had some way of sending the deposition

19  transcripts.  My recollection is Duke did that with John

20  Hartney pretty soon.  I just can't tell you the day or time

21  when he said to me, Jim, it's done, and there was nothing

22  there.

23         THE COURT:  OK.

24  BY MR. HANSEN:

25  Q.  So, Mr. Kreindler, based on your testimony, were you made

LB1H9113                    Kreindler - Cross

1   aware within a few days after July 15 that this email search

2   had pulled up the fact that Mr. Fawcett was in email

3   communication with Mr. Isikoff during the month of July?

4   A.  I knew John had some email --

5   Q.  No, no, this is about the email.

6           Were you made aware that they'd done a search; the

7   search had found an email from July 12 from Mr. Fawcett to

8   Mr. Isikoff sending case materials?  Were you aware of that?

9   A.  I was aware of the privilege log, if that's what you're

10  referring to.

11  Q.  Were you aware of the email sending the privilege log?

12  A.  I must have been.  I don't know how else he'd send the

13  privilege log to Mike Isikoff.

14  Q.  So when did you first become aware of the email sending the

15  privilege log from Fawcett to Isikoff?

16  A.  I don't know.

17  Q.  Was it before the leak was disclosed -- I'm sorry.  I'm

18  sorry.

19          Was it within a few days of July 15?

20  A.  I just don't remember when I saw the email from John to

21  Isikoff saying, here's the privilege log.

22  Q.  Again, I'm just asking whether you know.  You may or may

23  not.  When were the phones, the computer, cell phones, and

24  other devices of the Kreindler & Kreindler 9/11 case team

25  secured so they could be evaluated for evidence?

LB1H9113                    Kreindler - Cross

1   A.   Recently, with our lawyer Emily Kirsch, we had a whole

2   technological issue, and I was without my cell phone, my one

3   means of communication, for about four or five hours, which I

4   didn't particularly like, but managed.

5   Q.   I'm sorry.  Just so I'm clear, that was in October

6   sometime, wasn't it?

7   A.   That's the only time I gave my cell phone to tech people to

8   do whatever alchemy they did to pull information or the system

9   out of it.

10  Q.   As far as you're aware, no one else was asked to provide

11  devices, records, or other evidence prior to us asking for it

12  and the Court ordering it in October of this year?

13  A.   I'm not aware of anyone else turning over their cell phones

14  or computers until we went through this technological search

15  fairly recently.

16  Q.   Just before we leave this topic of your investigation,

17  according to your conversation with Mr. Maloney, your

18  expectation was the investigation was going to be Mr. Hartney

19  looking for evidence in your computer system that someone had

20  from your computer system provided the Al Jarrah transcript to

21  Mr. Isikoff, correct?

22        MS. KIRSCH:  Again, Mr. Kreindler was not involved in

23  the details of this so-called investigation.  That was

24  something that was tasked to Mr. Maloney.  He's not the right

25  witness for this topic.  This is a waste of time.

LB1H9113                          Kreindler - Cross

1           THE COURT:  I think he's testified, though, as to the

2   conversation he had with Mr. Maloney about what was expected,

3   so I think he can answer those questions.  I recognize he has

4   demonstrated he doesn't know the details of that investigation.

5   Q.  So can you answer my question?

6   A.  I've lost it by now.

7   Q.  Let's read it back to you.

8           (Record read)

9   A.  I think it was broader than that, that Duke would say I'll

10  check on all communications between anyone here and Mike

11  Isikoff in that time period.  But, you know, you'll be asking

12  him later today, I assume.

13  Q.  So what did you understand "all communications" to mean?

14  Phone calls?  Email?  Texts?  What?

15  A.  Whatever the system would show.  Certainly, I had in mind

16  emails.  If someone sent a text from a personal phone, I don't

17  know that that would be reflected anywhere in our computer

18  system.

19  Q.  So let's go to --

20  A.  I just don't know.

21  Q.  OK.  Let's go to July 21.  It's a few days after the

22  publication of Mr. Isikoff's story describing the confidential

23  transcript that was leaked to him.  Were you aware on July 21

24  that lawyers for the Kingdom requested that the PEC agree to go

25  to the court for a court-ordered investigation into the leak?

LB1H9113                     Kreindler - Cross

1    A.  I don't remember the day, but, certainly, I remember us

2    saying to the Court at around that time we, too, want to do

3    whatever we can to see who gave this prohibited information to

4    Mike Isikoff.

5    Q.  Well, let me give you little more specifics here.  Let's

6    pull up Exhibit 42 at page 3.

7    A.  OK.

8    Q.  This is an email that was sent to you, correct?

9    A.  Yeah.  Well, looks like an email sent to Steve, me, and

10   Duke.

11   Q.  And in the email, counsel for Saudi Arabia asks whether you

12   would consent to a motion requesting that the court direct all

13   entities or individuals to submit declarations, and so on.  Do

14   you recall getting that?

15   A.  Just generally.  I don't specifically recall this email,

16   but --

17   Q.  And that's --

18   A.  -- I do recall it generally.

19   Q.  That put you on notice that there was going to be a serious

20   problem, didn't it?

21   A.  No.

22   Q.  Well --

23   A.  It did not.

24   Q.  -- let's look at the phone records, then.  If we go to

25   Exhibit 135, the very next morning, after the Kingdom is asking

LB1H9113                    Kreindler - Cross

1   for a court-ordered investigation, you and Mr. Fawcett have a
2   phone call at 9:17.
3          Do you recall having that phone call with Mr. Fawcett
4   the morning after you got this communication from counsel for
5   Saudi Arabia saying that they're going to go to the court on
6   this?
7   A.  No.  I remember -- I don't remember what this phone call
8   was about.
9   Q.  It's a pretty long call, isn't it, 46 minutes?
10  A.  Yeah, it's 46 minutes.
11  Q.  You talked about the leak, didn't you?
12  A.  No.
13  Q.  You talked about the fact that the Court might order an
14  investigation, didn't you?
15  A.  Maybe, but I don't remember what this phone call was about.
16  It might have been the executive order.
17  Q.  You talked about the need for Mr. Fawcett to get a criminal
18  defense counsel, didn't you?
19  A.  No, absolutely not.  That would never have crossed my mind.
20  Q.  Who's Liz Crotty?
21  A.  Liz Crotty worked in our office as an associate.
22  Q.  And then she left your firm to go become a white-collar
23  defense lawyer, correct?
24  A.  I think so.
25  Q.  So explain for us why it was that immediately after your

LB1H9113                    Kreindler - Cross

1   call with Mr. Fawcett, he calls Liz Crotty and talks to her for

2   22 minutes?

3   A.   I have no idea why John called Liz Crotty.  I don't think

4   I've spoken to her for years.

5   Q.   Did you give Mr. Fawcett her information?

6   A.   No.

7   Q.   Do you know if they're friends?

8   A.   I know he knew her, as we all did, because she worked in

9   the office.

10  Q.   But the only reason he'd be calling Liz Crotty after your

11  46-minute phone call would be his concern that there was going

12  to be a big problem based on what you all had done with this

13  sealed transcript, right?

14       MS. KIRSCH:  Objection.

15  A.   Wrong.

16       MS. KIRSCH:  Objection.  All of this calls for

17  speculation.  There's no foundation why Mr. Fawcett made any

18  call that he did.

19       THE COURT:  Sustained.

20  Q.   Do you have any explanation for this call sequence,

21  Mr. Kreindler?

22  A.   I don't see it as a sequence.  I have no idea why John

23  called Liz Crotty then, absolutely none.

24  Q.   How about why did John call you back immediately after

25  hanging up with Ms. Crotty?

LB1H9113                    Kreindler - Cross

1          MS. KIRSCH:  Objection.  More speculation.

2          THE COURT:  Overruled.

3          You can answer.

4   A.  I have no idea.  I don't remember what we were talking

5   about then.  Given the time period, I think it was more likely

6   moving toward Joe Biden's executive order than anything we're

7   discussing today.

8   Q.  Do you remember anything about your five-minute call with

9   Mr. Fawcett that followed his 22-minute call with Ms. Crotty?

10  A.  I don't remember anything about this call, but as I've told

11  you before, probably not a day goes by that I'm not talking to

12  John Fawcett about our case and how we can move it forward.

13  Q.  Well, on the 23rd of July, the Kingdom of Saudi Arabia did

14  indeed go to court and request a thorough court investigation,

15  correct?

16  A.  I can't remember the date, but I remember that that's what

17  Saudi Arabia did, and there was a brouhaha.  We suggested a

18  meet-and-confer, and that never happened.  They moved.  There

19  was the limited meet and confer.  The order resulted.

20  Q.  Kreindler & Kreindler, alone among all firms in this case,

21  resisted a court-ordered investigation, isn't that the truth?

22          MS. KIRSCH:  Objection.

23  A.  No.

24          MS. KIRSCH:  It's both false and it mischaracterizes

25  the facts.

LB1H9113                    Kreindler - Cross

1          THE COURT:  Overruled.

2          You can answer the question.

3   A.  No.

4   Q.  All right.  Let's look at what your colleague Mr. Pounian

5   wrote on July 23 at Exhibit 43A, pages 4 to 5.

6          MR. ROBERTS:  Counsel, that has an MDL protective

7   order.  Should I just leave it?

8          THE COURT:  Is there an application?

9          MR. HANSEN:  Your Honor, I think he's being careful to

10  make sure that they have a chance to object before we put up

11  the document.

12         MS. KIRSCH:  Thank you.  I would like to take a moment

13  to read the document.

14         Kreindler & Kreindler does not have an objection.  I

15  don't know whether the other PECs do.

16         THE COURT:  I don't know that they are here or have an

17  argument to be made.  I see --

18         MR. CARTER:  Your Honor, this is Sean Carter, for the

19  PECs.  We're here, but we do not have a copy of the exhibit

20  binder, so I don't know what it contains.

21         MR. MIGLIORI:  Don Migliori from Motley Rice also on

22  behalf of the PECs.  I do not have a copy either.

23         MR. HANSEN:  Well, I don't want to slow things up, so

24  why don't I just ask Mr. Kreindler to look at it for himself.

25  I won't show it on the screen.

LB1H9113                    Kreindler - Cross

1  Q.  If you'd look at Exhibit 43A, pages 4 and 5, in that

2  exhibit binder.

3  A.  43A?

4  Q.  The A behind the tab 43.

5  A.  I see a 43, but not a 43A.  Oh, I see it.  OK.  Yes.

6  Q.  So my question, sir, is isn't it true that your colleague,

7  on behalf of your firm, said you weren't consenting to a

8  court-ordered investigation?

9  A.  No, I don't think that's what -- no, it's not true.

10 Q.  In fact, Mr. Pounian communicated that the Kreindler firm

11 had completed an internal review of the handling of the Jarrah

12 transcript and the conduct of Michael Isikoff and had

13 determined that it hadn't been the leaker, right?

14 A.  I'm looking for Steve's email.  Sorry.

15 Q.  Take your time.  Read as much as you'd like.

16 A.  Are you talking about Steve's email Friday, the 23rd, at

17 3 o'clock to Greg Rapawy?

18 Q.  If you look at page 4 of 5 of that -- I wish I could show

19 it on the screen for you, but I'm not going to -- pages 4 to 5,

20 there will be emails from your colleague to opposing counsel.

21 A.  OK.  At the top of page 4, yeah.

22 Q.  Isn't it true that your colleague represented to opposing

23 counsel that Kreindler & Kreindler had completed its own

24 internal review, and it had determined that the transcript

25 wasn't released by Kreindler & Kreindler?

LB1H9113                    Kreindler - Cross

1   A.  I may be looking at the wrong place, but I believe that's

2   true.

3            Oh, yeah, I see it.  Each firm has determined that the

4   transcript was not released through our firms or others working

5   with our firms and are prepared to document the facts if

6   necessary.  So that's exactly what Steve said.

7   Q.  Did you approve this email before it went out?

8   A.  No, Steve handled it.  He's my partner.

9   Q.  Were you copied on it?

10  A.  Let me see.  It looks that way, yeah.

11  Q.  So we're talking about six business days after the July 15

12  leak, correct?

13  A.  That's when this email went out, yes.

14  Q.  So what had Kreindler & Kreindler done between the 15th and

15  this date, the 23rd, so that it could make this representation

16  that it had determined it wasn't the leak?

17           MS. KIRSCH:  I'll just renew my objection that the

18  details of the investigation were not Mr. Kreindler's

19  responsibility.

20           THE COURT:  Understood.  You can answer, to the extent

21  you have information to answer.

22  A.  I don't.  Duke and Steve were working on it.

23  Q.  OK.  Let's just cut ahead to July 27.  After Saudi Arabia

24  applied to the court, your firm and the other firms went back

25  to the court and submitted a letter in which you again stated

LB1H9113                    Kreindler - Cross

1  that each of the lead PEC firms was confident it was not the

2  source of the leak.  Did you approve that letter before it went

3  out?

4  A.  I don't know which letter you're --

5  Q.  I'm sorry, Exhibit 43.

6         I don't know if there's an objection to -- if anybody

7  wants to object to us putting it up.

8         MS. KIRSCH:  The Kreindler firm has no objection, but

9  again, I don't know if the other PECs do.

10         MR. MIGLIORI:  Your Honor, Donald Migliori.

11  Obviously, without the document, we don't know what's being

12  shared.  I think the way it was handled just recently protects

13  any potential disclosure of work product or communications

14  within the plaintiffs.  So as long as the questions are limited

15  to the conduct of the Kreindler law firm and not disclosing

16  communications, we would object to any public disclosure of the

17  document or questions that go outside the scope of that narrow

18  language.

19         THE COURT:  I believe this is a July 27 letter filed

20  to the court that I believe is currently under seal, but it may

21  not be under seal at some point in the future, but it's

22  currently under seal and subject to the MDL protective order.

23         MR. HANSEN:  Well, your Honor, I don't want to take

24  more time than we need.  It certainly would be better if we

25  could show Mr. Kreindler what we're talking about, but I'll try

LB1H9113                          Kreindler - Cross

1    and do it another way.

2    BY MR. HANSEN:

3    Q.  So, Mr. Kreindler, take a look --

4              THE COURT:  You want to take a minute and show counsel

5    briefly?

6              MR. HANSEN:  I'll just show Mr. Kreindler.  I don't

7    think he objects to me showing Mr. Kreindler without showing it

8    on the screen.  I don't really want to take the time.

9              THE COURT:  OK.

10   Q.  Mr. Kreindler, take a look at Exhibit 43.

11   A.  OK.

12   Q.  It's a letter.  Did you review that letter before it was

13   filed with the court?

14   A.  No.  Steve did.

15   Q.  As the cochairman of the PEC, do you not at least review

16   letters filed with the court by the PEC?

17   A.  Sometimes, but I also rely upon my partners.

18   Q.  So, once again, this time in an official document sent to

19   the court, Kreindler & Kreindler is signing on to a letter in

20   which it is saying it's finished its internal investigation,

21   and it's confident that Kreindler & Kreindler didn't do it,

22   isn't that correct?

23   A.  If we're looking at the same thing, this July 27 letter

24   signed by Steve, Bob Haefele, and Sean Carter says we've done

25   investigations, and we're confident that these firms did not

LB1H9113                    Kreindler - Cross

1    have anything to do with the leak.

2    Q.  Just in the interest of completeness, I'll ask you again,

3    if you know, what investigation actually had been done by

4    Kreindler & Kreindler prior to July 27 in order to make this

5    representation to the court?

6              MS. KIRSCH:  Objection.

7              THE COURT:  You can answer the question.

8    A.  I can't tell you anything in addition to what I've said

9    already, that Duke headed up this effort to make sure that, as

10   far as we knew, no one at the firm gave Jarrah portions to Mike

11   Isikoff.

12   Q.  As the leader of your firm's team, as the cochairman of the

13   Executive Committee, wouldn't you want to satisfy yourself

14   about the accuracy and basis for any factual representation

15   being made to this Court?

16   A.   In this case, with the millions of letters, there are many

17   times when I've relied upon my co-lead counsel at Motley or

18   Cozen or my partners Steve, Megan, or Duke.  We do not -- it

19   would be impossible for every lawyer to review every document.

20   We'd never get anything out the door.

21   Q.  So let's go to July 29.

22             THE COURT:  May I ask a question on this exhibit, if

23   you don't mind?

24             MR. HANSEN:  Of course.

25             THE COURT:  Mr. Kreindler, I'm just curious on the

LB1H9113                      Kreindler - Cross

1   signature line of this letter submission, it lists Mr. Pounian,

2   who appears to be the signer of the letter, and Mr. Maloney and

3   Ms. Benett.  Was there a deliberate decision for you not to

4   sign this letter?

5           THE WITNESS:  No.

6           THE COURT:  Typically, all the firms are listed -- all

7   the lawyers, excuse me, are listed under your firm name.

8           THE WITNESS:  No, there was no deliberate decision.

9   What I can tell you is it was Duke who was doing the

10  investigation, later Megan prepared the declarations.

11          THE COURT:  Could you be sure to speak into the

12  microphone.

13          THE WITNESS:  I'm sorry.

14          THE COURT:  That's OK.  Duke prepared the

15  investigation.

16          THE WITNESS:  With the mask, it's even more difficult.

17          To answer the question is those were my three partners

18  who were really handling the details of this.  And to put it in

19  context so you know where I was and what I was doing, my

20  principal focus this last -- or a principal focus, the very end

21  of July and August was getting the 26 team review publicly

22  released, as Joe Biden did on 9/11, and getting a process under

23  way for declassification of the FBI documents.  So we had a

24  division of labor.

25          I had the discussion with Duke and John and Steve and

LB1H9113                    Kreindler – Cross

1   Megan about the leak, and since I had no idea and was confident

2   no one at the firm was doing it, this matter of communicating

3   with your Honor and providing information, other additional

4   information, you wanted was really being handled by Duke,

5   Steve, and Megan, and my focus was seeing that the FBI

6   documents would begin to come out in a public way by 9/11.

7           THE COURT:  So you don't have a specific recollection

8   of electing not to be on this letter?

9           THE WITNESS:  Correct.

10          THE COURT:  OK.  You can proceed.

11  BY MR. HANSEN:

12  Q.  So if we go to July 29, Mr. Kreindler, on that date two of

13  the four Plaintiffs' Executive Committee firms, without court

14  order, put in detailed proof, including sworn statements from

15  everybody at their firms who had access to the transcript, and

16  they described their internal investigations.  And I'm

17  referring specifically to Cozen, O'Connor and Motley Rice.

18  Were you aware they had done that?

19  A.  Yes.

20  Q.  Why didn't you do it?

21  A.  Our approach and the approach of some the other firms was

22  to provide the information that the Court requested.  If the

23  Court wanted more information, we would provide it.  But in the

24  history of this case, I can tell you that oftentimes, maybe on

25  a daily basis, we'll have disagreements in the committee about

LB1H9113                    Kreindler - Cross

1    how to respond to any of the 12 balls that were up in the air.
2    So half the committee said, we're going to do more than the
3    judge wanted; the other half said, let's give the judge what
4    she wants.  If she wants more, we'll provide it.  It was just a
5    difference in approach.
6    Q.  Actually, the third firm, Anderson Kill, went ahead and did
7    the same as the other two firms on August 13, and they
8    announced they were doing this voluntarily and not in response
9    to a court order.  You recall that?
10   A.  Yes.
11   Q.  So three of the four firms wanted their names cleared.  Why
12   didn't you want your name cleared?
13           MS. KIRSCH:  Your Honor, I'm sorry if I missed a
14   moment.  Of course, the order for declarations came down on
15   August 12, which is prior to Anderson Kill's submission, so the
16   record should be clarified.
17           MR. HANSEN:  No, the record shouldn't be clarified.
18   She's not testifying.  In fact, they put their thing in, and
19   they said they weren't doing it in response to the court order.
20   And he knew that and testified.  Now his lawyer wants to change
21   the testimony.  This is improper, your Honor.
22           THE COURT:  I think the record here is clear.  So to
23   the extent that is an objection, it's overruled.
24   BY MR. HANSEN:
25   Q.  OK.  Mr. Kreindler, why don't you answer my question.

LB1H9113                    Kreindler - Cross

1    A.  I'm sorry.  So what's the question?

2    Q.  Three of the four firms in the Plaintiffs' Executive

3    Committee welcomed an investigation and provided extensive

4    proof of their noninvolvement?

5          THE COURT:  Mr. Hansen, I wouldn't characterize how

6    the other firms -- whether they were welcoming it or not.  They

7    made their filings.  The record reflects that.

8          MR. HANSEN:  Thank you, your Honor.  I'll rephrase.

9    Q.  Three of the four firms submitted sworn testimony from

10   every person at the firm who had the Al Jarrah transcript and a

11   sworn declaration describing their internal investigation.

12   A.  Uh-huh.

13   Q.  Why wouldn't you also want to prove that you had nothing to

14   hide here?

15         MS. KIRSCH:  Objection.  That's just not true.  The

16   declarations and the description were filed in response to the

17   court order.

18         THE COURT:  I don't think that was the question.  But

19   can you rephrase your question, and then I think in five

20   minutes we're going to break.  So find an appropriate place for

21   a break.

22         MR. HANSEN:  I'll make my question nice and simple.

23   Q.  With all of your colleagues submitting sworn testimony from

24   every person who had access to the transcript and sworn

25   testimony about what they had done to investigate, what

LB1H9113                      Kreindler - Cross

1    possible reason was there for Kreindler & Kreindler to not

2    provide that proof other than Kreindler & Kreindler had

3    something to hide?

4              MS. KIRSCH:  Asked and answered.

5              THE COURT:  You can answer it.

6    A.  Sure.  It has nothing to do with having something to hide

7    because we had nothing to hide.

