IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 1:03-md-01570-GBD-SN |
| *This document relates to:* | ORAL ARGUMENT REQUESTED |
| *Ashton, et al. v. Al Qaeda, et al.*, No. 02-cv-6977; *Federal Ins. Co., et al. v. Al Qaida, et al.*, No. 03-cv-6978; *Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-9849; *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922; *Continental Casualty Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-5970; *O'Neill, et al. v. Republic of the Sudan, et al.*, No. 18-cv-12114; *Aronow, et al. v. Republic of Sudan*, No. 20-cv-07733; *Betru, et al. v. The Republic of Sudan*, No. 20-cv-10615; *Parker, et al. v. The Republic of the Sudan*, No. 20-cv-10657; and *Nolan, et al. v. The Republic of the Sudan*, No. 20-cv-10720. | |

**THE REPUBLIC OF THE SUDAN'S OBJECTIONS
TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC 20005

November 4, 2022                    *Counsel for the Republic of the Sudan*

**TABLE OF CONTENTS**

ARGUMENT .................................................................................................................1

I.    THE REPORT INCORRECTLY CONCLUDES THAT THIS COURT HAS
SUBJECT-MATTER JURISDICTION UNDER THE FSIA................................2

    A.    The Report Applies the Incorrect Standard of Review ...........................2

    B.    The Report Incorrectly Concludes that the Amended Complaints Allege
Facts Sufficient to Establish Jurisdictional Causation .............................3

        1.    The Report Overlooks Supreme Court Precedent and Applies the
Incorrect Standard for Jurisdictional Causation...........................3

        2.    The Report Misapplies *Ashton*, which Requires Dismissal of
Plaintiffs' Claims for Lack of Subject-Matter Jurisdiction.........5

        3.    The Report Improperly Credits Vague and Speculative Allegations
that Are Contradicted by the 9/11 Commission's Detailed Findings ..........7

        4.    The Report Improperly Relies on Vague and Conclusory
Allegations Insufficient to Show that any Sudanese Official,
Employee, or Agent Provided Any Material Support within the
Scope of His Authority ...............................................................10

        5.    The Report's Remaining Reasons for Concluding that Plaintiffs
Had Alleged Subject-Matter Jurisdiction Are Unavailing........11

    C.    The Report Incorrectly Concludes that the Amended Complaints Allege
Facts Sufficient to Meet Other Jurisdictional Prerequisites of § 1605(a)(7),
§ 1605A, and § 1605B ...............................................................................13

        1.    The Court Lacks Subject-Matter Jurisdiction Over the Claims of
Family Members of 9/11 Victims...............................................13

        2.    The Court Lacks Subject-Matter Jurisdiction Over the Claims of
Corporate Plaintiffs...................................................................14

II.    THE REPORT INCORRECTLY CONCLUDES THAT THE COURT HAS
PERSONAL JURISDICTION OVER SUDAN .................................................16

III.    THE REPORT INCORRECTLY CONCLUDES THAT PLAINTIFFS' CLAIMS
ARE TIMELY ....................................................................................................16

    A.    The Report Incorrectly Concludes that Plaintiffs' § 1605A Actions Are
Timely.......................................................................................................16

    B.    The Report Incorrectly Concludes that Plaintiffs Other than the *O'Neill* Plaintiffs Have Brought Timely § 2333 Actions ....................................................18

IV.    THE REPORT INCORRECTLY CONCLUDES THAT THE AMENDED COMPLAINTS STATE A CLAIM AGAINST SUDAN .................................................19

    A.    The Report Incorrectly Concludes that the Amended Complaints State a Claim Under the ATA.............................................................................................19

        1.    The Amended Complaints Fail to Allege that Sudan Proximately Caused the 9/11 Attacks that Injured Plaintiffs .........................................19

        2.    The Amended Complaints Fail to Allege that Sudan Was Generally Aware that It Was Substantially Assisting Al Qaeda with the 9/11 Attacks ...............................................................................20

        3.    The Amended Complaints Fail to Allege that Sudan Conspired with Al Qaeda to Commit the 9/11 Attacks................................................21

    B.    The Report Incorrectly Concludes that the Amended Complaints State Claims for Assault, Battery, and Trespass .............................................................22

        1.    Plaintiffs' State-Law Claims Are Preempted by § 1605A and § 1605B........................................................................................................22

        2.    Plaintiffs Have Not Adequately Pleaded Their State-Law Claims............23

    C.    The Report Incorrectly Concludes that the Amended Complaints State a Claim Under the Alien Tort Statute ......................................................................24

    D.    The Report Incorrectly Concludes that the Amended Complaints State a RICO Claim .......................................................................................................24

CONCLUSION........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. The Islamic Republic of Iran*,
   753 F. Supp. 2d 68 (D.D.C. 2010) ........................................................................................17

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006)..............................................................................................................19

*Ashton v. Al Qaeda Islamic Army*,
   298 F. Supp. 3d 631 (S.D.N.Y. 2018).............................................................................. *passim*

*Bob Jones Univ. v. Simon*,
   416 U.S. 725 (1974)..............................................................................................................17

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
   137 S. Ct. 1312 (2017).......................................................................................................2, 13

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020)......................................................................................................3, 19

*Burrage v. United States*,
   571 U.S. 204 (2014)................................................................................................................4

*Caraballo v. United States*,
   830 F.2d 19 (2d Cir. 1987)............................................................................................... 19-20

*Ctr. for Biological Diversity v. Raimondo*,
   No. 18-112, 2022 WL 2643535 (D.D.C. July 8, 2022) ....................................................18, 19

*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab
   Jamahiriya*,
   811 F. Supp. 2d 53 (D.D.C. 2011) ........................................................................................15

*City of Rancho Palos Verdes v. Abrams*,
   544 U.S. 113 (2005)......................................................................................................... 15-16

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
   140 S. Ct. 1009 (2020).................................................................................................... 3-4, 19

*Cromer Fin. Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001)...................................................................................20

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
   974 F.2d 270 (2d Cir. 1992)..................................................................................................20

*Fed. Republic of Ger. v. Philipp*,
    141 S. Ct. 703 (2021) ...........................................................................................15

*Fogel v. Chestnutt*,
    668 F.2d 100 (2d Cir. 1981) ............................................................................ 2-3

*Gater Assets Ltd. v. AC Gazsnabranzit*,
    413 F. Supp. 3d 304 (S.D.N.Y. 2019) ................................................................16

*Green v. City of New York*,
    465 F.3d 65 (2d Cir. 2006) ............................................................................ 23-24

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ...................................................................................... 13-14

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) .....................................................................20, 21

*Hernandez v. Smith*,
    793 F. App'x 261 (5th Cir. 2019) .......................................................................18

*Hijazi v. Permanent Mission of Saudi Arabia to the UN*,
    403 F. App'x 631 (2d Cir. 2010) .........................................................................2

*Hirsh v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995) ............................................................................ 7-8

*In re Islamic Republic of Iran Terrorism Litig.*,
    659 F. Supp. 2d 31 (D.D.C. 2009) .....................................................................17

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) .......................................................................................24

*Khaliq v. Republic of Sudan*,
    No. 04-1536, 2009 WL 10736793 (D.D.C. Oct. 26, 2009) ...................................17

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004) ...........................................................................3

*Leibovitch v. Islamic Republic of Iran*,
    697 F.3d 561 (7th Cir. 2012) .........................................................................22, 23

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ...............................................................................21

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) .........................................................................20, 21

*Mastafa v. Australian Wheat Bd. Ltd.*,
   No. 07-cv-7955, 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008) ............................................21

*Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukr.*,
   311 F.3d 488 (2d Cir. 2002)....................................................................................................9

*Murphy v. Islamic Republic of Iran*,
   740 F. Supp. 2d 51 (D.D.C. 2010) ........................................................................................17

*Owens v. Republic of Sudan*,
   864 F.3d 751 (D.C. Cir. 2017)...........................................................................................4, 22

*P&V Enters. v. U.S. Army Corps of Eng'rs*,
   516 F.3d 1021 (D.C. Cir. 2008)............................................................................................18

*Paroline v. United States*,
   572 U.S. 434 (2014)...........................................................................................................4-5

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)..............................................................................................................25

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947)........................................................................................................22-23

*Rimkus v. Islamic Republic of Iran*,
   750 F. Supp. 2d 163 (D.D.C. 2010) ................................................................................16-17

*Rothstein v. UBS*,
   708 F.3d 82 (2d Cir. 2013)...............................................................................................5, 19

*Rubin v. Islamic Republic of Iran*,
   138 S. Ct. 816 (2018)......................................................................................................13, 14

*Rux v. Republic of Sudan*,
   461 F.3d 461 (4th Cir. 2006) .................................................................................................3

*Rux v. Republic of Sudan*,
   495 F. Supp. 2d 541 (E.D. Va. 2007) ...................................................................................11

*Scribner v. Summers*,
   84 F.3d 554 (2d Cir. 1996)...................................................................................................24

*Simon v. Republic of Iraq*,
   529 F.3d 1187 (D.C. Cir. 2008)............................................................................................17

*SPV OSUS, Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018)..................................................................................................20

*In re Terrorist Attacks on Sept. 11, 2001,*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)..............................................................21-22

*In re Terrorist Attacks on Sept. 11, 2001,*
    740 F. Supp. 2d 494 (S.D.N.Y. 2010)..............................................................24-25

*In re Terrorist Attacks on September 11, 2001,*
    No. 03-MDL-1570, 2017 U.S. Dist. LEXIS 96332
    (S.D.N.Y. June 20, 2017)........................................................................................1

*United States v. Castillo,*
    36 F.4th 431 (2d Cir. 2022) ................................................................................14

*Van Beneden v. Al-Sanusi,*
    709 F.3d 1165 (D.C. Cir. 2013)..........................................................................17

*Verlinden B.V. v. Cent. Bank of Nigeria,*
    461 U.S. 480 (1983)............................................................................................23

## STATUTES

Anti-Terrorism Act, 18 U.S. Code § 2331, et seq.

    18 U.S.C. § 2333................................................................... 15, 16, 18-19

    18 U.S.C. § 2337.......................................................................................19

28 U.S.C. § 636...................................................................................................1

Foreign Sovereign Immunites Act of 1976, 28 U.S.C. §§ 1330, 1602, et seq.

    28 U.S.C. § 1330.......................................................................................16

    28 U.S.C. § 1605(a) ..........................................................................*passim*

    28 U.S.C. § 1605A.............................................................................*passim*

    28 U.S.C. § 1605B.............................................................................*passim*

    28 U.S.C. § 1606...................................................................................22, 23

    28 U.S.C. § 1607.......................................................................................22

    28 U.S.C. § 1610.......................................................................................16

28 U.S.C. § 2401................................................................................................18

National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181,
    121 State 3. (Jan. 28, 2008) ......................................................................16, 17, 18

**RULES**

Fed. R. Civ. P. 12(b)(1)............................................................................................................2

Fed. R. Civ. P. 15(c) ..............................................................................................................18

Fed. R. Civ. P. 72(b) ...............................................................................................................1

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 103-702 (1994)................................................................................................13

**OTHER AUTHORITIES**

Nat'l Comm'n on Terrorist Attacks Upon the United States,
    The 9/11 Commission Report (2004),
    http://govinfo.library.unt.edu/911/report/911Report.pdf.................................................. 8, 9-10

The Report and Recommendation disregards fundamental jurisdictional flaws in the Amended Complaints by applying incorrect legal standards that conflict with Supreme Court and Second Circuit precedent and by disregarding prior rulings in this very same MDL proceeding. When reviewed under the correct legal standards and applicable precedent, the Amended Complaints fail to allege facts that establish a causal link — for purposes of either jurisdiction or liability — between Sudan's alleged conduct and Plaintiffs' injuries in the 9/11 Attacks.   In particular, this Court's prior dismissal of claims against sovereign defendant the Saudi High Commission forecloses the claims against Sudan here.  *Ashton v. Al Qaeda Islamic Army*, 298 F. Supp. 3d 631, 659 (S.D.N.Y. 2018) ("Plaintiffs' allegations are conclusory, largely boilerplate, and concern conduct too temporally and geographically remote from the 9/11 Attacks to have proximately caused Plaintiffs' injuries.").   The Amended Complaints' allegations of Sudan's purported material support in the early- to mid-1990s half a world away are even more generalized and remote than the SHC allegations in *Ashton* and Plaintiffs' claims should be dismissed on this basis.

## ARGUMENT

Sudan objects, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, to the Magistrate Judge's Report and Recommendation (ECF No. 7942) and the Amended Report and Recommendation (ECF No. 8549) recommending denial in part of Sudan's Consolidated Motion to Dismiss the Amended Complaints (ECF No. 6574).   When a party objects to a report and recommendation, a court "must make a *de novo* determination as to the objected-to portions of the Report."  *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570, 2017 U.S. Dist. LEXIS 96332, at *276 (S.D.N.Y. June 20, 2017) (Daniels, J.) (citing 28 U.S.C. § 636(b)(1)(C)).

## I.   THE REPORT INCORRECTLY CONCLUDES THAT THIS COURT HAS SUBJECT-MATTER JURISDICTION UNDER THE FSIA

### A.   The Report Applies the Incorrect Standard of Review

The Report erroneously states that, on a Rule 12(b)(1) challenge to the legal sufficiency of the jurisdictional allegations, a challenge Sudan makes here, the standard of review is to "take all facts alleged in the complaint as true *and draw all reasonable inferences in favor of plaintiff*." R&R 5 (emphasis added).  But this Court already held in *Ashton* that, although "the court generally must accept the material factual allegations in the complaint as true," it "*does not draw all reasonable inferences in the plaintiff's favor*."  298 F. Supp. 3d at 641 (emphasis added) (quotation omitted).  Likewise, the Second Circuit has held that, in assessing a facial challenge to jurisdiction over a foreign sovereign under the FSIA, courts "*are not to draw inferences from the complaint favorable to plaintiff*[]."  *Hijazi v. Permanent Mission of Saudi Arabia to the UN*, 403 F. App'x 631, 632 (2d Cir. 2010) (alteration in original) (emphasis added).

The Report's application of the incorrect standard of review is also incompatible with Supreme Court precedent holding that plaintiffs must "show (and not just arguably show)" the elements of an exception to foreign sovereign immunity.  *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1324 (2017).  Whereas the Report (at 13) concludes that Plaintiffs satisfied their burden by pleading that Sudan "might" have provided material support or that such support "may have" led to the 9/11 Attacks, *Helmerich* rejected the lower court's conclusion that it was enough that plaintiffs "might" have a claim that property was taken in violation of international law, holding that to be insufficient to establish jurisdiction under the FSIA.  137 S. Ct. at 1318, 1324.  The Report's application of the incorrect standard is, alone, grounds to reject the Report.  *See Fogel v. Chestnutt*, 668 F.2d 100, 116-17 (2d Cir. 1981) (rejecting damages recommendation where magistrate judge was "mistaken in the legal test he

applied").

