# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) <br><br> **ORAL ARGUMENT REQUESTED** |
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*, <br><br>       Creditors, <br><br> v. <br><br> THE TALIBAN, *et al.*, <br><br>       Debtors, <br><br> FEDERAL RESERVE BANK OF NEW YORK, <br><br>       Garnishee. | Case No. 03-cv-9848 (GBD)(SN) |
| JOHN DOES 1 THROUGH 7, <br><br>       Creditors, <br><br> v. <br><br> THE TALIBAN, *et al.*, <br><br>       Debtors, <br><br> FEDERAL RESERVE BANK OF NEW YORK, <br><br>       Garnishee. | Case No. 20-mc-0740 (GBD)(SN) |

| | |
|---|---|
| FEDERAL INSURANCE CO., *et al.*, | Case No. 03-cv-6978 (GBD)(SN) |
|      Creditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|      Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|      Garnishee. | |
| ESTATE OF GEORGE E. SMITH, *et al.*, | Case No. 01-cv-10132 (GBD)(SN) |
|      Creditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|      Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|      Garnishee. | |

## JOINT CREDITORS' OBJECTIONS TO MAGISTRATE JUDGE NETBURN'S AUGUST 26, 2022 REPORT & RECOMMENDATION

## **TABLE OF CONTENTS**

Table of Authorities ........................................................................................................ iii

I.     Introduction.............................................................................................................1

II.    Procedural Background ...........................................................................................8

    A.   Statutory And Regulatory Background .............................................................8

        1.   The Taliban And The Federal Sanctions Regime ....................................8

        2.   TRIA Was Enacted To Ensure Terrorism Victims Like The Joint Creditors Could Enforce Their Judgments..................................................................9

    B.   The Movants Hold Judgments Against The Taliban Based On The Taliban's Acts Of Terrorism............................................................................................10

    C.   The Taliban Retakes Control Of DAB .............................................................11

    D.   The United States Acts To Ensure The Joint Creditors Could Pursue Enforcement Of Their Judgments Against The DAB Assets ...........................13

    E.   The Turnover Proceedings ...............................................................................14

III.   Legal Standard ......................................................................................................16

    A.   Objections To A Magistrate Judge's Report And Recommendation ..............16

    B.   The Essential Elements Applicable To The Underlying Turnover Motions ...................16

IV.    Objections And Argument......................................................................................19

    A.   Plaintiffs Are Entitled To Turnover Under TRIA ...........................................19

    B.   The Court Has Subject Matter Jurisdiction Over This Proceeding ..................22

        1.   The Court Has Federal Question Jurisdiction .......................................22

        2.   The FSIA Does Not Withdraw The Court's Jurisdiction Because This Is Not An Action Against A Foreign State ........................................................23

        3.   Alternatively, Even If The FSIA's Provisions On Jurisdictional Immunity Apply, That Immunity Would Be Abrogated By TRIA...........................28

            a.   Courts Have Repeatedly Confirmed That TRIA Addresses And Removes Jurisdictional Immunity ................................................................28

            b.   The Report Veers From Settled Law To Redefine TRIA's Scope .................31

                i.   The Report's Interpretation Is Incompatible With TRIA's Plain Text .......32

                ii.   The Report's Interpretation Is Incompatible With Congress's Intent .........39

                iii.  The Report's Interpretation Of Second Circuit Precedent Is Erroneous .....41

    C.   Applying TRIA Does Not Intrude On The President's Recognition Power ...................43

1.    TRIA Does Not Require The Court To Find That The Taliban Exercises Governmental Or Lawful Control Over DAB............................................................44

2.    The Court's Finding That The Taliban Controls DAB Would Not Unconstitutionally Infringe On The President's Recognition Power......................47

D.    There Is No "Nonconsensual" Exception To Agency Or Instrumentality Status Under TRIA.....................................................................................................52

1.    TRIA Does Not Require That Agencies Or Instrumentalities Have A Consensual Relationship With The Terrorist Party...................................................52

2.    DAB Is Not An Unconsenting Instrumentality Of The Taliban ............................57

V.    Preservation Of The Joint Creditors' Rights Pending Appeal................................59

VI.   Conclusion ........................................................................................................60

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                                                PAGE(S)

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)................................................................................................... 23–24

*Atchley v. AstraZeneca UK Ltd.*,
    22 F.4th 204 (D.C. Cir. 2022)................................................................................... 45

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.*,
    515 U.S. 687 (1995)................................................................................................... 53

*Bank Markazi v. Peterson*,
    578 U.S. 212 (2016)............................................................................................. 27, 38

*Bodoff v. Islamic Republic of Iran*,
    907 F. Supp. 2d 93 (D.D.C. 2012)............................................................................ 50

*Caballero v. FARC*,
    562 F. Supp. 3d 867 (C.D. Cal. 2021) ..................................................................... 24

*Cisneros v. Alpine Ridge Grp.*,
    508 U.S. 10 (1993)..................................................................................................... 32

*Collazos v. United States*,
    368 F.3d 190 (2d Cir. 2004) ..................................................................................... 53

*Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*,
    423 F. Supp. 3d 45 (S.D.N.Y. 2019) ....................................................................... 17

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*,
    879 F.3d 462 (2d Cir. 2018) ............................................................................... 16, 17

*Doe v. ELN*,
    2017 WL 591193 (S.D.N.Y. Feb. 14, 2017),
    *aff'd sub nom. Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152 (2d Cir. 2018)................. 22

*EM Ltd. v. Republic of Arg.*,
    695 F.3d 201 (2d Cir. 2012) ..................................................................................... 59

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*,
    919 F. Supp. 2d 411 (S.D.N.Y. 2013) ..................................................................... 18

*FG Hemisphere Assocs., LLC v. Republique du Congo*,
    455 F.3d 575 (5th Cir. 2006) ..................................................................................... 24

*Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*,
    918 F.3d 610 (9th Cir. 2019) ..................................................................................... 33

*Gallop Power Greenville, LLC v. Moosehead Sanitary Dist.*,
  2016 WL 5416444 (D. Me. Sept. 28, 2016) ........................................................... 34

*Harrison v. Republic of Sudan*,
  309 F. Supp. 3d 46 (S.D.N.Y. 2018) ...................................................... 25, 26, 29

*Harrison v. Republic of Sudan*,
  802 F.3d 399 (2d Cir. 2015),
  *rev'd on other grounds*, 139 S. Ct. 1048 (2019) ................................................... 17

*Hausler v. JP Morgan Chase Bank, N.A.*,
  127 F. Supp. 3d 17 (S.D.N.Y. 2015) ................................................................... 18

*Hausler v. JP Morgan Chase Bank, N.A.*,
  770 F.3d 207 (2d Cir. 2014) ...................................................................... 6, 28, 59

*HBE Leasing Corp. v. Frank*,
  48 F.3d 623 (2d Cir. 1995) ................................................................................. 58

*Heiser v. Islamic Republic of Iran*,
  735 F.3d 934 (D.C. Cir. 2013) ...................................................................... 55, 56

*Holland v. San Francisco*,
  2010 WL 5071597 (N.D. Cal. Dec. 7, 2010) ..................................................... 34

*In re Aquatic Dev. Grp., Inc.*,
  352 F.3d 671 (2d Cir. 2003) ........................................................................ 32–33

*In re B-727 Aircraft Serial No. 21010*,
  272 F.3d 264 (5th Cir. 2001) .............................................................................. 23

*In re Borges*,
  440 B.R. 551 (Bankr. D.N.M. 2010) ................................................................. 34

*In re Ionosphere Clubs*,
  922 F.2d 984 (2d Cir. 1990) ............................................................................... 30

*INS v. Cardoza–Fonseca*, 480 U.S. 421 (1987) ....................................................... 31

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
  830 F.3d 107 (2d Cir. 2016),
  *abrogated on other grounds by Rubin v. Islamic Republic of Iran*,
  138 S. Ct. 816 (2018) ................................................................................. *passim*

*Kirschenbaum v. 650 Fifth Ave.* (*Kirschenbaum II*),
  257 F. Supp. 3d 463 (S.D.N.Y. 2017),
  *rev'd and remanded on other grounds sub nom.*
  *Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019) ......................... 53, 55

*Kirschenbaum v. Assa Corp.* (*Assa II*),
    934 F.3d 191 (2d Cir. 2019) ................................................................. 19, 29

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in*
    *Amministrazione Straordinaria*,
    937 F.2d 44 (2d Cir. 1991) .................................................................... 45

*Koehler v. Bank of Bermuda Ltd.*,
    911 N.E.2d 825 (N.Y. 2009) ............................................................... 24, 25

*Krzalic v. Republic Title Co.*,
    314 F.3d 875 (7th Cir. 2002) ................................................................. 31

*Levin v. Bank of New York Mellon*,
    2013 WL 5312502 (S.D.N.Y. Sept. 23, 2013) .......................................... 31

*Mach Mining, LLC v. E.E.O.C.*,
    575 U.S. 480 (2015) ............................................................................. 37

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ................................................................ 31

*Menechem v. Frydman-Menachem*,
    240 F. Supp. 2d 437 (D. Md. 2003) ....................................................... 50

*Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers*,
    619 F.3d 1289 (11th Cir. 2010) ............................................................. 33

*N. Mariana Islands v. Canadian Imperial Bank of Com.*,
    717 F.3d 266 (2d Cir. 2013) ................................................................. 59

*N. Mariana Islands v. Millard*,
    287 F.R.D. 204 (S.D.N.Y. 2012) ........................................................... 60

*N.C. Freed Co. v. Bd. of Governors of Fed. Reserve Sys.*,
    473 F.2d 1210 (2d Cir. 1973) ............................................................... 40

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ............................................................................. 37

*Nat'l R.R. Passenger Corp. v. Two Parcels of Land*,
    822 F.2d 1261 (2d Cir. 1987) ............................................................... 35

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................. 60

*North Dakota v. United States*,
    460 U.S. 300 (1983) ........................................................................ 38–39

*Peterson v. Islamic Republic of Iran*,
   758 F.3d 185 (2d Cir. 2014) ............................................................... 32, 36

*Peterson v. Islamic Republic of Iran*,
   876 F.3d 63 (2d Cir. 2017),
   *vacated sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813,
   *reinstated in part*, 963 F. F.3d 192 (2d Cir. 2020) ............................. 6, 22, 23, 24–25

*Peterson v. Islamic Republic of Iran*,
   2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013),
   *aff'd*, 758 F.3d 185 (2d Cir. 2014),
   *aff'd*, 578 U.S. 212 (2016) ................................................................. 30, 35

*Phoenician Trading Partners LP v. Iseson*,
   2004 WL 3152394 (E.D.N.Y. Dec. 11, 2004) ......................................... 5

*Pippins v. KPMG LLP*,
   279 F.R.D. 245 (S.D.N.Y. 2012) .......................................................... 21

*RCA Corp. v. Tucker*,
   696 F. Supp. 845 (E.D.N.Y. 1988) ........................................................ 25

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) ........................................................................... 53

*Republic of Argentina v. NML Cap., Ltd.*,
   573 U.S. 134 (2014) ........................................................................... 24, 26

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004) ........................................................................... 30

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010) ................................................................ 23

*Salimoff & Co. v. Standard Oil Co. of New York*,
   262 N.Y. 220 (1933) ........................................................................... 48

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ........................................................................... 24

*Schneider v. National R.R. Passenger Corp.*,
   72 F.3d 17 (2d Cir. 1995) ................................................................... 15

*Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York* (*Smith II*),
   346 F. 3d 264 (2d Cir. 2003) ............................................................... 34, 35

*Smith v. Fed. Rsrv. Bank of New York* (*Smith I*),
  280 F. Supp. 2d 314 (S.D.N.Y),
  *aff'd*, 75 F. App'x 860 (2d Cir. 2003) ............................................................... 34, 35

*Stansell v. FARC*,
  2022 WL 2530359 (S.D.N.Y. Mar. 29, 2022) ....................................................... 22

*Stansell v. Revolutionary Armed Forces of Colombia* (*Stansell I*),
  771 F.3d 713 (11th Cir. 2014) ................................................................... 44–45, 46

*Stansell v. Revolutionary Armed Forces of Colombia* (*Stansell II*),
  45 F.4th 1340 (11th Cir. 2022) ............................................................... 7, 53, 55

*Sw. Airlines Co. v. Saxon*,
  142 S. Ct. 1783 (2022) .............................................................................. 37

*Tire Eng'g & Distrib. L.L.C. v. Bank of China Ltd.*,
  740 F.3d 108 (2d Cir. 2014) ........................................................................ 60

*U1it4less, Inc. v. Fedex Corp.*,
  871 F.3d 199 (2d Cir. 2017) ........................................................................ 57

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*,
  783 F.3d 607 (7th Cir. 2015) ............................................................... 31, 35, 36

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*,
  892 F. Supp. 2d 1038 (N.D. Ill. 2012) ................................................................ 30

*United States v. Assa Co.* (*Assa I*),
  934 F.3d 185 (2d Cir. 2019) ............................................................... 23, 24, 27

*United States v. Docherty*,
  468 F.2d 989 (2d Cir. 1972) ........................................................................ 42

*United States v. Holy Land Found. for Relief & Dev.*,
  722 F.3d 677 (5th Cir. 2013) ........................................................................ 34

*United States v. Johnson*,
  529 U.S. 53 (2000) ................................................................................. 33

*United States v. Romano*,
  794 F.3d 317 (2d Cir. 2015) ........................................................................ 16

*United States v. Welden*,
  377 U.S. 95 (1964) ................................................................................. 39

*Vera v. Republic of Cuba* (*Vera I*),
  867 F.3d 310 (2d Cir. 2017) ..................................................................... 29, 42

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A. (Vera II)*,
  946 F.3d 120 (2d Cir. 2019) ................................................................ 41, 42

*Vera v. Republic of Cuba*,
  651 F. App'x 22, 24 (2d Cir. 2016) ............................................................ 59

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) ......................................................................... 23, 26

*Villoldo v. Castro Ruz*,
  113 F. Supp. 3d 435 (D. Mass. 2015),
  *aff'd*, 821 F.3d 196 (1st Cir. 2016) ....................................................... 29–30

*Vincent v. The Money Store*,
  736 F.3d 88 (2d Cir. 2013) ..................................................................... 40

*Walters v. Indus. & Com. Bank of China, Ltd.*,
  651 F.3d 280 (2d Cir. 2011) .................................................................... 25

*Weininger v. Castro*,
  462 F. Supp. 2d 457 (S.D.N.Y. 2006) ............................................... 18, 24, 29, 30

*Weinstein v. Islamic Republic of Iran*,
  609 F.3d 43 (2d Cir. 2010) ............................................................... *passim*

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ....................................................................... *passim*

## STATUTES AND RULES

28 U.S.C. § 1330(a) ............................................................................ 26

28 U.S.C. § 1331 .............................................................................. 22

28 U.S.C. § 1603 .......................................................................... 24, 43

28 U.S.C. § 1604 ....................................................................... *passim*

28 U.S.C. § 1605B ............................................................................ 32

28 U.S.C. § 1609 ............................................................................. 27

28 U.S.C. § 1610 .................................................................. 37, 38, 40, 41

28 U.S.C. § 1611 .......................................................................... 38, 40

28 U.S.C. § 1658 ............................................................................. 32

28 U.S.C. § 1659 ................................................................................................. 32

28 U.S.C. § 636(b)(1) ......................................................................................... 16

28 U.S.C. § 8772 ................................................................................................. 38

N.Y. C.P.L.R. § 5225(b) ............................................................................... *passim*

N.Y. C.P.L.R. § 5227 ........................................................................................... 5

N.Y. C.P.L.R. § 5232(a) ..................................................................................... 15

Foreign Sovereign Immunities Act ("FSIA"),
    28 U.S.C. §§ 1602, *et seq.* ....................................................................... *passim*

Terrorism Risk Insurance Act of 2002 ("TRIA") § 201,
    Pub. L. No. 107-297, 116 Stat. 2322, 2337-2340,
    as amended, Pub. L. No. 112-158, 126 Stat. 1260
    (codified at 28 U.S.C. § 1610 note) ........................................................ *passim*

Fed. R. Civ. P. 69(a) ................................................................................ 5, 16, 25

## LEGISLATIVE MATERIALS

H.R. Con. Res. 414, 106th Cong. (2000) ............................................................ 2

S. Con. Res. 150, 106th Cong. (2000) ................................................................ 2

H.R. Rep. No. 107-779 (2002) (Conf. Rep.) ..................................................... 10

H.R. Doc. No. 106-268 (2000) ........................................................... 2, 8, 19, 21

H.R. Doc. No. 107-16 (2001) ................................................................... 2, 8, 40

147 Cong. Rec. 23377 (2001) ........................................................................... 40

148 Cong. Rec. 10312 (2002) (statement of Sen. Gordon Smith) ..................... 39

148 Cong. Rec. 16396 (2002) (statement of Rep. Vito Fossella) ........... 3–4, 10, 39–40

148 Cong. Rec. 16397 (2002) (statement of Rep. Chris Cannon) .................... 46

148 Cong. Rec. 16399 (2002) (statement of Rep. Vito Fossella) ............ 39–40, 46

148 Cong. Rec. 16400 (2002) (statement of Rep. Chris Shays) ....................... 39

148 Cong. Rec. 23121 (2002) (statement of Sen. Tom Harkin) ............... 9–10, 39

*The Taliban: Engagement or Confrontation? Hearing Before the S. Comm. on Foreign Relations*, 106th Cong. 1 (2000) ............................................................ 2

Actions Overview, H.R. 3210 – Terrorism Risk Insurance Act of 2002, https://www.congress.gov/bill/107th-congress/house-bill/3210/actions ................................... 9

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

31 C.F.R. § 594.201(a)...................................................................................................... 9

31 C.F.R. § 594.310 .......................................................................................................... 9

Exec. Order No. 13,129,
64 Fed. Reg. 36,759 (July 4, 1999)................................................................................ 2, 8

