# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |

| | |
|---|---|
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*, <br><br> Creditors, <br><br> v. <br><br> THE TALIBAN, *et al.*, <br><br> Debtors, <br><br> FEDERAL RESERVE BANK OF NEW YORK, <br><br> Garnishee. | Case No. 03-cv-9848 (GBD)(SN) |
| JOHN DOES 1 THROUGH 7, <br><br> Creditors, <br><br> v. <br><br> THE TALIBAN, *et al.*, <br><br> Debtors, <br><br> FEDERAL RESERVE BANK OF NEW YORK, <br><br> Garnishee. | Case No. 20-mc-0740 (GBD)(SN) |

| | |
|---|---|
| FEDERAL INSURANCE CO., *et al.*, | Case No. 03-cv-6978 (GBD)(SN) |
|       Creditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|       Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|       Garnishee. | |
| ESTATE OF GEORGE E. SMITH, *et al.*, | Case No. 01-cv-10132 (GBD)(SN) |
|       CreditorCreditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|       Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|       Garnishee. | |

## EXPERT DECLARATION OF WILLIAM W. BURKE-WHITE

### I.    Introduction and Qualifications

1.    My name is William Burke-White. I am submitting this declaration in my capacity as an expert consultant to the judgment creditors in the above-captioned actions.

2.    I am Professor of Law at the University of Pennsylvania Carey School of Law, where I have taught since 2005. From 2009-2011, I served on Secretary of State Hillary Clinton's Policy Planning Staff at the United States Department of State. In that capacity, I provided direct guidance to the Secretary of State on issues including international law, international institutions, and US foreign relations. From 2019-2021, I was Visiting Fellow at the Brookings Institution in

Washington, D.C. where I worked on issues of international law and US foreign relations law. From 2014-2019 I served as the Richard Perry Professor and Inaugural Director of Perry World House, the University of Pennsylvania's foreign policy and global affairs research institute. Earlier in my career, I taught at Princeton University's School of Public and International Affairs from 2003-2005. I have also been a Visiting Professor at institutions including Harvard Law School, The Hebrew University of Jerusalem, the Max Plank Institute of International Law in Heidelberg, Germany, and the Moscow State Institute of International Relations. I have written and published widely in both academic and policy journals on topics including US foreign policy, international investment law, international human rights law, and US national security law.

3.    I hold a Ph.D. and an M.Phil. from the University of Cambridge, where I was a J. William Fulbright Scholar, a *Juris Doctorate* from Harvard Law School (*magna cum laude)*, and an A.B. from Harvard College (*magna cum laude)*.

4.    I have been asked to opine on the mechanisms by which a state extends diplomatic recognition to a foreign government and U.S. practice in that regard. In my expert opinion, a judicial opinion that acknowledges the Taliban's *de facto* control over Afghanistan and Afghan state institutions, including Da Afghanistan Bank, would not and could not interfere with the President's exclusive recognition authority or imbue the Taliban, implicitly or otherwise, with status as Afghanistan's recognized or legitimate government. As I explain in further detail below, recognition of a foreign government is a formal act that is circumscribed by form, and can generally be accomplished only by express, unambiguous statements or a narrow subset of diplomatic actions. It is thus entirely appropriate, and consistent with both U.S. and international

law, for a court to acknowledge that an unrecognized, *de facto* government exercises control over state institutions and territory.

## II. To Ensure Clarity in the Functioning of the International System, the Mechanisms of Diplomatic Recognition are Circumscribed by Form and Technicality

5.      International law establishes a strict set of requirements for statehood based on whether the entity in question has a "permanent population," a "defined territory," a "government," and the "capacity to enter into relations with other states."[1] While the satisfaction of these criteria qualify an entity as a state under international law, every government has complete discretion as to whether to undertake the formal act of recognizing a new state or government. In modern practice, countries often condition recognition on a range of factors, including the means through which a government came to power and its commitment to the protection of international human rights.[2] This discretion allows a state to avoid formal recognition of malign actors that may control a state and to encourage such entities to improve their behavior.[3]

6.      Once a state has made the decision as to whether or not to formally recognize a foreign government, the effective functioning of the international legal and diplomatic system demands that such government have clarity as to its status in the eyes of other states. Clear indications of whether a government has been formally recognized by another state allow it, for

