## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————————
)
IN RE:  TERRORIST ATTACKS ON          )          Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001                    )          ECF Case
—————————————————————————           )

This document relates to:  *All Actions*


## SAUDI ARABIA'S OPPOSITION TO KREINDLER & KREINDLER'S
## <u>RULE 72 OBJECTIONS TO THE SEPTEMBER 21, 2022 OPINION & ORDER</u>

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
Christopher M. Young
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION .......................................................................................................................1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY .................................................2

    A.    Kreindler & Kreindler, Its Team, and Its Litigation Strategy ....................................2

    B.    This Court's Protective Orders and Kreindler & Kreindler's
        Past Violations ............................................................................................................3

    C.    The Al Jarrah Deposition and Fawcett's Leak of the Transcript ...............................4

    D.    Kreindler & Kreindler's Purported Investigation of the Leak ..................................6

    E.    Saudi Arabia's Email and Kreindler's and Fawcett's Responses ..............................8

    F.    Saudi Arabia's Motion, the August 12 Order, and Kreindler &
        Kreindler's Responses ............................................................................................. 10

    G.    The August 30 Order and Kreindler & Kreindler's Responses ............................... 12

    H.    The Evidentiary Hearing and the Attorneys' Testimony ........................................ 16

    I.    Kreindler & Kreindler's Additional Post-Hearing Violation................................. 17

    J.    Judge Netburn's Opinion & Order ......................................................................... 17

STANDARD OF REVIEW ........................................................................................................ 19

ARGUMENT ............................................................................................................................. 20

I.    Judge Netburn's Order Was Not Contrary to Law Under Rule 37(b) ............................ 20

    A.    Kreindler & Kreindler Forfeited Any Argument That It Cannot Be
        Sanctioned Under Rule 37(b)................................................................................... 20

    B.    Judge Netburn Had Authority To Sanction Kreindler & Kreindler
        Under Rule 37(b)(2)(A) ........................................................................................... 21

II.    The Evidence Supports Judge Netburn's Factual Findings ............................................ 27

    A.    Judge Netburn Reasonably Determined That Kreindler Knew of or
        at Least Tacitly Consented to Fawcett's Actions..................................................... 28

      B.     Judge Netburn Reasonably Determined That Kreindler & Kreindler's
Breach of the Protective Orders Was Willful ........................................................32

III.    Judge Netburn's Sanctions Against Kreindler & Kreindler Are Just
and Reasonable .............................................................................................................36

      A.     Judge Netburn Considered the Appropriate Factors Under
Circuit Precedent.................................................................................................36

      B.     Kreindler & Kreindler Fails To Show an Abuse of Discretion ............................37

CONCLUSION......................................................................................................................40

# TABLE OF AUTHORITIES

Page

## CASES

*Abbott Labs. v. Adelphia Supply USA*, 2017 WL 1732454 (E.D.N.Y. May 2, 2017) ...................................................................................................................39

*Am. Cash Card Corp. v. AT&T Corp.*, 2000 WL 357670 (2d Cir. Apr. 6, 2000) ........................22

*AMR Servs. Corp. v. Int'l Bhd. of Teamsters*, 821 F.2d 162 (2d Cir. 1987)........................... 30-31

*Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988) ...................................26

*Avago Techs., Inc. v. IPtronics Inc.*, 2015 WL 3640626 (N.D. Cal. June 11, 2015)...................25

*Blackrock Allocation Target Shares:  Series S. Portfolio v. Wells Fargo Bank, N.A.*, 2018 WL 3863447 (S.D.N.Y. Aug. 13, 2018)........................................................19

*BS BIG V, LLC v. Philadelphia Indem. Ins. Co.*, 2022 WL 4181823 (S.D.N.Y. Sept. 13, 2022) ............................................................................................20

*CEATS, Inc. v. TicketNetwork, Inc.*, 2021 WL 3738847 (E.D. Tex. Aug. 24, 2021), *appeals pending*, Nos. 21-40705, 22-40028 (5th Cir.);.................................25

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062 (2d Cir. 1979)...............................................................................22

*City of Almaty, Kazakhstan v. Ablyazov*, 2018 WL 1229730 (S.D.N.Y. Mar. 5, 2018) ........................................................................................................37, 38, 40

*Copeland v. Rosen*, 194 F.R.D. 127 (S.D.N.Y. 2000), *remanded*, 25 F. App'x 17 (2d Cir. 2001)...............................................................................................22

*Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357 (2d Cir. 1991)................................................................................................18

*Denis v. County of Nassau*, 2019 WL 7372957 (E.D.N.Y. Dec. 31, 2019) ................................39

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99 (2d Cir. 1997)........................23, 24

*Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332 (2d Cir. 1997) ............................27

*Hyman v. Brown*, 927 F.3d 639 (2d Cir. 2019)............................................................................31

*Jay v. Spectrum Brands Holdings, Inc.*, 2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015) ........................................................................................................................38, 39

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, *In re*, 336 F.R.D. 400 (S.D.N.Y. 2020) ...................................................................................21

*Khaldei v. Kaspiev*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013) ........................................................19

*Koch v. Greenberg*, 2011 WL 4485975 (S.D.N.Y. Sept. 28, 2011), *modified*,
2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012)....................................................................39

*Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2011 WL 2946380
(S.D.N.Y. July 14, 2011) ....................................................................................................19

*Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962)..........................................................................22

*Lugosch v. Congel*, 443 F. Supp. 2d 254 (N.D.N.Y. 2006)........................................................19

*Mahboob v. Educ. Credit Mgmt. Corp.*, 2021 WL 7448532 (S.D. Cal. Mar. 31,
2021) ..............................................................................................................................24, 25

*Markus v. Rozhkov*, 615 B.R. 679 (S.D.N.Y. 2020) ..................................................................24

*Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979) ...........................................37

*MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*,
2013 WL 6840282 (S.D.N.Y. Dec. 27, 2013) .....................................................................19

*Novick v. AXA Network, LLC*, 2014 WL 12797254 (S.D.N.Y. Mar. 19, 2014) ...........................19

*NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369 (6th Cir. 2022) ..............................26, 27

*O'Connor v. Uber Techs., Inc.*, 2017 WL 3782101 (N.D. Cal. Aug. 31, 2017).....................24, 25

*Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120 (1989) ...................................................26

*Pereira v. Narragansett Fishing Corp.*, 135 F.R.D. 24 (D. Mass. 1991) .................................24

*S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123 (2d Cir. 2010) .........................36, 37

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998).........................................................................22

*Shipstad v. One Way or Another Prods., LLC*, 2017 WL 2462657
(S.D.N.Y. June 6, 2017).......................................................................................................22

*Smith v. Bradley Pizza, Inc.*, 2019 WL 430851 (D. Minn. Feb. 4, 2019),
*objections overruled*, 2019 WL 2448575 (D. Minn. June 12, 2019),
*aff'd*, 821 F. App'x 656 (8th Cir. 2020) .......................................................................24, 25

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486 (5th Cir. 2012) ....................22

*Steward, In re*, 529 B.R. 903 (E.D. Mo. 2015), *aff'd*, 828 F.3d 672 (8th Cir. 2016)...................24

*United States v. Isiofia*, 370 F.3d 226 (2d Cir. 2004) ................................................................28

*Williams v. Beemiller, Inc.*, 527 F.3d 259 (2d Cir. 2008) ...............................................19

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005) ...........................................30

*World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155
    (2d Cir. 2012) ................................................................................................36, 37

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. amend. I .......................................................................................................12

28 U.S.C. § 636(b)(1)(A) ...............................................................................................19

Fed. R. Civ. P.:

    Rule 11 ...................................................................................................................26

    Rule 11(c) ...............................................................................................................26

    Rule 37 ......................................................................................................20, 24, 25

    Rule 37(b) ..............................................................1, 20, 21, 22, 23, 27

    Rule 37(b)(2) ..................................................................18, 22, 25, 38

    Rule 37(b)(2)(A) ...............................18, 21, 22, 23, 24, 25, 26, 27

    Rule 37(b)(2)(A)(vii) .............................................................................................24

    Rule 37(b)(2)(C) .....................................................................................................24

    Rule 37(b)(2)(D) (1997) .........................................................................................24

    Rule 37(c) (1987) ...................................................................................................26

    Rule 37(d) ...............................................................................................................26

    Rule 37(d)(1)(A) .....................................................................................................26

    Rule 37(d)(3) ....................................................................................................26, 27

    Rule 72(a) .......................................................................................19, 20, 27

**INTRODUCTION**

Judge Netburn appropriately removed Kreindler & Kreindler LLP ("Kreindler & Kreindler") from the Plaintiffs' Executive Committees ("PECs") as a sanction for that firm's willful breach of this Court's orders by sending a confidential transcript to a journalist and for its failed attempts to conceal its misconduct from the Court.  ECF No. 8544 ("Op.").  After a two-day evidentiary hearing in which Kreindler & Kreindler attempted to pin blame solely on its researcher and investigator John Fawcett, Judge Netburn rejected its story.  She found instead that supervising attorney James Kreindler "deliberate[ly] coordinat[ed]" the breach with Fawcett, Op. 46, and that Fawcett acted with Kreindler's "knowledge or at least tacit consent," Op. 2.

Judge Netburn further found that others at the firm, "at best, [made] efforts to remain willfully unaware of what Kreindler and Fawcett did, and at worst, active[ly] collu[ded] in a cover-up."  Op. 39.  Attorneys Andrew Maloney, Megan Benett, and Steven Pounian "obstructed the investigation," Op. 2; made "knowingly misleading statements to the Court," *id.*; and tried "to use the Court's investigation as a forum" for "introduc[ing] gratuitous and irrelevant material to disparage Saudi Arabian personnel," Op. 42.  Having "lost faith in the firm's ability to comply with court orders or appear before the Court on behalf of all the September 11 victims," Op. 2, Judge Netburn removed Kreindler & Kreindler from the PECs, reduced its ability to lay claim to other firms' recoveries, and ordered it to pay attorneys' fees.

Kreindler & Kreindler now asks this Court to set aside Judge Netburn's decision.  It argues that the Court's sanctions authority under Federal Rule of Civil Procedure 37(b) does not extend to law firms that violate court orders; that Judge Netburn was required to believe the testimony of witnesses she found untruthful; and that she exceeded her broad discretion to select appropriate sanctions.  Those meritless arguments are foreclosed by the deferential standard of review that applies to her ruling.  Kreindler & Kreindler's objections should be overruled.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.    Kreindler & Kreindler, Its Team, and Its Litigation Strategy**

Kreindler & Kreindler represents the plaintiffs in *Ashton v. al Qaeda Islamic Army*,

No. 1:02-cv-06977-GBD-SN, among other cases.  From 2004 until September 21, 2022,

Kreindler & Kreindler attorneys served on the PECs in this litigation.  The leader of the

Kreindler & Kreindler team is James Kreindler.  Op. 6.  Other relevant Kreindler & Kreindler

attorneys include partner Andrew Maloney, a former federal prosecutor; partner Megan Benett;

and counsel Steven Pounian.  The firm is working on a contingent-fee basis and expects a

substantial recovery if it prevails.  *Id.* (citing Tr. 23:1-24:2).[1]

Researcher and investigator John Fawcett was also part of the Kreindler & Kreindler

team.  For more than 20 years, Fawcett managed discovery materials and other documents for

this case.  Op. 7 (citing Tr. 40:5-9, 416:12-18); *see also* Op. 40 (quoting Kreindler's testimony

that Fawcett "was 'at the heart of the documents,'" Tr. 39:3).  The firm gave Fawcett a Kreindler

& Kreindler email address, phone, and office, and access to a proprietary internal computer

server.  Op. 7 (citing Tr. 148:8-10, 148:14-149:6).  His work for Kreindler & Kreindler generated

80 to 90 percent of his income.  *Id.* (citing Tr. 416:9-11).

