**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MD-01570 (GBD) (SN)

This document relates to: *All Actions*

ORAL ARGUMENT SCHEDULED
DECEMBER 8, 2022  @ 10:00 AM

---

**RULE 72 OBJECTIONS TO MAGISTRATE JUDGE SARAH NETBURN'S**
**ORDER IMPOSING SANCTIONS ON KREINDLER & KREINDLER LLP**

Emily Kirsch
Paul Niehaus
KIRSCH & NIEHAUS PLLC
950 Third Avenue, 19th floor
New York, NY 10022
(212) 832-0170
emily.kirsch@kirschniehaus.com

Edward M. Spiro
MORVILLO ABRAMOWITZ GRAND
 IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
espiro@maglaw.com

*Counsel for Non-Party Kreindler & Kreindler LLP*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    Fawcett Was a Longtime, Trusted Consultant for K&K ........................................ 3

    B.    Fawcett Secretly Leaks the Transcript, Evading K&K Security Measures and Lying to K&K Attorneys .................................................................................................. 4

    C.    K&K Investigates the Leak Independently and in Accordance with the Magistrate Judge's Orders to the Parties ...................................................................... 6

    D.    Fawcett Admits to Being the Source of the Leak ................................................. 10

    E.    The Magistrate Judge Permits Discovery of K&K by Saudi Arabia and Holds an Evidentiary Hearing on November 1 and 2, 2021 ................................................. 12

    F.    The Magistrate Judge's September 21, 2022 Opinion and Order ......................... 14

STANDARD OF REVIEW ........................................................................................... 15

ARGUMENT ................................................................................................................. 15

I.    The Magistrate Judge's Rule 37(b) Order Sanctioning K&K is "Contrary to Law" ........ 15

    A.    Rule 37(b) Did Not Authorize Sanctions Against K&K ...................................... 16

    B.    The Magistrate Judge Applied the Wrong Evidentiary Standard ........................ 19

II.    The Magistrate Judge's Finding that K&K "Willfully Breached" the Protective Orders, in Light of the Full Record, Cannot be Sustained as a Matter of Law. ........................... 21

    A.    Direct Evidence Confirms the Truth of Fawcett's Confession ............................ 22

    B.    No Circumstantial Evidence Supports the Finding that K&K Willfully Breached the Protective Order ........................................................................................ 26

        1.    K&K's "Litigation Strategy" ................................................................... 27

        2.    K&K's Post-Leak Investigation ................................................................ 28

        3.    K&K's Responses to the Magistrate Judge's Orders ............................... 30

i

      4.     The Timing of Phone Calls ........................................................................ 32

III.    The Sanctions Imposed on K&K Are Neither Just Nor Commensurate with Fawcett's Breach. ..................................................................................................................... 35

CONCLUSION ................................................................................................................ 40

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Abbott Laboratories v. Adelphia Supply USA*,
  2017 WL 1732454 (E.D.N.Y. May 2, 2017) .................................................... 38

*Apex Oil Co. v. Belcher Co. of New York*,
  855 F.2d 1009 (2d Cir. 1988) ......................................................................... 18

*Bloom v. Azar*,
  976 F.3d 157 (2d Cir. 2020) ........................................................................... 18

*Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*,
  498 U.S. 533 (1991) ........................................................................................ 16

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
  602 F.2d 1062 (2d Cir. 1979) .................................................................... 22, 36

*City of Almaty v. Ablyazov*,
  2018 WL 1229730 (S.D.N.Y. Mar. 5, 2018) .................................................. 36

*Daval Steel Prod. v. M/V Fakredine*,
  951 F.2d 1357 (2d Cir. 1991) .................................................................... 36, 38

*Denis v. County of Nassau*,
  2019 WL 7372957 (E.D.N.Y. Dec. 31, 2019) ................................................ 38

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*,
  128 F.3d 99 (2d Cir. 1997) ............................................................................. 19

*International Union v. Bagwell*,
  512 U.S. 821 (1994) ........................................................................................ 21

*Jay v. Spectrum Brands Holdings, Inc*,
  2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015) ........................................... 36, 38

*Koch v. Greenberg*,
  2011 WL 4485975 (S.D.N.Y. Sept. 28, 2011) ............................................... 41

*Mackler Prods., Inc. v. Cohen*,
  146 F.3d 126 (2d Cir. 1998) ........................................................................... 21

*Markus v. Rozhkov*,
  615 B.R. 679 (S.D.N.Y. 2020) ....................................................................... 19

*Nationwide Mut. Ins. Co. v. Mortensen*,
   2009 WL 2710264 (D. Conn. Aug. 24, 2009) ..................................................... 28

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................................... 29

*NPF Franchising, LLC v. SY Dawgs, LLC*,
   37 F.4th 369 (6th Cir. 2022) ............................................................................. 19

*Oliveri v. Thompson*,
   803 F.2d 1265 (2d Cir. 1986)............................................................................. 20

*Pavelic & LeFlore v. Marvel Entertainment Group*,
   493 U.S. 120 (1989)........................................................................................... 18

*Ramgoolie v. Ramgoolie*,
   333 F.R.D. 30 (S.D.N.Y. 2019) ......................................................................... 22

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
   490 F.3d 130 (2d Cir. 2007)............................................................................... 36

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
   685 F.3d 486 (5th Cir. 2012) ............................................................................. 19

*S. New England Tele. Co. v. Global NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010)............................................................................... 19

*Thompson v. Jam. Hosp. Med. Ctr.*,
   2015 WL 7430806 (S.D.N.Y. Nov. 20, 2015)........................................ 22, 29, 30

*U.S. ex rel. Eisenstein v. City of New York*,
   556 U.S. 928 (2009)........................................................................................... 16

*United States v. Pauling*,
   924 F.3d 649 (2d Cir. 2019)................................................... 22, 27, 32, 35

*United States v. Zapatero*,
   961 F.3d 123 (2d Cir. 2020)............................................................................... 16

*Update Art, Inc. v. Modiin Publ'g, Ltd.*,
   843 F.2d 67 (2d Cir. 1988)................................................................................. 40

*Williams v. Beemiller, Inc.*,
   527 F.3d 259 (2d Cir. 2008)............................................................................... 15

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
    564 F.3d 110 (2d Cir. 2009)............................................................................................ 20

*Yukos Cap. S.A.R.L. v. Feldman*,
    977 F.3d 216 (2d Cir. 2020)............................................................................................ 20

**Statutes**

18 U.S.C. § 1621 ............................................................................................................... 25

28 U.S.C. § 636(b) ...................................................................................................... 15, 34

28 U.S.C. § 1746 ............................................................................................................... 25

**Rules**

Fed. R. Civ. P. 11(c) .................................................................................................... 17, 18

Fed. R. Civ. P. 37(a) .................................................................................................... 16, 17

Fed. R. Civ. P. 37(b) .................................................................................................. *passim*

Fed. R. Civ. P. 37(c) (1987) ......................................................................................... 18, 19

Fed. R. Civ. P. 37(d) .................................................................................................... 17, 19

Fed. R. Civ. P. 72(a) .................................................................................................. *passim*

## PRELIMINARY STATEMENT

On September 27, 2021, Kreindler & Kreindler LLP ("K&K") discovered that a longtime and trusted consultant, John Fawcett, had violated the two protective orders of this Court (the "Protective Orders") by leaking a deposition transcript to a Yahoo! News reporter in July 2021. That morning, after months of prevarication, Fawcett confessed the truth to K&K attorneys. That same day, K&K reported what Fawcett had done to Magistrate Judge Sarah Netburn (hereinafter, the "Magistrate Judge" or "the court") and apologized to this Court, the Magistrate Judge, and the parties for Fawcett's misconduct.

Fawcett admitted, under penalty of perjury, that:

- he leaked the transcript to the reporter;

- he copied the transcript from K&K's computer storage system onto a thumb drive, a method that circumvented any means for K&K to discover his misconduct; sent the transcript via an encrypted email service; and deleted all evidence of his actions;

- no one other than the reporter was aware of what he had done until the morning of September 27, 2021;

- he leaked the transcript because he believed that media attention was the only means to protect the public from a deposition witness who collected pornography involving minor children;

- he was questioned by K&K attorneys shortly after the Yahoo! News article was published on July 15, 2021, and denied that he knew anything about the leak; and

- for over two months, he prevaricated, dissembled, and misled K&K attorneys to cover up what he had done.

K&K attorneys met immediately after the Yahoo! News article was published and started an investigation the following day, in order to find out whether the firm was the source of the leak. K&K's investigation was substantially similar to the investigations of other plaintiffs' and defendants' law firms. After the Magistrate Judge issued Orders directing K&K and other entities to submit declarations from its attorneys and staff, K&K faithfully and timely complied with those

Orders.  K&K was unable to uncover the leak until the day Fawcett confessed because Fawcett repeatedly lied to K&K to hide what he had done, and because Fawcett leaked the transcript in a way that left no trace.  K&K thereafter produced internal communications and other discovery to counsel for Defendant Kingdom of Saudi Arabia ("Saudi Arabia").

At a two-day hearing before the Magistrate Judge, all direct and indirect evidence corroborated Fawcett's sworn confession that he wrongfully leaked the transcript on his own, without permission or ratification, for personal reasons, and that K&K's attorneys were entirely unaware of what he had done until the day he confessed.

The Magistrate Judge's ruling is clearly erroneous and contrary to law and should be set aside.  The ruling is clearly erroneous because it overlooks the evidence and is based on speculation.  While the ruling finds that Fawcett would not submit perjurious testimony, it fails to address the undisputed facts in Fawcett's declarations and testimony that he acted alone to leak the transcript.  Despite being lied to and misled, K&K ultimately discovered who leaked the transcript, and K&K immediately reported the facts to the Court.

The ruling is contrary to law because it relies solely on Federal Rule of Civil Procedure 37(b) to impose sanctions on K&K.  But Rule 37(b)'s plain text only allows sanctions based on the misconduct of "a party," which is absent here, and does not authorize sanctions against K&K.  The ruling is also contrary to law because it did not consider or apply the requisite evidentiary standards.  Under Second Circuit caselaw, no sanction could be imposed on K&K or its attorneys without findings of bad faith based on specific facts and clear-and-convincing evidence.  No such findings were made, or could be made, based on the evidence.  In addition, the Magistrate Judge made additional errors of law by excluding and not considering key evidence.

Finally, the immediate removal of K&K from the Plaintiffs' Executive Committee for Death and Injury Claims ("PEC"), after nearly 20 years at the helm, was not only unauthorized as a matter of law but was not commensurate with the leak itself.  Given K&K's lead role in prosecuting the case of 9/11 death and injury plaintiffs ("Plaintiffs") against Saudi Arabia, the removal sanction highly prejudices Plaintiffs and was wholly out of proportion to K&K's responsibility for a breach that Fawcett perpetrated alone and in secret.

