

# POLITICO MAGAZINE

OUR LATEST | EMAIL SIGNUP | POLITICO.COM



**THE FRIDAY COVER**

## One Man's Quest to Prove Saudi Arabia Bankrolled 9/11

This New York lawyer says he has found a link between Saudi officials and the hijackers. The U.S. government refuses to do anything about it.

By CALEB HANNAN | April 07, 2017

POLITICO Illustration / AP and iStock

 Facebook

 Twitter

 Comment

Print

Caleb Hannan is a writer in Denver. He's written for *Rolling Stone*, *Businessweek* and others. He can be reached at iamcaleb2@gmail.com.

When Jim Kreindler got to his midtown Manhattan office on Friday, July 15, 2016, he had a surprise waiting for him. Twice in the previous eight years, Kreindler had been in the room as then-President Barack Obama promised Kreindler's clients he would declassify a batch of documents that had taken on near mythic importance to those seeking the full truth of who had helped plan and fund the September 11, 2001, terrorist attacks. Now, Kreindler learned, "the 28 pages" as they were known, were open for inspection and it was up to his team to find something of value. It wasn't long before they did—a single, vague line about a Somali charity in Southern California.

That obscure reference would soon become part of the backbone of an argument that Kreindler and his firm have been making for a long time: Without financial and logistical support from members of the government of Saudi Arabia, the 9/11 attacks would have never taken place.



**THE FRIDAY COVER**

Read more

AD

Proving the link between Saudi Arabia and the hijackers has been Kreindler's nearly sole focus since the moment, several days after the Twin Towers fell, when grieving

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/    Created 2021-10-11 at 12:57

KSAX-0011

Case No. 03-md-1570

families began to file into the lobby of the burly, boisterous 61-year-old's firm. That firm, Kreindler & Kreindler, was started by his grandfather and brought to prominence by his father, Lee, who the families knew was the man who had won a $3 billion judgment against Libya for the bomb that in 1988 destroyed Pan Am Flight 103 over Lockerbie, Scotland. They were hoping he could find the culprit here, too. But, just over a year after the attacks, Lee was dead from a stroke. The case, and some 850 clients, became Jim's to manage.

On that July morning, the case had slogged on for nearly a decade and a half. Some judges found it too large and unwieldy to understand. Sometimes it seemed as though Kreindler's own government were actively working against the firm; agencies denied Freedom of Information Act requests and shared information with the Saudis as often as with his team. "I've stopped calling what our government has done a cover-up," says former Senator Bob Graham, the co-chair of Congress's 9/11 Joint Inquiry and the most prominent voice alleging a connection between the Saudis and the hijackers. "Cover-up suggests a passive activity. What they're doing now I call aggressive deception."



Lawyer Jim Kreindler. Courtesy of Jim Kreindler

Saudi Arabia was Kreindler's focus because many, including well-placed people like Graham, had long suspected that it had played a role in the plot, a charge the Saudis had always vociferously denied. Suspicions were fueled, however, by what the U.S. government had chosen *not* to reveal after the attacks. The post-9/11 Joint Inquiry, the first U.S. investigation led by the House and Senate intelligence committees, had exposed nearly 1,000 pages of documentation and evidence to public scrutiny. But upon its release in 2002, President George W. Bush ordered a small portion—the 28 pages—to remain classified. They were allegedly full of unpursued leads that hinted at a relationship between the 19 hijackers—15 of whom were Saudi nationals—and people possibly linked to the Saudi government. Then came the later 9/11 Commission, whose own members protested drastic, last-minute edits that seemed to absolve the Saudi government of any responsibility.

