**KREINDLER**
LLP

KREINDLER & KREINDLER LLP | 485 Lexington Avenue | New York, NY 10017-2629
office: 212.687.8181 | fax: 212.972.9432 | www.kreindler.com

Filed Under Seal Pursuant to 03 MDL 1570 Protective Order

September 30, 2021

<u>Via ECF/CM</u>

The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

   Re: *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)
     (Ashton 02-cv-6977 only)

Dear Judge Netburn:

  Kreindler & Kreindler LLP ("Kreindler") submits this response to the letter from the Kingdom of Saudi Arabia (ECF No. 7157), together with a supplemental declaration from John Fawcett.

  As explained in our September 27, 2021 letter, Kreindler is genuinely sorry to the Court and counsel for a breach Kreindler first discovered hours before our papers were due despite our investigation efforts, including questioning of all individuals we knew had access to the Jarrah transcript, including John Fawcett. *See* ECF No. 7147-2 at ¶¶ 5-6. But contrary to the suggestions in Saudi Arabia's letter, apart from our consultant John Fawcett, Kreindler: (a) did not act in bad faith; (b) preserved and reported to the Court its communications as requested; (c) was not aware of what our consultant had done until the day our papers were due; (d) did not discuss the confidential content of the deposition of Musaed al Jarrah with Michael Isikoff or anyone else who had not signed the protective order; (e) did not approve of or encourage the breach, tacitly or otherwise; and (e) upon learning of the breach, immediately acted to remove the consultant from access to confidential materials and take additional steps to prevent a recurrence.

  Kreindler questioned each person with access to the transcript of Musaed al Jarrah and prepared declarations in accordance with our understanding of each person's knowledge. Everyone at Kreindler – except its consultant John Fawcett – answered the questions directed by this Court and confirmed under oath that they did not share the Jarrah transcript with Michael Isikoff or anyone else. ECF Nos. 7147-1 to 7147-10. They also confirmed that they learned for the first time on September 27 the information revealed in John Fawcett's September 27 declaration. *Id. Like numerous other law firms (e.g.,* Anderson Kill, Speiser Krause, Baumeister & Samuels, MoloLamken, Jones Day), Kreindler waited until the Court issued an order about what to file before submitting its initial and supplemental declarations. When the Court lifted its stay, Kreindler timely filed its supplemental declarations and did not seek a delay, even after finding out about Mr. Fawcett's actions at the eleventh hour. Any suggestion by Saudi Arabia that Kreindler took these steps to avoid discovery of its consultant's role is wrong. Kreindler did

New York    Boston    Los Angeles

2021-09-30 Kreindler & Kreindler LLP Letter
p. 2 of 3

not know the truth about what happened until September 27 and immediately shared the information with the Court and the parties.

It was late in the morning on September 27 that Mr. Fawcett told Kreindler he could not sign his declaration because he had furnished the transcript to Michael Isikoff. Mr. Fawcett then drafted the declaration submitted to the Court. After learning the truth from Mr. Fawcett, Kreindler had its director of information technology and lawyers review their investigation to see what if anything we had missed and needed to report to the Court. As we told the Court, Kreindler always knew that Mr. Fawcett had access to the Jarrah transcript and as described in the declaration from John Hartney, Kreindler had no evidence of incoming, outgoing or deleted messages to Isikoff or involving the Jarrah transcript between June 1 and August 2, 2021 other than those produced on September 27, 2021. ECF No. 7147-6 at ¶¶8-10 and pp. 6-27. It was the fact that Mr. Fawcett did not disclose until September 27 that he provided the Jarrah transcript to Isikoff and the steps he took to ensure that no one at Kreindler knew he had done so that led to Kreindler believing – until mid-morning on Monday – that Isikoff could not have obtained the transcript from anyone at Kreindler.

To complete the record, we asked Mr. Fawcett today to prepare a supplemental declaration to provide further details to the Court about how he sent the transcript to Michael Isikoff. That supplemental declaration confirms again that Mr. Fawcett downloaded the transcript to his personal devices and sent it to Michael Isikoff through a private, encrypted email service using a self-destruction option that, within days of sending the transcript to Isikoff, erased all evidence even on his personal account of the email exchange. Kreindler was unaware of this breach until Mr. Fawcett admitted it and was unaware of the steps Mr. Fawcett took until he described them to us.

Saudi Arabia unfairly claims that Kreindler does not take the violation of this Court's Orders "seriously" because Kreindler "was not tracking access" to the deposition transcript by approved users. ECF No. 7157 at 5. Andrew J. Maloney stated in his declaration that Kreindler only allowed individuals who had agreed to be bound by the MDL and FBI protective orders to review protected material, including the Jarrah deposition transcript. ECF No. 7147-2 at ¶ 5. Mr. Fawcett was an individual permitted to access those materials. Having software that tracked access with greater detail would not have led to a different outcome, as Kreindler knew that Mr. Fawcett had access to the Jarrah transcript. Any system is necessarily based on trust of the users. Even with a system tracking downloads, an authorized person can decide to copy and release protected material to the public. We only know how the breach occurred in this instance because Mr. Fawcett provided the information. Nevertheless, since it may help deter and serve as a check, Kreindler is obtaining the software necessary to automatically track all viewing and access of protected documents and, in the meantime, requiring all attorneys and staff working with protected materials to keep a log of their access.

