1155 AVENUE OF THE AMERICAS, NEW YORK, NY 10036-2711                    JENNER&BLOCK LLP

November 26, 2022

VIA ECF
The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: *In re Terrorist Attacks on September 11, 2001,* No. 03-md-1570 (GBD) (SN)
    **Response to Ashton Plaintiffs' Post-Conference Letter**

Dear Judge Netburn:

On behalf of Judgment Creditors Fiona Havlish, *et al.*, John Does 1 through 7, Federal Insurance Co., *et al.*, and Estate of Smith, *et al.*—collectively, the "Joint Creditors"—we submit this letter in response to the Ashton Plaintiffs' letter ("Post-Conference Letter," Dkt. 8766) submitted after the conference before your Honor on November 18, 2022 ("Conference").

As explained herein, the Ashton Plaintiffs' various proposals arising out of the Conference fail on the law. They also would "create chaos for no good reason," precisely the outcome Your Honor wishes to avoid. *See* Nov. 18 Transcript ("Tr.") 25. As parties with judgments, writs of execution, and pending turnover motions, the Joint Creditors have no quarrel with steps the Court might take to place those plaintiffs who do not yet have final judgments against the Taliban in a position where they have equal priority with each other. The Joint Creditors do object, however, to the Ashton Plaintiffs' latest attempt to put "*all* plaintiffs" in the same exact position with respect to the DAB Assets, Post-Conference Letter 2 (emphasis in original), irrespective of their entitlements to those assets under the law and irrespective of decades-old strategic decisions made by counsel for each group.

### I.     The Ashton Plaintiffs' Attachment Proposals Are Untenable

The Ashton Plaintiffs' proposals involving attachment are legally unavailable and would not advance the equality of the positions between parties with pending default judgment applications. To begin with, the Ashton Plaintiffs' initial proposal as raised at the Conference—that the Court enter an order of attachment over the DAB Assets on behalf of all plaintiffs with liability judgments, and *then* enter final money judgments—is legally untenable. *See* Tr. 27-28; Post-Conference Letter 1. As the Joint Creditors have explained, parties without final judgments cannot encumber blocked assets via a writ of attachment. *See* Dkt. 8419 (Joint Creditors' letter of August 21, 2022, responding to Ashton Plaintiffs' motion for writ of attachment).

To reiterate, TRIA is the sole mechanism to "attach . . . assets that the United States has '*blocked*.'" *See Ministry of Def. & Support for the Armed Forces of the Republic of Iran v. Elahi*, 556 U.S. 366, 369 (2009) (emphasis in original). The Ashton Plaintiffs note correctly in their letter that TRIA applies only to "persons who have 'obtained a judgment against a terrorist party,'" Letter 1 (citing TRIA § 201(a)), and cite the Second Circuit's holding in *Smith v. Fed. Resrv. Bank of New York*, 346 F.3d 264, 271 (2d Cir. 2003), that execution against blocked assets under TRIA

is available only to those "who actually receive favorable judgments." Then, without further explanation, they assume that default judgments solely as to liability qualify as such TRIA-eligible "judgments." Not so. As the Second Circuit has repeatedly emphasized, an entry of default judgment as to liability—even if styled a "default judgment"—is not actually a judgment until the quantum of damages has been ascertained. *See* Dkt. 8419 at 2 (collecting cases). Prior to a determination of damages, a default judgment as to liability is "no more than another interlocutory entry of default," *Dow Chem. Pac. v. Rascator Mar. S.A.*, 782 F.2d 329, 336 (2d Cir. 1986), or a mere "non-final order," *Swarna v. Al-Awadi*, 622 F.3d 123, 140 (2d Cir. 2010).

The Ashton Plaintiffs do not grapple with these cases. Nor do they explain how the Court could practically order attachment under TRIA in connection with a so-called judgment that does not include a determination of damages, when TRIA provides for "attachment in aid of execution in order to satisfy [a] judgment *to the extent of any compensatory damages* for which [the terrorist judgment debtor] *has been adjudged liable*." TRIA § 201(a) (emphases added). As of today, the Taliban has not been adjudged liable to parties without final judgments for a specific amount of compensatory damages. Parties without such judgments thus cannot attach the DAB Assets pursuant to TRIA.

