Mbi2TerC2

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    In re Terrorist Attacks on            03 MD 1570 (GBD)(SN)
     September 11, 2001
4                                          Conference
     ------------------------------x
5
                                           New York, N.Y.
6
                                           November 18, 2022
7                                          10:20 a.m.
8
9    Before:
10                      HON. SARAH NETBURN,
11                                        U.S. Magistrate Judge
12
13                        APPEARANCES
14   COZEN O'CONNOR
          Attorneys for Federal Insurance Plaintiffs
15   BY:  SEAN P. CARTER
16
     MOTLEY RICE, LLP
17        Attorneys for Burnett and Plaintiffs Executive Committee
     BY:  ROBERT T. HAEFELE
18        JOHN EUBANKS
19
     KREINDLER & KREINDLER LLP
20        Attorneys for Ashton Plaintiffs
     BY:  MEGAN WOLFE BENETT
21        ANDREW J. MALONEY III
22
     ANDERSON KILL P.C.
23        Attorneys for O'Neill Plaintiffs
     BY:  JERRY S. GOLDMAN
24
25
```

Mbi2TerC2

1                          APPEARANCES (continued)

2

3    SHER TREMONTE, LLP
          Attorneys for Ashton Plaintiffs
     BY:  NOAM BIALE

4

5    BAUMEISTER & SAMUELS, P.C.
          Attorneys for Bauer and Ashton Plaintiffs
6    BY:  MICHEL F. BAUMEISTER
          DOROTHEA M. CAPONE

7

8    WIGGINS CHILDS PANTAZIS FISHER GOLDFARB
          Attorneys for Ryan and Maher Plaintiffs
9    BY:  DENNIS G. PANTAZIS
          TIMOTHY B. FLEMING

10

11   JENNER & BLOCK
          Attorneys for Ryan and Maher Plaintiffs
12   BY:  DOUGLASS A. MITCHELL

13

14   SPEISER KRAUSE, P.C.
          Attorneys for Burlingame Plaintiffs
     BY KAITLYN VIDASOLO

15

16   LAW OFFICE OF JOHN F. SCHUTTY, P.C.
          Attorneys for Ashton, Burling, Dickey Plaintiffs
17   BY:  JOHN F. SCHUTTY

18

19

20

21

22

23

24

25

Mbi2TerC2

1          (Case called; all parties present)

2          THE COURT:  Once again, thank you all for being here.

3     Nice to see everybody.

4          So switching gears, we are here to talk about the

5     Taliban judgments and how to best proceed.

6          I scheduled this conference because I think there are

7     a number of potential issues with these judgments, and let me

8     just identify for you all what the Court sees as some of these

9     issues.

10          I think there is a quality control question that the

11    Court has to make sure that, when judgments come in, they are

12    appropriate, appropriate plaintiffs with appropriate claims

13    with judgments, etc.

14          You know, as you all know, we handle a very large

15    volume of default judgments against any number defendants, and

16    the Court spends a fair amount of time making sure that they

17    are correct.  We are not rubber stamping these judgments.  We

18    are doing the quality control within our chambers.  And so one

19    question is, given that the Taliban claims are brought in some

20    regards differently than some of the claims, let's say, against

21    Iran, how to make sure that we have quality control of those.

22    That is one issue that the Court has.

23          The second issue is the issue that I know is first and

24    foremost in everybody else's mind, which is what I will call

25    the equal footing question and whether or not it is appropriate

Mbi2TerC2

1    and possible for the Court to act in a way that is most

2    protective of everybody's claims.

3           And then the third issue is the issue that is raised

4    by Mr. Schutty about the potential for, at least in his view,

5    certain claimants bringing claims that he believes are not

6    proper and, as a result, there is a deleterious effect on

7    whatever funds are available for other claimants.

8           So I think those are the three issues here.  Like I

9    said, I think issues two and three are the ones that everybody

10   is here to talk about, but I also have a question about issue

11   one, which is this quality control question for the Court to

12   make sure that these are coming through in a way that the Court

13   can manage because we have quite a few already, and I

14   understand that there will be more coming.

15          The last thing I want to say is, following off of

16   Baumeister's comment——I have lost him, I don't have my glasses

17   on——about if there are funds, and it's my understanding that at

18   this moment the only funds that could potentially be available

19   for families are from the DAB funds.  You all know my opinion

20   on that.  Judge Daniels may have a different view.  The Second

21   Circuit may have a different view.  Maybe the Supreme Court

22   will have a different view.  But as of now, those funds I don't

23   believe are available for collection.  I also don't believe any

24   of the victims' funds are available as against Taliban

25   judgments.  So I also want to make sure that whatever firestorm

Mbi2TerC2

1    we are about to create is one that is reasonable.  There is a

2    lot going on in this case and it won't shock anybody to know

3    that this is not my only case, and so I want to make sure that

4    my time is being spent well, for a good purpose, without

5    creating unnecessary chaos if there is not really a reason for

6    it.

7        So those are my opening remarks.  I don't necessarily

8    have a particular agenda or view of who should begin.  I don't

9    know if, among you all, there is somebody who has been

10   designated to start this conversation.  I am not quite sure I

11   understand all of the diverging views.

12       Mr. Haefele, it looks like you --

13       MR. HAEFELE:  Judge, I'm not sure what order you want

14   to take, so I am riffing off of what you want to do in terms

15   of --

16       THE COURT:  I'm pretty agnostic.  If you have got

17   something you want to start with, I'm happen to go that way.

18       MR. HAEFELE:  I think if we take the quality control

19   one, I think everybody in the courtroom wants to do whatever it

20   is that gets you the information that you need.  Obviously on

21   our end we are trying to quality control before the information

22   comes to you.  I think your last order of what information you

23   needed from us was pretty clear, and I am hoping that the

24   information that came in the various spreadsheets from the

25   various firms answered what your questions were.  And if there

Mbi2TerC2

1  is something else that you need, I think the Plaintiffs

2  Executive Committee's position is whatever you need, we need to

3  give you.

4          THE COURT:  Let me ask you a question about

5  Mr. Schutty's comments in his letters and do you feel like -- I

6  will start by saying I'm not convinced that the Court should be

7  engaging in what I think feels like cross-border raids, and so

8  I'm not even sure that this is an issue for the Court to

9  decide.  But to the extent there are concerns that are raised

10 that people who are not appropriate claimants are seeking

11 judgments, do you believe that the information that's being put

12 forward to the Court is sufficient for the Court to evaluate

13 that at least on the first instance?

14         MR. HAEFELE:  I do, your Honor.  But part of that

15 answer has to do with, again, I think we are flipping to the

16 third question that you raised, which is addressing the issues

17 that were addressed in Mr. Schutty's letters, correct?

18         THE COURT:  Yes.

19         MR. HAEFELE:  I think that we certainly appreciate

20 that Mr. Schutty, he's got I think it's eight estates and he is

21 aggressively representing his clients and he is stating a

22 position, but the problem is, no matter how aggressive, no

23 matter how much you want to represent your clients zealously,

24 it can't be contrary to what the state of the law is; and the

25 state of the law is that it recognizes claims on behalf of not

Mbi2TerC2

1    just the states and not just the heirs, but the survivors, as

2    well.  And there is case law that I am happy to go through, but

3    there is case law in this circuit that recognizes that claims

4    on behalf of survivors, and that specifically has included the

5    parents and the siblings, those are claims that have been

6    recognized.  And if you look at Mr. Schutty's letters, while he

7    does acknowledge and he goes through the statute, the ATA

8    statute 2333, and he acknowledges that there are those three

9    phrases in the statute when he does his analysis, he completely

10   omits any analysis with regard to survivors and he completely

11   omits the case law of -- there is a 2004 decision in Rhode

12   Island called the *Ungar* case that I suspect your Honor is

13   fairly familiar with——it's a fairly familiar case to most folks

14   who practice in this arena——that specifically addresses the

15   issue of whether or not parents and children fall under the

16   survivors and goes through a policy analysis of why Congress

17   explicitly acknowledged that those folks had claims under the

18   ATA Section 2333.  And that analysis is absent from many of the

19   legal analysis declarations and the letters that Mr. Schutty

20   sent to the Court.  There is no analysis of the claims on

21   behalf of the survivors under the ATA 2333.

22        *Ungar* has been accepted in this district, and the *Knox*

23   case and a number of other cases, and in the Eastern District

24   there is at least three or four cases that I found that

25   recognize *Knox* and *Ungar*, indicating that this district

Mbi2TerC2

1    recognizes those claims on behalf of survivors, just as it does

2    for the heirs, just like it does for the estates.

3            So we have a fairly strong opinion that, to put it

4    bluntly, while I know he is representing his clients

5    aggressively, he has six -- I'm sorry, he has eight estates

6    that he represents and they are -- his only clients are estates

7    and heirs of those estates.  Apparently he doesn't have any

8    survivors, so he is not concerned.  But the survivors, just

9    because he doesn't represent them, they don't -- it's not that

10    they don't have claims.  The statute is very clear that they

11    do.  The case law in this circuit is very clear that those

12    people do have claims under the ATA.

13            THE COURT:  Is Mr. Schutty here?

14            MR. SCHUTTY:  Yes, your Honor.

15            THE COURT:  Would you like to be heard?

16            MR. SCHUTTY:  May I?

17            THE COURT:  Please.

18            MR. SCHUTTY:  Your Honor, good morning.

19            THE COURT:  Do you want to state your name for the

20    court reporter?

