UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br><br>ECF Case |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al., Case No. 02-cv-06977*
*Betru, et al. v. The Republic of Sudan, Case No. 20-cv-10615*
*Parker, et al. v. The Republic of the Sudan, Case No. 20-cv-10657*
*Nolan, et al. v. The Republic of the Sudan, Case No. 20-cv-10720*

<u>**ASHTON, BETRU, PARKER & NOLAN PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE REPUBLIC OF THE SUDAN'S RULE 72(b) OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT & REOMMENDATION**</u>

December 6, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................ 1

I.   THE MAGISTRATE COURT CORRECTLY DETERMINED THAT THERE IS SUBJECT
     MATTER JURISDICTION OVER SUDAN FOR ITS MATERIAL SUPPORT OF AL
     QAEDA THAT RESULTED IN THE 9/11 ATTACKS ........................................................ 4

  A.   The Report Applies the Correct Standard of Review ............................................. 4

  B.   The Magistrate Judge Correctly Found That Plaintiffs Have Plead Sufficient Facts to
       Establish Jurisdictional Causation for § 1605A, § 1605(a)(7), and § 1605B ...................... 5

    1.   The Deaths and Injuries Sustained by Plaintiffs in the September 11th Attacks Were
         Proximately Caused by Sudan's Support for al Qaeda ............................................... 6

    2.   Osama bin Laden's Departure Did Not Break the Casual Chain ...................................... 7

    3.   Sudan's Attenuation Arguments Are Legally and Factually Flawed ................................. 9

  C.   Sudanese Officials and Agents Acting Within the Scope of Their Authority Provided
       Material Support To and Conspired With Al Qaeda ............................................... 12

  D.   Family Member Plaintiffs Have Standing to Assert Jurisdiction Under § 1605A and §
       1605B for Loss of Solatium ..................................................................... 16

II.  THIS COURT HAS PERSONAL JURISDICTION OVER SUDAN ................................... 17

III. PLAINTIFFS' ACTIONS ARE TIMELY AS RELATED ACTIONS UNDER § 1605A(b)
     AND §1083(c)(3) .............................................................................. 18

IV.  THE AMENDED COMPLAINTS PLAUSIBLY PLEAD THE REQUIREMENTS OF
     THEIR SUBSTANTIVE LAW CLAIMS ....................................................... 20

  A.   Plaintiffs' Factual Allegations State a Claim Under § 1605A and the ATA ..................... 20

  B.   The Amended Complaints Plead ATA Conspiracy Claims ...................................... 20

  C.   The Amended Complaints Plead Valid ATA Aiding and Abetting Claims ........................ 21

V.   PLAINTIFFS' STATE TORT LAW CLAIMS ARE NOT PREEMPTED AND THE
     AMENDED COMPLAINTS SET FORTH THE REQUIRED STATE LAW
     ELEMENTS .................................................................................... 23

VI.  ALIEN TORT CLAIMS ACT ................................................................. 24

# TABLE OF AUTHORITIES

Page(s)

Cases

*Boim v Holy Land Found. for Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008) ................................... 6

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) ............................................................ 6

*Comcast Corp. v. National Association of African American-Owned Media*, 140 S.Ct. 1009
    (2020) ....................................................................................................................................... 6

*Doe v. Bin Laden*, 580 F. Supp. 2d 93 (D.D.C. 2008) ....................................................... 16

*Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) ................................................................. 19

*Flanagan v. Islamic Rep. of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2005) ......................................... 12, 16

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393
    (2d Cir. 2009) ........................................................................................................................ 18

*Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995) ........................................... 7, 11

*Halberstam v Welch*, 705 F.2d 472 (D.C.Cir. 1983) ........................................................ 20, 21, 22

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ............. 20, 24

*In re Terrorist Attacks on September 11, 2001*, 2011 WL 13244047 (S.D.N.Y. Dec. 22, 2011) ....... 9

*In re Terrorist Attacks on September 11, 2001*, 298 F.Supp. 631 (S.D.N.Y. 2018) ................. passim

*Johnson v. Holder*, 564 F.3d 95 (2d Cir. 2009) ............................................................... 5

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ......................................... 22

*Kilburn v Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004) ....... 6, 11, 12

*Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561 (7th Cir. 2012) ....................................... 17, 23

*Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980) ....................................................... 19

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) ............................................................ 21, 22

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) .............................................................. 19

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ............................................................................. 23

*Owens v. Republic of Sudan*, 412 F. Supp. 2d 99 (D.C.C. 2006) (*Owens I*) ................................... 11

*Owens v. Republic of Sudan*, 826 F. Supp. 2d  128 (D.D.C. 2011) (*Owens II*) .............................. 15

*Owens v. Republic of Sudan*, 174 F. Supp. 3d 242 (D.D.C. 2016) (*Owens III*) ............................. 15

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) (*Owens IV*) ................................. passim

*Palsgraf v. Long Island R. Co.*, 248 N. Y. 339, 162 N. E. 99 (1928) ............................................. 11

*Paroline v. United States*, 572 U.S. 434 (2014) ........................................................................... 7

*Robinson v. Govt. of Malaysia*, 269 F.3d 133 (2d Cir. 2001) ....................................................... 4

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ........................................................................ 6

*Rux v. Republic of Sudan*, No. 2:04-cv-428, 2005 WL 2086202 (E.D. Va. Aug. 26, 2005)

   (*Rux I*) ......................................................................................................................... 8, 14, 15

*Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006) (*Rux II*) .................................. 2, 3, 6, 8, 15

*Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007) (*Rux III*) ............................... 15

*Sweet v. Sheahan*, 235 F.3d 80 (2d Cir. 2000) ............................................................................... 4

*United States v. Quintieri*, 306 F.3d 1217 (2d Cir. 2002) .............................................................. 5

*University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013) ........................... 6

*USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namib.*, 681 F.3d 103 (2d Cir. 2012) .... 19

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.C.C. 2010) ......................................... 5

*Van Beneden v. Al-Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013) ....................................................... 19

*Van Riper v. United States*, 13 F.2d 961 (2d Cir. 1926) .............................................................. 16

Statutes

18 U.S.C. §2333 ......................................................................................................................... 20

28 U.S.C. § 1330(b) ..................................................................................................................... 17

28 U.S.C. § 1350 ......................................................................................................................... 24

28 U.S.C. § 1605A .................................................................................................................. passim

28 U.S.C. § 1605A(a)(2) .............................................................................................................. 17

28 U.S.C. §1605B ................................................................................................................... passim

46 U.S.C.A. § 30101 ................................................................................................................... 11

50 U.S.C. App. 2405 ................................................................................................................... 13

PL 114-222, 130 Stat 852 §2(a)(5) ........................................................................................ 20, 22

Pub. L. No. 110-181, 122 Stat. 3, § 1083 ..................................................................................... 3

Rules

Fed. R. Civ. P. 15 ......................................................................................................................... 3

Fed. R. Civ. P. 72(b) ..................................................................................................................... 3

Other Authorities

162 Cong. Rec. S2845 ............................................................................................................... 16, 17

Executive Order 13067 .................................................................................................................. 13

## INTRODUCTION

Magistrate Judge Sarah Netburn determined that Plaintiffs' well pleaded factual allegations and evidence presented in their Amended Complaints readily establish that the Republic of the Sudan ("Sudan") knowingly conspired with, aided and abetted, and provided material support to al Qaeda, continuously for over a decade before the September 11th Attacks. The Complaints detail how Sudan, as a designated State Sponsor of Terrorism, provided al Qaeda with resources and expertise to carry out sophisticated terrorist attacks against the United States. Sudan's key support for al Qaeda was initiated and orchestrated by its most senior leaders, and deployed through its intelligence, military, and other core government agencies.

