

KREINDLER & KREINDLER LLP | 485 Lexington Avenue | New York, NY 10017-2629
office: 212.687.8181 | fax: 212.972.9432 | www.kreindler.com

February 21, 2023

<u>VIA ECF</u>
The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

   Re: *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

  The *Ashton* Plaintiffs write in response to the Kingdom of Saudi Arabia's February 16, 2023 letter, ECF No. 8863, including its proposal to schedule briefing related to a "renewed motion" to dismiss. *Ashton* counsel received no advance notice of Saudi Arabia's proposals and were not included in meet-and-confer discussions held before the letter was filed.[1] We wrote to Saudi Arabia's counsel objecting to the approach set forth in the letter and stating our own proposals, Exhibit 1. We now present our positions to the Court.

  The *Ashton* Plaintiffs request that the Court hold a conference with all parties to address the status of the case and hear arguments regarding any potential schedule for jurisdictional motions. This status conference is necessary to assist in the proper examination of sharply contested legal issues and the uniquely complex factual record in this MDL.

  **1. Before any schedule for motions is set, this Court should take steps to remedy the unfair prejudice to Plaintiffs from the extraordinary production delays and the serious deficiencies in Saudi Arabia's discovery**

  Notwithstanding Plaintiffs' sustained best efforts, the discovery process in this case has been hampered by extraordinary delays. Additionally, new documents released under Executive Order 14040 (EO), as well as the Metropolitan Police Service (MPS) production, have exposed serious deficiencies in Saudi Arabia's discovery. For example, as detailed below, while this Court previously accepted the arguments of Saudi Arabia's counsel to narrowly restrict discovery of the Saudi intelligence agency, newly released FBI reports confirm that Omar al Bayoumi was a Saudi spy reporting to the Saudi Embassy, and that Fahad al Thumairy was similarly linked to Saudi intelligence.

  Plaintiffs are entitled to receive fair and complete interrogatory answers and document discovery. Before any schedule for jurisdictional motions is set, this Court should take steps to remedy the unfair prejudice that has occurred, and grant leave to Plaintiffs to bring a motion to compel Saudi Arabia to provide discovery, including supplementary answers to interrogatories,

---

[1] *Ashton* counsel include current members of the Plaintiffs' Executive Committee for Death and Injury Claims and should be included in any communications with opposing counsel. We have raised these concerns with other Committee members.

based on searches for and production of information held by Saudi Arabia's intelligence agencies, including its General Intelligence Directorate. The unfair prejudice to Plaintiffs that has already occurred should not be further compounded by acceding to Saudi Arabia's proposals for deadlines that would thwart Plaintiffs' rights to rely and litigate upon a fair and full record before the Court.

This Court's declaration with regard to Saudi Arabia at a January 13, 2020 hearing that "[the Court] view[s] formal paper discovery to now be over" imposed untimely limits on production based on an incomplete record, and enabled Saudi Arabia to unfairly evade its discovery obligations.[2] Saudi Arabia now submits that fact discovery was "completed" in June 2021, ECF 8863 at 4, yet the EO declassification review and production of U.S. government documents—which overturned at least in part the government's prior invocation of the "State Secrets" doctrine—did not even begin until September 2021. Production under the EO ultimately continued in incremental tranches until August 2022. Key underlying evidence in the sole possession of the FBI (which should have been produced in response to Plaintiffs' April 2018 subpoena) remains outstanding.[3] In addition, the MPS production, containing important documents and information, was not received by Plaintiffs until the end of March 2022.[4]

The Court imposed deadlines that forced the Plaintiffs to conduct the depositions of Saudi government officials by the end of June 2021 without the benefit of the EO or MPS productions. ECF 6546 at 10. After the issuance of the EO, the Court ordered Plaintiffs to submit expert reports by April 1, 2022 – but denied Plaintiffs' request to extend that deadline, notwithstanding delays in the EO production. ECF 7752. The resulting schedule meant that Plaintiffs' expert reports were due within days of receiving a large majority of the EO and MPS materials, thereby depriving Plaintiffs' experts of a proper opportunity to study and analyze those materials before finalizing their reports.

Saudi Arabia has to date avoided discovery about the actual roles of Saudi government agents Fahad al Thumairy and Omar al Bayoumi in what a newly produced EO document, compiled by the FBI in July 2021, describes as the "Saudi (Wahhabi) / Salafi / militant network" that "was created, funded, directed and supported by the KSA [Kingdom of Saudi Arabia] and its affiliated organizations and diplomatic personnel within the U.S." Ex. 3 at EO 3482. The FBI specifically verified the involvement of Saudi intelligence with that network. Ex. 3 at EO 3490.

