**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**



--------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/3/2023__

**03-MD-01570 (GBD)(SN)**

**REPORT &**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge:**

**To GEORGE B. DANIELS, United States District Judge:**

This document relates to:

> Mandelkow et al. v. Islamic Republic of Iran, No. 20-cv-00315
> Alcabes et al. v. Islamic Republic of Iran, No. 20-cv-00340
> Anderson et al. v. Islamic Republic of Iran, No. 20-cv-00354
> Ahearn et al. v. Islamic Republic of Iran, No. 20-cv-00355
> Asciutto et al. v. Islamic Republic of Iran, No. 20-cv-00411
> Amin et al. v. Islamic Republic of Iran, No. 20-cv-00412
> Basci et al. v. Islamic Republic of Iran, No. 20-cv-00415

      646 plaintiffs from seven cases in this multidistrict litigation seek partial final default

judgments against the Islamic Republic of Iran. ECF Nos. 8346, 8350, 8354, 8358, 8362, 8369,

8373.[1] The Court has granted similar motions and awarded damages to people who were injured,

killed, or lost immediate family members in the 9/11 Attacks. These motions address two new

categories of victims: (1) people who developed chronic and ultimately fatal medical conditions

after 9/11-related environmental exposures; and (2) their immediate family members. This

Report and Recommendation discusses the attendant questions of liability and damages for these

claims under the Foreign Sovereign Immunities Act. It recommends awarding damages to the

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

estates of those who died from latent injuries ("Latent Injury Decedents") and denying motions for default judgment brought by their family members ("Surviving Family Members").

## BACKGROUND[2]

On September 11, 2001, Astronaut Frank Culbertson watched from the International Space Station as smoke billowed from lower Manhattan, where al Qaeda had piloted two commercial airliners into the Twin Towers.[3] Two hundred miles beneath him, chaos consumed the crash sites in New York, Washington, DC, and Shanksville, PA. Even as thousands of people fled burning jet fuel and buckling steel at Ground Zero and the Pentagon, a legion of first responders and volunteers ran toward the destruction to render aid.

## I.     9/11 Environmental Exposures

On that day, and in the months of search, rescue, and cleanup that followed, first responders and ordinary civilians breathed a toxic combination of fumes, smoke, and particulates loaded with asbestos, silica, metals, concrete, and glass. See 9.11 World Trade Ctr. Health Program, Ctrs. for Disease Control & Prevention, Toxins and Health Impacts (January 24, 2023), https://www.cdc.gov/wtc/exhibition/toxins-and-health-impacts.html. Those environmental exposures are linked to aerodigestive conditions, cancers, and other fatal diseases. Id.

The Latent Injury Decedents are among the first responders and civilians who were exposed to the hazardous conditions created by the 9/11 Attacks. They developed severe medical conditions, including pulmonary fibrosis, asthma, and various types of cancer. Despite treatment, each eventually succumbed to these conditions.

---

[2] The Court assumes familiarity with this multidistrict litigation and summarizes only the procedural and factual background relevant to these motions.
[3] @Sept11Memorial, Twitter (Sept. 4, 2017, 1:17 PM),
https://twitter.com/Sept11Memorial/status/904755198924599297.

II.     **September 11th Victim Compensation Fund**

In the aftermath of the attacks, Congress passed the Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. § 40101 note). That statute created the original Victim Compensation Fund ("VCF1"), which was designed to "provide compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes" of 9/11. 49 U.S.C. § 40101 note. The program lapsed three years later, ECF No. 5484 at 2, but was revived in 2010 with the James Zadroga 9/11 Health and Compensation (Zadroga) Act, Pub. L. No. 111-347, 124 Stat. 3623 (2011) (codified at 26 U.S.C. § 5000C, 42 U.S.C. § 300mm, and 49 U.S.C. § 40101 note), and permanently authorized in 2019 by the Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez Permanent Authorization of the September 11th Victim Compensation Fund Act, Pub. L. No. 116-34, 133 Stat. 1040 (2019) (codified at 49 U.S.C. § 40101 note). Besides creating the current Victim Compensation Fund ("VCF"), these statutes established the World Trade Center Health Program ("WTC Health Program") to provide medical monitoring and health services to certain first responders and other attack survivors. Zadroga Act § 101.

Under the current VCF regime, claimants are entitled to compensation if they can, among other things, show that:

(1)     they were present at a "crash site" between September 11, 2001, and May 30, 2002;

(2)     they suffered a "WTC-Related Physical Health Condition" or injury; and

(3)     their injury or condition was a "direct result" of the crashes or the rescue, recovery, or debris-removal efforts.

28 C.F.R. § 104.2. To qualify, a claimant must be examined by the WTC Health Program or a private physician and obtain a certification that his 9/11-related exposure was "substantially likely to be a significant factor in aggravating, contributing to, or causing" his condition. 42

U.S.C. § 300mm-22(a)(1)(A)(i). Once approved, the claimant—or, in the case of a decedent, a personal representative—receives an eligibility decision letter from the VCF confirming the agency's findings.

The VCF recognizes two types of claims by decedents: "personal injury claims" for victims who "died of causes unrelated to 9/11," and "deceased claims" for victims whose deaths were "caused by . . . eligible 9/11-related conditions." Sept. 11th Victim Compensation Fund, Dep't of Justice, VCF Policies and Procedures – Section 6: Deceased Victims (Nov. 16, 2022), https://www.vcf.gov/policy/deceased-victims. Eligibility for the former claim requires only that a doctor determine that the condition was caused by 9/11-related exposures. Id. The second additionally requires a doctor to determine that the 9/11-related condition was the cause of death. Id.

