```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/6/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:

    TERRORIST ATTACKS ON
    SEPTEMBER 11, 2001

-----------------------------------------------------------------X

03-MD-01570 (GBD)(SN)

OPINION & ORDER

**SARAH NETBURN, United States Magistrate Judge:**

This document relates to:

    Federal Insurance Co., et al. v. Al Qaida, et al., No. 03-cv-06978
    Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al., No. 03-cv-09849
    Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al., No. 04-cv-01923
    Continental Casualty Co., et al. v. Al Qaeda, et al., No. 04-cv-05970
    Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al., No. 04-cv-07065
    Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al., No. 04-cv-07279

Defendant Dubai Islamic Bank ("DIB") moves to strike a "supplementary expert report" written by Jonathan Winer ("Winer"), the Plaintiffs' Executive Committees' (the "PECs") proposed expert. See ECF No. 7160.[1] In the alternative, DIB requests an opportunity to depose Winer, submit rebuttal expert reports, and file a revised motion under the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). See ECF No. 7160. The Court grants DIB's motion to strike.

## BACKGROUND

The parties engaged in extensive expert discovery through August 6, 2021.[2] During that period, the PECs identified Jonathan Winer, a lawyer and consultant, as an expert in:

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.
[2] The Court assumes familiarity with this multidistrict litigation and summarizes only the relevant procedural and factual background.

> Al Qaeda's pre-9/11 financial needs and sources of funding; the role of ostensible charities in providing funding and other resources to al Qaeda; the manner that support to al Qaeda enhanced al Qaeda's strike capabilities to enable it to carry out the 9/11 attacks; the types of programs ostensible charities exploited as cover to channel resources to al Qaeda; the existence or absence of internal records of ostensible charities supporting al Qaeda; financial improprieties and irregularities reflected in audits and financial documents of ostensible charities; whether, and if so, how, al Qaeda used its relationships with ostensible charities to channel resources to aligned terrorist organizations and causes; how those activities advanced al Qaeda's terrorist mission; the role of ostensible charities in providing support to al Qaeda pre-9/11 and in its immediate aftermath; the distinction, if any, between material support given for humanitarian purposes or terrorism purposes; the purpose and operation of the EO 13224 and UN designation programs; the significance and import of the U.S. government's engagements with Emirati officials concerning Dubai Islamic Bank prior to 9/11 and State Department spokesman James Foley's statements relating to those engagements, and the significance and import of the investigations and account closures described in the testimony of Alan Fine.

ECF No. 8345-3 at ¶ 7. Winer timely submitted affirmative and rebuttal reports ("Winer I" and "Winer II," respectively) and was deposed in July 2021. See ECF Nos. 7344-1, 7344-2.

**Winer I** asserts that Islamic charities supported al Qaeda by "recruit[ing]," "indoctrinating," "transport[ing]," "housing," and "providing fake work papers to" jihadists; "buying" and "stor[ing] . . . weapons" for its fighters; and providing "terrorist training camps," "office space," and "funds" for the terrorist organization. ECF No. 7344-1 at ¶ 3.5. Specifically, it addresses how "three major Saudi international charities . . . provided significant material support to al Qaeda." Id. at ¶ 3.11. And it explains that such charities exhibit a "recurrent pattern of deficient controls, missing funds, false invoicing, and other schemes." Id. at ¶ 3.9. Finally, it walks through terrorist sanctions programs administered by the United States and United Nations. See id. at ¶¶ 3.13–3.17. Winer I does not discuss DIB.

**Winer II** rebuts three categories of information addressed in other expert reports. First, it challenges findings that "the use of audits and other financial controls by the defendants . . .

