**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
In re:

                                                                    03-MD-01570 (GBD)(SN)

**TERRORIST ATTACKS ON SEPTEMBER 11, 2001**
-----------------------------------------------------------------------X
This document relates to:

    *Ashton, et al. v. al Qaeda Islamic Army, et al.,* 02-cv-6977 (GBD)(SN)

    AND ALL WRONGFUL DEATH ACTIONS FILED AGAINST THE TALIBAN

***ASHTON-DICKEY* PLAINTIFFS' MEMORANDUM OF LAW IN**
**SUPPORT OF MOTION TO CERTIFY AN INTERLOCUTORY APPEAL**
**UNDER 28 U.S.C. § 1292(b) AND REQUEST FOR A STAY OF ALL**
**PROCEEDINGS AGAINST THE TALIBAN PENDING THIS APPEAL**

Law Office of John F. Schutty, P.C.
Attorneys for the *Ashton-Dickey* Plaintiffs

445 Park Avenue, Ninth Floor
New York, New York 10022
Telephone: (646) 345-1441
Fax: (917) 591-5980
john@johnschutty.com

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

SUMMARY OF ARGUMENT ..............................................................................................6

ARGUMENT ..........................................................................................................................7

I.  The Interpretation of the ATA Presents a Controlling Question of Law That Can Resolve Thousands of Wrongful Death Claims in This Litigation. ...................................................7

II. There Are, at a Minimum, Substantial Grounds for Difference of Opinion About Who Qualifies to Pursue Wrongful Death Damages Under the ATA and When Wrongful Death Actions Had to Be Filed. ..........................................................................................7

   A.  The Statute's Plain Language and the "Canons of Construction" Support the *Ashton-Dickey* Plaintiffs' Reading of the ATA. ..........................................................................9

   B.  Enforcement of the ATA's Statute of Limitations Would Not Only Protect Plaintiffs Who Have Filed Timely Claims, Such Action Would Promote Important Institutional Interests of the Court – the Reduction of an Ever-Expanding, *Ad Infinitum* Docket. ...11

III. An Immediate Appeal Will Advance the Ultimate Termination of the Litigation & Will Resolve Uncertainty for Thousands of Plaintiffs. ...............................................................14

   A.  An Immediate Appeal Could Lead to the Prompt End of This Litigation for Thousands of Plaintiffs. ....................................................................................................................14

   B.  An Immediate Appeal Would Resolve Uncertainty for Thousands of Plaintiffs. ...........15

IV. The Wrongful Death Actions Against the Taliban Should Be Stayed Pending the Determination of the Interlocutory Appeal ........................................................................15

CONCLUSION ......................................................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. California,*
    530 U.S. 392 (2000) ................................................................................................................ 12

*Baker v. Cuomo,*
    58 F.3d 814 (2d Cir.), *vacated in part on other grounds*, 85 F.3d 919 (2d Cir. 1996)
    (en banc) (per curiam) ............................................................................................................ 8

*Boim v. Quranic Literacy Inst. & Holy Land Found.*
    291 F.3d 1000 (7th Cir. 2002) ................................................................................................ 3

*Brandon v. Travelers Ins. Co.,*
    18 F.3d 1321 (5th Cir. 1994) (abrogated on other grounds by, *Kennedy v. Plan Adm'r*
    *for DuPont Sav. and Inv. Plan*, 555 U.S. 285 (2009)) .......................................................... 10

*Burnett v. New York Cent. R.R. Co.,*
    380 U.S. 424 (1965) ................................................................................................................ 13

*Capitol Records, LLC v. Vimeo, LLC,*
    972 F. Supp. 2d 537 (S.D.N.Y. 2013) (Abrams, J.) ............................................ 7, 9, 14, 15

*Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail Rigging, LLC,*
    No. 11 Civ. 3238 (ALC) (GWG), 2015 WL 545565 (S.D.N.Y. Feb. 9, 2015) ................... 11

*City of New York v. Beretta U.S.A. Corp.,*
    401 F. Supp. 2d 244 (E.D.N.Y. 2005) .................................................................................. 15

*Cohen v. Beneficial Indus. Loan Corp.,*
    337 U.S. 541 (1949) ................................................................................................................ 6

*De Sylva v. Ballentine,*
    351 U.S. 570 (1956) ................................................................................................................ 10

*Donell v. Keppers,*
    835 F. Supp. 2d 871 (S.D. Cal. 2011) .................................................................................... 8

*Estates of Ungar ex reI. Strachman  v. Palestinian Auth.,*
    304 F.Supp.2d 232 (D.R.I. 2004) ........................................................................................... 2

*Geron v. Robinson & Cole LLP,*
    476 B.R. 732 (S.D.N.Y. 2012) .............................................................................................. 15

*In re Duplan Corp.,*
    591 F.2d 139 (2d Cir. 1978) ................................................................................................... 14

*Ivani Contracting Corp. v. City of New York*,
  103 F.3d 257 (2d Cir. 1997) ....................................................................................... 13

