**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |
|---|---|

**This document relates to:**

*All actions*

---

**PLAINTIFFS' OBJECTIONS TO THE COURT'S**
**APRIL 27, 2023, OPINION AND ORDER (ECF NO. 9060)**

---

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
C. Ross Heyl
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*For Plaintiffs' Executive Committee for Personal Injury*
*and Death Claims on behalf of the Plaintiffs*

Sean P. Carter
Stephen A. Cozen
J. Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*For the Plaintiffs' Executive Committee for Commercial*
*Claims on behalf of Plaintiffs*

May 31, 2023

## **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................................1

II.     PROCEDURAL HISTORY ..................................................................................................3

III.    STANDARD OF REVIEW ..................................................................................................4

IV.    LEGAL ARGUMENTS.........................................................................................................4

       a.   Winer is qualified to opine as to Wahhabism and Salafism in the context of their relationship to terrorism. ........................................................................................... 4

       b.   The Magistrate Judge erred in permitting testimony regarding Defendants' beneficent humanitarian work........................................................................................................ 9

V.      CONCLUSION ...................................................................................................................12

## TABLE OF AUTHORITIES

**Cases**

*Aboeid v. Saudi Arabian Airlines, Inc.*, CV-10-2518 (SJ) (VVP), 2011 WL 2222140 (E.D.N.Y. Jun. 1, 2011).................................................................................................................10

*Carranza v. City of New York*, No. 05 Civ. 10010 (RJS) (JCF) (S.D.N.Y. May. 15, 2009) ........................4

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................................................10, 11, 12

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ......................................................4

*Pension Committee of University v. Banc of America*, 716 F. Supp. 2d 220 (S.D.N.Y. 2010)..........................8

*S.E.C. v. Drescher*, No. 99-CV-1418, 2001 WL 1602978 (S.D.N.Y. Dec. 13, 2001) .............................12

*Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522 (2d Cir. 1990) ...........................................................4

**Other Authorities**

Final Report of the National Commission on Terrorist Attacks Upon the United States ........... 2, 3, 5

**Rules**

Fed. R. Civ. P. 72 ................................................................................................................... 3, 4

Fed. R. Civ. P. 72(a).......................................................................................................... 1, 4, 12

Fed. R. Evid. 404(a).......................................................................................................3, 9, 10, 12

Fed. R. Evid. 702 Advisory Committee Note ....................................................................................8

## I.    <u>INTRODUCTION</u>

Pursuant to Fed. R. Civ. P. 72(a), Plaintiffs object in part and request that this Court partially set aside (or clarify) Magistrate Judge Netburn's Opinion & Order, entered on April 27, 2023, at ECF No. 9060, (the "Order") in two limited respects. *First*, Plaintiffs object to the Order to the extent that it is read to suggest that Plaintiffs' expert Jonathan Winer lacks sufficient knowledge and expertise to testify as to the (well documented) fact that al Qaeda relied on Wahhabi and Salafi ideology to justify its actions, recruit members, and raise funds, under the theory that Winer "has *no* expertise in religion." *Id.* at 18 (emphasis added); *see also id.* (Winer's "opinions on 'Salafism' and 'Wahhabism' are excluded). *Second*, Plaintiffs object to the extent that the Order permitted Defendants' expert Jonathan Benthall to testify as to the good character of the Charity Defendants[1], *id* at 28, under the theory that "an organization engaged in legitimate charity work may be less likely to support terrorism." *Id.*

Jonathan Winer does not offer expert opinions broadly about religious doctrine or theology; but Plaintiffs object to the Order to the extent it can be read to preclude Winer from testifying about "the political impact of different types of interpretations of religion when a religion is politicized into a political movement," Exh. 1,[2] Winer Dep. 74:6-10 (July 13, 2021), a topic about which Winer repeatedly testified he has ample experience. *See infra*, at § IV. a. (summarizing Winer's testimony). Though the Order frames the issue by asserting that Winer has "no experience in religion," Winer's curriculum vitae, report, and testimony identify ample expertise in the specific area he repeatedly articulates throughout his testimony—namely, that al Qaeda invoked and relied upon Wahhabi and Salafi teaching to justify its actions and raise funds from sympathetic donors. *E.g.*, ECF No. 7344-1, Expert Report of Jonathan M. Winer (Mar. 10, 2020) ("Winer I") at §§ 7.7—7.7.4; *see also* Final Report

---

[1] Charity Defendants here refers to the defendants as to whom Benthall referenced in his report, and for whom he authored his report, including the Muslim World League, the International Islamic Relief Organization, and the four "Charity Officer Defendants," Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdullah Mohsen al Turki, and Adnan Basha.

