

# DEPARTMENT OF THE TREASURY
## OFFICE OF PUBLIC AFFAIRS

EMBARGOED UNTIL 10:00 AM  
July 13, 2005

Contact: Molly Millerwise  
(202) 622-2960

**Testimony of Stuart Levey, Under Secretary**  
**Office of Terrorism and Financial Intelligence**  
**U.S. Department of the Treasury**

**Before the Senate Committee on Banking, Housing, and Urban Affairs**

Chairman Shelby, Ranking Member Sarbanes and other distinguished members of the Committee, thank you for the opportunity to speak before you today about terrorist financing and money laundering in the Middle East. I welcome this committee's ongoing focus on this pressing topic, and your dedication to help stop the flow of funds to our nation's enemies.

This hearing comes less than a week after the terrible attacks in London and I would like to express my sincerest condolences to the families of the victims. The brave resolve that the British people have shown resonated around the world in defiant response to cowards who seek to disrupt our very way of life. These acts of terror serve as a tragic reminder that our resolve to combat terrorism and terrorist financing must not waver.

As I approach the end of my first full year as Under Secretary of the Office of Terrorism and Financial Intelligence at the Treasury Department, I am constantly assessing our progress in the fight against the financing of terrorism. To be sure, we have achieved some important successes in this fight. We can point to multiple successes which reflect the excellent coordination and teamwork of all U.S. Government agencies over the past year. Thanks to the State Department's leadership and concerted work with us, we are witnessing a growing consensus in the world about the need to address terrorist financing in tangible ways. We have seen the culmination of a number of critical prosecutions investigated by the FBI-led Joint Terrorism Task Forces and prosecuted by the Department of Justice, as I will discuss later in this testimony. We at Treasury have designated numerous supporters of terrorism – including particularly significant figures such as Adel Batterjee – acting in close coordination with our interagency and international counterparts. We have used Section 311 of the USA PATRIOT Act judiciously and effectively against primary money laundering concerns, and we are seeing real results. One of the most promising developments is the President's issuance of Executive Order 13382, which applies the same methods we have used successfully to block assets of terrorist supporters to those who aid in the spread of weapons of mass destruction. Our other interagency partners – especially in the

intelligence community – are constantly working to stem the tide of terrorist financing, with little glory or recognition for their tireless efforts. Our collective drive to hold financial supporters of terror personally responsible as terrorists is creating the desired pressure and deterrence. In the end, we are starting to see encouraging results: terrorist groups like al Qaida and HAMAS are feeling the pinch and do not have the same easy access to funds that they once did.

Our most significant progress has been in bringing about a change in mind-set. There is now near-unanimous recognition among nations that terrorist financing and money laundering pose threats that cannot be ignored and there is widespread agreement upon a shared set of standards to combat these dangers. We will not accept the protest that ideological differences or bureaucratic obstacles excuse nations from the obligation to comply with global standards. As we were all brutally reminded by the attacks in London last week, we are facing a global threat with global implications. All civilized nations must meet their basic responsibilities to prevent the financing and support of terrorism.

At the same time, we recognize that the range of threats and institutional frameworks across different countries necessitates flexibility and a range of approaches. We cannot apply a "one size fits all" approach to terrorist financing, nor can or should we try to force countries to adopt a "U.S. model." So long as internationally-established principles are given real effect, in law and in practice, there is room for a variety of approaches. – Indeed, we learn from the successes and failures of others. Each country and institution presents unique challenges that require nuanced solutions.

The Middle East rightfully captures our attention at Treasury, and in the interagency community, as it is both a wellspring of and a target for terrorist financiers and those who spread extremist ideologies that justify and fuel terrorism.

Terrorism is increasingly targeted at innocents in the Middle East. Recent terrorist attacks in Turkey, Morocco, Saudi Arabia, Kuwait, and Qatar should be impetus to drive change throughout the region. Where the threat of terrorism does not generate the will to take effective action, however, my office, working in close cooperation with all of our interagency counterparts, will push for action.

It would not be feasible to include a complete catalogue in this testimony of all of our engagements in multilateral forums and bilateral discussions with respect to terrorist financing in the Middle East. Instead, I would like to try give the Committee a general description and some examples that show how we are simultaneously (1) driving the adoption and implementation of common global standards to prevent terrorist financing and money laundering, and (2) pressing individual countries and the private sector to do more to combat the terrorist threat we all face.

