```
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
 2

 3   IN RE: TERRORIST ATTACKS    )  03-MDL-1570 (GBD) (SN)
     ON SEPTEMBER 11, 2001       )
 4                               )

 5

 6

 7

                            — — —
 8
                    Tuesday, July 13, 2021
 9                          — — —
10             THIS TRANSCRIPT CONTAINS
                  CONFIDENTIAL MATERIAL
11                          — — —
12
13     Remote video-recorded deposition of JONATHAN M.
     WINER, held at the location of the witness,
14   commencing at 10:04 a.m., on the above date, before
     Debra A. Dibble, Certified Court Reporter,
15   Registered Diplomate Reporter, Certified Realtime
     Captioner, Certified Realtime Reporter and Notary
16   Public.
17
                            — — —
18
19
20
21
22
23
                    GOLKOW LITIGATION SERVICES
24             877.370.DEPS | fax 917.591.5672
                      deps@golkow.com
25
```

This Transcript Contains Confidential Material

```
 1        A.     When I'm asked a question, as an expert,
 2   I draw on my own personal experience in the field,
 3   and the -- whatever period of time that I worked on
 4   an issue directly when I was in the government, I
 5   draw on my experience as a practitioner, as a
 6   lawyer, in which I -- when I've been exposed to
 7   clients with issues in that area, and my study of
 8   the law and my past study of facts.  I draw upon, as
 9   well, analysis and academic work that I've
10   undertaken in the past and the research I did in
11   connection with that.
12              I look at primary source information when
13   it's available.  So Jamal al-Fadl, for example,
14   Mr. Ahmad, would both be examples of first-hand
15   information.  There's also -- can be first-hand
16   information in newspaper reports when you have
17   contemporaneous interviews or quotes from
18   individuals, and I will use that as well.
19              I rely on government reports, both from
20   the United States and sometimes from other
21   governments.  I rely on UN reports and other
22   official reports, because based on my experience,
23   those are typically based on a tremendous amount of
24   work, which often is documented; it's not always
25   explicitly documented.
```

This Transcript Contains Confidential Material

```
 1            So what I try to do -- and this is --
 2   this was how I went about my work for the U.S.
 3   government from 2000 to 2008, when I was doing the
 4   analytic work I discussed with you.  It's
 5   essentially an all-source approach in which you take
 6   as many sources as you can and then weigh the
 7   sources and bring them together to form your
 8   analytic findings on a topic.  And so it's really I
 9   try and take advantage of the work that's been done
10   by others, as much first-hand information as I can
11   get my hands on, and analyze and assess it and bring
12   human reason to bear upon it.
13       Q.    (BY MR. MOHAMMEDI)  Do you apply any
14   scientific and social science methodology?
15       A.    I think I have just described the
16   methodology that I apply.  And I'm not sure
17   precisely what type of information you're looking
18   for.  Is it statistical information?
19       Q.    You are the expert here.  I guess you
20   will explain to me how you -- how you reach your
21   opinion by applying scientific and social science
22   methodology.
23             MR. HAEFELE:  Objection to form.
24       A.    As I've just described, I take primary
25   source material, which is capable of being read, and
```

```
 1   at together.  And that's how I understand the
 2   situation.
 3        Q.   (BY MR. MOHAMMEDI)  Isn't it a fact that
 4   because you are making a statement that BIF and LBI
 5   are intertwined and you mentioned that many times,
 6   interchangeable, based on a proffer; right?
 7   That's --
 8        A.   No.
 9        Q.   Okay.  So let me ask you a question.
10   Another question.
11             It's not based on a proffer you say;
12   correct?
13        A.   It's based on all the information
14   available to me.
15        Q.   Okay.  Okay.  So let's go through some of
16   the documents to show you.
17             If you put in Exhibit 26, which is --
18   just remind me where we are.
19             TRIAL TECHNICIAN:  914, I have.
20             (Winer Deposition Exhibit 914,
21             Minutes of the Seventh Meeting of the
22             Benevolence Committee's Supervisory
23             Council, was marked for
24             identification.)
25        Q.   (BY MR. MOHAMMEDI)  This is an Arabic
```

```
 1                Okay.  Are you ready?  Let me know when
 2   you're ready.
 3        A.    I've read the material that you've
 4   provided me, in front of me in yellow.
 5        Q.    Yes, the yellow pages.
 6              It is fair to say Batterjee's dismissal
 7   was in February 1993 if it was an extension of six
 8   months for the person who replaced him starting
 9   August 1993; correct?
10        A.    I don't see those dates here.
11              TRIAL TECHNICIAN:  Mr. Mohammedi, if
12        you could just direct me to what section.
13              MR. MOHAMMEDI:  Yeah, I'm going to.
14              Go to page 9.
15              This one here.
16              THE WITNESS:  So is executive
17         director the title Batterjee had rather than
18         chair?
19        Q.    (BY MR. MOHAMMEDI)  Correct.
20        A.    Then I'm corrected, it's executive
21   director rather than chair.  I accept that
22   correction, if that's what the records show.
23        Q.    And then also, that Mr. Batterjee was
24   dismissed, was gone in February 1993.
25        A.    Sir, where does it say that, please?
```

