# EXHIBIT 2

```
 1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2
 3    IN RE: TERRORIST ATTACKS    )  03-MDL-1570 (GBD) (SN)
      ON SEPTEMBER 11, 2001       )
 4                                )
 5
 6
 7
                          — — —
 8
                   Tuesday, July 13, 2021
 9                        — — —
10              THIS TRANSCRIPT CONTAINS
                  CONFIDENTIAL MATERIAL
11                        — — —
12
13     Remote video-recorded deposition of JONATHAN M.
      WINER, held at the location of the witness,
14    commencing at 10:04 a.m., on the above date, before
      Debra A. Dibble, Certified Court Reporter,
15    Registered Diplomate Reporter, Certified Realtime
      Captioner, Certified Realtime Reporter and Notary
16    Public.
17
                          — — —
18
19
20
21
22
23
                  GOLKOW LITIGATION SERVICES
24            877.370.DEPS | fax 917.591.5672
                     deps@golkow.com
25
```

1  the information is accurate?

2      A.    I believe that he ran LBI.  And in the
3  deposition of Noor Wali, Noor Wali talks about
4  Batterjee's central role.

5      Q.    I do understand that.  But you paint him
6  as a chairman of LBI; correct?

7      A.    He ran it.  Did he have the formal title
8  of chairman?  I don't recollect.

9      Q.    And it is fair to say you have not
10 reviewed documents produced in this case as to the
11 role of Batterjee with LBI; correct?

12     A.    I don't think it's fair to say that.  I
13 reviewed Noor Wali's deposition, which goes into it
14 in some depth about Batterjee's role.  I reviewed
15 other documents in which Batterjee was characterized
16 as the founder of LBI.  This includes the U.S.
17 government, and I think the UN's findings about
18 Batterjee, which in turn are consistent with the
19 proffer in the Arnaout case, put together by Patrick
20 Fitzgerald.  All of this is made complicated by the
21 fact that the word al-Barr in Arabic, A-L dash
22 B-A-R-R, I understand to be the word that's
23 translated often as "benevolence."  And that becomes
24 part of the elements of confusion, as well as what
25 Batterjee was doing within LBI and what Batterjee

1  was doing within what's known as BIF.
2      Q.    Mr. Winer, really -- I think -- that is
3  not my question, and you -- you know, we're spending
4  a lot of time, and I don't have it.  I am
5  specifically asking you if you get this
6  information -- where did you get this information
7  that Batterjee was the chairman of LBI?  That's the
8  only question I'm asking.
9      A.    I don't recollect.
10     Q.    Okay.  And then you go on in the
11 Section 12.12.15, at page 109, and quoting the New
12 York Times again, stated that:  If a BIF worker
13 decides he wanted to join fighting forces, we would
14 not stop him.  But he can no longer officially
15 represent our organization; correct?
16     A.    Yes.
17     Q.    But that's his quote, right?  That's the
18 New York Times quote, right?
19     A.    Yes.
20     Q.    You comment on 12.12.16, page 110, you
21 actually made it -- you changed that quote to say:
22 Instead, his clear message is that nothing would
23 change other than that a person engaged in jihad
24 could no longer "officially" be involved in our
25 organization.  And you said WAMY there?

1    A.    Yes.

2    Q.    You didn't say "our organization"; right?

3          MR. HAEFELE:  Form.

4    A.    I understood and believe that Batterjee

5  was carrying out work on behalf of WAMY and LBI at

6  the same time.  And the record shows --

7    Q.    (BY MR. MOHAMMEDI)  Which record are you

8  referring to?

9    A.    The record from the financial documents

10 that I looked at from the Batterjee deposition --

11 pardon me, I misspoke.  From the Noor Wali

12 deposition, for starters.  That WAMY was funding the

13 activities of LBI in Pakistan-Afghanistan, at the

14 time.  So I believed he was acting in both

15 capacities at that time in that location.

16   Q.    That's your belief; correct?

17   A.    Yes.

18   Q.    If I represent to you that the

19 document -- the documentary evidence in this case

20 shows that LBI/BIF as separate organization, do you

21 still rely on the government statement that does not

22 provide evidence on this matter?

23         MR. HAEFELE:  Objection to form and

24    foundation.  Misstates the evidence.

