**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

In re:

     **TERRORIST ATTACKS ON**
     **SEPTEMBER 11, 2001**

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __4/27/2023__

**03-MD-01570 (GBD)(SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

     The Court ordered the Plaintiffs' Executive Committees ("PECs" or "Plaintiffs") and Defendants Dubai Islamic Bank ("DIB"), World Assembly of Muslim Youth and World Assembly of Muslim Youth International (together, "WAMY"), International Islamic Relief Organization ("IIRO"), Muslim World League ("MWL"), Abdullah Omar Naseef ("Naseef"), Abdullah bin Saleh al Obaid ("Obaid"), Abdullah Abdelmohsen al Turki ("Turki"), Adnan Basha ("Basha"), and Yassin Kadi ("Kadi") (collectively, "Defendants") to file bellwether Daubert challenges to the opposing parties' proffered experts. ECF No. 7160. Between them, the parties moved to exclude the testimony of six witnesses. ECF Nos. 7342, 7345. Upon reviewing these witnesses' credentials, depositions, and the nine reports and declarations they produced, the Court grants in part and denies in part these motions.

## BACKGROUND

     The Court assumes familiarity with this multidistrict litigation and summarizes only the relevant procedural and factual background.

     The parties retained a range of experts to opine on Defendants' alleged material support for al Qaeda and the 9/11 Attacks. During the expert discovery period ending August 6, 2021, they exchanged 23 proposed expert reports and conducted 16 depositions. See ECF No. 6815. These experts come from different professions, hold different degrees, use different

methodologies, and speak to different aspects of the case. At the Court's instruction, the parties selected six experts to challenge under the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). See ECF No. 7160. The Court's rulings on these challenges should guide the parties as they identify or move to exclude other expert witnesses.

Defendants moved to exclude the testimony of Brian Michael Jenkins ("Jenkins") and Jonathan Winer ("Winer"). See ECF No. 7342. Jenkins, a senior advisor at the RAND Corporation, submitted a report entitled "The Road to 9/11: The September 11 Terrorist Attack on the World Trade Center" (the "Jenkins Report"), explaining how al Qaeda planned and executed the 9/11 Attacks. ECF No. 7344-3. Winer, a lawyer and consultant, submitted affirmative and rebuttal reports ("Winer I" and "Winer II," respectively), addressing terrorist financing, the role of charities, and sanctions. See ECF Nos. 7344-1, 7344-2.

Attached to its opposition brief, the PECs filed a new declaration from Winer defending his qualifications (the "Winer Declaration"). See ECF No. 7609. Defendants moved to strike the entire declaration as impermissibly argumentative, but the Court declined because "most of the Declaration's content [was] proper." ECF No. 7647 at 4. The Court noted, however, that the Winer Declaration contained "legal conclusions" and "pure argument," which are beyond the scope of expert testimony. Id. at 3.

Then on June 17, 2022, following the declassification of Central Intelligence Agency documents in March and April, the PECs served Defendants with a "supplementary" report written by Winer ("Winer III"). ECF No. 8345-1. Defendants moved to exclude that report as procedurally improper and untimely under the Federal Rules of Civil Procedure, as well as inadmissible under the Federal Rules of Evidence and Daubert. See ECF No. 8343. The Court

2

granted that motion and struck Winer III on March 6, 2023. ECF No. 8905. Objections to that

order are currently pending before Judge Daniels. See ECF No. 8939.

The PECs moved to exclude the testimony of Jonathan Benthall ("Benthall"), Charles W.

Freeman ("Freeman"), Jonathan Marks ("Marks"), and John Sidel ("Sidel"). ECF No. 7345.

Benthall, an anthropologist who has studied charitable organizations in the Middle East,

submitted two reports, one on behalf of the MWL, IIRO, Naseef, Obaid, Turki, and Basha, and

the other on behalf of Kadi (collectively, the "Benthall Reports"). See ECF Nos. 7351-1, 7351-2.

Freeman, a fellow at Brown University's Watson Institute for International and Public Affairs,

wrote "Saudia Arabia's Society and Government" (the "Freeman Report") on behalf of WAMY.

ECF No. 7351-3. Marks and his accounting firm, Baker Tilly US, LLP, submitted a rebuttal

report (the "Marks Report") evaluating WAMY's finances. See ECF No. 7351-4. Sidel, the Sir

Patrick Gillam Professor of International and Comparative Politics at the London School of

Economics, produced a report discussing the history of religious conflict in the Philippines and

Indonesia (the "Sidel Report"). See ECF No. 7351-5.

## DISCUSSION

Expert testimony is governed by the Federal Rules of Evidence.[1] Rule 702 tells us who

may give expert testimony and about what; Rule 703 tells us what information they may rely on;

and Rule 403 tells us when otherwise admissible testimony should be excluded. These Rules, and

the body of caselaw interpreting them, help courts fulfill their "gatekeeping" role—"ensuring

that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

Daubert, 509 U.S. at 597.

---

[1] Unless otherwise noted, subsequent references to "Rules" are to the Federal Rules of Evidence.

3

**Rule 702** permits a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify if:

- her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue";

- her "testimony is based on sufficient facts or data";

- her "testimony is the product of reliable principles and methods"; and

- she has "reliably applied the principles and methods to the facts."

Fed. R. Evid. 702. The party proffering expert testimony "bears the burden of establishing these admissibility requirements." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 253 (2d Cir. 2016).

Courts have a degree of "'flexib[ility]'" to tailor the Rule 702 inquiry to the needs of the case and the discipline of the expert. United States v. Farhane, 634 F.3d 127, 158 (2d Cir. 2011) (quoting Daubert, 509 U.S. at 594). For experts in the hard sciences, courts often evaluate reliability using the four Daubert factors: whether the witness's "methodology or theory has been or can be tested"; whether it "has been subjected to peer review and publication"; its "error rate"; and whether it "has gained general acceptance" in the scientific community. Clerveaux v. E. Ramapo Cent. Sch. Dist., 984 F.3d 213, 233 (2d Cir. 2021) (citing Daubert, 509 U.S. at 593–94). But these factors are poorly suited to terrorism experts, who are often security officials, social scientists, accountants, or historians. See Zaremba v. Gen. Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004) (explaining that Daubert factors should be applied only where reasonable). To ensure that their opinions are connected to the facts by more than "'the *ipse dixit* of the expert,'" Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) [hereinafter Joiner]), courts may look to other factors to analyze an expert's reliability, such as:

- whether the expert will "'testify about . . . [her] independent research . . . or whether the opinion was developed expressly for purposes of testifying'";

- whether she "'has unjustifiably extrapolated from an accepted premise to an unfounded conclusion'";

- whether she "'has adequately accounted for obvious alternative explanations'";

- whether she is "'as careful as [s]he would be in h[er] regular professional work'"; and

- whether her "'field of expertise . . . is known to reach reliable results for the type of opinion offered.'"

Deutsch v. Novartis Pharms. Corp., 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011) (quoting In re

Silicone Gel Breast Implants Prods. Liab. Litig., 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004)).

Even a "qualified" and "reliable" witness cannot testify unless his opinions are helpful to

the trier of fact. Fed. R. Evid. 702. As the Court of Appeals has explained, "[t]estimony is

properly characterized as 'expert' only if it concerns matters that the average juror is not capable

of understanding on his or her own." United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008). It

follows that testimony that "'is not beyond the ken of the average juror'" is inadmissible as

expert evidence. United States v. Zhong, 26 F.4th 536, 555 (2d Cir. 2022) (alterations in

original) (quoting United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)).

Expert testimony must also be relevant. Relevance is measured against the proffering

party's theory of the case. In re Pfizer Inc. Sec. Litig., 819 F.3d 642, 659 (2d Cir. 2016). It turns

on whether the testimony "has any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be

without the evidence." Amorgianos, 303 F.3d at 265 (cleaned up); accord Fed. R. Evid. 401.

Unlike lay witnesses, qualified expert witnesses are "permitted wide latitude to offer

opinions" on relevant subjects, "including those that are not based on firsthand knowledge or

observation." Daubert, 509 U.S. at 592. In particular, experts in terrorism cases may be well-

positioned to "synthesize dense or voluminous . . . texts," "offer background knowledge or context that illuminates . . . past events," or "identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson." Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135–36 (2d Cir. 2013). Here, this may include insight into "al Qaeda's origin, leadership, and operational structure, as such testimony will aid the jury in understanding" the group's history and operations.[2] United States v. Paracha, No. 03-cr-01197 (SHS), 2006 WL 12768, at *21 (S.D.N.Y. Jan. 3, 2006), aff'd, 313 F. App'x 347 (2d Cir. 2008); accord United States v. Abu-Jihaad, 553 F. Supp. 2d 121, 123 (D. Conn. 2008) (approving expert testimony as to the "history, structure, and goals of al Qaeda, the recruitment of Muslim fighters, mujahideen activities . . ."); see also Amuso, 21 F.3d at 1263–64 (same as to criminal organizations).

