## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | : |
| IN RE: TERRORIST ATTACKS ON | : Civil Action No. 03 MDL 1570 (GBD) (SN) |
| SEPTEMBER 11, 2001 | : ECF Case |
| | : |

This document relates to:

*All cases*

### DECLARATION OF JONATHAN WINER

I, Jonathan Winer, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that:

1.     I am an attorney licensed in the District of Columbia and Massachusetts and am currently the Principal at the Law Offices of Jonathan Winer in Washington, DC.

2.     At Plaintiffs' counsel's request, I wrote an expert report, dated March 10, 2020, and a rebuttal expert report, dated February 2, 2021.

3.     I was deposed by defense counsel over the course of two days, on July 13 and 14, 2021, spanning a course of over 17 ½ hours.

4.     I am providing this declaration in opposition to the motion to exclude my testimony (ECF No. 7342) filed on November 15, 2021, by defense counsel for the International Islamic Relief Organization (IIRO), Muslim World League (MWL), World Assembly of Muslim Youth (WAMY), and other defendants in this case, as argued in their Memorandum of Law filed with their motion (ECF No. 7343).

5.     This declaration is necessitated by defense counsel's failure to question me in adequate depth about my relevant experience during the 17 ½ hours of my deposition, despite the fact that it was all reflected on my CV.  Whether counsel chose not to fully explore these issues

1

in my testimony for strategic reasons or otherwise, I do not believe the defendants should be permitted to capitalize on those failures by mischaracterizing my work and experience.

6.       Defendants' arguments are premised on a number of (often vitriolic) assertions about me, my experience, and my expertise that are factually untrue; I am writing this declaration to set the record straight.

7.       For example, defendants are wrong where they indicate that my expertise is constrained to macro-level policy analysis in financial regulation of financial institutions to combat money laundering and terrorist financing (ECF No. 7343 at 11), and that my expertise does not extend to terrorist finance as applicable to al Qaeda or charities (id.).

8.       Defendants are also wrong where they argue that I do not have the requisite expertise to testify about financial record-keeping (*id.* at 8), charity controls (*id.*), accounting standards (*id.* at 12), that I lack the expertise to qualify me to testify as to OFAC matters (*id.* at 13), and that I am a race-baiting bigot (*id.* at 21, 22, 39).

9.       Defendants have mischaracterized my testimony and used their mischaracterizations of me and of my work to mislead. This Declaration will address their claims in turn.

10.       **Throughout their arguments, defendants understate my professional experience, expertise, work, and status.**  For example, they understated the roles I held with Congress and at the State Department, mischaracterizing them as a legislative staffer and a "mid-level" State Department employee.  They have also made similar misstatements describing me as a macro-level policy analyst focused solely on "policy issues." None of these assertions accurately depict the range of experience, expertise, or responsibilities the positions entailed.

2

11.     Defendants' reference to my position during my tenure as counsel to United States Senator John Kerry (D-Mass) from 1985-1994 improperly suggests that I held a relatively low-level staff position. However, as counsel for Senator Kerry, I was the only person to serve in that position, which involved greater responsibility than a legislative assistant (who would be focused solely on legislation) and included participating in and directing international investigations involving the issuance of subpoenas, interviews and preparation of witnesses, assessment of substantial numbers of documents, and drafting of reports on international matters relevant to those involved in this case.

12.     Defendants mischaracterize my position at the United States Department of State as "mid-level" and strictly policy focused. Between 1994 and 1999, as Deputy Assistant U.S. Secretary of State for International Law Enforcement, I was the senior State Department official responsible for countering threats posed to the United States by international financial criminal activity. This work involved extensive activity to understand and address gaps in financial regulation in Middle Eastern countries, including the Gulf States, and the lack of controls in the region and their impact on illicit finance, including terrorist finance.

13.     During my tenure as Deputy Assistant Secretary of State for International Law Enforcement, I led high-level U.S. interagency delegations with numerous countries seeking to secure greater controls on the threats posed by inadequate financial regulation and enforcement in a number of countries, including several in the Middle East.

14.     These delegations typically included representatives of the Departments of Justice and Treasury and law enforcement agencies such as the FBI, Secret Service, Drug Enforcement Administration, and U.S. Customs, but were led by me. These missions included missions to Middle Eastern countries that were directed by the White House.

