This Transcript Contains Confidential Material

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2
 3    IN RE: TERRORIST ATTACKS    )  03-MDL-1570 (GBD) (SN)
      ON SEPTEMBER 11, 2001       )
 4                                )
 5
 6
 7

                         —  —  —
 8
                  Tuesday, July 13, 2021
 9                       —  —  —
10            THIS TRANSCRIPT CONTAINS
               CONFIDENTIAL MATERIAL
11                       —  —  —
12
13     Remote video-recorded deposition of JONATHAN M.
      WINER, held at the location of the witness,
14    commencing at 10:04 a.m., on the above date, before
      Debra A. Dibble, Certified Court Reporter,
15    Registered Diplomate Reporter, Certified Realtime
      Captioner, Certified Realtime Reporter and Notary
16    Public.
17
                         —  —  —
18
19
20
21
22
23
               GOLKOW LITIGATION SERVICES
24        877.370.DEPS | fax 917.591.5672
                  deps@golkow.com
25
```

This Transcript Contains Confidential Material

```
 1    REMOTE APPEARANCES:
 2
           LAW FIRM OF OMAR T. MOHAMMEDI, LLC
 3         BY:  OMAR T. MOHAMMEDI, ESQUIRE
                omohammedi@otmlaw.com
 4              JILL L. MANDELL, ESQUIRE
                jmandell@otmlaw.com
 5         Woolworth Building
           233 Broadway, Suite 820
 6         New York, New York 10279
           (212) 725-3846
 7         Counsel for World Assembly of Muslim Youth
 8
 9         GOETZ & ECKLAND P.A.
           BY:  FREDERICK J. GOETZ, ESQUIRE
10              fgoetz@goetzeckland.com
           Banks Building
11         615 1st Avenue NE, Suite 425
           Minneapolis, Minnesota 55413
12         (612) 874-1552
           Counsel for World Assembly for
13         Muslim Youth
14
           KREINDLER & KREINDLER LLP
15         BY:  ANDREW J. MALONEY, ESQUIRE
                amaloney@kreindler.com
16         485 Lexington Avenue, 28th Floor
           New York, New York 10017
17         (212) 687-8181
           Counsel for Plaintiffs' Executive
18         Committee and the Ashton plaintiffs
19
           COZEN O'CONNOR
20         BY:  SEAN P. CARTER, ESQUIRE
                scarter1@cozen.com
21              J. SCOTT TARBUTTON, ESQUIRE
                starbutton@cozen.com
22         One Liberty Place
           1650 Market Street
23         Philadelphia, Pennsylvania 19103
           (800) 523-2900
24         Counsel for Plaintiffs' Executive
           Committee and the Federal Insurance
25         plaintiffs
```

This Transcript Contains Confidential Material

```
 1
    REMOTE APPEARANCES:
 2
 3       MOTLEY RICE
         BY:  ROBERT HAEFELE, ESQUIRE
 4            rhaefele@motleyrice.com
              C. ROSS HEYL, ESQUIRE
 5            rheyl@motleyrice.com
              JOHN M. EUBANKS, ESQUIRE
 6            jeubanks@motleyrice.com
              JODI FLOWERS, ESQUIRE
 7            jflowers@motleyrice.com
         28 Bridgeside Blvd.
 8       Mt. Pleasant, South Carolina 29464
         (843) 216-9184
 9       Counsel for Plaintiffs' Executive
         Committee and Brunett plaintiffs
10
11       ALFAHAD & PARTNERS
         BY:  ABDULAZIZ AL FAHAD, ESQUIRE
12            alfahad@fahadlaw.com
         Riyadh, Saudi Arabia
13       Counsel for Kingdom of Saudi Arabia
14
         LEWIS BAACH KAUFMAN MIDDLEMISS PLLC
15       BY:  WALEED NASSAR, ESQUIRE
              waleed.nassar@lbkmlaw.com
16            SUMAYYA KHATIB, ESQUIRE
              sumayya.khatib@lbkmlaw.com
17            AISHA E.R. BEMBRY, ESQUIRE
              aisha.bembry@lbkmlaw.com
18            ERIC L. LEWIS, ESQUIRE
              eric.lewis@lbkmlaw.com
19       1101 New York Avenue, N.W.
         Suite 1000
20       Washington, D.C. 20005
         (202) 833-8900
21       Counsel for the Muslim World League
         and the International Islamic Relief
22       Organization.
23
24
25
```

This Transcript Contains Confidential Material

```
 1
    REMOTE APPEARANCES:
 2
 3      JONES DAY
        BY:  STEVE COTTREAU, ESQUIRE
 4           scottreau@jonesday.com
             ERIC SNYDER, ESQUIRE
 5           esnyder@jonesday.com
             GABRIELLE PRITSKER, ESQUIRE
 6           gpritsker@jonesday.com
             AUDREY A. BECK, ESQUIRE
 7           abeck@jonesday.com
             C. KEVIN MARSHALL, ESQUIRE
 8           kmarshall@jonesday.com (DAY 2
        ONLY)
 9      51 Louisiana Avenue, N.W.
        Washington, D.C. 20001
10      (202) 879-3939
        Counsel for Dubai Islamic Bank
11
12      BERNABEI & KABAT PLLC
        BY:  ALAN KABAT, ESQUIRE
13           kabat@bernabeipllc.com
        1400 16th Street NW
14      Suite 500
        Washington DC 20036
15      (202) 745-1942
        Counsel for Dr. Abdullah al Turki,
16      Dr. Abdullah Al Obais, Dr. Abdullah
        Naseef, and Dr. Adnan Basha
17
18      SALERNO & ROTHSTEIN
        BY:  AMY ROTHSTEIN, ESQUIRE
19           amyrothsteinlaw@gmail.com
        P.O. Box 456
20      Pine Plains, New York 12567
        (518) 771-3050
21      Counsel for Yassin Kadi
22
23
24
25
```

This Transcript Contains Confidential Material

1

ALSO PRESENT:

2

       RICHARD CASHON, SENIOR PARALEGAL

3      MANAGER, MOTLEY RICE

4

5  TRIAL TECHNICIAN:

6      BRIAN FRONZAGLIA

       GOLKOW LITIGATION SERVICES

7

8  VIDEOGRAPHER:

9      DAVID LANE

       GOLKOW LITIGATION SERVICES

10

                    — — —

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

This Transcript Contains Confidential Material

```
 1                         INDEX

 2

 3     APPEARANCES                              2

 4     PROCEEDINGS                             13

 5

 6     EXAMINATION OF JONATHAN M. WINER:

 7

 8     CERTIFICATE                            339

 9     ERRATA                                 341

10     ACKNOWLEDGMENT OF DEPONENT             342

11     LAWYER'S NOTES                         343

12

13

14

15

16

17

18

19

20

21

22

23

24
```

This Transcript Contains Confidential Material

```
 1                    DEPOSITION EXHIBITS

 2     NUMBER                 DESCRIPTION          PAGE

 3     Exhibit 895    Notice of Deposition of       16

 4                    Jonathan M. Winer

 5     Exhibit 896    Expert Report of              19

 6                    Jonathan M. Winer

 7     Exhibit 897    Rebuttal Report of            19

 8                    Jonathan M. Winer

 9     Exhibit 898    Invoices                      24

10     Exhibit 899    Jonathan Winer -              39

11                    Reliance Material Chart

12     Exhibit 900    McDonald and Dickson v        65

13                    TD Bank citation

14     Exhibit 901    Gill v Arab Bank              68

15                    Memorandum and Order

16     Exhibit 902    Cheap Flights to Nigeria      85

17     Exhibit 903    DRAFT transcript of           97

18                    McDonald v TD Bank

19                    hearing

20     Exhibit 904    Jonathan M. Winer resume     101

21     Exhibit 905    Browder lawyer Jonathan      110

22                    Winer files perjured

23                    claims in Hermitage

24                    court case
```

This Transcript Contains Confidential Material

| 1 | Exhibit 906 | Money Laundering Alert | 112 |
| 2 | Exhibit 907 | The 9/11 Commission | 142 |
| 3 | | Report | |
| 4 | Exhibit 908 | Letters From Bin Laden, | 152 |
| 5 | | Date: 12 April 1994 to 7 | |
| 6 | | May 1998 | |
| 7 | Exhibit 909 | Monograph on Terrorist | 166 |
| 8 | | Financing - Staff Report | |
| 9 | | to the Commission | |
| 10 | Exhibit 910 | Summary of | 192 |
| 11 | | Administrative Review | |
| 12 | | Board Proceedings for | |
| 13 | | ISN 940 | |
| 14 | Exhibit 911 | Declaration of Colonel | 206 |
| 15 | | Lawrence B. Wilkerson | |
| 16 | | (Ret.) | |
| 17 | Exhibit 912 | Terrorism Financing | 208 |
| 18 | | Hearing 2003 video clip | |
| 19 | Exhibit 913 | WAMY International, Inc. | 217 |
| 20 | | 2021 Annual Report | |
| 21 | Exhibit 914 | Minutes of the Seventh | 225 |
| 22 | | Meeting of the | |
| 23 | | Benevolence Committee's | |
| 24 | | Supervisory Council | |

This Transcript Contains Confidential Material

| 1 | Exhibit 915 | 2-23-1993 letter to Adel | 230 |
| 2 | | Batterjee | |
| 3 | Exhibit 916 | 5-11-1993 letter to | 231 |
| 4 | | Salman bin Abdulaziz | |
| 5 | Exhibit 917 | 6-14-1996 Minutes of | 232 |
| 6 | | Islamic Benevolence | |
| 7 | | Committee dissolution | |
| 8 | | and merging with World | |
| 9 | | Assembly of Muslim Youth | |
| 10 | Exhibit 918 | 8-18-1997 letter to Your | 234 |
| 11 | | Eminence the Secretary | |
| 12 | | General of the World | |
| 13 | | Assembly of Islamic | |
| 14 | | Youth | |
| 15 | Exhibit 919 | United States v. Enaam | 240 |
| 16 | | M. Arnaout Memorandum | |
| 17 | | Opinion and Order | |
| 18 | Exhibit 920 | UAA v Arnaout | 244 |
| 19 | | Defendant's Sentencing | |
| 20 | | Memorandum | |
| 21 | Exhibit 921 | USA v. Arnaout Plea | 248 |
| 22 | | Agreement | |
| 23 | Exhibit 922 | U.S. v. Arnaout 282 F.2d | 248 |
| 24 | | 838 (2003) | |

This Transcript Contains Confidential Material

| 1  | Exhibit 923 | U.S. v. Arnaout 431 | 251 |
|----|-------------|---------------------|-----|
| 2  |             | F.Supp.3d 994 (2005) |     |
| 3  | Exhibit 924 | The Bookseller, Why CUP | 260 |
| 4  |             | acted responsibly   |     |
| 5  | Exhibit 925 | Letter to Ayman     | 263 |
| 6  |             | Al-Taher, Subj: Notice |    |
| 7  |             | of Intention to Revoke |    |
| 8  |             | the World Assembly of |     |
| 9  |             | Muslim Youth,       |     |
| 10 |             | FED-PEC0218170-218203 |   |
| 11 | Exhibit 926 | Declaration of Mohammed | 266 |
| 12 |             | Al Khatib           |     |
| 13 | Exhibit 927 | Declaration of Ibrahim | 267 |
| 14 |             | Sulayman Abdullah   |     |
| 15 | Exhibit 928 | 4-20-201 fax with   | 268 |
| 16 |             | attachment letter to Dr. | |
| 17 |             | Saleh Bin Ibrahim Babaer | |
| 18 | Exhibit 929 | 10-21-2019 excerpts from | 270 |
| 19 |             | the transcript of   |     |
| 20 |             | Ibrahim Abdullah, Ph.D. | |
| 21 | Exhibit 930 | World Assembly of Muslim | 272 |
| 22 |             | Youth T20 Auditor's |     |
| 23 |             | Report              |     |
| 24 |             |                     |     |

This Transcript Contains Confidential Material

| 1 | Exhibit 931 | Statistical Report for | 291 |
| 2 | | Documents by Branch | |
| 3 | | Office | |
| 4 | Exhibit 932 | WAMY's Responses to | 292 |
| 5 | | Plaintiffs' Exhibit 15 | |
| 6 | Exhibit 933 | International Standard | 304 |
| 7 | | on Auditing 580 Written | |
| 8 | | Representations | |
| 9 | Exhibit 934 | World Assembly of Muslim | 315 |
| 10 | | Youth - Pakistan Office, | |
| 11 | | Accounts for the Year | |
| 12 | | Ended 30 Zulhijjah 1422 | |
| 13 | | Hijrah | |
| 14 | Exhibit 935 | Defendants World | |
| 15 | | Assembly of Muslim Youth | |
| 16 | | Saudi Arabia and World | |
| 17 | | Assembly of Muslim Youth | |
| 18 | | International Memorandum | |
| 19 | | of Law in Support of | |
| 20 | | Motion for | |
| 21 | | Reconsideration of | |
| 22 | | Section IV of The | |
| 23 | | Court's Motion to Compel | |
| 24 | | Ruling | |

This Transcript Contains Confidential Material

```
1     Exhibit 936     In Re: Terrorist Attacks     331

2                     on September 11, 2001

3                     Opinion and Order

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

This Transcript Contains Confidential Material

```
 1                  ------------

 2                P R O C E E D I N G S

 3           July 13, 2021, 10:04 a.m. EDT

 4                  ------------.

 5           THE VIDEOGRAPHER:  We are now on the

 6      record.  My name is David Lane.  I'm the

 7      videographer for Golkow Litigation Services.

 8      Today's date is July 13, 2021, and our time is

 9      10:04 a.m. Eastern Standard Time.

10           This remote video deposition is being

11      held in the matter of the terrorist attacks on

12      September 11th, 2001.  Our deponent today is

13      John Winer.  All parties to this deposition

14      are appearing remotely and have agreed to the

15      witness being sworn in remotely.  Due to the

16      nature of remote reporting, please pause

17      briefly before speaking so that all the

18      parties can be heard completely.

19           Our court reporter today is Debbie

20      Dibble, and will now swear in our witness.

21                  ------------

22             JONATHAN M. WINER,

23             having been duly sworn,

24             testified as follows:

25                  EXAMINATION
```

This Transcript Contains Confidential Material

```
 1        Q.    (BY MR. MOHAMMEDI)  good morning,
 2   Mr. Winer.
 3              Can you just tell me your name, full
 4   name?
 5        A.    My full name?
 6        Q.    Can you mention your full name for me?
 7        A.    Yes, my full name is Jonathan Manuel
 8   Winer.
 9        Q.    And what is your age?
10        A.    I'm 67.
11        Q.    And date of birth?
12        A.    June 21st, 1954.
13        Q.    Have you ever been deposed before this
14   deposition before?
15        A.    Yes.
16        Q.    Have you ever testified in court before?
17        A.    Yes.
18        Q.    You understand that you are testifying
19   under penalty of perjury; correct?
20        A.    Yes.
21        Q.    And you know that if you answer any of my
22   questions, it will have to be verbal; correct?
23        A.    I could not hear you.
24        Q.    Any of your answers will have to be
25   verbal.  Yes and no.
```

This Transcript Contains Confidential Material

```
1        A.     Yes.

2        Q.     So would you be able to ask me if you

3   don't understand anything in my questions?

4        A.     Yes.

5        Q.     Because if you don't let me know, I

6   assume you understand the question.  Correct?

7        A.     Yes.

8        Q.     Anything about today that makes it a bad

9   day to testify?

10       A.     No.

11       Q.     Ever been involved in litigation or any

12   court action before as a party?

13       A.     As a party.  Yes.

14       Q.     Can you explain, were you a defendant or

15   were you a plaintiff?

16       A.     I was plaintiff.

17       Q.     What type of case?

18       A.     Divorce.

19       Q.     I really cannot hear you very well, so if

20   you could keep up your voice, that would be great.

21       A.     Divorce.

22       Q.     Have you ever been deposed before as an

23   expert?

24       A.     Yes.

25       Q.     How many times?
```

This Transcript Contains Confidential Material

```
 1        A.      I'm not sure.

 2        Q.      Approximately.

 3        A.      A couple.  Perhaps two, three, four.

 4        Q.      And when did that start, do you know?

 5                When did you start being -- either

 6   testifying in court as an expert, the date.  Do you

 7   have any time?

 8        A.      It would have been in the 00s, 2002 or

 9   '3, roughly.

10        Q.      So since 2002 to today you have testified

11   before the court two or three times?

12        A.      Let me think for a minute, please.

13        Q.      Sure.

14                MR. HAEFELE:  Object to the form.

15        A.      Twice that I can think of before a judge.

16        Q.      (BY MR. MOHAMMEDI)  Twice.  Okay.  Can we

17   enter into exhibit 1 that is your -- that we sent to

18   you?  I'm not sure exactly the number that we want

19   to start from.

20                (Winer Deposition Exhibit 895, Notice

21                of Deposition of Jonathan M. Winer,

22                was marked for identification.)

23        Q.      (BY MR. MOHAMMEDI)  Great.  That's good.

24                Mr. Winer, have you seen this document?

25        A.      I'm not sure.
```

This Transcript Contains Confidential Material

```
 1        Q.     It's a notice for the deposition of

 2    today.

 3        A.     I know about the deposition.  I'm not

 4    sure I've seen the document.

 5        Q.     You're not sure you've seen the document?

 6               If you could go to paragraph 5, it's

 7    highlighted for you.  I can see it very well if you

 8    can just put it in the middle.

 9               You have not seen this paragraph if you

10    have not seen the deposition notice itself; correct?

11        A.     I discussed it with counsel for the

12    plaintiffs.

13        Q.     Let me just -- I can see it well.  I just

14    want to get the field.  Just bear with me a second.

15               And it says:  At least seven days before

16    the deposition, a copy of the witness's current

17    curriculum vitae or resumé will have to be produced.

18               Do you have any updated resumé that you

19    have to produce?

20        A.     No, I have no updated resumé.

21        Q.     And all documents are used to refresh the

22    witness's recollection which you rely on in this

23    testimony will have to be produced.  Have you

24    produced those documents?

25                    MR. HAEFELE:  Objection, Omar.
```

This Transcript Contains Confidential Materials

```
1        Q.    (BY MR. MOHAMMEDI)  Do you have them now

2   with you?

3        A.    I have my reliance materials with me, and

4   I have my statement and my rebuttal report.

5        Q.    So which document did you -- sorry, go

6   ahead, I'm sorry.  Go ahead.

7                  MR. HAEFELE:  Objection, form.

8        A.    There are -- I don't really understand

9   the question, sir.

10        Q.    (BY MR. MOHAMMEDI)  Which documents have

11   you reviewed to refresh your recollection for this

12   deposition?

13                  MR. HAEFELE:  Objection to form.

14        A.    I've reviewed the 9/11 Commission report.

15   I've reviewed my expert report.  I reviewed the

16   rebuttal report, I reviewed the writings of Thomas

17   Hegghammer.  I've reviewed some writings of Jonathan

18   Benthall.  I reviewed testimony or statements of

19   al-Fadl, Jamal al-Fadl.  I reviewed material from

20   the UN.  I reviewed material from the United States

21   government, various designated of the United States

22   government.  Those are the principal things I

23   recollect reviewing.  All of this material is

24   material that's within my reliance report to the

25   best of my knowledge.
```

This Transcript Contains Confidential Material

```
 1        Q.    (BY MR. MOHAMMEDI)   Thank you very much.
 2   And we -- understand we -- your -- the counsel for
 3   plaintiffs submitted your invoices.  Have you
 4   submitted invoices for preparation for this
 5   deposition after filing a report?
 6        A.    I have not.
 7        Q.    And will you be able to send us those
 8   invoices to plaintiffs for us to receive them?
 9        A.    My understanding is that the same process
10   will be followed in that case, which is that the --
11   it will be reviewed by counsel.  They'll make
12   whatever redactions the two sides have agreed upon,
13   and then they will be provided to you in that
14   manner.
15        Q.    Okay.  Great.  Thank you.
16              Now, I'd like to introduce exhibit 2, and
17   exhibit 3, which is Mr. Winer's report and rebuttal
18   report.
19                   (Winer Deposition Exhibit 896, Expert
20                   Report of Jonathan M. Winer, was
21                   marked for identification.)
22                   (Winer Deposition Exhibit 897,
23                   Rebuttal Report of Jonathan M. Winer,
24                   was marked for identification.)
25                   MR. HAEFELE:  Omar, just to be clear,
```

This Transcript Contains Confidential Material

```
1          you're talking about introducing 896 and 897.

2                    MR. MOHAMMEDI:  Yes.  Yeah, I'm

3          speaking to the reporter, because that's how

4          we submitted them.  They're going to mention

5          the number for the exhibit.

6                    MR. HAEFELE:  Which is all fine to

7          communicate to get it up on the screen.  I

8          just want to keep the record straight in terms

9          of what we're going to -- how we're going to

10         find it later on.

11                   MR. MOHAMMEDI:  So the report,

12         Exhibit 896; correct?

13                   TRIAL TECHNICIAN:  Correct.

14                   MR. MOHAMMEDI:  And then 897 is the

15         rebuttal?

16                   TRIAL TECHNICIAN:  Correct.

17     Q.    (BY MR. MOHAMMEDI)  Mr. Winer, do you

18  have that report with you?

19     A.    Yes.

20     Q.    And you printed them out and you have

21  them in front of you?

22     A.    Yes.

23     Q.    If you go to page 3 of your report, which

24  is 896, and this paragraph 1.1.  And you state that

25  I -- and I quote:  Motley Rice hired me to render my
```

This Transcript Contains Confidential Material

```
 1    expert opinions on questions related to the

 2    involvement of charities in international terrorism

 3    finance into the period leading up to the 9/11

 4    attacks.

 5              Is that a fair statement?

 6       A.    Yes.

 7       Q.    With whom did you meet at Motley Rice

 8    when you were retained?

 9       A.    I first had contact with Michael Elsner,

10    and then I had contact with Robert Haefele.

11       Q.    I really, for some reason I can't hear

12    very well, so I'm not sure if it's me, or if it's --

13              MR. HAEFELE:  What he said was he met

14        with Michael Elsner and Robert Haefele.

15              MR. MOHAMMEDI:  I think it would be

16        good if I can hear it.  That way we don't

17        repeat over and over again.  So it would be

18        best if we can do that.

19       Q.    (BY MR. MOHAMMEDI)  When were you

20    formally retained?

21       A.    I believe it was December 2019.

22       Q.    Did you provide other services prior to

23    being formally retained?

24       A.    No.

25       Q.    Did you perform any services for
```

This Transcript Contains Confidential Material

```
 1   plaintiff in that advisory role?

 2       A.    No, but I would like to provide a further

 3   explanation.

 4       Q.    Sure.  Go ahead.

 5       A.    In 2002 or 2003, I am not sure of the

 6   year, I was contacted by Mr. Elsner at Motley Rice.

 7              MR. HAEFELE:  Let me stop there.  To

 8         the extent you have had communications with

 9         Motley Rice, that's not something that we're

10         going to have you get into.

11              MR. MOHAMMEDI:  That's not what --

12         that's not -- Robert, I'd really like to make

13         sure we are not going to stop every single

14         question I ask.  I'm not asking about the

15         conversation.  I'm asking about the contact.

16              MR. HAEFELE:  Which is fine, I'm

17         cautioning Mr. Winer not to get into the

18         topics of the communication or the subject of

19         the communication or the substance of the

20         communication.  He can talk to you that he met

21         with, that he communicated with, that's all

22         fine; but as you know, there is an agreement

23         among the parties and I'm allowed to make sure

24         that he doesn't do something or say something

25         that violates that agreement.  That's all.
```

This Transcript Contains Confidential Material

```
1          You can ask questions about when and if and

2          that sort of questions about the

3          communication, but the substance we've

4          agreed --

5               MR. MOHAMMEDI:  I'm not going to --

6          no problem.  Let's get to the question and the

7          answer, because we don't have a lot of time.

8          Go ahead, Mr. Winer.

9     A.     Ultimately, I did not provide services.

10    Q.     (BY MR. MOHAMMEDI)  But you were

11 contacted in 2003 and 2004?

12    A.     My testimony was and my memory is that it

13 was either 2002 or 2003, but I'm not positive about

14 the year.

15    Q.     And then in 2019 -- when did the

16 communication started before you were retained in

17 2019?

18    A.     December of 2019.

19    Q.     And you were retained in December 2019?

20    A.     Yes.

21    Q.     I assume -- it's a question that I --

22 obviously we know, but did you prepare an expert

23 report in this case?

24    A.     Yes.

25    Q.     Did you have any assistance in preparing
```

This Transcript Contains Confidential Material

1    the report?

2        A.    No.

3        Q.    So all your writing and report in

4    preparing for everything in this report was your

5    work, no one else helped you with this?

6        A.    I asked for materials from Motley Rice to

7    assist me in the preparation of that report, and

8    those materials were provided to me.

9        Q.    What is your hourly rate for this case?

10       A.    I am being compensated a rate of $800 for

11   a testimony and study in this case.

12       Q.    Is that your normal hourly rate?

13       A.    Yes.

14       Q.    And how much time did you spend preparing

15   for this report?

16       A.    I don't recollect.

17       Q.    Okay.  Let me refresh your recollection.

18   If you, reporter, if you can get exhibit 4 I sent,

19   which will be exhibit, I believe, 898.

20              (Winer Deposition Exhibit 898,

21               Invoices, was marked for

22               identification.)

23       Q.    (BY MR. MOHAMMEDI)  That will be the

24   invoices of Mr. Winer.

25              TRIAL TECHNICIAN:  What number was

This Transcript Contains Confidential Material

```
 1          that marked as?
 2                  MR. MOHAMMEDI:  Exhibit 4 that we
 3      sent you.
 4                  TRIAL TECHNICIAN:  Okay.
 5      Q.   (BY MR. MOHAMMEDI)  Are these the
 6  invoices that you sent to plaintiffs' lawyers in
 7  this case?
 8      A.   That's the first invoice, yes.
 9      Q.   When I looked at the invoice and totaled
10  the number of hours that you put in before writing
11  the report, I found that you spent about 40 hours,
12  40.4 hours to review the documents or to prepare for
13  your affirmative report.
14                  Does this sound accurate?
15      A.   I haven't totaled it up, so I don't know.
16      Q.   Okay.  So I assure you, I did that
17  calculations.
18                  I also total 29.4 hours to review
19  documents for the rebuttal.  Does it sound accurate?
20      A.   Again, I've not totaled up the amounts in
21  that way.
22      Q.   All right.  So I did make that
23  calculations for you, and I do have those as
24  accurate for my own calculations.
25                  It took you approximately a week based on
```

This Transcript Contains Confidential Material

```
 1    eight hours a day to review the documents for your

 2    report if we do 40 hours -- 40.4 hours.  That sound

 3    accurate?

 4                  MR. HAEFELE:  Form and foundation.

 5         Q.   (BY MR. MOHAMMEDI)  If you put in eight

 6    hours a day, it took you basically a week, right?

 7    Five days to review the documents in preparation for

 8    your --

 9                  MR. HAEFELE:  Objection, form,

10         foundation.

11         A.   I'm seeing here the one page.  I'll look

12    at the other pages.

13         Q.   (BY MR. MOHAMMEDI)  There are many pages

14    there.

15         A.   What it says is research and drafting.

16    So no, I don't agree with your premise, sir.

17         Q.   All right.  So I think -- research and

18    drafting is different, and I see -- I'm just looking

19    at the place where you said reviewed documents.

20         A.   Yes.

21         Q.   Okay.  How many pages were in your

22    affirmative report?

23                  I think that 135; is that correct?

24    That's without the appendix, the resumé and reliance

25    material.
```

This Transcript Contains Confidential Material

```
 1        A.    135 pages is correct.

 2        Q.    And is that correct that your rebuttal

 3   was 66 pages?

 4        A.    Yes.

 5        Q.    Do you agree with me that this is a

 6   massive case, correct?

 7        A.    Yes.

 8        Q.    With massive documents; correct?

 9        A.    Yes.

10        Q.    Massive documents produced?

11        A.    Yes.

12        Q.    This is for the finder to evaluate claims

13   and defense in this case.  Do you agree with me?

14        A.    Yes.

15        Q.    Did you choose which document to review

16   and which document not to review?

17        A.    Yes.

18        Q.    Did the lawyers select documents for you

19   to review?

20        A.    Yes and no.

21        Q.    What do you mean by yes and no?

22        A.    I was given an initial group of

23   documents.  After going through those documents, I

24   asked for more documents.  And that took place a

25   couple of times.
```

This Transcript Contains Confidential Material

```
 1        Q.    And that's from the time, I assume, that

 2   you start reviewing the documents to the time that

 3   you issued your final report; correct?

 4              MR. HAEFELE:  Objection to form.

 5        A.    Yes.

 6        Q.    (BY MR. MOHAMMEDI)  Were any documents in

 7   Arabic?

 8        A.    There are no documents in Arabic that I

 9   have read.  I don't read Arabic.

10        Q.    Were there any documents translate -- I'm

11   sorry.

12        A.    There were documents in Arabic that were

13   translated into English in which I had both English

14   and Arabic language next to it.  I am not able to

15   determine whether the English was authentic to the

16   Arabic, but they were still represented.

17        Q.    Which documents did plaintiff give you to

18   review?

19              MR. HAEFELE:  Objection.

20        A.    Please repeat --

21        Q.    (BY MR. MOHAMMEDI)  What documents did

22   plaintiffs' lawyers give to you review?

23        A.    The documents listed in my reliance

24   report.

25        Q.    So it is fair to assume that all the
```

```
 1   document that your reliance materials are the ones

 2   that plaintiff gave you to review?

 3              MR. HAEFELE:  Objection to form,

 4       foundation.

 5       A.    It's my understanding that the materials

 6   in the reliance report were the materials that were

 7   provided to me, that's correct, plus additional

 8   materials that I found.

 9       Q.    (BY MR. MOHAMMEDI)  And that includes the

10   materials that were produced in this litigation; is

11   that correct?

12       A.    It does include some materials produced

13   in this litigation, yes.

14       Q.    And do you know how many materials were

15   produced in this litigation?

16       A.    I do not.

17       Q.    So you have no idea how many documents

18   were produced in this litigation?

19       A.    It's not something that I have an opinion

20   on it.

21       Q.    Okay.

22       A.    I can make no representations of fact as

23   to how many documents have been produced in the

24   litigation.

25       Q.    Did you ask for that?
```

This Transcript Contains Confidential Material

```
 1      A.    I asked for -- to receive as much as
 2  possible given the amount of time that there was for
 3  me to prepare my report.
 4      Q.    So you specifically asked to be given --
 5  that plaintiffs' lawyers will give you as many
 6  documents as possible to review to render your
 7  opinion?
 8              MR. HAEFELE:  Objection to form,
 9        misstates testimony.
10      A.    What I have stated in this deposition and
11  am happy to restate is that I was given a lot of
12  material initially.  After spending some extensive
13  number of hours on that material, I requested
14  additional material of various kinds.  I did that on
15  more than one occasion.  I don't remember how many
16  occasions.
17              In addition, I asked for some academic
18  materials that I needed to get quickly, that I
19  understood the firm might have, which they were able
20  to provide me.  An example of that might be a report
21  by Mr. Benthall or Mr. Hegghammer.  Merely as
22  examples.  I don't recollect precisely which reports
23  those were, because once I had them, how I acquired
24  them was not particularly important.  Their
25  authenticity and accuracy, of course, was, but in an
```

This Transcript Contains Confidential Material

```
 1    academic report, it's clear where it came from.

 2         Q.    (BY MR. MOHAMMEDI)  And claimed -- I

 3    mean, your reliance material lists all the documents

 4    which you reviewed were provided by plaintiff to

 5    you; correct?

 6         A.    Yes.

 7         Q.    So you have now charged for the report,

 8    the rebuttal report as I see it is $303,581; is that

 9    correct?

10         A.    I don't know.

11         Q.    Okay.  That says that.

12               How many hours did you spend with

13    plaintiffs' lawyers in preparation for this

14    deposition?

15         A.    In preparation for this deposition?

16         Q.    Correct.

17         A.    Three to four.

18         Q.    I'm sorry, can you say that again?

19         A.    Three and a half to four.  About three

20    and a half.

21         Q.    And how -- so three and a half hours.

22    And that was only one meeting, two meetings?  How

23    many meetings were they?

24         A.    Two meetings.

25         Q.    Two meetings.  And how many times did you
```

This Transcript Contains Confidential Material

```
 1    meet plaintiffs' lawyers in preparation for your

 2    report and rebuttal?

 3         A.    I met the attorneys on one occasion.  I

 4    had discussions with the attorneys a few times.

 5         Q.    Okay.

 6         A.    The discussions were not lengthy.

 7         Q.    Have you ever testified on behalf of an

 8    accused of providing material support before?

 9         A.    No.

10         Q.    Have you ever represented -- you are a

11    lawyer; correct?

12         A.    Yes.

13         Q.    Have you ever represented any person who

14    was accused of providing material support before?

15         A.    Let me think about that question for a

16    minute.

17         Q.    Sure.

18         A.    Not in a criminal case.

19         Q.    In which aspect?

20         A.    In the course of my work as an attorney,

21    I have provided legal services to people who have

22    been SDNs.  That is sanctioned persons in

23    institutions.  And actually I'm going to correct

24    that statement.  I have provided legal services to a

25    person accused of material support.  I had forgotten
```

This Transcript Contains Confidential Material

```
 1    a matter in which I was involved in.  Substantially

 2    involving a person who was accused of material

 3    support.  So let me correct my statement on that.

 4         Q.    Can we know the case name?

 5         A.    No.

 6         Q.    Is it private?

 7         A.    It's --

 8         Q.    It's a public filed case, correct?

 9         A.    No.  The matter in which I advised the

10    person on was not in connection with a criminal

11    case.  It was in connection with a sanctions matter

12    and it was a confidential legal representation and

13    I'm not in a position to be able to tell you.

14         Q.    Okay.  So it's not the --

15         A.    My ethical obligation as an attorney.

16         Q.    I understand.  It's not a court

17    representation.  It's before administrative

18    proceedings; correct?

19         A.    It was in connection with an OFAC matter.

20         Q.    The Office of Foreign Asset Control

21    matter; correct?

22         A.    That's correct.

23         Q.    And it's fair to say that you represent

24    the people -- the people to delist them from being

25    listed on OFAC; is that correct?
```

This Transcript Contains Confidential Material

```
 1        A.     Yes.

 2        Q.     And how many cases did you handle, how

 3   did you take?

 4        A.     The last part of that sentence was what?

 5        Q.     How many cases?  How many cases you took

 6   to represent the people who were listed before OFAC?

 7        A.     Oh, there are two that are in my mind

 8   right now, but there were probably -- there may be

 9   more, but there are two I can think of right now.

10        Q.     And are they related to terrorism?

11        A.     One was terrorist -- they were both

12   related to terrorism, actually, yes.

13        Q.     Okay.  And what was the period?

14        A.     This was during my legal practice at

15   Alston & Bird, between 2000 and 2008.

16        Q.     In your -- on your website, you state

17   that after 2017 you represented people before OFAC;

18   is that correct?

19        A.     Yes.

20        Q.     So it was not the only ones that you

21   represent at that time.

22        A.     Your question was about material support

23   for terrorism, sir.

24        Q.     So this was not related to material

25   support to terrorism in 2017?
```

This Transcript Contains Confidential Material

```
1        A.    No.

2        Q.    And they were before OFAC as well;

3   correct?

4        A.    They're OFAC-related matters.  Beyond

5   that I can't say.

6        Q.    And the application was to delist them;

7   correct?

8        A.    No.

9        Q.    What was the application?

10       A.    I can't provide you further information.

11       Q.    So you -- okay.  Let me back up.

12             The two cases that you took with -- were

13  related to terrorism.  Were there applications to

14  delist your client from OFAC list?

15       A.    I can't provide you further information,

16  sir, on the nature of those engagements.

17       Q.    This is not -- I mean -- no, this --

18  we're not asking for private or confidential

19  information.  I'm asking for the specific question

20  that it does not affect your confidentiality issue.

21  Did you represent people before OFAC to delist them?

22       A.    Yes.

23       Q.    Okay.  That's the only thing I need to

24  know.  Thank you.

25             Have you ever been disqualified to
```

1    testify as an expert by court or ad -- on subjects?

2        A.    Disqualified, no.

3        Q.    So you were never disqualified as an

4    expert in specific areas to -- as an expert?

5        A.    No.

6        Q.    Okay.  Your firm provides legal service

7    and expert witness services at the same time; is

8    that correct presently?

9        A.    Yes.

10       Q.    How much money from your expert work you

11   have received since 2019?

12       A.    I don't know.

13       Q.    How many cases have you had since?

14       A.    Two.

15       Q.    Two?  Okay.

16             You cannot give an estimate?

17       A.    No.

18       Q.    Okay.  So which is the percentage of any

19   income from expert work since 2019?

20       A.    I have not calculated it, sir.

21       Q.    You don't have a percentage?

22       A.    No, I do not.

23       Q.    So is it fair to say that your legal

24   practice and expert practice are the same services

25   that you consider in your law firm; correct?

This Transcript Contains Confidential Material

```
 1                    MR. HAEFELE:  Objection to form.
 2        A.   No, it's not correct.
 3        Q.   (BY MR. MOHAMMEDI)  Isn't that true that
 4   your website says specifically you provide the
 5   services at the same time?
 6        A.   Yes, I provide legal services, I provide
 7   expert services, I provide consulting services.
 8   Those are not the same services.
 9        Q.   Okay.  But you don't know the percentage
10   of each work that you do for each areas of services?
11        A.   No.
12        Q.   Do you have anyone you know that was
13   impacted by 9/11 or anyone you know, any family
14   member, close friend, or coworker?
15                    MR. HAEFELE:  Objection to form.
16        A.   Do you mean -- by "impact," do you mean
17   killed?
18        Q.   (BY MR. MOHAMMEDI)  Killed or the loved
19   one killed that you know, friends and families.
20                    MR. HAEFELE:  Objection to form.
21        A.   I knew John O'Neill.  I didn't know him
22   well, but I knew John O'Neill.  Other than that, no
23   one I can think of.
24        Q.   (BY MR. MOHAMMEDI)  Do you have any
25   personal relationship with any plaintiffs' lawyers
```

This Transcript Contains Confidential Material

```
 1   who hired you?

 2        A.    No.

 3               MR. MOHAMMEDI:  Can I take two

 4        minutes break?  Just two minutes.

 5               MR. HAEFELE:  Sure.

 6               MR. MOHAMMEDI:  Thank you.

 7               THE VIDEOGRAPHER:  We're going to go

 8        off the record at 10:36 a.m.

 9               (Recess taken, 10:36 a.m. to

10               10:37 a.m. EDT)

11               THE VIDEOGRAPHER:  We're back on the

12        record at 10:37 a.m.

13        Q.    (BY MR. MOHAMMEDI)  Mr. Winer, based on

14   your affirmative report page -- paragraph 1.2,

15   that's page 3 again.  So you rely -- I'm just asking

16   again.  You relied on those exhibits -- on this

17   reliance material to render your opinion, but beyond

18   anything else, you have not relied on anything else;

19   correct?

20               MR. HAEFELE:  Objection to form.  And

21        Mr. Mohammedi, just be careful, because you

22        started before I was back in the room.  So

23        good thing --

24               MR. MOHAMMEDI:  Sorry.  Sorry,

25        Robert.
```

This Transcript Contains Confidential Material

```
 1                    MR. HAEFELE:  But objection to form.
 2        A.    Well, in addition to this, I rely on my
 3   experience and my knowledge from my years in
 4   governance.
 5                    MR. MOHAMMEDI:  If we enter
 6        Exhibit 5.  Which will be Exhibit 899.
 7                    (Winer Deposition Exhibit 899,
 8                    Jonathan Winer - Reliance Material
 9                    Chart, was marked for
10                    identification.)
11        Q.    (BY MR. MOHAMMEDI)  We have here all your
12   reliance material.  And the question I have for you,
13   did you review plaintiffs' other expert report in
14   this case?
15        A.    Could you repeat the question?
16        Q.    Did you review plaintiffs' other expert
17   report in this case?
18                    MR. HAEFELE:  Objection to form.
19        A.    Did I review the other plaintiffs'
20   experts' reports?
21        Q.    (BY MR. MOHAMMEDI)  Yes.
22        A.    Is that the question?
23        Q.    Yes.
24        A.    Not prior to my preparation of my
25   reports.
```

This Transcript Contains Confidential Material

```
 1        Q.    When did you review them?

 2        A.    I reviewed -- the only other one that I

 3   recollect reviewing was Mr. Levitt's report, and I

 4   don't recollect when I reviewed it.

 5        Q.    And what about --

 6        A.    It was after the completion of my

 7   reports.

 8        Q.    What about the defense expert report?

 9        A.    I reviewed the defense expert reports

10   discussed in my rebuttal report.

11        Q.    And all of them?

12        A.    The ones that I discussed.  My

13   understanding is there may be additional experts'

14   reports which I did not review on the defendants'

15   side.

16        Q.    Sure.  Now, the exhibit that we have

17   before us, which is 899, did you prepare this chart?

18        A.    No.

19        Q.    You didn't prepare this chart.

20              Who prepared this chart for you?

21        A.    The law firm of Motley Rice prepared the

22   chart.

23        Q.    Okay.  And did you provide them the

24   information for you to prepare the chart?

25        A.    I provided them my report with all of its
```

This Transcript Contains Confidential Material

```
 1   citations.  And in addition, they listed the

 2   material they provided me.

 3       Q.    Okay.  Just as a follow-up question, you

 4   are not aware that -- how many pages the Assembly of

 5   Muslim Youth produced in this case, correct?

 6       A.    I do not know the number of pages that

 7   any entity produced in this case.

 8       Q.    Let me tell you how many pages Mr. -- I'm

 9   sorry, what the Assembly of Muslim Youth has

10   produced.  It's 1.264621 pages.

11            And that's WAMY Saudi Arabia.

12            And WAMY International produced 15,202

13   pages of documents in this case.

14            Have you seen any of these?

15            MR. HAEFELE:  Objection, form,

16        foundation, misleading.

17       A.    I've seen some of them.  I've seen some

18   audits.  I have requested every bit of audit

19   material.

20       Q.    (BY MR. MOHAMMEDI)  But audits were not

21   listed in the affirmative report, were they?

22       A.    They were not.  I was not provided those

23   at the time.  I asked for them, and I got them

24   later.  And when I reviewed them, I then provided my

25   analysis.  But I wanted them from the beginning.  I
```

1   wanted an audit and I did request them.

2       Q.    Is it fair to say that you did not review

3   the audit before you produced your affirmative

4   report; correct?

5       A.    My report itself says I did not.

6       Q.    Okay.  And are you aware that Muslim

7   World League produced over 700,000 pages of

8   documents?

9            MR. HAEFELE:  Objection to form.

10      A.    I have stated and now repeat that I am

11  not aware of the amount of documents produced by

12  anyone involved in the case in terms of the numbers.

13      Q.    (BY MR. MOHAMMEDI)  And it's fair to say

14  that your affirmative report did not really rely

15  mostly on the documents produced in this case;

16  correct?

17            MR. HAEFELE:  Objection to form.

18      A.    I can't respond to that question with a

19  yes or a no.

20      Q.    (BY MR. MOHAMMEDI)  No, you can.

21      A.    It relied on the material that I've

22  listed.  I looked at every audit that I was able to

23  get my hands on and the financial records associated

24  with them.  And I went through depositions of the

25  officers of the defendants, for example, and sought

This Transcript Contains Confidential Material

1   to consider as much information as I could within

2   the time available.

3       Q.    Yeah.  It is fair to say it's over

4   2 million pages of documents between -- let's say

5   World Assembly Muslim Youth and Muslim World League,

6   we will call it WAMY and MWL.  So you have not

7   reviewed the over 2 million pages of documents that

8   were produced by WAMY and Muslim World League;

9   correct?

10          MR. HAEFELE:  Objection to form.

11      A.    It is correct that I have not reviewed

12  2 million documents from anyone at any time in my

13  life.

14      Q.    (BY MR. MOHAMMEDI)  I will direct you to

15  page 6 and page 26 of your reliance material.

16          If -- there is the highlighted version

17  there.  If you see Exhibits 267, which was actually

18  an exhibit to a deposition of WAMY, and there was a

19  document there, says, WAMYSA0276804.  Do you see

20  that?

21      A.    Yes.

22      Q.    That's one of your reliance material;

23  correct?

24      A.    It's material that was available to me,

25  which I considered.  I considered as much as I could

This Transcript Contains Confidential Material

 1   of the material that was provided within the time

 2   that I had.

 3       Q.    But my question is, is this the one that

 4   you relied on?

 5       A.    You would have to show me the document,

 6   sir.

 7       Q.    No, I don't need to show you the

 8   document.

 9       A.    Well, then I can't tell you to what

10   extent I considered it.

11       Q.    I am relying on the reliance material

12   that you produced and you said that those are the

13   documents you relied on when you produced your

14   report; correct?

15            MR. HAEFELE:  Objection, badgering.

16       A.    Those are the documents that were made

17   available to me by the law firm and which I did my

18   best to consider.  I considered as much as I

19   possibly could within the time allotted, within the

20   time that I had to get the report done.

21       Q.    (BY MR. MOHAMMEDI)  Is this reliance

22   material accurate?

23       A.    The material that was available to me,

24   it's accurate, yes.

25            Did I go through as much of it as I

This Transcript Contains Confidential Material

1    could?  Yes.

2         Q.    I would direct you to page 26.

3               And then you list three other documents.

4    Two, actually, two other documents, not three.

5               Two other documents, WAMYSAE001084,

6    WAMYSAE0018088.  Is that accurate?

7         A.    That's what that document shows on

8    page 26, that's correct.

9         Q.    Okay.  So those are the documents that

10   you list and relied on from WAMY production in your

11   affirmative report; is that correct?

12        A.    These are the documents included in the

13   reliance material chart.

14        Q.    Yes.  Okay.  Were there any documents

15   outside the reliance material chart?

16              MR. HAEFELE:  Objection to form.

17        A.    I didn't hear the question, sir.

18        Q.    (BY MR. MOHAMMEDI)  You said those are

19   the documents within the reliance chart.  Are there

20   any documents outside the reliance chart that you

21   relied on that are not in the chart?

22              MR. HAEFELE:  Objection to form.

23        A.    Not that I'm aware of.

24        Q.    (BY MR. MOHAMMEDI)  Okay.  In your --

25   strike that.

This Transcript Contains Confidential Material

```
 1              Did you review all documents Dr. Sageman
 2  reviewed in his report?
 3              MR. HAEFELE:  Objection to form.
 4       Foundation.
 5       A.    I don't know.  I can't say.  I would have
 6  to look back at his report and look at each document
 7  to decide.
 8              As mentioned, I'm not an Arabic reader.
 9  I don't remember whether any of his documents were
10  in Arabic.  And at this point, I don't remember
11  every document he cited.
12       Q.   (BY MR. MOHAMMEDI)  It was very
13  extensive, the document; is that correct?
14              MR. HAEFELE:  Objection.
15       A.    Mr. Sageman's report was very extensive.
16       Q.   (BY MR. MOHAMMEDI)  His reliance material
17  was extensive as well; correct?
18              MR. HAEFELE:  Objection to form.
19       A.    I did not look at his reliance material.
20  I can say that I found errors in his report.
21       Q.   (BY MR. MOHAMMEDI)  Did you review all
22  document John Marks reviewed in preparation for the
23  report?
24              MR. HAEFELE:  Same objection.
25       A.    I don't know.
```

This Transcript Contains Confidential Material

```
 1        Q.    (BY MR. MOHAMMEDI)  Did they submit

 2   reliance material, did they?

 3              John Marks would submit his reliance

 4   material.  Did you --

 5              MR. HAEFELE:  Object to the form.

 6        Q.    (BY MR. MOHAMMEDI)  Did you review the

 7   reliance materials that John Marks submitted in his

 8   report?

 9              MR. HAEFELE:  Objection to form,

10        foundation.

11        A.    I reviewed all the audit material that

12   was made available to me, and my conclusions about

13   that audit material were provided in my rebuttal

14   report.

15        Q.    (BY MR. MOHAMMEDI)  And is that fair to

16   say, based on his statement in his report?

17        A.    I looked at the statements in his report.

18   I looked at the audit material.  I asked if there

19   was any additional audit material, and I expressed

20   my concern that there was a lot of material that was

21   still missing.

22        Q.    Okay.  Which questions relating to the

23   involvement of charities in international terrorism

24   finance in the period leading up to 9/11 attacks

25   were you asked to opine on?
```

This Transcript Contains Confidential Material

```
1              This is -- as a matter of fact, this is a

2    question you pose at the beginning of each numbered

3    section in your report.

4              MR. HAEFELE:  Objection to form.

5    A.     Speaking generally, and I can't speak

6    with more precision than this, the sections four

7    through 18 reflected the questions that I was asked

8    to provide my opinion on.

9              And I did my best to do that.

10   Q.     (BY MR. MOHAMMEDI)  So do those questions

11   form the scope of you will be giving an opinion.

12   Where does call for your opinion?

13   A.     Yes.

14   Q.     They will discover your opinion.  Okay.

15             Who assigned you the topics?

16   A.     Motley Rice.  Mr. Haefele.

17   Q.     Okay.  Did you write about any topics

18   that were not assigned to you?

19             MR. HAEFELE:  Objection to form.

20        Don't answer that question.  You're getting

21        into communications that are beyond what we've

22        agreed that -- the parties have agreed --

23             MR. MOHAMMEDI:  I'm not asking him to

24        give me information, I'm asking him to say

25        "yes" or "no."  The question is "yes" or "no."
```

This Transcript Contains Confidential Material

```
 1              MR. HAEFELE:  I'm instructing him not
 2         to answer questions that relate to the
 3         communications that he's had with counsel for
 4         the plaintiffs.
 5              MR. MOHAMMEDI:  Robert, I am not
 6         going into the question of communication, I'm
 7         asking him --
 8              MR. HAEFELE:  You just asked him --
 9              MR. MOHAMMEDI:  If he relied, if he
10         express opinion that were not assigned to him.
11         And the question -- the answer, he just "yes"
12         or "no."
13              MR. HAEFELE:  All right.  So the
14         question, just so we're clear, the question is
15         did you answer any questions that were not
16         posed to you?
17    A.    No.  If that's the question, the answer
18    is no.
19    Q.    (BY MR. MOHAMMEDI)  Okay.  So are all of
20    the opinions you expect to provide in this case set
21    forth in your affirmative and rebuttal reports?
22    A.    Those are the questions that I've been
23    asked and those are the responses I've given, that's
24    correct.
25    Q.    And I think the question is a little
```

This Transcript Contains Confidential Material

```
 1   different.  Are all of the opinions you provide in

 2   this case were set forth in your affirmative report

 3   as well as your rebuttal report?

 4              MR. HAEFELE:  Objection to form.

 5        A.    I reserved the right in both reports to

 6   provide additional responses as appropriate based on

 7   additional information that I learn.  And I

 8   maintained that in, I believe, some formulation of

 9   that in each of the reports.

10        Q.    (BY MR. MOHAMMEDI)  Okay.  I'm talking

11   about your submission of the report.  Those opinions

12   are really the opinions that you express within your

13   report at the time of submission of your report and

14   your rebuttal report; correct?

15              MR. HAEFELE:  Objection to form.

16        A.    Yes.

17        Q.    (BY MR. MOHAMMEDI)  What areas are you

18   testifying as an expert in this case?

19              MR. HAEFELE:  Objection, form.

20        A.    You're asking me to recapitulate the

21   areas that I'm testifying about?

22        Q.    (BY MR. MOHAMMEDI)  Yes.  Yes.

23        A.    Al-Qaeda and its funding needs pre-9/11;

24   Saudi Arabia as a source of funds for al-Qaeda

25   terrorism to 9/11; charities as a source of funds
```

This Transcript Contains Confidential Material

```
 1    for al-Qaeda and terrorism to 9/11; the impact of

 2    the charities to build al-Qaeda's global strike

 3    capabilities.

 4         Q.    Are you reading from notes?

 5         A.    No.

 6         Q.    Okay.  Go ahead.

 7         A.    I'm reading from the list of my section

 8    in the table of contents.

 9         Q.    Okay.  No problem.  Go ahead.

10         A.    The role of training camps in building

11    al-Qaeda capabilities; why charity records would not

12    show al-Qaeda support; implications of financial

13    accounting irregularities; al-Qaeda's use of

14    charities for aligned terrorist groups; the role of

15    the IIRO, MWL, and WAMY in material support of

16    al-Qaeda.

17              No separation of purposes of funds used

18    in material support; purpose of the 13224 executive

19    order designation program; evidence the

20    United States needs to designate a person or entity

21    under executive order 13224; implications of

22    nondesignation of a personal entity under that same

23    order; implications of withdrawal of a designation

24    under that order; and implications of nondesignation

25    for withdrawal for UN program.
```

1    Q.    Okay.  So you are rendering your opinion

2    with this type of expertise in this report.  Is that

3    what you're claiming?  You are an expert in all

4    these areas that you are rendering your opinion on?

5    A.    I'm not claiming anything.  I have

6    rendered my opinion in these areas.

7    Q.    As an expert?

8    A.    As an expert in international financial

9    crime and terrorist finance, including the area of

10   charity abuse.

11   Q.    Okay.  So I'm just trying to understand

12   your area of expertise in this case.

13                MR. HAEFELE:  Objection to form.  Is

14     there a question there, Omar?

15   Q.    (BY MR. MOHAMMEDI)  Is there an area of

16   expertise you have and you're rendering an opinion

17   in this case?

18                MR. HAEFELE:  Objection to form.

19   A.    I have been studying and worked as a

20   practitioner in counter transnational financial

21   crime going back to the earliest phases of my career

22   beginning in 1980 when I did my first money

23   laundering case.  That expertise included

24   investigations of terrorist activity and terrorist

25   finance when I worked in the United States Senate in

This Transcript Contains Confidential Material

```
 1    the 1980s; that included exposure to these issues

 2    continuously during the time that I was at the State

 3    Department from 1994 through 1999.  So from the

 4    period of from 1985 to '99 while I was in the

 5    federal government, I was exposed -- 1985 to 1999 --

 6                    MR. MOHAMMEDI:  Mr. Winer, I thought

 7          you were answering my question.  We are going

 8          to go through those.

 9                    MR. HAEFELE:  I'm going to object to

10          the --

11    Q.    (BY MR. MOHAMMEDI)  My question is --

12                    MR. HAEFELE:  Omar, let me object to

13          you interrupting and not letting him finish

14          the answer to the question.  I understand --

15                    MR. MOHAMMEDI:  I don't think he's --

16          I don't think he's -- his answer is not

17          responsive and I want to make sure I have a

18          response.

19                    MR. HAEFELE:  All right.  I just want

20          the record --

21                    MR. MOHAMMEDI:  I am not asking

22          him --

23                    MR. HAEFELE:  Omar, I just want the

24          record --

25                    MR. MOHAMMEDI:  Listen, can you
```

This Transcript Contains Confidential Material

```
 1          not -- listen, this is my deposition, Robert.
 2                    MR. HAEFELE:  I know it's your
 3          deposition, but it's my opportunity to make
 4          sure that he gets to answer the questions, and
 5          you can't interrupt.
 6                    MR. MOHAMMEDI:  He is not answering
 7          the questions --
 8                    MR. HAEFELE:  Omar, I'm just --
 9                    MR. MOHAMMEDI:  He's not.
10                    MR. HAEFELE:  Omar, I'm just making a
11          record.  You can go on with your deposition.
12          I'm just making a record.
13                    MR. MOHAMMEDI:  Okay.  So I am -- I
14          want to make sure we don't waste a lot of
15          time.  We are going through those.  Sooner or
16          later we'll go through them.
17     Q.    (BY MR. MOHAMMEDI)  My question is very
18     specific:  Which area of expertise you're opining in
19     this case.  That's it.  You just need to tell me.
20     And you hold yourself as an expert.  Which area
21     you're holding yourself as an expert in this case.
22                    MR. HAEFELE:  And what is what he --
23                    MR. MOHAMMEDI:  You gave me page 2.
24                    MR. HAEFELE:  Just for the record,
25          that is what he was answering you, Omar, and
```

This Transcript Contains Confidential Material

```
1          you interrupted.

2          Q.    (BY MR. MOHAMMEDI)  So anyway, this is

3    the list of expertise you have provide -- you are

4    providing in this case, correct, Mr. Winer?

5                 MR. HAEFELE:  Objection to form.

6          A.    Yes.

7          Q.    (BY MR. MOHAMMEDI)  Are you an academic?

8          A.    Yes.

9          Q.    Do you teach?

10         A.    Yes.

11         Q.    Where do you teach?

12         A.    I've taught at various times, courses at

13   many different schools, Georgetown, George

14   Washington, American University, Princeton, Harvard,

15   NYU.  It's listed in my resumé, the various places

16   that I've taught in my CV.

17         Q.    And --

18         A.    I also taught for many years at the Kent

19   School operated by the CIA.  The CIA's Kent School,

20   and was regularly teaching there throughout most of

21   the 00s, most of the period from about 2000 to 2008.

22   I am affiliated today with the Middle East

23   Institute, where I regularly engage in various types

24   of teaching.

25         Q.    Now, you -- you said that you taught many
```

This Transcript Contains Confidential Material

1    places and you listed the universities and law

2    schools I believe that you taught at.  Where -- were

3    those positions are permanent positions, are they

4    adjunct professor positions, or they're just

5    occasional lectures you're giving to those

6    institutions?

7              MR. HAEFELE:  Objection to form.

8         A.    At the Kent School, my work was under

9    contract.  So that was regular and ongoing for the

10   period of many years.  I don't recollect precisely

11   the number of years.

12             The other were -- teaching has been

13   largely ad hoc, which is to say I've been invited to

14   teach a seminar by another academic.

15             In 2017, I taught a student -- a group of

16   students on transnational -- certain transnational

17   criminal issues at the MacDill school and I was an

18   adjunct faculty there at MacDill in Washington for a

19   semester.  So it's been a variety of different

20   capacities.  I have not been part of the regular

21   faculty or adjunct faculty at any school, but you

22   asked me the question, am I an academic.  I am

23   published in a number of academic journals.

24        Q.    (BY MR. MOHAMMEDI)  Okay.  We'll get into

25   that.

This Transcript Contains Confidential Material

```
 1               So is it fair, you have not been a

 2    faculty of any academic institution.  Is that fair

 3    to say?

 4        A.    I have not been a resident faculty member

 5    of any institution.  I am a nonresident scholar at

 6    this time and have been since 2017 at the Middle

 7    East Institute.

 8        Q.    Are you a social scientist?

 9        A.    I am an attorney.  I did study some

10    social science in law school.

11        Q.    But you are not a social scientist?

12        A.    I am not a Ph.D.

13        Q.    Are you a certified public accountant?

14        A.    No.

15        Q.    Are you a forensic accountant?

16        A.    No.

17        Q.    Are you certified fraud examiner?

18        A.    No.

19        Q.    Are you or have you been a member of the

20    law enforcement?

21        A.    Have I been a member of law enforcement?

22        Q.    Law enforcement.

23        A.    I worked as a prosecutor at the beginning

24    of my career.

25        Q.    But that's the -- that's the experience
```

This Transcript Contains Confidential Material

1    that related to law enforcement that you are talking

2    about, right?

3         A.    No, that's incorrect.

4         Q.    Okay.  Go ahead.

5         A.    For six years I was the lead person at

6    the United States Department of State, addressing

7    international law enforcement issues.  In that

8    period I worked with U.S. law enforcement on a daily

9    basis.

10        Q.    Were you yourself a member of law

11   enforcement?

12              MR. HAEFELE:  Objection to form.

13        A.    Did I have the power to prosecute?  I did

14   not.  Did I have the power to arrest?  I did not.  I

15   was not a prosecutor or a police officer.  Except

16   early on when I did a -- when I did a money

17   laundering prosecution.

18        Q.    (BY MR. MOHAMMEDI)  Have you ever worked

19   as an intelligence service analyst or agent?

20        A.    I have worked under contract for a U.S.

21   government analytic agency for many, many years,

22   providing both intelligence and analysis to that

23   agency, as disclosed in my CV.

24        Q.    You testified that you are an expert in

25   history of al-Qaeda; correct?

This Transcript Contains Confidential Material

```
1        A.    I would have to look at precisely what

2   their CV said.

3        Q.    Are you an expert in history of al-Qaeda?

4        A.    What is that?  Omar, I didn't hear you.

5        Q.    Al-Qaeda.  Are you an expert on history

6   of al-Qaeda?

7        A.    In certain context, yes.  I know enough

8   about its activities Afghanistan, Bosnia, Chechnya,

9   Sudan, Southeast Asia, and elsewhere to have

10  familiarity with its activities.

11       Q.    How do you know that?

12       A.    I have some expertise in the area.  I am

13  not an Arabic reader, so there are things that are

14  in Arabic, I'm sure, that would allow me to know

15  more.

16       Q.    How do you -- how did you gain that

17  expertise?

18       A.    When the United States government first

19  became concerned about al-Qaeda in the 1990s, I was

20  meeting regularly with Richard Clarke at the NSC who

21  is the United States government's counterterrorism

22  czar at the time.  And I was dealing with the

23  interrelated issue of international crime, and in

24  particular international financial crime.  And the

25  two are inexorably intermingled, and the
```

This Transcript Contains Confidential Material

```
 1   United States was seeking that period of time, both

 2   to understand these phenomena and to begin to build

 3   capacity to combat them.  And I had regular contact

 4   with Mr. Clarke and was working for him and with

 5   him, such as with Michael Sheehan, for example, and

 6   Rand Beers on these issues in the late 1990s and

 7   became aware of his concern.

 8        Q.   Okay.  And is it fair to say those were

 9   within the policy scope?

10             MR. HAEFELE:  Objection, form.

11        A.   I'm not sure I understand the question.

12        Q.   (BY MR. MOHAMMEDI)  Were you dealing with

13   this matter from a policy perspective?

14        A.   Yes, but I also was trying to -- it was

15   my job also to communicate to other countries about

16   what we needed them to do and what capacities we

17   needed.  I did not do that, however, regarding

18   al-Qaeda myself.  I was aware that others were, but

19   I was not.

20        Q.   You were not.  Okay.  Have you ever

21   studied terrorism in an academic setting?

22        A.   I couldn't understand the question.

23        Q.   Have you ever studied terrorism in any

24   academic setting?

25        A.   I have been asked to write about
```

This Transcript Contains Confidential Material

```
 1    terrorism by a number of academic publications and

 2    have done so.  For example, International Institute

 3    For Strategic Studies.

 4        Q.    Mr. Winer, my question is not that.  My

 5    question -- we're going to go through that, believe

 6    me.

 7              MR. HAEFELE:  Objection.  Omar, can

 8         you not stop -- you cannot keep interrupting.

 9              MR. MOHAMMEDI:  If you're going to --

10         stop interjecting, I'm going to call the

11         Court.

12              MR. HAEFELE:  You can call the Court.

13         Because I will tell the Court that you keep

14         interrupting the witness.

15              MR. MOHAMMEDI:  Listen, Robert, I am

16         not going to allow you, I am not -- you're

17         harassing.

18              MR. HAEFELE:  Omar, you have to let

19         him finish the question.

20              MR. MOHAMMEDI:  And now you will not

21         allow me to conduct my deposition.  I am

22         really being respectful to the witness.  I'm

23         asking question and --

24              MR. HAEFELE:  You are aren't doing a

25         deposition.  You are asking questions and then
```

This Transcript Contains Confidential Material

```
 1          you are permitting -- or not permitting the
 2          witness to answer the question.  That's not a
 3          deposition.  You have to let the answer
 4          proceed.
 5               MR. MOHAMMEDI:  No, the question --
 6          the answer is not what I ask, was not
 7          responsive.
 8               MR. HAEFELE:  Well, you don't get to
 9          say what the answer is.
10               MR. MOHAMMEDI:  Yes, I do.  I do,
11          Robert, but you get to stop obstructing this
12          deposition, Robert.
13               MR. HAEFELE:  I am not.  I am asking
14          for the deposition to proceed.
15               MR. MOHAMMEDI:  You are disrupting
16          this deposition, Robert, you need to stop.
17               MR. HAEFELE:  Omar, if you --
18               MR. MOHAMMEDI:  I'm going to call the
19          judge.
20               MR. HAEFELE:  Please, I welcome it.
21          I'm telling you, if you let the witness --
22               MR. MOHAMMEDI:  I -- I am not going
23          to go through 13 hours having to deal with
24          you, Robert, on this.  I need to conduct my
25          deposition --
```

This Transcript Contains Confidential Material

```
 1              MR. HAEFELE:  Omar, I want you to
 2        conduct your deposition, but I want you to let
 3        the witness answer the question.  That's all
 4        I'm asking.
 5              MR. MOHAMMEDI:  And the witness is
 6        not responsive.  I will tell him he's not
 7        responsive.
 8              MR. HAEFELE:  You are interjected and
 9        you -- you asked a question -- Omar, you asked
10        a question.  What is your experience and then
11        you wouldn't let him answer the question,
12        which is exactly what you --
13              MR. MOHAMMEDI:  Five minutes that we
14        are talking.  I'm going to add the five
15        minutes of timing.
16              MR. HAEFELE:  No.  Omar, you have to
17        let him answer the question.
18              MR. MOHAMMEDI:  Can you stop -- court
19        reporter, can you stop the time?
20              MR. HAEFELE:  No. She can't.
21              MR. MOHAMMEDI:  No.  You can't.  No,
22        we are going to stop now.
23              MR. HAEFELE:  Omar.
24              MR. MOHAMMEDI:  I'm going to stop and
25        we're going to discuss.
```

This Transcript Contains Confidential Material

```
 1              MR. HAEFELE:  Let him answer the

 2       question.

 3              MR. MOHAMMEDI:  We take a five-minute

 4       break.

 5              MR. HAEFELE:  We'll take a break.

 6       That's fine.  Omar, listen to what I'm saying.

 7       Listen to what I'm -- Omar, just listen to

 8       what I'm saying.  I don't want to fight with

 9       you.

10              MR. MOHAMMEDI:  Let me conduct my

11       deposition, Robert.

12              THE VIDEOGRAPHER:  We're going to go

13       off the record at 11:09 a.m.

14              (Recess taken, 11:09 a.m. to

15              11:22 a.m. EDT)

16              THE VIDEOGRAPHER:  We are back on

17       record at 11:22 a.m.

18       Q.   (BY MR. MOHAMMEDI)  Mr. Winer, have you

19   ever interviewed members of al-Qaeda?

20       A.   No.

21       Q.   Do you have a field experience -- when

22   I'm saying field experience -- before 9/11 including

23   Afghanistan, Chechnya, Bosnia?

24       A.   Not in those countries, no.

25       Q.   Are you an expert on terrorism -- or
```

This Transcript Contains Confidential Material

```
 1    charities?  Sorry.
 2        A.    I have done work in the field of
 3    charities now over -- since the late 1980s.
 4        Q.    In the McDonald versus TD Bank, you held
 5    yourself as an expert on interpretation application
 6    of Canadian banking laws; correct?
 7        A.    No.
 8        Q.    What did you hold yourself as an expert
 9    in?
10        A.    My expertise was on international banking
11    standards, including as they applied in Canada.
12        Q.    So it is an application of Canadian
13    banking law?
14              MR. HAEFELE:  Objection, form.
15        Q.    (BY MR. MOHAMMEDI)  Is it?
16        A.    My expertise was on the comparative law
17    and the underlying international standards that were
18    applicable in Canada and elsewhere.  And
19    understanding the obligations of banks.
20              MR. LEWIS:  Court reporter, can you
21         put the Exhibit 61 we sent you, which I think
22         would be 900.
23              (Winer Deposition Exhibit 900,
24              McDonald and Dickson v TD Bank
25              citation, was marked for
```

This Transcript Contains Confidential Material

```
 1                    identification.)

 2                    TRIAL TECHNICIAN:  And you said 61?

 3                    MR. MOHAMMEDI:  Yes.

 4          Q.   (BY MR. MOHAMMEDI)  If you go --

 5     Mr. Winer, if you go to page 32, 33 of this --

 6                    So it's McDonald versus TD Bank?

 7          A.   Yes.

 8          Q.   Right?  And it's a trial testimony;

 9     correct?

10          A.   Yes.

11          Q.   And in that exhibit, page 32, 33 -- I'm

12     trying to find here.  It's note 167.  Do you see

13     that?

14          A.   Yes.

15          Q.   What does it say?

16          A.   Do you want me to read it to you?

17          Q.   Yes, please.

18          A.   Messrs. Winer and Delston are U.S.

19     attorneys.  Mr. Winer has been referred to as a

20     leading architect of relevant laws, regulations, and

21     international standards addressing financial crime

22     and money laundering.  He served as counsel and a

23     legislative assistant to U.S. Senator John Kerry

24     from 1985 to 1994, following which he was directly

25     involved in numerous international anti-money
```

This Transcript Contains Confidential Material

```
 1   laundering initiatives for the United States

 2   government.  TD Bank objected to his testifying as

 3   an expert on matters concerning a Canadian bank

 4   since Mr. Winer is neither a banker nor a Canadian.

 5   At trial, I qualified him as an expert on

 6   international banking standards.

 7        Q.   Okay.  And then, so -- and then you go to

 8   same page, 169.

 9             It says:  Despite qualifying them as

10   experts -- referring to you and another expert named

11   Delston -- were not qualified to provide opinion

12   evidence regarding the interpretation or ... laws of

13   Canada or Ontario.  Indeed, they both acknowledged

14   that they are not experts in Canadian banking

15   practices and had no experience with the Canadian

16   regulatory regime.

17        A.   That was her finding.  I don't agree with

18   her characterization of --

19        Q.   But that's the finding.  That is the

20   finding; correct?

21        A.   Yes.

22        Q.   And when you applied as an expert, you

23   did apply as an expert in a Canadian regulatory

24   regime, correct?  And you were excluded?

25        A.   In part.
```

This Transcript Contains Confidential Material

```
 1        Q.     And you were excluded?

 2        A.     No, I was not excluded.

 3        Q.     You were excluded in that portion;

 4   correct?

 5        A.     That's correct.

 6        Q.     Okay.

 7               MR. MOHAMMEDI:  Can you put

 8        Exhibit 62, which is 901?

 9                     (Winer Deposition Exhibit 901, Gill v

10                     Arab Bank Memorandum and Order, was

11                     marked for identification.)

12        Q.     (BY MR. MOHAMMEDI)  This is the case Gill

13   versus Arab Bank.  You remember you were hired an

14   expert in this case; correct?

15        A.     Yes.

16        Q.     If you go to page 18, it says:  Mr. Winer

17   is qualified to testify as a rebuttal expert on U.S.

18   banking terminology, standards, and practices.  The

19   witness's background will not prevent adequate

20   cross-examination.

21               Mr. Winer is not -- is not qualified

22   under Daubert and Rule 702 to opine as to Hamas's

23   agenda or relationship with terrorist organizations.

24   He will not be permitted to testify as to Hamas and

25   its interaction with charitable organizations.
```

This Transcript Contains Confidential Material

```
 1              Did I read that correctly?

 2        A.    That's what that document says.  I was

 3   not aware --

 4        Q.    It's a --

 5        A.    I was not --

 6        Q.    It's a court order, isn't it?

 7        A.    If you tell me -- say that it is.  I've

 8   not seen this.

 9        Q.    It is a memorandum and order in the case

10   11-CV-3706.

11        A.    Okay.

12        Q.    Okay?  So is it fair to say that your

13   areas of expertise in TD Bank was limited to U.S.

14   banking, to -- I'm sorry, to international banking

15   standards; correct?

16              MR. HAEFELE:  Objection to the form.

17        A.    The ruling was not to allow me to testify

18   about Canadian law and regulations, but to tell --

19   but to testify about the international standards as

20   an expert, that is correct.

21        Q.    (BY MR. MOHAMMEDI)  And then the ruling

22   in the other bank, you were excluded to testify as

23   to Hamas and the charitable work; right?

24              MR. HAEFELE:  Objection to form,

25        foundation, and --
```

```
 1              MR. MOHAMMEDI:  Charities work.
 2        A.    That's what this document you've shown me
 3   says.  This is the first time I've been aware of it.
 4        Q.    (BY MR. MOHAMMEDI)  Okay.  Are you an
 5   expert on charity financial reporting?
 6        A.    Am I an expert on charity for what, sir?
 7        Q.    Financial reporting.
 8        A.    I don't understand the question, sir.
 9        Q.    Are you an expert on issues related to
10   financial reporting related to charities?
11        A.    I've spent considerable time on that
12   issue, sir, over some decades.
13        Q.    And that's charity financial reporting
14   you're talking about; correct?
15        A.    I don't understand the national reporting
16   element of your --
17        Q.    Charities.  Charities.  I'm referring
18   specifically to charities.
19        A.    I understand the word charities.  I don't
20   understand what you mean by national reporting.
21        Q.    Financial reporting.  Not national, I'm
22   sorry.  I'm saying financial reporting.
23        A.    Within the -- within some context, yes.
24   Other contexts, probably not.  It would depend upon
25   the specific area that we're looking at.
```

This Transcript Contains Confidential Material

```
 1              I am an expert in financial crime and in
 2    the question of when inadequate disclosure creates
 3    opportunities for the abuse of charities.  And I've
 4    been a proponent for many years of stronger
 5    reporting standards for charities, because of that
 6    concern, and testified before Congress some
 7    substantial number of years ago, I think in the 00s,
 8    on that issue.
 9        Q.    And do you do your own financial analysis
10    of this reporting or do you use accountant or
11    forensic accountant for that purpose?
12        A.    It depends on the context in the case.  I
13    have been involved in a matter in which the
14    attorneys involved in the matter retained an
15    accounting firm to do the forensic accounting work,
16    which we then assessed as -- in connection with an
17    OFAC matter.  And part of providing the terms of
18    reference for the accounting firm, what we needed,
19    what we needed to analyze and understand.
20              So for that purpose, I was an expert in
21    order to assess what the U.S. government would
22    require to provide certainty, enough certainty that
23    there was no risk of terrorist findings to enable a
24    person or entity to be delisted.  When I was
25    investigating BCCI in the 1980s, I spent extensive
```

This Transcript Contains Confidential Material

```
 1    time in direct analysis of financial records,

 2    records of BCCI, which included some records of its

 3    charities, and in interviewing witnesses about

 4    BCCI's charitable practices.  BCCI was a bank that

 5    was run by a group of Pakistani bankers, funded and

 6    originated out of the Gulf States, and engaged in

 7    very substantial criminal wrongdoing including

 8    terrorist finance.

 9              And in the course of that, I looked at a

10    lot of documents myself and came to understand that

11    charities in Pakistan at the time and in the Gulf

12    states were not at that point required to provide

13    documentary evidence of how they were spending their

14    money and that they were generated with no controls.

15    Bottom line, there were no controls.  I was told

16    this by one or more witnesses who I personally

17    interviewed; and looked at documents, and there were

18    certainty tens of thousands of pages of documents I

19    looked at.  Whether there were hundreds of

20    thousands, I don't know, but it was certainly tens

21    of thousands.  It was probably not millions.

22         Q.    And that was in 1993; correct?

23         A.    No, that was before -- that was before

24    then, the period leading up to 1993.

25         Q.    So when was the date exactly?
```

This Transcript Contains Confidential Material

```
 1        A.    I don't know.  It would --

 2        Q.    But there was definitely before --

 3        A.    Somewhere between the period of 1989 and

 4   1994.

 5        Q.    '94.  Okay.

 6              And you said that you relied on the

 7   forensic accountant and -- to run your expertise as

 8   far as assessment; correct?

 9              MR. HAEFELE:  Objection to form.

10        A.    An attorney group that I was part of

11   worked -- chose to retain a forensic accountant firm

12   to assist us in reconstructing a record that would

13   enable us to assess terrorist finance vulnerability

14   and what additional practices would need to be put

15   into place to correct those vulnerabilities in that

16   particular case.

17        Q.    (BY MR. MOHAMMEDI)  Was the case about

18   terrorism finance?

19        A.    Yes.

20        Q.    Okay.  And what type of terrorist finance

21   are you talking about?

22        A.    I'm sorry, I don't understand the

23   question.

24        Q.    It was a Middle Eastern finance or was

25   it --
```

```
 1        A.     Yes.

 2        Q.     -- related to where?

 3        A.     Yes.

 4        Q.     Are you an expert on Islam?

 5        A.     I am not an expert on the doc --

 6   religious doctrine of any kind, except to the extent

 7   that it involves the political impact of different

 8   types of interpretations of religion when a religion

 9   is politicized into a political movement, where I

10   have expertise.

11              So when you have a combination of foreign

12   policy, security, and religion, that's an area that

13   I have devoted some extensive work on over a long

14   period of time.

15              And that is an area of expertise, yes.

16   In the Middle East bureau, where I was from 2013 to

17   2017, we were constantly dealing with -- within the

18   bureau and I was personally -- the competing agendas

19   of political Islam and various strands and strains

20   of political Islam, including that in the Islamic

21   state and al-Qaeda and other groups like Ansar

22   al-Sharia.  And that competing with -- Arab

23   nationalism competing with states that would be

24   modern unitarian states, competing with warlord and

25   different types of rule in which pan-Islamic rule
```

1    was one of the strains, political strains that had

2    all kinds of consequences for terrorism and

3    terrorist risk, and having to understand the various

4    strands of those was critically important to my

5    work.

6              In that period in particular, while I was

7    involved.

8        Q.   (BY MR. MOHAMMEDI)  But you are not an

9    expert on Islamic terms of concept from a religious

10   standpoint, are you?

11             MR. HAEFELE:  Objection, form.  Asked

12       and answered.

13       A.   I am not really -- I'm not willing to

14   adopt your question as an answer.  I'm happy to say

15   again what my expertise is.

16       Q.   (BY MR. MOHAMMEDI)  Are you a religious

17   expert?  "Yes" or "no."

18             MR. HAEFELE:  Objection to form.

19       Q.   (BY MR. MOHAMMEDI)  Are you a religious

20   expert?

21             MR. HAEFELE:  Still objection to

22        form.  It's the same question and he's

23        answered.

24       A.   I developed expertise in the political --

25       Q.   (BY MR. MOHAMMEDI)  I just say, are you a

```
 1   religious expert?  I mean, it's -- you already

 2   explained that.  I'm just asking you are you a

 3   religious expert?

 4              MR. HAEFELE:  Omar, you keep asking

 5        and repeating the same answer he gave.

 6              MR. MOHAMMEDI:  He already answer a

 7        question that was not really what I was

 8        asking.  I'm just asking if you are a

 9        religious expert.

10   A.    I can answer it this way:  My father was

11   a medical researcher in cardiovascular disease and

12   learned some fundamental principles in connection

13   with the angiotensin system.  He was an expert in

14   that area.  He was also a doctor.  He was not an

15   expert in glioblastoma.  So if you're asking

16   somebody are you an expert in medicine, well, yes,

17   my father was a medical expert, a medical expert

18   with certain areas of expertise.

19              I have certain areas of expertise.  Am I

20   a religious expert who spent my life on Islam,

21   Christianity, Judaism, Buddhism, Bahaism, Sufism,

22   the difference between Sunni and Shia, I have not

23   spent my lifetime on it, although I could give you

24   the basics of the Sunni/Shia split if it was of help

25   to you.  I could discuss when Wahhabism originated
```

This Transcript Contains Confidential Material

```
 1    and when the modern Salafi movement originated, and

 2    the fact that some people think its antecedents go

 3    back earlier and foundations for it earlier.  I can

 4    talk about the relationship between Egypt and

 5    Saudi Arabia in competing for religious dominance.

 6    But does that make me an expert in religion?  No.

 7              MR. GOETZ:  Objection, nonresponsive,

 8         move to strike.

 9         Q.   (BY MR. MOHAMMEDI)  Do you hold yourself

10    as a religious expert in this case?

11              MR. HAEFELE:  Objection to form.

12              MR. MOHAMMEDI:  Just answer this

13         "yes" or "no."

14              MR. HAEFELE:  Objection, you can't

15         demand a "yes" or "no" answer.

16              MR. MOHAMMEDI:  Robert, you can stop

17         interjecting.

18              THE WITNESS:  I believe I've answered

19         the question.

20         Q.   (BY MR. MOHAMMEDI)  Are you an expert on

21    religion in this case?

22              MR. HAEFELE:  Objection to form,

23         asked and answered multiple times.

24         A.   I am expert on the political aspects of

25    Islam and how it played out in the region in the
```

1    1980s, 1990s, and 00s.

2        Q.    Are you an expert in Islamic terms and

3    concepts?

4        A.    I know about a few of them.  Not all of

5    them.

6        Q.    Are you an expert --

7              Knowing is not an expert.  Do you agree

8    with me?

9              MR. HAEFELE:  Objection to form,

10        argumentative.

11       A.    I think it's really up to others to

12   determine the scope of my expertise.  I felt

13   comfortable and continue to feel comfortable

14   answering questions that were posed to me in my

15   expert report.

16       Q.    (BY MR. MOHAMMEDI)  Okay.  Then we go to

17   the next point.

18              (Reporter clarification.)

19       Q.    (BY MR. MOHAMMEDI)  Are you an expert on

20   the Kingdom of Saudi Arabia history?

21       A.    I know a fair amount about the Kingdom of

22   Saudi Arabia.  I dealt with issues relating to it

23   every day in my last work, the state departments.  I

24   was not personally responsible for that

25   relationship, but I was in meetings each morning

This Transcript Contains Confidential Material

```
 1    when I was in Washington to discuss the ins and outs

 2    of that relationship.

 3              And I'm familiar with the modern history

 4    of Saudi Arabia.

 5        Q.    Have you ever been posted in

 6    Saudi Arabia?

 7        A.    No.

 8        Q.    Have you ever been posted anywhere in the

 9    Middle East pre-9/11 as U.S. representative?

10        A.    I'm sorry, please repeat the question.

11        Q.    Have you ever been posted anywhere in the

12    Middle East pre-9-11 as a U.S. representative?

13        A.    I've undertaken missions in a variety of

14    places in the Middle East.  I have been posted in

15    Washington.  I've always been -- I've lived in

16    Washington since 1985.

17        Q.    If we go to you -- as Exhibit 2, your CV

18    and the experience and qualifications.

19              MR. HAEFELE:  Just for the record,

20         it's not Exhibit 2.

21              MR. MOHAMMEDI:  I'm sorry, I'm sorry.

22         Which exhibit, that CV and qualification.

23              MR. HAEFELE:  896.

24              Wait, do you want his CV or his

25         expert report?
```

This Transcript Contains Confidential Material

```
 1                    MR. MOHAMMEDI:  Both.

 2                    MR. HAEFELE:  His expert report is

 3        896.

 4                    MR. MOHAMMEDI:  Sorry about that.

 5        Q.    (BY MR. MOHAMMEDI)  Did you gain

 6   experience in terrorist financing during the course

 7   of your undergrad studies?

 8        A.    In the course of my undergraduate

 9   studies?

10        Q.    Correct.

11        A.    No.

12        Q.    What about your law school studies?

13        A.    No.

14        Q.    Do you have any additional degrees other

15   than the two from Yale and NYU law school?

16        A.    No.

17        Q.    You were employed by the Department of

18   State; correct?

19        A.    Yes.

20        Q.    And if you go to one -- that's 144 -- 141

21   to 142.  Right?

22              That's the type of experience you had at

23   the State Department; right?

24              You were a deputy assistant secretary of

25   state for international law from 1994 to 1999?
```

This Transcript Contains Confidential Material

```
 1        A.    That's correct.

 2        Q.    Were you ever employed by the Department

 3   of Defense?

 4        A.    No.

 5        Q.    Were you ever employed by the Department

 6   of Treasury?

 7        A.    No.

 8        Q.    Were you ever employed by the Department

 9   of Justice?

10        A.    No.

11              Yes, actually, I was.  Sorry, was.

12        Q.    So if you go to page 138.

13        A.    Yeah, I was employed by the Department of

14   Justice in 1980.

15        Q.    Right.  And you said that you were an

16   associate while still in law school for the U.S.

17   Attorney in Denver.

18        A.    Yes.

19        Q.    It was the training from the FBI and the

20   office of the controller of the currency responsible

21   for regulating U.S. banks.

22              Do you see that?

23        A.    That's not on the page that's in front of

24   me, but yes, it's correct.

25        Q.    It is in page 138.
```

```
 1        A.     That's correct.

 2        Q.     What do you mean by associate while in

 3   law school?

 4        A.     I was a summer associate, where I spent

 5   the entire summer on one of the earliest money

 6   laundering cases in the United States.

 7        Q.     I don't believe the Department of Justice

 8   has summer associates.  They have summer clerks;

 9   right?

10        A.     I understood myself to be a summer

11   associate, not a summer clerk.

12        Q.     From what I see, United States office

13   Department of Justice has clerks and interns, not

14   summer associate.

15        A.     What's the year of the document, sir,

16   that you're reading from?

17        Q.     Okay.  If you go to --

18        A.     Is it from 1980 or is it more current?

19        Q.     So you are saying that you were an

20   associate.  You have an associate position at the

21   time?

22               MR. HAEFELE:  Objection to form.

23        Q.     (BY MR. MOHAMMEDI)  You were not a

24   lawyer -- okay.  Let me ask you another question.

25   Were you a lawyer with the Department of Justice at
```

1    the time?

2        A.    I was in law school.  I was not -- did

3    not have a law degree at that time.

4        Q.    And what did you do?

5              MR. HAEFELE:  Objection to form.

6        A.    I worked with the -- John Sharkey

7    comptroller of the currency and Tom Reardon of the

8    FBI in preparing materials for a trial involving

9    money laundering activity and fraud in the

10   Caribbean.  It was a cross-border crime, which

11   introduced me to a number of concepts in money

12   laundering and fraud.  That's how I began my

13   involvement in the skill.

14       Q.    (BY MR. MOHAMMEDI)  And you worked with

15   Financial Action Task Force; correct?

16       A.    Yes.

17       Q.    Which is the Financial Action Task Force?

18       A.    What is it?  Is that the question?

19       Q.    Yes.

20       A.    The Financial Action Task Force was

21   created in the meeting of the G7, I believe in 1989,

22   in response in part to legislation that I worked on

23   with Senator Kerry requiring the United States to

24   negotiate what were then called Kerry agreements so

25   that U.S. anti-money laundering laws, which were

This Transcript Contains Confidential Material

```
 1    still quite basic, would be adopted in other

 2    countries to avoid regulatory enforcement

 3    arbitration.

 4             And the Bush administration did not want

 5    to negotiate bilateral agreements in that area, and

 6    what evolved was instead the Financial Action Task

 7    Force by a decision of the G7 in 1989.

 8        Q.    And at the time of its creation, did

 9    financial task force have any policies to combat

10    terrorism financing in particular?

11        A.    No.

12        Q.    And the role was mostly related to policy

13    matters; correct?

14        A.    No.

15        Q.    What is relate -- what was it related to?

16        A.    It was a mechanism to develop

17    international money laundering standards, which

18    countries would then put into place to provide a

19    foundation to combat money laundering and all forms

20    of financial crime, essentially because money

21    laundering involves disguising the actual uses of

22    funds.  So it applies to a very great range of

23    felonies, of serious crimes.  And the idea was to

24    have it -- initially it was to combat drug

25    trafficking only, but by 1996 it became modified
```

This Transcript Contains Confidential Material

```
 1    to -- a system to combat all forms of serious crime.
 2         Q.    Okay.  And as a deputy assistant
 3    secretary of state for international law in 1984, on
 4    September 11, 1996 you testified before the House
 5    International Relations Committee; correct?
 6         A.    I don't recollect the date.
 7              MR. MOHAMMEDI:  Can you bring up
 8         Exhibit 6, which is 902, I believe.  Right?
 9              (Winer Deposition Exhibit 902, Cheap
10              Flights to Nigeria, was marked for
11              identification.)
12              TRIAL TECHNICIAN:  That might take a
13         second.  That didn't come through --
14              MR. MOHAMMEDI:  Can we go off record
15         until you figure this out?
16              THE VIDEOGRAPHER:  Going off the
17         record.  11:50 a.m.
18              (Recess taken, 11:50 a.m. to
19              11:51 a.m. EDT)
20              THE VIDEOGRAPHER:  Back on the
21         record.  The time is 11:51 a.m.
22         Q.    (BY MR. MOHAMMEDI)  So in page 1 of that
23    document, which is highlighted for you, in
24    paragraph 3, is you -- you refer to your bureau's
25    responsibility was to protect American citizens and
```

This Transcript Contains Confidential Material

```
1    American businessmen from threats posed by

2    international narcotics trafficking and crime;

3    correct?

4                    MR. HAEFELE:  Omar, can you tell us

5         what we're looking at?

6                    MR. MOHAMMEDI:  I just mentioned it.

7                    MR. HAEFELE:  I know, but can you

8         tell us --

9                    MR. MOHAMMEDI:  It's here.

10                   MR. HAEFELE:  What is the document?

11        I know you're highlighting something from a

12        document; I don't know what the document is.

13                   MR. MOHAMMEDI:  I understand.  At

14        paragraph 3, the highlighted version of

15        paragraph 3.

16                   MR. HAEFELE:  Of what -- what is the

17        document you're highlighting?

18                   MR. MOHAMMEDI:  Okay, the document I

19        mention is a Congressional testimony in 1996.

20                   MR. HAEFELE:  Thank you.  I must have

21         missed that.  I apologize.

22        Q.   (BY MR. MOHAMMEDI)  Do you read that,

23    Mr. Winer?

24        A.   Yes.  Would you like me to read it?

25        Q.   I just read it to you.  You agree with
```

This Transcript Contains Confidential Material

```
 1    that; right?

 2         A.    Yes.

 3         Q.    And your responsibility was for policy;

 4    correct?

 5         A.    That was part of my responsibility, yes.

 6         Q.    And there was nothing referencing to

 7    terrorism or terrorism financing, was there?

 8         A.    That's correct.

 9               MR. HAEFELE:  Objection to the form.

10         A.    But let me simply --

11               MR. MOHAMMEDI:  I don't have any

12         question pending.

13               MR. HAEFELE:  Let him finish the

14         answer, Omar.

15         A.    At my bureau, given our responsibility,

16    policy, and programs, the programs part got very

17    operational.  So it's a mistake and inaccurate to

18    state that it's limited to policy only.

19         Q.    (BY MR. MOHAMMEDI)  But it's a relate --

20    it's not related to anything about terrorism;

21    correct?

22         A.    That's correct.

23               MR. HAEFELE:  Objection to form.

24         A.    That statement is not related to anything

25    about terrorism.  The hearing was on Nigerian crime.
```

This Transcript Contains Confidential Materials

```
 1                  MR. HAEFELE:  Omar, what's on the

 2          screen, is it Exhibit 902?

 3                  MR. MOHAMMEDI:  Yes.

 4                  MR. HAEFELE:  Okay.

 5      Q.   (BY MR. MOHAMMEDI)  All right.  So let's

 6   go -- in 1999 -- we can take this off screen.

 7                  In 1999, you return to private legal

 8   practice; correct?

 9      A.    Yes.

10      Q.    And it was from 1999-2008; correct?

11      A.    Correct.

12      Q.    Did you gain any expertise in terrorism

13   finance while engaged in private practice during

14   that time?

15      A.    Yes.

16      Q.    Did you represent any Gulf state during

17   this period?

18      A.    No.

19      Q.    And what type of expertise in terrorism

20   finance did you gain during that time?

21                  MR. HAEFELE:  Objection to form.

22      A.    As I've stated, I had developed broad

23   experience in my work in the Senate initially, and

24   then at the Department of State on cross-border

25   financial crime, which includes frauds of every
```

1    kind.  Money laundering of every kind.

2            And fraud and money laundering including

3    terrorism.  As mentioned, I first encountered the

4    terrorism problem in my work for the subcommittee on

5    Terrorism, Narcotics, and International Operations,

6    organizations, I believe the subcommittee was

7    called, in the years I was working for then-Senator

8    John Kerry.

9            That expertise was the foundation for my

10   understanding on terrorist finance.  They also

11   worked closely with Richard Clarke, who was the lead

12   person in the U.S. government during the Clinton

13   administration for dealing with terrorism, and

14   chatted with him about it in the course of my work,

15   which was directly adjacent and intersected with the

16   work that was being undertaken on terrorism.  My

17   involvement was limited to an understanding that we

18   needed to take on terrorist finance at the same time

19   and that we had a growing problem associated with

20   terrorist finance.  This emerged fairly rather late

21   in my time at the Department of State, '98, '99,

22   with particular focus after the terrorist bombings

23   of our embassies, which got everybody's attention at

24   the State Department and caused people to broaden

25   and deepen their focus on these issues.

```
 1                During this period of time, Mr. Clarke
 2   was quite frustrated with the response of the U.S.
 3   government to what he perceived as a tremendous
 4   threat.  I was one of the people in the functional
 5   bureaus who he could talk with about the nature of
 6   the threat without getting push-back.
 7                The regional bureaus very often would
 8   push back when you were asking countries to do more.
 9   And the Middle East bureau, in this period of time,
10   would push back sometimes.
11                And so I got exposed to it in that
12   period.  When I went to Alston & Bird, after 9/11, I
13   was reached out to by the United States Senate, by
14   ABC News, by academic institutions, and participated
15   in a number of seminars, conferences, and so on, on
16   terrorism finance; and used that period of time to
17   deepen my knowledge and research into the
18   phenomenon.  I also was retained by the
19   United States government from a period of about 2000
20   to a period of about 2008 to provide regular reports
21   on countries relating to money laundering, terrorist
22   finance, corruption, these countries'
23   vulnerabilities, and these companies' capacities to
24   deal with them.
25                And so my study continued while I was
```

This Transcript Contains Confidential Material

```
 1   under contract to the United States government

 2   throughout that period.

 3       Q.    (BY MR. MOHAMMEDI)  And that was from

 4   1999-2008; correct?

 5       A.    No, I believe it was 2000 to 2008, not

 6   1999.

 7       Q.    2000.  Because I think it says 1999.

 8       A.    I was at Alston & Bird from 19 -- the end

 9   of 1999 to 2008, but my work in this territory did

10   not take place in 1999.  I was there only two months

11   in 1999, and that work began later.

12       Q.    And, Mr. Winer, what percentage of your

13   time would you estimate that was spent in counseling

14   regarding terrorism finance for that period of time,

15   which is from 2000-2008?

16       A.    Could you please repeat the question.

17       Q.    What percentage of your time would you

18   estimate was spent on counseling regarding terrorism

19   finance from 2000, 2008?

20       A.    It's difficult for me to put a percentage

21   on something I've never put a percentage on.  I can

22   tell you that I had a contract with the

23   United States government, a series of contracts,

24   which --

25       Q.    How many?  I'm sorry.  How many
```

This Transcript Contains Confidential Material

```
 1   contracts?

 2        A.    I can't tell you how many.  I can tell

 3   you how many years.  They began in 2000 and

 4   continued through 2008.  In which I was providing

 5   work regularly to the United States government

 6   throughout that period of time on this set of

 7   issues.

 8        Q.    And when you say, when you talk about

 9   2000, 2008, and you talk about your -- the contract,

10   are those the clients that you were advising during

11   that time?

12        A.    I had private sector clients I provided

13   advice to in connection with OFAC, and I had the

14   government as a client providing analytic --

15   academic or analytic work on country studies,

16   principally, though it was not only country studies,

17   of vulnerability to money laundering, vulnerability

18   to terrorist finance.  Their capacities to combat

19   these phenomena.  And what measures of performance

20   might look like if they built greater capacity.

21        Q.    And did you represent any charity itself

22   in this -- during that time period?

23        A.    Yes, as I've mentioned, I did.

24        Q.    And was there --

25        A.    As I've stated, I have, yes.
```

This Transcript Contains Confidential Material

```
 1        Q.     And those are foreign charities or U.S.
 2   charities?
 3        A.     Both.
 4        Q.     And the foreign charities, which area
 5   of --
 6        A.     Middle East --
 7        Q.     -- the world that you were representing?
 8        A.     Middle East.
 9        Q.     Middle East mostly?
10        A.     I can't -- you asked -- I talk about two
11   cases involving OFAC.  There's a third case which
12   did not involve that, which involved a U.S. domestic
13   charity which had other issues associated with
14   financial documentation of its activities and
15   investigated enforcement matters where I was
16   providing advice.
17        Q.     Did you represent any other government
18   other than the U.S. government?
19        A.     Let me think of what I did when.  Yes,
20   while I was at Alston & Bird, if that's the period
21   we're talking about, I represented the government of
22   Indonesia for a period.
23        Q.     Indonesia.  Any other government?
24        A.     Later, I represented the government of
25   Malaysia.
```

This Transcript Contains Confidential Material

```
 1        Q.    If you can just list them for me, I'd
 2   really appreciate that, if you have the list.
 3        A.    I represented the governments of
 4   Indonesia.  I don't know the exact year.  I
 5   represented the government of Malaysia in roughly
 6   2009 or '10.
 7              But again, I don't have these accurate.
 8   Indonesia would have been roughly 2005 or '6, but I
 9   don't recollect.
10        Q.    Were any of those governments you
11   represent before 9/11?
12        A.    No.
13        Q.    It was after 9/11?
14        A.    Yes.  And in Indonesia --
15              Let me wait until you ask a question.
16        Q.    What type of representation you had for
17   Indonesia and Malaysia in your practice?
18        A.    Generally both -- both countries wanted
19   to understand the U.S. government's major issues
20   with them and to think about how to enhance their
21   relationship with the United States.  In connection
22   with Indonesia, we provided legal advice on certain
23   matters.  And beyond that, I really can't get into
24   that.  Though separately I can say that I provided
25   an analysis or critique of Indonesia's anti-money
```

This Transcript Contains Confidential Material

1  laundering and antiterrorist laws and made

2  recommendations on them.  But that wasn't -- that

3  was a separate engagement that I did pro bono in

4  addition to the formal engagement.

5      Q.    Mr. Winer, every time you respond, you

6  say money laundering and terrorism finance.  Is it

7  that every time you dealt with money laundering you

8  dealt with the terrorism finances as well?

9      A.    I can't say every time, but after 9/11,

10  in the work that I did for the U.S. government, it

11  was, if not always, it was almost always.

12          As I said a few minutes ago, there were a

13  few reports that I did for the United States

14  government which were outside of the country

15  analysis framework.  The 100-plus reports that I

16  did -- and it might have been 120, I don't remember

17  the exact number.  It tended to be about 20 a year,

18  to the best of my memory -- were generally country

19  reports, but they also asked me to look at things

20  like global financial risk from derivatives, the

21  money laundering and crime risk of internet

22  gambling.  So occasionally there would be specialist

23  topics.  But the country reports always included,

24  the best of my memory, a charity finance department.

25      Q.    And were you responsible to get with

```
 1    those, terrorism finance every time they deal with

 2    the money laundering?

 3         A.    I had a -- that was part of the criteria,

 4    the scope of the work that I was asked and answered

 5    to do the research and analysis of.  That was the

 6    scope.

 7         Q.    Right.  And that was mostly after 9/11;

 8    correct?

 9         A.    It was entirely after -- no, it was not

10    entirely after.  It began in 2000.

11         Q.    2000.

12         A.    And prior to 9/11 is when it began.  But,

13    you know, the scope may have changed some between

14    2000 and 2001, but I just don't recall.

15         Q.    Okay.  But is it every time you do money

16    laundering, that was before nine -- after 9/11 you

17    had to deal with the terrorism finance; correct?

18         A.    Not every time.  The country reports

19    always did.  I mean, for example, I was asked at one

20    point by another component to the -- another

21    contractor of the United States government to write

22    a report on how money laundering works in China,

23    with China, Hong Kong, and Taiwan, and that report

24    did not include a terrorist finance component

25    because it wasn't part of the scope.  It included a
```

```
 1    heavy focus on tax evasion, money laundering, and

 2    fraud.

 3              MR. MOHAMMEDI:  Reporter, can you put

 4         up Exhibit 7, which will be 903, I believe?

 5                   (Winer Deposition Exhibit 903, DRAFT

 6                   transcript of McDonald v TD Bank

 7                   hearing, was marked for

 8                   identification.)

 9    Q.   (BY MR. MOHAMMEDI)  And again, this is

10    McDonald versus TD Bank, and this is a transcript of

11    the trial testimony.

12              MR. HAEFELE:  Just to be clear, Omar,

13         you're representing that it's a transcript,

14         the trial testimony, but the top of the

15         document says it's not certified.  It's a

16         rough draft only.

17              MR. MOHAMMEDI:  It's a rough draft

18         only, yes.

19              MR. HAEFELE:  So we can't take this

20         as the final version.

21              MR. MOHAMMEDI:  Okay.  It is a rough

22         draft.  It is the trial testimony.

23              MR. HAEFELE:  Just note my objection.

24              MR. MOHAMMEDI:  Okay.  I understand.

25    Q.   (BY MR. MOHAMMEDI)  If you go for like 7
```

This Transcript Contains Confidential Material

1    to 25, the numbering, which is 3598, the page.

2              It's highlighted.

3              Do you want to -- I mean, you can read it

4    to yourself, and I just have a few questions about

5    it.

6        A.    Sure.

7                   [Document review.]

8        A.    I've read it.

9              MR. MOHAMMEDI:  Let me know when you

10        finish.

11       A.    I've finished.

12       Q.    (BY MR. MOHAMMEDI)  Okay.  Great.  Thank

13   you.

14             So is it fair to say that you did not

15   include the phrase terrorism finance risk in this

16   testimony -- in this part of the testimony; right?

17       A.    It wasn't relevant to this case, so I

18   didn't mention it.

19       Q.    So is it because it was not relevant that

20   you did not mention it?

21       A.    Yes.

22       Q.    Okay.  But it is -- this is about banking

23   standard; correct?

24       A.    Terrorist finance was entirely irrelevant

25   to the scope of my testimony in that case.

This Transcript Contains Confidential Material

```
 1        Q.    So you're saying because it was not

 2   relevant, even though it's banking standard,

 3   terrorism finance was not relevant?

 4        A.    Not to this particular case.  It was

 5   about a Ponzi scheme and there was no terrorist

 6   finance involved.

 7        Q.    Okay.  In -- yeah.

 8              In exhibit, I think 896.  Page 151, 152.

 9              You referred that you teach terrorism

10   finance to CIA analyst at Kent School from

11   2002-2013; correct?

12        A.    I don't think I said 2013.  If that's --

13   if it says it anywhere, that's not -- I don't think

14   that's -- actually, let me think about that.  Yes, I

15   did.  I taught all the way until I went back to...

16              That's correct.  Yep.

17        Q.    How many courses on terrorism finance did

18   you teach to CIA analysts?

19        A.    I don't remember.

20        Q.    What was the duration of -- I mean, how

21   many times a -- I would say what was the frequency

22   of those lectures?

23              MR. HAEFELE:  Objection to the form.

24        A.    There were typically four a year, and

25   they covered corruption, money laundering, terrorist
```

This Transcript Contains Confidential Material

1    finance, that range of topics.

2        Q.    (BY MR. MOHAMMEDI)  Did you have any

3    syllabus?

4        A.    I did proposals to them and prepared

5    presentations and that type of thing.

6        Q.    So there was no syllabus for your

7    lectures?

8        A.    I don't understand the word syllabus in

9    this connection.

10        Q.    I teach in law school and whenever I

11    teach -- I go to teach, I'll have syllabus for the

12    duration of time during I teach, and people who

13    teach in the -- I mean, obviously everyone who

14    teach, they have syllabus, if it's a recognized

15    and -- a teaching position?

16             MR. HAEFELE:  Objection to the form.

17        A.    I didn't have a syllabus.

18        Q.    (BY MR. MOHAMMEDI)  You didn't have a

19    syllabus.  Okay.

20             Those courses that you were teaching,

21    were they in any way related to 9/11?

22             MR. HAEFELE:  Object to the form.

23        A.    Yes.

24        Q.    (BY MR. MOHAMMEDI)  Can you give me

25    examples?

This Transcript Contains Confidential Material

```
 1       A.    Sure.  I focused on Pakistan as a case
 2  study of the ways in which corruption played out in
 3  having very, very poor controls on the movement of
 4  money, and the terrorist problem, winding up being a
 5  destabilizing factor in India -- or in Pakistan over
 6  many, many years.  That's the main thing that I
 7  remember about it.  The evolution of Pakistani
 8  politics, including the impact of 9/11, which
 9  included the odd moment when money moved in, a
10  substantial amounts of payments moved in after there
11  was a crackdown, moved into the formal banking
12  system.  I remember that fact, for example, as being
13  part of the discussion.
14            And the need to understand integrity in
15  systems versus corruption in systems, in the banking
16  system, in the oversight banking mechanisms
17  generally.  That's my memory.
18       Q.    I see.  If we can go to Exhibit 8.
19                 (Winer Deposition Exhibit 904,
20                 Jonathan M. Winer resume, was marked
21                 for identification.)
22       Q.    (BY MR. MOHAMMEDI)  This is an exhibit of
23  your resumé submitted to 2012 court filing in Gill
24  versus Arab Bank.
25                 Is that correct?
```

This Transcript Contains Confidential Material

```
 1        A.     Mm-hmm.

 2        Q.     And you were hired as an expert in that

 3   case as well; correct?

 4        A.     Sure.  Mm-hmm.

 5        Q.     On page 1, which you have, in the third

 6   sentence of the first paragraph, your 2000 resumé,

 7   you are talking about your experience as deputy U.S.

 8   assistant secretary of state law enforcement;

 9   correct?

10        A.     Yes.

11        Q.     You stated you serve as a principal

12   policy-maker, as a principal policy-maker focused on

13   a daily basis on international organized crime and

14   financial crimes for the State Department, including

15   money laundering, the systems used for terrorist

16   finance, and mutual legal assistance and

17   international cooperation against transnational

18   threats such as crimes and terrorism; correct?

19        A.     That's correct.

20        Q.     In this resumé that you submitted in 2019

21   at page 36 -- 136, sorry.  896 -- Exhibit 896,

22   page 136.  You kept the same wording; right?  Except

23   you changed the last phrase to handled oversight of

24   U.S. law enforcement relation with many nations;

25   correct?
```

This Transcript Contains Confidential Material

```
 1        A.    Yes.

 2        Q.    How did the same experience come from

 3   hours of the policy maker focusing on mutual legal

 4   assistance and international cooperation to I

 5   handled oversight of law enforcement relations?

 6        A.    Both are true.

 7        Q.    But one was -- resumé was submitted in

 8   different cases, two different thing -- two

 9   different variation; correct?

10        A.    Yes.

11              MR. HAEFELE:  Objection to form.

12        Q.    (BY MR. MOHAMMEDI)  Why -- why are there

13   two different variations of your resumé?

14        A.    Well, probably because I thought of the

15   fact in connection with this that I was also doing

16   oversight of U.S. law enforcement relations.  Is

17   this one from the Canada case?  Where is this one

18   from?  Is this my current one?

19        Q.    This is not Canada case.  This is the

20   Gill versus Arab Bank.

21        A.    This one -- which one?  I have a few --

22        Q.    The 2012 I showed you was the Gill versus

23   Arab Bank.

24        A.    Yeah.  So I've also handled oversight of

25   U.S. law enforcement relations with many nations.
```

This Transcript Contains Confidential Material

1   It's a fact.  It's true.

2       Q.   So this -- you said -- just before you

3   said, you said just because you were dealing with

4   this issue here, that's why you added that.  Is that

5   correct?  That was your testimony right before I

6   asked you a question.

7       A.   No, I said I added it because it's also

8   true.  I don't recollect, to be honest, why I added

9   it.  I probably just wanted it.  But it's accurate.

10  I can go into detail if you'd like detail.

11      Q.   I'm just asking questions specifically

12  about that.  I'm not asking for detail.  Thank you.

13           In your 2019 resume which you submitted

14  in this case, the heading reads:  Experience in U.S.

15  Foreign Policy Sanctions and Terrorist Finance

16  Process; correct?

17      A.   Yes.

18      Q.   And that's page 137.

19           In your 2012 resumé you wrote, during my

20  six-year service as -- and let's go to page 2 of

21  that exhibit.

22      A.   Uh-huh.

23      Q.   Exhibit 8, page 904.

24           I'm sorry, Exhibit 904 -- Exhibit 904,

25  which is -- which we just have now, at page 2.

This Transcript Contains Confidential Material

```
 1            You --

 2                 MR. HAEFELE:  And Omar, just to be

 3        clear, Exhibit 904 is his --

 4                 MR. MOHAMMEDI:  This is the Gill

 5        versus Arab Bank.

 6                 MR. HAEFELE:  CV -- the CV from the

 7        Gill case.

 8                 MR. MOHAMMEDI:  Yes, that's 2012.

 9        Q.    (BY MR. MOHAMMEDI)  During my six-year --

10    you state:  During my six-year service as a U.S.

11    Deputy Assistant Secretary of State, I met daily

12    with other senior policy makers at the State

13    Department to discuss foreign policy issues.

14    Foreign policy issues.  Again you mentioned:  Issues

15    involving the response of the U.S. government to

16    foreign governments, officials, businesses, and

17    persons involved in planning or carrying out

18    criminal activity directed at the United States

19    and/or its people.

20            You see that, correct?

21        A.    Yes.

22        Q.    In the 2019 resumé that you submitted in

23    896, page 137, the exact sentence appears in the

24    same place except you add the phrase again:

25    Including issues related to terrorism; correct?
```

```
 1      A.    Sure.  Wasn't that the same?  Okay?  Is
 2  it not the same?
 3      Q.    That's my question, I just wanted to make
 4  sure you confirmed that.
 5            During your --
 6      A.    Yes, as I stated, after the bombings, the
 7  embassy bombings, we all had to incorporate the
 8  focus on terrorism.
 9      Q.    During your six-year service as U.S.
10  Deputy Assistant Secretary of State, did you chair
11  any interagency meetings involving this and other
12  U.S. agencies?
13      A.    Involving what and other U.S. agencies?
14      Q.    Any agencies.  Did you chair for any U.S.
15  agency that you were working with at the time?
16      A.    Yeah, many.
17      Q.    So you did chair many of those
18  interagency meetings?
19      A.    Yes.
20      Q.    You know, that's the -- the previous
21  resumé, which you submitted in Arab Bank, you did
22  not say that; correct?
23      A.    Maybe not.
24      Q.    Okay.
25      A.    Yeah, I was deputized by Dick Clarke at
```

This Transcript Contains Confidential Material

```
 1    the NSC to get the whole U.S. government going to

 2    deal with the international financial crimes bureau

 3    in that period.

 4         Q.    Okay.  In your 2019 resumé and the

 5    earlier experience, which is page 138 of

 6    Exhibit 196, you wrote about the Senate report drug

 7    law enforcement and foreign policy:  The Senate

 8    report analyzed cases in which U.S. foreign policy

 9    interests were preventing the U.S. government from

10    protecting U.S. citizens from injury for -- by

11    foreign drug traffickers, arms traffickers,

12    criminals, and terrorists.

13              Right?

14         A.    Yes.

15         Q.    Is that correct?

16              That sentence does not appear in your

17    2012 resumé that was submitted in the Gill versus

18    Arab Bank; correct?

19         A.    I don't know.

20         Q.    It does not.  Okay.

21              Have you ever written a book?

22         A.    I've written chapters of books.

23         Q.    You have not written a book?

24         A.    Chapters only.

25         Q.    Prior to 9/11, did you publish any
```

This Transcript Contains Confidential Material

```
 1   article or peer-reviewed journal on the subject of
 2   terrorism finance?
 3        A.    No.
 4        Q.    Prior to 9/11, did you publish any
 5   peer-reviewed books on the subject of terrorism
 6   finance, or chapters of the books, for that matter?
 7        A.    No.
 8        Q.    Have you ever authored any peer-reviewed
 9   article on al-Qaeda?
10        A.    I'd have to go back and look at the
11   articles that I wrote that were published in various
12   academic places to determine how much it was about
13   al-Qaeda.  So I can't answer the question offhand.
14        Q.    As you sit here, can you remember any --
15   anything --
16        A.    I was -- my writing, after 9/11, focused
17   very broadly on what was needed to combat terrorist
18   finance.  Those were works that I was commissioned
19   to do.  The writing I did was the work that was
20   commissioned.
21        Q.    Okay.  Have you ever authored any
22   peer-reviewed article on Islamic terrorism?
23        A.    Certainly, the writing that I've produced
24   includes that topic.  I'd have to go back and read
25   all of the articles to be able to answer the
```

```
1   question at this point.

2        Q.    Have you ever authored any peer-reviewed

3   article on al-Qaeda finance and terrorism finance of

4   facts of 9/11?

5        A.    I'd have to go back again to the survival

6   article that I wrote to the international -- it's

7   the one that was published in the aftermath, but I

8   wrote a bunch of things in that period of time which

9   covered all these issues.  But I have not gone back

10  lately to look at them.  So I'd have to go back and

11  look at them to be able to answer your question as

12  formulated.

13       Q.    Okay.

14       A.    I wrote a lot about those topics.  What I

15  put into those particular chapters of those books, I

16  don't recollect.  It tended to be largely focused on

17  what was needed institutionally to address the gaps

18  in regimes that were in place to combat terrorist

19  finance.  That was the major thing that I tended to

20  write about.  How much of that went into the

21  individual case of al-Qaeda, I just don't recollect.

22       Q.    Okay.  Have you ever been accused of

23  committing perjury?

24       A.    In court?

25       Q.    In general.
```

This Transcript Contains Confidential Material

```
 1      A.    Yes.

 2      Q.    Can you put Exhibit 9 --

 3      A.    No, I'd like -- I would like the

 4  opportunity to respond to that.

 5      Q.    Yes, we're going to go into it.  Yes,

 6  we're going to.

 7                  (Winer Deposition Exhibit 905,

 8                   Browder lawyer Jonathan Winer files

 9                   perjured claims in Hermitage court

10                   case, was marked for identification.)

11      A.    That's the one.

12      Q.    (BY MR. MOHAMMEDI)  That's the one,

13  right?

14      A.    Yeah.

15      Q.    905.  Exhibit 905.  You are aware of

16  this, correct?

17      A.    Yeah.  It's outrageous.  Absolutely

18  outrageous.

19            The person making the charge is not an

20  attorney.  The person making the charge is not an

21  expert.

22      Q.    Okay.  There's no question pending,

23  Mr. Winer.  I have not even asked you the question.

24      A.    Yeah, it's outrageous.

25      Q.    Yeah, let me just ask you the question.
```

This Transcript Contains Confidential Material

```
1              It is outrageous and I agree with you.

2    Its accusations are serious enough, especially an

3    officer of the court such as yourself, that makes it

4    outrageous; correct?

5              MR. HAEFELE:  Objection to form.

6         A.   No.  What makes it outrageous is not only

7    her defamatory statements, which are false, but

8    her -- the whole writing style.  She's been

9    attacking this particular company, Hermitage, for

10   years, as Mr. Browder has gone about defending

11   himself against the -- trying to preserve and

12   protect the memory of his attorney, Sergei

13   Magnitsky, who was killed in a Russian prison.  And

14   Ms. Komisar decided to take the Russians' side.

15        Q.   (BY MR. MOHAMMEDI)  Right.

16        A.   And so her stuff is extremely prejudiced

17   and she makes outrageous charges, and this is among

18   the outrageous charges.

19        Q.   Ever demanded a retraction or correction?

20        A.   Beg your pardon?

21        Q.   Have you ever demanded a retraction or

22   correction?

23        A.   This piece is on Ms. Komisar's blog.

24   It's a piece by her on her blog.  I know

25   Ms. Komisar.  There would be no --
```

This Transcript Contains Confidential Material

```
 1        Q.    I'm just saying did you -- I mean, the

 2   question, have you demanded a retraction or

 3   correction?

 4              MR. HAEFELE:  Omar, again, you have

 5         to let him answer the question.

 6        A.    I considered a variety of steps and

 7   decided that doing anything would just draw more

 8   attention to this person and her vendetta, and

 9   therefore I did not.

10        Q.    (BY MR. MOHAMMEDI)  Have you ever

11   initiated defamation or libel action against the

12   author?

13        A.    No.

14        Q.    Let's go to -- if you can put in

15   Exhibit 10.

16              (Winer Deposition Exhibit 906, Money

17               Laundering Alert, was marked for

18               identification.)

19        Q.    (BY MR. MOHAMMEDI)  Which is 906,

20   correct?  Is that 906?

21              MR. HAEFELE:  Is this a new,

22         uncertified version of the transcript?

23              MR. MOHAMMEDI:  No, this is not -- I

24         mean, this is sitting -- it is not.

25              MR. HAEFELE:  Is it going back to the
```

This Transcript Contains Confidential Material

```
 1          earlier document?

 2                    MR. MOHAMMEDI:  Let me just confirm,

 3          which is the exhibit.  There doesn't seem --

 4                    MR. HAEFELE:  That was 903, was the

 5          earlier rough of the trial testimony in

 6          McDonald.

 7     Q.    (BY MR. MOHAMMEDI)  So you've put in --

 8          So the court reporter, Exhibit 10 has

 9     Exhibit 10 and Exhibit 10 A.  This is what you put

10     in, I think, as Exhibit 10 A.  That we sent you.

11                    MR. HAEFELE:  So what are we putting

12          this -- what exhibit number is this going to

13          be for the purposes of our deposition?

14                    MR. MOHAMMEDI:  Yeah, we are just

15          waiting to the court reporter to fix this.

16                    TRIAL TECHNICIAN:  It's not the court

17          reporter.  It's the trial tech.  You have two

18          tens.  There's 10 A -- 10, a rough draft, day

19          21, and 10, Money Laundering Alert.

20                    MR. MOHAMMEDI:  The Money Laundering

21          Alert.

22                    MR. HAEFELE:  So is this now nine --

23                    MR. MOHAMMEDI:  We can't read this

24          one, but I'm going to refer to the transcript

25          that refers to it.  And I'm sure that
```

This Transcript Contains Confidential Material

```
 1        Mr. Winer can answer questions about this and
 2        that is related with the case that, the TD
 3        Bank case and the official transcript that we
 4        have as an expert.  And that was going to be
 5        where Mr. Winer, he was answering questions
 6        about this.
 7                 MR. HAEFELE:  I have no idea what the
 8        exhibit is here.
 9                 MR. MOHAMMEDI:  Okay.  Let me just --
10        let me just ask Mr. Winer the question and
11        then can you object if you have any objection.
12                 MR. HAEFELE:  It's not a matter of
13        objection, I'm just trying to keep the record
14        straight as to what exhibits you're showing
15        the witness.
16                 MR. MOHAMMEDI:  So can you put up --
17        what exhibit is this?
18                 (Reporter clarification.)
19                 MR. HAEFELE:  What was 905?
20                 MR. MOHAMMEDI:  That was the article
21        that we just put it on before.
22                 MR. HAEFELE:  Okay.  So this
23        document, this Money Laundering Alert is 906?
24                 MR. MOHAMMEDI:  Right.
25                 MR. HAEFELE:  Thank you.
```

This Transcript Contains Confidential Material

```
 1          Q.    (BY MR. MOHAMMEDI)  Mr. Winer, you are

 2   aware about this document; correct?

 3          A.    I remember the document.

 4          Q.    And you were cross-examined about this

 5   document in the McDonald's versus TD Bank; correct?

 6          A.    I think that they brought it out, yes.

 7          Q.    And then this alert states:  Winer,

 8   described by a former colleague as a conspiracy

 9   theorist, has experience in training

10   uncorroborated allegations, later proved baseless

11   about person in whom he develops an interest.

12                You remember that, correct?

13          A.    Sure do.

14          Q.    That's what it says.

15          A.    Sure do.  And I would like to be able to

16   explain it.

17          Q.    Go ahead.

18          A.    Sure.  This article was written by a

19   publication published by a man named Charlie

20   Intriago who was close to lawyers who were working

21   for Alan Stanford, who presided over the second

22   largest Ponzi scheme in North America history.

23                And I had focused on Antigua as a hotbed

24   of Russian money laundering and other criminal

25   activity and fraud.  And Stanford had become in
```

This Transcript Contains Confidential Material

1    charge of -- had taken over the regulatory agencies

2    of the agencies that were regulating his bank, and

3    the United States government was very upset about

4    it.  I was very upset about it.  Officers from the

5    Caribbean were very upset about it.  And this was

6    part of Stanford's counterattack.  In an effort to

7    smear me, by his henchmen, which was part of a

8    coverup which lasted another bunch of years.  Until

9    finally Stanford's empire collapsed.

10          And so the person who I have the

11   supposedly baseless conspiracy theory about, the

12   underlying reference there fundamentally is -- was

13   Stanford.  And Stanford was engaged.  Again he, he

14   was not quite as big as Bernie Madoff, but the next

15   one.  And that's the background for that

16   publication.  The first time I saw it, I recognized

17   it's a smear and knew where it came from.

18   Q.    And it was referred by also Wall Street

19   Journal; correct?

20   A.    Well, that was another related Wall

21   Street Journal article they referred to, yeah.  But

22   that's basically what was going on.  It was an

23   effort to smear me.

24   Q.    Okay.  But you were aware of this

25   article, what it says about you; correct?

This Transcript Contains Confidential Material

```
1              And you were aware before about this
2    article, TD Bank cross-examination?
3         A.   I was cross-examined on it by TD Bank,
4    that's correct.
5         Q.   Can you --
6         A.   I just told you what its origin was and
7    why.
8         Q.   Okay.
9              MR. MOHAMMEDI:  Can we take a break?
10             MR. HAEFELE:  Sure.
11             THE VIDEOGRAPHER:  Going off the
12        record.  The time is 12:33 p.m.
13             (Recess taken, 12:33 p.m. to
14             12:46 p.m. EDT)
15             THE VIDEOGRAPHER:  We are back on the
16        record at 12:46 p.m.
17        Q.   (BY MR. MOHAMMEDI)  Mr. Winer, have you
18   ever been a -- have you ever appeared before 9/11
19   Commission as a former government official?
20        A.   No.
21        Q.   Did the Commission refer to you as a
22   contributor to the report?
23        A.   No.
24        Q.   What is your methodology?
25             MR. HAEFELE:  Objection to the form.
```

```
 1        A.    When I'm asked a question, as an expert,
 2   I draw on my own personal experience in the field,
 3   and the -- whatever period of time that I worked on
 4   an issue directly when I was in the government, I
 5   draw on my experience as a practitioner, as a
 6   lawyer, in which I -- when I've been exposed to
 7   clients with issues in that area, and my study of
 8   the law and my past study of facts.  I draw upon, as
 9   well, analysis and academic work that I've
10   undertaken in the past and the research I did in
11   connection with that.
12             I look at primary source information when
13   it's available.  So Jamal al-Fadl, for example,
14   Mr. Ahmad, would both be examples of first-hand
15   information.  There's also -- can be first-hand
16   information in newspaper reports when you have
17   contemporaneous interviews or quotes from
18   individuals, and I will use that as well.
19             I rely on government reports, both from
20   the United States and sometimes from other
21   governments.  I rely on UN reports and other
22   official reports, because based on my experience,
23   those are typically based on a tremendous amount of
24   work, which often is documented; it's not always
25   explicitly documented.
```

This Transcript Contains Confidential Material

```
1              So what I try to do -- and this is --
2    this was how I went about my work for the U.S.
3    government from 2000 to 2008, when I was doing the
4    analytic work I discussed with you.  It's
5    essentially an all-source approach in which you take
6    as many sources as you can and then weigh the
7    sources and bring them together to form your
8    analytic findings on a topic.  And so it's really I
9    try and take advantage of the work that's been done
10   by others, as much first-hand information as I can
11   get my hands on, and analyze and assess it and bring
12   human reason to bear upon it.
13       Q.    (BY MR. MOHAMMEDI)  Do you apply any
14   scientific and social science methodology?
15       A.    I think I have just described the
16   methodology that I apply.  And I'm not sure
17   precisely what type of information you're looking
18   for.  Is it statistical information?
19       Q.    You are the expert here.  I guess you
20   will explain to me how you -- how you reach your
21   opinion by applying scientific and social science
22   methodology.
23              MR. HAEFELE:  Objection to form.
24       A.    As I've just described, I take primary
25   source material, which is capable of being read, and
```

This Transcript Contains Confidential Material

1    then of being further validated or invalidated.

2            For example, an audit, which contains

3    statements that says we did no checking in the

4    field, we had to rely on assurances.  That is a

5    factual statement.  That provides information that

6    is hopefully contemporaneous about what was and what

7    wasn't done.  So a scientific approach to that set

8    compares that against an audit which did not contain

9    those caveats.

10           And so you compare the audits against one

11   another, look at what the international standards

12   are, and apply the facts contained in the

13   information, which is a mixture of primary source

14   information, information that can be a combination

15   of primary and secondary, plus others' academic

16   research together with one's own experience and

17   one's own interviews, and you put that together and

18   come to your opinions.

19           That's the approach that I took in the

20   many years that I did the work for the U.S.

21   government, and that's the approach that I've taken

22   when I've been an expert.

23       Q.   (BY MR. MOHAMMEDI)  Do you use your

24   methodology by applying all facts to you available,

25   either helpful or not helpful to reach a conclusion?

This Transcript Contains Confidential Material

```
1         A.    Yes, I do.

2         Q.    You do?  Okay.  And when you mentioned

3    the primary sources, obviously primary sources can

4    be in the form of document produced in a case;

5    correct?

6         A.    Yes.

7         Q.    And then if you provide your

8    information -- your opinion by not reviewing the

9    documents in the case, would you consider that a

10   complete conclusion?

11                   MR. HAEFELE:  Form.

12        A.    You told me that there were millions of

13   pages of materials produced in this case.  That's my

14   understanding.  Is there anything that you would

15   have to correct that understanding or is that

16   correct?  There were millions of documents produced

17   in this case?

18        Q.    (BY MR. MOHAMMEDI)  Yes, I did.

19        A.    I don't know how I or any other human

20   being who is an expert witness could review millions

21   of pages of documents in the case.  There wouldn't

22   be enough time in a year to do that.  There wouldn't

23   be enough time maybe in five years or ten years for

24   one person to do that.  So that cannot be what's

25   required of an expert.
```

This Transcript Contains Confidential Material

```
 1                 What I did was I looked at, in light of

 2      my own experience and knowledge, which included the

 3      academic analytic work that I did for the U.S.

 4      government, as well as my own tenure working for the

 5      Senate and my two tenures at the State Department,

 6      and the work that I've done on behalf of clients, I

 7      looked at the materials provided to me by the

 8      attorneys in this case, supplemented it with

 9      additional research into the secondary literature of

10      some scholars, who I cite in my reliance material,

11      and that's how I came to my formulations.

12                 When there was first-hand information

13      that I thought was particularly relevant, I looked

14      at it.  And when I didn't have it, I asked for more

15      of it.  A particular case of that is there were

16      representations about the extent of audits.  I

17      wanted every audit that I could get my hands on.

18      The more, the better, because that's primary source

19      information that's very important to me.

20          Q.    So let's make it clear on the record that

21      the audit you're referring to are not in your

22      affirmative report.  Right?

23          A.    Yes.

24          Q.    Let's also --

25          A.    Excuse me, the audits for WAMY were not
```

This Transcript Contains Confidential Material

```
 1    in my affirmative report.  There were some IIRO
 2    audits.  I asked for them and I wanted them.  I got
 3    more audits from my rebuttal report and then
 4    analyzed those.
 5        Q.    And let's make it clear that the reliance
 6    materials that you have, the documents produced in
 7    this -- the documents produced in this case were
 8    given to you by plaintiffs' attorneys; correct?
 9        A.    Most of them were, or many of them were.
10    I supplemented as best I could with additional
11    research when I felt that additional research that I
12    was able to get in the limited amount of time that I
13    had between the time of my retention and the time
14    that my report was due, I would supplement.
15        Q.    In your prior testimony, you stated those
16    are the documents that you relied on in rendering
17    your opinion in your affirmative report, correct?
18        A.    Yes.
19        Q.    The index.  Okay.  If an allegation
20    appears in a government document in your
21    methodology, do you accept the fact -- accept it as
22    a fact or do you do anything to attempt to
23    corroborate or dispel fact assertions?
24              MR. HAEFELE:  Objection to form.
25        A.    That's a very broad category, government
```

This Transcript Contains Confidential Material

1   documents.  It really depends on the government

2   documents and the use for which I'm putting the

3   government document.  So it depends on the

4   government's document, the amount of weight.  It

5   also depends what kind of experience I have with a

6   particular government agency or entity that's

7   issuing the report and the nature of the work that's

8   likely to be behind the report.

9           So it depends.

10      Q.   (BY MR. MOHAMMEDI)  For instance, the CIA

11  report, do you rely -- do you use that as a document

12  as a fact or do you do your independent

13  investigation of the facts in the CIA report?

14      A.   Are you talking about --

15           MR. HAEFELE:  Objection to form.

16      A.   Are you talking about the 1996 report?

17      Q.   (BY MR. MOHAMMEDI)  I'm speaking about

18  the CIA report.

19           MR. HAEFELE:  Objection to form.

20           THE WITNESS:  Which CIA report are

21      you referring to, sir?

22      Q.   (BY MR. MOHAMMEDI)  I'm just saying a CIA

23  report that is issued.  Any CIA report related to

24  terrorists, let's give -- that's have an example,

25  1996.

This Transcript Contains Confidential Material

```
1                    MR. HAEFELE:  Objection to form.
2         Q.    (BY MR. MOHAMMEDI)  Do you use that as a
3    fact or you corroborate the information in the --
4    did you corroborate the information in the 1996?
5                    MR. HAEFELE:  Form.
6         A.    I looked at that report in the context of
7    everything else that I know about terrorist finance.
8    I look at that report in the context of what I was
9    hearing about terrorist finance in the last years of
10   the Clinton administration, which is consistent with
11   that report.  I look at it with a continued
12   expression of concern about some of the entities
13   listed in the report by the United States government
14   all the way up to and including two thousand --
15   December 2009.  I look at it in connection with the
16   academic research in findings of a number of
17   different academic researchers.  I look at it in
18   connection with the findings of the 9/11 Commission.
19   And so I weigh it with a lot of other material.
20                    But I do find the 1996 CIA report to be
21   prescient and to reflect the concerns that the
22   United States government was having in that period
23   of time, of 1996, in which it began to formulate a
24   lot of concern about al-Qaeda and terrorism in
25   connection with support for conflicts in connection
```

This Transcript Contains Confidential Material

```
1    with us, in a charitable support for conflicts in
2    what I would call ABC, which is Afghanistan first,
3    Bosnia, and Chechnya.  And as that concern began to
4    emerge, this report reflected, I believe, that
5    concern.  So I give that report substantial weight.
6         Q.   (BY MR. MOHAMMEDI)  Okay.  And which is
7    the standard for concern in your opinion?
8                   MR. HAEFELE:  Objection, form.
9         A.   Beg your pardon?
10        Q.   (BY MR. MOHAMMEDI)  What is the standard
11   of concern that you keep mentioning?
12                  MR. HAEFELE:  Form.
13        Q.   (BY MR. MOHAMMEDI)  Is there a standard
14   of concern?
15        A.   When the United States government says
16   it's concerned about something, in a formal
17   diplomatic cable, for example, or expresses it
18   publicly to another government, that's often -- it's
19   not always, but often a term that's used to indicate
20   a démarche.  A démarche is a communication from the
21   United States government to a foreign government
22   saying, in effect, we have a problem that we need to
23   discuss with you.  We're concerned about this.  We
24   need to have steps taken.  So it is expressing a
25   sense that there is a problem, and that concern can
```

This transcript contains Confidential Material

```
 1   be from a mild concern to a moderate concern to a

 2   serious concern.

 3             In the last half of the 1990s, terrorism

 4   associated with areas of Muslim and non-Muslim

 5   conflict and the growth of al-Qaeda were both things

 6   that were becoming of increased concern to the

 7   United States government as a matter of national

 8   security and a particular concern for Richard

 9   Clarke, who was my mentor in this period of time.

10        Q.   I get to -- I don't think you have

11   provided the standard of concern that I'm asking

12   you, but that's fine.  We can move on.

13             MR. HAEFELE:  Let me just object one

14        more time to the cutting off the witness

15        before he answers his questions.

16        A.   As I've tried to express, the term

17   concern can mean many things, but typically,

18   typically its meaning in this kind of a context,

19   when the U.S. government official says something is

20   of concern, or continuing concern, it's a -- it

21   involves a communication to another government.

22   There was not an internal communication within the

23   government to démarche the other government about

24   its concern.  And in connection with the three

25   defendants in this case, the United States
```

This Transcript Contains Confidential Material

1    government was still expressing concern as late as

2    December 2009 based on primary source documents that

3    I reviewed.

4         Q.    (BY MR. MOHAMMEDI)  Which primary source

5    are you referring?

6         A.    I'm referring to a U.S. Department of

7    State cable from 2009 -- might have been 2008 -- no,

8    it was 2009, December 2009, I believe.  If it's not

9    that, it's 2008, but I think it's 2009, regarding

10   WAMY, Muslim World League, IIRO, which is -- the

11   same entities which the United States government has

12   been expressing concern about publicly as well as

13   privately in various statements throughout the 00s.

14        Q.    I get your answer.  Let's -- let me ask

15   another question.

16             MR. HAEFELE:  Same objection as

17        earlier, cutting the witness off.

18             MR. MOHAMMEDI:  I am not cutting off

19        the witness.  I think the witness is going on

20        and on and on and is not answering my

21        questions.  And it's fine.  We just need to

22        move on.

23        Q.    (BY MR. MOHAMMEDI)  In Diaz versus -- and

24   now it's U.S. versus Arnaout case.  You rendered an

25   opinion on that, correct?  Do you remember that?

This Transcript Contains Confidential Material

```
 1      A.    You have to bring me to the text, please.

 2      Q.    Okay.  Do you remember Santiago proffer?

 3      A.    I'm sorry?

 4      Q.    Do you remember Santiago proffer?  In

 5 that case?

 6      A.    Is that the --

 7      Q.    Santiago proffer.

 8      A.    I'm having a hard time hearing you,

 9 forgive me.

10      Q.    Let me ask you this.  Do you consider a

11 proffer a primary source?

12      A.    A proffer?

13      Q.    Yes.

14      A.    A proffer can be a primary source.  It

15 can be a secondary source.  It depends on the

16 context.

17            In the terrorist finance cases, a proffer

18 from the government represents what the government

19 thinks it has as evidence.  Patrick Fitzgerald was a

20 careful prosecutor.  He did a number of important

21 cases.  He's still doing important cases in the

22 private sector.  And it's a document I take

23 seriously.

24      Q.    So your testimony at -- your testimony, a

25 proffer changes the standard of if it's primary
```

This Transcript Contains Confidential Material

1    source from not primary source from one case to

2    another or from one subject matter to another; is

3    that correct?

4                    MR. HAEFELE:  Objection to form.

5         A.    The question of what is a primary source

6    and what's a secondary source and what's a tertiary

7    source, there's a lot of literature on it as to what

8    something is in the particular context.

9              The rules for determining in an academic

10   world what's a primary source, what's a secondary

11   source, and in some cases what's a tertiary source,

12   may be different from rules on hearsay, for example,

13   or rules used for experts.  The question is, is it

14   part of the record and do I look at it as

15   information that I can weigh.  And the answer is,

16   yes, it's part of the information that I can weigh

17   and they can take, references to statements by

18   individuals.  Those statements by individuals may or

19   may not be available outside the proffer.  So you

20   have to be very concrete.  We look at what is being

21   relied on for and what it says.

22        Q.    (BY MR. MOHAMMEDI)  So the question is,

23   you corroborate, for instance, a proffer with other

24   information from which to reach an opinion; correct?

25                    MR. HAEFELE:  Objection --

This Transcript Contains Confidential Material

```
 1        A.    Sorry I --

 2        Q.    (BY MR. MOHAMMEDI)  Do you corroborate

 3   the proffer, if -- the information in the proffer

 4   with other information that you have to be able to

 5   reach an opinion?

 6              MR. HAEFELE:  Objection to form.

 7        A.    I looked at as much information as I

 8   could within the period of time allotted to me to

 9   try to incorporate and understand a wide range of

10   materials, which included the proffer but was not

11   limited to the proffer.  So for example, with monies

12   relating to the Aranda case, there's separate

13   documents from the United States government, such as

14   terrorist designations.  There's separate

15   information from the UN, such as terrorist

16   designations.  You look at everything you can to try

17   and figure out what's going on.

18        Q.    (BY MR. MOHAMMEDI)  Okay.  What about

19   Christopher Hedges' 1992 New York Times article.

20   It's not a primary source?

21        A.    It's not -- it's a newspaper article

22   that's contemporaneous.  And it's contemporaneous on

23   certain things.  Then I think it can be relied on as

24   a primary source for certain things.  In other

25   aspects, it's a secondary source.
```

This Transcript Contains Confidential Material

1          Let me explain what I mean by that.  It

2     contains a quote from an individual, which I assume

3     to be an accurate quote.  He was a good reporter for

4     a well-respected publication.  It's never been taken

5     down as false by that publication.  The New York

6     Times publishes corrections all the time and appends

7     them to stories when a fact is found not to be true.

8          And so the individual likely said exactly

9     what he was quoted as saying, regardless of whether

10    the quote -- what he's saying is accurate, the quote

11    is accurate.  I have no reason to believe otherwise.

12         It also quotes a Saudi official at the

13    same time as making certain statements.  So for the

14    references by the reporter to contemporaneous

15    quotes, for that purpose, it's primary or pretty

16    close.

17         Now, every newspaper article, every

18    article exists that's a newspaper article can be

19    looked at as a primary source for what was published

20    in that publication at that time.  And it can be

21    looked at as a secondary source to the extent that

22    it contains a collection of statements by different

23    people or assessments.

24    Q.   So is it your --

25    A.     It really depends on what use it is and

This Transcript Contains Confidential Material

```
 1   how you put it against other material.  In the case
 2   of that article, I now understand that the
 3   chairman --
 4       Q.    Okay.  So I think -- I really --
 5       A.    Yeah.
 6       Q.    Let me -- I'm sorry, let me ask you this.
 7   So you are saying any quotes in a newspaper article
 8   will -- you would consider it as primary source,
 9   anything else would not be -- you don't consider as
10   primary source.  Correct?
11       A.    No, it's not that simple.
12       Q.    Okay.  All right.  That's fine.  That's
13   fine.  We'll move on.
14             It's fine.
15             Do you know about Harmony database?
16       A.    Yes.
17       Q.    What is it?
18       A.    It's a collection maintained by
19   West Point, I believe, of various materials related
20   to terrorism.  Most recently it had materials up
21   that relate to the January 6th insurrection, for
22   example; and also contains collections of material
23   found in situ over time relating to al-Qaeda and
24   other terrorist groups.
25       Q.    So do you know where they came from?
```

This Transcript Contains Confidential Material

```
 1        A.     Pardon?

 2               MR. HAEFELE:  Object to the form.

 3        Q.    (BY MR. MOHAMMEDI)  Where did they come

 4   from?

 5        A.     Some of the material came from --

 6   material -- from my understanding, came from

 7   material captured by American troops and that kind

 8   of thing, in the field.

 9               It -- I believe it contains some kind of

10   legend because it's just stuff that's been captured

11   that you can't rely on it because it's not

12   systematic.  It's just stuff.  It's the legend.  And

13   that's what it is.

14        Q.     Okay.  Did you consider documents in the

15   database in rendering your opinion?

16        A.     Well, I didn't rely on anything in that

17   database.  I looked at it, and it said it was a

18   collection of stuff.  And I tried searching it.  It

19   wasn't really searchable in a very easy way.  And

20   the stuff that I found was involved -- it was

21   purchases of sheep.  A recipe of some kind for some

22   kind of treatments for a woman's illness, that kind

23   of thing.

24               And so it became clear to me it wasn't an

25   efficient use of my time and wasn't going to lead me
```

This Transcript Contains Confidential Material

```
 1   anywhere in particular, and so at that point I
 2   stopped.  It does have a good -- it does have a good
 3   study on the January 6th insurrection.  That was of
 4   value.
 5        Q.   And letter from lawyers that hired you
 6   and other plaintiffs' lawyers about the production,
 7   you cite them.  Do you consider them primary
 8   sources?
 9        A.   I'm sorry, what material?
10        Q.   You cited to lawyers' letters in your
11   report.  Right?  Your -- the lawyers who hired you,
12   the defense lawyers, you cite them in your report.
13   Do you consider this primary sources?
14             MR. HAEFELE:  Objection to the form.
15        A.   For the communications that took place,
16   the documents, the history between -- on the
17   discovery requests, for that purpose, it's a primary
18   source; it's a limited use and it's a very limited
19   issue covered by that letter.
20        Q.   (BY MR. MOHAMMEDI)  Okay.
21        A.   I don't have a better source for it.  The
22   only way I have a better source for it would have
23   been if I had been present for the communications.
24        Q.   Did you ask the lawyers to provide you
25   with other documentation related to that matter?
```

This Transcript Contains Confidential Material

```
 1        A.    I don't recollect.

 2        Q.    Okay.  So -- strike that.

 3              How many times did you -- how much time

 4   did you spend reviewing the Harmony database?

 5        A.    Not a lot.  As I said, the legend on it

 6   cautioned me on.  I tested the legend by looking at

 7   a couple of things to see if it was going to be of

 8   any value.  Found it wasn't any value for that

 9   purpose and didn't spend more time on it.  I had a

10   very limited amount of time between December and

11   when I turned the report in, and didn't spend much

12   time on it.

13        Q.    So it is your testimony you didn't find

14   any evidentiary value in those documents, that's why

15   you stopped looking at them?

16        A.    That's correct, I did not.

17        Q.    Does the CRA have any agency -- in your

18   report, you went through the details.  And I'm not

19   going to go through the details now, but I just

20   wanted to for the purposes of your methodology, did

21   you consider the adverse reporting in that case part

22   of -- as a primary source?

23        A.    I don't understand what you --

24        Q.    Okay.  So just to be very quick, the

25   Canadian report, the CRA report, listed adverse
```

This Transcript Contains Confidential Material

1    reporting on WAMY; right?  And those adverse

2    reporting listed many newspaper articles, or as a

3    matter of fact, listed is some other matters in this

4    lawsuit.  Will you consider those as a primary

5    source for you to consider?

6        A.    The primary source is the Canadian

7    report.  Their primary source may not be primary, it

8    may be secondary sources.  I'd have to look at the

9    various materials.  But that document itself

10   reflects what the findings were of Canada in

11   connection with this chart.  And so it's a primary

12   source for that purpose.  That's what it is.

13       Q.    Okay.

14       A.    But is that -- is that report in turn

15   based on secondary sources?  It's based on mixture

16   of primary source data such as financial records and

17   financial information, statements made to them, and

18   secondary source information, which are also relied

19   on.  That's my understanding of that report.

20       Q.    Okay.  Do you agree that charities --

21   that -- do you agree that charities

22   supported al-Qaeda?  They don't support the al-Qaeda

23   just because they operate in conflict zone?

24            MR. HAEFELE:  Objection to the form.

25       A.    If I understand the question correctly,

This Transcript Contains Confidential Material

```
1    your understanding of whether a charity that's

2    operating in a conflict zone is necessarily engaged

3    in terrorist support or terrorist finance?

4         Q.   (BY MR. MOHAMMEDI)  Correct.

5         A.   If that's the question, the answer is no,

6    they are not.

7         Q.   If you, Mr. Winer, if you can just refer

8    to your report.  We're going to go through a series

9    of sections about the report.

10             If you go to Section 5, page 18.

11             So in that one you said, Saudi Arabian

12   charities, and that's Section 501.  5.1, sorry.

13             Do you see that?

14        A.   Yes.

15        Q.   Okay.  You said:  Saudi Arabian charities

16   and Saudi nationals played a central role in helping

17   al-Qaeda create its global infrastructure, uniting

18   disparate Muslim groups in different parts of the

19   world into a common extremist cause.

20             Can you read that?

21        A.   Yes.

22        Q.   What do you mean by central role?

23        A.   I think if you turn to the 9/11

24   Commission report, I've given a great deal of

25   thought to this, and pages 170 to 171 I think
```

This Transcript Contains Confidential Material

1    provide the formulation.

2            What you essentially had was, the Saudi

3    government was facing several threats.  It faced the

4    domestic threat after as evidenced in the attack on

5    the grand mosque, of very extreme religious

6    thinking, turning into a political movement,

7    threatening their legitimacy.  That was one threat.

8    They faced an initial threat from nationalists,

9    which is Arab nationalism to an alternative to

10   political Islam.  They also faced a threat to

11   their -- to their hegemony, from potentially any

12   other Islamic group that were not part of -- or

13   within Saudi -- that were not supported by

14   Saudi Arabia or outside being friendly to them.

15           So what happened in response to that, as

16   I understand it, is the Muslim World League was

17   created with a goal in part of combatting what I

18   call nationalism.  Or Arab nationalism.  Or

19   pan-Islamic response instead.  And that in turn led

20   to the support of additional terrorists.

21       Q.   Now --

22       A.   As the -- please don't interrupt me, sir.

23   I'm answering your question as directly as I can.

24           And as the 9/11 report, commission report

25   found, on pages 170, 171, the big state-sponsored

1    charities wind up in turn supporting smaller

2    charities, and those smaller charities over the

3    course of a series of a conflicts, Afghanistan,

4    Bosnia, Chechnya, for example, but it also included

5    Kashmir and Dagestan and Sudan, began bit by bit to

6    provide a foundation for al-Qaeda.  And that's what

7    I believe happened.

8              It wasn't necessarily, by any means, this

9    global jihad.  The intent at the front end, the

10   intent at the front end was an effort to reduce the

11   threat to the Saudi government from a variety of

12   forces.  And in 2017, 2018, '19, and '20, when I was

13   back at the State Department, I saw this still

14   playing out in the Middle East and North Africa,

15   with the problems between Shia and Sunni, and with

16   the Islamic state, the al-Qaeda and the Maghreb and

17   elsewhere, still playing out in this battle between

18   what are we going to have, nation-states?  Or

19   political Islam?  Or dictators or al-Qaeda or

20   pan-Arabism.  Or even Ottomanism, which also

21   continues to play a role in the region.

22             So that's the backdrop to paragraph 51.

23        Q.   Can you point me to one single paragraph

24   in the 9/11 Commission where it's listed WAMY,

25   Muslim World League, that they had created -- that

This Transcript Contains Confidential Material

1    had create the global infrastructure of al-Qaeda?

2    And when I mean that, I mean list the name.

3    Anywhere in the report.  Right?

4         A.    Sure.  I would be --

5         Q.    -- Muslim groups in the part of the world

6    as a common extremist cause.  But I'd like you to

7    show me in the report that WAMY was referred to this

8    way, and also was remotely was referring to this

9    this way.

10             MR. HAEFELE:  Object to the form.

11        A.    I would be grateful to the opportunity to

12   have on the screen page 170 and 171 and then we can

13   discuss precisely that issue.

14             MR. MOHAMMEDI:  Okay.  Can we go off the

15   record a minute?  Just a minute, please.

16             THE VIDEOGRAPHER:  We are off the

17        record at 1:19 p.m.

18             (Recess taken, 1:19 p.m. to

19             1:21 p.m. EDT)

20             THE VIDEOGRAPHER:  Back on the record

21        at 1:21 p.m.

22        Q.    (BY MR. MOHAMMEDI)  So if you can just

23   put our Exhibit 13 on the screen, which we sent you.

24   That will be --

25             TRIAL TECHNICIAN:  It will be 907.

This Transcript Contains Confidential Material

```
 1              MR. MOHAMMEDI:  It's 170, I'm sorry,

 2         170 and 171.

 3              (Winer Deposition Exhibit 907, The

 4              9/11 Commission Report, was marked

 5              for identification.)

 6              MR. HAEFELE:  You're not putting up

 7         the pages he referenced, you're putting up

 8         different pages.

 9    A.    No, these are the pages I referenced.

10              MR. HAEFELE:  These are page 170.

11         These are the pages that he wanted.

12    A.    If we go to the first, second, third

13    paragraph -- hold on.  Fourth paragraph one, two,

14    three, four.  There's the following sentences, and

15    I'd like to read those sentences and then comment on

16    them with my understanding.

17              Al-Qaeda also collected money from

18    employees of corrupt charities.  It took two

19    approaches for using charities for fundraising.  One

20    was to rely on al-Qaeda sympathizers in specific

21    foreign branch offices of large, international

22    charities, particularly those with lax external

23    oversight and ineffective internal controls, such as

24    the Saudi-based al-Haramain Islamic Foundation.

25    Similar charities in various parts of the globe were
```

This Transcript Contains Confidential Material

```
1    funded by these large Gulf charities and had

2    employees who would siphon the money to al-Qaeda.

3         Q.    (BY MR. MOHAMMEDI)  So it says

4    al-Haramain.  It doesn't say WAMY, it doesn't say

5    Muslim World League, correct?

6              MR. HAEFELE:  Objection to form and

7         objection to the interruption.

8         A.    It says, smaller charities in various

9    parts of the globe were funded by these large Gulf

10   charities.  The al-Haramain reference is a reference

11   to an entity which Saudi Arabia joined and

12   sanctioned, and it is a "such as."  Such as means

13   it's not the only one.  Now, there were a limited

14   number of large international charities in

15   Saudi Arabia.  And the one the United States

16   government referred to repeatedly as a particular

17   concern in public testimony and in private

18   communications to the Saudi Arabian government were

19   IIRO, the Muslim World League, and WAMY.

20        Q.    (BY MR. MOHAMMEDI)  So here, if you --

21   Mr. Winer, what does it say on those pages that

22   WAMY, Muslim World League, and IIRO played any role

23   in helping create al-Qaeda's global infrastructure.

24   What does it say here?

25        A.    I believe it says, the statement, large
```

This Transcript Contains Confidential Material

1    international charities such as, which set up, were

2    supporting, smaller charities, is a reference to

3    those three entities.

4         Q.    But my question is very specific.  Has it

5    said those names that they form helping create

6    al-Qaeda global infrastructure.  Based on your

7    statement in 5.1:  Central role in helping al-Qaeda

8    creates its global infrastructure, uniting disparate

9    Muslim groups, in different parts of the world into

10   a common extremist cause.  I'm just asking, does --

11   is it true that WAMY, Muslim World League, and IIRO

12   were not named in this; correct?

13              MR. HAEFELE:  Objection to form.

14        Q.    (BY MR. MOHAMMEDI)  That is 9/11

15   Commission report; correct?

16              MR. HAEFELE:  The report is reticent

17        on the names of who the other large

18        international charities were.

19        Q.    (BY MR. MOHAMMEDI)  You're -- but,

20   Mr. Winer, you're the one who wanted to refer me to

21   page 170, 171 to support your opinions; right?

22   Correct?

23        A.    Yes, I'm asking to you understand this in

24   connection with many statements made by U.S.

25   government officials in other forums about these

This Transcript Contains Confidential Material

```
 1    entities, and you put two and two together and it

 2    makes four.

 3              Now, if you look on page 171 --

 4        Q.    These are your assumptions; correct?

 5        A.    I beg your pardon?

 6        Q.    These are your assumptions; correct?

 7        A.    This is my understanding.  Page 171,

 8    please.  The end of the first paragraph, the first

 9    full paragraph:  This conclusion does not exclude

10    the likelihood that charities with significant Saudi

11    government sponsorship -- charities -- diverted

12    funds to al-Qaeda.  Charities is more than one.

13    It's not just al-Haramain.

14        Q.    First of all, it does not say WAMY,

15    Muslim World League, and IIRO, correct?

16              MR. HAEFELE:  Objection.

17         Argumentative.

18        A.    It is reticent on the identity of those

19    charities.

20        Q.    (BY MR. MOHAMMEDI)  And that's based on

21    your assumption, correct?

22              MR. HAEFELE:  Objection.

23        A.    Based on the other statements made by

24    U.S. government officials in a number of other

25    contexts.  That is what I believe, correct.
```

This Transcript Contains Confidential Material

1    Q.    (BY MR. MOHAMMEDI)  Okay.  Just bear with

2    me a second.  I just want to -- while you're here,

3    I'd like to address one more.  So the commission

4    report does not exclude the likelihood; correct?

5    A.    That's correct.

6    Q.    Your testimony said is the likelihood;

7    correct?

8    A.    Yes.

9    Q.    Why do you do that?

10         MR. HAEFELE:  Objection to the form.

11   A.    Because I looked at the entire record

12   that's been available to me that I was able --

13   Q.    (BY MR. MOHAMMEDI)  But you are -- but

14   you are misquoting, Mr. Winer.  You're misquoting

15   the 9/11 Commission report; correct?

16         MR. HAEFELE:  Objection on

17     interrupting the witness.

18   A.    Please, sir, show me where I'm misquoting

19   the report.

20   Q.    (BY MR. MOHAMMEDI)  Let me show you.

21         MS. ROTHSTEIN:  Do not argue with the

22     witness.

23         MR. MOHAMMEDI:  Can we go off the

24     record for a second?

25         THE VIDEOGRAPHER:  We are going off

This Transcript Contains Confidential Material

1        the record at 1:29 p.m.

2                (Recess taken, 1:29 p.m. to

3                1:30 p.m. EDT)

4                THE VIDEOGRAPHER:  Back on the record

5         at 1:30 p.m.

6        Q.   (BY MR. MOHAMMEDI)  Mr. Winer, I direct

7    you to paragraph 5.34 of your report, affirmative

8    report at page 21.

9             And you put that in bold.

10             Commission noted, a likelihood that

11    charities with significant Saudi government's

12    sponsorship diverted funds to al-Qaeda.

13             Do you see that?

14        A.   Yes.

15        Q.   You don't think that's misquoting what

16    the commission said?

17        A.   No, I do not.

18        Q.   So you think exclusion of likelihood is

19    the same thing as likelihood?

20        A.   Not excluding the likelihood.  You just

21    misquoted the report, I believe.

22        Q.   Okay.  Let's move on, then.

23             Can you tell me who established this

24    infrastructure that you're referring to from the

25    charities?  And how this infrastructure was

This Transcript Contains Confidential Material

```
 1   established?

 2        A.    Sure.   There was a call to support

 3   Muslims in Afghanistan after the Soviet takeover of

 4   Afghanistan.  The Saudi Arabian government responded

 5   to that call, providing support to the Afghan

 6   fighters.  It also provided support to people from

 7   the Gulf, particularly Saudi Arabian, including with

 8   discounted airfare and things like -- of that

 9   nature, to have them come respond to the cause.

10            As they did that, Abdullah Azzam, while

11   Shareem, Osama bin Laden, and others, began to

12   develop a creed in which the war needed to be taken

13   beyond Afghanistan to go into other countries.  What

14   began as an Afghanistan-only set of activities

15   became increasingly transnational.  It included the

16   same kind of response, even the more aggressive and

17   directly in Bosnia that happened more quickly.  They

18   were trying to establish the weapons provided and

19   then in Chechnya.  And there's a pretty good record

20   for the support of both the Saudi government and

21   charities in these theaters of conflict.

22            And the problem with the provision of

23   humanitarian support in these regions because they

24   can become easily commingled with non-American

25   humanitarian support.  And when you have support
```

This Transcript Contains Confidential Material

```
 1   for -- from combatants and you're providing

 2   paramilitary support to combatants, for example --

 3   paramilitary means military support for

 4   combatants -- you are winding up creating

 5   capabilities, which in turn can be used and were

 6   used by terrorist groups.

 7           At the same time, the propagation efforts

 8   that I referred to earlier of the Saudi government

 9   in response to the threat from Nasserite

10   Pan-Arabism, and from their own threat to their

11   religious legitimacy that was expressed in the grand

12   mosque takeover, meant that for the Saudis, they

13   needed to incorporate as many different Islamist

14   groups around the world as they could into Wahhabism

15   as one way of maintaining and strengthening their

16   position domestically and internationally.

17           And that included many good deeds,

18   humanitarian deeds, taking care of poor people in

19   many different countries in all kinds of different

20   ways.  But in the orphanages and the schools,

21   including in madrassas in Pakistan, also became a

22   breeding ground for extremist doctrine.  And that

23   extremist doctrine in turn provided a foundation for

24   al-Qaeda.  So you had the doctrine on the one hand,

25   you had the people in the conflict zone being
```

This Transcript Contains Confidential Material

1   brought into the conflict zones who weren't there

2   originally, people from outside of Afghanistan and

3   Pakistan being brought in there.  You had madrassas.

4   You had then the ability to have people recruited,

5   trained, and taken care of while they were training.

6           And that's why the CIA report in 1996 is

7   such an important distillation, because it

8   highlighted, by the time they were in Bosnia, all of

9   that had matured, in part, into providing support

10  for terrorism, which is why I consider that to be a

11  particularly foundational report for that reason,

12  because it summarizes these foundations, which

13  developed over the core -- the tail of the last half

14  of the Afghan war, it continued even after the

15  Afghan war basically ended with the departure of the

16  Soviets.  Because it didn't just stop there, it

17  continued while Bin Laden was in Sudan and it

18  continued with particularly the Bosnian and Chechnya

19  and Dagestan episodes.  And it metastasized from

20  there.  And that's what I see as having happened.

21          Just to conclude, it is very important --

22  Q.    Okay --

23  A.    It's a fundamental importance to

24  emphasize the humanitarian aspects of what these

25  charities were doing, as well as to be able to note

This Transcript Contains Confidential Material

```
 1   the areas in which it went wrong.  Both were taking

 2   place.

 3        Q.    And this required facts; correct?

 4        A.    Yes.

 5        Q.    Okay.  And this is -- this is your

 6   understanding of an infrastructure; correct?

 7        A.    Yes.

 8              MR. MOHAMMEDI:  Let's -- I think

 9        let's go for lunch, and then we come back,

10        take a break.  So Mr. Winer, are you okay with

11        lunch now and then we can come back?

12        A.    Whatever you want.

13              THE VIDEOGRAPHER:  We're going to go

14        off the record at 1:37 p.m.

15              (Recess taken, 1:37 p.m. to

16              2:11 p.m. EDT)

17              THE VIDEOGRAPHER:  We are back on

18        record at 2:12 p.m.

19        Q.    (BY MR. MOHAMMEDI)  Thank you, Mr. Winer.

20              At the time of -- and if you go to

21   Section 4.1 of your report, which is page 12.

22              You state that:  Bin Laden combined

23   strands of extreme political Islam from ideas which

24   began in Egypt and in Saudi Arabia with his skills

25   as a fundraiser to build a global network of
```

This Transcript Contains Confidential Material

```
1    terrorist groups.

2              Do you see that?

3         A.    Yes.

4         Q.    At the time of its formation, 1988, was

5    al-Qaeda designated by U.S. government?

6         A.    United States didn't know about al-Qaeda

7    in 1988.

8         Q.    Was al-Qaeda designated in 1988?  When

9    was al-Qaeda designated?

10        A.    I believe 1998.  That's my memory.

11        Q.    Okay.  Turn to exhibit -- and this is

12   for -- it's our Exhibit 11.  I can't remember where

13   we are now.

14              (Winer Deposition Exhibit 908,

15              Letters From Bin Laden, Date: 12

16              April 1994 to 7 May 1998, was marked

17              for identification.)

18        Q.    (BY MR. MOHAMMEDI)  Is a document titled

19   Letters From Bin Laden.  Do you see that, Mr. Winer?

20        A.    Yes.

21        Q.    And its date is April 12, 1994 to May 7,

22   1998.  Do you see that?

23        A.    Yes.

24        Q.    Do you know what this document -- do you

25   know where this document comes from?
```

This Transcript Contains Confidential Material

```
 1        A.    No.

 2        Q.    Okay.  This document came from the

 3   Harmony database.

 4        A.    Oh, good.  Uh-huh.

 5        Q.    If you go to page 53 -- 51-53 of the PDF.

 6        A.    Okay.

 7        Q.    And go with starting with page 51.

 8              Just trying to see where it starts.

 9   Besides -- can you go -- can you go to page 52

10   again?  I'm sorry, that's page 52.  Sorry about

11   that.

12              Do you see that?  It says:  Beside the

13   regime's political and ideological blockade, it also

14   exercised a harsh economic and financial (policy) as

15   well.  Part of this blockade was dissolving

16   charitable organizations that used to deliver

17   donations from citizens to the many needy people

18   inside and outside the country.  It replaced them

19   with organizations and foundations subservient to

20   royal family members and particularly Prince Salman.

21              Do you see that?

22        A.    Yes.

23        Q.    And then at page 52-53 -- at section

24   52-3, which is bottom of 52, top of 53.

25              He goes on to say:  The reason behind
```

This Transcript Contains Confidential Material

```
 1   this procedure does not encourage good deeds, as the
 2   regime claims, but rather the following:  Prevents
 3   these funds from being delivered to areas where they
 4   could be used to serve Islam and Muslims following
 5   the principle "do not spend on those who are with
 6   the messenger of Allah till they desist."
 7            Do you see that?"
 8       A.    Yes.
 9       Q.    And then he goes on page 53, paragraph 3:
10   Based on what was stated, we, at the reform and
11   advice foundation, while celebrating this blessed
12   month as a month of giving for Allah's sake, wish to
13   draw the attention of all donors to the danger of
14   donating funds or zakat to these foundations and
15   organizations.  The regime is using them against God
16   and his messenger.  We are asking the donors to
17   provide these funds directly to the needy, whether,
18   inside or outside the country.  They could not --
19   they could also provide it to those trusted
20   individuals who will deliver them.  It is known that
21   the Saudi leaders cannot be trusted.  There are
22   other safe ways you can assist in delivering funds
23   to those who deserve them.  Among them are
24   benevolence foundations in Qatar, Kuwait, Jordan,
25   Yemen, Sudan, and others.  To assure that funds
```

This Transcript Contains Confidential Material

```
 1   transfer to these foundations' bank accounts, we
 2   draw your attention to the importance of
 3   transferring these funds outside the Saudi peninsula
 4   away of the pursuing regime's spies.
 5              That's correct, right?
 6              MR. HAEFELE:  Objection to form.
 7      A.    If I could just -- where is the date of
 8   this, please?
 9      Q.    (BY MR. MOHAMMEDI)  Okay.  So this is --
10   if you go up, you see what I mentioned, it's date
11   from -- so statement No. 13 is February 12, 1995.
12      A.    Right.  Okay.
13      Q.    Okay?  And then on August -- actually,
14   then on August 3rd, 1995, at page 85 of the PDF, he
15   also goes on to say:  Thanks to Allah and prayers
16   and mercy upon the messenger of Allah and those that
17   were rightly guided by his guidance.  It is no
18   longer hidden that the Saudi regime persistently
19   sought to block all the abilities and capabilities
20   of the ummah by placing control over it.  But the
21   regime was not satisfied with its unjust policies;
22   it had to go further by imposing control on the
23   minds and the politics of the nation.
24              Moreover, the regime sought to impose
25   economic control.  This resulted in the closure of
```

This Transcript Contains Confidential Material

```
 1   charitable organizations that delivered the
 2   contributions of the benefactors from this country
 3   to its deserving lawful owners.  The regime replaced
 4   these charitable organizations with associations and
 5   organizations that were supervised by members of the
 6   ruling family, such as Prince Sultan and Prince
 7   Salman.  This revealed a scheme by which they
 8   monopolized the charitable contributions in such a
 9   way that it prevented Islam and the Muslims from
10   benefitting from them.  The regime used the
11   contributions the same way it used the money of the
12   Afghani mujahidin.  That money was used to pressure
13   the mujahidin and influence their policies in a way
14   that would benefit the interests of the West.
15   Sometimes these contributions were used for the
16   private interests of the Princes.
17           Now, if you go to page 88, and I'm
18   reading this to you.  To 89.
19           Again, and he said:  We are drawing their
20   attention to the risk of forwarding those
21   contributions through the ruling regimes and its
22   organizations.  We are advising them to deliver
23   their contributions directly to the people or
24   through safe hands of the individuals,
25   organizations, and societies that are trusted, such
```

This Transcript Contains Confidential Material

```
 1    as the charitable societies in Qatar, Kuwait, Sudan,

 2    Yemen, and Jordan.  We are advising them to be

 3    careful that their contributions stay far from the

 4    pursuit of the servant of the two holy mosques and

 5    his agents, and to make sure that the money will

 6    reach the people it is intended for.

 7                 Are these recipes?

 8                 MR. HAEFELE:  Objection to form.

 9        Q.   (BY MR. MOHAMMEDI)  Just because they

10    come from the Harmony database.  You agree with me

11    these are not recipes, right?

12                 MR. HAEFELE:  Objection to form.

13        A.   I made no representation that all the

14    materials in the Harmony database were recipes.

15        Q.   (BY MR. MOHAMMEDI)  Okay.  Now, so

16    let's -- let's -- those were made in 1995.

17        A.   Yes.

18        Q.   And as of the time they were made, it

19    shows, like you said, the safe contemporaneous that

20    were made that those Harmony database were found

21    this is what Bin Laden's; correct?

22                 MR. HAEFELE:  Objection to form,

23         foundation.

24        A.   I can't say what the original source was

25    for this document.
```

This Transcript Contains Confidential Material

```
 1        Q.    (BY MR. MOHAMMEDI)  You didn't consider
 2   this, did you?
 3        A.    I am aware of this period in which the
 4   Saudi government, Osama bin Laden were very much at
 5   odds after he pled for them to support him in what
 6   he was doing and they declined and he got very angry
 7   about it.  And they then took further steps to take
 8   money away from him, and he faced a period where he
 9   was having a hard time getting the funding that he
10   wanted.  And that did take place, and I did consider
11   that.
12        Q.    You did consider this, you said?
13        A.    I considered that situation.
14              I don't recollect reading this particular
15   document, but I am aware of the break between him
16   and the Saudi government which had been reported in
17   a bunch of places.
18        Q.    Are those in your reliance considered
19   that were submitted in our case?  The Harmony
20   database?
21        A.    I don't know, as I said to you, whether
22   I've seen this document.  I am aware of what the
23   situation is.  And I certainly read material
24   relating to this moment, which is when Osama bin
25   Laden was facing financial pain.  He was very
```

1   unhappy about it and was trying to see if he could

2   grab direct control of resources rather than have to

3   rely on what he could get indirectly.  And that, I'm

4   quite familiar with.

5        Q.    And based on your testimony, you were

6   aware that Saudi Arabia took steps to marginalize

7   Osama bin Laden prior to 9/11; correct?

8             MR. HAEFELE:  Objection to form.

9        A.    In the 1995 period, roughly, as he was

10  coming back from Sudan, and I could be slightly off

11  on the date, he made a trip to Saudi Arabia, asked

12  for support, didn't get the support; there was a

13  very high level meeting between him and my memory

14  was members of the -- senior members of the royal

15  family, and there was a big parting at that moment.

16  But the controls that he talks about here and the

17  dissolution of charitable societies, those were not

18  put in based on the information that's been

19  available to me.

20       Q.    (BY MR. MOHAMMEDI)  Okay.

21       A.    Because things like al-Haramain, for

22  example, which the Saudis ultimately closed,

23  remained open.  So I don't know how much of this is

24  propaganda by Bin Laden and how much of this is

25  accurate.  It is a primary source --

```
1        Q.    So you -- your -- your statement, this is
2   not accurate; correct?
3              MR. HAEFELE:  Omar, don't interrupt
4         the witness, please.
5        A.    What I said actually was I can't say how
6   much of this is propaganda.
7        Q.    (BY MR. MOHAMMEDI)  So you are not sure
8   if this is --
9        A.    And how much of it accurately reflects
10  the actions that were taken by the Saudi government.
11             I do know that the United States
12  government felt for many years and expressed its
13  concerns for many years about the fact that the
14  major international charities in Saudi Arabia were
15  under the control, essentially, of their religious
16  establishment of Saudi Arabia separate from other
17  charities and that those controls were insufficient
18  to prevent their use from terrorist finance.
19       Q.    So --
20       A.    That's -- so what would happen, too, is
21  to assess, and to what extent this is Bin Laden
22  expressing his rage and trying to get funds for
23  himself and to what extent it's true.  And you have
24  to look at other information at the same time, such
25  as contemporaneous Saudi documents showing that they
```

This Transcript Contains Confidential Material

1  closed charities at that time, showing that they put

2  controls in place, that kind of thing.

3      Q.   So, Mr. Winer, I'm going -- I'm trying my

4  best to stop you, but I don't think you are

5  answering my questions.  My question is not what the

6  Saudi government did based on your knowledge.  What

7  my question is that did you consider this material

8  when you rendered your opinion?  That's the only

9  question I have for you.

10          MR. HAEFELE:  Objection to the form

11      of the question, except for the part were you

12      said you're trying your best to stop him.

13          MR. MOHAMMEDI:  I said trying my best

14      not to stop you.

15      A.   Well, I looked at material which

16  described this incident and this moment in time.  I

17  did not read this document, but I was aware of the

18  gist of its contents.

19      Q.   (BY MR. MOHAMMEDI)  And you were not sure

20  if this was in your reliance material of the Harmony

21  database in general?

22      A.   I don't know whether it was listed or

23  not.  As I told you, I looked at it, but I didn't

24  spend a lot of time with it.  And it wasn't

25  something that I particularly relied on, because I

This Transcript Contains Confidential Material

1   had a lot of information from other sources, and I

2   could not read everything.

3            As you pointed out, there are millions of

4   pages.

5       Q.   Sure.  Let's -- if you can -- we can take

6   this down.  We just go to -- and very quickly,

7   Mr. Winer, I'd like to ask you about your summary

8   section three, 3.1-3.17.  And I assume this is an

9   affirmative report.  I think that was 698, I

10  believe.

11           And this -- there is no citation because

12  they are executive summaries; correct?

13      A.   That's correct.

14      Q.   Okay.  Now, Section 3.12, you state that

15  charities such as IIRO, Muslim World League, and

16  WAMY did not accurately report support they provided

17  for terrorism; correct?

18      A.   Yes.

19      Q.   Okay.  And in footnote four of your

20  report, page 10, it's -- you say -- you stated that

21  you have seen no audit pertaining to WAMY or Muslim

22  World League, but audit entities -- of entities they

23  funded or assisted show false recordkeeping.

24           Which other organization did you review a

25  document showing WAMY audits were reported in this

This Transcript Contains Confidential Material

```
 1   or any other -- or Muslim World League?
 2        A.    Well, WAMY, for example, provided support
 3   to --
 4        Q.    That's not my question, Mr. Winer.
 5        A.    I'm sorry --
 6        Q.    I'm asking which other organization you
 7   reviewed documents showing WAMY audits.
 8                MR. HAEFELE:  Mr. Mohammedi, I'm
 9          going to caution you again, you have to let
10          the witness answer the question.  If you don't
11          like his answer --
12                MR. MOHAMMEDI:  If the witness does
13          not answer my question, I'll have to ask again
14          for it to --
15                MR. HAEFELE:  That's fine, you can
16          ask again, I suppose, and take the time, but
17          you can't interrupt the witness from answering
18          the question.
19                MR. MOHAMMEDI:  Okay.  I'm going to
20          ask another question -- I'm going to ask this
21          question again:  Which other organization you
22          reviewed documents showing WAMY audits?
23        A.    The Third World Relief Association.
24        Q.    (BY MR. MOHAMMEDI)  You reviewed the
25   documents showing WAMY audits?
```

This Transcript Contains Confidential Material

```
 1        A.    No, I didn't say WAMY audits.
 2        Q.    Okay.  So my question, which other
 3   organization you reviewed documents showing --
 4   because in your footnote, you state that you have
 5   seen no audits pertaining to WAMY or Muslim World
 6   League.  But audit of entities they funded or
 7   assisted show false recording.
 8        A.    I have sought to answer your question
 9   accurately each time you've asked it.  Let me try
10   again.
11             At the time I wrote the first report, I
12   asked for but did not receive audits pertaining to
13   WAMY or Muslim World League.  I wanted them, I
14   didn't get them.  I got them and discussed them in
15   the rebuttal -- my rebuttal report.  I did see
16   audits of entities they funded or assisted which
17   showed false recordkeeping.
18        Q.    And which organizations are those?
19        A.    The Third World Relief Association is
20   one.  And the IIRO is another.
21        Q.    So how come we don't have that in the
22   reliance material, the document of WAMY showing the
23   false recording in the Third World Relief
24   organization?
25        A.    I believe they are in the reliance
```

This Transcript Contains Confidential Material

1   material.  I believe that they are cited in my

2   report.

3       Q.    So you -- so the documents in your

4   reliance material show that -- which you stated show

5   that false -- I mean the false recording of WAMY,

6   when -- it was audits from WAMY, at TWRA, that show

7   false recording from WAMY audits; correct?

8       A.    That's not what my statement says.

9       Q.    Okay.  So I'm going to repeat that.

10          You state that you have seen no audit

11  pertaining to WAMY and Muslim World League, but

12  audits of entity they funded or assisted show false

13  recording.

14          Do you see that?

15      A.    Yes.

16      Q.    What do you mean by that?

17      A.    If you look at the Canadian audit of the

18  Canadian entity, if you look at the audit that was

19  undertaken of the Austrian, Vienna-based entity, the

20  Third World Relief Association, there are

21  transactions from WAMY in that case to them, and

22  they engage in false recordkeeping.  It's quite

23  clear from the audit -- had additional material that

24  that charting was providing, among other things,

25  military support, and that the recorded records,

This Transcript Contains Confidential Material

```
 1   financial transactions, were in one clearance is not
 2   the same as what a fax showed.
 3             And from context it's clear to me that
 4   there was pretty comprehensive false bookkeeping for
 5   the Third World Relief Agency.  It's also consistent
 6   with what I've seen in many financial --
 7   international financial crime cases, in which the
 8   purposes of transactions are mischaracterized for
 9   the purpose of transactions that went through banks
10   or that were recorded.  It's very typical of a lot
11   of various kinds of criminal activity.  And that's
12   the case with that organization.
13        Q.    So we're talking about WAMY Canada, we're
14   talking TWR; correct?
15        A.    Yes.  And IIRO --
16        Q.    Okay.
17        A.    -- and IIRO as well.
18        Q.    Okay.  We will get to that at some point.
19             If I can get Exhibit 12, monograph on
20   terrorist finance.
21                 (Winer Deposition Exhibit 909,
22                 Monograph on Terrorist Financing -
23                 Staff Report to the Commission, was
24                 marked for identification.)
25        Q.    (BY MR. MOHAMMEDI)  If you go to page 20,
```

This Transcript Contains Confidential Material

1    which is page 23 of the PDF.

2              MR. HAEFELE:  This is only nine

3         pages.

4              MR. MOHAMMEDI:  Just hold on one

5         second.  I think we're missing...

6              You have only nine pages there?

7    A.    Yes.

8              MR. MOHAMMEDI:  Can we go off record

9         and just get this straightened out?

10             THE VIDEOGRAPHER:  Going off the

11        record.  2:34 p.m.

12             (Recess taken, 2:34 p.m. to

13             2:35 p.m. EDT)

14             THE VIDEOGRAPHER:  Going back on the

15        record.  2:35 p.m.

16   Q.    (BY MR. MOHAMMEDI)  So Exhibit 909, it's

17   the monograph on terrorism finance.

18   A.    Yes.

19   Q.    Have you seen this document before?

20   A.    Yes, I cite it in my report.

21   Q.    Do you agree with the statement made

22   here, in 1993 the Saudi -- if you could read the

23   statement and tell me if you agree with them.

24   A.    Which page are we on?  Are we on page 20?

25   Q.    This is page 20 of the monograph?

This Transcript Contains Confidential Material

```
 1        A.    Yes.  This is why the material that you
 2  just read me from the Harmony database was in no way
 3  new to me.  This is among the many places that I've
 4  seen that describes this moment in the history of
 5  al-Qaeda and Jumaani.
 6        Q.    So it describes Osama bin Laden family
 7  money frozen 1993 to 1994; correct?
 8        A.    Yes.
 9        Q.    And then, same exhibit.  If you go to
10  same thing, page 20, it says:  That Bin Laden moved
11  to Afghanistan 1996.  His financial situation was
12  dire.  It took months for him to get back on his
13  feet.
14              Do you agree with that statement?
15        A.    Yes, that's consistent with the document
16  you just read to me of his correspondence in which
17  he's trying to get money going directly to him as
18  opposed to having to get it elsewhere.
19        Q.    And if you go to 9/11 Commission, the
20  same pages you were referring to, which is 170 --
21        A.    There is additional information on this
22  page and the next page that's also --
23        Q.    My question is this.
24              Can we go -- we go back to -- back and
25  forth.  Go to 9/11 Commission at page 170.
```

This Transcript Contains Confidential Material

```
 1              Which was that -- which was the exhibit
 2   of 9/11 Commission we have?
 3              907.
 4              Okay.  So -- and it says the same thing;
 5   correct?
 6       A.    Pretty much.  It's not the identical
 7   words, but it's the same substance.
 8       Q.    Same summary.
 9              It says:  When Bin Laden left Sudan in
10   1996 it appears the Sudanese government expropriated
11   all his assets:  He left Sudan with practically
12   nothing.
13              Do you agree with that?
14       A.    Yes.
15       Q.    We can take this down.
16              If you go for Section 4.3, page 14 of
17   your report.
18              And you mention -- if you go to -- these
19   propagation activities.  Do you see -- yeah.  The
20   last sentence.
21              These propagation activities included the
22   dissemination of extremely intolerant and
23   anti-western Wahhabist ideas which included strong
24   hostility to Christians, Jews, and to non-Islamicist
25   or secular governments.
```

This Transcript Contains Confidential Material

1          Do you see that?

2     A.    Yes.

3     Q.    You have no citation there; correct?

4     A.    That's correct.

5     Q.    Can you give me specifics of terrorist

6  training of fighters?

7     A.    I didn't hear the second half of the

8  question.

9     Q.    Can you give me specifics, and I'm asking

10 for specific, I'm not asking for anything else, just

11 specifics, of training fighters, the terrorist

12 training fighters?

13    A.    The training that took place in the

14 Afghanistan training camps were found to be by the

15 various U.S. government agencies to provide the

16 foundation for both armed Islamic resistance in

17 Afghanistan, Bosnia, and Chechnya, and training that

18 was then used to provide the foundations for

19 terrorist activity.

20          In my report, I provide examples in

21 connection with IIRO, WAMY, and -- WAMY, IIRO, and

22 Muslim World League.  So the specifics are in the

23 report in those sections.  They provide examples of

24 the type of language and which provide examples of

25 the type of activity.  The CIA report in 1990 -- in

This Transcript Contains Confidential Material

```
1    1996 describes the funding of essentially militant
2    training camps.  The militant training camps were
3    used both for a direct fighter for paramilitary
4    activities by combatants and also for the smaller
5    cadre of people who were then handpicked for
6    follow-on activities, directed externally by
7    Bin Laden and al-Qaeda.
8         Q.   And you have those specifics in your
9    report; correct?
10        A.   I have representative examples of the
11   information in my report, that's correct.
12        Q.   Showing that those charities provided
13   training to --
14        A.   The charities provided support for the
15   camps where the training took place.  They provided
16   essentially foundational support.  So, for example,
17   when you have a charity that's providing support to
18   a training camp, what does that mean?  Does it mean
19   that they're providing salaries?  Stipends for
20   student welfare?  Well, that's the kind of
21   infrastructure cost that becomes part and parcel to
22   train militants.
23             I take --
24        Q.   So --
25        A.   Excuse me, let me finish my response,
```

This Transcript Contains Confidential Material

1    sir.  I take, at face value, some of the statements

2    made by senior officials of charities and other

3    officials in the period of time of these wars about

4    the effort that was being made.  I also heard about

5    them in the late 1990s.  And again, the 1996

6    report -- I've seen a report that provides some of

7    the summaries of that.

8        Q.    And these are your basis for your -- for

9    this statement that has no citation; correct?

10       A.    I think that the citation portion of it

11   is what I do further on, in my report, in talking

12   about how it happened.

13            Again, please do not forget the framework

14   that I took the time to lay out a little earlier in

15   my deposition, because it's critical.  While in some

16   cases, like the IIRO cases in southeast Asia, you

17   had direct funding for infrastructure, developments,

18   and training, and various things, by the major

19   charities.  In other cases it was done through

20   smaller charities locally as both the terrorist

21   financed staff report you just brought me through on

22   the 9/11 Commission report states.

23            MR. LEWIS:  This is Eric Lewis.  I

24       object and move to strike the answer as

25       nonresponsive.

This Transcript Contains Confidential Material

```
 1        Q.    (BY MR. MOHAMMEDI)  So your report here
 2   at 4.3, you gave a specific -- and you were
 3   extremely -- you were very specific about the
 4   training of fighters; right?  So are you saying you
 5   have that in your report to show that?  We'll just
 6   take it a little bit, that's fine.  If that's what
 7   you say, we go with that.  But let me ask you
 8   another question.  What WAMY text, publications, or
 9   writings you rely on claim that WAMY ever justified
10   killing of nonbelievers?  And here, I'm asking you
11   to provide anything, coming from WAMY, not from any
12   other place, that they are justified in the killing
13   of nonbelievers.
14        A.    I'd like to go back for a moment to the
15   question you just asked me, because there is a
16   sentence that you stated that I believe is not
17   correct in its characterization of my testimony.
18        Q.    Just answer the question here, please.
19              I will ask the question, there is a
20   question pending?
21        A.    The word "training" is not in the
22   material that you have put up.  And so you're
23   mischaracterizing the paragraph.  I'll now go to
24   your next question.  What was your next question
25   again, sir?
```

This Transcript Contains Confidential Material

```
1       Q.    Sorry?

2             MR. MOHAMMEDI:  Can you go back and

3        read the question again?

4             (Whereupon, the following testimony

5             was read by the court reporter.)

6             "QUESTION:  Let me ask you another

7        question.  What WAMY text, publications, or

8        writings you rely on claim that WAMY ever

9        justified killing of nonbelievers?  And here,

10       I'm asking you to provide anything, coming

11       from WAMY, not from any other place, that they

12       are justified the killing of nonbelievers."

13            (End of readback.)

14       A.    I'm not sure where the phrase

15  nonbelievers comes from.  I don't recall using the

16  phrase nonbelievers in my report.  Can you point me

17  to a place in the report where I say that they

18  provide support of the killing of nonbelievers?"

19       Q.    (BY MR. MOHAMMEDI)  I'm going to find

20  that and show it to you.

21            Can we go off the record so I can find

22  this statement?

23            THE VIDEOGRAPHER:  Going off the

24       record.  The time is 2:46 p.m.

25            (Recess taken, 2:47 p.m. to
```

This Transcript Contains Confidential Material

```
 1                    2:47 p.m. EDT)

 2                    THE VIDEOGRAPHER:  Back on record at

 3          2:47 p.m.

 4       A.    Section 12.11 of my report.

 5       Q.    (BY MR. MOHAMMEDI)  If you go 3.5 of your

 6  report, which is page 7.

 7                    When it says:  These included

 8  indoctrinating fighters and terrorists by providing

 9  materials in mosques and madrassas that taught

10  Muslims it was proper to kill nonbelievers (that is,

11  Christians, Jews, those who not believing in God,

12  such as the Soviets, and Muslims they viewed as

13  apostates for having different views of Islam.)

14                    Do you see that?  That is accurate;

15  correct?

16       A.    Yes.

17       Q.    Okay.  So the question I have --

18       A.    You asked me to provide you sources for

19  that, and the sources --

20       Q.    That's not what I was asking.

21       A.    Let's repeat -- then, if we could go back

22  and have your question repeated to me what you

23  asked, I'm happy to respond to it.

24       Q.    Sure.

25                    What I said, what WAMY text publications,
```

This Transcript Contains Confidential Material

```
 1   writings you rely on claim that WAMY ever justified

 2   killing of nonbelievers.

 3       A.   If we go to Section 12.11 of my report,

 4   it provides a number of specific examples.

 5       Q.   Section 12 of your report?

 6       A.   12.11.

 7       Q.   Can you just -- can you just point me to

 8   where it says that specifically?  Where WAMY

 9   specifically had text publication or writing --

10       A.   Pages 102 and 103 of my report.

11       Q.   It was quote from Kane; correct?

12            MR. HAEFELE:  Objection to form.

13       Q.   (BY MR. MOHAMMEDI)  That was not the

14   statement directly; right?

15            MR. HAEFELE:  Objection to form.

16       A.   My understanding is these come from the

17   documents that were cited.

18       Q.   (BY MR. MOHAMMEDI)  Which document are

19   you referring?

20       A.   They're set forth and specified in

21   paragraph 12.11.

22       Q.   So you were saying that there are

23   documents in WAMY, texts or publications, that

24   justify the killing of nonbelievers?

25       A.   Yes, that's my --
```

This Transcript Contains Confidential Material

```
1        Q.     Is that correct?
2        A.     That's my understanding of when they say:
3   Who was behind the biological crisis which became
4   like brainwashing?  A Jew.  And it goes on from
5   there, and they talk about why are you so miserly
6   with your blood.
7        Q.     Okay.  So to you that is --
8        A.     Teach our children to love taking revenge
9   on the Jews and the oppressors.
10        Q.     Do you agree that there are hatred
11   statements made all over the world?
12               MR. HAEFELE:  Objection.
13        A.     I'm not in a position to discuss -- to
14   opine on hatred statements all over the world.  This
15   is calling for revenge on the Jews.
16        Q.     (BY MR. MOHAMMEDI)  And you are saying
17   that WAMY text specifically said that we are
18   justifying the killing of nonbelievers?
19        A.     Yes.
20        Q.     Okay.  We'll move on.
21               I'm just going to ask you another
22   question.  You are not a religious expert, are you?
23        A.     We've discussed this issue earlier.
24   You've asked me this question.  I understand a
25   religion in a political context when religion is
```

This Transcript Contains Confidential Material

```
 1   used for political purposes as part of my
 2   understanding of relationships among states, as part
 3   of my understanding of terrorism.  We had national
 4   and global security issues.  And so in that context,
 5   yes.  In the context of various religious doctrines,
 6   intrareligious discussions of text, there are people
 7   who spend their lifetimes as religious scholars, and
 8   that has not been my work.
 9        Q.    And you're referring -- is it fair that
10   you are referring to a document that's expressed
11   religious views of an organization, and you are
12   making the -- you are reaching the conclusion that
13   was calling for justifying the killing of
14   nonbelievers; correct?
15              MR. HAEFELE:  Objection to form.
16        A.    Yes.
17        Q.    (BY MR. MOHAMMEDI)  You understand the
18   meaning of jihad?
19        A.    It has multiple meanings.
20        Q.    Okay.  Do you understand the meaning of
21   Salafis?
22        A.    I believe so.
23        Q.    You do?  And are you testifying as an
24   expert here to discuss jihad and Salafis?
25        A.    Only in the context of the political
```

This Transcript Contains Confidential Material

```
 1   movements and terrorist activity which both

 2   Wahhabism and Salafism contributed to in connection

 3   with al-Qaeda in the 9/11 attacks.

 4        Q.    Do you believe that propagation of

 5   Wahhabism is a terrorist activity?

 6        A.    In and of itself, no.  It depends what

 7   it's combined with.  It certainly is an activity

 8   that has engendered extremism, including in

 9   societies where Wahhabism was not previously

10   present.  And there is an important distinction to

11   be made, which is that consistent with the

12   expression, not every Salafist is a Wahhabi, but

13   every Wahhabiist is a Salafist.  It's essentially

14   the indoctrination in seventh century values, as it

15   were, a very puritan and extreme version of Islam

16   that has caused a lot of trouble in a lot of places

17   and led to a lot of -- it led to extremist conduct.

18             And so it's the combination of that with

19   modern political realities, and that led to things

20   like al-Qaeda and the Islamic state.  The Islamic

21   state is, I believe, quite Salafist in its

22   orientation, for example.

23        Q.    So you -- your testimony and you are

24   saying this -- you can address it from a political

25   aspect, Salafism and Wahhabism, the way you
```

This Transcript Contains Confidential Material

1   described them, led to 9/11?

2       A.    They were part of what led to 9/11.  They

3   were not the only part, as some of the political and

4   security decisions that were made by governments in

5   the region for the reasons I articulated earlier in

6   my deposition also contributed to creating an

7   environment that allowed 9/11 to happen.  The

8   environment was an intellectual environment or a

9   cognitive environment, which is why the Da'wah

10  issues are so important, and it was a logistical and

11  practical environment as well.

12           And this played out through a series of

13  wars involving Muslims on one side and Christians or

14  secular regimes on the other in the '80s and '90s.

15      Q.    Okay.  Is Section 4.9.1 - 4.9.7 at

16  page 17.

17           I have one question I just ask you.

18  There's no citation here, correct?  Not a single

19  citation?

20      A.    That's correct.

21      Q.    Thank you.

22           Just bear with me just a second.  I'm

23  just going through my notes.

24           In your section 5.3.4, page 21 --

25  actually, we addressed this one.  I'm sorry, we

This Transcript Contains Confidential Material

1    addressed this one.

2              I will go to page 22-23 of your report.

3              The 9/11 Commission report states, and

4    this is -- which is 907.  At page 169.

5              It says:  The origin of the funds remains

6    unknown, although we have a general idea of how

7    al-Qaeda financed itself during the period leading

8    up to 9/11.

9              Do you see that statement?

10       A.    I don't.

11       Q.    It's page -- it's page 169 of the report.

12             Do you see that?

13       A.    Yes, I do.

14       Q.    And page 172, it says -- if you go to

15   page 172.

16             Are you there?  Okay.  Yes.

17             It says:  To date -- and they're all

18   highlighted -- the U.S. government has not been able

19   to determine the origin of the money used for the

20   9/11 attacks.

21             Do you see that?

22       A.    Yes.

23       Q.    Okay.  And then page 172 says:  Our

24   knowledge of the funding during the period before

25   the operatives entered the United States remains

This Transcript Contains Confidential Material

```
 1    murky.

 2              You see that, correct?

 3         A.    Yes.

 4         Q.    If we go to exhibit -- the monograph

 5    exhibit.  Which exhibit is that?

 6              909.

 7              And that will be page 144, which is 147

 8    of the PDF.

 9              Just go to the page, if you can.

10              Okay.  It says:  To date, the U.S.

11    government has not been able to determine the origin

12    of the money used for the 9/11 attacks.  As we have

13    discussed above, the compelling evidence appears to

14    trace the bulk of the funds directly back to KSM

15    and, possibly Qatari, but no further.  Available

16    information on this subject has thus far not been

17    illuminating.

18              You see that one; correct?

19         A.    Yes.

20         Q.    We can -- you can bring this down.

21              If you go to Section 6.4 of the report.

22              In section 6.4, which is page 23, you

23    state that the U.S. government officials you spoke

24    to during your tenure as Deputy Assistant Secretary

25    of State for International Law Enforcement -- 1994,
```

This Transcript Contains Confidential Material

```
 1    '99 -- and in days after 9/11 expressed views

 2    consistent with information developed by various

 3    further government agencies before and after 9/11

 4    about the role of charities.

 5              Who did you speak to?

 6         A.   While I was in the U.S. government or

 7    afterwards?

 8         Q.   In the U.S. government.  And afterwards.

 9         A.   Oh, Dick Clarke, William Wechsler, Lee

10    Wolosky, Mike Sheehan, Joseph Meyers, Stuart Levey,

11    Juan Zarate.  Those are the ones that come to mind.

12         Q.   And is it -- I think the previous

13    testimony said there were expressions of concern;

14    correct?

15         A.   You're referring there to their

16    statements about the charities that they made in

17    public testimony and separately to the official

18    démarche that was drafted or expressed by the

19    United States government.  There were actually a

20    series of them, I believe, in the 00s going up to

21    2009.  Yes.  This paragraph, of course, refers to

22    the material in 6.3.

23         Q.   Okay.  And that's the source of the

24    information that you're referring to?

25         A.   Paragraph 6.4 says:  Without exception,
```

This Transcript Contains Confidential Material

1   these officials expressed views consistent with the

2   assessments quoted above from the conclusions of the

3   9/11 Commission.

4        Q.    And those testimony before the 9/11

5   Commission that you are referring, are you referring

6   to the testimony before the 9/11 Commission?

7        A.    I'm referring to the quotes in

8   paragraph 6.3.  That 6.3.1, 6.3.2, 6.3.3, and 6.3.4.

9        Q.    And based on that information, you

10  concluded the material support for 9/11 in this

11  report by the charities; correct?

12              MR. HAEFELE:  Objection to form.

13       A.    I don't believe that your statement is

14  the same as what I said here or elsewhere in my

15  report, so I really don't know exactly what the

16  question is other than I think you're assuming

17  things in your question which are not the same as

18  what I've said.

19       Q.    (BY MR. MOHAMMEDI)  Is it fair to say

20  that in your report there is not one single fact to

21  connect material support to 9/11 from the charities?

22       A.    No.

23       Q.    Or is that something I'm not accurate?

24              MR. HAEFELE:  Objection to form.

25       A.    I can explain --

This Transcript Contains Confidential Material

```
1        Q.    (BY MR. MOHAMMEDI)  I'm not asking you to

2   explain.  If you can tell me, am I correct or I'm

3   not correct, that's in your report, or you do not

4   have one single fact to connect 9/11 terrorist act

5   to the charities.  "Yes" or "no?"

6              MR. HAEFELE:  Objection to form.

7        A.    My report says clearly that the 540,000

8   to $550,000 spent on the logistics for the 9/11

9   attack are not the only material support that was

10  relevant to what happened.  It says that expressly

11  and so does the 9/11 Commission report.

12       Q.    (BY MR. MOHAMMEDI)  In Section 7.1, which

13  is -- which I'm going to list from 6.1.1 to 7.1 --

14  7.1.1 to 7.1.11 page 37.

15             You continue to state indoctrinating

16  fighters and terrorists by providing education and

17  the religious materials in mosques and madrassas

18  that taught Muslims it was proper to kill

19  nonbelievers.  You are repeating this by the way.

20  But there was no -- again, you know, the first one

21  was an executive summary, right?  We understand

22  there was no citation.  But here, you are explaining

23  the three -- the Section 3.  But again, you provide

24  this information, and you have not provided any

25  citation; correct?
```

This Transcript Contains Confidential Material

```
 1                MR. HAEFELE:  Objection to form.
 2       A.    There's no citation in that paragraph.
 3  I'm asked a new question here.  This is in response
 4  to question 7.
 5                How did the money and other resources
 6  provided by purported charities enhance al-Qaeda's
 7  global strike capabilities and enable it to carry
 8  out 9/11.
 9                So I was covering, at the first end of
10  this -- first part of this paragraph, the -- it's
11  just actually a summary response to the question
12  that's asked.  That's the first part of it.
13                As it goes on, there are a series of
14  footnotes that provide further information on this,
15  including citations to al-Fadl -- al-Fadl and so on.
16       Q.    (BY MR. MOHAMMEDI)  So has 7.1.2, again,
17  you have -- you said helping to recruit the fighters
18  and terrorists through the propagation process.
19  There's no citation; correct?
20       A.    In paragraph 7.1?
21       Q.    7.1.2.
22                MR. HAEFELE:  Form.
23       A.    I'll repeat what I just said.
24       Q.    (BY MR. MOHAMMEDI)  I'm just asking, is
25  there a citation there or not?  My question is very,
```

This Transcript Contains Confidential Material

1    very simple.

2         A.    It's another summary.

3         Q.    Okay.  So 7.1.3, that has no citation;

4    correct?

5         A.    It's evidence.  There's no citation

6    because there's no citation.

7         Q.    Okay.  7.1.4, there's no citation.

8    7.1.5, no citation.

9                 7.1.7, no citation.  7.1.6, no citation.

10                7.1.8, no citation.  7.1.9, no citation.

11                And 7.1.10, no citation.  That's correct;

12   right?

13                MR. HAEFELE:  Objection to form.

14        A.    Not at that location, there is not.

15        Q.    (BY MR. MOHAMMEDI)  Okay.  Yeah.

16                In Section 7.7.3, at page 46.  Again,

17   here you do not provide any citation, and you said:

18   A number of the most visible charities, IIRO, Muslim

19   World League, and WAMY, at the same time supported

20   terrorist organizations, including al-Qaeda, in

21   areas where they had common goals, such as

22   Afghanistan and Bosnia, or where their personnel had

23   special interests.

24                So there's no citation here.

25                MR. HAEFELE:  Objection to form.

This Transcript Contains Confidential Material

```
1        Q.    (BY MR. MOHAMMEDI)  What do you define as

2   final period leading up to 9/11?  What is the

3   definition of final period leading up to 9/11?

4        A.    It's a very interesting question.  It

5   certainly includes 1989 through 2001.  You could

6   make arguments about whether it included the support

7   for the muje earlier, but the importation of foreign

8   fighters into Afghanistan, as well as the

9   indoctrination into Wahhabiist and Salafist

10  doctrine, played a role in what enabled al-Qaeda to

11  recruit fighters.

12            So that's what I mean.

13            MR. MOHAMMEDI:  Okay.  Can we take

14        5-10 minutes' break, and I think we are going

15        to another section, I prefer to stop right

16        here, if you don't mind.

17            THE VIDEOGRAPHER:  Going off the

18        record.  The time is 3:11 p.m.

19            (Recess taken, 3:11 p.m. to

20            3:28 p.m. EDT)

21            THE VIDEOGRAPHER:  We are back on the

22        record at 3:29 p.m.

23        Q.    (BY MR. MOHAMMEDI)  Welcome back,

24   Mr. Winer.

25            I have -- I'm going back to section 7,
```

This Transcript Contains Confidential Material

```
 1    and I have very specific questions related to some

 2    of the section you mentioned where I would really

 3    like to you answer, but I'm going to go one by one.

 4    There are only two.

 5             7.1.3 at page 38.  In addition to there

 6    being no citation, you also said:  Facilitating the

 7    transport of fighters and terrorist to combat zones.

 8         A.    Yes.

 9         Q.    I'd like you to give me the facts.

10         A.    Sure.

11             MR. HAEFELE:  Objection to form.

12         Q.    (BY MR. MOHAMMEDI)  Can you offer the

13    facts as they relate to WAMY now or anything in your

14    report?

15             MR. HAEFELE:  Objection to form.

16         A.    I'm not sure at this moment about WAMY in

17    particular, on facilitating the transport of

18    fighters and terrorists.

19         Q.    (BY MR. MOHAMMEDI)  My question is very

20    specific to WAMY, Mr. Winer.

21         A.    Yes.  In paragraph 7, I trust --

22         Q.    Yeah, 7.1 --

23         A.    -- the entire paragraph of paragraph 7.1

24    refers to the charities collectively.  It does not

25    refer to particular charities.  The information on
```

This Transcript Contains Confidential Material

1    particular charities is specified by name.

2         Q.    Okay.  But there is no -- as you sit here

3    and in your report, you don't refer to WAMY;

4    correct?

5         A.    I don't recollect referring to WAMY of

6    facilitating transport of fighters.  I would have to

7    go back and look as to which charities were involved

8    in that.

9         Q.    Okay.  And then 7.1.4.  You state:

10   Buying weapons for Islamic jihadists and terrorists?

11        A.    Yes.

12        Q.    What facts do you have that WAMY did

13   this?  Do you have any fact that WAMY did this?

14        A.    Yes.  WAMY's -- the co-head of WAMY

15   Vienna, and the -- federal relief agency was

16   involved in these activities, both by public

17   accounts and by some of the materials that were

18   looked at in the audit.

19              And he was in both roles, according to a

20   primary source document that I reviewed as well as

21   two statements that he made.

22        Q.    You're referring to the Bosnian war;

23   correct?

24        A.    Yes.

25              MR. HAEFELE:  Objection to the form.

This Transcript Contains Confidential Material

```
 1        A.    In that case.

 2        Q.    (BY MR. MOHAMMEDI)  And you believe

 3   that's terrorist activity?

 4        A.    I believe it contributed to later

 5   terrorism.  And as you -- in connection with the war

 6   itself, there was not -- the activities of the

 7   fighters on all sides were not pristine.

 8              As you may remember from that war, there

 9   were war crimes and military activities going all

10   the way around.  So it's --

11        Q.    And those war crimes were committed

12   against Muslims; correct?

13        A.    Yes.  And others, not just Muslims.

14        Q.    Okay.  I'm going to start, and I'm going

15   to go through if you go to Section 12.10.3 at

16   page 101.

17              You refer to the GTMO issue; correct?

18        A.    Yes.

19              MR. HAEFELE:  Objection.  Object to

20        form.

21        Q.    (BY MR. MOHAMMEDI)  And then you're

22   referring to assessment in Adel Hamat case; correct?

23        A.    Yes.

24        Q.    And then in that one, you state:  -- you

25   state, and you refer to it in footnote 196:  WAMY is
```

This Transcript Contains Confidential Material

```
 1    non-governmental organization operating in

 2    Afghanistan that may be affiliated with Osama bin

 3    Laden and al-Qaeda operations.

 4            You cite an unclassified summary of

 5    evidence for administrative review board in the case

 6    of Ameur, Mammar; correct?

 7        A.    Yes.

 8        Q.    "Maybe" is not a legal standard, is it?

 9        A.    "Maybe" is not a legal finding by the

10    United States government on that point in that

11    document, that's correct.  All of these are

12    statements made in connection with that case, as

13    statements of the U.S. government's view, which I'm

14    happy to go further on, but I want to make sure I

15    don't go beyond your question, so I'll stop there.

16        Q.    I appreciate that.  Thank you.

17            I'm going to enter as exhibit -- this is

18    15, for us.  The Summary of Administrative Review

19    Proceedings.

20                (Winer Deposition Exhibit 910,

21                Summary of Administrative Review

22                Board Proceedings for ISN 940, was

23                marked for identification.)

24        Q.    (BY MR. MOHAMMEDI)  You, in footnote 197,

25    seems like you're citing to the Summary of
```

```
 1    Administrative Review Board Proceedings; is that

 2    correct?

 3          A.    That's what the citation says; that's

 4    right.

 5          Q.    And it's undated, correct?  There's no

 6    date here?

 7          A.    I'm sorry, I couldn't understand you just

 8    now.

 9          Q.    There is no date here; correct?

10          A.    Not on this page.

11          Q.    And then, in your footnote 97 you said:

12    The U.S. government has also stated according to top

13    WAMY officials, both United States and Israel must

14    be destroyed; correct?

15          A.    That's what the footnote says.

16          Q.    What do you mean by U.S. government?

17          A.    Sure.  The way in which the United States

18    government works, when someone is engaged in this

19    kind of a process, is they're doing it according to

20    a variety of designations that they have made.

21                So, for example, as I explain in my

22    report, a Tier 1 NGO is defined as a particular

23    definition.  And that particular definition is

24    having demonstrated sustained and active support of

25    a terrorist organization, willing to attack U.S.
```

This Transcript Contains Confidential Material

```
 1   persons or interests.
 2          But before I go on, what I would like to
 3   do is to look at this entire document for a minute,
 4   rather than just this one page.
 5      Q.   Yeah.  I mean, Mr. Winer, the only
 6   thing -- I'm ask -- I'm going to ask you about some
 7   of the document.
 8      A.   Just give me --
 9      Q.   Bear with me.
10      A.   You have asked me a question, and I would
11   like to -- in order to answer the question properly,
12   I would like to take a minute to review the
13   document.
14          May I do that?
15             MR. HAEFELE:  Yes, Jonathan, you may.
16             MR. MOHAMMEDI:  I am not asking you
17         about this document, I'm asking you about the
18         report where you making the statement.
19             MR. HAEFELE:  Yeah, but you've asked
20         him about the document.  If there's something
21         in the document, he feels the need to review
22         the document, we've --
23             MR. MOHAMMEDI:  I have no question
24         pending, Robert.
25             MR. HAEFELE:  Omar, we've
```

This Transcript Contains Confidential Material

```
 1          consistently -- well, but there is a question
 2          out there that he may not be finished
 3          answering.  So to the extent that he feels the
 4          need to look at the document, we've
 5          consistently done that.  We've allowed your
 6          experts do it.  If you're not allowing our
 7          experts to do it, then just tell us you're not
 8          allowing our experts to review documents in
 9          order to answer questions.
10                  MR. MOHAMMEDI:  I'm just going to the
11          proposition that U.S. government has stated
12          that according to top WAMY officials, both
13          United States and Israel must be destroyed.
14          That's what I'm referring to, his statement.
15          The witness --
16                  MR. HAEFELE:  And if he feels the
17          need to review the document that you've put on
18          the screen in front of him, he may.  If he
19          doesn't feel the need to do it, I'm not
20          pushing him to do it, but --
21                  MR. MOHAMMEDI:  I'm not asking --
22          thank you.  I'm not asking the witness to do
23          that.  I'm just asking about the meaning of
24          U.S. government.
25                  MR. HAEFELE:  Omar, I understand what
```

This Transcript Contains Confidential Material

```
1          you're asking, but you're asking questions of

2          the witness and you have the document on the

3          screen.  It's related to the question.

4                    MR. MOHAMMEDI:  Can we put that

5          document down for now and then we can go back

6          to it.

7                    MR. HAEFELE:  Mr. Winer, do you feel

8          the need to review the document to answer any

9          question at the moment?

10                   THE WITNESS:  I do.

11                   MR. MOHAMMEDI:  The question is not

12         about the document itself.  The question is,

13         it's different questions.  We will -- we'll

14         get back to it, if we have to.

15                   MR. HAEFELE:  Mr. Winer --

16                   MR. MOHAMMEDI:  Not really --

17                   MR. HAEFELE:  Omar, stop.  Omar, just

18         wait.

19                   MR. MOHAMMEDI:  I am asking specific

20         questions what he's saying in his report.

21                   MR. HAEFELE:  I don't know whether

22         he's done with the last question is my point.

23         I don't know if he's done answering that

24         question, and if he feels the need to review

25         the document to complete his answer.  I don't
```

This Transcript Contains Confidential Material

```
 1          know.
 2                    MR. MOHAMMEDI:  Here's my question --
 3          I have a question and then you can review --
 4                    MR. HAEFELE:  Omar, I am telling you,
 5          I am instructing the witness not to answer any
 6          question until he's finished answering his
 7          question that he has already been -- that has
 8          already been posed.
 9                    MR. MOHAMMEDI:  What is the question
10          that you are talking about?
11                    MR. HAEFELE:  It's up to the witness.
12                    MR. MOHAMMEDI:  So the question is
13          very clear of what I am saying --
14                    MR. HAEFELE:  I didn't say it was --
15                    MR. MOHAMMEDI:  -- meaning by U.S.
16          government.  That's the question.
17                    That's it.  That's the question.  You
18          don't have to review the document to know what
19          is the U.S. government, do you?
20                    MR. HAEFELE:  Apparently Mr. Winer
21          feels the need to.  I'm not suggesting that it
22          has --
23                    MR. MOHAMMEDI:  I'm not asking about
24          the content of the --
25                    MR. HAEFELE:  Omar, we've been
```

This Transcript Contains Confidential Material

```
 1        fighting over this, but the witness could have

 2        reviewed the document in that time if you

 3        would just let him do it.

 4    Q.    (BY MR. MOHAMMEDI)   Okay.  Let me ask

 5  Mr. Winer, let me ask you one question.

 6             MR. HAEFELE:  Let the record reflect

 7        that Mr. Omar Mohammedi is not allowing the

 8        witness to review the document that he has

 9        asked to review before he answers the

10        question.

11             MR. MOHAMMEDI:  And let the record

12        reflect that I'm not asking about the document

13        itself.

14    Q.    (BY MR. MOHAMMEDI)   Is the Office for the

15  Administrative Review of the Detention of Enemy

16  Combatants at U.S. Naval base Guantanamo Bay Cuba

17  the entire government?

18    A.    That's a slightly different question from

19  the question you asked before.

20    Q.    That's what I was going to ask you.  Yes.

21    A.    It will take me a minute to answer the

22  question.  I don't need to look at the document

23  immediately to answer the question, but it would be

24  helpful to me to look at the document and footnote

25  197.  That said, since there's no document in front
```

1    of me, I'll try to explain as best I can.

2        Q.    Go ahead.

3        A.    Subject to further explanation when I

4    look at the document for a footnote 197, because I

5    believe it to be relevant.

6            The way in which the U.S. government

7    works, when it talks about something like a Tier 1

8    NGO, and its definition, or a statement about an

9    organization like WAMY in connection with Guantanamo

10   is it's taking essentially a summary of findings,

11   which can be at various levels of certainty, but are

12   finding that someone is a Tier 1 NGO, it has a

13   particular national security implication.

14           The United States government as a

15   government, involving coordination by the National

16   Security Counsel at the White House, the U.S.

17   military and U.S. intelligence agencies, the State

18   Department, treasury, other agencies participate,

19   but it's in particular driven by the NSC and whoever

20   the National Security Council wants to have, goes

21   through a process for intelligence purposes and for

22   national security purposes of providing tiers of

23   focus in various categories for collection and

24   analysis.  And so that has -- it's a very formal

25   process for a formal meeting.

This Transcript Contains Confidential Material

```
1        Q.    Okay.

2        A.    So you've asked me about this, what I

3   coined the U.S. government.  This material appeared

4   in one of the documents I reviewed.  It's not in the

5   document that you had me look at just now.  It might

6   be in the next document, 197; I'd have to look.  But

7   these findings or these statements were in the

8   materials that were provided to me, and I recognized

9   the kind of statements it is, which is the -- it's

10  the kind of statement of -- doctrine isn't quite the

11  right word.  Policy isn't quite the right word.

12          It's more or less a -- it's a judgment

13  reflecting your priority of being given a target by

14  the United States government, and then it's a

15  judgment of what the target is, and then, in the

16  case of -- or maybe that is an analytic question

17  that they're seeking to answer in part at that time.

18  If they knew that the answer was, yes, it's al-Qaeda

19  affiliated at that moment in time, they would say it

20  is al-Qaeda affiliated.  So that's what that

21  document means.

22          On the quote according to top WAMY

23  officials, that relates to a different document than

24  the document you showed me, which is why I wanted to

25  look at both of those documents before providing my
```

This Transcript Contains Confidential Material

```
 1   answer.

 2        Q.    Okay.  I appreciate that.

 3              Now, let me ask you, Mr. Winer, which is

 4   the standard for a tiered designation conducted?

 5        A.    I'm sorry?

 6        Q.    Which is the standard for a tier

 7   designation conducted?

 8        A.    It's a national security standard.  It

 9   reflects our national security judgment being made

10   by the national security components of the

11   United States government.

12        Q.    Okay.  Is there a burden of proof for a

13   Tier 1 designation?

14        A.    It's not an adversarial legal proceeding

15   with a judge.  With an outside judge.  There is

16   typically on any of these designations, including

17   the big national security designations, very

18   extensive legal review by lawyers from multiple

19   agencies looking at it in connection with the

20   president's apparent constitutional authorities, any

21   delegations of authority such as delegations of

22   authority made to the president following 9/11 by

23   the Congress, and whatever other legal standards are

24   in place, depending on the use of the information --

25        Q.    And can it -- sorry.
```

This Transcript Contains Confidential Material

```
1       A.      An array of assessments that go into the

2    making or characterization of who's going to be

3    designated in that way.  And that's probably enough

4    to say about it, because in this case, I was not in

5    the government at the time this was made, did not

6    participate in this particular process.  I'm

7    describing what's true in general of these processes

8    as I participate and understand it.  But I wasn't

9    involved in this one.

10      Q.      Okay.  But my question was under

11   standard, and I was looking, if you can answer me

12   the standard for a Tier 1 designation.

13              And you don't have the answer, then

14   that's fine.  We can move on.

15      A.      I believe that I just answered the

16   question.  I'll try and answer it again.

17              The standard is --

18      Q.      I'm sorry --

19      A.      The standard is, it must be

20   constitutional, it must fall within the president's

21   rights under both his inherent rights under the

22   Constitution as commander in chief, or her rights.

23   It must also fall within all appropriate delegations

24   of authority by Congress.  Plus any other criteria

25   that have been developed by law or regulation to
```

This Transcript Contains Confidential Material

1    govern that process.

2         So it will be reviewed from all of those

3    perspectives.  It may well also have been reviewed

4    from other perspectives if it was going to be used

5    in connection with an external legal process.

6         Q.    Can an NGO designee challenge the

7    designation in this process?

8         A.    No.  No, to the best of my knowledge, no.

9         Q.    Is there any due process procedure for

10   seeking in these matters?

11             MR. HAEFELE:  Objection to form.

12        A.    There's due process proceedings that

13   apply to designations undertaken by OFAC.  In these

14   national security processes, in terms of who is

15   designated as a Tier 1, I don't believe there are

16   any.  However, you're beginning to get into

17   Guantanamo territory, where you have this very

18   complex array of laws as to what is proper and what

19   is not proper when it intersects with the criminal

20   justice system and when it doesn't.  And in that

21   highly technical area, I would have do a great deal

22   of additional study before being able to provide

23   further guidance.

24        Q.    (BY MR. MOHAMMEDI)  But you did have that

25   in your report, right?  You did explain Guantanamo,

1    GTMO, in your report?

2        A.    Yes.  But there -- what I'm saying is in

3    order to discuss civil law standards and the

4    opportunity -- where the opportunities might be for

5    it to intersect with U.S. civil laws, that would

6    require further study.  That was not within the

7    scope of what I looked for.

8        Q.    Do you know if Mammar Ameur worked for

9    WAMY?  You mentioned his name.

10       A.    I believe there are references to WAMY in

11   the documents that you briefly showed me the first

12   page of.  I would prefer to go to that document in

13   order to provide a fuller answer.

14       Q.    Just give me a second, please.

15            We can come back to this one, because we

16   need to look at the document.  Let's move on to

17   another section.

18       A.    Just to complete your answer, I think he

19   said he worked for WAMY for three years.

20       Q.    That's what he said.  That's what you

21   believe.  And did you do any independent

22   investigation to find out if he worked for WAMY or

23   not?

24       A.    I don't know how I could have possibly

25   done that in the period between my retention in

This Transcript Contains Confidential Material

```
 1   December 2019 and the period of producing the

 2   report, and I did not.

 3        Q.    Are you familiar with the name Colonel

 4   Wilkerson, from Secretary of State Colin Powell's

 5   office?

 6        A.    Are you talking about Larry Wilkerson?

 7        Q.    I believe so, yes.

 8        A.    Yes.  I know him.

 9        Q.    You know him, right?

10        A.    Yes.

11        Q.    Good.  What do you think about him?

12        A.    He's a complex person.

13        Q.    That's nice way of saying it.  When you

14   say complex, I mean, do you find him credible?

15              MR. HAEFELE:  Objection to the form.

16        A.    It depends on what he's talking about.

17   It depends on what the issue is.  He has very strong

18   opinions on a variety of topics.

19        Q.    (BY MR. MOHAMMEDI)  Did you review his

20   declaration?

21        A.    I don't remember at this moment

22   Colonel Wilkerson's declaration.

23        Q.    I don't believe you did, because we don't

24   have it in your reliance material.

25        A.    Yeah, I don't remember reviewing it.
```

This Transcript Contains Confidential Material

```
 1        Q.    If you can just put exhibit up for our
 2   purpose 16, perhaps.
 3                    (Winer Deposition Exhibit 911,
 4                    Declaration of Colonel Lawrence B.
 5                    Wilkerson (Ret.), was marked for
 6                    identification.)
 7        Q.    (BY MR. MOHAMMEDI)  Have you seen this
 8   document?
 9        A.    No.
10        Q.    You have not seen this document.  Do you
11   know this document is in the production?
12        A.    No.
13        Q.    I am going to direct you to paragraph 9.
14   That's A-E, which is page 4-5.
15              Do you want to take a minute to read it?
16        A.    Yes, I do.  I'd like to be able to read
17   the entire document before I --
18        Q.    So in that case, we'll --
19        A.    As I've not seen it before.
20        Q.    Sure.  We'll go off the record while
21   you're reviewing, Mr. Winer.
22                    THE VIDEOGRAPHER:  We'll go off the
23        record.  The time is 3:52 p.m.
24                    (Recess taken, 3:52 p.m. to
25                    3:54 p.m. EDT)
```

This Transcript Contains Confidential Material

```
 1                  THE VIDEOGRAPHER:  We are back on the
 2      record.  The time is 3:54 p.m.
 3      Q.    (BY MR. MOHAMMEDI)  The question I guess
 4   you -- you just had the chance to review his
 5   declaration.  Do you -- do you agree or disagree
 6   with his statement, paragraph 9, A to E?
 7                  And I just need to know if you agree with
 8   his agreement.  I don't need more information.
 9      A.    I can't answer that with an agree or
10   disagree response, sir.
11      Q.    Why not?
12      A.    Because he makes many statements here,
13   not one statement.  And I have not, myself, gone
14   through Mr. Hamad's case to determine whether he was
15   wrongfully seized and detained, whether he was
16   innocent, guilty, partly guilty, partly innocent.  I
17   can't assess any of those things.  I can say that
18   Guantanamo is a serious failure of U.S. policy, and
19   that the way in which the United States approached
20   Guantanamo was not consistent with my values.  I
21   believe that people should be -- matters should be
22   tried in court; and for Mr. Hamad, he was not able
23   to be tried.  And that's a fundamental issue.
24                  So having him able to be tried is
25   important.  This is separate from the question that
```

This Transcript Contains Confidential Material

```
 1    you asked me earlier about the U.S. findings, which
 2    are separate from and not addressed by Colonel
 3    Wilkerson's statement, now that I've read it.
 4         Q.    Okay.  Thank you.  I appreciate your
 5    answer on this.
 6               We can bring this down.
 7               Has WAMY ever been designated under OFAC
 8    treasury of justice?
 9         A.    No, it has not.
10         Q.    Was LBI, which is Lajnat al-Birr
11    al-Islamiah -- I spell it for you -- LBI was ever
12    designated?
13         A.    I don't believe it was, no, sir.
14         Q.    Previous -- I guess you -- you made --
15    sorry, strike that.
16               I will enter into exhibit -- it's our
17    Exhibit 17.  It is a link to a video testimony of
18    the Undersecretary of Department of Treasury to the
19    9/11 Commission, Richard Newcomb.
20               (Winer Deposition Exhibit 912,
21               Terrorism Financing Hearing 2003
22               video clip, was marked for
23               identification.)
24               TRIAL TECHNICIAN:  This is a
25          five-minute video.
```

This Transcript Contains Confidential Material

```
 1                    MR. MOHAMMEDI:  I'd like Mr. Winer to
 2         watch it all.
 3         Q.   (BY MR. MOHAMMEDI)  So it's -- it is a
 4    video -- it's before -- let me see here.
 5                    Testimony of undersecretary before the --
 6    if you go before the -- before the -- let me see.
 7    Hold one second before I just --
 8                    MR. MOHAMMEDI:  Can you hold on a
 9         second?  Can we go off record just while I'm
10         looking for a second, please?
11                    THE VIDEOGRAPHER:  Going off the
12         record.  3:59 p.m.
13                    (Recess taken, 3:59 p.m. to
14                    4:01 p.m. EDT)
15                    THE VIDEOGRAPHER:  We're back on the
16         record.  The time is 4:01 p.m.
17         Q.   (BY MR. MOHAMMEDI)  The exhibit is
18    July 31, 2003.  Testimony before the Senate
19    Governmental Affairs Committee on Terrorism Finance
20    Commission.
21                    Do you know Richard Newcomb?
22         A.   Yes.
23                    MR. LEWIS:  So I would like to just
24         go to the exhibit where Senator Specter was
25         asking the questions.  If you could just play
```

This Transcript Contains Confidential Material

```
1           that for us.
2                    [Exhibit 912 - video played]
3                    SEN. ARLEN SPECTER:  We will now
4           proceed with questioning, five-minute rounds,
5           and the chairwoman has deferred to me for the
6           first round.
7                    Mr. Newcomb, in interviews by staff
8           preparatory to your coming here, you advised
9           that a good many of your recommendations for
10          sanctions are rejected.  Would you amplify
11          what has happened on that?
12                   RICHARD NEWCOMB:  Yes, Senator.  In
13          identifying key nodes, our responsibility is
14          to identify how these terrorist organizations
15          fit their activities together.  Who are --
16                   SEN. ARLEN SPECTER:  After you've
17          identified them and made the recommendation --
18          I only have five minutes, so I want to focus
19          very sharply on the rejections on the
20          recommendations which involve Saudi sources.
21          Precisely what has happened on that?
22                   RICHARD NEWCOMB:  Well, the
23          designation, as we indicated in our
24          discussions, is not the only possible action.
25          There's also law enforcement, intelligence.
```

This Transcript Contains Confidential Material

```
 1                SEN. ARLEN SPECTER:  Well, let's

 2       focus on economic sanctions, which is my

 3       question, before we go into other possible

 4       actions.  I want to know about the

 5       recommendations on economic sanctions as to

 6       Saudis, which have been turned down.

 7                RICHARD NEWCOMB:  Senator Specter,

 8       we've made numerous recommendations including

 9       relating to Saudi Arabia and other terrorist

10       support organizations and groups.  This goes

11       through a policy coordinating PCC process

12       where all of the equities of the government

13       come to the table.

14                SEN. ARLEN SPECTER:  Well, my

15       question -- my question -- my question focuses

16       on recommendations which you have made for

17       sanctions as to Saudi organizations which have

18       been rejected.

19                RICHARD NEWCOMB:  Well, first let me

20       say, it's not -- it's the policy not to

21       comment on internal policy deliberations

22       within the government.  I can tell you, these

23       issues have been discussed with all of the key

24       players at the table.  And when there's

25       another possible action that can be taken,
```

This Transcript Contains Confidential Material

```
 1          we've achieved our goal by teeing issues up.

 2          There are --

 3                  SEN. ARLEN SPECTER:  I'm not asking

 4          you about internal deliberations, I'm asking

 5          you -- and let me be -- let me be specific

 6          with some organizations which have been

 7          discussed with you by staff prior to your

 8          coming here.  Were there recommendations as to

 9          the National Commercial Bank of Saudi Arabia

10          for economic sanctions which were rejected?

11                  RICHARD NEWCOMB:  No,

12          Senator Specter, there was not.

13                  SEN. ARLEN SPECTER:  Were there

14          recommendations for sanctions against the

15          World Assembly of Muslim Youth?

16                  RICHARD NEWCOMB:  There, as in

17          others, these are issues that we looked at and

18          examined very carefully.  There was no

19          recommendation out of our office on either of

20          those.

21                  SEN. ARLEN SPECTER:  Well, what

22          conclusions did you come to on the World

23          Assembly of Muslim Youth?

24                  RICHARD NEWCOMB:  That, along with

25          the whole variety of charitable organizations
```

This Transcript Contains Confidential Material

```
1        operating head offices in Saudi or
2        organizations that we're looking at, as well
3        as the whole range of several hundred or so
4        possible organizations that may be funding
5        terrorist activities, rising to the level of a
6        recommendation is a complicated policy
7        practice --
8               SEN. ARLEN SPECTER:  Well, I'm not
9        concerned about several hundred others.  I'd
10       like to know what about the World Assembly of
11       Muslim Youth.  Were they funding terrorist
12       organizations subject to economic sanctions
13       without any action being taken?
14              RICHARD NEWCOMB:  I can't conclude
15       that in this hearing today.  It is an
16       organization that we --
17              SEN. ARLEN SPECTER:  You say you
18       can't conclude it --
19              RICHARD NEWCOMB:  Cannot.  Cannot.
20              SEN. ARLEN SPECTER:  -- at this
21       hearing today?
22              RICHARD NEWCOMB:  Well, we did not
23       conclude that in our deliberations, so I can't
24       say that that was a recommendation of our
25       office.
```

This Transcript Contains Confidential Material

```
 1              SEN. ARLEN SPECTER:  How about the
 2         International Islamic Relief Organization,
 3         were there recommendations for sanctions there
 4         which were rejected by higher officials in the
 5         Treasury Department?
 6              RICHARD NEWCOMB:  This is an issue
 7         that we'd looked at.  And again, your question
 8         relates to policy deliberations within the
 9         administration which I can't comment on.  I
10         can tell you we did look at --
11              SEN. ARLEN SPECTER:  I'm not
12         interested in your policy deliberations.  What
13         I'm interested in is your conclusions.  Were
14         there economic sanctions taken against the
15         International Islamic Relief Organization?
16              RICHARD NEWCOMB:  To date -- there
17         have not been as of this date.
18              SEN. ARLEN SPECTER:  Do you think
19         there should be?
20              RICHARD NEWCOMB:  It's something that
21         we would look at very carefully along with the
22         others participating in the policy process.
23              SEN. ARLEN SPECTER:  Well, when you
24         look at it very carefully, how long have you
25         been looking at it up until now?
```

This Transcript Contains Confidential Material

```
 1                    RICHARD NEWCOMB:  Certainly since
 2          immediately in the aftermath of 9/11.
 3                    SEN. ARLEN SPECTER:  Well, that's
 4          almost two years.  How long will it take you
 5          to come to a conclusion?
 6                    RICHARD NEWCOMB:  We can recommend
 7          and we can designate, but there is a policy
 8          process which takes into account all of the
 9          variety of --
10                    SEN. ARLEN SPECTER:  I've got
11          16 seconds left.  Had you recommended this to
12          any of the organizations I've mentioned to
13          you, some tough economic sanctions which were
14          turned down by higher officials implicitly
15          because they were Saudi organizations?
16                    RICHARD NEWCOMB:  I can't say it's
17          because they were Saudi organizations.
18                    SEN. ARLEN SPECTER:  Well, can you
19          say whether they were turned down?
20                    RICHARD NEWCOMB:  I can say there
21          have been some charities and other
22          organizations that we've considered, we've had
23          at the table, and that have been deferred for
24          other actions which I would deem as
25          appropriate.
```

This Transcript Contains Confidential Material

```
 1              SEN. ARLEN SPECTER:  Well, my red

 2          light went on in the middle of your last

 3          answer, but I'll be back.

 4              RICHARD NEWCOMB:  Okay.

 5              [Video concluded]

 6     Q.   (BY MR. MOHAMMEDI)  Mr. Winer, from 2003

 7     until today, which is 2021 -- and you answered this,

 8     but I want to make sure that I will ask this

 9     question based on this testimony:  WAMY has never

10     been subject to economic sanctions or designation by

11     U.S. government; correct?

12     A.   You dropped off at the end of the

13     sentence.  What I heard is are you asking me whether

14     WAMY has ever been designated by OPP?  Is that the

15     question?

16     Q.   Correct, from 2003 until today, which is

17     2021.

18     A.   It has not.

19     Q.   Do you -- are you aware that WAMY

20     International, which is WAMY USA, exists in

21     Virginia?

22     A.   Yeah, I believe so.  I believe so.  It's

23     not something I focused on, but I believe so.

24     Q.   Let's have the Exhibit 18.  Just want to

25     make sure for the record to put that into evidence.
```

This Transcript Contains Confidential Material

```
 1                    (Winer Deposition Exhibit 913, WAMY

 2                    International, Inc. 2021 Annual

 3                    Report, was marked for

 4                    identification.)

 5                    MR. HAEFELE:  What is Exhibit 18?  Do

 6          you mean --

 7                    MR. MOHAMMEDI:  Yeah, it is WAMY

 8          registration of 2021.  And this is a

 9          registration for WAMY International with the

10          Commonwealth of Virginia State Corporation

11          Commission.

12                    MR. HAEFELE:  Just so we're clear,

13          it's Exhibit 913.

14                    MR. MOHAMMEDI:  Exhibit 913, correct.

15     Q.   (BY MR. MOHAMMEDI)  You didn't consider

16     this in your material when you were rendering your

17     opinion, correct?

18     A.    This document is dated January 23, 2021,

19     so I did not consider it in my report that was

20     written some months before.

21     Q.   (BY MR. MOHAMMEDI)  Mr. Winer, if I

22     represent to you that all the registration of WAMY

23     International from that time until 2020 was

24     submitted and were produced to plaintiff counsel,

25     would you agree with me?
```

This Transcript Contains Confidential Material

```
 1                    MR. HAEFELE:  Object to the form.
 2         A.    Would I agree with you on what, sir?
 3         Q.    (BY MR. MOHAMMEDI)  We have produced the
 4    documents, the registration documents, for every
 5    year including -- every year up to 2020, I believe,
 6    to you -- to the lawyers who hired you in this
 7    production --
 8         A.    Yes.
 9         Q.    -- of this case production.
10         A.    What's the question, please?
11         Q.    The question -- so you said this was
12    2021, and you did not review.  And the question, are
13    you aware that WAMY produced all registrations of
14    WAMY prior to 2021?
15         A.    I was not aware of that production, but I
16    did understand WAMY was still out there, as I said
17    to you a minute ago.
18         Q.    We can take that down.
19                    MR. MOHAMMEDI:  Can we take a
20         five-minutes break?
21                    THE VIDEOGRAPHER:  Going off the
22         record.  4:11 p.m.
23                    (Recess taken, 4:10 p.m. to
24                    4:18 p.m. EDT)
25                    THE VIDEOGRAPHER:  Back on record at
```

This Transcript Contains Confidential Material

```
1        4:18 p.m.

2        Q.    (BY MR. MOHAMMEDI)  Mr. Winer, are you

3   aware of any person who attended madrassas, as you

4   mentioned from WAMY, WAMY madrassas, that became a

5   member of al-Qaeda?

6        A.    I don't know who attended WAMY madrassas

7   and who did not.

8        Q.    But you are not aware of anyone who was

9   at the madrassas that became a member of al-Qaeda?

10       A.    I do not know what madrassas incubated

11   which fighters and which terrorists, period.

12       Q.    Okay.  So the question you are not aware

13   of anyone who attended madrassas, it doesn't matter

14   which type of madrassas, that became a member of

15   al-Qaeda.

16       A.    I know that there are people who became

17   members of al-Qaeda who attended madrassas.

18       Q.    What about WAMY?

19       A.    I don't know which madrassas they

20   attended, whether they were related to WAMY or any

21   other organization that sponsored a madrassas.

22       Q.    So as you sit here, you don't "know"

23   know; correct?

24       A.    That's correct.

25       Q.    Let's go to your report, Section 12,
```

This Transcript Contains Confidential Material

```
1    which starts with page 104-110.

2             In your affirmative report, you refer to

3    Adel Batterjee as chairman of WAMY and global

4    chairman of WAMY.  Do you remember that?

5         A.   Yes.

6         Q.   At that time you did not review WAMY

7    documents; correct?

8         A.   I had reviewed some WAMY documents.  I

9    relied on his identification of himself as that role

10   to the New York Times.  That's not correct.  I

11   corrected it in my rebuttal report.

12        Q.   And you corrected that in your rebuttal

13   report; correct?

14        A.   I did.

15        Q.   Okay.  But then you mentioned in your

16   rebuttal which is 2.38.6, at page 31, if you look at

17   it, and you refer to Batterjee was the chairman of

18   LBI; correct?

19        A.   Yes.

20        Q.   Where do you get that information from?

21        A.   His function and the role in the field at

22   LBI.  I don't have a footnote there.  I don't

23   recollect the source but I believe it to be

24   accurate.

25        Q.   I'm sorry, what do you say?  You believe
```

This Transcript Contains Confidential Material

1   the information is accurate?

2       A.    I believe that he ran LBI.  And in the

3   deposition of Noor Wali, Noor Wali talks about

4   Batterjee's central role.

5       Q.    I do understand that.  But you paint him

6   as a chairman of LBI; correct?

7       A.    He ran it.  Did he have the formal title

8   of chairman?  I don't recollect.

9       Q.    And it is fair to say you have not

10  reviewed documents produced in this case as to the

11  role of Batterjee with LBI; correct?

12      A.    I don't think it's fair to say that.  I

13  reviewed Noor Wali's deposition, which goes into it

14  in some depth about Batterjee's role.  I reviewed

15  other documents in which Batterjee was characterized

16  as the founder of LBI.  This includes the U.S.

17  government, and I think the UN's findings about

18  Batterjee, which in turn are consistent with the

19  proffer in the Arnaout case, put together by Patrick

20  Fitzgerald.  All of this is made complicated by the

21  fact that the word al-Barr in Arabic, A-L dash

22  B-A-R-R, I understand to be the word that's

23  translated often as "benevolence."  And that becomes

24  part of the elements of confusion, as well as what

25  Batterjee was doing within LBI and what Batterjee

This Transcript Contains Confidential Material

```
 1   was doing within what's known as BIF.

 2       Q.   Mr. Winer, really -- I think -- that is

 3   not my question, and you -- you know, we're spending

 4   a lot of time, and I don't have it.  I am

 5   specifically asking you if you get this

 6   information -- where did you get this information

 7   that Batterjee was the chairman of LBI?  That's the

 8   only question I'm asking.

 9       A.   I don't recollect.

10       Q.   Okay.  And then you go on in the

11   Section 12.12.15, at page 109, and quoting the New

12   York Times again, stated that:  If a BIF worker

13   decides he wanted to join fighting forces, we would

14   not stop him.  But he can no longer officially

15   represent our organization; correct?

16       A.   Yes.

17       Q.   But that's his quote, right?  That's the

18   New York Times quote, right?

19       A.   Yes.

20       Q.   You comment on 12.12.16, page 110, you

21   actually made it -- you changed that quote to say:

22   Instead, his clear message is that nothing would

23   change other than that a person engaged in jihad

24   could no longer "officially" be involved in our

25   organization.  And you said WAMY there?
```

This Transcript Contains Confidential Material

```
 1        A.    Yes.

 2        Q.    You didn't say "our organization"; right?

 3             MR. HAEFELE:  Form.

 4        A.    I understood and believe that Batterjee

 5   was carrying out work on behalf of WAMY and LBI at

 6   the same time.  And the record shows --

 7        Q.    (BY MR. MOHAMMEDI)  Which record are you

 8   referring to?

 9        A.    The record from the financial documents

10   that I looked at from the Batterjee deposition --

11   pardon me, I misspoke.  From the Noor Wali

12   deposition, for starters.  That WAMY was funding the

13   activities of LBI in Pakistan-Afghanistan, at the

14   time.  So I believed he was acting in both

15   capacities at that time in that location.

16        Q.    That's your belief; correct?

17        A.    Yes.

18        Q.    If I represent to you that the

19   document -- the documentary evidence in this case

20   shows that LBI/BIF as separate organization, do you

21   still rely on the government statement that does not

22   provide evidence on this matter?

23             MR. HAEFELE:  Objection to form and

24        foundation.  Misstates the evidence.

25        Q.    (BY MR. MOHAMMEDI)  Do you believe that a
```

This Transcript Contains Confidential Material

```
 1   government employee is always right?
 2              MR. HAEFELE:  Objection to form.
 3       A.    I'm sorry, I couldn't understand what you
 4   just said.  Please repeat it.
 5       Q.    (BY MR. MOHAMMEDI)  Do you believe a
 6   government employee is always right?
 7       A.    No.
 8       Q.    And if the documentary evidence in a case
 9   that proves the opposite of that government
10   employee, will you consider that?
11              MR. HAEFELE:  Objection, form,
12        foundation, misstates the evidence.
13       A.    I try to consider everything.  In the
14   case of Arnaout and LBI and BIF, and WAMY, you have
15   a very complicated environment in which Arnaout and
16   Batterjee are meeting with key people who are part
17   of al-Qaeda early on, in which WAMY provides early
18   support to LBI, which is simultaneously Saudi and
19   Pakistani.  LBI at some -- at some point Batterjee
20   creates another benevolence, similarly named.  So a
21   person who previously met with Bin Laden becomes
22   head of the U.S. organization.
23              So sorting all of that out in a way that
24   is transparent, clean, and linear is not possible
25   because it's all concatenation.  It has to be looked
```

This Transcript Contains Confidential Material

```
 1    at together.  And that's how I understand the

 2    situation.

 3         Q.    (BY MR. MOHAMMEDI)  Isn't it a fact that

 4    because you are making a statement that BIF and LBI

 5    are intertwined and you mentioned that many times,

 6    interchangeable, based on a proffer; right?

 7    That's --

 8         A.    No.

 9         Q.    Okay.  So let me ask you a question.

10    Another question.

11              It's not based on a proffer you say;

12    correct?

13         A.    It's based on all the information

14    available to me.

15         Q.    Okay.  Okay.  So let's go through some of

16    the documents to show you.

17              If you put in Exhibit 26, which is --

18    just remind me where we are.

19              TRIAL TECHNICIAN:  914, I have.

20              (Winer Deposition Exhibit 914,

21              Minutes of the Seventh Meeting of the

22              Benevolence Committee's Supervisory

23              Council, was marked for

24              identification.)

25         Q.    (BY MR. MOHAMMEDI)  This is an Arabic
```

This Transcript Contains Confidential Material

```
 1   document, translated in English, which is -- which

 2   is document that have been produced in this case.

 3   Minutes of the Seventh Annual Meeting of LBI

 4   Supervisory Council on July 8, 1993.

 5           If you go to the -- I know you don't

 6   speak Arabic, Mr. Winer, but there is an English

 7   translation.  Can you go down to the English

 8   translation?  Or go up.  I'm not sure where.  It's

 9   either first.

10           Are we there?

11       A.   Yes.

12       Q.   No, not to you, Mr. Winer, I'm talking to

13   the tech.

14           TRIAL TECHNICIAN:  Is it not showing

15      on your screen?

16           MR. MOHAMMEDI:  It's not, no.

17           Oh, it's there.

18       Q.   (BY MR. MOHAMMEDI)  This meeting refers

19   to the council approval of Dr. Hassan Bahifz Allah

20   wanting to replace Adel Batterjee after being

21   dismissed for an extension of six months beginning

22   on August 1, 1993.  Do you see that?

23       A.   No.

24       Q.   Okay.  So can you go to the section --

25   that's it.
```

This Transcript Contains Confidential Material

```
 1              Okay.  Are you ready?  Let me know when
 2  you're ready.
 3       A.    I've read the material that you've
 4  provided me, in front of me in yellow.
 5       Q.    Yes, the yellow pages.
 6              It is fair to say Batterjee's dismissal
 7  was in February 1993 if it was an extension of six
 8  months for the person who replaced him starting
 9  August 1993; correct?
10       A.    I don't see those dates here.
11              TRIAL TECHNICIAN:  Mr. Mohammedi, if
12       you could just direct me to what section.
13              MR. MOHAMMEDI:  Yeah, I'm going to.
14              Go to page 9.
15              This one here.
16              THE WITNESS:  So is executive
17       director the title Batterjee had rather than
18       chair?
19       Q.    (BY MR. MOHAMMEDI)  Correct.
20       A.    Then I'm corrected, it's executive
21  director rather than chair.  I accept that
22  correction, if that's what the records show.
23       Q.    And then also, that Mr. Batterjee was
24  dismissed, was gone in February 1993.
25       A.    Sir, where does it say that, please?
```

This Transcript Contains Confidential Material

```
 1        Q.    It says extending the one date of
 2   Dr. Hassan Bahifz Allah, and that's No. 1 of the
 3   second No. 1.
 4        A.    I see that.
 5        Q.    Okay.  And the documents before talks --
 6   I mean, the same document talks about his -- the
 7   issue with the -- with the -- with Adel Batterjee,
 8   but here the extension of this extended the mandate
 9   of Hassan Bahifz Allah for an additional six months
10   that was following the dismissal of Mr. Batterjee.
11        A.    Where does it say that --
12        Q.    So we're going to show you -- if you
13   go -- if you go to page 7.
14              Make it a little bigger.
15        A.    It says:  The executive director briefly
16   spoke in his report of the latest updates regarding
17   the handover from the former director.  I don't see
18   the word "dismissal."  I see "handover."  And then I
19   see a reference to tension and a promise was made to
20   quickly and directly intervene to ease such tension.
21              What is the date of the document, sir,
22   please?
23        Q.    It's a meeting discussing the new
24   executive director that was an extension after six
25   months, which means Batterjee was not the executive
```

This Transcript Contains Confidential Material

```
 1   director starting February 1993; correct?

 2                  MR. HAEFELE:  Objection, form.

 3        A.    It does -- it actually doesn't say that.

 4   It refers to a handover from the former director.

 5   And refers to an attempt to ease the tension, which

 6   suggests there are still actions to be taken.  So I

 7   can't assess from this when he was dismissed.

 8        Q.   (BY MR. MOHAMMEDI)  But you can assess

 9   that he was not with LBI as of February 1993,

10   correct?

11                  MR. HAEFELE:  Objection, form.

12        A.    No, I cannot.

13        Q.   (BY MR. MOHAMMEDI)  You cannot?

14        A.    I can't tell what date he left, based on

15   this.

16        Q.    If you --

17        A.    If I may continue.  It looks to me from

18   this document that at some point in this period, a

19   new executive director took over from the old

20   executive director.  It doesn't say that the old

21   executive director was dismissed.  It does say that

22   there was tension and action going -- needed -- that

23   needed to take place to ease the tension.

24                  So the dates -- the basic idea that he

25   was leaving the position seems to me the most
```

This Transcript Contains Confidential Material

```
 1    plausible interpretation of this.  The statement
 2    that he's dismissed does not -- is not set forth in
 3    this document.
 4         Q.   Okay.  I think we -- you know, I guess we
 5    will go through the documents.
 6              If we can have Exhibits 23.
 7                   (Winer Deposition Exhibit 915,
 8                   2-23-1993 letter to Adel Batterjee,
 9                   was marked for identification.)
10         Q.   (BY MR. MOHAMMEDI)  Which is dated
11    February 23, 1993.
12              That is the English version, which is
13    FED-PEC0114419, the Arabic document.
14              And then there is a translation.
15              If you can just make that bigger.
16              Can you read it for -- I mean, you can
17    read it to yourself if you want to.
18         A.   Yes, this is consistent with Mr. Noor
19    Wali's deposition.
20         Q.   And you do not have any reason to dispute
21    this accurate -- the accuracy of this document,
22    right?
23         A.   No, I do not.  I believe this is likely
24    to be accurate.  I have no reason not to think it
25    accurate.
```

This Transcript Contains Confidential Material

```
1         Q.    Okay.  I'm also going to include to have

2   an exhibit, which is 25, ours.  Where are we?  Which

3   number are we at?

4                    (Winer Deposition Exhibit 916,

5                    5-11-1993 letter to Salman bin

6                    Abdulaziz, was marked for

7                    identification.)

8         Q.   (BY MR. MOHAMMEDI)  This is a letter from

9   Dr. Al-Juhani, who was the head of Muslim -- the

10  World Assembly of Muslim Youth.

11        A.    Yes.

12        Q.    Have you seen this document before?  You

13  can show the English version of it.

14        A.    Yes.  Thank you.

15        Q.    And it's dated May 11, 1993; correct?

16        A.    Yes, that's the date of it, if you'll

17  give me a minute, please.

18        Q.    Have you seen this document before?

19        A.    I need to read it to remember whether

20  I've seen it before or not.

21        Q.    Sure.  Just the highlighted sections.

22        A.    Yeah, I've not read this document before.

23        Q.    Do you have any reason to question the --

24  this document?

25        A.    No.
```

This Transcript Contains Confidential Material

```
1        Q.    It's a primary source; correct?

2        A.    Yes.

3        Q.    And it's dated May 11, 1993; correct?

4        A.    Yes.

5              MR. MOHAMMEDI:  Can we get

6        Exhibit 27?

7                   (Winer Deposition Exhibit 917,

8                    6-14-1996 Minutes of Islamic

9                    Benevolence Committee dissolution and

10                   merging with World Assembly of Muslim

11                   Youth, was marked for

12                   identification.)

13       Q.    (BY MR. MOHAMMEDI)  As of May 28, 1996,

14   LBI merged with WAMY; correct?

15       A.    Yes.  I am familiar with this.

16       Q.    You are familiar with this one, right?

17              MR. HAEFELE:  Omar, just so we're

18        keeping consistent with the markings here,

19        this is already Noor Wali Exhibit 267, I

20        think.

21              MR. MOHAMMEDI:  Okay, yeah.  That's

22        fine.  Yes.  Thank you, Robert.

23       A.    I do not remember whether I saw this

24   document or not.  I think I did, but I'm not

25   positive, but I'm certainly familiar with the action
```

This Transcript Contains Confidential Material

```
 1   and the date and the substance of it.
 2       Q.    (BY MR. MOHAMMEDI)  And the exhibit -- so
 3   let's get Exhibit 28.  If we could go to the
 4   select -- the highlighted sections, this is WAMY
 5   committee meeting minutes, discussing the
 6   dissolution of LBI.  This is the highlight sections
 7   in the recommendation.
 8            Can you make that bigger for us, please?
 9            And this is -- this is dated May 28,
10   1996.
11            Is it fair to say that this was more than
12   three years since Adel Batterjee left LBI?
13       A.    Based on the documents you've provided
14   me, which I have no doubt -- reason to doubt are
15   authentic and the date you've just represented to
16   me, it's a matter of calendar, three years later.
17   But I don't see a date on this document.
18            Based on your representation, that would
19   be three years, yes.
20       Q.    Have you reviewed the dissolution
21   documents?
22       A.    The dissolution documents of the LBI?
23       Q.    Correct, I'm sorry, the LBI, right.
24   Yeah.  Sorry about that.
25       A.    I don't remember what I reviewed in
```

This Transcript Contains Confidential Material

```
 1   relationship to its merger into WAMY.

 2        Q.    Okay.

 3        A.    I knew that that happened, and consistent

 4   with the timing that you have provided me.

 5        Q.    Are you aware of all asset of LBI, what

 6   happened to them after the dissolution?

 7        A.    No.

 8               MR. MOHAMMEDI:  Can we get

 9          Exhibit 29?

10               (Winer Deposition Exhibit 918,

11               8-18-1997 letter to Your Eminence the

12               Secretary General of the World

13               Assembly of Islamic Youth, was marked

14               for identification.)

15               (Discussion off the record.)

16               MR. MOHAMMEDI:  Can we go to the

17          English translation?

18               Sorry, I'm just having a hard time

19          seeing the whole document.

20        Q.    (BY MR. MOHAMMEDI)  The dates -- can you

21   repeat the dates for us, Mr. Winer, of this

22   document?

23        A.    Sure.  The English language dates are

24   August 18, 1997, is the date at the top.  And then

25   it refers to some other documents in 1997 and 1996.
```

This Transcript Contains Confidential Material

```
 1        Q.    And this letter is from the Kingdom of
 2   Saudi Arabia, Ministry of Islamic Affairs, Da'wah
 3   guidance to Eminence Secretary General of the World
 4   Assembly of Islamic Youth; correct?
 5        A.    I can't see who it's to.
 6        Q.    Okay.  So do you know who is the
 7   secretary -- who was the secretary at that time of
 8   where that --
 9        A.    I can see -- I can see that it's from the
10   Minister of Islamic Affairs, and it looked like it's
11   to the secretary general of WAMY.
12        Q.    Correct.  Yes.
13        A.    So now that it's smaller, I can see the
14   two in the front, which I couldn't before.
15        Q.    And it refers to dissolution and it does
16   reference to sending the money to the Kingdom to be
17   put there as in terms of escrow, and they return
18   that money to WAMY when the merger and dissolution
19   of LBI occurred; correct?
20        A.    Yes, that's what it says.
21              MR. MOHAMMEDI:  We can put this down
22         and just continue.
23        Q.    (BY MR. MOHAMMEDI)  If you go to
24   paragraph -- I guess Section 3 -- yeah,
25   paragraph 3.30.3 of your rebuttal report, which is
```

This Transcript Contains Confidential Material

1    page 52.

2            Do you have that?  So you refer to the

3    treasury designation regarding -- you refer to

4    treasury designation regarding this Lajnat al-Birr;

5    correct?

6        A.    Yes.

7        Q.    Is this a designation or this is the

8    release?  The press release?

9        A.    This is the...

10       Q.    You're referring to the press release;

11   correct?

12       A.    I don't recollect.  It could be the

13   release explaining it.

14       Q.    But you're not referring to the

15   designation itself; correct?

16       A.    This is the information the treasury

17   department put out at the time.  It looks to me like

18   it would probably be the release, but I'm not

19   positive.

20       Q.    Okay.

21       A.    There's certainly treasury language.

22       Q.    If you'd go to Section 7.7.3.1, 7.7 --

23   7.3.1.  Of your affirmative at page 46 -- 47, I'm

24   sorry.

25            You state that:  Benevolence

This Transcript Contains Confidential Material

```
 1   International was founded in 1987 and alleged in a
 2   federal indictment to have supported al-Qaeda for
 3   more than a decade, as the successor to the Saudi
 4   charity LBI, which then merged into WAMY.
 5           Correct?
 6      A.   That's what it says.  That's right.
 7      Q.   Then you reference to Benevolence
 8   International, headquarters in Sarajevo.  Were you
 9   aware that any documents found in that raid that
10   was -- you cannot -- you cannot claim that there
11   were LBI documents in that raid; correct?
12           MR. HAEFELE:  Objection, form.
13      Q.   (BY MR. MOHAMMEDI)  Sorry, that was
14   poorly phrased.  Let me go back.
15           In your testimony, you mentioned in your
16   report, you refer to raids by Benevolent
17   International headquarters in Sarajevo; correct?
18      A.   That's correct.
19      Q.   Are you aware of any documents found in
20   that raid that was LBI document?
21      A.   The documents refer -- my -- my memory
22   and understanding of this is that the documents
23   refer to Batterjee and Benevolence, but I don't
24   recollect whether it was to LBI, BIF, related to
25   benevolence activities in Sarajevo.  That's my
```

This Transcript Contains Confidential Material

1    memory.  That's what I wrote, and that's what I

2    believe to be happening.

3            If you have other information to add to

4    that, I'm certainly happy to look at it.  The word

5    as I mentioned al-Barr, A-L-B-A-R-R is benevolence.

6    That's the name of both entities, as was referenced

7    in the documents you showed me earlier about the

8    possibility for confusion.

9       Q.   So is it fair to say that one is called

10   Islamic Benevolent Committee, and the other is

11   Benevolent International, based on the documents I

12   showed you?

13      A.   Yeah, the word "benevolence" is in both.

14      Q.   Okay.  What is your basis that BIF was

15   founded in 1987?

16      A.   I believe the reference should be LBI.

17      Q.   Okay.

18      A.   I believe I corrected it, or if I didn't

19   correct it, I certainly intended to.

20      Q.   Is an indictment evidence?

21      A.   An indictment lays out the U.S. -- lays

22   out a case being brought by the indicting -- by the

23   prosecutors.  It's typically -- now, it's a --

24   always in the case of the U.S. government case,

25   based on some evidence.  The amount of evidence is

This Transcript Contains Confidential Material

1    going to vary depending on the case.  In my

2    experience, U.S. prosecutors do not bring cases

3    without evidence.

4         Q.    But it will have to be decided by the

5    Courts; right?

6         A.    It would be ultimately the -- what goes

7    into the case and doesn't go into the case is

8    decided by a judge.  And I think -- if it's a jury

9    trial, the weighing of the evidence is done by the

10   jury.  In some cases, a judicial ruling may limit --

11   it's quite common -- the information that's going to

12   be available to a jury.

13        Q.    And that's the beauty of our system,

14   separation of power; right?

15              Adjudicate cases before the judge to make

16   a decision; correct?

17        A.    There are separate roles for the judge,

18   the jury, the prosecutor, or the investigators, the

19   witnesses.  They all have separate roles.  All of

20   them are relevant.

21        Q.    Okay.  In your footnote 66, bears

22   page 47, you cite to -- you do cite to October 9,

23   2002 press release of indictment of Arnaout;

24   correct?

25        A.    Yes.

```
 1      Q.    Let's go back to 77 point -- 7.7.3.1.

 2            And we're going to discuss the proffer.

 3  And I know you mentioned it before, but let's go

 4  through that.

 5            In your reliance, do you have a proffer

 6  as a basis for analysis in forming your opinion?

 7      A.    It's one of the materials I considered,

 8  yes.

 9      Q.    Are you aware of how the federal report

10  would on direct motion supported by Santiago

11  proffer?

12      A.    Yes, I am.

13      Q.    Let me get Exhibit 34.

14            (Winer Deposition Exhibit 919, United

15            States v. Enaam M. Arnaout Memorandum

16            Opinion and Order, was marked for

17            identification.)

18      Q.    (BY MR. MOHAMMEDI)  And you go to order

19  page number 3.  And that's the Court order.

20            And if you can get the citation up there,

21  if you can go.

22            United States District Court, Northern

23  District of Illinois.

24            Have you seen this document?

25      A.    Yes.
```

This Transcript Contains Confidential Material

```
1      Q.    If you go to page 3.  And it's
2  highlighted.
3            You reviewed this document; correct?
4  Before you rendered your opinion?
5      A.    Yes.
6      Q.    Why do you rely on rejected proffer?
7      A.    Because the basis for the rejection is
8  based on the hearsay rules that were applicable for
9  a criminal case as found by a particular judge,
10 which prevented, as I understand the case,
11 additional sufficient evidence from the judge's
12 point of view to have co-conspirators.  And so the
13 exclusion --
14     Q.    And --
15     A.    Please allow me to finish.
16     Q.    Sorry, sorry.  Go ahead.  I thought you
17 finished.
18     A.    I was not finished.
19     Q.    No, sorry.  Go ahead.
20     A.    Thank you.
21           So as I understand the case, the judge's
22 ruling in relationship to the issue of hearsay
23 prevented information coming in regarding the other
24 co-conspirators, which thus caused an elimination
25 for a substantial portion of the case.
```

This Transcript Contains Confidential Material

```
1                In the reporting on the case, the
2      investigators, perhaps the prosecutors, I can't
3      remember -- it was someone from the Department of
4      Justice -- commented about how frustrated they were
5      by the ruling and how much they wanted -- actually,
6      that's not correct.  I'm going to stop right there.
7      Let me just correct that statement to say later on
8      when the case was settled, there were some people
9      who -- in the justice department who expressed a
10     view they wanted it to go to trial anyway because
11     they had a fair amount of additional information,
12     evidence that they wanted to have in front of the
13     Court.
14          Q.   So is your opinion that you will take --
15     you take -- you will use a proffer as a better
16     source for you to render your opinion than a
17     judgment and a decision; correct?
18          A.   That's not what I just stated.
19          Q.   Okay.  Do you use the judge's decision as
20     a primary source for you to make a decision in your
21     opinion?
22          A.   It is -- it is a primary source on what
23     decision she made regarding that criminal case for
24     the reasons she articulated as a legal matter in
25     terms of legal doctrine having to do with hearsay,
```

This Transcript Contains Confidential Material

```
 1    the hearsay rules and the introduction of evidence
 2    in that case.
 3        Q.    Can you read the last -- I mean, it
 4    says -- when it says:  Given the insufficiency of
 5    the Santiago proffer, the Court cannot find by a
 6    preponderance of the evidence -- right -- that the
 7    proffer -- that -- I can't see it.  Unfortunately I
 8    have this.
 9              You read the statement, right?  So the
10    Court finds insufficient evidence in Santiago
11    proffer; correct?
12        A.    Let me read the sentence and then I will
13    provide you my assessment of it.
14              Given the insufficiency of the Santiago
15    proffer, the Court cannot find by a preponderance of
16    the evidence that the proffered statements -- that
17    would be proffered statements -- that the proffered
18    statements are admissible under the co-conspirator
19    exception to the hearsay rule before trial.
20              So this is a reference to proffered
21    statements by co-conspirators.  It's not about the
22    prosecutor's statement, it's about the proffered
23    statements about what the co-conspirators said, is
24    how I read that sentence.
25        Q.    And the Santiago proffer --
```

This Transcript Contains Confidential Material

```
 1        A.    That is a reference to particular
 2   evidence that was put before the Court at that time
 3   in that court for that purpose in a criminal case,
 4   which is a different standard from a civil case.
 5   And that's what I read that sentence to say.
 6        Q.    The sentence says by preponderance of
 7   evidence.  Isn't that what it says?
 8        A.    For the purpose of her ruling -- for
 9   admissibility under the co-conspirator exception to
10   the hearsay rule before trial.  I think it applies
11   to that narrow legal issue.  I can't say what the
12   implications of it might be beyond the narrow ruling
13   by which the judge made her ruling.
14        Q.    Okay.  I guess we can go through some
15   other exhibits for us to clarify that matter.
16              I would say, if you can get Exhibit 35.
17                   (Winer Deposition Exhibit 920, UAA v
18                   Arnaout Defendant's Sentencing
19                   Memorandum, was marked for
20                   identification.)
21        Q.    (BY MR. MOHAMMEDI)  You continued to rely
22   on the proffer as a basis for your opinion that
23   Batterjee activity at LBI were precursors to BIF,
24   and that was -- that is Section 12.8, page 90;
25   correct?
```

This Transcript Contains Confidential Material

```
 1        A.    I don't see anything on the page you just

 2   referred me to, related to that issue.

 3        Q.    That's rebuttal.  I'm sorry.

 4        A.    Which paragraph?

 5        Q.    Rebuttal page --

 6              So it was rebuttal 2.38.10, I'm sorry

 7   page 32.

 8              But it was also referred to at 12.20.

 9        A.    Yes, that refers to the period prior to

10   the separation of Batterjee from LBI.  It refers to

11   the period in or about 1991.

12        Q.    Okay.  Now, also, based on your rebuttal

13   3.26-3.31, you cite various findings from the

14   prosecutor; correct?  In the Arnaout case.

15        A.    I'm sorry, I'm completely lost as to what

16   you're directing me to at the moment, sir.

17        Q.    I'm sorry.  I'm directing you to rebuttal

18   3.26-3.31.

19              MR. HAEFELE:  Give us the page

20         number, Omar.

21              MR. MOHAMMEDI:  Page No. 53 dash --

22         51-53.

23              MR. HAEFELE:  Thank you.

24        A.    This is the treasury tax that we're

25   talking about.
```

This Transcript Contains Confidential Material

```
 1        Q.    (BY MR. MOHAMMEDI)  Let me see.  50 --
 2   that's right.
 3        A.    Which paragraph?
 4        Q.    You are referring to U.S. versus Arnaout.
 5   When you're making statement, you're referring to
 6   the proffer; correct?  The prosecution documents.
 7        A.    I'm still lost as to what you're
 8   referring to.  What page?
 9        Q.    Let me direct you.  U.S. versus Arnaout.
10   This is the page 32.
11             If you go to page 32, and it is 2.38.10.
12             And when you making the statement, your
13   referring to the government evidentiary proffer
14   supporting the admissibility of co-conspirator
15   statement; correct?  And that's per footnote No.
16   45?
17        A.    I'm sorry, I'm still lost, sir, as to
18   what you're --
19        Q.    If you go to your rebuttal page 32.
20        A.    Yes.
21        Q.    And go to 2.38.10.  And then when you're
22   referring to --
23        A.    Yes.  Yes.  Footnote 45 refers to the
24   government evidentiary proffer.  That is correct.
25        Q.    You were referring to that.
```

This Transcript Contains Confidential Material

```
 1              Have you considered any other documents
 2   in the filing in that case?
 3       A.    I've considered whatever documents are in
 4   my reliance materials.  At this moment, I don't
 5   remember what I considered and did not over the
 6   course of all of this work.  I can't tell you every
 7   document is there.  I can say that I also considered
 8   the statements about Batterjee made by the U.S.
 9   government before, during, and after this matter,
10   and about what he did.  And what Arnaout did.  And
11   that's in my rebuttal statement laid out in a fairly
12   systematic fashion.
13       Q.    Okay.  If you go to Exhibit 35.  And now
14   it's sentencing memo.  We have it in front of us --
15   I meant, sorry, exhibit -- what is the exhibit we're
16   at right now?  920.
17              If you scroll down to page 4, this is --
18   this is a memo filed by Arnaout's lawyer in the
19   case.  Arnaout's lawyer in the case.  And if you go
20   to page 4, it says that Mr. Arnaout's organization,
21   BIF-USA, no affiliation to LBI.
22              Do you see that?
23       A.    Yes.
24       Q.    Let's go to the next exhibit we have for
25   you, Exhibit 36.
```

This Transcript Contains Confidential Material

```
 1                    (Winer Deposition Exhibit 921, USA v.

 2                    Arnaout Plea Agreement, was marked

 3                    for identification.)

 4        Q.    (BY MR. MOHAMMEDI)   If you go to page 2

 5   to 4 in that, it's a plea agreement.

 6             The question, do you know that burden of

 7   proof for sentencing enhancement under United States

 8   sentencing guidelines is preponderance of evidence?

 9   It's not beyond reasonable doubt?

10        A.    I haven't thought about the issue of what

11   the standard is for enhancements.

12        Q.    So government claim BIF are now subject

13   to terrorism enhancement under the guidelines.

14             Even with all the evidence at the

15   government's disposal with respect to BIF and

16   Arnaout, what the Court found government could not

17   meet the burden.

18        A.    I'm sorry, where are you reading from,

19   sir?

20        Q.    This is not --

21             Can you hold on a second, please?

22             Yeah.  Yes, can we put the Exhibit 37 --

23   sorry about that.

24                    (Winer Deposition Exhibit 922, U.S.

25                    v. Arnaout 282 F.Supp.2d 838 (2003),
```

This Transcript Contains Confidential Material

```
 1                 was marked for identification.)

 2      Q.    (BY MR. MOHAMMEDI)  Sir, the government

 3   claim BIF are now subject to terrorism enhancement

 4   under the guidelines.  But the Court, if you go

 5   to -- let's see, what page do we have.  This

 6   highlight I'm trying to find out.  838.

 7                 If you go down when you see the

 8   highlighted section.

 9                 So the application here, it says, if you

10   see that:  Arnaout does not stand convicted of a

11   terrorism offense, and goes on.  Do you want to read

12   that for us, Mr. Winer?

13      A.    I read it.

14      Q.    You read it?  Do you agree with that?

15                 MR. HAEFELE:  Objection to form.

16      A.    The terrorist charges were dropped as

17   part of the plea agreement.  That's accurate.

18      Q.    (BY MR. MOHAMMEDI)  And is it because the

19   government could not meet its burden; correct?

20                 MR. HAEFELE:  Objection to the form.

21      A.    My understanding of the case as laid out

22   in my report and my rebuttal report, is that the

23   judge's decision on the admissibility of statements

24   by co-conspirators impaired the government's case,

25   and thus the government was not going to be able to
```

This Transcript Contains Confidential Material

```
1    put into the record what it wanted to be able to put
2    into the record, and therefore it agreed to the plea
3    agreement, as did the defendant.
4         Q.   (BY MR. MOHAMMEDI)  Can you go to page 6
5    of the document?
6              Can you read this to us?
7         A.   Yes, I'm aware of this.  I've read this
8    at some point.
9         Q.   And do you agree with that statement?
10        A.   I agree with the statement based on --
11             MR. HAEFELE:  Objection to form --
12        A.   -- the information --
13             I agree with the statement based on the
14   consequences of the decision that was made to
15   eliminate the particular evidence that the
16   government was going to be relying on.
17        Q.   (BY MR. MOHAMMEDI)  Do you believe in the
18   judge's decisions?
19        A.   The judge's decisions are a legal fact.
20        Q.   They are legal facts, right?  And they
21   are better than proffer, aren't they?  They are
22   something you should be relying on rather than the
23   proffer; correct?
24        A.   Yes, but you have to distinguish between
25   a criminal case and a civil case, which are not the
```

This Transcript Contains Confidential Material

1    same thing.  And not every judicial ruling is a

2    ruling that's going to be correct.  Judges, in fact,

3    get overruled from time to time.  That's part of the

4    process.  In this particular case, no one appealed.

5    Neither the defendant nor the government appealed.

6    The government complained afterwards and reaffirmed

7    its belief that the defendants had committed more

8    serious offenses, but that's neither here nor there.

9    The decision is a fact, and it's legally accurate.

10   This was the decision that was reached.

11        Q.   And you said there were no more --

12             If you can just put Exhibit 38, which is

13   a Seventh Circuit decision, which is the document

14   affirming the district court ruling.

15                  (Winer Deposition Exhibit 923, U.S.

16                  v. Arnaout 431 F.3d 994 (2005), was

17                  marked for identification.)

18        A.   So was there appeal here?

19        Q.   (BY MR. MOHAMMEDI)  Look at the -- look

20   at the exhibit where it says --

21        A.   The United States did in fact appeal.  I

22   had forgotten.  Thank you for correcting me.

23        Q.   Thank you.

24             So you were not aware of this, correct?

25        A.   I had forgotten --

This Transcript Contains Confidential Material

```
 1      Q.    Of this decision, the Seventh Circuit

 2  decision?

 3      A.    I was aware of it.  I had forgotten.  It

 4  says that:  The District Court did not commit clear

 5  error in refusing to apply the --

 6      Q.    Let's go to Section 3A1.4.

 7            And there are highlights, if you go down.

 8            Can you go down, just for us to see?

 9            TRIAL TECHNICIAN:  What page is it

10      on?

11            MR. MOHAMMEDI:  Let me see.  It's

12        highlighted.  So you will find it.

13            Page 8.

14      Q.    (BY MR. MOHAMMEDI)  And the Court found

15  that:  The district court did not [sic] find that

16  the record did not establish by a preponderance of

17  the evidence that Arnaout attempted, participated

18  in, or conspired to commit any act of terrorism.

19  The district court also found that the government

20  had not established that the Bosnian and Chechen

21  recipients of BIF aid were engaged in a federal

22  crime of terrorism, or that Arnaout intended the

23  donated boots, uniforms, blankets, tents, x-ray

24  machine, ambulances, nylon or walkie-talkies to be

25  used to promote a federal crime of terrorism.
```

This Transcript Contains Confidential Material

```
 1            We find all of the district court's
 2   findings on this issue consistent with the record
 3   not clearly erroneous -- not clearly erroneous, and
 4   sufficient to support the District Court's refusal
 5   to apply Section 3A 1.4.
 6            Do you view that statement?
 7       A.   Yes, but I would like to see the previous
 8   sentence, if I may, since this is only part of the
 9   paragraph that's in yellow.  Thank you.  Let me read
10   the entire paragraph.
11            You left out a critical sentence:  We now
12   know that the district court should have considered
13   whether Arnaout's offense or relevant conduct
14   promoted a federal crime of terrorism.
15            This error notwithstanding, the district
16   did not find that the record -- did find -- pardon
17   me, the district court did find the record did not
18   establish by a preponderance of the evidence, that
19   he attempted, participated, and conspired to commit
20   any act of terrorism.  And then it goes on, and
21   that's why they refused to -- that's why she refused
22   to apply the enhancement.  And the appeals court
23   applied the standard of not overruling because it's
24   not clearly erroneous.  That's the full paragraph.
25       Q.   And this is because of the fact they did
```

This Transcript Contains Confidential Material

1    not support such a terrorism finance or terrorism

2    support; correct?

3              MR. HAEFELE:  Objection to form.

4         A.   I don't know what the full record was,

5    that the appeals -- that went before the appeals

6    court in this case, so I have no further comments to

7    offer other than that this finding, the appellate

8    court finding is a fact, as is the district court

9    finding.

10        Q.   (BY MR. MOHAMMEDI)  And it is fair to say

11   you did not consider this one when you rendered your

12   opinion; correct?

13             You did not consider the seventh circuit

14   and the district court when you're rendering your

15   opinion --

16        A.   I did consider the district court ruling.

17        Q.   You considered the sentencing, not --

18        A.   I don't -- I don't recollect whether I

19   did or didn't.  I just don't remember.

20             I certainly did not consider the

21   appellate one, because I had very little memory

22   of this, a trace, that there was one, which is why I

23   was inaccurate in my first statement about it.

24             I didn't consider the appellate one.  I

25   did consider the district court decision, and I

This Transcript Contains Confidential Material

1    don't recollect on the enhancement.

2        Q.    Okay.

3             Now, if we go back to the terrorism

4    finance staff monograph, I think we entered that as

5    Exhibit 12, I believe.  Sorry, exhibit -- what's

6    that exhibit you enter, the monograph?  909.

7             And if you go to page 11, which is PDF

8    page 114.  I'm sorry, page 111, PDF page 114.

9             And it says:  Despite these troubling

10   links, the investigation of BIF revealed little

11   compelling evidence that BIF actually provided

12   financial support of al-Qaeda, at least after

13   al-Qaeda was designated a foreign terrorist

14   organization in 1999.  Indeed, despite unprecedented

15   access to the U.S. and foreign records of these

16   organizations, one of the most experienced and best

17   terrorist prosecutors has not been able to resolve

18   the investigation of BIF without conviction for

19   support of terrorism, although the OFAC action --

20   not -- shut down BIF, that victory came at the

21   considerable cost of negative public opinion in the

22   Muslim and Arab communities, who contend that the

23   government's destruction of these charities reflects

24   bias and injustice with no measurable gain to

25   national security.

This Transcript Contains Confidential Material

```
1                    MR. HAEFELE:  Objection to form.

2                    Is there a question?

3         Q.    (BY MR. MOHAMMEDI)  Do you -- have you

4    considered this?

5                    MR. HAEFELE:  Objection to form.

6         A.    Yes, I read the terrorist financing staff

7    monograph.  And these cases, complex financial crime

8    cases from all counts.

9         Q.    (BY MR. MOHAMMEDI)  Did you --

10        A.    Please allow me to respond.

11             Complex financial crime cases, I've seen

12   repeatedly, run into problems even when it was clear

13   to me, in connection with such cases, that there was

14   serious criminal activity.  I've seen this

15   repeatedly.  They are hard cases to make, because

16   the actions that relate to complex international

17   crime cases, which include terrorist finance cases,

18   can take place over a long time.  They can involve

19   people who aren't available for testimony in the

20   United States.  The source is going to be a

21   mixture -- can involve intelligence sources which

22   can't be readily converted into physical evidence.

23   So they are hard case to make.

24             In this case, there is a reference here

25   to at least after al-Qaeda was designated a foreign
```

```
 1   terrorist organization in 1999.  One of the issues
 2   in the BIF case, as I understand it, was in the time
 3   period that the -- that was relating to the proofs.
 4   Some of the activity that the government alleged was
 5   from older activity.
 6              So all of those, that has to be taken
 7   into consideration, as one thinks about this
 8   paragraph.
 9              Finally, from the question of negative
10   public opinion, in any community, contend that
11   destruction of the charity reflects bias and
12   injustice, with no measurable gain to national
13   security.  I don't, as an expert, view the public
14   opinion in a particular community, whether it's
15   Muslim, Christian, or Jewish, Arab or Hispanic or
16   Latin, or any other group, to be a determining
17   factor of whether one should bring a case if a
18   prosecutor believes that they have a criminal case
19   to make.
20              And so I note here that the terrorist
21   financing staff monograph doesn't say that it
22   should, it simply said that these communities
23   contended this.
24              And so that's how I thought about this
25   paragraph when I read it, and that's how I think
```

This Transcript Contains Confidential Material

1    about it now.

2       Q.   (BY MR. MOHAMMEDI)  So your opinion, all

3    the exhibit they enter here into evidence for you to

4    look at, you don't think there were, you know, you

5    have a better understanding of all of these findings

6    than those exhibits that we entered into evidence

7    today that you did not consider them also in your

8    report; correct?

9               MR. HAEFELE:  Objection to form.

10      A.   That's a misstatement of my testimony.

11      Q.   (BY MR. MOHAMMEDI)  Okay.  That is -- I'm

12   not saying this is your statement, and actually I'm

13   asking the question, and that's fine.

14      A.   What is your question, please?

15      Q.   The question, you are -- all the exhibits

16   that we entered now into evidence for you to

17   evaluate, right?  Which you missed most of the time

18   in your reports, those evidence are not enough for

19   you to conclude -- right? -- what you have not

20   concluded before in your report by not considering

21   this information -- those information; correct?

22               MR. HAEFELE:  Objection to form.

23      Q.   (BY MR. MOHAMMEDI)  You still stood by

24   your opinion, what you wrote in your report;

25   correct?

1    A.    I stand by what I wrote on BIF and LBI in

2    my rebuttal report, which corrected some things in

3    the first report due to the complication of dealing

4    with the board benevolence, which is used in the

5    name of both of them.

6          I do not agree with the statements you

7    made that I ignored a bunch of stuff.  Your

8    particular formulation that makes a number of

9    assumptions about the basis for my opinion that I

10   don't agree with.

11          MR. MOHAMMEDI:  Maybe is good time to

12      take a break.

13          THE VIDEOGRAPHER:  We are going off

14      the record.  The time is 5:24 p.m.

15          (Recess taken, 5:24 p.m. to

16          5:45 p.m. EDT)

17          THE VIDEOGRAPHER:  We are back on the

18      record at 5:45 p.m.

19   Q.    (BY MR. MOHAMMEDI)  Mr. Winer, in

20   Section 7.4.7 in your affirmative report at page 44,

21   you cite to Alms for Jihad; correct?

22   A.    Yes.

23   Q.    Do you know that that publication was

24   withdrawn?

25   A.    I do.  It was a SLAPP suit.

This Transcript Contains Confidential Material

```
 1        Q.    And what did you cite for it if it was
 2   withdrawn?
 3        A.    It was withdrawn because bin Mahfouz,
 4   Khalid bin Mahfouz of National Commercial Bank
 5   called one of the wealthiest people in Saudi Arabia,
 6   threatened him with a defamation action.  And the
 7   former -- the historian and the former US-AID
 8   person, as I understand it, and their publisher
 9   working with the financial resources to fight a
10   billionaire in a Forum shop in London.
11        Q.    Okay.  Can we get exhibit --
12              MR. HAEFELE:  I'm sorry, a SLAPP
13         suit, S-L-A-P-P, a strategic litigation
14         against a public interest.
15        A.    Yes, or a public participation.
16        Q.    (BY MR. MOHAMMEDI) And that's how I
17   understood it.  I read the book.  I found the book
18   useful.
19              MR. MOHAMMEDI:  Can we get exhibit 39
20         that we have sent?
21              (Winer Deposition Exhibit 924, The
22              Bookseller, Why CUP acted
23              responsibly, was marked for
24              identification.)
25        Q.    (BY MR. MOHAMMEDI)  So Kevin Taylor,
```

This Transcript Contains Confidential Material

```
 1    intellectual property director Cambridge University

 2    Press, explained where the book was withdrawn in

 3    this, which is The Bookseller; correct?  And

 4    explains exactly why the book was withdrawn.

 5              And you do not agree with that statement?

 6    With those statements?

 7                   MR. HAEFELE:  Objection.

 8                   Omar, can you tell us what we're

 9         looking for?

10                   MR. MOHAMMEDI:  Let me read this into

11         the record:  Our book cited sources whose

12         falsity had been established to the

13         satisfaction of the English courts.

14                   And then he also noted:  Some

15         American public opinion holds that Sheikh bin

16         Mahfouz is guilty of funding terrorism, but

17         Cambridge University Press cannot act on the

18         basis of popular opinion, however widely held.

19         Evidence must be found.  And the evidence

20         produced by the authors of Alms for Jihad

21         repeated from earlier sources has not stood up

22         to the requisite tests.

23                   MR. HAEFELE:  Objection to form.

24         Q.   (BY MR. MOHAMMEDI)  Are you aware of

25    that?
```

This Transcript Contains Confidential Material

```
1              MR. HAEFELE:  Objection to form.

2       Q.   (BY MR. MOHAMMEDI)  Are you aware of the

3  Cambridge University Press making that statement,

4  Kevin Taylor who was the intellectual property

5  director of Cambridge?

6       A.   I had not seen this, no.

7       Q.   Okay.

8       A.   But I know a fair amount about bin

9  Mahfouz.  I investigated bin Mahfouz in connection

10  with BCCI, and my -- he's no longer alive.  And I

11  still believe this was a SLAPP suit.  And because

12  bin Mahfouz had previously been very aggressive,

13  he'd been successful in the earlier case, and

14  therefore they decided they weren't going to fight

15  it.

16       Q.   But my question was that you did not see

17  this document; correct?

18       A.   No.

19       Q.   Okay.  That's the only question that I

20  have for that.

21              Let's go to -- let's enter into

22  exhibit -- Exhibit 40 that we sent to you, which is

23  CRA report.  I think this was entered, Robert,

24  before, right?  As a --

25              MR. HAEFELE:  The '96 CIA Report?  I
```

This Transcript Contains Confidential Material

```
 1         suspect it has.  I don't know.

 2                   MR. MOHAMMEDI:  The CRA report.

 3                   MR. HAEFELE:  Pardon me?

 4                   MR. MOHAMMEDI:  The Canadian Revenue

 5         Agency report.

 6                   MR. HAEFELE:  Oh, CRA report.  I'm

 7         sorry.

 8                   MR. MOHAMMEDI:  Right.

 9                   MR. HAEFELE:  I suspect it has been.

10         I don't recall.

11                   MR. MOHAMMEDI:  Why don't you put it

12         in now, since we're not.

13                   MR. HAEFELE:  That's fine.  Let's put

14         it in as a new one.  925.

15                   (Winer Deposition Exhibit 925, Letter

16                   to Ayman Al-Taher, Subj: Notice of

17                   Intention to Revoke the World

18                   Assembly of Muslim Youth,

19                   FED-PEC0218170-218203, was marked for

20                   identification.)

21         Q.   (BY MR. MOHAMMEDI)  I assume, Mr. Winer,

22    that you've seen this one, since you refer to it

23    many times in your report?

24         A.   Your assumption is correct.

25         Q.   You'd agree with me this is not an
```

This Transcript Contains Confidential Material

1    intelligence report; right?

2        A.    It is not an intelligence report; that is

3    correct.

4        Q.    It is not a law enforcement report;

5    correct?

6        A.    It's a report of the Canada Revenue

7    Agency, notice of intention to revoke the WAMY

8    registration in connection with the Income Tax Act.

9        Q.    What type of registration that WAMY

10   Canada was -- CRA was trying to invoke WAMY Canada?

11       A.    I believe it was its registration for

12   charter.

13       Q.    It's fair to say its not-for-profit

14   status; correct?

15       A.    Yes.

16       Q.    So not revoking registration of WAMY

17   Canada altogether, just not-for-profit status;

18   correct?

19       A.    I'd have to look at it again to address

20   that issue.

21       Q.    Okay.  I guarantee that's what happened.

22       A.    I accept your representation on that.

23       Q.    What do you understand the consequences

24   of revoking WAMY Canada's status of charity for

25   Canadian tax purposes?

This Transcript Contains Confidential Material

```
 1       A.    Contributions to it wouldn't be counted
 2  as deductible.
 3       Q.    I'm sorry, I didn't hear that.
 4             Can you repeat that?  I'm sorry, I
 5  couldn't hear it.
 6       A.    I would think contributions to it would
 7  not be tax deductible.  I don't know what the impact
 8  would be on its operation -- operating ability.  I'd
 9  have to look at that issue.  I haven't considered
10  that issue.  Whether it could have --
11       Q.    Whether --
12       A.    Or not it could have any remaining
13  capacity to operate in Canada after that.
14       Q.    Are you aware if the Canadian government
15  froze the assets of WAMY Canada?
16       A.    I have no reason to believe that it did.
17       Q.    And you agree that the subject of all of
18  the review by CRA was WAMY Canada branch, not WAMY
19  Saudi Arabia; correct?
20       A.    That's correct.
21       Q.    It is fair to say that what -- CRA did
22  not investigate WAMY Saudi Arabia; correct?
23       A.    It investigated the matters that were
24  within its jurisdiction, which would go to the
25  activities of the entities based in Canada and the
```

This Transcript Contains Confidential Material

```
 1    transactions that it was involved in.  It certainly
 2    would not have gone to conduct an investigation in a
 3    foreign country.  That would tend to be outside the
 4    ability of most revenue services, and I presume of
 5    Canada's.
 6         Q.    Right.  And it did differentiate between
 7    WAMY and WAMY Canada, and I think what it says is,
 8    mostly in the exhibit that we have here, it says
 9    page 5 of 22, which is page 8 PDF, specifically
10    states WAMY and WAMY Saudi Arabia; correct?
11         A.    It does make references to WAMY
12    Saudi Arabia here.
13         Q.    And do you believe WAMY means WAMY
14    Canada?
15         A.    Yes.
16         Q.    Okay.  Can we get Exhibit 41?  It is a
17    declaration by Khatib.
18                   (Winer Deposition Exhibit 926,
19                    Declaration of Mohammed Al Khatib,
20                    was marked for identification.)
21         Q.    (BY MR. MOHAMMEDI)  Have you seen this --
22    have you seen this declaration before?
23         A.    Yes, I have seen it.
24         Q.    And you considered in your report by --
25    you went through it and you considered it in your
```

This Transcript Contains Confidential Material

```
 1   report?

 2        A.    I don't remember at this point when I've

 3   seen it before and whether it's referenced in

 4   my reliance materials or not.

 5        Q.    Okay.  We don't believe that it was

 6   referenced in your report.

 7        A.    You know, what, I don't remember.  I

 8   think I have seen it, but I don't remember relying

 9   on it.  And that's consistent with the statement

10   you've just made.

11        Q.    And when you say you rely -- so it's not

12   in your material -- in the materials considered;

13   correct?  That you submitted?

14        A.    I don't recollect.

15             MR. MOHAMMEDI:  Can we get Ibrahim

16         Abdullah declaration of 2018, which is

17         Exhibit 42 we sent to you?

18             And if you can just remind me the

19         exhibit number we are at.

20             If you can -- I think if you can go

21         down a little bit.

22             (Winer Deposition Exhibit

23             Exhibit 927, Declaration of Ibrahim

24             Sulayman Abdullah, was marked for

25             identification.)
```

This Transcript Contains Confidential Material

```
 1        Q.    (BY MR. MOHAMMEDI)  This declaration was
 2   filed along with the other declaration in court.
 3              Have you seen this one, this declaration
 4   for --
 5        A.    I'd like to be able to read it and then I
 6   can tell you whether I've read it before or not.
 7        Q.    If you can look at the declaration of
 8   Ibrahim Sulayman Abdullah.  Do you recall the name?
 9        A.    I don't recollect the name.
10        Q.    Okay.  If you want to read it we can go
11   off the record, it's up to you.
12        A.    Why don't you ask me a question instead.
13        Q.    Okay.
14              MR. MOHAMMEDI:  Can we put this down?
15         And get Exhibit 43.  It is another -- another
16         document that were filed in court and actually
17         produced in this case.
18              No, this is the wrong one.  That is
19         not the right document.  If you can just put
20         that down.
21              (Winer Deposition Exhibit 928,
22              4-20-201 fax with attachment letter
23              to Dr. Saleh Bin Ibrahim Babaer, was
24              marked for identification.)
25        Q.    (BY MR. MOHAMMEDI)  Can you look at the
```

This Transcript Contains Confidential Material

```
 1   translation of this document.

 2              I can't -- you know, I can't see the top

 3   where it says when it was filed.  Unfortunately I'm

 4   not able to see it.  It's preventing -- I think it's

 5   April 2 -- 2018, correct, that's when it was filed

 6   in court and it was produced.  Thank you.

 7              Have you seen this document, Mr. Winer?

 8        A.   No.

 9        Q.   So you have not considered this when you

10   rendered your opinion in WAMY Canada; is that

11   correct?

12        A.   That's correct.

13        Q.   Let's go to Exhibit 44.  Which is a

14   transcript from Abdullah -- Ibrahim Abdullah

15   deposition.

16              MR. HAEFELE:  Omar, on that last

17         document, 928, do you have a certification for

18         that one?

19              I don't see it -- a translation

20         certification attached to that.

21              MR. MOHAMMEDI:  I don't know if you

22         have it here, but we have a certification, but

23         this was filed in court.

24              MR. HAEFELE:  I realize that, but I

25         don't see a certified translation here.
```

This Transcript Contains Confidential Material

```
 1                    MR. MOHAMMEDI:  Can you go down to

 2          the document?  Can you go farther?

 3                    All right.  So we have the

 4          certification for this document.

 5                    MR. HAEFELE:  All right.  We do.

 6                    MR. MOHAMMEDI:  We do have.

 7                    MR. HAEFELE:  If you could provide

 8          that later on.

 9                    MR. MOHAMMEDI:  We do.

10                    (Winer Deposition Exhibit 929,

11                    10-21-2019 excerpts from the

12                    transcript of Ibrahim Abdullah,

13                    Ph.D., was marked for

14                    identification.)

15                    MR. MOHAMMEDI:  I just want for the

16          record, I don't think you have to produce

17          any -- you have not produced the translated

18          documents in your case that have

19          certification, correct, Robert?

20                    MR. HAEFELE:  Pardon me?

21                    MR. MOHAMMEDI:  Did you -- okay.

22          We'll deal with that later.  We'll deal with

23          that later.

24                    So this is the transcript from

25          page 158-168, we go --
```

This Transcript Contains Confidential Material

```
1        Q.    (BY MR. MOHAMMEDI)  First, have you seen
2   this document before?
3        A.    No.
4        Q.    Okay.  Then there is no reason for us to
5   go through it.  Okay.  No problem.
6        A.    Actually, hold on.  Let me just check.  I
7   want to look for a moment.  What I would like to do
8   is to take one moment off the record, if we could.
9              MR. MOHAMMEDI:  Okay.  Sure.
10             THE WITNESS:  Thank you.
11             THE VIDEOGRAPHER:  We're going to go
12       off the record at 6:00 p.m.
13             (Recess taken, 6:00 p.m. to
14             6:00 p.m. EDT)
15             THE VIDEOGRAPHER:  We are back on the
16       record at 6:01 p.m.
17       Q.    (BY MR. MOHAMMEDI)  I think the last time
18   before we went off the record I asked if you had
19   seen this document and you said you wanted to see
20   before -- you said you had not, but then you wanted
21   to review first.
22       A.    I would still like to read the first
23   couple of pages of the document, just to be certain.
24       Q.    You want to -- you want to review it?
25       A.    The first couple of pages, to be certain.
```

This Transcript Contains Confidential Material

```
 1                 MR. MOHAMMEDI:  Okay.  So we need to
 2          go off the record.  That's what I thought we
 3          were doing.
 4                 THE VIDEOGRAPHER:  We are going to go
 5          off the record.  6:01 p.m.
 6                 (Recess taken, 6:01 p.m. to
 7                 6:02 p.m. EDT)
 8                 THE VIDEOGRAPHER:  We're back on the
 9          record.  The time is 6:02 p.m.
10     A.    The document that was just provided me
11  contains only a couple of pages out of an extensive
12  deposition.  I don't believe I reviewed that
13  deposition, but the amounts that are excerpted
14  don't -- are not sufficient to enable me to
15  interpret -- would not be sufficient for me to be
16  able to interpret the full deposition or its
17  implications.
18     Q.    (BY MR. MOHAMMEDI)  The question, have
19  you reviewed the deposition transcript of Ibrahim
20  Abdullah?
21     A.    I don't believe so.
22     Q.    Let's go to Exhibit 45 of this -- which
23  is the CRA investigation in the file.
24                 (Winer Deposition Exhibit 930, World
25                 Assembly of Muslim Youth T20
```

This Transcript Contains Confidential Material

 1                    Auditor's Report, was marked for
 2                    identification.)
 3          Q.    (BY MR. MOHAMMEDI)  I think there is a
 4   second page to it.
 5                    Okay.  So that's the investigation file.
 6                    At page 485 of the PDF.  That's bank
 7   statement.
 8                    Mr. Winer, is there anything on the face
 9   of this bank statement showing that when
10   Saudi Arabia is the source of this March 20th wire
11   transfer?
12                    I think it's the second page.
13                    No, the first page.  I'm sorry.  Go back.
14                    MR. HAEFELE:  Objection to form.
15          A.    The document that you are showing me,
16   which is PEC-WAMY031322, World Assembly of Muslim
17   Youth business banking statement for April 5, 2001,
18   March 20th, there's a $50,000 wire transfer.  It
19   says U.S. S wire payment, U.S. dollar.
20                    Is that the transaction you're asking me
21   to look at?
22          Q.    (BY MR. MOHAMMEDI)  Correct, that's the
23   transaction.
24          A.    Yeah, it doesn't say anything other than
25   it's U.S. dollar PO.  And I don't know what 2987 is.

This Transcript Contains Confidential Material

```
1        Q.    Do you have an idea where the money came
2    from?
3        A.    Not from this record.
4        Q.    In your Section 10.3-10.4.  Page 68-71.
5              We can take this down.
6                    MR. HAEFELE:  What page?
7                    MR. MOHAMMEDI:  Page 68.
8                    MR. HAEFELE:  Of the initial report?
9                    MR. MOHAMMEDI:  Of the initial
10    report, yes.  The affirmative report.
11        Q.    (BY MR. MOHAMMEDI)  In that page 68, you
12    say, Section 10.3, you say that CRA assessed that
13    WAMY Canada, Saudi parent, provided support to
14    al-Qaeda.
15              Do you see that?
16        A.    I'm not clear as to which paragraph
17    you're pointing to, I'm sorry.
18        Q.    And in Section 10.3, page 68.
19        A.    It says that the WAMY branch was stripped
20    of its charitable status by Canada after a Canada
21    revenue agency investigation found that the charity
22    had failed to comply with basic bookkeeping and
23    accounting requirements for the charity and was
24    inextricably linked to its Saudi parents, which
25    Canada assessed to have provided support to
```

This Transcript Contains Confidential Material

1    al-Qaeda.

2         Q.    Where is it in the CRA report that this

3    finding was made?

4         A.    I would have to go back to the CRA report

5    to tell you.

6              I can't tell you out of my memory where

7    it said that.  I believe that summarizes what they

8    found.

9         Q.    So if you go to page --

10        A.    In paragraph 10.3.4, I quote what CRA

11   found.

12        Q.    Okay.  So if you go to -- let me just

13   look at it.

14             Page 1 of the CRA report at exhibit --

15   page 1.  The CRA report.  That's where we entered.

16   I can't remember the exhibit number now.

17             TRIAL TECHNICIAN:  Was it the last

18      exhibit entered?

19             MR. MOHAMMEDI:  925.

20        Q.    (BY MR. MOHAMMEDI)  So in page 1 of the

21   report, WAMY Canada parent organization located in

22   Saudi has been alleged to support terrorist.

23             Does it say that?  It says that, correct?

24        A.    Yes.

25        Q.    Okay.  So your statement -- do you -- is

This Transcript Contains Confidential Material

1    it fair to say your statement on CRA report on WAMY

2    is not correct?

3         A.    I would have to take a look at the rest

4    of the report.  There is a difference between the

5    word assessed and which has been alleged, and I

6    think we have to look at the whole report in order

7    to fully address that issue, and not just this

8    paragraph.

9         Q.    Okay.  Do you agree -- do you know that

10   in Exhibit 45, if you go to exhibit that were just

11   entered now.  Right.

12             At page 4, can you read that, which is

13   highlighted?  That's what off of the -- that's the

14   information, the content of the CRA report.

15             Can you read that?

16             It says United States District Court For

17   the District of Columbia lawsuit filed by victims

18   families of 9/11.

19             Do you see that?

20        A.    Yes.

21        Q.    Are you aware the CRA considered an

22   allegation made by the lawyers who hired you?

23             MR. HAEFELE:  Objection to form.

24        A.    They considered everything that they

25   listed, which was --

This Transcript Contains Confidential Material

1     Q.    (BY MR. MOHAMMEDI)  The lawyers that

2    hired you, those allegations, correct?  They're

3    still allegations.

4              MR. HAEFELE:  Objection to form.

5     A.    That's correct.

6     Q.    (BY MR. MOHAMMEDI)  In 10.3.1, page 68,

7    again, you say that CRA audit found massive

8    deficiencies.  Do you see that?

9     A.    Yes.

10    Q.    Are you an auditor?

11    A.    No, I am not an auditor, I'm an attorney.

12    Q.    Are you a CPA?

13              MR. HAEFELE:  Objection, asked and

14     answered.

15    A.    You asked me this question earlier.  I

16   previously have responded to that question to tell

17   you that I am not a certified public accountant.

18    Q.    (BY MR. MOHAMMEDI)  So what qualification

19   do you have to render this opinion?

20              MR. HAEFELE:  Objection.

21    A.    I have laid out my qualifications

22   previously in this deposition.  I'm going to respond

23   to your current question at some length since the

24   question is a very broad question.

25              I first began dealing with bank

This Transcript Contains Confidential Material

1    statements and the way in which financial crimes

2    take place internationally in 1980 in a very early

3    anti-money laundering case.  In the mid '80s, I was

4    on the staff of a series of Senate investigations

5    chaired by my -- man that I was employed by, Senator

6    John Kerry, in which I acted as his counsel.

7              And in the course of that, undertook

8    investigations that required me to look at and

9    understand financial reports and auditing and

10   accounting statements which included a review in the

11   Bank of Credit and Commerce International of

12   accounting and auditing standards that were in

13   effect at the time.  How to read what's in the

14   accounting review or an audit.  Because not every

15   accounting review is, of course, an audit.

16        Q.    (BY MR. MOHAMMEDI)  Okay.

17        A.    I continued to work in this space as an

18   attorney.  As previously mentioned, I represented

19   several persons or entities who were engaged in

20   activity that raised issues relating to terrorist

21   finance and accounting or audit, and in the course

22   of that work continued to become familiar with by

23   such standards.

24        Q.    So --

25        A.    In this case --

This Transcript Contains Confidential Material

```
 1        Q.    Let me ask you --

 2        A.    You asked me a question --

 3        Q.    I need to ask you -- you --

 4        A.    I am not --

 5              MR. HAEFELE:  Let him answer the

 6         question.

 7              MR. MOHAMMEDI:  What you have done

 8         before -- we have heard that already.

 9        A.    I am not -- you have asked me a question.

10   I would like to --

11        Q.    (BY MR. MOHAMMEDI)  I am asking you a

12   specific question.

13        A.    Yes, you did.  You asked me what my

14   expertise was.

15        Q.    No, I'm asking you what the basis of you

16   making many statement massive, what is your -- what

17   is your basis for --

18              MR. HAEFELE:  Mr. Mohammedi, I'm

19         going to object that you're not letting the

20         witness answer the question yet again.  This

21         is -- he's exactly answering exactly the

22         question you asked him.  Don't interrupt.

23        Q.    (BY MR. MOHAMMEDI)  So the question is,

24   what is the standard of massive?

25              MR. HAEFELE:  Mr. Winer, if you need
```

This Transcript Contains Confidential Material

```
1          to finish answering your previous question,

2          finish answering the question before you

3          proceed on to Mr. Mohammedi's new question.

4                  Mr. Mohammedi, please do not

5          interject and interrupt the witness.

6                  MR. MOHAMMEDI:  We'll move on.  It's

7          fine.  I don't need to hear it.  I really

8          don't need to hear it.  I asked a question and

9          you didn't answer.  It's nonresponsive so I'm

10         going to move on.

11                 MR. HAEFELE:  Let the record reflect

12         that his extensive experience surpasses what

13         you've allowed him to answer.

14                 MR. MOHAMMEDI:  We've heard that over

15         and over again.  I'm asking specific questions

16         related to CRA report.

17     A.    The answer to that not --

18     Q.    (BY MR. MOHAMMEDI)  There is no question

19  pending, Mr. Winer.  We are moving on.

20     A.    Excuse me, there was a question pending,

21  sir.

22     Q.    I heard it.  I heard your answer.

23     A.    You had a second question, which

24  lasted --

25                 Do you withdraw that question?  I just
```

This Transcript Contains Confidential Material

```
 1    want to make sure that I answer your question.
 2         Q.    I'm withdrawing the question.  We'll move
 3    on.
 4               In preparing your affirmative report,
 5    we -- you already stated that you did not review
 6    WAMY audits; correct?
 7         A.    I asked for but did not receive --
 8         Q.    And you asked from who, the plaintiff
 9    attorneys?
10         A.    Yes.
11         Q.    And, I mean, you -- so you asked for it
12    but you never received it; correct?
13         A.    That is correct.  I received it after
14    asking again, after the audit reports -- after the
15    expert reports for the defense were provided, I
16    asked for them again and got more.  There were still
17    many, many, many missing reports, but I did receive
18    some reports as set forth in my supplemental
19    statement.
20         Q.    Okay.  How many of the approximate 825
21    projects report listed in Mark's appendix did you
22    review in preparing for your rebuttal?
23         A.    I reviewed the materials that I listed in
24    my reliance report.  I reviewed all the audits and
25    material that were characterized as audits that I
```

This Transcript Contains Confidential Material

1    could find and was provided.  If there were more, I

2    would have -- been provided more, I would have read

3    more.  It's information that I consider to be of

4    great use when there's audits.

5              The audits that were provided me and I

6    asked for more did not correspond to the number

7    described in one of your expert's reports, and I

8    highlighted the difference between the number that

9    was described and what was made available to me.  I

10   don't know whether there were additional audit

11   reports available or not.  I am aware of the

12   representations regarding the report.

13   Q.    Do you know how many financial documents

14   have been produced in this case?

15   A.    I do not know, first, how you described

16   it, what the word financial means in this case.

17   Q.    Have you reviewed the receipts, WAMY

18   receipts produced in this case?

19              MR. HAEFELE:  Objection to form.

20   A.    You'd have to show me receipts in a

21   particular area.  I reviewed some receipts.  They

22   were purported to be audit material that's described

23   in one of your expert reports.  I went in the

24   reports and looked at all of the references to

25   material in the expert report on the auditing

This Transcript Contains Confidential Material

```
 1   issues, and went through those receipts.
 2        Q.    (BY MR. MOHAMMEDI)  Have you reviewed
 3   financial reports?
 4        A.    I beg your pardon?
 5        Q.    Have you reviewed financial reports?
 6        A.    I don't know what -- how you're defining
 7   financial reports in this regard.  Are you talking
 8   about --
 9        Q.    Do you know -- yeah, do you know that
10   WAMY issues every year a financial report?
11        A.    Yeah, for the -- globally?  I did read
12   those.
13        Q.    You read those ones?
14        A.    Yes.
15        Q.    And have you read project report?
16              MR. HAEFELE:  Objection to form.
17        A.    I described the project report --
18   material that was provided in connection with the
19   audits that were provided to me, and that's what I
20   focused on.
21        Q.    (BY MR. MOHAMMEDI)  And is it fair to say
22   there was limited to the audit that's WAMY expert
23   referred to; correct?
24        A.    Yes, those are the only --
25              MR. HAEFELE:  Objection to form.
```

This Transcript Contains Confidential Material

```
 1      A.     Those are the only audits that I was
 2   aware of.   I requested as much audit information as
 3   was available.
 4      Q.    (BY MR. MOHAMMEDI)  Did you have the
 5   appendix of reliance materials produced by Baker
 6   Tilly?
 7               MR. HAEFELE:  Objection to form.
 8      A.    I don't recollect.
 9      Q.    (BY MR. MOHAMMEDI)  Can you say -- as you
10   sit here, that you have reviewed all documents in
11   response -- in making your rebuttal that Baker Tilly
12   relied on in producing the report?
13               MR. HAEFELE:  Objection to form,
14       foundation.  You haven't produced those, Omar.
15      Q.    (BY MR. MOHAMMEDI)  They were produced.
16               MR. HAEFELE:  They were not produced.
17               MR. MOHAMMEDI:  Okay.  So it -- we
18       agree to disagree; they were produced.
19      Q.    (BY MR. MOHAMMEDI)  Can you answer the
20   question?
21      A.    I asked for all of the material that was
22   relied upon.  I reviewed -- material that I
23   reviewed, I described in my reliance materials and
24   as I stated in my supplemental report, there was a
25   discrepancy between the number of audits that the
```

This Transcript Contains Confidential Material

1    expert from Baker Tilly referred to and the number

2    that I was able to review.

3              I described with specificity in my

4    rebuttal report the audits that I was able to review

5    and what was in back of it.  In some cases, those

6    were not actual audits.  In some cases they were

7    financial -- unaudited financial statements.  In

8    other cases they were just backup materials or

9    materials about materials, which is to say they were

10   materials that were in the general vicinity of some

11   payments that were -- that may have been made but

12   did not contain sufficient information to enable me

13   to evaluate it, but they were most certainly not

14   audits, although they were the material referred to

15   in the Baker Tilly report.

16        Q.    So --

17        A.    So I was left unable to replicate that

18   which the Baker Tilly report referred to based on

19   the reference pages set forth in that report.

20        Q.    Is it fair to say you did not ask the

21   lawyers and the lawyers -- plaintiffs' lawyers did

22   not send you the document, financial document of

23   WAMY for you to render your opinion in your report,

24   affirmative report, as well as rebuttal; correct?

25                   MR. HAEFELE:  Objection to form,

This Transcript Contains Confidential Material

```
 1        foundation.  You have not produced all of

 2        those documents.

 3                MR. MOHAMMEDI:  Okay, we agree to

 4        disagree.

 5    A.    It is --

 6                MR. MOHAMMEDI:  Just state your

 7        objection.

 8    A.    May I respond to your question?

 9                MR. MOHAMMEDI:  State your objection,

10    you don't need to make statements.

11                MR. HAEFELE:  You're misleading the

12        witness.

13                MR. MOHAMMEDI:  It's not misleading.

14                MR. HAEFELE:  It is.

15                MR. MOHAMMEDI:  You're wrong.

16    Robert, you're wrong.

17                MR. HAEFELE:  Well, you say I'm

18        wrong.  I say I'm right.  But go ahead.  I'm

19        not stopping you from asking the questions.

20    Q.    (BY MR. MOHAMMEDI)  Go ahead.

21    A.    In my -- before my initial report, I

22    asked for all audit material.  As reflected in that

23    report, I received audit material for IIRO.  I did

24    not receive audits for WAMY.  I did not receive

25    audits from World Muslim League.  I did receive the
```

This Transcript Contains Confidential Material

```
1    annual financial reports which I found to be of a
2    very general nature and not something that I found
3    to be particularly useful.
4           And I did review that in connection with
5    my original report.  After reading the rebuttal --
6    the reports from the defendants, the expert reports,
7    I became aware of additional material and asked for
8    that additional material.  And when I asked for that
9    additional material, I reviewed that material and
10   provided my assessment to that material, which
11   included the fact that some of the reports that were
12   characterized as audits were not audits, some of
13   them were not verified audits.  They contained a
14   variety of other deficiencies in their limitations.
15   I noted the number of jurisdictions in which there
16   were no --
17      Q.   Mr. Winer, I've heard it three or four
18   times.
19      A.   This is what I did.  It is not consistent
20   with the question that you asked me, which is --
21      Q.   The question -- the question I'm asking
22   you is specific.  The question I'm asking you, and
23   I'm not going to go much more on this, because I --
24   it is clear that you have not reviewed the financial
25   documents produced by WAMY except for the ones that
```

This Transcript Contains Confidential Material

```
 1    the WAMY expert referred to.  Correct?
 2                 MR. HAEFELE:  Objection to form.
 3         A.    No, that's not correct.  I reviewed the
 4    annual reports of WAMY.
 5         Q.    (BY MR. MOHAMMEDI)  Okay.
 6         A.    I did not see other audits.
 7         Q.    Okay.
 8         A.    So if there are other audits, I would be
 9    happy to review them.  I would be pleased to review
10    additional audits.
11         Q.    It's fair to say that you, for you,
12    financial records are only audits; correct?
13         A.    That's incorrect and it's a misstatement
14    of what I just testified to.
15         Q.    Okay.  All right.  Let's move on to -- in
16    Section 2.4.1, at page 1 of your rebuttal, you state
17    that:  WAMY audit did not meet the international
18    standard; correct?  Do you remember that?
19    International accounting standard.
20         A.    Yes.
21         Q.    Does a not-for-profit organization have
22    the obligation to fulfill the international
23    accounting standard?
24         A.    It's a question of how much one is going
25    to rely on an audit and whether the audit is
```

This Transcript Contains Confidential Material

1    reliable.

2           For example, if an audit is undated, that

3    doesn't conform to an international accounting and

4    auditing practice, and that issue affects the

5    quality and reliability of the report.

6           If an audit is carried out more than six

7    months or some other reasonable period reflecting

8    the circumstances, after the date of -- the period

9    covered by the audit, and also reflects an

10   inconsistency of what is considered to be best

11   practice, and so on.

12       Q.    Okay.  Now, you also mentioned that WAMY

13   has 66 regional and local offices; correct?

14       A.    I looked at the web sites that were WAMY

15   websites, as articulated and set forth in the

16   footnote with the number of offices.

17       Q.    And that's when you say 66 regional and

18   local offices; correct?

19       A.    That was what it was based on.  I was

20   explicit about what I looked at.

21       Q.    And are you aware of how many offices

22   between 1992 to 2002 those offices were existing at

23   certain periods of time?  Are you aware?  Do you

24   know that for you to render that state -- to render

25   that opinion?

This Transcript Contains Confidential Material

```
 1        A.     The opinion is based on WAMY's website at

 2   2003, at that time.

 3        Q.     And at that time, when you say that time,

 4   which time are you referring to?

 5        A.     I'm referring to as of 2003.  Because

 6   that's -- because the audits that were provided to

 7   me.  So -- were over a period of the entire --

 8   covered by the entire litigation.

 9               And so that's within the period covered

10   by the litigation.  And so that reflects some

11   percentage.  As I said, there must have been at

12   least 66, but if not all of them, but I can't tell

13   the total number.  And I go on to say that the

14   number could have been from whatever -- a smaller

15   number to a larger number, but I don't know how many

16   there were.  That's what's all contained in my

17   supplemental report.

18        Q.     And it is fair to say that you were not

19   aware how many offices were existing a certain

20   period of time between 1992 and 2002; correct?

21        A.     I did not have a means at my disposal to

22   look at the exact number of offices for each of the

23   years.

24        Q.     Okay.  Fair enough.

25               If you go to Exhibit 53.  And that will
```

This Transcript Contains Confidential Material

1    be Document 28 -- 29.  929?  931.

2              (Winer Deposition Exhibit 931,

3              Statistical Report for Documents by

4              Branch Office, was marked for

5              identification.)

6    Q.    (BY MR. MOHAMMEDI)  This document is

7    court filing that was in 2000 -- October 31, 2018.

8    And it was an affirmation of -- my information with

9    the documents that were produced in this case

10   related to -- the financial documents related to

11   various chapters.

12             Have you seen this document?

13             MR. HAEFELE:  Objection to form.

14   A.    I don't recollect.

15   Q.    (BY MR. MOHAMMEDI)  Okay.

16   A.    It doesn't look complete to me.

17   Q.    That was not my question.  Have you seen

18   this document?

19   A.    I don't recollect.

20   Q.    Okay.  If you'd go to Exhibit 54.  That

21   we sent.

22   A.    Pardon me.  On this document, sir, is

23   this the only page or are there additional pages?

24   Q.    Yeah, it was an exhibit to a motion.

25             Can you go back to that exhibit one more

This Transcript Contains Confidential Material

```
 1   time?

 2              Yeah, can you go down?

 3              Is that the exhibit we entered before?

 4   Yeah.

 5              Do you see how many pages?  There are six

 6   pages.

 7      A.    Yeah, I don't recollect seeing this

 8   document.

 9      Q.    Where are we -- are we at Exhibit 54?

10   Exhibit 54.

11              (Winer Deposition Exhibit 932, WAMY's

12              Responses to Plaintiffs' Exhibit 15,

13              was marked for identification.)

14              MR. HAEFELE:  Omar, are you talking

15        about Exhibit 931, now?

16      Q.    (BY MR. MOHAMMEDI)  Have you seen this

17   document before?

18      A.    No.

19      Q.    And that was actually the report filed

20   with the court on April 2nd, 2018.

21      A.    This refers to annual reports.  It

22   doesn't refer to audits.

23      Q.    Yes, I'm -- yes, it does refer to annual

24   reports, yes.

25              If you -- you can bring this down.
```

This Transcript Contains Confidential Material

1    That's fine.

2            You did not -- so you have not seen,

3    which means you have not relied on these documents

4    for you to be able to render your opinion; correct?

5        A.    I received annual reports from the

6    defendants, and as of right now, cannot remember

7    which annual reports I reviewed.  The best of my

8    memory, I reviewed reports for the organization as a

9    whole, that were there, global reports, and did not

10   review annual report -- reports for the subchapters

11   of the individual offices.

12           I did review the audits referred to in my

13   supplemental report, which would be of greater value

14   in assessing what's going on.

15       Q.    Okay.  Is it your opinion missing audit

16   equates with support to terrorism?

17       A.    Will you please repeat the question?

18       Q.    Is it your opinion that missing audits

19   equates to supporting terrorism?

20       A.    Missing audits are relevant to this case

21   because when you don't have an audit, you don't know

22   whether what's been reported in a financial report

23   as to spending, how that corresponded to the actual

24   spending, and whether there was ever a check that

25   was undertaken of the spending.  So it's very

This Transcript Contains Confidential Material

 1   relevant to interpreting a financial report.  In

 2   fact, essential.  Particularly in a field where

 3   there is assistance being provided in a conflict

 4   zone, for example.

 5            So it's of great relevance and

 6   importance.  The fact that an audit report -- an

 7   audit has not been undertaken, its significance is

 8   going to be different in different circumstances.

 9   In the circumstances of this case, it's very

10   important.

11       Q.    Is a not-for-profit organization

12   obligated to issue a report?

13       A.    It depends on the laws of the country in

14   which it's operating, and the laws of the country in

15   which it's charted, what's it required to do.

16       Q.    And are you an expert on financial

17   aspects of income in Saudi Arabia?  On the standard?

18       A.    It depends what question you're asking.

19   I am very familiar with the lack of controls in

20   accounting, auditing -- please let me answer your

21   question -- and money laundering controls that were

22   in place at the time that I did my investigations of

23   BCCI in the senate.  I was also familiar with the

24   lack of accountability in the Kingdom of Saudi

25   Arabia as of the time I left the Department of State

1    in the late 1990s.

2          I've had recent experience in connection

3    with certain matters associated with Saudi Arabia

4    which lead me to believe that the standards have

5    changed substantially over the last 20 years, but I

6    did have representations made in the amount of

7    standards back then, and they were not standards the

8    United States government was happy about.

9    Q.    (BY MR. MOHAMMEDI)  Are you an expert in

10   countries implementing the international standards

11   in their own countries?  Are you an expert in the

12   field?

13   A.    That's what I was retained to provide

14   analysis and assistance on to the United States

15   government from 2000 through 2008 in the area of

16   money laundering, terrorist finance, and corruption,

17   vulnerability; both vulnerability, the systems to

18   combat it, the nature of the threat, and how we

19   might evaluate the effectiveness of the system

20   against the threat.

21         So where I was asked to look at that set

22   of issues in an integrated fashion for, as mentioned

23   in one of my statements, for a very large number of

24   countries around the world, including essentially

25   every country, if not every country in the Middle

This Transcript Contains Confidential Material

1   East.

2       Q.    So as you sit here, you are telling me

3   that you are an expert in maintaining of the

4   standard -- international banking standard in the

5   countries that you are referring to?

6       A.    In relationship to financial crime, yes.

7       Q.    What about the standard --

8       A.    The --

9       Q.    I'm talking about the financial standard,

10  not the crimes.  I'm talking the standard of

11  implementation of banking standard in countries.

12      A.    In the late 1990s, when I was in the

13  United States government, we became very focused on

14  the fact that there were essentially no controls on

15  movements of funds in most if not all -- actually

16  all at that point of the Middle Eastern states.

17  Whether they were Christian states, Muslim states,

18  or Jewish states, it was a problem across the board.

19  It was particularly a problem in countries that

20  didn't have annual taxes, that didn't have an income

21  tax.

22            And so one of the things that the

23  treasury department, the justice department, the

24  State Department focused on, in response to

25  direction from the White House, was how we start

This Transcript Contains Confidential Material

1    ratcheting up to these standards.  And that was part

2    of the work that was undertaken by the Financial

3    Action Task Force in the late 1990s.

4              After I left the government, I was asked

5    to continue to evaluate the situation in a large

6    number of countries, including all the countries in

7    the Middle East in this territory.

8         Q.    And you were saying this including the

9    Saudis and the accounting standard as implemented

10   from the international standards; correct?

11        A.    It would -- no, it would be too much to

12   say the accounting standard, because I did not cover

13   the details of accounting standards.  I looked at

14   the overall regulatory and enforcement system, which

15   looked at financial transparency and accountability,

16   and what the controls were in place in the banking

17   system at that time.  And that in turn looked at the

18   practices of businesses and sort of the general

19   level of oversight, which was poor.

20        Q.    And is it fair to say you did make the

21   similar statement during the TD Bank case when you

22   said that you were an expert in implementation of

23   the accounting standard in Canada and you were

24   excluded; correct?

25        A.    That's not correct.

This Transcript Contains Confidential Material

```
 1        Q.    It's not correct?  Okay.

 2        A.    That is not correct.  You've misstated

 3   both the judge's finding and my statements.

 4        Q.    Okay.  In your affirmative report, you

 5   opined that you would not expect to see evidence of

 6   support for terrorism in the charity records.  Do

 7   you remember that when you said that?

 8        A.    Oh, sure.

 9        Q.    Is that fact?

10        A.    In my experience, from what I --

11        Q.    No, is that the fact?  I'm saying, is

12   that a fact?

13              MR. HAEFELE:  Objection to form.

14        A.    Is what a fact?

15        Q.    (BY MR. MOHAMMEDI)  Is it a fact that you

16   will not expect that charity supporting terrorism

17   would not show charity's record doing so?

18        A.    I can provide an example from my report

19   which addresses this very issue.

20        Q.    Okay.  We can go through the examples.

21        A.    Which is the Third World Relief Agency,

22   which mischaracterized what it was doing; instead of

23   one thing -- the director was doing one thing.

24        Q.    Okay.  Speaking --

25        A.    And one fax showed it was doing something
```

This Transcript Contains Confidential Material

```
 1    very different, as well as a number of statements
 2    and other information.
 3              Charities like the Canada charity are at
 4    minimum at risk of losing, immediately, their
 5    accreditation as a charity if they declare any
 6    purpose that is outside the legitimate purpose of a
 7    charity.  Terrorism is not a legitimate purpose of a
 8    charity anywhere.  And since terrorism is not a
 9    legitimate purpose --
10       Q.    You are --
11       A.    -- charities are not going to be in a
12    position that they're engaged in supporting
13    terrorism.
14       Q.    So you are equating -- you are equating
15    lack of transparency, right, of a charity's record
16    to terrorism; correct?  Is that what you are doing?
17              MR. HAEFELE:  Objection to form.
18       A.    No, that's not correct.
19       Q.    (BY MR. MOHAMMEDI)  That's exactly what
20    you're doing.
21              MR. HAEFELE:  Objection to form,
22       argumentative.
23       Q.    (BY MR. MOHAMMEDI)  Let me ask you
24    another question.  Was TWRA designated?
25       A.    I beg your pardon?
```

This Transcript Contains Confidential Material

```
 1        Q.    Was TWRA designated?

 2        A.    I believe it was out of business by the

 3   time --

 4        Q.    My question, was it designated?

 5              MR. HAEFELE:  Objection to form,

 6        misleading.

 7        A.    TWRA has not been designated by the

 8   United States government or by the UN as providing

 9   terrorist finance.

10              MR. MOHAMMEDI:  Okay.  Can we take

11        five minutes' break, please?

12              THE VIDEOGRAPHER:  We are going to go

13        off the record at 6:40 p.m.

14              (Recess taken, 6:40 p.m. to

15              6:54 p.m. EDT)

16              THE VIDEOGRAPHER:  Back on record at

17        6:54 p.m.

18              MR. HAEFELE:  6:54, David?

19              Before we went off, there was an

20        exchange where the witness got cut off in his

21        answer.  The question was, my question was --

22        quote:  My question, was it designated -- the

23        witness was TWR designated?  I believe it was

24        out of business by that time is the answer.

25        He got cut off again by Mr. Mohammedi when he
```

This Transcript Contains Confidential Material

```
 1          was saying:  My question wasn't designated.
 2          And I think that Mr. Winer has indicated --
 3                  You know, I read the transcript and
 4          it's clear that he was cut off.  I think
 5          Mr. Winer needs to finish answering that
 6          question.
 7                  MR. MOHAMMEDI:  Just for the record,
 8          I was -- my question was if TWRA was
 9          designated and I was asking the question.
10                  MR. HAEFELE:  And he was answering
11          the question when you cut him off.
12     A.    It was out of business at the time the
13  U.S. was designating charities for terrorist
14  finance, so it could not be designated or would not
15  be designated because it was no longer in operation
16  at that time.  It was the same issue with the Rabita
17  Trust.  Rabita Trust.
18     Q.    (BY MR. MOHAMMEDI)  Is TWRA, can you
19  just -- sorry, strike that.
20          Do you have any facts to show that TWRA
21  gave any material support to 9/11?
22                  MR. HAEFELE:  And just so I'm clear,
23          Omar, are you saying TWRI or --
24                  MR. MOHAMMEDI:  TWRA.
25                  MR. HAEFELE:  The last letter is A.
```

This Transcript Contains Confidential Material

```
 1                    MR. MOHAMMEDI:  A.

 2        A.    I didn't hear the last part of the

 3   sentence.  Please repeat it.

 4        Q.    (BY MR. MOHAMMEDI)  Does TWRA have any

 5   connection for support to 9/11?  Did it have any

 6   support?

 7                    MR. HAEFELE:  Object to the form.

 8        A.    It depends on how you define 9/11.  If

 9   you're saying did it have any connection to the

10   $500,000 provided for the immediate logistics for

11   9/11, certainly not.

12              As part of the array of charities that

13   provided military support for combatants, in the

14   name of Islam, in the -- what I call the ABC wars,

15   Afghanistan, Bosnia, Chechnya, it was not limited to

16   that.  The answer is I believe it did provide

17   material support for the training of the Islamic

18   resistance, which was in turn part of what al-Qaeda

19   relied on as part of the chain of events that led to

20   9/11.

21        Q.    (BY MR. MOHAMMEDI)  And you are basing

22   this statement on a Bosnian war where the Bosniaks

23   were subjected to genocide; correct?

24                    MR. HAEFELE:  Objection to the form.

25        A.    The Bosniaks were not the only group that
```

1  were victims in that war.  This was a civil war in

2  which the various parties to the war all suffered

3  deaths and losses.  There was fighting between the

4  Serbs and the Croats, and murders involving Serbs

5  and Croats which did not involve the people of

6  Bosnia.  And Izetbegovic, who I knew, as well as

7  Tudjman, and Miloševic, were all busy accumulating

8  armies as fast as they could and setting their

9  warriors upon one another.

10          And the United States' goal at the time

11  that this was taking place was to stop it all from

12  happening.  And ultimately the United States

13  undertook a campaign to stop the war, which was

14  horrific every which way around.  And the war was

15  exploited by people who were doing a recruitment for

16  terrorism and jihad, among other things.

17      Q.   (BY MR. MOHAMMEDI)  And that's your

18  opinion, correct?

19      A.   Yes.

20      Q.   And you have facts to support that,

21  right?

22      A.   Yes.

23      Q.   Did WAMY or did it ever conclude that --

24  strike that.  Can we get Exhibit 55?

25              (Winer Deposition Exhibit 933,

This Transcript Contains Confidential Material

```
 1                 International Standard on Auditing
 2                 580 Written Representations, was
 3                 marked for identification.)
 4      Q.   (BY MR. MOHAMMEDI)  And just before we go
 5   to the exhibit, Mr. Winer, you're -- the facts that
 6   you are referring to are in your reports; correct?
 7      A.   Yes.
 8                 TRIAL TECHNICIAN:  Mr. Mohammedi,
 9           there is no Exhibit 55 in this folder.
10                 MR. MOHAMMEDI:  Can we just hold --
11           go off record for a few seconds?  I'm not sure
12           why, but let me check.
13                 THE VIDEOGRAPHER:  Off the record at
14           7:00 p.m.
15                 (Recess taken, 7:00 p.m. to
16                 7:03 p.m. EDT)
17                 THE VIDEOGRAPHER:  We are back on the
18           record at 7:04 p.m.
19      Q.   (BY MR. MOHAMMEDI)  Okay.  So if you can
20   put that Exhibit 55, which I was referring to.
21                 Mr. Winer, do you know about this
22   International Standard on Auditing --
23      A.   Yes.
24      Q.   -- 580 Written Representations?
25      A.   Mm-hmm.
```

This Transcript Contains Confidential Material

```
 1      Q.    Yes, right?

 2      A.    Yes.

 3      Q.    If you go to page 3 to 5.  And they're

 4  highlighted for sections.

 5            And it says:  International Standard on

 6  Auditing deals with the auditor's responsibility to

 7  obtain written representations from management and,

 8  where appropriate, those charged with governance in

 9  an audit of financial statements.

10            Then it goes on.  It says:  Although

11  written representations provide necessary audit

12  evidence, they do not provide sufficient appropriate

13  audit evidence on their own about -- of any of the

14  matters with which they deal.  Further, the fact

15  that management has provided reliable written

16  representation does not affect the nature or extent

17  of other audit evidence that the auditor obtains

18  from the fulfillment of the management's

19  responsibilities, or about specific assertions.

20            So, is it fair to say that auditors can

21  rely on the management representation; correct?

22                MR. HAEFELE:  Objection to form.

23      A.    I don't think it's fair to say that.

24  What it says is that the fact that management --

25  when a manager provides reliable written
```

This Transcript Contains Confidential Material

1    representations, it doesn't affect the nature or

2    extent of other audit evidence that the auditor

3    obtains about the fulfillment of management's

4    responsibilities or about specific assertions.

5              In essence it says the auditor has do a

6    proper audit and not just rely on management.

7        Q.    (BY MR. MOHAMMEDI)  Can you go to the

8    objective, the next one, 6, what it says?

9        A.    Uh-huh.

10       Q.    The objectives of the auditor are to

11   obtain written representations from management.  Can

12   you make it smaller, the way it was?  I cannot read

13   it like that, unfortunately.  Thank you.

14       A.    Yes, the paragraph -- I'll wait for your

15   question.

16       Q.    So the paragraph relies to the management

17   representation, right?  And the auditor can rely on

18   the management representation; correct?

19              MR. HAEFELE:  Objection to the form.

20       A.    What is your question, again, sir?

21       Q.    (BY MR. MOHAMMEDI)  Is it fair to say

22   that this standard allows for the auditor to -- or

23   relied on the management's representation?

24              MR. HAEFELE:  Objection, asked and

25        answered.

This Transcript Contains Confidential Material

```
 1        A.    I'm going to respond to this question as
 2   completely as I can, limiting myself to the material
 3   that is highlighted in yellow.
 4              Actually, I'm not, I'm going to go to
 5   paragraph 3 first.
 6              Audit evidence is the information used by
 7   the auditor in arriving at the conclusions.  Written
 8   representations are necessary in connection with the
 9   audit.  Written representations are audit evidence.
10   Although they provide necessary audit evidence, they
11   do not provide sufficient audit evidence on their
12   own about any of the matters in which they deal.
13              Furthermore, the fact that management has
14   provided reliable written representations does not
15   affect the nature or extent of other audit evidence
16   that the auditor obtains about the fulfillment of
17   management's responsibilities or about specific
18   assertions.
19              I'm going to now describe the meaning of
20   that, and then I'm going to go to paragraph 6(b).
21              You have to have written representations.
22   It's necessary for an audit.  But the written
23   representations are insufficient.  In addition, you
24   have to have them from management.  But that does
25   not mean that that alone is sufficient for the
```

This Transcript Contains Confidential Material

1    audit.

2              That's how I understand what's in

3    paragraph 3 and paragraph 4.  Necessary, but not in

4    itself sufficient.

5              Paragraph 6.  The auditor has to obtain

6    written representations from management and, where

7    appropriate, those charts of governance that they

8    believe they have fulfilled their responsibility for

9    the preparation of the financial statements and the

10   completeness of the information provided to the

11   auditor.  That's the first point.  You have to get a

12   representation from management that this is --

13        Q.   (BY MR. MOHAMMEDI)  So you do -- you do

14   get representions from the management and the

15   standard allows it; correct?

16        A.   I'm sorry, you've interrupted me.  May I

17   complete?

18        Q.   I just -- you know, I -- this is not --

19   this is not a two-hour explanation.  I'm just

20   asking, did the audit --

21        A.   You've asked me to respond to the

22   material that you've highlighted as to what it

23   means, and I'm responding to it.

24        Q.   So the standard allows for the

25   management --

This Transcript contains Confidential Material

```
 1                    MR. HAEFELE:  Mr. Mohammedi, you

 2          continue to interrupt the witness.

 3                    MR. MOHAMMEDI:  Stop, Robert.  Let me

 4          ask the question.

 5                    MR. HAEFELE:  No, you've already

 6          asked the question that the witness is in the

 7          middle of an answer.

 8                    MR. MOHAMMEDI:  It's not --

 9                    MR. HAEFELE:  The witness --

10          Omar, stop.

11                    MR. MOHAMMEDI:  We have to go off

12          record if you want to argue, because I have

13          the specific question --

14                    MR. HAEFELE:  No, you have to let the

15          witness answer the question.  I'll stop.  Let

16          the witness answer.

17      Q.    (BY MR. MOHAMMEDI)  Does the standard

18   allow for --

19                    MR. HAEFELE:  Let the record reflect

20          that the witness has not finished answering

21          the prior question.

22                    MR. MOHAMMEDI:  Go ahead.

23      A.    The objective of the auditor are to do

24   two things as shown on this page:  To obtain written

25   representations from management and other relevant
```

This Transcript Contains Confidential Material

```
 1   persons that they've fulfilled their responsibility
 2   to prepare the financial statements and for the
 3   completeness of that information.
 4            That's one element you see in every --
 5   I've seen it in essentially every financial
 6   statement I've ever looked at, that management will
 7   attest that they've met their responsibilities.
 8            And then there's a second part, which is
 9   also essential which is support that -- to support
10   other audit evidence relevant to the financial
11   statements or specific assertions by means of
12   written representations if determined necessary by
13   the auditor or acquired by other ISAs, and then
14   there's more on the next page which we should go to.
15      Q.   (BY MR. MOHAMMEDI)  Let me take you to
16   paragraph 16, page 5.
17              MR. HAEFELE:  Just to be clear,
18          you're not going to let him finish the answer
19          by looking at the rest --
20              MR. MOHAMMEDI:  I just want to look
21          at the specific areas that I'd like to
22          question back.
23              MR. HAEFELE:  But he's indicated he
24          needs to see the next page.
25      Q.   (BY MR. MOHAMMEDI)  Okay.  He can see the
```

This Transcript Contains Confidential Material

```
 1    next; but let me ask the question first and keep
 2    going and tell me if based on what you review on the
 3    next page?
 4                    MR. HAEFELE:  I don't understand why
 5          you can't let the man answer the question.
 6          Q.    (BY MR. MOHAMMEDI)  Okay.  Go ahead and
 7    answer the question.
 8          A.    I would like to see the further part
 9    which those paragraphs pertain to.  There is a part
10    C, I believe.
11                It would be the next page following on
12    the page we looked at a moment ago.
13          Q.    Okay.  So before we go to page -- to C,
14    I'd like to direct you to Section 16, which are part
15    of the -- if you go -- before we go to C, and then
16    allow you to go through C and tell me what you
17    think.
18                    MR. HAEFELE:  Let me just -- I'm
19          going to object to you breaking his train of
20          thought and not letting him answer the
21          question.
22                    Go ahead, Omar.  If you want to ask
23          the question and prohibit the --
24                    MR. MOHAMMEDI:  I am not prohibiting,
25          I'm going -- I'm going in chronological order,
```

This Transcript Contains Confidential Material

```
 1            and he -- and the witness want to go C, we're
 2            not even there yet.
 3                 So I'm going to ask for paragraph 16,
 4            where the auditor, I guess doubt as to the
 5            reliability of written representations.  If
 6            the auditor has concern about the competence,
 7            integrity, ethical values, or diligence of
 8            management or about his commitment to or
 9            enforcement of these, the auditor shall
10            determine that effect that such concerns may
11            have on the reliability of representations,
12            (oral or written.)
13                 Is that fair to say?
14       A.    Yes.
15       Q.    (BY MR. MOHAMMEDI)  That is the standard,
16  right?  Part of the standard?
17       A.    Yes.  That's correct.
18       Q.    Did WAMY auditor ever conclude that an
19  audit could not be completed due to concern about
20  competency and integrity, ethical values or
21  diligence of WAMY management?
22            MR. HAEFELE:  Objection to form.
23       A.    I would have to go back and look at each
24  of the audits on that point.  There were a number of
25  issues that arose in connection with the WAMY audit,
```

This Transcript contains Confidential Material

1  which I covered in my report; but after this number

2  of hours of testimony, I can't bring to mind

3  precisely what I said about each of the WAMY audits.

4  I would have to go back and look at them in order to

5  do that.  But I know paragraph 17, right below the

6  paragraph you quoted which is also relevant and

7  which I would like to have included in the record,

8  which is the notion of further work in order to

9  determine what's actually going on when necessary.

10          And good audits are going to do both 16

11  and 17, when issues arise.  And I'd have to look at

12  the WAMY audits again.  There were certainly audits

13  of some of the charities that did raise those

14  issues.  I believe it's on IIRO, but I believe that

15  there was some for the others as well, it's just at

16  this point I am fatigued, and I would have to look

17  at the particular audits in order to look at each

18  one and assess what the auditors said regarding each

19  one, as I did in some detail in my rebuttal report.

20      Q.    (BY MR. MOHAMMEDI)  In your

21  Section 2.17.2, at page 11, it's related to WAMY

22  Pakistan again.  Of your rebuttal report.

23          You are stating that the audit lacks of

24  control but the audit described the type of control

25  of booking error by WAMY; is that correct?

```
 1              MR. HAEFELE:  Object to the form.
 2     A.    First, you said we would go back to the
 3  other question, and I would like to do that before
 4  going on to this new area which relates to another
 5  part of my report.
 6              May we do that?
 7     Q.    (BY MR. MOHAMMEDI)  No.  We are going to
 8  this -- to this section now.
 9     A.    Okay.
10              Section -- oh, yeah.  Yeah.  We had --
11  there's quite a bit on the limitations in the WAMY
12  audits, which I addressed in the report.  Which
13  section do you want me to go to, please?
14     Q.    My question is that, isn't that true,
15  that when the auditor refers to some booking errors,
16  really describe the type of control that you claim
17  it does not exist at WAMY when they hired reputable
18  auditor to go through their financial statements and
19  audit their financial matters?
20              MR. HAEFELE:  Objection to form.
21     A.    This paragraph, paragraph 2.17, describes
22  various weaknesses and deficiencies in the audit
23  that we're talking about, which is that the audit
24  did not include release dates; we could not possibly
25  determine when -- whether they were timely.  And
```

This Transcript Contains Confidential Material

1    then it goes into a variety of other issues.  Let me

2    just see which part we are in.  Hold on.  We're in

3    paragraph 2.17.3, which is the 2000 audit.  Is that

4    correct?  The 2000 audit?

5         Q.    (BY MR. MOHAMMEDI)  2001 -- 2000 audit, I

6    believe, yes.

7              It's 2000-2001, audit.

8              MR. MOHAMMEDI:  So we can bring that

9         up.  Why don't we bring that up.  That is

10        Exhibit 56.

11        A.    That would be better.  Thank you.

12              (Winer Deposition Exhibit 934, World

13              Assembly of Muslim Youth - Pakistan

14              Office, Accounts for the Year Ended

15              30 Zulhijjah 1422 Hijrah, was marked

16              for identification.)

17        Q.    (BY MR. MOHAMMEDI)  So if you can see it

18    in page 3 of that exhibit, the bookkeeping -- the

19    audit refer to the error by WAMY, was an error

20    failure to report the donation in kind value of

21    tent, food stuff, clothes, and medicine.

22              Right?

23              [Document review.]

24        A.    Yes, that's correct.  That's what it

25    says.

This Transcript Contains Confidential Material

```
1        Q.    (BY MR. MOHAMMEDI)  So other than the
2   auditor's reporting to in kind value, you failed to
3   include that, what the auditor had said after that,
4   when he said:  In our opinion, except for the matter
5   discussed in the above paragraph, the financial
6   statements give a true and fair view of the
7   financial position of WAMY as to -- as of 30
8   Julhijjah -- sorry, it's written Zulhijjah, 1422
9   Hijrah, which is the date -- and of the result of
10  its operations and its cash flow for the year that
11  ended prepared in accordance with accounting -- the
12  International Accounting Standard as applicable in
13  Pakistan.
14             And that's the auditor's statement, on
15  page 3.
16       A.    Yes, and we're talking which audit year
17  again, please?
18       Q.    That's 2001, the one we just put it on
19  for you to review.
20       A.    Right.
21             I quoted extensively from the reports
22  what the auditors found.  The last sentence that you
23  have put down is that they've accepted assurance
24  from the Jeju that all of WAMY's transactions have
25  been reflected in the records.
```

This Transcript Contains Confidential Material

```
1              It's certainly not clear to me from this
2    report what testing was done of this in the field to
3    determine whether what was reported is what was
4    actually spent.  So they're -- they're -- they're
5    noting here, limits on independent confirmation and
6    acceptance of assurance.
7              And that's a critical sentence, as far as
8    I'm concerned.
9         Q.   Do you have any evidence to show that
10   food, tents, clothes went to al-Qaeda instead of the
11   needy, based on the report?
12        A.   We don't know what went where based on
13   the report.  What we know is that the discrepancy is
14   very substantial in terms of being locked, the sheer
15   amount.  As a percentage of the total.
16        Q.   The discrepancy was failure to report;
17   correct?
18        A.   It's a discrepancy in financial reporting
19   which took place at the very time the -- when the
20   area covered by that office of WAMY, the
21   Pakistan/Afghanistan border regions, was one of the
22   centers for al-Qaeda in its preparation for attacks
23   in the United States.
24             And it also -- there's a question here as
25   to when this report was prepared as well.  Which I
```

This Transcript Contains Confidential Material

```
 1   note in my expert report, because the -- the audit

 2   is stamped, but it's with a June 12th date with the

 3   year illegible, and it's the same as an audit report

 4   for another year, the same June 12th date, raising

 5   the question of whether both audits, one for 2000,

 6   2001, were both delayed until June 2003, and if so,

 7   why?

 8            So there are a number of questions that I

 9   had which I can't answer about what this report

10   actually attests to and whether it meets

11   International Accounting Standards.

12       Q.    And it is -- so you do not have any

13   evidence that food, tents, clothes went to al-Qaeda

14   instead of the needy; correct?

15       A.    I don't believe the auditor had any

16   evidence one way or the other.

17       Q.    Right.  The question is to you.  Do you

18   know --

19       A.    The question -- the issue is not the

20   evidence that I have.

21       Q.    No, the question is the evidence that you

22   have; it's not what the auditor has.  Because you

23   are claiming that this went to al-Qaeda, so the

24   evidence is for you to prove, not for audit.  Audit

25   is not saying that.  You are saying that.
```

This Transcript Contains Confidential Material

```
 1              The auditor is not saying that.  You are
 2    saying that.
 3                   MR. HAEFELE:  Objection to form.
 4        Watch your tone, please.
 5        A.    Is that a question, sir?
 6        Q.    (BY MR. MOHAMMEDI)  The question, do you
 7    have any evidence that food, tents, clothes went to
 8    al-Qaeda instead of the needy?
 9        A.    This report does not allow one to know
10    what the material -- what the goods went to or even
11    if the goods that went there were as represented in
12    the report.
13        Q.    And what is in your report is an
14    assumption; correct?
15        A.    I couldn't understand your last --
16        Q.    What's in your report is assumption.
17              You're assuming.  You don't have evidence
18    to show.
19        A.    I disagree with your characterization of
20    my report and of the testimony I've given.
21        Q.    Okay.  In your rebuttal Section 2.17.5,
22    page 14, from 1998 to 1994, Pakistan audit.  You're
23    referring to that.
24              You went on and explained the categories
25    are student welfare.  That is a red flag; right?
```

1    For supporting terrorists.  Is that correct?

2         A.    It's a red flag for the kind of slush

3    fund category that would enable a charity operating

4    in an area of conflict to provide support for a

5    terrorist group because it's providing support for

6    young men in an area of conflict that is foreign to

7    them.  In other words, you had foreign fighters in

8    this period of time in Pakistan and Afghanistan,

9    foreign meaning they're not Pakistani and they're

10   not Afghani, and there's money being provided for

11   them for student welfare.  So it's a slush fund.

12   And there are no controls.  There's a complete lack

13   of controls.  There's no evidence of any controls on

14   the actual uses.  And that's what I'm -- my

15   statement is essentially saying.

16        Q.    Do you know which is the objective of

17   WAMY?

18              Do you know the name itself, what it

19   means?  The World Assembly of Muslin Youth?

20                   MR. HAEFELE:  Object to form.

21        Q.    (BY MR. MOHAMMEDI)  Do you know the

22   objective of providing student with funds to educate

23   them?

24        A.    Yes, I'm -- but what -- it's more

25   difficult for me to know what's being done when the

This Transcript Contains Confidential Material

```
 1    people to whom the funds are being provided are in
 2    an active area of conflict or in an area that is
 3    over -- has got a substantial number of terrorist
 4    training camps and a terrorist presence in it.
 5         Q.    And that's --
 6         A.    And the issue --
 7               Let me finish my answer, please, sir.
 8         Q.    Go ahead.
 9         A.    Thank you.
10               So the issue is the location of where the
11    activity is, and the fact that this category of
12    funding is different from the kinds of categories of
13    funding audits show for areas that were not in
14    conflict.  You don't -- I didn't see these
15    categories in the other -- in the audits you
16    provided to me, and were provided to me, for WAMY,
17    in areas that were not conflict zones, that were
18    less susceptible to terrorist risk.
19               The fact that these categories appear in
20    these audits in this location at this time is of
21    concern and fits precisely within the
22    vulnerabilities that have been -- that have been
23    evident for years, and which reflect the 1996
24    findings of the CIA in the 1966 report -- pardon me,
25    the 1996 report in Bosnia.
```

This Transcript Contains Confidential Material

```
 1              So it's not merely that this is a

 2   category of potential substantial risk and abuse,

 3   it's also that this category was not present --

 4        Q.    Okay.  And --

 5        A.    -- in the audits that took place after

 6   9/11, in areas that were not conflict areas.

 7        Q.    So your testimony, because it's in an

 8   conflict zone that then it should be used to support

 9   terrorism; correct?

10        A.    That's not a correct statement of my

11   views or --

12        Q.    You said that exactly.  You said because

13   of a place of conflict.  That's exactly what you

14   said.  Correct?

15              MR. HAEFELE:  Objection,

16    argumentative.

17        A.    It is not exactly what I said.

18        Q.    (BY MR. MOHAMMEDI)  Okay.  Let me -- so

19   is it fair to say --

20        A.    That's not what I said at all.

21        Q.    Okay.  So is it fair to say place of

22   conflict and the places where there is a war, where

23   there are refugees, place of, that's exactly -- we

24   can assume that where you have the students' welfare

25   being used to help the population that is affected
```

This Transcript Contains Confidential Material

1    by the war; correct?

2         A.    That's partially true.  There's going to

3    be refugees in many areas that are affected by war

4    and conflict.  The issue is that in this area they

5    were foreign fighters.  And so it made it

6    particularly vulnerable.  And when you have an area

7    that's particularly vulnerable to abuse because of

8    the overall conditions, it's a good idea to put more

9    controls in place.  And rather than having more

10   controls in place, what you have instead is this

11   kind of slush fund category, that you don't see

12   elsewhere.  And this was precisely the period of

13   time when al-Qaeda was preparing using foreign

14   fighters who had been in conflict zones to send them

15   to the United States and had them in training camps.

16        Q.    As you sit here, you have no facts to

17   show that; correct?

18              MR. HAEFELE:  Objection.

19        A.    I disagree with your assertion.

20        Q.    (BY MR. MOHAMMEDI)  And the facts are in

21   your report; correct?

22              MR. HAEFELE:  Objection to form.

23        A.    There are facts in my report which

24   references additional reports.  There was

25   paramilitary support by charities for combatants in

This Transcript Contains Confidential Material

```
1    the countries that were going through religious war

2    or wars involving Muslims and non-Muslims.

3             And --

4         Q.    (BY MR. MOHAMMEDI)  Mr. Winer --

5         A.    Okay.

6         Q.    Mr. Winer, why do you always refer to

7    this matter of conflict as a religious war, Muslims

8    versus non-Muslims.  Do you know?

9             MR. HAEFELE:  Objection to form --

10        wait.  Objection to form, objection he cut the

11        witness off, and objection to the

12        argumentative nature of your constant barrage

13        with the witness.

14        A.    I'm responding to your questions with

15   answers that reflect my understanding of how

16   al-Qaeda built its global strike capability over a

17   period from the late 1980s through the late 1990s in

18   preparation for 2001.  And this is how it did it.

19   And I have described that over the course of my

20   testimony and over the course of my reports, and

21   I've referenced a great deal of material in both.

22        Q.    (BY MR. MOHAMMEDI)  I just for the

23   record, I, for the seven hours that I have been

24   asking you questions about this matter, you have not

25   provided one single fact related to your statements
```

This Transcript Contains Confidential Material

```
 1    about money being used to support al-Qaeda.

 2                MR. HAEFELE:  Objection, and

 3         that's --

 4                MR. MOHAMMEDI:  -- before this.

 5                MR. HAEFELE:  Objection to the

 6         dialogue.  There is no question there.

 7         Objection to your characterization --

 8                MR. MOHAMMEDI:  Is that correct?  Is

 9         that correct?

10         A.    No, it's not correct.  And the facts are

11    set forth in my report and in the documents

12    referenced in my report.

13         Q.    (BY MR. MOHAMMEDI)  Okay.

14         A.    And I do provide specific examples in the

15    report.  You've chosen not to ask questions about

16    them.

17         Q.    I did ask a lot of questions about them,

18    but you don't have the facts.  There is no facts in

19    your report, and I'm asking you to show me the facts

20    in this deposition; correct?

21         A.    Am I invited to go through the elements

22    of my report that I would like to talk about?

23         Q.    I have given you all the chances to do

24    that.

25                Sir, let me --
```

This Transcript Contains Confidential Material

```
 1        A.    I -- sir, I don't agree with that
 2   characterization.
 3              MR. HAEFELE:  Neither do I.
 4        Q.    (BY MR. MOHAMMEDI)  So do you -- again,
 5   do you have any facts showing that any money from
 6   student welfare went to support al-Qaeda?
 7        A.    Because the controls were so weak.
 8   There's no information that is available to show
 9   precisely what the funds were actually spent for in
10   the field.  That's the problem when you have lack of
11   controls.  And the 9/11 Commission talked about this
12   and other experts have talked about this.  If you
13   don't have controls on the expenditure of cash in
14   the field, or even the provision of goods, and it is
15   going to people who are training to be fighters, to
16   militants, and they cross over into terrorism and
17   it's going to people at terrorist training camps,
18   that's providing material support.
19              Now, when you don't have the controls in
20   place, it's going to be very difficult for anyone to
21   reconstruct exactly when it happened and with whom.
22   But there are data points, and the data points I go
23   into in my report.  This part of my report is about
24   the material weaknesses in the controls.  And so
25   what you're asking me is, do you have proof that the
```

This Transcript Contains Confidential Material

```
 1   material weaknesses in the controls caused this

 2   person to engage in training, who then became a

 3   terrorist and participated in the 9/11 attack.  And

 4   the answer is, there is no proof of that because by

 5   their very nature, this funding took place, the

 6   support took place without the controls that would

 7   have enabled anyone to reconstruct the support that

 8   led to al-Qaeda.

 9            So instead, one has to rely on a lack of

10   controls and the material deficiencies in the

11   controls, the presence in the location, the nature

12   of the people who were being served, the fact that

13   they're foreign fighters rather than domestic or

14   local -- they're foreigners rather than domestic or

15   local people, and a variety of other factors as I've

16   illustrated in the report.

17            Moreover, the report goes into facts such

18   as the provision of travel documents and

19   facilitation and so on.  One would then have to get

20   quite granular, and you've not asked me about those

21   granular issues.

22       Q.   I did ask you to answer them, but let's

23   move on.

24            Now, rebut -- in your rebuttal 2.34-2.35,

25   page 28-29, you stated at Section 2.34, I understand
```

This Transcript Contains Confidential Material

1    that WAMY's counsel in a premotion meet-and-confer

2    represented that WAMY's overseas branch officers

3    were recalcitrant and many of the offices did not

4    properly maintain office records and did not submit

5    required financial, administrative, operations, and

6    activity reports to WAMY headquarters.  And you said

7    as documented in a Plaintiffs' Reply Memo of Law,

8    whose substance on that issue did not refute.

9                In Section 2.35, you quote plaintiffs'

10   counsel legal brief arguing that statement by WAMY

11   counsel allegedly considered judicial admission; is

12   that correct?

13       A.    This language speaks for itself, I

14   believe.

15       Q.    Are counsel legal argument evidentiary

16   basis for you to render an opinion?

17                MR. HAEFELE:  Objection to form.

18       A.    I see these letters as providing

19   contemporaneous records of communication that took

20   place in relationship to this case.  If there are

21   other contemporaneous records regarding these

22   communications that are different from this, I would

23   be pleased to review them and add them to my report.

24       Q.    (BY MR. MOHAMMEDI)  Did you ask

25   plaintiffs' counsel if there was any finding to

This Transcript Contains Confidential Material

1    rebut their claim?

2              MR. HAEFELE:  Objection to form.

3    A.    I understand that this was the material

4    that was available on this issue.

5    Q.    (BY MR. MOHAMMEDI)  And you --

6    A.    It's all in quotes.

7    Q.    Okay.  My question, did you ask

8    plaintiffs' counsel if there was any filing to rebut

9    their claims?

10             MR. HAEFELE:  Objection to form.

11   A.    I wanted to know whether this was

12   complete on these issues, and I understood that this

13   was complete off of this issue.

14   Q.    (BY MR. MOHAMMEDI)  Are you aware that

15   WAMY moved for and was granted reconsideration based

16   specifically on plaintiffs' argument, raised only on

17   reply motion not raised in their moving papers, that

18   WAMY's counsel supposedly stated that office

19   branches failed to provide reports to headquarters

20   and that WAMY's compliance with discovery

21   obligations relied upon those uncooperative

22   branches?

23             MR. HAEFELE:  Objection --

24   Q.    (BY MR. MOHAMMEDI)  Are you aware that

25   WAMY moved for motion for reconsideration and was

This Transcript Contains Confidential Material

```
 1   granted?

 2                  MR. HAEFELE:  Objection to form.

 3                  This is --

 4        A.    I don't know what WAMY's counsel

 5   plaintiffs -- pardon me, for the defendants, did

 6   following this set of communications.  If there's

 7   information that's relevant, I'm happy to review it.

 8        Q.    (BY MR. MOHAMMEDI)  Let's put Exhibit 59.

 9   Motion for reconsideration.

10                  (Winer Deposition Exhibit 935,

11                  Defendants World Assembly of Muslim

12                  Youth Saudi Arabia and World Assembly

13                  of Muslim Youth International

14                  Memorandum of Law in Support of

15                  Motion for Reconsideration of Section

16                  IV of The Court's Motion to Compel

17                  Ruling, was marked for

18                  identification.)

19        Q.    (BY MR. MOHAMMEDI)  If you go to page 3

20   and footnote 2 of the motion, it says -- so if you

21   go to:  These allegations could not be farther from

22   the truth.  PEC's statements mischaracterize the

23   meet-and-confer between WAMY and PEC and blindly

24   assume that branch offices were solely responsible

25   for collecting documents, without any oversight and
```

This Transcript Contains Confidential Material

```
 1    control by WAMY's counsel.

 2              And the footnote states, the only chapter

 3    that has ignored counsel's instructions and

 4    directives is the Canada chapter.

 5              And I can't read -- if you can make that

 6    smaller, I can just --

 7              It says -- yes, thank you.

 8              So there is a footnote there that says

 9    about only WAMY Canada, but that was not by the

10    other chapters.  Do you see that?

11              MR. HAEFELE:  Objection to form.

12         Q.   (BY MR. MOHAMMEDI)  And use it for a

13    motion for reconsideration and it was granted.  Do

14    you know that?

15         A.   No.

16         Q.   Okay.  Let me direct you to Exhibit 60 of

17    the court order.

18              (Winer Deposition Exhibit 936, In Re:

19               Terrorist Attacks on September 11,

20               2001 Opinion and Order, was marked

21               for identification.)

22         Q.   (BY MR. MOHAMMEDI)  If you go -- this is

23    a court order.  In this -- related to this issue

24    that you raised in your report.

25              MR. HAEFELE:  Objection, apples and
```

This Transcript Contains Confidential Material

```
1          oranges.  Geez.  Omar, this is --
2                    MR. MOHAMMEDI:  No problem.
3                    MR. HAEFELE:  This is way beyond the
4          scope --
5                    MR. MOHAMMEDI:  Not speaking
6          objection.  You get to stop.  You need to let
7          me --
8                    MR. HAEFELE:  Objection --
9                    MR. MOHAMMEDI:  No speaking
10         objection.
11                   MR. HAEFELE:  Objection, scope,
12         vague, confusing --
13                   MR. MOHAMMEDI:  No, stop.  The
14         witness has -- has said in his report, I refer
15         to your letter and your motion, and ignored
16         the court order as well as a motion for --
17                   MR. HAEFELE:  But you're mixing
18         apples and oranges here.
19                   MR. MOHAMMEDI:  I am not.  Please,
20         Robert, stop.  You need to let me finish.
21         Okay?
22                   MR. HAEFELE:  Please finish.
23                   MR. MOHAMMEDI:  Thank you.
24                   Can you make it smaller, please?
25                   MR. HAEFELE:  But really small.  Like
```

This Transcript contains Confidential Material

1    off-the-screen small.

2              MR. MOHAMMEDI:  Thank you.

3    Q.   (BY MR. MOHAMMEDI)  Eleven of the bank

4    branches identified by the PECs are not actually

5    offices; rather work was conducted in these

6    countries from branch offices in other locations.

7              Other branch offices were not formed

8    until at least 2000, which suggests the number of

9    responsive documents will be limited.  For the

10   remaining offices, WAMY has produced tens of

11   thousand of pages for each office, including

12   hundreds of financial documents.

13             As a result, WAMY has addressed the PEC's

14   concern regarding the 22 specific WAMY overseas

15   branch and the four WAMY branch offices in the

16   Kingdom.  And it refers to the ECF filing.  That was

17   an order for a motion for reconsideration in which

18   we make the statement that was not plaintiffs --

19   that was statement from plaintiff was not correct,

20   and the judge order and grant to WAMY the motion for

21   consideration that WAMY fulfilled its obligation to

22   search and produce the financial document.  Correct?

23             MR. HAEFELE:  Objection to the form

24        of the question.

25   A.   In order to be able to respond to this

This Transcript Contains Confidential Material

1    document, I would need to be able to see more than

2    just the material which you've highlighted in

3    yellow.

4         Q.   (BY MR. MOHAMMEDI)  Have you considered

5    this material before you rendered your opinion?

6         A.   I had not seen this material.

7         Q.   Okay.

8         A.   And I can't evaluate it.

9         Q.   Okay.

10             MR. MOHAMMEDI:  How many times we

11        have from seven hours and 30 minutes?

12             THE VIDEOGRAPHER:  We have ten

13        minutes left.

14             MR. MOHAMMEDI:  Can we take the ten

15        minutes to just regroup and come back?  Just

16        take five minutes to see if we have any

17        further questions from our side.

18             MR. HAEFELE:  What was that last

19        number of that last exhibit?

20             THE REPORTER:  The last exhibit was

21        936.  I marked it.

22             THE VIDEOGRAPHER:  We're going to go

23        off the record.  7:42 p.m.

24             (Recess taken, 7:42 p.m. to

25             7:50 p.m. EDT)

This Transcript Contains Confidential Material

```
1              THE VIDEOGRAPHER:  Back on the record
2         at 7:50 p.m.
3              MR. MOHAMMEDI:  Mr. Winer, I do
4         believe we're done for today.  I guess we will
5         reconvene back tomorrow, back at 10:00 a.m.
6              MR. HAEFELE:  Well, actually, we need
7         to start a little earlier tomorrow, I think,
8         at 9 o'clock.  So can we convene tomorrow at
9         9 o'clock and the witness will be available at
10        that time.
11             MR. MOHAMMEDI:  Aisha?
12             MS. BEMBRY:  Robert, you need to
13        start at 9:00?  I mean, we have, what,
14        13 hours, so we've done seven and a half, we
15        have about five and a half hours to go.  Is
16        there a reason you need to start at 9?
17             MR. HAEFELE:  That's what Mr. Winer
18        has indicated a preference, and quite frankly
19        I don't disagree with him.  I think that that
20        would be a preference on everybody's part on
21        our side.
22             THE WITNESS:  I can represent that I
23        have both personal and family issues that have
24        arisen in the last day, as well as
25        professional obligations in the latter part of
```

This Transcript Contains Confidential Material

1        the day, and therefore I prefer starting as

2        early as possible, if it is possible.

3                MR. HAEFELE:  I quite frankly -- I

4        didn't realize we would go this late today and

5        still have as much left tomorrow.

6                MR. MOHAMMEDI:  Can you do 9:30?

7                MR. HAEFELE:  Is there a reason why

8        we need to start later?

9                MS. BEMBRY:  It's fine.  Let's go

10       with 9:00 a.m.  We can make that work.  We'll

11       start at 9:00.  Omar, is that okay?

12               MR. MOHAMMEDI:  I mean, I prefer

13       9:30, if that's possible.  Can we do 9:30?

14               MR. HAEFELE:  I'll leave it up to

15       Mr. Winer.  I don't understand why we can't --

16               THE WITNESS:  It's a question of how

17       late we have to go tomorrow.  I have other

18       obligations and something has arisen today, as

19       well as some client work in the evening.  So,

20       if we start at 9:30, I really hope it doesn't

21       go until --

22               MR. MOHAMMEDI:  I think we have done

23       most of the -- I mean, we are over half, so we

24       have done more than half and tomorrow is not

25       going to go this -- to 7.  Or 7:30.  And if we

This Transcript Contains Confidential Material

```
1          can start 9:30, would be better.

2                    MR. HAEFELE:  Omar, are you

3          representing that at least for now, WAMY's

4          questioning is done?  You're done?  Your

5          questioning?

6                    MR. MOHAMMEDI:  We have to -- we have

7          about few minutes left.  We might be using it

8          tomorrow.

9                    MR. HAEFELE:  Are you meaning you

10         might start tomorrow or you're anticipating at

11         the end --

12                   MR. MOHAMMEDI:  I'm not sure if we

13         would start or not, but we have a few minutes

14         at end we might be using.

15                   MR. HAEFELE:  So are we anticipating

16         picking up with somebody from IIRO, Muslim

17         World League tomorrow?

18                   MS. BEMBRY:  Yes, Eric will be

19         starting tomorrow.

20                   MR. HAEFELE:  Okay.  All right.

21                   MS. BEMBRY:  So are we at 9:30 or

22         9:00?

23                   MR. HAEFELE:  I leave it to Mr. Winer

24         at this point.  I'm just not sure why we can't

25         start at normal start time.
```

This Transcript Contains Confidential Material

```
 1                THE WITNESS:  I will accommodate and
 2         be at 9:30.  I hope that you will have a much
 3         more limited time that is not a credit towards
 4         the clock tomorrow.  There was a lot of time
 5         tolled that was not credited towards the
 6         clock, which is why this has gone on now for
 7         almost ten hours.
 8                MR. MOHAMMEDI:  And we appreciate
 9         that, Mr. Winer.  Thank you very much for
10         being gracious.
11                THE VIDEOGRAPHER:  Are we all done?
12                MS. BEMBRY:  Yep.
13                THE VIDEOGRAPHER:  This ends today's
14         deposition.  We're going to go off the record
15         at 7:54 p.m.
16                (Time noted: 7:54 p.m. EDT)
17                        --o0o--
18
19
20
21
22
23
24
25
```

This Transcript Contains Confidential Material

```
 1                    CERTIFICATE
 2        I, DEBRA A. DIBBLE, Registered Diplomate
    Reporter, Certified Realtime Reporter, Certified
 3  Court Reporter and Notary Public, do hereby certify
    that prior to the commencement of the examination,
 4  JONATHAN M. WINER was duly sworn by me to testify to
    the truth, the whole truth and nothing but the
 5  truth.
 6        I DO FURTHER CERTIFY that the foregoing is a
    verbatim transcript of the testimony as taken
 7  stenographically by and before me at the time, place
    and on the date hereinbefore set forth, to the best
 8  of my ability.
 9        I DO FURTHER CERTIFY that pursuant to FRCP
    Rule 30, signature of the witness was not requested
10  by the witness or other party before the conclusion
    of the deposition.
11
          I DO FURTHER CERTIFY that I am neither a
12  relative nor employee nor attorney nor counsel of
    any of the parties to this action, and that I am
13  neither a relative nor employee of such attorney or
    counsel, and that I am not financially interested in
14  the
    action.
15
16
17
18        Debra A. Dibble
19  _____
    DEBRA A. DIBBLE, RDR, CRR, CRC
20  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
21  Certified Court Reporter
22
    Dated: 8-3-2021
23
24
25
```

This Transcript Contains Confidential Material

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3        Please read your deposition over carefully and

 4   make any necessary corrections.  You should state

 5   the reason in the appropriate space on the errata

 6   sheet for any corrections that are made.

 7        After doing so, please sign the errata sheet

 8   and date it.

 9        You are signing same subject to the changes

10   you have noted on the errata sheet, which will be

11   attached to your deposition.

12        It is imperative that you return the original

13   errata sheet to the deposing attorney within sixty

14   (60) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition

16   transcript may be deemed to be accurate and may be

17   used in court.

18

19

20

21

22

23

24

25
```

This Transcript Contains Confidential Material

```
 1                         ERRATA

 2    PAGE   LINE   CHANGE

 3    _____  _____  _____

 4       REASON: _____

 5    _____  _____  _____

 6       REASON: _____

 7    _____  _____  _____

 8       REASON: _____

 9    _____  _____  _____

10       REASON: _____

11    _____  _____  _____

12       REASON: _____

13    _____  _____  _____

14       REASON: _____

15    _____  _____  _____

16       REASON: _____

17    _____  _____  _____

18       REASON: _____

19    _____  _____  _____

20       REASON: _____

21    _____  _____  _____

22       REASON: _____

23    _____  _____  _____

24       REASON: _____

25
```

This Transcript Contains Confidential Material

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4         I, JONATHAN M. WINER, do hereby certify that I
       have read the foregoing pages and that the same is a
 5     correct transcription of the answers given by me to
       the questions therein propounded, except for the
 6     corrections or changes in form or substance, if any,
       noted in the attached
 7     Errata Sheet.

 8

 9

10

11

       _____
12       JONATHAN M. WINER                       DATE

13

14

       Subscribed and sworn to before me this
15     _____ day of _____, 20 _____.

16     My commission expires: _____

17

18     _____
19     Notary Public

20

21

22

23

24

25
```

This Transcript Contains Confidential Material

```
 1                     LAWYER'S NOTES

 2

 3     PAGE     LINE

 4     _____    _____    _____

 5     _____    _____    _____

 6     _____    _____    _____

 7     _____    _____    _____

 8     _____    _____    _____

 9     _____    _____    _____

10     _____    _____    _____

11     _____    _____    _____

12     _____    _____    _____

13     _____    _____    _____

14     _____    _____    _____

15     _____    _____    _____

16     _____    _____    _____

17     _____    _____    _____

18     _____    _____    _____

19     _____    _____    _____

20     _____    _____    _____

21     _____    _____    _____

22     _____    _____    _____

23     _____    _____    _____

24     _____    _____    _____

25
```