This Transcript Contains Confidential Material

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2
 3    IN RE: TERRORIST ATTACKS    )   03-MDL-1570 (GBD) (SN)
      ON SEPTEMBER 11, 2001       )
 4                                 )
 5
 6
 7
                            — — —
 8
                     Tuesday, July 13, 2021
 9                          — — —
10               THIS TRANSCRIPT CONTAINS
                   CONFIDENTIAL MATERIAL
11                          — — —
12
13      Remote video-recorded deposition of JONATHAN M.
      WINER, held at the location of the witness,
14    commencing at 10:04 a.m., on the above date, before
      Debra A. Dibble, Certified Court Reporter,
15    Registered Diplomate Reporter, Certified Realtime
      Captioner, Certified Realtime Reporter and Notary
16    Public.
17
                            — — —
18
19
20
21
22
23
                    GOLKOW LITIGATION SERVICES
24            877.370.DEPS | fax 917.591.5672
                      deps@golkow.com
25
```

This Transcript Contains Confidential Material

```
 1              What I did was I looked at, in light of
 2    my own experience and knowledge, which included the
 3    academic analytic work that I did for the U.S.
 4    government, as well as my own tenure working for the
 5    Senate and my two tenures at the State Department,
 6    and the work that I've done on behalf of clients, I
 7    looked at the materials provided to me by the
 8    attorneys in this case, supplemented it with
 9    additional research into the secondary literature of
10    some scholars, who I cite in my reliance material,
11    and that's how I came to my formulations.
12              When there was first-hand information
13    that I thought was particularly relevant, I looked
14    at it.  And when I didn't have it, I asked for more
15    of it.  A particular case of that is there were
16    representations about the extent of audits.  I
17    wanted every audit that I could get my hands on.
18    The more, the better, because that's primary source
19    information that's very important to me.
20        Q.    So let's make it clear on the record that
21    the audit you're referring to are not in your
22    affirmative report.  Right?
23        A.    Yes.
24        Q.    Let's also --
25        A.    Excuse me, the audits for WAMY were not
```

This Transcript Contains Confidential Material

```
 1    in my affirmative report.  There were some IIRO

 2    audits.  I asked for them and I wanted them.  I got

 3    more audits from my rebuttal report and then

 4    analyzed those.

 5         Q.    And let's make it clear that the reliance

 6    materials that you have, the documents produced in

 7    this -- the documents produced in this case were

 8    given to you by plaintiffs' attorneys; correct?

 9         A.    Most of them were, or many of them were.

10    I supplemented as best I could with additional

11    research when I felt that additional research that I

12    was able to get in the limited amount of time that I

13    had between the time of my retention and the time

14    that my report was due, I would supplement.

15         Q.    In your prior testimony, you stated those

16    are the documents that you relied on in rendering

17    your opinion in your affirmative report, correct?

18         A.    Yes.

19         Q.    The index.  Okay.  If an allegation

20    appears in a government document in your

21    methodology, do you accept the fact -- accept it as

22    a fact or do you do anything to attempt to

23    corroborate or dispel fact assertions?

24              MR. HAEFELE:  Objection to form.

25         A.    That's a very broad category, government
```

This Transcript Contains Confidential Material

```
 1   govern that process.
 2           So it will be reviewed from all of those
 3   perspectives.  It may well also have been reviewed
 4   from other perspectives if it was going to be used
 5   in connection with an external legal process.
 6       Q.   Can an NGO designee challenge the
 7   designation in this process?
 8       A.   No.  No, to the best of my knowledge, no.
 9       Q.   Is there any due process procedure for
10   seeking in these matters?
11               MR. HAEFELE:  Objection to form.
12       A.   There's due process proceedings that
13   apply to designations undertaken by OFAC.  In these
14   national security processes, in terms of who is
15   designated as a Tier 1, I don't believe there are
16   any.  However, you're beginning to get into
17   Guantanamo territory, where you have this very
18   complex array of laws as to what is proper and what
19   is not proper when it intersects with the criminal
20   justice system and when it doesn't.  And in that
21   highly technical area, I would have do a great deal
22   of additional study before being able to provide
23   further guidance.
24       Q.   (BY MR. MOHAMMEDI)  But you did have that
25   in your report, right?  You did explain Guantanamo,
```

This Transcript Contains Confidential Material

1    GTMO, in your report?

2        A.    Yes.  But there -- what I'm saying is in

3    order to discuss civil law standards and the

4    opportunity -- where the opportunities might be for

5    it to intersect with U.S. civil laws, that would

6    require further study.  That was not within the

7    scope of what I looked for.

8        Q.    Do you know if Mammar Ameur worked for

9    WAMY?  You mentioned his name.

10       A.    I believe there are references to WAMY in

11   the documents that you briefly showed me the first

12   page of.  I would prefer to go to that document in

13   order to provide a fuller answer.

14       Q.    Just give me a second, please.

15             We can come back to this one, because we

16   need to look at the document.  Let's move on to

17   another section.

18       A.    Just to complete your answer, I think he

19   said he worked for WAMY for three years.

20       Q.    That's what he said.  That's what you

21   believe.  And did you do any independent

22   investigation to find out if he worked for WAMY or

23   not?

24       A.    I don't know how I could have possibly

25   done that in the period between my retention in

