

**U. S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

| | |
|---|---|
| *Patrick J. Fitzgerald* | *Federal Building* |
| *United States Attorney* | *219 South Dearborn Street, Fifth Floor* |
| | *Chicago, Illinois  60604* |
| | *(312) 353-5300* |

| | |
|---|---|
| FOR IMMEDIATE RELEASE | PRESS CONTACTS: |
| WEDNESDAY OCTOBER 9, 2002 | Randall Samborn, U.S. Attorney's Office |
| | (312) 353-5318 |
| | DOJ Public Affairs |
| | (202) 514-2008 |

### BENEVOLENCE DIRECTOR INDICTED FOR RACKETEERING CONSPIRACY; PROVIDING MATERIAL SUPPORT TO *AL QAEDA* AND OTHER VIOLENT GROUPS

CHICAGO – The executive director of Benevolence International Foundation, Inc. (BIF), a purportedly charitable organization based in south suburban Chicago, was indicted on racketeering and other charges for conspiracy to fraudulently obtain charitable donations to provide financial assistance to *al Qaeda* and other organizations engaged in violent activities, the Justice Department announced.  A federal grand jury today returned a seven-count indictment against **Enaam M. Arnaout**, 40, of Justice, Ill., a Syrian-born naturalized U.S. citizen.  Arnaout has twice been ordered detained in federal custody since he was arrested on April 30.  The indictment describes a multi-national criminal enterprise that for at least a decade used charitable contributions of innocent Americans – Muslim, non-Muslim and corporations alike – to support *al Qaeda* , the Chechen *mujahideen* and armed violence in Bosnia.

Arnaout, also known as "Abu Mahmoud," "Abu Mahmoud al Suri," "Abu Mahmoud al Hamawi," and "Abdel Samia," was charged with one count each of racketeering conspiracy, conspiracy to provide material support to terrorists, conspiracy to launder money, money laundering,

and wire fraud, and two counts of mail fraud. He will be arraigned at a later date in U.S. District Court in Chicago.

The indictment alleges that BIF – which was not indicted – operated, together with Arnaout, other individuals and entities, as a criminal enterprise that engaged in a pattern of racketeering activity. The objectives of the enterprise were to support the activities of *mujahideen* in various areas of the world by raising funds and providing support to *mujahideen* and others engaged in violence and armed confrontation, including *al Qaeda* and *Hezb e Islami*, an organization in Afghanistan.

According to the indictment, in 1987, an organization known as "*Lajnat Al-Birr Al-Islamiah*" (Islamic Benevolence Committee, or LBI) was founded by Adel Batterjee in Saudi Arabia and Peshawar, Pakistan, with one of its purposes to provide support for the *mujahideen* fighting in Afghanistan. In the early 1990s, LBI was renamed Benevolence International Foundation, referred to in Arabic as "*Al Birr al Dawalia*," and incorporated in the United States to increase donations and reduce scrutiny by authorities. BIF received status as a tax-exempt charitable organization in March 1993. About the same time, Arnaout assumed formal management of BIF, which proceeded to open various offices, including in Pakistan, Bosnia-Herzegovina and Azerbaijan.

In the mid to late 1980s, the indictment alleges that Arnaout, using various aliases, worked with LBI and another organization, *mekhtab al khidemat* (the "Services Office"), to provide assistance to fighters in Afghanistan. The "Services Office" was operated principally by Sheik Abdallah Azzam and Usama Bin Laden to provide logistical support for the *mujahideen* in Afghanistan, including financial assistance for military training and assistance with obtaining travel and identity documents and immigration status in Pakistan. Arnaout also allegedly provided

2

assistance to members of *Hezb e Islami* and its leader Gulbuddin Hekmatyar, as well as *mujahideen* under the command of Bin Laden, who, along with others in about August 1988, formed an organization in Afghanistan known as *al Qaeda* (the "Base") to provide logistical and financial support to *mujahideen* in various areas of the world outside Afghanistan. Bin Laden and *al Qaeda* relied on various organizations, including charities, to transfer money and provide cover for traveling *al Qaeda* members and associates, according to the indictment.

In the same late 1980s time frame, Arnaout allegedly served as director of communications in the "*al Masada*" *mujahideen* camp in Jaji, Afghanistan, under the direction of Bin Laden, distributing resources, including weapons. In 1991, Arnaout, while employed by LBI, allegedly worked with others, including *al Qaeda* members, to purchase rockets and assorted rifles in large quantities and distribute them to various *mujahideen* camps, including some operated by *al Qaeda.*

The racketeering conspiracy count alleges that Arnaout and his co-conspirators, including Batterjee, engaged in a fraud scheme in which they solicited and obtained money from donors to BIF, falsely representing that the funds would be used solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the material fact that a portion of the money was being used to support groups engaged in armed confrontations and violence overseas.

