UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br>ECF Case |
|---|---|

**This document relates to:**

*All actions*

---

### PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE [ECF No. 9179] TO PLAINTIFFS' OBJECTIONS [ECF No. 9110] TO THE COURT'S APRIL 27, 2023, OPINION AND ORDER [ECF No. 9060].

---

Robert T. Haefele
Jodi Westbrook Flowers
Donald A. Migliori
C. Ross Heyl
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com

*For Plaintiffs' Executive Committee for Personal Injury and Death Claims on behalf of the Plaintiffs*

Sean P. Carter
Stephen A. Cozen
J. Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com

*For the Plaintiffs' Executive Committee for Commercial Claims on behalf of Plaintiffs*

July 21, 2023

**TABLE OF CONTENTS**

I.   INTRODUCTION ...............................................................................................................1
II.  ARGUMENT.......................................................................................................................2
     A.  Defendants egregiously misrepresent the testimony of Winer, who explained his expertise. ...............................................................................................................2
     B.  Plaintiffs' argument that Benthall offers inappropriate character evidence is proper. .........7
     C.  Testimony regarding Defendants' good character is improper. ............................................8
     D.  The magistrate judge's findings were clearly erroneous and contrary to law. .....................9
III. CONCLUSION .................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) .................. ............6

*Berman v. Mobil Shipping & Transportation Co.*, 2019 WL 1510941 (S.D.N.Y. Mar. 27, 2019) ...... ............6

*Crown Cork & Seal Co. v. Credit Suisse First Boston Corp,* No. 12-CV-05803-JLG, 2013 WL 978980 (S.D.N.Y. Mar. 12, 2013) ........................................................................................................................6

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ................................................................7

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ....................................................... 9, 10

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 341 F. Supp. 3d 213 (S.D.N.Y. 2018) ...................................................................................................................................6

*In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230 (E.D.N.Y. 2007) ................................................6

*Levy v. Young Adult Inst., Inc.,* 103 F. Supp. 3d 426 (S.D.N.Y. 2015)...................................................7

*Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302 (S.D.N.Y. 2022) ....................................6

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995)................................................................6

*Nike, Inc. v. StockX LLC*, No. 22 Civ. 983, 2023 WL 3091671 (S.D.N.Y. Apr. 26, 2023) .................10

*Nimely v. City of N.Y.*, 414 F.3d 381 (2d Cir. 2005).............................................................................6

*S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) ......................................................................6

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997) .................................................................6

*U.S. v. Pujana-Mena*, 949 F.2d 24 (2d Cir. 1991) ..............................................................................9

*Zenian v. District of Columbia*, 283 F. Supp. 2d 36 (D.D.C. 2003) ...................................................9

*Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536 (S.D.N.Y. 2005) ............................................9

**Rules**

Federal Rule of Civil Procedure 72(a)..................................................................................................10

Federal Rule of Evidence 404(a)............................................................................................... 7, 9

Federal Rule of Evidence 404(e).................................................................................................8

Federal Rule of Evidence 404(b) ................................................................................................9

I.     **INTRODUCTION**

Plaintiffs' Objections ("Objections," ECF No. 9110) address only two limited parts of Magistrate Judge Netburn's April 27, 2023 Opinion & Order ("Order," ECF No. 9060). Plaintiffs' first objection sought clarification that a limited restriction applied to Plaintiffs' expert Jonathan Winer's testimony does not prohibit Winer from testifying about al Qaeda's Wahhabi/Salafi orientation, and invocation of Wahhabism/Salafism to justify its actions and solicitation of support. Plaintiffs' second discrete objection concerned the determination to permit Defendants' expert Jonathan Benthall to testify as to the good character of the Charity Defendants under the theory that "an organization engaged in legitimate charity work may be less likely to support terrorism." *Id.* at 28.

