Exhibit 4

S. Hrg. 108–683

# AN ASSESSMENT OF CURRENT EFFORTS TO COMBAT TERRORISM FINANCING

# HEARING

BEFORE THE

## COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE

ONE HUNDRED EIGHTH CONGRESS

SECOND SESSION

JUNE 15, 2004

Printed for the use of the Committee on Governmental Affairs



U.S. GOVERNMENT PRINTING OFFICE

95–189 PDF                    WASHINGTON : 2004

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

COMMITTEE ON GOVERNMENTAL AFFAIRS

SUSAN M. COLLINS, Maine, *Chairman*

| | |
|---|---|
| TED STEVENS, Alaska | JOSEPH I. LIEBERMAN, Connecticut |
| GEORGE V. VOINOVICH, Ohio | CARL LEVIN, Michigan |
| NORM COLEMAN, Minnesota | DANIEL K. AKAKA, Hawaii |
| ARLEN SPECTER, Pennsylvania | RICHARD J. DURBIN, Illinois |
| ROBERT F. BENNETT, Utah | THOMAS R. CARPER, Delaware |
| PETER G. FITZGERALD, Illinois | MARK DAYTON, Minnesota |
| JOHN E. SUNUNU, New Hampshire | FRANK LAUTENBERG, New Jersey |
| RICHARD C. SHELBY, Alabama | MARK PRYOR, Arkansas |

MICHAEL D. BOPP, *Staff Director and Chief Counsel*
DAVID A. KASS, *Chief Investigative Counsel*
EDWARD W. PRIESTOP, *Federal Bureau of Investigations Detailee*
JOYCE A. RECHTSCHAFFEN, *Minority Staff Director and Counsel*
DAVID BARTON, *Minority Professional Staff Member*
AMY B. NEWHOUSE, *Chief Clerk*

# C O N T E N T S

_____

|                                                                  | Page |
| ---------------------------------------------------------------- | ---- |
| Opening statements:                                              |      |
| Senator Collins ................................................ | 1    |
| Senator Lieberman ............................................. | 3    |
| Senator Coleman ............................................... | 5    |
| Senator Lautenberg ........................................... | 6    |
| Senator Akaka ................................................. | 7    |
| Senator Levin ................................................. | 8    |
| Senator Specter .............................................. | 27   |
| Senator Pryor ................................................ | 29   |
| Prepared statement:                                             |      |
| Senator Voinovich ........................................... | 35   |

## WITNESSES

### TUESDAY, JUNE 15, 2004

| | |
| --- | --- |
| Lee S. Wolosky, Co-Director, Independent Task Force on Terrorism Financing, Counsel, Boies, Schiller and Flexner, LLP ................................................ | 11 |
| Mallory Factor, Vice-Chairman, Independent Task Force on Terrorism Financing, President, Mallory Factor, Inc ................................................ | 14 |
| Hon. David D. Aufhauser, Counsel, Williams and Connolly, LLP, Former General Counsel, U.S. Department of the Treasury ........................................ | 16 |

### ALPHABETICAL LIST OF WITNESSES

| | |
| --- | --- |
| Aufhauser, Hon. David D.: | |
| Testimony ................................................ | 16 |
| Prepared Statement ................................................ | 46 |
| Factor, Mallory: | |
| Testimony ................................................ | 14 |
| Prepared Statement ................................................ | 41 |
| Wolosky, Lee S.: | |
| Testimony ................................................ | 11 |
| Prepared Statement ................................................ | 36 |

### APPENDIX

| | |
| --- | --- |
| Questions and responses for the Record from Senator Akaka for: | |
| Mr. Wolosky ................................................ | 51 |
| Mr. Factor ................................................ | 52 |
| Mr. Aufhauser ................................................ | 53 |
| "An Update on the Global Campaign Against Terrorist Financing," Second Report of an Independent Task Force on Terrorist Financing Sponsored by the Council on Foreign Relations, June 15, 2004 ................................................ | 54 |
| Letter from Stanton D. Anderson, McDermott Will & Emery, dated June 30, 2004 ................................................ | 312 |
| Response letter to Stanton D. Anderson, Esq. from William F. Wechsler and Lee S. Wolosky, Esq., dated August 3, 2004, with an attachment ........... | 315 |

(III)

# AN ASSESSMENT OF CURRENT EFFORTS TO COMBAT TERRORISM FINANCING

———————

### TUESDAY, JUNE 15, 2004

U.S. SENATE,
COMMITTEE ON GOVERNMENTAL AFFAIRS,
*Washington, DC.*

The Committee met, pursuant to notice, at 10:30 a.m., in room SD–342, Dirksen Senate Office Building, Hon. Susan M. Collins, Chairman of the Committee, presiding.

Present: Senators Collins, Coleman, Specter, Lieberman, Levin, Akaka, Lautenberg, and Pryor.

### OPENING STATEMENT BY CHAIRMAN COLLINS

Chairman COLLINS. The committee will come to order.

Good morning. Today the Governmental Affairs Committee will conduct a review of current efforts underway to combat terrorism financing.

This is the third hearing the Committee has held during the past year on this issue of great global importance. The focus of our hearing today is a new report by the Independent Task Force on Terrorism Financing sponsored by the Council on Foreign Relations. The Council's first report, released in October 2002, begins with these words: "The fog of war has long befuddled military and political leaders. Of all the battle fronts in today's war on terrorism, few are as foggy as efforts to combat terrorist financing."

As both of these reports make clear, however, this fog is no natural phenomenon. It is entirely manmade. Terrorism thrives in the shadows. It prospers by deceit and deliberate confusion. It is a perverted world in which murderers are called freedom fighters and in which building schools and health clinics can excuse the slaughter of innocents.

The answer is relentless scrutiny and then taking forceful and effective action.

This new report focuses primarily upon the actions taken by the Governments of the United States and of the Kingdom of Saudi Arabia. It provides an insightful analysis of the progress that has been made and of the challenges that remain.

As the report observes, Saudi Arabia has, on a comparative basis, taken more legal and regulatory actions to combat terrorism financing than many other Muslim States. However, the size, the reach and the wealth of persons and institutions there with connections to violent terrorist groups put the kingdom on the front lines of this battle.

2

There are other engines of terrorism financing, but as David Aufhauser, one of our distinguished witnesses, testified just 1 year ago, Saudi Arabia is, in many ways, the epicenter of terrorism financing. As the Council's first report stated, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaeda.

A phrase that occurs again and again throughout this new report is political will. In some instances, it is evident and growing. In others it is still woefully lacking. This mixed result characterizes Saudi Arabia. The Saudi government deserves credit for under-taking considerable legislative and regulatory reforms. Questions remain, however, about whether these reforms are being consist-ently, effectively, and vigorously implemented.

For example, the kingdom recently dissolved the notorious Al Haramain charity and it has created a new organization to coordi-nate and oversee private Saudi charitable giving abroad. This is a very positive step that should significantly diminish the ability of al Qaeda and other terrorist groups to raise and move funds using charities as conduits. There remain, however, serious questions. Most important, what are the Saudi's doing to crack down on the International Islamic Relief Organization, the World Assembly of Muslim Youth, and the Muslim World League, three of the char-ities alleged to have the most troubling terrorism connections.

Terrorists attacking Saudi Arabia from within the country have been killed and many Saudi law enforcement personnel have given their lives. Yet this report also notes that since September 11, 2001 we know of not a single Saudi donor of funds to terrorist groups who has been publicly punished.

Perhaps most troubling is the continued gap between what Saudi leaders say to the world and what some of them have to say to their own people. Following the al Qaeda attacks in early May, Crown Prince Abdullah said on Saudi TV that "Zionism is behind the terrorist attacks in the kingdom. . . . I am 95 percent sure of that." That astonishing and inflammatory remark was reiterated a few days later by the Saudi Foreign Minister. The Saudi Interior Minister then left no doubt as to the meaning when he bluntly stated that al Qaeda is backed by Israel.

This is not just a lack of political will. This is political blindness. To say that the Kingdom of Saudi Arabia is a full partner in the war against terrorism while such inflammatory and anti-Semitic statements are being made would certainly be vastly premature.

On an encouraging note, the report details significant progress by the U.S. Government in combating terrorism financing. A key recommendation of the first task force report in 2002 was for the Administration to centralize the coordination of efforts to combat terrorism financing. This has been accomplished to a significant de-gree.

The Administration also deserves credit for prompting the Saudis to begin to undertake serious reforms and to extend meaningful co-operation to American terrorism investigations. The progress rep-resented by the enactment of the Saudi legal reforms, the Saudi ac-tions against al Qaeda cells in the kingdom, and the creation of the Joint Terrorism Financing Task Force should not be understated. These are indeed important achievements.

3

But the report also finds several troubling shortcomings and includes a number of thought-provoking recommendations for change. I am particularly intrigued by the task force's recommendation for Congress to enact a certification regime that would require the President to certify whether foreign nations are fully cooperating with the fight against terrorism financing. If the President did not make this certification or issue a waiver in the interest of national security, non-cooperating nations would face an array of sanctions. This type of regime has been employed in the war on illegal drugs. The report suggests that it be in place for the fight against terrorist funds as well.

We, the Governments of the United States, Saudi Arabia, and all responsible nations, have made considerable progress in combating terrorism. But this struggle is not easily won and money remains the lifeblood of many terrorist operations. We must not rest until we have done everything in our power to halt the flow of money that breathes life into these groups. We must exercise relentless scrutiny and take strong action. And as this report emphasizes so clearly, we must have the sustained will necessary to win the war against terrorism.

Senator Lieberman.

## OPENING STATEMENT BY SENATOR LIEBERMAN

Senator LIEBERMAN. Thank you very much, Chairman Collins for convening this hearing, and also, I must say, for that excellent opening statement.

Our subject for today is about one of the most important battlefronts in our war against terror and that is the effort to stop the funding of terrorists. If we can succeed in choking off the money that sustains terrorist activities we can literally reduce the death and destruction the terrorists cause.

The Council on Foreign Relations, in its report today, has done a real service. The report should help us refocus, reexamine and redouble our efforts to cut off the flow of money to international terrorist groups. Of course, that includes leading us to take again a hard and demanding look at financial support for terrorism from Saudi Arabian sources.

Immediately after September 11, President Bush signed an executive order aimed at blocking terrorist funds. In one sense our overarching question in this hearing and our Committee's continuing investigations is what progress has been made in implementing that order.

It is clear that in the first few months following the President's announcement there was very significant success. Over $100 million in terrorist money was blocked or frozen around the world. But, in the 2 years since then only $30 million has been stopped. So that both the United Nations Monitoring Group on Terrorist Financing and Congress's own General Accounting Office concluded at the end of 2003 that American efforts have sadly not stemmed the flow of money to terror groups.

We will want to ask our witnesses today why this has happened and what we can do together to make sure that we do cut off the flow of money. The Council on Foreign Relations report does sug-

gest the beginning of a series of answers about where some of the problems may be.

I thought one surprising possible cause that the report cites is the fact that the Administration has only used new authorities under the Patriot Act, the much-maligned Patriot Act, to crack down on the assistance of foreign financial institutions for terrorism only one time and that was quite recently against a Syrian bank. I would like to get a little background about why we think that has happened and whether the witnesses believe that there are other areas in which we can use that Patriot Act authority.

Second, the Council report tells us that the coordination of America's efforts to block terrorist funding has bounced around a bit among the National Security Council, the Counsel of the Treasury Department, and the FBI. In fact, there have been five different people in charge since September 11. And, that uncertainty and changes in leadership may have undermined the coordination and the effectiveness of our anti-terror financing efforts.

Leadership has now shifted, with some clarity it appears to me, to the National Security Council, although not through any formal process that would give it continuity and institutional permanence. I think that is greatly to be desired.

I note for the record the nodding of at least two of the witnesses to that suggestion.

I do also note that one of our witnesses today, former Treasury Department General Counsel David Aufhauser, believes that this leadership role, in fact, should reside at the Treasury Department. I would be interested in hearing his views on that matter during his testimony.

But either way, whether at the Treasury Department or at the NSC, leadership has got to be made certain, and in that sense, institutionalized. It should no longer be left to ad hoc and uncertain arrangements.

The Intelligence Committees of Congress reported a while back in their joint inquiry into September 11 that the tendrils of Bin Laden's al Qaeda terrorist network extend into as many as 60 countries. That means our war against this network and those who finance it must be just as extensive.

The Council reports, hopefully, that 117 nations have signed now the International Convention to Suppress Terror Financing, which is up from four at the time of the September 11 attacks. So we have gone from four countries who are signatories to 117. That is the good news.

The bad news is that most of those countries, the Council reports, do not have either the actual tracking capabilities or the resources to track laundered money. I want to hear from the witnesses about what we can do to make that bad news better.

In working to cut off funding for terrorism, Saudi Arabia, long a very important and close ally of the United States of America, becomes a necessary focus of attention. Bin Laden was a Saudi but more to the point 15 of the 19 September 11 hijackers were Saudis and questions continue to remain about financial connections between Saudi money and terror funding within the United States.

Before the May 2003 terrorist bombings in Riyadh many independent analysts, including the Council on Foreign Relations, have

5

told us that Saudi officials may have talked the talk on cooperating with the United States in the blocking of terrorism financing and investigating and prosecuting of those who were involved in it. But then, in many cases, did not walk the walk. In fact, they turned a blind eye to Saudi money going to organizations directly or indirectly supporting terrorism.

Again, I stress that is not my conclusion, that is the conclusion of many independent analysts. Today's CFR report points encouragingly to positive signs of intelligence sharing and law enforcement cooperation between the Saudis and the United States, again particularly since the May 2003 bombings in Riyadh. It says there is evidence that the actions taken by the Saudi government since then have actually hindered Bin Laden's financial operations and forced foreign-based terror groups to begin to try to raise their funds locally. That cooperation and progress between the United States and the Saudis is important and must grow.

In fact a joint U.S.-Saudi task force on these subjects was established last August to help the Saudis clamp down on terrorism financing, but the Council report tells us jarringly that the work of the joint task force has not led yet to one public arrest or prosecution of anyone in Saudi Arabia for financing terrorism. And that is hard to understand, particularly as the Council on Foreign Relations report indicates that there are two Saudis named Yasin Qadi and Wa'el Hamza Julaidan, who have been declared financiers of terrorism by the U.S. Government.

So we have made some progress in tracking and stopping terrorist financing but we, in Congress, still need to consider whether our urgent need to starve the terrorists of funding is being hampered by an uncertain organizational structure, by turf battles and perhaps by continuing defensiveness about our special relationship with the Saudi government and the Saudi ruling family.

