# Exhibit 5

S. Hrg. 108–706

# MONEY LAUNDERING: CURRENT STATUS OF OUR EFFORTS TO COORDINATE AND COMBAT MONEY LAUNDERING AND TERRORIST FINANCING

# HEARING

BEFORE THE

# SENATE CAUCUS ON INTERNATIONAL NARCOTICS CONTROL

ONE HUNDRED EIGHTH CONGRESS

FIRST SESSION

MARCH 4, 2004



U.S. GOVERNMENT PRINTING OFFICE

96–211 PDF                WASHINGTON : 2004

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

40

Just yesterday, Mr. Chairman, the U.S. Attorney in the Southern District of New York announced the indictment of two of Colombia's most important drug kingpins based on Treasury-related prohibitions. The indictment was part of a joint effort among the DEA, Department of Justice and Treasury's OFAC.

Mr. Chairman, we are also dealing with identified weaknesses in the international financial system and improving financial information sharing around the world. We have worked internationally through the Financial Action Task Force and other groups to strengthen comprehensive customer identification, recordkeeping and information sharing standards. These efforts have provided for and produced meaningful change in countries like the Cayman Islands, Egypt, Guatemala, Indonesia, Israel, Lebanon and the Philippines. We have strengthened international standards and capabilities to attack terrorist financing, including freezing terrorist-related assets, regulating and monitoring alternative remittance systems such as hawala, ensuring accurate and meaningful information on cross-border wire transfers, and protecting non-profit organizations from terrorist abuse.

Along with ICE and other agencies, we are now addressing the problem of the use of couriers by terrorist and criminal organizations on a comprehensive and international basis. Under the USA PATRIOT Act, Treasury's Financial Crimes Enforcement Network has published 50 proposed and final rules to broaden and deepen our own anti-money laundering regime to now include oversight of money service businesses and broker dealers.

Under Section 314(a) of the USA PATRIOT Act, FinCEN has gained critical leads from over 30,000 financial institutions on identified money launderers and suspected terrorist supporters. This has resulted in over 10,000 matches that were passed on to law enforcement.

Mr. Chairman, these long-term and short-term initiatives are complimentary and address our priority challenges. Moreover, these initiatives capitalize on the progress we have achieved to date and apply the powers and expertise of the entire U.S. Government.

The Treasury will continue to use its powers and influence judiciously, but aggressively to change behavior by blocking tainted assets, naming, shaming and shutting out rogue institutions and regimes, and ensuring the integrity of the financial system.

Mr. Chairman, we appreciate the Caucus' focus on these issues and we look forward to continuing to work with the Congress to ensure the effective implementation of our national anti-money laundering and counterterrorist financing strategies.

Thank you.

[The prepared statement of Mr. Zarate follows:]

PREPARED STATEMENT OF HON. JUAN C. ZARATE, DEPUTY ASSISTANT SECRETARY, EXECUTIVE OFFICE FOR TERRORIST FINANCING AND FINANCIAL CRIMES, U.S. DEPARTMENT OF THE TREASURY

Chairman Grassley, Co-Chairman Biden, and distinguished Members of the Caucus, thank you for inviting me to testify today, and thank you for your interest in the coordination of our Government's efforts to combat money laundering and terrorist financing.

Let me begin by expressing my gratitude to the Congress for the additional resources, authorities, and support given to the Executive Branch to assist us in our

41

efforts to attack terrorist financing networks and money launderers. Of particular importance to these efforts, the USA PATRIOT Act expands the law enforcement and intelligence community's ability to access and share critical financial information regarding terrorist investigations, and Title III enhances our joint abilities to obtain and exploit financial information collectively to attack the financing of criminal activities. We at the Treasury will continue to apply aggressively, but judiciously, the enhanced powers that you have provided us to ensure that relevant financial information is used to initiate and support actions against terrorist and criminal organizations. We will also continue to develop and strengthen the relationships we have established with our private financial sector partners in these efforts.

As you will hear from this panel—and as we and the Department of Justice reaffirmed in our publication of the National Money Laundering Strategy of 2003 (2003 Strategy) last fall—the campaign against terrorist financing and money laundering forms an essential component of our national security strategy. Since September 11, we have leveraged the relationships, resources, authorities, and expertise that we have acquired over the past several years in combating money laundering to attack terrorist financing. Our efforts in both arenas are complementary and are effecting the changes required to protect the integrity of our financial systems by identifying, disrupting and dismantling sources, flows, and uses of tainted capital within those systems.

