# Exhibit 6

# TREASURY'S WAR



## The Unleashing of a New Era of Financial Warfare

### JUAN C. ZARATE



PublicAffairs  *New York*

3

# Nose Under the Tent

When our Treasury delegation landed in Jeddah on Air Force Two in the spring of 2002, the first thing we saw was the special airport terminal that the Saudi monarchy had built especially for the Hajj, the annual Muslim pilgrimage to Mecca. The terminal was enormous—a bright white edifice that looked like a large tent in the desert. Lines of buses for as far as the eye could see take the pilgrims from the airport to hotels and holy sites. The Saudi government had built a logistical marvel of transport and accommodation to handle the inflow and outflow of humanity's largest annual migration.

Led by Secretary O'Neill, our small, senior-level Treasury delegation had come to the Kingdom of Saudi Arabia to engage the Saudi monarchy in an uncomfortable discussion about terrorist financing. Crown Prince Abdullah, the heir apparent to the ailing King Fahd, along with other senior members of the Saudi royal family and several Saudi officials, would receive us in this modern city, the country's second largest after its capital, Riyadh. This would be the first time the Saudis would host the secretary of the treasury since 9/11. Despite decades as close allies, the United States and Saudi Arabia found themselves at a critical juncture. The role of the fifteen Saudi hijackers in the attacks had cast a pall over the relationship between the two countries. These tensions only deepened as Treasury officials began to delve into the financing of Al Qaeda, as part of that

funding had been coming from Saudi Arabia and the Arabian Gulf for years.

To be clear, there was no suggestion of state sponsorship of Al Qaeda. The Saudis had long ago disavowed bin Laden, who considered the Saudi monarchy to be an apostate, corrupt regime worth targeting and toppling. The problem was that the Saudis had built an infrastructure of donors, charities, and sponsors in the 1980s to help the Afghan mujahideen and foreign Islamic fighters in their opposition to the Soviet invasion of Afghanistan. That infrastructure still existed, and violent jihadist causes took full advantage of it. Fighters battling the Russians in Chechnya, the Israelis in the Palestinian territories, the Americans in Afghanistan, and apostate or infidel regimes in Asia reaped the rewards of this system.

We were there to provide a much-needed reality check to the highest levels of the Saudi monarchy about the need to shut these kinds of charities down. It would not be easy.

Saudi society was not predisposed to look favorably on such an initiative. Within the Saudi populace, there still remained some denial as to the perpetrators and motivations behind 9/11. There was some agreement that, like the 1979 seizing of the sacred mosque in Mecca by violent radical Muslims, the attacks had been an anomalous act by religious fanatics, to be condemned and prevented from happening again. Yet for the Saudis, the sins of these actors were not a reason to implicate an entire society or the monarchy. Some saw 9/11 as an isolated act of terror, not symptomatic of something more dangerous emerging from within their society or even from the broader Sunni extremist movement.

But there was more at play than most were willing to admit. The issue of financial support for Al Qaeda pointed to a deeper question about how money from Saudi Arabia was being used around the world. The Saudis had been committed for decades to the export of an extreme form of Sunni Wahhabi Islam. When the House of Saud established its rule over the Arabian Peninsula in 1932, the royal family made a pact with the ultraconservative clerical establishment

to allow the Saudi regime to maintain power and legitimacy. The kingdom's leadership and royal family derived their ultimate legitimacy from their role as the "Keeper of the Two Holy Mosques." This meant that the king was not only the head of state but also the religious guardian of the first and second holiest sites in Islam, the cities of Mecca and Medina. They required consistent validation from the Sunni clerical establishment in Saudi Arabia, which espoused the Wahhabi, Salafi ideology and embedded its strictures into Saudi culture. The Saudi government was thus wedded to the promotion of this theology and used its money around the world to establish Islamic centers and mosques and to export Islamic scholars who reinforced this extreme interpretation of Islam.

The Saudis had built an extensive global network for spreading a certain brand of religious thought, but in so doing they had provided a platform for Al Qaeda and its like-minded adherents, who benefited greatly from this network both financially and in terms of growth. The Wahhabi theology and Saudi proselytization around the world provided an ideological baseline for Al Qaeda and the recruitment of like-minded believers. Al Qaeda's leaders advocated the practice of declaring others as apostates (*takfir*) and the right to use violence against them and to defend Muslims against perceived assaults. Many of the Wahhabi institutions funded out of Saudi Arabia served as way stations for Al Qaeda operatives and fundraising. Distinguishing between some of the international Wahhabi organizations and terrorist support networks was nearly impossible, especially when support for Al Qaeda and support for spreading Wahhabi beliefs seemed to blend together so seamlessly. This was true in the work of some of the branches of Saudi-based institutions, such as the International Islamic Relief Organization (IIRO). For us, cutting off flows of funds to Al Qaeda thus meant much more than just targeting a few select individuals or institutions. It was ultimately about challenging a fundamental element of Saudi policy by constricting how the Saudis and their institutions funded activities abroad.

