# Exhibit 7

7/21/23, 11:04 AM  Address of Under Secretary Stuart Levey The American Israel Public Affairs Committee Policy Conference 2005 | U.S. Departme…

Case 1:03-md-01570-GBD-SN   Document 9229-7   Filed 07/21/23   Page 2 of 9

# U.S. DEPARTMENT OF THE TREASURY

# Address of Under Secretary Stuart Levey The American Israel Public Affairs Committee Policy Conference 2005

May 23, 2005

(Archived Content)

js-2466

It is a real pleasure to be speaking with you today. I have been an admirer of the great work this organization does since my days on the one-year program at Hebrew University in 1983 and 1984. I want to commend you for the important work that you are doing to promote strong ties between Israel and the United States and to advocate for a lasting peace in the Middle East.

The world's view of terrorism today is very different from when I attended my first AIPAC event. In 2005, people all over the world have come to recognize terrorism as among the most serious threats to freedom. Sparked by the attacks of 9/11, the world now recognizes the fight against terrorism as a vital cause. Brutal attacks from Madrid to Riyadh to Bali have shown that this threat is limited neither by region nor by ethnicity. And world leaders are beginning to see that terrorism is an absolute wrong - unjustifiable by cause or context. One striking symbol of this progress is that U.N. Secretary General Kofi Annan very recently published a report urging the U.N. to proclaim loud and clear that terrorism can never be accepted or justified in any cause whatsoever. And significant for this audience, he also asserted that The right to resist occupation cannot include the right to deliberately kill or maim civilians. We have come a long way.

These changes are welcome, but long overdue. For me, as I suspect for many of you, the events of 9/11 were shocking, but they did not introduce us to the threat of terrorism. Those of us here today have long been well aware of this threat, mindful that there were groups out there whose murderous attacks were limited only by means and opportunity. We all remember the Munich Olympics and Leon Klinghoffer and Pan Am 103 and Entebbe and Maalot and so many more. We all knew all along that terrorist groups could not be reasoned with or negotiated with, and that they sought nothing but destruction. As President Bush articulated in his address to you last

7/21/23, 11:04 AM                                    Address by Under Secretary Stuart Levey Die American Israel Public Affairs Committee Policy Conference 2005 | U.S. Departme…

Case 1:03-md-01570-GBD-SN   Document 9209-7   Filed 07/21/23   Page 3 of 9

year, [Terrorists] kill without mercy. They kill without shame. And they count their victories in the death of the innocent.

You can imagine, then, how meaningful it is for me to play a role in this Administration's efforts to combat terrorism. I start off every morning reading the daily intelligence book, and then spend my day working to undercut the supply-lines of terrorist groups. It is, quite honestly, exhilarating. I often feel like the baseball players I used to watch growing up who, when asked about salary issues, would say Are you kidding?? I get paid to do something that I love. I would do this for free. That is not something you hear very often these days from baseball players, but if you walked around my office, I think you would hear it quite a bit.

I would like to talk with you today about the work that we in the Treasury Department and the rest of the US Government are doing to track and disrupt the flow of money to terrorists.

To start, allow me to first introduce my office. I am the Under Secretary of the Treasury for Terrorism and Financial and Intelligence, or TFI. TFI is a relatively new office. It was created in 2004 to oversee the Treasury Department's enforcement and intelligence functions aimed at stopping illicit money flows to terrorists and other criminals. The office brings a wide range of authorities and capabilities together under a single umbrella, allowing us to wield a range of tools against various threats - whether they are terrorists, narcotics traffickers, proliferators of WMD or rogue regimes, like Iran and North Korea. We levy economic sanctions to pressure obstructionist regimes, and we have the ability to freeze the assets of wrongdoers. We also use regulatory authorities to help banks and other U.S. institutions implement systems to detect and halt corrupt money flows. Diplomatically, we work with governments around the world, pushing them to act with us against terrorists and other bad actors and to take critical steps to stem the flow of illicit finances.

I sometimes say that TFI fills an important niche in our national security system. When the U.S. is confronted with an overseas threat that is unreceptive to diplomatic outreach and when military action is not an option, TFI's tools - such as sanctions or the leverage we exert through the international financial bodies - are often the best authorities available to exert pressure and to wield a tangible impact.

