Exhibit 8

# STARVING TERRORISTS OF MONEY: THE ROLE OF MIDDLE EASTERN FINANCIAL INSTITUTIONS

## JOINT HEARING

BEFORE THE

## COMMITTEE ON FINANCIAL SERVICES

AND THE

## COMMITTEE ON INTERNATIONAL RELATIONS

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED NINTH CONGRESS

FIRST SESSION

————

MAY 4, 2005

————

Printed for the use of the Committee on Financial Services
and the Committee on International Relations

**Committee on Financial Services
Serial No. 109–24**

**Committee on International Relations
Serial No. 109–120**



U.S. GOVERNMENT PRINTING OFFICE

★24–090 PDF                    WASHINGTON : 2006

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

70



# DEPARTMENT OF THE TREASURY
## OFFICE OF PUBLIC AFFAIRS

EMBARGOED UNTIL 2:00 PM                              Contact: Molly Millerwise
May 4, 2005                                                      (202) 622-2960

### Testimony of Stuart Levey, Under Secretary
### Office of Terrorism and Financial Intelligence
### U.S. Department of the Treasury

### Before the House Financial Services Subcommittee on Oversight and Investigations
### and the House International Relations Subcommittee on
### International Terrorism and Nonproliferation

Chairwoman Kelly and Chairman Royce, Ranking Member Gutierrez, Ranking Member
Sherman, and distinguished members of these Subcommittees, thank you for inviting me to
testify before you today about the progress the U.S. Government has made in its fight against
terrorist financing in the Middle East. Your personal leadership and that of these subcommittees
have been vital to our shared work to keep our nation safe and I am grateful for it.

As Under Secretary for the Office of Terrorism and Financial Intelligence, my highest priority is
cutting off the flow of support to international terrorist groups. This has been the paramount
focus of our office from day one, and we remain as fixated on it today as we were at our
formation. Thanks to Congressional support, our office and our interagency colleagues grow
stronger, more experienced, and more capable with each passing day.

I would like to take this opportunity to give you a sense of how we are doing. Scientific metrics
are simply not available in our line of work. Al Qaida does not release financial statements, and
we will never know precisely how much money intended for terrorists never reached their hands
due to our efforts. We therefore find ourselves discussing proxies for the ultimate questions:
how many donors and facilitators have been captured; how many channels for moving terrorist
funds have been designated and blocked; or how many countries are equipped to monitor and
interdict illicit financing channels. Each of these benchmarks points to only one aspect of the
problem, though, and imperfectly at that. Most revealing, to my mind, is intelligence reporting
that – although anecdotal – speaks to the difficulty with which terrorists are raising, moving, and
storing money. The information available to us is encouraging. We are seeing terrorist groups
avoiding formal financing channels and instead resorting to riskier and more cumbersome

71

conduits like bulk cash smuggling.  And, most importantly, we have indications that terrorist groups like al Qaida and HAMAS are feeling the pressure and are hurting for money.

This progress is a direct result of the Bush Administration's unrelenting efforts.  As the President said again just last week, we must stay on the offensive in cutting off terrorist funding.  The first-rate interagency team has made great strides against terrorist financing, identifying, capturing, prosecuting, or otherwise incapacitating key financial operatives.  We are applying pressure on our international partners, particularly in the Middle East, to implement global standards and carry out their own targeted actions.

Of course, we are threatened not only by known financiers but also by those we don't know and those who may join their ranks in the future.  A key advantage that we enjoy in the financial arena, however, is that our targets have something to lose.  In contrast to terrorist operatives who may be willing to die for their hateful cause, terrorist financiers typically live public lives with all that entails: property, occupation, family, and social position.  Being publicly identified as a financier of terror threatens an end to all of this, lending our actions a real deterrent impact.  Our reporting confirms this, indicating that once-willing donors are now thinking twice or balking altogether at sending money to terrorist groups.

We are tracking and disrupting the flow of funds to terror in every area of the globe.  Today, however, I would like to focus on the work we are doing in the Middle East.  In February, I headed a trip to the Middle East, intended to engage with and deliver a range of messages to leaders in Syria, Jordan, Israel, and the Palestinian Territories.

With respect to Syria, my proposed visit was intended to follow up on demands that we had made to the Syrian Government one year ago when we issued a proposed rule, designating the Commercial Bank of Syria (CBS) as a "primary money laundering concern" pursuant to Section 311 of the USA PATRIOT Act.  This designation, premised on financial wrongdoing we observed at that bank including terrorist financing, has had a remarkable impact on an obstructionist regime.  The bank represents Syria's gateway to the international financial system and its access to international currencies like the U.S. Dollar.  In connection with the proposed rule, Deputy Assistant Secretary Daniel Glaser traveled to Damascus to deliver a series of demands to Syrian authorities, ranging from reform of their banking sector to immediate, effective action to cut the flow of funds and other support across the Syrian border to the Iraqi insurgency.  We made clear that Syria would either take effective steps to address our long list of concerns, or we would cut it off from our financial system.

