Exhibit 11



# DEPARTMENT OF THE TREASURY
### OFFICE OF PUBLIC AFFAIRS

**Contact: Taylor Griffin**
**(202) 622-2960**

**Written Testimony of David D. Aufhauser**
**General Counsel, Department of the Treasury**
**Before the Senate Judiciary Committee**
**Subcommittee on Terrorism, Technology and Homeland Security**
**June 26, 2003 2:00 p.m.**
**The United States Senate**

*The Threat of Terrorist Financing*

Chairman Kyl and distinguished Members of the Subcommittee on Terrorism, Technology and Homeland Security, thank you for inviting me to testify today about the threat posed by those who fund terrorism and what can be done to keep that money from getting into the hands of terrorists.

I want to take a moment to emphasize that the terrorist financing strategy of the United States government does not target any particular faith or sect.  We are not at war with a religion, but rather with terrorists who sometimes masquerade as its champion.  It is a difficult challenge to distinguish between an austere, uncompromising and intolerant view of faith from extremism and fanaticism that purposely seeks the blood of children.

This is a profoundly uncommon war. There is no known sovereign; no uniformed army; no road to take; and, as far as terrorists are concerned, no target that is out-of-bounds. Indeed, terrorists obscenely place a premium upon death and the maiming of innocents. It is shadow warfare. The primary source of the stealth and mobility necessary to wage it is money. It is the fuel for the enterprise of terror. But money is also the Achilles' heel of a terrorist. It leaves a signature, an audit trail which, once discovered, has proven to be the best single means of identification, prevention and capture. Books and records are literally diaries of terror and they can tell us much about the wrongful, criminal hijacking of religion.

*How Terrorists Raise and Move Money*

Terrorist financing is a unique form of financial crime. Unlike money laundering, which is finding dirty money that is trying to hide; terrorist financing is often clean money being used for lethal purposes. The source of the money used to put a bomb in the hand of a terrorist is often legitimate -- as in the case of charitable donations or profits from store-front businesses diverted from their ostensible use -- and the ultimate goal is not necessarily the attainment of more funds. The ultimate goal of terrorist financing is destruction.

Terrorists employ a wide range of terrorist financing mechanisms, both to raise and move money, and the means used by particular terrorist organizations vary from group to group. Some terrorist groups, such as those in Europe, East Asia, and Latin America, rely on common criminal activities including extortion, kidnapping, narcotics trafficking, counterfeiting, and fraud to support their terrorist acts. Other groups, such as those in the Middle East, rely on commercial enterprises, donations, and funds skimmed

2

from charitable organizations to not only fund their activities but also to move materiel and personnel. Still other groups rely on state sponsors for funding.

But both terrorist financing and traditional financial crimes have one thing in common – they leave a financial footprint that allows us to trace financial flows, unravel terrorist financing networks, and uncover terrorist sleeper cells. The following is a basic summary of the principal sources of funding and the means used to move money that terrorist organizations and their supporters use to plan attacks and to support their networks.

### *1.     Gaming the Banking System*

As the United States government sought the sources of support to terrorists in the wake of September 11th, the focuswas on the formal international banking system – the most visible conduit for terrorist financing. Terrorists exploited the openness of the international financial system by storing funds in shell banks and front companies and by using wire transfers to move funds through multiple jurisdictions.

Over the past twenty-one months, we – the Treasury Department, State, Justice, the FBI and other agencies, have conducted an intensive campaign to counter this threat. Through the broad powers of the USA PATRIOT Act (Patriot Act)and sustained international engagement, we have greatly improved the transparency and accountability of financial institutions around the world. These improvements have allowed us to identify and unravel terrorist financing networks embedded in the international financial system. We have also increased the costs for terrorists seeking to use the formal banking system as a means of storing and moving funds.

Domestically, Treasury has worked continuously and closely with the private financial sector in issuing a host of regulations to implement various provisions of the Patriot Act.  These regulations have reduced the risk of terrorist abuse of the U.S. financial system by improving and expanding customer identification, record-keeping and reporting requirements in vulnerable financial sectors; cutting off shell banks from the U.S financial system; requiring due diligence for correspondent accounts maintained for foreign financial institutions and enhanced due diligence for high risk accounts; and expanding information-sharing capabilities to ensure better communication between financial and law enforcement authorities.  We will continue to work with the private financial sector to ensure that our regulatory framework adequately protects our financial system from abuse while respecting the legitimate privacy and business interests of our financial institutions and their clients.

