**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03-MD-01570 (GBD)(SN)<br>ECF Case |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, 1:23-cv-02845

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' JOINT MOTION TO EXCLUDE THE EXPERT TESTIMONY OF**
**<u>EVAN KOHLMANN AND MATTHEW LEVITT</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ iv

**EVAN KOHLMANN'S TESTIMONY SHOULD BE EXCLUDED**

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................2

I.     KOHLMANN IS DISHONEST ABOUT HIS QUALIFICATIONS AND OPINES
       OUTSIDE THE SCOPE OF HIS LIMITED EXPERTISE ...................................2

       A.     Kohlmann has a pattern of dishonesty when representing his credentials...............2

       B.     Kohlmann is not an expert in accounting or financial audits and his opinions
              on these matters must be excluded..........................................................7

       C.     Kohlmann is concededly unqualified to offer opinions on the "structures"
              of the Charity Defendants ......................................................................8

       D.     Kohlmann is neither a religious expert nor an expert on Islamic charities.............9

II.    KOHLMANN'S DISHONEST TREATMENT OF EVIDENCE TAINTS HIS ENTIRE
       TESTIMONY ...................................................................................................10

       A.     Kohlmann manufactures and manipulates materials to prop up his opinions .......10

       B.     Kohlmann manipulates facts to create associations that do not exist ...................13

III.   KOHLMANN OFFERS IMPROPER LEGAL CONCLUSIONS AND STATE OF
       MIND OPINIONS AND LAUNDERS HEARSAY AS HIS OWN TESTIMONY ........15

       A.     Kohlmann draws legal conclusions ......................................................15

       B.     Kohlmann speculates as to motive or mental state ...............................17

       C.     Kohlmann serves as a mere conduit of hearsay ...................................18

IV.    KOHLMANN'S TESTIMONY IS LITTERED WITH IRRELEVANT TOPICS...........21

V.      KOHLMANN OFFERS SPECULATIVE, CONJECTURAL AND CONCLUSORY
        OPINIONS ........................................................................................................23

        A.      Kohlmann speculates about the import of the Defendants' financial
                documents ............................................................................................23

        B.      Kohlmann presents conclusory claims and opinions without factual basis ..........26


**MATTHEW LEVITT SHOULD BE PRECLUDED FROM TESTIFYING**

INTRODUCTION ......................................................................................................30

ARGUMENT ..............................................................................................................31

VI.     LEVITT'S TESTIMONY RELATING TO TREASURY'S DESIGNATION
        PROCESS IS UNFAIRLY PREJUDICIAL AND LIKELY TO CONFUSE AND
        MISLEAD THE JURY ....................................................................................31

        A.      The Treasury Department denied access to Levitt's testimony as a fact witness,
                and the evidentiary package he authored and reviewed remains classified ..........33

        B.      Allowing Levitt's testimony concerning Treasury's designations would permit
                him to use his Treasury experience as both sword and shield ..............................34

        C.      Levitt's testimony concerning Treasury's designations would confuse and
                mislead the jury ..................................................................................35

VII.    LEVITT OFFERS IMPROPER LEGAL CONCLUSIONS AND LAUNDERS
        HEARSAY TESTIMONY ................................................................................37

        A.      Levitt draws legal conclusions ..........................................................37

        B.      Levitt is a mere conduit of hearsay ..................................................37

VIII.   LEVITT'S TESTIMONY IS REPLETE WITH IRRELEVANT OPINIONS .................40

IX.     LEVITT OFFERS OPINIONS ON ISSUES BEYOND HIS EXPERTISE ....................41

        A.      Levitt is not an expert on religion, Islam, or Shariah, or on accounting,
                finance, or audits ................................................................................41

        B.      Levitt is not an Al Qaeda or Saudi Charity expert ..................................41

X.   LEVITT OFFERS NO OPINIONS WITH RESPECT TO WAMY AND HIS
     COMMENTS AND "CONCERNS" LACK THE INTELLECTUAL RIGOR
     AND EXPERT ANALYSIS TO BE ADMISSIBLE..........................................................44

CONCLUSION.....................................................................................................................45

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 3M Combat Arms Earplug Prods. Liability Litig.*,
    No. 3:19-MD-2885, 2021 WL 2028682 (N.D. Fla. May 11, 2021) ................................31, 36

*Ahmed v. Obama*,
    613 F. Supp. 2d 51 (D.D.C. 2019) ........................................................................................19

*Amduso v. Republic of Sudan*,
    61 F. Supp. 3d 42 (D.D.C. 2014) ..........................................................................................42

*Amorgianos v. Amtrak*,
    303 F.3d 256 (2d Cir. 2002)..................................................................................................23

*CBSP v. Samuels*
    (Court of Appeals, Paris, France, 2008) ...............................................................................42

*Chill v. Calamos Advisors LLC*,
    417 F. Supp. 3d 208 (S.D.N.Y. 2019).....................................................................................8

*Deutsch v. Novartis Pharms. Corp.*,
    768 F. Supp. 2d 420 (E.D.N.Y. 2011) ....................................................................................6

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)....................................................................................................5

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...............................................................................................................28

*Gharani v. Bush*,
    593 F. Supp. 2d 144 (D.D.C. 2009) ......................................................................................19

*Hamilton v. Negi*,
    No. 09-CV-0664, 2012 WL 1067857 (W.D. La. Mar. 15, 2012), *report and*
    *recommendation adopted*, No. CIV.A. 09-860, 2012 WL 1067897 (W.D. La.
    Mar. 29, 2012)........................................................................................................................6

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992)............................................................................................15, 37

*I.M. v. United States*,
    362 F. Supp. 3d 161 (S.D.N.Y. 2019)......................................................................................6

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
  103 F. Supp. 2d 268 (S.D.N.Y. 2000) ....................................................................23

*Konrick v. Exxon Mobil Corp.*,
  C.A. No. 14-524, 2016 WL 439361 (E.D. La. 2016) ....................................4, 10, 15

*In re Leap Wireless Int'l, Inc.*,
  301 B.R. 80 (Bankr. S.D. Cal. 2003) ....................................................................35

*LinkCo, Inc. v. Fujitsu Ltd.*,
  No. 00 CIV. 7242 (SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ...............36

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008)....................................................................................23

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013).....................................................................................17

*McMahon v. Presidential Airways, Inc.*,
  No. 6:05-CV-1002-Orl-28GJK, 2009 WL 10705562 (M.D. Fla. Nov. 5, 2009)....................33

*In re Mirena IUD Prod. Liab. Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016).......................................................33, 35, 36

*On Track Innovations Ltd. v. T-Mobile USA, Inc.*,
  106 F. Supp. 3d 369 (S.D.N.Y. 2015) (Nathan, J.)................................................10

*In re Puda Coal Sec. Inc., Litig.*,
  30 F. Supp. 3d 230 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*,
  649 F. App'x 55 (2d Cir. 2016) ...............................................................................8

*Republic of Sudan v. Owens*,
  No. 17-1236 (U.S. April 5, 2018) ............................................................................5

*Rubel v. Eli Lilly & Co.*,
  160 F.R.D. 458 (S.D.N.Y. 1995) ...........................................................................36

*Sana-Bell, Inc. v. BMI Real Estate, et al.*,
  No. 8:98-cv-04177 (PJM) (D. Md. Dec. 23, 1998)................................................25

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ..............................................................................18

*Secretary of State for the Home Department v AR*,
  [2008]........................................................................................................................3

*Strauss v. Crédit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2017) ......................................................18, 20, 38

*In re Terrorist Attacks on Sept. 11, 2001,*
    134 F. Supp. 3d 774 (S.D.N.Y. 2015)......................................................................3

*In re Terrorist Attacks on Sept. 11, 2001,*
    718 F. Supp. 2d 456 (S.D.N.Y. 2010)....................................................................14

*In re Terrorist Attacks on Sept. 11, 2001,*
    No. 15-3426, 2017 WL 8776686 (2d Cir. Feb. 7, 2017) ...........................................3

*In Re Terrorist Attacks on September 11, 2001,*
    740 F. Supp. 2d 494 (S.D.N.Y. 2010)..............................................................22, 33

*Twitter, Inc. v. Taamneh,*
    598 U.S. ___, 143 S. Ct. 1206 (2023)........................................................21, 22, 40

*United States v. Abu-Jihad,*
    553 F. Supp. 2d 121 (S.D.N.Y. 2008)..............................................................4, 6, 18

*United States v. Akhavan,*
    No. 20-CR-188 (JSR), 2021 WL 2776648 (S.D.N.Y. July 2, 2021) ......................36

*United States v. Bradley,*
    No. 3:21-CR-00087 (VAB), 2022 WL 1708400 (D. Conn. May 27, 2022)..........36

*United States v. Damrah,*
    No. 1:03CR484, 2004 WL 5010196 (N.D. Ohio June 7, 2004) ................41, 42, 43

*United States v. Delance,*
    694 Fed. Appx. 829 (2d Cir. 2017).......................................................................36

*United States v. Dukagjini,*
    326 F.3d 45 (2d Cir. 2003)............................................................................ *passim*

*United States v. Farhane,*
    634 F.3d 127 (2d Cir. 2011).................................................................................5, 6

*United States v. Hausa,*
    No. 12-cr-0134 (E.D.N.Y. Feb. 6, 2017) .............................................................13

*United States v. Kabir,*
    12-CR-00092-VAP, Min. Order (C.D. Cal., July 7, 2014 ECF 433) ......................5

*United States v. Mejia,*
    545 F.3d 179 (2d Cir. 2008)......................................................20, 35, 36, 38

*United States v. Mostafa,*
    No. 04 Cr. 356 (KFF), 2014 WL 1744717 (S.D.N.Y. April 23, 2014) ...................6

*United States v. Muntasser*,
    No. 4:05-CR-40026-FDS (D.Mass Nov.28, 2007) .......................................................4, 5, 6, 9

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988)...................................................................................................36

*United States v. Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004)..................................................................................................7, 8

*Vale v. United States*,
    No. 10-CV-4270 PKC LB, 2015 WL 5773729 (E.D.N.Y. Sept. 30, 2015),
    *aff'd sub nom. Vale v. United States*, 673 F. App'x 114 (2d Cir. 2016) ...................................6

*Valentine v. Pioneer Chlor Alkali Co.*,
    921 F. Supp. 666 (D. Nev. 1996).............................................................................................4

## Other Authorities

Executive Order 13224 ....................................................................................................33, 34, 35

Fed. R. Civ. P. 72...........................................................................................................................28

FRE 403 .................................................................................................................... *passim*

FRE 404 ...............................................................................................................................1

Rule 702 .................................................................................................................... *passim*

Defendants,[1] pursuant to the Court's Order dated June 28, 2023 (ECF No. 9173) and reflecting the principles in the Court's bellwether Order (ECF No. 9060), move pursuant to Fed. R. Evid. 702 and 403[2] and *Daubert* to exclude the proffered testimony of Plaintiffs' experts Evan Kohlmann ("Kohlmann") and Matthew Levitt ("Levitt"). Given the length of these experts' reports and the frequency of improper testimony, Defendants address certain examples below, and include a table (attached as Exhibit 1 to the Declaration of Aisha Bembry) that catalogues all other similar instances of excludable testimony.

## EVAN KOHLMANN'S TESTIMONY SHOULD BE EXCLUDED

### INTRODUCTION

With very little, if any, relevant education, training, or experience,[3] Kohlmann has emerged as Plaintiffs' expert on all things, even as he fabricates his qualifications and misrepresents key facts. In this case and in the past, he has fabricated an association with a prestigious publisher to exaggerate his qualifications, falsely claimed his writings are peer-reviewed, and invented a degree he does not hold. His manipulative tactics do not stop there. As in the past, Kohlmann misrepresents the contents of material documents that he cites. He contrives evidence to support his claims about Defendants and their purported connections to Al Qaeda and terrorism financing. These are not the actions of a reliable and trustworthy expert. They are so pervasive and egregious that they warrant excluding all of Kohlmann's testimony.

---

[1] "Defendants" means World Assembly of Muslim Youth and World Assembly of Muslim Youth International ("WAMY"), International Islamic Relief Organization ("IIRO"), Muslim World League ("MWL"), the four "Charity Officer Defendants" (Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdullah Mohsen al Turki, and Adnan Basha), and Yassin Kadi. "Charity Defendants," as used herein, WAMY, IIRO and MWL collectively.

[2] Defendants raise FRE 403 challenges to Matthew Levitt only at this stage because of the unique circumstances surrounding his presence in this litigation, as detailed herein. As with Plaintiffs' experts Jonathan Winer and Brian Jenkins, Defendants reserve the right to raise evidentiary challenges, including but not limited to FRE 403 and 404, to the expert testimony of Kohlmann at a later date should the Court not strike his reports. ECF No. 7343 at 7 n.2. Defendants understand the Court permitted this. ECF No. 9060 at 8 n. 3.

[3] He is not an academic and has never worked in any official capacity for the U.S. government or in law enforcement. While he holds a law degree, he has never practiced as a lawyer and never passed the Bar.

If Kohlmann is permitted to testify, his opinions should be curtailed significantly as he repeatedly crosses the line into improper testimony. He opines on specialized topics when he admits he is not qualified to do so. He offers irrelevant opinions and legal conclusions. He improperly testifies as to the Defendants' state of mind and speculates about matters on which he has no evidence. He renders conclusory opinions that lack any factual basis and openly parrots hearsay testimony. The reasons for his entire exclusion are too numerous for this Court to ignore.[4] In the alternative, this Court should significantly limit the subjects on which he may opine.

## ARGUMENT

## I.     KOHLMANN IS DISHONEST ABOUT HIS QUALIFICATIONS AND OPINES OUTSIDE THE SCOPE OF HIS LIMITED EXPERTISE

Rule 702 instructs "who may give expert testimony and about what."[5] Kohlmann fails both the "who" and "what." The who: Kohlmann's career is built on a pattern of dishonesty and deception about his "academic" credentials. The what: Kohlmann opines on issues on which he admits he is no expert, including financial audits, accounting practices, the structures of Saudi charities, and Islam.

### A.     Kohlmann has a pattern of dishonesty when representing his credentials

As this Court held in its bellwether Order, experts who lack certain "minimum credentials" must be excluded.[6] Kohlmann has repeatedly lied about his credentials by manufacturing and coopting academic cachet in an attempt to prop himself up as an expert. He claims "Oxford University Press;" published his book;  that his work is peer reviewed; and that he has a relevant degree. None of that is true. When confronted with his lies, Kohlmann disingenuously redefines

---

[4] Report of Evan Kohlmann, attached as Exhibit 2, at ¶ 11 (Scope of the Assignment); *id.* at ¶ 17 (Summary of Professional Opinions and Conclusions). All exhibits referenced herein are attached to the Declaration of Aisha Bembry.

[5] *Daubert* bellwether Order at 3, Apr . 27, 2023, ECF No. 9060 ("Order" or "bellwether Order").

[6] Order at 9.

basic concepts, intending to rationalize his testimonies, or simply declares past and present fictions "mistakes." These maneuvers fail the tenets of "academic integrity;" reveal that he is not "as careful as he would be in his regular professional work;" and demonstrate that he lacks the requisite credentials.[7] This Court should disqualify him.[8]

Kohlmann has misappropriated Oxford University Press's renown for years. In case after case, he falsely claimed that it published his 2004 book even though Berg, the real publisher, is part of the *unaffiliated* Oxford International Publishers. In 2005, he claimed that "Berg is an imprint of Oxford University Press."[9] In 2007, he was caught in this lie.[10] Justifying his distortions as "mistakes," he explained here that "ever since then I have been very, very careful when anyone asks me about this to be very clear Oxford International, not Oxford University."[11] This, too, is false. In 2011, Kohlmann again described Berg as a university press, demonstrating that he was either not "very, very careful" or, more plausibly, intentionally misleading.[12] Now, trying to

---

[7] Order at 4-5 (court considerations for qualification of experts); *id.* at 9 ("excluding a witness from testifying altogether—for experts who lack the minimum credentials or whose testimony is significantly corrupted"); *id.* at 32 (Failure to cite credible sources is intellectually dishonest and undermines court's confidence that expert has "'reliably applied' 'reliable principles and methods' 'to the facts of the case'" — these defects taint all of the expert's testimony and the court excluded it entirely).

