UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

*In re* Terrorist Attacks on September 11, 2001

03 MDL 1570 (GBD) (SN)

ECF Case

---

*This document relates to:*

> *Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al., Case No. 02 Civ. 6977*
> *Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al., No. 03 Civ. 9849*
> *Federal Insurance Co., et al. v. Al Qaida, et al., No. 03 Civ. 6978*
> *Continental Casualty Co., et al. v. Al Qaeda, et al., No. 04 Civ. 5970*
> *Euro Brokers Inc., et al., v. Al Baraka, et al., No. 04 Civ. 7279*
> *Estate of John P. O'Neill et. al., v. Al Baraka et. al., No. 04 Civ. 1923*

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANT YASSIN KADI'S MOTION**
**TO EXCLUDE THE TESTIMONY OF VICTOR COMRAS**

**TABLE OF CONTENTS**

I.  Introduction ............................................................................................................1

II.  Discussion ..............................................................................................................3

    A.  Comras's Background ....................................................................................3

    B.  Comras's Flawed Methodology .....................................................................3

        1.  Comras Misused the Concept of "Red Flags" ..........................................4

        2.  Comras Improperly Relied on OFAC Designations and Other Hearsay ......7

    C.  Comras's Deceptive, Unreliable Arguments ................................................12

        1.  The "Unexplained" Label ........................................................................12

        2.  Guilt by Association .................................................................................14

        3.  The "Maram Affair" ................................................................................16

        4.  Distortions and Misrepresentations Permeate Comras's Report .................19

Conclusion ..................................................................................................................25

Exhibit List..................................................................................................................

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amorgianos v. National R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) .................................................................................1, 3, 4, 19, 24

*Daniels-Feasel v. Forest Pharmaceuticals, Inc.*,
   No. 17-cv-4188-LTS, 2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021) .........................11, 12, 17

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ........................................................................................................24

*Kadi v. Geithner*,
   42 F. Supp. 3d 1 (D.D.C. 2012) .......................................................................................3

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ...................................................................................................12, 19

*In re Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152 (S.D.N.Y. 2018) .............................................................................18

*Nimely v. City of New York*,
   414 F. 3d 381 (2d Cir. 2005) ...........................................................................................14

*Rubenstein by Rubenstein v. Marsh*,
   No. CV-80-0177, 1987 WL 30608 (E.D.N.Y. Dec. 10, 1987) ....................................12, 25

*In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570,
   2023 WL 1797629, ECF 8862 ..........................................................................................8

*In re Terrorist Attacks VII*,
   714 F.3d 659 (2d Cir. 2013) ..............................................................................................2

*Tyus v. Urban Search Management*,
   102 F.3d 256 (7th Cir. 1996) ...........................................................................................25

*United States v. Ray*,
   No. 20-cr-110 (LJL), 2022 WL 101911 (S.D.N.Y. Jan. 11, 2022) ....................................19

*United State v. Zhong*,
   26 F.4th 536 (2d Cir. 2022) .............................................................................................14

**Other Authorities**

Fed. R. Evid. 403 ...................................................................................................7

Fed. R. Evid. 702 ............................................................................................3, 14

*The 9/11 Commission Report* ..............................................................................21

FATF, "Risk of Terrorist Abuse in Non-Profit Organizations" (June 2014) ....................4, 5, 6, 7

FFIEC BSA/AML Examination Manual, Appendix F "Money Laundering and
    Terrorist Financing 'Red Flags,'" ...............................................................4

History of the FATF, https://www.fatf-gafi.org/en/the-fatf/history-of-the-fatf.html ....................4

Jonathan Benthall and Jérôme Bellion-Jourdan, *The Charitable Crescent*
    (paperback ed. 2009)...............................................................................20

Peter L. Bergen, *The Osama bin Laden I Know* (2006)..................................................17

Victor D. Comras, Flawed Diplomacy: The United Nations & The War on
    Terrorism 94-95 (2010)...........................................................................2

## I.     Introduction

Defendant Yassin Abdullah Kadi submits this memorandum of law in support of his motion to exclude the testimony of Victor Comras, proffered by Plaintiffs as an expert on terrorism financing with respect to Mr. Kadi.[1]

Comras's opinions are excludable on virtually every ground set forth by the Court in ECF 9060,[2] and others. He misrepresents and distorts facts and sources, fails to consider "obvious alternative explanations" and evidence, renders *ipse dixit* pronouncements, reaches unfounded conclusions based on speculation and guilt by association, regurgitates hearsay without applying any expertise, comments on "motivations and intentions of individuals [and] entities," and opines on ultimate issues of liability. In sum, he is guilty of "intellectual dishonesty" that infects his entire proposed testimony. (*See* ECF 9060 at 5-7, 32 (cleaned up)). As the Second Circuit recognized, expert analysis should be excluded when it is unreliable as to "the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). This Court should similarly exclude Comras's opinions.

Comras's Reports and deposition testimony address "Terrorism Financing Risk Factors and 'Red Flags,'" a number of Mr. Kadi's associations, business and charitable dealings, and Mr. Kadi's designations and de-designations as a "terrorist supporter." (Report, Table of

---

[1] Comras's anticipated testimony is contained in a principal report dated October 30, 2020 ("Report"), a copy of which is annexed to the accompanying Declaration of Peter C. Salerno ("Salerno Dec.") as Ex. A), a Rebuttal Report dated February 16, 2021 ("Rebuttal Report"), a copy of which is annexed to the Salerno Dec. as Ex. B), and a deposition taken July 23, 2021 (pertinent pages of which are annexed to the Salerno Dec. as Ex. C, hereinafter cited as "Dep."). A post-deposition "Corrigendum" is annexed to the Salerno Dec. as Ex. D. Comras's testimony is also offered against Wa'el Julaidan. This Court entered a default judgment against Mr. Julaidan on July 31, 2023. (ECF 9241).

This memorandum principally addresses the main Report and Comras's deposition testimony. The Rebuttal Report was offered in response to the report of Mr. Kadi's joint expert, Jonathan Benthall, whose testimony in relation to Mr. Kadi and his co-defendants MWL and IIRO the Court has already ruled largely admissible in its bellwether opinion. (Opinion and Order deciding the "bellwether" *Daubert* motions made by the parties, filed April 27, 2023 (ECF 9060) at 25-30).

[2] All ECF references are to 03MDL1570 unless otherwise noted.

Content[s]).[3] Comras claims that his arguments are sufficient to paint a picture of Mr. Kadi as a funder of al Qaeda. Yet Comras has adduced no evidence of Mr. Kadi's funding of al Qaeda, let alone his desire or intent to do so. He has not identified one cent that has traveled from Mr. Kadi, his charity Muwafaq Foundation, or any of his businesses to al Qaeda by any route. *A fortiori*, Comras has provided no evidence that would answer the questions posed by the Second Circuit in remanding the claims against Mr. Kadi for jurisdictional discovery.[4]

Instead, Comras relies on speculation, dishonest representation of the facts, and other impermissible tactics in order to create the impression that Mr. Kadi funded terrorism and, in particular, al Qaeda. Comras's Reports are written as advocacy, not opinions reached after an examination and evaluation of relevant information. Indeed, they are not the result of any application of expertise . Every word could have been written by counsel in a memorandum of law. His deposition testimony underscores the inescapable conclusion that his opinions are based on the mission assigned by Plaintiffs' counsel and his pre-conceived ideas about Mr. Kadi (as demonstrated in a blog post he wrote about Mr. Kadi in 2005, titled *It's Time to Put Yasin Al Kadi Out of Business!*, which Comras failed to disclose in his Report).[5] It is obvious from Comras's Report, Rebuttal Report, and testimony that his "expert" "analysis" was grounded in a

---

[3] Mr. Kadi, along with 38 others, was listed by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC" ) as a "Specially Designated Global Terrorist" on October 12, 2001. Consequently, he was listed by the UN. (Report at 51; Dep. at 246:3-13; *see also* Victor D. Comras, *Flawed Diplomacy: The United Nations & The War on Terrorism* 94-95 (2010) (copy of pertinent pages annexed to Salerno Dec. as Ex. E) (At the time that Mr. Kadi was listed by the U.N., the Security Council's Sanctions Committee did not conduct its own investigations but relied on information provided by the member country advocating the listing). Mr. Kadi was subsequently delisted by the U.S., the U.N., and the E.U. (Report at 52-53).

