EXHIBIT 1

**EXHIBIT 1**

| BASIS FOR EXCLUSION | KOHLMANN AFFIRMATIVE REPORT | KOHLMANN REBUTTAL REPORT | LEVITT AFFIRMATIVE REPORT[1] | LEVITT REBUTTAL REPORT[2] |
|---|---|---|---|---|
| **INSUFFICIENT QUALIFICATIONS** | ¶¶ 11c, 17-18, 36-67, 130-154, 160-162, 164, 169-170, 174-175, 177-179, 182-185, 187, 190-194, 200-201, 204-206 | ¶¶ 11, 23, 44, 47, 60-61, 63, 75-79 | ¶¶ 21-40, 42, 48, 52, 64-78, 82-83, 85-86, 91-96, 111-112, 134-135 | ¶¶ 26-40, 29, 65, 67, 69, 73-74 |
| **LACK OF RELEVANCE** | ¶¶ 11a, 11c, 19, 21, 24-25, 28-50, 55, 68-72, 75-76, 82, 84-91, 95-99, 101-105, 107-118, 122, 126-137, 142-144, 146, 156-157, 162-163, 165-167, 169-170, 174-175, 177-179, 187-190, 195-203 | ¶¶ 4-11, 22, 24-26, 28-29, 35-38, 46-47, 53, 62, 71, 82-83 | ¶¶ 32-35, 37, 39, 41, 43-44, 47, 50, 52, 57, 64, 70, 74-75, 78-81, 83-92, 95, 99-100, 111-115, 117-133 | ¶¶ 11-12, 24, 69-71, 74 |
| **IMPERMISSIBLE STATE OF MIND TESTIMONY** | ¶¶ 11d, 17, 21, 58, 129, 204-206 | ¶¶ 31 | ¶¶ 41, 47 | ¶¶ 24, 37, 41 |
| **IMPERMISSIBLE LEGAL CONCLUSIONS** | ¶¶ 11b, 11d, 17, 30, 51, 77, 158, 204-205 | ¶¶ 47 | ¶¶ 2.6, 58, 62, 99-100, 116-121 | ¶¶ 14, 22 |

---

[1] Attached hereto at Exhibit A is a numbered paragraph version of Levitt's Affirmative Report. Numbers were added to the margin next to each paragraph for ease of reference only.

[2] Attached hereto at Exhibit B is a numbered paragraph version of Levitt's Rebuttal Report. Numbers were added to the margin next to each paragraph for ease of reference only.

| BASIS FOR EXCLUSION | KOHLMANN AFFIRMATIVE REPORT | KOHLMANN REBUTTAL REPORT | LEVITT AFFIRMATIVE REPORT[1] | LEVITT REBUTTAL REPORT[2] |
|---|---|---|---|---|
| **LACK OF SUFFICIENT FACTUAL BASIS (SPECULATION, CONJECTURE, CONCLUSORY OPINIONS (*IPSE DIXIT*))** | ¶¶ 23, 49, 51, 55-56, 58-62, 71-73, 81-82, 87, 90-91, 105-106, 119, 130-157, 161-162, 166-179, 183, 186, 190-195, 204-206 | ¶ 47 | ¶¶ 37, 58, 95, 99, 100, 103, 107, 112, 114, 116, 118, 121, 124, 126 | ¶¶ 9, 26-40, 62 |
| **UNRELIABLE PRINCIPLES, METHODS AND APPLICATION TO FACTS** | ¶¶ 23, 71-73, 81-82, 87, 90-91, 119, 175 | | ¶¶ | ¶¶ |
| **IMPERMISSIBLE CONDUIT OF HEARSAY** | ¶¶ 20-22, 67, 97, 106, 112-113, 118, 121, 123-124, 137, 152, 159, 168-172, 190-194 | ¶¶ 2, 4-23, 33-36, 38, 41-44, 48-51, 53, 55, 60-61, 73, 81, 84 | ¶¶ 23-27, 31, 33-37, 41-43, 65-66, 68-69, 73, 77, 94-95, 98, 101-104, 106-107, 110-111, 113, 116-117, 119-120, 124, 126-128 | ¶¶ 31, 49-51, 67 |
| **FRE 403** | | | ¶¶ 32-35, 37, 39, 41, 43-44, 47, 50, 52, 55, 57-58, 62-64, 70, 74-75, 78-92, 95, 99-100, 111-115, 117-133 | ¶¶ 5-6, 8, 11-25, 32, 38, 69-71, 74 |

EXHIBIT A

## EXPERT REPORT OF DR. MATTHEW LEVITT

In re Terrorist Attacks on September 11, 2001, 03-md-1570 (GDB) (SN) - MDL 1570
Senior Fellow and Director of the Program on Counterterrorism & Intelligence at the
Washington Institute for Near East Policy, and Adjunct Professor at Georgetown University

## I.  SCOPE OF THIS EXPERT OPINION:

1       I have been asked by Plaintiff's lawyers to offer an expert opinion on the following:

1.1   •   The founding and development of al Qaeda, its ideology and focus on
          targeting America and American interests;

1.2   •   Al Qaeda's development as a terrorist group and militant organization through
          the establishment of alliances with other groups and cooption of local
          conflicts;

1.3   •   Al Qaeda's radicalization, recruitment and funding modus operandi in the
          years leading up to the 9/11 attacks;

1.4   •   Background on abuse of charity and religious tithing to finance terrorism;

1.5   •   Al Qaeda's particular reliance in the years leading up to the 9/11 attacks on
          abuse of charity and nongovernmental organizations (NGOs)—including
          several based in Saudi-Arabia—for recruitment, logistics, and fundraising
          purposes.

## II.  SUMMARY EXPERT OPINION:

2       Based on my knowledge, experience, training and education, and drawing on my own
extensive research, it is my expert opinion that:

2.1   •   In the years leading up to the 9/11 terrorist attacks, Osama bin Laden founded and
          built up al Qaeda into a transnational terrorist group engaged in both militant and
          terrorist activities around the world.

2.2   •   Key to al Qaeda's success was its ability to coopt local conflicts involving Muslim
          groups and to expand its influence through building alliances with other Muslim
          militant organizations.

2.3   •   Through these efforts, al Qaeda was able to broaden its pool of potential recruits,
          radicalize people to the terrorist group's violent and transnational ideology and its
          particular focus on targeting the United States, raise funds, and conduct operations
          on a broad scale around the world.

2.4   •   Critical to the success of al Qaeda, and for the 9/11 operation in particular, was the
          ability to raise, launder, place, transfer and access funds for al Qaeda's activities.
          From paying salaries, to bribing officials, to funding travel and training, to
          procuring weapons and much more, al Qaeda needed reliable funding streams to
          cover its significant expenses.

2.5 • Especially in the years leading up to 9/11, al Qaeda relied heavily on abuse of charity to raise, launder and move money for its terrorist purposes.

2.6 • Some of the most significant examples of such charities were based in Saudi Arabia and were tied to the Saudi government and its ministries and instrumentalities. The support these entities provided al Qaeda was critical to the terrorist group's development and operational prowess

## III. QUALIFICATIONS

3    My qualifications as a noted expert in international terrorism, with a focus on Middle East terrorist groups and particular expertise in their logistical and financial support networks, are based on a multidisciplinary combination of my academic education, professional training and experience, details of which are included in my C.V. which is attached here as Exhibit A.

4    I am a United States citizen, residing in the Washington, D.C. area. I hold both a Masters of Law and Diplomacy (MALD) and a Ph.D. in International Relations from The Fletcher School of Law and Diplomacy at Tufts University. The Fletcher School, a member of the Association of Professional Schools of International Affairs and one of the preeminent graduate programs in international affairs in the United States, is renowned for its interdisciplinary curriculum and approach to international studies. I also hold a B.A. cum laude in Political Science from Yeshiva University.

5    My Master's degree included concentrations in Conflict Resolution, International Security Studies, and the Middle East. My doctoral dissertation entitled "The Impact of Acute Security Crises on the Process of Ongoing Negotiations," examines the impact of terrorism on the Arab-Israeli peace process. The dissertation examines acts of terrorism carried out by both Islamic and Jewish terrorists. I was awarded several fellowships and grants in support of this research, including a graduate research fellowship from the Program on Negotiation at Harvard Law School.

6    Prior to joining the Washington Institute, I served as a counterterrorism intelligence analyst with the Federal Bureau of Investigation (FBI) providing tactical and strategic analysis in support of counterterrorism operations. There I developed a special focus on fundraising and logistical support networks for Middle East terrorist groups. In addition, I participated as a team member in a number of crisis situations, including the terrorist threat surrounding the turn of the millennium and the September 11 attacks. I led the analytical team focused on flight UA175 as part of the FBI's PENTTBOM investigation into the attacks of September 11. In my official capacity as a U.S. government intelligence analyst, I researched and analyzed trends and patterns of international terrorist groups, produced written products and oral presentations for FBI management, FBI field agents and other agencies, and liaised with U.S. intelligence community counterparts, other U.S. government agencies, and foreign services. I received extensive training and developed particular expertise in the analysis of material collected through investigations and the synthesis and further analysis of this material together with other sources of information provided by other agencies, open source information, and more. I earned three letters of

commendation for my analytical contributions to FBI counterterrorism operations, as well as five awards in recognition of superior service rendered to the FBI.

7        In November 2001 I joined The Washington Institute for Near East Policy as a Senior Fellow in Terrorism Studies. Founded in 1985, The Washington Institute seeks to "advance a balanced and realistic understanding of American interests in the Middle East" by bringing "scholarship to bear on the making of U.S. policy in this vital region of the world." The Institute's Board of Advisors includes several former Secretaries of State, a former Director of Central Intelligence, and other former senior government officials and diplomats. The Washington Institute holds annual conferences and periodic policy forums, hosts blue-ribbon presidential study groups, and publishes scholarly research.

8        In 2003, I briefly served as a part-time consultant to the National Commission on Terrorist Attacks Upon the United States (the 9/11 Commission). I consulted for the Commission's "al Qaeda and other transnational threats" team, advising the team on the direction and strategy of its investigation. The term of my contract with the 9/11 Commission ended in or around August 2003.

9        From November 2005 through January 2007 I served as Deputy Assistant Secretary for Intelligence and Analysis in the United States Department of the Treasury. In that capacity, I served both as a senior official within the department's terrorism and financial intelligence branch and as deputy chief of the Office of Intelligence and Analysis, one of sixteen U.S. intelligence agencies coordinated under the Office of the Director of National Intelligence. During my tenure at Treasury, I was at the center of the government's efforts to protect the U.S. financial system from abuse and to deny terrorists, weapons proliferators, and other rogue actors the ability to finance threats to U.S. national security. In recognition of exceptional service to the department, in January 2007 I was awarded the Treasury Department's "Exceptional Service Award."

10        In 2008-2009 I served as an advisor on counterterrorism and intelligence for the U.S. State Department's Special Envoy Middle East Regional Security (SEMERS) whose mission was to help achieve the Secretary of State's vision of resolving the Israeli-Palestinian conflict through two states living side by side in peace and security.

11        In February 2007 I returned to the Washington Institute, where I am a Senior Fellow and Director of the since renamed Reinhard Program on Counterterrorism and Intelligence. In this capacity, I write frequent policy briefs and articles on issues relating to terrorism and U.S. policy and am frequently sought after as an analyst and commentator on terrorism issues for major media outlets.

12        I am an adjunct professor at Georgetown University's Edmund A. Walsh School of Foreign Service. I have also taught as a Professorial Lecturer in International Relations and Strategic Studies at Johns Hopkins University's School of Advanced International Studies (SAIS).  Along with a collection of journal articles and edited volumes, I am also the author of *Targeting Terror* (Washington Institute, 2002), *Hamas: Politics, Charity and Terrorism in the Service of Jihad* (Yale University Press, 2006), *Negotiating under Fire: Preserving Peace Talks*

4

*in the Face of Terror Attacks* (Rowman & Littlefield, 2008) and *Hezbollah: The Global Footprint of Lebanon's Party of God* (Georgetown University Press, 2013). My latest edited monographs on international terrorism include *Countering Violent Extremism: From the Boston Marathon to the Islamic State* (April 2015) and *The Rise of ISIL* (September 2016).

13    As a practitioner and academic, I have developed particular expertise on terrorist financing, countering violent extremist ideology, and trans-national Jihadist terrorism, with a particular focus on al Qaeda and its affiliate and successor groups, including the Islamic State. This expertise is evident from my professional experience working on these issues, my academic experience lecturing and teaching about them, as well as the many publications I have written on these subjects, from newspaper editorials and peer reviewed journal articles to Congressional and court testimonies, and more.

14    I have lectured on terrorism, counterterrorism, and state sponsorship of terrorism (including Syrian state sponsorship) around the world, for government, multilateral organization, university, think tank and private sector audiences and have received awards and accolades for these presentations from departments and agencies such as the Federal Bureau of Investigation, the U.S. Secret Service, and the International Institute for Justice and the Rule of Law. I have participated in United Nations, Global Counterterrorism Forum, Europol, and many other international gatherings on these issues, and meet and consult with government officials and experts in the field from around the world.

15    At the Washington Institute my work includes the study of Middle Eastern terrorist groups, front organizations and state sponsors, the logistical and financial support networks that facilitate their activities, and the extremist and militant ideologies that drive their recruitment and radicalization efforts. In my efforts to study and understand terrorism and militant Islamist ideology I interview experts, officials, academics and others with insight into these issues, both in the United States and around the world. I engage in private, personal meetings, public conferences, group discussions, and talks that are both on and off the record. I travel to the Middle East regularly, including trips to the Palestinian territories, Israel, Jordan, Egypt, Bahrain, Kuwait, Qatar, the UAE, Saudi Arabia, and Turkey. I also attend conferences and academic and professional lectures, and read books, newspapers, academic and policy journals, and research these materials on the internet (including the websites, video and audio clips and images on sites geared towards counterterrorism and those of terrorist groups and their sympathizers as well).

16    These are the standard sources and methods in the academic and policy communities for developing the kind of specialized knowledge and expertise I have accumulated—and for which I have been awarded and commended—in my field. Indeed, the United States Court of Appeals for the Sixth Circuit has described my research methodology as "the gold standard."[1] And, in a watershed ruling upholding the constitutionality of the material support statute §2339B, the Supreme Court of the United States cited my work twice to support its position.[2]

---

[1] See Sixth Circuit Court of Appeals ruling in *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005). http://ftp.resource.org/courts.gov/c/F3/412/412.F3d.618.04-4216.html.
[2] See SCOTUS opinion in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2725 (2010).

17       In addition to my work at the Institute, I use my specialized expertise to teach and consult, for both the U.S. and other governments and private sector firms. I was a member of the Council on Foreign Relations' task force on terrorist financing, and am a member of the international advisory boards for the Institute for Counter-terrorism (ICT) in Israel, the International Centre for Political Violence & Terrorism Research (ICPVTR) in Singapore. I served as a CTC Fellow at the Combating Terrorism Center (CTC) at U.S. Military Academy (West Point), a senior fellow at The George Washington University's Homeland Security Policy Institute, a member of the academic advisory board for the Emirates Center for Strategic Studies and Research (ECSSR), and am a life member of The Council on Foreign Relations.

18       The awards and honors I have received in my field include:

18.1    • U.S. Embassy Expert Speaker Grant, U.S. Embassy Berlin, May 2019

18.2    • Certificate of Appreciation, United States Secret Service, 2015

18.3    • Certificate of Recognition, U.S. Departments of Justice and State and the International Institute for Justice and the Rule of Law, October 2015

18.4    • U.S. Marine Corps Forces Cyber Command, Letter of Appreciation, April 3, 2013

18.5    • Certificate of Appreciation, Federal Bureau of Investigation, March 2013

18.6    • Exceptional Service Award, U.S. Department of the Treasury, January 2007;

18.7    • Certificate of Appreciation, United States Central Command Directorate of Intelligence, February 2006;

18.8    • Selected by CNN as one of "The 2005 New Guard: Washington's Next Generation of   Newsmakers," April 2005;

18.9    • European Union Visitors Program (EUVP), 2005;

18.10   • Visiting Scholar, Security Studies Department, the Paul H. Nitze School of Advanced International Studies (SAIS), Johns Hopkins University, March 2003;

18.11   • U.S. Department of State Speaker and Specialist Grant (2), April 2002 (lectures in Lithuania), and January 2003 (lectures in Austria);

18.12   • Letters of Commendation from Deputy Assistant Director (3), Federal Bureau of Investigation, July 2000, August 2000, July 2001;

18.13   • Performance Awards (2), Federal Bureau of Investigation, December 1999, November 2000;

18.14   • Special Act or Service Award, Federal Bureau of Investigation, September 1999;

---

http://www.supremecourt.gov/opinions/09pdf/08-1498.pdf.

