EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:  *All Actions*

## EXPERT REPORT OF EVAN FRANCOIS KOHLMANN

I. **Pedigree**

1.      My full name is Evan Francois Kohlmann.  I am a private International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements.

2.      I hold a degree in International Politics from the Edmund A. Walsh School of Foreign Service (Georgetown University), and a Juris Doctor (professional law degree) from the University of Pennsylvania Law School.  I am also the recipient of a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University.  I currently work as the co-founder and Chief Innovation Officer at Flashpoint Global Partners, a New York-based business risk intelligence firm with branch offices in Washington D.C. and Dublin, Ireland. I additionally serve as an on-air analyst for NBC News in the United States.  I am author of the book Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network (Berg/Oxford International Press, London, 2004), which has been used as a teaching text in graduate-level terrorism courses offered at such educational institutions as Harvard University's Kennedy School of Government, Princeton University, and the Johns Hopkins School of Advanced International Studies (SAIS).

3.      As part of my research beginning in approximately 1997, I have traveled overseas to interview known terrorist recruiters and organizers (such as Abu Hamza al-Masri) and to attend underground conferences and rallies; I have reviewed thousands of open source documents; and, I have amassed one of the largest digital collections of terrorist multimedia and propaganda in the world.  The open source documents in my collection include sworn legal affidavits, original court exhibits, video and audio recordings, text communiqués, eyewitness testimonies, and archived Internet websites.  I have also personally developed computer software and database applications in PHP/MYSQL format designed to draw out this data and provide statistical trends and models to human analysts.

4.      I have testified on twelve occasions as an expert witness in jurisdictions beyond the United States—including the United Kingdom, Denmark, Australia, Switzerland, and Bosnia-Herzegovina.

5.      I have testified four times as an approved expert witness in U.S. civil cases—<u>Gates v. Syrian Arab Republic</u> and <u>Amduso v. Sudan</u>, before the U.S. District Court for the District of Columbia, as well as <u>Linde et al. v. Arab Bank PLC</u>, before the U.S. District Court for the Eastern District of New York and <u>Khan v. U.S. Citizenship and Immigration Services</u> in the U.S. District Court for the Southern District of Florida.

6.      I have additionally testified as an approved expert witness on behalf of the prosecution in United States federal and military courts in thirty-five criminal cases, including:

- <u>United States v. Sabri Benkhala</u> (Eastern District of Virginia, 2004)
- <u>United States v. Ali Timimi</u> (Eastern District of Virginia, 2005)
- <u>United States v. Uzair Paracha</u> (Southern District of New York, 2005)
- <u>United States v. Ali Asad Chandia</u> (Eastern District of Virginia, 2006)
- <u>United States v. Yassin Aref</u> (Northern District of New York, 2006)
- <u>United States v. Sabri Benkhala</u> (Eastern District of Virginia, 2007)
- <u>United States v. Rafiq Sabir</u> (Southern District of New York, 2007)
- <u>United States v. Emaddedine Muntasser</u> (District of Massachusetts, 2007)
- <u>United States v. Hassan Abu Jihaad</u> (District of Connecticut, 2008)
- <u>United States v. Mohammed Amawi et al.</u> (Northern District of Ohio, 2008)
- <u>United States v. Salim Hamdan</u> (Guantanamo Bay Military Commissions, 2008)
- <u>United States v. Ali Hamza al-Bahlul</u> (Guantanamo Bay Military Commissions, 2008)
- <u>United States v. Mohamed Shnewer et al</u>. (District of New Jersey, 2008)
- <u>United States v. Oussama Kassir</u> (Southern District of New York, 2009)
- <u>United States v. Syed Haris Ahmed</u> (Northern District of Georgia, 2009)
- <u>United States v. Ehsanul Sadequee</u> (Northern District of Georgia, 2009)
- <u>United States v. Pete Seda et al</u>. (District of Oregon, 2010)
- <u>United States v. Betim Kaziu</u> (Eastern District of New York, 2011)
- <u>United States v. Daniel Boyd et al</u>. (Eastern District of North Carolina, 2011)
- <u>United States v. Barry Walter Bujol Jr.</u> (Southern District of Texas, 2011)
- <u>United States v. Tarek Mehanna et al</u>. (District of Massachussetts, 2011)
- <u>United States v. Patrick Nayyar</u> (Southern District of New York, 2012)
- <u>United States v. Adis Medunjanin</u> (Eastern District of New York, 2012)
- <u>United States v. Anes Subasic</u> (Eastern District of North Carolina, 2012)
- <u>United States v. Mohammed Nisar Khan</u> (Western District of Texas, 2012)
- <u>United States v. Mohamed Mohamud</u> (District of Oregon, 2013)
- <u>United States v. Abdel Hameed Shehadeh</u> (Eastern District of New York, 2013)
- <u>United States v. Sulaiman Abu Ghaith</u> (Southern District of New York, 2014)
- <u>United States v. Mustafa Kamel</u> (Southern District of New York, 2014)
- <u>United States v. Sami Osmakac</u> (Middle District of Florida, 2014)
- <u>United States v. Soheil Kabir et al</u>. (Central District of California, 2014)
- <u>United States v. Abid Naseer</u> (Eastern District of New York, 2015)
- <u>United States v. Fazliddin Kurbanov</u> (District of Idaho, 2015)
- <u>United States v. Abdul Malik Abdul Kareem</u> (District of Arizona, 2016)

- <u>United States v. Ibrahim Suleiman Adnan Adam Harun</u> (Eastern District of New York, 2017)

7.      In <u>United States v. Uzair Paracha</u>, Federal District Judge Sidney Stein held a <u>Daubert</u> hearing on my qualifications as an expert witness and issued a ruling concluding: "Evan Kohlmann has sufficient education, training, and knowledge to be qualified as an expert, and… Kohlmann's methodology—that is, his process of gathering sources, including a variety of original and secondary sources, cross-checking sources against each other, and subjecting his opinions and conclusions to peer review—is sufficiently reliable to meet the standards for admissibility of expert testimony set by the Federal Rules of Evidence."

8.      In <u>United States v. Hassan Abu Jihaad</u>, Federal District Judge Mark Kravitz held a <u>Daubert</u> hearing on my qualifications as an expert witness and issued a ruling concluding, "Mr. Kohlmann is certainly qualified to provide expert testimony.... Mr. Kohlmann is qualified by means of his education, training, background, and experience to testify as an expert on terrorism.... Mr. Kohlmann has conducted first-hand interviews of several leaders of terrorist organizations and has reviewed reams of information about al Qaeda... and the other subjects on which he will offer testimony.  Indeed... it is apparent that these subjects are Mr. Kohlmann's life work, and he has, therefore, acquired a considerable amount of information and documentation on these subjects.... Mr. Kohlmann's work receives a considerable amount of peer review from academic scholars and others, and by all accounts, Mr. Kohlmann's work is well regarded."

9.      During <u>United States v. Syed Haris Ahmed</u>, Federal District Judge William S. Duffey, Jr., held a <u>Daubert</u> hearing on my qualifications as an expert witness, and noted in his published ruling, "Kohlmann has developed an understanding of terrorist organization structures, operations, and membership, allowing him to speak with authority about Al-Qaeda in Iraq, Lashkar-e-Taiba, and Jaish-e-Mohammed.  His research and experience have provided him a base of understanding far greater, and far more sophisticated, than of the Court or of jurors.... A person lacking Kohlmann's advanced knowledge of JeM and LeT essentially would not be able to recognize the information on Khan's hard drive as information that might link a person to JeM or LeT."

10.      Most recently, on February 4, 2011, the United States Circuit Court of Appeals, Second Circuit, issued a formal ruling regarding the admissibility of my testimony during <u>United States v. Rafiq Sabir</u> (2007), stating: "Kohlmann has, in fact, been qualified as an expert on al Qaeda and terrorism in a number of federal prosecutions.... Kohlmann's proposed expert testimony had a considerable factual basis.... We conclude that the district court acted well within its discretion in concluding that Kohlmann's testimony satisfied the enumerated requirements of Rule 702. . . . Such testimony was plainly relevant to mens rea."

3

## II.   Scope of the Assignment

11.    Based on my knowledge, experience, review of thousands of open-source documents and documents produced in discovery (including hundreds of pages of documents produced from inside the files of Saudi dawah organizations at issue), and using the methodology and principles described above, I have been asked to provide expert testimony concerning.

a)   the degree to which various Saudi-based Islamic "charitable," or dawah organizations (including the Muslim World League (MWL), the International Islamic Relief Organization (IIRO), and the World Assembly of Muslim Youth (WAMY)) were involved in financing and directing terrorist activities;

b)   the degree to which the money, direction, and other forms of material support provided to Al-Qaida through the Saudi-based dawah organizations were a cause of the attacks on September 11, 2001;

c)   the degree to which financial irregularities and atypical accounting practices on the part of MWL, IIRO, and WAMY reflect typical terrorist financing modes and methodologies; and

d)   the degree to which any material support from these Saudi-based dawah organizations to al Qaeda and allied jihadists was conducted with the awareness and knowledge of the senior officials who headed those organizations.

## III.   Research and Archival Methodology

12.    The social science methodology I have employed to formulate my expert opinion is known as comparative analysis, which "holds a central place in social science research."[1] Terrorism is generally a rare phenomenon comprised of a small number of incidents and a fringe group of secretive actors.  In the absence of a large pool of reliable data points or controls, strict statistical or quantitative social science methods can often be of uncertain reliability and can even produce misleading results.  In contrast, my research methodology is "case-oriented," with the aim to juxtapose "rich descriptions of a few instances of a certain phenomenon" and to distill a common, accepted narrative.[2]  However, this approach is not "just a second-best one imposed by the availability of data; rather, it is justified by its capacity to go beyond descriptive statistical measures, towards an in-depth understanding of historical processes and individual motivations."[3]

---

[1] Della Porta, Donatella and Michael Keating. Approaches and Methodologies in the Social Sciences. Cambridge University Press (2008), at p. 198.

[2] Della Porta, Donatella and Michael Keating. Approaches and Methodologies in the Social Sciences. Cambridge University Press(2008), at p. 198.

[3] Della Porta, Donatella and Michael Keating. Approaches and Methodologies in the Social Sciences. Cambridge University Press(2008), at p. 202.

13.     In order to create the most accurate historical narrative, information is weighted according to the credibility of its source: primary, secondary, or tertiary:

- In the study of terrorism, an example of a primary source would be directly witnessing a terrorist attack or interviewing a representative of a terrorist organization. Quite obviously, such sources would be few and far between, so researchers such as myself often are also compelled to rely heavily on secondary sources.

- An example of a secondary source in my field would be a video-recorded speech by a terrorist leader obtained through official sources, internal organizational records, original magazines published by the official media wing of a terrorist organization, or the official website of such a group. While not quite the same as witnessing an event live, secondary sources provide a rich, highly compelling level of detail directly from the voices of actors who are centrally involved in the events we actively study. In the field of terrorism, secondary sources can also be relatively challenging to obtain, in that they can require specialized knowledge of the communications mechanisms employed by extremists; however, they are generally far more available for access and study by savvy researchers.

- Tertiary sources would include newspaper and magazine articles written by outside observers, topical papers published by academics, and other relevant commentary from experts in the field. While such materials can be undoubtedly helpful to establish general context or to identify issues of scholarly debate, researchers generally avoid relying wholesale on the content of tertiary sources, absent some supporting primary or secondary source information.

14.     Upon classifying research material according to its credibility, analysts must still also assess information contained therein for potential issues of bias. Obviously, no matter how authentic a speech by a terrorist leader may be, this is still not an absolute guarantee that the facts or perspectives provided in the speech are a completely accurate depiction of reality.

15.     The methodology of comparative analysis as described above is employed by countless other researchers in the field of terrorism—as well as a wide variety of other subjects. As stated by Judge Brian Cogan of the Eastern District of New York, formulating conclusions based on "reviewing primary, secondary, and tertiary sources, and then exercising judgment about which are corroborated or otherwise believed to be credible, and which should not be accepted… seems to me no different than, for example, the exercise a historian would undertake to determine the precise location of the Battle of Hastings, or the troop size or unit strength of the combatants." In other words, according to Judge Cogan, our essential "methodology strikes me as little, if at all, different than most qualitative political science research."[4]

---

[4] Order by Judge Brian M. Cogan resulting from Daubert hearing for Evan Kohlmann. United States v. Adnan Ibrahim Harun A Hausa. U.S. District Court for the Eastern District of New York (EDNY). February 10, 2017.

16.     During a May 2009 Daubert hearing before Judge William S. Duffey Jr. in the Northern District of Georgia, I explained the process of "comparative analysis" and how I rely upon it when making determinations of fact. This testimony was subsequently summarized by Judge Duffey in his own published ruling qualifying me as an expert:

> The basis for Kohlmann's testimony, generally, is his years of research and tracking of terrorist information, through websites, primary interviews, books, news articles, and journals, and other information.  His testimony essentially synthesizes these concepts, and through the use of the comparative analysis methodology, Kohlmann has developed an understanding of terrorist organization structures, operations, and membership… Kohlmann testified in detail regarding the methodology of comparative analysis, how it is relied upon by experts in social sciences, and how the particular information he gathers allows him to perform reliable analysis.  He specifically testified to how he gathers and analyses information from primary, secondary, and tertiary sources, and he explained the difference between the sources and why and how he relies on each differently.  He further explained how comparative analysis is performed, assimilating the relevant information and comparing and contrasting sources against one another to form a cohesive whole. The sources Kohlmann uses and the methodology he employs to analyze those sources, are identical to those used by other experts in his field.  Kohlmann explained his methodology and how he used the methodology to arrive at his opinions in this case.   The defendants did not offer any evidence at the hearing or subsequent to it to suggest that Kohlmann's methodology is not sound or is not the same methodology typically relied upon by other social scientists… Mr. Kohlmann's ability to synthesize that information through comparative analysis establishes his qualification as an expert.

## IV.     Summary of Professional Opinions and Conclusions

17.     Based on the methodology and principles described above, and available evidence, my professional opinions, to a reasonable degree of certainty, are as follows:

- In the period before the September 11, 2001 terrorist attacks, Al-Qaida was largely funded and otherwise supported by money and other support (for example, safe haven, travel documents, access to operatives, training, etc.) that were channeled to Al-Qaida through Saudi-based Islamic "charitable," or dawah organizations.

- These dawah organizations include (but are not limited to) the Muslim World League (MWL), the International Islamic Relief Organization (IIRO), and the World Assembly for Muslim Youth (WAMY).

6

- The money and other support that was channeled to Al-Qaida through Saudi-based dawah organizations fueled Al-Qaida's development – meaning, the Saudi-based dawah organizations were essential elements in Al-Qaida's engine. Without this fuel, Al-Qaida would not have been a global threat, nor capable of executing sophisticated, elaborate terrorist attacks on a global scale—including the September 11 terrorist attacks on the United States.

- Financial irregularities and atypical accounting practices used by these Saudi-based dawah organizations are not bugs, but rather features of these groups—and are consistent with typical terrorist financing modes and methodologies.

- The organizational and financial structures of the MWL, IIRO, and WAMY are evidence that their material support of al Qaeda and affiliated organizations was conducted with the awareness and knowledge of the senior officials who headed those organizations.

## V. <u>Discussion of Professional Opinions and Conclusions</u>

18.     My professional opinions, as an International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements, regarding the role of Saudi state-sponsored dawah organizations in sponsoring acts of violence, the nature of the financial irregularities evidenced by these organizations, and the degree to which various far-flung regional offices were under the control and oversight of senior administrators in the Kingdom of Saudi Arabia, all of which I hold to a reasonable degree of certainty, are outlined in the sections and paragraphs that follow in this expert report. I have been compensated at a rate of $225/hour for my work on this report. Attached as Exhibit A to this report is a list of materials on which I relied in forming my opinions stated in this report, in addition to relying on my own personal recollections, involvement, and experience.

## VI. <u>Evidence of the Involvement of Saudi "Charities" in Financing and Directing Terrorist Activities</u>

19.     The roots of the contemporary Al-Qaida terrorist financing network can be directly traced back to lessons learned by Arab-Afghan fighters during the early days of the Soviet-Afghan jihad nearly two decades ago. As the 1980s drew to a close, thousands of idealistic Islamic fundamentalist volunteers arrived in Pakistan, often with no local guide or requisite accommodations. At the time, several wealthy Arabian Gulf charitable organizations, under the guise of aiding Afghan and Pakistani refugees, stepped forward to help channel the jihadi recruits where they were most needed. These wealthy NGOs—sponsored by a number of prominent Gulf businessmen—provided weapons, guesthouses, and travel papers to needy members of the quickly-coalescing Al-Qaida movement. Medical ambulances belonging to the Saudi Red Crescent and other fundamentalist-run relief groups were even diverted to bring Arab mujahideen ("holy warriors") back and forth from

combat operations.[5]  By clothing their militant activity with charitable ideals, Arab-Afghan leaders including Usama Bin Laden discovered that they were able to slip below the radar of many global intelligence agencies.  U.S. Defense Department officials have repeatedly noted that "dawa" and "charity work" under "the guise [of] intend[ing] to assist in relief efforts for the Afghani people" are "common al-Qaida cover stories."[6]

20.     According to the final report of the bi-partisan National Commission on Terrorist Attacks Upon the United States (a.k.a. the 9-11 Commission), Al-Qaida "took two approaches to using charities for fundraising:"

> "One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities—particularly those with lax external oversight and ineffective internal controls.... Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda.  In addition, entire charities... may have wittingly participated in funneling money to al Qaeda.  In those cases, al Qaeda operatives controlled the entire organization, including access to bank accounts.  Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."[7]

21.     The efficiency and success of the Afghan jihad financing model was quite an accomplishment for Usama Bin Laden and his international allies—so much so that operations continued even after the end of the Soviet-Afghan war and the expulsion of Bin Laden from the region.  In approximately 1993, in conversations with former senior Al-Qaida lieutenant Jamal Ahmed Al-Fadl, Usama Bin Laden identified several prominent international Muslim charities as the primary sources of Al-Qaida financial and fundraising activity.[8]  In 1996, a since declassified U.S. government report—attributed by the United Nations Security Council to the Central Intelligence Agency (CIA)—alleged that "approximately one third of… Islamic NGOs support terrorist groups or employ individuals who are suspected of having terrorist connections."[9]  The final report of the

---

[5] Muhammad, Basil.  *Al-Ansaru l'Arab fi Afghanistan*.  The Committee for Islamic Benevolence Publications (©1991), at p. 187.

[6] Set_45_3065-3095, at p. 1.  See also U.S. Department of Defense, JTF-GTMO Matrix of Threat Indicators for Enemy Combatants.

[7] 9/11 Commission Final Report, at pp. 170-171.

[8] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003) at p. 25.

[9] January 1996 CIA Report on "International Islamic NGOs" and links to terrorism, at p. 1.  See also "Second report of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban and individuals and entities associated with them," United Nations Security Council (December 2, 2003), at p. 15. https://undocs.org/pdf?symbol=en/S/2003/1070.  See also Affidavit by Senior Special Agent David Kane (Bureau

U.S. Congressional 9/11 Commission concluded that "entire charities" under the control of "al Qaeda operatives… may have wittingly participated in funneling money to al Qaeda."[10]

22.     These organizations served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al-Qaida personnel worldwide, and helping "to move funds to areas where al Qaeda was carrying out operations."[11]  According to a U.S. Justice Department brief on the subject:

> [Al-Fadl] understood from conversations with Bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money for al Qaeda operations would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor or the needy.[12]

23.     Standing orders were left by Bin Laden to keep all transactions involving the charitable groups in cash only; by this method, these NGOs were manipulated as a secret laundry to make Al-Qaida's financial network virtually invisible.  The charities would then create false documentation for the benefit of unwary donors, purportedly showing that the money had actually been spent on orphans or starving refugees.  According to some former employees of these organizations, upwards of 50% of their total funding was secretly diverted directly to Al-Qaida and Usama Bin Laden.[13]  The 9/11 Commission also found evidence that such would-be charities had "provided significant cover… enabl[ing] [Al-Qaida] operatives to travel undetected."[14]

24.     Meanwhile, in Europe and North America, Muslim NGOs would come to serve an additional role in indoctrinating new generations of international jihadists.  According to a 1996 French intelligence memorandum, "these charities—screens for Islamic groups like… the Egyptian Al-Gama`at al-Islamiyya… permitted a very large recruitment among

---

of Immigration and Customs Enforcement, Department of Homeland Security).  United States of America v. Soliman S. Biheiri.  United States District Court for the Eastern District of Virginia, Alexandria Division, Case #: 03-365-A (August 14, 2003), at p. 2.

[10] The 9/11 Commission Report.  Final Report of the National Commission on Terrorist Attacks Upon the United States, (July 22, 2004), at p. 170.

[11] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003) at pp. 28-29.

[12] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at pp. 28-29.

[13] Dugger, Celia W.  "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say."  The New York Times (January 21, 1999), at p. 4.

