EXHIBIT 15

𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘 𝕸𝖆𝖌𝖆𝖟𝖎𝖓𝖊 | https://www.nytimes.com/2015/08/30/magazine/the-lessons-of-anwar-al-awlaki.html

FEATURE

# The Lessons of Anwar al-Awlaki

Four years after the United States assassinated the radical cleric in a drone strike, his influence on jihadists is greater than ever. Was there a better way to stop him?

By Scott Shane

Aug. 27, 2015

T ype "Anwar al-Awlaki" into YouTube's search bar, and you get 40,000 hits. Most of them bring up the earnest, smiling face and placid voice of the first American citizen to be hunted and killed without trial by his own government since the Civil War. Here is Awlaki on what makes a good marriage; on the nature of paradise; on Jesus Christ, considered a prophet by Muslims; on tolerance; on the holy month of Ramadan; and, more quirkily, on "obesity and overeating in Islam." Here is Awlaki, or Sheikh Anwar, as his many admirers still call him, easily mixing Quranic Arabic with American English in chapters from his 53-CD series on the life of the Prophet Muhammad, once a best seller among English-speaking Muslims.

But in the same queue of videos is material of an altogether different nature. You will find Awlaki explaining why you should never trust a non-Muslim; how the United States is at war with Islam; why Nidal Hasan, who fatally shot 13 people at Fort Hood, and Umar Farouk Abulmutallab, who tried to blow up an airliner over Detroit, were heroes. There is, finally, his culminating "Call to Jihad," recorded in 2010 when he was already on President Obama's kill list and on the run in Yemen's tribal badlands. In it, with the confidence and poise of a YouTube handyman explaining how to caulk a window, he details just why, exactly, it is every Muslim's religious duty to kill Americans.

Exhibit
1037
8/6/2021
Evan Kohlmann

This is the digital legacy of Awlaki, who was killed in a drone strike in Yemen in September 2011. Addressing a V.F.W. convention in Pittsburgh last month, President Obama championed the counterterrorism record of his administration. "I've shown," he said, "I will not hesitate to use force to protect our nation, including from the threat of terrorism." He listed some of the terrorists killed on his watch. "Anwar al-Awlaki, a leader of the Al Qaeda affiliate in Yemen — gone," Obama said to applause.

The government has a portentous euphemism — "removed from the battlefield" — for the targeted killing of terrorists. But Awlaki has by no means been removed from the most important battlefield in any ideological conflict, the battlefield of ideas. Five days before the president spoke, Mohammod Youssuf Abdulazeez, a troubled 24-year-old electrical engineer, opened fire at two military installations in Chattanooga, Tenn., killing four Marines and a sailor. F.B.I. investigators who examined his computer discovered that he had been watching Awlaki videos in the weeks before the shootings.

They could not have been surprised. In May, two men shot up a Prophet Muhammad cartoon contest in Garland, Tex. One used Awlaki's familiar portrait, with wire-rimmed glasses and bushy beard, as his profile picture on Twitter; the other gave Awlaki CDs to his mother, who described the assassination of the cleric in 2011 as a turning point in her son's radicalization. For counterterrorism investigators, such discoveries have become routine: Check the suspect's laptop, and Awlaki will be prominent in the download and search history. This has held true in dozens of cases. Shannon Conley, a 19-year-old Colorado convert to Islam, left behind a pile of Awlaki DVDs before trying to fly off to Syria to join the Islamic State last year. In June, when the F.B.I. arrested several New Jersey men whom they charged with talking about staging an attack, agents said they found that Awlaki came up regularly in their social-media chatter. Officials said one bragged that he had watched "almost all of his lectures" and said, "America killed him," to which his co-defendant typed back, "Then Amreeka shale burn."

