EXHIBIT 18

# Risk Matrix for the Charitable Sector

## Introduction

The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") is charged with administering and enforcing U.S. economic sanctions programs, which include a range of sanctions against foreign states, terrorists, international narcotics traffickers, and other specially designated targets. Since September 11, 2001, a number of investigations in the United States and abroad, as well as reports by international organizations and in the media, have revealed the vulnerability of the charitable sector to abuse by terrorists, rogue actors, and other sanctions targets. In particular, terrorist organizations have exploited charitable organizations, both in the United States and worldwide, to raise and move funds, provide logistical support, or otherwise cultivate support for their organizations and operations.

This type of abuse can result in violations of OFAC-administered economic sanctions programs. For this reason, OFAC has actively engaged with charitable organizations to assist them in understanding and complying with their legal obligations under U.S. sanctions programs while delivering aid in high-risk areas.[1] OFAC has encouraged charities to develop proactive, risk-based compliance programs, informed by best practices, to protect their assets and resources from diversion or exploitation by rogue actors, terrorists, or other sanctions targets.[2]

To assist the charitable sector in adopting an effective, risk-based approach, OFAC is providing this matrix of common risk factors associated with disbursing funds and resources to grantees.[3] This matrix will be particularly useful to charities that conduct overseas charitable activity due to the increased risks associated with international activities.[4] The matrix is designed to provide charities with an understanding of the risks that they should consider in the course of conducting their due diligence. However, the matrix is not a comprehensive list of risk factors indicating abuse or exploitation of a particular charity or its operations, nor is it meant to establish whether or not a charity or grantee is engaged in illicit activities. Any of the risks highlighted in this matrix could constitute normal business operations for certain charities, given the resources they possess, the environments in which they work, and the constraints under which they operate. We hope that charities find this matrix to be a helpful tool in developing an appropriate compliance program.

## Risk Factors for Charities Disbursing Funds or Resources to Grantees[5]

| Low Risk | Medium Risk | High Risk |
| --- | --- | --- |
| The grantee has explicit charitable purposes and discloses how funds are used with specificity. | The grantee has general charitable purposes and discloses how funds are used with specificity. | The grantee has general charitable purposes and does not disclose how funds are used. |
| The charity and the grantee have a written grant agreement that contains effective safeguards. For example, provisions addressing proper use of funds by the grantee, delineation of appropriate oversight, and programmatic verification. | The charity and the grantee have a written grant agreement with limited safeguards. | The charity and the grantee do not have a written grant agreement. |
| The grantee has an existing relationship with the charity. | The grantee has existing relationships with other known charities but not with this charity. | The grantee has no prior history with any charities. |
| The grantee can provide references from trusted sources. | The grantee's references are from sources with which the charity is unfamiliar. | The grantee can provide no references or sources to corroborate references provided. |
| The grantee has a history of legitimate charitable activities. | The grantee is newly or recently formed, but its leadership has a history of legitimate charitable activities. | The grantee has little or no history of legitimate charitable activities. |
| Charity performs on-site grantee due diligence through regular audits and reporting. | Charity performs remote grantee due diligence through regular audits and reporting. | Charity performs no grantee due diligence, or due diligence is random and inconsistent. |
| Grantee provides documentation of the use of funds in the form of video, receipts, photographs, | Grantee provides documentation of the use of funds. Documentation may only include receipts and | Grantee provides no documentation of use of funds. |

