EXHIBIT 22

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

03-MDL-1570 (GBD) (SN)

EXPERT REPORT OF JOHN BARRON

## Scope of Assignment

I have been asked by counsel for the Muslim World League, the International Islamic Relief Organization ("IIRO") and Drs. Naseef, Al-Obaid, Al-Turki and Basha to do the following:

1.  Evaluate the report issued by Ford Rhodes Sidat Hyder &Co. ("Sidat Hyder"), titled "Verification of Receipts and Payments for the Period 1 January 1996 to 22 February 2001" (Bates No. IIRO 26468-26490) regarding the Pakistan Branch of the IIRO (the "Sidat Hyder report") and to offer my opinion on (i) whether the objectives and scope of work applied to the engagement and Sidat Hyder's conformity to standards for professional accountants and uniform professional requirements would have allowed Sidat Hyder to adequately and reliably come to the conclusions offered in the Sidat Hyder report and (ii) whether the findings and conclusions offered in the Sidat Hyder report are fair and reasonable based on the scope of work, methodology and information referenced in the report;

2.  Review documents produced in the course of discovery as well as transcripts of deposition testimony concerning investigations into allegations of fraud and collusion by former employees of IIRO's Pakistan office and to opine on the nature and extent of the response by IIRO's senior management to those allegations; and

3.  Review certain opinions offered in the expert reports of Evan F. Kohlmann and Jonathan M. Winer concerning purported "irregularities," "critical deficiencies" and "atypical accounting practices" and to offer my opinion concerning (i) the experts' methodology and qualifications with respect to accounting related matters; and (ii) the extent to which the documents cited by Mr. Kohlmann and Mr. Winer, as well as the documents I reviewed as part of my affirmative report, support or undermine the opinions offered concerning accounting related matters.

## Summary of Affirmative Opinions

4.  Sidat Hyder's objectives included ascertaining weaknesses in IIRO's internal controls and non-compliance with IIRO's control-related policies and procedures. To reach fair, balanced, and reliable conclusions with respect to internal controls requires an understanding of all relevant controls. Sidat Hyder failed to do this and, as a result, its conclusions regarding IIRO's internal controls were based on incomplete information and were potentially misleading thus limiting the usefulness of its conclusions.

5.  Sidat Hyder's report addressed fraudulent activities in the Pakistan branch office but failed to acknowledge and communicate the limitations of internal controls, especially those associated with fraud. As a result, Sidat Hyder's conclusions regarding internal control weaknesses did not present a fair and balanced view of IIRO's internal controls, causing its conclusions to be misleading.

6.   Given the nature of the fraud involving collusion, forgery, intentional destruction of documents, and coercion, it is unlikely that even well-designed internal controls would have prevented or detected the fraud in the Pakistan office.

7.   The lack of records in Pakistan resulting from their intentional destruction designed to conceal the fraud did not provide a basis for Sidat Hyder's conclusion that proper records were not maintained prior to their destruction.  In addition, there is nothing that Sidat Hyder references that would show that IIRO senior management was responsible for the absence of records in the Pakistan branch.

8.   Certain language used in its report suggests a lack of impartiality and fairness and potential bias on the part of Sidat Hyder, thus calling into question the fairness of Sidat Hyder's conclusions regarding IIRO's internal controls.

9.   Actions taken by IIRO senior management in response to suspected fraud in the Pakistan branch office show that IIRO took the matter seriously, in a manner that one would not expect if senior management knew about, was indifferent to or wished to cover up or prevent detection of the improper diversion of IIRO assets from the Pakistan branch office. I have seen nothing to show that IIRO senior management had knowledge of the fraud or internal control weaknesses in the Pakistan branch office prior to the time the fraud was discovered or that IIRO senior management planned for there to be internal control weaknesses at the Pakistan branch.

**Summary of Rebuttal Opinions**

10.   Mr. Kohlmann uses terminology in his report that is either not found in professional accounting standards or guidance or is inconsistent with such standards or guidance, which reflect his lack of knowledge and expertise in accounting and internal control-related matters.

11.   Ongoing activities and actions undertaken by IIRO senior management with respect to internal controls and other matters brought to light through inquiries and internal audits are inconsistent with Mr. Kohlmann's opinion that IIRO used "financial irregularities" and "atypical accounting practices" as "features" of the organization for purposes of diverting funds to terrorist organizations as implied by Mr. Kohlmann.

12.   Mr. Kohlmann's description and reference to the fraud at the IIRO Pakistan branch without mention of the inherent limitations on internal controls associated with such fraud further demonstrates Mr. Kohlmann's lack of knowledge in this specialized area of accounting and internal controls.

13.   I have seen nothing in the materials cited by Mr. Kohlmann and Mr. Winer nor the other materials I reviewed in preparing this report showing that IIRO senior management intended for there to be  internal control weaknesses designed to permit improper diversion of IIRO funds and indeed IIRO senior management took steps that reflected lack of such intent.

**Expert Qualifications**

14.     I am a certified public accountant ("CPA"), licensed to practice continuously since November 1987 by the state of Georgia (1987-1998) and New York (1998 to present). I have been a CPA for 37 years. During that time, I have been directly involved in performing or overseeing more than 100 audit engagements of public and private entities. I was employed by Deloitte for a total of 21 years including twelve years as an audit partner.

15.     In my current role as Director of Quality Control of Frost, PLLC, I perform final pre-issuance reviews of all audit, review, and agreed-upon procedures engagements, conduct annual post-issuance quality control inspections, coordinate the Public Company Accounting Oversight Board ("PCAOB") and American Institute of Certified Public Accountants' ("AICPA") Peer Review inspections, and consult internally on technical matters involving professional auditing and financial reporting standards and ethics. My responsibilities also include internal training in accounting and auditing related topics, ethics and independence.

16.     From 2003 through today, I have testified and been accepted as an expert in four administrative proceedings before the U.S. Securities and Exchange Commission (SEC") or the PCAOB, and have been deposed as an expert witness three times in matters related to U.S. federal court proceedings, including one matter (American Realty Capital Properties, Inc. litigation, Civil Action No. 1:15-mc-00040-AKH, United States District Court, Southern District of New York) within the last four years.

17.     My qualifications are further documented in my curriculum vitae, which is attached to this report as Exhibit A. I am being compensated for my time on this matter at a rate of $500 per work hour.

**Methodology**

18.     I have read thousands of pages of documents (or translations thereof) that were produced in the course of discovery in this matter as well as the transcripts of the depositions of certain fact witnesses. I evaluated the fairness of opinions offered and conclusions reached in the reports referenced herein based on the documents and testimony reviewed, applicable professional practice standards, and my professional knowledge, training, and experience in accounting and internal control-related matters. The documents and testimony I considered in forming my opinions are attached to this report as Exhibit B.

19.     I am performing this expert witness engagement in accordance with the AICPA's Statement of Standards for Consulting Services, which require me to be impartial, intellectually honest, and free of conflicts of interest. Consistent with those requirements, my opinions, which are expressed throughout this Report, are my present opinions based on information I have considered to date. These opinions are based on my knowledge, training, and experience, as well as various sources of evidence cited throughout this report.

3

**Affirmative Opinions**

20.      **Sidat Hyder's objectives included ascertaining weaknesses in IIRO's internal controls and non-compliance with IIRO's control-related policies and procedures.  To reach fair, balanced, and reliable conclusions with respect to internal controls requires an understanding of all relevant controls.  Sidat Hyder failed to do this and, as a result, its conclusions regarding IIRO's internal controls were based on incomplete information, and were potentially misleading, thus limiting the usefulness of its conclusions**.

20.1.    Recognized standards define internal controls in terms of components or elements which work together in a system designed to achieve management's objectives.

20.1.1. The International Federation of Accountants (IFAC) sets forth standards for professional accountants.[1]   Based on these standards, internal controls consist of all policies and procedures adopted by management to assist in meeting management's objectives, including those related to safeguarding assets and prevention or detection of fraud:

> *Internal control system*—An internal control system consists of all the policies and procedures (internal controls) adopted by the management of an entity to assist in achieving management's objective of ensuring, as far as practicable, the orderly and efficient conduct of its business, including adherence to management policies, the safeguarding of assets, the prevention and detection of fraud and error, the accuracy and completeness of the accounting records, and the timely preparation of reliable financial information. The internal control system extends beyond these matters which relate directly to the functions of the accounting system.[2]

20.1.2. In 1992, the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") published *Internal Control – Integrated Framework* (the "COSO Framework").    The objective was "to assist managements in improving their entities' internal control systems, and  to provide a common understanding of internal control among interested parties."[3]  The COSO Framework, recognized by IFAC,[4] is the only internal

---

[1] IFAC, founded in 1977, is a worldwide organization for the accountancy profession.  Currently, there are a total of 175 member organizations in 130 countries representing over 3 million accounting professionals.  IFAC website at  https://www.ifac.org/who-we-are/our-purpose.

