EXHIBIT 31

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 03-MDL-1570 (GBD) (SN)

5    ----------------------------------x.

6    IN RE: TERRORIST ATTACKS ON

7    SEPTEMBER 11, 2001

8    ----------------------------------x

               April 7, 2021

9                  2:25 p.m.

10

11           Videotaped Deposition via Zoom

12   of MATTHEW A. LEVITT, pursuant to Notice,

13   before Jineen Pavesi, a Registered

14   Professional Reporter, Registered Merit

15   Reporter, Certified Realtime Reporter and

16   Notary Public of the State of New York.

17

18

19

20

21

22

23

24

25

```
 1                 LEVITT
 2  lawyers, really just to review how these
 3  things go, especially given that this is
 4  on Zoom, which is different, at least for
 5  me.
 6                 That's it.
 7      Q.        Approximately how much time did
 8  you spend preparing for today's
 9  deposition?
10      A.        A handful of hours; an hour
11  before we met today, an hour or two hours
12  for the past several days, so not many
13  hours.
14      Q.        Dr. Levitt, when did you first
15  begin to consult on this case, and by this
16  case, there are, as you know, a series of
17  cases beginning with the Burnett case
18  filed in August of '02 and I mean to refer
19  to that case and all of the subsequent
20  cases that are part of the multidistrict
21  litigation going forward.
22      A.        I don't have the date in front
23  of me when I was hired to serve as an
24  expert witness by Motley Rice, it's
25  several years ago now.
```

1                    LEVITT

2      Q.        And was Motley Rice the firm

3   that first contacted you to serve as an

4   expert in this case?

5      A.        To serve as an expert in this

6   case, yes.

7                Early on, I don't know the

8   date, probably somewhere around 2003, the

9   firm of Cozen O'Connor asked me to come to

10   Philadelphia for a few hours for a

11   conversation, which I did.

12                I was not hired as an expert,

13   it was not an ongoing relationship of any

14   kind, I think it was probably a two-hour

15   meeting, I took the train, we met, I took

16   the train back.

17      Q.        At the time that you met with

18   Cozen O'Connor in or around 2003, were any

19   of these cases already on file, to your

20   knowledge?

21      A.        I don't know.

22      Q.        Did you review a complaint or

23   draft complaint prior to your meeting with

24   Cozen O'Connor?

25      A.        I don't recall.

1                    LEVITT

2       Q.        Did you then have a further

3    discussion about whether you would be

4    hired or not?

5       A.        It's a long time ago, but not

6    to my knowledge, no, this was very early

7    days.

8                   I don't remember much of the

9    meeting other than it was very general and

10   I am assuming that at the end of it they

11   said, well, if we need something from you,

12   we'll come back to you or something.

13                  But we weren't in touch then

14   for several years, quite a few years.

15      Q.        But the purpose of the meeting

16   was to discuss the case that they are

17   contemplating or had brought, is that

18   correct?

19      A.        Again, I don't remember if they

20   had filed or not; the purpose was to talk

21   in general terms about 9/11, about Al

22   Qaeda financing this type of thing.

23                  Of course that was in support

24   of either the case that they had already

25   filed or a case that they were going to

```
                                        Page 13

  1                 LEVITT

  2   file.

  3             But my personal involvement was

  4   kind of not anywhere near that kind of

  5   granular level.

  6      Q.      Did you send them a bill for

  7   your time in or around 2003?

  8      A.      I certainly hope so, it would

  9   have been a handful of hours, literally I

 10   took the train up, we met for probably a

 11   couple of hours or so, I took the train

 12   back.

 13      Q.      And when was the next time that

 14   you were contacted by anyone on the

 15   plaintiffs' team with respect to these

 16   cases that bring us here today?

 17      A.      I don't remember the date and I

 18   don't remember if the first contact was

 19   from Motley Rice or Cozen O'Connor, but it

 20   was kind of --  they were working together

 21   at that point already and we had a meeting

 22   in Washington, D.C. at one of their

 23   offices to discuss the possibility of me

 24   serving as an expert witness.

 25      Q.      Was that discussion before you
```

```
 1                 LEVITT
 2   went into the government of the Department
 3   of Treasury or after you came out?
 4        A.      Certainly after.
 5        Q.      And so the '03 meeting was the
 6   only meeting that you recall before you
 7   went into government?
 8        A.      Correct.
 9        Q.      When did you first see the
10   complaint in this case?
11        A.      Oh, I have no idea.
12        Q.      Or a complaint.
13        A.      I apologize, I talked over you,
14   can you say it again.
15        Q.      When did you first see any
16   complaint that has been filed in this
17   case?
18        A.      Oh, I honestly don't know, I
19   wouldn't know when I first saw it.
20        Q.      Would you know whether it was
21   before you went into the Treasury
22   Department or after?
23        A.      I don't; it is possible that I
24   saw the complaint before going into
25   Treasury, because it would be a matter
```

