EXHIBIT 35

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | | |
|---|---|---|
| In Re Terrorists Attacks on September 11, 2001 | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   03 MDL 1570 |
| | ) | |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                        MATTHEW A. LEVITT
In care of: General Counsel, Dept. of the Treasury, 1500 Pennsylvania Ave., NW, Washington, DC 20220
_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_ **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Attachment A.

| Place: Cozen O'Connor, 1200 19th Street, NW Washington, DC 20036 (202) 912-4800 | Date and Time: 09/18/2019 10:00 am |
|---|---|

The deposition will be recorded by this method:     Stenographer and videographer

❐ _Production:_ You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     06/28/2019

_CLERK OF COURT_

OR

_____                    _____
_Signature of Clerk or Deputy Clerk_                         _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_     Plaintiffs'
Executive Committees                                          , who issues or requests this subpoena, are:

Sean Carter, Cozen O'Connor, 1650 Market St., 28th Fl., Phila., PA 19103; 215-665-2105; scarter1@cozen.com
Robert Haefele, Motley Rice, 28 Bridgeside Blvd., Mt. Pleasant, SC 29464; 843-216-9184; rhaefele@motleyrice.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 03 MDL 1570

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

□  I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

□  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
  (i) is a party or a party's officer; or
  (ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
 (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
 (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

 (A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

  (i) fails to allow a reasonable time to comply;
  (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
  (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  (iv) subjects a person to undue burden.
 (B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  (i) disclosing a trade secret or other confidential research, development, or commercial information; or
  (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
 (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
 (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
 (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  (i) expressly make the claim; and
  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

I.     **Foundational Topics**

The following are areas of inquiry that Plaintiffs intend to pursue through testimony of the U.S. Department of the Treasury witness:

(a)     The Kingdom of Saudi Arabia was the "epicenter" of terrorist financing prior to the attacks of September 11, 2001.

(b)     The role of Saudi proselytizing organizations in supporting the jihad against the Soviet Union's invasion and occupation of Afghanistan.

(c)     Makhtab al Kihdmat.

(d)     The roles of Osama bin Laden and Abdullah Azzam in the jihad against the Soviet Union's invasion and occupation of Afghanistan.

(e)     The role of Osama bin Laden and Abdullah Azzam in the establishment of al Qaeda at the conclusion of the Soviet-Afghan conflict.

(f)     Objectives in establishing al Qaeda.

(g)     Evidence concerning the formation of al Qaeda, including but not limited to the participants, organizations, meeting attendees, and attendees' organizational affiliations ("Tareekh Osama" or "Osama's History").

(h)     Osama bin Laden's adaptation of the Afghan jihad infrastructure to support al Qaeda.

(i)     The role of Saudi proselytizing organizations in the funding and sponsorship of al Qaeda.

(j)     The funding required to sustain al Qaeda prior to the attacks of September 11, 2001.

(k)     Al Qaeda's relationship with the Taliban (1996-2001).

(l)     Al Qaeda subsidies and payments to the Taliban (1996-2001).

(m)     Taliban support for Osama bin Laden and al Qaeda.

(n)     Funding and resources needed by Osama bin Laden and al Qaeda to carry out terrorist attacks like the September 11, 2001 attacks.

(o)     Al Qaeda's efforts to extend its sphere of influence around the globe through like-minded organizations, including but not limited to Abu Sayyef Group, Jemaah Islamiyah, Moro Islamic Liberation Front (MILF), Lashkar-e-Taiba, Hamas, Palestinian Islamic Jihad, Al Itihaad Al Islamiyah (AIAI), Hizb-ul-Mujahideen,

Students' Islamic Movement of India ("SIMI"), Harakat ul Mujahideen, and Islamic Army of Aden.

(p)     Efforts by the Kingdom of Saudi Arabia to propagate Wahhabi Islam around the globe.

(q)     Ideological linkages between Wahhabi Islam and al Qaeda.

(r)     The roles of Saudi proselytizing organizations in supporting the Kingdom of Saudi Arabia's efforts to propagate Wahhabi Islam around the globe.

(s)     International resources associated with, and used by, Osama bin Laden and al Qaeda.

(t)     International supporters' resources associated with, and used by, Osama bin Laden and al Qaeda.

(u)     Banking and financial structures used by Osama bin Laden and al Qaeda.

(v)     Banking and financial accounts used by Osama bin Laden and al Qaeda.

(w)     Hawala networks used by Osama bin Laden and al Qaeda.

(x)     Corporate entities associated with Osama bin Laden and al Qaeda members and their use in support of al Qaeda.

(y)     The relationship between Saudi proselytizing organizations and the government of the Kingdom of Saudi Arabia.

(z)     The process for listing individuals as Specially Designated Global Terrorists ("SDGTs") under Executive Order 13224.

(aa)    The criteria for listing individuals as Specially Designated Global Terrorists ("SDGTs") under Executive Order 13224.

(bb)    The remedies available to an individual seeking to challenge his listing as a Specially Designated Global Terrorists ("SDGTs") under Executive Order 13224.

(cc)    The alternatives to listing under Executive Order 13224 available to the United States.

(dd)    The process and criteria for de-listing persons under Executive Order 13224.

## II.  Muslim World League ("MWL") and International Islamic Relief Organization ("IIRO")

The following areas, (a) through (f), are areas of inquiry that Plaintiffs intend to pursue through testimony of the U.S. Department of the Treasury witness, and area (g) is added at the request of the MWL and IIRO:

(a)     Factual and evidentiary predicate for the Treasury Department's August 3, 2006 Executive Order 13224 designations of the International Islamic Relief Organization's branch offices in the Philippines and Indonesia and Abd al Hamid Sulaiman al Mujil, a senior IIRO official in Saudi Arabia, "for facilitating fundraising for al Qaida and affiliated terrorist groups."

(b)     Factual and evidentiary predicate for the statement by Stuart A. Levey, Treasury Department Undersecretary for Terrorism and Financial Intelligence, in support of the Treasury Department's August 3, 2006 Executive Order 13224 designations of the IIRO's branch offices in the Philippines and Indonesia and Abd Al Hamid Sulaiman al Mujil:  "Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia.  Al Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes."

(c)     Factual and evidentiary predicate for the Treasury Department's Memorandum for Barbara Hammerle concerning the Executive Order 13224 designations of the International Islamic Relief Organization's branch offices in the Philippines and Indonesia and Abd al Hamid Sulaiman al Mujil, authored by Matthew A. Levitt, Deputy Assistant Secretary, Office of Intelligence & Analysis.

(d)     Factual and evidentiary predicate for the following statement in Juan C. Zarate's book, *Treasury's War, The Unleashing of a New Era of Financial Warfare*, at p. 69:  "Many of the Wahhabi institutions funded out of Saudi Arabia served as way stations for Al Qaeda operatives and fundraising.  Distinguishing between some of the international Wahhabi organizations and terrorist support networks was nearly impossible, especially when support for Al Qaeda and support for spreading Wahhabi beliefs seemed to blend together so seamlessly.  This was true in the work of some of the branches of Saudi-based institutions, such as the International Islamic Relief Organization (IIRO)."

(e)     Factual and evidentiary predicate for the testimony provided by Stuart A. Levey, Treasury Department Undersecretary for Terrorism and Financial Intelligence, before the U.S. Senate Committee on Banking, Housing, and Urban Affairs (July 13, 2005):  "The Committee is also well aware that the challenges posed by terrorist financing from within Saudi Arabia are among the most daunting we have faced. Wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda.  Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq.  Saudi Arabia-based and funded organizations

remain a key source for the promotion of ideologies used by terrorists and violent extremists around the world to justify their hate-filled agenda." "Saudi Arabian charities, particularly the International Islamic Relief Organization (IIRO), the World Association of Muslim Youth (WAMY), and the Muslim World League (MWL) continue to cause us concern."

(f)     Facts and evidence relating to the Treasury Department's terrorism investigations, analyses, and assessments of other non-designated branch offices and entities of the International Islamic Relief Organization concerning their links to al Qaeda, including but not limited to IIRO's branch offices in Pakistan and Afghanistan, the UHUD Hospital (Queta, Pakistan), and the Fatima al Zahra Hospital (Jalalabad, Afghanistan).

(g)     The Treasury Department's de-listing, on August 16, 2016, of the International Islamic Relief Organization's branch offices in the Philippines and Indonesia under Executive Order 13224.

## III.    <u>Al Haramain Islamic Foundation</u>

The following are areas of inquiry that Plaintiffs intend to pursue through testimony of the U.S. Department of the Treasury witness:

(a)     Factual and evidentiary predicate for the Treasury Department's March 11, 2002 Executive Order 13224 designations of the Al Haramain Islamic Foundation's branch offices in Somalia and Bosnia-Herzegovina for "supporting terrorist activities and terrorist organizations such as al-Qaida, AIAI (al-Itihaad al-Islamiya), and others."

(b)     Factual and evidentiary predicate for the Treasury Department's January 22, 2004 Executive Order 13224 designations of the Al Haramain Islamic Foundation's branch offices in Indonesia, Kenya, Tanzania, and Pakistan for providing "financial, material and logistical support to the al-Qaida network and other terrorist organizations."

(c)     Factual and evidentiary predicate for the Treasury Department's June 2, 2004 Executive Order 13224 designations of the Al Haramain Islamic Foundation's branch offices in Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands "for the financial material and logistical support they provided to the al-Qaida network and other terrorist organizations."

(d)     Factual and evidentiary predicate for the Treasury Department's June 2, 2004 Executive Order 13224 designation of the Al Haramain Islamic Foundation's founder and long-time leader, Aqeel Abdelaziz al Aqil. "Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network."

(e)    Factual and evidentiary predicate for the Treasury Department's Memorandum for Richard R. Newcomb concerning the Executive Order 13224 designations of the Al Haramain Islamic Foundation's branch offices in Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands, and Aqeel Abdelaziz al Aqil.

(f)    Factual and evidentiary predicate for the Treasury Department's September 9, 2004 Executive Order 13224 designations of the Al Haramain Islamic Foundation's branch offices in the United States and Union of the Comoros.

(g)    Factual and evidentiary predicate for the Treasury Department's September 9, 2004 Executive Order 13224 designation Al Haramain Islamic Foundation official, Soliman al Buthe.

(h)    Factual and evidentiary predicate for the statement by Stuart A. Levey, Treasury Department Undersecretary for Terrorism and Financial Intelligence, in support of the Treasury Department's September 9, 2004 Executive Order 13224 designations of the Al Haramain Islamic Foundation's branch offices in the United States and Union of the Comoros, and Soliman al Buthe: "We continue to use all relevant powers of the U.S. government to pursue and identify the channels of terrorist financing, such as corrupted charities, at home and abroad. Al Haramain has been used around the world to underwrite terror, therefore we have taken this action to excommunicate these two branches and Suliman Al-Buthe from the worldwide financial community."

(i)    Factual and evidentiary predicate for the Treasury Department's June 19, 2008 Executive Order 13224 designation of the entirety of the Al Haramain Islamic Foundation organization, including Al Haramain's headquarters in Saudi Arabia.

## IV.   **Wa'el Hamza Jelaidan**

The following are areas of inquiry that Plaintiffs intend to pursue through testimony of the U.S. Department of the Treasury witness:

(a)    Factual and evidentiary predicate for the Treasury Department's September 6, 2002 Executive Order 13224 designation of Wa'el Hamza Jelaidan, "an associate of Usama bin Laden and a supporter of al-Qa'ida terror," and the "head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network."

(b)    Facts and evidence relating to the Treasury Department's terrorism investigations, analyses, and assessments concerning Wa'el Hamza Jelaidan's links to al Qaeda, Islamic extremists, militants, and jihadists, including but not limited to, Jelaidan's relationship with Basit al Madani and Ahmad bin Halifa who traveled to Afghanistan in 2000 to meet with Osama bin Laden on behalf of Jelaidan and the International Islamic Relief Organization.

## V.    Rabita Trust

The following are areas of inquiry that Plaintiffs intend to pursue through testimony of the U.S. Department of the Treasury witness:

(a)    Factual and evidentiary predicate for the Treasury Department's October 12, 2001 Executive Order 13224 designation of Rabita Trust "for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida."

## VI.    Yassin Abdullah Kadi

The following areas, (a) and (b), are areas of inquiry that Plaintiffs intend to pursue through testimony of the U.S. Department of the Treasury witness, and areas (c) and (d) are added at the request of Yassin Abdullah Kadi:

(a)    Factual and evidentiary predicate for the Treasury Department's October 12, 2001 Executive Order 13224 designation of Yassin Abdullah Kadi.

(b)    Factual and evidentiary predicate for the Treasury Department's Memorandum for Richard R. Newcomb concerning the Executive Order 13224 designation of Yassin Abdullah Kadi for being "a financial supporter of Usama bin Laden and other known Islamic extremists for nearly a decade."

(c)    All information pertaining to the de-listing of Yassin Abdullah Kadi.

(d)    All facts and evidence possessed by the Treasury Department pertaining to Yassin Abdullah Kadi.

## VII.    World Assembly of Muslim Youth-Saudi Arabia and World Assembly of Muslim Youth-International ("WAMY"), and Benevolence International Foundation ("BIF")

The following areas, (a) through (c), are areas of inquiry that Plaintiffs intend to pursue through testimony of the U.S. Department of the Treasury witness, and areas (d) through (f) are added at the request of WAMY:

(a)    Factual and evidentiary predicate for the Treasury Department's November 19, 2002 Executive Order 13224 designations of Benevolence International Foundation, Benevolence International Fund (Canada), and Bosanka Idealna Futura (Bosnia) as "financiers of terrorism."

(b)    Facts and evidence relating to the Treasury Department's terrorism investigations, analyses, and assessments concerning the World Assembly of Muslim Youth's relationship with the Benevolence International Foundation, including but not limited to the transfer of funds between the organizations.

(c)    Facts and evidence relating to the Treasury Department's terrorism investigations, analyses, and assessments concerning the World Assembly of Muslim Youth's links to al Qaeda, Islamic extremists, militants, and jihadists.

6

(d)     Facts and evidence relating to any investigations by the Treasury Department concerning WAMY.

(e)     Facts and evidence relating to the Treasury Department's investigations, analyses, and assessments concerning WAMY's lack of relationship with or connection to any individuals or entities who Plaintiffs may deem as "Islamic extremists, militants, and jihadists," including but not limited to Benevolence International Foundation, al Qaeda, and any individuals or entities designated by the Treasury Department under Executive Order 13224 (the "Executive Order").

(f)     Facts and evidence relating to the Treasury Department's investigations, analyses, and assessments concerning its non-designation of WAMY pursuant to Executive Order.

