EXHIBIT 43

*dep. - pleading*
*70346-83087*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

---

THE SANA-BELL, INC.,

                Plaintiff,

v.                                                                                    Case No. 98-CV-4177 (PJM)

BMI REAL ESTATE DEVELOPMENT, INC.,
BMI LEASING, INC., SOLIMAN S. BIHIERI, and
SULEIMAN BIN ALI ALALI,

                Defendants.

---x

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

1. The Plaintiff, Sana-Bell, a Washington, D.C. non-profit corporation, invested in two limited partnerships in 1992. Sana-Bell's investment comprised of $1.1 million in units in BMI Construction Fund Limited Partnership and $1 million in units in BMI Leasing Limited Partnership.

2. The original Limited Partnership Subscription Agreements in the Defendants' possession were signed by Dr. Al-Saati and Dr. Mirza, the true President and Secretary/Treasurer, respectively, of Sana-Bell.

3. The two corporate Defendants in this case, BMI Real Estate Development, Inc. ("BMI REDI") and BMI Leasing, Inc. ("BMI Leasing") are the managing general partners of the two limited partnerships, respectively.

4. The general partners are companies wholly-owned by Defendant Soliman Biheiri ("Biheiri").

51013146.01

KMR - 00095
ASH 024829

5. From the beginning of Sana-Bell's investments, regular reporting to Sana-Bell of the Limited Partnership's investments showed no unusual activities. Then, in 1998, certain accounting irregularities, including the partnerships' failure to provide Sana-Bell with annual K-1 reports of partnership disbursements, prompted requests from Sana-Bell to provide a proper accounting of its investments. Meetings were held among Defendant Alali (a long-time friend of Biheiri), and certain officers of Sana-Bell to address Sana-Bell's concerns.

6. At a heated meeting in September 1998, which Biheiri attended, it was disclosed that Sana-Bell's investments had been transferred out of the partnerships by Biheiri and his friend Alali.

7. Following the meeting, Sana-Bell demanded in writing a full accounting of its investments. Those requests went unanswered, and this lawsuit followed.

8. Although Alali was a member of Sana-Bell's investment committee, he was never an officer, director, nor a trustee of Sana-Bell with actual authority to dissipate or transfer Sana-Bell's partnership interests.

9. Despite Biheiri's claims that he believed Alali's representations that Alali was the president, secretary and treasurer of Sana-Bell, Biheiri knew or should have known that the true president of Sana-Bell was Dr. Al-Saati because. In addition to the fact that Al-Saati signed one of the original Limited Partnership Subscription agreements as "President", Biheiri also met with Al-Saati in Saudi Arabia approximately twice a year, providing Al-Saati with status reports on the Sana-Bell investments. Biheiri also provided Sana-Bell's true Treasurer and Secretary, Dr. Mirza with K-1 tax forms on a regular basis up until 1998.

10. Dr. Mirza previously authorized a $110k disbursement from Sana-Bell's account. No other disbursements on account of Sana-Bell's partnership interests were ever authorized by either Dr. Mirza or Dr. Al-Saati.

KMR - 00096
ASH 024830

11. Alali confessed to Mirza upon inquiry into the status of Sana-Bells investments that there was a "problem" with Sana-Bell's investments that was much bigger than Mirza might suspect.

12. Early in the case the parties voluntarily exchanged documents. Defendants produced a series of documents each bearing a January 1996 date which purport to have effectuated a transfer of Sana-Bell's investments some three years earlier to one of Mr. Biheiri's companies, BMI Leasing from which approximately $1M was withdrawn by Alali individually.

13. Mr. Alali's "authority" to sign these withdrawal documents on behalf of Sana-Bell is allegedly reflected in a Certificate of Incumbency which purports to certify, by virtue of Mr. Alali's signature alone, that Alali was President, Chief Executive Officer and Secretary of Sana-Bell.

14. The Certificate of Incumbency and the other withdrawal related documents are not signed by any officer, trustee, or board member of Sana-Bell. It is not even certain if any were actually signed by Alali himself. The transactional documents that were offered by Defendants bear only a signature line for Mr. Alali, and contain a signature, although certain signatures differ markedly from others purported to be of the same name.

