# EXHIBIT A

Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's Motion
To Exclude the Testimony of Victor Comras

03 MDL 1570

July 31, 2023

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001
03-MDL-1570 (GBD) (SN)**

**EXPERT REPORT OF VICTOR D. COMRAS**

# *TABLE OF CONTENT*

*Page*

*Scope of Work*------------------------------------------------------------ *1*

*Background and Qualifications*------------------------------------------*1-4*

*Methodology*------------------------------------------------------------ *4-5*

*Summary Conclusions*---------------------------------------------------- *5-6*

*My Opinions, Basis and Reasons, Facts and Data Considered - 6*

*1.  Terrorism Financing Risk Factors and "Red Flags"*--------- *6-8*

*2.  Osama bin Laden and al Qaeda*-------------------------------- *9-13*

*3.  Yasin Kadi*-------------------------------------------------------- *14-19*

*4.  Wael Julaidan*---------------------------------------------------- *19-29*

*5.  Kadi's Close Relationship with Julaidan*----------------------- *30-32*

*6.  The Muwafaq Foundation and Yasin Kadi's Business
     Dealings*------------------------------------------------------------*33-47*

      *A. Sudan*------------------------------------------------- *34-39*
      *B. Pakistan*---------------------------------------------- *40-42*
      *C. Balkans*----------------------------------------------- *42-47*

*7.  The Maram Affair*------------------------------------------------ *47-49*

*8.  Kadi Designated a Terrorist Supporter*----------------------- *50-51*

*9.  The Removal of Yasin Kadi's Designations*----------------- *51-52*

*10. Conclusion*------------------------------------------------------- *52-56*

*Appendix 1: Resume of Victor D. Comras*
*Appendix 2: List of Reliance Materials*

## Scope of Work

I have been engaged by counsel for the Plaintiffs as an expert with regard to allegations concerning Yasin Kadi and Wael Julaidan's involvement in providing financial and logistical support to Osama bin Laden and al Qaeda. This support enabled bin Laden and al Qaeda to conspire to launch terror attacks against Americans, specifically, the September 11, 2001 terror attacks in the United States.

I am being compensated for my work in this case at the rate of $350.00 per hour.

## Background and Qualifications

I am an attorney and consultant specializing in measures to combat money laundering and terrorism financing and in the development, implementation and enforcement of economic and financial sanctions. I received my JD with honors from the University of Florida Law Center in 1966 and my LLM in International Law from Harvard Law School in 1975. I have been an active member of the Florida Bar since 1967.

I was appointed a Foreign Service Officer with the U.S. Department of State in 1966 and as a Senior Foreign Service Officer in 1990. My assignments included, *inter alia*, serving as Attorney Advisor on Arms Control and Disarmament (1969-1971), U.S. Delegate to COCOM[1] (1975-78), Officer in Charge for Export Controls for the Office of East-West Trade (1980-82), East West Trade Officer for the European Bureau (1983-85), Director of the Office of International Economic Sanctions Policy (1991-93), Director of the White House's Inter-Agency Task Force on Serbia Sanctions[2] (1993-94), Chief of Mission (with the equivalent rank of Ambassador) of the United States Embassy in Skopje, Republic of Northern Macedonia[3] (1994-1996), Special State Department

---

[1] COCOM, located in Paris, France, served as an international (NATO countries, Japan, Australia, New Zealand and South Korea) Coordinating Committee charged with administering a strategic economic and trade embargo on the Soviet Union, Warsaw pact countries, China and North Korea during the cold war period. It was disbanded in 1992.

[2] In my capacity as Director of the White House Inter-Agency Task Force on Serbia Sanctions I was charged with coordinating and overseeing the implementation of both U.S. and International trade and financial sanctions against Serbia. This included working closely with the Treasury Department's Office of Foreign Assets Control concerning the application and enforcement of financial sanctions on Serbia.

[3] The country was then known as the Former Yugoslav Republic of Macedonia. I was appointed as Chief of Mission pursuant to Section 502c of the Foreign Service Act.

Coordinator for the Restitution of World War II (Holocaust) Assets (1997-1998), and Special Advisor to the Secretary of State for Sanctions Policy (1999-2001). I was also detailed for one academic year beginning in September 1996 to serve as Diplomat-in-Residence at the University of Pittsburgh Graduate School of Public and International Affairs ("GSPIA") where I taught courses related to international sanctions policy, diplomacy, and U.S. foreign policy. My overseas postings with the State Department included Zaire (1967-69); Nigeria (1971-72), South Africa (1972-72), France (1974-78 & 1985-89), Canada (1990-91) and Macedonia (1994-96). I retired from the Department of State in September 2001 with the Permanent Rank of Minister-Counselor.

As Director of the State Department's Office of Sanctions Policy from 1991 to 1993, I was directly involved in the development, implementation, and enforcement of our economic, financial and trade sanctions against Libya, Iraq, Iran, Haiti, and Serbia. I was also charged with managing the State Department's role and responsibilities with regard to U.S. sanctions on Cuba, North Korea, as well as those sanctions measures directed at states and entities designated as supporting international terrorism. This included participation in the design, implementation, and monitoring of international regulatory and other measures to identify, prevent, stop and/or punish the use of illicit financial transactions and other means to circumvent such sanctions measures. It was during this period that targeted financial sanctions, such as those requiring the freezing of assets of specific individuals and entities, were first developed and implemented. These measures incorporate the same AML[4] regulatory and compliance measures and techniques applied to illicit financial transactions linked to terrorism and trans-national crimes. I subsequently served as Special Advisor to the Office of the Secretary of State for Sanctions Policy (1999-2001). My effective performance in these roles necessitated a full understanding of U.S. and international financial regulations, norms and practices related to preventing money laundering and countering the financing of terrorism.

Following my retirement from the State Department, I was appointed by UN Secretary General Kofi Annan (with the concurrence of the UN Security Council) to serve from

---

[4] Anti-Money Laundering.

April 2002 to January 2004 as the U.S. member of the five-member International Monitoring Group on Al Qaeda and the Taliban established pursuant to UN Security Council Resolutions 1267, 1330, 1390 et seq. I served as the group's lead member on terrorist financing. One of my key responsibilities was to evaluate the methodology used by al Qaeda and the Taliban to obtain the financing needed to support their organization and operations, as well as the steps countries were taking to implement the provisions of UN Security Council Resolutions to combat terrorism and terrorism financing. In the course of carrying out this responsibility I met with government and international officials and public and private counterterrorism experts. I also represented the Monitoring Group at FATF[5] Plenary and G-20 Ministerial meetings that dealt with terrorism financing issues.

From September 2009 to October 2010, I served, pursuant to an appointment by UN Secretary General Ban Ki-Moon, as the U.S. member of the Security Council's Panel of Experts on North Korean Sanctions, and headed the panel's efforts to identify and address illicit financial transactions and sanctions issues.

Between, and since, my UN appointments, I have advised a variety of clients, spoken, and written on issues related to money laundering, terrorism, and terrorism financing. I was a regular contributor to the reputed online Counterterrorism Blog. I was also called upon regularly to testify before various U.S. Congressional and Canadian Parliamentary Committees on these issues. I am the author of *Flawed Diplomacy: The United Nations and the War on Terrorism* (Potomac Books 2010), co-author of *Pressure: Coercive Economic Statecraft and U.S. National Security* (CNAS 2011) and a contributing author of *Terrorism Financing and State Responses* (Stanford Univ. Press 2007). In 2004 the Association for Diplomatic Studies and Training and the Library of Congress published an oral history of my career which can be found online at https://www.loc.gov/item/mfdipbib001340.

---

[5] The Financial Action Task Force, a subsidiary body of the Organization for Economic Co-operation and Development ("OECD").

Attached hereto, as Appendix A, is my true and correct resume, including a representative list of my various publications, articles and presentations.

## Methodology

In putting together this report, and formulating my opinion, I have relied on my professional experience developed over the course of my career at the U.S. State Department, the United Nations, and as a private consultant in dealing with terrorism financing, money-laundering, and sanctions-circumvention cases. I have relied also on the use of my forensic accounting, social science research, and evaluation skills in reviewing documentary evidence. I have employed secondary source analysis methodology [6] and used my AML/TF[7] practitioner's skills in evaluating the relevance, reliability and accuracy of secondary sources such as concurrent press reports, intelligence reports, testimonies, and other publicly available source information.  In each case I have identified the secondary source, author, and date.

I have also sought to evaluate secondary source information against disclosed and discovered related documentation.  This has involved the use of forensic accounting methodologies to evaluate related financial and transactional activities and documents. Forensic accounting involves the use of accounting, auditing, and investigative skills to examine the financial activities of an individual or business.  It involves analyzing the financial aspects of commercial and other types of transactions involving the transfer of financial assets. It includes the tracing of funds, asset identification, and the evaluation of, or absence of, record keeping and due diligence reviews. My objective has been to identify and evaluate "red flags," where present, signaling the potential or likelihood of terrorism financing activities. The criteria I used to identify and evaluate such "red flags" was developed by several public and private financial institutions, including FATF,[8] EGMONT,[9] the International Monetary Fund, The Wolfsberg Group[10], and The Federal

---

[6] Secondary analysis is a research method that involves analyzing data collected by someone else.

[7] Anti-Money Laundering/Terrorism Financing.

[8] The Financial Action Task Force which is located within the OECD headquarters.

[9] The Egmont Group of Financial Intelligence Units is an informal network of 164 national financial intelligence units ("FIUs") that collect information on suspicious or unusual financial activity from the

Financial Institutions Examination Council ("FFIEC").[11]  A number of these "red flag" indicators are discussed below.

## Summary Conclusions

From its inception, al Qaeda and its leader, Osama bin Laden, relied heavily on the provision of funds by individual donors, charities, and businesses to finance al Qaeda's organizational, indoctrination, recruitment, and operational activities. This involved the establishment of a complex and sophisticated network that intertwined Islamic charities, banks, shell companies, businesses, and business dealings to channel and mask such financial support and transactions, and to insulate the group's resource supporters and donors from suspicion. The bulk of these donations originated from wealthy Saudi Arabian donors, including members of the Saudi Royal family, those closely connected to them, and the charities they were associated with. Many of these people also held senior managerial government positions.

Based on my work as a member of the UNSC Al Qaeda and Taliban Monitoring Group, my independent research, and a review of documents provided to me, it is my expert opinion that Yasin Kadi and Wael Julaidan, both Saudi nationals, assisted in the establishment of this financial network and used its complex mechanisms to channel funds for al Qaeda's organization and its activities. These funds were provided to Osama bin Laden and al Qaeda through, and with the cooperation of, officials within or closely associated with the Saudi Government. This financial support predated and continued after bin Laden's declarations of war on America.[12] The support assisted bin Laden and al

---

financial industry and other entities or professions required to report transactions suspected of being money laundering or terrorism financing.

[10] The Wolfsberg Group is an association of thirteen global banks which aims to develop frameworks and guidance for the management of financial crime risks. *See* https://www.wolfsberg-principles.com/sites/default/files/wb/pdfs/wolfsberg-standards/8.%20Wolfsberg-Correspondent-Banking-Principles-2014.pdf.

[11] The FFIEC was established pursuant to title X of the Financial Institutions Regulatory and Interest Rate Control Act of 1978 ("FIRA"), Public Law 95-630.  Its website is https://www.ffiec.gov/about.htm.

[12] In 1996, Osama bin Laden issued his "Declaration of War against the Americans Occupying the Land of the Two Holy Places" putting "Muslim brethren all over the world generally and the Arabian Peninsula specifically" on notice of his intention to employ "Mujahidin military attacks" against the United States and its interests overseas.

Qaeda's activities in Sudan, continued through his move back to Afghanistan, as well as into and beyond September 11, 2001. For years, the government of Saudi Arabia supported this effort and/or intentionally turned a blind eye to these activities. Kadi and Julaidan's support contributed substantially to al Qaeda's ability to launch coordinated and sophisticated terror attacks against Americans, including the September 11, 2001 terror attacks in the United States.

## My Opinions, Basis and Reasons, and Facts and Data Considered

## Terrorism Financing Risk Factors and "Red Flags"

Terrorist financing is a complex issue. It involves a full range of financial support that goes well beyond the actual funding of specific terrorist operations. In fact, most funds raised to support terrorist organizations go toward their non-operational activities. Financing involves the support and funding that underlie the terrorist organization, including proselytizing, recruitment, training, subsistence, supply, and logistics. It sustains the terrorist organization and enables the group to plan and execute terrorist operations.

Much effort has been placed by national and international counter-terrorism enforcement and financial regulatory agencies over the last three decades to study the methodology, and to uncover and curtail, the financing that permits terrorist groups to operate.  One main strategy has been to "follow the money." Money, however, is fungible and very difficult to follow. While ostensibly directed at one purpose, such as a business transaction or humanitarian cause, it can also be laundered, siphoned off, or used to free up other funds for terrorism related purposes. Therefore, financial transactions, even stemming from licit business activities and charitable contributions, remain vulnerable to diversion toward terrorist purposes and must be monitored.  A number of "red flags" have been developed by financial institutions and documented for this purpose.

Much of this counter-terrorism financing study and work has been done by public and private international organizations including the FATF, EGMONT, the International

Monetary Fund, The Wolfsberg Group, and The Federal Financial Institutions Examination Council ("FFIEC"). They have developed and issued terrorism financing typologies and/or "red flag" indicators that are meant to alert government regulators and financial institutions to illicit terrorism financing activities.

FATF experts have highlighted the specific vulnerabilities that charities and non-profit organizations ("NPOs") pose for terrorist financing. They found that "the diversion of NPO funds by terrorist entities was a dominant method of abuse." They concluded that the charities most at risk appear to be those engaged in service activities, and that operate in close proximity to an active terrorist threat, an area of conflict or within a population that is actively targeted by the terrorist movement for cover and support.[13]

FATF, EGMONT, the IMF, and FFIEC have also highlighted several specific factors that should be considered in evaluating the terrorism financing risks posed by non-profit organizations. Such evaluations should include the NPO's stated objectives, sources of funds, regulatory and monitoring oversight of distribution of funds, record keeping, transparency, and proximity to known terrorist organizations.[14] They have published a series of "red flags," or "Terrorist Abuse Indicators," to alert financial institutions and government regulators to terrorism financing transactions occurring through NPO's or commercial enterprises.

The "red flags" listed here are among the factors that must be considered in evaluating the likelihood of terrorist financing:

1. The parties to the transaction (owner, beneficiary, etc.) are from countries known to support terrorist activities and organizations.

2. The funds are generated by a business owned by persons of the same origin or by a business that involves persons of the same origin from higher-risk countries.

3. The parties have channeled funds to false corporations and shell-companies.

---

[13] FATF Report: Risk of Terrorist Abuse of Non-Profit Organizations (June 2014), at p. 3.

[14] FFIEC BSA/AML Examination Manual, Appendix F "Money Laundering and Terrorist Financing "Red Flags,"" available at https://bsaaml.ffiec.gov/docs/manual/07_Appendices/06.pdf.

4. A series of complicated transfers of funds take place from one person to another as a means to hide the source and intended use of the funds.

5. Transactions involving foreign currency exchanges are followed within a short time by funds transfers to higher-risk locations.

6. Multiple accounts are used to collect and funnel funds to a small number of foreign beneficiaries, both persons and businesses, particularly in higher-risk locations.

7. The use of multiple, foreign bank accounts.

8. Inclusion in the transaction of an associated individual in the United Nations 1267 Sanctions list.

9. Media reports that an account holder is linked to known terrorist organizations.

10. Improperly identified beneficial owner of the account.

11. Use of nominees, trusts, family member or third-party accounts.

12. The transaction is not economically justified considering the account holder's business or profession.

I have sought to evaluate several Yasin Kadi and Wael Julaidan related transactions to determine if they raised these "red flags," and the likelihood they were used to provide resources and financial assistance to bin Laden and other terrorist support groups. I have found that many of the above listed "red flags'' permeate the transactions I have studied.

## Osama bin Laden and al Qaeda

Al Qaeda was established in the late 1980s during the final days of the Soviet Union's war in Afghanistan. Its establishment and growth were supported initially by an extensive network of Muslim donors, organizations and charities which viewed their role in the Afghan war as legitimate jihad in defence of Afghanistan's Muslim population. In many cases, al Qaeda operatives were also able to use this network to raise and mask funding for their other goals and operations, including their terrorist attacks against groups and countries they viewed as enemies of their brand of Islam.

On June 30, 1989, a coup d'état by Sudanese General Omar Hassan al-Bashir brought the National Islamic Front, an Islamist group led by Hasan al-Turabi, to power in Sudan. Turabi subsequently invited al Qaeda to move operations to Sudan. Turabi, Bashir, and

the National Islamic Front ("NIF")[15] shared many of bin Laden's objectives and wanted bin Laden's help in rebuilding Sudan, as well as al Qaeda's help in the NIF's ongoing war against African Christian separatists in South Sudan. In return, Turabi, Bashir, and the NIF provided bin Laden safe haven in Sudan and a secure base from which al Qaeda could recruit, train and operate. Over the next few years, al Qaeda began re-locating to Sudan while bin Laden, who could no longer remain in Saudi Arabia, finally moved to Sudan in 1992 where he began renewing and expanding upon the financial network that had backed al Qaeda during the Afghan-Soviet war.

