# EXHIBIT C

Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's Motion
To Exclude the Testimony of Victor Comras

03 MDL 1570

July 31, 2023

THE ANNOTATIONS ON THIS TRANSCRIPT WERE DONE BY PETER C. SALERNO AND REFLECT
CORRECTIONS SUPPLIED IN A "CORRIGENDUM" BY THE DEPONENT

Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 03-MDL-1570 (GBD)(SN)

5   ------------------------------------x

6   IN RE:  TERRORIST ATTACKS ON

7

8   SEPTEMBER 11, 2001

9   ------------------------------------x

10

11        REMOTE VIDEOTAPED DEPOSITION OF

            VICTOR COMRAS

12          Ft. Lauderdale, Florida

              July 23, 2021

13

14

15  Reported By:

16  ERIC J. FINZ

17

18

19

20

21

22

23

24

25

Page 2

1

2                          July 23, 2021

                           8:16 a.m.

3

4          Remote Videotaped Deposition of

5    VICTOR COMRAS, taken by Defendants,

6    pursuant to Notice, before ERIC J. FINZ,

7    a Shorthand Reporter and Notary Public

8    within and for the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1
2   A P P E A R A N C E S: (All Via Remote)
3   ANDERSON KILL P.C.
    Attorneys for Plaintiff O'Neill and
4   Plaintiffs' Executive Committee
            1251 Avenue of the Americas
5           New York, New York 10020
6   BY:   JERRY S. GOLDMAN, ESQ.
            jgoldman@andersonkill.com
7
8

    MOTLEY RICE LLC
9   Attorneys for Burnett Plaintiffs and for
    the Plaintiffs' Executive Committee
10          28 Bridgeside Boulevard
            Mount Pleasant, South Carolina 29465
11
    BY:   ROBERT T. HAEFELE, ESQ.
12          rhaefele@motleyrice.com
            JADE HAILESELASSIE, ESQ.
13          jhaileselassie@motleyrice.com
14
15  KREINDLER & KREINDLER LLP
    Attorneys for Plaintiffs' Executive
16  Committee
            750 Third Avenue
17          New York, New York 10017
18  BY:   ANDREW J. MALONEY, III, ESQ.
            amaloney@kreindler.com
19          JOHN FAWCETT, ESQ.
            jfawcett@kreindler.com
20
21
22
23
24
25

Page 4

1
2    A P P E A R A N C E S: (Continued)
3    LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
     Attorneys for The Muslim World League,
4    International Islamic Relief Organization
     and the Charity Officials
5         1101 New York Avenue NW
          Washington, D.C. 20005
6
     BY:  WALEED NASSAR, ESQ.
7         waleed.nassar@lbkmlaw.com
8
9    COZEN O'CONNOR
     Attorneys for Federal Insurance
10   Plaintiffs
          One Liberty Place
11        1650 Market Street
          Philadelphia, Pennsylvania 19103
12
     BY:  J. SCOTT TARBUTTON, ESQ.
13        starbutton@cozen.com.com
          SEAN CARTER, ESQ.
14        scarter@cozen.com
15
16   JONES DAY
     Attorneys for Dubai Islamic Bank
17        51 Louisiana Avenue NW
          Washington, D.C. 20001
18
     BY:  GABRIELLE PRITSKER, ESQ.
19        gpritsker@jonesday.com
          ABIGAEL BOSCH, ESQ.
20        abosch@jonesday.com
          ERIC SNYDER, ESQ.
21        esnyder@jonesday.com
22
23
24
25

```
 1
 2   A P P E A R A N C E S: (All Via Remote)
 3   OMAR T. MOHAMMEDI LLC
     Attorneys for World Assembly of Muslim
 4   Youth
          233 Broadway
 5        New York, New York 10279
 6   BY:  OMAR T. MOHAMMEDI, ESQ.
          omohammedi@otmlaw.com
 7
 8
     SALERNO & ROTHSTEIN
 9   Attorneys for Yasin Kadi
          221 Schultz Hill Road
10        Pine Plains, New York 12567
11   BY:  PETER C. SALERNO, ESQ.
          peter.salerno.law@gmail.com
12        AMY ROTHSTEIN, ESQ.
          amyrothsteinlaw@gmail.com
13
14
     ALSO PRESENT:
15
          KATHARINE SILVERLEAF
16
          NOUR SOUBANI
17
          SUMAYYA KHATIB
18
          JODI FLOWERS
19
          LINDA HOFFMAN, Jones Day
20
          DUANE MILNER, Veritext Concierge
21
          CRAIG JONES, Videographer
22
23
24
25
```

Page 6

```
1                    VICTOR COMRAS
2               THE COURT REPORTER:  Due to
3          the need for this deposition to
4          take place remotely because of the
5          government's order for social
6          distancing, the parties will
7          stipulate that the court reporter
8          may swear in the witness remotely
9          and that the witness has verified
10         that he is in fact Victor Comras.
11              THE WITNESS:  Yes, I'm Victor
12         Comras.
13              MR. MALONEY:  Andrew Maloney
14         from Kreindler & Kreindler for
15         plaintiffs.
16              MR. SALERNO:  Agreed.
17   VICTOR COMRAS,
18   having been first duly sworn by the
19   Notary Public (Eric J. Finz), was
20   examined and testified as follows:
21              EXAMINATION BY
22              MR. SALERNO:
23         Q.   Good morning, Mr. Comras.  How
24     are you today?
25         A.   Good, thank you.  How are you?
```

```
                                              Page 18
 1                    VICTOR COMRAS
 2            identification, document headed
 3            "Corrigendum.")
 4    BY MR. SALERNO:
 5            Q.    Mr. Comras, I show you what
 6       has been marked as Exhibit 974, and ask
 7       if this is the corrigendum that you
 8       submitted to your main report sometime in
 9       July of 2021?
10            A.    It appears to be, yes.
11            Q.    And for the record, this
12       corrigendum changes the last sentence on
13       page 39 of your main report to state --
14            A.    That's correct.
15            Q.    And let me finish.
16                  And to state, please, that
17       the -- let me start again.
18                  My understanding is, and I'm
19       going to ask you if this is correct, that
20       this changes the last sentence on page 39
21       to state that the total of bounced checks
22       referred to is $1.7 million rather than
23       $27 million.  Is that correct?
24            A.    Yes.
25            Q.    And there are two additional
```

                    VICTOR COMRAS

1                   Now, your list goes back to

2   September 20, 2002.  Doesn't it?

3        A.    I think it does, yes.

4        Q.    How did you select what

5   material to include in this list and what

6   to exclude?

7        A.    What I considered to be work

8   that was relevant and important.  I've

9   written other things on the side that

10  have nothing to do with this issue,

11  particularly in the areas of

12  nonproliferation.

13       Q.    Thank you.

14             Mr. Comras, do you have any

15  experience analyzing pre-9/11 financial

16  transactions in Sudan?

