# EXHIBIT G

Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's Motion
To Exclude the Testimony of Victor Comras

03 MDL 1570

July 31, 2023

Page 1

1
2  UNITED STATES DISTRICT COURT
3  SOUTHERN DISTRICT OF NEW YORK
4  Case No. 03-MDL-1570 (GBD) (SN)
5  ------------------------------------x.
6  IN RE: TERRORIST ATTACKS ON
7  SEPTEMBER 11, 2001
8  ------------------------------------x
9            July 7, 2021
10           9:06 a.m.
11
          Videotaped Deposition via Zoom
12  of JIMMY GURULE, pursuant to Notice,
13  before Jineen Pavesi, a Registered
14  Professional Reporter, Registered Merit
15  Reporter, Certified Realtime Reporter and
16  Notary Public of the State of New York.
17
18
19
20
21
22
23
24
25

Page 2

```
 1
 2  A P P E A R A N C E S :
 3  ANDERSON KILL P.C.
       1251 Avenue of the Americas
 4  New York, New York 10020
       Attorneys for Plaintiff O'Neill and
 5     Plaintiffs' Executive Committee
    BY: JERRY S. GOLDMAN, ESQ.
 6      jgoldman@andersonkill.com
 7
    MOTLEY RICE, LLC
 8  28 Bridgeside Boulevard
    Mount Pleasant, South Carolina 29465
 9     Attorneys for Attorneys for
       Plaintiffs in Burnett Case and
10     Plaintiffs' Executive Committee for
       Personal Injury and Death Claims
11  BY: JOHN EUBANKS, ESQ.
        jeubanks@motleyrice.com
12      ROBERT T. HAEFELE, ESQ.
        rhaefele@motleyrice.com
13
    KREINDLER & KREINDLER, LLP
14  750 Third Avenue
    New York, New York 10017
15     Attorneys for Plaintiffs' Executive
       Committee
16  BY: ANDREW J. MALONEY, III, ESQ.
        amaloney@kreindler.com
17
18  LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
    1101 New York Avenue NW, Suite 1000
19  Washington, DC 20005
       Attorneys for Muslim World League and
20     International Islamic Relief
       Organization, Dr. Abdullah Al Turki,
21     Dr. Adnan Basha, Dr. Abdullah Al
       Obaid and Dr. Abdullah Naseef
22  BY: AISHA BEMBRY, ESQ.
        aisha.bembry@lbkmlaw.com
23      WALEED NASSAR, ESQ.
        waleed.nassar@lbkmlaw.com
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S (Continued):
 3  BERNABEI & KABAT PLLC
    1400 16th Street NW, Suite 500
 4  Washington, DC 20009
        Attorneys for Dr. Abdullah Al Turki,
 5      Dr. Adnan Basha, Dr. Abdullah Al
        Obaid and Dr. Abdullah Naseef
 6  BY: ALAN KABAT, ESQ.
        kabat@bernabeipllc.com
 7
 8  JONES DAY
    51 Louisiana Avenue NW
 9  Washington, DC 20001
        Attorneys for Dubai Islamic Bank
10  BY: GABRIELLE PRITSKER, ESQ.
        gpritsker@jonesday.com
11      ERIC SNYDER, ESQ.
        esnyder@jonesday.com
12
13  OMAR T. MOHAMMEDI LLC
    233 Broadway, Suite 820
14  New York, New York 10279-0815
        Attorneys for World Assembly of
15      Muslim Youth
    BY: JILL MANDELL, ESQ.
16      jmandell@otmlaw.com
17
    SALERNO & ROTHSTEIN
18  221 Schultz Hill Road
    Pine Plains, New York 12567
19      Attorneys for Yassin Kadi
    BY: AMY ROTHSTEIN, ESQ.
20      amyrothsteinlaw@gmail.com
21
22  ALSO PRESENT:
        KEN WILLIAMSON, The Video Technician
23      MICHAEL TOTH, Veritext Concierge Tech
24
25
```

