# EXHIBIT
# I2

Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's Motion
To Exclude the Testimony of Victor Comras

03 MDL 1570

July 31, 2023

because of his excellent knowledge of conditions in Albania and his experience in his work for the IIRO.

99.   In November 1999, Dr Saleh, to my surprise, was deported from Albania notwithstanding that 7 years previously he had been granted Albanian citizenship.  He was given one hour's notice to leave the country with his family, and young children.  Dr Saleh now resides in Jordan.  He has never been informed of any reason for his deportation, despite his commencing a Court action in Albania challenging his deportation and despite his numerous requests for details of the allegations against him. Dr Saleh has written to the US Ambassador in Albania seeking clarification and expressing his readiness to meet with the US authorities anywhere in the world and to answer any questions regarding his activities.

100.   So far as I am aware, Dr Saleh has a clean record.  Neither I, nor so far as I am aware Dr Saleh himself, has any knowledge of why he was deported in November 1999, or any information as to the allegations against him. This is even more difficult to understand in light of the excellent working relationship Dr Saleh enjoyed throughout his time in Albania with American relief agencies, including the American Catholic Relief Service, US Aid, the American Relief Service, and other western agencies including the United Nations High Commission for Refugees ("UNHCR") and UNDP. In Dr Saleh's most recent talks with my lawyers he has in fact renewed his calls to be interviewed by the US authorities.

KADI0002248

101. Since OFAC listed me on October 12 2001, I have tried to find out more about the Albanian Government's decision to deport Dr Saleh. I can only attribute this to what one Western reliable source has told me is a case of mistaken identity. I believe that Dr Saleh has been confused with an Egyptian citizen of the same name who was extradited by the Albanian authorities to Egypt where he was imprisoned for allegedly being a member of the **Jihad Group**. I have never met or had any dealings with this other Abdul Latif Saleh, nor did I even know of his existence until my lawyers told me about him.

102. So far as I am aware from my long relationship with Dr Saleh he is a peaceful man and is not the type who would ever become involved with extremism or terrorism in any form.

**Albania**

103. Before I describe my activities in Albania it is necessary to understand that in 1996/97 economic conditions in Albania changed for the worse. This was caused by two factors; first, a weakening of government resolve to maintain stabilization policies in the election year of 1996, which contributed to renewal of inflationary pressures. Secondly, a substantial portion of Albania's population had invested in financial pyramid schemes, which collapsed in early 1997 triggering severe social unrest, many deaths and widespread destruction of property. I make it clear that I had nothing whatsoever to do with the financial pyramid schemes in Albania.

KADI0002249

104.   After I started commercial activities in Albania, in conjunction with Dr Saleh, In late 1994 I asked Dr Saleh to register the Foundation in Albania.  The activities of the Foundation in Albania included:

**Building and running community centers and Mosques in Kukes, Krome and Tirana:**

105.   During the communist rule, many Mosques, along with other aspects of Islamic religious culture were obliterated.   To regenerate Islamic communities following the collapse of communism,   the Foundation built, furnished and equipped Mosques and community  centers.   The Foundation did this at the request of official religious leaders in Albania.

106.   Kukes and Krome are in the northern part of Albania, near the border with Kosovo.   At the request of the Albanian Government, I decided that the Foundation should carry out relief work in this area because at that time, in 1994, it was extremely poor, and there were no humanitarian agencies working there and there was a pressing need for relief work.  By an agreement dated February 2 1994 between the General Mufti of Albania and the President of the Islamic Call Society and the Director of Muwafaq Foundation Albania, a copy of which is at pages 184 to 186 together with a translation, the Foundation was requested, amongst other things, to build and renovate community centers in Kukes, and Krome, and Tirana, a Mosque in Bajaram Curri and ten small Mosques in the villages of the provinces of Kukes, Bajaram Curri, and Dhe Has, to sponsor Imams and staff and to pay their salaries.

KADI0002250

107.     For the purpose of building Mosques and community centers in Kukes and Krome, the Government or local municipality donated land to the Foundation. It was also agreed that the Foundation would pay for the costs of furnishing and equipping these community centers and Mosques. Ownership of the Mosques was in each case upon completion transferred to the local Muslim community. In both Kukes and Krome the Foundation built and ran a Mosque, community center and annexed shops. In Tirana, the Foundation built and ran a womens' center, with a Mosque attached to it, called Al Xhora, on land which was donated by a local businessman. These Mosques and community centers were all completed in 1997, before the troubles in Kosovo, but due to the unstable circumstances prevailing in Albania in 1997 following the financial pyramid selling crisis, to which I have already referred, it was not possible for the Foundation to furnish or equip these projects fully.

**Classes and seminars**

108.     In the Al Xhora community center the Foundation provided classes in languages and computers and secretarial classes. The Al Xhora center was established in 1995 and upon completion of its construction was run by the FLS (Fountain of Life and Science Foundation), a local Albanian foundation founded by Dr Saleh. The Al Xhora community center is still in existence. It is run by local qualified staff. About 1,000 women attend the Al Xhora center every year and a total of 5,000 women have graduated from Al Xhora. In addition to this, the Foundation arranged and sponsored a training course for NGOs in 1994/95 bringing an expert from the UNDP to address a seminar for NGOs in Tirana which lasted 2 to 3 days.

KADI0002251

**School:**

109.   In Kukes there used to be a school which the Foundation supported financially. The school was monitored by the local Albanian education department based in Kukes and was run according to the same educational curriculum as other government schools in Albania. All the staff employed at the school were local Albanians, apart from one Arabic language teacher. Following the financial pyramid selling crisis in 1997, which I explain above, the school was looted, stripped of all equipment and furniture and closed down. Subsequently, Dr Saleh, at the request of the Albanian Ministry of Education, restarted the school but due to lack of finance it closed down again after about 1 year.

110.   In all its activities, the Foundation co-operated and co-ordinated closely with the relevant Albanian Government authorities and international relief agencies. The Foundation, like other NGOs, signed a Memorandum of Understanding with the Albanian Ministry of Labor. In fact, all the Foundation's projects in Albania were requested or approved by the official authorities in Albania. On March 1 1997, I instructed the local Foundation staff by letter, copy of which with a translation is at pages 95 to 96 to cease all activities not yet implemented in Albania, to establish a committee to review all ongoing projects and to consider transferring these to other NGOs. The Foundation eventually ceased all its activites in Albania in July 1997.

111.   In addition to the Foundation, in Albania, I supported the following charitable activities:

111.1   **FLS (Fountain of Life and Science Foundation):** As mentioned above, the FLS was a local Albanian foundation founded by Dr Saleh in 1995/96.

KADI0002252

The FLS published educational calendars, pocket diaries and periodical magazines, which included information on such matters as science, history, the dangers of drugs and AIDS. The diaries included a quote or statement for each day designed to promote good social practices and universal understanding. In some cases these quotes were by Arabs and in other cases by Westerners. These publications were very popular as the Ministries, Local Authorities, Universities and Schools of Albania used to place advance reservations to ensure their orders were met. The FLS also had a language center and a womens' development center in addition to providing language and computer courses for both men and women. The FLS has also been supported by Yussuf Islam, the British singer formerly known as Cat Stevens. I supported the activities of FLS in 1996 and 1997. In addition to this FLS took over various activities of the Foundation, including the Al Xhora center.

111.2 **Albanian Sports Club :** This was run by an individual of Kosovar nationality called Sulaiman Charchizi. It was registered with the Ministry of Youth, a Ministry of the Albanian Government. Along with other businessmen, I made donations to the sports club in 1996 and 1997 to help it run soccer competitions for young people and other sports activities. I now understand that Sulaiman Charchizi later, following the intervention of NATO in Kosovo, left Albania and went to Kosovo where he set up a political party. I had nothing to do with him after 1997 and had no link with or interest in any political ambitions he may have had, or any political party he may have established.

KADI0002253

111.3 **Albanian Thoughts and Civilization Institute:** This institute, which Dr Saleh introduced me to, published a family based magazine covering Albanian heritage and cultural issues, including such topics as divorce and AIDS. I provided this institute with offices.

111.4 **Footbridge on Dursee Street, Tirana:**

Karavan Sh.P.K. ("Karavan"), an Albanian company in which I own shares, has contributed to charitable activity in Albania by constructing a footbridge on Dursee Street as a gift for the municipality of Tirana.

**Kosovo**

112.   When my legal team met with Mr Newcomb on August 1 2002, he enquired about my commercial and charitable activities in Kosovo. I would like to confirm that I have never conducted any charitable activities in Kosovo. Karavan in the ordinary course of its business activity constructed, as part of its work for the Saudi Joint Relief Committee ("SJRC") a warehouse at Shtima in Kosovo. Other than this, neither I nor any of my companies have ever carried out any commercial activities in Kosovo. Moreover, I have never even visited Kosovo. However, I believe that confusion may have arisen as a result of one or more of the following matters:

113.   The last director of the Foundation in Albania was Yussuf Ismail. He was director when the Foundation closed down in Albania in July 1997. Yussuf Ismail is of Jordanian origin. After the closure of the Foundation in July 1997 he left Albania to go to Jordan. Some time later I heard that he was in Kosovo working for a Saudi relief organisation, which I believe was the SJRC. I should emphasise that

KADI0002254

after Yussuf Ismail left the Foundation, he had nothing further to do with me or any of my companies in Albania or elsewhere. I have no knowledge of any activities he may have engaged in while he was in Kosovo after having left the Foundation's employment. I add for the sake of completeness that I did not personally recruit Yussuf Ismail, but he was recruited by one of the former managers of the Foundation in Albania Mr Abu Sukkur and later promoted as director.