8              The short answer is the way we operate -- I operated,

9    my dad, most of the partners -- is kind of the KISS principle.

10   The judge asked for something narrow.  We all gave our word

11   that we had nothing to do with it.  We had Duke do an internal

12   investigation, and I'm -- we decided, let's keep it simple.  If

13   the Court wanted more information like some other of the other

14   firms were providing, or anything else, we'd comply.  But we

15   were doing what the Court asked and keeping it simple.  It had

16   nothing to do with trying to hide anything, because there is

17   nothing to hide.

18   Q.  Wait a second.  Your answer just a minute ago you said we

19   had all "given our word" that we had nothing to do with it, but

20   you answered my prior question saying you're not aware of

21   anybody ever directly asking Mr. Fawcett whether he leaked the

22   transcript.  How do you reconcile those two statements?

23             MS. KIRSCH:  Objection.

24             THE COURT:  What's the objection?

25             MS. KIRSCH:  It's a compound question, it

LB1H9113                     Kreindler - Cross

1    mischaracterizes prior testimony, and it's misleading.

2               THE COURT:  Overruled.

3    A.  Because in everything John said to me, I was certain that

4    he had nothing to do with it.  And for him to -- it never would

5    be possible, in my mind, for him to have something to do with

6    it.  And that's why we were talking about the only conceivable

7    party who might have wanted this to get out was Saudi Arabia

8    months before the attention of 9/11.

9    Q.  On August 12 the Court orders you to provide sworn

10   testimony because the circumstantial evidence suggests

11   Kreindler & Kreindler is the leak.  Do you recall that order?

12   A.  I recall the order.

13   Q.  And the Court ordered, at a minimum, that you provide

14   declarations from four named attorneys.  Remember that?

15   A.  Yes.

16   Q.  It didn't limit you to four attorneys, did it?

17   A.  I don't think there was any limitation.  It just said

18   provide declarations from myself, Steve, Megan, and Duke.

19   Q.  And you were perfectly free to provide additional

20   declarations from people who had the transcript, weren't you?

21   A.  I'm not aware of who else had the transcript.

22   Q.  How about Mr. Fawcett?

23   A.  Oh, from John?  OK.  So what -- I'm sorry.  I don't

24   understand what your question is.

25   Q.  You had every right to not do the bare minimum, but to

1  provide full declarations from everyone at Kreindler &

2  Kreindler who you know had access to the Al Jarrah deposition

3  transcript, correct?

4  A.  I guess we could provide unlimited depositions from

5  everybody if we wanted to.

6  Q.  That's not my question, but I think you understand the

7  point.

8          On August 16 --

9  A.  Can I respond to that comment?

10 Q.  On August 16, Mr. Kreindler, what you submitted --

11         THE COURT:  You'll have an opportunity on redirect.

12 Q.  -- was bare one-and-a-half-page boilerplate denials from

13 you, Mr. Pounian, Mr. Maloney, and Ms. Benett, correct?

14 A.  I would not call it bare boilerplate.  I would say we

15 answered the question that the judge asked truthfully.  You're

16 the one who's calling it bare boilerplate.

17 Q.  You didn't provide any IT declaration, did you?

18 A.  I don't think so, no.

19 Q.  You didn't provide any description of whatever internal

20 investigation you'd supposedly done?

21 A.  I don't think we did.

22 Q.  You didn't disclose to the Court that everybody with

23 employee login access could have gotten that transcript?

24 A.  It is probably dozens of people who could have gotten the

25 transcript, from translators, all the tech people doing the

LB1H9113                         Kreindler – Cross

1    video depositions.

2    Q.  I'm talking about Kreindler & Kreindler employees.

3    A.  OK.

4    Q.  You didn't disclose to the Court on August 16 that anybody

5    with employee login credentials could have accessed the

6    Al Jarrah transcripts, right?

7    A.  All I can tell you is we provided the information that the

8    Court asked for.

9             MR. HANSEN:  Your Honor, would now be a good time to

10   break?  I know you wanted to break at 1:00.

11            THE COURT:  OK.  Let's take a break.  As I indicated,

12   I'd like counsel back in the room by 1:45 so we can begin

13   questioning again at 2 o'clock.

14            MR. HANSEN:  Thank you, your Honor.

15            MR. GERBER:  Your Honor, a quick procedural question.

16            THE COURT:  Yes.

17            MR. GERBER:  Is it permissible for the attorneys here

18   in the courtroom to have lunch with our client?  Obviously, we

19   will not be discussing the substance of the testimony.  We just

20   want to get clarity from the Court on --

21            THE COURT:  I don't mind you having lunch with your

22   clients, but not to discuss the subject of the testimony.

23            MR. GERBER:  All right.  Thank you, your Honor.

24            THE COURT:  Enjoy your lunch, everybody.  We'll see

25   you back here at 1:59.  (Lunch recess)

LB189114                    Kreindler - Cross

1                        AFTERNOON SESSION

2                           2:00 p.m.

3          THE COURT:  Good afternoon, everybody.  Please be

4     seated.

5          I hope everybody had some lunch, even if it wasn't a

6     great lunch.

7          Mr. Kreindler, I will remind you that you are still

8     under oath.

9          THE WITNESS:  Yes, your Honor.

10         THE COURT:  Mr. Hansen, your witness.

11    BY MR. HANSEN:

12    Q.  Mr. Kreindler, on August 30, the court issued an order.

13    Did you read that order?

14    A.  I read all the court's orders, yes.

15    Q.  So, you learned on August 30 that Kreindler & Kreindler was

16    going to have to put in a sworn declaration from John Fawcett,

17    didn't you?

18    A.  Yes.  Offhand, I don't remember the date, but that's right.

19    Q.  If the order provided on August 30, you read it on August

20    30, right?

21    A.  Correct.

22    Q.  You didn't wait days to read court orders?

23    A.  No.

24    Q.  So you knew on August 30 you had to get a Fawcett sworn

25    statement.  Did you go to him on August 30 and ask him to sign

1    a sworn statement?

2    A.  I did not.

3    Q.  Did you ever ask him to do so?

4    A.  No.  I said, as I mentioned earlier, Megan and Steve and

5    Duke were handling it.

6    Q.  Well, we have evidence that other members of your team were

7    asked to sign, and did sign, sworn declarations as early as

8    September 2nd.  And I would ask you to look at Exhibit 62B.

9    A.  Hang on a second.

10   Q.  62B.

11   A.  Sorry.  It's a big book.

12   Q.  62B, as in boy.

13   A.  OK.

14   Q.  I am just interested in the signature page and the date.

15           THE COURT:  I will just remind Mr. Kreindler that the

16   person who signed this is known as Consultant-1 in the public

17   record.

18           THE WITNESS:  Yeah.  What I have in front of me does

19   not have a signature page.  It's blacked out.

20           THE COURT:  OK.

21   Q.  But there is a date of September 2, 2021, right?

22   A.  On the one I have, the date is partly blacked out.  It

23   could be September 2nd.

24   Q.  And it was for a person identified as Consultant-A?

25           THE COURT:  I believe it was Consultant-1.

LB189114                    Kreindler - Cross

1          MR. HANSEN:  I'm sorry, your Honor.

2    Q.  Consultant-1, Mr. Kreindler?

3    A.  I don't see Consultant-1 on here.  Maybe I am looking at

4    the wrong page.  62B, it's declaration of blank redacted.

5    Q.  Well, that's not important.  It's a declaration for use in

6    this proceeding about the transcript leak, isn't it?

7    A.  Yeah.

8    Q.  It's got a date of September 2, 2021, doesn't it?

9    A.  I'm not being difficult with you, but on this page the date

10   is partly blacked out.

11   Q.  It's a single digit, how about that?

12         MS. KIRSCH:  Your Honor, this is not Mr. Kreindler's

13   declaration.  There is no foundation that he had any experience

14   with this document.

15         THE COURT:  Well, it's a declaration that was filed by

16   the law firm in response to the court's order.

17         MS. KIRSCH:  Correct.

18         THE COURT:  So I think Mr. Hansen is just asking a

19   question about what is on this declaration.  And if Mr.

20   Kreindler can't identify it because of a redacted version, I

21   don't know if we have an unredacted version or whether the

22   parties can stipulate to the date of this.

23         MS. KIRSCH:  Your Honor, I understand that this was

24   filed by the law firm, but that's a different matter from

25   whether Mr. Kreindler was involved in the process of obtaining

LB189114                    Kreindler – Cross

1   the declaration itself.  There is no indication that he would

2   know anything about this document.

3            MR. HANSEN:  That's what I am trying to figure out.

4            THE COURT:  Can we stipulate that this declaration is

5   signed September 2, 2021?

6            MR. HANSEN:  I hope so.

7            MS. KIRSCH:  Yes, I will stipulate to that.

8            THE COURT:  Mr. Kreindler, it's signed.  I know it's

9   blacked out partially, but the date that you could partially

10  see is September 2, 2021.

11           THE WITNESS:  OK.

12  BY MR. HANSEN:

13  Q.  So the question, Mr. Kreindler, if you know, is whether a

14  similar declaration was prepared for Mr. Fawcett on or about

15  September 2, 2021?

16  A.  I don't know.

17  Q.  Why would it be prepared for one member of your team and

18  signed on September 2 and not for Mr. Fawcett?

19           MS. KIRSCH:  Objection.

20  Q.  If you know.

21  A.  I don't know.  I'm not even sure whose declaration this is.

22  Q.  When, to your knowledge, was Mr. Fawcett first asked to

23  give a sworn statement in response to the court's order

24  requiring him to do so, dated August 30, 2021?

25  A.  I don't know.

LB189114                    Kreindler - Cross

1    Q.  Did you ever go to him and say, John, we are going to need

2    a sworn declaration from you, let's get it done?

3    A.  No.

4    Q.  Did you ever talk to him about it?

5    A.  I talked to him about the Isikoff article the day we saw

6    it.

7    Q.  I am talking about a sworn statement.

8    A.  No, I never talked to him about a sworn statement.

9    Q.  As the team leader, didn't you think it was important, in

10   response to the August 30 court order, to go to everyone

11   covered by that order and make clear that they were going to

12   have to submit sworn testimony in this proceeding?

13   A.  It's important, but that doesn't mean I am going to be

14   doing everything; we divied up responsibilities.

15   Q.  Mr. Kreindler, after the court's August 30 order, which is

16   going to reveal the evidence we now know today, Yahoo News

17   filed a motion with the court to either stop or substantially

18   limit the court's investigation into what happened.  Do you

19   recall that?

20   A.  Yes.

21   Q.  You personally supported that motion, didn't you?

22   A.  I really had very little to do with it, but I thought sure.

23   Q.  Let's put on the screen Exhibit 51.  This letter you did

24   sign.  You didn't delegate it to one of your subordinates.

25   September 9, 2021.  Let's go to the second page.  That's your

LB189114                     Kreindler – Cross

1   electronic signature, right?

2   A.  Yes, it is.

3   Q.  Let's go to the first page.  Isn't the substance of this

4   letter you supporting Yahoo News' motion?

5   A.  Let me just see it for a second.

6           Yes.  This is our letter saying we think the order

7   should be modified.

8   Q.  You're supporting Yahoo News' motion, correct?

9   A.  To modify the court's order, yes.

10  Q.  And this one you think is important to sign yourself,

11  right?

12  A.  Sure.

13  Q.  In this one, you again make your statement that materials

14  shouldn't be covered by these protective orders, which you have

15  otherwise called disgusting in other places?

16  A.  I'm sorry.  What are you pointing out to me in this letter?

17  Q.  Don't you also say in this letter that you think materials

18  covered by the protective order shouldn't be covered?

19  A.  I say exactly what you say.  We have argued in favor of

20  public access to all judicial materials.

21  Q.  And you again disparage the two protective orders, don't

22  you?

23  A.  In this letter, no.

24  Q.  But the Yahoo -- by the way, which other of your

25  plaintiffs' firms joined you in this request to squash or

LB189114                    Kreindler - Cross

1   limit, the Yahoo News' motion, the court's investigation?

2   A.  I don't know from memory.

3   Q.  The answer is zero, right?

4   A.  If you say so.

5   Q.  Well, do you remember any other firm joining you in support

6   of Yahoo News' motion to try and obfuscate or obstruct the

7   court's investigation?

8           MS. KIRSCH:  Objection.

9           THE COURT:  Overruled.

10  A.  I don't.  And I will tell you exactly why my --

11  Q.  I don't need why.  It's a "what" question.  Did anybody

12  else join you in your efforts to support the Yahoo News motion?

13  A.  Not that I recall.

14  Q.  So another couple of questions and we will be done.

15          You submitted a declaration as demanded by the court

16  in its August 30 order.  It's at 56A, and I will get that up in

17  front of you.

18          We have talked at some length this morning about what

19  you did and didn't do to try and be accurate in what you were

20  submitting to the court, but isn't it true, Mr. Kreindler, that

21  this declaration is false or misleading?

22  A.  I do not believe it's false and misleading.  If there is

23  something that concerns you, please point it out to me.

24  Q.  Let's go to page 3.

25          You say, underlined, "I never discussed the content of

1    the Jarrah deposition with Isikoff or anyone acting on his

2    behalf."

3              Do you see that?

4    A.  Not yet.  Oh, yes, I see it now.

5    Q.  Those are your words, correct?

6    A.  Yes.  Correct.

7    Q.  In fact, you talked with Mr. Isikoff on his podcast about

8    what he characterizes as three principles, including Bayoumi,

9    Thumairy, and Jarrah by name, correct?

10   A.  Are you asking me if he referred to Jarrah, Bayoumi, and

11   Thumairy by name?

12   Q.  Yes.

13   A.  I think so.  I don't specifically remember it.

14   Q.  And you claimed, again in the podcast, and we played the

15   podcast, I am quoting here, you claimed you "exposed all kinds

16   of lies" in the sworn and sealed testimony.

17              Do you recall saying that?

18   A.  Yes.

19   Q.  In fact, that's content of depositions, isn't it?

20   A.  No.  It's my characterization, my opinion of what we

21   accomplished during the deposition.

22   Q.  It's not an opinion, it's what the witnesses supposedly

23   said, isn't it?

24   A.  Not supposedly, what they did say.

25   Q.  I see.  Now you're communicating the truth about these

1   sworn depositions.  And that's what you do, Mr. Kreindler, you

2   decide what is OK to communicate, even though you are

3   purporting to communicate things that you are not allowed by

4   order to try and communicate, correct?

5               MS. KIRSCH:  Objection.  It's argumentative.  It

6   misstates facts and six other things.

7               THE COURT:  Sustained.

8               Rephrase the question, Mr. Hansen.

9   Q.  I will just ask it very simply, Mr. Kreindler.

10              When you say that you exposed all kinds of lies, in

11  the sworn sealed testimony, are you telling this court under

12  oath that this isn't purporting to communicate content from the

13  depositions?

14  A.  It is not communicating the content of what anyone said.

15  It is me saying to Mike Isikoff that we accomplished what we

16  hoped to accomplish, and pointing out -- now I am struggling

17  because there are things I can't say, but it is me

18  communicating to Mike Isikoff that the depositions were a

19  success because we got witnesses to contradict each other,

20  lies, etc.  It is my absolute belief that I said nothing about

21  the content of what any of the witnesses said because I wasn't

22  allowed to.

23  Q.  How about when you said to Mr. Isikoff on the air, "One

24  witness will contradict another."  That was content too, wasn't

25  it?

1          MS. KIRSCH:  Objection.

2          THE COURT:  Basis.

3          MS. KIRSCH:  Asked and answered.

4          THE COURT:  Overruled.

5          You can answer it.

6    A.  I do not believe that's content.  That's characterization,

7    in my opinion.

8    Q.  How about when you said, "Each person wants to minimize

9    their own role and point fingers at others."  That was content

10   too, wasn't it?

11   A.  No.

12   Q.  How about when you claimed you had a "smoking gun or guns,"

13   that's content too, right?

14   A.  No.

15   Q.  How about when you said Mr. Isikoff said it sounded like "a

16   confession," but then you responded by saying, "No, not a

17   confession," but it was still "damning dramatic."  That's not

18   content either?

19   A.  No.  It's a characterization that it's damning and

20   dramatic.  It is not the content because I am not allowed to

21   talk about the content.

22   Q.  Let's look at another part of your declaration.  You said

23   in your declaration under oath that no one other than people at

24   your firm who had submitted sworn statements on the 27th of

25   September had access to the deposition transcripts, correct?

LB189114                    Kreindler – Cross

1   A.  That's what I said in my declaration?

2   Q.  Let's put it on the screen so we are all looking at the

3   same thing.  56A, pages 3, 4.

4           THE COURT:  Mr. Hansen, to the extent you are going to

5   read anything, can I remind you to speak more slowly, please.

6           MR. HANSEN:  I apologize for my speed.

7           Let's get to the right place.  This is the last page

8   carry-over.  I am going to discipline myself to try not to

9   rush.

10  Q.  It says, "State every person that they know had access to

11  the deposition transcripts who has not already supplied a

12  declaration in this investigation."  And you answered "none."

13          Do you see that?

14  A.  Yes.

15  Q.  Now, I don't want to go back and do all the questions we

16  did this morning, but I think we established this morning that

17  you had no idea who within Kreindler & Kreindler had access to

18  the deposition transcripts.  Isn't that true?

19          MS. KIRSCH:  Objection.  He can point to the testimony

20  if that's what he wants to do.  I don't know what he is talking

21  about.

22          THE COURT:  You don't know?

23          MS. KIRSCH:  He is purporting to quote earlier

24  testimony.  If he wants to purport to quote earlier testimony

25  of Mr. Kreindler, he can show us the earlier testimony.

LB189114                     Kreindler - Cross

1           THE COURT:  Overruled.

2           You can continue.

3   A.  I'm sorry.  Your question is?

4   Q.  I will ask it again so we are not confused.  And I won't

5   characterize your prior testimony.

6           What was your basis, your basis for giving a sworn

7   statement that no one other than the people from Kreindler &

8   Kreindler, who had provided sworn declarations on September 27,

9   had, quote, access to the deposition transcripts?

10  A.  Again, I am relying upon my partners who were working on

11  this.

12  Q.  Who told you that?

13  A.  We had a -- we talked about the declarations.  Duke told

14  everyone about his --

15  Q.  Who told you that the only people at Kreindler & Kreindler

16  who had access to deposition transcripts were those that

17  submitted declarations?  Real simple.

18          MS. KIRSCH:  Objection.  Mr. Hansen is respectfully

19  misreading the sentence.  If he wants to go back and read the

20  sentence in Mr. Kreindler's declaration, he can do that, but

21  let's not skip words, let's read the whole sentence.

22          MR. HANSEN:  Can you put it up again?

23          THE COURT:  The "they" here is the firm Kreindler &

24  Kreindler?

25          MR. HANSEN:  It's Mr. Kreindler responding to this.

1        MS. KIRSCH:  Respectfully, your Honor, the "they" is

2   not the firm.  This is for each person to answer these

3   questions.

4        MR. HANSEN:  He is the affiant here.  It goes to his

5   knowledge.

6        THE COURT:  The "they" is the affiant.

7        MR. HANSEN:  It's got to be.

8        MS. KIRSCH:  "They" is the affiant.

9        MR. HANSEN:  They can't be an affiant.

10       MS. KIRSCH:  Actually, nowadays it is.

11  BY MR. HANSEN:

12  Q.  Mr. Kreindler, did you understand yourself to be giving an

13  affidavit here in this sworn statement?

14  A.  Yes.

15  Q.  Were you answering this as to your own personal knowledge?

16  A.  Yes.

17  Q.  In response to my prior question, you said someone told you

18  the information that gave you the basis to answer this last

19  question the way you answered it.  The last question is, who

20  was the person who told you that?

21  A.  Now looking at it, I understand it.  "They," in this case,

22  being me.  I read the question asking me, state every person

23  who they, Jim Kreindler, shared the deposition transcript with.

24  Q.  Wrong question.  They had access.  The question was about

25  access.

LB189114                    Kreindler – Cross

1    A.  I'm saying, from my personal knowledge, I didn't know that

2    someone had access other than my partners who we have been

3    talking about.

4    Q.  That's still not answering my question.  In response to my

5    earlier question, you said someone had provided you information

6    that gave you what you considered to be a valid basis for

7    giving this answer.  So who is the someone?

8    A.  Now we have got to -- I am looking at the question now.

9    Let me answer it as I see it and understand it now.

10            State every person that I knew had access to the

11   deposition transcript who has not already supplied a

12   declaration.  I didn't know of anyone who had access other than

13   my partners who were supplying declarations.

14   Q.  What did you do to inform yourself as to who actually did

15   have access before you provided this sworn testimony to the

16   court?

17   A.  We are talking in circles because I understand this to mean

18   who did I personally know had access, and I didn't know of

19   anyone else.

20   Q.  Did you ask Mr. Hartney if this was an accurate statement?

21   A.  No, because I am answering from my personal knowledge.

22   Q.  I will give you a hypothetical, Mr. Kreindler.  If you had

23   been told by Mr. Hartney before submitting this that, in fact,

24   everybody with employee log-in credentials at Kreindler &

25   Kreindler had at least access to these transcripts, would you

LB189114                    Kreindler – Cross

1  answer this question this way?

2         MS. KIRSCH:  Objection.  It's an improper

3  hypothetical.

4         THE COURT:  Overruled.

5  A.  I think I would have tried one way or another to get it

6  clarified so that I can answer the question properly.  So if

7  someone came to me and said, John Hartney knows that everybody

8  in the firm had access to the deposition, when looking at this,

9  I would have discussed it with my partners and tried to figure

10 out if we should seek clarification or I should answer it the

11 way I understand it, so that there is no mistake or

12 misunderstanding.