> **B.     The Report Incorrectly Concludes that the Amended Complaints Allege Facts Sufficient to Establish Jurisdictional Causation**
>
> > **1.     The Report Overlooks Supreme Court Precedent and Applies the Incorrect Standard for Jurisdictional Causation**

**But-for Causation.**  In invoking the "law of the case" doctrine and following this Court's ruling in *Ashton* that but-for causation is not required under § 1605(a)(7), § 1605A, or § 1605B, the Report (at 7-8) ignores recent Supreme Court precedent reiterating that but-for causation is the *default rule*.  *See* Mot. at 7-8, ECF No. 6575.  In *Comcast Corp. v. National Association of African American-Owned Media*, the Supreme Court held that no "textual warrant" is required to assume a requirement for "but for" causation:  The "ancient and simple 'but for' common law causation test, we have held, supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action."  140 S. Ct. 1009, 1014-16 (2020) (citation omitted); *see also Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020).

The Report, like *Ashton*, relies on the *Kilburn*, *Owens*, and *Rux* decisions from the U.S. Courts of Appeals for the District of Columbia and Fourth Circuits.  R&R 7.  But those decisions all predate the Supreme Court's intervening decisions in *Comcast* and *Bostock* that control here. In particular, *Kilburn* and *Rux* conflict with *Comcast* and *Bostock* in that they incorrectly look to whether there was a "textual warrant" in § 1605(a)(7) for requiring but-for causation.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (concluding "there is *no textual warrant*" for requiring "but for" causation (emphasis added)); *Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006) (holding "the *text of the statute*" did not warrant but-for causation (emphasis added)).  In contrast, the Supreme Court is clear:  no textual warrant is necessary because, as a matter of statutory interpretation, phrases like "because of" or "by reason of" *require* a showing of but-for causation.  *Bostock*, 140 S. Ct. at 1739; *Comcast*, 140 S. Ct. at

1014-16.  The same logic extends to "caused by" in §1605(a)(7), § 1605A, and § 1605B.  *See Burrage v. United States*, 571 U.S. 204, 210 (2014) (equating "caused by" with "resulting from," which requires but-for causation).

**Proximate Causation.**  The Report misapplies the proximate-cause standard set forth in *Ashton*.  As discussed in more detail below, under any proximate-cause standard, the allegations of purported material support by Sudan in the early- to mid-1990s — like the allegations against the Saudi High Commission ("SHC") — are far "too temporally and geographically remote from the 9/11 Attacks" to support subject-matter jurisdiction under § 1605(a)(7), § 1605A, or § 1605B. *Ashton*, 298 F. Supp. 3d at 659.

In *Ashton*, this Court held that proximate cause requires "some reasonable connection" between the defendant's act and the plaintiff's injury.  R&R 8 (quoting *Ashton*, 298 F. Supp. 3d at 646).  This "reasonable connection" standard "contains two separate but related elements":  (1) the defendant's acts must be a "'substantial factor' in the sequence of events that led to the plaintiff's injury," and (2) the injury must have been "reasonably foreseeable or anticipated as a natural consequence" of the defendant's acts.  *Ashton*, 298 F. Supp. 3d at 646 (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017)).  This Court further explained: "The proximate cause requirement is designed 'to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.'" *Id*. (quoting *Paroline v. United States*, 572 U.S. 434, 444-45 (2014)).

In invoking the "reasonable connection" standard, however, the Report suggests (at 18) that the jurisdictional standard for proximate cause here does not require any "direct relation" as required by the general tort standard for proximate cause.  But as *Paroline* explains — in the same paragraph quoted in *Ashton* — the "classic tort notion" of proximate cause "refers to the basic

requirement that . . . there must be some *direct relation* between" the defendant's action and the plaintiff's injury.  572 U.S. 434, 444-45 (2014) (emphasis added) (citations omitted).  The Second Circuit in *Rothstein v. UBS* — on which *Ashton* also relies, *see* 298 F. Supp. 3d at 646 — likewise adopts a *direct relation* requirement for proximate causation.  *See* 708 F.3d 82, 91-92 (2d Cir. 2013) (explaining that, in determining proximate cause, "the central question . . . is 'whether the alleged violation led *directly* to the plaintiff's injuries'" (citation omitted)).  Thus, contrary to the Report's conclusion (at 18), implicit in the two-part proximate-cause standard referenced in *Ashton* is a requirement that there be some direct relation between the defendant's act and the plaintiff's injury.  Nothing in § 1605(a)(7), § 1605A, or § 1605B provides any basis to disregard the traditional proximate-cause standard.

### 2.    The Report Misapplies *Ashton*, which Requires Dismissal of Plaintiffs' Claims for Lack of Subject-Matter Jurisdiction

Though the Report purports to invoke *Ashton*'s proximate-cause standard, the Report fails (at 18) to apply that standard faithfully here.  This Court concluded in *Ashton* that allegations of material support by the SHC, another foreign sovereign defendant, did not establish jurisdictional causation under § 1605B.  *See Ashton*, 298 F. Supp. 3d at 647.  Proper application of the *Ashton* decision requires dismissal of Plaintiffs' claims against Sudan because Plaintiffs' allegations of material support here are less direct and are far more attenuated, "both in time and place," *id.,* than those the Court deemed insufficient in *Ashton*.

The Report mischaracterizes the deficient allegations in *Ashton* as being "against a set of Saudi-linked charities [that] were simply too tenuous to support jurisdiction, in no small part because if support from these entities reached al Qaeda, it did so indirectly and through intermediaries."  R&R 19.  But the allegations were against a sovereign defendant, the SHC, not "Saudi-linked charities."  *Ashton*, 298 F. Supp. 3d at 638-40.  And, unlike here, plaintiffs there

made numerous allegations that the SHC purportedly provided material support *directly to al Qaeda*. *See, e.g.*, *id*. at 646-47 (rejecting as insufficient allegations that SHC provided cover jobs for numerous al Qaeda members and had at least six members al Qaeda on its payroll, "provided financial and logistical support to al Qaeda and its operatives fighting in the Bosnian War," "funneled hundreds of thousands of dollars to al Qaeda," and "provided arms to a Somalian faction trained by al Qaeda, which were used to fight American military personnel").

The Report's attempt (at 19) to distinguish the allegations against the SHC as "material support to al Qaeda primarily for attacks far afield in Bosnia" is mistaken. *Ashton* addressed allegations of "the SHC's *direct involvement* in the portfolio of plots al Qaeda was developing to attack *the American homeland*," not just in Bosnia. 298 F. Supp. 3d at 646 (emphasis added). The Court still concluded that these allegations "do not provide a basis to assert jurisdiction under [§ 1605B] over the claims asserted against the SHC." *Id*.