Exec. Order No. 13,224,
66 Fed. Reg. 49,079 (Sept. 23, 2001) ............................................................................. 9

Exec. Order No. 13,268,
67 Fed. Reg. 44,751 (July 2, 2002)................................................................................. 9

Exec. Order No. 14,064,
87 Fed. Reg 8391 (Feb. 11, 2022) ............................................................................ 4, 14, 51

Agreement for Bringing Peace to Afghanistan, Taliban-United States, Feb. 29, 2020, https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-Bringing-Peace-to-Afghanistan-02.29.20.pdf.......................................................... 11

Background Press Call by Senior Admin. Officials on U.S. Support for the People of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-support-for-the-people-of-afghanistan/.......................................................................................................... 4, 14, 51

Fact Sheet: *Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan*, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/ ................................................ 56

Memo from William H. Taft IV, Legal Adviser, Dep't of State, to Paul V. Kelley, Assistant Sec'y of State for Legis. Affairs (Oct. 4, 2002) (on file in *Bank of N.Y. v. Rubin*, No. 05-cv-4926 (S.D.N.Y. Mar. 8, 2006), ECF No. 40 at 12 ........................... 30

Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-center/press-releases/Pages/po943.aspx ............................................................ 9, 19

x

Press Statement on the Death of Ayman al-Zawahiri, Secretary of State Antony J.
Blinken (Aug. 1, 2022), https://www.state.gov/the-death-of-ayman-al-zawahiri/ .................. 14

Remarks on the End of United States Military Operations in Afghanistan,
2021 DAILY COMP. PRES. DOC. 693 (Aug. 31, 2021) ............................................................ 51

Remarks on United States Military Operations in Afghanistan,
2021 DAILY COMP. PRES. DOC. 313 (Apr. 14, 2021) ............................................................. 11

State Dep't, *U.S. Relations With Afghanistan* (Aug. 15, 2022),
https://www.state.gov/u-s-relations-with-afghanistan/ ........................................................... 51

**OTHER AUTHORITIES**

Peter Baker, *U.S. Will Not Release $3.5 Billion in Frozen Afghan Funds for Now,
Citing Terror Fears,* N.Y. Times (Aug. 15, 2022), https://nyti.ms/3NVMlrm ...................... 14

Brief for the U.S. as *Amicus Curiae, Clearstream Banking S.A. v. Peterson*, 140
S. Ct. 813 (2020) (No. 17-1529) ............................................................................................ 27

Nabih Bulos, *Afghanistan's Money is Crumbling to Pieces, Just Like its Economy*,
Los Angeles Times (September 27, 2022), https://lat.ms/3M0HAf7 ...................................... 58

Civil Action/Class Action Compl., *Havlish v. bin Laden*, No. 02-cv-305 (D.D.C.
Feb. 19, 2002), ECF No. 1 ...................................................................................................... 10

Charlie Savage, *Taliban and 9/11 Families Fight for Billions in Frozen Afghan
Funds*, N.Y. Times (Nov. 29, 2021), https://nyti.ms/3hwbA7s ................................................. 8

Da Afghanistan Bank, Supreme Council, https://dab.gov.af/supreme-council2
(last visited Nov. 9, 2022) ....................................................................................................... 58

*House Foreign Affairs Committee Holds Hearing on Afghanistan*, CQ
Congressional Transcripts (Sept. 13, 2021) ............................................................................ 51

Interview by Steve Inskeep with Shah Mehrabi, NPR Morning Edition (Aug. 24,
2022), https://n.pr/3NM6D6L ................................................................................................. 58

Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on
the Taliban*, N.Y. Times (Aug. 18, 2021), https://nyti.ms/3TprjlV ......................................... 13

Notice of Appeal, *Dussault v. Republic of Arg.*, 06-cv-13085, ECF No. 89
(S.D.N.Y. Nov. 7, 2014) ......................................................................................................... 59

Notice of Appeal, *Hausler v. JP Morgan Chase Bank, N.A.*, No. 09-cv-10289,
ECF No. 512 (S.D.N.Y. Mar. 16, 2012) ................................................................................. 59

Notice of Appeal, *N. Mariana Islands v. Millard*, No. 11-mc-99 (S.D.N.Y. Apr. 16, 2012), ECF No. 96 ................................................................................................. 59

*Restatement (Second) of Foreign Relations Law* (1965) ....................................... 48–49

*Restatement (Third) of Foreign Relations Law* (1987) ......................................... 48, 51

*Restatement (Fourth) of Foreign Relations Law* (2018) .............................................. 27

Reuters, *Taliban Name New Afghan Government, Interior Minister on U.S. Sanctions List* (Sept. 7, 2021), https://reut.rs/3DQbgb2 ......................................... 13

David Rohde, *Rebels In Control In Kabul As Taliban Troops Retreat; Bin Laden Hunt Intensifies*, N.Y. Times, Nov. 14, 2001, at A1, https://timesmachine.nytimes.com/timesmachine/2001/11/14/ 183644.html?pageNumber=1 ........................................................................................ 9

Antonin Scalia & Bryan Garner, Reading Law (2012) ................................................ 37

David Siegel, *N.Y. Prac.* (6th ed. 2022) ............................................................... 15, 25

Jeff Stein, *Biden Administration Freezes Billions of Dollars in Afghan Reserves, Depriving Taliban of Cash*, Wash. Post (Aug. 17, 2021), https://wapo.st/3G4p2to ................................................................................................. 13

Karin Strohecker, et al., *Analysis: Afghan Central Bank's $10 Billion Stash Mostly Out Of Taliban's Reach*, Reuters (Aug. 18, 2021), https://reut.rs/3hlyyOv ................................................................................................. 13

Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban Takeover in Afghanistan: Frequently Asked Questions* (2021), https://crsreports.congress.gov/product/pdf/R/R46879 ........................................... 11

Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress* (2021), https://crsreports.congress.gov/product/pdf/R/R46955 ........................................... 13

Judgment Creditors Fiona Havlish *et al.* (the "Havlish Creditors"), John Doe *et al.* (the "Doe Creditors"), Federal Insurance Company *et al.* (the "Federal Insurance Creditors"), and Estate of Smith *et al.* (the "Smith Creditors) (collectively, the "Joint Creditors"), by and through their undersigned counsel, respectfully object to Magistrate Judge Sarah Netburn's August 26, 2022 Report & Recommendation (the "Report," Dkt. 8463) concerning their Motions for Turnover of Assets from Garnishee the Federal Reserve Bank of New York (the "FRBNY").[1]

## I.     Introduction

On the morning of September 11, 2001, four hijacked jetliners soared out of the clear blue sky. Al Qaeda operatives who had murdered the pilots sat at the controls. Implementing a plan for which they had trained in Afghanistan under the protection of the Taliban, they crashed two of the planes into the twin towers of the World Trade Center and a third into the Pentagon. They murdered thousands of Americans. The fourth plane was heroically retaken by passengers and crashed into a field outside Shanksville, Pennsylvania before it could reach its target—likely the White House or the U.S. Capitol.

It was one of the worst days in the history of this country. It was also the day that American policymakers' longstanding worries about the Taliban came true.

***Prelude to 9/11.*** The Taliban is a religious fundamentalist terror group founded in southern Afghanistan which, by 1996, had taken control of the capital city of Kabul (including Da Afghanistan Bank ("DAB"), the central bank), and established a theocratic proto-state. The Taliban used its newfound dominance to offer safe harbor and support to other terrorists from around the world, including, significantly, Osama bin Laden and his al Qaeda organization, which

---

[1] The Joint Creditors further expressly join in and incorporate the arguments made in the concurrently-filed Memorandum of Law in Response to the Notice of Supplemental Authority Submitted by Amicus Curiae Naseer Faiq and in Further Support of Their Objections to the Report (the "MOL").

relied on the Taliban's protection in Afghanistan to set up training camps and recruit fighters. Over the next five years, al Qaeda used this safe haven to plan and carry out terrorist attacks against U.S. interests throughout the world.

In response, President Clinton in 1999 proclaimed the Taliban "an unusual and extraordinary threat to the national security and foreign policy of the United States" and blocked all property of any entity found "to be owned or controlled by, or to act for or on behalf of, the Taliban," including DAB. Exec. Order No. 13,129, 64 Fed. Reg. 36,759 (July 4, 1999); H.R. Doc. No. 106-268, at 4 (2000). The President specifically and repeatedly warned Congress that the Taliban had commandeered DAB as an instrumentality of terror and was using DAB to finance its domination of Afghanistan and to support terrorism around the world. *E.g.*, *id.*; H.R. Doc. No. 107-16, at 4 (2001). By 2000, the Senate and House had both passed resolutions finding that "since the Taliban came to power in 1996, Afghanistan has become a haven for terrorist activity[.]" S. Con. Res. 150, 106th Cong. (2000); H.R. Con. Res. 414, 106th Cong. (2000). In a July 2000 Senate hearing on Taliban control of Afghanistan, the presiding senator asserted that Afghanistan had become "[t]he center of terrorism from around the world[.]" *The Taliban: Engagement or Confrontation? Hearing Before the S. Comm. on Foreign Relations*, 106th Cong. 1 (2000) (statement of Sen. Sam Brownback).

***Congress Acts.*** On September 11, 2001, the political branches' fears about the Taliban's use of Afghan resources and territory to support terrorism against the United States homeland came true. And policymakers reacted swiftly. They began a military campaign, Operation Enduring Freedom, designed to dislodge the Taliban from Afghanistan. They also aimed to cripple the Taliban financially, both through blocking sanctions and by giving the Taliban's victims the power to claim the terrorists' assets. By November 1, just 51 days after the attacks, Congress introduced

new legislation with the specific purpose of allowing victims of terrorism to obtain relief from

blocked terrorist funds. Enacted in 2002, the Terrorism Risk Insurance Act of 2002 ("TRIA")

§ 201, Pub. L. No. 107-297, 116 Stat. 2322, 2337-2340, as amended, Pub. L. No. 112-158, 126

Stat. 1260 (codified at 28 U.S.C. § 1610 note), provides in relevant part:

> *Notwithstanding any other provision of law,* and except as provided
> in subsection (b), *in every case* in which a person has obtained a
> *judgment against a terrorist party* on a claim based upon an act of
> terrorism, or for which a terrorist party is not immune under [28
> U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party
> (*including the blocked assets of any agency or instrumentality of
> that terrorist party*) *shall* be subject to execution or attachment in
> aid of execution in order to satisfy such judgment to the extent of
> any compensatory damages for which such terrorist party has been
> adjudged liable.

*Id.* § 201(a) (emphases added).

A primary author of Section 201, Rep. Vito Fossella of New York, explained on the House

floor that he wrote the provision in the wake of September 11 to address cases where American

terror victims "seek[] a judgment in a court of law and [are] successful against some of these

terrorist organizations *or* states that sponsor terrorism, and assets are frozen by the United States

Government," but cannot recover on their judgments because of principles of foreign sovereign

immunity—or because the executive branch refuses to assist them. 148 Cong. Rec. 16396 (2002)

(emphasis added). The purpose of Section 201, he said, was "to right that wrong" and ensure that

the families of September 11 victims would be able to obtain and then actually enforce judgments

against the assets of those who had taken everything from them. *Id.* at 16396-97. Representative

Fossella noted that efforts to do so were already underway in the form of a "lawsuit aimed at

recovering and undermining the ability of these groups to perpetuate their acts of evil"—

referencing these very proceedings against the Taliban, which had been filed and were pending at

the time, as motivation for drafting Section 201 of TRIA.[2] *Id.* at 16397.

Presciently, Rep. Fossella pleaded with his fellow members: "We should not be here next year or 10 years from now debating this. We should end the subject right now, put it to a close, and bring justice to those victims who suffer today and will be suffering for a long time." *Id.*

***The Joint Creditors.*** The Joint Creditors are the victims of terrorism at the hands of the Taliban. They brought suit and obtained judgments—in some cases, decades ago—to seek justice and compensation against the terrorists who stole their lives and livelihoods. And they are now seeking to enforce their judgments under TRIA, the very statute Congress passed specifically to enable them to execute against blocked assets of the Taliban and agencies and instrumentalities under its control, and to foster U.S. national security by holding the Taliban accountable. Despite their diligence in pursuing the remedies Congress established to achieve those precise aims, both justice against, and meaningful compensation from, the Taliban have long seemed out of reach.

The situation changed in August 2021, when the Taliban retook control of DAB.

***The Response to the Taliban's Return to Power in Afghanistan.*** In response, the executive branch took a number of actions. First, in mid-August 2021, the Treasury Department immediately blocked Taliban-controlled DAB from accessing the more than $7 billion in funds held by DAB at the FRBNY. Second, in February 2022, the President took several actions intended both to benefit the "welfare of the people of Afghanistan"[3] and to permit U.S. victims "a full opportunity to have their claims heard in U.S. courts."[4] Among other things, the steps taken

---

[2] *See Havlish v. Bin Laden*, No. 02-cv-305 (D.D.C. complaint filed Feb. 19, 2002); *Smith v. Islamic Emirate*, No. 01-cv-10132 (S.D.N.Y. complaint filed Nov. 14, 2001).

[3] Exec. Order No. 14,064, 87 Fed. Reg 8391 (Feb. 11, 2022).

[4] Background Press Call by Senior Admin. Officials on U.S. Support for the People of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-support-for-the-people-of-afghanistan/.

ensured that the property of DAB at the FRBNY remained blocked, confirming that it would be subject to execution under TRIA—the statute Congress passed with these plaintiffs and these proceedings in mind.

TRIA mandates that "in *every* case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism," the blocked assets of a terrorist party, "including the blocked assets of *any* agency or instrumentality of" a terrorist party, "*shall* be subject to execution . . . in order to satisfy such judgment to the extent of any compensatory damages for which" the terrorist party is liable, "*notwithstanding* any other provision of law[.]" TRIA § 201(a) (emphases added). The Joint Creditors have obtained judgments against a terrorist party, the Taliban, on claims based on acts of terrorism. They are therefore entitled to execute against assets of the Taliban or any of its agencies or instrumentalities, including DAB.

**The Turnover Motions**. Last spring, each of the Joint Creditors moved pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. §§ 5225(b) and 5227,[5] and Section 201 of TRIA for an order compelling the FRBNY to turn over those blocked assets of DAB in the FRBNY's possession (the "DAB Assets") sufficient to satisfy fully the compensatory damages for which the Taliban has been adjudged liable, plus interest. *See* Dkts. 7763, 7767, 7936; *Smith* Dkt. 62.

**The Report and Recommendation.** Magistrate Judge Netburn recommended the denial of the turnover motions in her Report of August 26, 2022. Several significant recommendations in the Report concern matters that were not addressed in the Joint Creditors' underlying motions or otherwise in the briefing, and the Report was issued without the benefit of oral argument.

Specifically, the Report concluded that turnover cannot be granted for three reasons. First,

---

[5] Because Sections 5225 and 5227 are "essentially interchangeable," it is common practice to move for a turnover order under both provisions. *See Phoenician Trading Partners LP v. Iseson*, No. 04-CV-2178, 2004 WL 3152394, at *3 (E.D.N.Y. Dec. 11, 2004) (citation omitted).

it concluded that DAB is immune from the Court's subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, *et seq.*, and that, as a result, the Court lacks authority to turn DAB's assets over to the Joint Creditors. Report 12-27. Second, it concluded that the Court cannot find that DAB is now an agency or instrumentality of the Taliban for purposes of TRIA because doing so would formally recognize the Taliban as the legitimate government of Afghanistan. *Id.* 27-37. And third, it concluded that TRIA contains an unwritten requirement that an agency or instrumentality of a terrorist party must consensually enter into its relationship with the terrorists, and that DAB had not. *Id.* 37-41. All three conclusions are mistaken.

First, the Court has subject matter jurisdiction. This TRIA turnover proceeding is a garnishment action against the FRBNY, which is neither a foreign state nor an agency or instrumentality of a foreign state. In such circumstances, federal courts have jurisdiction and the FSIA confers no jurisdictional immunity. *Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 91 (2d Cir. 2017), *vacated sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813, *reinstated in relevant part*, 963 F. F.3d 192, 196 (2d Cir. 2020); *see generally* MOL. And even if the FSIA were implicated in some way, the Second Circuit has confirmed that TRIA permits the exercise of subject matter jurisdiction notwithstanding the provisions of the FSIA or "any other provision of law." *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014); *see also Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010).

Second, the Report misinterprets both TRIA and the Supreme Court's separation-of-powers precedents in concluding that the Court cannot grant turnover without recognizing the Taliban as Afghanistan's government. To be an agency or instrumentality of the Taliban under TRIA, DAB need only be controlled or used by the Taliban; there is no requirement that such control be legitimate or governmental. And a court's factual finding that the Taliban controls DAB,

or even that the Taliban is acting as a *de facto* government, would not bestow the United States'
formal recognition on the Taliban regime or even impact the President's position on Afghanistan's
government, which is all the Constitution precludes. *See Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015).
In fact, that factual finding would be consistent with the President's own determination that the
Taliban controls DAB, as reflected by the blocking of DAB's assets.

Third, the Report's conclusion that an entity cannot be an agency or instrumentality under
TRIA unless it has knowingly and affirmatively consented to an agency relationship with a terrorist
principal cannot be reconciled with the text of TRIA, has no basis in existing precedent, and
diverges from binding Second Circuit authority as well as a recent decision of the Eleventh Circuit,
which itself relied on Second Circuit authority. *See Stansell v. Revolutionary Armed Forces of
Colombia* (*Stansell II*), 45 F.4th 1340, 1354 (11th Cir. 2022). And even if the Court were to adopt
the Report's novel consent requirement, the Joint Creditors have shown that DAB and its senior
officials—both those installed by the Taliban and those previously appointed who continue to
serve—are willingly operating under Taliban control.