---

[1] Montevideo Convention on the Rights and Duties of States art. 1, Dec. 26, 1933, 165 L.N.T.S. 19.
[2] *Declaration on the `Guidelines on the Recognition of New States in Eastern Europe and in the Soviet Union'*, Dipublico (Oct. 15, 2010), https://www.dipublico.org/100636/declaration-on-the-guidelines-on-the-recognition-of-new-states-in-eastern-europe-and-in-the-soviet-union-16-december-1991/ (last visited Nov. 9, 2022).
[3] James Crawford, Brownlie's Principles of Public International Law 142 (9th ed. 2019).

example, to know in advance whether its ambassadors will be accorded diplomatic immunity.[4] To ensure that needed clarity, the recognition of foreign states and governments is undertaken through highly specific diplomatic and legal forms and processes. International law requires that for recognition to be effective, a state must manifest an *intent* to recognize the foreign state or government. Article 7 of the Montevideo Convention on the Rights and Duties of States—the critical international legal instrument on point—provides that recognition turns on "the intention of recognizing the new state."[5] In diplomatic practice, only a narrow set of acts manifest such intent in a way that is clear to the rest of the international community.

7.     Typically, recognition involves an express, unambiguous statement by the recognizing government. As Moore's influential *Digest of International Law* (1906) makes clear: recognition generally takes the form of an express "written or oral declaration."[6] So too, Ian Brownlie, the former Chichele Professor of International Law at Cambridge, explains that the "most common form of recognition … involves the sending of a letter or telegram of felicitations by a Head of State to the Head of State or other appropriate organ of the new state."[7] The formal and specific nature of recognition of foreign states and governments is confirmed by the Restatement (Third) of the Foreign Relations Law of the United States: "Recognition of a government is formal acknowledgment that a particular regime is the effective government of a state and implies a commitment to treat that regime as the government of that state."[8]

---

[4] *Zivotofsky ex rel. Zivotofsky v.* Kerry, 576 U.S. 1, 11 (2015) (citing 1 J. Moore, Digest of International Law §27 72 (1906))..

[5] *Id.* at 7.

[6] *Id.* at 11 (quoting 1 J. Moore, Digest of International Law §27 73 (1906)).

[7] Ian Brownlie, *Recognition in Theory and Practice*, 53 British Y.B. Int'l L. 197 (1982) [hereinafter Brownlie 1982]..

[8] Restatement (Third) of Foreign Relations Law § 203 cmt. a (Am. L. Inst. 1987).

8.      Throughout modern US diplomatic history, recognition of both states and governments has taken the form of express statements by the US executive. For example, when the US government officially recognized the State of Israel on January 31, 1949, the White House issued a note stating that the United States was "pleased to extend *de jure* recognition to the Government of Israel."[9] When President Carter recognized the Communist government in China, he announced, "The United States of America recognizes the Government of the People's Republic of China as the sole legal Government of China."[10] More recently, when the US recognized Kosovo on February 18, 2008, Secretary of State Condoleezza Rice issued the following statement: "The United States has today formally recognized Kosovo as a sovereign and independent state."[11] On July 9, 2011, President Obama issued a statement recognizing South Sudan: "I am proud to declare that the United States formally recognizes the Republic of South Sudan as a sovereign and independent state upon this day, July 9, 2011."[12]  On January 23, 2019, President Trump declared that he was "officially recognizing the President of the Venezuelan National Assembly, Juan Guaido, as the Interim President of Venezuela" and noted his view that the National Assembly was "the only legitimate branch of government duly elected by the Venezuelan people."[13]

---

[9] Israel, 1963 Digest of International Law, ch. 3, §25, at 169; *see also*, Charles L. Cochran, *De facto and de jure recognition: Is there a difference?* 62 Am. J. Int'l L. 457, 458 (1968).

[10] Terence Smith, *Link to Taiwan Ends*, N.Y. Times, Dec. 16, 1978, at 1, https://www.nytimes.com/1978/12/16/archives/link-to-taiwan-ends-carter-in-tv-speech-says-we-recognize-reality.html.

[11] Press Release, Condoleezza Rice, U.S. Secretary of State, U.S. Recognizes Kosovo as Independent State (Feb. 18, 2008).

[12] Press Release, Office of the Press Secretary, White House, Statement of President Barack Obama Recognition of the Republic of South Sudan (July 9, 2011).