Based on the testimony at the hearing, Judge Netburn found that Fawcett has "substantial

loyalty" to Kreindler & Kreindler and to James Kreindler personally, and that the firm is loyal to

Fawcett in return.  *Id.*  For example, "in a tearful moment at the evidentiary hearing, Kreindler

said that only his own father could surpass Fawcett for honest[y] and nobility."  Op. 7-8

(citing Tr. 128:24-129:1).  Maloney, Pounian, and Benett each also praised Fawcett.  Op. 8.

---

[1] References to "Tr." mean the transcript for the hearing held by Judge Netburn on
November 1 and 2, 2021, which is publicly docketed at ECF Nos. 8670-1 and 8670-2.

Kreindler & Kreindler "aggressively promotes its litigation narrative in the press," and doing so is a "central part" of the firm's litigation strategy – it talks to the press in an effort to "pressure" Saudi Arabia into settling.  Op. 1, 6, 37 (citing Tr. 25:3-5, 25:21-24).  Fawcett was "instrumental" in those efforts.  Op. 6.  He spoke to reporters directly and provided them with documents.  Op. 6-7.  His "standard procedure" was to "s[eek] approval from senior Kreindler & Kreindler personnel before providing materials to reporters."  Op. 7 (citing Tr. 209:3-5).

## B.  This Court's Protective Orders and Kreindler & Kreindler's Past Violations

The sanctions Judge Netburn imposed were based on violations of two protective orders. The first order (the "MDL Protective Order"), entered by Judge Casey in 2006, limits the use of discovery material, with special protections for information designated as confidential.  Op. 3-4 (citing ECF No. 1900 at 8).  The second order (the "FBI Protective Order"), entered by Judge Netburn in 2018, protects information the FBI has designated as confidential.  Op. 4 (citing ECF No. 4255).  Both orders prohibit disclosure of confidential information except to certain categories of individuals – mostly, attorneys and their staff.  *Id.*  Both provide that depositions discussing confidential information shall remain wholly confidential for at least 30 days.  *Id.*

Because the protective orders limit what information Kreindler & Kreindler can disclose to the press, the entire Kreindler & Kreindler team "hates" the orders.  Op. 5 (citing Tr. 210:7-14). Kreindler has been "particularly vociferous" in his public attacks on the protective orders.  *Id.*  He has expressed that he is "'angered and disgusted with the protective orders that the FBI and Saudi Arabia have insisted on.'"  *Id.* (quoting Tr. 29:18-21).  He has described the orders in "vitriolic terms" such as "'gag orders,'" "'disgusting,'" "'hated,'" and "'a damn gag order imposed on us by the Saudis, our Department of Justice, and the court.'"  Op. 5, 37 (quoting Tr. 29:1-25).

In 2017, Kreindler & Kreindler breached the MDL Protective Order.  Op. 5.  This breach occurred when Fawcett gave a reporter at *Politico* magazine a "specific description of a

confidential document" while explaining how Kreindler & Kreindler used that document to advance its investigation.  *Id.* (citing KSAX-0010 at 4:2-5:1, 9:6-7).[2]  Kreindler was the only person from his firm other than Fawcett who spoke to that reporter.  *Id.* (citing Tr. 38:3-8).  At that time, Judge Netburn issued a " 'first warning,' " admonishing Kreindler to " 'be more careful as you continue to litigate this case, including given that you are an executive member of the plaintiffs' executive committee.' "  *Id.* (quoting KSAX-0010 at 10:2, 13:12-15).  Kreindler & Kreindler took no action to prevent further protective order violations following this breach: no discipline of Fawcett, no limits on his access to confidential information, and no restrictions on his interactions with the press.  Op. 5-6 (citing Tr. 38:12-24, 40:19-24).

## C.    The Al Jarrah Deposition and Fawcett's Leak of the Transcript

On June 17 and 18, 2021, Benett deposed Musaed Al Jarrah.  Op. 8.  Fawcett then violated the MDL and FBI Protective Orders by sending a copy of the Al Jarrah deposition transcript to journalist Michael Isikoff of *Yahoo! News*.  Although Kreindler and Fawcett testified that Fawcett acted alone, Judge Netburn did not believe them.  She weighed evidence including Kreindler & Kreindler's financial "motive for the leak," Op. 37; the "extreme reciprocal loyalty between Fawcett and Kreindler," Op. 9, 43; their past method of "tag-team[ing]" journalists with confidential documents, Op. 37-38; a series of "suspicious communications" between Kreindler, Fawcett, and Isikoff for which Kreindler and Fawcett had no "credible explanation," Op. 38; and Kreindler & Kreindler's efforts (discussed below) to "resist[ ]" the Court's investigation of the breach," Op. 44.  Considering those facts, along with her first-hand observation of the witnesses' testimony and demeanor, she found that Fawcett sent

---

[2] References to "KSAX" and "K&K Ex." mean exhibits that were (1) admitted at the hearing; (2) admitted by post-hearing order, ECF No. 7369; or (3) as indicated by parentheticals accompanying the first citation, filed on ECF and therefore part of the record.  *See* Op. 3 n.3.

the transcript "with [Kreindler's] knowledge or at least tacit consent," as part of a "coordinated campaign" in which Fawcett "t[ook] his direction from Kreindler."  Op. 2, 37, 44.

Kreindler's and Fawcett's communications with Isikoff began on June 21, 2021, shortly after the Al Jarrah deposition, and included phone calls from Isikoff to Kreindler and Fawcett to Kreindler on the morning of June 28.  Op. 8 (citing KSAX-0134; KSAX-0142).  On July 3, five days after Kreindler's calls, Fawcett and Isikoff exchanged a flurry of phone calls and electronic messages using the Signal application.  Op. 9-10 (citing KSAX-0082 at 1-3; KSAX-0134).  These exchanges started with a 22-minute phone call from Fawcett to Isikoff on the afternoon of July 3.  Op. 10.  A few phone calls later, Isikoff sent a Signal message saying, "'Try calling me – it's not going through on signal.'"  *Id.* (quoting KSAX-0082 at 1).  A series of Signal calls followed.  On July 5, Isikoff asked Fawcett via Signal whether another deponent "'also invoke[d] the Vienna convention,'" suggesting that Isikoff had read the Al Jarrah transcript by that time.  *Id.* (quoting KSAX-0082 at 3; citing Tr. 435:19-24) (alteration in original).

Judge Netburn found that "the calls between Kreindler, Fawcett, and Isikoff were discussions about how to get the Al Jarrah Transcript into Isikoff's hands in violation of the Protective Orders."  Op. 39.  She declined to credit Kreindler's contrary testimony that he told Isikoff that he would find out whether he could disclose part of the Al Jarrah transcript, that he asked Fawcett, and that Fawcett said no.  Op. 9 (citing Tr. 61:19-62:9).  Judge Netburn did not believe that explanation because it required her to accept that Kreindler was "completely ignorant of the requirements of the Protective Orders," which made the transcript confidential for at least 30 days; and that "Fawcett would betray his friend and long-time employer by leaking the transcript to Isikoff a little more than a week after a call where he and Kreindler allegedly agreed that the transcript could not be sent to Isikoff."  Op. 9, 38.

After Fawcett sent the transcript to Isikoff, Kreindler and Fawcett each continued to communicate with Isikoff.  Op. 11.  On July 10, 2021, Isikoff released an episode of his podcast *Conspiracyland* in which he and Kreindler discussed this litigation.  Op. 6 & n.4.  On July 12, Fawcett emailed Isikoff a copy of the FBI privilege log listing documents that the Department of Justice ("DOJ") had withheld.  Op. 11 (citing KSAX-0056F at 13-23).  Kreindler testified that he knew Fawcett gave the log to Isikoff and that Fawcett "'[p]robably did so at his direction.'"  *Id.* (quoting Tr. 66:3-21) (alteration in original).  Benett later testified that Kreindler told her in September 2021 that he was "'not aware that Fawcett had sent the privilege log back in July.'" *Id.* (quoting Tr. 387:3-6).  On July 13, Kreindler and Isikoff emailed about Plaintiffs' "'request to DOJ to lift the state secrets privilege and gag order.'"  *Id.* (quoting KSAX-0056F at 24-27).

On July 15, 2021, Isikoff published his article about Al Jarrah's deposition on *Yahoo! News*.  *Id.*  The article, titled "FBI Tried to Flip Saudi Official in 9/11 Investigation," stated that *Yahoo! News* had obtained a copy of the confidential Al Jarrah deposition transcript.  *Id.*

## D.     Kreindler & Kreindler's Purported Investigation of the Leak

The publication of Isikoff's article on July 15, 2021 purportedly set off an "internal investigation" at Kreindler & Kreindler.  Op. 11.  The first part ran from July 15 to July 29, 2021.  Op. 12 (citing Tr. 69:24-70:13, 172:14-24).  Judge Netburn found that "the firm failed to take basic investigative steps in an investigation that conspicuously failed to consider Fawcett in any meaningful way," Op. 16, and that the inquiries made by Maloney, who performed the investigation, were "neither professional nor comprehensive," Op. 12.  She found that the "conduct" of Maloney and his colleagues "reflect[ed], at best, efforts to remain willfully unaware of what Kreindler and Fawcett did, and at worst, active collusion in a cover-up."  Op. 39.

Maloney testified that he began his investigation "confident" that Kreindler & Kreindler "wasn't the source of the leak."  Tr. 212:3-5; *see* Op. 12, 39 (citing Tr. 212:3-5, 212:25-213:6,

219:20-25).  He made no lists of witnesses to interview or of questions to ask.  Op. 12, 39-40

(citing Tr. 215:17-25).  He did not ask anyone whether they had contacted Isikoff, and did not

even speak with a Kreindler & Kreindler consultant who attended the Al Jarrah deposition and

appeared on Isikoff's podcast.  *Id.* (citing Tr. 198:25-199:6, 205:14-206:16, 215:17-25).

Maloney directed Kreindler & Kreindler's Local Area Network administrator, John

Hartney, to conduct "a few searches for messages on the firm's email system."  Op. 40.  He

asked Hartney to search for emails to Isikoff and for outgoing emails from eight individuals that

might contain the transcript.  Op. 15 (citing Tr. 221:1-222:17, 223:10-17; KSAX-0084 at 1).

The searches turned up emails between Isikoff and Kreindler, and Isikoff and Fawcett, some of

which suggested earlier communications, but Maloney did not ask Hartney to look for those

earlier communications.  Op. 15-16 (citing Tr. 162:12-163:6, 235:17-236:17, 237:3-238:11).

Despite the MDL Protective Order's requirement that confidential material be stored "in

a secure manner," ECF No. 1900 at 11, anyone working at Kreindler & Kreindler had the ability

to access the transcript using the firm's proprietary internal server called "Case Media."   Op.

31-32.  Nevertheless, Maloney and Hartney made no efforts to find out who did so.  Op. 15, 40

(citing Tr. 138:18-139:8).  The transcript was also accessible to certain Kreindler & Kreindler

employees and consultants through a service called "Citrix ShareFile," but Maloney did not

direct Hartney to search that service until July 29, 2021.  Op. 14, 16 (citing Tr. 137:3-5, 147:21-

22, 149:21-150:03).  By that time, the firm had already told the Court that it had conducted an

internal investigation and was confident it was not the source of the leak.  *See infra* p. 11.