## BACKGROUND

### A.    Fawcett Was a Longtime, Trusted Consultant for K&K

In 2002, Fawcett started working for K&K as a researcher and consultant.  *See* Transcript of Nov. 1-2, 2021 Hearing ("Tr.") 365:11-13; KSAX-62A (ECF 7166-1).  Before joining the firm, in addition to spending ten years in Turkey, Fawcett worked for a humanitarian aid organization in Iraq, the former Yugoslavia, Afghanistan, and Pakistan, among other countries.  Tr. 483:13-17.  Through his human rights work, Fawcett became aware of the "dreadful history of child sex trafficking" in Morocco.  KSAX-62A.  With such knowledge, Fawcett adopted two children from Morocco.  *Id.*; Tr. 489:11-16.

Until late September 2021, Fawcett primarily managed and analyzed the 9/11 discovery materials for K&K.  Tr. 40:5-9, 483:22-24.  This work represented 80-90% of his income.  Tr. 416:9-11.  Over two decades, Fawcett spent significant time engaging with 9/11 families, including participating in weekly calls with the families and educating them about the progress of the case. Tr. 366:6-13, 483:24-484:1.  He worked with Jim Kreindler and Andrew Maloney for 20 years, and with Steven Pounian and Megan Benett for at least four years.  *See* Tr. 21:9-10, 398:8-9, 410:25-411:2.  Since the commencement of this action in 2016 against Saudi Arabia, as a core team member, Fawcett interacted on an almost "daily basis" with K&K attorneys.  Tr. 275:9-14, 411:3-7.  After decades together, K&K attorneys viewed Fawcett as an "key member" of the team,

3

Tr. 215:12-16 (Maloney), a "tireless advocate" for 9/11 families, Tr. 366:6-13 (Benett), and as a "colleague and a peer" about whom they "never" received a complaint, Tr. 412:1-2, 413:9-12 (Pounian).  As a result, K&K attorneys trusted Fawcett deeply.  *See, e.g.*, Tr. 128:14-15 (Kreindler: "[O]ne of the most . . . honest and trustworthy people I ever met."); Tr. 411:25-412:1 (Pounian: "[S]omeone that we trusted as a professional."); Tr. 279:5-6 (Maloney: "You come to know people after 20 years of working with them [and], you know, their integrity . . . .").

### B.    Fawcett Secretly Leaks the Transcript, Evading K&K Security Measures and Lying to K&K Attorneys

In mid-June 2021, Benett deposed Musaed al Jarrah, who had served as an official at the Saudi Embassy in Washington, D.C.  The deposition transcript (the "Transcript") was designated confidential under the governing Protective Orders, *see* ECF 1900 (MDL protective order), and was presumptively confidential for 30 days after the deposition, *see id.*; ECF 4255 (FBI protective order) .  Although Fawcett had heard a "rumor" of Jarrah's activities involving child pornography in the months preceding his deposition, the deposition confirmed the rumor and, on the day of the deposition, Fawcett and Benett received "disturbing" descriptions of the images.  Tr. 468:21-470:4 (Fawcett); Tr. 327:3-25, 393:10-15 (Benett).

In his own words, Fawcett decided to leak the Transcript "[a]fter the revelations at the deposition that [Jarrah] was a child pornographer" because the public "must be forewarned in order to have some chance to protect themselves" and "the only venue for such warning is the media." KSAX-108A.  Fawcett wrote that the Saudi and U.S. governments "continue to protect [Jarrah] rather than prosecute him . . . ."  *Id.*  According to Fawcett, his knowledge that Jarrah worked as a Saudi diplomat in Morocco for years and continued to live there, and of Morocco's history of child sex trafficking, further informed his decision to leak the Transcript.  ECF 7166-1 at ¶ 4.  He stated

that "I sent the Jarrah transcripts to Isikoff because I wanted someone to do something to stop Jarrah." ECF 7162-2 at ¶ 6.

In early July 2021, Fawcett contacted Michael Isikoff of Yahoo! News about the Jarrah deposition and sent him the Transcript on or about July 5, 2021. Tr. 430:11-431:14, 432:10-25, 436:1-5. To avoid detection, Fawcett said that he took "several steps" to send the Transcript "without anyone at Kreindler knowing": he "saved [the Transcript] onto a thumb drive" from an office computer; "took the thumb drive home"; and "used a personal email account [he] established on ProtonMail," an encrypted end-to-end email service, "to send the transcript [to Isikoff]." ECF 7162-2 ¶¶ 7-9. To further avoid detection, Fawcett used a self-destruct feature to erase any trace of the email after seven days and later wiped and destroyed the thumb drive. *Id.* According to Fawcett, he took steps to hide his misconduct because he knew that "[the K&K lawyers] would tell me not to do it" and would not "condone" it. Tr. 485:17-21.

During this same period, Isikoff's staff also communicated with Jim Kreindler about joining Isikoff's podcast *Conspiracyland*, with Kreindler attending on July 1, 2021 and it ultimately airing on July 10, 2021. *See, e.g.*, Tr. 59:18-24; ECF 7147-6 at 6. Kreindler discussed on the podcast where things stood with the case against Saudi Arabia, including general discussion of the depositions of Omar al Bayoumi, Fahad al Thumairy, and Jarrah. ECF 8000 at 2.[1] Fawcett and Kreindler, who worked with each other "every day," also communicated over the phone throughout this period, as "probably not a day [went] by" where they were not talking. Tr. 59:22-23, 86:10-12 (Kreindler). Given the timing, Fawcett said he called Isikoff to convey that he was "worried" that Kreindler might get blamed for the leak because of his participation in the podcast with Isikoff even though Kreindler had no knowledge about the leak. ECF 7162-2 at ¶ 8.

---

[1] *See generally* Apple Podcasts, *Conspiracyland*, Bonus Episode 2: "Khashoggi and the 9/11 lawsuit" (July 10, 2021), https://tinyurl.com/4u6ze9rx.

On July 5, 2021, Isikoff emailed counsel for Saudi Arabia, stated that he was "doing a story on the state of the 9/11 lawsuit," and asked whether he wanted to comment "in response to what Jim Kreindler had to say about where things stand – and how the [three] depositions went."  ECF 6981-4 at 10.[2]

On July 15, 2021, Isikoff published an article based on the Transcript that he obtained from Fawcett, in which he reported that the FBI had confronted Jarrah with child pornography found on his laptop in an effort to get Jarrah to cooperate with their 9/11 investigation.  KSAX40.

### C.    K&K Investigates the Leak Independently and in Accordance with the Magistrate Judge's Orders to the Parties

Recognizing "immediately that [this] was a serious issue," K&K attorneys held a conference call the day of the leak, which Fawcett attended, and discussed "whether anyone knew how Isikoff had obtained the transcript, whether anybody at Kreindler had sent the transcript to him or told Mr. Isikoff anything about the Jarrah deposition."  Tr. 277:9-13, 278:17-21 (Maloney). Despite this discussion, Fawcett did not admit his misconduct to his colleagues and Maloney and other K&K lawyers finished the call initially "confident" that "no one," including Fawcett, "had sent the transcript" to Isikoff or "knew how he got it."   Tr. 212:3-5, 216:5-11, 278:22-24 (Maloney); Tr. 123:18-21 (Kreindler).  Despite having "trust" in his colleagues, Maloney sought to "verify" that K&K was not the source of the leak, working with John Hartney, the firm's head of information technology.   Tr. 279:3-10.   Pounian did his own internal checks with K&K personnel because he similarly was "very concerned about nailing down exactly what had

---

[2] In his email, Isikoff included the following quote from Kreindler's the podcast that had been taped but not yet broadcast: "If I could tell you now everything we knew about the Saudi role, you could see a resolution in Congress to declare war. I mean, it is so dramatic… 'We are thrilled with how the depositions went,. I can say that we've exposed all kinds of lies. You know, one witness will contradict another.  Each person wants to minimize their own role and point fingers at each other."  ECF 6981-4 (errors in original).

happened with the transcript" and "wanted to determine if the transcript had left the law firm in any way, shape or form." Tr. 406:2-3, 406:23-24, 407:1-5 (Pounian).

Seeking to determine whether anyone shared the Transcript, the internal investigation searched the firm's email and document servers to track any movement of the Transcript, and reviewed the Citrix cloud-based system. Tr. 185:2-186:10; KK-14 (Citrix access report). The initial email server searches revealed only two instances of the Transcript leaving the firm; it was sent by a K&K paralegal to an authorized co-counsel at Baumeister & Samuels P.C. and by Fawcett to an authorized consultant living abroad. Tr. 290:14-291:2; Tr. 407:23-408:1. Maloney spoke to the consultant and verified that the consultant had not sent the Transcript to Isikoff. Tr. 291:24-292:7. Maloney and Hartney performed additional searches too, including broad searches, refined searches, and searches targeted to Isikoff and Yahoo! News. Tr. 183:22-183:20; KK-4. The searches of the K&K systems, among other things, revealed a brief email exchange between Isikoff's staff and Kreindler regarding his upcoming appearance on the *Conspiracyland* podcast, an inquiry from Isikoff about motions in the litigation, and an email from Fawcett to Isikoff regarding the publicly filed FBI list of documents being withheld. ECF 7147-6 at 6-27; Tr. 160:7-24. Hartney confirmed that while K&K consultants and experts had access to the Transcript on K&K's cloud-based storage system, none of them had downloaded the Transcript from that system before Isikoff's story was published. ECF 7147-6 at ¶ 6.

On multiple occasions shortly after the Yahoo! News article was published, K&K attorneys directly asked Fawcett whether he was the source of the leak, or whether he knew anything about how the leak could have happened. Maloney, for example, asked Fawcett "face-to-face" whether he "sent this transcript to Mr. Isikoff or if he knew anything about it," and Fawcett said he "did not." Tr. 279:11-20. Fawcett also told Pounian "to [his] face" that "he knew nothing

about" the leak.  Tr. 407:8-408:4.