Kreindler's team knew they were unlikely to ever find a smoking gun, a document that they jokingly referred to as "a thank-you note from Osama bin Laden to the Saudi King." But even before the release of the 28 pages, they thought that they had amassed enough circumstantial evidence to meet the standards of a civil suit, where the burden of proof is considerably lower than in criminal court. Over the course of 15 years, Kreindler's firm had named hundreds of defendants, ranging from wealthy Middle Eastern businessmen to even wealthier charities. In that time, the firm had compiled a tremendous amount of revealing information on its defendants—from the inner workings of secretive Swiss bank accounts to internal audits of massive corporations. So much information, in fact, that its lawyers often wondered whether the people they were suing knew what they were handing over. Legally, the firm knew it would be difficult to win a case against Saudi Arabia—the country had never been considered a state supporter of terrorism, which was the minimum standard needed for a lawsuit. Still, the firm kept tabs on the most interesting evidence suggesting a connection between the Saudi

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/    Created 2021-10-11 at 12:57

government and the plotters, especially a support network in Southern California. Yet there was skepticism that Kreindler's team could ever turn its immense amount of data into a winning case. A newspaper editor once derisively described the firm's evidence as being burdened by the presence of "Too many Mohameds."

But on March 20, 2017, for the first time in the case's long history, the firm named the Kingdom of Saudi Arabia as its lead defendant. This was made possible because the Justice Against Sponsors of Terrorism Act, a bill that allows U.S. nationals to sue countries even if those countries have not been deemed a state sponsor of terrorism, had passed in September and survived Obama's veto.



Saudi Foreign Minister Adel al-Jubeir leaves after holding a press conference in Washington, DC, on July 15, 2016, following the release of 28 pages of a 9/11 congressional report. | Getty

The new filing—which seeks $10 million per death, the same as in the Lockerbie suit—is chock full of obscure names of private citizens and massive charities. Some of the names would be familiar to anyone who has waded into the minutiae of the Joint Inquiry and the lengthy, bestselling 9/11 Commission report. But the new filing also contains a narrative about a trail of money that Kreindler's team believes will help further implicate the Saudis. That trail is still centered in Southern California, but it involves people whom the firm says no one has connected before. One of the key players: a lanky former teacher's aide in San Diego.

***

**Early on the morning of January 22, 2004,** Omar Abdi Mohamed sat across from Immigration and Customs Enforcement Senior Agent Steve Schultz looking untroubled. Mohamed, 42, 6'2" and rail thin, may have believed he had been called in to talk about his pending citizenship, for which he had applied four years earlier. But the real reason for the interview was more serious. Mohamed was one of roughly 25 men in the San Diego area who had been targeted by a Joint Terrorism Task Force established in the wake of 9/11. The goal was to use immigration laws to charge, convict and deport people suspected of having terrorist ties. Mohamed may have thought Agent Schultz to be harmless. He couldn't have been more wrong.

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/    Created 2021-10-11 at 12:57

According to a government transcript, as the interview began Mohamed sketched out some of the details of his life. His first wife had been killed during a civil war in their home country of Somalia, and their son, now a teenager, lived in the same refugee camp in Kenya where Mohamed's parents had settled. Mohamed had arrived in the United States in 1995 on a religious worker's visa. He had come to work and study under the tutelage of an imam at a local mosque. Not long after he arrived he got a job as an instructor's aide in the San Diego City School system, where he helped young Somalis adjust to American culture. Mohamed had arrived in America with his second wife and their two kids. They now had four more. He was fluent in Arabic, well-versed in English, and knew some Swahili. He had a master's in health care management and dreams of opening an African food market, and he had started two separate nonprofits aimed at assisting his fellow countrymen. One was something like an after-school program designed to keep kids from joining the gangs that had become a problem among second-generation immigrants. The other was called the Western Somali Relief Agency. It was meant to help the hundreds of thousands of Somalis still struggling from the after-effects of a famine. Mohamed, it seemed, was a man doing his best to raise a family and benefit his community.