Contrary to Saudi Arabia's statements, Jim Kreindler's comments on Consipracyland did not disclose any content from the Jarrah deposition. The only specific reference by Jim Kreindler to Jarrah in the Conspiracyland broadcast was to the public allegations set forth in the 2012 and 2014 FBI Summary Reports that Jarrah tasked Fahad al Thumairy and Omar al Bayoumi to support the 9/11 hijackers. The comments made by Jim Kreindler about the depositions in general did not amount to disclosing the content of the Jarrah deposition and had previously been addressed by the Kingdom before the Court. ECF No. 7084 at 5 & n. 4.

2021-09-30 Kreindler & Kreindler LLP Letter
p. 3 of 3

  We must note to the Court that until now, John Fawcett has worked on the litigation for nearly 20 years without blemish. We do not condone his serious mistake. Mr. Fawcett presented the facts about what he did to the Court. He accepts the consequences of his act. He explained the moral and emotional reasons that he felt compelled him to act in the way that he did. His error must be judged together with the steadfast, tireless work he has done for two decades on behalf of the 9/11 Families.

  Finally, the Kingdom's claim that it and Mr. Jarrah "have been irreparably harmed," ECF No. 7157 at 4, is based on technicalities, not substance. It was Mr. Jarrah who actively tried to  but neither the Kingdom nor the FBI produced records documenting those meetings and while the Kingdom served supplemental interrogatory responses that stated Jarrah had advised them of three meetings, that response was neither subject to the MDL protective order nor, as we know now from Jarrah's deposition testimony, complete.) None of Plaintiffs' questions or Jarrah's answers at issue here were based on documents subject to the protective orders.

                Respectfully,

                /s/ Megan Wolfe Benett
                KREINDLER & KREINDLER LLP
                Megan Wolfe Benett, Esq.
                Steven R. Pounian, Esq.
                James P. Kreindler, Esq.
                Andrew J. Maloney, Esq.
                485 Lexington Avenue
                New York, New York 10017
                Tel.: 212-687-8181
                Email: mbenett@kreindler.com

Enclosures

**Attachment filed under seal**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |

*This document relates to:*
All Actions

### DECLARATION OF JOHN FAWCETT

I, John Fawcett, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following:

1. I provide this statement to supplement my sworn declaration dated September 27, 2021 concerning the information I provided to Yahoo! News investigative reporter Michael Isikoff.

2. As previously stated, I have worked for the 9/11 Families as a researcher and consultant to Kreindler & Kreindler ("Kreindler") since 2002. I have no contract and I bill Kreindler on an hourly basis. Kreindler granted me access to its computer network and provided me with a Kreindler email account. Kreindler shut down my access to its computer network as of September 27, 2021.

3. I privately communicated with Michael Isikoff several times between June 1 and August 1 of this year. I don't recall exactly the dates that I spoke with him, but I believe the first time was in early July. During the call, Isikoff asked me if there was anything he should know about the Jarrah deposition and I told him yes, that Jarrah was a child pornographer.

4. After I talked with Isikoff, I decided I would send him the Jarrah transcript. I don't recall if I sent him the rough or the final transcript. I do recall that I made sure that whatever I sent didn't have any of the questions or answers about FBI material.

5. I sent the Jarrah transcripts to Isikoff so he could see that Jarrah had admitted that he had sexual images of minors on his computer – after lying during the first day of his deposition and then claiming that he "couldn't remember" if FBI agents confronted him with the child pornography they found on Jarrah's computer.

6. I sent the Jarrah transcripts to Isikoff because I wanted someone to do something to stop Jarrah. The transcript I sent to Isikoff was the version that was heavily redacted, leaving out all the questions and answers that concerned information and documents that the FBI had provided under the FBI Protective Order. The only way Isikoff could understand that Jarrah had lied during the deposition was to compare his testimony after he was confronted with the fact that he had been questioned about the images on his computer with his earlier testimony claiming that he had only friendly meetings with FBI agents. The facts that the FBI interviewed Jarrah on at least three occasions were not subject to either protective order.

7. To send the transcript without anyone at Kreindler knowing, I took several steps. First, while I could access the network and share drive where the transcript was saved via my own laptop and the firm's remote access program, I couldn't find a way to save the transcript to my laptop directly, so I saved it onto a thumb drive. I took the thumb drive home. I used a personal email account I established on ProtonMail to send the transcript. ProtonMail is an end-to-end encrypted email service. My ProtonMail account had a self-destructing messages option which automatically deletes emails from a recipient's email inbox after a certain period of time. That option also automatically deletes the email from my sent folder. I believe I set up the self-destructing messages option on my ProtonMail account to delete after 7 days. I recently checked my ProtonMail account to see whether any emails to or from Isikoff about the Jarrah deposition

2

(or any other emails between June 1 and August 1, 2021) are saved in an inbox, a sent folder or a deleted folder. I could not find any such emails.

8. After I sent Isikoff the Jarrah transcript, I believe I had a second phone call with him about the timing of his article discussing Jarrah. I was worried that if he published an article around the same time as he aired the podcast with Jim Kreindler, people would assume that Jim Kreindler had given Isikoff the information about Jarrah, even though I knew that Jim hadn't done so, didn't know I'd done it, and hadn't encouraged me to do it or suggested I do it.

9. Once Isikoff published his article, I deleted everything from the thumb drive that contained the Jarrah transcript and then threw the thumb drive out in my household garbage.

10. I believe I had a third call with Isikoff before the publication of his article. He was interested in doing another article about the 2016 FBI Operation Encore report. He asked how to verify that such a report existed. I sent him the FBI privilege log. I told him that between the privilege log and the Pro Publica article entitled Operation Encore he should have enough to confirm the existence of the document.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
September 30, 2021

By: _____
JOHN FAWCETT

3