Without TRIA, any attachment of blocked assets by parties without a final judgment would be void. As the Joint Creditors explained in their August 21 letter and at the Conference, President Biden's executive order blocking the DAB assets decrees that those assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in," Exec. Order No. 14,064, § 1(a), "except to the extent provided by statutes" (such as TRIA) or regulations, *id*. § 1(c). Orders of attachment are universally considered "transfers" under federal sanctions regulations, and thus cannot be lawfully issued as to blocked assets unless the party encumbering the assets has a final judgment. *See* Dkt. 8419 at 3; Tr. 48.[1] The Court asked at the Conference whether any party would raise objections such as these to an order of attachment, Tr. 34; to be clear, we raised them at the conference, we are raising them again now, and we will continue to do so as necessary.

Recognizing these problems, the Ashton Plaintiffs' post-conference letter floats an alternative proposal—now their third alternative approach—that would "invert the order of operations" of their original proposal. Post-Conference Letter 1. They now argue that the Court should grant the motions for final judgments against the Taliban and thereafter issue writs of attachment on behalf of all parties with final judgments. In this scenario, however, the writs of attachment are entirely unnecessary. They would create more, rather than less work for the Court, and they would not advance the parties' "equal footing" any more than the Court's proposal of issuing judgments in the ordinary course but staying their enforcement until all motions have been adjudicated. *See* Tr. 29. This inverse proposal would also wholly undermine the stated goal of their original proposal, as counsel portrayed it at the conference: to "put in place [a] pause [on issuing

---

[1] Contrary to the Ashton Plaintiffs' suggestions, nothing about the Second Circuit's decision in *Levinson* changes this analysis or provides that parties without final judgments can obtain writs of attachment under TRIA. *See* Tr. 42-43, 53. In *Levinson*, the plaintiffs had already obtained a final money judgment against Iran. *See Levinson v. Kuwait Fin. House (Malaysia) Berhad*, 44 F.4th 91, 98 (2d Cir. 2022).

Page 3

pending judgments] . . . and take the time that the Court needs to do the quality control assessment" of the pending motions. Tr. 28.

The Court should not rush to enter judgments without regard to quality control. Moreover, the purpose of an order of attachment is to secure assets that are at risk of dissipation; it "keeps the debtor away from his property." *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 538 (2009); *see also Levinson*, 44 F.4th at 98 (attachment is an "interim remed[y]" to "prevent the dissipation" of assets). Here, the DAB assets are doubly restrained—first by President Biden's blocking order, and second by the Joint Creditors' writs of execution. There is thus no risk that the assets will be moved outside the Court's jurisdiction, that the Taliban will regain access to these assets, or that an attachment order is somehow otherwise "needed to secure payment." *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 222 (2d Cir. 2006). Although the Ashton Plaintiffs have wrongly argued that the Joint Creditors' writs of execution are now invalid, *see* Dkts. 8339, 8399, the writs are still in force, and all parties agree that issues concerning the writs are "to be sorted out later." Tr. 28 (Biale).[2] Given that the DAB Assets are doubly restrained, it would serve no purpose to issue redundant and opposed encumbrances on them, particularly when Your Honor has recommended a finding that *no* plaintiff is entitled to execute on those assets. *See* Tr. 5 ("I want to make sure that my time is being spent well, for a good purpose."). The entry of unlawful or unnecessary restraints on these assets will lead to *more* rather than less litigation and further divert the resources of the Court and the parties.

The Court should see this proposal for what it is: an attempt to exploit its invitation for the parties to discuss the pending default judgment motions in order to argue for a writ of attachment to which they are not entitled and that goes far beyond the scope of the Court's invitation.