21            MR. SCHUTTY:  I'm John Schutty, representing the

22    Ashton, Burling, and Dickey plaintiffs.

23            Your Honor, thank you.  I think your first point is

24    interrelated with the second and third point.  This Court has

25    been swamped with the filing of wrongful death claims by

Mbi2TerC2

1    individual claimants who, under applicable state law, have no

2    right to bring a claim unless they are a personal

3    representative of an estate.  That's the first issue.

4           Now, I heard the Motley firm argue that there is a

5    case in Rhode Island that says survivors includes parents and

6    siblings, but in this circuit there has never been a decision

7    where the phrase "heirs" has been defined by federal common

8    law.

9           I have worked on many MDL cases in the past.  I know

10   many of the attorneys here.  When there is a plane crash, for

11   example, and there are decedents from different states, the

12   laws of those states apply in a wrongful death action.  My

13   position with respect to the wrongful death cases is that the

14   laws of the domicile of the decedent should be applied in a

15   state administration.

16          What we have is chaos now.  We have fights among

17   family members that we shouldn't have.  In New York State, for

18   example, if a decedent passes away, New York State has specific

19   rules in place that define who the heirs are who can bring a

20   wrongful death action, when that wrongful death action must be

21   brought.  These rules have gone out the window here in this

22   litigation because if you can add a plaintiff at any moment in

23   time who has some familial relationship with a decedent, you

24   file a claim on their behalf, and I submit that's incorrect.

25   The Court cannot ignore the estate administration laws that are

Mbi2TerC2

1    applied and should be applied here.

2            THE COURT:  Let me ask you a question.  So if, for

3    instance -- there are different types of claims, right?  And so

4    estates have their own claims for the injury caused to the

5    estates, and I agree with you that that is governed by state

6    law.  But in these terrorism cases, there are also federal

7    claims, and those claims have been interpreted by the courts to

8    allow for a broader category of people who can collect damages.

9    So even if you are right that someone who is alleging to be a

10   beneficiary of an estate should not because they are a cousin,

11   many individuals have their own personal claims and I don't

12   understand what your argument is as to those particular

13   claimants and why they can't proceed.

14           MR. SCHUTTY:  Your Honor if it's a wrongful death

15   claim—wrongful death claim—which all the Taliban claims are

16   of two varieties, a state law claim, which is governed by

17   New York law, undoubtedly, two-year statute of limitations, the

18   claim can only be brought by personal representative and the

19   heirs as defined by statute; and then we have the Antiterrorism

20   Act, which has a phrase that says "heirs or survivors."

21           What the PEC has urged this court to do is define that

22   phrase under federal common law.  I submit to you the proper

23   thing to do is to not create federal common law.  This Court

24   should not be defining on its own who the heirs and survivors

25   are.  It should look to applicable state law.  Heirs and

Mbi2TerC2

1    survivors are synonymous.  Under New York law, it's clear, for

2    example, who the heirs and survivors are, and they clearly are

3    not parents and siblings if it's a widow and children.

4         THE COURT:  And are you aware of any federal case law

5    that holds that the federal claims, the ATA claims here or

6    other federal claims, have to be narrowly construed to be

7    coextensive with the state law claims?

8         MR. SCHUTTY:  Your Honor, this is novel -- the

9    Antiterrorism Act has been litigated in the D.C. Circuit and

10   Rhode Island, but not in the Second Circuit.  And what I am

11   urging the Court to do, for quality control, one order where

12   the PEC can put in a brief where the PEC defines for you who

13   can bring the claim, who the heirs are, what the statute of

14   limitations is and allow the other plaintiffs, like myself, to

15   file its own brief, and I think your Honor can reach a

16   decision, which could be an appealable order for the Second

17   Circuit.  This circuit has never defined into federal common

18   law who the heirs are in a wrongful death action.  That's not

19   the role of the federal courts.

20        THE COURT:  As everybody knows, I have certainly

21   issued several orders denying claims of people in the context

22   of whether they were immediate family members, right?  There

23   has been a fair amount of law that's developed out of this case

24   about who falls within that category.  And those decisions are

25   borne out of the concern that you are raising, to make sure

Mbi2TerC2

1    that it is not a neighbor, it's not a distant cousin.  It's got

2    to be somebody that federal common law identifies as within the

3    immediate family.  But that's all borne out of federal common

4    law.  So from the Court's perspective, I am doing that, I am

5    quality controlling with respect to those claims, and there

6    have been family members that I have denied claims for various

7    reasons.  So again, it is not clear to me what more needs to be

8    done on that issue.

9        And then I guess what I might -- I will have a couple

10   of other things to say.  One is, to the extent there is a

11   dispute about the estates' rights and the like, it seems to me

12   that that is a dispute that is much better brought to a

13   surrogate's court which has greater expertise and that that

14   would be the place to bring your application.

15       And then the last thing I want to say, and then I will

16   give you an opportunity, is with respect to the statute of

17   limitations, trust me, I see these cases and I think to myself

18   how is it possible in 2022 that these are still being brought?

19   I am aware of one case out of the D.C. Circuit from 2019 which

20   made very clear that the Court on its own cannot *sua sponte*

21   raise statute of limitations defenses as to a defaulting

22   defendant.  The D.C. Circuit gets it wrong sometimes, but

23   that's the only law I'm aware of.  I don't believe the Second

24   Circuit has spoken on that issue.  So I'm not even sure that

25   the Court would have the authority to do that.

Mbi2TerC2

1          MR. SCHUTTY: Your Honor, let me address the first

2    issue you raised that you think that it would be more

3    appropriate for a surrogate's court to resolve in an estate

4    dispute who gets what. That's exactly the problem. And if

5    this Court enters default judgments on behalf of non-heirs,

6    that is subject to challenge by the heirs in a surrogate's

7    court because my clients, for example, will oppose an award of

8    damages to an in-law who is not entitled under New York law to

9    damages. And a surrogate is going to follow New York law, but

10   if this Court enters a default judgment for the -- for a

11   non-heir that's a problem. And there is no reason to do that

12   if we follow the estate administration laws of the states

13   involved in this MDL litigation. Connecticut for the most

14   part, New Jersey, and New York are the same. The only person

15   who can bring a wrongful death action is a personal

16   representative. That's not the case in this litigation. The

17   only person -- the only heirs that can bring a wrongful death

18   claim through the personal representative are defined by

19   statute. And we are splitting hairs now if we get into is it a

20   cousin, is it an adopted son, etc. The states are responsible

21   for the welfare of the surviving family members. The states

22   for decades have defined who can recover. And all of a sudden

23   we are creating federal common law that deviates from state law

24   which is inappropriate. And the problem is --

25          THE COURT: I understand your concerns and your legal

Mbi2TerC2

1    argument.  Do you have a proposal procedurally to address this?

2    Because I think I used the expression cross-border raids.  That

3    is what this feels like.  And so do you even have a procedural

4    mechanism other than going to probate court in the relevant

5    states to raise this?  I'm not sure your clients have standing

6    to raise this.  I don't know how this gets resolved, and I'm

7    curious what you would propose.

8          MR. SCHUTTY:  May I suggest something, your Honor?

9    Your Honor has received hundreds, if not thousands, of Taliban

10    default judgments and wrongful death cases, correct?  And

11    everyone is urging their own memo of law on why their clients

12    can recover.  Here is what I ask you to do, because my clients

13    are not properly represented by the PEC here because all the

14    law firms on the PEC are representing heirs and non-heirs.

15    Here is what I ask: that a briefing schedule be set.  Let the

16    PEC describe to your Honor, as officers of the court, who is

17    entitled to recover in a wrongful death action.  What heirs?

18    Who are the heirs?  Does the action have to be brought by a

19    personal representative?  And what should the statute of

20    limitations be?  Those three issues we need to get resolved

21    before you start piecemealing default judgments for different

22    law firms.  Do you follow me?

23          THE COURT:  I do.  I don't think anybody in this room

24    would have a real argument about who can bring a state law

25    wrongful death claim.  I think the question is with respect to

Mbi2TerC2

1    the federal case.

2            MR. SCHUTTY:  All right.  Your Honor, so let me go

3    further.  The PEC should define under the antiterrorism

4    statute, the Antiterrorism Act, who can bring the claim for

5    wrongful death, what's the statute of limitations, who -- how

6    do you define heirs or survivors.  Let the PEC brief that issue

7    and I will brief it if I am alone and the Court will reach one

8    order defining who can bring a claim for wrongful death against

9    the Taliban.  That's what I ask.

10            THE COURT:  Thank you.

11            MR. HAEFELE:  Robert Haefele again, your Honor.  And I

12    am looking forward to the day where we can start focusing our

13    energies back on the defendants instead of between the

14    plaintiffs.

15            Your Honor, Mr. Schutty, he just gets it wrong when it

16    comes to the ATA claims, and he gets it wrong particularly when

17    he says that there is nothing in this circuit that addresses

18    the issue.

19            In 2006 in this district, in the Southern District of

20    New York, a decade and a half ago, in the *Knox* v. *PLO* case,

21    this Court adopted a glowing recommendation that considered the

22    *Ungar* case out of Rhode Island.  He referenced it.  I

23    referenced it.