The Magistrate Judge's Report and Recommendation[1] found that the Amended Complaints[2] detail the various ways that Sudan's material support for al Qaeda was a legal cause of the 9/11 Attacks under the applicable jurisdictional and substantive standards. Confirmed by findings in U.S. government reports, Plaintiffs alleged how Sudan, including its President and top leadership, was a knowing and active participant in al Qaeda's conspiracy to conduct a terrorist attack on the United States. In addition, Plaintiffs' allegations detailed how Sudan's support was essential to al Qaeda's development, such that al Qaeda simply may not have existed, let alone possess the capabilities necessary to carry out a sophisticated international terrorist attack, absent Sudan's help. The complaints further allege that Sudan provided al Qaeda not only with substantial resources but with unique and valuable training in counter-intelligence practices and operational planning that was essential to the execution of the 9/11 Attacks. Finally, Sudan allowed al Qaeda to use Sudan as a safe haven and logistical base to carry out its terror attacks

---

[1] R&R refers to Magistrate Judge Netburn's May 3, 2022 Report & Recommendation, ECF No. 7942.
[2] The complaints are the Ashton Amended Complaint, ECF No. 6537, referenced herein as "AAC," and the Consolidated Amended Complaint, ECF No. 6539, referenced as "CAC."

1

against the United States, and conspired with Iran and its terror proxy Hezbollah to provide material support to al Qaeda to facilitate the travel and training of several of the 9/11 hijackers.

Magistrate Judge Netburn rejected Sudan's arguments that its continuous support for over a decade in cultivating, building, protecting, enabling, supporting, conspiring with and aiding and abetting al Qaeda was irrelevant simply because Osama bin Laden himself left the Sudan in 1996 to return to Afghanistan. To the contrary, Judge Netburn correctly determined that:

> Al Qaeda's organizational expertise existed because of Sudan. For years, it was a safe harbor as al Qaeda devised plans to attack civil aviation. It introduced al Qaeda to Iranian and Hezbollah contacts who trained al Qaeda's agents. It gave terrorists papers to foil international counter terrorism efforts. Finally, it supported repeated al Qaeda attacks on Americans at home and abroad.

R&R 19.

Sudan glosses over the critical factual and legal designation by the United States that Sudan had been formally designated as a State Sponsor of Terrorism for 27 years starting in 1993.[3] Sudan's support for al Qaeda and its threat to America were specifically listed as reasons for its designation—confirming Sudan's key support role. Sudan's arguments amount to a request that this Court overturn the Executive Branch's designation of Sudan as a State Sponsor of Terrorism and its specific assessments supporting that designation.

Sudan made and lost the same arguments it now repeats before this Court in a series of death and injury cases involving al Qaeda's 1998 attacks on U.S. Embassies in Kenya and Tanzania and al Qaeda's 2000 attack on the USS Cole that were litigated in the D.C. and Fourth Circuits.[4] Sudan's claim that the Amended Complaints fail to allege that the material support at

---

[3] That designation was lifted by the Trump Administration in the fall of 2020 in exchange for compensation to be paid by Sudan to victims of Sudanese and al Qaeda terrorism at the American East African embassies (1998) and the U.S.S. Cole. (2000).

[4] *See, e.g.*, *Owens v. Republic of Sudan,* 864 F.3d 751, 794 (D.C. Cir. 2017) (*Owens IV*) (Embassy bombings); *Rux v. Republic of Sudan,* 461 F.3d 461, 474 (4th Cir. 2006) (*Rux II*) (USS Cole bombing).

issue was provided by an official, employee, or agent acting within the scope of his role for Sudan was heard and rejected by those courts. Sudan continues to ignore detailed factual allegations that its support for al Qaeda was implemented and maintained as a matter of official Sudan government policy, encompassed types of material support that only a state actor could provide, and was carried out by core ministries of Sudan over a period of many years.

Sudan's additional procedural and technical arguments, directed at only a subset of the claims and/or claimants, such as immediate family members for loss of solatium, fair no better. Contrary to Sudan's arguments, the immunity exceptions set forth in 28 U.S.C. §1605A and 28 U.S.C. §1605B, and the additional substantive causes of action asserted in the Amended Complaints are timely because they are related actions under § 1083(c)(3) of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3, § 1083 and/or because they relate back to the dates of the filing of the original complaints, pursuant to Fed. R. Civ. P. 15. Judge Netburn determined that § 1083 applied here as the Amended Complaints relate back to the original complaints and the date of their filing.[5]

\* \* \* \*

In deciding Fed. R. Civ. P. 72(b) objections on a dispositive motion, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Rule 72(b)(3).

---

[5] The Ashton, Betru, Parker and Nolan Plaintiffs do not address all of Sudan's Rule 72 objections herein, only those that apply to these plaintiffs. Other plaintiffs may file additional opposition to Sudan's objections to the R&R.

I.    **THE MAGISTRATE COURT CORRECTLY DETERMINED THAT THERE IS SUBJECT MATTER JURISDICTION OVER SUDAN FOR ITS MATERIAL SUPPORT OF AL QAEDA THAT RESULTED IN THE 9/11 ATTACKS**

A.    **The Report Applies the Correct Standard of Review**

Sudan's first argument is that the Magistrate Judge "applies the incorrect standard of review," but this argument is erroneously based on cases where (unlike here) the foreign sovereign raised a *factual* challenge to jurisdiction.  Sudan's motion to dismiss, however, raised only a *legal* challenge to the sufficiency of Plaintiffs' jurisdictional allegations in their complaints—and did not present a *factual* challenge.  *See, e.g.,* ECF 6575 at 14 (Sudan argues that "The Amended Complaints Fail To Allege Jurisdictional Causation" and "The Amended Complaints Fail To State A Claim Against Sudan" but does not present factual challenge and instead argues that "such an evidentiary showing [by Sudan] should be unnecessary").  Therefore, the Magistrate Judge properly held that it was required to draw all reasonable inferences in favor of the plaintiffs.  R&R 5.  The Second Circuit has ruled that where

> "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations," *id.,* "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000) (citation omitted).