At the very outset of discovery, Saudi Arabia successfully argued at a May 2018 conference that it need not search for and produce relevant information and documents from its

---

[2] Jan. 13, 2020 Conference at 43. In December 2021, Plaintiffs moved on an expedited basis for discovery regarding three religious officials employed by Saudi Arabia (Adel al Sadhan, Mutaeb al Sudairy, and Omar Abdi Mohamed) that was necessary for their expert reports due on April 1, 2022. Plaintiffs' motion was denied by Judge Daniels in his February 7, 2023 decision, long after the expert deadline and without the benefit of the new information from EO and MPS documents produced in the intervening period, which shed more inculpatory light on these three officials.
[3] Plaintiffs are still working to obtain specific evidence in the possession of the U.S. government — including numerous "substantive records" (a term used in the EO to describe original evidence such as telephone records and banking records, ECF 7091-1, at 3) — which is referenced in the EO production but has not yet been produced. For example, the production identifies telephone toll records of a cell phone used by Omar al Bayoumi that the FBI believed was used by one or both of the 9/11 hijackers, and which Bayoumi called frequently "during the period of time they all resided in San Diego," Ex. 2, EO 2798.
[4] The FBI had previously received and analyzed the materials from the MPS, but the FBI produced only a small subset of the MPS materials in its own production.

intelligence agencies about the work of Omar al Bayoumi and Fahad al Thumairy in the U.S. May 24, 2018 Conference at 23-31.[5]  Less than three weeks later, Saudi Arabia served its answers to interrogatories which swore that Bayoumi was in the U.S. solely "to pursue his education"; did not have "any other job with, responsibility to, or assignment or instruction from Saudi Arabia"; and, that "Saudi Arabia is not currently aware of any person who supervised, oversaw, provided direction to, or received reports from Al Bayoumi."[6]  The EO production revealed that the FBI obtained contrary information showing that Bayoumi was working inside the U.S. as a Saudi government agent:

> **In the late 1990's and up to September 11, 2001, Omar Albayoumi was paid a monthly stipend as a cooptee of the Saudi General Intelligence Presidency (GIP) via then Ambassador Prince Bandar bin Sultan Alsaud.  The information Albayoumi obtained on persons of interest in the Saudi community in Los Angeles and San Diego and other issues, which met certain GIP intelligence requirements, would be forwarded to Bandar.**

Ex. 4 at EO 2638-39 (bold added).[7]  The findings in this FBI Report that Bayoumi worked as part of a Saudi government intelligence reporting chain to Saudi Ambassador Bandar are independently supported by other recently received record evidence that demands careful, cumulative analysis.

Citing to materials in the public record alone,[8] support is found in: witness statements in the EO production regarding Bayoumi's suspected status as a Saudi spy and his intelligence collection activities[9]; Bayoumi's numerous phone calls to the Saudi Embassy in Washington and the Saudi Consulate in Los Angeles[10]; Bayoumi's extraordinary pay history from Saudi government contractors Dallah Avco and Ercan through phony job positions[11]; and myriad details regarding Bayoumi's preparation of a close-knit support network for the 9/11 hijackers, bringing them to San Diego and providing them with housing, communications, transportation, and other assistance, and assigning others to assist them in navigating and assimilating into life