Before seeking default judgment, representatives of the Latent Injury Decedents submitted VCF claims as described above. Each received an eligibility decision letter from the VCF stating that "the decedent has been found eligible for" certain 9/11-related illnesses. See, e.g., ECF No. 8348-4 at 3. The VCF eligibility decision letters filed by Plaintiffs do not indicate which type of VCF claim the representative pursued.

## DISCUSSION

Plaintiffs ask the Court to hold Iran liable for 9/11-linked latent injuries and consequent damages via these default judgment motions. "No judgment by default shall be entered by a court of the United States . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). In evaluating the record, the Court may "accept as true the plaintiffs' uncontroverted evidence," including affidavits. Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); see Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 19 (D.D.C. 2002). For Plaintiffs to

4

prevail, the Court must find that (1) it has subject matter jurisdiction; (2) it has personal jurisdiction; (3) Iran defaulted; (4) Iran is liable; and (5) damages are appropriate. The Court addresses each in turn.

## I.      Subject Matter Jurisdiction

The Foreign Sovereign Immunities Act ("FSIA") is the "sole basis for obtaining jurisdiction over a foreign state" in American courts. Samantar v. Yousef, 560 U.S. 305, 314 (2010). It provides district courts with subject matter jurisdiction over: "1) nonjury civil actions, 2) for claims seeking relief in personam, 3) against a foreign state, 4) when the foreign state is not entitled to immunity under the FSIA." Ben-Yishai v. Syrian Arab Republic, No. 18-cv-03150 (RCL), 2022 WL 17250344, at *5 (D.D.C. Nov. 28, 2022). The nature of the suit (a FSIA action with no right to a jury trial) and the case caption (identifying the state of Iran, not its property, as the defendant) satisfy the first three requirements. The fourth, Iran's immunity, turns on § 1605A(a).

Section 1605A(a) provides an exception to the general rule that foreign states are immune from suit. 28 U.S.C. §§ 1604, 1605A. The so-called "terrorism exception" authorizes suits by United States nationals seeking "money damages" from "state sponsor[s] of terrorism" that— directly or through an "official, employee, or agent . . . acting within the scope" of his duties— engaged in or provided "material support or resources for" an "act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking" that "caused" "personal injury or death." § 1605A(a).

The § 1605A(a) elements "almost total[ly] 'overlap'" with the § 1605A(c) cause of action plaintiffs assert here. Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 369 (D.D.C. 2020) (quoting Foley v. Syrian Arab Republic, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)) (noting that § 1605A(c) applies to a more limited set of plaintiffs than § 1605A(a)). Indeed, a qualifying

"plaintiff that offers proof" of one "has also established" the other. Id. As such, the Court has collapsed the jurisdictional and liability inquiries and discusses both below. See, e.g., id. It exercises jurisdiction over claims for which it finds liability and lacks jurisdiction over the remainder.

## II.    Personal Jurisdiction

"Under the FSIA, . . . personal jurisdiction equals subject matter jurisdiction plus valid service of process." Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1020 (2d Cir. 1991). Having provisionally dispensed with subject matter jurisdiction, the remaining issue is whether Iran was properly served.

Section 1608(a) "prescribes a hierarchy of four alternative procedures to use when serving process on a foreign state." Finamar Invs. Inc. v. Republic of Tadjikistan, 889 F. Supp. 114, 116 (S.D.N.Y. 1995). In descending order of preference, they are: (1) service by a "special arrangement" between the plaintiff and the foreign state; (2) service by an applicable international convention on the service of judicial documents; (3) service by mail "requiring a signed receipt"; and (4) diplomatic service aided by the State Department. 28 U.S.C. § 1608(a). Plaintiffs have no "special arrangement" with Iran, so the first option is unavailable. See ECF Nos. 8347 at 6, 8351 at 6, 8355 at 6, 8359 at 6, 8365 at 6, 8370 at 6, 8374 at 6. Iran is not party to an applicable international convention, so the second option is also unavailable. See id. Plaintiffs attempted service by the third option, registered mail with return receipt requested. See ECF Nos. 8347 at 7, 8351 at 7, 8355 at 7, 8359 at 7, 8365 at 7, 8370 at 7, 8374 at 7. Iran refused receipt, and the documents were returned to counsel's office. See id. Finally, Plaintiffs effected service via diplomatic channels. See ECF Nos. 8347 at 7–8, 8351 at 7–8, 8355 at 7–8, 8359 at 7–8, 8365 at 7–8, 8370 at 7–8, 8374 at 7–8. Service was thus valid under the FSIA. That, in combination with subject matter jurisdiction, gives the Court personal jurisdiction over Iran.

### III.    Default

Default judgment is appropriate only where the defendant has failed to appear. Under the FSIA, foreign sovereigns must "serve an answer or other responsive pleading . . . within sixty days after service" is completed, 28 U.S.C. § 1608(d), as recorded in the "certified copy of the diplomatic note," § 1608(c)(1) (defining effective date of service made under § 1608(a)(4)). In the 60 days after Plaintiffs effected service, Iran failed to respond or otherwise appear in this multidistrict litigation. Accordingly, the Clerk of Court entered certificates of default against Iran in each of the seven cases. Mandelkow, No. 20-cv-00315, ECF No. 28; Alcabes, No. 20-cv-00340, ECF No. 26; Anderson, No. 20-cv-00354, ECF No. 21; Ahearn, No. 20-cv-00355, ECF No. 24; Asciutto, No. 20-cv-00411, ECF No. 25; Amin, No. 20-cv-00412, ECF No. 26; Basci, No. 20-cv-00415, ECF No. 27.