2

pro[ve] that they maintained sufficient controls to prevent the Islamic charities from the risk of abuse for terrorist finance." ECF No. 7344-2 at ¶ 2.1. Second, it defends the "reliability and significance of U.S. government intelligence and terrorist designation reports." Id. at ¶ 3.1. Third, it attacks three reports denying the "role of Islamic charities in al Qaeda's financial infrastructure and the importance of that support to transforming al Qaeda into a sophisticated terrorist organization capable of carrying out global attacks." Id. at ¶ 4. Winer II does not discuss DIB.

After expert discovery closed, the parties filed bellwether Daubert motions and DIB moved for summary judgment. As of February 2022, the parties had fully briefed the motion challenging Winer's testimony. See ECF Nos. 7342, 7688. But at the parties' request, the Court stayed briefing on the motion for summary judgment in light of "discussions that the parties had hoped would obviate the need for the Court to decide DIB's motion." ECF No. 8089 at 1. Those discussions broke down in March, when the Central Intelligence Agency ("CIA") declassified a tranche of documents referencing DIB and its board members. See id. The Court ordered DIB to file its renewed motion for summary judgment on June 17, 2022. ECF No. 8096. Hours after it had done so, the PECs served DIB with a "supplementary" report written by Winer ("Winer III") discussing the contents of the declassified files. ECF No. 8345-1 (Winer III); see ECF Nos. 8126 (DIB's renewed motion for summary judgment), 8344 at 11 (describing timing of the PECs' disclosure).

**Winer III** discusses whether "DIB knowingly aided and abetted Bin Ladin and Al Qaeda to support terrorism, which culminated in the 9/11 terrorist attacks on the United States," and whether "DIB's senior management supported or were aligned with Bin Ladin and Al Qaeda's global jihad against the United States." ECF No. 8345-1 at 1.3.1–1.3.2. It relies on declassified

CIA documents, depositions of Dr. Hussein Hassan and Judge Alan Fine, documentary evidence produced by DIB, and other sources. See ECF No. 8345-1.

DIB moved to strike Winer III as procedurally improper and untimely under the Federal Rules of Civil Procedure and inadmissible under the Federal Rules of Evidence and Daubert. ECF No. 8343. As an alternative to exclusion, DIB requested an opportunity to re-depose Winer, submit rebuttal expert reports, and file a revised Daubert motion. Id. The PECs opposed DIB's motion. ECF No. 8471.

## DISCUSSION

Rule 26(a)(2)(D) of the Federal Rules of Civil Procedure[3] requires parties to disclose expert testimony "at the times and in the sequence that the [C]ourt orders." "If a party fails to provide information . . . as required," it may be subject to sanctions. Fed. R. Civ. P. 37(c)(1) (authorizing exclusion or other sanctions where a party fails to produce information as required under Rule 26(e)).

Winer III was labeled a "Supplementary Expert Report" and was produced on June 17, 2022, after both expert discovery and briefing on Daubert motions had closed. See ECF Nos. 8345-1, 8344 at 6. The PECs never sought, and the Court never granted, leave to file a supplemental expert report or reopen expert discovery. Because the Court did not permit Winer III's untimely filing, its admission turns on: (1) whether its late filing was authorized by the Rules; and (2) if not, what sanctions are warranted.

---

[3] Unless otherwise noted, subsequent citations to the Rules refer to the Federal Rules of Civil Procedure.

4

I.        **Winer III Is Not a Proper Rule 26(e) Supplement**

The PECs argue that Winer III qualifies as a "supplement[al] disclosure" under Rule 26(e). Rule 26(e) governs a party's duty to amend initial expert disclosures. Like most duties, it exists for the benefit of the opposing party, not the proffering one. Sandata Techs., Inc. v. Infocrossing, Inc., No. 05-cv-09546 (LMM)(THK), 2007 WL 4157163, at *7 (S.D.N.Y. Nov. 16, 2007). It requires the proffering party to supplement an expert's "report" or "deposition" if it learns that it is "in some material respect . . . incomplete or incorrect." Fed. R. Civ. P. 26(e).