*J & J Sports Prods., Inc. v. Martinez*,
  2010 WL 1038467 (N.D. Cal. Mar. 2, 2010) ............................................................... 8

*Joe Hand Promotions, Inc. v. Tu Minh Nguyen*,
  2011 WL 1642306 (N.D. Cal. May 2, 2011) ............................................................... 8

*Kai Wu Chan v. Reno*,
  932 F. Supp. 535 (S.D.N.Y. 1996) .............................................................................. 11

*Klinghoffer v. S.N.C. Achille Lauro*,
  921 F.2d 21 (2d Cir. 1990) ...................................................................................... 5, 7

*Knox v. Palestine Liberation Organization*,
  442 F. Supp. 2d 62 (S.D.N.Y. 2006) ............................................................................ 2

*Koehler v. Bank of Bermuda Ltd.*,
  101 F.3d 863 (2d Cir. 1996) ...................................................................................... 16

*Lee v. Coughlin*,
  26 F. Supp. 2d 615 (S.D.N.Y. 1998) (Sotomayor, J.) .............................................. 15

*Leonhard v. United States*,
  633 F.2d 599 (2d Cir. 1980) ...................................................................................... 12

*Link v. Wabash R.R. Co.*,
  370 U.S. 626 (1962) ........................................................................................ 8, 12, 13

*Marx v. Gen. Revenue Corp.*,
  568 U.S. 371 (2013) ................................................................................................... 10

*McGourkey v. Toledo & Ohio Cent. Ry. Co.*,
  146 U.S. 536 (1892) ..................................................................................................... 4

*Mohawk Indus., Inc. v. Carpenter*,
  558 U.S. 100 (2009) ..................................................................................................... 5

*Nice v. Centennial Area School Dist.*,
  98 F. Supp. 2d 665 (E.D. Pa. 2000) ........................................................................... 10

*Obduskey v. McCarthy & Holthus LLP*,
  139 S. Ct. 1029 (2019) ............................................................................................... 10

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014) ..................................................................................................... 9

*Rampersad v. Deutsche Bank Sec., Inc.*,
  2004 WL 616132 (S.D.N.Y. Mar. 30, 2004) ............................................................... 8

*Rederi A/B Disa v. Cunard S.S. Co.*,
  389 U.S. 852 (1967) (Black, J., dissenting), (2d Cir. 1967) ................................. 4

*Rotella v. Wood*,
  528 U.S. 549 (2000) ................................................................................................. 13

*Shiekh v. Republic of Sudan*,
  308 F.Supp.3d 46 (D.D.C. 2018), *rev'd on other grounds by*, *Maalouf v. Republic of
  Iran*, 923 F.3d 1095 (D.C. Cir. 2019) ..................................................................... 12

*Taiwan Civil Rights Litig. Org. v. Kuomintang Bus. Mgmt. Comm.*,
  486 F. App'x 671 (9th Cir. 2012) ............................................................................. 8

*Transp. Workers Union of Am., Local 100 v. New York City Transit Auth.*,
  358 F. Supp. 2d 347 (S.D.N.Y. 2005) ...................................................................... 15

*United States v. Am. Trucking Ass'ns, Inc.*,
  310 U.S. 534 (1940) ................................................................................................. 9

*Will v. Hallock*,
  546 U.S. 345 (2006) ................................................................................................. 7

*Wright v. Rensselaer Cty Jail*,
  771 Fed.Appx. 58 (2d Cir. 2019) ............................................................................. 12

**Statutes**

Anti-Terrorism Act, 18 U.S.C. § 2333 ........................................................................... *passim*

28 U.S.C. § 1292(b) ...................................................................................................... *passim*

**Other Authorities**

National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, §
  1251(c), 126 Stat. 1632, 2017 (2013) ...................................................................... 11

Pub. L. No. 102-572, Title X, § 1003(a)(4), 106 Stat. 4506 ....................................... 1

137 CONG REC. S4511-04 (daily ed. Apr. 16, 1991) (statement of Sen. Grassley) ................... 3

Andrew S. Pollis, *The Need for Non-Discretionary Interlocutory Appellate Review in
  Multidistrict Litigation*, 79 Fordham L. Rev. 1643, 1646 (2011) ........................... 14

Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022) ...................................... 4

Federal Rule of Civil Procedure 60 ............................................................................. 11

## INTRODUCTION

The *Ashton-Dickey* Plaintiffs respectfully request that this Court certify for interlocutory appeal the March 30, 2023 "Memorandum Decision and Order" (the "Order") (MDL ECF#8973) affirming the Report & Recommendation of Magistrate Judge Sarah Netburn (ECF MDL#8929) (collectively, the "Order").  The Order adopts the reasoning of the Report & Recommendation in virtually all respects.  Accordingly, for convenience, this memorandum cites to the Order, but the arguments herein apply equally to the Report & Recommendation.