[2] Exhibits identified in these Objection are attached to the Declaration of Robert T. Haefele, which is being filed to accompany Plaintiffs' Objections.

of the National Commission on Terrorist Attacks Upon the United States ("9/11 Comm'n Report"[3])

at 362 ("Usama bin Laden and other Islamist terrorist leaders draw on a long tradition of extreme

intolerance within one stream of Islam (a minority tradition), from at least Ibn Tamiyyah, through the

founders of Wahhabism, through the Muslim Brotherhood, to Sayyid Qutb. That stream is motivated

by religion and does not distinguish politics from religion, thus distorting both"); *id.* at 52 ("In the

1980s, awash in sudden oil wealth, Saudi Arabia competed with Shia Iran to promote its Sunni

fundamentalist interpretation of Islam, Wahhabism."); *id.* at 63 ("The influence of the Wahhabi school

of Islam had also grown, nurtured by Saudi-funded institutions."); *id.* at 372 (recognizing the

involvement of Saudi Arabia's Ministry of Islamic Affairs (MOIA) and Islamic charities "to spread

Wahhabi beliefs throughout the world" facilitating extremists' "goal of violent jihad against non-

Muslims"); *id.* at 216 (finding Thumairy was an adherent to Orthodox Wahhabi doctrine who had a

group of followers supportive of 9/11); Exh. 2, Testimony of Stuart Levey, Under Secretary, Office

of Terrorism and Financial Intelligence, U.S. Department of Treasury, before the Senate Committee

on Banking, Housing and Urban Affairs, July 13, 2005, at 8 ("Levey Testimony") (testifying that "the

challenges posed by terrorist financing from within Saudi Arabia are among the most daunting we

have faced. . . . [C]harities have funded terrorist organizations and causes that support terrorism and

the ideology that fuels the terrorists' agenda" and "Saudi Arabia-based and funded organizations

remain a key source for the promotion of ideologies used by terrorists and violent extremists around

the world to justify their hate-filled agenda.").

The Wahhabi ideological underpinnings of al Qaeda's campaign and fundraising efforts are

well-documented historical facts that are foundational to the terrorist financing field. *E.g.,* 9/11

Comm'n Report at 171 ("al Qaeda found fertile fund-raising ground in Saudi Arabia, where extreme

religious views are common"); *id.* at 172 (Charities were a source of money and also provided

---

[3] The 9/11 Comm'n Report is available at https://9-11commission.gov/report/.

significant cover); *id.* ("charities with significant Saudi government sponsorship diverted funds to al Qaeda"). Indeed, the 9/11 Commission emphasized that "[v]igorous efforts to track terrorist financing must remain front and center of U.S. counterterrorism efforts." *Id.* at 382. An expert in terrorist financing could not understand his or her field or carry out his or her work without a foundational understanding of the documented relationship between Wahhabi ideology and al Qaeda's fundraising tactics and networks. Accordingly, Plaintiffs object as clear error to the extent the Order is read to preclude Winer from testifying consistent with this expertise.

The magistrate judge also erred in not precluding defense expert Jonathan Benthall's improper character testimony that the Charity Defendants' good actions can potentially offset the bad. This impermissible character evidence is offered to show that the Charity Defendants acted in accord with their supposed altruism at all material times. As such, the magistrate judge erred in not precluding Benthall's testimony regarding the Charity Defendants' beneficent actions.

Plaintiffs object to the above two rulings in the Order and ask this Court to set them both aside pursuant to Rule 72; allow Plaintiffs' expert Jonathan Winer to opine on issues of religion to the extent they concern counterterrorism or "the political impact of different types of interpretations of religion when a religion is politicized into a political movement," consistent with his experience and expertise; and preclude Benthall from offering character evidence in contravention of Federal Rule of Evidence 404(a).