## COMMON APPROACHES

In our common approach to the Middle East, one important objective is to persuade each country to attach the necessary priority to anti-money laundering and counter-terrorist financing. This is not only important from an enforcement perspective, but also a prerequisite for any country looking to attract international business and investment. For the most part, countries are

increasingly recognizing this and looking to comply with global standards and reassure international businesses and investors.

I made a trip to Libya last month, representing the highest level delegation to visit that country since the lifting of sanctions eleven months ago. While there, I met with Colonel Qadhafi, the Central Bank Governor, and the Minister of Finance and pressed Libya to adopt anti-money laundering and counter-terrorist financing reforms as it attempts to emerge from isolation and engage increasingly in the world's financial community. The Libyan financial sector is in its infancy, but as it develops, I conveyed that the United States expects anti-money laundering and terrorist financing initiatives to be high on their agenda as part of an overall counterterrorism strategy.

We are also seeing that countries are responsive to the type of pressure that comes from international standard-setting bodies. The Financial Action Task Force (FATF) sets the global standards for anti-money laundering and counter-terrorist financing, and it is also through this venue that we promote results. Treasury, along with our counterparts at State, Justice, and Homeland Security, has taken an active role in this 33-member body which articulates international standards in the form of recommendations, guidelines, and best practices to aid countries in developing their own specific anti-money laundering and counter-terrorist financing laws and regulations. FATF maintains the authority and has demonstrated its willingness to take collective actions against jurisdictions that pose a threat to the financial system. We do our part to promote the multilateral effect of FATF standards through focused bilateral engagement.

As an example, I recently visited Turkey to speak with the Finance Minister, Justice Minister and several other high-level members of the Turkish government. While Turkey is not part of what we generally refer to as the Middle East, its geographic location – bordering on Syria, Iran, and Iraq – makes it an important part of our strategy when we think about the threat of terrorism emanating from the Middle East. Turkey has been a key NATO ally and has a long and painful history of fighting terrorism within its borders. I expressed our appreciation for the close cooperation we have enjoyed with the Turkish government in combating terrorism and in many other areas. However, as a FATF member since 1991, Turkey's current anti-money laundering and counter-terrorist financing regimes need significant improvement. Turkey is looking to address these issues, and I encouraged Turkey to redouble its efforts to comply with FATF standards in advance of its mutual evaluation scheduled for early next year. Turkey is too important a partner to us, and too important a regional power to let its anti-money laundering and counter-terrorist financing regimes fall out of step. We look forward to seeing Turkey succeed in its reform efforts over the coming months.

Although not a member of FATF, Jordan, another regional ally, is working hard to bring its anti-money laundering and counter-terrorist financing practices up to international standards. The government has submitted a new AML law to the Parliament, which may consider it in its extraordinary session this summer. I visited Jordan this past February in large part to encourage them to pass this law and implement it as quickly as possible. These steps will inure to their own economic benefit – bolstering the health and attractiveness of their financial sector – while also aiding in the global fight against terrorist financing. Given Jordan's prominent role in the

financial sector of the West Bank and Gaza, these improvements are also important to reduce the potential for terrorist financing in those areas of strategic concern.

The success and force of FATF lie not only in the mutual evaluation process to which it holds its own members, but also in the emergence of FATF-style regional bodies (FSRBs) that agree to adopt FATF standards and model themselves accordingly on a regional level. The Middle East and North Africa body, or "MENA FATF" is one of the newest and potentially most effective organizations to emerge. Launched in November 2004, this 14-member body held its first plenary session in Bahrain in April 2005 and is preparing for its second plenary session in September of this year, currently scheduled to take place in Beirut. It remains too early to tell how effective MENA FATF will be, but the indications so far demonstrate considerable enthusiasm and energy. This body is already working on a process to assess its members for compliance with international standards and have formed working groups to address key issues like cash couriers, charities, and hawala. We support this initiative and hope that it will succeed on the difficult road that lies ahead of it.

The Egmont Group is an international body comprised of financial intelligence units (FIUs) across the globe. It is another example of a body that demands that its members comply with certain standards and maintain those standards over time. Treasury's Financial Crimes Enforcement Network is currently working closely with Saudi Arabia, Jordan, and Kuwait to develop their FIUs; we have seen some progress to date and are eager to see it develop further.

*Implementation*

Adoption of legislation and regulations is meaningless without strong and effective implementation. Some countries, eager to curry favor with their neighbors or the international community, may believe that adopting an anti-money laundering and counter-terrorist financing law will keep observers at bay. Such half-steps will neither fool nor satisfy the United States and the international community. We will continue to press for effective implementation, including investigations, prosecutions, designations, and other demonstrable actions.