1   Q.   It says extending the one date of
2   Dr. Hassan Bahifz Allah, and that's No. 1 of the
3   second No. 1.
4   A.   I see that.
5   Q.   Okay.  And the documents before talks --
6   I mean, the same document talks about his -- the
7   issue with the -- with the -- with Adel Batterjee,
8   but here the extension of this extended the mandate
9   of Hassan Bahifz Allah for an additional six months
10  that was following the dismissal of Mr. Batterjee.
11  A.   Where does it say that --
12  Q.   So we're going to show you -- if you
13  go -- if you go to page 7.
14       Make it a little bigger.
15  A.   It says:  The executive director briefly
16  spoke in his report of the latest updates regarding
17  the handover from the former director.  I don't see
18  the word "dismissal."  I see "handover."  And then I
19  see a reference to tension and a promise was made to
20  quickly and directly intervene to ease such tension.
21       What is the date of the document, sir,
22  please?
23  Q.   It's a meeting discussing the new
24  executive director that was an extension after six
25  months, which means Batterjee was not the executive

1  director starting February 1993; correct?
2           MR. HAEFELE:  Objection, form.
3     A.    It does -- it actually doesn't say that.
4  It refers to a handover from the former director.
5  And refers to an attempt to ease the tension, which
6  suggests there are still actions to be taken.  So I
7  can't assess from this when he was dismissed.
8     Q.    (BY MR. MOHAMMEDI)  But you can assess
9  that he was not with LBI as of February 1993,
10 correct?
11          MR. HAEFELE:  Objection, form.
12    A.    No, I cannot.
13    Q.    (BY MR. MOHAMMEDI)  You cannot?
14    A.    I can't tell what date he left, based on
15 this.
16    Q.    If you --
17    A.    If I may continue.  It looks to me from
18 this document that at some point in this period, a
19 new executive director took over from the old
20 executive director.  It doesn't say that the old
21 executive director was dismissed.  It does say that
22 there was tension and action going -- needed -- that
23 needed to take place to ease the tension.
24          So the dates -- the basic idea that he
25 was leaving the position seems to me the most