25   Q.    (BY MR. MOHAMMEDI)  Do you believe that a

This Transcript Contains Confidential Material

```
 1        Q.    It says extending the one date of
 2   Dr. Hassan Bahifz Allah, and that's No. 1 of the
 3   second No. 1.
 4        A.    I see that.
 5        Q.    Okay.  And the documents before talks --
 6   I mean, the same document talks about his -- the
 7   issue with the -- with the -- with Adel Batterjee,
 8   but here the extension of this extended the mandate
 9   of Hassan Bahifz Allah for an additional six months
10   that was following the dismissal of Mr. Batterjee.
11        A.    Where does it say that --
12        Q.    So we're going to show you -- if you
13   go -- if you go to page 7.
14              Make it a little bigger.
15        A.    It says:  The executive director briefly
16   spoke in his report of the latest updates regarding
17   the handover from the former director.  I don't see
18   the word "dismissal."  I see "handover."  And then I
19   see a reference to tension and a promise was made to
20   quickly and directly intervene to ease such tension.
21              What is the date of the document, sir,
22   please?
23        Q.    It's a meeting discussing the new
24   executive director that was an extension after six
25   months, which means Batterjee was not the executive
```

This Transcript Contains Confidential Material

```
 1   director starting February 1993; correct?
 2              MR. HAEFELE:  Objection, form.
 3        A.    It does -- it actually doesn't say that.
 4   It refers to a handover from the former director.
 5   And refers to an attempt to ease the tension, which
 6   suggests there are still actions to be taken.  So I
 7   can't assess from this when he was dismissed.
 8        Q.    (BY MR. MOHAMMEDI)  But you can assess
 9   that he was not with LBI as of February 1993,
10   correct?
11              MR. HAEFELE:  Objection, form.
12        A.    No, I cannot.
13        Q.    (BY MR. MOHAMMEDI)  You cannot?
14        A.    I can't tell what date he left, based on
15   this.
16        Q.    If you --
17        A.    If I may continue.  It looks to me from
18   this document that at some point in this period, a
19   new executive director took over from the old
20   executive director.  It doesn't say that the old
21   executive director was dismissed.  It does say that
22   there was tension and action going -- needed -- that
23   needed to take place to ease the tension.
24              So the dates -- the basic idea that he
25   was leaving the position seems to me the most
```

```
 1      Q.    Let's go back to 77 point -- 7.7.3.1.
 2            And we're going to discuss the proffer.
 3   And I know you mentioned it before, but let's go
 4   through that.
 5            In your reliance, do you have a proffer
 6   as a basis for analysis in forming your opinion?
 7      A.    It's one of the materials I considered,
 8   yes.
 9      Q.    Are you aware of how the federal report
10   would on direct motion supported by Santiago
11   proffer?
12      A.    Yes, I am.
13      Q.    Let me get Exhibit 34.
14               (Winer Deposition Exhibit 919, United
15                States v. Enaam M. Arnaout Memorandum
16                Opinion and Order, was marked for
17                identification.)
18      Q.    (BY MR. MOHAMMEDI)  And you go to order
19   page number 3.  And that's the Court order.
20            And if you can get the citation up there,
21   if you can go.
22               United States District Court, Northern
23   District of Illinois.
24               Have you seen this document?
25      A.    Yes.
```

```
 1       Q.    If you go to page 3.  And it's
 2   highlighted.
 3             You reviewed this document; correct?
 4   Before you rendered your opinion?
 5       A.    Yes.
 6       Q.    Why do you rely on rejected proffer?
 7       A.    Because the basis for the rejection is
 8   based on the hearsay rules that were applicable for
 9   a criminal case as found by a particular judge,
10   which prevented, as I understand the case,
11   additional sufficient evidence from the judge's
12   point of view to have co-conspirators.  And so the
13   exclusion --
14       Q.    And --
15       A.    Please allow me to finish.
16       Q.    Sorry, sorry.  Go ahead.  I thought you
17   finished.
18       A.    I was not finished.
19       Q.    No, sorry.  Go ahead.
20       A.    Thank you.
21             So as I understand the case, the judge's
22   ruling in relationship to the issue of hearsay
23   prevented information coming in regarding the other
24   co-conspirators, which thus caused an elimination
25   for a substantial portion of the case.
```

```
 1   the hearsay rules and the introduction of evidence

 2   in that case.

 3        Q.   Can you read the last -- I mean, it

 4   says -- when it says:  Given the insufficiency of

 5   the Santiago proffer, the Court cannot find by a

 6   preponderance of the evidence -- right -- that the

 7   proffer -- that -- I can't see it.  Unfortunately I

 8   have this.

 9             You read the statement, right?  So the

10   Court finds insufficient evidence in Santiago

11   proffer; correct?

12        A.   Let me read the sentence and then I will

13   provide you my assessment of it.

14             Given the insufficiency of the Santiago

15   proffer, the Court cannot find by a preponderance of

16   the evidence that the proffered statements -- that