Yet certain areas remain out of bounds. Experts cannot testify to "legal conclusion[s]," Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992); offer "speculative," "conjectural," or "conclusory" opinions, Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008); or opine "as to the motivations and intentions" of individuals or entities, Marvel Characters, 726 F.3d at 135–36. Collectively, these limits ensure that witnesses do not invade the judge's authority to tell the jury what the law is, Hygh, 961 F.2d at 363, or "'usurp[] the jury's function'" to weigh the facts and reach an ultimate decision on an issue, Zhong, 26 F.4th at 556 (alterations in original) (quoting United States v. Dukagjini, 326 F.3d 45, 54 (2d Cir. 2003)).

**Rule 703** dictates that an expert may base his opinion on any "facts or data" (admissible or not) that "experts in the particular field would reasonably rely on." In the terrorism field,

---

[2] This opinion uses the term "jury" to refer to the finder of fact.

courts recognize that experts "must, perforce, rely often on hearsay," Abu-Jihaad, 553 F. Supp. 2d at 126, rather than "fieldwork, as terrorist organizations necessarily are secretive and dangerous, and there may be political reasons against meeting with reputed terrorists," Strauss, 925 F. Supp. 2d at 439.

Here, too, there are limits. "'[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.'" Marvel Characters, 726 F.3d at 136 (quoting Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)); accord Mejia, 545 F.3d at 197. After all, if an expert simply repeats someone else's statements and does not "apply[] [her] expertise to that hearsay evidence," then the jury does not need help understanding the underlying hearsay and it is an improper subject for expert testimony. Dukagjini, 326 F.3d at 58; accord Zhong, 26 F.4th at 555 (precluding expert testimony about matters a jury can understand). Introducing hearsay through the mouth of the expert also denies "the jury the information it need[s] 'to factor into its deliberations the reliability (or unreliability) of the particular source." Mejia, 545 F.3d at 198 (quoting Dukagjini, 326 F.3d at 57 n.7). Without that information, the jury's ability to "judg[e] . . . [the] credibility" of the evidence "and draw[] inferences" is compromised. Marvel Characters, 726 F.3d at 136. An expert properly relies on hearsay where she "piece[s] together bits of information from different sources and reach[es] a studied conclusion." Mejia, 545 F.3d at 198. Otherwise, hearsay is admissible only as provided in Rules 802 and 803.

**Rule 403**[3] additionally permits courts to exclude expert testimony "if its probative value is substantially outweighed by the danger of unfair prejudice." Dukagjini, 326 F.3d at 51–52 (cleaned up). Exclusion under Rule 403 is appropriate where the testimony "cloud[s] the issue for the jury," United States v. Gatto, 986 F.3d 104, 118 (2d Cir. 2021), "waste[s] time by diverting attention from the . . . relevant" evidence, United States v. Gabinskaya, 829 F.3d 127, 134 (2d Cir. 2016), or would "induce[e] [the jury to] deci[de] [the case] on a purely emotional basis," Fed. R. Evid. 403 advisory committee notes to 1972 proposed rules.

Collectively, the Rules "'embod[y] a liberal standard of admissibility for expert opinions.'" United States v. Napout, 963 F.3d 163, 187 (2d Cir. 2020) (quoting Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005)). Courts faced with questionable witness testimony opt for the mildest effective remedy. If testimony is merely "shaky," Daubert, 509 U.S. at 596, any weaknesses "'go to the weight of the evidence, not to its admissibility.'" SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 134 (2d Cir. 2004) (quoting Campbell, 239 F.3d at 186). Such weaknesses can be adequately addressed by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509 U.S. at 596; see SR Int'l Bus. Ins., 467 F.3d at 134 (approving cross-examination to confront "gaps or inconsistencies" in an expert's testimony); Amorgianos, 303 F.3d at 267 (same as to a "lack of textual support" for the expert's conclusions in academic literature); United States v. Joseph, 542 F.3d 13, 21–22 (2d Cir. 2008), abrogated on other grounds by Hedgpeth v. Pulido, 555 U.S. 57 (2008), as recognized in United States v. Waqar, 542 F.3d 13 (2d Cir. 2008) (same

---

[3] Because the Court requested "[b]ellwether Daubert motions," Defendants declined to challenge Winer's and Jenkins's testimony under Rule 403 at this stage and "reserve[d] the right to raise such [evidentiary] challenges" later. ECF No. 7343 at 7.

as to academic training). If testimony has more substantial reliability issues, courts excise "only the unreliable testimony" and permit the jury to hear the remainder. In re Pfizer, 819 F.3d at 665. They reserve the most drastic measure—excluding a witness from testifying altogether—for experts who lack the minimum credentials or whose testimony is significantly corrupted. See Dukagjini, 326 F.3d at 54 (directing courts to exclude testimony altogether "if the witness is not actually applying expert methodology"); Amorgianos, 303 F.3d at 267 (same where a methodological "flaw is large enough").

Against this backdrop, the Court evaluates each of the witnesses and their proffered testimony.

## I.     Brian Michael Jenkins

Brian Michael Jenkins is a senior advisor at the RAND Corporation, a policy thinktank with ties to the national security establishment. See ECF No. 7344-3 at 39. He has served on both the White House Commission on Aviation Safety and Security and the National Commission on Terrorism. Id. He has testified about terrorism before House and Senate committees dozens of times and has published scores of books and articles on the subject. Id. at 40–62.

The Jenkins Report addresses "the origin, planning, and development of the 9/11 plot (including discussion of various precursors and testing of previous plots); the roles of relevant actors in originating, planning, and developing the plot; the training and selection of operatives; operational aspects of the plot and attack; and the events of the day of the 9/11 attack." Id. at 2.

Defendants challenge Jenkins's testimony on five grounds. They allege he: (1) lacks the expertise to offer religious opinions; (2) does not reliably apply his methodology; (3) testifies to irrelevant background information; (4) impermissibly opines on states of mind; and (5) acts as an improper conduit for hearsay.

**First**, Defendants protest that Jenkins is unqualified to opine on Islam. See ECF No. 7343 at 15. They maintain he lacks the "knowledge, skill, experience, training, or education" to explain the history of the faith or the differences between its sects. Fed. R. Evid. 702; see ECF No. 7344-3 at 39–50. Jenkins, himself, eschews any claim to expertise in religion or the history of Islam. See ECF No. 7344-7 at 65. Plaintiffs downplay this admission, arguing that Jenkins's knowledge of extremist violence and *jihad* qualifies him to testify about Islam, a "closely related" subject. In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); see ECF No. 7606 at 18; see also ECF No. 7344-3 at 40–42, 45–46 (listing Jenkins's publications and testimony on extremist violence and *jihad*).

Admittedly, a witness's expertise may cover topics related to other fields. "[A] proposed religious expert," for instance, "wouldn't need to be a biologist to opine that eating pork violates Islam." Tate v. Carr, No. 20-cv-00302 (JDP), 2021 WL 4972444, at *1 (W.D. Wis. Oct. 26, 2021). But that logic does not work in reverse—neither a pig farmer nor a biologist could explain to a jury what food is considered *haram*. By the same token, Jenkins's specific focus on violent *jihad* does not qualify him to describe the evolution of religious doctrine or the nuanced distinctions between Islam's sects. See Wilson v. Pepsi Bottling Grp., 609 F. Supp. 2d 1350, 1360 (N.D. Ga. 2009) (precluding witness with "expertise in the construction of white identity, but not racial identity in general," from opining "whether Ismaili Muslims were a race"). Some of Jenkins's proffered testimony strays too far afield from his expertise, offering interpretations of the Quran and describing the relationship between Wahhabism and Salafism. See ECF No. 7344-3 at 18–19. Accordingly, Jenkins may not testify on those topics but may opine on al Qaeda's ideology and violent *jihad*.

**Second**, Defendants question the Jenkins Report's dearth of citations and, by extension, Jenkins's adherence to his methodology. See ECF No. 7343 at 30, 39. Jenkins's "historical methodology" involves assembling material sources, identifying comparators, and making judgments supported by the available information. ECF No. 7344-7 at 22–23, 27, 31, 33. As Defendants note, Jenkins failed to footnote many of the propositions in his report and struggled to identify certain citations during his deposition. See ECF Nos. 7343 at 30, 7344-7 at 34. He did, however, provide an 11-page list of reliance materials and a 7-page list of his own publications. ECF No. 7344-3 at 43–50, 52–62. We cannot require much more from historical experts whose fields lack the "'exactness of hard science methodologies.'" Joseph, 542 F.3d at 21 (quoting Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1297 (8th Cir. 1997)). Jenkins has offered "some explanation as to how [he] came to his conclusion[s] and what methodologies or evidence substantiate" them. Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006). That is enough to admit his testimony, and Defendants are free to attack his "testimony's weight" by "'quibbl[ing]'" with his citations on cross-examination. Joseph, 542 F.3d at 21 (quoting McCullock v. H.B. Fuller co., 61 F.3d 1038, 1043 (2d Cir. 1995)).