3

15.     As stated in my Expert Report, I was placed in the Near Eastern Bureau of the State Department during President Obama's second term and put in charge of resettling an Iranian group that had previously been designated as terrorists and who had renounced terrorism, and in charge of trying to resolve Libya's civil war at a time when Libya was threatened by the terrorist group, the Islamic State.

16.     My placement in these senior positions at the State Department reflected decisions by President Clinton, President Obama, and my senior diplomatic and national security advisors, including three Secretaries of State (Christopher, Albright, and Kerry), to rely on my knowledge, experience, expertise, and skills, including with respect to the threat in the Middle East in the 1990's, and two distinct sets of Middle Eastern terrorist-related problems in the period 2013-2017, one in the Iraq, and the second in Libya.

17.     The value placed on my work in these areas and my expertise was further reflected in the State Department awarding me its two highest honors.

18.     In 1999, I was awarded the "Distinguished Honor Award" by the U.S. Department of State. The award, the second highest award that can be bestowed by the State Department, is awarded for "exceptionally outstanding service to the agencies or the U.S. Government resulting in achievements of marked national or international significance." That award stated that "the scope and significance" of my achievements in that position "are virtually unprecedented for any single official."

19.     In 2016, I was awarded the "Distinguished Service Award" by the U.S. Department of State, the highest award issuable by the Secretary of State and that can be bestowed by the U.S. Department of State. It is awarded for "exceptionally outstanding leadership, especially in the management of safety and security issues; professional competence,

4

including ensuring employee accountability and the effective management of inappropriate employee behavior; and significant accomplishment over a sustained period of time in the field of foreign affairs. Such achievements must be of notable national or international significance and have made an important contribution to the advancement of U.S. national interests."

20.     The award stated that I was chosen to receive the award "for extraordinary service to the U.S. government in solving one of the most intractable issues in U.S. foreign policy, thereby avoiding the massacre of over 3,000 members of the Muhadein-e Khalq and averting a crisis between Iran and Iraq" and for "leading U.S. policy in Libya, tenaciously and brilliantly moving Libya from a major foreign policy embarrassment to a fragile but democratic internationally recognized government."

21.     **Defendants are wrong where they assert that my extensive experience concerning terrorist finance issues is not applicable to al Qaeda and Saudi charities.** In fact, over the decades, numerous institutions have relied on my expertise in these areas.

22.     To start, contrary to defense counsel's assertions, I have published works related to Al Qaeda and charitable support for Al Qaeda. (Each of these works were disclosed on the curriculum vita that I provided with my report.)

23.     In the immediate aftermath of the 9/11 attacks, I was invited by the prestigious British Foreign Policy Journal "**Survival,**" published by the London-based International Institute for Strategic Studies (IISS), a prominent British international affairs research institute founded in 1959. Survival is a bimonthly academic journal which describes itself as "a leading forum for analysis and debate of international and strategic affairs."[1]

---

[1] https://www.iiss.org/about-us

5

24.     The article, commissioned by the editor of Survival, went through the normal academic review process Survival used to vet the quality of its content, and was published alongside articles by other prominent foreign policy experts, such as the former U.S. Ambassador to Israel, Martin Indyk.

25.     The article, coauthored with another terrorism finance expert, Trifin Roule, is titled "Fighting Terrorist Finance," and it discussed the phenomenon of "misapplied Islamic charitable contributions," and other methods used by al-Qaeda and its network to generate revenues. The article also discussed how terrorist finance can be tracked, and the particular failure of members of the Gulf Cooperation Council, which includes Saudi Arabia, to track funds linked to Al Qaeda.[2]

26.     At the invitation of Norway's FAFO institute, I also published an article in 2002 titled "Illicit Finance and Global Conflict" which systematically addressed the abuse of financial institutions to fund illicit activity, including terrorist finance and the activities of Al Qaeda.[3]

27.     A later version of this article was published in the Swiss-based academic publication, the European Journal of Law Reform, entitled "Globalization, Terrorist Finance, and Global Conflict – Time for a White List?" It included analysis of reported terrorist finance involving financial institutions and al Qaeda and other terrorist groups, as well as the problem of the use of cash by Al Qaeda.