```
 1    December 2019 and the period of producing the
 2    report, and I did not.
 3         Q.    Are you familiar with the name Colonel
 4    Wilkerson, from Secretary of State Colin Powell's
 5    office?
 6         A.    Are you talking about Larry Wilkerson?
 7         Q.    I believe so, yes.
 8         A.    Yes.  I know him.
 9         Q.    You know him, right?
10         A.    Yes.
11         Q.    Good.  What do you think about him?
12         A.    He's a complex person.
13         Q.    That's nice way of saying it.  When you
14    say complex, I mean, do you find him credible?
15               MR. HAEFELE:  Objection to the form.
16         A.    It depends on what he's talking about.
17    It depends on what the issue is.  He has very strong
18    opinions on a variety of topics.
19         Q.    (BY MR. MOHAMMEDI)  Did you review his
20    declaration?
21         A.    I don't remember at this moment
22    Colonel Wilkerson's declaration.
23         Q.    I don't believe you did, because we don't
24    have it in your reliance material.
25         A.    Yeah, I don't remember reviewing it.
```

This Transcript Contains Confidential Material

```
 1        Q.    If you can just put exhibit up for our

 2    purpose 16, perhaps.

 3                  (Winer Deposition Exhibit 911,

 4                  Declaration of Colonel Lawrence B.

 5                  Wilkerson (Ret.), was marked for

 6                  identification.)

 7        Q.    (BY MR. MOHAMMEDI)  Have you seen this

 8    document?

 9        A.    No.

10        Q.    You have not seen this document.  Do you

11    know this document is in the production?

12        A.    No.

13        Q.    I am going to direct you to paragraph 9.

14    That's A-E, which is page 4-5.

15              Do you want to take a minute to read it?

16        A.    Yes, I do.  I'd like to be able to read

17    the entire document before I --

18        Q.    So in that case, we'll --

19        A.    As I've not seen it before.

20        Q.    Sure.  We'll go off the record while

21    you're reviewing, Mr. Winer.

22                  THE VIDEOGRAPHER:  We'll go off the

23         record.  The time is 3:52 p.m.

24                  (Recess taken, 3:52 p.m. to

25                  3:54 p.m. EDT)
```

This Transcript Contains Confidential Material

```
 1                THE VIDEOGRAPHER:  We are back on the
 2      record.  The time is 3:54 p.m.
 3      Q.    (BY MR. MOHAMMEDI)  The question I guess
 4   you -- you just had the chance to review his
 5   declaration.  Do you -- do you agree or disagree
 6   with his statement, paragraph 9, A to E?
 7              And I just need to know if you agree with
 8   his agreement.  I don't need more information.
 9      A.    I can't answer that with an agree or
10   disagree response, sir.
11      Q.    Why not?
12      A.    Because he makes many statements here,
13   not one statement.  And I have not, myself, gone
14   through Mr. Hamad's case to determine whether he was
15   wrongfully seized and detained, whether he was
16   innocent, guilty, partly guilty, partly innocent.  I
17   can't assess any of those things.  I can say that
18   Guantanamo is a serious failure of U.S. policy, and
19   that the way in which the United States approached
20   Guantanamo was not consistent with my values.  I
21   believe that people should be -- matters should be
22   tried in court; and for Mr. Hamad, he was not able
23   to be tried.  And that's a fundamental issue.
24              So having him able to be tried is
25   important.  This is separate from the question that
```

This Transcript Contains Confidential Material

 1    you asked me earlier about the U.S. findings, which

 2    are separate from and not addressed by Colonel

 3    Wilkerson's statement, now that I've read it.

 4         Q.   Okay.  Thank you.  I appreciate your

 5    answer on this.

 6              We can bring this down.

 7              Has WAMY ever been designated under OFAC

 8    treasury of justice?

 9         A.   No, it has not.

10         Q.   Was LBI, which is Lajnat al-Birr

11    al-Islamiah -- I spell it for you -- LBI was ever

12    designated?

13         A.   I don't believe it was, no, sir.

14         Q.   Previous -- I guess you -- you made --

15    sorry, strike that.

16              I will enter into exhibit -- it's our

17    Exhibit 17.  It is a link to a video testimony of

18    the Undersecretary of Department of Treasury to the

19    9/11 Commission, Richard Newcomb.

20              (Winer Deposition Exhibit 912,

21              Terrorism Financing Hearing 2003

22              video clip, was marked for

23              identification.)

24              TRIAL TECHNICIAN:  This is a

25         five-minute video.

This Transcript Contains Confidential Material

```
 1                MR. MOHAMMEDI:  I'd like Mr. Winer to

 2        watch it all.

 3        Q.   (BY MR. MOHAMMEDI)  So it's -- it is a

 4   video -- it's before -- let me see here.

 5                Testimony of undersecretary before the --

 6   if you go before the -- before the -- let me see.

 7   Hold one second before I just --

 8                MR. MOHAMMEDI:  Can you hold on a

 9        second?  Can we go off record just while I'm

10        looking for a second, please?

11                THE VIDEOGRAPHER:  Going off the

12        record.  3:59 p.m.

13                (Recess taken, 3:59 p.m. to

14                4:01 p.m. EDT)

15                THE VIDEOGRAPHER:  We're back on the

16        record.  The time is 4:01 p.m.