As part of the fraud scheme, the indictment alleges, among other things, that:

- Arnaout and his co-conspirators focused their appeals for donations principally on Muslim donors, who were required by the Islamic principle of *zakat* to give a percentage of their income for charitable purposes;

- Arnaout and his co-conspirators concealed from many donors the material fact that funds raised from certain trusted donors (who were in fact aware that BIF was providing support to groups engaged in armed confrontations and violence overseas) were being commingled with other donors' funds to avoid scrutiny of those donors who knowingly provided money to support violence and armed confrontation;

3

- members of the conspiracy encouraged donors to use or establish corporate matching programs, through which donors' employers would match in whole or in part donations made to BIF by individual employees;

- Arnaout and his co-conspirators concealed from the State of Illinois, the United States and other governments the fact that a portion of the money raised by BIF was being used to support groups engaged in armed confrontations and violence overseas;

- Arnaout and his co-conspirators used BIF's status as a charity and a tax-exempt organization to lessen scrutiny by various governments concerning BIF's financial and other activities, as well as it employees, overseas offices, and the travel its employees and associates; and

- Arnaout and others kept secret from governments and the public, including a significant number of donors, material facts about Arnaout's relationship with organizations engaging in violence, including *al Qaeda* and *Hezb e Islami*, and their leaders, including Bin Laden and Hekmatyar.

In addition to the fraud scheme, the racketeering conspiracy count alleges that Arnaout and his co-conspirators:

- engaged in money laundering by wire transferring funds from BIF's checking accounts in the United States to accounts outside Illinois, including New Jersey and overseas;

- agreed to provide material support and resources to groups and organizations engaged in violent activities including *al Qaeda* and *Hezb e Islami*, and to individuals engaged in violence in Bosnia, Chechnya and neighboring regions, knowing that they were to be used in carrying out conspiracy to kill, kidnap, maim or injure persons in a foreign country; and

- corruptly endeavored to obstruct justice by submitting false and misleading declarations of Arnaout to the U.S. District Court in an effort to obtain an order releasing BIF's funds which had been blocked by the U.S. Treasury Department. The declarations in a civil proceeding brought by BIF allegedly were false by stating in substance that BIF had never provided aid or support to people or organizations known to be engaged in violence, terrorist activities or military operations of any nature.

Furthermore, among the methods and means of racketeering conspiracy, the indictment alleges the following (all dates are approximate):

4

- in 1992, Arnaout assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by Hekmatyar and *Hezb-e-Islami;*

- sometime in 1993 or later, members of the conspiracy caused the production of videotapes depicting fighters in Bosnia-Herzegovina and eulogizing dead fighters, including *al Qaeda* members known as "Abu Zubair al Madani" and "Abu Abbas al Madani," and soliciting donations to support the *mujahideen* in Bosnia-Herzegovina;

- on June 10, 1995, members of the conspiracy caused the delivery of an X-ray machine and currency from BIF to a representative of the Chechen *mujahideen* in Baku, Azerbaijan, for use by the Chechen *mujahideen*;

- In November 1995, Arnaout and others caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen *mujahideen*, and following its initial shipment, Arnaout and others solicited donations from the public to purchase additional anti-mine boots for the *mujahideen*, falsely claiming that the project was for the benefit of civilians;

- in May 1998, members of the conspiracy, using a letter bearing a signature in the name of defendant Arnaout facilitated the travel of an influential, founding member of the *al Qaeda* network, Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," to Bosnia-Herzegovina by indicating that Salim was a director of BIF;

- in the latter 1990's, with defendant Arnaout's knowledge, Saif al Islam el Masry, a/k/a "Abu Islam el Masry," a member of *al Qaeda*'s *majlis al shura* (consultation council), as well as a top military expert and instructor, served as an officer of the BIF Enterprise in Chechnya;

- between June 2000 and September 2001, members of the conspiracy caused the transfer of approximately $1,414,406 via wire from an account at Union Bank of Switzerland (the "Swiss Bank Account") to BIF's checking account in the United States. Those funds were commingled in BIF's checking account with donations that BIF received from other sources and disbursed in large part to BIF offices overseas;

- in a schedule of donations exceeding $5,000 attached to BIF's Form 990 Tax Return for its fiscal year 2000, executed by defendant Arnaout under the penalty of perjury, BIF substantially understated the amount of funds it received from the Swiss Bank Account and did not attribute a substantial portion of the funds to a known source;

5

- in February 2000, a website seeking money to support the efforts of the *mujahideen* fighting in Chechnya under the command of Ibn al Khattab, a *mujahideen* leader who had fought in Afghanistan, listed BIF as an organization that would receive donations for this purpose;

- in October 2001, defendant Arnaout relayed to BIF's founder, Batterjee, in Saudi Arabia via telephone Arnaout's concern that Arnaout was under scrutiny of the United States government, and, in particular, the fact that Arnaout had been searched at the airport upon his return to the United States;