Plaintiffs first objection applies only to the extent that the Order is read to suggest that Winer lacks sufficient expertise to testify as to the fact that al Qaeda relied on Wahhabi/Salafi ideology to justify its actions, recruit members, and raise funds, under the theory that Winer "has no expertise in religion." *Id.* at 18; *see also id.* (Winer's "opinions on 'Salafism' and 'Wahhabism' are excluded"). Winer testified that he has devoted years of extensive work in the area where "foreign policy, [national] security, and religion" are combined, Ex. 1, Tr. 74:11-14,[1] and has developed expertise where religious doctrine "involves the political impact of different interpretations of religion when a religion is politicized into a political movement." *Id.* at 74:6-10. That expertise includes "the political aspects of Islam" and how those political aspects impacted the Middle East from the 1980's through to 2000's. *Id.* at 77:24 to 78:1. He agreed, though, that he has not devoted studies to religion in a manner to develop expertise in all of the world's religions such that he could hold himself out to be an expert on religion generally. *Id.* at 76:19-23. Accordingly, Winer defined a specific area of expertise and Plaintiffs object only to the extent that Winer is precluded from testifying within that lane of expertise.

In their response brief ("Opp'n Br.," ECF No. 9179), Defendants err in several regards. *First*,

---

[1] Exhibits cited herein are to exhibits attached the Declaration of Robert T. Haefele, filed with Plaintiffs' Reply Brief.

*Defendants misquote and misrepresent (to an alarming degree) Winer's deposition testimony* to argue that he conceded he is unqualified to opine concerning any Islamic issues. In fact, Winer's testimony was the opposite, and the caselaw Defendants cite support Winer testifying within the guidelines Winer set for himself. *Second*, Defendants err in arguing that Plaintiffs waived or are otherwise not entitled to argue that Benthall presents improper character evidence as an expert opinion. It was clear error to permit Benthall to present expert evidence suggesting that, just because the charity defendants engaged in good conduct, they could not also have engaged in bad conduct; especially given the overwhelming evidence that charities that engage in supporting terrorism also engage in other legitimately charitable conduct.

Before addressing the gravamen of the errors in Defendants' Response Brief, Plaintiffs first address Defendants' repeated attempts to suggest that Plaintiffs' claims are directed at the Muslim faith. Plaintiffs have not sued Islam; and inflammatory arguments suggesting otherwise mischaracterize Plaintiffs' claims. As U.S. policy makers have explained, the need to consider Islamic issues in developing the nation's counterterrorism policy is not a "war with a faith." Instead, it is about distortion by "those who would seek to compromise faith [and]… those who counterfeit it….".[2]

## II.  ARGUMENT

### A.  Defendants egregiously misrepresent the testimony of Winer, who explained his expertise.

Defendants' argument about Winer is built almost entirely around text they purportedly quote from Winer's deposition to argue that he "explicitly" acknowledges he has no expertise in religion. Opp'n. Br. 4. But their argument is built on a blatant misrepresentation of his testimony, as Winer

---

[2] Ex. 2, David Aufhauser, Former General Counsel, U.S. Department of Treasury, Terrorism: Growing Wahhabi Influence in the United States, Testimony to the Subcommittee on Terrorism, Technology and Homeland Security at 9 (hereafter "Aufhauser, Growing Wahhabi Influence"); *see also* Ex. 3, Juan Zarate, Assistant Secretary of the Treasury, Prepared Remarks to Islamic Society of North Americas Sixth Annual Education Event, at 5 (March 25, 2005) (hereafter, "Zarate Prepared Remarks")("Our war against terrorism and our efforts to combat terrorist abuse of charity must never be confused as a war against Islam. Al Qaida . . . and other such terrorist groups do not represent or speak for Islam.").

testified essentially to the opposite of what Defendants claim. Specifically, using quotation marks and bolded text, Defendants have represented to the Court that Winer testified, "I'm **not an expert on the doc…religious doctrine** to the extent it involves the political impact of different types of interpretations of religion when a religion is politicized into a political movement . . . ." Opp'n. Br. 4 (ECF No. 9179 at 9); *see also id.* at 1 ("[Winer] "admits that he is not qualified to opine on matters of Islamic religious doctrine or theology."). But, after reinserting the words Defendants omitted from Winer's actual testimony, Winer testified essentially to the opposite, when he said:

> I'm not an expert on the doc…religious doctrine **of any kind, *except*** to the extent it involves the political impact of different types of interpretations of religion when a religion is politicized into a political movement, where I have expertise. So when you have a combination of foreign policy, security, and religion, that's an area that I have devoted some extensive work on over a long period of time. And that is an area of expertise, yes.[3]

Defendants omit the key word—"except"—to reverse the meaning of the quote. In addition, Defendants emphasize their misquote in their introduction (Opp'n. Br. 1 ("[H]e admits that he is not qualified to opine on matters of Islamic religious doctrine or theology.")) and allude back to it throughout their argument. *See e.g.*, Opp'n. Br. 8 ("Winer says so himself.")] This key word changes the meaning of Winer's response from a "no" to a "yes" and this import cannot be overstated.

Defendants' compound their misrepresentation in the next sentence of their brief. Opp'n. Br. 4. Specifically, Defendants claim that when Winer was asked if he was an expert on Islamic terms and concepts, he responded "I am not really." In fact, when read in full context, the testimony is clear that Winer disputed the improper framing of counsel's question and sought to provide a clear answer on the nature and limits of his expertise: "I am not really--I'm not willing to adopt your question as an answer. I'm happy to say again what my expertise is." Ex. 1, Tr. 75:13-15. The response followed a series of repeated questions where defense counsel insisted Winer respond with only a "yes" or "no"

---

[3] Ex. 1, Tr. 74:4-15 (emphasis added to identify text omitted from Defendants' misquote).

response, after Winer had already explained his expertise and declined to answer counsel's improper question based on the improper restrictions counsel sought to impose. *See* Ex. 1, Tr. 73:4 to 77:1. Winer unequivocally did not concede he lacked expertise, as Defendants argue; rather, he declined to adopt the premise of the question and reiterated his previous response about his expertise.[4] Indeed, Winer re-affirmed his expertise, testifying, "I am [an] expert on the political aspects of Islam and how it played out in the region in the 1980s, 1990s, and 00s." *Id.* 77:24 to 78:1.

Winer testified as to what his experience in Islam is and the degree to which his opinions touch and concern Islam. As Plaintiffs have said, Winer is not an expert on esoteric religious doctrine and will not testify to those matters. Despite Defendants' misrepresentation about Winer's testimony, when asked about his expertise regarding Islam, Winer consistently explained his expertise and its limits, did not claim expertise outside of political Islam, and will not testify outside of those bounds.

The appropriateness of Winer's testimony on those issues is underscored by the fact that counterterrorism experts who, like Winer, have attended to our nation's counterterrorism policies have focused on those precise matters in crafting U.S. counterterrorism policy. Indeed, the counterterrorism policy advisors who have directed U.S. government national security have similar pedigrees to Winer, including David Aufhauser, Juan Zarate, and Stuart Levey. Each of these former Treasury Department senior officials, like Winer, had substantial financial backgrounds, and, like Winer, none of them had formal religious training in Islam. But the record is clear that an understanding of the linkages between Wahhabism/Salafism and al Qaeda was essential to their work. Aufhauser, former General Counsel for the U.S. Department of the Treasury, explained in testimony before Congress that "Wahhabism, which is the strain of Islam that they [Saudi Arabia] endorse and

---

[4] Defendants' deception is particularly indefensible given their deficient citation. Had Defendants *not* been trying to deceive the Court, they would have used ellipses to show that the deletion was not the end of the sentence in the quote, as required by the Bluebook. *See* Bluebook Rule 5.3(b)(iii) ("Where the *end* of a quoted sentence is being omitted, insert an ellipsis between the last word being quoted and the final punctuation of the sentence being quoted.").