In a day and age of terrorism which brings death and destruction not just to us and others but to Saudis themselves, we ought to be able best to preserve our relationship with the Saudis with total honesty and the most aggressive joint efforts against terrorism.

The CFR report and today's hearing, I hope, will begin to give us some answers to these questions which have become, in fact, life and death questions.

Thank you, Chairman Collins.

Chairman COLLINS. Thank you Senator. Senator Coleman.

**OPENING STATEMENT OF SENATOR COLEMAN**

Senator COLEMAN. Thank you, Chairman Collins. And thank you for your commitment to relentless scrutiny of this issue by holding a series of hearings on the report by the Council on Foreign Relations regarding terrorist financing.

Just two observations. One, it is clear that a new framework for the U.S.-Saudi relationship needs to be put into play focusing on accountability, accountability for terrorist financing. We have to see concrete results.

Second, in light of last week where we had a celebration of the life of Ronald Reagan and his optimism and belief that we would win the Cold War, and we did, I have the same optimism that we are going to win this struggle against terrorism, the same opti-

6

mism. But it is going to take resolve, it is going to take commitment. This report and these series of hearings go a long way to bolstering that optimism and making it a reality.

So again, I look forward to hearing the witnesses' testimony. Thank you for your leadership.

Chairman COLLINS. Senator Lautenberg.

### OPENING STATEMENT OF SENATOR LAUTENBERG

Senator LAUTENBERG. Thank you, Madam Chairman, for holding this important hearing.

President Bush has said it, that money is the lifeblood of terrorism. And if we want to win the global war on terrorism, it is critical that we find out who is financing terrorism, how they are doing it, what we can do to stop it. And I am disappointed that we do not have any Administration official available to us today but these are good witnesses, Madam Chairman, and I am sure we will learn a lot.

Cooperation between Congress and the Administration is imperative. And we face a daunting challenge when it comes to attacking the financial infrastructure that makes terrorism function. That is why I am puzzled that we did not take an obvious step a few weeks ago when I offered an amendment to the Department of Defense Authorization Bill to close the loophole that allows American companies to do business through foreign subsidiaries with nations that sponsor terrorism.

I salute Chairman Collins for her vote. The amendment was defeated 49 to 50 and I am grateful that the Chairman was one of three Republicans to support the amendment. And I hope that she has the capacity to convince the rest of the caucus of the amendment's merits because I will keep offering it until the Senate adopts it.

For the life of me, I do not know how we can condone U.S. companies doing business with rogue states like Iran. 60 Minutes had a segment just a few months ago detailing an interest that, for instance, Halliburton had with a sham foreign subsidiary in the Grand Caymans so that it could sell oil field equipment to Iran. Nothing more, by the way, than an address, a drop station. There was nothing else there. But it enabled Halliburton to do business with Iran and other rogue states.

I have had members of my staff look into this and sure enough they found evidence of the business activity that existed between this subsidiary and a London-based subsidiary of the National Iranian Oil Company called Kala Limited. The State Department has verified that Iran supports Hamas and Hezbollah and Islamic Jihad.

I was in Israel some years ago when a terrorist attack by Islamic Jihad killed eight people. And I was there just a few weeks ago when a terrorist killed 10 people in the port city of Ashtarak. And we cannot forget when Hezbollah attacked the Marine barracks in Beirut, killing 241 of our soldiers.

Does it make sense for an American company to help Iranians produce oil more efficiently when they use those extra profits to finance terrorist groups that have killed Americans? I went to four viewings and funerals last week in the State of New Jersey, people

7

who died in the service of their country. And to think that an American company could be helping to finance indirectly those terrorist organizations is a national disgrace. We had a chance to close that loophole and we failed.

I am also concerned, as was suggested by Chairman Collins and by the Ranking Member, Senator Lieberman, about the complicity that seems to be in existence in Saudi Arabia and without criticism coming sufficiently from the Administration. Saudi Arabia still has not designated groups like Hamas as terrorist organizations. And as much as 60 percent of Hamas' annual budget is donated from Saudi sources. And although the Saudis have passed some anti-money-laundering laws, they do not seem to be enforcing them.

So I appreciate that we have a delicate relationship with countries like Saudi Arabia. But if we are going to protect Americans, which is the primary concern, here and abroad from the scourge of terrorism, we have got to find out who is financing it even if we disturb some of our buddies in the process.

I thank you, Madam Chairman, for holding this hearing.

Chairman COLLINS. Senator Pryor.

Senator PRYOR. I do not have any opening statement. Thank you.

Chairman COLLINS. Thank you, Senator. Senator Akaka.

### OPENING STATEMENT OF SENATOR AKAKA

Senator AKAKA. Thank you very much, Madam Chairman.

I want to commend you for having this hearing and we hope that it will strengthen our capability to address the threats and challenges of terrorism financing.

I have a statement that I would like to place in the record. I just want to thank you again for holding this hearing and I look forward to hearing our witnesses and working with my colleagues on this important problem. Thank you.

[The prepared statement of Senator Akaka follows:]

PREPARED OPENING STATEMENT OF SENATOR AKAKA

Madam Chairman, thank you for holding this hearing. I hope it will help to strengthen our capability to address the threats and challenges of terrorism financing.

Last July, Mr. Pistole, from the Federal Bureau of Investigation reminded this Committee that identifying and dismantling the financial structures of terrorist groups is critical to preventing future attacks. We must heed Mr. Pistole's words especially as terrorist attacks continue to rise.

It is disheartening that almost three years after September 11, terrorist groups, including al Qaeda, continue to maintain sophisticated financial networks. What is more alarming is that sources attribute at least 60 percent of Hamas and al Qaeda funds to Saudi-based entities. Most of these funds are diverted from charities and businessmen to terrorist groups and are used to execute attacks or to entice new recruits.

Earlier this month, Saudi Arabia pledged it would dissolve the Al-Haramain Islamic Foundation, which U.S. officials allege to be al Qaeda's largest financial supporter, contributing $50 million on an annual basis. The National Commission for Relief and Charity Work Abroad will merge the assets of Al-Haramain and other Saudi-based charities into one account and ensure their legitimate use. But, Saudi officials have not yet specified whether the Commission will oversee charities with known terrorist connections.

I am concerned that this may be another promise that the Saudis cannot fulfill.

Last May, the Saudi government announced it would establish the High Commission for Charities to address Saudi-based groups financing terrorism. As of February of this year, no proposed budget or staff existed for this Commission. Furthermore,

8

no action has been taken against Al-Haramain's former leader, Al-Aqil, despite Saudi Arabia's promises to conduct criminal proceedings.

In addition, Saudi officials have not provided sufficient support to the Saudi Arabian Monetary Agency nor has the Saudi government created a financial intelligence unit.

Today, many view the U.S. and Saudi Joint Task Force on Terrorism Financing as a test of Saudi Arabia's responsiveness to terrorism. This collaboration will be an opportunity to gauge the Saudi's willingness to block the flow of money from its general and elite populations to terrorist organizations. I hope this task force will mark the beginning of progress.

I look forward to hearing from our witnesses and to working with my colleagues to address this critical issue.

Thank you.

Chairman COLLINS. Thank you, Senator. Senator Levin.

**OPENING STATEMENT OF SENATOR LEVIN**

Senator LEVIN. Madam Chairman, thank you, and thank you for your continuing leadership in this effort.

Since the September 11 attacks, this Committee has focused needed attention on the role of Saudi Arabia and the Saudia-based charitable organizations and terrorist financing. Today's hearing is the third in a series focusing on this issue over the past year. And I commend you again, Madam Chairman, for sustaining this Committee's strong oversight tradition for this critical issue.

Today's hearing focuses on a report authorized by the non-partisan Council on Foreign Relations. It builds on a prior Council report issued nearly 2 years ago. It offers a number of important and practical suggestions including revitalizing the international effort led by the Financial Action Task Force to convince jurisdictions to strengthen their anti-money laundering efforts and improving the U.S. Government's sharing of terrorist financing information with U.S. financial institutions so that they can do a better job.

I want to focus just for a moment on one of the primary topics examined in the report and that is the role of Saudi Arabia. Right now, Saudi Arabia has two primary exports to the rest of the world: Oil and an extreme form of Islam that advocates hatred and violence to achieve its ends. Two exports, both having a huge impact on the world.

The report before us today does not shy away from the reality of that second export. It describes the "fundamental centrality that persons and institutions based in Saudi Arabia have had in financing militant Islamic groups on a global basis."

And then it repeats a statement that was made in its earlier report which is worth repeating, and that is that "it is worth stating clearly and unambiguously what official U.S. Government spokespersons have not. For years individuals and charities based in Saudi Arabia have been the most important source of funds for al-Qaeda; and for years Saudi officials have turned a blind eye to that problem."

Madam Chairman, because of the number of witnesses that we have I would ask that the balance of my statement be placed in the record at this time.

[The prepared statement of Senator Levin follows:]

9

PREPARED OPENING STATEMENT OF SENATOR LEVIN

Terrorists need money to carry out acts of terrorism. They need money for explosives, for communications, for travel, and for all the other details involved in carrying out plans for mass murder and mayhem. Global terrorist organizations need global financing. They need to be able to transfer funds across international lines, move money quickly, and minimize inquiries into their finances, their activities, and their supporters.

Since the September 11 attack, stopping terrorist financing has become a U.S. priority. This Committee has contributed in a significant way to that priority. First, prior to the attack, the Committee's Permanent Subcommittee on Investigations conducted a 3-year anti-money laundering investigation which produced extensive hearings and reports, documented little known methods for transferring illegal funds into the United States, and identified ways to strengthen U.S. laws to stop money laundering and terrorist financing. In early 2001, I introduced a bipartisan bill, S. 1371, with specific legislative proposals for strengthening U.S. anti-money laundering laws. The Senate Banking Committee utilized them in Title III of the USA Patriot Act, which was enacted into law in October 2001, 6 weeks after the September 11 attack.

Additionally, since the attack, this Committee has focused needed attention on the role of Saudi Arabia and Saudi-based charitable organizations in terrorist financing. Today's hearing is the third in a series focusing on this issue over the past year, and I commend Chairman Collins for sustaining the Committee's strong oversight of this critical issue. In the last Committee hearing on this topic, a key government official stated that "in many ways, [Saudi Arabia] is the epicenter" for financing of al Qaeda and other terrorist movements. Today's hearing focuses on a report that carries much the same message.

This report is authored by the nonpartisan Council on Foreign Relations. It builds on a prior Council report issued nearly 2 years ago, and addresses both the global campaign against terrorist financing and the additional steps that need to be taken by the United States and Saudi Arabia to combat terrorist financing. It offers a number of important and practical suggestions, including revitalizing the international effort led by the Financial Action Task Force to convince jurisdictions to strengthen their anti-money laundering efforts and improving the U.S. Government's sharing of terrorist financing information with U.S. financial institutions so they can do a better job.

I want to focus for a moment on one of the primary topics examined in the report and that is the role of Saudi Arabia. Right now, Saudi Arabia has two primary exports to the rest of the world: Oil and an extreme form of Islam that advocates hatred and violence to achieve its end.

The report before us today does not shy away from this reality. It describes "the fundamental centrality persons and institutions based in Saudi Arabia have had in financing militant Islamist groups on a global basis." It repeats a statement made in its earlier report:

"It is worth stating clearly and unambiguously what official U.S. Government spokespersons have not: For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al-Qaeda; and for years, Saudi officials have turned a blind eye to this problem."

The report cites with approval Saudi actions over the past 2 years to overhaul its anti-money laundering laws, increase its oversight of Saudi charities, and disrupt al Qaeda cells within the country. But it also faults Saudi Arabia for failing to prosecute a single individual involved with terrorist financing and for continuing to export radical extremism even while curbing it domestically.

For too long, Saudi Arabia has made a Faustian deal with the extremists who preach hatred and violence to achieve their ends, hoping that the violence these extremists advocate would not bloody the sands of Saudi Arabia itself. But recent events indicate that Saudi Arabia is beginning to reap what it has helped to sow worldwide, and that no one is safe from those who advocate terrorism to achieve their aims. The list of tragic events in Saudi Arabia resembles those in other countries ravaged by terrorism, with repeated bombings, kidnappings, and senseless death and destruction. On May 12 and November 9 of last year, for example, al Qaeda operatives bombed housing complexes used by foreign workers living in Riyadh, leading to the deaths of more than 50 individuals. This year saw an attack on Riyadh's General Security building followed by two attacks on Saudi oil facilities with the latter resulting in 22 fatalities. Now rumors allege a plot to kill Crown Prince Abdullah.

10

The report before us today advocates building a new framework for U.S.-Saudi relations that will include a frank acknowledgment of terrorist financing issues and the need to end Saudi support for radical extremism that condones violence. The plain fact is that, to stop terrorism, Saudi Arabia needs to stop financing radical clerics and madrassas that preach violence and hatred. It needs to publicly prosecute those who foment and finance terror. Ultimately, the Saudi government needs to recognize that it is not sufficient to selectively oppose terrorist groups that pose an immediate threat. The presence of any terrorist organization, regardless of its immediate focus, is a threat to all nations. For that reason, Saudi Arabia as well as our European allies need to cease funding for all terrorist groups, including Hamas and the charities that support it.

Of course, it is not just Saudi Arabia that needs to do more to fight terrorist financing. There is plenty that we in the United States need to do here at home. The report's recommendation that the U.S. conduct an analysis of Federal agencies to determine "who is doing what, how well and with what resources," is another way of saying that our current anti-money laundering and terrorist financing efforts are scattered, duplicative, and inefficient. There is no one top official in charge, little coordination, and less accountability.

The unfolding scandal at Riggs National Bank is another measure of our own weak anti-money laundering enforcement. Bank regulators recently imposed a $25 million fine on Riggs for its inadequate anti-money laundering efforts, but at the same time apologized for their own lax oversight in allowing Riggs to continue its failed policies and procedures for more than five years. Riggs has managed bank accounts not just for Saudi officials, but also for more than 100 other governments around the world. Recently, Riggs announced its intention to close many Embassy-related accounts due to high money laundering risks and the bank's inability to monitor them. These Embassies are now looking to open accounts at other banks. Federal regulators recently held a meeting with major U.S. banks to explain their expectations for managing these Embassy accounts. While the regulators insist this meeting was intended to spread the word about the need for due diligence, the media reported that others apparently interpreted the meeting as signaling regulatory support for taking on these accounts.