### I. CREATION OF THE EXECUTIVE OFFICE FOR TERRORIST FINANCING & FINANCIAL CRIMES

Almost one year ago, the Secretary of the Treasury established the Executive Office for Terrorist Financing and Financial Crimes (EOTF/FC). This Office is responsible for developing policies relating to the Department's anti-money laundering, terrorist financing and financial crimes mission. It also oversees the offices and Bureaus responsible for implementing and administering these policies, i.e., the Office of Foreign Assets Control (OFAC), the Financial Crimes Enforcement Network (FinCEN), and the Treasury Executive Office for Asset Forfeiture (TEOAF).

We have achieved important results, but not without the coordinated efforts of all Treasury and other agency components engaged in anti-terrorist financing, money laundering and financial crimes efforts, including the law enforcement, intelligence and military communities, foreign government counterparts, and the private sector. Together, we are effecting long-term change and strengthening domestic and international financial systems against terrorist and criminal abuse by developing and enhancing effective and comprehensive standards of financial transparency and accountability. In the shorter term, we are capitalizing on existing transparencies in financial systems and aggressively applying new authorities to identify, disrupt and dismantle terrorist and criminal organizations.

### II. ATTACKING THE FINANCIAL INFRASTRUCTURE OF TERRORIST AND CRIMINAL ORGANIZATIONS

No matter whether the driving force is religious extremism, political power, financial greed, or any combination thereof, the infrastructure supporting crime necessarily includes a financial component. Money is required to fuel these enterprises of terror, narco-trafficking and organized crime, and as such, it represents a significant vulnerability that Treasury and its Federal, State and local allies must and do exploit.

Targeting money flows is among the best means of tracking, exposing and capturing terrorists and their facilitators, narco-trafficking cartels and their supporting infrastructure, and organized crime networks worldwide. Money flows leave a signature, an audit trail, and provide a road map of terrorist and other criminal activity. As we and our international partners work together to follow and stop terrorist or illicit funds, we strengthen the integrity of our financial systems and erode the infrastructure that supports terrorists and criminals.

This is why we are committed to "targeting the money" from a systemic approach. We believe that resources devoted to fighting money laundering and financial crimes through a systemic approach reap benefits far beyond merely addressing the underlying financial crimes they directly target. When applied on a systemic basis, targeting the money can identify and attack all kinds of activity, including the financing of terrorism, narcotics trafficking, securities frauds, alien smuggling, organized crime, and public corruption. Financial investigations lead upstream to those who are generating the underlying financial crimes, as well as downstream to provide a roadmap to those financial professionals who facilitate the criminal activity.

42

*A. Terrorist Financing*

The terrorism we are fighting generally operates through complex networks. In this context, a terrorist act, no matter how basic and inexpensive, cannot be accomplished without a sophisticated financial and operational infrastructure. Terrorist organizations such as al Qaida and Hamas require a financial and operational infrastructures. They must pay for the security of "safe havens," financial support for the families of "martyrs," recruitment, indoctrination, logistical support, and personnel training. This doesn't even get into the costs of ostensibly humanitarian efforts—charitable organizations, medical clinics and schools—that are either created as fronts for terrorism or to win support and recruits. Finally, there is the cost of weapons. In short, the horrific results of terrorism require the raising, movement and use of considerable funds. The terrorist leaves identifiable and traceable footprints in the global financial systems, and these footprints must be pursued forward to identify future perpetrators and facilitators, and backwards to identify funding sources and to dismantle supporting entities and individuals.

The President has made it clear that we must use every available tool in waging a comprehensive campaign against terrorism, and we at Treasury are working with other relevant USG agencies in taking meaningful and effective action on a variety of fronts. We are developing effective international standards of financial transparency and accountability; sanctioning non-compliant behavior by non-cooperative states; coordinating effective technical assistance to weak but willing states; freezing terrorist-related and other criminal assets; investigating and prosecuting crimes; directing intelligence operations either at a financier, a financial node, or a facilitator; and using diplomatic suasion to convince other governments to take significant steps.

Depriving the terrorists of funding remains both an ongoing priority and an effective tool in the war on terrorism. Ever since the President took initial action in freezing terrorist finances through the issuance of Executive Order 13224, the U.S. Government (USG) has led an international coalition to disrupt, dismantle, and destroy the sources and pipelines from and through which terrorists receive money.