This was a critical aspect of our work. Al Qaeda's financial and logistical base consisted of a network of radicalized Islamic fundamentalists and institutions around the world whose roots could be traced to the days of the Afghan mujahideen. This meant that Al Qaeda could take advantage of certain madrassas (educational institutions), Islamic cultural centers, and Islamic charities around the world both to promote its militant ideology and to raise, hide, and move funds. Such funds were intended, at least partially, for the maintenance of the terrorist network and allegiances as well as for operations.[1] The money chain traveled from sympathizers in the Arabian Gulf and around the world to hot spots such as Afghanistan and Pakistan where Al Qaeda was recruiting and operating.

The flow of money was constant. Al Qaeda and other violent extremists used the Islamic obligation of *zakhat* (charitable giving) and their interpretation of obligatory jihad to generate financing through charity. They used the logistics, networks, and funding of charities to support their operations and build allegiances. This was a well-established strategy and structure. For certain groups, such as Hamas and Hezbollah, charitable operations—and their Dawa (fundraising) committees—were a key function that allowed them to provide services to people in need while building allegiances necessary for recruitment outside the confines of the state or official channels. They fiendishly used the infrastructure and nature of charity to enlist devotees and move operatives around the world under a benevolent cloak. It was a devious and ingenious way of raising and moving money—especially with chapters of charities located around the world. Charities might be providing services to widows and orphans, but their funding and recruitment would often send suicide bombers into buses and cafés.

Despite our attempts to be surgical in our financial strikes, sometimes our actions and tools proved blunt and imprecise against charities. There was a legitimate concern that the effects of US designations, raids, and asset freezes on charities were creating unintended consequences and an impression that US policy was

intentionally trying to extinguish Islamic charity. Many worried that the aggressive actions we had taken were chilling good-faith giving and philanthropy, a hallmark of American culture.[2] Al Qaeda leaders latched onto this theme, with Ayman al-Zawahiri—then bin Laden's deputy—highlighting the "American war on Islamic charity" in the wake of the devastating Pakistani earthquake in 2005.[3]

There was no doubt that charity now required new layers of fact finding and diligence—especially if organizations were doing business or sponsoring projects in places where terrorist organizations were known to run charitable services. They intermingled their activities and funds, and we had no easy way to carve their organizations or activities neatly between the legitimate and the illegitimate, or to distinguish consistently between funds going to Al Qaeda or other terrorist groups and funds going to charitable causes. We were careful with our designations and began trying to encourage "charitable backfill" in communities around the world where our targeted sanctions and enforcement efforts were shutting down critical services and legitimate funding flows.

Al Qaeda and groups like the Taliban were also clever to leverage the Hajj as cover to gather donations and move cash donations out of Saudi Arabia back to Afghanistan, Pakistan, and the rest of the world. Though the Saudi authorities would do what they could to monitor the movement of people in and out of the country for the world's largest annual migration, groups like the Taliban and Hamas would send special representatives to meet with donors and collect money, jewelry, and other financial commitments from fellow Muslims from around the world—including wealthy donors. Despite our protestations, the Saudis had been unwilling to deny access to Mecca to pilgrims who were also potential fundraisers. Instead, they opted for monitoring, but even that proved difficult as a flood of pilgrims flowed in and out of the airport at Jeddah.

The American approach was far more visible. We were using an aggressive notification method to stop and deter terrorist financing, publicly designating individuals and entities as terrorist financiers as

our cudgel. Not only did this freeze millions of dollars around the world, it made the organizations we designated radioactive to others doing business. Our flurry of designations was intended to clog Al Qaeda's financial system and to send a clear deterrent message to those who would support or finance terrorism that they could be next.

When it came to companies, organizations, and individuals abroad, our work would have more impact if the host government took actions along with us to freeze assets and shut down suspect operations. This is why we still needed Saudi help. What we were asking the Saudis to do would be difficult, considering the internal dynamics of their country. The House of Saud ruled because the leadership was able to balance the power centers within the kingdom and to reassert legitimacy with each decision made. To avoid upsetting harmony among tribes and power brokers, the Saudis preferred to isolate rogue individuals quietly or to co-opt or force them to submit to the monarchy's wishes. The Saudi approach was less about punishment and more about channeling internal support for extremist causes into support for the government's actions. Part of this strategy entailed building opposition to Al Qaeda slowly but surely. This approach took time—and it was not what Washington was looking for from the Saudis in the aftermath of 9/11. We wanted quick, visible action.

Our specific goal in this meeting was to gain Saudi approval to shut down its largest Islamic charity, the Al Haramain Foundation. Al Haramain had established branches around the world, including in the United States, to raise money for Muslim causes. Despite supporting some legitimate charitable causes, however, Al Haramain was also a platform for Al Qaeda to raise and move money into places like Bosnia and Indonesia. It seemed that the organization's head, Sheikh Aqeel Abdulaziz al-Aqil, was well aware that this was going on, and quite willing to let it happen.

We wanted to close down all of Al Haramain—its headquarters and all its branches (including in Oregon)—but knew that we

would need to take this one step at a time. This was not about targeting Islamic charity. It was about shutting down conduits that had been used by terrorists and could be used in the future by Al Qaeda. We needed to be sensitive to the perception that we were simply trying to attack Islamic charities as we targeted groups that were funding terrorist groups.