Of all of the threats that we confront, terrorism is at the center of our sights. Combating terrorism effectively requires that we fight our enemies not only on the battlefield, but also in banks, money exchange houses, and underground financial networks. We do this both through targeted actions, such as blocking the accounts of terrorist financiers and front companies and

7/21/23, 11:04 AM  Address of Under Secretary Stuart Levey The American Israel Public Affairs Committee Policy Conference 2005 | U.S. Departme…

Case 1:03-md-01570-GBD-SN   Document 9209-7   Filed 07/21/23   Page 4 of 9

sanctioning corrupt banks, and by systemic actions, such as by working with countries around the world, prodding them to put systems in place that will allow them to take similar actions.

It is now universally accepted that attacking terrorist financing is one of the most important ways we have to attack a terrorist organization. There are a number of reasons for this: first, money trails do not lie. Financial intelligence tends to be very reliable and people do not send money to another person for no reason at all. Tracking financial transactions is therefore often the best way to identify terrorists and their facilitators. Second, financing is a vulnerability for a terrorist group. Every time terrorists raise, store, or move money, they expose themselves to surveillance and attack. And third, while individual attacks may be inexpensive, it takes quite a bit of money to run a terrorist organization of global reach. Al Qaida paid the Taliban $10 to $20 million a year for safe haven. These organizations also need money to train, recruit, pay off operatives' families, purchase false travel documents, and so on. For all of these reasons, we are making our fight against terrorist financing a central part of the overall counterterrorism campaign.

I would like to focus today on charities, a funding channel that has proved to be especially attractive to terrorist groups -- al Qaida and HAMAS in particular. These organizations have long exploited the images of widows and orphans to fund an agenda of terror. There are a number of reasons why charities are so often abused by terrorists.

- Charities naturally focus their relief efforts on areas of conflict, which tend to also be prime locations for terrorist networks. Charities provide excellent cover for the movement of money, personnel, and even military supplies to and from high-risk areas.
- Unlike the funds of for-profit organizations, charitable funds are meant to move in one direction only; accordingly, large purported charitable transfers can move without a corresponding return of value and without arousing suspicion.
- Charities attract large numbers of unwitting donors along with the witting, thus increasing the amount of money available to terrorists.
- The legitimate activities of these charities, such as the operation of schools, religious institutions, and hospitals, create fertile recruitment grounds, allowing terrorists to generate support for their causes and to propagate extremist ideologies.
- To the extent that these charities provide genuine relief, which nearly all of them do, they benefit from public support and an attendant disinclination by many governments to take enforcement action against them.

7/21/23, 11:04 AM  Address of Under Secretary Stuart Levey The American Israel Public Affairs Committee Policy Conference 2005 | U.S. Departme…

Case 1:03-md-01570-GBD-SN   Document 9229-7   Filed 07/21/23   Page 5 of 9

We have attacked this problem aggressively, on multiple fronts. First, we have taken enforcement action to shut down those charities that we know to be aiding terrorists. To date, we have identified and designated more than thirty charitable organizations as supporters of terrorist groups, from al Qaida to HAMAS and Palestinian Islamic Jihad.

Where the charities have a presence in the United States, we have frozen their assets and prevented them from engaging in any further fund-raising or donations. Where appropriate, we have also taken coordinated action with law enforcement. In the cases of the Holy Land Foundation and the Al Haramain Islamic Foundation, we blocked the assets of the organizations on the same day as law enforcement agents executed search warrants. We were thus able to ensure that no money flowed through these groups to terrorists as the investigations proceeded.

When the charities do not have a U.S. presence, we designate them domestically to prevent U.S. donors from contributing and to ensure that any money that transits the United States in the name of the charity is blocked. We also approach our international partners and the United Nations, where appropriate, to internationalize the sanctions. A good example of this is the HAMAS-affiliated Al Aqsa Foundation. Through its offices in Europe, Yemen, and elsewhere, Al Aqsa acted as a conduit of money for HAMAS. International action has now been taken against this organization: German authorities closed their Al Aqsa Foundation office, Dutch authorities blocked the charity's assets in The Netherlands, and criminal charges were pursued against three Al Aqsa Foundation officials in Denmark for supporting terrorism. Branch offices of Al Aqsa continue to function in other countries, however, and we will continue to pressure those governments to close the entire organization down.