Over the past year, the Syrian Government has sought desperately to avoid finalization of this proposed rule and has taken some steps to address our concerns.  At our urging, the Syrian Government joined us in recommending the designation of terrorist financier Sulayman Darwish at the United Nations, and placed his name on a Syrian wanted list.  They have also worked to increase the oversight and transparency of their financial sector.  In other respects, though, we have been nowhere near satisfied.  The Syrian Government has released over $600 million of assets belonging to the Iraqi government to third parties, and thus far refused to return over $250 million of Iraqi assets that remain frozen.

72

Days before my planned February trip, I met with the Syrian ambassador to the United States and made clear that, above all, even if Syria met some of our requirements, the continued flow of money and personnel from Syria into the hands of terrorists and insurgents in Iraq was absolutely unacceptable.  My dissatisfaction with the official Syrian response prompted me to cancel my planned visit.  Our office continues its engagement, but we will not be satisfied until all of our requirements are met.

The remainder of the trip occurred as planned and was extremely productive.  In Jordan, I met with the Prime Minister and other ministers to discuss regional terrorism and money laundering trends.  As a key and valued ally in the war on terror, the Jordanians clearly appreciate the importance of these issues.  In my meetings, I stressed the need for the Jordanians to ensure passage of an anti-money laundering law.  The Jordanians recognize the importance of such a law in assuring investors of a transparent and secure financial system and they are working aggressively towards its passage.  I also repeatedly emphasized to the Jordanians the need for rigorous oversight of their financial institutions to help prevent the type of serious deficiencies that have recently come to light.  The Jordanians responded positively and we will continue to work with their government, the Central Bank of Jordan in particular, to assure that this oversight is as robust as it needs to be.  Finally, the Jordanians agreed to work with FinCEN Director Bill Fox to create a Financial Intelligence Unit (FIU) in Jordan.

In Israel and in the Palestinian Territories, I met with high level officials to discuss the current status of regional terrorism and terrorist financing.  In Israel, I was given an encouraging account of a substantial reduction of funds flowing to HAMAS, particularly from the Gulf region.  In general, the mood on both sides is one of cautious optimism, with the political developments in the Palestinian Authority clearing the way for productive dialogue and the beginnings of trust.

In speaking with President Abbas and in several follow-up sessions with Finance Minister Fayyad, I noted serious commitment on their part to cutting off the flow of funds to terrorism, and welcomed the message that responsibility for accountable financial systems begins with the government.

A recurring theme in my meetings and a continual focus of our counter-terrorist financing efforts in the Middle East are charitable organizations.  Terrorist groups have long exploited charities for several key reasons:

- The "legitimate" activities of these charities, such as the operation of schools, religious institutions, and hospitals, create fertile recruitment grounds, allowing terrorists to generate support for their causes and to propagate extremist ideologies.

- Charities attract large numbers of unwitting donors along with the witting, thus increasing the amount of money available to terrorists.

- To the extent that these charities provide genuine relief, which nearly all of them do, they benefit from public support and an attendant disinclination by many governments to take enforcement action against them.

73

- Charitable funds are meant to move in one direction only; accordingly, large purported charitable transfers can move without a corresponding return of value do not arouse suspicion.

- International charities naturally focus their relief efforts on areas of conflict, also prime locations for terrorist networks. Such charities provide excellent cover for the movement of personnel and even military supplies to and from high-risk areas.

Since September 11, the U.S. Government has confronted this problem head on. Our interagency efforts in this arena have been a team effort in every sense of the term. Two notable examples are the designations of the U.S. branches of the Al Haramain Islamic Foundation and the Islamic African Relief Agency (IARA), both al Qaida-linked charities operating in the United States. In February 2004, federal agents executed a search warrant on Al Haramain, pursuant to a joint investigation by IRS-CI, the FBI, and DHS/ICE. Simultaneously, Treasury's OFAC blocked the accounts of the organization pending investigation, freezing the organization's assets in place and ensuring that no money would flow through this group during further investigation.

A similar coordinated Treasury/law enforcement action was taken in October 2004 against the Islamic African Relief Agency (IARA) and its affiliates, including its U.S. alias, the Islamic American Relief Agency. Treasury designated this global network as well as five of its senior officials as Specially Designated Global Terrorists pursuant to E.O. 13224. On the same day, the FBI raided IARA's headquarters in Columbia, Missouri as part of a separate criminal investigation.