Treasury and the State Department have also advanced the development of global standards to protect the international financial system from the threat of terrorist financing through the Financial Action Task Force (FATF), the premier international body in the fight against money laundering.  Treasury co-chairs the FATF's Working Group on Terrorist Financing and has worked through FATF to create a comprehensive and effective framework for protecting the international financial system from the threat of terrorist financing and money laundering.   We are continuing to engage in a comprehensive international effort to facilitate country compliance with these global standards.

### *2. Corrupting Charitable Giving*

Investigation and analysis by intelligence and enforcement agencies have clearly revealed that terrorist organizations utilize charities to facilitate funding and to funnel money. Charitable donations to non-governmental organizations (NGOs) are commingled and then sometimes diverted or siphoned to groups or organizations that support terrorism. Fundraising may involve community solicitation in the United States, Canada, Europe, and the Middle East or solicitations directly to wealthy donors.

Though these charities may be offering humanitarian services here or abroad, funds raised by these various charities are sometimes diverted to terrorist causes. This scheme is particularly troubling because of the perverse use of funds donated in good will to fuel terrorist acts.

We have seen clear examples of this type of scheme in our efforts to identify and freeze terrorist-related assets. In one instance, Hamas, a foreign terrorist organization, used the largest U.S. Islamic charity, the Holy Land Foundation for Relief and Development (Holy Land), as a fundraising source for its terrorist activities. Based on preliminary work of the FBI, we designated Holy Land on December 4, 2001, pursuant to E.O. 12334 and froze the assets of Holy Land because it was being used as a charitable front to raise and funnel money to Hamas.

We have also collaborated with foreign governments and designated NGOs at the 1267 Sanctions Committee of the United Nations to shut down international charities that have operated as terrorist financing networks in foreign jurisdictions. On March 11, 2002, the United States participated in its first joint designation of a terrorist supporter. The United States and Saudi Arabia jointly designated the Somalia and Bosnia-

5

Herzegovina offices of Al Haramain, a Saudi-based NGO. These two offices were linked to al Qaida and their names were forwarded to the Sanctions Committee for inclusion under the UNSCR 1267/1333/1390/1455 list.[1] Most recently, we have worked with a number of other governments to designate or otherwise shut down the activities of the al Aqsa Foundation, owing to this charity's support for the Hamas terrorist organization.

In total, the Treasury Department has now designated 18 NGOs under E.O. 13224 as financing or otherwise supporting terrorist activity. I would like to clarify the importance of these designations in protecting the charitable sector from terrorist abuse. There is often a misperception that our designations of charities create a chilling effect in the donor community by raising fears that innocent donor funds nobly intended for sorely needed humanitarian aid will be frozen.

But we must remember that the problem underlying this concern is the abuse of charities by terrorist organizations. It is this abuse, not the consequential freezing actions taken by our government, which undermines donor confidence. In the absence of our designations, money intended for humanitarian assistance would not be frozen; rather, it would finance further destruction. Our designation actions protect U.S. charitable organizations and innocent donors from abuse by illuminating those charities that finance terror rather than need. These designations are essential in restoring donor confidence in the integrity of the charitable sector and form a crucial part of our larger strategy to protect charities from terrorist abuse.

To assist U.S.-based charities concerned that their distribution of funds abroad might reach terrorist-related entities and thereby trigger a blocking action on the part of

---

[1] UN Resolutions 1267/1333/1390/1455 mandate blocking sanctions on Usama bin Laden, al Qaida, the Taliban, and those associated with them.

6

the Treasury Department, the Department has developed *voluntary* best practices guidelines for all U.S.-based charities. (The guidelines are available at http://www.treas.gov/press/releases/po3607.htm). The Treasury Department developed these guidelines in response to requests from the Arab American and American Muslim communities, who reported a reduction in charitable giving and an increased apprehension among donors as a consequence of the Treasury Department's blocking of the three domestic charities. Although wholly voluntary, the guidelines, if implemented, offer a means by which charities can protect themselves against terrorist abuse and are consistent with the principles espoused in both the private and international public sectors.

We are also increasing the transparency and oversight of charities through multilateral efforts. In addition to working with FATF, we are working bilaterally with many countries to ensure transparency in charitable operations. Saudi Arabia and Kuwait have announced the establishment of oversight authorities for charities in their respective countries. We are confident that our work bilaterally and through FATF on this issue will prompt other countries to adopt competent authorities to protect charities from terrorist abuse.