[8] *Id.* at 9, 32; *In re Terrorist Attacks on Sept. 11, 2001*, 134 F. Supp. 3d 774, 784 n.9 (S.D.N.Y. 2015) (rejecting Kohlmann's affirmation for containing conclusory, largely boilerplate allegations). The Second Circuit vacated this 2015 Opinion following the enactment of JASTA; it did not address this Court's conclusion regarding Kohlmann. *In re Terrorist Attacks on Sept. 11, 2001*, No. 15-3426, 2017 WL 8776686 (2d Cir. Feb. 7, 2017).

[9] *United States v. Paracha*, Trial Tr. at 41:18-19 (S.D.N.Y. Nov. 2, 2005) attached as Exhibit 3.

[10] *Regina v. Faqih*, Trial Tr. 21:16-23 (Jan. 23, 2007), attached as Exhibit 4 ("Q: Your book is a book described as published by Berg Publishers? A: It is Oxford University Press, I believe. Q: That is a false statement, Mr. Kohlmann; is it not? Oxford University Press? It was published by Berg? A: Which is an imprint of Oxford University Press. Q: No, it is an imprint of Oxford International Publishers, which is not Oxford University Press?"); *see also* Kohlmann Dep. Tr., attached as Exhibit 5, at 103:9-106:16. Another English court referred to this examination as one of the "palpable hits secured by defense Counsel in the criminal trial of AV, which caused the prosecution to abandon reliance on any *expression* of opinion by Mr. Kohlmann." *Secretary of State for the Home Department v AR*, [2008] EWHC 2789 (Admin), http://www.bailii.org/ew/cases/EWHC/Admin/2008/2789.html.

[11] Exhibit 5 at 109:12-15.

[12] *Id.* at 109:12-17; *see also id.* at 103:6-109:17 (describing his past mistakes). He even evasively said that his use of "I believe" explained away his "accidental mistake." When challenged, however, he shifted again, claiming to be responding to the assertion that Berg was not an academic press. *Id.* at 105:25-109:2. But the deposition transcript is clear: he was not referring to an assertion that it was an academic press but that it was specifically the Oxford University Press.

harmonize his testimonies, he shamelessly redefines "university press," by contending that Berg is "producing books that are used in universities for teaching purposes, by my definition that's a university press."[13] This *post hoc* rationalization fails: the location of instruction does not control; it is the publisher's imprint that controls.

Kohlmann has long falsely claimed that most of his writings are peer reviewed.[14] While the lack of peer review may not itself be disqualifying, his dishonesty is.[15] For instance, in 2007, he falsely testified in *Regina v. Faqih* that "every paper that I write is extensively peer-reviewed by academics and by others around the world."[16] Yet at least 70% of the 47 "papers" in his CV (and two-thirds of his then-extant "papers," which include television interviews) would not be peer reviewed or fact checked.[17] At deposition, Kohlmann justified his actions by redefining "peer review" to include "*informal* peer review" or, in his words, showing his work "to a bunch of different people."[18] He then declared that he "engaged in *at least informal peer review*, if not formal peer review" for "every paper that [he] produced,"[19] perhaps relying on his contrived

---

[13] *Id.* at 109:18-25. In late 2007, he admitted that Berg was not a university publisher but declared it to be an academic publisher, sowing the seeds for this redefinition and showing he knew Berg was no university press. *United States v. Muntasser*, No. 4:05-CR-40026-FDS, Daubert Hrg. Tr. at 45:8-48:10 (D. Mass. Nov. 28, 2007, ECF. 459); *id.* at 45:10 ("It's an academic publisher"); *id.* at 48:9-10 ("The fact that Berg is not a university press is true . . . ."); *id.* at 45:22-46:3 (describing Berg's commitment to fashion, film, art, design, food, sport, and anthropology).

[14] Order at 4 (courts evaluate an expert's reliability by examining whether his "methodology or theory has been . . . subjected to peer review and publication").

[15] Order at 4 (peer review "poorly suited to terrorism experts"); 32 ("dishonesty" disqualifying); *see Konrick v. Exxon Mobil Corp.*, C.A. No. 14-524, 2016 WL 439361, at *7 (E.D. La. 2016) (mischaracterizing contents of a source and ignoring contradictory facts grounds for exclusion).

[16] Exhibit 5 at 29:14-31:12.

[17] Fourteen papers were for Nine Eleven Finding Answers, Kohlmann's then-employer, and include television interviews; three were for his company, Flashpoint; five are Congressional testimonies; four are unpublished school papers; three are news pieces; three are for *Foreign Policy*; and one is for *Foreign Affairs* magazine, which "rel[ies] mainly on authors to ensure the accuracy of information in their pieces." *Foreign Affairs*, Submissions, available at: https://www.foreignaffairs.com/submissions-0; *compare id. with United States v. Abu-Jihad*, 553 F. Supp. 2d 121, 125 (S.D.N.Y. 2008) ("Mr. Kohlmann has published peer-reviewed articles on the subjects about which he intends to testify, including articles for *Foreign Affairs.*"). Importantly, "the scope of editorial peer review is necessarily narrower than true peer review, [and] it is a serious error to conflate the two processes, and . . . to assume that because an article is accepted for publication, even in a prestigious scientific journal, that the science it contains is therefore valid." *Valentine v. Pioneer Chlor Alkali Co.*, 921 F. Supp. 666, 675 (D. Nev. 1996).

[18] Exhibit 5 at 29:14-34:11.

[19] *Id.* at 30:14-18 (emphasis added).

innovation that posting his writings to the Internet – where perhaps someone might read them – amounts to peer review.[20] Like his feigned definition of "university press," this peerless peer review rationalization seeks to continue to mislead this Court, fails basic standards of academic integrity, and is disqualifying.[21]

Kohlmann has also long falsely claimed to have an academic degree in "Islamic Studies" to conjure expertise in Islam and buoy his related opinions.[22] Indeed, courts have credulously qualified him based on this fabrication, underscoring the dangerous nature of Kohlmann's deceptions.[23] Here, he lists a minor in Islamic Studies on his CV, but a certificate in Islamic Studies in his Affirmative Report ("Report").[24] Neither is true. He has a *certificate* in "Islam and Christian-Muslim Understanding." He brazenly explains that, *in a 62-page, single-spaced report*, the certificate's name is "a long thing to write out."[25] But his repeated self-recredentialing rubbishes that implausible excuse, particularly in light of his claims in other cases. For example, in *Muntasser*, he claimed a second degree in Islam, clarified it was not another bachelor's degree,

---

[20] Exhibit 3 at Tr. 32:7-17 ("THE COURT: When you say peer review, . . . I think this is what you mean. . . . . Is that by virtue of your findings going out of the Internet, they're available for anyone who reads that posting to comment on it. Is that what you're talking about? THE WITNESS: Correct. THE COURT: It's not as if it's a formal jury peer review of an article . . . . THE WITNESS: Right, right."). Kohlmann thus knows what peer review means.

[21] *Elcock v. Kmart Corp.*, 233 F.3d 734, 751 n.8 (3d Cir. 2000) (lies about whether methodology subject to peer review has bearing on expert's methodology); *United States v. Kabir*, 12-CR-00092-VAP, Min. Order at 4 (C.D. Cal., July 7, 2014 ECF 433) (finding that because Kohlmann "has not submitted the profile and its application for rigorous peer review" and other reasons "the Government has not sufficiently shown Kohlmann's methodology of constructing and refining the 'homegrown terrorist' profile to be reliable"). Indeed, those he would claim as peers have torched his work and described him as a "hand for hire" before the Supreme Court. *See* Amici Brief of Terrorism and Evidence Experts, *Republic of Sudan v. Owens*, No. 17-1236 (U.S. April 5, 2018) at 11-12, available at https://www.supremecourt.gov/DocketPDF/17/17-1236/42518/20180405162217825_17-1236%20tsac%20terrorism%20and%20evidence%20experts.pdf .

[22] *See, e.g.,* Exhibit 2 at ¶¶ 36, 49, 71, 164, 182-83, 185, 204-06; Rebuttal Report of Evan Kohlmann, attached as Exhibit 6, at ¶¶ 11, 23, 44, 60-61, 63 (opining on Wahhabism, jihad, radical Islam, extremist indoctrination, violent jihad, violent extremism).

[23] *United States v. Farhane*, 634 F.3d 127, 158-59 (2d Cir. 2011) ("Kohlmann's proposed expert testimony had a considerable factual basis: (1) his *graduate* studies at Georgetown University's School of Foreign Service and Center for Contemporary Arab Studies and at the University of Pennsylvania Law School . . . .") (emphasis added).

[24] *Compare* Kohlmann CV, attached as Exhibit 7, at 1 *with* Exhibit 2 at 1.

[25] Exhibit 5 at 19:20-20:2.

and then proclaimed its content as at "a master's level."[26] In *Paracha*, he again claimed that the certificate amounted to graduate-level work, before admitting that he did not obtain a graduate degree.[27]

Kohlmann's dishonest contrivances are not trivial. They are not "accidental mistakes."[28] At worst, they reveal a campaign and a pattern to deceive both the courts and the public at large;[29] at best, a careless, mistake-prone individual who is not "as careful as he should be in his regular professional work."[30] Simply put, Kohlmann—in his repeated, deceitful attempts to convince this (and other) courts on his credentials—shatters his credibility and corrupts his testimony.[31] These misrepresentations, repeated over years, before numerous tribunals, and across legal systems (by a trained lawyer no less), disqualify Kohlmann.[32]

---

[26] *Muntasser*, Daubert Hrg. Tr. at 8:11-16 (D. Mass. Nov. 28, 2007, ECF 459), ("I actually have a second degree."); 8:13-16 ("it's a certificate for Islam"); 8:24 ("a certificate in Islam"); 14:6-19 (The certificate "is not part of undergraduate. . . . the point of this is to offer, if you have a particular interest in a particular field, to specialize at a master's level in a shorter period of time and to get the certificate.").

[27] Exhibit 3 at 96:11-22, 97:5-10. The *Muntasser* court was as right in 2007 as today: "[Kohlmann] does not speak Arabic and is not an expert on Islam." *Muntasser*, Voir Dire Re: Robert Charnoff and Rule 702 Ruling Re: Evan F. Kohlmann, at 30:10-11 (D. Mass. Nov. 28, 2007, ECF 458) ("[T]herefore, I don't think he could testify, for example, as to what jihad means within the Islamic religion, or what a particular Arabic term means as a general matter.").

[28] Exhibit 5 at 105:25-109:2.

[29] *E.g., Farhane*, 634 F.3d at 158-59; *United States v. Mostafa*, No. 04 Cr. 356 (KFF), 2014 WL 1744717, at *5 (S.D.N.Y. April 23, 2014) (noting Kohlmann was peer reviewed) (quoting *Farhane*, 634 F.3d at 158); *United States v. Abu-Jihad*, 553 F. Supp. 2d 121, 125 (S.D.N.Y. 2008) ("Mr. Kohlmann has published peer-reviewed articles on the subjects about which he intends to testify, including articles for *Foreign Affairs*."). Prior court decisions alone are neither dispositive nor sufficient bases for this Court to qualify Kohlmann, and they were often based on Kohlmann's self-mythology. *See* Order at 16; *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 464 (E.D.N.Y. 2011) ("This Court is not bound by . . . those cases, only by the criteria of *Daubert,* Rule 702, the Second Circuit, the Supreme Court, and to some extent the rulings of the MDL court."); *United States v. Abu Ali*, 05 Cr. 53 (GBL) (E.D. Va.) (Oct. 28, 2005 Hrg. Tr. 28-29) (excluding Kohlmann and noting his use as government witness elsewhere "does not . . . sit as a basis to qualify him as an expert in al-Qaeda"), attached as Exhibit 8.

[30] Order at 4-5.

[31] Order at 9.

[32] *I.M. v. United States*, 362 F. Supp. 3d 161, 193 (S.D.N.Y. 2019) (noting an expert in *Vale v. United States* was disqualified in part because he "had made misrepresentations to the court about his qualifications . . . he lied to the Court"); *Vale v. United States*, No. 10-CV-4270 PKC LB, 2015 WL 5773729, at *3 (E.D.N.Y. Sept. 30, 2015), *aff'd sub nom. Vale v. United States*, 673 F. App'x 124 (2d Cir. 2016) ("Judge Bloom's thorough Report contains a litany of facts that also render Dr. Lipsius unqualified to testify as a medical expert, including [that] he was not forthcoming with Judge Bloom about his professional background"); *Hamilton v. Negi*, No. 09-CV-0664, 2012 WL 1067857, at *2 (W.D. La. Mar. 15, 2012), *report and recommendation adopted*, No. CIV.A. 09-860, 2012 WL 1067897 (W.D. La. Mar. 29, 2012).

### B.    Kohlmann is not an expert in accounting or financial audits and his opinions on these matters must be excluded

Kohlmann *admits* that he: (1) has *no* formal training in accounting; (2) is *not* a CPA; (3) is *not* a forensic accountant; (4) has *never* conducted a financial audit; and (5) has *never* opined on whether a particular audit met international accounting or audit standards.[33] Yet he claims to be able to identify "critical deficiencies in accounting practices and significant irregularities" in IIRO's audit reports[34] and WAMY's Canadian branch's filings for Canadian charitable organization tax status,[35] opining, in summary, that "[f]inancial irregularities and atypical accounting practices used by these Saudi-based dawah organizations are not bugs, but features of these groups and are consistent with typical terrorist financing modes and methodologies."[36] The rules, however, require more of professionals who seek to offer opinions in specialized and technical fields such as accounting and financial audits.[37] Without the "knowledge, skill, experience, training, or education"[38] Rule 702 demands in any relevant area, Kohlmann does not have the requisite qualifications to offer an opinion as to whether any of the Charity Defendants' financial practices or audits are regular or irregular; typical or atypical; or consistent with typical

---

[33] Exhibit 5 at 375:12-18 ("[Q.] Do you have any training, sir, any formal training in accountancy? A. No. . . . Q. You're not a CPA? A. No, no, no, no."); *id.* at 715:4-716:10 ("Q. [Y]ou are not a forensic accountant, correct? A. Correct. Q. Have you ever conducted a financial audit yourself? A. Not like this, no. . . . Q. [H]ave [you] ever given an expert review and opined on a basis of international accounting standards, international audit standards, whether or not an audit did or did not meet those standards. . . . A. No, no, no, I have never offered an opinion like that, no.").

[34] Exhibit 2 ¶ 130 ("I understand that the IIRO has produced a number of auditor reports . . . *many of which identify critical deficiencies in accounting practices and significant irregularities*.") (emphasis added); *see also id.* at ¶ 205 ("the financial irregularities and atypical accounting practices exercised by these dawah organizations were not acceptable for international charitable organizations, and instead represented convenient vehicles for illicit money laundering and providing material support to terrorists and other violent extremists").

[35] *Id.* at ¶ 191.

[36] *Id.* at ¶ 17 (Summary of Professional Opinions and Conclusions).