[4] "(1) [W]hen the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda." *In re Terrorist Attacks VII*, 714 F.3d 659, 678-79 & n.15 (2d Cir. 2013). *See also id.* at 682.

[5] A copy of the blog post is annexed to the Salerno Dec. as Ex. F. Comras omitted this blog post from his Sample list of Recent Publications, Articles and Presentations that was part of the résumé annexed to his Report as Appendix 1, a list that included items dating back to 2002. At his deposition, Comras claimed that he did not recall having written this blog post, dated September 20, 2005. (Dep. at 48:25-49:5, 49:17-25, 50:5-14)**.** This despite having also stated that he included material going back to 2002 that he considered "relevant and important." (Dep at 23:3-13).

refusal to consider any evidence that undercut his thesis about Mr. Kadi and his activities. Comras's testimony reveals his ignorance of the need for the analytical approach necessary to render an expert's testimony reliable. The Second Circuit made clear that: "To warrant admissibility . . . it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 265. As for Comras, to the extent that analysis exists, it is virtually never reliable.

## II.   Discussion

### A.   Comras's Background

Most of Comras's career was spent in a variety of positions at the U.S. Department of State, followed by two periods at the United Nations. (Report at 1-4). His principal experience as it relates to his testimony in this case is in the area of terrorism sanctions. He has not identified any occasion on which he has testified as an expert. His principal relevant "expertise" is derived from being a monetary sanctions expert and terrorism financing designator. (*Id.*). By his own testimony, as well as that of Plaintiffs' expert on OFAC designations under E.O. 13224, the purpose of the designation process is to identify perceived risks of future conduct, not to prove past conduct, and definitely not with the rigor that would render it admissible to prove such conduct in a civil case.[6] (Dep. at 248:15-20; Deposition of Professor Jimmy Gurulé ("Gurulé Dep.") at 83:19-84:4, 85:24-86:6, 90:16-91:22).[7] Such experience is therefore of dubious relevance or help to the Court or other factfinder in analyzing evidence proffered to support a finding of personal jurisdiction. (ECF 9060 at 5, 7; Fed. R. Evid. 702).

### B.   Comras's Flawed Methodology

In service of his goal of tying Mr. Kadi to terrorist financing, Comras ignored the

---

[6] *See Kadi v. Geithner,* 42 F. Supp. 3d 1, 11 (D.D.C. 2012) (only a reasonable basis for designation is required).
[7] Plaintiffs' expert Professor Jimmy Gurulé testified that OFAC might designate someone who even unknowingly financed terrorism. (Gurulé Dep. at 87:14-88:4) (Excerpts from the Gurulé deposition transcript are annexed to the Salerno Dec. as Ex. G).

foundational principles of his own purported methodology. Although Comras claimed to have used a methodology that relied on, among other things, "social science research, and evaluation skills" (Report at 4), even a cursory reading of his reports and testimony confirms that his approach lacked both. The entire thrust of his Report is that he is suspicious of some of Mr. Kadi's transactions and affiliations. He claimed to have applied the guidelines of the Financial Action Task Force of the Organization for Economic Cooperation and Development ("FATF"), but he distorted and diverged from those guidelines.[8] He relied on the suspicions expressed by OFAC, parroting OFAC's documents, themselves based on hearsay, as well as other hearsay sources, without objectively analyzing them or weighing them against conflicting evidence.

1.  Comras Misused the Concept of "Red Flags"

Comras's analysis of Mr. Kadi's financial transactions purportedly used "red flags" "developed by several public and private financial institutions" to "signa[l] the potential or likelihood of terrorism financing activities." (*Id*. at 4, 7-8). The Report superficially appears to rely on the "red flag" analysis set forth in guidelines issued by the FATF (whose standards the Court has recognized as "global norms" (ECF 9060 at 17)), and other financial industry and oversight entities. (Report at 4, 6-7, n.14; Rebuttal Report at 9, 11-13, 15).[9] (The FATF guidelines were not applied to terrorism until after 9/11.)[10] Throughout his Report, Comras used circumstances he termed "red flags" to create the impression that there was evidence that Mr.

---

[8] FATF, "Risk of Terrorist Abuse in Non-Profit Organizations" (June 2014) ("FATF Report"), annexed to the Salerno Dec. as Ex. H..

[9] The Federal Financial Institutions Examination Council ("FFIEC") is the only other entity whose guidelines document Comras cites, and they state that the FFIEC relied primarily on the FATF's terrorist financing guidelines. FFIEC BSA/AML Examination Manual, Appendix F "Money Laundering and Terrorist Financing 'Red Flags," available at https://bsaaml.ffiec.gov/docs/manual/07_Appendices/06.pdf.. The other such institutions mentioned in the Report are the EGMONT Group of Financial Intelligence Units, the International Monetary Fund, and The Wolfsberg Group (of thirteen global banks). (Report at 4-7 & nn.10, 11, 13 and 14).

[10] The FATF was originally established to deal with money laundering. It only "expanded its mandate … to combat terrorist financing" in 2001. (FATF web site, https://www.fatf-gafi.org/en/the-fatf/history-of-the-fatf.html (accessed July 6, 2023); *see also* FATF Report at 1).

Kadi had engaged in terrorist financing. In fact, all Comras was able to do in his Report was engage in speculation that the practices of which he disapproved showed "likely terrorism financing," "potential terrorist financing issues" (at 33), "potential terrorism financing concerns" (at 40), or "potential … siphon[ing] off for terrorism or related illicit purposes" (at 42), all the while ignoring possible innocent explanations.

"Indicators are ultimately leads that require further investigation to assess the nature or risk of abuse."[11] Indeed, Comras conceded at his deposition that a "red flag" simply alerts financial institutions, regulators and investigators to *potential* terrorist financing transactions (Dep. at 74:7-16, 85:15-18); it is not a finding that such a transaction has occurred.[12]

Compounding his incorrect and misleading use of "red flags" as purported evidence of terrorist financing, Comras misapplied and distorted his own analytical tool by collapsing the FATF's two tiers of alerts ("Risk Indicators" and "Terrorist Abuse Indicators") into one tier, treating every fact he found suspicious as if it belonged in the more serious category of "Terrorist Abuse Indicator." In reality, many of the criticisms he had of Mr. Kadi's financial activities properly fell into the less serious category of "Risk Indicator," *i.e.*, a circumstance which "also has possible alternative explanations." (FATF Report at 65).[13]

When questioned about his conflation of the two tiers, Comras testified: "You're asking

_____

[11] FATF Report at 65.

[12] Comras seems to concede this point in his Rebuttal Report but then treats his findings as having greater significance. (Rebuttal Report at 11-12).

[13] See FATF Report (page 3 of which is cited by Comras in his report at 7 n.13), Chapter 6 "Risk Indicators and Terrorist Abuse Indicators, pp. 65-73.