18.15 • Graduate Research Fellow, The Program On Negotiation at Harvard Law School, 1997-1998;

18.16 • International Security Studies Fellow, International Security Studies Ph.D. Dissertation Fellowship, the Fletcher School of Law and Diplomacy, 1996-1997;

18.17 • International Security Studies Program Graduate Student Research Grant on the Emerging Issues of Ethnic, Sectarian, and Religious Conflict, William H. Donner Foundation, 1996;

18.18 • Doctoral Scholarship, the Fletcher School of Law and Diplomacy, 1995-1996;

18.19 • Sarah Scaife Frank Rockwell Barnett Memorial Grant in International Security Studies, The Fletcher School of Law and Diplomacy, 1994 and 1996

19      I am frequently called upon to testify before the United States Senate and House of Representatives as an expert on international terrorism, and have also testified before the Canadian Parliament, the European Parliament of the European Union, and the Counter-Terrorism Committee of the United Nations Security Council. I have been qualified as an expert witness and provided expert testimony in many U.S. federal court proceedings and have testified as an expert in several terrorism-related immigration cases in the U.S. and Canada, as well as in terrorism-related cases in France, Denmark and Scotland. Many of these cases involved al Qaeda and/or the Islamic State group. A list of these cases is included in my C.V.

20      I have been compensated for my time at a rate of $550.00 per hour.  Attached as Exhibit A please find a copy of my C.V., and as Exhibit B a list of materials I relied on in the preparation of this expert report.

## IV.     EXPERT OPINIONS

### 1.   Al-Qaeda Background

21      Al Qaeda is an infamous Jihadist terrorist group that utilizes terrorism to achieve its aims. Founded in Afghanistan in the 1980s, it is a fundamentalist Sunni movement that leverages a violent, extremist ideology to promote terrorism and political violence, and which operates globally as a multinational network. Although originally founded to facilitate the movement of Islamist fighters to Afghanistan as the Afghan Services Bureau, or Makhtab al Khidamat (MEK), al Qaeda became an Islamist army that would last far beyond the war in Afghanistan.

22      The name al Qaeda translates to "the base." In a videotaped interview with al-Jazeera in October 2001, Usama bin Ladin explained its origin: "The name 'al-Qaeda' was established a long time ago by mere chance. The late Abu Ebeida El-Banashiri established the training camps

for our mujahedeen against Russia's terrorism. We used to call the training camp al-Qaeda. The name stayed."[3]

23        According to the indictment of several al Qaeda members for their involvement in the 1998 East Africa bombings, al Qaeda grew out of the Maktab al-Khadimat organization, which was founded by al Qaeda leader Usama bin Ladin and Muhammed Atef, aka Abu Hafs al-Masri.[4] According to Gunaratna, "prior to its formation, however, al Qaeda existed as Maktab-il Khidamat (MAK – Afghan Service Bureau) for four years."[5] Describing "the rise of Bin Laden and al-Qaeda" in the period from 1988 to 1992, the 9/11 Commission Report noted the following:

> Mosques, schools, and boardinghouses served as recruiting stations in parts of the world, including the United States. Some were set up by Islamic extremists or their financial backers. Bin Laden had an important part in this activity. He and the cleric Azzam had joined in creating a "Bureau of Services" (Mektab al Khidmat, or MAK), which channeled recruits into Afghanistan.[6]

24        From 1989 until roughly 1991, al Qaeda was headquartered in Afghanistan and Pakistan, before the relocating to Sudan. Al Qaeda's headquarters resided in Sudan until 1996. Bin Ladin moved to Sudan in 1989, when the National Islamic Front (NIF) came to power there, "and sought to establish a world-wide Islamic extremist network."[7] According to Rohan Gunaratna, "Al Qaeda's global network, as we know it today, was created while it was based in Khartoum, from December 1991 until May 1996. To coordinate its overt and covert operations as Al Qaeda's ambitions and resources increased, it developed a decentralized, regional structure…As a global [entity], al Qaeda makes its constituent nationalities and ethnic groups, of which there are several dozen, responsible for a particular geographic region. Although its modus operandi is cellular, familial relationships play a key role."[8]

25        In the years after his move to Sudan, Bin Ladin's Islamic Army (al Qaeda) grew. "The NIF and the government of Sudan provided a receptive environment and personnel in support of Islamic Army activities," the CIA assessed in 1996. "In return, Bin Ladin provided

---

[3] "Transcript of Bin Laden's October interview," CNN, February 5, 2002, http://archives.cnn.com/2002/WORLD/asiapcf/south/02/05/binladen.transcript/index.html

[4] US District Court, Southern District of New York, U.S. v. Usama bin Laden, et al. Available online at http://cns.miis.edu/pubs/reports/pdfs/binladen/indict.pdf.

[5] Rohan Gunaratna, "The Evolution of al Qaeda," in Thomas J. Biersteker and Sue E. Eckert, Eds., *Countering the Financing of Terrorism* (New York: Routledge, 2008), 50.

[6] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 56-57, available online at http://www.9-11commission.gov/report/911Report.pdf.

[7] CIA Cable Nov 26, 1996, approved for release September 18, 2018, Marked C01164985, provided by Plaintiff's counsel.

[8] Rohan Gunaratna, *Inside Al Qaeda* (1st ed.). (London, UK: C. Hurst & Co, 2002), 95-96.

infrastructure, [redacted] within this cooperative setting, Bin Ladin further defined the Koranic basis for the Islamic Army and its intent to use violence as a means to achieve Islamic goals."[9]

26      According to the CIA, "while based in Sudan form 1992-1996, al Qaeda was transformed from an only partially realized idea to an international organization ready to operate on its own." It developed ties to other extremists groups, learned how to build and run training camps, and developed the contacts and skill sets necessary to build up a set of training camps and safe haven when the group returned to Afghanistan in 1996.[10] The CIA described al Qaeda's experience in Sudan as a "terrorist university," during which time it defined its formal structure and became a "self-sufficient international terrorist organization."[11] In Sudan, al Qaeda "established cooperative relationships with at least 20 Sunni Islamic extremist groups in the Middle East, South Asia, Africa, and East Asia, as well as with elements of the Saudi opposition."[12]

27      According to a since-declassified CIA memorandum dated December 4, 1998, even after Bin Laden left Sudan for Afghanistan, al Qaeda associates remained in Sudan and continued supporting al Qaeda terrorism in much the same way they did leading up to the East Africa embassy bombings.  In the context of reporting possible anti-U.S. attacks, the memorandum notes that "a Bin Laden associate in Sudan late last month told a colleague in Kandahar that he had shipped a group of containers to Afghanistan. Bin Laden associates also talked about the movement of containers to Afghanistan before the East Africa bombings."[13] According to the indictment, "At all relevant times, al Qaeda was led by its emir, defendant Usama bin Laden. Members of al Qaeda pledged an oath of allegiance (called a "bayat") to defend Usama bin Laden and al Qaeda."[14]

28      While Osama Bin Laden would later claim that he had already pinpointed America as his ultimate enemy while fighting the USSR, his immediate goal, he articulated, would be to topple

---

[9] CIA Cable Nov 26, 1996, approved for release September 18, 2018, Marked C01164985, provided by Plaintiff's counsel.

[10] "Al-Qa'ida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths," Central Intelligence Agency, Directorate of Intelligence, 10 March 2003, (approved for release November 19, 2018), provided by Plaintiff's counsel.

[11] "Al-Qa'ida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths," Central Intelligence Agency, Directorate of Intelligence, 10 March 2003, (approved for release November 19, 2018), provided by Plaintiff's counsel.

[12] "Al-Qa'ida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths," Central Intelligence Agency, Directorate of Intelligence, 10 March 2003, (approved for release November 19, 2018), provided by Plaintiff's counsel.

[13] "SUBJECT: Bin Ladin Preparing To Hijack US Aircraft and Other Attacks," Memorandum prepared by [REDACTED] of the DI Counterterrorist Center, 4 December 1998, Declassified and Approved for Release 12 July 2004, http://www.foia.cia.gov/.

[14] US District Court, Southern District of New York, U.S. v. Usama bin Laden, et al. Available online at http://cns.miis.edu/pubs/reports/pdfs/binladen/indict.pdf

existing Muslim governments and establish a new caliphate.[15] In this vein, Al Qaeda opposes the United States, which it considers to be an enemy for supporting insufficiently Islamic governments in around the world. Al Qaeda views U.S. military action in Iraq and Kuwait during the first Gulf War and in operations in Somalia as an "occupation" of Muslim nations. The presence of the U.S. military in countries such as Bin Ladin's home country of Saudi Arabia is also viewed as "occupation." According to the federal indictment in U.S. v. Usama bin Laden et al., one of al Qaeda's primary goals is to force U.S. military presence from Saudi Arabia—in addition to other places in the Middle East and Africa—by means of violence. The terrorist organization also opposes the U.S. for its arrest, imprisonment, and indictment of al Qaeda members.[16]

29       To promote the group's objectives, members have issued religious edicts, or fatwas, which justify the use of violence. In 1996, al Qaeda announced its jihad to expel foreign troops from "Islamic lands." Bin Ladin issued a 1996 fatwa which, effectively, was a public declaration of war against the U.S. and its allies.[17] In 1997, the CIA reported that Islamic Army (i.e. al Qaeda) sent operatives, with National Islamic Front support, to target U.S. troops in Somalia.[18] In February 1998, Bin Ladin, Ayman Zawahiri, Bin Laden's successor and former leader of the Egyptian Islamic Jihad, and three other Islamist leaders co-issued a fatwa stating that:

> [T]he ruling to kill the Americans and their allies—civilian and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it, in order to liberate the al-Aqsa mosque and the holy mosque from their grip, and in order for their armies to move out of all the lands of Islam, defeated and unable to threaten any Muslim.  This is in accordance with the words of Almighty Allah, and 'fight the pagans all together as they fight you all together,' and 'fight them until there is no more tumult or oppression, and there prevail justice and faith in Allah.'[19]

30       Bin Laden aimed to create an "international jihad confederation," as the 9/11 Commission put it, coordinating a "consortium of terrorist groups with which he was forging alliances."[20] These included groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda invested in the Abu Sayyaf group in the Philippines, Jemaah Islamiya in Indonesia, Lashkar e-Tayba in Pakistan, and others. Less formal relationships were established with more extremist groups, including groups in

---

[15] Daniel Benjamin and Steven Simon, *The Age of Sacred Terror* (New York: Random House, 2002), 103.

[16] US District Court, Southern District of New York, U.S. v. Usama bin Laden, et al. Available online at http://cns.miis.edu/pubs/reports/pdfs/binladen/indict.pdf

[17] "Bin Laden's Fatwa," *Al Quds Al Arabi*, August 1996, http://www.pbs.org/newshour/terrorism/international/fatwa_1996.html.

[18] CIA Cable dated April 30, 1997 (approved for release September 18, 2018), Document marked C01164992, Provided by Plaintiff's counsel.

[19] "Text of Fatwah Urging Jihad against Americans," PBS, http://www.pbs.org/newshour/terrorism/international/fatwa_1998.html.

[20] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 58, http://www.9-11commission.gov/report/911Report.pdf.

Chad, Mali, Niger, Nigeria, and Uganda in Africa and Burma, Thailand, Malaysia, and Indonesia.[21]

31      The CIA noted in early 1999 that "al-Qa'ida's wide network in some 60 countries, as well as its ties to like-minded groups, enables it to conduct more than one major terrorist operation simultaneously and adapt readily to change." The group, the report continued, "develops relationships with sympathetic groups and individuals through its own religious, military, and terrorist training programs in Afghanistan, assistance to Islamic insurgent movements in various countries, and exploitation of contacts in certain Islamic relief organizations."[22]

32      Al Qaeda developed a strategy of expansion through building alliances with likeminded militant groups around the world. This strategy enabled the group to spot new recruits, raise funds, export its ideology, gain military and terrorist experience fighting in other conflict zones, and develop the interpersonal relationships that would prove critical to the development of a truly transnational terrorist organization. Al Qaeda would coopt far-flung conflicts and local grievances and superimpose its own worldview and ideology on them, bringing al Qaeda's view of the world to conflicts in Africa and Asia. Some of these local groups were fully absorbed into al Qaeda's larger structure over time, such as Jemaah Islamiyah in Indonesia and the Algerian Armed Islamic Group (GIA).[23]

33      Consider the CIA's assessment of the impact of increased fighting in Chechnya in 1999 on the al Qaeda network: "The network also has benefited from a sharp increase in mujahidin recruitment since the resumption of the conflict in Chechnya in 1999, which exposed a new generation of militants to terrorist techniques and extremist ideology through training at al-Qaeda-run camps in Afghanistan."[24] Indeed, in another report the CIA noted how some al Qaeda foreign fighters went home, while others traveled to other battlefronts: "Militants who received training [in Afghanistan] were sent to fight jihads in Kashmir, Chechnya, or Bosnia. When they returned to their homes to resume their normal lives or migrate to other countries, they

---

[21] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 58, http://www.9-11commission.gov/report/911Report.pdf.

[22] "How Bin Ladin Commands a Global Terrorist Network," DCI Counterterrorism Center, Intelligence Report, 27 January 1999 (approved for release 25 April 2012), available online at National Security Archive https://assets.documentcloud.org/documents/368944/1999-01-27-how-bin-ladin-commands-a-global.pdf.

[23] Zachary Abuza, *Militant Islam in Southeast Asia: Crucible of Terror* (Boulder: Lynne Rienner, 2003), 9.

[24] "Sunni Terrorist Threat Growing," Senior Executive Intelligence Brief 6 February 2001, Central Intelligence Agency (approved for release 25 April 2012, available online via National Security Archive https://assets.documentcloud.org/documents/368971/2001-02-06-sunni-terrorist-threat-growing-senior.pdf.

constituted a ready supply of manpower for terrorist operations. Two of the 9/11 hijackers followed this pattern."[25]

34          As Zachary Abuza noted in his book on al Qaeda's networks in Southeast Asia, the region became a "major center for operations" for al Qaeda for several reasons. One of these was "the network of Islamic charities, the spread of poorly regulated Islamic banks, business-friendly environments, and economies that already had records of extensive money laundering."[26]

35          Similarly, Stig Jarle Hansen noted in his book on al-Shabaab in Somalia that "al-Shabaab is more than a product of insecurity; it is also a product of the export of al-Qaeda's ideology into Somalia. The importance of international informal networks in this process should not be forgotten." He continued, "It was a network of former Afghanistan veterans that established al-Shabaab, and the diffusion of ideas has gone through individuals with al-Qaeda connections."[27]

36          Barak Mendelsohn explained al Qaeda's early decision to help Muslims struggling around the world by "carry[ing] the torch of jihad beyond the Afghan arena." According to Mendelsohn, al Qaeda's existence would "help overcome the inefficiencies involved in mobilizing mujahideen afresh for each new cause. With al-Qaeda, the umma [Muslim nation] would bear minimal start-up costs; it would have the infrastructure and core force to allow an efficient and quick reaction."[28]

37          In 1994, Khalid Sheikh Mohammad, who would later mastermind the 9/11 plot, travelled to the Philippines and planned to bomb twelve U.S.-bound civilian aircraft as they flew across the Pacific. Known as the "Bojinka" plot, the operation was thwarted when Mohammad's co-conspirator and nephew, Ramzi Yousef, was arrested in Pakistan in February 1995. During his time in the Philippines, Mohammed reportedly received funding through Jamal Khalifa, bin Laden's brother-in-law and head of the Manila office of the International Islamic Relief Organization (IIRO).[29] According to a 1996 CIA report, "The IIRO is affiliated with the Muslim World League, a major international organization largely financed by the government of Saudi

---

[25] "DCI Report: The Rise of UBL and Al-Qa'ida and the Intelligence Community Response," Draft, CIA Analytic Report, March 19, 2004, available at National Security Archive
https://assets.documentcloud.org/documents/368992/2004-03-19-dci-report-the-rise-of-ubl-and-al.pdf.
[26] Zachary Abuza, *Militant Islam in Southeast Asia: Crucible of* Terror (Boulder: Lynne Rienner, 2003), 10.
[27] Stig Jarle Hansen, *Al-Shabaab in Somalia: The History and Ideology of a Militant Islamist Group* (Oxford: Oxford University Press, 2016), 6.
[28] Barak Mendelsohn, *The Al-Qaeda Franchise: The Expansion of al-Qaeda and Its Consequences* (Oxford: Oxford University Press, 2016), 20.
[29] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 147-148, http://www.9-11commission.gov/report/911Report.pdf. See also Richard Miniter, *Mastermind: The Many Faces of the 9/11 Architect, Khalid Shaik Mohammed* (New York: Sentinel, 2011), 83-84; Steve Coll, *Ghost Wars* (New York: Penguin Books, 2004), 278-279.