[14] The 9/11 Commission Report.  Final Report of the National Commission on Terrorist Attacks Upon the United States, (July 22, 2004), at p. 171.

young volunteers; under the notion of jihad, they provided 'humanitarian' support for the indoctrination of the youth [and it worked] so well that numerous French converts to Islam joined the ranks of Islamic extremists."[15]  A 1996 intelligence report attributed to the CIA alleged that "nearly one third of the Islamic NGOs in the Balkans have facilitated the activities of Islamic groups that engage in terrorism, including the Egyptian Al-Gama`at Al-Islamiyya, Palestinian Hamas, and Lebanese Hizballah."  The report added that "some of the terrorist groups, such as Al-Gama'at, have access to credentials for the UN High Commission for Refugees and other UN staffs in the former Yugoslavia."[16]

25.     Even the operational mastermind of the 9/11 terrorist attacks in the United States—Khalid Sheikh Mohammed (KSM)—was involved with the activities of suspect Islamic humanitarian groups as early as 1988.[17]  KSM's brother Zahid Sheikh Mohammed (a.k.a. Abu Hafs al-Baluchi) was responsible for overseeing at least two such NGOs active in Pakistan:  the Kuwaiti Lajnat al-Dawa al-Islamiyya (officially designated as a terrorist front group by the U.S. government[18]) and Mercy International.[19]  When KSM's nephew Ramzi Yousef—the explosives expert behind the 1993 World Trade Center bombing in New York—was training at an Al-Qaida camp in eastern Afghanistan, he "visited" the office of Lajnat al-Dawa in Jalalabad.[20]  Likewise, Mercy International's lawyer in Islamabad admitted that Pakistani police had investigated his client in 1994-5 "because [Ramzi] Yousef had made a phone call to the Mercy offices [in Pakistan]."[21]

26.     Much of the funding responsible for underwriting international Muslim charities has originated from the Arabian Peninsula—and in particular, the Kingdom of Saudi Arabia. Among the most important Saudi state-affiliated charities to become enmeshed in

---

[15] "La Formation Des Volontaires Pour Le Djihad En Camps D'Entrainement."  Confidential memorandum issued by UCLAT (French Central Anti-Terrorism Unit).  December 27, 1996.

[16] January 1996 CIA Report on "International Islamic NGOs" and links to terrorism, at p. 1.  See also "Second report of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban and individuals and entities associated with them."  United  Nations  Security  Council  (December  2,  2003),  at  p.  15. https://undocs.org/pdf?symbol=en/S/2003/1070.  See also Affidavit by Senior Special Agent David Kane (Bureau of Immigration and Customs Enforcement, Department of Homeland Security).  United States of America v. Soliman S. Biheiri.  United States District Court for the Eastern District of Virginia, Alexandria Division, Case #: 03-365-A (August 14, 2003), at p. 2.

[17] The 9/11 Commission Report.  Final Report of the National Commission on Terrorist Attacks Upon the United States (July 22, 2004), at p. 147.

[18] http://www.ustreas.gov/offices/eotffc/ofac/sanctions/terror.txt.  September 2004.

[19] Azzam Publications.  "What Sheikh Abdullah Azzam said about Khalid Ash-Sheikh Muhammad."  Azzam Publications news update carried by IslamicAwakening.com.  http://www.as-sahwah.com/discus/messages/ 3079/3079.html.  March 4, 2003; see also The 9/11 Commission Report.  Final Report of the National Commission on Terrorist Attacks Upon the United States, (July 22, 2004), at pp. 146-147.  See also "After Debriefing Report [on ABDUL HAKIM ALI HASHIM MURAD]."  Philippine National Police Criminal Investigation Command; Camp Crame, Quezon City.  February 18, 1995 (1400hrs-1535hrs).

[20] The 9/11 Commission Report.  Final Report of the National Commission on Terrorist Attacks Upon the United States (July 22, 2004), at p. 488.

[21] Pallister, David and Jamie Wilson.  "Muslim relief groups caught in crossfire."  Guardian (London).  September 26, 2001.  http://society.guardian.co.uk/disasterresponse/story/0,1321,558348,00.html.

the sponsorship of terrorism include the Muslim World League, the International Islamic Relief Organization, and the World Assembly of Muslim Youth.

## A.      The Muslim World League (MWL)

27.      The multi-million dollar Muslim World League (MWL), founded in 1962 to "promote Islamic unity," is one of the largest of the Saudi Islamic evangelical charities.[22] On its current website, MWL lists its main objectives as "to disseminate Islamic Dawah and expound the teachings of Islam.  To defend Islamic causes in a manner that safeguards the interests and aspirations of Muslims, solves their problems, refutes false allegations against Islam, and repels inimical trends and dogma which the enemies of Islam seek to exploit in order to destroy the unity of Muslims and to sow seeds of doubt in our Muslim brethren."[23]  In 1997, Prince Majid bin Abdel Aziz, emir of the Mecca province, attended a meeting of the MWL Constituent Council in Saudi Arabia and delivered a speech on behalf of King Fahd.  During his lecture, he called MWL "an outstanding Muslim body" that "has devoted its concern to Muslim affairs, and… the spreading of the Islamic call in accordance with the Islamic rite."[24]

28.      According to U.S. Department of Defense documents, "Muslim World League is listed as a Tier 2 NGO.  Tier 2 NGO is defined [by the U.S. government] as having demonstrated the intent and willingness to support terrorist organizations willing to attack US persons or interests."[25]  The Department of Defense has classified MWL as among the "Associated forces" of Al-Qaida, "with which al-Qaida, the al-Qaida network, or the Taliban had or has an established working, supportive, or beneficiary relationship for the achievement of common goals… Through associations with these groups and organizations a detainee may have provided support to al-Qaida or the Taliban, or engaged in hostilities against U.S. or Coalition forces."[26]

29.      MWL has secretly provided critical financial and organizational assistance to Islamic militants loyal to Al-Qaida and Usama Bin Laden. According to credible Al-Qaida sources, Bin Laden's original jihad mentor, Shaykh Abdallah Yousif Azzam, was first sponsored by the Muslim World League to open and head a branch office in Peshawar, Pakistan, in order to aid arriving Arab-Afghan volunteer fighters starting in the early 1980s. The Peshawar office was financed by Usama Bin Laden, and later was subsidized by large donations from the Kingdom of Saudi Arabia.[27]  Simultaneously, the Egyptian MWL

---

[22] "Saudi Arabian Information Resources: Muslim World League."   http://www.saudinf.com/main/k312.htm. March 1, 2003.

[23] "About the Muslim World League."  http://www.arab.net/mwl/about.htm.

[24] "AT THE OPENING OF THE MUSLIM WORLD LEAGUE MEETING: THE CUSTODIAN OF THE TWO HOLY PLACES CALLS FOR ISLAMIC SOLIDARITY TO OVERCOME OBSTACLES."  _Ain al-Yaqeen_. December 15, 1997.  http://www.ain-al-yaqeen.com/issues/19971215/feat1en.htm.

[25] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Mammar Ameur (ISN No. 939) (April 13, 2005).

[26] U.S. Department of Defense, JTF-GTMO Matrix of Threat Indicators for Enemy Combatants.

[27] Muhammad, Basil.  _Al-Ansaru l'Arab fi Afghanistan_.  The Committee for Islamic Benevolence Publications (©1991), at p. 193.

branch office served as the "third route to the Al-Ansar House in Jedda." The Al-Ansar House was one of Bin Laden's "guest houses" used to funnel recruits to terrorist training camps.[28] International law enforcement investigators later recovered a copy of a report written on an MWL/IIRO letterhead documenting "a meeting between Abu Abdallah/Dr. Abdallah Naseef/Sheikh Abdel Majeed Zindani and Dhiaul Haq" to establish a "secret" agreement seeking "an open license for the borders… in a way that League offices will be opened as (illegible) for the Pakistanis, and the attacks will be launched from them (these offices), and that there are no gatherings inside the cities which will attract attention."[29] Mujahideen supporters were advised to "pursue finding an umbrella which you can stay under, other than the Crescent… I prefer the name of the [Muslim World] League because Dr. Naseef is one of the brothers."[30] Dr. Abdullah Omar Naseef served as Secretary General of the Muslim World League from 1983 to 1993.

30.   Official Muslim World League publications have openly acknowledged the role that the MWL and its subsidiary known as the International Islamic Relief Organization (IIRO) have played in serving as a backchannel through which "the government and people of Saudi Arabia provided in-kind and financial support to the Afghani Mujahideen, purchased arms and ammunition, and paid the costs of transporting them even inside Afghanistan."[31]

31.   In a book published in Saudi Arabia about foreign mujahideen fighters during the Soviet-Afghan war, Usama Bin Laden was quoted as he described "returning to Peshawar" in July 1985 from the frontline in Afghanistan:  "At the time, I met brother Mohammad Jamal Khalifa (Abu Al-Baraa) and he was our teacher in Medina and had come to open up the office of the Muslim World League.  So I helped him a little in establishing the office... and then left for areas close to the fronts such as Nanjahar and Tachmakni… After our training was over, each one of us went to his own business.  So I joined Abu Al-Baraa in the League."[32]  Khalifa later became Bin Laden's brother-in-law, "a senior al Qaida member,"[33] and a "known financier of terrorist operations."[34]

32.   According to another early Al-Qaida member Abu Rida al-Suri, "brother Jamal Khalifa (Abu Al Baraa) is the one who launched the project of education domestically or externally.  With endeavors made by Dr. Abdullah Azzam, he was able to get the approval of the Muslim World League to open a branch in Peshawar that would function as an umbrella to facilitate the work and free movement of the brothers in Pakistan… Initially the branch was financed by Abu Abdullah [Usama Bin Laden], then donations started to

---

[28] Sharaf-ad-din, Nabil.  "Usama BinLaden - A Millionair[sic] Finances Extremism in Egypt and Saudi Arabia." _Rose Al-Yusif_.  No. 3388.  May 17, 1993.

[29] United States v. Enaam Arnaout.  Document name: /TAREEKHOSAMA/49/Tareekh Osama.121.

[30] United States v. Enaam Arnaout.  Document name: /TAREEKHOSAMA/49/Tareekh Osama.121.

[31] Al Alam Al Islami (August 31, 1992),"More than a Million and Half a Million of Martyrs and Thousands of Widows are the Price of Victory in Afghanistan," at p. 8.

[32] Al-Ansaru Arab fi Afghanistan, at p. 165.

[33] https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[34] Sworn affidavit of FBI Special Agent Robert Walker.  United States of America v. Benevolence International Foundation, Inc.  April 29, 2002.  District of Illinois, Eastern Division.  Case number: 02CR0414.

arrive from the Kingdom."[35]  Azzam is known to be the "co-founder" of Al-Qaida, the "spiritual founder" of Hamas, and the creator of Makhtab al-Khidamat (the "Mujahideen Services Office" in Afghanistan), which "is considered to be the pre-cursor organization to al Qaida and the basis for its infrastructure."[36]

33.     The Peshawar, Pakistan MWL branch office was taken over for a time by Wael Hamza Jalaidan (a.k.a. Abu Al-Hasan Al-Madani), an old friend of Usama Bin Laden and Abdallah Azzam, and one of the original founders of Al-Qaida.[37]  According to his resume produced in connection with this litigation, Jalaidan acknowledges having "joined MWL Muslim World League as a Director and worked until 1994, looking after education and relief work for the refugees."  In a 1999 interview with Qatar-based Al-Jazeera television, Bin Laden discussed the assassination of Abdallah Azzam ten years earlier and the founding of Al-Qaida.  He recalled, "We were all in one boat, as is known to you, including our brother, Wa'el Julaidan."[38]  Jalaidan also served as the veteran director of the Saudi Red Crescent in Pakistan during the critical years of the Soviet-Afghan jihad.[39]  In early 2000, U.S. officials sent a confidential memorandum to U.N. police forces in southeastern Europe titled "Secret: US office only-Release to UNMIK [the U. N. administration in Kosovo]."  The document named MWL representative Wael Jalaidan as an associate of Usama Bin Laden and stated that Jalaidan had directly assisted Bin Laden to "move money and men to and from the Balkans."[40]

34.     U.S. authorities have also alleged personal contacts between Jalaidan and senior military lieutenants of Bin Laden, including Dr. Ayman al-Zawahiri and now captured terrorist mastermind Abu Zubaydah.  Under interrogation by U.S. authorities, the latter claimed that he accompanied Jalaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000.  Moreover, according to Abu Zubaydah, upon his arrival in Kandahar, Jalaidan met personally with Usama bin Laden and former Al-Qaida military chief Mohammed Atef (a.k.a. Abu Hafs al-Masri).  As a result, on September 6, 2002, the U.S. and Saudi governments announced an unprecedented joint action to freeze Jalaidan's assets and to specially designate him as a supporter of international terrorism.[41]

35.     According to documents produced during discovery as part of this litigation, on July 22, 1993, agents from the Filipino Bureau of Immigration and Deportation raided the

---

[35] Al-Ansaru Arab fi Afghanistan, at p. 193.

[36] https://www.treasury.gov/resource-center/terrorist-illicit-finance/Terrorist-Finance-Tracking/Pages/charities_execorder_13224-i.aspx.

[37] Sharaf-ad-din, Nabil.  "Usama BinLaden - A Millionair[sic] Finances Extremism in Egypt and Saudi Arabia."  *Rose Al-Yusif*.  No. 3388.  May 17, 1993.  See also Muhammad, Basil.  *Al-Ansaru l'Arab fi Afghanistan*.  The Committee for Islamic Benevolence Publications (©1991), at p. 26.

[38] Office of Public Affairs, United States Treasury Department.  "Treasury Department Statement on the Designation of Wa'el Hamza Julidan."  September 6, 2002.  Document #PO-3397.

[39] Muhammad, Basil.  *Al-Ansaru l'Arab fi Afghanistan*.  The Committee for Islamic Benevolence Publications (©1991), at p. 187.

[40] Cited in news report by British Broadcasting Company (BBC).  April 3, 2000.

[41] Office of Public Affairs, United States Treasury Department.  "Treasury Department Statement on the Designation of Wa'el Hamza Julidan."  September 6, 2002.  Document #PO-3397.

MWL branch office in the Philippines with the intent of arresting staff there for operating without an appropriate license.[42]  On two separate occasions—in both 2002 and 2005, U.S. federal authorities conducted a search of the MWL branch office in Falls Church, Virginia as part of investigations into MWL's ties to terrorist organizations and financing.  In July 2005, FBI and ICE agents raided the Northern Virginia office and arrested a Saudi national who served as director, Abdullah Alnoshan, on immigration fraud charges.  The criminal complaint against Alnoshan also included the name of another Sudanese national arrested by the FBI who was working as an employee at the MWL office in New York.

36.    The Muslim World League has produced a number of different booklets and periodicals in a variety of languages, including both Arabic and English.  Many of these materials have focused on the concept of dawah, or the proselytization of a particular interpretation of Islam.  In this respect, MWL publications have promoted a hardline Wahhabi creed, including overt support for violent jihad and the concept of "jihad by wealth" – namely, fulfilling the religious obligation of jihad by providing funds to support mujahideen fighters instead of participating in fighting directly.

37.    In June 1981, the Muslim World League held a joint conference with the Saudi Ministry of Hajj and Waqf in the city of Mecca.  During the conference, the participants adopted a number of resolutions that were later memorialized in writing by MWL—including calling upon "Muslim countries to promote the spirit of Jihad in the Muslim armies, determine ways and means of coordination among themselves especially in the field of joint military industries, so that the Muslim Ummah may be able to defend itself against any aggression:"

> "The Conference appeals to all Islamic governments to prepare all sections of the Ummah for Jihad, with special reference to the youth who must be given special training in Jihad in all its aspects, i.e. Jihad through self-sacrifice, sacrifice of property and life.... The Conference appeals to all Islamic governments to extend assistance and support to Ulema and teachers so as to enable them to play an effective role in mobilizing the Ummah for Jihad.... Appeals to all Muslim countries to establish training camps for Mujahideen in countries that are capable of organizing these camps.  Camps belonging to the Palestine Liberation Organization and other Islamic Jihad organizations may be utilized in this regard and Muslim youth exhorted upon to join these camps which should be provided with adequate number of qualified Dawah workers for religious orientation and guidance.... Appeals to Islamic countries to extend their support to Muslim 'Mujahideen' who are struggling against colonialism, aggression, and tyranny and also to provide them with all that may be required to help in achieving their Islamic goals through every possible and legitimate means.  Special emphasis

---

[42] MWL 15876-15877.

should be given to Mujahideen in Palestine, Afghanistan, Western
Somalia, Eritrea, Moro, Patani, etc., etc.  Appeals to Islamic
countries to intensify mass-media programmes on the obligation of
Jihad and its methods.  Efforts should also be made by the mass-
media to highlight the activities of the Mujahideen."[43]

38.     The July 8, 1991 issue of the MWL Journal included an article titled, "Jihad with
Money in the Way of Allah."  The article explained that "God Almighty has enjoined upon
the Believers to strive in the way of Allah with their wealth and their lives:"

"It is thus quite clear that Jihad with one's wealth and with one's life
is an essential part of the teachings of Islam.  Yet Jihad with one's
wealth 'takes precedence 'over Jihad with life in several verses of
the Holy Quran calling the Believers to Jihad, because of finance
being indispensable for supplying the army with its needs (and on
many occasions its requirements may far exceed its demand for
manpower).  Hence, in view of the unlimited material needs of war,
a person may contribute money towards Jihad if he does not
personally join it for reasons of physical weakness, illness or
distance from the scene of confrontation with the enemy."[44]

39.     The April 20, 1992 edition of MWL's Al-Alam al-Islami newsletter featured an
article titled, "Preparing for Islamic Strength and for Jihad is an Obligation Anytime and
Anywhere."   The article spoke of the need for Muslims to actively "remove" any
"obstacles" to Islam, emphasizing that "Islam has greatly taken care of the strength of
Muslims as individuals and groups and has ordered that every effort must be made to
prepare for Jihad for the sake of Allah and for preparing the entire nation:"

"Preparation is an obligation that accompanies the obligation of
Jihad.  The text orders the preparation of the strength in its different
ranks, types, and causes.  Preparation includes moral preparation
and material preparation.  The moral preparation is the basis, and it
distinguishes the Islamic army from other armies.  The Mujahideen
for the sake of Allah are fighting by the strength of the ideology in
their hearts.  They believe in Allah's victory for them over their
enemies.  They do not fear death, even if they are few.  This is unlike
other armies that count on numerical and material strength and soon
collapse in front of the strength of belief.  Strength is a word that
refers to all what has been and still is known of war machines,
whether ground, marine, or aerial. It includes the necessary

---

[43] MWL Journal (September 1981), "Rabita-Sponsored Auqaf Conference Resolutions," at p. 59.

[44] MWL Journal (July/August 1991), "Jihad with Money in the Way of Allah," at p. 62.

education and training, the development of military factories, and the creation of the military expertise and necessary competencies."[45]

The article concluded, "Muslims in every era must therefore use whatever they have according to their ability. The fighting forces in the cause of Allah must be provided with money, so they are equipped with all types of strength… The Islamic history recorded that during its eras and the days of Jihad and true religion, many Muslims gave their money and souls for the sake of Allah and for the hereafter in order to strengthen the Jihad so that the donors may perform the duty in a due manner."[46]

40.     In March 1992, the MWL published an open appeal from Dr. Abdullah Omar Naseef, Secretary General of the MWL, calling for donations "to support their Mujahidin brothers who are steadfast in the occupied territories in confronting the enemy forces and facing their repeated attempts and continued occupation schemes in the absence of law and consciousness:"  "The Muslim World League confirms that this financial and moral support helps continue the blessed Intifada for the liberation of the stolen homeland and the Islamic holy places, particularly the blessed Al-Aqsa Mosque.  The Muslim World League reports that it assigned a special account with the Al Ahli National Commercial Bank, Mecca Main Branch, Account No. 14807000107/01, for this purpose."[47]

41.     The April 27, 1992 edition of MWL's Al-Alam al-Islami newsletter included an "important statement" from MWL Secretary General Dr. Abdullah Omar Naseef in which Naseef declared, "we find that the problems of Muslims and their common events at the present time need attention from their Muslim brothers everywhere and from the Islamic countries in particular.  The Islamic countries have the political decision and can impact on the events that confront Muslims.  Then comes the role of the rest of Muslims, who can exercise Jihad by their money and their souls and by supplication for their brothers who are harmed everywhere....  Regarding the role of the Muslim World League towards such events, His Excellency said that the Muslim World League was established, as it is known, to serve Muslims, pay attention to their affairs, and support them for their benefit in this world and the hereafter."[48]

---

[45] Al Alam Al Islami (April 20, 1992), "Preparing for Islamic Strength and for Jihad is an Obligation Anytime and Anywhere," at p. 13.

[46] Al Alam Al Islami (April 20, 1992), "Preparing for Islamic Strength and for Jihad is an Obligation Anytime and Anywhere," at p. 13.

[47] Al Alam Al Islami (March 23, 1992), "On the Occasion of the Al-Aqsa Mosque Week:  Dr. Naseef Calls for Supporting the Intifada (Uprising) and Backing the Palestinian People in the Occupied Territories," at p. 1.

[48] Al Alam Al Islami (April 27, 1992) "Important Statement by the Muslim World League's Secretary General:  Dr. Naseef Stresses the Serious Conditions Witnessed by Muslims These Days," at p. 1.

42.     The June 29, 1992 edition of the Al-Alam al-Islami similarly stated that "Muslims should commit to sacrificing their souls, money, family members, and children for the sake of Allah."[49]

43.     The November 2, 1992 edition of the Al-Alam al-Islami newsletter featured an appeal from Sheikh Abdul Aziz bin Baz, Grand Mufti of the Kingdom of Saudi Arabia and Chairman of the Councils of the Muslim World League in Mecca, calling for Muslims around the world "to support Muslims in Bosnia and Herzegovina so that they are enabled to strike their enemy, the Serbs, and their enemy's supporters with men, money, arms, and supplication:"  "I call upon all Islamic governments and peoples in all the countries that love peace and love to support the afflicted to help Muslims in Bosnia and Herzegovina in the war against their enemy, the Serbs, and their enemy's supporters with men, money, arms, and supplication.... There are so many verses and hadiths about the obligation of exercising Jihad against the enemies and about supporting the oppressed.  It is the duty of all Islamic governments and peoples to support the oppressed with men, arms, money, and supplication as much as possible."[50]

44.     The April 19, 1993 edition of Al Alam Al-Islami included an article titled, "How To Rescue Bosnia."  According to the essay, "it is necessary to stand with our brothers in the afflicted Muslim Republic in one row, and to fight for achieving the truth and attacking the aggressor.  Perhaps the first step is to provide the Bosnian Mujahideen with all the needs for Jihad for the sake of Allah.  This is the way to help Bosnia, and this is the right way to rescue."[51]

45.     Later editions of the MWL Journal supported Sheikh Abdul Aziz bin Baz's call to support the Bosnian people with money and arms.  In the September 1995 issue of the MWL Journal, "[a] spokesman of the MWL called on the Muslim states to rush to the support of the Bosnia people who were facing single-handed the barbaric Serb aggression abandoned by the world and its organizations to receive the barbaric bloody blows alone from the Serb aggressors.  It supported the call of Shaikh Abdul Aziz bin Baz, Chief Mufti of Saudi Arabia, urging the Muslims to back the Bosnian people with whatever means they can by way of money, arms and prayers."[52]

---

[49] Al Alam Al Islami (June 29, 1992), "The Lessons Learned from the Hegira," at p. 5.  See also MWL Journal (February 1994), "Child Upbringing in Islam," at p. 34 ("A child should be made to be aware that participating in Jihad is worship in itself and running away from the battle field is a great sin.  Taking part in the battle fought in Allah's Cause can be done by sacrificing one's life and wealth.").