The Tsarnaevs, Chechen-born brothers who set off two pressure-cooker bombs at the Boston Marathon in 2013, owed part of their ideological training and their bomb-making skills to Awlaki's online work. "Listen to Anwar al-Awlaki's ... here after series," Dzhokhar Tsarnaev, the younger brother, tweeted a few weeks before the attack, "you will gain an unbelievable amount of knowledge." Chérif Kouachi, one of the Algerian-French brothers who massacred the staff of the satirical newspaper Charlie Hebdo in Paris in January, told a TV station in his last public words before being shot by the police that "Sheikh Anwar al-Awlaki" had sponsored the attack. The list of plots and attacks influenced by Awlaki goes on and on.



Anwar al-Awlaki on Oct. 14, 2001, when he was an imam of the Dar Al-Hijrah Islamic Center in Falls Church, Va.  Linda Spillers for The New York Times

In fact, Awlaki's pronouncements seem to carry greater authority today than when he was living, *because* America killed him. On Sept. 30, 2011, the day that Obama announced Awlaki's death, many Islamic websites attached the word ''*martyrdom*'' to this news. Ten days later Al Qaeda in the Arabian Peninsula, Awlaki's Yemen branch, confirmed the death: "America killed Sheikh Anwar, may Allah have mercy on him, but it could not kill his thoughts. The martyrdom of the Sheikh is a new and renewing life for his thoughts and style." It was a self-serving claim, but nearly four years later, it is hard to dismiss.

Awlaki's collected works move seamlessly from praising Islam's ancient heroes to calling for slaughter in the name of Allah. And this rich afterlife on the web raises disturbing questions: Is Awlaki as dangerous — perhaps even more dangerous — dead than alive? Was there a way to undermine his message without giving it the gloss of martyrdom? To

answer these questions, which have implications for the broader American strategy against terrorist groups, it is necessary to understand Awlaki's own evolution, including his interaction with American authorities, a story that has long been misunderstood.

Some government agencies have tried to boil the process of radicalization down to a few clear-cut and inevitable stages, but in reality, the journey to extremism is a messy, human affair that defies such predictability. This was true of Awlaki's acolytes; it was also true of the great radicalizer himself. Before Awlaki could talk anyone else into violent jihad, he had to talk himself into it. One giant step came as the unintended result of surveillance by the United States government.

At midnight on Sept. 14, 2001, Awlaki, then a young Yemeni-American imam at the prominent Dar al-Hijrah mosque in Falls Church, Va., finished a long day by answering an email from his younger brother about the terrorist attacks of a few days before. ''I personally think it was horrible,'' he wrote to Ammar, a college student in New Mexico at the time. ''I am very upset about it.'' He added, ''The media are all over us.'' Anwar was disconcerted, but perhaps also pleased that an onslaught of reporters had turned his Friday prayers, or *jummah*, into a circus. ''At *jummah* today we had ABC, NBC, CBS and The Washington Post.'' He closed on a positive note, hinting at a noble purpose, to be sure, but also displaying a trace of personal ambition: ''I hope we can use this for the good of all of us.''

Though the country was in mourning, a sense of defiant unity emerged. A non-Muslim neighbor of Dar al-Hijrah organized a candlelight vigil around the building to show solidarity with the mosque. Roughly 80 residents of a nearby apartment building sent over a note saying, ''We want your congregation to know that we welcome you in this community.'' Journalists, hunting for an authoritative voice from the Muslim community, began to pass regularly under the mosque's grand marble arches or to gather in Awlaki's modest family home. He denounced the 9/11 attacks but in the same breath would criticize America's record in the Middle East. Reporters were impressed. The New York Times wrote that Awlaki, just 30, was being ''held up as a new generation of Muslim leader capable of merging East and West.'' He relished the spotlight. He seemed to be quite self-consciously auditioning for a dual role: explainer of Islam to America and of America to Muslims. ''We came here to build, not to destroy,'' he declared from his pulpit. ''We are the bridge between America and one billion Muslims worldwide.''