2

| | | |
|---|---|---|
| testimonies, and written records. | written records. | |
| | | |
| The charity disburses funds in small increments as needed for specific projects or expenditures. | The charity authorizes grantee discretion within specified limits. | The charity disburses funds in one large payment to be invested and spent over time or for unspecified projects selected by the grantee. |
| | | |
| Reliable banking systems or other regulated financial channels for transferring funds are available and used by the grantee, subjecting such transfers to the safeguards of regulated financial systems consistent with international standards. | Reliable banking systems or other regulated financial channels for transferring funds are not reasonably available for the grantee's relevant activity, but the charity and the grantee agree on alternative methods that they reasonably believe to be reliable, trustworthy, and protected against diversion. | The grantee does not use regulated financial channels or take steps to develop alternative methods that the charity and grantee reasonably believe to be reliable, trustworthy, and protected against diversion. |
| | | |
| Detailed procedures and processes for the suspension of grantee funds are included within the written agreement and enforceable both in the United States and at the grantee's locale. | Detailed procedures and processes for the suspension of grantee funds are included within the written agreement but may not be enforceable at the grantee's locale due to instability or other issues. | There exist no procedures or processes for suspension of grantee funds in the event there is a breach of the written agreement. |
| | | |
| The charity engages exclusively in charitable work in the U.S. or in foreign countries/regions where terrorist organizations are not known to be active. | The charity engages in some work in foreign countries/regions where terrorist organizations may be active. | The charity primarily engages in work in conflict zones or in countries/regions known to have a concentration of terrorist activity. |

---

[1] Engaging in a prohibited sanctions transaction, including one with a person on the Specially Designated Nationals and Blocked Persons List, administered by the Office of Foreign Assets Control ("OFAC"), is a violation of U.S. law. Nevertheless, in implementing and enforcing sanctions programs, OFAC recognizes that charities and their grantees differ from one another in size, products, and services, sources of funding, the geographic locations that

3

they serve, and numerous other variables.  OFAC will take these variables into account in evaluating the compliance measures of charities.  OFAC addresses every violation in context, taking into account the nature of a charity's business, the history of the group's enforcement record with OFAC, the sanctions harm that may have resulted from the transaction, and the charity's compliance procedures.

[2] To assist charities in protecting their funds against terrorist diversion, Treasury developed the Anti-Terrorist Financing Guidelines: Voluntary Practices for U.S.-Based Charities ("Guidelines") and released them in November 2002.  In December 2005, after extensive public comment and numerous outreach engagements with the sector, Treasury revised the Guidelines and released them in draft form for public comment.  Based on the comments received, in September 2006, Treasury released an updated version of the Guidelines.  These updated Guidelines encourage charities to adopt a risk-based approach in developing protective measures to guard against the risk of terrorist abuse.  They acknowledge that charities are in the best position to understand and address the specific risks they face in their operations.  The Guidelines also reference various materials that demonstrate and describe the ongoing risks of terrorist abuse of the charitable sector.  Many of these materials are available on the Treasury Web site at http://www.treas.gov/offices/enforcement/key-issues/protecting/index.shtml.

[3] This risk matrix is designed to assist charities that attempt in good faith to protect themselves from abuse by sanctioned parties or other bad actors and are not intended to address the problem of organizations that use the cover of charitable work, whether real or perceived, to provide support for illicit causes. The matrix is not mandatory; non-adherence to this guidance, in and of itself, does not constitute a violation of existing U.S. law.  Conversely, adherence to the risk matrix does not excuse any person (individual or entity) from compliance with any local, state, or federal law or regulation, nor does it release any person from or constitute a legal defense against any civil or criminal liability for violating any such law or regulation.  In particular, adherence to the risk matrix shall not be construed to preclude any criminal charge, civil fine, or other action by Treasury or the Department of Justice against persons who engage in prohibited transactions with persons designated pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, as amended, or with persons designated under the criteria defining prohibited persons in the relevant Executive orders issued pursuant to statute, such as the International Emergency Economic Powers Act, as amended.

[4] The term "grantee," as it is used throughout the matrix, means an immediate grantee of charitable resources or services.  To the extent reasonably practicable, charitable organizations should also use the matrix and the Guidelines to ensure the safe delivery of charitable resources by any downstream sub-grantees.

[5] OFAC appreciates The American Bar Association's instructive comments on risk factors listed in Table 1 of Comments in Response to Internal Revenue Service Announcement 1003-29, 2003-20 I.R.B. 928 Regarding International Grant-Making and International Activities by Domestic 501(c)(3) Organizations, July 18, 2003 (Comment).  The Comment represented the views of  individual members of the Committee on Exempt Organizations of the Section of Taxation and  contained recommendations on how the IRS might clarify existing requirements of section 501(c)(3) organizations with respect to international grant-making and other international activities.  .