[2] International Standards on Quality Control, Auditing, Assurance, and Related Services, Glossary of terms (December 2002).

[3] COSO Framework, Appendix B, Methodology.  Committee of Sponsoring Organizations of the Treadway Commission.  *Internal Control – Integrated Framework*, September 1992.

[4] International Framework for Assurance Engagements, Handbook of International Auditing, Assurance, and Ethics Pronouncements (2004).

control framework that I have seen used in evaluating internal controls and, just like the IFAC standards, defines internal controls in terms of elements working together as part of an integrated system, including:[5]

- Control Environment

- Risk Assessment

- Information and Communication

- Control Activities

- Monitoring of Controls

21.   Sidat Hyder's scope of work and methodology were not designed to gain an understanding of IIRO's internal controls, so the report could not have reached a fair, balanced, and reliable conclusion with respect to those internal controls.

21.1.   The core objective of Sidat Hyder's engagement was the determination of the loss of funds due to misuse or embezzlement, *not* the entirely distinct function of ascertaining weaknesses in IIRO's internal controls and non-compliance with internal control-related policies and accounting practices.

Engagement Objective

We were required to carry out the assignment, in accordance with the scope of work defined below, for the purpose of determining maintenance of proper books of account and financial records and ascertaining weaknesses and non-compliance, if any, which may have resulted in financial mismanagement and/or misappropriation of funds at the Pakistan Branch. Thus, the core objective of this assignment was to determine the loss of funds due to misuse or embezzlement, if any, and submit a report on our findings.[6]   (Emphasis added.)

21.2.   Following the Engagement Objective section of its report, Sidat Hyder  specified its  scope of work and methodology which were comprised of examining, checking, verifying, and tracing  various documents, transactions, and records.  Sidat Hyder's scope of work and methodology do not include procedures specifically designed to ascertain  internal  control  weaknesses,  non-compliance  with  policies  and procedures, or gaining an understanding of all relevant controls.[7] As a result, Sidat

---

[5] COSO Framework (1992), pages 12-14.  *Understanding the Entity and its Environment. And Assessing the Risks of Material Misstatement,* Internal Control, paragraph 43.  International Standard on Auditing (ISA) 315.

[6] IIRO 026471.

[7] IIRO 026472-026473.

Hyder's conclusions with respect to internal controls are based on incomplete information, and are potentially misleading, thus limiting the usefulness of Sidat Hyder's conclusions with respect to IIRO's internal controls.

22.     IIRO Head Office ("H.O.") had monitoring controls.

22.1.   It was Sidat Hyder's finding that "… the internal controls relating to proper monitoring of funding to Pakistan were not in place at H.O. …" noting the absence of any "system or mechanism for financial discipline or required proper reporting from Pakistan …"  and "no internal or external audit was ever carried out for Pakistan branch and H.O management never asked local management to provide them [an] audit report on some fixed interval/periodic basis."  Sidat Hyder concluded that "[t]hese control weaknesses on the part of H.O. management, in our view, paved the way towards providing opportunities for financial mismanagement and misappropriation of funds."[8]  Sidat Hyder's report does not provide a description of the procedures it undertook to arrive at these findings including determining what monitoring controls, if any, or other control activities were in place.

22.2.   Dr. Adnan Khalil Basha served as Secretary General of IIRO from 1997 through 2013.[9]  The Pakistan branch office was one of many external offices through which IIRO carried out its relief outside the Kingdom of Saudi Arabia.[10]  In his testimony, Dr. Basha provided examples of Head Office control-related policies and procedures:[11]

        •       Annual budgeting process.[12]

        •       Hiring of external auditors for IIRO, which included samples of external offices.[13]

---

[8] IIRO 0026475.

[9] Deposition of Adnan Basha (Feb. 20, 2019) ("Basha I"), 21:19-21:23.

[10] Basha I, 79:24-80:10.

[11] Dr. Basha was not asked to describe all relevant controls.

[12] Basha, 85:7-91:1; 125:23-126:9.

[13] External offices were not required to obtain external audits of their operations.  External audits were performed for the organization as a whole.  The external auditors selected local offices and external offices. Basha I, 91:2-92:7.  Deposition of Adnan Basha (Feb. 21, 2019) ("Basha II"), 230:13-233:19.

- A committee, chaired by Dr. Basha, was responsible for the general blueprint of policies and procedures in the local and external offices and how to develop them.[14]

- Establishment of committees to manage affairs of offices whenever the position of office manager became vacant.[15]

- Requiring joint involvement of a delegation from the General Secretariat and local IIRO office to go into the field to oversee funding for disaster relief to local governments "to prevent any misuse or suspicion or misuse or resale."[16]

- Approval by the Urgent Relief Department of IIRO of distribution of gifts from the Saudi government in coordination with the Saudi Embassy.[17]

Based on the nature and context of the questions asked of Dr. Basha, it is obvious that the several examples that he provided of IIRO's Head Office monitoring or other control-related policies and procedures in place during the relevant time period were not intended to be an exhaustive list of every policy or procedure that was in place.

22.3. In addition, IIRO's 1999/2000 Annual Report describes IIRO's financial control system including pre-expenditure and post-expenditure controls and the retention of chartered auditors "assigned by the board of directors to control the financial performance of the organization. …"[18] In addition to internal audits, IIRO carried out inspections related to orphanages.[19]

22.4. These examples of H.O. control policies and procedures shows that Sidat Hyder's conclusions concerning H.O. monitoring controls were not based on a comprehensive evaluation of relevant controls. As discussed below, Sidat Hyder also failed to take into consideration factors affecting the frequency and extent of certain control procedures throughout the organization including the frequency of internal audit and external audit visits to specific locations.

23. Drawing conclusions based on individual internal controls ignores other internal control components or elements of the internal control system that may have resulted in different conclusions.

---

[14] Basha II, 156:2-158:19.

[15] Basha II, 176:3-180:13.

[16] Basha II, 188:12-190:5.

[17] Basha II, 207:2-210:7.

[18] IIRO 000212-000330.

[19] IIRO 111421-111431; 158082-158091; 49708; 287559-287585; 115300-115349.

24.     The danger in reaching conclusions with respect to individual controls or control activities in isolation is the potential for overlooking other control elements or control activities that mitigate identified control weaknesses.  As evidenced by the examples above, there were control activities at the Head Office that were not taken into consideration by Sidat Hyder.  Also, management's risk assessment process is a key element of internal controls affecting the extent and frequency of control activities.

24.1.   An entity's risk assessment process is one of five elements of the COSO Framework.  Due to normal cost constraints, internal control systems cannot be expected to address every risk.  Some risks are more significant than others.  Accordingly, in the accounting and financial reporting area, management assesses the various risks, identifying the areas most susceptible to material error or fraud and designing controls to address those risks.  The types of controls selected may vary.  This explains why an entity would establish different control-related policies and procedures for different locations based on relative assessed risk.  For example, risk assessment would explain the frequency of the performance of internal audits at different locations.  The same is true for external auditors who make the same risk assessments in determining the frequency of visiting different office locations.

24.2.   Based on management's assessment of risk, it would not have been unreasonable for IIRO to have concluded that an individual location such as the Pakistan branch had sufficiently skilled and experienced personnel in key positions to provide adequate segregation of duties,[20] thus requiring less extensive oversight from Head Office.  Dr. Basha, Secretary General of IIRO, testified that Mr. Jasim, the accountant in Pakistan, "was one of the most efficient accountants and one of the oldest employees in the IIRO."  Dr. Basha testified that Mr. Butairi, the office director, "was receiving the title of the ideal manager."[21]  If, after the fact, using the benefit of hindsight, it was determined that segregation of duties at the local level had been circumvented though collusive fraud, this would not mean that the original risk assessment and their decisions concerning control design had been inappropriate.

24.3.   Based on its reported scope of work and methodology, it is clear that Sidat Hyder did not consider the various elements that made up IIRO's overall system of internal controls, including management's risk assessment process, that would have affected such things as the frequency of internal audit or external audit visits to IIRO locations.  As a result, Sidat Hyder's conclusions regarding H.O. monitoring controls is based on limited information and potentially misleading.