Page 27

```
 1                LEVITT
 2   offered a job at the F.B.I. pending my
 3   clearances.
 4                Because I had spent time in
 5   Israel, the West Bank and Gaza Strip,
 6   pardon me, because I had spent time in
 7   Israel, West Bank and Gaza Strip, doing my
 8   field research during the summer of 1997,
 9   the F.B.I. kind of warned me that my
10   clearances were going to take some time
11   and so I already had two children at the
12   time, my wife's a teacher, we decided to
13   move down to the Washington area from the
14   Boston area that summer so that the kids
15   could be in school, my wife could have a
16   job, and I applied for and got the
17   position as a Soref fellow, which is kind
18   of the introductory level, junior level
19   position on the senior research staff at
20   The Washington Institute of Policy, the
21   time was a one-year fellowship, the F.B.I.
22   told me my clearance would take 11, 12
23   months.
24                In the end the clearances went
25   through faster than anticipated and I only
```

```
 1                    LEVITT
 2   terrorism analysis units, the whole idea
 3   of kind of a truly trained intelligence
 4   analyst position at the F.B.I. was
 5   something new.
 6             Before then it was really
 7   something that people just kind of got
 8   promoted up into, but not something that
 9   they necessarily had the advanced degrees
10   for, et cetera.
11             I got hired into the
12   International Terrorism Intelligence Unit,
13   so I was on the intelligence side of the
14   house, F.B.I. of course is the Federal law
15   enforcement agency, but it also is
16   responsible for the domestic intelligence
17   function.
18             I provided tactical and
19   strategic analytical support for F.B.I.
20   counterterrorism operations related to
21   Middle East terrorist activity.
22             So the Middle East unit that I
23   supported covered state sponsors of
24   terrorism and terrorist groups emanating
25   from the Middle East.
```

```
 1                    LEVITT
 2      Q.        Was Al Qaeda one of those
 3  groups?
 4      A.        I did not -- well, I am
 5  limited into what I can get into the
 6  details of what I did, but what I can say
 7  is I did not work full-time on Al Qaeda, I
 8  worked on a large number of different
 9  things, but I did work on Al Qaeda while I
10  was there, including a senior analytical
11  position during the millennium plot and
12  also in the 9/11 investigation.
13      Q.        In the course of your time at
14  the F.B.I., did you do any work involving
15  charities?
16      A.        So, yes, the F.B.I. doesn't
17  have like a charities department, but
18  because there have been cases of terrorist
19  abuse of charity and fraud, on defrauding
20  charities, defrauding donors, I did have
21  experience in that type of issue.
22      Q.        Did you look or do any work
23  involving Gulf-based charities?
24      A.        I did a lot of work relating to
25  charities in the United States and
```

```
 1                      LEVITT
 2   charities in the Middle East.
 3        Q.        Including in the Gulf or just
 4   in Palestine/Israel?
 5        A.        It was not just
 6   Palestine/Israel, but I don't remember
 7   honestly, because we didn't have --  we
 8   would have full field investigations of
 9   entities in the United States, other
10   entities abroad would interact with those
11   entities in the United States and come up
12   in the course of our investigation, but I
13   honestly wouldn't remember a list.
14        Q.        I presume that you had access
15   to classified information in your capacity
16   as an F.B.I. intelligence research
17   specialist, correct?
18        A.        Yes.
19        Q.        You said some of your work
20   crossed Al Qaeda.
21                  Was it part of your remit at
22   the F.B.I. to look into the origins,
23   structure, or history of Al Qaeda or were
24   you just focused on current actionable
25   intelligence?
```

```
 1                    LEVITT
 2      A.        So the work we did did
 3  obviously involve current actionable
 4  intelligence, but it was frequently our
 5  responsibility to help put things into
 6  context and so it would not be uncommon
 7  for us as analysts to be looking at
 8  earlier activities, activities elsewhere,
 9  as it related to the investigations that
10  were ongoing at the F.B.I.
11      Q.        Did you look into the
12  Afghan-Soviet period while you were at the
13  F.B.I. with respect to the origins of Al
14  Qaeda?
15      A.        Again, I'm very limited in what
16  I can say, but what I can explain to you
17  is that we would not have had an open
18  investigation into that, so if there was
19  anything like that, which I don't recall,
20  it would have been something in the
21  context of just something short providing
22  context to something else, something very
23  specific.
24      Q.        You said that you had
25  involvement with respect to the events of
```

```
 1                    LEVITT
 2   going in, I forget, a few hours a week, I
 3   said, you know what, I think it would be
 4   best if you get only full-time people and
 5   they agreed.
 6        Q.      Did you not have a clearance
 7   while you were working for the 9/11
 8   Commission, had the clearance not come
 9   through?
10        A.      That's true, that's correct.
11                I only ended up staying there
12   for a small number of weeks.
13                There is also the issue that
14   they wanted to interview me and they did
15   ultimately interview me and if I had
16   stayed that would have been difficult, so
17   this kind of addressed both issues.
18        Q.      I see you don't list that on
19   the CV; is that because of the brevity of
20   time that you were there?
21        A.      Yes, it was a very part-time
22   short thing.
23                I feel like, you know, you put
24   that on your CV and people aren't going to
25   pay attention to the time and it's going
```

```
 1              LEVITT
 2     A.        I did and then when I left, I
 3  didn't have to, but I chose to terminate
 4  it.
 5     Q.        And have you had a security
 6  clearance since?
 7     A.        I have not had a regular
 8  security, an ongoing security clearance
 9  since, and in very rare instances, where
10  the intelligence community wanted to
11  consult me on something, they either, if
12  it's a secret collateral clearance
13  information, they just grant that to you
14  for the moment, and then for more
15  sophisticated stuff, they can basically
16  read you in, you sign a bunch of papers,
17  do your consultancy, they read you out,
18  you sign a bunch of papers and you're done
19  and can't talk about it.
20     Q.        Did any of those subsequent
21  clearances have anything to do with events
22  that are the subject of this case?
23     A.        The good news is I can't
24  remember because the bad news is if I did
25  I wouldn't be able to tell.
```

```
 1                    LEVITT
 2             It is the same type of thing,
 3    you have to sign all kinds of things to do
 4    this, to be, quote/unquote, read out, and
 5    that most basic thing is you can't talk
 6    about what you did here.
 7        Q.       Let me ask you this question
 8    then.
 9             You saw a lot of classified
10    material while you were at Treasury,
11    correct?
12        A.       Correct.
13        Q.       And you reviewed intelligence
14    product concerning terrorism, correct?
15        A.       Correct.
16        Q.       And you reviewed intelligence
17    product regarding OFAC designations of
18    SDGTs, correct?
19        A.       Correct.
20        Q.       And you reviewed intelligence
21    product concerning designations of
22    defendants in this case, correct?
23        A.       At least some; certainly not
24    all of the defendants in this case.
25        Q.       Did you review intelligence
```