LEGAL\41715228\1

## AFFIDAVIT OF J. SCOTT TARBUTTON

I, J. Scott Tarbutton affirm, under penalty of perjury, as follows:

1.      I am liaison counsel to the Plaintiffs' Executive Committees ("PECs") in the consolidated multidistrict litigation proceeding *In re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (SDNY) (GBD) (SN) (the "September 11th Terrorism MDL"). I submit this Affidavit pursuant to 31 CFR §1.11(d)(3)(i), in support of the subpoena issued by plaintiffs in the September 11th Terrorism MDL to the United States Department of the Treasury.

2.      Title of the Action. As set forth above, the title of the legal proceeding in which the subpoena has issued is *In re: Terrorist Attacks of September 11, 2001*, 03 MDL 1570 (SDNY) (GBD) (SN).

3.      The Forum. Judge George B. Daniels of the United States District Court for the Southern District of New York is presiding over the pre-trial proceedings in the September 11th Terrorism MDL. Judge Daniels has referred certain pre-trial matters to Magistrate Judge Sarah Netburn.

4.      The Plaintiffs' Interest in the Proceeding. The subpoena directed to the Department of the Treasury is issued on behalf of plaintiffs in the September 11th Terrorism MDL. Those plaintiffs include thousands of surviving family members of individuals killed in the September 11th attacks; thousands of individuals who were seriously injured by those attacks; and commercial interests that suffered billions of dollars in property damage and economic losses as a result of the attacks (collectively "the 9/11 plaintiffs"). Generally, the 9/11 plaintiffs' complaints assert claims against individuals, organizations, and/or foreign states that are alleged to have provided material support or resources to al Qaeda.

5.     <u>The Reason for the Subpoena</u>.  The subpoena demands deposition testimony from former officials of the Department of the Treasury concerning al Qaeda's origins and financial and material support infrastructure, and the following individuals and organizations:  (a) Osama bin Laden; (b) al Qaeda; (c) Muslim World League ("MWL"); (d) International Islamic Relief Organization ("IIRO"); (e) Abd al Hamid Sulaiman al Mujil; (f) Al Haramain Islamic Foundation ("AHIF"); (g) Aqeel Abdelaziz al Aqeel; (h) Soliman al Buthe; (i) Wa'el Hamza Jelaidan; (j) Rabita Trust; (k) Yassin Abdullah Kadi; (l) World Assembly of Muslim Youth ("WAMY"); and (m) Benevolence International Foundation ("BIF").  Complaints from the September 11th Terrorism MDL containing representative allegations referring or relating to these issues, individuals and/or organizations include:  the *Federal Insurance* Complaint at ECF No. 772 (Case No. 1:03-cv-06978); the *Burnett* Complaint at ECF No. 29 (Case No. 1:02-cv-01616 (D.D.C.)) and ECF No. 1377 (Case No. 03-cv-9849 (S.D.N.Y.)); and the *Ashton* Complaint at ECF No. 111 (Case No. 1:02-cv-06977).

6.     <u>Osama bin Laden and Al Qaeda</u>.  Following the attacks of September 11, 2001, the Department of the Treasury has undertaken actions to disrupt the fundraising and support networks of Specially Designated Global Terrorists ("SDGT") Osama bin Laden and al Qaeda, including the network of ostensible charitable organizations responsible for establishing the financial and logistical infrastructure to support al Qaeda following the Soviet Union's invasion and occupation of Afghanistan.  *See e.g.* "Additional Background Information on Charities Designated Under Executive Order 13224," Section on Makhtab al Kihdmat, United States Department of the Treasury, available at https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-i.aspx#makhtab.

7.     <u>Muslim World League ("MWL")</u>.  On July 13, 2005, Stuart A. Levey, the Department of Treasury Under Secretary for Terrorism and Financial Intelligence, appeared before the Senate Committee on Banking, Housing, and Urban Affairs to speak "about terrorist financing and money laundering in the Middle East.  I welcome this committee's ongoing focus on this pressing topic, and your dedication to help stop the flow of funds to our nation's enemies."  In his prepared testimony, Mr. Levey stated that "Saudi Arabian charities, particularly the International Islamic Relief Organization (IIRO), the World Association of Muslim Youth (WAMY), and the Muslim World League (MWL) continue to cause us concern."  *See* July 13, 2005 Testimony of Stuart Levey at Exhibit 1.

8.     <u>International Islamic Relief Organization and Abd al Sulaiman al Mujil</u>.  On August 3, 2006, the Department of Treasury designated the IIRO's branch offices in the Philippines and Indonesia "for facilitating fundraising for al Qaida and affiliated terrorist groups," and additionally designated Abd al Hamid Sulaiman al Mujil, "the Executive Director of the Eastern Province branch office of the IIRO in the Kingdom of Saudi Arabia."  *See* August 3, 2006 Press Release at Exhibit 2 ("Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia.  Al-Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes.").

9.     <u>Al Haramain Islamic Foundation ("AHIF"), Aqeel al Aqeel, and Soliman al Buthe</u>.  Pursuant to Executive Order 13224, between 2002-2004, the Department of Treasury designated thirteen AHIF branch offices operating in Afghanistan, Albania, Bangladesh, Bosnia & Herzegovina, Comoros Islands, Ethiopia, Indonesia, Kenya, Netherlands, Pakistan, Somalia, Tanzania, and the United States, for "providing financial and materials support to al Qaida, as

3

well as a wide range of designated terrorists and terrorist organizations." *See* June 19, 2008
Press Release at Exhibit 3.  The Department of Treasury also designated AHIF officials Aqeel al
Aqeel and Soliman al Buthe pursuant to Executive Order 13224.  *See* June 2, 2004 Press Release
at Exhibit 4 ("When viewed as a single entity, AHF is one of the principal Islamic NGOs
providing support for the al Qaida network and promoting militant Islamic doctrine worldwide.
Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating
throughout Africa, Asia, Europe and North America appeared to be providing financial and
material support to the al Qaida network.").  *See also* September 9, 2004 Press Release at Exhibit
5 (Al Buthe used AHIF "to underwrite terror.").  In 2008, the Department of Treasury designated
"the entirety of the AHF organization, including its headquarters in Saudi Arabia," for
"providing financial and logistical support to the al Qaida network and other terrorist
organizations designated by the United States and the United Nations." *See* Exhibit 3.

     10.    <u>Wa'el Hamza Jelaidan</u>.  On September 6, 2002 the Department of Treasury
designated Wa'el Jelaidan as a Specially Designated Global Terrorist ("SDGT") and "an
associate of Usama bin Laden and a supporter of al-Qa'ida terror." *See* September 6, 2002 Press
Release at Exhibit 6 ("Usama bin Laden and a top al-Qai'da lieutenant, Abu Zubaida, have
acknowledged Wa'el Julaidan as a known associate of their operations.  Julaidan has been the
head of various non-governmental organizations providing financial and logistical support to the
al-Qa'ida network.").

     11.    <u>Rabita Trust</u>.  On October 12, 2001, the Department of Treasury designated
Rabita Trust as a Specially Designated Global Terrorist ("SDGT") "for its close ties to senior al
Qaida leadership and for providing logistical and financial support to al Qaida." *See* Exhibit 7.

12.     <u>Yassin Abdullah Kadi</u>.  According to a November 29, 2001 letter authored by
David D. Aufhauser, Treasury Department General Counsel, concerning the October 12, 2001
designation of Yassin al Kadi as a Specially Designated Global Terrorist ("SDGT"), "Kadi has a
long history of financing and facilitating the activities of terrorists and terrorist-related
organizations, often acting through seemingly legitimate charitable enterprises and businesses."
*See* Exhibit 8 (concluding that "[t]he pattern of activity displayed by Mr. Kadi, and his
foundation and businesses, is typical of the financial support network of Al Qa'ida and other
terrorist organizations.").

13.     <u>World Assembly of Muslim Youth ("WAMY")</u>.  During testimony before the
U.S. Senate Committee on Governmental Affairs on July 31, 2003, Senator Arlen Specter asked
R. Richard Newcomb, Director of the Treasury Department's Office of Foreign Assets Control
("OFAC") the following:  "Were there recommendations for sanctions against the World
Assembly of Muslim Youth?"  In response, Mr. Newcomb answered that "these are issues that
we looked at and examined very carefully."   Senator Specter further asked "what conclusions
did you come to on the World Assembly of Muslim Youth?"  Mr. Newcomb stated "[t]hat along
with the whole variety of charitable organizations operating head offices in Saudi are
organizations that we are looking at, as well as the whole range of several hundred or so possible
organizations that may be funding terrorist activities."  *See* excerpt of July 31, 2003 Hearing
before the Committee on Governmental Affairs at Exhibit 9, pp. 11-12.  *See also* July 13, 2005
Testimony of Stuart Levey concerning WAMY at Exhibit 1.

14.     <u>Benevolence International Foundation ("BIF")</u>.  On November 19, 2002, the
Department of Treasury designated BIF pursuant to Executive Order 13224.  *See* November 19,
2002 Press Release at Exhibit 10 ("Enaam Arnaout, BIF's Chief Executive Officer and a

member of the Board of Directors, recently was indicted in the United States for operating BIF as a racketeering enterprise and providing material support to organizations, including al Qaida, that are engaged in violent activities.").

15.     Showing That Evidence is Not Available From Another Source.  Given the nature of the Department of the Treasury's involvement in the actions and issues described above relating to the individuals and organizations at issue, the 9/11 plaintiffs do not believe that the information in the possession of the Department of the Treasury, or reasonably equivalent information, would be available from another source.

16.     Intended Use of Testimony.  The 9/11 plaintiffs intend to use the deposition testimony in support of their claims against the aforementioned defendant individuals and organizations in the September 11th Terrorism MDL.

17.     Summary of the Desired Testimony.   The 9/11 plaintiffs seek testimony concerning the Department of the Treasury's investigations, findings, and assessments concerning the issues and topics identified in the attachment to the subpoenas being served along with the present *Touhy* request, and concerning its investigations, findings, and assessments as to the aforementioned individuals and organizations; the bases for any applicable designations pursuant to Executive Order 13224; the imposition of any and all sanctions programs, economic or otherwise, in conjunction with any such designations pursuant to Executive Order 13224; and other issues and topics identified in the attachment to the relevant subpoenas.

18.     Showing That No Documents Can be Provided and Used in Lieu of Testimony. The 9/11 plaintiffs have submitted numerous requests for documents to the Department of the Treasury (Freedom of Information Act ("FOIA") and subpoena) since the commencement of the September 11th Terrorism MDL, seeking records relating to the aforementioned individuals and

organizations.  The limited documentation released by the Department of the Treasury in

response to the 9/11 plaintiffs' FOIA requests has been heavily redacted.  In addition, the

Department of the Treasury has indicated that searching for and processing the requested

documents would be burdensome.  *See* September 14, 2018 letter from Jeannette A. Vargas,

Assistant United States Attorney, to the MDL 1570 Plaintiffs' Executive Committees at 2.

Accordingly, the testimony of the former officials of the Department of the Treasury who were

intimately involved in the matters described in the attachment to the subpoenas is necessary.


Dated:  June 28, 2019

                                       J. Scott Tarbutton, Esq.
                                       COZEN O'CONNOR
                                       1650 Market Street, 28th Floor
                                       Philadelphia, PA  19103
                                       (215) 665-2000

LEGAL\41763233\1

7

Affidavit of J. Scott Tarbutton, Esq.

<u>Exhibit 1</u>



# DEPARTMENT OF THE TREASURY
## OFFICE OF PUBLIC AFFAIRS

EMBARGOED UNTIL 10:00 AM
July 13, 2005

Contact: Molly Millerwise
(202) 622-2960

### Testimony of Stuart Levey, Under Secretary
### Office of Terrorism and Financial Intelligence
### U.S. Department of the Treasury

### Before the Senate Committee on Banking, Housing, and Urban Affairs

Chairman Shelby, Ranking Member Sarbanes and other distinguished members of the Committee, thank you for the opportunity to speak before you today about terrorist financing and money laundering in the Middle East. I welcome this committee's ongoing focus on this pressing topic, and your dedication to help stop the flow of funds to our nation's enemies.

This hearing comes less than a week after the terrible attacks in London and I would like to express my sincerest condolences to the families of the victims. The brave resolve that the British people have shown resonated around the world in defiant response to cowards who seek to disrupt our very way of life. These acts of terror serve as a tragic reminder that our resolve to combat terrorism and terrorist financing must not waver.

As I approach the end of my first full year as Under Secretary of the Office of Terrorism and Financial Intelligence at the Treasury Department, I am constantly assessing our progress in the fight against the financing of terrorism. To be sure, we have achieved some important successes in this fight. We can point to multiple successes which reflect the excellent coordination and teamwork of all U.S. Government agencies over the past year. Thanks to the State Department's leadership and concerted work with us, we are witnessing a growing consensus in the world about the need to address terrorist financing in tangible ways. We have seen the culmination of a number of critical prosecutions investigated by the FBI-led Joint Terrorism Task Forces and prosecuted by the Department of Justice, as I will discuss later in this testimony. We at Treasury have designated numerous supporters of terrorism – including particularly significant figures such as Adel Batterjee – acting in close coordination with our interagency and international counterparts. We have used Section 311 of the USA PATRIOT Act judiciously and effectively against primary money laundering concerns, and we are seeing real results. One of the most promising developments is the President's issuance of Executive Order 13382, which applies the same methods we have used successfully to block assets of terrorist supporters to those who aid in the spread of weapons of mass destruction. Our other interagency partners – especially in the

intelligence community – are constantly working to stem the tide of terrorist financing, with little glory or recognition for their tireless efforts. Our collective drive to hold financial supporters of terror personally responsible as terrorists is creating the desired pressure and deterrence. In the end, we are starting to see encouraging results: terrorist groups like al Qaida and HAMAS are feeling the pinch and do not have the same easy access to funds that they once did.

Our most significant progress has been in bringing about a change in mind-set. There is now near-unanimous recognition among nations that terrorist financing and money laundering pose threats that cannot be ignored and there is widespread agreement upon a shared set of standards to combat these dangers. We will not accept the protest that ideological differences or bureaucratic obstacles excuse nations from the obligation to comply with global standards. As we were all brutally reminded by the attacks in London last week, we are facing a global threat with global implications. All civilized nations must meet their basic responsibilities to prevent the financing and support of terrorism.

At the same time, we recognize that the range of threats and institutional frameworks across different countries necessitates flexibility and a range of approaches. We cannot apply a "one size fits all" approach to terrorist financing, nor can or should we try to force countries to adopt a "U.S. model." So long as internationally-established principles are given real effect, in law and in practice, there is room for a variety of approaches. – Indeed, we learn from the successes and failures of others. Each country and institution presents unique challenges that require nuanced solutions.