15. The Certificate of Incumbency is the document upon which all the other withdrawal documents rely as the sole document purporting to authorize Alali to act on behalf of Sana-Bell. Because Alali is the only one who signed the Certificate of Incumbency and it purports to verify his own status, it in fact verifies nothing.

16. Defendants never attempted to verify Alali's authority to withdraw Sana-Bell's investments in their entirety, and never disclosed to either Dr. al-Saati or Dr. Mirza that the assets were being transferred.

17. Defendant Biheiri claimed that his practice was to mail two sets of each of the withdrawal documents to Alali, one blank and one signed by BMI. Biheiri, therefore, never saw

KMR - 00097
ASH 024831

Alali execute any of the documents, and he has no fully executed copies. Biheiri also testified that the first time he had ever really looked at Mr. Alali's signature was at his deposition. Finally, Biheiri himself acknowledged that at least two of the purported copies of Alali's signature are different from one another.

18.  None of the documents produced in connection with the transfer is executed by Mr. Biheiri, BMI REDI or BMI Leasing, and none of Mr. Alali's purported signatures is notarized.

19.  Although Biheiri contends under the withdrawal transaction that he "sold" Sana-Bell 49,000 shares of stock in his company (BMI Leasing) in exchange for Sana-Bell's limited partnership units, Biheiri never actually became a limited partner in Sana-Bell's place. Indeed, on the books of the limited partnerships, Sana-Bell remained a partner even after the alleged transfer of all of Sana-Bell's partnership units. At the same time, Biheiri claimed that on the books of BMI Leasing, Sana-Bell nonetheless became a 49% owner.

20.  No shares were ever actually issued in BMI Leasing, as reported in the withdrawal documents. The Schedule K-1 tax filings sent to Sana-Bell reflected that Sana-Bell maintained its partnership interests even after the purported withdrawal transaction had occurred.

21.  Following the filing of the litigation, Biheiri confessed that he had mishandled Sana-Bell's investments and was willing to "go to jail" to put this all behind him.

## CONCLUSIONS OF LAW

22.  Authentication and identification of evidence represents a special aspect of relevancy that itself must be proven by direct or circumstantial evidence. 31 Graham, Federal Practice and Procedure (2nd Ed. 1997) at 668. Ordinarily, the determination of authenticity ultimately rests with the jury, once the proponent of the evidence makes a prima facia showing of authenticity to the court. U.S. v. Goichman, 547 F.2d 778, 783 (3rd Cir. 1976). However, in this action without a jury, the Court may determine the issue.

KMR - 00098
ASH 024832

23.     The requirement of authenticity or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Fed. R. Ev. 901(a). Defendants claim that the series of withdrawal documents purporting to contain the signature of the absent Defendant, Alali and that Alali possessed actual or apparent authority to sign on behalf of Sana-Bell. The evidence, however, fails to establish even a prima facia showing that the documents were ever actually signed by Alali. Consequently, Defendants lack the evidence to make a prima facia case that the documents contain an authentic signature or are otherwise what Defendants purport them to be. Without authentic transactional documents, Defendants cannot establish their defense that Sana-Bell's funds were legitimately "withdrawn" from the partnerships.

24.     Federal Rule of Evidence 901(b) lists ten examples of authentication or identification conforming to the requirements of the rule. Of those ten, only the following three could potentially apply to the withdrawal documents at issue here:

> (1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.
>
> (2) Nonexpert opinion on handwriting. Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.
>
> *       *       *
>
> (4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

Fed. R. Ev. 901(b)(1), (2) and (4).

25.     Similarly, Federal Rule 902 lists ten categories of self-authenticating documents that require no extrinsic evidence of authenticity. Of those ten, only Rule 902(8) could potentially apply here.

> (8) Acknowledged documents. Documents accompanied by a certificate of acknowledgement executed in the manner provided by law by a notary public or other officer authorized by law to take acknowledgements.

5

51013146.01

KMR - 00099

ASH 024833

Fed. R. Ev. 902(8).

26. None of those provisions can be used to solve Defendants' authenticity problems. Defendants lack the testimony of a person who witnessed Alali's alleged act of signing under Fed. Ev. Rule 901(b)(1). Without Alali who Defendants did not produce as a witness at trial, they lack a witness with the requisite familiarity to testify as to the authenticity of the purported signatures under Fed. Ev. Rule 901(b)(2). The inconsistency of the signatures, which Biheiri himself admitted are "different," militates against a finding of a consistent internal pattern supporting authenticity under Fed. R. Ev. 901(b)(4). Finally, the lack of any notarization renders authentication under Fed. R. Ev. 902(8) unavailable.