According to the indictment handed down by the Federal Grand Jury for the bombings of U.S. Embassies in Kenya and Tanzania, Osama bin Laden "'established a series of businesses in the Sudan, including a holding company known as 'Wadi al Aqiq,' a construction business known as 'Al Hijra,' an agricultural company known as 'al Themar al Mubaraka,' an investment company known as 'Ladin International,' an investment company known as 'Taba Investments,' a leather company known as the 'Khartoum Tannery,' and a transportation company known as 'Qudarat Transport Company.' These companies were operated to provide income to support al Qaeda and to provide cover for the procurement of explosives, weapons and chemicals and for the travel of al Qaeda operatives."[16] Al Qaeda also purchased two large farms, including a very large farm at Damazine which was also used as an al Qaeda training camp.  The Turabi government also reportedly gave bin Laden a near monopoly for the exportation of gum, corn, sunflower, and sesame products.[17]

Bin Laden also invested in and became a part owner of the Al Shamal Islamic Bank. He opened numerous accounts therein to benefit al Qaeda and the NIF.[18]  He also invested

---

[15] The National Islamic Front (al-Jabhah al-Islamiyah al-Qawmiyah) was an Islamist political organization founded in 1976.

[16] *United States v. Bin Laden et al.*, U.S. District Court (SDNY) 98 Cr. 1023 (LBS), Indictment, October 7, 1998, p. 13, Section F.

[17] "Bin Laden's import-export firm, Wadi al-Aqiq Company, Ltd., in conjunction with his Taba Investment Company, Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members. At the same time, bin Laden's Al-Themar al-Mubarak~ah Agriculture Company, Ltd. grew to encompass large tracts of land near Khartoum and in eastern Sudan." U.S. State Department Fact Sheet dated August 14, 1996.

[18] "Bin Laden and wealthy NIF members capitalized Al-Shamal Islamic Bank in Khartoum. Bin Laden

separately in another bank – Bank Al Muzare, which translates into "Farmers Bank."[19] The Farmers Bank was ostensibly intended to act as a conduit for financing local farming activity. These entities subsequently invited and obtained foreign investment and engaged in business transactions with outside sympathetic individuals. Many of these individuals were subsequently designated Specially Designated Global Terrorists ("SDGT") by the U.S. Treasury Department and the United Nations Al Qaeda and Taliban Sanctions Committee for supporting terrorist organizations, such as al Qaeda.[20]

The covert financial network constructed by Osama bin Laden and al Qaeda also involved the use of compromised or complicit charities. To a large measure these charities shared several common characteristics that made them particularly vulnerable to misuse for terrorist financing. They benefited from Islamic tenets of "Zakat"[21] or "Sadaqa,"[22] were well funded, and had a global presence that provided a framework for national and international operations and financial transactions. In most cases they had branches in or near areas in which al Qaeda operated and were able to engage locally in various humanitarian, social, or educational projects. As shown below Yasin Kadi's Muwafaq Foundation reflected these characteristics and Kadi actively engaged with these tainted companies and entities while channeling funds to bin Laden and al Qaeda through his own business entities and his Muwafaq Foundation charity.

Many of these transactions involved the use of "black-washing" techniques to siphon off funds for use by al Qaeda and other terrorist organizations.[23] This was done, for example, by cash payments, false invoicing, under-reporting actual sales and/or under-

---

invested $50 million in the bank." U.S. State Department Fact Sheet dated August 14, 1996.

[19] A/k/a The Farmers Bank for Investment and Rural Development.

[20] Adel Abdul Jalil Batterjee, a major stockholder and the Bank's chairman, was designated as an al Qaeda financier and SDGT by the U.S. Treasury Department on December 21, 2004. The U.S. Treasury Dept. Press Release JS 2164 stated "Adel Batterjee was ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida."

[21] An obligatory payment made annually under Islamic law on certain kinds of property and used for charitable and religious purposes.

[22] Sadaqa is a voluntary donation beyond the zakat obligatory payment.

[23] Black washing or money darkening is the term used to describe taking legitimate financial assets and, through a series of transactions used to obscure the trail, make the funds available to terrorist operations.

factorization. The related losses incurred from such activities would then be written off as unprofitable deals or investments gone sour. Such activities were further obscured by the indirect and often convoluted routing of related financial and trade transactions.

According to a U.S. Justice Department brief on the subject:

> "[Al-Fadl][24] understood from conversations with bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money for al Qaeda operations would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor or the needy."[25]

Many of these charities, as was the case with Muwafaq, also conducted business activities for their own account or were closely associated with extensive business networks run by potentially sympathetic donors. Such arrangements provided an additional, ostensibly legal, channel for transferring funds from abroad.

While bin Laden was in Sudan, al Qaeda was involved in a series of terrorist attacks. In 1992, the group bombed two hotels in Yemen, targeting U.S. troops en route to Somalia. Al Qaeda supported the Somali warlords who attacked U.S. military forces on a humanitarian mission in Mogadishu in 1993. Al Qaeda was also believed to have taken part in an assassination attempt against Egyptian President Mubarak. These attacks brought great international pressure on the Sudanese government to turn bin Laden over to U.S., E.U. or other international counter terrorism authorities. Instead of turning bin Laden over, Sudanese officials chose to ask bin Laden to leave Sudan, while allowing other al Qaeda operatives to remain.  A State Department report from 1998 that was published after the U.S. embassy bombings noted that "Sudan continued to serve as a meeting place, safe haven, and training hub for a number of international terrorist groups, particularly Usama bin Laden's al-Qaida organization."[26]

---

[24] Jamal Ahmed al-Fadl, ex bin Laden aide. As noted below, Wael Julaidan was also cited by Fadl as being a funder of al Qaeda.

[25] Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *United States of America v. Enaam M. Arnaout*, United States District Court Northern District of Illinois, Eastern Division, Case No. 02 CR 892 (January 6, 2003), at p 25

[26] U.S. State Department Patterns of Global Terrorism, 1998 (1999).

Al Qaeda was well established in Sudan by the time Osama bin Laden left for
Afghanistan in 1996. Al Qaeda adherents and supporters remained endowed with many
of the assets and channels of financing that bin Laden had established, including
extensive agricultural holdings, business ventures and ties to local Islamic charities.  This
included accounts maintained in Farmers Bank. The Sudanese government, particularly
the military and intelligence services also remained supportive of al Qaeda.[27]

The 9/11 Commission concluded that it was in Sudan that al Qaeda grew into a truly
international organization.  There the road to 9/11 had begun:

> "Bin Laden now had a vision of himself as head of an international jihad
> confederation. In Sudan he established …. the consortium of terrorist groups with
> which he was forging alliances…. [H]e enlisted groups from Saudi Arabia, Egypt,
> Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and
> Eritrea…and from African states… [and from] Southeast Asia…. Bin Laden
> maintained connections in the Bosnian conflict as well.  The groundwork for a
> true global terrorist network was being laid."[28]

It was in Sudan that Khalid Sheikh Mohammed met in mid-1996 with Abu Hafs al Masri,
also known as Mohammed Atef, al Qaeda's head of military operations to discuss
terrorist attacks against U.S. interests. This is where he reportedly first discussed the
impact and feasibility of using commercial aircraft to carry out a terrorist attack directly
against the United States. Through Atef, Khalid Sheikh Mohammed arranged a meeting
with bin Laden in Tora Bora, Afghanistan.[29]

The CIA estimated that it cost al Qaeda at least $30 million per year to sustain its
activities in Afghanistan and beyond before 9/11.[30]  This figure admittedly did not
include the vast sums expended for proselytizing, indoctrination, and recruitment.
According to the 9/11 Commission report, al Qaeda at that time continued to "rely on a

---

[27] "Sudan's support of Al Qaeda continued after Bin Laden's 1996 departure until at least the Cole
bombing. …. As of 1999, this assistance consisted of "paramilitary training, money, religious
indoctrination, travel, documents, safe passage, and refuge." As of 2000, support "included the provision of
travel documentation, safe passage, and refuge."  Memorandum Opinion, *Harrison v. Sudan*, USDC(DC)
Civil Action 10-1689 (RCL), March 30, 2012.

[28] 9/11 Commission Report, p. 58.

[29] 9/11 Commission Report, p. 148.

[30] 9/11 Commission Staff Monograph on Terrorist Financing, p. 19.

core group of financial facilitators who raised money from a variety of donors and other fund raisers, primarily in the Gulf countries and particularly Saudi Arabia…. In addition, entire charities …wittingly participated in funneling money to al Qaeda."[31] This included the Muwafaq Foundation.[32]

Coming out of Sudan, the tentacles of al Qaeda began to reach beyond the Middle East into numerous conflict areas including, *inter alia*, the Balkans, the horn of Africa, Africa south of the Sahara, and Southeast Asia. As noted by the United Nations Al Qaeda and Taliban Sanctions Committee report in December 2003:

> "Al-Qaida has spread over past decades, from a movement which had its origins in the "holy war" against the Soviet occupation of Afghanistan into a global terrorist network, it has promoted a doctrine which provides for a battleground where aspiring Jihadis can undertake their misguided duty." [33]

## Yasin Kadi

Yasin Abdullah Ezzedine Kadi[34] is a wealthy Saudi businessman with close ties to the Saudi Royal family.  Born in Cairo, Egypt in 1955, he moved to Jeddah, Saudi Arabia in his early youth. He studied architecture at schools and universities in Saudi Arabia, Egypt and the United States. Upon returning to Saudi Arabia, he worked for a hospital supply company and in 1978-1979, he took up a training position with the Skidmore, Owings & Merrill's offices in Chicago. In Chicago, Kadi met bin Laden and provided him assistance by recruiting for the bin Laden family business.[35] He returned to Saudi Arabia in 1981 as Vice President of Jamjoom Hospital Supplies, a company started by his father.[36]

---

[31] 9/11 Commission Report pp. 170-71. See also Staff Monograph on Terrorist Financing, p. 21: "al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses…., entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization, including access to bank accounts."

[32] See infra at pp. 34-42

[33] UN Security Council Monitoring Group Report #2, Doc S2003/1070.

[34] Kadi's name is often spelled Qadi or al-Qadi. I will use Kadi in this report except for quotations.

[35] Kadi 2944.

[36] Statement of Yassin Abdullah Kadi In the Matter of Yassin Abdullah Kadi and the Office of Foreign

Kadi allegedly became associated in the 1980's with members of the Muslim Brotherhood and supporters of the Makhtab al-Khidamat, also known as the Afghan Services Bureau. The Makhtab al-Khidamat was co-founded in around 1984–1985 by Abdullah Azzam and Osama bin Laden to raise funds and recruit foreign mujahidin for the war against the Soviets in Afghanistan. The Makhtab network, often referred to as the precursor of al Qaeda, continued as a vehicle for recruiting and raising funds for al Qaeda even after the Soviet troop withdrawal.[37] Yasin Kadi became further acquainted with Osama bin Laden during this period.[38]

Yasin Kadi maintained and continued to develop multiple associations with individuals and entities associated with bin Laden and al Qaeda. This included regular business and social contact with a number of known financial facilitators, donors and supporters linked to al Qaeda and other jihadi groups. His associates included, inter alia, Wael Julaidan, Amir Mehdi, Chafiq Ayadi and Abdul Latif Saleh[39]. As detailed below, each had been linked with Makhtab al Khidamat and/or were subsequently implicated in the financing of al Qaeda and other jihadi groups. He continued these relationships despite their known connections to al Qaeda and terrorism financing. To avoid red flags, Kadi tried to mask many of these questionable dealings as business or humanitarian related transactions, using bearer checks, shell companies, and circuitous routings.

---

Assets Control Dated December 19, 2002. ("OFAC Statement")

[37] Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *United States of America v. Enaam M. Arnaout*, United States District Court Northern District of Illinois, Eastern Division. Case No. 02 CR 892 (January 6, 2003), at p 19:  "By way of background, Usama  bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ("MK") (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989.  Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*.  MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ('Abu Hassan al Madani') of the International Islamic Relief Organization … which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL').  In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network.  Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."

[38] Sources told the FBI that they saw Yasin Kadi more than once at bin Laden/al Qaeda guesthouses in Peshawar and at the Dawa Organization Guesthouse in Khartoum. Kadi 2944

[39] Deposition of Yassin Abdullah Kadi, In the Matter of: In Re Terrorist Attacks, July 10, 2018 ("Kadi Deposition"), p. 289, lines 1-10.

In 1991, Yasin Kadi joined with Saudi billionaire Khalid bin Mahfouz to establish the Muwafaq Foundation.[40] Khalid bin Mahfouz was a Saudi Arabian financer and then chairman of the National Commercial Bank ("NCB"), a bank founded in 1953 by his father Salem Bin Mahfouz. NCB served as the bank of the royal family at a time when oil revenues soared and laid the foundation for Saudi Arabia to join the global financial community. Khalid owned a controlling interest in the bank and served as President and CEO until 1999 when the bank, near bankrupt, was taken over by the Saudi government.

NCB was used by the Saudi royal family as a principal channel for funding and supporting non-profit organizations spreading radical Wahhabi and Salafi theology. For this purpose, they were willing to overlook and to tacitly condone possible links of such non-profits to al Qaeda. Martin Indyk, of the Brookings Institution and former Asst. Sec. of State for Near East Affairs noted that Saudi rulers often used the bank and the associated non-profits as channels to finance an effort to proselytize on behalf of Wahhabi's puritanical theology and to build religious centers, mosques and schools outside the Kingdom. Indyk posited that the royal family often got Saudi tycoons like Mahfouz to foot the bill.[41] The Saudi government allowed such efforts to continue despite being informed by U.S. intelligence and other sources that Osama bin Laden had taken advantage of this channel for his own purposes. As a former CIA chief of Counterterrorism Operations testified before Congress:

> "There is little doubt that a financial conduit to bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to bin Laden through this mechanism."[42]

While under Mahfouz control, NCB provided extensive financial resources to a number of businesses and Islamic non-profits and service organizations that were implicated in providing material and financial support to al Qaeda. Besides Muwafaq, this included the

---

[40] The first major contribution came from bin Mahfouz, Kadi Deposition p. 62, lines 6-15.

[41] Indyk, Martin, Back to the Bazaar, Foreign Affairs, January 2002

[42] Congressional Hearing, Prepared Statement of Vincent Cannistraro, Former Chief of Counterterrorism Operations, CIA before The Committee on International Relations, House of Representatives, October 3, 2001, Serial No. 107-50.

Muslim World League, ("MWL") Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), and the Saudi Red Crescent ("SRC"), among others. NCB also operated as a correspondent bank for the Sudan-based Al Shamal Islamic Bank[43], which had extensive activities in support of al Qaeda as noted below. The name Mahfouz was also found on the so-called "Golden Chain" list of al Qaeda's principal financiers.[44]

According to the 9/11 Commission Staff Monograph on Terrorist Financing, "the Saudi government turned a blind eye to the financing of al Qaeda" before September 11, 2001, and "the Saudis did not begin to crack down hard on Al Qaeda financing in the Kingdom until after the May 2003 al Qaeda attacks in Riyadh."[45]

Together, Yasin Kadi and Khalid bin Mahfouz used their resources to propagate a radical Islamic theology that contributed to the virulence and capabilities of such terrorist organizations as al Qaeda.

Kadi stated in his memorandum to OFAC that he had developed a professional relationship with Khalid bin Mahfouz in 1990 concerning the introduction of Islamic banking products at NCB.[46] Shortly afterwards, in 1991, according to Kadi, Mahfouz asked Kadi to establish and lead the Muwafaq Foundation in order to undertake relief, educational and healthcare projects, job creation, and training.[47]  Mahfouz provided the foundation's initial $5 million donation. Kadi indicated that he also initially contributed at least $2 million to the foundation.[48] The organization was co-directed at that time by Kadi and Khalid bin Mahfouz's son, Abdulrahman bin Mahfouz, and was subsequently registered as a charitable trust in Jersey on May 31, 1992.[49]

---

[43] Al Shamal Bank Website.

[44] According to the 9/11 Commission's report, Saudi individuals and other financiers associated with the Golden Chain enabled bin Laden and al Qaeda to replace lost financial assets and establish a base in Afghanistan following their abrupt departure from Sudan in 1996. These activities were facilitated in part, the report argues, by the "extreme religious views."

[45] 9/11 Commission Staff Monograph on Terrorist Financing, p 24, footnote 14.

[46] OFAC Statement p. 6

[47] Kadi Deposition, pp. 61-62

[48] Kadi Deposition, p. 62, lines 16-25.

[49] Jersey registry regulations, unlike the UK mainland, make no provision for oversight into the registered

A substantial number of the financial transactions between Khalid bin Mahfouz and Yasin Kadi involved the use of bearer checks,[50] many drawn on his NCB account. In one instance, Kadi received and deposited a series of bearer checks from Mahfouz in April 1991 for $10 million.[51] On April 23, 1991, the funds were sent by Kadi to the Islamic Investment Company of the Gulf. The Islamic Investment Company of the Gulf ("IICG") was the subject of multiple investigations concerning possible links to terrorism.[52] The IICG is a wholly owned subsidiary of the Dar al-Maal al-Islami ("DMI") Trust[53] founded by Saudi Prince Mohamed al-Faisal in the 1990s. This transaction was never appropriately explained. Consequently, Osama bin Laden had been present in Jeddah during this time and had been restricted from transferring his funds out of Saudi Arabia, raising suspicions that this $10 million transfer may have been made on his behalf.[54] By using a bearer check, Mahfouz effectively kept his involvement in the ultimate disposition of the funds hidden. From 1992 through 1996, a further series of additional bearer checks from Mahfouz's NCB totaling more than $50 million were routed to Kadi and his various companies.[55]

Roughly at the same time as establishing the Muwafaq Foundation, Kadi independently incorporated a related business company, Muwafaq Limited in the Isle of Man, a tax

---

entity.