17       A.    I cannot say specifically

18  Sudan.  I do have experience in dealing

19  with financial transfers from other

20  countries.  I may have come across

21  something when I was in the Office of

22  Sanctions Policy that dealt with Sudan.

23  But that would test my memory.

24       Q.    And do you have any experience

Page 45

```
 1              VICTOR COMRAS
 2              What experience do you have in
 3    forensic accounting?  Would it be the
 4    same thing?
 5         A.    Pretty much so.  Greatest
 6    experience is being the lead person on
 7    the Al Qaeda and Taliban Sanctions
 8    Committee Monitoring Group for financial
 9    sanctions.  And then following that,
10    having the same responsibility with
11    respect to north Korea, from 2009-2010.
12    In both of those times I was the man who
13    led our group's efforts with respect to
14    financial violations of sanctions.
15         Q.    Thank you.
16              Changing the subject, sir.
17    Did you read the entire transcript of
18    Mr. Kadi's deposition in this case?
19         A.    Yes.
20         Q.    And did you read the --
21         A.    Let me correct that.  I read
22    what was sent to me as volume 1.  I
23    assume that that was the whole
24    transcript.  I'm not sure if there was
25    anything more.  But I was provided what
```

Page 46

```
 1                VICTOR COMRAS
 2    was called volume 1 of his transcript.
 3    It seemed to be complete.
 4          Q.    Thank you.
 5                There was also an errata
 6    sheet.  Did you ever see an errata sheet
 7    to that transcript?
 8          A.    I did not.
 9          Q.    Mr. Comras, prior to writing
10    your report in this case, did you have
11    any bias regarding defendant Yasin
12    Abdullah Kati?
13          A.    I don't know how to quite
14    answer that question.  I had some
15    knowledge of him.  I don't think that
16    that led to any bias, no.
17          Q.    So you don't think you had
18    bias, that's your answer?
19          A.    I think that I understood that
20    he was a designated entity.  And that
21    based upon the information available to
22    me in the Al Qaeda and sanctions
23    monitoring group, that there were reasons
24    for that designation.  So to the extent
25    that that may have influenced me, I don't
```

Page 47

1                    VICTOR COMRAS
2      know how you want to express that.  I
3      would not call that bias, I would call it
4      simply assessing the facts.
5           Q.    Did you write a post for the
6      counterterrorism blog titled "It's time
7      to put Yasin Al-Kadi out of business"?
8           A.    I did.
9                 MR. SALERNO:  I would ask the
10          court reporter to put up Exhibit
11          008 -- I'm sorry, 006, excuse me.
12                This is 976, correct, now?
13                THE CONCIERGE:  Yes, sir.
14                MR. SALERNO:  Can you put it
15          up, please.
16                (Deposition Exhibit 976 for
17          identification, blog titled "It's
18          time to put Yasin Al-Kadi out of
19          business," production numbers KADI
20          67861 through KADI 67862.)
21                MR. SALERNO:  We're waiting
22          for the court reporter to put up
23          the exhibit.
24                THE CONCIERGE:  My name is
25          Duane, I'll be the concierge tech,

```
 1                VICTOR COMRAS
 2        I'm actually putting the sticker on
 3        it right at this moment.  It's kind
 4        of an odd document.  I jut don't
 5        want to have anything blocked with
 6        that sticker.
 7             I did get ahold of support and
 8        we will have a videographer joining
 9        us.
10             THE VIDEOGRAPHER:  I've
11        actually joined and started my
12        local recording.  If you'd like
13        I'll begin the Zoom recording as
14        well.
15             MR. HAEFELE:  We would object
16        to the Zoom recording.
17             THE VIDEOGRAPHER:  Okay.  I'll
18        just record local.
19             MR. SALERNO:  What's the
20        difference?
21             MR. HAEFELE:  Courts have
22        found Zoom recordings are not
23        something that are admissible.
24   BY MR. SALERNO:
25        Q.   I show you what has been
```

Page 49

```
 1                    VICTOR COMRAS
 2    marked as Exhibit 976, and ask if that is
 3    a true copy of the blog post you wrote
 4    titled "It's time to put Yasin Al Kadi
 5    out of business."
 6         A.    I'm looking for the date.
 7    Because I don't recall the exact wording
 8    of the blog at that time.  But it looks
 9    like what would be my blog, yes.
10         Q.    Well, I was going to ask.
11         A.    Could you scroll it a little
12    bit so that I could see a little bit more
13    of the blog.
14              If you have patience, I'll
15    read through it and recall -- refresh my
16    memory.
17         Q.    I'm just going to ask you if
18    that's your blog.  If you could look at
19    the end of the post, it's dated September
20    20, 2005.
21         A.    Okay, September 20, 2005, yup.
22         Q.    Okay.  Is this the blog you
23    wrote?
24         A.    It appears to be the blog I
25    wrote, yes.
```

1                VICTOR COMRAS

2        Q.    Did you consider this post in

3    writing either your initial report or

4    your rebuttal report in this case?

5        A.    To be honest, until this

6    moment I had completely forgotten it.

7        Q.    So is that the reason that you

8    didn't list this article in your -- in a

9    list of sample list of recent

10   publications?

11       A.    That's correct.  I think it's

12   very hard for me to get back the stuff on

13   the counterterrorism blog since it was

14   taken offline.

15            MR. HAEFELE:  I'd also lodge

16        an objection under Rule 26.  I

17        don't think he's required to list a

18        2005 publication.  But in any

19        event, we have it.

20            MR. SALERNO:  I'm just asking

21        the question, Mr. Maloney.

22            MR. MALONEY:  Well, no.  You

23        asked it in a way is that the

24        reason you didn't list it.  That's

25        not fair.  So I'm objecting to the

```
 1                    VICTOR COMRAS
 2           form of your question.  There are
 3           certain requirements under Rule 26
 4           for disclosure.  You know it and I
 5           know it.  The way you phrase the
 6           question was not proper.
 7                    MR. SALERNO:  Thank you,
 8           Mr. Maloney, I appreciate the
 9           clarification.
10   BY MR. SALERNO:
11           Q.    The final sentence of this
12      post, Mr. Comras, "When, if ever, will
13      the UN sanctions put him, Mr. Kadi, out
14      of business?"  Is that correct?
15           A.    I'm sorry.  It says "he
16      continues to run a number of these
17      businesses from his offices in Jeddah.
18      When, if ever, will the UN sanctions put
19      him out of business?"  Correct.
20           Q.    And in that post, you also
21      wrote, going back to the first page,
22      please, the second full paragraph.
23           A.    Can you scroll back to it,
24      please.
25                    MR. SALERNO:  Court reporter,
```

```
 1                    VICTOR COMRAS
 2         are you there?
 3         Q.     Second full paragraph.   Did
 4    you write that Muwafaq and its Blessed
 5    Relief charities were implicated directly
 6    in financing the 1998 U.S. Embassy
 7    bombings in Kenya and Tanzania?
 8         A.     Let me see.   Financial
 9    supporters.   He was the founder and key
10    financial supporter of Muwafaq, that were
11    implicated directly in financing.
12    Despite designations by the U.S. Treasury
13    Department.
14         Q.     And to be clear, you were
15    referring there to the Muwafaq Foundation
16    with which Yasin Al Kadi was affiliated.
17    Correct?
18         A.     Correct.
19         Q.     How was Muwafaq Foundation
20    implicated in the embassy bombings in
21    1998?
22         A.     Through the financing route to
23    those individuals and entities through
24    the al Shamal Bank and Farmers Bank that
25    reached Al Qaeda -- sorry, reached Al
```

Page 53

VICTOR COMRAS

1
2    Qaeda membership which were directly
3    implicated.  Has to do with the route of
4    financing at the time it believed to have
5    involved, as I expressed in my report as
6    well, financing directly from Muwafaq to
7    Al Qaeda in Sudan.  And that, it was the
8    implication.
9         Q.    So it's your testimony that
10   you had evidence that Mr. Kadi was
11   financing Al Qaeda?
12        A.    To the extent that I express
13   it in the report, correct.  Evidence
14   meaning what?  I mean, was I there, no.
15   Did I see it, no.
16        Q.    Beyond what you've just told
17   us, did you have any basis for the
18   statement that Muwafaq and its Blessed
19   Relief branch charities were implicated
20   directly in financing for the 1998 U.S.
21   Embassy bombings in Kenya and Tanzania?
22        A.    The only reference is whatever
23   is in my report.  I stand by the words in
24   my report.  That's the extent of my
25   knowledge of this transaction.