Page 4

```
 1
 2           S T I P U L A T I O N S
 3
 4       IT IS HEREBY STIPULATED AND AGREED by
 5  and between the Attorneys for the
 6  respective parties hereto that filing and
 7  sealing be and the same are hereby waived.
 8       IT IS FURTHER STIPULATED AND AGREED
 9  that all objections except as to the form
10  of the question, shall be reserved to the
11  time of the trial.
12       IT IS FURTHER STIPULATED AND AGREED
13  that the within examination may be signed
14  and sworn to before any notary public with
15  the same force and effect as though signed
16  and sworn to before this Court.
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2       THE VIDEO TECHNICIAN: Good
 3  morning, we're on the record at 9:06 a.m.
 4  on July 7, 2021.
 5       This is media unit 1 of the
 6  video recorded deposition of Professor
 7  Jimmy Gurule taken by counsel for
 8  defendant In re Terrorist Attacks on
 9  September 11, 2021, filed in the U.S.
10  District Court, Southern District of New
11  York, Case No. 03-MDL-1570 (GBD) (SN).
12       This deposition is being held
13  on-line as a zoom video conference with
14  all parties appearing remotely.
15       My name is Thomas Devine from
16  the firm Veritext New York and I am the
17  videographer; the court reporter is Jineen
18  Pavesi, also with Veritext New York.
19       I am not authorized to
20  administer an oath, I am not related to
21  any party in this action, nor am I
22  financially interested in the outcome.
23       Counsel appearing remotely will
24  have their appearances noted on the
25  stenographic record.
```

2 (Pages 2 - 5)

Page 6

1
2      MS. BEMBRY:  Good morning, my
3  name is Aisha Bembry with the law firm of
4  Lewis Baach Kaufmann Middlemiss and I
5  represent defendants Muslim World League
6  and International Islamic Relief
7  Organization and a number of former
8  secretary generals of those two charities.
9      MR. EUBANKS:  My name is John
10 Eubanks, I am representing plaintiffs in
11 the Burnett action, but also on behalf of
12 the Plaintiffs Executive Committees today
13 defending the witness.
14 J I M M Y   G U R U L E,
15 having first been duly sworn by a Notary
16 Public of the State of New York, was
17 examined and testified as follows:
18 EXAMINATION BY
19 MS. BEMBRY:
20   Q.    Good morning again, Professor
21 Gurule, how are you this morning?
22   A.    I'm fine, how are you.
23   Q.    Good, thanks.
24         Can you state your full name
25 for the record, please.

Page 7

1            GURULE
2   A.    My name is Jimmy, J-I-M-M-Y,
3  Gurule, G-U-R-U-L-E.
4   Q.    And I asked before we got on
5  the record, is it okay if I refer to you
6  as Professor Gurule?
7   A.    Yes.
8   Q.    Okay, thank you.
9         You've been deposed before, is
10 that right?
11  A.    Yes.
12  Q.    So I just want to, since you
13 have been through this before, I just want
14 to go through a few things.
15        As you know, I'll be asking you
16 a number of questions today; I would just
17 ask that before you answer my question,
18 that you just let me finish asking my
19 question, is that okay with you?
20  A.    Certainly.
21  Q.    And likewise, I will try to
22 remember to let you finish your answer
23 before I move on to the next question.
24        And if you don't understand a
25 question I ask, if you could ask me to

Page 8

1            GURULE
2  clarify or let me know that you don't
3  understand the question, I would
4  appreciate that, is that okay?
5   A.    Yes, I will do that.
6   Q.    So if you answer a question, is
7  it understood that you understood the
8  question that I asked, is that fair to
9  say?
10  A.    Yes.
11  Q.    Okay.
12        Did you take any medication
13 today that would impact your ability to
14 provide truthful testimony here today?
15  A.    No.
16  Q.    And where are you presently
17 located?
18  A.    I'm located in South Bend,
19 Indiana, on the campus of Notre Dame Law
20 School.
21  Q.    Are you in your office?
22  A.    Yes.
23  Q.    Is anyone in your office with
24 you?
25  A.    Yes, Ed Marshall is in the

Page 9

1            GURULE
2  office, he is one of our IT staff and I
3  had asked him if he would stay in the room
4  just to make sure that there are no
5  technical difficulties.
6         I was particularly concerned
7  about viewing any exhibits and making sure
8  that there were no glitches or problems in
9  being able to do that.
10  Q.    Is he assisting you in any way
11 in terms of the substance of your
12 testimony?
13  A.    Oh, no, not at all.
14  Q.    Do you have a copy of your
15 report in front of you?
16  A.    I do have a copy, yes.
17  Q.    Do you have any other documents
18 there in front of you?
19  A.    There are other documents, not
20 in front of me, no; I have documents on my
21 desk, but not in front of me.
22  Q.    Any other documents that you're
23 planning to use for purposes of your
24 deposition today?
25  A.    No.