114.   A further source of confusion may be facilities which Albanian companies associated with me have provided to the SJRC, on arms length commercial terms, to facilitate the SJRC's humanitarian efforts assisting refugees fleeing from Kosovo. In 1999, there were literally tens of thousands of refugees being forced out Kosovo into the neighbouring countries of Albania and Macedonia. In 1999, following an appeal from the Albanian Government and international relief agencies, it was decided by the Saudi relief authorities that the number of refugees fleeing Kosovo was so high that Muslim relief work had to be conducted by way of a joint co-ordinated effort of the 5 main Saudi relief organisations in that region. The SJRC was thus formed and was headed by the chairman of the Saudi Red Crescent Society Dr Abdurahman Swailem. At the request of Dr Swailem I arranged for Albanian companies associated with me to provide facilities to the SJRC at the time of the Kosovo crisis. These transactions were undertaken on a commercial basis to assist the SJRC in its humanitarian relief work for refugees from Kosovo. I explain this in detail below as I believe the assistance provided to the SJRC, at the request of Dr Swailem, may have given rise to some confusion. Before I do so, however, it is appropriate that I provide background information on my relationship with Waa'el Julaidan who was

KADI0002255

appointed Executive Director of the SJRC, as he has been designated by the US Department of Treasury as a Specially Designated National and Blocked Person.

**Waa'el Julaidan**

115.   First of all, I have known Waa'el Julaidan, who is a Saudi citizen, as a family friend since the 1980's.   He is well known for his humanitarian relief work for the Afghan refugees during the Soviet occupation of Afghanistan in the 1980s. The only aspect of his life which has ever been of any interest to me is his humanitarian relief work for refugees.   Waa'el Julaidan assisted me and the Foundation to establish a women's teachers' college  for refugees in Croatia and relief programs in Bosnia. He recommended Chafiq Ayadi for the management of this institute.    Waa'el Julaidan recommended Chafiq Ayadi highly for his experience and his ability in the area of humanitarian work for refugees and for his honesty.

116.   In 1999, Waa'el Julaidan was appointed as the executive director of the SJRC in Albania and Kosovo.   I describe below how at the request of Dr Swailem, the chairman of the SJRC, Albanian companies associated with me provided to the SJRC in 1999 necessary facilities in establishing a temporary hospital for refugees, stores for medicines and relief supplies and apartments and office space.   All these transactions were carried out on a commercial basis.

117.   I should stress that my relationship with Waa'el Julaidan has never encompassed any element of support whatsoever for Osama bin Laden or Al-Qaeda.  I have known him as a family friend, and socially.  Our relationship focused on relief and limited business activities.  By way of example when I was invited to join the

KADI0002256

board of Dar Al Walidain School in Bosnia, to which I refer above, Waa'el Julaidan was already a board member of it. I am also involved as described below, in Abrar, a company incorporated in Saudi Arabia, which is a small scale business venture also involving Waa'el Julaidan and other members of his family. Waa'el Julaidan is a minority shareholder in Euroinvest, a Bosnian company in which I have an interest and which I describe further below. He came to be a shareholder in this company by way of reward for the assistance he provided to my charitable activities in Bosnia.

118.    In the late 1990's, I was invited by Mahmood Taiba, a relative of mine, and the chairman of the board of directors of Dar Al Walidain school, to join its board of directors. Dar Al Walidain is a school and hostel in Sarajevo for Bosnian children who have lost either their father or both parents, under the patronage of Al-Haramain Wa Al Masjed Al Aqsa Charity, which I refer to above and, as I have mentioned, is entirely separate from the Al-Haramain Foundation. At the time I joined the board, Waa'el Julaidan was already a member of it.

119.    In addition to this, I became involved in a small-scale business venture with Waa'el Julaidan and other members of his family. I am a shareholder and director of Abrar, a company incorporated in Saudi Arabia, for the purpose of carrying on business in the travel and tourism industry. I am a director of this company along with Qays Julaidan who is a cousin of Wa'el Julaidan. Wa'el Julaidan is not and never has been a director of this company, although he is a minority shareholder in it. Abrar of Saudi Arabia was incorporated to carry on business in the travel and tourism sector, specifically for Muslim pilgrims, especially during the pilgrimage (Hajj) season and, throughout the year, for minor pilgrimages

KADI0002257

(Omrah). It should be noted that this company has never carried out any significant level of business.  In addition, as explained below, both Waa'el Julaidan and I have held shares in Euroinvest and KA Stan, 2 Bosnian companies to which I refer below.  My involvement with these companies has absolutely nothing whatsoever to do with Osama bin Laden, Al-Qaeda, or any terrorist activities or purposes.

**Assistance provided by companies associated with me to the SJRC**

120.   As part of his work for the SJRC, Waa'el Julaidan obviously spent time in Albania before the SJRC shifted its activities to Kosovo.  While Waa'el Julaidan was in Tirana, he frequently met Dr Saleh and had close relations with senior government officials in Albania.  At the outset the chairman of the SJRC, Dr Swailem, asked me to help because they had no previous experience working in Albania, nor were they aware of the inadequate infrastructure in the country or the difficulties of dealing with official institutions there.  My companies in Albania were among the few organisations in Albania at that time that had the resources, capacity and management structure to assist the SJRC. Being a Saudi relief agency, I was keen to assist the SJRC and instructed Dr Saleh to make their mission successful.  My companies undertook this work on commercial terms to facilitate the humanitarian efforts of the SJRC in various ways.

121.   First of all the SJRC rented spare warehouse space in Tirana owned by a company in which I am a shareholder, **Lojall Sh.P.K.**, ("Lojall") for the purpose of storing medicines and relief supplies.  The SJRC also rented from Lojall a large yard outside the warehouse where **Karavan**, another Albanian company in which I am a shareholder,  constructed a prefabricated temporary hospital for refugees

KADI0002258

at the request of the SJRC. The tender for the construction of this hospital was awarded to Karavan due to their experience in construction project supervision. The construction of this hospital was completed within only 18 days.  The Albanian President and other senior Albanian Government officials attended the opening ceremony of the hospital, which was covered by the local and international media.  The SJRC paid for both the use of the warehouse and the construction of the hospital.

122.    At the time of the arrival of the SJRC, Karavan had just finished completion of the development of a major commercial and residential development on the main road in Tirana, Dursee Street, comprising 123 flats and some offices and shops and were beginning to sell apartments within the building. I refer to this property as the "Dursee Street Building."  The SJRC urgently needed both living accommodation for their staff and office space from which to run their activities. Karavan rented to the SJRC vacant apartments and office space which were awaiting sale in the Dursee Street Building.  About 50 SJRC workers occupied the building.  They would come and go at various times and it is possible that the congregation of a number of Arabs at the same time in the building may have caused confusion.

123.    I refer above to the community center and Mosque which the Foundation built in Kukes near the border with Kosovo.  At the time of the arrival of the SJRC the community center was not being used.  The SJRC through its chairman Dr Swailem asked me if it could use the community center as a clinic.  I agreed, and accordingly the SJRC used the community center, which the Foundation formerly ran in Kukes, as a medical point for refugees fleeing Kosovo in 1999.  The SJRC

KADI0002259

used the same community center as a clinic again later at the time of the repatriation of the refugees. I have recently been told that the refugees would use the Kukes center as a temporary stop for one or two days while they were on their way to more permanent refugee camps within Albania. It is possible that the movement of large numbers of people to and from the Kukes center, situated very near to the border with Kosovo, is also a cause of confusion.

124. A further source of confusion may be that these centers and the Mosque were being used after 1998, even though the Foundation had closed in Albania in July 1997. It is quite possible that since the centers and Mosque were built by the Foundation, they continued to be referred to by local people as the Muwafaq centers or the Muwafaq Mosque. This may have given rise to a mistaken belief that the Foundation continued to exist after its closure.

125. It is also possible that the presence of Waa'el Julaidan, the Executive Director of the SJRC, in both the Dursee Street Building and the warehouse and hospital may have caused confusion.