13 Q.  So one last question on this topic.

14        What, if anything, did you do to inform yourself about

15 who actually did have access before you gave this sworn

16 statement to the court?

17 A.  Since I understood this question to refer to my personal

18 knowledge, I didn't do anything to find out if people who I

19 didn't know about had access.

20 Q.  All right.  Just some wrap-up questions, Mr. Kreindler.

21        You have already said in your declaration that you

22 never instructed anyone, including Mr. Fawcett, to turn over

23 the sealed transcript to Mr. Isikoff or anyone else.  But given

24 your press strategy, your corrosive statements about protective

25 orders being disgusting and your own personal violation of

LB189114                    Kreindler – Cross

1  protective orders in 2017, as well as what we have shown today,

2  there is substantial reason to doubt your word on that, isn't

3  there?

4  A.  None whatsoever.  And your question contains statements

5  that are not true.

6  Q.  You still dispute that you were found guilty of a

7  protective order violation in 2017?

8           MS. KIRSCH:  Objection.

9           THE COURT:  He doesn't need to answer the question.

10  Q.  You didn't even need to give an express instruction to Mr.

11  Fawcett to make this leak happen, did you?

12  A.  That's nonsense.  I have no idea the leak could happen, and

13  the leak was antithetical to what we were trying to proceed.

14  Q.  According to your testimony, you didn't have an idea about

15  a lot of what was happening, correct?

16           MS. KIRSCH:  Objection.

17           THE COURT:  Sustained.

18  Q.  Mr. Fawcett knew what you wanted, and he did what you

19  wanted, and that's why we are here today, isn't that right?

20  A.  No.

21           MS. KIRSCH:  Objection.

22           THE COURT:  Overruled.

23  A.  That is absolutely 100 percent false and has no relation to

24  reality.

25           MR. HANSEN:  No further questions, your Honor.

LB189114                    Kreindler – Redirect

1              THE COURT:  Thank you.

2              Ms. Kirsch, are you ready or would you like a moment?

3              MS. KIRSCH:  I would like a moment.

4              THE COURT:  We will take a quick two-minute recess.

5              (Recess)

6              THE COURT:  Ms. Kirsch, your witness.

7    REDIRECT EXAMINATION

8    BY MS. KIRSCH:

9    Q.  Mr. Kreindler, good afternoon.

10             There was some discussion earlier about the protective

11   orders in this case, correct?

12   A.  Yes.

13   Q.  You were asked, or the point was made that you personally

14   have not made a motion to lift those protective orders.  Can

15   you tell me, have you ever considered making such a motion?

16   A.  Yes.  More than considered it.  We had it drafted and under

17   discussion for really quite some time, as we, the committee,

18   tried to formulate the best motion to bring.  We never filed

19   it, actually, because at the time we were ready to file, in the

20   lead up to 9/11, we knew that there was going to be an

21   Executive Order, which, in fact, Joe Biden issued on September

22   4th.  And, as you know, that Executive Order mandated that the

23   2016 review be given to us and the public, mooting any orders

24   from DOJ as to that, and providing for declassification of

25   other 9/11 documents, which is going to happen tomorrow.

LB189114                    Kreindler – Redirect

1          Now, tomorrow we don't know what will be released and

2     whether there will be redactions or how many, but tomorrow we

3     expect a lot of what we have and have had to keep secret to be

4     made public.  I should also add that I talked to a number of

5     people in the Administration about this to suggest that they do

6     it on their own.

7     Q.  So I wanted to turn your attention briefly, there should be

8     a witness book of exhibits by the Kreindler firm, not that big

9     book.

10    A.  This is the only one up here now.

11          MS. KIRSCH:  Your Honor, may I approach?

12          THE COURT:  Yes.

13    A.  Thank you.  OK.

14    Q.  I am going to ask you to flip all the way to the back, if

15    you would, to Exhibit 102.

16    A.  Yes.

17    Q.  Do you see that this is the July 23rd motion filed by the

18    Kingdom of Saudi Arabia in relation to getting some discovery

19    and looking into the Isikoff leak.  Do you see that?

20    A.  Yes.

21    Q.  If you turn a few more pages, there is a document that is

22    the declaration of Michael Kellogg, Exhibit D3 to that filing.

23    Do you see that?

24    A.  Yes.

25    Q.  And then I am going to turn you to what looks like Exhibit

LB189114                    Kreindler - Redirect

1    D3-A, which is an e-mail from Mr. Isikoff to Mr. Kellogg.  Do

2    you see that?

3    A.  Yes.

4    Q.  I am going to give you a moment to look at that e-mail and

5    ask you whether you recognize the quotation that Mr. Kellogg is

6    being asked to comment on, the quotation that is attributed to

7    you.

8    A.  Yes.

9    Q.  Is that a quotation that you said on the podcast?

10   A.  Yes.

11   Q.  We actually just heard the podcast with you saying these

12   very words?

13   A.  Right.

14   Q.  And that podcast aired on July 10, correct?

15   A.  Yes.

16   Q.  This was filed on July 23, is that correct?

17   A.  Yes.

18   Q.  So if you look back, the previous page of Mr. Kellogg's

19   declaration filed in support of his motion, you will see the

20   very last sentence says, "A true and correct copy of a July 5,

21   2021 e-mail from Mr. Isikoff to me is attached as Exhibit A."

22           Do you see that?

23   A.  Yes.

24   Q.  And does Mr. Kellogg in his statement to the court advise

25   the court that this is a publicly made statement?

LB189114                    Kreindler - Redirect

1   A.  No.

2   Q.  Does Mr. Kellogg advise the court that this was a podcast

3   that had aired two weeks prior that Mr. Kellogg was offered the

4   opportunity to comment on?

5   A.  No, he does not.

6   Q.  Does Mr. Kellogg provide in his declaration to the court

7   any context about this e-mail whatsoever to help the court

8   understand what it is?

9   A.  No.

10  Q.  I wanted you now, can we just flip to what is Exhibit 29 in

11  our book?

12  A.  Sure.  OK.

13  Q.  By the way, Mr. Kreindler, do you think it would have been

14  helpful to the court to understand that Mr. Isikoff is asking

15  Mr. Kellogg to comment on a publicly made statement as opposed

16  to something that may have been said privately?

17  A.  Yes.

18  Q.  If we look at Exhibit 29, that cover page, this is the

19  August 16 filing made by the Kreindler firm in response to the

20  court's order.  Do you see that?

21  A.  Yes.

22  Q.  And your declaration, Mr. Kreindler, is the second one.

23  It's labeled page 5 of 10 at the top.  If we could take a look

24  at that.

25  A.  Yes.

1   Q.  Now, the two introductory paragraphs we are going to skip

2   over.

3           Paragraph 3.  "I obtained a copy of the rough

4   transcript of the Jarrah deposition at the end of each day that

5   he was deposed and a final copy of the transcript from both

6   days of the Jarrah deposition on June 28 from Golkow Litigation

7   Services, both in unredacted and a redacted copy."

8           Do you see that?

9   A.  Yes.

10  Q.  Is that a true and accurate statement, Mr. Kreindler?

11  A.  Yes.

12  Q.  Paragraph 4.  "On July 7, Golkow Litigation Services sent

13  an e-mail with links to the video of the Jarrah deposition."

14          Is that a true statement, Mr. Kreindler?

15  A.  Yes.

16  Q.  "At no time did I share the Jarrah deposition transcript or

17  videos with anyone unauthorized to see it under the protective

18  order and the FBI protective order."

19          Is that a true statement?

20  A.  Yes, it is.

21  Q.  "At no time did I direct anyone to share the Jarrah

22  deposition transcript or videos with anyone unauthorized to see

23  it under the protective order and the FBI protective order."

24          Is that a true statement?

25  A.  Yes.

LB189114                    Kreindler - Redirect

1    Q.  "To my knowledge, no one with the Kreindler firm or anyone

2    acting on its direction shared the Jarrah deposition transcript

3    with anyone unauthorized by the protective order in the FBI

4    protective order."

5              Is that true statement?

6    A.  Yes.

7    Q.  In your opinion, Mr. Kreindler, is there anything about

8    this that is misleading?

9    A.  No.

10   Q.  Is there anything in this declaration that is incomplete?

11   A.  No.

12   Q.  Is it your opinion that this is what the court had asked

13   for the declarations to opine on?

14   A.  Yes.

15   Q.  If you could flip to Exhibit 87 in our book also, Mr.

16   Kreindler.

17   A.  Sure.

18   Q.  This is the September 27 filing that was made by the

19   Kreindler firm.  Do you see this?

20   A.  Yes.

21   Q.  We spent some time on this on your cross-examination, or

22   Mr. Hansen did.

23              If you look at page 3 of 53 through 6 of 53.

24   A.  OK.

25   Q.  That's your declaration, is that true?

LB189114                    Kreindler - Redirect

1   A.  Yes.

2   Q.  If you would start with paragraph 5 which refers -- let's

3   go back to paragraph 4.

4           "I learned on July 15th."  So you learned the day the

5   article came out, you learned that there had been a leak of the

6   Jarrah transcript, is that right?

7   A.  Yes.

8   Q.  And that was discussed with others from the Kreindler firm

9   working on the 9/11 litigation, correct?

10  A.  Yes.

11  Q.  On that call, Mr. Kreindler, was there a discussion of

12  whether any of the participants of that call, the Kreindler

13  9/11 team, was there a discussion as to whether any of you had

14  any knowledge of how the Jarrah transcript was transmitted to

15  Mr. Isikoff?

16  A.  Yes.

17  Q.  Can you tell me what that discussion entailed?

18  A.  Sure.  It was each of us saying, I have no idea how this

19  could have happened, does anybody have any ideas?  And going

20  around in the group saying the same thing.  Where did this come

21  from?  And this is not good for us.  Any clue?

22  Q.  If you look at paragraph 5 -- well, let me just finish that

23  question.  I assume the takeaway was that everyone indicated

24  that they had no knowledge, is that true?

25  A.  Yes.  We all had no knowledge, and then there was some

LB189114                    Kreindler - Redirect

1   speculation as to who might have done it.  Is it possible for

2   somebody in the technical group to do it?  I volunteered, I

3   said, the only entity that might have done it that would make

4   sense would be the Saudis, to get it out now before 9/11 when

5   there is great media attention, if it's going to come out

6   anyway.  But other than that guess, speculation, no one had any

7   idea where it could have come from.

8   Q.  Mr. Kreindler, was Mr. Fawcett on that call?

9   A.  I think so.

10  Q.  Was it your takeaway that Mr. Fawcett was one of the many

11  who said he had no idea how this could have happened?

12  A.  Yeah.  What I distinctly remember more than the call was

13  our in-person discussion in the office.  But, yeah, John, to me

14  seemed as surprised as everyone.

15          THE COURT:  Who was involved in that in-person

16  discussion?

17          THE WITNESS:  The sequence, your Honor, I read it at

18  home, got to the office later.  The first people I spoke to

19  were Duke and John.  And I think, we can check the dates, that

20  Steve was doing a deposition that day.  I'm not positive, but I

21  remember him being tied up and I think then later talked to

22  Megan.  And in an earlier call, we decided that, as of that

23  moment, Duke would lead the investigation into all the computer

24  stuff and who could have had access or e-mailed Mike Isikoff.

25          Then, later that day we had a call with the whole PEC.

LB189114                    Kreindler - Redirect

1    First, we had an internal Kreindler call and then a PEC call a

2    little later that day.  The specific question, I don't

3    distinctly remember John being on the PEC, but he might have.

4    I just don't remember.  But I do remember the personal

5    discussions with him in the office face-to-face.

6              THE COURT:  Thank you.

7    BY MS. KIRSCH:

8    Q.  Mr. Kreindler, when you pulled together this declaration

9    that was filed on September 27, did you make your best efforts

10   to ensure that every statement here was accurate and not

11   misleading?

12   A.  Of course.

13   Q.  In your opinion, sitting here today, is any of it

14   inaccurate?

15   A.  No.

16   Q.  Or misleading?

17   A.  No, not at all.

18   Q.  It says on page 6 of 53, at paragraph 7, "For the first

19   time today" -- which is September 27 -- "I learned the

20   information set forth in the declaration of John Fawcett."

21              Is that a true statement?

22   A.  It is.  Later that afternoon.

23   Q.  Mr. Kreindler, as a general matter, how often did you

24   communicate with Mr. Fawcett in the course of your work on this

25   case?

LB189114                    Kreindler - Redirect

1  A.  Probably more than I talked to my wife.  9/11 is all I do,

2  what John was working on.  There were times when John's

3  attention was needed by one of my partners, getting ready for a

4  deposition, but I would talk to John all day.  I can't say I

5  spoke to him every single day, but constantly.

6  Q.  Would you say you spoke to him most days?

7  A.  Oh, sure.  Many times at night, I would wake up at 3 in the

8  morning with an idea, shoot him a message.  And sometimes it's

9  still dark when I hear from John, get your first cup of coffee,

10  and we would talk about something.  But it's constant.  We were

11  working on the Saudi case all the time, every day.

12  Q.  Did you communicate with Mr. Fawcett about the protective

13  orders in this case?

14  A.  Yes.  Sure.

15  Q.  What was the nature of those communications?

16  A.  They were really two-fold.  We would often talk about our

17  efforts to get these orders lifted, the motion we were working

18  on.  But even long before that, I talked about these orders

19  with Kirsten Gillibrand, Chuck Schumer, Dick Blumenthal, all

20  the time, Tony Blinken, Brian McKeon, later with Jonathan

21  Cedarbaum in the NSA, DOJ people.  And in talking to them about

22  our need for the FBI documents so the whole story can come out,

23  and our need once we have documents to be able to share them

24  with the families and the public so everyone can know and we

25  could really talk to our clients, I would always talk to John

LB189114                    Kreindler - Redirect

1   and say, hey, can you dig up something or other that I might

2   refer to in these communications with people in our government.

3          The other distinct area where I talked to him was what

4   we talked about before, 2017, with the phone number in the

5   letterhead of the Saudi Embassy, and that was found to be a

6   violation.  And John and I -- John would deal with protective

7   stuff every day for 20 years.  And that brought home to us,

8   even if we are not revealing content, you can't show a page,

9   even if it's in Arabic and no content can be communicated,

10  particularly something that's public like you could get the

11  phone number from the yellow pages.

12         So, John and I had that discussion in 2017 so that, to

13  the extent humanly possible, there would never be any violation

14  of these court orders.  That was a discreet discussion.  The

15  other discussion about how we can, number one, and most

16  importantly, get the documents, and that stuff I raised with

17  President Trump and others, that has been constant for these

18  last four years.

19  Q.  So, is it fair to say that in the course of these different

20  types of discussions, Mr. Fawcett indicated that he understood

21  his obligations under these protective orders?

22  A.  Absolutely.  What we tried to do is often, if you have the

23  two versions side by side and you look at it, it's hard to tell

24  because a word is hidden in one and not the other, so before

25  sending anything public to anyone, even if I had the document

LB189114                    Kreindler - Redirect

1    in front of me on my phone, I would say, John, please send me

2    the public one to be doubly sure that we are not making a

3    mistake and passing on one that we can't.

4           So John was involved in helping me try and live with

5    this procedure that everyone knows is a lot of work with the

6    two versions, in the public or not, to make sure there was no

7    mistake.

8    Q.   Did Mr. Fawcett ever give any indication that he did not

9    intend to abide by his obligations under the protective orders?

10   A.   Not at all.

11   Q.   Did Mr. Fawcett ever act in an unprofessional manner in any

12   respect?

13   A.   No.   John, for almost 20 years, it will be 20 years in

14   February, John is one of the most committed -- I'm sorry -- and

15   honest and trustworthy people I ever met.

16          I'm sorry for getting emotional.   I have told you this

17   story.   It's neither here nor there.   But I believe John came

18   to work for us the day after my dad died, and my dad died when

19   we were settling the Pan Am 103 case with Libya.   We were

20   almost done, and it's like Moses dying when he is bringing home

21   the Ten Commandments.   And John got to me through a high school

22   classmate, and John has been so central to the families and has

23   this unique ability to uncover and handle information.   In my

24   entire life, I have never met anyone who I think of as a more

25   honest and noble person than John, with one exception, my

LB189114                    Kreindler – Redirect

1   father.

2          We would not be here today, and we would not be

3   getting FBI documents tomorrow, and this coming out, if it

4   wasn't for John.  And truthfully, it breaks my heart for us, to

5   the families who he has devoted 20 years of his life to, I wish

6   it didn't happen, it was a mistake, but he is such a good

7   person and so important to thousands of people.  And when this

8   is over, when the whole case is over, and hopefully sooner

9   rather than later, and we all are where we want to be, he just

10  deserves so much credit for what he has done and what he has

11  given.

12         I know I am violating in talking so much, but this has

13  been my life for 20 years, and his.  I had to say it.  I

14  apologize for being emotional, and I apologize for diverting

15  from the specific question, but I think it just needs to be

16  said.  So I'm sorry for talking too much.

17  Q.  I just have a couple more questions, Mr. Kreindler.

18  A.  Sure.

19  Q.  Did you order or direct Mr. Fawcett to send the copy of the

20  Jarrah transcript to Mr. Isikoff?

21  A.  No.

22  Q.  Did you know that Mr. Fawcett was going to send the Jarrah

23  transcript to Mr. Isikoff?

24  A.  No.

25  Q.  Did you know at any time prior to September 27 that Mr.

1  Fawcett had sent the transcript to Mr. Isikoff?

2  A.  No.  I had no idea at all until I heard that afternoon.

3  Q.  Did you ever have any reason to suspect that Mr. Fawcett

4  would send the Jarrah transcript to Mr. Isikoff?

5  A.  None whatsoever.

6          MS. KIRSCH:  I have no further questions.

7          THE COURT:  Yes, Mr. Hansen.

8          MR. HANSEN:  No more questions for Mr. Kreindler, your

9  Honor.

10          THE COURT:  I just have one question for you, Mr.

11  Kreindler.  Did you ever reach out to Mr. Isikoff and ask him

12  how he received the transcript?

13          THE WITNESS:  No, I didn't.  Once I saw the story, I

14  didn't say anything to anyone until we got to the office and

15  talked about what we are going to do with this revelation.  But

16  I thought, we all thought that none of us should be calling

17  Mike Isikoff.

18  Q.  Did anyone on the PEC side ask you, given your relationship

19  with Mr. Isikoff, to reach out to him to find out how he got

20  the transcript?

21  A.  No, that never came up.  And we all expect that if he was

22  ever asked, I am not going to reveal my sources.

23          THE COURT:  Thank you.

24          You are excused.

25          THE WITNESS:  Thank you, your Honor.

LB189114                          Kreindler – Redirect

1              Can I stay in the courtroom now?

2              THE COURT:  Yes, you may.  In fact, you should.

3              (Witness excused)

4              THE COURT:  Who is your next witness?

5              MR. SHEN:  Saudi Arabia calls John Hartney.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB1H9115                        Hartney - Cross

1            THE COURT:  Mr. Shen, while we're waiting, do you have

2    an estimate of how long we'll need this witness time-wise?

3            MR. SHEN:  For Mr. Hartney?

4            THE COURT:  Yes.

5            MR. SHEN:  Maybe an hour and a half.

6            THE COURT:  Maybe an hour and a half.  It's nearly

7    3 o'clock.  Maybe in a half-hour, we can take a five-minute leg

8    stretch.

9            MR. SHEN:  Yes, your Honor.

10            THE COURT:  Hello, sir.  Have a seat here.  Stay

11    standing for a second.

12    JOHN HARTNEY,

13         called as a witness by the Defendants,

14         having been duly sworn, testified as follows:

15            THE WITNESS:  John Hartney.

16            THE COURT:  Thank you, sir.

17    CROSS-EXAMINATION

18    BY MR. SHEN:

19    Q.  Good afternoon, Mr. Hartney.

20    A.  Good afternoon.

21    Q.  Are you currently employed for Kreindler & Kreindler?

22    A.  Yes.

23            MR. SHEN:  And can we show Exhibit 74, please.

24    Q.  Do you recognize this as your profile in the Kreindler

25    website?

LB1H9115                              Hartney - Cross

1          MS. KIRSCH:  I'm sorry.  Can I have a moment to look

2    at the document, please?

3          THE COURT:  Sure.

4          MR. SHEN:  We can do it without the document.

5          THE COURT:  It's the signature line on the website.

6          MS. KIRSCH:  I'm sure it is.

7    BY MR. SHEN:

8    Q.  Is your title LAN administrator?

9    A.  Correct.  Yes.

10   Q.  Sir, does "LAN" stand for local area network?

11   A.  Yes.

12   Q.  And how long have you had that title, sir?

13   A.  Since I've been at Kreindler.

14   Q.  And when did you start at the firm?

15   A.  April 1991.

16   Q.  Sir, do you report to Javier Cisneros?

17   A.  No.

18   Q.  Who's your direct supervisor, sir?

19   A.  I'd say the partnership.

20   Q.  The attorneys at the firm?

21   A.  Yeah.

22   Q.  Now, sir, you signed a declaration in this case, correct?

23   A.  Yes.

24   Q.  Can we see the declaration at 56F.

25          You have a binder of exhibits that are in front of

LB1H9115                        Hartney - Cross

1   you.  Sir, you did not draft this declaration, correct?

2   A.  No.

3   Q.  The lawyers at the firm drafted it for you?

4   A.  Yes.

5   Q.  And that was Mr. Maloney, correct?

6   A.  The first one, yes.

7   Q.  And Ms. Benett --

8   A.  Yes.

9   Q.  -- correct?

10          And Mr. Pounian also drafted the language in your

11  declaration, correct?