The allegations against Sudan here are even more attenuated than the allegations against the SHC. Most of the allegations against Sudan are hopelessly vague, conclusory, and devoid of underlying facts, e.g., that Sudan "supported" attacking the United States. *See, e.g.*, R&R 15-16 (citing CAC ¶¶ 30, 35; *Ashton* Compl. ¶ 73). The few connections the Report draws between allegations about al Qaeda's purported time in Sudan and the 9/11 Attacks are insufficient to establish jurisdictional causation. For example, the Report (at 14) points to allegations that from its "sanctuary" in Sudan, "al Qaeda began developing the tactics that culminated in the September 11 Attacks" by initiating flight training. But the Amended Complaints explicitly allege that this flight training occurred *in the United States*, not Sudan, and allege no Sudanese governmental support for such training. *Id.* (citing CAC ¶¶ 157-58). The Report refers to allegations that Sudan "hosted a meeting" between two al Qaeda operatives, *id.* (citing CAC ¶ 164), but those allegations

fail to identify any Sudanese employee or official involved or explain how this meeting led to the 9/11 Attacks.  And the Report relies on allegations that there was a "1991 agreement between al Qaeda, Iran, and Sudan's NIF" that "suggests the existence of a terrorist coalition that could strike the United States."  R&R 16 (citing CAC ¶¶ 50-52).  Neither the Amended Complaints nor the CIA Report they cite for these conclusory allegations even state that *Sudan* was a party to *any* agreement (illicit or otherwise).  *See* CAC ¶¶ 75 & n.31, 76 & n.32, 81 & n.34, 82 & n.35 (incorporating CIA Report by reference).  At most, the "NIF" — an alleged "political party" (CAC ¶ 31) — purportedly entered an agreement with Bin Laden and Iran in 1991 — *ten years before the 9/11 Attacks*.  CAC ¶¶ 75, 76, 82.

The allegations here are also more attenuated in time than those alleged against the SHC.  The Report (at 12) places undue weight on Plaintiffs' vague allegations of Sudan's purported material support for al Qaeda before Bin Laden was expelled in 1996, but fails to recognize that this Court already deemed similar allegations of material support provided by the SHC to al Qaeda *much closer in time* to the 9/11 Attacks insufficient to establish jurisdiction.  *See, e.g.*, *Ashton*, 298 F. Supp. 3d at 646-47 (rejecting as insufficient allegations that "from *1996 through 1999*, SHC funneled hundreds of thousands of dollars to al Qaeda" as too attenuated to "implicate the SHC's personal involvement, or that of any of its employees or agents, in any particular tortious act or act that caused the 9/11 Attacks").  As discussed below, Plaintiffs' allegations of material support that occurred after Bin Laden's expulsion in 1996 are wholly conclusory and do not establish that Sudan provided material support that caused the 9/11 Attacks.

**3.      The Report Improperly Credits Vague and Speculative Allegations that Are Contradicted by the 9/11 Commission's Detailed Findings**

It is axiomatic that "[g]eneral, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint," in "papers and exhibits appended to the

complaint," or "any matters of which judicial notice may be taken."  *Hirsh v. Arthur Andersen &*
*Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).  But, rather than give due weight to the 9/11 Commission's
findings — based on a comprehensive review of millions of pages of documents and interviews of
more than a thousand individuals, *see* 9/11 Comm'n Rep. xv — the Report improperly favors
vague and conclusory allegations that do not support the Report's conclusion that "Plaintiffs have
plausibly alleged that Sudan still supported al Qaeda after bin Laden's departure."  R&R 17; *see
also id.* at 5 (acknowledging Court may consider 9/11 Commission Report on motion to dismiss);
CAC ¶¶ 19, 24, 52, 53, 85, 91, 103, 120, 163 (incorporating 9/11 Comm'n Rep.).

The Report fails to credit the 9/11 Commission's finding that, when Sudan expelled Bin
Laden in 1996, he left Sudan "significantly weakened" and "with practically nothing," because
"the Sudanese government expropriated all his assets."  9/11 Comm'n Rep. 63, 170.  The Report
further ignores the 9/11 Commission's findings that (i) when Bin Laden was expelled from Sudan
in 1996, he "was in his *weakest position* since his early days in the war against the Soviet Union"
and "the government of Sudan *seized everything Bin Ladin had possessed there*"; (ii) after Bin
Laden's expulsion he "*relied on the Taliban* until he was able to reinvigorate his fundraising efforts
by drawing on ties to wealthy Saudi individuals that he had established during the Afghan war in
the 1980"; and (iii) "[n]ot until 1998 did al Qaeda undertake a major terrorist operation of its own,
in large part because Bin Ladin *lost his base in Sudan*."  *Id.* at 62, 65, 170 (emphases added).  The
Report, instead, credits vague and speculative assertions from State Department and Congressional
Research Service documents noting that "Sudan was *trying to give the impression* that they were
changing without surrendering Islamic radicals"; Sudan "*may have worked* to conceal bin Ladin's
ties" to companies in Sudan; and "Hassan al Turabi, '*[c]ontinue[d] to be politically and
ideologically close* to' Bin Laden."  R&R 13-14.  None of these assertions is a specific factual

allegation that establishes any reasonable connection or direct relation between Sudan's purported conduct and the 9/11 Attacks.  *See supra* § I.A; *see also Ashton*, 298 F. Supp. 3d at 647.

The Report also improperly relies on conclusory State Department cables and reports that provide only the vaguest descriptions of purported "material support or resources."  *See* R&R 13, 17 (stating that "Sudan continued to serve as a meeting place, safehaven, and training hub" for al Qaeda).   Such "meager and conclusory submissions" are insufficient.   *See Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukr.*, 311 F.3d 488, 499 (2d Cir. 2002) (rejecting State Department Country Reports as "meager and conclusory submissions"); *see also* Br. for Petitioner-Appellant at 40-43, *Monegasque de Reassurances S.A.M.*, 311 F.3d 488 (identifying reports rejected in Second Circuit's opinion as State Department Country Reports).   Unlike the 9/11 Commission Report, which is far more detailed and identifies the sources of the information referenced in it, the Amended Complaints point to these State Department materials, which fail to identify their source material and do not supply *any specific facts* establishing that Sudan provided material support to al Qaeda or Bin Laden that caused the 9/11 Attacks.  *See* CAC ¶ 135; *see also Ashton*, 298 F. Supp. 3d at 646-47 (claims that "al Qaeda members were 'broadly embedded' in SHC offices and used SHC facilities 'to plot attacks against the West'" did not amount to "specific, non-conclusory allegations").

Similarly, the Report (at 14) emphasizes that the decision of the United States to bomb the al Shifa pharmaceutical factory in Khartoum, following the 1998 Embassy bombings, purportedly is "evidence" that Sudan continued its support to al Qaeda after 1996.   But the 9/11 Commission explains that the decision to carry out the al Shifa bombing was based on a single CIA report, which rested on "rather uncertain connections between al Qaeda and the al Shifa factory" and was *not* corroborated by "independent evidence."  9/11 Comm'n Rep. 117-18.   And after the al Shifa

attack, "much public commentary turned immediately to scalding criticism that the [attack] was too aggressive." *Id.* The decision by the United States to strike the al Shifa factory, therefore, does not establish that Sudan provided material support to al Qaeda that caused the 9/11 Attacks.

### 4. The Report Improperly Relies on Vague and Conclusory Allegations Insufficient to Show that any Sudanese Official, Employee, or Agent Provided Any Material Support within the Scope of His Authority

Contrary to the Report's conclusion (at 22-23), the Amended Complaints' vague and conclusory allegations cannot establish that any Sudanese officials, employees, or agents provided material support to al Qaeda while acting within the scope of his office, employment, or agency, a requirement for jurisdiction under § 1605(a)(7), § 1605A, or § 1605B. The Report cites no legal authority to support its erroneous determination that Plaintiffs adequately alleged that Hassan al-Turabi was acting as an "official, employee or agent" of Sudan. *See* R&R 22-23. Plaintiffs' allegations concerning Turabi are precisely the sort of non-specific and conclusory allegations that this Court has deemed insufficient to sustain jurisdiction. *See, e.g.*, *Ashton*, 298 F. Supp. 3d at 652-53 (holding allegations that individuals were "undeclared employees and agents of the Saudi government" who "received "money from the Saudi government" were insufficient to establish jurisdiction over Saudi Arabia under § 1605B. The Report references (at 22 (citing CAC ¶ 30)) Plaintiffs' allegation that Turabi acted as a "de facto leader of Sudan" from 1989 until 1999. But neither the Report nor any Amended Complaint identifies factual support for this vague allegation nor do they define what "de facto leader" means or explain how it qualifies someone as an "official, employee, or agent" acting within the scope of his employment.