A straightforward application of Second Circuit precedent and TRIA's text mandates
turnover. This Court should overrule the Report and grant the Joint Creditors' turnover motions.
This will not only allow the Joint Creditors to satisfy their rights as terror victims in precisely the
manner that Congress intended when it enacted TRIA—it will also allow the Havlish, Smith, and
Federal Insurance Creditors to broadly distribute the turnover proceeds to as many 9/11 MDL
plaintiffs as possible. Under a fully-agreed and binding plan (the "Framework Agreement"), these
creditors will share the proceeds with other 9/11 plaintiffs, including widows and orphans excluded
from earlier VSST payouts.[6] To date, more than 10,000 MDL plaintiffs pursuing claims against

---

[6] *See* Charlie Savage, *Taliban and 9/11 Families Fight for Billions in Frozen Afghan Funds*, N.Y. Times (Nov. 29,
(cont.)

the Taliban have joined the Framework Agreement,[7] and it represents the best opportunity in a generation for meaningful recovery by the victims of 9/11 from those responsible for the attack.

## II.     Procedural Background

### A.     Statutory And Regulatory Background

#### 1.     The Taliban And The Federal Sanctions Regime

As summarized above, the Taliban has twice taken control of Afghanistan's territory and its governmental institutions—specifically including DAB, which has been the central bank of Afghanistan since 1939. The first time the Taliban did so, in the late 1990s, President Clinton declared a national emergency and exercised his authority under the International Emergency Economic Powers Act ("IEEPA") to block (1) "all property and interests in property of the Taliban," (2) all property or interests in property of anyone determined by the executive "to be owned or controlled by" or "to act for or on behalf of" the Taliban, and (3) all property or interests in property of anyone found "to provide financial, material, or technological support for, or services in support of" anyone owned, controlled by, or acting for or on behalf of the Taliban. Exec. Order No. 13,129 § 1, 64 Fed. Reg. 36,759 (July 7, 1999). Months later, the administration added DAB to the list of persons blocked under this order. H.R. Doc. No. 106-268, at 4; *see also* H.R. Doc. No. 107-16, at 4 (same). In his report to Congress, President Clinton stated that DAB "ha[s] been found to be controlled by the Taliban, and to be [an] entit[y] in which the Taliban has an interest." *Id.* Then, as now, the United States did not recognize the Taliban as the legitimate government of Afghanistan but instead acknowledged the reality that the Taliban was a terrorist

---

2021), https://nyti.ms/3hwbA7s. The term "VSST" refers to the U.S. Victims of State Sponsored Terrorism Fund.

[7] The agreement has been reached between and among the Havlish and Federal Insurance Creditors and the Burnett, O'Neill, and Grazioso Plaintiffs (who include Hoglan, Ray, and Ryan Plaintiffs), with such plaintiffs referred to herein as the "Framework Agreement Plaintiffs." *See* Dkt. 7790.

organization that controlled DAB (even though DAB was Afghanistan's central bank).[8]

After the September 11 attacks, President George W. Bush took immediate action under IEEPA to block terrorists from accessing any property in the United States or within the control of any U.S. person. On September 23, 2001, he directed that "all property and interests in property" in the United States in which certain identified terrorists had any interest were henceforth blocked. Exec. Order No. 13,224 § 1, 66 Fed. Reg. 49,079. Nine months later, when President Clinton's 1999 executive order expired, President Bush transitioned the Taliban to the list of persons blocked pursuant to Executive Order 13,224, thereby designating the Taliban as a "Specially Designated Global Terrorist" or "SDGT." Exec. Order No. 13,268 § 1, 67 Fed. Reg. 44,751 (July 2, 2002); 31 C.F.R. §§ 594.201(a), 594.310. The Taliban remains a blocked person and an SDGT to this day.

### 2. TRIA Was Enacted To Ensure Terrorism Victims Like The Joint Creditors Could Enforce Their Judgments

When Congress began its consideration of TRIA in November 2001, smoke still hung over Ground Zero and the Taliban still controlled DAB.[9] The law was enacted in the shadow of 9/11 to ensure that victims of those and other terrorist attacks were able to enforce their judgments against the parties responsible for the murder of their loved ones. *See* Part I, *supra*. Senator Tom Harkin, one of the sponsors of TRIA, further explained: "The purpose of [Section 201] is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist

---

[8] The block remained in place until the end of 2001 after U.S military forces expelled the Taliban. *See* Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-center/press-releases/Pages/po943.aspx.

[9] TRIA was introduced on November 1, 2001. Actions Overview, H.R. 3210 – Terrorism Risk Insurance Act of 2002, https://www.congress.gov/bill/107th-congress/house-bill/3210/actions. The Taliban was not driven out of Kabul until November 14, 2001. David Rohde, *Rebels In Control In Kabul As Taliban Troops Retreat; Bin Laden Hunt Intensifies*, N.Y. Times, Nov. 14, 2001, at A1, https://timesmachine.nytimes.com/timesmachine/2001/11/14/183644.html?pageNumber=1.

parties. . . . [TRIA] establishes once and for all, that such judgments are to be enforced against any assets available in the U.S., and that the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act." 148 Cong. Rec. 23122 (2002) (statement of Sen. Tom Harkin).

The conference committee's report echoed these fundamental themes: "The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced." H.R. Rep. No. 107-779, at 27 (2002) (Conf. Rep.).

At the time of TRIA's passage, the *Havlish* and *Smith* actions had already been filed against the Taliban. *See supra* note 2. Congress was aware that victims seeking to impose civil liability on the Taliban were heading to the courthouse—and wanted those victims to be able to enforce their judgments. *See, e.g.*, 148 Cong. Rec. 16397 (2002) (statement of Rep. Vito Fossella) ("[T]housands of Americans and their families are considering and have joined the class action lawsuit aimed at recovering and undermining the ability of these groups to perpetuate their acts of evil.").[10]

### B.      The Movants Hold Judgments Against The Taliban Based On The Taliban's Acts Of Terrorism

The Havlish and Smith Creditors consist of the estates and family members of Americans killed on 9/11. The Federal Insurance Creditors consist of insurance companies that incurred billions in losses as a result of the attacks. The Doe Creditors were civilian contractors in

---

[10] In its original incarnation, the Havlish Creditors' complaint was a class action and was pending the day Rep. Fossella spoke on the House Floor. *See* Civil Action/Class Action Compl. ¶ 25, *Havlish v. bin Laden*, No. 02-cv-305 (D.D.C. Feb. 19, 2002), ECF No. 1.

Afghanistan who were injured in a suicide bomb attack committed by the Taliban, al Qaeda and others on January 4, 2016.

The Havlish Creditors hold outstanding judgments for compensatory damages against the Taliban in the amount of $2,086,386,669.[11] Mitchell Decl. (Dkt. 7765) ¶ 10. The Smith Creditors hold outstanding judgments for compensatory damages against the Taliban in the amount of $72,527,184. *Smith* Dkt. 65 at 3. The Federal Insurance Creditors hold outstanding judgments for compensatory damages against the Taliban in the amount of $14,672,806,120. Carter Decl. (Dkt. 7938) ¶ 9. And the Doe Creditors hold outstanding judgments for compensatory damages against the Taliban in the amount of $138,284,213. Thornton Decl. (Dkt. 7770) ¶ 4.

### C.     The Taliban Retakes Control Of DAB

On Sunday, August 15, 2021, as the United States was completing its withdrawal from Afghanistan,[12] the former government of Afghanistan collapsed and its leaders fled the country.[13] The Taliban arrived in Kabul and quickly retook physical and operational control of certain Afghan government offices, agencies, and instrumentalities for its own purposes and benefit.[14] Most significantly for present purposes, the Taliban retook control of DAB.[15]

By August 22, 2021, the Taliban had assumed complete control of DAB and continues to

---

[11] All compensatory damages amounts were calculated as of the date each party moved for turnover. Post-judgment interest continues to accrue for each amount on a daily basis.

[12] On February 29, 2020, the United States and the Taliban signed the Doha Agreement to bring the decades-long war in Afghanistan to an end and to facilitate the transition to a "new post-settlement Afghan Islamic government." Agreement for Bringing Peace to Afghanistan, Taliban-United States, Feb. 29, 2020, https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-Bringing-Peace-to-Afghanistan-02.29.20.pdf. That transition accelerated with extraordinary speed after April 14, 2021, when President Biden announced that the United States would withdraw all U.S. forces from Afghanistan by September 11, 2021. Remarks on United States Military Operations in Afghanistan, 2021 DAILY COMP. PRES. DOC. 313 (Apr. 14, 2021). The Taliban rapidly took control of most territory in Afghanistan during the summer of 2021.

[13] *See* Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban Takeover in Afghanistan: Frequently Asked Questions* 10, 12-13 (2021), https://crsreports.congress.gov/product/pdf/R/R46879.

[14] Expert Declaration of Alex B. Zerden ("Zerden Decl.," Dkt. 7766), ¶¶ 39-40; Thomas, *supra* note 13, at 10, 13-14.

[15] Zerden Decl. ¶¶ 39, 49; *see* Thomas, *supra* note 13, at 40.

exercise complete control to this day.[16] Control is exercised and evidenced in several ways, including through DAB's new leadership. One of the Taliban's first acts in Kabul was installing, as DAB's Acting Governor, a staunch Taliban loyalist whose only prior financial experience was serving as head of the Taliban's finance commission—a body tasked with managing money from narcotics trafficking and collecting illegal taxes collected from businesses and farmers in areas where the Taliban ran shadow governments.[17] The Taliban also installed as the First and Second Deputy Governors, the number two and three leadership positions at DAB, individuals who are personally sanctioned by the United States, the United Nations, and others for terrorist activities undertaken as members of the Taliban.[18] DAB's organizational structure assigns those sanctioned terrorists significant operational and management responsibilities.[19] For example, DAB's First Deputy Governor, sanctioned terrorist Noor Ahmad Agha, ironically was tasked with supervising the functions at DAB relating to countering terrorist financing, among others—facilitating the use of DAB's resources for terrorist aims.[20]

As it did in 2001, the Taliban again permeates every level of DAB. Taliban-affiliated staff are increasingly present at all levels of DAB.[21] The Taliban Council of Ministers' open control over DAB removes any illusion that DAB is or can be independent of the Taliban.[22] The Council

---

[16] *See* Zerden Decl. ¶ 51.

[17] *Id.* ¶¶ 54-58 (concerning Haji Mohammed Idris, DAB's Acting Governor).

[18] Noor Ahmad Agha is DAB's First Deputy Governor. He was sanctioned for his activities as the leader of the Taliban's military council and as a finance officer. Among other things, Agha had responsibilities for financing Taliban commanders and funding improvised explosive devices. Zerden Decl. ¶¶ 59-72. Abdul Qadeer Ahmad is DAB's Second Deputy Governor. He was sanctioned for, among other things, providing funds to Taliban commanders who carried out terrorist attacks in Afghanistan, collecting financial aid from the Taliban's domestic and foreign sponsors, distributing funds to Taliban shadow governors, and collecting Taliban revenues from narcotics trafficking. *Id.* at ¶¶ 73-82.

[19] *Id.* ¶¶ 59, 73.

[20] *Id.* ¶ 69.

[21] *Id.* ¶ 85.

[22] *Id.* ¶ 92, 139.

of Ministers consists of the heads of all Taliban government ministries, and, like DAB's leadership, includes individuals sanctioned for Taliban terrorist activities.[23] The Council of Ministers has directed DAB policy.[24] The Taliban's Deputy Prime Minister has chaired meetings at DAB.[25]

These facts demonstrating the Taliban's control of DAB are undisputed. Indeed, the Report confirmed these are "the facts on the ground." Report 34.

### D.   The United States Acts To Ensure The Joint Creditors Could Pursue Enforcement Of Their Judgments Against The DAB Assets

On the same day the Taliban took control of Afghanistan's capital, including the facilities of DAB, the United States froze DAB's assets at the FRBNY to prevent them from being withdrawn by a Taliban-controlled DAB or otherwise used by the Taliban.[26] DAB holds substantial assets in accounts in foreign central banks, including at the FRBNY. As of August 15, 2021, approximately $7 billion of DAB's assets were held at the FRBNY.[27]

On February 11, 2022, President Biden signed an executive order designating "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, a[s] blocked[.]"[28] Exec. Order No. 14,064 § 1(a). By blocking the DAB Assets, the Order expressly

---

[23] *Id.* ¶¶ 93, 130; *see also* Reuters, *Taliban Name New Afghan Government, Interior Minister on U.S. Sanctions List* (Sept. 7, 2021), https://reut.rs/3DQbgb2.

[24] Zerden Decl. ¶¶ 92, 139.

[25] *Id.* ¶¶ 94-95, 139.

[26] *See* Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress* 39 (2021), https://crsreports.congress.gov/product/pdf/R/R46955; Jeff Stein, *Biden Administration Freezes Billions of Dollars in Afghan Reserves, Depriving Taliban of Cash*, Wash. Post (Aug. 17, 2021), https://wapo.st/3G4p2to.

[27] *See* Mitchell Decl. (Dkt. 7765), Ex. 6; Karin Strohecker, et al., *Analysis: Afghan Central Bank's $10 Billion Stash Mostly Out Of Taliban's Reach*, Reuters (Aug. 18, 2021), https://reut.rs/3hlyyOv; Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on the Taliban*, N.Y. Times (Aug. 18, 2021), https://nyti.ms/3TprjlV; *see also* Mitchell Decl., *supra*, ¶¶ 4-8 & Ex. 4 (DAB held nearly $6 billion at the FRBNY at the end of 2020).

[28] The Executive Order further provides that all U.S. financial institutions must transfer all property and interests in property of DAB in the United States to the FRBNY. *Id.* § 1(b). At the same time, the Treasury Department's Office

(cont.)

confirmed that those assets were subject to execution under TRIA, and guaranteed that at least $3.5 billion in DAB Assets would remain blocked so that victims of terrorism, using TRIA, could "have their claims heard in U.S. courts."[29]

The situation in Afghanistan today is thus practically identical to the situation in Afghanistan when Congress introduced and first considered TRIA in 2001. The Taliban, although not recognized by the United States as the legitimate government of Afghanistan, controls the country and DAB. The Taliban is once again providing material aid and assistance to al Qaeda, including by harboring its senior leadership in Kabul.[30] DAB's assets are blocked. And claims against the Taliban that were pending when TRIA was passed have resulted in judgments—which the Joint Creditors now seek to enforce under that law.

### E.      The Turnover Proceedings

The Havlish Creditors obtained a writ of execution from this Court against the DAB Assets at the FRBNY on August 27, 2021. *Havlish* Aug. 27, 2021 Minute Order; Mitchell Decl. Ex. 1. That writ was delivered that same day to the officer with jurisdiction to levy,[31] the U.S. Marshal for the Southern District of New York. Mitchell Decl. ¶ 2 & Ex. 2. The Marshal levied against

---

of Foreign Assets Control ("OFAC") issued a license that authorizes, directs, and compels the FRBNY, upon further instructions, to transfer up to $3.5 billion of DAB's blocked assets "for the benefit of the people of Afghanistan, or to a United Nations fund, programme, specialized agency, or other entity or body for the benefit of the people of Afghanistan." *Havlish* Dkt. 563-2 at 2.

[29] White House, *supra* note 4.

[30] The Taliban maintained its close relationship with al Qaeda in the years after 9/11, leading U.S. officials to express concern that a Taliban-controlled Afghanistan could once again offer safe harbor to the terrorist group. *See* Dkt. 7764 at 4 & n.9. Those concerns have already proved prescient. *See* Press Statement on the Death of Ayman al-Zawahiri, Secretary of State Antony J. Blinken (Aug. 1, 2022), https://www.state.gov/the-death-of-ayman-al-zawahiri/ ("By hosting and sheltering the leader of al Qa'ida in Kabul, the Taliban grossly violated the Doha Agreement and repeated assurances to the world that they would not allow Afghan territory to be used by terrorists to threaten the security of other countries."); Peter Baker, *U.S. Will Not Release $3.5 Billion in Frozen Afghan Funds for Now, Citing Terror Fears*, N.Y. Times (Aug. 15, 2022), https://nyti.ms/3NVMlrm (noting the Biden administration's decision in the wake of the Zawahiri strike to suspend its plans to release to Afghanistan half of the $7 billion in DAB Assets at the FRBNY, because it had "not secured persuasive guarantees that the money would not fall into terrorist hands").

[31] *See Schneider v. National R.R. Passenger Corp.*, 72 F.3d 17, 18-19 (2d Cir. 1995).

DAB's assets at the FRBNY by service of the writ on the FRBNY on September 14, 2021.[32] *Id.* ¶¶ 3-4 & Ex. 3; *see also Havlish* Dkt. 526-1. The Doe Creditors obtained a writ of execution on September 27, 2021, which was delivered to the U.S. Marshal on December 14, 2021. *Doe* Dkt. 67. The Marshal levied against DAB's assets at the FRBNY by service of the writ on the FRBNY on January 3, 2022. *Id.* The Smith Creditors obtained a writ of execution on February 22, 2022, which was delivered to the U.S. Marshal the following day and served on the FRBNY on March 4, 2022. *Smith* Dkt. 41. The Federal Insurance Creditors obtained a writ of execution on April 20, 2022, which was delivered to the U.S. Marshal the same day and then levied against DAB's assets by service at the FRBNY the following day. Dkt. 7937 at 9.

Judicial enforcement of the Havlish and Doe writs was stayed pending the executive branch's anticipated filing of a Statement of Interest. Doe Dkt. 19 (Doe Stay); Dkt. 7120 (Havlish Stay). The Court simultaneously directed that the Havlish and Doe writs would not expire absent further action of the Court. Dkt. 7447.

The executive branch filed a statement on February 11, 2022 taking no position on the Joint Creditors' anticipated turnover motions. Dkt. 7661. The Court then lifted its stay of enforcement of the Havlish and Doe writs. The Havlish and Doe Creditors moved for turnover on March 20, 2022. Dkt. 7763, 7767. The Federal Insurance Creditors moved for turnover on April 29, 2022. Dkt. 7937. The Smith Creditors moved for turnover on May 18, 2022. *Smith* Dkts. 62, 63.