[13] Press Release, Office of the Press Secretary, U.S. Embassy & Consulate in Ecuador, Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela (Jan. 23, 2019).

9.     Such clear and unequivocal statements of recognition are critical for both international law and the effective conduct of US foreign affairs. Unambiguous statements of recognition put foreign governments on notice that a state has been recognized and therefore has had its international legal personality accepted "with all the rights and duties determined by international law."[14] As the Supreme Court observed in *Zivotofsky v. Kerry*, "Foreign countries need to know, before entering into diplomatic relations or commerce with the United States, whether their ambassadors will be received; whether their officials will be immune from suit in federal court; and whether they may initiate law suits here to vindicate their rights. These assurances can not be equivocal."[15] So too, clarity of recognition allows the recognizing government to act consistently and coherently toward a foreign state, "speak[ing] ... with a single voice."[16] Hence, the US executive has consistently relied on clear, formal, and unambiguous statements to recognize foreign states and governments.

10.     Beyond written or oral declarations of recognition, a narrow category of diplomatic acts can themselves be deemed a form of tacit recognition.  Again, such acts must clearly manifest the *intent* of the recognizing state to grant recognition through the act in question. The Montevideo Convention provides that tacit recognition only arises where there is a clear "intention of recognizing the new state."[17] Similarly, Brownlie explains that the "correct approach" to determine if an act constitutes recognition is to look to the "intention of the government concerned on the basis of the documents and other evidence."[18]

---

[14] Montevideo Convention on the Rights and Duties of States, *supra* note 1, 165 L.N.T.S. at 25.
[15] *Zivotofsky*, 576 U.S. at 11.
[16] *American Insurance Ass'n* v. *Garamendi*, 539 U.S. 396, 424 (2003).
[17] Montevideo Convention on the Rights and Duties of States, *supra* note 1, 165 L.N.T.S. at 25.
[18] Brownlie 1982, *supra* note 7, at 199.

11.    In diplomatic practice, only a select few acts carry the necessary intent of recognition. The two most notable are "concluding a bilateral treaty or by sending or receiving diplomatic agents."[19] Limiting tacit recognition to these two categories of acts is well founded in international law and diplomacy. In his seminal 1947 volume on the topic, Hersh Lauterpacht QC, a judge on the International Court of Justice, explains: "only the conclusion of a bilateral treaty, the formal initiation of diplomatic relations, and, probably, the issue of consular exequaturs, justify the implication" of recognition.[20] It is only acts such as these, according to Story's *Commentary on the Constitution of the United States* that constitute an "acknowledgment of the sovereign authority … of such new nation, or party."[21] Critically, the act of receiving a foreign ambassador, like the act of entering into a treaty, is broadly understood by all states as constitutive of recognition. Acts short thereof are not. As the Swiss Jurist Emirch de Vattel wrote in the *Law of Nations* in 1758, "Every sovereign state then has a right to send and to receive public ministers; for they are necessary instruments in the management of those affairs which sovereigns have to transact with each other."[22] The act of entering into a bilateral treaty with a foreign sovereign necessarily implies a recognition of that state and its government because only sovereign states and their rightful governments have the international legal personality necessary to enter into a treaty.[23]

---

[19] Ian Brownlie, Brownlie's Principles of Public International Law 93 (7th ed. 2008) (hereinafter Brownlie 2008).

[20] Hersch Lauterpacht, Recognition in International Law 406 (1947, reprt. 2013).

[21] 3 J. Story, Commentaries on the Constitution of the United States §1560, 416 (1833).

[22] Emer de Vattel, The Law of Nations; or, Principles of the Law of Nature Applied to the Conduct and Affairs of Nations and Sovereigns 80 (1805).

[23] Vienna Convention on the Law of Treaties art. 6, May 23, 1969, 1155 U.N.T.S. 331.

12.   Other acts that may involve engagement with an unrecognized state should not and do not imply recognition.  To suggest otherwise undermines the clarity of the recognition doctrines in international law and the effective functioning of the diplomatic system. Construing other ambiguous acts as indicators of formal recognition would prevent governments from undertaking the necessary maintenance of foreign affairs with entities that they have decided – for whatever reason in their discretion – not to recognize. Again, Lauterpacht explains: "No recognition is implied from negotiations, unofficial representation, the conclusion of a multilateral treaty to which the unrecognized entity is also a party, admission to an international organization … or participation with the entity concerned at an international conference."[24] Avoiding any presumption of recognition allows countries to carry on necessary diplomacy and foreign affairs without unintentionally engaging in recognition.