Judge Netburn found a particular "blind spot" in Kreindler & Kreindler's purported

investigation where Fawcett was concerned.  Op. 13.  Attorneys at the firm knew Fawcett

had communicated with Isikoff, but never checked whether Fawcett did so by means other

than his firm email account.  Op. 14.  Hartney knew Fawcett used a cloud-based storage system called Dropbox to store documents, but did not investigate that Dropbox account.  *Id.* (citing Tr. 150:8-14).  Maloney did not instruct anyone to search Fawcett's personal devices, testifying that he believed this would have been "unreasonable."  *Id.* (citing Tr. 233:22-25).

No one at Kreindler & Kreindler ever directly asked Fawcett whether he had leaked the transcript to Isikoff.  Fawcett testified that he did not recall being asked that question.  Op. 13 (citing Tr. 439:1-12).  Kreindler testified that he never asked Fawcett whether Fawcett had leaked the transcript, never directed anyone else to do so, and indeed told Fawcett:  " 'I know you didn't do it.' "  Op. 13-14 (quoting Tr. 78:7-9; citing Tr. 78:22-79:3).  Although Maloney and Pounian each testified that they did ask Fawcett whether he leaked the transcript, Op. 12-13 (citing Tr. 216:24-217:6, 407:6-21), Judge Netburn did not believe them.  She reasoned that Fawcett, as the culprit, would likely recall being confronted, but Maloney and Pounian "approached the investigation confident that their firm was not the source."  Op. 13.  She also doubted Pounian's testimony because he did not object when Fawcett later removed from a draft declaration language that would have stated that Fawcett " 'told Kreindler & Kreindler that [he] did not know how Michael Isikoff had obtained the transcript.' "  Op. 13, 40 (quoting KSAX-0121 at 1) (alteration in original); *see infra* p. 16.  In any event, all witnesses agreed that no one at Kreindler & Kreindler asked Fawcett to sign a sworn statement until the "absolute deadline" under the Court's orders, and then, when so asked, he "confessed immediately."  Op. 40.

## E.    Saudi Arabia's Email and Kreindler's and Fawcett's Responses

On July 21, 2021, at 9:14 p.m., Saudi Arabia sent an email informing the PECs, including Kreindler & Kreindler, that it would ask the Court to investigate the leak of the Al Jarrah transcript.  Op. 16 (citing KSAX-0042 at 3-4).  Fawcett was not copied on this email.  Judge Netburn found that, starting early the next morning, Fawcett initiated a burst of "suspicious

communications" that came to light only after he and Kreindler & Kreindler retained outside counsel in response to the court-ordered investigation, not as part of the firm's internal investigation. Op. 16-17 (citing KSAX-0135 at 3; KSAX-0151 at 1). She inferred that "someone inside the firm alerted Fawcett to the impending threat." Op. 18, 39.

On July 22, 2021, at 8:18 a.m., Fawcett texted Elizabeth Crotty, a criminal defense lawyer and former Kreindler & Kreindler attorney, seeking legal advice. Op. 17 (citing KSAX-0151 at 1). At 9:17 a.m., Fawcett had a 46-minute phone call with Kreindler. *Id.* (citing KSAX-0135 at 3). At 10:41 a.m., Fawcett called Crotty for 22 minutes. Op. 18 (citing KSAX-0135 at 3). At 12:07 p.m., he emailed Crotty, again seeking legal advice. *Id.* (citing KSAX-0151 at 1). At 12:56 p.m., he again called Kreindler. *Id.* (citing KSAX-0135 at 3). During discovery, Fawcett asserted attorney-client privilege over his July 22, 2021 communications with Crotty, *id.* (citing Tr. 449:5-11), but Kreindler & Kreindler did not assert work-product protection as to Fawcett's 46-minute call with Kreindler, Op. 17 (citing KSAX-0135).

At the hearing, Kreindler and Fawcett each testified that they could not remember the topic of their 46-minute phone call but were sure that they did not discuss the leak. *Id.* (citing Tr. 84:3-19, 445:25-446:2). Fawcett suggested that the call might have been work-related. *Id.* (citing Tr. 445:18-447:1). When asked about his 10:41 a.m. call with Crotty, Fawcett initially testified that it was not about the leak either; and that he and Crotty spoke about her recent run for district attorney, and nothing else. Op. 18 (citing Tr. 449:16-20). On cross-examination, counsel for Saudi Arabia pressed Fawcett as to why he asserted privilege over a personal phone call. *Id.* (citing Tr. 449:21-451:4). Fawcett stuck to his original answer. Then, after cross-examination and a recess, he corrected his testimony, stating that he spoke to Crotty because he "saw the court order" and needed legal advice because of his responsibility for the leak. *Id.* (citing Tr. 480:16, 481:6-9).

Judge Netburn declined to credit Fawcett's testimony that he called Crotty because he "saw the court order." *Id.* There was no court order about the breach as of July 22, 2021, the day Fawcett called Crotty. *Id.* There was only Saudi Arabia's July 21 email to the PECs – copying Kreindler, Pounian, Benett, and Maloney, but not Fawcett – stating that Saudi Arabia would request a court-ordered investigation. *Id.* Thus, one of these attorneys must have told Fawcett of the email before the July 22 calls to Crotty. Judge Netburn also declined to credit Fawcett's and Kreindler's testimony about their July 22 calls. Op. 17, 19. To start, she found that Fawcett's suggestion that his 9:17 a.m. call with Kreindler was a work-related conference call was belied by the fact that Kreindler & Kreindler asserted work-product protection over numerous other calls, but not that one. Op. 17 (citing KSAX-0135). She also did not believe that Fawcett could manage the "duplicity" that his and Kreindler's version of events implied. Op. 19. That is, crediting their testimonies would have required

> accept[ing] that, despite his long friendship with Kreindler, Fawcett reached out to a defense attorney about betraying Kreindler, had a normal, extended call with Kreindler, switched back to talking to his attorney about betraying Kreindler, and then talked to Kreindler again, all apparently without revealing a hint of his guilt.

*Id.* "Having witnessed Fawcett on the stand, heard tributes to his loyalty, and knowing that he confessed instantly when forced to sign a sworn statement," Judge Netburn found that such a maneuver would have exceeded his ability. *Id.* That finding further supported her inference that Kreindler knew of Fawcett's conduct and that his later denials of knowledge were false.

**F.    Saudi Arabia's Motion, the August 12 Order, and Kreindler & Kreindler's Responses**

On July 23, 2021, Saudi Arabia asked the Court to order discovery into the breach of the protective orders, suggesting as a first step that everyone with access to the Al Jarrah transcript submit declarations. Op. 19 (citing KSAX-0041 (ECF No. 6981)). The motion asked the Court to invoke its powers under Rule 37, as well as its inherent powers. *Id.* (citing KSAX-0041 at 4).

Saudi Arabia provided declarations from every attorney and staff member who had received or accessed the transcript, averring that: (i) the declarant had not leaked the transcript; (ii) did not know who did; and (iii) either had no communications with Isikoff or had been contacted by him for comment but did not respond. *Id.* (citing KSAX-0041A (ECF No. 6981-4)).

On July 27, 2021, the PECs, including Kreindler & Kreindler, opposed Saudi Arabia's motion. *Id.* (citing KSAX-0043 at 2). Their opposition letter stated that "'each of the lead PEC firms had already conducted internal investigations into the handling of the Jarrah transcript and communications with Mr. Isikoff'" and was "'confident that it was not the source of the leak to Mr. Isikoff.'" Op. 19-20 (quoting KSAX-0043 at 2). Judge Netburn found that Kreindler & Kreindler misled the Court by joining those statements. Even aside from Kreindler's own personal knowledge, Hartney testified that, at the time this letter was filed, he "'could not have concluded that no one at the Kreindler firm was the source of the leak'" because his investigation was ongoing. Op. 20 (quoting Tr. 174:25-175:3). For example. Maloney did not direct Hartney to review the ShareFile system until two days later. Op. 16 (citing Tr. 149:21-150:3, 172:14-24; KSAX-0043 at 2).

On July 29, 2021, two other PEC firms – Cozen O'Connor and Motley Rice – voluntarily submitted declarations from attorneys and firm staff, as well as their firms' IT specialists. Op. 20 (citing KSAX-0044 (ECF No. 6991); KSAX-0045 (ECF No. 6992)). Judge Netburn found their declarations were "thorough," confirming no communications with Isikoff (at all, or after the deposition) and describing investigative steps taken to determine that no one at the firm had given Isikoff the transcript. *Id.* (citing KSAX-0044 at 3-10, 14-17; KSAX-0045 at 3-17, 18-21). Later, Anderson Kill voluntarily submitted similar declarations. Op. 21 (citing KSAX-0047 (ECF No. 7013)). Kreindler & Kreindler made a "consensus decision" to file nothing until ordered to do so. *Id.* (citing Tr. 262:6-15).

On August 12, 2021, Judge Netburn ordered Kreindler & Kreindler to file declarations addressing "'whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by the Protective Order and the FBI Protective Order,'" including, "'[a]t a minimum,'" declarations from Kreindler, Pounian, Maloney, and Benett.  *Id.* (quoting ECF No. 7011 ("August 12 Order") at 2) (alteration in original).

On August 16, 2021, Kreindler & Kreindler filed declarations from those four attorneys alone.  Op. 22 (citing KSAX-0048 (ECF No. 7016)).  Judge Netburn found those declarations were "substantially vaguer and less comprehensive" than those of other PEC firms.  *Id.*  The declarants did not address communications with Isikoff and gave "virtually no detail" about their firm's purported investigation.  *Id.* (citing, *e.g.*, KSAX-0048A (ECF No. 7016), ¶ 6).  Maloney, who later testified that he conducted the investigation, did not mention it in his own declaration, leaving that to Benett.  *Id.* (citing KSAX-0048A, ¶ 8; KSAX-0048C, ¶¶ 7-8).