On July 21, 2021, six days after the article was published, Saudi Arabia emailed the PECs at 9:14 p.m., stating it would ask the court to order discovery into the leak.  KSAX-42 at 3-4.  The following morning, Fawcett sent a text message to a criminal defense attorney, requesting legal advice.  KSAX-151 at 1.  Later that morning, at 9:17 a.m., Fawcett joined a conference call with Pounian and Kreindler to discuss various case issues, including that Pounian would coordinate with the other PEC firms concerning the response to Saudi Arabia's email.  ECF 7359-1 ¶ 4.[3]

K&K has led the fact discovery efforts against Saudi Arabia, including investigating and locating witnesses abroad.  Tr. 370:25-371:8 (Benett).  At the time of the publication, K&K attorneys had "genuine concerns" about revealing K&K's own sensitive, confidential work product information to Saudi Arabia, including the identity of its consultants who had access to protected information.  Tr. 370:9-17, 371:13-18 (Benett).  None of the other plaintiffs' firms had the same work product concerns as they had not provided access to the deposition transcripts to consultants or anyone else outside of their firms.  *See* ECF 6991; ECF 6992; Tr. 372:4-10 (Benett). K&K was particularly "worried" about protecting the identity of one consultant who was living abroad,  especially given the circumstances of the murder of Jamal Khashoggi, who had been interviewed by a K&K representative.   Tr. 372:4-10 (Benett); KK-52 (Pounian: "I'm also concerned about sharing [] name with [Saudi Arabia] since he is living abroad.").  K&K attorneys thought Saudi Arabia might use the leak as a tactical opportunity to access the firm's work product. Tr. 336:17-19; Tr. 370:3-372:20 (discussing safety and work product concerns).  K&K therefore decided "to wait for the court to issue an order to guide the process."  Tr. 336:14-21 (Benett); Tr. 262:9-10 (Maloney: "[T]he consensus was we would wait to see what the court asked us to do.").

---

[3] As discussed in Section II.B.4 *infra*, the Magistrate Judge improperly refused to admit this evidence regarding the conference call.

On July 23, 2021, Saudi Arabia filed a motion for discovery into the handling of the Transcript, as well as the transcripts of the depositions of Bayoumi and Thumairy.  KSAX-41.  Saudi Arabia filed its motion without seeking to meet and confer with the plaintiffs, as required by Judge Netburn's rules.  *See* Individual Rules and Practice § II(C) (June 28, 2021).  On July 27, 2021, the PEC firms—Cozen O'Connor, Motley Rice LLC, and K&K—responded to the motion and asked the Magistrate Judge to direct the parties to meet and confer to prepare a joint plan to investigate the Transcript leak that included adequate protections for Plaintiffs' work product.  ECF 6988 at 1-3.[4]

The letter also stated that, based on their investigations, each of the lead PEC firms is "confident that it was not the source of the leak."  *Id.* at 2.  The described staff meetings and the firm's investigations to date gave K&K such confidence.  Cozen O'Connor and Motley Rice submitted declarations to the court a few days later, including descriptions of their firm's investigations concerning the leak.  ECF 6991; ECF 6992.  The declarations confirmed that those firms did not have the same work product concerns as K&K as neither firm had shared the relevant transcripts with consultants or experts.  ECF 6991; ECF 6992.

On August 12, 2021, the Magistrate Judge granted Saudi Arabia's motion, denied the PECs' request for the parties to agree on an investigation plan, and issued an order requiring Maloney, Pounian, Benett, and Kreindler to file, "*on* August 16, 2021," "declarations, under penalty of perjury, as to whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by" the Protective Orders.  ECF 7011 at

---

[4] The letter explained K&K's concerns that Saudi Arabia's demands "would require Plaintiffs to reveal to Saudi Arabia any unidentified consultant or expert" that had access to any of the three depositions identified by Saudi Arabia.  ECF 6988 at 1-3.  The firms' letter supported a thorough investigation of the leak, with the caveat that "it must do so in a manner that protects Rule 26 work product and prevents the unnecessary identification of . . . consultants and experts."  *Id.*

2 (emphasis added).  As directed, on August 16, 2021, each K&K attorney declared, under penalty of perjury, that they did not individually "share the Jarrah deposition transcript or videos with anyone unauthorized," did not "direct anyone to share the Jarrah deposition transcript or videos with anyone unauthorized," and to their knowledge, "no one with [K&K] or anyone acting on its direction shared the Jarrah deposition transcript with anyone unauthorized."  *See* ECF 7016.

On August 30, 2021, the Magistrate Judge ordered supplemental declarations from additional personnel at K&K, in addition to declarations from the deposition transcription services company and from other plaintiff and defendant law firms.  ECF 7082.  After Oath Inc., which offers the Yahoo! News Service, moved to intervene in this matter, the Magistrate Judge extended the deadline until September 27.  ECF 7134 at 24.

### D.     Fawcett Admits to Being the Source of the Leak

Following the Magistrate Judge's Order, Benett prepared K&K's draft supplemental declarations, spoke to each of the declarants about the contents of the declaration, and explained to the non-lawyers, such as Fawcett, what it meant to sign a declaration under penalty of perjury. Tr. 368:6-369:7.  Before September 27, 2021, Benett emailed Fawcett the Order and prepared and sent a draft declaration to Fawcett based on his previous statements to Maloney and Pounian that he had no knowledge of how Isikoff received the Transcript.  Tr. 339:12-340:3.  On the morning of the court's September 27 deadline, Fawcett confessed to Benett that he leaked the Transcript to Isikoff; Benett then broke the news to the K&K partnership.  Tr. 388:19-389:18.  About two hours later, at 12:20 p.m., Fawcett emailed Benett and Pounian a statement, KSAX-108 (the "Statement"), which "he had drafted himself."  Order at 26; *see also* Tr. 456:7-15 (Fawcett).  The Statement read, in predominate part:

> I sent a redacted version of the transcript of the deposition of Musaed al Jarrah to
> Michael Isikoff in early July, 2021.  The redacted portions related to the sections of
> the deposition which were taken subject to the FBI protective order and irrelevant

to the issue at hand, evidence of Jarrah's use of child pornography. . . . No one at [K&K] instructed me to send the transcript to Michael Isikoff nor did anyone at [K&K] have any knowledge of my sending it to Mr. Isikoff. . . . Until today, no one aside from myself and Michael Isikoff, was aware that I sent the Jarrah transcript to him. I sent the transcript to Mr. Isikoff via a non-[K&K] email address. I did so to prevent the partners and staff of [K&K] from knowing about my intended action and to prevent them from stopping me, should they wish to do so. . . . Neither [the FBI nor Saudi Arabia] has brought legal action despite clear evidence a crime has been committed and there is no evidence to demonstrate that Jarrah has ceased his criminal activity. The protective order should not be used to cover up evidence of a crime that is not being adjudicated. If the Saudi [and U.S. governments] continue to protect Musaed al Jarrah rather than prosecute him, then the public at least must be forewarned in order to have some chance to protect themselves. The only venue for such warning is the media. After the revelations at the deposition that he was a child pornographer, I could not allow Musaed al Jarrah's criminal acts to remain a secret, when I had the opportunity to do something about it. . . . I accept all responsibility for my actions.

*See* Statement (errors in original). Pounian also spoke with Fawcett after receiving the news of his confession from Benett; Pounian and Benett worked that day with Fawcett to prepare his declaration for submission to the court based on the Statement. Tr. 352:19-353:19, 392:2-15 (Benett); Tr. 466:22-467:2 (Fawcett). In addition to the facts in his Statement, in his September 27 Declaration, Fawcett added, under penalty of perjury, that "I had a personal interest because [Jarrah] worked for Saudi Arabia as a diplomat in Morocco for many years and still lives there, . . . and I know from my prior international humanitarian and human rights work that Morocco has a dreadful history of child sex trafficking." KSAX-0121 ¶¶ 3-4. Fawcett later testified that his September 27 Declaration to the court was his own. Tr. 467:12-19.

K&K submitted that declaration, and ten other declarations from K&K attorneys and staff, as required by the deadline set under the court's August 30 order. *See* ECF 7147 et seq. Maloney, Pounian, Benett, and Kreindler each declared, under penalty of perjury, that: "For the first time today I learned the information set forth in the declaration of John Fawcett." *See* ECF 7147-1 to 7147-4. Three days later, on September 30, Fawcett submitted a second declaration to the court,

detailing the substantial steps he took to hide his misconduct through the use of a thumb drive, the use of an encrypted email service, and the destruction of evidence.  ECF 7162-2 at ¶¶ 7-9.

Fawcett later testified that, although he could not recall the specific words used by K&K attorneys when questioning him about the leak during the firm's investigation, he "prevaricated," "dissembled" and "was not being honest with" the K&K attorneys when they asked him "in substance" whether he was the source of the leak, or whether he knew anything about it.  Tr. 436:12-17, 486:21-487:7, 488:12 (Fawcett).

### E. The Magistrate Judge Permits Discovery of K&K by Saudi Arabia and Holds an Evidentiary Hearing on November 1 and 2, 2021

On September 29, 2021, Saudi Arabia requested that the Magistrate Judge continue investigating K&K in connection with the leak.  ECF 7157.  On October 4, 2021, the Magistrate Judge scheduled a hearing "to render findings of fact in connection with the breach and to determine the appropriate remedies." ECF 7167 at 1.  The court ordered Fawcett, Maloney, Benett, Pounian, Kreindler, and Hartney to appear as witnesses at the hearing and forbade them from discussing the matter amongst themselves in the month prior to or during the hearing.  *Id.* at 1-2.

By joint letter submitted October 8, 2021 with Saudi Arabia, K&K consented to pre-hearing discovery into the firm.  ECF 7251.  On October 21, 2021, the Magistrate Judge ordered further pre-hearing discovery, and stated that the court "intends *to issue findings of fact and to recommend remedies* to District Judge Daniels."   ECF 7277 at 1 (emphasis added).  K&K thereafter conducted a forensic search and produced over 1,500 pages of internal documents, including, as K&K had anticipated, attorney work product.  *See, e.g.*, ECF 7251; ECF 7215-1; ECF 7277.  K&K also imaged the personal devices of Maloney, Benett, Pounian, and Kreindler and produced to Saudi Arabia further documents found in personal emails, messaging applications, and phone history.  *See* ECF 7251 at 6; ECF 7277 at 5; ECF 7359 at 4.

12

On October 29, 2021, this Court heard argument on Fawcett's attempt to assert his Fifth Amendment privilege against self-incrimination. This Court denied Fawcett's request, noting that Fawcett "handled [the leak] as if this was the most serious conduct that he had ever engaged in in his life in terms of hiding it from the law firm, in terms of hiding it from the Court, in terms of how he destroyed the evidence." 10/29/22 Tr. 9:7-11. This Court further stated that "it would be quite awkward for Magistrate Judge Netburn to say I'm going to disregard the declarations so therefore there is no evidence in this case whatsoever that supports the lawyers' assertions that they didn't know." 10/29/22 Tr. 23:23-24:1.