Omar Abdi Mohamed

Agent Schultz knew all this. He and Mohamed had gone over much of the same territory in another interview two years earlier. For this interview, though, Schultz wanted to start somewhere different. "The things that I was concerned about are the travel that you listed here," he told Mohamed, according to transcripts. "Have you done any travel since the last time that we interviewed you?"

Mohamed said he had recently come back from Australia. Then he did something that, according to the complaint, had become routine when speaking to federal officials: He told part of the truth. In their previous interview, Mohamed had told Schultz that he had cousins in Sydney whom he visited often. What he had failed to mention was his real reason for the visit—the birth of his second child with his third wife, a native Australian.

In his initial conversation with Schultz, Mohamed had said he had seven children— the teenager in Kenya and the six who lived with him and their mother in a one-story stucco home with a white picket fence. Mohamed had neglected to tell Schultz that the Australian woman had just given birth to *their* first child. Now he left out another detail. That most recent trip to Australia had been planned so Mohamed could visit his newest child, his ninth in total. His failure to give the government a proper accounting of his offspring would eventually be one of the details that led to Mohamed's deportation. But Schultz had more pressing matters on his mind.

Mohamed had claimed previously that the Western Somali Relief Agency brought in almost nothing in donations. "It didn't make it," he had told Schultz. Money was so tight, he said, that if he and his organization had been given a box of blankets they wouldn't have been able to afford postage for shipping.

By now, according to the agent's later grand jury testimony, Schultz knew this to be untrue. As he and Mohamed were speaking, Schultz's

colleagues were rifling through that stucco home and finding deposit slips that told a very different story. Far from destitute, the Western Somali Relief Agency had received more than $370,000 in donations in less than three years. The vast majority of that money had come from the suburban Chicago branch of an international nonprofit called Global Relief, according to the indictment that the government would ultimately file against Mohamed. In the two years between Mohamed's first interview and his second, Global Relief had been designated by the United States Treasury Department as a supporter of terrorism due to its alleged connections to Osama bin Laden and Al Qaeda, according to Schultz's grand jury testimony. What's more, the agents discovered checks that showed Mohamed quickly moved the cash he had received from Global Relief to a money transfer service that operated throughout the Middle East. For a nonprofit allegedly created to provide humanitarian assistance, the series of events looked suspicious. So did the fact that Mohamed refused to tell the truth.

Schultz also knew something else. Mohamed had claimed that his one and only job was as a teacher's aide. But ICE officials had just discovered that was also untrue. Even before his arrival in the United States, Mohamed had been employed as a "propagator" for the Kingdom of Saudi Arabia's Ministry of Islamic Affairs, an agency long suspected of ties to extremists. For nearly a decade, Mohamed had received $1,750 a month to provide written reports on the local Islamic community. Even Mohamed's listed reason for obtaining a religious worker's visa, that he was to assist a San Diego imam, had been untrue. That same imam had told Schultz that Mohamed didn't actually do any work. The mosque where he was supposedly first employed was just a small apartment. The story had been a ruse meant to help him gain entry into the United States.

Roughly 45 minutes into their conversation, Schultz asked Mohamed to stand up. He told him he was under arrest for immigration fraud. Mohamed pleaded with the agent. "I didn't hide anything," he said as he was being handcuffed. "I swear to God you have the wrong information." Within two years, Mohamed would be gone from the country for good.

***

**This might have been the last anyone ever heard** of Mohamed if it hadn't been for a member of Kreindler's team who noticed that one vague line in the "28 pages." It was a reference to a Somali nonprofit that, according to an FBI agent, "may allow the Saudi government to provide al Qaeda with funding through covert or indirect means." They knew of only one Somali nonprofit with Saudi ties in San Diego—Mohamed's Western Somali Relief.