**II. Once Again, There Is No Basis in the Law to Force All MDL Plaintiffs Into the Same Position With Respect to the DAB Assets**

The Ashton Plaintiffs' proposals should be rejected for the reasons noted above. But it bears emphasizing a larger problem with their arguments—a problem at the center of their previous claims concerning priority on execution under New York law, *see* Dkt. 7928, and their failed class action gambit, *see* Dkt. 7923. At each juncture, the Ashton Plaintiffs have persisted in arguing that every MDL plaintiff must be placed in the exact same position with respect to the DAB Assets, regardless of what the law says, and regardless of the choices their lawyers have made over the last two decades about how best to pursue justice on behalf of the families they represent. Anything short of that, they claim, would imply that one victim's life was worth less than another's, Tr. 40, or would amount to a failure to treat the 9/11 community "on an equitable basis," *id*. 53.

These apocalyptic arguments ring hollow and would lead to results that are far from equitable in the broader context of these proceedings. The position each group of plaintiffs finds

---

[2] The Joint Creditors, as the only parties with the rights under TRIA to attach the DAB Assets, have themselves moved pursuant to Article 62 of the New York C.P.L.R. for a writ of attachment. *See* Dkt. 8587. But as that motion makes clear, it presents an "argument in the alternative" in the event the Court concludes that the Joint Creditors' writs of execution are invalid. *Id*. at 4, n.3.

itself in today is the result of strategic decisions their lawyers have made over the course of two decades. The Ashton Plaintiffs, for example, have prioritized litigation against Saudi Arabia, as well as collection of public funds from the VSST Fund (from which they are believed to have already collected hundreds of millions). Almost all the Havlish Creditors, by contrast, have eschewed collecting VSST funds in order to be able to aggressively pursue a worldwide campaign to enforce those judgments against Iran and the Taliban. Some of the Havlish Creditors' global enforcement efforts are a matter of public record (such as the freezing of approximately two billion dollars of Iranian money in Luxembourg), but others are not. These enforcement efforts have been undertaken at significant expense in multiple jurisdictions in which assets of the judgment debtors are located, with no guarantees of recovery. It is never the case that any satisfaction of judgments obtained by one group of plaintiffs from any party—regardless of the choices made by clients and attorneys, and the investments made to achieve that recovery—should, absent agreement amongst the parties, be made available on an equal basis to every other group who has claims but who have chosen not to pursue them. Were the Ashton Plaintiffs' view the predominant philosophy, no lawyers would undertake the creative, expensive, and time-intensive efforts needed to secure victories for their clients in this complex case, and there would be no reason to have separately represented groups of MDL plaintiffs at all.[3]

The Ashton Plaintiffs are focused, almost myopically, on disrupting and replacing a distribution plan agreed to by more than 10,000 MDL plaintiffs ("Framework Agreement").[4] The Framework Agreement was reached following many hours of discussions and consultations among every MDL plaintiffs group who had then asserted claims against the Taliban – except for the Ashton Plaintiffs, who boycotted those discussions shortly after the initial meeting and declined to participate in the agreement. Now, they have relegated themselves to making inaccurate statements to the Court and to others about it.

---

[3] The Ashton Plaintiffs state they "are not suggesting there isn't some way . . . to give some credit to those people who may have come first." Tr. 40. But there is no way to do that under the law, which provides for priority of executions, not piecemeal, *ad hoc* determinations of fairness. The Ashton Plaintiffs' unsound proposal is revealed to be all the more untenable, and unfair, when one realizes that these are far from the last assets that may be collected from MDL defendants. Any time that a plaintiff executes against an asset of Iran, the Taliban, or another MDL judgment debtor, there would be a flurry of litigation about what the "fair" distribution of that asset is to all MDL plaintiffs and what "credit" to give the party that came first, regardless of who actually enjoys execution priority under the applicable law. These issues become even more impracticable for pending and future enforcement proceedings taking place in countries other than the United States.

[4] The Framework Agreement encompasses both (a) all MDL plaintiff groups who hold final, enforceable money judgments against the Taliban, and are thus lawfully authorized to enforce their judgments under TRIA, and (b) more than 10,000 MDL plaintiffs who do not currently have judgments against the Taliban. The Framework Agreement was negotiated to benefit as many MDL plaintiffs as are willing and as a way to ease burdens on the Court created by the Ashton Plaintiffs' request that the Court expedite its review of motions for default judgment. By refusing to participate in the negotiations and final agreement, it is the Ashton Plaintiffs who have created two competing groups: the approximately 75 percent of MDL plaintiffs who are part of the Framework Agreement and the approximately 25 percent who are not.