24            But it's not just Rhode Island.  I went back to that

25    because that has a very strong, aggressive analysis exactly on

Mbi2TerC2

1    point with the issue that we are here about.  And in the *Knox*

2    case, the *Knox* case looked at the *Ungar* court's reasoning and

3    reached the same holding.  Specifically, at the end of going

4    through the analysis that *Ungar* went through, considering the

5    same things -- and in *Knox*, by the way, the plaintiffs had an

6    ATA 2333 claim that included the decedent's parents and

7    siblings.  There were adult siblings and parents, and that's

8    who the plaintiffs were, and they had claims based on their

9    being survivors.

10            The Court considered the reasoning in *Ungar* just the

11    same way the Court in *Ungar* had done, including that the

12    legislative history of 2333 showed that Congress intended the

13    class of persons able to pursue claims under 2333 to be

14    interpreted broadly and including that by -- including the term

15    "survivors" in the class of persons eligible to bring the

16    action, Congress evidenced an intention that the family members

17    of those who are not legal heirs had claims under 2333.

18            The *Knox* court also considered the same thing as

19    *Ungar*, that the legislative history of the ATA and the

20    underlying purpose of the ATA to deter and punish acts of

21    international terrorism, led the Court to conclude that the

22    term "survivor" as used in 2333(a) includes parents and grown

23    siblings of United States nationals killed by reason of -- by

24    acts -- in acts of terrorism.

25            And as a result of the analysis, the same analysis

Mbi2TerC2

1    that *Ungar* had done, the Court assessed in the *Knox* case the

2    rogue quote "a victim's parents and adult siblings properly

3    fall within the class of individuals that may claim damages

4    under Section 2333 as survivors."  I don't know that that could

5    be more clear that that is the state of the law in this

6    district as well.

7            If I can just pause for a minute and address a few

8    related policy points.

9            First, as recognized in both *Ungar* and *Knox*, and a

10   host of other cases in this circuit and particularly in the

11   Eastern District, and relatedly, not identical, but relatedly

12   in the D.C. Circuit, and I think there is a case in Florida, as

13   well, but there is a host in the Eastern District.  The ATA, as

14   enacted and as amended through JASTA had broad policy

15   objectives of affording a vehicle for providing compensation by

16   the families of those killed in terrorism attacks, and a

17   secondary issue or a secondary purpose of imposing maximal

18   liability on terror sponsors, or on terror sponsors and

19   supporters of terrorism, to deter terror sponsors' activities

20   and thereby promote national security.

21           And one of the problems is that the approach that

22   Mr. Schutty is asking us to do here eliminates much of what

23   Congress intended to do by reason of both the ATA and JASTA.

24   Those were the purposes of the ATA.  In fact, if you take

25   Mr. Schutty's approach of minimizing the number of people who

Mbi2TerC2

1    actually can get compensation for the losses that they have

2    suffered, you have actually diminished Congress's intention of

3    protecting national security by maximizing the hit on those who

4    would sponsor terrorism.  So you are minimizing Congress's

5    intent by doing it the way Mr. Schutty has proposed.  Neither

6    the goal of compensation nor the goal of imposing consequences

7    on terrorists is served by minimizing the folks -- by

8    minimizing the hit on those that would do those acts.

9         Second, Congress's intent to provide a federal

10    remedy -- and that's one of the issues that I think Mr. Schutty

11    is missing, is that Congress intended a federal remedy here and

12    intended it for a broad category of people.  And by taking the

13    approach that he's done, the protection of national interest is

14    diminished, and those interests are much greater served by

15    making the -- taking the broad remedy that Congress allowed for

16    more people.  So, in a sense, Congress's goals are met better,

17    much better, by the broader reading that Congress intended than

18    what's intended by Mr. Schutty's approach.

19         But I go back to the beginning of what I said, which

20    is that Mr. Schutty's reference that this is not the state of

21    the law in this district is wrong.  It is the state of the law

22    in this district.  In fact, Mr. Schutty has hasn't cited

23    anything in his -- either in his legal analysis, in his

24    declarations, or in his letters that says something contrary to

25    what the state of the law is based on the *Ungar* case out of

Mbi2TerC2

1    Rhode Island, based on the *Knox* case out of this district,

2    based on the *Estate of Henkin* case out of the Eastern District

3    that recognizes the same thing, the *Weiss* case in the Eastern

4    District, the *Miller* case in the Eastern District, and a host

5    of others.

6            So the state of the law is pretty clear that the folks

7    that are allowed to collect or allowed to have cases under the

8    "survival" term in the ATA includes, in addition to the estates

9    and in addition to the folks that he's got in his eight

10   estates, includes the parents and the siblings, as well.

11           And I think Mr. Eubanks, I believe, had one point on

12   the estate issues that he wanted to make to your Honor.

13           THE COURT:  Okay.  Just make sure you speak into the

14   microphone, please.

15           MR. EUBANKS:  John Eubanks from Motley Rice.

16           One of the issues that Mr. Schutty conveniently is

17   raising is that all of these plaintiffs are bringing claims on

18   behalf of the estates, on behalf of -- or bringing wrongful

19   death claims, and I think that's a misnomer, as Mr. Haefele

20   stated.

21           These cases are brought under federal law, under the

22   ATA, in addition to common law claims where there hasn't been a

23   choice of law determination in this case since these attacks

24   happened in three separate geographical locations.  That said,

25   for the estate claims, as your Honor stated earlier, I don't

Mbi2TerC2

1    think anyone on the PEC is going to argue that an estate claim

2    can be brought by anyone other than the court-appointed estate

3    representative from the surrogate's court, from the probate

4    court in wherever they were domiciled at the time of their

5    death.

6           I don't think that's the issue here.  The issue, as

7    Mr. Haefele has stated, is that these other claims are arising

8    under federal law, not under New York wrongful death law.  The

9    statute of limitations under the ATA, if an attack were to

10   happen today, it's ten years.  It's very clear in the statute.

11   For the 9/11 attacks, there was some movement in that statute

12   of limitations, so the statute of limitations, as your Honor

13   even noted in a more recent order, ran to January 2, 2019.

14          So but in the end we are talking about a default case

15   against a terrorist entity—against the Taliban—who has not

16   appeared, and Mr. Schutty is trying to bring a defendant's

17   affirmative defense of statute of limitations to try and limit

18   the category of claimants who can bring a claim in this case

19   when, in all reality, the number of people who were killed on

20   that day is a known number and the family members who are

21   immediate family members is again a known number.  We are not

22   talking about going out into perpetuity here.

23          But that said, these individuals have claims.  And

24   whether it is within the Eastern District, Southern District,

25   there are cases within the Second Circuit that have decided

Mbi2TerC2

1    that what we would call under the FSIA escalation claimants

2    have claims also under the ATA.

3         THE COURT:  Thank you, Mr. Eubanks.  I don't know who

4    wants to respond.  I'm curious if you have a position with

5    respect to the procedural question that Mr. Schutty raises.  He

6    requests that I set a briefing schedule to brief this issue.

7    Do you have a view on whether that's appropriate, whether there

8    is a procedural mechanism for the Court to address this, if the

9    Court should address this?

10         MR. HAEFELE:  Your Honor, I think, given that there --

11    I am troubled, because I think the answer is so clear that

12    there is no law that says that these folks don't have claims

13    under the ATA 2333.  There are so many other things that need

14    to be attended to in the MDL that making a -- it's not that we

15    couldn't brief it.  We could certainly brief.  I think we have

16    hashed out most of the legal issues here today.  If the sole

17    issue -- and it seems to me that that is the starting point and

18    the end point if the issue is whether or not the parents and

19    siblings have claims, that's been addressed, and it's very

20    clear under the law.

21         Mr. Schutty made one point that I do agree with.

22    There is some infighting within the community having clarity of

23    this that I think would help.  The problem is that where you

24    have folks saying that certain folks don't have claims is part

25    of what causes the dissension within the community.  Some folks

Mbi2TerC2

1    say they are not right plaintiffs.  That's wrong.  They are.

2    So the preference would be to not have a briefing schedule on

3    an issue that is so clear that these folks do have claims.  If

4    there is some other issue that needs to be briefed, I just

5    haven't seen what it is.  It's not clear to me what's not clear

6    that needs to be briefed.

7              THE COURT:  Okay.  Thank you.

8              Yes, Mr. Schutty.

9              MR. SCHUTTY:  Your Honor, we are officers of the

10   Court.  Our objective should be to guide your Honor to the

11   proper decision.

12             Here there is no doubt a contest on the law.  The PEC

13   takes the position that there is this precedent.  There is not

14   a lot of precedent on the Antiterrorism Act.  There certainly

15   is no Second Circuit precedent on this issue.  And it's not the

16   federal court's role to get involved in familial relationships

17   and defining what an heir is under federal common law.

18             I can quote, as I did in my letter to you, a Supreme

19   Court decision where Justice Harlan said, "The scope of a

20   federal right is of course a federal question, but that does

21   not mean that its content is not to be determined by state,

22   rather than federal, law.  This is especially true where a

23   statute deals with a familial relationship.  There is no

24   federal law of domestic relations, which is primarily a matter

25   of state concern.  We think it proper, therefore, to draw on

Mbi2TerC2

1   the readymade body of state law to define the word "children."

2           The Supreme Court has historically said we don't get

3   involved in the administration of estates, and that is the

4   issue before this Court.  Should we disregard well-established

5   state law on who is an heir or should we create a new federal

6   common law and the chaos that now ensues in a newly developed

7   area of the law?

8           So what I ask your Honor to do, so that you are guided

9   to the right decision, have it briefed, issue one order

10  regarding who is a qualified plaintiff in a wrongful death

11  action against the Taliban.  The PEC can file a brief.  I will

12  file a response.