*Robinson v. Govt. of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001).

Sudan cites to the March 2018 ruling of this Court denying Saudi Arabia's motion to dismiss on jurisdictional grounds, but Saudi Arabia—unlike Sudan—made a *factual* challenge and asked this Court to consider facts outside of the Plaintiffs' complaints.  *In re Terrorist Attacks on September 11, 2001*, 298 F.Supp. 631, 641 (S.D.N.Y. 2018).  In that situation, the evidence is weighed without drawing favorable inferences from the complaint, but as this Court found, the motion must be denied where relevant discovery remains outstanding.  *Id.* at 651.  Here Sudan chose to make only a legal challenge to the Complaints and therefore all reasonable inferences

4

must be drawn in favor of the plaintiff.  In any event, Sudan fails to identify any specific inferences made by the Magistrate Judge that it claims was improper.

B.      **The Magistrate Judge Correctly Found That Plaintiffs Have Plead Sufficient Facts to Establish Jurisdictional Causation for § 1605A, § 1605(a)(7), and § 1605B**

Magistrate Judge Netburn rejected Sudan's argument that a 'but for' causation test must be used here where multiple tortfeasors conspired with al Qaeda to attack Americans. As described by the Magistrate and detailed below, Sudan provided substantial direct material support to al Qaeda and shared its goals of murdering Americans.  The 9/11 Attacks were not only reasonably foreseeable but intended by Sudan and clearly satisfied the applicable proximate cause standards. Even if a "but-for" standard were used here, Sudan's knowing partnership in al Qaeda's war against the U.S. led to the 9/11 Attacks.

> Plaintiffs have properly alleged jurisdictional causation. This determination requires first assessing the appropriate causal standard under § 1605(a)(7), § 1605A, and § 1605B. The law of the case doctrine in this MDL, supported by years of precedent, shows that only proximate, not but-for, causation is required. "The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)).

> In this MDL, the law of the case is that § 1605(a)(7), § 1605A, and § 1605B require only proximate causation. In re Terrorist Attacks on September 11, 2001 held that "[t]he causation requirement under [§ 1605A] is satisfied by a showing of proximate cause." No. 03-md-1570 (GBD)(SN), 2011 WL 13244047, at *41 (S.D.N.Y. Dec. 22, 2011). This holding relied on prior cases finding that jurisdictional causation for § 1605(a)(7) was similarly satisfied by proximate causation. Id. (citing *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.C.C. 2010)). Then, in 2018, Terrorist Attacks III held that "JASTA's [i.e., § 1605B's] "caused by" requirement did not incorporate principles of "but for" causation." 298 F. Supp. 3d at 645.

R&R 7.

1. **The Deaths and Injuries Sustained by Plaintiffs in the September 11th Attacks Were Proximately Caused by Sudan's Support for al Qaeda**

This Court previously considered and rejected the same causation arguments made by Sudan in considering Saudi Arabia's prior motion to dismiss. This Court held, in accord with Supreme Court, Second Circuit, and other circuit court precedent, that the "caused by" requirement of the Justice Against Sponsors of Terrorism Act (JASTA) incorporates the "traditional test for proximate causation" and does not impose an additional causation test, including a "but for" test. 298 F. Supp.3d at 645. As this Court found, the proximate cause standard is the traditional rule uniformly imposed in terror and other complex tort cases that necessarily involve a web of concurrent causes. *Id.*; *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013) (Anti-Terrorism Act requires "proof of proximate cause"); *Boim v Holy Land Found. for Relief and Dev.* 549 F.3d 685, 695-99 (7th Cir. 2008)(Anti-Terrorism Act cause of action for financing terrorism did not require "but for" causation); *Rux v. Republic of Sudan*, 461 F.3d 461, 474 (4th Cir. 2006)(rejecting additional requirement of "but for" cause and holding that "proximate cause is the appropriate standard to apply" on FSIA jurisdiction)(*Rux II*); *Kilburn v Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127-30 (D.C. Cir. 2004)(proximate cause, not "but for" cause, was the appropriate standard in case involving material support of terrorists who tortured and murdered plaintiff's decedent). Sudan relies on distinguishable decisions which involve simple allegations of employment discrimination, where a "but for" test effectuated the statutes at issue;[6] does not consider other Supreme Court cases where the circumstances dictated application of the proximate

---

[6] *Comcast Corp. v. National Association of African American-Owned Media*, 140 S.Ct. 1009 (2020)(§ 1981 discrimination claim); *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020)(Title VII discrimination case). *Comcast* and *Bostock* applied the Court's prior decision in *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013). Saudi Arabia had previously cited *Nassar* and presented the same arguments now advanced by Sudan. ECF 3668 at 14-15. Plaintiffs opposed the application of *Nassar* to a terror case, ECF 3781 at 60. This Court rejected Saudi Arabia's arguments and applied a proximate causation test. 298 F. Supp.3d at 645.

cause test alone;[7] and, fails to properly address the causation test uniformly applied by federal courts in terror cases.

As this Court held, Plaintiffs need not prove that Sudan provided direct support for the 9/11 Attacks themselves, but only that there is "some reasonable connection between the act or omission of the defendant [Sudan] and the damage which the plaintiff has suffered."  298 F.Supp.3d at 645, *citing Owens v. Republic of Sudan,* 864 F.3d 751, 794 (D.C. Cir. 2017)(*Owens IV*).

As it has unsuccessfully attempted to do in other cases, Sudan attempts to deflect the content and import of the actual record, based on largely irrelevant and inaccurate fact-bound arguments.  None of these arguments has any factual or legal merit.

### 2.  Osama bin Laden's Departure Did Not Break the Casual Chain

Sudan does not deny it had a close relationship with Osama bin Laden and al Qaeda operatives inside Sudan, but instead claims that because bin Laden moved to Afghanistan sometime in 1996, the relationship must have ended and Sudan's support for al Qaeda could not been a cause of the 9/11 Attacks.  Sudan's arguments misstate the governing legal standards, and ignore factual allegations that are more than sufficient to satisfy Sudan's own erroneous legal standards.  Indeed, even if a "but for" causation standard did apply (which is not the rule in terror cases), Plaintiffs' factual allegations are more than sufficient to satisfy it.   Sudan provided essential support that allowed al Qaeda to carry out the 9/11 Attacks.   Sudan and its governing leadership—Hassan al Turabi, founder of the National Islamic Front (NIF) and Sudan's President Omar al Bashir—invited al Qaeda to reside in Sudan and train for jihadi attacks against

---

[7] *Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995)(the words "caused by" in an admiralty jurisdiction statute reference "what tort law has traditionally called 'proximate causation.'")'; *Paroline v. United States*, 572 U.S. 434, 452 (2014) ("but for" causation test rejected in case involving criminal restitution for child pornography, finding that "alternative and less demanding causal standards are necessary in certain circumstances to vindicate the law's purposes.").