---

[5] Later reaffirmed by this Court in a November 2019 ruling.  ECF 6579 at 12-16. Saudi Arabia only produced documents that its intelligence agency may have collected from other Saudi Ministries following the 9/11 Attacks.
[6] KSA's June 12, 2018 Amended Objections and Responses at 16-18.
[7] See also Ex. 5 at EO 3283.  A "cooptee" is a specific term used by U.S. intelligence agencies meaning a "[f]oreign official or visitor tasked to do particular tasks, such as spotting potential recruits or servicing drops." See e.g. U.S. Department of Defense publication "Hostile Intelligence Threat," DoD 5200.1-PH-2 (Nov. 1988), at 19.
[8] Throughout this brief, we have cited only from public documents released under the EO.  Plaintiffs' proposed motion to compel discovery from Saudi Arabia will additionally rely upon a significant volume of materials that are presently confidential, including documents and other important information from the MPS production.
[9] See, *inter alia*, FBI report of interview on 10/03/2001: "Albayoumi is considered by many in the Muslim community to be a Saudi Arabian intelligence officer, as he would come to the Mosque and videotape everything," Ex. 6 at EO 1847; FBI report of interview on 09/27/2001: witness "did not trust Al-Bayoumi and felt that he was a[n] undercover agent for Saudi Arabia," Ex. 7 at EO 2070; and FBI report of interview on 01/09/2008, witness "commented that everyone, NFI, in the San Diego Muslim community thought Al Bayoumi was a spy for the Saudi Government. Al Bayoumi would video tape every event that took place in the community which was of concern to many." Ex. 8 EO 290.
[10] Ex. 9 at EO 458 (Bayoumi had made at least 141 calls to Saudi government entities in Washington and a further 34 calls to Saudi government entities in Los Angeles.)
[11] See, *inter alia*, Ex. 3 at EO 3517 ("Omar Albayoumi was one of the ghost employees.")

February 21, 2023
Page 4

in America.[12]  Finally, by way of rationale for Bayoumi's documenting the hijackers' activities, introductions, and the support he gave them, Ambassador Bandar himself publicly admitted in a 2011 interview that "Saudi security was actively following the movements of most of the terrorists [in the United States] with precision."[13]  Taken as a whole, these materials show that Saudi Arabia submitted false interrogatory answers and knowingly withheld relevant information about the role and responsibilities of its agent Omar al Bayoumi inside the U.S.

Saudi Arabia's interrogatory Answers were similarly false in respect of Fahad al Thumairy, claiming that it was unaware of any person supervising or directing Thumairy or who reported to Thumairy.[14]  The EO production notes that "Al-Thumairy, like Al-Bayoumi, was a possible Saudi Arabian intelligence asset", Ex. 10 at EO 2802; that Thumairy reported to Embassy officials, including Khalid al Sowailem and Musaed al Jarrah, and was assigned to lead a team of religious employees in California[15]; that "Jarrah was one of the known GIP [intelligence] officers in the MIA [Islamic Affairs] section", Ex. 3 at EO 3488; and that the Director of the King Fahad Mosque where Thumairy was Imam, Khalil al Khalil, was also believed to work for Saudi intelligence.[16]

The EO production also reveals that there were a total of 67 phone calls between Thumairy and Bayoumi,[17] and that in late 1999 Thumairy personally received a telephone call from "an individual from Malaysia,"[18] who had "asked for ALTHUMAIRY and stated that 'the guys' [understood to be Hazmi and Mihdhar] were coming in and needed to be picked up at the airport."[19]  The EO production also confirms that upon their arrival in Los Angeles the hijackers were brought immediately to the King Fahad Mosque to meet Thumairy.[20]

Saudi Arabia has never fairly answered interrogatories based on the complete information in its possession, including from Saudi intelligence agencies, about the activities of Omar al Bayoumi and Fahad al Thumairy.  At the very least, Plaintiffs are entitled at this time to file a motion to compel such answers and the production of further relevant documents.

## 2. The schedule for resolution of the outstanding jurisdictional issues

a. Saudi Arabia's scheduling request is premature.  In addition to remedying the discovery issues described above, it remains appropriate for the Court to defer any schedule for handling the jurisdictional issues until resolution of the pending motions brought by the *Ashton* and *CAC* plaintiffs, ECF 8870 and ECF 8864, concerning Judge Daniels' February 7, 2023

---

[12] Ex. 16 at 7-10.  In this regard, Plaintiffs also previously submitted the Declaration of Steven Moore, who led the FBI's PENTTBOM investigations at its Los Angeles Field Office, that his team believed that Bayoumi was a Saudi intelligence agent, ECF 3780-4 at 2.
[13] Interview with Al-Arabiyya, 2011; CNN re-broadcast at: https://www.youtube.com/watch?v=ZAw_nT8DZp4.
[14] KSA's June 12, 2018 Amended Objections and Responses at 13-16.
[15] The EO reported that Thumairy "oversaw the disbursement of Saudi money to Saudi[-employed] religious workers in San Diego," and described Thumairy's close degree of involvement in the day-to-day affairs of those he managed. Ex. 11 at EO at 722.
[16] Ex. 3 at EO 3487-88.
[17] Ex. 12 at EO 2757.
[18] Ex. 13 at EO 520.
[19] Ex. 14 at EO 3612.
[20] Ex. 15 at EO 598.