### IV.    Liability Under § 1605A

Section 1605A(c) provides a cause of action for claims (1) brought by a United States national or her representative (2) against a designated state sponsor of terrorism that (3) directly, or through a state official, employee, or agent, committed or provided material support or resources for (4) "an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking" that (5) caused (6) personal injury or death.[4] 28 U.S.C. § 1605(a)(1), (c).

---

[4] The courts are split as to the requirements of § 1605A(c). Some say that the provision requires plaintiffs to articulate a claim sounding in tort. In Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran, 313 F. Supp. 3d 50 (D.D.C. 2018), for example, the district court explained that "[i]n order to satisfy the statutory elements of causation and injury, plaintiffs in actions arising under companion [§] 1605A(c) 'must articulate the justification for such recovery, generally through the lens of civil tort liability.'" Id. at 61 (quoting Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 176 (D.D.C. 2010)). On this interpretation, the plaintiff "'must identify a particular theory of tort liability—e.g., intentional infliction of emotional distress, wrongful death, [or] battery'—to properly pursue a § 1605A(c) claim. Id. (quoting Stansell v. Republic of Cuba, 217 F. Supp. 3d 320, 341 (D.D.C. 2016)). Other courts simply analyze the elements of § 1605A(c) as written in the statute, using background tort principles where necessary or

Plaintiffs' claims easily meet five of these six elements. First, the relevant plaintiffs or victims were all United States citizens on September 11, 2001. ECF Nos. 8348 at ¶ 10, 8352 at ¶ 10, 8356 at ¶ 10, 8360 at ¶ 10, 8367 at ¶ 10, 8371 at ¶ 10, 8375 at ¶ 10. Second, Iran has been a designated state sponsor of terrorism since 1984. Bureau of Counterterrorism, U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Feb. 22, 2023). Third, as the Court previously found, Iran "provided direct support to al Qaeda specifically for the [9/11 Attacks]." In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-01570 (GBD), 2011 WL 13244047, at *40 (S.D.N.Y. Dec. 22, 2011) ("Havlish I"); see also Anderson v. Islamic Republic of Iran, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (permitting courts "in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced"). Fourth, "the 9/11 attacks and the resulting deaths constitute 'extrajudicial killings.'" Havlish I, 2011 WL 13244047, at *39. And as to the sixth element, the Latent Injury Decedents suffered injury and death, while their Surviving Family Members suffered emotional distress. See In re Grossman, 538 B.R. 34, 41 (Bankr. E.D. Cal. 2015) (relying on Restatement (Second) of Torts to hold that "personal injury" included "emotional distress"); ECF Nos. 8348, 8352, 8356, 8360, 8367, 8371, 8375 (collecting VCF letters and declarations documenting injury, death, and emotional distress).

The only question is whether Plaintiffs can show causation under § 1605A(c). Courts interpret § 1605A(c) causation using "'well-established principles of law, such as those found in

_____

useful. See, e.g., Roberts v. Islamic Republic of Iran, 581 F. Supp. 3d 152, 173 (D.D.C. 2022) (analyzing § 1605A(c) claims without referencing theory of tort liability).

The Court declines to recommend one or the other approach at this time because the choice is not outcome determinative as to either the Latent Injury Decedents or the Surviving Family Members. Out of caution and where helpful, the Court draws on both approaches to analyze liability.

[the] Restatement (Second) of Torts and other leading treatises.'" Bodoff v. Islamic Republic of Iran, 907 F. Supp. 2d 93, 103 (D.D.C. 2012) (cleaned up). Those principles require Plaintiffs to demonstrate "proximate cause," Roberts, 581 F. Supp. 3d at 170, a characteristically opaque term for "scope of liability," Restatement (Third) of Torts: Liab. for Physical & Emotional Harm 6 Special Note (2010). The Court applies these principles first to claims brought by Latent Injury Decedents and then turns to claims brought by Surviving Family Members.

### A. Latent Injury Decedents

The Latent Injury Decedents allege that they were exposed to environmental toxins because of the 9/11 Attacks, which led to serious and ultimately fatal medical conditions. Their estates submitted VCF letters confirming that they suffered "physical harm . . . as a direct result of the [9/11] crashes or the rescue and recovery efforts or debris removal." 28 C.F.R. § 104.2(b)(3); see ECF Nos. 8348-4, 8352-4, 8356-4, 8360-4, 8367-4, 8371-4, 8375-4 (VCF letters). And their surviving family members document in moving detail how those conditions eventually cut their lives short. See ECF Nos. 8348, 8352, 8356, 8360, 8367, 8371, 8375 (collecting family declarations in attached exhibits).

These facts meet the two-pronged test for proximate cause endorsed in Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017), vacated and remanded on other grounds by Opati v. Republic of Sudan, 140 S. Ct. 1601 (2020). Under Owens, a proximate cause finding is appropriate where plaintiffs show that (1) the defendant's actions were a "'substantial factor' in the sequence of events that led to" their injuries, and (2) their injuries were "'reasonably foreseeable or anticipated as a natural consequence'" of the defendant's conduct. Id. at 794 (quoting Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013)).

First, Iran's tortious conduct was a "substantial factor" leading to the Latent Injury Decedents' deaths. Id. The Court has already found that Iran's "provision of material support to

al Qaeda" was a substantial factor leading to the 9/11 Attacks. Havlish I, 2011 WL 13244047, at

*41. All that is needed, then, is to connect the 9/11 Attacks to the Plaintiffs' latent injuries. They

seek to do so through their VCF eligibility determination letters, which reflect the agency's

conclusion that a person's injuries were a "direct result" of the 9/11 Attacks. 28 C.F.R. § 104(a).