Rule 26(e) does not give parties a free pass to supplement expert reports whenever they "'want[] to.'" Sandata, 2007 WL 4157163, at *4 (quoting Coles v. Perry, 217 F.R.D. 1, 3 (D.D.C. 2003)). If it did, every expert-worthy lawsuit would be stuck in disclosure purgatory, with parties producing supplemental reports any time it served their litigation strategies. See Cedar Petrochemicals, Inc. v. Dongbu Honnong Chem. Co., 769 F. Supp. 2d 269, 278 (S.D.N.Y. 2011) (explaining that experts cannot "'continually bolster, strengthen, or improve their reports'" or "'continually supplement their opinions'" (quoting Sandata, 2007 WL 4157163, at *6)).

Accordingly, courts impose certain limits on supplemental reports. They admit only those that address matters "within the scope of the initial expert report" and rely on information "'previously unknown or unavailable'" to the expert. Id. at 279-80. To illustrate, the court in Moore v. Keller, 498 F. Supp. 3d 335 (N.D.N.Y. 2020), admitted a supplemental affidavit because it "merely 'provide[d] evidentiary details' for opinions [the expert] ha[d] already expressed in his timely filed report." Id. at 349 (quoting Cedar Petrochemicals, 769 F. Supp. 2d at 279). Similarly, the Sandata court permitted limited supplementation based on new documents concerning an invention because the expert had "addressed [the significance of the invention] in his initial report." 2007 WL 4157163, at *10.

Winer III does not meet this standard. Its content falls decidedly outside the scope of Winer I and II. It addresses the alleged relationship between al Qaeda and DIB—a subject never discussed in Winer's original reports or at his deposition. See ECF Nos. 8345-1 at 3 (listing DIB-related questions Winer III sought to answer), 8471 at 16 (admitting that Winer I and II did not "specifically discuss *DIB's* role in financing Al Qaeda"). Indeed, Winer I and II fail to even mention DIB. Winer III therefore "does not supplement or correct [Winer's] previous theories" about al Qaeda's relationships, "but instead constitutes a new opinion." Coene v. 3M Co., 303 F.R.D. 32, 43 (W.D.N.Y. 2014).

The PECs try and fail to recast the scope of Winer's initial reports. They point to a January 17, 2020 expert witness list in which they posited that Winer would testify about DIB's ties to al Qaeda. ECF No. 8471 at 15 (citing ECF No. 8345-3 at ¶ 7). According to the PECs, that witness list "set[s] forth the scope of Mr. Winer's expert testimony" and is the baseline against which the Court should evaluate Winer III. Rule 26(e) directs otherwise. It permits parties to supplement expert "report[s]" and "deposition[s]," not witness lists.[4] Fed. R. Civ. P. 26(e). The "scope of the initial expert report" means the scope of Winer I and II. Cedar Petrochemicals, 769 F. Supp. 2d at 279. DIB is outside that scope.

The PECs then seek to excuse DIB's omission from Winer I and II. They contend that, without the declassified CIA reports, there was insufficient evidence for Winer to draw conclusions about DIB. ECF No. 8471 at 16. This line of argument fails to account for Winer III's heavy reliance on information other than the CIA reports. Whole portions of Winer's report

---

[4] A contrary rule would also encourage parties to draft expert witness lists as broadly as possible—even for experts who intend to offer narrow opinions—to reserve the option of supplementing a report or deposition after the close of discovery.