The Order meets all the requirements for interlocutory review.  Prompt appellate review is necessary to address controlling questions of law that could obviate the need for prolonged, costly, and complex litigation, and resolve uncertainty in terrorist actions brought not only in this Circuit but also in other federal courts throughout the United States—uncertainty that will be sown by an irreconcilable conflict between the interpretation of law adopted in the Order, on the one hand, the plain language and history of the Anti-Terrorism Act ("ATA"),[1] 18 U.S.C. § 2333, and the practical reality of not enforcing a statute of limitations against a defendant-in-default that encourages the filing of lawsuits *ad infinitum*.

***First***, the Order decided an issue of first impression in the Second Circuit – whether the estate administration laws of a decedent's domicile state, which definitively detail which "heirs" are qualified to receive wrongful death damages, are *preempted* by the ATA's statutory language (in § 2333) and/or the legislative history of the ATA (*viz.*, does the ATA's express language and/or its legislative history require the preemption of otherwise applicable state law).  This is a controlling question of law because the only claims asserted against the defendant-in-default (the

---

[1]      The ATA provides a private right of action for any United States national injured by an act of international terrorism.  18 U.S.C. § 2333 *et seq.*, is the civil remedies provision of the Anti-Terrorism Act, added Oct. 29, 1992, Pub. L. No. 102-572, Title X, § 1003(a)(4), 106 Stat. 4506, codified as amended.

Taliban) are based on: (1) state law and (2) the ATA.   If the *Ashton-Dickey* Plaintiffs'
interpretation of the statute is adopted, and if state law was never intended to be preempted by §
2333, the claims of thousands of plaintiffs would be dismissed in their entirety.   The parties
would certainly benefit from an immediate appellate review of the Order on this issue.

**Second**, there is at least substantial ground for difference of opinion regarding the proper
interpretation of the statutory language.   The *Ashton-Dickey* Plaintiffs contend that the precise
phrase "estate, survivors, or heirs" cannot be twisted and contorted to mean "immediate family
members" (whatever that latter phrase means in legal terms), as this Court determined.   The
Court adopted a reading of the ATA that simply cannot be squared with the plain language of the
statute ("estate, survivors, or heirs" = "immediate family members").   And, this Court's
interpretation of the phrase conflicts with the interpretation of the statute by the two district court
decisions,[2] cited in the Order (Order at 7-8 ) as supporting its interpretation, because both of
these decisions looked to the decedent's domicile to determine how the relevant language should
be interpreted, with one of those decisions stating in terms, absolutely contrary to the Order here,
that "[t]he ATA does not define the terms 'survivors' or 'heirs,' *terms that are usually defined by
state law*." *Knox v. Palestine Liberation Organization,* 442 F. Supp. 2d 62, 74 (S.D.N.Y. 2006).
Choice of law principles caused those two district judges to apply the law of Israel and that is the
only reason why damages were awarded to parents and siblings in those two cases (it was not
due to an "interpretation" of the language in the statute).   Those two decisions provide precedent

---

[2]      *Knox v. Palestine Liberation Organization,* 442 F. Supp. 2d 62, 74 (S.D.N.Y. 2006) ("*Knox*")
(the court applied the estate administration law of the decedent's domicile (Israel) in determining "heirs"
under the ATA) (Order at 7); *Estates of Ungar ex reI. Strachman v. Palestinian Auth.,* 304 F.Supp.2d
232, 261 (D.R.I. 2004) ("*Ungar*") ("the meaning of the terms "survivors" and "heirs" as used in § 2333(a)
cannot be determined by referring to the law of a particular [American] state. . . Israeli law provides that
[law]" in this instance because "Yaron Ungar had not been a resident of any state in this country since he
was fourteen years old.") (Order at 7).

for applying the laws of the decedents' domiciles in determining how wrongful death damages should be distributed, which supports the interpretation of the statute suggested by the *Ashton-Dickey* Plaintiffs.

**Third,** the legislative history of the ATA does not support this Court's claim that Congress intended the ATA to preempt state law on estate administration with respect to the distributees of wrongful death damages.  In fact, the legislative history shows the exact opposite – Congress sought only "*to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law.*"  *Boim v. Quranic Literacy Inst. & Holy Land Found.* 291 F.3d 1000, 1010 (7th Cir. 2002) (emphasis added); *see also* 137 CONG REC. S4511-04 (daily ed. Apr. 16, 1991) (statement of Sen. Grassley) (emphasis added) (The ATA accords victims of terrorism "*the remedies of American tort law,* including treble damages and attorney's fees.").  The ATA purposely did not set forth a detailed liability scheme, as that was left to general tort law (state law); the ATA merely intended to codify that additional damages might be sought by victims of terrorism to punish wrongdoers (treble damages and attorneys' fees that might not be recoverable under the common law) *in traditional wrongful death actions.  Id.*  In no way has this Court demonstrated that Congress intended to supplant/preempt traditional tort law developed by each state.

**Fourth,** the *Ashton-Dickey* Plaintiffs suggest that it is in the best interests of this Court to enforce a statute of limitations in this MDL litigation as against defendants-in-default since the practical reality of not enforcing a time bar will force the courthouse doors to remain open to new 9/11 legal actions for decades to come.  That cannot be the law.  This court is already burdened by extraordinary docket congestion.  The appellate court should surely weigh in on this very important question.