## II.   **PROCEDURAL HISTORY**

Winer authored two expert reports concerning the Charity Defendants. ("Winer I" at ECF No. 7344-1 and "Winer II" at ECF No. 7344-2). Benthall submitted two reports: one for the Muslim World League ("MWL") the International Islamic Relief Organization ("IIRO"), and the Charity Officials, and a second report for defendant Yassin Kadi. Winer was deposed on July 13 and 14, 2021. Benthall was deposed on July 20, 2021. Plaintiffs and Defendants filed bellwether *Daubert* briefs on

November 15, 2021 (ECF Nos 7346 and 7343). Oppositions were filed on January 14, 2022 (ECF Nos. 7606 and 7602) and replies were filed on February 18, 2022 (ECF Nos. 7690 and 7688). On April 27, 2023, Magistrate Judge Netburn issued the Order that is the subject of this Objection. ECF No. 9060.

## III.   <u>STANDARD OF REVIEW</u>

The legal standard for fully or partially setting aside a nondispositive pretrial order under Rule 72(a) is whether the order was "clearly erroneous" or "contrary to law." Fed. R. Civ. P. 72. A finding is "clearly erroneous" "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). Further, "[a]n order is contrary to law "when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Carranza v. City of New York*, No. 05 Civ. 10010 (RJS) (JCF) (S.D.N.Y. May. 15, 2009) Additionally, "clearly erroneous or contrary to law" is a "a deferential standard." *See Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990).

## IV.   <u>LEGAL ARGUMENTS</u>

a.   <u>Winer is qualified to opine as to Wahhabism and Salafism in the context of their relationship to terrorism.</u>

In the Order, the magistrate judge limited Winer from testifying as to "Salafism and Wahhabism" (ECF No. 9060 at 17-18) (quotations excluded), supporting her conclusion by writing that Winer "has no expertise in religion," "[h]is counterterrorism work focused on al Qaeda's financing, not its ideology…" and that "[h]is service in the diplomatic corps in the Middle East centered on international law enforcement, financial regulation, and the like – not the social, cultural, or religious dynamics in the region." *Id.* Winer does not purport to offer opinions on the theological differences between distinct schools of Islam, such as Wahhabism and Hanafiyyism, but rather merely to lay the groundwork regarding the roots of extremism and in a context as it relates to terrorism.

4

Plaintiffs object to this limitation on Winer's opinions only to the extent that the Order is read to limit Winer's expert opinions concerning al Qaeda's invocation of Wahhabi and Salafi teachings to justify its actions and raise funds and the politicization of Wahhabi ideology by al Qaeda and associated terrorists, issues that are squarely within his expertise. Winer does not opine broadly about religion or the doctrinal and theological differences between different schools of Islam. Instead, his opinions on "Salafism" and "Wahhabism," are offered within a particular field of expertise that Winer repeatedly explained in his deposition. However, the magistrate judge premised her decision on her understanding that he has "no expertise in religion," that his counterterrorism work focused on al Qaeda's financing, and her limiting view of his vast counterterrorism experience both in and out of government. But her characterizations do not reflect the focus of Winer's actual testimony or capture the breadth of his experience, as explained throughout his deposition. Accordingly, Plaintiffs object to the extent the Order broadly preempts his opinions offered within the scope of his expertise.

The magistrate judge clearly errs in four ways when assessing Winer's expertise and limiting his opinions.

*First*, the magistrate judge conflated the issues and erred when she predicated her opinion on the premise that Winer's counterterrorism expertise focuses solely on "financing" (ECF No. 9060 at 17) and that "he has no expertise in religion," *id.* at 18. Understanding foundational concepts of the religious and ideological movements that al Qaeda and associated terrorists exploited to raise funds is essential to gaining expertise in the field of terrorist financing.[4] An understanding of these matters is an implicit requirement for any terrorism financing expert. It is axiomatic that one cannot understand

---

[4] For example, the Islamic concept of *zakat* "is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax." 9/11 Comm'n Report at 372. It is undeniable that "Al Qaeda and its friends took advantage of Islam's strong calls for charitable giving, zakat. These financial facilitators also appeared to rely heavily on certain imams [preachers] at mosques who were willing to divert zakat donations to al Qaeda's cause." *Id.* at 170.

and combat terrorist financing without understanding the ideologies that fuel it, and the particular susceptibility of "charities" engaged in promoting certain religious ideologies to abuse and supporting terrorists. The magistrate judge writes that "Winer's own description of his experience" supports her decision. But she cites nothing from Winer's expert report or his deposition transcript to support the comment. In fact, throughout Winer's deposition, when asked about his expertise concerning religion, he repeatedly pushed back against suggestions that he had no expertise concerning religious issues as related to counterterrorism. He explained that, while he did not consider himself an "expert in religion," (*i.e.*, he has not spent his lifetime studying all the religions of the world, such as Islam, Christianity, Judaism, Buddhism, etc.), he nonetheless has certain areas of expertise concerning religion. Exh. 1, Winer Dep. 76:19—77:6.