*Private Sector*

Collective pressure to implement international standards has been effective in the drive to bring countries on board with anti-money laundering and counter-terrorist financing efforts. At the same time that we are pressing at the government level, though, we are also working with the international private sector. The potential, both for information exchange and for combating the flow of illicit funds, is enormous. As but one example, we have seen financial institutions in the Middle East and elsewhere voluntarily checking account holders and transactions against Treasury's list of designated entities, as well as other lists, and using that information to determine whether or not to take on business or process a transaction. This means that the rigorous efforts by Treasury and the U.S. Government to identify and isolate key sponsors of terrorism, as well as sponsors of weapons proliferation, are being given wide effect in private banks in the Middle East and the world.

We have also solicited the cooperation of some of the larger and more responsible financial institutions to advocate for reforms among their colleagues and in their various host countries. These institutions typically exhibit diligent anti-money laundering and terrorist financing practices even when their host countries do not require it. This puts these institutions at a competitive disadvantage vis-à-vis institutions that are less conscientious. Furthermore, these institutions are forced to take measures to protect themselves when doing business with financial institutions in countries with weak anti-money laundering and counter-terrorist financing regimes. We therefore believe that it is in the interest of more responsible institutions to create a momentum for reform among their colleagues, not just in the Middle East but worldwide.

## ALTERNATIVE FINANCING METHODS

One effect of U.S. and international action against terrorist financiers has been to push supporters of terrorism out of the formal financial system and into riskier, more expensive, and more cumbersome methods of raising and moving money, such as cash couriers, charities, and hawala. While this hearing is not focused on alternative financing methods, I wanted to give the Committee a brief overview of our work in these areas.

### *Charities*

Terrorist groups have long exploited charities for several key reasons, including the following:

- The "legitimate" activities of these charities, such as the operation of schools, religious institutions, and hospitals, can – if abused – create fertile recruitment grounds, allowing terrorists to generate support for their causes and to propagate extremist ideologies.

- Charities attract large numbers of unwitting donors along with the witting, thus increasing the amount of money available to terrorists.

- To the extent that these charities provide genuine relief, which nearly all of them do, they benefit from public support and an attendant disinclination by many governments to take enforcement action against them.

- Charitable funds are meant to move in one direction only; accordingly, large purported charitable transfers can move without a corresponding return of value and without arousing suspicion.

- International charities naturally focus their relief efforts on areas of conflict, also prime locations for terrorist networks. Such charities provide excellent cover for the movement of personnel and even military supplies to and from high-risk areas.

The U.S. Government has confronted this problem head on in a coordinated manner. We have thus far designated more than 40 charities worldwide as supporters of terrorism. Two notable examples are our actions against the U.S. branches of the Al Haramain Islamic Foundation and the Islamic African Relief Agency (IARA), both al Qaida-linked charities that were operating in the United States. In both cases, law enforcement agents executed search warrants while

Treasury's OFAC simultaneously blocked the organizations' assets, stopping the flow of money through these groups. Thanks to the work of the State Department, we have persuaded other nations to join us in bringing these and other charities to the United Nations Security Council for designation, and to shutter these dangerous organizations in their respective countries.

Designations and law enforcement actions are making an impact and are serving as a valuable deterrent. Anecdotal evidence suggests that once-willing donors are now thinking twice or balking altogether at sending money to terrorist groups. In this regard, I would note that one advantage we enjoy in the terrorist financing arena is the strength of deterrence – our targets have something to lose. In contrast to terrorist operatives who may be willing to die for their hateful cause, terrorist financiers typically live public lives with all that entails: property, occupation, family, and social position. Being publicly identified as a financier and supporter of terror threatens an end to all of this, lending our actions a real deterrent impact.

### *Hawala*

Hawala, a relationship-based system of money remittances, plays a prominent role in the financial systems of the Middle East. Domestically, we have worked with our interagency partners to ensure that money service businesses like hawalas, register with the Financial Crimes Enforcement Network and comply with applicable anti-money laundering provisions. On the one hand, we are reaching out to this sector to educate businesses about their legal obligations. Enforcement of the Patriot Act's criminal provisions against operating an unlicensed money service business also plays a key deterrent role. Just this week, an ICE investigation led to a guilty plea by an unlicensed money service business, who had sent millions of dollars to Syria and other countries. While we are making progress, the effective regulation of money service businesses continues to present a significant challenge. Internationally, Treasury leadership in the FATF has brought the issue of hawala to the forefront, resulting in the implementation of FATF Special Recommendation VI, which requires all FATF countries to ensure that individuals and entities providing money transmission services must be licensed or registered, and subjected to the international standards set out by FATF. Regionally, the UAE is playing a key leadership role on this issue. We will continue to insist that hawala be subjected to appropriate regulation and oversight.