This Transcript Contains Confidential Material

 1   plausible interpretation of this.  The statement
 2   that he's dismissed does not -- is not set forth in
 3   this document.
 4       Q.   Okay.  I think we -- you know, I guess we
 5   will go through the documents.
 6            If we can have Exhibits 23.
 7            (Winer Deposition Exhibit 915,
 8            2-23-1993 letter to Adel Batterjee,
 9            was marked for identification.)
10       Q.   (BY MR. MOHAMMEDI)  Which is dated
11   February 23, 1993.
12            That is the English version, which is
13   FED-PEC0114419, the Arabic document.
14            And then there is a translation.
15            If you can just make that bigger.
16            Can you read it for -- I mean, you can
17   read it to yourself if you want to.
18       A.   Yes, this is consistent with Mr. Noor
19   Wali's deposition.
20       Q.   And you do not have any reason to dispute
21   this accurate -- the accuracy of this document,
22   right?
23       A.   No, I do not.  I believe this is likely
24   to be accurate.  I have no reason not to think it
25   accurate.

```
 1        Q.    Okay.  I'm also going to include to have
 2   an exhibit, which is 25, ours.  Where are we?  Which
 3   number are we at?
 4                    (Winer Deposition Exhibit 916,
 5                    5-11-1993 letter to Salman bin
 6                    Abdulaziz, was marked for
 7                    identification.)
 8        Q.    (BY MR. MOHAMMEDI)  This is a letter from
 9   Dr. Al-Juhani, who was the head of Muslim -- the
10   World Assembly of Muslim Youth.
11        A.    Yes.
12        Q.    Have you seen this document before?  You
13   can show the English version of it.
14        A.    Yes.  Thank you.
15        Q.    And it's dated May 11, 1993; correct?
16        A.    Yes, that's the date of it, if you'll
17   give me a minute, please.
18        Q.    Have you seen this document before?
19        A.    I need to read it to remember whether
20   I've seen it before or not.
21        Q.    Sure.  Just the highlighted sections.
22        A.    Yeah, I've not read this document before.
23        Q.    Do you have any reason to question the --
24   this document?
25        A.    No.
```

```
 1      Q.    It's a primary source; correct?
 2      A.    Yes.
 3      Q.    And it's dated May 11, 1993; correct?
 4      A.    Yes.
 5            MR. MOHAMMEDI:  Can we get
 6      Exhibit 27?
 7                  (Winer Deposition Exhibit 917,
 8                  6-14-1996 Minutes of Islamic
 9                  Benevolence Committee dissolution and
10                  merging with World Assembly of Muslim
11                  Youth, was marked for
12                  identification.)
13      Q.    (BY MR. MOHAMMEDI)  As of May 28, 1996,
14   LBI merged with WAMY; correct?
15      A.    Yes.  I am familiar with this.
16      Q.    You are familiar with this one, right?
17            MR. HAEFELE:  Omar, just so we're
18      keeping consistent with the markings here,
19      this is already Noor Wali Exhibit 267, I
20      think.
21            MR. MOHAMMEDI:  Okay, yeah.  That's
22      fine.  Yes.  Thank you, Robert.
23      A.    I do not remember whether I saw this
24   document or not.  I think I did, but I'm not
25   positive, but I'm certainly familiar with the action
```

 1      Q.    (BY MR. MOHAMMEDI)  Let me see.  50 --
 2   that's right.
 3      A.    Which paragraph?
 4      Q.    You are referring to U.S. versus Arnaout.
 5   When you're making statement, you're referring to
 6   the proffer; correct?  The prosecution documents.
 7      A.    I'm still lost as to what you're
 8   referring to.  What page?
 9      Q.    Let me direct you.  U.S. versus Arnaout.
10   This is the page 32.
11            If you go to page 32, and it is 2.38.10.
12            And when you making the statement, your
13   referring to the government evidentiary proffer
14   supporting the admissibility of co-conspirator
15   statement; correct?  And that's per footnote No.
16   45?
17      A.    I'm sorry, I'm still lost, sir, as to
18   what you're --
19      Q.    If you go to your rebuttal page 32.
20      A.    Yes.
21      Q.    And go to 2.38.10.  And then when you're
22   referring to --
23      A.    Yes.  Yes.  Footnote 45 refers to the
24   government evidentiary proffer.  That is correct.
25      Q.    You were referring to that.

This Transcript Contains Confidential Material

1          Have you considered any other documents
2   in the filing in that case?
3       A.   I've considered whatever documents are in
4   my reliance materials.  At this moment, I don't
5   remember what I considered and did not over the
6   course of all of this work.  I can't tell you every
7   document is there.  I can say that I also considered
8   the statements about Batterjee made by the U.S.
9   government before, during, and after this matter,
10  and about what he did.  And what Arnaout did.  And
11  that's in my rebuttal statement laid out in a fairly
12  systematic fashion.
13      Q.   Okay.  If you go to Exhibit 35.  And now
14  it's sentencing memo.  We have it in front of us --
15  I meant, sorry, exhibit -- what is the exhibit we're
16  at right now?  920.
17           If you scroll down to page 4, this is --
18  this is a memo filed by Arnaout's lawyer in the
19  case.  Arnaout's lawyer in the case.  And if you go
20  to page 4, it says that Mr. Arnaout's organization,
21  BIF-USA, no affiliation to LBI.
22           Do you see that?
23      A.   Yes.
24      Q.   Let's go to the next exhibit we have for
25  you, Exhibit 36.