17   would be proffered statements -- that the proffered

18   statements are admissible under the co-conspirator

19   exception to the hearsay rule before trial.

20             So this is a reference to proffered

21   statements by co-conspirators.  It's not about the

22   prosecutor's statement, it's about the proffered

23   statements about what the co-conspirators said, is

24   how I read that sentence.

25        Q.   And the Santiago proffer --
```

```
 1                was marked for identification.)
 2       Q.    (BY MR. MOHAMMEDI)  Sir, the government
 3   claim BIF are now subject to terrorism enhancement
 4   under the guidelines.  But the Court, if you go
 5   to -- let's see, what page do we have.  This
 6   highlight I'm trying to find out.  838.
 7             If you go down when you see the
 8   highlighted section.
 9             So the application here, it says, if you
10   see that:  Arnaout does not stand convicted of a
11   terrorism offense, and goes on.  Do you want to read
12   that for us, Mr. Winer?
13       A.    I read it.
14       Q.    You read it?  Do you agree with that?
15             MR. HAEFELE:  Objection to form.
16       A.    The terrorist charges were dropped as
17   part of the plea agreement.  That's accurate.
18       Q.    (BY MR. MOHAMMEDI)  And is it because the
19   government could not meet its burden; correct?
20             MR. HAEFELE:  Objection to the form.
21       A.    My understanding of the case as laid out
22   in my report and my rebuttal report, is that the
23   judge's decision on the admissibility of statements
24   by co-conspirators impaired the government's case,
25   and thus the government was not going to be able to
```

```
 1                    MR. HAEFELE:  Objection to form.
 2                    Is there a question?
 3          Q.   (BY MR. MOHAMMEDI)  Do you -- have you
 4     considered this?
 5                    MR. HAEFELE:  Objection to form.
 6          A.   Yes, I read the terrorist financing staff
 7     monograph.  And these cases, complex financial crime
 8     cases from all counts.
 9          Q.   (BY MR. MOHAMMEDI)  Did you --
10          A.   Please allow me to respond.
11                    Complex financial crime cases, I've seen
12     repeatedly, run into problems even when it was clear
13     to me, in connection with such cases, that there was
14     serious criminal activity.  I've seen this
15     repeatedly.  They are hard cases to make, because
16     the actions that relate to complex international
17     crime cases, which include terrorist finance cases,
18     can take place over a long time.  They can involve
19     people who aren't available for testimony in the
20     United States.  The source is going to be a
21     mixture -- can involve intelligence sources which
22     can't be readily converted into physical evidence.
23     So they are hard case to make.
24                    In this case, there is a reference here
25     to at least after al-Qaeda was designated a foreign
```

```
 1   terrorist organization in 1999.  One of the issues
 2   in the BIF case, as I understand it, was in the time
 3   period that the -- that was relating to the proofs.
 4   Some of the activity that the government alleged was
 5   from older activity.
 6              So all of those, that has to be taken
 7   into consideration, as one thinks about this
 8   paragraph.
 9              Finally, from the question of negative
10   public opinion, in any community, contend that
11   destruction of the charity reflects bias and
12   injustice, with no measurable gain to national
13   security.  I don't, as an expert, view the public
14   opinion in a particular community, whether it's
15   Muslim, Christian, or Jewish, Arab or Hispanic or
16   Latin, or any other group, to be a determining
17   factor of whether one should bring a case if a
18   prosecutor believes that they have a criminal case
19   to make.
20              And so I note here that the terrorist
21   financing staff monograph doesn't say that it
22   should, it simply said that these communities
23   contended this.
24              And so that's how I thought about this
25   paragraph when I read it, and that's how I think
```

This Transcript Contains Confidential Material

```
 1   about it now.
 2       Q.   (BY MR. MOHAMMEDI)  So your opinion, all
 3   the exhibit they enter here into evidence for you to
 4   look at, you don't think there were, you know, you
 5   have a better understanding of all of these findings
 6   than those exhibits that we entered into evidence
 7   today that you did not consider them also in your
 8   report; correct?
 9            MR. HAEFELE:  Objection to form.
10       A.   That's a misstatement of my testimony.
11       Q.   (BY MR. MOHAMMEDI)  Okay.  That is -- I'm
12   not saying this is your statement, and actually I'm
13   asking the question, and that's fine.
14       A.   What is your question, please?
15       Q.   The question, you are -- all the exhibits
16   that we entered now into evidence for you to
17   evaluate, right?  Which you missed most of the time
18   in your reports, those evidence are not enough for
19   you to conclude -- right? -- what you have not
20   concluded before in your report by not considering
21   this information -- those information; correct?
22            MR. HAEFELE:  Objection to form.
23       Q.   (BY MR. MOHAMMEDI)  You still stood by
24   your opinion, what you wrote in your report;
25   correct?
```