**Third**, Defendants assert that Jenkins should be barred from testifying to irrelevant background information. ECF No. 7343 at 19. They specifically object to Jenkins's discussion of history "that long predates Al Qaeda, covers actors . . . with no connection . . . to Al Qaeda, and details . . . events with absolutely no relation to 9/11," including the 1993 World Trade Center bombing and the Bojinka plot. Id. The Court agrees in part.

Jenkins devotes roughly a fifth of his 32-page report to terrorism trends dating back to the 1970s. See ECF No. 7344-3 at 6–11, 13–14. This history, while edifying, will not "'aid the jury in resolving'" the core factual dispute: whether Defendants materially supported al Qaeda.

11

Daubert, 509 U.S. at 591 (quoting Downing, 753 F.2d at 1242). And in a case that will require the jury to synthesize reams of information, the Court is mindful that it must exclude any evidence that would pointlessly add to that task. Cf. Capri Sun GmbH v. Am. Beverage Corp., 595 F. Supp. 3d 83, 133 (S.D.N.Y. 2022) (approving expert testimony that would "'sav[e] the jury time and avoid[] unnecessary confusion'" (quoting Scott, 315 F.R.D. at 45)). The Court therefore precludes Jenkins from testifying to irrelevant terrorism history. See ECF No. 7344-3 at 6–11, 13–14.

The 1993 World Trade Center bombing and the Bojinka plot are a different story. As Jenkins explains, both plots required coordination among broad networks. See ECF No. 7344-3 at 12–15. Khalid Sheikh Mohammed, a principal architect of 9/11, was firmly enmeshed in those networks; he assisted attackers in the wake of the 1993 bombing and helped develop the Bojinka plot. Id. This background may help the jury understand the relationships between various individuals and groups in the lead up to 9/11. And ultimately, it will inform the jury's decision as to whether Defendants' alleged relationships with terrorist actors constituted material support. It is relevant and admissible. See Amorgianos, 303 F.3d at 265 (applying Rule 401 relevance standard to expert testimony).

**Fourth**, Defendants object to Jenkins's "speculation as to motive and mental state." ECF No. 7343 at 23. No expert can divine an actor's subjective intent. A jury, as much as any expert, can evaluate evidence and draw conclusions about an actor's state of mind. In re Rezulin, 309 F. Supp. 2d at 546. The Court of Appeals has accordingly held that state of mind testimony is outside an expert's purview. Marvel Characters, 726 F.3d at 135–36. For example, it excluded an expert's opinion that a person "'subscribe[d] first and foremost to the concept of *jihad* to, as he

s[aw] it, cleanse or purify nominally Muslim countries.'" <u>United States v. Rahman</u>, 189 F.3d 88,

136 (2d Cir. 1999) (quoting counsel's description of proffered testimony).

The Jenkins Report includes descriptions of actors' "intentions or beliefs" analogous to

those excluded in <u>Rahman</u>. <u>Id.</u> For instance, it describes Khalid Sheikh Mohammed as "[n]ot an

especially pious man," one not "driven by religious devotion or ideological fervor," and "[a]

craftsman of violence, . . . more interested in the what, where, and how than in why." ECF No.

7344-3 at 17; <u>see also</u> <u>id.</u> at 7 ("People convinced that they have the mandate of God to kill their

foes, who they portray as enemies of God, have fewer moral qualms about mass murder and care

little about constituents on earth."), and at 18 (". . . bin Laden saw the Afghan resistance as

merely the first phase of a global *jihad*. Its Arab veterans would become the cadre of a vast

multinational host that would defend the faithful, bring down the Infidel aggressors, and bring an

end to Western influence in the Muslim world."). These statements and others like them are

beyond Jenkins's mandate to discuss al Qaeda's operations. Jenkins may address the

organization's history, structure, tactics, and stated aims, but he may not speculate about the

intent of individuals or the organization as a whole "without dispositive support." <u>Scott v.

Chipotle Mexican Grill, Inc.</u>, 315 F.R.D. 33, 47 (S.D.N.Y. 2016) (disapproving of expert

testimony about Chipotle's motivations).

**Fifth**, Defendants claim that Jenkins acts as no more than a conduit of hearsay from the

9/11 Commission Report. <u>See</u> ECF No. 7343 at 45. Jenkins is entitled to consider information

from the 9/11 Commission Report to formulate his opinions because "experts in the [terrorism]

field" "reasonably rel[y] upon" hearsay evidence. <u>Locascio</u>, 6 F.3d at 938; <u>accord</u> <u>Abu-Jihaad</u>,

553 F. Supp. 2d at 126; <u>see</u> <u>In re Sept. 11 Litig.</u>, 621 F. Supp. 2d 131, 153–56 (S.D.N.Y. 2009)

(analyzing 9/11 Commission Report under hearsay rules). But relying on hearsay and

"regurgitat[ing]" hearsay are two different things. Strauss, 925 F. Supp. 2d at 439. We expect experts to "gather[] information from multiple sources" and "cross-check[] factual information" against other accounts. Abu-Jihaad, 553 F. Supp. 2d at 126. They may not "merely repeat[] information [t]he[y] ha[ve] read or heard." Mejia, 545 F.3d at 197.

The Jenkins Report crosses this line. It expressly "incorporate[s] the discussion[s] from [Chapter 1, section 1.1, Chapter 5, section 5.3, and Chapter 7 of] the 9/11 [Commission] Report." ECF No. 7344-3 at 27. Jenkins uses this shortcut to avoid "repeating [the Report] ad nauseum," id., but merely "repeating" information is exactly what experts must avoid, Mejia, 545 F.3d at 197. Although Jenkins may rely on hearsay statements to support his testimony, he may not offer whole sections of the 9/11 Commission Report as his opinion. Doing so undermines the jury's ability to properly analyze the evidence. See Marvel Characters, 726 F.3d at 136; Mejia, 545 F.3d at 198.

**To summarize**, the Court concludes that Jenkins is qualified to testify as an expert but his testimony must be limited. Jenkins cannot testify about interpretations of Islam or the relationship between various sects because those subjects are outside his expertise. See ECF No. 7344-3 at 18–19. He cannot give unnecessary testimony about the history of terrorism, see id. at 6–11, 13–14, offer improper opinions about individuals' and organizations' states of mind, see id. at 7, 17, 18, or offer the 9/11 Commission Report as his own opinion, see id. at 27. His other opinions are admissible.

## II.    Jonathan Winer

Jonathan Winer is a lawyer in private practice and a scholar at the Middle East Institute. See ECF No. 7344-1 at 141. Early in his career he was counsel to Senator John Kerry, the then-chairman of the Senate Subcommittee on Terrorism, Narcotics, and International Operations. See

id. at 4. Later, Winer served as the Deputy Assistant Secretary of State for International Law

Enforcement and in the State Department's Bureau for Near Eastern Affairs. See id. at 5, 7. He

has written, lectured, published, and testified about national security issues for decades. See id. at

144–53.

Winer I and II discuss "the involvement of charities in international terrorist finance in

the period leading up to the 9/11 attacks," as well as "sanctions under U.S. law and under

processes involving the United Nations." Id. at 4.

Defendants challenge this testimony on seven grounds. They claim (1) Winer is

unqualified to address the issues in his report; (2) he failed to reliably apply his methodology; (3)

his opinions are disconnected from the facts; (4) he discusses irrelevant issues; (5) he

impermissibly draws legal conclusions; (6) he improperly opines on states of mind; and (7) his

testimony is based on inadmissible hearsay.

**First**, Defendants assert that Winer's experience does not qualify him to cover the

breadth of topics he addresses in Winer I and II. See ECF Nos. 7343 at 10–15, 7688 at 10–17.

They allege that he lacks the credentials to discuss al Qaeda, Islam, the Kingdom of Saudi

Arabia, charitable financial controls, and sanctions. See ECF No. 7343 at 11–12. Plaintiffs

defend Winer by pointing to his extensive government service, including his investigation into

the use of charities to carry out criminal activity, his work in academic institutions and the

private sector, and his publications in prominent journals. See ECF No. 7607 at 9–17.

Both parties urge the Court to consider Winer's prior testimony in its evaluation. See

ECF Nos. 7343 at 13, 7606 at 15. Many courts favorably cite prior expert testimony when

analyzing a witness's qualifications. See, e.g., WIZKIDS/NECA, LLC v. TIII Ventures, LLC,

No. 17-cv-02400 (RA), 2019 WL 1454666, at *12 n.4 (S.D.N.Y. Mar. 31, 2019) (finding witness

qualified in part because "he has testified as an expert witness . . . in various federal courts");

United States v. Tanguay, 895 F. Supp. 2d 284, 291 n.3 (D.N.H. Dec. 7, 2012) (same); Seals v.

Mitchell, No. 04-cv-3764 (NJV), 2011 WL 1399245, at *10 (N.D. Cal. Apr. 3, 2011) (same). A

court's restriction of a witness's testimony likewise carries weight. See, e.g., Topliff v. Wal-Mart

Stores East LP, No. 6:04-cv-0297 (GHL), 2007 WL 911891, at *5 (N.D.N.Y. Mar. 22, 2007)

(relying in part on previous finding that witness was unqualified to exclude opinion on apparel

flammability).