28.     In addition to these publications, the World Bank also invited me to address the financing of illicit resource extraction, including its relationship to terrorist finance. The World

---

[2] "Fighting Terrorist Finance," Jonathan M. Winer and Trifin J. Roule,, Survival (London) Vol. 44, No. 3, p. 87-104, Vol. 44, No. 3, p. 87-104.

[3] "Illicit Finance and Global Conflict," Jonathan M. Winer, Economies of Conflict: Private Sector Activity in Armed Conflict Illicit Finance and Global Conflict, FAFO Institution, Oslo, Norway, www.fafo.no Ihttps://www.fafo.no/images/pub/2002/380.pdf

6

Bank published my writing online, first as an article, co-authored with Triffin J. Roule, on January 13, 2003, and then as a chapter in a book, "Natural Resources and Violent Conflict," published in 2003. The article and chapter addressed a range of abuses associated with violence and natural resources, including incidents relating to Al Qaeda's terrorist finance through this mechanism.[4]

29.     In 2008, the American Academy of Political and Social Science, one of the United States' oldest and most prestigious institutes in the field of social science, invited me to address the progress made since the 9/11 attacks in efforts to counter terrorist finance, for inclusion in its flagship publication, the *Annals of the American Academy of Political and Social Science*, a bimonthly journal published since 1890, whose editorial board consists of prominent academics from Cornell, Harvard, New York University, Princeton, Stanford, the University of Pennsylvania, and Washington University. [5]

30.     The Annals published my article, "Countering Terrorist Finance: A Work, Mostly in Progress," in its July 2008 issue, [6] which provided a taxonomy of the sources of terrorist funds and the mechanics of terrorist financing, using Al Qaeda's terrorist finance as a principal case study. My article also addressed the use by terrorist groups of charities that provided social services such as education, health care, and religious instruction as mechanisms to generate support for their causes and to propagate extremist ideologies.

31.     As stated in my article in the Annals: "[t]he intermingling of charitable activities with terrorism allows the terrorists to use the charities to attract large numbers of unwitting

---

[4] "Follow the Money: The Finance of Illicit Resource Extraction," Jonathan M. Winer and Triffin J. Roule, Chapter 5, "Natural Resources and Violent Conflict, Options and Actions," The World Bank (2003)
[5] https://www.aapss.org/the-annals/editorial-advisory-board/
[6] "Countering Terrorist Finance: A Work, Mostly in Progress," Jonathan M. Winer, The Annals of the American Academy of Political and Social Science, Vol. 618, Terrorism: What the Next President Will Face (July 2008), pp. 112-132 (21 pages), Published By: Sage Publications, Inc.

7

donors along with the witting, to increase public support, to discourage government action against them, and to operate in areas of conflict where the terrorists otherwise would have no cover."[7]

32.     My published academic writing between the period of 9/11 and 2008 on terrorist finance, al Qaeda, and its use of, inadequate regulation of, and poor controls on international charities in the Gulf Region, and my research and preparation for that academic writing, were part of the expertise and experience I drew on in submitting my report in this matter.

33.     **Those relying on my knowledge and expertise related to Al Qaeda and charitable funding of Al Qaeda included the United States Senate in the period of 1988-1994.**

34.     As Counsel for Senator John F. Kerry, I conducted numerous Congressional investigations of international financial crimes. For example, I was the principal investigator, researcher, analyst, and drafter of the 613-page Report on the Bank of Credit and Commerce International ("BCCI") Affair, published by the Senate in 1992, following four years of investigation and two years of public hearings set forth in six volumes published by the Senate.

35.     The Senate Report, of which I was the primary drafter, covered how BCCI was used to fund terrorism and other financial crime issues due to its lack of controls, and the low-level of controls in place throughout the Middle East region.

36.     The BCCI investigation included investigation and analysis of the bank's support of terrorism and arms trafficking and its use of charities to carry out criminal activity and also reviewed how the lack of regulation of and controls on charities in Pakistan and other countries enabled BCCI to facilitate systematic abuses of charitable funds.

---

[7] *Id.* at 115.

37.     The findings of this report, issued by two U.S. Senators in their capacity as heads of the Senate Subcommittee on Terrorism, about conditions in the financial sector in Pakistan, precisely tracks the findings I made in this case that the lack of controls on the charity defendants made them susceptible to use for terrorist finance.