17        Q.   (BY MR. MOHAMMEDI)  The exhibit is

18   July 31, 2003.  Testimony before the Senate

19   Governmental Affairs Committee on Terrorism Finance

20   Commission.

21                Do you know Richard Newcomb?

22        A.   Yes.

23                MR. LEWIS:  So I would like to just

24        go to the exhibit where Senator Specter was

25        asking the questions.  If you could just play
```

This Transcript Contains Confidential Material

```
 1          that for us.
 2                    [Exhibit 912 - video played]
 3                    SEN. ARLEN SPECTER:  We will now
 4          proceed with questioning, five-minute rounds,
 5          and the chairwoman has deferred to me for the
 6          first round.
 7                    Mr. Newcomb, in interviews by staff
 8          preparatory to your coming here, you advised
 9          that a good many of your recommendations for
10          sanctions are rejected.  Would you amplify
11          what has happened on that?
12                    RICHARD NEWCOMB:  Yes, Senator.  In
13          identifying key nodes, our responsibility is
14          to identify how these terrorist organizations
15          fit their activities together.  Who are --
16                    SEN. ARLEN SPECTER:  After you've
17          identified them and made the recommendation --
18          I only have five minutes, so I want to focus
19          very sharply on the rejections on the
20          recommendations which involve Saudi sources.
21          Precisely what has happened on that?
22                    RICHARD NEWCOMB:  Well, the
23          designation, as we indicated in our
24          discussions, is not the only possible action.
25          There's also law enforcement, intelligence.
```

This Transcript Contains Confidential Material

```
 1                    SEN. ARLEN SPECTER:  Well, let's
 2           focus on economic sanctions, which is my
 3           question, before we go into other possible
 4           actions.  I want to know about the
 5           recommendations on economic sanctions as to
 6           Saudis, which have been turned down.
 7                    RICHARD NEWCOMB:  Senator Specter,
 8           we've made numerous recommendations including
 9           relating to Saudi Arabia and other terrorist
10           support organizations and groups.  This goes
11           through a policy coordinating PCC process
12           where all of the equities of the government
13           come to the table.
14                    SEN. ARLEN SPECTER:  Well, my
15           question -- my question -- my question focuses
16           on recommendations which you have made for
17           sanctions as to Saudi organizations which have
18           been rejected.
19                    RICHARD NEWCOMB:  Well, first let me
20           say, it's not -- it's the policy not to
21           comment on internal policy deliberations
22           within the government.  I can tell you, these
23           issues have been discussed with all of the key
24           players at the table.  And when there's
25           another possible action that can be taken,
```

This Transcript Contains Confidential Material

```
 1          we've achieved our goal by teeing issues up.

 2          There are --

 3                    SEN. ARLEN SPECTER:  I'm not asking

 4          you about internal deliberations, I'm asking

 5          you -- and let me be -- let me be specific

 6          with some organizations which have been

 7          discussed with you by staff prior to your

 8          coming here.  Were there recommendations as to

 9          the National Commercial Bank of Saudi Arabia

10          for economic sanctions which were rejected?

11                    RICHARD NEWCOMB:  No,

12          Senator Specter, there was not.

13                    SEN. ARLEN SPECTER:  Were there

14          recommendations for sanctions against the

15          World Assembly of Muslim Youth?

16                    RICHARD NEWCOMB:  There, as in

17          others, these are issues that we looked at and

18          examined very carefully.  There was no

19          recommendation out of our office on either of

20          those.

21                    SEN. ARLEN SPECTER:  Well, what

22          conclusions did you come to on the World

23          Assembly of Muslim Youth?

24                    RICHARD NEWCOMB:  That, along with

25          the whole variety of charitable organizations
```

This Transcript Contains Confidential Material

```
 1         operating head offices in Saudi or

 2         organizations that we're looking at, as well

 3         as the whole range of several hundred or so

 4         possible organizations that may be funding

 5         terrorist activities, rising to the level of a

 6         recommendation is a complicated policy

 7         practice --

 8                 SEN. ARLEN SPECTER:  Well, I'm not

 9         concerned about several hundred others.  I'd

10         like to know what about the World Assembly of

11         Muslim Youth.  Were they funding terrorist

12         organizations subject to economic sanctions

13         without any action being taken?

14                 RICHARD NEWCOMB:  I can't conclude

15         that in this hearing today.  It is an

16         organization that we --

17                 SEN. ARLEN SPECTER:  You say you

18         can't conclude it --

19                 RICHARD NEWCOMB:  Cannot.  Cannot.

20                 SEN. ARLEN SPECTER:  -- at this

21         hearing today?

22                 RICHARD NEWCOMB:  Well, we did not

23         conclude that in our deliberations, so I can't

24         say that that was a recommendation of our

25         office.
```

This Transcript Contains Confidential Material

```
 1                    SEN. ARLEN SPECTER:  How about the
 2          International Islamic Relief Organization,
 3          were there recommendations for sanctions there
 4          which were rejected by higher officials in the
 5          Treasury Department?
 6                    RICHARD NEWCOMB:  This is an issue
 7          that we'd looked at.  And again, your question
 8          relates to policy deliberations within the
 9          administration which I can't comment on.  I
10          can tell you we did look at --
11                    SEN. ARLEN SPECTER:  I'm not
12          interested in your policy deliberations.  What
13          I'm interested in is your conclusions.  Were
14          there economic sanctions taken against the
15          International Islamic Relief Organization?
16                    RICHARD NEWCOMB:  To date -- there
17          have not been as of this date.
18                    SEN. ARLEN SPECTER:  Do you think
19          there should be?
20                    RICHARD NEWCOMB:  It's something that
21          we would look at very carefully along with the
22          others participating in the policy process.
23                    SEN. ARLEN SPECTER:  Well, when you
24          look at it very carefully, how long have you
25          been looking at it up until now?
```

This Transcript Contains Confidential Material