- in November 2001, Arnaout spoke via telephone to a BIF employee in Bosnia-Herzegovina, and agreed with that employee that financial support for an injured fighter could not be reflected on BIF's financial records and that the employee should create a new list of orphans as a means of justifying the expenditures. Arnaout and the BIF employee also discussed a plan of transferring money from a BIF account in the United States to the BIF Enterprise in Bosnia-Herzegovina in cash without leaving a trail so that the BIF Enterprise could balance its books in light of certain expenses that could not be listed on the books;

- in January 2002, following the blocking of BIF's bank accounts by the U.S. Treasury Department, Arnaout spoke via telephone to Batterjee in Saudi Arabia, and Batterjee requested Arnaout to relocate with his family to Saudi Arabia;

- beginning at a time unknown through March 2002, Arnaout and employees of BIF in Bosnia-Herzegovina possessed, and attempted to erase in part, among other items, an archive of documents and photographs concerning Bin Laden and *al Qaeda* and Hekmatyar and *Hezb e Islami*, including:

    - a chart of an organization involved in military activity headed by Bin Laden and with which Abdallah Azzam, Abu Ubaidah al Banshiri, and Mamdouh Salim, among others, were involved;

    - notes summarizing several meetings during which *al Qaeda* was formed in Afghanistan in August 1988 (indicating that Bin Laden, Abu Ubaidah al Banshiri, and Mamdouh Salim, among others, were in attendance), and specifying the text of the original *bayat* (oath of allegiance) made by prospective *al Qaeda* members to *al Qaeda*;

    - notes reflecting the commencement of *al Qaeda*'s "work" on or about Sept. 10, 1988;

- personnel files of the *mujahideen* trained in the *al Masada* camp in Jaji, Afghanistan, in 1988, which contained the true names and aliases and military experience of the trainees;

- a list of wealthy sponsors from Saudi Arabia, including references to Bin Laden and Batterjee;

- various documents reflecting Arnaout's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the *al Masada* camp;

- various documents in a separate folder reflecting Arnaout's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with *Hezb e Islami*;

- various newspaper articles including a 1988 article with a photograph depicting Bin Laden, Arnaout and one of the founders of the BIF Enterprise; as well as 1998 articles concerning Bin Laden's threats against the United States and the U.S. State Department's 1997 list of designated terrorist organizations;

- a February 1992 letter to Arnaout requesting assistance with food and clothing for 1200 *mujahideen*;

- a handwritten organizational chart placing Arnaout at the top of a *jihad* organization involved with weapons; and

- a series of reports from a *Hezb e Islami* Special Forces camp in the Paktia province of Afghanistan indicating that Arnaout had inspected the camp, that 70 *mujahideen* had been sent to Peshawar, Pakistan, for a "special matter," and that military training had started as of November 1991, with a class of special forces *mujahideen* graduating in January 1992;

• on March 21, 2002, Arnaout spoke via telephone to Munib Zaharigac in Bosnia-Herzegovina and learned that Zaharigac had been arrested and that searches had been conducted of various locations in Bosnia-Herzegovina. After being told that no BIF documents were seized, Arnaout coached Zaharigac about what to tell authorities about persons associated with the BIF Enterprise including himself;

• on March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds blocked by the Treasury Department, BIF

      and Arnaout submitted a declaration in a civil matter pending in the U.S. District Court in Chicago, knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings." The declaration was executed by Arnaout on March 22, 2002. BIF and Arnaout submitted a purported "corrected" declaration on April 5, 2002, in the same civil case, again containing the same false statement. The "corrected" declaration was executed by Arnaout on April 1, 2002; and

- on April 15, 2002, Arnaout spoke to the BIF director in Pakistan and advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF Enterprise's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

The indictment was announced by Attorney General John Ashcroft, together with Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, Thomas J. Kneir, Special Agent-in-Charge of the Chicago Office of the Federal Bureau of Investigation, and Charlotte Bonner, Assistant Special Agent-in-Charge of the Internal Revenue Service Criminal Investigation Division. The investigation is continuing, they said.

The government is being represented by U.S. Attorney Patrick J. Fitzgerald and Assistant U.S. Attorneys John Kocoras and Deborah Steiner.

If convicted, racketeering conspiracy, money laundering conspiracy and money laundering each carry a maximum penalty of 20 years in prison; providing material support to a terrorist organization carries a maximum penalty of 15 years in prison; each count of mail and wire fraud carries a maximum penalty of 5 years in prison, and each count carries a maximum fine of $250,000, except the money laundering and money laundering conspiracy count, each of which carries a maximum fine of $500,000. As an alternative fine, on the fraud counts, the Court may impose a fine totaling twice the gross loss to any victim or twice the gain to the defendant, whichever is greater, and the money laundering fines may be twice the value of the funds laundered. Note, however, that

8

the Court, would determine the appropriate sentence to be imposed under the United States Sentencing Guidelines.

The public is reminded that an indictment contains only charges and is not evidence of guilt. The defendant is presumed innocent and is entitled to a fair trial at which the government has the burden of proving guilt beyond a reasonable doubt.

# # # #