4

champion, is very austere, very severe, very uncompromising, and very intolerant of differences in views, and can easily be morphed into religious sanction for violence."[5] Zarate, former Assistant Secretary of the Treasury for Terrorist Financing, has also testified before Congress concerning "religious extremism, political power, financial greed, [and] any combination thereof."[6] In remarks to a major American Islamic organization, then Assistant Treasury Secretary Zarate addressed threats of terrorism support tied specifically to Islamic charities.[7] In his 2013 book, *Treasury's War*, Zarate included substantial discussion regarding concerns about politicized Islam.[8] Levey, former Under Secretary of the Treasury for Terrorism and Financial Intelligence, also testified before Congress and addressed other national security focused organizations regarding the Treasury Department's concerns about terrorists' use of Islamic charities to support terrorism, commenting that in addition to being concerned about the Muslim charities' "export of terrorist funds, we are extremely concerned about the export of terrorist ideologies. These teachings are as indispensable to terrorists as money, and possibly even more dangerous. We must do all we can to ensure that extremist, violent ideologies are not disseminated under the cover of religious organizations, charities, or schools."[9] Like Winer, while much of the experience of these Treasury officials concerned financial issues, it would have been impossible for them to address the U.S. counterterrorism concerns without addressing how Islamic

---

[5] Ex. 4, David Aufhauser, An Assessment of Current Efforts to Combat Terrorism Financing, Testimony to the Committee on Governmental Affairs, United States Senate, at 29 (June 15, 2004); *see also* Ex. 2, Aufhauser, Growing Wahhabi Influence at 9 ("[The salafist Wahhabi view] is a very important factor to be taken into account when discussing terrorist financing.").

[6] Ex. 5, Juan C. Zarate, Senate, Congress, Money Laundering: Current Status of Our Efforts to Coordinate and Combat Money Laundering and Terrorist Financing, at 41 (March 4, 2004).

[7] Ex. 3 (Zarate Prepared Remarks).

[8] Ex. 6, Juan C. Zarate, Treasury's Wars: Unleashing of a New Era of Financial Warfare (2013); *see, e.g., id.* Ch. 3 ("Nose Under the Tent") (Discussing, at 68, the Saudi kingdom's decades of exporting "an extreme form of Sunni Wahhabi Islam" that was embedded into Saudi culture and "provided a platform for Al-Qaeda and its like-minded adherents" (at 69) and "an ideological baseline for Al Qaeda and the recruitment of like-minded believers" (*id.*) and the Treasury Department's concerns about "the underlying problem of Wahhabi proselytization." (at 83)).

[9] Ex. 7, Address of Under Secretary Stuart Levey, The American Israel Public Affairs Committee Policy Conference, at 6 (May 23,2005); *see also* Ex. 8, Stuart Levey, House of Representatives, Congress, Starving Terrorists of Money: The Role of Middle Eastern Financial Institutions, at 72-73, 76 (May 4, 2005).

issues played a role in driving the very support they were charged with interdicting.

The National Commission on Terrorist Attacks Upon the United States, commonly known as the 9/11 Commission, is another example where U.S. policymakers relied on expertise addressing Islamic issues, without the need for formalized training specifically in esoteric religious doctrine. In its effort to inform the American public and U.S. policymakers about the circumstances that led to the attacks on September 11, 2001, the 9/11 Commission included in its report pages of assessments related to Islam, though no Commissioner or staff member had religious education in Islam.[10]

Lastly, the cases Defendants cite to limit Winer's testimony support Plaintiffs' argument.[11] Plaintiffs do not quarrel with the concepts from the cited cases, which collectively stand for the proposition that experts must stay in their own lane. Those cases must also be read in tandem with cases that permit experts to testify where their "educational and experiential qualifications [are] in a general field closely related to the subject matter in question…." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 329 (S.D.N.Y. 2022) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)),[12] and "construed with an eye towards the liberal thrust of the federal rules of evidence and their general approach of relaxing the traditional barriers to opinion testimony." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588–89

---

[10] *See, e.g.,* Ex. 9, 9/11 Commission Report 49–54, 63 (discussing, *inter alia*, differences between Sunni and Shia Islam, the influence of Sayyid Qutb, and Wahhabism); *see also* Ex. 10, Terrorist Financing Staff Monograph (at 21, contextualizing *zakat*).