These mixed signals are a huge mistake. One of the lessons of the Riggs scandal must be that Embassy bank accounts can no longer operate with minimal scrutiny. Our banks and bank regulators must establish new rules and expectations. Embassy officials need to realize they can no longer engage in substantial cash transactions with no questions asked. Multiple Embassy accounts can no longer be opened with little or no due diligence. Suspicious transactions must be explained and justified. It can't be business as usual. Our security and the world's security depends upon it.

The 2002 report by the Council on Foreign Relations made a positive contribution to the fight against terrorist financing by saying a number of things that needed to be said openly and clearly and by making reasonable and practical suggestions. This second report has the potential to do the same. I thank today's witnesses for their service to our nation in contributing to this report and look forward to hearing their testimony today.

Chairman COLLINS. Thank you, Senator Levin.

I am delighted to welcome our witnesses this morning. We are extremely fortunate to have three such qualified experts to testify before us.

Lee Wolosky previously worked as the Director of Transnational Threats at the National Security Council. He is currently Counsel at the law firm of Boies, Schiller and Flexner and is an Adjunct Professor of International Affairs at Columbia University. Mr. Wolosky is also the Co-Director of the Independent Task Force on Terrorist Financing sponsored by the Council on Foreign Relations.

Mallory Factor is the President of Mallory Factor Inc., an independent merchant bank and financial relations firm that he founded in 1976. Mr. Factor has also worked as a Professor at the School of Continuing and Professional Studies at New York University and he serves as Vice-Chairman of the Task Force on Terrorist Financing.

11

We are also pleased to have with us for a second time David Aufhauser, who is now a member of the law firm of Williams and Connolly. He previously served as General Counsel of the Treasury Department from March 2001 to November 2003. At the Treasury Department, in addition to his responsibilities as General Counsel, Mr. Aufhauser served as the Chairman of the National Security Council's Policy Coordinating Committee on Terrorist Financing.

Thank you all for being with us today. We look forward to hearing your testimony. We will begin with you, Mr. Wolosky.

### TESTIMONY OF LEE S. WOLOSKY,[1] CO-DIRECTOR, INDEPENDENT TASK FORCE ON TERRORISM FINANCING, COUNSEL, BOIES, SCHILLER AND FLEXNER, LLP

Mr. WOLOSKY. Thank you very much. Madam Chairman, Senator Lieberman and distinguished Members of the Committee, thank you for your kind words about our report and for your continuing leadership on terrorist financing issues.

This Committee's sustained attention to these issues is critically important to our Nation.

We are honored to report to you today on the Second Report of the Independent Task Force on Terrorist Financing sponsored by the Council on Foreign Relations. I have served as co-director of this bipartisan initiative since its founding in the Summer of 2002.

Our report is the result of the hard work of a number of dedicated individuals of both political parties to seek to further vital national interests. I wish to thank our Chairman, Maurice Greenberg, for his unwavering support of the task force. I would also like to thank our Vice-Chairman, Mallory Factor, and our Co-director and Co-author, William F. Wechsler, for all they have done to make the task force a success.

Finally, I am also grateful to Council President, Richard Haas, for his support and assistance to our work and it is an honor, let me add, to testify beside David Aufhauser, who served our country with dedication and distinction. Many of the positive developments in this area since September 11 are the direct fruits of his vision and leadership.

I will discuss the background of our second report and its findings. Mallory Factor will then discuss the report's recommendations.

Since the report, along with its various appendices, is almost 200 pages in length we will only be able to highlight core points and findings. We will ask that the full report and its appendices be entered into the record and we will look forward to a fuller discussion of various aspects of the report in response to your questions.[2]

In our first report, released in October 2002, we concluded "It is worth stating clearly and unambiguously what official U.S. Government spokespersons have not, for years individuals and organizations based in Saudi Arabia have been the most important source of funds for al-Qaeda and for years Saudi officials have turned a blind eye to this problem."

---

[1] The prepared statement of Mr. Wolosky appears in the Appendix on page 36.
[2] The report entitled "An Update on the Global Campaign Against Terrorist Financing," appears in the Appendix on page 54.

12

We recommended the encouragement of the Saudi regime to strengthen significantly its efforts to combat terrorist financing. In this regard, we noted a recent historical record of inattention, denial, and half measures.

We urged the U.S. Government to confront directly the lack of political will in Saudi Arabia and elsewhere through the institution of a declaratory policy that would permit or compel U.S. officials to speak more frankly about the nature of the problem.

The reaction to the release of the task force's initial report was reflective of then-prevailing mindsets. The Saudi Arabian Foreign Minister, for example, told *CNN* that the report was "long on accusation and short on documented proof."

The U.S. Treasury Department spokesperson called the report "seriously flawed."

The status quo changed on May 12, 2003 when al Qaeda bombed housing compounds in Riyadh used by Americans and other foreign residents, prompting more comprehensive Saudi action against terrorism. Public statements and actions by both the United States and Saudi Arabia since May 2003 have evidenced in many respects a more urgent approach to terrorist financing.

For example, Saudi Arabia has announced a profusion of new laws, regulations and institutions regarding money-laundering, charitable oversight and the supervision of the formal and informal financial services sector. Critically, for the first time, the Saudi Arabian government decided to use force to hunt and kill members of domestic al Qaeda cells, including, in one case, a financier known by the name of Swift Sword.

Saudi Arabia has markedly improved its tactical law enforcement and intelligence cooperation with the United States. The Bush Administration acted quickly to take advantage of the newfound political will in Saudi Arabia to renew and reinvigorate U.S. efforts to combat terrorist financing.

The Bush Administration also moved toward a more declaratory policy. On June 26, 2003, for example, David Aufhauser testified before the Congress that in many respects Saudi Arabia was an "epicenter" of terrorist financing.

As a result of these and other activities, al Qaeda's current and prospective ability to raise and move funds with impunity has been significantly diminished. These efforts have likely made a real impact on al Qaeda's financial picture, and it is undoubtedly a weaker organization as a result.

Indeed, in many respects, the views expressed in the task force's first report are now widely held at home and abroad. But although much work has been done, much work remains.

Although Saudi Arabia has made significant improvements in its legal and regulatory regime, it has not fully implemented its new laws and regulations. Because of that, opportunities for the witting or unwitting financing of terrorism persist.

Indicia of implementation and enforcement are generally unavailable. We are concerned that the unavailability of such indicia may negatively impact the deterrent effect presumably intended by these measures. As our report was going to press, for example, we were unable to find evidence to suggest that the announced High Commission of Oversight of Charities was fully operational. More-

13

over, its composition, authority, mandate and charter remain unclear, as do important metrics of its likely effectiveness, such as staffing levels, budget, and the training of its personnel.

The mandate and authority of the High Commission of Oversights of Charity is also unclear, relative to that of the Saudi National Entity for Charitable Work Abroad which was first announced in February of this year and which was the subject of a press conference in Washington a few days ago.

At least one other key body, Saudi Arabia's Financial Intelligence Unit, is also not yet fully operational. Reliable, accessible metrics are lacking with respect to many of the other newly announced legal, regulatory and institutional reforms. We find this troubling given the importance of these issues to the national security of the United States.

Additionally, despite the flurry of laws and regulations, we believe that there have been no publicly announced arrests, trials or incarcerations in Saudi Arabia in response to the financing of terrorism. As a result Saudi Arabia has yet to demand personal accountability in its efforts to combat terrorist financing and, more broadly and fundamentally, to delegitimize these activities.

Against its poor historical enforcement record any Saudi actions against financiers of terrorism are welcome. But action taken in the shadows may have little consistent or systemic impact on ingrained social or cultural practices that directly or indirectly threaten the security of the United States.

Not only have there been no publicly announced arrests in Saudi Arabia related to terrorist financing, but key financiers remain free and go unpunished. In sum, we find it regrettable and unacceptable that since September 11, 2001 we know of not a single Saudi donor of funds to terrorist groups who has been publicly punished.

Finally, as Senator Levin indicated, Saudi Arabia continues to export radical extremism. As a core tenet of its foreign-policy, Saudi Arabia funds the global propagation of Wahabism, a brand of Islam that, in some instances, supports militancy by encouraging divisiveness and violent acts against Muslims and non-Muslims alike.

This massive spending is a key part of the terrorist financing problem. We are concerned that it is helping to create the next generation of terrorists and therefore constitutes a paramount strategic threat to the United States.

Saudi Arabia has begun to crack down on domestic extremism, most dramatically through education reform and the banishment or reeducation of scores of radical Wahabi clerics. But our task force found there is little evidence of effective action to curb the ongoing export of extremism.

We have made a number of findings that I hope we can discuss. In the interest of time, however, Mallory Factor will now address the report's recommendations, after which I would be happy to entertain any questions.

Chairman COLLINS. Thank you. Mr. Factor.

14

**TESTIMONY OF MALLORY FACTOR,[1] VICE-CHAIRMAN, INDE-PENDENT TASK FORCE ON TERRORISM FINANCING, PRESI-DENT OF MALLORY FACTOR, INC**

Mr. FACTOR. Madam Chairman, Senator Lieberman, and distinguished Members of the Committee, I am honored to testify here today on the recommendations of the Independent Task Force of the Council on Foreign Relations on Terrorist Financing, of which I serve as Vice-Chair.

This subject is of critical importance to the security of our Nation and the world. Madam Chairman, and Senator Lieberman, I would like to commend you for your interest in and leadership on these very important issues and thank you for inviting us to appear before you today.

I would also like to thank and commend Lee Wolosky for his tireless work and dedication to this project. Achievements of our bipartisan task force are a direct result of Lee Wolosky's dedication to this project and his superior judgment in matters involving this task force.

The Bush Administration has made significant progress in its approach to terror financing since September 11. Our report, which is based on publicly available information as well as discussions with current and former Administration officials, finds that the Administration's effort, combined with those of Saudis and other international partners, has significantly diminished al Qaeda's current and prospective ability to raise and move funds.

Our task force makes the point that there is still much work to be done. It also sets forth a framework of constructive, forward-looking recommendations for improving U.S. efforts against terrorism financing.

We note that Saudi Arabia has also made progress since May 2003 by putting in place new anti-money laundering laws designed to impede the flow of funds from Saudi Arabia to terrorist groups. These laws have a number of exceptions and flaws which would weaken their effectiveness in curbing terror financing if fully implemented.

The real problem is that we could not find evidence of significant enforcement and implementation by Saudi Arabia of several of these new laws. Quite simply, many key financiers of global terror continue to operate, remain free and go unpunished in Saudi Arabia.

Our task force report generally reaffirms the recommendations made in the task force's first report and makes nine new recommendations. Although my written testimony explains each of these recommendations, I will discuss only four recommendations now. However, I welcome the opportunity to discuss any of them in response to your questions.

First, our task force urges U.S. policymakers to build a new framework for U.S.-Saudi relations. We recognize that historically the United States has maintained a policy of noninterference in the domestic affairs of Saudi Arabia. Recently, however, al Qaeda, a terrorist organization rooted in Saudi Arabian domestic affairs, has killed and threatened Americans both at home and abroad. Saudi

---

[1] The prepared statement of Mr. Factor appears in the Appendix on page 41.

15

Arabia is now involved in a kind of civil war with extremists. This civil war has global implications.

We propose a new framework for U.S.-Saudi relations which would recognize certain Saudi domestic issues that impact U.S. security. These issues, such as terrorist financing and the global export of Islamic extremism, can no longer be off the table.

We acknowledge that this transition is already underway but our recommendation is still out in front of the Administration's public statements on this issue. We believe that the U.S. Government must engage the Saudis openly and unequivocally to confront the ideological, religious and cultural issues that fuel al Qaeda, its imitators and its financiers throughout the world.

Second, and this was already brought up by Senator Lieberman, we believe that the Executive Branch should formalize its efforts to centralize the coordination of U.S. measures to combat terrorist financing. We commend the Executive Branch for centralizing the coordination of terrorist financing issues in the White House as we recommended in our original task force report. The sound allocation of responsibility to the White House needs to be formalized and, as Senator Lieberman said, institutionalized. And we believe this should be done through a national security presidential directive or some measure similar to that.

Third, we recommend that Congress enact a Treasury-led certification regime specifically on terrorist financing. Many countries have taken steps to improve their anti-money laundering and counterterrorist fighting regimes but many have not. We understand that certification systems should be used sparingly. They can strain relations with foreign governments and require expenditures of resources. The fight against terrorist financing is sufficiently important, however, to warrant its own certification regime. This will ensure that stringent requirements are maintained specifically with respect to foreign nations' policies and practices on terrorist financing.

Such a certification system would require the Executive Branch to submit to Congress on an annual basis a written certification, classified if necessary, detailing the steps that foreign nations have taken to cooperate in United States and international efforts to combat terrorist financing. This would be similar in some ways to the Saudi Arabia Accountability Act of 2003, S. 1888, sponsored by Senator Arlen Specter and co-sponsored by Chairman Collins and others. The Act would provide a good starting point for a terrorist financing certification regime if it were narrowed to focus solely on the financing of terrorism and expanded to apply to other nations.

Sanctions for non-certification could include smart sanctions such as denial of U.S. foreign assistance and limitations on access to the U.S. financial system.

Fourth, we recommend that the National Security Council and the White House Office of Management and Budget conduct a cross-cutting analysis of the budgets of all U.S. Government agencies as they relate to terrorist financing. We believe it is crucial that the U.S. Government keep a central accounting of all financial and human resources expended by the government in combating terrorist financing. We understand this cross-cutting analysis could take a significant amount of work on the part of NSC and OMB.

16

However, it is crucial for government leaders to gain clarity about who is doing what, how well they are doing, and with what resources.

We commend Jody Myers, a former NSC staffer, for suggesting a similar cross-cutting analysis in his Senate testimony given last month.

I thank you for your time and I look forward to your questions.

Chairman COLLINS. Thank you, Mr. Factor. Mr. Aufhauser.

## TESTIMONY OF HON. DAVID D. AUFHAUSER,[1] COUNSEL, WILLIAMS AND CONNOLLY, LLP, FORMER GENERAL COUNSEL, U.S. DEPARTMENT OF THE TREASURY

Mr. AUFHAUSER. Thank you, Madam Chairman.

I just wish I could get back to Maine as often as I have gotten back to this room since I left the government.

Chairman COLLINS. We would welcome you back anytime.

Mr. AUFHAUSER. In early 1996, Osama bin Laden was living in exile in the Sudan. He was at war with the House of Saud policy that countenanced the presence of U.S. military troops on Saudi soil. And he was already plotting mayhem sufficient enough to warrant the establishment of a special issue station at the CIA devoted exclusively to divining his ambitions and his designs. Still, he was largely regarded as the son of a rich man and principally a financier of terror. In fact, the original name for the special-purpose unit at the agency was TFL, Terrorist Financial Links.