- Under Executive Order 13224, the USG has designated a total of 351 individuals and entities, resulting in the freezing or seizure of approximately $200 million of terrorist-related funds worldwide. The impact of these actions goes beyond the amount of money frozen. Public designation and asset blocking choke off terrorist cash flows by cutting off access to the U.S. and other financial systems and also provide access to further intelligence. Recent designations under E.O. 13224 include the following:
- The Al-Aqsa International Foundation (Hamas-related) on May 29, 2003
- Shamil Basayev (al-Qaida-related) on August 8, 2003
- The National Council of Resistance of Iran (including its U.S. representative office and all other offices worldwide) and the People's Mujahedin Organization of Iran (including its U.S. press office and all other offices worldwide) on August 15, 2003
- Commite de Beianfaisance et de Secours aux Palestiniens (France), Association de Secours Palestinien (Switzerland), Interpal (UK), Palestinian Association in Austria, and the Sanibil Association for Relief and Development (Lebanon) (all Hamas-related charities) on August 22, 2003
- Sheik Ahmed Yassin (Gaza), Imad Khalil Al-Alami (Syria), Usama Hamdan (Lebanon), Khalid Mishaal (Syria), Musa Abu Marzouk (Syna), and Abdel Aziz Rantisi (Gaza) (Hamas political leaders) on August 22, 2003
- Yassin Sywal, Mukhlis Yunos, Imam Samudra, Huda bin Abdul Haq, Parlindungan Siregar, Julkipli Salamuddin,, Aris Munandar, Fathur Rohman Al-Ghozi, Agus Dwikarna, and Abdul Hakim Murad (members of Jemaah Islamiyah) on September 5, 2003
- Abu Musa'ab Al-Zargawi (al-Qaida-related) on September 24, 2003
- Al Akhtar Trust International (al-Qaida-related) on October 14, 2003
- Dawood Ibrahim (al-Qaida-related) on October 17, 2003
- Abu Ghaith (al-Qaida-related) on January 16, 2004
- Four branches of the Al Haramain Islamic Foundation (al-Qaida-related) on January 22, 2004)
- Shaykh Abd Al-Zindani (al-Qaida-related) on February 24, 2004
- We have made it harder for al Qaida to raise and move money around the world by cutting off channels of funding and freezing assets. In the last year, over fifty individuals and entities were designated by the USG pursuant to the obligations of UN-member states to freeze the assets of individuals and entities related to Usama bin Laden, al-Qaida, and/or the Taliban.
- Important financial networks—such as those of al Barakaat and parts of the Al Haramain Islamic Foundation—have been identified and shut down. The UAE and

43

Somalia-based al Barakaat network was once used to funnel potentially millions of dollars annually to al Qaida and its affiliates.