To get this done, we hoped to build a case against the entire Al Haramain organization. We would focus on the most problematic branches and work toward closing down the entire network. This would not happen overnight, but we needed to take a first step. It was imperative for us to get the Saudis on board with us to make a public announcement, and we hoped they would commit to shutting down all suspected conduits and donors for Al Qaeda. From Washington and with the help of our embassy in Riyadh, we had prescripted what could be done, but the Saudi decision ultimately had to come from the top.

The Saudis received us warmly. Red carpets led into the main VIP terminal. We raced after Secretary O'Neill, who was always quick off the plane and first to the motorcade or meeting. In the terminal, we met our ambassador, Robert Jordan, and the deputy chief of mission, Margaret Scobey, and discussed where things stood with the Saudis before heading in a long motorcade to the Conference Palace Hotel. We would prepare for our planned site visits and await word of our meetings with Crown Prince Abdullah.

Once we received word that he was ready for us, we got into the motorcade and were escorted into the royal palace in Jeddah. I did not know what to expect, but I was eager to see whether there would be agreement on a joint designation of Saudi Arabia's biggest charity. More importantly, I wanted to see whether the Saudi leadership was taking the problem of terrorist financing seriously.

We entered the grounds and were escorted by the crown prince's royal guard into a waiting room in the palace near his office. We waited briefly amid lush couches as the protocol officers made sure they knew who would be attending the meeting and how we would

introduce ourselves. John Taylor, Michele Davis (the assistant secretary for public affairs), Bill Murden, and I shuffled to stay close to the secretary for fear of being left outside the bubble and missing the meeting altogether, which had been known to happen in the past.

Secretary O'Neill led the way along with our ambassador into the large, opulent office, introducing all of us as we greeted Crown Prince Abdullah. The crown prince appeared like a figure out of biblical times who had walked into the ornate and relatively modern office straight out of the desert. His stark black goatee and flowing royal thobe and cloak, accented in gold and black lining, gave shape to his large frame. His sandals reminded me of the desert origins of the Saudi monarchy. The green Saudi flag framed his desk, with couches on each side of the office for the guests and Saudi officials who would join the meeting. His deep, baritone voice welcomed us and filled the large office with his authority. King Fahd was very ill, and it was no secret that the crown prince was running the kingdom. Crown Prince Abdullah would become the king of Saudi Arabia in 2005.

Directly next to the crown prince was his adviser and translator, Adel al-Jubeir, who would later become Saudi Arabia's ambassador to the United States. Al-Jubeir, a thin, cerebral man who spoke perfect English, would prove critical in this period as a trusted figure on all sides on these issues, acting as a shadow ambassador in the United States even though he was not a royal. Educated in the United States, he also handled Saudi Arabia's public relations campaign in the West, while long-standing Saudi ambassador Prince Bandar weathered criticisms.

The office was covered with beautiful oriental rugs. Sitting on the other side of the room were key Saudi government ministers, including the interior minister, Prince Nayef bin Abdulaziz al-Saud; the Saudi finance minister; and the central bank governor. This was the first time an American treasury secretary had met with the Saudi leadership to talk almost exclusively about terrorist financing.

Crown Prince Abdullah and Secretary O'Neill sat next to each other, and we sat along the couch and seats next to Secretary O'Neill. Saudi hospitality, with multiple rounds of coffee, tea, and juice, would follow in due course.

After some basic pleasantries and a discussion about the world economy, the real discussion began. O'Neill and the crown prince talked about the importance of attacking the financial support for Al Qaeda and terrorism—with O'Neill emphasizing the need to take aggressive action against those we suspected of assisting Al Qaeda. The deep sting of 9/11 was still with us, and there was a desire to do everything possible to prevent another attack and to send signals throughout the world that financial support for Al Qaeda would be met with economic isolation and ruin. Having clarity on Saudi Arabia's position was critical. The crown prince agreed but underscored the need for any steps taken to be in the right sequence. O'Neill and Crown Prince Abdullah then began to discuss the problems with Al Haramain, with O'Neill suggesting that we take action together against some of its branches and investigate its leadership—all with the aim of shutting down its worldwide operations.

The proposal itself had been prescribed behind the scenes with the Saudi government. We already knew that the Saudis were amenable to taking the step we were proposing, with the prospect that this could lead to tougher and tougher actions on their part over time. Still, the Saudis also wanted to modulate their actions, being careful about how aggressively and how quickly they confronted influential elements within Saudi society. We would not be shutting down the entire charity right away, but would take the first step in this direction. Furthermore, it behooved both countries to demonstrate cooperation on this matter. We wanted to send a clear signal that the United States and Saudi Arabia were cooperating closely on countering terrorist financing.

The presentation proved persuasive. Crown Prince Abdullah agreed to take the action we were requesting—as the first of many to follow. He seemed committed to cutting off funding for Al Qaeda.

Furthermore, the Saudis understood that the perception that they allowed funding to occur was not good for their reputation globally and in the United States—and was in fact dangerous to the survival of their regime. The resulting joint designation of the Al Haramain branches would be the first joint designation with any country. This was a way of signaling cooperation publicly and diplomatically, undercutting any attempt by Al Qaeda to drive a wedge between two of its enemies and catalyzing more action against Al Qaeda's support network in Saudi Arabia.