One very positive development is that we are beginning to see international banks using the U.S. list of designated entities to screen transactions, even when they are under no domestic requirement to do so. Recently, a delegation from our office to Kuwait watched as a local bank demonstrated how it uses our list to determine whether to block or complete a transaction. These practices broaden the impact of U.S. designations exponentially, and we will continue to urge financial institutions to protect themselves against abuse in this manner.

Our most recent enforcement action against a charity took place on May 4, when we designated a Palestinian Islamic Jihad (PIJ) front, the Elehssan Society. I do not need to tell this audience about PIJ, which, as recently as February of this year, took responsibility for a terrorist attack in Tel-Aviv that killed five and wounded over 50. The Elehssan Society served as the fund-raising arm of PIJ in Gaza and the West Bank. It distributed funds to the families of PIJ prisoners and

7/21/23, 11:04 AM — Address of Under Secretary Stuart Levey to American Israel Public Affairs Committee Policy Conference 2005 | U.S. Departme…

Case 1:03-md-01570-GBD-SN Document 9229-7 Filed 07/21/23 Page 6 of 9

suicide bombers. We will continue to pursue this organization and any that rise up to take its place.

As we take enforcement actions, we have witnessed a noticeable deterrent impact on complicit donors who in the past might have used charities to direct money to terrorists. Our reporting indicates that once-willing donors are now thinking twice or balking altogether at sending money through charitable fronts, knowing that it may expose them to investigation or legal action.

This highlights an advantage that we enjoy in the financial arena of the war on terrorism: our targets have something to lose. In contrast to terrorist operatives who may be willing to die for their hateful cause, terrorist financiers typically live public lives with all that entails: property, occupation, family, and social position. Being publicly identified as a financier of terror threatens an end to all of this, lending our actions a real deterrent impact. We will continue to hold donors who knowingly contribute to terrorist organizations personally accountable as terrorists - just as much as operatives themselves.

Of course, the great majority of charitable donors in this country are well intentioned and are genuinely looking to help those in need. In one sense, our actions have warned such donors away from corrupt charities and encouraged them to be more careful with their donations in general. This is a success in its own right.

We recognize, however, that enforcement actions have also discouraged some well-intentioned donors from giving altogether, cutting off sources of needed relief. This predicament is especially acute in the Palestinian Territories, where HAMAS, PIJ, and other terrorist groups have so infiltrated the charitable sector that it is difficult for innocent overseas donors to find a safe conduit for relief. We therefore see a particularly urgent need in this area to assure that such secure channels exist, beyond the reach of terrorists. In February, I met with President Abbas and various Israeli officials, in part to explore this idea. I was gratified to receive support and agreement from all sides. The Palestinian Authority needs to be able to provide a social safety net to the poor - that niche cannot be filled by terrorist organizations if there is to be peace. We are currently working with the relevant parties to develop options through which such aid can be provided safely, and I am hopeful that we will be able to do so.

Another regional focus of ours in addressing charities and terrorism has been the Gulf, and Saudi Arabia in particular. For too long, wealthy donors and multinational charities in Saudi Arabia were underwriting terrorism of all kinds, without any meaningful controls. Since 9/11, our government has worked aggressively to press the Saudis to take action against these

7/21/23, 11:04 AM Address of Under Secretary Stuart Levey to the American Israel Public Affairs Committee Policy Conference 2005 | U.S. Departme…

Case 1:03-md-01570-GBD-SN Document 9299-7 Filed 07/21/23 Page 7 of 9

financiers and to clean up their charitable sector. It is true that the Saudis have come a long way to improve their efforts against terrorist financing. It is also true that they probably had the furthest to go. Some progress has been made. The Saudis have closed down the domestic offices of the designated charity Al Haramain. In addition, until they are prepared to oversee their charitable sector properly, they have prohibited nearly all charities from moving money outside the country altogether.