Thanks to the work of the State Department, we have persuaded other nations, including Saudi Arabia, to join us in bringing these and other charities to the United Nations Security Council for designation, and to shutter these dangerous organizations in their respective countries.

Persistent investigations by the intelligence and law enforcement communities have illuminated the illicit activities of multiple other charities, both at home and abroad. The Department of Justice and FBI-led Joint Terrorism Task Forces have taken action against several other U.S.-based charities, indicting organizations and their directors. Just last month, the Department of Justice secured the convictions of three brothers linked to the designated Holy Land Foundation on over twenty counts, including material support for HAMAS. These convictions, just the latest in a series of aggressive prosecutions coordinated by the Counterterrorism Section of the Justice Department's Criminal Division, are an enormous victory in the war on terrorism.

Treasury has designated dozens of other charities worldwide as supporters of terrorism. Some have criticized the use of designations against charities. I want to make clear that the designation process entails exhaustive research to ensure it is fair and fully supported by evidence. All judicial challenges to our designations have failed. Indeed, it has been the unanimous opinion of every judge to consider these claims, including the appellate judges of the District of Columbia and the Seventh Circuits, that Treasury has acted properly and within the law. See Holy Land Foundation for Relief & Development v. Ashcroft, 333 F.3d 156 (D.C. Cir. 2003); Global Relief Foundation, Inc. v. O'Neill, 315 F.3d 748 (7th Cir. 2002). We are grateful to the top-notch team in the Civil Division of the Justice Department for advocating our position in these cases so expertly.

74

From a different vantage point, we hear the criticism that designations are ineffective, particularly if they are not endorsed by the U.N. or other multilateral bodies. We do seek to enlist international support for our designations as a matter of course, recognizing that multilateral action is exponentially more effective than action by ourselves. At the same time, there are cases where joint action is not possible and in those instances we must and will proceed by ourselves. As the world's financial center, the impact of U.S. sanctions carries tremendous weight in and of itself, and in most cases prevents foreign designated entities from carrying out transactions in U.S. Dollars, the international currency of choice.

But the ramifications of our actions extend even further, as we are seeing private banks in other jurisdictions voluntarily adopting the United States list of designated parties as a screen to protect them against terrorists and criminals, even when not required by law. Indeed, in Kuwait, a delegation from our office watched as a bank demonstrated how it uses Treasury's Office of Foreign Assets Control (OFAC) list to determine whether to complete a transaction. Such practices give wide-ranging effect to our actions, and are a result of sustained engagement.

Designations and law enforcement actions are making an impact and are serving as a valuable deterrent. Anecdotal evidence suggests that prospective donors are avoiding suspicious international charities altogether and are being far more watchful with their donations in general. This is a major success in its own right, as the donor community is best-positioned to demand reform and accountability from charitable organizations. The Treasury Department is doing all we can to encourage the charitable sector to police its own institutions against abuse and to combat it. In a similar vein, Treasury is also working with private sector watchdog groups to promote awareness of terrorist financing issues in the charitable sector.

We are of course cognizant that well-intentioned donors have given money to some of the same charities abused by terrorist organizations. It is painful when funds and services donated with the intention of providing legitimate relief do not reach their intended and needy beneficiaries. But frustration with this situation must be directed at those who have corrupted the charities that have – either through willfulness or willful blindness – been used to support terrorism.

We recognize that enforcement actions have sometimes also cut off sources of relief to communities in need and inadvertently decreased the support of charities and donors that deliver funds to legitimate causes. Our goal is not to deter charitable giving but instead to protect the charitable sector such that donors' generosity is not abused and they feel safe in providing their contributions. Well-meaning donors in the United States are as eager to deliver aid to international populations in need as the disadvantaged are to receive it. This situation is significantly complicated in the Palestinian Territories, where the intermingling of charitable activity, militant political activism, and terrorism has been a defining characteristic of HAMAS and other terrorist groups. There is therefore a particularly urgent need in this region for safe channels of assistance that donors can be assured will not be subverted by terrorists. I have explored this idea with both Palestinian and Israeli officials and I was gratified to find agreement that it is in the interests of all involved. We are currently working with the Palestinian Authority to develop options through which such aid could be provided in a safe and effective manner and I am hopeful that we will be able to do so.

75

Apart from my recent trip, our office is involved in several other engagements in the Middle East, both multilateral and bilateral.