### 3.     *Hiding Behind Front Companies and Businesses*

In addition to abusing charities as a means of terrorist financing, supporters of terrorist groups create front businesses and corporations, transfer funds between them, and "layer" the financial transactions to avoid detection. Seemingly legitimate businesses have been used by terrorists and their supporters as "fronts" to disguise a variety of criminal activities.

7

Terrorist supporters also corrupt otherwise legitimate companies to either raise or move funds for terrorists.  Such activity, as with the abuse of charitable organizations, is particularly nefarious since this may occur without the knowledge of other shareholders, employees, or customers.

To date, the United States has taken strong action to shut down such front companies and businesses which have become corrupted by the influences of terrorist financiers and to strip away the otherwise legitimate holdings of those individuals who finance and abet terror.  For example, we worked closely with our partners in the Caribbean and Europe for nearly a year to unearth the insidious network of financial houses and investment firms used by the European and Caribbean-based al Qaida supporters, Youssef Nada and Ahmed Idris Nasreddin.  These companies were then publicly designated, shut down, and acted against by the United Nations for their ties to al Qaida in a joint action between the U.S., Italy, Switzerland, Luxembourg, and the Bahamas.  We have also publicly designated a network of honey shops and bakeries in Yemen that funded al Qaida's operations as well as the front companies for the European-based al Qaida supporter, Mamoun Darkanzali.

We continue to monitor, analyze, and investigate the links between businesses, in the United States and elsewhere, and terrorist groups. Using Bank Secrecy Act data and analysis provided by the Financial Crimes Enforcement Network (FinCEN) and other relevant law enforcement resources, we are able to target suspicious business activities and anomalous transactions.  This type of methodical investigative and analytical work will continue to uncover networks of businesses used to generate and funnel money to terrorist groups.

8

### *4. Exploiting Hawalas and Other Informal Value Transfer Systems*

Terrorists have also used informal value transfer systems such as *hawala* as a means of terrorist financing. The word "*hawala*" (meaning "trust") refers to a fast and cost-effective method for the worldwide remittance of money or value, particularly for persons who may be outside the reach of the traditional financial sector. While it is difficult to measure accurately the total volume of financial activity associated with the system, it is estimated that, at a minimum, tens of billions of dollars flow through *hawalas* and other informal value transfer systems on an annual basis.

The danger is that some of the features which make *hawalas* attractive to legitimate customers -- efficiency, reliable access to remote or under-developed regions, potential anonymity, and low cost -- also make the system attractive for the transfer of illicit or terrorist-destined funds.

The terrorist events of September 11th have brought into focus the ease with which informal value transfer systems may be utilized to conceal and transfer illicit funds and have prompted numerous studies of this financing mechanism. Not surprisingly, concerns in this area have led many nations to reexamine their regulatory policies and practices in regard to *hawalas* and other informal value transfer systems.

The United States has already taken steps to regulate *hawalas* and informal value transfer systems. The PATRIOT Act requires money remitters (informal or otherwise) to register as "money services businesses" or "MSBs", thereby subjecting them to existing money laundering and terrorist financing regulations, including customer identification, record keeping and suspicious transaction reporting requirements. Well over 14,000 money service businesses have registered with the federal government and are now

required to report suspicious activities. In order to increase awareness within the diverse MSB community nationwide about their obligations under the MSB rules, FinCEN plans to conduct an outreach campaign to include advertising, community outreach and the distribution of educational materials.

We have succeeded in disrupting the operations of several illegal money remitters implicated in terrorist financing. On November 7, 2001, the Treasury Department blocked the assets of the al-Barakaat network, which was a global money remitting company being used by Usama bin Laden to support terrorist activities. Though the operations of al-Barakaat in the United States relied on traditional banking systems, internationally it operated as a hawala network that allowed for funds to be funneled into Somalia through Dubai. This hawala network was not only used to finance bin Laden's organization, but also to provide logistical support for his network. We have conservatively estimated that tens of millions of dollars flowed through the Barakaat network annually, a portion of which was siphoned off to terrorist organizations. Beyond simply freezing terrorist assets, our designation action against the Barakaat network, combined with the actions of the UN and cooperating countries, shut down a considerable pipeline of terrorist financing by putting this network out of business.