[37] *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (nexus must exist between expert's "area in which [he] has superior knowledge, education, experience, or skill [and] the subject matter of the proffered testimony").

[38] Order at 4.

terrorist financing modes and methodologies.[39] These opinions should thus be excluded.[40]

### C.   Kohlmann is concededly unqualified to offer opinions on the "structures" of the Charity Defendants

Kohlmann offers his opinion that "[t]he organizational and financial structures of the MWL, IIRO, and WAMY are evidence that their material support of al Qaeda and affiliated organizations was conducted with the awareness and knowledge of the senior officials who headed those organizations."[41] To testify, however, an expert must demonstrate some nexus between "the area in which [he] has superior knowledge, education, experience, or skill [and] the subject matter of the proffered testimony."[42] No nexus exists here to support Kohlmann's testimony about the organizational and financial structures of the Charity Defendants. Beyond his inadequate training and experience in the fields of accounting and financial audits, Kohlmann *admits* that he has *no* expertise in charity regulations outside the United States and *no* training concerning the operation of NGOs.[43] In other words, he has no idea how a legitimate foreign charity operates, so he has no ability to contrast a legitimate one with one supporting Al Qaeda. Having no training or other relevant experience,[44] Kohlmann's opinions outstrip his actual expertise. The Court should reject

---

[39] *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 254 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016) (excluding auditing expert who "never conducted such an audit," lacked "the requisite training," and "concedes that she lacks qualifications to opine in this area"); *Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 244 (S.D.N.Y. 2019) (excluding accounting expert who lacked "degrees or certifications in accounting," was "not an expert in GAAP or managerial accounting," and had "no experience in preparing, auditing, or analyzing financial statements").

[40] Exhibit 2 at ¶ 17 (opining that financial irregularities are a feature of the charity defendant's organization); *Id.* at ¶¶ 190-94 (repeating claims from CRA about WAMY's audits and alleged financial irregularities); ¶ 205 (opining that IIRO and MWL's financial irregularities and atypical practices—whatever that means—are not acceptable for international charitable organization).

[41] *Id.* at ¶ 17. This is also improper state of mind and legal conclusion testimony. Order at 6 (legal conclusions not permitted); 20-21 (precluding conclusions speaking to liability that usurp jury); *see infra* at §§ III.A-B..

[42] *Tin Yat Chin*, 371 F.3d at 40.

[43] Exhibit 5 at 186:16-22 (Q: "And so you know what regulations apply to specific charities in specific countries in specific times, do you?" A: "My expertise in charitable is mostly focused on how it applies in the U.S."); *Id.* at 187:18-22 (Q: "Do you have training with respect to the operation of NGOs? A: Not NGOs generally, NGOs that are affiliated with armed organizations, I guess is the way you can say it.").

[44] *Id.* at 375:12-16 ("[Q.] Do you have any training, sir, any formal training in accountancy? A. No, not beyond just analyzing the financial documents of charitable organizations, that's it.").

his opinions on the Charity Defendants' organizational and financial structures.[45]

### D.    Kohlmann is neither a religious expert nor an expert on Islamic charities

As this Court has concluded with respect to another of Plaintiffs' experts, Jonathan Winer ("Winer"), Kohlmann offers opinions on religious matters outside of his expertise.[46] Although he admits, and one court confirmed, that he is not an expert on Islam,[47] Kohlmann seeks to impart a violent meaning to the discussion by speakers at WAMY events and WAMY officials about Islamic concepts.[48] He references jihad and the five pillars of Islam without explaining the meaning of the terms or contextualizing their religious importance.[49] He offers his opinions that the MWL's publications have "focused on the concept of dawah, or the proselytization of a particular interpretation of Islam" and that "[i]n this respect, MWL publications have promoted a hardline Wahhabi creed."[50] Similarly, without providing any context for its relevance, Kohlmann seeks to interpret the lyrics of a song included in a WAMY youth-camp pamphlet, which describes key events from Islamic history dating back to the 7th Century with religious connotations, as part of the basis for his opinion that WAMY has connections to "international terrorist organizations and

---

[45] *See, e.g.,* Exhibit 2 at ¶ 17 (summary of opinions concerning finances, accounting practices, and organizational and financial structures of MWL, IIRO, and WAMY); *id.* at ¶ 187; *id.* at ¶ 174, Exhibit 6 at ¶¶ 75-78 (opining on WAMY corporate structure and controls) Exhibit 2 at ¶ 51 (opining that MWL and IIRO held considerable oversight and control over Rabita Trust's operations and activities); *Id.* at ¶¶ 130-53, 206; Exhibit 6 at ¶ 47 (opining on IIRO audits and financial operations and controls); Exhibit 2 at ¶¶ 190-94, 206; Exhibit 6 at ¶¶ 47, 79 (opining on WAMY audits and financial operations). Many of these also amount to improper legal conclusions. *See infra* at § III.A.

[46] Order at 17 (prohibiting Winer's testimony about religion).

[47] Exhibit 5 at 213:23-25 ("Generally speaking, I'm not proffered as an expert on Islam, that's true, and I don't speak Arabic"); *see e.g., supra* at 6 n.27; *Muntasser*, Daubert Hrg. Tr. at 88:23-25 (D. Mass. Nov. 28, 2007, ECF 459).

[48] Exhibit 2 at ¶¶ 161-62, 164, 182, 200, 201, 204, and 206 (WAMY Operations Manager Suleman Ahmer presented a lecture to campers titled "Jihad, The Misunderstood Word" and Ahmer shared that Bosnian fighters vowed "we are fools is we don't practice Islam" because jihad establishes Islam and is what attracted fighters to the faith (*id.* at ¶ 161); WAMY Secretary General Maneh al-Johani said in a conference before Kashmiri Muslims "Jihad could be performed in many forms. Muslims can go to battlefield to wage a war against the enemies of Islam or they can give their moral, physical, and financial support [to] the cause of jihad." (*id.* at ¶ 164); WAMY Assistant Secretary General Abdulwahab Noorwali was quoted in the *Saudi Gazette* as questioning the definition of 'terrorism:' 'People should differentiate between 'self-defense,' which is the other correct word for 'Jihad,' and 'terrorism.' (*id.* at ¶ 182).

[49] *Id.* at ¶¶ 183-85 (citing references to jihad and other Islamic concepts that he cannot explain to a jury).

[50] *Id.* ¶ 36; *see id.* ¶¶ 37-48.

terrorist financing."[51] Kohlmann is not qualified to speak about a historic religious song and its Islamic lyrics to connect WAMY to Al Qaeda.

As with Winer, Kohlmann's legal training and internet-based research do not make him qualified to opine on Islamic creeds, principles, religious terms, or religious publications authored or used by the Charity Defendants.

## II.    KOHLMANN'S DISHONEST TREATMENT OF EVIDENCE TAINTS HIS ENTIRE TESTIMONY

An expert's opinion lacks adequate support under Rule 702 where it is based on manipulation, omission, or misrepresentation and not supported by facts or data. Expert opinions are "valueless as evidence without exploration of the underlying facts and rationale showing the path from the facts to the opinion."[52] Products of Kohlmann's manipulations of evidence, his opinions should be stricken.[53]

### A.    Kohlmann manufactures and manipulates materials to prop up his opinions

Kohlmann does not just invent credentials. He also misrepresents and manipulates the contents of documents to support his claims.[54] For instance, Kohlmann falsely links a 9/11 hijacker to IIRO, writing that: "IIRO has become quite infamous for its often direct and inexplicable links to violent jihadists, including Al-Qaida and Usama Bin Laden. Fayez Ahmed Alshehri, *one of the September 11 airline hijackers*, reportedly told his father he was going to go work for the IIRO and never saw his family again."[55] But Fayez Ahmed Alshehri was *not* a 9/11 hijacker. When confronted with this fact at deposition, Kohlmann admitted that he made a "mistake."[56] Tellingly,

---

[51] Exhibit 2 at ¶ 160.
[52] *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 413 (S.D.N.Y. 2015) (Nathan, J.).
[53] Order at 40.
[54] *Konrick*, 2016 WL 439361, at *7 (mischaracterizing the contents of a source is grounds for exclusion).
[55] Exhibit 2 at ¶ 71 (emphasis added).
[56] Exhibit 5 at 437:5; *see also id.* at 434:17-439:15.

however, in the intervening time since his deposition he has made no attempt to correct this reckless "mistake" in his report, exhibiting a cavalier attitude towards his role as an "expert."[57]

Another particularly troubling example of manipulation of the facts and deception appears in Kohlmann's Rebuttal Report. There, under the heading: "*The Saudi Government Position on the Role of Islamic Charities **in Supporting Al-Qaida**,*"[58] he writes: "[a] 2018 report from Saudi Arabia's official Anti-Money Laundering authority warned that on-site inspections of IIRO and WAMY offices in 2016 led to several offices being shuttered for 'several administrative and financial violations . . . to ensure that financial and administrative imbalance is not exploited.'"[59] Kohlmann's ellipsis drastically misrepresents what the report said. The report actually states, "several offices were closed with several administrative and financial violations, ***not for financing terrorism***, but to ensure that financial and administrative imbalance is not exploited."[60] By omitting the key words "not for financing terrorism," Kohlmann intentionally implies that Saudi Arabia closed IIRO and WAMY offices for "supporting Al-Qaida," when the opposite is true.

This is not an immaterial omission as Kohlmann claims; he includes the distorted quote as support for his claim that the Charities supported Al Qaida.[61] In a terrorism financing case, it is hard to imagine words more relevant than the words Kohlmann deceitfully omitted: "***not for financing terrorism,***" especially when the misrepresented quote appears in a section Kohlmann labeled "The Saudi Government Position on the Role of Islamic Charities **in Supporting Al-**

---

[57] Kohlmann cited a single tertiary source to support this claim. Exhibit 2 at ¶ 71. The cited article states that a completely different individual, Waleed Alshehri, was the 9/11 hijacker. Exhibit 5 at 436:8-437:18; *see* "Another Saudi 'hijacker' turns up in Tunis," Kohlmann Ex. 1020, attached as Exhibit 9. This error is also evidence of Kohlmann's lack of engagement with the documentary evidence and a citation to a tertiary source without corroboration. *See infra* at § V.B.
[58] Exhibit 6 at 19 (emphasis added).
[59] *Id.* at ¶ 47.
[60] *See* September 2018 FATF Anti-money laundering and counter-terrorist financing measures, attached as Exhibit 10, at 99.
[61] Exhibit 5 at 759:6-761:20; Exhibit 6 at 19.

*Qaida*." In true deceptive fashion, when challenged during his deposition he doubled down, insisting that neither the report nor his rebuttal section had anything "to do specifically with funding terrorism,"[62] despite the fact that they clearly did.

Kohlmann also contorts statements from an Administrative Review Board summary of evidence concerning a Guantanamo Bay detainee, falsely ascribing the detainee's stated intention to take advantage of IIRO as "support" for his opinion that IIRO itself engaged in wrongful conduct. In his report, Kohlmann writes that detainee Said Muhammad Husayn Qahtani "described how ***IIRO offered*** fraudulent employment and documents to foreign mujahideen fighters who wished to cross the border into Chechnya and engage in combat with the Russian military."[63] In actuality, the statement says:

> The detainee contact[ed] relief organizations such as the Islamic Relief Organization and Haramain Organization. The ***detainee's intention*** was to join a relief organization because those entities would offer him a way to get into Chechnya, whose borders were closed at that time. Once there, the detainee would be free to leave the relief organization and join the fighting."[64]

The document does not state that IIRO offered anyone fraudulent employment or documents.[65] Kohlmann's sleight of hand distorts the statement and creates the false impression that his claim that "IIRO offered" fraudulent employment and documents is substantiated. It is not.[66]

Kohlmann also misrepresents the findings of the Canadian Revenue Agency ("CRA") report as support for his opinion that WAMY supported Al Qaida or other Foreign Terrorist Organizations ("FTO").[67] Kohlmann suggests that the CRA was investigating whether WAMY-

---

[62] Exhibit 5 at 761:14-15; *see also id*. at 760:11-761:20.
[63] Exhibit 2 at ¶ 82.
[64] *Id.* at ¶ 82 (original is in past tense; Kohlmann misquotes it).
[65] In fact, the detainee never made it to Chechnya, and the Islamic Relief Organization is not mentioned again in the summary of evidence. *See* Unclassified Summary of Evidence for Administrative Review Board in the Case of Qahtani, Said Muhammad Husayn, attached as Exhibit 41.
[66] The opinion also provides impermissible state of mind testimony. Order at 6; *see infra* at § III.B.
[67] *See* Exhibit 2 at ¶¶ 190-194 (discussing some of CRA's financial audit concerns).

Canada supported terrorism,[68] but the CRA was, in fact, investigating WAMY-Canada's charitable status under Canadian tax code[69] for, *inter alia*, "failure to "maintain essential books and records."[70] Of course, Kohlmann fails to mention that the CRA report found "no sanctionable concerns."[71] Kohlmann also deliberately misrepresents that WAMY published the book *Arab Volunteers*, about Osama Bin Laden in the first Afghan period, when, in fact, the book identifies the publisher as the House of Learning Printing Press Co.[72]

Kohlmann has a long history of altering key source material. In three terrorism cases, Kohlmann altered testimony, including in *United States v. Usama bin Laden* when he replaced the words "the rule" with "Al Qaeda,"[73] doing so even after being alerted to his error.[74] When confronted from the bench, Kohlmann (again) claimed mistake.[75]

### B.    Kohlmann manipulates facts to create associations that do not exist

Kohlmann also deceives when he improperly opines that WAMY is connected to Al Qaeda based on its association with individuals without any evidence that the individuals themselves had any connection with Al Qaida at all or certainly at the period when WAMY may have interacted with them. Kohlmann's report discusses Abdullah Bin Laden, a former WAMY-USA director who

---

[68] Exhibit 5 at 713:3-19 (conceding that the purpose of the report is to determine the validity of WAMY-USA's charity status).

[69] CRA Report, attached as Exhibit 11, at PEC-WAMY031436.

[70] Exhibit 11 at PEC-WAMY031448.

[71] Exhibit 5 at 717:10-24; *see* Exhibit 11 at PEC-WAMY031440.

[72] *See* Arab Cohort-Volunteers cover, indicating the publishing company as House of Learning Printing Press Co., attached as Exhibit 12.

[73] Exhibit 5 at 215:21-216:8 (admitting to swap in *United States v. Ahmad,* Case No. 04-cr-00301 (D. Conn.); *id.* at 216:22-25 (same in *United States v. Hasbajrami,* 11-cr-00623-DLI (E.D.N.Y)); *id.* at 222:2-12 (same in *United States v. Haroun,* No. 1:13-CR-00272 (E.D.N.Y)); *see also United States v. Hausa*, No. 12-cr-0134), Kohlmann Cross Testimony, attached as Exhibit 13, at 70:11-73:12 (E.D.N.Y. Feb. 6, 2017).

[74] Exhibit 5 at 215:21-217:25, 222:2-223:13 (admitting to erroneous substitution across three matters); *see also* Exhibit 13 at 70:11-73:12.