       FATF "Risk Indicators" for NGOs such as charities (as contrasted with governments) include such practices as: acting in an area where terrorists are also present, lack of complete accounting records (in this case sought years later) of all its activities, commingling funds, unexplained bank accounts or transactions, structured transactions, concealed bank accounts, transfers to unassociated entities, unreported activities or partners, use of shell companies, avoidance of mandatory reporting requirements, and vague explanations to oversight bodies. "Terrorist Abuse Indicators" for NGOs include reliable information that an organization or its representatives are linked to parties supporting or engaging in terrorist activity, transferring funds to entities believed to be so engaged, receipt of funds from such entities, sharing property with such an entity, and having directors believed to support terrorist activity. (FATF Report at 67-73).

me to divide them between terrorist abuse indicators and risk indicator. I'm sorry, that may be an exercise for others. That's not one of the exercises that I went through." When pressed as to whether he accepted the FATF's distinction between risk indicators and terrorist abuse indicators, Comras testified that, "I do accept it. It's not something that I used, that's all, in preparing my report. I did not divide out the two." (Dep at 299:6-19). Instead, Comras constructed "my own list of red flags." (Dep at 297:2-6). Comras's "own list of red flags" does not readily correspond to the items in the "Risk Indicators" and "Terrorist Abuse Indicators" columns in the relevant chapter (Chapter 6) of the FATF Report. Several of Comras's items do not appear at all in FATF Chapter 6, a few appear to coincide with actual "Terrorist Abuse Indicators," and several appear to coincide with the less serious category of "Risk Indicators." In a nutshell, Comras attempted to create the impression in his Report that his methodology had the imprimatur of the FATF, while admitting at his deposition that he did not apply that methodology. Exclusion of a witness's entire testimony is required "if the witness is not actually applying expert methodology." (ECF 9060 at 9 (cleaned up)).

Although Comras was unable to show any connection between Mr. Kadi's financial practices and support for al Qaeda, he elevated his suspicions into a misleading impression of serious misconduct. For instance, he characterized as "a whole series of 'red flags'" Mr. Kadi's cash infusions and loans to KA Stan, one of his own businesses in Bosnia, and condemned what he deemed "an absence of accurate accounting information and lack of transparency" with respect to KA Stan and its presence in a "conflict zone, and the proximity of known Islamic terrorist groups operating in the region." (Report at 32). FATF's guidelines categorize these kinds of activities as "Risk Indicators," indicating "possible alternative explanations." (FATF Report at 65, 67-73).

Similarly, Comras found "probable terrorism financing" from facts he determined to exist

with respect to Euroinvest, another of Mr. Kadi's companies in Bosnia. (Report at 32). These alleged facts, too, fell primarily into the "Risk Indicator" rather than the "Terrorist Abuse Indicator" category (see FATF Report at 67-73): the company was partly financed in 1996 by a Bosnian bank Mr. Kadi owned; it recorded "a steady series of losses"; it sold consumer goods to Bosnians on credit; it employed or had as a shareholder and made personal loans to two individuals designated by OFAC (after 9/11); and ceased doing business in 1998. (Report at 32-33). It should be obvious that these kinds of ordinary commercial events do not justify an inference of terrorism financing.[14] In any event, despite his repeated attempts to imply assistance to al Qaeda from these facts, Comras failed to make any logical connection between them and financing to any terrorist group, let alone al Qaeda, beyond his *ipse dixit*. It would be unfair and prejudicial to allow Comras to use his flawed expertise to give these facts more significance than they merit. (*See* Fed. R. Evid. 403).

2. <u>Comras Improperly Relied on OFAC Designations and Other Hearsay</u>

Another flaw in Comras's methodology was his reliance on OFAC designations of Mr. Kadi and others with whom he associated. (Report at 31 & nn.121 & 124, 32, 39, 43 & n.184, 47-48, 50-51; Rebuttal Report at 13-14, 16 & n.17). First, all but one of the designations were after 9/11, simultaneous with or after Mr. Kadi's designation, so any implication that Mr. Kadi should have known about them when the relevant associations took place is without merit.[15] It was Comras's view, however, that Mr. Kadi, as a "wise businessman," would have known, as far back as 1992, the facts that would lead OFAC to designate these persons after 9/11. (Dep. at

---

[14] Mr. Kadi explained in his 2002 Statement to OFAC ("OFAC Statement") (which Comras had read (Dep. at 62:13-18, 301:3-5)), that at the end of the Bosnian war, Euroinvest sold commodities such as sugar and flour to impacted people, and that many of these customers were unable to pay for their purchases. (OFAC Statement at 78 ¶ 159 (Mr. Kadi's OFAC Statement, dated Dec. 19, 2002, is annexed to the Salerno Dec. Ex. As Ex. I)

[15] The only pre-9/11 designation was that of the Farmer's Bank in Sudan, and Mr. Kadi testified that he was unaware of that designation. (Kadi Dep. at 170:22-174:23). Excerpts from the transcript of the deposition of Mr. Kadi, taken on July 10, 2018, are annexed to the Salerno Dec. as Ex. J. The Errata Sheet for the Kadi deposition is annexed to the Salerno Dec. as Ex. K.

224:10-225:2; *see also id.* at 248:3-14). Second, as with the FATF risk indicators and terrorist abuse indicators, the OFAC listings were intended to be predictive of possible terrorist financing. Thus, the fact of a designation (or a refusal by OFAC to de-designate), let alone a post-9/11 one, is not a reliable indicator that either Mr. Kadi or the person or entity he associated with was in fact involved in terrorism financing. Plaintiffs' own expert on OFAC designation, Prof. Jimmy Gurulé, who supervised OFAC as Under Secretary for Enforcement at the Treasury Department from 2001 to 2003, and Comras himself, said as much. (Gurulé Dep. at 30:6-31:7, 33:5-13, 84:8-86:6; Dep at 248:18-249:4).

Apart from Mr. Kadi's own testimony and statements to OFAC about his benign encounters with OBL (*see* Kadi Dep. at 69:18-73:20, 192:19-193:4; Answers to Questions Concerning the Petition to Delist Yassin Abdullah Kadi (KADI0002928, 2944-45, Salerno Dec. Ex. L), the primary alleged interactions the Report or Rebuttal report mention between Kadi (or Muwafaq or a Kadi associate) and OBL or other extremist individuals or groups, are provided in documents by various governmental entities: the U.S. State Department (Report at 9 & n.17, 38 & n.156); the FBI (*id*. at 14 & n.38, 25 & n.92; 36-37 & nn.151 & 152);[16] the Treasury Department (*id*. at 30-31 & n.118; 41 & n.75; 43 & n.184); the United Nations (*id*. at 37 & n.153, 43 & n.185); the U.S. Foreign Broadcast Information Service (*id*. at 44 & n.188), which in turn relied on a 1996 CIA report on Balkans Charities;[17] and Swiss Police Reports. (*Id*. at 40 &

---

[16] On their face, the FBI documents consist of double and even triple hearsay. For example, PEC-KSA002133-2134 (Salerno Dec. Ex. M), an FBI memo of an interview with the cooperating witness (presumed to be Jamal al Fadl), cited in Report at 25 n.92, states outright that some of the cooperator's information came from other sources, and close reading of the entire memo suggests that much of the information from this cooperator may have been obtained from other individuals.

[17] *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570, 2023 WL 1797629, at *11, ECF 8862 at 24 (cautioning against "relying on unsupported 'conclusions' in investigative documents") (citing ECF 6579, Order at 13-14 n.5)**.** The FBIS was not an investigative agency at all, but rather a media aggregator and creator of related editorial matter under the CIA. (*See* Wikipedia (https://en.wikipedia.org/wiki/Foreign_Broadcast_Information_Service); JFK Library Archives description of CIA Records (https://www.jfklibrary.org/asset-viewer/archives/USCIA) (both accessed July 29, 2023).

n.171).[18] Comras simply repeats the material in these documents (sometimes after cherry-picking material in them) and treats them as accurate without analyzing them or viewing them in the context of other material. "An expert properly relies on hearsay where she 'piece[s] together bits of information from difference sources and reaches a studied conclusion.'" ECF 9060 at 7 (cleaned up). "[I]f an expert simply repeats someone else's statements and does not 'apply[] [her] expertise to that hearsay evidence,' then the jury does not need help understanding the underlying hearsay and it is an improper subject for expert testimony." ECF 9060 at 7 (cleaned up).