Arabia."[30]  The report went on to tie the IIRO to Ramzi Yousef and a host of other terrorists and terrorist groups.[31]

38         In August 1996, Bin Laden and leaders of several other Islamist extremist groups issued a fatwa, or religious ruling, which he called his "Declaration of War," calling for attacks against Western military targets in the Arabian Peninsula. Bin Laden underscored this message in media interviews. Then in February 1998—six months before the East Africa Embassy bombings—he issued another fatwa calling for attacks on all Americans, including civilians, and announced the formation of the International Islamic Front for Jihad against the Jews and Crusaders.[32] If not before, then certainly by 1996, Bin Laden and al Qaeda's links to terrorism were publicly known and verifiable.

39         Since Bin Laden was killed by U.S. forces in Pakistan in 2011, al Qaeda has been headed by Ayman al Zawahiri, the emir and chief of operations. The Majlis al-Shura, or consultation council, approves major operations, activities and undertakings. Additionally, al Qaeda has a military committee, which is charged with all "military" matters, including training and arming al Qaeda members and planning military operations.[33]

40         Al Qaeda has attacked both civilian and military targets in various countries in order to achieve its aims. Characteristics of the group's actions and techniques include suicide attacks and simultaneous bombings of dual targets.[34] Al Qaeda's operations are often carried out by core members of the group, but also involve al Qaeda-linked individuals. Many of the latter group have either undergone training in an al Qaeda camp, but did not pledged loyalty to Bin Laden or Zawahiri, or ascribe to al Qaeda's global jihadist ideology.[35]

41         Al Qaeda has also maintained contacts with Iran. According to the 9/11 Commission Report, "while in Sudan, senior managers in al Qaeda maintained contacts with Iran and the Iranian-supported worldwide terrorist organization Hezbollah, which is based mainly in southern Lebanon and Beirut." Intelligence, the 9/11 Commission found, "indicates the persistence of contacts between Iranian security officials and senior al Qaeda figures after Bin Laden's return to

30 Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300.
31 1996, Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300.
32 "Osama Bin Laden v. The U.S.: Edicts and Statements," PBS Frontline, https://www.pbs.org/wgbh/pages/frontline/shows/binladen/who/edicts.html.
33 US District Court, Southern District of New York, U.S. v. Usama bin Laden, et al. Available online at http://cns.miis.edu/pubs/reports/pdfs/binladen/indict.pdf.
34 Lawrence Wright, *The Looming Tower: Al-Qaeda and the Road to 9/11* (New York: Vintage Books, 2006), 107-108, 185, 270-271.
35 Wright, *The Looming Tower: Al-Qaeda and the Road to 9/11* (New York: Vintage Books, 2006): 270-271.

Afghanistan."[36]  In fact, following the successful al Qaeda attack on the *USS Cole* in Aden Harbor in October 2000, Iranian officials reached out to al Qaeda in a "concerted effort to strengthen relations," according to the 9/11 Commission Report.[37]

42      Al Qaeda financed its activities through individual donations, abuse of charity, criminal activities and business investments. Early on, the role of deep pocket donors and charities in Saudi Arabia in financing al Qaeda became clear. According to a 2002 report of an independent task force sponsored by the Council on Foreign Relations on terrorist financing, "For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaeda. And for years, Saudi officials have turned a blind eye to this problem."[38]

### 2.  Background on Terrorist Abuse of Charity

43      The Financial Action Task Force (FATF)—the 34-member multilateral body that aims to set global standards for anti-money laundering and counter-terror financing—has found that "Terror networks often use compromised or complicit charities and businesses to support their objectives."[39]  In fact, FATF warned that "the misuse of non-profit organizations for the financing of terrorism is coming to be recognized as a crucial weak point in the global struggle to stop such funding at its source."[40] According to the Justice Department, intelligence indicates that terrorists continue to use charities as sources of both financial and logistical support.[41] British officials concur. According to a joint United Kingdom HM Treasury/Home Office report, a "significant proportion" of terror finance investigations in the UK in 2006 included analysis of links to charities. The report found that "the risk of exploitation of charities is a significant aspect of the terrorist finance threat."[42]

44      Non-profit organizations are especially susceptible to abuse by terrorists and their supporters. Indeed, terrorist groups have long exploited charities for a variety of purposes. Charities offer a

---

[36] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 240, http://www.9-11commission.gov/report/911Report.pdf.

[37] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 240, http://www.9-11commission.gov/report/911Report.pdf.

[38] "Terrorist Financing," Report of an Independent Task Force Sponsored by the Council on Foreign Relations, Council on Foreign Relations, 2002, 1, https://cdn.cfr.org/sites/default/files/pdf/2002/10/Terrorist_Financing_TF.pdf?_ga=2.205608277.755224661.1579632365-1372710009.1579202949.

[39] Financial Action Task Force, *Terrorist Financing,* February 29, 2008, http://www.fatf-gafi.org/media/fatf/documents/reports/FATF%20Terrorist%20Financing%20Typologies%20Report.pdf.

[40] Financial Action Task Force, *Terrorist Financing*, February 29, 2008, http://www.fatf-gafi.org/media/fatf/documents/reports/FATF%20Terrorist%20Financing%20Typologies%20Report.pdf.

[41] Glenn R. Simpson, "Islamic Charities Draw More Scrutiny," *Wall Street Journal*, February 23, 2008.

[42] HM Treasury, "Financial Challenge to Crime and Terrorism," February 28, 2007, http://webarchive.nationalarchives.gov.uk/+/http://www.hm-treasury.gov.uk/media/C/B/financialchallenge_crime_280207.pdf, 52.

veil of legitimacy for terrorist fundraising, attracting unwitting donors who are unaware that monies they donate for humanitarian purposes instead fund terror. Charities are vulnerable to abuse as money laundering mechanisms, and can be abused to provide terrorist operatives with day jobs, salaries, meeting places, and a means of obtaining official documents such as licenses and mortgages. Consider that Hamas terrorist operatives frequently hold day jobs working within the group's network of charities and social service organizations, which both provide a salary and cover for their less charitable activities, such as plotting and carrying out terror attacks. For example, documents seized from the offices of the Islamic Relief Agency (IRA) revealed that the charity had been paying the salaries of ten West Bank Hamas activists.[43] Those social welfare organizations funded by terrorist groups engender grassroots support for said groups and create fertile spotting and recruitment grounds.

45    Charities tend to operate in zones of conflict and traditionally involve the flow of money in only one direction, both of which are characteristics that would arouse money laundering suspicions in other organizations. For this reason, charities are not only ideal fundraising fronts for terrorists and other illicit actors, but can also function as ideal money laundering mechanisms. Through charities, transnational terrorist groups have been able to move personnel, funds, and material to and from high-risk areas under cover of humanitarian or charity work.

46    Moreover, terrorists co-opt charitable giving through a range of diverse tactics. Some charities are founded with the express purpose of financing terror, while others are infiltrated by terrorist operatives and supporters and are co-opted from within. Recognizing that analysis of this particular preferred means of terror financing demands a discerning and discriminating level-of-analysis approach, Ambassador Francis X. Taylor, then the State Department's Coordinator for Counterterrorism, noted in 2002 that "any money can be diverted if you don't pay attention to it. And I believe that terrorist organizations, just like criminal enterprises, can bore into any legitimate enterprise to try to divert money for illegitimate purposes."[44]

47    A growing challenge in this arena is that banned or exposed charities tied to terrorism often shut down one day only to open up some time later under new names. For example, the U.S. Treasury Department noted that after being designated in March 2002, the Bosnian branch of the al Haramain Islamic Foundation "reconstituted itself and continued operations under the name 'Vazir.'" In another case, Treasury noted that the Indonesian branch of a charity designated for its ties to terrorism, al Haramain, also attempted to operate under an assumed name, "Yayasan

---

[43] Dale L. Watson, assistant director for counterterrorism, Federal Bureau of Investigation, "Holy Land Foundation for Relief and Development, International Emergency Economic Powers Act, Action Memorandum," memorandum to R. Richard Newcomb, director of the Office of Foreign Assets Control, U.S. Department of the Treasury, November 5, 2001 ("Watson Memorandum").

[44] "Patterns of Global Terrorism 2001," U.S. Department of State, International Information Programs, U.S. Department of State Archives, May 21, 2002, https://2001-2009.state.gov/s/ct/rls/rm/10367.htm.

Al-Manahil-Indonesia."[45] In July 2008, Treasury added new aliases under which Al Rashid Trust and Al-Akhtar Trust International continued to operate, years after their U.S. and U.N. designations, in "an apparent effort to circumvent sanctions imposed by the United States and the United Nations."[46]

48      Generally, donors are especially willing to give to humanitarian causes, but in the Muslim world they often do so as part of religiously mandated annual *zakat* contributions. Such otherwise praiseworthy donations have long been known to lend themselves to abuse.  The mixing of funds across different "wings" of terrorist groups also shields the group's terrorist activities under a veil of political and humanitarian legitimacy.[47]

49      An article in *Military Review*, written by a Belgian military officer, offers important insights into what the author describes as "zakat-jihad activism." That is, a group engaged in terrorism or political violence "generates popular support by establishing an unarmed infrastructure that provides essential services."[48] This tactic not only produces significant grassroots support, but also creates an ideal means to launder and transfer funds as well as a means of providing activists day jobs and a veneer of legitimacy.

50      Beyond engendering grassroots support, those charities focused on providing funds to the families, orphans, and widows of martyrs remove any existing financial disincentives to prospective mujahideen and provide an incentive for participation in jihad.  Knowing their families will be provided for after their "martyrdom" enables mujahideen to focus on their violent jihad activities with the peace of mind that their own families will enjoy the benefits of what amounts to a life insurance policy for mujahideen. The organization Alkifah/CARE actively solicited funds for families of mujahideen, and discussed the subject on intercepted telephone calls as well. Consider, for example, an online solicitation for Orphans Sponsorship

---

[45] "Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain In The Fight Against Terrorist Financing," Document number JS-1108, Office of Public Affairs, U.S. Department of the Treasury, January 22, 2004, https://www.treasury.gov/press-center/press-releases/Pages/js1108.aspx.

[46] Treasury Identifies New Aliases of Al Rashid and Al-Akhtar Trusts Pakistan-Based Trusts Previously Designated for Supporting al Qaida, U.S. Department of the Treasury, July 2, 2008, https://www.treasury.gov/press-center/press-releases/Pages/hp1065.aspx.

[47] Information on the Islamic Red Crescent from Senate Committee on Banking, Housing and Urban Affairs, "Prepared testimony of Jean-Charles Brisard, international expert on terrorism financing, lead investigator, 9/11 lawsuit CEO, JCB Consulting International," October 22, 2003, accessed through Federal News Service; "Saudi pilot on FBI list denies terror links," Agence France Presse, October 16, 2001; "Treasury Department Statement on the Designation of Wa'el Hamza Julidan," U.S. Department of the Treasury, Office of Public Affairs, September 6, 2002, http://www.treas.gov/press/releases/po3397.htm; For Taylor quote see "Patterns of Global Terrorism 2001," U.S. Department of State, International Information Programs, May 21, 2002, https://2001-2009.state.gov/s/ct/rls/rm/10367.htm; For Pakistan see Timur Kuran, "Islam and Mammon: Book Excerpt," *The Milken Institute Review: A Journal of Economic Policy* (3rd Qtr. 2004), 76.

[48] Erik A. Claessen, "S.W.E.T. and BLOOD: Essential Services in the Battle Between Insurgents and Counterinsurgents," *Military Review* (November-December 2007), https://www.questia.com/library/journal/1P3-1402462381/s-w-e-t-and-blood-essential-services-in-the-battle.

that opens with the statement: "Do you know who I am?  I am an orphan whose father died in defense of the faith."  It continues, "Won't you sponsor me, and fulfill part of your obligation to my father?  Won't you sponsor me? I am not really a stranger to you; I am your brother's child."[49]

51      Clearly, there is a need for due diligence within the charitable sector. The findings of investigative bodies in the U.S., Great Britain, and elsewhere, as well as those of technocratic, non-partisan, multilateral bodies such as the Financial Action Task Force (FATF), appear to come as an unwelcome surprise to some in the academic and non-profits sectors. For some, efforts to stem the flow of funds available for terrorism and other transnational threats is a farce, and governments are not to be believed when they point to successes in either stemming the flow of funds to terrorists or following financial trails to ferret out terrorist networks. Some dismissively describe abuse of charities for terrorist financing as a "reflexive equation of Islamic charities with terrorism."[50] This, however, is a critique that flies in the face of the extensive available evidence and simply falls flat.

52      Consider, for example, that in October 2007, Sheikh Abdel-Aziz Al-Asheikh, the Grand Mufti of Saudi Arabia and the most senior Wahhabi cleric, released a religious edict, or *fatwa,* instructing Saudis not to leave the Kingdom to participate in jihad—a statement directed primarily at those considering going to Iraq—and urged Saudis to "be careful about where [their money is] spent so it does not damage Muslims."[51] In April 2010, the Saudi Council of Senior Ulema (scholars) issued a *fatwa* explicitly forbidding the financing of terrorists and their activities.[52] Such statements are notable for acknowledging that Saudi charitable giving has been and is susceptible to abuse by terrorists and insurgents and taking public action to mitigate the threats this poses for both the personal security of citizens and the public integrity of charitable giving.

53      There can be no doubt that charity is a value of paramount importance to donors and recipients alike. International aid is a powerful tool in international foreign policy, and humanitarian giving is a laudable religious tradition and strong value in many societies. Recognizing, as illicit actors already have, that the charitable sector is vulnerable to abuse, and devising policies that protect charities from abuse, is the true challenge of the day.

54      The clean image of violent organizations engaged in charitable activity, often operating in a corrupt environment, also leaves them open to exposure. It is therefore critical to expose the underlying fraud inherent in such organizations. The most effective means of doing this is by

---

[49] "Orphans Sponsorship," CARE website, http://web/archive.org/web/20001209030900/care-intl.org/orphans1.htm.
[50] Ibrahim Warde, *The Price of Fear: The Truth Behind the Financial War on Terror* (Berkeley: University of California Press, 2007), 128.
[51] "Saudi Cleric Issues Warnings Over Militants," Reuters, October 1, 2007,
http://www.reuters.com/article/topNews/idUSL0117164820071001?feedType=RSS&feedName=topNews.
[52] "Council of Senior Ulema Fatwa on Terror-Financing," Press Release from the Royal Embassy of Saudi Arabia, Washington, D.C., May 2, 2010, http://www.saudiembassy.net/print/announcement/announcement05071001.aspx.

publicly designating such groups as a means of informing the public and disrupting terrorist financing.

55      Recognizing this truism, the U.S. Treasury Department has proactively sought to help the charitable sector better regulate itself from diversion or exploitation. Treasury developed and published guidelines of best practices for charities, as well as a risk matrix identifying "common risk factors associated with disbursing funds and resources to grantees." But even Treasury acknowledges that self-regulating guidelines are only designed to assist charities that attempt "in good faith" to protect themselves from terrorist abuse.[53]

56      The charitable sector remains vulnerable to terrorist financing. One reason for this, according to FATF, is that charities are subjected to lesser regulatory requirements than other entities, such as financial institutions or private companies.[54]

57      Despite some criticism, the U.S. government has been consistent in its efforts to crack down on the abuse of the charitable sector by terrorist organizations. The U.S. Treasury Department has designated tens of charities with ties to al Qaeda, Hezbollah, and Hamas among other terrorist groups, some with branch offices in the U.S. The U.S. has also prosecuted charities and their leaders, including in the case of the Holy Land Foundation for Relief and Development (HLF), which was found guilty on all counts in November 2008.

58      In none of these cases was U.S. government action capricious or based on sparse, dated, or unreliable information. I know from first-hand experience that the designation process is appropriately robust, vigorous, and errs on the side of caution. Designated entities can and do appeal their designations, and the U.S. Treasury Department has a record of lifting designations when warranted.[55]

59      It should be clear that promoting opportunities for legitimate charitable giving and reducing the risk those opportunities are abused for illicit purposes are in no way mutually exclusive goals. Unfortunately, there are those who insist otherwise. They stress that due diligence on the part of charities is difficult and costly, and insist it has only limited value.

---

[53] "Risk Matrix for the Charitable Sector," U.S. Department of the Treasury, March 8, 2007, https://www.treasury.gov/resource-center/terrorist-illicit-finance/Documents/charity_risk_matrix.pdf.

[54] FATF Report Combating the Abuse of Non-Profit Organizations, June 2015, http://www.fatf-gafi.org/media/fatf/documents/reports/BPP-combating-abuse-non-profit-organisations.pdf.