[50] Al Alam Al Islami (November 2, 1992), "Calling for Their Victory in Their Jihad Against the Serbs:  Ibn Baz Calls Upon the Islamic Governments and Peoples to Support the Muslims of Bosnia and Herzegovina," at p. 3.

[51] Al Alam Al Islami (April 19, 1993), "How To Rescue Bosnia," at p. 2.

[52] MWL Journal  (September 1995), "Latest Developments in Bosnia, Croatia's Stunning Success and its Implications," at p. 27.

46.     The January 1994 issue of the MWL Journal advised that "[i]t is the duty of Muslims to support the Bosnian Muslims with arms, money, and whatever they can provide."[53]

47.     In August 1993, the MWL called on the Islamic world to provide all support to the Muslim people of Kashmir, including money and weapons: "The Muslims should provide the Kashmiris with material and moral support, including money, military hardware and men in order to protect themselves against the heretic Indian occupation and regain all their legitimate rights."[54]

48.     The February 1994 issue of the MWL Journal included an article titled, "Palestine: The Blessed Land," which advised: "When the enemy occupies the land of Islam, Jihad becomes obligatory on every Muslim.  Therefore[sic] Muslims should look forward to the liberation of the holy land and the blessed land.  Muslims are looking forward to a leader like Salahuddin to liberate the land of Islam.  However, it needs Jihad Fi Sabil Lillah."[55]

49.     The MWL also maintains a subsidiary organization known as the "Fiqh Council," which was established in 1977 by the MWL Constituent Council.  Overseen by the Secretary General of the MWL, the Fiqh Council is comprised of Sunni clerics who are responsible for parsing religious rulings and issuing resolutions and recommendations. Like the MWL Journal and the Al-Alam al-Islami newsletter, the MWL Fiqh Council has also endorsed both the concept of armed jihad generally, as well as specifically the obligation to support armed fighters with financial support through charitable channels. The Fiqh Council's "Fourth Resolution on Collection and Distribution of Zakah and Oshr in Pakistan" admonishes readers to carry out "armed jihad" in the face of an "ideological and intellectual onslaught by athiests, Jews, Christians, and other enemies… It is the duty of Muslims as well to confront them with the same arms and equipments that are used against Islam… Since the purpose of armed Jihad is to raise the word of Almighty Allah high as this purpose is achieved through fighting in the cause of Allah, it is also achieved through the work of Da'wah to the religion of Almighty Allah, and preparation of preachers and their assistance in order to carry out their mission, so both words would be considered as Jihad."  Other MWL Fiqh Council resolutions emphasize the importance of aiding refugees who "so that Mujahideen are assured that their families behind them are not lost and they can continue their Jihad with strength and steadfastness. No doubt, any disturbance or weakness on this front will have a damaging impact of Jihad."[56]

50.     In July 1988, MWL—in conjunction with the government of Pakistan—formed a subsidiary charity known as the "Rabita Trust for the Repatriation of the Pakistanis Stranded in Bangladesh."  The charity (based in Pakistan) sought to "plan and arrange… to bring these Stranded Pakistanis to Pakistan and rehabilitate them in the Province of

[53] MWL Journal (January 1994), "Bosnia Issue Top on the Agenda, GCC Summit, MWL Meeting and Bosnia Solidarity Day," at p. 19.
[54] Al Alam Al Islami (August 30-September 5, 1993), "Imam of Holy Haram Calls for Assistance to Kashmiris," at p. 16.
[55] MWL Journal (February 1994), "Palestine: The Blessed Land," at p. 40.
[56] MWL 8574 (identifying the Fiqh Council as one of the main policy-making bodies of the MWL).

18

Punjab." According to Rabita Trust documents produced as discovery during the present litigation, the cost of such a project was forecast to run into the hundreds of millions of dollars: "this great project requires stupendous financial resources which can only be pooled with the help of the Muslim governments, charitable organizations, and philanthropic individuals."[57]

51.    Documents produced in discovery by MWL, IIRO, and Jalaidan demonstrate that MWL (and its IIRO affiliate) were directly responsible for and involved in the founding of Rabita Trust, appointed senior MWL (and IIRO) officials to serve as its corporate officers and Board of Trustees, held considerable oversight and control over the group's operations and activities beginning with its founding in 1988, and exerted executive authority over appointing the leaders of the organization—including Wael Jalaidan.

52.    According to the founding "deed" of the Rabita Trust produced in connection with this litigation, the initial Board of Trustees for the organization included: Saudi Prince Talal bin Abdul Aziz (Co-Chairman), MWL Secretary General Dr. Abdullah Omar Naseef (Vice-Chairman), and MWL Assistant Secretary General Syed Amin Aqeel Attas (Director General).[58] An update to the composition of the Rabita Trust Board of Trustees was issued in March 2000, identifying board members MWL Secretary General Dr. Abdullah bin Saleh Al-Obaid and International Islamic Relief Organization (IIRO) Secretary General Dr. Adnan Khalil Basha. According to the update, Prince Talal Bin Abdul Aziz remained as Co-Chairman of the group.[59]

53.    An additional letter produced from this litigation issued on Rabita Trust letterhead and dated October 14, 2000 lists the following individuals as board members of the organization: Prince Talal Bin Abdul Aziz Al-Said (Co-Chairman), MWL Secretary General Dr. Abdullah Bin Saleh Al-Obaid (Vice Chairman), Wael Jalaidan (Director General), IIRO Secretary General Dr. Adnan Khalil Basha, IIRO Eastern Province office Supervisor General Prince Turki Bin Fahd Bin Jalawy Al-Saud, and MWL Riyadh Office chief Mohammed Bin Abdallah Al-Dubaiban.[60]

54.    According to his resume produced in connection with this litigation, Wael Jalaidan acknowledges in 1992 becoming a "Project Director of the Rabita Trust.... As a Project Director, I supervised the construction of 1000 residential units in the province of Punjab."[61] According to Jalaidan's account, "[i]n 1998, I was appointed as the Secretary General of the Rabita Trust by the Muslim World League."[62] The U.S. Treasury has indicated that, in February 2000, Jalaidan was further appointed to the Board of Trustees

[57] https://www.docketbird.com/court-documents/In-Re-Terrorist-Attacks-on-September-11-2001/Exhibit-28-to-W-Nassar-Declaration/nysd-1:2003-md-01570-03857-031.
[58] Jelaidan (017) – The Rabita Trust Deed.
[59] Jelaidan (016) - Composition of Rabita Trust Board.
[60] MWL 30817-30819.
[61] Jelaidan (022).
[62] Jelaidan (022).

of the Rabita Trust.[63]  This is confirmed by an update to the Board of Trustees issued in March 2000 that was produced in connection with this litigation.[64]

55.     Documents produced in discovery by MWL, IIRO, and Jalaidan also demonstrate that Rabita Trust and its employees operated out of the MWL's office in Mecca, Saudi Arabia and the MWL's branch office in Pakistan.  For instance, an October 29, 1992 letter concerning a Rabita Trust office in Lahore is addressed to "*Mr. Wa'el H. Jelaidan, Project Director, Rabita Trust, Muslim World League, H-8/1, Islamabad*."[65]  A December 29, 1997 letter co-authored by MWL Secretary General Abdullah al Obaid on Rabita Trust letterhead identifies Rabita Trust offices operating from the MWL offices in Mecca, Saudi Arabia and Islamabad, Pakistan:  *Makkah Office:  c/o Muslim World League, P.O. Box 537, Makkah*; and *Islamabad Office:  c/o Muslim World League, H-8/1, Islamabad*.[66]  Finally, a series of letters dated October 22, 2001 letter concerning Rabita Trust account balances are addressed to "*The Secretary General, Rabita Trust for Stranded Pakistanis, World Muslim League, P.O. Box 1030, Makkah Al Mukrmah, Saudi Arabia.*"[67]

56.     Documents produced in discovery further demonstrate that Rabita Trust and its employees operated out of the IIRO's branch office in Islamabad, Pakistan.  A series of letters dated October 11, 2001 concerning Rabita Trust are addressed to "*Mr. Rahmat Ullah Nazir Kahn, Project Director, Rabita Trust for Rehabilitation of Stranded Pakistanis, Pitrus Bokari Road, H-8/1, Islamabad.*"[68]  An October 12, 2001 letter authored by Mr. Khan in his capacity as the office director of the IIRO branch office in Islamabad identifies the same address as "*H-8/1 - Pitrus Bokari Road.*"[69]

57.     On October 12, 2001, the U.S. government blacklisted the Rabita Trust as a Specially Designated Global Terrorist ("SDGT") entity "for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida.  In February 2000, Wael Hamza Jalaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General."[70]  According to the United Nations—which jointly designated Rabita Trust—the organization "has also had close ties to Al-Qaida leaders and other listed individuals and entities, including Aiman Muhammed Rabi al-Zawahiri, Sobhi Abdel Aziz Mohamed el Gohary Abu Sinna, Makhtab al-Khidamat, and the Armed Islamic Group."[71]

---

[63] Office of Public Affairs, United States Treasury Department.  "Treasury Department Statement on the Designation of Wa'el Hamza Julidan."  September 6, 2002.  Document #PO-3397.

[64] Jelaidan (016) - Composition of Rabita Trust Board.

[65] MWL 8691.

[66] IIRO 149661.

[67] MWL 30890-30892.

[68] IIRO 149642-149644.

[69] IIRO 14960.

[70] https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-p.aspx.  See also Office of Public Affairs, United States Treasury Department.  "Treasury Department Statement on the Designation of Wa'el Hamza Julidan."  September 6, 2002.  Document #PO-3397.

[71] https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/rabita-trust.

58.     Documents produced in discovery by MWL, IIRO, and Jalaidan further indicate that the MWL, IIRO and Rabita Trust coordinated efforts in the wake of the September 11 terrorist attacks on the United States in an attempt to limit their exposure as a result of their management of the charity.[72]

59.     For instance, soon after the attacks, IIRO Secretary General Adnan Basha directed Rabita Trust's Project Director "to close the Lahore Office, [and] take the full charge of all the assets and documents."[73]

60.     Also among the relevant discovered documents are three near identical letters written on October 13, 2001 by Rahmatallah Nazir Khan.[74]  The letters are each written, respectively, on paper under the letterheads of MWL, IIRO, and Rabita Trust—yet, each list the identical same street address.  Khan lists himself, again respectively, as the Office Director for MWL, IIRO, and Rabita Trust.  The MWL letter is addressed to MWL Secretary General Dr. Abdullah al-Turki; the IIRO letter is addressed to IIRO Secretary General Dr. Adnan Basha; and, the Rabita Trust letter is addressed to Rabita Secretary General Wael Jalaidan.  Each letter advises the respective recipient:

> "I would like to inform you that no single day passes by without a few journalists from Western countries coming to our offices…. We have received instructions from the ambassador of the Custodian of the Two Holy Mosques in Islamabad Mr. Ali Awwad Asiri not to release any statements to the press or the television.  We wanted to let you know that we abide by these instructions.  If you advise otherwise, we hope that you will inform us."[75]

61.     On October 14, 2001, MWL/IIRO/Rabita Trust "Office Director" Rahmatullah Nazir Khan wrote another identical letter with the same physical address, this time to Rabita Trust Secretary General Wael Jalaidan and IIRO Secretary General Dr. Adnan Basha.   This letter offered the recipients an update on the situation: "Some daily newspapers… have published the news of including the Rabita Trust among the organizations that support Osama Bin Laden or Al-Qaeda… The Pakistani government will be undertaking an audit for all of the Rabita Trust's accounts in Pakistan in the next two days.  This is to let you know, and we will be waiting for your instructions."[76]

62.     Similarly produced in discovery is a 2003 letter from MWL Secretary General Dr. Abdullah bin Abdul Mohsin Al Turki addressed to the Pakistani ambassador in the Kingdom of Saudi Arabia Abdul Aziz Mirza.  The letter outlines a request from the leadership of MWL in Saudi Arabia to the government of Pakistan requesting that they issue "a joint letter to the United States Treasury Department with the request to drop the

---

[72] Jelaidan (007), Jelaidan (008), Jelaidan (020), Jelaidan (021), IIRO 149637-149639, IIRO 149628, IIRO 149630, and IIRO 149633-149636.

[73] Jelaidan (020).

[74] IIRO 149637-149639.

[75] IIRO 149637-149639.

[76] IIRO 149628, IIRO 149630, IIRO 149633-149636.

name of Rabita Trust from the List." With regards to demands from the Pakistani government that MWL immediately remove designated Bin Laden associate Wael Jalaidan as head of Al-Rabita Trust, the MWL Secretary General complained about the "freezing of the Rabita Trust accounts in Habib Bank Limited by the Government of Pakistan," and insisted that "the issue of re-constitution of the Board of Trustees of the Rabita Trust and replacement of [Jalaidan] should be put after all the dues as explained above are paid… In my view, we should start with the re-activation of the Trust accounts since its legal stand is good and well justified… At the same time, efforts should be made to remove the name of Rabita Trust and subsequently get the clearance from the false and baseless accusation from the American Treasury Department."

63.     To the best of my knowledge, the U.S. government's blacklisting of Rabita Trust as a Specially Designated Global Terrorist ("SDGT") continues to this day.

64.     In addition to Rabita Trust, the MWL and its senior leadership also played key roles in facilitating the activities of another blacklisted charity known as Al-Haramain Al-Masjed Al-Aqsa—which MWL acknowledged in its 2002 annual report was founded in 1990 and "started its activities under the banner of the Muslim World League in 1419 AH" [corresponding to 1998].[77]

65.     Officials of Al-Haramain Al-Masjed Al-Aqsa simultaneously served as members of IIRO's Board of Directors. Minutes of the 8th Session of the IIRO's Board of Directors held on May 27, 2001 indicate that Al-Haramain Al-Masjed Al-Aqsa officials Mohammed bin Abdullah al Debyban and Mohammed bin Abdullah Taibah were IIRO board members along with IIRO Secretary General Adnan Basha.[78] Debyban and Taibah were also serving as IIRO board members in 1999, as indicated in the Minutes of the 2nd Meeting of the IIRO Board of Directors held on May 8, 1999.[79]

66.     I have also been provided a copy of an undated organizational chart of the Muslim World League that lists six key sub-entities within the MWL umbrella that report directly to the MWL Secretary General, one of which is listed as Al-Haramain & Masjid Al-Aqsa Foundation.[80]

67.     In May 2004, the U.S. Treasury Department blacklisted Al-Haramain Al-Masjed al-Aqsa as a Specially Designated Global Terrorist entity ("SDGT") for "funneling dollars to Al-Qaida."[81] According to the Treasury Department:

> "The Al-Haramain & Al Masjed Al-Aqsa Charity Foundation (AHAMAA) has significant financial ties to the Bosnia-based NGO Al Furqan, and al Qaida financier Wael Hamza Julaidan… As a member of the Board of Directors for AHAMAA, Julaidan opened

---

[77] IIRO 17721-17944.

[78] MWLIIRO 16233-16237

[79] MWLIIRO 16270-16276.

[80] MWL 19138.

[81] https://www.treasury.gov/press-center/press-releases/Pages/js1527.aspx.

three bank accounts on behalf of the NGO between 1997 and 2001 and continued to have authorization to handle two of their accounts as a signatory on two the NGO's Bosnian accounts."[82]

68.      U.S. government diplomatic cables have described the MWL's associations with international terrorist organizations and activities.  For instance, an August 21, 2008 cable originating from the U.S. Embassy in Jakarta, Indonesia advises that Muhammad Thalib, "a commission member with the Muslim World League since 1989," was selected as the supreme leader of the Majelis Mujahiddin Council ("MMI"), "the political wing of the terrorist organization Jemaah Islamiyah."[83]

69.      A March 24, 2008 U.S. State Department diplomatic cable identifies the MWL and World Assembly of Muslim Youth ("WAMY") as having ties to terrorist organizations.[84]

70.      A June 1, 2005 diplomatic cable from the U.S. Embassy in Madrid, Spain describes a joint investigation conducted by the Department of Justice and Spanish authorities linking the MWL to several million dollars in payments to accounts held by the Islamic Cultural Center in Madrid "between 1998 and 2003 that may have been diverted to persons suspected of supporting international jihadist activities."[85]

## B.      The International Islamic Relief Organization (IIRO)

71.      The Jeddah-based charity International Islamic Relief Organization (IIRO) (Hay'at al-Ighatha al-Islamiyya al-Alamiyya), known locally as "Ighatha," "IGASA," or "IGASE," was founded in 1978 as a separate branch of the Muslim World League (MWL).  Over the last thirty years, IIRO has become quite infamous for its often direct and inexplicable links to violent jihadists, including Al-Qaida and Usama Bin Laden.  Fayez Ahmed Alshehri, one of the September 11 airline hijackers, reportedly told his father he was going to go work for the IIRO and never saw his family again.[86]  Even Mohammed al-Zawahiri, leader of the Egyptian Islamic Jihad's military wing and the brother of Dr. Ayman al-Zawahiri (Bin Laden's personal physician and top advisor), worked and traveled around the world on behalf of IIRO.[87]  U.S. government diplomatic cables have stated that "Usama bin Ladin used the entire IIRO network for his terrorist activities."[88]

72.      According to U.S. Department of Defense documents, the U.S. government has privately designated IIRO as a "National Intelligence Priority Framework (NIPF) Counter-

---

[82] https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-a.aspx.

[83] PEC-KSA 1444-1445.

[84] PEC-KSA 1446-1450.

[85] PEC-KSA 1791-1792.

[86] Ba-Isa, Molouk Y. and Saud Al-Towaim.  "Another Saudi 'hijacker' turns up in Tunis."  Middle East Newsfile. September 18, 2001.

[87] "Official sources deny reports on UAE's extradition of Islamist."  Al-Hayat.  June 7, 2000.

[88] FED-PEC 220501-220502.

Terrorism (CT) Priority 2 Terrorist Support Entity (TSE)."[89]   According to these
documents, "Priority 2 TSEs have demonstrated sustained and active financial support for
terrorist organizations willing to attack U.S. persons or interests, or provide witting
operational support to Priority 2 terrorist groups."[90]   Separately, IIRO is also reportedly an
"NGO Tier 1 counterterrorism target defined as having demonstrative sustained and active
support for terrorist organizations willing to attack US persons or interests."[91]  Other DOD
documents have classified IIRO as among the "Associated forces" of Al-Qaida, "with
which al-Qaida, the al-Qaida network, or the Taliban had or has an established working,
supportive, or beneficiary relationship for the achievement of common goals… Through
associations with these groups and organizations a detainee may have provided support to
al-Qaida or the Taliban, or engaged in hostilities against U.S. or Coalition forces."[92]

73.     The Department of Defense has also internally acknowledged that the IIRO "is
financed by Usama bin Laden;"[93] "has been directly linked to Al-Qaida and Usama Bin
Ladin;"[94] has "provided financial assistance, funds transfers and legitimate cover for
moving money under the pretense of humanitarian relief to Al-Qaida;"[95] "has connections
to terrorist organizations and has channeled funds to Islamic extremists from
Afghanistan;"[96] has a network of "field offices worldwide, many of which are staffed by
or support terrorists or mujahidin;"[97] and, "is linked to… other extremist NGOs."[98]

74.     A 2004 U.S. State Department diplomatic cable produced as evidence in the present
litigation alleges "that some elements of the International Islamic Relief Organization
(IIRO) have been exploited by terrorists and their financiers as a means of transferring
assets, providing organizational cover, or otherwise supporting extremist, violent
operations."  The cable further identifies the IIRO "as the principal sponsor of terrorist
training camps in Afghanistan during the Taliban regime."[99]

---

[89] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Samir N. Al Hasan (ISN No. 043)
(March 4, 2008).

[90] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Samir N. Al Hasan (ISN No. 043)
(March 4, 2008).

[91] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN
No. 186) (June 28, 2006); U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Rashid Abd al
Muslih Qaid al Qaid (ISN No. 344) (May 13, 2005).

[92] U.S. Department of Defense, JTF-GTMO Matrix of Threat Indicators for Enemy Combatants.

[93] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Samir N. Al Hasan (ISN No. 043)
(October 13, 2006).

[94] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abdallah Ibrahim al Rushaydan (ISN
No. 343) (September 10, 2004).

[95] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abdallah Ibrahim al Rushaydan (ISN
No. 343) (September 10, 2004).

[96] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Ahmed Hassan Jamil Suleyman (ISN
No. 662) (March 28, 2005).

[97] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Rashid Abd al Muslih Qaid al Qaid
(ISN No. 344) (September 30, 2004).

[98] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Rashid Abd al Muslih Qaid al Qaid
(ISN No. 344) (September 30, 2004).

[99] PEC-KSA 1464-1466.