Awlaki's rise was a rapid one. Born in New Mexico in 1971, he lived in the United States until he was 7, while his father was in graduate school studying agriculture, then moved to Yemen with his family before returning for college at 19. At Colorado State, he was soon bored by his major in civil engineering and didn't last long at the entry-level engineering job

that followed. But he had discovered a knack for preaching, taking turns with other students and professors to lead prayers at the little mosque just off campus. He quickly landed a part-time position at the Denver Islamic Society. As an imam there and later in San Diego, he won over diverse, sometimes fractious communities. Older immigrants were captivated by his respectful manner and his bilingual, bicultural charisma. ''He had a beautiful tongue,'' said one leader of the Denver mosque, a Palestinian-American in his 60s who did not want to be named praising a man who later became notorious. ''He had a nice voice. He had earned the knowledge he needed.'' Young people, turned off by older imams who spoke English with heavy accents and knew little about American ways, found Awlaki approachable. ''He lit up when he was with the youth,'' Jamal Ali, 40, an airport driver who prayed at the San Diego mosque, told me.

He was also driven, a young man determined to make his mark. Among the books Awlaki devoured was Stephen R. Covey's 1989 best seller, ''The Seven Habits of Highly Effective People.'' In San Diego, he accepted a growing number of invitations to speak outside his mosque. He found a publisher to sell CD sets of his lectures through Islamic bookstores and online sales; these would attract a steadily growing audience over the next few years. But in 2000, at age 29, as he contemplated leaving San Diego, he was still not entirely certain about career paths. His father, Nasser al-Awlaki, who had earned his doctorate in the United States and served as Yemen's agriculture minister and as a university chancellor, was dubious about a clerical career for his son. Awlaki bent to his father's wishes and pursued a doctorate in education at George Washington University, agreeing to serve as a chaplain there. A job as the head of a department at Sana University in Yemen's capital awaited him if he wanted it, his father said. As it happened, while he was studying for his Ph.D., Dar al-Hijrah, a far bigger and more prestigious mosque than the one in San Diego, was looking for a young imam, hoping, in part, to compete with a radical storefront mosque for the attention of local Muslim youth. Awlaki got the job; he seemed full of optimism. He told his father that he supported Bush in the 2000 election and hoped his new job might get him an invitation to the White House.

That didn't happen, but Awlaki quickly made his mark in Washington. He was invited to give the sermon one Friday in the United States Capitol. A team filming a documentary on Muhammad captured the moment. He lectured at a local institute that was training Muslim chaplains for the military. His reputation, spreading through his CDs, established him on the Islamic speaking circuit. With his Yemeni wife, Gihan, and their three young children, he explored Washington's museums and restaurants and settled into suburban life.

On the morning of 9/11, Awlaki was returning from a West Coast visit and learned of the attacks while riding in a taxi to the mosque from Reagan National Airport. He was soon caught up in the sudden, panicky American appetite for information about Islam. He was quoted regularly in the national media. He made a favorable impression at the interfaith forums that became popular in the Washington area. ''He struck me in his personality as a gentle man, very well read and intelligent,'' said the Rev. Gerry Creedon, a priest at a Catholic parish in Arlington, Va. Simon Amiel, an organizer with the campus Jewish organization Hillel, recalled Awlaki's speaking at George Washington University on the parallel traditions of Islam and Judaism. Amiel found him ''cordial and friendly.''

At his mosque, Awlaki argued for the unique position of American Muslims. ''Yes, we disagree with a lot of issues when it comes to the foreign policy of the United States,'' he said in one sermon caught on camera. ''We are very conservative when it comes to family values. We are against the moral decay that we see in the society. But we also cherish a lot of the values that are in America. Freedom is one of them; opportunity is another. And that's why there is more appreciation among the American Muslims compared to the Muslims in other parts of the world.''

It was a paean to conservative social values and American exceptionalism that would not have been out of place at a Republican National Convention. But as with many preachers who thunder against ''moral decay,'' there was a side of Awlaki that neither his admiring congregation nor the national media were allowed to see.

**Sign up for The New York Times Magazine Newsletter**  The best of The New York Times Magazine delivered to your inbox every week, including exclusive feature stories, photography, columns and more. Get it sent to your inbox.