---

[20] The COSO Framework at page 47 defines segregation of duties as follows: "Duties are divided, or segregated, among different people to reduce the risk of error or inappropriate actions. For instance, responsibilities for authorizing transactions, recording them and handling the related asset are divided …."

[21] Basha II, 221:2-221:18.

25.     Ascertaining non-compliance with IIRO's internal control-related policies and procedures required an understanding of relevant control policies and procedures.  Without first obtaining an understanding of policies and procedures it is not possible to ascertain non-compliance.  There is nothing in the Sidat Hyder report to show that it undertook steps to do so.

  25.1.   In summary, Sidat Hyder's scope of work and methodology did not include specific procedures to identify control weaknesses or non-compliance with IIRO's internal control-related policies and procedures.   Sidat Hyder failed to obtain an understanding of all relevant controls  and ignored a key element of internal control systems that may have explained the rationale underlying the selection of different types of controls for different locations, including the timing and frequency of internal and external audits.  Sidat Hyder's failure to obtain an understanding of all relevant controls caused its conclusions with respect to internal control weaknesses to be incomplete, lacking in balance, potentially misleading, and therefore of limited usefulness.

26.     **Sidat Hyder's report addressed fraudulent activities in the Pakistan branch office but failed to acknowledge and communicate the limitations of internal controls, especially those associated with fraud.  As a result, Sidat Hyder's conclusions regarding internal control weaknesses did not present a fair and balanced view of IIRO's internal controls, causing its conclusions to be misleading**.

  26.1.   Even in matters not involving fraud, internal controls frequently fail to prevent or detect material errors and violations of rules and regulations even among the largest and most heavily scrutinized entities in the world.[22]

  26.2.   IIRO learned of suspected fraud in the Pakistan office through a letter sent to Dr. Basha by a former employee who had been dismissed by Mr. Butairi.[23]  Such "tips" account for over 40% of the detection of occupational frauds, far more than by any other single means of detection including internal audits, external audits, and internal control activities,  highlighting the limitations of internal controls when it comes to fraud.[24]

---

[22] The U.S Securities and Exchange Commission ("SEC") brought over 4,000 enforcement actions over the five years period (2015-2019) against public companies for a variety of violations, including issuance of materially misstated financial statements and fraud.  *SEC Fiscal Year 2019 Agency Financial Report.* (https://www.sec.gov/files/sec-2019-agency-financial-report.pdf).   It should be noted that entities filing with the SEC typically have interdependent audit committees and receive annual reports from independent auditors regarding the effectiveness of internal controls.

[23] Deposition of Rahmatullah Nazir Khan Gari (July 31, 2019) ("Gari"), 56:10-58:13.

[24] Association of Certified Fraud Examiners, *2020 Report to the Nations 2020 Global Study on Occupational Fraud and Abuse, 18* https://acfepublic.s3-us-west-2.amazonaws.com/2020-Report-to-the-Nations.pdf.

26.3.   Due to inherent limitations, including those related to fraud, internal controls can provide only reasonable assurance.  For example, individuals acting in collusion are in a position to falsify records such that the fraud cannot be detected by internal controls and this is exactly what Messrs. Butairi and Jasim appeared to have done in the case of IIRO's Pakistan branch office.

26.4.   As set forth in the COSO Framework, even well-designed internal controls can provide only reasonable assurance. The limitations of internal controls associated with fraud are particularly relevant to the events which led to IIRO's investigation of the Pakistan branch office.   Limitations on internal controls include circumvention through collusion and the override of internal controls by management.   The following excerpt from the COSO Framework addressing control limitations is nearly identical to provisions of International Standards cited above:

> Internal control, no matter how well designed and operated, can provide only reasonable assurance to management and the board of directors regarding achievement of an entity's objectives. The likelihood of achievement is affected by limitations inherent in all internal control systems. These include the realities that human judgment in decision-making can be faulty, and that breakdowns can occur because of such human failures as simple error or mistake. Additionally, controls can be circumvented by the collusion of two or more people, and management has the ability to override the internal control system ….[25]  (Emphasis added.)

26.5.   The COSO Framework defines management override as overruling prescribed policies or procedures, including for the purpose of personal gain. Override practices include deliberate misrepresentations and falsification of documents. Individuals acting collectively to perpetrate and conceal fraud together "often can alter financial data or other management information in a manner that cannot be identified by the control system:"

> The term "management override" is used here to mean overruling prescribed policies or procedures for illegitimate purposes with the intent of personal gain or an enhanced presentation of an entity's financial condition or compliance status. A manager of a division or unit, or a member of top management, might override the control system for many reasons: to increase reported revenue to cover an unanticipated decrease in market share, to enhance reported earnings to meet unrealistic budgets, to boost the market value of the  entity prior to  a public offering or sale, to meet sales or earnings projections to bolster bonus pay-outs tied to performance, to appear to cover violations of debt covenant agreements, or to hide lack of compliance with legal requirements. Override practices include deliberate misrepresentations to bankers, lawyers, accountants and vendors, and

---

[25] COSO Framework, Chapter 7, *Limitations on Internal Control*, page 75.

intentionally issuing false documents such as purchase orders and sales invoices.[26] (Emphasis added.)

* * *

The collusive activities of two or more individuals can result in control failures. Individuals acting collectively to perpetrate and conceal an action from detection often can alter financial data or other management information in a manner that cannot be identified by the control system. For example, there may be collusion between an employee performing an important control function and a customer, supplier or another employee. On a different level, several layers of sales or divisional management might collude in circumventing controls so that reported results meet budgets or incentive targets.[27] (Emphasis added.)

* * *

27.     The fraud in Pakistan was committed for personal gain by the director and the accountant of the Pakistan office.

    27.1.     It was found that "[t]he collected evidence indicated the existence of cheating, forgery and misuse of IIRO's funds which were disbursed on private projects."[28] Dr. Adnan Basha, the IIRO General Secretary, testified that it took some time to obtain conclusive evidence of Mr. Butairi's involvement and when Mr. Butairi found that he had the chance of being arrested "he wrote a waiver or an assignment of the three clinics he had [unclear words], which he operated from the embezzled funds from the IIRO."[29]

    27.2.     On January 21, 2004, Amir Jasim, the accountant of the Pakistan branch, signed an admission of guilt for having manipulated payment reports, exchange rates, and purchases for orphanages and hospitals for his personal benefit without knowledge of the IIRO or its Secretariat General.[30]  According to Dr. Basha, Jasim confessed that he owned the clinics with Butairi and petitioned for a settlement once he knew that Mr. Butairi had given up the clinics.[31]

    27.3.     Sidat Hyder's report identified the fact that Messrs. Butairi and Jasim had been operating medical centers personally:

---

[26] COSO Framework, Chapter 7, page 76.

[27] COSO Framework, Chapter 7, page 77.

[28] IIRO 031022-031023; Basha II, 211:2-215:11.

[29] Basha II, 216:8-216:18.  IIRO 031134; 031014.

[30] IIRO 031148.

[31] Basha II, 217:13-218:4247:19-248:15; IIRO 031125-031126.

> Apart from GMC we learned that the ex-DG was also running two other medical centers, viz., VIP medical center in Islamabad and Al-Hijaz medical center in Karachi. VIP center, we are informed, was personal project of ex-DG handled by IIRO's Director Finance and himself. VIP medical center benefited from GMC operations as we noted that expenses like staff salaries of VIP, GMACA contribution, VIP's equipment transportation cost, etc., were all paid through GMC.[32]

27.4.   Based on the content of Sidat Hyder's report and the documents examined, I found nothing to show that the funds embezzled from IIRO's Pakistan branch were used for any purpose other than the personal gain of the perpetrators of the fraud.

28.   Characteristics of the fraud perpetrated by management of IIRO's Pakistan branch office were consistent with recognized fraud-related factors limiting the effectiveness of internal controls.

28.1.   The fraud carried out by Al-Butairi, the former director of the Pakistan branch office, and Amir Jasim, the Pakistan branch accountant, was complex, involving forgery, collusion, destruction of documents, and coercion of employees to conceal the fraud from IIRO senior management.[33]

28.2.   Mr. Butairi initially claimed that Jasim had acted alone. Later, IIRO received evidence that Butairi was also involved.[34] Dr. Basha testified that the embezzled funds were stolen by Amir Jasim, with the knowledge of Mr. Butairi.[35]

28.3.   In addition to collusion, the fraud involved forgery and preparation of false documentation,[36] further limiting the effectiveness of IIRO's internal controls.