Page 45

```
 1                    LEVITT
 2   product concerning the IIRO or
 3   International Islamic Relief Organization?
 4        A.        I'm sure I did.
 5        Q.        You've testified as an expert
 6   and you list the cases that you have, you
 7   say you've testified in 19 domestic
 8   criminal cases, or at least I counted them
 9   up, does that sound about right?
10        A.        It does.
11        Q.        Have you testified in any cases
12   since you prepared this CV in or around
13   March 2020?
14        A.        Is it possible for you to
15   scroll down the page and I can just take a
16   look.
17        Q.        It is on page A 049, it is on
18   the third page of your CV.
19        A.        Okay.
20                  Just in terms of how to go
21   about this, I don't know if it's you or
22   court reporter doing this right now --
23        Q.        Not me.
24        A.        Well, the way this is working
25   right now is it is very, very good for me
```

Page 47

```
 1                    LEVITT
 2       A.        That's correct.
 3       Q.        Have you ever been asked to
 4   testify by a defendant?
 5       A.        Not to my knowledge in criminal
 6   cases, but I have in immigration cases and
 7   have provided such testimony.
 8       Q.        On behalf of people who were
 9   about to be deported?
10       A.        Correct.
11       Q.        Let's look at the foreign
12   terrorism case; are those all criminal
13   cases as well, next paragraph down, and
14   you list six?
15       A.        So I believe they are.
16                 CBSP v. Samuels we would
17   consider to be a civil case, but in the
18   French system it was a libel case, in the
19   French system that is kind of double --
20   there is a prosecutor in there as well.
21       Q.        Was your testimony in those
22   cases on behalf of the prosecution?
23       A.        So CBSP, again, we would think
24   of it as a civil case.
25                 CBSP was the plaintiff in that
```

```
                                              Page 49
 1                   LEVITT
 2   see if I can find --
 3       Q.        We can --
 4       A.        I don't want to waste your
 5   time.
 6       Q.        I presume in all of these cases
 7   you've testified on behalf of plaintiffs,
 8   is that correct?
 9       A.        I believe so, yes.
10       Q.        How many times in the course of
11   your giving expert testimony have you
12   testified in a case that was primarily
13   about the activities of Al Qaeda?
14       A.        A handful.
15                 The Foley/Sotloff case is an
16   example of an ISIS case, going back and
17   explaining the history of ISIS coming out
18   of Al Qaeda, Iraq, et cetera.
19       Q.        Al Qaeda and Iraq is post
20   September 11th, correct?
21       A.        Yes.
22       Q.        Have you ever given testimony
23   in cases that involved the activities of
24   Al Qaeda prior to September 11th, other
25   than this case?
```

Page 50

1                 LEVITT

2      A.      No.

3      Q.      Have you ever given testimony

4    about Gulf charities in any of your expert

5    testimony prior to this case.

6      A.      There were several cases that

7    involved issues of charities and likely

8    included issues of Gulf charities.

9              Examples would include the Holy

10   Land Foundation case, the Arab Bank case,

11   the Fawaz Damrah, D-A-M-R-A-H, case, but I

12   don't remember specifically beyond that,

13   the Boim case, B-O-I-M.

14      Q.      Boim involved Hamas-related

15   charities, correct?

16      A.      That's correct.

17      Q.      Have you ever given testimony

18   in a case where a Gulf charity was a

19   defendant?

20      A.      I don't think so.

21      Q.      Moving on, have you written --

22   I've looked at your publications and it

23   has taken quite a bit of time, but the

24   last article that I saw, which appears on

25   page A 77, that relates to Al Qaeda, is

```
 1                    LEVITT
 2   some things are more analytical, but where
 3   we can, we do try to be policy relevant.
 4        Q.       In terms of your scholarship,
 5   your extended scholarship is principally
 6   with respect to Israel, Palestine, Hamas
 7   and Hezbollah, is that correct?
 8        A.       No, I wouldn't limit to that.
 9                 I have developed particular
10   expertise in Hamas and Hezbollah, but I've
11   spent a significant amount of time in and
12   out of government focused on other
13   terrorist groups, most specifically Al
14   Qaeda and more recently the Islamic state.
15        Q.       I want to ask you some
16   questions just so I can understand the
17   scope of the expertise that you're
18   offering with respect to your opinion.
19                 Do you consider yourself, sir,
20   an expert on charities or nonprofit
21   organizations?
22        A.       That's a very broad question.
23                 I consider myself an expert on
24   the issue of terrorist abuse of charities.
25                 I would not say I am an expert
```

Page 54

```
 1                    LEVITT
 2   in all things charity.
 3                I have had the opportunity to
 4   testify before Congress on this, engage in
 5   conversations with members of the
 6   charitable sector on this in and out of
 7   government, I've spent a lot of time on
 8   this, I teach about this, but when I say
 9   this, I do mean the limited issue of the
10   ways in which charities can be vulnerable
11   to abuse, which of course includes noting
12   that not all charities are abused and
13   charity is a good thing.
14        Q.      Charities, I think you said in
15   your opinion, that charities, more than
16   other organizations, can be abused by
17   those who wish to do so, correct?
18        A.      I don't remember if that's how
19   I put it, but that's correct.
20        Q.      You studied Palestinian
21   charities extensively, have you?
22        A.      I have.
23        Q.      Have you studied Gulf charities
24   as well?
25        A.      I have.
```