The Middle East rightfully captures our attention at Treasury, and in the interagency community, as it is both a wellspring of and a target for terrorist financiers and those who spread extremist ideologies that justify and fuel terrorism.

Terrorism is increasingly targeted at innocents in the Middle East. Recent terrorist attacks in Turkey, Morocco, Saudi Arabia, Kuwait, and Qatar should be impetus to drive change throughout the region. Where the threat of terrorism does not generate the will to take effective action, however, my office, working in close cooperation with all of our interagency counterparts, will push for action.

It would not be feasible to include a complete catalogue in this testimony of all of our engagements in multilateral forums and bilateral discussions with respect to terrorist financing in the Middle East. Instead, I would like to try give the Committee a general description and some examples that show how we are simultaneously (1) driving the adoption and implementation of common global standards to prevent terrorist financing and money laundering, and (2) pressing individual countries and the private sector to do more to combat the terrorist threat we all face.

## COMMON APPROACHES

In our common approach to the Middle East, one important objective is to persuade each country to attach the necessary priority to anti-money laundering and counter-terrorist financing. This is not only important from an enforcement perspective, but also a prerequisite for any country looking to attract international business and investment. For the most part, countries are

increasingly recognizing this and looking to comply with global standards and reassure international businesses and investors.

I made a trip to Libya last month, representing the highest level delegation to visit that country since the lifting of sanctions eleven months ago.  While there, I met with Colonel Qadhafi, the Central Bank Governor, and the Minister of Finance and pressed Libya to adopt anti-money laundering and counter-terrorist financing reforms as it attempts to emerge from isolation and engage increasingly in the world's financial community.  The Libyan financial sector is in its infancy, but as it develops, I conveyed that the United States expects anti-money laundering and terrorist financing initiatives to be high on their agenda as part of an overall counterterrorism strategy.

We are also seeing that countries are responsive to the type of pressure that comes from international standard-setting bodies.  The Financial Action Task Force (FATF) sets the global standards for anti-money laundering and counter-terrorist financing, and it is also through this venue that we promote results.  Treasury, along with our counterparts at State, Justice, and Homeland Security, has taken an active role in this 33-member body which articulates international standards in the form of recommendations, guidelines, and best practices to aid countries in developing their own specific anti-money laundering and counter-terrorist financing laws and regulations.  FATF maintains the authority and has demonstrated its willingness to take collective actions against jurisdictions that pose a threat to the financial system.  We do our part to promote the multilateral effect of FATF standards through focused bilateral engagement.

As an example, I recently visited Turkey to speak with the Finance Minister, Justice Minister and several other high-level members of the Turkish government.  While Turkey is not part of what we generally refer to as the Middle East, its geographic location – bordering on Syria, Iran, and Iraq – makes it an important part of our strategy when we think about the threat of terrorism emanating from the Middle East.  Turkey has been a key NATO ally and has a long and painful history of fighting terrorism within its borders.   I expressed our appreciation for the close cooperation we have enjoyed with the Turkish government in combating terrorism and in many other areas.  However, as a FATF member since 1991, Turkey's current anti-money laundering and counter-terrorist financing regimes need significant improvement.  Turkey is looking to address these issues, and I encouraged Turkey to redouble its efforts to comply with FATF standards in advance of its mutual evaluation scheduled for early next year.  Turkey is too important a partner to us, and too important a regional power to let its anti-money laundering and counter-terrorist financing regimes fall out of step.  We look forward to seeing Turkey succeed in its reform efforts over the coming months.

Although not a member of FATF, Jordan, another regional ally, is working hard to bring its anti-money laundering and counter-terrorist financing practices up to international standards.  The government has submitted a new AML law to the Parliament, which may consider it in its extraordinary session this summer.  I visited Jordan this past February in large part to encourage them to pass this law and implement it as quickly as possible.  These steps will inure to their own economic benefit – bolstering the health and attractiveness of their financial sector – while also aiding in the global fight against terrorist financing.  Given Jordan's prominent role in the

financial sector of the West Bank and Gaza, these improvements are also important to reduce the potential for terrorist financing in those areas of strategic concern.

The success and force of FATF lie not only in the mutual evaluation process to which it holds its own members, but also in the emergence of FATF-style regional bodies (FSRBs) that agree to adopt FATF standards and model themselves accordingly on a regional level. The Middle East and North Africa body, or "MENA FATF" is one of the newest and potentially most effective organizations to emerge. Launched in November 2004, this 14-member body held its first plenary session in Bahrain in April 2005 and is preparing for its second plenary session in September of this year, currently scheduled to take place in Beirut. It remains too early to tell how effective MENA FATF will be, but the indications so far demonstrate considerable enthusiasm and energy. This body is already working on a process to assess its members for compliance with international standards and have formed working groups to address key issues like cash couriers, charities, and hawala. We support this initiative and hope that it will succeed on the difficult road that lies ahead of it.

The Egmont Group is an international body comprised of financial intelligence units (FIUs) across the globe. It is another example of a body that demands that its members comply with certain standards and maintain those standards over time. Treasury's Financial Crimes Enforcement Network is currently working closely with Saudi Arabia, Jordan, and Kuwait to develop their FIUs; we have seen some progress to date and are eager to see it develop further.

*Implementation*

Adoption of legislation and regulations is meaningless without strong and effective implementation. Some countries, eager to curry favor with their neighbors or the international community, may believe that adopting an anti-money laundering and counter-terrorist financing law will keep observers at bay. Such half-steps will neither fool nor satisfy the United States and the international community. We will continue to press for effective implementation, including investigations, prosecutions, designations, and other demonstrable actions.

*Private Sector*

Collective pressure to implement international standards has been effective in the drive to bring countries on board with anti-money laundering and counter-terrorist financing efforts. At the same time that we are pressing at the government level, though, we are also working with the international private sector. The potential, both for information exchange and for combating the flow of illicit funds, is enormous. As but one example, we have seen financial institutions in the Middle East and elsewhere voluntarily checking account holders and transactions against Treasury's list of designated entities, as well as other lists, and using that information to determine whether or not to take on business or process a transaction. This means that the rigorous efforts by Treasury and the U.S. Government to identify and isolate key sponsors of terrorism, as well as sponsors of weapons proliferation, are being given wide effect in private banks in the Middle East and the world.

We have also solicited the cooperation of some of the larger and more responsible financial institutions to advocate for reforms among their colleagues and in their various host countries. These institutions typically exhibit diligent anti-money laundering and terrorist financing practices even when their host countries do not require it. This puts these institutions at a competitive disadvantage vis-à-vis institutions that are less conscientious. Furthermore, these institutions are forced to take measures to protect themselves when doing business with financial institutions in countries with weak anti-money laundering and counter-terrorist financing regimes. We therefore believe that it is in the interest of more responsible institutions to create a momentum for reform among their colleagues, not just in the Middle East but worldwide.

## ALTERNATIVE FINANCING METHODS

One effect of U.S. and international action against terrorist financiers has been to push supporters of terrorism out of the formal financial system and into riskier, more expensive, and more cumbersome methods of raising and moving money, such as cash couriers, charities, and hawala. While this hearing is not focused on alternative financing methods, I wanted to give the Committee a brief overview of our work in these areas.

### *Charities*

Terrorist groups have long exploited charities for several key reasons, including the following:

- The "legitimate" activities of these charities, such as the operation of schools, religious institutions, and hospitals, can – if abused – create fertile recruitment grounds, allowing terrorists to generate support for their causes and to propagate extremist ideologies.

- Charities attract large numbers of unwitting donors along with the witting, thus increasing the amount of money available to terrorists.

- To the extent that these charities provide genuine relief, which nearly all of them do, they benefit from public support and an attendant disinclination by many governments to take enforcement action against them.

- Charitable funds are meant to move in one direction only; accordingly, large purported charitable transfers can move without a corresponding return of value and without arousing suspicion.

- International charities naturally focus their relief efforts on areas of conflict, also prime locations for terrorist networks. Such charities provide excellent cover for the movement of personnel and even military supplies to and from high-risk areas.

The U.S. Government has confronted this problem head on in a coordinated manner. We have thus far designated more than 40 charities worldwide as supporters of terrorism. Two notable examples are our actions against the U.S. branches of the Al Haramain Islamic Foundation and the Islamic African Relief Agency (IARA), both al Qaida-linked charities that were operating in the United States. In both cases, law enforcement agents executed search warrants while

Treasury's OFAC simultaneously blocked the organizations' assets, stopping the flow of money through these groups. Thanks to the work of the State Department, we have persuaded other nations to join us in bringing these and other charities to the United Nations Security Council for designation, and to shutter these dangerous organizations in their respective countries.

Designations and law enforcement actions are making an impact and are serving as a valuable deterrent. Anecdotal evidence suggests that once-willing donors are now thinking twice or balking altogether at sending money to terrorist groups. In this regard, I would note that one advantage we enjoy in the terrorist financing arena is the strength of deterrence – our targets have something to lose. In contrast to terrorist operatives who may be willing to die for their hateful cause, terrorist financiers typically live public lives with all that entails: property, occupation, family, and social position. Being publicly identified as a financier and supporter of terror threatens an end to all of this, lending our actions a real deterrent impact.

### *Hawala*

Hawala, a relationship-based system of money remittances, plays a prominent role in the financial systems of the Middle East. Domestically, we have worked with our interagency partners to ensure that money service businesses like hawalas, register with the Financial Crimes Enforcement Network and comply with applicable anti-money laundering provisions. On the one hand, we are reaching out to this sector to educate businesses about their legal obligations. Enforcement of the Patriot Act's criminal provisions against operating an unlicensed money service business also plays a key deterrent role. Just this week, an ICE investigation led to a guilty plea by an unlicensed money service business, who had sent millions of dollars to Syria and other countries. While we are making progress, the effective regulation of money service businesses continues to present a significant challenge. Internationally, Treasury leadership in the FATF has brought the issue of hawala to the forefront, resulting in the implementation of FATF Special Recommendation VI, which requires all FATF countries to ensure that individuals and entities providing money transmission services must be licensed or registered, and subjected to the international standards set out by FATF. Regionally, the UAE is playing a key leadership role on this issue. We will continue to insist that hawala be subjected to appropriate regulation and oversight.

### *Cash Couriers*

As governments apply stricter oversight and controls to banks, wire transmitters, and other traditional methods of moving money, we are witnessing terrorists and criminals resorting to bulk cash smuggling. FATF Special Recommendation IX was issued in late 2004 to address this problem and it calls upon countries to monitor for cross-border transportation of currency and to make sanctions available against those who make false declarations or disclosures in this regard. This recommendation has already prompted changes in legislation abroad. On the domestic front, Treasury is working with the interagency community, particularly the Department of Homeland Security's Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP), to deter, disrupt, and apprehend cash smugglers. We are also looking into technologies that will allow us to detect secreted concentrations of cash, as well as tools that will allow us to track the movement of physical cash around the world.

**CASE STUDIES**

*Syria*

As a serious national security threat and a state sponsor of terrorism, Syria has been the object of targeted Treasury action for some time. Syria continues to meddle in Lebanon's affairs, allows the Iraqi insurgency to be partially funded and fueled from within its borders, and allows terrorist organizations and supporters to flourish there as well. At Treasury, we are addressing this threat with a spectrum of targeted actions aimed at reversing this course.

On June 30, we designated Ghazi Kanaan, the current Syrian Minister of Interior, and Rustum Ghazali, the Chief of Syrian Military Intelligence for Lebanon pursuant to E.O. 13338 for their role in supporting Syria's military and security presence in Lebanon and support for terrorism. This was a very important first step at identifying high-level Syrian officials who are interfering in Lebanon's political developments. With respect to the Iraq insurgency, in January of this year, we designated the Syria-based supporter of Abu Mus'ab al-Zarqawi, Sulayman Darwish, pursuant to E.O. 13224 for acting as one of Zarqawi's operatives in Iraq and serving on his Advisory Council. The Syrian government joined us in co-designating this individual at the United Nations pursuant to UNSC 1267. On June 17, we designated Muhammad Yunis Ahmad, pursuant to E.O. 13315, for providing funding, leadership and support from his base in Syria to several insurgent groups that are conducting attacks in Iraq. We also designated the Syria-based SES International Corporation and two associated individuals, General Zuhayr Shalish and Asif Shalish pursuant to E.O. 13315 for their support to senior officials of the former Iraqi regime. SES acted as false end-user for the former Iraqi regime and facilitated Iraq's procurement of illicit military goods in contravention of UN sanctions. Finally, President Bush specifically designated Syria's Scientific Studies Research Center (SSRC) as one of the eight entities (the others were in North Korea and Iran) designated pursuant to the newly issued Executive Order 13382, which blocks the property of proliferators of weapons of mass destruction and their supporters. SSRC is the Syrian government agency responsible for developing and producing non-conventional weapons and the missiles to deliver them. While it has a civilian research function, SSRC's activities focus substantively on the acquisition of biological and chemical weapons.

Separately, in May of last year, we issued a proposed rule, designating the Commercial Bank of Syria (CBS) as a "primary money laundering concern," pursuant to Section 311 of the USA PATRIOT Act. The designation was premised on concerns about financial wrongdoing at that bank, including terrorist financing. In connection with the proposed rule, we presented a series of demands to Syrian authorities, ranging from reform of their banking sector to immediate, effective action to cut off the flow of funds across the Syrian border to the Iraqi insurgency.

We will continue to use the tools available to us to press Syria to take concrete actions to address our concerns.

*Saudi Arabia*

We have pursued a strategy of sustained pressure and cooperation with Saudi Arabia to address a number of challenges. This Committee is by now well aware that Saudi Arabia has increased its counter-terrorism cooperation since the Riyadh bombings in May 2003, marked by ever more intense Saudi efforts to confront directly violent extremism in the Kingdom. The Committee is also well aware that the challenges posed by terrorist financing from within Saudi Arabia are among the most daunting we have faced. Wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda. Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq.

Saudi Arabia-based and funded organizations remain a key source for the promotion of ideologies used by terrorists and violent extremists around the world to justify their hate-filled agenda. The Saudi government has taken seriously the threats posed to both the Kingdom and the United States by all of these issues, and we have worked with and offered guidance to help confront the real threat of terrorist support. As a result, among other things, the Kingdom has made changes to its charitable system and regulations to address certain vulnerabilities. This progress is the result of focused interagency attention and cooperation, led by Homeland Security and Counterterrorism Advisor Frances Fragos Townsend's consistent and direct outreach.