27. In addition to the authenticity problems concerning the withdrawal documents allegedly signed by Alali, Defendants have other insurmountable barriers with regard to the legitimacy of the Certificate of Incumbency that purports to certify Alali's authority to enter into the asset transfer on behalf of Sana-Bell.

28. First, the Certificate of Incumbency is nothing more than Alali's claim to authority <u>certified by Alali alone</u>. For the document to have any legal meaning at all, the certification would have to come from some authority other than the person whose authority is purportedly confirmed thereby. See <u>Sullivan v. Mosner</u>, 295 A.2d 482, 494 (Md. App. 1975) (a purported agent's own declarations are insufficient to establish his agency).

29. The fatal circularity of the Certificate of Incumbency is compounded by the fact that in a District of Columbia nonprofit corporation such as Sana-Bell, it is illegal to hold the offices of President and Secretary simultaneously. D.C. Code § 29-524 (in a District of Columbia nonprofit corporation, "any two or more offices may be held by the same person, <u>except the offices of president and secretary</u>"). Alali allegedly signed the Certificate as President, CEO <u>and</u> Secretary of Sana-Bell. Thus, the Certificate, as a matter of law, is a nullity on its face.

6

51013146.01

KMR - 00100

ASH 024834

30.  Indeed, each of the transactional documents presented by Defendants suffers from a number of deficiencies. Even if the documents were authentic and admissible, they are so fraught with obvious legal deficiencies that they are ineffective as transactional documents, and evidence a sham transaction. A summary description of these deficiencies is as follows:

A. <u>Limited Partnership Withdrawal Agreement</u>. (This document was executed by "Suleiman Alali" purportedly in his capacity as director of Sana-Bell but was never executed by BMI Leasing Limited Partnership, the purported other party to the agreement. Directors typically do not have authority to execute such agreements, and there is no indication that Alali was ever given corporate authority as a director to execute this document on behalf of Sana-Bell. The document bears a date of January 1, 1996 and states in its preamble that the value of Sana-Bell's interest in the BMI Leasing Limited Partnership as of September 1, 1995 was $1 Million, yet the agreement purports to effect a withdrawal by Sana-Bell from the partnership without indicating that Sana-Bell was to receive any value for its interest. Subsequent to the date of the agreement, both BMI Leasing and Sana-Bell continued to reflect Sana-Bell as a partner in the partnership by continuing to issue Schedule K-1's to Sana-Bell. The signature on the agreement is not notarized.

B. <u>Limited Partnership Withdrawal Agreement</u>. This agreement purports to be between Sana-Bell and BMI Construction Fund Limited Partnership but again was only executed on behalf of Sana-Bell by "Suleiman Alali" as director and never executed by an officer of Sana-Bell or by BMI Construction Fund Limited Partnership. All of the comments made with respect to the BMI Leasing Limited Partnership, above, are applicable with respect to this document. In addition, the date of this document is January 1, 1996 but the preamble to the document inexplicably purports to value Sana-Bell's interest in the limited partnership as of December 5, 1997 at (prospectively) $1 Million. The signature on the agreement is not notarized.

C. <u>Discharge and Release</u>. This agreement is a release given by Suleiman Bin Ali Alali personally and in his alleged capacity as "President and CEO of Sana-Bell Inc." in favor of a

KMR - 00101
ASH 024835

"Company" which appears to include BMI Leasing Limited Partnership, BMI Construction Fund Limited Partnership and possibly their general partners, BMI Leasing and BMI REDI, although the term "Company" was never defined. The terms of the release speak about claims which Suleiman Bin Ali Alali himself and his heirs have, thus rendering it ineffective as a release of any Sana-Bell claims and, therefore, incongruous with the claimed withdrawal transactions. The address provided is not Sana-Bell's corporate address. Nor is there any indication of any consideration having been given for this release. Furthermore, the signature on the release is not notarized.

D. <u>Release</u>. This document purports to be signed by "Suleiman Bin Ali Elali" in his alleged the capacity as President and CEO of Sana-Bell and purports to release all claims Sana-Bell has against BMI Leasing and BMI REDI arising on or before January 1, 1996. There is no indication as to what consideration Sana-Bell received for this release, and the address used is not Sana-Bell's corporate address. The release is not notarized.