[50] A bearer check is a check payable to the person in physical possession of the check.  It can be transferred to the holder by delivery without having to be endorsed. Pay-to-bearer instruments are not registered in the name of a specific owner and are difficult to trace through their value transfer circuit, until they are ultimately deposited. It is a method used to insulate the issuer of the check from those who hold, transfer or cash the check since he may not have actual knowledge of its interim or final disposition at the time of issue.

[51] Kadi Deposition, p 99, lines 1-4.

[52] Kadi Deposition, Exhibit 21.

[53] The DMI trust is a Bahamas-incorporated holding company with a portfolio of Islamic banks in Bahrain, Niger, Egypt, Sudan and Pakistan. DMI-related companies, including, *inter alia,* the Faisal Islamic Bank of Sudan, maintained accounts for, and facilitated financial transactions for a number of charities and businesses which were subsequently designated by the United Nations and the U.S. Treasury Department as financial conduits for al Qaeda, including the Islamic Foundation, International Islamic Relief Organization and the Muslim World League.

[54] Osama bin Laden's brother, Haydar Mohammed bin Laden was a director of the Islamic Investment Company of the Gulf (Bahrain) at that time. The IICG was a main shareholder of Faisal Islamic Bank of Sudan with accounts in the al Shamal Bank.

[55] Kadi Deposition Exhibit 21.

haven with minimum regulatory oversight.[56] Kadi told OFAC that Muwafaq Limited had the sole purpose of holding his shares in Shifa International Hospitals Limited, a publicly limited company in Pakistan. He also claimed that "Muwafaq Limited of the Isle of Man, has never had any connection, financial or otherwise, with the Foundation (established in Jersey) and vice versa."[57]

Kadi's document production contradicts this assertion. Muwafaq Limited was engaged in a much broader series of activities and maintained accounts in the NCB in Saudi Arabia. From this account, funded via millions of dollars of Bin Mahfouz' bearer's checks,[58] Kadi sent money to a Sudanese businessman, Mohamed Abdullah Gar-al-Nabi, an NIF member, close associate of Turabi, and affiliate of al Qaeda.[59]

A third Muwafaq, Muwafaq Trading Limited was also operating from Peshawar, Pakistan, the site of the founding of al Qaeda. Muwafaq Trading was co-located with the Muwafaq Foundation.[60]

Kadi also registered a number of other companies in the Isle of Man including Leemount Limited which was to serve as a principal conduit for his financial transfers to the Muwafaq Foundation and to other entities suspected of links to al Qaeda.[61] Leemount functioned principally in Saudi Arabia, Sudan, and Pakistan. Khalid bin Mahfouz was also a heavy investor in many of these enterprises. See more on Leemount below.

---

[56] *See* https://www.offshore-protection.com/isle-of-man-tax-haven.

[57] OFAC Statement, Para 30.

[58] Kadi Deposition Exhibit 21.

[59] Kadi 150486.  Mohamed Abdullah Gar-al-Nabi (a/k/a Mohamed Abdallah Garelnabi) was a National Islamic Front member and served as an intermediary for the NIF in acquiring extensive oil and other business holdings for Turabi and the NIF. See also "Pursuing Transparency in Sudan's Oil Industry," Sudan Transparency Initiative Series, Alsir Sidahmed, 20 January 2016. Al Nabi assisted al Qaeda in the movement of weapons from Sudan to Yemen. See *U.S. v. Bin Laden* Trial Transcript Feb. 6, 2001 p 338. Kadi met with al-Nabi in London in November 1992. Kadi 187044.

[60] Kadi 51329, Kadi 79615.

[61] Other Kadi companies registered in the Isle of Man include Caravan Development Groups Ltd ("Karavan"), Sarmay Ltd, Loxhall Limited, Melidan Limited, NMCC Limited, Twenty First Century Media Limited, Abrar Development Limited, Arkday Limited, Cavallo Limited and Nash Development Limited.

Kadi selected the managers responsible for his enterprises, including Muwafaq Foundation's various branches, but remained directly engaged in determining their projects and activities. These directors and managers included Wael Julaidan, Chafiq Ayadi, Amir Mehdi, Abdul Latif Saleh, and other individuals closely associated with al Qaeda and other Islamic terrorist groups. Kadi also remained active in soliciting and channeling the funding to Muwafaq's individual country branches.[62]

## Wael Julaidan

Wael Hamza Julaidan, a Saudi national, was born in Medina in 1958. According to his resume he attended university in the United States, graduating from Eastern Kentucky University in 1981. After graduation he returned to Saudi Arabia and was appointed as a tutor at King Abdul Aziz University in Jeddah. During that time, he met and socialized with Osama bin Laden.[63] He also took an increasing interest in, and devotion to, Salafis Islam. In 1983, he returned to the United States to undertake a Masters Degree at the University of Arizona in Tucson. There, he assumed the role of President of the Muslim Students Association on campus as well as President of the Islamic Center (Mosque) of Tucson. In that capacity, he worked with Abdullah Azzam, who, as noted above, was a close associate bin Laden in the Afghan jihad and linked Azzam's Al-Khifa Refugee Center[64] to the Tucson Islamic Center Mosque.

Under Julaidan's and Azzam's tutelage, the Tucson Mosque served as an important center for Islamic radicalization. Several al Qaeda operatives, including Wadi al-Hage, Ramzi Yousef, Mubarak al-Duri, Muhammad Beyazid, and eventual 9/11 hijacker Hani Hanjour attended the Mosque. These men were involved in some of the most significant terrorist attacks against the United States including the 1993 World Trade Center

---

[62] OFAC Newcomb Memorandum, DOJ AR 06.

[63] Peter Bergen quotes Julaidan to that effect in his book The Osama Bin Laden I Know: An Oral History of Al Qaeda's Leader, p 31 ("I lived in Jeddah for three years from '81 to '83, Osama, we see him from time to time in our social activities, but then in '85 in Pakistan, that's when I start to create some relationship [with him]").

[64] The Al-Khifa Refugee Center was established as a recruitment and fundraising center in the United States. There were some 30 Al-Khifa Refugee Centers operating in cities across the United States with the principal offices in Brooklyn, New York and Tucson, Arizona.

bombing, the 1998 bombing of the U.S. embassies in Kenya and Tanzania, and the 9/11 World Trade Center attack.

Sometime between 1984 – 1985, Julaidan left Tucson for Peshawar to support the Afghan jihad. In Pakistan, Julaidan took on multiple fundraising, resource managing and distribution roles. He also became an active associate of the Makhtab al-Khidamat,[65] and worked for the local branches of several Saudi-government sponsored organizations. These organizations included the Muslim World League ("MWL") and International Islamic Relief Organization ("IIRO"),[66] serving as local director of the Saudi Red Crescent ("SRC"), and representing the Saudi Relief Committee in Peshawar. He subsequently became the director of the Muslim World League in Pakistan,[67] and Project Director of the Rabita Trust.  These multiple roles and activities put him in regular close contact with Osama bin Laden.

Julaidan was present during the terror organization's initial meetings in 1988 and served on al Qaeda's Advisory Committee, Finance Committee, and Conveyance Committee.[68] His al Qaeda operative name was Abu al Hassan al Madani.[69] Bin Laden himself acknowledged his close ties to Julaidan in a 1999 interview with al-Jazeera TV, noting that "We were all in one boat, as is known to you, including our brother, Wa'el Julaidan."[70] Julaidan and bin Laden established a joint bank account at Habib Bank

---

[65] According to the U.S. Treasury Department Statement on the Designation of Wa'el Hamza Julaidan, dated Sept, 6, 2002:  "Julaidan is also associated with several individuals and entities linked to al-Qa'ida, including bin Laden lieutenants, Ayman al-Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Makhtab al Khedmat, the Rabita Trust, and al-Gam'a al-Islamiya."

[66] The Muslim World League was established by the Saudi government under the auspices of the Crown Prince Faisal and in accordance with a resolution adopted during the meeting of the General Islamic Conference held in Mecca on 8 May 1962.  The MWL serves as an umbrella organization for a number of other Islamic non-profits, commonly referred to as bodies or members of the League, including the International Islamic Relief Organization ("IIRO"), the Al-Haramain & Al Masjed Al-Aqsa Charity Foundation, and Rabita Trust, among others.

[67] The Muslim World League office in Peshawar was established by Abdullah Azzam with a grant from the Saudi government.  Julaidan initially worked at the MWL Peshawar office as an aide to Azzam.

[68] FED-PEC 212243-244, FED-PEC 215313-314, BUR-PEC 63170-63210.

[69] United Nations Security Council 1267 Committee Consolidated List (2002).

[70] U.S. Treasury Department Statement on the Designation of Wa'el Hamza Julaidan, Sept. 6, 2002.

Peshawar.[71]  Julaidan also established close contacts with several other al Qaeda leaders including Ayman al-Zawahiri, Abu Zubaida, and Mohammed Atef.[72]

By the early 1980's, Saudi Arabia had become quite active in providing aid and assistance to the many Saudi and other Arab-Afghans fighting the Soviet Union in Afghanistan. The Saudi government established a branch of the Saudi Red Crescent in Peshawar to assist in this endeavor. Julaidan was chosen as its local director in 1986. He served as its director until the end of 1988.  Concurrent to his appointment as a director of the Saudi Red Crescent, Julaidan also was appointed to run the Pakistan office of the Saudi Relief Committee, a fund-raising committee established by the Governor of the capital city, Riyadh, Prince Salman. Abdullah Azzam and bin Laden subsequently lauded Prince Salman's relief organization for its role as a primary entity supporting his mujahidin in Afghanistan and thanked those running the committee for providing needed munitions and weapons to his jihadists.[73]

> "They conducted 3000 portages…each about seven kilometers as they carried weapons into Afghanistan….When the Afghans had confirmed that the weapons arrived, the Saudi Relief Committee would compensate [the porters] for the expenses."[74]

In 1988, around the time al Qaeda was being created, bin Laden gave jihad fund-raising speeches in Saudi Arabia. In one of these speeches, he urged listeners to make contributions to the Mujahidin through a committee of Prince Salman in Peshawar.[75]

Abdullah Azzam also acknowledged the important role Julaidan played as head of the Saudi Red Crescent and Prince Salman's Saudi Relief Agency in providing funds for his and bin Laden's activities.[76]

---

[71] Global News Wire – Pakistan Frozen Accounts – June 23, 2003.  The account was frozen by Pakistani authorities following the designation of Julaidan as a Specially Designated Global Terrorist.

[72] U.S. Treasury Department Statement on the Designation of Wa'el Hamza Julaidan, Sept. 6, 2002.

[73] Kadi 52040 – Undated Interview of Azzam.

[74] Hegghammer, Thomas, *The Caravan: Abdullah Azzam and the Rise of Global Jihad*, p. 197.

[75] Yale University Library, Guide to the Islamic Fundamentalist Audio Recordings Collection, Tape 491, A sermon on Jihad in Palestine and Afghanistan, *1 audiocassette*.

[76] Documents seized from a Benevolence International Foundation office in 2002 in Bosnia confirmed that

Toward the end of Julaidan's tenure as head of Saudi Red Crescent in Pakistan, Abdullah Naseef, the Secretary General of the Muslim World League, met with bin Laden and others to plan the assistance that the MWL and the IIRO could provide to bin Laden and al Qaeda.  During that meeting, it was agreed that attacks would be launched from MWL offices:  "And if he is being subjected to any pressures, let it be a secret (*agreement*) in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from the (*these offices*) ….).[77]  Naseef and bin Laden further noted that they would need to find another organization to protect the passports of the mujahideen fighters as Julaidan would be leaving his Saudi Red Crescent post.[78]

In 1989, after the assassination of Abdullah Azzam, Julaidan was appointed director of the Muslim World League in Pakistan and served until 1994. Julaidan also worked closely with the International Islamic Relief Organization ("IIRO")[79] bureau in Peshawar, run by a senior Egyptian al Gama at Al-Islamiyyah leader, Abu Talaat-Qasimy (aka Talaat Fouad Qassem).

The IIRO was established ostensibly to provide humanitarian assistance to refugees from the Afghan war. However, this "humanitarian" facade became a cover for the charities channeling covert military and financial assistance to various Arab-Afghan militant groups fighting both in Afghanistan and Bosnia, including al Qaeda. By 1992, the Peshawar IIRO was also actively engaged in sending recruited Afghan fighters to Bosnia.

During this time, Julaidan as head of the Saudi Red Crescent in Pakistan helped his associate Aqeel Abdulaziz al Aqeel[80] set up the Al Haramain Islamic Foundation

---

the Saudi Red Crescent, the Muslim World League, and the International Islamic Relief Organization, all affiliated at some point with Julaidan, were principal sources of support for al Qaeda.

[77] FED-PEC 212276-281 (MWL/IIRO letterhead).

[78] *Id.  See also* FED-PEC 212309-310 and 212164-167 (Julaidan was also responsible for the procurement of weapons for bin Laden.).

[79] The IIRO had been founded by the Muslim World League in 1978 and serves as a major financial sub-branch of the Muslim World League.  It reportedly receives 70% of its charitable funding directly from the Saudi government.  *Canada v. Jaballah*, Reasons for Order, DES-6-99, Federal Court of Canada. November 2, 1999, p. 13.

[80] Aqeel, under Julaidan's supervision, ran a sub-office of the SRC in Quetta, Pakistan. BUR-PEC 75113-75133

("AHIF"), which became one of bin Laden's principal financial supporters.[81] Aqeel was forced to curtail his activities in February 1989 when Pakistan lodged a complaint about his activities.

In 1992, Julaidan became the project director of the Rabita Trust, a charity formed by the Government of Pakistan and Muslim World League.[82] The Rabita Trust was co-located in Pakistan with the Muslim World League and the IIRO.[83] The Rabita Trust was established during Naseef's July 1988 trip to Pakistan with the stated purpose of assisting in the repatriation and rehabilitation of Pakistanis from Burma. However, Julaidan focused much of its activities on providing logistical and financial support to jihadists fighting for bin Laden. In 1998, he was appointed Secretary General of the Rabita Trust. According to a Pentagon report, Sheikh Abd al-Hayy (a former Pakistani military officer) who was Julaidan's Deputy Director at the Rabita Trust, was directly involved in providing logistical assistance to al Qaeda.[84] Immediately after 9/11, the Muslim World League and the Pakistan government dismissed Abd al-Hayy.[85]

The United Nations al Qaeda and Taliban Sanctions Committee described the Rabita Trust as "a non-governmental organization (NGO) based in Pakistan which has provided logistical and financial support to Al-Qaeda. The Rabita Trust also had close ties to Al-Qaeda leaders and other listed individuals and entities, including Ayman Mohamed Rabi

---

[81] "There is evidence that field offices and representatives operating throughout Africa, Asia and Europe have provided financial and logistical support to the al Qaida network and other terrorist organizations designated by the United States." (U.S. Treasury Dept. Protecting Charitable Organizations -A). See also factsheet prepared by the French Organization Aid Watch stating that the AHIF was formed in Pakistan in 1988 and was officially launched with the help of Prince (now King) Salman bin Abdulaziz. AHIF moved its headquarters to Riyadh in 1992.

[82] Senior leaders of the MWL and IIRO served as members of the Rabita Trust Board, including but not limited to:  Dr. Abdullah bin Saleh al Obaid (MWL Secretary General); Dr. Abdullah bin Abdullah Naseef (former MWL Secretary General); Prince Turki bin Fahd bin Jalawy al Saud (Director of the IIRO's Eastern Province Branch, later designated by OFAC); Dr. Adnan Khalil Basha (IIRO Secretary General); and Mohammed bin Abdullah al Dubaiban (MWL).  *See* MWL 30817-19.

[83] Rabita Trust, MWL, and IIRO all operated out of the same office in Islamabad, Pakistan. *Compare* IIRO 149642 (Rabita Trust address identified as Pitrus Bokari Road, H-8/1, Islamabad); IIRO 149637 (IIRO address identified as H-8/1 – Pitrus Bukhari Road, Islamabad); and IIRO 149639 (MWL address identified as Pitrus Bukhari Road Sector H-8/1, Islamabad).  *See also* MWL 8691 (October 29, 1992 letter to "Mr. Wa'el H. Jelaidan, Project Director, Rabita Trust, Muslim World League, H, 8/1, Islamabad").

[84] U.S. Department of Defense, JTF-GTMO Algeria 1452 p. 4.

[85] IIRO 149642.

al-Zawahiri, Sobhi Abdel Aziz Mohamed el Gohary Abu Sinna), Makhtab al-Khidamat and the Armed Islamic Group."[86]  The Rabita Trust was designated as a SDGT by the U.S. Treasury Department on October 12, 2001.[87]

Jamal al-Fadl, a Sudanese national who worked for both Sudan's intelligence service and al Qaeda, broke with al Qaeda in 1996, and defected to U.S. government officials in Eritrea. He became a primary witness for the U.S. Attorney's Office in the Southern District of New York criminal case against the perpetrators of the 1998 bombings of the U.S. Embassies in Kenya and Tanzania.[88] Al-Fadl also revealed to U.S. investigators valuable information concerning al Qaeda's funding sources.[89]

In a response to a 2005 Mutual Legal Assistance Treaty request from Swiss authorities, the U.S. Federal Bureau of Investigation ("FBI") shared information obtained from its interviews with al-Fadl concerning Julaidan's involvement with al Qaeda. Al-Fadl stated that Julaidan also went by the name Abu Hassan al Madani. While working for the Saudi Red Crescent, Julaidan provided funds to bin Laden before and after the creation of al Qaeda. He also supplied al Qaeda with Saudi Red Crescent ID cards and medical supplies. While working for the IIRO, Julaidan funded al Qaeda via the hawala system, with cash transferred from the IIRO HQ in Saudi Arabia and via the Peshawar branch of the Habib Bank.  Approximately 30% of the funds originated with the Saudi Government. Al-Fadl was not aware that Julaidan ever stopped supporting al Qaeda.[90]

---

[86] United Nations Security Council 1267 Committee Narrative Summary Rabita Trust.