Page 54

1                    VICTOR COMRAS

2          Q.      Thank you.

3                  You note in this post in the

4    first paragraph that the Albanian

5    authorities had seized assets of Mr. Kadi

6    owned in that country.  Correct?

7          A.      In Albania, yes, they had

8    seized assets of Al Kadi.

9          Q.      And the Albanians were

10   conducting a criminal investigation of

11   Mr. Kadi.  Correct?

12         A.      Correct.

13         Q.      Do you know the outcome of

14   that investigation?

15         A.      It was dropped.

16         Q.      So you were a contributing

17   expert to the Counterterrorism Blog.

18   Correct?

19         A.      I was a contributor to the

20   Counterterrorism Blog, correct.

21         Q.      You didn't have any kind of a

22   title that you would call contributing

23   expert?

24         A.      I did.  I was a contributing

25   expert.  It says so on the blog.  The

```
 1                 VICTOR COMRAS
 2      not cite any authority for that?
 3           A.    None that I can think of.
 4           Q.    Do you have any authority for
 5      that?
 6           A.    I apparently do, but I have to
 7      find it again.  Obviously I don't try to
 8      use my words lightly.  It's come to my
 9      attention that facts from the reading and
10      research, it may have been a lacuna to
11      not put in a footnote.
12           Q.    But as you sit here today --
13           A.    I think that there are other
14      footnotes showing his involvement in
15      those groups.  Not sure that he may have
16      referenced it also in his deposition
17      testimony.  Or statements to OFAC.  I'll
18      have to check that, sorry.
19           Q.    So you can't tell us then what
20      now, as you sit here today, what the
21      nature of Mr. Kadi's alleged association
22      with members of the Muslim Brotherhood
23      was, can you, or can you?
24           A.    I cannot go beyond what I
25      stated in the report.  That he was
```

Page 74

1              VICTOR COMRAS
2        A.    It's broader than that.
3        Q.    But --
4        A.    Terrorism financing, you
5    mentioned just transactions.  It's
6    broader than transactions itself.  Well,
7    financial transactions.  The red flags of
8    terrorism financing, in the broad sense.
9    They were developed by different
10   institutions for somewhat different
11   purposes, mainly to alert financial
12   institutions of possible transactions
13   that involved terrorism.  But also to
14   inform other regulators and investigators
15   of potential activities involving the
16   financial support of terrorism.
17        Q.    Your report at the bottom of
18   page 7 and continuing on page 8.
19        A.    7 and 8, yes.
20        Q.    That lists twelve red flags
21   that you say, quote, must be considered
22   in evaluating the likelihood of terrorism
23   financing, close quote.
24              Have I read that correctly?
25        A.    Yes, you have.

                    VICTOR COMRAS

1

2       Q.     So you're not saying it's bad

3   behavior to be a Saudi citizen; are you?

4       A.     I'm not saying it's a bad

5   behavior.  I'm saying it's a red flag

6   along with other red flags that you use

7   to evaluate risks.  These are risk

8   factors.  It says red flag.  They are

9   risk factors.  And you take these risk

10  factors and you look at transactions

11  using these risk factors to determine

12  whether something might have happened.

13  And you study the transaction to see if

14  it appears to be.

15              It's not the risk factors that

16  determine that they are, it's the risk

17  factors that point to the transaction to

18  be studied.

19              I hope that answers your

20  question.

21      Q.     Yes, I think it does.

22              MR. SALERNO:  Could the court

23          reporter please mark and put up --

24          I think I'm skipping one here, yes.

25          011, our internal tab 011.

Page 104

1                    VICTOR COMRAS
2      So if it flows through him to somebody,
3      he's not the issuer, but he's the
4      handler.
5                 So the issue is, did he issue
6      it or did he handle it.  Did a check end
7      up where it ended up.  We don't know
8      that.  We don't know what checks he may
9      have handled along the way.  But there is
10     reason to believe that he did.  That's
11     what I'm saying.
12          Q.    So how did Mr. Kadi -- I'm
13     sorry.  So you said in your opinion that
14     Mr. Kadi, quote, used, unquote, bearer
15     checks to mask questionable dealings.
16     Correct?
17          A.    Yes.
18          Q.    So how did Mr. Kadi use bearer
19     checks to mask questionable dealings?
20          A.    By passing them on.  By being
21     an intermediary in the handling of the
22     check.
23                 (Reporter clarification.)
24                 MR. MALONEY:  I just objected,
25          it was asked and answered.

```
 1                    VICTOR COMRAS
 2          A.    On April 23rd, the fund were
 3     sent by Kadi to the Islamic Investment
 4     Company of the Gulf.
 5          Q.    And in the sentence after that
 6     you state, "the Islamic Investment
 7     Company of the Gulf was the subject of
 8     multiple investigations concerning
 9     possibly links to terrorism."
10               Have I read that correctly?
11          A.    That's correct.
12          Q.    When did these investigations
13     of IICG occur?
14          A.    Let's take a look at 52.
15     Footnote 52.  Exhibit 21.
16          Q.    I'm asking you when these
17     investigations concerning possible links
18     to terrorism that you assert exist of the
19     Islamic Investment Company of the Gulf,
20     that's not in Exhibit 21.
21          A.    That's not in Exhibit 21,
22     okay.
23               Well, there were
24     investigations, I'm not sure how they
25     finally came out.  I think in the end
```

Page 108

```
 1                    VICTOR COMRAS
 2     there was an issue settled on tax
 3     grounds.  But I cannot recall offhand all
 4     of the details about the investigations.
 5              But I know that they were
 6     under investigation at that time, for
 7     several things.  How that investigation
 8     resulted, I cannot tell you.  I do know
 9     that there was something, I'm thinking
10     from my memory now, there was something
11     in the end that ended up in a tax
12     violation.  What was the extent of the
13     investigation for several reasons, I
14     don't know.
15          Q.    It's your testimony that some
16     of these investigations were going on in
17     April of 1991; is that correct?  You said
18     at that time.
19          A.    That's right.  The
20     investigation subject -- they were the
21     subject of multiple investigations at
22     that time.
23          Q.    Concerning possible links to
24     terrorism?
25          A.    I believe that's the case.
```

Page 109

```
 1                    VICTOR COMRAS
 2          Q.     But you can't cite us
 3     specifics as to any as you sit here
 4     today; can you?
 5          A.     Sitting here today I cannot,
 6     although I do have some -- I don't come
 7     up with things off the top of my head.
 8     There must have been something -- some
 9     source that I used to give me that
10     impression, or that information.
11          Q.     Okay.
12               MR. SALERNO:  Now I'm going to
13          ask the court reporter or
14          videographer to put up tab 012,
15          which is indeed Exhibit 21 to the
16          Kadi deposition.
17               THE WITNESS:  You're back on
18          the screen, by the way.
19               MR. SALERNO:  Veritext, I'm
20          not seeing my whole screen.  I've
21          got a postage stamp.
22               (Deposition Exhibit 981 for
23          identification, document headed
24          "Islamic Fidicuary {sic} Account,"
25          with attachments, production
```