3 (Pages 6 - 9)

Page 30

1    GURULE
2  any experience relating specifically to
3  the area of economic sanctions or
4  terrorism financing?
5    A.   No.
6    Q.   You were sworn into the office
7  as under secretary of Enforcement at the
8  U.S. Department of Treasury in 2001, is
9  that correct?
10   A.   Yes.
11   Q.   And I understand from your
12 report and reading some of your writings
13 that there is quite a bit of
14 responsibility that comes along with that
15 position.
16       Can you detail for me briefly
17 the various responsibilities that you had
18 and the different Federal law enforcement
19 agencies over which you had oversight.
20   A.   At the time the under secretary
21 for Enforcement, and me specifically, had
22 responsibility for several major Treasury
23 Department law enforcement agencies,
24 including the U.S. Customs Service, U.S.
25 Secret Service and Bureau of Alcohol,

Page 31

1    GURULE
2  Tobacco and Firearms, Office of Foreign
3  Assets Control, Financial Crimes
4  Enforcement Network or FinCEN, the Foreign
5  Law Enforcement, Federal Law Enforcement
6  Training Center and Executive Office of
7  Asset Forfeiture.
8    Q.   Anything else?
9    A.   No, that was plenty.
10   Q.   And I read that when you took
11 the position, you assumed you would be
12 spending most of your time focusing
13 largely on anti-money laundering, is that
14 right?
15   A.   That's correct.
16   Q.   What did you mean by that?
17   A.   Well, I knew when I assumed the
18 position, I knew that the Treasury
19 Department had responsibility for
20 developing and publishing the National
21 Money Laundering Strategy, so it was the
22 Federal government's, so to speak,
23 framework for preventing money laundering.
24       And as I stated earlier, I had
25 a very -- I had an interest in money

Page 32

1    GURULE
2  laundering based upon my work at the U.S.
3  Attorney's Office in Los Angeles, so I
4  thought that this would be an opportunity
5  for me to continue that interest and work
6  on a much broader national scale.
7        And so I went into the position
8  thinking that that was going to be my
9  priority, you know, that was going to be
10 the top priority that I was going to be
11 focusing on, but of course the events of
12 9/11/2001 changed that, changed those
13 plans dramatically.
14   Q.   How did it change it, in what
15 respect?
16   A.   Well, after the 9/11 attacks,
17 President George W. Bush declared that the
18 U.S. was now engaged in the global war on
19 terrorism and he stated in one or more of
20 his public addresses that this global war
21 on terrorism was going to implicate, was
22 going to involve, all of the levers of
23 Federal power, including law enforcement,
24 again to prosecute the terrorists that
25 were responsible for the 9/11 attacks, you

Page 33

1    GURULE
2  know, diplomacy through the State
3  Department, but also the financing of
4  terrorism through the Treasury Department.
5        And that became my primary
6  responsibility, to develop the U.S.
7  government's or to assist in developing
8  the U.S. government's first anti-terrorist
9  financing strategy and to use these vast
10 resources that I was responsible for
11 overseeing, including OFAC and FinCEN and
12 the Secret Service, to develop that plan
13 and to implement that plan.
14   Q.   Would you agree that the work
15 and experience that you had in terms of
16 anti-money laundering and what you were
17 envisioning as you were coming into the
18 Treasury, the work that you then largely
19 focused on, which you referenced as
20 anti-terrorism financing, that those were
21 different?
22   A.   They're different but related.
23   Q.   How so?
24   A.   Well, you know, money
25 laundering is -- involves the process of

Page 82

GURULE

Q. And you determined that you did not need them in order to form the opinions that you are offering in this case, is that correct?

A. I don't know that I consciously made that determination at all.

I just was asked to opine on three issues and these are the materials that I relied upon in expressing the opinions on what I had been asked to render an expert opinion on.

Q. And you weren't given any documents produced by the defendants in this case, is that right?

A. Documents, no.

Q. And you didn't ask for any in terms of forming your opinions in this case, is that right?

A. That's correct.

Q. Did you consider -- strike that.

In forming the opinions that you offer in your report dated February 1st, 2021, and marked as Exhibit 2032, you

Page 83

GURULE

did not consider any underlying evidence pertaining to any specific SDGT designation made pursuant to Executive Order 13224, is that correct?

A. Yes.

Q. In forming your opinions that are offered in your expert opinion dated February 1st, 2021, and marked as Exhibit 2032, you did not consider any underlying evidence pertaining to any specific designation made pursuant to U.N. Resolution 1267, is that correct?