126. I wish to make it crystal clear that the sole reason I assisted the SJRC in the ways I have described was to help their humanitarian causes and the relief effort in Albania. I should reiterate that this assistance was provided on a commercial basis. All the assistance provided was with the full knowledge and approval of both the Saudi and the Albanian authorities, and the international relief agencies operating in Albania. I have never intended whether through the assistance provided to the SJRC or otherwise, to support in any way or manner any armed or terrorist group, including Osama bin Laden or Al-Qaeda. In addition to this, I

KADI0002260

must emphasise that the Foundation was not in existence in Albania after 1997 and I have no knowledge of or responsibility for anything which may have been done by former Foundation employees after 1997 which may have caused confusion. Ever since the Foundation closed down in Albania in 1997, I have continued to receive requests for financial assistance for repairs or renovation of Mosques and/or community centers which the Foundation set up in Albania. I should make clear that I have never, through any commercial or charitable activities, supported Osama bin Laden or Al Qaeda, whether in Albania, Kosovo or elsewhere.

**Ethiopia**

127.    In April 1993 the Foundation signed a General Agreement with the Relief and Rehabilitation Commission of the Ethiopian Government. A copy of this Agreement is at pages 187 to 193. Further to this, the Foundation undertook the following programs in Ethiopia: -

127.1   Educational programs covering:

a.    Elementary education in 3 schools.

b.    Training Programs for School Teachers teaching Arabic Language, with emphasis on lexicology, phonology, syntax and grammar, literature, recitation, rhetoric and learning methodology.

127.2   Iftaar Saim (breaking of fast at sunset during the month of Ramadan) food stuff distribution to 1,500 poor people daily, for 30 days of the month of Ramadan, undertaken annually.

KADI0002261

128.    In late 1995, as a result of the allegations published in the London based magazine Africa Confidential, the Ethiopian authorities decided to close down the operations of the Foundation along with all other non-western NGOs that also had a presence in Sudan.  This was hardly surprising given that as authoritative a publication as Africa Confidential had wrongly accused the Foundation of being party to an attempt to assassinate the President of Egypt on Ethiopian soil, an allegation of which the trustees were later totally vindicated.   When the Foundation discussed the position with the Ethiopian authorities it was confirmed to us that the Foundation was not, in fact, itself under suspicion of involvement in the assassination attempt, but that since Sudanese links were suspected, a decision had been taken to close down the operations of all non-western NGOs that also had a substantial presence in Sudan.  The Foundation was only one of a number of organisations affected by this decision. Among the other NGOs affected were the Islamic African Relief Agency and Al Da'awa al Islamiya.

**Somalia**

129.    The Foundation commenced activities in Somalia in December 1992. The Foundation was never formally registered there because no proper governmental structure existed there. The Foundation's director in Somalia was Sohaib Abdul Lateef Sheikh Bashir, a Somali citizen who had been educated in Saudi Arabia.  I refer to the listing of International NGO activities in Somalia dated March 15 1994 a copy of which is at pages 194 to 197. The Foundation developed the following programs in Somalia:

129.1  In **Mogadishu** the Foundation ran 10 schools, a women's development project for training women in nursing and sewing skills. The Foundation

KADI0002262

distributed free sewing machines and materials for dress-making.   In addition to this the Foundation distributed food and clothes for the poor people of Mogadishu.

129.2   In **Lower Shabelle** area, the Foundation had a demonstration farm project in Samey Samey village where it assisted poor families in the local community.   The Foundation also distributed food and relief aid to a number of villages in the area of Genale.

129.3   In **Middle Shabelle** area, the Foundation distributed food and relief aid to a number of villages in the Jowhar region.

129.4   In the **Bay** Region, the Foundation opened a number of feedings centers for orphans and poor children, and in addition to the above:

129.5   Health and Sanitation programs in **Mogadishu**

129.6   Education programs for the rehabilitation support of existing schools or institutions which had been destroyed or vandalised.   These education programs followed the Somali national curricula.

129.7   Textile project in **Mogadishu** the object of which was to create jobs by the production of hand-woven textiles on looms.

KADI0002263

The Foundation ceased activities in Somalia in early 1996 when all the ongoing projects in progress at the time were transferred to ZamZam Foundation, another NGO active in Somalia.

**Germany**

130.   The Foundation was registered in Karlsruhe, Germany on March 17 1995.   The reason for registering the Foundation in Germany was to collect goods from donors in Germany for onward distribution by the Foundation to Bosnian refugees.   The sole purpose of all the Foundation's activities in Germany and throughout Europe was to assist Bosnian refugees.  The Foundation was registered with a new address in Munich on March 4 1996. Copies of the registration documents for the Foundation in Germany are at pages 97 to 108.

**Austria**

131.   During 1993 the Foundation was registered in Austria where an office was opened to distribute humanitarian relief to the Bosnian refugees located in Austria.  The Foundation's activities in Austria consisted of the distribution of food to the Bosnian refugees and assisting displaced Bosnian students to find education.  The Foundation's office in Austria was closed in 1996.  I understand that the Foundation's registration in Austria will have automatically lapsed by reason of the non-payment of annual fees.

**UK**

132.   The Foundation never actively operated in the UK.  However it did make a donation in 1993 to the Muslim Welfare House, in North London, to enable the Muslim Welfare House to have a new library which was named after the Foundation.

KADI0002264

**Women's College and other Humanitarian Activities in Saudi Arabia**

133.    Personally, I am strongly committed to promoting education in society in general and among women in particular, to enable women to exercise leadership roles in the family and society.   Accordingly in 1996 I founded and led a planning committee to establish higher educational institutions for women in Saudi Arabia. This ultimately led to the founding of a pioneering women's college in Jeddah named Dar Al Hekma College in 1999.  Dar Al Hekma College is now one of the first private colleges for women in the Kingdom, offering university level degrees. It is also unique as it educates women in an English language setting.

134.    As well as leading the planning committee of the college, I am chairman of its academic committee.  I decided to base the curriculum on the American higher education model.  Thus, under my initiative and direction the college sought professional assistance and expertise from the United States.  This led us to identifying and later contracting with the Texas International Education Consortium ("TIEC"), which is based in Austin, Texas.  TIEC is a consortium of 32 public universities in the State of Texas formed for the purpose of developing, co-ordinating and implementing international education projects and academic programs.

135.    The collaboration between TIEC and the college has been most successful in preparing the complete academic program and administrative and organisational structure for the college. At the completion of the TIEC project, I recruited several American administrators and faculty members and have supported their

KADI0002265

involvement ever since the establishment of the college. The college now employs internationally qualified faculty members representing ten different nationalities, including American and many others who are American trained, including the Saudi Dean and Vice Deans who have earned their doctorates in the United States.

136.    The college was inaugurated by HRH Crown Prince Abdullah of Saudi Arabia in September 1999 after 4 years of planning. The college has won support from the Saudi Royal family, business people, local and foreign dignitaries, all of whom have commended its work. The college has been visited by Ambassadors and their wives including the US Ambassador to Saudi Arabia and by his wife and the wife of the UK Ambassador. I also had the honour of receiving the former President of the United States, President Jimmy Carter and Mrs Rosalyn Carter, during their visit to Saudi Arabia in the year 2000. They were very pleased with their visit to the college. President Carter gave a speech expressing his pride to be given the opportunity to visit the college; he said the college reflected the advances made by Saudi society and stressed the importance of private education adding that education was a source of freedom. Rosalyn Carter remarked that she had been very impressed by the achievements of Saudi women and that she had met many women during her visit to the college who had asked her to speak of the positive impression she had gained.

137.    I have supported the college, not only ideologically by supporting the aims of the college, but also financially, by providing finance myself and raising funds for the college from others. Since 1996 I have personally contributed substantial sums to the college and have raised very substantial donations and scholarship funds

KADI0002266

from others.  I am also a very active member of the Board of Trustees of the college and attend the college meetings and other functions one or more times per week throughout the year.

138.   Soon after the tragic events of September 11th, I called a meeting with the American staff and faculty to express personally my regrets, sympathy and support for them; to offer them help in contacting their families back in the USA; and to reassure them that they would be protected and secure while working at the college and living in Saudi Arabia.  I also sought to assure them of the solidarity of myself and of my fellow Board members against the vile acts of September 11th.

139.   In addition to my involvement in the promotion of higher education in the Kingdom through the founding of this non-profit private college, I support various charities in Saudi Arabia, as follows.  I stress that I am merely a donor to these charities and am not actively involved in the running or management of any of them:

139.1   **Al Haia Al Alamiah -li- Tahfeez Al Quran Al Kareem** – (International Memorizing of The Holy Quran Organization): this is a new charity, founded in 2001.

139.2   **Al Jamaia Al Khairia -lil- Khidmat Al Ijtemaiah in the Holy City of Medina** – (The Philanthropy Committee for Social Services in Medina Munawara City): this is a charity set up to help and educate people in the

KADI0002267

city of Medina.  It is under the supervision of the Ministry of Labour and Social Affairs, Kingdom of Saudi Arabia.

139.3  **Jamiat Al Bir,** Jeddah, Saudi Arabia: this is a social charity which looks after orphans or fatherless children in Saudi Arabia.  It provides them with food and other aid, social activities and education.

139.4  **Al Majlis Al Tanfeeze -li- Mashrooh Jamiat Taibah Al Nisaiah Al Khairia, Medina Munawara**  – (Executive Council for the Project of Taibah Women Philanthropy Committee): the objects of this charity are to create a women's college in the City of Medina.