12  A.  I believe so, yes.

13  Q.  Now, sir, the lawyers at the firm, you said that you report

14  to them.  They're generally in a position of authority over

15  you?

16  A.  I report to the partnership.

17  Q.  The partners are in a position of authority over you, sir?

18  A.  Yes.

19  Q.  And generally speaking, if one of those partners asked you

20  to do something, you do it, right?

21  A.  Well, it matters what they're asking me to do.

22  Q.  All right.  Well, they asked you to sign a declaration.  So

23  you reviewed the declaration, and you signed it, correct?

24  A.  They asked me to sign the declaration that I felt was

25  truthful.

LB1H9115                    Hartney – Cross

1    Q.  Now, sir, you're generally familiar with the fact that

2    Kreindler & Kreindler is representing the plaintiffs in the

3    9/11 litigation?

4    A.  Correct.

5    Q.  And you're generally familiar with the fact that certain

6    material, such as documents and deposition transcripts, are

7    governed by protective orders in this action, correct?

8    A.  Yes.

9    Q.  Have you reviewed the MDL protective order?

10   A.  No.

11   Q.  You've never looked at it?

12   A.  Not that I recall, no.

13   Q.  Have you looked at the FBI protective order?

14   A.  No.

15   Q.  You've never looked at it?

16   A.  No.

17   Q.  You've never signed it?

18   A.  No.

19   Q.  You never agreed to abide by it?

20   A.  No.

21   Q.  Did the Kreindler firm maintain a list of the individuals

22   who had signed each of the protective orders?

23           MS. KIRSCH:  Objection.  Foundation.

24           THE COURT:  If you know the answer, you can answer it,

25   sir.

1          THE WITNESS:  Say that again.

2          THE COURT:  You can answer the question if you are

3   able.

4   A.  No, I do not.

5   Q.  Did the IT department maintain a list of the individuals

6   who had signed the MDL and FBI protective order?

7   A.  No.

8   Q.  So you have no idea who at the firm had signed the MDL or

9   the FBI protective order, correct?

10  A.  Correct.

11  Q.  Now, sir, prior to September 27 of 2021, the protected

12  confidential material relating to the 9/11 case, they were

13  saved in electronic form in various places at the Kreindler

14  firm, correct?

15  A.  Can you repeat that question?

16  Q.  Sure.  I'm referring to the confidential and protected

17  material relating to the 9/11 case.  Those were saved in

18  various location at the Kreindler firm.  I'm talking

19  electronically.

20  A.  Are you saying that every document that was classified was

21  saved in different locations or --

22  Q.  Classified documents were saved in different locations,

23  correct?

24  A.  What do you mean by "locations"?

25  Q.  One of those locations was an internal proprietary server

1   that the Kreindler firm maintained?

2   A.  Yes.

3   Q.  One of those locations was a cloud-based storage system,

4   correct?

5   A.  Correct.

6   Q.  Some of that protected information was also saved as

7   attachments to emails and were discussed in Kreindler firm

8   emails, correct?

9   A.  Correct.

10  Q.  They were also saved on firm or home computers used by the

11  Kreindler attorneys, correct?

12  A.  I don't know.

13  Q.  You don't know one way or the other?

14  A.  What do you mean "one way or the other"?  Of what?

15  Q.  You have no idea whether any of the Kreindler attorneys

16  kept protected confidential information on their home

17  computers --

18  A.  No.

19  Q.  -- or on their devices, their phones?  You have no idea?

20  A.  No.

21  Q.  You were never asked to investigate that issue?

22  A.  No.

23  Q.  Now, you testified that one of the places that protected

24  information is stored is on the Kreindler firm's internal

25  proprietary server.  What's that server called?

LB1H9115                       Hartney – Cross

1    A.  The main server?  The exact name, it's NYFS1.

2    Q.  What do you refer to it as?

3    A.  Well, there's a share on that network called Case Media.

4    Q.  You refer to it as Case Media?

5    A.  And there's other shares also.

6    Q.  Was the 9/11 protected material stored in Case Media?

7    A.  Yes.

8    Q.  That includes -- well, do you know whether that includes

9    MDL-protected information as well as FBI-protected information?

10   A.  I don't know.

11   Q.  You just know that it's confidential, protected information

12   was stored in the Case Media server, correct?

13   A.  Correct.

14   Q.  Now, prior to September 27 of 2021, anybody who worked at

15   the Kreindler firm had access to the Case Media server,

16   correct?

17   A.  Could you repeat that.

18   Q.  Prior to September 27 of 2021, anybody who worked at the

19   Kreindler firm had access to Case Media where the protected

20   information relating to the 9/11 case was saved, correct?

21   A.  Yes.

22   Q.  That's all of the lawyers who worked at the Kreindler firm?

23   A.  Yes.

24   Q.  That's all of the staff at the Kreindler firm?

25   A.  Yes.

LB1H9115                         Hartney – Cross

1    Q.  That is individuals like John Fawcett as well?

2    A.  Yes.

3    Q.  So long as you had a Kreindler login, you could access that

4    Case Media, correct?

5    A.  Yes.

6    Q.  So that includes people who did not work on the 9/11 case,

7    right?

8    A.  Correct.

9    Q.  That includes people who had never seen the FBI or the MDL

10   protective order, correct?

11   A.  Can you repeat that question.

12   Q.  That includes people who had never seen the protective

13   orders in this case.  They had access to Case Media, too?

14   A.  You mean the users that have login credentials that have

15   never seen that information?

16   Q.  People who have not signed the protective orders in this

17   case, they had access to the Case Media server, too, correct?

18           MS. KIRSCH:  Objection.  He doesn't know who did or

19   didn't sign, so how can he answer that question?

20           THE COURT:  I think the testimony is that everybody

21   who has access to the server has access to this file.  Is that

22   correct, sir?

23           THE WITNESS:  Correct.

24           THE COURT:  OK.

25   Q.  And the firm has no ability to track who actually accessed

LB1H9115                         Hartney – Cross

1   any of the confidential and protected material saved in Case

2   Media, correct?

3   A.   Correct.

4   Q.   So you have no idea, for instance, whether Jim Kreindler

5   accessed the Al Jarrah transcript, correct?

6   A.   On.

7   Q.   On Case Media?

8   A.   Correct.

9   Q.   Or anybody else at the firm.  You just have no idea?

10   A.   Correct.

11   Q.   So sitting here today, throughout the history of this case,

12   you couldn't tell the Court who accessed any confidential

13   document relating to the 9/11 case, is that correct?

14   A.   That was on Case Media, correct.

15   Q.   And that's where the Al Jarrah transcript was saved,

16   correct?

17   A.   Correct.

18   Q.   All right.  Let's look at your declaration, 56F, please,

19   and I'm looking at paragraph 5.

20           Now, sir, in paragraph 5 you stated that only

21   individuals given Kreindler login credentials have access to

22   Kreindler's server.  Do you see that?

23   A.   Yes.

24   Q.   You're referring to Case Media there?

25   A.   Yes.

LB1H9115                        Hartney - Cross

1   Q.  When you say only individuals given Kreindler login

2   credentials, that's everybody at the firm, correct?

3   A.  Yes.

4   Q.  And then you say, "I created a directory on a network share

5   drive where the 9/11 litigation materials are saved," and then

6   you say that the Al Jarrah transcripts were saved there.

7           Do you see that?

8   A.  Yes.

9   Q.  Then you go on to say:  I was told the following had been

10  able to access the Jarrah transcripts, and then you list a

11  number of individuals.

12          Do you see that?

13  A.  Yes.

14  Q.  Who told you that?

15  A.  Well, I guess somebody along the way of the litigation had

16  told me that these certain individuals worked on the case.

17  Q.  Who told you that only those individuals had access to the

18  Jarrah transcript?

19          MS. KIRSCH:  I'm sorry.  Mr. Shen needs -- if he's

20  going to ask him about the words of the declaration, please

21  quote them properly.  That was --

22          THE COURT:  I think the word "only" is not there.

23          MS. KIRSCH:  I'm sure it was an accident.

24  BY MR. SHEN:

25  Q.  "I was told the following had been able to access the

1    Jarrah transcripts."  Those are your words, correct?

2    A.  Correct.

3    Q.  Actually, someone else drafted that language for you,

4    correct?

5    A.  Yes.

6    Q.  But you signed it under penalty of perjury?

7    A.  Correct.

8    Q.  Who told you the following had been able to access the

9    Jarrah transcript?  Who told you that?

10   A.  In particular, one particular person?  I guess it would be

11   Megan Benett.

12   Q.  Your best recollection is Ms. Benett told you that, is that

13   right?

14   A.  Yes.

15   Q.  Now, when you drafted -- before you signed this

16   declaration, you told Ms. Benett and the other attorneys that

17   everybody at the Kreindler firm had access to the Case Media

18   where the Jarrah transcript was saved, correct?

19   A.  Correct.

20   Q.  And, nonetheless, they urged you, and actually drafted the

21   language in your declaration, so you don't disclose that,

22   correct?

23            MS. KIRSCH:  Objection.

24            THE COURT:  What's the objection?

25   A.  The word "urge" I wouldn't say.  I signed the document that

LB1H9115                          Hartney – Cross

1    was truthful in that the only people that should be saving

2    documents and accessing documents in that -- in that directory

3    were these individuals listed.

4    Q.  Sir, you told Ms. Benett that everybody at the Kreindler

5    firm had access to everything in Case Media, correct?

6    A.  Correct.

7    Q.  That doesn't appear anywhere in your declaration, does it?

8    A.  No.

9    Q.  All right.  Ms. Benett drafted your declaration, right?

10   A.  Correct.

11   Q.  Did she tell you that she didn't want to disclose that to

12   the court?

13   A.  Yes.  Well --

14   Q.  Let's look, sir, at Exhibit --

15          THE COURT:  Sorry.  Can I ask a question, follow-up

16   question on this section before we move on?

17          MR. SHEN:  Absolutely.

18          THE COURT:  Would you mind putting the declaration

19   back up.

20          I was confused by a statement there.  The last at the

21   same time of this paragraph 5 says:  "I did not find any

22   evidence that the Jarrah transcripts had been downloaded,

23   printed, or emailed by anyone else."

24          I confess to not being the most technologically savvy

25   person, but my understanding of your declaration was that you

LB1H9115                        Hartney - Cross

1   couldn't tell whether anyone had downloaded, printed, or

2   emailed the transcript.  So one question I have is, is there

3   evidence that the people in the sentence preceding that last

4   line -- there is evidence that they had downloaded, printed, or

5   emailed the transcript?

6           THE WITNESS:  I'm not sure what you're saying.

7           THE COURT:  Your last sentence says:  "I did not find

8   any evidence that the Jarrah transcripts had been downloaded,

9   printed, or emailed by anyone else."  I read that to say that

10  the people in the line above, namely, Jim Kreindler, Steven

11  Pounian, all the way through to John Fawcett, that there was

12  evidence that they had either downloaded, printed, or emailed

13  the declaration.

14          THE WITNESS:  I meant that anybody other than those

15  people did not download.

16          THE COURT:  Anybody other than those people what?

17          THE WITNESS:  Yeah, did not download, print it, or

18  email.

19          THE COURT:  So you were able to see that those people

20  did, in fact, download, print, or email?

21          THE WITNESS:  We don't keep track of downloading and

22  printing or emailing.

23          THE COURT:  What does this sentence mean, "I did not

24  find any evidence that the Jarrah transcripts had been

25  downloaded, printed, or emailed by anyone else"?  I don't know

1   what that means.

2          THE WITNESS:  I guess what I'm trying to say there is

3   that I didn't really find any real solid evidence that anybody

4   other than those people downloaded, printed, or emailed.

5          THE COURT:  The transcript?  But you did have evidence

6   that those people did download, print, or --

7          THE WITNESS:  I had evidence that they -- two of them

8   emailed.

9          THE COURT:  Evidence that two of them had emailed it?

10          THE WITNESS:  Yeah.

11          THE COURT:  And those two people were?

12          THE WITNESS:  Were Debra Pagan and John Fawcett.

13          THE COURT:  Debra Pagan and John Fawcett.

14          So your system does allow you to see who downloaded,

15   printed, or emailed?

16          THE WITNESS:  I can only see the tracking of email.

17   We don't track downloading, printing.  But I guess I maybe

18   should have elaborated more and said that we don't track

19   downloading.

20          THE COURT:  So there would never be any evidence that

21   anybody downloaded or printed the transcript?

22          THE WITNESS:  No.

23          THE COURT:  OK.

24          THE WITNESS:  I mean, the downloading, that might

25   pertain to the downloading of it on the cloud server also.

1              THE COURT:  Downloading it from the cloud?

2              THE WITNESS:  Yes, that's being kept track.

3              THE COURT:  Right.  I think you go on to talk about

4    that in the next paragraph.

5              THE WITNESS:  Yeah.

6              THE COURT:  But this is the proprietary server.

7              THE WITNESS:  Yeah, OK.  Yes.

8              THE COURT:  So with respect to the proprietary server,

9    you cannot tell if anybody downloaded or printed?

10             THE WITNESS:  No, no, you cannot tell.

11             THE COURT:  So when you listed that there's no

12   evidence that the Jarrah transcript had been downloaded,

13   printed, or emailed by anyone else, what you're saying is you

14   know two people emailed it because you can track the email?

15             THE WITNESS:  Yeah.

16             THE COURT:  But you can't see if anybody downloaded it

17   or printed it?

18             THE WITNESS:  Yes.

19             THE COURT:  OK.  Thank you.  Sorry.

20             MR. SHEN:  Sure.

21   BY MR. SHEN:

22   Q.  Mr. Hartney, you said that Ms. Benett didn't want to tell

23   the Court that anyone at the Kreindler firm had access to all

24   of the protected 9/11 material.  What other attorneys told you

25   that they didn't want to tell that to the Court?

1    A.  No other.

2    Q.  Only Ms. Benett?

3    A.  Correct.

4    Q.  Is that right?

5    A.  Yes.

6    Q.  Did you discuss that issue with Mr. Maloney?

7    A.  No.

8    Q.  Did you discuss that issue with Mr. Pounian?

9    A.  No.

10   Q.  Did you ever discuss access issues at all with

11   Mr. Kreindler?

12   A.  No.

13   Q.  Can we look at paragraph 6 of your declaration in front of

14   you.

15          Paragraph 6 discusses the cloud-based storage system.

16   Do you see that?

17   A.  I don't see it yet.  It's not on the screen.  Yes, now it

18   is.

19   Q.  Do you see that?

20   A.  Yes, I see that.

21   Q.  Sir, the cloud-based system, is that called share file?

22   A.  Citrix share file, C-i-t-r-i-x.

23   Q.  And certain FBI and other protected information were saved

24   on that Citrix share file, is that right?

25   A.  My understanding, only thing I saw saved on it was the

LB1H9115                        Hartney – Cross

1  depositions that recall.

2  Q.  Particular depositions or many depositions?

3  A.  Many depositions.

4  Q.  All right.  Now, consultants, experts, and others could

5  access this cloud-based system if they were provided login

6  access.  That's what you write, correct?

7  A.  Correct.

8  Q.  But Mr. Fawcett, he was provided access to the internal

9  proprietary server, correct?

10  A.  Correct.

11  Q.  The firm actually considered Mr. Fawcett to be staff,

12  correct?

13  A.  I can't answer that question.

14  Q.  From an IT perspective, did you treat Mr. Fawcett any

15  differently from any other employee at the firm?

16  A.  You mean through access, login access?

17  Q.  Sure.

18  A.  Yes, we gave him login access and we gave him email access.

19  Q.  The question was did you treat him any differently than any

20  other employee at the firm?

21  A.  Did I treat him differently?  I guess not, no.

22  Q.  You were aware he had a phone at the firm?

23  A.  I was aware he had a phone.

24  Q.  Sorry?

25  A.  You mean a telephone, a desk phone?

LB1H9115                          Hartney - Cross

1    Q.  A desk phone, yes, sir.

2    A.  Yes.

3    Q.  All right.  And did he have his own email from the firm?

4    A.  Yes.

5    Q.  He had an office at the firm, correct?

6    A.  Yes.

7    Q.  Now, to view documents that were saved on this cloud-based

8    server, the user would actually have to download them, and so

9    you have a record of that, is that right?

10   A.  Yes.

11   Q.  That's the only location where documents were actually

12   stored on a server that keeps a record of who downloads them,

13   is that right?

14   A.  Can you -- when you mean "download," you mean download from

15   outside the office or do you mean download --

16   Q.  Just accesses the documents.

17   A.  Access the documents, yes.

18   Q.  That's the only system that tracks access to the documents?

19           (Discussion off the record)

20   A.  Yes.

21   Q.  You state in paragraph 6 that you reviewed the user history

22   of this cloud-based share file system on July 29, 2021.  Do you

23   see that?

24   A.  Yes.

25   Q.  And that's the first time that you did that, correct?

LB1H9115                        Hartney - Cross

1    A.  First time I ever reviewed it, I believe so, yes.

2    Q.  You were instructed to review it on July 29, correct?

3    A.  Correct.

4    Q.  Now, are you aware that Mr. Fawcett actually managed and

5    maintained confidential, protected materials on other

6    cloud-based systems?

7    A.  No.

8    Q.  Are you aware that he had a Dropbox account that he managed

9    that contained protected material?

10   A.  I know he had a Dropbox account.

11   Q.  Did you know that it contained protected material on it?

12   A.  No.

13   Q.  That's not something that you investigated?

14   A.  I wasn't asked to investigate that.

15   Q.  All right.  No one at the Kreindler firm asked you to

16   investigate any other cloud-based systems that contained

17   protected information, correct?

18   A.  Correct.

19   Q.  All right.  Now, let's show Exhibit 68, please.  Now, this

20   is a screenshot of a Dropbox account.  If we zoom in on the

21   right-hand side, it says that John Fawcett is the owner of the

22   account.

23       Now, you had no idea that Mr. Fawcett was saving

24   confidential and protected materials to this Dropbox account,

25   correct?

LB1H9115                          Hartney – Cross

1              MS. KIRSCH:  Objection.  This is a screenshot without

2       a date on it, without any context.

3              MR. SHEN:  There is a date on the document.

4              MS. KIRSCH:  Where is the date?

5              MR. SHEN:  It's in the bottom right-hand side,

6       October 15, 2021.

7              MS. KIRSCH:  OK.

8       BY MR. SHEN:

9       Q.  Sir, the question is did you have any idea that Mr. Fawcett

10      was saving protected material on other cloud-based servers such

11      as this Dropbox account?

12      A.  No.

13      Q.  Did you ever take any actions to limit his access after the

14      breach of the protective order?

15      A.  Yes.

16      Q.  -- to --

17      A.  I'm sorry.  Sorry.

18      Q.  -- to other cloud-based systems that he had, such as this

19      Dropbox account?

20      A.  Can you repeat the question.

21      Q.  Yeah.  Let me ask a cleaner question.

22              Sir, you had no idea that he maintained this Dropbox

23      account, right?

24      A.  I know he had the Dropbox.

25      Q.  You had no idea he had protected information on this

LB1H9115                          Hartney - Cross

1  account, right?

2  A.  Correct.

3  Q.  Did you undertake actions to limit his access to the

4  Dropbox account?

5  A.  After what time?

6  Q.  After the breach.

7  A.  Yes.

8  Q.  When?

9  A.  I don't recall the exact date, to tell the truth.  I'm

10  sorry.

11  Q.  Was it in October?

12  A.  I believe so, yes.

13       MR. SHEN:  All right.  Let's show Exhibit 67, please.

14  Q.  Exhibit 67 is an email from an attorney at my firm to

15  counsel for Kreindler & Kreindler identifying this particular

16  Dropbox account containing protected information.  It's dated

17  October 15.

18       Do you recall that after October 15 is when you

19  actually stopped Mr. Fawcett's access to that material?

20  A.  Can you repeat the question.

21  Q.  The email is dated October 15.  Do you see that?

22  A.  Yes.

23       THE COURT:  If you want to take a look over that

24  email, you can.

25       THE WITNESS:  OK.  OK.

LB1H9115                    Hartney – Cross

1    Q.  Sir, my question to you is, was it after October 15 that

2    you stopped Mr. Fawcett's access to that Dropbox account?

3    A.  I don't recall.

4    Q.  You don't know one way or another?

5    A.  I cannot tell you the exact date.

6    Q.  Sir, did you know that Mr. Fawcett maintained a cloud

7    platform called Tresorit that had MDL-protected information on

8    it?

9    A.  No.

10        MS. KIRSCH:  I'm going to object here.  I really don't

11   know where these lines of questions are going, but to the

12   extent it goes to our work product, and -- this could be

13   something that we would have an issue with this being discussed

14   in any depth publicly.  I don't know.

15        MR. SHEN:  This goes to the reasonableness of the

16   investigation and where protected materials were actually

17   saved.

18        THE COURT:  All right.  Thus far I don't see any issue

19   with work product, but if we get close, please raise an

20   objection.

21   BY MR. SHEN:

22   Q.  Now, sir, the question was did you know that Mr. Fawcett

23   was maintaining protected material on a cloud platform called

24   Tresorit?

25   A.  No.

LB1H9115                    Hartney – Cross

1    Q.  Did you ever stop Mr. Fawcett's access to a cloud platform

2    called Tresorit?

3    A.  No.

4           THE COURT:  Can I ask a clarifying question.  The

5    Dropbox account, was that a Kreindler & Kreindler account or

6    was that a Fawcett personal account?

7           THE WITNESS:  I can't tell from the screenshot where

8    that was coming from, whether it was from his personal account.