Beyond Turabi, the Report makes the sweeping and generalized statement, with no alleged facts in support, that "[h]igh level [Sudanese] officials, including President Bashir, acting within the scope of their duties allegedly carried out the tortious acts." R&R 22. Instead of citing specific factual allegations, the Report simply notes that "President Bashir was a Sudanese Government

representative," and suggests that "evidence of material support through official government acts supports an inference of official activity." *Id.* But this "evidence" is nowhere to be found in the Report or Amended Complaints. Instead, the Amended Complaints point to various temporally remote forms of support allegedly provided by Sudan, including counter-intelligence support in the "early 1990s," CAC ¶ 67, and a purported "official Sudanese government letter" that allegedly enabled al Qaeda operatives to bypass security screening of their possessions *in Sudan* around the same time, *see id.* ¶ 72. These temporally and geographically attenuated allegations are insufficient to establish a reasonable connection or direct relation between Sudan's purported conduct and the 9/11 Attacks.

> **5.** **The Report's Remaining Reasons for Concluding that Plaintiffs Had Alleged Subject-Matter Jurisdiction Are Unavailing**

None of the Report's remaining reasons for concluding that Plaintiffs have alleged facts giving rise to subject-matter jurisdiction passes muster. For example, the Report cites *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007), a case decided in the default context, to support its conclusion that "as 'early as 1998, Sudan provided Al Qaeda members with Sudanese diplomatic passports as well as regular Sudanese travel documentation that facilitated the movement of Al Qaeda operatives in and out of Sudan." R&R 14. But nothing in the *Rux* opinion, the Report, or Plaintiffs' allegations connects the alleged provision of those purported passports to entry into the United States or the 9/11 Attacks. These allegations are even weaker than those that the Court deemed insufficient as to Saudi Arabia in *Ashton*, which held that allegations of "Saudi Arabia's involvement in cleansing passports *for the 9/11 hijackers*" and provision of a "fraudulent Saudi passport *in July 2001 to 9/11 mastermind* Khalid Sheikh Mohammed" were conclusory and insufficient to show proximate cause. 298 F. Supp. 3d at 647 (emphases added).

The Report also points to allegations of a money-laundering scheme, through which Bin

Laden allegedly moved between $26 and 28 million out of Sudan.  R&R 14 (citing *Ashton* Compl. ¶¶ 106-13).  But the Amended Complaints do not allege involvement in this scheme by any Sudanese official, employee, or agent, let alone one acting within the scope of his or her office, employment, or agency.  *Id*.  Nor do they tie this alleged scheme to the 9/11 Attacks.  *See id*.

The Report further points to *default judgments* regarding the Embassy and U.S.S. *Cole* bombings as evidence that Sudan continued to provide material support to al Qaeda after Bin Laden's expulsion in 1996.  R&R 16-17.  But those default judgments were based upon uncontested findings that Sudan had facilitated the delivery of "weapons" and "explosives" to the terrorists who carried out these attacks *in nearby countries*.  *Ashton* Compl. ¶¶ 89, 91-92; CAC ¶ 191.  There are no comparable allegations here connecting Sudan to the 9/11 Attacks, which occurred on the other side of the world.  *See Ashton*, 298 F. Supp. 3d at 647 (finding alleged material support provided in Bosnia "far removed, both in time and place, from the 9/11 Attacks").

The Report also references Sudan's alleged mobilization of its purported "sovereign might."  R&R 10.  But the allegations supporting such "sovereign might" are, again, nonspecific and conclusory and support no reasonable connection or direct relation between that "sovereign might" and the 9/11 Attacks.  These allegations are that Sudan provided security services for Bin Laden, "Sudanese security services worked with al Qaeda to vet potential recruits," and al Qaeda-operated training camps "were protected from local [Sudanese] police by Sudanese intelligence."  R&R 10.  But these are conclusory allegations of a few ad hoc instances of purported assistance by "intelligence services" that allegedly helped al Qaeda to "transform."  This Court previously found insufficient similar generalized allegations of material support that allowed al Qaeda to "develop" and it should do so again here.  *Ashton*, 298 F. Supp. 3d at 638, 647 (rejecting as insufficient allegations "that al Qaeda's development into a terrorist organization and its ability to

carry out the 9/11 Attacks was made possible through the" SHC's material support).

    **C.**    **The Report Incorrectly Concludes that the Amended Complaints Allege Facts Sufficient to Meet Other Jurisdictional Prerequisites of § 1605(a)(7), § 1605A, and § 1605B**

        **1.**    **The Court Lacks Subject-Matter Jurisdiction Over the Claims of Family Members of 9/11 Victims**

The Report incorrectly concludes that the Court has subject-matter jurisdiction over claims brought by family members of victims of the 9/11 Attacks.  R&R 29-30.  In reaching this conclusion, the Report fails to heed the Supreme Court's direction that interpretation of the FSIA's statutory terms must be "consistent with the history and structure of the FSIA."  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 825 (2018); *see also Helmerich*, 137 S. Ct. at 1319-21.  The proper reading of § 1605(a)(2)(A)(ii) limits jurisdiction to actions brought by the individuals killed or injured in the 9/11 Attacks, or their personal representatives, and does not extend to family members bringing solatium claims in their own right.

The plain meaning of § 1605A is that immunity is withdrawn for claims of either (i) a "victim" who was injured and has the requisite U.S. nationality or employment; or (ii) a "claimant" acting as the "legal representative" of a person who was killed or incapacitated (a "victim") if either the claimant has or the victim had the requisite U.S. nationality or employment.  *See* §§ 1605A(a)(1), (a)(2)(A)(ii), (c).  The term "claimant" is required because a "victim" cannot assert a claim directly in the case of a killing or incapacitation.  The FSIA's legislative history supports this natural reading.  *See* H.R. Rep. No. 103-702, at 5 (1994) (explaining "where the victim is not alive . . . the victim's legal representative or . . . a proper claimant in an action for wrongful death may bring suit").  The Report's erroneous interpretation (at 29-30) that "claimant" essentially applies to anyone who brings a claim would render "victim" meaningless and violate the canon of statutory construction that courts should "avoid a reading which renders some words

altogether redundant." *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995).  Moreover, the Report's incorrect reading renders § 1605A(a) out of step with § 1605A(c), unlike Sudan's proffered interpretation where a foreign state's immunity would be withdrawn only for claims of persons who qualify to bring claims under the exclusive federal cause of action in § 1605A(c). *See, e.g.*, *Rubin*, 138 S. Ct. at 823-25.

Family-member Plaintiffs also lack standing under § 1605B, and the Report's contrary conclusion ignores the plain text of that statute as well.  *See* R&R 31.  Section 1605B(b) withdraws a foreign state's immunity for cases "in which money damages are sought against a foreign state for *physical injury* to person or property or *death* occurring in the United States."  (emphasis added).  The Report focuses only on the first part of the statute, that the family-member Plaintiffs are seeking money damages, but ignores that the money damages must be to compensate for a *physical injury* or *death* suffered by the person bringing the claim or on behalf of that person if there was incapacitation or death.  The FSIA does not define "physical injury," but this Circuit has made clear that physical injury is a concept distinct from emotional distress.  *See, e.g.*, *United States v. Castillo*, 36 F.4th 431, 434 (2d Cir. 2022) (explaining that "physical injury" is defined under New York law as "impairment of physical condition or substantial pain").