Only one MDL plaintiffs group, the Ashton Plaintiffs, opposed the motions. Dkt. 7894. The Havlish and Doe Creditors filed a joint reply to that opposition. Dkt. 7928. None of the matters

---

[32] Levy was accomplished by service because the FRBNY has refused to turn DAB's assets over to the Marshal. C.P.L.R. § 5232(a) (property not capable of delivery is levied upon service by marshal). This is precisely the sort of case where levy by service is appropriate. *See also* David Siegel, *N.Y. Prac.*, § 497 (6th ed. 2022) ("Any situation in which the sheriff cannot readily lay hands on the property interest involved, and by some means take immediate actual or at least constructive custody of it, should be deemed to involve property 'not capable of delivery' and therefore to permit levy by service under subdivision (a) of CPLR 5232[.]").

raised in that opposition or reply are at issue in the Report. Judge Netburn also permitted four non-party *amici* to file briefs concerning the turnover motions. *See* Dkt. 7823, 7896-1, 7932-1; *Havlish* Dkt. 617. The Havlish and Doe Creditors replied to these briefs on May 13, 2022. Dkt. 8019.

Judge Netburn issued the Report on August 26, 2022, recommending denials of the turnover motions for the three reasons cited above. *See* Dkt. 8463. Several of the Report's recommendations were based on issues not addressed in the underlying motion papers, the executive branch's statement, or otherwise in the briefing. With respect to those issues, therefore, these Objections constitute the first opportunity for the Joint Creditors to present their position.

## III.   Legal Standard

### A.   Objections To A Magistrate Judge's Report And Recommendation

"If a party timely objects to any portion of a magistrate judge's report and recommendation, the district court must 'make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015) (quoting 28 U.S.C. § 636(b)(1)). The Joint Creditors, as set forth with specificity below, hereby object to the Report in all aspects except insofar as it concludes that certain requirements of TRIA have been satisfied.

### B.   The Essential Elements Applicable To The Underlying Turnover Motions

The procedure for post-judgment enforcement proceedings is governed by Federal Rule of Civil Procedure 69(a)(1), which provides that those proceedings "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." In the state of New York, C.P.L.R. Section 5225(b) provides the relevant procedure for enforcement of a judgment "against a third party who is 'in possession or custody of money or other personal property' in which the judgment debtor has an interest." *CSX Transp., Inc. v. Island Rail Terminal,*

*Inc.*, 879 F.3d 462, 468 (2d Cir. 2018).[33]

In ordinary turnover proceedings, "C.P.L.R. § 5225(b) requires a two-part showing before the Court can order [a] third party to turn over the money to the judgment creditor. The first prong requires that the judgment creditor show the judgment debtor has an interest in the property that the creditor is trying to reach. To satisfy the second prong, the Court must find either that the judgment debtor is entitled to the possession of such property, or that the judgment creditor's rights to the property are superior to those of the party who controls or possesses that property." *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019).

In this case, the Court must also apply TRIA, which expressly supersedes conflicting state and federal laws. Under TRIA, "[n]otwithstanding any other provision of law," the blocked assets of a terrorist party, "including the blocked assets of any agency or instrumentality of that terrorist party[] shall be subject to execution," "in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism." TRIA empowers holders of judgments to enforce their judgments against such blocked assets to "the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a).[34]

Because TRIA provides the relevant framework for analyzing whether a terrorist party "has an interest in the property the judgment creditor is trying to reach" under C.P.L.R. § 5225(b), and because it mandates that such property "shall be subject to execution," courts routinely analyze whether assets are subject to TRIA first and then, based on that decision, address whether turnover

---

[33] Although the text of Section 5225(b) contemplates that enforcement actions under that statute will be brought as a "special proceeding," the Second Circuit has clarified that "a party seeking a money judgment against a non-party garnishee" in federal court "may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee." *CSX Transp.*, 879 F.3d at 469.

[34] An OFAC license is not required to execute against blocked assets under TRIA. *Harrison v. Republic of Sudan*, 802 F.3d 399, 408-09 (2d Cir. 2015), *rev'd on other grounds*, 139 S. Ct. 1048 (2019).

is appropriate.[35]

TRIA Section 201(a) authorizes the Joint Creditors to enforce their judgments against either (i) blocked assets of the Taliban or (ii) blocked assets of an agency or instrumentality of the Taliban. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018). As *Kirschenbaum* held, the fact that the Joint Creditors "obtained their underlying judgments against [a terrorist party] . . . does not prevent" them from executing against a legally separate third party's properties under TRIA if the third party is an "agenc[y] or instrumentalit[y] of [the terrorist party] under the TRIA." *Id*.

The Joint Creditors are entitled to enforce their judgments to the extent of their compensatory damages under TRIA and New York law against the DAB Assets so long as they establish: (1) that they possess a "judgment against a terrorist party"; (2) that such judgment arises from an act of terrorism; and (3) that the DAB Assets are "blocked assets" of the Taliban or an agency or instrumentality of the Taliban. *Weininger*, 462 F. Supp. 2d at 479. The Joint Creditors satisfy each element.

The Report itself concludes that the Joint Creditors have "easily show[n]" that they possess judgments against a terrorist party arising from an act of terrorism, that they seek to execute against blocked assets,[36] and that they are seeking turnover only to the extent of their compensatory damages. Report 29. This Court should now determine both that it has jurisdiction to order turnover and that DAB is an agency or instrumentality of the Taliban within the meaning of TRIA.

---

[35] *See, e.g., Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 48 (S.D.N.Y. 2015); *Weininger v. Castro*, 462 F. Supp. 2d 457, 499 (S.D.N.Y. 2006); *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013).

[36] The Report similarly found facts demonstrating that the blocked assets are assets "of" DAB. *See* Report 4.

## IV.    Objections And Argument

### A.    Plaintiffs Are Entitled To Turnover Under TRIA

As the Report found, the "only [remaining] question [under TRIA] is whether the blocked DAB Funds are the assets of an agency or instrumentality of the Taliban." Report 29-30. A straightforward application of the governing *Kirschenbaum* test answers that question in the affirmative. In fact, the Report found all the facts necessary to satisfy that test.

Under the *Kirschenbaum* test, there are "three ways" for an entity to qualify as "an agency or instrumentality of a terrorist party for TRIA purposes[.]" *Kirschenbaum v. Assa Corp.* (*Assa II*), 934 F.3d 191, 199 (2d Cir. 2019). First, DAB will be an agency or instrumentality if it is "owned, controlled, or directed by the terrorist party." *Kirschenbaum*, 830 F.3d at 135. Second, DAB will be an agency or instrumentality if it is "a means through which a material function of the terrorist party is accomplished[.]" *Id.* Or third, DAB will be an agency or instrumentality of the Taliban if it provides "material services to, on behalf of, or in support of the terrorist party." *Id.* Although it would be sufficient for the Judgment Creditors to demonstrate that DAB meets any of these three tests, in this case all three are satisfied.

First, DAB is and was controlled and directed by the Taliban at all times relevant to this litigation. It was controlled and directed by the Taliban from 1996 to 2001, when the Taliban aided and abetted al Qaeda's execution of the September 11 attacks giving rise to these claims. H.R. Doc. No. 106-268, at 4; *see also* Press Release, U.S. Dep't of Treasury, *supra* note 8 (DAB Assets were "associated with the Taliban regime"). And DAB is again controlled and directed by the Taliban today—and has been since August 2021, when the operative writs underlying these proceedings began to be served after Taliban-installed leadership took control of DAB and began

managing its operations and activities for the Taliban's benefit.[37] There can be no dispute that DAB is now completely controlled by the Taliban.[38] Taliban leaders have been installed as leaders of DAB.[39] The Taliban Council of Ministers issues edicts for DAB to implement.[40] Current and former U.S. government officials recognize that the Taliban controls DAB.[41] DAB's own media relations show that the Taliban controls DAB.[42] Public and private organizations that previously worked with or through DAB are now bypassing it because of the Taliban's control.[43] The reality is that "DAB is now operating under the Taliban's direct operational control."[44]

Second, the Taliban is using DAB to accomplish material functions relevant to its role as a terrorist organization. For example, the Taliban is using DAB to enhance revenue-generating illegal narcotics trafficking.[45] By using DAB's authority to supervise Afghanistan's banking system, the Taliban can abrogate the anti-money laundering and counter-terrorism financing ("AML/CFT") controls, monitoring systems, and enforcement mechanisms that previously curtailed its terrorist financing activities.[46] In fact, a Taliban official who was sanctioned for terror financing was put in charge of DAB's AML/CFT functions, presumably for this purpose.[47] The Taliban can also use DAB to remove any attempts to regulate Afghanistan's *hawala* system, a

---

[37] Zerden Decl. ¶¶ 39, 49-51. This control was evident at the time these turnover proceedings were filed in the spring of 2022. DAB's "agency or instrumentality" status is evaluated as of the date the turnover motions were filed. *See* Dkt. 8019 at 18-21.

[38] Zerden Decl. ¶¶ 14, 49-143; *see also supra* Part II.C.

[39] *Id*. ¶¶ 54-84.

[40] *Id*. ¶¶ 92-95.

[41] *Id*. ¶¶ 99-114.

[42] *Id*. ¶¶ 115-35.

[43] *Id*. ¶¶ 140-43.

[44] *Id*. ¶ 137; *see also id.* ¶ 51.

[45] *Id*. ¶¶ 146-55.

[46] *Id*. ¶¶ 160-67.

[47] *Id*. ¶ 69.

centuries-old informal money exchange system that has also been used to fund terrorism.[48] Finally, the Taliban can now use DAB's archive of highly sensitive Suspicious Activity Reports and financial investigation records to identify, punish, and retaliate against opponents.[49]

Third, the same evidence shows that DAB is providing material services to the Taliban.

Indeed, the present circumstances are just a return to form for the Taliban's relationship with DAB—it is now using DAB in the same way that it did during the period when it controlled Afghan territory and institutions between 1997 and 2001.[50] These same facts led the United States to conclude then that DAB was "controlled by the Taliban," H.R. Doc. No. 106-268, at 4, notwithstanding that the United States did not recognize the Taliban regime as Afghanistan's legitimate government. The Taliban has simply reimposed its former control and picked up where it left off twenty years ago.

In response to the overwhelming and undisputed evidence put forward by the Joint Creditors, the Report states that it "has little doubt that much or all of this is factually true." Report 33. And the Report concludes "that the Taliban is using their control of DAB to advance their aims." *Id*. The Court should adopt that finding, which satisfies the final element of TRIA. *See Pippins v. KPMG LLP*, 279 F.R.D. 245, 253 (S.D.N.Y. 2012) ("Factual findings by a magistrate judge are reviewed for clear error."). Consequently, having satisfied every element required by TRIA, the Joint Creditors are entitled to turnover "[n]otwithstanding any other provision of law."

\*   \*   \*

Instead of recognizing that entitlement, however, the Report identified three reasons why the Court should refrain from enforcing TRIA according to its terms. All three are mistaken.

---

[48] *Id*. ¶¶ 168-78.

[49] *Id*. ¶¶ 156-59.

[50] *Id*. ¶ 27.

### B.      The Court Has Subject Matter Jurisdiction Over This Proceeding

First, the Report incorrectly concluded that the Foreign Sovereign Immunities Act withdraws the Court's subject matter jurisdiction to adjudicate the Joint Creditors' turnover motions. It does not. In conformity with long-established law, the Joint Creditors bring these motions against the FRBNY as a garnishee of the assets, not against DAB. The FRBNY is neither a foreign state nor an agency or instrumentality of a foreign state. In such circumstances, the FSIA confers no jurisdictional immunity. *See Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 91-92 (2d Cir. 2017), *vacated sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813, *reinstated in relevant part*, 963 F. F.3d 192, 196 (2d Cir. 2020). The only immunity that needs to be overcome is the immunity from execution of DAB's assets, which (as the Report agrees, on page 12) TRIA indisputably defeats. And in the alternative, even if a foreign sovereign's jurisdictional immunity could in some fashion be implicated by a TRIA enforcement proceeding, the Second Circuit's binding interpretation of TRIA (and underlying principles of statutory construction) provides an independent basis for jurisdiction when necessary to make execution effective.

### 1.      The Court Has Federal Question Jurisdiction

Foundationally, this turnover proceeding is an action against the FRBNY involving the interpretation and application of a federal statute, TRIA. It presents a federal question regarding the statute's application. It is well established that actions enforcing TRIA create subject matter jurisdiction pursuant to the general federal question jurisdiction statute, 28 U.S.C. § 1331. *See Doe v. ELN*, No. 15-cv-8652, 2017 WL 591193, at *1 (S.D.N.Y. Feb. 14, 2017) (Section 1331 provides jurisdiction over turnover proceedings brought under TRIA), *aff'd sub nom. Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152 (2d Cir. 2018); *see Stansell v. FARC*, No. 16-MC-405, 2022 WL 2530359, at *4 (S.D.N.Y. Mar. 29, 2022) (Netburn, M.J.) (same); *see also Weinstein*, 609 F.3d at 50 (It is "clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter

jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment."). And this basis for jurisdiction cannot be withdrawn absent a clear statement from Congress. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 135 (2d Cir. 2010). No such statement exists.

**2.     The FSIA Does Not Withdraw The Court's Jurisdiction Because This Is Not An Action Against A Foreign State**

The Report asserts that jurisdiction has been withdrawn by the jurisdictional immunities granted to foreign states in Section 1604 of the FSIA. It quotes *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 (1983), for the proposition that the Act must be applied "in every action against a foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity[.]" Report 13.

But this is not an "action against a foreign sovereign," *see Verlinden*, 461 U.S. at 493, seeking relief "*in personam*," which is the only circumstance in which the FSIA's grant of jurisdictional immunity (codified in Section 1604) comes into play. *United States v. Assa Co.* (*Assa I*), 934 F.3d 185, 189 (2d Cir. 2019); *see also Peterson*, 876 F.3d at 88 (Section 1604 imposes a "limit on *in personam* jurisdiction"); *In re B-727 Aircraft Serial No. 21010*, 272 F.3d 264, 270 (5th Cir. 2001) ("[T]he FSIA provides the sole basis for obtaining *in personam* jurisdiction over a foreign state."). The Joint Creditors need not overcome any immunity from jurisdiction to which DAB may be entitled because DAB is not a party to this turnover action.

The distinction between this TRIA proceeding against the FRBNY and *Verlinden* is the inexorable result of the FSIA's text. As the Second Circuit has held, "[t]he gateway into the FSIA's immunity regime is the phrase 'foreign state'" in Sections 1604 and 1330(a). *Assa I*, 934 F.3d at 188; *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)

23

("Sections 1604 and 1330(a) work in tandem[.]"). "[I]f the defendant is not a foreign state, the gateway closes" and "§ 1604 does not confer immunity." *Assa I*, 934 F.3d at 189. The Second Circuit has said clearly that the only entities qualifying as "foreign state[s]" for purposes of the analysis are "actual foreign states, their 'political subdivision[s],' and their 'agenc[ies] or instrumentalit[ies].'" *Id.* (quoting § 1603(a)). "Property of a foreign state does not fit any of these categories." *Id.* So the involvement of the DAB Assets, standing alone, is insufficient to render this action one against a "foreign state." It is therefore also insufficient to open the door to the FSIA's jurisdictional immunity. The Court may not expand the FSIA's jurisdictional immunity beyond the textual limits of the statute. *See Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141-42 (2014); *see also Samantar v. Yousuf*, 560 U.S. 305, 313 (2010) (refusing to expand § 1603(a)'s definition of "foreign state" to include state officials).

There is no *in personam* claim against a foreign state defendant in this enforcement action. The Joint Creditors have brought this TRIA turnover proceeding against a garnishee, the FRBNY, for turnover of the assets of an agency or instrumentality of the Taliban, the judgment debtor, because the garnishee holds the blocked assets in this District. *See* C.P.L.R. § 5225(b).

The Second Circuit has explained that in these circumstances, the jurisdictional immunity found in Section 1604 of the FSIA does not apply.[51] *See Peterson*, 876 F.3d at 91 (Section 1604 is

---

[51] The Report acknowledges, but then improperly disregards, the Second Circuit's binding decision in *Assa I* holding that the FSIA's jurisdictional immunities do not apply to "*in rem*" actions seeking to seize the property of a foreign sovereign. Report 13 n.7 (citing *Assa I*, 934 F.3d at 190). As an initial matter, the Report's characterization of *in rem* proceedings as an "exception" to Section 1604's jurisdictional immunity is a misnomer. An exception is a carve-out from an otherwise applicable immunity. In contrast, the Second Circuit held, the FSIA's jurisdictional immunity simply has no application in actions (like civil forfeiture and garnishment of assets held by third parties) that are not *in personam* actions "against a foreign sovereign." Additionally, even if one were to accept the Report's framework, this proceeding would fall into that "exception" because it is *in rem* as to the DAB Assets themselves. A TRIA garnishment action is "operative *in rem* upon the property of the defendant debtor in the hands of the garnishee." *Weininger*, 463 F. Supp. 2d at 492; *see also Caballero v. FARC*, 562 F. Supp. 3d 867, 883-85 (C.D. Cal. 2021); *FG Hemisphere Assocs., LLC v. Republique du Congo*, 455 F.3d 575, 585 (5th Cir. 2006)). To the extent this action has *in personam* effects, they are directed only against the garnishee (which is therefore the only *party* over which the Court need exercise jurisdiction). *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825, 831 (N.Y. 2009). There is no

(cont.)

"no impediment to an order" directing a garnishee to turn over state assets to a judgment creditor); *see also Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 292 (2d Cir. 2011) ("[I]n this turnover action only execution, not jurisdictional, immunity is at issue.").