13.   US law and diplomacy likewise affirm the narrow category of acts that can constitute recognition. The reporters' notes to Section 204 of the Restatement (Third) of Foreign Relations Law provide: "the President may exercise his power of recognition either expressly or by implication. Recognition of a state has been affected by express official declaration, by the conclusion of a bilateral agreement with the state, by the presentation of credentials by a United States representative to the authorities of the new state, and by receiving the credentials of a diplomatic representative of that state."[25] Other acts should not be construed as implying recognition. The Restatement makes clear, for example, that the mere "fact that the United States is a member of an international organization of which a state it does not recognize is also a member does not imply recognition of that state by the United States…"[26]

---

[24] Lauterpacht, *supra* note 20, at 406.
[25] Restatement (Third) of Foreign Relations Law § 204 reporters' note 2 (Am. L. Inst. 1987).
[26] *Id.*

14.    While these forms of tacit recognition were more common in the early years of US history, in contemporary practice they have been almost exclusively supplanted by formal written or oral statements of recognition. While the *Zivotofsky* opinion references that "President Washington recognized the French Revolutionary Government by receiving its ambassador,"[27] the modern US executive almost exclusively grants recognition through formal written statements.[28]

### III.    International Law Permits Broad Engagement With Non-recognized Governments, and Gives Legal Effect to Their Actions

15.    The pursuit of foreign policy interests and the maintenance of international peace and security require governments to engage with a wide range of foreign actors, including potentially malign actors that a government may not wish to formally recognize. International law gives effect to the acts of a government where it has become the *de facto* authority in a territory, even where it is not formally recognized by other countries. In so doing, a legal fiction is established through which the acts of the *de facto* government are treated as authoritative, *even vis-a-vis* a country that refuses to formally recognize it. The Restatement (Third) of Foreign Relations explains: "Formal recognition of a government, like formal recognition of a state, is not mandatory, but there is a duty to treat as the government a regime that is the government in fact … Treating a regime as a government includes accepting its acts as creating international rights and obligations."[29]

16.    Given the discretion states enjoy in deciding whether to formally recognize another state and the imperative of conducting foreign affairs with the full range of governments,

---

[27] *Zivotofsky*, 576 U.S. at 12.
[28] L. Thomas Galloway, Recognizing Foreign Governments: The Practice of the United States (1978).
[29] Restatement (Third) of Foreign Relations Law § 203 cmt. b (Am. L. Inst. 1987)

the international legal and diplomatic systems expressly facilitate broad engagement with non-recognized states and governments. Engagement with governments that exercise *de facto* control over a territory, even if they are not formally recognized, is ubiquitous in international diplomacy. Such engagement often includes bilateral meetings, mutual participation in international conferences, and cooperation around common threats and objectives. So too, international law and domestic practice give effect to the official acts of non-recognized entities to ensure the orderly functioning of the international system. It is critical to note that such engagement does not constitute an act of recognition, particularly given the narrow, formal processes described above through which official recognition is undertaken.

17.    International law's facilitation of engagement with *de facto* but non-recognized governments is grounded in long historical tradition, through which the acts of *de facto* governments are given effect under international law. The 1923 Tinoco Claims Arbitration (Great Britain v. Costa Rica) is illustrative of how international law respects the official acts of *de facto* regimes while preserving a state's discretion not to recognize the regime behind the acts. In the Tinoco Arbitration, Costa Rica sought to invalidate a concession granted to a British national by its own prior government (the Tinoco government) on the grounds that Great Britain had not recognized that government. Britain sought to enforce the concession granted by the Tinoco government, notwithstanding its non-recognition thereof. The sole arbitrator, former US President William H. Taft, observed: "When recognition *vel non* is by such nations determined by inquiry not into its *de facto* sovereignty and complete governmental control, but into its illegitimacy or irregularity of origin, their non-recognition loses something of evidential weight on the issue with which those applying the rules of international law are concerned…. Such non-recognition for any reason, however, can not outweigh the evidence before me as to the *de facto*

character of Tinoco's government according to the standards of international law."[30] Ultimately

Taft upheld the concession agreement on the grounds that the Tinoco government was the *de*

*facto* government of Costa Rica, even though it was not recognized by Great Britain. Notably

Taft did not find that Great Britain's attempt to enforce the concession agreement entered into

with a non-recognized government itself constituted a form of tacit recognition.