## G.    The August 30 Order and Kreindler & Kreindler's Responses

On August 30, 2021, Judge Netburn found Kreindler & Kreindler's August 16 declarations "deficien[t]" and ordered the firm to supplement.  Op. 22 (citing KSAX-0049 ("August 30 Order")).  She directed each original declarant – Kreindler, Pounian, Maloney, and Benett – to disclose communications with Isikoff and identify others who had access to the transcript, and at least one to describe the firm's investigation and attach communications with Isikoff.  Op. 23 (citing KSAX-0049 at 1).  She also required declarations from others with access to the transcript and a declaration from the head of Kreindler & Kreindler's IT group attesting that the firm had performed a "forensic analysis" to investigate the leak.  *Id.* (citing KSAX-0049 at 2).[3]

_____

[3] On September 3, 2021, Oath, Inc., which offers *Yahoo! News*, moved to intervene to challenge the August 30 Order on First Amendment grounds.  Op. 23 (citing ECF Nos. 7094-7095).  Kreindler & Kreindler, alone among Plaintiffs' firms, supported Oath's position.  *Id.* (citing KSAX-0051).  Judge Netburn stayed the August 30 Order to consider Oath's motion,

On September 27, 2021, Kreindler & Kreindler submitted its supplemental declarations. Op. 24. Benett was primarily responsible for creating them, with help from Pounian. *Id.* (citing K&K Ex. 51; K&K Ex. 52; K&K Ex. 62; Tr. 368:14-17, 369:25-370:2). Judge Netburn found that each declaration included "numerous misleading or false statements." *Id.*

**Hartney's Declaration.** Hartney's declaration, KSAX-0056F, made "several material misleading statements." Op. 25. Although everyone at Kreindler & Kreindler had access to the confidential deposition transcripts saved on Case Media, Hartney stated that Case Media "'is for use only by individual Kreindler attorneys and staff involved in this litigation and one consultant to Kreindler, John Fawcett.'" *Id.* (quoting KSAX-0056F, ¶ 5; citing Tr. 138:18-25). When the declaration was being prepared, Hartney had warned Benett that he "'d[id]n't think'" that statement was "'truthful,'" observing that the Al Jarrah transcript "'was saved in the case media share . . . and everyone at Kreindler has access to everything in casemedia.'" *Id.* (quoting KSAX-0115). She replied that this "'language is drafted carefully, and it does not say that it was restricted, in fact I was careful NOT to say that.'" *Id.* (quoting KSAX-0115). At the hearing, Hartney admitted that "Benett insist[ed] on not including that language in the declaration" and that "[s]he d[id]n't want to tell the court that everyone has access to everything." Tr. 196:3-19; *see* Tr. 142:8-143:13. Judge Netburn found that Benett intentionally hid from the Court that her entire firm could access the transcript. Op. 25 (citing Tr. 143:4-13, 196:3-19).

Benett also included in Hartney's declaration, and Hartney signed, a statement that he "'did not find any evidence that the Jarrah transcripts had been downloaded, printed, or emailed, by anyone else.'" *Id.* (quoting KSAX-0056F, ¶ 5). Judge Netburn found that statement

---

then denied that motion as meritless. *Id.* (citing KSAX-0055 (ECF No. 7134)). During the stay, all remaining Plaintiffs' firms other than Kreindler & Kreindler voluntarily filed declarations denying involvement in the breach. Op. 24 (citing ECF No. 7106).

misleading as well, because it implies that Hartney looked for evidence of downloading or printing. *Id.* But it was "impossible" for Hartney to find such evidence because the firm's systems did not track those activities. *Id.* (citing Tr. 145:14-22).

*Maloney's, Benett's, and Pounian's Declarations.* Maloney, Benett, and Pounian each declared that no one with access to the transcript failed to submit a declaration. Op. 28-29 (citing KSAX-0056B, ¶ 9; KSAX-0056C (ECF No. 7147-3), ¶ 5; KSAX-0056D (ECF No. 7147-4), ¶ 4). Judge Netburn found that was "false" because the entire firm had access through Case Media, as at least Maloney and Benett knew. Op. 29 (citing KSAX-0115; Tr. 245:15-247:11).

*Kreindler's Declaration.* Like the other attorneys, Kreindler declared that he knew of no one with access to the transcript who had not submitted a declaration, even though everyone at his firm had access. Op. 29 (citing KSAX-0056A, ¶ 6). He "understate[d]" his interactions with Isikoff, omitting several text messages and a phone call, and violated the August 30 Order by failing to attach the messages. *Id.* (citing Tr. 54:17-25, 55:2-56:12). When asked about those omissions, Kreindler testified that he did not check any records to prepare his declaration and relied only on memory. *Id.* (citing Tr. 51:15-52:11, 52:23-25). Judge Netburn observed that he "did not explain why he took so little effort to verify his sworn statements before filing them with a federal court investigating his firm for deliberate breaches of protective orders." *Id.*

*Fawcett's Two Declarations.* No one asked Fawcett to prepare a declaration until September 23, 2021. Op. 24 (citing Tr. 454:9-455:20). On the morning of September 27, he purportedly told Kreindler & Kreindler attorneys that he was responsible for the leak. Op. 26 (citing Tr. 388:19-25). He wrote a draft declaration confessing to the breach and sent it to Benett and Pounian. *Id.* (citing Tr. 456:7-15). In that draft, Fawcett claimed that Kreindler & Kreindler had no knowledge of his actions. He alleged that Al Jarrah's deposition transcript showed that Al Jarrah had "possess[ed] and view[ed] child pornography." KSAX-0108A at 1. He wrote that

14

he sent Isikoff the transcript because "'the public must at least be forewarned'" about Al Jarrah's alleged conduct "'in order to have a chance to protect themselves.'"  Op. 26 (quoting KSAX-0108A at 1).  He did not mention any personal motivation.  *Id.* (citing Tr. 348:21-25).  He also stated that he had "'sent a redacted version of the transcript'" to Isikoff, but did not deny that it contained FBI protected material.  *Id.* (quoting KSAX-0108A at 1).

Benett and Pounian edited the declaration.  Op. 27-28.  Pounian added statements that "'the redacted portions of the deposition [Fawcett] sent to Michael Isikoff were limited to Jarrah's possession of child pornography'" and that Fawcett "'did not send any other portions of the deposition to Isikoff.'"  Op. 27 (quoting KSAX-0109A at 1) (alteration in original).  Judge Netburn found that those statements "give the impression that Fawcett sent only portions of the deposition transcript to Isikoff, when in fact, he sent the whole transcript"; although Fawcett later changed "'limited'" to "'focused on,'" the statement remained "misleading."  Op. 27-28.

Pounian also added language stating that Fawcett "had a 'personal interest' in this issue because Al Jarrah worked in Morocco as a diplomat and Fawcett's children were from that country."  Op. 27.  Benett further edited this language to state that Fawcett knew from his "'background in global humanitarian work . . . that Morocco is a country with a history of child sex trafficking.'"  *Id.* (quoting KSAX-0110A at 1) (ellipsis in original).  Judge Netburn found those statements were "fabricated and intended to make Fawcett appear more sympathetic."  Op. 28, 38; *see also* Op. 42 (Fawcett's "personal motivation" was "primarily an invention of Pounian and Benett").  Although Benett testified that she did not come up with the added language, Judge Netburn did not credit that testimony, finding "no evidence at the hearing or in Fawcett's phone records that he participated the[] additions."  Op. 27 (citing Tr. 346:20-22; KSAX-0136 at 2-3).[4]

---

[4] Judge Netburn also observed that Fawcett had known about the decades-old allegations related to Al Jarrah for at least six months before the deposition, that his own children were at

As noted above, *see supra* p. 8, Fawcett made one other important edit to his declaration before signing it.  He deleted:  "'Until today, I had told Kreindler & Kreindler that I did not know how Michael Isikoff, had obtained the transcript,'" and replaced it with:  "'No one from Kreindler & Kreindler even knew about what I had done, even while they were responding to the Court's Orders.'"  Op. 27-28 (quoting KSAX-0121 at 1).  Judge Netburn found it significant that Fawcett was "unwilling" to swear that he had lied to his firm.  Op. 13, 40.

Fawcett's second declaration, dated September 30, 2021, included more details about his communications with Isikoff and the leak.  Op. 30 (citing KSAX-0059, ¶¶ 3, 7, 8, 10).  Contrary to the August 30 Order, neither Fawcett's declaration nor his second one included copies of Fawcett's communications with Isikoff.  Kreindler & Kreindler did not produce those communications until Judge Netburn ordered further discovery, after he and Kreindler & Kreindler had retained outside counsel.  *Id.* (citing Tr. 177:21-178:6, 178:24-180:19).

## H.     The Evidentiary Hearing and the Attorneys' Testimony

On November 1 and 2, 2021, Judge Netburn held an evidentiary hearing.  Op. 30-31.  She admitted the declarations of Kreindler, Maloney, Benett, Pounian, Hartney, and Fawcett as their direct testimony, and counsel for Saudi Arabia cross-examined them.  *Id.* (citing ECF No. 7167 at 1-2).  Before the hearing, Judge Netburn issued an order stating that its purpose was to investigate "the breach of the protective orders by Kreindler & Kreindler" and that potential remedies would include "removal from the Plaintiffs' Executive Committees, monetary sanctions, a referral for professional discipline . . . , and a criminal referral."  ECF No. 7167 at 1.

At the hearing, Kreindler & Kreindler's attorneys claimed they had no knowledge of Fawcett's actions and defended the reasonableness of their investigation.  As set out above,

---

least 21 by the time of the leak, and that he never notified the U.S. or Moroccan governments about his concerns.  Op. 28 (citing Tr. 468:8-24, 470:5-471:16, 489:11-14; KSAX-0040 at 2).

Judge Netburn declined to credit much of their testimony.  Judge Netburn also found that Kreindler & Kreindler's attorneys "used the hearing to continue their efforts to inject embarrassing and irrelevant information targeting Saudi Arabia."  Op. 31; *see also* Op. 42 (describing Kreindler & Kreindler's attempt "to use the Court's investigation as a forum to compound the damage caused by the breach").  Most notably, Benett "went out of her way" to testify that Fawcett had " 'strong feelings about somebody that he believed was not only trafficking in sexual images of minors but was deliberately living in a place where he would have easy access to minor children for sexual purposes.' "  Op. 31 (quoting Tr. 393:1-5).  That "additional gratuitous attack on Al Jarrah," Judge Netburn observed, had no support in the record.  *Id.*[5]

Judge Netburn directed Kreindler & Kreindler, Fawcett, and Saudi Arabia to propose findings of fact and conclusions of law, which they did.

**I.    Kreindler & Kreindler's Additional Post-Hearing Violation**

A few months after the hearing, Kreindler & Kreindler again violated the MDL Protective Order by publishing on a website a set of documents produced by the United Kingdom's Metropolitan Police Service.  Op. 33-34.  Under the MDL Protective Order, those documents should have been used only for the prosecution or defense of this case.  Op. 34 (citing ECF No. 8066 at 5; KSAX-0002 at 8).  Judge Netburn noted this conduct as evidence of Kreindler & Kreindler's "almost complete lack of respect for the Court and its orders."  Op. 52.

**J.    Judge Netburn's Opinion & Order**

On September 21, 2021, Judge Netburn issued her Opinion & Order.  Based on detailed factual findings, she concluded that "Kreindler & Kreindler, through Fawcett and Kreindler,

---

[5] Benett's testimony at the hearing and later discovery also revealed that Kreindler & Kreindler had improperly permitted a consultant to attend the Al Jarrah deposition, did not notice his appearance on the record, and failed to obtain his written consent to abide by the MDL Protective Order.  Op. 32-33 (citing Tr. 328:6-330:1; KSAX-0002 at 12-13).

breached the Protective Orders by carrying out a deliberate scheme to leak the Al Jarrah Transcript to Isikoff."  Op. 36.  She invoked Rule 37(b)(2) to issue a "'just'" order that "'relate[d] to the particular claim to which the discovery order was addressed.'"  Op. 45 (quoting *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991), in turn quoting Fed. R. Civ. P. 37(b)(2)(A)).  She found that the appropriate sanctions were to remove "Kreindler & Kreindler . . . from the PECs effective immediately," Op. 2, 45-46, to reduce the firm's ability to share in any future common fund, and to order it "to pay attorneys' fees and costs sought by Saudi Arabia in connection with the breach," Op. 46.