Two days before the hearing, the Magistrate Judge issued several additional procedural orders. First, without explanation, the court denied K&K's request for the parties to exchange exhibits before the hearing. ECF 7337. Second, the day before the hearing, the court referred to the forthcoming proceeding as a "contempt hearing" and ordered that the "witnesses" were in fact "subjects" and "will be sequestered in the jury deliberation room until they testify and then will be required to remain in the courtroom after their testimony." ECF 7310 at 3.[5]

Over November 1 and 2, 2021, Kreindler, Hartney, Maloney, Benett, Pounian, and Fawcett testified, in listed order. The court admitted their "previously filed declarations as their direct testimony," permitted lawyers for Saudi Arabia to "cross-examine the witnesses" without limitation "in scope by their direct testimony," and permitted K&K to "conduct a re-direct examination following the cross-examination." ECF 7167 at 2.

Following the hearing, Saudi Arabia sought to obtain additional discovery from K&K and to admit additional documents into evidence that were not admitted during the hearing. ECF 7322,

---

[5] Although K&K "participated in good faith with the [c]ourt's inquiry into the breach of its Protective Orders," K&K's "cooperation in this Hearing should not in any way be construed as consent to any of its procedural or substantive infirmities and all of [K&K]'s objections are hereby expressly preserved." ECF 7386 at 56.

7330, 7336; ECF 7327, 7337, 7356; ECF 7328, 7359, 7365.  Over K&K's objection, the court admitted all but one of Saudi Arabia's documents into evidence.  ECF 7369.  Based on hearing testimony, the court also ordered Brian Weidner—a former FBI agent who on the day of the deposition described in detail to Fawcett and Benett the child pornography that the FBI found in Jarrah's possession—to submit a declaration regarding whether he attended part of the Jarrah deposition and failed to note his appearance.  ECF 7369 at 3; *see also* ECF 7379 (Weidner declaration).

At no point before, during, or after the hearing did the court inform K&K that it might consider issuing sanctions under Federal Rule of Civil Procedure 37.

### F.    The Magistrate Judge's September 21, 2022 Opinion and Order

On September 21, 2022 the Magistrate Judge issued her Opinion and Order, concluding that K&K had "willfully breached" the Protective Orders and finding that:

> Fawcett leaked the transcript as part of [K&K]'s long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into a settlement, and that he did so with the knowledge or at least tacit consent of lead attorney James Kreindler.  Other attorneys at the firm were, at best, willfully blind to the leak . . . .

Order at 2.

Failing to engage with the direct evidence of Fawcett's admission that he acted alone and his exoneration of K&K attorneys, the court concluded that "circumstantial evidence" of K&K's "coordinated campaign" to leak the Transcript supported finding K&K "willfully breached" the Protective Orders.  *Id.* at 37, 64.  In particular, the court found (i) that K&K had "amply demonstrated their motive for the leak," namely, a "litigation strategy" of using "press attention to force Saudi Arabia into a settlement"; (ii) that K&K attorneys investigating the leak were "willfully blind" to the leak based on the scope of their post-leak investigation; (iii) that K&K attempted to "frustrate" and "foil" the Magistrate Judge's investigation into the leak and engaged

in "a sustained campaign of delay and obstruction"; and (iv) that "a series of suspicious communications" between Isikoff, Fawcett, and Kreindler around early July 2021 were in fact "discussions about how to get the Al Jarrah Transcript into Isikoff's hands in violation of the Protective Order." Order at 36-45, 65.

Rather than hold K&K attorneys in contempt or issue sanctions under the court's inherent powers, the court invoked the "just orders" provision of Federal Rule of Civil Procedure 37(b) and, "effective immediately," removed the entire K&K firm from the PEC after nearly 20 years at the helm and nearly a year after the hearing. Order at 2.[6]  The court also required K&K to pay the reasonable attorneys' fees of counsel for Saudi Arabia; forbade K&K from seeking compensation from the common benefit fund after July 5, 2021; and barred Fawcett from any further participation in this case.  *Id.* at 57, 64-65

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 72(a) "requires a district court to consider a party's timely objections to a magistrate judge's order deciding a 'pretrial matter not dispositive of a party's claim or defense' and to 'modify or set aside any part of the order that is clearly erroneous or is contrary to law.'"  *Williams v. Beemiller, Inc.*, 527 F.3d 259, 264 (2d Cir. 2008) (quoting Fed. R. Civ. P. 72(a)); *see also* 28 U.S.C. § 636(b)(1)(A).  In determining whether a magistrate judge's order was issued "contrary to law" under Rule 72(a), this Court reviews *de novo* interpretations of the Federal Rules of Civil Procedure.  *Beemiller*, 527 F.3d at 264.

## ARGUMENT

I.   **The Magistrate Judge's Rule 37(b) Order Sanctioning K&K Is "Contrary to Law"**

The Magistrate Judge's factual findings were contrary to the record evidence and erroneous

---

[6] Two other K&K attorneys, Justin Green and Marc Moller, serve on the PEC as alternates.  ECF 248-2 at ¶¶ 5-6.

as a matter of law. *See* Point II *infra*. But the Order suffers from a threshold flaw: The court exceeded its authority by removing the entire K&K firm from the PEC under Rule 37(b), upturning the nearly twenty-year status quo of K&K's leading this multidistrict litigation on behalf of 9/11 victims and their families.

Rule 37(b) does not authorize sanctions against K&K. The rule requires "party" misconduct as the foundation for any sanctions, including sanctions against an attorney. Fed. R. Civ. P. 37(b)(2)(A). But there is no allegation of such misconduct there. The Magistrate Judge expressly rejected issuing sanctions against K&K under the court's inherent powers, which would have required findings of clear-and-convincing evidence of bad faith by each attorney. Because the court issued sanctions without authority, applied the wrong legal standard, and otherwise did not (and could not) identify evidence rising to the level of clear-and-convincing bad faith, this Court should "set aside" the sanctions imposed under the Order. Fed. R. Civ. P. 72(a).

## A.     Rule 37(b) Did Not Authorize Sanctions Against K&K

When the text of a Federal Rule of Procedure is clear and unambiguous, the analysis begins and ends with the plain text. *Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 498 U.S. 533, 540-41 (1991); *United States v. Zapatero*, 961 F.3d 123, 127 (2d Cir. 2020).

Rule 37(b) authorizes sanctions solely for the misconduct of "a party" or "a party's" corporate official. The text of the rule is clear:

> If *a party* or *a party's* officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.

Fed. R. Civ. P. 37(b)(2)(A) (emphasis added). A court may issue sanctions under Rule 37(b) only where a party (*i.e.*, a plaintiff or defendant) or a party's corporate official violates a discovery order. *See U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933-34 (2009) ("A 'party' to

16

litigation is one by or against whom a lawsuit is brought." (alteration adopted; quotation marks omitted)).  No such conduct occurred here.

Neither the text of Rule 37(b)(2)(A)—nor any other provision of Rule 37—mentions a law firm.  Rule 37 expressly authorizes, at most, monetary sanctions against individual attorneys advising a disobedient party.  For example, if a court finds that a party or its corporate official violated a discovery order, Rule 37(b) authorizes the court to impose monetary sanctions on "the disobedient party, the attorney advising that party, or both" by requiring payment of reasonable expenses caused by the party's violation.  Fed. R. Civ. P. 37(b)(2)(C).  Likewise, Rule 37(d) authorizes the court to require "the party failing to act, the attorney advising that party, or both" to pay the reasonable expenses caused by the party's failure to engage in discovery.  Fed. R. Civ. P. 37(d)(3).  And, if opposing counsel successfully moves to compel discovery under Rule 37(a), the rule authorizes a court to "require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both" to pay the movant's reasonable expenses incurred in making the motion.  Fed. R. Civ. P. 37(a)(5)(A).  Accordingly, Rule 37 authorizes only monetary sanctions against the individual attorney advising the disobedient *party*—and such a sanction is only derivative of wrongdoing by *the party*.

Congress's decision to exclude law-firm conduct from Rule 37(b) was intentional, as Federal Rule of Civil Procedure 11 authorizes sanctions against "any attorney, law firm, or party" for impermissible documents submitted before the court.  *See* Fed. R. Civ. P. 11(c)(1).  An earlier version of Rule 11, which concerned representations to a court by "the person who signed" an offending document submitted to the court, did not include reference to a "law firm."  *See* Fed. R. Civ. P. 11(c)(1) (amended 1987).  In 1993, Congress amended Rule 11 to expand its reach to include law firms:

> [T]he court may impose an appropriate sanction on any *attorney*, *law firm, or party* that violated the rule or is responsible for the violation.   Absent exceptional circumstances, *a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.*

Fed. R. Civ. P. 11(c)(1) (emphasis added); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.  That same year, Congress amended Rule 37 but did not similarly authorize sanctions against law firms.  *See generally* Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment.  Then and now, Rule 37 only authorized sanctions for "party" misconduct, not law-firm conduct.  Nor does Rule 37 authorize joint liability for a law firm based on the conduct of an individual lawyer or employee.  *Cf. Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) ("[T]he interpretive canon, *expressio unius est exclusio alterius*, expressing one item of an associated group or series excludes another left unmentioned," applies when "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." (alteration adopted; quotation marks omitted)).

U.S. Supreme Court, Second Circuit, and sister circuit caselaw confirm that Rule 37(b) does not sweep so broadly.  In *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989), the Supreme Court held that then-Rule 11, which only authorized sanctions against "the person who signed" an offending court submission, did not permit sanctions against the law firm of the signing-attorney.  *Id.* at 120, 123-24.  Likewise, in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988), the Second Circuit held that then-Rule 37(c), which authorized sanctions for failing to admit the truth of matters contained in a request for admission, did not include sanctions against a party's law firm, Shea & Gould.  *Id.* at 1013-14.[7]  And earlier this year,

---

[7] The text of then Rule 37(c) provided in relevant part:

> If *a party* fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the

in *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 373 (6th Cir. 2022), the Sixth Circuit held that Rule 37(d), which authorizes sanctions for failure to produce documents, "does not allow for sanctions against a law firm, unless it is a party." *Id.* at 383.

The Magistrate Judge cites no caselaw to the contrary. *See* Order at 36 & n.14, 44. In *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99, 101 (2d Cir. 1997), the court upheld a small *monetary* sanction entered against an *individual attorney* for "his role in [the company president's] failure to appear for deposition." *Cf.* Fed. R. Civ. P. 37(b)(2)(C) (authorizing monetary sanctions against "the attorney advising" the disobedient party). In *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 147-48 & n.10 (2d Cir. 2010), the court entered sanctions against *a party* for the actions of one of its bookkeepers. And in *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012), the court imposed *monetary* sanctions against an *individual attorney* and a law firm—which the firm did not contest; *see also Markus v. Rozhkov*, 615 B.R. 679, 701 (S.D.N.Y. 2020) (imposing monetary sanction against an individual attorney).[8] Nowhere do these cases discuss—let alone authorize—sanctions against an entire law firm based on the conduct of a firm employee or even an individual attorney.