In their 15 years on the case, Kreindler's team hadn't persuaded the U.S. government to provide them much of anything useful. And it certainly hadn't had any success with the government's Saudi counterparts. But they had spent more than a decade legally compelling some of the largest charities in the Middle East to hand over documents. Many individuals within the U.S. government knew these charities had provided financial and logistical support for the people and groups American officials labeled as terrorists. This trove of documents had grown into a database

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/    Created 2021-10-11 at 12:57

made up of terabytes worth of information—the firm's well-organized haystack. And after Kreindler started looking more closely at Omar Abdi Mohamed, the firm found a needle.

During his 2004 interview with ICE, Mohamed said he once had been visited by an official from the Saudi Ministry of Islamic Affairs, the same department from which he was receiving a monthly check. Mohamed gave the man's name as "Khaleid", though the last name he offered was garbled. The ICE agent helpfully provided him with one: Sowailem. Khaleid Sowailem was, at the time, the head of Da'Wah, a department within the ministry whose stated goal is proselytizing. It's a mission the Saudis accomplish by spending more than anyone in the world to build, staff and support madrassas and mosques to spread Wahhabism, the ultraconservative form of Islam unique to the kingdom and embraced by Osama bin Laden. It's the main reason why one analyst once described Saudi Arabia as "both the arsonist and the firefighter" when it comes to global terrorism. It only made sense, then, that a man like Mohamed, a "propagator," would be of interest to Sowaleim, the bureaucrat in charge of propagation.



Former Senator Bob Graham, a Democrat from Florida, speaks during a news conference on the "Transparency for the Families of 9/11 Victims and Survivors Act of 2015" with Sen. Rand Paul, of Kentucky in Washington, D.C. in June 2015. | Getty

Bob Graham had long suspected that men like Sowailem working in the Ministry of Islamic Affairs were the strongest link between the hijackers and the Saudis. "I came to the conclusion that there was a support network by trying to assess how the 19 hijackers could pull it off with their significant limitations," Graham told me recently. "Most couldn't speak English, most had never been in the United States, and most were not well educated. How could they carry out such a complex task?" Graham's suspicions were heightened by the connections between the ministry and two men in what had come to be known as the San Diego cell.

The first man was Fahad al-Thumairy, an imam at the King Fahad mosque in Los Angeles who was known for his virulently anti-American views. Thumairy was also an employee of the Ministry of Islamic Affairs. The second was Omar al-Bayoumi, a garrulous man who many in San Diego's Islamic community assumed to be a spy, since he could often be found walking around with a video recorder, taping everyone he

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/     Created 2021-10-11 at 12:57

encountered. Bayoumi was also paid by the Saudis—he had been employed in a series of ghost jobs since the '70s, according to the complaint. He was also the man who had made a claim that many U.S. investigators still find too coincidental to be true.



Clockwise from top left: Fahad al-Thumairy; Omar al-Bayoumi; Khalid al-Mihdhar; Nawaf al-Hazmi.

In a post-9/11 interview with the FBI, Bayoumi had said that he was dining in a Middle Eastern restaurant in Los Angeles in early 2000 when he happened to strike up a conversation with two complete strangers with familiar accents. A friendship developed, based off that single encounter. Bayoumi helped the strangers find apartments in San Diego; threw them a large welcome party; co-signed their leases and provided them money for rent; let them borrow his cellphone; even introduced them to people who helped them obtain drivers licenses and contact flight schools. Those two men were hijackers Khalid al-Mihdhar and Nawaf al-Hazmi, the first plotters to enter the United States, whose lives would end when American Airlines Flight 77 crashed into the Pentagon.

The FBI has long believed that Bayoumi's chance encounter came immediately after meeting with Thumairy. Shortly after that meeting, Bayoumi's $3,000-a-month Saudi salary was bumped up to $7,000. To people like Graham, the implication was clear: Thumairy, a Ministry of Islamic Affairs employee, had tasked Bayoumi with helping the hijackers settle into a foreign country, and his Saudi employers had provided him with extra cash to do so.