The Joint Creditors have doggedly pursued the DAB Assets for fifteen months now, following federal and New York law to the letter in their efforts to obtain turnover orders. Our law firms have spent millions of dollars in the process, fully aware that there was no guarantee of success for our clients or for the more than 10,000 9/11 plaintiffs without enforceable judgments with whom our clients have agreed to share any recovery. Counsel for the Ashton Plaintiffs, for their part, have obstructed these efforts at every turn, and yet they insist that they must be given an equal share of any recovery made possible by the efforts of others. That is not how the MDL has worked, it is not how New York law works, *see* Dkt. 7928, and it is not how principles of equity work. *See Harper v. Ercole*, 648 F.3d 132, 138 (2d Cir. 2011) ("[E]quity aids the vigilant.").

\*\*\*

In sum, the Joint Creditors[5] would propose the following procedure for resolving the pending motions for default judgment against the Taliban:

(a) review each motion for default judgment against the Taliban in the ordinary course;

(b) as part of the review, undertake a careful quality control assessment for each movant to ensure the judgments will survive scrutiny in future enforcement proceedings, *see* Tr. 37;

(c) stay enforcement of those judgments as they are entered and only lift the stay after all such motions have been resolved so as to permit the group of plaintiffs who do not yet have judgments against the Taliban "to proceed on equal footing one with another," Dkts. 8590, 8704; and

(d) order the parties who do not yet have judgments (including the Ashton Plaintiffs) to meet and confer in an effort to reach agreement concerning priorities and distribution plans as amongst themselves.

This proposed procedure would have several benefits. First, it would lift the burden on the Court arising from the request to expedite its review of motions for default filed on behalf of more than 13,000 MDL plaintiffs. Second, it would increase the probability that potential defects in motions for default judgment could be corrected now, thereby ensuring a greater number of enforceable judgments in future proceedings in the United States and abroad. Third, the stays on enforcement would provide the parties without judgments the time and space to reach agreement on a distribution plan that resolves the "race to the courthouse" scenario the Ashton Plaintiffs profess they wish to avoid. Fourth, unlike the Ashton Plaintiffs' various proposals, this proposal complies with the law. Finally, the proposed procedure would also provide Judge Daniels the opportunity to focus on Your Honor's August 26 Report & Recommendation and the objections thereto—*i.e.*, the core merits issues in these proceedings—without burdening the Court with continued jockeying among plaintiff groups. As the Court noted at the Conference, the priority issues as to the DAB Assets will be relevant only in the event that Judge Daniels or an appellate court determines that the DAB Assets are available for execution.

---

[5] The Doe Creditors join in these recommendations only insofar as they would prevent the Ashton Plaintiffs from further improperly attacking the Doe Creditors' superior rights from outside the Doe Creditors' action.

Respectfully submitted,

/s/ Lee Wolosky
Lee Wolosky
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1628
lwolosky@jenner.com

Douglass A. Mitchell *(pro hac vice)*
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6090
dmitchell@jenner.com

*Counsel for Judgment Creditors Fiona Havlish, et al.*


/s/ Orlando do Campo
Orlando do Campo
John Thornton (*pro hac vice)*
Daniela Jaramillo (*pro hac vice*)
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
od@dandtlaw.com

*Counsel for Judgment Creditors John Does 1-7*


/s/ Sean P. Carter, Esq.
Sean P. Carter, Esq.
Stephen A. Cozen, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 665-2105
scarter1@cozen.com

*Counsel for Judgment Creditors Federal Insurance Co., et al.*

Page 7

/s/ James Edwin Beasley
James Edwin Beasley
The Beasley Firm, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215)-592-1000
jbj@beasleyfirm.com

*Counsel for Judgment Creditors Estate of Smith, et al.*


cc: All counsel of record (by ECF)