13          Thank you, your Honor.

14          MR. HAEFELE:  Your Honor one quick point, very quick.

15          THE COURT:  Yes.

16          MR. HAEFELE:  The idea that the United States

17  government crafted a federal remedy and then wanted the

18  availability of that remedy to vary based on the vagaries of

19  particular states where the citizen of State A has a different

20  right on a federal remedy than a citizen of State B,

21  particularly in the context where national -- you know, the

22  national security issues, protection of the United States where

23  we are engaged here.  It makes no sense that clearly they did

24  not intend, and there is nothing in any of the case law and

25  there is nothing in the statute that indicates that the

Mbi2TerC2

1    Congress intended this remedy to be differing based on one

2    state's law versus another state's law.

3         THE COURT:  Okay.  Thank you.

4         I am going to take all of this under advisement.  If I

5    think that briefing is appropriate, I will issue an order

6    either setting a schedule or asking the parties to propose one.

7         All right.  Mr. Schutty, I think --

8         MR. SCHUTTY:  Thank you, your Honor.

9         THE COURT:  -- you can give your seat back to

10   Ms. Benett.

11        And thank you, Ms. Benett.

12        Let's turn to the issue of what we have been calling

13   equal footing.  I think there have been a couple of proposals

14   that have been submitted to the Court as I understand it.

15        One would be to have the Court hold off issuing any

16   judgments and then enter a single judgment that attaches as an

17   exhibit essentially every judgment at once.  I think there is a

18   concern that if one of those judgments is defective, it may

19   cause the entire order to be defective, which would prejudice

20   everybody.

21        There has been a proposal just to file every one on

22   the same day.  I use the analogy of twins in that instance,

23   because I think you always know one was always born first.  So

24   I'm not sure, even if I file everything on the same day, that

25   you will know which one was filed at 11:01 and which was filed

Mbi2TerC2

1     at 11:02, setting aside whether or not the Court has the

2     staffing to spend a day entering judgments all day long.

3            So I would like to hear from the parties if there is a

4     way to resolve this issue.  I will just say two last things and

5     then I will give Ms. Benett, who looks like she is ready to

6     speak, an opportunity.

7            Two things:  One is the first point I made, which is,

8     I don't want to create chaos for no good reason, and at this

9     point I'm unaware of a fund on which these judgments can be

10    capped, so I want to make sure that we are acting appropriately

11    for good reason.  And then the second thing I will just say is

12    it may be that it's not possible to achieve the laudable goals

13    that everybody has and that the Court will just do what the

14    Court does, which is sort of first in, first out and we will

15    just have to manage it in that regard.  I am more than happy to

16    work with you all to come up with a way it works, but it may

17    not be possible, in which case we may just have to have this

18    play out in the way it would ordinarily play out.

19           Ms. Benett.

20           MS. BENETT:  Thank you, your Honor.

21           I think we actually have a third proposal, which

22    Mr. Biale will describe in more detail, which may actually

23    address both the quality control issues and sort of the burden

24    on the Court of adjudicating all of the individual judgments

25    while there is the possibility that the Afghan bank assets are

Mbi2TerC2

1    never actually available to the plaintiffs.

2              THE COURT:  Okay.

3              MS. BENETT:  But I did want to sort of say that, yes,

4    on our proposal, which the Ashton plaintiffs submitted in the

5    letter from Jeanne O'Grady from Speiser Krause, who is not here

6    today because she is out of state, was intended to achieve, as

7    your Honor noted, a mechanism through which no individual or

8    individual group of plaintiffs could assert priority because of

9    the timing issue, which I think is an inevitability in any

10    other procedure.

11              That said, we recognize that there is no perfect

12    solution between what the Ashton families presented and what

13    the Motley firm presented, and I did just want to say -- and I

14    know that this came out in the letter, but we were -- I just

15    think it is important enough to put on the record here, we did

16    ask the Plaintiffs' Executive Committee for wrongful death and

17    personal injury claims to present both proposals.  We asked

18    them, when they declined to do so, to at least note to the

19    Court that it was over the objection of the Ashton group of

20    plaintiffs, which includes two members of the Plaintiffs'

21    Executive Committee even now, and they did not do so.

22              And I think this is important to note on the record

23    because it does illustrate some of the sort of fractiousness of

24    this issue and I think emphasizes the need for some solution

25    that, if possible, will put everybody on equal footing and will

Mbi2TerC2

1    sort of put the brakes on the race to execution here.

2            And I know that this is sort of well-covered

3    territory, but the Ashton families have always and have

4    consistently sought a way, if these Afghan bank assets are

5    available, to make them available on an equitable basis, and

6    that is not true for everybody here today.  I am going to let

7    Mr. Biale discuss with the Court what might be a workable

8    solution that, as I said, would also maybe hit the pause button

9    on having to adjudicate all of the pending monetary judgments

10    before the Court.

11            MR. BIALE:  Your Honor, we have labored to come up

12    with a solution here, and I understand from the Court's

13    perspective what you want to do is something that is not going

14    to exacerbate the issues that have already been well briefed

15    and thought about in this matter regarding priority based on

16    delivery of writs of execution.

17            As I understand what the Court wants to do, when you

18    talk about having everyone proceed on an equal footing, is not

19    simply to start everybody at the same starting line and fire

20    the gun so that the race starts.  We want to actually have a

21    process where we don't create a situation where everybody gets

22    their judgments and then there is a race to deliver those writs

23    of execution.

24            So I think that *Levinson* provides a potential way to

25    do this, and so what we would propose is issuing an order of

Mbi2TerC2

1    attachment in favor of all of the plaintiffs who have liability

2    judgments on the DAB assets, understanding, of course, that

3    there will be issues to be sorted out later about whether the

4    existing writ of execution are valid under *Levinson*.  We don't

5    think that that is something that the Court needs to decide

6    now.  And obviously, based on your Honor's -- if the report and

7    recommendation is ultimately upheld by Judge Daniels and

8    potentially by the Second Circuit, then that issue will be

9    moot.  But anticipating that it's possible that somewhere down

10   the road those DAB assets will become available, if there is an

11   order of attachment in favor of everyone who has a liability

12   judgment now, no one would be able to take the final damages

13   judgments that the Court would issue subsequently and run

14   through the door of the enforcement officer with a writ of

15   execution because those assets would be attached.  So that

16   would sort of allow the Court to put in place the pause, as

17   Ms. Benett put it, and take the time that the Court needs to do

18   the quality control assessment, assess each individual

19   application for final damages judgment, issue those judgments,

20   and then the issues regarding writs of execution and priorities

21   that have been well briefed can be sorted out later.

22           THE COURT:  Your microphone just went off.

23           MR. BIALE:  So just to repeat what I said, the idea

24   here of the concept is that that would allow the Court to take

25   the time it needs for quality control and for resolving the

Mbi2TerC2

1    issues that were just discussed, and then once the Court begins

2    issuing final damages judgments, that would prevent a race to

3    deliver writs of execution.

4          THE COURT:  You referenced *Levinson*.  Maybe I should

5    know this.  What is *Levinson*?

6          MR. BIALE:  Sure.  So, your Honor, that's the Second

7    Circuit's recent decision in *Levinson* v. *Kuwait Finance House*

8    *(Malaysia) Berhad*, B-E-R-H-A-D, which is 44 F.4th 91.

9          THE COURT:  I know what you are talking about.  Sorry.

10   Let me ask you a question that just popped in my mind.

11         MR. BIALE:  Ms. Benett points out——sorry——one more

12   point, which is that with this order of attachment in place,

13   the Court would not necessarily have to decide the pending

14   default judgments because the issues about whether the assets

15   are available could be sorted out first.

16         THE COURT:  Okay.  Helpful.  All right.  I want to

17   hear from others on that possibility, but maybe I will just ask

18   this question because it occurred to me while you were

19   speaking.  Would another solution, which doesn't have the

20   benefit of allowing me to not deal with all of the judgments,

21   but would another solution be for me to handle judgments in the

22   ordinary course, but with respect to each judgment stay its

23   enforcement individually, and then once they are all done I

24   could issue a single order lifting the stay as to all of the

25   judgments?  That, I think, addresses the concern that was

Mbi2TerC2

1    raised about if they all came at once and one was defective,

2    you would have a problem.  Each one would be its own judgment,

3    but each one would be stayed until I shot the gun and everyone

4    could run.

5         MS. BENETT:  Right.  So I think it would solve the

6    problem of one coming out on day one and one coming out on day

7    two because you would stay them until you shot the gun.  It

8    wouldn't solve the race to execute that is one of the issues

9    that has arisen because of the Afghan bank assets.

10        So the attachment proposal would achieve something in

11   addition to what your Honor has suggested, and it would, as

12   Mr. Biale just said, have the benefit of not requiring the

13   Court to individually adjudicate the pending motions or pending

14   motions for monetary damages until the Afghan bank issues are

15   fully resolved, whether by Judge Daniels or the Second Circuit.

16   So it would preserve everybody's interests in the Afghanistan

17   Bank assets by issuing that order of attachment without

18   requiring the Court to expend the resources on adjudicating the

19   motions for monetary damages and without putting the families

20   in this position that they have been in sort of agonizingly

21   watching one group of victims prioritize themselves over

22   another.