Americans.

Sudan's arguments relating to Osama bin Laden's personal departure from Sudan in 1996 are not only irrelevant, but Sudan has already fully litigated and lost the same arguments before other federal courts that addressed death and injury claims against Sudan.[8]   Sudan once again selectively cites the 9/11 Commission Report and regurgitates its claims that its "expulsion" of Osama bin Laden in 1996 weakened al Qaeda and breaks the causal chain.   In *Owens IV,* however, the D.C. Circuit held that "we do not believe Sudan broke the chain of proximate causation by completely disassociating itself from al Qaeda in or after 1996," concluding "as the district court inferred, it is far more likely that Sudan, despite having expelled bin Laden in 1996, continued to harbor al-Qaeda terrorists until and after the bombings." *Id.* at 796.

*Owens IV* further rejected Sudan's claims that "Bin Ladin left Sudan…significantly weakened", concluding that "bin Laden's expulsion did not undo the support Sudan provided in the previous years." *Id.* at 796-7.   Again, relying on many of the same facts alleged in the Amended Complaints, AAC ¶¶ 51-118, *Owens IV* emphasized Sudan's complete program of support that enabled al Qaeda to establish itself and possess the operational capabilities necessary to carry out sophisticated attacks: Sudan "allowed al Qaeda to extricate itself from a war-torn Afghanistan"; enabled it to "organize its terrorist enterprise in a stable safe haven"; "sheltered the group from foreign intelligence"; "put al Qaeda in contact with other, more experienced terrorist groups residing in Sudan"; and, "allowed al Qaeda to grow its membership." *Id.* at 797.  The D.C.

---

[8] *See generally Owens IV,* 864 F.3d 751 (D.C. Cir. 2017) (rejecting Sudan's but for causation argument, its claimant/victim argument, its argument regarding admissibility and reliance on official government reports, its argument that 28 U.S.C. § 1605A preempts state tort law claims, its broken chain of causation argument, its argument that the statute of limitations is jurisdictional; its argument that State Department reports are conclusory and inadmissible; and its argument that the 9/11 report statement that bin Laden's departure broke the chain of causation); *Rux v. Republic of Sudan,* No. 2:04-cv-428, 2005 WL 2086202, at *12 (E.D. Va. Aug. 26, 2005) (*Rux I*), *aff'd in part, appeal dismissed in part*; *Rux v. Republic of Sudan,* 461 F.3d 461, 471-72 (4th Cir. 2006) (*Rux II*) (both courts rejecting Sudan's causation and the within the scope argument that the material support provided was not provided by the government of Sudan).

Circuit concluded that while

> the expulsion of bin Laden may have marked a temporary setback for Al Qaeda, on balance, the organization benefited greatly from Sudan's aid during the 1990s. Therefore, the district court's conclusion that Sudan's support was a 'substantial factor' in the chain of causation leading to the embassy bombings was far from clearly erroneous.

*Id.* This holding and the reasoning underlying it, in the more demanding context of a review of the sufficiency of the evidence to support a final default judgment, demonstrate that Sudan's repetition of the same failed arguments before this Court borders on being frivolous. The Amended Complaints are predicated on much of the same evidence of Sudan's substantial material support for al Qaeda as set out in the *Owens* and *Rux* cases, including key assistance that Sudan continuously provided al Qaeda with terrorist recruitment, training, counter-intelligence, covert operations, covert travel, bomb making, fundraising, and a safe haven to plan and collaborate with other terrorists. AAC ¶¶ 86-95. Further, Sudan directly brokered the agreement for Iran to provide support for al Qaeda operations, which this Court previously found constituted material support for the terror group and a direct cause of the 9/11 Attacks. *See, e.g., In re Terrorist Attacks on September 11, 2001,* 2011 WL 13244047, at *10-19, 25 (S.D.N.Y. Dec. 22, 2011). At best, Sudan's arguments identify questions of fact that cannot be resolved in Sudan's favor as a matter of law.

### 3. Sudan's Attenuation Arguments Are Legally and Factually Flawed

Sudan asks this Court to disregard literally dozens of paragraphs of factual allegations in the Amended Complaints, detailing the critical support that Sudan provided to al Qaeda both before and after Osama bin Laden personally departed Sudan, *see e.g.,* AAC ¶¶ 86-118, by arbitrarily claiming that those allegations are too remote in time and place to even be considered in conducting the jurisdictional causation analysis. ECF No. 6575 at 27-31. Here again Sudan violates the

applicable legal test by suggesting that its pervasive, knowing support for a terror group's operations is somehow irrelevant unless that support can be directly tied to a particular attack. This Court held that the applicable causation test determines whether the material support was a substantial factor in the sequence of events that led to the terrorist attacks. 298 F. Supp.3d at 645-646. Instead of attempting to engage that standard as this Court defined in its March 2018 decision or the facts detailed in the Amended Complaints, Sudan focuses on a completely distinguishable portion of this Court's March 2018 decision that dismissed claims against the Saudi High Commission based on its support to al Qaeda in Bosnia.[9]

But Judge Netburn determined that Sudan's alleged conduct was different in kind from the charities and non-governmental groups found to be causally unconnected to the 9/11 Attacks.

> The differences are stark. Sudan was not several steps removed from al Qaeda. It worked directly with the organization and actively sought to forge connections with its leadership. Sudan aided operations directly against the U.S. homeland and U.S. personnel overseas rather than against other nations. Finally, Sudanese support was not limited to cash or arms. Year after year, it put the might of a sovereign nation's security services and diplomatic privileges into al Qaeda's growth. The scale of this investment in al Qaeda overcomes any concerns about attenuation at this stage of the proceeding.

> In sum, Plaintiffs have shown enough to infer jurisdictional causation. If a nation takes in a group of terrorists because it wants them to attack the United States, listens approvingly as they talk about attacking the United States, helps them fund attacks on the United States, trains them in the skills needed to attack the United States, and supports them in other terrorist attacks on the United States, then that nation is a substantial factor in the reasonably foreseeable outcome of those terrorists injuring and killing people when they again attack the United States.

R&R 19-20.

---

[9] While Plaintiffs respectfully disagree with the Court's determination that the allegations as to the SHC were insufficient, the nature and scope of the support SHC was alleged to have provided to al Qaeda is different from that which Sudan is alleged to have provided. Sudan ran a comprehensive program of state support for more than a decade, including safe haven, military and intelligence assistance, training in terrorism operations, issuance of false passports and diplomatic papers, and every other form of material support.