February 21, 2023
Page 5

Order, ECF 8862, holding that aiding-and-abetting liability was not available in Plaintiffs' cases against Saudi Arabia under the Justice Against Sponsors of Terrorism Act (JASTA).[21]

      **b.**    Any schedule on the jurisdictional issue should be based on a simultaneous exchange by the parties of their respective motions and submissions. The *Ashton* Plaintiffs are prosecuting their own separate complaint and plan to submit their own motion papers, as was done on Saudi Arabia's prior motion to dismiss. We propose a deadline for the initial exchange of papers of four months from the date of the Court's order arising from the pre-motion status conference, given the substantial and complex tasks entailed in assembling the relevant record. We further propose that the parties exchange opposition papers three months after the initial papers, and reply papers one month after the opposition papers. A schedule requiring simultaneous exchanges of papers will streamline the motion process to afford sufficient, equal time to each side.[22] No side should have the "last word;" rather, each side should be given the same opportunity and number of pages to present its arguments to the Court.

      Saudi Arabia's proposal fails to account for the motions that Plaintiffs will bring to establish jurisdiction and to hold a jurisdictional fact hearing; similarly, Saudi Arabia fails to address the fact that it bears the ultimate burden of persuasion on the jurisdictional issue. *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 560 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1069, 208 L. Ed. 2d 531 (2021) ("Once the plaintiff has met its initial burden of production, the defendant bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply. In other words, the ultimate burden of persuasion remains on the party seeking sovereign immunity.") (internal citations omitted). Continued failure to acknowledge its own burdens on the motion should be regarded as a concession on Saudi Arabia's part that it will be subject to jurisdiction once Plaintiffs meet their initial burden of production. The parties' submissions should include their respective statements of facts; outstanding discovery; exhibit and witness lists; *in limine* challenges (including as to experts); and legal memoranda.

      **c.**    This Court should set a single brief with an expanded page limit to permit the parties a sufficient opportunity to raise the issues of their choosing. We propose initial briefs of 100 pages for each side; opposition briefs of 100 pages; and reply briefs of 25 pages.

      Saudi Arabia's proposal to submit separate *Daubert* motions for each witness is unwieldy, needlessly confusing, and excessive.[23] Since any *Daubert* issues will substantially overlap with the facts to be presented on the jurisdictional motions, there is no need for separate *Daubert* motions in this non-jury case. The Court should order any challenges to the experts' testimonies and their weight to be addressed together with the facts. We believe that fairness and efficiency are best served by setting a single, aggregate page limit and requiring each side to decide how to present its arguments in a single set of motion papers.

---

[21] Your Honor previously recognized the need for deferral of all further proceedings until such time as Plaintiffs' "pending motions under Rule 54" could be resolved. ECF 8542.

[22] Saudi Arabia again argues that Plaintiffs should first file an initial jurisdictional statement of facts in order to avoid a "potential sandbag," ECF 8863 at 1. This argument is bogus. Saudi Arabia has the benefit of the entire case record to review and rely upon in making its submissions, including Plaintiffs' expert reports with supporting documents.

[23] Saudi Arabia's proposal, ECF 8863 at 3, would lead to multiple submissions totaling 200 pages (plus replies) on *Daubert* issues — which is *double* the number of pages Saudi Arabia proposes on the main jurisdictional issue.

Respectfully,

KREINDLER & KREINDLER LLP

By: /s/ *Steven R. Pounian*
Steven R. Pounian, Esq.
James P. Kreindler, Esq.
Andrew J. Maloney, Esq.
Megan W. Benett, Esq.
James Gavin Simpson, Esq.
485 Lexington Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: spounian@kreindler.com
*Attorneys for Ashton Plaintiffs*

SPEISER KRAUSE, PC
Frank H. Granito, III, Esq.
Douglas A. Latto, Esq.
Jeanne M. O'Grady, Esq.
800 Westchester Avenue, Suite S-608
Rye Brook, New York 10573
Tel: (914) 220-5333
*Attorneys for Ashton/Burlingame Plaintiffs*

BAUMEISTER & SAMUELS, P.C.
Michel F. Baumeister, Esq.
Dorothea M. Capone, Esq.
140 Broadway, 46th Floor
New York, New York 10005
Tel: (212) 363-1200
*Attorneys for Ashton/Bauer Plaintiffs*