The VCF issues these letters only after a physician determines that a person's "exposure to

airborne toxins, any other hazard, or any other adverse condition resulting from the [9/11

Attacks] . . . is substantially likely to be a significant factor in aggravating, contributing to, or

causing the illness or health condition." 42 U.S.C. § 300mm-22(a)(1)(A)(i). In short, the VCF

letters tell us that 9/11 triggered the Latent Injury Decedents' illnesses.

The VCF and the WTC Health Program are best positioned to evaluate these medical

facts. Together these programs leverage the expertise of medical experts and rigorous research.

See World Trade Center Health Program; Addition of Certain Types of Cancer to the List of

WTC-Related Health Conditions, 77 Fed. Reg. 56138, 56141–42 (Sept. 12, 2012) (to be codified

at 42 C.F.R. pt. 88) (describing scientific processes for adding medical conditions to a list of

potential 9/11-related illnesses, emphasizing reliance on peer-reviewed epidemiological

evidence). And the eligibility determination process incorporates robust procedural protections.

See Sept. 11th Victim Compensation Fund, Dep't of Justice, VCF Claim Review Process (Mar.

2019), https://www.vcf.gov/sites/vcf/files/resources/VCFProcess.pdf (outlining process for

submitting VCF claims and seeking review of VCF eligibility decisions). The Court is confident

in the quality of the conclusions the VCF reaches and sees no reason to duplicate these efforts by

requiring MDL plaintiffs to submit medical records and retain medical experts. Accordingly, the

Court accepts the VCF eligibility determination letters as evidence establishing that 9/11 was a substantial factor leading to the Latent Injury Decedents' medical conditions.[5]

For evidence that 9/11 was a substantial factor also in their deaths, the Court must look beyond the VCF letters. As noted above, the VCF can certify decedents as eligible for compensation on two grounds, only one of which requires finding that the 9/11-related illness was the cause of death. See Sept. 11th Victim Compensation Fund, Dep't of Justice, VCF Policies and Procedures – Section 6: Deceased Victims (Nov. 16, 2022), https://www.vcf.gov/policy/deceased-victims. It is unclear from Plaintiffs' exhibits which type of determination the VCF made. See ECF Nos. 8348-4, 8352-4, 8356-4, 8360-4, 8367-4, 8371-4, 8375-4 (VCF letters). Thus, the VCF letters establish only that each decedent's medical condition was linked to 9/11.[6] Declarations from family members, however, reasonably establish that each Latent Injury Decedent died from 9/11-related conditions.[7] See ECF Nos. 8348 at ¶ 7, 8352 at ¶ 7, 8356 at ¶ 7, 8360 at ¶ 7, 8367 at ¶ 7, 8371 at ¶ 7, 8375 at ¶ 7 (counsel's attestations that 9/11 caused decedents' deaths, as described in attached declarations from family members). The Court credits these representations and finds that, together with the VCF letters and the Court's Havlish I findings, the evidence establishes that Iran's conduct was a substantial factor leading to the Latent Injury Decedents' deaths.

_____

[5] A caveat: three VCF letters purport to assess the injuries of the *personal representatives*, rather than the *decedents*. For these estates, the Court's finding is contingent on the provision of additional evidence. See Appendix A for further details and instructions.
[6] In future motions, evidence confirming that a VCF eligibility decision letter was issued for a "deceased claim" rather than a "personal injury claim" may obviate the need for extraneous proof of cause of death, such as a death certificate.
[7] Another caveat: two estates filed evidence that does not clearly connect the VCF-approved medical conditions to the decedents' causes of death. For these estates, the Court's finding is contingent on the provision of additional evidence. See Appendix A for further details and instructions.

Second, these deaths were a "reasonably foreseeable" consequence of Iran's material support to al Qaeda. The Court has previously found that Iran's material support for al Qaeda proximately caused the 9/11 Attacks and the resulting deaths, which necessarily means that those deaths were reasonably foreseeable. Havlish I, 2011 WL 13244047, at *41. The only question is whether Plaintiffs' deaths after prolonged 9/11-linked illnesses are different in legally salient ways.

Basic principles of tort law require answering this question in the negative. "While a plaintiff must establish that a harm was within the ambit of reasonably foreseeable risk, a plaintiff need not demonstrate that the precise manner in which the [harm] happened, or the extent of the injuries, was foreseeable." Aegis Ins. Services, Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 177 (2d Cir. 2013) (cleaned up); see also Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 29 cmt. o (2010) (explaining that the "manner of harm" is "irrelevant . . . so long as the harm is foreseeable"). Accordingly, Latent Injury Decedents need not show that particular kinds of latent injuries were foreseeable, or that those injuries foreseeable caused their deaths. It is enough that explosions caused by commercial aircrafts slamming into buildings inevitably created an unsafe environment for the survivors of the immediate impact. Carcinogens from building materials, gases, and jet fuel created hazardous conditions, so the latent injuries and deaths caused by those conditions were reasonably foreseeable.

This finding is buttressed by the Restatement's support of broad liability for intentional torts. It counsels that "[a]n actor who intentionally causes harm is subject to liability for that harm even if it was unlikely to occur" and advises courts to consider "the moral culpability of the actor" and the "seriousness of harm intended" when analyzing the scope of a defendant's

liability. Id. § 33. Thus, although an individual cancer or respiratory disorder may be statistically

unlikely, Iran's culpability in the grave harm caused by terrorist attacks favors imposing liability.