cite only depositions and discovery produced by DIB—evidence that was available long before the CIA declassified its intelligence assessments in March and April of 2022. See ECF No. 8345-1 at 13–17, 20–24. These sections are entirely independent of those premised on the CIA assessments and therefore cannot be justified as based on "previously unknown or unavailable" evidence. Moore, 498 F. Supp. 3d at 349 (cleaned up). The unavailability of CIA evidence thus does not explain why Winer I and II did not address DIB.[5]

Put simply, the PECs did not file Winer III because Winer I or II was "incomplete or incorrect." Fed. R. Evid. 26(e). Winer III does not "complete[]" or "enhance[]" the earlier reports. Supplement, Oxford Pocket Dictionary of Current English, https://www.encyclopedia.com/supplement (last visited Mar. 6, 2023). It was filed in response to new evidence about a defendant not named in Winer I or II. It falls outside the scope of Winer's original reports and relies heavily on previously available information. It is not a proper Rule 26(e) supplement, so the Court considers it an untimely expert report.

## II.    Sanctions Are Warranted Under Rule 37(c)

The Court next turns to the question of sanctions. Rule 37(c) designates exclusion as the default sanction for any violation that was not "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1). A court exercising its "considerable discretion" to order exclusion must consider the four Outley factors: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4)

---

[5] More to the point, if Winer did not have enough evidence to analyze DIB until the CIA released its assessments, the proper course of action would have been a motion to reopen expert discovery. No motion to reopen was filed.

the possibility of a continuance." Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc., 118 F.3d 955, 961 (2d Cir. 1997) (citing Outley v. City of New York, 837 F.2d 587, 590–91 (2d Cir. 1988)).

Courts employ the Outley factors in different ways. Some courts use them to inform the substantial-justification and harmlessness inquiries. See Precision Trenchless, LLC v. Saertex multiCom LP, No. 19-cv-0054 (JCH), 2022 WL 594096, at *22 (D. Conn. Feb. 28, 2022) ("[C]ourts in this Circuit weigh the Outley factors to determine whether a party's failure to comply with the requirements of Rule 26 was 'substantially justified' or 'harmless.'"); see, e.g., Pace v. Air & Liquid Sys. Corp., 171 F. Supp. 3d 254, 265 (S.D.N.Y. 2016) (applying the Outley factors without conducting separate substantial-justification and harmlessness analyses). Others treat substantial justification and harmlessness as threshold questions and use the Outley factors only if neither exception applies. See, e.g., Coene, 303 F.R.D. at 44–45 (making findings that violation was not substantially justified or harmless before analyzing appropriate sanctions under Outley). The Court applies the latter framework out of an abundance of caution.

The Court first evaluates whether the PECs have met their burden to show that their violation of discovery rules was substantially justified or harmless. See id. at 44 (explaining that the proffering party bears the burden of showing a Rule 37(c)(1) exception applies). Then, it turns to the appropriate sanctions.

A. **The PECs' Violation Was Neither Substantially Justified nor Harmless**

A party's violation is "substantially justified," Fed. R. Civ. P. 37(c), if a "'reasonable person'" would believe that "'parties could differ'" as to whether the conduct violated the discovery rules. Id. (quoting Kunstler v. City of New York, 242 F.R.D. 261, 264–65 (S.D.N.Y. 2007)). No reasonable person would believe that Winer III was timely filed. And for the reasons

canvassed above, no reasonable person would deem Winer III a proper Rule 26(e) supplement. See *supra* at 5–7. The PECs cannot justify their violation as a matter of reasonable disagreement.

Courts may also find a party's conduct substantially justified for equitable reasons. In Morel v. Daimler-Chrysler Corp., 259 F.R.D. 17 (D.P.R. 2009), for example, the court found "late disclosure . . . substantially justified because a critical expert witness died after the deadlines for discovery had passed." Id. at 20. Here, the parties present two contradictory views of the circumstances surrounding Winer III. The PECs say that the CIA's release of relevant documents warranted a new report. Standing alone, that might support a substantial justification finding. But as DIB notes, the PECs' actions following their receipt of new evidence paint a difference picture. They "did not seek leave of the Court to file a late declaration, nor did [they] confer with the defendant before doing so." Wannall v. Honeywell Int'l, Inc., 292 F.R.D. 26, 35–36 (D.D.C. 2013), aff'd sub nom. Wannall v. Honeywell, Inc., 775 F.3d 425 (D.C. Cir. 2014) (finding plaintiff's late disclosure "not 'substantially justified'" in part because of the "manner in which plaintiff submitted" the declaration). They produced Winer III the day DIB's motion for summary judgment was due, effectively "'sandbagging'" DIB with additional evidence. See Capitol Records, 2015 WL 1402049, at *29. And the report itself is mostly hearsay. See *infra* at 11–12. These facts suggest that the PECs produced Winer III to create a genuine issue of material fact on the eve of summary judgment. On these countervailing versions of events, the PECs cannot meet their burden to show that Winer III's late disclosure was "substantially justified." Fed. R. Civ. P. 37(c).