**Fifth**, an interlocutory appeal would materially advance the ultimate termination of thousands of lawsuits and resolve nationwide-wide uncertainty as to: (1) who is a proper plaintiff in a "terrorist wrongful death case," and (2) when their lawsuit must be filed against a defendant-in-default.  If the Court of Appeals were to agree to enforce state law and a statute of limitations, that undeniably would put an end to thousands of lawsuits, and thereby avoid costly and burdensome litigation for both the parties and the Court.  There could not be a clearer need for appellate review.

**Sixth,** for all intents and purposes, the Order resolves all the wrongful death claims against the Taliban, once formal dollar awards are calculated for each plaintiff asserting such claims.  Although the Court may title its ultimate results through individual "partial default judgments," these will be final as to each claimant and may result in an award from some fund or limited source (as happened with all the default judgments issued against the Islamic Republic of Iran, where partial final judgments resulted in awards from the U.S. Victims of State Sponsored Terrorism Fund ("USVSST")).[3]  In short, this court is entering or will be entering "final" judgments[4] in favor of thousands and thousands of plaintiffs and, for this

---

[3]     If any money is recovered from any damage awards against the Taliban, it may come from the assets held in the name of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), held at the Federal Reserve Bank of New York (the "FRBNY").  When the Republic of Afghanistan fell in August 2021, the DAB held approximately $7 billion in assets at the FRBNY.  *See* ECF MDL#8866 at 6.  In February 2022, President Biden issued an executive order titled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan."  Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022).  The frozen, limited assets of the DAB are now sought by the plaintiffs herein, through appeal from an Order of this Court.  ECF MDL#8866.  And a bill has been prepared, the so-called "Weber Bill" , a bill that seeks to redirect $3.5 billion of frozen Afghan funds into the USVSST Fund, so that all U.S. victims of terror, including military and civilian victims and the families of deceased victims, will be equitably compensated for their losses.  The legislation would amend President Biden's executive order dictating that funds be distributed to a small subset of U.S. terror victims through the American legal system.  *See* https://weber.house.gov/news/documentsingle.aspx?DocumentID=1333

[4]     Justice Hugo Black observed that the Court's decisions "dealing with the meaning of finality have provided no satisfactory definition of this term."  *Rederi A/B Disa v. Cunard S.S. Co.*, 389 U.S. 852, 854 (1967) (Black, J., dissenting), *denying cert. to* 376 F.2d 125 (2d Cir. 1967); *see also McGourkey v. Toledo*

reason, this Court should certify its Order for appeal now.

**Seventh,** interlocutory review is particularly appropriate because the issues are of significance to the general public.  This litigation is already over two decades old and has been newsworthy over its long history.  This Court should do what is right and just – provide widows and children of 9/11 decedents a voice in an appellate court.

As the Supreme Court has explained, "district courts should not hesitate to certify an interlocutory appeal" if the relevant criteria are satisfied and a decision "involves a new legal question or is of special consequence." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110-11 (2009); *see Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (stating that "exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment" (alteration in original)). This case presents exactly the type of exceptional circumstances that warrant interlocutory appeal.

---

*& Ohio Cent. Ry. Co.*, 146 U.S. 536, 544–45 (1892) ("Probably no question of equity practice has been the subject of more frequent discussion in this court than the finality of decrees."); Maurice Rosenberg, *Solving the Federal Finality-Appealability Problem*, LAW & CONTEMP. PROBS., Summer 1984, at 170, 171 ("The idea that an appeal to the second level of a court system should wait until a final decision has issued at the first level of the system is as sweet and simple as a baby's kiss. But as so often happens with legal affairs that are simple in theory the finality requirement in actual operation becomes 'dazzling in its complexity' . . . ." (quoting Edward H. Cooper, *Timing As Jurisdiction: Federal Civil Appeals in Context*, LAW & CONTEMP. PROBS., Summer 1984, at 156, 156)).

## SUMMARY OF ARGUMENT

The Order addressed two issues that are without question matters of first impression:

1. Whether Congress intended to preempt state wrongful death distribution law in enacting the Anti-Terrorism Act?

2. Whether the institutional interests of this Court require the enforcement of a statute of limitations against a defendant-in-default, in a two-decades-old litigation, where the alternative is an ever-expanding-court-docket for decades to come?

*First*, the Court judicially-created an interpretation of language in the ATA that is not supported by the ATA's express language and legislative history, and an interpretation that preempts and disregards otherwise applicable state law, despite black letter law that there is a "presumption against preemption" long-followed by the Supreme Court and the Second Circuit.

*Second*, while a Court should "ordinarily" not enforce a statute of limitations against a defendant-in-default, this litigation is over two decades old and there must be some reasonable end to it. The latter fact has been recognized by both the Supreme Court and the Second Circuit to ensure that the institutional interests of the judicial system are protected. The Court's refusal to enforce any reasonable end to this litigation simply cannot be correct.