Throughout his deposition, Winer took pains to explain the contours within which his expertise concerning the politicization of specific ideologies rested, explaining that his expertise rests at the ideologies' intersection with politics and counterterrorism. He clarified that his expertise exists "in a political context when religion is used for political purposes as part of [his] understanding of relationships among states, [and] as part of [his] understanding of terrorism." *Id.* at 177:24—178:5; *see also id.* at 77:24—78:1 ("I am expert on the political aspects of Islam and how it played out in the region in the 1980s, 1990s, and 00s"). He explained that his expertise concerning the manipulation of certain doctrines includes where those issues involve "the political impact of different types of interpretations of religion when a religion is politicized into a political movement," *id.* at 74:5—10. Addressing specifically the context of his expertise as it related to Salafism and Wahhabism, issues addressed in the Order, Winer responded to a question about his expertise concerning "jihad and Salafis," stating that he had expertise "in the context of the political movements and terrorist activity which both Wahhabism and Salafism contributed to in connection with al-Qaeda in the 9/11 attacks," *id.* at 178:23—179:3.

About his experience, Winer testified that he has devoted "extensive work" "over a long period of time" on issues that concern "a combination of foreign policy, security, and religion" *Id.* at 74:11-14. To support that explanation, Winer pointed specifically to his experience in the Middle East Bureau between 2013 and 2017, where he was constantly dealing with "the competing agendas of political Islam and various strands and strains of political Islam…." *Id.* 74:15-22. Winer testified that "having to understand the various strands [of political Islam] was critically important to [his] work." *Id.* 75:3-5.

The magistrate judge errs in seemingly giving outsized weight to Winer's introductory comments of his clarification of his expertise, where he said he is not an expert on "religion" (which Winer addressed as being a question about whether he is an expert on all religions). But she gave no weight to Winer's extensive explanations that followed, clarifying the contours of his expertise with the politicization of religion and its use to support terrorists' agendas, as fundamental to his counterterrorism work, or the context and focus of his proffered opinions. This error is compounded because Winer's counterterrorism law-enforcement experience itself requires an understanding of extremist ideologies, including distinctions among ideologies to identify extremism. The magistrate judge committed clear error in failing to give proper weight to the fact that understanding al Qaeda's financing necessarily requires some understanding of Islam. *See, e.g., supra,* n. 4*; infra,* n. 5.

*Second*, the magistrate judge errs by not weighing Winer's experience outside of his work in the diplomatic corps and for the U.S. Government. The Order identifies his "service in the diplomatic corps" as his only relevant experience. ECF No. 9060 at 17-18. The magistrate judge was wrong to suggest that Winer's experience in the diplomatic corps did not implicate the intersection between religion and politics/counterterrorism referenced above. Indeed, the example Winer identified to illustrate a period when he was constantly dealing with "the competing agendas of political Islam and various strands and strains of political Islam," Exh. 1, Winer Dep. at 74:15-22, was a period when he

was in the diplomatic corps. But in addition to his diplomatic corps qualifications, Winer has worked for years for a U.S. government analytic agency providing intelligence and analysis, *id.* at 58:18-23, has taught at the CIA's Kent Center for Intelligence, *id.* at 55:18-24, is a non-resident scholar at the Middle East Institute and has researched, studied, analyzed and written about terrorism and counterterrorism generally, not just specifically as to banking or finance. Indeed, Winer "worked on a daily basis with counterparts at the NSC, the U.S. Department of Justice, Treasury, the U.S. Department of Commerce, Department of Defense, the Central Intelligence Agency, and other components of the U.S. intelligence community." Winer I at 138 (parentheticals omitted)

*Third,* Winer's Opinions addressing issues of religion in connection with counterterrorism may be fodder for cross exam but are not properly excluded under *Daubert* principles. Winer's specific areas of expertise are closely related to Salafism and Wahhabism, and any gaps in his knowledge can be explored (as they already have) on cross-exam. "To the extent that [parties] are able to point to areas where [an expert's] experience is less robust, these concerns go to the 'testimony's weight and credibility-not its admissibility' and are 'properly explored on cross-examination.'" *Pension Committee of University v. Banc of America*, 716 F. Supp. 2d 220, 226 (S.D.N.Y. 2010) (citing Fed. R. Evid. 702 Advisory Committee Note.) Even if Winer's experience might be slightly "less robust" on certain aspects concerning religion than a theologian's, that alone does not render it excludable.