### *Cash Couriers*

As governments apply stricter oversight and controls to banks, wire transmitters, and other traditional methods of moving money, we are witnessing terrorists and criminals resorting to bulk cash smuggling. FATF Special Recommendation IX was issued in late 2004 to address this problem and it calls upon countries to monitor for cross-border transportation of currency and to make sanctions available against those who make false declarations or disclosures in this regard. This recommendation has already prompted changes in legislation abroad. On the domestic front, Treasury is working with the interagency community, particularly the Department of Homeland Security's Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP), to deter, disrupt, and apprehend cash smugglers. We are also looking into technologies that will allow us to detect secreted concentrations of cash, as well as tools that will allow us to track the movement of physical cash around the world.

## CASE STUDIES

*Syria*

As a serious national security threat and a state sponsor of terrorism, Syria has been the object of targeted Treasury action for some time. Syria continues to meddle in Lebanon's affairs, allows the Iraqi insurgency to be partially funded and fueled from within its borders, and allows terrorist organizations and supporters to flourish there as well. At Treasury, we are addressing this threat with a spectrum of targeted actions aimed at reversing this course.

On June 30, we designated Ghazi Kanaan, the current Syrian Minister of Interior, and Rustum Ghazali, the Chief of Syrian Military Intelligence for Lebanon pursuant to E.O. 13338 for their role in supporting Syria's military and security presence in Lebanon and support for terrorism. This was a very important first step at identifying high-level Syrian officials who are interfering in Lebanon's political developments. With respect to the Iraq insurgency, in January of this year, we designated the Syria-based supporter of Abu Mus'ab al-Zarqawi, Sulayman Darwish, pursuant to E.O. 13224 for acting as one of Zarqawi's operatives in Iraq and serving on his Advisory Council. The Syrian government joined us in co-designating this individual at the United Nations pursuant to UNSC 1267. On June 17, we designated Muhammad Yunis Ahmad, pursuant to E.O. 13315, for providing funding, leadership and support from his base in Syria to several insurgent groups that are conducting attacks in Iraq. We also designated the Syria-based SES International Corporation and two associated individuals, General Zuhayr Shalish and Asif Shalish pursuant to E.O. 13315 for their support to senior officials of the former Iraqi regime. SES acted as false end-user for the former Iraqi regime and facilitated Iraq's procurement of illicit military goods in contravention of UN sanctions. Finally, President Bush specifically designated Syria's Scientific Studies Research Center (SSRC) as one of the eight entities (the others were in North Korea and Iran) designated pursuant to the newly issued Executive Order 13382, which blocks the property of proliferators of weapons of mass destruction and their supporters. SSRC is the Syrian government agency responsible for developing and producing non-conventional weapons and the missiles to deliver them. While it has a civilian research function, SSRC's activities focus substantively on the acquisition of biological and chemical weapons.

Separately, in May of last year, we issued a proposed rule, designating the Commercial Bank of Syria (CBS) as a "primary money laundering concern," pursuant to Section 311 of the USA PATRIOT Act. The designation was premised on concerns about financial wrongdoing at that bank, including terrorist financing. In connection with the proposed rule, we presented a series of demands to Syrian authorities, ranging from reform of their banking sector to immediate, effective action to cut off the flow of funds across the Syrian border to the Iraqi insurgency.

We will continue to use the tools available to us to press Syria to take concrete actions to address our concerns.

*Saudi Arabia*

We have pursued a strategy of sustained pressure and cooperation with Saudi Arabia to address a number of challenges. This Committee is by now well aware that Saudi Arabia has increased its counter-terrorism cooperation since the Riyadh bombings in May 2003, marked by ever more intense Saudi efforts to confront directly violent extremism in the Kingdom. The Committee is also well aware that the challenges posed by terrorist financing from within Saudi Arabia are among the most daunting we have faced. Wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda. Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq.