This Transcript Contains Confidential Material

```
 1                    (Winer Deposition Exhibit 921, USA v.
 2               Arnaout Plea Agreement, was marked
 3               for identification.)
 4      Q.    (BY MR. MOHAMMEDI)  If you go to page 2
 5   to 4 in that, it's a plea agreement.
 6              The question, do you know that burden of
 7   proof for sentencing enhancement under United States
 8   sentencing guidelines is preponderance of evidence?
 9   It's not beyond reasonable doubt?
10      A.    I haven't thought about the issue of what
11   the standard is for enhancements.
12      Q.    So government claim BIF are now subject
13   to terrorism enhancement under the guidelines.
14              Even with all the evidence at the
15   government's disposal with respect to BIF and
16   Arnaout, what the Court found government could not
17   meet the burden.
18      A.    I'm sorry, where are you reading from,
19   sir?
20      Q.    This is not --
21              Can you hold on a second, please?
22              Yeah.  Yes, can we put the Exhibit 37 --
23   sorry about that.
24                    (Winer Deposition Exhibit 922, U.S.
25               v. Arnaout 282 F.Supp.2d 838 (2003),
```

```
 1                was marked for identification.)
 2      Q.    (BY MR. MOHAMMEDI)  Sir, the government
 3   claim BIF are now subject to terrorism enhancement
 4   under the guidelines.  But the Court, if you go
 5   to -- let's see, what page do we have.  This
 6   highlight I'm trying to find out.  838.
 7                If you go down when you see the
 8   highlighted section.
 9                So the application here, it says, if you
10   see that:  Arnaout does not stand convicted of a
11   terrorism offense, and goes on.  Do you want to read
12   that for us, Mr. Winer?
13      A.    I read it.
14      Q.    You read it?  Do you agree with that?
15                MR. HAEFELE:  Objection to form.
16      A.    The terrorist charges were dropped as
17   part of the plea agreement.  That's accurate.
18      Q.    (BY MR. MOHAMMEDI)  And is it because the
19   government could not meet its burden; correct?
20                MR. HAEFELE:  Objection to the form.
21      A.    My understanding of the case as laid out
22   in my report and my rebuttal report, is that the
23   judge's decision on the admissibility of statements
24   by co-conspirators impaired the government's case,
25   and thus the government was not going to be able to
```

This Transcript Contains Confidential Material

```
 1   put into the record what it wanted to be able to put
 2   into the record, and therefore it agreed to the plea
 3   agreement, as did the defendant.
 4        Q.   (BY MR. MOHAMMEDI)  Can you go to page 6
 5   of the document?
 6             Can you read this to us?
 7        A.   Yes, I'm aware of this.  I've read this
 8   at some point.
 9        Q.   And do you agree with that statement?
10        A.   I agree with the statement based on --
11             MR. HAEFELE:  Objection to form --
12        A.   -- the information --
13             I agree with the statement based on the
14   consequences of the decision that was made to
15   eliminate the particular evidence that the
16   government was going to be relying on.
17        Q.   (BY MR. MOHAMMEDI)  Do you believe in the
18   judge's decisions?
19        A.   The judge's decisions are a legal fact.
20        Q.   They are legal facts, right?  And they
21   are better than proffer, aren't they?  They are
22   something you should be relying on rather than the
23   proffer; correct?
24        A.   Yes, but you have to distinguish between
25   a criminal case and a civil case, which are not the
```