Prior Daubert analyses are by no means controlling, however. Another court's assessment

of an expert witness can be "irrelevant," United States v. Nacchio, 608 F. Supp. 2d 1237, 1252

n.24 (D. Colo. 2009), because the issues in the prior case may bear little relation to the "unique

facts" of the current one, Pedraza v. Davis, No. 2:17-cv-190 (MJK)(LAR), 2020 WL 4698325, at

*1 (N.D. Tex. Aug. 13, 2020) (declining to presume that expert was qualified based on prior

testimony).

Winer previously testified as an expert in Gill v. Arab Bank, PLC, 893 F. Supp. 2d 523

(E.D.N.Y. 2012). There, Winer was authorized to opine on "United States banking terminology,

standards, and practices," but not "Hamas and its interaction with charitable organizations." Id.

at 536. The court's opinion provides little explanation for this limitation, which in any event does

not address al Qaeda or Saudi Arabia. See id. The Court thus considers Gill only mildly

persuasive.

Winer boasts significant experience relevant to this case. As counsel to Senator Kerry, he

helped investigate the Bank of Credit and Commerce International, "which was involved in

serious corruption, fraud, narcotics money laundering, and the handling of terrorist funds." ECF

No. 7344-1 at 4–5. The investigative team ultimately developed the principles that formed the

foundation of the Financial Action Task Force ("FATF"), whose anti-money laundering and counter-terrorism finance standards are now "global norms." Id. at 5. During the five years Winer served as the Deputy Assistant Secretary of State for International Law Enforcement, he was the "senior U.S. diplomat focused on cross-border financial crime" and worked closely with the White House office tasked with coordinating the country's counter-terrorism efforts. Id. His position "required extensive analysis and understanding of terrorist financing modalities" and, toward the end of his stint, "became increasingly focused on the threat posed . . . by Osama Bin Ladin." Id. His work since has concentrated on the Middle East, including Saudi Arabia, and has involved money laundering and terrorist finance enforcement—including Office of Foreign Assets Control ("OFAC") sanctions. Id. at 5–8; see also ECF No. 7609 at 16–17.

Collectively, these experiences qualify Winer to discuss al Qaeda, Saudi Arabia, charitable financial controls, and OFAC sanctions. To the extent Defendants contest the depth of Winer's experience or its pertinence to the precise issues in this case, Defendants are free to cross-examine him on those points. See SR Int'l Bus. Ins. Co., 467 F.3d at 134. That leaves two areas of contention: Islam and UN sanctions.

Beginning with Islam, Defendants argue that Winer's legal and policy experience does not meet Rule 702's requirements for testifying about religion. See ECF No. 7343 at 11. Plaintiffs assert that Winer's "lack[ of] expertise in the specialized area[] that [is] directly pertinent"— religion—is outweighed by his "qualifications in a general field closely related to the subject matter"— counterterrorism and the Middle East. In re Zyprexa, 489 F. Supp. 2d at 282; see ECF No. 7606 at 14. This argument is belied by Winer's own description of his experience. His counterterrorism work focused on al Qaeda's financing, not its ideology (making him even less equipped to discuss Islam than Jenkins). His service in the diplomatic corps in the

17

Middle East centered on international law enforcement, financial regulation, and the like—not the social, cultural, or religious dynamics in the region. See ECF No. 7344-1 at 4–8. He has no expertise in religion, so his opinions on "Salafism" and "Wahhabism" are excluded. See id. at 16, 36.

Turning to UN sanctions, Defendants protest that Winer lacks the experience necessary to testify on Resolution 1267 listing and delisting processes. See ECF No. 7343 at 14–15. Plaintiffs' brief does nothing to defend Winer on this count. See ECF No. 7606 at 16–17 (discussing OFAC qualifications). Neither does the Winer Declaration, which buoys his credentials on OFAC sanctions and other subjects but not Resolution 1267 sanctions. See ECF No. 7609 at 16 (discussing sanctions experience only as to OFAC). It is Plaintiffs' duty to establish Winer's expertise, so the Court construes their silence as an admission. See In re Vivendi, 838 F.3d at 253 (placing burden to prove qualification on proffering party); cf. Doe v. Columbia University, 551 F. Supp. 3d 433, 473 (S.D.N.Y. 2021) (collecting cases holding that party's failure to respond to arguments concedes claim). Winer is accordingly prohibited from testifying about Resolution 1267 sanctions. See ECF No. 7344-1 at 94, 95, 135–36.

**Second**, Defendants question Winer's "all source" methodology. They posit that Winer has not "reliably applied the principles and methods to the facts" because he failed to review relevant financial records, employment records, and documents that elucidate the relationship between WAMY and Benevolence International Foundation. Fed. R. Evid. 702; see ECF No. 7343 at 33–39. The Court does not interpret Winer's description of his methodology so strictly. No witness, expert or otherwise, could readily review all the discovery in this case plus all publications relevant to the issues it presents. Winer pledged to analyze a range of evidence before arriving at a conclusion, just as other expert witnesses have. See, e.g., Paracha, 2006 WL

12768, at *20 (approving methodology that consisted of "gathering multiple sources of information, . . . cross-checking and juxtaposing new information against existing information[,] and evaluating new information to determine whether his conclusions remain consonant with the most reliable sources"). If there are additional relevant documents that contradict Winer's opinions, Defendants can effectively test his conclusions via cross-examination. See Daubert, 509 U.S. at 596. Exclusion on this basis is unwarranted.

**Third**, Defendants contend that Winer lacks any factual basis for his claims that MWL, WAMY, and IIRO provided funding and training to al Qaeda. See ECF No. 7343 at 25–30. They attack Winer's conclusions that Rabita Trust is linked to MWL, that a charity's lack of financial controls suggests links to terrorism, and that the Canadian Revenue Agency report on WAMY showed massive deficiencies. See id.

Some of Winer's statements find support (or contradiction) in documentary evidence about which the parties and their experts disagree. Compare ECF No. 7343 at 28–30 (describing, for example, documents produced by IIRO that "make clear that the Rabita Trust was not a subsidiary of MWL"), with ECF No. 7606 at 38-42 (describing documents produced by Defendants that "confirm that the MWL and IIRO . . . exerted significant oversight and control over Rabita Trust's operations and activities"). These are factual disputes that a jury should decide and are fitting fodder for cross-examination. See SR Int'l Bus. Ins. Co., 467 F.3d at 134.

In other areas, Winer engages in speculation. He asserts that Defendants' discovery "cannot possibly represent all the actual documentation regarding financial transactions" with sanctioned individuals and entities, and there "very likely . . . is, or was, additional documentation which could provide further information on the extent to which these organizations provided assistance to *jihadists* in zones of conflict." ECF No. 7344-1 at 118; see

also id. at 121 (conjecturing that the existence of an audit that finds deficiencies "suggest[s] that other audits would find similar deficiencies, making the financial records that do exist at best untrustworthy and unreliable"). It is the role of an expert to apply his methodology to the facts of the case, not to imagine new ones. See Fed. R. Evid. 702; cf. Daniel Patrick Moynihan, Wash. Post, Jan. 18, 1983 ("Everyone is entitled to his own opinion, but not his own facts."). As such, Winer's speculation about such documents is excluded. See Major League Baseball Props., 542 F.3d at 311 (precluding speculation, conjecture, and conclusory opinions); ECF No. 7344-1 at 118, 121.

**Fourth**, Defendants challenge the relevance of Winer's testimony about the Saudi royal family's finances and post-9/11 OFAC designations. ECF No. 7343 at 17–18. As to the former, Plaintiffs counter that financial corruption among the Saudi royal family is a "building block" for Winer's opinion that "the absence of Ministry of Finance oversight or controls . . . allowed Saudi charities to operate with impunity." ECF No. 7606 at 19–20. This point can be made without reference to the royal family's personal spending. The Court therefore prohibits any detours into the lifestyles of the rich and famous. See ECF No. 7344-1 at 66–67 (discussing diplomatic cable describing family's "'fabulous wealth'").

As to the latter, Defendants provide no cogent explanation for excluding post-9/11 OFAC sanctions that rely upon information collected before designation. OFAC-related expert testimony has been admitted in other terrorism cases, and the Court will allow it here. See, e.g., Stansell v. Revolutionary Armed Forces of Colombia, 45 F.4th 1340, 1358 (11th Cir. 2022).

**Fifth**, Defendants take issue with Winer's "impermissible legal conclusions." ECF No. 7343 at 19. Experts cannot draw legal conclusions because they are "not qualified to compete with the judge in the function of instructing the jury" with the proper legal standard. Hygh, 961

F.2d at 363. Winer crosses that line on several occasions. He concludes that Defendants provided "material support" to al Qaeda, and that the conduct of individuals is attributable to Defendant organizations. ECF No. 7344-1 at 10, 83, 118. These conclusions speak to Defendants' liability, rather than adding helpful context or analysis. They "'usurp[] the jury's function'" to apply the law to the facts. Zhong, 26 F.4th at 556 (alterations in original) (quoting Dukagjini, 326 F.3d at 54). As such, Winer is precluded from offering these statements as his testimony. See ECF No. 7344-1 at 10, 83, 118.