38.     My work investigating BCCI's terrorist finance activities, the Bank's abuse of charities, the lack of regulation in Pakistan and other relevant jurisdictions which made its terrorist finance, charity abuse and other crimes possible, and the role that failures by accounting firms reflected in the audits of the bank, was part of the expertise and experience I drew on in submitting my report in the above-captioned matter.

39.     **Those relying on my knowledge and expertise related to Al Qaeda and charitable funding of Al Qaeda also included the United States Department of State and the White House in the period of 1994-1999.**

40.     I was recruited, selected and appointed by President Clinton and Secretary of State Christopher to be the first person to hold the position of Deputy Assistant Secretary for International Law Enforcement, where I served as the senior U.S. government official responsible for global international crime, including financial crime.

41.     I served in that position for six years, which were critical years for the development of U.S. government understanding of terrorist finance

42.     I worked on matters relating to sanctions with representatives of the Office of Foreign Assets Control ("OFAC") at the U.S. Department of Treasury (as well as with the Department of Justice and the White House). During this period, the United States government expanded the sanctions designation process to include terrorist groups, following on the use of

sanctions against drug trafficking organizations. In the course of my work, I became intimately familiar with the sanctions designation process.

43.     I was dispatched by the White House to lead interagency delegations on missions to countries that had inadequate controls to combat money laundering and financial crime, including in the Middle East.

44.     I was the most senior official responsible for combating global financial crime on a day-to-day basis at the U.S. Department of State from 1994-1999. This was also part of the expertise and experience I drew on in submitting my report in this matter

45.     During my tenure with the State Department, I received daily briefings from the CIA on transnational threats, including terrorist threats.

46.     I participated in regular meetings at the White House, chaired by Richard Clarke, head of Transnational Threats at the White House, who was the U.S. government's senior official coordinating counter-terrorism efforts of all types, and who was the first senior U.S. government official focused on al Qaeda and bin Laden. In the course of those meetings, I became aware of Mr. Clarke's views on the threat to the United States posed by both Al Qaeda and bin Laden, and had regular discussions regarding the threat.

47.     **Those relying on my knowledge and expertise on terrorist finance during the 1994-1999 period also included a United States Senator who later become the Democratic nominee for President and the Secretary of State, John F. Kerry.**

48.     In 1995-1996, while at the State Department, I was consulted by then Senator John Kerry as Senator Kerry as the latter wrote a book called "The New War," published in 1997.

10

49.     In the preface to The New War, Kerry stated: "I want to single out for special thanks the extraordinary contribution of Jonathan Winer, formerly my staff counsel, currently the deputy secretary of state for law enforcement and crime. His brilliant investigative work throughout my eight years as chairman of the Subcommittee on Terrorism, Narcotics and International Operations of the Senate Foreign Relations Committee and his understanding of this issue is reflected throughout the book."

50.     My discussions with the chairman of the Senate Subcommittee on Terrorism, while I was at the Department of State, including our discussion of a possible terrorist attack on the U.S. homeland, a threat expressly referenced in the 1997 book, was part of the expertise and experience I drew on in submitting my report in the above-captioned matter.

51.     **Those relying on my knowledge and expertise on terrorist finance and Al Qaeda during the 2000-2008 period also included the U.S. Central Intelligence Agency.**

52.     Shortly after I left the U.S. government for private practice, I was invited by the Central Intelligence Agency to prepare country reports and analyses on country vulnerabilities to money laundering, terrorist finance, and corruption.

53.     After accepting this invitation, I became a contractor to the CIA for the duration of my tenure at my law firm, a period of eight years.

54.     During that time, I authored more than 100 reports on these topics, which covered essentially every country in the Middle East. Notably, this work was not short-term or occasional, but ongoing, and extended throughout the period covered by this litigation.

55.     I also lectured on these topics at the Sherman Kent School for Intelligence Analysis on a recurring basis from 2002-2013 to train analysts in how to think about threats relating to corruption, financial crime, money laundering, terrorism, and to assess failures to put

11

in place effective controls to counter these threats. The Kent School is a training school for Central Intelligence Agency (CIA) intelligence analysts and since 2002 it has served as the CIA Directorate of Intelligence's component of CIA University, a CIA-wide training program founded in 2002 in response to changing intelligence needs following the September 11 attacks.

56.     My work for the Kent School as a teacher was separate from my work for a different part of the CIA as an analyst. In the Kent School work, my expertise was relied on to train the CIA's own personnel.