```
 1              RICHARD NEWCOMB:  Certainly since
 2         immediately in the aftermath of 9/11.
 3              SEN. ARLEN SPECTER:  Well, that's
 4         almost two years.  How long will it take you
 5         to come to a conclusion?
 6              RICHARD NEWCOMB:  We can recommend
 7         and we can designate, but there is a policy
 8         process which takes into account all of the
 9         variety of --
10              SEN. ARLEN SPECTER:  I've got
11         16 seconds left.  Had you recommended this to
12         any of the organizations I've mentioned to
13         you, some tough economic sanctions which were
14         turned down by higher officials implicitly
15         because they were Saudi organizations?
16              RICHARD NEWCOMB:  I can't say it's
17         because they were Saudi organizations.
18              SEN. ARLEN SPECTER:  Well, can you
19         say whether they were turned down?
20              RICHARD NEWCOMB:  I can say there
21         have been some charities and other
22         organizations that we've considered, we've had
23         at the table, and that have been deferred for
24         other actions which I would deem as
25         appropriate.
```

This Transcript Contains Confidential Material

```
 1              SEN. ARLEN SPECTER:  Well, my red
 2         light went on in the middle of your last
 3         answer, but I'll be back.
 4              RICHARD NEWCOMB:  Okay.
 5              [Video concluded]
 6    Q.   (BY MR. MOHAMMEDI)  Mr. Winer, from 2003
 7  until today, which is 2021 -- and you answered this,
 8  but I want to make sure that I will ask this
 9  question based on this testimony:  WAMY has never
10  been subject to economic sanctions or designation by
11  U.S. government; correct?
12    A.   You dropped off at the end of the
13  sentence.  What I heard is are you asking me whether
14  WAMY has ever been designated by OPP?  Is that the
15  question?
16    Q.   Correct, from 2003 until today, which is
17  2021.
18    A.   It has not.
19    Q.   Do you -- are you aware that WAMY
20  International, which is WAMY USA, exists in
21  Virginia?
22    A.   Yeah, I believe so.  I believe so.  It's
23  not something I focused on, but I believe so.
24    Q.   Let's have the Exhibit 18.  Just want to
25  make sure for the record to put that into evidence.
```

This Transcript Contains Confidential Material

```
 1                    (Winer Deposition Exhibit 913, WAMY

 2                    International, Inc. 2021 Annual

 3                    Report, was marked for

 4                    identification.)

 5                    MR. HAEFELE:  What is Exhibit 18?  Do

 6          you mean --

 7                    MR. MOHAMMEDI:  Yeah, it is WAMY

 8          registration of 2021.  And this is a

 9          registration for WAMY International with the

10          Commonwealth of Virginia State Corporation

11          Commission.

12                    MR. HAEFELE:  Just so we're clear,

13          it's Exhibit 913.

14                    MR. MOHAMMEDI:  Exhibit 913, correct.

15     Q.   (BY MR. MOHAMMEDI)  You didn't consider

16     this in your material when you were rendering your

17     opinion, correct?

18     A.   This document is dated January 23, 2021,

19     so I did not consider it in my report that was

20     written some months before.

21     Q.   (BY MR. MOHAMMEDI)  Mr. Winer, if I

22     represent to you that all the registration of WAMY

23     International from that time until 2020 was

24     submitted and were produced to plaintiff counsel,

25     would you agree with me?
```

This Transcript Contains Confidential Material

```
 1                    MR. HAEFELE:  Object to the form.

 2        A.     Would I agree with you on what, sir?

 3        Q.     (BY MR. MOHAMMEDI)  We have produced the

 4   documents, the registration documents, for every

 5   year including -- every year up to 2020, I believe,

 6   to you -- to the lawyers who hired you in this

 7   production --

 8        A.     Yes.

 9        Q.     -- of this case production.

10        A.     What's the question, please?

11        Q.     The question -- so you said this was

12   2021, and you did not review.  And the question, are

13   you aware that WAMY produced all registrations of

14   WAMY prior to 2021?

15        A.     I was not aware of that production, but I

16   did understand WAMY was still out there, as I said

17   to you a minute ago.

18        Q.     We can take that down.

19                    MR. MOHAMMEDI:  Can we take a

20          five-minutes break?

21                    THE VIDEOGRAPHER:  Going off the

22          record.  4:11 p.m.

23                    (Recess taken, 4:10 p.m. to

24                    4:18 p.m. EDT)

25                    THE VIDEOGRAPHER:  Back on record at
```

This Transcript Contains Confidential Material

```
1        4:18 p.m.

2        Q.    (BY MR. MOHAMMEDI)  Mr. Winer, are you

3   aware of any person who attended madrassas, as you

4   mentioned from WAMY, WAMY madrassas, that became a

5   member of al-Qaeda?

6        A.    I don't know who attended WAMY madrassas

7   and who did not.

8        Q.    But you are not aware of anyone who was

9   at the madrassas that became a member of al-Qaeda?

10       A.    I do not know what madrassas incubated

11   which fighters and which terrorists, period.

12       Q.    Okay.  So the question you are not aware

13   of anyone who attended madrassas, it doesn't matter

14   which type of madrassas, that became a member of

15   al-Qaeda.

16       A.    I know that there are people who became

17   members of al-Qaeda who attended madrassas.

18       Q.    What about WAMY?

19       A.    I don't know which madrassas they

20   attended, whether they were related to WAMY or any

21   other organization that sponsored a madrassas.

22       Q.    So as you sit here, you don't "know"

23   know; correct?

24       A.    That's correct.

25       Q.    Let's go to your report, Section 12,
```

This Transcript Contains Confidential Material

```
 1    which starts with page 104-110.