[11] Defendants cite *Nimely v. City of N.Y.*, 414 F.3d 381, 399 & n.13 (2d Cir. 2005), which holds ha an expert in one field is not necessarily qualified as to other fields (cited in Opp'n Br. 2, 8); *Crown Cork & Seal Co. v. Credit Suisse First Boston Corp,* No. 12-CV-05803-JLG, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013), which holds that expert's testimony must be related to those issues or subjects within his or her area of expertise (cited in Opp'n Br. 3), and *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 341 F. Supp. 3d 213, 240-41 (S.D.N.Y. 2018), which holds that courts must exclude an expert who does not possess superior knowledge, education, experience, or skill in the relevant area) (cited in Opp'n Br. 7).

[12] *See also Berman v. Mobil Shipping & Transportation Co.*, 2019 WL 1510941, at *8 (S.D.N.Y. Mar. 27, 2019) ("Assertions that the witness lacks particular educational or other experiential background[ ] 'go to the weight, not the admissibility, of [the] testimony.'") (citing *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, at 282 (E.D.N.Y. 2007) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)) (alteration in original)); *Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) (approving expert opinion where testimony involved "broad economic principles" notwithstanding "lack of economics expertise" or training) (citations omitted).

(1993). Here, the cited legal authorities support allowing Winer to testify within the lanes of expertise he has identified and committed himself.

Winer explained what his expertise regarding Islam is, and what it is not. He explained the guardrails of the experience he has in connection with the political aspects of Islam. *See, e.g.,* Ex. 1, Tr. 74:5 to 75:5; 77:24 to 78:1; *see also* 177:24 to 178:5 (clarifying that his expertise exists "in a political context when religion is used for political purposes as part of [his] understanding of relationships among states, [and] as part of [his] understanding of terrorism." If permitted to testify consistent with the case law and the guardrails he explained, his testimony will be within those limits.

### B. Plaintiffs' argument that Benthall offers inappropriate character evidence is proper.

Contrary to Defendants' assertions, it was not improper for Plaintiffs to advance their argument pursuant to Federal Rule of Evidence 404(a) in response to the magistrate judge's order, where the issue was raised in the first instance. The magistrate judge raised the issue in her order when she ruled that "An organization engaged in legitimate charity work may be less likely to support terrorism and other legitimate endeavors.…" Order 28. By finding that the likelihood of supporting terrorism can hinge on an organization's good behavior, the magistrate judge effectively introduced a new basis for allowing Benthall to vouch for the charities' good character. Plaintiffs are entitled to respond to this argument to the extent that it was raised for the first time in the magistrate judge's order.[13] Further, this issue is ripe for decision because it is a "pure question of law" and "no further factual development or briefing is necessary." *Levy*, 103 F. Supp. 3d at 434

Even if the magistrate judge's Order did not raise the character evidence issue, Plaintiffs did not waive the argument because the Court has held that additional expert challenges are not waived and are permitted in pre-trial briefing. *See* ECF No. 9173 at 2 (Plaintiffs may challenge additional

---

[13] Indeed, resolution of this argument at this stage would be "most efficient." *See Levy v. Young Adult Inst., Inc.,* 103 F. Supp. 3d 426, 434 (S.D.N.Y. 2015) (where the district judge considers challenge raised only in a footnote in a Reply brief).

7

defense experts in pre-trial briefing). So, even if Plaintiffs are denied the opportunity to challenge Benthall now based on Fed. R. Evid. 404(e), Plaintiffs could argue for his exclusion based on the rule later. *Id.* at 2 ("Plaintiffs' agreement to defer briefing does not constitute a waiver of any challenge.").