It turned out actually that bin Laden was a hapless businessman. His ventures failed and were not the principal source of al Qaeda's wealth. Rather, he tapped something far deeper and more dangerous, hate preached and taught in places of despair, married to rivers of unaccounted for funds that flowed across borders in the counterfeit name of charity and faith. In so doing, bin Laden managed to leverage the tactic of terror into a malevolent dogma embraced by an army of madmen.

How we got here is instructive to where we ought to go next.

In 1974, a disgraced president was driven from office for lies and deceits. In 1977, an international extralegal cartel literally dimmed the lights of the White House, demonstrating profound new powers abroad not tied to guns and bullets. And in 1979, the nadir of U.S. influence—the Shah transformed into a stateless person, hostages held captive for more than a year; a failed rescue mission and the Soviet invasion of Afghanistan.

Tied to that significantly was the takeover of the Grand Mosque in Mecca, challenging the sole claim to legitimacy of the Saudi Royal family as the guardians of the faith. A United States seen as impotent to protect its allies and citizens abroad held little promise to the threatened Saudi monarchy.

So it understandably responded with a vengeance of its own, retaking the mosque and directing an unfathomable wealth of petrodollars—by some estimates that I read while I was still in the Administration north of $75 billion—to demonstrate that it is the true and rightful champion of Islam. It did so by underwriting schools, mosques, call centers, and charities throughout the Islamic dias-

---

[1] The prepared statement of Mr. Aufhauser appears in the Appendix on page 46.

17

pora. Wherever there was need they came as teachers, as providers of social welfare and safety nets, and as holy men. But what they taught was unforgiving, intolerant, uncompromising and austere views of a faith that became kindling for Osama bin Laden's match.

At the same time I want to note that there was a parallel explosion in the growth of Gulf and Western State-sponsored NGOs, in Eastern Europe, Africa, the Middle East, and Southeast Asia. Much like the Saudi model of outreach, these organizations rushed in to fill a vacuum left by the abdication of responsibility by sovereign powers to solve issues not uncommon or unlike what we see going on in the Sudan today.

Again through the delivery of default government civilian services of the most basic type—schools, welfare, medical aid—these NGOs, once proud of the principal of neutrality, have become the principal medium of thought and teaching in those areas.

And an air and patina of legitimacy attached to these extralegal, non-sovereign entities and a cover frequently, unwittingly was established to disguise charitable money corrupted for terrorist purposes.

All of these extralegal non-sovereign international entities need more policing, not just of the application of their proceeds, but what they teach and what they preach and the consequence of it. And nowhere is that more telling than when you focus on Saudi Arabia.

It will take a generation, and to be frank a clearheaded program of public diplomacy that, for example, condemns legal sophistries that would justify torture, to recapture hearts and minds poisoned by false teachings of hate. What can be done and should be done to scale back the violence in the interim is to deplete the resources made available to kill innocent people. No tool is more useful in doing so than stopping the funding of terrorism. The Council on Foreign Relations and this Committee are to be commended for the profile given to the subject.

As for al Qaeda, the organization is broken, its central bank severely challenged. Yet today it is more lethal than the day that it brought down the twin towers in Manhattan. It is more a movement than an organization today, less predictable with less explicit design. There are autonomous cells, catering to acts of near nihilism, increasingly funded through pedestrian local criminal activity. And they threaten sudden and senseless death without any purpose. And they do so everywhere today, in Bali, in Istanbul, the London subway system, Casablanca, Baghdad, New York, and Washington.

We know we cannot bunker and guard every school, marketplace, shopping center, airport, train station, or place of worship. So new elements of national power are required to prevent more killing and another calamity. None are more central to the prevention of a calamity than intelligence and the disruption of the lines of logistical support for terror. Money informs and defines both. It informs and defines both with a degree of integrity, reliability, insight, and impact that is without peer.

Many of you have heard me testify before that most of the intelligence and information we get in the war on terrorism is suspect,

18

the product of treachery, deceit, custodial interrogation, and now we learn the product of torture. But the money records do not lie. They are diaries. They are confessions never intended to see the light of day and they lead to trails of plots not unlike the plot to use ricin in the London subway system which was stopped because of the exploitation of the money trail.

By the way, for those of you who do not know ricin, if made well, is 10 times more lethal than VX gas.

September 11 brought a group of us together in the Administration to tackle the subject of terrorist financing with demonstrable successes. Today there is a new vocabulary about it and it includes new laws, new standards of professional and fiduciary conduct, extraordinary commitments of multilateralism at the UN, World Bank, IMF, and within the G8, 10, and 20, as well as APEC, greater capacity building abroad which I think was alluded to by Senator Lieberman, more sophisticated intelligence and a greatly enhanced partnership with the private sector.

But the effort remains at best a proxy, in my judgment, for the real thing. Terrorism permits murder to masquerade under religious sanction altering the whole DNA of war by placing a premium on the death of women and children. Until it is an act of shame to provide money for any such purpose the blood will flow. Accordingly, we must return to first principles: Terror must be defined, at the UN and elsewhere, in a manner to condemn money intended to kill civilians for political purpose.

We must also disrupt not only the funding of terror but the funding of the teaching of hate because it is the crucible for terror.

And we must address the deficit of hope that haunts much of the Islamic world with debt reduction and meaningful economic aid and development assistance, the very reasons I joined the Treasury Department. Paul O'Neill had a metaphor that I liked, even as quixotic as it sounded, our ambition was to build a well in every village.

Of more immediate purpose within the jurisdiction of this Committee, the assets and cash flow that we seek to freeze and disrupt are located abroad. International cooperation is therefore critical and it requires a new mindset in intelligence that will inform both the nature and the manner of collection.

Our new secrets must be collected with the intention of sharing them and strong enough to withstand a measure of judicial scrutiny abroad. That is a sea change and it is a sea change required by the developing jurisprudence of terrorism and its singular and unprecedented focus on prevention rather than punishment.

In addition, if Madrid has any lessons terrorism funded through criminal activity—and that was the case in Madrid—local law enforcement must be integrated more directly with the national intelligence community to facilitate a two-way dialogue of increasingly equal value.

Finally, we must vest an agency of the U.S. Government with the power to direct and execute the campaign against terrorist financing. The NSC is simply not the appropriate place to direct a theater of war.

The man who straps a bomb to his chest as he enters a marketplace is implacable. He is beyond redemption and cannot be de-

19

terred. It would be the height of irony and a promise of future tragedy if we permit the orthodoxy of how we have organized ourselves in the past and how we have collected and acted upon intelligence in the past to deter us from responding in the future.

Thank you.

Chairman COLLINS. Thank you for your eloquent statement.

Mr. Wolosky, Mr. Aufhauser mentioned the money trail. The money trail often leads from prominent Saudi individuals to Islamic charities to terrorist groups. That is why the Saudi crackdown and increased regulation of Islamic charities that have been too often used as a conduit to terrorist groups is so important.

However, it appears that some of the Saudi regulations explicitly exempt three of the charities that I mentioned in my opening statement that are alleged to have strong ties to terrorist groups, and that is the International Islamic Relief Organization, the World Assembly of Muslim Youth, and the Muslim World League.

Is there any reason for those three charities to be treated differently from some of the others where the Saudis have, in fact, cracked down? I am thinking, for example, the regulations generally restrict Saudi charities from sending monies overseas and yet those three charities are exempt from that regulation. Is there any reason that they should be treated differently?

Mr. WOLOSKY. That is a very good question and thank you, Senator, for it.

There are issues concerning not only the laws and regulations that have been passed by Saudi Arabia relating to these issues but also their scope and their implementation. The issue that you point out, I believe, relates to this body of law which is the body of law that governs bank accounts that are opened and operated within Saudi financial institutions. And specifically, there is a provision of law 300–1–6–5 which appears on its face to exempt from its purview the three specific organizations that you have identified, which collectively account for billions of dollars in international disbursements, from the body of law of which it is a part and which restricts or prohibits disbursements by Saudi-based charitable institutions abroad.

It is an open question and it is one that I would encourage this Committee to pursue, and certainly our task force will pursue it. But it certainly appears to be a case where the exemption might swallow the rule.

In addition, I would like to point out that there are questions regarding the scope of the purview of the new institutions that are being created to regulate Saudi charities. And in that regard, I note that in a press conference just a few days ago in Washington a new entity was announced into which all Saudi charities were going to be dissolved, at least that is what was indicated by the Saudi spokesperson.

However, when pressed for specific charities he indicated not only Al Haramain, which was a primary focus of the press conference, but a bunch of what I would consider relatively minor organizations, namely the Committee to Support the Afghans, the Committee to Support the Bosnians, the Committee for Relief in Kosovo, the Crossover Relief Fund, and the Committee to Support the Palestinians.

20

I certainly welcome the inclusion of these organizations within the new entity that has been established to regulate charitable giving abroad but really what was not mentioned were those three multibillion-dollar organizations which are a significant part, and should be in my judgment, a significant part of any overall Saudi efforts to regulate charitable giving abroad.

Chairman COLLINS. Thank you.

Mr. Aufhauser, the money trail often leads back to very high-profile wealthy individuals living freely in Saudi Arabia. In fact, the report notes three prominent men whom the Treasury Department has listed as specifically designated global terrorists, and I believe two of the three were added to that list while you were at the Treasury Department as General Counsel.

In your judgment, why are not Saudi leaders cracking down and arresting and making an example of these prominent individuals who are the source of considerable funding for terrorist groups?

Mr. AUFHAUSER. Let me answer it in a somewhat roundabout way because I think your opening statement alluded to the Joint Terrorism Task Force, about which I was vainly proud at the time I left the Treasury Department, as being a singular success.

The ambition of that task force was to take our body of knowledge of their domestic citizens, including prominent merchants of Jetta or Riyadh and to ally it with, for the first time that I am aware in our history of cooperation with domestic law enforcement compulsory process powers of the Saudi government so that they could take what I will call our package of intelligence and remold it and morph it into a package of evidence sustainable in a court of law and that would permit a judicial action of a criminal nature.

Mind you, they did take the action of freezing assets so they have done the regulatory administrative measures we asked of them with regard to those three miscreants.

The disappointment about the Joint Terrorism Task Force is that it apparently has not been used to date to complement the intelligence that we have shared on those three gentlemen and on others, but rather its resources appear to have been redirected to the forensic demands of the bombings. So we have, with some irony, new zeal in the pursuit of terror in Saudi Arabia but at a substantial cost to less resources devoted to the export of terror.

Chairman COLLINS. Thank you. Senator Lieberman.

Senator LIEBERMAN. Thanks very much, Chairman Collins.

Let me focus on one interesting aspect of your report which is about the failure to use a part of the Patriot Act, Section 311. It gives Treasury anti-money laundering special measures to prosecute terrorist financing in countries with inadequate banking regulations and, in fact, to restrict any bank charity business or country that engages in money laundering from using U.S. markets.

Your report today states that these special prosecutorial powers have still not been used, or perhaps used recently, once against a Syrian bank.

Why is that, and what can we do to get the folks in the Administration and in the Treasury Department, to use these powers more aggressively? Mr. Wolosky or Mr. Aufhauser, whichever one of you would like to answer.

21

Mr. WOLOSKY. I do not know. I cannot speak to why they have not been used more broadly. As you point out, our first report in October 2002 urges the U.S. Government to use more aggressively the special measures contained in Section 311 of the Patriot Act to prohibit or restrict the access of certain foreign jurisdictions or specific foreign financial institutions from the U.S. financial system under the powers in that act.

Certainly it has been the case that to the extent that you use classified material to support those designations you have to have concerns about challenges to your designations under the Administrative Procedures Act in court in such a way that you might have to reveal the classified information.

Fortunately, there have been changes to the law since the enactment of Section 311 to protect classified information from disclosure. So any historical concerns in that regard that might have existed with respect to the use of this aspect of the Patriot Act, I believe, are mitigated.

Senator LIEBERMAN. What can you tell us about the recent use of Section 311 of the Patriot Act against the Syrian bank? Just briefly.

Mr. WOLOSKY. What I can tell you is that it is the first instance of the use of that provision of the Patriot Act in respect to terrorist financing.

Senator LIEBERMAN. What were the circumstances? Is that publicly available?

Mr. WOLOSKY. Is not publicly—the specific basis for the designation, I do not believe, is in the public record.

Senator LIEBERMAN. Mr. Aufhauser, I want to get you into this discussion based on your previous experience, but I would also begin by raising this question. I presume that Section 311 of the Patriot Act could be used to leverage or compel cooperation from Saudi banks, for instance, by giving them a very strong economic incentive to cooperate or run the risk of losing U.S. business and being unable to do business in the United States.

Mr. AUFHAUSER. Let me give you the benefit of my perspective. First, Lee is right, not laying any responsibility at the door of Congress. It took about 9 months for you all to grant an evidentiary privilege that protected classified information in any Section 311 action.

IEPA gave it to us automatically in freeze orders but not under the Patriot Act. It was one of the first things I asked for but it took a while to wind its way through the uncharted course of Congress.

Second, it is not really fruitful to name and shame a bank as a mere act of political theater. If it does not have substantial correspondent banking relationships with the United States, it is merely political theater. But that informed a lot of judgments about what I will call bad banks, and the Treasury Department does have an informal bad banks initiative going on right now, focusing particularly on banks that are implicated in the export of nuclear materials, the improper export of nuclear materials.

Senator LIEBERMAN. The financing of those exports?

Mr. AUFHAUSER. Trade financing and the like of those exports.

Third, where we thought we had problems with banks, and again this is an important distinction I made earlier with Senator Col-

22

lins, intelligence is called intelligence because it is not fact. It is inference based on being a truffle hound and digging something up which is suggestive.

We have gone abroad and sought the domestic assistance of countries and regulators to reform suspect banks. It is a better way then merely using the blunderbuss of a nuclear Section 311 action against a bank that does not otherwise maintain correspondent accounts.

Senator LIEBERMAN. So, in other words, it is not worth using because it will not really hurt them because they do not have correspondent relationships with U.S. institutions?

Mr. AUFHAUSER. In many instances, you are talking about rather minor banks that do not have correspondent relationships.

Now the Syrian banks in question do have correspondent relationships with several New York banks. They are modest in scope but the gravimen of the Syrian banks was believed by the Administration to be so grave, particularly—they were the principal conduits for the UN Oil for Food Program frauds, for the smuggling of unsanctioned oil out of Iraq and for using some of those funds or placing them in the hands of Hezbollah.