- Key terrorist financiers and facilitators, such as Saudi-millionaires Yasin al-Qadi and Wa'el Hamza Julaidan, Swift Sword, and Bin Laden's Yemeni spiritual advisor, Shaykh Abd-Al-Zindani, have had their assets frozen and/or have been arrested or otherwise addressed through the international community's concerted law enforcement efforts.
- The U.S. has also taken significant actions against non-al Qaida linked terrorist organizations such as Hamas and the Basque terrorist group, ETA. On December 4, 2001, President Bush issued an order to freeze the assets of a U.S.-based foundation—The Holy Land Foundation for Relief and Development—along with two other HAMAS financiers, Beit al Mal and the Al Aqsa Islamic Bank. Six leaders of Hamas and six charities in Europe and the Middle East that support Hamas were subsequently designated in May and August 2003. In partnership with our EU allies, the U.S. designated 31 ETA operatives and one organization that supports ETA.
- Working together with the international community, we have taken steps to ensure global compliance with international standards against terrorist financing and money laundering. Treasury and other elements of the USG have launched a three-prong strategy that includes: (i) objectively assessing countries against international standards; (ii) providing capacity-building assistance for key countries in need, and (iii) isolating and punishing those countries and institutions that facilitate terrorist financing.
- The USG has identified 26 countries as priorities for receiving counter-terrorist financing technical assistance and training, and we are working bilaterally to deliver such assistance to these priority countries. The USG is also working together with its allies in the CounterTerrorism Action Group (CTAG) and the Financial Action Task Force (FATF) to coordinate bilateral and international technical assistance efforts to additional priority countries in the campaign against terrorist financing.
- We have forged an international coalition against terrorist financing, gaining the support and action of countries around the world to search for and interdict terrorist funds. Most terrorist-related assets are located outside the jurisdictional reach of the U.S. We, therefore, have worked closely with our international partners and focused other countries' attention on these issues. We have convinced them to improve their legal and regulatory systems so they can more effectively identify and block terrorist funds, retrieve and share incriminating financial information, and investigate and prosecute criminal and terrorist organizations.
- Through FinCEN, we have directed the attention of the Egmont Group towards terrorist financing and expanded its global reach. The Egmont Group is now comprised of 84 Financial Intelligence Units (FIUs) from various countries around the world which are responsible for receiving, analyzing and disseminating financial information reported pursuant to their respective anti-money laundering and anti-terrorist financing regimes. FinCEN is the FIU for the United States. Through the Egmont Group, these FIUs have agreed to: (i) work to eliminate impediments to information exchange; (ii) make terrorist financing a predicate for suspicious activity required to be reported by all financial sectors to their respective FIUs; (iii) undertake joint studies of particular money laundering vulnerabilities, especially when they may have some bearing on counterterrorism, such as hawala; and (iv) create sanitized cases for training purposes.
- We have enlisted the active support of international bodies, such as the G-7, G-10, G-20, APEC, and others—to make efforts against terrorist financing a priority for their members. The G7, G20, Asia-Pacific Economic Cooperation Forum (APEC), Western Hemisphere Finance Ministers (WHFM), ASEAN Regional Forum (ARF), and OSCE have all issued action plans calling on their members to take a series of concrete measures to enhance the effectiveness of their counter-terrorist financing regimes.
- Our systemic efforts and targeted designations, together with USG law enforcement, diplomatic, intelligence and military actions, have deterred potential terrorist supporters and sympathizers by increasing the cost and the risk of doing business with terrorists.
- Several countries, including members of the Gulf Cooperative Council, have taken steps to begin regulation and oversight of charities and donations abroad. Islamic States have also moved forward on regulating and harmonizing accounting, transparency, and oversight principles for Islamic banking. In addition, several countries, such as the United Arab Emirates and Pakistan, have begun the process of regulating alternative remittance systems like hawalas, a system of money exchange previously unregulated throughout the world.

*B. Drug Trafficking*

Our focus and commitment to targeting the financing of illicit activities includes an aggressive use of authorities against narcotics traffickers. A particularly potent financial weapon in our war against drug money laundering systems is that wielded by Treasury's ability to apply and enforce narcotics trafficking sanctions.

Treasury, in conjunction with the Departments of Justice, State and Homeland Security, enforces the IEEPA narcotics sanctions against Colombian drug cartels under Executive Order 12978. The objectives of the Specially Designated Narcotics Traffickers (SDNT) program are to identify, expose, isolate and incapacitate the businesses and agents of the Colombian drug cartels and to deny them access to the U.S. financial system and to the benefits of trade and transactions involving U.S. businesses and individuals. Targets are identified in consultation with the Drug Enforcement Administration and the Narcotics and Dangerous Drug Section of the Department of Justice. Since the inception of the SDNT program in October 1995, 956 parties have been identified as SDNTs, consisting of 14 Colombian drug cartel leaders, 381 businesses and 561 other individuals.

Recent designations under E.O. 12978 include:

- A financial network of 134 front companies and individuals in Colombia, Costa Rica, Ecuador, Panama, Peru, Spain, Venezuela, the Bahamas, the British Virgin Islands, and the United States that were acting on behalf of the Cali cartel leaders, Gilberto and Miguel Rodriguez Orejuela, on October 17, 2003.

Treasury also implements the President's sanctions under the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"). The Kingpin Act, enacted in December 1999, operates on a global scale and authorizes the President to deny significant foreign narcotics traffickers, and their related businesses and operatives, access to the U.S. financial system and all trade and transactions involving U.S. companies and individuals. During 2003, the President named seven new kingpins, including two USG designated foreign terrorist organizations—Revolutionary Armed Forces of Colombia and United Self-Defense Forces of Columbia—and a Burmese narco-trafficking ethnic guerilla army, bringing the total number designated to 38.