On March 11, 2002, the United States and Saudi Arabia made their first joint submission to the United Nations and designated the Bosnian and Somalia branches of the Al Haramain Foundation.[4] The United States and Saudi Arabia would later designate other branches of the charity and launch an investigation of Sheikh Aqeel Abdulaziz al-Aqil, the head of the organization. As it turned out, thanks to a strategic mistake by Al Qaeda, Saudi Arabia would soon be aiding our campaign even more aggressively than we could have hoped.

The catalyst was a new act of terror on Saudi soil. In May 2003, Al Qaeda cells in the kingdom executed deadly attacks on housing compounds in Riyadh, killing dozens. The attackers used suicide car bombs to target housing and apartment complexes of foreign workers, including Americans.

The Saudis responded ferociously. Counterterrorism units in the Mubahith—the internal security and intelligence service—published most-wanted lists for Al Qaeda operatives and supporters in the kingdom and proceeded to painstakingly track them down and kill them. New wanted lists emerged every few weeks. At times, it was difficult to keep up with the Saudis' extermination of the Al Qaeda operatives. By picking a fight with the Saudis, Al Qaeda had inadvertently given the Saudi monarchy the leeway it needed to crack down—not only militarily, but also financially. By 2004, our

ultimate request had been granted, and the Saudis would shut down all of Al Haramain, ultimately prosecuting its director for financial irregularities.

The leader of the Saudi effort to break Al Qaeda's back in the kingdom was the ruthless but mild-mannered Prince Muhammad bin Nayef, the deputy interior minister and son of the Saudi interior minister, Prince Nayef bin Abdulaziz al-Saud. "MbN," as the deputy minister was called within the US government, managed the kingdom's counterterrorism efforts, and he was trusted by both the crown prince and the United States to protect the kingdom and pursue its counterterrorism policies. He led the Mubahith's investigations, raids, and crackdowns on Al Qaeda operatives—whom we called the "Vampires" because of their middle-of-the-night work hours and their ability to strike after dark.

MbN developed a smart and stealthy strategy that was lethal in its execution. His approach was to make cases and examples of those supporting Al Qaeda within the Saudi court system—with the clerical establishment and judiciary condemning the acts—while leveraging the shame and constrictions embedded in Saudi society to punish those willing to support the terrorist group. He would argue for taking the long view, where the bad guys would be killed, deterred, or reconciled. MbN would establish the now famous and well-studied Saudi rehabilitation program for recruits into Al Qaeda, creating a system of theological and social deprogramming and reintegration. Such reintegration would include incentives such as homes and wives, creating a collective familial and tribal responsibility for the extremists who were allowed to return to Saudi society. Some of those released from the program would go on to kill again, but the program has nevertheless been seen as one model for addressing the ideological underpinnings and allure of Al Qaeda's message.

The importance of MbN's role in breaking the back of Al Qaeda was not well known. MbN kept a low profile, and he preferred not to receive public recognition, though he was named minister of the

interior in 2012. He was focused on his mission and on protecting his men and the Saudi people. But Al Qaeda knew how important he was. On August 8, 2009, an Al Qaeda operative who claimed to be willing to reconcile and meet with MbN instead attempted to assassinate him. Though the man was searched by Saudi security, they missed the explosive that was contained in his rear end. The operative exploded the bomb, and MbN was wounded but not killed. Al Qaeda in the Arabian Peninsula (AQAP)—the Al Qaeda affiliate in Yemen made up largely of Saudi and Yemeni operatives—claimed responsibility for the attempt. Just a few months later, AQAP would send an underwear bomber on an airliner to Detroit to try to hit the United States.

This personal attack only strengthened the kingdom's resolve. In meeting after meeting thereafter, there was never any wavering on Crown Prince Abdullah's part about tackling terrorist financing, even after 2005 when he became king. In time, he came to challenge us to do more to go after the nexus between drug trafficking and terrorism. In September 2003, when Secretary O'Neill's successor, Secretary John Snow, visited with Crown Prince Abdullah, they talked about the need to take additional steps together against terrorist financing. When Secretary Snow told the crown prince that our Treasury delegation was traveling to Afghanistan, the Saudi leader stopped Snow and told him he had to be especially careful. He leaned into the secretary and said, "The terrorists are most afraid of you because you go after their money."

Despite this high-level commitment, countering terrorist financing would remain a constant irritant for both countries. The fundamental tension and issues persisted. This was not just about institutions and an infrastructure of financing for extremist causes. There were individuals in the Arabian Gulf who were committed to supporting Al Qaeda. We sought to find the "deep-pocket donors" who were supplying Al Qaeda and its allies with necessary and consistent funding, but Al Qaeda treated the identities of its most important financial supporters as prized possessions, secrets held

within the inner sanctum where its other sacred secrets were contained. This was information not widely known even within the Al Qaeda network itself, and it was not easily uncovered. As with the possible location of Osama bin Laden and Ayman al-Zawahiri (known within the US government as "high value targets," specifically, "HVTs 1 and 2"), high-level detainees were not providing names. Meanwhile, intelligence and arrests were not revealing the core investors in terror, either.