One byproduct of these steps is that Palestinian terrorist groups, HAMAS in particular, have seen a sharp drop-off in funding from Saudi Arabia. While perhaps unintentional on the part of the Saudis, this is a real success, and one that Israeli officials told me had made a noticeable impact.

Of course, much remains for the Saudis to do. We impatiently await the creation of a commission to monitor the charitable sector, and continue to insist that this commission regulate all Saudi charities, without exception of such groups as the Muslim World League and the International Islamic Relief Organization, or IIRO. Also, in addition to the export of terrorist funds, we are extremely concerned about the export of terrorist ideologies. These teachings are as indispensable to terrorists as money, and possibly even more dangerous. We must do all we can to ensure that extremist, violent ideologies are not disseminated under the cover of religious organizations, charities, or schools.

We are also continuing to press our European allies to address terrorist charities in their countries. The European Union has not yet reached agreement that Hizbollah should be designated a terrorist organization. HAMAS has been designated, but several prominent HAMAS charities continue to operate openly. Progress has been slow, but we will continue to stress these issues at every opportunity. We are still hopeful that our European counterparts will take a more aggressive role in combating terrorism of all kinds.

Time does not allow me to explore the work we are doing with respect to charities in all regions of the world, or the work we are doing in other sectors to counter the various conduits that terrorists have exploited to move money illicitly. I would like to note one other area, however, that I think will be of interest.

Last May, the Treasury Department designated Syria's primary international bank - the Commercial Bank of Syria - as a primary money laundering concern, based on a lack of financial transparency and other issues, including terrorist financing. Pursuant to this designation, we issued a proposed rule that, when adopted in final form, will oblige U.S. financial institutions to sever all correspondent relations with this bank. This designation has had a remarkable impact

7/21/23, 11:04 AM Address by Under Secretary Stuart Levey the American Israel Public Affairs Committee Policy Conference 2005 | U.S. Departme…

Case 1:03-md-01570-GBD-SN Document 9209-7 Filed 07/21/23 Page 8 of 9

on a notorious state sponsor of terrorism. The bank represents Syria's gateway to the international financial system and its access to international currencies like the U.S. Dollar.

In connection with the proposed rule, we delivered a long list of demands to the Syrians, ranging from reform of their banking sector to immediate, effective action to cut the flow of funds and other support across the Syrian border to terrorists and insurgents in Iraq. Over the past year, the Syrian Government has sought desperately to avoid finalization of this proposed rule and has taken some steps to address our concerns. In key respects, though, we remain unsatisfied - especially about the support of terrorism and the Iraqi insurgency coming from within Syria. Syria will either take effective steps to address our concerns, or we will cut it off from our financial system.

The question I am asked most frequently is How are we doing in fighting terrorist financing? It is difficult to quantify our successes. Al Qaida does not release financial statements, and we will never know precisely how much money intended for terrorists never reached their hands due to our efforts. We therefore find ourselves discussing proxies for the ultimate questions: How many donors and facilitators have been captured; how many channels for moving terrorist funds have been designated and blocked; or how many countries are equipped to monitor and interdict illicit financing channels. Each of these benchmarks points to only one aspect of the problem, though, and imperfectly at that. Most revealing, to my mind, is intelligence reporting that - although anecdotal - speaks to the difficulty with which terrorists are raising, moving, and storing money. The information available to us is encouraging. We are seeing terrorist groups avoiding formal financing channels and instead resorting to riskier and more cumbersome conduits like bulk cash smuggling. Most importantly, we have indications that terrorist groups like al Qaida and HAMAS are feeling the pressure and are hurting for money.

It is critical, though, that we remain aggressive and adaptive. Terrorists and their supporters are constantly exploring new means to move and store money, and we cannot afford to become set in our ways. Those who work with me will tell you that I am not complacent and not very patient either. I can assure you that we will bring every intelligence and enforcement tool at our disposal to bear in attacking the financial underpinnings of terrorism. We have no higher priority.

Thank you.

7/21/23, 11:04 AM
Address of Under Secretary Stuart Levey to the American Israel Public Affairs Committee Policy Conference 2009 | U.S. Departme…
Case 1:03-md-01570-GBD-SN   Document 9229-7   Filed 07/21/23   Page 9 of 9