One of the most promising developments in the region is the emergence of the Middle East North Africa Financial Action Task Force (MENA FATF). A delegation led by my office just returned from the first plenary session of this body, hosted by Bahrain. Launched in November 2004, this FATF-style regional body of 14 member countries has taken on the charge of finding regional solutions to terrorist financing and money laundering based on the global guidelines set out by FATF. This important first session, attended by full delegations from each member country, was characterized by enthusiasm and optimism for the work which lies ahead of it. Lebanon currently holds the MENA FATF presidency and is leading it adeptly, based on its own progress in building anti-money laundering and counter-terrorist financing architecture at home. Strategies for dealing with the charitable sector made up a key portion of the 4-day conference, both within the working sessions themselves and as part of the 2-day IMF/World Bank seminar series. Kuwait, the UAE, Egypt, and Bahrain all took active leadership roles in the plenary, making presentations on the comprehensive nature of their anti-money laundering and counter-terrorist financing reforms, particularly in the charitable sector. The MENA FATF is addressing more than just the issue of charities. Alternative financing mechanisms such as hawalas and cash couriers are the subjects of three ad hoc working groups which were formed during the first plenary session.

The integration of the Middle East into a body like the MENA FATF serves the important purpose of setting standards and holding countries to those standards. We will continue to offer strong support to these initiatives as we attend these meetings in observer status, and we look forward to the second MENA FATF plenary in September of this year. We welcome the fact that countries are discussing standards and how to police themselves. But this is plainly just the beginning. Many of these countries have not passed their own money laundering and terrorist financing laws; many have not established Financial Intelligence Units (FIUs); many have no control over their informal hawala sectors; and many have failed to implement standards to stop the illicit flow of money through cash couriers. We see a long road ahead, but welcome the multilateral framework through which pressure to implement these standards can be applied.

Our office also recently led a delegation to Kuwait. We learned that Kuwait has taken measures to increase the oversight of its charitable sector. Earlier this year, Kuwait's Ministry of Labor and Social Affairs ordered five charities to remove unlicensed cash boxes which were collecting unregulated funds to evade government controls. Although Kuwait is taking steps in the right direction and we are told that processes are in place to protect charitable giving, Kuwait must do more to ensure that funds and extremist ideologies are not exported overseas in support of terrorist causes. Again, standards and guidelines may be in place, but what matters is what governments actually do with them. We have called upon Kuwait to intensify its battle against terrorist financing and will continue to do so.

Saudi Arabia, too, has worked with us to some extent to address vulnerabilities in its charitable sector. This progress is the result of focused interagency attention and cooperation, Treasury action, and Homeland Security Advisor Frances Townsend's consistent outreach directly to the

76

Saudis on her many trips there. The Saudis have taken proactive steps including the banning transfers of money from charitable accounts abroad. Additional measures include:

- Enhancing customer identification requirements for charitable accounts;
- Restricting charities to a single account with withdrawal access;
- Eliminating cash disbursements from charitable accounts and instead requiring that payments be made by check and deposited into a Saudi bank.

The adoption of these measures has been the subject of much previous testimony. What continues to concern me are the measures which have not yet been taken. The Government of Saudi Arabia announced that it would freeze all international transfers until it had established an oversight commission to regulate its charitable sector. While that would represent a satisfactory short-term solution if actually implemented, it is important that the announced commission take shape. It is particularly important that charities like the International Islamic Relief Organization (IIRO), the World Association of Muslim Youth (WAMY), and the Muslim World League (MWL) – expressly excluded from the commission – become subject to its oversight once it is finalized.

In addition to the export of terrorist funds from Saudi Arabia, we are extremely concerned with the export of terrorist ideologies that promote war and killing in the name of religion. These distorted ideologies are just as indispensable to terrorists as money, and possibly even more pernicious. We must do all we can to ensure that extremist, violent ideologies are not exported under the cover of religious organizations, charities, or schools.

We have also been advocating and eagerly anticipating the establishment of a Saudi FIU. The interaction of FIUs worldwide form the basis for cooperative action based on suspicious activity reports. When I testified here in August, I informed you that we had not seen progress on this front. And, despite some assurances of progress, Chairman Kelly recently confirmed that there still is no operational FIU in Saudi Arabia. Given the concentration of financial activity in Saudi Arabia and the grim reality of terrorist activity in its own cities, the lack of an FIU must be remedied, and we will continue to press for its establishment.

**CONCLUSION**

We have made real inroads in combating terrorist financing in the Middle East. Our actions with respect to charities, both targeted and systemic, have made a tangible difference. And, with the establishment of the MENA FATF, the Middle East is now subject to the leading counter-terrorist financing standards in the world. Enormous work remains, however. Perhaps our most important task in the region is ensuring implementation and enforcement. We do not measure success by the number of laws put on the books but by changes made on the ground. Real progress will come in the form of border stops, cash seizures, account blockings, and arrests. The challenges ahead are serious but we remain fully committed to combating terrorist financing in all of its forms wherever it may occur. We look forward to continuing our work with you on these issues, and I would be happy to answer your questions.

-30-