***Success in Separating Terrorists from their Funding Sources***

The international efforts led by the U.S. government have produced considerable results. To date, 281 names of persons or entities have been designated by the US under Executive Order 13224. As a result of international cooperation since September 11, 2001, over $137 million has been blocked around the world (representing 688 accounts). Through extensive communication, cooperation and collaboration with the private sector

10

and the international community, and through the expansive tools provided by Congress in the the PATRIOT Act and other authorities, the interagency effort has identified, disrupted and dismantled high value terrorist financing networks used to support al Qaida and other terrorist organizations.

But this is not a box score game. Only a small measure of success in the campaign is counted in the dollars of frozen accounts. The larger balance is found in the wariness, caution, and apprehension of donors; in the renunciation of any immunity for fiduciaries and financial intermediaries who seek refuge in notions of benign neglect and discretion, rather than vigilance; in pipelines that have gone dry; in the ability to focus our resources on those avenues of last resort; and in the gnawing awareness on the part of those who bank terror that the symmetry of borderless war means that there is no place to hide the capital that underwrites terror.

***Treasury's Tools to Combat Terrorist Financing: Attacking the Networks***

A terrorist act doesn't occur because one person acting alone makes a little money and buys a bomb. Terrorism is an enterprise – scouting, recruiting, transporting, training, arming, targeting, conceal, executing, and escaping. It takes a great deal of money. Al-Qai'da paid the Taliban a $20 million tithe alone each year for their safe harbor in Afghanistan. Wherever possible, Treasury is focused on the extensive network required to underwrite the enterprise of terror with our eye towards "effects based targeting."

As time has passed, our knowledge of how terrorists fund their operations today has continued to develop and we are committed to continually reevaluating our tools, expertise and resources to reflect this more sophisticated understanding of the problem. For example, rather than designating all of the individual charities who may provide

11

support to the families of suicide bombers, the targets are the key international charities that fund them -- such as the Holy Land Foundation for Relief and Development, the Global Relief Foundation, the Benevolence International Foundation and, most recently, the al Aqsa Foundation – a few key targets that make it more difficult for all the others. Likewise, rather than just designating a terrorist organization, such as Jemaah Islamiya, we also designate key leaders who have control over financial operations and can direct the movement of money.

As we increase our understanding of networks and develop country-specific strategies – we are committed to using all tools available to us. One of the most powerful is Section 311 of the PATRIOT Act (31 U.S.C. § 5318A). Section 311 is the "smart bomb" of terrorist financing. Section 311 of the USA PATRIOT Act provides the Secretary of the Treasury with broad authority to identify foreign money laundering and terrorist financing threats and order U.S. financial institutions to take appropriate countermeasures against those threats. Threats can include foreign jurisdictions that lack an adequate anti-money laundering regime, individual foreign financial institutions that either knowingly or unwittingly support money laundering or the financing of terrorism, and classes of foreign accounts or transactions that pose a money laundering risk. Once the foreign jurisdiction, account, or transactions are designated by the Secretary to be a primary money laundering concern based on an appropriate factual record, the Secretary has the discretion to require U.S. financial institutions to take one or more special measures to minimize the threat. The special measures range from increased recordkeeping and recording obligations to cutting off the primary money laundering concern from the U.S. financial system. Thus, rather than freezing all accounts or

sanctioning an entire country, section 311 allows the U.S. government to strategically focus on one aspect of a foreign government's operations, the financial sector, and even to focus on one bank within that sector in order to impose measures that range from greater due diligence that will enable us to find and trace evidence of financial crimes to denial of all access to the U.S. financial system.

Designation under Executive Orders and 311 actions are just two of the tools available to the federal government. At an inter-agency level, much of the effort is overseen by a policy coordinating committee established by the National Security Council. As best as humanly possible, and surely we have feet of clay, we have one government, working in concert, fighting the campaign against terrorist financing. But the task remains daunting. Material issues that face us include a near-insatiable appetite for *actionable* intelligence, increasing demands by coalition partners to share that intelligence, and a chorus of competing voices that risk confusion of our message.

As I have just indicated, the predicate for everything we do is actionable intelligence. Owing to the foreign nature of the covered threats, the evidence supporting the designation of a primary money laundering concern will, in large part, be comprised of sensitive intelligence information, often classified and protected from disclosure to the public.

*Conclusion*

Much remains to be done. We will continue to use every tool of diplomacy, regulation, law enforcement, and intelligence to attack terrorist financing on all fronts. Many of our efforts, past and ongoing, cannot responsibly be discussed in an open hearing. But I welcome this opportunity to seek your counsel in open session about how best to proceed. If we stop the money, we stop the killing.

Thank you.