[75] *See* Exhibit 13 at 73:9-12("THE COURT: Why did it wind up in this report in my case when you had already committed the error earlier? THE WITNESS: It was a mistake on my part, I was not even aware of it being in there."). The Court permitted Kohlmann to testify.

was dismissed as a defendant in this case[76] and has no links to terrorism.[77] Kohlmann invokes Bin Laden's last name repeatedly[78] as "proof" that WAMY has links to Al-Qaida.[79] The Bin Laden name alone is not enough to create a terror link.[80] Similarly, Kohlmann cannot create a link between WAMY and terrorism by falsely claiming that Saad Buraik was an "employee of WAMY"[81] based on unverified writings[82] and posts on Islamophobic and "problematic" sources,[83] when discovery has shown no evidence that Buraik ever worked for WAMY.[84]

Kohlmann also attempts to link WAMY to terrorism by falsely claiming that Anwar Al-Awlaki's speaking at WAMY events — **well before** he left the United States and became radicalized — establishes a link between WAMY and Al Qaida.[85] Kohlmann neglects to mention that during the same period when Awlaki interacted with WAMY, he was invited to and spoke at the U.S. Capitol and the Pentagon as a voice of moderation.[86] Kohlmann plays fast and loose with

---

[76] Order at 19-20 (an expert should not speculate about imaginary facts).

[77] Exhibit 5 at 535:16-536:12 (Kohlmann concedes Abdullah Bin Laden has never supported Al Qaeda or given money to Al Qaeda); *see also In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 470 (S.D.N.Y. 2010) (dismissing Abdullah Bin Laden).

[78] Exhibit 2 ¶¶ 173,176.

[79] Exhibit 5 at 590:11-591:17 (Kohlmann concedes that WAMY-USA was never sanctioned and continued to exist up to the date of his deposition. This is the case despite Kohlmann citation to the 2004 "raid"—Exhibit 2 ¶ 176—and "terrorism related investigation" where WAMY's files and hard drives were seized).

[80] Exhibit 5 at 537:8-538:3 (Kohlmann concedes the Bin Laden name alone is insufficient to create a link to terrorism).

[81] Exhibit 2 at ¶ 183; *see also* Exhibit 5 at 591:23-595:18 (Kohlmann justifies Buraik being a WAMY employee based on the lecture he gave at the camp without providing anything more).

[82] Exhibit 5 at 605:5-608:23 (Kohlmann relies on *Frontpage* Magazine, his former employer and Islamophobic source according to the Southern Poverty Law Center, for his claim that Buraik is a WAMY employee). *But see id.* at 609:7-612:3 (Kohlmann cites to a government cable in which WAMY's Secretary General speaks about Buraik, yet no mention is made of Buraik being an employee of WAMY).

[83] Order at 31. *See also* Exhibit 5 at 597:6-605:2 (Buraik speaking at a WAMY camp, as the biased website asserts without basis, makes it a fact according to Kohlmann); *See, e.g., Saudis Spread Hate Speech in U.S.*, attached as Exhibit 14, at FED-PEC0234958 (this unreliable internet article refers to Abdullah Bin Laden as Osama's brother when that is not true).

[84] Exhibit 5 at 588:6-590:5 (Kohlmann also claims Suleiman Ahmer was a WAMY employee—Exhibit 2 at 161-162—simply because he spoke at a summer youth camp but provides no other basis for this unsupported conclusion).

[85] Exhibit 2 at 186 (Kohlmann recites sensational data about Awlaki but makes no effort to contextualize when Awlaki had contact with WAMY and how Awlaki was viewed at that time).

[86] Exhibit 5 at 626:2-15 (Awlaki was invited to speak at the Pentagon in 2001 and at the Capitol in 2002); *see also id.* at 623:13-625:25 (Kohlmann does not recall reading the *New York Times* article—Kohlmann Ex. 1037—but concedes that Awlaki was popularly perceived in the United States as a moderate after the 9/11 attacks. The *New York Times* article describes Awlaki as a "new generation of Muslim leader capable of merging East and West."). It was only after Awlaki left the U.S. in 2002 (and after WAMY ceased interacting with him) that his rhetoric turned anti-West. *See*

the facts to create connections between WAMY and Al Qaeda that do not exist.[87]

While Kohlmann tries to mask these deliberate misrepresentations as "mistakes," they all seem to go in only one direction: bolstering his credentials and inflating the findings in his reports. This establishes a pattern of deception, shows a lack of reliability, and destroys his credibility. Even more disturbing than the conduct of the experts in *Konrick*, who were excluded for mischaracterizing and ignoring contradictory facts, Kohlmann goes further by hiding crucial text and contradictory facts from his sources, blinding the reader to exculpatory facts.[88] For these reasons, Kohlmann should be excluded.

## III.   KOHLMANN OFFERS IMPROPER LEGAL CONCLUSIONS AND STATE OF MIND OPINIONS AND LAUNDERS HEARSAY AS HIS OWN TESTIMONY

As this Court has concluded with respect to Plaintiffs' experts Winer and Brian Jenkins ("Jenkins"), Kohlmann improperly draws legal conclusions, speculates as to the state of mind of individuals and organizations, and frequently relies on hearsay evidence without analysis or opinion of his own.

### A.   Kohlmann draws legal conclusions

As the Court concluded in the bellwether Order, "[e]xperts cannot draw legal conclusions because they are 'not qualified to compete with the judge in the function of instructing the jury' with the proper legal standard."[89] Therefore, experts "must refrain from offering legal conclusions," including, in this case, "characterizations of a Defendants' conduct as providing

---

*The Lessons of Anwar al-Awlaki*, New York Times article, attached as Exhibit 15 ("The reason for Awlaki's eventual departure from the United States, and for the steady hardening of his message that followed, have long been misunderstood.").

[87] Order at 20 (warning that experts should apply the facts of the case and not imagine new ones); *see also* Exhibit 2. at ¶ 177. All we know from Kohlmann's citation is that Ali Bapir was at an "outdoor" 2002 "public event" and Ansar Al Islam was not designated until a year after the public event—*See e.g.,* Exhibit 5 at 512:21-513:16. Bapir is not alleged to have been a WAMY official, an employee or that he even spoke at the event); *see id.* at 509:13-512:4-9 (When asked for more detail about the event, Kohlmann is unable to provide any information.).

[88] *Konrick,* 2016 WL 439361, at *7; *see also,* Order at 32.

[89] Order at 20 (quoting *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992)).

'material support' to al Qaeda."[90] Like Winer,[91] Kohlmann crosses that line on multiple occasions, improperly opining that "[t]he organization and financial structures of the MWL, IIRO, and WAMY are evidence" of "their material support of al Qaeda and affiliated organizations."[92] He further argues with his own facts and legal conclusions: "the tens of millions of dollars in support provided by these dawah organizations was the fuel for Al-Qaida's engine in the period leading up to the September 11th attacks, and [ ] Al-Qaida could not have successfully planned and carried out the attacks without that funding."[93]

Kohlmann's conclusory testimony goes further still. He opines that certain "financial irregularities and atypical accounting practices" by "these dawah organizations . . . represented convenient vehicles for illicit money laundering and providing material support to terrorists and other violent extremists."[94] With respect to IIRO, he improperly concludes that IIRO has permitted a long list of crimes: "[f]rom the late 1980s, IIRO offices, representatives, and employees have been involved in money laundering, weapons smuggling, document fraud, terrorist financing, and acts of violence."[95] He also concludes without any basis that WAMY top officials "explicitly endorse[d] the concept of violent jihad (and the linked notion of 'jihad by wealth')," and engaged in "illicit activities like "diversion of money, weapons, and [production] of travel documents to al Qaeda."[96] The Court excluded statements just like these from Winer's report because they "speak

---

[90] *Id.* at 40. For purposes of efficiency, Defendants do not repeat but instead incorporate herein the legal arguments and citations regarding the inadmissibility of an expert witness' legal conclusions at pages 10 and 12-13 of their "Memorandum of Law in Support of Defendants' Joint Motion to Exclude Expert Testimony of Jonathan Winer and Brian Michael Jenkins" (ECF No. 7343) (Nov. 15, 2021) (the "Bellwether Motion").

[91] Order at 20-21 (excluding Winer's legal conclusions).

[92] Exhibit 2 at ¶ 17.

[93] *Id.* at ¶ 204; *see also* ¶ 17 ("Without this fuel, Al-Qaida would not have been a global threat, nor capable of executing sophisticated, elaborate terrorist attacks on a global scale—including the September 11 terrorist attacks on the United States.").

[94] *Id.* at ¶ 205.

[95] *Id.* at ¶ 77.

[96] Exhibit 2 at ¶ 206; *see also id.* at ¶ 158 ("The Jeddah-based World Assembly for Muslim Youth (WAMY) is another example of the shadowy Saudi dawah/charitable entities that have helped support Al-Qaida over the past three decades.").

to Defendants' liability, rather than adding helpful context or analysis."[97] Lacking facts sufficient to support their claims, Plaintiffs improperly use Kohlmann to do what their evidence cannot. Kohlmann's improper legal conclusions should be excluded.

### B.  Kohlmann speculates as to motive or mental state

In the bellwether Order, the Court explained that "[n]o expert can divine an actor's subjective intent" because "[a] jury, as much as any expert, can evaluate evidence and draw conclusions about an actor's state of mind."[98] Because "experts are prohibited from 'speculat[ing] as to the motivations and intentions' of organizations,"[99] the Court excluded portions of Jenkins' and Winer's reports as "improper state of mind testimony."[100] Like Jenkins and Winer, Kohlmann repeatedly violates this prohibition by improperly opining on groups' and individuals' mindsets and motives.

Kohlmann opines on the mindset of senior MWL, IIRO, and WAMY officials: "The organization and financial structures of MWL, IIRO, and WAMY are evidence that their material support of al Qaeda and affiliated organizations was conducted *with the awareness and knowledge of senior officials* who headed those organizations."[101] Yet Kohlmann cannot possibly divine what these individuals knew or did not know, and such state of mind speculation is impermissible. Similarly, he improperly describes a "litany of documentary evidence . . . demonstrating how the senior leadership of Saudi state-sponsored dawah organizations including MWL, IIRO, and WAMY *were well aware* of the ideological agenda being pushed by their respective groups, the suspicious financial practices used by their employees, and the growing list of connections

---

[97] Order at 21.
[98] *Id.* at 12.
[99] *Id.* at 21 (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013)).
[100] For purposes of efficiency, Defendants do not repeat but instead incorporate herein the legal arguments and citations regarding the inadmissibility of speculative testimony at pages 14-17 of their Bellwether Motion.
[101] Exhibit 2 at ¶ 17 (emphasis added).

between their entities and violent jihadi extremists, most notably al Qaeda."[102] Testimony about the "wishful thinking of some former IIRO and MWL employees;"[103] MWL, IIRO and Rabita Trust's alleged "attempt to limit their exposure" in "the wake of September 11;"[104] and that certain actions were taken "[i]n order to evade the attention of law enforcement and intelligence agencies,"[105] is also improper. As was the case with Jenkins, the inclusion of "descriptions of actors' 'intentions or beliefs'" is "beyond [Kohlmann's] mandate."[106] Kohlmann "may not speculate about the intent of individuals or the organization as a whole 'without dispositive support,'"[107] which he lacks.

## C.     Kohlmann serves as a mere conduit of hearsay

Although "terrorism experts may rely on hearsay to reach their conclusions," this "does not give the parties a blank check to slip hearsay statements into expert reports."[108] Instead, "[e]xperts are supposed to synthesize and interpret information for the jury, not parrot other sources."[109] "If an expert provides no commentary or analysis, if his testimony is nothing more than quotes from a single hearsay source, then the expert cannot properly testify to that content."[110] Because Kohlmann often merely "'regurgitat[es]' hearsay," rather than "'gather[ing] information from multiple sources' and 'cross-check[ing] factual information' against other accounts,"[111] these portions of his testimony are properly excluded.[112]

---

[102] *Id.* at ¶ 206 (emphasis added).
[103] *Id.* at ¶ 205.
[104] *Id.* at ¶ 58.
[105] Exhibit 6 at ¶ 31.
[106] Order at 13.
[107] *Id.* (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 47 (S.D.N.Y. 2016)).
[108] Order at 41.
[109] *Id.*
[110] *Id.*.
[111] *Id.* at 14 (quoting *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 439 (E.D.N.Y. 2017) and *Abu-Jihaad*, 553 F. Supp. 2d at 126).
[112] Defendants incorporate herein the legal arguments and citations regarding the exclusion of expert testimony that repeats hearsay evidence at pages 35-36 of their Bellwether Motion.

Kohlmann parrots unreliable Department of Defense (DOD) Detainee Assessments[113] for two Guantanamo Bay detainees: Adel Hamad, a WAMY employee wrongly arrested by Pakistani authorities and eventually detained at Guantanamo, and Mammar Ameur.[114] Kohlmann repeatedly lifts sections from DOD assessments without analysis.[115] He also manipulates quotes from DOD assessments to mispresent their meaning.[116] "Such a naked use of 'cut and paste' has no place in an expert report."[117] Similarly, Kohlmann simply parrots unverified "adverse reporting" from the 500-page CRA report and its exhibits,[118] which includes his own statements, newspaper articles, and other tertiary sources,[119] to support his opinion that WAMY had close relations with

---

[113] The DOD assessments consist of unproven allegations and have been rejected by federal courts as insufficient for continued detention because they are often the product of "third-hand hearsay" and "unreliable information" derived from torture, inhumane treatment, and detainees motivated to implicate others. *See Gharani v. Bush*, 593 F. Supp. 2d 144, 148-49 (D.D.C. 2009); *see also Ahmed v. Obama*, 613 F. Supp. 2d 51, 55, 57-58, 62 (D.D.C. 2019) (finding that some of the information in the assessment is the product of torture and is third-hand hearsay); Human Rights Watch Fact Sheet: *Flawed Guantanamo Assessment File*, December 2016 at 1 (rejection by federal courts and the implication of torture and motivation to implicate other prisoners and the inhuman and cruel conditions of their detention). Attached as Exhibit 16; *see* Human Rights Watch Issue Brief: *Guantanamo Detainee Transfers*, December 2018 at 1 and 4 (discussing unreliable information and flawed methodology of the assessment where information is the product of torture) Attached as Exhibit 17. They are only intended to point to a detainee's threat level and are not "evidence to prove a detainee's guilt or innocence." *See* JTF-GTMO Matrix of Threat Indicators, attached as Exhibit 18.

[114] Exhibit 2 at ¶¶ 159, 168-72 (citing to DOD assessments for Hamad, Ameur and Balkhair, with the relevance of the latter never being explained); *see Linde v. Arab Bank*, No. 1:06-cv-01623-BMC-PK, Kohlmann Trial Tr. 490:3-10 (E.D.N.Y. Aug. 18, 2014 ECF 947) (testifying about his reluctance to use government sources except when it is part of an objective process); *see* Exhibit 5 at 720:22-721:19 (conceding that he does not know and cannot confirm the source of the DOD claims in the assessment).

[115] Exhibit 2 at ¶ 171; *see* JTF GTMO Detainee Assessment, attached as Exhibit 19, at FED-PEC0197468 (Ameur's assessment lists NGOs where he worked and WAMY is not one of them). Exhibit 2 at ¶¶ 168-170 (as discussed above, the DOD assessment, which may very likely also be the product of torture, is not a document that even Kohlmann would use even though he tries to do so here).

[116] Unclassified Summary of Evidence for Administrative Review Board in the Case of Ameur, Mammar, attached as Exhibit 20, at FED-PEC0181047; and Unclassified Summary of Evidence for Administrative Review Board in the Case of Adel Hussein, Hassan, attached as Exhibit 21, at FED-PEC0218312 (the DOD report reads "[WAMY] **may** be affiliated and associated with" terrorists, whereas Kohlmann's report (Exhibit 2) at ¶ 159, intentionally omits "may" to give the claim a sense of certainty); *see* Exhibit 5 at 723:2-724:8 (Kohlmann tries to suggest there is no meaningful difference in removing the word "may").

[117] Order at 23.

[118] Exhibit 2 at ¶¶ 190-194.