Strikingly, despite his heavy reliance on OFAC documents related to Mr. Kadi's designation, Comras barely noted the existence of the one actual investigation of Mr. Kadi that OFAC undertook. OFAC performed a three-week on-site investigation of Mr. Kadi's companies in Albania in May 2002, an investigation whose report Comras only noted in a footnote. (Report at 29 n.108).[19] OFAC's primary purpose in conducting this investigation was to find evidence supporting Mr. Kadi's designation. (OFAC Albania Report at KADI0005090 (Salerno Dec. Ex. Q)).[20] To this end, the OFAC investigators reviewed "nearly 100 linear feet of documents." (*Id.*). OFAC's preliminary review of these documents showed that Mr. Kadi's companies were not

---

[18] Swiss Federal Bureau of Investigation, Final Report dated May 20, 2005 (KADI0010744 *et seq.*, portions of which are annexed to the Salerno Dec. Ex. N); Federal Judicial Police, Supplementary Report dated Nov. 5, 2007 (KADI0015541 *et seq.*, portions of which are annexed to the Salerno Dec. Ex O). Comras embellished on the Swiss Police Report excerpts by citing them for the proposition that "[i]t was generally known that Amir Mehdi maintained a close association with bin Laden and al Qaeda activists and that he was actively engaged with the Pakistani terrorist group Harakat ul-Mujahidin and Harakat-al-Ansar." (Report at 40 & n.171). The cited pages do not support the claim that Mehdi's alleged unsavory associations were a matter of general knowledge. And characteristically, Comras omitted the information on the page prior to the first Swiss Police Report page he cites, to the effect that Mr. Kadi hired Mehdi for Muwaffaq in Pakistan because he had good knowledge of the area and had served as a teacher in Peshawar and Islamabad. (KADI0010792, Salerno Dec. Ex. N).

[19] *OFAC TDY to Albania April 30, 2002-May 21,2002 – A Review of the Kadi Companies* ("OFAC Albania Report"). Comras cited to an incomplete version of the OFAC Albania Report, which is Ex. P to the Salerno Dec. A complete copy, with a different range of Bates numbers, is Ex. Q to the Salerno Dec.

[20] A secondary purpose was to assist the Albanian authorities in their criminal investigation into alleged money laundering by Mr. Kadi and his companies. (KADI0005090). The Albanian investigation was terminated without charges, a fact of which Comras was aware but did not mention in his report. (*See* Dep. at 54:9-15).

directly involved in, but "support[ed] Muslim communities [in Bosnia] with material, funds and possibly arms." This finding was "based on . . . circumstantial/hearsay evidence" and was "only hint[ed] at" by the documents reviewed.[21] (KADI0005091 (Salerno Dec. Ex. Q)). The OFAC investigators also interviewed four former employees of Kadi companies and Muwafaq in Albania. (KADI0005092-94,5098-5105, 5108-19 (Salerno Dec. Ex. Q)).

Comras's relegation of OFAC's Albanian investigation of Kadi to a footnote, merely noting its existence, is noteworthy because although it was the one actual investigation of Mr. Kadi that OFAC conducted, it yielded no evidence of any connection between Mr. Kadi and al Qaeda. If OFAC, with its resources, was unable to do so, it is not surprising that Comras also could not do so.

OFAC's investigation in Albania was significant also because it undercut two of Comras's assertions about Mr. Kadi. The first is that Mr. Kadi was a financial supporter of the Al Haramain Islamic Foundation ("AHIF"), reputed to be a radical organization. (Report at 47; Rebuttal Report at 8). The OFAC investigators recorded the fact that one of Mr. Kadi's former employees, Petrit Musa, clearly stated that on two occasions when Muwafaq was in the process of unwinding its Albanian operations, Mr. Kadi emphasized to him that "whatever happened" he did not want Muwafaq's school building to fall into the hands of the Al Haramain NGO. (KADI0005114, see also KADI0005111 (Salerno Dec. Ex. Q)). Mr. Musa's statements to OFAC were consistent with Mr. Kadi's OFAC Statement and his deposition testimony, where he explained that he had nothing to do with AHIF, but rather was on the board of directors of a charity called Al Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA"), which he

---

[21] Approximately ten days into OFAC's onsite investigation, investigators found that "the most promising material" was that connecting Mr. Kadi to Wa'el Julaidan. (KADI0005095 Salerno Dec. Ex. Q).

believed had no relation to AHIF. (OFAC statement at 42, ¶ 90; Kadi Dep. at 193:12-194:14).[22]

Comras made no reference to any of this evidence, while asserting that Mr. Kadi supported

AHIF. This is but one example of the cherry-picking that disqualifies Comras from testifying.

The OFAC investigation in Albania also contained information that was directly at odds

with Comras's insistence that some of Mr. Kadi's companies were "shell" companies. Although

Comras's reports contain numerous references to Mr. Kadi's allegedly having such companies

(Report at 5, 7, 14, 37, 38 n.159; Rebuttal Report at 15), Comras could articulate no basis for this

claim. In his Report, he identified none of Mr. Kadi's companies as shell companies, despite his

repeated criticism of this supposed practice of Mr. Kadi's. At his deposition, he struggled to

identify Kadi companies that were shells, but insisted that there had to be some shells because

Mr. Kadi had so many companies.[23] When asked how many companies Mr. Kadi had, Comras

testified that he thought that there were 50 or 60, a number he arrived at by "taking an

*impressionist* perspective …." (Dep. at 423:10-13) (emphasis added). Eventually, Comras took a

"stab at" identifying alleged shells owned by Mr. Kadi and named Loxhall, Karavan, Campbell

and Medicare. (Dep. at 422:20-25). Yet OFAC, in its Albanian investigation, recorded (in the

very report that Comras cited in his Report (at 29 n.108)), that Loxhall was a foodstuffs firm

(KADI0005102 (Salerno Dec. Ex. Q)), Karavan was a construction business (KADI0005092-94,

5098 (*Id.*)), and Medicare imported medical products (KADI0005106, 5121 (*Id.*)). Comras's

---

[22] AHAMAA was designated by OFAC only after Mr. Kadi was listed and had sat for an interview with OFAC. (Kadi Dep. at 193:10- 194:14; *see* Salerno Dec. Ex. R (Treasury Dep't Press Release May 6, 2004).

[23] Comras testified that his opinion that Mr. Kadi operated shell companies was based on "my expertise. It's based upon other factors. It's based upon looking at transactions and seeing the number of companies. That's the only tool in my trade. I'm not in a position go out and delve specifically document by document, prove company by company, to do so. I believe I have sufficient information to discuss that opinion, to provide that opinion in an expert report. If somebody wants to challenge that position, I invite them to do so." (Dep. at 428:23-429:12). *See Daniels-Feasel v. Forest Pharmaceuticals, Inc.*, No. 17-cv-4188-LTS, 2021 WL 4037820 at *17 (S.D.N.Y. Sept. 3, 2021) (expert excluded in part based on her assertion that she was entitled to use her expertise to decide which data were worthy of mention and which were not). Comras's assertion that his opinions are accurate, without "reliably applied" "reliable principles and methods" "to the facts of the case," has no value. (*See* ECF 9060 at 32).

work in this matter fell far short of the "level of intellectual rigor" one would expect from an expert in his – or any – field. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

As with other critical failures by Comras to mention or address contrary evidence, the issue is not whether the evidence Comras ignored was compelling or dispositive – although frequently it was. What is significant is that he completely ignored, rather than evaluated, any material tending to contradict his view that Mr. Kadi was a financier of terrorism. Comras was no "independent evaluator of Mr. Kadi's activities." (Rebuttal Report at 16, referring to a lawyer for Mr. Kadi; *see also Daniels-Feasel,* 2021 WL 4037820, at *5, *8). "When expert witnesses become partisans, objectivity is sacrificed to the need to win." *Rubenstein by Rubenstein v. Marsh*, No. CV-80-0177, 1987 WL 30608, at *7 (E.D.N.Y. Dec. 10, 1987). Comras virtually admitted in his testimony that he treated as irrelevant facts not supportive of his thesis about Mr. Kadi. (*See infra* pp. 20-22).