[55] Note for example, the appeals of the Holy Land Foundation for Relief and Development (HLFRD), the Islamic African Relief Agency (IARA), Al-Haramain Foundation, and Kindhearts, to the U.S. courts. Examples of individuals removed from the Treasury designation lists can be found on the Treasury website. For the removal of Mohamad Nasir Abas, a former commander of Jemaah Islamiyah, see http://www.treas.gov/offices/enforcement/ofac/actions/20081002.shtml. For other examples, see http://www.treas.gov/offices/enforcement/ofac/actions/20100506.shtml for removals made on May 6, 2010; See http://www.treas.gov/offices/enforcement/ofac/actions/20100108.shtml for removals made on January 8, 2010; See http://www.treas.gov/offices/enforcement/ofac/actions/20091103.shtml for removals made on November 3, 2009.

60      In fact, the real question of the day is how to most effectively streamline due diligence and make it more cost effective. There should be no debate over the basic threshold for harmonizing charity and security: a basic commitment to non-violence. Balancing the risk of violence and the opportunity for charity, government and the non-profit sector both have a responsibility to err on the side caution. Both also have a responsibility to work cooperatively to thaw the chilling effect that the government's public response to terrorists' abuse of charities has had on charitable giving within the United States, and within Muslim-American communities in particular.

61      The problem is not enforcement of U.S. laws banning material support to terrorist organizations (indeed, in the history of Treasury's designation regime, only a handful of U.S.-based charities have been designated), but rather, the unintended impact this has had on charitable giving.  Greater due diligence on the part of non-profit organizations, combined with government outreach and information campaigns such as Treasury's "Updated Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S.-Based Charities," would go a long way toward resolving this problem.[56]

62      This report includes information from U.S. Treasury Department designations, which warrants a note on the rigor of the government's designation process and regime. The designation of a person or entity as a specially designated terrorist entity by either the U.S. Department of the Treasury or Department of State is based on a significant body of evidence—some classified, some open source—that the person or entity supports terrorism. Specifically, to be considered for designation, a proposed target must either be owned or controlled by designated persons or entities; be acting for or on behalf of designated persons or entities; be assisting or sponsoring designated persons or acts of terrorism; be providing financial, material or technological support for designated persons or acts of terrorism; be providing financial or other services to or in support of designated persons or acts of terrorism; or be otherwise associated with designated persons (this last category of "associated with" is undefined, and therefore generally not used).

63      Such designations are the product of a robust interagency process that considers timeliness and strength of the evidence, and considers diplomatic concerns and the impact on intelligence or other government equities, among other factors. The evidentiary record produced to support a designation then undergoes several rounds of review by lawyers representing various U.S. departments, both for legal sufficiency and litigation risk. Given the appropriately intense rigor involved in this process, many more entities are considered for designation than those that are ultimately designated. In the case of entities tied to al Qaeda and/or the Taliban (and, more recently, the Islamic State), designations are frequently brought before the United Nations, where

---

[56] See "Updated Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S.-Based Charities," U.S. Department of the Treasury, https://www.treasury.gov/press-center/press-releases/Documents/0929%20finalrevised.pdf.

they are subject to UN standards and regulations before being approved as UN-designated terrorist entities under UN Security Council Resolutions.

### 3.   Al Qaeda's Pre-9/11 Reliance on Abuse of Charity

64      Writing in April 1999, the CIA's Counterterrorist Center released a report entitled "Islamic Terrorists: Using Nongovernmental Organizations Extensively."[57]  The report noted that the vast majority of Islamic NGOs are not tied to terrorism, but documented that the few dozen that do operate in support of terrorism fell into three basic categories: (1) NGOs tied to state sponsors of terrorism; (2) "large, internationally active NGOs based in Saudi Arabia or one of the Persian Gulf States that are exploited by individual employees with ties to extremists;" and (3) "private organizations—some also are headquartered in the Persian Gulf countries—that either have opened offices in areas of military conflict involving Muslims or have grown out of such conflicts."[58]  As an example of a Saudi-based international NGO financing terrorism, the report cited as a "case study" Bin Laden's use of al Haramain. The report cited Maktab al-Khidamat (MAK) as "the premier example" of a private organization established in the context of a conflict involving Muslims.[59]

65      A January 1999 CIA report analyzed how Bin Ladin managed to command a global terrorist network. The report underscored al Qaeda's need for funds:

> Al-Qaeda provides members of its network training, safehaven, moneymaking opportunities, access to arms and illicit material, publishing and media facilities, communications, transportation, documentation, technical support, intelligence, counterintelligence, and liaison with other groups.[60]

66      To finance these various costs, the report explained, Bin Ladin "taps into the resources of some international Islamic nongovernmental organizations (NGOs) for financial and logistical support," among other sources.[61]

---

[57] "Islamic Terrorists: Using Nongovernmental Organizations Extensively," Intelligence Report, DCI Counterterrorist Center, 9 April, 1999 (Approved for release 25 April 2012), accessed from The National Security Archive at https://assets.documentcloud.org/documents/368948/1999-04-09-islamic-terrorists-using.pdf.
[58] "Islamic Terrorists: Using Nongovernmental Organizations Extensively," Intelligence Report, DCI Counterterrorist Center, 9 April, 1999 (Approved for release 25 April 2012), accessed from The National Security Archive at https://assets.documentcloud.org/documents/368948/1999-04-09-islamic-terrorists-using.pdf.
[59] "Islamic Terrorists: Using Nongovernmental Organizations Extensively," Intelligence Report, DCI Counterterrorist Center, 9 April, 1999 (Approved for release 25 April 2012), accessed from The National Security Archive at https://assets.documentcloud.org/documents/368948/1999-04-09-islamic-terrorists-using.pdf.
[60] "How Bin Ladin Commands a Global Terrorist Network," Intelligence Report, Central Intelligence Agency, DCI Counterterrorism Center, 27 January 1999, (Approved for release 25 April 2012), accessed from The National Security Archive at https://www.documentcloud.org/documents/368944-1999-01-27-how-bin-ladin-commands-a-global.html.
[61] "How Bin Ladin Commands a Global Terrorist Network," Intelligence Report, Central Intelligence Agency, DCI Counterterrorism Center, 27 January 1999, (Approved for release 25 April 2012), accessed from The National

67        The CIA assessed in 2002 that prior to 9/11, al Qaeda likely spent approximately $30
million per year, including payments of around $20 million per year to the Taliban to enable the
group to operate in Afghanistan. Those costs dropped after 9/11, when al Qaeda lost its safe
haven in Afghanistan, but even then the group had to cover the costs of bribing authorities,
greasing the palms of facilitators who provided shelter or travel assistance, protecting its
leadership, and funding terrorist operations.[62]

68        In February 2002, the CIA produced a status report on its efforts to identify al Qaeda's
donors and fundraisers. "Wealthy individuals in the Arabian Peninsula and grassroots supporters
from around the world are critical funding sources for al-Qa'ida," the CIA reported as one of its
key findings.[63] And, the report added, they typically used cut-outs in attempt to hide the money
trail between them and al Qaeda:

        Donors generally channel money intended for terrorist-related activities through middlemen—
        including nongovernmental organizations (NGOs), mosques, fundraisers, and businessmen—
        rather than giving funds directly to Bin Ladin or other senior al-Qa'ida members.  This practice
        hides the donors' role and allows them to deny knowing funds went to terrorists.[64]

69        A few months later, in November 2002, the CIA published a report entitled "Saudi-Based
Financial Support for Terrorist Organizations." The report's first key finding was blunt: "Saudi
Arabia is a key base of financial support for al-Qa'ida." After a few words redacted from the
declassified version of the report, it went on to explain: "Most of the money originates from
wealthy individuals, fundraisers who solicit smaller donations, and diversions from non-
governmental organizations (NGOs); a portion of the funding is derived from legitimate religious
contributions."[65] Some religious donations are diverted to terrorism, and in these cases the donor
is unwitting or misled, the CIA reported. But in other cases, financiers "knowingly donate funds
to al-Qa'ida and are witting that the money finances terrorist activity."[66]  The report made clear,

Security Archive at https://www.documentcloud.org/documents/368944-1999-01-27-how-bin-ladin-commands-a-global.html.

[62] "Terrorism: Amount of Money It Takes To Keep al-Qa'ida Functioning," Central Intelligence Agency, 08/07/2002, 1999 (Approved for release 25 April 2012), accessed from The National Security Archive at https://www.documentcloud.org/documents/368986-2002-08-07-terrorism-amount-of-money-it-takes-to.html.

[63] "Identifying Al-Qai'da's Donors and Fundraisers: A Status Report," Central Intelligence Agency, Directorate of Intelligence, 27 February 2020, (Approved for release 25 April 2012), accessed from The National Security Archive at https://assets.documentcloud.org/documents/369175/2002-02-27-identifying-al-qaidas-donors-and.pdf.

[64] "Identifying Al-Qai'da's Donors and Fundraisers: A Status Report," Central Intelligence Agency, Directorate of Intelligence, 27 February 2020, (Approved for release 25 April 2012), accessed from The National Security Archive at https://assets.documentcloud.org/documents/369175/2002-02-27-identifying-al-qaidas-donors-and.pdf.

[65] "Saudi-Based Financial Support for Terrorist Organizations," Central Intelligence Agecy, Directorate of Intelligence, 14 November 2002, (Approved for release 25 April 2012), accessed from The National Security Archive at https://assets.documentcloud.org/documents/368987/2002-11-14-saudi-based-financial-support-for.pdf.

[66] "Saudi-Based Financial Support for Terrorist Organizations," Central Intelligence Agecy, Directorate of Intelligence, 14 November 2002, (Approved for release 25 April 2012), accessed from The National Security Archive at https://assets.documentcloud.org/documents/368987/2002-11-14-saudi-based-financial-support-for.pdf.

however, that Saudi Arabia was a "key financial base for al-Qa'ida," adding that "Bin Ladin's network [redacted text] Saudi Arabia for the bulk of its fundraising for several years," and that al-Qa'ida was able to exploit several Saudi-based NGOs and divert funds to al-Qa'ida.[67]

70      The 9/11 Commission report is clear about al Qaeda's use of businesses and NGOs in Croatia, Bosnia, Azerbaijan, Chechnya, Budapest and Nairobi as fronts that "covertly provided financial and other support for terrorism activities."[68]

### 4. _Dawa_ in Islam

71      According to Islamic tradition, all Muslims are obligated to submit themselves to God (_ibadah_) and preach or propagate (_dawa_, literally "a call to God") true Islam. The obligation to spread true Islam covers a wide spectrum of outreach activity, from outright proselytizing (which benefits the soul) to charitable giving and social welfare activities (which benefit the body). To fulfill these social welfare duties, the Islamic endowments (waqf, or awqaf in the plural) that are responsible for the upkeep of mosques and holy sites in contemporary Muslim societies also typically manage social service institutions. Throughout the Muslim world, revenue derived from the waqf's endowed properties and individual donations typically fund "a veritable network of welfare and charitable services (such as schools, orphanages, soup kitchens)." These not only provide for the needs of the population, but are also a means of drawing in the people to whom religious leaders want to preach.[69]

72      Within the more radical Salafi strain of Sunni Islam, _dawa_ activities are seen as protecting the umma (Islamic community, or nation) from insufficiently Islamic rulers and other perceived enemies of Islam, such as non-Muslim infidels. Salafiyya is a school within Sunni Islam that spread throughout the Arab world in the twentieth century. Its name comes from the Arabic words al-salaf al-salih, "the venerable forefathers," referring to the generation of the Prophet Mohammad and his companions. Salafis originally believed Islam had been corrupted by idolatry, and they sought to bring it back to the purity of its earliest days as it was practiced in the time of the Prophet. Accordingly, Salafis today reject modernizing tendencies, and believe that the Koran and Hadith (traditions of the Prophet) should be interpreted as they were during the first few generations after Mohammad's death. Salafis are sometimes considered extreme in belief; after 9/11, the term has been used to describe various groups within Sunni Islamic

---

[67] "Saudi-Based Financial Support for Terrorist Organizations," Central Intelligence Agnecy, Directorate of Intelligence, 14 November 2002, (Approved for release 25 April 2012), accessed from The National Security Archive at https://assets.documentcloud.org/documents/368987/2002-11-14-saudi-based-financial-support-for.pdf.

[68] _The 9/11 Commission Report_, authorized edition (New York: Norton, 2004), 58, http://www.9-11commission.gov/report/911Report.pdf.

[69] For dawa definition see R. Hrair Dekmejian, _Islam in Revolution: Fundamentalism in the Arab World_ (Syracuse: Syracuse University Press, 1985), 44; Quote regarding waqf from Michael Dumper, _Islam and Israel: Muslim Religious Endowments and the Jewish State_ (Washington D.C.: Institute for Palestine Studies, 1994), 1-2.

ideology that practice purist or reactionary interpretations of Islam—especially the militant expressions of these ideologies.[70]

73        To promote their particular version of Islam, many Salafis use *dawa* activities to promote a "pure" Islamic practice modeled after the lifestyle of the Prophet Mohammed, emphasizing individual piety and self-purification. When, as with Salafis, the goal is "the transformation of society through religious education, and moral and social reform," the wide array of social services that make up the *dawa* are ideally suited to the religious goals of reviving and propagating the faith in a population. This Salafist ideological framework is common to the various modern militant Islamist organizations that grew out of the Muslim Brotherhood and the Afghan jihad against the Soviets. As the Congressional Research Service notes of the former al Qaeda leader, "[Osama] Bin Laden has identified Salafist thinkers such as his former mentor Abdallah Azzam, Hamas founder Ahmed Yasin, World Trade Center bombing conspirator Omar Abdel Rahman, Saudi dissident clerics Salman al-Awdah and Safar al-Hawali, and thirteenth century Islamic scholar Ibn Taymiyah as prominent ideological influences."[71]

### 5. *Dawa*, Violence and Extremism

74        One of the ideological principles developed by Muslim Brotherhood theoretician Sayyid Qutb is that "the duty of the faithful Muslim is to revive Islam to transform the jahili [immoral, pre-Islamic] society through proselytization (dawa) and militant jihad." Islam scholar Olivier Roy has noted that militant behavior in Islamist groups appears to be motivated more by a particularly aggressive style of religious preaching than by political training. For Roy, the word *dawa* is defined as "militant preaching" and is a more significant cause of militant behavior than is strictly political training (he literally translates the word as "call" or "invitation"). Indeed, Muslim Brotherhood founder Hassan al-Banna wrote a tract titled *Da'watuna* (Our Militant Preaching). Among Muslim militants, Roy pointed out, "Preaching (da'wa) is the instrument of the march to power."[72]

75        Many open societies, particularly democratic ones, are concerned about the preaching and social welfare activities of groups with militant ties, particularly because the *dawa* culture often features anti-democratic and anti-western undertones. The Dutch General Intelligence and

---

[70] See Robert Worth, "The deep intellectual roots of Islamic terror," *New York Times*, October 13, 2001; Wikipedia Online Encyclopedia, s.v. "Salafi," http://en.wikipedia.org/wiki/Salafi

[71] John Esposito, *Islam: The Straight Path* (Oxford: Oxford University Press, 1988), 200; Christopher M. Blanchard, *Al Qaeda: Statements and Evolving Ideology*, Congressional Research Service, CRS Report RL32759, February 4, 2005, http://www.fas.org/irp/crs/RL32759.pdf; For an insightful discussion of Salafi means of spreading Islam, from dawa to violent activity, see Quintan Wiktorowicz and John Kaltner, "Killing in the Name of Islam: Al-Qaeda's Justification for September 11," *Middle East Policy* 10, no. 2 (2003).

[72] For Qutb quote see R. Hrair Dekmejian, *Islam in Revolution: Fundamentalism in the Arab World* (Syracuse: Syracuse University Press, 1985), 91; Olivier Roy, The Failure of Political Islam, trans. Carol Volk, (Cambridge: Harvard University Press, 1994), 57, 70.