75.     As a result of the overwhelming evidence assembled against IIRO, the Canadian government (among others) has classified it as "secretly fund[ing] terrorism," officially branding it a terrorist charity.[100]   According to Canadian court documents, Mahmoud Jaballah, a suspected Egyptian Al-Jihad militant jailed in Canada and accused of having contact with Al-Qaida operatives, spent three years working for the International Islamic Relief Organization in Pakistan.   The Canadian Security and Intelligence Service CSIS "believes that Jaballah continues to actively support [Al-Jihad's] terrorist agenda."   As a result of their investigation, CSIS concluded that "the degree of Jaballah's dedication to the cause is such that Jaballah would resort to violence and would direct others to resort to violence if he was ordered to do so by leaders such as Osama Bin Laden or Dr. Ayman Al-Zawaheri."[101]   Among others, Jaballah was suspected of cooperating with senior Canadian Al-Qaida lieutenant Ahmad Saeed Khadr (a.k.a. Abdel Rahman Al-Kanadi), considered to be a highly influential figure in the international terrorist financing network.[102]

76.     During Jaballah's immigration trial, Mr. Arafat El-Asahi, the director of IIRO in Canada and a full-time employee of the Muslim World League, was called to testify on Jaballah's behalf.   The director admitted that Jaballah had "worked as a Principle of one of our organizations in Pakistan" and that he had been recommended by IIRO's administrators in Pakistan as having "excellent character and good behaviour."[103]   During his testimony, El-Asahi insisted, "The [IIRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia.   If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."[104]

77.     From the late 1980s, IIRO offices, representatives, and employees have been involved in money laundering, weapons smuggling, document fraud, terrorist financing, and acts of violence.   According to former Al-Qaida member Jamal al-Fadl, IIRO ran an Al-Qaida guesthouse in Peshawar, Pakistan.[105]   Al-Fadl also spoke of two Al-Qaida members "who were involved in the financial aspects of the group"—Abu Unaith al Saudi and Abu Hammam al Saudi—"purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989."   According to al-Fadl, "this office was located inside the offices of the Islamic Relief Organization (IRO)."   During his debriefing, al-Fadl "further advised that the manager and person who ran the

---

[100] Evidence introduced by the Canadian government in the trial of Mahmoud Es-sayy Jaballah.

[101] "Respondent's (Moving Party) Motion Record."  The Minister of Citizenship and Immigration and Mahmoud Jaballah, Docket: DES-6-99 (June 2, 1999), at pp. 61-62.

[102] "Respondent's (Moving Party) Motion Record."  The Minister of Citizenship and Immigration and Mahmoud Jaballah, Docket: DES-6-99 (June 2, 1999), at p. 10.  See also FED-PEC 144926-145008 (December 2, 3003 Report of the United Nations Security Council Committee Concerning Al-Qaida and Taliban at p. 15: "Evidence produced recently in a Canadian court linked IIRO funding directly to Al-Jihad, a designated entity tied closely to Al-Qaida, and responsible for the bombing in 1998 of the American Embassies in Dar es Salaam and Nairobi.").

[103] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah, Docket: DES-6-99, Federal Court of Canada (November 2, 1999), at p. 85.

[104] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah, Docket: DES-6-99, Federal Court of Canada (November 2, 1999), at pp. 81-88.

[105] Cooperating Witness Statement (January-February 1998) (PEC-KSA 2144-2157), at p. 3.

IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani… Julidan was one of Bin Laden's closest friends at the time."[106]

78.    Al-Fadl later identified Abu Hammam al-Saudi from Jeddah as the head of IIRO's office in Peshawar.  According to al-Fadl, Abu Hammam was an influential operator within the Al-Qaida network, who helped establish Bin Laden's company in Sudan, Wadi al-Aqiq, "and would provide false IIRO identifications for people to travel."  Al-Fadl told FBI investigators that some of the money Bin Laden distributed during the Soviet-Afghan war came from a very wealthy Saudi that "was sent to the IRO run by Abu Hammam."[107]

79.    According to al-Fadl, Al-Qaida's chief financial officer Saidi Madani al Tayyib "was working under Abu Hamam Al-Saudi, the individual who ran the Islamic International Relief Organization in Peshawar, Pakistan."  "Abu Hamam al Saudi would give money to Al-Tayyib who would then distribute certain amounts to both Sheikh Said Al-Masri (an Egyptian) and Abu Yassir Sarrir (an Algerian)."  Al-Fadl indicated that the latter two individuals "were in charge of salary, travel, and health benefits for Al-Qaida."[108] Said Al-Masri, a.k.a. Mustafa Abu al-Yazid, "took part in founding al-Qaida in 1989, and is a member of the Shura council of Qaida al-Jihad."[109]  He later ascended to the position of Al-Qaida's emir in Afghanistan and third-in-command in the Al-Qaida organization behind only Bin Laden and Dr. Ayman al-Zawahiri.

80.    Jamal al-Fadl recalled that the extent of support for Bin Laden within the ranks of IIRO ran throughout the organization all the way to its headquarters in Jeddah, Saudi Arabia.  According to al-Fadl, one of IIRO's managers in Jeddah, Sharaf al Din Ali Mukhar, had accompanied Bin Laden both to Afghanistan and later to Sudan, where he "run everything for Bin Laden."[110]

81.    During testimony before the Pentagon's Administrative Review Board, Guantanamo Bay enemy combatant detainees have made a number of references to their involvement in IIRO—such as a Saudi national from Dammam, Ghanim Abd al Rahman Ghanim al Huwaymadi al Harbi (ISN No. 516), who identified himself as "a [Saudi] government employee of a charitable organization… the IIRO, International Islam Relief Organization," and insisted that Al-Qaida's Al-Farouq training camp in Afghanistan—where at least seven of the 9/11 suicide hijackers were trained—was a "charity-funded camp." [111]   Another detainee—an unnamed Algerian who "voluntarily traveled from Mauritania, Africa to Islamabad, Pakistan in 1987 to work for [IIRO]"—likewise admits

---

[106] June 2, 2004 FBI Report (PEC-KSA 2133-2134).

[107] Cooperating Witness Statement (November 1996) (PEC-KSA 2115-2132), at pp. 6, 7, 10.  See also Jamal Al-Fadhl, Videotape Interviews, at pp. SA-894-901 (Jamal al-Fadl explained that the IIRO office in Peshwar, Pakistan, under the leadership of Wael Jalaidan, provided IIRO identification cards to members of Al-Qaida to allow them to cross the Afghanistan-Pakistan border.).

[108] Cooperating Witness Statement (January-February 1998) (PEC-KSA 2144-2157), at pp. 2-3.

[109] http://www.alhesbah.org/v/showthread.php?t=130663. May 26, 2007.

[110] Jamal Al-Fadhl, Videotape Interviews, at pp. SA-680 and SA-907.

[111] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abd al Rahman Ghanim al Huwaymadi al Harbi (ISN No. 516).

that he "received weapons training on the Kalashnikov rifle while working for the IRO… near the border town of Peshawar."[112]

82.     During testimony before U.S. Defense Department personnel, Guantanamo Bay detainee Said Muhammad Husayn Qahtani (ISN No. 200) described how IIRO offered fraudulent employment and documents to foreign mujahideen fighters who wished to cross the border into Chechnya and engage in combat with the Russian military:  "The detainee contacts relief organizations such as the Islamic Relief Organization and Haramain Organization.  The detainee's intention was to join a relief organization because those entities would offer him a way to get into Chechnya, whose borders were closed at that time.  Once there, the detainee would be free to leave the relief organization and join the fighting."[113]  According to Guantanamo Bay detainee Abdul Latif Elbanna (ISN No. 905), while away from the battlefield, "fighters from Afghanistan" lived for free during the early 1990s at an IIRO-owned guesthouse in the Hayatabad district of Peshawar."[114]

83.     IIRO's operations in Pakistan were allegedly responsible for sponsoring 7 Al-Qaida training camps in the region.[115]  Following the 9/11 attacks, the government of Pakistan "identified and expelled some two dozen Al-Qaida supporters who had been working for the IIRO-sponsored organizations in Pakistan."[116]

84.     In 2006, the government of Bangladesh seized and froze the IIRO's bank accounts at the Islami Bank of Bangladesh based on concerns expressed by the U.S. government that the IIRO has ties to al-Qaida.[117]

85.     In 2005, the government of Bahrain identified and closed an IIRO bank account that had been opened illegally and was being used "to circumvent Saudi restrictions on sending money abroad."  According to government officials, "during the first half of 2005, IIRO headquarters provided over $7 million from an account in Shamil Bank of Bahrain in Manama to 18 different IIRO satellite offices.  Among these transactions, IIRO provided funds from the Bahrain account to three Saudi Embassies.  Director Werner noted that the second largest single recipient of these funds was IIRO's Djibouti office."[118]

---

[112] Set_12_1179-1239, at p. 16.

[113] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Said Muhammad Husayn Qahtani (ISN No. 200) (August 12, 2006).

[114] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abdul Latif Elbanna (ISN No. 905) (August 26, 2005).

[115] January 1996 CIA Report on "International Islamic NGOs" and links to terrorism.  Page 1.  See also Affidavit by Senior Special Agent David Kane (Bureau of Immigration and Customs Enforcement, Department of Homeland Security).  United States of America v. Soliman S. Biheiri.  United States District Court for the Eastern District of Virginia, Alexandria Division, Case #: 03-365-A (August 14, 2003), at p. 2.

[116] FED-PEC 144926-145008 (December 2, 3003 Report of the United Nations Security Council Committee Concerning Al-Qaida and Taliban).

[117] FED-PEC 220511-220513.

[118] FED-PEC 220490-220491, FED-PEC 210514-210517.

86.     In 1999, the government of Azerbaijan closed the IIRO branch office in Makhachkala and confiscated the IIRO's assets.[119]

87.     Following the 1998 Embassy bombings in East Africa, IIRO's chapter in Nairobi was deregistered by the government of Kenya for its alleged connection to the terrorists responsible for the devastating blasts.  In the wake of the American retaliation for the suicide bombings, Indian police arrested a number of suspects charged in a successive attempted attack on the U.S. consulates in Madras and Calcutta.  This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, acting on orders from, among others, Shaykh Ahmed al-Gamdin, director of IIRO operations in Asia.[120]

88.     In September 1995, a German and Austrian counterterrorism task force raided the branch office of IIRO in Vienna, Austria as part of a weapons smuggling and terrorism financing investigation into the Third World Relief Agency (TWRA).  Earlier that year, in March 1995, authorities in Macedonia ordered the closure of the IIRO branch office in that country and the expulsion of its staff based on concerns of terrorism financing.[121]  In early 2000, IIRO's shared office in Kosovo with the Saudi Joint Relief Committee (SJRC) was raided in an attempt to thwart potential attacks on U.S. interests.[122]  IIRO's offices in neighboring Tirana, Albania were searched at least twice by local authorities in 2001 and 2003.[123]

89.     Dr. Farid Qurashi, IIRO's former "general supervisor," has publicly boasted that "IIRO was the first relief organization to enter Bosnia-Herzegovina and the Balkan region. From the very beginning of the Bosnia war, we were there to help."[124]  According to the Bosnian Muslim Army's Military Intelligence Service, IIRO's employees seemed to oddly "fluctuate… in and out of the humanitarian organization. They successively communicate with the members of the squad 'El-Mudzahidin '(Tesanj) and are the bearers of a so-called Pan-Arabian idea…. They tend to change traditional living and religious norms of behavior of Bosnians-Moslems.  This culminates through various reactions and confrontations, fights within the community."[125]  In an exclusive prison interview, former American mujahideen recruit Randall Todd Royer (a.k.a. Ismail Royer), who participated in the

---

[119] IIRO 284675, IIRO 103718, IIRO 96423, IIRO 48084.

[120] Dugger, Celia W.  "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say."  The New York Times.  January 21, 1999, at p. 4.  See also FED-PEC 203706-203709.

[121] FED-PEC 220506-220510; FED-PEC 104843-104856.  See also The Sunday Times, "Saudis Fund Balkan Muslims Spreading Hate of the West," March 28, 2010 ("Classified documents seen by The Sunday Times reveal that Macedonia officials are also investigating a number of Islamic charities, some in Saudi Arabia, which are active throughout the Balkans and are suspected of spreading extremism and laundering money for terrorist organizations. One of the groups under scrutiny is the International Islamic Relief Organization from Saudi Arabia, which is on a United Nations blacklist of organizations backing terrorism.").

[122] FED-PEC 97363-97365, IIRO 41030, IIRO 39085-39086, IIRO 39278, IIRO 122181-122181.  See also IIRO 122181-122182 (IIRO remained under surveillance by KFOR troops in 2003.).

[123] IIRO 42360, IIRO 42373, IIRO 122003.

[124] "IIRO saves forty thousand Bosnians from starvation."  Moneyclips.  July 4, 1993.

[125] "Disruption of the enemy's activities."  Memorandum dispatched from Zenica by Colonel Ramiz Dugalic, commander of the Ministry of Defense Security Administration  Republic of Bosnia and Herzegovina.  Army of Bosnia and Herzegovina (ARBiH) Security Service Department.  Classified No. 258-33.  September 14, 1994.

Bosnian jihad, acknowledged that IIRO's reputation was "well-known" in the Balkans: "it was well known that they helped get 'people 'into Bosnia." Royer explained that another mujahideen fighter in Zenica had openly discussed his efforts to use IIRO in order to obtain identity cards for fellow jihadis.[126]

90.     A United Nations Security Council report noted that, in the summer of 1992, "troops from Saudi Arabia allegedly killed three Serbian Territorial Defence members and placed the victims 'severed heads on poles near the 'Tesanj turret.'"[127]  In September 1992, Balkan press agencies published photos depicting the severed heads of Serb soldiers killed by foreign mujahideen collected in boxes.  The photos had been seized from the belongings of fallen Saudi Arabian nationals fighting with local Muslim forces in July and August near Tesanj.  Also confiscated alongside the images were business cards for companies in the Persian Gulf and an IIRO humanitarian worker identification card.  The recovered card was labeled with the name and photo of "Khalil Abdel Aziz," a teacher from Saudi Arabia, and indicated that it had been printed by the Peshawar, Pakistan office of IIRO.[128]  The discovery of the identification card in Bosnia was no coincidence:  until he moved to Europe in the early 1990s, the Egyptian Islamic radical Abu Talal al-Qasimy had personally been in charge of the very same IIRO issuing office in Peshawar.[129]

91.     By mid-1993, the operations of the IIRO in Bosnia-Herzegovina were under the primary oversight of a Palestinian national known as Abdelaziz Zaher (a.k.a. Abu Anas, Abu Enes) and his deputy, an Algerian national, Djamel Lamrani (a.k.a. Abu Musab al-Djazairi).  Zaher was expelled from his former residence in Belgrade at the beginning of 1993 after being tied by Serbian authorities to various organizations suspected of aiding armed fundamentalist militant groups, including IIRO.[130]  In the aftermath of his expulsion from Yugoslavia, Zaher moved his base of operations to Vienna and Zagreb.[131]

92.     One of the members of IIRO's initial management team in Vienna in 1992, Sukarno Ali Hassanein (brother of Third World Relief Agency chief El Fatih Hassanein), recalled during a later interview with Austrian police, "I know him as Zaher Abdelaziz, [he] works

---

[126] Interview with Randall Todd Royer (a.k.a. "Ismail Royer") at the Alexandria Detention Center; Alexandria, VA.  June 30, 2004.

[127] Final Report of the United Nations Commission of Experts Established Pursuant to Security Council Resolution 780 (1992): Annex III.A: Special Forces.  May 27, 1994.  EX: 0027-7184-0027-7441.

[128] Compass Newswire.  November 1, 1995.  See also Emerson, Steven, "An Investigation into the Modus Operandi of Terrorist Networks in the United States: The Structure of Osama Bin Laden, Al-Qaeda, Hamas and other Jihadist Organizations in the United States."  Testimony given before the House Subcommittee on National Security, Veterans Affairs and International Relations of the House Committee on Government Reform.  October 11, 2001.

[129] Compass Newswire.  November 1, 1995.

[130] Vujicic, D.  "Bombs in the Name of the Almighty:  Part II."  *Vecernje Novosti* (Belgrade) (September 27, 2001), at p. 13.

[131] According to a report from the Bosnian MUP police service, "in those days", four other individuals were known to work alongside Zaher in the IIRO's regional headquarters: Saudi national Dr. Abdala Alabdan, "Abdalin", Palestinian national Muhamed Salah, and Syrian national Mustafa Hamami.  See: "Subject: ABDEL RAHMAN MAMDOUH – Operative Data."  Internal memorandum from the BiH FMUP Special Detachment, Department for the Tuzla Canton; #12/2-3-356/04.  Dated: April 5, 2005.

for IGASA/IIRO.  He might be the boss for Vienna or Zagreb.  He is one of our successors at IGASA."  As to what he meant by "successors," Sukarno explained, "we haven't been representing this organization for a year and half already since the Main Office in Saudi Arabia sent their own people to Vienna."[132]

93.     During a June 2019 deposition of Abdulrauf Khalaf Al-Shorman, former chief of the IIRO branch office in Sarajevo, al-Shorman confirmed that Abdelaziz Zaher "was the supervisor" of IIRO's offices in Bosnia-Herzegovina, Croatia, and Slovenia: "The offices of the IIRO, yes."  Al-Shorman also confirmed that Zaher was known to him by the pseudonym Abu Anas: "yes, of course.  It's a name, it's a nickname, because his son is Anas, so he is Abu Anas, father of Anas... the first time he visited Sarajevo—the first time I saw him, in his first visit to Sarajevo in 1994, back then I was an employee with the orphans."  Al-Shorman recalled meeting Zaher on two separate occasions, "probably '95 or even '94, same year.... He visited the office and he came to greet the employees.... He was the executive director of the offices."[133]

94.     Al-Shorman also confirmed during his deposition that Zaher's associate Djamel Lamrani had served as "the orphans coordinator" at IIRO's office in Split, Croatia: "he was the coordinator of the orphans in Split, and then he came to Konitz office."[134]

95.     Abdelaziz Zaher was an eyewitness, and a possible accessory to, the 1994 murder of British aid worker Paul Goodall near Zenica—acknowledged by the Bosnian Muslim Army at the time as "one of the most serious incidents caused by the members of the [El-Mujahidin] unit."[135]  On January 27, 1994, three Britons—Simon King, David Court, and Paul Goodall—working for their government's Overseas Development Administration (ODA), were traveling through Zenica at night in a UN-marked Land Rover.  After being chased and forced off the road, five Arabic-speaking "bearded gunmen" in combat fatigues quickly alighted from a Volkswagen Golf.

96.     Instead of holding the Westerners hostage, their assailants confiscated their coats and wallets, and forced them to lie on the ground.  Within twenty minutes, another unidentified car arrived with two more gunmen.  After a "short discussion," one of the men suddenly turned and shot Paul Goodall twice at short range in the back of his head.[136]  A Bosnian police checkpoint near the crime scene noticed the Volkswagen Golf as it later passed by and marked its license number.  Two days later, local authorities located the Golf and arrested three men inside:  Saudi national Abdul Hadi al-Qahtani (a.k.a. Abdul Hadi al-Gahtani), "Abu Khulud al-Yemeni," and "Abu Enes" (a.k.a. IIRO chief Abdelaziz Zaher).  At the time of his arrest, al-Qahtani was carrying an identification card issued by

---

[132] Minutes of Austrian police interview with Sukarno Ali Hassanein following search of premises belonging to El Fatih Hassanein.  September 5, 1995.  FED-PEC 224262, FED-PEC 224273-224280.

[133] Transcript, Deposition of Abderraouf Khalaf Alshorman (June 21, 2019), at pp. 229, 269-271.

[134] Transcript, Deposition of Abderraouf Khalaf Alshorman (June 21, 2019), at pp. 272, 274.

[135] "Review of the Information on Activities of the Persons from Afro-Asian Countries Directly Before the War and During the War in the Territory of BIH Republic."  Report written by the BIH Administration of the Military Security Service– Department for Analytical and Informative Affairs."  Sarajevo; May 6, 1995.

[136] Stephen, Chris.  "Shots First then the Questions."  The Guardian (London) (June 16, 1994), at p. T4.

the Zenica office of the Saudi High Commission for Relief.[137]  Dzemaludin Mutapcic, the deputy prosecutor of Zenica, announced to reporters that al-Qahtani had come to Bosnia "to fight in the way of God, to save Bosnia's Muslims."[138]

97.     When shown a photograph of al-Qahtani, both King and Court allegedly identified him as the lead assailant behind the murder of Paul Goodall.[139]  Asim Fazlic, then-chief of police in Zenica, commented, "One of the strangest elements is that we still do not know the exact identity of [those]… we hold in Zenica.  They are very uncooperative and so far still insist, in spite of their car, uniform and weapons, that they are humanitarian aid workers helping privately funded organisations."[140]  In a letter dated January 30, 1994, deputy commander of the El-Mudzahid Unit Dr. Abul-Harith al-Liby appealed to "authorized individuals" in the BiH Military Police and security services to release the two "mujahideen" arrested alongside Abdulhadi al-Qahtani:

> "We came to Zenica together on Friday [January 28] of this year and spent the whole day in Trokuce, i.e. in the Command of the Detachment.  In the evening of the same day [January 28] these two Mujahedins left, together with Abdulhadi Alkahtani, [a] person who was in our unit until one month ago, when he left the unit and went to work at the Saudi Organisation 'IGASE.'  However, [Al-Qahtani] continued to visit our premises, just like this Friday… [On] Friday evening him and the two Mujahedins (Abu Hulud and Abu Enes) went towards Mehuric in a vehicle owned by a brother from 'IGASE.'  Therefore, I confirm that these two brothers Mujahedins have nothing to do with the event that happened on [January 27]… I am personally responsible for them and their actions… In the name of all the Mujahedins, I request the two Mujahedins to be released… We want complete co-operation with the authorised organs for establishing peace and order in the Republic of Bosnia and Herzegovina… [which] will be held responsible in case of ill-treatment of brothers Mujahedins."[141]

98.     It should be noted that, in his letter, the deputy commander of the mujahideen identified both Abdelaziz Zaher ("Abu Enes") and his colleague Abdulhadi al-Qahtani interchangeably as "mujahideen" and as "employees" of IIRO ("IGASE"), who were detained by BiH authorities as part of a murder investigation while traveling in an IIRO employee-owned vehicle.  Following the end of the war in Bosnia-Herzegovina in late

---

[137] Higgins, Andrew et al.  "Assault on Charities is Risky Front for U.S."  The Wall Street Journal.  October 16, 2001.