**On Dec. 13, 2001,** a mild but blustery day, Awlaki drove his white Dodge Caravan across the Potomac into Washington and parked west of Dupont Circle. Such solo drives had become routine for him, though the destinations varied; sometimes it was a motel in a rundown part of the city, sometimes it was more upscale lodging in the Virginia suburbs. On this occasion, it was the Marriott Residence Inn on P Street toward the end of the holy month of Ramadan. A few weeks earlier, in an online chat accompanying a Washington Post video, he explained that Muslims abstained from sexual activity during Ramadan between sunrise and sunset. It was 2:30 p.m. when he made his way to Room 1010, where a young woman from Texas awaited him.

He was a computer engineer, Awlaki told her, born in India and now living in California. He was polite and apologized for sneezing so much, explaining that he was suffering from hay fever. He handed over $220, and she performed oral sex on him. He ''finished very quickly'' and asked her for another round, the woman would later recount. She said he would have to pay another $220 — she was trying to raise the money to go to college in Florida. He said he would pay again only for full sexual intercourse. She declined, and he went on his way.

Every detail of Awlaki's encounters with prostitutes was being recorded in government files. It was not that the government especially cared about his sex life. But soon after 9/11, in the frantic hunt for clues to the next attack, the F.B.I. discovered that two of the hijackers, Nawaz al-Hazmi and Khalid al-Mihdhar, had prayed at Awlaki's mosque in San Diego, and some congregants thought they remembered seeing Hazmi enter Awlaki's study for private discussions. Later, Hazmi and a third hijacker turned up across the country at Dar al-Hijrah. Worried about this connection, agents interviewed Awlaki at least three times in the days following the attacks. They found him clear in his condemnation of the carnage, hazy in his recollection of the hijackers and obviously wary. He declined to show the agents his passport, perhaps fearing it might be confiscated. He opted not to answer when asked whether he lectured on jihad, possibly fearing that the agents, clearly ignorant about Islam, might misconstrue his answer. Not surprisingly, he did not allay their suspicions. The F.B.I. opened a formal investigation. A surveillance team began following him 24 hours a day. His calls were monitored and his contacts vetted for ties to terrorism. His growing stature sometimes made monitoring him a peculiar assignment for federal agents. ==One day in February 2002, his F.B.I. watchers followed him to the Pentagon, where he disappeared inside. He was a luncheon speaker, part of an outreach effort to the Muslim community.==

Anwar al-Awlaki, at the Dar al-Hijrah Islamic Center in Falls Church, Va., with Patricia Morris, who organized a vigil supporting the center shortly after 9/11. Tracy A. Woodward/The Washington Post, via Getty Images

As the weeks passed, the bureau found no evidence that Awlaki was involved in terrorism. But the surveillance teams did discover that he was leading a complicated secret life. The F.B.I. listened in when he called escort services, followed him to hotels, photographed him surreptitiously on the street and often interviewed the women afterward. The voluminous F.B.I. files, released under the Freedom of Information Act, make for excruciating reading, detailing every occasion on which he paid for oral sex, for intercourse or just to watch a woman stimulate herself. One woman remarked that he "likes all lights on." She found him "sweet."

He was also, of course, staggeringly reckless. He was a married man who stood on a moral pedestal in front of a conservative congregation. In one of his lectures, dedicated to *zina*, or fornication, he hailed the sanctity of marriage and denounced "the culture of Hollywood" for promoting illicit sex, including prostitution. "The movies and the nudity and the destruction of this culture is now global," he declared. Every week or so, this same man was squandering his limited family budget for half an hour of pleasure. Awlaki had no idea anyone knew, and he kept up his hotel visits at a steady pace.

**The reasons for** Awlaki's eventual departure from the United States, and for the steady hardening of his message that followed, have long been misunderstood. For years, anyone who studied his story assumed that he judged life in America as a Muslim leader to be no longer tenable. By this theory, the precipitating event happened in March 2002, when federal agents on a hunt for terrorist financiers swept through the Islamic institutions in Northern Virginia and the homes of their leaders. An association with Islam seemed to be the only requirement for being targeted, and the conduct of the agents carrying out the raids was often crude. Two days later, on March 22, Awlaki's voice shook with anger as he made the raids

the subject of his Friday sermon. He described how the wife and daughter of one local leader had been handcuffed for four hours, prevented from retrieving their head scarves, while male agents searched their home. He dropped his customary calm and declared, in language he had never publicly used before: ''So this is not now a war on terrorism. We need to all be clear about this. This is a war against Muslims. It is a war against Muslims and Islam. Not only is it happening worldwide, but it is happening right here in America, that is claiming to be fighting this war for the sake of freedom while it's infringing on the freedom of its own citizens, just because they're Muslim.''