29.   Forgery limits the effectiveness of internal controls.

29.1.   Individuals acting in collusion are in a position to alter financial data or other information such that it cannot be identified by the control system.[37]

29.2.   The detection of forgery, falsification or alteration of documents normally requires specialized skills or a forensic examination. Documents can be prepared in such a way that they appear to be legitimate to an individual lacking specialized training and skills. Normal systems of internal controls are not designed to include forensic examination of supporting documentation. Forensic examinations are normally

---

[32] IIRO 026488.

[33] IIRO 031033-031072; 031022-031023.

[34] Basha II 215:4-216:7.

[35] Basha II 237:16-237:22.

[36] IIRO 031033-031072; 031022-031023.

[37] COSO Framework, Chapter 7, page 77.

conducted *after* fraud is suspected. I have not personally seen an internal control specifically designed to detect forged or falsified documents. Even independent auditors are not expected to have the skills necessary to detect forgery.

29.3. Given the nature of the fraud involving collusion, forgery, intentional destruction of documents, and coercion, it is unlikely that even well-designed internal controls would have prevented or detected the fraud in the Pakistan office. For example, with respect to the documentation supporting the payment for goods for orphanages submitted to Head Office, Sidat Hyder concluded that the acceptance of this documentation by Head Office provided clear evidence "that no proper checking was conducted and verification controls were observed which eventually resulted into possible misappropriation/utilization of funds."[38] In this circumstance, I believe it would have been unreasonable to expect Head Office personnel, exercising reasonable care, to detect that the documentation was falsified. Even a well-designed system of internal control cannot be expected to detect collusive fraud involving forgery.

30. Forgery and the falsification of documents by the Pakistan branch office employees in question was a major element of the fraud committed in the Pakistan office.

30.1. On April 19, 2001, an appellate judge in Islamabad ruled that Jasim had manipulated financial data enabling him to embezzle large sums through preparation of forged documents.[39]

30.2. Documents in this case referring to forgery or document alteration or falsification included the following:

- Forgery of receipts for construction of mosques[40]
- Alteration of quantities on invoices[41]
- Forgery of receipts for goods at orphanages[42]
- Having a vendor sign a receipt for more than was received[43]
- Forgery of payroll records[44]

30.3. Following his dismissal, the former Director of the al-Baraem Orphanage in Mansehra, Abdel Razzak, sent letters of complaint to Dr. Basha and Engineer Abdel

---

[38] IIRO 026481.

[39] IIRO 031161-031162.

[40] IIRO 283118.

[41] IIRO 283152.

[42] IIRO 149495; 149501-149508.

[43] IIRO 149456.

[44] IIRO 149456.

Aziz a-Peshawri concerning forgery, preparation of false documentation, and coercion of employees:[45]

> … In fact, I see him [Butairi] leaning more and more towards methods of embezzlement, forgery, and fraud which he coordinated with the Financial Director Amer Jassim. This includes forging currency exchange rates from USD to rupees in the currency exchange reports sent to the Jeddah Office; forging the signatures of many employees and other individuals or making several employees sign payrolls without mentioning the amounts of money on these payrolls; making fake invoices that have no market truth and adding the names and prices of items on these fake forged invoices; and other things similar to these.  When I would confront him with this, he would deny it or act like he had no idea about it as if he had never heard or seen it before.[46]

30.4.   The fraud also involved coercion of Pakistan branch office employees causing them to become participants in the fraud, compounding the difficulty of detecting the fraud.

31.     Coercion limits the effectiveness of internal controls.

31.1.   Through pressure, intimidation, or threat, such as fear of loss of employment, management can effectively enlist the aid of otherwise honest employees in the concealment of fraud essentially expanding the scope of the collusion.  Employees might be coerced into "looking the other way" or be forced to provide false evidence to conceal the fraud.  In some cases, vendors may be asked to provide false or incomplete documentation further enabling the fraud and preventing or severely limiting its detection.  The results of the coercion make the fraud even more difficult to detect.

32.     Coercion was another key element in the fraud committed in the Pakistan office.

32.1.   On April 19, 2001, in connection with Jasim's request for bail, the court of appeals found that Jasim had pressured his employees to alter financial data and submit forged records:

> "…Additionally, the petitioner has pressured his employees to alter financial data and submit forged records instead of actual ones.  The complainant has provided the names of those employees as witnesses and they are:  Ghulam Habib – computer employee, Khaled Nasar – accountant for Gulf Medical Center in Islamabad, and Mr. Shawkat Ali Ghory."[47]

---

[45] IIRO 031046-031061.

[46] IIRO 031049.

[47] IIRO 282048.

14

* * *

"…The two aforementioned employees have confirmed that they were forced to prepare forged records and the amounts shown in the documents related to the mosques and clinics were prepared by the suspect and were not paid to the competent authority."[48]

32.2.    During the investigation, Pakistan branch office employees informed IIRO they were afraid to complain about the actions of Jasim for fear of termination of employment.  In at least one instance, an employee was terminated.  Employees were intimidated into signing blank documents and preparing false documents to be sent to Jeddah.[49]

32.3.    Pakistan orphanage directors and coordinators were not consulted by Jasim on purchases and were forced to accept items that were not in line with their wishes.[50] Orphanage directors were excluded from records of transfers sent from Jeddah.[51] The social welfare coordinator linked to the orphanages was stripped of authority, forcing the orphanages to "try to make ties with Abi Awwab [Jasim] to keep him from bothering us and causing trouble for us."[52]

32.4.    The coercion of third parties in concealing the fraud is documented in the minutes of a meeting of department directors and IIRO-Islamabad office employees held on April 16, 2001, concluding that Jasim and Butairi paid one contractor, Talaat Saadoon, less than the approved amount for digging a large number of wells with Director [Butairi] requiring the contractor to put in writing that he had received the approved amount.[53]

33.    Sidat Hyder's report identified instances of fraud but did not communicate the associated internal control limitations.

33.1.    Sidat Hyder's report noted numerous instances of fraud including:

- Purported purchases supported by quotes/bills from a supplier who did not receive payment and did not provide the goods[54]

---

[48] IIRO 282049.

[49] IIRO 031033-031072; 031124.

[50] IIRO 031067.

[51] IIRO 031070.

[52] IIRO 031069.

[53] IIRO 149454.

[54] IIRO 026480.

- Purported purchases supported by an invoice of a company that did not exist[55]

- Forged acknowledgments from persons shown as having received purchased goods and supplies when such goods were never received[56]

- Forged invoices/supporting documents for construction projects for companies that did not seem to exist[57]

33.2.   In offering its conclusions with respect to internal controls, Sidat Hyder failed to acknowledge and communicate the limitations of IIRO's controls resulting from the very activity identified in its report. As a result, Sidat Hyder's conclusions with respect to IIRO's internal controls did not present a fair and balanced view to the users of the report, causing the conclusions to be misleading.

34.   **The lack of records in Pakistan resulting from their intentional destruction designed to conceal the fraud did not provide a basis for Sidat Hyder's conclusion that proper records were not maintained prior to their destruction. In addition, there is nothing that Sidat Hyder references that would show that IIRO senior management was responsible for the absence of records in the Pakistan branch.**

34.1.   One of Sidat Hyder's objectives was to determine the maintenance of proper books of account and financial records:

> We were required to carry out the assignment, in accordance with the scope of work defined below, for the purpose of <u>determining maintenance of proper books of account and financial records</u> and ascertaining weaknesses and non-compliance, if any, which may have resulted in financial mismanagement and/or misappropriation of funds at the Pakistan Branch. Thus, the core objective of the assignment was to determine the loss of funds due to misuse or embezzlement, if any, and submit a report on our findings.[58]  (Emphasis added.)

34.1.1.   Sidat Hyder's "first task was to take inventory of the books of account and underlying accounting record kept and maintained locally and to ascertain its level of completeness and reasonableness." The inventory included in Sidat Hyder's report lists various ledgers, journals, and "few duplicate copies of payment, receipt and expense vouchers."[59]

---

[55] IIRO 026480.

[56] IIRO 026481.

[57] IIRO 026482.

[58] IIRO 026471.

[59] IIRO 026474.

34.2.    Sidat Hyder's conclusion that the accountant and staff in Pakistan failed to discharge their responsibility to maintain proper books of account was reached without determining whether the absence of documents was due to intentional destruction for the purpose of concealing fraud. [60]

34.2.1. Sidat Hyder found the records in Pakistan were inadequate, improper, incomplete and inaccurate:

> As is very evident the above-mentioned accounting record is not only inadequate and improper it was found incomplete and inaccurate.   The management, we understand, had hired an accountant who was responsible for doing all the finance related work primarily ensuring the maintenance of all the required books of account and related record, maintaining custody of cash in hand and at bank and to work as a bridge between project coordinators and higher management.   We also found that project coordinators also had not kept any record of the funds they received and expenses made against those funds.[61]

34.2.2. With respect to the finding that project coordinators had not kept records of funds received and expenses paid, it is highly questionable whether such records would have provided information that would have detected the fraud given the coercion that was applied to employees and the exclusion of coordinators from records.