Page 55

```
 1                    LEVITT
 2      Q.        Have you studied them in terms
 3   of understanding their operations and
 4   finances or only with respect to
 5   investigating terrorist abuse?
 6      A.        No, also with the operations,
 7   et cetera, so I've met with officials of
 8   Gulf charities, I've provided trainings
 9   for Gulf states seeking to put in place
10   charitable oversight structures,
11   regulators.
12             That included meeting with
13   regulators in Gulf countries and meeting
14   with officials from charities in these
15   countries.
16             Again, that doesn't make me an
17   expert in how those charities operate, but
18   if you want to understand the ways in
19   which a sector might be vulnerable to
20   abuse, you have to have some understanding
21   of how they work.
22      Q.        Did you visit those Gulf
23   charities while you were at OFAC or while
24   you have been at WINEP, can I call it
25   WINEP, is that what you call it, or is it
```

Page 56

```
 1              LEVITT
 2  WINEP, I've only read the acronym?
 3      A.      Yeah, we call it The Washington
 4  Institute, but I'll respond however you
 5  would like to call it.
 6              To be clear, I never worked at
 7  OFAC, Office of Foreign Assets Control, I
 8  was in the Office of Intelligence and
 9  Analysis, which along with OFAC is within
10  Treasury's Department of Terrorism and
11  Financial Intelligence.
12      Q.      Was OFAC an office within your
13  reporting structure or was it separate?
14      A.      It was parallel.
15      Q.      So you had no supervisory
16  authority in what you were doing, is that
17  correct?
18      A.      So the way --  it's not
19  structured this way anymore, but the way
20  it was structured at the time, the Office
21  of Intelligence and Analysis did a lot of
22  work with OFAC, OFAC would ultimately
23  implement sanctions, but the process of
24  researching, drafting, working on
25  designations was part of what Office of
```

```
 1              LEVITT
 2   Intelligence and Analysis, for which I was
 3   the deputy assistant secretary, worked on
 4   together with OFAC.
 5       Q.       Whose decision was it to
 6   implement or not implement sanctions
 7   recommendation?
 8       A.       Oh, a whole lot of different
 9   people and a whole lot of different
10   offices in and well beyond Treasury.
11       Q.       Ultimately who was the
12   decision-maker?
13       A.       Ultimately the secretary of the
14   Treasury.
15       Q.       Would your office have input
16   into that decision?
17       A.       My office and many others in
18   and out of Treasury.
19       Q.       And your office wrote up the
20   recommendation package and dossier, is
21   that right?
22       A.       The specifics of how it works,
23   I can only get into so much detail, but,
24   yes; analysts would write up the various
25   drafts, it would have to go up through
```

```
1                    LEVITT
2   various chains, I described the process as
3   best I could in my report.
4                    Part of that review went across
5   my desk.
6        Q.        You said that you met with Gulf
7   charities.
8                    Was that, I apologize for using
9   the term OFAC, was that when you were at
10  Treasury or when you were at The
11  Washington Institute?
12       A.        I can't answer the question
13  about Treasury because that was in my
14  capacity as an intelligence official.
15                   But it's certainly been as an
16  academic outside of government.
17       Q.        You've met with the directors
18  of Gulf charities?
19       A.        I believe it was with
20  directors; I don't remember titles and
21  names right now, it certainly was with
22  senior officials.
23       Q.        Which ones?
24       A.        Again, I'd have to look that
25  up, but I travel significantly --  well,
```

Page 63

```
 1                    LEVITT
 2       Q.       Just coming on to areas of
 3   expertise, do you consider yourself an
 4   expert in accounting or finance?
 5       A.       I have some experience, but I
 6   do not consider myself an accounting
 7   expert.
 8       Q.       Do you have any formal training
 9   in accounting or finance?
10       A.       Sorry, you cut off.
11       Q.       Do you have any formal training
12   in accounting or finance?
13       A.       No, I have no degree in
14   accounting or finance.
15                Of course working at the
16   Department of Treasury one gets exposure
17   to such things, but, like I said, I do not
18   consider myself an expert in accounting.
19       Q.       And you're not a lawyer, but do
20   you consider yourself an expert in law?
21                MR. HAEFELE:  Objection to
22   form.
23       Q.       I'm a lawyer, I don't consider
24   myself an expert, but I am going to ask
25   you that question.
```

                       LEVITT

1
2      A.        I was about to say it's a very,

3   very broad question and I certainly don't

4   consider myself an expert in all things

5   legal.

6              I do have a masters in law and

7   diplomacy, I consider myself someone who

8   has an understanding of certain issues in

9   the law, but I do not consider myself a

10   legal expert as such.

11      Q.        Do you consider yourself having

12   an expertise in the statutory framework

13   set forth by the U.S. government with

14   respect to terrorist designations?

15      A.        Yes, I have experience in that

16   and with other countries' regulatory

17   systems.

18      Q.        Do you consider yourself an

19   expert in evaluating audit reports?

20      A.        I really don't enjoy doing

21   that, so I suppose the answer is no, but

22   it has been --

23      Q.        No one does.

24      A.        -- for my sins, something

25   I've had to do from time to time.

Page 71

1                    LEVITT
2   there is a problem here inherent to Islam
3   in any way or particular to Muslim
4   charities.
5            Charities are susceptible to
6   abuse.
7       Q.      Do you consider yourself an
8   expert in Islamic doctrine or practice?
9       A.      I have developed significant
10  understanding of the Muslim religion, but
11  I do not consider myself an expert on
12  religion or on Islam specifically, that's
13  a lifetime commitment I have not made.
14      Q.      Do you consider yourself an
15  expert on Islamic law or Sharif?
16      A.      Yes, it is the same answer; I
17  am not an expert on Islamic law, but I
18  have invested time and effort to try and
19  develop an understanding -- forgive me for
20  answering while I pour some water --
21      Q.      No, please.
22      A.      -- but I do not consider myself
23  an expert on Islamic religious law.
24      Q.      I didn't go over this and this
25  is not your first rodeo or mine, so if you

```
                                        Page 80
 1                 LEVITT
 2             MR. HAEFELE:  Now you're asking
 3    him to tell you what was possible; I'm not
 4    instructing him --  I'm instructing him to
 5    answer your question, and we aren't
 6    waiving the privilege, but he has already
 7    answered your question and I think you
 8    need to move on.
 9        Q.      Let me ask you this question;
10    at the time that you went into government
11    in or around 2005, were you familiar with
12    the International Islamic Relief
13    Organization?
14        A.      Yes.
15        Q.      Had you had the opportunity to
16    consider any information about the
17    International Islamic Relief Organization
18    in the Philippines?
19        A.      I don't recall.
20        Q.      Did you have any information
21    about the International Islamic Relief
22    Organization in Indonesia at the time that
23    you went into the government in 2005?
24        A.      I don't recall.
25        Q.      I think this is a breaking
```