However, Saudi Arabian charities, particularly the International Islamic Relief Organization (IIRO), the World Association of Muslim Youth (WAMY), and the Muslim World League (MWL) continue to cause us concern. The Kingdom of Saudi Arabia announced that it would freeze all international transfers until it had established an oversight commission to regulate its charitable sector. While that would represent a satisfactory short-term solution if implemented fully, it is important that the announced commission take shape. As we have stated previously to our Saudi counterparts, these three charities must fall under the commission's oversight. I recently conveyed my views on these issues to Saudi officials, and was met with positive indications that they wish to redress these lingering concerns. I will keep this Committee informed of progress in this area.

At the same time, it must be noted that there have been real and tangible improvements in Saudi Arabia's cooperation on terrorism financing issues. Through the Joint Terrorist Financing Task Force (JTFTF), we have built the foundation for consequential and timely information exchange as well as selected joint action. We expect to continue building on the initial success of the JTFTF and look forward to broadening the cooperation in that area. In fact, the preliminary success of the JTFTF has prompted us to consider applying a similar model to our efforts elsewhere in the Gulf.

Our work on cash couriers offers another example of the need for continuing work with Saudi Arabia. Cash couriers present a serious danger, particularly because of their use to fund the deadly insurgency in Iraq. It is critical that Saudi Arabia and other Gulf countries lower reporting thresholds for cross-border transfers of cash and enforce these provisions aggressively. We intend to work with Saudi Arabia and others in the Gulf to pursue that goal.

*Palestinian Territories*

With respect to the Palestinian territories, we continue to grapple with the problem of charities being abused to support terrorism. Groups such as HAMAS, Palestinian Islamic Jihad (PIJ), and others have infiltrated the charitable sector in the territories and have corrupted badly needed relief organizations. We have been very aggressive in acting against such charities. Most recently, Treasury designated a PIJ charitable front, the Elehssan Society on May 4. The Elehssan Society served as the fund-raising arm of PIJ in Gaza and the West Bank and distributed funds to the families of PIJ prisoners and suicide bombers. Just this February, PIJ claimed responsibility for a terrorist attack in Tel-Aviv that killed five and wounded over 50. We will continue to pursue this organization and any that rise up to take its place. The Justice Department has played a vital role in this arena. In April, for example, the Department of Justice secured the conviction of three brothers linked to the Holy Land Foundation for their conduct in concealing the continuing ownership interests of Hamas leader Mousa Abu Marzook in their closely-held private company.

We recognize that enforcement actions have sometimes cut off sources of relief to communities in need and inadvertently decreased the support of charities and donors that deliver funds to legitimate causes. Our goal is not to deter charitable giving but instead to protect the charitable sector such that donors' generosity is not abused and they feel safe in providing their contributions. Therefore, there is therefore a particularly urgent need in this region for safe channels of assistance that donors can be assured will not be subverted by terrorists. When I traveled to the region in February, I discussed this problem with both Israeli and Palestinian officials. In speaking with President Abbas and in several follow-up meetings with Finance Minister Fayyad, I noted serious commitment on their part to cutting off the flow of funds to terrorism, and welcomed the message they expressed that responsibility for accountable financial systems begins with the government. The Israelis were also strongly of the view that it would be advantageous for all involved to find a way to provide needed humanitarian aid, outside the control of HAMAS or any other terrorist group. We are currently working with the Palestinian Authority to develop options through which such aid could be provided in a safe and effective manner.

## CONCLUSION

To combat terrorist financing and money laundering over the long term, we are vigorously and effectively promoting international standards and encouraging countries in the Middle East to adopt appropriate legislation and to implement those laws. We are also taking the necessary actions to build political will at the highest levels of every government to combat the financing of terrorism. Still, we have a long way to go in the battle against terrorist financing in the Middle East, both in terms of robust implementation of those standards and in responding to specific threats and circumstances. Thank you again for holding this hearing and for your sustained commitment to this topic. I would be happy to take your questions.

Affidavit of J. Scott Tarbutton, Esq.

<u>Exhibit 2</u>



PRESS ROOM

August 3, 2006
hp-45

### Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network

The U.S. Department of the Treasury today designated the Philippine and Indonesian branch offices of the Saudi-based International Islamic Relief Organization (IIRO) for facilitating fundraising for al Qaida and affiliated terrorist groups. Treasury additionally designated Abd Al Hamid Sulaiman Al-Mujil, the Executive Director of the Eastern Province Branch of IIRO in the Kingdom of Saudi Arabia.

"Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia. Al-Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes," said Stuart Levey, Treasury's Under Secretary for Terrorism and Financial Intelligence (TFI). "Today we are holding him to account."

The IIRO was established in 1978 and, according to its website, the organization has branch offices in over 20 countries in Africa, Europe, Asia, and the Middle East.

"It is particularly shameful when groups that hold themselves out as charitable or religious organizations defraud their donors and divert funds in support of violent terrorist groups," said Levey. "We have long been concerned about these IIRO offices; we are now taking public action to sever this link in the al Qaida network's funding chain."

Today's action was taken pursuant to Executive Order 13224, which is aimed at detecting and disrupting financial flows to terrorists. Under this authority, U.S. persons are prohibited from engaging in transactions with the designees, and any assets they may have under U.S. jurisdiction are frozen.

### IDENTIFIER INFORMATION

#### Abd Al Hamid Sulaiman Al-Mujil

Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the "million dollar man" for supporting Islamic militant groups.

Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224. These terrorist groups are also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin.

In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI.

Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil

traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.

Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).

The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN).

**Name:** Abd al-Hamid Sulaiman Al-Mujil

**AKAs:**

- Dr. Abd al-Hamid Al-Mujal
- Dr. Abd Abdul-Hamid bin Sulaiman Al-Mu'jil
- Dr. Abd Al-Hamid Al-Mu'ajjal
- Abd al-Hamid Mu'jil
- A.S. Mujel
- Abu Abdallah

**DOB:** 28 April 1949
**Nationality:** Saudi Arabian

**International Islamic Relief Organization, Philippines Branch Offices**

The IIRO-PHL is a source of funding for the al Qaida-affiliated ASG. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations.

The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifa, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of Khalifa.

While working as the director of IIRO-PHL, Khalifa maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan. At the time Khalifa directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994.

In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992.

**AKAs:**

- International Islamic Relief Agency
- International Relief Organization
- Islamic Relief Organization
- Islamic World Relief
- International Islamic Aid Organization
- Islamic Salvation Committee
- IIRO

- The Human Relief Committee of the Muslim World League
- World Islamic Relief Organization
- Al Igatha Al-Islamiya
- Hayat al-Aghatha al-Islamia al-Alamiya
- Hayat al-Igatha
- Hayat Al-`Igatha
- Ighatha
- Igatha
- Igassa
- Igasa
- Igase
- Egassa

**Address:** International Islamic Relief Organization, Philippines Offices
201 Heart Tower Building
108 Valero Street
Salcedo Village, Makati City
Manila, Philippines

**Other Locations:** Zamboanga City, Philippines
Tawi Tawi, Philippines
Marawi City, Philippines
Basilan, Philippines
Cotabato City, Philippines

**International Islamic Relief Organization, Indonesia Branch Office**
The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.

**AKAs:**

- International Islamic Relief Agency
- International Relief Organization
- Islamic Relief Organization
- Islamic World Relief
- International Islamic Aid Organization
- Islamic Salvation Committee
- IIRO
- The Human Relief Committee of the Muslim World League
- World Islamic Relief Organization
- Al Igatha Al-Islamiya
- Hayat al-Aghatha al-Islamia al-Alamiya
- Hayat al-Igatha
- Hayat Al-`Igatha
- Ighatha
- Igatha
- Igassa
- Igasa
- Igase
- Egassa

**Address:** International Islamic Relief Organization, Indonesia Office
Jalan Raya Cipinang Jaya No. 90
East Jakarta, 13410, Indonesia

P.O. Box 3654
Jakarta, Indonesia 54021

- 30 -

Affidavit of J. Scott Tarbutton, Esq.

Exhibit 3

**PRESS ROOM**
U.S. DEPARTMENT OF THE TREASURY

June 19, 2008
HP-1043

### Treasury Designates Al Haramain Islamic Foundation

**Washington** - The U.S. Department of the Treasury today designated the Al Haramain Islamic Foundation (AHF) for having provided financial and material support to al Qaida, as well as a wide range of designated terrorists and terrorist organizations.

Today's action targets the entirety of the AHF organization, including its headquarters in Saudi Arabia. Evidence demonstrates that the AHF organization was involved in providing financial and logistical support to the al Qaida network and other terrorist organizations designated by the United States and the United Nations.

Between 2002-2004, the United States designated thirteen AHF branch offices operating in Afghanistan, Albania, Bangladesh, Bosnia & Herzegovina, Comoros Islands, Ethiopia, Indonesia, Kenya, Netherlands, Pakistan, Somalia, Tanzania, and the United States.

Several of these branch offices have also been designated by the United Nations 1267 Committee based on evidence of their support for al Qaida. The United States and United Nations also designated in 2004 the former leader of AHF, Aqeel Abdelaziz Al-Aqil.

The Kingdom of Saudi Arabia joined the United States in designating several branch offices of AHF and, due to actions by Saudi authorities, AHF has largely been precluded from operating in its own name.

Despite these efforts, AHF leadership has attempted to reconstitute the operations of the organization, and parts of the organization have continued to operate.

Al Haramain Foundation was designated today under Executive Order 13224, which targets terrorists and those providing financial, technological, or material support to terrorists or acts of terrorism. Assets held by any office of the AHF organization under U.S. jurisdiction are frozen and U.S. persons are prohibited from engaging in any transactions with AHF.

For more information on the actions taken against Al Haramain Foundation, please visit the following link: http://www.treasury.gov/offices/enforcement/key-issues/protecting/charities_execorder_13224-a.shtml#ahbranches.

**-30-**

Affidavit of J. Scott Tarbutton, Esq.

Exhibit 4



**FROM THE OFFICE OF PUBLIC AFFAIRS**

June 2, 2004
JS-1703

### Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters
### Treasury Marks Latest Action in Joint Designation with Saudi Arabia

The United States and Saudi Arabian governments today announced yet further steps in the war against terrorist financing by jointly designating five additional branches of the Al-Haramain Islamic Foundation (AHF) for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations. Today's action marks the latest in a series of joint efforts between the United States and Saudi Arabia in the financial war on terror.

"Terrorists and their tainted dollars have corrupted charity by using the philanthropic spirit and charitable institutions to further their warped motives," said Juan Zarate, Treasury's Deputy Assistant Secretary for the Executive Office for Terrorist Financing and Financial Crimes.

The U.S. and Saudi Arabia are jointly submitting the entities to the United Nations' 1267 Committee to be added to the consolidated list of terrorists tied to al Qaida, Usama bin Laden (UBL) and the Taliban.

The United States is also designating the former leader of Al-Haramain, Aqeel Abdulaziz Al-Aqil, and submitting his name to the UN 1267 Committee for inclusion on the consolidated international list.

"The act of charity is sacrosanct. We need to take every step possible to stop the flow of terrorist funding through charities while preserving the integrity of charitable giving around the world," said Zarate. "The United States is working with our international partners and the charitable community to safeguard this sector from terrorists who mock the very idea of charity by converting good will and humanitarian aid into hate-filled agendas supported by blood money."

Based upon the following information and additional classified material, Treasury is designating Al-Aqil and the branches of AHF located in Afghanistan, Albania, Bangladesh, Ethiopia and the Netherlands.

**Afghanistan**

In Afghanistan, prior to the removal of the Taliban from power, AHF supported the cause of Jihad and was linked to the UBL financed Makhtab al-Khidemat (MK), a pre-cursor organization of al Qaida and a Specially Designated Global Terrorist pursuant to the authorities of E.O. 13224.

Following the September 11, 2001 terrorist attacks, activities supporting terrorism in Afghanistan continued. In 2002, activities included involvement with a group of persons trained to attack foreigners in Afghanistan. A journalist suspected of meeting with al Qaida and Taliban members in Afghanistan was reportedly transferring funds on behalf of the al Qaida-affiliated AHF and forwarding videotapes from al Qaida leaders to an Arabic language TV network for broadcast.

## Albania
Irfan Tomini Street, #58
Tirana, Albania

The U.S. has information that indicates UBL may have financed the establishment of AHF in Albania, which has been used as cover for terrorist activity in Albania and in Europe. In late 2000, a close associate of a UBL operative moved to Albania and was running an unnamed AHF subsidiary. In 1998, the head of Egyptian Islamic Jihad in Albania was reportedly also a financial official for AHF in Albania. This individual, Ahmed Ibrahim al-Nagar, was reportedly extradited from Albania to Egypt in 1998. At his trial in Egypt, al-Nager reportedly voiced his support for UBL and al Qaida's August 1998 terrorist attacks against the U.S. embassies in Kenya and Tanzania.

Salih Tivari, a senior official of the moderate Albanian Muslim community, was murdered in January 2002. Ermir Gjinishi, who had been supported by AHF, was detained in connection with the murder, but no charges were filed; he was later released by Albanian authorities. Just prior to being murdered, Tivari informed the AHF-affiliated Gjinishi that he intended to reduce "foreign Islamic influence" in the Albanian Muslim community.

Prior to his murder, Tivari controlled finances, personnel decisions, and donations within the Albanian Muslim community. This provided him significant power, enabling him to survive several attempts by extremists trained overseas to replace him or usurp his power.

As of late 2002, AHF was reportedly withdrawing virtually all funding to the Albanian Muslim community. AHF in Albania was to send all proceeds from the sale of some property to the AHF headquarters in Saudi Arabia. As of late 2003, AHF was paying for, through a HAMAS member with close ties to AHF in Albania, security personnel to guard the AHF building in Albania, which had been shut down earlier in 2003.

## Bangladesh
House 1, Road 1, S-6
Uttara, Dhaka
Bangladesh

Information available to the U.S. shows that a senior AHF official deployed a Bangladeshi national to conduct surveillance on U.S. consulates in India for potential terrorist attacks. The Bangladeshi national was arrested in early 1999 in India, reportedly carrying four pounds of explosives and five detonators. The terrorist suspect told police that he intended to attack U.S. diplomatic missions in India. The suspect reportedly confessed to training in al Qaida terrorist camps in Afghanistan, where he met personally with Usama bin Laden in 1994. The suspect first heard of plans for these attacks at the AHF office in Bangladesh.