E. <u>Shareholders Agreement</u>. This document, dated January 1, 1996, purportedly exists between Sana-Bell and Soliman Biheiri, but was never signed by Biheiri. The person signing on behalf of Sana-Bell was Suleiman Alali as director (again no indication exists as to what authority he had to sign in such capacity). The signature on the agreement is not notarized. Additionally, the agreement suggests that Sana-Bell bought a stock interest in BMI Leasing. No such stock issuance ever occurred.

F. <u>Certificate of Incumbency</u>. This document, dated January 20, 1996, purports to set forth the name and signature of the officers of Sana-Bell. It was signed solely by "Suleiman Bin Ali Alali" who purports to be the President, CEO and Secretary of Sana-Bell. Under D.C. law, he is not allowed to hold those positions simultaneously. Thus, this document is a legal impossibility on its face. No other officers are listed, and the signature is not notarized.

G. <u>Corporate Resolution</u>. This document purportedly signed January 20, 1996 by "Suleiman Bin Ali Elali" allegedly as President and CEO of Sana-Bell purports to set forth and

8

51013146.01

KMR - 00102

ASH 024836

certify certain resolutions adopted by the Board of Directors of Sana-Bell. The documents states on its face that "the Board of Directors of the Company SANA-BELL Inc., certify hereby" suggesting that the signature at the bottom should be those of the Board of Directors. Thus, the fact that the document is signed by someone other than the Board of Directors makes it false on its face. The certification is that "Suleiman Bin Ali Elali" is the President and CEO of Sana-Bell. He was the only person who signed, and the signature is not notarized.

H. <u>K-1 Statement for Sana-Bell Inc. from BMI Leasing L.P. for 1996</u>. This document shows Sana-Bell's interest in such limited partnership to be close to 19% at the end of 1996 having a value of approximately $980,000. The first page of the 1997 K-1 is also included, again showing a 19% interest for a value of $1.059 Million. These values are reflected to exist more than one year after the claimed withdrawal from the partnership occurred.

I. <u>K-1 For Sana-Bell Inc. from BMI Construction Fund Limited for 1997</u>. This shows Sana-Bell's interest being liquidated during the year of 1997, not 1996. It is, thus, entirely inconsistent with the documentation claimed by Defendants to have effected a withdrawal in 1996.

31. Defendants seek to avoid liability in this case based on the equitable defense that Alali possessed apparent authority to act on behalf of Sana-Bell. Yet the evidence presented by Defendants falls far short of satisfying Defendants' burden of proving that Alali possessed apparent authority to act on Sana-Bell's behalf.

32. First, this defense cannot prevail in light of the fact that the documents purporting to evidence the allegedly authorized acts are on their face enough to put any reasonable person on notice that the transfer was highly suspicious and clearly unauthorized. <u>C.f.</u>, <u>Burns v. Prudential Ins. Co. of America</u>, 159 A. 606, 608 (Md. App. 1932) (person cannot be misled by declaration of agent known to be acting beyond the scope of his actual or apparent authority). "[A] third person must use reasonable diligence and prudence to ascertain whether an agent is acting within the scope of his or her powers." <u>Hill v. State</u>, 585 A.2d 252 (Md. App. 1991). The

9

KMR - 00103

ASH 024837

Fourth Circuit has explained that under Maryland law, "[t]he mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and, like a railroad crossing, suggests the duty to 'stop, look and listen,' and he who would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority...." Standard Acc. Ins. Co. v. Simpson, 64 F.2d 583, 589 (4th Cir. 1933); see also Springfield Television, Inc. v. Gary, 628 S.W.2d 398, 403 (Mo. App. 1982) (" person dealing with a supposed agent has a duty to ascertain for himself the fact and scope of agency and must display that degree of common sense which distinguishes good faith from blind faith"). BMI never took these measures. Instead, BMI rests its case on the theory that Alali's apparent authority relieved them of their obligation to confirm the existence and scope of his agency powers.