[87] FED-PEC 215391-394 (stating that Rabita Trust was "designated for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida").  *See also* WJ 012 (Six Rabita Trust bank accounts under Jelaidan's authority at Habib Bank in Pakistan were seized and frozen following the September 11 attacks.).

[88] *U.S. v. Bin Laden*, Trial Transcript Day 2, February 6, 2001.

[89] U.S. Attorney Patrick Fitzgerald subsequently told the 9/11 Commission, "Fadl was an invaluable source of information; the mystery was over, and it was clear that bin Laden was running a major terrorist organization. Fadl's information later played a very important role in the investigation and prosecution of the 1998 Embassy Bombings conspirators." He also stated that he has complete confidence in Fadl 's honesty, and that Fadl accurately remembered everything in which he participated. See 911 Commission Interview of Patrick J. Fitzgerald, Jan. 28, 2004, p. 2.

[90] Kadi 28396-28402.

In separate interviews, Jamal al-Fadl also provided the following information to the FBI concerning Julaidan's connection to the IIRO-Pakistan office, and the use of the office to funnel funds from Yasin Kadi to purchase weapons for al Qaeda:

> "Abu al Hassan listed under the title 'Jihad support.'  Source advised that Abu al Hassan was from Madina, Saudi Arabia and source referred to him as Abu al Hassan al Madani.  Source advised that Abu Al Hassan's true name was Wael Jelaidan.  Source explained that he was of Saudi Arabian descent.  Source was aware that Abu al Hassan al Madani ran the Pakistan office of the International Islamic Relief Organization which source also referred to as IGASA.  Source explained that the International Islamic Relief Organization fell under the Rabita al Islami organization which source also knew to use the name MWLKA."[91]

> "The source [al-Fadl] advised that Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group.  These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi.  The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989.  According to [Jamal al Fadl], this office was located inside the offices of the Islamic Relief Organization (IRO).  The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani.  According to the source, Julidan was one Bin Laden's closest friends at the time.  The source was told by Abu Fadl Al-Makki that Al-Kadi would bring donated money from the Gulf area, mainly Saudi Arabia, to Al-Qaida which was used to purchase weapons in Jalalabad, Afghanistan."[92]

In 1994, with Afghanistan embroiled in a civil war between competing Islamist factions, and as Pakistan was becoming less welcoming to al Qaeda fighters, Julaidan returned to Saudi Arabia. Bin Laden had already departed for Sudan, and many of his al Qaeda jihadists had already begun to scatter to other battlefields including Sudan, Iraq, the Horn of Africa, and the Balkans. The Saudi government was increasingly reticent to involve itself in the inter-Afghan fighting and focused greater interest and involvement in the intensifying Bosnia war.

---

[91] PEC-KSA 329-352 at 335.

[92] PEC-KSA 2133-2134.

The Third World Relief Agency ("TWRA"), a Sudanese NGO based in Vienna, Austria, also became a channel for Julaidan, Kadi, and Prince Salman to assist radical Islamic fighters, including al Qaeda in Bosnia. In addition to its humanitarian mission, TWRA also ran a covert weapons supply operation for the Bosnian Government. American and German counter-terrorism investigators also concluded that the TWRA provided a primary pipeline for arms shipments to al Qaeda.[93] From 1992 to 1995, some $400 million from Islamic donors flowed through the organization's bank accounts in Vienna. By the time it was finally shut down by Austrian officials, approximately half of the money had gone for arms purchases, including for al Qaeda. A German criminal investigation on behalf of the International Criminal Tribunal for the Former Yugoslavia ("ICTY") reported that Saudi Prince Salman and the Saudi High Commission alone had funded the TWRA with over $120 million between 1992 and 1994.[94]  They also reported that Wael Julaidan transferred some $6 million to the TWRA and received from the TWRA over $7 million, for suspected arms purchases.[95] The German investigators called the humanitarian aid justifications for these transactions, "dubious".[96] Julaidan was still based in Peshawar during this time, heading the MWL office and running the Saudi Relief Agency there, but traveled to Sudan in 1993 to meet with TWRA officials as well as bin Laden.[97] Kadi also provided $5 million via his Leemount company to TWRA.[98]

Julaidan was also linked to the Al-Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA") which was designated as a SDGT on May 6, 2004.[99]  According to the

---

[93] The 9/11 Commission concluded that Osama bin Laden used the TWRA to "covertly provide financial and other support for terrorist activities."  *See* 9/11 Commission Final Report at p. 58.  *See also* German Federal Office of Criminal Investigation, Expert Report Concerning the Area – Financial Investigations – relating to the Third World Relief Agency (TWRA) at FED-PEC 213792-854.

[94] *Id.* at FED-PEC 213802-804.

[95] *Id.* at FED-PEC 213804-806.

[96] *Id.* at FED-PEC 213853.

[97]  Bergen, Peter, *The Osama bin Laden I Know: An Oral History of al Qaeda's Leader*, p. 128.

[98] Kadi 18587, 104053, 29646.  The funds originated from unknown contributors to an investment fund at Prince Mohamed Bin Faisal's DMI known as the General Modaraba Investment Pool. *See* Kadi 35071.

[99] U.S. Treasury Dept. Protecting Charitable Organizations –A. ("The Al-Haramain & Al Masjed Al-Aqsa Charity Foundation (AHAMAA) has significant financial ties to the Bosnia-based NGO Al Furqan, and al Qaida financier Wa'el Hamza Julaidan, who was designated by the Treasury Department on September 6, 2002.  Wa'el Hamza Julaidan, a Saudi citizen, is a close associate of Usama bin Laden.  Julaidan fought

United Nations Al Qaeda Sanctions Committee:  "Al-Haramain & Al Masjed al-Aqsa Charity Foundation had significant financial ties to an Al-Qaeda financier and provided financial support to the Bosnia-based non-governmental organization Al Furqan."[100] Julaidan and Kadi were board directors of AHAMAA and Julaidan had signatory authority over its bank accounts.[101]

The Saudi Joint Relief Commission ("SJRC") was established on May 19, 1999, pursuant to High Order No.7/B/1863 (the "Albanian High Order") issued by HRM King Fahd bin Abdulaziz upon the recommendation of the Council of Ministers of the Kingdom of Saudi Arabia. The SJRC was made up of the Saudi Red Crescent, the IIRO, the World Assembly of Muslim Youth ("WAMY"), al Haramain Islamic Foundation and the Islamic Endowment Foundation. Julaidan was selected as its executive director.[102]  The SJRC operated under the supervision of Saudi Arabia's Minister of the Interior and was largely staffed with members of Saudi Arabia's economic and foreign affairs agencies. The SJRC was co-located with the IIRO.[103] The Saudi royal family made no secret of its close relationship with, and its endorsement of, SJRC activities. [104]

---

with bin Laden in Afghanistan in the 1980s. Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV.  As a member of the Board of Directors for AHAMAA, Julaidan opened three bank accounts on behalf of the NGO between 1997 and 2001 and continued to have authorization to handle two of their accounts as a signatory on two the NGO's Bosnian accounts."); FED-PEC 213978-979 ("According to information, the Bosnian branch of this entity has significant financial ties to al Qaeda financier Wa'el Hamza Julaidan who was designated by the Treasury Department on September 6, 2002.").

[100] United Nations Security Council Narrative Summary for Al-Haramain & Al Masjed al-Aqsa Charity Foundation.  *See also* U.S. State Dept Cable – Bosnia's Dirty Dozen (identifying AHAMAA as one of "at least a dozen Islamic NGOs currently involved in providing financial support to known terrorist organizations"); PEC-FOIA 49927-932 ("Documentation was provided to EUR/SCE demonstrating control over Al Haramayn al Masjid Al Aqsa by top Al Qa'ida financier Wa'el Julaidan (designated on E.O. 13224 in 2002").

[101] OFAC Statement at Para. 90, 118; FED-PEC 212659-696 at p. 4 (detailing Julaidan's authority over the AHAMMA bank accounts).  *See also* Affidavit of Wael Hamzah Jelaidan at ECF No. 2702, Para. 10 ("Over the years, I have had signatory authority over charity accounts with the MWL, Rabita Trust, SJRC, AHAMAA, and SJRC.")

[102] WJ 022.

[103] IIRO 41030.

[104] Declaration of Dr. Abdulrahman A. Al-Suwailem, Jan 10, 2005, and Ex. B to the Declaration.  "The Saudi royal family has made no secret of its close relationship with, and its endorsement of, the activities of the Saudi Joint Relief Committee. In February 2003, Prince Naif bin Abdul Aziz publicly 'expressed his thanks for the efforts exerted by members of the [SJRC]… For his part Dr. Al Suwailam expressed his

Concerns about SJRC ties with al Qaeda and other terrorist groups surfaced quickly after its establishment in Albania and Kosovo. Several of its employees were, or had previously been, associated with other terrorism-oriented jihadist movements, including Mohamed Hasan Mahmud, an Egyptian who was wanted by Egypt for his alleged involvement in the 1997 Luxor terrorist attack. In August 1999, a local employee of the SJRC office in Tirana, a Pakistani national Muhammad Adel Sadiq Kathum, was expelled from Albania for engaging in extremist activity. A month later, in September 1999, SJRC employees were spotted by international peacekeeping soldiers as they apparently conducted surveillance of U.S. facilities in Kosovo. In March and April 2000, SJRC staff members were once again caught as they conducted surveillance of U.S. and other peacekeeping facilities. [105]

On April 1, 2000, Italian KFOR peacekeeping troops raided the SJRC's offices in Pristina, Kosovo. Shortly thereafter, U.N. Peacekeeping Forces in Pristina were advised that officials of the SJRC were acting as associates of Osama bin Laden and were using the SJRC to help bin Laden "move money and men to and from the Balkans."[106]

The CIA and Albanian authorities concluded from these and other events that the SJRC was actively building a terrorist network in both Albania and Kosovo. In September 1999, Julaidan was called "undesirable" by Albanian authorities and barred from re-entering the country.[107] Julaidan along with the SJRC secretary, Abdel Sadek (who was

---

gratitude to Prince Naif Ibn Abdul Aziz, the Minister of the Interior and Supervisor of the Saudi Joint Committee for the Relief of Kosovo and Chechnya and stressed that his support is always behind the success of the members of the Committee in their mission.' Similarly, in June 2003, the head of Saudi Arabia's General Intelligence Directorate, Prince Nawaf bin Abdul Aziz, openly applauded 'the Saudi relief aid provided to the people of Kosovo and Chechen refugees…'" Quoted from Senate Judiciary Committee Testimony of Evan F. Kohlmann, July 14, 2010.

[105] Testimony of Evan F. Kohlmann before the Senate Judiciary Committee, July 14, 2010, citing "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom, August 2003.

[106] In the spring of 2000, U.S. officials sent a confidential memorandum to UN police forces in southeastern Europe titled "Secret: US office only-Release to UNMIK [the U. N. administration in Kosovo]." The document warned that Wael Julaidan was an associate of Usama Bin Laden and stated that Julaidan had directly assisted Bin Laden by moving money and men to and from the Balkans. *See* Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating The Justice Against Sponsors of Terrorism Act, S. 2930," July 14, 2010. *See also* FED-PEC 97363-65.

[107] Kadi 5129-5132 – US State Dept. Embassy Berne Cable providing justification for Julaidan's designation by United Nations 1267 Sanctions Committee.

also a Rabita Trust officer) were declared "persona non grata." The SJRC offices in Albania were closed. [108]

In the summer of 2000, Julaidan, on behalf of the IIRO, sent emissaries to visit bin Laden in Afghanistan.[109] At this time, bin Laden and al Qaeda were headquartered at a set of camps and safe houses in the city and surrounding area of Kandahar, Afghanistan. IIRO maintained an office and guesthouse in Kandahar which was staffed by al Qaeda and provided logistical support to al Qaeda.[110] The IIRO also provided financial support to the al Qaeda training camps.[111]

On September 6, 2002, the United States and Saudi Arabia governments  announced they were jointing listing Julaidan, "an associate of Usama bin Laden and a supporter of al-Qa'ida terror,"  as a Specially Designated Global Terrorist ("SDGT"),[112] stating in part:

> "Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaida, have acknowledged Wa'el Julaidan as a known associate of their operations.  Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network."

> "Julaidan is …associated with several individuals and entities linked to al-Qa'ida, including bin Laden lieutenants, Ayman al-Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Makhtab al Khidamat, the Rabita Trust, and al-Gam'a al-Islamiya. These individuals and entities have been previously designated …[by OFAC and] by the United Nations."[113]

The United Nations Security Council also declared that:

---

[108] An OFAC TDY team investigating Yasin Kadi's activities visited Albania in May 2002.  Kadi 2910-2912 OFAC TDY Report. *See also* Bala, Eduart, Deputy Director of Defense Intelligence Agency, "Financing of Terrorism-Case study, Albania," in MILITARY REVIEW, Security and Defense Review Training and Doctrine Command Second Edition, December 2013, p. 129.

[109] Kadi 5129-5132.

[110] U.S. Department of Defense JTF-GTMO April 1, 2008 YM 033.

[111] U.N. Security Council Monitoring Group 2nd Report, Nov 3, 2003 pp. 15-16.

[112] The SDGT designation is governed by the International Emergency Economic Powers Act, 50 U.S.C. 1701 et seq, (IEEPA) and Executive Orders issued pursuant thereto which have delegated the authority to designate to the Secretary of the Treasury. The Secretary of the Treasury is authorized to designate when the Secretary finds that such persons are associated with, or act for or on behalf' or are owned or controlled by designated terrorists, or that assist them, sponsor, or provide support for (including financial)  to them. Persons so designated are referred to as specially designated global terrorists ("SDGT").

[113] U.S. Treasury Department Statement on the Designation of Wa'el Hamza Julaidan, Sept. 6, 2002.  FED-PEC 203469-470.

"Wa'el Hamza Abd al-Fatah Julaidan is an associate of Usama Muhammad Awad bin Laden with whom he fought in Afghanistan in the 1980s. He then worked on behalf of various Saudi non-governmental organizations, and was the head of many of them, providing financial and logistical support to the Al-Qaida network."[114]

A Saudi Embassy press release on September 10, 2002, in Washington, at the time of his listing, identified Julaidan as a "bin Laden operative" and stated**:** "Julaidan, who fought with bin Laden in Afghanistan during the 1980s, allegedly provided financial and logistical support to the al-Qaeda network."[115] Nevertheless, the Saudi government was reluctant to freeze his financial and other assets[116]as required under U.N. Security Council resolutions 1267 et seq.

### *Kadi's Close Relationship with Julaidan*

As described above, Wael Julaidan was one of Yasin al Kadi's closest and most problematic colleagues and associates. The Kadi family and the Julaidan family had known each other in Saudi Arabia for years. Kadi and Julaidan were also together in Pakistan and Afghanistan during the Soviet Afghan war.  Both were closely involved with the Makhtab al Khidamat. They also worked together closely on business and charitable-related activities in Afghanistan, Pakistan, Sudan, Yemen, and the Balkans up to, and beyond, 9/11.[117]

Yasin Kadi has stated that he began dealing professionally with Julaidan when they were both together in Pakistan and Afghanistan during the Soviet-Afghan war. As noted above, Makhtab al-Khidamat was established between 1984 – 1985 by Abdullah Azzam and Osama bin Laden to raise funds and recruit foreign mujahidin for the war against the Soviets in Afghanistan. According to the U.S. Treasury Department, Kadi's Muwafaq Foundation joined in the funding and activities of Makhtab sometime around 1991. The Muwafaq Foundation also provided cover for Arab recruits to allow them to obtain visas

---

[114] U.N. Security Council 1267 Committee Narrative Summaries of Reasons for Listing QI.J.79.02. Wa'el Hamza Abd Al-Fatah Julaidan.  *See also* FED-PEC 213923-929.

[115] Saudi Arabia Embassy, Washington DC Press Release: "Saudi Arabia and U.S. Track Down Assets of Bin Ladin Operative," September 10, 2002.

[116] Arab News, Badr Almotawa - US urged to give sound proof in Julaidan's case, Aug. 9, 2002.