Page 110

```
 1                    VICTOR COMRAS
 2          numbers KADI 34026 through KADI
 3          57011.)
 4  BY MR. SALERNO:
 5          Q.    I'm going back to page 17 of
 6      your report, where you say, about eight,
 7      nine lines down, "This transaction was
 8      never appropriately explained."
 9                  Have I read that correctly.
10          A.    I believe you have, yes.
11      Never appropriately explained.
12          Q.    And to whom was it supposed to
13      be explained?
14          A.    To my satisfaction that it had
15      another purpose.  It should be --
16      transactions should provide information
17      today about who is the originator, who is
18      the beneficiary, and sometimes about what
19      the purpose is.  You just don't do a
20      transaction that's not explained.
21          Q.    And it's your testimony that
22      this requirement to explain it to your
23      satisfaction existed in 1991, what we're
24      talking about here?
25          A.    No.  It's not a requirement
```

```
 1                    VICTOR COMRAS
 2      that it be done to my satisfaction.  It
 3      is a factor, an indicator that for me, in
 4      formulating my opinion.  I mean, I look
 5      at the situation, the situation is full
 6      of different issues and facts and
 7      environment and scenery.  And I draw
 8      conclusions from what I see.
 9                 That's my expertise, is to
10      take a look at something and see, oh,
11      maybe this is this, maybe this is that,
12      what do I think it is, what do I think it
13      is enough to express an expert opinion
14      about.  And that's how I derive my
15      opinions.  They are educated, informative
16      opinions based upon many factors taken
17      together, nothing independent of its own
18      stands as a foundation or as a structure
19      that will hold up my opinion, but many
20      factors together that leads to an
21      opinion.
22          Q.    You never asked -- you never
23      asked Mr. Kadi to explain it; did you?
24          A.    I never asked Mr. Kadi
25      anything, no.
```

Page 112

1                    VICTOR COMRAS
2          Q.     Did anyone ever ask Mr. Kadi
3     to explain it?
4          A.     That I do not know.
5               MR. SALERNO:  Would the
6          videographer please put up tab 013,
7          which is the Kadi deposition
8          transcript.  Which I believe would
9          now be Exhibit 982, if I've
10         correctly marked up my stuff.
11              (Deposition Exhibit 982 for
12         identification, deposition
13         transcript dated July 10, 2018.)
14              MR. SALERNO:  Then could you
15         also put up Exhibit 014 for
16         completeness, it's not really
17         applicable to this deposition, but
18         for completeness, the errata sheet
19         to the Kadi deposition transcript.
20         And this is all asking Veritext to
21         do that.
22              (Deposition Exhibit 983 for
23         identification, errata sheet.)
24              THE CONCIERGE:  The errata
25         will be 0983.

Page 117

1               VICTOR COMRAS

2        Q.    In the sentence on page 17 of

3   your report, and immediately after the

4   one we've been talking about, and so this

5   will be about, I'm eyeballing it, nine or

6   ten or eleven lines from the top of page

7   17, you say, "Consequently, Osama bin

8   Laden had been present in Jeddah during

9   this time and had been restricted from

10  transferring his funds out of Saudi

11  Arabia, raising suspicions that this $10

12  million transfer may have been made on

13  his behalf," close quote.

14            Have I read that correctly?

15       A.    Yes.

16       Q.    What did you mean by

17  "consequently" in that sentence, by the

18  way?

19       A.    Concurrently, a little bit

20  more than concurrently.  It was just

21  coincidentally.  Whatever you want to

22  read into it.  I don't think, maybe the

23  "consequently" was not the best use of a

24  word, consequently.

25       Q.    Okay.  We understand that

```
1                    VICTOR COMRAS
2      you're talking more about you mean
3      coincidentally really, don't you?
4           A.    Probably.  Enough to raise in
5      my mind a suspicion, that's all.  It may.
6           Q.    Do you know anybody --
7                 (Simultaneous crosstalk.)
8           Q.    Do you know anybody else
9      besides yourself who had these
10     suspicions?
11          A.    I do not.
12          Q.    And what, if any, is the
13     evidence to support these suspicions?
14          A.    I do not provide any because I
15     say may.  I reached no particular
16     conclusion other than it raised a
17     question in my mind.  It was suspicious
18     to me.  I am reflecting that in my
19     opinion, that it was suspicious to me.
20     Nothing more.  That it may have been.  I
21     am not concluding that it did.  I am not
22     making any conclusions about that
23     sentence.  It's a very conditional
24     sentence.
25          Q.    Let's go on to the second
```

Page 127

1                    VICTOR COMRAS
2         A.    Correct.
3         Q.    So it's still your opinion,
4    though, that the original source or
5    purpose of these funds was never fully
6    explained?
7         A.    I'm sorry, I don't understand
8    your question.
9         Q.    You have said that the source
10   and purpose or source or purpose of these
11   funds was never explained in your report.
12   Correct?  My question is, is that still
13   your opinion after looking at --
14        A.    I'd like to know the
15   explanation.  Still, I don't understand.
16   All I know is that $30 million was
17   transferred from NCB to Leemount,
18   Leemount invested the money.  I don't
19   know what the purpose of the investment
20   was.  That it now was the purpose of the
21   issuing of the 30 million, I don't know.
22   Was the 30 million originally provided
23   for this investment, I don't know.
24        Q.    Okay.  You conclude in the
25   first, this first full -- you conclude

1                    VICTOR COMRAS

2     this first full paragraph at page 42 with

3     the sentence, "This lack of accounting

4     information concerning the origin,

5     distribution and disbursement of these

6     funds, raises serious red flags

7     concerning the potential that some of

8     these funds were siphoned off for

9     terrorism or related illicit purposes,"

10    close paren.

11         A.    Let me go back to the

12    beginning of the paragraph.  Kadi again

13    used his Leemount company to funnel money

14    to Muwafaq for its projects.  He got,

15    according to the federal Swiss federal

16    police, which is my source of information

17    here --

18         Q.    Okay, that's fine.  Thank you.

19         A.    Kadi made deposits.

20              MR. MALONEY:  Mr. Salerno, you

21         got to let him finish.

22              MR. SALERNO:  I don't have to

23         let him filibuster, Mr. Maloney.

24              MR. MALONEY:  That's not

25         filibustering.  You posed a

```
                                        Page 129
 1                    VICTOR COMRAS
 2          question about explanation or lack
 3          thereof.  He's continuing to
 4          answer.
 5                    Continue, Mr. Comras.
 6          A.    It seems to me that I am
 7     reflecting the opinion of the Swiss
 8     investigators.
 9          Q.    By the way, the Swiss never
10     prosecuted, or never concluded any
11     prosecution of Mr. Kadi; did they?
12          A.    They never concluded any, no.
13          Q.    They investigated him for a
14     number of years and never charged him.
15     Correct?
16          A.    Never charged him, correct.
17          Q.    And you're aware that they
18     investigated him for a number of years.
19     Correct?
20          A.    Never have implicated him,
21     correct.
22          Q.    Never indicted him?
23          A.    Never indicted him.
24          Q.    Mr. Comras, you have not
25     traced any funds directly from Mr. Kadi
```

Page 161

1                    VICTOR COMRAS
2     in line 1, of the second paragraph, "when
3     referring to the assassination of Al
4     Qaeda co-founder Abdullah Azzam, bin
5     Laden stated, quote, we were all in one
6     boat, as is known to you including our
7     brother, Wael Julaidan, close quote.
8                    You quoted the part about we
9     were all in one boat, but you didn't say
10    when referring to the assassination of Al
11    Qaeda co-founder Abdullah Azzam; did you?
12                    MR. MALONEY:   Objection.
13         A.    I did not.  I did not quote
14    that because that was not part of what I
15    was trying to say.  What I was trying to
16    take, and I had found in several places,
17    was the interview.  That was not part of
18    the interview of Mr. Bin Laden at the
19    time.
20         Q.    So even the Treasury
21    Department is essentially saying in its
22    press release that the boat bin Laden is
23    referring to in that quote, contains
24    himself, Julaidan and Abdullah Azzam.  Is
25    that a fair characterization of what the