A. Yes.

Q. You have your report in front of you.

MS. BEMBRY: We can take down Exhibit 2033.

Q. You note on page 6 of your report that designation as an SDGT is an administrative rather than a criminal action, is that right?

A. Yes.

Q. And that means that it's not an adjudication process of the guilt or

Page 84

GURULE

innocence of any individual or entity, is that right?

A. Yes.

Q. It's not a criminal or a civil action?

A. That's correct.

Q. There is no requirement that the government establish the existence of evidence that an actual act of terrorism was committed by any individual or entity that is being considered for designation pursuant to Executive Order 13224?

A. Yes.

Q. And there is no requirement that the government have to demonstrate that an individual that's being considered for designation under Executive Order 13224 actually intended to support terrorism in any way, is that correct?

A. That's correct.

I mean, the designation again falls within the scope of Executive Order 13224.

Q. And that's a fairly broad

Page 85

GURULE

order, is that right?

A. That's right, yes.

Q. And the idea of it, the ultimate goal, is one that is preventative, that is, to prevent the use of funds to fuel or further terrorist attacks, is that right?

A. Yes.

Q. And it is to save lives?

A. Yes.

Q. And an individual can be designated if there is reason to believe that that entity poses a significant risk for committing acts of terrorism, is that right?

A. That's one basis for designation.

Q. And there is no requirement of evidence that the individual actually committed an act of terrorism, right, it's the posing a significant risk, do I have that correct?

A. Well, you can be designated if you actually, if the individual has

22 (Pages 82 - 85)

Page 86

```
 1                GURULE
 2  actually committed an act of terrorism,
 3  but the individual could also be
 4  designated if he or she poses a threat of
 5  committing acts of terrorism that threaten
 6  national security.
 7      Q.    You note in your report, and I
 8  refer you to page 4 if you want to look at
 9  it, at page 4 you note that, second full
10  paragraph, towards the end of that second
11  full paragraph, "Publicly designating
12  individuals and organizations for asset
13  freeze 'notifies the U.S. public and the
14  world that these parties are either
15  actively engaged in or supporting
16  terrorism or that they are being used by
17  terrorists and their organizations'."
18            Did I read that correctly?
19      A.    Yes.
20      Q.    What did you mean by being used
21  by terrorists and their organizations,
22  what did you mean by that?
23            MR. EUBANKS:  Objection to
24  form, mischaracterization.
25      A.    First of all, it is a quote, it
```

Page 87

```
 1                GURULE
 2  is a quote from the Terrorist Assets
 3  Report, 18th annual report to Congress on
 4  the assets, on assets in the United States
 5  of terrorist countries, international
 6  terrorists, terrorist program designees,
 7  2008, 2009, and so I'm quoting from the
 8  Treasury Department report.
 9            And so for me it could be that
10  these individuals are providing, either
11  knowingly or unknowingly, financial
12  assistance or other support to terrorist
13  or terrorist organizations.
14      Q.    So your understanding is that
15  an individual who may be unknowingly
16  providing or financing terrorist activity
17  could be subject to designation under
18  Executive Order 13224, is that right?
19      A.    Yes.
20      Q.    And by the same token, an
21  individual who may be unwittingly
22  financing terrorism activity could be
23  subject to designation under Executive
24  Order 13224, is that fair to say?
25      A.    Yes; so it's both, someone
```

Page 88

```
 1                GURULE
 2  could be doing it intentionally,
 3  knowingly, willfully, or inadvertently,
 4  unknowingly.
 5      Q.    And the idea is that Executive
 6  Order seeks to cast a wide net so as to
 7  disrupt the channels of terrorist
 8  financing to save lives, is that fair to
 9  say?
10      A.    Yes.
11      Q.    You state on page 6, and this
12  is under the section SDGT Designation
13  Process, this is the third sentence under
14  that section, "First, OFAC collects
15  evidence to support the SDGT designation."
16            Did I read that correctly?
17      A.    Yes.
18      Q.    Do you mean by that to say that
19  the first step in the process is to look
20  for evidence or, rather, collect evidence,
21  I'm trying to distinguish that between
22  identifying an individual who might be
23  subject to Executive Order 13224 and so I
24  would like to understand, in making this
25  statement, are you saying that the first
```