I cite these as further examples of my commitment to improving education in Saudi Arabia and amongst the poor and needy.

**Commercial Activities**

**Saudi Arabia**

140.  Up until late 2001 the bulk of my commercial activities in Saudi Arabia was devoted to the business operations of the National Management Consultancy Center (NMCC), Saudi Arabia, which I headed as chairman. As I describe above, NMCC advised and assisted local and international financial institutions in developing and implementing Islamic banking and Islamic investment products. Prior to the start of my activities through NMCC, I registered, in 1976, Yassin A. Kadi Establishment for undertaking general commercial activities in Saudi Arabia and worldwide. In addition to the above, I would mention the following:

KADI0002268

140.1 I am a board member of **Dar Ul Ilm Company Limited (Andalus Schools).** an organisation which provides private educational services in schooling for boys and girls from kindergarten to high school level.

140.2 I was a member of the **Islamic Banking Services Committee,** which was formed by the National Commercial Bank in July 1997 and on which I served until December 8 1999. This is a committee responsible for the strategic development of Islamic banking services which was chaired by the CEO of the NCB. I served on this committee with other senior bank officials.

140.3 I was chairman of **Cortoba Trading Company Limited,** which was active in the property development field, constructing and developing exclusive commercial real estate and residential complexes. It has not carried out any business for some years. A branch of the bin Mahfouz family (not related to KBM) also had an interest in this company.

140.4 I have a shareholding in **Shirikat Injizat Muqawalat Al Fanee Al Hadeesa – Ibtikarat ("Injizat"),** which is currently in the process of liquidation. This company supplied kitchen and bathroom equipment in Saudi Arabia.

140.5 I have already mentioned in the context of my explanation of my relationship with Waa'el Julaidan above my involvement as shareholder and director of **Abrar of Saudi Arabia**. This company has no connection with Abrar Investments Inc. USA mentioned below

KADI0002269

140.6 I am a minority shareholder in **Saudi Najam Services and Development Company** which is a company incorporated in Saudi Arabia to carry on business in the travel and tourism sector, specifically for Muslim pilgrims, especially during the pilgrimage (Hajj) season and, throughout the year, for minor pilgrimages (Omrah)

140.7 I am a shareholder in **Jeddah Holding Company for Development** which is a contracting company for the development and maintenance of Jeddah City.

**Sudan**

141. In 1990 I learned that Al Shamal Islamic Bank was achieving much greater returns on Islamic-style investments than those institutions such as Faisal Finance SA with which my funds were then placed. I had not previously had any dealings with Al Shamal Islamic Bank (although it had been founded in, and followed Islamic precepts since, 1985) but I discovered that these higher returns were generated by the adoption of a more vigorous approach to investment. In some cases, Al Shamal Islamic Bank was able to achieve returns in excess of 15% through investment arrangements which complied with Islamic precepts. I also discovered, that in comparison with other institutions, Al Shamal Islamic Bank operated in a more transparent fashion, providing its investors with a more detailed picture of the projects and businesses in which their funds were invested. Both of these aspects were attractive to me and thus, for solely commercial reasons, and in order to obtain a better return on my money, I decided to make investments with Al Shamal Islamic Bank.

KADI0002270

142. It was my intention that all the funds I transferred to Al Shamal be invested in strict accordance with Islamic precepts. This means that generally funds would be invested according to Islamic principles and procedures. These modes have a built-in element of profit (or risk) which replaces the interest that would be payable were the parties non-Muslim. At no stage did I ever transfer funds to Al Shamal Bank for any purpose connected with terrorism or to support Osama bin Laden, Al-Qaeda or any other terrorist group.

143. Before committing funds for investments with Al Shamal Islamic Bank, the bank provided me with a list of correspondent banks. A copy of this list is at pages 198 to 201. It will be seen that Al Shamal's correspondent banks included such names as American Express Bank, Commerz Bank and Credit Lyonnais (Suisse) SA. The correspondent banks also included Al Barakah Bank and others. At that time, none of these institutions had, so far as I am aware, ever been the subject of any official sanction relating to money laundering or other illegal activity. Whenever I wished to invest with Al Shamal Bank, they directed me to transfer my funds to the relevant correspondent bank nominated by them. This did not cause me any concern as it is quite usual in banking transactions to transfer monies to a bank via its correspondent bank. In this case I understood that there was no facility for the direct transfer of funds to Al Shamal Bank in Sudan. Upon the transfer being effected, Al Shamal would credit my US dollar investment account in Sudan.

144. The correspondent banks to which Al Shamal Bank instructed me to transfer funds were Credit Lyonnais (Suisse) S.A, and Al Barakah Bank in London. I

KADI0002271

understand this is an issue because it has been alleged in the *Burnett* civil law suit that Osama bin Laden maintained one or more accounts at Al Shamal Bank, and that Al Barakah Bank has supported Al Haramain Charity and Osama bin Laden. I have no knowledge of whether these allegations are true; in any case I confirm that I never transferred funds to Al Shamal Bank or any of its correspondent banks including Al Barakah Bank to support Osama bin Laden, Al-Qaeda or any terrorist group or activity and I am not aware that any of these banks has ever engaged in financing or supporting any such terrorist group or activity. In all my dealings with Al Shamal Bank I never had any knowledge whatsoever of the identity of any other client or investor with that bank or any of its correspondent banks or any financial institution associated with it. Obviously, it follows from this that my reasons for investing with Al Shamal Bank had nothing whatever to do with the identity of any of its other clients or investors, none of whom were known to me.

145.    To the best of my knowledge none of the funds I transferred to Al Shamal Bank or any of its correspondent banks including Al Barakah Bank were ever used for any purpose connected with Osama bin Laden, Al-Qaeda or any terrorist group or activity. At all times I intended the funds I invested with Al Shamal Bank to be applied for one or more of the following purposes:

145.1   to enable Al Shamal Bank to issue a guarantee to the Sudanese Government in respect of a substantial scrap metal tender issued by the Sudanese Government, which I won after a contested bid in 1990 and which I considered to be a good business opportunity. The tender for this

KADI0002272

contract expressly required payment to be made to the Sudanese Government in US dollars;

145.2   to make payment in US dollars, to the Sudanese Government of monies due to it under the scrap metal contract;

145.3   concurrently with the issuing of the guarantee I refer to above, Al Shamal Bank used the funds to invest in specific Islamic investments including the purchase of wheat for sale in Sudan and other commodities;

145.4   to meet the costs involved in cutting, transporting and exporting the scrap metal I had purchased from the Sudanese Government. Under the scrap metal contract it was agreed that I was to be responsible for these costs;

145.5   to invest in the manufacture and supply of construction rods by a Sudanese company called SMT Engineering Co.;

145.6   to invest in a contract with the Sudan Petroleum Corporation for the supply of gas oil;

145.7   to invest in shares in the Saudi - Sudanese Bank;

145.8   to invest in a large quantity of sesame;

145.9   to invest in the purchase of aircraft equipment for Sudanese Airlines from General Electric Company in the USA.;

KADI0002273

145.10 to invest in duty free shops run by the Sudanese Government.

I add that I have not made any transfers to Al Shamal Bank since 1994.

146.    Many of these investments achieved excellent rates of return.  For example in the case of the aircraft equipment purchased for Sudanese Airlines, the rate of return was in excess of 30%, which I earned over a period of 1 year.

147.    Many of my activities in Sudan were conducted through two companies associated with me: Leemount Limited and Solano Limited.   Leemount Limited was a company registered on January 15 1992 in the Isle of Man (de-registered in March 2002).  I owned shares in this company.  Leemount maintained US dollar and Sudanese pound accounts with Al Shamal Islamic Bank. On May 19 1999, Solano Limited was incorporated in the Bahamas, a company in which I also had a shareholding until it was de-registered in April 2001.  Solano Limited also had an account with Al Shamal Islamic bank.  It engaged in the trading of commodities and agricultural products.  Both these companies were registered in Sudan as foreign companies.

148.    Finally, and for the sake of completeness, I add this: in 1991 I attended a convention of leading Saudi businessmen in Khartoum, Sudan, hosted by the Sudanese Government, which at the time was seeking to persuade foreign investors to invest in Sudan.  I travelled to Khartoum with other leading Saudi businessmen, including, I recall, H.R.H. Prince Mohamed Al Faisal, Ibrahim Affendi, Saleh Kamel, representatives of Al Rahji Banking and Investment

KADI0002274

Corporation along with other Arab businessmen. We attended at the invitation of the Sudanese Minister of Finance and Chairman of the Sudanese Economic Committee.

**Albania**

149.    I have already explained how I met Dr Abdul Latif Saleh in 1993 at the 1st Muslim-Albanian International Investment Conference held in Tirana, Albania.  At the conference, Dr Saleh outlined to me the business opportunities for foreign investors in Albania.  He described Albania to me as an emerging market with excellent investment opportunities.   He told me that there was no sugar in Albania and good returns were to be made from importing sugar provided the opportunity was seized quickly.  Dr Saleh had no capital but he was able to offer to our joint enterprise his expertise and contacts within Albania.  We agreed to share profits.  We started trading activities, slowly and on a trial basis, importing sugar through a company called **Loks Holl Sh.P.K. ("Loks Holl")** registered in Albania.  These transactions yielded exceptional returns.  We then expanded our activities to rice, wheat and other food stuffs.