9    We did maintain an account for him.

10          THE COURT:  You maintained a Dropbox account for him?

11          THE WITNESS:  Yes, but I don't know from that

12   screenshot whether he had his own Dropbox account.

13          THE COURT:  Understood.  Thank you.

14          THE WITNESS:  I can't say either way.  It's possible.

15   BY MR. SHEN:

16   Q.  Sir, in the investigation that Mr. Maloney instructed you

17   to do pertaining to the breach, did you do any investigation of

18   Dropbox or Tresorit?

19   A.  No.

20          MR. SHEN:  I'm going to show an Exhibit 23, but before

21   I do that, I want to give Mr. Fawcett's counsel a chance to

22   comment on confidentiality.

23          THE COURT:  Sorry, Mr. Shen, you said Exhibit 23?

24          MR. SHEN:  Yes, your Honor.

25          (Counsel confer)

1          MR. SHEN:  Could we put up Exhibit 23, please.

2    Q.  This is a letter that counsel for Mr. Fawcett has written

3    to me.  If we could show the second page, there is a discussion

4    of a Tresorit-encrypted storage platform.  Do you see that?

5    A.  Yes.

6    Q.  Do you even know what that Tresorit platform is?

7    A.  I've never used it.

8    Q.  And you had no idea that Mr. Fawcett was using it?

9    A.  No.

10   Q.  Now, we discussed that confidential documents are also --

11   can be saved on the email server if they're attachments to

12   emails or they're discussed in the body of emails, correct?

13   A.  Can you say that one more time.  Repeat that.

14   Q.  Sure.  Confidential, protected documents, they could also

15   be attached to emails that are sent around.  If they are, then

16   they're saved on the email server, is that right?

17   A.  Yes.

18   Q.  Now, part of your responsibilities is managing the

19   Kreindler email system, is that right?

20   A.  Correct.

21   Q.  Now, the Kreindler firm, in connection with the 9/11 cases,

22   has hired a number of investigators, former FBI agents.

23   They're all disclosed on the public record.  Do you give

24   Kreindler email accounts to those investigators?

25   A.  No.

LB1H9115                         Hartney – Cross

1   Q.  All right.  Now, you have administrative access to the

2   email server, so you can search that server, is that right?

3   A.  Correct.

4   Q.  And you can monitor the email activity at the firm, right?

5   A.  What do you mean by monitoring?

6   Q.  If you wanted to search for particular content on the email

7   server, you could do that, right?

8   A.  Yeah, I can search for content.  I don't see content

9   moving, watching it where it's going to and from, but I can do

10  a search from where it's going to and from.

11  Q.  Can we look at your declaration, 56F, again, paragraph 8.

12          Now, sir, in paragraph 8 of your declaration, you

13  described the search of the Kreindler email system that you

14  conducted, is that right?

15  A.  Correct.

16  Q.  You say that you searched for incoming and outgoing

17  messages to three -- or four email addresses relating to Mike

18  Isikoff from June 1, 2021, to August 1, 2021, is that right?

19  A.  Yes.

20  Q.  Did you search for any deleted messages?

21  A.  It would search -- my understanding was Office 365 that it

22  saves 30 days and stays under the purged directory.

23  Q.  So if a user manually deletes an email, it goes into a

24  purge file and Office 365 will search that purge file and can

25  locate that deleted email?

1    A.  Yes, I believe so.

2    Q.  What if it's gone past 30 days?

3    A.  Then I don't know.

4    Q.  Is that email gone forever?

5    A.  I believe so, yes.

6    Q.  All right.  So you say that you conducted this search.  The

7    search parameters were June 1 to August 1, 2021.  That means

8    that you necessarily conducted that search after August 1,

9    right?

10   A.  Yes.

11   Q.  All right.  So if the user had deleted a document in June

12   and manually deleted that document, your search would not have

13   located that document, is that right?

14   A.  I should say I don't really know.

15   Q.  Did you search for emails that were saved on the hard

16   drives of any of the attorneys or staff?

17   A.  No.

18   Q.  Did you conduct a search of any home computers, laptops,

19   devices?

20   A.  No.

21   Q.  Did you search any text messages?

22   A.  No.

23   Q.  Phone logs?

24   A.  Phone logs for what?

25   Q.  Did you search any phone records?

LB1H9115                         Hartney - Cross

1   A.  Phone records, yes.

2   Q.  You did search phone records?

3   A.  Phone records for certain phone calls, I -- yes.

4   Q.  Let me ask a clean question.

5   A.  Yes, not exactly sure.

6   Q.  Did you look through Kreindler & Kreindler's phone records?

7   A.  I didn't personally look through Kreindler & Kreindler.

8   Q.  Did you pull them?

9   A.  I had them.  I had the counsel for our -- our phone vendor,

10  our phone provider.

11  Q.  This was after Ms. Kirsch had been retained?

12  A.  Correct, yes, yes.

13  Q.  Correct.

14         But in connection with what you're describing as the

15  investigation in your declaration, did you pull any phone

16  records?

17  A.  No, no, no.

18  Q.  Now, if the user does not delete an email, does that email

19  get purged automatically from the Kreindler system?

20  A.  My understanding, we used a default Office 365, which is

21  30-day window.

22  Q.  30-day default?

23  A.  Yes.

24  Q.  So if an email is in an inbox and it's now been 31 days,

25  that email is deleted off the server?

LB1H9115                          Hartney - Cross

1    A.  Oh, no, no.  I misunderstood your question.

2    Q.  OK.

3    A.  Nobody -- unless it's deleted by the user.

4    Q.  But is there an automatic purging of emails if the user

5    does not delete it?

6    A.  No.

7    Q.  All right.  So if someone had an email from five years ago

8    that they didn't delete, it would still be in the inbox?

9    A.  Correct.

10   Q.  Now, paragraph 9, you describe another email search, is

11   that right?

12   A.  Correct.

13   Q.  You say that you searched the email server for outgoing,

14   incoming, saved, and deleted messages containing the names

15   Jarrah or Isikoff or the name that the court reporter had given

16   to the transcript.  You see that?

17   A.  Yes.

18   Q.  And, again, the same search period -- well, strike that.

19           Did you do that after August 1, or did you do it

20   before?

21   A.  Well, that's a good question.  It had to be after August 1,

22   I believe.  I can't -- yeah, actually, yes, I can -- it was

23   done -- I've done multiple searches to make sure that it was a

24   thorough investigation of our email system, and so I performed

25   the searches two or three, maybe even four, five times.  I had

LB1H9115                        Hartney – Cross

1   redone that search either if it was before or after.

2   Q.  You did that search several times?

3   A.  Yes.

4   Q.  The same search, searching for Jarrah or searching for

5   Isikoff or the name in the transcript?

6   A.  Yes.

7   Q.  You did that several times, and you say that the only

8   emails that resulted are attached at Exhibit 1 of your

9   declaration.  You see that?

10  A.  Yeah.

11  Q.  That's in paragraph 10.

12  A.  I see that.

13  Q.  And you attached several emails in Exhibit 1.  You see

14  that?

15  A.  I'm supposed to be looking at the exhibits, the emails

16  or --

17  Q.  Yes.  Can we look at Exhibit 1, and we'll look in

18  particular at page 6.  This is one of the emails that you cite

19  in your declaration.  You with me?

20  A.  Yes.

21  Q.  And this particular email is one from Jim Kreindler to Mark

22  Seman of Yahoo! News, and it's discussing Mr. Kreindler's

23  appearance on the *Conspiracyland* podcast.  Do you see that?

24  A.  Yes.

25  Q.  And you see that Mr. Kreindler is actually sending the

LB1H9115                          Hartney - Cross

1   email from his personal device, right?

2   A.  Yes, I believe so.

3   Q.  It says "sent from my iPhone."  You see that?  You see

4   that?  You have to say yes or no.

5   A.  Yes.

6   Q.  Sir, you see that of all of the emails that you've attached

7   in your exhibits, I will represent to you that this is the one

8   earliest in time.  This is the earliest email, June 28 of 2021.

9          Now, given the fact that Mr. Kreindler is being sent

10  details on when to appear on the *Conspiracyland* podcast, it

11  certainly stands to reason that he had earlier communications

12  with Mr. Isikoff, right?

13         MS. KIRSCH:  I'm going to object to that.  I'm not

14  really sure why this witness should be opining on what the

15  pattern of communications should or should not have been.

16         THE COURT:  Sustained.

17  Q.  Sir, did you search for any emails prior to June 28, after

18  you saw this email?

19  A.  You're asking is this search --

20  Q.  Let me ask --

21  A.  -- June 1?

22  Q.  When you saw this email June 28 coming from

23  Mr. Kreindler's iPhone setting up an appointment to appear on

24  the podcast, did anyone ask you to determine whether there were

25  earlier communications?

LB1H9115                         Hartney - Cross

1    A.  No.

2    Q.  Sir, you never asked for Mr. Kreindler's personal devices

3    or his personal emails, is that right?

4    A.  What do you mean by "personal email"?

5    Q.  Like if he has a Yahoo! account or Gmail account, you never

6    asked for access to those?

7    A.  No.

8    Q.  And even after Ms. Kirsch got involved in this case, do you

9    know if Kreindler ever searched the personal emails of any of

10   its attorneys?

11   A.  Do I know?  No, I don't know.

12   Q.  If you could look at page 13 of your declaration -- of the

13   exhibits to your declaration.  Page 13 is an email from

14   Mr. Fawcett to Mr. Isikoff dated July 12, 2021, is that right?

15   A.  Yes.

16   Q.  And this email attaches a privilege log, but there's no

17   actual content in the body of the email, correct?

18   A.  I believe that's true.  I'm not sure.  I can't remember.

19          THE COURT:  Sir, can you put the microphone just

20   closer to you so the court reporter can hear you.

21          THE WITNESS:  Oh, I'm sorry.

22   Q.  This email certainly suggests that there were earlier

23   communications with Mr. Fawcett.  Did anyone ask you to search

24   for those communications?

25          MS. KIRSCH:  I'm sorry.  I'm going to object to what

LB1H9115                          Hartney - Cross

1   this document does or doesn't imply.

2           THE COURT:  OK.  He can answer the question, though,

3   as to whether or not anyone asked him to follow up.  I'll

4   accept your objection as to its implications, but Mr. Shen can

5   ask the question.

6   A.  No.

7   Q.  Now, sir, because the firm has the ability to monitor its

8   firm emails, it's certainly the case that if someone were to

9   leak confidential information, it wouldn't make any sense to

10  leak it over firm email, correct?

11  A.  It's my opinion you're asking?

12  Q.  Yes.

13  A.  My opinion -- can you repeat the question.

14  Q.  Sure.  The firm has the ability to monitor firm email.  You

15  testified to that, correct?

16  A.  Correct.

17  Q.  Now, because it has that ability, if someone were to leak

18  confidential information, it would make no sense to do that

19  over firm email, correct?

20          MS. KIRSCH:  I'm going to object to that.  Who knows

21  what monitoring there is or isn't?  It's a ridiculous question

22  for this witness.

23          THE COURT:  Sustained.  You can ask a different

24  question, please.

25  Q.  Now, paragraph 10 of your declaration discusses -- it

LB1H9115                     Hartney - Cross

1   states that all of the results of your searches are attached

2   to -- in Exhibit 1.  Do you see that?

3   A.  Yes.

4   Q.  The exact language is "the only" emails returned are in

5   Exhibit 1.  Do you see that?

6   A.  Yes.

7   Q.  If you could, there's a binder to your right.  It might be

8   easier to flip through that.

9          THE COURT:  It's going to be the larger one, sir.

10  I'll take this one.

11         THE WITNESS:  Not that one?

12         THE COURT:  You're going to want that one.

13  A.  OK.  What number?

14  Q.  Now, sir, Exhibit 1, I'm going to represent to you, doesn't

15  contain any of the emails from the court reporter with the

16  Jarrah transcript, and you can confirm that.

17  A.  Where would I find it?

18  Q.  56F, please.

19  A.  Can you -- which document are you talking about?  Can you

20  show me the document?

21  Q.  Sure.  It's 56F.  It's Exhibit 1.  It's on page 5.

22  A.  OK.

23  Q.  Behind page 5 are what you describe in your deposition as

24  the only emails returned as a result of the searches you

25  conducted, and specifically, the searches you conducted are

LB1H9115                        Hartney - Cross

1    described as a search of emails for Jarrah, Isikoff, or the

2    name of the transcript.

3    A.   Yes.

4    Q.   All right.  So you don't see any email from the court

5    reporter providing the transcript, correct?

6    A.   Can you repeat that.

7    Q.   You don't see an email from the court reporter providing

8    the transcript in Exhibit 1?

9    A.   I'm not sure.  I'm sorry.  I'm not following you.

10   Q.   All right.  I'm going to make a representation to you.

11   Exhibit 1 does not contain any transmission from the court

12   reporter to anyone at the Kreindler firm containing the Jarrah

13   transcript.

14   A.   The court reporter?

15   Q.   The court reporter who actually took down the transcript of

16   the deposition and then sent the transcript to the Kreindler

17   firm by email.

18   A.   So you're saying that there's -- I'm not following you.

19   I'm sorry.  Can you just --

20   Q.   Sure.  All right.  Let's take a step back.

21   A.   OK.

22   Q.   Your declaration says that all of the emails that you

23   located in your search are contained in Exhibit 1, right?

24   A.   That's only one email.

25   Q.   Paragraph 10 says:  "The only emails returned as a result

LB1H9115                          Hartney - Cross

1   of the searches I conducted are in Exhibit 1."  That's what it

2   says, right?

3   A.  I don't think it's showing all the emails.

4   Q.  So Exhibit 1 does not contain all the emails that you

5   located?

6   A.  No, there's more emails than that.

7   Q.  Can you speak into the microphone.

8   A.  Oh, I'm sorry.  Yes, there's more emails.

9   Q.  There's more emails than are in Exhibit 1?

10  A.  Yes.

11  Q.  What happened to those emails?

12  A.  I thought they were all part of the exhibits.

13  Q.  All right.  But what we know is that the actual statement

14  in paragraph 10 of your declaration is false?

15  A.  I don't understand why all the other emails wouldn't be in

16  there.

17  Q.  OK.

18  A.  I don't know.

19  Q.  Sir --

20  A.  I don't think it's our --

21  Q.  Did you actually do a search through all of the emails for

22  the name Jarrah or Isikoff?

23  A.  I don't recall the exact search.  I think it would be both

24  one or the other, yes, not for both.

25  Q.  One or the other?

LB1H9115                        Hartney - Cross

1   A.  Yes.

2   Q.  OK.  The term "Jarrah," you would agree, would come up with

3   dozens and dozens and dozens of hits, correct?

4   A.  Yes, I believe so, yes.

5   Q.  How many hits came up when you did that search?

6   A.  I don't recall.

7   Q.  Did you provide those documents to Mr. Maloney?

8   A.  The -- no, I reviewed them myself.

9   Q.  You reviewed them yourself?

10  A.  Yeah.

11  Q.  But what we know from your declaration is that when you

12  state that all of the results of your searches are listed in

13  Exhibit 1, that's not a correct statement?

14  A.  Well, for some reason, I don't -- well, the only emails

15  returned -- there is an email.  So this is only one email.  Are

16  there two emails?  There was a couple of emails between --

17          THE COURT:  Why don't you spend two minutes and just

18  flip through.

19          THE WITNESS:  I'm sorry.

20          THE COURT:  That's OK.  Because there are a handful of

21  emails in that attachment.  Why don't you spend just a minute

22  to flip through it so you can see.

23  A.  Oh, it's this part.  I'm sorry, because I'm going back and

24  forth to the screen.

25          So all this is part of Exhibit 1.  In between here

LB1H9115                       Hartney - Cross

1   is -- I'm not understanding it.  So everything in between --

2   I'm sorry, all the emails are.  I was thinking -- confused

3   because it came up to this document.  Why is this --

4   Q.  Take a minute to review the emails that are in Exhibit 1,

5   sir.

6   A.  Okay.  I thought Exhibit 1 ended here because it had this.

7       Yes, I didn't --

8   Q.  OK.

9   A.  -- I thought the exhibit list ended when it hit this letter

10  here.

11  Q.  All right.  Sir, I've counted a total of ten emails.  I can

12  make that representation to you, sir.

13  A.  I wish there were more.  Yes, these are all the emails.

14  Q.  All right.  Did you actually do a search for all emails for

15  the term "Jarrah"?

16  A.  Say that again.  Sorry.

17  Q.  Did you actually do a search of the email server for the

18  term "Jarrah"?

19  A.  No.

20  Q.  What did you do an email search of?

21  A.  Sorry, emails.  I'm sorry.  When you said "search," I

22  apologize, I thought you meant network search.  Email server.

23  Q.  Did you do a search for just the term "Jarrah"?

24  A.  Yes.

25  Q.  And all of the searches that came up are in these ten

LB1H9115                    Hartney – Cross

1   emails attached as Exhibit 1?

2   A.  Yes.

3   Q.  Did you --

4   A.  I'm sorry.  I'm sorry.  Say that again.  All the emails

5   that had Jarrah in it?

6   Q.  Yes.

7   A.  Are in these emails?

8   Q.  Yes.

9   A.  There would be more emails because it was discussed, yes.

10  Q.  How many more emails?

11  A.  I don't know.

12  Q.  Did you review those emails?

13  A.  Yes.

14  Q.  Was it hundreds of emails?

15  A.  I don't remember.

16  Q.  All right.  But what we do know is that the statement in

17  your declaration saying all of the emails that hit upon your

18  searches are contained in Exhibit 1, that's not a true

19  statement?

20          MS. KIRSCH:  I'm sorry.

21  A.  That's --

22          MS. KIRSCH:  Could I have the question read back?  I

23  think I have an objection.  I don't think that states his

24  testimony, but I could be mistaken.

25          THE COURT:  Can you read the question.

LB1H9115                          Hartney – Cross

1      (Record read)

2           MS. KIRSCH:  That's fine.

3           THE COURT:  OK.  You can answer it.

4           THE WITNESS:  Can you repeat that again.  I'm reading

5   what I wrote here.

6      (Record read)

7   A.  No, all the searches -- no, the only -- they talk about --

8   what I'm talking about is emails with the portion of the Jarrah

9   deposition transcript in it.

10  Q.  That's not what your declaration says, sir.  Paragraph 9 of

11  your declaration says --

12  A.  I'm sorry.  I'm looking at 10.  I also searched -- I have

13  10 up on my --

14  Q.  Can we show paragraph 9.

15       Paragraph 9 says that you searched emails for Jarrah

16  or Isikoff or the name of the transcript.

17  A.  Yes.

18  Q.  Did you do that search?

19  A.  Yes, I did that search.

20  Q.  All right.  Were there hundreds of emails that came up with

21  just the term "Jarrah" in it?

22  A.  I can't recall.

23  Q.  There were more than ten, right?

24  A.  Yes.

25  Q.  And your Exhibit 1 attaches only ten emails?

LB1H9115                              Hartney - Cross

1    A.  Because on my -- the only emails return results conducted

2    are attached, because I was referring to that didn't have the

3    Jarrah deposition.

4    Q.  Say that again, sir.

5    A.  I was referring to that didn't discuss -- that didn't have

6    any Jarrah deposition transcripts attached to them, so --

7    Q.  You're only referring to the emails that didn't have Jarrah

8    deposition transcripts attached to them?

9    A.  Yes.

10           MR. SHEN:  All right.  Let's show Exhibit 31, please.

11   Q.  Exhibit 31 is an email that my colleague sent to a number

12   of attorneys at the Kreindler firm.  It has the term "Jarrah"

13   in it.  It's not attached as Exhibit 1 to your declaration.

14   A.  No, but I was referring to anything that has to do with the

15   Jarrah transcript.  Any text of Jarrah transcript, that's what

16   I was referring to.

17   Q.  Just so the record is clear, what is in Exhibit 1?

18   A.  It's the emails.  It is just the emails that are between

19   Isikoff and Jim Kreindler.

20   Q.  All right.  Sir, we're going to move on from this point.

21           These paragraphs, were they drafted by Ms. Benett?

22   A.  Correct.

23   Q.  Did she pull together the documents for this declaration?

24   A.  I believe so, yes.

25   Q.  All right.  Are you aware, sir, that on July 21 my firm

LB1H9115                    Hartney – Cross

1    informed the Kreindler firm that we were aware of the leak and

2    that we were going to move the Court for certain discovery

3    pertaining to the leak?

4    A.  Say that again.  Can you?

5    Q.  Were you aware, sir, that on July 21 my firm reached out to

6    the Kreindler firm and told the Kreindler firm that we were

7    aware of the leak of the transcript, and we were going to move

8    the Court for certain relief pertaining to the leak?

9    A.  No, I wasn't.

10   Q.  Are you aware that the Kreindler firm wrote to the Court on

11   July 27 and took the position that there should not be

12   discovery?

13   A.  No.

14   Q.  On July 27 –– I'm not going to show you on the screen, but

15   I will read it to you.  It says that plaintiffs advised

16   Saudi Arabia that each of the lead PEC firms had already

17   conducted internal investigations into the handling of the

18   Jarrah transcripts and communications with Mr. Isikoff.  That

19   was on July 27.

20          For the Court's reference, that's Exhibit 43.

21          When those representations were made by the Kreindler

22   firm, you had not, in fact, done any search of the cloud-based

23   server, correct?  That was done on July 29, as we discussed?

24   A.  I believe so, yes.

25   Q.  On July 27, you had not done any review of the Case Media

LB1H9115                        Hartney - Cross

1    proprietary internal server, correct?

2                MS. KIRSCH:  I'm sorry.  What's the foundation for

3    that question?