### 2.    The Court Lacks Subject-Matter Jurisdiction Over the Claims of Corporate Plaintiffs

The Report incorrectly concludes (at 32-33) that § 1605A(d) provides a basis for subject-matter jurisdiction for the Corporate Plaintiffs' claims on a subrogation basis.  Section 1605A(a)(2)(A)(ii) abrogates Sudan's sovereign immunity *only* for actions brought by a plaintiff who is a "national of the United States," member of the armed forces, or U.S. government employee or contractor.  The Report correctly recognizes (at 32) that the Corporate Plaintiffs do not fall into any of these categories, yet concludes that their claims may proceed on a subrogation

–14–

basis.  Such a conclusion renders the jurisdictional limits in § 1605A(a)(2)(A)(ii) meaningless.  *See Fed. Republic of Ger. v. Philipp*, 141 S. Ct. 703, 714 (2021) ("[T]he terrorism exception eliminates sovereign immunity for state sponsors of terrorism *but only for* certain human rights claims, *brought by certain victims*, against certain defendants." (emphases added)).

The Report cites (at 32-33) *Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 71 (D.D.C. 2011), to support the untenable conclusion that the Corporate Plaintiffs may pursue their claims against Sudan on a subrogation basis.  But that opinion resulted from an uncontested default judgment, and in any event is not binding on this Court.  Furthermore, even if subrogation were permitted under § 1605A, the Corporate Plaintiffs have pleaded no facts to show that their claims in fact derive from those of "nationals of the United States."  They offer only a conclusory allegation in a footnote:  "The causes of action pursuant to the ATA, [2]8 U.S.C. § 2331 et seq., are asserted on behalf of plaintiffs . . . who are subrogated to the rights of U.S. nationals who incurred physical injuries to property and related losses as a result of the September 11th attacks . . . ."  CAC p. 68 n.102.

The Corporate Plaintiffs also cannot avail themselves of § 1605B to establish subject-matter jurisdiction over Sudan.  The Report's statement that § 1605B(b) and § 1605B(c) "do different things" adopts an interpretation broader than what the plain text of the statute permits.  *See* R&R 33-35.  Sections 1605B(b) and (c) must be read together, such that §1605B(b) lifts the jurisdictional bar on causes of action against foreign states only for the ATA claims specifically outlined in § 1605B(c).  Indeed, the only claims that § 1605B explicitly authorizes are those brought "in accordance with section 2333."  *See* 28 U.S.C. § 1605B(c); *see also City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) ("As we have said in a different setting, '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended

to preclude others.'" (citation omitted)).  And claims brought under § 2333 plainly can be brought only by "nationals of the United States," which do not include corporations.  *See* 18 U.S.C. § 2333(a) (providing a remedy only for natural persons).

## II. THE REPORT INCORRECTLY CONCLUDES THAT THE COURT HAS PERSONAL JURISDICTION OVER SUDAN

Since no sovereign-immunity exception applies, this Court lacks personal jurisdiction over Sudan.  *See* 28 U.S.C. § 1330(b) (requiring an applicable exception to sovereign immunity and service of process for personal jurisdiction).  Sudan expressly preserves the argument that foreign states are persons entitled to a minimum-contacts analysis under the Due Process Clause, notwithstanding this Circuit's contrary authority.  *See Gater Assets Ltd. v. AC Gazsnabranzit*, 413 F. Supp. 3d 304, 313 (S.D.N.Y. 2019).

## III. THE REPORT INCORRECTLY CONCLUDES THAT PLAINTIFFS' CLAIMS ARE TIMELY

### A. The Report Incorrectly Concludes that Plaintiffs' § 1605A Actions Are Timely

Under § 1605A(b) and a correct reading of § 1083 of the 2008 National Defense Authorization Act, Plaintiffs' last opportunity to bring § 1605A actions was September 11, 2011.  The Report is correct that Plaintiffs' § 1605(a)(7) actions "cannot just become or be maintained as" § 1605A actions.  R&R 24.  But its conclusion (at 25) that Plaintiffs may now bring § 1605A actions through § 1083(c)(3) is erroneous.

The Report's expansive reading of § 1083(c) is unwarranted given the provisions' text and context.  *See* R&R 23; *see also, e.g.*, *Rubin*, 138 S. Ct. at 823, 826 (rejecting petitioners' "strained and unnatural reading" of a phrase in 28 U.S.C. § 1610(g)).  As the Report recognizes, § 1083(c) provides a "system for managing the transition for § 1605(a)(7) to § 1605A."  R&R 24.  Specifically, § 1083(c)(2) allowed "plaintiffs in already pending cases to move from the former

terrorism exception to § 1605A *only* where they would otherwise be hampered by the prior provisions applicable to their original suit." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 178-79 (D.D.C. 2010). And § 1083(c)(3) "is really a vehicle best reserved for those cases that had reached a final judgment and were not before the courts at time of the enactment of the 2008 NDAA." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 91 (D.D.C. 2009). Contrary to the Report's conclusions, which wrongly characterize and dismiss that case law, Plaintiffs' purported § 1605A actions do not satisfy the requirements for either category. Most notably, Plaintiffs do not meet the requirements of § 1083(c)(3) because *no judgment exists* in any related "original action" brought by Plaintiffs under § 1605(a)(7).

The cases cited in the Report (at 25-26) do not support the Report's construction. *Simon v. Republic of Iraq*, 529 F.3d 1187 (D.C. Cir. 2008), merely held that "courts retain jurisdiction pursuant to § 1605(a)(7) over cases that were pending under that section when the Congress enacted the NDAA." *Id.* at 1192. And *Van Beneden v. Al-Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013), *Anderson v. The Islamic Republic of Iran*, 753 F. Supp. 2d 68 (D.D.C. 2010), and *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010), all interpreted § 1083(c)(3) without the benefit of adversarial argument. *See Bob Jones Univ. v. Simon*, 416 U.S. 725, 740 n.11 (1974) (finding decision lacked "precedential weight" where case did not "involve[e] a truly adversary controversy").

Further, misinterpreting *Khaliq v. Republic of Sudan*, No. 04-1536, 2009 WL 10736793 (D.D.C. Oct. 26, 2009), the Report incorrectly concludes (at 27) that "allowing [Plaintiffs'] cases to be brought through § 1083(c)(3) does not make § 1083(c)(2) superfluous." To the contrary, if plaintiffs were allowed to bring § 1605A claims so long as *any* related § 1605(a)(7) action remained pending (as the Report suggests they are allowed to do here), § 1083(c)(2) would be

–17–

entirely unnecessary.  Instead, §§ 1083(c)(2) and (c)(3) address two different scenarios, neither of which encompasses Plaintiffs' actions.  The Report's judicial efficiency concerns (at 27) are also misguided.  Plaintiffs could have avoided reliance on an incorrect interpretation of § 1083(c) if only they had amended their complaints to add § 1605A as a basis for jurisdiction any time between the 2008 NDAA enactment and the expiration of the statute of limitations on September 11, 2011.  28 U.S.C. § 1605A(b).