As the New York Court of Appeals has explained, a court need not exercise jurisdiction over anyone but the garnishee to order the turnover of assets held by the garnishee on the judgment debtor's behalf. *Koehler*, 911 N.E.2d at 830-31. TRIA extends that jurisdictional principle to assets held by the garnishee on behalf of an agency or instrumentality of a terrorist party judgment debtor. Under established New York law, neither the Taliban, as judgment debtor, nor DAB, as the agency or instrumentality of the judgment debtor, nor the State of Afghanistan are necessary parties to a turnover proceeding under C.P.L.R. § 5225(b). *See RCA Corp. v. Tucker*, 696 F. Supp. 845, 850 (E.D.N.Y. 1988) (judgment debtor is "not a necessary party to the proceeding" for turnover); *see also* Siegel N.Y. Prac. § 510 (6th ed. 2022) (turnover orders are in effect judgments running against the garnishee).

Judge Castel confronted this very issue in *Harrison v. Republic of Sudan*, 309 F. Supp. 3d 46 (S.D.N.Y. 2018). Victims of the 2000 terrorist attack on the USS Cole obtained TRIA-qualifying judgments against Sudan and moved for turnover of assets held by a New York bank on behalf of the Sudanese central bank. *Id.* at 48. Judge Castel explained that while the FSIA afforded instrumentalities of foreign states with jurisdictional immunity, "the Court did not need jurisdiction over the Central Bank to order [the New York bank] to turnover the [assets]." *Id.* at 50. Because Rule 69 "directs the federal courts to apply state court procedures to enforce a money

---

question that this Court has *in personam* jurisdiction over the FRBNY and that the FRBNY is not a foreign state.

Finally, contrary to the Report, the fact that Congress, in 1976, sought to limit *quasi in rem* jurisdiction in ordinary, run-of-the-mill civil actions does not limit Congress' authority to promulgate TRIA in 2002 for the express purpose of providing courts a basis for jurisdiction over the blocked assets of a terrorist party or the agencies or instrumentalities of that terrorist party, "notwithstanding any other provision of law" and "in every case" where the terrorism victims have a judgment against the terrorist party.

judgment[,]" and because "[u]nder New York law, jurisdiction over the judgment debtor is not necessary to order the turnover of assets held by a third party . . . the Court had jurisdiction to order [the New York Bank] to turnover the [assets]." *Id.*

The jurisdictional path for the Court in this case is thus well-illuminated and well-trodden. By contrast, to hold that jurisdictional immunity applies here without regard to the FSIA's text— which applies only to "action[s] against a foreign sovereign," *Verlinden*, 461 U.S. at 493 (citing 28 U.S.C. § 1330(a))—would be to expand foreign sovereign immunity beyond the boundaries Congress has set. That is precisely the outcome that the FSIA was enacted to prevent. Congress enacted the FSIA to

> replac[e] the old executive-driven, factor-intensive, loosely common-law-based immunity regime with [a] 'comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state.' . . . Thus, any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall.

*NML Cap.*, 573 U.S. at 141-42. It is not for the courts to fill in what they think are gaps in the statutory immunity scheme and refuse to exercise jurisdiction in scenarios left unmentioned by Congress, whether out of concern for "worrisome international-relations consequences" or otherwise. *Id.* at 146. "The riddle is not [the courts'] to solve. . . . [T]he question is not what Congress 'would have wanted' but what Congress enacted in the FSIA." *Id.* at 145-46. Any apprehensions about that application "are better directed to that branch of government with authority to amend the Act—which, as it happens, is the same branch that forced [the courts'] retirement from the immunity-by-factor-balancing business nearly 40 years ago." *Id.* at 146.

In turnover proceedings like this one, a foreign state's interests in property are protected not by immunity from *jurisdiction*, but rather by a separate and independent immunity from

26

*execution*.[52] The Second Circuit focused on this distinction in *Assa I*: "To be sure, the FSIA is not completely silent on immunity in actions involving a foreign state's property. Section 1609 states that 'the property in the United States of a foreign state shall be immune from attachment arrest and execution [subject to certain exceptions].'" 934 F.3d at 190 (quoting 28 U.S.C. § 1609); *see also Restatement (Fourth) of Foreign Relations Law* § 464 note 1 (2018). The execution immunity conferred by Section 1609 is even stronger than the jurisdictional immunity conferred by Section 1604, and scholars have said it should be construed strictly—even more so than immunity from jurisdiction—in order to protect foreign state property where the state is not able, willing, or entitled to intervene. *Id.*; *see also* Brief for the U.S. as *Amicus Curiae* at 12, *Clearstream Banking S.A. v. Peterson*, 140 S. Ct. 813 (2020) (No. 17-1529) ("The narrower scope of the immunity exceptions reflects a judgment that authorizing execution against a sovereign's property is a greater intrusion on state sovereignty than merely exercising jurisdiction."). In light of the Second Circuit's rulings in *Peterson* and *Assa I*, TRIA enforcement proceedings do not, therefore, open a free-for-all on sovereign assets through New York turnover procedures. In ordinary, non-terrorism cases, execution immunity will shield such assets from even the most diligent judgment holders.

But in terrorism judgment cases, as the Report correctly concludes, Congress determined that TRIA should overcome immunity from execution. Report 12-13 (TRIA "defeats the immunity from execution that the property of sovereign states and their instrumentalities normally enjoy."); *see also Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016) (Although "the FSIA's central-bank immunity provision [] limits" execution through other mechanisms of law, it does "not [limit] the TRIA" because TRIA "take[s] precedence over 'any other provision of law[.]'"). TRIA

---

[52] Of the twin immunities conferred by the FSIA, only the immunity conferred by Section 1604 is jurisdictional. *See Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 479 (D.C. Cir. 2016) (citing cases), *abrogated on other grounds,* 138 S. Ct. 816 (2018). The immunity from execution conferred by Section 1609 is not jurisdictional. *Id.*

therefore does what Congress intended: exposing the blocked assets, and only the blocked assets, of terrorist parties (and their agencies and instrumentalities) to execution by terror victims.

For the reasons set forth above, this is not an *in personam* action against a foreign state. Therefore, the FSIA's jurisdictional immunity provisions are neither relevant nor operative. FSIA Section 1604 simply does not remove the Court's federal question jurisdiction to compel the FRBNY to turn DAB Assets over to the Joint Creditors.

### 3. Alternatively, Even If The FSIA's Provisions On Jurisdictional Immunity Apply, That Immunity Would Be Abrogated By TRIA

As the previous discussion has shown, the Court has subject matter jurisdiction over this federal law turnover action which the FSIA does not withdraw because this action is not an *in personam* action against a foreign state. But even if the FSIA did confer immunity from jurisdiction upon turnover proceedings to which no foreign state is a party merely because they may involve state assets, TRIA would restore jurisdiction. TRIA's text, context, and legislative history all demonstrate Congress's intent to permit terrorism judgment holders to enforce their judgments against blocked assets notwithstanding any otherwise applicable foreign sovereign immunity.

#### a. Courts Have Repeatedly Confirmed That TRIA Addresses And Removes Jurisdictional Immunity

The Second Circuit has consistently confirmed that Section 201(a) of TRIA creates an independent basis for subject matter jurisdiction—notwithstanding the FSIA's jurisdictional immunity provisions. In *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014) (*per curiam*), the court explained that while "[i]n the ordinary case, a foreign state will be 'immune from the jurisdiction of the courts of the United States and of the States'" pursuant to Section 1604 of the FSIA, "Congress . . . has created terrorism-related exceptions to immunity under FSIA," and "[o]ne such exception is TRIA." That is because, as the court of appeals has noted in identifying the source of TRIA's independent conferral of subject matter jurisdiction,

Section 201(a) uses the broad phrases "in every case" and "[n]otwithstanding any other provision of law," "making plain that the force of the section extends everywhere.". *Weinstein*, 609 F.3d at 49. In other words, its scope must be extended to statutes and doctrines that would otherwise conflict with the court's exercise of jurisdiction.

Similarly, in *Kirschenbaum*, the Second Circuit held that "Section 201(a) of the TRIA confers an independent basis for subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment." 830 F.3d at 132. That basis for jurisdiction, the court explained, "derives from the plain language of TRIA § 201(a)[.]" *Id.* In *Vera I*, the court again explained that "[t]he TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property of a foreign state 'in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism[.]'" *Vera v. Republic of Cuba* (*Vera I*), 867 F.3d 310, 321 (2d Cir. 2017) (quoting TRIA § 201). In *Assa II*, the court applied these principles and once again explained that TRIA provided the district court with jurisdiction. 934 F.3d at 198.

Every other court to consider the issue has likewise concluded that TRIA obviates foreign sovereign immunity from jurisdiction when it would otherwise frustrate terrorism judgment holders' collection efforts. *See, e.g.*, *Weininger*, 462 F. Supp. 2d at 488 ("This Court concludes that the 'notwithstanding any other provision of law' language in TRIA operates as an exception to immunity from both jurisdiction and execution."); *Harrison*, 309 F. Supp. 3d at 49 ("[t]he TRIA provides an exception to FSIA immunity"); *Villoldo v. Castro Ruz*, 113 F. Supp. 3d 435, 437 (D. Mass. 2015) ("Congress has created certain terrorism-related exceptions to the general immunity [from jurisdiction] that foreign sovereigns enjoy in federal and state courts. One of those

exceptions is § 201 of [TRIA.]"), *aff'd*, 821 F.3d 196 (1st Cir. 2016); *see also Peterson v. Islamic Republic of Iran*, No. 10-cv-4518, 2013 WL 1155576, at \*23 (S.D.N.Y. Mar. 13, 2013) ("TRIA provides for subject matter jurisdiction[.]"), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd*, 578 U.S. 212 (2016). As Judge Marrero reasoned in *Weininger*, "it would be contradictory for Congress in the same breath to expressly make assets subject to execution and at the same time make the owner of those assets immune from suit to recover those assets." *Id.*[53] And in its Statement of Interest in this case, the United States agreed that TRIA removes jurisdictional impediments to execution. U.S. Statement 15 (Dkt. 7661) ("Except where TRIA applies, the FSIA provides 'the sole basis for obtaining jurisdiction over a foreign state in our courts.'") (citation omitted); *see also id.* at 10 ("When its conditions are satisfied, TRIA [§] 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA.").[54] Indeed, the Seventh Circuit has held

---

[53] As it was enacted later in time, TRIA overrides the earlier-conferred immunities in the FSIA. *Weininger*, 462 F. Supp. 2d at 498-99; *see also In re Ionosphere Clubs*, 922 F.2d 984, 991 (2d Cir. 1990).

[54] In its Statement of Interest in this case, the executive branch took no position on the Joint Creditors' entitlement to turnover. Dkt. 7661. *Amicus* asks the Court to take notice of a different statement by the executive branch in an unrelated case called *Caballero*. Dkt. 8645. The Joint Creditors are concurrently filing a separate brief in response to the notice of supplemental authority that attaches the *Caballero* statement. *See* MOL.

As discussed in that brief, the *Caballero* statement takes questionable positions. It interprets TRIA as applying only to judgments against state sponsors of terrorism and to agencies or instrumentalities of state sponsors of terrorism— an interpretation plainly inconsistent with the statute's text and the Second Circuit's interpretation thereof. It advances arguments that are precluded by binding Second Circuit case law, *see, e.g.*, Dkt. 8645-1 at 31-35 (arguing *Kirschenbaum*'s definition of "agency or instrumentality" should not be applied), and attempts to question other long-settled legal principles, *see, e.g.*, *id.* at 29 (taking no position on whether TRIA is satisfied where "[an] agency or instrumentality of [a] terrorist party [has] an ownership interest" in blocked assets). Rather than an explanation of what the law actually is, it appears to be an attempt by its authors to describe what they would like the law to be.

This attempt to narrow the meaning of Section 201 of TRIA is merely a further expression of the longstanding antipathy of the executive branch to the provision, which it has opposed since before its enactment, arguing that it "interferes with the President's management of foreign affairs." Memo from William H. Taft IV, Legal Adviser, Dep't of State, to Paul V. Kelley, Assistant Sec'y of State for Legis. Affairs (Oct. 4, 2002) (on file in *Bank of N.Y. v. Rubin*, No. 05-cv-4926 (S.D.N.Y. Mar. 8, 2006), ECF No. 40 at 12). But Congress passed the law over those objections because it wanted to "prevent executive branch interference with terrorist victims' collection of their judgments." *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 892 F. Supp. 2d 1038, 1045 (N.D. Ill. 2012).

Ultimately, the question before the Court—the meaning and effect of TRIA's text—is an ordinary issue of statutory interpretation, and the executive branch's views on that question are neither binding nor entitled to special deference. *See, e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004) (interpretation of foreign affairs law is a "pure question of statutory construction . . . well within the province of the Judiciary," and "[w]hile the United States' views

(cont.)

that TRIA overcomes even the United States' assertion of its own sovereign immunity. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 633 (7th Cir. 2015).

Until the Report, no court had ever found that TRIA does not overcome an obstacle to the assertion of subject matter jurisdiction in a case where its elements are satisfied. This Court should not be the first to deviate from this unanimous consensus in a case of such import to 9/11 victims.

### b.     The Report Veers From Settled Law To Redefine TRIA's Scope

Contrary to settled case law that TRIA provides an independent basis for the exercise of subject matter jurisdiction to execute against assets where its conditions apply, the Report concludes that TRIA does not independently abrogate jurisdictional immunity at all. The Report instead pronounces TRIA a mere "execution statute[,]" (Report 23, 25, 27), recasting the extensive case law we have just discussed as reflecting a minor corollary that "pulls . . . through" an existing, non-TRIA waiver of jurisdictional immunity only in "certain limited circumstances." Report 13; *see also id.* at 16, 25. This interpretation is precluded by precedent for all the reasons discussed above and does not succeed even on its own terms.

Although the Report begins by acknowledging the "broad language" of TRIA's "notwithstanding any other provision of law" clause, Report 20, it soon concludes that TRIA's scope is extraordinarily narrow. According to the Report, the only situation in which TRIA does its work is when a judgment creditor is "prevented from [executing on blocked assets] by an

---

on such an issue are of considerable interest to the Court, they merit no special deference") (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 448 (1987)); *Krzalic v. Republic Title Co.*, 314 F.3d 875, 877 (7th Cir. 2002) (Posner, J.) ("Ordinarily issues of statutory interpretation are treated as pure issues of law, and no deference is given the interpretation adopted by executive or other officials."); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the Judicial Department to say what the law is."). This principle is all the more salient where the executive branch is advancing an interpretation intended to restrict the application of a law—like TRIA—which was expressly intended to rein in executive power over the executive branch's opposition. *See supra* Part II.A.2; *see also Levin v. Bank of New York Mellon*, 2013 WL 5312502, at *6 n.9 (S.D.N.Y. Sept. 23, 2013) ("Any statement from the Executive Branch submitted with respect to the TRIA should be considered suspect[.]").

immunity to execution contained in 28 U.S.C. § 1610, 28 U.S.C. § 1611, or some other statute. *Only in that case would TRIA prevail.*" Report 25 (emphasis added). The Report thus rewrites the phrases "notwithstanding any other provision of law" and "in every case" as "notwithstanding these two sections of this one law." Likewise, the Report narrows the phrase "any agency or instrumentality of that terrorist party" to mean "only agencies of designated state sponsors of terror" and converts the word "shall" to the word "may." This narrow construction is atextual, ahistorical, and incorrect.

### i.   The Report's Interpretation Is Incompatible With TRIA's Plain Text

Section 201(a) states unequivocally: "*Notwithstanding any other provision of law . . . in every case* in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of *any* agency or instrumentality of that terrorist party . . . *shall* be subject to execution[.]" (emphases added). Each term has a well-established meaning in statutory construction, and their combined breadth is sweeping.

"*Notwithstanding Any Other Provision of Law*." TRIA begins with these six key words. The Courts of Appeals "have regularly interpreted such 'notwithstanding' provisions 'to supersede all other laws[.]'" *Peterson*, 758 F.3d at 190 (quoting *Weinstein,* 609 F.3d at 53). Indeed, a "notwithstanding" clause like the one found in TRIA is perhaps the clearest indication of Congress's broad intent to override contrary enactments. *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("A clearer statement" than a notwithstanding clause "is difficult to imagine.").

In other words, this is not an instance in which Congress has enacted a limited provision designed to trump only certain specific, enumerated statutes.[55] "[N]otwithstanding any other

---

[55] *See, e.g.*, 28 U.S.C. § 1605B(c) ("Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state . . . ."); § 1658(b) ("Notwithstanding subsection (a) . . . ."); § 1659(b) ("Notwithstanding section 337(n)(1) of the Tariff Act of 1930 . . . .").

provision of law" is a "singularly broad phrase." *In re Aquatic Dev. Grp., Inc.*, 352 F.3d 671, 680 (2d Cir. 2003) (Straub, J., concurring). Courts have interpreted such clauses accordingly. *E.g.*, *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers*, 619 F.3d 1289, 1301 (11th Cir. 2010) (despite its use in an appropriations provision, "[n]othing about the word 'any'" in the phrase "notwithstanding any other provision of law . . . suggests that 'law' should refer only to appropriation laws, rather than 'any' laws."); *Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 619 (9th Cir. 2019) (decision to use "notwithstanding any other provision of law" rather than "nothing in this section" reflected "a deliberate choice" to preempt any other applicable laws). That is exactly what the Second Circuit in *Weinstein* held when it rejected the same argument that the Report now advances—that TRIA's scope is limited to immunity from execution, not jurisdiction—with a blunt rejoinder: "[T]he operative language begins with the phrase '[n]otwithstanding any other provision of law,' thus making plain that the force of the section extends *everywhere*." *Weinstein*, 609 F.3d at 49 (emphasis added).