18.     The Tinoco example is just one in a long list of historical precedents of

engagement with *de facto* governments. As Crawford explains, "Unrecognized states are quite

commonly the object of international claims by the very states refusing recognition. An example

is Israel, long held accountable under international humanitarian and human rights law by certain

Arab states that still deny its recognition."[31] Similarly, in the years preceding World War II,

many European governments "accepted certain legal consequences of German control of

Austria" even while they did not "accept the lawfulness of German control."[32]

19.     International law gives effect to a broad range of actions undertaken by *de facto,*

but unrecognized, governments. The 1937 decision of Britain's High Court of Justice in *Bank of*

*Ethiopia vs National Bank of Egypt and Liguori* is illustrative. The case involved a decree by

Italian authorities that were the *de facto,* but not recognized, government of Ethiopia after their

capture of Addis Ababa in 1936. The decree dissolved the Bank of Ethiopia which, in turn,

sought to claim certain accounts being held by the National Bank of Egypt. The case turned on

whether the Italian dissolution decree was valid in that it would prevent the Bank of Ethiopia

from making claims against the National Bank of Egypt. The judge found that because the

---

[30] Aguilar-Amory and Royal Bank of Canada Claims (Great Britain v. Costa Rica), 1 R.I.A.A. 369
(1923).
[31] Brownlie 2008, *supra* note 19, at 136.
[32] *Id.*

British government had "recognized the Italian government as being in fact (*de facto*) the government of the area then under Italian control"—even though Britain had not formally recognized the Italian government in Ethiopia—he was "bound to treat the acts of the government as acts that can not be impugned on the ground that they were not the acts of a rightful but usurping government."[33] Notably, the judge found that the validity of the Italian rule "applies not only to acts done after the date when His Majesty's Government recognized the Italian government as the *de facto* government but also to any acts of that government done at any time at which … they were in fact the government."[34] Similar cases, including notably *AM Luther v James Sagor & Co*,[35] have held that even where the recognition of a foreign government was "on a de facto basis alone," it "did not diminish the legal rights available to the state."[36]

20.    US courts are often called upon and commonly do give consideration to acts undertaken by *de facto*, but non-recognized governments, and address those questions without resulting in recognition.  In *Oetjen v. Central Leather Co.* the Supreme Court took notice "of the fact that since the transactions thus detailed and since the trial of this case in the lower courts, the government of the United States recognized the government of Carranza as the *de facto* government of the Republic of Mexico, on October 19, 1915."[37] Notably, in that case, formal

---

[33] *Bank of Ethiopia v. National Bank of Egypt and Liguori*, 31 Am. J. Int'l L. 742, 747 (Oct. 1937)..

[34] *Id*.

[35] AM Luther v. Sagor [1921] 3 K.B. 532.

[36] Brownlie 2008, *supra* note 19, at 149. In the words of the court "The Government of this country [the UK] having, to use the language just quoted, recognized the Soviet Government as the Government really in possession of the powers of sovereignty in Russia, the acts of that Government must be treated by the Courts of this country with all the respect due to the acts of a duly recognized foreign sovereign state." AM Luther v. Sagor [1921] 3 K.B. 532. The court concluded that "there is no difference for the present purpose between a government recognized as such de jure and one recognized de facto." *Id*.

[37] *Oetjen v. Central Leather Co.*, 246 U.S. 297, 301  (1918).

recognition of the Republic of Mexico did not occur until August 31, 1917. Similarly, in *Upright v. Mercury Business Machines,* a New York appellate court observed that "[a] foreign government, although not recognized by the political arm of the United States Government, may nevertheless have *de facto* existence which is juridically cognizable."[38]

21.    The Restatement (Third) of Foreign Relations similarly affirms that "a regime representing a non-state or an unrecognized regime is not an absolute nullity."[39] Rather, "acts of unrecognized governments" dealing with "domestic matters" will "be given effect" in the courts of foreign states.[40]   The approach is clearly illustrated in the rationale expressed in *Salimoff v Standard Oil Co. of New York*, in which the Court found that "to refuse to recognize Soviet Russia as a government regulating the internal affairs of the country, is to give to fictions an air of reality which they do not deserve."[41]

## IV.    The US Has an Established Practice of Engagement with *De Facto* Governments that it Has Not Formally Recognized.