In determining the appropriate sanction, Judge Netburn concluded that Kreindler & Kreindler's violation was "willful" and "the result of deliberate coordination between Fawcett and Kreindler," while "the rest of the firm was, at best, willfully blind to this strategy."  *Id.*  She considered lesser remedies, such as "admonishment," "financial penalties," and "[p]rohibiting the use of the Al Jarrah Transcript," but found they had been or would be ineffective.  Op. 47-49. She balanced any harm to Kreindler & Kreindler's clients against the need to address "the firm's repeated flouting of the Protective Orders and lack of candor before the Court."  Op. 49-50.  She also took into account the "effectively permanent" effects of "Kreindler & Kreindler's conduct," Op. 50; the "warn[ings]" she had previously given, Op. 51-52; and the firm's "complete lack of respect for the Court and its orders," as shown by "the sheer number of misrepresentations the firm made during the Court's investigation," and its "increasing rate" of "violations of the Protective Orders," Op. 52-54.  Summarizing her reasoning, Judge Netburn explained that she had "lost faith in [Kreindler & Kreindler's] ability to comply with court orders or appear before the Court on behalf of all the September 11 victims."  Op. 2, 55.

The present Rule 72(a) objections followed.

## STANDARD OF REVIEW

Parties objecting to a magistrate judge's non-dispositive order bear a "heavy burden." *Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2011 WL 2946380, at *1 (S.D.N.Y. July 14, 2011). They must show that the order was "clearly erroneous" or "contrary to law." Fed. R. Civ. P. 72(a); *see* 28 U.S.C. § 636(b)(1)(A).  "An order is clearly erroneous only when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," while "[i]t is contrary to law if 'it fails to apply or misapplies relevant statutes, case law or rules of procedure.'" *Khaldei v. Kaspiev*, 961 F. Supp. 2d 572, 575 (S.D.N.Y. 2013) (citation omitted).

"[G]reater deference may be appropriate" for "a decision at least partially based on a credibility determination," as Judge Netburn's decision is here. *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, 2013 WL 6840282, at *1 (S.D.N.Y. Dec. 27, 2013). District courts "defer" to a magistrate judge's "decision as to the appropriate sanctions." *Novick v. AXA Network, LLC*, 2014 WL 12797254, at *3 (S.D.N.Y. Mar. 19, 2014).  Further, this Court has given "particular deference" to Judge Netburn's rulings because she has been "'deeply involved in discovery matters in the case for years.'"  ECF No. 6611 at 2 (quoting *Lugosch v. Congel*, 443 F. Supp. 2d 254, 276 (N.D.N.Y. 2006).

Kreindler & Kreindler erroneously argues (at 15) for *de novo* review of Judge Netburn's interpretation of the Federal Rules of Civil Procedure, citing *Williams v. Beemiller, Inc.*, 527 F.3d 259 (2d Cir. 2008).  *Williams* involved appellate review of a district court's decision, not district court review of a magistrate judge's legal conclusions in a non-dispositive order.  *See id.* at 264.  The standard for the latter is "contrary to law."  *See Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, N.A.*, 2018 WL 3863447, at *3 (S.D.N.Y. Aug. 13, 2018) (rejecting *de novo* review of "legal conclusions" in a non-dispositive order).

## ARGUMENT

### I.  Judge Netburn's Order Was Not Contrary to Law Under Rule 37(b)

Kreindler & Kreindler fails to show that Judge Netburn exceeded her authority under Rule 37(b).  Its argument that the Rule does not authorize sanctions against a law firm for violations of discovery orders was not preserved for review and in any event lacks merit.

#### A.  Kreindler & Kreindler Forfeited Any Argument That It Cannot Be Sanctioned Under Rule 37(b)

On July 23, 2021, in its first letter about the breach of the MDL Protective Order, Saudi Arabia made plain that it would ask the Court to invoke its "authority . . . under Federal Rule of Civil Procedure 37(b)."  ECF No. 6981 at 3-4.  On October 4, in scheduling a hearing, Judge Netburn explained that she would "render findings of fact" in connection with "the breach of the protective orders by Kreindler & Kreindler" and "to determine the appropriate remedies," which "may include . . . removal from the Plaintiffs' Executive Committees."  ECF No. 7167 at 1. Accordingly, if Kreindler & Kreindler wanted to argue that Rule 37(b) did not authorize this Court to remove it from the PECs, it had fair notice to do so.  Further, not only did Saudi Arabia address Rule 37(b) in its November 15 proposed findings of fact and conclusions of law, *see* ECF No. 7389, ¶¶ 301-303, 308, but so did Fawcett, *see* ECF No. 7387 at 32-36 – confirming that the record made clear that Rule 37 sanctions were under consideration.

By contrast, Kreindler & Kreindler never cited Rule 37(b) – or any other provision of Rule 37 – in its own proposed findings of fact and conclusions of law.  *See* ECF No. 7386. Kreindler & Kreindler's failure to raise this issue before Judge Netburn, despite notice and opportunity to do so, precludes the Court from considering it on a Rule 72(a) objection.  *See*, *e.g.*, *BS BIG V, LLC v. Philadelphia Indem. Ins. Co.*, 2022 WL 4181823, at *5 (S.D.N.Y. Sept. 13, 2022) (Daniels, J.) ("[I]t is established law that a district judge will not consider new

arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 336 F.R.D. 400, 404 (S.D.N.Y. 2020) ("[n]ew arguments and factual assertions cannot properly be raised for the first time in objections" to a magistrate's discovery order, "and indeed may not be deemed objections at all") (brackets in original).

### B.   Judge Netburn Had Authority To Sanction Kreindler & Kreindler Under Rule 37(b)(2)(A)

**1.**     Kreindler & Kreindler's interpretation of Rule 37(b) is also wrong as a matter of law.  Rule 37(b)(2)(A) authorizes sanctions "For Not Obeying a Discovery Order" and states: "If a party or a party's officer, director, or managing agent – or a witness designated under Rule 30(b)(6) or 31(a)(4) – fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders."  After that general authorizing language, Rule 37(b)(2)(A) gives a list of examples that just orders "may include," but does not limit the court's authority to those examples.  Accordingly, a sanctions order requires a finding that "a party or a party's officer, director, or managing agent," or a dedicated witness, failed to obey an order of the court.  After finding that such a failure has occurred, a district court can issue any "just order[ ]" as an appropriate sanction.  The language in Rule 37(b)(2)(A) requires only that the orders be "just" – it neither says nor implies that they may be directed only against a party.

This is a case in which a party failed to obey discovery orders.  Judge Netburn found that "Fawcett leaked the transcript" of the Musaed Al Jarrah deposition in violation of the Court's protective orders "as part of Kreindler & Kreindler's long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into a settlement, and that he did so with the knowledge or at least tacit consent of lead attorney James Kreindler." Op. 2.  It is settled law that "the conduct of an attorney is imputed to his client, for allowing a party to evade 'the consequences of the acts or

21

omissions of [ ]his freely selected agent' 'would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent.' " *SEC v. McNulty*, 137 F.3d 732, 739 (2d Cir. 1998) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962)) (brackets in *McNulty*).  Where – as here – an attorney violates a discovery order, that violation is deemed to have been committed by the "party" that the attorney represents, triggering sanctions under Rule 37(b).  *See Am. Cash Card Corp. v. AT&T Corp.*, 2000 WL 357670, at \*5 (2d Cir. Apr. 6, 2000) (judgment noted at 210 F.3d 354 (table)) ("in reference to Rule 37(b) sanctions, '[a] litigant chooses counsel at his peril' ") (quoting *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979)) (brackets in *Am. Cash*).[6]  Thus, when Kreindler & Kreindler attorneys willfully violated the Court's protective orders and obstructed the Court's investigation of the violation to pursue a litigation strategy against Saudi Arabia, those actions were imputed to their clients – the *Ashton* Plaintiffs.

The application of those general principles to this case is confirmed by the language of the protective orders that Kreindler & Kreindler violated.  Those orders make clear that counsel for a party gains access to confidential material, and undertakes to protect that material, precisely because counsel is acting on behalf of a party.[7]  The MDL Protective Order governs the use and disclosure of confidential information by any "Party," which it defines to "mean any party to this MDL, including all of its officers, directors, employees, consultants, retained experts, and

---

[6] *See also Shipstad v. One Way or Another Prods., LLC*, 2017 WL 2462657, at \*3, \*5 (S.D.N.Y. June 6, 2017) (following *McNulty* and imputing attorney's violation of discovery order to a party under Rule 37(b)); *Copeland v. Rosen*, 194 F.R.D. 127, 133 (S.D.N.Y. 2000) (same), *remanded on other grounds*, 25 F. App'x 17 (2d Cir. 2001).

[7] *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486 (5th Cir. 2012), *cited in* Op. 36 n.14, illustrates the point.  In *Smith*, the Fifth Circuit upheld Rule 37(b)(2) sanctions against both an attorney and that attorney's law firm for violation of a protective order.  *See id.* at 487, 490-91 (discussing Rule 37(b)(2)(A)).  The Fifth Circuit reasoned that courts are "authorized [under Rule 37(b)] to impose sanctions against parties or counsel."  *Id.* at 490.

*outside counsel (and their support staff)*."  ECF No. 1900, ¶ II.B.1 (emphasis added).  And it further defines the confidentiality obligations of a "Receiving Party," *see id.* ¶¶ II.B.4, II.H.1-5, which Kreindler & Kreindler has repeatedly violated.

Similarly, the Privacy Act Order and Protective Order for FBI Documents ("FBI Protective Order") governs the use of documents produced by the FBI to "Qualified Persons." The term "Qualified Persons" includes "Members of the Plaintiffs' Executive Committees ('PECs'), and any support staff of such PEC members . . . , as well as attorneys who are members of the same law firm as a member of the PEC."  ECF No. 4255, ¶ 6(i).  The FBI Protective Order further describes various actions that a "party" may or must take, such as challenging designations, *id.* ¶ 4; seeking consent to share protected information, *id.* ¶ 7; filing under seal, *id.* ¶ 11; and using protected information in court, *id.* ¶ 13.  All of those actions can be taken only by the Qualified Persons representing a party rather than by the party personally, because only the Qualified Persons are authorized to have access to the protected information.

Accordingly, the textual predicate for Rule 37(b)(2)(A) sanctions – a violation of a discovery order by a "party" – is satisfied here.  When Kreindler & Kreindler willfully violated the Court's orders, its breach was imputed to its clients (the *Ashton* Plaintiffs).  Once that predicate is satisfied, the language of Rule 37(b)(2)(A) imposes no restrictions on who may be the subject of a "just order" that remedies the violation.

**2.**     Consistent with the language and structure of Rule 37(b), courts have imposed "just order" sanctions on both individual attorneys and law firms who violate discovery orders. *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99 (2d Cir. 1997) (per curiam), *cited in* Op. 36 n.14, is an example.  In that case, the Second Circuit affirmed Rule 37(b) sanctions against a party's attorney for the attorney's role in the witness's failure to appear for deposition, explaining that the attorney's conduct "justifie[d] the district court's imposition of sanctions for

his contempt of court under Rule 37(b)." *Id.* at 103.  Kreindler & Kreindler errs (at 19) in

attempting to distinguish *Fonar* as a "*monetary* sanction" against an "*individual* attorney," citing

to current Rule 37(b)(2)(C).  *Fonar* did not rely on Rule 37(b)(2)(C), which did not exist in its

current form in 1997.  *Fonar* relied on former Rule 37(b)(2)(D), *see* 128 F.3d at 102, which is

worded similarly to current Rule 37(b)(2)(A)(vii).  Thus, *Fonar* supports Judge Netburn's

reasoning that current Rule 37(b)(2)(A) is not limited to sanctions against parties.[8]

    *Fonar* is far from the only example of a court directing a "just order" sanction to an

attorney – or a law firm – as a remedy for a violation of a discovery order.  *See Mahboob v.*

*Educ. Credit Mgmt. Corp.*, 2021 WL 7448532, at *4 (S.D. Cal. Mar. 31, 2021) (adopting order

directing counsel to disclose names of improperly contacted individuals as Rule 37 sanction for

protective order violation); *Smith v. Bradley Pizza, Inc.*, 2019 WL 430851, at *1 (D. Minn. Feb.