Accordingly, the Magistrate Judge's Order should be "set aside." Fed. R. Civ. P. 72(a).

## B.    The Magistrate Judge Applied the Wrong Evidentiary Standard

In the Order, the Magistrate Judge expressly declined to invoke the court's inherent powers, relying on Rule 37(b) as the sole authority for the sanctions imposed against K&K, *see* Order at 36 n.15, despite stating prior to the hearing that she would only be "recommend[ing] remedies to

---

document or the truth of the matter, the requesting party may apply to the court for an order requiring *the other party* to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

Fed. R. Civ. P. 37(c) (amended 1987) (emphasis added).
[8] Cases cited elsewhere in the Order fit this same inapposite pattern. *See* Order at 60.

[this Court]," which would have been done under contempt or inherent powers.  ECF 7277 at 1; *see also* Order at 36 n.15, 61 (concluding, without explanation, that "imposing sanctions under a court's inherent power" is "problematic" and can be "needless and confusing" (quotation marks omitted)).

Whatever the Magistrate Judge's rationale for declining to rely on inherent powers and basing the decision solely on Rule 37(b), the court circumvented the heightened "bad faith" standard mandated by Second Circuit caselaw under inherent powers.  Together, those cases require "clear and convincing evidence" of "bad faith" (*i.e.*, action that is "entirely without color"), which "must be supported by a high degree of specificity in the factual findings."  *See Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020); *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009); *Oliveri v. Thompson*, 803 F.2d 1265, 1281 (2d Cir. 1986) (quotation marks omitted).  Bad faith is "personal" and "may not automatically" be "imputed" on others.  *Wolters Kluwer*, 564 F.3d 110 at 114 (quotation marks omitted).

There was no such evidence here.  Without even attempting to identify clear-and-convincing evidence of bad faith, the Magistrate Judge imposed sweeping sanctions against the entire K&K law firm, barring all K&K attorneys (including K&K attorneys uninvolved with the leak or investigation) from positions on the PEC.  In fact, the Order does not use the phrase "clear and convincing" or "bad faith" once.  Even more fundamentally, the Magistrate Judge "imputed" the conduct of Fawcett and Kreindler to the entire K&K firm, *see* Order at 44, a finding well short of what is required under inherent powers.  *Cf. Wolters Kluwer*, 564 F.3d at 114 (reversing sanctions where "the district court imputed Peters's bad faith to Dorsey" under its inherent powers, without "specific evidence of Dorsey's bad faith").  This heightened "bad faith" standard is particularly important where a court acts as the "accuser, fact finder and sentencing judge, not

20

subject to restrictions of any procedural code and at times not limited by any rule of law governing the severity of sanctions that may be imposed." *Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 128 (2d Cir. 1998) (citing *International Union v. Bagwell*, 512 U.S. 821, 831 (1994)).

Because the Magistrate Judge's findings are facially deficient under the "bad faith" standard, the sanctions against K&K are unsupported as a matter of law. This Court need go no further; it should "set aside" the sanctions against the firm as "contrary to law." Fed. R. Civ. P. 72(a).

## II. The Magistrate Judge's Finding that K&K "Willfully Breached" the Protective Orders, in Light of the Full Record, Cannot be Sustained as a Matter of Law

Under either evidentiary standard—whether clear-and-convincing evidence of bad faith or preponderance of evidence of willfulness—the finding that the entire K&K firm "willfully breached" the Protective Orders cannot stand as a matter of law.

The hearing evidence demonstrated that Fawcett acted on his own initiative, intentionally downloaded the Transcript onto a thumb drive, sent the Transcript to Isikoff via an end-to-end encrypted email service, utilized the service's self-destruction feature to delete any trace of the email, and wiped and destroyed the thumb drive to cover any trace of his misconduct. ECF 1537-2 ¶¶ 7, 9. Fawcett admitted that, when K&K attorneys questioned Fawcett about the leak, he "prevaricated and dissembled and avoided letting them know" about his misconduct and was "not being honest with them." Tr. 486:21-25, 488:12 (Fawcett). K&K provided broad and invasive discovery to counsel for Saudi Arabia, including the firm's internal documents, phone logs, text messages and cell phone data. *See* ECF 7277. And no evidence contradicted Fawcett's sworn declarations or his hearing testimony.

Based exclusively on strained inferences from "circumstantial evidence," the Magistrate Judge nevertheless concluded that, with the "knowledge or at least tacit consent" of James

Kreindler, Fawcett leaked the Transcript to further K&K's "litigation strategy" to pressure Saudi Arabia into a settlement and that other K&K attorneys were "willfully blind to the leak."  Order at 2.  Against the full record, the Magistrate Judge's finding is erroneous as a matter of law.

"Any decision under Rule 37 should be made in light of the full record in the case." *Ramgoolie v. Ramgoolie*, 333 F.R.D. 30, 35 (S.D.N.Y. 2019) (citing *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979)).  Although a fact finder is permitted to make inferences from the full record, the Court "may not credit inferences within the realm of possibility when those inferences are unreasonable."  *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) (quotation marks omitted).  The Court cannot find "willfulness" where breach of a discovery order was "due to factors beyond the party's control."  *See Thompson v. Jam. Hosp. Med. Ctr.*, 2015 WL 7430806, at *3 (S.D.N.Y. Nov. 20, 2015) (quotation marks omitted).  Here, the record evidence demonstrated that the breach of the Protective Order was due to factors beyond K&K's control.  *See id.*

## A.    Direct Evidence Confirms the Truth of Fawcett's Confession

The record demonstrates that Fawcett on his own initiative leaked the Transcript to Yahoo! News and, using his knowledge of K&K's security systems, took substantial steps to hide his misconduct from K&K.  On the morning of the September 27, 2021 deadline, Fawcett admitted "for the first time" that he leaked the Transcript to Isikoff and that, "[u]ntil today, no one other than" Isikoff knew.  *See* Statement.  He acted "to prevent the partners and staff of [K&K] from knowing about my intended action and to prevent them from stopping me."  *Id.*

In the Statement sent to Benett and Pounian, Fawcett explained that he leaked the Transcript because he did not believe that a protective order should "extend to cover evidence of a criminal act such as possessing and viewing child pornography."  *Id.*  Fawcett further stated that

"[a]fter the revelations at the deposition that [Jarrah] was a child pornographer, I could not allow [Jarrah]'s criminal acts to remain secret, when I had the opportunity to do something about it." *Id.* And that if the Saudi and U.S. government "continue to protect [Jarrah] rather than prosecute him, then the public at least must be forewarned in order to have some chance to protect themselves" and the "only venue for such warning is the media." *Id.*[9]   Later that day, Fawcett provided additional detail, under penalty of perjury, that "I had a personal interest because [Jarrah] worked for Saudi Arabia as a diplomat in Morocco for many years and still lives there, . . . and I know from my prior international humanitarian and human rights work that Morocco has a dreadful history of child sex trafficking." KSAX-0121 ¶¶ 3-4.  Three days later, Fawcett provided further detail, under penalty of perjury, regarding his use of a thumb drive, his use of an encrypted email service, and his destruction of the evidence of his misconduct.  ECF 1537 ¶¶ 7-9.  Fawcett's hearing testimony affirmed the truth of these statements.  *See, e.g.*, Tr. 444:13-15, 465:11-17, 485:3-19.

Following the leak, each of K&K's attorneys, including Benett, Maloney, Pounian and Kreindler, categorically denied having any knowledge about how Isikoff got the Transcript.  ECF 7016 (Aug. 16, 2021 declarations).  The same day that Fawcett confessed, each of the K&K attorneys submitted an additional declaration, under penalty of perjury, attesting that, "For the first time today, I learned the information set forth in the declaration of John Fawcett." ECF 7147.  The testimony evidence over two days reaffirmed each attorney's lack of knowledge or complicity. *See, e.g.*, Tr. 129:19-130:5 (Kreindler); Tr. 304:18-305:4 (Maloney); Tr. 358:13-124, 402:5-8 (Benett); Tr. 413:24-414:6 (Pounian); Tr. 485:17-486:25 (Fawcett).  Nor did any evidence adduced

---

[9] Further demonstrating that these words and thoughts were Fawcett's alone, he had, three minutes before sending his declaration to Pounian and Benett, emailed it to himself from a personal email address to his K&K email address, from which he then emailed it to Pounian and Benett.  KSAX-107A.

at the hearing indicate that any K&K attorneys had any reason to suspect that Fawcett—a deeply trusted and respected consultant—had anything to do with the leak prior to September 27, 2021. *See, e.g.*, Tr. 129:19-130:5 (Kreindler); Tr. 304:18-305:4 (Maloney); Tr. 340:11-342:9, 358:13-124, 402:5-8 (Benett); Tr. 413:24-414:6 (Pounian).

No record evidence contradicted Fawcett's Statement, despite significant discovery produced by K&K, including the firm's internal documents, phone logs, text messages and cell phone data. After a two-day hearing where counsel for Saudi Arabia was permitted unfettered cross-examination of K&K attorneys, where K&K attorneys were forbidden from communicating with one another about the facts for one month before and during the hearing, where K&K attorneys were denied the opportunity to see opposing counsel's exhibits before the hearing, and where K&K attorneys were sequestered, ECF 7167 at 1; ECF 7337; ECF 7310 at 3, no evidence was adduced that refuted Fawcett's confession.