Kreindler's team knew all of this, as did any student of 9/11. What they didn't know was whether there was any link to Mohamed, or to the man whom ICE agents had identified as his boss. So Kreindler's team took Sowailem's name and plugged it into their database. They got a hit. Years before, Kreindler had received hundreds of thousands of pages of documents from a Saudi-funded charity called World Assembly of

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/    Created 2021-10-11 at 12:57

Muslim Youth, which according to the complaint, was linked to Al Qaeda. There, at the top of a single page, it found a note from Khaleid Sowailem written on official letterhead from the ministry. On that note was Sowailem's phone number at the Saudi Embassy in Washington, D.C. They then plugged that number into the database and, again, out came a hit—this time, one that linked back to the men Kreindler and the rest of the world had already heard of.



The FBI released a group of photos on March 30, 2017, showing the aftermath of the hijacked American Airlines Flight 77 crash into the Pentagon. | AP

According to heavily redacted FBI records gathered after 9/11, in the three months after Bayoumi allegedly randomly ran into and befriended the two hijackers, he also made nearly 100 calls to Saudi officials in the U.S. Thirty of those calls went to the number that Kreindler had uncovered as Sowailem's direct line. What's more, Kreindler's team knew that in December 2003 the U.S. State Department had quietly revoked the diplomatic credentials of two dozen Saudi personnel. Kreindler knew that the State Department published complete lists of diplomats every quarter. They checked the last listing in 2003—Sowailem's name was on it. They then checked the first listing in 2004—Sowailem's name was gone.

***

**In its new filing,** Kreindler contends not only that Omar Abdi Mohamed was receiving and passing on hundreds of thousands of dollars from another charity, Global Relief, known to support Al Qaeda, but that the money itself was used to fund the attack. Here's Kreindler's theory:

Sometime late in 1998, a Somali Al Qaeda operative named Mohamed Sulaiman Barre established a branch of Dahabshiil in Karachi, Pakistan. (Dahabshiil is like an Islamic Western Union. A Somali-owned, Dubai- and London-based money transfer service.) Barre, who would later be held and interviewed repeatedly at Guantanamo Bay, operated the branch out of his apartment and internet cafes. He never had it registered, either, which meant that a branch supposedly intended to receive and send money to and from the whole world only had the capacity to accept it.

Also in Karachi at the same time was Khalid Sheikh Mohammed, the alleged mastermind of 9/11. KSM, as U.S. officials later called him, was the point man for getting money to the 19 hijackers. He did this in a

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/ Created 2021-10-11 at 12:57

number of different ways, including by sending $100,000 via courier to his nephew in Dubai, who would later wire it to the hijackers in the U.S. (In the interim, KSM's nephew hid the cash in a laundry bag stored under his bed.)

According to court documents filed in the case against him, starting in December 1998 and continuing until May 2001 Omar Abdi Mohamed wrote 65 checks—some as small as $370; others as large as $60,000—to Dahabshiil**.** The total amount, some $370,000, is roughly the same as what the 9/11 Commission estimated as the cost of the plot. When John Pistole, deputy assistant director of the FBI's Counterterrorism Division, testified in 2003 before the Senate Committee on Governmental Affairs, he acknowledged a "continuing investigation" into the "origin of the funding of 9/11 back to financial accounts in Pakistan." When Pakistan's CIA-equivalent raided Barre's apartment in November 2001, its agents found that the Dahabshiil employee's address book was full of aliases and phone numbers for senior Al Qaeda officials. They also interrupted Barre as he shredded documents.

To the people at Kreindler, there's something else suspicious about Mohamed's money transfers. It's not just that he lied about them to the government. Or lied about the fact that he conducted them while working for the Saudis. It's also the timing. The transfers came just months after two massive truck bombs went off almost simultaneously in front of U.S. embassies in Kenya and Tanzania. One of the statements issued by 9/11 Commission staff shows that in the aftermath of those bombings, Vice President Al Gore made a trip to Riyadh with the express purpose of getting the Saudis to give American investigators more access to people who could shed light on Al Qaeda's financial backing—people who were already in Saudi custody. The Saudis, the 9/11 Commission staff wrote, were "reluctant or unable to provide much help … the United States never obtained this access."