23        THE COURT:  So it's your view that if I were to issue

24   an order of attachment on behalf of anybody who has a liability

25   judgment against the Taliban and then the next day I issued one

Mbi2TerC2

1    damages judgment and then a month later I issued another

2    damages judgment, those two sets of plaintiffs would not be in

3    the same sort of adverse position.

4             MS. BENETT:  I don't necessarily think that that would

5    be so.  I think if the Court were inclined to go ahead and

6    adjudicate the motions for final damages against the Taliban

7    with an order of attachment restraining the assets that we

8    would ask, then, that, as you suggested, you sort of put a stay

9    on issuance, final issuance of any of the judgments, because I

10   think -- I'm not -- I believe it is the case that the order of

11   attachment would sort of stop the race from amongst individual

12   judgment holders because the attachment order would have come

13   first, but I don't know if that question was fully settled.

14   And if the concerns -- certainly the concern that we have been

15   focused on, on behalf of not just the families that we

16   represent but, frankly, the entire 9/11 family community, is

17   how to make sure that everybody is on equal footing, which is

18   what we had put in the letter on behalf of the death and injury

19   plaintiffs.

20             So I think I am just not sure that the attachment

21   followed by a sequence of judgments accomplishes the equal

22   footing goal.  It may.  But it also may be the case that the

23   attachment sitting in place while the DAB issue is fully

24   adjudicated accomplishes this in the best possible way to

25   protect all of the families and to conserve judicial resources.

Mbi2TerC2

1              THE COURT:  Just to summarize what I think you are

2       saying, you think that the best thing to do is to first issue

3       an order of attachment on behalf of everybody who has a

4       liability judgment; second, address the monetary judgments in

5       whatever way I choose, but with each one stay its enforcement

6       until all of them are done and then you will have one order of

7       attachment that applies to everybody followed by one order

8       lifting the stay.

9              MS. BENETT:  Right, yes.  And I would also -- I think

10      this goes back . . .

11              (Counsel confer)

12              MS. BENETT:  So as Mr. Biale described, it is sort of

13      a belt and suspenders approach to kind of ensure that there is

14      not a race.  And I don't know that others will agree, but I

15      do -- because of the unusual posture here, I do just want to

16      make the record that the folks who would put in the letter with

17      an alternate proposal which, you know, the Court obviously will

18      take into consideration, but that those are all parties to the

19      framework agreement to which the 800-plus families represented

20      by the Ashton group are not a party, because we didn't believe

21      that it was appropriate to prioritize, in the way that the

22      framework agreement would, a very small group of families over

23      the vast majority of other families.  Our proposal here would

24      put everybody on equal footing.  And I ask the Court take into

25      consideration that there are competing interests among the

Mbi2TerC2

1    various firms here when weighing the different proposals.

2            THE COURT:  Thank you.

3            MR. HAEFELE:  Your Honor, Robert Haefele, from Motley

4    Rice again.

5            I will make a few comments and I think some other

6    folks at this table also may have some comments to make, as

7    well.

8            I think the foot race imagery was appropriate earlier,

9    but the concern that we have, what I haven't heard is if you do

10   these orders that have everybody in one order, you haven't

11   addressed the concern of one camp getting infected by the

12   infirmities of the other.  It's sort of like you are at the

13   foot race, but you are tied up to somebody else in the foot

14   race; and if they have some infirmity, you are having a problem

15   with running faster than somebody else.

16           THE COURT:  And you think that would be true just if

17   we were to do the order of attachment in that regard?

18   Everybody's liability judgment I think is all the same.

19           MS. BENETT:  Just to be clear, we weren't

20   suggesting -- this new proposal would be just the order of

21   attachment and then the judgments would be separate.  So it

22   would circumvent the issue that the Motley firm raised in the

23   letter of -- and that the Court recognized of being tied to

24   somebody else's infirm judgment.  So everybody would still have

25   their pending judgments individually, it is just that the order

Mbi2TerC2

1    of attachment would be a single order of attachment restraining

2    the assets during the pendency of the DAB litigation.

3         MR. MITCHELL:  I appreciate Ms. Benett's suggestion

4    and what she is trying to do, but there is a fundamental sort

5    of foundational problem with it, and that is that these assets

6    at Da Afghanistan Bank are blocked assets; and, as a

7    consequence, under federal sanctions law, writs of attachment

8    and other attempts to secure or to execute against those assets

9    are prohibited and they are barred by federal law except in two

10   instances.

11        The first instance is that you have a final money

12   judgment awarding compensatory damages, and then in that case,

13   under TRIA, you have an exception to the federal sanctions law

14   that allows those holders of final judgments to then seek to

15   attach and execute against the blocked assets.  The Second

16   Circuit has been pretty clear that if you don't have that

17   final, enforceable judgment, then you do not have -- you can't

18   enter the TRIA gateway and you cannot then seek to attach or

19   execute against those assets.  So that is the first problem

20   with it.

21        THE COURT:  Who would raise that?

22        MR. MITCHELL:  Pardon me?

23        THE COURT:  Who would raise that?  Let's just say, for

24   argument's sake, I issue an order tomorrow—which is Saturday

25   and I'm not going to do it—that issues writ of attachment for

Mbi2TerC2

1    anybody who holds a liability finding that gets brought down to

2    the Federal Reserve and it either does something or it doesn't

3    do something.  What's wrong with that proposal?  Maybe someone

4    is going to come in and challenge it.  But as a sort of a best

5    effort to try to achieve the goal everyone is trying to

6    achieve, what would be wrong with doing that?

7             MR. MITCHELL:  Well, there are other aspects to that.

8    First is, there are already writs of execution that attach to

9    the Da Afghanistan bank assets, and those writs of execution

10   today are still valid and binding, and we believe they will

11   ultimately be found to be valid and binding, and they would

12   predate and have priority over any proposed attachment that

13   Ms. Benett is suggesting.

14            The second issue is that the same creditors, the joint

15   creditors who have the writs of attachment, also have a pending

16   Article 62 motion for attachment.  Those joint creditors who

17   have that Article 62 motion for attachment are entitled, under

18   federal law and TRIA, to that order of attachment.  Because

19   again, the gateway, when you have a blocked asset, is a final

20   judgment awarding compensatory damages for acts of a terrorist

21   party arising out of a terrorist event.

22            There are only four groups that currently can get

23   through that gateway, and they are already through that gateway

24   in the sense that they have writs of execution; they are

25   through that gateway in the sense that they have their motions

Mbi2TerC2

1    for turnover that are pending and have now been taken to

2    Judge Daniels; and they are through that gateway in the sense

3    that their own Article 62 motion is pending before the Court.

4            And I think on August 21, we submitted to the Court a

5    letter responding to the suggestion that Ms. Benett is raising

6    now and explaining in that letter why it is that a prejudgment

7    or a writ of attachment of sorts for somebody who does not have

8    a final judgment is in fact appropriate and in fact it's not.

9    It is barred by federal law on a number of different levels.

10   And so we have laid that out in that letter for you, your

11   Honor.

12           And so while I appreciate what she is trying to do,

13   there is just not a legal basis for doing it.

14           And with respect to who might contest that, well, we

15   have joint creditors who, as I said, are already through the

16   gate and they already have writs of attachment, motions for

17   turnover and, out of an abundance of caution, the Article 62

18   motion.  And unlike the other plaintiff groups, the joint

19   creditors are through the gateway that TRIA provides to attach

20   assets that are blocked.

21           The only other way to accomplish that, to override the

22   prohibition against attaching blocked assets, is to have a

23   license from OFAC.  And to my knowledge, no one in the MDL has

24   a license from OFAC to authorize attaching these blocked

25   assets.  And in fact the President, in his February executive

Mbi2TerC2

1    order, established a different mechanism for resolving claims

2    to the Da Afghanistan Bank assets.

3            And if I might, with respect to the Da Afghanistan

4    Bank assets themselves, we at least on behalf of the Havlish

5    creditors and I think there is also the Federal Insurance

6    creditors and the others who are part of the joint creditor

7    group, we are not prepared to concede right now that the

8    Da Afghanistan Bank assets are the only Taliban assets that are

9    available.  Assets become available periodically and

10   intermittently at various times in various parts of the world,

11   and one of the objects of this exercise is not just to secure,

12   turnover, and satisfy judgments using the Da Afghanistan Bank

13   assets, which are now effectively Taliban assets, but also to

14   take these judgments and be prepared to have valid enforceable

15   judgments that we can take and use anywhere we might find

16   assets, any time we might find assets.  And we are reasonably

17   confident that we will have those opportunities in the future.

18           And so to your points earlier about quality control,

19   we are very interested in quality control, your Honor, because

20   we want to make sure that whatever judgments are entered are

21   going to be enforceable in other countries where those assets

22   might be, and we know from very hard-earned experience that the

23   other countries where we might be litigating over those assets

24   are going to scrutinize very, very closely all of the processes

25   and procedures that led to the entry of that judgment from the

Mbi2TerC2

1    moment a complaint was filed until the moment the judgment was

2    entered and after that.  And so we want to be very, very

3    careful there is quality control, we want to be very, very

4    careful the law is followed, and we want to be very, very

5    careful that, when everything is said and done, the judgments

6    can be enforced against whatever assets are found wherever they

7    are found; and with respect particularly to the Da Afghanistan

8    Bank assets, that any attachments, any writs of execution, any

9    turnover orders comply with the requirements of federal law,

10   which include right now the only people who are in a position

11   to get through the gateway are those with final enforceable

12   judgments for compensatory damages, and there are already four

13   groups who are through that gateway and there are no other

14   groups who are through that gateway right now.