Sudan's proposed temporal and spatial proximity arguments are directly at odds with the Supreme Court's explicit admonition that the lower courts should not impose any such requirements in applying causation language in jurisdictional statutes. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527 (1995).   In *Grubart,* the Supreme Court considered jurisdictional causation under the Extension of Admiralty Jurisdiction Act, which provides that "the admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water…." *Id.* (quoting 46 U.S.C.A. § 30101 (West)). The Supreme Court stated

> The Act uses the phrase 'caused by,' which more than one Court of Appeals has read as requiring what tort law has traditionally called 'proximate causation.' This classic tort notion normally eliminates the bizarre, cf. *Palsgraf v. Long Island R. Co.*, 248 N. Y. 339, 162 N. E. 99 (1928), and its use *should obviate not only the complication but even the need for further temporal or spatial limitations*.

*Id.* at 536. (emphasis added) (citations omitted).

The *Rux, Kilburn*, and *Owens* cases relied on *Grubart* in adopting the traditional proximate cause test for the identical "caused by" language of the FSIA's terrorism-related exceptions.   And consistent with *Grubart,* they too have rejected a requirement of a spatial or temporal proximity between the provision of material support and the ultimate terrorist act.   *Owens IV,* 864 F.3d at 796 ("provided the plaintiffs demonstrated proximate cause, the *temporal remoteness* between Sudan's material support and the embassy bombings *was irrelevant*") (emphasis added)*; Owens I,* 412 F. Supp. 2d at 114-15.[10]

---

[10] In *Owens I,* the court also rejected Sudan's attenuation theory under the scope of risk analysis set forth by *Restatement (Third) of Torts, § 29 (Scope of Liability (Proximate Cause)).* The court noted this scope of risk analysis focuses on whether there is a "intuitive relationship" between the act(s) alleged and the resulting harm—that is "whether the conduct was wrongful *because* that type of damage might result." *Id.* at 115. (emphasis in original). The court went on to state "does the 'scope of risk' associated with providing material support to terrorist groups include the risk that such support might facilitate a terrorist act by members of those groups at some future time? The obvious answer is yes; giving aid and comfort to those who engage in terrorist acts such as extrajudicial killing—here, al Qaeda and Hizbollah—is wrongful *precisely* because it makes it more likely that the beneficiaries of the aid will, *years later,* commit murders and cause injuries." *Id.* (first emphasis in original, second emphasis added).

Sudan's remoteness arguments also ignore that its program of material support for al Qaeda continued unabated after bin Laden's departure, and was very much active on 9/11. AAC ¶¶ 98-118. As the State Department's official terrorism reports cited in the Amended Complaints and by Judge Netburn, R&R 13-15, 17-18, make clear, al Qaeda continued to maintain operations and a logistical base in Sudan after bin Laden's departure, and up until the 9/11 Attacks. This Sudan base was actively supporting al Qaeda and its terrorist operations throughout the period that 9/11 plot was conceived, planned, and carried out. Sudan's remoteness argument is thus a fallacy from the outset. And Sudan has no way to distinguish the 9/11 Attacks from the U.S. Embassy bombings (*Owens*) and Cole bombing (*Rux*) cases, where Sudan's remoteness arguments were soundly rejected, given Sudan's longstanding, active support for al Qaeda's efforts to attack the U.S., and the fact that al Qaeda's planning for the 9/11 plot was ongoing well before the 9/11 Attacks (the Cole attack occurred less than a year before 9/11 at a time when the al Qaeda hijackers had already been inside the United States for over nine months).

Finally, as with other of its theories, Sudan's "remoteness" arguments ignore its status as a member of al Qaeda's conspiracy to attack America. As set forth *infra,* Sudan, as co-conspirator with al Qaeda, is vicariously liable for al Qaeda's perpetration of the 9/11 Attacks, without any independent need for Sudan to have directly participated in the 9/11 Attacks.[11]

### C.      Sudanese Officials and Agents Acting Within the Scope of Their Authority Provided Material Support To and Conspired With Al Qaeda

As described above, the Amended Complaints, the *Rux*, *Owens* and *Kilburn* courts, and the Magistrate Judge, R&R 21-3, set forth in detail how Sudan's highest leaders initiated and sustained a comprehensive program of state support for al Qaeda, which spanned numerous core

---

[11] *See, e.g., Flanagan v. Islamic Rep. of Iran*, 87 F. Supp. 3d 93, 116-17 (D.D.C. 2005) (as co-conspirators with al Qaeda, Iran and Sudan are jointly and severally liable for al Qaeda's terrorist attacks).

ministries of the Sudanese government and encompassed forms of support that only a state actor could provide, in furtherance of Sudan's official anti-U.S. policy that used terrorism as a tool. Instead of seriously engaging with this record, Sudan culls a handful of summary allegations, and labels them as "conclusory," while ignoring the detailed factual allegations of Sudan's involvement with al Qaeda.  Sudan Br. at 8-11. This attempted sleight of hand does not withstand even a cursory review of the record.

First of all, Sudan's argument on this point ignores Plaintiffs' allegations on the Executive Branch's designation of Sudan as a State Sponsor of Terrorism. *See e.g.*, AAC ¶¶ 3, 58, 79.[6]  That designation was first issued in 1993 and remained in place through (and after) September 11, 2001.  The State Department's annual terrorism reports for 1997-2001 all cite Sudan's continuing support for al Qaeda as a predicate for the annual re-certifications of Sudan's State Sponsor status. In addition, on November 3, 1997, President Clinton issued Executive Order 13067, declaring "I, William J. Clinton,President of the United States of America find that *the policies and actions of the Government of Sudan, including continued support for international terrorism*…constitute[s] an unusual and extraordinary threat to the national security and foreign policy of the United States." (emphasis added).[12]

The Executive Branch's determinations that the *Sudan government* sponsored al Qaeda as part of its official policies and activities is an essential lens through which the facts set forth in the Amended Complaints must be viewed. Those formal determinations give rise to a clear inference, and make plausible Plaintiffs' allegations, that Sudan's top leadership, including President Bashir

---

[12] On August 12, 1993, Secretary of State Warren Christopher made the following determination: "In accordance with section 6(j) of the Export Administration Act (50 U.S.C. App. 2405 (j)), I hereby determine that Sudan is a country which has repeatedly provided support for acts of international terrorism."

and NIF's chief Turabi, along with Sudan's government officials and agents, provided material support to al Qaeda within the scope of their roles for Sudan's government and in furtherance of Sudan's government policy.