The Latent Injury Decedents' claims pass both the "substantial factor" and "reasonable

foreseeability" tests, so the Court concludes that Iran proximately caused their latent injuries.

Owens, 864 F.3d at 797. It follows that the Court has subject matter jurisdiction under

§ 1605A(a), it has personal jurisdiction over Iran, and Iran is liable for 9/11-linked latent injuries

under § 1605A(c). The Court therefore recommends granting the Latent Injury Decedents'

motions for default judgment.

### B.    Surviving Family Members

Surviving Family Members seek solatium damages after their immediate family members

died from latent injuries and illnesses linked to 9/11. Solatium claims are "indistinguishable

from" intentional infliction of emotional distress ("IIED") claims under the FSIA. Valore v.

Islamic Republic of Iran, 700 F. Supp. 2d 52, 85 (D.D.C. 2010).

"The Restatement (Second) of Torts § 46 has traditionally guided this Court in deciding

who [can] recover solatium damages in FSIA § 1605A cases." Davis v. Islamic Republic of Iran,

882 F. Supp. 2d 7, 14 (D.D.C. 2012) (collecting cases). Section 46 states:

> (1) One who by extreme and outrageous conduct intentionally or
> recklessly causes severe emotional distress to another is subject to
> liability for such emotional distress, and if bodily harm to the other
> results from it, for such bodily harm.
>
> (2) Where such conduct is directed at a third person, the actor is
> subject to liability if he intentionally or recklessly causes severe
> emotional distress (a) to a member of such person's immediate
> family who is present at the time, whether or not such distress results
> in bodily harm.

In the terrorism context, when immediate family members bring "bystander" claims

under § 46(2), courts have dispensed with the presence requirement in recognition that terrorists

aim not only to murder but to effect change by instilling fear in the surviving community.

Terrorist attacks are designed to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1), (5). In that sense, "'a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families.'" Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 29 (D.D.C. 2008) (quoting Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 328 (D.D.C. 2006). For these reasons, courts allow surviving immediate family members to recover solatium damages even if they did not witness the attack. See, e.g., ECF No. 2618 at 10–11.

The Surviving Family Members ask the Court to hold that al Qaeda "intentionally or recklessly caused" the injuries they suffered when their immediate family members died of a 9/11-related latent injury. Such a holding would extend liability beyond the scope previously permitted in terrorism cases.

The Court first recognizes that among the Surviving Family Members are people who married a decedent or were born after 2001. Courts that have considered similar plaintiffs have concluded that terrorist acts are not directed at family members who lacked a relationship with the victim at the time of the attack. In Davis, for example, the district court dismissed solatium claims of children who were born after their fathers were injured in a terrorist attack because it would create "a potentially unlimited class," which could "remain open for decades after a terrorist attack." Id. The court recognized the need to avoid "such an expansive and indefinite scope of liability" under the FSIA and dismissed their claims. Id.; see also Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 46 (D.D.C. 2014) (dismissing claims of children born after terrorist attack; noting the potential for liability to be created "fifteen years after an attack").

But the concern raised in <u>Davis</u> of creating a potentially unlimited class counsels against authorizing claims even for Surviving Family Members whose relationships to the decedents pre-dates 9/11. To avoid an indefinite scope of liability, courts require a plaintiff to establish proximate cause. Proximate cause confines a defendant's liability to "those harms that have a reasonable connection" to the defendant's conduct. <u>Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.</u>, 191 F.3d 229, 235 (2d Cir. 1999). In other words, there must be a "'direct relation between the injury asserted and the injurious conduct alleged.'" <u>Id.</u> (quoting <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258, 268 (1992)). If that relationship is "too attenuated," it cannot support liability. <u>Lerner v. Fleet Bank, N.A.</u>, 318 F.3d 113, 123 (2003), abrogated on other grounds by <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118 (2014), as recognized by <u>Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.</u>, 821 F.3d 352 (2d Cir. 2016).

<u>Kinsman Transit Co. v. City of Buffalo</u>, 388 F.2d 821 (2d Cir. 1968), is instructive. There, the "defendant's ship broke loose, crashing into and collapsing a bridge, such that the debris disrupted river traffic and caused damage to plaintiffs' businesses that depended on that traffic." <u>Laborers Local 17 Health & Benefit Fund</u>, 191 F.3d at 236 (describing <u>Kinsman Transit</u> ruling). Even though the harm to the plaintiffs' businesses was "foreseeable," the court held that those injuries "were too remote to permit recovery." <u>Id.</u>

Similarly here, "'the . . . recitation of the chain of causation alleged by the plaintiffs is perhaps the best explanation of why'" Iran is not liable for their injuries. <u>Lerner</u>, 318 F.3d at 123 (quoting <u>Newton v. Tyson Foods, Inc.</u>, 207 F.3d 444, 447 (8th Cir. 2000)). The Surviving Family Members allege that Iran's support for al Qaeda led to the 9/11 Attacks, which created an environmental hazard that exposed the Latent Injury Decedents to toxins that, years later, caused

severe medical conditions, which eventually resulted in their family members' deaths, and that those deaths—not the immediate shock and terror from the attack—caused the plaintiffs' emotional injuries. Even if their injures were foreseeable, that "chain of causation is far too long to constitute proximate cause." MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP, 43 F. Supp. 3d 309, 314 (S.D.N.Y. 2014) (cleaned up). The Court therefore declines to impose liability on Iran for the Surviving Family Members' claims.