A discovery violation is "harmless," id., if the opposing party is not "'prejudice[d].'" Coene, 303 F.R.D. at 44 (quoting Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First, LLC, 280 F.R.D. 147, 158–59 (S.D.N.Y. 2012)). Courts routinely find prejudice where an

expert report is produced after discovery is complete. In these circumstances, the opposing party has no "opportunity to depose [the expert] concerning his new opinions" or produce rebuttal reports—and doing so would require "time consuming and expensive" discovery continuances. Id.; see also Wannall, 292 F.R.D. at 36. That is precisely the dilemma DIB faces here. Either it must proceed without re-deposing Winer or rebutting his new opinions, or it must face the monetary and practical costs of reopening discovery and postponing adjudication of the pending motion for summary judgment. The PECs cannot meet their burden to demonstrate that Winer III's late disclosure was "harmless." Fed. R. Civ. P. 37(c). As such, the PECs' violation does not qualify for either of Rule 37(c)'s get-out-of-jail-free cards.

>   B.  **Exclusion Is the Appropriate Sanction**

The PECs' unexcused violation of the discovery rules requires the Court to select an appropriate sanction. The four Outley factors govern this analysis: (1) the PECs' explanation for their failure to comply; (2) the importance of Winer's testimony; (3) any prejudice to DIB; and (4) the possibility of a continuance. Softel, 118 F.3d at 961.

**First**, the PECs offer no reasonable "'explanation for the failure to comply with the discovery order.'" Softel, 118 F.3d at 961 (quoting Outley, 837 F.2d at 590). They claim that Winer III is just a supplemental report analyzing previously unavailable documents. But Winer III relies heavily on evidence long available to the PECs. See ECF No. 8345-1 (relying on Hassan and Fine depositions). The PECs could have timely served an expert report discussing that evidence. Indeed, their witness list proves they considered it. See ECF No. 8345-3 at ¶ 7 (PEC witness list describing Winer's scope of expertise as including "the significance and import of the U.S. government's engagements with Emirati officials concerning Dubai Islamic Bank prior to 9/11 and State Department spokesman James Foley's statements relating to those engagements, and the significance and import of the investigations and account closures

described in the testimony of Alan Fine"). For whatever reason, they chose not to do so. See ECF Nos. 7344-1, 7344-2 (Winer I and II, which do not reference DIB). When they later had second thoughts, they tried to slip a report into the record, using the CIA's declassification of its files as an opportunity to correct an error. But the PECs cannot use the CIA to excuse their oversight. The declassification also does not explain their failure to proactively seek permission to offer a late report. See, e.g., Papyrus Tech. Corp. v. N.Y. Stock Exch., LLC, 257 F.R.D. 39, 43 (S.D.N.Y. 2009) (finding that the first Outley factor favored exclusion where the proffering party failed to take any of its "numerous opportunities . . . to alert the court of its need to supplement" an expert report). The first factor cuts in favor of exclusion.