The Court's decision on these important issues of first impression should be certified for interlocutory appeal under 28 U.S.C. § 1292(b) because they involve "[1] a controlling question of law [2] as to which there is substantial ground for difference of opinion and . . . [3] an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Here, not only would an immediate appeal advance this litigation,[5] but it is also necessary to provide future guidance on issues that are at the very heart

---

[5] We also may claim that the Order allows for an appeal as of right under the "Collateral Order Doctrine." The Supreme Court has long construed "final decisions" to include judgments that "terminate

of this MDL litigation.

## ARGUMENT

### I.  The Interpretation of the ATA Presents a Controlling Question of Law That Can Resolve Thousands of Wrongful Death Claims in This Litigation.

The interpretation of the ATA involves a "controlling question of law."  28 U.S.C. § 1292(b).  Determining who qualifies to recover wrongful death damages from within the § 2333 phrase "estate, survivors, or heirs" involves "a question of statutory interpretation" that the Court of Appeals can resolve "quickly and cleanly without having to study the record."  *See Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551,552 (S.D.N.Y. 2013) (Abrams, J.).  In this case, if the Court of Appeals agrees with the plain-language interpretation provided by applicable state law that has been advanced by the *Ashton-Dickey* Plaintiffs, thousands of claims would be dismissed in their entirety.  Accordingly, because "reversal of the . . . order would terminate the action," it is "clear that [the] question of law is controlling" within the meaning of Section 1292(b).  *See Klinghoffer*, 921 F.2d at 24.

### II.  There Are, at a Minimum, Substantial Grounds for Difference of Opinion About Who Qualifies to Pursue Wrongful Death Damages Under the ATA and When Wrongful Death Actions Had to Be Filed.

The question of who may recover wrongful death damages under § 2333 of the ATA presents a novel issue of first impression in this Circuit, and the Court implicitly recognized that there are substantial grounds for difference of opinion about the requirements of the statute by failing to cite a single Second Circuit decision in support of its Order.  And, not only does the

---

an action" as well as a "small class" of collateral rulings that are deemed "final" despite not ending the litigation.  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545-56 (1949).  This "small class" resolves "claims of right separate from, and collateral to, rights asserted in the action" that are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  *Will v. Hallock*, 546 U.S. 345, 349 (2006).  Such an order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment."  *Id.*  The Order satisfies all three of these criteria.

Court's decision conflict with the position of the *Ashton-Dickey* Plaintiffs, it also conflicts with the (1) plain language of the statute, (2) the applicable canons of construction, (3) the legislative history of the ATA, (4) the "presumption against preemption," and (5) prior precedent that suggests that law of the decedent's domicile (state law) should be employed to determine this question.

Moreover, there is a substantial difference of opinion in the federal courts as to whether a statute of limitations should be enforced to protect the institutional interests of the courts.[6]  And the Supreme Court's guidance on this subject was ignored in the Order – namely, the Supreme Court has noted that courts have always had the power to dismiss for failure to prosecute, and explained "[t]he power to invoke this sanction is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts."  *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629-30 (1962). This authority is an inherent power "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 630-31.  A level of control over the docket by this Court is desperately needed.

The difference between the Court's decision and these other sources confirms that

---

[6]      A substantial number of courts have found that they have the discretion to raise the statute of limitations *sua sponte* and have dismissed time-barred claims when presented with a request for a default judgment.  *See, e.g., Taiwan Civil Rights Litig. Org. v. Kuomintang Bus. Mgmt. Comm.*, 486 F. App'x 671, 671-72 (9th Cir. 2012) ("[T]he district court did not err by addressing the statute of limitations issue *sua sponte* in ruling on plaintiffs' motion for default judgment."); *Donell v. Keppers*, 835 F. Supp. 2d 871, 877 (S.D. Cal. 2011) (prior to entering default judgment, "it is proper for the Court to consider sua sponte whether Plaintiff's claims are barred by the relevant statute of  limitations"); *Joe Hand Promotions, Inc. v. Tu Minh Nguyen*, 2011 WL 1642306, at *2 (N.D. Cal. May 2, 2011) (same); *J & J Sports Prods., Inc. v. Martinez*, 2010 WL 1038467, at *6 (N.D. Cal. Mar. 2, 2010) (same); *see also Baker v. Cuomo*, 58 F.3d 814, 819 (2d Cir.) (stating in dictum that dismissal is "appropriate if it appears from the face of the complaint that the action is barred, for example by expiration of the statute of limitations"), *vacated in part on other grounds*, 85 F.3d 919 (2d Cir. 1996) (en banc) (per curiam); *Rampersad v. Deutsche Bank Sec., Inc.*, 2004 WL 616132, at *9 (S.D.N.Y. Mar. 30, 2004) (suggesting that time barred claims against defaulting  defendant may be dismissed when the defect is apparent from face of complaint, but dismissing on other grounds).

substantial grounds for difference of opinion exist as to the proper interpretation of § 2333 of the ATA and its statute of limitations.  Because "the issue is particularly difficult and of first impression," certification for interlocutory appeal is appropriate.  *Capitol Records*, 972 F. Supp. 2d at 551.