*Fourth*, understanding counterterrorism necessarily requires understanding distinct differences between the general practice of Islam and radical extremism. An expert on Islamic extremism must also understand basic tenets of Islam, such as *zakat*, which Winer has discussed in his peer-reviewed writings.[5] Winer clearly stated that his professional experience routinely required familiarity and experience with Islam as a political movement, stating affirmatively that while he was in the Middle

---

[5] "Charitable giving (*zakat*) is a religious obligation for Muslims, constituting one of the five "pillars of Islam." Jonathan Winer, *Countering Terrorist Finance: A Work, Mostly in Progress*, 618 The Annals of the American Academy of Political and Social Science 112 (2008).

East Bureau between 2013 and 2017, he was constantly dealing with "the competing agendas of political Islam and various strands and strains of political Islam, including that in the Islamic state and al-Qaeda and other groups like Ansar al-Sharia." Exh. 1, Winer Dep. 74:15—75:7. It is disingenuous to suggest that Winer's lengthy professional study of political Islam, including senior roles guiding U.S. policy to address those very issues, did not require an understanding of different Islamic philosophies as they relate to extremism.

b. The Magistrate Judge erred in permitting testimony regarding Defendants' beneficent humanitarian work

The magistrate judge's decision to allow Benthall to opine about the Charity Defendants' purported humanitarian work to allow the Charity Defendants to try to show that they would have acted in conformity with their supposed altruistic character, ECF No. 9060 at 28, violates Rule 404(a) of the Federal Rules of Evidence and misunderstands that a core reason for using charities for terror support is because the charities' "legitimate" activities provide cover for its terrorist activities.

In the Order, at 28, the magistrate judge concluded that "[t]estimony about Defendants' humanitarian work is . . . admissible; extensive discussion of other charities' beneficent work, on the other hand, is inappropriate." The magistrate judge supported this conclusion by writing, at 28, "Benthall's descriptions of legitimate charity work help counter allegations that the Defendant charities had dealings with al Qaeda" and "[a]n organization engaged in legitimate charity work may be less likely to support terrorism and other illegitimate endeavors, and that evidence will not 'confus[e] the issues.'" The magistrate judge also found that Plaintiffs' contention that Defendants should directly meet the allegations of support for al Qaeda was a "strawman" argument. *Id.*

Rule 404(a) of the Federal Rules of Evidence prohibits use of evidence of a person's character or character trait to prove that the person acted in accordance with the character or trait. Evidence of altruism by a non-person entity "is essentially character evidence," and "would thus run afoul of the

prohibition against the use of such evidence." See *Aboeid v. Saudi Arabian Airlines, Inc.*, CV-10-2518 (SJ) (VVP), 2011 WL 2222140, at *2 (E.D.N.Y. Jun. 1, 2011).

In addition to allowing testimony in violation of Evidence Rule 404(a), the magistrate judge's decision contradicts and undermines empirical findings of the Executive Branch and the United States Supreme Court set out, for example, in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), where the Court found:

> "Terrorist organizations do not maintain *organizational* 'firewalls' that would prevent or deter . . . sharing and commingling of support and benefits." "[I]nvestigators have revealed how terrorist groups systematically conceal their activities behind charitable, social, and political fronts." "Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations." ("Muddying the waters between its political activism, good works, and terrorist attacks, Hamas is able to use its overt political and charitable organizations as a financial and logistical support network for its terrorist operations").

> Money is fungible, and "[w]hen foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put." But "there is reason to believe that foreign terrorist organizations do not maintain legitimate *financial* firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations." Thus, "[f]unds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives."