Saudi Arabia-based and funded organizations remain a key source for the promotion of ideologies used by terrorists and violent extremists around the world to justify their hate-filled agenda. The Saudi government has taken seriously the threats posed to both the Kingdom and the United States by all of these issues, and we have worked with and offered guidance to help confront the real threat of terrorist support. As a result, among other things, the Kingdom has made changes to its charitable system and regulations to address certain vulnerabilities. This progress is the result of focused interagency attention and cooperation, led by Homeland Security and Counterterrorism Advisor Frances Fragos Townsend's consistent and direct outreach.

However, Saudi Arabian charities, particularly the International Islamic Relief Organization (IIRO), the World Association of Muslim Youth (WAMY), and the Muslim World League (MWL) continue to cause us concern. The Kingdom of Saudi Arabia announced that it would freeze all international transfers until it had established an oversight commission to regulate its charitable sector. While that would represent a satisfactory short-term solution if implemented fully, it is important that the announced commission take shape. As we have stated previously to our Saudi counterparts, these three charities must fall under the commission's oversight. I recently conveyed my views on these issues to Saudi officials, and was met with positive indications that they wish to redress these lingering concerns. I will keep this Committee informed of progress in this area.

At the same time, it must be noted that there have been real and tangible improvements in Saudi Arabia's cooperation on terrorism financing issues. Through the Joint Terrorist Financing Task Force (JTFTF), we have built the foundation for consequential and timely information exchange as well as selected joint action. We expect to continue building on the initial success of the JTFTF and look forward to broadening the cooperation in that area. In fact, the preliminary success of the JTFTF has prompted us to consider applying a similar model to our efforts elsewhere in the Gulf.

Our work on cash couriers offers another example of the need for continuing work with Saudi Arabia. Cash couriers present a serious danger, particularly because of their use to fund the deadly insurgency in Iraq. It is critical that Saudi Arabia and other Gulf countries lower reporting thresholds for cross-border transfers of cash and enforce these provisions aggressively. We intend to work with Saudi Arabia and others in the Gulf to pursue that goal.

*Palestinian Territories*

With respect to the Palestinian territories, we continue to grapple with the problem of charities being abused to support terrorism. Groups such as HAMAS, Palestinian Islamic Jihad (PIJ), and others have infiltrated the charitable sector in the territories and have corrupted badly needed relief organizations. We have been very aggressive in acting against such charities. Most recently, Treasury designated a PIJ charitable front, the Elehssan Society on May 4. The Elehssan Society served as the fund-raising arm of PIJ in Gaza and the West Bank and distributed funds to the families of PIJ prisoners and suicide bombers. Just this February, PIJ claimed responsibility for a terrorist attack in Tel-Aviv that killed five and wounded over 50. We will continue to pursue this organization and any that rise up to take its place. The Justice Department has played a vital role in this arena. In April, for example, the Department of Justice secured the conviction of three brothers linked to the Holy Land Foundation for their conduct in concealing the continuing ownership interests of Hamas leader Mousa Abu Marzook in their closely-held private company.

We recognize that enforcement actions have sometimes cut off sources of relief to communities in need and inadvertently decreased the support of charities and donors that deliver funds to legitimate causes. Our goal is not to deter charitable giving but instead to protect the charitable sector such that donors' generosity is not abused and they feel safe in providing their contributions. Therefore, there is therefore a particularly urgent need in this region for safe channels of assistance that donors can be assured will not be subverted by terrorists. When I traveled to the region in February, I discussed this problem with both Israeli and Palestinian officials. In speaking with President Abbas and in several follow-up meetings with Finance Minister Fayyad, I noted serious commitment on their part to cutting off the flow of funds to terrorism, and welcomed the message they expressed that responsibility for accountable financial systems begins with the government. The Israelis were also strongly of the view that it would be advantageous for all involved to find a way to provide needed humanitarian aid, outside the control of HAMAS or any other terrorist group. We are currently working with the Palestinian Authority to develop options through which such aid could be provided in a safe and effective manner.

## CONCLUSION

To combat terrorist financing and money laundering over the long term, we are vigorously and effectively promoting international standards and encouraging countries in the Middle East to adopt appropriate legislation and to implement those laws. We are also taking the necessary actions to build political will at the highest levels of every government to combat the financing of terrorism. Still, we have a long way to go in the battle against terrorist financing in the Middle East, both in terms of robust implementation of those standards and in responding to specific threats and circumstances. Thank you again for holding this hearing and for your sustained commitment to this topic. I would be happy to take your questions.