This Transcript Contains Confidential Material

1  same thing.  And not every judicial ruling is a
2  ruling that's going to be correct.  Judges, in fact,
3  get overruled from time to time.  That's part of the
4  process.  In this particular case, no one appealed.
5  Neither the defendant nor the government appealed.
6  The government complained afterwards and reaffirmed
7  its belief that the defendants had committed more
8  serious offenses, but that's neither here nor there.
9  The decision is a fact, and it's legally accurate.
10 This was the decision that was reached.
11      Q.    And you said there were no more --
12            If you can just put Exhibit 38, which is
13 a Seventh Circuit decision, which is the document
14 affirming the district court ruling.
15            (Winer Deposition Exhibit 923, U.S.
16            v. Arnaout 431 F.3d 994 (2005), was
17            marked for identification.)
18      A.    So was there appeal here?
19      Q.    (BY MR. MOHAMMEDI)  Look at the -- look
20 at the exhibit where it says --
21      A.    The United States did in fact appeal.  I
22 had forgotten.  Thank you for correcting me.
23      Q.    Thank you.
24            So you were not aware of this, correct?
25      A.    I had forgotten --

This Transcript Contains Confidential Material

```
 1        Q.    Of this decision, the Seventh Circuit
 2   decision?
 3        A.    I was aware of it.  I had forgotten.  It
 4   says that:  The District Court did not commit clear
 5   error in refusing to apply the --
 6        Q.    Let's go to Section 3A1.4.
 7              And there are highlights, if you go down.
 8              Can you go down, just for us to see?
 9              TRIAL TECHNICIAN:  What page is it
10        on?
11              MR. MOHAMMEDI:  Let me see.  It's
12        highlighted.  So you will find it.
13              Page 8.
14        Q.    (BY MR. MOHAMMEDI)  And the Court found
15   that:  The district court did not [sic] find that
16   the record did not establish by a preponderance of
17   the evidence that Arnaout attempted, participated
18   in, or conspired to commit any act of terrorism.
19   The district court also found that the government
20   had not established that the Bosnian and Chechen
21   recipients of BIF aid were engaged in a federal
22   crime of terrorism, or that Arnaout intended the
23   donated boots, uniforms, blankets, tents, x-ray
24   machine, ambulances, nylon or walkie-talkies to be
25   used to promote a federal crime of terrorism.
```

```
 1   don't recollect on the enhancement.
 2       Q.   Okay.
 3            Now, if we go back to the terrorism
 4   finance staff monograph, I think we entered that as
 5   Exhibit 12, I believe.  Sorry, exhibit -- what's
 6   that exhibit you enter, the monograph?  909.
 7            And if you go to page 11, which is PDF
 8   page 114.  I'm sorry, page 111, PDF page 114.
 9            And it says:  Despite these troubling
10   links, the investigation of BIF revealed little
11   compelling evidence that BIF actually provided
12   financial support of al-Qaeda, at least after
13   al-Qaeda was designated a foreign terrorist
14   organization in 1999.  Indeed, despite unprecedented
15   access to the U.S. and foreign records of these
16   organizations, one of the most experienced and best
17   terrorist prosecutors has not been able to resolve
18   the investigation of BIF without conviction for
19   support of terrorism, although the OFAC action --
20   not -- shut down BIF, that victory came at the
21   considerable cost of negative public opinion in the
22   Muslim and Arab communities, who contend that the
23   government's destruction of these charities reflects
24   bias and injustice with no measurable gain to
25   national security.
```

```
 1                MR. HAEFELE:  Objection to form.
 2                Is there a question?
 3       Q.    (BY MR. MOHAMMEDI)  Do you -- have you
 4    considered this?
 5                MR. HAEFELE:  Objection to form.
 6       A.    Yes, I read the terrorist financing staff
 7    monograph.  And these cases, complex financial crime
 8    cases from all counts.
 9       Q.    (BY MR. MOHAMMEDI)  Did you --
10       A.    Please allow me to respond.
11                Complex financial crime cases, I've seen
12    repeatedly, run into problems even when it was clear
13    to me, in connection with such cases, that there was
14    serious criminal activity.  I've seen this
15    repeatedly.  They are hard cases to make, because
16    the actions that relate to complex international
17    crime cases, which include terrorist finance cases,
18    can take place over a long time.  They can involve
19    people who aren't available for testimony in the
20    United States.  The source is going to be a
21    mixture -- can involve intelligence sources which
22    can't be readily converted into physical evidence.
23    So they are hard case to make.
24                In this case, there is a reference here
25    to at least after al-Qaeda was designated a foreign
```