**Sixth**, Defendants seek exclusion of testimony describing the "intent" of various charities and of the 9/11 Commission. ECF No. 7343 at 21–22. As explained above, experts are prohibited from "speculat[ing] as to the motivations and intentions" of organizations. Marvel Characters, 726 F.3d at 135–36. Winer I does that and more. It states that a charity's decisions "not to document what it was doing, even when it was legally required to do so, were *intended* to provide deniability and could be used to avoid the risk of legal liability for having provided funds to terrorists." ECF No. 7344-1 at 61. And, in a disturbing turn, it alleges that "people and institutions" in the Middle East often "inten[d] to avoid direct conflict with the West through duplicity, or engaging in a double game." Id. at 60. An expert cannot speak to the state of mind of an individual or a corporation, let alone that of a whole region. To do so while trafficking in stereotypes is "'self-evidently improper and prejudicial.'" Zhong, 26 F.4th at 557 (quoting United States v. Cruz, 981 F.2d 659 664 (2d Cir. 1992)); accord Jinro Am. Inc. v. Secure Invs., Inc., 266 F.3d 993, 1007 (9th Cir. 2001) (finding error where district court allowed expert "to generalize that most Korean businesses are corrupt, are not to be trusted and will engage in complicated business transactions to evade Korean currency laws"). These statements are therefore excluded as both prejudicial and improper state of mind testimony. See In re Rezulin,

309 F. Supp. 2d at 545–46 (excluding testimony as prejudicial and as improper state of mind evidence); ECF No. 7344-1 at 60, 61.

**Seventh**, Defendants challenge Winer's reliance on hearsay evidence. See ECF No. 7343 at 12, 42–45. Terrorism experts are permitted to rely upon hearsay, but they may not simply parrot what they have read or heard. Compare Locascio, 6 F.3d at 938 (confirming experts may rely upon hearsay), with Mejia, 545 F.3d at 197 (condemning experts who regurgitate other texts). Much of Winer I flirts with that line. Consider one of the more egregious examples:

> The 9/11 Commission reached a number of conclusions about the role that the Saudi charities played in funding al Qaeda's ability to attack the United States on 9/11, as set forth in its final report, issued July 22, 2004, based on extensive investigation, and reflecting the consensus of its bipartisan members:

> "Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudia [sic] Arabia and the Persian Gulf States. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the 'Afghan Arabs' drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the majahideen, or '[sic]holy warriors.'" p. 55

> "Al-Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia. Some individual donors surely knew, and others did not, the ultimate destination of their donations. . . . These financial facilitators also appeared to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause." p. 170

> "Al Qaeda also collected money from employees of corrupt charities. . . . It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large international charities – particular those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation. Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda." p. 170

> "In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, Al Qaeda operatives controlled the entire organization, including access to bank accounts. Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian operation." pp. 170-171.

ECF No. 7344-1 at 23–24 (paragraph numbers omitted) (quoting 9/11 Commission Report). As Winer acknowledges, these are the 9/11 Commission's conclusions, not his. 80% of the passage is directly quoted from the 9/11 Commission Report; the only original portion—the first paragraph—simply introduces the source. Such naked use of "cut and paste" has no place in an expert report. Strauss, 925 F. Supp. 2d at 439. Winer can rely on the 9/11 Commission's findings, yes, but only if he is compiling those findings with "bits of information from different sources" to say something more. See Mejia, 545 F.3d at 198. If all Winer has to say on this subject is what the Commission has already said, then the jury should hear it straight from the 9/11 Commission Report. See id. (explaining that when an expert transmits hearsay, he denies "the jury the information it need[s]" to evaluate credibility). As such, Winer cannot testify to the portions of his opinion that consist of extended quotes from a single hearsay source without any analysis. See ECF No. 7344-1 at 17, 19–24, 32–33, 34, 35–38, 44–45, 54–55, 96–98.

Winer can still rely on hearsay evidence if his opinion includes his own analysis. Consider a second example:

> The brief profile in the 1996 CIA Report of IIRO is of particular interest, as by1996 [sic] the CIA was aware of IIRO's involvement with bin Ladin amd [sic] terrorist activities, as specified in the excerpts from the 1996 CIA Report below:

> *"Headquarters in Jiddah, Saudi Arabia. The IIRO is affiliated with the Muslim World League (MWL) a major international organization largely financed by the Government of Saudi Arabia. Last year, the head of the MWL, who is appointed by King Fahd, was also chairman of the Board of Trustees of the IIRO. According to the IIRO literature, the IIRO has offices in over 90 countries."*

> "*Extremist Connections: Hamas, Algerians, Al-Gama'at al Islamiyya. Ramzi Ahmed Yousef, who is awaiting trial in New York for his suspected involvement in the World Trade Center bombing. Usama Bin Ladin, a wealthy Saudi-born businessman currently residing in Sudan who supports various Islamic extremist groups.*"
>
> "*Support for Extremist/Terrorist Activity: ... The former head of the IIRO office in the Philippines, Mohammad Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin. . . The IIRO helps fund six militant training camps in Afghanistan, according to a clandestine source.*"
>
> "*Links to other NGOs: "Coordination Council, HRA, Third World Relief Agency, Qatar Charitable Society, KJRC, Saudi High Commission.*"
>
> Comment: The brief profile of IIRO in the 1996 CIA Report shows the CIA as of that time to have concluded that IIRO was an (1) Islamic charity, operating all over the world; (2) providing support of terrorism in the Philippines and Islamic militant training in Afghanistan, involving (3) al Qaeda and bin Ladin, and (4) planning for further attacks on Americans. Over the past 24 years, there has been documentary, evidentiary, and analytical confirmation of each of these 1996 assessments.

Id. at 30–31 (paragraph numbers omitted) (italics in original). Winer is free to testify to the contents of his "Comment" because it purports to reach a conclusion by considering various "documentary, evidentiary, and analytical" sources. Id. at 31. If asked about the basis of his opinion, Winer may cite the 1996 CIA Report (or any other source he relied on) and summarize its contents. He may not, however, simply read the 1996 CIA Report into evidence as his initial testimony. Accordingly, where Winer I incorporates extended quotes from hearsay sources with commentary, the Court restricts Winer's direct testimony to his commentary. See id. at 25–28, 66–67, 84, 103–04. He may summarize the underlying hearsay evidence where necessary to respond to questions about the bases of his opinions.

**To summarize**, Winer is qualified to testify as an expert, but is unqualified to opine on Islam, see id. at 16, 36, or United Nations sanctions under Resolution 1267, see id. at 94, 95, 135–36. Winer may not speculate about the existence of additional documents or their contents,

see id. at 118, 121, testify about personal spending habits among the Saudi royal family, see id. at 66–67, draw legal conclusions about Defendants' material support or liability, see id. at 10, 83, 118, or opine on the intent of individuals, organizations, or cultures, see id. at 60, 61. Finally, Winer may not testify to opinions that consist only of quotes from a single hearsay source, see id. at 17, 19–24, 32–33, 34, 35–38, 44–45, 54–55, 96–98, but may offer his commentary or analyses and summarize the underlying hearsay when probed about the bases of his opinions, see id. at 25–28, 66–67, 84, 103–04.

## III.   Jonathan Benthall

Jonathan Benthall is an anthropologist currently affiliated with the University College London who was previously the Director of the Royal Anthropological Institute of Great Britain and Ireland. See ECF No. 7351-1 at 34. In 1996, his research took him to the Middle East for six months to study "Islamic organized charity." Id. He has published several books and scores of articles in peer-reviewed publications, several of which specifically address charitable giving under Islam. See id. at 34–41.

Defendants retained Benthall to produce two separate reports: one on behalf of MWL, IIRO, Naseef, Obaid, Turki, and Basha; the other on behalf of Kadi. See ECF Nos. 7351-1, 7351-2. Both reports detail the history and "role of charitable giving in Islam," the "[c]ultural norms and historical transparency issues surrounding Islamic" non-governmental organizations ("NGOs"), the constituencies these NGOs serve, and the practical challenges they face. ECF Nos. 7351-1 at 2, 7351-2.

Plaintiffs challenge Benthall's testimony on the grounds that: (1) he is not qualified to opine about terror financing; (2) he fails to apply his own methodology; (3) his testimony is irrelevant; (4) he improperly describes states of mind; and (5) he draws legal conclusions.

**First**, Benthall's qualifications permit him to testify within the scope of his stated expertise: "Islamic charities." ECF No. 7351-7 at 27. As explained above, prior qualification as an expert witness is persuasive to the extent the issues and scope of testimony mirror the case at hand. See *supra* at 15–16. In Linde v. Arab Bank, PLC, 922 F. Supp. 2d 316 (E.D.N.Y. 2013), the court convincingly found that Benthall's scholarship, his experience as an academic, and his roles advising charitable and government agencies qualified him to "opine on the role of charitable and non-governmental aid organizations . . . including their origins, their organization, governance, operations, and the needs to which they typically respond." Id. at 327; see ECF No. 7351-1 at 5–8 (describing qualifications). This precedent strongly favors his qualification here.