57.     **Those relying on my knowledge and expertise on terrorist finance, Al Qaeda, and the risks posed by poorly regulated charities, included the United States Congress, during the period 2001-2006.**

58.     On September 26, 2001, at the invitation of the Senate Committee on Banking, Housing and Urban Affairs, I testified as an expert before that committee on how to combat terrorist finance in the immediate aftermath of the 9/11 Attacks.

59.     My Senate testimony included explicit reference to the hydra-headed nature of Al Qaeda's financing, including al Qaeda's reliance on charities. In my testimony, I said: "Public information demonstrates terrorist funds moving through Islamic charities, travel agents, construction businesses, fisheries, import-export businesses, stock markets, chemical companies, and a number of banks."

60.     The hearing was undertaken for the purpose of strengthening controls within the United States and globally on terrorist finance, and my testimony was thus part of the official record of the considerations that led to the enactment of the USA-PATRIOT Act one month after I testified before the Senate, on October 26, 2001.

61. On November 20, 2002, another Senate Committee, the Senate Judiciary Committee, selected me to testify as an expert on terrorist finance. In that testimony, I was asked to focus on what U.S. laws needed to be changed and what U.S. laws regarded enhanced enforcement, to address the threat posed by terrorist finance. In response, I focused on the need for toughened regulation, as well as investigations, of charities, due to their involvement in terrorist finance. Specifically, I called for "immediate enhanced scrutiny of financial institutions in under regulated jurisdictions, especially those in the Middle East." I also advised enhanced scrutiny of Islamic charities, stating that a number of Islamic charities had either provided funds to terrorists or failed to prevent their funds from being diverted to terrorist use.

62. On July 31, 2003, yet another Senate Committee, the Senate Committee on Government Relations, selected me to testify as an expert on terrorist finance, asking me to focus in particular on the role Saudi Arabia and Saudi Arabian charities played in the financing of al Qaeda. My 21 pages of written testimony described the publicly-known information about terrorist funding for al Qaeda and other terrorist groups, and the use of funds from charities by those groups. I was also asked to assess the efforts of Middle Eastern States to curtail terrorist finance, and described the central role of Saudi Arabia as the preponderant source for funds for the development of Al Qaeda, and the charities there as a particular problem. My findings, and the recommendations I made in my testimony, were consistent with, and anticipated, findings in the non-partisan 9/11 Commission Report issued July 22, 2004.

63. On May 19, 2004, yet another Senate Committee, the Senate Committee on Finance, invited me to testify as an expert on terrorist finance on issues relating to charities and their regulation. In that testimony, I was asked to discuss both the role of the U.S. Treasury

13

(including OFAC), how best to regulate charities to protect them from abuse by terrorists, and to address Saudi Arabian terrorist finance issues.

64.     In this testimony, I provided precise formulations of the relationship of these charities to al Qaeda and bin Laden, and referring as one proof point statements by a senior Kuwaiti diplomat, Abdallah Bishara, the long-time head of the Gulf Cooperation Council, which coordinates policy for the Gulf states, addressing links between charities in Kuwait, Saudi Arabia, and other Gulf countries and financing terrorist generally and bin Laden and al Qaeda in particular.

65.     On March 29, 2006, the House Subcommittee on Oversight and Investigations selected me to testify as an expert on terrorism, where I again addressed the particular problem posed by under-regulated charities with insufficient controls for terrorist finance.

66.     **Those relying on my knowledge and expertise on terrorist finance and al Qaeda during the 2000-2008 period also included the Council on Foreign Relations, an independent, nonpartisan membership organization, think tank, and publisher which is among the most prominent and prestigious organizations in this field.**

67.     In 2002, the Council on Foreign Relations invited me to join an Independent Task Force on Terrorist Financing, as one of fourteen members. Other members included a former Director of the Central Intelligence Agency and FBI; a former Deputy Secretary of the Treasury; a former Undersecretary for Economics of the State Department; and other former senior U.S. government officials from the State Department, Treasury, White House, and intelligence community.

68.     The Task Force directly reviewed and assessed al-Qaeda and its use of charities to fund its activities.

14

69.     My work as part of this Task Force on Terrorist Financing, which included a focus on al Qaeda and its use of charities based in Saudi Arabia, and recommendations on the types of controls on the charities that had yet to be put into place as of 2002, was part of the expertise and experience I drew on in submitting my report in the above-captioned matter.