 2              In your affirmative report, you refer to

 3    Adel Batterjee as chairman of WAMY and global

 4    chairman of WAMY.  Do you remember that?

 5        A.    Yes.

 6        Q.    At that time you did not review WAMY

 7    documents; correct?

 8        A.    I had reviewed some WAMY documents.  I

 9    relied on his identification of himself as that role

10    to the New York Times.  That's not correct.  I

11    corrected it in my rebuttal report.

12        Q.    And you corrected that in your rebuttal

13    report; correct?

14        A.    I did.

15        Q.    Okay.  But then you mentioned in your

16    rebuttal which is 2.38.6, at page 31, if you look at

17    it, and you refer to Batterjee was the chairman of

18    LBI; correct?

19        A.    Yes.

20        Q.    Where do you get that information from?

21        A.    His function and the role in the field at

22    LBI.  I don't have a footnote there.  I don't

23    recollect the source but I believe it to be

24    accurate.

25        Q.    I'm sorry, what do you say?  You believe
```

This Transcript Contains Confidential Material

```
 1   the information is accurate?

 2        A.    I believe that he ran LBI.  And in the

 3   deposition of Noor Wali, Noor Wali talks about

 4   Batterjee's central role.

 5        Q.    I do understand that.  But you paint him

 6   as a chairman of LBI; correct?

 7        A.    He ran it.  Did he have the formal title

 8   of chairman?  I don't recollect.

 9        Q.    And it is fair to say you have not

10   reviewed documents produced in this case as to the

11   role of Batterjee with LBI; correct?

12        A.    I don't think it's fair to say that.  I

13   reviewed Noor Wali's deposition, which goes into it

14   in some depth about Batterjee's role.  I reviewed

15   other documents in which Batterjee was characterized

16   as the founder of LBI.  This includes the U.S.

17   government, and I think the UN's findings about

18   Batterjee, which in turn are consistent with the

19   proffer in the Arnaout case, put together by Patrick

20   Fitzgerald.  All of this is made complicated by the

21   fact that the word al-Barr in Arabic, A-L dash

22   B-A-R-R, I understand to be the word that's

23   translated often as "benevolence."  And that becomes

24   part of the elements of confusion, as well as what

25   Batterjee was doing within LBI and what Batterjee
```

This Transcript Contains Confidential Material

```
 1    was doing within what's known as BIF.

 2         Q.    Mr. Winer, really -- I think -- that is

 3    not my question, and you -- you know, we're spending

 4    a lot of time, and I don't have it.  I am

 5    specifically asking you if you get this

 6    information -- where did you get this information

 7    that Batterjee was the chairman of LBI?  That's the

 8    only question I'm asking.

 9         A.    I don't recollect.

10         Q.    Okay.  And then you go on in the

11    Section 12.12.15, at page 109, and quoting the New

12    York Times again, stated that:  If a BIF worker

13    decides he wanted to join fighting forces, we would

14    not stop him.  But he can no longer officially

15    represent our organization; correct?

16         A.    Yes.

17         Q.    But that's his quote, right?  That's the

18    New York Times quote, right?

19         A.    Yes.

20         Q.    You comment on 12.12.16, page 110, you

21    actually made it -- you changed that quote to say:

22    Instead, his clear message is that nothing would

23    change other than that a person engaged in jihad

24    could no longer "officially" be involved in our

25    organization.  And you said WAMY there?
```

This Transcript Contains Confidential Material

```
 1        A.    Yes.

 2        Q.    You didn't say "our organization"; right?

 3              MR. HAEFELE:  Form.

 4        A.    I understood and believe that Batterjee

 5   was carrying out work on behalf of WAMY and LBI at

 6   the same time.  And the record shows --

 7        Q.    (BY MR. MOHAMMEDI)  Which record are you

 8   referring to?

 9        A.    The record from the financial documents

10   that I looked at from the Batterjee deposition --

11   pardon me, I misspoke.  From the Noor Wali

12   deposition, for starters.  That WAMY was funding the

13   activities of LBI in Pakistan-Afghanistan, at the

14   time.  So I believed he was acting in both

15   capacities at that time in that location.

16        Q.    That's your belief; correct?

17        A.    Yes.

18        Q.    If I represent to you that the

19   document -- the documentary evidence in this case

20   shows that LBI/BIF as separate organization, do you

21   still rely on the government statement that does not

22   provide evidence on this matter?

23              MR. HAEFELE:  Objection to form and

24        foundation.  Misstates the evidence.

25        Q.    (BY MR. MOHAMMEDI)  Do you believe that a
```

This Transcript Contains Confidential Material

1    government employee is always right?

2              MR. HAEFELE:  Objection to form.

3         A.    I'm sorry, I couldn't understand what you

4    just said.  Please repeat it.

5         Q.    (BY MR. MOHAMMEDI)  Do you believe a

6    government employee is always right?

7         A.    No.

8         Q.    And if the documentary evidence in a case

9    that proves the opposite of that government

10   employee, will you consider that?

11             MR. HAEFELE:  Objection, form,

12        foundation, misstates the evidence.

13        A.    I try to consider everything.  In the

14   case of Arnaout and LBI and BIF, and WAMY, you have

15   a very complicated environment in which Arnaout and

16   Batterjee are meeting with key people who are part

17   of al-Qaeda early on, in which WAMY provides early

18   support to LBI, which is simultaneously Saudi and

19   Pakistani.  LBI at some -- at some point Batterjee

20   creates another benevolence, similarly named.  So a

21   person who previously met with Bin Laden becomes

22   head of the U.S. organization.

23             So sorting all of that out in a way that

24   is transparent, clean, and linear is not possible

25   because it's all concatenation.  It has to be looked

This Transcript Contains Confidential Material

```
 1   at together.  And that's how I understand the

 2   situation.