### C. Testimony regarding Defendants' good character is improper.

Defendants advance the mistaken argument that their good character "illuminates Defendants' conduct" and that Plaintiffs' assertions of specific instances where Defendants are alleged to have supported Al Qaeda are "twist[ing] the practical realities of charitable giving." Plaintiffs have been clear that a charity's bad acts do not, by themselves, mean the charity did not perform good acts. But the deficiencies in Defendant's argument are (at least) twofold. *First*, Defendants do not accept that merely because a charity does good works does not mean that it does not support terrorism (or even that it is disinclined to support terrorism). Benthall's testimony about charity defendants' good works does not confront the evidence or describe specific conduct precisely *because* charities that do good works *also* support terrorism. Rather than addressing evidence, the statements are merely general statements applicable to many charities.[14] The fact that Defendants may have "assist[ed] orphans or displaced persons" has no bearing on whether Defendants supported Al Qaeda in the years before the September 11th Attacks. Indeed, the evidence suggests that charities that have engaged in supporting terrorism have done good works to mask their bad deeds.[15] Regardless, Benthall's generalized descriptions of charity work do not make it more or less likely that Defendants supported terrorism and thus should be excluded. *Second*, even if the charities may be entitled, within appropriate limits, to explain the nature of their good works at trial, they can put fact witnesses up to explain their

---

[14] *See, e.g.,* ECF 7690 § II, at 8 (arguing, *inter alia*, "Defendants' desire to have Benthall testify in the broadest possible terms that Islamic charities 'raise awareness of Islam' bears no nexus to accusations that they materially supported terrorism.").

[15] *See, e.g.*, ECF No. 9111-2 (Levey Testimony) (explaining that charities used to support terrorist activities use the charities "legitimate" or "genuine" relief activities to support their terrorist support agendas); Ex. 11, Testimony of David D. Aufhauser, General Counsel, Dep't of the Treasury Before the Senate Judiciary Committee Subcommittee on Terrorism, Technology and Homeland Security, at 5 (June 26, 2003) ("Though these charities may be offering humanitarian services here or abroad, funds raised by these various charities are sometimes diverted to terrorist causes. This scheme is particularly troubling because of the perverse use of funds donated in good will to fuel terrorist acts.").

work. There is nothing beyond the ken of the factfinder needed to explain that the charities have done charitable work. Allowing them to introduce good character testimony through an expert suggests an improper imprimatur of specialized training on the evidence introduced.

Defendants' legal argument, Opp'n Br. 11-12, that their good character is "probative of another fact that is of consequence to the determination of the action or for another purpose such as proving 'motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident'" is a mistaken application of the law. These exceptions are not applicable under Fed. R. Evid. 404(a) and are applicable when evidence related to "other crimes, wrongs, or acts" is presented under Fed. R. Evid. 404(b). Here, no "other crimes, wrongs, or acts" have been proffered to show action in conformity with Defendants' character at a given time. Even if these exceptions did apply, Defendants make no effort to explain why any of them should. Opp'n. Br. 11-12.

Put simply, Defendants argue that their good conduct at some point in time evidences that they likely conformed with that good conduct at times relevant here. This is "exactly what a litigant cannot do." *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536 (S.D.N.Y. 2005) (citing *Zenian v. District of Columbia*, 283 F. Supp. 2d 36,40 (D.D.C. 2003)). Defendants' character is not an "essential element of a claim or defense." *Id*. Indeed, this character evidence should be precluded because it "often possesses limited probative value…." *U.S. v. Pujana-Mena*, 949 F.2d 24, 29 (2d Cir. 1991).