So it was a very strong case and not withstanding the modest ties with New York banks, it was decided that it should be pursued.

Senator LIEBERMAN. How about the Saudi banks? Do they tend to have correspondent relations with U.S. banks that might bring them within Section 311?

Mr. AUFHAUSER. Yes, and they also have, interestingly, substantial correspondent relationships, even more substantial correspondent relationships, with European banks.

There is an open legal question—I think, frankly, it falls against us, I actually asked my staff to look at it at one juncture—whether the Patriot Act Section 311 permits what I call a secondary boycott. That is if we say a bank in Saudi Arabia, following your hypothetical, is to be barred from correspondent banking in the United States, can we say that any bank that does banking with it abroad is similarly barred? I think the way the act is written now, the answer to that is no.

Senator LIEBERMAN. So, bottom line, you would say that in some cases it does not make sense to use Section 311 of the Patriot Act because the banks do not have correspondent relations here. But, generally, would you counsel that it be used more aggressively?

Mr. AUFHAUSER. I will do more than counsel. I will tell you, in the next calendar year, because of the bad banks initiative that I mentioned, there will be substantial actions taken against miscreant banks under Section 311.

Senator LIEBERMAN. Good. Thank you, my time is up.

Chairman COLLINS. Senator Coleman.

Senator COLEMAN. Thank you. Mr. Aufhauser, in your testimony you noted that if Madrid has any lessons, local law enforcement must be integrated more directly with the national intelligence community to facilitate a two-way dialogue of increasingly equal value. Do you have any specific recommendations as to how we accomplish that?

23

Mr. AUFHAUSER. Perhaps, but let me build down. One of the questions that you all said you were going to pose here is what are the Treasury Department's equities at the table if you were going to have terrorist financing, one general and one command post and an aggregation of resources.

One of the problems I found at the Treasury Department in pursuing terrorist financing is it was not a fully integrated member the intelligence community. So is was not always made aware of the full panoply of counterterrorism activity and relationship that was going on with any country that I was visiting.

So, as a consequence, you could find yourself across the table from folks who thought they were trading different poker chips and equities about cooperation when I was demanding cooperation for terrorist financing.

As a consequence of that, I pushed, and Secretary Snow pushed, for the creation of an Assistant Secretary for Intelligence so that we could be more integrated into the intelligence community, subject to oversight by the Intelligence Committee here on the Hill.

That was passed by Congress, I think wisely passed, and someone will soon be named to that post.

Obviously something less formal was in the offing for the integration of local law enforcement but getting them to the table with the information that they are developing about the petty crimes that are perhaps tied to terror, and marrying that information with what the Federal Bureau of Investigation and what the CIA is developing, is absolute critical in my judgment.

Madrid was financed with false passports, smuggled aliens, and the sale of hashish, all of it known to the local police and most of it not known to the national intelligence officials. National intelligence officials were aware of activity at the area. If the two had been married, maybe something could have been prevented. It is not unlike the quandary we find the 9/11 Commission facing.

Senator COLEMAN. The challenge we have, though, is how to marry that. I come from a local prosecutor perspective, Attorney General's Office in Minnesota. We have our Joint Task Force now and we seem to be making headway. But both structurally and practically there are barriers. I am looking for practical suggestions on how to overcome those.

Mr. AUFHAUSER. Let me give you one possible vehicle. FinCEN is responsible for the compilation of currency transaction reports and suspicious activity reports. It is all put into a computer and it is all made available by access to local cops, cops in Toledo or cops in Minneapolis. If they have an inquiry about Aufhauser, they can ping the FinCEN database.

That FinCEN database is in the process of also being married, in a more secure sense, with what the agency is developing from abroad. This is also being married, in a more secure sense, with what has been developed by the FBI with regard to intelligence issues, terrorism issues.

If local law enforcement could somehow have classified online access to that kind of information it might materially advance our defense of the Nation.

In addition, this is most important and I am talking to you like a local prosecutor, you guys have to share towards Washington,

24

too. Because I am finding, from what I am reading and what happened in Madrid, is that the better information was known locally.

Senator COLEMAN. That is very helpful.

I am trying to somehow weigh Mr. Factor's testimony with Mr. Wolosky's. Mr. Factor, you noted what I would say structural changes in the relationship dealing with the Saudis, that if we had a certification regime that would be helpful, that you recommend the Saudi's fully implement new laws and regulations.

The concern I have in terms of dealing with terrorist financing, as does Mr. Wolosky, listening to your testimony, there seems to be a fundamental lack of commitment on the part of the Saudis to actually confront this evil.

Are looking for structural changes enough? Or are we simply changing the shape of the box?

Mr. WOLOSKY. It is a good question. It is a difficult question. Of course, we are reporting to you on the same report, so the fact that our testimonies are somewhat schizophrenic is a reflection of the fact that much has been done, as I said, but much work remains.

As you point out, we do recommend a fundamental change in the nature of the bilateral relationship. As Mallory described, one which is more declaratory and one which focuses—or at least does not put off of the table—issues that historically have been considered purely domestic ones in Saudi Arabia. We have come to the conclusion, as have many Americans and Members of this Committee, that after the murder of 3,000 Americans with respect to issues that implicated domestic Saudi problems and concerns, that those issues can no longer be off of the table.

But your question is a good one. Ultimately, in issues of political will, as we have pointed out in our report and in our testimonies, welcome the aggressive pursuit of al Qaeda cells. We condemn the fact that financiers have not been arrested. Those are different issues. They go to issues in my judgment, and in our report's judgment, of political will.

It is relatively easier to go after people who are socially marginalized, members of cells. It is much more difficult to go after financiers who are members of the economic and political establishment.

Mr. FACTOR. I would add on to that that it may seem schizophrenic but it really is not, it is very consistent. We are calling for a new framework for U.S.-Saudi Arabian relations.

For decades U.S.-Saudi Arabia relations have been built upon a consistent framework well understood by both sides. Saudi Arabia would be a constructive actor with regard to the world's oil and markets and regional security issues. And the United States would help provide for the defense of Saudi Arabia, work to address the Israeli-Palestinian conflict, and not raise any significant questions about Saudi Arabian domestic issues, either publicly or privately.

That has changed. We have to bring these things into the open light of day. We are an open society, they are an opaque society. If you want to change, you need political will to have those changes, as Madam Chairman pointed out.

And we have to work with them to force that issue.

Senator COLEMAN. Thank you, Madam Chairman

Chairman COLLINS. Thank you. Senator Lautenberg.

25

Senator LAUTENBERG. Thank you, Madam Chairman.

Once again I want to express gratitude for the fact that you are holding this hearing. We have a very good panel of witnesses. Their statements are extremely interesting and I think you have furthered the cause and the fight against terrorism. I greatly respect and appreciate that.

I want to get a couple of things out in public view. Mr. Aufhauser, I am sure you heard about the amendment that we passed, and as I mentioned in my opening remarks, that would shut down subsidiaries, either real or sham, that are then in turn used to do business with rogue states.

Have you been aware in your previous government service or since then that these things exist?

Mr. AUFHAUSER. Yes.

Senator LAUTENBERG. Is it important——

Mr. AUFHAUSER. In a broader context, if I can say. Generally speaking, the economic sanctions laws and OFAC regulations for which I was responsible have enormous loopholes for subsidiary conduct abroad.

Senator LAUTENBERG. So let me extend your comment a little bit and say I take an implication there that we ought to close it down wherever we can do it?

Mr. AUFHAUSER. If you believe in the effectiveness of the economic sanctions programs which are part of our law, yes.

Senator LAUTENBERG. It was disappointing that we lost that amendment by a single vote but that is what happened.

Mr. Wolosky, are we doing enough—and Mr. Factor may have just mentioned—to put public pressure on the Saudis? Do you think that we can ratchet that up substantially for the benefit of the elimination of this financing route that encourages terrorism?

Mr. WOLOSKY. Certainly we can, in some instances, yes. The report recognizes that some issues are best dealt with privately. But it also strongly urges a more declaratory policy when the U.S. Government finds significant and enduring shortcomings in the response of Saudi Arabia to terrorist financing issues.

Benchmarks need to be set out publicly if they are not being met privately. Individuals, who the United States has designated as terrorist financiers and has indicated in no uncertain terms part of the al Qaeda financial network, and who have not been incarcerated in Saudi Arabia, those are the very issues that need to be brought to the fore of our public statements and respect of these matters.

Senator LAUTENBERG. The private discussions do not have the same effect. And I think we ought to declare once and for all that if Saudi Arabia has to dial 911, as they did in 1990, do not call us. The phone is going to be out of order. And that we have to say that every dollar, let the word go out of this Committee and across the media. Let the word go out that if you contribute to anything that encourages terrorism that it is pointing a gun at the head of our people. And we are going to think of it that way and our punishment is going to be swift and full.

It is bothersome as the devil to me that—and I was early on the ground in the Gulf War, and I have been to Iraq since then, and

26

I know a lot of people associated with the Saudi government and had some semi-friendly relationships with them.

But for them to pass off the blame, it is in print and the news, when the Crown Prince Abdullah statement after the May 24 attack at Yanbu says "Zionism is behind terrorist actions in the kingdom. . . . I am (95%) sure of that." And the Foreign Minister then affirms these comments, says the affirmation of these comments is again absolutely correct, 95 percent. And then Adel Jubeir declined to repudiate these statements at a June 2, 2004 press conference. And the State Department has been silent on them. And they have to speak out.

I think Mr. Aufhauser made a very important statement. He talked about the fact that we have to recognize that this is far beyond the normal activities that we see these oblique apologies, etc. Because it is inherent in the culture. When you teach little kids to hate other little kids, that is the beginning of the end. It is the end of their lives and the end of peaceful lives around the country. And we have to make sure that they understand that in public terms, and denounce that kind of educational thrust. It just is not going to work and it is not helpful.

I would ask one last question here. I know that you have seen the report that was issued in the *New York Times,* on June 12. It talks about some internal dispute within the task force. And perhaps some redaction or reduction in terms of the comments that the task force report was going to carry.

Mr. Factor, I would ask you, you are very much a part of the activities that go on in our government and I say that respectfully, and you are also a businessman that knows very much about how things operate in terms of financing and investor relationships and things of that nature.

So when you see a report issued and it is suggested that you thought maybe this report was too critical, is that the context of the article that was printed in the *New York Times* that suggested there was dissension and some alteration made by you to get this report in acceptable fashion for the Administration, as well as for the mission?

Mr. FACTOR. I can only answer that this report is a consensus report. We all had various beliefs and feelings and we talked those out very thoroughly. Our project directors' position was to try to reach a consensus and try to put together the fairest, most accurate, bipartisan report possible. We believe we have achieved that. And I believe all of us unequivocally support the findings and recommendations in this report and we are very proud of it.

There were many discussions on a host of topics. We solicited information from a host of people—the Administration, Saudi Arabia. We, at one point, planned a trip over there which never came about. It is very common for all task forces at the Council on Foreign Relations to solicit input from the subjects of those task forces. So this is a common thing.

Senator LAUTENBERG. Even after the report is complete, a report is not complete?

Mr. FACTOR. A report is not complete until everybody signs off on it.

Senator LAUTENBERG. Thank you.

27

Chairman COLLINS. Thank you, Senator.

Mr. Wolosky, before I turn to Senator Specter, I want to give you an opportunity to discuss the issue that was just raised, as well, since you were one of the two principal authors of the report.

Mr. WOLOSKY. Thank you.

First, I would like to respond to another point that Senator Lautenberg made concerning the anti-Semitic statements made by the Crown Prince and consistently reaffirmed by other Saudi officials, including just a few days at a press conference in Washington. In my view, and in the view of our task force, they call into question the commitment of Saudi Arabia as a reliable partner in the war on terror. They cloud its efforts in moral uncertainty. And they must be immediately retracted.

The U.S. Government, the President of the United States, in my view, should immediately condemn those statements and urge the Saudis to condemn those statements.

I personally was very distressed to see a senior State Department official stand by on June 2 in Washington and not repudiate those comments in response to a question from a reporter. In my view, that is a disservice to many people and to the war on terror.

Now as to the *New York Times* report, as I have discussed with your staff, I wish to clarify that the language that was in the first draft of the report I distributed to the full task force membership on May 2, 2004 was as follows: "There is insufficient evidence to conclude Saudi Arabia has fully implemented its new laws and regulations and important questions remain. As part of Saudi Arabia's offer of assistance to the work of our task force, we sought to visit Riyadh to discuss, among other things, the state of the implementation of these new laws, regulations and oversight mechanisms."

Senator LAUTENBERG. Madam Chairman, I appreciate the clarification. Thank you.

Chairman COLLINS. I thought it might be helpful to you, Senator.

Senator LIEBERMAN. Madam Chairman, I join you. Tomorrow morning, when we open our *New York Times*, I expect the headlines to say "Times Snookered."

Chairman COLLINS. Senator Specter.

**OPENING STATEMENT OF SENATOR SPECTER**

Senator SPECTER. Thank you, Madam Chairman, and thank you for scheduling these hearings.

I compliment the Council on Foreign Relations for undertaking this kind of study. I am very interested in all of your findings.

I focus for just a moment on the one that Saudi Arabia, whose people and organizations contribute 60 percent of the annual budget of Hamas, does not recognize Hamas as a terrorist organization. Mr. Factor or Mr. Wolosky, do you know what their factual basis is for that kind of a statement, when Hamas admittedly target civilians?

Mr. FACTOR. I do not know what their basis is for that. I can only speculate.

Senator SPECTER. Mr. Wolosky.

Mr. WOLOSKY. My own personal view is that one man's terrorist is another man's freedom fighter.

28

Senator SPECTER. That is a fine generalization of another era, but not when civilians are targeted.

Mr. WOLOSKY. It is not my view, Senator. It is my sense of what the Saudi position on Hamas is. I firmly believe that Hamas is a terrorist organization.

I also think that there is a misconception. David Aufhauser has used the word sophistry in understanding what Hamas is. The sophistry lies in the fact that it is true that Hamas provides social services in Palestinian territories. However, it is also a terrorist organization that kills innocent people. A vast majority of its funds have come from Saudi Arabia in recent years. Only relatively recently has that begun to change at the official level, although private Saudi contributions to Hamas must continue to be strictly monitored.

Our report recommends, in fact it goes very far on this issue, and it recommends that as a mandatory matter of international law, the United Nations Security Council pass a resolution that specifically designates Hamas as a terrorist organization and obligates all member states to close down Hamas organizations and fronts.