Since the inception of the Kingpin Act and after multi-agency consultations, Treasury has named 14 foreign businesses and 37 foreign individuals in Mexico, Colombia, and the Caribbean as derivative ("Tier II") designations. These derivative designations are flexible, and permit Treasury to attack the financial infrastructure of these kingpins as their infrastructure changes. A total of 104 organizations, individuals and businesses in 12 countries are now designated under the Kingpin Act. On February 19, 2004, Treasury designated 40 key individuals and companies associated with the Colombian narco-terrorist organizations, the FARC and the AUC. These two organizations were previously named by the President on May 29, 2003 as drug kingpins.

Another weapon that the USG uses aggressively against narco-traffickers and money launderers is that of seizure and confiscation. In fiscal year 2003, Treasury's Executive Office for Asset Forfeiture (TEOAF) received over 234 million dollars in annual forfeiture revenue from the combined efforts of the former Bureau of Alcohol, Tobacco, Firearms and Explosives, the U.S. Secret Service (USSS), the Internal Revenue Service (IRS), and the former U.S. Customs Service (USCS). This represents a significant increase over fiscal year 2002, in which TEOAF received over $152. million dollars of forfeiture revenue. Such an improvement is particularly impressive when considering the transition undertaken by three of these law enforcement bureaus in the government reorganization last year.

*C. Terrorist Financing and Drug Trafficking*

Although terrorist financing and drug money laundering differ in some respects, they utilize many of the same financial systems and methods. To that end, we seek solutions and tools that provide us the greatest systemic change and flexibility. As part of our long term strategy, we have focused our efforts on enhancing the transparency and accountability of formal and informal financial systems, particularly those that have been abused by terrorist and criminal organizations. In the shorter term, we are exploiting existing transparencies and developing a variety of weapons to identify, disrupt and dismantle these organizations.

*D. Enhancing the Transparency and Accountability of Financial Systems*

Attacking the financial infrastructure of terrorist and other criminal activity requires transparent and accountable financial systems that allow us to identify and take effective action against sources, movement and use of terrorist funds and criminal proceeds moving through such systems. As part of our long-term strategy, therefore, we have focused on developing or enhancing the transparency and accountability of financial systems, particularly those that have been abused by terrorists

and money launderers in the past. We have achieved considerable success thus far, both internationally and domestically, and in both formal and informal financial systems. For example:

- Internationally, we have worked with our counterparts in the FATF to revise the 40 Recommendations, thereby enhancing international standards of transparency and accountability required to effectively combat money laundering and other financial crimes. In June 2003, the FATF issued the revised 40 Recommendations to add shell banks, politically-exposed persons, correspondent banking, wire transfers, bearer shares, the regulation of trusts, the regulation of trust and company service providers, and the regulation of lawyers and accountants. These newly revised Recommendations were endorsed by the G-7 Finance Ministers in a public statement issued the same day that the revised Recommendations were adopted by FATF.
- In the larger context of the need for a strong anti-money laundering regime as a necessity for combating terrorist financing, we have seen many countries take important steps to improve their legal regimes and strengthen the oversight of their financial sectors. Countries like Egypt, Guatemala, Indonesia, Israel, Lebanon, and the Philippines have taken important strides to develop and implement effective and comprehensive anti-money laundering regimes, improving their institutions and their enforcement of anti-money laundering laws.
- We have engaged the IMF and World Bank to gain their recognition of the FATF 40 Recommendations as one of the 12 Key International Standards and Codes. Pursuant to these efforts, the IMF and World Bank have completed a worldwide pilot program to assess countries against these standards. We look forward to the IMF and the World Bank agreeing this month to make this assessment program permanent and comprehensive.
- We have capitalized on the FATF's expertise on money laundering to attack terrorist financing, largely through the Eight Special Recommendations on Terrorist Financing developed and adopted by the FATF in October 2001. Since that time, we have worked within the FATF's Working Group on Terrorist Financing, which Treasury co-chairs, to issue interpretive guidance on the Eight Special Recommendations, particularly with respect to: freezing terrorist-related assets; regulating and monitoring alternative remittance systems such as hawala; ensuring accurate and meaningful originator information on cross-border wire transfers, and protecting non-profit organizations from terrorist abuse.
- To facilitate the global development and implementation of effective counter-terrorist financing regimes, the USG is driving a coordinated and comprehensive process to deliver technical assistance to combat terrorist financing around the world. In coordination with our international allies in the CTAG, the international community has identified nine priority countries to receive immediate assistance. The FATF's Working Group on Terrorist Financing is completing terrorist financing needs assessments in these priority countries and will forward these assessments to the CTAG for coordinated assistance by donor states.
- We have built relationships with the private sector to enlist their support as the gatekeepers to the financial system. We have broadened and deepened the regulatory structure and reporting requirements in the domestic financial system. We have created a level-playing field and attacked money laundering and terrorist financing through non-banking financial systems under the USA PATRIOT Act, subjecting new sectors of the economy (such as money service businesses and broker-dealers) to anti-money laundering controls like recordkeeping and reporting requirements previously imposed on banks alone.