In Sarajevo in 2002, security services came across an interesting and potentially explosive find that seemed to be the "Golden Fleece" of Al Qaeda financing we had long sought. Bosnia had been the site of Islamic extremist militant activity in the 1990s, at the height of the war in the Balkans—with groups like Al Qaeda issuing a clarion call for Muslim men to join the fight to defend fellow Muslims. The Balkans campaign became another jihadi battlefield—like Chechnya, Kashmir, and Somalia—animating the movement after the Soviet withdrawal from Afghanistan and the initiation of Taliban control over much of the country.

While raiding a terrorist safe house, Bosnian services collected incriminating documents and computer files about the Balkan-based fighters and their support network. Using this information, the Treasury designated the Saudi-based Benevolence International Foundation (BIF) as a terrorist financier, citing the handwritten correspondence between Osama bin Laden and the BIF director, authorizing the latter to act on behalf of the terrorist mastermind, as evidence.[5] The FBI would later raid BIF offices in Chicago, and its leader would be prosecuted for financial crimes. In the trove discovered in Bosnia, authorities found a list of twenty-three names—some of them prominent Arab businessmen—described as primary donors to Al Qaeda.

Heretofore, there had been little intelligence about the big names and deep pockets behind the Al Qaeda movement. There were certainly suspicions about the families and wealthy businessmen in the Middle East—especially in the Persian Gulf countries—who might

be behind the day-to-day budget that Al Qaeda needed to pay for its members, their families, and recruitment and training. This list was the first concrete set of subjects. Prominent and wealthy names long familiar to law enforcement appeared on the list. Not surprisingly, many of these men were prominent Saudis—such as Suleiman al-Rajhi and Khalid bin Mahfouz. Most of those named were involved in charity organizations as founders or board members in addition to their formal employment. The list, which became known as the "Golden Chain," was later reported to be verified as authentic by former Al Qaeda member Jamal al-Fadl.[6]

As promising as the list seemed, though, it raised several crucial questions. Were those on the Golden Chain list really the select group of long-standing deep-pocket donors we were looking for? Had these investors been the main support for the global extremist movement? Was it current, post-9/11, Al Qaeda support, or was this just a historical list of those who had been supportive in the past? Or perhaps, even more vaguely, was this merely a wish list for jihadis holed up in Bosnia who were looking for funding from a supposed group of sympathetic wealthy actors? Importantly, could those on the list provide insights into the terrorist support, or even tracks to find HVTs 1 and 2? Although we did not yet know the answers to all the questions, the list did provide concrete leads. And it sparked an important debate over past and potential current support from wealthy Saudis to Al Qaeda and like-minded terrorist groups.

The list underscored the nature of terrorist financing for the broader Sunni violent extremist movement, which was reliant over time on key donors and donations. The donors to Al Qaeda were often not just passive contributors, but demanding investors in a cause. Over time, the donor class would grow increasingly demanding of Al Qaeda, asking to hear directly from bin Laden and requiring that their funds be leveraged specifically to launch significant attacks.

Al Qaeda obliged with recorded messages from Osama bin Laden reassuring supporters of the centrality and vitality of Al Qaeda's cause. Radical ideologues reminded followers of their obligation to

provide financial support to their jihadi brethren. Their plots would continue to materialize, but Al Qaeda would find it increasingly difficult to mount successful attacks against the West—in large part because it became difficult to raise, control, and move money.

The question of whether deep-pocket donors as a class or segment of the terrorist network actually existed would persist for years. We had designated a few well-known, suspected financiers of Al Qaeda and its causes, such as Yasin al-Qadi on October 12, 2001. Qadi was a Saudi businessman who was considered a key financier for Al Qaeda as well as Hamas. He ran the Muwafaq Foundation, which the Treasury exposed as a conduit for Al Qaeda funding. Qadi was also a principal funder for the Al Barakaat Foundation, an Islamic charity believed to support Al Qaeda operations around the world prior to 9/11, and had served as a conduit for Al Qaeda banking in the Sudan, Saudi Arabia, and Afghanistan. Qadi's business enterprises and investments extended from the Middle East into Turkey and Europe, including Albania.[7]

Once Qadi was designated, his assets were frozen throughout Europe, and this complicated his business transactions around the world. It became difficult for Qadi to move money through banks, and investors and partners became wary about doing business with him. The spotlight had been put on him, and he was required to demonstrate that he was not funding bin Laden. Qadi quickly instructed his lawyers to challenge the designations in courts in London and in the European Court of Justice.[8]

He enlisted the support of friends and supporters, including Turkish Prime Minister Recep Tayyip Erdogan, who proclaimed in 2007 that he would not abide by the UN mandate to freeze Qadi's assets. His efforts to delist himself from the UN sanctions list and from the European list succeeded, with his delisting taking effect on October 21, 2012. The United Kingdom and the European Union proceeded to delist him as well. Qadi had succeeded in pleading his case. Nevertheless, the designation and the resulting international scrutiny had put a spotlight on those who had supported bin Laden

prior to 9/11 and forced those designated to end any such support.