[119] Exhibit 11 at PEC-WAMY031455-58 (for example the CRA's "adverse reporting" section cites to the Indian newspaper article about SIMI, Epstein and Kohlmann testimony before Congress, the *Santiago* Proffer, and Hedges 1992 *New York Times* article, all of which are cited in Kohlmann's report. Kohlmann himself has testified about the problematic use of government sources that are tertiary in nature. *See Linde*, No. 1:06-cv-01623-BMC-PK, Kohlmann Trial Tr. 490:3-10 (E.D.N.Y. Aug. 18, 2014 ECF 947) (testifying about his reluctance to use government sources except when it is part of an objective process); *Id.* at 491:12-492:8 (cautioning against drawing conclusions from journalist reports because the meanings can be altered).

organizations engaged in "providing resources to entities engaged in terrorist activities."[120]

Paragraphs 121 and 123 of Kohlmann's Report are particularly egregious. In both paragraphs, Kohlmann quotes extensively from OFAC statements about the Philippine and Indonesian branches of IIRO and the former Executive Director of the Eastern Province Branch of IIRO, but provides no analysis whatsoever. In each instance, he merely introduces OFAC's language with "According to a statement from the Treasury Department," and, in the latter instance, "According to an accompanying statement from the Treasury Department." However, "[m]erely 'repeating' information is exactly what experts must avoid."[121] Kohlmann "did not analyze his source materials so much as repeat their contents."[122]

Indeed, it was this exact scenario that led this Court to exclude hearsay evidence from Winer's Report. Considering a page of block quotes from the *9/11 Commission Report*, the Court concluded "[s]uch naked use of 'cut and paste' has no place in an expert report."[123] But this is precisely Kohlmann's strategy. He "simply repeats someone else's statements and does not 'apply[] [his] expertise to that hearsay evidence,'" even though "the jury does not need help understanding the underlying hearsay and it is an improper subject for expert testimony."[124] Additional examples of such "naked use of 'cut and paste'" abound. Just like Winer, Kohlmann quotes from the *9/11 Commission Report*, regurgitating the Report's conclusions without synthesizing or analyzing them in any way to reach his own conclusions. Instead, he simply quotes the Commission's conclusion and then quotes the Commission's text, noting that both were "according to the final report."[125] Kohlmann follows the same strategy in quoting a letter from a

---

[120] Exhibit 2 at ¶ 190 (these organizations include BIF).
[121] Order at 14 (quoting *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008))(cleaned up).
[122] *Mejia*, 545 F.3d at 198.
[123] Order at 23 (citing *Strauss*, 925 F. Supp. 2d at 439).
[124] *Id*. at 7 (quoting *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003)).
[125] *See* Exhibit 2 at ¶ 20; *see also id.* at ¶ 21 (repeating chunks of text from the *9/11 Commission Report*); Exhibit 6 at ¶¶ 60, 81, 84 (same).

U.S. State Department Official, using his own language only to introduce the quotes in each of the two paragraphs.[126] In his Rebuttal Report, Kohlmann extensively quotes from partially declassified C.I.A. Intelligence Reports to support his thesis that "U.S. government agencies . . . have resoundingly concluded that Saudi Islamic charities have played a pivotal role in supporting international terrorism."[127] Kohlmann does not even attempt a façade of expert analysis of these hearsay sources, expressly acknowledging that he is merely "tak[ing] the opportunity [] to add additional illustrative sources."[128] His Rebuttal Report introduces a half page of additional quoted text with language that could have been offered by any lay person: "The person in the recording noted,"[129] and later in his Rebuttal Report, Kohlmann introduces a full page of quoted text with: "In the video, Abu Zubaydah states the following…."[130]

In none of these instances does Kohlmann apply any expertise or analysis to the lengthy quotations. Kohlmann, like Winer, "cannot testify to the portions of his opinion that consist of extended quotes from a single hearsay source without any analysis."[131] There are proper ways to introduce factual evidence; using an expert to parrot hearsay is not one of them.

## IV.   KOHLMANN'S TESTIMONY IS LITTERED WITH IRRELEVANT TOPICS

As explained in the bellwether Order, this Court "will exclude opinions that are not directly relevant to resolving the legal claims at issue."[132] And in *Twitter, Inc. v. Taamneh*, addressing the elements of aiding and abetting claims under the ATA, the Supreme Court recently explained that the "focus must remain on assistance to the tort for which plaintiffs seek to impose liability"—

---

[126] Exhibit 2 at ¶¶ 112-113. He writes, "In a second letter dated December 20, 1994, Wilcox stated that Khalifa," and then he quotes from the letter. *Id*. at ¶ 112. In the next paragraph, his introduction is more succinct: "Wilcox's letter made the following additional points." *Id*. at ¶ 113.
[127] Exhibit 6 at ¶ 48.
[128] *Id*. at ¶¶ 49-51.
[129] *Id*. at ¶ 38.
[130] *Id*. at ¶ 44.
[131] Order at 23.
[132] *Id*. at 40.

here, 9/11.[133]

Kohlmann's opinion exudes the irrelevant. For example, Kohlmann covers MWL resolutions and journals dating from 1981 and the early 1990s covering topics like the al-Aqsa Mosque, the Bosnian genocide, and Kashmir; Sheikh Azzam's purported efforts to aid arriving "Arab-Afghan volunteer fighters starting in the early 1980s;" 1993 WAMY publications concerning Kashmir; immigration raids of MWL offices by the Philippine and U.S. governments in 1993 and 2005, respectively; actions affecting IIRO by Bangladesh in 2004 and Bahrain in 2005; photos of a 1992 killing of three Serbian Territorial Defense members found with an IIRO identification card; an IIRO employee who "was an eyewitness, and a possible accessory, to a 1994 murder;" the 1991 establishment of an IIRO office in Northern Virginia; the 1996 donation of computer equipment to an IIRO office; attacks in the Philippines in July 2007 by non-al Qaeda groups; the embezzlement of IIRO-Pakistan funds by the IIRO staff; Al Qaeda's, not IIRO or MWL's, team manufacturing false documents; a 2004 IIRO audit; WAMY's alleged support in Chechnya and Palestine; and WAMY's post-9/11 charitable work in Iraq. [134] These tangential issues—far removed from Al Qaeda and 9/11 in time, location, and topic—divert the focus from the "tort for which plaintiffs seek to impose liability" and are not "directly relevant to resolving the legal claims at issue."[135]

---

[133] 598 U.S.___, 143 S. Ct. 1206, 1230 (2023). *Taamneh* underscores that expert testimony on "'al Qaeda's origin, leadership, and operational structure" only helps the jury in its task to the extent that such testimony is consistent with the requisite focus on 9/11. Order at 6.

[134] *See, e.g.*, Exhibit 2 at ¶¶ 37-48 (MWL resolutions and journals); ¶ 29 (Sheikh Azzam); ¶ 47 (WAMY Kashmir); ¶ 35 (immigration raids); ¶¶ 84-85 (Bangladesh and Bahrain); ¶ 90 (1992 killing); ¶¶ 95-97 (1994 eyewitness); ¶ 103 (1991 Virginia offices); ¶ 104 (1996 computer donation); ¶ 122 (2007 Philippines attack); ¶¶ 131-136 (embezzlement); ¶ 137 (false document team); ¶¶ 142-144 (2004 audit); ¶¶ 166-67 (Chechnya); ¶¶ 178-79 (Palestine and Union of Good); ¶ 177 (post-9/11 charitable work in Iraq). *See In Re Terrorist Attacks on September 11, 2001*, 740 F. Supp. 2d 494, 519 (S.D.N.Y. 2010) (commenting on the protection of free speech, including "to disseminate virulent rhetoric" or "to espouse support for a foreign terrorist organization").

[135] *Taamneh*, 143 S. 143S.Ct. 1230; Order at 40.

## V.   KOHLMANN OFFERS SPECULATIVE, CONJECTURAL AND CONCLUSORY OPINIONS

An expert's analysis must "be reliable at every step."[136] If the proffered expert testimony is not "based on relevant and reliable data," *Daubert* and Rule 702 mandate its exclusion.[137] While "qualified expert witnesses are permitted wide latitude to offer opinions on relevant subjects . . . certain areas remain out of bounds."[138] Experts may not "offer speculative, conjectural, or conclusory opinions."[139] Yet such opinions appear with frequency in Kohlmann's reports.

### A.   Kohlmann speculates about the import of the Defendants' financial documents

Even if Kohlmann had the requisite qualifications to opine on financial documents (which he does not, as discussed *supra* at § I.B), his speculation as to the import of IIRO's audit reports and other of Defendants' financial documents would be impermissible.[140]

For example, Kohlmann opines that "quite obviously, the financial irregularities and atypical accounting practices exercised by these dawah organizations ***were not acceptable for international charitable organizations, and instead represented convenient vehicles for illicit money laundering and providing material support to terrorists and other violent extremists***."[141] But his "analysis" and testimony reveal that this opinion is nothing more than conjecture. Kohlmann begins his discussion of IIRO's accounting practices with his conclusion, writing that many of IIRO's reports "identify critical deficiencies in accounting practices and significant financial irregularities."[142] But rather than support these conclusions or his opinion that IIRO's accounting practices represented vehicles for "money laundering and providing material support

---

[136] *Amorgianos v. Amtrak,* 303 F.3d 256, 267 (2d Cir. 2002).
[137] *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000).
[138] Order at 6.
[139] *Id*. (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008)).
[140] Order at 6, 19-20.
[141] Exhibit 2 at ¶ 205 (emphasis added).
[142] *Id*. ¶ 130.

to terrorist," Kohlmann's report either parrots hearsay or simply labels financial transactions examined by others as "irregularities," "deficiencies" and "atypical accounting practices" without explaining what independent analysis he conducted.[143] None of the documents or testimony cited by Kohlmann supports his speculative opinion about money laundering and terrorist funding. Indeed, when asked if he had any evidence that the example he cites frequently concerning the embezzlement of funds by rogue employees at IIRO's Pakistan office was done in order to funnel money for terrorism, Kohlmann concedes that he has no evidence and exposes that he is simply speculating:

> Q: Do you have any evidence that the fraud that was carried on by the head of the Pakistan office and chief accountant was done in order to funnel money for terrorism.
>
> A: *That particular incident I don't*. However, I am aware of the fact that the U.S. government and U.S. Treasury Department has multiple times said that the entire IIRO network was used to fund Al Qaeda's organization. *And based on that inference, I have to say that either it was graph [sic] or it was terrorist funding, I don't know which one it was, but clearly it was illicit*.[144]

Moreover, Kohlmann admitted that he only reviewed documents provided to him by counsel and, when asked whether a review of the complete set of audit reports produced by IIRO would have been helpful for his analysis of the organization's accounting practices, he brazenly admits that he simply stops looking at the evidence when he finds what he wants: "[a]gain, *once there is already evidence of something, what is that other stuff going to show me*, I already found multiple instances where this has occurred."[145] The Rules and *Daubert* demand more of experts. As stated in the bellwether Order, "[t]o ensure that [expert] opinions are connected to the facts by more than 'the ipse dixit' of the expert . . . courts may look to other factors to analyze an expert's

---

[143] *Id*. at ¶¶ 130-157, 205.
[144] Exhibit 5 at 384:11-385:2 (emphasis added).
[145] *Id.* at ¶¶ 380:20-383:8 (emphasis added).

reliability, *such as . . . whether she 'has adequately accounted for obvious alternative explanations'*…."[146] Kohlmann's opinion about money laundering and terrorist funding fails this Court's reliability test. As explained in the testimony of defense expert John Barron, a Certified Public Accountant with nearly 40 years of experience who, in contrast to Kohlmann, reviewed all the financial documents produced by IIRO:

> Ongoing activities and actions undertaken by IIRO senior management with respect to internal controls and other matters brought to light through inquiries and internal audits *are inconsistent with Mr. Kohlmann's opinion that IIRO used "financial irregularities" and "atypical accounting practices" as "features" of the organization for purposes of diverting funds to terrorist organizations* as implied by Mr. Kohlmann. [147]

Kohlmann failed to examine all the evidence and did not adequately connect the facts to his conclusions or "account[ ] for obvious alternative explanations," rendering his opinion that IIRO's operations "represented convenient vehicles for illicit money laundering and providing material support to terrorists" unreliable speculation that is properly excluded.[148]

Kohlmann also cites a 1992 "transfer" of $2.1 million from IIRO to investment projects controlled by an entity known as BMI, Inc. ("BMI"). In fact, the money was ultimately stolen and IIRO was forced to initiate a civil lawsuit to retrieve the funds.[149] Kohlmann speculates that this transfer was an example of IIRO providing financial support to Al Qaeda.[150] Kohlmann's only support for his claim is a double hearsay statement by an FBI agent claiming that an accountant at BMI told a different FBI agent about concerns that BMI's funds *may* have been used to finance *the embassy bombings in Africa*.[151] This hearsay statement concerning what "may have" happened

---

[146] *See* Order at 4-5 (citing factors a court may look to when analyzing an expert's reliability) (emphasis added).
[147] Report of John Barron, attached as Exhibit 22, at ¶ 11 (emphasis added).
[148] Order at 4-5.
[149] *See* Complaint and Proposed Findings of Fact from *Sana-Bell, Inc. v. BMI Real Estate, et al.*, No. 8:98-cv-04177 (PJM) (D. Md. Dec. 23, 1998) describing theft of funds, attached as Exhibits 42 and 43, respectively.
[150] Exhibit 2 ¶¶ 105-106; Exhibit 5 at 347:2-348:9.
[151] *Id.* ¶ 105.

with the funds transferred to BMI does not support the assertion *that IIRO provided financial support to Al Qaeda*, and Kohlmann certainly did not account for the unreliability of the source, the lack of any clear connection between the embassy bombings in Africa and al Qaeda, or the obvious alternative explanation that the funds had been stolen from IIRO.

Without a shred of evidence that any WAMY funds went to al-Qaeda, Kohlmann also improperly speculates that this occurred through WAMY's contributions to other charities.[152] He suggests that WAMY's providing charitable relief in Iraq in 2004, and a photo of an individual from a designated entity at a public event with a WAMY banner in the background, creates a financial link between WAMY and Al Qaeda.[153]

### B.   Kohlmann presents conclusory claims and opinions without factual basis

Kohlmann's affirmative report also contains several additional sensational conclusory claims and opinions that lack factual bases. In just one example, he purports to summarize "material presented" earlier in his report and writes:

> Consistent with the material presented above, there is clear and unambiguous public evidence that Saudi state-sponsored dawah organizations including (but not limited to) the Muslim World League, the International Islamic Relief Organization, and the World Assembly for Muslim Youth have endorsed the concept of violent jihad, have pushed young Muslims to join violent jihadist organizations, and have provided critical support and resources to al Qaeda and its affiliates.[154]

Looking to the other factors a court may examine when analyzing an expert's reliability,[155] Kohlmann's testimony does not withstand scrutiny. Kohlmann's vague reference to "material presented above" and purported "clear and unambiguous public evidence" do not explain what *specific evidence* he reviewed or what independent research *he conducted* to reach his conclusions.

---

[152] Exhibit 2 at ¶¶ 174, 177-79.
[153] *Id*. at ¶ 177; Exhibit 5 at 509:13-512:9; *see also* Exhibit 2 at ¶¶ 166-167; 173-178; 192; 195; and 204-06.
[154] *Id*. at ¶ 204.
[155] Order at 4-5 (listing factors).

This opinion is without foundation.