C.   Comras's Deceptive, Unreliable Arguments

1.   The "Unexplained" Label

Comras embellished his scenario of "probable terrorism financing" (Report at 32) with the repeated (and unsupported) refrain to the effect that certain of Mr. Kadi's transactions lacked an explanation and were therefore suspect. Comras cited Euroinvest, a company of Mr. Kadi's in Bosnia, which made loans despite suffering losses. Comras asserted that "[t]he rationale for these transactions is never presented[,]" indicating to him "likely terrorism financing." (Report at 33). Comras could not explain, when testifying, to whom a rationale should have been presented. He seemed to be saying that Euroinvest's own accountants should have received the explanation but he conceded that he had not seen all of Euroinvest's financial records, nevertheless insisting that "I've seen enough to know that there are blanks." (Dep. at 303:3-305:4).

Comras made a similarly unfounded "analysis" of a deposit of several checks totaling $30 million into Mr. Kadi's Leemount account in 1993, complaining that "[t]he original source or purpose of these funds was never explained." (Report at 42). This, Comras stated in his report, "raises serious 'red flags' concerning the potential that some of these funds were siphoned off for terrorism or related illicit purposes." (*Id*.). His deposition testimony made it clear that "serious red flags" existed for him simply because he did not know why the money was transferred or what it was used for. (Dep. at 127:9-23).[24]

Similarly, Comras claimed in his Report that Mr. Kadi's 1991 transfer of $10 million that he had received from his mentor, Khalid bin Mahfouz, to the Islamic Investment Company of the

---

[24] A deposition colloquy about these transactions vividly demonstrates, in addition to Comras's *ipse dixit* approach to expert testimony, that his statement was misleading, since there had been no requirement or request for a rationale:

Q. I'll ask you a question that may be familiar to you now. To whom should a rationale have been presented?

A. It was a company, to its records, to facilities that can kept – a company should do its own accounting, shouldn't it not? [sic] They should be explained. Their activities should be explained. If they go unexplained, they raise questions. If they raise questions, they create risks. If they create risks, they are vulnerable. If they are vulnerable in an atmosphere where a vulnerability can be taken advantage of, their money is lost. So to whom should it be explained? To their own accountants, to their own accounting facility. Should they have accounting, yes. And what company should not know what it's doing, where its money is going, what's happening. But there is no record of any of that in these cases.

Q. Well, have you seen all the financial records of the Kadi companies we've been discussing?

A. I've seen enough to know that there are blanks. And the companies where there were some recordings of accounting, such as in Pakistan, the accountants had to rely on information that was simply relying on the statements of the managers or the directors.

Q. Well, your knowledge of what you allege here is based entirely on your assumption that documents that you have not seen support the proposition that they're still unexplained. Am I not correct about that?

MR. MALONEY: Objection.

Q. You can answer.

A. Listen, they are unexplained as far as I could tell. If there is explanation, I certainly hope it will be presented. That's not my job. My job is to take a look at what I know is to be the situation. If there is an explanation, please provide it. That's your job, not mine.

(Dep at 303:3-305:4).

Gulf was "never appropriately explained." (Report at 17). When questioned at his deposition, Comras conceded that he was not aware of any person or entity having asked for a rationale and did not know to whom one should have been presented. (Dep. at 110:5-112:4).

Comras's facile and flawed logic allowed him to draw yet another baseless inference from this 1991 transfer: that "[c]onsequently, Osama bin Laden had been present in Jeddah during this time and had been restricted from transferring his funds out of Saudi Arabia, raising suspicions that this $10 million transfer may have been made on his behalf." (Report at 17; *see also* Dep. at 117:17-118:11).[25] This wild leap in reasoning, even if couched in speculative terms, is illustrative of the quality of Comras's analyses and the unreliability of his opinions. "Such a leap is the essence of unverifiable subjectivity amounting to the sort of *ipse dixit* connection between methodology and conclusion that the district court has the duty to exclude under Rule 702." *Nimely v. City of New York*, 414 F. 3d 381, 399 (2d Cir. 2005).

2.  Guilt by Association

Guilt by association is an unacceptable basis for an expert opinion. *United State v. Zhong*, 26 F.4th 536, 557-58 (2d Cir. 2022) (collecting cases). Examples are Comras's statements that:

**1)** A former member of the "Al Muwafaq Brigade" in Bosnia was arrested for attempting to plant a bomb at the Los Angeles airport in 1999 (Report at 44);

**2)** Mr. Kadi transferred money he received from Khalid bin Mahfouz, his mentor and primary funder of the Muwafaq Foundation, to the Islamic Investment Company of the Gulf, which was "the subject of multiple investigations concerning possible links to terrorism" (Report at 17). At his deposition, Comras conceded that he did not know the outcome of these investigations, occurring in or about 1991, but that he thought that they resulted in a finding of

---

[25] At his deposition, Comras stated that he should have said "coincidentally," not "consequently." (Dep. at 117). He also conceded that he did not know of anyone who shared this suspicion. (*Id.* at 117:16-118:11).

tax violations. (Dep. at 107:16-109:10));

3) Mr. Kadi used Al Shamal Bank in Sudan for his business transactions in that country and Osama bin Laden was a part owner of and held accounts at that bank (Report at 39), omitting reference to Mr. Kadi's testimony that he banked at Al Shamal because it offered attractive returns using Islamic financial principles, he was not a partner or investor in that bank, and did not know whether OBL was a partner or shareholder (Kadi Dep. at 75:18-77:3, 78:24-79:3; *see also* OFAC statement at 68-72, ¶¶ 141-47);[26]

4) Two of Mr. Kadi's affiliated entities were co-shareholders with Osama bin Laden in a Sudanese agricultural company, omitting reference to Mr. Kadi's testimony that he did not know that OBL was a shareholder, did not know the name "Wadi al Aqiq" (the name of OBL's company), did not sign the shareholder agreement, and was not present when it was signed (*cf.* Report at 38 with Kadi Dep. at 87:23-88-14, 90:24-91:6, 138:9-139:5, 141:5-142:25, 145:3-5, 147:22-148:1);

5) Mr. Kadi had "unmonitored business transactions" with a sesame company in Sudan with which OBL had done business in previous years (Report at 39,55); [27]

6) Mr. Kadi had made a payment to Gari al Nabi, an associate of Hasan al-Turabi, the head of the NIF party and government in Sudan in the early 1990s (Report at 18 and n.59);

7) Mr. Kadi associated with Wa'el Julaidan (*see infra* pp. 16-17 & nn. 34 & 35), 19-20);

8) Mr. Kadi hired Amir Mehdi to run Muwafaq's operations in Pakistan (Report at 40), omitting the reasons Mr. Kadi gave for this hire, cited by the Swiss authorities in their police reports (pages of which Comras cited) about their investigation of Mr. Kadi, *i.e.*, that Mr. Mehdi

---

[26] Comras knew that there were "not many" banks handling commercial transactions in Sudan in the early 1990s and perhaps only two that offered Islamic investment products. (Dep. at 216:18-24).

[27] Comras was unaware of any obligation to have such transactions monitored and could not state who should have been the monitor. (Dep at 205:21-206:12).

had teaching experience and good local knowledge of Peshawar and Islamabad, where Muwafaq had offices, and also stating without support that Mr. Mehdi's alleged terrorist associations were "generally known" (*id.*; Swiss Reports, Salerno Dec. Exs. N & O);[28] and

**9)** National Commercial Bank, with which Mr. Kadi had an association in the early 1990s, was used by the Saudi royal family to support unnamed "non-profit organizations spreading radical Wahhabi and Salafist theology." (Report at 15).