Security Service (AIVD) outlined these concerns in a report entitled, "From Dawa to Jihad: The Various Threats from Radical Islam to the Democratic Legal Order." Groups that focus on *dawa* activities, the report claimed, "follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas." The report warned that "the choice of [some] dawa-oriented groups for non-violent activities does not always imply that they are non-violent on principle. Often they simply do not yet consider armed jihad expedient for practical reasons (jihad can be counterproductive or impossible because of the other side's superiority) or for religious reasons (the jihad against non-believers is only possible when all Muslims have returned to their 'pure' faith)."[73]

76    Of course, there is nothing inherently violent or antisocial about *dawa* activities, per se. Indeed, the opposite is true: *dawa* organizations—frequently formed as local charities, non-governmental organizations or private voluntary organizations—play an important communal role in Islamic history and culture. Like their Salafi cousins, however, radical Islamist organizations take advantage of the otherwise laudable Islamic tradition of charity and good works not only to teach their particular version of Islam but also to actively support terrorist operations.[74]

77    Using religious arguments to justify, promote, and raise funds for terrorism and other acts of violence, terrorist groups and their ideological, financial and logistical supporters have sometimes abused Islamic ideals to promote their extremist causes. As Dr. Shmuel Bar described in his book on Islamic religious rulings (fatwa) used to support jihad, "Financially supporting armed jihad may be performed through a number of mechanisms, foremost of which is zakat—the tithe that each Muslim must pay to the community for orphans, widows, and poor within the community and for building religious institutions."[75] The 9/11 Commission concluded that "Al Qaeda and its friends took advantage of Islam's strong calls for charitable giving, zakat. These financial facilitators also appeared to rely heavily on certain imams [preachers] at mosques who were willing to divert zakat donations to al Qaeda's cause."[76] The Commission found that, like

[73] General Intelligence and Security Service, "From Dawa to Jihad: The Various Threats from Radical Islam to the Democratic Legal Order," The Netherlands Ministry of the Interior and Kingdom Relations (December 2004): 7, 27.
[74] For more on legitimate dawa activity as NGOs, see Testimony of Quintan Wiktorwicz, "Prepared Statement to a Hearing on the Role of Charities and NGO's in the Financing of Terrorist Activities," United States Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on International Trade and Finance, August 1, 2002; For MB ties to suspect NGOs, see, for example, Edward Alden, Mark Huband, and Mark Turner, "Al-Qaeda 'Financiers' Active In Europe: A UN Report Reveals A Lack Of Action Over Youssef Nada and Ahmed Idris Nasreddin," *Financial Times*, November 14, 2003. See also Testimony of Matthew Levitt, "Untangling the Terror Web: The Need for a Strategic Understanding of the Crossover Between International Terrorist Groups to Successfully Prosecute the War on Terror," United States Senate Committee on Banking, Housing, and Urban Affairs, October 22, 2003.
[75] Shmuel Bar, *Warrant for Terror: The Fatwas of Radical Islam and the Duty to Jihad* (Lanham: Rowman & Littlefield, 2006), 74.
[76] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 170, http://www.9-11commission.gov/report/911Report.pdf.

radical preachers at certain mosques, charities—some abused by corrupt employees and other full and witting terror financiers—also played a critical role in financing al Qaeda.

78    Al Qaeda took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities (particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation). Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda. In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, al Qaeda operatives controlled the entire organization, including access to bank accounts. Charities were a source of money and also provided significant cover, enabling operatives to travel undetected under the guise of humanitarian work.[77]

79    Al Kifah (a key part of the international network of MAK organizations), operating under this name and later operating as CARE International, played a central role raising funds for radical organizations and causes affiliated with the global jihadist movement. For example, Al Kifah/CARE specifically urged donors to include donations for jihad in order to fulfill their *zakat* obligations and warned that "the one who withholds the zakat will be severely tortured in Hell-fire unless Allah forgives him."[78]

80    Similarly, the editor of the December 30, 1994 edition of CARE publication *Al-Hussam* added an Editor's Note stressing that praying for Chechen fighters was not enough; Muslims must also fight with them or at least fund them:

> When some people hear the word "pray for us, which is all we ask", they rejoice and think that there is no need for men or money.  This is a grave error; if they do not need us, we need them so we can accomplish Jihad together…  And if they say we do not need anything, it is because they have integrity and will not ask, even if they need help.[79]

81    Like Al Kifah/CARE's *al-Hussam*, GRF publications also issued calls to fund and support armed jihad:

> GRF has published several Arabic newsletters and pamphlets that advocate armed action through jihad against groups perceived to be un-Islamic.  For example, one 1995 GRF pamphlet reads "God equated martyrdom through JIHAD with supplying funds for the JIHAD effort.  All contributions should be mailed to: GRF."  Another GRF newsletter requested donations "for God's cause – they [the Zakat funds] are disbursed for equipping the raiders, for the purchase of ammunition and food, and for their [Mujahideen's] transportation so that they can raise God the Almighty's word . . .

---

[77] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 170-171, http://www.9-11commission.gov/report/911Report.pdf.
[78] "The Obligation of Zakat," *Al-Hussam* 5, no. 7 (January 1997), see U.S. v Mubayyid et al, U.S. District Court, District of Massachusetts
[79] *Al-Hussam*, no.18 (December 1994), see U.S. v Mubayyid et al, U.S. District Court, District of Massachusetts

25

it is likely that the most important of disbursement of Zakat in our times is on the jihad for God's cause . . . ."[80]

### 6. "Economic Jihad"

82      *Dawa* organizations hijacked by terrorist groups have often been key nodes in what radical Islamist leaders have described as the "economic jihad" (al-Jihad bil-mal), a phrase that features prominently in their fundraising techniques. The concept is simple in practice. Radical leaders claim their followers have a religious duty to engage in jihad—either by physically fighting Islam's enemies or by supporting those who do. Proponents of this logic ground their position in a Quranic verse in Surah 9 (al-Tawbah) Verse 41: "Fight with your possessions and your souls in the way of Allah." Typically, "possessions" translates into "money," for purposes of expediency.

83      The call to wage economic jihad is a staple of radical leaders of various stripes. For example, speaking of the need to support Palestinian militants in a "Jerusalem Day" speech in December 2003, Hezbollah leader Sheikh Hassan Nasrallah said, "All the institutions, committees, parties, private and collective initiatives throughout the Moslem world must be spurred on to collect money, everywhere in the world, and to bring that money to Palestine. With it they will buy bread and rebuild their houses. The money will bandage their wounds. With that money they are assured of the ability to buy weapons, for the men and women of Palestine will not be weakened. The [challenge] of our era is found today in Palestine . . . If we cannot give them arms, we can give them the money to buy them."[81]

84      Sheikh Nasrallah's position mirrors that of Hezbollah's benefactor, Iran's Ayatollah Khomeini. A Syrian Ministry of Information publication records Khomeini as saying that it is the duty of all Muslims "to get rid of that germ corruption [Israel] in any way possible," and that to achieve that goal "it is not enough to extend practical support to [Palestinians to achieve] the goal but to direct resources to that end from the zakat and other Islamic charity monies."[82]

85      Sheikh Yousef Qardawi, a prominent Muslim Brotherhood theologian who founded the Union of Good, has also issued numerous calls for economic jihad. Though better known for his religious rulings (fatwa) calling on Muslims to murder American and other civilians in Iraq and justifying Hamas suicide bombings against Israeli civilians, Qardawi has also decreed that it is more important that Muslims donate money to "support Palestinians fighting occupation and other struggles of Muslim populations, such as in Bosnia" than that they make the Hajj (the pilgrimage to Mecca required of every able Muslim at least once in his or her life). In an

---

[80] "Treasury Department Statement Regarding the Designation of the Global Relief Foundation," U.S. Department of the Treasury, October 18, 2002, www.ustreas.gov/press/releases/po3553.htm.

[81] C.S.S. Special Information Bulletin, "The speech given by Hassan Nasrallah, Hezbollah leader," *Jerusalem Day* (December 2003), http://www.intelligence.org.il/eng/bu/iran/jerusalem.htm.

[82] Adnan Hussein Abu Nasser, *Palestine in the Speeches of the Ayatollah Khoeini* (Arabic), The Syrian Ministry of Information (2000), 120, as cited in C.S.S., Interpal, Part I.

interview with the *Palestine Times*, he said of Islamist resistance in Lebanon and the Occupied Territories that "if we can't carry out acts of jihad ourselves, we at least should support and prop up the mujahideen financially and morally so that they will be steadfast until God's victory." A more calculating variation on Qardawi's theme was played by Sheikh Omar Bakri Mohammad. Speaking to followers in his hometown of London, the sheikh said, "The market of jihad has opened. Now all we need is the people who are the merchandise, the ones who want to buy jennah (paradise). If you cannot do it physically, do it verbally, do it financially, but do it."[83]

86      Even secular Muslim leaders have echoed the call of economic jihad. Former Iraqi dictator Saddam Hussein argued in 2002 that Arab leaders should shun further peace plans and commit "to support the Palestinian people in armed fighting." He added, "If we are incapable of offering aid to the armies, our support should be by [giving] money or buying them arms, or by giving Muslims and Arabs the option of volunteering [to help the Palestinian people.]"[84]

87      In November 2002, Hamas issued a communiqué on one of its web sites calling on supporters worldwide to atone for their sins and ensure themselves a place in heaven by helping to finance Hamas. "We call on you," the statement read, "my brother the Jihad fighter and my sister the Jihad fighter to donate part of your money to the Jihad fighters who are protecting the honor of the Islamic nation. . . . Even if you cannot participate yourselves alongside us in the Jihad, your [financial] donation to us from the money that Allah gave you is not less important [than participating in the Jihad]."[85]

88      Fawaz Damrah took a page from the same radical Islamist book in his fundraising pitches to U.S. audiences of radicalized Muslims. Damrah was the imam of Cleveland's largest mosque, an officer of Maktab al-Khidmat (MAK, or Afghani Services Bureau), and a major fundraiser for Palestinian Islamic Jihad (PIJ) before his conviction in 2004 for unlawfully obtaining citizenship via false statements to immigration officials, including failure to note affiliations with terrorist groups. Damrah had been involved in the establishment of the MAK office in New York in the late 1980s. His investigation by federal authorities offers a model of how an Islamist fundraiser uses religious rhetoric to drum up financial support for Islamist terrorism. Transcripts of phone

---

[83] For Qardawi see "The Muslim Brotherhood Movement in Support of Fighting American Forces in Iraq," Middle East Media Research Institute (MEMRI), Special Dispatch Series, No. 776 (September 3, 2004), http://memri.org/bin/articles.cgi?Page=subjects&Area=middleeast&ID=SP77604; Amany Abdel-Moneim, "Online with the Sheikh," *Al Ahram Weekly*, no. 563 (December 2001).  For Palestine Times see "Sheikh Yousef al-Qaradawi: Hamas and the Islamic Jihad represent the glorious face of the Islamic Umma- Interview," *Palestine Times*, September 1999, http://www.ptimes.org/issue99/index0.htm; For Sheikh Omar Bakri Mohammad see Douglas Davis, "UK Muslim Cleric Faces Deportation for Calling on Followers to Join Al-Qaida," *Jerusalem Post*, January 19, 2005.

[84] The Middle East Media Research Institute (MEMRI), "Palestinian Authority and Iraqi Media on Iraqi Support of the Intifada," *Special Dispatch--Iraq/Jihad and Terrorism Studies*, no. 415, August 28, 2002, http://www.memri.org/bin/opener_latest.cgi?ID=SD41502 (accessed August 29, 2002).

[85] IDF Spokesperson, "Hamas is Conducting a Global Search for Financing for Terrorism Activities," November 29, 2002, www.imra.org.il.

conversations between Damrah and individuals such as senior PIJ officials Sami al Arian, Sheikh Abdelaziz Awda, Bashir Nafi, Ghassan Ballut, and others, along with videos of Damrah sharing the dais with them at PIJ conferences, were key pieces of evidence at the trial.[86]

89   For example, at a "Round Table Discussion about Jihad and the Intifada" held in Cleveland, Ohio, on April 7, 1991, Damrah was recorded saying, "God says, '[w]hoever equipped a raider for the sake of God, has himself raided.' Whoever donates for a mujahid so that he may throw stones, as if he too is fighting the Holy War, and will be rewarded like him, even if he stays home."[87]

90   While fundraisers frequently frame their fundraising pitch in terms of their terrorist group's humanitarian support activities, sometimes—especially before the extra scrutiny brought on by the attacks of September 11—they also call on donors to fund overtly violent, militant activities. That was clearly the case with Al Kifah/CARE, which specifically called for funding violent jihad. Indeed, Al Kifah/CARE received checks from donor with directions to support various jihad causes, such as comments on the memo line of checks stating "Bosnia mujahideen," or 'jihad,' or 'for jihad only," or "Chechen Muslim Fighters."[88]

91   In some cases, however, Al Kifah/CARE went so far as to express the opinion that engaging in economic jihad—supporting others actively engaged in jihad—was insufficient.  An article that ran in *Al-Hussam* entitled "Words and Blood" informed that "there is no worship greater than the worship offered in Jihad and there is no more serious worship than the worship offered in Jihad. Jihad of the self [personally participating in jihad] is a must, those who do not practice that do not benefit in their souls and spirits."  The article went on to state explicitly that "Jihad with money without Jihad of the soul is not beneficial to the person even if they spend all the money on earth. It is useless if they do not take part in wars."[89] In another article that appeared in *Al-Hussam*'s "Sisters' Corner," readers were informed that they must not be held back "from fulfilling one of the most difficult, yet one of the most rewarding of absolute obligations on every Muslim: jihad, in its physical form, for the sake of Allah." Only in the event that one is truly unable to go fight in jihad ("being blind, lame or ill"), "then at least express your support and encouragement for those brothers among us who are able and willing."[90]

---

[86] Regarding Damrah and MAK, see U.S. v Fawaz Damrah, U.S. Court of Appeals, Sixth Circuit https://www.courtlistener.com/opinion/790718/united-states-v-fawaz-mohammed-damrah-aka-fawaz-damra/

[87] "Round Table Discussion about Jihad and the Intifada" held in Cleveland, Ohio, on April 7, 1991, transcript p. 6, in court documents from United States of America v. Fawaz Damrah. https://www.investigativeproject.org/documents/case_docs/471.pdf

[88] Affidavit of FBI Special Agent James T. Marinelli, April 2005, submitted in support of United States v. Mubayyid, Muntasser, and al-Monla, Criminal Complaint, Case No. 05-40026-FDS, United States District Court, Eastern District of Massachusetts.

[89] *Al-Hussam*, no. 9 (August 26, 1994).

[90] *Al-Hussam*, 4, no. 5 (June 2, 1995).

92      This theme appears in Muslim World League publications MWL Journal and Al Alam Al Islami as well.  Consider a few examples:

92.1    • According to an article in the MWL's weekly newspaper, *Muslim World News*, the Secretary General of the World Assembly of Muslim Youth (WAMY), Dr. Maneh al-Johani, told a group of Kashmiri expatriates at a MWL event that "Muslims can go to the battlefield to wage a war again the enemies of Islam, or they can give their moral, physical and financial support [to] the cause of Jihad."[91]

92.2    • An article on "Child Upbringing in Islam," featured in the February 1994 volume of the *MWL Journal*, included this: "A child should be made to be aware that participating in Jihad is worship in itself and running away from the battle field is a great sin.  Taking part in the battle fought in Allah's Cause can be done by sacrificing one's life and wealth."[92]

92.3    • Reporting on a MWL Constituent Council Meeting, the *MWL Journal* reported in January 1994 on the comments that Sheikh Abdul Aziz bin Baz, the chairman of the MWL Constituent Assembly, told the gathering: "It is the duty of Muslims to support the Bosnian Muslims with arms, money, and whatever they can provide, he said."[93]

92.4    • The July/August 1991 volume of the *MWL Journal* includes an article specifically entitled, "Jihad with Money in the Way of Allah."  The article argues that "Jihad with one's wealth and with one's life is an essential part of the teachings of Islam."  The article continues, "Yet Jihad with one's wealth 'takes precedence' over Jihad with life in several verses of the Holy Qur'an, calling the Believers to Jihad, because of finance being indispensable for supplying the army with its needs (and on many occasions its requirements may far exceed its demand for manpower).  Hence, in view of the unlimited material needs of war, a person may contribute money towards Jihad if he does not personally join it for reasons of physical weakness, illness or distance from the scene of confrontation with the enemy."[94]

### 7.  Examples of Key Saudi Charities and Terrorist and Extremist Financing

93      This report will highlight the Muslim World League, the International Islamic Relief Organization, and the al Haramain Foundation as examples Saudi charities that government investigations and expert studies have tied to the financing of terrorism and/or extremism in the years leading up to 9/11.