[138] Stephen, Chris.  "No Justice over Murdered British Aid Worker as Suspect Languishes Behind Prison Bars."  The Guardian (London) (March 23, 1994), at p. 1.

[139] Stephen, Chris.  "No Justice over Murdered British Aid Worker as Suspect Languishes Behind Prison Bars."  The Guardian (London) (March 23, 1994), at p. 1.

[140] Loyd, Anthony.  "3 held for Goodall murder."  The Times (London).  February 2, 1994.

[141] Letter from Dr. Abul-Harith al-Liby.  Dated: January 30, 1994.  International Prosecutors v. Rasim Delic.  International Criminal Tribunal for the Former Yugoslavia (ICTFY).  Exhibit 0403-3847-0403-3847.

1995, Abdelaziz Zaher and IIRO continued their operations in the Balkans.  The same year, "with the financial help of Selim Ben Mafuz, the executive director of 'Igasa 'in Vienna," Zaher and other local IIRO organizers founded two commercial enterprises, "Sahara" and "Isra-Trade" which allegedly were the recipient of suspicious financial transfers from "residential accounts of the H.O. 'Igasa.'"[142]

99.     According to a guidebook on Islamic charitable organizations printed by NATO, in April 1995, "the regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb" for his involvement in alleged criminal activity.[143]

100.    A November 2002 U.S. State Department diplomatic cable titled "Terrorist Finance: Bosnia's Dirty Dozen," identifies a number of Saudi charities that "are currently involved in providing financial support to known terrorist organizations," including the IIRO, Al Haraman Islamic Foundation, Saudi High Commission, and others.[144]

101.    An August 2003 U.S. State Department diplomatic cable titled "Terrorist Finance: Dirty Dozen's Web of Deceit," reports that the IIRO was implicated in weapons smuggling:  "The RS Police arrested 9 Bosnian Serbs in July 2003 for allegedly smuggling weapons to the International Islamic Relief Organization (IIRO), known locally as Igassa."[145]

102.    During his 2019 deposition in this litigation, IIRO official Abdulrauf Khalaf al-Shorman, who was the IIRO representative in Bosnia-Herzegovina at the time of the smuggling allegations in 2003, confirmed that he heard of the incident but did not ask any questions about it because there was "no need for it … [b]ecause we didn't hear about it except from the newspapers."[146]  Shorman further claimed that he did not do anything to investigate the allegations, he did not instruct anyone to look into the allegations, and cannot recall whether he asked the IIRO headquarters to investigate the matter.[147]

---

[142] "Subject: ABDEL RAHMAN MAMDOUH – Operative Data."  Internal memorandum from the BiH FMUP Special Detachment, Department for the Tuzla Canton; #12/2-3-356/04.  Dated: April 5, 2005.

[143] January 1996 CIA Report on "International Islamic NGOs" and links to terrorism.  Page 1.  See also Affidavit by Senior Special Agent David Kane (Bureau of Immigration and Customs Enforcement, Department of Homeland Security).  United States of America v. Soliman S. Biheiri.  United States District Court for the Eastern District of Virginia, Alexandria Division, Case #: 03-365-A (August 14, 2003), at p. 2.

[144] PEC-FOIA 4499-4503.

[145] PEC-FOIA 49927-49932.  See also The Islamic Library – Lessons of Sheikh Saad Buraik, "Explaining the Meaning of Jihad for Support," at p. 3095 ("Praise be to Allah, we know that the Islamic Relief Organization is an official agency under the command, care, and sponsorship of the country.  It has big, clear, and strong projects in all areas of Jihad, in addition to the relief projects and orphan sponsorship projects.  This also applies to the trusted people whom we know.  This means that if someone comes to you and gives you money saying, 'Oh, brother, take this.  You are going to Afghanistan,' just take it and hand it over to Sayyaf, or hand it over to Hekmatyar.  Or, use it to buy a thousand missiles and take them there.  If you can hold the trust, we say, 'May Allah reward you with goodness.'  And if you come and hand it over to the Islamic Relief Organization, it is a reliable and well-known agency and we do not doubt about it.").

[146] Transcript, Deposition of Abderraouf Khalaf Alshorman (June 21, 2019), at pp. 309-310.

[147] Transcript, Deposition of Abderraouf Khalaf Alshorman (June 21, 2019), at pp. 356-358.

103.    On July 22, 1991, the U.S. branch of IIRO ("The International Relief Organization, IRO") was first officially established at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali, wealthy businessman, member of IIRO's Executive Committee, and a member of the Shura (Consultative) Council of the Kingdom of Saudi Arabia.[148] IIRO in America was established to fund "institutions, groups, and individuals whose projects, programs and situations fall in one of [IIRO's] service program areas… Institutions, groups and individuals submit proposals for assistance or cooperation. Proposals are reviewed to determine eligibility and validity. Once approved, [IIRO's] administration decides on the size and amount of help."[149]

104.    A July 1998 letter from then-MWL Secretary General and IIRO Chairman Dr. Abdullah al-Obaid vouched for Al-Ali as a "member of the Executive Committee" of an IIRO investment fund and affirmed that he was empowered to review IIRO/MWL financial assets.[150] According to former business associates, al-Ali was able to marshal large sums of cash from donors and investors because "he's originally from Saudi Arabia, and he knew a lot of businessmen overseas in the Gulf area, and he… was the potential person to generate that money from different businessmen."[151] Even inside the U.S., IIRO received significant funding from official Saudi sources:  on January 18, 1996, Sulaiman bin Al-Ali reported to Arab journalists that Prince Bandar ibn Sultan, Saudi Ambassador in Washington, had donated SR500,000 worth of computer equipment directly to the IIRO office in Washington D.C.[152]

105.    In December 1992, Sulaiman Al-Ali transferred over $2.1 million in financial assets from a charitable investment fund controlled by IIRO and the Muslim World League to investment projects controlled by BMI, Inc. (a.k.a. Bait ul-Mal), a company founded in Secaucus, New Jersey by al-Ali's business associate Soliman Beheiri.[153]  The $2.1 million invested in BMI ultimately became the subject of a civil lawsuit after the money

---

[148] IIRO was originally organized as International Relief Organization in the U.S. on July 22, 1991. On February 18, 1992, International Islamic Relief Organization was formed. The two organizations are one-and-the-same, and therefore will be referred to as IIRO herein. Virgina Secretary of State, Corporate Record, International Relief Organization and International Islamic Relief Organization. See also http://www.saudiembassy.net/gov_profile/shura00.html, November 6, 2002.

[149] IRS 990 form for the "International Relief Organization" for Fiscal Year 1992.

[150] Exhibits A-1 & A-2 to The Sana-Bell, Inc. v. BMI Real Estate Development, Defendant's Opposition to Plaintiff's Motion for Summary Judgment., p.10, January 21, 2000.

[151] Direct Examination of Khaled Y. Falah. United States of America v. Mohammed Mabrook. United States District Court Northern District of Illinois, Eastern Division, Case #: 98 CR 271, at p. 593.

[152] "Bandar donates computers." Moneyclips. January 19, 1996.

[153] The Sana-Bell, Inc. v. BMI Real Estate Development, Plaintiff's Proposed Findings of Fact and Conclusions of Law., p.1, February 24, 2002. Defendants' Proposed Findings of Fact and Conclusions of Law. The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al. United States District Court for the District of Maryland (Southern Division) (February 24, 2000), at p. 9.  See also Limited Partnership Withdrawal Agreement; BMI Leasing Limited Partnership and Sana-Bell Inc. Dated January 1, 1996. Document submitted as an exhibit attached to "Memorandum in Support of Plaintiff's Motion for Summary Judgment." The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al. United States District Court for the District of Maryland (Southern Division). Case No. 98-CV-4177 (PJM). Filed December 15, 1999.  See also Secretary of State, State of New Jersey, BUM, Inc, March 19, 1986.

disappeared entirely. According to a sworn statement from FBI Agent Robert Wright, an accountant at BMI later called another FBI agent to discuss his concerns that "funds the accountant was transferring overseas on behalf of [BMI] may have been used to finance the embassy bombings in Africa."[154]

106.     In January 1997, IIRO's Northern Virginia offices run by Sulaiman Al-Ali were raided by FBI agents as part of a terrorism, money laundering and fraud investigation.  The individuals and organizations named in the Search Warrant included Sulaiman Al-Ali himself.[155]  In an online chat session posted on March 22, 2002, a former IIRO employee explained:

> "I used to work with International Islamic Relief Organization [in the U.S.]. This organization ended its work about three years ago. The reason was …a decision of the administrative council at that time…The investigation to which IIRO was subject was for its being an investor in a commercial organization in Chicago which was raided by the authorities for a background of supporting terrorism, and IIRO was a chief investor. What touched the company touched the organization."[156]

107.     According to the Philippine military's southern command, the IIRO local office in Zamboanga City is the prime coordinating center for the Abu Sayyaf Group (ASG), a coalition of secessionist Islamic militants in the southern region of the Philippines linked to Al-Qaida.  The Zamboanga office, established in 1992, was under the direct control and guidance of Mohammad Jamal Khalifa, brother-in-law of Usama Bin Laden.[157]

108.     Khalifa, known to be close to Usama, was detained by American law enforcement officials as he attempted to return from San Francisco to the Philippines on December 16, 1994.  Travelling with Khalifa on this occasion was Mohamed Loay Bayazid (a.k.a. Abu Rida al-Suri), one of the founders and key international operatives of Al-Qaida.

109.     After searching Khalifa's electronic organizer and personal address book, agents found entries for two telephone numbers of intimate associates of Ramzi Yousef, the convicted bombmaker in the February 1993 World Trade Center attack.  They also

---

[154] March 21, 2000, Sworn Statement of Special Agent Robert Wright obtained through the Free of Information Act.

[155] Attachment B In the Matter of the Search of: 360 S. Washington, 3rd Floor, Falls Church VA, USDC Eastern District of Virginia, Filed January 30, 1997.  See also IIRO 285529-285530 (October 16, 2002 letter from Sulaiman Al-Ali to IIRO Secretary General Adnan Basha describing the raid in 1997.).

[156] Islam Online chat session with Mohammad Omeish, March 22, 2002.

[157] See also PEC-KSA 294-295 (Notices authored by MWL Secretary General Dr. Abdullah Naseef and IIRO Director General Dr. Farid Y. Qurashi certifying that Mohammed Jamal Khalifa is "the Regional Director for the IIRO in South-East Asia" and "he is authorized to sign any agreement between the governments of South-East Asia Countries and the Muslim World League and the International Islamic Relief Organization."); FED-PEC 210798-210808 (IIRO's September 20, 1991 filing with the Philippines Securities and Exchange Commission establishing the IIRO branch office in the City/Municipality of Makati, Metro Manila under the leadership of Mohammed Jamal Khalifa.).

34

discovered documents on Khalifa "referring to the assassination of bishops and bombings of churches (at a time when evidence gathered in the investigation indicates that… others were planning to kill the Pope during a planned January 1995 visit to the Philippines and after churches had already been bombed in the Philippines in the preceding year)."[158]  Four days later, a State Department cable to the American Embassy in Khartoum, Sudan referred to IIRO administrator Khalifa as a "known financier of terrorist operations."[159]

110.    U.S. law enforcement officials were also able to recover a handwritten Arabic document from the luggage of Mohammad Jamal Khalifah which apparently represents a curriculum catalogue for an IIRO-sponsored school in the Philippines known as the Institute of al-Imam al-Shafi for Education (a.k.a. Dar al Imam al Shafi'i).  The catalogue indicates that the institute is headed by Mohammad Jamal Khalifa (a.k.a. Abu al-Baraa). Advanced level courses at the institute included "Propaganda: introduction, its relation to jihad, illustrations of Islamic propaganda, Zionist hegemony over channels of propaganda…. Security of individuals, surveillance, how to escape surveillance, security of secret houses and secret documents, methods of information gathering on individuals… how to resist, importance of steadfastness and judgement to confession, methods of torture used in investigations."  An entire section of the curriculum is dedicated exclusively to "Jihad:" "Legal provisions for assassinations and kidnapping; Legal provisions for assassinate priests and Christians; Legal provision for bombing churches and places of worship; Legal provisions for martyrdom operations…. Assassinations: introduction, causes, methods, how to implement it; Explosives: types, how to put together simple explosives."  It emphasized the inclusion of "a round (training cycle) on weapons and explosives, 'full military training.'"[160]

111.    Following Khalifa's arrest, the Department of State's Coordinator for Counterterrorism, Philip C. Wilcox, Jr., submitted several letters to the immigration court in support of Khalifa's continued detention.  In a December 16, 1994 letter, Wilcox stated that "the United Stated Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the

---

[158] Sworn affidavit of FBI Special Agent Robert Walker.  United States of America v. Benevolence International Foundation, Inc.  April 29, 2002.  District of Illinois, Eastern Division.  Case number: 02CR0414.  See also 1996 Central Intelligence Agency report (FED-PEC 104843-104856) ("The former head of the IIRO office in the Philippines, Mohammad Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin.  Another high-ranking official in the Philippines leads Hamas meetings, and the majority of Hamas members in the Philippines are employed by the organization.").

[159] Sworn affidavit of FBI Special Agent Robert Walker.  United States of America v. Benevolence International Foundation, Inc.  April 29, 2002.  District of Illinois, Eastern Division.  Case number: 02CR0414.  See also December 2004 U.S. State Department diplomatic cable (PEC-KSA 2275-2276).

[160] FED-PEC 202848-202852.  See also MWL 8434-8453 (IIRO publication identifying the Dar al Imam al Shafi'i as one of several schools in the Philippines supported by the IIRO's Social Services Division); FED-PEC 211425-211465 (Philippines Intelligence report stating that teachers and staff of the Dar al Imam al Shafi'i, "one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar,'" which was used to train members of the Moro Islamic Liberation Front ("MILF") terrorist group and the IIRO.).

Philippine terrorist group Abu Sayyaf. We also have information that while in the Philippines he has been involved in organizations closely linked to Hamas."[161]

112. In a second letter dated December 20, 1994, Wilcox stated that Khalifa "has engaged in a repeated pattern of providing financial, logistical and training assistance to international terrorists."[162]

113. Wilcox's letter made the following additional points:

- "Mohammed Jamal Khalifa has provided support to terrorist groups in the Philippines. These organizations have undertaken bombings of civilian targets in the Philippines, including theaters, and have kidnapped American citizens.

- Khalifa has helped organize efforts by former fighters in Afghanistan and others with military experience in the Middle East to provide training and assistance in the Philippines to terrorists.

- Khalifa has extensive ties to the HAMAS organization which has undertaken repeated and fatal attacks against civilian targets in Israel and the Occupied Territories in an effort to disrupt the Middle East peace process.

- Khalifa also has links to the Gama't Islamiyya terrorist group which is undertaking terrorist attacks against the Government of Egypt and civilian targets in that nation."[163]

114. A U.S. State Department diplomatic cable issued at this same time further described Khalifa's ties to Usama bin Laden and terror groups in that region: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations. Khalifa is reported to be the brother in law of Usama Bin Laden, the Sudan-based financier of Islamic extremists. Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf."[164]

115. Additional U.S. government diplomatic cables describe Khalifa's use of the IIRO to finance the Abu Sayyaf Group (ASG) terrorist organization. For instance, an April 1995 cable issued by the U.S. Embassy in Manila, Philippines states "Mohammed Jamal Khalifa, the former head of the International Islamic Relief Organization in Manila, [i]s a principal financier of Abu Sayyaf."[165]

---

[161] PEC-KSA 2260-2261.

[162] PEC-KSA 2262-2263.

[163] PEC-KSA 2262-2263.

[164] PEC-KSA 2264-2274.

[165] PEC-KSA 2277-2280. See also European Parliament, Directorate-General for External Policies, "The Involvement of Salafism/Wahhabims in the Support and Supply of Arms to Rebel Groups Around the World," June 2013, at p. 9 ("The so-called Khalifa network counted at least twelve charitable organisations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organisations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region

116.     An October 2001 U.S. State Department cable advises that "Philippine authorities reported that Saudi national Muhammad Jamal Khalifa who ran two Islamic nongovernmental organizations in Manila was the major financier of the terrorists arrested there.  Khalifa who has also been implicated in terrorist activities in Jordan is Bin Ladin's brother-in-law."[166]

117.     An April 2004 U.S. State Department cable states that the IIRO is "tied to al-Qaida and other terrorist organizations.  For example, IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime.  IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."[167]

118.     A May 23, 2005 U.S. State Department cable states that the IIRO was used by Khalifa to covertly transfer funding and materials to Abu Sayyaf Group and associated terror groups in the Philippines:  "Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and materiel to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines.  Although Khalifa left the Philippines in 1994 and the IIRO was shut down, there remain concerns that his network and associates may still be operating here."[168]

119.     In November 2001, as per reporting in both Filipino media and the Wall Street Journal, Philippine National Police intelligence agents and a counterterrorism "strike force" arrested four suspected Al-Qaida operatives while allegedly in the possession of explosives, blasting caps, maps to targets, weapons, and ammunition.[169]   One of the detained individuals, a Palestinian named Mohammad Sabri Selemah Abusweirah, "was assigned as head of the WML-IIRO (World Muslim League-International Islamic Relief Organization) for Western Mindanao" under the direction of Mohammad Jamal Khalifa.

120.     In a January 8, 2003 letter to IIRO Secretary General Adnan Basha responding to allegations of his involvement in terrorist activities in the Philippines, Khalifa stated that "the [IIRO's] office and my work in the Philippines were entirely legal and they were under the oversight of the Saudi Embassy."[170]

---

under the control of the aforementioned rebel groups.  For instance, the head of IIRO's branch office in Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf.").

[166] PEC-KSA 2281-2304.

[167] PEC-KSA 1467-1470.

[168] FED-PEC 220479-220481.

[169] The Philippine Star, "4 Suspected Terrorists with Al-Qaeda Links in RO Custody" (March 10, 2002); Wall Street Journal, "Manila Suspends Talks with Rebels After Allegations of Al Qaeda Links" (March 12, 2002).

[170] IIRO 3010-3011.

121.     In August 2006, the U.S. Treasury Department announced that it was blacklisting the Philippine and Indonesian branch offices of IIRO as Specially Designated Global Terrorist (SDGT) entities for "facilitating fundraising for al Qaida and affiliated terrorist groups."[171]     According to a statement from the Treasury Department:

> "The IIRO-PHL is a source of funding for the al Qaida-affiliated ASG [Abu Sayyaf Group].  IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups.  A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations. The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member.  IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of Khalifah.  While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan.  At the time Khalifah directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994.  In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992.... The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates."[172]

122.     In connection with this litigation, the IIRO has produced a letter written in 2002 from IIRO Secretary General Dr. Adnan Basha citing a visit to IIRO's headquarters by a delegation from the Moro Islamic Liberation Front ("MILF").[173]  The MILF is an armed

---

[171] https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.  See also FED-PEC 202100-202112, FED-PEC 202113-202132 (U.S. Treasury Department Office of Foreign Asset Control's evidentiary memorandum supporting the August 3, 2006 Executive Order 13224 designations of the IIRO branch offices in the Philippines and Indonesia and the Executive Director of the IIRO's Eastern Province Branch, Abd al Hamid Sulaiman al Mujil).

[172] https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[173] IIRO 97450.  See also IIRO 93331-93333 (correspondence between the Chairman of the Moro Islamic Liberation Front ("MILF") and MWL Secretary General Abdullah al Turki).

Islamist insurgent group in the southern Philippines whose fighters have engaged in joint terrorist attacks with the Abu Sayyaf Group in the Philippines as recently as July 2007.[174]

123.    As part of its enforcement action, the U.S. Treasury additionally personally designated the former Executive Director of the Eastern Province Branch of IIRO in Saudi Arabia, Abd Al Hamid Sulaiman Al-Mujil.[175]   According to an accompanying statement from the Treasury Department:

> "Al-Mujil has been called the 'million dollar man 'for supporting Islamic militant groups.  Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI)… In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI. Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries.  In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.  Al-Mujil has a long history of providing support to terrorist organizations.   He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).  The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN)."[176]

124.    According to comments from Stuart Levey, former Undersecretary for Terrorism and Financial Intelligence (TFI) at the U.S. Treasury Department, "Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia.  Al-Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes."[177]

125.    The August 2006 enforcement action by the U.S. Treasury was the culmination of years of work by senior levels of the U.S. government.  A June 16, 2006 U.S. diplomatic cable details a visit by then-Homeland Security advisor Frances Townsend to Saudi Arabia in order to quietly announce to the Saudis the U.S. government's intention to designate IIRO's branch offices, as well as Mujil.  According to the cable, "The United States is also

---

[174] https://www.dni.gov/nctc/groups/abu_sayyaf.html.