A few days later, Awlaki flew to London for a planned speaking engagement. To the astonishment of many of his colleagues and friends, he did not return. Dar al-Hijrah put out a statement dressing up his disappearance as a sabbatical: ''We have decided to transfer Imam Al-Awlaki to Yemen in order to take extensive Islamic law classes.''

But the idea that Awlaki's sermon was a coded farewell doesn't hold up on examination. In it, he cited the experience of African-Americans to urge American Muslims to unite and fight for their rights. ''There are no rights unless there is a struggle for those rights,'' he declared. ''And the history of America in that sense is very clear. African-Americans in this country had to go through a struggle. Their rights were not handed to them.'' Awlaki was urging his fellow Muslims to stand up and demand respect. It would be an odd, or at least cowardly, moment to flee.

As it happens, there was an intimate witness to this crucial moment, someone who can help explain Awlaki's departure. His younger brother, Ammar, arrived for a visit on March 23, the day after Anwar's fiery sermon. (The F.B.I. duly recorded the arrival of a U.M.E.M., an ''unknown Middle Eastern male.'')

Ammar recalls that he lightheartedly asked his big brother just how long he intended to stay in the United States. ''And he goes, like, 'Forever,' '' Ammar told me, his American English even more colloquial than his brother's was. ''I looked up to Dad and what he'd done in Yemen. I wanted Anwar to be the same. But he said, 'No, I'm going to spend the rest of my life in America.' '' With his preaching success, his comfortable lifestyle, his CDs and his growing national reputation, he had set aside his father's idea of a post at Sana University. ''He was totally planning to stay,'' Ammar said.

Starting in 2010, Awlaki often posed with weapons in Al Qaeda propaganda.  SITE Intelligence Group, via Agence France-Presse.

A few days later, however, that plan somehow changed. Ammar arrived at the mosque one evening at the time of *isha*, the last of the five daily prayers. He found his generally coolheaded brother ashen and distraught. ''He was in such a mental state, so devastated that he couldn't even lead the prayer,'' Ammar recalled. ''He was angry, upset, sad, maybe confused.'' He put off Ammar's questions until the next day, when he took him to a room where they could talk privately and asked him to take the battery out of his cellphone, doing the same himself. ''He said, 'Something happened last night that made me reconsider my stay here in the States,''' Ammar recalled. '' 'I was told that the F.B.I. has a file on me, and this file could destroy my life. I'm now rethinking my options, and one of them might be as drastic as leaving the States.' ''

Awlaki did not tell his admiring younger brother what was in the file. But a document from the 9/11 Commission records at the National Archives, declassified at my request, shows that a few days after Ammar's arrival, the manager of an escort service called Awlaki to warn him that he had been interviewed by Wade Ammerman, an F.B.I. agent, who had asked about the imam's visits to prostitutes. It was clear from Ammerman's questions that the F.B.I. knew everything.

Awlaki's panic, his sudden agitation about the course of his life, does not appear to have been triggered by American hostility to Muslims. Rather, he seems to have realized that his own un-Islamic behavior had put his career success and family comity at risk. If the bureau charged him, or leaked the files, he might instantly lose the moral authority he brought

to public arguments over the war in Afghanistan or the dubious roundup of Muslim men. If the F.B.I. chose instead to threaten exposure to coerce his cooperation, that might be even worse. Within a few days, he was gone, and he would never live in the United States again.