34.3.    Sidat Hyder concluded that the failure to maintain proper books of account created opportunities for misuse and misappropriation of funds and fraud:

> The concerned accountant and any other staff responsible failed to discharge the basic function of preparing and maintaining proper books of account and underlying accounting record which is an essential element of any organization. … This not only facilitated financial mismanagement it created opportunities for misuse misappropriations of funds and fraud. …[62]

34.3.1. However, in presenting its findings and conclusions Sidat Hyder acknowledged that it had not determined whether the non-maintenance of the records in Pakistan was done deliberately or due to carelessness.   This acknowledgment limited the weight of its conclusion with respect to preparation and maintenance of proper books of account:

> … We are, however, unable to determine whether the non-maintenance of books of account was done deliberately or was only

---

[60] IIRO 026474.

[61] IIRO 026474.

[62] IIRO 026474.

due to inability or carelessness, for which the management is equally responsible.[63]

34.4.   The books and records of the Pakistan office were intentionally destroyed by the perpetrators of the fraud.

34.4.1. In a letter from Dr. Basha to Dr. Al Din Bahgat , Dr. Basha described the difficulties encountered in turning over records of the branch office in connection with a change in directors, including "hiding the book system," coupled with cheating, forgery and misuse of IIRO's funds:[64]

> … It was found out that there was a manipulation that led to hiding the book system. As a result, the delegation formed for this task had to investigate the facts about the financial performance. The collected evidence indicated the existence of cheating, forgery and misuse of the IIRO's funds, which were used for the disbursement of private projects. Accordingly, the foregoing represents violations of the IIRO's financial and administrative regulations.

* * *

34.4.2. A letter addressed to the Director General IIRO – Pakistan from the Inquiry Officer in the State's case against Amir Jasim brought to light Amir Jasim's burning of records maintained in Pakistan done at the direction of Al-Butairi, another instance of collusion on the part of Jasim and Butairi:

> Dear Sir,
>
> We want to bring it your kind notice that some new events have arised which were unknown before, and if they could have been unveiled in time, Amir Jasim could not come out of jail.  The new fact found is that Amir Jasim burnt the record of IIRO on the orders of Moayad Al Butairi the then Director General of the office. Whereas the legal advisor has collected a lot of information in this regard which makes it imperative that he stays here so that further necessary action could be complete.  His early departure from Pakistan may result in changing of evidence by the witnesses. (Emphasis added.)
>
> For this reason you are informed that Mr. Salama Misulam Quraani, the legal consultant should not leave Pakistan because his stay in Pakistan will greatly support the inquiry which will have a very good impact on the case.

---

[63] IIRO 026474.

[64] Basha, Dep. Ex. 149, IIRO 031022-031023.

Thanks and best regards,

Yours sincerely,

Shoukat Hayat (Sub Inspector) Inquiry Officer[65]

34.4.3. When asked about the letter, the new Pakistan director Mr. Gari testified he was told by the guards at the office in Pakistan that they had witnessed the burning of the records.[66]

34.5. Although Sidat Hyder was unable to determine whether the absence of books was done deliberately, it is evident from the documents and testimony that the "non-maintenance" of records in Pakistan was due to their deliberate destruction by one of the perpetrators of the fraud in Pakistan at the direction of the other perpetrator. The fact that records were unavailable in Pakistan as a result of their intentional destruction did not provide a basis for Sidat Hyder's conclusion that such records were not maintained prior to their destruction. Nor was it possible for Sidat Hyder to determine the extent, nature, or condition of the records prior to their destruction.

34.6. I have seen nothing to support Sidat Hyder's conclusion that IIRO senior management was "equally responsible" for the absence of documents in the Pakistan office. It is my opinion that this conclusion in the Sidat Hyder report is unsubstantiated.

35. By its own admission, Sidat Hyder acknowledged that they were unable to achieve all of its objectives.

35.1. Sidat Hyder was engaged to report on numerous matters related to the issues identified in Pakistan. However, the absence of records limited Sidat Hyder's ability to reach conclusions in several areas of its report. These included both non-maintenance of books of account and expenses not reported against funds received from H.O.

… Thus they failed to perform their functions due to which it was not possible to perform any conclusive verification and checking of receipts and payments transactions. …[67]

\* \* \*

… However, in the absence of proper record at Pakistan office and information requested from banks, we are not in a position to investigate

---

[65] Basha Dep. Ex. 151, IIRO 168291.

[66] Gari, 96:13-97:13; *see also* Basha Dep. Ex, 151; IIRO 168291-168292.

[67] IIRO 026474 "Non Maintenance of Proper Books of Account."

this matter, as per laid down methodology, further in order to conclude our findings.[68] …

\* \* \*

35.2.     The above circumstances limited the overall usefulness of Sidat Hyder's report.

36.     **Certain language used in its report suggests a lack of impartiality and fairness and potential bias on the part of Sidat Hyder, thus calling into question the fairness of Sidat Hyder's conclusions regarding IIRO's internal controls.**

36.1.     The Code of Ethics for Professional Accountants requires integrity and objectivity.

36.1.1.     The International Federation of Accountants (IFAC) provides a code of ethics for all professional accountants (the "Code"). The Code is. intended to serve as a model for national ethical guidance for IFAC members and member bodies.[69] The Code recognizes the responsibility of professional accountants to the public, including clients, lenders, investors, governments, employees, and others who rely on the objectively and integrity of the accounting profession.

36.1.2.     The underlying principles include integrity and objectivity. The principle of integrity requires the professional accountant to be straightforward and honest.[70] Objectivity is defined as follows:

- A combination of impartiality, intellectual honesty and a freedom from conflicts of interest.[71]

- A professional accountant should be fair and should not allow prejudice or bias, conflict of interest or influence of others to override objectivity.[72]

36.2.     With respect to expenses reported against funds received from H.O., Sidat Hyder expressed its conclusion that there was a "complete mess" at the IIRO organizational level:

… We consider it appropriate to state that there is *a complete mess* at the organizational level as none of the persons either at H.O. or in

---

[68] IIRO 026478. "Expenses Not Reported Against Funds Received From Home Office."

[69] IFAC Code of Ethics for Professional Accountants, as revised November 2001. The Institute of Chartered Accountants of Pakistan (ICAP) is a member body of IFAC.

[70] Code of Ethics for Professional Accountants, *Fundamental Principles.*

[71] Code of Ethics for Professional Accountants, *Definitions.*

[72] Code of Ethics for Professional Accountants, *Fundamental Principles.*

Pakistan is aware about the outstanding expenses details due to lack of proper communication and absence of internal controls. …[73] (Emphasis added.)

36.3.   The characterization as a "complete mess" goes well beyond the norms of language used in professional accountant's reports to clients and others.  The description was an embellishment beyond what was necessary.  The characterization suggests a lack of impartiality and fairness and potential bias and prejudice on the part of Sidat Hyder.  Controls over funds received in Pakistan from Head Office was a critical objective of Sidat Hyder's assignment.  Their use of this language calls into question the overall fairness of Sidat Hyder's conclusions with respect to IIRO's internal controls.

**37.   Actions taken by IIRO senior management in response to the suspected fraud in the Pakistan branch office show that IIRO took the matter seriously, in a manner that one would not expect if senior management knew about, was indifferent to or wished to cover up or prevent detection of the improper diversion of IIRO assets from the Pakistan branch office.  I have seen nothing to show that IIRO senior management had knowledge of the fraud or internal control weaknesses in the Pakistan branch office prior to the time the fraud was discovered or that IIRO senior management planned for there to be internal control weaknesses at the Pakistan branch.**

37.1.   Upon receiving the letter from the former employee, Dr. Basha immediately sent Mr. Bashawri and Mr. Mujahid from the Head Office to Pakistan to commence an investigation.[74]  Mr. Gari testified that Dr. Basha took things very seriously and he was told by Dr. Basha to take the first flight from Bangladesh and go to Pakistan to meet Mujahid and Bashawri.  Based on the allegations of embezzlement, Mr. Gari testified that he was told that IIRO wished for him to take over the manager's position in Pakistan.[75]

37.2.   Dr. Basha testified that the delegation sent to Pakistan "found evidence indicating the existence of cheating, forgery, and the misuse of IIRO's funds" and, as a result of these discoveries, the financial officer of the Pakistan office, Amir Jasim, was arrested based on a complaint from IIRO and was placed under investigation.  Mr. Butairi, a citizen of Saudi Arabia, was called back to Jeddah to answer to the legal department.[76]  Faced with arrest in Saudi Arabia, Mr. Butairi assigned three clinics to IIRO that he and Jasim had obtained from funds embezzled from IIRO.  In addition to sending the delegation to Pakistan, Dr. Basha was responsible for appointing an external auditor, and forming the committee comprised of individuals

---

[73] IIRO 026478.