Page 81

```
 1                    LEVITT
 2   point, it's 3:49 p.m.; would it be
 3   acceptable to come back at 4 o'clock, Dr.
 4   Levitt?
 5        A.        Yes, that's fine with me.
 6                  Again, I have a hard stop at 6
 7   today, so if you need a shorter break, I
 8   want to be as accommodating to you this
 9   afternoon as I can.
10        Q.        I appreciate that, we have a
11   lot of folks and not that many bathrooms,
12   so we'll do our best and try to get going
13   as soon as we can.
14                  THE VIDEO TECHNICIAN: Time is
15   3:50 p.m., we're off the record.
16                  (Recess taken.)
17                  THE VIDEO TECHNICIAN: We are on
18   the record, time is 4:03 p.m., please
19   continue.
20   BY MR. LEWIS:
21                  MR. LEWIS: I would like to ask
22   our concierge, please, to mark the
23   document which has just been uploaded,
24   which I think is called invoices.
25                  I don't think it has a letter
```

Page 82

```
 1                    LEVITT
 2   designation, and if you could mark that
 3   and put it in front of the witness.
 4             THE TECH CONCIERGE:  This will
 5   be 2002.
 6             (Defendants' Exhibit 2002,
 7   Invoices, was marked for identification,
 8   as of this date.)
 9             MR. LEWIS:  Not the year,
10   because the document is from 2003, but the
11   number is 2002.
12       Q.     Dr. Levitt, can you identify
13   this document that has just been put up on
14   the screen?
15       A.     This looks like an invoice of
16   mine dated November 7, 2003.
17       Q.     It says "invoice for services
18   provided by Matthew A. Levitt as expert
19   witness"; is that your signature at the
20   bottom of the document?
21       A.     Yes.
22       Q.     It refers under date services
23   provided to October 9th, 2003, initial
24   meeting in Washington, and November 6,
25   2003, day-long meeting in Philadelphia.
```

Page 83

1                    LEVITT

2              Does that refresh your

3    recollection, sir, that you had two

4    meetings with the Cozen O'Connor attorneys

5    in or around the fall of 2003?

6        A.      Honestly, no; I mean, I am not

7    disputing this invoice, but I don't

8    remember an initial meeting in Washington.

9              I'm sure it took place, but...

10       Q.      Does it refresh your

11   recollection with respect to a day-long

12   meeting in Philadelphia for which you

13   billed 12 hours?

14       A.      Is it possible to remove --

15   there we go.

16              (Witness perusing document.)

17       A.      This looks like this is the

18   meeting we discussed earlier.

19       Q.      Dr. Levitt, that was 2003, you

20   went into government 2005, you came out in

21   2007.

22              If you look at the next page of

23   this document, it starts up again in

24   January of 2020.

25              My question, sir, is, between

Page 84

```
 1              LEVITT
 2  the time you left government in or around
 3  January 2007 and January of 2020, which is
 4  approximately 13 years, do you recall
 5  whether you had any conversations with any
 6  of the attorneys on this case about this
 7  case?
 8      A.      I don't think I did.
 9              MR. LEWIS:  I am going to ask
10  the concierge to be kind enough to mark as
11  2003 what we have designated as document B
12  and which I think we referred to earlier,
13  which was a memorandum for Barbara
14  Hammerle, and ask for that to be put put
15  up, please.
16              (Defendants' Exhibit 2003,
17  memorandum for Barbara Hammerle, was
18  marked for identification, as of this
19  date.)
20      Q.      Dr. Levitt, is that your
21  initial on the first page of the memo next
22  to your name?
23      A.      It is.
24      Q.      And do you recall sending this
25  memo in or around 2006?
```

Page 85

                          LEVITT

1

2      A.        I remember it happened, I don't

3    remember doing it, but, yeah, for purposes

4    of your question, yeah.

5      Q.        I'm still a little bit unclear

6    on your relationship to the Office of

7    Foreign Assets Control.

8              Was it your responsibility as

9    deputy assistant secretary for the Office

10   of Intelligence and Analysis to prepare

11   this type of memo with respect to

12   designations under Executive Order 13224?

13     A.        Intelligence analysts in my

14   office would do the research and prepare

15   the evidentiary, which would go through

16   all the stages I discussed in my report,

17   within the Department of Treasury and

18   within and across the larger general

19   agency.

20              Once it went through the vast

21   majority of those hurdles, the process was

22   that it would go in the form of a memo

23   like this from the Office of Intelligence

24   and Analysis to the Office of Foreign

25   Assets Control.

```
 1                    LEVITT
 2              Again, OFAC and OIA were both,
 3   you could think of it as sister components
 4   within the larger TFI, Terrorism and
 5   Financial Intelligence branch of the
 6   Treasury Department.
 7      Q.        Once you prepared this memo,
 8   your office would have already gone
 9   through the interagency process in
10   compiling of information that's contained
11   therein, is that correct?
12      A.        Yes, it is possible that there
13   can still be other steps, but generally,
14   yes.
15              At this point it has gone
16   through these various hoops, with the
17   exception, I believe, of the two stages of
18   legal review.
19              The intelligence office would
20   be doing kind of the substantive
21   information based on all the various
22   sources and then it goes to OFAC and OFAC
23   doesn't just, you know, say sure, OFAC
24   then does its piece of this, which is the
25   legal review for sufficiency by OFAC
```