## Ethiopia
Woreda District 24 Kebele Section 13
Addis Ababa, Ethiopia

Information available to the U.S. shows that AHF in Ethiopia has provided support to Al-Ittihad Al-Islamiya (AIAI). In Ethiopia, AIAI has engaged in attacks against Ethiopian defense forces. AIAI has been designated both by the U.S. Government and by the UN 1267 Sanctions Committee.

Ethiopia is one of the countries where AHF's website states that they have operations, but there does not appear to be a formal branch office. As part of our efforts to designate this branch, we are asking that action be taken to ensure that individuals cannot use the name of AHF or act under its auspices within, or in connection with services provided in, Ethiopia.

## The Netherlands
(a/k/a Stichting Al Haramain Humanitarian Aid)

Jan Hanzenstraat 114, 1053SV
Amsterdam, the Netherlands

Since 2001, Dutch officials have confirmed that the Al Haramain Humanitarian Aid Foundation located in Amsterdam is part of the larger AHF network and that Al-Aqil, also being designated today, is chairman of this foundation's board of directors. As noted elsewhere in this document, AHF was the founder and leader of AHF and was responsible for all of its activities, including its support of terrorism.

**Aqeel Abdulaziz Al-Aqil's**
DOB: April 29, 1949

These activities within the branches took place under the control of Aqeel Abdulaziz Al-Aqil, the founder and long-time leader of AHF and a suspected al Qaida supporter. Al-Aqil has been identified as AHF's Chairman, Director General and President in a variety of sources and reports. As AHF's founder and leader, Al-Aqil controlled AHF and was responsible for all AHF activities, including its support for terrorism. Having been under investigation in late 2003, by March 2004 Al-Aqil was reportedly no longer leading AHF activities; however, some reports indicate Al-Aqil may still be in a position to exercise control or influence over AHF.

When viewed as a single entity, AHF is one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network. Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah received funding from AHF and used AHF as a front for fundraising and operational activities.

Under Al-Aqil's leadership, AHF implemented its tasks through its offices and representatives, which span more than 50 countries around the world. AHF maintained nine general committees and several other "active committees" that included the "Continuous Charity Committee, African Committee, Asian Committee, Da'wah and Sponsorship Committee, Masjid Committee, Seasonal Projects Committee, Doctor's Committee, European Committee, Internet and the American Committee, the Domestic Committee, Zakaat Committee and the Worldwide Revenue Promotion Committee."

After the AHF branch is Bosnia was designated in 2002, it immediately began efforts to avoid these sanctions. Despite the joint efforts of the United States and Saudi Arabia to designate the al Qaida-affiliated AHF Bosnia branch office, and the subsequent raid of this office by Bosnian authorities on June 3, 2002, all AHF employees were ordered to avoid cooperating with Bosnian and other authorities under Al-Aqil's leadership. In 2003, AHF headquarters in Saudi Arabia provided instructions to AHF in Bosnia for the disposition of AHF assets. These instructions provided for actions contravening local and international counter terrorism laws and regulations. Al-Aqil stated that AHF's work in Bosnia would continue. After the Bosnian branch reconstituted itself under the name "Vazir," the U.S. and Saudi Arabia joined in designating the branch as an alias for the AHF-Bosnian branch.

These entities are subject to designation under Executive Order 13224 pursuant to paragraphs (d)(i) and (d)(ii) based on a determination that they assist in, sponsor or provide financial, material, or technological support for, or financial or other services to or in support of, or are otherwise associated with, persons listed as subject to E.O. 13224. These branches also meet the standard for inclusion in the United Nations' 1267 Sanctions Committee's consolidated list because of the support provided to UBL, al Qaida or the Taliban,

Inclusion on the 1267 Committee's list triggers international obligations on all member countries, requiring them to freeze the assets of these offices. Publicly identifying these supporters of terrorism is a critical part of the international campaign to counter terrorism. Additionally, other organizations and individuals are put on notice that they are prohibited from doing business with them.

Blocking actions are critical to combating the financing of terrorism. When an action is put into place, any assets existing in the formal financial system at the time of the order are to be frozen. Blocking actions serve additional functions as well, acting as a deterrent for non-designated parties who might otherwise be willing to finance terrorist activity; exposing terrorist financing "money trails" that may generate leads to previously unknown terrorist cells and financiers, disrupting terrorist financing networks by encouraging designated terrorist supporters to disassociate themselves from terrorist activity and renounce their affiliation with terrorist groups; terminating terrorist cash flows by shutting down the pipelines used to move terrorist-related assets; forcing terrorists to use alternative, more costly and higher-risk means of financing their activities; and engendering international cooperation and compliance with obligations under U.N. Security Council Resolutions.

On March 11, 2002, the United States and Saudi Arabia initiated joint public efforts against terrorist support networks by designating and blocking the funds of the Somalia and Bosnia-Herzegovina branches of AHF based on evidence these branches were diverting charitable funds to terrorism. In 2003, the Saudi government ordered AHF to close all of its overseas branches. AHF stated it closed several branches, but continued monitoring by the United States and Saudi Arabia indicated that some branches, and/or former officials associated with these branches, were either continuing to operate or maintaining other plans to avoid these measures, such as the Bosnia-Herzegovina branch attempting to reconstitute itself and continue operations under the name "Vazir." Similarly, the Indonesian branch of AHF also sought to operate under an alias.

To counter these and other efforts, on December 22, 2003, the United States and Saudi Arabia announced the designation of Vazir, as an a/k/a for the AHF branch in Bosnia-Herzegovina. On January 22, 2004, the U.S. and Saudi Arabia announced the designation of AHF branches in Indonesia, Kenya, Tanzania and Pakistan. The Saudi Arabian government made it clear to host countries that these branch offices should not be considered Saudi entities and should be treated appropriately under local law.

The United States works to preserve the sanctity of charitable giving and the value of humanitarian aid provided by charities of all faiths. In this context, we are working to identify those charities that are abusing the trust of their donors. In addition to today's designation, several other charities have been designated by the United States because of their support of terrorism, including:

- Makhtab al-Khidamat/Al Kifah (formerly U.S.-based)
- Al Rashid Trust (Pakistan)
- WAFA Humanitarian Organization (Pakistan, Saudi Arabia, Kuwait and UAE)
- Rabita Trust (Pakistan)
- The Holy Land Foundation for Relief and Development (U.S.)
- Ummah Tamer E-Nau (Pakistan)
- Revival of Islamic Heritage Society (Kuwait, Afghanistan and Pakistan)
- Afghan Support Committee (Pakistan)
- Aid Organization of the Ulema (Pakistan)
- Global Relief Foundation (U.S.)
- Benevolence International Foundation (U.S.)
- Benevolence International Fund (Canada)
- Bosanska Idealna Futura (Bosnia)
- Lajnat al Daawa al Islamiyya (Kuwait)
- Stichting Benevolence International Nederland (Netherlands)
- Al Aqsa Foundation (U.S., Europe, Pakistan, Yemen, South Africa)
- Commité de Bienfaisance et de Secours aux Palestiniens (France)
- Association de Secours Palestinien (Switzerland)
- Interpal (UK)
- Palestinian Association in Austria (Austria)
- Sanibil Association for Relief and Development (Lebanon)
- Al Akhtar Trust (Pakistan)
- Six other branches of AHF (Bosnia, Indonesia, Kenya, Pakistan, Somalia,

Case 1:03-md-01570-GBD-SN   Document 9250-34   Filed 07/31/23   Page 40 of 67

and Tanzania) (March 2002 and January 2004)

The United States is committed to rooting out terrorism by halting those who provide financial support for nefarious acts. With this designation, 374 individuals and entities will have been designated under President Bush's Executive Order aimed at freezing the assets of terrorists and their supporters. Nearly $200 million in terrorist-related assets has been frozen or seized as a result of efforts by the United States and its allies.

Affidavit of J. Scott Tarbutton, Esq.

<u>Exhibit 5</u>



**FROM THE OFFICE OF PUBLIC AFFAIRS**

September 9, 2004
JS-1895

**U.S.-Based Branch of Al Haramain Foundation Linked to Terror
Treasury Designates U.S. Branch, Director**

The Treasury Department announced today the designation of the U.S. branch of the Saudi Arabia-based Al Haramain Islamic Foundation (AHF), along with one of its directors, Suliman Al-Buthe.  In addition, the AHF branch located in the Union of the Comoros was also designated today.

"We continue to use all relevant powers of the U.S. government to pursue and identify the channels of terrorist financing, such as corrupted charities, at home and abroad.  Al Haramain has been used around the world to underwrite terror, therefore we have taken this action to excommunicate these two branches and Suliman Al-Buthe from the worldwide financial community," said Stuart Levey, Treasury's Under Secretary for Terrorism and Financial Intelligence.

The assets of the U.S. AHF branch, which is headquartered in Oregon, were blocked pending investigation on February 19, 2004.  On the previous day, a federal search warrant was executed against all property purchased on behalf of the U.S. AHF branch.  The investigation involved agents from the Internal Revenue Service – Criminal Investigations (IRS-CI), the Federal Bureau of Investigation (FBI) and the Department of Homeland Security's Immigration and Customs Enforcement (ICE).

The U.S.-based branch of AHF was formally established in 1997.  Documents naming Al-Buthe as the organization's attorney and providing him with broad legal authority were signed by Aqeel Abdul Aziz Al-Aqil, the former director of AFH.  Aqil has been designated by the United States and the UN 1267 Sanctions Committee because of AHF's support for al Qaida while under his oversight.

The investigation shows direct links between the U.S. branch and Usama bin Laden.  In addition, the affidavit alleges the U.S. branch of AHF criminally violated tax laws and engaged in other money laundering offenses.  Information shows that individuals associated with the branch tried to conceal the movement of funds intended for Chechnya by omitting them from tax returns and mischaracterizing their use, which they claimed was for the purchase of a prayer house in Springfield, Missouri.

Other information available to the U.S. shows that funds that were donated to AHF with the intention of supporting Chechen refugees were diverted to support mujahideen, as well as Chechen leaders affiliated with the al Qaida network.

AHF has operations throughout the Union of the Comoros, and information shows that two associates of AHF Comoros are linked to al Qaida.  According to the transcript from U.S. v. Bin Laden, the Union of the Comoros was used as a staging area and exfiltration route for the perpetrators of the 1998 bombings of the U.S. embassies in Kenya and Tanzania.  The AHF branches in Kenya and Tanzania have been previously designated for providing financial and other operational support to these terrorist attacks.

Since March 2002, the United States and Saudi Arabia have jointly designated eleven branches of AHF based on evidence of financial, material and/or logistical support to the al Qaida network and affiliated organizations.  These branches, Afghanistan, Albania, Bangladesh, Bosnia, Ethiopia, Indonesia, Kenya, the

Netherlands, Pakistan, Somalia, and Tanzania, along with the former director of AHF, Aqeel Abdul Aziz Al-Aqil, are named on the UN's 1267 Committee's consolidated list of terrorists associated with al Qaida, Usama bin Laden and the Taliban and are subject to international sanctions.

The entities were designated today pursuant to Executive Order 13224 pursuant to paragraphs (d)(i) and (d)(ii) based on a determination that they assist in, sponsor or provide financial, material, or technological support for, or financial or other services to or in support of, or are otherwise associated with, persons listed as subject to E.O. 13224.  These entities also meet the standard for inclusion in the UN 1267 Sanctions Committee's consolidated list because of the support provided to UBL, al Qaida or the Taliban.

Inclusion on the 1267 Committee's list triggers international obligations on all member countries, requiring them to freeze the assets of these offices.  Publicly identifying these supporters of terrorism is a critical part of the international campaign to counter terrorism. Additionally, other organizations and individuals are put on notice that they are prohibited from doing business with them.

Blocking actions are critical to combating the financing of terrorism.  When an action is put into place, any assets existing in the formal financial system at the time of the order are to be frozen.  Blocking actions serve additional functions as well, acting as a deterrent for non-designated parties who might otherwise be willing to finance terrorist activity; exposing terrorist financing "money trails" that may generate leads to previously unknown terrorist cells and financiers, disrupting terrorist financing networks by encouraging designated terrorist supporters to disassociate themselves from terrorist activity and renounce their affiliation with terrorist groups; terminating terrorist cash flows by shutting down the pipelines used to move terrorist-related assets; forcing terrorists to use alternative, more costly and higher-risk means of financing their activities; and engendering international cooperation and compliance with obligations under UN Security Council Resolutions.

The United States has designated 387 individuals and entities as terrorists, their financiers or facilitators.  In addition, the global community has frozen over $142 million in terrorist-related assets.

**Al Haramain Islamic Foundation – United States**

1257 Siskiyou Blvd.
Ashland, Oregon  97520

3800 Highway 99 S
Ashland, Oregon  97520

2151 E. Division Street
Springfield, MO  65803

**Al Haramain Islamic Foundation – Union of the Comoros**

B/P: 1652 Moroni
Union of the Comoros

**Suliman Al-Buthe**
DOB: 12/08/1961
POB: Egypt
Nationality: Saudi Arabian
Passport No: B049614

For more information on the February 19, 2004 designation of the U.S.-based AHF branch, please visit: http://www.treasury.gov/press/releases/js1183.htm.

Note: In June of 2004, the Saudi government announced it was dissolving AHF and other Saudi charities and committees operating aboard and folding their assets into

Case 1:03-md-01570-GBD-SN   Document 9250-34   Filed 07/31/23   Page 44 of 67

a newly created entity, the Saudi National Commission for Relief and Charity Work Abroad.  According to the Saudi Embassy, the Commission, which will be a non-governmental body, will take over all aspects of private overseas aid operations and assume responsibility for the distribution of private charitable donations from Saudi Arabia.

Affidavit of J. Scott Tarbutton, Esq.

<u>Exhibit 6</u>



PRESS ROOM

### FROM THE OFFICE OF PUBLIC AFFAIRS

September 6, 2002
PO-3397

#### Treasury Department Statement on the Designation of Wa'el Hamza Julidan

Today the United States and Saudi Arabia jointly designated Wa'el Hamza Julaidan, an associate of Usama bin Laden and a supporter of al-Qa'ida terror. We are pleased to be taking our second joint action with the Kingdom of Saudi Arabia to publicly identify and freeze the assets of terrorists and their supporters. The Kingdom of Saudi Arabia has already forwarded his name to the United Nations Sanctions Committee established by UNSCR 1267. Today's designation follows a series of joint actions with our allies in the war on terrorist financing, which to date has included actions with the EU, the G-7 countries, Italy, and now our second joint action with Saudi Arabia.