33. Succinctly put, apparent authority to do an act is created as to a third person by written or spoken words or other conduct of the principal which, when reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him. Parker v. Junior Press Printing Service, Inc., 296 A.2d 377, 380 (Md. App. 1972). Driving this rule of law is the notion that, if two innocent people are harmed by the acts of an unauthorized agent, the person who misled the other into the contract by holding out the agent as competent to act will be the one to suffer. Id. at 381. The reasonable assessment of the apparent authority cannot be viewed generally, but must be specific to the transaction. P. Flanigan & Sons, Inc. v. Childs, 248 A.2d 473, 476 (Md. App. 1968). Moreover, the acts relied on must be those of the principal and not the apparent agent. Integrated Consulting Services, Inc. v. LDDS Communications, Inc., 996 F. Supp. 470, 476 (D. Md. 1998). The burden of proving not only the existence but the nature and extent of the alleged agency is on the Defendants. Medical Mutual Liberty Ins. Society of Maryland v. Mutual Fire, Marine and Inland Ins. Co., 379 A.2d 739, 743 (Md. Ct. Spec. App. 1977).

34. Defendants themselves admit that the acts that allegedly led them to believe in Alali's authority were Alali's acts alone, and not those of Sana-Bell, as required by the doctrine

KMR - 00104
ASH 024838

of apparent authority. <u>See</u> Defendants' Interrogatory Response No. 7 ("Dr. Ali Alali affirmatively represented that he possessed the authority to do those acts described above. *No one else on behalf of plaintiff ever contacted any representative of defendants with respect to these investments or Dr. Ali Alali's authority* (or lack thereof). . . .") (emphasis added).

35.  Defendants assert that because Alali was the only person from Sana-Bell with whom Biheiri dealt, it was reasonable to conclude that Alali had the right to sell the corporation's assets. The fallacy of this principal was long-ago recognized in <u>Hopper v. Callahan</u>, 28 A. 385 (Md. App. 1894). In the <u>Hopper</u> case, the court considered the situation where a landowner placed a caretaker in charge of a farm, and the caretaker sold the property to a third party. The court explained:

> Certainly it could not justly be said that the owner had given [the caretaker] the apparent authority to sell [the farm]. It is not the common business of persons who are placed in charge of farms to sell the personal property which the owners confide to their custody for the ordinary and necessary requirements of farms. <u>Persons who purchase such property from them without the necessary evidence of their right to sell must take the consequences of their own improvidence</u>.

<u>Hopper</u>, 28 A. at 386 (emphasis added). Defendants cannot meet their burden of proving that it was reasonable to believe that Alali had Sana-Bell's permission to "sell the farm."

36.  Finally, equity precludes Defendants from relying on the defense of apparent authority to avoid liability for the unauthorized transfer of Sana-Bell's assets. Apparent authority finds its roots in the equitable doctrine of estoppel. <u>See</u> <u>Parker v. Junior Press Printing Service, Inc.</u>, 296 A.2d 377, 381 (Md. App. 1972). The long-established principle of unclean hands prohibits Defendants from raising the defense of apparent authority in this case due to the misleading nature of the inconsistent K-1 tax statements they prepared. <u>See</u> <u>Ettridge v. TSI Group, Inc.</u>, 548 A.2d 813, 818 (Md. App. 1988) ("he that has committed inequity shall not have equity"), <u>citing</u>, 2 <u>Pomeroy's Equity Jurisprudence</u> 90 (5th Ed. 1941). Defendants can hardly claim the equitable protection of apparent authority when they prepared and delivered to Sana-

11

KMR - 00105

ASH 024839

Bell misleading tax documents that are wholly inconsistent with the allegedly authorized withdrawal transaction.

Respectfully submitted,

/s/ Richard A. Gross, Bar No. 360913
Michael D. Gaffney, Bar No. 439699
Rosenman & Colin LLP
805 15th Street, N.W., 9th Floor
Washington, DC 20005
(202) 216-4600

Dated: February 24, 2000

KMR - 00106

ASH 024840

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2000, I caused a true and correct copy of the foregoing Plaintiff's Proposed Findings Of Fact And Conclusions Of Law to be served by U.S. Mail, first class, postage prepaid, on William F. Krebs, Esq., Galland, Kharasch, Greenberg, Fellman & Swirsky, P.C., Canal Square, 1054 31st Street, N.W., Washington, DC 20007-4492.

/s/ Richard A. Gross

51008858.01

KMR - 00107
ASH 024841