[117] OFAC Statement Para 115-119.

to remain in Pakistan.[118] Records show that between November 1992 and January 1993, Kadi transferred some $5.3 million to Julaidan.[119] A number of additional transfers were made by Kadi's Muwafaq charity to Julaidan, including in cash in late 1994, either just prior to or just after his departure from Pakistan.[120]

Kadi and Julaidan also worked together during the Bosnia conflict forming joint business undertakings, as well as "charitable" projects. They set up several companies together, including KA Stan and Euro-invest,[121] which were ostensibly established to undertake construction activities and other investments. At the time Julaidan, was also the head of the Saudi Joint Relief Committee in Kosovo. The United Nations' mission in Kosovo reported that the Saudi Joint Relief Committee in Pristina, Kosovo was, in fact, a cover for al Qaeda operatives.[122]

Working with Julaidan, Kadi established the KA Stan company in March 1996. The stated purpose of the company was to build houses, a mosque, a school and student housing, principally in Bosnia. Reportedly, Kadi provided most of the capital for KA Stan. He stated that he gave shares of the company to Julaidan as a reward for Julaidan's "charitable" activities.[123]  The shareholders of KA Stan were Kadi, Julaidan, and Chafiq Ayadi, who was also subsequently designated an SDGT by OFAC, the EU and the United Nations for his terrorist financing activities.[124]

The Saudi High Commission also provided KA Stan with several million dollars worth of construction contracts in post-war Bosnia between October 1996 and September 1998.[125]

---

[118] U.S. Treasury Dept. Letter from General Counsel David Aufhauser to Claude Nicati, Deputy Prosecutor General of Switzerland dated November 29, 2001.

[119] Kadi 106559, 135297-99.

[120] Kadi 72128-72132.

[121] Another partner in these companies was Chafiq Ayadi who was also designated by the United Nations and OFAC for his connection to the bin Laden financial network on October 12, 2001.

[122] *See infra* at p 28.

[123] OFAC Statement, Para 162.

[124] Yasin Kadi and Chafiq Ayadi were added to Treasury's list of Specially Designated Global Terrorists on October 12, 2001, and Julaidan was added on September 6, 2002.

[125] Kadi 122337, 125792, 126079.

A number of other Kadi companies including Karavan were also engaged in these projects. KA Stan claimed significant profits on some of these projects. The KA Stan books also show cash payments and 'loans' of over 100,000 DM to Taibah International,[126] a Bosnia based organization that the U.S. government named as a Specially Designated Global Terrorist based on its financial support of al Qaeda.

According to Kadi, the KA Stan company actually was unprofitable and went bust in 1998. Nevertheless, he stated that he continued to finance most of the company's activities until it was dissolved in 2001. These cash infusions included 277,000 DM in 1998. An additional 200,000 DM was debited from the Kadi controlled Depozitna Bank. Kadi said he ended up repaying these bank "loans."[127] The absence of accurate accounting information and lack of transparency regarding KA Stan's actual revenues, loans, expenditures and activities present a whole series of "red flags." These red flags become particularly stark given the parties involved, the conflict zone, and the proximity of known Islamic terrorist groups operating in the region.

Another Kadi Company, Euro-Invest, followed a similar course. Its similar characteristics also point to probable terrorism financing. The Company was established in April 1996 and financed through Kadi's Depozitna bank,[128] along with funds from Faisal Finance. Kadi again made Julaidan a shareholder, he said, "by way of reward for the assistance he provided to my charitable activities in Bosnia."[129] Kadi chose Chafiq Ayadi to be the company's director. Euro-Invest engaged in importing commodities such as oil, sugar and flour, which Kadi stated were mostly sold locally "on credit." Like KA Stan, the company recorded a steady series of losses and, according to Kadi, also ceased its activities circa 1998.

---

[126] Kadi 116194, 116386, 116556.

[127] Kadi 73949-950.

[128] Euro Invest's offices were co-located with the Depozitna Bank in Sarajevo.

[129] OFAC Statement Para. 158.

Despite the company's continued series of losses, Euro-invest loaned substantial funds to KA Stan, Ayadi, and some $6200 as a personal loan to Julaidan.[130] There are no indications that the loan was ever repaid. The rationale for these transactions is never presented. These are precisely the kind of blind transactions that international financial organizations warn are indicative of likely terrorism financing.

Kadi also engaged in a number of other questionable financial transactions with Julaidan. For example, Kadi acknowledged transferring some $1.25 million to Julaidan's personal account between February and August 1998.  These transfers were made from Kadi's Karavan Development Company in Albania, ostensibly to fund housing units for Al Emam University in Sanaa, Yemen. The Al Emam project had been contracted to the Maram company which while controlled by Julaidan, held its own accounts. Transferring money intended for this project to Julaidan's private account was irregular, raising both money laundering and potential terrorist financing issues. These suspicions were exacerbated by a subsequent accounting indicating that up to $300,000 of these funds remained unaccounted for. More about this Maram project below.

## The Muwafaq Foundation and Yasin Kadi's Business Dealings

As noted above, the Muwafaq Foundation was established in Saudi Arabia in 1991 with a starting contribution from Khalid bin Mahfouz.[131] The organization was co-directed by Kadi and Khalid bin Mahfouz's son, Abdelrahman bin Mahfouz, and registered as a charitable trust in Jersey on May 31, 1992.[132] The board of trustees, in addition to Kadi and Abdurrahman bin Mahfouz, included Rais bin Mahfouz, Talal Badkook, Mohamed Ali Bin Eid, and Abdul Gani Al-Khariji. However, the Board relegated to Kadi the actual running and operation of the foundation.

---

[130] Kadi 51469.

[131] Kadi Deposition, p. 62, lines 6-15.

[132] *Id.* at 10-12. According to an investigative report in the Guardian (Sept. 25, 2001), Jersey does not have a charities commission and does not appear to maintain any public record of the Muwafaq Foundation. Officials there say if it was structured as a financial trust, it would not require to be registered at all.

According to Kadi's submissions to OFAC, Sudan was the first country in which Muwafaq was active. Subsequently, Muwafaq also established offices in Pakistan, Afghanistan, Ethiopia, Somalia, Bosnia/Herzegovina, Albania, Austria, and Germany.

Kadi told OFAC that it was left to him also to select the various branch managers. Once established, he took on the principal role of raising money for the activities of the local offices. He regularly visited each active project "about three or four times a year." Kadi also acknowledged that there was little actual auditing and that "no meaningful financial records [were] available."[133] He described the Muwafaq Foundation as a "highly decentralised operation" that "carried out separate activities in various countries or regions," and, therefore, it had "no central administration," and "no central accounting systems nor any central bank accounts." [134]

## *Sudan*

In 1989, Hassan al Turabi, Omar Hassan Ahmed al Bashir, and the National Islamic Front installed an extremist government in Sudan via a coup d'etat.[135] Within weeks of taking power, emissaries of the new government in Sudan traveled to Pakistan and Afghanistan where they met with bin Laden and al Qaeda. Sudan invited bin Laden and al Qaeda to relocate their operations to Sudan. Members of al Qaeda travelled to Sudan for an assessment mission. They returned to Pakistan and Afghanistan and made a positive report to bin Laden and al Qaeda.[136] A CIA report indicated that "Bin Ladin moved al-Qaida to Sudan, at the behest of the National Islamic Front."[137] A 1996 U.S. Government fact sheet on Osama Bin Laden described his operations in the country beginning in 1991:

"Bin Laden relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan Al Turabi. . . . [bin Laden] embarked on several business ventures in Sudan in 1990, which began to thrive following his move to

---

[133] Kadi Deposition, Exhibit 31, p. 6.

[134] U.S. Treasury Dept. Administrative Review- Answer to Questions Concerning the Petition to Delist Yassin Abdullah Kadi. DOJ AR 1357-1358.

[135] 9/11 Commission Report, p.57.

[136] *U.S. v. Bin Laden,* Trial Transcript February 6, 2001 pp. 216-235.

[137] CIA - Historical Background of the Islamic Army, Nov. 26, 1996

> Khartoum. Bin Laden also formed symbiotic business relationships with wealthy
> NIF members by undertaking civil infrastructure development projects on the
> regime's behalf."[138]

Muwafaq began its operations in Sudan in 1992 with its principal office in Khartoum.
The charity operated in and around Port Sudan and Khartoum, as well as at a number of
so-called "Peace villages" and displaced persons camps controlled by the National
Islamic Front (NIF). Muwafaq's projects were largely developed in conjunction with the
Turabi Government's "Peace and Development Foundation (PDF)," and the NIF.[139] The
government of Sudan contributed substantial sums raised from government collected
"zakat." By 1993, the NIF and Sudan's Islamic Relief Agency had taken full control of
the Peace and Development Foundation and were exercising considerable influence on
Muwafaq. The Peace and Development Foundation proved to be an effective channel for
the NIF to spread its radical Islamic influence, along with arms and funds, throughout the
horn of Africa, and particularly to Somalia and Ethiopia where Muwafaq also maintained
branches.[140]

The American Embassy in Khartoum reported at that time that the National Islamic Front
was using a number of charities, including Muwafaq, to promote its radical, anti-Western
version of Islam. "It promotes its ideology abroad by training and helping foreign
Islamist and by proselytizing through Islamic non-governmental organizations"[141] The
embassy also reported that the Muwafaq Foundation "purports to be an international
Islamic non-governmental organization…[with ] markedly pro- National Islamic Front
sympathies."[142] The links between the NIF and Muwafaq were so tight that the U.S.

---

[138] CIA - Usama Bin Laden: Islamic Extremist Financer, 1996 from the National Security Archive FOIA-
https://nsarchive2.gwu.edu/NSAEBB/NSAEBB343/.

[139] Burr, Millard & Collins, Robert, *Revolutionary Sudan: Hasan Al-Turabi and the Islamist State, 1989-2000*, p. 89.

[140] *Id.* p 89-90.  Muwafaq also opened an office in Mogadishu and was reportedly engaged in providing
weapons and ammunition to Islamists in the city.

[141] U.S. State Dept cable, *Sudanese Mischief-Making: Does it Matter*?, Khartoum 06366, Dec 14, 1994 via
Wikileaks.

[142] U.S. State Dept cable, *Anatomy of an Islamist NGO*, Khartoum 04913, Sept 21, 1994.

ambassador called Muwafaq, an NIF instrument.[143] Muwafaq's staff was peopled by members of the National Islamic Front and two of its supporting charities Islamic Call and Islamic American Relief Agency ("IARA").[144]

The National Islamic Front was directly implicated in supporting the 1993 attack on U.S. troops during a humanitarian mission in Somalia in 1993,[145] the 1998 al Qaeda truck bombings of the U.S. Embassies in Nairobi, Kenya, and Dar-es-Salaam, Tanzania [146] and the bombing of the USS Cole in Yemen in October 2000.[147]

Kadi himself oversaw much of Muwafaq's work in the Peace Villages.[148]  He regularly used his Leemount Ltd and Muwafaq Ltd companies to transfer funding to Muwafaq for these activities. Both companies maintained bank accounts at the Al Shamal bank which were used, inter alia, for this purpose.[149] Between 1992-1993, his Muwafaq Foundation also provided some 10.4m Sudanese Pounds to the Peace and Development Foundation.[150]

In response to an information request from Swiss investigative authorities, the FBI related:

> "The source advised that Bin Laden had mentioned the Muwafaq Foundation many times particularly when discussing the "Dafa al Shabi" (the Sudanese

---

[143] U.S. State Dept cable, *Sudanese Mischief-Making: Does it Matter?*, Dec 14, 1994 via Wikileaks.

[144] U.S. State Dept cable, *Anatomy of an Islamist NGO*, Khartoum 04913, Sept 21, 1994. The IARA connection to al-Qaeda dated to well before Sept. 11, 2001; it arose while Osama  bin Laden was a guest of the government of Sudan. Ziyad Khaleel, who lived in Columbia, Missouri and was a fundraiser for IARA, purchased a satellite telephone and delivered it to al-Qaeda operatives while he was on travel paid for by IARA. That satellite phone was used by al-Qaeda to direct operations and to orchestrate the Aug. 7, 1998, simultaneous bombings of U.S. embassies in Kenya and Tanzania, which killed more than 200 people.

[145] CIA Report, Usama Bin Laden's Activities in Somalia and Sudanese NIF Support, April 30, 1997. *U.S. v. Bin Laden* Indictment, (U.S. District Court, S.D.N.Y. Case number S(9) 98 Cr. 1023 (LBS), 4 November 1998) pp. 15-16.

[146] *James Owens v Republic of Sudan*, USDC for District of Columbia,  Memorandum Opinion, Decided November 28, 2011.

[147] *Olivia Rux v. Republic of Sudan*, Opinion and Order.

[148] Kadi 103523.

[149] Kadi 93278.

[150] Kadi 3070.

37

militia known as the Popular Defense Forces) and the war in the south of Sudan which was supported by al-Qaida."[151]

"The source advised that Muwafaq supported the Dafa al-Shabi (Popular Defense Forces) in the war in the south of Sudan by providing money, weapons, military training, supplies etc.  For example, the source advised that Muwafaq provided the Dafa with approximately 100 tanker trucks that were used to supply water and gas to the militia force fighting in the south.  Furthermore, the source advised that Osama Bin Laden gave money to Muwafaq through Saad al Sharif to assist the Dafa al Shabi.  The source advised that Saad Al-Sharif was Al-Qaeda's representative to Muwafaq.  The source believes that Al Sharif was involved in the financial aspects of Muwafaq.  According to the source Al Sharif maintained an office at Muwafaq in Khartoum although he would not go there every day."[152]

Kadi claimed that the Muwafaq Foundation ceased operations in 1996. While the charity may have closed officially, its operations were carried on by the Sub-Saharan International Development Organization ("SIDO") which was directed by Siraq al-din Abdel Bari who had simply moved over to this new entity from being Muwafaq's director in Sudan. The United Nations stated that Muwafaq was still active in Sudan in 1997. Moreover, far from ceasing operations, the U.N. report stated that the "Muwafaq Foundation plans to continue to expand its humanitarian activities in the coming year...."[153]

Kadi also interwove a series of distinct business ventures, shell companies, and investments with the activities of his Muwafaq charities. He would use complex transactions through multiple banks and shell companies to engage with local commerce and fund Muwafaq's activities. These business ventures and transactions continued well after bin Laden's departure from Sudan and were instrumental in channeling funds to the NIF and al Qaeda. These transactions included the use of several of Kadi-established companies, including, inter alia, Loxhall Ltd, Leemount Ltd, and Solano that engaged in business transfers or operations in Sudan. "If Mr. Kadi had concurrent business activity in that country he would sometimes arrange for his local businesses to make a contribution to the Foundation, or to finance specific expenditures of the Foundation in

---

[151] Kadi 27092.

[152] Kadi 27182-83.

[153] Kadi 6960, U.N. Department of Humanitarian Affairs, Appeal for Sudan Feb. 18, 1997.

that country. An example of this is Sudan where …the Foundation received funding from Leemount Limited…..There are no meaningful records available of these transfers….”[154] His Muwafaq Foundation also engaged in questionable relationships with Sudanese companies, such as Wadi al Aqiq in which bin Laden and al Qaeda had financial interests. Mr. Kadi's attorneys acknowledged to OFAC that there was no government or regulatory oversight of these transactions. Muwafaq was not required to submit any audited accounts to the Government of Sudan and never did so. [155]

Yasin Kadi was particularly interested at the time in purchasing and re-selling Sudanese agricultural products such as sesame seeds and corn. These were commodities in which Osama bin Laden related farms were heavily planted. At that time, the export trade in Sudanese sesame products were held, according to a U.S. State Department Fact Sheet, as a 'near monopoly' by bin Laden.[156] One of the companies through which this trade was conducted was Rowad Development & Investment, which was registered in Khartoum on Dec. 19, 1992.[157] That Registration shows that shareholders in Rowad included the Wadi al-Aqiq Corporation owned by Osama bin Laden. Bin Laden's signature was included on the registration document.[158] Kadi was also a shareholder via his wholly owned Loxhall Corporation.[159] His Muwafaq charity is also a listed as a co-owner of Rowad.[160]

Kadi's Leemount Ltd. was very active in Sudan and maintained an account at al Shamal Islamic Bank from which it regularly provided financial services to Muwafaq.[161] Leemount handled Kadi's investments in Sudanese commodities. Kadi acknowledged in his deposition testimony that he regularly used its accounts in Al Shamal Bank to transfer

---

[154] U.S. Treasury Dept. Administrative Review - Answer to Questions Concerning the Petition to Delist Yassin Abdullah Kadi, DOJ AR 1366.

[155] Id. at DOJ AR 1363.

[156] U.S. State Department Fact Sheet, August 14, 1996. Usama Bin Ladin: Islamic Extremist Financier.

[157] Kadi 89825-89878 produced in response to Plaintiffs' Document Request No. 92 relating to transactions with any UBL company.

[158] Id. at Kadi 89843.

[159] Loxhall was incorporated in Sudan on March 25, 1992. Kadi 52707. It appears to be a shell company used by Kadi to obscure his business activities in Sudan.

[160] Kadi 89843.

[161] Kadi 10813, 20348.

funds for his various business activities in Sudan, including for the bank's investment in what he called "a major agricultural project."[162] It should be recalled that bin Laden was a part owner of the al Shamal Islamic Bank and that he and his al Qaeda colleagues held numerous accounts in the bank. These accounts were regularly used to purchase military supplies, conduct business and receive deposits.