Page 162

1                    VICTOR COMRAS
2       Treasury Department saying?
3              A.    I'm sorry, will you repeat
4       what you just said?
5              Q.    Even the Treasury Department,
6       in the press release, the sentence we've
7       just read and any other part of this
8       release you wish to look at, is
9       essentially saying that the boat that bin
10      Laden is referring to contains himself,
11      Julaidan and Abdullah Azzam.  Isn't that
12      a fair characterization of what the
13      Treasury Department is saying?
14             A.    You can draw that conclusion.
15      Maybe I can too.  But that's not what I
16      read for sure says what they're saying,
17      no.
18             Q.    Do you know that Abdullah
19      Azzam was assassinated in 1989?
20             A.    Yes.
21             Q.    By the way, you know from this
22      very document that Wael Julaidan, was not
23      listed by OFAC until September 6, 2002.
24      Do you?  Or don't you?
25             A.    I do know that he was -- when

```
 1                    VICTOR COMRAS
 2     criteria."
 3                Have I read that correctly?
 4          A.    Correct.
 5          Q.    And am I correct that in your
 6     footnote to that statement, you cite
 7     Jonathan Benthall's "The Charitable
 8     Crescent", page 124.  Am I correct about
 9     that?
10          A.    Correct.
11          Q.    And am I correct in your
12     footnote you go on to state that, quote,
13     "In 1996, as a journalist, Mr. Benthall
14     visited a displaced person camp serviced
15     by Muwafaq in Sudan."
16                Have I read that correctly?
17          A.    You have.
18          Q.    Do you happen to have a copy
19     of "The Charitable Crescent" near you
20     today?
21          A.    I do not.
22          Q.    Do you possess it at all?
23          A.    I'm sorry?
24          Q.    Have you ever seen the entire
25     book, "The Charitable Crescent"?
```

Page 171

1              VICTOR COMRAS

2         A.    Yes, I purchased it on Amazon.

3              MR. SALERNO:  I would ask the

4         court reporter, please, to put up

5         tab 021.  And mark it as 989, I

6         believe we're at.

7              (Deposition Exhibit 989 for

8         identification, excerpt from "The

9         Charitable Crescent.")

10             MR. SALERNO:  I think we have

11        it up.

12   BY MR. SALERNO:

13        Q.    Do you accept that what I'm

14   about to show you is from "The Charitable

15   Crescent"?

16        A.    Okay.  My cover is in color.

17        Q.    I didn't use a color scanner,

18   I apologize.

19             I want to direct your

20   attention, and the court reporter's

21   attention to page 124.  These are

22   excerpts.  So 124 will be some number of

23   pages into this excerpt, Exhibit 989.

24        A.    Okay.

25        Q.    You've seen this page before;

Page 175

```
 1              VICTOR COMRAS
 2      Q.    Mr. Benthall.  Okay.  Fine.
 3            MR. MALONEY:  He has that in
 4      his report, Peter.  I'm a little
 5      confused at really what you're
 6      asking.  It's in his report.
 7            MR. SALERNO:  Andrew, in
 8      another context I would love your
 9      legal advice, but not this one.
10            MR. MALONEY:  It's not legal
11      advice.  It's the form of your
12      question that is confusing to
13      everybody.
14            MR. SALERNO:  Okay.  If I
15      heard a proper objection, that
16      would be sufficient.
17      Q.    In page 124 --
18      A.    Going back to the main report?
19      Q.    No.
20      A.    Okay.  In the document, got
21   you.  Sorry.
22      Q.    It identifies, toward the end
23   that first full paragraph, a total of 8
24   humanitarian organizations servicing the
25   camp the writer visits.  Doesn't it?
```

1                     VICTOR COMRAS

2          A.     Yes, it does.

3          Q.     And one of them is the Sudan

4    Council of Churches; isn't it?

5          A.     Yes.

6          Q.     And the writer identifies only

7    three of those eight agencies as Islamic.

8    Isn't that correct?

9          A.     I'm sorry, what are you

10   saying?

11         Q.     I'm asking you if the writer

12   identifies only three of these eight

13   agencies as Islamic.

14         A.     Correct.

15         Q.     Thank you.

16                Is there any reason you did

17   not mention these other agencies,

18   especially the nonIslamic ones, in the

19   paragraph of your rebuttal where you

20   discuss it, or anywhere in your report?

21                MR. MALONEY:  Objection.

22         A.     Because it was irrelevant to

23   the report.  I'm sorry to talk about

24   relevance.  But it had nothing to do with

25   what I was writing.

Page 204

VICTOR COMRAS

1                    VICTOR COMRAS
2     said about investing in or dealing with
3     generally, can you describe the business
4     dealings in any more detail?
5          A.    Not much more, other than
6     there was the involvement, his
7     investments in these companies, financial
8     transactions with these companies through
9     his accounts in al Shamal Bank, through
10    his companies, including Leemount, Rowad,
11    it was one of the investments, he had
12    worked together with Loxhall, was
13    involved in the Rowad investigation.
14    Transactions, I'm sorry.  Starts with --
15         Q.    May I interrupt you.  Is it
16    your testimony that Mr. Kadi and Muwafaq
17    worked together with bin Laden in Rowad,
18    R-o-w-a-d?
19         A.    They were invested in Rowad
20    and that they also with Rowad sold sesame
21    and other agricultural products, yes.
22    Muwafaq was also a party to those
23    activities and was to receive, as I
24    understand it, percentage of the profits
25    or of the revenues produced by the

Page 205

                    VICTOR COMRAS

1
2    activity.
3         Q.    Also on page 55 you say that a
4    Kadi company engaged in, quote,
5    unmonitored business transactions with
6    Dan Fodio, or Dan Fodio.  I know it's not
7    a first name.
8         A.    Right.  Sorry, what's your
9    question?
10        Q.    What evidence do you have for
11   the proposition that any transactions
12   with Dan Fodio were unmonitored?
13        A.    There was no monitoring of any
14   companies by the Sudanese government.
15   They had no auditing capabilities, they
16   had no reporting capabilities and no
17   regulatory capabilities.  So all
18   transactions in a sense, especially with
19   the NIF companies, would not be subject
20   to any regulatory oversight.
21        Q.    So am I correct from your
22   answer that no Kadi company in Sudan had
23   an obligation to be monitored.  Is that
24   correct?
25                MR. MALONEY:  Objection.

Page 208

1                    VICTOR COMRAS
2      Wadi al Aqiq?
3           A.    Mr. Bin Laden.  Mr. Bin Laden
4      was already on the designation list for
5      the United States since 1995.  Even
6      before.  He was engaged in terrorism
7      activities and identified as a promoter
8      of terrorism.  He declared war on the
9      United States in 1992 or '93.
10          Q.    He declared war on the United
11     States in 1992 or '93?
12          A.    I think when he first did it.
13     In his first declaration.  Let me check
14     my dates.  It's at the front of my
15     report.
16                I'm sorry, I spoke too soon.
17     1996 he declared war against the Americas
18     occupying the land of two holy places.
19          Q.    Rowad was liquidated in 1996;
20     wasn't it?
21          A.    I'm sorry?
22          Q.    Rowad was liquidated in 1996;
23     wasn't it?
24          A.    Yes, I take that as a point.
25          Q.    And the relationship between

1                  VICTOR COMRAS

2          reporter to take it down.  Now it's

3          down.

4                  MR. HAEFELE:  Thank you.

5                  MR. SALERNO:  You're welcome.

6          Q.    You also say on page 38 and 39

7      that Al Qaeda colleagues of Osama bin

8      Laden used al Shamal Bank.  And I'm

9      asking, does that mean in your view that

10     anyone who had an account at that bank

11     was a member or a supporter of Al Qaeda?