Page 89

```
 1                GURULE
 2  step is not the identification of an
 3  individual?
 4      A.    No, I think it would be the
 5  identification of an individual, but then
 6  the question is, I mean, we need to move
 7  beyond or OFAC would need to move beyond a
 8  suspicion, suspicion that someone is
 9  providing financial assistance or
10  financial support to a terrorist, to
11  whether there's a reasonable basis for
12  believing that that individual falls
13  within the scope of Executive Order 13224
14  for designation.
15            And so the starting point of
16  determining whether or not there is
17  sufficient basis, reasonable basis,
18  involves the collection of information.
19            So we move from suspicion to
20  reasonable basis and we get to reasonable
21  basis based upon the collection of
22  additional evidence.
23      Q.    Where does that standard come
24  from, you said reasonable basis, what's
25  the basis of that phrase, reasonable
```

23 (Pages 86 - 89)

| Page 90 | Page 92 |
|---|---|
| 1  GURULE<br>2  basis?<br>3    A.    So neither IEEPA or the<br>4  Executive Order articulates a specific<br>5  legal standard for designation and so the<br>6  IEEPA statutes are silent on the matter,<br>7  the Executive Order is silent on the<br>8  matter.<br>9           And so I think Congress<br>10 intended, I don't know if this was<br>11 intentional or not, but could be that<br>12 Congress intended to keep this kind of<br>13 broad and provide flexibility to the<br>14 executive branch, to the Treasury<br>15 Department, in making the designation.<br>16          We know a couple of things, as<br>17 you stated; we know that it's not a<br>18 criminal determination, you know, so it's<br>19 not a finding of criminal guilt and so<br>20 therefore the standard of beyond a<br>21 reasonable doubt would not be applicable.<br>22          And it's not a civil<br>23 determination, a civil judgment, you know,<br>24 finding of liability, and so therefore the<br>25 preponderance of the evidence standard | 1  GURULE<br>2    A.    Yeah, it's difficult, you know,<br>3  it's difficult to quantify it, to quantify<br>4  it, but I would say this; reasonable, you<br>5  know, the use of the word reasonable<br>6  suggests an objective basis, so it's not<br>7  just subjectively, a subjective<br>8  determination, that someone falls within<br>9  the scope of Executive Order 13224.<br>10          Instead there has to be<br>11 objective criteria and objective reason<br>12 for concluding that, you know, that the<br>13 person falls within the scope of the<br>14 Executive Order, so it's objective, it is<br>15 an objective standard, not a subjective<br>16 standard, and reasonable basis, you know,<br>17 captures that objective nature of the<br>18 standard.<br>19    Q.    And what's your basis for<br>20 saying that it is an objective reasonable<br>21 standard?<br>22    A.    The use of the word reasonable.<br>23          You know, whenever you see<br>24 reasonable, you know, in a legal standard,<br>25 reasonable, you know, suggests, implies, |

| Page 91 | Page 93 |
|---|---|
| 1  GURULE<br>2  would not apply, it is an administrative<br>3  determination.<br>4           And so it's someplace in<br>5  between; so the standard that was used was<br>6  reasonable basis.<br>7    Q.    When you say someplace in<br>8  between, in between what?<br>9    A.    Well, in between the heightened<br>10 standard, we have this very high standard<br>11 in the criminal context of beyond a<br>12 reasonable doubt, and we have a lower<br>13 standard in the civil context, in civil<br>14 litigation, of preponderance of the<br>15 evidence, and the administrative<br>16 designation under the Executive Order is<br>17 neither criminal nor civil, it is<br>18 administrative and so a different standard<br>19 is applicable.<br>20          And reasonable basis tries to<br>21 capture that different standard that is<br>22 required.<br>23    Q.    Is it fair to say that a<br>24 reasonable basis is a standard lower than<br>25 the preponderance of the evidence? | 1  GURULE<br>2  an objective determination.<br>3           So it's a distinction between,<br>4  you know, subjective, you know, subjective<br>5  belief versus a reasonable belief.<br>6           So subjective belief is just I<br>7  believe it, but my belief may not be<br>8  reasonable, there may not be some<br>9  objective reason to support my personal<br>10 belief, and if that's the case, that's a<br>11 subjective belief, that's not Executive<br>12 Order 13224.<br>13          Executive Order 13224 does not<br>14 implicate a subjective, purely subjective,<br>15 determination or a subjective belief,<br>16 there must be some objective reason,<br>17 objective criteria, objective basis, for<br>18 determining that the individual or entity<br>19 falls within the scope of the Executive<br>20 Order.<br>21    Q.    And is that basis, the<br>22 objective basis that you're talking about,<br>23 is that identified and defined in<br>24 Executive Order 13224?<br>25    A.    No, it's not, nor in IEEPA, |