150.    I also started other business activities in Albania sharing the profits with Dr Saleh:

150.1 **Real Estate:**   Following the collapse of communism, for the first time in 40 years Albanian citizens were permitted to own real property. There was a shortage of liquidity in the real estate market, and many of the new land owners wished to sell.  Dr Saleh and I decided to start a real estate business by arranging to purchase properties from new owners, who were keen to liquidate their assets, which resulted in good discounts

KADI0002275

being available. We carried out this business through **Lojall**, also registered in Albania. The properties we purchased included **warehouse/store space in Tirana**, purchased in order to store our imports of sugar, rice and wheat and also pharmaceuticals for our pharmaceutical distribution business described below; six **shops** on the main Dursee Street in Tirana; four **flats**; two **villas**; a small covered **market**; two pieces of **land** and a **carpet shop**.

150.2 **Pharmaceuticals**:  This business started in 1994 for the import and distribution of medicines through a company called **Medicare SH.P.K. ("Medicare")**, once again registered in Albania.  As before, I shared profits with Dr Saleh.   We succeeded in being appointed the main distributors in Albania by such leading pharmaceutical companies as Beecham and Merck and became the main contractors and suppliers of intravenous fluids to the Albanian Ministry of Health hospitals.

151. Following the success of these businesses, in 1995 Dr Saleh and I started a construction and property development business which we carried on through **Karavan**, a company registered in Albania.  Once again, Dr Saleh and I shared the profits of this company.  The first project was Dursee Street Building, which I have already described above, which we developed in a 50/50 joint venture with a locally registered company called **Alinted SH.P.K. ("Alinted")**.  Alinted was an investment holding company formed by Dr Yamani, and some of the other leading Saudi Arabian investors who had attended the 1993 conference in Tirana sponsored by the IDB.

KADI0002276

152.  Through the same joint venture company, Karavan, in 2000 we began to develop the Boulevard Towers in the city center of Tirana. The present status of this development is that Karavan owns a share of the development and the remainder is owned by local Albanian shareholders and Dr Saleh. At the time of freezing of my assets in Albania the development was partly completed. The Boulevard Towers comprise two office towers built over a three storey shopping center. I understand that construction of the towers is continuing.

153.  Due to the change in economic conditions in Albania in 1997, including the financial pyramid schemes which collapsed in early 1997, I ceased all my business activities within Albania by 1998 with the exception of the pharmaceutical distribution business, which I ceased in 2000 upon the resignation of its General Manager, and the property development at Boulevard Towers, which I have continued.

**Kazakhstan**

154.  I have never been to Kazakhstan, nor have I ever visited Russia or any of the former Soviet Republics. During the pilgrimage season in Saudi Arabia in 1990 (the Hajj) I met Dr Yahia Khairy Abdul Rahman through a mutual acquaintance, Soliman El-Khereiji. The latter had already had business dealings with Dr Yahia. Dr Yahia, a US citizen, is a banker active in the field of Islamic banking, who is based in California. A copy of his resume is at pages 202 to 205. In 1992, the various Governments of the newly independent Central Asian Republics invited Dr Yahia to visit them for the purpose of considering foreign investment opportunities. After the dissolution of the former Soviet Republics, Dr Yahia identified Kazakhstan as an emerging market ripe for foreign investment. Many

KADI0002277

major multi-national corporations, especially those in the oil and gas sector, were at that time investing in Kazakhstan.

155.  On September 22 1993, Dr Yahia formed Kazakhstan American Finance House Lariba, a Nevada Corporation.  I understand Kazakhstan American Finance House Lariba received appropriate approvals from both the UK and US banking authorities.  Dr Yahia asked me to subscribe to this company and to invest in an interest free bank in Kazakhstan, named "Lariba Bank".  I agreed.  I now understand that Kazakhstan American Finance House Lariba was dissolved in October 2000.  I hold my shareholding directly in Lariba Bank.  Apart from my shareholding in Lariba Bank, I have never had any commercial interests or charitable activities in Kazakhstan.

**Bosnia**

156.  After the 1995 Dayton Peace Accord the prospects for social and economic regeneration in Bosnia seemed promising.  Accordingly, I was happy to be part of that reconstruction process of the country and commit investment to it.    In addition to this I was concerned to create employment opportunities for the people of that country who had suffered during the war in the 1990s.  I therefore decided to make investments in the region.

**Depozitna Bank**

157.  In May 1996 I purchased a majority holding in Depozitna Bank, based in Sarajevo.  As a business proposition, I found the idea attractive, not least because, assuming things continued to normalise, I would end up with a bank which benefited from a European banking licence.  In addition to this the price

KADI0002278

was right. I purchased a majority shareholding and Chafiq Ayadi, who has Bosnian nationality, held the shares as nominee for me. It was a requirement under local law that the shareholders of a Bosnian bank be of Bosnian nationality. The other shareholders were parties unconnected to me. Apart from seeking a good return on my investment my aim in making this investment was to help the financial infrastructure in Bosnia. I also planned at that time to run Depozitna Bank in accordance with Islamic precepts (in other words, no usury). I was never involved in the day to day activities of Depozitna Bank and the Bank was managed by its Executive Director Suad Sahovic. Following the sale of some of my shares, my stake was reduced in about 1999 as part of an exercise in raising capital, and in 2001 the bank merged with Vakufska Bank in which I now hold a minority interest.

158.    In addition to Depozitna Bank I made other investments in Bosnia. I invested in a company called Euroinvest, which was set up in April 1996, with an office in Sarajevo. It was officially registered with the Court in Sarajevo on April 24 1996. I am still a majority shareholder in Euroinvest although the company ceased its activities in 1998 because of appalling losses suffered by it and the level of debts owed to it. I refer to a copy of Euroinvest's current and historic list of debtors (pages 206 to 207) from which it will be noted that all its debtors are local Bosnian individuals or companies. Euroinvest continues to exist but only for the purpose of collecting trading debts owed to it. In addition Waa'el Julaidan is a minority shareholder in Euroinvest. He came to be a shareholder in this company by way of reward for the assistance he provided to my charitable activities in Bosnia.

KADI0002279

159.   When Euroinvest was set up by Chafiq Ayadi I invested capital to cover its initial
       costs and to purchase equipment such as trucks, cars, forklift trucks and cranes.
       In the period 1996-99 Chafiq Ayadi was the sole director, and he operated and
       managed the company on a day to day basis.   The company imported
       commodities for sale from abroad, such as oil, sugar and flour. I acted as the
       guarantor of its activities with Faisal Finance for the funds required for these
       purchases throughout this period. Until 1998 it was an active company and in the
       period 1996 to 1998, it imported goods to a very substantial value.   Unfortunately
       the company floundered because Chafiq Ayadi sold a substantial quantity of
       goods on credit to local Bosnians in order to help them establish themselves after
       peace in the region following the Dayton Peace Accord. Many of these customers
       were not in a position to pay for the goods they had purchased.   As a result of
       this Euroinvest's level of debtors reached a level where trading could no longer
       be sustained due to Euroinvest's debts not being paid.    Although a shareholder
       and guarantor of the business, I have played no active management role in it.
       When Chafiq Ayadi left Euroinvest, he recruited Tarik Swadi, a Bosnian citizen, to
       take on his role.   I did not personally recruit Tarik Swadi and know nothing of his
       background save that he was one of the employees of Euroinvest, and hired and
       retained by Chafiq Ayadi.

**Other investments in Bosnia**

160.   In addition to Euroinvest I invested, in the period since April 1996, in other
       companies in Bosnia

KADI0002280

**KA Stan**

161.   I was a majority shareholder in KA Stan until the company was dissolved by means of a Court decision dated January 24 2001.

162.   KA Stan was set up in March 1996, and also had offices in Sarajevo.  It was officially registered with the Court in Sarajevo on March 1 1996.   The shareholders were myself and Waa'el Julaidan and Chafiq Ayadi.  Waa'el Julaidan came to be a shareholder in this company by way of reward for the assistance he provided to my charitable activities in Bosnia.  KA Stan ceased work in 1999 and was dissolved, as I have mentioned, on  January 24 2001. KA Stan was a construction company, which was responsible for a number of large projects in Bosnia, including construction of houses, a Mosque, restoration of Risala School and student housing.  The company ceased to be financially viable during the course of 1998, with its expenses outstripping its income.

163.   As with Euroinvest, I played no active management role in the company which was run by Chafiq Ayadi, the sole director until 1999, and by Tarik Swadi from 1999 until its dissolution on January 24 2001.

164.   Other investments I had in Bosnia are as follows:

164.1  Shareholding in KA Profarm, formed in 1996 for farming, agriculture and fisheries.  It ceased work in 1998 and now trades solely for the collection of debts owed.