4                MR. SHEN:  I'm asking, as of that date, whether

5    Mr. Hartney had done the search.

6                MS. KIRSCH:  Objection.  I don't know what the

7    foundation is for that date.

8                THE WITNESS:  Yeah, I don't --

9                THE COURT:  The date is the date of a letter that was

10   filed with the court.  I believe the -- Mr. Shen is asking

11   about a letter that was filed with the court by the Plaintiffs'

12   Executive Committee on July 27, and I think Mr. Shen is asking

13   about what investigation had been conducted at that point in

14   time.

15               MS. KIRSCH:  I understood Mr. Shen to say, Isn't it

16   true that your investigation did not happen by July 27? which

17   struck me as an inappropriate.  We have no foundation for when

18   Mr. Hartney's searches took place.  That was the basis of my

19   objection.

20   BY MR. SHEN:

21   Q.  Let me ask the question.  July 27, the Kreindler firm

22   writes to the court saying that the investigation is complete.

23   As of that date, had you done an investigation of the Case

24   Media internal proprietary server?

25   A.  Only to the fact that we found that document in Case Media,

LB1H9115                        Hartney - Cross

1    but no.

2    Q.  OK.  Only the fact that it was stored on that media server,

3    but no other investigation, correct?

4    A.  Yeah.

5    Q.  And as of that date, you knew that anyone at the Kreindler

6    firm had access to everything on that server, correct?

7    A.  Correct.

8    Q.  Now, as of July 27, you knew that there were email

9    communications between Mr. Kreindler and Mr. Isikoff, as well

10   as email communications between Mr. Fawcett and Mr. Isikoff, is

11   that right?  Those are attached as Exhibit 1 to your

12   declaration.

13   A.  Yes.

14   Q.  And you knew that some of those email communications came

15   from Mr. Kreindler's personal device, correct?  We saw --

16   A.  Yes.

17   Q.  -- that it was sent from his iPhone, and no one asked you

18   to search for his iPhone, right?

19   A.  Correct.

20   Q.  Or his personal email?

21   A.  That came up on the Kreindler email.

22   Q.  No one asked you to reach out to Jim Kreindler and provide

23   his personal email, correct?

24   A.  Correct.

25   Q.  So it's certainly the case by July 27 that you could not

LB1H9115                    Hartney – Cross

1    have concluded that no one at the Kreindler firm was the source

2    of the leak, right?

3    A.   Yeah, I believe so.

4    Q.   Let's look at Exhibit 49.  This is the August 30 order from

5    the court.  On page 2 of that order, it says that the Kreindler

6    firm is required to provide a declaration from the head of the

7    law firm's information technology group that should demonstrate

8    that a forensic analysis was done to identify who accessed the

9    deposition transcripts and determine the dates of that access.

10           You see that?

11   A.   Yeah.

12   Q.   And you knew it was impossible for you to conduct any

13   forensic analysis of who had actually accessed the Jarrah

14   transcripts on the Case Media server, correct?

15   A.   I was never asked to do one.

16   Q.   You were never asked to do one?

17   A.   I don't recall, no.  I mean, in the sense that we don't

18   keep any tracking of that information.

19   Q.   All right.  So no one asked you to do a forensic analysis,

20   correct?

21   A.   Correct.

22   Q.   Now, are you aware, sir, that on September 27 the Kreindler

23   firm informed the court that John Fawcett had leaked the Jarrah

24   transcript to Michael Isikoff?

25   A.   Can you repeat that.

LB1H9115                        Hartney - Cross

1    Q.  Are you aware that the Kreindler firm on September 27

2    informed the court that John Fawcett had leaked the Jarrah

3    transcript to Michael Isikoff?

4    A.  One more time.  What date?

5    Q.  September 27.

6    A.  Correct, yes.

7    Q.  And after that disclosure, were you asked to conduct any

8    forensic investigation of anybody's computer to determine

9    whether they knew of that leak or directed it?

10   A.  Was -- no.

11   Q.  After that disclosure and before Ms. Kirsch got involved in

12   October, were you asked to search personal devices, text

13   messages, personal emails?

14   A.  No.

15   Q.  Were you asked to search phone records?

16   A.  After the --

17   Q.  After the leak but before Ms. Kirsch got involved.

18   A.  No.

19   Q.  All right.  So as you sit here today, you have no ability

20   to conclude that no one at the Kreindler firm had directed the

21   leak or had knowledge of it, correct?

22   A.  I was just directed to do what the --

23   Q.  And you just did what the attorneys told you?

24   A.  Well, and we all discussed a -- a -- you know, a way of,

25   you know, doing searches on emails to see if it went out from

LB1H9115                          Hartney - Cross

1    the Kreindler.

2    Q.  You're referring to searches of the Kreindler email server?

3    A.  Yes.

4    Q.  And that's it, that's the only search you did, right?

5    A.  Yes.

6           THE COURT:  I don't want to interrupt you, Mr. Shen,

7    but I think, for the court reporter's sake, we're going to take

8    a break at some point, but you tell me if you think you're

9    getting close or if you want to take a break.  I don't know how

10   much longer you've got.

11          MR. SHEN:  Five to ten minutes, and I'll be done.

12          THE COURT:  OK.  So let's finish this witness for you,

13   and then we'll take a break and then Ms. Kirsch will go.

14   BY MR. SHEN:

15   Q.  If we could look at Mr. Fawcett's declaration, Exhibit 59,

16   from September 30 and paragraph 3.  Mr. Fawcett says -- first

17   of all, have you seen this declaration before?

18   A.  No.

19   Q.  No.  So this is your first time looking at it?

20   A.  Correct.

21   Q.  Now, Mr. Fawcett says that "I privately communicated with

22   Michael Isikoff several times between June 1 and August 1 of

23   this year."

24          After September 27, did anyone ask you to look at the

25   firm's phone records for Mr. Fawcett's communications with

1  Mr. Isikoff or with anyone else?

2  A.  Yes.

3  Q.  Was that after Ms. Kirsch got involved?

4  A.  Correct.

5  Q.  But not before that, correct?

6  A.  Correct.

7  Q.  Now, are you currently in the process of installing an

8  internal proprietary server that actually restricts access to

9  who can access the 9/11 materials?

10 A.  Yes, that's in place.

11 Q.  It's already in place?

12 A.  Yes.

13 Q.  And you did that after September 28, correct?

14 A.  I can't recall the date I did it.

15 Q.  But it was after the disclosure of the leak?

16 A.  Yes.

17 Q.  And are you currently installing or have you installed a

18 system that tracks who actually accessed proprietary material?

19 A.  Yes.

20 Q.  All right.  Are you aware that that type of software is

21 routinely available and used by law firms to keep protected

22 information actually protected?

23 A.  Yes.

24 Q.  Now, paragraph 7 of Mr. Fawcett's declaration says that he

25 used a ProtonMail account to send the transcript to

LB1H9115                           Hartney - Cross

1  Mr. Isikoff.  Do you see that?

2  A.  Yeah.

3  Q.  Anyone ever ask you to get Mr. Fawcett's ProtonMail

4  account?

5  A.  No.

6  Q.  And you never did any investigation of that ProtonMail

7  account, correct?

8  A.  Correct.

9  Q.  You never reached out to ProtonMail to determine whether

10 any of the messages Mr. Fawcett had sent to Mr. Isikoff were

11 still available?

12 A.  Correct.

13 Q.  Did you ever, after the disclosure that Mr. Fawcett was the

14 source of the leak, seek the return of his home computer to the

15 firm, his personal computer?

16 A.  No.

17 Q.  No one asked you to do that?

18 A.  No.

19 Q.  Do you have any idea what protected and confidential

20 material is on that computer?

21      MS. KIRSCH:  I'm going to object here.  There's

22 implications in these questions that are inappropriate.

23 Mr. Fawcett was an outside consultant.  He had his own personal

24 laptop.  This line of questioning has no foundation and is not

25 relevant, and it's misleading, as Mr. Shen well knows.

LB1H9115                    Hartney – Cross

1          MR. SHEN:  I'm asking the witness whether he

2   personally engaged in certain conduct, and the question here is

3   whether he sought the return of devices that held protected and

4   confidential material.

5          MS. KIRSCH:  And I object to the use of the word

6   "return" because if it's his own personal computer, there's

7   nothing to return.  It's a misleading question, and Mr. Shen

8   knows it.

9          THE COURT:  The objection is overruled.  You can

10  answer the question.

11         THE WITNESS:  Say it again.

12         THE COURT:  You can answer the question.

13  A.  OK.  Can you repeat the question?

14  Q.  Yeah.  Did you ever ask or did anyone ever ask you to get

15  Mr. Fawcett's laptop and inspect it?

16  A.  No.

17  Q.  Did anyone ever ask you to get Mr. Fawcett's cell phones

18  and inspect it?

19  A.  No.

20         MR. SHEN:  No further questions.  Thank you very much.

21         THE COURT:  OK.  We'll take a very quick recess, and

22  we'll be back in five minutes.

23         (Recess)

24

25

1    THE COURT:  Ms. Kirsch, you may proceed.

2    REDIRECT EXAMINATION

3    BY MS. KIRSCH:

4    Q.  Good afternoon, Mr. Hartney.

5    A.  Good afternoon.

6    Q.  Mr. Hartney, we just spent a fair amount of time talking

7    about the searches that you performed and what you were

8    directed to perform over the summer.

9         So there is a book that's not that big yellow one.

10   It's a slightly smaller one that has tabs in it.  We are going

11   to look at some of the documents in that book.

12   A.  Sure.

13   Q.  So let me turn your attention, to begin with, right to

14   Exhibit 2, tab 2.  If you look down at the bottom, which is the

15   first e-mail in this thread, it seems to be Mr. Maloney sending

16   you a note on July 21st saying "any questions?"  Do you see

17   that?

18   A.  Yes.

19   Q.  And then, if we go up to the next e-mail, you are reporting

20   on what it is you have done on the e-mails called "Jarrah

21   search."  Do you see that?

22   A.  Correct.

23   Q.  Now, can you tell me what your search, looking at this

24   e-mail, what did you do and what turned up as a result of this

25   search?

LB189116                     Hartney – Redirect

1   A.  It was a pretty broad search in the beginning.  So it

2   turned out a good number of hits, like I said, but I don't know

3   exactly how many hits.

4   Q.  I am going to ask you if you could please get a little

5   closer to the microphone.  That's just me personally.  I don't

6   hear so well.

7        I see the last line you write, "I did not see any

8   e-mails going out of anyone's e-mail box with that particular

9   transcript."

10        Do you remember why you wrote that line or what you

11   meant by that?

12   A.  I meant that I didn't find the Jarrah transcript being

13   e-mailed out by anybody at Kreindler.

14   Q.  Was that the first thing you were looking for as of July

15   21st?

16   A.  Yes.

17   Q.  Then the next two e-mails suggests that you and Mr. Maloney

18   are looking to speak by phone.  Do you recall that?

19   A.  The conversation?

20   Q.  Yes.

21   A.  Yes.

22   Q.  Do you remember what you discussed on that phone call?

23   A.  It was to narrow the search down with particular search

24   terms and e-mail addresses.

25   Q.  Then, if you turn to Exhibit 4, this document appears to be

LB189116                     Hartney - Redirect

1  a text message exchanged on July 22nd between you and Mr.

2  Maloney.  Do you see that?

3  A.  Yes.

4  Q.  And Mr. Maloney appears to say to you, "Please finish your

5  second search on Isikoff ASAP and let me know tomorrow before

6  noon if possible."  Do you see that?

7  A.  Yes.

8  Q.  Do you remember what that second search was on July 22nd

9  that you were asked to perform?

10  A.  The exact search, no.  But it was for the e-mail -- adding

11  more e-mail addresses that Isikoff used and using the name of

12  the deposition.  It was a developing search criteria that we

13  were gathering each time we would find it.

14  Q.  So, prior to July 22nd, you had done a first immediate

15  search that turned up some results, is that right?

16  A.  Yes.

17  Q.  And then as more search terms became available, or more

18  targeted search terms, you went back at Mr. Maloney's direction

19  to do a second search, is that my understanding?

20  A.  Yes.

21  Q.  So, if you look then at tab 5, can you read me -- so this

22  appears to be another text on July 22nd.  Would you read that

23  text message that you sent to Mr. Maloney here?

24  A.  "Performed search on Isikoff name and e-mail address and

25  found no one sent him the transcript.  There was e-mail

LB189116                     Hartney – Redirect

1   communication with Jim discussing lifting of the gag order and

2   Isikoff writing an article."

3   Q.  So, can you just tell us, reading that, what exactly you

4   had been asked to do and what that turned up?

5   A.  That was –– we performed the search on Isikoff's name and

6   additional e-mail addresses.

7   Q.  And specifically what were you looking for with those

8   searches?

9   A.  We were looking for whether the transcript was sent out by

10  anybody in Kreindler.

11  Q.  So, if you look now at tab 8, this is something that you,

12  Mr. Hartney, are forwarding to Mr. Maloney on July 22nd.  Is

13  this one of the e-mails that you found in your search?

14  A.  Yes.

15  Q.  And you were sending it to Mr. Maloney for his review?

16  A.  Yes.

17  Q.  And if you look at tab 9, Mr. Hartney, is this also an

18  e-mail that you had found by July 22nd responsive to your

19  search that you're sending to Mr. Maloney?

20  A.  Yes.

21  Q.  What does Mr. Maloney respond to you, up at the top?

22  A.  "Thank you.  Is this all there is?"

23  Q.  Do you remember if that was all there is?

24  A.  I can't recall.  I think there were some other e-mails.

25  Q.  OK.

LB189116                    Hartney – Redirect

1    A.  I can't recall.  I'm sorry.

2    Q.  If we turn to Exhibit 14, would you take a look at this

3    document Exhibit 14, and can you just tell me what it is,

4    please?

5    A.  This is the users that have access to the deposition files

6    that were shared on the shared file system.

7    Q.  Can you walk me through this chart and tell me what it

8    reflects?  There's check boxes and names.  Can you explain it

9    to the Court, please?

10   A.  It's hard to see, but it looks like the first one is

11   view/download.  So any check mark would be, you would be able

12   to view or download the transcript.

13           The other one is download alerts, that you would

14   receive an alert if anybody had downloaded any documents from

15   the system.

16   Q.  Is it fair to say that these boxes reflect different

17   permissions or different actions?

18   A.  Correct.

19           THE COURT:  I'm sorry.  This was on the Citrix system?

20           THE WITNESS:  Yes.

21           THE COURT:  Which is the same or different from the

22   cloud system?

23           THE WITNESS:  That is the cloud system.

24           THE COURT:  That is the cloud system.

25   Q.  Do you remember why you were asked to forward this

LB189116                        Hartney - Redirect

1    screenshot or this document to Mr. Maloney?

2    A.  I think he initially wanted to -- he wanted to know who had

3    access to these files.

4    Q.  So you were performing one set of searches on the shared

5    file and another set of searches through the servers, do I

6    understand that?

7    A.  You mean the e-mail server?

8    Q.  Correct.

9    A.  We did one set of searches on the e-mail server, and we

10   reviewed the documents on the shared server, cloud server.

11   Q.  So then let's turn to tab 20, please.

12          If you look at the second e-mail here, this is dated

13   July 29 from you to Mr. Maloney.  Do you see that?

14   A.  Yes.

15   Q.  Can you tell me what this e-mail represents?

16   A.  This represents searches that were performed on these

17   users' mailboxes, and if anybody had e-mailed the Jarrah

18   deposition transcript outside of the office and inside.

19   Q.  I'm sorry?

20   A.  And internally, too.

21   Q.  So does this reflect the records of where the Jarrah

22   transcript went by e-mail?

23   A.  Yes.

24   Q.  Did you discuss this summary document with Mr. Maloney at

25   all or did you just forward it to him for him to do whatever

1  work he needed to do with it?

2  A.  I forwarded it to him and he did the work.

3  Q.  Was that the case with most of the searches, you performed

4  the searches, provided the information to Mr. Maloney, and he

5  took it from there?

6  A.  Correct.

7  Q.  Let's look at tab 34, if you would.

8         THE COURT:  Can I ask a clarifying question on this

9  document?

10        MS. KIRSCH:  Yes.

11        THE COURT:  I want to make sure that I understand.

12        On this document, if you can go back at what we were

13  looking at.

14        THE WITNESS:  Which one is that?

15        THE COURT:  20.  Where we just were.

16        THE WITNESS:  I'm there.

17        THE COURT:  Sometime before you sent this July 29th

18  e-mail, you performed searches on the e-mail boxes to see if

19  anyone e-mailed the deposition transcript, and this list are

20  your results?

21        THE WITNESS:  Right.

22        THE COURT:  It indicates that Debra Pagan e-mailed it

23  to John Fawcett, is that correct?

24        THE WITNESS:  Correct.

25        THE COURT:  We also know that John Fawcett e-mailed it

LB189116                     Hartney - Redirect

1   to somebody, but we don't know who that is, is that correct?

2                   THE WITNESS:  Correct.

3                   THE COURT:  Then, are these e-mails part of Exhibit 1

4   of your declaration?

5                   THE WITNESS:  These e-mails, I don't think they were

6   included.

7                   THE COURT:  Thank you.  Sorry.

8   BY MS. KIRSCH:

9   Q.  So, Mr. Hartney, let's turn to tab 34.

10                  If you go down to the bottom there, there is an e-mail

11  on August 30th from Mr. Maloney to you that says, "Here is my

12  first draft, please review for accuracy."

13                  Do you know what he is referring to there, Mr.

14  Hartney?

15  A.  My declaration.

16  Q.  Then, if you go up, the next day you write back to Mr.

17  Maloney, presumably after you have reviewed the declaration,

18  and you say, "I would like to redo the searches on the

19  journalist e-mail addresses.  I don't feel confident I searched

20  both e-mail addresses.  Can you send me the two e-mails

21  addresses?"

22                  Do you see that?

23  A.  Yes.

24  Q.  Do you recall sitting here today why you weren't feeling

25  confident?

LB189116                    Hartney – Redirect

1    A.  Well, the court had ordered the declarations and

2    specifically the search of the Isikoff e-mails, and any other

3    e-mails that he may be associated with.  Then Duke sent me the

4    declaration and I didn't want to sign it until I was confident

5    enough.  So I redid the searches and re-reviewed the searches

6    just to be confident enough that what I was saying was truthful

7    in the declaration.

8    Q.  As you're getting ready to prepare this declaration on

9    August 31st, you are redoing the searches for the journalist's

10   e-mail addresses, Mr. Isikoff?

11   A.  Correct.

12   Q.  But you didn't at this point redo the full panoply of

13   searches for the name Jarrah, correct?

14   A.  I did everything.

15   Q.  You did everything?

16   A.  Yeah.  I did all the searches again and re-reviewed just to

17   make sure that I wasn't missing anything.

18   Q.  OK.  And then when you're double-checking and doing

19   everything, you also looked to confirm with Mr. Maloney what

20   was the date range.  Do you see that?

21   A.  Yes.

22   Q.  And then Mr. Maloney responds to you that the court

23   actually asked us to cover June 1 to August 1.

24           Do you know what you did after you received Mr.

25   Maloney's e-mail there?

LB189116                    Hartney - Redirect

1    A.  I corrected the dates on the searches and reran them and

2    re-reviewed all the results.

3    Q.  With these Isikoff e-mail addresses, did anything new turn

4    up when you expanded the date range?

5    A.  I don't recall.  I don't think so.

6    Q.  You don't recall or you don't think so?

7    A.  I think there was one e-mail to John Fawcett that talked

8    about some privilege log.  I don't know if I got that before

9    the searches or after the searches.  That would have been the

10   only thing I could think of.

11   Q.  Now, if you can turn to Exhibit 66.  The date of this

12   e-mail is September 26.  And this is from Ms. Benett to you.

13   She writes, "Just confirming.  I need all incoming and outgoing

14   and in any delete folders of the following e-mail addresses

15   between June 1 and August 1:"  And then there is a bunch of

16   e-mail addresses, four addresses for Mr. Isikoff.  Do you see

17   that?

18   A.  Yes.

19   Q.  Did you rerun the search again at that time?

20   A.  Yes.  I would have reran the search, yes.

21   Q.  Do you know whether this turned up anything new that you

22   hadn't found earlier?

23   A.  No, it didn't.

24   Q.  It was the same?

25   A.  The same, yeah.

LB189116                    Hartney - Redirect

1   Q.  But Ms. Benett is not asking you here for all of the e-mail

2   addresses that hit on the word "Jarrah," is she?

3   A.  No.

4   Q.  And she is not asking you to rerun the searches that hit on

5   the name of the transcript file?

6   A.  No, she is not.

7   Q.  It's just the incoming and outgoing with Mr. Isikoff,

8   correct?

9   A.  Correct.

10  Q.  So let's take a look at Exhibit 87.

11          If you look, your declaration, the September 27

12  declaration, begins, if you look at the bottom right-hand

13  corner, at 19 of 53.

14  A.  Wait.  You said 87?

15  Q.  Yes.  Tab 87, page 19 of 53.

16  A.  OK.

17  Q.  Do you see this is your declaration that you were just

18  looking at with Mr. Shen a few minutes ago?

19  A.  Correct.

20  Q.  Now, if we look at the third page of your declaration,

21  which is actually page 21 of 53, I want to focus your attention

22  for a minute on paragraphs 8, 9 and 10.

23  A.  Correct.

24  Q.  In light of the fact that we just looked at the e-mail

25  where Ms. Benett, who was helping you with this declaration,

LB189116                     Hartney – Redirect

1    asked for all of the e-mails responsive to the search described

2    in paragraph 8, do you think it's possible that there was an

3    error and that paragraphs 9 and 10 are reversed?  In other

4    words, that paragraph 10 was intended to refer to the results

5    of the searches described in paragraph 8 as opposed to the

6    results of the searches described in paragraph 9?