Finally, the Report correctly recognizes (at 23 n.7) that "[w]hether § 1605A(b)'s time limits are jurisdictional is an open question."  Should this Court hold that Plaintiffs may not bring § 1605A actions through § 1083(c)(3), it should further hold that Plaintiffs may not bring such actions through Rule 15(c) of the Federal Rules of Civil Procedure.  Under Rule 15(c), where a statute of limitation is jurisdictional, plaintiffs may not "go back in time" to cure jurisdictional defects.  *Hernandez v. Smith*, 793 F. App'x 261, 265-66 (5th Cir. 2019).  Section 1605A(b) is jurisdictional as it limits the timing of the court's power to hear an "action" brought "under this section."  *See P&V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1026 (D.C. Cir. 2008) (holding 28 U.S.C. § 2401(a), which contained a deadline to bring an "action" against the United States, was jurisdictional); *Ctr. for Biological Diversity v. Raimondo*, No. 18-112, 2022 WL 2643535, at *16 (D.D.C. July 8, 2022) ("§ 2401(a) is a jurisdictional condition *attached to* the government's waiver of sovereign immunity" (emphasis added)).

### B.  The Report Incorrectly Concludes that Plaintiffs Other than the *O'Neill* Plaintiffs Have Brought Timely § 2333 Actions

The Report is also incorrect in allowing the *Ashton*, *Burnett*, *Federal Insurance*, and *Continental Casualty* Plaintiffs to bring their untimely 18 U.S.C. § 2333 claims against Sudan.  R&R 44-47; Am. R&R 2-3.  As discussed immediately above, Rule 15(c) cannot be used to cure jurisdictional defects in a complaint.  *See Hernandez*, 793 F. App'x at 265-66.  At the time

Plaintiffs filed their complaints, the only potential jurisdictional basis for their claims against Sudan was § 1605(a)(7) and they were expressly barred from asserting claims under § 2333.  *See* 18 U.S.C. § 2337(2).

The Report's conclusion that the statute of limitations for § 2333 claims against foreign states is nonjurisdictional is also incorrect.  R&R 46.  The availability of a § 2333 claim against a foreign state depends on the existence of jurisdiction under § 1605B.  28 U.S.C. § 1605B(c).  Thus, the time bar on actions against foreign states under § 2333 is necessarily "attached" to the exception to immunity in § 1605B.  *See Ctr. for Biological Diversity*, 2022 WL 2643535, at *16.

## IV. THE REPORT INCORRECTLY CONCLUDES THAT THE AMENDED COMPLAINTS STATE A CLAIM AGAINST SUDAN

### A. The Report Incorrectly Concludes that the Amended Complaints State a Claim Under the ATA

#### 1. The Amended Complaints Fail to Allege that Sudan Proximately Caused the 9/11 Attacks that Injured Plaintiffs

The Report addresses the ATA's causation requirement in a single sentence stating, without analysis: "Proximate causation is sufficient . . . ."  R&R 38.  In dispensing with "but for" causation, the Report ignores that in *Rothstein*, the Second Circuit required that plaintiffs allege facts supporting the plausible inference that the "defendant's violation not only was a *'but for' cause* of his injury, but was the proximate cause" of plaintiffs injuries.  *Rothstein*, 708 F.3d at 95 (analyzing primary-liability claims under the ATA and dismissing for lack of proximate cause) (citation omitted) (emphasis added); *see also Comcast*, 140 S. Ct. at 1014-16; *Bostock*, 140 S. Ct. at 1739.

To show proximate cause, "the central question . . . is 'whether the alleged violation led *directly* to the plaintiff's injuries.'"  *Rothstein*, 708 F.3d at 91-92 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)); *Caraballo v. United States*, 830 F.2d 19, 22 (2d Cir. 1987) (defining proximate cause as that "which in a natural sequence, unbroken by any new cause,

produces that event and without which that event would not have occurred").

The proximate-cause requirement is equally applicable to aiding-and-abetting claims under the ATA.  The Second Circuit has held that proximate cause is incorporated in the tort concept of substantial assistance, a core element of the *Halberstam* framework that JASTA expressly endorsed.  *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018).  As a result, "aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).  Indeed, in a case relied upon by this Court in *Cromer*, the Second Circuit expressly relied on *Halberstam* itself in holding that "[w]hether the aid rendered is 'enough' to warrant the imposition of liability is essentially a proximate cause inquiry."  *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir. 1992) (citing *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983)).  And the Second Circuit has explained that "aiding and abetting focuses on the relationship between the act of international terrorism" (here the 9/11 Attacks) "and the secondary actor's alleged supportive conduct" (here Sudan's alleged activity).  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 331 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 488).

As explained above, the Amended Complaints fail to allege facts sufficient to support a causal connection (of any kind) between Sudan's alleged material support and the 9/11 Attacks. ATA claims against Sudan must therefore be dismissed for that reason alone.

### 2.   The Amended Complaints Fail to Allege that Sudan Was Generally Aware that It Was Substantially Assisting Al Qaeda with the 9/11 Attacks

The Report is incorrect to conclude (at 48-51) that Plaintiffs have plausibly alleged that (1) Sudan was generally aware that it was aiding a known terrorist organization and (2) Sudan substantially assisted al Qaeda in carrying out the 9/11 Attacks.  General awareness requires that a defendant know it is providing services to a *designated* foreign terrorist organization ("FTO"),

and al Qaeda was not designated as an FTO until 1999, several years after Sudan expelled Bin Laden. *See Linde*, 882 F.3d at 329-30 ("[A]iding and abetting an act of international terrorism requires more than the provision of material support to a designated terrorist organization."). Yet the Report fails to acknowledge that Sudan's alleged provision of material support occurred years before al Qaeda's designation as a terrorist organization.

The Report further erroneously concludes that Sudan knowingly provided substantial assistance to al Qaeda by relying on generalized and tenuous links between Sudan and al Qaeda that are not in any way linked to the 9/11 Attacks. The Report again overlooks the foundational principle that "[i]t is not enough that a defendant provide substantial assistance to a tortfeasor; the 'substantial assistance' must also 'advance the [tort's] commission.'" *Mastafa v. Australian Wheat Bd. Ltd.*, No. 07-cv-7955, 2008 WL 4378443, at *4 (S.D.N.Y. Sept. 25, 2008) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)). None of the Report's conclusions (at 50) as to the *Halberstam* factors establishes in any way that Sudan's purported assistance to al Qaeda "advance[d]" the 9/11 Attacks.

### 3.   The Amended Complaints Fail to Allege that Sudan Conspired with Al Qaeda to Commit the 9/11 Attacks

In concluding "Plaintiffs have pleaded enough to infer a conspiracy to commit international acts of terror against the United States," the Report fails to cite a single allegation and instead relies on sweeping generalizations of Sudan's purported "guidance" and "support" for al Qaeda. R&R 51-52. None of these generalizations even mentions the 9/11 Attacks themselves. *See id.* The Report has so erroneously broadened the conspiracy standard, that it has removed the event *that is supposed to be the object of the conspiracy*. The Report's conclusion ignores this Court's requirement that a plaintiff must, at minimum, plausibly allege that "Defendants were involved in an agreement to accomplish an unlawful act and that the attacks of September 11 were a *reasonably*

–21–

*foreseeable consequence* of that conspiracy." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 829 (S.D.N.Y. 2005) (emphasis added). As discussed, Plaintiffs do not, and cannot, establish that Sudan entered any agreement with al Qaeda concerning the 9/11 Attacks or that the 9/11 Attacks were a reasonably foreseeable consequence of any agreement.