It is also noteworthy that the scope of Section 201(a)'s notwithstanding clause is expressly limited by a subclause specifying that it applies to "any other provision of law, . . . except as provided in subsection (b)" of TRIA. The explicit enumeration of an exception to the "notwithstanding" clause implies that Congress considered other potential limitations on the clause's scope and chose to enact only the exceptions contained in Section 201(b). Under the canon of statutory interpretation known as *expressio unius est exclusio alterius*, "[w]hen Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000). Courts routinely apply the canon to notwithstanding clauses that are followed by

subclauses listing exceptions, concluding that provisions of law which do not fall within the enumerated exceptions are preempted. *E.g.*, *Gallop Power Greenville, LLC v. Moosehead Sanitary Dist.*, 2016 WL 5416444, at \*26 (D. Me. Sept. 28, 2016); *Holland v. San Francisco*, 2010 WL 5071597, at \*10 (N.D. Cal. Dec. 7, 2010); *In re Borges*, 440 B.R. 551, 557 (Bankr. D.N.M. 2010).

To be sure, the Joint Creditors have no quarrel with the Report's assertion that the notwithstanding clause is not a "bulldozer" that removes ordinary procedural rules or disempowers other parts of the government to undertake actions with collateral effects on these proceedings. *See* Report 21. And to that end, the Joint Creditors assiduously followed every applicable procedural requirement. But the notwithstanding clause does target obstacles—like foreign sovereign immunity—that conflict with TRIA's terms. The difference is that FSIA jurisdictional immunity is a legal doctrine that directly conflicts with the operative clause of TRIA by barring execution on the assets of an instrumentality of a terrorist party, whereas the other issues constitute either (1) procedural requirements that are merely conditions precedent to bringing any action under TRIA, or (2) the exercise of independent power by a coordinate branch of government.

The *Smith* cases, which the Report cites (at 21-22), demonstrate the distinction. As the Report acknowledges, the complained-of action in *Smith* was the independent confiscation of Iraqi assets by the President pursuant to IEEPA—a wholly-collateral act expressly authorized by Congress in the very same statute otherwise modified by TRIA. *Id.* (citing *Smith v. Fed. Rsrv. Bank of New York* (*Smith I*), 280 F. Supp. 2d 314, 317-19 (S.D.N.Y), *aff'd*, 75 F. App'x 860 (2d Cir. 2003), *and aff'd sub nom. Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York* (*Smith II*), 346 F.3d 264 (2d Cir. 2003)). The confiscation was an exercise of separate authority with "the incidental effect of removing funds from the reach of judgment creditors." *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 688 (5th Cir. 2013). The President's exercise of

34

authority under IEEPA was not in conflict with TRIA, which did not evince any indicia of Congressional intent to generally eliminate Presidential authority to take otherwise-lawful actions that causally affect the availability of funds to terror victims who did not have final judgments when the presidential actions were taken. *Smith II*, 346 F.3d at 271. But the *Smith* opinions were quite clear that TRIA's scope does extend to the removal of real conflicts with irreconcilable principles of law *such as sovereign immunity*. 280 F. Supp. 2d at 319 ("[T]o the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict."). Precisely the same conflict is presented here—assuming *arguendo* that § 1604 applies to this turnover action, *see supra* Part IV.B.2—and TRIA controls.

*"In Every Case."* In drafting TRIA, Congress paired the "notwithstanding" clause with the similarly broad edict that TRIA must be applied "in every case" that meets its criteria, further emphasizing Section 201's broad sweep. *R.J. O'Brien*, 783 F.3d at 621 ("[W]ords of broad application bookend TRIA's "notwithstanding" clause. The statute reads in pertinent part: '*In general.*—Notwithstanding any other provision of law . . . *in every case* in which a person has obtained a judgment . . . .'") (emphasis in *O'Brien*); *Peterson*, 2013 WL 1155576 at *7 (TRIA's combination of "notwithstanding" and "in every case" clauses creates "broad" preemptive effect). When Congress states that a statute applies "in every case," its words must be taken seriously. *See Nat'l R.R. Passenger Corp. v. Two Parcels of Land*, 822 F.2d 1261, 1265 n.4 (2d Cir. 1987).

Despite Congress's unequivocal mandate that TRIA applies to "every case" that satisfies its terms, the Report concludes that the "[o]nly . . . case" in which "TRIA prevail[s]" is where a judgment creditor is "prevented from [executing on blocked assets] by an immunity to execution contained in 28 U.S.C. § 1610, 28 U.S.C. § 1611, or some other statute." Report 25 (emphasis

added). The courts of appeals have already rejected attempts to limit TRIA's application in this way. In both *Weinstein* and *Peterson*, the Second Circuit held that TRIA prevailed over treaties between the United States and foreign nations that were invoked for reasons irrelevant to immunity from execution. *See Weinstein*, 609 F.3d at 52-53 (TRIA would "abrogate" U.S.-Iran treaty designating Iranian bank juridically separate from Iranian state); *Peterson*, 758 F.3d at 190 (same as to 28 U.S.C. § 8772). And the Seventh Circuit has held that TRIA prevails over the procedural requirements of the civil forfeiture statutes. *See R.J. O'Brien*, 783 F.3d at 621. It is thus clear from text and precedent that TRIA extends to "every case"—much further than the Report suggests.

***"Any Agency or Instrumentality of That Terrorist Party."*** TRIA mandates that "the blocked assets of *any* agency or instrumentality of that terrorist party . . . *shall* be subject to execution." But the Report recommends holding that the assets of *some* instrumentalities of terrorist parties are in fact not subject to execution—namely, the assets of terrorist instrumentalities that are also agencies of states. *See* Report 16 (TRIA overcomes jurisdictional immunity of agencies and instrumentalities only in "limited circumstances" where the terrorist party itself is sovereign). As discussed here and further in Part IV.B.3.b.iii, that recommendation cannot be reconciled with Second Circuit precedent or the statutory text.

The Report limits TRIA's application only to underlying judgments against terrorist states in part by reference to an erroneous construction of the statutory definition of "terrorist party." *See* Report 20 (citing TRIA § 201(d)(4)). That provision states that a "terrorist party" for purposes of TRIA may be a "terrorist," a "terrorist organization," or a "foreign state designated as a state sponsor of terrorism," and Section 201(a) extends TRIA's reach to any "agency or instrumentality" of those parties. But the Report reads "terrorist organization" and "any agency or instrumentality" thereof out of the statutory scope.

If Congress wanted to make the distinction found in the Report, it could have written "foreign state" rather than "terrorist party." Indeed, Congress used the phrase "foreign state" in two provisions of Section 1610 where it created exceptions to immunity from execution for judgments against state sponsors of terrorism. *See, e.g.*, 28 U.S.C. §§ 1610(a)(7) (creating exception when "the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7)"), 1610(g) (creating exception for "the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state"). The Report reads TRIA to be limited in the same way as these other provisions even though Congress chose broader language in TRIA. *See Kirschenbaum*, 830 F.3d at 133; *see also Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea" (quoting A. Scalia & B. Garner, Reading Law 170 (2012)). The Report's erroneous interpretation should not be adopted.

*"Shall Be Subject to Execution."* TRIA provides that, when its conditions are satisfied, covered blocked assets "shall be subject to execution[.]" TRIA § 201(a). The word "shall" is "mandatory, not precatory." *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015). It "admits of no discretion." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002)). Regardless of extra-statutory concerns that the Court might otherwise be inclined to consider when it does possess some equitable discretion, in *this* turnover proceeding, when the Court is applying TRIA and the Joint Creditors have satisfied the law's elements, there is no room to do anything but grant the relief to which they are entitled.

*Context and Structure.* The Report attempts to limit the application of TRIA's broad text by comparing the general terminology and phrasing used in TRIA with certain terms used in the

FSIA and then concluding that because TRIA's phrasing resembles that of an exception to execution immunity rather than an exception to jurisdictional immunity, TRIA must necessarily be interpreted to apply only as an exception to immunity from execution. Report 23-25.

There are several problems with this analysis. First, it is expressly precluded by *Kirschenbaum*, which rejected arguments that TRIA's terms should be interpreted by reference even to identical terms in the FSIA. 830 F.3d at 132-33. Second, it fails to explain why the "notwithstanding any other provision of law" provision of TRIA would not apply to Section 1604 of the FSIA, which, as explained above, is itself a "provision" of the same "law" that TRIA was intended to target. Third, it fails to reckon with Congress's decision to enact TRIA as a freestanding measure rather than an amendment to the FSIA's executional immunities in Sections 1610 and 1611 (where all the other limited immunities from execution and attachment are located). Courts (including the Supreme Court) have enforced Congress's judgment, embodied in independent statutes that bypass the FSIA entirely, that otherwise protected assets should be available for execution despite provisions of the FSIA that would otherwise bar enforcement. *See Bank Markazi*, 578 U.S. at 218 (noting that 28 U.S.C. § 8772, a similar statute, was "[e]nacted as a freestanding measure, not as an amendment to the FSIA"). The FSIA's internal distinctions are thus wholly irrelevant when interpreting TRIA.

Structural arguments that TRIA is limited in scope are untenable for the same reasons. The Report suggests that TRIA can be found with and among "other" exceptions to immunity from execution in 28 USC § 1610. *See* Report 16. But TRIA is not part of Section 1610, and nothing can be inferred from its placement in the United States Code. *See Kirschenbaum*, 830 F.3d at 132–33. TRIA's placement in the notes of Section 1610 was a choice made by the Office of Law Revision Counsel rather than by Congress. Such a decision, "made by a codifier without the

approval of Congress . . . should be given no weight." *North Dakota v. United States*, 460 U.S. 300, 311 n.13 (1983) (quoting *United States v. Welden,* 377 U.S. 95, 99 n.4 (1964)).

### ii.    The Report's Interpretation Is Incompatible With Congress's Intent

The legislative history of TRIA confirms that when the 107th Congress drafted Section 201, it had one essential goal: enabling victims of terrorism to collect on their judgments against blocked assets, including by removing sovereign immunity where necessary to do so. And the legislative record and context make clear that Congress, in enacting TRIA, had this very circumstance and these very victims in mind.

For years before Section 201's passage, the executive branch and the courts had expressed sympathy for terrorism victims while at the same time invoking foreign policy concerns and principles of sovereign immunity to prevent them from recovering on their judgments. *See, e.g.*, 148 Cong. Rec. 10312–13 (2002) (statement of Sen. Gordon Smith), 16400 (2002) (statement of Rep. Chris Shays), 23121 (2002) (statement of Sen. Tom Harkin). After the September 11 attacks, members of Congress wanted to ensure that this would not happen again—with victims of the Taliban keenly in mind. As Rep. Vito Fossella, one of Section 201's primary sponsors, said on the House Floor just one day before the first anniversary of September 11:

> Madam Speaker, tragically and regrettably, I lost a lot of friends and a lot of neighbors [on 9/11] . . . Those families right now are suffering the shock of it, the shock of losing a father or a mother or a sister or brother or uncle or aunt, and tomorrow marks the anniversary. The notion that while brave men and women are fighting the war overseas in seeking out these terrorists and those who help them and harbor them and finance them because they are thinking of doing it again, the notion that this government, our government, could prevent my neighbors and friends one day, if successful in a court of law in obtaining judgment, to be unable to recover assets of *a terrorist organization or* a state that sponsors terrorism to me is the most unjust thing in this Nation . . . I think it is unbelievable that these families down the road, in the event that they will obtain a judgment, would have to come back to Congress or to their own government to petition *against a terrorist organization or* a state that sponsors terrorism *to recover some of those assets*. We should not be here next year or 10 years from now debating this. We should end

39

the subject right now, put it to a close, and bring justice to those victims who suffer today and will be suffering for a long time. But at least this Congress is speaking with one voice and saying that we are going to right that wrong and provide equity for all.

148 Cong. Rec. 16397, 16399 (2002) (emphases added); *see also supra* at 3, 10. Other contemporaneous materials also make clear that the legislature intended to remove all sovereign immunity, not just one part of sovereign immunity, as a barrier to enforcement. 147 Cong. Rec. 23377 (2001) (explaining in an unqualified manner that draft version of Section 201 "removes foreign sovereign immunity and is designed to ensure that victims of terrorism receive the compensation they are owed").

Given Congress's broad remedial intent—including an intent to remove sovereign immunity as an obstacle to the enforcement of terror judgments—the notwithstanding clause which expressly reaches "any other provision of law" should not be construed as reaching only two specific provisions of law, Sections 1610 and 1611. *See Vincent v. The Money Store*, 736 F.3d 88, 98 (2d Cir. 2013) (When a statute is "remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated.") (quoting *N.C. Freed Co. v. Bd. of Governors of Fed. Reserve Sys.,* 473 F.2d 1210, 1214 (2d Cir. 1973)).

The idea that a nonstate terrorist party might commandeer and control a state agency or instrumentality to facilitate terrorist attacks would not have been foreign to the 107th Congress when it enacted TRIA. Indeed, the very same Congress that passed TRIA received a report from the President informing them that, as of early 2001, the Taliban (in its role as a terrorist organization and nonstate actor) had been in control of DAB for five years. H.R. Doc. No. 107-16, at 4. And, on September 11, 2001, that same Congress experienced the consequences of the Taliban's control over Afghanistan and DAB.

If that Congress had wanted to write a statute that limited the ability of terror victims to

enforce their judgments in these familiar circumstances—if it wanted terror victims to recover from only *non-governmental* agencies or instrumentalities of *nonstate* terrorist actors, or wanted to limit them to recovery only from *state sponsors* of terrorism or their agencies or instrumentalities, or wanted to limit them to recovery only where some independent exception to the FSIA's jurisdictional immunities existed—it could have done so. *See* 28 U.S.C. § 1610(a)(7) (creating exception when "the judgment relates to a claim for which the *foreign state* is not immune under section 1605A or section 1605(a)(7)" (emphasis added)); *id.* § 1610(g) (creating exception for "the property of a *foreign state* against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of *such a state*" (emphasis added)). But Congress plainly did not. To confer jurisdictional immunity on DAB's assets in this instance would effectively immunize the Taliban (or any other terrorist party that obtains and deploys foreign state assets in service of future attacks on the United States) from TRIA and would frustrate the purpose of that law: making blocked assets of *any* agency or instrumentality of a terrorist party available for attachment and execution by victims of that terrorist party.

### iii.   The Report's Interpretation Of Second Circuit Precedent Is Erroneous

To reconcile its conclusion with Second Circuit precedent, the Report argues that TRIA's jurisdictional effect is limited to circumstances when "jurisdictional immunity has already been overcome against the sovereign" in the underlying judgment. Report 17, 25. This limitation has no basis in the case law, the statute, or principles of foreign sovereign immunity. TRIA provides for the enforcement of judgments—notwithstanding any jurisdictional or execution immunity—in any case where the court entering the underlying judgment had jurisdiction to do so.

The Report's narrowing of Second Circuit precedent is based on its misreading of two cases: *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.* (*Vera II*), 946 F.3d 120 (2d Cir. 2019) and

*Vera v. Republic of Cuba* (*Vera I*), 867 F.3d 310 (2d Cir. 2017). Report 17, 25. The *Vera* cases simply stand for the uncontroversial proposition that one cannot use TRIA to enforce an *invalid underlying judgment*.[56] The Second Circuit made this perfectly clear in both opinions (and in *Weinstein*, which *Vera I* cites). In *Vera II*, Judge Carney stated that Section 201(a) "would provide the District Court here a jurisdictional basis for enforcing those state judgments, *if valid*, by attaching and executing on" blocked Cuban assets. 946 F.3d at 125 (emphasis added). The court did not limit the validity requirement to validity *under the FSIA*—a valid judgment itself is all that is required. *See also Vera I*, 867 F.3d at 321 (repeatedly emphasizing the word "valid" in *Weinstein* and *Kirschenbaum*'s discussion of TRIA-eligible judgments). *Vera II* elsewhere summarized *Vera I*'s holding as follows: "[I]n [the] absence of [a] valid underlying judgment, 'TRIA did not provide a proper basis for subject matter jurisdiction over subsequent proceedings[.]'" 946 F.3d at 136 (quoting 867 F.3d at 321)). And that makes sense, because TRIA cannot be triggered unless the creditor "has obtained a judgment against a terrorist party[.]" TRIA § 201(a). That the Second Circuit in some instances phrased the inquiry as whether the creditors in that case had obtained a "valid judgment against a foreign sovereign" simply reflects the fact that the judgment debtor in those cases *was* a foreign sovereign. That does not, however, circumscribe TRIA's application in all other cases, especially given the breadth of the statutory text. After all, "[a] statement in an opinion must be read in the light of the facts and contentions to which it is addressed." *United States v. Docherty*, 468 F.2d 989, 995 (2d Cir. 1972). And as we have explained (*supra* at 37), if Congress had meant to adopt the Report's narrowed construction, it could and would have said so.

Furthermore, the Second Circuit's decision in *Kirschenbaum* rejected the Report's

---

[56] The underlying judgments in the *Vera* cases were invalid because Cuba was not a designated state sponsor of terrorism at the time the acts of terror occurred nor was it designated because of them. The court entering the judgments thus did not have *in personam* jurisdiction over Cuba and the judgments were invalid. *Vera II*, 946 F.3d at 142.

requirement of an underlying judgment against a foreign sovereign under the FSIA for purposes of TRIA. Noting that TRIA refers to agencies or instrumentalities of a "terrorist party" rather than agencies or instrumentalities of a "foreign state," the *Kirschenbaum* court concluded that it could not, therefore, rely on the FSIA's definition for agencies or instrumentalities of a foreign state. *See* 28 U.S.C. § 1603(b). The court observed that "the text of the TRIA unambiguously reaches more broadly to permit the attachment of property in circumstances not covered by the FSIA or FSIA immunity." *Kirschenbaum*, 830 F.3d at 133. "Precisely because TRIA § 201 encompasses non-state actors and, thus, reaches more broadly than the FSIA, "it would contravene a plain reading of the TRIA to cabin its reach by applying the FSIA's definition of agency or instrumentality— which requires a foreign state principal." *Id.* But that is precisely what the Report would do.

*     *     *

For all these reasons, the Report should be overruled. The Court should hold that the FSIA's jurisdictional immunity does not apply to this proceeding because it is not an "action against a foreign sovereign." Alternatively, it should follow binding case law and hold that TRIA remains an independent source of subject matter jurisdiction notwithstanding any other law when its elements are satisfied.