22.    The US President's power to recognize foreign governments does not always involve a binary choice of recognition or non-recognition. In fact, throughout its history, the United States has frequently engaged with foreign governments in *de facto* control of a territory, despite not formally recognizing that government. Such engagement is a standard part of US foreign policy and allows the US to advance its national interests without undermining the President's freedom to decide whether or not to engage in formal recognition. When the President decides to treat a government as the *de facto* authority on a territory, but not to

---

[38] *Upright v. Mercury Business Machines*, 213 N.Y.S.2d 417, 419 (1961).

[39] Restatement (Third) of Foreign Relations Law § 205(3) (Am. L. Inst. 1987)

[40] Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 293 F.Supp. 892, 900 (S.D.N.Y.1968), *modified*, 433 F.2d 686 (2d Cir.1970), *certiorari denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971)

[41] *M. Salimoff & Co. v. Standard Oil Co. of New York*, 262 N.Y. 220, 227 (1933); Brownlie 2008, *supra* note 19, at 152.

formally recognize the government, the President is exercising his constitutional "control over recognition decisions."[42] In such cases, the President has decided to engage with the foreign government as the *de facto* authority over the territory, but to refrain from formal recognition through one of the processes described above. Such a decision is an express foreign policy choice, usually intended to allow effective functioning of the nation's foreign policy, without the conferral of legitimacy that may flow from formal recognition.

23.    Among numerous historical examples of the US executive deciding to engage with a foreign government without formally recognizing it, two are particularly illustrative: US policy toward the Soviet Union between 1917 and 1933, and toward Taiwan since 1972. Both cases illustrate the policy choice of the US executive to engage with a foreign government without formal recognition and the broad range of activities the US conducts with such governments without implying recognition.

24.    On December 6, 1917 the US Government terminated its diplomatic relations with the Russian Empire. After a brief recognition of a Provisional Government, President Wilson decided, consistent with his discretionary power over formal recognition, not to recognize the new Bolshevik regime because it refused to honor debts incurred by the prior government.[43] In the nearly two decades the followed, the US had robust political, diplomatic, and commercial engagement with the Soviet government, which it continued not to recognize. For example, in 1921, the US government's American Relief Administration negotiated and signed an implementation agreement with Soviet officials so as to provide famine relief

---

[42] *Zivotofsky v. Kerry*, 576 U.S. 13 (2015).
[43] Office of the Historian, *Recognition of the Soviet Union, 1933*, U.S. Department of State, https://history.state.gov/milestones/1921-1936/ussr (last visited Nov. 9, 2022).

assistance.[44] In 1921, the US formally lifted a ban on trade with Russia and annual bilateral trade

reached more than $140 million in 1930.[45] In 1928, the US and the Soviet Union both signed the

Kellogg-Briand Pact, forbidding recourse to war under international law.[46] So too, a range of US

companies engaged with Soviet Russia in the 1920s. It was not, however, until November 15,

1933 that President Roosevelt formally recognized the Soviet Union through the Roosevelt-

Litvinov Agreement and dispatched the first US Ambassador to the Soviet Union.[47]

25.    US relations with Taiwan offer a second useful example. Prior to 1979, the US

Government recognized the government seated in Taipei as the government of China. However,

that year the US switched its recognition, withdrawing formal recognition of the Taipei

government and officially recognizing the government in Beijing as the legitimate government of

China.[48] Also in 1979, the US Congress passed the Taiwan Relations Act, affirming that,

notwithstanding the lack of formal recognition, the US would maintain significant relations with

Taiwan, including the sale of arms,[49] a range of programs, transactions, and other relations with

the people on Taiwan,[50] allowing Taiwan to sue and be sued in US courts,[51] continuing the

commitments contained in "all treaties and international agreements which were in force

between the US and Taiwan," and the establishment of bilateral relations through the American

---

[44] Benjamin M. Weissman, *Herbert Hoover and the Famine in Soviet Russia, 1921-23*, *in* Herbert Hoover Reassessed 390-96 (Mark Hatfield ed., 1981).

[45] Harold Kellock, *American and British Relations with Russia*, CQ Press (Apr. 1, 1963), https://library.cqpress.com/cqresearcher/document.php?id=cqresrre1943040100.