4, 2019) (relying on Rule 37(b)(2)(A) to direct "defense counsel" to pay non-contempt monetary

sanction), *objections overruled*, 2019 WL 2448575 (D. Minn. June 12, 2019), *aff'd*, 821 F. App'x

656 (8th Cir. 2020) (per curiam); *O'Connor v. Uber Techs., Inc.*, 2017 WL 3782101, at *4, *9

(N.D. Cal. Aug. 31, 2017) (relying on Rule 37(b)(2)(A), among other authorities, to direct class

counsel to issue corrective notice after violating protective order); *In re Steward*, 529 B.R. 903,

913, 918 (E.D. Mo. 2015) (affirming bankruptcy court's imposition of monetary sanction on

attorney under Rule 37(b)(2)(A), in addition to fee award), *aff'd*, 828 F.3d 672 (8th Cir. 2016);

*see also Pereira v. Narragansett Fishing Corp.*, 135 F.R.D. 24, 26-27 (D. Mass. 1991) (relying

---

[8] *Markus v. Rozhkov*, 615 B.R. 679 (S.D.N.Y. 2020), *cited in* Op. 36 n.14, also supports
Judge Netburn's decision.  That case determined that "Rule 37(b)(2)(A)(vii)," along with "Rule
37(d)," permits sanctions against a party's attorney.  *Id.* at 700-01.  Thus, *Markus* also refutes
Kreindler & Kreindler's position that Rule 37(b)(2)(A) authorizes sanctions only against parties.

on authority to issue "such orders in regard thereto as are just" in former Rule 37(b)(2) to order plaintiff's counsel to pay a non-contempt, non-compensatory fine).[9]

Courts have also directed Rule 37 "just orders" towards other non-parties, such as non-party corporate officers and retained experts. *See CEATS, Inc. v. TicketNetwork, Inc.*, 2021 WL 3738847, at *10-11 (E.D. Tex. Aug. 24, 2021) (relying on Rule 37(b)(2)(A) to impose bar on patent licensing by "individuals who violated [a] protective order," who included a party's CEO and two of its consulting experts), *appeals pending*, Nos. 21-40705, 22-40028 (5th Cir.); *Avago Techs., Inc. v. IPtronics Inc.*, 2015 WL 3640626, at *3, *5 (N.D. Cal. June 11, 2015) (relying on Rule 37(b)(2)(A) to direct expert who violated protective order to "return any . . . designated information" and "not [to] use that information for any purpose"). If Kreindler & Kreindler's interpretation of Rule 37(b)(2)(A) were correct, and only parties could be subjects of sanctions under that provision, then each of those orders would have been in error.

**3.**      Kreindler & Kreindler's arguments confuse the difference between Rule 37(b)(2)(A)'s predicate for a sanctions order (which requires a violation by a "party") and the "just orders" that a district court may issue after finding that predicate (which may sanction the attorney or law firm through which the party violated the order). That confusion is best illustrated by Kreindler & Kreindler's attempts to compare Rule 37(b)(2)(A) to differently worded rules. Each of those rules contains specific language restricting a district court's remedial authority that Rule 37(b)(2)(A) does not contain.

---

[9] Although *Mahboob*, *Smith*, and *O'Connor* refer to the targets of sanctions using terms such as "Plaintiffs' counsel," "defense counsel," and "class counsel," context indicates that firms, not attorneys, were sanctioned. *See Mahboob*, 2021 WL 7448532, at *4 (referring to "Plaintiff's counsel" in the plural); *Smith*, 2019 WL 430851, at *1 (granting a sanctions motion against "Best & Flanagan LLP"); *O'Connor*, 2017 WL 3782101, at *5-6 (referring to "Class Counsel" as "it").

*First*, Kreindler & Kreindler errs in comparing (at 17-18) Rule 37(b)(2)(A) to Rule 11(c), which states that, if "the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." That is, Rule 11(c) contains language listing the entities "on" whom "the court may impose an appropriate sanction."[10] The "just orders" provision of Rule 37(b)(2)(A) does not contain any similar limit on the entities that may be the subject of a "just order[ ]." The appropriate inference is that Rule 37(b)(2)(A) does not impose any such limit.

*Second,* Kreindler & Kreindler errs in comparing (at 18) Rule 37(b)(2)(A) to former Rule 37(c), which the Second Circuit construed in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009, 1014 (2d Cir. 1988). Former Rule 37(c) authorized, where "'a party fail[ed] to admit the genuineness of any document or the truth of any matter,'" the relief of "'an order *requiring [that] party* to pay'" reasonable expenses and fees. *Id.* at 1013-14 (quoting Fed. R. Civ. P. 37(c) (1987)) (emphasis in *Apex Oil*). Thus, like Rule 11(c), but unlike current Rule 37(b)(2)(A), former Rule 37(c) did not contain a general authorization for "just orders," but a specific authorization for a fee order against the "party" that improperly failed to admit.

*Third*, Kreindler & Kreindler errs in comparing (at 17) Rule 37(b)(2)(A) to Rule 37(d)(3), which the Sixth Circuit construed in *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369 (6th Cir. 2022). Rule 37(d) authorizes sanctions where a "party" or a "person designated" under certain rules "fails . . . to appear for [a] deposition" or to properly answer or object to "interrogatories" or a "request for inspection." Fed. R. Civ. P. 37(d)(1)(A). The resulting sanctions "may include

---

[10] In *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989), which Kreindler & Kreindler cites (at 18), the Supreme Court applied this rationale to hold that an earlier version of Rule 11 authorizing sanctions against "the person who signed" a violative "pleading, motion, or other paper" did not authorize sanctions against the person's law firm. *See Pavelic & LeFlore*, 493 U.S. at 123-25.

any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)" and also "must," with certain exceptions, include an order "requir[ing] the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure," with certain exceptions. Fed. R. Civ. P. 37(d)(3). Thus, Rule 37(d)(3) neither contains its own general authorization for "just orders" nor incorporates the authorization from the first paragraph of Rule 37(b)(2)(A). And the Sixth Circuit reasoned not merely that Rule 37(d)(3) fails to "mention . . . law firms," but that it "confines liability to 'the party failing to act, the attorney advising the party, or both.'" *NPF Franchising*, 37 F.4th at 383 (quoting Fed. R. Civ. P. 37(d)(3)). That reasoning does not help Kreindler & Kreindler.

Kreindler & Kreindler cites no case adopting its theory that district courts can issue Rule 37(b)(2)(A) "just orders" only against parties. As set out above, *see supra* pp. 23-25, courts have issued such orders not only against parties to litigation, but also their attorneys, law firms, officers, and experts. Those cases cohere with the Rule's text and the Second Circuit's teaching that "[a] district court has broad power to impose Rule 37(b) sanctions in response to abusive litigation practices." *Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332, 334 (2d Cir. 1997) (per curiam). Judge Netburn did not act contrary to law in exercising that broad power.

## II.   The Evidence Supports Judge Netburn's Factual Findings

Kreindler & Kreindler also fails to show error, much less "clear[] error[]," Fed. R. Civ. P. 72(a), in Judge Netburn's careful review of the evidence. Her findings rest on an extensive documentary record, observations of witness demeanor, and long familiarity with discovery in this litigation. She determined that Kreindler, Maloney, Benett, Pounian, and Fawcett not only signed false and misleading declarations, *see* Op. 24-29, but also testified untruthfully in her

27

courtroom.[11]  Such credibility determinations receive "even greater deference," *United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004), than do other findings of fact.

A.     **Judge Netburn Reasonably Determined That Kreindler Knew of or at Least Tacitly Consented to Fawcett's Actions**

1.     Judge Netburn reasonably determined that Fawcett acted with Kreindler's "knowledge or at least tacit consent" and "t[ook] his direction from Kreindler [in] leak[ing] confidential material." Op. 2, 44.  Although Fawcett's September 29, 2021 declaration stated that, "[u]ntil today, no one other than Michael Isikoff and I knew that I sent the redacted transcript to Michael Isikoff" and that "[n]o one from Kreindler [& Kreindler] directed me to send the transcript to Michael Isikoff," KSAX-0056J, ¶ 3, Judge Neburn was not required to credit those statements.  Nor was she required to credit Kreindler's denials that he knew Fawcett had sent the transcript to Isikoff.  *E.g.*, Tr. 122:1-6.  Her contrary findings were supported by her observation of the witnesses and by four categories of evidence.

*First*, Judge Netburn found that Kreindler had an "amply demonstrated . . . motive for the leak." Op. 37.  That motive was his "litigation strategy" of "us[ing] press attention to force Saudi Arabia into a settlement," with an expectation of a "substantial benefit" – based on a "likely" award of "billions of dollars" – if that strategy succeeds.  Op. 37, 48.  Kreindler's "vitriolic" attacks on the Court's orders further demonstrate his heavy reliance on, and personal attachment to, his press-centered strategy.  Op. 37.  Fawcett also had a motive to leak the transcript in coordination with Kreindler, even though it put him at personal risk, because of the "extreme

---

[11] *See, e.g.*, Op. 9 ("The Court does not find this testimony [from Kreindler] credible."), 13 ("The Court credits Fawcett's testimony over the testimony of Pounian and Maloney."), 17-19, 38-39 (finding Kreindler's and Fawcett's "explanations" for their phone calls "not credible"), 27 (rejecting Benett's testimony that she "'formatted'" Fawcett's declaration but "did not 'write the words'"), 39 ("Fawcett's explanation for what triggered these communications to Crotty is also suspect.").

reciprocal loyalty" he shared with Kreindler.  Op. 9, 43.  By contrast, Judge Netburn reasonably

rejected Kreindler & Kreindler's depiction of Fawcett as "a man with such a blinding hatred for

child pornography that he would betray his long-time employer and friends by disclosing

confidential material they had a duty to protect."  Op. 43.

*Second*, Judge Netburn found that Kreindler and Fawcett had an established method

of "coordinated efforts" in contacting reporters, with Kreindler or another attorney "lay[ing]

the groundwork" and Fawcett "follow[ing] up with supporting documents."  Op. 37-38.  This

"tag team" approach "resulted in the 2017 breach," *id.*, and the hearing record contained other

examples, *see* Tr. 41:12-18, 43:17-44-9 (Kreindler discussing Fawcett's contacts with reporters

including Laura Sullivan of NPR News); Tr. 208:11-209:5 (Maloney stating that "from time to

time [Fawcett] was asked to provide a nonconfidential document" for a reporter, and agreeing

that "[b]efore" doing so Fawcett would "seek[] the approval of the attorneys at the firm").