That confession has particularly strong veracity here. *See* Statement. By leaking the Transcript and admitting to his misconduct, Fawcett exposed himself to potential criminal liability. *See* KSAX-151 at 1; 10/29/21 Transcript. Fawcett also faced significant financial loss associated with his confession: he had worked as a consultant and researcher for K&K for more than twenty years, Tr. 312:1-3, 416:3-5, and this work accounted for 80 to 90 percent of his income. Tr. 416:9-11. The signing and submission of a declaration to the court, if false, also carried with it potential criminal prosecution, fines, and up to five years' imprisonment. *See* 18 U.S.C. § 1621; 28 U.S.C. § 1746. On a personal level, Fawcett's Statement required him to admit to individuals that he had worked with for years, individuals that deeply respected and trusted him, that he had utterly betrayed that trust, and harmed the firm. *See* ECF 7167. The timing of the confession—admitting to his misconduct on the morning of the Magistrate Judge's deadline for the submission of

24

declarations after his leak had been public for weeks—shows that this was not an easy decision for Fawcett.  Ultimately, he determined that while he could lie to his co-workers, he was unwilling, as even the Magistrate Judge found, to lie to the federal court and commit perjury.  *See* Order at 13 ("[Fawcett] was apparently unwilling to sign a perjurious declaration.").[10]

The Magistrate Judge disregarded these facts in large part because she believed that Fawcett's motive for disclosing the Transcript—"to protect the children of Morocco"—was "fabricated" by two K&K attorneys, Pounian and Benett.  Order at 28, 38.  But the Magistrate Judge overlooked that Fawcett clearly rejected Saudi Arabia's characterization that he had "signed what Mr. Pounian and Ms. Benett wrote for you" and testified: "No, I signed what I believed to be a correct declaration at the time" and that "I felt that was my declaration." Tr. 467:12-19.  Fawcett clearly stated his motive in his Statement which the Magistrate Judge found was "his own words." Order at 26.  In the Statement Fawcett confessed that he leaked the Transcript because the Saudi and U.S. governments were protecting a "child pornographer" and therefore the public "must be forewarned in order to have some chance to protect themselves."  *See* Statement.  Fawcett's exposure to Morocco and its history of child sex trafficking through his prior human rights work, and his adopting two Moroccan children, informed the reason for his misconduct, was sworn to by Fawcett, and is true, Tr. 467:12-19 (Fawcett).  The fact that Pounian and Benett included these words to the final declaration based on their discussions with and knowledge of their longtime colleague does not alter their truth.  *Id.*; Tr. 352:19-353:19, 392:2-393:15 (Benett) (explaining that

---

[10] The Magistrate Judge's finding that Fawcett was "unwilling to sign a perjurious declaration" in executing the September 27, 2021 declaration cannot be reconciled with her other findings that ignore statements Fawcett made in that declaration: that he acted alone and no one except the reporter knew he leaked the Transcript; he took extraordinary steps "so that no one from Kreindler would know that I had done"; he decided to leak the information after the "revelations at the deposition" that Jarrah "was a child pornographer"; he knew Jarrah lives in Morocco, a place that "has a dreadful history of child sex trafficking" and that no one, including the Saudi and U.S. governments, "was taking action to protect the children at risk"; and that "the media was the only venue available to protect the public and children from [Jarrah] and his conduct."  ECF 7166-1; Order at 28.

the additions to the declaration were based on the information from Fawcett, and that she believed this provided important context to understand what happened).[11]

While the Magistrate Judge criticized Fawcett for "not alert[ing] anyone in the U.S. or Moroccan governments about his concerns," Fawcett's Statement made clear his belief that the "only venue for such warning is the media" because those governments were "protecting" Jarrah. *See* Statement; ECF 7166-1, ¶ 4.  And although there might have been "unconfirmed" rumors about Jarrah's conduct before the deposition, Order 28 (citing Tr. 468:8-24), Fawcett's Statement made clear that Jarrah's conduct and his admission to possessing the child sexual images at the deposition was a "revelatio[n]" to him.  *See* Statement.[12]

## B.   No Circumstantial Evidence Supports the Finding that K&K Willfully Breached the Protective Order

The Magistrate Judge does not address the key evidence: Fawcett's direct confessions in his declarations and testimony that he acted alone in leaking the Transcript and repeatedly lied to K&K about doing so; and that the K&K attorneys discovered that Fawcett was the leaker and immediately notified the Court and all parties.  Instead, the Magistrate Judge concluded from circumstantial evidence that K&K, "through Fawcett and [Jim] Kreindler, breached the Protective Orders by carrying out a deliberate scheme to leak the Al Jarrah Transcript to Isikoff."  Order at

---

[11] While the Magistrate Judge found that "there was no evidence at the hearing or in Fawcett's phone records that he participated in these additions," Opinion at 27, this overlooks Fawcett's testimony at the hearing that the statements in his declaration were true and that he made them himself, Tr. 467:12-19 (Fawcett),  and that Fawcett had numerous phone calls with Pounian and Benett on the day his declaration was prepared and submitted to the court.  Tr. 466:22-25, 467:1-2 (Fawcett); KSAX-136 (showing eight phone calls with Fawcett and Benett or Pounian on September 27).  Additionally, Fawcett had a decades-long relationship with the K&K attorneys, many of whom knew his personal and professional history well before the leak.

[12] The Magistrate Judge found changes made to the description of the leaked material in Fawcett's September 27 Declaration were "misleading."  Order at 27-28.  But any errors in Fawcett's declaration are attributable to Fawcett and not K&K; it was Fawcett who confessed on the morning of the court's September 27 deadline and K&K attorneys who attempted to learn the facts throughout a "very wild day" that ensued. Tr. 343:9-18 (Benett); Tr. 459:15-21 (Fawcett: "I think in the pace of doing this, I've got a very poor sentence" that "doesn't make any sense").  In any event, because there is no dispute that Fawcett leaked the Transcript, it is not directly relevant whether the portions of the Transcript sent to Isikoff were "limited to" or "focused on" Jarrah's testimony about his possession of child pornography.

36.   To reach that conclusion, the Magistrate Judge found four categories of circumstantial evidence to be "compelling," almost all of which relates to events either years before or months after the leak.  The Magistrate Judge's inferences from these circumstances were not reasonable. *See Pauling*, 924 F.3d at 657.

### 1.   K&K's "Litigation Strategy"

The Magistrate Judge first found that K&K had "amply demonstrated their motive for the leak," namely, a "litigation strategy" of using "press attention to force Saudi Arabia into a settlement."  Order 37.  But K&K's "litigation strategy" has never been to "force" Saudi Arabia into "a settlement" based on bad press, rather than increase general "pressure."  Tr. 24:3-25:5.  Nor would such a strategy make sense as a general matter: if the U.S. government cannot influence the Saudi government through international diplomacy to act, "press attention" created by a U.S. law firm certainly would not "force" Saudi Arabia into settlement.  Regardless of any "pressure" on Saudi Arabia, this case, like any other, will be determined by the strength of the evidence and the merits of the parties' arguments—whether by a determination through the courts or "what we traditionally think of as a settlement."  *See* Tr. 24:3-5, 25:3-5 (Kreindler).

In the nearly 20 years litigating this case, when Jim Kreindler speaks with the press, he has done so openly, with attribution, and using care not to divulge protected information.   *See* Tr. 25:7-20 (Kreindler).  This Court has repeatedly affirmed the parties' freedom to speak with the press.  *See* Order at 47 (collecting examples).  Fawcett's willful and secretive leak of information to the press, the first such incident in this nearly 20-year litigation, is inconsistent with the interactions of Kreindler—K&K's leading voice—with the press.  It would make no sense for the firm to break from its normal practice to suddenly leak a deposition transcript, particularly one that (according to the Magistrate Judge) was not clearly "important."  *See* Order at 49.

27

To be sure, K&K attorneys have criticized the Protective Orders as overly broad. *See* Order 37; Tr. 29:18-30:4. But such criticism does not permit a reasonable inference that K&K attorneys would violate the Orders that they swore to obey and had painstakingly worked to follow on a nearly daily basis, including through their court filings and client discussions. Tr. 412:3-413:8.

The Magistrate Judge's finding regarding K&K's "litigation strategy," in addition to being inconsistent with K&K's historical press communications, are unsupported by the record, irrational as a general matter and particularly unfounded with regards to Fawcett's leak specifically. The Court should therefore reject this factual finding of "motive." *Cf. Nationwide Mut. Ins. Co. Mortensen*, 2009 WL 2710264 at *7 (D. Conn. Aug. 24, 2009) (granting summary judgment where the record evidence, including speculation of a "general plan" to harm the plaintiffs, could not support a reasonable inference of bad faith).

### 2.    K&K's Post-Leak Investigation

The Magistrate Judge similarly erred in concluding that K&K attorneys investigating the leak were "willfully blind" to the leak based on the scope of their post-leak investigation. Order 2, 39, 45, 46. The record reflects that the K&K investigation was nearly identical to the investigation conducted by the other PECs and other plaintiff and defense firms in the case. *See* ECF 7385 ¶¶ 74-75. Indeed, upon learning of the leak, Andrew Maloney held a meeting with the entire team, including Fawcett, regarding "whether anyone knew how Isikoff had obtained the transcript, whether anybody at Kreindler had sent the transcript to him or told Mr. Isikoff anything about the Jarrah deposition, the substance of the Jarrah deposition." Tr. 278:18-21 (Maloney). Concurrently, Pounian checked to determine if the Transcript had "left the law firm in any way, shape or form." Tr. 405:12-407:5. The K&K team searched the email and document servers to track any movement of the Transcript and reviewed the firm's cloud-based system to see if anyone

had accessed, downloaded, or printed the Transcript.  Tr. 185:2-186:10 (Hartney); KKX-14.  These searches did not identify Fawcett, or anyone else at K&K, as the source of the leak.

The Magistrate Judge criticized various aspects of the investigation.  *See* Order 39-40.  But given the various steps Fawcett took to hide his misconduct, the heightened investigatory steps suggested by the Magistrate Judge would not have revealed Fawcett as the leaker and are not tantamount to willful blindness on the part of the investigators.[13]  *See* ECF 7162-2 ¶¶ 7, 9.  None of the Magistrate Judge's criticisms about the investigation, if performed differently, would have changed that.  *Cf. Thompson*, 2015 WL 7430806, at *3 (noncompliance with a court's order is not willful if it is "due to factors beyond the party's control" (quotation marks omitted)).  But most fundamentally, all contemporaneous emails produced in this matter show that Maloney, Hartney, and the investigative team were focused on trying to determine if anyone connected to K&K was the source of the leak.  *See, e.g.*, KSAX-84–87, KSAX-88–91, KSAX-93, KSAX-96–98.

To that end, this Court should reject the Magistrate Judge's conclusion that "Fawcett reports that he was not directly questioned about his role in the breach until September 27, long after the firm had reported its investigation was complete."  Order at 40 (citing Tr. 436:11-439:12).  The Order cites an exchange at the hearing in which counsel for Saudi Arabia asked Fawcett a narrow and specifically framed question, and demanded a yes/no answer: did specific K&K attorneys come to you and say, precisely, "did you disclose this transcript?"  Because Fawcett did not recall that precise wording, the Order wrongly concludes that Fawcett "does not recall being questioned by anyone."  *Id.*  This finding, without reason, ignores Fawcett's testimony, moments

---

[13] In a different context, the Second Circuit has held that it is inappropriate to hold a party to a standard based on "hindsight." *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them" and "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim . . . ." (cleaned up)).

earlier, that he *was* asked in substance whether he had disclosed the Transcript, and that he lied

and misled the K&K attorneys when he was asked about the leak:

> Q:   Did anyone from Kreindler & Kreindler, on July 15 or any time prior to
> September 27, in words or substance, John Fawcett, did you disclose the
> transcript to Michael Isikoff?
>
> A:   *I don't recall directly, but in substance, yes, they would have asked in
> substance.*

Tr. 436:12-23 (emphasis added); *see also* Tr. 486:21-24 (Fawcett: "I certainly prevaricated and

dissembled and avoided letting them know [who leaked the Transcript]."); Tr. 488:4-12 (Fawcett:

"I was not being honest with them.").  That testimony is affirmed by the testimony of Pounian and

Maloney—each of whom testified that they directly asked him about the leak.  *See, e.g.*, Tr. 407:8-

17 (Pounian); Tr. 252:1-10 (Maloney).  Contrary to the Magistrate Judge's finding otherwise, *see*

Order 40, Fawcett and K&K attorneys' testimony is fully consistent and affirming.