Kreindler's theory holds that in the wake of the embassy bombings and increased pressure from then-President Bill Clinton's administration for the Saudis to provide investigative assistance, Al Qaeda was either encouraged or decided independently to make its money harder to trace. Kreindler's complaint and other government documents, including the indictment against Omar Abdi Mohamed, trace a circuitous route that would take hundreds of thousands of dollars from the Chicago office of the Al Qaeda-linked charity Global Relief on to San Diego and Omar Abdi Mohamed's Western Somali Relief Agency, then through the money transfer service Dahabshiil to Karachi, Pakistan, where a waiting Khalid Sheikh Mohammed sent it to his nephew in Dubai, who put it into the pockets of the 19 men who would travel to the United States.

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/    Created 2021-10-11 at 12:57




Getty

Kreindler's team knows the chain they've put together is missing a link. They have no direct evidence that when Mohamed wrote checks to Dahabshiil from his charity's bank accounts that they ended up in the Karachi branch. Yet they do have Barre, the Al Qaeda operative who set it up, telling U.S. investigators specifically that he received money from Somalis in the U.S. Kreindler also has the knowledge that the U.S. Department of Defense has extensive records seized at the time of Barre's arrest that they've yet to share with them or anyone else. They, of course, would like to see those records.

In the aftermath of the "28 pages" release, the Saudis once again proclaimed their innocence and asserted that the details within were vindicating. (Neither Michael Kellogg, the lawyer representing the Saudis in the lawsuit, nor the Saudi Embassy would answer questions for this story.) And there is always the possibility that a very small number of officials in one branch of government, the Ministry of Islamic Affairs, went rogue without the knowledge or blessing of the kingdom's royal family. But Kreindler has experienced that scenario before with Libya, where then-Libyan leader Muammar al-Qadhafi paid the settlement even as he denied ordering the bombing. Even if that happens, Kreindler believes he and his clients still win.

There's also another element that ties the 9/11 case back to Libya. "Our secret sauce," says Kreindler, "is sharing all the information we have with Justice and State and then getting to the point where plaintiffs' demand for compensation becomes part of U.S. policy." In short, Kreindler thinks he can win by being transparent and accommodating with a series of administrations that have shown no willingness to offer their own transparency or accommodation.

***

**Omar Abdi Mohamed's second wife and their six children** still live in San Diego today. When reached by phone, one of them, now an adult, says her father is living happily in Nairobi, Kenya, with his third wife, the Australian, and the children they have together. That adult daughter, who didn't want to be named, says the family isn't sure whether her father has plans to return to the United States, though she thinks he may have recently reached out to an immigration attorney. What Mohamed's daughter does finally know is that the case she had always assumed was a mere religiously motivated witch hunt actually had the weight of evidence behind it. It's fair to characterize her reaction to

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/    Created 2021-10-11 at 12:57

this new information as shock. She promised to pass along my contact information to Mohamed at his new home in Nairobi. She said she thought there was a chance he would call. So far he hasn't.

Similar attempts to reach ICE's Schultz and the FBI agent who helped investigate Mohamed were also unsuccessful. During Mohamed's immigration trial, the government successfully persuaded a judge to suppress the evidence it had gathered against him, citing matters of national security. In late March, Jim Kreindler's firm received a formal notice from the Justice Department that its request to review that evidence would be denied.