15           THE COURT:  Do you have a solution to the problem that

16   brings us here today?

17           MR. MITCHELL:  Well, I appreciate --

18           THE COURT:  Maybe it's not a problem for you.

19           MR. MITCHELL:  Well, it's a different question for us.

20   But we do represent some parties who are in this other group of

21   people who are -- who don't yet have final enforceable

22   judgments, and so we have an interest in doing this in an

23   orderly and effective way.  And I agree, your Honor, that it's

24   a very difficult thing for the Court to do.  It is just hard to

25   try to put everybody on the same level with the same starting

Mbi2TerC2

1  line and to do things in a way that satisfies everybody.

2       It seems to me that the better option is something

3  like what you were suggesting a moment ago, staying enforcement

4  of these judgments for a period of time, and then in that

5  period of time allowing the parties to get together and reach

6  some agreement amongst themselves about how they would deal

7  with the priorities and the distributions among this group of

8  plaintiffs who do not yet have judgments, and that is probably,

9  from my perspective, anyway, truly the only effective way to do

10  it.  Because at that point the mechanical priorities, the race

11  to the courthouse that Ms. Benett talks about, and those other

12  things that complicate and sometimes depend on happenstance,

13  those things are taken out of the equation because everybody is

14  already in agreement about how that distribution will take

15  place no matter who wins the race.  And then you have a

16  cooperative effort where everybody is working together to

17  achieve a laudable and noble result, and that's what I would

18  suggest is that buffer in time with an instruction from the

19  Court that it will be difficult for the Court to accomplish it

20  in the form of its orders and actions and then just advise the

21  parties that it's really in their best interest to work this

22  out amongst themselves and to try and reach a solution that

23  everybody can live with.

24       I know in the conversations that were mentioned

25  earlier about some discussions with Ms. O'Grady, you know, in

Mbi2TerC2

1  that set of discussions, it seems like most everybody in this

2  group of plaintiffs who do not yet have judgments are kind of

3  on the same page.  It just is going to take a little bit of

4  time for everybody to work through the mechanics of how to do

5  that, but it seems like there is a sense of some unity on that

6  point amongst that group.

7      MS. BENETT:  So I respectfully disagree with that.

8  We represent the Ashton group, more than a quarter of the

9  families who lost someone on 9/11.  There is not, generally

10  speaking -- it is not, generally speaking, most everybody who

11  is okay with working this out together.

12      At the risk of trying the Court's patience, the

13  proposal that Mr. Mitchell has presented would effectively

14  prioritize the families of 47 victims on a 100-to-1 basis over

15  everybody else.  We are not suggesting that there isn't some

16  way, if the DAB money is available ever or if there are Taliban

17  assets available, to give some credit to those people who may

18  have come first.  But we have always said that it is simply not

19  right to say that one person's life was worth 100 times more

20  and allow the families of 47 victims to take the vast majority

21  of Afghan bank assets if they are available.

22      He kept talking about how the joint creditors were

23  through the gate first.  They are only through the gate first

24  because, as this was unfolding, the Federal Insurance

25  plaintiffs successfully argued to this Court to issue their

Mbi2TerC2

1    judgment ahead of the family members, leaving 2,930 families

2    without a judgment.  We are trying to come up with a creative

3    solution that protects the families.  Mr. Mitchell's firm

4    represents the 47 families on the Havlish complaint who, in

5    2011, got a judgment against non-sovereign defendants with a

6    presentation of zero evidence.  And I understand that there is

7    nothing improper about how they did that.  They did that with

8    all of their foreign terrorist organizations.  All of their

9    non-sovereign defendants were on the motion that they presented

10    in 2011.  We already had our liability judgment.  There were

11    differing opinions about how to approach things.

12            We understand that they will continue to take the

13    position that the families of their 47 victims deserve priority

14    because they did get the monetary judgment; and not even just

15    because they got the monetary judgment first, because they

16    delivered it first.  So even if the 2,930 families had their

17    judgment first, it is the fact that it was delivered on the

18    fed, with no notice to anybody, in August of last year that

19    puts them in the position they are in now.

20            This Court, through *Levinson*, has the authority to

21    issue a prejudgment attachment order under Article 62 of the

22    New York CPLR.  That's exactly why the Havlish and Federal

23    Insurance joint creditors have moved for that order.

24    Mr. Mitchell says it is out of an abundance of caution, but

25    it's legally supportable under --

Mbi2TerC2

1          THE COURT:  You are speaking too quickly.

2          MS. BENETT:  I'm sorry.  He said it's out of an

3    abundance of caution that they filed their August motion for an

4    Article 62 order of attachment, but it's specifically

5    authorized by *Levinson*.  They filed that in August, after

6    *Levinson* was decided in July.  *Levinson* gives this Court a

7    mechanism to attach the assets.

8          To the extent that Mr. Mitchell is concerned about

9    other enforcement actions, the joint creditors have their

10   judgments.  The Court issued the judgment to the Havlish family

11   and to the Federal Insurance companies.  They have those

12   judgments.  They don't need to proceed with other judgments to

13   pursue enforcement actions elsewhere if there are any to be

14   pursued.

15         And the order of attachment would only apply to the

16   Afghan bank assets, so it would have no impact on any other

17   enforcement action that they --

18         THE COURT:  Can you speak to the issue that

19   Mr. Mitchell raised that he believes a writ of attachment would

20   be inappropriate under TRIA because you don't have a final

21   monetary judgment?

22         MS. BENETT:  Sure.  And Mr. Biale may be better

23   positioned than I am to take on that point, but I think that is

24   going to go directly to *Levinson* and what the Second Circuit

25   said in July of this year.

Mbi2TerC2

1          MR. BIALE:  Sure, your Honor.

2          So the issue of the assets being blocked is really not

3     a problem given that these -- if TRIA does come in to the

4     picture then and allows the Court to attach or execute on

5     blocked assets, *Levinson* makes clear that the execution

6     component of that cannot happen until there is a determination

7     that the assets are an agency or instrumentality of a terrorism

8     organization.  But the Second Circuit said that does not apply

9     to the attachment provision.

10          And TRIA, its express terms speak of a judgment and

11     that the writ of -- the order of attachment of execution can be

12     sufficient to satisfy such judgment to the extent of any

13     compensatory damages.  There is no question here that the

14     parties have that have liability judgments will have

15     compensatory damages.  The question is just the quantum of

16     damages.  And at least with respect to the Ashton plaintiffs,

17     there is no big mystery about that, because we have a final

18     default judgment against Iran, which is the joint tortfeasor of

19     the Taliban here.  So there is not -- I don't think it's going

20     to be that difficult to come up with a quantum of damages.

21          So, I think, we have the judgments.  TRIA permits us

22     to attach even though those assets are blocked.  The questions

23     that Mr. Mitchell raised regarding some of us are already

24     through the gateway, well, we think, under *Levinson*, those

25     writs of execution that got them into the gateway are invalid.

Mbi2TerC2

1    But that's an issue for another day.  The Court doesn't have to

2    decide that now.  The concept behind the order of attachment is

3    just to put everyone on equal footing with respect to this

4    question of the order of granting the default judgments and to

5    prevent anyone from obtaining a writ of execution based on one

6    of those final damages judgments because there will be an order

7    of attachment that applies to everyone.

8         And I take your Honor's point that you made to

9    Mr. Mitchell.  Who is going to say, well, you know, this order

10   of attachment is not valid?  It could only be a party who does

11   not actually subscribe to the notion that everyone should be on

12   equal footing here.  And I think, given what we heard about

13   some parties being through the gateway first, that's what

14   Mr. Mitchell suggested his client's position is.  So that's

15   fine.  That's his client's position.  But we are trying to help

16   the Court put everyone on an equal footing and allow everyone

17   to proceed on an equal footing, and so we are trying to come up

18   with a solution to do that.  I don't think -- I think that TRIA

19   permits the Court to do that, and I don't think that the

20   concerns that Mr. Mitchell raised would impose a barrier to

21   that.

22        MR. MITCHELL:  Your Honor, I know a couple of other

23   people had some points they want to make, but maybe just

24   briefly if I could respond to some of the most recent comments.

25   First of all, it is in fact not true that a liability judgment

Mbi2TerC2

1    in and of itself is sufficient to get through this gateway that

2    we have been talking about.  And referring to that August 21

3    submission that I referenced earlier, we lay out a series of

4    cases from the Second Circuit and other districts within the

5    Second Circuit to the effect that a default judgment cannot be

6    entered until the amount of damages has been ascertained.  And

7    it is repeated.  It says, "Although a default judgment with

8    regard to liability may be entered prior to award of damages, a

9    default judgment is not considered an entry of a final judgment

10   until damages have been awarded."

11          So you don't have at this point in time, under pretty

12   well-established, pretty consistent law in this circuit, a

13   judgment that can be enforced and is final within the meaning

14   of TRIA until you have an award of compensatory damages.  And

15   the Kreindler plaintiffs, the Ashton plaintiffs just don't have

16   that, your Honor.  And a judgment on liability is just not

17   quite a full final judgment.