Even without the inferences that flow from the Executive Branch's designation and supporting documents, the Amended Complaints contain exhaustive factual detail that Sudanese officials, employees, and agents, acting within the scope of their roles for Sudan, provided material support to al Qaeda, including through the cooperation agreements that senior Sudanese officials brokered with Iran and Hezbollah. The Amended Complaints detail how the NIF, and its leader Hussan al Turabi, installed General Omar al Bashir as Sudan's President, and that Turabi and Bashir jointly governed Sudan in the ensuing years. AAC ¶¶ 13-16, 64-66. The complaints offer undisputed facts that Sudan's leadership urged bin Laden to build a terrorist organization in Sudan, with the official aim of building its capacities to attack the U.S. The pleadings show how this program was implemented through hand-in-glove cooperation between al Qaeda and Sudan's intelligence, military, customs and other agencies, all of which would have been impossible without the active participation of Sudan's most senior officials. They also detail forms of support to al Qaeda that only a state actor and its officials could provide, including safe haven and training camps in Sudan, and access to and use of government-owned infrastructure including army bases and Sudan's government-owned airline. The complaints also show that Sudan's President Bashir personally granted special financial privileges to al Qaeda run businesses. AAC ¶¶ 21-48, 56-57; 65. These and other allegations describe an official, state-run material support program.

Consistent with this evidence, the precise "scope of office, employment, or agency" argument that Sudan proffers here was rejected in the *Rux* decisions. *Rux I* found that providing

14

diplomatic pouches, waiving of taxes and duties, allowing the formation of terrorist training camps, and establishing a bank with Osama bin Laden could reasonably be done within the scope of government duty, and that many of them can only be done with the assistance of the highest echelons of government.  Accordingly, the court concluded that "[a]s a matter of law, the factual allegations in the Complaint are sufficient to satisfy the 'within the scope' element of jurisdiction." *Rux I*, 2005 WL 2086202, at *12.

In affirming *Rux I,* the Fourth Circuit, after reviewing President al-Bashir's personal involvement in supporting al Qaeda, stated "other aspects of providing safe haven to Al-Qaeda also necessarily involved official governmental support. For example, as the district court recognized, permitting "the use of diplomatic pouches, granting relief from taxes and duties, allowing the establishment and operation of terrorist training camps, and establishing financial joint ventures between Sudan and Al-Qaeda could only be carried out by government officials acting within the scope of their offices." *Rux II,* 461 F.3d at 472, n.5; *see also Owens v. Republic of Sudan,* 826 F. Supp. 2d 128, 139 (D.D.C. 2011) ("*Owens II*"); *Owens v. Republic of Sudan,* 174 F. Supp. 3d 242, 280 (D.D.C. 2016)("*Owens III*"), *aff'd, Owens v. Republic of Sudan,* 864 F.3d 751 (D.C. Cir. 2017) ("*Owens IV*"); *Rux v. Republic of Sudan,* 495 F. Supp. 2d 541, 554 (E.D. Va. 2007) ("*Rux III*") (all finding or affirming that the Sudanese government provided material support to al Qaeda).

Judge Netburn found that Plaintiffs' factual allegations that Sudan and its officials, employees, and agents conspired with al Qaeda and Iran, and further satisfy the "scope of office, employment, or agency' in an additional way. R&R 21-23.  As Learned Hand explained long ago,"[w]hen men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made 'a partnership in crime.' What one does pursuant to their common

purpose, all do." *Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir. 1926); *Doe v. Bin Laden*, 580 F. Supp. 2d 93, 98-99 (D.D.C. 2008) (recognizing attribution through conspiracy); *see also* 162 Cong. Rec. S2845 (daily ed. May 17, 2016) (statement of Sen. Cornyn that JASTA's new FSIA exception "incorporates traditional principles of vicarious liability and attribution, including doctrines such as . . . secondary liability").  Here, the very purpose of Sudan's conspiracy with al Qaeda was to attack America.  Thus, the terrorist acts of Sudan's agent al Qaeda in conducting the 9/11 Attacks (and Sudan's arrangements with Iran to provide further support for those attacks), were within the scope of their co-conspirator agencies and attributable to Sudan.  *Flanagan* 87 F. Supp. 3d at 116-17.

In sum, Plaintiffs' facts and evidence show that terrorist attacks against the U.S. were not only a foreseeable and natural consequence of Sudan's collaboration with al Qaeda, but the intended and specific aim of their partnership.

### D.  Family Member Plaintiffs Have Standing to Assert Jurisdiction Under § 1605A and § 1605B for Loss of Solatium

Sudan's claim that additional family member Plaintiffs who suffered loss of solatium lack jurisdictional standing under § 1605A and § 1605B(b) is contrary to the plain text of those provisions, and once again rests on implausible theories that have been repeatedly rejected by other courts.

Without citing to any authority on point and failing to inform this Court that Sudan's arguments have previously been rejected, Sudan argues that Congress limited the terrorism exceptions in §1605A(a) and §1605B(b) to victims who died or suffered personal injuries but immunized Sudan from claims by family members of those terrorism victims. As Judge Netburn noted, "[t]wo circuit courts have considered and rejected similar arguments. The argument has also been rejected during this MDL and the Court rejects it here too." R&R 29.  Sudan made and

16

lost the identical argument under § 1605A(a) in *Owens IV*.  It concluded that

> by its plain text, the FSIA terrorism exception grants a court jurisdiction to hear a claim brought by a third-party claimant who is not the legal representative of a victim physically injured by a terrorist attack. Who in particular may bring a claim against a foreign sovereign is a question of substantive law, wholly separate from the question of our jurisdiction.

*Owens IV,* 864 F.3d at 807.

Section 1605A(a)(2) eliminates immunity if "the claimant or the victim" is a U.S. national, service member, or government employee. 28 U.S.C. § 1605A(a)(2). Thus, on its face § 1605A(a)(2) permits claims by persons other than the victim. As the Seventh Circuit has held, "[d]enying jurisdiction over family members' claims for American victims would require us [the court] to ignore the disjunctive structure of § 1605A(a)(2)(A)(ii)." *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 569-70 (7th Cir. 2012).

Judge Netburn further correctly rejected Sudan's challenge under JASTA, 28 U.S.C. 1605B, with regard to the loss of solatium claims.

> JASTA's § 1605B(b) waives sovereign immunity when "money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States" caused by international terrorism. The statute's goal is to "to allow the families of the 9/11 tragedy to seek justice in our courts of law." 162 Cong. Rec. S2845 (daily ed. May 17, 2016) (statement of Sen. John Cornyn).

R&R 31.

"Thus, while the Plaintiffs are not alleging *physical injury,* they are seeking "money damages" for "death occurring in the United States"—precisely the harm that Congress designed JASTA to address." *Id*. at 31.