The Court does not reach this conclusion lightly. As always, it is mindful of the extraordinary loss plaintiffs in this litigation have experienced—a loss that is no less profound because it came years after the 9/11 Attacks. This decision is not a referendum on that loss or the value of the plaintiffs' relationships with their families. Some will consider it an arbitrary line to draw. But the Court must draw lines, and they must be based in the law. This decision reflects settled tort principles that limit the scope of liability for emotional harms and define proximate cause. On this record, the Court cannot find that the Surviving Family Members have demonstrated causation. For the same reasons, Plaintiffs cannot establish jurisdiction under § 1605A(a). The Court therefore recommends dismissing the Surviving Family Members' claims.

## V.     Damages Under § 1605A

The Court does not write on a blank slate when addressing damages. Various factors are relevant to calculating pain and suffering damages, including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 46 (D.D.C. 2012). Here, the Court must determine how to compensate Latent Injury Decedents for the pain and suffering they experienced when they developed 9/11-related illnesses and ultimately died. Of course, no amount of money can offset the sacrifices

16

they made or the harm they suffered. Any number the Court chooses will feel inadequate. The best it can aim for is consistency in its damages assessments. The Court therefore begins by looking to its previous awards in this multidistrict litigation.

The Court has awarded damages for pain and suffering to two other categories of plaintiffs. First, the Court awarded $2 million to the estates of those killed in the 9/11 Attacks (the "estate plaintiffs"). ECF No. 2618 at 9. The Court recognized that some of the victims may have died instantly and some may have suffered for hours before succumbing to injuries. Id. at 8–9. Typically, such varied experiences would support individualized pain-and-suffering awards, but the Court concluded that it would be impossible to make defensible, case-by-case assessments. Id. at 9. It therefore approved a standard amount for pain and suffering for each estate plaintiff. Id.

The second category includes people who were injured on 9/11 but survived (the "personal injury plaintiffs"). For these individuals, the Court has awarded a baseline of $7 million, with an opportunity for an upward or downward departure. ECF No. 5879 at 6. The Court based its order on the framework described in Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24 (D.D.C. 2012), which set a baseline of $5 million but permitted departures. ECF No. 5879 at 3. The Court reasoned that personal injury plaintiffs in this MDL were entitled to an elevated baseline number because they "cannot escape the memory of 9/11." Id. at 5 (recognizing the "life-altering effect [9/11] had on so many people" and "the heroism that ordinary men and women displayed when an act of terror turned their lives upside down").

The Court draws from its experience adjudicating both categories of claims. Like the estate plaintiffs, it is difficult to meaningfully distinguish one person's experience from another. Because of their 9/11-related environmental exposures, the Latent Injury Decedents developed

serious, painful health conditions that required years of treatment before ultimately killing them. Like the personal injury plaintiffs, they lived with the physical and emotional consequences of the 9/11 Attacks for many years. Their deteriorating health served as a constant reminder of the harrowing experiences of that day. For these reasons, the Court agrees that a framework with a baseline award and opportunities for upward or downward departures is appropriate for plaintiffs with latent injuries.

Plaintiffs request baseline awards of $7 million for all but two estates. The Court agrees that the Latent Injury Decedents should be awarded a baseline of $7 million as a reflection of the "severe" nature of the medical conditions that killed each plaintiff. It addresses the remaining two estates next.

**Mark Harris** was a firefighter who was buried in the rubble of the South Tower for nine hours before escaping. See ECF No. 8367-13 at 15–18. While working to rescue others, he found himself trapped in an air pocket amid heat so intense he lost both corneas when he removed his contact lenses. See id. Since then, he suffered back and neck pain and respiratory problems from the ground glass particles in his lungs. See id. His lung functionality dropped to 28%; he could not breathe without an oxygen mask. Id. Later he developed thyroid cancer and Hodgkin's lymphoma. See id. He lost all his teeth. See id. His tongue was completely removed and reconstructed using skin and veins from his arms. See id. He required a feeding tube for over a year, had to re-learn how to eat, speak, and drink, and never regained the use of his arms. See id. He suffered almost weekly heart attacks during chemotherapy and began losing his memory. See id. These injuries are analogous to those the Court has previously found to be "devastating"— "loss of limbs or multiple digits," "paraplegia," "significant disfigurement," and "strokes." ECF

No. 5879 at 8. The Court recommends awarding Mr. Harris's estate $10 million in pain and suffering damages.

**Ronald Coyne** was an EMT for the New York City Fire Department who was at Ground Zero aiding the evacuation when the South Tower collapsed. See ECF No. 8348-13 at 28–31. He took cover in an SUV, where he became trapped when it flipped over. See id. He managed to escape but sustained second degree burns on his neck and back. See id. After the Attacks, he suffered from severe respiratory problems that at times meant rushing him to the hospital. See id. 9/11 also took a mental toll on Mr. Coyne; he had difficulty sleeping and sought therapy. See id. Then, in February 2012, Mr. Coyne suffered from an enlarged pancreas. See id. While he was in the hospital seeking treatment, he picked up a new infection that compromised his kidneys and required placing him in a medically induced coma. See id. When he died in June 2013, his autopsy showed a severe pancreas infection, colon polyps, and acute bronchopneumonia. See id. These injuries are undoubtedly "severe," but they lack the hallmarks of the "devastating" injuries that warrant an upward departure. ECF No. 5879 at 7–8. "Burns," "psychological injuries," and "severe pulmonary or neurological traumas," all fall into the category of "severe" injuries, even where surgeries or lengthy hospital stays are required. Id. Many first responders, including other Latent Injury Decedents, experienced similarly difficult illnesses. The Court therefore recommends awarding Mr. Coyne's estate $7 million in pain and suffering damages.