**Second**, Winer's "precluded [testimony]" is of low "importance." Softel, 118 F.3d at 961. Expert testimony is only permissible—let alone, "importan[t]," id.—if it would "'aid the jury'" in understanding the issues and the evidence, Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). Winer III does almost nothing to help a jury understand the facts. The report consists largely of quotes (in plain English) from the declassified CIA documents, deposition transcripts, and other documentary evidence. See, e.g., ECF No. 8345-1 at 7–12. Winer offers little or no analysis of these quotes. See id. Stated differently, he relies on hearsay but fails to "bring to bear [his] terrorism expertise." Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 439 (E.D.N.Y. 2013). By nakedly "cut[ing] and past[ing]" from intelligence reports, Winer ensures that a juror could just as easily understand the evidence by reading a passage from the original CIA documents as by reading Winer III. Id. And because an expert cannot testify to "'lay matters which a jury is capable of understanding,'" it follows that Winer III is an improper use of expert testimony. In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (quoting Andrews v. Metro N. Commuter R.R. Co.,

11

882 F.2d 705, 708 (2d Cir. 1989)). As such, striking Winer III would not deprive the PECs of important testimony. The second factor favors exclusion.

**Third**, DIB faces "prejudice . . . as a result of having to prepare to meet the new testimony." Softel, 118 F.3d at 961. If the Court admitted Winer III, DIB would either be forced to take its chances at trial without deposing Winer on his new opinions or absorb the delay and "expense of conducting another deposition" and seeking rebuttal experts of its own. Sandata, 2007 WL 4157163, at *8 (finding prejudice). This litigation has already stretched decades, so further delay would be prejudicial. The third factor weighs in favor of exclusion.

**Fourth**, a "continuance" is not in the best interests of this litigation. Softel, 118 F.3d at 961. The Court has thoroughly considered the benefits and harms of ordering additional discovery. While reopening expert discovery could mitigate the prejudice to DIB associated with admitting Winer III, the PECs have not demonstrated that it is warranted here. Winer III simply does not provide evidence critical enough to further delay DIB's pending motion for summary judgment.[6] The fourth factor similarly supports exclusion.

The Outley factors universally favor excluding Winer III. Such a "'drastic remedy'" should never be ordered lightly. Ceglia, 287 F.R.D. at 158 (quoting Lent, 2011 WL 4575312, at *3). Nevertheless, other courts confronting similar facts have excluded expert reports. In Beller v. United States, 221 F.R.D. 696 (D.N.M. 2003), the court "excluded a supplemental expert report where the report was filed after the court's ordered deadline, the filing party did not seek or obtain leave of the court to modify case management deadlines, and opinions contained in the

---

[6] The Court also notes that the PECs could have spared themselves, DIB, and the Court this dilemma if they had served Winer III even one day earlier. Then, DIB could have requested an extension to the summary judgment briefing schedule to allow the parties to resolve the threshold expert issues first.

supplemental report differed from those in the earlier report." Leviton Mgf. Co. v. Nicor, Inc., 245 F.R.D. 524, 530–31 (D.N.M. 2007) (discussing Beller). By contrast, courts that admitted supplemental reports did so on distinguishable facts—in cases where reports were filed before the experts were deposed, Ceglia, 287 F.R.D. at 158; included only "minor changes, offered well in advance of trial," Lent, 2011 WL 4575312, at *3; or "'did not alter [the expert's] position' and 'did not include a new opinion which had not been previously disclosed,'" Cedar Petrochemicals, 769 F. Supp. 2d at 279 (quoting Lore v. City of Syracuse, No. 5:00-cv-1833 (HGM), 2005 WL 3095506, at *4 (N.D.N.Y. Nov. 17, 2005)).

Consistent with this jurisprudence, the Court strikes Winer III. Alternative sanctions would not effectuate the intent of the discovery rules, cure the prejudice to DIB, and allow this litigation to continue apace. Moreover, given the dubious importance of Winer III, precluding Winer's testimony on the topics discussed in this report is reasonable.

## CONCLUSION

DIB's motion to strike Winer III is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 8343.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:   March 6, 2023
         New York, New York