>    A.    **The Statute's Plain Language and the "Canons of Construction"**
>          **Support the *Ashton-Dickey* Plaintiffs' Reading of the ATA.**

The Court's interpretation of the ATA's phrase "estate, survivors, or heirs" conflicts with the language of the statute and the applicable canons of statutory interpretation;[7] these facts support the *Aston-Dickey* Plaintiff's position that the federal judiciary may not interpret that phrase to mean "immediate family members," if it cannot be shown that Congress intended that interpretation.

The starting place for any statutory interpretation question is the statute's plain language. Here, the plain language of § 2333 is entirely consistent with the interpretation suggested by the *Ashton-Dickey* Plaintiffs.  The statute provides in relevant part:

> **Any national** of the United States **injured** in his or her person, property, or business **by reason of an act of international terrorism**, **or his or her estate, survivors, or heirs**, **may sue therefor** in any appropriate district court of the United States **and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees**.

The phrase in question – "**Any national** … **or his or her estate, survivors, or heirs**" – in no way suggests that "estate, survivors, or heirs" means the same thing as "immediate family members" (a non-legal, undefined category of individuals).  The *Ashton-Dickey* Plaintiffs

---

[7]    The predominant view of a judge's proper role in statutory interpretation is one of "legislative supremacy." This theory holds that when a court interprets a federal statute, it seeks "to give effect to the intent of Congress."  *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 542 (1940).  Under this view, judges attempt to act as "faithful agents" of Congress.  The judiciary is not free to simply substitute their policy views for those of the legislature that enacted the statute.  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014) ("[C]ourts are not at liberty to jettison Congress' judgment[.]").

suggest, on the other hand, that the use of the words "estate" and "heirs" show that Congress meant to limit those who might recover under the statute to a legally-recognized group of "survivors."[8]   And since the federal courts have always relied upon state law to define who qualifies as a member of an "estate" and who qualifies as an "heir" of a decedent, the statute implies the need to look to state law to help define these terms.  Particularly in the area of family relationships and domestic relations, a federal court should defer to the well-established laws of the several states.  *Nice v. Centennial Area School Dist.*, 98 F. Supp. 2d 665 (E.D. Pa. 2000).  For example, in *De Sylva v. Ballentine*, 351 U.S. 570, 580–581 (1956), where the issue was whether the illegitimate son of a copyright owner was one of the owner's "children" within the meaning of the copyright statute, the Supreme Court said: "The scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be determined by state, rather than federal law … *This is especially true where a statute deals with a familial relationship; there is no federal law of domestic relations, which is primarily a matter of state concern … We think it proper, therefore, to draw on the ready-made body of state law to define the word 'children' …*." (Harlan, J.) (emphasis added); *Brandon v. Travelers Ins. Co.*, 18 F.3d 1321, 1326 (5th Cir. 1994) ("[t]he law of family relations has been a sacrosanct enclave, carefully protected against federal intrusion") (abrogated on other grounds by, *Kennedy v. Plan Adm'r for DuPont Sav. and Inv. Plan*, 555 U.S. 285 (2009)).  By contrast, the Order here

---

[8]      In fact, it is the extra word "survivors" in § 2333, a lay term with no legal meaning (here, surplasage), which seems to have spurred the Court to expand the number of qualifying "injured," beyond the known meaning of who might qualify as "injured" if the words "estate" and "heirs" were used alone in the statute.  The "surplusage canon" asks whether a particular interpretation of the statute renders language in that statute, as the statute is actually written, mere surplusage.  *See, e.g.*, *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019).  "Survivors" has no legal meaning and it fails to define a specific group of qualifying "injured."  Congress may have affirmatively chosen redundancy as part of a belt-and-suspenders approach, to add extra clarity—and may have done so in a statute like this where it recognized that claims against terrorists would proceed under *traditional tort law* that would provide that necessary clarity.  *See, e.g.*, *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

interpreted the language of the statute in a manner that is inconsistent with its plain meaning. And instead, the Court read the statute as requiring a judicially-created interpretation – "immediate family members."

In short, by diverging from well-established principles of statutory interpretation and giving the phrase "estate, survivors, or heirs" a judicially-created meaning ("immediate family members"), the Court departed from the plain meaning of the statute, well-known canons of construction, the presumption against preemption and applicable state law. This shows, at least, that there are substantial grounds for difference of opinion concerning the proper interpretation of the statute.[9]

    **B.**    **Enforcement of the ATA's Statute of Limitations Would Not Only Protect Plaintiffs Who Have Filed Timely Claims, Such Action Would Promote Important Institutional Interests of the Court – the Reduction of an Ever-Expanding, *Ad Infinitum* Docket.**

To be timely in their own right, the wrongful death actions against the Taliban based on the Anti-Terrorism Act must have been commenced no later than January 1, 2019. *See* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 1251(c), 126 Stat. 1632, 2017 (2013). Many of the Taliban wrongful death (and personal injury) actions here were, however, filed long after this deadline.