561 U.S. at 30-31 (citations omitted, quoting from expert evidence offered by the United States Executive Branch).

In addition to contradicting and undermining empirical findings of the Executive branch, the magistrate judge's rationale misunderstands key reasons for using charities to support terrorism. As explained by then-Treasury Under Secretary Stuart Levey in testimony before the Senate Committee on Banking, Housing and Urban Affairs, a core element of terror financing rests on charities engaging in "legitimate" activities to support terror activities. Terror-supporting charities use "legitimate" activities to create "fertile recruitment grounds, allowing terrorists to generate support for their causes and to propagate extremist ideologies;" to allow for collection of donations from unwitting donors

"increasing the amounts of money available to terrorists;" to "benefit from public support and an attendant disinclination by many governments to take enforcement action against them;" "and to provide excellent cover for the movement of personnel and even military supplies to and from high-risk areas" where "legitimate" activities are often focused. Exh. 2, Levey Testimony at 5; *see also Holder*, 561 U.S. at 30-31, Exh. 3, IIRO designation of Philippines Branch Offices, at 3 (designating the IIRO, Philippines Branch Office, the US Department of Treasury cited to a former member of the AQ-affiliated ASG, familiar with IIRO's operations in the Philippines, who reported that "a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations"). The magistrate judge's rationale—aside from adopting character evidence by an expert for a corporate defendant contrary to the law—disregards both the findings of the U.S. Government and endorsed by the Supreme Court that charities that engage in supporting terrorism are to engage in humanitarian activities along-side of their wrongful conduct for the reasons explained in Under Secretary Levey's testimony and the findings espoused in *Holder v. Humanitarian Law Project*.

Further, the magistrate judge's finding that Defendants need not produce evidence contrary to Plaintiffs' evidence because Plaintiffs argument is a "strawman" is clearly erroneous. Any instances of beneficent work, when viewed in a vacuum, do not make it less likely that the Charity Defendants supported terrorism. Even the most obviously fraudulent organizations, from Enron to Theranos, engaged in *some* legitimate activity, but that did not make it less likely that they committed fraud. Moreover, while the Charity Defendants' own representatives *may* be permitted to testify to the nature of the organizations' own work, it would be improper to permit an "expert' to amplify such factual testimony, offering opinions about its alleged significance. That would be a matter for the jury.

Lastly, the magistrate judge did not articulate that evidence of the charities' good character met any relevant exception to the rule prohibiting character evidence. Indeed, "as a general matter, character evidence in civil cases is inadmissible unless it falls within one of the stated exceptions [of

Rule 404(a)]." *S.E.C. v. Drescher*, No. 99-CV-1418, 2001 WL 1602978, *2 (S.D.N.Y. Dec. 13, 2001). Neither the magistrate judge, nor defendants, have argued that Benthall's testimony meets any relevant exception.

Thus, the magistrate judge erred and made clearly erroneous findings in ruling that Benthall's testimony about Defendants' humanitarian work was admissible.

**V.      CONCLUSION**

For the foregoing reasons, pursuant to Rule 72(a), Plaintiffs respectfully request that this Court set aside the above holdings in the April 27, 2023, Opinion and Order (ECF NO. 9060); allow Plaintiffs' expert Jonathan Winer to opine on issues of religion to the extent they concern counterterrorism or "the political impact of different types of interpretations of religion when a religion is politicized into a political movement," consistent with his experience and expertise; and preclude Defendants' expert Jonathan Benthall from offering character evidence in contravention of Federal Rule of Evidence 404(a), namely, precluding Benthall from opining about any charity's "legitimate charitable work" to counter allegations that a defendant charity had dealings with al Qaeda or to suggest that "[a]n organization engaged in legitimate charity work may be less likely to support terrorism and other illegitimate endeavors."

Dated:  May 31, 2023

MOTLEY RICE LLC

By:  */s/ Robert T. Haefele*
ROBERT T. HAEFELE
JODI WESTBROOK FLOWERS
DONALD A. MIGLIORI
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*Liaison Counsel for the Plaintiffs'*
*Executive Committee for Personal Injury and Death*
*Claims on behalf of the Plaintiffs*

Respectfully submitted,

COZEN O'CONNOR

By:  */s/ Sean P. Carter*
SEAN P. CARTER
STEPHEN A. COZEN
J. SCOTT TARBUTTON
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*Co-Chair of the Plaintiffs' Executive Committee for*
*Commercial Claims on behalf of Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the Plaintiffs' Objections to the Courts' April 27, 2023 Opinion and Order (ECF No. 9060) was electronically filed this 31st day of May, 2023. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system, which the parties may access.

_____
Robert T. Haefele