To the extent Plaintiffs suggest that Benthall departs from these topics and opines on financial issues he lacks the training to address, this critique fails on its own terms. See ECF No. 7346 at 17–19; Linde, 922 F. Supp. 2d at 327 (disapproving Benthall's testimony on "financial irregularities"). Plaintiffs acknowledge that "[a]lmost nothing in Benthall's reports addresses material support, terrorist financing, or money laundering." ECF No. 7346 at 17. Instead, Benthall employs his expertise to give the historical and practical context that will aid the jury in evaluating any irregularities in Defendants' operations. Benthall is free to testify accordingly and leave the financial analysis to other experts.

**Second**, Plaintiffs assert that Benthall should be disqualified as an expert witness because he failed to consult all the "types of material he identified" in the methodology sections of his reports. ECF No. 7346 at 47. This is splitting hairs. Benthall identified the range of materials he considers as an ethnographer. See ECF Nos. 7351-1 at 8, 7351-2 at 10. He is not bound to analyze all types of materials in all cases—just to consider information from diverse sources, like other social scientists. See id.; see, e.g., Paracha, 2006 WL 12768, at *20 (approving

methodology that consisted of "gathering multiple sources of information, . . . cross-checking and juxtaposing new information against existing information[,] and evaluating new information to determine whether his conclusions remain consonant with the most reliable sources"). Because he adhered to his methodology and courts have previously found similar methodologies reliable, the Court rejects Plaintiffs' challenge. Plaintiffs identify no other issues with Benthall's methodology or its application, so his testimony is admissible.

      **Third**, Plaintiffs seek to exclude as irrelevant and prejudicial portions of Benthall's testimony. To begin, Plaintiffs claim that the history of Islamic charities is irrelevant to the question of Defendants' liability. <u>See</u> ECF No. 7346 at 30–33. Not true. History can provide important "background knowledge or context that illuminates or places in perspective past events." <u>Marvel Characters</u>, 726 F.3d at 135–35. Benthall illuminates Defendants' conduct by cataloguing the theological roots of charity in Islamic societies and how those roots have influenced the structure of Islamic NGOs. <u>See, e.g.</u>, ECF Nos. 7351-1 at 10–12, 15–16, 27–28, 7351-2 at 12–17. To take just one example, Benthall explains that Islam esteems the "'person who practices charity so secretly that his left hand does not know what his right hand has given.'" ECF No. 7351-1 at 27. This testimony provides one explanation for *laissez-faire* accounting practices among charitable organizations and will aid the jury in evaluating Defendants' conduct. <u>Karavitis v. Makita U.S.A., Inc.</u>, 722 F. App'x 53, 55 (2d Cir. 2018) (explaining that expert testimony must "be helpful to the trier of fact"). This testimony is therefore admitted.

      Benthall's other big-picture opinions are not as relevant. His digressions into the evolution of nineteenth and twentieth century civil society and the challenges faced by Islamic NGOs since 9/11, for example, will not help determine Defendants' liability. <u>See</u> ECF No. 7351-

1 at 12–14 (discussing, for example, the rise of NGOs after various wars), 21–23 (stating, for

example, that the "overreaction against Islamic charities" has resulted in a *humanitarian*

*deficit*"). They are therefore excluded. See In re Air Disaster at Lockerbie Scot. on Dec. 21,

1988, 37 F.3d 804, 824 (2d Cir. 1994), abrogated on other grounds by Zicherman v. Korean Air

Lines Co., 516 U.S. 217 (1996) (approving decision to exclude "unhelpful" expert testimony).

Plaintiffs additionally challenge Benthall's discussion of positive work by the Defendant

charities. See ECF No. 7346 at 32–33. In their view, Defendants should confront allegations that

they supported al Qaeda by directly undercutting such claims. This is nothing but a strawman.

Benthall's descriptions of legitimate charity work help counter allegations that the Defendant

charities had dealings with al Qaeda. An organization engaged in legitimate charity work may be

less likely to support terrorism and other illegitimate endeavors, and that evidence will not

"confus[e] the issues." Fed. R. Evid. 403; see, e.g., ECF No. 7351-1 at 15 (describing IIRO's

humanitarian efforts). Testimony about Defendants' humanitarian work is therefore admissible;

extensive discussion of other charities' beneficent work, on the other hand, is inappropriate.

Plaintiffs also challenge Benthall's discussion of misconduct at Western charities. See

ECF No. 7346 at 33–34. Limited comparisons to Western charities are appropriate to illustrate

general principles. See Sec. & Exch. Comm'n v. Ambassador Advisors, LLC, 576 F. Supp. 3d

250, 257 (E.D. Pa. 2021) (permitting experts to "compare a party's conduct to [industry] customs

and practices"). But detours into Western governments' political influence on and regulation of

NGOs are unwarranted. See ECF Nos. 7351-1 at 23–24 (noting, for example, that "humanitarian

action [by Western NGOs] often provides a fig leaf for military intervention"), 7351-2 at 31.

These dynamics are not the subject of this litigation, so extended analysis of Western NGOs is

excluded. See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir.

1998) (upholding decision to exclude testimony about custom of partial performance as irrelevant where no party alleged partial performance).

Finally, Plaintiffs take umbrage at Benthall's critique of Winer I's allegedly Islamophobic statements. See ECF No. 7346 at 34–35. The Court has already excluded the offending sections of Winer's testimony, so rebuttal is no longer required. See *supra* at 21. Benthall's analysis of those sections is correspondingly excluded. See ECF No. 7351-1 at 30.

**Fourth**, Plaintiffs challenge Benthall's statements about organizations' liability for individuals' misconduct. See ECF No. 7346 at 53–54. They allege that these assessments improperly draw legal conclusions about Defendant organizations. Id. At multiple points in his report, Benthall cautions that "abuse by individual office-holders," ECF No. 7351-1 at 3, should not be attributed to the organization as a whole or assumed to indicate "systemic wrongdoing," ECF No. 7351-2 at 29. See also ECF No. 7351-1 at 17, 20. In so doing, he invades the provinces of the judge and the jury. Whether an individual's conduct can be attributed to his employer is a legal question upon which the Court is entitled to instruct the jury. See Hygh, 961 F.2d at 363 (reserving to the judge all instruction on legal standards). Whether individual conduct evidences systemic abuse is a factual determination the jury is entitled to make. See Zhong, 26 F.4th at 556 (reserving to the jury all ultimate conclusions about conduct). Benthall's liability conclusions are therefore inadmissible. See ECF Nos. 7351-1 at 3, 17, 20, 7351-2 at 29.

**Fifth**, Plaintiffs impugn Benthall's descriptions of Basha's and Kadi's states of mind. See ECF No. 7346 at 52, 54–55. An expert cannot opine as to another's state of mind, but he may testify to the goals of an organization, provided he has sufficient basis. Compare Rahman, 189 F.3d at 136 (precluding testimony about alleged terrorist's "intentions or beliefs"), with Abu-Jihaad, 553 F. Supp. 2d 121 (approving expert testimony as to the "history, structure, and goals

of al Qaeda, the recruitment of Muslim fighters, mujahideen activities. . .”). Benthall's testimony falls into both categories. On the one hand, he improperly concludes that Basha did not intend to provide material support based on "speculation" that others "ma[d]e it difficult for him" to curtail misconduct. ECF No. 7351-7 at 77:11–13, 80:6. On the other, he toes the line when he analyzes evidence of Kadi's goals for the Muwafaq Foundation. ECF No. 7351-2 at 36–39. Accordingly, the former is excluded and the latter is admitted.

**To summarize**, Benthall is qualified to testify as an expert. The Court excludes as irrelevant and unnecessary his opinions on the development of civil society, see ECF No. 7351-1 at 12–14, post-9/11 challenges Islamic charities have faced, see id. at 21–23, and extensive discussions of non-Defendant charities—especially with respect to Western NGOs, see id. at 23–24. Testimony rebutting Winer's allegedly Islamophobic characterizations is unnecessary because the Court excluded the relevant portion of Winer I. See id. at 31. Finally, Benthall cannot draw legal conclusions about Defendants' liability, see id. at 3, 17, 20; ECF No. 7351-2 at 29, or speak to their states of mind, see ECF No. 7351-7 at 77:11–13, 80:6.

## IV.    Charles W. Freeman

Charles W. Freeman is a fellow at Brown University's Watson Institute for International and Public Affairs. Over a long career in the diplomatic corps, Freeman served as Ambassador to Saudi Arabia and Acting Assistant Secretary of State for African Affairs. See ECF No. 7351-3 at 1.

The Freeman Report addresses "the history, politics, and culture of Saudi Arabia, including Wahhabism; world conflicts and their relationship to 9/11; the relationship between the Kingdom of Saudi Arabia ('the Kingdom') and WAMY; and the relationship between the Kingdom, Osama bin Laden, and al Qaeda." Id.