70.     Those relying on my knowledge and expertise on terrorist finance and charities also included two legal clients seeking to have themselves delisted as terrorists from sanctions after being named SDNs by the Treasury's Office of Foreign Assets control.

71.     **Those relying on my knowledge and expertise on terrorist finance, Al Qaeda, and the risks posed by poorly regulated charities included a British court,** in the case of Al Rajhi Banking and Investment Corporation and The Wall Street Journal Europe SPRL (HQ02C00924).

72.     In that 2004 case, I was credentialed as an Expert Witness in the High Court of Justice – Queen's Bench Division by the presiding magistrate to address the involvement of Saudi Arabia and Saudi Arabian entities in international terrorist finance with regard to Al Qaeda.

73.     I was also asked to provide information to the British court regarding Saudi Arabia's relationship to terrorist financing and its formal banking and regulatory controls.

74.     The plaintiffs in that case sought to disqualify me as an Expert Witness. After arguments, I was accepted as a witness by the presiding magistrate in all areas.

75.     Shortly thereafter, the plaintiffs chose to settle the case and accordingly, my testimony was no longer needed.

76.     **Defendants are wrong where they assert that I do not have the requisite expertise to testify about accounting standards.**

15

77.     As discussed above, I first undertook money laundering and terrorist finance investigations while working for the United States Senate, during which period I was the principal author of the Senate's Report on the BCCI Affair, which featured an entire chapter (Chapter 10) on the failure of BCCI's auditors and then applicable accounting standards to protect against BCCI's criminal activity, including its financing of terrorist and its abuse of charities.

78.     The BCCI Report of which I was the principal drafter was based on reviews of audit reports, interviews with bank personnel, submissions by BCCI's auditors to the British government following the collapse of the bank, and similar information.

79.     My knowledge of accounting and auditing standards was evidenced in the first major article I wrote on terrorist finance after I left the State Department, written soon after the 9/11 terrorist attacks, in the British publication, Survival, published in the autumn of 2002, "Fighting Terrorist Finance."

80.     My knowledge of international accounting standards (ISAs) enabled me to identify a range of deficiencies in the audits undertaken by the Defendants, and to identify the specific ISA standard they violated, as set forth in the International Standard on Auditing 230, a central and deeply relevant standard that was not acknowledged by the "experts" selected by the Defendants.

81.     **Defendants are wrong where they assert that I do not have the requisite expertise to testify on the OFAC designation process and other OFAC-related issues.**

82.     As set forth in my Expert Statement, during my service at the Department of State from 1994-1999 as Deputy Assistant Secretary of State for International Law Enforcement, I was

16

directly involved in the OFAC designation processes on a range of issues and came to know and understand the process through that involvement.

83.    As set forth in my Expert Statement, during my service at the Department of State from 2013-2017 as Senior Advisor for Resettlement of the MEK and as Special Envoy for Libya, I was again directly involved in OFAC sanctions processes on issues relating to the Middle East, in this period, directly involving terrorism.

84.    As I stated in my deposition, I directly participated in discussions of designations with other senior U.S. government officials in both periods, including with regards to particular targets for sanctions I was personally proposing, in my official capacity.

85.    As additional experience, I testified in my deposition that in my work as an attorney after I left the government, I undertook legal work involving OFAC seeking to delist two SDNs listed in connection with terrorism.

86.    To undertake that work, I had to have sufficient experience and expertise in the criteria for listing and for delisting in order to represent the clients.

87.    **Finally, the defendants grossly mischaracterize my statements and views, alleging that I am peddling "bigoted tropes" and "race-baiting."**

88.    Throughout their arguments, defendants rely heavily on the notion that I harbor prejudices that have infected my opinions, as evidenced—they argue—by bigoted tropes and race-baiting they consistently argue are present in my opinions.  The only example to which they point is that—they argue—I characterized all Middle Easterners (or at least some group that presumably includes their clients) as "duplicitous."  Key to showing the fallacy in defendants' arguments is that I did not make the statement that Middle Easterners (or any other group) are

17

generally "duplicitous" – indeed, at no time did I use in my reports or my deposition the word

defendants have placed in "quotes" and attribute to me.