 3       Q.    (BY MR. MOHAMMEDI)  Isn't it a fact that

 4   because you are making a statement that BIF and LBI

 5   are intertwined and you mentioned that many times,

 6   interchangeable, based on a proffer; right?

 7   That's --

 8       A.    No.

 9       Q.    Okay.  So let me ask you a question.

10   Another question.

11            It's not based on a proffer you say;

12   correct?

13       A.    It's based on all the information

14   available to me.

15       Q.    Okay.  Okay.  So let's go through some of

16   the documents to show you.

17            If you put in Exhibit 26, which is --

18   just remind me where we are.

19            TRIAL TECHNICIAN:  914, I have.

20            (Winer Deposition Exhibit 914,

21            Minutes of the Seventh Meeting of the

22            Benevolence Committee's Supervisory

23            Council, was marked for

24            identification.)

25       Q.    (BY MR. MOHAMMEDI)  This is an Arabic
```

This Transcript Contains Confidential Material

```
 1   document, translated in English, which is -- which

 2   is document that have been produced in this case.

 3   Minutes of the Seventh Annual Meeting of LBI

 4   Supervisory Council on July 8, 1993.

 5            If you go to the -- I know you don't

 6   speak Arabic, Mr. Winer, but there is an English

 7   translation.  Can you go down to the English

 8   translation?  Or go up.  I'm not sure where.  It's

 9   either first.

10            Are we there?

11      A.    Yes.

12      Q.    No, not to you, Mr. Winer, I'm talking to

13   the tech.

14            TRIAL TECHNICIAN:  Is it not showing

15       on your screen?

16            MR. MOHAMMEDI:  It's not, no.

17            Oh, it's there.

18      Q.    (BY MR. MOHAMMEDI)  This meeting refers

19   to the council approval of Dr. Hassan Bahifz Allah

20   wanting to replace Adel Batterjee after being

21   dismissed for an extension of six months beginning

22   on August 1, 1993.  Do you see that?

23      A.    No.

24      Q.    Okay.  So can you go to the section --

25   that's it.
```

```
 1              Okay.  Are you ready?  Let me know when
 2    you're ready.
 3         A.    I've read the material that you've
 4    provided me, in front of me in yellow.
 5         Q.    Yes, the yellow pages.
 6              It is fair to say Batterjee's dismissal
 7    was in February 1993 if it was an extension of six
 8    months for the person who replaced him starting
 9    August 1993; correct?
10         A.    I don't see those dates here.
11              TRIAL TECHNICIAN:  Mr. Mohammedi, if
12       you could just direct me to what section.
13              MR. MOHAMMEDI:  Yeah, I'm going to.
14              Go to page 9.
15              This one here.
16              THE WITNESS:  So is executive
17       director the title Batterjee had rather than
18       chair?
19         Q.    (BY MR. MOHAMMEDI)  Correct.
20         A.    Then I'm corrected, it's executive
21    director rather than chair.  I accept that
22    correction, if that's what the records show.
23         Q.    And then also, that Mr. Batterjee was
24    dismissed, was gone in February 1993.
25         A.    Sir, where does it say that, please?
```

This Transcript Contains Confidential Material

```
 1        Q.    It says extending the one date of

 2   Dr. Hassan Bahifz Allah, and that's No. 1 of the

 3   second No. 1.

 4        A.    I see that.

 5        Q.    Okay.  And the documents before talks --

 6   I mean, the same document talks about his -- the

 7   issue with the -- with the -- with Adel Batterjee,

 8   but here the extension of this extended the mandate

 9   of Hassan Bahifz Allah for an additional six months

10   that was following the dismissal of Mr. Batterjee.

11        A.    Where does it say that --

12        Q.    So we're going to show you -- if you

13   go -- if you go to page 7.

14              Make it a little bigger.

15        A.    It says:  The executive director briefly

16   spoke in his report of the latest updates regarding

17   the handover from the former director.  I don't see

18   the word "dismissal."  I see "handover."  And then I

19   see a reference to tension and a promise was made to

20   quickly and directly intervene to ease such tension.

21              What is the date of the document, sir,

22   please?

23        Q.    It's a meeting discussing the new

24   executive director that was an extension after six

25   months, which means Batterjee was not the executive
```

1    director starting February 1993; correct?

2              MR. HAEFELE:  Objection, form.

3    A.    It does -- it actually doesn't say that.

4    It refers to a handover from the former director.

5    And refers to an attempt to ease the tension, which

6    suggests there are still actions to be taken.  So I

7    can't assess from this when he was dismissed.

8    Q.    (BY MR. MOHAMMEDI)  But you can assess

9    that he was not with LBI as of February 1993,

10   correct?

11             MR. HAEFELE:  Objection, form.

12   A.    No, I cannot.

13   Q.    (BY MR. MOHAMMEDI)  You cannot?

14   A.    I can't tell what date he left, based on

15   this.

16   Q.    If you --

17   A.    If I may continue.  It looks to me from

18   this document that at some point in this period, a

19   new executive director took over from the old

20   executive director.  It doesn't say that the old

21   executive director was dismissed.  It does say that

22   there was tension and action going -- needed -- that

23   needed to take place to ease the tension.

24             So the dates -- the basic idea that he

25   was leaving the position seems to me the most

This Transcript Contains Confidential Material

```
 1    plausible interpretation of this.  The statement

 2    that he's dismissed does not -- is not set forth in

 3    this document.