### D. The magistrate judge's findings were clearly erroneous and contrary to law.

Defendants take issue with the Executive branch's findings and the Supreme Court's ruling in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). Defendants do not counter the core substance of Kenneth R. McKune's affidavit testimony cited by the Supreme Court in *Holder*[16] or the Congressional testimony of then-Treasury Undersecretary Stuart Levey, which both support the Supreme Court's

---

[16] Kenneth R. McKune was Acting Coordinator for Counterterrorism, U.S. State Department.

findings in *Holder* that terrorist organizations conceal their activities behind charitable institutions. Instead, Defendants suggest that only the portion of the testimony affirming that charities do good works should be considered to support Defendants' argument (ignoring that the import of the testimony was that the good works masked terrorist support). Opp'n Br. 10. The sum of Plaintiffs' argument is that the magistrate judge failed to consider relevant legal authority (*Holder*) when she ruled that evidence of the Defendants' beneficent work would make it "more likely" that they did not support terrorism. This is clearly contrary to the Supreme Court's findings and the evidence in *Holder* that terrorist organizations "muddy the waters" for precisely the purpose of masking their criminal activities. *See* Objections 10 (citing *Holder*, 561 U.S. 1 at 30-31).[17]

It is inconsistent with *Holder* to permit vague and general suggestions that a charity engaged in some legitimate activity at some nebulous time to support the argument that it is "less likely" that it supported the 9/11 Attacks. Plaintiffs' citation to relevant case authority is not "importing the facts of another case," as Defendants suggest, but offers legal analysis. A weakness in Defendants' position is obvious from their failure to rebut the substance of the testimony of then-Treasury Under-Secretary Levey or the declaration testimony of Kenneth R. McKune, former Acting Coordinator for Counterterrorism, U.S. State Department, saying only that they are not binding here.

It is not a "theory" that terrorist organizations have used the good works of charities to shield them from scrutiny.[18] To disregard this fact is clear error and contrary to law.

## III.   CONCLUSION

For the foregoing reasons and as set out in Plaintiffs' objections, pursuant to Rule 72(a), Plaintiffs respectfully request that the Court sustain the Plaintiffs Objections.

---

[17] In this case, the magistrate judge failed to apply the relevant case law. *Nike, Inc. v. StockX LLC*, No. 22 Civ. 983, 2023 WL 3091671, at *1 (S.D.N.Y. Apr. 26, 2023) (stating a ruling is contrary to law if it "fails to apply or misapplies relevant statutes, case law or rules of procedure.").

[18] *Holder*, 561 U.S. 1 at 30-31; *see* Financial Action Task Force Report, Risk if Terrorist Abuse in Non-Profit Organizations (June 2014), https://www.fatf-gafi.org/en/publications/Methodsandtrends/Risk-terrorist-abuse-non-profits.html.

10

Dated: July 21, 2023                                    Respectfully submitted,

MOTLEY RICE LLC                                         COZEN O'CONNOR

By:  /s/ *Robert T. Haefele*                            By:  /s/ *Sean P. Carter*
ROBERT T. HAEFELE                                       SEAN P. CARTER
JODI WESTBROOK FLOWERS                                  STEPHEN A. COZEN
DONALD A. MIGLIORI                                      J. SCOTT TARBUTTON
28 Bridgeside Boulevard                                 One Liberty Place
Mount Pleasant, SC 29465                                1650 Market Street, Suite 2800
Tel.: (843) 216-9184                                    Philadelphia, Pennsylvania 19103
Email: rhaefele@motleyrice.com                          Tel.: (215) 665-2105
                                                        Email: scarter@cozen.com
*Liaison Counsel for the Plaintiffs'*
*Executive Committee for Personal Injury and Death*     *Co-Chair of the Plaintiffs' Executive Committee for*
*Claims on behalf of the Plaintiffs*                    *Commercial Claims on behalf of Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the Plaintiffs' Reply To Defendants' Response [ECF No. 9179] To Plaintiffs' Objections [ECF No. 9179] To The Court's April 27, 2023, Opinion And Order [ECF No. 9060] was electronically filed this 21st day of July, 2023. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system, which the parties may access.

_____
Robert T. Haefele