Senator SPECTER. Mr. Aufhauser, let me ask you a different question, and that is what more could the Administration do in a very active way to motivate the Saudis or compel the Saudis or sanction the Saudis into doing a better job on fighting terrorism?

Mr. AUFHAUSER. Well, they have come a long way, as you know from testimony I have given before committees that you have sat on, as outlined by Lee and Mallory and the Council. Some extraordinary systemic changes. But what is missing is a sense of personal accountability and follow-through.

Also, on the broader scale, and I think far more important to us, far more important to us than personal accountability of one or two bad actors, is to stop the funding of the teaching of hate. And I think there should be a concerted Administration policy and campaign.

Senator SPECTER. Mr. Factor, thank you for the statement in your opening statement about the Saudi Arabia Accountability Act, which was cosponsored by the Chairman, and I am the principal sponsor, to provide a good starting point for focusing on terrorist financing certification regime.

Mr. Aufhauser, the Administration at first opposed the Syrian Accountability Act and then moved from opposed to neutral. And I think finally ended up perhaps inferentially supportive, although the formal neutral position was never changed.

What do you think the prospects are for the Administration to move to neutral or to support the Saudi Arabia Accountability Act? Or somewhere in between.

Mr. AUFHAUSER. I would just be guessing, Senator, but there is an institutional prejudice, understandable and I think to be lauded, at the Treasury Department to only have economic sanctions programs that are really quite enforceable and with real-world impact. And so they are studied about whether or not what has been proposed can be pursued and whether it can be effective.

Can I just say one thing about Hamas?

Senator SPECTER. Sure.

29

Mr. AUFHAUSER. It is reprehensible that they are not treated as a terrorist organization by the Saudis, I agree, but some historical perspective helps. For 6 years we have urged our European counterparts to join us in naming Hamas as a terrorist organization. And it was only September of last year that they finally joined us as another school bus was blown up in Jerusalem.

Even now, immediately after the designation of Hamas as a terrorist group by the Europeans, we then went to our European allies and said here are four organizations that are transmitting money directly to Hamas. And we were turned down in the freezing of those assets by all of them because they are still not use to the idea. They still cling to what I said before, the sophistry that the social welfare program of Hamas somehow excuses money that goes to killing.

The recent raids by the Israelis on banks, four banks in the West Bank, and the actual seizure physically of money intended for rejectionist groups, was intended to send a signal to a new funding source of Hamas, and that is Iran and Syria, getting back to your Syrian issue.

And informed intelligence sources tell me that for whatever reason, the money going to Hamas from Saudi Arabia has substantially dried up. Nobody can divine the reason. But it has been supplemented by money from Iran and Syria flowing through even more dangerous rejectionist groups in the West Bank.

Senator SPECTER. Thank you very much. My time has expired. I thank you, Madam Chairwoman.

Chairman COLLINS. Thank you Senator. Senator Pryor.

**OPENING STATEMENT OF SENATOR PRYOR**

Senator PRYOR. Thank you, Madam Chairman.

I would like to join all my colleagues on the Committee in thanking you for your leadership on this issue.

If I may follow-up with some of Senator Specter's questions, Mr. Aufhauser, something you said a few moments ago. You said that they need to stop funding the teaching of hate. That is a foreign concept, I think, to us here in America. Could you elaborate on that a little bit and explain to the Committee exactly what you mean by that?

Mr. AUFHAUSER. Sure. Wahabism, which is the strain of Islam that they endorse and champion, is very austere, very severe, very uncompromising and very intolerant of differences in views, and can easily be morphed into religious sanction for violence.

And it is taught by clerics who are sent out globally with funding from the Ministry for Islamic Affairs, which in my judgment is a much more important audience to talk to about our future then the Ministry of Internal Security or Defense in Saudi Arabia.

Indeed, on my last trip to Saudi Arabia, we met with the Minister for Islamic Affairs and he affirmed that they need to do some trimming of their clerical group to weed radical extremists out of it. Unfortunately, their first focus has been domestically and not those who have already been exported abroad.

Senator, one last thing. I had a dinner with the prime minister of one of the Southeast Asian countries who said he will not let an

30

Islamic cleric into his country anymore. The reason is they teach a hate which becomes a bullet.

Senator PRYOR. Let me follow-up on something you said, that they have focused internally first, within Saudi Arabia. But apparently, there is not much evidence to show that they are trying to curb the export of terrorism and extremism. Is that fair to say, for Saudi Arabia?

Mr. AUFHAUSER. I hope I am not sounding too legalistic—to me, this is a very important thing. I chaired a group in the situation room at the White House every Wednesday morning, and it was a group of terrific men and women from every agency of any relevancy, where we would review what we had learned in the preceding 7 days about terrorist financing.

We had a mountain of evidence about the financing of the teaching of hate, who was funding it, where it was going, what they were teaching in the schools, who the converts were, what social welfare they were pursuing, what the threat was in pursuing something more militant.

And we had a modest pile over here on my right hand which was evidence of the funding of an act of terror.

So there is a distinction between fundamental and extremism and an act of terror that gives us the power to try to act abroad in policing things.

The problem with the Saudi model today is it is a blizzard of this funding for folks who teach people that I am their enemy. There is even something more dramatic—it is not the Saudis, but the Iranians that fund a radio station out of Beirut called al-Manar, to the tune of about $110 million a year. That funding helps al-Manar publish and broadcast every day a screed that says Jews and Americans should be killed.

Now should we not stop that funding of that broadcast?

That is not an act of terror. But it is no different from lighting a match in a parched forest.

Senator PRYOR. I know that you would never speak for any of these countries and you would never presume that, but I would like to get your impressions, if we can focus on Saudi Arabia, on why they have not cracked down internally? I am just assuming there are domestic reasons, domestic political reasons that they may fear a backlash within their own country for doing this. I would like to get your impressions on that.

Mr. AUFHAUSER. The most immediate reason for no activity on terrorist financing is they are singularly focused on the guys who are trying to kill them within their confines. They are not looking for financiers. They are looking for terrorists. If he happens also to be a financier, he is a dead man.

So they are devoting virtually every police and intelligence and military resource they have to ferreting out terrorists within their own cells.

That has drawn away, as I said earlier, ironically the focus that we wanted them to have. I cannot blame them. I will tell you that. But for the moment it has drawn away literally every resource from looking at people who export—I think it was Senator Levin who said Saudi Arabia exports two things, a counterfeit religion and oil. He is only two-thirds right. They also export money.

31

And that money is the purchase for terror. And we would like them to refocus on that.

Senator PRYOR. Madam Chairman, since I have just a few seconds left, I would like to ask the other two witnesses to respond to that last question about Saudi Arabia. Why, in your impressions—not to speak for them, but your impressions about why they are reluctant to crack down internally or at least why they have not done so to date?

Mr. FACTOR. I believe that they have a civil war on their hands which is their first and foremost interest. They also have not had enormous pressure put on them to open up their society. And they fear for their own regime being toppled. So putting all of those three things together, what is being exported is a secondary issue.

I believe the conclusion they need to come to very rapidly is that that civil war will never be solved as long as they are exporting money that could be used for terrorism.

And last, the political will of the country has to establish that no cause, however legitimate, justifies the use of terror. Indeed, the use of terror delegitimizes even the most worthy cause. They have to build political will on that, which they are not doing doing.

Mr. WOLOSKY. I largely agree with these two comments.

First, I do think they are trying to crack down internally. They are fighting a civil war because it threatens the leadership of their country. It threatens their lives. And they are dedicating resources to fight that civil war.

They are also cracking down internally, at least there are suggestions that they are cracking down internally, on the extremism that is propagated within Saudi Arabia. Our report makes a distinction between the propagation of extremism within Saudi Arabia and its export outside of Saudi Arabia.

Within Saudi Arabia we have seen the remarkable spectacle in the past year, for instance, of clerics, extremist clerics, going on television to renounce their old views. That is a rather remarkable occurrence within the cultural and social context in which it has occurred.

Externally, we find very little evidence of action being taken in respect to this pile, the pile that evidences the flow of billions of dollars in support of the propagation of extremism internationally. And our report says that constitutes, that export of extremism constitutes a strategic threat to the United States.

I think we are the first group to go that far in characterizing that financial flow in that manner.

Senator PRYOR. Thank you, Madam Chairman.

Chairman COLLINS. Thank you.

We have had a vote just called. So I am going to do one final quick round of a question each, and then we will adjourn the hearing. I do thank you for your very valuable testimony.

Mr. Factor, as you know from our discussions, I am particularly interested in the recommendation of the report that we pass legislation creating a certification whereby the President would certify the compliance of nations with an effort to halt terrorism financing.

Some people have expressed concerns that would be too narrow a test for nations to have to pass. They say that the war against

32

terrorism is a broad war being fought on many fronts and that it would be a mistake to just look at this one factor.

Could you comment on whether you think the separate analysis of compliance with the effort to halt terrorism financing is appropriate? Or should the certification be a broader assessment?

Mr. FACTOR. It is our belief on the task force that the certification should be for terrorist financing. I am not going to suggest that other certifications might not be needed or necessary, or for that matter might be unnecessary. But we believe that if you follow the money, if you check out the money, if you are sure where the money is going and how it is going, you will have the opportunity to cut down on the abilities of terrorists to operate throughout the world. We believe a certification regime specifically on terrorist financing is necessary and called for.

We also believe that we would give waivers to the President obviously and the information can be classified. But we need to name and shame and bring the open light of our society and the discussion that our society allows forward. The only way we will do it is not by getting it confused in a broader regime.

Chairman COLLINS. Thank you. Senator Lieberman.

Senator LIEBERMAN. Thanks very much, Chairman Collins.

I am going to submit a few questions to the witnesses for answers in writing, but I did want to ask this summary question.

In your report in October 2002, this language has already been quoted, you said, "it is worth stating clearly and unambiguously what official U.S. Government spokespersons have not for years, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaeda and for years Saudi officials have turned a blind eye to this problem."

So, your report and testimony today certainly suggest that maybe the Saudi officials, probably the Saudi officials, are no longer turning a blind eye. But there are problems, as you have documented on how fully they are following through.

So, my baseline question for this report, now June 2004. Would the conclusion of October 2002 be essentially the same, which is that individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaeda and also the other terrorist groups? Or, has that changed?

Mr. WOLOSKY. Historically, of course, that has been true and it has been affirmed.

Senator LIEBERMAN. Is it true today?

Mr. WOLOSKY. It is a difficult analysis because of the more diffuse nature of al Qaeda. Al Qaeda is no longer an organization that has a highly centralized command and control mechanism, and that includes its financial components both input and output. It is a much more diffuse movement.

And also that relates to the issue of propagation of extremism which we in this report—again, I think for the first time, although it certainly was implicit in the response of the U.S. Government that David described—are saying is a key part of the terrorist financing problem.

Senator LIEBERMAN. I think that is a very important point today. It is not that we do not know about the export of extremism, but you are saying that while they may have curtailed the funding to

33

some extent, or at least not turned a blind eye to it, as long as they continue to export extremism then there is trouble.

Mr. Factor or Mr. Aufhauser, do you want to add anything to that?

Mr. FACTOR. I would like to add that we know very well that, for example, the Muslim World League, IIRO, the International Islamic Relief Organization, and the World Assembly of Muslim Youth, known by the acronym WAMY, still operates.

I believe funding to al Qaeda has been stopped to a significant extent. But there is funding to numerous other organizations and other organizations may be picking up what al Qaeda was doing, in terms of operations.

Mr. AUFHAUSER. Can I add one thing? I want to put a spotlight on a reservation put at the front of the Committee's report, which is that you can become Saudi-centric when you talk about terrorist financing and it is a grave danger. They have done remarkable things and they should be given credit for it. There remain substantial issues in Saudi Arabia.

But all that I learned before I left and what I have learned since I left suggest that terrorist financing is alive and well from Iran and Syria and increasingly local criminal activity, and also substantial amounts flowing into the occupied territories from Western Europe still.

I would suggest that the spotlight be shifted, if there is only one spotlight, on what is the more immediate threat right now to homeland security here and to security in the Middle East, which I think is money from other sources.

Senator LIEBERMAN. Thank you, very much. You have done a great public service here and I thank you for it.

Chairman COLLINS. Thank you, Senator Lieberman, for your leadership on this issue and your participation in the Committee's ongoing work examining the sources of terrorism financing.

I want to thank all three of our witnesses today. You have done remarkable work. We appreciate your expertise and your sharing your wisdom and knowledge with the Committee.

The hearing record will remain open for 15 days for the submission of any additional questions. We would ask you to return those as quickly as you can.

I also want to thank our staff for their work on this important hearing. The hearing is now adjourned.

[Whereupon, at 12:29 p.m., the hearing was concluded.]

# APPENDIX

PREPARED STATEMENT OF SENATOR GEORGE V. VOINOVICH

Good morning. I would like to thank the Chairman, Senator Collins, for convening this hearing today to examine an issue that is extremely important to our national security—our progress in efforts to deny terrorists the resources they seek to perform deadly attacks against Americans and our allies at home and abroad.

The tragic events of September 11, 2001 brought home to all of us the urgent need to cut off funding for terrorist organizations such as al Qaeda. More than 2½ years later, it is imperative that we continue to make this a top priority of the U.S. Government. Simply stated, we cannot afford to be complacent in our efforts.

Last month, Attorney General John Ashcroft and Secretary of Homeland Security Tom Ridge reminded the American people of al Qaeda's unrelenting desire to again attack Americans on U.S. soil. The potential impact is not limited to those living in our country's largest cities. Just yesterday, Federal officials unsealed an indictment against a Somali man living in Columbus, Ohio. The charges against this man include conspiring with al Qaeda to blow up a shopping mall in Ohio's capital city. This is a chilling reminder of what is possible, and again underscores the need to redouble our efforts to deny terrorists the financial resources that they desire.

Today, an Independent Task Force on Terrorist Financing sponsored by the Council on Foreign Relations will release its second report on our progress in this effort. We are glad to have two individuals who serve on this task force, Lee Wolosky and Mallory Factor, with us this morning. I look forward to hearing their thoughts on how we can step up our efforts at home to disrupt and destroy the financial network of al Qaeda and other terrorist organizations. I also look forward to their views on how we can enhance cooperation with other countries to deny terrorists the funding that they seek—particularly Saudi Arabia.

I would also like to welcome David Aufhauser, who served as former General Counsel at the U.S. Department of Treasury. I look forward to his candid views on how we are doing in this effort here at home, where the men and women at the Treasury Department and other Federal, State and local agencies serve on the front lines in the effort to disrupt and destroy terrorists' financial networks.