*E. Identifying, Disrupting and Dismantling Terrorist and Criminal Organizations*

We are capitalizing on our long-term efforts to improve the transparency and accountability of formal and informal financial systems by developing and applying various weapons to identify, disrupt and dismantle terrorist and criminal organizations that operate within these systems. Our efforts to date have produced considerable results:

- We are aggressively using the force of Section 311 of the PATRIOT Act to address primary money laundering concerns on a jurisdictional and institutional basis. Working in cooperation with the law enforcement and intelligence communities, we have designated three foreign jurisdictions and two financial institutions under Section 311. In addition to designating the jurisdiction of Burma, consistent with the FATF's demand for countries to impose additional counter-measures on Burma, Treasury also designated the Myanmar Mayflower Bank and Asia Wealth Bank, two Burmese banks that are heavily implicated in facilitating money laundering for the notorious drug trafficking organizations in Southeast Asia. We have also designated the jurisdictions of the Ukraine and Nauru. Most importantly, the mere possibility

46

of a Section 311 designation has caused nations to make changes to their legal and regulatory regimes that enhance the global anti-money laundering and anti-terrorist financing infrastructure. We are continuing to seek out appropriate opportunities to utilize these new powers aggressively, but judiciously, to protect the U.S financial system, punish jurisdictions and institutions complicit in money laundering, and encourage compliance with international standards of transparency and accountability.

- We have enhanced law enforcement efforts that attack those who support terrorism through other means of organized crime:
- On December 4, 2002, Federal prosecutors in Houston indicted several individuals, including two high ranking members of Autodefensas Unidas de Colombia (AUC/United Self Defense Forces of Colombia), the Colombian right wing designated terrorist organization, with drug conspiracy and conspiracy to provide material support or resources to AUC. To date, two of the defendants have pled guilty to the material support charge under 18 USC § 2339B and the drug conspiracy charges. The AUC principals are in Costa Rican custody awaiting extradition.
- On March 7, 2002, a grand jury in the District of Columbia returned an indictment charging the leader of the 16th front of the Fuerzas Armadas Revolucionarias de Colombia (FARC), and six others, with participating in a drug trafficking conspiracy. Two superseding indictments have added Jorge Briceno-Suarez, the second in command of the FARC, and two Peruvian drug traffickers, the Aybar brothers. The Aybar brothers also were indicted in the Southern District of Florida for providing material support to a terrorist organization by supplying 10,000 AK-47s to the FARO in exchange for cocaine and money.
- Most recently, on February 19, 2004, the Treasury Department took action against leaders and key figures of the FARC and AUC. Treasury added the names of FARC leaders, including Pedro Antonio Marin and Jorge Briceno Suarez, key AUC figures, including Carlos Castaio Gil and Salvatore Mancuso Gomez, and AUC front companies to the list of "Tier II" persons designated under the Foreign Narcotics Kingpin Designation Act (Kingpin Act). The 40 Colombian names added to the Kingpin Act list include 19 FARC individuals, 18 individuals associated with the AUC and three front companies connected to the AUC. These 40 persons are subject to the economic sanctions imposed against foreign drug cartels under the Kingpin Act.

We have used Section 314(a) of the PATRIOT Act to enable law enforcement, through FinCEN "Blastfaxes" to more than 30,000 financial institutions, to locate quickly the accounts and transactions of those suspected of money laundering or the financing of terrorism. Since Section 314a's creation, the system has been used to send the names of 11,547 persons suspected of terrorism financing or money laundering to financial institutions. This has resulted in 10,560 matches that were passed on to law enforcement.