We designated others as key financiers, such as bin Laden's brother-in-law Mohammed Jamal Khalifa. He would later be killed in Mauritania under suspicious circumstances. Even so, skeptics remained, especially in the intelligence community, because we had found little hard evidence of a terrorist donor class. Detainees were not revealing names, and our intelligence collection efforts and work with liaison and law-enforcement partners had not revealed such information. The Golden Chain list was a helpful marker, but it was not seen as an authentic list of current Al Qaeda financiers. One's appearance on the list could not alone justify severe actions against someone. In truth, we had little actionable information about those continuing to bankroll the movement. This was enormously frustrating and problematic.

Still, we would learn more about the financial networks and donors over time. With the growing success of the Saudi crackdowns on terrorist networks—including arrests of terrorist financiers—and mounting efforts to stop terrorist financing, funding coming from Qatar and Kuwait soon became the greater issue.

In 2006, we would designate three deep-pocket donors from Kuwait for their role in supporting terrorism. In 2007, the Saudis would wrap up a network of financiers who were passing along mobile messages from Ayman al-Zawahiri exhorting supporters to donate to the cause. In June 2008, we named additional Kuwaiti financiers tied to groups supporting Al Qaeda, including a charity called the Revival of the Islamic Heritage Society (RIHS). RIHS's Peshawar office in Pakistan was a charity, but it was also a front for moving funding directly from Kuwait to Al Qaeda in western Pakistan. In 2011, the Treasury Department would publicly designate the most significant Al Qaeda terrorist financing network that had been revealed in the past five years. The network relied on several donors in Kuwait and Qatar—Ezedin Abdel Aziz Khalil, Atiyah Abd al-Rahman, Umid Muhammadi, Salim Hasan Khalifa Rashid al-Kuwari, Abdallah Ghanim Mafuz Muslim al-Khawar, and 'Ali Hasan 'Ali al-'Ajmi. These donors were providing funding directly to the Al Qaeda core via a financial facilitation network in Iran. In designating this Al Qaeda financial network, the Treasury announced, "This network serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East and South Asia."[9] In October 2012, the Treasury would add another name to the list of those who formed part of this Iran-based financial network.

We knew we were going to have a generational struggle and a problem on our hands for years with supporters of terrorist causes in the Arabian Gulf. The dialogue with the Saudis, Kuwaitis, and Qataris would remain tense, with the Treasury Department serving as the gadfly. A series of Treasury officials would publicly articulate our frustration with slow progress in shutting down and regulating suspect charities, holding terrorist financiers accountable, and addressing the underlying problem of Wahhabi proselytization. In 2003, David Aufhauser, Treasury's general counsel, testified before the Senate, calling Saudi Arabia the "epicenter of terrorist financing." These episodes were deeply embarrassing to the Saudis and did not match up with their sense of friendship with the United States and their broader cooperation with the United States' counterterrorism efforts.

The Saudis would often push back, asking for the evidence to justify our charges. Sometimes we could not provide the information they requested because of the sources and methods we had used. Other times, we just did not have enough information to satisfy the Saudis—especially when taking controversial actions such as freezing assets or arresting a prominent individual. The Saudis frequently complained that they were providing information to the United States and could not understand why the Treasury Department was complaining—but the problem in some cases was that they were giving the information to the CIA, and the CIA was not sharing the information with the Treasury Department.

To manage this important counterterrorism relationship across the board, the White House assigned Frances M. Fragos Townsend,

who was then the deputy national security adviser for combating terrorism, to the job of referee. Townsend later served as homeland security adviser to President Bush from 2004 to 2007. It would be left to her to smooth ruffled feathers when Treasury officials criticized the Saudis, and it would be her job to ensure that there was information sharing within the US government—especially between Treasury and CIA. Townsend would take interagency delegations with her to Saudi Arabia to present a united front. On several occasions, I was a part of these delegations. By 2007, Treasury had assigned a full-time attaché to sit in Riyadh to interact with the Saudi government. All of these measures helped to improve the level of communication between Treasury and both the Saudis and the CIA.

The pressure on the Saudis was real—and not just from the Treasury Department. There was public and congressional scrutiny over their actions, public heat from Treasury designations and statements, and FBI investigations over Saudi embassy funding that found its way to some of the 9/11 hijackers.

In late 2003, Prince Bandar, the longtime Saudi ambassador to the United States and dean of the diplomatic corps, paid a visit to the Treasury Department to meet with Secretary Snow about the state of US-Saudi relations. Bandar could get a meeting with the president whenever he needed, and he was always considered a critical figure in the relationship between the United States and Saudi Arabia, though he took a less and less public role in the United States after 9/11. Bandar considered himself a real friend to the United States, having trained to fly military jets with American pilots. He had served as the key interlocutor in the early 1980s to ensure funding to equip the Afghan mujahideen against the Soviets.