Other examples permeate his report. Kohlmann's opening thesis that "Al-Qaida was largely funded and otherwise supported by money and other support" from Saudi-based Islamic organizations and his concluding opinion that "the tens of millions of dollars in support provided by these dawah organizations was the fuel for Al-Qaida's engine" also lack a factual basis and are excludable.[156] Kohlmann does not cite a single example of funds flowing directly from the Charity Defendants to Al Qaeda let alone "tens of millions of dollars." Nor does he substantiate the claim that Saudi charities were the largest funders of Al-Qaida in the period leading up to 9/11. Kohlmann's report contains no evidence that any organization was the most significant supporter or source of funding for Al-Qaida. It provides no analysis of the various sources of funds or other support provided to Al-Qaida and fails to explain how Kohlmann supposedly was able to quantify how much funding was allegedly provided by the Charity Defendants specifically.

Indeed, another of Plaintiffs' experts and the *9/11 Commission Report* contradict Kohlmann's claim that the amount of any purported financial assistance provided by the charities could be quantified.[157] Instead of proving his thesis, Kohlmann "has unjustifiably extrapolated from an accepted premise to an unfounded conclusion."[158] As the Supreme Court made clear, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. [Instead, a] court may conclude that there is simply too great an analytical gap between the data and the opinion

---

[156] Exhibit 2 at ¶¶ 17, 204.

[157] Jonathan Winer has opined that (i) it is "impossible to determine the precise amounts provided by these entities that were used to provide material support to al Qaeda" (Report of Johnathan Winer, attached as Exhibit 23, at ¶ 13.5) and "[e]ven the most comprehensive review of the documents that exist today would not make it possible to precisely allocate the use of IIRO, WAMY and MWL assets prior to the 9/11 attacks between humanitarian support, on the one hand, and material support for terrorism, on the other." Exhibit 23 at ¶ 13.6; *9/11 Commission Report*, attached as Exhibit 24, at 169 ("The origin of the funds remains unknown, although we have a general idea of how al Qaeda financed itself during the period leading up to 9/11.").

[158] Order at 5.

proffered."[159] Such a gap exists between Kohlmann's opening thesis and his conclusion concerning purported funding and other support allegedly provided by the Charity Defendants to Al Qaeda.

Another example of Kohlmann forming an opinion out of thin air is his oft-repeated claim that the U.S. charity Benevolence International Foundation ("BIF," "*Al-Bir Al Dawlia*" or *Munathama*[160]) is the "child" of WAMY.[161] Understanding that the Court disagreed with a challenge to Winer opining on the BIF/WAMY issue, Kohlmann's opinion is even more problematic as he continues to manipulate the sources while he selectively uses only the ones that support his one sided opinion, urging this Court to exclude him.[162] In an intentional effort to create a connection between WAMY and BIF, Kohlmann uses BIF and *Lajnat Al-Bir Al-Islamiya* (LBI) — a past WAMY affiliate — interchangeably as aliases,[163] when in fact they are two separate entities.[164] He falsely states that the name or logo for BIF appears on documents when it does not.[165] He dismisses and ignores evidence showing his theory is wrong, blindly stating that he does not "trust anything WAMY says."[166] Rather than address information that contradicts his opinion, Kohlmann cites only data that conforms to the Plaintiffs' claims, for whom he has been a

---

[159] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[160] Kohlmann Dep. Ex. 1041, attached as Exhibit 25 – the OFAC Sanction list includes a BIF alias as the *Al Bir Al Dawlia*. *See* Exhibit 5 at 656:6-10 (affirming that Al Bir Dawha is an alias for BIF).

[161] *See* Exhibit 5 at 637:2-11 (claiming, with no proof, that BIF is a child of WAMY); *but see* Winer Dep. Ex. 915, attached as Exhibit 26 – Feb. 1993 letter requesting BIF to stop defrauding people into thinking BIF and WAMY are the same).

[161] Exhibit 5 at 547:10-19.

[162] Order at 18-19. WAMY has filed an objection to this finding under Fed. R. Civ. P. 72.

[163] Exhibit 5 at 629:12-25 (used both terms interchangeably); *Id.* at 631:14-632:11 (conceding that LBI translated literally to English does not translate to BIF); While OFAC lists all BIF aliases (see n.160 *supra*), neither WAMY, nor LBI are included. *See* Exhibit 5 at 653:25-654:5 (conceding as much).

[164] *See* WAMYSA057782 (BIF flyer documents) and WAMYSA029936 (LBI flyer documents), attached as Exhibit 27 (The discovery of the BIF flyer, which surreptitiously used the WAMY logo and a logo resembling the LBI logo prompted the dismissal of Adel Batterjee from serving as LBI's head, *See Letters* in n.168, *infra*). An expert, as Kohlmann claims he is, would have seen the difference in similar logos. *See* Exhibit 5 at 654:9-25 (conceding that BIF was designated whereas WAMY was not).

[165] Exhibit 5 at 659:15-661:5; 736:12-739:20; Kohlmann Dep. Ex. 1045—LBI envelope (in an effort to confuse, Kohlmann asserts the document is a BIF document when in fact it is an LBI document), attached as Exhibit 28.

[166] Exhibit 5 at 546:12-547:19.

consultant since 2004.[167] To save his foundationless opinion, he claims without evidence that documents produced in this case, which are primary sources, are not to be believed.[168]

Kohlmann examined only cherry-picked documents, fed to him by Plaintiffs' counsel;[169] he ignored documents and testimony[170] plainly germane to the issues on which he opines, including some that undercut those opinions. Kohlmann emphasized during his deposition that his methodology requires one to be "very careful" with tertiary sources (such as newspaper articles, the *9/11 Commission Report*, and detainee unclassified evidence summaries), which he says should be used "for contextual reasons," because "tertiary information has been laundered several times" and one cannot take those facts "verbatim unless you have other sources that can corroborate it."[171] Yet his report contains multiple examples where he relies on a single tertiary source without considering other sources, even primary or secondary ones, that contradict his own opinion.[172] Kohlmann cites to unreliable tertiary sources, with no qualifications to advance his *WAMY-has-links-to-terror* narrative, including a *Times of India* article that claims WAMY was providing funds to Lakshar e Taibah, an FTO, Jaishe Mohammed, also an FTO, and Students Islamic Movement of India, banned in India.[173] Though the article does not say so,[174] Kohlmann claims the Indian government "shuttered" WAMY's office in India for allegedly funding the banned

---

[167] *Id.* 9:4-7; 779:22.

[168] Exhibit 5 at 546:12-547:19, 656:22-667:21; Exhibit 26; Kohlmann Dep. Exhibit 916 (May 1993 Letter), attached as Exhibit 29.

[169] Exhibit 5 at 381:2-3 ("In this case I reviewed the documents that were provided to me").

[170] Kohlmann's relied-upon material list reflects that he reviewed only half of the deposition transcripts of MWL/IIRO officials that were conducted in this litigation.

[171] Exhibit 5 at 262:3-263:5; *see also id.* at 328:2-8; 519:15-23; *Linde v. Arab Bank*, No. 1:06-cv-01623-BMC-PK, Kohlmann Trial Tr. 499:16-19 (E.D.N.Y. Aug. 18, 2014 ECF 947) ("But generally, I don't rely on statements made by [secondary or tertiary] media unless they are including original information, which is verifiable and which stands on its own, which is self-authenticating.").

[172] *See e.g.,* Exhibit 2 at ¶¶ 23, 72-73, 81-82, 87, 90-91, 119, and 175.

[173] *Id.* ¶ 175 (citing to WAMY Sets Its Foot In Hyderabad *Times of India* article), attached as Exhibit 30.

[174] Exhibit 5 at 543:2-544:4 (Kohlmann does not see a difference between how he frames the articles – that the Indian government shuttered the WAMY office – but what the articles actually say is that WAMY itself closed its office).

organizations,[175] yet concedes that he knows nothing about the author of the article, knows nothing about the source of the information in the article, and admits that there is a level of anti-Muslim bias in Indian news reporting.[176] He nonetheless cites this unreliable source as the only proof of the supposed terrorism-related "shuttering."[177] These opinions are properly excluded.

## MATTHEW LEVITT SHOULD BE PRECLUDED FROM TESTIFYING

### INTRODUCTION

Addressing matters beyond his qualifications, Levitt parrots hearsay with no analysis (particularly from governmental documents) and offers legal conclusions on the precise matters at issue in this case. While improper for many of the same reasons the Court partly excluded the testimony of Winer and Jenkins, Levitt's testimony also carries the pronounced danger of unfair prejudice.

Before he was hired as an "expert," Levitt's testimony as a fact witness was sought by the Plaintiffs but denied by the Department of the Treasury. Plaintiffs now attempt a creative end run around Treasury's decision by proffering him as an "expert" witness. While Levitt conveniently claims to have forgotten every detail of an evidentiary package that he helped author and reviewed relating to the designation of certain defendants, he necessarily had direct access to classified documents that Defendants cannot now access in their defense of this case.

Bound by the government's refusal to allow his testimony as a fact witness, Levitt declines to comment on the classified documents contained in the evidentiary package. Instead, he focuses on the purported "intense rigor" and "robust[ness]" of the designation process, a process that he repeatedly exalts in his two reports. But allowing Levitt to testify on those topics in light of his

---

[175] Exhibit 2 at ¶ 175.
[176] *See* Exhibit 5 at 539:8-542:25 (Kohlmann concedes to defects in tertiary sources).
[177] *Id.* at 545:11-20.

previous access to classified information will necessarily lead the jury to believe that *Levitt knows best*. How *Levitt knows best*, and why *Levitt knows best,* cannot properly be probed because the *Touhy* requests seeking access to such information were denied and over 95% of the evidentiary package Levitt personally reviewed and approved remains classified. These material defects taint Levitt's entire testimony.

## **ARGUMENT**

## VI. **LEVITT'S TESTIMONY RELATING TO TREASURY'S DESIGNATION PROCESS IS UNFAIRLY PREJUDICIAL AND LIKELY TO CONFUSE AND MISLEAD THE JURY**

Expert testimony, like all testimony, must comply with Rule 403. Even where the testimony is relevant, Courts may exclude relevant expert testimony "if its probative value is substantially outweighed by the danger of unfair prejudice."[178] Here, the danger of unfair prejudice is especially pronounced. Because of Levitt's role as an underlying percipient witness and his heavy reliance on his work within the U.S. government, permitting him to offer "expert" testimony would be unfairly prejudicial and would be likely to confuse and mislead the jury.[179]

Levitt's involvement in this case began twenty years ago. In 2003, he consulted with PEC members, meeting for over 12 hours across two days to discuss the case.[180] As Levitt put it, they met "to talk in general terms about 9/11, about Al Qaeda financing this type of thing. Of course that was in support of either the case that they had already filed or a case that they were going to file."[181] While Levitt could not recall *any* other details of that meeting, at that time at least five

---

[178] Order at 8 (*citing Dukagjini*, 326 F.3d at 51-52).
[179] *In re 3M Combat Arms Earplug Prods. Liability Litig.*, No. 3:19-MD-2885, 2021 WL 2028682, at *4 (N.D. Fla. May 11, 2021) ("[P]robative value of . . . opinion, which is nothing more than lay opinion testimony disguised as 'expert' testimony, is substantially outweighed by a risk that his testimony will confuse or mislead the jury, and is cumulative of the testimony of other experts who are qualified to actually interpret McCombs' audiograms.").
[180] Levitt Dep. Tr., attached as Exhibit 31, at 10:14–14:8; 81:21-83:18 and Invoices (Levitt Dep. Ex. 2002), attached as Exhibit 32, at 1.
[181] Exhibit 31 at 12:15-13:2.

complaints naming the Defendants had already been filed.[182]

Between 2005 and 2007, Levitt worked as Deputy Assistant Secretary for the Treasury Department's Office of Intelligence Analysis.[183] There, Levitt had access to classified documents and intelligence products, including information relating to the designation of IIRO's offices in 2006, a matter on which he played a direct role while at Treasury.[184] Individuals in his office and under his supervision were responsible for "researching, drafting, [and] working on [IIRO's] designations."[185] Levitt is listed as the author of Treasury's 2006 Memorandum concerning those designations (the "OFAC Memo") which was part of a 754-page evidentiary package that would ultimately form the purported basis for the designation of these offices.[186] Levitt personally reviewed and approved the package as part of the designation process.[187] Of its 754 pages, 719 pages are fully redacted; the remaining 35 pages have both readable text as well as redactions.[188] The compilation of the 35 pages of partially readable information represents less than 5% of the entire evidentiary package. The other 719 pages, which Levitt personally reviewed, remain classified.[189]

In 2020, Levitt assumed his third and current role as a testifying "expert" witness for the Plaintiffs, offering testimony about "the rigor of the government's designation process and regime."[190] In this role, he was careful *not to cite* the evidentiary package and claimed not to recall

---

[182] Exhibit 31 at 11:17-12:14; 82:22–83:8 (no recollection). The five matters are *Ashton*, No. 02 cv 6977, filed Sept. 4, 2002; *Burnett*, No. 02-cv-01616, filed Sept. 15, 2002 (D.D.C.); *Salvo*, No. 03-cv-05071, filed July 8, 2003; *Federal Ins.*, 03-cv-06978, filed Sept. 4, 2003; *Barrera*, No. 03-cv-07036, filed Sept. 10, 2003 (*Barrera* and *Salvo* were merged into *Ashton*, several years later).
[183] Exhibit 31 at 56:6-14; 83:19-21.
[184] *Id.* at 44:7-45:4.
[185] *Id* at 56:12–58:5.
[186] *Id.* 84:9-91:19.
[187] *Id.; see also* 365:4-6.
[188] *See* Memorandum for Barbara Hammerele (Levitt Dep. Tr. Ex. 2003), attached as Exhibit 33.
[189] Exhibit 31 at 88:13-89:11.
[190] Report of Dr. Matthew Levitt, attached as Exhibit 34, at 18.

its contents.[191] Yet he has not forgotten a single detail about Treasury's designation process, which he recounts with seemingly photographic precision for several pages in his combined reports.

A. **The Treasury Department denied access to Levitt's testimony as a fact witness, and the evidentiary package he authored and reviewed remains classified**

In June 2019, as part of fact discovery, the parties sought the deposition of five former high-ranking Treasury officials, including Levitt, pursuant to *Touhy* regulations.[192] The *Touhy* requests sought, *inter alia*, testimony and documents regarding the factual and evidentiary predicate for the Treasury's August 3, 2006, Executive Order 13224 designations of the IIRO's branch offices in the Philippines and Indonesia and the Levitt-authored OFAC Memo.[193] On August 16, 2019, Treasury denied these requests.[194] Undeterred, Plaintiffs seek his "expertise" to incorporate *the very same information to which they unsuccessfully sought access under Touhy*.[195]

Recasting Levitt's testimony this way is especially problematic because, while at Treasury, he necessarily had access to and relied upon classified information unavailable to Defendants.[196] While Defendants have been given access to a heavily redacted copy of the evidentiary package, which includes the OFAC Memo, approximately 95% of the underlying package Levitt authored or reviewed is redacted and remains classified. Having been denied access to testimony and documents regarding the factual and evidentiary predicate for the designation of its offices, IIRO has been denied the opportunity to explore, for example, whether those documents contain

---

[191] Exhibit 31 at 109:10-111:20 (claiming to have forgotten the "vast majority" of classified information he has ever reviewed); 365:7-24 (testifying that it would be "inappropriate" and "a little strange" to cite the package).

[192] June 28, 2019 Subpoena to Matthew A. Levitt, to Testify at Deposition in a Civil Action, *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN) (S.D.N.Y.), attached as Exhibit 35.

[193] *Id*. at Attachment A, pg. 3.

[194] August 16, 2019 Paul Ahern, Dept. of Treasury Response Letter to Sean O'Connor and Robert Haefele, attached as Exhibit 36, at 1 ("In light of those factors . . . the Treasury Department declines to authorize the testimony . . .").