Even if guilt by association could in theory serve as evidentiary support for Comras's opinion that Mr. Kadi and Muwafaq Foundation had a "role in the channeling of funds to al Qaeda" (Report at 56), the conclusions Comras drew from the associations were based on such strained logic that they are wholly unreliable. Furthermore, Comras had no factual basis apart from the suspicions of others to assert that the associates whose guilt he seeks to impute to Mr. Kadi (Messrs. Mehdi, Saleh and Julaidan), were in fact guilty of anything, let alone "substantial links to Al Qaeda." (*Id.*). He nevertheless made such assertions, along with what he claims was "the more detailed information" contained in his report, as evidence that Mr. Kadi helped fund al Qaeda and its targeting of the United States. (*Id.*)

   3.   The "Maram Affair"

   Comras justified his conclusion that Mr. Kadi's funding of student housing at Al Eman University in Yemen was "a money darkening scheme" in large part by his views about other people associated with the project. (Report at 49-50). He relied on the fact that Al Eman was headed by Dr. Abdul Majeed al-Zindani, whom OFAC years later deemed to be an al Qaeda

---

[28] Comras had read and cited the Swiss investigative reports (Report at 40 and nn.168, 171; 41, 42; Dep. at 128:15-17, 129:9-23, 225:11-20); was aware that Mr. Mehdi had been released by the Pakistani authorities with no charges (Dep. at 227); and had no evidence that Mr. Kadi was aware that Mr. Mehdi had a suspicious person's telephone number in his telephone book (Dep. at 227:24-228:18). Although Comras had read Mehdi's qualifications as described in the Swiss Report, he discounted Mr. Kadi's reliance on them, saying "Either he was a fool and didn't know about who he was hiring, or he knew who he was hiring and did not care." (Dep. at 225:22-226:20).

supporter (U.S. Treasury Department Press Release JS 1190 (Feb. 24, 2004) (Salerno Dec. Ex. S); *see* Report at 49), and on Mr. Kadi's hiring of Wa'el Julaidan, a former associate of OBL during the Soviet-Afghan conflict, to organize the dormitory buildings' construction.[29] Although Comras had read Mr. Kadi's deposition, his report made no mention of Mr. Kadi's explanations for supporting the dormitory project or for his decision to retain Mr. Julaidan to execute it.[30] Comras offered no evidence that Mr. Julaidan supported OBL at the time Mr. Kadi dealt with him. There is evidence to the contrary, that Mr. Julaidan had abjured OBL by the early 1990s, and that Mr. Kadi believed this to be the case.[31] Comras ignored this evidence. This is but one example of the "cherry-picking" in which Comras engaged throughout his Report. "Cherry-picking is a form of result-driven analysis" undermining an expert's reliability. (*Daniels-Feasel,* 2021 WL 4037820 at *5 (cleaned up)). Such cherry-picking, or repeated "dismiss[al of] inconsistent findings without explanation," justifies an expert's exclusion as a witness. (*Id*. at *8; *see also* *12, *15-17, *19-21).

Comras termed the Al Eman project the "Maram Affair."[32] Maram was the name of the company through which Mr. Julaidan handled the purchase and transportation of construction

---

[29] Mr. Julaidan was not designated by OFAC until September 2002. (Salerno Dec. Ex. T).

[30] Mr. Kadi explained at his deposition (which Comras had read in its entirety (Dep. at 45:16-46:3)) that he agreed to undertake the project at the request of an uncle, Dr. Mohammed Omar Zubayir, who had partly raised him and was a former colleague of Dr. Al-Zindani, with whom Dr. Zubayir had taught at King Abdulaziz University in Saudi Arabia . Furthermore, as with the Muwafaq Foundation and many other of his charitable projects, most of the money for Al Eman came from Mr. Kadi's mentor, Khalid bin Mahfouz, who Mr. Kadi knew would be happy to support a project for education in Yemen, Mr. bin Mahfouz's country of origin. (Kadi Dep. at 220:2-225:1). Mr. Kadi explained that his choice of Mr. Julaidan to oversee the construction plan was based on Mr. Julaidan's experience in relief work during the Afghan-Soviet War and on Mr. Kadi's uncle's recommendation of Mr. Julaidan for the job. (Kadi Dep. at 221:3-222:11; 264:18-266:7).

[31] Mr. Kadi repeatedly has explained his confidence in Mr. Julaidan's abilities as a relief worker and his awareness that Mr. Julaidan had abjured support for OBL after OBL had become a "fanatic." (Kadi Dep. at 220:12-224:20, 239:15-242:2, 265:2-266:18). Mr. Julaidan's rejection of OBL after OBL's goals became extreme is discussed in Peter L. Bergen, *The Osama bin Laden I Know* (2006), a book Comras cited to demonstrate that Mr. Julaidan had had a relationship with OBL. (Report at 19 n.63). Comras omitted the portion of the Bergen book reflecting Mr. Julaidan's rejection of OBL and OBL's extreme views after the early 1990s. (Bergen, *supra*, at 62, 104, 111, 129-30) (Excerpts from the Bergen book are in Salerno Dec. Ex. T).

[32] A more neutral and accurate label would have been "the Al Eman University Project."

-17-

materials for the project from Turkey, where he was then located. (Kadi Dep. at 215:18-216:5, 222:21-223:21). Prior to the inception of the project and Mr. Kadi's involvement in it, Mr. Julaidan purchased Maram from Mamdouh Mahmud Salim, who was arrested in 1998 and imprisoned in the United States. (Report at 48-49). Comras thereby implied an association between Mr. Kadi and Salim, ignoring Mr. Kadi's testimony that he never heard of Salim. (Kadi Dep at 216:6-9). Salim's only "connection" to the Al Eman project was as the seller of the company that Mr. Julaidan later used in connection with the construction work. Comras cited no evidence to the contrary.

Comras's treatment of the Al Eman project in Yemen has the dubious distinction of combining an array of flaws in Comras's work. It represents guilt by association, wild speculation, *ipse dixit* pronouncements, distortion of and cherry-picking the evidence, and unreliable (indeed incomprehensible) methodology.

Based on his description of a limited number of relevant facts, Comras reported that not all of the funds Mr. Kadi put into the construction of student housing at Al Eman University in Sanaa, Yemen, could be accounted for, justifying his *ipse dixit* conclusion that the unaccounted-for money "was likely skimmed off for other purposes, including for Al Qaeda." (Report at 50). This accusation, lacking even the appearance of a logical thread, like his other opinions about Mr. Kadi, was based on nothing more than "unsupported speculation cloaked as expertise." *In re Namenda Direct Purchaser Antitrust Litig.,* 331 F. Supp. 3d 152, 172 (S.D.N.Y. 2018) (cleaned up).

Straining logic even further, Comras reported the missing amount variously as "up to $300,000" (Report at 33) or between $936,000 and $1.28 million (*id*. at 50). When questioned about the discrepancy between these two sets of numbers in his own Report, Comras denied that

there was a discrepancy. He testified that while the Swiss police (who terminated their scrutiny of Mr. Kadi's transactions in 2007 (KADI0018536-37, Salerno Dec. Ex. U) after a six-year investigation) had found that up to $300,000 was unaccounted for, Comras had come up with his own finding that between $926,000 and $1.28 million was unaccounted for. Rather than a discrepancy, he testified, this was simply "two different accountings by two different groups for two different purposes." (Dep. at 307:22-308:2). Comras could not explain his own accounting, however. When asked to explain how he arrived at the range of between $926,000 and $1.28 million – a range unexplained in his report – Comras testified that he could not, while testifying, reconstruct his calculation. His only description of the methodology he used to arrive at his estimate was "[t]he methodology is, again, the fungibility of money." (*Id*. at 309:4-310:5).