---

[91] "WAMY Calls for Jihad to Free Kashmir," *Muslim World News*, Vo. 26, No. 1216, June 3, 1991, p. 15

[92] Abdul Malik Bappa Mahmud, "Child Upbringing in Islam," *The Muslim World League Journal*, Vol. 21, No. 8, Sa'aban 1414—February 1994, p. 34

[93] Dr. Mozammel Haque, "Bosnia Issue Top on the Agenda: GCC Summit, MWL Meeting and Bosnia Solidarity Day," *The Muslim World League Journal*, Vol. 21, No. 7, Rajab 1414—January 1994, p. 19

[94] Muhammad Gamal al-Din Mahfooz, "Jihad with Money in the Way of Allah," *The Muslim World League Journal*, Vol. 19, Nos. 1-2, Muharram/Safar 1412—July/August 1991, p. 62

94      A 2005 report by the Dutch General Intelligence and Security Service (AIVD) offers a good summary explanation of how these charities functioned as a part of Saudi government policy and as an extension of branches of the Saudi government:

> The combination of charity and missionary activities for a long time marked the financing activities of the Saudi government. Within the Saudi government an important role was played by the Ministry for Islamic Affairs that via the Saudi diplomatic representations abroad made funds available to the Muslim communities residing in these countries. Often even more important in volume was the financial support from prominent Saudi private benefactors and large organisations, which since the 1960s and 1970s have undertaken worldwide charity and missionary activities (in itself, incidentally, a legitimate combination which also applies to many Western religiously inspired aid organisations). These institutions, such as the Muslim World League (also known as Rabita Trust), Al-Haramain, World Assembly of Muslim Youth (WAMY) and International Islamic Relief Organisation (IIRO), are officially known as 'non-governmental organisations (NGOs), but in fact maintain close ties with parts of the Saudi establishment. Although to the outside world they strongly emphasise their strong humanitarian aims, these organisations are primarily focused on propagating the Salafist interpretation of Islam. They concentrate on setting up and supporting mosque centres with an orthodox persuasion, hiring, training and subsidising imams with a like persuasion, publishing and disseminating Salafist literature, et cetera.[95]

95      It is important to note that the three Saudi charities examined below are not the only ones that have raised concerns of intelligence, law enforcement, and policy officials. Consider, for example, the Canada Revenue Agency's (CRA) decision to revoke the charity registration of the World Assembly of Muslim Youth (WAMY) in Canada. The CRA found that WAMY provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF), an entity on the U.N.'s list of entities tied to al Qaeda. CRA found that the WAMY office in Saudi Arabia "maintains substantial control over WAMY's finances [in Canada], and uses this control to carry out its own objectives in Canada." The CRA report went on to lists examples of "adverse reporting on WAMY and its affiliates," linking the groups to terrorist organizations.[96]

96      According to the 9/11 Commission Report, WAMY operated under the official Saudi government oversight, regulated by the Ministry of Islamic Affairs.[97]

### a.      The Muslim World League (MWL)

---

[95] "Saudi Influences in the Netherlands: Links between the Salafist Mission, Radicalisation Processes and Islamic Terrorism," General Intelligence and Security Service, Ministry of Interior and Kingdom Relations, June 1, 2005, https://english.aivd.nl/publications/publications/2005/01/06/saudi-influences-in-the-netherlands.

[96] "Notice of Intention to Revoke the World Assembly of Muslim Youth," Letter from Canada Revenue Agency to Mr. Ayman Al-Taher, Canada Revenue Agency, January 5, 2012, https://www.canadiancharitylaw.ca/uploads/World_Assembly_of_Muslim_Youth.pdf.

[97] *The 9/11 Commission Report*, authorized edition (New York: Norton, 2004), 372, http://www.9-11commission.gov/report/911Report.pdf.

97          According to Victor Comras, a former U.S. diplomat who served under appointment as an international monitor to oversee the implementation of UN Security Council measures against terrorism and terror financing, "In 1962, the Saudi Royal family established the Muslim World League in Mecca and provided it funds to support the propagation of Wahhabi Islam."[98] David Aufhauser, former General Counsel at the U.S. Treasury Department, stated in congressional testimony to the Senate Committee on Homeland Security and Governmental Affairs that, by some estimates he read during the George W. Bush administration, Saudi funding for the MWL had exceeded $75 billion.[99] In March 1997, then-Secretary General of MWL, Dr. Abdullah al-Obaid, thanked King Fahd for his continued support, noting that the Saudi government officially provided more than $1.33 billion in financial aid to MWL since its founding.[100] According to Israeli scholar and former diplomat Dore Gold, the Saudi government has funded 99% of the MWL's money.[101] It has funded institutions in Afghanistan, Pakistan, Southeast Asia, the Middle East, and Europe.[102]

98          The MWL and several of its officials have been tied to terrorism. A senior MWL official, Wael Hamza al-Julaidan, was designated as a Specially Designated Terrorist by the U.S. Treasury Department for his association with Osama bin Laden and al Qaeda. According to the designation, "Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with several individuals and entities linked to al-Qa'ida, including bin Ladin lieutenants, Ayman al-Zawahiri, Abu Zubaida, and Mohammed Atef; and the organizations: Makhtab al Khedmat, the Rabita Trust, and al-Gam'a al-Islamiya." Julaidan also served on the Board of Trustees of the Rabita Trust, another NGO designated for its support for terror.

99          In March 2002, in the context of a much larger dragnet, the northern Virginia offices of the MWL were raided by a U.S. Treasury Department task force searching for evidence of the MWL's raising and laundering of funds to the aforementioned groups.[103] According to an unclassified CIA document released in 1996, the MWL has been tied to supporting a variety of terrorist groups. This report stated that the head of the MWL office in Pakistan supplied Muslim World League documentation and arms to Afghani and Tajik militants.[104] Likewise, according to

---

[98] Victor Comras, "Al Qaeda Finances and Funding to Affiliated Groups," *Strategic Insights* 6, no. 1 (January 2005), https://core.ac.uk/download/pdf/36704498.pdf.

[99] Cited in Victor Comras, "Al Qaeda Finances," in Giraldo and Trinkunas, eds., *Terrorism Financing and State Responses* (Stanford: Stanford University Press, 1996), 119.

[100] J. Millard Burr and Robert O. Collins, *Alms for Jihad: Charity and Terrorism in the Islamic World* (Cambridge: Cambridge University Press), 34.

[101] Dore Gold, *Hatred's Kingdom: How Saudi Arabia Supports the New Global Terrorism* (Washington, D.C.: Regnery Publishing, 2003), 76.

[102] Victor Comras, "Al Qaeda Finances," in Giraldo and Trinkunas, eds., *Terrorism Financing and State Responses* (Stanford: Stanford University Press, 1996), 119.

[103] Judith Miller, "Raids Seek Evidence of Money-Laundering," *New York Times*, March 21, 2002.

[104] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also David E. Kaplan, "How billions in oil money spawned a global terror network," *US News and World Report*, December 7, 2003; Wikipedia Online Encyclopedia, s.v. "CIA Report on NGOs With Terror Links,"

an International Crisis Group report, the Somali terrorist group al-Itihaad al-Islaami, designated under Executive Order 13224, derived part of its revenue from the MWL and its subsidiary, the IIRO, although it is unknown whether the MWL and IIRO were aware of the usage of these funds.[105]

100        A great deal of MWL's material support for terrorism has been financial. According to investigative journalist David E. Kaplan, the MWL has sent cash to Islamic guerillas in the Philippines.[106] According to Jimmy Gurule, a former U.S. Treasury Department official and law professor at Notre Dame, Osama bin Laden himself covertly funded several terrorist organizations through the MWL.[107] The MWL also provided non-financial material support such as arms and documents to "militants in Afghanistan and Tajikistan," according to a CIA report.[108]

101        The MWL's ties to terrorism and religious extremism go back to the Afghan jihad against the Soviets in the 1980s. Together with Osama bin Laden, Sheikh Abdullah Azzam co-founded Maktab al-Khidmat (MAK)—also known as the Afghan Services Bureau or the Human Services Office. "Join the Caravan," the radical manifesto of Sheikh Abdullah Azzam, is a call to jihad. Consider, for example, the preface to the second edition: "We hope that Allah will provide us with sincerity and steadfastness and that He will accept our deeds from us, and bring us our end in martyrdom." Among its principles, the monograph informs that "jihad is the highest peak of Islam," that "jihad is the most excellent form of worship," and warns that "a person who discourages people from jihad is like the one who discourages people from fasting. Whoever advises an able Muslim not to go for jihad is just like the one who advises him to eat in Ramadan while he is healthy and in residence."[109]

102        According to Dr. Thomas Hegghammer, a Harvard scholar specializing in the study of violent Islamism, "Azzam's message resonated because it coincided with a growing sense in the Muslim world that Muslims were a people challenged by external threats. This message had been promoted very actively and forcefully in the late 1970s by non-violent international Islamic organizations, *above all the Muslim World League*" (emphasis added). Arab fighters sent to

http://en.wikisource.org/wiki/CIA_Report_on_NGOs_With_Terror_Links#INTERNATIONAL_ISLAMIC_RELIEF_ORGANIZATION_.28IIRO.29.

[105] "Somalia's Islamists," International Crisis Group Africa Report, no. 100 (December 12, 2005): 6.

[106] David E. Kaplan, "How billions in oil money spawned a global terror network," *US News and World Report*, December 7, 2003.

[107] Jimmy Gurule, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* (Northampton: Edward Elgar Publishing, 2008), 34.

[108] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300; David E. Kaplan, "How billions in oil money spawned a global terror network," *US News and World Report*, December 7, 2003.

[109] Abdullah Azzam, *Join the Caravan* (CARE International, 1995), 5, 19, 29, https://ebooks.worldofislam.info/ebooks/Jihad/Join%20the%20Caravan.pdf.

103    Afghanistan, Hegghammer noted, were socially and organizationally intertwined, often through the MWL. He wrote: "Most of the early Arab fighters in Afghanistan had links to either the Muslim Brotherhood or the Muslim World League." In fact, according to Hegghammer, Sheikh Abdullah Azzam's salary at the International Islamic University in Islamabad, where he propagated his violent extremist ideology, was paid by the Muslim World League from 1981 to 1986.[110] According to an unclassified CIA document, at least as of 1996, U.S. intelligence suspected MAK was linked to the Muslim World League.[111]

104    The actions of the Muslim World League have been closely tied to the Saudi government, especially in the years leading up to 9/11 (later, the MWL would take steps to try to become a more independent organization). Discussing the MWL and "the terrorism connection," Dr. Sarah Feuer concluded: "Regarding the degree to which the league has been an extension of the Saudi government, U.S. intelligence operations have exposed direct funding links between members of the royal family, various Saudi banks, the Islamic Affairs ministry, Saudi embassies and consulates abroad, and the league."[112]

### b.   The International Islamic Relief Organization (IIRO)

105    In 1978, the Muslim World League established the International Islamic Relief Organization (IIRO) to serve as its humanitarian branch. Headquartered in Jeddah, IIRO is a global organization, with offices in Africa, Asia, Europe, Latin America and North America. According to former USAID relief coordinator in Sudan J. Millard Burr and historian Robert O. Collins, the IIRO seeks to provide relief and aid to Muslims, especially in the face of natural disaster and to those who suffered on account of war. The IIRO funds economic development projects and financial and management assistance, often in the form of direct payments. Additionally, the IIRO has set out to protect Muslim minorities and disseminate the teachings of Islam.[113]

106    According to Feuer, when founded, "IIRO was tasked with running orphanages, building mosques, and operating Islamic schools around the world. The organization would ultimately be implicated in terrorism including the 9/11 attack, and it has been renamed the International

---

[110] Thomas Hegghammer, "The Origins of Global Jihad: Explaining the Arab Mobilization to 1980s Afghanistan," Belfer Center for Science and International Affairs International Security Program, January 22, 2009, https://www.belfercenter.org/publication/origins-global-jihad-explaining-arab-mobilization-1980s-afghanistan.

[111] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also David E. Kaplan, "How billions in oil money spawned a global terror network," *US News and World Report*, December 7, 2003

[112] Sarah Feuer, *Course Correction: The Muslim World League, Saudi Arabia's Export of Islam, and Opportunities for Washington*, Policy Focus 161, The Washington Institute for Near East Policy, November 2019, 16-17 https://www.washingtoninstitute.org/uploads/Documents/pubs/PolicyFocus161-Feuer.pdf.

[113] J. Millard Burr and Robert O. Collins, *Alms for Jihad: Charity and Terrorism in the Islamic World* (Cambridge: Cambridge University Press), 35.

Organization for Relief, Welfare, and Development."[114] Victor Comras has also argued that "[t]he International Islamic Relief Organization is another Wahhabi-sponsored charity." In an article in the journal *Strategic Insights*, Comras wrote, "The bulk of its financial contributions come from private donations in Saudi Arabia."[115]

107          As stated in an unclassified CIA document, "[t]he IIRO is affiliated with the Muslim World League, a major international organization largely financed by the government of Saudi Arabia."[116] Globalsecurity.org, an online database, states with "high confidence" that the IIRO is part of the MWL.[117] Additionally, the report stated: "Last year [1995], the head of the MWL, who is appointed by King Fahd, was also chairman of the board of trustees of the IIRO, according to IIRO literature."[118]

108          In several countries, the MWL and IIRO even share office space, which was demonstrated by the U.S. Treasury Department raid in North Virginia.[119] According to Andre Le Sage, a professor at the National Defense University (NDU), Somalis often referred to the MWL and the IIRO interchangeably when mentioning *Rabidat alum Islamiya*.[120] Furthermore, an employee of the IIRO's Canadian branch, Mahmoud Jaballah, testified in his 1999 deportation hearing that "the MWL, which is the mother of the IIRO, is a fully government-funded organization."[121]

109          According to a report by the UN Al Qaeda and Taliban Monitoring Group, "The charity [IIRO] also works in close association with the MWL."[122] There are several ties between the two organizations. An account of a meeting in the late 1980s was found in Bosnia, which detailed the Secretary General of the MWL informing Osama bin Laden's representatives that IIRO was

---

[114] Sarah Feuer, *Course Correction: The Muslim World League, Saudi Arabia's Export of Islam, and Opportunities for Washington*, Policy Focus 161, The Washington Institute for Near East Policy, November 2019, 11-12, https://www.washingtoninstitute.org/uploads/Documents/pubs/PolicyFocus161-Feuer.pdf.

[115] Victor Comras, "Al Qaeda Finances and Funding to Affiliated Groups," *Strategic Insights* 6, no. 1 (January 2005), https://core.ac.uk/download/pdf/36704498.pdf.

[116] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also David E. Kaplan, "How billions in oil money spawned a global terror network," *US News and World Report*, December 7, 2003

[117] "Homeland Security, IIRO Profile," GlobalSecurity.org, http://www.globalsecurity.org/security/profiles/international_islamic_relief_organization.htm.

[118] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also David E. Kaplan, "How billions in oil money spawned a global terror network," *US News and World Report*, December 7, 2003.

[119] Judith Miller, "Raids Seek Evidence of Money-Laundering," *New York Times*, March 21, 2002.

[120] Andre Le Sage, "Islamic Charities in Somalia," in *Understanding Islamic Charities* (Washington, D.C.: CSIS, 2007), 159.

[121] Minister of Citizenship and Immigration v. Mahmoud Jaballah, Federal Court of Canada, Docket: Des-6-99, November 2, 1999. See also David E. Kaplan, "How billions in oil money spawned a global terror network," *US News and World Report*, December 7, 2003.

[122] Excerpt of UN Al Qaeda and Taliban Monitoring Group Report, December 3, 2003, reprinted in "UN Al Qaida Monitoring Group Recommended UN listing of IIRO in December 2003", Victor Comras, August 3, 2006.

offering its offices in support of the mujahedeen.[123] Several individuals have also been tied to both organizations. In the Philippines, Mohamed Jalal Khalifa, Osama bin Laden's brother in law, headed the Manila branches of both the IIRO and the MWL.[124] Ahmed Harakat was linked by Canadian intelligence to the MWL and IIRO; Harakat is best known for his ties to al Qaeda.[125]

110    Former al Qaeda operative Jamal al-Fadel, who was a close aide to Bin Laden until he defected from the organization, testified as a witness in U.S. v Osama bin Laden (SDNY), and pled guilty to terrorism charges, mentioned the IIRO and its ties to al Qaeda in his November 1996 FBI debriefing. According to al-Fadl, "the head of the International Islamic Relief Organization (IIRO) in Peshawar is Abu Hammam." Together with several others, al-Fadl reported, Abu Hammam established the Bin Ladin company Wadi Al Aqiq. Al-Fadl "described Hammam as a facilitator, not an operations person, and [said] that he would contribute funds or contacts to an operation."[126] According to the FBI report, Al-Fadl added that during the war in Afghanistan "many donations, including one from a very rich Saudi whose name he does not know, was sent to the IRO run by Abu Hammam. Gamal believes that all of the money was not spent in Afghanistan, and that Bin Ladin most likely used some of the funds for other Arab causes."[127]

111    The FBI would later tie the MWL and IIRO to Ramzi Yousef and al Qaeda plotting in Southeast Asia. Steve Coll explained in his book, *Ghost Wars*:

> There was now reason to 'suspect Yousef and his associates receive support from Osama bin Laden and may be able to tap into bin Laden's mujahedin support network.' In addition, they may also have been able to draw on Islamic charities for support. The FBI analysis listed the huge semiofficial Saudi Arabian charity, the International Islamic Relief Organization, and the largest government-sponsored Saudi religious proselytizing organization, the Muslim World League, as important resources for the new terrorist.[128]

112    A 1996 CIA report also tied Ramzi Yousef to the IIRO.[129]

---

[123] J. Millard Burr and Robert O. Collins, *Alms for Jihad: Charity and Terrorism in the Islamic World* (Cambridge: Cambridge University Press), 36.