[175] https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[176] https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[177] https://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

aware of IIRO's significant illegitimate and illegal activities that fund terrorist activity. We have been concerned about IIRO for many years now and have shared our concerns and information with the Government of Saudi Arabia on a regular basis."[178]

126.    Despite the designation of the IIRO's branch office in the Philippines, U.S. officials raised concerns with Saudi Foreign Minister Prince Saud Al-Faisal a year later in 2007 that the Saudi Ambassador to the Philippines, Muhammad Amin Waly, was involved "in terrorism facilitation, particularly his intervention to get two members of IIRO out of prison."[179]

127.    In 2009, the U.S. government continued to express concerns about the IIRO's Eastern Province office despite assurances from the Saudi government that it had shut down the office, warning "that money continued to be funneled overseas from the Eastern Province Branch."[180]

128.    Fahd al-Harbi, who supervised the IIRO's branch office in Indonesia at the time of the 2006 designation, claimed that he did not conduct any inquiries concerning the designation.  According to al-Harbi, he never spoke to IIRO Secretary General Adnan Basha, Abd Al Hamid Sulaiman Al-Mujil, or anyone at the local Saudi Embassy about the designation of the office.[181]  Al-Harbi said that no one in the Indonesia office was fired or disciplined following the designation.[182]

129.    Abdelhadi Daguit, the former MWL and IIRO official in the Philippines, similarly feigned ignorance when asked about the 2006 designation of the IIRO office during his deposition.  Daguit claims that despite being affiliated with the IIRO in the Philippines for many years at the time of the designation, he did not conduct any inquiry to determine whether the designation of the IIRO's office was proper, and did not conduct any inquiry to determine if the people he worked with had any information concerning the allegations that Abd Al Hamid Sulaiman Al-Mujil was tied to terrorists.[183]  Daguit further testified that he did not conduct any inquires to determine why the IIRO office bank accounts in the Philippines had been frozen, and did not ask anyone why the IIRO office closed its operations or why he stopped receiving a salary.[184]

130.    In connection with the present litigation, I understand that the IIRO has produced a number of auditor reports that it conducted of its branch offices across the Muslim world, many of which identify critical deficiencies in accounting practices and significant financial irregularities.

---

[178] FED-PEC 220571-220572.

[179] FED-PEC 220503-220505.

[180] PEC-KSA 2346-2349.

[181] Transcript, Deposition of Fahd Mohammad Sanad Alharbi (March 27, 2019), at p. 352.

[182] Transcript, Deposition of Fahd Mohammad Sanad Alharbi (March 27, 2019), at p. 356.

[183] Transcript, Deposition of Abdulhadi T. Daguit (June 27, 2019), at pp. 156-157.

[184] Transcript, Deposition of Abdulhadi T. Daguit (June 27, 2019), at pp. 156-161.

131.    For instance, in 2000, an IIRO delegation formed to review the financial performance of the IIRO-Pakistan office discovered that "[t]he collected evidence indicated the existence of cheating, forgery and misuse of the IIRO's funds, which were used for the disbursement of private projects."[185]    IIRO officials subsequently informed Pakistani authorities and the IIRO's accountant, Amer Jassim Mohammed Talib, was arrested.

132.    A formal audit of the IIRO branch office in Pakistan ordered by IIRO's senior leadership in Saudi Arabia for the 1996-2001 timeframe, confirmed the deliberate diversion of millions of dollars from that office through the deceptive fabrication of receipts, invoices, and project documents.[186]

133.    According to the Court of Appeal in Islamabad, the investigation into Talib's actions "found tremendous financial embezzlement; roughly millions according to the local currency.  [Talib] was the Head of Accounting Department in the IIRO.  He was responsible for and beneficiary of such embezzlements.  Large amounts of money were embezzled by him.  He, sometimes, forged the accounts or provided the higher management with wrong accounts." [187]

134.    The Court of Appeal further found that Talib "never bought medicines or food, but forged the documents and authorities and pretended to achieve the required actions. He transferred the gained amounts into his own account or pocket. There are 185 authenticated copies of the documents and invoices (attached herewith) that include non-small amounts, and the material mentioned and registered therein were not bought. The concerned shops and storehouses were communicated, and they confirmed that such documents are forged and not issued by them and that the signatures shown thereon are irrelevant. Accordingly, they are not real."

135.    The Court of Appeal concluded that "the general nature of the events confirm that [Talib] manipulated the funds.  Whilst such manipulation, he was able to embezzle tremendous amounts of money by preparing forged documents and authorities. Such embezzled funds were allocated for orphans and other charitable purposes." [188]

136.    The director of the IIRO-Pakistan office, Moayad al Butairi, was also implicated in the cheating, forgery, and misuse of IIRO funds.[189]  According to investigation records,

---

[185] IIRO 31022-31023.  See also IIRO 31006-31007 ("For example, certain invoices are forged with names of unreal companies. The team went to the addresses of these companies and shops and confirmed that they are unreal.").

[186] IIRO 111020, IIRO 26468-26490.  See also Transcript, Deposition of Adnan Basha (February 21, 2019), at p. 238 (The "net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts which have been misused or misappropriated locally.").

[187] IIRO 31160-31166.

[188] IIRO 31160-31166.

[189] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 212-215 (Basha testifies that the IIRO received evidence that Butairi was involved in the cheating, forgery, and misuse of IIRO funds); pp. 237-238 (Basha confirms "that the embezzled funds were stolen by Amir Jasim, with the knowledge of Moayad al Butairi," and "it was explicit that there was fabrication in invoices, fabrication of documents.").

Butairi directed Talib to burn IIRO records to conceal their criminal acts.[190]  However, despite their roles in the diversion of millions of IIRO dollars and attempts to conceal those acts, the IIRO never prosecuted Butairi and eventually settled the case with Talib who was released from custody. [191]

137.    Former Al-Qaida member Jamal al-Fadl explained to U.S. investigators that Al-Qaida had a unit that was dedicated to manufacturing false documents: "Gamal explained that the Islamic Army was very efficient in producing false documents, and they actually had a separate unit that handled this…. Two of the individuals that were specialists in in manufacturing false documents were Ahmed Ali Mohammad Abu Abaida from Alexandria, Egypt, and Hawah al Masri, who was from the Jihad group in Egypt, which is linked to the Islamic Army.  In order to become an expert in the manufacture of these documents, you had to attend instructional courses."[192]

138.    In his deposition for the present litigation, IIRO Secretary General Adnan Basha confirmed that "financial improprieties" were occurring in the IIRO's Eastern Province branch office in the Kingdom as well.[193] According to the Secretary General, the Eastern Province office was implementing and financing projects in IIRO offices outside the Kingdom without informing the General Secretariat and going through the required validation process.[194]  According to Dr. Basha, the Eastern Province would send funds from the accounts of the Eastern district office to the accounts of the external offices of the IIRO outside Saudi Arabia," including Pakistan, Philippines, Indonesia, Sudan, and others.[195]

139.    Dr. Basha testified he contacted the head of the Eastern Province office, Prince Turki bin Fahad bin Jiluwi, and asked him to stop sending funds to IIRO overseas offices without informing IIRO headquarters.  Prince Turki did not comply with his request.[196]  Dr. Basha confirmed that this was during the same time period that Moayad al Butairi and Amer Jassim Mohammed Talib were in the IIRO office in Pakistan.[197]

140.    The IIRO formed a committee to investigate the financial irregularities at the Eastern Province office, and an audit of the office revealed that Khalil Ibrahim, the manager of the Eastern Province, was making payments without supporting vouchers, "a violation of the regulations."  Prince Turki was Ibrahim's supervisor at this time.[198]

---

[190] IIRO 168291.

[191] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 220, 247-248; IIRO 127895.

[192] PEC-KSA 2115-2132.

[193] Transcript, Deposition of Adnan Basha (February 21, 2019), at p. 278.; IIRO 287007-287013.

[194] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 265-266.

[195] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 267-268.

[196] Transcript, Deposition of Adnan Basha (February 21, 2019), at p. 268.

[197] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 268-269.

[198] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 269-271, 272; IIRO 49708-49710; IIRO 49696.

141.    Dr. Basha further testified that Prince Turki resigned as the regional supervisor of the Eastern Province office following the audit's findings "[b]ecause he did not wish to implement the recommendations of the auditor." According to Dr. Basha, "the auditor's report connected all the violations to requests from the Prince."[199] Ironically, it was "Million Dollar Man" Abd Al Hamid Sulaiman Al-Mujil who was appointed to manage the activities of IIRO's Eastern Province branch in the wake of Prince Turki's abrupt departure.[200]

142.    In early October 2004, an "internal auditor" from IIRO's headquarters in Saudi Arabia visited the IIRO branch office in Indonesia and subsequently wrote a report that identified critical deficiencies in accounting practices and significant financial irregularities—including an ineffective "accounting system," financial expenditures missing any references to the "source of fund[ing]," and significant balance discrepancies.[201]

143.    In his deposition, former IIRO official in Indonesia Fahd al-Harbi acknowledged that the auditor's report concludes that the auditor cannot match IIRO-Indonesia's debit balance of 3,277,546 Saudi Riyals; excesses in expenditures on administrative affairs amounted to 110,045 Saudi Riyals; the Indonesia office spent 25,869 Saudi Riyals from the currency exchange differences without authorization from the main office; and there is a deficit of $6,001 in the Eastern District account.[202]

144.    When asked about allegations "that IIRO Indonesian office failed to use sound accounting practices" by allowing direct transfers of funds to Indonesia from IIRO's Eastern Province office in Saudi Arabia, al-Harbi professed ignorance: "I'm not concerned by this audit—by what the auditor's talking about… These are financial issues. We do not interfere with them." However, al-Harbi admitted that donor funds were typically "supposed to go to the headquarters—to the General Secretariat, and then the General Secretariat would send them…. If the monies go directly, it's an error in the procedures…. They are supposed to go first to the General Secretariat."[203] Nonetheless, al-Harbi conceded that IIRO's auditors had noted that its Indonesia office lacked a proper accounting ledger and that thousands of dollars of funds were missing from its account.

145.    Financial irregularities and accounting deficiencies also plagued the IIRO's branch office in the Philippines, which also received financial support from the IIRO's Eastern Province Office.[204]

---

[199] Transcript, Deposition of Adnan Basha (February 21, 2019), at pp. 271-274.

[200] IIRO 287391.

[201] IIRO 34989-35007.

[202] Transcript, Deposition of Fahd Mohammad Sanad Alharbi (March 27, 2019), at pp. 347-348.

[203] Transcript, Deposition of Fahd Mohammad Sanad Alharbi (March 27, 2019), at pp. 322-323.

[204] IIRO 212-330 (1999-2000 IIRO Annual Report identifying the Philippines and Indonesia offices as the beneficiaries of the Eastern Province under the leadership of Prince Turki bin Fahad bin Jalawi Al-Saud); IIRO 331-441 (2000-2001 IIRO Annual Report indicating same); IIRO 442-552 (2001-2002 IIRO Annual Report indicating same).

146.    A Report on the Visit of the Supervisor of the Social Care Department to the Philippines, dated July 19-25, 1998, describes the lack of financial controls by the IIRO-Philippines branch office with respect to the distribution of financial aid to orphans in the Philippines.[205]   According to the report:  (1) "there was no prior preparation for the distribution of the orphans 'allowances" and "there was no plan for this purpose;"[206] (2) the IIRO-Philippines office failed to "carry out the instructions of the Social Care Department to form the Tripartite Committee for the delivery of the allowances to the orphans;"[207] (3) the orphans 'allowances were distributed "without scrutiny or control;"[208] (4) orphan files were "incomplete" and lacked the required documentation;[209] (5) records at the IIRO's Social Care Department in Saudi Arabia indicated there were 80 male and female orphans at a certain orphanage, but it was determined there were really only 22 female orphans and 23 male orphans;[210] and (6) certain orphans did not receive financial assistance despite the fact that IIRO headquarters had sent the funds earlier in the year.[211]   The report additionally indicates that the IIRO Eastern Province Branch directly supervised and funded projects and entities in the Philippines.[212]

147.    In his deposition for the present litigation, former MWL and IIRO official in the Philippines Abdelhadi Daguit[213] was unable to account for why IIRO's Eastern Province office in Saudi Arabia would be directly funding any program in the Philippines "[b]ecause the protocol is anything that came from them, in the form of budgets or in form of assistance, it will be sent through the Jeddah office."[214]

148.    Daguit did acknowledge at least two visits to the Philippines by IIRO Eastern Province representative Abd Al Hamid Sulaiman Al-Mujil:  "Maybe the late part of the '90s... I honestly did not ask them why they visited the Philippines... There are three or not less than five... persons... I don't know what is the purpose of this visit."[215]

149.    Concerns about the financial integrity of the IIRO-Philippines branch office persisted for years after the 1998 visit by the Supervisor of the Social Care Department, Dr. Saleh Marzouk al-Harbi.  In late 2003, Dr. al-Harbi again raised issues with IIRO headquarters about "a lack of clarity in the Philippines Office about the balances of custodies recorded on it."  In a January 7, 2004 letter to IIRO Secretary General Basha

---

[205] IIRO 111421-111431.

[206] IIRO 111422.

[207] IIRO 111423.

[208] IIRO 111423.

[209] IIRO 111424.

[210] IIRO 111424.

[211] IIRO 111425.

[212] IIRO 111427.

[213] FED-PEC 202110-202112 (According to the U.S. government designation of the IIRO-Philippines office, "IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of [Mohammed Jamal] Khalifa.").

[214] Transcript, Deposition of Abdulhadi T. Daguit (June 27, 2019), at p. 133.  See also p. 64 (stating that any assistance from the Eastern Province office "must be sent through the office in Jeddah").

[215] Transcript, Deposition of Abdulhadi T. Daguit (June 27, 2019), at pp. 65-68.

addressing Dr. al-Harbi's concerns, it is recommended that a committee should be formed to investigate "all the custodies including the last five transactions and to issue a statement detailing the custodies recorded on the Philippines Office" from October 22, 1998 through January 15, 2002. "I suggest that these custodies should be liquidated as soon as possible so that the problem of the Pakistan Office is not repeated."[216]

150.    The apparent discrepancy involving questionable financial transfers from the IIRO's Eastern Province office was not unique to southeast Asia.  An internal IIRO auditor report (produced in response to this litigation) from the IIRO office in Jordan dated 1999-2000 similarly identified accounting irregularities and deviations, such as cash dispersals "without expense vouchers."[217]  The audit also discovered significant issues concerning the IIRO Eastern Province relationship with the Jordan office:  "[T]he examination and audit revealed a procedural defect in the flow of funds from the local organization's office in the eastern region to implement the organization's projects that are overseen by the organization's office in Jordan, a lack of clarity in the mechanism of project and program implementation, [and] the absence of oversight of these projects and program's by the organization's office in Jordan."[218]

151.    The IIRO's branch office in Sarajevo, Bosnia-Herzegovina was similarly found to have deficient accounting practices as a result of an investigation and audit conducted by the Bosnian Financial Police.  A May 27, 2002 report of the Federation Ministry of Justice Financial Police indicates that an audit, for the period from January 1, 1996 to December 31, 1998, found that "there were no business books prescribed by the Law on Accounting," including "general ledger, journal, and analytic entries, cashier and other auxiliary books." The Financial Police further concluded that the IIRO "has not been balancing bookkeeping positions of assets and liabilities and the sources of the funds" … "did not have documentation available with reference to the securing and acquisition of financial funds, nor the records about its use for the period of 1996, 1997, and 1998" … and "has not been preparing annual and semi-annual accounting statements and financial reports."[219]

152.    A subsequent audit report issued by the Bosnian Financial Police on July 25, 2002 described its findings as follows:  "In the course of supervision and researches of disposing documents and records of business legality and the way of obtaining and spending money means by the [IIRO], it was found that it did not have constituted Business books prescribed by the Law of Accountancy … and it did not contain annual, half annual accountancy reports i.e. financial reports (balance of statement and balance of success) for the period in which the supervision and research works were done … and it did not have documents concerning to obtaining and providing financial means as well as records of their spending, the could be the basis for establishing the sources from which the [IIRO] provided money means…."[220]

---

[216] IIRO 59754.

[217] IIRO 287559-287561.

[218] IIRO 287560.

[219] FED-PEC 212644-212646.

[220] IIRO 270967-271042.

153.     Deficient accounting practices and financial irregularities were also found in the IIRO's branch office in Tuzla, Bosnia-Herzegovina.  An April 1997 Report of the IIRO Monitoring Committee on the Disbursement of Orphans 'Allowances in the Tuzla Office discovered a number of financial irregularities:  (1) orphans received an amount less that what was recorded in the books; (2) orphans did not receive any financial disbursements despite being recorded in the books; and (3) signatures of financial aid recipients were often forged.[221]

154.     The IIRO has also produced documents indicating that IIRO Secretary General Adnan Basha ordered an investigation into the disappearance of a sum of 779,750 Saudi Riyals that was transferred to the director of the IIRO's branch office in Vienna, Austria, El Fatih Hassanein, that was subsequently delivered to Abdelaziz Zaher (a.k.a. Abu Anas, Abu Enes).[222]  Hassanein simultaneously served as the head of the Third World Relief Agency ("TWRA").  The 9/11 Commission Final Report at p. 58 affirms that Usama bin Laden used the TWRA "covertly provide[] financial and other support for terrorist activities."

155.     As suggested by the activities of Prince Turki Bin Fahd Bin Jalawy Al-Saud, Abd Al Hamid Sulaiman Al-Mujil and others, IIRO's role in financing and providing logistical support jihadi operations was not a phenomenon limited merely to errant individuals at far-flung branch offices.  At least four members of the IIRO's board of directors in Saudi Arabia were also serving simultaneously as executives at the Specially Designated Global Terrorist (SDGT) entity Al Haramain Al Masjed Al Aqsa—including the Secretary General of IIRO Dr. Adnan Basha and Chairman of the IIRO Board of Directors Abdullah al-Turki.[223]

156.     On March 19, 2002, police and intelligent agents in Bosnia-Herzegovina raided a location as part of an international terrorism financing investigation, who seized a number of documents related to the Al-Qaida terrorist organization. One of these documents, known as the "Golden Chain," is a list of 20 of some of the most successful and influential merchants in the Arabian Gulf.[224]  The list, titled "And spend for God's cause," was identified by former Al-Qaida lieutenant-turned FBI informant Jamal Ahmed Al-Fadl. According to Al-Fadl, "the 'Golden Chain 'consisted of wealthy individuals from the Gulf region who provided Bin Laden and Al Qaeda with money on a regular basis."[225]  At least three names from the "Golden Chain" have served at various times on IIRO's Executive

---

[221] IIRO 115300-115302.

[222] IIRO 339030-339032.

[223] MWLIIRO 16233-16237 (Minutes of the 8th Session of the IIRO's Board of Directors held on May 27, 2001); MWLIIRO 16270-16276 (Minutes of the 8th Session of the IIRO's Board of Directors held on May 8, 1999).

[224] FED-PEC 134853-134955.

[225] Transcript of FBI interview of Jamal Ahmed Al-Fadl. Dated August 29, 2002. United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892, at p. 23.  See also PEC-KSA 329-352.

Committee and/or Board of Directors:  Ibrahim Afandi, Saleh Kamel, and Abdel Qader Faqeeh.[226]

157.    Even inside Saudi Arabia, IIRO's suspect activities had created "pervasive" problems with "negative public relations," a thorny subject addressed by IIRO Secretary General Adnan Basha:  "Dr. Adnan talked about summer camps.  He said that the negative media reaction stemming from extremist lectures, such as Sheikh al-Break[sic]'s lecture this summer, is unfortunate, but that no one can 'guarantee 100 percent of the time ' that no extremists will enter the camps and attempt to pass their ideologies on to the youth."[227]

## C.    World Assembly for Muslim Youth (WAMY)

158.    The Jeddah-based World Assembly for Muslim Youth (WAMY) is another example of the shadowy Saudi dawah/charitable entities that have helped support Al-Qaida over the past three decades.  Founded in 1972, WAMY claims to be the world's largest Muslim youth organization.[228]  WAMY sponsors various "humanitarian" causes, including religious youth camps around the world—including in Western Europe and North America.

159.    According to U.S. Department of Defense documents, in the assessment of the U.S. government, "WAMY is a Tier 1 Counterterrorism NGO target, defined as those that have demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests."[229]  The DOD has privately accused WAMY of being "affiliated" and "associated with Usama Bin Ladin and al Qaeda operations:  "According to top WAMY officials, both the United States and Israel must be destroyed.  WAMY provides financial support to the Palestinians fighting against Israel.  In addition, WAMY has put forward a proposal that the Palestinians should declare open war on Israel."[230]  The Pentagon charged further, "WAMY supports terrorist ideals and causes."[231]  The Department of Defense has classified WAMY as among the "Associated forces" of Al-Qaida, "with which al-Qaida, the al-Qaida network, or the Taliban had or has an established working, supportive, or beneficiary relationship for the achievement of common goals… Through associations

[226] MWLIIRO 16233-16237 (Minutes of the 8th Session of the IIRO's Board of Directors held on May 27, 2001); MWLIIRO16247-16255 (Minutes of the 5th Session of the IIRO's Board of Directors held on April 13, 2000); IIRO 287034-287039 (Minutes of the 8th Session of the IIRO's Executive Committee held on February 21, 2000); MWLIIRO 16260-16267 (Minutes of the 3rd Session of the IIRO's Board of Directors held on September 29, 1999); MWLIIRO 16270-16276 (Minutes of the 8th Session of the IIRO's Board of Directors held on May 8, 1999); IIRO 287007-287013 (Minutes of the 3rd meeting of the IIRO Executive Committee held on March 8, 1999); MWLIIRO 16305-16310 (Minutes of the 19th Session of the IIRO's Constituent Council held on June 4, 1994).

[227] FED-PEC 220554-220557.

[228] http://www.wamyusa.org/about/about%20wamy.htm, as of December 10, 2002.

[229] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (June 28, 2006); U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (March 25, 2005).

[230] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Mammar Ameur (ISN No. 939) (July 25, 2005); U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (June 28, 2005).