Despite the danger that he perceived from the prostitution dossier, Awlaki did not immediately give up on the possibility of resuming his American life. Awlaki was hardly in a position to tell his family about the menacing F.B.I. file, and his father pressured him to return to Washington and resume work on his Ph.D. Awlaki returned for one visit, in October 2002, but uncertain of the F.B.I.'s intentions, he did not dare risk staying. In fact, though he had no way of knowing it, F.B.I. memos from 2002 show that officials were exploring the possibility of charging Awlaki with a prostitution-related offense. A year after his visit, in the fall of 2003, he astonished F.B.I. agents by calling the bureau's Washington field office out of the blue, expressing a desire to meet in London or Sana to clear up any suspicions, possibly as a prelude to returning to the United States. He mentioned media reports tying him to 9/11 because some hijackers had visited his mosques, which he called "absurd"; presumably he also wanted to find out whether the bureau planned to act on the prostitution file. But the F.B.I. treated the issue as a low priority, and when Awlaki stopped answering emails, plans to meet in London fell through, records show. As late as 2004, when Awlaki returned to Yemen for what would prove to be the remainder of his life, he would sometimes suggest to family members that he might still move back to the United States. "He would always say, 'Thank God I'm an American citizen and I have a second home to go back to if things go wrong in Yemen,'" his uncle, Saleh bin Fareed al-Awlaki, told me.

It is a tantalizing period, hinting at an alternate history. What if the F.B.I., recognizing Awlaki's influence and value as a mediator with the Muslim community, had assured him that there was no plan to use the prostitution evidence to charge or embarrass him? What if he had resumed his life in Washington and continued to grow into an important public figure? Might he have become a responsible leader, a voice in the debates over the wars in Muslim countries, the wisdom of drone strikes, the fate of Guantánamo? Might he never have joined Al Qaeda? The contemporary history of terrorism, not to mention his playlist on YouTube, could have unspooled quite differently.

Instead, Awlaki's ambition took a new and more militant path. At first subtly in 2003, while in Britain, and more clearly after 2005, his rhetoric became increasingly ferocious, his embrace of violence more open. After moving on to Yemen, he was arrested in 2006 and held for 18 months without charges at least in part as a result of American pressure. Not long

after his release at the end of 2007, angered by the Yemeni surveillance teams constantly following him around Sana, he would depart for his family's ancestral home in Shabwah province, also the hideout for Al Qaeda in the Arabian Peninsula. Within months he would be part of the group and, soon after that, deeply involved in plotting attacks on America.

**In 2010,** when Obama ordered a legal review and then approved the killing of Awlaki, some civil libertarians objected, saying that he was being denied his constitutional rights as an American citizen. But some Muslim commentators publicly expressed caution for more practical reasons. One was Mohamed Elibiary, a security consultant and a law-and-order Texas Republican. "It was very clear, at least to me, that if you're trying to fight a martyrdom culture, you don't go make martyrs," he said. "I'm sorry to say, I think I was right." In recent years, Elibiary has regularly interviewed Americans charged with terrorism for the federal public defender's office. "In that world, to the last person, you find that they're convinced that Anwar al-Awlaki is a good guy and a martyr," he said. "What seals the deal for them is that he was killed by the United States."

Awlaki's son Abdulrahman, 16, was also killed in a drone strike in Yemen. Photograph from Awlaki family

Beyond Awlaki's case, concerns inside and outside the government about blowback from drone strikes have steadily grown, fed by the backlash against the unintended deaths of civilians. Among those victims was Awlaki's 16-year-old son, also a U.S. citizen, killed two weeks after his father in what American officials call a mistake; they say they were targeting an Al Qaeda operative. Part of the problem with the focus on targeted killing is that it fuels the central narrative of Al Qaeda and the Islamic State: that the United States is at war with Islam, that it is killing Muslims and that the obligatory religious response is armed jihad. The suspected perpetrators of two of the most prominent foiled attacks in the United States, a plot to blow up the New York subway and the failed car bombing of Times Square, said their anger at drone strikes pushed them to act.