[74] Gari, 56:10-59:10.

[75] Gari, 46:1-47:2; 51:14-52:5; 52:20-52:24; 55:15-56:3;58:24-59:14.

[76] Basha II, 213:10-214:16;  IIRO 031022-031023.

from four departments to investigate the matter overseen by a senior official in the IIRO. The committee was responsible for examining documents and obtaining the results, including estimation and recovery of the losses incurred resulting from the fraud.[77]

37.3.   In summary, the actions taken by IIRO upon learning of the suspected fraud in the Pakistan office included:

- Dispatching a delegation from Head Office to commence an investigation
- Creating a committee to oversee the investigation
- Relieving the parties believed to be responsible from their duties
- Assigning a new Pakistan director
- Retaining the firm of Sidat Hyder to investigate the matter and report to IIRO
- Recovering the estimated amount of embezzled funds

37.4.   On January 21, 2004, Amir Jasim, the accountant of the Pakistan branch, signed an admission that his actions were taken without knowledge of the IIRO or its Secretariat General.[78]

37.5.   The prompt actions taken by IIRO, including senior management's efforts to determine how the fraud had occurred and taking steps to keep it from recurring clearly show how seriously they took this matter and are inconsistent with any prior knowledge on the part of senior management. I have seen nothing to show that senior IIRO management had knowledge of the fraud or weaknesses in internal controls prior to the time the fraud was committed or that IIRO senior management intended for there to be weaknesses in internal controls by design. Had this been intended by IIRO senior management, one would have expected a much more limited and non-substantive response, if any.

**Rebuttal Opinions**

38.   Mr. Kohlmann uses terminology in his report that is either not found in professional accounting standards or guidance or is inconsistent with such standards or guidance, which reflect his lack of knowledge and expertise in accounting and internal control-related matters.

38.1.   According to his report, it is Mr. Kohlmann's understanding that a number of auditor reports conducted of IIRO branch offices identified "critical deficiencies in accounting practices" and significant "financial irregularities."[79]

---

[77] Basha II, 236:17-237:3; 218:16-220:11; 217:3-218:4.

[78] IIRO 031148.

[79] Kohlmann Expert Report, paragraphs 130, 142.

38.1.1   Standards for professional accountants provide that accounting practices are part of internal controls and systems of internal controls.[80]  In classifying or characterizing weaknesses in internal control, international standards provide for only two categories:   (1) control weaknesses; and (2) material weaknesses.[81]  U.S. standards provide for three categories:  (1) deficiency; (2) significant deficiency; and (3) material weakness.[82]  Neither set of standards use the term "critical" in referring to weaknesses or deficiencies in internal controls.  Neither the Sidat Hyder report nor the internal audit reports referred to in Mr. Kohlmann's report use the term "critical" in describing deficiencies in IIRO's accounting practices or controls.

38.2.  Mr. Kohlmann also uses the term "financial irregularities" in describing various accounting practices at IIRO branch offices, including the Eastern Province, Bosnia-Herzegovina, Philippines, and Indonesia.[83]

38.2.1.  In accounting and financial reporting matters, the term irregularities is understood to mean an intentional error or misstatement or misappropriation of assets.  In other words, fraud.  This meaning can be traced back to as early as 1912,[84]  and is consistent with the current U.S. Securities and Exchange Commission definition. [85]

38.2.2.  In the documents I have reviewed, including the internal audit reports referred to in Mr. Kohlmann's report, I have not seen the word "irregularity" used.  Of the four offices described in Mr. Kohlmann's report where Mr. Kohlmann makes reference to an internal audit or visit to the office by a supervisory body,  potentially fraudulent acts (irregularities) were identified only in the Tuzla, Bosnia Herzegovina office.   These related to three

---

[80] *See* Paragraph 20.1, *supra*.

[81] International Standards on Quality Control, Auditing, Assurance and Related Services, *Glossary of Terms*, December 2002.

[82] AICPA, AU-C 265.07.

[83] Kohlmann Expert Report, paragraph 130, 140, 142, 145,153.

[84] *Auditing Theory and Practice, Second Edition.*  Robert H. Montgomery, C.P.A. pages 237, 247, 262, and 408. (Stationer's Hall, London, 1912).

[85] Securities and Exchange Commission Release No. 38762, File No. 3-9337, June 24, 1997.  "The term irregularities refer to intentional misstatements or omissions of amounts or disclosures in financial statements. Irregularities include fraudulent financial reporting undertaken to render financial statements misleading, sometimes called management fraud, and misappropriation of assets, sometimes called defalcations." (https://www.sec.gov/litigation/admin/3438762.txt).

payments to orphans, among 833 payments examined, representing a trivial exception rate of one-third of one percent.[86]

38.3.   The expert report of Evan Francois Kohlmann contains his background describing Mr. Kohlmann as a private International Terrorism Consultant with a degree in International Politics and a Juris Doctor (law degree).  In addition, Mr. Kohlmann is a recipient of a certificate in Islamic studies and is the co-founder of a business risk intelligence firm.   Based on his own statement, however, Mr. Kohlmann lacks any of the education, training, and experience necessary to independently evaluate and conclude on accounting and internal control-related matters.

38.4.   In summary, Mr. Kohlmann's use of the terms "critical deficiencies" and "financial irregularities" in describing IIRO's accounting practices is consistent with Mr. Kohlmann's lack of knowledge and expertise in this area.

39.   According to his report, Mr. Kohlmann employed a methodology known as comparative analysis relying on sources weighted based on credibility (primary, secondary, and tertiary sources).  It is unclear from the report how this methodology was applied in reaching conclusions regarding accounting practices and, specifically, that atypical accounting practices and irregularities were "not bugs, but rather features" of the organizations referred to in Mr. Kohlmann's report, including IIRO.

40.   Mr. Kohlmann opines that irregularities and atypical accounting practices "are not bugs, but features:"

> "Financial irregularities and atypical accounting practices used by these Saudi-based dawah organizations are not bugs, but rather features of these groups—and are consistent with typical terrorist financing modes and methodologies."[87]

40.1.   The terminology "not bugs, but rather features" used to describe accounting practices in the reports of Messrs. Kohlmann and Winer is, according to Mr. Winer, "a popular catchphrase used in the world of computer software design." [88]  I have never seen this phrase used to describe accounting practices and find it odd that Mr. Kohlmann and Mr. Winer would both choose the same catchphrase from the world of computer software design in the wholly unrelated context of accounting or record keeping matters.

---

[86] Kohlmann Expert Report, paragraph 153.  The report of the Control Committee of Orphans Sponsorship of the Tuzla office reviewed controls over payments to 833 children (80% of the population), finding a total of three instances in which the guardian stated that the signature in a register was not theirs, representing an exception rate of approximately 0.3%.  IIRO115300-115302.

[87] Kohlmann Expert Report, paragraph 17.

[88] Winer Expert Report, 9.6.1.

40.2.  Mr. Kohlmann's opinion regarding "not bugs, but rather features … consistent with typical terrorist financing modes and methodologies" implies that "financial irregularities" and "atypical accounting practices" were intentional on the part of senior IIRO management, designed for the purpose of diverting funds to terrorist organizations.  As discussed below, the activities and actions of IIRO senior management show just the opposite—senior management sought to identify and rectify identified deficiencies or weakness in IIRO accounting practices and internal controls.

41.  Ongoing activities and actions undertaken by IIRO senior management with respect to internal controls and other matters brought to light through inquiries and internal audits are inconsistent with Mr. Kohlmann's opinion that IIRO used "financial irregularities" (fraud) and "atypical accounting practices" as "features" of the organization for purposes of diverting funds to terrorist organizations.

41.1.  If IIRO senior management had purposely designed or intended for there to be financial irregularities, atypical accounting practices, or weaknesses in IIRO's internal controls they would not have monitored and reviewed such practices and taken corrective actions when issues were discovered.  The actions on the part of IIRO senior management are inconsistent with Mr. Kohlmann's opinion that atypical accounting practices were deliberate "features."