Page 87

```
 1                    LEVITT
 2   Treasury Department lawyers and the
 3   simultaneous but very separate legal
 4   review by lawyers at the Department of
 5   Justice for litigation risk.
 6        Q.       At the time that you prepared
 7   this memorandum, had there been a dialogue
 8   between your office and the office of the
 9   secretary with respect to whether this
10   designation was approved or would be
11   approved?
12        A.       I am not going to get into the
13   internal conversations I had with Treasury
14   leadership.
15              But these are not rogue, you
16   know, operations, this is part of the
17   department.
18              So the department, it goes
19   through all the checks and all the
20   balances, no one's surprised, and so
21   authorities would be aware that this is in
22   process, that it had even been considered,
23   that it was approved at various levels, et
24   cetera and so the appropriate offices
25   would know.
```

```
 1                   LEVITT
 2      Q.        Approximately how long did the
 3  process take from your office being
 4  charged with investigating and considering
 5  this designation to the preparation of
 6  this memo which has been marked as 2003?
 7      A.        These can be extensive
 8  processes; more than that I can't say.
 9      Q.        When you came to the Treasury
10  Department, was it already in process?
11      A.        That's very possible, I don't
12  remember.
13      Q.        Did you personally review the
14  evidentiary package before you signed the
15  agreement?
16      A.        Of course.
17      Q.        Did you review --
18      A.        I, like many, many others,
19  there are all these different levels that
20  have to be gone through.
21      Q.        Did you review the exhibits?
22      A.        Yes.
23      Q.        I assume there was a tremendous
24  amount of classified information that went
25  into this given that it's 754 pages and we
```

Page 89

```
 1              LEVITT
 2   can read about eight of them, is that a
 3   fair assumption?
 4       A.      You can see that the document
 5   that you put in front of me was at one
 6   point classified top secret and more,
 7   which has been redacted.
 8       Q.      The current redactions continue
 9   to remain, because it continues to remain
10   classified, is that right?
11       A.      As far as I know.
12       Q.      How many classification
13   designations did you work on during your
14   15 months at the Department of Treasury?
15       A.      Many.
16       Q.      More than ten, fewer than ten?
17       A.      More than ten.
18       Q.      How many memos like this one,
19   which then went to OFAC for final review,
20   would you have signed off on?
21       A.      Each of them.
22               Well, yeah, each of the ones
23   that I was involved in.
24               There is many different types
25   of sanction regimes and many different
```

```
                                         Page 90

 1                      LEVITT

 2   types of designations and I did not -- I

 3   was not the from signatories that you see

 4   here on all of them.

 5                But for the ones that were

 6   related to terrorism and a variety of

 7   other sanction regimes, that would have

 8   been me at the time.

 9       Q.      Can I then deduce that you

10   signed off on more than ten of these while

11   you were there?

12       A.      Yes.

13       Q.      Now, you refer in your report

14   to the preparation of an evidentiary

15   package.

16                Is the evidentiary package what

17   appears here as the memorandum which

18   contains it looks like 13 pages or, yes,

19   it is numbered 13 on the bottom, is that

20   what you were referring to as the

21   evidentiary package, and then following

22   from that is an exhibit list and footnotes

23   and exhibits, is that correct?

24                MR. HAEFELE:  Object to the

25   form.
```

```
                                      Page 91

 1                   LEVITT
 2              THE WITNESS:  Sorry?
 3              MR. HAEFELE:  I said objection
 4     to form, but you can answer it.
 5        A.       Evidentiary package is the
 6     whole kit and caboodle to include this
 7     memo of the kind of narrative, if you
 8     will; it would include all of the
 9     underlying information.
10        Q.       I think that you spoke in your
11     report about an evidentiary package
12     supported by an --  an evidence package
13     supported by exhibits, but maybe it is
14     just terminological.
15                 I just want to make sure that
16     we're on the same page as to how it's
17     done; maybe when we come back to the
18     substance on this, I can find that
19     reference in your report.
20                 There are exhibits and is that
21     a standard feature of this kind of
22     memorandum, that there is a list of
23     exhibits and then exhibits and then a list
24     of notes that cite the exhibits, is that
25     correct?
```

Page 109

```
 1                    LEVITT
 2  answer that question, please.
 3      A.      I would do terrible on Jeopardy
 4  for that reason.
 5              I did include, so I did rely
 6  on, some number, but I don't think it was
 7  all that many, of declassified
 8  intelligence reports, because I thought
 9  that would be useful.
10      Q.      There were reports that you
11  relied on, you were relying on the
12  unredacted material, not the redacted
13  material, correct?
14      A.      Clearly.
15      Q.      Obviously the Hammerle memo,
16  you saw the classified material, but now
17  it's redacted, correct?
18      A.      That's correct, and the nature
19  of the human brain is such that there is
20  no way I'd remember those details now,
21  anyway.
22      Q.      You've forgotten every single
23  bit of it, if you looked at the exhibits
24  you would have no idea what you looked at,
25  is that your testimony, sir?
```

```
                                              Page 110
 1                    LEVITT
 2       A.        I think you're twisting my
 3   words, so, no.
 4       Q.        No, I'm asking you a question,
 5   I am not twisting anything, I'm asking you
 6   a question.
 7       A.        If I were to look at the
 8   report, would I remember other things,
 9   maybe, maybe not.
10                 If I were to then look at the
11   exhibits, would that trigger something,
12   maybe, maybe not.
13                 You know, I don't know how good
14   your memory is, maybe mine is just
15   particularly poor, but I am not going to
16   remember every sentence or term or phrase
17   from a document that I reviewed quite a
18   few years ago.
19       Q.        You looked at classified
20   information; you can't say sitting here
21   today whether you recall some of that
22   classified information or you don't?
23       A.        I can definitely tell you
24   that I have forgotten a vast majority of
25   classified information I've ever seen,
```

```
 1                    LEVITT
 2  that's the way the brain works and I
 3  wanted it that way, that's why I turned in
 4  my clearances, because I knew I'd be going
 5  out into the open source world and I would
 6  want to be able to go to conferences and
 7  do media appearances or, not like what I
 8  was thinking about at the time, but it
 9  also enables me to do something like this,
10  serve as an expert witness, without having
11  to worry where do I know something from.
12             And so I left government, each
13  time I had a several-month period where I
14  didn't speak publicly and I did not do
15  media and you kind of just let that kind
16  of settle and I don't think it is
17  surprising that if you don't review it, if
18  you're not exposed to it on a regular
19  basis, the brain is only so big and it is
20  filled by other current things.
21     Q.       And also there are things that
22  you remember from a long time ago and you
23  don't remember how you remember them,
24  isn't that a fair thing to say?
25     A.       Sure, mostly about, you know,
```