Today's action brings the total number of names to 236 under President Bush's Executive Order aimed at freezing the assets of terrorists and their supporters – Executive Order 13224. Together with our allies we have blocked over $112 million in terrorist related assets around the world. "Today's action is important in that it demonstrates the commitment of both the United States and Saudi Arabia to go after high impact targets in our war against terrorist financing," said Treasury Under Secretary for Enforcement Jimmy Gurulé. "We have received unprecedented cooperation from our friends abroad, and today's action is indicative of that synergy and commitment to this issue."

Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaida, have acknowledged Wa'el Julaidan as a known associate of their operations. Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network.

Statement of the Case for

#### Wa'el Hamza JULAIDAN

Identifier Information

**Wa'el Hamza JULAIDAN a.k.a. Wa'il Hamza JULAIDAN a.k.a.**

**Wa'el Hamza JULAYDAN a.k.a. Wa'il Hamza JULAYDAN a.k.a.**

**Wa'el Hamza JALAIDAN a.k.a. Wa'il Hamza JALAIDAN a.k.a.**

**Wa'el Hamza JALADIN a.k.a. Wa'il Hamza JALADIN a.k.a. Abu**

**Al-Hasan al Madani**

DOB: January 22, 1958

POB: Al-Madinah, Saudi Arabia

## Background Information

Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Usama bin Ladin. Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with several individuals and entities linked to al-Qa'ida, including bin Ladin lieutenants, Ayman al-Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Makhtab al Khedmat, the Rabita Trust, and al-Gam'a al-Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations.

Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that "We were all in one boat, as is known to you, including our brother, Wa'el Julaidan." Julaidan has established contacts with several known Arab Islamic extremists, including bin Ladin's principal lieutenant, Ayman al-Zawahri. Another bin Ladin lieutenant, Abu Zubaida, claimed that he accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Ladin and senior bin Ladin lieutenant Mohammed Atef soon after arriving in Kandahar.

In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida.

## Basis for Designation

The United States has credible information that Wa'el Hamza Julaidan is an associate of Usama bin Laden and several of bin Laden's top lieutenants. Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida. Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

Affidavit of J. Scott Tarbutton, Esq.

<u>Exhibit 7</u>

U.S. DEPARTMENT OF THE TREASURY

# Resource Center

**Protecting Charitable Organizations - P**

Additional Background Information on Charities Designated Under Executive Order 13224

A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z

**P**

**The Palestinian Association in Austria (PVOE)**

**U.S. Designation Date:** August 22, 2003

**Background:** The Palestinian Association in Austria (PVOE) is controlled by the leader of HAMAS in Austria. Like other HAMAS-affiliated charities, the money is targeted to support members of HAMAS and is funneled through other charities in Lebanon, the West Bank and Gaza or other areas of the Middle East in order to obscure the transfer of funds while ensuring they reach intended HAMAS recipients.

**AKAs:** Palestinian Union in Austria
Palestinian League in Austria
Palaestinaenser Verein
Palaestinaenserverein Oesterreich
Palaestinensisch Verband Oesterreich
Palaestinensische Vereinigung
Palaestininiensische Bereinigung
Palestine League
Palestine Union
Palestinensische Ver In Sterreich
PALESTINIAN ASSOCIATION
Palestinian Association
Palestinian League in Austria
Palestinian Organization
Palestinian Union
Palestinian Union in Austria
Palestinische Vereinigung
PVOE

For Additional Information: http://www.treas.gov/press/releases/js672.htm

**R**

**Rabita Trust**

**U.S. Designation Date:** October 12, 2001

**UN Designation Date:** October 17, 2001

**Background:** Rabita Trust is a Pakistani non-governmental organization (NGO) designated for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida. In February 2000, Wa'el Hamza Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General. Julaidan was jointly designated on September 6th, 2002 by Saudi Arabia and by the United States under Executive Order 13224. Julaidan is a Saudi citizen and a close associate of Usama bin Laden, having fought with bin Laden in Afghanistan in the 1980s. Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. Julaidan is also linked to Makhtab al-Khidamat as well as al Qaida lieutenants Ayman al-Zawahiri, Abu Zubaida, and Mohammed Atef.

For Additional Information: http://www.treas.gov/press/releases/po3397.htm

**Revival of Islamic Heritage Society - Pakistan and Afghanistan Branches**

**U.S. Designation Date:** January 9, 2002

**UN Designation Date:** January 11, 2002

**Background:** The Revival of Islamic Heritage Society (RIHS) is a Kuwaiti-based non-governmental organization (NGO). Its operations in Pakistan and Afghanistan have been affiliated with the Afghan Support Committee (ASC), an organization that has funded bin Laden and al Qaida. As a result, the RIHS Pakistan and Afghanistan branches were designated under Executive Order 13224 on January 9th, 2002. The Peshawar, Pakistan office director for RIHS is Abd al-Muhsin Al-Libi, who also serves as the ASC manager in Peshawar and was also designated under EO 13224 on January 9th, 2002. Al-Libi has provided Usama bin Laden and his associates with facilities in Peshawar, and has carried money and messages on behalf of UBL. The Pakistan office defrauded RIHS donors to fund terrorism. In order to obtain additional funds from the Kuwait RIHS headquarters, the RIHS office in Pakistan padded the number of orphans it claimed to care for by providing names of orphans that did not exist or who had died. Funds then sent for the purpose of caring for the non-existent or dead orphans were instead diverted to al Qaida terrorists. There is no evidence at this point that this financing was done with the knowledge of RIHS in Kuwait.

**AKAs:** Jamia Ihya ul Turath
Jamiat Ihia Al- Turath Al-Islamiya
Revival of Islamic Society Heritage on the African Continent

For Additional Information: http://www.treas.gov/press/releases/po909.htm

**Revival of Islamic Heritage Society – All Offices**

**U.S. Designation Date:** June 13, 2008

**Background:** The Revival of Islamic Heritage Society (RIHS) is a Kuwaiti-based non-governmental organization (NGO). It has provided financial and material support to al Qaida and al Qaida affiliates, including Lashkar e-Tayyiba, Jemaah Islamiyah, and Al-Itihaad al-Islamiya. RIHS has also provided financial support for acts of terrorism. When

the U.S. Government first designated RIHS-Afghanistan and RIHS-Pakistan in 2002, there was no evidence that the Kuwait-based RIHS headquarters (RIHS-HQ) knew that the two branch offices were financing al Qaida. Since that time, evidence has mounted implicating RIHS-HQ in terrorism support activity. The U.S. Government has learned that RIHS senior leadership, who have actively managed all aspects of the organization's day-to-day operations, have been aware of both legitimate and illegitimate uses of RIHS funds. Suspected of providing support to terrorism, RIHS offices have been closed or raided by the governments of Albania, Azerbaijan, Bangladesh, Bosnia-Herzegovina, Cambodia, and Russia. In countries where RIHS activities are banned or scrutinized by local governments, RIHS-HQ has developed multiple methods, including using different names, to continue its operations. RIHS-HQ provides significant financial and logistical support to the Pakistan-based U.N.-designated terrorist group Lashkar e-Tayyiba (LeT) in South Asia and to Jemaah Islamiyah (JI) in Southeast Asia and the Horn of Africa.

**AKAs:** RIHS Headquarters-Kuwait
Revival of Islamic Heritage Foundation
RIHF
Society for the Revival of Islamic Heritage
Islamic Heritage Revival Party
Islamic Heritage Restoration Society
IHRS
Kuwaiti Heritage
Ihya Turas Al-Islami
Ijha Turath Al-Islami
Jamia Ihya Ul Turath
Jamiat Ihia Al-Turath Al-Islamiya
Jam'iyat Ihya' Al-Turath Al-Islami
Jami'at Ihy'a Al-Tirath Al-Islamia
Jamiatul Ihya Ul Turath
Jamiyat Ikhya At-Turaz Al-Islami, Society of the Rebirth of the Islamic People
Jamiatul-Yahya Ut Turaz
Jomiatul Ehya-Ut Turaj
Jomiyatu-Ehya-Ut Turas Al Islami
Jama'ah Ihya Al-Turaz Al-Islami
Jami'ah Al-Hiya Al-Turath Al Islamiyah
Lajnat Ihya Al-Turath Al-Islami
Lajnat Al-Ihya Al-Turath Al-Islami
RIHS Administration for the Building of Mosques and Islamic Projects
RIHS Mosques Committee
Administration of the Revival of Islamic Heritage Society Committee
RIHS Arab World Committee
RIHS Committee for the Arab World
RIHS Committee for West Asia
RIHS Central Asia Committee
Committee for Europe and the Americas
RIHS Europe and the Americas Committee
RIHS Two Americas and European Muslim Committee
RIHS Europe America Muslims Committee
RIHS Southeast Asia Committee
RIHS Committee for South East Asia
RIHS Indian Continent Committee
RIHS Indian Subcontinent Committee
RIHS Committee for India
RIHS African Continent Committee
RIHS Committee for Africa
Revival of Islamic Society Heritage on the African Continent
RIHS Public Relations Committee
RIHS Cultural Committee
RIHS Principle Committee for the Center for Preservation of the Holy Qu'aran
RIHS General Committee for Donations
RIHS Youth Center Committee
RIHS Scientific Committee-Branch of Sabah Al-Nasir
RIHS Fatwas Committee
RIHS Center for Manuscripts Committee
RIHS Educating Committees, Al-Jahra'
RIHS Audio Recordings Committee
RIHS Project of Assigning Preachers Committee
RIHS Office of Printing and Publishing
RIHS Committee for Women
RIHS Committee for Women, Administration for the Building of Mosques
RIHS Women's Branch for the Project of Endowment
RIHS Administration for the Committees of Almsgiving
RIHS Committee for Almsgiving and Charities
RIHS Committee for the Call and Guidance
RIHS-Cambodia
RIHS Cambodia-Kuwait Orphanage Center
The Kuwaiti-Cambodian Orphanage Center
The Kuwait-Cambodia Islamic Cultural Training Center
RIHS Chaom Chau Center
Nara Welfare and Education Association
RIHS-Bosnia and Herzegovina
Kuwaiti Joint Relief Committee, Bosnia and Herzegovina
KJRC-Bosnia and Herzegovina
Plandiste School, Bosnia and Herzegovina
Organizacija Preporoda Islamske Tradicije Kuvajt
Kuwait General Committee for Aid
General Kuwait Committee
RIHS-Albania
Center of Call for Wisdom
CCFW
Thirrja Per Utesi
NGO Turath
RIHS-Kosovo

Dora E Miresise
Hand of Mercy
RIHS-Azerbaijan
RIHS-Russia
RIHS-Lebanon
RIHS-Bangladesh
RIHS-Somalia
RIHS-Ghana
RIHS-Tanzania
RIHS-Benin
RIHS-Cameroon
RIHS-Senegal
RIHS-Nigeria
RIHS-Liberia
RIHS-Ivory Coast

For Additional Information: http://www.treas.gov/press/releases/hp1023.htm

**S**

**The Sanabil Association for Relief and Development**

**U.S. Designation Date:** August 22, 2003

**Background:** The Sanabil Association for Relief and Development (Sanabil), based in Sidon, Lebanon, receives large quantities of funds raised by major HAMAS-affiliated charities in Europe and the Middle East and, in turn, provides funding to HAMAS. For example, Sanabil has received funding from the Al Aqsa Foundation; the Holy Land Foundation for Relief and Development, and Interpal. Like other HAMAS-affiliated charities, Sanabil is used by HAMAS to recruit permanent members from the religious and the poor through the extension of charity. At the request of a HAMAS political leader, Sanabil began opening offices in all of the Palestinian refugee camps in Lebanon in August of 2001 in order to increase the foundation's role inside the camps.

For Additional Information: http://www.treas.gov/press/releases/js672.htm

**Stichting Benevolence International Nederland (BIF a/k/a)**

**U.S. Designation Date:** January 23, 2003

**Background:** See Benevolence International Foundation.

**T**

**Taibah International (Bosnia)**

**U.S. Designation Date:** May 6, 2004

**UN Designation Date:** May 11, 2004

**Background:** Taibah International in Bosnia has significant ties to the Global Relief Foundation (GRF), which initially operated in Bosnia under the auspices of Taibah. Up until 1996, Muhamed El Nagmy, the registered leader of GRF, was also working with Ahmed Abdul Kerim as joint leaders of Taibah International. By December 2001, El Nagmy, still listed as the leader of GRF, was working in the Taibah office in Travnik. Additionally, the acting director of Taibah in Bosnia, Ali Hamid El Tayeb, again in December 2001, confirmed that El Nagmy was responsible for bringing financial support to Taibah International while holding the position as the Bosnia representative of GRF. A former employee of Taibah International was a member of Ayadi Chafiq Bin Muhammad's network, who was designated by the Treasury Department on October 12, 2001.

**AKAs:** Taibah International Aid Agency
Taibah International Aid Association
Al Taibah, Intl.
Taibah International Aide Association

For Additional Information: http://www.treas.gov/press/releases/js1527.htm

**Tamil Foundation**

**U.S. Designation Date:** 2/11/2009

**Background:**

The U.S. Department of the Treasury targeted the support network of the Sri Lanka-based designated terrorist group Liberation Tigers of Tamil Eelam (LTTE) by designating the U.S.-based Tamil Foundation under Executive Order 13224.  Executive Order 13224 targets terrorists and those providing support to terrorists or acts of terrorism. The LTTE, like other terrorist groups, has relied on so-called charities to raise funds and advance its violent aims. The head of the Tamil Foundation is also president of the Tamils Rehabilitation Organization (TRO) in the United States. The TRO was named a Specially Designated Global Terrorist (SDGT) under Executive Order 13224 on November 15, 2007. Over the course of many years, the Tamil Foundation and the TRO have co-mingled funds and carried out coordinated financial actions.  Additional information links the Tamil Foundation to the TRO through a matching gift program. The common leadership of the TRO and the Tamil Foundation has facilitated these activities.

**Address:**

TAMIL FOUNDATION
517 E. Oldtown Road, Cumberland, MD 21502
Tax ID number:
52-1699409

For Additional Information: http://www.treas.gov/press/releases/tg22.htm

**U**

**Ummah Tameer E-Nau (UTN)**

**U.S. Designation Date:** December 20, 2001

**UN Designation Date:** December 24, 2001

**Background:** Ummah Tameer-e-Nau (UTN) has provided material support and otherwise facilitated the activities of terrorists and terrorist-related organizations. UTN is a non-governmental organization (NGO) that was founded by Bashir-ud-Din Mahmood. Mahmood established UTN after leaving Pakistan's Atomic Energy Commission (PAEC) in 1998, where he most recently served as Director for Nuclear Power and was the chief designer and director of Pakistan's Khushab Atomic Reactor. Mahmood was also a pioneer in setting up Pakistan's uranium enrichment program. Mahmood is a supporter of the Taliban -- once describing the Taliban as the "ideal Islamic state". He purportedly established UTN to rebuild Afghanistan's infrastructure and raise money to develop the Taliban-held areas of Afghanistan. UTN reportedly had the personal support of Mullah Omar and close ties to his Taliban regime.