Subsequently, another of Kadi's companies, Solano, became involved in channeling funds for Kadi's operations in Sudan. Solano Limited was registered in the Bahamas ostensibly to engage in trading Sudanese commodities and agricultural products.[163] During the period of 1999-2000, Solano bought agricultural products from Sudan, including sesame seed products from Dan Fodio, a Sudanese company owned by the National Islamic Front. A few years previously, Dan Fodio had handled al Qaeda's trade in sesame. Solano's funds were principally maintained in a Faisal Finance account in Geneva which had been opened in June 1999 with Mohamed Bin Mahfouz and Kadi having signatory authority.[164] The account was provisioned by a $3.9 million transfer from Kadi's Karavan and Sara companies which were based in the Balkans, and a transfer of some $200,000 from his East Africa Grains company. In October 1999, Solano transferred much of these funds to its account in al Shamal Islamic Bank. Some of this money was subsequently transferred to the Farmers Bank, in which al Qaeda adherents maintained accounts, ostensibly for the purchase of sesame seed. The Farmers Bank was at the time an OFAC designated entity.[165]

Between October 1999 and February 2000, in a series of transactions al Shamal Islamic Bank, someone drained the Solano account to zero. An additional thirty-four more checks totaling $27 million were presented for payment but according to al Shamal records, there were insufficient funds to cover the checks.[166]

---

[162] Kadi Deposition, p.76.

[163] OFAC Statement, Para. 147.

[164] Kadi 11907, 11912.

[165] The Farmers Bank for Investment & Rural Development, Khartoum, Sudan, was designated by OFAC as a SDN on May 26, 1998.

[166] Kadi 104350-53, Kadi 13588.

A document recovered from the 2011 raid on bin Laden's Abbottabad compound revealed that in 1999, bin Laden declared that he had between 26 and 28 million dollars still left in Sudan and was attempting to find a way to access the funds from Afghanistan.[167]

No revenue from sales of any of these Sudanese products was ever recorded. Kadi acknowledged in his deposition testimony that his Solano business ventures in Sudan were run at a substantial loss.[168] The complex nature of these Solano transactions through al Shamal bank raised a number of accounting and potential terrorism financing concerns with few records to detail the actual disposition of the funds provided and the revenues produced.

## *Pakistan*

Muwafaq's Pakistan operation was established in Islamabad in 1992. Amir Mehdi was chosen by Kadi as its local Manager/Regional Director.[169] He also had the title of Regional General of the Muwafaq Asia Office which ran programs in Pakistan, Afghanistan, Uzbekistan, and Tajikistan. Kadi also appointed Mehdi CEO of Muwafaq (PVT) Ltd, his Peshawar-based company.[170] It was generally known that Amir Mehdi maintained a close association with bin Laden and al Qaeda activists and that he was actively engaged with the Pakistani terrorist group Harakat ul- Mujahidin and Harakat-al-Ansar.[171] According to a Swiss Police Investigative Report, Kadi sent considerable sums of money to Amir Mehdi via his Leemount company, including loan payments that were never re-paid.[172]

---

[167] Abbottabad Document – OBL's last will and testament.

[168] According to a Swiss investigation summary, Yasin Kadi's Solano operational losses were some $3.9 million during the period 1999 to 2001. In his deposition, Kadi provided no clarification stating that he had "no recollections" concerning these matters. Kadi Deposition pp. 176-177.

[169] OFAC Statement, Para. 53.

[170] Kadi 51329.

[171] Kadi 10793, 15542-43 – Swiss Police Reports.

[172] *Id.*

The Muwafaq office was raided by the Pakistan Government on March 21, 1995, and Amir Mehdi was arrested and charged with terrorism related offences.[173] Swiss police reports indicated that the arrest was in association with the investigation into Ramzi Yousef and the first World Trade Center bombing that occurred in 1993.[174] The Muwafaq office in Islamabad was reportedly closed permanently in 1997. There are, however, reports of its continued activities in Pakistan until at least 2003. According to OFAC, Muwafaq "continued to operate until mid-2001 under the umbrella of Makhtab al-Khidamat."[175]

The United Nations Security Council Sanctions Committee's Summary Narrative covering Yasin Kadi states:

> "The Muwafaq Foundation [Pakistan] historically operated under the umbrella of Makhtab Al-Khidamat/Al Kifah, an organization founded by Mr. Abdullah Azzam and Mr. Usama Mohamed Awad bin Laden, and the predecessor to Al-Qaeda. Following the dissolution of Makhtab Al-Khidamat/Al Kifah in early June 2001 and its absorption into Al-Qaeda, a number of NGOs formerly associated with Makhtab Al-Khidamat/Al Kifah, including the Muwafaq Foundation, also joined with Al-Qaeda."[176]

Although most of Muwafaq Foundation's worldwide activities were never audited, the Government of Pakistan did require annual audits. Amir Mehdi was permitted to choose the auditors. These annual audits were undertaken from 1992 to 1996 and made available to the Government of Pakistan and to Yasin Kadi and Khalid bin Mahfouz.[177] The audits revealed a significant number of irregularities and discrepancies including financial improprieties, undocumented loans (including to Wael Julaidan), expenditures poorly accounted or totally unaccounted for, and the absence of any cash accounting.[178] When the auditors could not confirm the books they simply recorded Regional Director Amir

---

[173] OFAC Statement, Para. 63.

[174] Kadi 15542-43.

[175] OFAC Newcomb Memorandum forwarded to Stanton D. Anderson, Esq, of McDermott, Will & Emery, representing Yassin Kadi, via letter from OFAC Director R. Richard Newcomb, dated March 12, 2004, DOJ AR 14

[176] United Nations Security Council 1267 Committee Narrative Summary for Yassin Qadi.

[177] Kadi 2933.

[178] Kadi 51013, 51042, 51067-51071, 51226.

Mehdi's assurances that all transactions were in order.[179] Mehdi had a personal bank account which was used for Muwafaq's activities and for which there was no accounting.[180] Kadi and Mahfouz were aware of all of these reported discrepancies. Letters written on December 31, 1994 and June 20, 1995 from the external auditors to Kadi drew specific attention to many of these continuing accounting shortcomings.[181] Mehdi was finally dismissed by Kadi in 1995 after his arrest.

Kadi again used his Leemount company to funnel funds to Muwafaq Pakistan for its projects and activities. According to a financial analysis report prepared by the Swiss Federal Police, Kadi made deposits into Leemount Ltd's account of more than $30 million during this period including via a series of bearer checks issued by the National Commercial Bank.[182] The original source or purpose of these funds was never explained. This lack of accounting information concerning the origin, distribution and disbursement of these funds, raises serious "red flags" concerning the potential that some of these funds were siphoned off for terrorism or related illicit purposes.

### Balkans

When war broke out in Bosnia, the Saudi government was among the first to pledge its financial support for Bosnia's Islamic community. A Supreme Committee for the Collection of Donations for the Muslims of Bosnia (Saudi High Commission) was established, and Prince Salman bin Abd al-Aziz, Governor of Riyadh, assumed the coordination of seven major Islamic charities - MWL, Al Haramain, IIRO, WAMY, SARCS, the Islamic Waqf Organization, and the Makkah Humanitarian Organization - which operated in Bosnia through offices in Zagreb, Sarajevo, and Tuzla. Millions of

---

[179] "…[T]he Foundation's system of control is dependent upon close involvement of the Director General. Where independent confirmation of the completeness and authenticity of the accounting records was therefore not available, we have accepted assurances from the Director General that all the Foundation's transactions have been reflected in the records and are authentic."  As stated in Kadi 51062, the Auditor's Report prepared by Sidat Hyder Qamar Maqbool and Company, Chartered Accountants (representing Arthur Andersen Worldwide in Pakistan) on the Muwafaq Foundation Pakistan as of 31 December 1992.

[180] Kadi 50966.

[181] Kadi 51226.

[182] Kadi 35392.

dollars from Saudi charities poured into Bosnia in support of the Bosniaks and mujahidin jihadists who had come to fight for them. Their mission also was to build mosques, schools and Islamic centers that would preach and indoctrinate Saudi Wahhabi Islamic doctrine. Al Qaeda operatives quickly infiltrated or networked with these charities to finance their own indoctrination, recruitment, training and logistics requirements. [183]

Yasin Kadi also quickly became active in the Balkans where he set up several Muwafaq Foundation offices. Muwafaq's offices in Sarajevo and elsewhere in the Balkans coordinated, supported and undertook joint projects with the Saudi High Commission. The Muwafaq offices in Zagreb, Sarajevo, Vienna and elsewhere in Europe, with the exception of Albania, were directed by Chafiq Ayadi. Abdul Latif Saleh[184] was appointed as Muwafaq Albania's local director.

According to a statement subsequently issued by the United Nations Security Council Sanctions Committee:

> "At the time of his appointment by Mr. [K]adi as Muwafaq's European director, Mr. Al-Ayadi was operating under agreements with Bin Laden. Mr. Al-Ayadi went to Afghanistan in the early 1990s to receive paramilitary training, and then went to Sudan with others to meet Mr. Bin Laden, with whom they concluded a formal agreement regarding the reception and terrorist training of Tunisians. They later met with Mr. Bin Laden a second time, securing an agreement for Mr. Bin Laden['s] collaborators in Bosnia and Herzegovina to receive Tunisian fighters from Italy."[185]

---

[183] According to the witness statement of Ali Ahmad Ali Hamad, a senior SHC employee, "Representatives of the Saudi High Commission provided extensive financial support and food to the mujihadeen forces, and also permitted the mujihadeen and al Qaeda members in Bosnia to use the Saudi High Commission's offices and rented houses. In addition to providing food, money and shelter to support al Qaeda's operations in Bosnia…. After the conclusion of the Bosnian War, the Saudi High Commission provided ostensible employment to a number of foreign fighters and al Qaeda members who had fought in the War."

[184] Abdul Latif Saleh was named by the U.S. Treasury Department as a Specially Designated Global Terrorist on September 19, 2005. The accompanying Press Release stated: Saleh is closely associated with Usama bin Laden and was expelled from Albania on suspicion of membership in a "radical Islamic Jihad group."… In addition, Saleh is closely associated with a number of non-governmental organizations in Albania with links to the Egyptian Islamic Jihad, a terrorist organization tied to al Qaeda. U.S. Treasury Dept. Press Release JS-2727.

[185] United Nations Security Council 1267 Committee Narrative Summary for Chafiq Ayadi as referenced in the European Union Court of Justice, Judgment of July 18, 2013.

By 1993, reports began filtering out of Bosnia that the Muwafaq Foundation was engaged in supplying funds and resources to the so called "Al Muwafaq Brigade" fighting in Bosnia and was financially supporting at least one camp in Afghanistan training mujahidin for Bosnia.[186] One member of the brigade, Ahmed Ressam, was later arrested in an al-Qaeda plot to blow up the Los Angeles airport.[187]

On July 31, 1995, a U.S. Foreign Broadcast Information Service ("FBIS") report indicated that the Muwafaq Foundation office in Zagreb was acting as a front for Osama bin Laden's operations. Several foreign and U.S. intelligence reports began to list Muwafaq as a primary source of funding for other Islamic terrorist groups in the region and around the world as well. A CIA report on Balkan charities stated that Muwafaq helped fund a mujahidin battalion in Bosnia and "also funds at least one training camp in Afghanistan."[188]

Muwafaq's documents state that it distributed 45 tons to military units fighting in Bosnia, including numerous units of the Bosnian Army, the notorious 7th Muslimanski Brigade, the Abu Zubeir Group, and the Abu Bashir Group.[189] The Muwafaq Foundation's Bosnia sub-office in Zenica also reportedly distributed 3.5 tons of supplies[190] to the Abu Zubeir Group. The Muwafaq Foundation assisted al Qaeda fighters in gaining entry into Bosnia.[191] The Saudi High Commission, a government entity, and TWRA also systematically supported the Abu Zubeir and Abu Bashir group with goods, vehicles and personnel.[192] According to the CIA, two of the 9/11 hijackers, Nawaf al Hazmi and Khalid al Mihdhar, served with these mujahidin units.[193]

---

[186] Burr and Collins, Alms for Jihad (April 2006), pp. 137-138.

[187] *Id*. p. 145.

[188] CIA - Balkans' Charities, 1996.

[189] Kadi 79422-23, 79434 – Muwafaq warehouse report January-May 1995.

[190] Kadi 79434, 79406.

[191] International Criminal Tribunal for the Former Yugoslavia, Rasim Delic Trial Transcript Testimony of Ayman Awad, February 10, 2008, at pp. 239-240.

[192] "On the basis of my personal knowledge I can attest that al Qaida's operations in Bosnia, including the activities of the al Qaida fighters who participated in the Bosnian war, were financed and otherwise supported, by the so-called Islamic charitable organizations and institutions, including the Third World Relief Agency and the Saudi High Commission….," Witness Statement of Ali Ahmad Ali Hamad taken on

Post-Communist Albania, Bosnia, and Kosovo offered fertile ground for Islamic charities, such as Muwafaq, seeking to provide economic assistance while propagating Salafist Islamic doctrine. Albania, for example, lacked the capacity to regulate or oversee the activities of the Islamic nongovernmental organizations and businesses flooding in. This made it an enticing environment for Kadi, but also for Islamic terrorist organizations, including al Qaeda[194] and brethren terrorist groups, which came there to solicit support, assist local mujahidin, and recruit new members. A nexus quickly developed between a number of these charities and terrorist organizations.[195] They used Albania as a bridge to promote their terrorist activities and operations throughout the Balkans and overseas.

Kadi was a founding shareholder of the Arab Albanian Islamic Bank, whose other shareholders were companies owned by himself and Saudi Prince Mohamed al Faisal. Kadi, Muwafaq, and Kadi's companies and affiliated persons held over 40 accounts at this bank. One of the affiliated persons, Abdul Latif Saleh, was appointed as Muwafaq Albania's local director. According to the independent Albanian newspaper *Shekulli*, Albanian police subsequently opened an investigation into the bank's activities on evidence that it was being used by terrorists to transfer large amounts of money.[196] Kadi opened account #101 at the Arab Albanian Islamic Bank, and in the first two weeks just over $600,000 was transferred into the account.[197] The United Nations stated that "Bin

March 4, 2008 in the city of Doboj, Bosnia-Herzegovina. See also Kadi 79406.

[193] Nawaf al Hazmi and Khalid al Mihdhar hijacked American Airlines Flight 77 which crashed into the Pentagon.  CIA Report, The Plot and the Plotters, June 2003, pp. 49-50.

[194] According to the London Independent, bin Laden was reported by Interpol to have visited Albania to attend a 1994 meeting. "It was during this meeting that many structures and networks were established for propaganda and fund raising activities and for providing the Algerian armed groups with logistical support," The Independent, Colin Brown, *Bin Laden linked to Albanian drug gang*, October 21, 2001.

[195] "Terrorist organizations such as al-Qaeda, Egyptian Islamic Jihad (EIJ), the Algerian Islamic Salvation Front (FIS), and the Islamic Armed Islamic Group (GIA) used the cover of NGOs and charities to raise and distribute funds in Albania." Bala, Edward, "The Financing of Islamic Groups in Albania" in Freeman, M, Financing Terrorism, Case Studies (2012).

[196] Los Angeles Times, *10 Arrested in Anti-Terrorism Raids in Albania*, August 23, 1998.

[197] Kadi 45871.

Laden provided the working capital for up to five of Qadi's companies in Albania."[198] In addition, according to the U.S. Treasury Department:

> "Bin Laden provided Saleh with $600,000 to encourage the establishment of extremist groups in Albania.  [In addition,] Saleh is closely associated with a number of non-governmental organizations in Albania with links to the Egyptian Islamic Jihad, a terrorist organization tied to al Qaida."[199]

In line with bin Laden's directive, Muwafaq's Director Abdul Latif Saleh, joined with the Saudi al Haramain Islamic Foundation to form an Albanian Jihadist group. The U.S. Treasury Department said:

> "Saleh founded and organized an Albanian jihadist organization that has been financed by the Al Haramain Foundation, a non-governmental organization linked to al Qaida.  The mission of the Albanian jihadist group has been to destabilize the internal situation in Albania by fomenting conflict among the different religious groups in the country.  Al Haramain recruited members from this organization, which Saleh directly assisted in vetting.... Qadi was known to be an active supporter of, and fundraiser for Saleh's jihadist group."[200]

Much of the funding for Muwafaq Foundation's Albania office came directly from, or via Kadi companies in Albania. Kadi himself acknowledged that money was often taken from his local businesses "to make payments to support [Muwafaq's] activities."[201] Kadi would draw on the accounts of his Karavan company, for example, to fund Muwafaq and other Islamic NGOS, including the Saudi Joint Relief Committee headed by Wael Julaidan. He would then reimburse the funds to Karavan from his other personal accounts. This arrangement was confirmed by OFAC's interviews with two Karavan employees -- Violet Spaho, a financial manager, and Amr Al Zainy (aka Amr al-Zaini), who was Karavan's director and Kadi's financial representative in Albania. According to OFAC, when Karavan was ready to send a large sum of money back to Saudi Arabia as

---

[198] United Nations Security Council 1267 Committee Narrative Summary for Yassin Qadi.

[199] U.S. Treasury Dept. Press Release JS-2727.

[200] *Id.*

[201] U.S. Treasury Dept.  Administrative Review – Answers to Questions DOJ AR 1367.

profits, the main office in Saudi Arabia instructed Karavan to give the funds instead to Muwafaq, the Saudi Joint Relief Committee (SJRC) and other Islamic charities.[202]

The SJRC run by Wael Julaidan was established in Albania in 1999 and played a leading role among the Saudi NGOs in Kosovo such as the IIRO, Al-Haramain Islamic Foundation, WAMY, and Al Waqf al Islamia. As noted above, Julaidan, and SJRC secretary, Abdel Sadek Kathum, were shortly thereafter declared "persona non grata".