12         A.    It is my view that Mr. Kadi

13     channelled funds into that bank, in

14     significant sums.  That those sums were

15     subsequently used to buy products from Al

16     Qaeda-related companies, or bin

17     Laden-related companies, yes.

18         Q.    Do you know how many banks in

19     Sudan handled commercial transactions in

20     the early 1990s?

21         A.    Not many.

22         Q.    Do you know how many offered

23     Islamic investment products?

24         A.    At least two, maybe three.

25         Q.    Besides al Shamal, do you know

Page 224

1                   VICTOR COMRAS
2       those who had engaged in such activities
3       from continuing such activities.
4            Q.    You're not expecting an actor
5       in 1992 to know that someone is going to
6       be listed eight years later; are you?
7                   MR. MALONEY:  Objection.
8            A.    I'm sorry, I don't quite
9       understand your question.
10           Q.    You're not expecting an actor
11      in 1992, by actor I mean a person doing
12      business in the circumstances we've been
13      discussing, in 1992, to be aware that a
14      person he is dealing with is going to be
15      designated eight years later; are you?
16                  MR. MALONEY:  Objection.
17           A.    No, I'm not.  But the point is
18      not that.  The point is that I would know
19      who I -- I would think that Mr. Kadi, as
20      a wise businessman, would know with whom
21      he's dealing and would know who they are
22      involved in and what they are doing.  And
23      would have been aware of his
24      relationships with these groups.  And the
25      fact that he was not yet designated for

Page 225

                    VICTOR COMRAS

1

2      that should be irrelevant.

3           Q.    Did you notice by any chance

4      that the Exhibit 994 that we are looking

5      at, we are looking at the Bates number

6      KADI 10793.  Turn back if you would one

7      page, both the tech person and

8      Mr. Comras, to 10792.

9           A.    I'm sorry, I didn't catch what

10     you said.

11          Q.    I'm asking you to look at what

12     is Exhibit 994, which is a Swiss police

13     report.

14          A.    Okay.

15          Q.    We've been talking about.  And

16     we've been on Bates number KADI 10793,

17     that we looked at.  And now I'm asking

18     you to turn back to 10792, one page

19     previously.

20          A.    I'm looking at it on the

21     screen.

22          Q.    Okay.  Do you notice where it

23     says, let's see if I can find this

24     myself -- did you notice that at the

25     bottom the regional director, Amir Mehdi,

Page 226

1                    VICTOR COMRAS
2     it says that he once lived in Jeddah, he
3     was a lecturer at King Abdul Aziz
4     University -- I'm sorry, it was his
5     brother, who recommended Amir to Kadi.
6     Amir Mehdi had excellent local knowledge
7     because he had worked as a teacher in
8     Peshawar and Islamabad, that was why he
9     was appointed by Mr. Kadi.
10              Did you notice that when you
11    were writing your report?
12         A.    I noticed that when I was
13    writing my report, yes, I did.  But I'm
14    not sure what inference you take from
15    that.  I take that he was recommended,
16    and based upon a recommendation he
17    accepted to hire Amir Mehdi.  Either he
18    was a fool and didn't know about who he
19    was hiring, or he knew who he was hiring
20    and didn't care.
21         Q.    And you're assuming that who
22    he was hiring is in fact guilty of the
23    things that the various regulators eight
24    years later accused him of doing.
25    Correct?

```
 1                   VICTOR COMRAS
 2        A.    No, he was accused by the
 3   Pakistani government very shortly
 4   afterwards.  He was arrested, he was
 5   engaged in a relationship with the
 6   bombers in 1993 of the Twin Towers.  And
 7   he was fired by Kadi right about that
 8   time.
 9        Q.    He was arrested.  Do you know
10   if he was tried and convicted or pled
11   guilty to any crime?
12        A.    He was not tried and
13   convicted.  But that does not mean that
14   he was vindicated.  The police did find
15   that he had a relationship through a
16   telephone conversation and others in his
17   books.  So he was engaged, the Pakistani
18   government knew who he was, yes.
19        Q.    Did the Pakistani government
20   find Mr. Mehdi's phone book before or
21   after they arrested him, do you know?
22        A.    They found it when they
23   arrested him.
24        Q.    And do you have any reason
25   to -- do you have any evidence that
```

Page 228

1                    VICTOR COMRAS
2      Mr. Kadi knew that Mr. Mehdi had a
3      suspicious person's name in his phone
4      book?
5              A.    I think that Mr. Kadi should
6      know who he's appointing as director of
7      his various companies, because he was not
8      only -- he was more than just the head of
9      the local Muwafaq director.  He served
10     Mr. Kadi in several capacities.  And
11     certainly Kadi placed a number of trusts
12     in this man.  Should have known, if he
13     didn't know, then he's just a lousy
14     businessman.  And I don't think he's a
15     lousy businessman.
16             You can't be an idiot and a
17     smart person at the same time.  You have
18     to know who you're dealing with.
19             Q.    Do you have any information
20     other than what is in your report about
21     Mr. Mehdi's alleged relationship with
22     Amir Mehdi Yousef, who is the person that
23     was in his phone book, apparently?
24             A.    You're asking me, I'm sorry,
25     you're asking me if there is other

```
 1                    VICTOR COMRAS
 2     notes.
 3          Q.    In deciding to list someone as
 4     a founder of -- funder, excuse me, of
 5     terrorism, the U.S. Security Council
 6     Sanctions Committee doesn't conduct its
 7     own investigation; does it?
 8          A.    No, it does not.
 9          Q.    It relies on information from
10     the member country that advocated for its
11     listing.  Correct?
12          A.    Yes.  It relies on information
13     obtained from the governments, members.
14          Q.    Changing the subject.
15                When did it become known that
16     Chafiq Ayadi was allegedly a financial
17     facilitator, donor or supporter of other
18     gentleman Kadi group?
19          A.    Say the first name again.
20          Q.    Chafiq.  C-h-a-f-i-q.
21          A.    We're talking about Ayadi now.
22     Okay.  I'm sorry.
23          Q.    When did it become known that
24     Ayadi was allegedly a financial
25     facilitator, donor or supporter of Al
```

Page 247

```
 1              VICTOR COMRAS
 2    Qaeda or other jihadi group?
 3         A.    Sufficiently, before October
 4    12, 2001, to provide enough information
 5    to allow for his designation on that
 6    date.
 7         Q.    What was the information?
 8         A.    I'm sorry, the information
 9    is -- that's public is involved -- is
10    provided in the statement at the time.
11         Q.    What statement at the time?
12         A.    By Treasury Department, in
13    listing him.
14              Designation is a long process.
15    It requires interagency clearance, it
16    requires a basis -- a demonstration that
17    it is not being made on a capricious
18    basis, that it's a reasonable activity,
19    reasonable grounds to believe.  And there
20    are many sources that lead to that,
21    including, as Mr. Suez (phon) stated, who
22    was a subsequent director of OFAC,
23    intelligence sources.  So there are many
24    sources that lead to the belief and the
25    understanding that Mr. Ayadi was involved
```

Szubin

Page 248

1                    VICTOR COMRAS
2      in terrorist financing.
3           Q.    And so you're just assuming
4      that Mr. Kadi had all this knowledge that
5      is reported with the listing after 9/11.
6      Am I correct?
7           A.    I am assuming that if it was
8      found out by intelligence sources it
9      should have been obvious to Mr. Kadi, who
10     is a businessman dealing so intimately
11     with Mr. Ayadi, along with certain
12     others.  He must have known who he's
13     dealing with.  He better than anybody
14     else.
15          Q.    You're assuming, aren't you,
16     that all intelligence information is
17     accurate?
18          A.    I'm assuming that it is
19     information that is credible.  Accurate
20     is a different issue.  I think there was
21     sufficient credible information
22     surrounding Mr. Ayadi to convince OFAC in
23     an intergovernmental process involving
24     much more than confidential information,
25     that Mr. Ayadi was involved in terrorist

Page 297

                    VICTOR COMRAS

1

2         Q.    And I asked you what a whole

3    series meant.  And what are the red

4    flags?