KADI0002281

164.2    6 homes bought by Chafiq Ayadi in 1996 in Sarajevo. Since foreign individuals were not at that time permitted to own property in Bosnia, these were bought by Chafiq Ayadi as nominee for me. 3 are now sold.

164.3    I am a minority shareholder in a company called Mahmal Confectionary Company registered in Sarajevo, Bosnia.

**Saudi Arabian Financiers**

165.    At the meeting on August 1 2002, Mr Newcomb asked for details of my relationships with other wealthy Saudi Arabian citizens or entities who are in a position of providing finance. I now describe these:

**Al Barakah Bank**

166.    I now describe my relationship with Al Barakah Bank:

166.1    As described in the section on Sudan above, I have transferred funds for investment to Al Shamal Bank via Al Barakah Bank, London in the period 1990 to 1992. In all my dealings with Al Shamal Bank I never had any knowledge of the identity of any other client or investor with that bank or any of its correspondent banks or any financial institution associated with it. Until my lawyers advised me of the allegation in the Burnett civil law suit that Al Barakah Bank supported Al-Haramain Charity and Osama bin Laden, I was not aware of any alleged link between Al Barakah Bank or any of its associated institutions, investors or clients and Osama bin Laden and/or Al-Haramain Charity.

KADI0002282

166.2   In addition to this, until 1997 I invested in an investment fund through Leemount Limited. This investment fund was managed by Al – Tawfeek Co for Investment Funds, CR 432500 of the Cayman Islands, which is member of the Dallah Al-Baraka Group.  A copy of a valuation report for this fund  is at page 208. My interest in this investment fund was liquidated by the end of December 1997.

166.3   I have never transferred any funds to Al Barakah Bank or any individual or institution associated with it  – or any other individual or entity – for the purpose of supporting any terrorist group or activity, including Osama bin Laden or Al-Qaeda.

**Dar Al – Maal Al Islami Trust**

167.   This is the holding company of Faisal Finance (Switzerland) SA, a well known financial institution incorporated in Switzerland with which I have invested for the past 12 years.  It also owns Faisal Islamic Bank, with which I have invested because of it's Islamic banking services.  After I began investing in the bank, I met socially its head, H.R.H. Prince Mohammed Al Faisal Al Saud.

**Bin Laden Group**

168.   In 1999 I invested in Global Diamond Resources Inc., a US company.  I was appointed to the board of directors of Global Diamond Resources as a nominee of New Diamond Holdings Limited, incorporated in the British Virgin Islands, a family company owned by me and my wife on behalf of our children. The Bin

KADI0002283

Laden Group is also a shareholder in Global Diamond Resources. I point out that, as is well known, the Bin Laden family, who own the Bin Laden Group, have publicly disowned Osama bin Laden. I have already provided OFAC with details of my investment in Global Diamond Resources. My investment in Global Diamond Resources should not, therefore, be understood as implying any form of link or support or sympathy for Osama bin Laden or Al-Qaeda. To the best of my knowledge Osama bin Laden has no shares or interest in Global Diamond Resources.

**Mr Yahya bin Laden**

169. **Yahya bin Laden** is a brother of Osama bin Laden. As is well known Osama bin Laden has more than 50 brothers and sisters. I know him as he is on the board of trustees of Dar El Hekma College.

**Mr Zuhair H Fayez**
**Mr Qays Julaidan**
**Mr Hussain Shobokshi**

170. These three gentleman are also on the board of trustees of Dar El Hekma College. In addition to this I have a limited business relationship with Qays Julaidan as he is associated with the Abrar company of Saudi Arabia as I have described above.

**Mr Saleh Kamel**

171. I know him socially. He is a well known financier and media magnate in Saudi Arabia and elsewhere in the Muslim world. He owns Al Barakah Bank and has also contributed to Dar Al-Hekma College in Jeddah. He was part of the Saudi

KADI0002284

delegation of investors who attended the conference in Sudan as described above.

**Dr Mohamed Abdu Yamani**

172.   I know him as a friend of my maternal uncle and as a friend of my family. He was part of the Saudi delegation of investors who attended the conference sponsored by the IDB and the Albanian Government which I have mentioned above. He is the former Saudi Information Minister.  He is a shareholder in Alinted in Albania which is a partner of mine in Karavan. Apart from this I have never had any business relationship with him.  I have known him socially for many years.

**Mr Khalid bin Mahfouz**
**Mr Abdul Rahman bin Mahfouz**
**Mr Sultan Khalid bin Mahfouz**
**Mr Rais bin Mahfouz**

173.   I refer to the relevant paragraphs above for my account of my relationship with these individuals.  I also invested in a Vancouver registered diamond prospecting company called MIT Ventures Corp. in June 1999.  I have recently learned that a year before, Abdul Rahman bin Mahfouz and his brother Sultan Khalid bin Mahfouz invested in MIT Ventures in 1998 through their private company Al Murjan Minerals.  My interest in MIT Ventures was held through New Diamond Holdings Limited, a British Virgin Islands company.

KADI0002285

**Mr Talal Badkook**

174.     As I describe above, I worked for him for one year and suggested his name to KBM as a trustee of the Foundation. I have known Talal Badkook since I worked for him in the late 1980's. To the best of my knowledge he has never had any connection whatsoever with any terrorist group or activity including Osama bin Laden or Al Qaeda. My relationship with him is solely and exclusively concerned with the work I carried out for his company in the late 1980's, and his trusteeship of the Foundation from 1992. Our relationship has never been concerned with any issues relating to Osama bin Laden or Al-Qaeda.

**Dr Mohamed El Gheiri**

175.     He was the General Manager of NMCC at the time of NMCC's consultancy agreement with NCB. We worked closely together on developing Islamic banking products for NCB. He is a leading expert in Islamic Economics and holds a doctorate in this subject. I nominated him as a trustee of the Foundation.

**Abdul Gani El Khereiji**

176.     I know him as a friend. He is involved in the construction business. He headed the Al Andalus school in Jeddah. I would not describe him as a financier. I am a shareholder with him in Dar Ul Ilm school, which I describe above. I nominated him as a trustee of the Foundation.

**Mr Saleh Al-Turki**

177.     Mr Al-Turki is the owner of an engineering and construction company NESMA and also other diversified interests in Saudi Arabia and internationally. He holds

KADI0002286

minority investments in 2 investments I have: Vakufska Bank in Sarajevo and Mahmal Confectionery Company.

**Article in the Wall Street Journal dated November 26, 2002 by Glenn Simpson**

178.   I now respond to the allegations published about me in an article entitled "Businessman's Actions Show How Saudi Money May Get To Extremists", published in the issue of the Wall Street Journal dated November 26 , 2002 ("the Article"). I was disturbed to read the contents of the Article given that prior to its publication, my English lawyers had provided its author, Mr Simpson, with information and clarification which unequivocally refuted the allegations which subsequently appeared in the Article. For the same purpose, my US lawyers, prior to publication of the Article, met with Mr Simpson and went through the main allegations which form the substance of the Article demonstrating to him that there was no foundation to them. It would appear Mr Simpson ignored what he learned in these meetings to write a sensationalist article concerning me and my activities.

179.   This Article alleges that there are very strong grounds to suspect me of knowingly supporting HAMAS, Osama bin Laden and Al-Qaeda; that I am connected with the bombing of 2 US Embassies in East Africa in August 1998 through investments I made in BMI, Inc.; and that through an investment I made in Abrar Investments Inc. I have assisted in financing the manufacture of explosives.

180.   Each and everyone of these allegations is totally untrue. The Wall Street Journal purport in their Article to support these allegations by referring to 3 issues which are as follows:

KADI0002287

180.1   My financial support for the Quranic Literary Institute of Chicago, Illinois ("QLI").

180.2   My investment through a New Jersey company formerly owned by me, Kadi International Inc., in a real-estate and leasing company, also incorporated in New Jersey, named BMI, Inc.

180.3   My investment in Abrar Investments Inc. of Stamford, Connecticut.

I respond to each of these issues in turn:

**Quranic Literary Institute of Chicago, Illinois ("QLI")**

181.    I refer to my supplemental witness statement dated July 23 2002 (my "Supplemental Witness Statement"), copies of which have been provided to OFAC. In my Supplemental Witness Statement I have provided a point by point rebuttal of the US Government's Verified Complaint for Forfeiture in *USA v. One 1997 E35 Ford Van et al Civil Action No. 98 C 3548* ("the forfeiture proceedings") and the affidavit of FBI agent Robert Wright sworn on June 9 1998 in those proceedings ("the Robert Wright Affidavit"). As I demonstrate in my Supplemental Witness Statement, the Robert Wright Affidavit, which is the basis of the US Government's Complaint in the forfeiture proceedings, contains numerous fundamental mis-statements of fact; it omits at least one material fact which I believe must have been within the knowledge of the FBI at the time Robert Wright swore his affidavit; and it provides a wholly mis-represented account of the transaction with which I was involved concerning the Woodridge,

KADI0002288

Illinois property. Given these points, which I amplify in detail in my Supplemental Witness Statement, the Robert Wright Affidavit should be understood as based essentially on errors, a lack of proper analysis and unjustifiable inferences.