7            Is that too confusing a question?

8    A.  No.  I believe so.  Because the only e-mail results found,

9    it was my understanding, was the searches on the e-mail

10   addresses.  And that's what confused me.

11   Q.  So, despite what the words say, which is undoubtedly

12   confusing here, was it your intention that you were attaching

13   only the e-mails that hit on the Isikoff e-mail addresses,

14   incoming and outgoing and deleted?

15   A.  Yes.

16   Q.  Mr. Hartney, something else came up.  In connection with

17   preparing your declaration with Ms. Benett, did Ms. Benett

18   force you to sign anything that you thought was not truthful?

19   A.  No.

20   Q.  Can you tell me what your discussions with Ms. Benett about

21   your declaration were?

22   A.  Basically, it was to describe where the location of the

23   document was found on our internal network server, and also to

24   determine where the location was of the transcripts that were

25   classified, and searching of the e-mail.

LB189116                          Hartney – Redirect

1    Q.  Did Ms. Benett pressure you to write your declaration in

2    any particular way that you were not comfortable with?

3    A.  No.

4    Q.  Is it your opinion that Ms. Benett would ever pressure you

5    to do something you were not comfortable with?

6    A.  No.

7    Q.  Did you discuss the language with Ms. Benett and why things

8    were drafted the way they were?

9    A.  Yes.

10   Q.  Did Ms. Benett provide you good explanations for any

11   questions that you had about the drafting?

12   A.  Absolutely.

13   Q.  When you signed the declaration, were you comfortable that

14   it was complete and accurate and not something that Ms. Benett

15   was asking you to sign that you were not comfortable with?

16   A.  Yes.

17   Q.  I would like to ask you also, there was a discussion about

18   a Dropbox account that Mr. Fawcett had?

19   A.  Yes.

20   Q.  Do you recall that that Dropbox account was assigned to Mr.

21   Fawcett's Kreindler e-mail address?

22   A.  Yes.

23   Q.  And do you recall that when Mr. Fawcett's Kreindler e-mail

24   address was shut down, that you were comfortable that he would

25   no longer be able to access that Dropbox account?

LB189116                    Hartney – Recross

1    A.  Yes.

2    Q.  In fact, that's true, once he lost his e-mail credentials,

3    he could not access that Dropbox account on the screenshot we

4    were looking at, isn't that true?

5    A.  I believe so.

6              MS. KIRSCH:  I have no further questions.

7              THE COURT:  Thank you.

8              MR. SHEN:  Just a few questions, your Honor.

9    RECROSS EXAMINATION

10   BY MR. SHEN:

11   Q.  Mr. Hartney, you were asked questions about your

12   declaration.  And if you have it in front of you, our Exhibit

13   56F, but it's in the binder that you went over with Ms. Kirsch

14   as well.

15             You were asked questions about whether paragraph 9 and

16   paragraph 10 may have been switched in your declaration.  Do

17   you recall that?

18   A.  Yes.

19   Q.  Now, paragraph 10, if you move it up, that would describe

20   the search reference in paragraph 8, right?

21   A.  I believe so, yes.

22   Q.  And paragraph 9 describes a search for Jarrah, Isikoff, or

23   the name of the Jarrah transcript, right?

24   A.  Correct.

25   Q.  Then there is no discussion at all as to what that search

LB189116                    Hartney - Recross

1    revealed in your declaration, correct?

2    A.   Yes.

3    Q.   And that wouldn't make any sense for you to just put a

4    search in but not describe what it showed, right?

5    A.   I guess, yeah.

6    Q.   Now, Ms. Kirsch asked you about the preparation of your

7    declaration and your discussions with Ms. Benett.  Do you

8    recall that?

9    A.   Yes.

10   Q.   Let's look at Exhibit 115.

11   A.   You said 115?

12   Q.   It's on the screen in front of you as well.

13              Now, Exhibit 115 is a document that's been

14   produced --

15   A.   It's not on the screen.

16              THE COURT:   The witness's screen has gone black.

17   Q.   Do you have the document in front of you, Exhibit 115?

18   A.   I believe so.

19   Q.   Now, Exhibit 115 is an e-mail produced by the Kreindler

20   firm just this week.

21              Sir, you see at the bottom e-mail from Ms. Benett,

22   dated September 27, 2021, Ms. Benett is sending you a draft of

23   your declaration.  Do you see that?

24   A.   Yes.

25   Q.   And you write back to Ms. Benett on the 27th at 10:27 a.m.

LB189116

1    Do you see that?

2    A.  Yes.

3    Q.  And you identify an issue with the statement that the

4    shared drive is for use only by the Kreindler attorneys and

5    staff involved in this litigation, right?

6    A.  Yes.

7    Q.  And you actually highlight it in the e-mail, correct?

8    A.  Yes.

9    Q.  And you tell Ms. Benett that, I don't think it is truthful,

10   correct?

11   A.  Correct.

12   Q.  And that's because everyone at Kreindler has access to

13   everything on the Case Media server; that's what you write in

14   the e-mail, right?

15   A.  Yes.

16   Q.  Then Ms. Benett insists on not including that language in

17   the declaration, right?  She doesn't want to tell the court

18   that everyone has access to everything, correct?

19   A.  Yes.

20          MR. SHEN:  No further questions.

21          THE COURT:  Thank you, sir.

22          You may step down.

23          (Witness excused)

24          THE COURT:  I think we should keep going because we

25   are taking a lot of time here.  I would like to call our next

LB189116

1    witness and press through at least for another 20 minutes.  I

2    think we are going to start early tomorrow because I really

3    want to finish tomorrow, but let's call a witness now.

4            MR. SHEN:  Saudi Arabia calls Andrew Maloney.

5            MS. KIRSCH:  Does Mr. Hartney have to stay in the

6    courtroom per your order as the others do?

7            THE COURT:  Any objection to Mr. Hartney being

8    dismissed from the hearing for good?

9            MR. KELLOGG:  No, your Honor.

10           THE COURT:  And he doesn't have to come back tomorrow?

11           MR. KELLOGG:  No, your Honor.

12           THE COURT:  Mr. Hartney, thank you for your service.

13   You are excused and you don't have to return tomorrow.

14           My hope is we can do 20 to 30 minutes of this witness

15   and then break and then start, hopefully, at 9 tomorrow

16   morning.

17           MR. SHEN:  Yes, your Honor.

18           THE COURT:  You may end up not being able to use the

19   monitor right now.

20           Unfortunately, there is not a HEPA filter and

21   therefore under our court protocols you need to keep your mask

22   on.  Second, we are having some IT problems.  Ordinarily the

23   screen in front of you might reveal a document.  We are on the

24   phone trying to get someone to come up now so maybe we will

25   have somebody.

LB189116                    Maloney - Cross

1              THE WITNESS:  I will roll with it.

2              THE COURT:  Until then, you have a very large binder

3    to your right and Mr. Shen may ask you to look at exhibits in

4    that binder.

5     ANDREW J. MALONEY III,

6          called as a witness by the defendants,

7          having been duly sworn, testified as follows:

8              THE DEPUTY CLERK:  Please state your full name for the

9    record.

10             THE WITNESS:  Andrew J. Maloney III.

11             THE COURT:  Thank you, sir.

12   CROSS-EXAMINATION

13   CROSS-EXAMINATION

14   BY MR. SHEN:

15   Q.  Good afternoon, Mr. Maloney.

16   A.  Good afternoon.

17   Q.  Mr. Maloney, you attended the Jarrah deposition on June 17

18   and June 18, correct?

19   A.  Remotely, correct.

20   Q.  A number of your colleagues at the Kreindler firm attended

21   as well, particularly, Steve Pounian, Megan Benett, and Jim

22   Kreindler, those were the attorneys that attended?

23   A.  I was not at their location, but I believe they were all on

24   the line.

25   Q.  And a consultant for the firm named Catherine Hunt attended

LB189116                        Maloney – Cross

1  the deposition as well, correct?

2  A.  I don't know.  I don't remember seeing her on the screen so

3  I can't tell you.

4  Q.  I can represent to you that she is on the appearance sheet.

5  If we had the screen working I can show you, but it is also at

6  Exhibit 32.

7          Now, you know from attending the depositions that

8  there is a real-time feed of the deposition transcript,

9  correct?

10 A.  Yes.

11 Q.  And you can view that real-time feed on your own home

12 computer as you're watching the deposition, right?

13 A.  Yes.

14 Q.  And the link to that real-time feed, that's in a chat box

15 of the Zoom application that we used for remote depositions,

16 right?

17 A.  I think there was a link in the chat box.  When I did it, I

18 usually had a separate laptop that I would use the link to the

19 court reporters real-time, and I would use my other computer to

20 watch the screen of the witness or exhibits displayed.  On the

21 Jarrah deposition, I didn't do that because I was in Kansas

22 City.

23 Q.  You were the individual who conducted the investigation of

24 the leak at the Kreindler firm once the July 15 Isikoff article

25 came out, right?

LB189116                    Maloney - Cross

1   A.  Yes.

2   Q.  Did you ever contact Catherine Hunt to interview her?

3   A.  I did not.  I don't believe she ever got a copy of the

4   transcript.

5   Q.  You never asked her whether she downloaded the real-time

6   transcript?

7   A.  I would have known if she had downloaded the transcript.  I

8   didn't need to ask her.

9   Q.  The real-time transcript?

10  A.  I'm not aware that you can do that, but I did not ask her

11  that.

12  Q.  Now, sir, you read the July 15 Isikoff article when it came

13  out, correct?

14  A.  Yes.

15  Q.  And you know that Mr. Isikoff stated that he had a copy of

16  the Jarrah transcript, right?

17  A.  Yes.

18  Q.  And you know that that article also describes what happened

19  at the Bayoumi and the Thumairy depositions as well, right?

20  A.  I don't recall specifically.  There may have been a general

21  reference that we had deposed Bayoumi and Thumairy.  I don't

22  know if there was a description.

23  Q.  Do you recall that there is a discussion about invocation

24  of the Vienna Convention privilege at the Jarrah transcript,

25  and then Mr. Isikoff said that, "The families' lawyers also got

LB189116                    Maloney - Cross

1   an equally frustrating lack of response in their closed-door

2   video depositions last month with Thumairy and Bayoumi"?

3        MS. KIRSCH:  I object.  Mr. Maloney just said he

4   doesn't recall the article verbatim.  I think it would be

5   better to put the article in front of him.

6        MR. SHEN:  I am just refreshing his recollection.

7   A.  I don't recall the details of the article except for the

8   reference to -- I remember the title was something about FBI

9   attempting to flip Mr. Jarrah.  And I remember the thing that

10  stood out in my mind immediately was his reference to the

11  transcript itself, that he claimed to have a copy of the

12  transcript itself.

13       THE COURT:  Mr. Shen, can I interrupt you for one

14  second.  We have AV here.  Is it worth spending a minute fixing

15  it?

16  Q.  Let's look at Exhibit --

17       THE COURT:  Hold on.  I think we need to have AV

18  interrupt you is the question.

19       Do you want to take a quick look?

20       Thank you so much.

21  BY MR. SHEN:

22  Q.  Exhibit 40 in front of you is the July 15 article by

23  Mr. Isikoff.  If we could just scroll down --

24  A.  Hold on.

25       Exhibit?  Sorry.

LB189116                    Maloney – Cross

1  Q.  It's Exhibit 40.

2          Do you recognize this, July 15, 2021?

3  A.  Yes.  I don't think I saw it in color, but yeah.

4  Q.  Now, sir, you said that what struck you about this article

5  is that there is a reference to someone had given Mr. Isikoff

6  the transcript, correct?

7  A.  Yes.  That he had obtained one, yes.

8  Q.  And you understood that to be a serious violation of the

9  protective orders in this case, right?

10  A.  Yes.

11  Q.  Now, at that time, had you had any discussions with

12  Mr. Isikoff?

13  A.  No.

14  Q.  Are you aware of any discussions that Mr. Pounian or Ms.

15  Benett of your firm had with Mr. Isikoff?

16  A.  Am I aware?  I am not aware of any.  I think that I at one

17  time would have asked him, and I was told no.

18  Q.  Now, you're certainly aware that Mr. Kreindler had

19  discussions with Mr. Isikoff, correct?

20  A.  He has had discussions with him at various times over the

21  last few years, as well as probably two dozen other

22  journalists.

23  Q.  But he has known Mr. Isikoff for a long time and he

24  frequently speaks with him, right?

25  A.  I would not characterize it that way.  I don't think that's

1  accurate.

2  Q.  You knew that Mr. Kreindler had spoken to Mr. Isikoff over

3  a number of years, correct?

4  A.  Well, as I said, Mr. Kreindler spoke to a number of

5  journalists, including Mr. Isikoff.

6  Q.  That's not my question.  My question is, did you know that

7  Mr. Kreindler was speaking with Mr. Isikoff over a number of

8  years?

9  A.  I would say, no, I didn't know that.  I know from time to

10  time he spoke to him.  If you are asking me the first time I

11  became aware he spoke to him, was it a few years earlier,

12  possibly.

13  Q.  Look at Exhibit 79 in your binder, please.

14        Sir, on page 2 --

15  A.  Hold on.

16        I'm with you.

17  Q.  Sir, on page 2 of this article about Mr. Isikoff, he

18  describes an interview that James Kreindler gave to him.  Do

19  you see that?

20  A.  Two thirds of the way down?  Yes.

21  Q.  And this is, for the record, a March 1, 2021 article.

22        Were you aware that Mr. Kreindler had spoken to

23  Mr. Isikoff in connection with this article?

24  A.  I can't recall.

25  Q.  Were you aware that Mr. Kreindler had appeared on the

1   Conspiracyland podcast?

2   A.  I was not aware at the time.  I found out when we did our

3   investigation of the leak.

4   Q.  Did you become aware on or about July 15 right after the

5   Isikoff article came out?

6   A.  I don't think it was day one, but it was within the first

7   two weeks, probably.  There are numerous searches that we did

8   during the course of the investigation.  The first one was to

9   see if there was any transmission of the Jarrah transcript to

10  Mr. Isikoff or anyone at Yahoo News.  That's what we looked for

11  initially and then we expanded the search later.

12  Q.  Just so I understand your testimony, when the July 15

13  Isikoff article came out, you never asked Mr. Kreindler whether

14  he had been in recent contact with Mr. Isikoff?

15  A.  I asked him if he knew anything about the transcript that

16  Mr. Isikoff referred to in the article, and he told me he had

17  no idea.

18  Q.  But you never asked him whether he had been in contact with

19  Mr. Isikoff?

20  A.  I don't think I put it that way.  I was interested in

21  whether or not he knew anything about the transcript getting to

22  Isikoff.

23  Q.  I am just asking whether you asked him whether he had been

24  in contact with Mr. Isikoff.  Did you ask him that question?

25  A.  Not on the first day, no.

LB189116                    Maloney - Cross

1   Q.  When did you ask him that question, if at all?

2   A.  Probably within my first week or two of the investigation.

3   Q.  Do you specifically recall that?

4   A.  I do because we found, when I had the IT, head of IT John

5   Hartney do the search, we eventually found e-mails from Mr.

6   Kreindler to Mr. Isikoff.  So I asked him about those.

7   Q.  So, when you found out that Mr. Kreindler had appeared on

8   the Isikoff podcast, did you listen to that podcast?

9   A.  No, I did not.

10  Q.  Have you listened to it to this day?

11  A.  I have not.

12  Q.  You don't know what Mr. Kreindler said on that podcast?

13  A.  I do not.

14  Q.  Now, were you aware that Ms. Hunt also had contacts with

15  Mr. Isikoff?

16  A.  I can't recall that.  It's possible I knew at one time, but

17  I don't recall as I sit here.

18  Q.  Do you know that Ms. Hunt appeared on the exact same

19  podcast that Mr. Kreindler appeared on with Mr. Isikoff?

20  A.  I was not aware, but I knew that Ali Soufan had appeared,

21  or at least that's what the e-mail traffic showed.

22  Q.  Let's look at Exhibit 38, please.

23       Exhibit 38 is a printout of the specific

24  Conspiracyland podcast.  You will see it describes who appears

25  on this particular podcast.  You see that Ms. Catherine Hunt

LB189116                    Maloney – Cross

1  and Jim Kreindler appeared on it?

2  A.  Are you in -- I am trying to find it here.

3      THE COURT:  At the bottom in the black box.

4  Q.  It's the second-to-last line in the black box, sir.

5  A.  Yes, I see her name there.

6  Q.  And sitting here today, this is the first time that you are

7  realizing that Catherine Hunt, an investigator for your firm,

8  appeared on the same podcast that Mr. Kreindler appeared on?

9  A.  Yeah.  I had never seen this document before.

10  Q.  It's not something that you discovered in the course of

11  your, quote, investigation here?

12  A.  No.  It wasn't relevant to the investigation.

13  Q.  You never spoke to Ms. Hunt, you never asked whether she

14  had any discussions with Mr. Isikoff about the Jarrah

15  transcript?

16  A.  I did not.

17  Q.  Now, when you first saw the July 15 article by Mr. Isikoff,

18  were you aware that Mr. Fawcett had also had contacts with

19  Mr. Isikoff?

20  A.  On July 15 was I aware?  No.

21  Q.  On or about July 15.

22  A.  On or about could mean a lot of things.

23  Q.  July 15 or prior, did you know that Mr. Fawcett was talking

24  with Mr. Isikoff?

25  A.  I did not.

LB189116                    Maloney - Cross

1    Q.  On or around July 15, did you ask Mr. Kreindler if he knew

2    whether Mr. Fawcett was in discussions with Mr. Isikoff?

3    A.  I don't recall.  If I did, it probably wasn't July 15.  It

4    was probably within the first two weeks when we got more

5    information.

6    Q.  Did you ever ask that question?

7    A.  I may have asked that question, but I don't recall.

8    Q.  You don't remember one way or the other?

9    A.  I don't.

10   Q.  When, to the best of your recollection, when is the first

11   time you learned that Mr. Fawcett had contacts with

12   Mr. Isikoff?

13   A.  I think sometime late July, I want to say between July 22

14   and 29, Mr. Hartney told me about e-mails from Mr. Kreindler,

15   to and from Mr. Kreindler and Mr. Isikoff, and one from John

16   Fawcett, and naturally I asked him, did it have anything about

17   Jarrah?  And he said no.  I later asked to see a copy of each

18   and every one of those e-mails, and there was no mention of

19   Jarrah or the Jarrah transcript.

20   Q.  So, the first time you actually learned Mr. Fawcett was in

21   communications with Mr. Isikoff is after Mr. Hartney did the

22   e-mail searches that you directed him to do?

23   A.  Well, if you're asking for my memory today, it's the first

24   time I remember, certainly in connection with this.  If he had

25   spoken with Mr. Jarrah a year or two before, I wouldn't

LB189116                         Maloney - Cross

1   necessarily remember that even if I knew it at the time.

2            THE COURT:  You mean Mr. Isikoff.

3   A.  I wasn't keeping track of every person who spoke to every

4   journalist necessarily.  It's possible I knew he spoke to or

5   had contact with Mr. Isikoff at some other time, but not as I

6   remember it in July.

7   Q.  You knew that Mr. Kreindler and Mr. Fawcett were speaking

8   with dozens of journalists concerning 9/11?

9   A.  I don't think Mr. Fawcett was.  I knew Mr. Kreindler was.

10  I was as well.

11  Q.  Did you know that Mr. Fawcett was also speaking to

12  journalists?

13  A.  No.  I should say I know from time to time he was asked to

14  provide a nonconfidential document or something.  We often

15  asked Mr. Fawcett to provide us information, and it's possible

16  on occasions I knew that he had said something to a person we

17  had asked him to do or something like that.  It was obviously

18  clear every time we always checked to make sure it was not

19  confidential or protected material.

20  Q.  So, Mr. Kreindler and yourself, you're the face of the firm

21  and you speak to the press about the 9/11 case, right?

22  A.  I do on occasion.

23  Q.  And when you need to provide documents to the press, you

24  enlist Mr. Fawcett to provide those documents, right?

25  A.  Yeah.  Usually I would have him give me the document.  I

LB189116                      Maloney – Cross

1    would look it over and determine whether it is something we can

2    make available.

3    Q.  Before Mr. Fawcett actually provides the document, he seeks

4    the approval of the attorneys at the firm?

5    A.  Yes.

6    Q.  Now, you're certainly aware of Mr. Kreindler's history of

7    violating the protective order in this case, right?

8              MS. KIRSCH:  Objection.

9              THE COURT:  Overruled.

10             You can answer it.

11   A.  I am aware of the Dartmouth speech.  I think I was actually

12   in the court when Judge Netburn admonished him for saying

13   something.

14   Q.  You're also aware he violated the protective order in

15   connection with the 2017 Politico article by Caleb Hanan.  Are

16   you aware of that?

17   A.  Vaguely.  I do remember some of that.  I don't remember the

18   details.

19   Q.  So, you're aware of multiple times that Mr. Kreindler had

20   violated the protective order, correct?

21             MS. KIRSCH:  I am going to object.  That misstates the

22   record.

23             THE COURT:  Sustained.

24             Continue.

25   Q.  Sir, you're aware and you have heard Mr. Kreindler express

LB189116                          Maloney – Cross

1    his disdain for the protective orders in this case, right?

2    A.  I have heard many people say that, including Mr. Kreindler.

3    Q.  You have heard him call the protective orders damn gag

4    orders?

5    A.  Yeah, I have probably heard him say that.  I have heard

6    that from almost every one of our clients.