**B.     The Report Incorrectly Concludes that the Amended Complaints State Claims for Assault, Battery, and Trespass**

**1.     Plaintiffs' State-Law Claims Are Preempted by § 1605A and § 1605B**

Contrary to the Report's assertion (at 55) that "no evidence suggests that Congress intended § 1605A or § 1605B to preempt state law," the texts of the statutes provide ample evidence of Congressional intent for preemption, and Plaintiffs should thus not be permitted to assert state-law tort claims against Sudan. First, the Report cites (at 53) the rejection of Sudan's preemption argument in *Owens v. Republic of Sudan*, 864 F.3d 751, 809 (D.C. Cir. 2017). *Owens* itself acknowledged that § 1606 does not apply to § 1605A, though *Owens* (and the Report (at 53)) attempt to limit this to the issue of punitive damages. In any event, the Report's interpretation creates an irreconcilable conflict between § 1605A and § 1605B, on the one hand, and § 1606, on the other, because, by its terms, § 1606 applies only to cases brought "under 1605 and 1607." Consequently, Sudan's interpretation fulfills Congressional intent to avoid conflicting statutes.

The Report (at 55) also cites *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012), which concluded that § 1605A created a new cause of action, but "did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity." Sudan agrees; § 1605A does not prevent claimants from bringing state-law claims under § 1605 or § 1607. But such claims cannot be brought under § 1605A.

Contrary to the Report's conclusion (at 54), Congress has indicated a "clear and manifest purpose" that requires a holding of preemption of state-law claims for actions brought under

§ 1605A and § 1605B.  *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Because Congress did not amend § 1606 to apply to either § 1605A or § 1605B, § 1605A(c) and § 1605B(c) provide the exclusive rules on the scope of liability under § 1605A and § 1605B, respectively.

Application of the three-factor test in *Rice* also requires the conclusion that state-law claims are preempted here.  331 U.S. at 230.  For the first factor, the Report concludes that there is no "pervasive regulatory scheme" present in § 1605A and § 1605B because "family members of foreign nationals cannot use [these statutes]."  R&R 54 (quoting *Rice*, 331 U.S. at 230).  The exclusion of this narrowly defined and minority group of claimants from the scope of § 1605A and § 1605B cannot plausibly lead to a conclusion that these statutes "do not *pervasively* regulate the field of terrorism-related suits" against foreign states.  R&R 54 (emphasis added).  Congress enacted these statutes to exclusively regulate these types of suits; the exclusion of a narrow category of claimants does not negate the widespread reach of the statutes in this context.

The Report also wrongly applies the second factor, which asks whether the regulation is "in an area where federal law predominates."  R&R 54 (quoting *Rice*, 331 U.S. at 230).  The Report focuses on a "state's police power" to enforce tort law, rather than on § 1605A and § 1605B, which address terrorism-related suits against foreign states.  Undoubtedly, "federal law predominates" what suits can be brought against foreign states and whether a state has waived immunity.  *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983).  As to the third factor — assessing whether a state scheme would frustrate the federal scheme — Congress enacted § 1605A(c), in part, *to eliminate* the "pass-through approach [of § 1606 that] created a patch-work of inconsistent recovery."  *Leibovitch*, 697 F.3d at 567-69 (quoting floor statements).

### 2.    Plaintiffs Have Not Adequately Pleaded Their State-Law Claims

As the Report implicitly acknowledges (at 56) proximate cause is a required element of Plaintiffs' assault, battery, and trespass claims.  *See Green v. City of New York*, 465 F.3d 65, 86

(2d Cir. 2006) (assault and battery); *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) (trespass).  As discussed, Plaintiffs fail to plausibly allege facts sufficient to show proximate cause.

The Report also incorrectly concludes (at 56) that Plaintiffs have alleged the necessary level of intent for such claims.  The Report cites the correct legal standards, but it does not and cannot point to allegations that connect Sudan to the assault, battery, or trespass arising from the 9/11 Attacks.  The Report merely asserts (at 57) that "Plaintiffs have adequately alleged knowing support in other contexts," which the Report determines, without explanation, is "also sufficient for the intentional concerted action required for trespass, assault, and battery claims."  But Plaintiffs' allegations focus almost entirely on Bin Laden and other al Qaeda individuals and do not include facts supporting the plausible inference that Sudan was aware of plans for the 9/11 Attacks, or otherwise committed any intentional tortious conduct tied to the 9/11 Attacks.  *Ashton* Compl. ¶¶ 70-81, 97-119; *see also* CAC ¶¶ 155-177.  Even Plaintiffs' allegation that "Sudan provided 200 passports to al Qaeda so that its members could travel with new identities" provides no specific dates or facts that connect any action by Sudan to the assault, battery, or trespass arising from the 9/11 Attacks.  *Ashton* Compl. ¶ 57; *see also* CAC ¶¶ 70-71, 104, 110.

### C.   The Report Incorrectly Concludes that the Amended Complaints State a Claim Under the Alien Tort Statute

This Court must reject the Report's erroneous conclusion (at 60-61) that Plaintiffs' ATS claims against Sudan can proceed.  Because the FSIA is the exclusive basis for jurisdiction over a foreign state (R&R 5), and the ATS is "strictly jurisdictional," the ATS cannot provide an alternate basis for jurisdiction against Sudan.  *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018).

### D.   The Report Incorrectly Concludes that the Amended Complaints State a RICO Claim

Contrary to the Report's conclusion (at 61) that *Terrorist Attacks IV* is a "fact-bound determination," that decision is relevant and controlling precedent given the similar factual

allegations against Sudan here. *See In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 515 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*").  Like the complaint in *Terrorist Attacks IV*, the Amended Complaints fail to plausibly allege that Sudan took any part in directing the affairs of an enterprise with al Qaeda.  *Id.*; *see also Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993) (requiring the defendant to take "an element of direction" in the enterprise's affairs).  Describing Sudan's relationship with al Qaeda, the Report states (at 14) that "Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network."  Even taking this incredibly vague and conclusory allegation as true, Sudan's conduct does not rise to the level of "direction" necessary to satisfy the RICO standard.  *See Terrorist Attacks IV*, 740 F. Supp. 2d at 515.  The Amended Complaints also do not allege facts that support a plausible inference that there was a "conscious agreement" between Sudan and al Qaeda "to commit two predicate acts in furtherance of the common purpose" of their purported joint enterprise.  *Id.*  Rather, Plaintiffs simply allege in a conclusory manner that "Sudan and al Qaeda agreed to work in concert with one another to carry out the terrorist attacks against the United States and its citizens."  CAC ¶ 229.  The RICO claims must be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should reject the Magistrate Judge's Report and Recommendation (as amended), and should dismiss with prejudice the Amended Complaints against Sudan for lack of subject-matter jurisdiction, lack of personal jurisdiction, and failure to state a claim.

Dated:   November 4, 2022
       Washington, DC

Respectfully submitted,

## WHITE & CASE

 /s/ *Christopher M. Curran*
Christopher M. Curran
Nicole Erb
Claire A. DeLelle
Matthew S. Leddicotte (*pro hac vice*)
Nicolle Kownacki (*pro hac vice*)
Celia A. McLaughlin (admission application
    forthcoming)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:     + 1 202 626 3600
Facsimile:     + 1 202 639 9355
ccurran@whitecase.com
nerb@whitecase.com
cdelelle@whitecase.com
mleddicotte@whitecase.com
nkownacki@whitecase.com
cmclaughlin@whitecase.com

*Counsel for the Republic of the Sudan*