### C.     Applying TRIA Does Not Intrude On The President's Recognition Power

The Report's second basis for recommending the denial of turnover is that the Court could not constitutionally "mak[e] the findings that are required by TRIA § 201 to authorize execution" because finding that DAB is an agency or instrumentality of the Taliban would amount to an implied recognition of the Taliban as Afghanistan's government in violation of the President's exclusive authority to recognize foreign governments. Report 27-28. In reaching this conclusion, the Report committed two significant and independent legal errors, misconstruing both: (1) the nature of the finding required to authorize execution under TRIA, and (2) the scope of the

43

President's exclusive recognition power. To find that DAB is an agency or instrumentality of the Taliban under TRIA, the Court must only find that the Taliban controls DAB or uses it to advance its aims—not that such control or use is lawful, legitimate, or governmental in nature. And such a finding would in no way "bestow[] governmental recognition" on the Taliban. Report 35.

1.      **TRIA Does Not Require The Court To Find That The Taliban Exercises Governmental Or Lawful Control Over DAB**

First, the Report mistakenly concluded that to find that DAB is a Taliban agency or instrumentality would "inescapably impl[y] that the Taliban is the government of Afghanistan." Report 30. Granting turnover would require no such finding, whether express or by implication. As the Report itself recognized, the Second Circuit's *Kirschenbaum* test for whether an entity is an agency or instrumentality of a terrorist party is satisfied whenever the entity is "owned, controlled, or directed by the terrorist party." *Id*. (citing *Kirschenbaum*, 830 F.3d at 135). The Report reviewed the Joint Creditors' evidence that the Taliban does, in fact, exercise significant control over DAB, and concluded that there was "little doubt that much or all" of their evidence "is factually true, and that the Taliban is *using their control of DAB* to advance their aims." Report 33 (emphasis added). Those findings alone—what the Report called "the facts on the ground," *id*. 34—demonstrate that the *Kirschenbaum* test is satisfied.

Rather than stop there, however, the Report concluded that a judicial finding that the Taliban controls DAB would necessarily imply that the Taliban controls DAB *as the government of Afghanistan*, and would imply that the Taliban's appointment of DAB's leaders and direction of DAB policy is somehow "legitimate[]." Report 30, 35. But this conclusion cannot be reconciled with TRIA or Second Circuit cases interpreting it. Nothing in *Kirschenbaum* or any other case holds that, for an entity to qualify as an agency or instrumentality of a terrorist party under TRIA, the terrorist party must exercise its control over the entity as a legitimate government. *Cf. Stansell*

44

*v. Revolutionary Armed Forces of Colombia* (*Stansell I*), 771 F.3d 713, 722 (11th Cir. 2014) (considering agency or instrumentality relationship based on "illicit ties" between the FARC and third parties). Giving effect to TRIA and noting the Taliban's practical control of DAB does not indicate anything about the "legitima[cy]" of the acts of those controlling DAB.

In other cases bearing on foreign affairs, courts have no difficulty acknowledging when an entity exercises control over a state's institutions or territory—and acknowledging the legal consequences that flow from such control—without implying that it does so as the rightful governmental authority. *See, e.g., Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 209 (D.C. Cir. 2022) (plaintiffs stated claim under Anti-Terrorism Act against companies that did business with Iraq's Health Ministry while a terrorist organization "openly controlled [the ministry] and used it as a vehicle for terrorist activity"); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 48 (2d Cir. 1991) (observing that "the West Bank, the Gaza Strip, and East Jerusalem . . . are all under the control of the State of Israel," such that the PLO was not a state with defined territory entitled to immunity under the FSIA). Just as *Atchley* could determine that Iraq's Ministry of Health was under the control of Jaysh al-Mahdi, a terrorist organization, without implying that Jaysh al-Mahdi was the Iraqi government, and just as *Klinghoffer* could draw legal conclusions from the fact of Israel's control of the West Bank and Gaza without needing to confront questions of whether Israel was the rightful government in those territories, the Court here can authorize execution on the basis of the Taliban's control of DAB without concluding that the Taliban is Afghanistan's legitimate government. To use the Report's analogy, *see* Report 38, concluding that bank robbers have taken over a state-owned bank says nothing about whether the robbers are the state's lawful government.

It would make little sense to construe TRIA to apply only when a terrorist party exercises

legitimate control over its agencies or instrumentalities. A "terrorist party" under TRIA can be either a state designated as a state sponsor of terrorism *or* a nonstate terrorist organization *or* even an individual terrorist. TRIA § 201(d)(4). Nonstate terrorist groups are, by nature, criminal organizations, and frequently do not exercise control in a lawful manner. They also do not generally hold assets in their own names. If the Report's understanding of TRIA were to prevail, the statute would essentially be limited to authorizing execution against the blocked assets of agencies or instrumentalities of terrorist parties that are also the recognized governments of foreign states. But TRIA's text is not limited in that way—a point its Congressional sponsors and the Second Circuit have emphasized. *See Kirschenbaum*, 830 F.3d at 133 ("Individual terrorists and many terrorist organizations encompassed in the TRIA's definition of 'terrorist party' are distinguishable from FSIA foreign states and their agencies and instrumentalities in an important respect: they can be *non-state actors*."); *see also Stansell I*, 771 F.3d at 731 (same). As a result, the Report's interpretation of TRIA—that a state entity can be considered the agency or instrumentality of a nonstate terrorist party only if the terrorist party controls the entity by dint of its status as the legitimate government of the state—would rewrite and defang a statute designed to "punish[] [terrorists] financially" by "compensating victims." 148 Cong. Rec. 16399 (2002).[57]

Nor would finding that DAB is an agency or instrumentality of the Taliban imply that the Taliban itself "owns" the DAB Assets or is "entitled to" them. *See* Report 36. As is evident from

---

[57] It bears repeating that, in passing TRIA, Congress understood that nonstate terrorist entities can and sometimes do unlawfully commandeer a state's institutions. Congress wrote the statute in that context and in such a way that would permit execution against those institutions' assets. *See supra* at 40. Making the assets of a corrupted state institution subject to execution in no way implies that the nonstate terrorist entity is the government of the state, or that a previous government is not. Allowing execution against state assets illegitimately controlled by nonstate terrorists is also consonant with the goals of TRIA. One can imagine many situations in which a nation might fail to prevent an organ of the state from falling under the control of terrorists. Allowing that state organ's assets to be paid to the terrorist party's victims puts foreign states on notice that if they do not prevent their state agencies from being used by terrorists, their assets in the United States will be made available to terror victims. *See* 148 Cong. Rec. 16397 (2002) (statement of Rep. Chris Cannon) ("Unless the U.S. finds ways to make it more costly, terrorists and states which sponsor terrorism have less economic incentive to stop.").

the multipronged *Kirschenbaum* test, authorizing execution under TRIA does not require the Court to find that the Taliban "own[s]" DAB and its assets or is "entitled to" them by dint of being the government of Afghanistan. Once again, such a limited rule would make little sense in the context of a statute that covers nonstate terrorist organizations, which generally operate outside the bounds of the law. Indeed, *Kirschenbaum* recognizes a broader test that focuses on the *fact* of control rather than the *legal right* to control. Although ownership is one means under *Kirschenbaum* of establishing agency or instrumentality status, an entity can also be found to be an agency or instrumentality of a terrorist party if it is "controlled" or "used" by the terrorist party, or provides it with material services, or helps it achieve a material function. *See Kirschenbaum*, 830 F.3d at 135. So long as DAB qualifies as an agency or instrumentality of the Taliban under the *Kirschenbaum* test—which it must given that the Report has found that the "facts on the ground" are that the Taliban controls DAB—then TRIA simply does not call for the type of analysis the Report engaged in about whether allowing the Taliban's liability to be paid with DAB's assets implies that the Taliban is "entitled to" those assets. TRIA is satisfied whenever the assets sought are "the blocked assets of any agency or instrumentality" of the terrorist judgment debtor. In every such case, those assets "*shall*" be subject to execution. TRIA § 201(a) (emphasis added).

In short, applying TRIA would not require the Court to take the position that the Taliban is the lawful government of Afghanistan. The Court need only find that the Taliban controls DAB—a finding that the Report has already made—and the *Kirschenbaum* test is satisfied.[58]

### 2.    The Court's Finding That The Taliban Controls DAB Would Not Unconstitutionally Infringe On The President's Recognition Power

The Report committed further legal error in assuming that its findings with respect to the

---

[58] The executive branch has also already acknowledged the Taliban's control over DAB. *See* Expert Declaration of William Burke-White ("Burke-White Decl.") ¶ 28.

Taliban's control over DAB would amount to an unconstitutional judicial usurpation of the President's exclusive authority to recognize foreign governments. It has long been understood that "[d]ecisions by courts in the United States to the effect that unrecognized regimes have certain powers to act within the territory controlled by them . . . do not constitute recognition of such regimes." *Restatement (Second) of Foreign Relations Law* § 106, cmt. b (1965). There is thus a crucial distinction, overlooked by the Report, between acknowledging that as a factual matter "the Taliban *acts as* a government," *see* Report 34 (emphasis added), and formally bestowing upon the Taliban official legal status as the recognized government of Afghanistan in the eyes of the United States. *See Salimoff & Co. v. Standard Oil Co. of New York*, 262 N.Y. 220, 227 (1933) ("The courts may not recognize the Soviet government as the *de jure* government until the State Department gives the word. They may, however, say that it is a government. . . .").

As noted in the preceding section, the Court need not find that the Taliban exercises control over DAB "*as a government*," but even if it did find that the Taliban is acting as the *de facto* government of Afghanistan, such a finding would not "bestow[] [the United States'] governmental recognition" on the Taliban. Report 35. Under international law, "[r]ecognition of a government is *formal* acknowledgment that a particular regime is the effective government of a state," *Restatement (Third) of Foreign Relations Law* § 203, cmt. a (1987) (emphasis added). In the United States, "recognition may be effected by different means, but each means is dependent upon Presidential power." *Zivotofsky*, 576 U.S. at 13. Most commonly, a state recognizes a foreign government via an express, unambiguous, written or oral declaration by the organ of the recognizing state that wields the executive power. *See* Burke-White Decl. ¶ 7; *see also Restatement (Second) of Foreign Relations Law* § 106, cmt. a. Recognition can also be bestowed tacitly, but only through a narrow set of acts that clearly manifest the recognizing state's intent to grant

48

recognition, such as concluding a treaty or exchanging ambassadors. *Id*. ¶¶ 10-13.

It is only these "formal" acts of recognition, whether express or implied, that implicate the Constitutional separation of powers. Judicial or legislative acts short of the formal act of recognition are not constitutionally problematic. As the Supreme Court made clear in *Zivotofsky*, the President's "exclusive power extends no further than his *formal* recognition determination." 576 U.S. at 30 (emphasis added). Congress can, for example, decline to pay for an embassy or refuse to confirm an ambassador to a foreign government it finds to be illegitimate. It could even declare war on a state whose government the President has recognized to express its view that the government is not legitimate. *See id*. These acts are constitutionally permissible because they do not "alter the President's recognition decision." *Id*. There is thus nothing constitutionally problematic about a judicial finding that the Taliban controls DAB. Such a judicial determination would not touch any of the attributes of either an explicit or an implied act of recognition and would not impact the President's own determinations regarding recognition.

In reaching the opposite conclusion, the Report misreads *Zivotofsky*, drawing from its facts a principle of law that a federal court may not "by implication" suggest that a particular regime is the government of a state. *See* Report 30-31. But this reading mischaracterizes the actual constitutional problem the Supreme Court identified with the passport statute at issue in that case. The *Zivotofsky* litigation centered on a dispute about whether Congress could command the President to print "Jerusalem, Israel" in the passports of Jerusalem-born U.S. citizens, notwithstanding the President's refusal to recognize Israel's claim of sovereignty over Jerusalem. The Supreme Court saw the statute at issue not, as the Report describes it, as "little more than a requirement that the President accommodate private citizens' requests on their passports," Report 31, but rather as a Congressional mandate that the Secretary of State issue a formal document

amounting to an "official executive statement implicating recognition." *Zivotofsky*, 576 U.S. at 30. The problem, in other words, was not that the statute expressed Congress's own view that Israel exercised sovereignty over Jerusalem; it was that Congress required *the President himself*, via his agent the Secretary of State, to contradict the executive branch's longstanding policy on Jerusalem's status in a formal U.S. document issued by the executive branch. *See id.* at 21 (because "the *President's* position [on recognition] must be clear," Congress "cannot require him to contradict his own statement regarding a determination of formal recognition") (emphasis added).

Here, by contrast, none of the *Zivotofsky* concerns are present. A judicial finding that the Taliban controls DAB would not put any words in the President's mouth and would not require the executive branch to say or do anything that would amount to recognizing the Taliban. Nor would the Court's finding force the President to contradict any earlier position he has taken or preclude him from at a later moment in time deciding to recognize any particular government of Afghanistan. Nor could a judicial opinion be perceived in the eyes of the international community as extending the United States' recognition to the Taliban. It would accord the Taliban none of the entitlements or benefits of formal recognition by the United States. These distinctions are crucial. A Westlaw search for judicial opinions mentioning "Jerusalem, Israel"—the same exact two words whose mandatory inclusion on a U.S. passport was held to be unconstitutional in *Zivotofsky* because it forced the President to contradict himself—reveals dozens of cases. *E.g., Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 96 (D.D.C. 2012) (referring to a suicide bombing in "Jerusalem, Israel"); *Menechem v. Frydman-Menachem*, 240 F. Supp. 2d 437, 439 (D. Md. 2003) (noting that the petitioner "resides in Jerusalem, Israel"). Nobody thinks that those federal court opinions implicitly bestowed the United States' formal recognition of Israeli sovereignty over Jerusalem and thereby violated the constitutional separation of powers.

Finally, a judicial finding that the Taliban controls DAB would be fully aligned with the executive branch's positions, which have consistently acknowledged the fact of the Taliban's control over Afghanistan while refraining from recognizing the Taliban or any other entity as the government of Afghanistan.[59] Indeed, the very reason the United States blocked the DAB Assets was to prevent the Taliban from accessing the funds as a result of its practical control over DAB. Giving effect to TRIA and ordering turnover would no more recognize the Taliban as the legitimate Afghan government than the United States did when it blocked the funds.

Particularly "[i]n the absence of a Presidential decision" as to the legitimate government of Afghanistan, the courts are not required to be blind to the realities on the ground in Afghanistan—and they may even "decide whether to treat . . . a foreign regime as a government, where such a determination is necessary for the purposes of a case before the court." *Restatement (Third) of Foreign Relations Law* § 204, cmt. a. In short, a judicial finding that DAB is a Taliban instrumentality would not be constitutionally problematic under *Zivotofsky*, because it would not impact the United States' position on the status of Afghanistan's government.[60]

---

[59] According to the State Department, "[t]he United States has not yet made a decision as to whether to recognize the Taliban or any other entity as the Government of Afghanistan." *See* State Dep't, *U.S. Relations With Afghanistan* (Aug. 15, 2022), https://www.state.gov/u-s-relations-with-afghanistan/. At the same time, President Biden has explained that the "Taliban seized power" in Afghanistan, *see* Remarks on the End of United States Military Operations in Afghanistan, 2021 DAILY COMP. PRES. DOC. 693 (Aug. 31, 2021), and Secretary Blinken has called the Taliban the "de facto government of Afghanistan," *see House Foreign Affairs Committee Holds Hearing on Afghanistan*, CQ Congressional Transcripts (Sept. 13, 2021). *See also* Burke-White Decl. ¶¶ 28-30.

[60] The Report purports to protect the executive branch's power, yet neither the President nor the Department of Justice have asserted the position that the Joint Creditors could never prevail in this litigation because to do so the Court would have to usurp the Executive's exclusive constitutional powers. To the contrary, Executive Order 14,064 reflected President Biden's understanding of "the importance of ongoing efforts by victims of terrorism . . . to pursue [their] claims in court," and his view that the victims should have "a full opportunity" to have their claims heard. *See* White House, *supra* note 4. If the President shared the Report's view that the outcome of this litigation was predetermined because of separation of powers concerns, he would not have made clear that he expected the Court to exercise its authority to adjudicate the victims' claims in the first instance. Although the DOJ's statement of interest noted that for the judgment creditors to prevail, they would need to "establish a theory" of their entitlement to execute on the assets without requiring the Court to "make its own determination as to the identity of Afghanistan's government," Dkt. 7661 at 27, the Joint Creditors have made clear why no such determinations are required here. *See supra* Part IV.C.1. The Court should not now abstain from adjudicating this case out of deference to the President's Constitutional authority when the President has stated that the Joint Creditors' claims should be heard.

### D.    There Is No "Nonconsensual" Exception To Agency Or Instrumentality Status Under TRIA

The Report's final basis for recommending denial of turnover is that DAB cannot be an "agency or instrumentality" of the Taliban under TRIA unless its relationship with the Taliban is "consensual, or at least not adversarial." Report 40. As noted above and in their motion papers, the Joint Creditors' have amassed overwhelming, undisputed evidence that DAB is an agency or instrumentality of the Taliban under controlling Second Circuit precedent interpreting TRIA. *See supra* Part IV.A. The Report accepted this evidence, finding that "the facts on the ground" are that "the Taliban is using their control of DAB to advance their aims." Report 33-34. Rather than adopt the conclusion to which such a finding inexorably leads—that the Joint Creditors are entitled to turnover—the Report instead concludes that an entity can only be an "agency or instrumentality of [a] terrorist party" under TRIA if its relationship with the terrorist party is consensual.

In reaching this conclusion, the Report reads into TRIA a new statutory requirement that appears nowhere in the text, contravenes decisions of courts in this Circuit and the Eleventh Circuit, and undermines the scheme adopted by Congress to compensate victims from assets that would otherwise be available for use by the terrorists who harmed them. The Report also makes erroneous factual assumptions to support its conclusion that the Taliban-DAB relationship is adversarial, disregarding the record evidence that DAB is a willing instrumentality of the Taliban.