[46] Office of the Historian, *The Kellogg-Briand Pact, 1928*, U.S. Department of State, https://history.state.gov/milestones/1921-1936/kellogg (last visited Nov. 9, 2022).

[47] *Recognition of the Soviet Union*, *supra* note 43.

[48] Bureau of East Asia and Pacific Affairs, *U.S. Relations with Taiwan*, U.S. Department of State (May 28, 2022), https://www.state.gov/u-s-relations-with-taiwan/.

[49] Taiwan Relations Act, 22 U.S.C. § 3301(b)(5).

[50] Taiwan Relations Act § 3303(b)(2).

[51] Taiwan Relations Act § 3303(b)(7),

Institute in Taiwan.[52] The US has maintained extremely close working relations with Taiwan over the succeeding decades. In 1982, President Reagan offered Taiwan formal assurances as to its security and sovereignty.[53] The US has continued arms sales to Taiwan and has sent high level government officials to Taiwan including in 2022 Speaker of the House Nancy Pelosi. The US and Taiwan are both part of numerous international organizations, including the World Trade Organization, the Asia-Pacific Economic Cooperation Forum, and the Asian Development Bank.[54]

26.     Consistent with the Taiwan Relations Act, US courts treat Taiwan as a sovereign in many respects, without in any way formally recognizing it. Specifically, the Foreign Sovereign Immunities Act applies to Taiwan, notwithstanding the fact that such applicability is usually the result of formal recognition. 22 U.S.C. § 3303(b)(1) provides that "[w]henever the laws of the United States refer to or relate to foreign countries, nations, states, governments, or similar entities, such terms shall include and such laws shall apply with respect to Taiwan." Recent decisions continue to affirm this approach. For example, in *Kuo v. Government of Taiwan,* the court found that Taiwan and its Ministry of Defense are properly treated as "foreign state" defendants and dismissed the case against them.[55]

### V.     Acknowledgement the Taliban's of Control of DAB is Fully Consistent With the Policy of the US Executive to Treat the Taliban as the *De Facto* Government of Afghanistan, Even Without Formal Recognition.

---

[52] Taiwan Relations Act §§ 3305, 3310.

[53] Cong. Rsch. Serv., IF11665, President Reagan's Six Assurances to Taiwan, (Oct. 8, 2020). f

[54] *U.S. Relations with Taiwan, supra* note 48. /

[55] *Kuo v. Gov't of Taiwan*, No. 17-CV-10156 (JPO), 2019 WL 120725, at *2 (S.D.N.Y. Jan. 7, 2019), *aff'd sub nom. Sheafen Kuo v. Gov't of Taiwan*, 802 F. App'x 594 (2d Cir. 2020); *see also Lu v. Cent. Bank of Republic of China Taiwan*, No. LACV1200317JAKRZX, 2013 WL 12128821 (C.D. Cal. June 18, 2013), *aff'd sub nom. Lu v. Cent. Bank of Republic of China (Taiwan)*, 610 F. App'x 674 (9th Cir. 2015).

27.     The Soviet and Taiwan situations clearly demonstrate that the US government is legally entitled and politically capable of deep engagement with *de facto* governments that the US has expressly chosen not to formally recognize. Such engagement, including giving effect to the legal decisions and decrees of the relevant *de facto* authorities, do not trigger formal recognition.

28.     This is exactly the policy choice to date of the US executive with respect to the Taliban in Afghanistan. As early as August 2021, just days after the US military withdrawal from Afghanistan and the Taliban's seizure of Kabul, Secretary of State Blinken acknowledged: "the Taliban, whether we like it or not, is in control—largely in control of the country, certainly in control of the city of Kabul."[56] Responding to questions from Congress in September 2021, Secretary Blinken expressly stated that the Taliban is "the de facto government of Afghanistan. Those are just the facts."[57] The US has also recognized that the Taliban is in fact running key governmental institutions in Afghanistan, including its central bank. In a joint statement of September 14, 2022, the US Departments of State and Treasury noted that the economic situation in Afghanistan is continuing to deteriorate "due to the Taliban's poor economic management and failure to restore critical capabilities to DAB."[58]

29.     The United States has also maintained regular contacts with the Taliban since its seizure of power in the summer of 2021 on issues from humanitarian aid to terrorism to prisoner

---

[56] Press Release, Antony J. Blinken, U.S. Secretary of State, Secretary Antony J. Blinken on Afghanistan (Aug. 25, 2021).