*Third*, Judge Netburn found that Kreindler's and Fawcett's phone calls with Isikoff and

with one another on June 28 were "suspicious," as were their phone calls with one another on

July 22, interspersed with Fawcett's contacts with Crotty.  Op. 38-39.  She also rejected their

explanations of those calls as not "credible" and "suspect."  *Id.*  Her reason was not merely that

the calls were close in time.  It was that, for Kreindler's version of events to be true, Fawcett

would have needed to be a skilled deceiver – switching back and forth between telling Kreindler

that the documents could not be shared and then leaking them himself, *see* Op. 38, or alternating

between calls with Kreindler about their work together and communications with defense counsel

about his betrayal of Kreindler, *see* Op. 38-39.  "[H]aving witnessed Fawcett on the stand," she

did not believe he had such skill.  Op. 39.  That credibility determination was further supported

by Fawcett's inconsistent and false testimony about the calls with Crotty – first, that they had

not discussed the leak at all, and then that he contacted Crotty because he "saw the court order," even though on July 22 no investigative order had yet issued.  Op. 18, 39.

*Fourth*, Judge Netburn found that Kreindler & Kreindler's so-called internal investigation had a "clear blind spot" for Fawcett and "completely . . . passed over" him.  Op. 39-40.  That included never "directly question[ing]" Fawcett "about his role in the breach," Op. 40; never following up on Fawcett's known communications with Isikoff, Op. 13; and never asking Fawcett to sign a declaration until the "absolute deadline" set by court order, Op. 40.  If Kreindler and his colleagues had truly thought Fawcett was innocent, they would have had every reason to dispel the suspicion directed at their firm by questioning him and obtaining a declaration from him sooner, so that Kreindler & Kreindler could match the declarations submitted by Saudi Arabia's counsel and the non-Kreindler PEC firms.  *See supra* pp. 10-11.[12]  The Kreindler & Kreindler attorneys' avoidance of such measures is far better explained as a showing of "reciprocal loyalty" to Fawcett, Op. 44, protecting him as long as possible.

2.     Kreindler & Kreindler's assertion (at 24) that "[n]o record evidence contradicted" Kreindler's and Fawcett's denials cannot withstand comparison to Judge Netburn's careful assembly of facts and weighing of inferences.  It does not matter that the denials were direct and the contrary proof was circumstantial.  *See, e.g., Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 83 (2d Cir. 2005) ("'Knowledge' is a fact often established – even in criminal cases where the prosecution's burden is beyond a reasonable doubt – simply through circumstantial evidence.").  Further, Kreindler & Kreindler's attempts (at 24-26) to marshal contrary evidence are misplaced under a clear-error standard of review.  *See AMR Servs. Corp. v. Int'l Bhd. of Teamsters*, 821

---

[12] Kreindler & Kreindler unpersuasively contends (at 8, 31) that its reluctance can be explained by a desire to protect a consultant's confidential identity.  The firm could have asked the Court to keep the consultant's name *ex parte* and under seal, as it ultimately did. Judge Netburn granted that request.  *See* ECF No. 7165.

F.2d 162, 163 (2d Cir. 1987) (per curiam) ("[E]vidence from which a contrary inference could have been drawn" does "not entitle[ ]" the Court "to overturn the inference that was drawn.").

Thus, contrary to Kreindler & Kreindler's assertions (at 24-25 & n.10), Judge Netburn's finding that Fawcett was "unwilling" to "perjur[e]" himself about being asked directly about the Isikoff leak did not require her to believe everything else he said.  *See Hyman v. Brown*, 927 F.3d 639, 661-62 (2d Cir. 2019) (explaining that "a factfinder [has] discretion to credit parts of a witness's testimony despite discrediting others").  Nor can Kreindler & Kreindler overcome her finding that Benett and Pounian fabricated Fawcett's supposed personal motive by pointing (at 25-26) to his reaffirmation of that motive on the stand.  Given the evidence showing that the attorneys wrote the words for him, *see* Op. 27, as well as other instances at the hearing where Fawcett testified falsely, *see supra* pp. 9-10, 29-30, Judge Netburn could reasonably interpret his testimony as showing only that he remained willing to regurgitate the story he had been fed.[13]

    **3.**    Kreindler & Kreindler also fails to show (at 32-35) that the inferences that Judge Netburn drew from Kreindler's and Fawcett's phone calls were unreasonable.  As to the June 28 phone calls, the firm asserts that it is not "surprising" that Kreindler would not recall the details of the protective orders and would need to ask Fawcett, but Kreindler testified under oath that he was "very familiar with the terms" of at least the FBI Protective Order.  Tr. 18:17.  Judge Netburn could reasonably credit that statement over his contrary (and self-exculpatory) claim that he had not recalled the 30-day period.  Kreindler & Kreindler also fails to address Judge

---

[13] Kreindler & Kreindler remarkably contends (at 27-28) that it has no "litigation strategy" of attempting to "'force' Saudi Arabia into 'a settlement.'"  The record supports Judge Netburn's contrary finding.  *See* Tr. 24:3-25:5 ("Q.  So, Mr. Kreindler, you have been making public statements about this case for years to put settlement pressure on the defendants, haven't you? . . . .  A.  I would say to put pressure on the defendant Saudi Arabia, yes.  The form of a resolution may or may not be what we traditionally think of as a settlement.").

Netburn's reasoning that Fawcett's loyalty to Kreindler was not consistent with his affirming to Kreindler that a transcript was confidential and then secretly leaking it.

As to the July 22 phone calls, Kreindler & Kreindler asserts (at 33) that even though both Kreindler and Fawcett testified that they could not "recall the contents of the call," Judge Netburn was still required to accept the one fact that did they claim to be able to recall – that the call "was not about the leak." It does not address her contrary reasoning that, based on her personal observation of Kreindler and Fawcett, Fawcett would not have been able to switch back and forth between his communications with Crotty and his calls with Kreindler, while concealing his guilt from Kreindler.[14]

### B.  Judge Netburn Reasonably Determined That Kreindler & Kreindler's Breach of the Protective Orders Was Willful

**1.**     Judge Netburn reasonably determined that Kreindler & Kreindler acted willfully in violating the MDL and FBI Protective Orders because the breach was "the result of deliberate coordination" between Kreindler and Fawcett and because "the rest of the firm was, at best, willfully blind to this strategy." Op. 46. Her finding of deliberate coordination was supported by the same evidence set forth above. *See supra* pp. 28-30. Her finding of willful blindness was based on the firm's "lackadaisical," "paltry," and "facially deficient" investigation and its attorneys' "knowingly misleading statements to the Court." Op. 2, 39, 41, 44.

The investigation's defects included (1) "prejudg[ment]" and unjustified "confiden[ce] that Kreindler & Kreindler was not the source of the leak"; (2) reliance on informal questioning

---

[14] Kreindler & Kreindler misplaces reliance (at 33-34) on a post-hearing declaration from Pounian, which Judge Netburn found to be inadmissible hearsay and declined to accept. Op. 17 n.8. The firm cites no authority to show that her evidentiary ruling was an abuse of discretion. Also, as Judge Netburn observed, Pounian's version of events "undercut Kreindler's testimony" because Pounian declared that the call was about a response to Saudi Arabia's July 21 email, contrary to Kreindler's protestations that it was not about the leak. *Id.*

in a group setting; (3) disregard for document retention until outside counsel was retained; (4) insufficient document searches and failure to follow up on them; (5) failure to account for firm-wide "access" to the transcript through the "Case Media" system; (6) failure to check firm phone records; (7) failure to search personal devices or outside cloud-based systems; and (8) absence of any "forensic" efforts.  Op. 12-16, 39-40; *see supra* pp. 6-8.  Maloney, a former federal prosecutor, knew how to conduct a professional investigation.  *See* Tr. 225:7-12. Judge Netburn reasonably inferred that he decided not to conduct one here because he wanted to remain "willfully unaware" of what one would reveal – or, alternatively, was already aware and "active[ly] collu[ding] in a cover-up."  Op. 39.

Kreindler & Kreindler's "sheer number of misrepresentations" to the Court, Op. 52, also contributed to Judge Netburn's finding of willfulness.  The most important were the false or misleading statements to the Court that Kreindler & Kreindler was not responsible for the breach, that no firm attorneys knew who was responsible for the breach until September 27, that Fawcett acted alone, and that he had a personal motive for the breach.  Op. 19-20, 22, 26-28, 31, 39, 42.[15]  In addition, firm attorneys also made or caused others to make false or misleading statements that (i) the firm's investigation was "complete" by July 27, even though Hartney still had searches to run; (ii) the September 27 declarations included all individuals with "access" to the Al Jarrah transcript, even though the entire firm could access it; (iii)  Hartney "did not find any evidence that the Jarrah transcripts had been downloaded[ or] printed," even though Kreindler & Kreindler's systems did not permit him to look for such evidence; and (iv) Fawcett

---

[15] Those statements included the PEC's July 27 letter to the Court, in which Kreindler & Kreindler joined, KSAX-0043; the Kreindler & Kreindler attorneys' August 16 declarations, KSAX-0048A through 48D; the Kreindler & Kreindler attorneys' September 27 declarations, KSAX-0056A through 56D; Fawcett's September 27 and 30 declarations, KSAX-0056J, KSAX-0059; and hearing testimony from Kreindler and others.

had sent "portions" of the transcript to Isikoff that were "'focused on'" child pornography allegations, even though he had sent the entire transcript.  Op. 16, 19-20, 25-26, 27-28, 40.

In addition, Judge Netburn's finding of willfulness drew further support from Kreindler & Kreindler's attempts "to use the Court's investigation as a forum to compound the damage caused by the breach," Op. 42, pointing to "embarrassing and irrelevant information targeting Saudi Arabia" that Benett "went out of her way" to introduce, Op. 31 (discussing Tr. 393:1-15), and to "'gratuitous and irrelevant information about Al Jarrah's interactions with the FBI'" that Kreindler & Kreindler "tried" to "inject" into the record in a post-hearing declaration that Judge Netburn ordered sealed and refiled in redacted form, Op. 33 (quoting ECF No. 7381 at 1).

2.      Kreindler & Kreindler's criticisms of Judge Netburn's findings (at 28-32) fall short.  *First*, it takes issue (at 29-30) with Judge Netburn's finding that Fawcett was not directly questioned until September 27, pointing to purportedly contrary testimony from Fawcett, Tr. 436:12-23, and erroneously claiming that Judge Netburn "ignore[d]" it.  Judge Netburn cited the exact testimony that Kreindler & Kreindler highlights.  Op. 40.  Although Kreindler & Kreindler emphasizes Fawcett's statement that "they would have asked in substance," Tr. 436:16-17, Judge Netburn reasonably interpreted his entire testimony as meaning that he was never directly asked – especially the follow-on colloquy in which counsel asked him specifically about each Kreindler & Kreindler attorney and he answered that he did not recall being asked the question directly. *See* Tr. 439:1-3 (Kreindler), 439:4-6 (Benett), 439:7-9 (Maloney), 439:10-12 (Pounian).  As finder of fact watching Fawcett answer those questions, Judge Netburn could see him attempting to equivocate and ultimately failing.

*Second*, Kreindler & Kreindler erroneously asserts (at 29) that "the heightened investigatory steps suggested by [Judge Netburn] would not have revealed Fawcett as the leaker."  Maloney could have examined Fawcett's personal device and found Signal messages

showing that he and Isikoff were discussing the contents of confidential depositions by July 5, *see supra* p. 5, or a later exchange in which Fawcett warned Isikoff of a "witch hunt," KSAX-0150 at 2; *see* Tr. 232:22-234:2.  Maloney could have found the suspicious calls between and among Kreindler, Fawcett, and Isikoff on June 28, or between and among Kreindler, Fawcett, and Crotty on July 22.  *See supra* pp. 5-6, 9-10.  Before or after doing those things, Maloney could also have asked Fawcett directly about the leak or – most importantly – required him to sign a statement under oath for submission to the Court, as other firms did for their attorneys and employees.  *See supra* pp. 8, 10-11.  A requirement to sign such a declaration ultimately caused Fawcett to confess.  Kreindler & Kreindler's reluctance to impose such a requirement on Fawcett supports Judge Netburn's reasonable inference that Maloney and others either already knew or deliberately sought to avoid learning what Fawcett would say under oath.