Given the degree to which Fawcett covered up his misconduct so that no investigation

would have uncovered it, this Court should reject the finding that K&K investigation *after* the leak

supports an inference of willful blindness *before* the leak was discovered.  *Cf. Thompson*, 2015

WL 7430806, at *3.

### 3.    K&K's Responses to the Magistrate Judge's Orders

The Magistrate Judge further supported her finding of willfulness based on K&K supposed

attempt to "frustrate" and "foil" the Magistrate Judge's investigation.  *See* Order at 41-42   But

from the outset, K&K supported a process for identifying the leaker.  *See* KSAX-43 at 1-3 (K&K,

among others, was "committed to a process to identify [the] source" of the violation of the

Protective Orders).  The conduct that the Magistrate Judge cites to support her opposite conclusion

does not support an inference of an attempt to "frustrate" or "foil" the investigation.  K&K

submitted its declarations to the Court by the required deadlines and in compliance with the Magistrate Judge's Orders.  *See* ECF 7011, 7147.

Given that K&K's conduct throughout the investigation complied with the Magistrate Judge's directives, it is unreasonable to conclude that K&K attempted to "obstruct" the investigation because there were instances of other firms filing declarations before the deadline or because several declarations may have provided more detail than requested by the Magistrate Judge's orders.  Order at 41-42.

K&K, as the lead firm prosecuting the case against Saudi Arabia, had unique and pressing work product concerns that had to be resolved at the outset. Tr. 370:3-372:20 (Benett).  Saudi Arabia's motion demanded information to obtain the names of K&K's consultants and experts who had reviewed not only Jarrah's deposition but also the depositions of the central discovery subjects, Bayoumi and Thumairy.  ECF 6981.  One of the consultants who received the Transcript was working overseas and faced serious personal security issues.  Tr. 372:4-10; KK-52.  No other law firm faced similar work product issues.[14]

Nor did K&K use the "investigation as a forum to compound the damage caused by the breach."  Order 42.  In its declarations and at the hearing, K&K attorneys repeated the truth: that Fawcett confessed that he leaked the Transcript because of Jarrah's illicit background.  There is no way to state that fact without some "disparagement [of] Saudi Arabian personnel."  Order at 42.

K&K complied with the Magistrate Judge's investigation and orders in a timely fashion. Because the Magistrate Judge held K&K to a standard *after* her investigation that she did not

---

[14] As reflected in the declarations submitted to the Court, other plaintiffs' firms did not share the Jarrah and other two Saudi employee transcripts with any outside consultants and therefore did not have the same work product concerns as K&K.  *See, e.g.,* ECF 6992, Haefele Decl. ¶¶ 6, 12 (Motley Rice attorney: "I did not provide access to those transcripts" and after the Transcript was filed onto the firm's system "it was not accessed").

require *during* her investigation, this Court should reject the inference that K&K willfully breached the Protective Order because it allegedly sought to "obstruct" the Magistrate Judge's investigation.

### 4.    The Timing of Phone Calls

The only remaining circumstantial evidence cited by the Magistrate Judge to support her finding that the law firm willfully breached the Protective Order is her finding that "a series of suspicious communications" between Fawcett, Jim Kreindler, and Isikoff were "discussions about how to get the Al Jarrah Transcript into Isikoff's hands in violation of the Protective Order." Order 38-39; *but see Pauling*, 924 F.3d at 649 ("[a]n inference is not a suspicion or a guess" (citations and internal quotations omitted)).

But rather than being suspicious, Kreindler's communications with Isikoff in the weeks leading up to early July 2021 are consistent with what no party disputes: Jim Kreindler was a guest on Isikoff's podcast on July 1, 2021.  In the lead up to his appearance, Kreindler was in communications with Isikoff and other Yahoo! News personnel regarding the podcast.  ECF 7147-6 at 6.  Kreindler also made clear that his communications with Fawcett were to inquire whether "any part of the Jarrah deposition not marked confidential" that could be shared with Isikoff under the Protective Orders.  Tr. 61:19-62:9.

In refusing to credit Kreindler's testimony, the court found that it is "not reasonable that Kreindler would suspect that any portion of the deposition of a Saudi official would not be under seal just ten days after the deposition," as the Protective Orders required "Confidential Information to be kept confidential for at least 30 days."  Order at 9.  But it is no secret that Kreindler operates at the strategy level in the 9/11 litigation, with other K&K lawyers handling the discovery, depositions, and motion practice through the case.  *See, e.g.*, Tr. 310:10-16 (Benett) (describing the distribution of discovery work); *see also* Maloney Decl. ¶¶ 8, 14.  Indeed, Kreindler confirmed that he asked K&K staff, including Fawcett, to send him documents located on the firm's

computers. *See* Tr. 74:16-19 (Kreindler: "I need to ask someone like John, can you send me a particular document."); *see also see also* Tr. 89:14-22 (Kreindler: "I don't [know the details of the leak investigation]. Duke and Steve were working on it."). Nor is it surprising that Kreindler (or any individual in this matter) would not recall from memory the details of two Protective Orders and seek clarification. Kreindler testified that he "didn't remember at the time whether there was something innocuous that wasn't confidential" but after checking confirmed that the entire deposition was confidential. Tr. 27:18-28:23. And the length of the two so-called "suspicious" phone calls (one minute each from 12:22 p.m. to 12:23 p.m.) is consistent with Kreindler's testimony about asking a quick question. *See* Order at 8 (Table 1).

The Magistrate Judge's inference from a 46-minute call between Fawcett and Kreindler in late July 2021 after the Yahoo! News article, operates on similar unfounded suspicion. The Magistrate Judge wrongfully infers from the fact that Fawcett texted a criminal defense attorney, Elizabeth Crotty, who was a friend and former K&K employee, an hour before the call, and then spoke to that attorney for 22 minutes after the call, that the 46-minute call with Jim Kreindler (and possibly others) must have been about the leak. Order 16-19. There is no direct evidence from the hearing about the substance of the call with K&K lawyers other than the log reflecting the call took place—and neither Fawcett nor Jim Kreindler, who spoke with each other frequently about the 9/11 litigation, could recall the contents of the call but testified that it was not about the leak. Tr. 84:3-8 (Kreindler); Tr. 446:10-447:4 (Fawcett). Fawcett testified that the leak was not discussed during the 46-minute call and surmised that due to the length of the call, that it was probably a conference call with others, as those usually last longer. Tr. 446:9-20.

After the hearing, when Pounian had learned what was discussed while he was sequestered, he submitted a declaration with his Verizon bill for his personal cell phone, showing that he

participated in that 46-minute call. Order 18 n.8. His declaration further stated what was in fact discussed on the call, and he corroborated that the call did not contain any discussion of Fawcett's leak. *Id.* The Magistrate Judge declined to rely on this declaration, finding that it was hearsay and unhelpful. *Id.*[15] And yet, knowing that this contrary evidence existed, she still drew the unsubstantiated inference that Kreindler and Fawcett had a private conversation about the leak, and used this July 22 call as purported circumstantial evidence of Kreindler's complicity. Order at 19. The Magistrate Judge's opinion does not seek to reconcile the phone records reflecting that Pounian was also on this work conference call for its duration.[16] Nor does it explain reasons for discrediting Pounian's testimony. It simply declines to engage with it. *Id.*[17]

Further, it ignores the record evidence demonstrating that calls between Fawcett and K&K such as that 46-minute July 22 were routine, Fawcett phone records are replete with daily calls between Fawcett, Kreindler and other K&K personnel from before the Jarrah deposition through K&K's discovery of the breach. *See* KSAX-133–136.

Although a fact finder is permitted to make reasonable inference from known facts, the Court "may not credit inferences within the realm of possibility when those inferences are

---

[15] Because no advance notice was given of the exhibits (the phone log to be used), and because witnesses were sequestered, Pounian could not been aware that this call would be the subject of speculation as to its contents, or what Kreindler's testimony about it was. *See generally* Tr. 404-409. Under these circumstances, the Magistrate Judge should have at a minimum allowed K&K the opportunity to address and overcome any possible hearsay issue before making her ruling.

[16] The Magistrate mistakenly determined that because the log of the 46-minute call was not specifically labeled on the exhibit as "work product," the call must not have been related to work and was therefore related to the leak. Opinion at 17. The court itself had previously ordered that all of Fawcett's phone records be produced with redactions permitted only for his personal communications. ECF 7277 at 6. The court expressly ruled that all of Fawcett's work communications with K&K be produced, *id.*, and it was later agreed that only the names of K&K's outside consultants and experts could be redacted as work product. Based on the court's order, the phone call exhibits (which Fawcett's counsel prepared) list all calls between Fawcett and Kreindler personnel, and do not redact or mark any of those calls as work product. See, e.g., KSAX-136 (showing calls of Fawcett with Kreindler, Pounian, Benett, Maloney, and a Kreindler paralegal). The only calls marked as work product were calls between Fawcett and K&K's consultants and consultants.

[17] For this reason and others discussed, K&K respectfully requests that if this Court reconsiders this matter anew, it admits this evidence into the record. *See* 28 U.S.C. § 636(b)(1)(A), (C).

unreasonable." *Pauling*, 924 F.3d at 657.  Because the Magistrate Judge's finding is based on a suspicion and not a reasoned inference, *id.*, this Court should reject her finding that the calls between Fawcett and Kreindler were discussions on how to leak the Transcript.  Order 39.

Based on the full record, there is no preponderance of evidence to support the finding of willfulness, and there certainly is no clear-and-convincing evidence to support it.

## III.   The Sanctions Imposed on K&K Are Neither Just Nor Commensurate with Fawcett's Breach

The Magistrate Judge's Order was erroneous for a third independent reason: the sanctions imposed on K&K were not commensurate with Fawcett's violation of the Protective Orders.  Based on Fawcett's breach, the Magistrate Judge, nearly a year after the hearing, (i) immediately removed K&K from its leadership position on the PEC after nearly two decades; (ii) barred K&K from seeking compensation from the common benefit fund after the date of the breach (*i.e.*, July 5, 2021), in effect a significant monetary fine; and (iii) required K&K to pay Saudi Arabia's attorneys' fees incurred to determine who leaked the Transcript, which Saudi Arabia claims total $1.39 million.  *See* Order at 45-63.  In light of the full record in this case, these sweeping sanctions are not proportional to the breach and should be set aside.  *See* Fed. R. Civ. P. 72(a).