What happens next in Kreindler's case against Saudi Arabia is unclear. JASTA allowed him and his firm to name the country as a defendant, but the bill has come under serious attack since its passage. (Congress overrode Obama's veto, the first of his two terms.) Senators John McCain and Lindsay Graham have spent a considerable amount of time arguing against it, and continue to argue to water it down, saying that if other countries pass similar laws the nation hurt most by the trend may be our own. Then there is the Saudi lobbying apparatus, which at one point last fall numbered more than 10 firms and millions of dollars in fees per month. Just recently, the *Daily Caller* reported that U.S. military veterans were allegedly being offered what they thought were merely free trips to Washington, D.C., that were actually a Saudi-backed attempt by a lobbying firm to use former service members to argue against JASTA.

Least known of all is what might happen now that Donald Trump is president. During the campaign, Trump described Obama's veto of JASTA as "shameful" and "one of the low points of his presidency." Once in office, however, Trump has seemingly reverted to the status quo. He recently held a series of high-level meetings with Saudi deputies that the country's delegates described optimistically as a "historic turning point" in the two allies' relationship. Trump's administration is now said to be weighing even greater involvement in Saudi Arabia's war in Yemen, which the Saudis see as a proxy battle with Iran, its primary Middle East antagonist. The Trump State Department has also approved a resumption of sales of precision-guided weapons to the Saudis, a measure that was suspended late in the Obama administration.

It seems exceedingly unlikely that Kreindler's firm will receive anything like the sort of treatment it got from the U.S. government during its two decades-long case against Libya. Back then, the firm worked hand in glove with high-ranking officials in the State Department in order to resolve the Lockerbie case—paying victims' families their settlement money was one of the conditions Qadhafi had to satisfy in order to have key economic sanctions finally lifted. In lieu of that level of support, Kreindler has identified a series of smaller measures Trump could take that would still help his case and, just as important, paint a fuller picture of the years and months of stateside planning prior to 9/11. Key among those are FBI reports that might shed light on who, if anyone, was helping the terrorists in the many other American cities in which they lived. As Bob Graham points out, the only reason the evidence in San Diego is compelling is because we actually know it, a result of some good detective work by a member of his Joint Inquiry staff. "I believe if we knew *all* the facts," Graham says, "We would find that there were people

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/    Created 2021-10-11 at 12:57

similar to al-Bayoumi and Mohamed in southeast Florida, Virginia and New Jersey."

That we don't have definitive answers is a testament to the enduring secrecy that persists almost 16 years later. It's also a testament to the patience of people like Kreindler, whose team has been working that whole time to get what it needs to prove its case, and who believes that no matter who is in office, there will only be one conclusion.

"If the president does nothing, we'll still prevail," he says. "The only question is how much longer it will take."

 Share on Facebook     Share on Twitter

**This article tagged under:**

Terrorism    Saudi Arabia    The Friday Cover    POLITICO Magazine

September 11

**SHOW COMMENTS**

### MORE FROM POLITICO MAGAZINE



**CALIFORNIA**
**California's road to recovery runs through D.C. Republicans**
By JEREMY B. WHITE | Updated 05/08/20 09:44 PM EDT



**Why New Jersey's ventilator guidelines may favor younger, whiter patients**
By SAM SUTTON and CARLY SITRIN



**Rhode Island ends specific restrictions on New Yorkers — by making them national**
By BILL MAHONEY and JOSH GERSTEIN | Updated 03/29/20 02:48 PM EDT

SPONSORED CONTENT                                                         By outbrain

**Read This Before You Renew Amazon Prime Again**
Capital One Shopping

Source: https://www.politico.com/magazine/story/2017/04/saudi-arabia-911-lawyer-214996/     Created 2021-10-11 at 12:57

**Users say these $29 gummies ease pain so well they 'only need 1 a day'**
webmdnews.com

**This is Where the Majority of Singles Over 50 Are Finding Love in Washington**
SilverSingles

# POLITICO MAGAZINE

OUR LATEST   WEEKLY NEWSLETTER   PRINT ARCHIVE   WEB ARCHIVE   ABOUT US   WRITE FOR US   FAQ

© 2021 POLITICO LLC                                                                 Terms of Service | Privacy Policy