18          Second, with respect to Ms. Benett's statements about,

19   well, there was this race to the courthouse and, just by

20   happenstance, the Havlish plaintiffs got there first and so on,

21   the Havlish plaintiffs had their judgment against the Taliban

22   in 2012.  This is not a situation where they came in all of a

23   sudden in 2021 and said, oh, we want to get a judgment against

24   the Taliban.  Our judgments were existing in 2012.  In 2021, in

25   August, after the Taliban took over Afghanistan and took over

Mbi2TerC2

1    Da Afghanistan Bank, the Havlish plaintiffs issued a writ of

2    execution which was on the docket.

3            MS. BENETT:  That is not correct.  That is not

4    correct.

5            THE COURT:  Ms. Benett, you can't speak out and over

6    people.

7            MR. MITCHELL:  It was on the docket, to Ms. Benett

8    point.  I received telephone calls from another lawyer the day

9    after that writ of execution was filed asking me about that

10   writ of execution and asking me about the legal basis upon

11   which we thought we could proceed.  So it wasn't a secret.  It

12   wasn't done in hiding.  It was open and obvious to the lawyers

13   who weren't even part of the MDL who were aware that we had

14   served a writ of execution or issued a writ of execution

15   relating to those Da Afghanistan Bank assets.

16           Third, with respect to the Federal Insurance sort of

17   winning the second race to the courthouse, that's just not

18   true, your Honor.  It goes back to what I was mentioning a

19   little bit ago about everybody just needs to get together and

20   work these things out and cooperate and come up with an

21   understanding about how we are going to do it.

22           The Federal Insurance judgment that you recommended be

23   entered and that Judge Daniels ultimately did enter was part of

24   this framework agreement, part of this effort by 10,000

25   different members of the MDL community to ensure that the

Mbi2TerC2

1    Da Afghanistan Bank assets would be restrained to the full

2    extent of the President's executive order.  And the Federal

3    Insurance judgment and the subsequent writ of execution was

4    part of that agreed plan among 10,000 of the members of the

5    9/11 community.  And the Ashton plaintiffs were offered the

6    very same opportunity to participate in that.  For their

7    reasons, they have decided not to, and that's fine, and they

8    have their arguments for why it should be different than the

9    framework agreement is.  But at the end of the day, your Honor,

10   the point is that it was part of -- what they are suggesting

11   now, some sort of effort to resolve the race to the courthouse

12   issues, and we got together and by sitting down and negotiating

13   the agreement we were able to do that at least --

14        THE COURT:  So to summarize, your view is a writ of

15   attachment is not appropriate, but you would support judgments

16   being entered in the ordinary course and their enforcement

17   being stayed until all judgments could be entered.  Is that

18   correct?

19        MR. MITCHELL:  You know, I think that's a way to do

20   it, and then it gives the parties a chance to try to reach some

21   agreement about -- to deal with the race to the courthouse

22   priority issues.  But yes, your Honor, I think that the only

23   people who are legally entitled to an Article 62 writ of

24   attachment --

25        THE COURT:  I understand your point.

Mbi2TerC2

1          MR. MITCHELL:  -- are the joint creditors.

2          THE COURT:  Mr. Carter.

3          MR. CARTER:  Your Honor, just briefly, to try to

4     simplify this because I think about it in very simple terms.

5          The President issued a blocking order.  As a result of

6     the issuance of that blocking order, there is a prohibition on

7     any dealings in these assets whatsoever.  It is actually a

8     criminal violation to try and deal with them.  And the statutes

9     define efforts to include any attachment.  And as Mr. Mitchell

10    explained, the only way to properly deal in them is either to

11    get a license from the Office of Foreign Assets Control that

12    says you are entitled to transact in these assets or to have a

13    final enforceable judgment via TRIA.

14         It was very much a recognition of that dilemma that

15    led so many of us to come together with regard to the framework

16    agreement.  We recognized immediately that the only way

17    additional parties would be able to have an opportunity to

18    participate in any attachment execution of these asset was to

19    have a final judgment that secured them and that gave rise to

20    rights under TRIA.  We also recognized, at least some of us,

21    that the process for this Court to try to issue judgments for

22    everyone who was now coming to the courthouse in the first

23    instance seeking one would likely be a Herculean task that

24    could take an extended period of time.  And meanwhile there

25    were parties outside of this MDL with very sizeable judgments

Mbi2TerC2

1    who were seeking to attach the same assets and prevent anyone

2    from the 9/11 community from attaching them.

3         It was all of those and a range of other

4    considerations that led many of us to sit down in a creative

5    and cooperative way to try and come up with a solution, and

6    that was the framework agreement, and we have litigated that

7    extensively.  The letters that gave rise to this hearing today

8    were focused on putting the plaintiffs who were now seeking

9    judgments, who did not have them, on equal footing with one

10   another.  The parties to the framework agreement are still

11   adhering to that agreement and still see it as the best

12   possible solution to deliver compensation to the broadest

13   universe of people within the 9/11 community.  So we are still

14   all on board and hoping that the framework agreement does

15   ultimately successfully produce that result.

16        And in terms of the sequence of events here, I would

17   just say very basically, your Honor, that the United States

18   government has been engaged in active efforts to identify and

19   block terrorist assets since immediately after 9/11.  That's

20   been an existing process.  In 2002, Congress passed TRIA and

21   made very clear that in order to have an opportunity to execute

22   against those blocked assets, you needed to get a final

23   judgment.  And so the Havlish people chose that as their

24   litigation strategy.  The Federal Insurance plaintiffs did the

25   same.  We filed for a monetary judgment and went to extensive

Mbi2TerC2

1    effort to file proofs with the Court back in 2007, went through

2    a process to do it with al Qaeda.  All of those public filings

3    dating back over 15 years made very clear that the point of all

4    that was to put those plaintiffs in a position to be able to

5    successfully invoke their rights under TRIA in the event the

6    pools of blocked assets became available.  And all that work

7    ultimately put those plaintiffs in a position to be cooperative

8    and help to facilitate the framework agreement, file a writ,

9    serve a writ that protected the assets from attack from people

10    outside of this MDL.  And I think that that is still going on

11    and we are likely to see it.

12          And with regard to the idea of just issuing sort of an

13    attachment that is otherwise violative of the blocking order, I

14    think you would see plaintiffs from outside of this MDL

15    attacking it as well who are going to seek their own judgments

16    against the Taliban.

17          Thank you, your Honor.

18          THE COURT:  Thank you.

19          Ms. Benett.

20          MS. BENETT:  Sorry for my intemperate interruption

21    earlier.  Thank you for the opportunity to speak again.

22          I just want to correct a few things.

23          First of all, I didn't say it was happenstance that

24    the Havlish creditors obtained their judgment first.  What I

25    said was that the New York priority rules created this race

Mbi2TerC2

1    where, after obtaining their judgment in August of 2021 -- and

2    it is not correct.  There was a minute entry on the docket in

3    August of 2021 that the Havlish group obtained something.  It

4    does not say what it was, the writ of execution.  And the Court

5    can go back and look at the docket.  The writ of execution was

6    not publicly available until September, I think it was 16th,

7    when the federal government, the Department of Justice, filed a

8    letter stating that they may be putting in a statement of

9    interest and attaching the writ of execution to that.  That was

10   the first time it was publicly docketed.  It was never

11   discussed amongst the plaintiffs, amongst the families.

12           This goes back to the issues that we see with the

13   firms that are purporting to represent the interests of the

14   wrongful death community generally engaging in discussions

15   amongst the lawyers, not with their clients' consent, on a

16   framework agreement that has wildly inequitable terms that this

17   Court could -- I mean, I know -- I have a rough understanding

18   of them because there were efforts to try to get it.  And when

19   Mr. Mitchell talks about 10,000 plaintiffs, that means not just

20   the estates of the victims, but their spouses and children and

21   other family members.  So by that metric, the Ashton group is

22   probably somewhere closer to 6,000 family members.  There was a

23   powerful interest amongst the Havlish group to have everybody

24   participate in the framework agreement.  Because under the

25   terms of the framework agreement, as we understand it, their

Mbi2TerC2

family members would receive almost $2 billion, the insurance

companies would give up a couple hundred million dollars on

their judgments, and the 2,930 other families would each be

left to share the remainder.

        If a framework agreement overseen by the Court or some

neutral party were an option with transparency and terms put on

the record, we would certainly be open to that.  Our goal is

and always has been to treat every family equitably, and at the

April 26 hearing Judge Daniels said the same, that this was not

going to be a first come, first serve.  If the DAB assets were

available, they were going to be distributed in an equitable

way.

        To the Court's question to Mr. Mitchell who would

object to an attachment order here?  If people are interested

in an equitable solution, nobody here should be objecting to an

order of attachment.

        THE COURT:  There could be, as he points out, other

victims of Taliban terrorism.

        MS. BENETT:  You mean -- right, but if we have our

order of attachment -- oh.  You mean who would obtain writs of

execution.  They have their -- there are already writs

between -- among the framework agreement plaintiffs that would

secure -- that would absorb the entirety of the DAB assets if

those writs are valid.  So this order of attachment on behalf

of everybody simply, as I said before, puts a pause button on

Mbi2TerC2

1     issuing pending judgments and allows the entire 9/11 family

2     community to be treated on an equitable basis.  And I don't

3     think that the concern of other potential Taliban judgment

4     holders seeking to prioritize themselves -- I think that's not

5     a genuine one in light of the fact that the insurance companies

6     have their judgment for $600 million and the Havlish families

7     have their judgment thereby absorbing essentially the entirety

8     of the DAB assets.