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER SUDAN

Sudan argues that his Court should decline personal jurisdiction over Sudan because the Amended Complaints fail to properly plead an FSIA immunity exception. As set forth above, the

Amended Complaints sufficiently plead both the § 1605A and § 1605B immunity exceptions. An immunity exception and proper service are all that is required for personal jurisdiction over a foreign state as Sudan concedes in citing 28 U.S.C. § 1330(b). Sudan concedes that it has been properly served and that proper service and an immunity exception are all that is required under current Second Circuit precedent. R&R 36. The Magistrate properly followed Circuit law in rejecting Sudan's claim that minimum U.S. contacts were required by a foreign sovereign, *see Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,* 582 F.3d 393 (2d Cir. 2009).  Accordingly, Judge Netburn correctly rejected Sudan's halfhearted attempt to contest personal jurisdiction. R&R 36.

## III.   PLAINTIFFS' ACTIONS ARE TIMELY AS RELATED ACTIONS UNDER § 1605A(b) and §1083(c)(3)

Plaintiffs brought a timely § 1605(a)(7) action years before Congress, amended the statute, replacing it with § 1605A.  As a result of the amendments, these cases can be brought as related actions under §1083(c)(3) of the NDAA which stated:

> If an action arising out of an act or incident has been timely commenced under [§ 1605(a)(7)] . . . any other action arising out of the same act or incident may be brought under [§ 1605A] if the action is commenced not later than the latter of 60 days after— (A) the date of the entry of judgment in the original action; or (B) the date of the enactment of this Act.

R&R 25.

"Because no judgment has been entered in the Plaintiffs' § 1605(a)(7) actions, the time to bring the related actions has not elapsed."  R&R 25.

> Sudan's reading would thus create an irrational world where § 1083(c) renders the original plaintiffs here less able to prosecute their action than related parties filing almost two decades later. Alternatively, it would create unnecessary inefficiency by forcing plaintiffs to file entirely duplicative new cases whose sole difference is that they are brought under § 1605A rather than § 1605(a)(7). Basically, it would require accepting that Congress created a provision whose only practical effect is to create unnecessary duplicative filings while extracting further filing fees from

18

terror victims. This reading is entirely inconsistent with the requirement to read §
1605A's "ambiguities flexibly and capaciously." *Van Beneden v. Al-Sanusi*, 709
F.3d 1165, 1167 (D.C. Cir. 2013)

R&R 27.

The Magistrate Judge rejected Sudan's reading of cases it claimed support its position,
and found that because the Amended Complaints were related to the same terrorist attack and fact
allegations, Plaintiffs' actions are therefore timely under § 1605A(b) as related actions under
§1083(c)(3). R&R 28-29.[13]

Finally, because Sudan's conduct involves material support program for terrorism in
violation of U.S. and international law, as reflected by Sudan's designations as a terrorist state, its
conduct may not be deemed a discretionary function.  *See, e.g., USAA Cas. Ins. Co. v. Permanent
Mission of Republic of Namib.*, 681 F.3d 103, 113 (2d Cir. 2012) (defendant's conduct was not
"discretionary" because it violated city ordinance); *Liu v. Republic of China*, 892 F.2d 1419, 1431
(9th Cir. 1989) (exception is inapplicable because defendant had no discretion to violate law that
prohibits murder); *Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) ("there is
no discretion to commit, or to have one's officers or agents commit, an illegal act").  Thus, this
Court also has jurisdiction under § 1605(a)(5).

---

[13] The facts and principles presented in the context of sections 1605A and B also demonstrate jurisdiction under §
1605(a)(5). As for §1605B, these are claims for money damages for personal injury, death, and property damage,
based on tortious acts of Sudanese officials, also satisfying those common elements of § 1605(a)(5). For the reasons
discussed herein, Plaintiffs' allegations also satisfy § 1605(a)(5)'s causation and scope of office or employment
elements. *Supra*, Section I. To the extent § 1605(a)(5) requires a tortious act in the U.S. in addition to the injury,  the
September 11th attacks and attributable acts of the al Qaeda terrorists who committed them satisfy it. *Supra*, Section
I; *Doe v. Bin Laden*, 663 F.3d 64, 66-67 (2d Cir. 2011).

19

IV.   **THE AMENDED COMPLAINTS PLAUSIBLY PLEAD THE REQUIREMENTS OF THEIR SUBSTANTIVE LAW CLAIMS**

A.   **Plaintiffs' Factual Allegations State a Claim Under § 1605A and the ATA**

Magistrate Judge Netburn correctly rejected Sudan's redundant claim that Plaintiffs fail to state a claim because they do not meet the jurisdictional and causal requirements, *see* Section I, *supra*, and that the nationality requirements had also been plead.  R&R 37-38. In addition, the court correctly determined that Plaintiffs plausibly pled the necessary elements under the Anti-Terrorism Act (ATA) for primary liability, which requires (1) predicate unlawful action; (2) a knowing and willful mental state; and (3) proximate causation. Having already determined causation (*see* Section I, *supra*), the court reviewed the unlawful predicate acts, R&R 38-41, and also addressed Sudan's necessary mental state as indicated by the official anti-U.S. policy of Sudan and its support for al Qaeda at the highest levels of its government and government offices. R&R 41-42.

Section 1605B (JASTA) has made clear that secondary liability against a foreign state is permitted as it would be against any person or entity who aids and abets acts of terrorism. R&R 42, *citing*  28 U.S.C. § 1605B(c) and 18 U.S.C. § 2333 (ATA).

B.   **The Amended Complaints Plead ATA Conspiracy Claims**

Plaintiffs also plausibly alleged secondary liability under the ATA on a conspiracy theory.

Here, again, JASTA made *Halberstam* the framework for assessing civil conspiracy. JASTA, PL 114-222, 130 Stat 852 §2(a)(5). The elements of civil conspiracy are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." Halberstam, 705 F.2d at 477. R&R 51.

The law of conspiracy does not require agreement on the precise target or timing of the attacks. To state a claim for ATA conspiracy liability, "[p]laintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." *Terrorist Attacks* I, 349 F. Supp. 2d at 829.

> Plaintiffs have pleaded enough to infer a conspiracy to commit international acts of terror against the United States. As alleged, Sudan and al Qaeda came together because they considered the United States a common enemy. Sudan guided and supported al Qaeda so that it could target the United States with acts of terrorism designed to intimidate the American people. It hosted meetings between al Qaeda and other terrorists to build al Qaeda's capacity to strike America. At this stage, that is enough to infer Sudan knew that al Qaeda wanted to commit terrorist acts against the United States, agreed to assist in that endeavor, and then took steps to do so.

R&R 51-52. *See also* Section I, *supra*.