## CONCLUSION

The Court recommends GRANTING the motions for partial default judgment brought on behalf of the Latent Injury Decedents and DENYING the motions for partial default judgment brought by Surviving Family Members. It recommends awarding Latent Injury Decedents damages as described in Section V and as listed in the attached exhibit, awarding prejudgment

interest of 4.96 percent compounded annually running from September 11, 2001, until the date of judgment, and permitting them to apply for punitive, economic, or other damages at a later date.

SARAH NETBURN
United States Magistrate Judge

DATED:      March 3, 2023
            New York, New York

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). These objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**APPENDIX A**

The Court recommends the following awards for the estates of the Latent Injury Decedents, represented by personal representatives as indicated in the Plaintiffs' exhibits. See ECF Nos. 8348-2, 8352-2, 8356-2, 8360-2, 8367-2, 8371-2, 8375-2. Instructions regarding estates marked with one (*) or two (**) asterisks are appended below.

| Estate | Case | Damages |
|---|---|---|
| Accurso, Victor L. | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Acevedo, Steven J. | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Achong, Charles William | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Armenta, Daniel Victor | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Askin, Haskell | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Atlas, Keith Edward | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Barocas, Sheldon | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Bastidas, Mario | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Becker, Arthur S. | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Behette, Michael | Basci, No. 20-cv-00415 | $7,000,000 |
| Benson, Charles Michael | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Bohlmann, John | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Borowski, Alfred | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Brenneisen, Ronald Robert | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Bruzza, James | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Buck, Rebecca A. | Amin, No. 20-cv-00412 | $7,000,000 |
| Byrd, Henry Bruce | Ahearn, No. 20-cv-00355 | $7,000,000 |
| Campbell, Maryann | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Cao, Miao Ling | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Carlock, Owen Thomas | Basci, No. 20-cv-00415 | $7,000,000 |

| | | |
|---|---|---|
| Carroll, Norma | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Casaletto, Victor** | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Cassella, Joseph Patrick | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Chirico, Pat | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Christofilakes, Christopher | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Codner, Robert Royce | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Costello, James Nicholas | Basci, No. 20-cv-00415 | $7,000,000 |
| Coyne, Ronald Thomas | Ahearn, No. 20-cv-00355 | $7,000,000 |
| DeFrancisci, Thomas | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Dellacona, Richard A. | Ahearn, No. 20-cv-00355 | $7,000,000 |
| Devlin, John Charles | Basci, No. 20-cv-00415 | $7,000,000 |
| Dillon, John Charles | Amin, No. 20-cv-00412 | $7,000,000 |
| Doepfner, Thomas P. | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Dong, John | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Drobchinskiy, Aleksandr | Amin, No. 20-cv-00412 | $7,000,000 |
| Eysser, George | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Ferguson, Charles | Ahearn, No. 20-cv-00355 | $7,000,000 |
| Finck, Kenneth John | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Finelli, Nicholas Gerard | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Fitzpatrick, Joseph Francis, Sr. | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Garipoli, Christine Noelle | Ahearn, No. 20-cv-00355 | $7,000,000 |
| Goggin, John Edward | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Gonzalez, Fernando Augusto | Ahearn, No. 20-cv-00355 | $7,000,000 |
| Gunzelman, Charles Richard | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Haberland, Wayne Kenneth | Amin, No. 20-cv-00412 | $7,000,000 |

| | | |
|---|---|---|
| Halpin, John James | Ahearn, No. 20-cv-00355 | $7,000,000 |
| Harris, Mark | Basci, No. 20-cv-00415 | $10,000,000 |
| Henry, Keith Owen | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Hess, Robert M. | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Hittmann, Stephan | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Hough, John Joseph | Amin, No. 20-cv-00412 | $7,000,000 |
| Humphrey, Nancy Alicia | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Iannace, Arthur Bartolomeo | Amin, No. 20-cv-00412 | $7,000,000 |
| Jones, Marion Claire* | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Kahanov, Phoebe Catherine | Amin, No. 20-cv-00412 | $7,000,000 |
| Kelly, James Joseph | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Krasko, Geraldine | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Kristoffersen, John Frank | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Laks, Mitchell David | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Lampkin, Michael | Asciutto, No. 20-cv-00411 | $7,000,000 |
| LaPointe, John Paul | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Loughery, Michael John | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Lynch, Joseph W. | Asciutto, No. 20-cv-00411 | $7,000,000 |
| Machado, Alberto | Asciutto, No. 20-cv-00411 | $7,000,000 |
| MacMenamie, Duane F. | Asciutto, No. 20-cv-00411 | $7,000,000 |
| MacPherson-Williams, Gwynne K. | Basci, No. 20-cv-00415 | $7,000,000 |
| Mandelkow, James William, Jr. | Mandelkow, No. 20-cv-00315 | $7,000,000 |
| Marcucci, Daniel | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Marion, Timothy Charles | Alcabes, No. 20-cv-00340 | $7,000,000 |
| Marshall, James J. | Ahearn, No. 20-cv-00355 | $7,000,000 |