Under the Order, no statute of limitations ever exists as to any defendant-in-default. This leads not only to absurd and unjust results, it invites serious consequences. The Order opens the floodgates to thousands of potential plaintiffs who may now file 9/11 claims in the decades to

---

[9]    Of course, the Court also has the authority to reconsider its decision *sua sponte*, with full briefing on its novel interpretation of the statute and in light of the fact that that interpretation is inconsistent with the long-standing interpretation of "estate" and "heirs" under state law. *See, e.g.*, *ChartisSeguros Mexico, S.A. de C.V. v. HLI Rail Rigging, LLC*, No. 11 Civ. 3238 (ALC) (GWG), 2015 WL 545565, at *2 (S.D.N.Y. Feb. 9, 2015); *Kai Wu Chan v. Reno*, 932 F. Supp. 535, 540 (S.D.N.Y. 1996) (inviting motion under Federal Rule of Civil Procedure 60 because the court *sua sponte* decided an issue not briefed by either party).

come against any defendant-in-default, and this is at the expense of the judiciary and the plaintiffs who have filed timely claims (*see* fn. 3 above – if DAB assets are placed in a Fund, awards to "untimely plaintiffs" ultimately will reduce the recoveries of "timely plaintiffs"). Surely, that is cannot be correct; it certainly is not just.

Will there ever be an end to the filing of new legal actions and default judgment applications in this litigation against the defendants-in-default?  Will innumerable new claimants now belatedly file new actions against the defendants-in-default without any future time limit imposed?   The Order allows plaintiffs to "continue piggybacking off of older decisions for decades to come to extract multimillion dollar judgments from absent [defendants-in-default]." *Shiekh v. Republic of Sudan*, 308 F.Supp.3d 46, 55 (D.D.C. 2018) ("The possibility of nearly endless litigation takes on a new and more troubling dimension when paired with the murky public policy consequences of enabling untimely judgments"), *rev'd on other grounds by*, *Maalouf v. Republic of Iran*, 923 F.3d 1095,  1114 (D.C. Cir. 2019) (holding: district court may not raise a statute of limitations defense *sua sponte* against a defendant-in-default, but the Circuit Court acknowledged that it could not recognize an argument by plaintiffs with timely claims, who alleged an adverse interest to that of untimely plaintiffs -- since the recoveries of timely-filed plaintiffs were allegedly diluted in the USVSST Fund by the untimely claimants -- "because the Fund was not addressed by the District Courts. We therefore have no record on which to assess the accuracy or import of the parties' claims.").

It is well-established, through Supreme Court precedent, that a district court has the "inherent power" to dismiss a case *sua sponte* without prompting by an adverse party.  *See, e.g., Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962); *Arizona v. California*, 530 U.S. 392, 412-13 (2000)*; Leonhard v. United States*, 633 F.2d 599, 608, fn. 11 (2d Cir. 1980); *Wright v.*

*Rensselaer Cty Jail,* 771 Fed.Appx. 58, 59-60 (2d Cir. 2019).  These decisions address a district court's power to protect important institutional interests of the court.   In *Link, supra,* the Supreme Court noted that courts have always had the power to dismiss for failure to prosecute, and explained "[t]he power to invoke this sanction is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts."  *Id.* at 629-30. This authority is an inherent power "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  *Id.* at 630-31.  A level of control over the docket by this Court is desperately needed.  Here, the enormous and unmanageable size of the ever-expanding docket in this MDL litigation, and the Order's failure to enforce a statute of limitations defense in favor of those plaintiffs who have filed timely claims, directly implicates the institutional interests of the judiciary.

The Order undermines the purpose of a statute of limitations — a limitations period generally serves to prevent plaintiffs from sleeping on their rights, promote judicial economy, and provide parties with certainty.  *Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("[T]he basic policies of all limitations provisions [are] repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities."); *Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 428 (1965) ("[C]ourts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights.").[10]  If the Order is upheld, and the statute of limitations is not enforced in some manner, this Court will literally be advancing the interests of an always-still-expanding subset of plaintiffs who have "slept on their rights," at the

---

[10]      "Modern statutes of limitations trace directly back to 1624, and embody the notion that fixing the periods for bringing damages actions is a legislative function that imposes certainty and predictability upon how long a defendant should be subject to suit."  *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997).

expense of plaintiffs who filed timely actions and preserved the ongoing litigation for a belated throng of newcomers.

### III.    An Immediate Appeal Will Advance the Ultimate Termination of the Litigation & Will Resolve Uncertainty for Thousands of Plaintiffs.