Plaintiffs challenge Freeman's testimony on five grounds. They assert that: (1) he is unqualified to opine on the topics discussed in his report; (2) his methodology is unreliable; (3) he gives conclusory opinions; (4) he offers state of mind testimony; and (5) his testimony is prejudicial.

The Court begins and ends its analysis with Freeman's methodology. Plaintiffs assert that Freeman's opinions are based only on his "*ipse dixit*," and thus are categorically unreliable. Joiner, 522 U.S. at 146; see ECF No. 7346 at 47–50. Defendants respond that Freeman's testimony is based on "his vast practical and field experience," and his opinions are "solidly supported by primary sources." ECF No. 7602 at 30. On Defendants' latter point, the Court disagrees.

Freeman's testimony lacks adequate support. His report includes sparse citations. And unlike Jenkins, his "reading list" is anemic and he appends no list of his own publications. ECF No. 7351-3 at 19. The sources he does name are problematic. He thrice cites Wikipedia—hardly the gold standard for scholarly or professional writing. And he includes a full-page endnote that he attributes to "a former U.S. intelligence officer who wishes to remain anonymous." ECF No. 7351-3 at 4, 12–3. When asked about the endnote in his deposition, he first maintained that it was a "quotation from an intelligence officer, retired." ECF No. 7351-8 at 30. When pressed about the source, he later confirmed that the quote came from a "blogger [named Tidewater] who was commenting on Colonel Patrick Lang's posting." Id. at 31. Despite having no personal knowledge of Tidewater's identity, Freeman incorporated the post verbatim. See ECF Nos. 7351-3 at 4, 12–3, 7351-8 at 31–32, 36–38. He then relied on the tenets of the post to support his conclusions. See ECF No. 7351-3 at 4, 12–13.

One could forgive Freeman for relying on an anonymous internet source. As other courts have recognized, terrorism experts "must, perforce, rely often on hearsay" to learn information about inherently clandestine organizations. <u>Abu-Jihaad</u>, 553 F. Supp. 2d at 126. But one cannot absolve Freeman for "mischaracterize[ing]" the provenance of the quote. <u>In re Taxotere (Docetaxel) Prods. Liab. Litig.</u>, No. 16-md-02740 (JTM), 2019 WL 3554211, at *2 (E.D. La. 2019). Academic integrity requires us to cite our sources.[4] It is a rule every student knows, but one Freeman violated. He replaced a standard citation to a blog comment with an unverified, third-hand description of its author as an intelligence officer. That decision does not reflect the "level of intellectual rigor" Rule 702 contemplated. <u>Zaremba</u>, 360 F.3d at 358.

The Court is concerned both by Freeman's failure to cite credible sources and his stubborn defense of his choice to whitewash the author of his endnote text. His intellectual dishonesty undermines the Court's confidence that Freeman has "reliably applied" "reliable principles and methods" "to the facts of the case." Fed. R. Evid. 702. What remains is only Freeman's assertion that his opinions are accurate. But an expert's "*ipse dixit*" is not enough. <u>Joiner</u>, 522 U.S. at 146. These defects taint all of Freeman's testimony, so the Court excludes it in its entirety.

## V.    Jonathan Marks

Jonathan Marks is a certified public accountant and a partner at Baker Tilley US, LLP who works on "global and cross-border fraud and misconduct investigations." ECF No. 7351-4 at 41. He has certifications in financial forensics, information technology, chartered global

---

[4] <u>See, e.g.</u>, Brown University, The Academic Code 6 (2012) https://college.brown.edu/sites/default/files/2022-04/Academic-Code.pdf ("Word-for-word inclusion of any part of someone else's written or oral sentence . . . requires citation in quotation marks and use of the appropriate conventions for attribution.").

management, and fraud examination. See id. at 3. He has taught auditing and forensic accounting and served on various professional task forces and boards. See id. at 4, 43–44.

Defendants engaged Marks as a rebuttal witness. See id. at 3. Together, he and his firm analyzed "primary source documents, including financial documentation from WAMY and its chapters and uses of WAMY's funding for the period 1992 through 2002." Id.

Plaintiffs move to exclude Marks's testimony on three grounds. They argue that: (1) he lacks the counterterrorism experience to opine on this case; (2) his methodology was unreliable; and (3) he improperly testifies to states of mind.

**First**, Plaintiffs protest that Marks has no experience with counterterrorism, al Qaeda, or charitable programs assisting refugees and orphans. See ECF No. 7346 at 22–23, 43. Consequently, they argue, Marks cannot evaluate whether WAMY diverted funds from its charitable endeavors to al Qaeda. See id. Here, the pork analogy is again instructive. "Just as a proposed religious expert wouldn't need to be a biologist to opine that eating pork violates Islam," a proposed forensic accountant does not need to operate a refugee camp to analyze misuse of charitable funding. Tate, 2021 WL 4972444, at *1; see ECF No. 7351-4 at 41 (listing Marks's certifications in financial forensics and fraud examination, among others).

During his thirty years in the field, Marks has conducted multiple Foreign Corrupt Practices Act investigations; led a special audit related to a $400 million fraud; and worked directly with the United States Attorney's Office, the Federal Bureau of Investigation, the Internal Revenue Service's Criminal Investigation Division, and United States Customs and Border Protection to investigate individuals and companies engaged in fraud, concealment, and conversion schemes. See ECF No. 7351-4 at 41–43. His technical skill, education, and experience amply qualify him to review WAMY's financial records for signs of diversion. See,

e.g., In re Bayou Group, LLC, 439 B.R. 284, 331–32 (S.D.N.Y. 2010) (approving forensic accountant as expert witness).

His lack of experience auditing refugee programs or terrorist accounts does not prevent him from helping the jury understand reams of financial information and potential signs of fraud. See F.D.S. Marine, LLC v. Brix Mar. Co., 211 F.R.D. 396, 402 (D. Or. 2001) (observing that an accountant's testimony would assist jurors in understanding evidence). Furthermore, where he has opined that practices are not consistent with terrorist financing, he has provided citation to the relevant standards. See, e.g., ECF No. 7351-4 at 10 (citing FATF publications in support of conclusion that "the institution of centralized controls is not reflective of 'typical terrorist financing modes and methodologies'"). Marks is qualified to testify as an expert, and any further questions about his qualifications can be raised on cross examination. See SR Int'l Bus. Ins. Co., 467 F.3d at 134.

**Second**, Plaintiffs attack the methodology Marks used and the evidence he considered when reaching his conclusions. See ECF No. 7346 at 14, 36–43. They object to his relying on others' analyses and claim his findings are only weakly supported by the documentary evidence. See id. They assert that Marks identified no methodology, did not have a list of red flags, could not answer operational questions about WAMY, and could not identify gaps in WAMY's financial documentation. See ECF No. 7346 at 50–52.

Marks testified that his methodology was guided by the principles set out in FATF publications, those identified by former FBI Agent Dennis Lormel, and his own forensic accounting experience. See ECF Nos. 7351-4 at 10, 21, 32, 7604-18 at 38 (noting "small" list of "reg flags"). His inability to respond to operational questions or identify gaps in financial documentation can be explained by the volume of evidence he and his team reviewed.

Reviewing that evidence single-handedly would be impractical, and experts are permitted rely on analyses by others. See Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 94–95 (2d Cir. 2000) (explaining that experts may rely on data collected or tests performed by others). Marks's methodology is thus sufficiently reliable to permit his testimony.

**Third**, Plaintiffs seek to exclude Marks's testimony as to WAMY's state of mind. See ECF No. 7346 at 55–56. The Marks Report includes several statements suggesting that WAMY did not "intentionally" or "knowingly" support terrorism. ECF No. 7351-4 at 10, 38. As previously discussed, whether WAMY intended to support al Qaeda is a conclusion for the jury to reach. See In re Rezulin, 309 F. Supp. 2d at 546. Any expert conclusions about WAMY's state of mind are thus improper. See id. Marks is free to opine that in his review of the financial documents, he did not find any suspect transactions or signs that would be consistent with fraud or misappropriation. He cannot, however, say what WAMY knew. See Marvel Characters, 726 F.3d at 135–36 (disapproving of expert testimony about motivations and intentions).

**To summarize**, Marks is qualified to testify as a rebuttal expert, but may not offer his opinion about WAMY's state of mind. See ECF No. 7351-4 at 10, 38.

## VI.    John Sidel

John Sidel is the Sir Patrick Gillam Professor of International and Comparative Politics at the London School of Economics. See ECF No. 7351-5 at 41. He previously held positions in South East Asian Politics at the University of London's School of Oriental and African Studies. See id. at 42. Since earning his doctorate in government from Cornell University, he has published dozens of peer-reviewed articles on South East Asian politics and history. See id. at 41, 43–46.

The Sidel Report discusses "the historical and political context within which violent conflict emerged and evolved" in the Philippines and Indonesia, the role of charitable organizations in those conflicts, and the "significance . . . of Southeast Asia within the global *jihad*." ECF No. 7351-5 at 2.