89.     Rather, in one header to one sentence in my Expert Report, I stated that in

situations where a direct confrontation over an issue could take place due to differences in views,

rather than to acknowledge the differences, I found it common for people to send different

messages to different audiences as a means of conflict avoidance.

90.     The full statement following this header is as follows: "Over my decades of work

on Middle East issues, I have found it common for people and institutions there to send different

messages to different audiences as a means of seeking to avoid direct confrontation with

powerful western countries, especially the United States. During the 1980's, the U.S. and the

Islamic world were united in wanting to see the Soviet Union out of Afghanistan. This unity for

that limited purpose broke apart in other conflicts between Muslims and non-Muslims in other

areas, such as Israel/Palestine, or Bosnia, and diverged in the Afghanistan/Pakistan region as

soon as the Soviets departed. In any case, the use of a charity to facilitate militant activity would

have been seen from the outset as problematic by the west, as well as in conflict with universal

international standards that go back to the founding of the Red Cross, and which were formally

adopted by the Red Cross, Red Crescent, and other humanitarian groups in 1979. The seven

fundamental standards include the requirement of neutrality – that a relief organization such as

the Red Cross and Red Crescent may not take sides in hostilities or engage at any time in

controversies of a political, racial, religious or ideological nature. Thus, any Islamic charity

providing support for military efforts would need to keep that support hidden because such

support would be in conflict with the universal international norms considered essential to the

work of all charities."

91.     Contrary to the defendants' willful misinterpretation of this statement, I did not refer to any particular religious, ethnic, or racial group in my statement about the practice of people in the region providing different messages to different audiences to avoid confrontation.

92.     As set forth in my Expert Report, I led numerous missions to the Middle East during both of my tours at the U.S. Department of State. In the 1990's, while serving as the lead person on international law enforcement issues and financial crime, these included delegations to Cyprus, Israel, Lebanon, and Syria, each of which was within the scope of my reference to Middle Eastern Countries, and each of which had serious deficiencies in addressing financial crime. (Section 2.2.3 of Expert Report).

93.     When I returned to the State Department in 2013 to serve President Obama and Secretary of State Kerry, they placed me in the State Department's Bureau for the Middle East, the Bureau of Near Eastern Affairs, where I had regular contact with senior foreign officials from many Middle Eastern countries.

94.     I was placed in the bureau of the State Department responsible for the Middle East, despite the fact that my previous experience had been in a functional bureau of the Department of State, rather than a regional bureau governing a particular part of the world such as the Bureau of Near Eastern Affairs.

95.     My placement in the Bureau of Near Eastern Affairs, rather than in any other region, was determined by the White House and the State Department who decided my expertise and experience would be most valuable there, rather than in some other region, reflecting the confidence they had that my experience, skill, and judgment were needed for work in the Middle East.

19

96.     As set forth in my CV, I achieved extraordinary success during this placement and received the highest award issuable by the Secretary of State, the Secretary's Distinguished Service Award, in November 2016. I would never have received this award if there was any factual basis for the defendants' false contention that I am prejudiced against any group.

97.     Currently, I am in an academic position as a Non-Resident Scholar at the Middle East Institute in Washington, D.C., and am a member of its North Africa Program. Founded in 1946, the Middle East Institute is the oldest Washington-based institution dedicated solely to the study of the Middle East. It is a non-partisan think tank providing expert policy analysis, educational and professional development services, and a hub for engaging with the region's arts and culture.

98.     I was invited to join the Middle East Institute shortly following my departure from the U.S. Department of State in 2017, reflecting the judgment of the leadership of the Middle East Institute that my experience and expertise would be valuable for the Middle East Institute in its work on behalf of the Middle Eastern region.

99.     I have now served as a Non-Resident Scholar at the Middle East Institute for more than four years, regularly publishing articles for them and participating in conferences, as reflected in its website. I was also invited to contribute to write a chapter in a book published by the Middle East Institute, "Escaping the Conflict Trap: Toward Ending Civil Wars in the Middle East" (2019) which remains available online and in print.

100.    My position at this institution, whose faculty includes scholars from a wide-range of backgrounds, including from throughout the Middle East, reflects the esteem in which I am held as an expert in the Middle Eastern region for my experience, expertise, analytic work, integrity, judgment, and impartiality.

20

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 12, 2022

Jonathan Winer