 4         Q.    Okay.  I think we -- you know, I guess we

 5    will go through the documents.

 6              If we can have Exhibits 23.

 7                   (Winer Deposition Exhibit 915,

 8                   2-23-1993 letter to Adel Batterjee,

 9                   was marked for identification.)

10         Q.   (BY MR. MOHAMMEDI)  Which is dated

11    February 23, 1993.

12              That is the English version, which is

13    FED-PEC0114419, the Arabic document.

14              And then there is a translation.

15              If you can just make that bigger.

16              Can you read it for -- I mean, you can

17    read it to yourself if you want to.

18         A.    Yes, this is consistent with Mr. Noor

19    Wali's deposition.

20         Q.    And you do not have any reason to dispute

21    this accurate -- the accuracy of this document,

22    right?

23         A.    No, I do not.  I believe this is likely

24    to be accurate.  I have no reason not to think it

25    accurate.
```

This Transcript Contains Confidential Material

```
 1         Q.    Okay.  I'm also going to include to have

 2   an exhibit, which is 25, ours.  Where are we?  Which

 3   number are we at?

 4                    (Winer Deposition Exhibit 916,

 5                    5-11-1993 letter to Salman bin

 6                    Abdulaziz, was marked for

 7                    identification.)

 8         Q.    (BY MR. MOHAMMEDI)  This is a letter from

 9   Dr. Al-Juhani, who was the head of Muslim -- the

10   World Assembly of Muslim Youth.

11         A.    Yes.

12         Q.    Have you seen this document before?  You

13   can show the English version of it.

14         A.    Yes.  Thank you.

15         Q.    And it's dated May 11, 1993; correct?

16         A.    Yes, that's the date of it, if you'll

17   give me a minute, please.

18         Q.    Have you seen this document before?

19         A.    I need to read it to remember whether

20   I've seen it before or not.

21         Q.    Sure.  Just the highlighted sections.

22         A.    Yeah, I've not read this document before.

23         Q.    Do you have any reason to question the --

24   this document?

25         A.    No.
```

This Transcript Contains Confidential Material

```
 1        Q.    It's a primary source; correct?

 2        A.    Yes.

 3        Q.    And it's dated May 11, 1993; correct?

 4        A.    Yes.

 5              MR. MOHAMMEDI:  Can we get

 6        Exhibit 27?

 7              (Winer Deposition Exhibit 917,

 8              6-14-1996 Minutes of Islamic

 9              Benevolence Committee dissolution and

10              merging with World Assembly of Muslim

11              Youth, was marked for

12              identification.)

13        Q.    (BY MR. MOHAMMEDI)  As of May 28, 1996,

14   LBI merged with WAMY; correct?

15        A.    Yes.  I am familiar with this.

16        Q.    You are familiar with this one, right?

17              MR. HAEFELE:  Omar, just so we're

18         keeping consistent with the markings here,

19         this is already Noor Wali Exhibit 267, I

20         think.

21              MR. MOHAMMEDI:  Okay, yeah.  That's

22         fine.  Yes.  Thank you, Robert.

23        A.    I do not remember whether I saw this

24   document or not.  I think I did, but I'm not

25   positive, but I'm certainly familiar with the action
```

1    and the date and the substance of it.

2         Q.    (BY MR. MOHAMMEDI)  And the exhibit -- so

3    let's get Exhibit 28.  If we could go to the

4    select -- the highlighted sections, this is WAMY

5    committee meeting minutes, discussing the

6    dissolution of LBI.  This is the highlight sections

7    in the recommendation.

8              Can you make that bigger for us, please?

9              And this is -- this is dated May 28,

10   1996.

11             Is it fair to say that this was more than

12   three years since Adel Batterjee left LBI?

13        A.    Based on the documents you've provided

14   me, which I have no doubt -- reason to doubt are

15   authentic and the date you've just represented to

16   me, it's a matter of calendar, three years later.

17   But I don't see a date on this document.

18             Based on your representation, that would

19   be three years, yes.

20        Q.    Have you reviewed the dissolution

21   documents?

22        A.    The dissolution documents of the LBI?

23        Q.    Correct, I'm sorry, the LBI, right.

24   Yeah.  Sorry about that.

25        A.    I don't remember what I reviewed in

This Transcript Contains Confidential Material

```
1    relationship to its merger into WAMY.

2         Q.    Okay.

3         A.    I knew that that happened, and consistent

4    with the timing that you have provided me.

5         Q.    Are you aware of all asset of LBI, what

6    happened to them after the dissolution?

7         A.    No.

8               MR. MOHAMMEDI:  Can we get

9         Exhibit 29?

10              (Winer Deposition Exhibit 918,

11              8-18-1997 letter to Your Eminence the

12              Secretary General of the World

13              Assembly of Islamic Youth, was marked

14              for identification.)

15              (Discussion off the record.)

16              MR. MOHAMMEDI:  Can we go to the

17        English translation?

18              Sorry, I'm just having a hard time

19         seeing the whole document.

20        Q.    (BY MR. MOHAMMEDI)  The dates -- can you

21    repeat the dates for us, Mr. Winer, of this

22    document?