As my colleagues are aware, since 1999, I have worked to express the urgency of the Federal Government's human capital challenges and their impact on critically important government functions, such as national security. With strong bi-partisan support from this Committee, I have championed a series of legislative reforms in Congress, which should have a significant impact on the way the Federal Government manages its people in the coming years.

In March 2001, the Subcommittee on Oversight of Government Management held a hearing entitled, "National Security Implications of the Human Capital Crisis." Our panel of distinguished witnesses included former Defense Secretary James Schlesinger, member of the U.S. Commission on National Security in the 21st Century. Secretary Schlesinger discussed a comprehensive evaluation on national security strategy and structure that was undertaken by the Commission. Regarding human capital, the Commission's final report concluded:

"As it enters the 21st Century, the United States finds itself on the brink of an unprecedented crisis of competence in government. The maintenance of American power in the world depends on the quality of U.S. Government personnel, civil and military, at all levels. We must take immediate action in the personnel area to ensure that the United States can meet future challenges."

Secretary Schlesinger added further: ". . . it is the Commission's view that fixing the personnel problem is a precondition for fixing virtually everything else that needs repair in the institutional edifice of U.S. national security policy."

This remains true as our government looks to deny terrorists, whose purpose is to inflict grave harm on the United States, the resources that they seek. I again thank Chairman Collins for convening this hearing, and I look forward to the testimony of our witnesses.

36

**Testimony Concerning the Second Report of an Independent Task Force on
Terrorist Financing Sponsored by the Council on Foreign Relations
Lee S. Wolosky, Co-Director
Of Counsel, Boies, Schiller & Flexner LLP
Adjunct Professor, Columbia University
U.S. Senate Committee on Governmental Affairs
June 15, 2004**

Madame Chairman, Senator Lieberman and Distinguished Members of the Committee:

Thank you for your dedicated leadership on these issues. This Committee's sustained
attention to terrorist financing issues is critically important to our nation.

We are honored to report to you today on the second report of the Independent Task
Force Relations on Terrorist Financing sponsored by the Council on Foreign. I have
served as co-Director of this bipartisan initiative since its inception in the summer of
2002.

Our report is the result of the hard work of a number of dedicated individuals of both
political parties who seek to further vital national interests. I wish to thank our
Chairman, Maurice Greenberg, for his unwavering support of the Task Force and his
broader leadership in assuring continued attention to, and scholarship on, issues at the
intersection of global finance and national security. Our Vice-Chairman, Mallory
Factor, undertook important efforts to advance the mission of the Task Force. My co-
Director and co-author, William F. Wechsler, brought not only a wealth of talent and
energy but the wealth of experience that comes from being the first senior U.S. official to
focus seriously on these issues, beginning in 1998.

I am also grateful to Council President Richard Haass. This Task Force would not have
succeeded without his support and assistance.

Finally, it is my honor to testify beside David Aufhauser, who served our country with
dedication and distinction. Many of the positive developments in this area since 9/11 are
the direct fruits of his vision and leadership.

I will discuss the background of our second report and its findings. Mallory will then
discuss the report's recommendations. Since the report, along with its various
appendices, is almost 300 pages in length, we will only be able to highlight core points.
We ask that the full report and its appendices be placed into the record, and we look
forward to a fuller discussion of various aspects of the report in response to your
questions.

In our first report, released in October 2002, we concluded: "It is worth stating clearly
and unambiguously what official U.S. government spokespersons have not: For years,
individuals and charities based in Saudi Arabia have been the most important source of

37

funds for al-Qaeda; and for years, Saudi officials have turned a blind eye to this problem." We recommended the encouragement of the Saudi regime to strengthen significantly its efforts to combat terrorist financing. In this regard, we noted a recent historical record of inattention, denial, and half measures. And we urged the U.S. Government to confront directly the lack of political will in Saudi Arabia and elsewhere through the institution of a declaratory policy that would permit or compel U.S. officials to speak more frankly about the nature of the problem.

The reaction to the release of the Task Force's initial report was reflective of then-prevailing mindsets. The Saudi Arabian Foreign Minister, Prince Saud al-Faisal, told CNN that the report was "long on accusation and short on documented proof." The Saudi ambassador to the United States, Prince Bandar bin Sultan, said the Task Force report was based on "false and inconclusive information" and "clearly out of touch with current activities." He also maintained that "Saudi Arabia has put into place the tools, resources, laws, and regulations to combat terrorism and terrorist financing" and promised to "prosecute the guilty to the fullest extent of the law." The U.S. Treasury Department's spokesperson called the report "seriously flawed."

During 2002 and into the first few months of 2003, U.S. officials quietly engaged their Saudi counterparts on a sustained basis in Washington and Riyadh—at increasingly high levels, with more intelligence they were prepared to share, and with more aggressive demands. Results were mixed. Less transparent methods of curtailing terrorist financing were also stepped up, with significant successes.

The status quo changed on May 12, 2003, when al-Qaeda bombed housing compounds in Riyadh used by U.S. and other foreign residents, prompting more comprehensive Saudi action against terrorism. Public statements and actions by both the United States and Saudi Arabia since May 2003 have evidenced in many respects a more urgent approach to terrorist financing, one that is broadly consistent with our initial report's conclusions, findings, and recommendations.

For example, Saudi Arabia has announced a profusion of new laws, regulations, and institutions regarding money laundering, charitable oversight, and the supervision of the formal and informal financial services sector. Significantly, the government also took steps to remove donation boxes from mosques and shopping malls. And, for the first time, Saudi Arabia has subjected aspects of its anti-money laundering regime to international scrutiny.

While Saudi officials were previously unwilling to acknowledge or address the role government-sanctioned religious messages play in supporting militant Islamic groups, following the May terrorist attacks Saudi officials began to take steps to address the mindset that foments and justifies acts of terrorism.

Most critically, for the first time, the Saudi government decided to use force to hunt—and kill—members of domestic al-Qaeda cells, including, in one case, a financier named

38

Yousif Salih Fahad Al-Ayeeri (aka "Swift Sword"). Actions on this scale were not in evidence prior to the 2003 bombings.

Saudi Arabia has markedly increased its tactical law enforcement and intelligence cooperation with the United States and the Bush administration acted quickly to take advantage of newfound political will in Saudi Arabia to renew and reinvigorate its own efforts to combat terrorist financing.

The Bush administration also moved toward a more declaratory policy.  On June 26, 2003, for example, at the annual U.S.-EU Summit, President Bush took the important step of publicly urging European leaders to criminalize all fundraising by Hamas.  That same day, David Aufhauser testified before Congress that "in many ways, [Saudi Arabia] is the epicenter" of the financing of al-Qaeda and other terrorist movements.

The pace of joint U.S.-Saudi designations quickened, specifically in respect to efforts to close problematic overseas branches of the sprawling, Saudi-based Al Haramain Islamic Foundation, which Saudi officials estimate was, at its height, raising between forty and fifty million dollars per year.

As our report was going to press, the government of Saudi Arabia announced the dissolution of Al Haramain and other charitable entities and the creation of a nongovernmental organization to coordinate private Saudi charitable giving abroad.

As a result of the foregoing activities, al-Qaeda's current and prospective ability to raise and move funds with impunity has been significantly diminished. These efforts have likely made a real impact on al-Qaeda's financial picture, and it is undoubtedly a weaker organization as a result.

Indeed, in many respects, the views expressed in the Task Force's first report are now widely held, at home and abroad. But although much work has been done, much work remains.

I will now describe a number of our core findings.

Although Saudi Arabia has made significant improvements in its legal and regulatory regime, it has not fully implemented its new laws and regulations, and because of that, opportunities for the witting or unwitting financing of terrorism persist.

Indicia of implementation and enforcement are generally unavailable. We are concerned that the unavailability of such indicia may negatively impact the deterrent effect presumably intended by these measures.

As our report was going to press, for example, we were unable to find evidence to suggest that the announced High Commission of Oversight of Charities was fully operational. Moreover, its composition, authority, mandate, and charter remain unclear, as do important metrics of its likely effectiveness, such as staffing levels, budget, and

39

personnel training. The mandate and authority of the High Commission of Oversight of Charities is also unclear relative to that of the Saudi National Entity for Charitable Work Abroad, which was first announced in February 2004. As Juan Zarate told Congress earlier this spring, "the Kingdom must move forward to clarify and empower an oversight authority that will administer effective control over the [charity] sector and ensure compliance with obligations under the new regulatory measures." More recently, on June 2, 2004, Zarate called the establishment of the Saudi National Entity for Charitable Work Abroad a "major step forward" and noted, "we're looking forward to seeing the implementation of that."

At least one other key body, Saudi Arabia's Financial Intelligence Unit (FIU), is also not yet fully functional. FIU's are intended to collect and analyze suspicious financial data. Reliable, accessible metrics are lacking with respect to many of the other newly announced legal, regulatory, and institutional reforms. Critical data necessary to assess the implementation, enforcement, and effectiveness of many of these announced reforms are generally nonexistent or not publicly available. We find this troubling given the importance of these issues to the national security interests of the United States and other countries (including Saudi Arabia) that remain targets of al-Qaeda and similar terrorist organizations.

Additionally, we have found no evidence that Saudi Arabia has taken public punitive actions against any individual for financing terror. As a result, Saudi Arabia has yet to demand personal accountability in its efforts to combat terrorist financing and, more broadly and fundamentally, to de-legitimize these activities. The lack of transparent and compelling evidence of implementation is particularly troublesome in the criminal law enforcement context. Despite the flurry of laws and regulations, we believe that there have been no publicly announced arrests, trials, or incarcerations in Saudi Arabia in response to the financing of terrorism—despite the fact that such arrests and other punitive steps have reportedly taken place.

Against its poor historical enforcement record, any Saudi actions against financiers of terror are welcome. But actions taken in the shadows may have little consistent or systemic impact on ingrained social or cultural practices that directly or indirectly threaten the security of the United States.

Put simply, our Task Force found that people and organizations need to be publicly punished, including for past involvement in terrorist financing activities.

Not only have there been no publicly announced arrests in Saudi Arabia related to terrorist financing, but key financiers remain free or go unpunished. For example, Yasin al-Qadi, a Specially Designated Global Terrorist, appears to live freely in Saudi Arabia. According to the Treasury Department, "He heads the Saudi-based Muwafaq Foundation. Muwafaq is an al-Qaeda front that receives funding from wealthy Saudi businessmen. Blessed Relief is the English translation. Saudi businessmen have been transferring millions of dollars to bin Laden through Blessed Relief." Wa'el Julaidan, who was jointly designated on September 6, 2002, by the governments of the United States and Saudi

40

Arabia as "an associate of Usama bin Laden and a supporter of al-Qa'ida terror," also appears to live freely in Saudi Arabia. According to the Treasury Department, "The United States has credible information that Wa'el Hamza Julaidan is an associate of Usama bin Laden and several of bin Laden's close lieutenants. Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida." The same is true for Aqeel Abdulaziz Al-Aqil, the founder and long-time leader of the Al Haramain Islamic Foundation (AHF). According to the Treasury Department, "As AHF's founder and leader, Al-Aqil controlled AHF and was responsible for all AHF activities, including its support for terrorism.... Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al-Qa'ida network. Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS, and Lashkar E-Taibah received funding from AHF and used AHF as a front for fundraising and operational activities."

We find it regrettable and unacceptable that *since September 11, 2001, we know of not a single Saudi donor of funds to terrorist groups who has been publicly punished*—despite Ambassador Bandar's assertion, in response to the issuance of our first report, that Saudi Arabia would "prosecute the guilty to the fullest extent of the law."

Finally, Saudi Arabia continues to export radical extremism. A battle of ideas undergirds the global war on terrorism. Militant groups such as al-Qaeda are fueled by uncompromising fundamentalist interpretations of Islam that espouse violence and that millions of Muslims join Christians and Jews in rejecting.

As a core tenet of its foreign policy, Saudi Arabia funds the global propagation of Wahabism, a brand of Islam that, in some instances, supports militancy by encouraging divisiveness and violent acts against Muslims and non-Muslims alike. We are concerned that this massive spending is helping to create the next generation of terrorists and therefore constitutes a paramount strategic threat to the United States. Through the support for *madrassas*, mosques, cultural centers, hospitals, and other institutions, and the training and export of radical clerics to populate these outposts, Saudi Arabia has spent what could amount to hundreds of millions of dollars around the world financing extremism. Such Saudi financing is contributing significantly to the radicalization of millions of Muslims in places ranging from Pakistan to Indonesia to Nigeria to the United States. Foreign funding of extremist *madrassas* in Pakistan alone, for example, is estimated in the tens of millions, much of it historically from Saudi Arabia.

Saudi Arabia has begun to crack down on *domestic* extremism, most dramatically through education reform and the banishment or "re-education" of scores of radical Wahabi clerics. But our Task Force found that there is less evidence of effective action to curb the ongoing *export* of extremism.

Although the United States is not and should not be at war with any religion or any religious sect, we found that U.S. policy should affirmatively seek to drain the ideological breeding grounds of Islamic extremism, financially and otherwise. To do so, we will need more demonstrable cooperation from Saudi Arabia, which so far as not been sufficiently forthcoming.

We have made a number of other findings that I hope we can discuss. In the interest of time, Mallory will now address the report's recommendations, after which time I would be happy to answer any questions.

41

**Testimony Concerning the Second Report of an Independent Task Force on
Terrorist Financing Sponsored by the Council on Foreign Relations
Mallory Factor, Vice-Chair
Chairman, MALLORY FACTOR INC
U.S. Senate Committee on Governmental Affairs
June 15, 2004**

Madame Chairman, Senator Lieberman and Distinguished Members of the Committee:

I am honored to testify here today to report to you on the recommendations of the
Independent Task Force of the Council on Foreign Relations on Terrorist Financing, of
which I have served as Vice-Chair.

Madame Chairman and Senator Lieberman, I would like to commend you for your
unwavering commitment to these issues.   The work this Committee is undertaking is of
critical importance to the United States and the world.  Thank you for your important
leadership.

Until relatively recently, too little was done to curb the flow of funds to terrorists and
extremists.  That is why the Council on Foreign Relations sponsored this Task Force in
2002 and renewed its mandate more recently.  I would like to thank Council President
Richard Haass for all that he has done to make this Task Force a success.

Our distinguished bi-partisan Task Force is chaired by Maurice R. Greenberg and
directed by William F. Wechsler and Lee S. Wolosky.  They led this Task Force in the
interest of serving our nation.   I believe they have succeeded.

I would particularly like to commend Lee Wolosky, without whose leadership, judgment,
diplomacy, draftsmanship and dedicated efforts this task force would not have been a
success.   Lee worked tirelessly to reach consensus among task force members on the
report and its recommendations.