- Since September 11th, FinCEN has supported 3,248 terrorism investigations and has made 342 proactive case referrals to law enforcement potentially involving terrorism based upon an analysis of information in the Bank Secrecy Act database. The Terror Hotline established by FinCEN has resulted in 833 tips passed on to law enforcement. FinCEN also is implementing an Electronic Reports program that will be able to issue these reports in an electronic format, thus enhancing law enforcement's ability to utilize the information. With the expansion of the Suspicious Activity Report (SAR) regime since September 11th, financial institutions nationwide have filed 2,818 SARs reporting possible terrorist financing, including 607 SARs in which terrorist financing represented a primary suspicion.
- We have developed the use of technology to identify possible sources of terrorist financing, particularly through the pilot counterterrorism project undertaken by IRS-CI in Garden City, New York. The Garden City Counterterrorism Lead Development Center is dedicated to providing research and nationwide project support to IRS-CI and the Joint Terrorism Task Force (JTTF) counterterrorism financing investigations. Relying on modern technology, the Center is comprised of a staff of IRS Special Agents, Intelligence Analysts, and civil components from the Service's Tax Exempt/Government Entities Operating Division, who will research leads and field office inquiries concerning terrorism investigations. Center personnel specializing in terrorism issues will develop case knowledge, identify trends, and provide comprehensive data reports to IRS field agents assigned to JTTFs or to those conducting CI counterterrorism financing investigations. The Center may also serve to deconflict related investigations among multiple field offices, and will have distinctive analytical capabilities to include link analysis, data matching, and pro-active data modeling. Using data from tax-exempt organizations and other tax-related information that is protected by strict disclosure laws, the Center will analyze information not available to or captured by other law enforcement agencies. Thus, a complete analysis of all financial data will be performed by the Center and disseminated

for further investigation. This research, technology, and intuitive modeling, coupled with CI's financial expertise, are maximizing IRS-CI's impact against sophisticated terrorist organizations.

### III. ENHANCING INTERAGENCY COORDINATION

What these actions show is the strength of Treasury's resources and expertise and the value and critical need of interagency cooperation in order to tighten the trap around terrorist financiers, drug traffickers and other criminal enterprises. A core principle of the *2003 Strategy* is enhancing our ongoing efforts to combat money laundering by ensuring that law enforcement agencies and task forces, including the High Intensity Financial Crime Area (HIFCA) Task Forces, Organized Crime and Drug Enforcement Task Forces (OCDETF), the Suspicious Activity Report (SAR) Review Teams, and the High Intensity Drug Trafficking Area (HIDTA) Task Forces use and share all available financial databases and analytical tools and focus their personnel and other resources on high-impact targets and financial systems.

To help achieve this goal and in accordance with the 2003 Strategy, the interagency law enforcement community is taking aggressive steps to develop an interagency anti-drug-money laundering financial intelligence center, to serve as a drug-money laundering intelligence and operations center. As stated in the just-released 2004 National Drug Control Strategy, some $6.3 million has been approved to support and expand the OCDETF Drug Fusion Center. We at Treasury are working with the Departments of Justice and Homeland Security to ensure that there is a robust financial component at the OCDETF Drug Fusion Center to develop the highest value financial targets, identify and disseminate information about developing trends and patterns, and help coordinate financial attacks on the systems, geographic locations, and individuals by and through which drug proceeds are moved and laundered.

HIFCAs have been created specifically to identify and address money laundering in designated geographical areas (currently in New York/New Jersey; San Juan, Puerto Rico; Los Angeles; San Francisco; Chicago; Miami; and a Bulk Cash HIFCA along the Southwest Border). HIFCA Task Forces bring together Federal money laundering and other financial crime investigation expertise, utilizing all FinCEN, Drug Enforcement Agency (DEA) Special Operations Division, and DHS/ICE Money Laundering Coordination Center financial databases. For example, the New York/New Jersey HIFCA Task Force reports that, during FY 2001/2002, it opened 747 investigations leading to 344 arrests, 155 indictments, 160 convictions, and 805 seizures totaling more than $75 million.

### IV. NEXT STEPS

Despite the considerable progress that we have achieved, largely through enhanced inter-agency and international communication, cooperation and collaboration, several ongoing and important challenges remain in the campaign against terrorist financing and money laundering. We have identified a number of priorities to advance our long-term and short-term goals as described above and in the *2003 Strategy*.

We are continuing to develop international standards where necessary to advance our long term strategy of enhancing the transparency and accountability of financial systems and mechanisms prone to terrorist and criminal abuse. We are currently engaging the FATF and the Asia-Pacific Group (APG), a FATF-style regional body, to complete a study of mandatory, cross-border, cash reporting requirements as an effective tool in identifying and interdicting cash couriers carrying illicit funds. We anticipate that the results of this study will facilitate countries' adoption of reporting requirements and the sharing of information obtained through such reports.