Secretary Snow received Prince Bandar in his small conference room. It was not clear exactly what Bandar wanted to discuss, so Snow included a small group of us to listen and assist if necessary. From the moment Bandar entered the small conference room, he filled the space with his larger-than-life presence and big personality. As always, Bandar was friendly and garrulous, but he had come

with a specific problem in mind. Bandar was disturbed by the investigations into the embassy banking practices led by the FBI—they were proving embarrassing to him and the Saudis. Much public attention had been given to the cash payments from the embassy to Saudi citizens out of its account at Riggs Bank. These had included some payments to Khalid al-Mihdhar and Nawaf al-Hazmi, two of the 9/11 hijackers. Although there was no evidence that the Saudi government had tried to assist the 9/11 hijackers, the payments looked very bad. The FBI was investigating to get to the bottom of suspicions that the embassy had been subsidizing the hijackers' stay in the United States.

Bandar sat down and spoke passionately for over an hour. He laid out the history of his relationship with the United States and the role he had played as a trusted interlocutor from president to president. He spoke of the 1980s and how he had brokered payments to the Pakistani government and ensured that weapons and supplies were delivered to Afghan mujahideen who were fighting the Soviets. He talked of the checks that were written and cut to fund weapons and allegiance using the very same embassy bank accounts. Bandar saw himself as America's closest friend and most critical Cold Warrior. Why was he now under scrutiny?

This was a new period, where the old rules no longer applied. What was clear was that Bandar was making a plea for a return to a time when the allies trusted each other implicitly, and when money could flow easily without questions to allied causes and people. The conversation he had with us was more about a longing for a different period than a realistic argument for any change in policy. September 11 had changed this relationship and the nature of the world forever.

There was now suspicion between the longtime allies. Those whom we had supported in Afghanistan had now turned their guns on us, and money had to be monitored. Suspicious and blind transactions now had to be questioned. We listened respectfully, and the conversation ended without any conclusion or course to follow. The

conversation left a deep impression on me as well as on the others who were present that day. Secretary Snow recalls this meeting as one of the most interesting of his tenure. Prince Bandar was a good friend to the United States, and he would continue to play an important role in the relationship between our two countries. Importantly, Bandar has reemerged in 2012 as the Saudi external intelligence chief—helping to orchestrate Saudi Arabia's efforts to counter Iran in the region and to support Syrian rebels in their fight against President Bashar al-Assad. Saudi funding and Prince Bandar are again in the middle of a critical international security crisis—one vital to the United States.

The private sector did not know how to address the changing environment in Saudi Arabia. There were suspect individuals with historical ties to bin Laden or groups associated with Al Qaeda in the Saudi kingdom. There seemed to be tainted money flows coming out of Saudi Arabia. And there were actions by the state that could not be fully reconciled with the requirements that states now had after 9/11 to ensure that their banks were not being misused by terrorist groups and financiers.

In early 2002, the CEO and representatives from Citibank paid a visit to the Treasury Department to talk about Saudi Arabia. Secretary O'Neill hosted the large group, to include Citi's chief lawyers, in the main conference room. The Citibank officials wanted to know whether they should stop doing business in Saudi Arabia altogether due to the risk of terrorist financing.

At issue was what they referred to as "Account 98." This was a series of unified charitable bank accounts at major financial institutions in Saudi Arabia. Created in October 2000 by order of the Saudi royal family, Account 98 held funds dedicated to "humanitarian" efforts in Palestine—including both financial and material aid—during the Al Quds Intifada. The initiative was managed by the Saudi Committee for the Support of the Intifada Al Quds (later renamed the Saudi Committee for the Relief of the Palestinian People), run by Interior Minister Prince Nayef bin Abdulaziz al-Saud. It also received support from Prince Salman bin Abdulaziz, governor of Riyadh.[10] The account was similar to others dedicated to needy Muslims in areas such as Bosnia and Chechnya.[11]

According to a 2001 official Saudi report published in the United States by the Middle East Media Research Institute, funds were directed through the Palestinian Authority under the close supervision of several top-ranking Saudi officials and the Arab League.[12] The report also shows that in its first year alone, Account 98 was used to funnel 10,000 to 20,000 rials to 986 families of Palestinian "martyrs," many of them suicide bombers and members of Hamas.[13] Increased scrutiny of the funds' use showed a pattern of terrorist financing. In one case, Israeli authorities searching the possessions of a Hamas operative who was involved in a deadly bombing discovered a spreadsheet bearing the official mark of the "Kingdom of Saudi Arabia, the Saudi Committee for Support of the Intifada Al Quds," and detailing funds received by the operative, his family, and eight other suicide bombers through Account 98.[14]

Despite criticism from the US Treasury Department, Saudis renewed calls for donations to Account 98 in a December 2001 announcement on a government website.[15] In April 2002, King Fahd sponsored a telethon that raised over $110 million.[16] When outright allegations of terrorist financing arose, Saudi officials insisted the funds were being channeled through international organizations such as the Red Cross and the United Nations and used for legitimate humanitarian purposes.[17]

The growing public discussions and questions about Account 98 were disconcerting to American financial institutions doing business in Saudi Arabia. It wasn't just their reputation that was on the line—Citigroup had held a 20 percent stake in the Saudi American Bank (Samba) since 1955.[18] The activities of Samba and the role of Account 98 in funding families of suicide bombers became a central issue for Citibank. Citigroup had run the bank under a management contract

since 1980 and had 62 offices in Saudi Arabia to maximize the bank's ties to the Saudi elite. In 2002, Samba was named as a defendant in a lawsuit filed by 9/11 victims for allegedly collecting Saudi funds to support the Palestinian uprising. Samba filed a motion to dismiss the case, but Citigroup attempted to investigate the allegations.