[195] *Compare* Exhibit 35 (subpoena), Att. A at p. 1-2 *with* Exhibit 34 (Levitt Rpt.) at 1-2; *see also   McMahon v. Presidential Airways, Inc*., No. 6:05-CV-1002-Orl-28GJK, 2009 WL 10705562, at *2 (M.D. Fla. Nov. 5, 2009) (excluding expert because Air Force did not authorize testimony, even though expert would not testify on official or confidential information and would not be asked to testify regarding events during Air Force service).

[196] *See In re Mirena IUD Prod. Liab. Litig*., 169 F. Supp. 3d 396, 471-73 (S.D.N.Y. 2016) (finding it impossible to segregate confidential government experience from expert opinion).

exculpatory information.[197] In fact, the designation process by design excludes potential targets from any participation.[198] Thus, fairness to all parties is not integral to the process.

### B. Allowing Levitt's testimony concerning Treasury's designations would permit him to use his Treasury experience as both sword and shield

In his role as "expert witness," Levitt's two reports rely on Treasury's designation of certain defendants and include testimony concerning Treasury's designation process.[199] For example, Levitt writes that he has "first-hand experience" of how "robust" and "vigorous" the designation process is generally.[200] He boasts about the "several rounds of legal review," and "timeliness and strength of evidence."[201] However, Defendants were denied access to documents and testimony relating to Levitt's first-hand experience as a percipient witness. In fact, at his deposition Levitt was careful not to divulge any information about the contents of documents that he reviewed concerning the designation of two IIRO offices or the factual basis for the one-sided, confidential designation that he bolsters in his reports. In response to questioning, he claimed: "[t]he good news is I can't remember because the bad news is if I did I wouldn't be able to tell."[202] By contrast, somehow he has *not* forgotten the many details about the designation process, which he uses to justify Treasury's determination and give it outsized importance in his reports.

Permitting Levitt's testimony about the designation process when Treasury has denied access to his testimony and documents concerning the details of the designation of IIRO's two

---

[197] Indeed, both offices were de-designated in 2016. *See* https://ofac.treasury.gov/recent-actions/20160816.

[198] As Plaintiffs' expert Jimmy Gurulé (former Under Secretary of Enforcement at the Treasury Department from 2001 to 2003) explained, the designation process under E.O. 13224 is an administrative process that casts the widest net possible. Gurulé Dep. Tr., attached as Exhibit 37, at 83:19-88:10. It does not include adjudication of the guilt or innocence of a potential target, and there is no requirement that the government establish involvement in an act of terrorism or even intent to support an act of terrorism. *Id.* Even a person who unwittingly supports terrorist activities can be designated. *Id.*

[199] Exhibit 34 at 17-19; Matthew Levitt Supplemental Expert Report, attached as Exhibit 38, at 4-7.

[200] Exhibit 34 at 17.

[201] Exhibit 34 at 18; Exhibit 38 at 4.

[202] Exhibit 31 at 43:20-25.

offices would effectively allow Levitt to use his time at Treasury as both sword and shield against the Defendants. On the one hand, Levitt could testify to the "robust[ness]" and "intense rigor" of the process, bolstering the credibility of the determination made when he was at Treasury, while, on the other hand, Defendants are denied the opportunity to probe the factual and evidentiary predicate for that determination, including whether potentially exculpatory facts and documents were among the classified materials collected and appended to Levitt's OFAC Memo.[203] While Defendants do not challenge the federal government's authority to restrict access to documents pursuant to E.O. 13224 or to block a former employee from providing testimony about his first-hand experience with the designation of one of the Defendants in this case, they do question the fairness of allowing that very same former employee to testify as a purported "expert" about the "intense rigor" of that process and to implicitly rely on his insight into those designations in his reports. Such a result would unduly prejudice Defendants.[204]

### C. Levitt's testimony concerning Treasury's designations would confuse and mislead the jury

Levitt's "expert" testimony is also likely to confuse and mislead the jury. Levitt's "first-hand experience" working on the designations of IIRO's offices means he is a fact witness. As such, the jury may be inclined to credit his testimony because of his involvement in the designation process of IIRO's offices, even though Treasury has barred his testimony.[205] In this way, Levitt is

---

[203] *See In re Mirena*, 169 F. Supp. 3d at 473 (finding Rule 403 violation where expert would testify about non-public government activity in which she was personally involved because "Plaintiffs cannot . . . effectively cross-examine her or dissipate the aura of credibility from her 'insider' testimony") (citing cases); *In re Leap Wireless Int'l, Inc.*, 301 B.R. 80, 84-85 (Bankr. S.D. Cal. 2003) ("The Court is left with a report which inextricably relies on confidential information for the conclusions reached by the witness. . . .The Court and MCG PCS are left with the bare option of, to paraphrase, to trust but not to verify. Although this evidence may be probative, its probative value is substantially outweighed by the danger of unfair prejudice.") (citing Rule 403).

[204] *In re Mirena*, 169 F. Supp. 3d at 473; *see also United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) ("When case agents testify as experts, they gain 'unmerited credibility when testifying about factual matters from first-hand knowledge.'"); *Dukagjini*, 326 F.3d at 53 ("This aura creates a risk of prejudice 'because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial,' a risk that increases when the witness has supervised the case.").

[205] *In re Mirena*, 169 F. Supp. 3d at 473.

a fact witness masquerading as an expert.[206] The risk of misleading the jury far outweighs any probative value of Levitt's testimony.[207]

Moreover, excluding Levitt's testimony about the designation process would not prejudice Plaintiffs because such testimony can be elicited from Jimmy Gurulé, former Under Secretary of Enforcement at the Treasury Department,[208] whom Defendants do not challenge. Gurulé's testimony about the designation process diminishes any probative value of Levitt's testimony.[209]

Accordingly, Levitt should be precluded from testifying in this case pursuant to Rule 403.[210] At a minimum, just as his fact witness testimony has been precluded by Treasury, this Court should bar Levitt from offering "expert" testimony about the Treasury's designation process or the circumstances surrounding the designation of IIRO's branch offices.

---

[206] *See United States v. Bradley*, No. 3:21-CR-00087 (VAB), 2022 WL 1708400, at *4 (D. Conn. May 27, 2022) ("The Court will not . . . permit SEEC witness testimony that following its investigation . . . SEEC denied Mr. Bradley's application for a general election grant. While this testimony is not expert testimony, as it is grounded in the SEEC witnesses' investigation of Mr. Bradley, it strongly implies that SEEC determined that Mr. Bradley violated state election law and therefore was not eligible for the grant."); *LinkCo, Inc. v. Fujitsu Ltd*., No. 00 CIV. 7242 (SAS), 2002 WL 1585551, at *3, *4 (S.D.N.Y. July 16, 2002) ("If experts are permitted to testify on an issue of fact, they must provide some explanation for their conclusions, rather than referring generally to their experience.").

[207] *See United States v. Delance*, 694 Fed. Appx. 829 (2d Cir. 2017). For this reason as well, his proffered testimony about the Treasury's designation process should be excluded pursuant to Rule 403. *See In re Mirena*, 169 F. Supp. 3d at 473; *see also Mejia*, 545 F.3d at 196; *Dukagjini*, 326 F.3d at 53; *United States v. Scop*, 846 F.2d 135, 143 (2d Cir. 1988) ("[V]irtually impossible for an investigator so deeply involved in a case to put aside previous judgments regarding the credibility of witnesses and to render de novo judgments on their credibility after listening to the trial . . . the risk of a jury believing that an opinion offered as to credibility by an agent such as Whitten was based on his investigation as a whole rather than solely on evidence adduced at trial is particularly great."), *on reh'g,* 856 F.2d 5 (2d Cir. 1988).

[208] *See* Gurulé Report, attached as Exhibit 39 at 5-8 (explaining designation process); *see also In re Mirena*, 169 F. Supp. 3d at 473 ("Defendants have not offered a reason why they chose [this] expert when they knew she could not fully disclose the bases of her opinions. Plaintiffs should not be unfairly prejudiced because Defendants chose to retain an expert who participated directly in some of the events at issue but cannot discuss them.").

[209] *United States v. Akhavan*, No. 20-CR-188 (JSR), 2021 WL 2776648, at *9 (S.D.N.Y. July 2, 2021) (excluding testimony because it was properly lay testimony, not expert testimony, and cumulative with substantial testimony from other witnesses); *Rubel v. Eli Lilly & Co*., 160 F.R.D. 458, 460 (S.D.N.Y. 1995) (excluding expert testimony because it was potentially highly prejudicial and, since it was cumulative with other evidence, reduced prejudice arising from exclusion to proponent of evidence); *see also In re 3M Combat Arms Earplug Prods. Liability Litig*., No. 3:19-MD-2885, 2021 WL 2028682, at *4 (N.D. Fla. May 11, 2021) ("[T]he probative value of Driscoll's opinion . . . is cumulative of the testimony of other experts who are qualified to actually interpret McCombs' audiograms.").

[210] Order at 8 (citing cases).

## VII.   LEVITT OFFERS IMPROPER LEGAL CONCLUSIONS AND LAUNDERS HEARSAY TESTIMONY

Throughout his report, like Winer and Jenkins, Levitt draws impermissible legal conclusions and frequently quotes hearsay evidence without analysis or opinion. Given the length of Levitt's reports and the frequency of such improper testimony, especially hearsay testimony.

### A.   Levitt draws legal conclusions

"Experts cannot draw legal conclusions because they are 'not qualified to compete with the judge in the function of instructing the jury' with the proper legal standard."[211] Therefore, experts "must refrain from offering legal conclusions," including, in this case, "characterizations of a Defendants' conduct as providing 'material support' to al Qaeda."[212] Like Winer,[213] Levitt crosses that line on multiple occasions, improperly opining that "[a] great deal of MWL's material support for terrorism has been financial" and that "[t]he MWL also provided non-financial material support such as arms and documents to 'militants in Afghanistan and Tajikistan,' according to a CIA report."[214] Similarly, as to IIRO, Levitt improperly opines that "[t]he IIRO has [] provided material support to al Qaeda."[215] These are the types of statements that the Court excluded from Winer's report because they "speak to Defendants' liability, rather than adding helpful context or analysis."[216] Such use of an expert witness is impermissible. These opinions should be excluded.

### B.   Levitt is a mere conduit of hearsay

"If an expert provides no commentary or analysis, if his testimony is nothing more than

---

[211] *Id.* at 20 (quoting *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992)).

[212] *Id.* at 40.

[213] *Id.* at 20-21.

[214] Exhibit 34 at 31 (citation omitted). Defendants dispute the authenticity of the "CIA Report" Levitt cites (Fed-PEC0214474), which "report" Plaintiffs attempted unsuccessfully to obtain through a FOIA request. At the appropriate time, Defendants will raise an evidentiary challenge to the introduction of this document into evidence.

[215] *Id.* at 35.

[216] Order at 21.

quotes from a single hearsay source, then the expert cannot properly testify to that content." [217] Because large portions of Levitt's reports "merely repeat" hearsay, they should be excluded.

Repeatedly, Levitt merely regurgitates hearsay, rather than "gather[ing] information from multiple sources and cross-check[ing] factual information against other accounts."[218] Levitt quotes extensively from various documents without applying any analysis or expertise. For example, in the final paragraph of page 7 of his report, Levitt introduces his thesis that "[i]n the years after his move to Sudan, Bin Laden's Islamic Army (al Qaeda) grew."[219] He then quotes purported CIA materials for nearly a full page, adding only introductory phrases such as "[a]ccording to the CIA," and "[a]ccording to a since-declassified CIA memorandum." [220] Levitt continues to repeat hearsay from CIA sources throughout his report. He asks the reader to "Consider the CIA's assessment of the impact of increased fighting in Chechnya in 1999 on the al Qaeda network,"[221] and then quotes without comment from the CIA documents. Though Levitt occasionally interjects introductory or summary language, he offers only what a layperson could offer after reading the same material. "Merely 'repeating' information is exactly what experts must avoid."[222]

Indeed, this Court excluded hearsay evidence from Winer's Report for these same reasons. Considering a page of block quotes, the Court noted that "80% of the passage is directly quoted from the 9/11 Commission Report; the only original portion—the first paragraph—simply introduces the source.[223] This is precisely Levitt's strategy. He "simply repeats someone else's statements and does not 'apply[] [his] expertise to that hearsay evidence,'" even though "the jury

---

[217] *Id.* at 41.
[218] *Id.* at 14 (quoting cases) (internal quotations omitted).
[219] Exhibit 34 at 7.
[220] *Id.* at 8.
[221] *Id.* at 10.
[222] Order at 14 (quoting *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008)).
[223] *Id.* at 23 (citing *Strauss*, 925 F. Supp. 2d at 439) (emphasis added); *see supra* at § III.C. (discussing Order's hearsay application).

does not need help understanding the underlying hearsay and it is an improper subject for expert testimony."[224] Like Winer, Levitt quotes from the 9/11 Commission report, regurgitating the report's conclusions without synthesizing or analyzing them to reach his own conclusions. Instead, he simply introduces the report like a lay person: "According to the 9/11 Commission Report," "the 9/11 Commission found, or "[t]he 9/11 Commission concluded."[225]

Levitt follows the same strategy in quoting various other sources. For instance, he cut-and-pastes three headers and 16 paragraphs (including the formatting) of an OFAC press release, introducing these with only the note that the U.S. and Saudi Arabia "jointly designated" "al Haramain [Islamic Foundation] branches" and that the "evidence was extensive"[226] And he copies and pastes a half page of text from a report by the Dutch General Intelligence and Security Service, offering only that it is "a good summary explanation of how [Saudi] charities functioned as part of Saudi government policy and as an extension of branches of the Saudi Government."[227] Such commentary does not require any expertise. Nor is any expertise required to parrot another individual's conclusions, as Levitt in his report, where he cut-and-pastes quotes from Sarah Feuer and Victor Comras about MWL and IIRO and their alleged connections to Saudi Arabia.[228] Though he introduces the other individuals' statements with language such as "[a]ccording to Feuer," and "Victor Comras has also argued," he does not offer any unique perspective. The application of any expertise is likewise lacking when Levitt quotes from *Ghost Wars*, which in turn quotes from another unspecified source, to introduce the topic that "[t]he FBI would later tie the MWL and IIRO to Ramzi Yousef and al Qaeda plotting in Southeast Asia," and then allowing the quoted

---

[224] *Id.* at 7 (quoting *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003)).
[225] *See* Exhibit 34 at 12, 23.
[226] *Compare* Exhibit 34 at 41-43 *with* https://home.treasury.gov/news/press-releases/js1108. Levitt does add quotation marks to the penultimate paragraph. The link the Levitt report provides does not land on the press release, so a new link has been provided.
[227] Exhibit 34 at 29.
[228] *Id.* at 32-33.

material to speak for itself without further commentary.[229]

Levitt, like Winer, "cannot testify to the portions of his opinion that consist of extended quotes from a single hearsay source without any analysis."[230] There are proper ways to introduce factual evidence; the shortcut of using an expert to parrot hearsay is not one of them.[231]

## VIII.   LEVITT'S TESTIMONY IS REPLETE WITH IRRELEVANT OPINIONS

Levitt's testimony covers many irrelevant topics. He describes Al Qaeda's operations after 2011; U.S. and UK government concerns from 2006 and 2008; Hamas operatives' workplaces; the operations of other charities, their use of aliases, and their alleged wrongdoings, including the prosecution of the Holy Land Foundation in 2008, CARE International's urgings to donors, including its 1994 and 1995 publications, and the Al Haramain Islamic Foundation; the ravings of various individuals like a 2003 speech by the leader of Hezbollah; the views of Iran's Ayatollah; the urgings of a Muslim Brotherhood theologian to donate to Palestinians; the calls of Saddam Hussein; a 2002 Hamas communique; the words of a Cleveland imam; MWL publications from the early 1990s; and alleged support to Hamas.[232] These issues are far removed from Al Qaeda and 9/11 in time, location, and topic and remove the focus from the "tort for which plaintiffs seek to impose liability" and are not "directly relevant to resolving the legal claims at issue."[233] These irrelevant topics would also mislead the jury in violation of Rule 403.[234]

---

[229] *Id*. at 34.