Experts cannot simply rely on their experience to justify their opinions. They "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Ray*, No. 20-cr-110 (LJL), 2022 WL 101911, at *2 (S.D.N.Y. Jan. 11, 2022) (cleaned up). Comras's inability to appreciate the significance of conflicting accounting results or to articulate the basis on which he arrived at his own result also vividly demonstrates – yet again – that his Report lacks "intellectual rigor." *Kumho Tire*, 526 U.S. at 152; *Amorgianos*, 303 F.3d at 265-66.

4.   Distortions and Misrepresentations Permeate Comras's Report

In his zeal, Comras even stooped to distorting quotes. For instance, he made a strategic omission from an OBL interview quote, creating the impression that Mr. Kadi's associate, Wa'el Julaidan, had a connection to OBL that was far more recent than it actually was. Comras's OBL quote was: "We were all in one boat, as is known to you, including our brother, Wa'el Julaidan." (Report at 20, n.70). Comras took this partial quote from the quote used by OFAC in its press

release when it listed Mr. Julaidan. The full quote from OFAC's press release, which Comras

cited as authority for his quote (*id*.), included in the "one boat" Abdullah Azzam, a towering

figure in Afghanistan prior to al Qaeda's formation, who was assassinated in 1989. (Press

Release, Salerno Dec. Ex. V). Comras admitted at his deposition that he knew that Azzam was

assassinated in 1989, but that he "did not quote that part [the reference to Azzam] because that

was not part of what I was trying to say." (Dep. at 161:8-15, 162:18-20).

Along similar lines were gross distortions and omissions from Comras's Rebuttal Report

where, relying on a book entitled *The Charitable Crescent,* co-authored by Jonathan Benthall,

Mr. Kadi's expert witness, Comras claimed that a refugee camp in Sudan, supposedly visited by

Mr. Benthall, constituted a visit to "Muwafaq in Sudan, [where] he was prevented from

questioning the displaced persons, prevented from taking photos and came away with the

impression that the provision of aid was conditioned on adherence to political and religious

criteria." (Rebuttal Report at 7 & n.8). The chapter Comras cites makes it clear that 1) the visitor

was not Mr. Benthall,[33] and 2) the refugee camp was serviced by eight NGOs, some Sudanese, at

least one Christian, and that Muwafaq was but one of three international Islamic agencies at that

camp. It also is clear from these pages, despite the impression created by Comras's strategic use

of the passive voice, that the visitor's tour of the camp was handled by a state employee, not by a

Muwafaq employee. (*The Charitable Crescent*, Salerno Dec. Ex. W at 124). When asked at this

deposition why he omitted mentioning that one of the NGOs on site was Christian and only three

were identified as Islamic, Comras testified, "[b]ecause it was irrelevant to the report. I'm sorry

to talk about relevance. But it had nothing to do with what I was writing." (Dep. at 175:22-

176:25).

---

[33] The visitor actually was, as the first page of the chapter clearly shows, Mr. Benthall's co-author, Dr. Jerome
Bellion-Jourdan. (A copy of chapter 6 of *The Charitable Crescent* is annexed to the Salerno Dec. as Ex. W). Comras
owned a copy of the book, so there is no excuse for this mistake on his part. (Dep. at 170:24-171:2).

Comras used ellipses to alter the meaning of the 9/11 Commission Report's statement that "entire charities …wittingly participated in funneling money to al Qaeda." (Report at 13 (ellipsis in Report)). The elided words were "such as the al Wafa organization, *may have*." (*The 9/11 Commission Report* at 170) (emphasis added**).** Comras also stated that these charities "included the Muwafaq Foundation." (Report at 13). This assertion was supported only by citation to pages 34-42 of his own report. These pages contain only speculation, *ipse dixit* pronouncements, distortion of facts and reliance on hearsay. *The 9/11 Commission Report* did not mention Muwafaq or Mr. Kadi anywhere.

Another example of omitting pertinent material (without even indicating an elision) is found in a reference to U.S. Attorney Patrick Fitzgerald's interview by the 9/11 Commission: Comras did not use quotations marks when he wrote "He [Fitzgerald] also stated that he has complete confidence in Fadl 's honesty, and that Fadl accurately remembered everything in which he participated." (Report at 24, n.89). Every word in the preceding quotation, except the material in brackets, is a verbatim quote (without quotation marks) from the Commission staff memorandum of the Fitzgerald interview, *except* Comras omitted the word "believes" before "that Fadl accurately remembered everything …," thus endowing Mr. Fitzgerald's statement about Fadl's memory with greater certitude than it warranted. (*See* "Memorandum for the Record," 911 Commission Interview of Patrick J. Fitzgerald (Jan. 28, 2004) at 2) (Salerno Dec. Ex. X).

Also omitted from Comras's discussion of statements by Mr. Fitzgerald was Fitzgerald's caveat that the recollections of FBI cooperator Jamal al Fadl "may not have been as good when he tried to recount what other people had told him about events in which he had not participated …." (*Id***.**). When asked whether he was aware of this qualifying comment by Mr. Fitzgerald,

Comras testified that ". . . I did not reflect on it, did not think about it and did not find it to be useful." (Dep. at 156:17-19). Comras's approach, clearly, was to report only material helpful to his viewpoint, even if it meant using quotes deceptively and omitting information he did not find "useful."

Comras's Report contains abundant additional distortions and misrepresentations of information in the documents he examined. For instance, his report discusses "bearer checks, shell companies, and circuitous routings" as methods Mr. Kadi allegedly used "[t]o avoid red flags." (Report at 14). First, of course, Comras's opinion about Mr. Kadi's motive is impermissible (ECF 9060 at 6, 12, 14, 21, 29, 40), a fault that recurs in Comras's Report.[34] Second, although Comras criticized Mr. Kadi for "using" bearer checks (Report at 14; *see also id.* at 17 & 42; Rebuttal Report at 15), implying money laundering, he admitted that Mr. Kadi himself never issued bearer checks, but only transferred such checks that his mentor and primary Muwafaq funder, Khalid bin Mahfouz, was in the habit of providing. (Dep. at 104:18-22; *see* Kadi Dep. at 95:4-17, 110:16-25, 120:11-18, 125:12-25; 128:1-5).[35]

In addition to noting Mr. Kadi's brief and casual interactions with OBL in the 1980s and early 1990s in order to create an impression of an actual relationship between the two,[36] Comras

---

[34] For example, after concluding, without support, that Muwafaq diverted money to Al Qaeda, Comras claimed that Mr. Kadi "failed [to supervise Muwafaq's transactions] more likely than not because he was, in fact, *intentionally, knowingly and willfully* directing the funds to support al Qaeda and its well publicized intent to kill Americans." (Report at 55) (emphasis added). Comras also stated, "[I]t is my expert opinion that Yassin Kadi … *knowingly and intentionally* participated in a financial network to support Al Qaeda and finance its activities, including during the planning stages for the 9/11 Attacks …." (*Id.* at 56) (emphasis added).

[35] Despite Comras's repeated use of the term "money laundering" in his reports (Report at 33; Rebuttal Report at 4, 5, 11, 13), he never points to any actual evidence of money laundering by Mr. Kadi for any purpose, let alone for support of Al Qaeda.