[124] Dan Ottaway and Dan Morgan, "Two Muslim Charities Under Scrutiny; Saudi-Funded Groups Deny Ties to Terrorist Networks but Cite Vulnerability," *Washington Post*, September 30, 2001.

[125] Jerry Seper, "Al Qaeda said to be operating in Canada," *Washington Times*, December 19, 2002.

[126] FBI FD-302 of Gamal Al-Fadl, November 10, 1996, Marked PEC-KSA002115, provided by Plaintiff's Counsel

[127] FBI FD-302 of Gamal Al-Fadl, November 10, 1996, Marked PEC-KSA002115, provided by Plaintiff's Counsel

[128] Steve Coll, *Ghost Wars* (New York: Penguin Books, 2004), 278-279.

[129] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300.

113     Indeed, Bin Laden had an especially close conduit to the MWL and later to the IIRO in Southeast Asia. As former CIA officer Michael Scheuer, who led the Agency's Osama bin Laden tracking unit (known as Alec Station) from 1996 to 1999 reported:

> Mohammed Jamal Khalifah, bin Laden's brother-in-law, for example, once worked for the World Muslim League and then ran an IIRO branch in Manila in the early 1990s that Philippine military authorities have identified as a 'conduit of Arab financiers for money to the Abu Sayyef [terrorist group].' In June 2000, in fact, the chief of the Philippine military intelligence said that Islamic NGOs are still being used to fund the Moro insurgency. He also claimed bin Laden had transferred $3 million to the Moro Islamic Liberation Front (MILF) to assist its fight for an independent Islamic state in Mindanao.[130]

114     According to the CIA, Croatian authorities conducted a raid and detained Hossam Meawad Mohammad Ali, an Egyptian who served as the IIRO's accountant. The Agency reported that the Macedonians shut the IIRO office in Skopje in March 1995, and noted Mohammad Jamal Khalifa's ties to plots targeting the Pope and American airlines when he headed the IIRO office in Manila. "Another high-ranking [IIRO] official in the Philippines leads Hamas meetings," the report stated, adding that "the majority of Hamas members in the Philippines are employed by the organization."[131]

115     On August 3, 2006, the U.S. Treasury Department designated Abd al Hamid Sulaiman al-Mujil, the Executive Director of the IIRO Eastern Province branch in Saudi Arabia. According to Treasury, al-Mujil is commonly known as the "million dollar man," a nod to his extensive funding of Islamist groups. His ties to Osama bin Laden, Abdallah Azzam, and Khaled Sheikh Mohammad made him a prime financier of al Qaeda operations. The U.S. Treasury Department revealed that, as a senior IIRO official, he also provided financial support to the Abu Sayyaf Group, the Islamic State's East Asia province.[132]

116     According to the U.S. Treasury Department, the IIRO has assisted with recruitment of Islamic militants, transportation and logistics, lodging, and weapons, and it has acted as a liaison between extremist groups.[133] The IIRO has also provided material support to al Qaeda. According to the UN Al Qaeda and Taliban Monitoring Group, the "IIRO, and some of it is constituent organizations, has also been used, knowingly or unknowingly, to assist in financing

---

[130] Michael Scheuer, *Through Our Enemies' Eyes: Osama bin Laden, Radical Islam, and the Future of America* (Dulles: Brassey's 2003), 41.

[131] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300.

[132] "Treasury Designated Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[133] "Treasury Designated Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of Treasury, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

al-Qa'ida."[134] In a report suggesting the listing of the IIRO, the monitoring group furthered, "Evidence produced recently in a Canadian court linked IIRO funding directly to Al-Jihad, a designated entity tied closely to al-Qaida and responsible for the bombing in 1998 of the American Embassies in Dar es Salaam ad Nairobi."[135] A declassified CIA report also indicated that IIRO funds directly supported six al Qaeda training camps in Afghanistan prior to 9/11.[136] After that date, Pakistan also identified and expelled some two dozen al-Qaida supporters who had been working for the IIRO-sponsored organizations in Pakistan."[137] Information released by the U.S. Treasury Department supports this finding. According to Treasury, in 2002, an IIRO office financed the establishment of training facilities that were used by al Qaeda associates.[138] On August 3, 2006, Stuart Levey, former Under Secretary for Terrorism and Financial Intelligence at Treasury, stated in the press release for the designation of the IIRO Philippines and Indonesia offices: "We have long been concerned about these IIRO offices; we are now taking public action to sever this link in the al Qaida network's funding chain."[139]

117    The IIRO has provided extensive support to Jemaah Islamiyya, the militant Southeast Asian organization tied to al Qaeda. According to U.S. Treasury Department, Abd Al Hamid Sulaiman Al-Mujil, Executive Director of an IIRO office who was named a specially designated individual, invited a Philippines-based JI supporter to travel to Saudi Arabia in 2004. This supporter used the guise of undertaking the hajj pilgrimage for his travel, and al-Mujil planned for him to carry cash back to the JI in the Philippines.[140] Treasury also revealed that an IIRO office supported JI by providing assistance with recruitment of members, transportation and logistics, and provided a safe-haven.[141] According to Southeast Asia expert and professor at Simmons College Zachary Abuza, "[A local charity organization called KOMPAK] immediately partnered with the Saudi IIRO." He further stated, "[KOMPAK's] aid won support for Jemaah Islamiyah and its paramilitary organizations such as Laskar Jundallah and Lskar Mujahidin."

---

[134] Excerpt of UN Al Qaeda and Taliban Monitoring Group Report, December 3, 2003, reprinted in "UN Al Qaida Monitoring Group Recommended UN listing of IIRO in December 2003," Victor Comras, August 3, 2006.

[135] Excerpt of UN Al Qaeda and Taliban Monitoring Group Report, December 3, 2003, reprinted in "UN Al Qaida Monitoring Group Recommended UN listing of IIRO in December 2003," Victor Comras, August 3, 2006.

[136] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300; David E. Kaplan, "How billions in oil money spawned a global terror network," *US News and World Report*, December 7, 2003.

[137] Excerpt of UN Al Qaeda and Taliban Monitoring Group Report, December 3, 2003, reprinted in "UN Al Qaida Monitoring Group Recommended UN listing of IIRO in December 2003," Victor Comras, August 3, 2006.

[138] "Treasury Designated Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[139] "Treasury Designated Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[140] "Treasury Designated Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[141] "Treasury Designated Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

Abuza also noted that Agus Dwikarna, the head of KOMPAK for South Sulawesi "...was also the regional branch officer for the IIRO…" According to Abuza, "There is some evidence that the Medical Emergency Relief Charity received funding from the Indonesian branch of the Saudi-funded IIRO." MERC has additionally provided assistance to JI, according to Abuza, and produced two-well publicized jihadi videos for "fundraising purposes."[142]

118        Hamas, the Palestinian terrorist group, has also benefited from IIRO support. In 1994, Osama bin Laden's brother-in-law and IIRO member, Mohammed Jamal Khalifa, was reportedly detained with another IIRO leader in San Francisco. In his belongings were materials that discussed explosives, assassinations, military and jihad-related training; among these materials were information and contacts for Hamas and Palestinian Islamic Jihad.[143] Also, following an Israeli raid on the Tulkarem charity (*zakat*) committee, authorities found that the IIRO had donated at least $280,000 to the Tulkarem charity committee and other Hamas linked organizations.[144] According to a 2004 Israeli report, following a Saudi crackdown on charitable money transfers, including those from the IIRO, funding for Hamas all but dried up for a brief period of time.[145] According to an unclassified CIA document released in 1996, in the Philippines, the IIRO employed "the majority of Hamas members," and there, the Hamas meetings were led by a "high ranking" IIRO official.[146]

119        Furthermore, the IIRO's Philippines office has been tied to funding the al Qaeda affiliated Abu Sayyaf Group. An excerpt from the 2006 UN al Qaeda and Taliban Monitoring Group report stated that "[t]he IIRO in the Philippines, reportedly served during the early 1990s as the coordinating centre for secessionist Islamic activities, and as late as 1996 channeled money to the Abu Sayyaf group, another designated entity."[147]According to the U.S. Treasury

---

[142] Zachary Abuza, " Jemaah Islamiyah Adopts the Hezbollah Model: Assessing Hezbollah's Influence," *Middle East Quarterly* (Winter 2009), https://www.meforum.org/2044/jemaah-islamiyah-adopts-the-hezbollah-model.

[143] Rohan Gunaratna, "Inside Al-Qaeda: Global Network of Terror" (New York: Columbia University Press, 2002), 114.

[144] "Documents Captured by the IDF: Large Sums of Money Transferred by Saudi Arabia to the Palestinians Are Used for Financing Terror Organizations (Particularly the Hamas) and Terrorist Activities (Including Suicide Attacks inside Israel)," Israel Defense Forces, May 3, 2002.

[145] "IRFAN: A Hamas Front Organization Operating in Canada to Enlist Financial Support for Hamas Institutions in the Palestinian Authority-Administered Territories," C.S.S. Special Information Bulletin, November 2004, https://www.imra.org.il/story.php?id=22905.

[146] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300; David E. Kaplan, "How billions in oil money spawned a global terror network," *US News and World Report*, December 7, 2003

[147] Excerpt of UN Al Qaeda and Taliban Monitoring Group Report, December 3, 2003, reprinted in "UN Al Qaida Monitoring Group Recommended UN listing of IIRO in December 2003", Victor Comras, August 3, 2006.

Department, this office has also served as a liaison to other extremist groups on behalf of the Abu Sayyaf Group.[148]

120        According to the U.S. Treasury Department, a former Abu Sayyaf Group member familiar with IIRO operations reported that the majority of the IIRO's foreign funding was directed to terrorist groups. Several employees of the IIRO's Philippines office were Abu Sayyaf Group members, including an Abu Sayyaf Group intelligence officer in the IIRO Philippines office. Many of the IIRO Philippines directors—Mohammed Jamal Khalifah, Abd al-Hadi Daguit and Mahmud Abd al-Jalil Afif—have used the organization to funnel money to the Abu Sayyaf Group.[149] Mohammed Jamal Khalifah has contributed direct financial assistance to Abu Sayyaf Group leaders, including the deceased Aburajak Janjalani.[150] Citing this material, Jimmy Gurule, former U.S. Treasury Department Undersecretary for Enforcement and former Justice Department Assistant Attorney General, concluded that "the International Islamic Relief Organization, a Saudi-based charity with a long history of facilitating fundraising for al Qaeda and affiliated terrorist organizations, has been a source of funding for the Abu Sayyaf Group."[151]

121        Likewise, the IIRO's Philippines office is tied to funding of the Philippines based Moro Islamic Liberation Front.[152] According to a *Wall Street Journal* article, from November to December 2001, Philippine police arrested four Arabs associated with this group; one of these men, Mohammad Sabri, was an IIRO employee and directly linked to Mohammad Jamal Khalifa.[153] According to an unclassified CIA document, Khalifa has been linked to Manila-based plots to target the Pope and U.S. airlines, although it is not specified which terrorist group attempted these actions.[154]

122        The IIRO is also linked to Egyptian Islamic Jihad. Mohammed al-Zawahiri, brother of al Qaeda leader Ayman al-Zawahiri, worked for the IIRO in Albania during the 1990s and helped

---

[148] "Treasury Designated Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[149] "Treasury Designated Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[150] "Treasury Designated Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Department of the Treasury, August 3, 2006, https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[151] Jimmy Gurlue, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* (Northampton: Edward Elgar Publishing, 2008), 86.

[152] Jay Solomon, "Manila Suspends Talks with Rebels After Allegations of al-Qaeda Links," *Wall Street Journal*, March 12, 2002.

[153] Jay Solomon, "Manila Suspends Talks with Rebels After Allegations of al-Qaeda Links," *Wall Street Journal*, March 12, 2002.

[154] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300; David E. Kaplan, "How billions in oil money spawned a global terror network", *US News and World Report*, December 7, 2003

EIJ members land jobs as cover.[155] Talaat Fouad Abdul Qasim, another EIJ leader and wanted in Egypt, had been the director of the IIRO in Peshawar; he helped fund Arab militants who fought alongside Afghani mujahedeen.[156] In 1999, Mahmoud Jaballah, an IIRO employee in Canada, was linked to the Egyptian Islamic Jihad.[157] The IIRO had earlier employed Mahmoud Jaballah in Saudi Arabia; he was later deported from Canada on the basis of his terrorist support and action.[158]

123         There have been other instances of IIRO support for terrorist action. In 1999, Indian police foiled a plot to blow up the U.S. consulates in Calcutta and Madras. The ringleader of this plot was Sayed Abu Nasir, an IIRO employee who was trained in Afghanistan.[159] Additionally, the IIRO solicited funds to build a trauma clinic in Fallujah, Iraq. The IIRO oversaw the construction of the clinic, which was destroyed in 2004 by U.S. Marines because it was a haven for insurgent fighters.[160]

124         Furthermore, the IIRO has been linked to other groups that the CIA views as aiding terrorism. The MAK is one such group, as reported in an unclassified CIA document. The Qatar Charitable Society is also named in this report as being linked to IIRO. According to the report, the Qatar Charitable Society has extremist connections to Hamas. The report also linked the IIRO to the Saudi High Commission, which it claimed has provided support to Hamas and Algerian extremists.[161]

### 3. Al Haramain Islamic Foundation

125         Burr and Collins note that al Haramain "was founded in 1988 as a branch of MWL at its 22nd Session in Mecca." It was endorsed by the Royal Family, they add, and supervised by the Saudi Ministry of Religious Affairs.[162]

---

[155] J. Millard Burr and Robert O. Collins, *Alms for Jihad: Charity and Terrorism in the Islamic World* (Cambridge: Cambridge University Press), 36.

[156] J. Millard Burr and Robert O. Collins, *Alms for Jihad: Charity and Terrorism in the Islamic World* (Cambridge: Cambridge University Press), 36.

[157] Minister of Citizenship and Immigration v. Mahmoud Jaballah, Federal Court of Canada, Docket: Des-6-99, November 2, 1999. See also Laurie P. Cohen et al., "Bush's Financial War on Terrorism Includes Strikes at Islamic Charities," *Wall Street Journal*, September 25, 2001.

[158] Minister of Citizenship and Immigration v. Mahmoud Jaballah, Federal Court of Canada, Docket: Des-6-99, November 2, 1999. See also Laurie P. Cohen et al., "Bush's Financial War on Terrorism Includes Strikes at Islamic Charities," *Wall Street Journal*, September 25, 2001.

[159] Dexter Filkins, "Attacks on U.S. Mission Foiled, Indian Police Say," *Los Angeles Times*, January 21, 1999.

[160] Glenn R. Simpson, "US tracks Saudi bank favored by extremists," Associated Press, July 26, 2007.

[161] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300.

[162] J. Millard Burr and Robert O. Collins, *Alms for Jihad: Charity and Terrorism in the Islamic World* (Cambridge: Cambridge University Press), 38

126          In 1996, the CIA assessed that al Haramain was tied to the Egyptian Gama'at al-Islamiya terrorist group. Under the heading "support for extremist/terrorist activities," the report noted al Haramain's funding and support to "the Mujahideen Battalion in Zenica," adding that the foundation's office in Zagreb "has been raided often Croatian security for smuggling activities."[163]

127          In March 2002, the governments of the United States and Saudi Arabia designated the Somali and Bosnian branches of the al Haramain Islamic Foundation "because these branches were diverting charitable funds to terrorism."[164] The press release announcing the action included additional information about these branches' ties to terrorism:

> The branch offices of al Haramain in Somalia and Bosnia are clearly linked to terrorist financing. The Somalia office of al Haramain is linked to Usama bin Laden's al-Qaida network and Al-Itihaad al-Islamiya (AIAI), a Somali terrorist group. Al Haramain Somalia employed AIAI members and provided them with salaries through Al-Barakaat Bank, which was designated on November 7, 2001 under E.O. 13224 because of its activities as a principal source of funding, intelligence and money transfers for Usama bin Laden.

> The Bosnia office of al Haramain is linked to Al-Gama'at Al-Islamiyya, an Egyptian terrorist group. Al-Gama'at Al-Islamiyya was designated on November 2, 2001 and it is a signatory to Usama bin Laden's Fatwah dated February 23, 1998, targeting Americans and their allies.