[231] Set_52_3643-3869, at p. 37.

with these groups and organizations a detainee may have provided support to al-Qaida or the Taliban, or engaged in hostilities against U.S. or Coalition forces."[232]

160.    The following is an excerpt from an officially sanctioned song to be performed by participants at WAMY youth camps, as printed in an English-language WAMY training manual obtained in the United Kingdom:

> "Youth of [Islam] are the guided youth.  Come!  Come to a final decision: The Prophet has called out and so has the Qur'an.  So blessed is the servant who responds when he is called… Bring back the glory to it's lions, And restore the zeal to its soldiers.  Flatten evil in its cradle, And unsheath the swords… Hail! Hail!  O sacrificing soldiers! To us!  To us!  So we may defend the flag.  On this Day of Jihad, are you miserly with your blood?!"[233]

161.    In July 1996, WAMY held a youth camp in Okeechobee, Florida that included seminars overseen by senior WAMY officials in the United States.  As part of the program, an operations manager for WAMY charitable activities named Suleman Ahmer presented a lecture to campers titled, "Jihad, The Misunderstood Word."  Ahmed professed to have "spent some months in Bosnia, and I've spent some time in Chechnya where we have active wars going on, and there are certain things I've come across they're very educational and also very motivational, they'll motivate you.  You've been hearing negative things about jihad right, so you should hear something positive also.... If the Chechens come up and they fight, if the Bosnians come up and they fight you call them terrorists!  This is unfair... without jihad the evil forces will overwhelm you and that's why Allah has given you so much promises to you, to people who do jihad, to people who struggle."[234]  Ahmer described the challenge during the Bosnian war of indoctrinating non-Arabic-speaking European Muslims in fundamentalist Islamic principles: "the Bosnians were well away from Islam…. They couldn't even say the word 'jihad.'  They used to call 'mujahedin,' 'muhajedin.' It took them many months to learn the right word."[235]  According to Ahmer, after witnessing the dramatic entrance of mujahideen fighters into the Bosnian conflict, local Bosnian Muslims vowed, "'if this is really, if this is what Islam teaches you, we are fools if we don't practice Islam.'  See, jihad, how it establishes Islam?"[236]  In response to

---

[232] U.S. Department of Defense, JTF-GTMO Matrix of Threat Indicators for Enemy Combatants.

[233] "Islamic Camps Objectives, Program Outlines, Preparatory Steps."  World Assembly of Muslim Youth (WAMY); Riyadh, Saudi Arabia.  Prepared by the Camps & Conference Unit of the World Assembly of Muslim Youth 1987.  Translated (with additions) by Abu-Bakr M. Asmal 1990.  Obtained at the WAMY Western Europe Office; 46 Goodge Street; London, UK.

[234] "Jihad, The Misunderstood Word." Lecture given by Suleman Ahmer at the World Assembly of Muslim Youth (WAMY) Okeechobee Summer Da`wah Camp. July 26, 1996. Videotape obtained from the Meccacentric Da`wah Group.

[235] "Jihad, The Misunderstood Word." Lecture given by Suleman Ahmer at the World Assembly of Muslim Youth (WAMY) Okeechobee Summer Da`wah Camp. July 26, 1996. Videotape obtained from the Meccacentric Da`wah Group.

[236] "Jihad, The Misunderstood Word." Lecture given by Suleman Ahmer at the World Assembly of Muslim Youth (WAMY) Okeechobee Summer Da`wah Camp. July 26, 1996. Videotape obtained from the Meccacentric Da`wah Group.

criticisms of the violent extremist indoctrination taking place at WAMY summer youth camps inside Saudi Arabia, WAMY Secretary General al-Wohaibi has insisted that it is "not possible to control" all of the content being disseminated during the presentations at the camps.[237]

162.    As suggested by Suleman Ahmer, from the early days of the Bosnian war, WAMY was "deeply involved" in supporting Saudi jihadists seeking to take part in the conflict.  A WAMY representative was quoted in the New York Times defending the role of the dawah group: "If a relief worker decides that he wants to join the fighting forces, we would not stop him.  But he can no longer officially represent our organization."  Nonetheless, Saudi government officials quoted anonymously in the same article acknowledged that "men who volunteer for the relief work often end up as soldiers:"  "Since August most of the money raised for relief has been turned over to the Bosnians for weapons… And most contributors probably support this."[238]

163.    According to the New York Times, among the services provided by WAMY to jihadist fighters in the Balkans, it "flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.  On the second floor of the modern medical complex in a Jidda suburb several rooms hold wounded Saudi fighters, but bearded companions in the hallway and officials at the Islamic Organization, while confirming that the wounded combatants were in the hospital, refused to let an American reporter speak with them."[239]

164.    Open support for violent jihad extended across the WAMY corporate ladder.  The Muslim World League publication Al-Alam Al-Islami published an article titled, "Wamy calls for Jihad to free Kashmir," covering comments by WAMY Secretary General Dr. Maneh al-Johani before a conference of Kashmiri Muslims in the Saudi capital Riyadh.  According to the account of Al-Alam Al-Islami:

> "Dr. Johani said that according to the Islamic faith, Jihad could be performed in many forms.  Muslims can go to the battlefield to wage a war against the enemies of Islam or they can give their moral, physical, and financial support [to] the cause of Jihad.  The Muslims in the Kingdom... should have a sense of responsibility to help their brethren to secure their freedom through Jihad, he said.... Dr. Johani pointed out that there is an organised effort to crush the Muslims in many parts of the world.  Some of these destructive elements could

---

[237] FED-PEC 210330-210331.

[238] December 5, 1992, Saturday, Late Edition - Final SECTION: Section 1; Page 1; Column 2; Foreign Desk LENGTH: 1058 words HEADLINE: Muslims >From Afar Joining 'Holy War' in Bosnia BYLINE: By CHRIS HEDGES, Special to The New York Times.

[239] December 5, 1992, Saturday, Late Edition - Final SECTION: Section 1; Page 1; Column 2; Foreign Desk LENGTH: 1058 words HEADLINE: Muslims >From Afar Joining 'Holy War' in Bosnia BYLINE: By CHRIS HEDGES, Special to The New York Times.

be seen while others cannot be seen, he said.  'Jihad is the only way out for us to get emancipated from these cruel hands,' he added."[240]

165.     Following a December 1995 meeting in Riyadh, Saudi Arabia with WAMY Secretary General Dr. Maneh al-Johani, Kashmiri political activist Chaudhry Yaqub held a press conference in which he "lauded the efforts of the World Assembly of Muslim Youth (WAMY) and other charitable organizations in helping the mujahideen in their struggle for independence from India"—emphasizing "that WAMY in particular is supporting the cause of Kashmiris through its Kashmir Committee in its Riyadh headquarters."[241]

166.     In January 2000, WAMY chief Dr. Maneh al-Johani published an editorial in the Al-Jazeera newspaper regarding the "Chechen Tragedy," stressing "that these steadfast heroic Muslims, the mujahideen, deserve our support, prayers, and all our energies to support them so that they would defeat the enemies again.  They showed great examples that will be recorded in the history's brightest pages.  They faced the enemy of Allah and their enemy with all courage and strength.  They were not appalled at their magnitude and military equipment. They fought and inflicted great losses on the Russian ranks, forcing the Russians to withdraw.  They will force them again to withdraw in the second round as well, Allah willing.  They will defeat them again."[242]  According to al-Johani:

> "The question that arises is: What do the Chechen Muslims need from us today?  They need money to buy weapons and gear.... The young children should know their cause.  We should motivate them to donate to them and console them as much as we can.  The Islamic awakening is growing, praise be to Allah. Perhaps this is what worries the Communist East and the polytheistic West. They fear that they will wake up some day to find the Muslims ordering them to pay the tribute."[243]

167.     That same month (January 2000), the Minister of Islamic Affairs in the Kingdom of Saudi Arabia Sheikh al Sheikh dispatched a letter to WAMY Secretary General Maneh al-Johani with a check for 20,000 Saudi Riyals attached "as a donation from me to the benefit of the Muslims of Chechnya.  Please receive it and notify our private office accordingly.  I ask Allah the almighty to support our mujahideen brothers and to support

---

[240] Muslim World News, "WAMY Calls for Jihad to Free Kashmir," (June 3, 1991), at p. 15.

[241] December 8, 1995 LENGTH: 360 words HEADLINE: Kashmiri leader thanks WAMY for help BYLINE: By FURQAN AHMED, Riyadh Daily.

[242] Saturday 15th January, 2000 G No. 9970    Al-Jazeera newspaper    The Chechen Tragedy – Johani HYPERLINK. http://www.suhuf.net.sa/2000jaz/jan/15/fe1.htm"http://www.suhuf.net.sa/2000jaz/jan/15/fe1.htm THE CHECHEN TRAGEDY: THE REALITY AND THE REQUIRED ROLE Dr. Manei bin Hammad Al Juhani. See also FED-PEC 233836-233843.

[243] Saturday 15th January, 2000 G No. 9970    Al-Jazeera newspaper    The Chechen Tragedy – Johani HYPERLINK. http://www.suhuf.net.sa/2000jaz/jan/15/fe1.htm"http://www.suhuf.net.sa/2000jaz/jan/15/fe1.htm THE CHECHEN TRAGEDY: THE REALITY AND THE REQUIRED ROLE Dr. Manei bin Hammad Al Juhani. See also FED-PEC 233836-233843.

Islam and the Muslims."[244]  Upon receipt of the letter, al-Johani wrote back to confirm "your generous donation to the World Assembly of Muslim Youth for the benefit of the Muslims of Chechnya."[245]

168.     Several Guantanamo Bay detainees have made references to their work for or association with WAMY.  One of these men, Sudanese national Adel Hassan Hamad was allegedly "employed by the World Assembly of Muslim Youth (WAMY) in Afghanistan and Pakistan for approximately one and one half years until the time of his capture [on] 18 July 2002."[246]  Hamad admitted being employed by WAMY in Pakistan as the "manager of the Assembly hospital" and the person responsible for "distribut[ing] aid supplies to the refugee camps in Pakistan."[247]

169.     Prior to his employment with WAMY, Hassan worked with Specially Designated Global Terrorist (SDGT) entity Lajnat al Da'awa al Islamiya (LDI) for several years in Peshawar, Pakistan.[248]  Designated on January 9, 2003, the U.S. government asserted the following:  "LDI is one of the most active Islamic NGOs to give logistical and financial support to mujahideen operating in the Pakistan-Afghanistan area."  "Several workers of LDI in Peshawar belonged to al Qaida, including Ramzi Yussef, who has been convicted for his role in the 1993 bombing of the World Trade Center.  Khalid Sheikh Mohammed, considered as one of the most important operational officers for al Qaida, was head of the Peshawar branch of LDI from 1988 to 1995." [249]  Hassan met with Khalid Sheikh Mohammed (KSM) while working at the same refugee camp run by LDI.  That camp, the Jelazee Refugee Camp, was overseen by KSM's brother, Zahid Al-Sheikh.[250]

170.     At the time that Hassan was employed by LDI, it was categorized as a Tier 2 NGO.  "Tier 2 NGOs have demonstrated the intent and willingness to support terrorist organizations willing to attack US persons or interests."[251]

171.     Hassan "was captured with Mammar Ameur," who "was also affiliated with radical NGOs and had traveled extensively throughout the Middle East.  He was assessed as an

---

[244] WAMYSA 1249305.  See also FED-PEC 234243-234244 (WAMY Secretary General Dr. Maneh al-Johani discussing the collection of monetary donations and informing that a WAMY delegation made contact with the fighters.).

[245] WAMYSA 1249304.  See also FED-PEC 234930-234931 (WAMY Secretary General Dr. Maneh al-Johani explaining that "WAMY's office in Chechnya along with other Islamic social organizations operating in that country were ordered to close down.").

[246] Set_52_3643-3869, at p. 37.  See also WAMYSA 1088-1091, WAMYSA 1084.

[247] Set_52_3643-3869, at pp. 38-39.

[248] FED-PEC 181049-181051.

[249] https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-i.aspx#ldi.

[250] FED-PEC 141770-141786.

[251] FED-PEC 197472-197479.  See also IIRO 278956-278957, IIRO 278983-278984, IIRO 278986, IIRO 278990-278991, IIRO 279010 (IIRO took over the operations of three hospitals in Afghanistan from LDI at a time when the U.S. government considered LDI "more dangerous" and a significant "threat.").

Al-Qaida facilitator due to his associations and employment with WAMY, who has ties to extremist organizations."[252]

172.    According to the DOD, other Guantanamo Bay prisoners like Hamad who were working under the auspices of WAMY were "likely using [their] employment in Non-Government Organizations (NGOs) to facilitate funds and personnel for Al-Qaida and its global terrorist network."[253]

173.    There are numerous other connections linking WAMY to international terrorist organizations and terrorist financing.  In fact, the U.S. branch of WAMY was incorporated in 1992 by Usama Bin Laden's own nephew Abdullah in Falls Church, Virginia.[254]  During his tenure at WAMY, Abdullah Bin Laden, who was seconded to WAMY after being appointed to his position by the Ministry of Islamic Affairs, was responsible for making key personnel decisions and "represented the organization at various sponsored events."[255] Minutes from the eighth meeting of WAMY's General Secretariat in 1998 identify Abdullah Bin Laden as a WAMY "Board Member and the Assembly's Representative in North America."[256]  In other WAMY documents, the younger Bin Laden is identified as the "President" of WAMY's U.S. branch and it appears he has signatory authority over the branch's local bank accounts.[257]  According to Bin Laden's successor in Falls Church, "WAMY USA did not undertake any fundraising activities; all funding came from WAMY Saudi Arabia."[258]

174.    WAMY's operations in eastern Europe were deeply intertwined with those of the Vienna, Austria-based Third World Relief Agency (TWRA).  As previously cited in this report, TWRA was a thinly-veiled charity cover for arms smuggling, money laundering, and terrorist financing.  The 9/11 Commission Final Report concluded that Usama Bin Laden had used TWRA to "covertly provide financial and other support for terrorist activities."[259]  The founder of TWRA—a Sudanese National Islamic Front (NIF) official named El Fatih Hassanein—also simultaneously served as the "Director of the Office of WAMY office [sic] in Austria and Eastern Europe."[260]  Likewise, WAMY shared the same office space as TWRA in Vienna, Austria.[261]  Other documents from 1993 produced during discovery in connection with the present litigation confirmed that WAMY's headquarters in Jeddah exercised supervision and control over its various branch offices—including its

[252] FED-PEC 197472-197479.

[253] U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Mammar Ameur (ISN No. 939) (April 13, 2005).

[254] United States Internal Revenue Service (IRS) Form 1023 Application by WAMY for Recognition of Exemption, filed November 9, 1992.

[255] Affidavit of Abdullah Awad Bin Laden (November 19, 2005).

[256] WAMYSA 51692-51698.

[257] WAMY INTL 13864, WAMY INTL 1366-1370.

[258] Declaration of Ibrahim Sulayman Abdullah (March 29, 2019).

[259] 9/11 Commission Final Report, at p. 58.

[260] WAMY document indices (produced March 23, 2012).

[261] FED-PEC 289619, 218206.

"Eastern Europe Office" in Austria.[262]  WAMY also made significant financial donations or transfers to TWRA, with a German criminal investigation of TWRA identifying at least approximately US$37,000 in transfers.[263]

175.    In November 2001, the Indian government shuttered WAMY's offices in that country for allegedly financing banned terrorist groups, including Lashkar-e-Taiba (LET) and Jaish-e-Mohammed (JEM).[264]  A year later, in November 2002, international media reported that WAMY's Peshawar office was raided in a joint FBI-Pakistani intelligence operation.[265]  A WAMY employee was subsequently questioned for allegedly hand delivering a recorded message from Usama Bin Laden to local media.[266]  In that tape, bin Laden praised various terrorist attacks—including the Bali nightclub bombing that killed over 200 people and the Chechen takeover of a theatre in Moscow that led to over 150 deaths.

176.    In June 2004, federal agents from the Federal Bureau of Investigation (FBI), the Bureau of Immigration and Customs Enforcement (ICE), and the Joint Terrorism Task Force (JTTF) raided Abdullah Bin Laden's WAMY office in Virginia, allegedly "in connection with a terrorism-related investigation."  Agents seized all of the files and computer hard drives in WAMY's offices.  Additionally, a WAMY board member was arrested on immigration charges.[267]

177.    Since the September 11 terrorist attacks on the United States, WAMY has continued to fund numerous "charitable" projects—including in neighboring Iraq, where donations in 2004 alone totaled over $200,000.  In late 2002, an Internet website affiliated with the Ansar al-Islam terrorist organization in northern Iraq released a photo showing Ali Bapir—a detained Ansar al-Islam commander—at a public event sponsored by WAMY and featuring banners emblazoned with the WAMY logo.[268]  In February 2003, the U.S. Treasury Department announced the designation of Ansar al-Islam "as a terrorist group with links to Al-Qaida… and support from al-Qaida:"

> "Al-Qaida and Usama bin Laden participated in the formation and funding of Ansar al-Islam, and AI has provided safe haven to al-Qaida in northeastern Iraq. AI's predecessor, Jund al-Islam, was formed in September 2001.  AI came into being with the blessing of bin Laden after its leaders visited al-Qaida in Afghanistan in 2000 and 2001.  Bin Laden provided AI with an estimated $300,000 to $600,000 in seed money. AI has acknowledged that it contracted Islamic figures abroad before declaring jihad in northeastern Iraq. Ansar al-Islam has received training and logistical assistance from

---

[262] WAMYSA 1665-1666.

[263] PEC-KSA 3656-3718, WAMYSA 42103.

[264] FED-PEC 234023-234024.

[265] "Pakistan Questions Sudan Man About Tape."  Associated Press.  December 9, 2002.

[266] "Pakistan Questions Sudan Man About Tape."  Associated Press.  December 9, 2002.

[267] Markon, Jerry.  "U.S. Raids N.Va. Office Of Saudi-Based Charity."  Washington Post.  June 2, 2004.

[268] http://www.ayobi.com/photo/isl_17.jpg.  August 2002.

al-Qaida. Groups of AI's Kurdish members have traveled to Afghanistan to train with al-Qaida, while AI's foreign members are believed to be al-Qaida-trained veterans of conflicts in Afghanistan and Chechnya.  Ansar al-Islam has a close association with senior al-Qaida operative Abu Musab al-Zarqawi, a poisons and chemical weapons expert whose network has established a poison and explosives training camp in the area of northeastern Iraq that is controlled by Ansar al-Islam.  Zarqawi's lieutenants help run this camp, which teaches operatives how to produce ricin and other poisons."[269]

178.    The Israeli government has also accused WAMY of funding Hamas and the Palestinian Islamic Jihad—and at least one subsidiary charity with WAMY officers at the helm has been blacklisted as a Specially Designated Global Terrorist entity for its ties to Hamas.  In November 2008, the U.S. Treasury Department designated the "Union of Good," a charitable front group that was allegedly created by Hamas in late 2000 "in order to facilitate the transfer of funds to Hamas.  The Union of Good acts as a broker for Hamas by facilitating financial transfers between a web of charitable organizations."  According to the U.S. Treasury, "the primary purpose of this activity is to strengthen Hamas' political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas."[270]

179.    In August 2002, WAMY Secretary General Saleh al-Wohaibi sent a letter to the Union of Good CEO expressing his gratitude for an invitation "to join the membership of the Board of Trustees of the Union of Good as a successor of our dear late Dr. Mane bin Hammad Al-Juhani… I have the pleasure to accept your kind invitation to join the membership."[271]  Documents produced during discovery in connection to the present litigation show that WAMY Assistant Secretary General Abdulwahab Noorwali is also a member of the Board of Trustees of the Union of Good.  In November 2002, the Union of Good CEO sent Noorwali a letter to thank him for WAMY's role in the success of a Ramadan fundraising project.[272]

180.    Interviewed in Saudi media in the years following the September 11, 2001 terrorist attacks on the United States, WAMY Secretary General Saleh al-Wohaibi has defended Saudi religious charities as "the finest civil society organizations to adorn any modern society" and insists that any "mistakes" made by groups like WAMY solely "accrue to their managers" and not to the organizations themselves:

"This charity work has a record that is not without flaws or gaps that are now held against it in light of the Western attack, including the accusation that it supports terrorist acts. There is no doubt that

[269] https://www.treasury.gov/press-center/press-releases/Pages/js48.aspx.

[270] https://www.treasury.gov/press-center/press-releases/Pages/hp1267.aspx.

[271] WAMYSA 1235606.

[272] WAMYSA 1235604.

54

> charity work has sometimes been undertaken by people who lack enough experience to handle and consider international matters. Support for the Afghan Jihad, which was once considered a bonus has now become a drawback!!"[273]

181.   In Al-Hayat Newspaper, WAMY Secretary General Saleh al-Wohaibi has attempted to broad-brush characterize U.S. government punitive actions targeting terrorist financing as part of a "widespread Western attack on Islamic charitable institutions, branding them as terrorists and randomly accusing them based on false grounds." According to al-Wohaibi:

> "[T]here are political objectives that are more dangerous than those feelings that are being planned by Zionists and the neo-conservatives in the US. They want to destabilize the Muslim world and sow tension between it and other nations. Therefore, they attack Muslim countries and their charitable institutions, first and foremost of which is the Kingdom of Saudi Arabia and its charitable institutions whose benefit has encompassed all parts of the world."[274]

182.   Nonetheless, senior WAMY officers continue to defend and promote the concept of violent jihad, even after the 9/11 terrorist attacks. In November 2001, WAMY Assistant Secretary General Abdulwahab Noorwali was quoted in the Saudi Gazette as questioning the definition of "terrorism:" "People should differentiate between 'self-defense,' which is the other correct word for 'Jihad,' and 'terrorism.' Palestinians defending their home and families against the Israeli occupier are not terrorists. There are some extreme attitudes toward Islam in the world that are presented by western media to give a wrong conception of Islamic Jihad."[275]

183.   Sheikh Saleh al-Buraik, a WAMY employee who has provided anti-American lectures at WAMY's summer youth camps,[276] has similarly urged Muslim to engage in violent jihad or become a financial supporter of jihad:  "The most sublime favor of Jihad is that it is the pillar and peak of religion.  The five pillars are: Shahadah [Declaration of faith], prayer, Zakat, Hajj, and fasting.  And Jihad for the sake of Allah is the pillar that guards, preserves, and governs them.  Bear in mind that Jihad is the pillar and peak of religion.  Brothers, I would say: Jihad has a high status, which is neither attainable nor accessible by everyone.  It is a very, very great status.  Do not be surprised by the lack of the Mujahideen or those who make their way to Jihad.  Why?  Because no people were found qualified to obtain the high status.  But least of all, if you are not in the battlefield frontline, in the right side, in the rear, or in the left side, you could be at least a supporter

---

[273] FED-PEC 234792-234795.