A number of high-ranking security officials, after leaving office, have also expressed deep concerns about drone strikes. ''They are hated on a visceral level, even by people who've never seen one or seen the effects of one,'' Stanley McChrystal, a retired general and former head of the Joint Special Operations Command, told Reuters. Lt. Gen. Michael Flynn, former head of the Defense Intelligence Agency, told Al Jazeera English that he had concluded that drone strikes were doing more harm than good. ''It's a failed strategy,'' he said. Bruce Riedel, a former veteran C.I.A. officer who has long studied terrorism, said drones have eliminated very dangerous people, but the government has become ''drone addicted,'' firing missiles too often in Pakistan and Yemen.

There can be no doubt that President Obama has thought deeply about the problem of blowback in the war on Al Qaeda — he campaigned for president in 2008 on exactly that issue. He denounced the Iraq invasion, torture, secret detention and the prison at Guantánamo Bay as mistakes that had become ''recruiting tools'' for Al Qaeda. The rise of the Islamic State, that monstrous offspring of Al Qaeda and the Iraq war, has only underscored the catastrophic repercussions of bad decisions. When Islamic State executioners dressed American journalists in Guantánamo-style orange jumpsuits before beheading them, it was hard to miss the reference. Today the familiar image of the Predator drone is scrawled in graffiti on walls from Cairo to Karachi, reflecting a defiant anger.

Speaking at the Pentagon in early July, Obama acknowledged, not for the first time, the limits of counterterrorism based solely on killing: ''Ultimately, in order for us to defeat terrorist groups like ISIL and Al Qaeda, it's going to also require us to discredit their ideology — the twisted thinking that draws vulnerable people into their ranks. Ideologies are not defeated with guns; they're defeated by better ideas.'' Underlying such statements is a concern, quiet but widespread inside the government, about the wisdom of American strategy. Increased surveillance and strikes overseas have almost certainly made the country less vulnerable to a major attack. But it is also true that the minority of Muslims worldwide

who believe that America is at war with Islam, and that their faith justifies violence in response, appears to have grown since 2001. And jihadist ideology, slickly packaged and repackaged on the Internet and social media, seems able to lure an endless supply of new recruits to terrorist groups.

So, was there a better idea of how to deal with Awlaki once he had joined Al Qaeda? Yemeni tribes might have been induced to capture him and turn him over, but a criminal trial would have given a global audience to a mesmerizing orator. Martyrdom would have been avoided, but his YouTube presence would have lived on intact. A more outlandish idea was raised immediately after Awlaki's death by Ed Husain, a former British militant who recounts his journey into and out of extremism in his memoir, ''The Islamist.'' Husain suggested then, and believes now, that a better approach might have been a careful, high-profile public release of the prostitution files on Awlaki. ''He was an imam when he was up to these shenanigans,'' Husain told me. ''Exposing that, I think, would have discredited him and more important undermined the message — that they are these high and mighty, pious, believing brothers who are declaring jihad on the West. Expose them for what they are.''

Such a move would, of course, have raised its own dilemmas and risks. There is something unsavory about peddling sexual secrets, though that seems a minor objection if the alternative is execution by drone. For some, the suggestion would echo the F.B.I.'s deplorable attempts to use surveillance recordings to smear the Rev. Martin Luther King Jr., however profound the moral gulf between the two targets. Awlaki and Al Qaeda could have been counted on to denounce the material as a fabrication, though its volume and detail might have undercut such claims. In any case, far from trying such an unconventional tactic, the F.B.I. kept the documents secret until long after Awlaki's death, releasing them in redacted form only when forced to under the Freedom of Information Act.

Riedel, the C.I.A. veteran, said innovative tactics that focus on countering the ideology of Al Qaeda and ISIS merit serious consideration. The overreliance on killing, he said, has pushed aside more imaginative approaches. ''We've spent trillions on hard power,'' he said. ''How much have we spent on soft power? We are, after all, the nation of Hollywood. We know how to make our case and sell a product and smear an enemy. With Awlaki, we could have done all of those things: We could have countered his argument, we could have smeared his reputation. Here it is more than three years after his death, and we still haven't made the case. He still has this iconic status as a knight of Islam. And he was anything but.''