41.2.  Mr. Kohlmann refers to the external investigation of fraud in the Pakistan office and internal audits and other inquiries of the IIRO offices in the Eastern Province, Indonesia, and Philippines, Jordan, and Vienna. These monitoring activities, inquiries, and associated corrective actions undertaken by IIRO senior management are inconsistent with Mr. Kohlmann's conclusions with respect to accounting practices being "features" of the organization.  They are consistent with senior management learning of the types of problems that affect organizations broadly and taking measures to investigate such issues.

41.2.1.  In connection with the fraud in Pakistan, IIRO senior management appointed a commission and engaged Sidat Hyder, an independent accounting firm, to conduct an investigation of the matter.

41.2.2.  With respect to the implementation of IIRO projects in Jordan and Indonesia by the Eastern Province office, an internal audit report recommended promptly informing the General Secretariat of funds transferred from the Eastern Province to the Indonesian office.[89]  With respect to projects implemented by the Eastern Province in Jordan, the IIRO merged certain activities and reporting of the Eastern Province office in Jordan with the IIRO Jordan office.[90] In addition, IIRO accepted the resignation of the

---

[89] Kohlmann Expert Report, paragraphs 142-144, 150; IIRO 34989-35007; IIRO 158091.

[90] IIRO 287559-287585.

director of the Eastern Province office in connection with internal audit findings, including payments without supporting invoices.[91]

41.2.3. Based on concerns about a lack of clarity in the Philippines office concerning custodies balances, the office of the Secretary for Financial and Administrative Affairs suggested the liquidation of the custodies "as soon as possible so that the problem of the Pakistan office is not repeated."[92]

41.2.4. As described in Mr. Kohlmann's report, the IIRO Secretary General undertook an investigation into funds transferred to the IIRO office in Vienna that were unaccounted for.  The Secretary General's inquiries continued over a three-year period indicating the diligence with which the matter was pursued.

42.    Mr. Kohlmann's description and reference to the fraud at the IIRO Pakistan branch without mention of the inherent limitations on internal controls associated with fraud further demonstrates Mr. Kohlmann's lack of knowledge in this specialized area of accounting and internal controls.

43.    As evidence of "bad practices" by IIRO's personnel "in handling and reporting their uses of funds" Mr. Winer describes the fraud in IIRO's Pakistan office including "cheating, forgery, and misuse of IIRO's funds," incineration of "the financial documents needed to determine what had happened,"[93] the providing of wrong accounts by the perpetrators of the fraud, and pressure applied to subordinates to change financial statements and forget accounts.[94] However, Mr. Winer does not address the inherent limitations on internal controls and that the actions taken by the perpetrators were of the type that can cause even a well-designed system of internal controls to fail to prevent or detect fraud.

44.    Mr. Winer also notes, without further background or explanation, that "[p]rior to 2003, the IIRO's Pakistan branch had transferred funds to Afghanistan in cash."[95] Mr. Winer cites the testimony of Dr. Basha as support for this statement but fails to describe the business reasons for the cash transfers given in Dr. Basha's testimony--there were no official banks in Afghanistan at the time.[96]

45.    As further evidence of bad practices on the part of IIRO personnel, Mr. Winer cites from a portion of the report of Sidat Hyder, including Sidat Hyder's statement that it was "unable to determine whether the non-maintenance of books of account was done deliberately or was

[91] Kohlmann Expert Report, paragraphs 140, 141; IIRO 49708-49710.

[92] Kohlmann Expert Report, paragraph 149;  IIRO 59754.

[93] Winer Expert Report, 10.9.1.

[94] Winer Expert Report, 10.9.2.2.

[95] Winer Expert Report, 10.9.1.

[96] Basha II, 249:3-250:8.

only due to inability or carelessness…"[97]  As Mr. Winer should know from the documents produced in discovery, the documents in the Pakistan branch were in fact intentionally destroyed by the perpetrators of the fraud and that such destruction undermines Sidat Hyder's conclusion, repeated in Mr. Winer's report, that IIRO staff failed to prepare and maintain proper books of account.

46.   Mr. Winer cites internal audits and an external investigation into suspected fraud and a complaint filed by IIRO against a perpetrator of fraud but fails to point out that such audits and investigation are evidence that senior IIRO management took issues of accounting practices seriously.

47.   I have seen nothing in the materials cited by Mr. Kohlmann and Mr. Winer nor the other materials I reviewed in preparing this report showing that IIRO senior management intended for there to be internal control weaknesses designed to permit improper diversion of IIRO funds and indeed IIRO senior management took steps that reflected lack of such intent.

_8/07/2020_____                    _John Barron_____
Date                                          John Barron

---

[97] Winer Expert Report, 10.9.2; IIRO 026474.

**EXHIBIT A**

**CURRICULUM VITAE**

## CURRICULUM VITAE

## JOHN E. BARRON, CPA

**Director of Quality Control, Frost, PLLC, Little Rock, AR,  2016 to present**

Responsibilities as director of quality control include oversight of the firm's assurance practice with respect to compliance with AICPA and PCAOB quality control standards.  Specific responsibilities include development of quality control policies, oversight of periodic PCAOB and AICPA Peer Review inspections, conducting annual internal inspections of selected engagements for compliance with applicable standards, performing detailed second partner reviews of a majority of the firm's attest engagements, preparing formal reports on recommended improvements to the methods and practices of the assurance group, and monitoring other processes affecting quality including recruiting, assignments, training, and independence.

**Sole Practitioner, litigations services 2014 - 2016**

Performed consulting services on behalf of the Enforcement Division of the Securities and Exchange Commission on three matters related to the application of PCAOB standards and the application of generally accepted accounting principles.

**Marks Paneth LLP, CPAs, New York, Director, Litigation Services 2003 - 2014**

Expert services on behalf of the SEC, PCAOB and private legal counsel in matters related to financial reporting, application of generally accepted accounting principles, and PCAOB audit standards.  Industries included banking, real estate, financial services, manufacturing, and technology.  The two most significant cases involved a $12 billion restatement by Fannie Mae involving its accounting for derivatives and litigation in Bermuda involving an audit of a Madoff "feeder fund".

**Adjunct professor of accounting – Baruch College, New York, 2008 – 2012**

Instructed undergraduate courses in financial accounting, auditing, and managerial accounting

**Deloitte LLP, Atlanta, GA and New York, NY - Audit Partner (1990 – 2003); Audit Senior Manager (1987 to 1990)**

Began career at Haskins & Sells (Deloitte predecessor) from 1970 to 1976.  Rejoined the firm in 1987 as a senior manager in the firm's Atlanta office, admitted to the partnership in 1990 and relocated to the firm's New York office in 1998, specializing in real estate, mortgage investments, construction, and private and public investment funds.  Clients included MetLife, Equitable Life, Fortress Investments, Kajima Construction, Morgan Stanley and Merrill Lynch real estate investment funds, and four real estate investment trusts.  Served as the firm's national director of REIT accounting and auditing services from approximately 1997 to 2001.

**Private real estate investment company - 1976 - 1987**

Chief Financial Officer for privately owned real estate investment firm specializing in the acquisition and sale of commercial properties subject to net leases, primarily single tenant post office facilities and bank properties.  The firm was also involved in commercial office development.  As Chief Financial Officer, responsibilities included property acquisitions and financing.

**Haskins & Sells, Atlanta, GA, 1970 - 1976**

Began career on audit staff, promoted to audit manager in 1975.  Clients industries included broadcasting, construction, savings and loan associations, and a publicly traded real estate investment trust.

**Education**

University of Florida - B.S. in Business Administration-Accounting, with Honors, June 1970

**Testimony during the prior four years**

American Realty Capital Properties, Inc. litigation, Civil Action No. 1:15-mc-00040-AKH, United States District Court, Southern District of New York.  Testified at deposition June 11 and June 12, 2019.