Page 184

1

2          C E R T I F I C A T I O N

3

4

5

6      I, Jineen Pavesi, a Registered

7    Professional Reporter, Registered Merit

8    Reporter, Certified Realtime Reporter and

9    a Notary Public, do hereby certify that

10   the foregoing witness, MATTHEW A. LEVITT,

11   was duly sworn on the date indicated, and

12   that the foregoing is a true and accurate

13   transcription of my stenographic notes.

14      I further certify that I am not employed

15   by nor related to any party to this

16   action.

17

18

19

20

21

     JINEEN PAVESI, RPR, RMR, CRR

22

23

24

25

Page 187

1

2     UNITED STATES DISTRICT COURT

3     SOUTHERN DISTRICT OF NEW YORK

4     Case No. 03-MDL-1570 (GBD) (SN)

5     -----------------------------------x.

6     IN RE: TERRORIST ATTACKS ON

7     SEPTEMBER 11, 2001

8     -----------------------------------x

                    April 8, 2021

9                   9:10 a.m.

10

11              Continued Videotaped Deposition

12    via Zoom of MATTHEW A. LEVITT, pursuant to

13    Adjournment, before Jineen Pavesi, a

14    Registered Professional Reporter,

15    Registered Merit Reporter, Certified

16    Realtime Reporter and Notary Public of the

17    State of New York.

18

19

20

21

22

23

24

25

Page 239

1                    LEVITT

2   defined by the Afghans as a Jihad,

3   correct?

4        A.        Correct.

5        Q.        And do you have a view as to

6   whether that definition of Jihad was

7   legitimate as a matter of Islamic

8   doctrine?

9        A.        So I don't claim to be an

10  expert in Islamic doctrine, but there are

11  multiple legitimate definitions of the

12  term Jihad and this would certainly fill

13  one of them.

14                One is kind of personal

15  self-improvement and religious

16  observeness, so would include things like

17  fasting in the holy month of Ramadan or

18  going on the pilgrimage of the Hajj or

19  other things that are about religious

20  observance or being a good person and that

21  is typically referred to as the greater

22  Jihad.

23                That personal improvement is

24  typically referred to as the greater

25  Jihad, which we can all kind of identify

Page 365

```
 1                    LEVITT
 2   its internal workings of formally passing
 3   it over to OFAC.
 4       Q.        You reviewed and approved it
 5   before you initialed it, correct?
 6       A.        Yes.
 7       Q.        Were you aware at the time that
 8   you prepared your report that this
 9   document had been produced in the
10   litigation?
11       A.        Yes.
12       Q.        And you reviewed it and relied
13   on it but did not cite it in your report,
14   is that correct?
15                 MR. HAEFELE:  Object to form.
16       A.        I did not use it in my report
17   because it seemed kind of inappropriate
18   for the document that had my name on it.
19                 So I just, you know, I relied
20   on the other material, I think I included
21   the press release and the IIRO
22   designation.
23                 It just seemed a little --
24   like it would be a little strange.
25       Q.        I'd like to direct your
```

Page 479

```
 1                      LEVITT
 2   excluded anything.
 3               For the purpose of my limited
 4   report, I included the part that was
 5   relevant to my report.
 6      Q.        Which was the part about
 7   militant Jihad as opposed to peaceful
 8   solution to the Kashmir problem, correct?
 9      A.        My report is not about the
10   Kashmir problem.
11               The report --  if a person in
12   one point says let's be peaceful and in
13   another says or talks about militancy, the
14   one doesn't, you know, nullify the other.
15               What's interesting is the
16   promotion or discussion of militancy.
17               We should be able to take for
18   granted when people say talk peacefully.
19               So that's why one stands out as
20   being relevant for the purpose of my
21   report and the other does not, not to
22   exclude it, but the report, I don't want
23   this report to be 500 pages long.
24               And so the question is, has a
25   WAMY official made a statement like this,
```

```
 1                    LEVITT
 2   relationships, particular financial
 3   relationships, with entities tied to Al
 4   Qaeda.
 5        Q.        In your report, getting back to
 6   page 29 --
 7        A.        I can barely hear you, I think
 8   maybe you've turned away from the
 9   microphone, I can't see because there is a
10   document up.
11        Q.        Can you hear me now?
12        A.        Yes.
13        Q.        In your report, page 29, third
14   sentence of the second paragraph after the
15   quoted paragraph, you report reads, "The
16   CRA found that WAMY provided thousands of
17   dollars to U.N.-sanctioned Benevolence
18   International Foundation, BIF."
19                  Do you see that sentence?
20        A.        Yes.
21        Q.        Would you agree that, as the
22   Canadian Revenue Authority report reads,
23   the finding was as to WAMY Canada, not
24   WAMY (Saudi Arabia)?
25        A.        This is the WAMY in Canada,
```