UTN's real objective was to assist the Taliban and UBL and his al Qaida terrorist network in developing high-tech weapons. Mahmood is reported to have showed a willingness to help produce weapons grade plutonium and enriched uranium for the Taliban. During UTN visits to Afghanistan, Mahmood met with bin Laden and al Qaida leaders and discussed nuclear, chemical and biological weapons. Other prominent Pakistani scientists, retired military officers, and industrialists joined UTN: Abdul Majeed, a former high ranking official at PAEC and an expert in nuclear fuels; Mirza Yousaf Baig, a senior scientist and the owner of a construction company; Humayan Niaz, a retired navy officer in the electrical engineering division; S.M. Tufail, an industrialist; retired navy commander Arshad Chaudhry; and Mohammed Hanif. UTN funding has also been linked to Al Rashid Trust, a charity with ties to al Qaida. In November 2001, the Taliban left Kabul and the workers at UTN's Kabul offices fled the area with them. Searches of UTN locations in Kabul have yielded documents setting out a plan to kidnap a U.S. attaché and outlining basic nuclear physics related to nuclear weapons. Several UTN members are known to have direct connections to the Taliban, UBL, and al Qaida.

**AKAs:** Ummat Tamir-I-Pau
Ummat Tamir I-Nau

For Additional Information: http://www.treas.gov/press/releases/po885.htm

### W

### WAFA Humanitarian Organization

**U.S. Designation Date:** September 24, 2001

**UN Designation Date:** October 6, 2001

**Background:** The WAFA Humanitarian Organization is a key Saudi charity and Pakistan-based organization financing al Qaida. WAFA was a militant supporter of the Taliban. Documents found in WAFA's offices in Afghanistan revealed that the charity was intimately involved in assassination plots against U.S. citizens as well as the distribution of "how to" manuals on chemical and biological warfare. U.S. officials have described WAFA as a key component of bin Laden's organization.

For Additional Information: http://www.whitehouse.gov/news/releases/2001/09/20010924-1.html

Affidavit of J. Scott Tarbutton, Esq.

<u>Exhibit 8</u>

DEPARTMENT OF THE TREASURY

WASHINGTON

GENERAL COUNSEL

November 29, 2001

M. Claude Nicati
Substitut du Procureur General
Taubenstrasse 16
3003 Berne
SWITZERLAND

Re:   Yassin A. Kadi

Dear Mr. Nicati:

This letter is provided to you pursuant to your request under the mutual legal assistance treaty between the United States and Switzerland in connection with the action taken by the Government of Switzerland to block assets of Yassin A. Kadi (aka Qadi or Qadhi). Although some of the information concerning Mr. Kadi comes from sensitive sources that we cannot disclose, we have agreed to provide you with an unclassified summary of certain information concerning Mr. Kadi. We believe that this information is generally reliable and, taken as a whole, supports the decision to block Mr. Kadi's assets. This summary may be disclosed publicly in legal proceedings.

Based upon information available to the United States Government, we have a reasonable basis to believe that Mr. Kadi has a long history of financing and facilitating the activities of terrorists and terrorist-related organizations, often acting through seemingly legitimate charitable enterprises and businesses.

In 1991, Mr. Kadi wired $820,000 to a business in the United States. This money was laundered through a complex land transaction in Illinois, apparently to hide any connection to Mr. Kadi and the eventual transfer of the funds to the Quranic Literacy Institute (QLI). Some of the proceeds of this transaction were used by QLI to finance the activities of Mohammed Salah (alias Abu Ahmed),[1] an admitted head of the military wing of the terrorist organization HAMAS.[2] Subsequently, Mr. Kadi wired $27,000 *directly* to Mr. Salah's account in March

---

[1] Mr. Salah is a "Specially Designated Terrorist" (STD) under United States Executive Order No. 12947, 60 Fed. Reg. 5079 (1995) (E.O. 12947). See Notice of Blocking, 60 Fed. Reg. 41152 (1995).
[2] HAMAS has been designated a "Foreign Terrorist Organization" pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (1996) and an SDT under E.O. 12947, see 31 C.F.R. Ch V, App. A, and a "Specially Designated Global Terrorist" (SDGT) under United States Executive Order No. 13224, 66 Fed. Reg. 49079 (2001) (E.O. 13224).

M. Claude Nicati
November 29, 2001
Page 2

1992. This wire, from Faisal Finance account number IFA 10004, came directly from an account that is the subject of the Swiss sequestration order covering Mr. Kadi's accounts. There were additional wires from Faisal Finance to Mr. Salah's account, but our information on those transfers is still incomplete. Similarly, we are still investigating other Faisal Finance transfers, one for $200,000 and another for $665,000, all or a substantial portion of which were sent to Mr. Salah through an account controlled by another HAMAS operative, Abu Marzook.[3]

At the direction of Abu Marzook, Mr. Salah distributed tens of thousands of dollars, and perhaps more, to HAMAS cells in and around Israel. Mr. Salah was arrested in Israel in 1993 carrying nearly $100,000 in cash and extensive notes of his meetings with HAMAS operatives during the days preceding his arrest. Analysis of the monetary transfers involved in the Illinois land transaction, and of wires into Mr. Salah's accounts prior to leaving for Israel, show a close connection between the funds involved in the transactions and those distributed by Mr. Salah to terrorist cells.[4]

In recent press interviews, Mr. Kadi has denied any wrongdoing in connection with these money transfers. He says that the loan on the Illinois property was intended to help the QLI "open a peaceful dialogue between nations," but he has neither explained the convoluted nature of the transaction nor made any claim for repayment of the "loan." He claims not to recall ever having met Mr. Salah, although Mr. Salah's lawyer states that Mr. Salah did meet with Mr. Kadi, that Mr. Kadi befriended him, and that he gave the $27,000 to Mr. Salah to open a bank account in Chicago.

Mr. Kadi has acknowledged in a number of press accounts that he is the founder of the Muwafaq, or "Blessed Relief," Foundation. He is identified in legal records as "Chairman" of the foundation. The leader of the terrorist organization Al-Gama'at Al-Islamiya,[5] Talad Fuad Kassem, has said that the Muwafaq Foundation provided logistical and financial support for a mujahadin battalion in Bosnia. The foundation also operated in Sudan, Somalia and Pakistan, among other places.

A number of individuals employed by or otherwise associated with the Muwafaq Foundation have connections to various terrorist organizations. Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TIF) in the United Kingdom, was associated with Muwafaq personnel in Bosnia and other TIF members worked at the Muwafaq Foundation. Syrian citizen Mahmoud Mehdi, once a director of the Muwafaq Foundation in Pakistan, was a member of Al-Qa'ida and the Al-Faran terrorist group[6] responsible for the kidnapping of

---

[3] Mr. Marzook has been designated a SDT under E.O. 12947. See 31 C.F.R. Ch. V, App. A.

[4] A detailed account of Mr. Salah's activities, which included the recruitment and funding of HAMAS terrorists, can be found in the affidavit of FBI Special Agent Robert Wright (previously provided to you) and in *In re Extradition of Marzook*, 924 F. Supp. 565, 587-92 (S.D.N.Y. 1996).

[5] Al-Gama'at Al-Islamiya has been designated a "Foreign Terrorist Organization" pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996. See 31 C.F.R. Ch. V, App. A.

[6] Al-Faran is a "Specially Designated Global Terrorist Entity" under E.O. 13224.

M. Claude Nicati
November 29, 2001
Page 3

Westerners in Kashmir. He was also close to Ramzi Yusif who has been convicted in the United States for his role in the first World Trade Center attack. Following the arrest of Ramzi Yusif in 1995, the Pakistani police reportedly raided Muwafaq's offices and held its local director in custody for several months. The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization[7] in the Philippines.

The Muwafaq Foundation also employed or served as cover for Islamic extremists connected with the military activities of Makhtab Al-Khidamat (MK),[8] which has been partially financed by the Muwafaq Foundation. The Muwafaq Foundation supplied identity cards and employment as cover for some Arabs to allow them to obtain visas to remain in Pakistan. The founder of MK was Abdallah Azzam, who was Usama bin Laden's mentor. Following the dissolution of MK in early June 2001 and its absorption into Al-Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq, also merged with Al-Qa'ida.

Mr. Kadi has asserted in various press interviews that the Muwafaq Foundation ceased operations at a range of different times in 1995, 1996 or 1997. However, the United Nations reported that Muwafaq was active in Sudan as late as 1997. Moreover, far from ceasing operations, the U.N. report stated that the "Muwafaq Foundation plans to *continue to expand* its humanitarian activities in the coming year . . . ." U.N. Department of Humanitarian Affairs, *Consolidated Inter-Agency Appeal for Sudan January-December 1997* (Feb. 18, 1997)(emphasis added).

From 1993, the head of the European offices of the Muwafaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate.[9] Ayadi Chafiq fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mohammad Salah Maklouf, its leader. Mr. Chafiq was expelled from Tunisia because of his membership in the TIF. As of February 1999, Mr. Chafiq was running Mr. Kadi's European network and serving as the president of Deposina Banka in Sarajevo, Bosnia, which was owned by Mr. Kadi. Mr. Chafiq may have participated in planning an attack on a U.S. facility in Saudi Arabia. Mr. Chafiq left his residence in London in a hurry after the September 11 attacks, and had reportedly been in the United States in the months preceding the attack.

The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is typical of the financial support network of Al Qa'ida and other terrorist organizations. Working in troubled areas such as Bosnia, Somalia, Sudan, and various refugee camps, the putative "relief" organizations provide cover for individuals engaged in recruiting, organizing, and

---

[7] The Abu Sayyaf Organization is a "Specially Designated Global Terrorist Entity" under E.O. 13224.

[8] MK is a "Specially Designated Global Terrorist Entity" under E.O. 13224.

[9] Ayadi Chafiq is a "Specially Designated Global Terrorist Individual" under E.O. 13224. See Amendment of Final Rule, 66 Fed. Reg. 54404 (2001). He also is listed as one of the signatories on Swiss accounts at Faisal Financial with Kadi.

M. Claude Nicati
November 29, 2001
Page 4

training terrorist cells. Their provision of humanitarian aid and educational services is done in concert with the terrorists to win the hearts and minds of the local people to whatever causes the terrorists espouse. When a region becomes more settled, such as Bosnia or Albania today, seemingly legitimate businesses replace charitable foundations as cover for continuing terrorist organizational activity. Mr. Kadi's actions and those of his Muwafaq Foundation and businesses fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist activities.

As noted previously, this is a summary of information concerning Mr. Kadi that we can release at this time. If we are able to release additional information in the future we will let you know.

Sincerely,

David D. Aufhauser
General Counsel

TOTAL P.06

Affidavit of J. Scott Tarbutton, Esq.

<u>Exhibit 9</u>

S. Hrg. 108–245

# TERRORISM FINANCING: ORIGINATION, ORGANIZATION, AND PREVENTION

# HEARING

BEFORE THE

## COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE

ONE HUNDRED EIGHTH CONGRESS

FIRST SESSION

———————

JULY 31, 2003

———————

Printed for the use of the Committee on Governmental Affairs



U.S. GOVERNMENT PRINTING OFFICE

89–039 PDF                WASHINGTON : 2004

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

7

Saudi officials to address a number of the issues that may arise in this hearing today.

That would conclude my opening statement.

Senator Specter. OK. Thank you very much, Mr. Pistole.

Our next witness is Rick Newcomb, who is the Treasury Office of Foreign Assets Control Director. Thank you for joining us, and we look forward to your testimony.

## TESTIMONY OF R. RICHARD NEWCOMB,[1] DIRECTOR, OFFICE OF FOREIGN ASSETS CONTROL, U.S. DEPARTMENT OF THE TREASURY

Mr. Newcomb. Thank you, Senator Specter, Madam Chairman, Members of the Committee. I am pleased to have the opportunity to testify this morning about our efforts to combat terrorist support networks that threaten U.S. citizens and property worldwide.

The threat of terrorist support networks and financing is real. It has been our mission to help identify and disrupt these networks. There is much we know about how radical Islamic terrorist networks are established and still thrive. Wealthy individuals and influential individuals and families based in the Middle East have provided seed money and support to build a transnational support infrastructure that terrorists have used for their purposes. This network, fueled by deep-pocket donors and often controlled by terrorist organizations, their supporters, and those willing to look the other way, includes or implicates banks, businesses, NGOs, charities, social service organizations, schools, mosques, madrassas, and affiliated terrorist training camps and safe houses throughout the world.

The terrorist networks are well entrenched, self-sustaining, though vulnerable to the United States, allied, and international efforts applying all tools at our disposal. Today, I will explain our efforts being implemented in coordination with other Federal agencies, including the Departments of Defense, State, Justice, Homeland Security, the FBI, the intelligence community, and other agencies to choke off the key nodes in the transnational terrorist support infrastructure.

The primary mission of the Office of Foreign Assets Control of the Treasury Department is to administer and enforce economic sanctions against targeted foreign countries and foreign groups and individuals, such as terrorists, terrorist organizations, and narcotics traffickers, which pose a threat to the national security, foreign policy, or economy of the United States. We act under the general Presidential wartime and national emergency powers, as well as specific legislation, to prohibit transactions and block or freeze assets subject to U.S. jurisdiction. The origin of our involvement in the fight against terrorism stems from the initial conception of terrorism as being solely state-sponsored. Our mandate in the realm of terrorism was to compile available evidence establishing that certain foreign entities or individuals that were owned or controlled by, or acting for or on behalf of, a foreign government subject to an economic sanctions program. Such entities and individuals be-

---

[1] The prepared statement of Mr. Newcomb with attachments appears in the Appendix on page 54.

8

came known as SDNs and are subject to the same sanctions as the foreign government to which they are related.

The President harnessed these powers and authorities in launching the economic war against terrorism in response to the terrorist attack of September 11 and pursuant to the powers available to the President under the International Emergency Economic Powers Act. President Bush issued Executive Order 13224, entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism," declaring that acts of grave terrorism and threats of terrorism committed by foreign terrorists pose an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States. This order prohibits U.S. persons from transacting or dealing with individuals or entities owned or controlled, acting for or on behalf of, assisting or supporting, or otherwise associated with persons listed in the Executive Order and those designated under the Executive Order as specially designated global terrorists.