According to OFAC "As of late 2001, . . . [Kadi] continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996," [203] including two entities that were designated as SDGTs in early 2002 – The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia Herzegovina branch of the Al-Haramain Foundation.[204]

As noted above, Abdul Latif Saleh was also hired by Kadi as an officer in multiple Kadi commercial operations. During this period, Saleh and Kadi conducted several business ventures together, including a sugar importing business, a medical enterprise and a construction business. In fact, Saleh served as the general manager of all of Kadi's businesses in Albania and reportedly held 10 percent of the Kadi Group's investments in Albania.[205] He also had authority from Kadi to act as "official signer" for Karavan and its bank accounts, and had authorization to withdraw money directly from Kadi's bank accounts and transfer funds. In 1999, Saleh was deported from Albania because of his radical activities. He returned to Albania in 2000, but was again expelled in 2002 because of his involvement with Tirana-based charities related to bin Laden.

As stated in OFAC's March 2002 memorandum denying Kadi's reconsideration request:

**"Yassin Al-Qadi is an experienced and sophisticated businessman and financier. He has operated companies, including investment vehicles and**

---

[202] OFAC Newcomb Memorandum, DOJ AR 13 and Kadi 44901. OFAC pointed to large wire transfers in and out of Kadi's personal bank accounts, as well as large cash withdrawals made from Karavan accounts and large payments to Saleh.

[203] OFAC Newcomb Memorandum, DOJ AR 10-11.

[204] OFAC Szubin Declaration, May 22, 2009 pp. 17-18.

[205] OFAC Newcomb Memorandum, DOJ AR 10-11.

**banks, in many corners of the world. He is presumed to be capable of understanding his investments, his companies and his charities, and of being responsible for the actions of those entities which he founds, funds and/or controls.…**

**"It strains credulity that Al-Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character, and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists. These are individuals who Al-Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf. …. OFAC concludes that when considering the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified, provides a reason to believe Yassin Al-Qadi has funded terrorist and extremist individuals and operations."[206]**

(Emphasis supplied)

## The Maram Affair

*"Those who were involved in this operation all number amongst the trusted inner circle of Osama Bin Laden and his Al-Qaeda organization." - Swiss Police.[207]*

The Maram affair is often cited as a key source of funding for al Qaeda in the run-up to the 9/11 attacks on the United States. Maram Seyahat Ithalat Ihracat Ticaret Limited Sirketi, or Maram Travel for short, was established by Mahmdou Mahmoud Salim[208] and his wife in October 1996 and registered in Turkey.[209] In July 1997, Salim sold Maram to Wael Julaidan and Mohamed Bayazid.[210] Salim, Julaidan and Bayazid had known each other since the late 1980s.[211] Salim, Beyazid[212] and Julaidan were active with Osama bin Laden and al Qaeda in the Afghan Jihad.[213] In September 1998, Salim was arrested in

---

[206] OFAC Newcomb Memorandum DOJ AR 21-22.

[207] Kadi 10758.

[208] a/k/a Abu Hajer al Iraqi, Kadi 28389.

[209] Turkish Corporate Records for Maram in the U.S. Treasury Dept. Administrative Review DOJ AR pp. 2115-2117.

[210] *Id.* at DOJ AR 2146-48.

[211] Kadi 12168.

[212] a/k/a Abu Rida al Suri, Kadi 11506.

[213] 9/11 Commission Report pp. 58, 437, 521, Kadi 28389, U.S. Treasury Dept. Statement on the Designation of Wa'el Hamza Julaidan.

Germany and extradited to the United States for his role in the 1998 U.S. Embassy bombings. Salim is currently imprisoned in the Supermax facility in Colorado.

When Julaidan purchased Maram he gave Bayazid 50% of the shares for running the company.[214] One of the first activities of Maram was to provide military equipment to the al Qaeda front charity Benevolence International Foundation, which then passed the material onto the Chechen jihadists.[215]

In 1997, Sheikh Abdul Majeed al-Zindani, a leader of the Yemen chapter of the Muslim Brotherhood, sought assistance in developing his newly established Al-Eman University in Sanaa, Yemen. Al-Zindani had close ties with Osama bin Laden and al Qaeda, and had active fought alongside Osama bin Laden in the 1980s. Al Zindani was named a Specially Designated Global Terrorist by the U.S. Government on February 24, 2004. The accompanying Press Release stated:

> "Al-Zindani has a long history of working with bin Laden, notably serving as one of his spiritual leaders.  In this leadership capacity, he has been able to influence and support many terrorist causes, including actively recruiting for al-Qaeda training camps.  Most recently, he played a key role in the purchase of weapons on behalf of al-Qaeda and other terrorists."[216]

Al-Eman University was largely supported by rich Saudi and Gulf country donors and taught a militant Islamist curriculum. Zindani and many of the school's instructors preached and extolled militant jihadi sentiments. A number of al-Eman students joined al Qaeda. Dr. Fadl al Masri (head of Islamic Jihad and al Qaeda's Fatwa committee) taught at al-Eman. Anwar Al Awlaki, a close confidant of the 9/11 hijackers also lectured at al-Eman. American Taliban member John Walker Lindh studied there as well.

In late 1997, Yasin Kadi's uncle, Omar Zubayr, a trustee of al-Eman University and close friend of Zindani, arranged for Kadi and Julaidan to be involved in what amounted to a

---

[214] Kadi 12168.

[215] Kadi 10778-80, 115482, 115761.

[216] U.S. Treasury Dept. Press Release JS-1190, Designation of Zindani.

money-darkening scheme centered on al Eman University.[217] All the principals involved in this project knew each other and bin Laden well.[218] Working with Yasin Kadi, they agreed that Kadi would provide the bulk of funding for a contract with Julaidan's Maram company ostensibly for the purchase and installation of pre-fabricated barrack-style student housing for the University.[219]

Between February and May 1998, Kadi transferred some $1.25 million through his Karavan company in Turkey to Julaidan's Faisal Finance Switzerland account for this project. There was also a $250,000 transfer from the Saudi National Commercial Bank to Julaidan's Faisal Finance account in June 1998. The records show that Julaidan transferred $850,000 of these funds to Maram's Faisal Finance Turkey account and another $300,000 to his own personal account. While Maram did purchase Turkish-made, pre-fabricated houses and other needed equipment, and shipped and installed them, the expenditures and actual payments recorded in the ledgers indicate that Maram actually only covered a small percentage of the actual costs from the funds at its disposal for this purpose. This indicates that the remainder had to have been covered from other non-Maram sources. Between $926,000 and $1.28 million of the Kadi/Karavan provided funding for this transaction remained unaccounted for and was likely skimmed off for other purposes, including for al Qaeda.[220]

The Maram Company was closed and liquidated in 2002.  Following OFAC's designation of Julaidan, Swiss authorities froze his Faisal Finance account.[221]

## Kadi Designated a Terrorist Supporter

Yasin Kadi was among the first to be designated by the U.S. Treasury Department as a terrorism financier after the 9/11 Attacks. On October 12, 2001, Yasin Kadi was listed by the Office of Foreign Assets Control ("OFAC") as a Specially Designated National

---

[217] Kadi 4273-4278, 12169.  Kadi's uncle, Omar Zubayr and Zindani had become acquainted when Zindani was a guest lecturer at King Abdul Aziz University in Jeddah, while Zubayr was its president.

[218] The three knew each other well having traveled together on several trips to Pakistan. Kadi 2229.

[219] Kadi 4273-78.

[220] Kadi 2191-2194.  Kadi 15390-15399.

[221] WJ 013.

("SDN") under the Global Terrorism Sanctions Regulations (SDGT).[222] OFAC's designation of Kadi was founded on three grounds specified under Executive Order ("EO") 13224. They included findings that he:

1. Acted for or on behalf of al Qaida, Osama bin Laden, and Makhtab al-Khidamat, persons listed in the Annex to E.O. 13224;

2. Assisted in, sponsored, or provided financial, material, or technological support for, or financial or other services to or in support of, among others, al Qaeda, Osama bin Laden, Makhtab al-Khidamat, Hamas, the Revival of Islamic Heritage Society, Al-Haramayn (Bosnia), Chafiq Ayadi, and Wa'el Julaidan, entities and persons also subject to  E.O. 13224 and;

3. Associated with entities & individuals suspected of terrorism-related activities.[223]

This designation resulted in the proscribed blocking of all of Yasin Kadi's finances and property and interests in property subject to the jurisdiction of the United States. He was also placed by the United Nations Security Council Al Qaeda and Taliban Sanctions Committee on its Consolidated List pursuant to Resolutions 1267 (1999) and 1333 (2000) of individuals and entities determined as being associated with Al-Qaeda or the Taliban.[224] Such listing required all countries to freeze his assets, ban him from international travel and cut him off from acquiring weapons and explosives. Kadi effectively circumvented many of these sanctions and continued to operate several of his businesses and to travel.[225] It is believed that the government of Saudi Arabia did not freeze Kadi assets and permitted him to have access to banks, finances, and property and did not limit his travel.

[222] U.S. Treasury Dept. Press Release PO-689, Designation of Kadi et al.

[223] Executive Order 13224. The was issued pursuant to the President's authority under the International Economic Emergency Powers Act ("IEEPA").

[224]  The United Nations said "The individual Yasin Abdullah Ezzedine Qadi … satisfies the standard for listing by the [Sanctions Committee] because of his actions in (a) participating in the financing, planning, facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf of, or in support of; (b) supplying, selling, or transferring arms and related material to; (c) recruiting for; or (d) otherwise supporting acts or activities of; Al-Qaeda, Usama bin Laden or the Taliban, or any cell, affiliate, splinter group or derivative thereof (see United Nations Security Council Resolution 1822 (2008), paragraph 2)."  European Union Court of Justice, Judgment July 18, 2013 p 7.  United Nations Security Council Resolutions 1267 (1999) and 1333 (2000).  United Nations Security Council 1267 Committee Narrative Summary for Yassin Qadi.

[225] See, e.g., FORBES, Morais, Richard, *The Al Qadi Affair*, January 24, 2008.

# The Removal of Yasin Kadi's Designations

Despite the mountain of evidence to the contrary, Yasin Kadi employed considerable legal resources to have his designation status lifted. This included, *inter alia*, filing challenges to both his United States and European Union listings and asset freeze. His appeals based on his claims that he had not participated in the financing of terrorism were unavailing for over a decade. However, he was eventually able to raise questions about fundamental due process regarding the designation process. While the due process issues he raised were eventually litigated before the European Court of Justice and found in his favor, the rulings did not detract from findings by the U.S. Treasury Department, The European Union, or the United Nations that Yasin Kadi engaged in channeling funds to Osama bin Laden. The critical ruling by the European Court of Justice held only that:

> "The contested regulation, in so far as it concerns Mr. Kadi, was adopted without furnishing any guarantee enabling him to put his case to the competent authorities, in a situation in which the restriction of his property rights must be regarded as significant, having regard to the general application and actual continuation of the freezing measures affecting him. It must therefore be held that, in the circumstances of the case, the imposition of the restrictive measures laid down by the contested regulation in respect of Mr. Kadi, by including him in the list contained in Annex I to that regulation, constitutes an unjustified restriction of his right to property."[226]

While the UN Sanctions Committee ruled on a decision in November 2012 to remove Yasin Kadi's name from the United Nations Consolidated Sanctions list, this decision did not vindicate him. As the United Nations Ombudsperson subsequently explained:

> "The standard to be used by the Ombudsperson in making such recommendations to the Sanctions Committee is "a de novo one which looks at the circumstances, **as they stand at the time of the delisting request**, to determine the appropriateness of a continued listing….The reference in resolution 1904 (2009) to the removal from the Consolidated List of "members and/or associates of Al Qaida, Usama bin Laden, or the Taliban [is to those] **who no longer meet the criteria [and]** supports a consideration of **circumstances which have changed since the original listing.**"[227]   (emphasis added)

The Ombudsperson also explained that the imposition of UN sanctions had to be considered as a preventative, rather than a punitive, measure "to hamper access to

---

[226] European Union Court of Justice, Judgment, Sept.3, 2008 Para. 369-372.

[227] United Nations Security Council Report of the Ombudsperson, Jan 31, 2013 Annex 2.

resources in order to impede, impair, isolate and incapacitate the terrorist threat from Al-Qaeda, Usama bin Laden and the Taliban, and to encourage a change of conduct on the part of those who are members of these groups or 'associated with' this individual or these groups."[228] His presentation to the Sanctions Committee maintained that, in the present circumstance and at that time, Yasin Kadi no longer posed such risks.

Similarly, the United States Treasury Department's eventual removal of  Yasin Kadi from its SDN list in November 2014 stating only that "the circumstances resulting in Mr. Kadi's designation as an SDGT **no longer apply.**"(emphasis added) Kadi was further cautioned that "OFAC may consider re-designating Mr. Kadi should it become aware of information indicating that **he has resumed** the activities that resulted in his designation as an SDGT or that he has otherwise engaged in activities that would make him subject to designation pursuant to Executive Order 13224 or other authorities administered by OFAC."[229]

## Conclusion

The attack on America on 9/11 was well-planned, prepared, and perpetrated by a very sophisticated, well-organized, well-established and well-financed al Qaeda terrorist organization. From its inception, al Qaeda and its leader, Osama bin Laden, had benefited from the provision of funds by governments, individual donors, charities and businesses that financed its organizational, indoctrination, recruitment and operational activities. They were the enablers that allowed al Qaeda to gain strength and spread, to indoctrinate and recruit, and to plan and execute terrorist attacks. Yasin Kadi and Wael Hamza Julaidan were prominent among these enablers. They used their respective NPO, and business activities to channel funds to al Qaeda and other terrorist groups. Yasin Kadi and his circle of friends, colleagues and business associates, including Wael Hamza Julaidan, knowingly helped promote the radical Islamic ideology and resources that sustained them.

---

[228] *Id.*

[229] Kadi 103660 - OFAC letter re: Delisting (undated).

The financial network developed by al Qaeda and its supporters was sophisticated, complex and covert. Much of this financing was channeled through Islamic charities able to raise funds from anonymous rich donors seeking to hide their identity. They also benefited from the collection of "zakat" and "sadaqa." While these charities often did actively engage in legitimate humanitarian, developmental and social work, they had a double purpose. They provided a surreptitious channel for passing funds to support al Qaeda and brethren terrorist groups. Muwafaq was such a charity. It precisely fit the model of a terrorism financing charity as described by FATF experts: a service charity operating in close proximity to conflict areas where the local population provided sympathy, cover and support.

Many of Yasin Kadi's activities through his Muwafaq Foundation and personal and business transactions raised the "red flags" developed by FATF and other counter-terrorism financing groups, including:

1. Parties to the transaction came from countries known to support terrorist activities and organizations.

2. The funds were generated by a business located in a high-risk area that are owned or involving persons of some relations to those terrorists they may seek to support.

3. The parties have channeled funds through false corporations and shell-companies.

4. They have used a series of complicated transfers of funds as a means to obfuscate the source and intended use of the funds.

5. Multiple accounts were used to collect and funnel funds to a small number of foreign beneficiaries, both persons and businesses, particularly in higher-risk locations.

6. Multiple foreign bank accounts were used.

7. A person or persons involved in the transaction were associated with an individual on the United Nations 1267 Sanctions list.

8. Media reports have alerted the public to the possibility that an account or person involved is believed to be linked to known terrorist organizations.

9. The parties have used nominees, trusts, family member or third-party accounts to make the transfers.

10. The transaction is not economically justified.

Muwafaq Sudan and Yasin Kadi had regular dealings with bin Laden run companies, and made deposits into al Qaeda controlled accounts, in the al Shamal and Farmers Banks. They also actively supported Sudan's NIF radical Islamic agenda and war effort.

In 1999-2000, even after Muwafaq Sudan was closed, a Kadi company engaged in unmonitored business transactions with Dan Fodio, a Sudanese company owned by the National Islamic Front, with deposits flowing into accounts in both al Shamal Bank and Farmers Bank. The National Islamic Front was directly implicated in supporting the al Qaeda terrorists involved in the 1998 truck bombings of the U.S. Embassies in Nairobi, Kenya and Dar-es-Salaam, Tanzania. Likewise, accounts in the Farmers Bank were also used by the al Qaeda group responsible for the bombing to the USS Cole on October 12, 2000, only eleven months before the 9/11 Attacks and at a time period when the 9/11 hijackers had already arrived in the U.S. to train for the final stages of the attack.

Pakistan and the Balkan chapters of Muwafaq were also directly linked to al Qaeda through their local managers and directors, including Amir Mehdi, Chafiq Ayadi and Abdul Latif Saleh. Wael Julaidan was an active accomplice in channeling funds and resources in support of al Qaeda activities, particularly in Pakistan, Afghanistan, Yemen and the Balkans. Kadi acknowledged in his deposition and in court that he transferred large amounts of cash to these persons and allowed them access to his personal funds. These were persons known to have been implicated in terrorist activities. As OFAC stated in rejecting Kadi's appeal for de-listing in 2004: "It strains credulity that Al-[K]adi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character, and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists." He also stated in depositions and in court that he was actively engaged in overseeing the various Muwafaq projects. He had an obligation, therefore, to assure against the diversion of funds to al Qaeda. He failed to do so, more likely than not because he was, in fact, intentionally, knowingly and willfully directing the funds to support al Qaeda and its well publicized intent to kill Americans.

56

Yasin Kadi's choice of business partners, such as Wael Julaidan, Chafiq Ayadi and Abdul Latif Saleh, all of whom had substantial links to al Qaeda, stands out as a very high-risk indicator of terrorist financing. Many of Kadi's transactions involving these individuals or the entities they ran and controlled went undocumented, off-the-books, and/or lacked traceable accounting records. Kadi's transactions with Maram and Wael Julaidan exemplified these failings, and raised substantive reasons for believing that substantial amounts were knowingly and intentionally siphoned off for al Qaeda just before 9/11.