5         A.    Well, I go to my own list of

6    red flags.  And --

7              MR. MALONEY:  Can I just ask

8         for clarification, Peter.  What are

9         the red flags in general or what

10        are the red flags in this case for

11        Mr. Comras?

12             MR. SALERNO:  What are the red

13        flags that Mr. Comras is referring

14        to in the sentence that I just

15        read, in the KA Stan transactions.

16             MR. MALONEY:  Okay.

17        A.    Let me summarize by saying

18    lack of any clear indication as to what

19    was involved, what wasn't involved, and

20    what happened to the funds.

21        Q.    And by your reference --

22        A.    Parties that were -- that meet

23    several of the criteria, that is funds

24    coming from a high risk area to people in

25    an area that are questionable.  So there

Page 298

```
 1                    VICTOR COMRAS
 2     are many red flags.  There are a list of
 3     red flags that can be put together, and I
 4     would be glad to do so subsequently if
 5     you want to give me the time, is
 6     considerable.  Because the list of red
 7     flags is considerably longer than the
 8     list that I have provided.
 9          Q.    Well, can you tell me, in this
10     sentence about KA Stan specifically that
11     we are referring to, using FATF terms,
12     can you tell me which red flags are risk
13     indicators and which are terrorist abuse
14     indicators?
15          A.    That's a definition that's
16     created subsequently by OFAC -- sorry, by
17     FATF.  FATF began creating the issue, or
18     the resource of red flags starting in
19     2002.  The earliest reports -- in fact, I
20     have a list from 2004 that I can cite to
21     you.
22          Q.    Mr. Comras, please just stop
23     for a moment.  I'm asking you
24     specifically --
25          A.    I am going to -- you're asking
```

Page 299

```
 1                   VICTOR COMRAS
 2     me for red flags.  And I'm going to give
 3     you the list of red flags.
 4          Q.    I didn't ask -- that was the
 5     last question.
 6          A.    All right.  You're asking me
 7     to divide them between terrorist abuse
 8     indicators and risk indicator.  I'm
 9     sorry, that may be an exercise for
10     others.  That's not one of the exercises
11     that I went through.
12          Q.    Do you accept or you do not
13     accept the FATF's distinction between
14     risk indicators and terrorist abuse
15     indicators; do you?
16          A.    I do accept it.  It's not
17     something that I used, that's all, in
18     preparing my report.  I did not divide
19     out the two.
20          Q.    Okay.
21          A.    In my view, the accumulation
22     of information creates enough risk
23     indicators to do more than be just a
24     terrorist abuse indicator.  I've taken a
25     somewhat different approach in the use of
```

Page 301

```
 1                    VICTOR COMRAS
 2    by "a steady series of losses"?
 3         A.    I mean only what was stated by
 4    Mr. Kadi himself in his deposition
 5    testimony.  And in his memo to OFAC.
 6    These are factors that he indicated, and
 7    I'm simply repeating them there.  That
 8    they had steady losses and that in the
 9    end he had to close the company in 1998.
10         Q.    Do you mean that Euro-invest
11    never had a profitable year?
12         A.    They may have had a profitable
13    year.  They certainly used their money
14    to -- as indicated, to provide funds for
15    Muwafaq and other purposes.  They were
16    very profitable years in the
17    construction.  These companies, if run
18    correctly, it should have made a
19    significant profit.  They were
20    investments made by Kadi because he felt
21    that there was great opportunities in
22    Albania and in the Balkans to make great
23    profits.
24              And in fact, he ran these
25    companies in a way that took whatever
```

Page 302

1                    VICTOR COMRAS
2       funds that they made, he gave them away
3       in loans, in other activities.  He sold
4       things he says on credit, and never got
5       paid for them.  But not quite justified
6       by the activities of the company and by
7       they're simply statements to explain why
8       there were losses.
9                    But most of this is taken from
10      his own testimony.
11           Q.    Moving on.  At the top of page
12      33 of your report, you refer to some --
13           A.    Sorry, let me get to 33,
14      please.
15                 Okay.
16           Q.    You refer to some loans made
17      by Euro-invest and conclude that, quote,
18      "the rationale for these transactions is
19      never presented."  I'm looking at lines 3
20      and 4.  Correct?
21           A.    The rationale for these
22      transactions is never presented.  That's
23      correct.
24           Q.    And this includes a $6,200
25      personal loan to Julaidan.  Correct?

```
 1                    VICTOR COMRAS
 2          A.      Correct.
 3          Q.      I'll ask you a question that
 4     may be familiar to you now.  To whom
 5     should a rationale have been presented?
 6          A.      It was a company, to its
 7     records, to facilities that can kept -- a
 8     company should do its own accounting,
 9     shouldn't it not?  They should be
10     explained.  Their activities should be
11     explained.  If they go unexplained, they
12     raise questions.  If they raise
13     questions, they create risks.  If they
14     create risks, they are vulnerable.  If
15     they are vulnerable in an atmosphere
16     where a vulnerability can be taken
17     advantage of, their money is lost.
18                  So to whom should it be
19     explained?  To their own accountants, to
20     their own accounting facility.  Should
21     they have accounting, yes.  And what
22     company should not know what it's doing,
23     where its money is going, what's
24     happening.  But there is no record of any
25     of that in these cases.
```

1                        VICTOR COMRAS

2            Q.     Well, have you seen all the

3       financial records of the Kadi companies

4       we've been discussing?

5            A.     I've seen enough to know that

6       there are blanks.  And the companies

7       where there were some recordings of

8       accounting, such as in Pakistan, the

9       accountants had to rely on information

10      that was simply relying on the statements

11      of the managers or the directors.

12           Q.     Well, your knowledge of what

13      you allege here is based entirely on your

14      assumption that documents that you have

15      not seen support the proposition that

16      they're still unexplained.  Am I not

17      correct about that?

18                  MR. MALONEY:  Objection.

19           Q.     You can answer.

20           A.     Listen, they are unexplained

21      as far as I could tell.  If there is

22      explanation, I certainly hope it will be

23      presented.  That's not my job.  My job is

24      to take a look at what I know is to be

25      the situation.  And what I know to be the

Page 305

1                          VICTOR COMRAS
2        situation is that these are unexplained.
3        If there is an explanation, please
4        provide it.  That's your job, not mine.
5             Q.    On page 50 of your main
6        report.  I will pause for you to get
7        there.
8             A.    Thank you.  Okay.
9             Q.    You discuss the el-Eman, e-l,
10       new word, E-m-a-n, dormitory project for
11       which Kadi arranged Julaidan to arrange
12       construction.  Correct?
13            A.    Correct.
14            Q.    And you conclude that
15       between -- and this is a quote, between
16       926,000 and 1.28 million of the
17       Kadi/Karavan, Karavan with a K, provided
18       funding for this transaction remained
19       unaccounted for and was likely skimmed
20       off for our purposes including Al Qaeda,
21       close quote.
22                  Did I read that correctly?
23            A.    You did.
24            Q.    And then if you could turn to
25       page 33 of your main report.

```
                        VICTOR COMRAS
 1
 2          A.      Sorry, which page?
 3          Q.      33.  3-3.
 4          A.      Got it.
 5          Q.      Second full paragraph.  This
 6      is not a run-over paragraph, so it's also
 7      the second paragraph.
 8          A.      Okay.
 9          Q.      And the last sentence of that
10      paragraph is, "These suspicions were
11      exacerbated by a subsequent accounting
12      indicating that up to 300,000 of these
13      funds remain unaccounted for."  Second to
14      last sentence.
15          A.      Okay and?
16          Q.      You say "more about this Maram
17      project below."
18                  Do you not see a discrepancy
19      between 300,926 to 1.28 million?
20          A.      I think you're comparing
21      apples and oranges.  I'm saying that a
22      certain amount of money unaccounted for
23      in a sense that we don't -- skimmed off,
24      what happened to it.  It did not
25      logically or clearly go for the projects
```