182. In light of the above, I do not propose in this statement to repeat the contents of my Supplemental Witness Statement save in respect of the specific issues relied upon by the Wall Street Journal in the Article.

183. The Article refers to allegations in the Robert Wright Affidavit (paragraph 33) that

"The [Woodridge land] transaction resulted in the Quranic institute [QLI] "gaining possession and ownership of the Woodridge property in a manner that obscured its connection to the overseas transfer of $820,000 from the Saudi entity [K]adi International".

184. There was nothing illegal, sinister or concealing in the Woodridge land transaction which was conducted in accordance with normal business practices. At no stage was it ever my intention to conceal my involvement in the Woodridge land transaction or my interest in the land, which I held through Kadi International, Inc., a company incorporated in New Jersey, USA, bearing my name and most obviously associated with me. I have never concealed my connection with QLI; the Annual Reports of QLI for the years 1994-1998, all of which are publicly available documents, all list me as one of the directors of QLI. There are, in addition to this, numerous documents connected with the Woodridge land transaction which recognise or otherwise reference myself or Kadi International, Inc. as a party with an interest in or otherwise connected to

KADI0002289

the Woodridge property.  Of these, the deeds of transfer of the Woodridge land are publicly available documents.

185.   The Article also alleges that QLI:

> **"sold the Woodridge property in 1994 for more than the initial purchase price but never repaid [my loan of] $820,000"**

and implies that some or all of these funds were used to support terrorism.

186.   This allegation is, once again, totally untrue: when QLI sold the Woodridge property in 1994, the proceeds of sale were put into a bank account and remained there largely undisturbed  for 4 years. During this 4 year period QLI continued  their  charitable  activities  and  were  engaged  in  finding  suitable premises. To this end they made various offers to purchase property at 17972 East 9000 North Road, Grant Park, Illinois. QLI's bids were all rejected. By the Spring of 1998 QLI had found suitable premises which they were preparing to purchase at the time of the forfeiture proceedings in 1998. The premises QLI were negotiating to acquire were the Reformed Church of Palos Heights located at 6600 W. 127th Street, Palos Heights, Illinois. In fact by May 1998 QLI's attorney had prepared a draft contract for the purchase of this building. There is thus no evidence that these funds were ever used to fund any illegal or HAMAS related activities, but they were intended to buy premises for QLI to use as a Mosque.

187.   The Article further alleges:

KADI0002290

> "**According to FBI agent Wright 1998 Affidavit, Mr Salah received most of about $110,000 in income generated by the Woodridge property.**"

188.   Once again, this allegation, which appears in paragraph 31 of the Robert Wright Affidavit, is totally untrue. Robert Wright's allegation is that rent proceeds were in effect funnelled from QLI to Mr Salah via Faisal Finance by means of QLI's endorsement of rent proceeds due to QLI from the lessee of the Woodridge property. However the entire factual matrix underpinning this allegation is totally false in fundamental respects. The true facts are: rent cheques in respect of the Woodridge property were never endorsed, as alleged in the Robert Wright Affidavit, to Faisal Finance or, so far as I am aware, to any party connected with me. They were endorsed to North America Islamic Trust ("NAIT") a body which manages funds on behalf of Islamic communities in North America and which invests in non-interest bearing instruments. QLI in common with other Islamic institutions maintained a regular account with NAIT. Moreover, the date Robert Wright alleges QLI endorsed the rent cheques occurred **after** my faxed instructions to Faisal Finance to send the first transfer to Mr Salah. If the rent had been funnelled as alleged by Robert Wright from QLI via Faisal Finance to Mr Salah one would expect QLI's endorsement of the rent cheques to have occurred **before** any instruction from me authorising the transfer of funds to Mr Salah. Furthermore, there is no allegation anywhere in the Robert Wright Affidavit that these monies were connected in any way with any HAMAS related purposes or any unlawful activities whatsoever.

KADI0002291

189.    In my Supplemental Witness Statement I have effectively refuted each and every allegation referring to me contained in the Robert Wright Affidavit, I have proved that the transaction with which I was involved was entirely legitimate and conducted and negotiated by lawyers acting on both sides. It is unfortunate that the Wall Street Journal are relying for the purposes of the Article on the Robert Wright Affidavit which I believe has been thoroughly discredited.

**BMI, Inc.**

190.    The article alleges that through my investment in BMI Inc. I am connected with financing "the Embassy bombings in Africa".   Once again, this allegation is completely untrue.

191.    In 1991, I decided to invest in a company named BMI, Inc. based at Secaucus, Newark in New Jersey, USA. BMI, Inc. carried out real estate business activities and subsequently leasing activities.   The company interested me as an investment opportunity as it adhered to Islamic principles of investment. Specifically, the leasing activities related to medical equipment which was a field I have some experience and knowledge of from my first business in the late 1970's as sole agent in Saudi Arabia of American Hospital Supplies.

192.    BMI, Inc. suggested to me that part of my investment in the company should be held through a new corporation, Kadi International, Inc. I agreed to let them establish Kadi International, Inc. for me.  BMI, Inc. registered Kadi International, Inc. with a registered office c/o BMI, Inc. at their address in Secaucus, New Jersey.

KADI0002292

193.    The Article alleges that BMI "described itself as an Islamic bank".  So far as I am aware, this allegation is untrue as BMI was never licensed as a depository institution and BMI described itself as an Islamic financial institution.  The Article alleges that BMI "solicited investments by means of pamphlets distributed at Muslim gatherings".  So far as I am aware this allegation is also untrue: I refer to copies of promotional literature BMI supplied to me, at pages 209 to 218, as a potential private investor.

194.    As I have stated, my investments with BMI, Inc. in the company's real-estate and leasing investment funds, were passive and were entirely innocent.  At the time of my investment in BMI I was totally unaware of the identity, nature or activities of any other investors in BMI. I am not aware that BMI, Inc. has ever had any connection with Osama bin Laden, Al-Qaeda, Mousa Abu Marzouk, International Relief Organisation or Sulaiman Al-Ali or Mercy International as alleged in the Article.  It follows that the allegation in the Article that I am connected, through my investment in BMI, Inc., with the bombing of 2 US Embassies in East Africa in August 1998 is totally baseless and untrue.

195.    In 1995 I became unhappy with my investment in BMI, Inc. and decided to withdraw my investment.   I instructed BMI, Inc. to terminate my relationship with them, dissolve Kadi International, Inc. and return my investment.   In this regard I refer to the documents appearing at pages 219 to 229.

196.    On June 17 1996, my Chief Accountant, Masood Syed, spoke to BMI who reported on progress concerning the withdrawal of my investment from the company.   As will be seen from Masood Syed's memorandum of his

KADI0002293

conversation to me  (page 226) BMI expected that by the end of June 1996 the appropriate documentation would be received from the competent US tax authorities and "Then the company [Kadi International Inc.] will be officially dissolved and final distribution will be made to close down the affairs".

197.   I would also refer to page 230 being the Certificate of Dissolution of Kadi International, Inc., dated December 5 1996.

198.   In 1996 I learned that there were other investors with BMI who were also unhappy with BMI, Inc. In November 1996 my Chief Accountant Masood Syed made a request to the Office of Investor Education and Assistance of the Securities and Exchange Commission for copies of investor complaints filed with the SEC against BMI. The SEC supplied copies of the investor complaints to Mr Syed with the names and identifying details of the investors concealed. These documents together with the SEC's covering letter to Mr Syed are at pages 232 to 244. They show  that BMI was making distributions to shareholders far in excess of the profits BMI earned and were thus distributing part of BMI's capital as profit.

199.   In conclusion therefore I would say that my investment in BMI, Inc. was an innocent passive investment, and I was not involved in the day to day activities of the company, any management decisions or any decisions regarding the company's allocation of investments. I along with other investors suffered as a result of the company's activities and its distributions of capital to shareholders.

KADI0002294

**Abrar Investments Inc.**

200.    The article alleges that through an investment I made in a US company, Abrar Investments Inc. I have assisted in financing the manufacture of explosives by Global Chemical Corporation, an Illinois corporation.

201.    The basis for this allegation is tenuous in the extreme: it appears, from the Article, to be based on an affidavit by FBI agent, Valerie Donahue, in an investigation by the FBI concerning "possible mail and wire fraud and money laundering" by Global Chemical.  From this affidavit it would appear that Global Chemical Corporation was involved in fraud and that Abrar Investments Inc. was one of the  victims of the fraud.  There is no indication in Ms Donahue's affidavit that Abrar Investments Inc. had any knowledge of any allegedly inappropriate activity by Global Chemical Corporation nor is there any mention of me in that affidavit.