7    Q.  You heard him say those orders are disgusting, you have

8    heard that, right?

9    A.  I never heard it.  I think I read that in one of the

10   articles.

11   Q.  You have heard him say that he hates the protective orders

12   in this case?

13   A.  We all do, every client and every lawyer on the plaintiffs'

14   side.

15   Q.  So every lawyer on the Kreindler side, yourself included,

16   Ms. Benett, who is sitting at counsel table, you hate the

17   protective orders that the court has entered in this case.  Is

18   that your testimony?

19   A.  My testimony is that I can tell you I have never been

20   involved in a case where everything is kept secret from our own

21   clients.

22   Q.  You just testified that you and all the lawyers at the

23   Kreindler firm hate the protective orders, right?

24   A.  That was your words, Mr. Shen.

25          MS. KIRSCH:  I am going do object.  That misstates his

LB189116                       Maloney – Cross

1  testimony.

2  Q.  Sir, when the July 15 --

3       MR. SHEN:  I am going to move on and withdraw the

4  question.

5  Q.  Sir, when the July 15 Isikoff article came out and it

6  stated that he had a copy of the Jarrah transcript, which was

7  leaked to him, were you concerned, given Mr. Kreindler's

8  extensive violations of the protective order and his disdain

9  for the protective order, that he was the source of the leak?

10      MS. KIRSCH:  I would like to object one more time.  I

11 don't know how many times Mr. Shen is going to misstate the

12 record.  I don't know what he is talking about with "extensive

13 violations," but it makes a very messy record to bake that into

14 a question that Mr. Maloney could possibly otherwise answer.

15      MR. SHEN:  Mr. Maloney testified to two violations of

16 the protective order, the Dartmouth speech and the 2017 order.

17 A.  I didn't say they were violations of the protective order.

18 I said I was aware of two or three occasions where that issue

19 was discussed.

20 Q.  Now, sir, given those issues and given the disdain that Mr.

21 Kreindler has expressed with the protective order, were you

22 concerned at the time that he was the source of the leak?

23 A.  I was not.

24 Q.  Did you have any concern that anyone at Kreindler was the

25 source of the leak?

1    A.  I was not.  I asked everyone and then I did my own

2    investigation to confirm that.

3    Q.  But before you conducted the investigation, were you

4    confident that Kreindler wasn't the source of the leak?

5    A.  Yes.

6    Q.  So, before doing anything, in your mind, you said it

7    couldn't have come from this firm, correct?

8    A.  In my own mind, before I spoke to him, I would have been

9    very surprised if it came from the firm.  Then I started to ask

10   people that had access to the transcript and I was told they

11   had nothing to do with it and didn't know anything about.  And

12   then I started the e-mail investigation with IT.

13   Q.  You submitted two declarations in this case?

14   A.  Yes.

15   Q.  There is the August 16 declaration that's at 48.C in the

16   binder.

17   A.  I recall.

18   Q.  The September 27 declaration, for the record, that's at

19   Exhibit 56B.

20           Now, you're aware, sir, that the August 16 declaration

21   in this case, it doesn't describe any investigation that was

22   conducted, right?

23   A.  We were not asked by the court to describe it.  We gave the

24   court what the court asked for.

25   Q.  So, after the leak occurred, you took the initiative to do

LB189116                        Maloney - Cross

1    the investigation?

2    A.  Yes.

3    Q.  That was you and Mr. Hartney?

4    A.  Yes.

5    Q.  Anyone else involved in that investigation?

6    A.  I don't think so.  I asked everybody else.  I told

7    everybody else what I was doing after I had begun it.  I don't

8    think they were involved.  I think Ms. Benett later got

9    involved when we did another sweep, probably a triple check,

10   I'd say, much later in the process.  But the first month it was

11   myself and Mr. Hartney.

12   Q.  So Ms. Benett might have gotten involved when you were

13   submitting the September 27 declaration, but certainly not the

14   August 16 declaration?

15   A.  I'm not sure when she got involved, but I know the initial

16   part of the investigation, for the first few weeks, was just

17   myself and Mr. Hartney.

18   Q.  Let's look at the actual declaration, 56B.

19            Let's look at paragraph 4.

20   A.  Paragraph 4?

21   Q.  Paragraph 4.

22   A.  Yes.  My declaration.

23   Q.  It says that "I learned on July 15," and it talks about the

24   article, right?

25   A.  Yes.

LB189116                      Maloney - Cross

1    Q.  Then it says, "That day I discussed the article with others
2    at Kreindler working on the 9/11 litigation."  Do you see that?
3    A.  Yes.
4    Q.  And who did you actually discuss that article with on the
5    15th?
6    A.  I believe Jim Kreindler, Steve Pounian, possibly Megan
7    Benett and John Fawcett, and I think that was it, and myself.
8    Q.  Did you discuss it with them in person?
9    A.  No.  I did discuss it with Mr. Fawcett in person because I
10   think he was in the office and I was in the office that day,
11   and I think the others were not in the office that day.
12   Q.  Did you say you did discuss it with Mr. Fawcett in person?
13   A.  Yes, I believe so.
14   Q.  And the two of you were the only ones in the office that
15   day?
16   A.  No.  But in terms of the terror group that had access, he
17   and I were in there.  I don't think anybody else was.  It's
18   possible Ms. Benett was, but I don't recall speaking to her in
19   person, but I remember we had a phone call.
20   Q.  You don't recall Mr. Pounian being there in person?
21   A.  I don't believe he was, but I can't recall.  I don't
22   believe he was.
23   Q.  You don't recall Mr. Kreindler being there in person?
24   A.  He was not.
25   Q.  Now, in these discussions with your colleagues at the

LB189116                       Maloney - Cross

1   Kreindler group -- and these were the core members of the 9/11

2   team, right?

3   A.  Yes.

4   Q.  So Mr. Fawcett is included in that core group that

5   litigates this case?

6   A.  He is not a lawyer litigating it, but he is part of the

7   team, yes.

8   Q.  He is the only nonlawyer in that group, right?

9   A.  Well, no, we have other nonlawyers that are part of the

10  team.  I think they have been identified, and we have

11  paralegals, and we have a lot of consultants and investigators.

12  Q.  My question to you is just Mr. Fawcett was a core member of

13  the 9/11 team?

14  A.  Can you define core?

15  Q.  Key member, very important member.

16  A.  Certainly.

17  Q.  Now, in these discussions on July 15, did you ask whether

18  the other core members of your team had discussions with

19  Michael Isikoff?

20  A.  I asked if any of them knew anything about how Mr. Isikoff

21  got the Jarrah transcript.

22  Q.  If you could answer my question, please.

23  A.  I think I did.

24  Q.  Did you ask whether they had contact with Mr. Isikoff?

25  A.  I didn't put the question that way.  I asked them the way I

1   just told you.

2   Q.  You asked each member of the team, is that your testimony?

3   A.  We had a conversation about it.

4   Q.  You asked Ms. Benett, for instance?

5   A.  I think on the call I said, does anybody know how

6   Mr. Isikoff got a copy of the Jarrah transcript?  Everyone

7   said, No, no idea.  I have no idea how he got it, it didn't

8   come from me, words to that effect.

9   Q.  You posed a question to the entire group and you got

10  negative responses in general?

11  A.  Correct.

12  Q.  But you never sat down one-on-one with each of the lawyers

13  and asked them?

14  A.  On that first day I didn't.  We had multiple conversations.

15  Q.  Sir, did you ever do that?

16  A.  Face-to-face?

17  Q.  One-on-one, face-to-face.

18  A.  With several of them I did.  Some of them it was, again,

19  phone calls.  Mr. Kreindler in particular was probably phone

20  calls.  Ms. Benett was probably in person at one time or

21  another.  Mr. Pounian in person at one time or another.  Mr.

22  Fawcett.  Probably the only one I didn't have a face-to-face

23  with was Mr. Kreindler.

24  Q.  So I understand your testimony, you sat down face-to-face

25  with Mr. Fawcett, asked him whether he leaked the transcript to

LB189116                    Maloney – Cross

1    Mr. Isikoff, and he told you he had not?

2    A.   Correct.  I didn't sit down; I was standing.

3    Q.   So he lied to your face?

4    A.   He did not tell me the truth.

5    Q.   That's lying to you, right?

6    A.   Yeah.  He didn't tell me the truth.

7    Q.   How many times did he lie to you about that?

8    A.   Throughout the next several weeks it was a topic of

9    conversation for all of us.  At one point I asked him, and

10   everyone else, if you didn't send it to Mr. Isikoff, did you

11   send it to anybody?  So I asked that of Mr. Fawcett.

12   Q.   And he said he didn't send it to anybody?

13   A.   That's not correct.

14   Q.   What did he say?

15   A.   He said he sent it to one of our consultants who is

16   identified as Consultant-1.  He told me that either the first

17   day or second.

18   Q.   How many times did he tell you that he did not send the

19   transcript to Mr. Isikoff?

20   A.   Well, I would say, it depends on how -- if you want those

21   exact words, probably only once.  But there was certainly a

22   clear indication when I said, did you send it to anyone or

23   anyone else, or things like that, and the answers I got to me

24   were consistent that he was claiming he didn't send it to

25   Isikoff or didn't know how Isikoff got it.  So it wasn't quite

1  the same words that you used, but it was the same conclusion.

2  Q.  Each and every one of those interactions you had with him

3  he lied to you, is that right?

4  A.  Yeah.  He wasn't candid.  He didn't tell me or anyone, to

5  my knowledge, that he had sent Mr. Isikoff the Jarrah

6  transcript.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  All right.  Let's look at paragraph 5 of your declaration,

2   sir.

3              THE COURT:  Mr. Shen, let's just be sensitive to the

4   time, when you think it's an appropriate time to take a break

5   for the day.

6              MR. SHEN:  Whenever you want.  I don't have a watch.

7              THE WITNESS:  They took mine at security.

8              THE COURT:  It's ten past 5:00.  You want to go for

9   another five or ten minutes, or you want to wrap up?

10             THE WITNESS:  I'd rather go as long as Mr. Shen

11  and the --

12             THE COURT:  I know, but we have the court reporters.

13             MR. SHEN:  Let's go for another five minutes or so,

14  and then we'll wrap up.

15             THE COURT:  OK.  Thank you.

16  BY MR. SHEN:

17  Q.  Paragraph 5 of your declaration discusses conferring with

18  Mr. Hartney on July 16.  Do you see that?

19  A.  Yes.

20  Q.  And, sir, you're a former prosecutor?

21  A.  Yes.

22  Q.  At the S.D.N.Y.?

23  A.  Yes.

24  Q.  So you have experience investigating these types of issues?

25  A.  Yes.

1    Q.  And you understood here that the goal was to conduct an

2    objective and comprehensive investigation to determine whether

3    anyone at the Kreindler firm was the source of the leak, right?

4    A.  Yes.

5    Q.  And if someone was, in fact, the source, the goal was to

6    investigate whether anyone had knowledge of it or directed

7    Mr. -- or whoever did it to do it, right?

8    A.  Well, yeah, that would be part of the investigation.

9    Q.  OK.  Now let's look at Exhibit 100, please.

10   A.  My copy, the print is extremely small, Mr. Shen.

11   Q.  I apologize for that.  That's just the way it was produced

12   to us.  Is your screen working?

13   A.  Nope.

14   Q.  All right.  Now, on Exhibit 100, this is an email chain

15   between you and Mr. Hartney.  Do you see that?  And it's on

16   July 16?

17   A.  I have -- there's a couple email strands here.  So there's

18   one on June 28 and then there's a July 16 and a September 24.

19   Q.  Let's put it in context.

20          The June 28, that is an email from the court reporter

21   forwarding on the transcript for the Jarrah deposition, right?

22   A.  Yes, correct.

23   Q.  And then on July 16, in the bottom paragraph, you're asking

24   Mr. Hartney to do a review, correct?

25   A.  Yes.

LB1H9117                      Maloney - Cross

1    Q.  Specifically, you're asking him if it's possible to do a

2    search of the outgoing emails on the K and K -- that's

3    Kreindler & Kreindler, right?

4    A.  Yes.

5    Q.  -- server on June 28 that contains the Jarrah transcript.

6    And then you say you can limit that search, if you'd like, to

7    the following individuals, and it lists eight individuals.  Do

8    you see that?

9    A.  Yes.

10   Q.  And that's the search that you're describing in paragraph 5

11   of your declaration when you say:  On July 16, I conferred with

12   Mr. Hartney and asked him to do a search, right?

13   A.  Yes.

14   Q.  OK.  This particular search, you asked him to do just a

15   search of the outgoing emails, not a search of the entire email

16   server, correct?

17   A.  Correct.

18        I should point out, to your last question on my

19   declaration, which is August 16, we did subsequent searches

20   after this initial search.

21   Q.  We'll get there.

22   A.  OK.  I didn't want -- I didn't want you to be confused or

23   have the record confused that this was the only search I had

24   him do, but the one to begin the search on July 16, that was

25   what I sent to him.

LB1H9117                       Maloney - Cross

1    Q.  You're asking him to do a search only of outgoing emails.

2    You're not asking him to search for incoming emails, right?

3    A.  Correct.

4    Q.  And you're asking him to do a search only of particular

5    custodians, not of everybody at Kreindler & Kreindler, right?

6    A.  Yeah, nobody else had access to the transcript that I was

7    aware of at Kreindler.

8    Q.  OK.  Sir, do you know, for instance -- well, strike that.

9            You're not asking him to search for any personal

10   devices, personal laptops, personal email accounts, none of

11   that, right?

12   A.  No.  I think the email server at the firm would have

13   detected if somebody sent an email to --

14   Q.  From a firm email?

15   A.  From a firm email, yeah.

16   Q.  But not from a personal email?

17   A.  You asked me about telephones.  I don't know how -- I'm not

18   tech savvy, but I don't think you can do that.

19   Q.  My question to you is just did you direct Mr. Hartney to

20   search personal --

21   A.  Personal.

22   Q.  -- laptops?

23   A.  Of everybody at the firm or everybody on the terror team?

24   Q.  Yes, sir.

25   A.  No.

LB1H9117                    Maloney – Cross

1   Q.  And you never asked him to do that, right?

2   A.  No.

3   Q.  Let's look at Exhibit 84.

4          Now, you discussed, Mr. Maloney, that there were some

5   subsequent searches that you asked Mr. Hartney to do, right?

6   A.  Yes.

7   Q.  This is an email on July 21 to you and the "terror team,"

8   right?

9   A.  Yes.

10  Q.  So it discusses two searches.  The first email talks about

11  the outgoing email boxes for the Jarrah transcripts.  That's

12  what we saw you asked him to do on July 16, right?

13  A.  Yes.

14  Q.  And then you asked him to search for any emails to Mike

15  Isikoff in the last month, and he says he'll finish that search

16  tomorrow, right, so by the 22nd?

17  A.  Yes.

18  Q.  All right.  And, again, in this second search, this is just

19  of the firm email server, right?  This isn't any personal

20  emails or personal devices?

21  A.  I had no reason to believe that anybody used a personal

22  device to communicate with Mr. Isikoff.

23  Q.  OK.

24  A.  And certainly not to be able to export a transcript.

25  Q.  You know, sir, that the firm email accounts are monitored,

LB1H9117                        Maloney – Cross

1  right?  The IT department has the ability to search them?

2  A.  Yes.

3  Q.  You're actually asking the IT department to search them

4  here?

5  A.  That's exactly what I was doing.

6  Q.  If someone were to leak the transcript and didn't want to

7  get caught, wouldn't it stand to reason they would do so over a

8  personal account and not firm account?

9         MS. KIRSCH:  Objection.

10  Q.  Asking for your opinion.

11  A.  You're asking me to speculate in terms of what I believed.

12  Q.  Yeah.  I'm not asking you to speculate.  I'm asking what

13  you believe.

14  A.  Ask your question.

15  Q.  So you know the email accounts at the firm are monitored?

16  A.  Yes.

17  Q.  People can search them, right?

18  A.  Yes.

19  Q.  If someone wanted to leak the transcript, doesn't it stand

20  to reason that they wouldn't do it over a medium that could be

21  easily monitored and discovered?

22  A.  Listen, if somebody had access to the transcript and wanted

23  to hide the fact that they were going to leak it, I guess there

24  are -- there may be infinite ways to do it, but, typically, I

25  would have thought if they -- the transcript was only available

1    on the Kreindler server, they would email it to themselves,

2    maybe their laptop or a different email address, and we would

3    have picked that up.

4    Q.  When you say "different email address," you mean a

5    different email address, personal email address?

6    A.  Any email address we would have picked up.

7    Q.  And, sir, we discussed this, but you're a former federal

8    prosecutor, right?

9    A.  Yes, you've asked me that.

10   Q.  You know how to do these investigations?

11   A.  I've never investigated a leak, but I've done plenty of

12   investigations.

13   Q.  And as a former prosecutor, in your mind, it wasn't

14   reasonable for you to conclude that you needed to search the

15   personal emails and the personal devices of the terror team and

16   anyone else who had access?

17   A.  That's not a reasonable request, no.

18   Q.  OK.  Now let's look at Exhibit 86.  86 is a text message

19   between you and Mr. Hartney, right?

20   A.  Yes.

21   Q.  And it's dated July 22, 2021, right?

22   A.  Yep.

23   Q.  So you're communicating with Mr. Hartney over text message,

24   right?

25   A.  Yes.

LB1H9117                          Maloney - Cross

1   Q.  On your personal device?

2   A.  Yeah.

3   Q.  Not over firm emails.  Your firm email search wouldn't pick

4   this up, right?

5   A.  No, the firm email would not pick this up, no.

6   Q.  And you actually do business over text.  You text a lot of

7   people for work, right?

8   A.  Not very many.  There's only basically office people, and

9   it's usually if I'm not in the office and I'm not at my

10  desktop.  If, let's say, I'm somewhere else, I may text them to

11  get their attention.

12  Q.  But you're doing that here, right?

13  A.  Yeah, I did that here.

14  Q.  And this is a message that would not have been found

15  through a search of the email server, right?

16  A.  Correct.

17  Q.  All right.  And Mr. Hartney's actually telling you what the

18  results of his search are in this text message, right?

19  A.  Yes.

20  Q.  And he says that, well, we found communications between

21  Mr. Kreindler and Mr. Isikoff discussing "lifting of gag order

22  and Isikoff writing an article," right?

23  A.  Yeah, I see that.

24  Q.  So at this point, July 22, you know for sure that

25  Mr. Kreindler and Mr. Isikoff are having discussions, right?

LB1H9117                    Maloney – Cross

1   A.   Yeah, I think I testified to that.

2   Q.   Right.  You also know, and you testified before, that at

3   around this time you also knew that Mr. Fawcett was having

4   discussions with Mr. Isikoff?

5   A.   I think in a subsequent communication or conversation with

6   Mr. Hartney, I did learn that, probably within days of this, if

7   not that day, certainly that week, I think.  I think I

8   testified somewhere between July 22 and 29th.

9        MR. SHEN:  OK.  Is it a good time to stop, your Honor?

10        THE COURT:  I think so.

11        MR. SHEN:  All right.

12        THE COURT:  All right.  Given the pace, I think we

13   should start earlier tomorrow.  And I confirmed with the court

14   reporters that they can start as early as 9:00, so unless

15   anyone has a reason why they can't be here at 9:00, I'd like to

16   start at 9:00.  We'll finish tomorrow.  So if we need to start

17   pacing folks, we will, but I'll ask the lawyers to please be

18   sensitive to the time.  So we'll start here directly at 9:00.

19        Sir, you will remain under oath.  The direction not to

20   discuss the nature of your testimony or the underlying issues

21   remains.  You're not to speak with the witnesses who testified

22   or the witnesses who have not testified about the nature of

23   your testimony or their testimony, and then you'll come back

24   here at 9 a.m. tomorrow.

25        THE WITNESS:  Am I allowed to speak to my counsel, or

LB1H9117                          Maloney - Cross

 1  no?

 2              THE COURT:  Yes, of course.

 3              Anything further from anyone?

 4              MS. KIRSCH:  I just wanted to raise it appears

 5  Ms. Benett has a commitment that would make her not able to be

 6  here at 9:00.  We can certainly start without her if that's

 7  fine.  I just wanted to make sure that if it was 9:30, that

 8  your Honor didn't think she was just being late.

 9              THE COURT:  Do you mind if we begin at 9:00 and you

10  join us at 9:30, Ms. Benett?

11              MS. BENETT:  No, that's fine.  I just have to drop my

12  son at school.  I will be here right after that.

13              THE COURT:  Sorry for the inconvenience.

14              MR. KELLOGG:  Your Honor, just for my understanding of

15  the rules, counsel cannot talk to the remaining witnesses that

16  have not appeared yet about what happened in court today or the

17  exhibits on cross.

18              THE COURT:  Correct.  You can speak to your counsel,

19  but you can't reveal the nature of the testimony from today.

20              All right.  You're excused.  We'll see you tomorrow

21  morning at 9:00.

22              Thank you, everybody.

23              (Adjourned to November 2, 2021, at 9:00 a.m.)

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   JAMES PAUL KREINDLER

 4   Cross By Mr. Hansen  . . . . . . . . . . . . .17

 5   Redirect By Ms. Kirsch . . . . . . . . . . . 117

 6   JOHN HARTNEY

 7   Cross By Mr. Shen  . . . . . . . . . . . . . 132

 8   Redirect By Ms. Kirsch . . . . . . . . . . . 181

 9   Recross By Mr. Shen  . . . . . . . . . . . . 194

10    ANDREW J. MALONEY III

11   Cross By Mr. Shen  . . . . . . . . . . . . . 198

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```