### 1.    TRIA Does Not Require That Agencies Or Instrumentalities Have A Consensual Relationship With The Terrorist Party

The Report's consent requirement has no basis in either the text of TRIA or the cases interpreting it. The Report notes with some support that an *agency* relationship must generally be a consensual one, but then mistakenly concludes that "agency" and "instrumentality" under TRIA mean the same thing, such that being an "instrumentality" also requires consent. Report 38-40. This contention fails as a matter of common sense and is contrary to the persuasive conclusions of

the Eleventh Circuit and Judge Forrest that an entity can be an "instrumentality" of a terrorist party without knowledge (and therefore necessarily without consent). *See Stansell II*, 45 F.4th at 1354 (finding "no indication that to be an instrumentality [under TRIA] one must know the person or entity seeking the end result," and noting that "instrumentality" has "been used to refer to unwitting cogs in a criminal scheme"); *see also Kirschenbaum v. 650 Fifth Ave.* (*Kirschenbaum II*), 257 F. Supp. 3d 463, 523 (S.D.N.Y. 2017) ("As a matter of law, however, this Court does not believe knowledge of instrumentality status is a required element for a TRIA § 201(a) claim; . . . people or entities may become the unwitting instruments of another."), *rev'd and remanded on other grounds sub nom. Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019).

The first problem with the Report's interpretation is that, by giving "agency" and "instrumentality" the same meaning under the statute, the Report renders the inclusion of "instrumentality" a nullity and violates the basic principle that courts must be "reluctan[t] to treat statutory terms as surplusage." *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 698 (1995). The Second Circuit has said that where, as in TRIA § 201(a), "two words . . . are connected by 'or' rather than 'and,' and when no commas set off the second word to suggest that it stands in apposition to the first, [courts should] construe the disjunctive words to convey different meanings." *Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings."). Had Congress wished to make available for execution only the assets of consenting, fiduciary agents of terrorist judgment debtors, it would have omitted the word "instrumentalities," the legal definition of which at the time of TRIA's passage was simply "any means of accomplishing an end." *Stansell II*, 45 F.4th at 1352.

To address this problem, a footnote in the Report suggests that any "concerns about . . .

surplusage" could be "eliminate[d]" if one "imagine[s] a[n] interpretation in which an 'instrumentality' is an inanimate object such as a boat used by terrorists, and so seized by judgment creditors, where an agency relationship is then inapplicable." Report 41 n.13. But TRIA does not allow judgment creditors to "seize" terrorist instrumentalities themselves; it allows creditors to execute against "the blocked assets *of*" such instrumentalities. An inanimate object such as a boat cannot own blocked assets, and thus cannot be what Congress had in mind when enacting the statute. Nor is the Report's interpretation of instrumentality to mean an inanimate object reconcilable with the Second Circuit's understanding of an instrumentality as an entity that is "analogous to a branch of a governing body." *Kirschenbaum*, 830 F.3d at 135.

Next, although the Report cites *Kirschenbaum* to support its proposition that "the concept of agency" is an "essential element of being an instrumentality," Report 39, *Kirschenbaum* in fact confirms the opposite view. The Report cites a passage from that opinion which discusses several dictionary definitions of "instrumentality" that incorporate the concept of agency. *See id.* (citing *Kirschenbaum*, 830 F.3d at 135). But each of these definitions disproves the conclusion that agency is an "essential element" of instrumentality. In three of the definitions cited by the Second Circuit, the word "agency" or "agent" is proceeded by a disjunctive "or." In the fourth—"a means, an agency"—the disjunctive is implied by giving two alternatives separated by a comma. These definitions suggest that some agents of a party may also be that party's instrumentality, but that the definition of instrumentality is broader and can refer to any "means" by which a party accomplishes something. That is, in fact, the meaning that the Second Circuit synthesized from the definitions. *See Kirschenbaum*, 830 F.3d at 135 ("'Instrumentality' is a means through which a function of another entity is accomplished, analogous to a branch of a governing body.")[61]

---

[61] The Report also draws from *Kirschenbaum* the notion that "agency and instrumentality" should be given a "common

(cont.)

Third, the Report's interpretation is at odds with the policies underlying TRIA—to make assets of terrorists available to their victims, thereby preventing those assets from being used by terrorists and reducing the financial incentives for terrorists to seize entities and turn them into instrumentalities of terror. As Judge Forrest noted in *Kirschenbaum II*, "[t]he legislative intent in enacting the TRIA does not support a knowledge requirement, even for a passive instrumentality," because of Congress's "intent to cast a broad net to effectuate deterrence." 257 F. Supp. 3d at 523. And as the Eleventh Circuit concluded in *Stansell II*, the goal of TRIA was to "make[] it easier for victims of terrorism to collect on judgments obtained against terrorist organizations," and this goal is "furthered by allowing the execution and attachment of assets belonging to instrumentalities who were unaware of the terrorist party or parties involved." 45 F.4th at 1354. It is not for the courts to second guess Congress's choice to prioritize compensation for victims. It would defeat Congress's goals to require that terror victims prove that the agency or instrumentality is a consenting partner of the terrorist party. It would also be illogical: there is inherently an element of coercion or intimidation when terrorist entities exercise control over other people and entities— *terror* is, after all, how they operate.

The only support the Report marshals for its conclusion that "[a]n agency requirement . . . aligns with Congress' purpose in passing TRIA," is the statement in *Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 940 (D.C. Cir. 2013), that Congress could not have intended to allow an

---

usage" definition rather than a "legal definition[]"—recognizing that there is a distinction between what each term means as a legal term of art—because the Second Circuit "defined instrumentality by reference to common usage and general-purpose dictionaries." *See* Report 41, n.13 (citing 830 F.3d at 135). But as the passage excerpted on page 39 of the Report itself demonstrates, *Kirschenbaum* was not merely concerned with common usage; the first dictionary the Second Circuit consulted was Black's Law Dictionary. *See* 830 F.3d at 135. In any event, as the Eleventh Circuit concluded, "[u]sing the legal understanding of [agency and instrumentality] is textually appropriate and preferable because it prevents [the two terms] from being superfluous to each other." *Stansell II*, 45 F.4th at 1353. And as shown in the preceding paragraphs, even the "common usage" understanding of "instrumentality"—namely, a means through which a person or entity accomplishes a goal—would not support the Report's conclusion regarding consent.

"innocent part[y]" to pay the debts of a terrorist. Report 40. But *Heiser* does not support the Report's consent requirement. The statement in *Heiser* about "innocent parties" had nothing to do with the question of when an entity is properly considered an agency or instrumentality of a terrorist party, but rather with the question of what degree of ownership TRIA requires for property to be considered the "assets of" a terrorist party. *See Heiser*, 735 F.3d at 939 ("[I]f the debtor does not own that property, then someone else must. And that someone could, and very well might, be an innocent person who then unjustly bears the costs of the debtor's wrong."). Here, of course, there is no question that DAB owns the blocked assets, and there is also no question that were DAB to regain access to those assets, the Taliban would dictate how they are used. *See* Dkt. 8019 at 14-15 (explaining that DAB indisputably has a property interest in the blocked assets and discussing why *Heiser* is not an obstacle to turnover). Indeed, it was precisely to prevent DAB and the Taliban from having access to these assets that the President blocked them. *See* Fact Sheet: *Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan*, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/ (E.O. 14,064 is "designed to . . . keep[] [the DAB Assets] out of the hands of the Taliban and malicious actors"). Awarding the assets to the Taliban's victims would thus not be, as the Report suggests, reducing the Taliban's liability with other people's money. It would rather be—as Congress intended—forever depriving the Taliban of funds over which it might otherwise gain control.[62]

---

[62] The notion that the Taliban would benefit from the blocked assets being used to satisfy terror victims' judgments against it is belied by its reaction to these proceedings. The Taliban has publicly denounced these proceedings, revealing that its preference would be for the assets to remain blocked such that it might one day obtain access to them. *See* Dkt. 7784 at 7 (collecting Taliban statements protesting this litigation).

## 2.      DAB Is Not An Unconsenting Instrumentality Of The Taliban

Even assuming, *arguendo*, that an "agency or instrumentality of a terrorist party" under TRIA must have a consensual relationship with the terrorist party, that principle would not support the denial of turnover. The Report assumes that DAB and the Taliban cannot have a consensual relationship because the "Taliban destroyed the Republic [of Afghanistan] in battle and occupies its central bank by force." Report 41. But in reaching that conclusion, the Report overlooks undisputed record evidence that DAB is willingly serving as an instrument of the Taliban.

To begin, it is textbook law that a corporation can act only through its employees or agents, *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017), such that DAB has no independent will apart from the individuals running it. Today, DAB's top officers are themselves Taliban leaders who, by every indication, have intentionally brought DAB into the Taliban fold. Two of DAB's top leaders are sanctioned for terrorist activities undertaken as members of the Taliban.[63] The Taliban Council of Ministers directs DAB policy, and the Taliban's Deputy Prime Minister has chaired DAB meetings.[64] The Taliban flag quite literally hangs over those meetings.[65] It is thus clear that DAB's leadership knows of and consents to the bank's control by the Taliban.[66]

More strikingly, the record reflects that even certain DAB leaders who were *not* installed by the Taliban consented to the Taliban's control of DAB. Individuals appointed under Afghanistan's previous government to DAB's Supreme Council—the bank's "highest decision-

---

[63] *See* Zerden Decl. ¶¶ 59-82.

[64] *Id*. ¶¶ 92-95, 139.

[65] *Id*. ¶¶ 72, 95, 116, 118, 119.

[66] How the Taliban initially secured control of DAB has nothing to do with whether DAB is currently its agency or instrumentality. If, to use the Report's analogy, bank robbers (say, in the form of organized crime) unlawfully took control of a bank and then installed compatriots to continue to run the bank, the bank would plainly be operating as an instrumentality or agent of the unlawful enterprise. Myriad RICO and money laundering prosecutions in the financial sector rest on just that conclusion.

making and policy-making body," *see* Dkt. 7784 at 12—have continued to work as directors under the Taliban. This includes directors not physically located in Afghanistan—like U.S. resident Dr. Shah Mehrabi—and therefore arguably beyond the reach of direct Taliban coercion. *See* Dkt. 7784 at 13 (citing interviews with Dr. Mehrabi in which he continues to refer to himself in the present tense as a member of DAB's Supreme Council and chairman of its audit committee). The Los Angeles Times identified Dr. Mehrabi as recently as September 2022 as "a Washington-based member of the Afghan central bank's governing board who was appointed by the previous government but continues serving under the Taliban," and Dr. Mehrabi himself says that he is "still doing [his] job" and is "constantly in contact with the central bank."[67] These facts demonstrate that, if consent is indeed required under TRIA, the Judgment Creditors have put forward sufficient and undisputed evidence to establish DAB's consent.

It was further error for the Report to have reached its conclusion without any sort of evidentiary hearing or other opportunity for the movants to develop evidence of DAB's consent. That is especially so in light of the fact that, prior to the issuance of the Report, no court had pronounced a consent requirement for agencies and instrumentalities under TRIA, such that the judgment creditors had no reason to highlight evidence of consent in their motion papers. Given the record evidence described above, there is, *at the very least*, a dispute of material fact as to whether DAB has consented to Taliban control. And a court "must conduct a trial on disputed issues of fact on adverse claims in a turnover matter." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir. 1995) (internal citation and quotation marks omitted).

---

[67] *See* Nabih Bulos, *Afghanistan's Money is Crumbling to Pieces, Just Like its Economy*, Los Angeles Times (September 27, 2022), https://lat.ms/3M0HAf7; Interview by Steve Inskeep with Shah Mehrabi, NPR Morning Edition (Aug. 24, 2022), https://n.pr/3NM6D6L. The three other members of DAB's Supreme Council listed on the bank's website were also appointed prior to 2021. *See* Da Afghanistan Bank, Supreme Council, https://dab.gov.af/supreme-council2 (last visited Nov. 9, 2022).

## V.     Preservation Of The Joint Creditors' Rights Pending Appeal

Finally, if the Court is not prepared to sustain the Joint Creditors' objections, reverse the Report, and grant turnover, the Joint Creditors respectfully ask that it take two steps to protect the rights of thousands of 9/11 families during their subsequent appeal to the Second Circuit.

First, to guarantee that the Court of Appeals would have appellate jurisdiction to entertain an appeal from the denial of turnover, any order overruling these objections should formally take the form of a "judgment" or should otherwise make clear that it is an appealable final order. The Second Circuit has in at least one case dismissed an appeal from an order granting turnover because the turnover order was non-final. *See Vera v. Republic of Cuba*, 651 F. App'x 22, 24 (2d Cir. 2016). In "post-judgment litigation" pursuant to Rule 69(a), the "final decision" which may be appealed "is not the underlying judgment that the plaintiff is attempting to enforce, but the subsequent *judgment* that concludes the collection proceedings." *EM Ltd. v. Republic of Arg.*, 695 F.3d 201, 205 (2d Cir. 2012) (emphasis added). An example of such a "judgment" denying turnover in a TRIA case can be found at *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, No. 11-cv-3283 (S.D.N.Y. Dec. 8, 2011), Dkt. 32. Without conceding that such a formality is necessary,[68] the Joint Creditors request entry of such a "judgment" out of an abundance of caution.

Second, the Court should preserve the status quo pending appeal by directing that the DAB Assets continue to be restrained by the judgment creditors' writs of execution, such that they will be available in the event the Court of Appeals reverses. To the extent an order denying turnover

---

[68] In other cases, the Second Circuit has adjudicated appeals from orders denying or granting turnover even where the order did not take the form of a judgment. *See* Notice of Appeal, *N. Mariana Islands v. Millard*, No. 11-mc-99 (S.D.N.Y. Apr. 16, 2012), ECF No. 96 (appealing from Judge Kaplan's "Memorandum Opinion" denying turnover) and *N. Mariana Islands v. Canadian Imperial Bank of Com.*, 717 F.3d 266, 267 (2d Cir. 2013) (considering the appeal); Notice of Appeal, *Dussault v. Republic of Arg.*, 06-cv-13085, ECF No. 89 (S.D.N.Y. Nov. 7, 2014) (appealing from Judge Preska's "Order" denying turnover) and *Dussault v. Republic of Arg.*, 616 F. App'x 26 (2d Cir. 2015) (considering the appeal); Notice of Appeal, *Hausler v. JP Morgan Chase Bank, N.A.*, No. 09-cv-10289, ECF No. 512 (S.D.N.Y. Mar. 16, 2012) (appealing "Decision and Order" granting turnover) and *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014) (considering the appeal).

would dissolve the Joint Creditors' writs and restraining notices, the Court should stay such an order pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). In *Northern Mariana Islands v. Millard*, Judge Kaplan determined that the judgment creditor in a turnover proceeding was not entitled to turnover, but nonetheless found it appropriate, *sua sponte*, to leave in place restraints on the property pending appeal. *See* 287 F.R.D. 204, 215 (S.D.N.Y. 2012); *see also Tire Eng'g & Distrib. L.L.C. v. Bank of China Ltd.*, 740 F.3d 108, 112 (2d Cir. 2014) (district court stayed its order denying turnover pending appeal, "permitting the restraining notice to remain in place until the appeal was decided"). Here, as in *Millard,* the Joint Creditors and the more than 10,000 members of the 9/11 community who have joined the Framework Agreement will "face irreparable injury should the restraint dissolve, . . . continuing the restraint will not harm the interests of the [judgment debtor] in any way, and . . . the public interest lies in preventing the further dissolution or movement of assets in avoidance of a registered [] judgment." 287 F.R.D. at 215. Even if the Court is not ultimately persuaded by the instant Objections, it should have no trouble acknowledging, as Judge Kaplan did in *Millard*, that the judgment creditors' "argument[s] . . . have sufficient force amidst admittedly murky concepts to eventually have a fair chance of success on the merits." *Id*. For these reasons, in the event the Court adopts the Report or otherwise denies the turnover motions, the Joint Creditors respectfully ask it to stay its judgment pending appeal to preserve the status quo while the Joint Creditors seek appellate review.

## VI.   Conclusion

For the foregoing reasons, the Court should overrule the Report and grant the Joint Creditors' turnover motions as to the blocked assets of DAB (as an agency or instrumentality of the Taliban) held by the FRBNY in an amount sufficient to satisfy their awards of compensatory damages pursuant to Section 201(a) of TRIA, enabling a broad distribution to the more than 10,000 family members of September 11 victims who have joined the Framework Agreement.

Dated: November 10, 2022

/s/ Lee Wolosky

Lee Wolosky
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1628
lwolosky@jenner.com

Douglass A. Mitchell (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6090
dmitchell@jenner.com

Timothy B. Fleming (DC Bar No 351114)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB PLLC
2202 18th Street, NW, #110
Washington, DC 20009-1813
(202) 467-4489

Dennis G. Pantazis
(AL Bar No. ASB-2216-A59D)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB, LLC (Lead Counsel)
301 19th Street
North Birmingham, AL 35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN 46260
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
FOOTE, MIELKE,
CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
(630) 232-7450

Stuart H. Singer (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Phone 954 356 0011
Fax 954 356 0022

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Phone 212 446 2300

*Counsel for the Havlish Creditors*

/s/ Orlando do Campo
Orlando do Campo
John Thornton (*pro hac vice*)
Daniela Jaramillo (*pro hac vice*)
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
od@dandtlaw.com

*Counsel for Judgment Creditors John Does 1-7*

/s/ Sean P. Carter, Esq.
Sean P. Carter, Esq.
Stephen A. Cozen, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 665-2105
scarter1@cozen.com

*Counsel for Judgment Creditors Federal
Insurance Co., et al.*

/s/ James Edwin Beasley
James Edwin Beasley
The Beasley Firm, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215)-592-1000
jbj@beasleyfirm.com

*Counsel for Judgment Creditors Estate of Smith, et al.*