[57] Amanda Macias, *Secretary of State Blinken calls Taliban 'the de facto government of Afghanistan'*, CNBC, Sept. 13, 2021, https://www.cnbc.com/2021/09/13/secretary-of-state-blinken-calls-taliban-the-de-facto-government-of-afghanistan.html.

[58] Press Release, U.S. Department of Treasury, Joint Statement by U.S. Treasury and State Department: The United States and Partners Announce Establishment of Fund for the People of Afghanistan (Sept. 14, 2022).

exchanges.[59] At least two high profile U.S.-Taliban meetings have occurred in recent months. In July 2022, a "senior interagency delegation from the Department of State and the Department of the Treasury" met with "senior Taliban representatives" in Uzbekistan to discuss the humanitarian situation in Afghanistan and "ongoing efforts to enable the $3.5 billion in licensed Afghan central bank reserves to be used for the benefit of the Afghan people."[60] In October 2022, the Deputy Director of the CIA and the State Department's special representative for Afghanistan met with a Taliban delegation in Doha, Qatar.[61]

30.    The US executive has termed this policy choice one of "pragmatic engagement." Under this policy, the US will continue to engage diplomatically with the Taliban and provide humanitarian aid to the Afghan people, while conditioning the prospect of future recognition on improvements in the Taliban's governance and policies.[62] As Secretary Blinken explained: "[t]he Taliban can earn that legitimacy [of formal recognition] gradually, over time, through a sustained pattern of action that demonstrates a genuine commitment to core expectations that are enshrined in the Security Council resolution adopted on August 30th."[63] The goal of US policy is not to deny the reality that the Taliban is the *de facto* government running Afghanistan nor that it

---

[59] Karen DeYoung, *U.S. holds first direct talks with Taliban since withdrawal*, Washington Post, Oct. 9, 2021, https://www.washingtonpost.com/national-security/us-taliban-talks/2021/10/09/0e4326ee-2914-11ec-8831-a31e7b3de188_story.html; *see also* Press Briefing, White House, Background Press Call by Senior Administration Officials on the Release of Mark Frerichs (Sept. 19, 2022) (stating that "We undertook months of tough negotiations with the Taliban for Mark's release.").

[60] Media Note, Office of the Spokesperson, U.S. Department of State, U.S. Delegation Meeting with Taliban Representatives on Afghan Central Bank Reserves (July 28, 2022).

[61] Alex Marquardt, *First on CNN: Top US officials hold first in-person meeting with the Taliban since the US killed al Qaeda's leader in July*, CNN, Oct. 8, 2022, https://www.cnn.com/2022/10/08/politics/us-taliban-talks-wasiq-qatar.

[62] *See generally* Joint Declaration between the Islamic Republic of Afghanistan and the United States of America for Bringing Peace to Afghanistan, Taliban-U.S., Feb. 29, 2020.

[63] Antony Blinken, U.S. Sec'y of State, Remarks at Ramstein Air Base: Secretary Antony J. Blinken Opening Remarks at Ministerial on Afghanistan (Sept. 8, 2021).

controls the agencies and instrumentalities of the state. Rather, the goal is to advance US policy objectives *while* maintaining the leverage that comes with the prospect of future recognition.

31.    US courts may give effect to this express policy choice made by the President under his recognition powers. The Court may permissibly acknowledge, as the US executive has, that the Taliban is in *de facto* control of Afghanistan, including DAB. In fact, the acknowledgement of the Taliban's *de facto* control is fully consistent with the US executive's decision to block Afghanistan's assets precisely because the Taliban was in control of Afghanistan. I understand the Joint Creditors to be arguing that, for purposes of resolving their turnover motions, the Court does not need to decide whether or not the Taliban is acting as a *de facto* government. But if the Court were to treat the Taliban as the *de facto* government of Afghanistan, even that would not usurp the President's recognition powers. Rather, it would be fully consistent with both longstanding precedent and the manner in which the President has chosen to engage the Taliban.  Under well-settled applicable law and U.S. practice, it would in no way constitute an act of tacit recognition with legal consequence beyond what the executive has already done.

***

I declare that the foregoing is true under penalty of perjury of the laws of the United States.

Executed this 10th day of November, 2022 in Philadelphia, Pennsylvania.

By: _____

William W. Burke-White