*Third*, Kreindler & Kreindler professes (at 30-32) that it "supported a process for identifying the leaker," that it "complied with [Judge Netburn's] directives," and that its refusal to come forward with information about how it had shared the Al Jarrah transcript reflected "unique and pressing work product concerns."  Its self-serving assertions cannot overcome Judge Netburn's meticulous catalogue of Kreindler & Kreindler's refusals to cooperate, misleading statements to the Court, and other misconduct, especially on deferential review.

*Fourth*, Kreindler & Kreindler also unpersuasively responds to Judge Netburn's finding that it "tried to use the Court's investigation as a forum to compound the damage caused by the breach," Op. 42, by asserting (at 31) that its attorneys "repeated the truth" about Fawcett's motives.  It fails to address Judge Netburn's finding that Benett "went out of her way in her testimony" to make baseless allegations against Al Jarrah that were "nowhere in the original declaration Fawcett drafted, [in] the declaration prepared after Benett['s] and Pounian's tinkering, [in] the follow-up declaration Fawcett provided," or even in "Isikoff's article."

Op. 31 (citations omitted).  Judge Netburn could reasonably infer that Benett was again resorting to "fabricat[ion]" and "invention," Op. 42, not testifying honestly about Fawcett's motives.

## III.     Judge Netburn's Sanctions Against Kreindler & Kreindler Are Just and Reasonable

### A.     Judge Netburn Considered the Appropriate Factors Under Circuit Precedent

Judge Netburn had "'wide discretion in imposing sanctions under Rule 37'" because "'the text of [Rule 37(b)(2)(A)] requires only that the district court's orders be "just."'" *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (quoting *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)). In fashioning sanctions, she considered four non-exclusive factors that the Second Circuit has identified as relevant in guiding that exercise of discretion:

> (1) the willfulness of the non-compliant party or the reason for noncompliance;
> (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance;
> and (4) whether the non-compliant party had been warned of the consequences
> of . . . noncompliance.

*Id.* (internal quotation marks omitted; ellipsis in original); *see* Op. 45-52.  She also properly considered Kreindler & Kreindler's "almost complete lack of respect for the Court and its orders," Op. 52, including additional violations of those orders.

After examining those factors and additional considerations, Judge Netburn determined that "removal from the PECs is the appropriate sanction," Op. 55, reasoning that "[b]eyond removal there is no lesser sanction that can address the firm's repeated flouting of the Protective Orders and lack of candor before the Court" and that other sanctions would "unfairly penalize" or "unfairly harm" Kreindler & Kreindler's clients, Op. 47-50.  She noted that, "[w]ith this episode, the Court has lost faith in Kreindler & Kreindler" and that "the firm's removal from the PECs is not only an appropriate sanction, but a necessary step to ensure that body's continuing efficacy and credibility."  Op. 57.  She also limited Kreindler & Kreindler's ability to recover

fees from any future common fund fee award, Op. 57-58, and ordered it to "pay Saudi Arabia reasonable attorneys' fees and costs associated with investigating and addressing the breach of the Protective Orders," Op. 59.  Those rulings were within her broad discretion.

### B.      Kreindler & Kreindler Fails To Show an Abuse of Discretion

**1.**      Kreindler & Kreindler errs in contending (at 36-37) both that Judge Netburn was required to consider "the harm that resulted from the leak" in fashioning appropriate sanctions and that she "failed" to do so.  Harm from a violation of a court order is not a separate factor under *Worldwide Polymers* or *Global NAPs*.  Judge Netburn did not err by framing her analysis using the factors set forth in the Second Circuit's precedent.

In any event, Judge Netburn noted several kinds of "damage caused by the breach." Op. 42.  Al Jarrah and Saudi Arabia were harmed by the release of "embarrassing and irrelevant information" and "gratuitous attack[s]" that will "permanent[ly]" remain public "on the internet." Op. 31, 50-51.  Kreindler & Kreindler's own clients were harmed because their attorneys "diverted focus from their clients' case."  Op. 58.  Other Plaintiffs were harmed because Kreindler & Kreindler "injected false information into the PECs' communication with the Court," damaging Plaintiffs' collective credibility.  *Id.*  "[O]ther firms" were "forced . . . to spend time and resources on an investigation irrelevant to their client's claims."  *Id.*  The Court's own time and resources have been (and are still being) consumed by what Judge Netburn described as a "draining debacle." Op. 50.  And "Isikoff's article has permanently damaged the credibility of the Protective Orders as a tool for encouraging fulsome disclosure," harming the important public interest in "'fully and fairly enforc[ing]'" such orders to "'encourag[e] full disclosure of . . . evidence.'"  Op. 51 (quoting *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 295 (2d Cir. 1979)).

The cases that Kreindler & Kreindler cites (at 36) do not support its claims of error. *City of Almaty, Kazakhstan v. Ablyazov*, 2018 WL 1229730 (S.D.N.Y. Mar. 5, 2018), rejected

a proposed Rule 37(b)(2) sanction (appointment of a discovery master), observing that "it [wa]s not necessary to make Plaintiffs whole." *Id.* at *7 n.2.  That footnoted observation did not detract from the thrust of the court's reasoning, which focused on the sufficiency of the sanction in deterring future breaches, *see id.* at *7, as Judge Netburn did here, *see* Op. 50.  *Jay v. Spectrum Brands Holdings, Inc.*, 2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015), noted a lack of prejudice from a protective order breach, and further reasoned that "the narrow parameters of the violation" ("a single incident" involving disclosure of "limited information") suggested "that a lesser sanction" than disqualification of the plaintiff's counsel "would be [ ]sufficient to address the situation presented and deter future misconduct." *Id.* at *11.  Judge Netburn considered several alternative sanctions here, but reasonably concluded they were not sufficient.

2.       Kreindler & Kreindler fails to show (at 37-38) that Plaintiffs have been harmed by Kreindler & Kreindler's removal from the PECs.  Both fact and expert discovery are complete. The next step will be the briefing of *Daubert* motions and a renewed motion to dismiss, but no schedule for this briefing is currently in place.  When a schedule is set, the remaining members of the PECs are capable of handling those filings.  They have informed the Court that they are ready to "conduct[ ] all pre-trial proceedings involving common legal and factual issues, whether relating to liability or damages, on behalf of all Plaintiffs" and that no "structural changes to the PECs are necessary" because of Kreindler & Kreindler's removal.  ECF No. 8603 at 1.  To the extent they need past work product generated by Kreindler & Kreindler, nothing in Judge Netburn's order prevents Kreindler & Kreindler from providing it.

In addition, Judge Netburn observed that, because of Kreindler & Kreindler's willful and deliberate violations of the protective orders and attempts by the firm to mislead the Court and frustrate the Court's investigation, she "ha[d] lost faith in the firm's ability to conduct this litigation responsibly and report honestly as a representative of all plaintiffs."  Op. 55.

Even assuming for argument's sake that Plaintiffs have been harmed by the loss of Kreindler &
Kreindler as a representative, that harm was caused by the firm's own conduct. Judge Netburn
merely recognized the loss of credibility that had already taken place. *See* Op. 57 ("The PECs
cannot efficiently perform their functions if the Court cannot trust their statements.").[16]

3.      Kreindler & Kreindler also fails to show (at 38) that Judge Netburn's sanctions
are "out of step" with the case law. *Koch v. Greenberg*, 2011 WL 4485975 (S.D.N.Y. Sept. 28,
2011), *modified*, 2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012), involved an incident in which
an attorney gave documents to one unauthorized recipient, who gave at least one document to a
reporter. *Id.* at *1. That case featured no litigation strategy of disclosure, no previous violations,
no obstruction of a court investigation, and no misrepresentations. *Denis v. County of Nassau*,
2019 WL 7372957 (E.D.N.Y. Dec. 31, 2019), involved an unauthorized disclosure because of
"gross negligence," not an intentional violation; the negligent attorney also "apologized" and
"accepted responsibility." *Id.* at *7, *9. *Abbott Laboratories v. Adelphia Supply USA*, 2017 WL
1732454 (E.D.N.Y. May 2, 2017), involved a party who observed depositions without signing
the appropriate form. *Id.* at *1-2; *see also supra* p. 38 (discussing *Jay v. Spectrum Brands*).
The conduct here was far more serious than in any of those cases.

4.      Kreindler & Kreindler mischaracterizes (at 39-40) Judge Netburn's ruling as
drawing support from what it calls "unrelated incidents" that it asserts were not "intentional
breach[es]." Other violations that supported Judge Netburn's ruling included Kreindler &
Kreindler's 2017 violation of the MDL Protective Order by disclosing the contents of a

---

[16] This point is further confirmed by a recent exchange between Kreindler & Kreindler and
the remaining PEC members in which, responding to a declaration by Maloney touting the
importance of his firm's work, the remaining members "dispute[d] the veracity of the facts and
characterizations as recited in [his] declaration" and expressed reluctance "to engage in any
further distractions created by the Kreindler firm." ECF No. 8620 at 1.

confidential document to a journalist, Op. 5; its failure to maintain the Al Jarrah transcript securely, Op. 25-26, 53; its violation during the Al Jarrah deposition of the Court's discovery protocol through an undisclosed attendee, Op. 32-33, 53; and its posting on a public website of an entire tranche of discovery materials from the London Metropolitan Police Service, Op. 33-34, 54. All of that conduct is relevant to the remedy for the current breach because it concerns Kreindler & Kreindler's consistent failure to comply with the Court's orders and, as Judge Netburn observed, shows "how little respect the firm has for the Court's efforts to manage this litigation." Op. 53.

5.     Finally, Kreindler & Kreindler cannot show error (at 40) in Judge Netburn's determination that financial sanctions alone will not sufficiently deter future misconduct. As she explained, "[d]irect financial penalties . . . are frequently ineffective in cases involving protective order breaches." Op. 48; *see City of Ablyazov*, 2018 WL 1229730, at *7 (noting that a sanction should not enable a party "to simply pay for breaches of court orders and transform compliance with them into a mere financial calculation"). That is all the more so in this case, given Kreindler & Kreindler's own claim that any award against Saudi Arabia "will likely be worth billions of dollars." Op. 48. Although Kreindler & Kreindler attempts (at 40) to frame any award as "speculative," Judge Netburn found that the potential for an award drives Kreindler & Kreindler's litigation strategy and actions in furtherance of that strategy. Op. 2, 6, 37, 44. That finding was supported by the record and by her long experience with the case. It supports her reasoning that "[f]inancial sanctions alone are simply not viable" as a deterrent. Op. 48.

## CONCLUSION

Kreindler & Kreindler's Rule 72 objections should be overruled.

Dated:  November 15, 2022

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
Christopher M. Young
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 15, 2022, I caused a copy of the foregoing Opposition to Kreindler & Kreindler's Rule 72 Objections to the September 21, 2022 Opinion & Order filed by the Kingdom of Saudi Arabia to be served electronically pursuant to the Court's ECF system.


/s/ *Michael K. Kellogg*
Michael K. Kellogg
*Attorney for the Kingdom of Saudi Arabia*