Although a court has discretion in imposing sanctions, there are "two basic limitations upon a district court's discretion in imposing sanctions pursuant to Rule 37(b)(2)."  *Daval Steel Prod. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991).  The sanctions (i) "must be 'just'" and (ii) "must relate to the particular claim to which the discovery order was addressed."  *Id.*  To be just, "the severity of sanction[s] must be commensurate with the non-compliance."  *Shcherbakovskiy v. Da Capo Al Fine, Ltd.,* 490 F.3d 130, 140 (2d Cir. 2007).  Any sanction "must be weighed in light of the full record in the case."  *Cine Forty-Second Street Theatre Corp.*, 602 F.2d at 1068.

In determining whether sanctions are commensurate, *Shcherbakovskiy*, 490 F.3d at 140, courts in this Circuit often consider the harm caused, or prejudice suffered, in fashioning appropriate sanctions.  In *City of Almaty v. Ablyazov*, for example, the court concluded that a party's requested sanction, appointment of a special master to oversee discovery, was "not an appropriate remedy for the leak" of a deposition transcript because the sanction was "not necessary to make [the requesting party] whole."  2018 WL 1229730, at *7 n.2 (S.D.N.Y. Mar. 5, 2018).  Similarly, in *Jay v. Spectrum Brands Holdings, Inc.*, the court held that payment of reasonable attorneys' fees for breach of a protective order was an appropriate sanction because the breach did not provide "litigation advantage" or result in "any actual prejudice" to the opposing party, "commercially or in the context of this action."  2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015).

In removing K&K from the PEC, including barring the firm from seeking any compensation from the common benefit fund after July 5, 2021, the Magistrate Judge failed to weigh the harm that resulted from the leak.  *See generally* Order at 45-59.  The Magistrate Judge in fact identified no harm to Saudi Arabia.  Although repeatedly referring to K&K leaking the Transcript to "obtain a litigation advantage," *see* Order at 46, 52, 63, 64, the court does not identify what that advantage might be, *see id.* at 46-47.  There is no evidence, for example, that the Transcript contains "Confidential Information or Material" as defined in the Protective Orders, which might give rise to a "litigation advantage" if improperly released.  ECF 1900.  Indeed, the Magistrate Judge found that the Yahoo! News article itself "does not suggest that the deposition was particularly revelatory" and that the Transcript is not clearly "important enough" to preclude its use in the case.  Order at 49.  To the extent that the Magistrate Judge suggests that the leak could cause embarrassment to Saudi Arabia and force a settlement, *see* Order at 2, there is no evidence in the record (and the court identifies none) that the leak of one embassy official's

36

deposition transcript would cause a foreign sovereign to agree to a potentially multi-billion-dollar settlement.  And, of course, sixteen months after the leak, no such result has occurred.  If anything, removal of K&K from the PEC after nearly 20 years and six years leading the case against Saudi Arabia will only provide a litigation advantage to Saudi Arabia.

By contrast, the harm caused to 9/11 Plaintiffs by removing K&K from the PEC after years of work is real, not theoretical.  K&K (along with co-counsel in some cases) represents more than 830 of the estates of those killed on September 11, 2001, as well as over 2,000 of their immediate surviving family members and more than 10,000 victims who suffered personal injury.  *See* Corrected Declaration of Andrew Maloney ¶ 2, ECF 8613.  K&K's attorneys have taken the lead role and handled nearly every aspect of this complex case against Saudi Arabia, including dispositive motions, overseeing a world-wide investigation, discovery motions, depositions, witness interviews and statements, and experts.  *Id.* ¶¶ 3, 10-18.  The wealth of knowledge and experience assembled by K&K from its prosecution of the case against Saudi Arabia is indispensable to the proper representation of the 9/11 Plaintiffs.  Save for the retention of a single expert by Motley Rice, no other firm representing Plaintiffs was involved in the aforementioned investigatory and expert work, and motion practice.  *Id.* ¶¶ 17-18.  Given that K&K handled nearly every aspect of the litigation against Saudi Arabia, the availability of other law firms, Order at 49-50, does not mitigate the unfair prejudice to Plaintiffs by removing K&K from the PEC.

Nor does removing K&K from the PEC relate to any "particular claim to which the [Protective Orders were] addressed," or even to the purpose of the Protective Orders as a whole.  *See Daval,* 951 F.2d at 1366.  No claim or defense has been affected by the leak of the Transcript, and thus no remedial measures are necessary to re-level the playing field.  Removing K&K from

the PEC simply disadvantages the 9/11 Plaintiffs and serves no purpose in either mitigating the harm (if any) that has been caused Saudi Arabia, or preventing a similar event in the future.

The Magistrate Judge's sanctions are also out of step with other cases in this Circuit for similar violations of protective orders.  In *Koch v. Greenberg*, for example, the court sanctioned a party for leaking confidential documents to the press by requiring the party to pay the attorneys' fees incurred in bringing the Rule 37 motion and by precluding the party from using documents at any hearing or trial; the latter of which was later vacated.  2011 WL 4485975, at *4 (S.D.N.Y. Sept. 28, 2011), modified, 2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012).  Similarly, in *Denis v. County of Nassau*, the court sanctioned a party that was grossly negligent in maintaining security leading to the leak of confidential documents by requiring payment of attorneys' fees in bringing the Rule 37 motion.  2019 WL 7372957, at *9 (E.D.N.Y. Dec. 31, 2019); *Abbott Laboratories v. Adelphia Supply USA*, 2017 WL 1732454, at *2 (E.D.N.Y. May 2, 2017) (same).  And in *Jay*, the court sanctioned a party whose lawyer revealed highly confidential attorney's eyes-only material to the client by requiring the party to pay the reasonable fees and costs of the sanctions motion, while declining to disqualify the attorney or preclude evidence.  2015 WL 6437581, at *9 (S.D.N.Y. Oct. 20, 2015); *see also id.* at *6 n.3 (invoking, in part, the court's inherent powers).

The Magistrate Judge's reasoning for imposing such harsh sanctions, on its own terms, does not justify the broad sanctions imposed.  *See* Order at 46-59.  Given the extreme trust and respect K&K attorneys had for Fawcett, their accepting his denial of guilt in the early stages of K&K's investigation is understandable.  K&K's investigation, moreover, had difficulty detecting his leak of the Transcript, in light of Fawcett's lies and substantial efforts to cover up his misconduct.  This does not rise to the level of "willful" conduct by K&K or its attorneys.  Nor, as explained above, was there a litigation advantage to be had.  *Cf.* Order at 46-47.  Although the

38

breach is permanent, Order at 50-51, there is no evidence of harm caused to Saudi Arabia.  Nor is there any potential for future harm as the Magistrate Judge found that the deposition was not "particularly revelatory," and not clearly "important" enough to strike.  *See* Order at 49.

The Magistrate Judge justified the sanctions against K&K in part because of other purported breaches of the Protective Order.  *See* Order at 52-54.  But in this decades-long litigation, K&K has never been accused of intentionally leaking a document or deposition designated as confidential until Fawcett's breach.  Each of the unrelated incidents cited by the Magistrate Judge did not rise to the level of an intentional breach.  For example, Brian Weidner, an authorized consultant of K&K who had investigated Jarrah previously and was entitled to review the Transcript under the Protective Orders, viewed a small portion of the Jarrah's deposition while visiting the K&K offices without being listed on the appearance sheet.  *See* ECF 7384-1; ECF 1900 at 12; ECF 4255 at 2.  The technical breach involving *Politico* likewise did not involve the leak of a confidential document.  That incident involved the disclosure of a phone number that was otherwise publicly available and listed on Saudi Embassy stationery; while correspondence, marked confidential, was written on that stationary, the confidential contents of the letter itself were not disclosed.    ECF 3619 at 4:2-5:1, 9:6-7.  The MPS materials provided by the United Kingdom, which stated the materials were no longer classified or protected as confidential (ECF 8114 at 3; ECF 7831-1 at ¶¶ 19-21) and which Saudi Arabia did not designate as "confidential" pursuant to the procedures set forth in the Protective Order (*see* ECF 1900 at 8-10) for a month after K&K provided express notice of its position that the materials were "not subject to any confidentiality or sealing orders" (ECF 8114 at 3), could be viewed as a "minor incident" standing alone (according to the Magistrate Judge), and occurred long after the hearing at issue in this matter.  ECF 8066 at 7.  It was improper for the Magistrate Judge to bolster her sanctions finding

based on these unrelated events, particularly when K&K's objections to her finding on the MPS materials remain unresolved, ECF 8113, 8195, when the Magistrate Judge previously viewed these as technical and not willful, ECF 3629 at 9:19-20, and when any issues with K&K's document security (which the court criticized) have been remedied through significant (and expensive) steps to solidify the firm's data infrastructure, *see* ECF 8614 at 1-2; ECF 8615.

The Magistrate Judge's decision against imposing lesser sanctions turned heavily on her belief that financial sanctions are not viable where there are large *potential* damages awards at stake. Order at 48. But that rationale assumes that K&K will in fact secure money damages against Saudi Arabia, and assumes further that K&K will then be able to collect on the judgment in the near future. The Magistrate Judge herself acknowledged, "this case is likely to continue for many years." Order at 62. Given the speculative nature of a monetary award, the Order does not explain why financial sanctions alone are insufficient. To the extent that deterrence is a relevant consideration, a reasonable monetary sanction would serve the purpose of specific and general deterrence in this case, while not punishing 9/11 victims and their families who are blameless. *See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988).

The broad sanctions levied against K&K were not just and should be set aside.

## <u>CONCLUSION</u>

For the foregoing reason, this Court should set aside the Magistrate Judge's sanctions against K&K. Fed. R. Civ. P. 72(a).

Dated: October 25, 2022
New York, New York

Respectfully submitted,

 /s/ Edward M. Spiro

Emily Kirsch                          Edward M. Spiro
Paul Niehaus                          MORVILLO ABRAMOWITZ GRAND
KIRSCH & NIEHAUS PLLC                  IASON & ANELLO P.C.
950 Third Avenue, 19th floor          565 Fifth Avenue
New York, NY 10022                    New York, NY 10017
(212) 832-0170                        (212) 856-9600
emily.kirsch@kirschniehaus.com        espiro@maglaw.com

41