9          THE COURT:  Do you have a view about Mr. Mitchell's

10    statement of the law and that TRIA would not allow such a writ

11    of attachment if you don't have a final judgment.

12         MS. BENETT:  I don't think that that is a resolved

13    question.  I don't think he is correct.  I don't think that it

14    needs to be -- even -- the Second Circuit in *Levinson*

15    specifically talks about the availability of attachment under

16    TRIA for these -- well, for the assets at issue there, which

17    are analogous to the DAB assets here.

18         And I think the more important question to me is why

19    is Mr. Mitchell suggesting that there is an infirmity with that

20    if what our goal is is to treat all the families on an

21    equitable basis?  And the reason that I am concerned here with

22    an alternate proposal is that we know that not everybody at the

23    other table has wanted equal footing here.

24         We know that because there have been efforts to

25    exclude all of the 9/11 families up until all of the

Mbi2TerC2

1    non-Havlish 9/11 families except for through this framework

2    agreement.  We know that there have been concerted efforts

3    to -- we would like to work with transparency.  We would -- we

4    have an incredibly, as this Court knows, incredibly complex

5    case.  It is a many-headed beast.  We would like to be able to

6    work collaboratively, and this issue has not only created

7    enormous division amongst the families, but has impaired our

8    ability to work with each other, as evidenced by this

9    insistence that somehow that Ashton families, again,

10   representing 25 percent of the death, wrongful death families

11   here, are interfering with the framework agreement whose terms

12   the parties still won't put on the record.

13          I think the goal, as I hear it from the Court, from

14   the April 26 hearing, and from our colloquy today, is to find a

15   solution that protects all of the families as well as possible,

16   and I don't believe that the attachment order is prohibited

17   under TRIA.  I do think *Levinson* in the Second Circuit gave

18   this Court authority to do so.  And I also believe this is the

19   only way to avoid this sort of -- the sordid race to deliver

20   judgments that we have seen so far.

21          THE COURT:  Thank you.

22          MR. GOLDMAN:  Your Honor, may I be heard?

23          MS. BENETT:  And, sorry, as my co-counsel reminds me,

24   we would love, in the interest of transparency, if those

25   parties to the framework agreement would put its terms on the

Mbi2TerC2

1    record.

2            THE COURT:  Thank you.

3            Yes.

4            MR. GOLDMAN:  Jerry Goldman for the O'Neill plaintiffs

5    and a member of the Plaintiffs' Executive Committee.

6            I have rarely spoken in these proceedings for the last

7    19 years or 18 years that I have been involved, but today I

8    feel compelled to do so.

9            When this whole mess——and that's the word I will

10   use——with regard to these funds arose, I clearly felt, on

11   behalf of my clients, that everybody should be treated

12   equitably, everybody should be treated fairly.

13           But then I looked at the law and I looked at what this

14   Court's discretion could and could not do.  And based on that

15   analysis by people within my firm who are far smarter than me,

16   I realized what the limitations were, what the restrictions of

17   the law would be, and what would be an outcome of years of

18   litigation that I felt we would ultimately fail if we pursued

19   that.

20           So I negotiated in good faith, along with the folks

21   from Motley and along with the folks from Ashton, to see if we

22   can reach an understanding with the folks from Havlish.  Most

23   of us——probably 70 percent of the families between us and

24   Motley——agreed to that deal along with the folks from Federal

25   and the folks from Havlish, both would win concessions.

Mbi2TerC2

1           Is it a perfect deal?  Of course not.  But is it a

2     deal that would be in the benefit of my clients?  Absolutely

3     yes.  And that's why I agreed to it.

4           Now, the proposal today about the attachment, the

5     attachment proposal, which is supposed to benefit all of the

6     families, may not really do that.  And that's why I am speaking

7     now and speaking briefly.  The proposal is based upon liability

8     judgments in effect today.  While this Court which we believe

9     rightly and appropriately and equitably entered orders adding

10    3,000, 3,200, something like that, O'Neill plaintiffs to the

11    originally filed 2003 case against the Taliban where there was

12    a liability judgment for the O'Neill family and indicated that

13    all prior proceedings and orders apply, it is unclear to me or

14    at least there is a risk that the liability judgment from the

15    O'Neill family applies to the others.

16          So I had asked, in a series of orders which we filed,

17    proposed orders which we filed on motions, that that liability

18    judgment be extended, and I would like clarification because

19    otherwise their proposal certainly doesn't work and would

20    exclude roughly 20 percent of the families who lost somebody in

21    9/11.  And more importantly, I think, for the reasons set forth

22    by Mr. Mitchell and Mr. Carter, I think the proposal for

23    attachment wouldn't work.

24          MR. BIALE:  Your Honor, we have no objection to the

25    liability judgments being extended.  We want everyone to have a

Mbi2TerC2

1    liability judgment that's entitled to it and then for everyone

2    who has a liability judgment to be on equal footing with

3    respect to these assets.  So as to that last thing Mr. Goldman

4    said, there is no objection from this side of the table.

5            THE COURT:  Mr. Goldman, do you know offhand what

6    docket number that application is?

7            MR. GOLDMAN:  There are several of them.  I can get a

8    letter to the Court this afternoon --

9            THE COURT:  That would be helpful.

10           MR. GOLDMAN:  -- with that information.

11           MR. CARTER:  Your Honor, just very briefly, your Honor

12   will probably recall that there has been an effort on the part

13   of the Owens plaintiffs who are before Judge Caproni to attach

14   the same pool of assets.  Those plaintiffs obtained a

15   prejudgment attachment from Judge Caproni in an *ex parte*

16   setting without full briefing.  Our principal argument that

17   they are not entitled to assert priority on the basis that

18   prejudgment attachment is that it is invalid because of the

19   blocking order.  So the various arguments --

20           THE COURT:  Because of the what order?

21           MR. CARTER:  Because of the blocking order, the

22   President's blocking order.

23           THE COURT:  Under TRIA you are saying.

24           MR. CARTER:  Yes.

25           THE COURT:  Okay.

Mbi2TerC2

1          MR. CARTER:  The blocking order prohibits any

2    transaction.  They didn't have a final monetary judgment, so

3    they don't have a basis to pursue any kind of attachment.  Some

4    of the arguments that are being made today strike me as having

5    a potentially very dangerous impact of advantaging the Owens

6    plaintiffs and actually putting them in priority ahead of a lot

7    of other folks.

8          So this issue of just issuing an attachment and who is

9    going to complain, well, we have already complained about the

10   idea as a mechanism of protecting our interest *vis-à-vis* the

11   claims of the Owens plaintiffs, so we are already on record

12   about that issue, and it is a very real concern.

13         Again, this is all part of the broader thinking that

14   went into the framework agreement along with the notion, you

15   know, this might be a mechanism that would obviate the need for

16   the Court to spend endless time focusing on a priority basis on

17   these judgments so that we can focus on other matters, all of

18   which was part of the motivation.

19         Thank you, your Honor.

20         THE COURT:  Thank you.

21         MR. BIALE:  Very briefly, the Owens plaintiffs do not

22   have a liability judgment, so that's a *non sequitur*.

23         THE COURT:  I think what Mr. Carter is saying is their

24   argument, his argument as to the Owens writ of attachment is

25   that it is invalid because they have nothing and that under

Mbi2TerC2

1    TRIA you need to have a full liability and damages judgment,

2    not just that they have no -- not even a liability judgment.

3    You need everything.  And so I think what he is saying is if he

4    is arguing, I don't know if it's to Judge Caproni or to

5    whomever, that the Owens attachment is invalid because it's not

6    in compliance with TRIA, then it would be inappropriate or

7    inconsistent to say that people with only liability judgments

8    can still get a writ of attachment because it's inconsistent

9    with the argument he is making *vis-à-vis* the Owens attachment.

10    I think that's the argument.

11            MR. BIALE:  But I think that that's not a concern

12    because the issue -- TRIA is clear that you need a judgment,

13    and we are resting that on the liability judgments and that

14    encompasses everyone, all the 9/11 families who are in the MDL,

15    and it does not -- the Owens issue is not implicated by that.

16    So that's why we have focused it on folks who have a liability

17    judgment, both to make clear that we are complying with the

18    express terms of TRIA and so that we do not have this -- the

19    issue of other people who are outside the MDL saying, well,

20    then I would be entitled to that same order of attachment

21    because if they don't have a liability judgment, then they are

22    not in that order.

23            THE COURT:  Okay.  All right.  Unless anyone else has

24    something to add, I think we have exhausted these topics.

25            Unfortunately, I'm not going to give you any direction

Mbi2TerC2

1    right now.  This has been incredibly helpful for me, so I

2    appreciate it.  I'm going to take it all under advisement.  I

3    may ask for some additional information.  I really am focused

4    on this issue, I hope everyone appreciates that, and trying to

5    come up with a solution that works for everyone as best as I

6    can under the law, and I don't know what that answer is but

7    that's my goal.

8            So I'm going to take all of this under advisement.  I

9    will issue orders in the coming days or weeks——I know we have

10   got Thanksgiving coming up next week——to give the parties some

11   direction.

12           So with that, unless anyone else wishes to be heard, I

13   know we have lots of lawyers also in the gallery, anybody else?

14   Going once, going twice.  Great.

15           Thank you all for being here.  I hope everybody has a

16   happy Thanksgiving.

17           COUNSEL:  Thank you, your Honor.

18                            oOo

19

20

21

22

23

24

25