Sudan argues the Amended Complaints must plead that Sudan conspired specifically as to the 9/11 Attacks and with the actual perpetrators of 9/11 Attacks. This is simply contrary to the law on conspiracy-based ATA secondary liability. Indeed,

> once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action . . . so long as the purpose of the tortious action was to advance the overall object of the conspiracy.

*Halberstam*, 705 F.2d at 481. Civil conspiracy liability attaches even if the co-conspirator's participation was remote or not significant; it is the agreement to support wrongdoing that is the critical factor in the causal chain. *Id.* at 485.

### C.     The Amended Complaints Plead Valid ATA Aiding and Abetting Claims

The court further correctly held that:

Plaintiffs have satisfactorily alleged secondary ATA liability on an aiding and abetting theory. The claim has three elements:

> (1)     'the party whom the defendant aids must perform a wrongful act that causes an injury,' (2) 'the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance,' and (3) 'the defendant must knowingly and substantially assist the principal violation.' *Linde*, 882 F.3d at 329 (quoting *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)).

R&R 48.

The court also addressed the awareness element again and determined that "general

21

awareness" was all that was required, provided plaintiff's injury was reasonably foreseeable. R&R 48. There is no requirement that the aider and abettor know about the *specific* act. *Id.* Magistrate Judge Netburn distinguished and rejected Sudan's flawed analogy involving routine banking services for a terror group. R&R 49.

In addressing the third element for aiding and abetting liability, the court correctly identified the balancing factors and applied them to Plaintiffs' allegations.

> Assistance is judged by six factors originally enumerated in *Halberstam*, 705 F.2d 472, which JASTA adopted as the test for aiding and abetting liability. JASTA, PL 114-222, 130 Stat 852 §2(a)(5). These factors are: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329.

> Sudan's alleged conduct weighs against it on every count but actual presence. Briefly re-applying the facts alleged to these factors: (1) the September 11 Attacks Sudan abetted are one of most devastating ever carried out against the United States; (2) Sudan's assistance was substantial, bringing the might and privileges of a sovereign nation to bear on al Qaeda's behalf, (3) there was a close and enduring relationship between al Qaeda's leadership and the highest levels of Sudanese government, (4) Sudan knowingly assisted with al Qaeda's schemes; and (5) the collaboration lasted from 1990 to at least 2000. The only factor in Sudan's favor is that it was not physically present at the September 11 Attacks.

> This is not enough: counterbalancing the sustained Sudanese support for al Qaeda requires more than Sudan being elsewhere that fatal day. Just knowingly providing money-laundering services for intermediaries who then aided terrorists can show substantial assistance in an aiding and abetting claim. See, e.g., *Kaplan*, 999 F.3d at 866 ("[A] JASTA claim for aiding and abetting an FTO is available even when the defendant has given assistance only indirectly" by providing banking services to parties who then aided Hezbollah). If laundering money for intermediaries can show substantial assistance for an aiding and abetting ATA claim, then the wide range of support Sudan is alleged to have provided directly to al Qaeda can hardly fall short. Thus, the Plaintiffs have shown the elements necessary to sustain their ATA aiding and abetting claim.

R&R 49-51.

## V.   PLAINTIFFS' STATE TORT LAW CLAIMS ARE NOT PREEMPTED AND THE AMENDED COMPLAINTS SET FORTH THE REQUIRED STATE LAW ELEMENTS

Again recycling arguments that it previously litigated and lost, Sudan maintains that the enactment of § 1605A and § 1605B should be interpreted as preempting state tort law claims against foreign sovereigns. This argument, which Sudan has coined as "closing the gateway," has been rejected by the Courts that have addressed it. *Owens IV,* 864 F.3d at 809 (Congress did not intend to foreclose access to state tort law); *Leibovitch*, 697 F.3d at 567-69 ("[A]lthough 1605A created a new cause of action it did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity.").

JASTA made this all the more clear.  It was enacted to "provide civil litigants with the broadest possible basis to seek relief against persons, entities, and foreign countries." JASTA, § 2(b). That declared purpose stands at fundamental odds with Sudan's implausible claim that Congress intended to eliminate significant rights of terrorism victims contrary to the expressed purpose of JASTA, and without saying so much as a word.  Further, JASTA's immunity exception applies broadly to "tortious acts" of foreign states, *see id.* § 3(b), and the only limitation Congress placed on its reach was that foreign states shall not be subject to jurisdiction "on the basis of an omission or tortious act or acts that constitute mere negligence." *Id.* § 3(d). The inclusion of that provision would make no sense if Sudan's preemption theory were correct, as Congress already would have eliminated any such tort claims.

When Congress created these new remedies to bolster the rights of terrorism victims, it did not eliminate existing rights. To find otherwise would distort the plain text of the statutes and run afoul of the fundamental statutory presumption that Congress did not intend to supplant state law. *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981).

Magistrate Judge Netburn correctly determined that Plaintiffs have shown the necessary intent for the intentional tort claims of assault and battery, and that the *Ashton* Plaintiffs had complied with the New York statute of limitations by filing its original claims within a year of September 11, 2001. R&R 56-57.

## VI.    ALIEN TORT CLAIMS ACT

The Alien Tort Claim Act ("ATCA"), 28 U.S.C. § 1350, is a jurisdictional statute that confers federal question jurisdiction over any civil action by an alien for a tort committed in violation of the law of nations. Conspiracy to commit and aiding and abetting a terror organization to carry out an aircraft hijacking is a violation of international law that provides a basis for a concerted action claim of material support by alien-plaintiffs injured as a result of 9/11. *In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d 765, 825 (S.D.N.Y. 2005). The Amended Complaints plausibly allege ATCA claims that Sudan violated international law through its conspiracy and aid to al Qaeda, and that Sudan's conspiracy and aid was a substantial factor in causing the sequence of events that led to the 9/11 Attacks and that the 9/11 Attacks were a reasonably foreseeable consequence of Sudan's conspiracy and aid. Section I, *supra.* Magistrate Judge Netburn correctly held that Plaintiffs have satisfied the three elements of an Alien Tort Claim. R&R 60-61.

24

Dated:  December 6, 2022

Respectfully submitted,

 /s/ Andrew J. Maloney, III
James P. Kreindler, Esq.
Steven R. Pounian, Esq.
Andrew J. Maloney, III Esq
Megan Bennett, Esq.
KREINDLER & KREINDLER, LLP
485 Lexington Avenue
New York, NY 10017
Tel:  (212) 687-8181

Dorothea M. Capone, Esq.
BAUMEISTER & SAMUELS, P.C.
One Exchange Plz 15th Fl.
New York, NY 10006
Tel:  (212) 363-1200

Jeanne Marie O'Grady, Esq.
SPEISER, KRAUSE, NOLAN & GRANITO
140 East 45th Street
New York, NY 10017
Tel:  (212) 661-0011

*Attorneys for Plaintiffs*