| | | |
|---|---|---|
| Martin, Joseph James | <u>Alcabes</u>, No. 20-cv-00340 | $7,000,000 |
| Mausberg, Gary Gerald | <u>Alcabes</u>, No. 20-cv-00340 | $7,000,000 |
| Mazur, Steven | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| McCain, Robert Kenner, Jr. | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| McCoy, Stephen M. | <u>Alcabes</u>, No. 20-cv-00340 | $7,000,000 |
| McKee, John Patrick | <u>Alcabes</u>, No. 20-cv-00340 | $7,000,000 |
| McQuade, Kevin Patrick | <u>Alcabes</u>, No. 20-cv-00340 | $7,000,000 |
| Miller, Trevor Arnold | <u>Alcabes</u>, No. 20-cv-00340 | $7,000,000 |
| Morigi, Paul Steven | <u>Alcabes</u>, No. 20-cv-00340 | $7,000,000 |
| Morrissey, John Patrick | <u>Alcabes</u>, No. 20-cv-00340 | $7,000,000 |
| Mucaria, Marilyn | <u>Basci</u>, No. 20-cv-00415 | $7,000,000 |
| Munro, James Bronson | <u>Ahearn</u>, No. 20-cv-00355 | $7,000,000 |
| Murphy, Paul** | <u>Basci</u>, No. 20-cv-00415 | $7,000,000 |
| Mustillo, Michael | <u>Basci</u>, No. 20-cv-00415 | $7,000,000 |
| Negri, Robert Daniel, Jr. | <u>Ahearn</u>, No. 20-cv-00355 | $7,000,000 |
| Norfort, Michael Peter | <u>Ahearn</u>, No. 20-cv-00355 | $7,000,000 |
| Organ, Dennis M. | <u>Ahearn</u>, No. 20-cv-00355 | $7,000,000 |
| Ortiz, Milagros | <u>Basci</u>, No. 20-cv-00415 | $7,000,000 |
| O'Sullivan, Daniel | <u>Basci</u>, No. 20-cv-00415 | $7,000,000 |
| O'Toole, Joseph | <u>Basci</u>, No. 20-cv-00415 | $7,000,000 |
| Petrone, Robert | <u>Basci</u>, No. 20-cv-00415 | $7,000,000 |
| Phillips, Stephen E. | <u>Ahearn</u>, No. 20-cv-00355 | $7,000,000 |
| Quinn, Michael V. | <u>Basci</u>, No. 20-cv-00415 | $7,000,000 |
| Raimondi, Michael, Jr. | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Rappe, Larry Ordell | <u>Asciutto</u>, No. 20-cv-00411 | $7,000,000 |

| | | |
|---|---|---|
| Reilly, Robert J. | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Reingold, Albert | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| Relyea, Larry Scott | <u>Asciutto</u>, No. 20-cv-00411 | $7,000,000 |
| Rexach, Antolino | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Reynolds, Mary Elizabeth* | <u>Ahearn</u>, No. 20-cv-00355 | $7,000,000 |
| Rodenheiser, Richard Edmund | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Rolon, Robert | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Rooney, Kevin A. | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| Rossi, Robert Carlo | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| Rozenberg, Boris | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Sargent, Colin Michael | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Schiavone, James Anthony | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| Scoblic, Joseph M. | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| Shea, Michael Patrick | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Sheldon, William | <u>Ahearn</u>, No. 20-cv-00355 | $7,000,000 |
| Sherman, Howard Bernard | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Shipsey, Michael F. | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Siciliano, Donna | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| Simmons, Martin C. | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Skipton, Stephen E., Sr. | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| Smith, Michael Paul, Jr. | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| Steiner, Michael | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Svoboda, Frank Richard | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Switzer, William E. | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Thomas, George M. | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |

| | | |
|---|---|---|
| Turner-Cox, Vikki Allyn | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Vashovsky, Sam | <u>Amin</u>, No. 20-cv-00412 | $7,000,000 |
| Vaughan, Stephen | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Wallace-Rakis, Freddie* | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Walsh, Elizabeth Ann | <u>Anderson</u>, No. 20-cv-00354 | $7,000,000 |
| Waters, Gregory Alan | <u>Asciutto</u>, No. 20-cv-00411 | $7,000,000 |

**Estates with one asterisk (\*)**: The Court's liability findings are based in part on VCF letters confirming that a decedents' medical conditions were triggered by 9/11. After reviewing the letters filed by these estates, it appears that the VCF erroneously attributed decedents' medical conditions to their personal representatives. <u>See, e.g.</u>, ECF No. 8356-4 at 66 (VCF letter finding "John Rakis"—husband and personal representative of the late Freddie Wallace-Rakis—"eligible for the following injuries: ACUTE MYELOGENOUS LEUKEMIA"). Taken at face value, these letters do not establish that the decedents' medical conditions were caused by 9/11. The Court's recommended judgments and awards for these estates are therefore contingent on plaintiffs' filing supplemental evidence that either: (1) confirms and explains the VCF error; or (2) otherwise establishes that a physician determined that the decedent's medical condition was caused by 9/11. Any such evidence must be filed within the 14-day period for submitting objections to this Report and Recommendation.

**Estates with two asterisks (\*\*)**: As explained above, the Court's finding that 9/11-linked injuries caused each decedent's death is based on the combination of a VCF eligibility letter (which connects the medical condition to 9/11) and a supporting declaration (which connects the medical condition to the cause of death). After reviewing the declarations offered in support of these estates' claims, the Court finds discrepancies that prevent it from concluding that one or more of the conditions listed on the VCF letters caused the decedents' deaths. <u>Compare</u> ECF No. 8360-4 at 45 (VCF letter finding Victor Casaletto "eligible" for "MALIGNANT NEOPLASM – SKIN"), <u>with</u> ECF No. 8360-13 at 19 (declaration stating that Victor Casaletto "passed away from respiratory failure and end stage kidney disease"). The Court's recommended judgments and awards for these estates are therefore contingent on plaintiffs filing supplemental evidence that connects a 9/11-linked medical condition to the decedent's cause of death. Any such evidence must be filed within the 14-day period for submitting objections to this Report and Recommendation.