Certifying this matter for interlocutory appeal now "may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), and resolve uncertainty that surround thousands of wrongful death claims asserted against the Taliban.  This is especially true in an MDL context:

> Consolidation of power in a single federal judge offers advantages in terms of uniformity, efficiency, and the facilitation of global settlement.  **But it also ratchets up considerably the risk and consequences of legal error, particularly when the MDL raises issues of first impression. A single judge's thinking exerts a disproportionate influence on the evolution of the law. New legal theories emerge, unrefined by the scrutiny of other trial court judges wrestling with the same problems. And, because interlocutory rulings generally are not subject to immediate appeal, the trial judge presiding over an MDL lacks any meaningful appellate supervision**. . .
>
> . . . Early appellate scrutiny would serve as a much-needed antidote to the excess power the current MDL system bestows on the individual presiding judge.

Andrew S. Pollis, *The Need for Non-Discretionary Interlocutory Appellate Review in Multidistrict Litigation* , 79 Fordham L. Rev. 1643, 1646 (2011) (emphasis added).

### A.    An Immediate Appeal Could Lead to the Prompt End of This Litigation for Thousands of Plaintiffs.

If the Court of Appeals interprets "estate, survivors, or heirs" in accordance with the state law of the decedent's domicile, and/or applies ATA's statute of limitations, as the *Ashton-Dickey* Plaintiffs believe it should, that willmaterially advance the litigation by completely ending it as to thousands of plaintiffs, and thereby avoid significant expense and burdens attendant to this type of complex, MDL litigation.   The material advancement prong of Section 1292(b) is satisfied when a decision by the Court of Appeals would resolve all of a plaintiff's claims, or

even "most" of them.  *Capitol Records*, 972 F. Supp. 2d at 554; *see also, e.g.*, *In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978) (material advancement prong satisfied if appeal has "the potential for substantially accelerating the disposition of the litigation"); *Transp. Workers Union of Am., Local 100 v. New York City Transit Auth.*, 358 F. Supp. 2d 347, 352-53 (S.D.N.Y. 2005) (certifying order because "[i]f the Court of Appeals reverses . . . the litigation will end"). Accordingly, certification is an appropriate use of judicial resources to materially advance this litigation.

### B.    An Immediate Appeal Would Resolve Uncertainty for Thousands of Plaintiffs.

Certifying the Order for interlocutory appeal is appropriate for an additional reason: the Court's interpretation of the ATA will have substantial ramifications in terrorist actions across the United States.  Courts recognize that the interlocutory appeal procedure is appropriate when "[r]esolution of the[] arguments will have far-reaching implications" for a form of litigation.  *See Capitol Records*, 972 F. Supp. 2d at 551-54 (noting "important ramifications" of case for industry participants).  As explained above, the Order interprets § 2333 contrary to how the federal courts have enforced federal statutes when state law is applicable.   Courts have recognized that the interlocutory review process is appropriate when the issue "raises a novel issue of great importance to many other" parties.  *Transp. Workers Union of Am.*, 358 F. Supp. 2d at 353.  Here, if review is delayed or denied, the legal "heirs" of 9/11 decedents may lose their right to seek appellate guidance forever.

### IV.    The Wrongful Death Actions Against the Taliban Should Be Stayed Pending the Determination of the Interlocutory Appeal

District courts granting 28 U.S.C. § 1292(b) certification frequently also grant a stay of proceedings in the district court pending the appellate court's determination of the appeal, thus ensuring that the goal of interlocutory appeal – to avoid needless proceedings in the district court

– is not undermined.  *See, e.g.*, *Geron v. Robinson & Cole LLP*, 476 B.R. 732, 746 (S.D.N.Y. 2012); *City of New York v. Beretta U.S.A. Corp.*, 401 F. Supp. 2d 244, 298 (E.D.N.Y. 2005); *Lee v. Coughlin*, 26 F. Supp. 2d 615, 638 (S.D.N.Y. 1998) (Sotomayor, J.).  This Court should do so here as well because, as just discussed, a strong reason for certifying the Order for interlocutory appeal is that an appellate decision will potentially lead to the dismissal of thousands of lawsuits.

## CONCLUSION

Because an interlocutory appeal will advance the ultimate termination of this lawsuit, and resolve uncertainty in thousands of wrongful death actions brought under the Anti-Terrorism Act, the controlling questions of law involving the statute of limitations and "heirs" vs. "non-heirs," presents the "rare exception to the final judgment rule that generally prohibits piecemeal appeals," *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996), and warrants certifying the Order for interlocutory appeal.

Accordingly, the *Ashton-Dickey* Plaintiffs respectfully requests that this Court certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  Within ten days of such a certification, the *Ashton-Dickey* Plaintiffs will ask the Second Circuit for permission to take an appeal from the Order.  *See* 28 U.S.C. § 1292(b).

Dated:  April 6, 2023

Respectfully submitted,

By:   *John F. Schutty*

John F. Schutty, Esq.
(JS2173)
Law Office of John F. Schutty, P.C.
Attorneys for the *Ashton-Dickey* Plaintiffs
445 Park Avenue, Ninth Floor
New York, New York 10022
Telephone: (646) 345-1441
Fax: (917) 591-5980
john@johnschutty.com