Plaintiffs challenge Sidel's testimony on five grounds. They claim: (1) he lacks the experience necessary to testify about the issues in his report; (2) his conclusions are not based on facts; (3) he discusses irrelevant issues; (4) he improperly evaluates states of mind; and (5) his opinions are prejudicial.

**First**, Plaintiffs challenge Sidel's qualifications. They allege that he has too little familiarity with charitable organizations, al Qaeda, terrorist financing and operations, the 9/11 Commission Report, the Philippines, and Indonesia. See ECF No. 7346 at 16, 24–27, 44–45. Sidel does not profess to be an expert on all these areas. See ECF No. 7602 at 52. His experience and training are in Southeast Asian political movements. See id. He has "publi[shed]" "peer[-]review[ed]" research informed by years of fieldwork in both the Philippines and Indonesia. Clerveaux, 984 F.3d at 233 (listing factors relevant to expert qualification); see ECF No. 7351-5 at 43–46 (listing publications). Although he does not specialize in terrorist movements, he is familiar with the "authoritative accounts of al-Qaeda and its development over the course of the 1990s and beyond." ECF No. 7604-33 at 52–53. Collectively, his own research and his engagement with scholarship in his field provide him insight into the relationships between various Southeast Asian religious movements and organizations. He therefore has the requisite "specialized knowledge" to qualify as an expert. Fed. R. Evid. 702; see ECF No. 7351-5 at 5–8 (describing Sidel's qualifications).

Sidel's testimony falls within the scope of that expertise. His affirmative opinions speak to the histories and operations of Southeast Asian groups with alleged connections to al Qaeda. See ECF No. 7351-5 at 3. And his rebuttal opinions flag methodological issues with the opposing experts' reports where they opine on Southeast Asian organizations or events. See id. at 4–5. Sidel's testimony on Southeast Asian history and culture "will help the trier of fact to understand" evidence of contact between Defendants and al Qaeda, so his expert testimony is admissible. Fed. R. Evid. 702.

**Second**, and relatedly, Plaintiffs attack the evidence Sidel relies on. They claim that he based his opinion on insufficient documentation and failed to conduct "independent research concerning allegations" of Southeast charities' ties to al Qaeda. ECF No. 7346 at 45; see also id. at 28. "Independent research" is not the only indicator of a solid methodology. See Deutsch, 768 F. Supp. 2d at 426 (cleaned up). Courts may consider many factors, including whether an expert was "as careful as he would be in his regular professional work," "adequately accounted for obvious alternative explanations," or "unjustifiably extrapolated from an accepted premise to an unfounded conclusion." Deutsch, 768 F. Supp. 2d at 426 (cleaned up) (listing factors courts can consider in evaluating an expert's methodology). Sidel's explanation of his methodology provides reassurance on these fronts. His report draws on a 20-page list of academic sources and evidence produced in discovery. See ECF No. 7351-5 at 48–67. It details the techniques he used to evaluate those sources, account for "competing explanations," and reach studied conclusions. See id. at 9. While Plaintiffs may view the evidence differently, they cannot point to a fundamental disconnect between Sidel's premises and his conclusions. His opinions have sufficient factual basis and are admissible.

**Third**, Plaintiffs suggest that the Sidel Report is irrelevant to the question of material support. See ECF No. 7346 at 45–46. Not so. Expert testimony is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Amorgianos, 303 F.3d at 265 (cleaned up) (applying Rule 401 to expert testimony). Unlike lay witnesses, experts may give background information, but even that information must help the jury decide the case. See Daubert, 509 U.S. at 592.

Much of the Sidel Report provides helpful context. It drills down on religious violence in Southeast Asia—a piece of the puzzle addressed more superficially in opposing reports. See, e.g., ECF No. 7344-3 (addressing Bojinka plot). This information will aid the jury in understanding al Qaeda's contacts in the region.

Other sections, however, fall short. The report includes an extensive history beginning with the "Islamicization of the Philippine archipelago . . . at the time of the Spanish conquest in the mid-16th century." ECF No. 7351-5 at 9–13. This information long predates the charities and events in question and will not help the jury understand the dynamics between the relevant Southeast Asian organizations and individuals. Conscious that the jury deciding this case will be faced with voluminous evidence, the Court excludes this background information as irrelevant. Cf. Capri Sun GmbH, 595 F. Supp. 3d at 133 (approving expert testimony that would "'sav[e] the jury time and avoid[] unnecessary confusion'" (quoting Scott, 315 F.R.D. at 45)).

**Fourth**, Plaintiffs suggest that Sidel improperly testifies to the states of mind of these organizations by concluding that their actions were "localized." ECF No. 7346 at 56–57. This attack misses the mark. Sidel's characterization of the groups' activities as "localized" speaks to what they did, where they did it, and to whom. See generally ECF No. 7351-5. This evidence

may ultimately relate to Khalifa's state of mind (because someone who intended to support global terrorism would likely engage in attacks beyond his small region), but it is still testimony about conduct. See ECF No. 7351-5 at 35 ("But the years that followed Khalifa's departure from the Philippines saw the *Abu Sayyaf* group focusing on localized criminal activities, rather than anything more recognizably 'global' or '*jihadi*' in orientation or impact."). Testimony about "action[s]" that may bear on "a party's state of mind" are permissible, so Sidel's characterizations are admitted. U.S. Commodities Futures Trading Comm'n v. Wilson, No. 13-cv-7844 (AT), 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016) (permitting testimony where expert did "not directly opine" on intent).

**Fifth**, Plaintiffs claim that Sidel's discussion of charities is prejudicial. See ECF No. 7346 at 45–46. They allege that affiliates of these charities have links to terrorism and discussing the charities without discussing those links would "confus[e] the issues." Fed. R. Evid. 403; see ECF No. 7346 at 45–46. Accepting this argument requires accepting Plaintiffs' theory of the case. Plaintiffs have yet to prove the existence, nature, and extent of these charities' links to terrorism and must do so to prevail on their claims. Defendants, for their part, may offer a competing view of the charities' activities and relationships. And as a defense witness, Sidel's testimony must be evaluated using the defense's theory of the case. See In re Pfizer, 819 F.3d at 659. Against that yardstick, Sidel's account does nothing to "confus[e] the issues." Fed. R. Evid. 403. Sidel provides "context," Marvel Characters, 726 F.3d at 136, that will "'aid the jury in resolving'" the role of Defendant organizations in supporting terrorism, Daubert, 509 U.S. at 591 (quoting Downing, 753 F.2d at 1242). This testimony is admissible.

**To summarize**, Sidel is qualified to testify as an expert, but the Court excludes his opinions about historical events too attenuated to impact the issues in this case. See ECF No. 7351-5 at 9–13.

## VII.    Bellwether Issues

These six experts present common issues that will likely reappear in this litigation. By issuing this detailed opinion, the Court intends to provide the parties with guidance for future Daubert challenges. To that end, it offers the following three observations.

Experts proffered in terrorism litigation generally boast acceptable academic or professional credentials. They tend not to be hard scientists and often rely on sources of information that in other fields would be considered suspect. That said, the Court must still police the reliability of these experts' methods and factual premises. It will generally find witnesses qualified where they describe their methodologies in detail; demonstrate that they analyze information in ways analogous to accepted social science, accounting, or national security practices; and provide citations to respected sources. If an opinion is supported only by the witness's *ipse dixit*, the Court will exclude the testimony.

In addition to qualifications and methodologies, the Court is attentive to the proper province of an expert's testimony. Experts in all cases must refrain from offering legal conclusions or testifying to states of mind. Here, this means avoiding characterizations of a Defendants' conduct as providing "material support" to al Qaeda or claiming that an individual or organization subjectively intended a specific outcome. Experts can, however, speak to the type of resources an organization or individual offered and their express aims. Further, to avoid burdening the jury with unnecessary evidence, the Court will exclude opinions that are not directly relevant to resolving the legal claims at issue.

Perhaps the most difficult issue is hearsay. The Court agrees with its sister courts that terrorism experts may rely on hearsay to reach their conclusions. But this does not give the parties a blank check to slip hearsay statements into expert reports. Experts are supposed to synthesize and interpret information for the jury, not parrot other sources. They should offer informed, original opinions even if those opinions are based exclusively on hearsay information. If an expert provides no commentary or analysis, if his testimony is nothing more than quotes from a single hearsay source, then the expert cannot properly testify to that content. The jury should instead learn that information, if at all, from the underlying source. The Court will therefore admit testimony that relies on hearsay but preclude testimony that merely repeats it.

The Court encourages counsel to consider these principles when challenging experts in the future.

## CONCLUSION

The parties' cross-motions to exclude expert witnesses are GRANTED in part and DENIED in part. See ECF Nos. 7342, 7345. Freeman's testimony is excluded in its entirety; all other witnesses are permitted to testify consistent with the limitations outlined in this opinion.

The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 7342 and 7345.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:    April 27, 2023
           New York, New York