23        A.    Sure.  The English language dates are

24    August 18, 1997, is the date at the top.  And then

25    it refers to some other documents in 1997 and 1996.
```

This Transcript Contains Confidential Material

```
 1      Q.    And this letter is from the Kingdom of
 2  Saudi Arabia, Ministry of Islamic Affairs, Da'wah
 3  guidance to Eminence Secretary General of the World
 4  Assembly of Islamic Youth; correct?
 5      A.    I can't see who it's to.
 6      Q.    Okay.  So do you know who is the
 7  secretary -- who was the secretary at that time of
 8  where that --
 9      A.    I can see -- I can see that it's from the
10  Minister of Islamic Affairs, and it looked like it's
11  to the secretary general of WAMY.
12      Q.    Correct.  Yes.
13      A.    So now that it's smaller, I can see the
14  two in the front, which I couldn't before.
15      Q.    And it refers to dissolution and it does
16  reference to sending the money to the Kingdom to be
17  put there as in terms of escrow, and they return
18  that money to WAMY when the merger and dissolution
19  of LBI occurred; correct?
20      A.    Yes, that's what it says.
21            MR. MOHAMMEDI:  We can put this down
22       and just continue.
23      Q.    (BY MR. MOHAMMEDI)  If you go to
24  paragraph -- I guess Section 3 -- yeah,
25  paragraph 3.30.3 of your rebuttal report, which is
```

This Transcript Contains Confidential Material

1              was marked for identification.)

2      Q.    (BY MR. MOHAMMEDI)  Sir, the government

3   claim BIF are now subject to terrorism enhancement

4   under the guidelines.  But the Court, if you go

5   to -- let's see, what page do we have.  This

6   highlight I'm trying to find out.  838.

7              If you go down when you see the

8   highlighted section.

9              So the application here, it says, if you

10  see that:  Arnaout does not stand convicted of a

11  terrorism offense, and goes on.  Do you want to read

12  that for us, Mr. Winer?

13     A.    I read it.

14     Q.    You read it?  Do you agree with that?

15             MR. HAEFELE:  Objection to form.

16     A.    The terrorist charges were dropped as

17  part of the plea agreement.  That's accurate.

18     Q.    (BY MR. MOHAMMEDI)  And is it because the

19  government could not meet its burden; correct?

20             MR. HAEFELE:  Objection to the form.

21     A.    My understanding of the case as laid out

22  in my report and my rebuttal report, is that the

23  judge's decision on the admissibility of statements

24  by co-conspirators impaired the government's case,

25  and thus the government was not going to be able to

This Transcript Contains Confidential Material

```
 1   put into the record what it wanted to be able to put

 2   into the record, and therefore it agreed to the plea

 3   agreement, as did the defendant.

 4        Q.   (BY MR. MOHAMMEDI)  Can you go to page 6

 5   of the document?

 6             Can you read this to us?

 7        A.   Yes, I'm aware of this.  I've read this

 8   at some point.

 9        Q.   And do you agree with that statement?

10        A.   I agree with the statement based on --

11             MR. HAEFELE:  Objection to form --

12        A.   -- the information --

13             I agree with the statement based on the

14   consequences of the decision that was made to

15   eliminate the particular evidence that the

16   government was going to be relying on.

17        Q.   (BY MR. MOHAMMEDI)  Do you believe in the

18   judge's decisions?

19        A.   The judge's decisions are a legal fact.

20        Q.   They are legal facts, right?  And they

21   are better than proffer, aren't they?  They are

22   something you should be relying on rather than the

23   proffer; correct?

24        A.   Yes, but you have to distinguish between

25   a criminal case and a civil case, which are not the
```

1    same thing.  And not every judicial ruling is a

2    ruling that's going to be correct.  Judges, in fact,

3    get overruled from time to time.  That's part of the

4    process.  In this particular case, no one appealed.

5    Neither the defendant nor the government appealed.

6    The government complained afterwards and reaffirmed

7    its belief that the defendants had committed more

8    serious offenses, but that's neither here nor there.

9    The decision is a fact, and it's legally accurate.

10   This was the decision that was reached.

11        Q.    And you said there were no more --

12              If you can just put Exhibit 38, which is

13   a Seventh Circuit decision, which is the document

14   affirming the district court ruling.

15              (Winer Deposition Exhibit 923, U.S.

16              v. Arnaout 431 F.3d 994 (2005), was

17              marked for identification.)

18        A.    So was there appeal here?

19        Q.    (BY MR. MOHAMMEDI)  Look at the -- look

20   at the exhibit where it says --

21        A.    The United States did in fact appeal.  I

22   had forgotten.  Thank you for correcting me.

23        Q.    Thank you.

24              So you were not aware of this, correct?

25        A.    I had forgotten --

This Transcript Contains Confidential Material

```
 1       Q.    Of this decision, the Seventh Circuit
 2  decision?
 3       A.    I was aware of it.  I had forgotten.  It
 4  says that:  The District Court did not commit clear
 5  error in refusing to apply the --
 6       Q.    Let's go to Section 3A1.4.
 7             And there are highlights, if you go down.
 8             Can you go down, just for us to see?
 9             TRIAL TECHNICIAN:  What page is it
10       on?
11             MR. MOHAMMEDI:  Let me see.  It's
12       highlighted.  So you will find it.
13             Page 8.
14       Q.    (BY MR. MOHAMMEDI)  And the Court found
15  that:  The district court did not [sic] find that
16  the record did not establish by a preponderance of
17  the evidence that Arnaout attempted, participated
18  in, or conspired to commit any act of terrorism.
19  The district court also found that the government
20  had not established that the Bosnian and Chechen
21  recipients of BIF aid were engaged in a federal
22  crime of terrorism, or that Arnaout intended the
23  donated boots, uniforms, blankets, tents, x-ray
24  machine, ambulances, nylon or walkie-talkies to be
25  used to promote a federal crime of terrorism.
```