The Bush administration has accomplished a great deal since 9/11.  Some of the
Administration's achievements in this area have been integrating terrorist financing into
the U.S. government's overall counterterrorism effort, securing unprecedented
international support for UN sanctions against al-Qaeda, strengthening international
standards for financial supervision through FATF, issuing significant and meaningful
regulations under the Patriot Act and implementing a wide-ranging strategy to engage
Saudi Arabia on the subject of financial and ideological support of extremists.  Still, there
is much work to be done and I believe that the Task Force report sets forth a framework
of constructive, forward looking recommendations for improving U.S. efforts against
terrorism financing.

Our report focuses on terror financing from within the Kingdom of Saudi Arabia because
of the enormous resources emanating from that state that fund terrorist activities.

42

Clearly, there are numerous other states that finance terror and that should be examined also.

The Kingdom of Saudi Arabia has accomplished a great deal since May 2003. Most notably, Saudi Arabia has enacted extensive laws and regulations which, if fully implemented, would significantly reduce the flow of funds from within Saudi Arabia to terrorists. However, we have not found Saudi Arabia to be effectively enforcing these laws and regulations as Lee Wolosky has discussed. Many issues still need to be addressed before Saudi Arabia will have an acceptable regime in place to combat terror financing.

Our task force report generally reaffirms the recommendations made in the Task Force's first report and makes nine new recommendations. I will discuss them in varying levels of detail and would welcome the opportunity to discuss any of them in greater length in response to your questions.

***First, we urge U.S. policymakers to build a new framework for U.S.-Saudi relations.*** We recognize the broader context of the complex and important bilateral relationship in which the terrorist financing issue is situated. For decades, U.S.-Saudi Arabia relations have been built upon a consistent framework understood by both sides: Saudi Arabia would be a constructive actor with regard to the world's oil markets and regional security issues, and the United States would help provide for the defense of Saudi Arabia, work to address the Israeli-Palestinian conflict, and not raise any significant questions about Saudi Arabian domestic issues, either publicly or privately.

More recently however, this framework has come under strain because al-Qaeda, a terrorist organization rooted in issues central to Saudi Arabian domestic affairs, has murdered thousands of Americans. Al-Qaeda and similar organizations continue to conspire to kill even more Americans and to threaten our way of life.

Changed circumstances require a new policy framework for U.S.-Saudi relations. When domestic Saudi problems threaten Americans at home and abroad, the U.S. must pay attention to those Saudi "domestic" issues that impact U.S. security such as terrorist financing and the global export of Islamic extremism. These issues can no longer be "off the table"; they must be front and center in our bilateral relationship.

We acknowledge that this transition is already well underway, as evidenced by the turbulence in the bilateral relationship since 9/11. We note that some Bush administration officials have privately characterized the current state of affairs in Saudi Arabia as a "civil war" and suggested that the appropriate objective for U.S. policy in this context is to help the current regime prevail. We agree, but we believe the domestic Saudi problem will not be solved by dispersing al-Qaeda cells and members in Saudi Arabia alone. Rather, the "civil war" will be won only when the regime confronts directly and unequivocally addresses the ideological, religious, social, and cultural realities that fuel al-Qaeda, its imitators, and its financiers all over the world.

43

***Second, we recommend that Saudi Arabia fully implement its new laws and regulations and take additional steps to further improve its efforts to combat terrorist financing.*** In addition to implementing its recently enacted laws and regulations in this area, Saudi Arabia should also deter the financing of terrorism by publicly punishing those Saudi individuals and organizations that have funded terrorist organizations. It should increase the financial transparency and programmatic verification of its global charities and publicly release audit reports of those charities.   Saudi Arabia should also ratify and implement treaties that create binding international legal obligations relating to combating money laundering and terrorist financing.

***Third, we suggest that multilateral initiatives be better coordinated, appropriately funded, and invested with clear punitive authorities.*** The need for a new international organization specializing in terrorist financing issues, as recommended by our initial report, has diminished as a result of significant efforts being undertaken by a variety of international actors. The need for proper coordination and clearer mandates has increased for the same reason.   It is now time to minimize duplicative efforts and reallocate resources to the most effective and appropriate lead organization.

***Fourth, we believe that the executive branch should formalize its efforts to centralize the coordination of U.S. measures to combat terrorist financing.*** Our understanding is that, in practice, responsibilities for the coordination of terrorist financing issues have shifted from the Treasury Department to the White House, as we recommended in our original Task· Force report.   I commend the Bush Administration for this action. However, we believe that this allocation of responsibility to the White House needs to be formalized through a National Security Presidential Directive (NSPD) or otherwise.

***Fifth, we recommend that Congress enact a Treasury-led certification regime specifically on terrorist financing.*** The financial support for terrorism is the life-blood of global terrorism and requires its own certification regime.   A separate certification process will ensure that stringent requirements are maintained specifically with respect to a nation's policies and practices on terrorist financing without consideration of other issues.

I believe that the Saudi Arabia Accountability Act of 2003, S. 1888, sponsored by Senator Arlen Specter and co-sponsored by Chairman Collins and others would provide a good starting point for a terrorist financing certification regime if it were narrowed to focus solely on the financing of terrorism and expanded to apply to other nations.

We understand that certification regimes are generally disfavored by the executive branch (which must implement them) and favored by the legislative branch (which they empower). Although controversial, they also have the ability to galvanize quickly action consistent with U.S. interests. Moreover, they require official findings of fact that have the effect of promoting transparency and compelling sustained U.S. attention to important topics that, on occasion, U.S. officials find it more expedient to avoid.

44

For these reasons, we believe that Congress should pass and the President should sign legislation requiring the executive branch to submit to Congress on an annual basis a written certification (classified if necessary) detailing the steps that foreign nations have taken to cooperate in U.S. and international efforts to combat terrorist financing.   We suggest that in the absence of a presidential national security waiver, states that do not receive this certification would be subject to sanctions--including denial of U.S. foreign assistance monies and limitations on access to the U.S. financial system.

*Sixth, we urge the U.N. Security Council to broaden the scope of the U.N.'s al-Qaeda and Taliban Sanctions Committee.* The UN Security Council should specifically impose international sanctions on other groups and individuals that have been designated as terrorists, as Hamas has been by the United States and E.U.  Furthermore, it should require, as a matter of international law, that member states take enforcement action against groups, persons and entities designated by the Sanctions Committee. The enabling resolution for these expanded authorities should explicitly reject the notion that acts of terror may be legitimized by the charitable activities or political motivations of the perpetrator. No cause, however legitimate, justifies the use of terror; indeed, the use of terror delegitimizes even the most worthy causes.

*Seventh, we suggest that the U.S. government increase sharing of information with the financial services sector as permitted by Section 314 of the USA PATRIOT ACT so that this sector can cooperate more effectively with the U.S. government in identifying incidences of terror financing.*   International financial institutions subject to U.S. jurisdiction are among our best sources of raw financial intelligence to identify terror financing, but these institutions need to be given appropriate information from the U.S. government on what to look for.  Currently, the procedures required by Section 314 of the Patriot Act which are designed to promote cooperation with financial institutions in identifying terror financing are not working as effectively as they might.  We suggest greater information sharing between the U.S. government and the financial institutions within the framework of the Patriot Act in order to allow these institutions to cooperate more effectively with the U.S. government in identifying incidences of terror financing.

*Eighth, we recommend that the National Security Council (NSC) and the White House Office of Management and Budget (OMB) conduct a cross-cutting analysis of the budgets of all U.S. government agencies as they relate to terrorist financing.* We understand this recommendation is difficult to implement; however, we think that monitoring the financial and human resources that are actually devoted to the various tasks involved in combating terrorist financing will facilitate fully informed, strategic decisions about whether resource allocations are optimal or functions are duplicative. For this reason, the NSC and OMB should conduct a cross-cutting analysis of all agencies' budgets in this area, to gain clarity about who is doing what, how well, and with what resources. Only with such a cross-cut in hand can we can begin to make assessments regarding the efficiency of our existing efforts and the adequacy of appropriations relative to the threat.  We commend Jody Myers, the former NSC staffer, for suggesting a similar cross-cutting analysis in his Senate testimony given last month.

45

***Ninth, we urge the U.S. government and private foundations, universities, and think tanks to increase efforts to understand the strategic threat posed to the United States by radical Islamic militancy, including specifically the methods and modalities of its financing and global propagation.*** At the dawn of the Cold War, the U.S. government and U.S. nongovernmental organizations committed substantial public and philanthropic resources to endow Soviet studies programs across the United States. The purpose of these efforts was to increase the level of understanding in this country of the profound strategic threat posed to the United States by Soviet Communism. A similar undertaking is now needed to understand adequately the threat posed to the United States by radical Islamic militancy, along with its causes, which we believe constitutes the greatest strategic threat to the United States at the dawn of this new century. To be commensurate with the threat, much more will need to be done, not only in Washington, but also by private U.S. foundations, universities, and think tanks, in a more sustained, deliberate, and well-financed manner than that afforded through ad hoc initiatives such as our Task Force.

I look forward to your questions.

46

**Opening Statement of
David D. Aufhauser, former General Counsel,
U.S. Department of the Treasury,
Senior Fellow, Center for Strategic & International Studies
Before the Senate Governmental Affairs Committee
June 15, 2004**

In early 1996, Usama Bin Laden was living in exile in the Sudan.  He was at war with a House of Saud policy that countenanced the presence of U.S. troops on Saudi soil.  And he was already plotting mayhem sufficient enough to warrant the establishment of a special "Issue Station" at the CIA devoted exclusively to divining his ambitions and designs.  Still, he was regarded as the son of a rich man and principally a financier of terror.  In fact, the original name for the special purpose unit at the agency was "TFL" -- terrorist financial links.

It turned out that Bin Laden was actually a hapless businessman.  His ventures failed and were **not** the principal source of Al Qaeda's wealth.  Rather, he tapped something far deeper and more dangerous – hate preached and taught in places of despair, married to rivers of unaccounted for funds that flowed across borders in the counterfeit name of charity and faith.  And in so doing, Bin Laden managed to leverage the **tactic** of terror into a malevolent **dogma** embraced by an army of madmen.

How we got here is instructive to where we must go.

1

47

In 1974, a disgraced President was driven from office for lies and deceits. In 1977, an international extra-legal cartel literally dimmed the lights of the White House, demonstrating profound new powers abroad not tied to guns, bullets or boots on the ground.  And in 1979, the nadir of U.S. influence – the Shah transformed into a stateless person; hostages held captive for more than a year; a failed rescue mission; and the Soviet invasion of Afghanistan.

Tied to that was the takeover of the Grand Mosque in Mecca, challenging the sole claim to legitimacy of the Saudi royal family as the guardians of the faith.  A U.S. impotent to protect its allies and citizens abroad held little promise to the threatened Saudi monarchy.  So it understandably responded with a vengeance, retaking the Mosque and directing an unfathomable wealth of petrodollars – by some estimates, north of $75 billion – to demonstrate that it is the true and rightful champion of Islam.  It did so by underwriting schools, mosques, call center and charities throughout the Islamic Diaspora.  Wherever there was need, they came as teachers, as providers of social welfare, and as holy men.  But what they taught was an unforgiving, intolerant, uncompromising and austere view of the faith that became kindling for Usama Bin Laden's match.

It will take a generation – and a clear headed program of public diplomacy that, for example, condemns legal sophistries that justify torture – to recapture hearts and minds poisoned by false teachings of hate.   What can be done and

2

48

should be done to scale back the violence in the interim is to deplete the resources made available to kill innocents. No tool is more useful in doing so than in stopping the funding of terrorism. The Council on Foreign Relations, and this Committee, are to be commended for the profile given to the subject.

As for al-Qaeda, the organization is broken, its central bank severely challenged. Yet, today, it is more lethal than the day that it brought down the twin towers in Manhattan -- more a movement than an organization with predictable or explicit design. Autonomous cells, catering to acts of nihilism, increasingly funded through pedestrian criminal activity, threaten sudden and senseless death without purpose. And they do so everywhere -- Bali, Istanbul, the London subway system, Casablanca, Baghdad, New York and Washington. We cannot bunker and guard every school, marketplace, shopping center, airport, train station or place of worship.

New elements of national power are therefore required to **prevent** the killing. None are more central than intelligence and the disruption of the lines of logistical support. Money informs and defines both with a degree of integrity, reliability, insight and impact that is without peer.

9/11 brought a group of us together in the Administration that tackled the subject with demonstrable successes. Today, there is a new vocabulary about

3

49

terrorist financing and it includes new laws, new standards of professional and fiduciary conduct, extraordinary commitments of multilateralism at the UN, World Bank, IMF, and within the G8, 10 and 20 as well as APEC, greater capacity abroad, more sophisticated intelligence, and a greatly enhanced partnership with the private sector.

But the effort remains, at best, a proxy for the real thing.  Terrorism permits murder to masquerade under religious sanction, altering the whole DNA of war by placing a premium on the death of women and children.  Until it is an **act of shame** to provide money for any such counterfeit purpose, the blood will flow.  Accordingly, we must return to first principles:

- Terror must be defined -- at the UN and elsewhere -- to condemn money intended to kill civilians for political reason;
- We must disrupt the funding not only of terror, but of the teaching of hate that is its crucible; and
- We must address the deficit of hope that haunts much of the Islamic world with debt reduction and meaningful economic aide and development assistance.  Paul O'Neill and I had a metaphor for that proposition, as Quixotic as it may sound, a well in every village.

4

50

Of more immediate purpose within the jurisdiction of the Committee, the assets and cash flow that we seek to freeze and disrupt are located abroad. International cooperation is therefore critical, and it requires a new mind set in intelligence that will inform both the nature and manner of collection. Our new secrets must be collected with the intention of sharing, and strong enough to withstand a measure of judicial scrutiny. That is a sea change required by the developing jurisprudence of terrorism and its focus on prevention, rather than punishment.

In addition, if Madrid has any lessons – terrorism funded through criminal activity – local law enforcement must be integrated more directly with the national intelligence community to facilitate a two way dialogue of increasingly equal value. Finally, we must vest an agency of the U.S. government with the power to direct and execute the campaign against terrorist financing. The NSC is not the appropriate place to direct a theater of war.

The man who straps a bomb to his chest as he enters a marketplace is an implacable foe. He is beyond redemption and cannot be deterred. It would be the height of irony – and perhaps the promise of future tragedy – if we permit the orthodoxy of how we have organized government, and collected and acted upon intelligence in the past to deter us from responding in the future.