In addition to these standard-setting priorities, we are facilitating compliance with existing international standards through terrorist financing technical assistance to priority countries, both bilaterally and through a coordinated international effort. Internationally, we anticipate completing technical needs assessments of priority countries through the FATF within the next few months. Thereafter, we will work with the State Department in coordinating the delivery of appropriate assistance to these countries through the CTAG. Bilaterally, we will continue to work with the State Department and the interagency community to ensure that those countries targeted for bilateral assistance receive such assistance as planned.

We are also launching a number of initiatives to reduce the threat of terrorist financing through non-profit organizations (NPOs). For example, the Treasury Department is planning an initial outreach event with the NPO sector to discuss issues raised by Treasury's *Anti-Terrorist Financing Guidelines* for charities. Through the FATF Terrorist Financing Working Group, we are encouraging jurisdictions to re-

48

view the adequacy of existing authorities and oversight mechanisms in protecting the NPO sector from terrorist abuse. We have formed a Treasury Working Group on Charities and Terrorist Financing to ensure effective communication, cooperation and collaboration among Treasury's various components assisting in this effort. We are presently engaging the inter-agency community to enlist the support of other agencies where necessary and to provide support where appropriate to attack and reduce the threat of terrorist financing through charities operating in the U.S.

We are also engaging the Middle East, as a priority, in promoting greater transparency and understanding of regional financial systems and regional money laundering and terrorist financing threats. We are working with the World Bank, other supporting organizations and states, and the countries in the region to facilitate the development of a FATF-style regional body (FSRB) for the Middle East and North Africa. We have already participated in a number of progressive meetings with these parties and anticipate the launch of this organization by the end of 2004. In addition, we are participating in a number of ongoing training and outreach seminars with government officials in the region on anti-money laundering and counter-terrorist financing issues, including in the United Arab Emirates and in Lebanon. We are also exploring the continued study of terrorist financing and drug trafficking connections with countries in the region, following up on a joint presentation on these issues by the USG and the Kingdom of Saudi Arabia in a terrorist financing seminar hosted by the FATF last week.

Finally, we are enhancing the transparency of financial systems by working directly with the private sector whenever possible. In addition to our direct engagement with the charities sector as described above, we are working with the international banking sector to facilitate bank-to-bank training and assistance in understanding and complying with enhanced anti-money laundering and counter-terrorist financing obligations.

To exploit these existing and developing transparencies, we must also advance our short-term strategy by enhancing our ability to identify, disrupt and dismantle terrorist and criminal organizations. We are pursuing a number of priorities to advance these interests, domestically and internationally.

In addition to supporting the targeting strategies against narco-traffickers through the OCDETF Drug Fusion Center, Treasury will continue to develop terrorist financing targeting strategies for priority regions and terrorist organizations. We will continue applying and executing these strategies through our designation authorities under Executive Order 13224 and Section 311, acting together with the international community whenever possible, but acting unilaterally whenever necessary and appropriate to protect our financial system from identifiable high risk targets. We are particularly focused on identifying opportunities to apply Section 311 against those foreign banks that either facilitate money laundering or ignore their responsibilities as gatekeepers to the international financial system. Such banks will learn to comply with international standards or they will be cut off from the U.S. financial system.

Internationally, we are focusing our efforts on achieving greater European cooperation and support for our terrorist financing designations. We are capitalizing on our progress in improving and clarifying international standards for freezing terrorist-related assets under FATF Special Recommendation III by: (i) pursuing bilateral and multilateral efforts to reform the EU Clearinghouse process, and (ii) encouraging national implementation of UN member state obligations under United Nations' Security Council Resolution 1373.

These long-term and short-term initiatives are complementary and address the priority challenges that we face in the campaign against terrorist financing and money laundering. Moreover, these initiatives capitalize on the progress we have achieved to date, and on the relationships that we have forged in the inter-agency and international communities, as well as in the private sector, over the course of our sustained campaign.

The *2003 Strategy*, published last fall, provides a framework for the USG's ongoing commitment to attack money laundering and terrorist financing on all fronts. As this Caucus is aware, the 2003 Strategy was the last of the five Congressionally-mandated strategies. We have and will continue our efforts with this Caucus and the Congress to evaluate the need for future Congressionally-mandated strategies and the contours of such a mandate.

I will be happy to answer any questions you may have.

Senator COLEMAN. Thank you, Secretary Zarate.
Administrator Tandy.