Citi's leadership wanted answers from the US Treasury. In the meeting in the secretary's conference room, the mood was dark and serious. The Citi executives had a major problem on their hands and had little information to help them make a hard choice. Would they stop doing business in Saudi Arabia because of concerns about potential terrorist financing? Was there enough information to make that risk assessment? This was a major decision for a quintessential American financial institution that had done business in Saudi Arabia for decades.

As we sat across the large conference table, the Citi officials explained their predicament and asked for as much information as possible regarding Account 98 and our suspicions about terrorist funding out of Saudi Arabia. Citigroup claimed not to have taken note of the special account earlier because Saudi secrecy laws limited access to information about it.[19] We did not know much more than they did about Account 98. We knew it had been mandatory for banks operating in Saudi Arabia to establish these accounts and to transfer the monies deposited to the Palestinian territories. It appeared that some of the funding did go to help those in need, but it was also clear that there were problematic transactions and uses, including the payments to families of suicide bombers. We were pressuring the Saudi government to shut down the accounts or stop problematic payments and to lift the requirement that the account be maintained in all the relevant institutions. There was little that we could say that would satisfy the Citi leadership. They wanted more information and clarity to be able to make a decision. They didn't get much of either. In early 2003, Citi requested information officially from the Saudi government, Treasury, and the State Department, but with little success.[20]

The Citigroup executives made a decision to limit their exposure and potential liability. They could not operate in an environment in which their institution might be used to support terrorist causes and could not bear the reputational risks and liabilities that came with this. Account 98 has now been phased out and the funds directed to other accounts.[21]

This would not be an isolated action or consideration for the private sector. The new international environment had shifted the paradigm of risk and reputation for the banks. Governments—driven by the United States—were now requiring financial institutions to apply strict compliance standards and programs to their business. The color of money had changed, and reputational risk was now a key element of a bank's bottom line. Large, multinational banks needed to make sure that their institutions were not being misused by terrorists, and they were being forced by government regulations and policies to prevent the infiltration of the financial system. The banks were now viewed and treated as the guardians of the integrity of the financial system.

Many of the biggest financial institutions—including American, European, and Asian banks—were increasing exponentially the amount of reporting they submitted to government entities about suspicious financial activities. Banking officials were now spending hundreds of millions of dollars to ensure that they were scouring their systems to check for those designated or those suspected of illicit financing. These searches were not limited to Saudi Arabia. The concerns lay around the world—especially anywhere there was lack of transparency or accountability for financial transactions. The risk calculus had changed, and banks did not want to find themselves in the middle of a terrorist financing scheme.

Switzerland, Luxembourg, and Liechtenstein in particular were confronting an uncomfortable reality. The tradition of bank secrecy they had long followed was being pierced by the intensity of the international community's focus on transparent and accountable financial transactions. It was no longer acceptable for a banking

center or country to say simply that they did not know or could not find out whether tainted money was nested in their banks. Banking centers in places such as Dubai and Beirut would have to confront the financial activity in their midst, where commercial actors and players from around the world converged. These countries would need to adjust their systems and find a balance that ensured they were being cooperative with the international community while still allowing their banking system to survive and take on customers from around the world. They all had to adjust to the new risk calculus for financial institutions.

Quiet cooperation often followed, with bank accounts frozen and financial intelligence shared. Countries such as the United Arab Emirates and Bahrain wanted to demonstrate the vitality and integrity of their financial centers—sponsoring conferences and expanding their role in international bodies like the Egmont Group of Financial Intelligence Units and the regional bodies of the Financial Action Task Force. In the classic banking centers of Europe, there was a hard shift to greater transparency and accountability, with the Swiss and Liechtenstein governments leading the way to reconsider their bank-secrecy foundations. The evolution occurred quickly, with the Swiss ultimately launching a "white money" campaign in 2010 to ensure that all its banking practices maintained the integrity of the system. Money, indeed, had a color after 9/11, and the banks and financial centers wanted to paint it white. It would be up to us at Treasury to leverage these changing dynamics of the financial industry explicitly in the financial campaigns to come.

By the time Osama bin Laden was killed, Treasury's work had paid off. Al Qaeda's old financial networks had been decimated, and the Al Qaeda core was pleading for money from its affiliates and donors and trying to find new ways to raise money. The Saudis and others had taken the concerns about terrorist funding seriously. Even Israeli counterterrorism officials marveled that by 2007, the flow of

funds from Saudi Arabia to Al Qaeda had been greatly diminished. Regardless of diplomatic or geopolitical disputes, the fight against terrorist financing remained a consistent arena of cooperation. The art of financial diplomacy—with governments and banks—would play a prominent role in the financial battles ahead.

The Treasury had learned to flex its muscles and use most of the new tools and networks at its command aggressively along with new forms of financial intelligence. At times, the tools could be blunt financial instruments, but they were proving effective in isolating suspect people, institutions, and money. Now it was time to refine and sharpen our approach to address the financial chokepoints and vulnerabilities that remained.