[230] Order at 23.

[231] Indeed, as demonstrated, Levitt's opinions regarding the pre-9/11 formation of Al Qaeda and its development in the years leading up to 9/11 is mere recitation of hearsay. Levitt's laundered hearsay thus also reveals the boundaries of his expertise. *See infra* at § IX..

[232] Exhibit 34 at 12 (2011 operations), 13 (US and UK concerns), 14 (Hamas workplaces), 14-15 (operations and aliases of other charities), 17 (Holy Land prosecution), 24-25 & 27 (CARE International), 14-15, 24, 39-45 (Al Haramain Islamic Foundation), 25 (2003 Hezbollah speech, Ayatollah, Muslim Brotherhood theologian), 26 (Hussein, Hamas communique), 26-27 (Cleveland imam), 28 (MWL publications), 37 (alleged Hamas support).

[233] *Taamneh*, 143 S.Ct. 1230; Order at 40.

[234] Order at 8 (Rule 403 exclusion "appropriate where the testimony clouds the issue for the jury, wastes time by diverting attention from the relevant evidence, or would induce the jury to decide the case on a purely emotional basis.") (citations and alteration omitted).

## IX.    LEVITT OFFERS OPINIONS ON ISSUES BEYOND HIS EXPERTISE

### A.    Levitt is not an expert on religion, Islam, or Shariah, or on accounting, finance, or audits

Levitt admits that he is not an expert on religion, Islam, or Shariah and that he does not have expertise or formal training in accounting or finance or in the evaluation of audit reports.[235] Yet, he opines on these topics.[236] Given Levitt's admission that these subjects are not within his expertise, those opinions should be excluded.

### B.    Levitt is not an Al Qaeda or Saudi Charity expert

Levitt is also not an al Qaeda expert.[237] His expertise pertains to the Palestinian-Israeli conflict, Hamas and Hezbollah, and state sponsors of terrorism like Iran. During his doctoral fellowship, Levitt conducted field research in the Summer of 1997 in Israel, Gaza, and the West Bank,[238] which are not areas where Al Qaeda was active or the Charity Defendants are based. Levitt's doctoral dissertation examined the impact of acts of terrorism carried out by Muslim and Jewish extremists in Palestine and Israel on the Palestinian-Israeli peace process.[239] His scholarship focuses on Hamas and Hezbollah, not Al Qaeda,[240] and on Iran, not Saudi Arabia.[241]

---

[235] Exhibit 31 at 71:7-23; 239:9-10 (Islam); *id.* at 63:2-18 and 64:18-21 (accounting/finance).

[236] *See, e.g.*, Exhibit 34 at 21-28 (discussing "*Dawa* in Islam," defining "dawa" and elaborating on the types of dawa activities and the Salafi school of thought); *id.* (linking Dawa to "Violence and Extremism" and elaborating on the definition of dawa, claiming that it is "defined as 'militant preaching'" and discussing Islamic religious rulings on jihad and zakat); *id.* (creating alleged Islamic concept of "Economic Jihad," a novel issue that is unheard of in Islamic doctrine).

[237] Yet, he opines on: (1) "[t]he founding and development of al Qaeda, its ideology and focus on targeting America and American interests;" (2) "Al Qaeda's development as a terrorist group and militant organization through the establishment of alliances with other groups and cooption of local conflicts;" (3) "Al Qaeda's radicalization, recruitment and funding modus operandi in the years leading up to the 9/11 attacks;" (4) "[b]ackground on abuse of charity and religious tithing to finance terrorism;" and (5) "Al Qaeda's particular reliance in the years leading up to the 9/11 attacks on abuse of charity and nongovernmental organizations (NGOs)—including several based in Saudi-Arabia—for recruitment, logistics, and fundraising purposes." Exhibit 34 at 1.

[238] Exhibit 31 at 27:4-8.

[239] Exhibit 34 at 2; *United States v. Damrah,* No. 1:03CR484, 2004 WL 5010196, Transcript of Proceedings (N.D. Ohio June 7, 2004) at 2 (explaining dissertation covered impact of terror acts in Palestine and Israel).

[240] Exhibit A to Levitt's Expert Report (Mar. 10, 2020), attached as Exhibit 40, at 4-45.

[241] *Id.* Notably, Levitt has also written over 100 times on Iran, not Saudi Arabia.

Levitt himself admits that he has never testified regarding Al Qaeda's pre-9/11 activity.[242] During his deposition, he lists several cases involving charities in which he has testified,[243] all of his testimony related to the support of terrorist groups in Palestine, not Al Qaeda. Specifically, Levitt testified that he has "been qualified in issues related to Iran and the Israeli-Palestinian arena…and U.S. policy towards the Middle East more broadly."[244] When asked about testifying in cases focused on the activities of Al Qaeda, Levitt cites a post-9/11 ISIS case in which he explained the "history of ISIS coming out of Al Qaeda [in] Iraq."[245] While "prior qualification as an expert is persuasive to the extent the issues and scope of testimony *mirror* the case at hand,"[246] the cases cited by Levitt in his deposition involved terrorist groups other than Al Qaeda.[247] Levitt's qualifications concerning Israel, Palestine, Hamas, Iran, and Hezbollah do not qualify him to speak on Al Qaeda or Saudi Arabian charities, much less 9/11.

Moreover, Levitt's general expertise in Middle Eastern counterterrorism with a specific focus on Hamas and Hezbollah does not qualify him to testify about Al Qaeda as it is not a "closely related" issue.[248] In its bellwether Order, the Court ruled that despite Jenkins' expertise in violent jihad, he was not qualified to opine about other religious issues in Islam.[249] The same logic applies here. Levitt's expertise in Palestinian and Israeli terrorist groups, Hezbollah, and Iran does not qualify him to speak about the history, origins, or structure of Al Qaeda.

---

[242] Exhibit 31 at 49:22-50:1.

[243] *Id*. at 50:3-21 (listing the *Holy Land Foundation*, *Arab Bank*, *Damrah*, and *Boim* cases); *see also id.* at 47:16 (*CBSP v. Samuels* (Court of Appeals, Paris, France, 2008).

[244] Exhibit 31 at 512:12-17.

[245] *Id*. at 49:10-21.

[246] Order at 26 (emphasis added); see *id.* at 16 (prior court's limitation of Plaintiff's expert Jonathan Winer from opining on Hamas "mildly persuasive" because that opinion did not address Al Qaeda or Saudi Arabia).

[247] Exhibit 31 at 50:3-21 (listing the *Holy Land Foundation*, *Arab Bank*, *Damrah*, and *Boim* cases); even in the *Amduso* case, which centers on Iran and Sudan's support of Al Qaeda, Levitt's testimony focused on Iran and Hezbollah's support to the terrorist group. *Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42 (D.D.C. 2014).

[248] Order at 10.

[249] *Id*.

Levitt admits that during his pre-9/11 time at the FBI – where he provided "tactical and strategic analytical support for F.B.I. counterterrorism operations related to Middle East terrorist activity" specifically relating to "state sponsors of terrorism and terrorist groups emanating from the Middle East"[250] – his work "involve[d] current actionable intelligence" and only when they needed to "help put things into context" did they look at Al Qaeda's previous activities "*as it related to the investigations that were ongoing at the FBI.*"[251] Furthermore, Levitt admits that the FBI did not, while he was there, have an "open investigation" into the Afghan-Soviet period "with respect to the origin of Al Qaeda" and any research into this period was also only for contextual purposes.[252] Levitt's limited experience with pre-9/11 Al Qaeda is insufficient to qualify him to opine on these issues in this litigation.[253]

Finally, even though Levitt has expertise on "the issue of terrorist abuse of charities,"[254] that expertise, too, is focused on charities based in Palestine and Israel. While Levitt claims to have expertise in charities outside of that small region, he could not recall whether that included charities in the Gulf, because he did not conduct "full field investigations" into those entities as he did with U.S.-based entities.[255] Similar to his tangential work on Al Qaeda, his research on entities in the Gulf would simply "*come up* in the course of…[his] investigation" of U.S.-based entities.[256] That does not equate to actual expertise. In reality, Levitt focused on Palestinian and U.S.-based entities, and only indirectly researched NGOs based in the Gulf.[257] That is also insufficient under Rule 702.

---

[250] Exhibit 31 at 29:18-25.

[251] *Id*. at 31:19-32:10.

[252] *Id*. at 32:11-23

[253] His work after 9/11 consisted of working with the 9/11 Commission for a "small number of weeks." *Id.* at 39:11-12.

[254] *Id*. at 53:22-54:2; 55:16-17.

[255] *Id*. at 30:24-31:13 (Levitt simply stated that he did "a lot of work" on charities in the Middle East without specifying the type of work he engaged in, except to state that he has met officials in Gulf charities, again, without specifying who).

[256] *Id*. at 31:11-12.

[257] *Id.* at 31:5-15*; id.* at 50:3-21 (listing the *Holy Land Foundation*, *Arab Bank*, *Damrah*, and *Boim* cases).

## X.    LEVITT OFFERS NO OPINIONS WITH RESPECT TO WAMY AND HIS COMMENTS AND "CONCERNS" LACK THE INTELLECTUAL RIGOR AND EXPERT ANALYSIS TO BE ADMISSIBLE

Levitt's Report does not include opinions with respect to WAMY. Rather, in one paragraph, he disclaims: "[i]t is important to note that the three Saudi charities examined below are not the only ones that have raised concerns of intelligence, law enforcement, and policy officials."[258] As an example of these "concerns," Levitt mentions the Canada Revenue Agency's (CRA) decision to revoke the charity status of WAMY-Canada for Canadian tax purposes. In three sentences, Levitt then merely summarizes the lengthy CRA Report without any analysis.[259]

Levitt's comment about WAMY is not the product of any analysis and falls well short of the Court's standards for admissibility of an expert's opinion.[260] Accepting that the four *Daubert* factors are "poorly suited to terrorism experts," applying the "other factors" used to analyze an expert's reliability to Levitt's comment about WAMY shows it is unreliable and inadmissible.[261]

Levitt did not conduct any independent research, account for any alternative explanations, or carefully apply any reliable methodology in making his offhand comment about WAMY. He did not analyze any information about WAMY, let alone analyze information in a way analogous to accepted social science or national security practices. He did not independently verify any of the allegations in the "adverse reporting" and knows nothing about many of the publications and sources.[262] Noting others' "concerns" is not rendering an opinion and is not the product of careful

---

[258] Exhibit 34 at 29. The three Saudi charities referenced are the Muslim World League, the International Islamic Relief Organization, and the Al Haramain Foundation.

[259] *Id*. This includes that the CRA Report "lists examples of 'adverse reporting on WAMY and its affiliates,' linking the groups to terrorist organizations."

[260] Order at 40 (The Court will "generally find witnesses qualified where they describe their methodologies in detail; demonstrate that they analyze information in ways analogous to accepted social science, accounting, or national security practices; and provide citations to respected sources. If an opinion is supported by the witness's *ipse dixit,* the Court will exclude the testimony.").

[261] *Id*. at 4-5

[262] Exhibit 31 at 500:13–505:19.

analysis or any analysis at all. This passing comment should not be admitted.

Levitt's citations to comments allegedly made by former WAMY Secretary General Al Johani in a 1991 MWL publication about the then-existing circumstances in Kashmir are also not relevant to resolving the legal claims at issue and should be excluded.[263] There has been no showing that the long-standing ethnic and religious conflicts in the Kashmir region have anything to do with Al Qaeda in general or the terrorist attacks of September 11, 2001 in particular.[264] While Levitt finds al Johani's discussion of "militancy" with respect to Kashmir in one sentence of the article interesting, the comment has nothing to do with terrorism or advocating support for terrorists in general or advocating support of Al Qaeda or any attacks against the United States in particular.[265] The comment is not directly relevant and should be stricken.[266]

Finally, Levitt's parroting of the "adverse reporting" from the CRA report is laundering inadmissible hearsay which this Court has excluded.[267] By citing the adverse reporting without any analysis, Levitt blatantly seeks to slip hearsay statements about WAMY into his expert report and opinion. As the Court noted, "[e]xperts are supposed to synthesize and interpret information for the jury, not parrot other sources."[268] Levitt's commentary noting "concerns" about WAMY based on "adverse reporting" does not offer any "informed, original opinion" but merely repeats hearsay and therefore should be excluded.

## CONCLUSION

The testimony of Kohlmann and Levitt should be excluded.

---

[263] Exhibit 34 at 28; Order at 40.

[264] *See* Order at 5 (noting that the relevancy of expert testimony "turns on whether the testimony 'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (citations omitted).

[265] Exhibit 31 at 479:15-16.

[266] *See Taamneh*, 143 S. Ct. 1223 (elements of aiding-and-abetting liability under JASTA rest on the "conceptual core…that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed'").

[267] Exhibit 31 at 503:1-505:8.

[268] Order at 41.

July 31, 2023                          Respectfully submitted,

/s/ *Aisha E. R. Bembry*
Eric L. Lewis
Waleed Nassar (admitted *pro hac vice*)
Aisha E. R. Bembry (admitted *pro hac vice*)
Sumayya Khatib (admitted *pro hac vice*)
Lewis Baach Kaufmann Middlemiss PLLC
1101 New York Avenue, NW Suite 1000
Washington, DC 20005
Telephone: (202) 833-8900
Fax: (202) 466-5738
Email: eric.lewis@lbkmlaw.com
Email: waleed.nassar@lbkmlaw.com
Email: aisha.bembry@lbkmlaw.com
Email: sumayya.khatib@lbkmlaw.com
*Counsel for Defendants Muslim World League, International Islamic Relief Organization, Dr. Abdullah bin Saleh Al Obaid, Dr. Adnan Khalil Basha, Dr. Abdullah Omar Naseef, and Dr. Abdullah bin Abdelmohsen Al Turki*

/s/ *Omar T. Mohammedi*
Omar T. Mohammedi
Frederick Goetz, *of counsel* (admitted *pro hac vice*)
The Law Firm of Omar T. Mohammedi, LLC
233 Broadway, Suite 820
New York, NY 10279
Telephone: (212) 725-3846
Fax: (212) 202-7621
Email: omohammedi@otmlaw.com
Email: fgoetz@goetzeckland.com
*Counsel for Defendants World Assembly of Muslim Youth and World Assembly of Muslim Youth International*

/s/ *Alan Kabat*
Alan Kabat
Bernabei & Kabat PLLC
1400 16th St. NW #500
Washington, DC 20036-2223
Telephone: 202-745-1942
Email: Kabat@BernabeiPLLC.com
*Counsel for Dr. Abdullah bin Saleh Al Obaid, Dr. Adnan Khalil Basha, Dr. Abdullah Omar Naseef, and Dr. Abdullah bin Abdelmohsen Al Turki*

/s/ *Peter C. Salerno*
Peter C. Salerno
Amy Rothstein
Salerno & Rothstein
221 Schultz Hill Road
Pine Plains, NY 12567
Telephone: (518) 771-3050
Email: peter.salerno.law@gmail.com
Email: amyrothsteinlaw@gmail.com
*Counsel for Defendant Yassin Kadi*