[36] Comras referred to Mr. Kadi's brief assistance to OBL in hiring engineers for a bin Laden company in Chicago during the late 1970s or early 1980s, while Mr. Kadi was a trainee architect there with Skidmore Owing & Merrill (Report at 13; OFAC Statement, at 3-4, ¶ 6; Kadi Dep at 15:17-23, 71:9-72:8, 73:20) and to the FBI's hearsay information that Mr. Kadi had allegedly been seen at OBL/al Qaeda guesthouses in 1993-94. (Report at 14 n.38) (Comras mis-cites "Kadi 2944" for this statement. KADI0002944 is part of Mr. Kadi's answers to OFAC questions (Salerno Dec. Ex. L), and it says nothing about guesthouses. There are documents in the discovery record containing allegations about guesthouses). He cited the facts that Mr. Kadi and OBL were both engaged in the sesame trade in

made a contorted effort to create the impression that Mr. Kadi gave money to OBL. Comras stated in his Report that Mr. Kadi's Solano account at Al Shamal accounts bounced $27 million dollars in checks at a time when OBL reportedly was barred from having access to between $26 and $28 million he had left in Sudan. (Report at 39-40). However, shortly before his deposition, Comras submitted a correction to the Report, changing the amount of money that the Solano account was short from $27 million to $1.7 million. (*See* Dep. at 18:5-24). Apparently, Comras's eagerness to create – on the flimsiest of foundations – the impression that Mr. Kadi might be giving financial support to OBL led him, initially, to make this crude error.

The Report does not even pretend to have any basis for the statement that, "[t]ogether, Yasin Kadi and Khalid bin Mahfouz used their resources to propagate a radical Islamic theology that contributed to the virulence and capabilities of such terrorist organizations as al Qaeda." (Report at 16). Nor does Comras cite any evidence that they even had such an ideology. The only evidence as to the version of Islam to which Mr. Kadi adhered shows that he was pro-Western in his outlook. In his OFAC Statement, Mr. Kadi described having founded a pioneering women's college in Jeddah in 1996 for which he decided to use a curriculum based on an American higher education model, partnering with the Texas International Education Consortium, and hiring American faculty members. (OFAC Statement at 63-65, ¶¶ 133-37 (KADI**XXXXX,** Salerno Dec. Ex. I). Naturally, Comras made no mention of this women's college.

When questioned at his deposition as to what evidence he had connecting Mr. Kadi to the funding of al Qaeda, Comras obliquely conceded that he had none.

---

Sudan in the early 1990s (Report at 38, 39; Dep. at 204:15-205:2), and that each had companies or entities that owned shares in the same agricultural products company, Rowad Development & Investment (Report at 38), a company that was dissolved in 1996 (Dep. at 208:19-24). Comras also said that Mr. Kadi became "further acquainted with" OBL at the end of the Soviet War in Afghanistan, subtly exaggerating the extent of Mr. Kadi's fleeting encounter with OBL at that time, which, Mr. Kadi testified, occurred while he was in Pakistan and Afghanistan with his uncle, attempting to mediate among warring mujahadin factions at about the time that the Soviets withdrew from Afghanistan. (Report at 14; Kadi Dep. at 191:9-193:4).

> Q. So it's your testimony that you had evidence that Mr. Kadi was financing Al Qaeda?
>
> A. To the extent that I express it in the report, correct. Evidence meaning what? I mean, was I there, no. Did I see it, no.

(Dep. at 53:9-15). To be clear, there was no such evidence in the Report.

\* \* \*

As demonstrated above, rather than evidence, the Report relies on rank speculation, factual distortions, *ipse dixit* pronouncements, unreliable hearsay, irrelevant argument, guilt by association, and other unsupported derogatory assumptions. The absence of evidence did not deter Comras from concluding that there are "substantive reasons for believing that substantial amounts were knowingly and intentionally siphoned off for al Qaeda just before 9/11." (Report at 56). Needless to say, Comras never articulated those "substantive reasons." In similar fashion, Comras, stated "it is my expert opinion that Yasin Kadi, through his Muwafaq charity and business practices, knowingly and intentionally participated in a financial network to support Al Qaeda and finance its activities, including during the planning stages for the 9/11 Attacks on the United States." (*Id.*). These are but two examples of Comras offering an opinion "that is connected to existing data only by [his] *ipse dixit* . . . . " *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). They also, of course, are egregious examples of improper opinions on Mr. Kadi's state of mind (*see* ECF 9060 at 12 ("No expert can divine an actor's subjective intent")) and on an ultimate fact that is an issue for the fact-finder. (ECF 9060 at 21).

We have demonstrated that Comras's testimony is unreliable at every step: "the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia.*" *See Amorgianos*, 303 F.3d at 267 (cleaned up). Comras's one-sided offerings did not admit of analysis and they were devoid even of the methodology he purported

to use. He wrote and testified not as an expert but as a "partisan," *see Rubenstein*, 1987 WL

30608, at *7; or a "hired gun." *See Tyus v. Urban Search Management*, 102 F.3d 256, 263 (7th

Cir. 1996) ("In all cases, however, the district court must ensure that it is dealing with an expert,

not just a hired gun"). This Court should find that the exclusion of an expert witness is the

appropriate remedy where, as here, the expert's "testimony is significantly corrupted." (ECF

9060 at 9).

<u>Conclusion</u>

Comras's Report, Rebuttal Report, and proffered testimony should be excluded.

Dated: July 31, 2023

Respectfully submitted,

_____/s/_____

Peter C. Salerno
Amy Rothstein
Salerno & Rothstein
Attorneys for Defendant Kadi
221 Schultz Hill Road
Pine Plains, NY 12567
Tel. No. 518 771 3050
Email: peter.salerno.law@gmail.com

-25-

Exhibits to Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's
<u>Motion to Exclude the Testimony of Victor Comras</u>

A.  Expert Report of Victor D. Comras

B.  Expert Rebuttal Report of Victor D. Comras

C.  Excerpts from Transcript of Deposition of Victor Comras in 03 MDL 1570 taken July 23, 2021

D.  Corrigendum to Transcript of Deposition of Victor Comras

E.  Excerpts from Victor D. Comras, *Flawed Diplomacy* (2010)

F.  Victor Comras*, It's Time to Put Yasin Al Kadi Out of Business!*, in "Counterterrorism Blog," dated Sept. 20, 2005

G.   Excerpts from Transcript of Deposition of Jimmy Gurulé in 03 MDL 1570 taken July 7, 2021

H.  FATF, "Risk of Terrorist Abuse in Non-Profit Organizations" (June 2014)

I.  Statement of Yassin Abdullah Kadi to OFAC, dated Dec. 19, 2002

J.  Excerpts from Transcript of Deposition of Yassin Abdullah Kadi in 03 MDL 1570 taken July 10, 2018

K.  Errata Sheet for Transcript of Deposition of Yassin Abdullah Kadi dated Oct. 24, 2018

L.  Answers to Questions Concerning the Petition to Delist Yassin Abdullah Kadi

M.  FBI memorandum, "Co-operating Witness Interview," dated June 2, 2004

N.  Excerpts from Swiss Federal Bureau of Investigation, Final Report dated May 20, 2005

O.  Excerpts from Federal Judicial Police, Supplementary Report dated Nov. 5, 2007

P.  *OFAC TDY to Albania April 30, 2002-May 21,2002 – A Review of the Kadi Companies* (partial version with Bates numbers cited by Victor Comras)

Q. *OFAC TDY to Albania April 30, 2002-May 21,2002 – A Review of the Kadi Companies* (complete version)

R. Treasury Dep't Press Release dated May 6, 2004 announcing designation of Al-Haramain & Al Masjed Al-Aqsa Charity Foundation

S. Treasury Department Press Release JS 1190, dated Feb. 24, 2004, designating Abdul Majeed al-Zindani

T. Excerpts from in Peter L. Bergen, *The Osama bin Laden I Know* (2006)

U. Letter from Deputy Attorney General Claude Nicati dated Dec. 17, 2007 announcing termination of the Swiss investigation

V. Treasury Department Press Release dated Sep. 6, 2002, designating Wa'el Julaidan

W. Jonathan Benthall and Jerome Bellion-Jourdan, *The Charitable Crescent,* Ch. 6 (paperback ed. 2009)

X. "Memorandum for the Record," 9/11 Comm'n interview with Patrick J. Fitzgerald (Jan. 28, 2004)

*   *   *