> Over the past few years, al Haramain Somalia has funneled money to AIAI by disguising funds as if they were intended for orphanage projects or Islamic school and mosque construction. The organization has also employed AIAI members and provided them with salaries through Barakaat Banks and Remittances, a subsidiary of Al-Barakaat Bank.

> Even after AIAI was named in the Annex to Executive Order 13224 on September 23, 2001, and subsequently designated by the United Nations under UNSCR 1333, al Haramain Somalia has continued to provide financial support to AIAI. In late December 2001, al Haramain Somalia was facilitating the travel of AIAI members in Somalia to Saudi Arabia where the AIAI members planned to apply for residency permits.[165]

---

[163] Unclassified 1996 CIA document, marked Fed-PEC0214474. See also Glenn Simpson, "U.S. Officials Knew of Ties Between Terror, Charities," *Wall Street Journal*, May 9, 2003, https://www.wsj.com/articles/SB10524385762417300.

[164] "Fact Sheet: Designations of Somalia and Bosnia-Herzegovina Branches of Al-Haramain Islamic Foundation," Office of Public Affairs, U.S. Department of the Treasury, March 11, 2002, http://fas.org/irp/news/2002/03/dot031102fact.html.

[165] "Fact Sheet: Designations of Somalia and Bosnia-Herzegovina Branches of Al-Haramain Islamic Foundation," Office of Public Affairs, U.S. Department of the Treasury, March 11, 2002, http://fas.org/irp/news/2002/03/dot031102fact.html.

128    In January 2004, Washington and Riyadh jointly designated the al Haramain branches in Indonesia, Kenya, Tanzania, and Pakistan for providing financial, material, and logistical support to al Qaeda and other terrorist groups.[166] The evidence was extensive:

### AL-HARAMAIN FOUNDATION (INDONESIA)

128.1    • In 2002, money purportedly donated by AHF for humanitarian purposes to non-profit organizations in Indonesia was possibly diverted for weapons procurement, with the full knowledge of AHF in Indonesia.

128.2    • Using a variety of means, AHF has provided financial support to al-Qaida operatives in Indonesia and to Jemaah Islamiyah (JI). According to a senior al-Qaida official apprehended in Southeast Asia, Omar al-Faruq, AHF was one of the primary sources of funding for al-Qaida network activities in the region. The U.S. has designated JI, and the 1267 Committee has included it on its list, because of its ties to al-Qaida. JI has committed a series of terrorist attacks, including the bombing of a nightclub in Bali on October 12, 2002 that killed 202 and wounded over 300.

### AL-HARAMAYN FOUNDATION (KENYA & TANZANIA)

128.3    • Information available to the US shows that AHF offices in Kenya and Tanzania provide support, or act for or on behalf of AIA and Al-Qaida. AIAI shares ideological, financial and training links with al-Qaida and financial links with several NGOs and companies, including AHF, which is used to transfer funds. AIAI also has invested in the "legitimate" business activities of AHF.

128.4    • As early as 1997, U.S. and other friendly authorities were informed that the Kenyan branch of AHF was involved in plotting terrorist attacks against Americans. As a result, a number of individuals connected to AHF in Kenya were arrested and later deported by Kenyan authorities.

128.5    • In August 1997, an AHF employee indicated that the planned attack against the U.S. Embassy in Nairobi would be a suicide bombing carried out by crashing a vehicle into the gate at the Embassy. A wealthy AHF official outside East Africa agreed to provide the necessary funds. Information available to the U.S. shows that AHF was used as a cover for another organization whose priorities include dislike for the U.S. Government's alleged anti-Muslim stance and purposed U.S. support for Christian movements fighting Islamic countries.

128.6    • Also in 1997, AHF senior activities in Nairobi decided to alter their (then) previous plans to bomb the U.S. Embassy in Nairobi and instead sought to attempt the assassination of U.S. citizens. During this time period, an AHF official indicated he had obtained five hand grenades and seven "bazookas' from a source in Somalia. According to information available to the U.S., these weapons were to be used in a possible assassination attempt against a U.S. official.

128.7    • Information available to the U.S. shows that a former Tanzanian AHF Director was believed to be associated with UBL and was responsible for making preparations for the advance party that

[166]"Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain In The Fight Against Terrorist Financing," Office of Public Affairs, U.S. Department of the Treasury, January 22, 2004, https://www.treasury.gov/press-center/press-releases/Pages/js1108.aspx.

planned the August 7, 1998, bombings of the U.S. Embassies in Dar Es Salaam, Tanzania, and Nairobi, Kenya. As a result of these attacks, 224 people were killed.

128.8 • Shortly before the dual-Embassy bombing attacks in Kenya and Tanzania, a former AHF official in Tanzania met with another conspirator to the attacks and cautioned the individual against disclosing knowledge of preparations for the attacks. Around the same time, four individuals led by an AHF official were arrested in Europe. At that time, they admitted maintaining close ties with EIJ and Gamma Islamiyah.

128.9 • Wadih el-Hage, a leader of the East African al-Qaida cell and personal secretary to UBL, visited the Kenya offices of AHF before the1998 dual-embassy attacks. Searches conducted by authorities revealed that el-Hage possessed contact information for a senior AHF official who was head of AHF's Africa Committee, the overseeing authority for AHF's offices in Kenya and Tanzania.

128.10 • In early 2003, individuals affiliated with AHF in Tanzania discussed the status of plans for an attack against several hotels in Zanzibar. The scheduled attacks did not take place due to increased security by local authorities, but planning for the attacks remained active.

128.11 • Information made available to the U.S. as shows that AHF offices in Kenya and Tanzania provide support, or act for or on behalf of al-Qaida and AIM.

**AL-HARAMAIN FOUNDATION (PAKISTAN)**

128.12 • Sometime in 2000, an AHF representative in Karachi, Pakistan met with Zelinkhan Yandarbiev. The U.S. has designated Yandarbiev, and the1267 Committee has included him on its list because of his connections to al-Qaida. The AHF representative and Yandarbiev reportedly resolved the issue of delivery to Chechnya of Zenit missiles, Sting anti-aircraft missiles, and hand-held anti-tank weapons.

128.13 • Before the removal of the Taliban from power in Afghanistan, the AHF in Pakistan supported the Taliban and other groups. It was linked to the UBL-financed and designated terrorist organization, Makhtab al-Khidemat (MK). In one instance, some time in 2000, the MK director instructed funds to be deposited in AHF accounts in Pakistan and from there transferred to other accounts.

128.14 • At least two former AHF employees who worked in Pakistan are suspected of having al-Qaida ties. One AHF employee in Pakistan is detained at Guantanamo Bay on suspicion of financing al-Qaida operations. Another former AHF employee in Islamabad was identified as an alleged al-Qaida member who reportedly planned to carry out several devastating terrorist operations in the United States. In January 2001, extremists with ties to individuals associated with a fugitive UBL lieutenant were indirectly involved with a Pakistani branch of the AHF.

128.15 • As of late 2002, a senior member of AHF in Pakistan, who has also been identified as a "bin Laden facilitator," reportedly operated a human smuggling ring to facilitate travel of al-Qaida members and their families out of Afghanistan to various other countries.

128.16   • AHF in Pakistan also supports the designated terrorist organization, Lashkar E-Taibah (LET).[167]

129      In February 2004, U.S. federal agents raided the Oregon offices of al Haramain.  The following day the U.S. Treasury Department blocked the group's bank accounts pending investigation.[168]  Four months later, in June 2004, the U.S. Treasury Department designated five additional al Haramain branches—in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands—as well as Aqeel al Aqil, the founder and longtime leader of al Haramain and a suspected al Qaeda supporter. Once again, the press release provided detailed evidence of these entities' ties to terrorism.[169] In June 2008, the U.S. Treasury Department designated the entirety of the al Haramain Foundation, noting the group's track record of evading sanctions and reconstituting in operations.[170]

130      Eleven branches of al Haramain around the world were similarly designated by the United Nations Security Council's al Qaeda Sanctions Committee.[171]

131      Individuals related to al Haramain have also been linked to al Qaeda. For example, Sami Al-Hajj was a Guantanamo detainee from 2002 to 2008. According to the unclassified summary evidence presented at his July 2005 Combatant Status Review Board, Al-Hajj had a long history of ties to terrorist entities and personnel, including for an Iraqi businessman with reported "close ties to Usama Bin Laden."[172]

131.1   • Al-Hajj worked as an executive secretary for the Abdul al-Latif al-Imran, the general manager of the Union Beverage Company (UBC), a company "associated with Bosnia/Chechen mujahid."

131.2   • Al-Hajj traveled to Azerbaijan at least eight times to courier money to the al-Haramain foundation—an entity including on the United Nations terrorist list for ties to al Qaeda[173] (see

---

[167] "Treasury Announces Joint Action with Saudi Arabia Against Four Branches of Al-Haramain In The Fight Against Terrorist Financing," Office of Public Affairs, U.S. Department of the Treasury, January 22, 2004, https://www.treasury.gov/press-center/press-releases/Pages/js1108.aspx.
[168] "Treasury Announces Actions Against AL-Haramain," Office of Public Affairs, U.S. Department of the Treasury, February 19, 2004, https://www.treasury.gov/press-center/press-releases/Pages/js1183.aspx.
[169]"Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters Treasury Marks Latest Action in Joint Designation with Saudi Arabia," Office of Public Affairs, U.S. Department of the Treasury, June 2, 2004, https://www.treasury.gov/press-center/press-releases/Pages/js1703.aspx.
[170]"Treasury Designates Al Haramain Islamic Foundation," Office of Public Affairs, U.S. Department of the Treasury, June 18, 2008, https://www.treasury.gov/press-center/press-releases/Pages/hp1043.aspx.
[171]"Al-Haramain Foundation (Union of the Comoros)," Al Qaeda Sanctions Committee Narrative Summary, October 30, 2009, https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/al-haramain-foundation-%28union-of-the-comoros%29.
[172] Summary of Evidence for Combatant Status Review Tribunal – AL HAJJ, Sami Mohy El Din Muhammed, 22 October 2004, http://www.documentcloud.org/documents/76749-isn-345-sami-al-hajj-combatant-status-review.html#document/p1.
[173] "Al-Haramain Islamic Foundation (Bosnia and Herzegovina)" (Narrative Summary of Reasons for Listing, United Nations, Security Council Committee Pursuant to Resolutions 1267 (1999) 1989 (2011) and 2253 (2015) Concerning Isil (Da'esh) Al-Qaida And Associated Individuals Groups Undertakings And Entities, October 30,

below)—on behalf of Omran.  For example, Al-Hajj delivered $7,000 USD to al-Haramain in the winter of 1997, $13,000 USD in the winter of 1998, and an additional $13,000 in the summer of 1999.  In November 1999, he delivered $100,000 to an al-Haramain official.

131.3   • Al-Hajj was detained in Azerbaijan for the transport of $220,000 USD, which was destined for Chechen rebels and not humanitarian support as Al-Hajj had been told.  In 2000, Al-Hajj attempted to reenter Azerbaijan but was detained and deported due to his alleged activities supporting Chechen rebels.

131.4   • While working at UBC, Al-Hajj met al Qaeda operative Mamdouh Mahmoud Salem.

131.5   • While Azerbaijan, Al-Hajj met Ashraf Abdulkarim Ayub who ran UBC's juice distribution business and worked for the UN-designated Revival of Islamic Heritage Society (RIHS, see below) from 1994-1998.  As of March 2003 Ashraf was under investigation for possible ties to terrorism.

131.6   • In December 2001, Al-Hajj was stopped by Pakistani security officials because his passport did not agree with Pakistani records.

131.7   • Al-Hajj was at the Afghan/Pakistan border because his name was on a border authority watch list.

132   Additional information about Al-Hajj came to light in the September 2007 unclassified summary of evidence for his administrative review board hearing.[174]

132.1   • Al-Hajj stated, according to the summary evidence that one of his responsibilities was to assist al-Haramain (see below) in delivering humanitarian goods to Baku, Azerbaijan.

132.2   • During multiple trips to Azerbaijan between 1996 and 1999, Al Hajj reportedly stated, he delivered a total of $233,000 USD to al Haramain.

132.3   • According to the unclassified summary of evidence, "the detainee [Al-Hajj] was a senior al Qaida operative and logistics expert."

132.4   • UBC, Al-Hajj reportedly stated, was so powerful that "all charities working with Chechen Mujahedin used his boss' Union Beverage Company to smuggle money and goods between the United Arab Emirates, Azerbaijan, and Chechnya."

133   An earlier summary of evidence regarding Al-Hajj, from October 2004, added that "from 1997 through 2000, the detainee [Al-Hajj] was responsible for financial and material aid for Chechen armed groups and foreign mercenaries operating in Northern Caucasus." Al-Hajj was also said to have provided travel and document assistance for an Iraqi businessman with reported

---

2009, https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/al-haramain-islamic-foundation-(bosnia-and-

[174] Unclassified Summary of Evidence for Administrative Review Board in the case of AL HAJJ, Sami Mohy El Din Muhammed, September 11, 2007, http://www.documentcloud.org/documents/76750-isn-345-sami-al-hajj-administrative-review-board.html#document/p1.

"close ties to Usama Bin Laden" and to have arranged for the transport of a Stinger anti-aircraft system from Afghanistan to Chechnya prior to the September 11, 2001 attacks.[175]

## V.    **Conclusion**:

134        In the years leading up to the 9/11 attacks, Osama bin Laden built al Qaeda into a truly transnational violent extremist organization engaged in both militant and terrorist activities around the world. Bin Laden sought to coopt local conflicts involving Muslim groups, expanded his influence through alliance-building with other Muslim militant organizations, and through these efforts, was able to broaden the pool of potential recruits, radicalize people to al Qaeda's ideology, raise funds, and conduct international operations.

135        Critical to the success of al Qaeda, and for the 9/11 operation in particular, was the ability to raise, launder, place, transfer and access funds for al Qaeda's activities. From paying salaries, to bribing officials, to funding travel and training, to procuring weapons and much more, al Qaeda needed reliable funding streams. Especially in the years preceding 9/11, al Qaeda relied heavily on abuse of charity—as well as the mainstream Islamic principles of *dawa* and *zakat*—to raise, launder, and move money for its terrorist purposes. Some of the most significant examples of such charities were based in Saudi Arabia and were tied to the Saudi government and its ministries and instrumentalities. The support these entities provided al Qaeda was critical to the terrorist group's development and operational prowess.


_____        3/9/2020
Dr. Matthew Levitt                                Date

---

[175] Summary of Evidence for Combatant Status Review Tribunal – AL HAJJ, Sami Mohy El Din Muhammed, October 22, 2004, http://www.documentcloud.org/documents/76749-isn-345-sami-al-hajj-combatant-status-review.html#document/p1.

EXHIBIT B

**EXPERT REBUTTAL REPORT OF DR. MATTHEW LEVITT**

In re Terrorist Attacks on September 11, 2001, 03-md-1570 (GDB) (SN)
Senior Fellow and Director of the Program on Counterterrorism & Intelligence at the
Washington Institute for Near East Policy, and Adjunct Professor at Georgetown University

I.   Scope of Work

1   I have been asked to review expert reports submitted by defendants' counsel and to comment on a select few topics.

2   I previously submitted an expert report in this matter dated March 9, 2020 (the "First Report"). I will not repeat my First Report here, but incorporate it herein by reference in full. My First Report, along with my curriculum vitae attached as Exhibit 1 to that Report, discusses my prior publications, prior testimony, and relevant experience. I continue to be compensated for my time at a rate of $550.00 per hour.

3   To be clear, the following critique of defense expert reports should not be interpreted as a suggestion that different professionals examining issues germane to counter-terrorism, the history of al Qaeda, the September 11 attacks, terrorist financing, or organizational characteristics of terrorist organizations might construct different hypotheses and arrive at varying conclusions. However, in my view, some of defense experts' statements and conclusions include mistaken assumptions, methodological error, and factual inaccuracies worthy of correction. Nothing here should be mistaken for personal animus of any kind—I know several defense experts personally, several more by reputation. Rather, I respectfully offer comment on several key points of professional disagreement.

4   I reserve the right to respond further to additional comments about my report, opinions, methodology, qualifications, and findings.

II.   Reliability of U.S. Government Reports

5   Defense experts call into question the reliability and probative value of various types of U.S. government reports. In fact, both because the authors of those reports have access to information that is not available to the wider public (along with the open source information available to academics and scholars), and because their written products go through such robust editing processes (and, depending on the type of product, legal review), U.S. government reports are uniquely reliable and authoritative.

6   U.S. government documents are generally regarded as authoritative, a category that is not limited to scholarly publications. One way to determine if a source is authoritative, for example, is to look at the publisher or sponsor of the publication. "For websites," one academic source recommends, "look for the domain; .gov or .edu sites are more likely to contain unbiased