[274] WAMYSA 6034-6039.

[275] FED-PEC 235725-235730.

[276] FED-PEC 234957-234961, FED-PEC 210330-210331.  See also FED-PEC 218854-218865 (Buraik is a member of the Union of Good, a designated Hamas entity); WAMYSA 1235606 (WAMY Secretary General Wohaibi is also a member of the Union of Good).

of Jihad, a collector of donations for Jihad, an advocate of Jihad. You should keep your prayer at night and day for Jihad and for the Mujahideen."[277]

184.    Sheikh al-Buraik has further advocated using jihad to spread the Islamic faith: "O brothers, Islam spread when the blood of its companions was shed on the land of Jihad… This religion will only spread by Jihad for the sake of Allah, the Sharia of the nation, the Sharia of immortality, and the Sharia of survival. If you are alive, you are happy, and if you die in the land, in the land of Jihad, you are with the martyrs. The Muslims live this way… This is how religions spread. This is how religion and doctrines spread. Without this, no idea spreads unless its people water it with their own blood."[278]

185.    It should be noted that Sheikh al-Buraik also lectured participants at IIRO youth camps in Saudi Arabia, stoking similar controversy with his hardline jihadist indoctrination and forcing the IIRO Secretary General to publicly disavow his remarks.[279]

186.    Sheikh Anwar al-Awlaki, a senior member of Al-Qaida in the Arabian Peninsula (AQAP) and spiritual mentor to 9/11 hijackers Nawaf al Hazmi, Khalid al Mihdhar, Hani Hanjour, Ahmed al Ghamdi, and Majed Moqed while they were in the United States preparing for the attacks, simultaneously had a close association with WAMY's branch office in the United States and its officers (WAMY-USA). According to discovery documents and deposition testimony in this litigation, WAMY invited al-Awlaki to give lectures at several WAMY-USA summer camps in the United States, [280] WAMY distributed audio tapes featuring al-Awlaki's sermons,[281] and WAMY coordinated with al-Awlaki in his capacity as Imam of the Dar al-Hijrah mosque in Northern Virginia.[282] In September 2011, al-Awlaki was killed in a targeted U.S. drone missile strike in Yemen. At the time of his death, President Barack Obama described al-Awlaki as "the leader of external operations for Al Qaeda in the Arabian Peninsula," adding "The death of Awlaki is a major blow to Al Qaeda's most active operational affiliate."[283]

187.    WAMY's corporate structure has hidden other, darker secrets as well—such as the benignly-named Benevolence International Foundation (BIF), a.k.a. Lajnat al-Birr al-Islamiyya. Lajnat Al-Birr, the precursor to BIF, was established in 1987 in Pakistan and Saudi Arabia by Shaykh Adel Batterjee, a powerful Saudi business magnate in Jeddah.

188.    Although the Secretary General of WAMY Saleh al Wohaibi has insisted in his declaration for the present litigation that "WAMY has never had any connection with

---

[277] The Islamic Library – Lessons of Sheikh Saad Buraik, "The Favor of Jihad Over Other Acts," at p. 3091.

[278] Islamweb.net, "The Martyr of Jihad, Abdullah Azzam," Sheikh Saad Buraik.

[279] FED-PEC 220554-220557.

[280] WAMYSA 30079-30081; Transcript, Deposition of Ibrahim Abdullah (Oct. 21, 2019), at pp. 71-72, 75-78, 82, 87-88.

[281] WAMYINTL 15165-15168.

[282] WAMYSA 1519. See also PEC-KSA 666-669 (Al-Awlaki's ties to the 9/11 hijackers while at Dar al Hijrah); PEC-KSA 691-693 (witness met Nawaf al Hazmi and Hani Hanjour with al-Awlaki at Dar al Imam).

[283] Mazzetti, Mark et al. "Two-Year Manhunt Led to Killing of Awlaki in Yemen." New York Times. September 30, 2011.

Benevolence International Foundation," there is a wealth of documentary evidence proving that this statement is completely false.[284]  The connections between the two organizations are both numerous and troubling.  Adel Batterjee (designated as a terrorist by the U.S. government in December 2004) claims to be a former "chairman" of WAMY and reportedly founded BIF as an "affiliate" branch of WAMY.[285]

189.    According to a Pakistani Government website, the local mailing address for WAMY is P.O. Box 1055 in Peshawar.[286]  The U.S. Treasury Department's Office of Foreign Assets Control (OFAC) lists the same post office box in Peshawar as a known address of the Benevolence International Foundation (BIF).[287]  In fact, OFAC's list of Specially Designated Nationals and Blocked Persons List identifies at least 3 other mailing addresses for BIF that are, in fact, offices for WAMY in Saudi Arabia, Pakistan, and Sudan.[288]

190.    A Canadian government investigation and financial audit of WAMY's branch office in Canada (WAMY-Canada) found that "WAMY maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities" including Specially Designated Global Terrorists (SDGT) Benevolence International Fund-Canada (BIF-Canada) and Benevolence International Foundation (BIF-USA).[289]

191.    In 2011-2012, the Canadian government conducted an audit of WAMY-Canada's financial records and operations for the period from January 1, 2000 to December 31, 2000, including a review of "Registered Charity Information Return(s) (T3010's)" for the 2005, 2006, 2007, 2008, and 2009 fiscal years.[290]  The audit uncovered significant financial irregularities and deficient accounting practices, including:  "failure to maintain a general ledger or similar record of receipts and expenditures;" "unable to provide any cancelled cheques for its fiscal year ending December 31, 2001, and canceled cheques number 5, 26 through 32, and 51 were missing from tis records for fiscal year ending December 31, 2002;" "failure to maintain a minute book or hold board meetings in compliance with its corporate by-laws;" "the accuracy and accounting of receipts were inadequate;" "unable to provide copies of official donation receipts 30 through 82 for the fiscal year ending December 31, 2002;" and "failure to maintain bank deposit slips for any of the fiscal years that were under audit."  According the Canadian government, "WAMY's failure to maintain essential books and records" limited its ability "to verify the nature and recipients

---

[284] Declaration of Saleh Al-Wohaibi (October 30, 2005).

[285] Hedges, Chris.  "Muslims from afar joining 'Holy War' in Bosnia."  The New York Times.  December 5, 1992.  See also Basaddiq, Omar.  "Islamic Charity Committee moves to new premises."  Arab News.  May 21, 1994.  See also IRS 990 forms for the "World Assembly of Muslim Youth" submitted for Fiscal Years 1993 through 1999.

[286] http://www.epb.gov.pk/epb/jsp/ngo.jsp.  December 12, 2002.

[287] http://www.treas.gov/offices/enforcement/ofac/sanctions/terrorism.html.  December 12, 2002.

[288] WAMYSA 57760, WAMYSA 61323, WAMYSA 57745, KADI 222029.

[289] FED-PEC 218170-218203.

[290] FED-PEC 218170-218203.

of payments, confirm all revenues, and expenditures as recorded or verify the accuracy of its official donation receipts."[291]

192.    The audit also determined that "WAMY (Saudi Arabia) maintains substantial control over WAMY's finances, and uses this control to carry out its own objectives in Canada," citing the following:  "WAMY (Saudi Arabia) provides substantially all of WAMY's operational funds;" "WAMY representatives advised the CRA during the audit that WAMY (Saudi Arabia) exercised a significant amount of control over their expenses;" and "WAMY provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses … [because] WAMY (Saudi Arabia) wanted to know what it was responsible for supporting."  The Canadian government concluded that "[t]he audit findings did not reveal any apparent separation between the activities of WAMY (Saudi Arabia) and WAMY, with all related financial and operating positions being made by WAMY (Saudi Arabia)."[292]

193.    Additionally, the Canadian government's review of WAMY-Canada's records revealed that "WAMY was closely associated with [Benevolence International Fund] BIF-Canada and provided funding to the Benevolence International Foundation (BIF-USA) in the United States.  According to the audit: "BIF-Canada and WAMY shared a common director and contact information;" "BIF-Canada and WAMY shared a Canadian bank account" ("World Assembly of Muslim Youth o/a BIF"); and "WAMY provided funding to BIF-USA," including a $50,256 transfer to BIF-USA's Orphan Program.[293]

194.    Finally, the investigation and audit discovered that WAMY-Canada has been distributing literature and other material produced by WAMY-Saudi Arabia which "in our view, appears to promote intolerance of, and/or advocate violence against, non-Muslims and/or the use of violence as a means to bring about political or societal change."[294]

195.    When 1993 World Trade Center bombing conspirator Ahmed Ajaj was arrested in New York, authorities seized an envelope from him containing Arabic-language terrorist training manuals.  The envelope was marked with the letterhead of BIF, with a notation explaining that BIF is a branch of the "World Assembly of Muslim Youth."[295]

196.    From its inception, the Benevolence International Foundation (BIF) served as a means for pious, wealthy Muslims to secretly contribute to the jihad in Afghanistan.  The Jeddah-based charitable group went to great lengths to protect the reputation of its prestigious donors.  In 1993, Adel Batterjee publicly stepped down as head of BIF in exchange for a more behind-the-scenes role.  Several years afterwards, the individual who took over Benevolence from Batterji, Enaam Arnaout (a.k.a. Abu Mahmoud Al-Hamawi),

---

[291] FED-PEC 218170-218203, at pp. 2-3.

[292] FED-PEC 218170-218203, at pp. 5-7.

[293] FED-PEC 218170-218203 at pp. 12-14.  See also WAMYSA 1745-1768, WAMYSA 1785, WAMYSA 1865-1872, WAMYSA 1885-1887, WAMYSA 1889, WAMYSA 4443.

[294] FED-PEC 218170-218203, at pp. 17-18.

[295] United States v. Usama Bin Laden, et al.  S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Government Exhibit 2800-A.

instructed his staff to disavow any knowledge of the "founders" and "[t]ell him that all we know about them is that they are Saudi Business men and that they left the organization in May 93.  Donot[sic] disclose any other information."[296]

197.     By 1993, it was hardly a secret that BIF was involved in more than just charitable activities.  The entity openly advertised itself in its Arabic-language fundraising appeals as a "trustworthy hand for the support of [both] the mujahideen and refugees" in Bosnia.[297]  Similarly, documents taken from BIF's U.S.-based offices in December 2001 included handwritten Arabic notations explaining that its headquarters in Croatia was established "for relief operations and support of jihad in Bosnia-Herzegovina… Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands."[298]  Another handwritten note found in Illinois by investigators revealed BIF's supreme "unwritten law:" "no matter how poor/sick – first priority is for mujahideen."[299]

198.     The raid of BIF's Illinois office by American investigators also turned up a number of other documents directly related to the war in Bosnia: a receipt dated July 21, 1994, from the "Black Swans" Bosnian Muslim commando brigade for 300 blankets and 200 pairs of boots obtained from BIF; a receipt from the BiH army dated June 3, 1994, for 2,000 uniforms, 2,000 pairs of shoes, and ten "mass communication stations" donated by BIF to "this military unit;" a request dated December 31, 1994, from the Bosnian military for a combat ambulance (later delivered as promised in January 1995); and, a memorandum to BIF director Enaam Arnaout dated November 17, 1995 describing the recent contribution of 200 tents to the Muslim army.[300]

199.     The relationship between BIF and militants fighting in Bosnia went beyond mere financing.  The Military Security Service of the Bosnian Muslim Army warned its superiors in May 1995 that known members of the Arab-Afghan mujahideen in the Balkans were "connected with the activists from Arab humanitarian organization Benevolence International Foundation.'"  The Bosnian Army's Military Security Service further complained that it had received information "indicating that [BIF] abused the humanitarian aid, in a way that they condition the acceptance of the same with the acceptance of [Islam]." According to its own May 1995 internal memorandum:

---

[296] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at pp. 28-29.

[297] Institute for Study and Documentation.  "The Balkan War."  Video produced by the Committee for Islamic Benevolence, Saudi Arabia (Lajnat al-Birr al-Islamiyya).

[298] Sworn affidavit of FBI Special Agent Robert Walker.  United States of America v. Benevolence International Foundation, Inc.  April 29, 2002.  District of Illinois, Eastern Division, Case number: 02CR0414, at p. 29.

[299] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at p. 57.

[300] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at pp. 67-69.

In order to win as many as possible followers among the population, so these patrons of the 'new' approach to religion, are visiting the families of soldiers killed in war and offer them aid 100-200 KM in case they accept their way of religion, if not they tell them that their killed member will not be 'sehid' [a martyr].  In their positions they go that far to recommend that closest family relations should be renounced if they do not accept their way of religion and practicing of the same.  The consequence of this is the already present polarization between Bosnian-Muslim population and that could have far reaching damaging consequences.[301]

200.     A number of employees working at BIF's office in Illinois could not help but notice the glaring inconsistencies in their supposed "humanitarian" work.  In a handwritten note recovered by the FBI, a BIF employee wrote unhappily:  "That is our mission – Lying to the people."[302]  However, some of BIF's other staff members openly embraced the jihadi philosophy espoused by Al-Qaida.  Suleman Ahmer, a BIF board member and BIF's former operations manager in the United States, was an unabashed supporter of cooperation with radical Islamic movements around the world.  In an October 1997 letter to other BIF administrators, Ahmer expressed surprise that the organization would even claim to sponsor relief activities: "we have never worked in the countries which are affected by natural disasters and… we may never work in this area.  But somehow in so many of our publications we have that BIF works in areas affected by wars and natural disasters.  I wonder where it came from and so on."[303]  Ahmer managed to convince his colleagues to create two separate BIF mission statements, one detailing supposed relief work for public consumption and a second internal document that emphasized "making Islam supreme" for the benefit of the extremist board members.[304]

201.     In the New York area, BIF was represented by a senior Bosnian diplomat and "Minister Counsellor" at the Bosnian Mission to United Nations in Manhattan:  Saffet Abid Catovic.  Since 1993, Catovic has been a prominent charitable fundraiser for the Balkans and an outspoken voice at the UN mission on Islamic religious and political issues.[305]  He has had a close relationship with the Kingdom of Saudi Arabia and, in interviews in 1994,

---

[301] "Review of the Information on Activities of the Persons from Afro-Asian Countries Directly Before the War and During the War in the Territory of BIH Republic."  Report written by the BIH Administration of the Military Security Service– Department for Analytical and Informative Affairs."  Sarajevo; May 6, 1995.

[302] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at p. 57.

[303] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at p. 53.

[304] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at p. 54.

[305] Mehdi, Anisa.  "CATCH THE SPIRIT: PROGRAM #93-23 (BOSNIA)."  1.5 hour VHS videocassette produced by the United Methodist Church featuring Saffet Abid Catovic, Rev. Samuel B. Phillips, Stephen W. Walker, and Kathleen M. Pratt.  UMCom; ©1993.

he publicly thanked the Saudis for their generous financial assistance to Bosnian religious projects.[306]  However, he has since noted: "there was no way to do wire transfers into Bosnia; it had to be physically carried—the funds had to be physically carried in to give the people, uh, financial help… it's not unusual." [307] During proceedings in U.S. Immigration court, Catovic has acknowledged admiring "the recitation of the Koran" by convicted terrorist Shaykh Omar Abdel Rahman, former head of Egyptian jihadist faction Al-Gamaat al-Islamiyya: "He's a blind man who recites Koran very beautifully." [308] Catovic was also recorded on video introducing Siddig Ali (later convicted of a central role in a fundamentalist conspiracy to bomb New York landmarks including the World Trade Center in 1993) to speak on the subject of "Jihad: The Forgotten Duty."  Catovic praised Siddig Ali, telling his audience that they should feel "honored to have our dear brother from Sudan, a land which is participating in the Jihad in the struggle itself."[309]

202.    In the aftermath of the September 11 terrorist attacks, the U.S. government froze the assets of BIF and commenced legal action against one of its principle directors and founders, Illinois-resident Enaam Arnaout.  In February 2002, Arnaout worriedly contacted his brother "Dr. Hisham" to discuss how "they" had taken the former director of BIF's office in Bosnia "in a special plane… [t]o Cuba."  Arnaout, convinced of his own inevitable fate, explained to Hisham how he would attempt to shoulder the blame and exonerate BIF's Saudi founders.  He somberly reflected, "It means, we, I mean, there is death that we will be swallowing.  Meaning, the razor will fall on us, but we do not know how."[310]  Less than a month later, the razor did fall; Bosnian police raided BIF's regional headquarters in Sarajevo and detained its manager, Munib Zahiragic, a former intelligence officer affiliated with the Bosnian Foreign Ministry.  Zahiragic reportedly turned over nearly 100 top-secret documents about suspected fundamentalist terrorists operating in Bosnia, including transcripts of communications between BIF management and senior commanders of Al-Qaida based in Afghanistan.[311]  Also found were three firearms, a ski mask, numerous military manuals on topics including small arms and explosives, fraudulent passport materials, and photographs of Usama Bin Laden.[312]

203.    Enaam Arnaout, about to be arrested himself in the U.S., contacted Zahiragic in jail to discover the extent of the damage caused by the raids.  The latter admitted on the phone, "[T]hey took things… I had documents from, from, intelligence, where I worked before,

---

[306] Shaikh, Habib.  "U.N. subject to whims of 'Big Five': Catovic."  Arab News.  July 17, 1994.

[307] Individual Hearing of Mazen Al-Najjar and Fedaa Al-Najjar.  United States Immigration Court; Orlando, Florida.  Judge Dan Dowell presiding (October 8, 1996), at p. 858.

[308] Individual Hearing of Mazen Al-Najjar and Fedaa Al-Najjar.  United States Immigration Court; Orlando, Florida.  Judge Dan Dowell presiding (October 8, 1996), at p. 829.

[309] "Jihad: The Forgotten Duty, by Br. Siddig Ali, and Jihad in Kashmir and Bosnia."  Islamic Educational Video Series from The International Institute of Islamic Research [Director: Shaykh Zahiruddin Shafi].  P.O. Box 1653, Burlington, NJ 08016.  (609)387-5070.

[310] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements."  United States of America v. Enaam M. Arnaout.  United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at p. 74.

[311] Whitmore, Brian.  "Bosnian Charities Tied to Terror."  The Boston Globe (July 2, 2002), at p. 1.

[312] Sworn affidavit of FBI Special Agent Robert Walker.  United States of America v. Benevolence International Foundation, Inc.  April 29, 2002.  District of Illinois, Eastern Division, Case number: 02CR0414, at p. 10.

and I had various documents, from the, from the, from the, what is it called, from the job." Arnaout, not realizing how much Zahiragic had already disclosed attempted to order the Bosnian, "not to give information about the others... Meaning we now, I don't know a thing about you... I don't know your life... [W]hat do you know about me, you don't know a thing about me."[313]

204.    Consistent with the material presented above, there is clear and unambiguous public evidence that Saudi state-sponsored dawah organizations including (but not limited to) the Muslim World League, the International Islamic Relief Organization, and the World Assembly for Muslim Youth have endorsed the concept of violent jihad, have pushed young Muslims to join violent jihadist organizations, and have provided critical support and resources to al Qaeda and its affiliates. It is my professional opinion that the tens of millions of dollars in support provided by these dawah organizations was the fuel for Al-Qaida's engine in the period leading up to the September 11th attacks, and that Al-Qaida could not have successfully planned and carried out the attacks without that funding.

205.    Contrary to the wishful thinking of some former IIRO and MWL employees deposed in the present litigation, quite obviously, the financial irregularities and atypical accounting practices exercised by these dawah organizations were not acceptable for international charitable organizations, and instead represented convenient vehicles for illicit money laundering and providing material support to terrorists and other violent extremists. If they were the least bit normal or acceptable, they would never have come to the critical attention of their own internal financial auditors to begin with. One must ask themselves why these dawah organizations—after being repeatedly confronted (in some cases by their own internal auditors) with glaring evidence of these insufficiencies—still refused to take any real punitive or corrective action until (at least) long after the September 11 terrorist attacks on the United States, if ever.

206.    There is a litany of documentary evidence—in the form of internal correspondence, published editorials, and witness testimony—demonstrating how the senior leadership of Saudi state-sponsored dawah organizations including MWL, IIRO, and WAMY were well aware of the ideological agenda being pushed by their respective groups, the suspicious financial practices used by their employees, and the growing list of connections between their entities and violent jihadi extremists, most notably al Qaeda. Once again, the question begs itself—if top officials like former WAMY Secretary General Maneh al-Johani and former MWL Secretary General Dr. Abdullah Omar Naseef themselves explicitly endorse the concept of violent jihad (and the linked notion of "jihad by wealth") in their own dawah publications, if they refer to the U.S. and the West as the "enemies of Islam," and if they whitewash the illicit activities of their own employees—including the diversion of money, weapons, and travel documents to al Qaeda—what other result could they have logically expected?

---

[313] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division, Case #: 02 CR 892 (January 31, 2003), at p. 103.