**Publications authored in previous ten years**

"Owner-Manager Fraud," White-Collar Crime Fighter, April 2012

EXHIBIT B

DOCUMENTS CONSIDERED  BY EXPERT

## DOCUMENTS CONSIDERED BY EXPERT

| |
|---|
| AICPA, AU-C 265.07 |
| Annex - III - Al - Qaida - Sanctions - List |
| Association of Certified Fraud Examiners, *2020 Report to the Nations 2020 Global Study on Occupational Fraud and Abuse,* https://acfepublic.s3-us-west-2.amazonaws.com/2020-Report-to-the-Nations.pdf |
| *Auditing Theory and Practice, Second Edition.* Robert H. Montgomery, C.P.A (Stationer's Hall, London, 1912) |
| Committee of Sponsoring Organizations of the Treadway Commission. *Internal Control – Integrated Framework* (1992) ("COSO Frammework") |
| Deposition of Al - Harbi (03.27.2019) |
| Deposition of Basha (02.20.2019) |
| Deposition of Basha (02.21.2019) |
| Deposition of Basha Exhibits 131 – 159 |
| Deposition of Daguit (06.27.2019) |
| Deposition of Gari (07.21.2019 |
| Deposition of Gari Exhibits 249  -  250 |
| Exhibit 13 to the Declaration of Waleed Nassar (ECF #3857-16) |
| Exhibit 14 to the Declaration of Waleed Nassar (ECF #3857-16) |
| Expert Report of Evan Kohlmann |
| Expert Report of Jonathan Winer |
| FED - PEC 202110 - 202112 |
| FED - PEC 212644  -  212646 |
| IFAC, *Code of Ethics for Professional Accountants (2001)* *https://www.interniaudit.cz/download/clenstvi/ETH-code_of_ethics_en.doc* |
| IIRO  287559 - 287585 |
| IIRO  49696  -  49712 |
| IIRO 000212  -  000330, 000331  -  000441, 000442  -  000552 |
| IIRO 000331  -  000441 |
| IIRO 000442  - 000552 |

1

### DOCUMENTS CONSIDERED BY EXPERT

| |
|---|
| IIRO 000868 - 000882 |
| IIRO 026468 - 026490 |
| IIRO 026491 - 026506 |
| IIRO 026491- 026506 |
| IIRO 031001 - 031078 |
| IIRO 031001 - 310078 |
| IIRO 031022 – 031023 |
| IIRO 031033 - 031072 |
| IIRO 031120 – 031174 |
| IIRO 031137 |
| IIRO 031148 |
| IIRO 031160 - 031166 |
| IIRO 105571 - 105575 |
| IIRO 105638 |
| IIRO 106408 |
| IIRO 106438 - 106440 |
| IIRO 106951 |
| IIRO 109362 |
| IIRO 109549 - 109550 |
| IIRO 109650 - 109659 |
| IIRO 110003 - 110007 |
| IIRO 110014 |
| IIRO 110031 |
| IIRO 110040 |

**DOCUMENTS CONSIDERED BY EXPERT**

| |
|---|
| IIRO 110054 – 110057 |
| IIRO 110058 |
| IIRO 110061 - 110073 |
| IIRO 110074 - 110081 |
| IIRO 110184 - 110187 |
| IIRO 110207 - 110211 |
| IIRO 110212 - 110230 |
| IIRO 111020 |
| IIRO 111021 - 111025 |
| IIRO 111028 |
| IIRO 111421 - 111431 |
| IIRO 111422 |
| IIRO 111423 |
| IIRO 111424 |
| IIRO 111425 |
| IIRO 111427 |
| IIRO 113124 |
| IIRO 113125 - 113127 |
| IIRO 115300 - 115302 |
| IIRO 127473-127474 |
| IIRO 127578 – 127580 |
| IIRO 127578-127580 |
| IIRO 127589-127592 |
| IIRO 127686 - 127690 |

**DOCUMENTS CONSIDERED BY EXPERT**

| |
|---|
| IIRO 127715 |
| IIRO 127759 |
| IIRO 127767 |
| IIRO 127778 - 127780 |
| IIRO 127831 - 127832 |
| IIRO 127859 |
| IIRO 127859 - 127592 |
| IIRO 127870 |
| IIRO 127895 |
| IIRO 127900 - 127904 |
| IIRO 127907 - 127910 |
| IIRO 127917 - 127918 |
| IIRO 127920 - 127935 |
| IIRO 127938 |
| IIRO 127945 |
| IIRO 127946 |
| IIRO 127947 |
| IIRO 127949 |
| IIRO 130659-130814 |
| IIRO 131356 |
| IIRO 131357 |
| IIRO 131359 |
| IIRO 131365 - 131366 |
| IIRO 131367 - 131368 |

**DOCUMENTS CONSIDERED BY EXPERT**

| |
|---|
| IIRO 131369-131373 |
| IIRO 131374 |
| IIRO 131376 - 131377 |
| IIRO 131378 - 131379 |
| IIRO 131380 |
| IIRO 131381 |
| IIRO 131381 – 131382 |
| IIRO 131384 |
| IIRO 131385 |
| IIRO 131386 |
| IIRO 131387 - 131388 |
| IIRO 131389 |
| IIRO 131390 - 131392 |
| IIRO 149268 - 149318 |
| IIRO 149319 – 149322 |
| IIRO 149328 |
| IIRO 149335-149342 |
| IIRO 149343-149344 |
| IIRO 149346 |
| IIRO 149348 |
| IIRO 149353 |
| IIRO 149355 – 149362 |
| IIRO 149363 |
| IIRO 149364 - 149367 |
| IIRO 149386 |
| IIRO 149387 – 149389 |

**DOCUMENTS CONSIDERED BY EXPERT**

| |
|---|
| IIRO 149390 - 149391 |
| IIRO 149402 |
| IIRO 149403 - 149409 |
| IIRO 149410 - 149419 |
| IIRO 149420 |
| IIRO 149421 - 149434 |
| IIRO 149435 – 149447 |
| IIRO 149448 - 149466 |
| IIRO 149467 - 149470 |
| IIRO 149484 - 149486 |
| IIRO 149489 - 149494 |
| IIRO 149495 - 149508 |
| IIRO 149509 - 149513 |
| IIRO 149509 -149513 |
| IIRO 149514 - 149521 |
| IIRO 149522 - 149531 |
| IIRO 149532 |
| IIRO 149535-149543 |
| IIRO 149557 - 149568 |
| IIRO 149580 – 149587 |
| IIRO 149588 - 149591 |
| IIRO 149592 – 149593 |
| IIRO 158082 – 158091 |
| IIRO 168188 |

**DOCUMENTS CONSIDERED BY EXPERT**

| |
|---|
| IIRO 168291 |
| IIRO 26468 - 26490 |
| IIRO 270163 - 270166 |
| IIRO 270967 - 271042 |
| IIRO 281304 |
| IIRO 281684 |
| IIRO 282047 |
| IIRO 282048 - 0282050 |
| IIRO 282053 |
| IIRO 282054 |
| IIRO 283101 - 283102 |
| IIRO 283103 |
| IIRO 283106 - 283114 |
| IIRO 283117 - 283118 |
| IIRO 283134 - 283135 |
| IIRO 283144 - 283150 |
| IIRO 283151 - 283156 |
| IIRO 287007 |
| IIRO 287391 |
| IIRO 287449-287561 |
| IIRO 287559  -  287561 |
| IIRO 287560 |
| IIRO 31001 - 310078 |
| IIRO 31006  -  31007 |
| IIRO 31160  -  31166 |

## DOCUMENTS CONSIDERED BY EXPERT

| |
|---|
| IIRO 339030 |
| IIRO 339031 |
| IIRO 339032 |
| IIRO 34989 - 35007 |
| IIRO 36823 |
| IIRO 36869-36871 |
| IIRO 36875 |
| IIRO 49708 - 049710 |
| IIRO 59754 |
| IIRO 93328 |
| International Standards on Auditing (ISA) 315. *Understanding the Entity and its Environment. And Assessing the Risks of Material Misstatement,* Internal Control. |
| International  Standards on Quality Control, Auditing, Assurance and Related Services, *Glossary of Terms* (2002) |
| International Federation of Accountants ("IFAC"), https://www.ifac.org/who-we-are/our-purpose |
| International Framework for Assurance Engagements, Handbook of International Auditing, Assurance, and Ethics Pronouncements (2004) |
| MWL 010524 - 010530 |
| MWL 016173 |
| MWL 016175 - 016176 |
| MWL016173 |
| PEC - KSA 2115 - 2132 |
| Securities and Exchange Commission Release No. 38762, File No. 3-9337( June 24, 1997 https://www.sec.gov/litigation/admin/3438762.txt |
| Securities and Exchange Commission, Division of Enforcement*, 2019 Annual Report https://www.sec.gov/files/enforcement-annual-report-2019.pdf* |
| Sixth Amended Complaint (09.30.2005) |
| The Rise and Decline of Saudi Overseas Humanitarian Charities |
| WAMYSA018575 |

**DOCUMENTS CONSIDERED BY EXPERT**

WAMYSA2973