Page 501

```
 1              LEVITT
 2   that's the entity over which the CRA had
 3   jurisdiction here.
 4        Q.      And you also talk about in your
 5   report the CRA noting that there had been
 6   "adverse reporting" with respect to WAMY
 7   and WAMY (Saudi Arabia), do you recall
 8   that portion of your report?
 9        A.      I think you're completing two
10   sentences, the last two sentences --
11        Q.      The last sentence, "The CRA
12   report went on to list examples of
13   'adverse reporting' on WAMY and its
14   affiliates, linking the groups to
15   terrorist organizations," that's the
16   sentence I'm referring to.
17        A.      Okay.
18        Q.      That adverse reporting that --
19        A.      Sorry, I can't hear you again.
20        Q.      The adverse reporting that
21   you're referring to, that appears at Bates
22   stamp 218181 of Exhibit 2024, if we can
23   pull that up, please.
24              There are a number of different
25   reports; I'm just asking you, Dr. Levitt,
```

Page 502

```
 1                    LEVITT
 2    did you ever do anything independently to
 3    verify or confirm any of the allegations
 4    in any of the reports?
 5         A.      I did not.
 6         Q.      Whether or not the reported
 7    incidents are reliable or accurate, you
 8    can't say one way or the other because you
 9    never did anything to confirm that
10    yourself, would you agree?
11                 MR. HAEFELE:  Objection to
12    form.
13         A.      I wouldn't quite put it that
14    way.
15                 By virtue of knowing CRA and
16    having had interactions with them, I
17    understand how thorough they are.
18                 Reports like these, including
19    media reports, which typically will be
20    used in reports like this just because
21    it's easier to cite to them than to
22    classified sources that might get to the
23    same reporting, are very, very careful.
24                 Actions like this by the CRA
25    are not common, so for the CRA to include
```

Page 503

```
 1                    LEVITT
 2   this type of information in a report, for
 3   them to have a report like this at all, is
 4   quite significant, I think.
 5       Q.        Let's see how significant it
 6   is.
 7                 The first bullet on 218181
 8   talks about a July 29, 2006, edition of
 9   the Indian Express.
10       A.        It is the last bullet on the
11   page?
12       Q.        First bullet of the sequence.
13       A.        The last bullet, the full
14   paragraph on page 922, it starts "the July
15   29, 2006," if I'm understanding you
16   correctly.
17       Q.        Do you know anything about the
18   Indian Express?
19       A.        No.
20       Q.        Do you know their journalistic
21   standards?
22       A.        No, I have an understanding of
23   the standards of the CRA --
24       Q.        That's not what I'm asking you.
25       A.        It's relevant as explained; I
```

Page 504

1                     LEVITT

2     don't think I need to know the standards

3     of the Indian Express when I know the CRA,

4     and as I said, there might be reasons why

5     they would cite to something public, that

6     doesn't mean the Indian Express is the

7     ultimate foundational report for this

8     claim.

9          Q.     Just answer my questions.

10         A.     I think I am.

11         Q.     Do you know who wrote this

12    article?

13         A.     No.

14         Q.     Going to the next page, 218182,

15    the first bullet, please highlight that.

16                Do you know the Jamestown

17    Foundation's Terrorism Monitor?

18                MR. HAEFELE:   Objection.

19         A.     I do.

20         Q.     Do you have independent

21    knowledge of this October 2005 report?

22         A.     The Terrorism Monitor is

23    available on-line.

24                I don't recall the last time I

25    looked this up, but it's there for anybody

Page 505

```
 1                    LEVITT
 2   to look at, I probably have.
 3       Q.     Do you know who authored that
 4   one, that bullet cited?
 5       A.     The bullet or cited article?
 6       Q.     I'm sorry, I asked the question
 7   poorly.
 8              The article cited in this
 9   bullet point, do you know who authored
10   that?
11       A.     Not offhand, we could show the
12   footnote if you wanted, the actual
13   footnote 27, and we could then see if it
14   says who it is and I can tell you if I
15   know who that is.
16       Q.     What it says is I guess a
17   Steven Schwartz, 2005; do you know Steven
18   Schwartz?
19       A.     I don't think I do.
20       Q.     And then if we can go to the
21   last bullet, this is -- of this section,
22   218183, part of the adverse reporting that
23   the CRA cites is testimony by terrorism
24   consultants and analysts Matthew Epstein
25   and Evan Kohlmann.
```

```
                                        Page 512
 1                  LEVITT
 2   I couldn't hear you.
 3        A.      Middle Eastern terrorism, 911
 4   specifically, terrorist charity.
 5        Q.      Do you have any other areas of
 6   expertise that you're not using in this
 7   case?
 8        A.      I think another one that we
 9   could mention is what I think is obvious,
10   the issue of illicit finance and
11   sanctions.
12              I have been qualified in issues
13   related to Iran and the
14   Israeli-Palestinian arena, maybe that
15   describes the subsets of the larger issue,
16   and U.S. policy towards the Middle East
17   more broadly.
18        Q.      Do your two expert reports
19   contain all the opinions that you have for
20   purposes of this case?
21        A.      Yes.
22        Q.      I want to direct your attention
23   to your expert rebuttal report, if you can
24   take a look at that, and this is Exhibit
25   2005.
```

Page 576

1

2        C E R T I F I C A T I O N

3

4

5

6      I, Jineen Pavesi, a Registered

7    Professional Reporter, Registered Merit

8    Reporter, Certified Realtime Reporter and

9    a Notary Public, do hereby certify that

10    the foregoing witness, MATTHEW A. LEVITT,

11    was duly sworn on the date indicated, and

12    that the foregoing is a true and accurate

13    transcription of my stenographic notes.

14      I further certify that I am not employed

15    by nor related to any party to this

16    action.

17

18

19    *Jineen Pavesi, RPR, RMR*

JINEEN PAVESI, RPR, RMR, CRR

20

21

22

23

24

25