After the September 11 attacks, President Bush rallied the international community to unite in the economic war on terrorism. The U.S. Government has worked with the United Nations to pass resolutions that parallel U.S. authorities to designate entities supporting al-Qaeda. The international community, including our allies in the Persian Gulf, joined us and have committed to fully cooperating on all fronts against al-Qaeda and its supporters. On a regular basis, for example, the United States works cooperatively with Saudi authorities on issues relating to the war on terrorism. In some areas, cooperation is routine and systematic. In others, especially those touching aspects of terrorist financing and infrastructure, which touches all aspects of government, coordination is more complex.

We have acted with Saudi Arabia and other allies in targeting al-Qaeda and other terrorist infrastructure. These actions have included a number of multilateral efforts that many times resulted in notifying and listing at the United Nations under United Nations Security Council Resolutions 1267 and 1455.

Some of the terrorist supporters we targeted include financial networks, including the al-Barakaat network, a Somalia-based hawala operator that was active worldwide. And the Muslim Brotherhood-backed Nasreddin financial services network. Other efforts have targeted charitable fronts based in the United States, including the Benevolence International Foundation, Global Relief Foundation, and the Holy Land Foundation, and foreign-based charitable fronts including branch offices of the Revival of Islamic Heritage Society and the Afghan Support Committee. We also acted with our allies against major al-Qaeda-affiliated organizations such as Jemaa Islamiyah.

In the coming months, we are seeking to significantly expand these efforts and impact the implementation of the President's authorities under the Executive Order by adopting a more systematic approach to evaluating the activities of major terrorist organizations in various regions. This approach will focus on identifying key nodes that sustain the abilities of terrorist organizations to remain operational despite successful actions by the United States and its

9

allies to capture and arrest terrorists, cell members, leaders, and operational planners.

In furtherance of this end, we have initiated a collaborative effort with the Department of Defense and other agencies to develop information and strategies against terrorist financing and infrastructure. Last fall, we began a pilot project with the U.S. Pacific Command and other DOD elements that identified terrorist support networks in Southeast Asia and selected key nodes or priority targets in these networks. The project focused special attention on al-Qaeda network affiliates in PACOM's AOR, including Jemaa Islamiyah, which subsequently carried out the Bali bombings, and the Abu Sayaff Group and others. This approach identified the key leaders, fundraisers, businessmen, recruiters, companies, charities, mosques, and schools that were part of its support network. Thus far, we have imposed sanctions against two of these key nodes and are coordinating actions against several others.

This process is the model that we are seeking to continue and expand in the collaborative efforts with DOD agencies and the combatant commands. We are working with USEUCOM headquarters. Meetings in the near future are planned to lay the groundwork for a continuing joint project. We also plan to begin projects with the Central Command Southern Command shortly thereafter. Working with these commands and other agencies provides us and DOD partners with, in effect, a force multiplier that brings together a variety of counterterrorism tools and resources to enhance opportunities for future efforts.

Taking a regional approach, following the various command's areas of responsibility, this effort will seek to identify and isolate the key nodes of the transnational terrorist support infrastructure in the respective AORs. This approach seeks to provide the opportunity to cripple an entire organization at one time through our implementation of the President's authority in coordination with possible actions in other departments and agencies and in cooperation with our allies at the UN.

We have already taken steps to implement this approach in some regions. For example, we are working with other DOD agencies, including the Office of Naval Intelligence, to fully identify the terrorism support infrastructure in the Horn of Africa. In this region, shipping and related drug-smuggling activities appear to be strengthening the terrorist networks in this area. Working with ONI provides us the opportunity to work with analysts who have unique experience in other areas less accessible to us.

I have today a few graphical representations of the key nodes approach that could be applicable to a terrorist support network in any region. It is related in Appendix 2 of my written testimony. Charts 1 and 2 are examples of the various steps of the funding process. Donors provide money to a variety of intermediaries often acting on behalf of charitable organizations to collect funds. The charitable organizations in turn use the funds both for legitimate humanitarian efforts but also, either wittingly or unwittingly, allow some funds to be siphoned off by facilitators who serve as the conduit to the extremist groups. Facilitators frequently are employees of the charitable organizations with close ties to the extremist

10

groups or members of the extremist group with responsibility for liaising with charitable organizations.

Chart 2 is a theoretical model of how the key nodes of the terrorist support structure can be more systematically identified in their respective levels of participation in the funding network.

Chart 3 is a model of a terrorist support network with the key nodes highlighted that we believe economic sanctions could effectively impact. These include financial, leadership, and influence nodes, which are color-coded in red, blue, and green. Influence nodes can include individuals and institutions that provide spiritual or other guidance or serve as recruitment centers.

Chart 4 shows theoretically how designation and——

Senator SPECTER. Before you leave Chart 3, what does Chart 3 show?

Mr. NEWCOMB. Chart 3 shows in green the financial targets, in red the leadership targets, in purple the influence targets. And by using an effects-based targeting approach, we are able on an interagency basis to identify who the key leaders of these various participating entities are so that when taking them out, we can result in Chart 4, which shows theoretically how designation will isolate the key nodes of Chart 3 and sever the critical ties within the overall network and thereby disrupt its overall functioning. By removing these key nodes of the support structure, the leadership, the influence, the financial, the terrorist group is unable to mobilize people and resources in support of terrorists, thus rendering it ineffective.

The funds necessary for a terrorist organization to carry——

Senator SPECTER. Mr. Newcomb, you are double time now plus. Would you sum up? And we will go to Q and A.

Mr. NEWCOMB. I have perhaps another minute.

Senator SPECTER. OK.

Mr. NEWCOMB. The funds necessary for a terrorist organization to carry out an attack often are minimal, but the support infrastructure critical for indoctrination, recruitment, training, logistical support, the dissemination of propaganda, and other material requires substantial funding. The President's power under Executive Order 13224, as well as other legislation, provide the United States with authorities that are critical to attacking this threat posed by these terrorist organizations. Our effectiveness in implementing these authorities requires strong coordination with other U.S. departments and agencies and support from U.S. allies under United Nations Security Council Resolutions 1267 and 1455.

Terrorist organizations including al-Qaeda, the Egyptian Islamic Jihad, Jemaa Islamiyah, Al-Ittihad Al-Islamiyya, Hamas, Hizbollah, and others rely on their infrastructure for support and to shield their activities from scrutiny. The secretive nature of their activities and their frequent reliance on charitable, humanitarian, educational, and religious cover are vulnerabilities we can exploit by making designations under the Executive Order. Decisive action against high-impact targets deters others, forcing key nodes of financial support to choose between public exposure of support for terrorist activities or tarnishing their reputation, to the detriment of their business and commercial interest.

Thank you, Senator.

11

Senator SPECTER. We will now proceed with questioning, 5-minute rounds, and the Chairman has deferred to me for the first round.

Mr. Newcomb, in interviews by staff preparatory to your coming here, you advised that a good many of your recommendations for sanctions were rejected. Would you amplify what has happened on that?

Mr. NEWCOMB. Yes, Senator. In identifying key nodes, our responsibility is to identify how these terrorist organizations fit their activities together.

Senator SPECTER. Well, after you have identified them and made the recommendation—I only have 5 minutes. I want to focus very sharply on the rejections on the recommendations which involve Saudi sources. Precisely what has happened on that?

Mr. NEWCOMB. Well, the designation, as we indicated in our discussions, is not the only possible action. There is also law enforcement, intelligence, diplomatic, and military——

Senator SPECTER. Well, let's focus on economic sanctions, which is my question, before we go into other possible actions. I want to know about the recommendations on economic sanctions as to Saudis which have been turned down.

Mr. NEWCOMB. Senator Specter, we have made numerous recommendations, including relating to Saudi Arabia and other terrorist support organizations and groups. This goes through a Policy Coordinating, PCC process, where all the equities of the government come to the table, including——

Senator SPECTER. Well, my question focuses on recommendations which you have made for sanctions as to Saudi organizations which have been rejected.

Mr. NEWCOMB. Well, first let me say it is not—it is the policy not to comment on internal policy deliberations within the government. I can tell you these issues have been discussed with all the key players at the table, and when there is another possible action that can be taken, we have achieved our goal by teeing issues up.

Senator SPECTER. I am not asking about internal deliberations. I am asking you—and let me be specific with some organizations which have been discussed with you by staff prior to your coming here.

Were there recommendations as to the National Commercial Bank of Saudi Arabia for economic sanctions which were rejected?

Mr. NEWCOMB. No, Senator Specter, there was not.

Senator SPECTER. Were there recommendations for sanctions against the World Assembly of Muslim Youth?

Mr. NEWCOMB. There, as in others, these are issues that we looked at and examined very carefully. There was no recommendation out of our office on either of those.

Senator SPECTER. Well, what conclusions did you come to on the World Assembly of Muslim Youth?

Mr. NEWCOMB. That along with the whole variety of charitable organizations operating head offices in Saudi are organizations that we are looking at, as well as the whole range of several hundred or so possible organizations that may be funding terrorist activities. Rising to the level of a recommendation is a complicated policy——

12

Senator SPECTER. Well, I am not concerned about several hundred others. I would like to know, what about the World Assembly of Muslim Youth? Were they funding terrorist organizations, subject to economic sanctions, without any action being taken?

Mr. NEWCOMB. I can not conclude that in this hearing today. It is an organization that we——

Senator SPECTER. You can or you can not conclude——

Mr. NEWCOMB. Cannot.

Senator SPECTER. At this hearing today?

Mr. NEWCOMB. Well, we did not conclude that in our deliberations, so I can not say that was a recommendation of our office.

Senator SPECTER. How about the International Islamic Relief Organization? Were there recommendations for sanctions there which were rejected by higher officials in the Treasury Department?

Mr. NEWCOMB. This is an issue that we looked at, and, again, your question relates to policy deliberations within the administration which I can not comment on. I can tell you we did look at that organization.

Senator SPECTER. I am not interested in your policy deliberations. What I am interested in is your conclusions. Were there economic sanctions taken against the International Islamic Relief Organization?

Mr. NEWCOMB. To date, there have not been as of this date.

Senator SPECTER. Do you think there should be?

Mr. NEWCOMB. It is something that we would look at very carefully along with the others participating in the policy process.

Senator SPECTER. Well, when you look at it very carefully, how long have you been looking at it up until now?

Mr. NEWCOMB. Certainly since immediately in the aftermath of September 11.

Senator SPECTER. Well, that is almost 2 years. How long will it take you to come to a conclusion?

Mr. NEWCOMB. We can recommend and we can designate, but there is a policy process which takes into account all the variety of——

Senator SPECTER. I have got 16 seconds left. Have you recommended as to any of the organizations I have mentioned to you some tough economic sanctions which were turned down by higher officials, implicitly because they were Saudi organizations?

Mr. NEWCOMB. I can not say it is because they were Saudi organizations.

Senator SPECTER. Well, could you say whether they were turned down?

Mr. NEWCOMB. I can say that there have been some charities and other organizations that we have considered, we have had at the table, and that have been deferred for other actions which I would deem as appropriate.

Senator SPECTER. Well, my red light went on in the middle of your last answer, but I will be back.

Mr. NEWCOMB. OK.

Senator SPECTER. Senator Akaka.

Affidavit of J. Scott Tarbutton, Esq.

Exhibit 10

# U.S. DEPARTMENT OF THE TREASURY

**Press Center**

## Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism

11/19/2002

Today the US Treasury designated three entities as financiers of terrorism under Executive Order 13224 and will ask the United Nations to add these names to the list of those whose assets must be blocked by all member nations under UNSCR 1390. The financial accounts of the principal entity, Benevolence International Foundation, were blocked pending investigation in December 2001. The three closely linked but separately incorporated entities designated today are Benevolence International Foundation, Benevolence International Fund (Canada), Bosanska Idealna Futura (Bosnia), and their branch offices.

"UN designation of these financiers of terror will cut off their access to the global financial system and strip them of their ability to fund evil," said Treasury Secretary Paul O'Neill.

Benevolence International Foundation ("BIF") is a U.S. tax-exempt not-for-profit organization whose stated purpose is to conduct humanitarian relief projects throughout the world. BIF was incorporated in the State of Illinois on March 30, 1992. Although BIF is incorporated in the United States, it operates around the world, in Bosnia, Chechnya, Pakistan, China, Ingushetia, Russia, and other nations. BIF operates as Benevolence International Fund in Canada and as Bosanska Idealna Futura in Bosnia.

Enaam Arnaout, BIF's Chief Executive Officer and a member of the Board of Directors, recently was indicted in the United States for operating BIF as a racketeering enterprise and providing material support to organizations, including al Qaida, that are engaged in violent activities.

Substantial evidence documents the close relationship between Arnaout and Usama bin Laden, dating from the mid-1980s. An article in the Arab News from 1988, reporting on bin Laden's activities at the "al Masada" mujahideen camp in Afghanistan, included a photograph of Arnaout and bin Laden walking together. In a March 2002 search of BIF's offices, Bosnian law enforcement authorities discovered a host of evidence linking Arnaout to bin Laden and al Qaida. Among the files were scanned letters between Arnaout and bin Laden, under their aliases.

In one handwritten letter, bin Laden indicates that Arnaout is authorized to sign on bin Laden's behalf.

Various documents also established that Arnaout worked with others -- including members of al Qaida -- to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida.

Arnaout claimed to the Chicago Tribune last winter that he did not know bin Laden personally, that he had never been to the "al Masada" camp (at which he had been photographed walking with bin Laden), and that he was working in a restaurant in the Persian Gulf area during the relevant time frame. BIF's counsel later acknowledged in court that "it would appear that the nature of [Arnaout's] contacts [with bin Laden] may have been of a deeper nature than what he described to the Tribune."

BIF also has provided additional support for and has been linked in other ways to al Qaida and its operatives. First, BIF lent direct logistical support in 1998 to Mamdouh Mahmud Salim, a bin Laden lieutenant present at the founding of al Qaida. Salim was indicted for conspiring to kill U.S. nationals. Testimony at the 2001 trial of United States v. Bin Laden, et al, implicated Salim in efforts to develop chemical weapons on behalf of al Qaeda in the 1990s. As early as 1992, Salim and bin Laden made efforts to develop conventional weapons and to obtain nuclear weapons components. BIF is also linked to Mohamed Loay Bayazid, who was implicated in the U.S. embassy bombings trial for his efforts, approved by Salim, to obtain weapons components on behalf of bin Laden in 1993-1994. Bayazid's driver's license application, dated September 12, 1994, identifies his address as the address of BIF's Illinois office. In the late 1990s, Saif al Islam el Masry, a member of al Qaida's majlis al shura (consultation council), served as an officer in BIF's Chechnya office.