Yasin Kadi's and Muwafaq's role in the channeling of funds to al Qaeda did not go unnoticed by the Saudi Royal Family nor major Saudi donors, such as Khalid bin Mahfouz, CEO and President of Saudi Arabia's National Commercial Bank. Yet each of them retained very close oversight and working relationships with Yasin Kadi despite the fact that they must have known of the growing public perception, and U.S. and E.U. concerns that Muwafaq and Kadi were engaged in business and other transactions with Sudan's National Islamic Front and with al Qaeda. According to the 9/11 Commission Staff Monograph on Terrorist Financing, "the Saudi government turned a blind eye to the financing of al Qaeda" before September 11, 2001, and "the Saudis did not begin to crack down hard on Al Qaeda financing in the Kingdom until after the May 2003 Al Qaeda attacks in Riyadh."[230]

For these reasons, and the more detailed information outlined above, it is my expert opinion that Yasin Kadi, through his Muwafaq charity and business practices, knowingly and intentionally participated in a financial network to support Al Qaeda and finance its activities, including during the planning stages for the 9/11 Attacks on the United States. It is also my opinion that he did so in partnership with various persons associated with al Qaeda including, *inter alia*, Wael Julaidan, Abdul Latif Saleh, and Chafiq Ayadi, with the knowledge and tacit approval of members of the Saudi Royal family, Saudi government officials, and major Saudi donors such as Khalid bin Mahfouz. This support contributed

---

[230] 9/11 Commission Staff Monograph on Terrorist Financing, p 24, footnote 14.

57

substantially to al Qaeda's ability to launch terror attacks against Americans, including the September 11, 2001 terror attacks in the United States.


Victor D. Comras


Executed this 29th day of October, 2020

**Appendix 1**

**Resume of Victor D. Comras**

**VICTOR D. COMRAS**

Attorney at Law

Fort Lauderdale, Florida 33304

Falls Church, Virginia 22043

954 563 4386

703 573 1971

vicomras@aol.com

Victor Comras has pursued a public service career in international law and diplomacy, and is an internationally recognized expert and frequent speaker on global efforts to combat terrorism, terrorism financing, nuclear proliferation, and other illicit international transactions. He has extensive experience in the development and implementation of international financial and trade sanctions, and export controls, including those imposed by the United States, the European Union and the United Nations. He frequently testifies before Congress and advises corporate and other clients on these issues.  His articles have appeared in numerous national and international press media, books and professional journals.  He is the author of **Flawed Diplomacy: The United Nations and the War on Terrorism** (Potomac Books, 2010), a co-author of **Pressure: Coercive Economic Statecraft and U.S. National Security** (CNAS 2011) and contributing author to **Terrorism Financing and State Responses** (Stanford Univ. Press 2007).

Prior to entering private law practice Mr. Comras held several senior positions at the U.S. State Department dealing with export controls, strategic trade regulation and bilateral and international economic and financial issues.  He served as director of the US State Department's Office of Sanctions and Export Controls from 1991 to 1994 and was the chief U.S. architect of the international economic sanctions against Serbia during the Bosnia and subsequent Kosovo wars.  During his prior diplomatic assignments he also led US efforts to expand the implementation of international strategic export controls pursuant to the International COCOM regime.

In 1990, Mr. Comras was elected by his Foreign Service peers as chairman of the State Department Open Forum, a position established by Secretary Henry Kissinger to stimulate internal State Department debate on critical foreign policy issues. And, in 1994, he was appointed by President Clinton to serve as the first U.S. envoy, and Chief of Mission (with the rank of Ambassador), to the Former Yugoslav Republic of Macedonia (now Republic of Northern Macedonia).

Mr. Comras' other diplomatic assignments included postings in Africa, Europe and Canada, and at the United Nations, the Council of Europe, the European Union and as US delegate to COCOM. From 1978 to 1980 he served as a member of the U.S. Delegation to the Law of the Sea. He also served from 1997 to 1999 as the first U.S. State Department Coordinator for the Restitution of World War II and Holocaust assets.

He is recipient of 10 Superior and Meritorious Honor Awards from the Department of State and the President's Medal from the Council of Europe.

Following the 9/11 attack on the United States Mr. Comras was asked by UN Secretary General Kofi Annan to serve as one of five international monitors charged with overseeing the implementation of UN Security Council measures against al Qaeda and the Taliban. In that capacity he led the Monitoring Group's efforts to gather and report information related to the financing of terrorism. In 2009, he was appointed to serve as the U.S. member of the UN Security Council's special Panel of Experts on the implementation of UN sanctions and mandated export controls on North Korea.

Mr. Comras received his LLM from Harvard University in International Legal Studies and his J.D. (with honors) from the University of Florida Law Center, where he was on the Law Review.  He earned his B.S. from the Georgetown University School of Foreign Service.   He is admitted to the bar in Florida and is a member of the U.S. Supreme Court Bar.

In 2004, the Association for Diplomatic Studies and Training and the Library of Congress published an Oral History of his career and foreign policy perspectives which can be found online at https://www.loc.gov/item/mfdipbib001340.


Sample list of Recent Publications, Articles and Presentations


1. Flawed Diplomacy: The United Nations and the War on Terrorism (Potomac Books 2010)
2. Pressure: Coercive Economic Statecraft and U.S. National Security ( CNAS 2011) co-authored with David Asher and Patrick Cronin
3. "We Need to Tighten the International Non-Proliferation Control System", Palm Beach Center for Democracy and Policy Research, January 20, 2019
4. "How to More Effectively Encourage and Assist MENA Governments to Implement their International Legal Obligations Related to NonProliferation," Paper prepared for Arizona State University/Department of Defense (ASU/DOD) Lawfare Project, April 16, 2016
5. "Heightening the Salience of the Crime of Illicit Nuclear Procurement," Paper for the James Martin Center for Nonproliferation Studies, June 6, 2016
6. "Uses of Lawfare to Deter Turkish and Qatari Support for Hamas," Paper prepared for ASU/DOD Lawfare Project, May 31, 2015
7. "Curtailing the Flow of Funds and Other Economic and Logistical Resources That Support ISIL and Other Terrorist Groups Operating in the Levant,"  Paper for ASU/DOD Lawfare Project, December 26, 2014
8. "UN Designation System Needs Reform," in Perspectives on Terrorism, Journal of the Terrorism Initiative, Volume 2 No 10, Fall 2008
9. "Sanctions: Still A Viable Option?", Oral Testimony Before the Canadian House of Commons Foreign Relations Committee, June 11, 2009
10. "Al Qaeda Finances and Funding for Affiliated Groups" in Terrorism Financing and State Responses (Stanford University Press 2007)
11. "A Sanctions Strategy For Dealing with Iran," Presentation before the Jewish Federation of South Florida, December 2, 2007 (CSPAN)
12. Iran Sanctions and Halliburton, Testimony before the Senate Interstate Commerce,

Trade and Tourism Subcommittee, US Senate, April 30,2007(CSPAN)

13. "Using Sanctions to Dissuade Iran and North Korea from Current Nuclear Proliferation Policies," Testimony before the House Subcommittee on Terrorism, Nonproliferation, and Trade, US. House of Representatives, April 18, 2007 (CSPAN)

14. "Current and Evolving Trends in Terrorism Financing," Testimony before House Subcommittee on Financial Services, September 28, 2010

15. "Judge finds proper balance between due process and national security in Al-Haramain wiretapping case," in Jurist Legal News and Research, March 10, 2009

16. "Reforming U.S. Counter-Terrorism Assistance Programs," Panel Presentation, U.S. House of Representatives Committee on Foreign Affairs, Washington DC

17. "Deterring Terrorism By Providing A Civil Right Of Action Against Perpetrators And Sponsors of Terrorism," Testimony before the Canadian Parliament, Senate Committee on Legal and Constitutional Affairs, Ottawa, June 18, 2008

18. "Protecting the Rights of Victims of Terrorism: A Critique of the Boim Case," Panel Presentation, Senate Judiciary Committee, January 28, 2008

19. "The International Response to Terrorism Financing," An Address Delivered at the International Conference on Terrorism, Herzilya, Israel, September 14, 2006

20. "Winning the War Against Terrorism Financing, An Address to the First International Conference of Armed Forces Commanders," Atlanta, March 8, 2006

21. "Funding for Al Qaeda," Strategic Insights, Center For Contemporary Conflict, January, 2005

22. "Civil Liability is Crucial in the War on Terrorism: A Response to the Wall Street Journal," The Counterterrorism Blog, October 30, 2006

23. "Following Terrorists' Money," The Washington Post, June 5, 2005

24. "Terrorist Money Trail Still Leads to US-Based Charities," Houston Chronicle, June 10, 2005

25. "The United Nations and the Fight Against Terrorism," Testimony Before the Subcommittee on International Terrorism and Non Proliferation of Committee on International Relations, United States House of Representatives, March 17, 2005

26. "Filling the Information Gaps on Al Qaeda," Washington Post, June 1. 2004

27. "Al Qaeda and the War on Terrorism, An International Perspective," Naples Council of World Affairs, Naples, Florida, April 13, 2004

28. Special Reports for the United Nations Security Council Monitoring Group  on the State of Implementation of Measures Against Al Qaeda and Taliban, December 2, 2003; July 7, 2003; December 17, 2002;  and September 20, 2002.

**Appendix 2**

**List of Reliance Materials**

911 Commission Interview of Patrick Fitzgerald, Jan 28, 2004

911 Commission Report

911 Commission Staff Monograph on Terrorist Financing

Abbottabad Document- OBL Will Translation

Affidavit of Wael Hamzah Jelaidan

Aid Watch Factsheet on Al Haramain Islamic Foundation

Al Shamal Bank Website - Correspondents

Arab News, Badr Almotawa - US urged to give sound proof in Julaidan's case, Aug 9, 2002

Bergen, Peter, The Osama Bin Laden I Know: An Oral History of Al Qaeda's Leader

BUR-PEC 63170-63210

BUR-PEC 75113-75133

Burr, Millard & Collins, Robert – Alms for Jihad

Burr, Millard & Collins, Robert - Revolutionary Sudan: Hasan Al-Turabi and the Islamist State, 1989-2000

Canada (Minister of Citizenship and Immigration) v. Jaballah

CIA – Balkans' Charities, 1996

CIA - Historical Background of the Islamic Army, Nov 26, 1996

CIA - The Plot and the Plotters, June 2003

CIA - Usama Bin Laden: Islamic Extremist Financer, 1996

CIA - Usama Bin Laden's Activities in Somalia and Sudanese NIF Support, April 30 1997

Congressional Hearing, Committee on International Relations, Al-Qaeda and the Global Reach of Terrorism, Oct 3, 2001

Declaration of Dr. Abdulrahman al Suwailem and Exhibits, Jan 10, 2005

Deposition of Yassin Abdullah Kadi Exhibits

Deposition of Yassin Abdullah Kadi, In the Matter of: In Re Terrorist Attacks, July 10, 2018

European Union Court of Justice, Judgment July 18, 2013

European Union Court of Justice, Judgment Sept 3, 2008

Executive Order 13224

FATF Report: Risk of Terrorist Abuse of Non-Profit Organizations, p 3  June 2014

FED-PEC 97363-97365

FED-PEC 203469-203470

FED-PEC 212243-212246

FED-PEC 212276-212281

FED-PEC 212309-212310

FED-PEC 212164-212167

FED-PEC 212659-212696

FED-PEC 213792-213854

FED-PEC 213923-213929

FRD-PEC 213978-213979

FED-PEC 215313-215314

FED-PEC 215391-215294

FFIEC BSA/AML Examination Manual, Appendix F "Money Laundering and Terrorist Financing "Red Flags

FORBES, Morais, Richard, "The Al Qadi Affair," January 24, 2008

Foreign Affairs, Indyk, Martin, Back to the Bazaar, January 2002

German Federal Office of Criminal Investigation report on TWRA

Global News Wire, Pakistan Frozen Accounts, June 23, 2003

Harrison v Sudan, DCDC Opinion, March 30 2012

Hegghammer, Thomas - The Caravan: Abdullah Azzam and the Rise of Global Jihad

IIRO 149637

IIRO 149642

IIRO 41030

Independent, Colin Brown, Bin Laden linked to Albanian Drug Gangs, October 21, 2001

International Criminal Tribunal for the Former Yugoslavia, Rasim Delic trial transcript Feb 10, 2008

International Criminal Tribunal for the Former Yugoslavia, Rasim Delic trial transcript Feb 9, 2008

James Owens v Republic of Sudan Memorandum Opinion

Kadi 103523

Kadi 103660

Kadi 104053

Kadi 104350-104353

Kadi 106559

Kadi 10758

Kadi 10778-10780

Kadi 10793

Kadi 10813

Kadi 11506

Kadi 115482

Kadi 115761

Kadi 116190

Kadi 116194

Kadi 116202

Kadi 116386

Kadi 116556

Kadi 11907

Kadi 11912

Kadi 12168

Kadi 12169

Kadi 122337

Kadi 125792

Kadi 126079

Kadi 131279

Kadi 135297-135299

Kadi 13588

Kadi 150486

Kadi 15390-13099

Kadi 15542-15543

Kadi 18587

Kadi 187044

Kadi 20348

Kadi 2191-2194

Kadi 2229

Kadi 27078

Kadi 27092

Kadi 27182-27183

Kadi 28389

Kadi 28396-28402

Kadi 2910-2912

Kadi 2933

Kadi 2944

Kadi 29646

Kadi 3070

Kadi 35071

Kadi 35392

Kadi 4273-4278

Kadi 44901

Kadi 45871

Kadi 50966

Kadi 51013

Kadi 51042

Kadi 51062

Kadi 51067-51071

Kadi 51226

Kadi 5129-5132

Kadi 51329

Kadi 51469

Kadi 52040

Kadi 52707

Kadi 6960

Kadi 72128-72132

Kadi 73949-73950

Kadi 79406

Kadi 79422-79423

Kadi 79434

Kadi 79615

Kadi 89787

Kadi 89825-89878

Kadi 93278

Los Angeles Times, 10 Arrested in Anti-Terrorism Raids in Albania, August 23, 1998

Madrid Indictment Spanish and English

Military Review Dec 2013

MWL 30817-30819

MWL 8691

OFAC Kadi Statement

OFAC Newcomb Memorandum

OFAC Szubin Declaration

Olivia Rux v Republic of Sudan Opinion and Order

PEC-FOIA 49927-49932

PEC-KSA 2133-2134

PEC-KSA 329-352

Rabita Trust Document Production

Saudi Arabia Embassy Press Release – Saudi Arabia and U.S. Track Down Assets of Bin Ladin Operative, Sep 10, 2002

Senate Judiciary Committee Kohlmann Testimony July 14, 2010

Sudan Transparency Initiative, Pursuing Transparency in Sudan's Oil Industry, January 20, 2016

Turkish Corporate Records - Maram

U.S. Defense Dept.  JTF-GTMO Algeria 1452

U.S. Defense Dept.  JTF-GTMO SA 239

U.S. Defense Dept.  JTF-GTMO YM 170

U.S. Defense Dept.  JTF-GTMO YM 33

U.S. State Dept Cable – Bosnia's Dirty Dozen

U.S. State Dept. Cable - Anatomy-of-an-Islamist-NGO

U.S. State Dept. Cable - Sudanese Mischief-Making: Does it Matter

U.S. State Dept. Factsheet on UBL Aug 14 1996

U.S. State Dept. Patterns of Global Terrorism 1998

U.S. Treasury Dept.  Administrative Review

U.S. Treasury Dept.  Administrative Review – Answers to Questions.

U.S. Treasury Dept. Letter to Swiss Prosecutor Nov 29 2001

U.S. Treasury Dept. Press Release JS-1190, Designation of Zindani

U.S. Treasury Dept. Press Release JS-2164, Designation of Batterjee

U.S. Treasury Dept. Press Release JS-2727, Designation of Saleh

U.S. Treasury Dept. Press Release PO-689, Designation of Kadi et al.

U.S. Treasury Dept. Protecting Charitable Organizations -A

U.S. Treasury Dept. Statement on the Designation of Wa'el Hamza Julaidan

U.S. v Arnaout Government's Evidentiary Proffer, Jan 31, 2003

U.S. v Bin Laden Indictment, Oct 7, 1998

U.S. v Bin Laden Trial Transcript February 6, 2001

United Nations Security Council 1267 Committee Consolidated List (2002)

United Nations Security Council 1267 Committee Narrative Summary for Al-Haramain & Al Masjed al-Aqsa Charity Foundation

United Nations Security Council 1267 Committee Narrative Summary for Wael Julaidan

United Nations Security Council 1267 Committee Narrative Summary for Yassin Qadi

United Nations Security Council 1267 Committee Narrative Summary for Rabita Trust

United Nations Security Council 1267 Committee Narrative Summary for Chafiq Ayadi

United Nations Security Council Monitoring Group Report #2 Nov 3, 2003

United Nations Security Council Report of the Ombudsperson, Jan 31, 2013

United Nations Security Council Resolution 1267 (1999)

United Nations Security Council Resolution 1333 (2000)

Witness Statement Ali Hamad

WJ 001-022

Yale University Library - Guide to the Islamic Fundamentalist Audio Recordings Collection excerpt