Page 307

1                    VICTOR COMRAS
2     concerned.  The 300,000 comes from a
3     report that was done, I think, by the
4     Swiss or the Germans, I'm not sure.  The
5     Swiss police, I think.  That they said
6     that 300,000 in the accounting was
7     unaccountable.
8               Money, again, is fungible.
9     You can find a purpose for the funds.
10    But the funds' purpose may be somewhat
11    off of the project that you're talking
12    about.  May have even been replaced by
13    other funds.  May involve other
14    transactions.
15              So when I looked at it, it
16    seemed to me that there was a real risk
17    or great amount of this money could have
18    been skimmed off.
19              Other sources also paid for
20    some of the projects that were ordered by
21    those involved, by Julaidan and others.
22              So I don't see a discrepancy
23    between the figures, no.  I just see that
24    they're involving two different
25    accountings by two different groups for

1                    VICTOR COMRAS
2      two different purposes.
3           Q.    You used the phrase
4      "unaccounted for" in reference to both
5      sets of figures.  Correct?
6           A.    Correct.  Unaccounted for for
7      me may mean a different thing than
8      unaccounted for for the Swiss police.
9      And I was simply referring to the Swiss
10     police.  I think it was the Swiss police
11     report.
12          Q.    And you're sticking with the
13     926,000 to $1.28 million range as funds
14     that were never accounted for that you
15     claim may have been skimmed off?
16          A.    I said that were inefficiently
17     or insufficiently accounted for.  And may
18     have been skimmed off, would be a more
19     correct perhaps statement.
20          Q.    How did you calculate those
21     figures, by the way?
22          A.    I calculated them at the time
23     I created the report.  I would spend some
24     time recreating that calculation.  And I
25     don't think we have that within the hour

Page 309

VICTOR COMRAS

1
2     that's left.
3          Q.     No, we don't.
4               As you sit here today then,
5     just to be clear, you can't account for
6     yourself how you get to the figures of
7     $926,000 to $1.28 million as being
8     unaccounted for; can you?
9               MR. MALONEY:   Objection.
10          That's not what he said.
11          Mischaracterizes his testimony.
12          A.     I believe that I can stand by
13     my statement.  And if required, I can do
14     so.  I can put it back together again and
15     provide a decent rationale for that
16     statement, yes.
17          Q.     Can you --
18          A.     I don't think I'm in a
19     position do that standing here on Zoom,
20     no, in this deposition.
21          Q.     We agree.  But maybe perhaps
22     you do remember the methodology you used
23     to calculate those figures?
24          A.     The methodology is, again, the
25     fungibility of money.  I noted when I

Page 310

1                    VICTOR COMRAS
2     prepared the report that there were
3     alternative sources of funds for the same
4     items from other sources.  So I
5     questioned what happened to which funds.
6                 MR. SALERNO:  Can we put up,
7          it's Mr. Kadi's deposition, which
8          is Exhibit 982.  And then can we
9          turn, please, to page 226.
10                And I need to get the exhibit
11         myself.
12         Q.    I am directing your attention
13    to lines 10 through 12.  Where Mr. Kadi
14    said, it was okay that Julaidan will make
15    certain profit for his work and
16    supervision and contacting the companies.
17                Do you recall seeing that at
18    the time you wrote your report?
19         A.    Yes, I do.
20         Q.    And I take it you don't think
21    it was relevant to put into your report
22    anything about Mr. Kadi's explanation for
23    a possible shortfall in these funds
24    relating to el-Eman?
25         A.    I did not give much

Page 422

```
 1                    VICTOR COMRAS
 2    commercial activity.
 3         Q.    Well, the sentence says, "the
 4    Albanian government then closed the
 5    activities of these companies."
 6              So I'm assuming it's every
 7    company on the list; correct?
 8         A.    I don't know that answer.  We
 9    could assume that.
10              MR. MALONEY:  I'm sorry, what
11         --
12              MR. SALERNO:  I want to
13         establish what companies that
14         Mr. Kadi was involved with that
15         your witness, Mr. Comras, thinks
16         are fictitious.  Okay, he cited
17         this.  I don't know were it's some
18         or all, and if it's some, which
19         ones.
20         A.    Okay, well, let's take a stab
21    and say, many, Campbell, Medicare,
22    Loxhall.  I know Karavan had many
23    different activities, but there were many
24    Karavans.  Some of them had more
25    substance than others.
```

Page 423

1              VICTOR COMRAS

2              I'm not aware that each --

3      when I look at the list of companies,

4      including companies that I've never even

5      heard of before, there must be at least

6      50 or 60 companies that are supposedly

7      created at some point by Mr. Kadi.  How

8      he keeps track of all of them without

9      accounting information, I have no idea.

10         Q.    Where do you get the number 50

11     or 60 companies, please?

12         A.    I'm taking an impressionist

13     perspective on that number.  But if we

14     had the companies in the Far East, we had
                                                    add              add

15     the companies that he's registered in

16     Albania, the companies that he's

17     registered in Turkey, the companies that

18     he's registered in the Isle of Man and

19     Jersey, the companies that he registered

20     in Pakistan and Saudi Arabia.  If you

21     start counting them up, you get to a

22     considerable number.  I lost count.

23         Q.    Okay.  Getting back to, you

24     pulled out the names of some of these

25     companies and said those are the ones

Page 428

1                    VICTOR COMRAS
2      available to me or to others or in any
3      litigation that shows that they were
4      anything but.
5           Q.    So you say the burden is on
6      somebody to establish or us to establish
7      that they are not shell companies.  Is
8      that correct?
9           A.    No, I'm saying if somebody
10     wants to challenge my opinion, it's their
11     burden to show that my opinion is
12     incorrect.  I've stated my position and I
13     stand on my position and on the
14     information that I have provided.  I
15     believe it's sufficient information to
16     make that judgment.  And I believe my
17     background provides an opportunity for me
18     to do so, a basis for me to do so.
19               If somebody wants to challenge
20     that I'm incorrect, they should show me
21     why I'm incorrect.  They should not say
22     to me that I have to further evidence my
23     opinion.  My opinion is based upon my
24     expertise.  It's based upon other
25     factors.  It's based upon looking at

```
 1                    VICTOR COMRAS
 2    transactions and seeing the number of
 3    companies.  That's the only tool in my
 4    trade.
 5               I'm not in a position go out
 6    and delve specifically document by
 7    document, prove company by company, to do
 8    so.  I believe I have sufficient
 9    information to discuss that opinion, to
10    provide that opinion in an expert report.
11    If somebody wants to challenge that
12    position, I invite them to do so.
13         Q.   What was your methodology in
14    determining these were shell companies?
15         A.   My methodology is well
16    expressed at the beginning of my report.
17               MR. MALONEY:  And at the
18          beginning of this deposition as
19          well.
20         Q.   Do you have anything to add to
21    what you've said in your report and at
22    this deposition on that topic?
23         A.   I do not at this time, no.
24         Q.   Why was this article by Eduart
25    Bala that is now -- it shouldn't be tab
```