202.    The true position is this:  in May 1993 I placed the sum of US$ 1 million with Abrar Investments Inc., USA ("Abrar USA"), a US based fund management company. I intended Abrar USA to invest these funds in public companies in the USA. Subject only to this, Abrar USA, as fund manager, had complete discretion as to all investment decisions.  In the period 1993 – 1995, Abrar USA reported satisfactorily on the state of my investment.  However, subsequently, my staff stopped receiving regular reports.  In late 1998, I instructed my Chief Accountant, Masood Syed, to check on my investment and he discovered, for the first time, that a sum of money had been invested by Abrar USA in a company named Global Chemicals.  Thus, the first I ever knew about the investment in Global Chemicals was in late 1998, some years after the investment had apparently

KADI0002295

been made. I have never had any knowledge of what other funds were invested by Abrar USA in Global Chemicals or what other investors' funds Abrar USA had mixed my funds with.

203.   Moreover, I add that nowhere in Valerie Donahue's affidavit is there any evidence or even any allegation that Global Chemical was in fact engaged in any bomb or explosive manufacturing activities, and so the allegation in the Article that it was appears to be based entirely on speculation.

204.   In summary, I would state that I gave Abrar USA complete discretion to manage my funds on my behalf, at the time of Abrar USA's investment in Global Chemicals I was completely unaware of it, and it was not until some years later, in 1998, that I first became aware of the investment in Global Chemicals following the investigation carried out by Masood Syed.

**Summary**

205.   In summary, I make the following points about the basis on which US and UK Treasury have placed me on their Specially Designated Global Terrorists lists. In a Witness Statement of Mr Joseph Halligan, assistant secretary at the UK Treasury, dated November 16 2001, Mr Halligan states that on the morning of October 12 2001 he was given a fax from the US Treasury Department dated October 11 2001, which included details about me. I shall refer to this as the "US Treasury Department's fax". A copy of the US Treasury Department's fax appears at pages 1 to 2. The US Treasury Department's fax is the only document my lawyers have ever received setting out what I understand to be the

KADI0002296

allegations against me. I believe I have refuted the allegations in the US Treasury Department's fax in detail as I explain and summarise below.

**QLI**

206.    The primary basis on which US and UK Treasury have placed me on their lists (and I would add the **only** piece of evidence cited in footnotes to the US Treasury Department's fax, which is not hearsay) appears to be my financial support of QLI, and the allegations against me in the Robert Wright Affidavit.   Having investigated this fully, I have refuted each and every allegation referring to me contained in the Robert Wright Affidavit. I have shown the Robert Wright Affidavit to contain numerous fundamental mis-statements of fact and a wholly mis-represented account of the transaction with which I was involved concerning the Woodridge, Illinois property.  I believe I have demonstrated that the allegations in the Robert Wright Affidavit are based essentially on errors, a lack of proper analysis and unjustifiable inferences. In this regard I refer to my Statement dated December 17 2001 ("my First Statement"), paragraphs 23-45, my Supplemental Witness Statement, paragraphs 15-99 and paragraphs 181 to 189 above.

**The Foundation**

207.    I have explained in detail my extensive charitable activities, conducted through the Foundation.   My solicitors have examined an enormous quantity of documentation and have interviewed numerous witnesses, including former employees of the Foundation and have found no evidence whatsoever that any transaction benefited or was intended to benefit Osama bin Laden, Al-Qaeda or any other terrorist activity or group.  There is no basis for concluding that there was anything illegal or improper about my support of the Foundation's

KADI0002297

considerable charitable endeavours.  In this regard I refer to my First Statement, paragraphs 9-14, my Supplemental Witness Statement, paragraphs 10-13, and my detailed account of my charitable activities through the Foundation appearing in paragraphs 24 to 132 above.

**Chafiq Ayadi**

208.  I have shown that Chafiq Ayadi was the European Director of the Foundation from 1992-1996 and that during this period I transferred substantial sums of money to the accounts of the Foundation in Bosnia and Croatia through European correspondent banks for the charitable objectives of the Foundation and specifically to further the Foundation's considerable charitable objectives and purposes in Bosnia and Croatia.  I have never transferred any funds, to Chafiq Ayadi or anybody else, for the purpose of supporting Osama bin Laden, Al-Qaeda or any other terrorist group or activity nor have I ever seen any evidence that any funds I did transfer to Chafiq Ayadi have actually been used for any such purposes.   In this regard I refer to my First Statement, paragraph 15, my Supplemental Witness Statement, paragraphs 9-13 and paragraphs 67 to 89 above.

**FBIS Article**

209.  I believe I have demonstrated that it is highly improbable that the so-called "interview" with bin Laden ever took place and that the FBIS article, aside from being a hearsay document, and of no evidential value at all, is wholly unreliable. In this regard I refer to my First Statement, paragraphs 16-21 and paragraphs 74 to 80 above.

KADI0002298

**USA Today Article**

210.    I believe I have demonstrated that the Foundation never had any account with the National Commercial Bank (NCB).  I have shown that NCB management have vehemently denied the existence of any Saudi Government audit showing that money had been diverted to the Foundation and transferred to bin Laden and described the allegations as "incorrect, false and frivolous".  I have also shown that the USA Today article repeats allegations made in 1995 in the London-based magazine, Africa Confidential, which were totally discredited in proceedings for libel which I and my fellow trustees commenced in 1995 in the High Court in London against the Editor and Publisher of Africa Confidential.  In this regard, I refer to my First Statement, paragraphs 22-22.3, and paragraphs 40 to 43 above.

**Global Diamond Resources**

211.    I believe I have demonstrated that contrary to the allegations in the US Treasury Department's fax, and as is perfectly clear from publicly available documents, I served on the Board of Directors of Global Diamond Resources as a nominee of New Diamond Holdings Limited.   It is totally untrue, as alleged in the US Treasury Department's fax, that I served on the Board of Global Diamond Resources as a representative of one of two "foreign, anonymous, investor groups" an allegation which is calculated to create the most mysterious and sinister of impressions about me. In this regard I refer to my First Statement, paragraph 47 and paragraph 168 above.

PCR1-180007.1                                    97

KADI0002299

**Shifa International Hospitals**

**MM Badkook Co. for Catering & Trading**

212.   It is unclear to me on what basis, if any, my involvement with these entities is a separate ground of criticism against me. I have explained my involvement with these entities in detail, which is completely innocent. I refer to my First Statement, paragraphs 48-49 and paragraph 9-11 above and paragraph 174 above. In regard to Shifa International Hospitals I also refer to paragraphs 55 to 62 above.

**Al-Abrar Group International**

**Abrar Investments Inc. (Abrar USA)**

213.   It is unclear to me what, if any, wrongdoing Al-Abrar Group International is alleged to have carried out and on what ground this allegation is a separate basis of criticism against me. As I have demonstrated in paragraphs 200 to 204 above, my investment with Abrar Investments Inc. was completely innocent and I am not aware that any of the funds I invested with this company were used to support any terrorist group or activity. In relation to Al-Abrar Group International Inc. I would also refer to my First Statement, paragraphs 50 to 51.

**My so-called brother "Omar Al-Qadi" and Mercy International**

214.   I have demonstrated that I do not have any brother. As is very well known in Saudi Arabia, I am the only son of my parents and have 6 sisters. It frankly is beyond belief that the US Treasury Department, followed by HM Treasury in the UK, have apparently based their allegations against me in part on my having a so-called brother who is supposedly a director of Mercy International, an

KADI0002300

allegation which the most basic of enquiries would have revealed to be false. The statement regarding the relationship between someone called Omar Al-Qadi and me is completely untrue. Since the case against me is based, in so easily verifiable a matter, on a factual error, I am very concerned that the other allegations, which are even more vague and subjective, should equally be understood as based essentially on errors and a lack of proper analysis. In this regard I refer to my First Statement, paragraph 52, and paragraph 13 above.

## Conclusion

215.   For the avoidance of doubt I would reiterate that none of my dealings or relationships with the individuals or entities I have mentioned above have ever been involved to my knowledge with supporting terrorism, Osama bin Laden, Al-Qaeda or any terrorist group or activity. I have made full and frank disclosure in response to all the questions raised by Mr Newcomb at the meeting on August 1 2002. My lawyers have spent literally thousands of hours reviewing documents and interviewing witnesses and have found no evidence that I intended any of my activities to benefit Osama bin Laden, Al-Qaeda or any terrorist group. I believe that the burden now falls upon OFAC to identify precisely what matters (if any) would justify maintaining sanctions against me. The basis of the case against me seems to be that I am a wealthy Saudi Arabian businessman who has made substantial charitable donations throughout the world. I believe I have fully explained when and why such donations were made. It is now over a year since my assets were frozen on a worldwide basis as a result of the actions of the US authorities.

KADI0002301

I believe I am a victim of a gross miscarriage of justice. Accordingly, I now ask that my assets be de-listed by OFAC without any further delay.

I believe that the facts stated in this statement are true.

Signed ....................................
Yassin Abdullah Kadi

Dated .... December 19th, 2002

100

KADI0002302

believe I am a victim of a gross miscarriage of justice.  Accordingly, I now ask

that my assets be de-listed by OFAC without any further delay.

I believe that the facts stated in this statement are true.

Signed ........................................        Dated ........................................
   **Yassin Abdullah Kadi**

100