# EXHIBIT X

Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's Motion
To Exclude the Testimony of Victor Comras

03 MDL 1570

July 31, 2023

~~TOP SECRET~~                                E.O. 13526, section 1.4(c)

## MEMORANDUM FOR THE RECORD

Event: Interview of Patrick J. Fitzgerald
Date: January 28, 2004
Special Access Issues: ~~TS~~/SCI
Prepared by: Yoel Tobin & Doug Greenburg
Reviewed by: Doug MacEachin
Team Numbers: One & Four
Location: Department of Justice Command Center
Participants:   9-11 Commission: Doug MacEachin, Yoel Tobin, Doug Greenburg
                Justice Department: Faith Burton

DECLASSIFIED UNDER AUTHORITY OF THE INTERAGENCY SECURITY CLASSIFICATION APPEALS PANEL, E.O. 13526, SECTION 5.3(b)(3)
ISCAP APPEAL NO. 2012-048, document no. 11
DECLASSIFICATION DATE: July 8, 2015

### INTERVIEWEE BACKGROUND

(U) Mr. Fitzgerald graduated law school in 1985. He worked from 1985-1988 at a law firm. He became an Assistant United States Attorney in the Southern District of New York in 1988. He began working on the Landmarks case in the spring of 1994, and participated in the trial of that case from January 1995 to October 1995. From December 1995 until August 2001, he served as co-chief of the Organized Crime and Terrorism Section in the Southern District. In 2001, he participated in the Embassy Bombings trial. He became Interim United States Attorney for the Northern District of Illinois in early September 2001, just before the 9/11 attacks. He was confirmed as United States Attorney for that district in October 2001, and currently serves in that capacity.

(FOUO) Mr. Fitzgerald remarked that he stayed current on intelligence and other information relating to al Qaeda until the start of the Embassy Bombing trial in February 2001.

### RECOGNITION OF USAMA BIN LADEN AS A THREAT

(LES) Mr. Fitzgerald stated that through the end of 1995, Usama bin Laden's name had come up, but not prominently. Mr. Fitzgerald commented that no one thought he was what he was. For example, during the Landmarks trial, bin Laden was either not mentioned at all, or, at most, was mentioned only once, by a defense witness. In addition, the Government listed bin Laden on a list of potential coconspirators in that case, but this had little significance: there were 167 people on the list, the list was assembled under time pressure, and, for evidentiary reasons not pertinent to our inquiry, the benefit of the doubt went to inclusion rather than exclusion. (The government filed the list under seal to protect the reputation of the persons named, but the list nevertheless leaked immediately.) The evidence for listing bin Laden at the time was mainly from phone records showing potential connections of some kind.

(S) In late 1995 or early 1996, prosecutors in the Southern District of New York learned of a new CIA station focused on bin Laden, and were given access to the information that

~~TOP SECRET~~                                E.O. 13526, section 1.4(c)

1

~~TOP SECRET~~/                    E.O. 13526, section 1.4(c)

the CIA had collected. Upon reading the CIA materials in 1996, prosecutors were struck by bin Laden's connection to various jihads – but it was still unclear what bin Laden was doing, or how strongly connected he was: was he merely a rich person donating some funds, or was he a dedicated jihadist?

(FOUO) Mr. Fitzgerald said that the "light bulb" went on in 1996, with the defection of Jamal Fadl. Fadl was an invaluable source of information; the mystery was over, and it was clear that bin Laden was running a major terrorist organization. Fadl's information later played a very important role in the investigation and prosecution of the 1998 Embassy Bombings conspirators.

(C/LES) In relating these events, Mr. Fitzgerald made a point of commending the CIA for sharing information and access to Fadl with prosecutors. He also stated that he has complete confidence in Fadl's honesty, and believes that Fadl accurately remembered everything in which he participated. Fadl's recollection may not have been as good when he tried to recount what other people had told him about events in which he had not participated, plus he was not good at identifying photographs.

## THE NATURE OF AL-QAEDA

(FOUO) As noted above, Fadl revealed to the U.S. Government that bin Laden was actually running an organization. Although Fadl usually spoke of the "Islamic Army" rather than "al Qaeda," Fadl's use of the term "Qaeda" in mid-97 triggered Fitzgerald's recollection of a recorded 1993 telephone conversation in which the Blind Sheikh had asked a Pakistani interlocutor whether "Qaeda" bases had been closed because of Pakistani pressure.

(U) Mr. Fitzgerald distinguishes between "al Qaeda the organization"; "al Qaeda the network"; and the larger jihadi network.

(C) "Al Qaeda the organization" is made up of members who get paid by the organization, swear bayat to bin Laden, and agree to do whatever he wants them to do. So, for example, an al Qaeda member like Khaled al Fawwaz might be assigned to work at a training camp in Afghanistan, get transferred to Nairobi to set up a cell, and then be sent to London on yet another tasking.

(U) "Al Qaeda the network" is wider than al Qaeda the organization, and includes persons who work for al Qaeda on specific, defined projects, without becoming members or pledging unqualified allegiance. They are analogous to "contractors" who participate in al Qaeda directed projects.

(U) Finally, al Qaeda also interacts with the larger jihadi network. That network is made up of various independent or autonomous groups, whom al Qaeda may fund or train without directing their activities.

(LES) Mr. Fitzgerald recommended that for more on this topic we should look at an FBI 302 of an interview held in August 1998 with embassy bomber 'Owhali.[1]

(U) Mr. Fitzgerald also stated that bin Laden impressed many jihadists by fighting against the Soviets and spending a great deal of his own money to advance jihad, when he could have had an easy life in Saudi Arabia. He described Al Qaeda's core belief as the unification of all Islamic countries under one ruler, or caliph. This vision had a powerful effect on the various Islamist groups who were trying to gain power in their individual countries, and these groups increasingly saw themselves as part of a broader struggle for a unified caliphate. Anti-Western violence was one aspect of this broader struggle.

## THE 1993 BOMBING OF THE WORLD TRADE CENTER

(LES) Mr. Fitzgerald said that he has never been convinced that Al Qaeda was behind this attack, although he did not rule it out. He also said that there was a lot we still don't know about the attack. For example, the USG was never able to trace the source of the money used to fund the attack. When asked about bin Laden's reported $20,000 contribution to the El Sayyid Nosair legal defense fund, Mr. Fitzgerald stated that the government could never prove that bin Laden had ever made the contribution, let alone that part or all of it was diverted to fund the 1993 World Trade Center bombing.

(LES) He also said that we just do not know much about how it is that Ramzi Yousef and Ahmad Ajaj arrived in the United States carrying bombmaking manuals and clearly intending to blow something up. Nor do we know whether the U.S.-based conspirators were awaiting the arrival of Yousef and Ajaj; Mr. Fitzgerald thought it possible that there were no prior arrangements, and that Yousef went to a NY mosque looking for jihadis and found them.

(S/OC/NF) When asked about a statement by Fadl that Yousef had met bin Laden twice in Sudan in 1992, Mr. Fitzgerald noted that Fadl was not present at the alleged meeting and was merely relaying what someone else had told him. Mr. Fitzgerald did believe that Yousef was likely part of a larger international network at the time of the bombing. He also noted that Yousef may have joined Al Qaeda after the 1993 bombing, based on

---

[1] (LES/OC) We believe that Mr. Fitzgerald was referring to the following excerpt from an FBI 302:

> Subject was asked if [he] had ever taken a "Bayat" or an oath to Usama bin Ladin. Subject replied that it is not necessary to take a "bayat" to serve. Once you take the bayat you no longer have a choice in what your missions would be. After taking the bayat, you would be designated for a [certain] role (be it a body guard, cook etc.) and you would remain in that role until otherwise advised. If you were told to do a mission, you could not decline. However having not taken the bayat, subject advised that he could accept or decline whatever mission he wanted. Subject stated that he never took the 'bayat' though he was invited to do so. Subject had a strong desire to participate in military actions and was afraid that he might receive a non-combatant or logistical assignment with Al Qaeda because Al Qaeda assigns people to both military and supporting military roles. (FBI 302 reporting content of 'Owhali interviews held from August 22, 1998, to August 25, 1998, at 16).

Yousef's subsequent presence in Al Qaeda camps as well as credible reports that Yousef was working in 1994 on a Bin Laden funded effort to build poison gas bombs.

## THE LANDMARKS CASE

(TS) Mr. Fitzgerald discussed the involvement of Sudanese officials in the landmarks bombing plot. He said that there was no doubt that Sudanese diplomats were involved in the aborted jihadi plot to blow up the United Nations – they were taped talking to one of the defendants, and the incriminating tape or a transcript of it was introduced in court. He said that the United States Government responded by expelling Sudanese diplomats, but he does not know if any other action was taken. He did not know whether more senior Sudanese officials were involved as well, and suggested that an FBI intelligence unit in New York that focuses on the UN might know more.

(FOUO) Mr. Fitzgerald also noted that he had heard rumors that the Blind Sheikh's lawyers were funded by bin Laden.

## BOJINKA, OPM SANG, AND KHOBAR

(S) Mr. Fitzgerald indicated that the Bojinka attack appeared to him to be part of the "Al Qaeda network," based upon the involvement of Wali Khan, who was very close to bin Laden; the fact that Ramzi Yousef was in Al Qaeda camps after the 1993 World Trade Center bombing; and the conspirators' contacts with bin Laden brother-in-law Jamal Khalifa. He added, however, that the prosecutors who tried the case, Dieter Snell and Michael Garcia, have a better handle on this than he does.

(U) Mr. Fitzgerald stated that he did not know whether the November 1995 attack on OPM SANG in Saudi Arabia was a bin Laden operation or not.

(U) He also stated that he did not know if al Qaeda was involved in the 1996 Khobar Tower attacks attributed to Saudi Hezbollah, although he noted that al Qaeda was capable of working with Shia. (See discussion below on al Qaeda links with Hezbollah and Iran.)

## THE EAST AFRICA BOMBINGS

When asked about the August 1997 raid on the apartment of Wadi al Hage in Kenya, Mr. Fitzgerald said that prior to the bombings, the U.S. did not have a full picture of the Nairobi cell. The Government was interested in the Kenyan cell because of information from Fadl, recollections of Hage's connections with participants in the WTC1/Landmark cases,

(C) plan to raid the apartment (with assistance of Kenyan police) it was proposed that an FBI officer take part, so as to ease chain-of-custody issues if significant evidence was seized that might be useful in a future prosecution. and FBI officer Dan Coleman took part. The raid turned out to

~~TOP SECRET~~ | E.O. 13526, section 1.4(c)

produce more than had been expected. A key find, according to Mr. Fitzgerald, was a laptop computer belonging to Fazul Harun, that corroborated what Fadl had been describing regarding al Qaeda's support of attacks on U.S. forces in Somalia. However, prior to the bombings, the U.S. authorities still thought that the Kenyan cell was purely a logistical cell that ran a "flophouse" for Al Qaeda travelers. After the bombings, the evidence that had been seized in 1997 helped US authorities identify Harun as the principal organizer of the attacks on the U.S. Embassies in Nairobi and Dar es Salaam.

(U) The convictions of some of the defendants in the Embassy Bombings trial have been appealed, but no briefs have been filed yet in the court of appeals. Three of the defendants have recently filed a motion for a new trial in the district court.

## AL QAEDA'S TIES WITH IRAN AND HEZBOLLAH

(LES) Mr. Fitzgerald said that he had complete confidence in the accuracy of every statement that Ali Mohamed made during his change-of-plea hearing on October 20, 2000, to include Mr. Mohamed's assertions regarding ties between al Qaeda and Egyptian Islamic Jihad, on the one hand, and Iran and Hezbollah, on the other. (Among other things, Mr. Mohamed said that Hezbollah had provided explosives training to al Qaeda, and that he had arranged security for a meeting between bin Laden and Hezbollah's Imad Mughaniya.)

(C) More generally, Mr. Fitzgerald spoke of a tripartite relationship between Al Qaeda, Sudan, and Iran. Sudan and al Qaeda were joined at the hip, while the relationship with Iran was considerably looser, because Iran was Shia. Bin Laden did not widely advertise his relationship with Iran within al Qaeda, because of anti-Shia sentiment among some members of al Qaeda.

(LES) Mr. Fitzgerald was asked about a memorandum that he had written to the Deputy Attorney General on October 11, 2001. According to the memorandum (at 2-3), Fadl understood from conversation with other al Qaeda members that al Qaeda was working on acquiring chemical and biological weapons in conjunction with Sudan, Iran, and Iraq. Mr. Fitzgerald noted that Fadl was merely reporting what others were telling him. He also urged us to look at the FBI 302s that report these remarks by Fadl as well as Fadl's assertions concerning collaboration on conventional weapons.

(S) Another section of the same memorandum (at 15) says that Ali Mohamed (identified as "Source One" in the memorandum) asserted that Hezbollah had given amphibious training to elements of al Qaeda. Mr. Fitzgerald advised that Mohamed's claim seemed credible, and that there is a long history of jihadists undergoing scuba training

(S) Mr. Fitzgerald also spoke of links between Iran/Hezbollah and the Egyptian Islamic Jihad, which eventually merged with al Qaeda. He stated that Egyptian Islamic Jihad had learned about car bombings from Hezbollah, and had been influenced doctrinally to allow suicide operations, a practice which Sunni Islam had traditionally forbidden. He

recommended a book by Judith Miller, "God Has 99 Names," for more information on the relationship between Iran and the Egyptian Islamic Jihad.

## AL QAEDA CELLS AROUND THE WORLD

(S) When asked about major al Qaeda cells around the world, Mr. Fitzgerald named a very large number of cities, countries, or geographical regions, including Kashmir, the Philippines (particularly Mindanao, and at least partly through the Abu Sayaf group), Uzbekistan, Tajikistan, Baku (an important waystation to Chechnya), Italy, France, Egypt (through the EIJ and the Islamic Group), Lebanon (through Asbat al Ansar), Kenya (at least through the embassy bombings), Somalia and other countries on the Horn of Africa, Saudi Arabia, Yemen, North African countries, the Emirates, South Africa, Germany, Belgium, London, Denmark (known as a good place to request asylum), Canada (same), and the TriBorder area in South America.

## MISCELLANEOUS

(S) When asked whether there was a relationship between Pakistani ISID and al Qaeda, Mr. Fitzgerald said he doesn't really know, but that he assumes there was a relationship between them based on open source information, such as Ahmed Rashid's book Taliban. On the other hand, he stated that Ali Mohamed talked of ISID surveillance <u>against</u> bin Laden in the early 90s.

(S) Mr. Fitzgerald said that the CIA would be a better source of information about successful US efforts to disrupt major al Qaeda operations, particularly where the disruption efforts have not been made public. He was not involved in any attempts to extradite or render Khalid Sheikh Mohammed to the United States in 1996.

## TERRORIST FINANCING (TEAM 4)

(U) Mr. Fitzgerald said he believes terrorists and jihadists are raising substantial funds in the U.S. He cited Steve Emerson's work as reflecting the large amounts of funds being raised. Hamas is plainly raising very substantial amounts of money in the U.S., primarily through charities. In this regard, Fitzgerald said that he cannot believe that Hamas and Al Qaeda – two of the world's most anti-Semitic organizations -- are not collaborating. Although he has seen no evidence of it, he believes there has been some tacit agreement that Al Qaeda will let Hamas handle attacks against Israel and that Al Qaeda and Hamas will remain publicly separate and distinct, so as not to dry up Hamas's fund-raising in the U.S. Fitzgerald also believes Hezbollah raises money in the U.S., often through illicit schemes such as cigarette smuggling, drug-dealing, or even counterfeiting. He said various other jihadist and militant groups also raise money in the U.S., and it is often impossible to know exactly where those funds are going. He does not know if Al Qaeda is raising funds in the U.S. He cannot quantify the overall amount of funds terrorist groups are raising here.

~~TOP SECRET~~ | E.O. 13526, section 1.4(c)

(U) Mr. Fitzgerald said that bringing criminal prosecutions based on terrorists financing presents enormous difficulties. Typically, the funds are sent overseas, through a charity, and then some of these funds are diverted for terrorist or jihadist purposes. To make a material support case, records usually have to be obtained from overseas to reflect where money is going, which itself is often very difficult. Although the Patriot Act provision regarding correspondent accounts might be helpful, people have been reluctant to use it. Fitzgerald is not sure why.

(LES) Even with access to the relevant records, tracing the funds to a specific criminal act or to a designated terrorist group is extraordinarily difficult. Funds are often dispersed overseas in cash, making tracing them virtually impossible. The books may reflect that $100,000 was used to build a mosque. The mosque, in fact, gets built, but some fraction of the funds gets diverted for terrorist purposes. Even with access to foreign records, the challenge of tracing the diversions is daunting. Al-Fadl explained in one of his debriefings, reflected in a 302, how Al Qaeda perfected the use of these type of diversions to raise funds.

(U) Mr. Fitzgerald pointed out that unraveling the terrorist financing schemes is even more complicated because the same groups financing terror and jihad are generally providing real charity as well. The people running these groups believe in charity, just as much as terror. In this regard, the Islamists differ from the Italian mob in the U.S. Mob front businesses, such as candy stores and coffee shops, typically do not really do business. You can't buy coffee in a mob coffee shop. The mobsters are not interested in business, so they eventually drop the front. By contrast, the jihadists genuinely believe in charity, practice it, and keep voluminous records of it, all of which serves to more effectively conceal their illicit fund-raising activities. Prosecutors must be careful to recognize this fact, and acknowledge that the corrupt NGOs are indeed providing charity. Otherwise, there may be 50 orphans in the courtroom testifying for the defendant.

(U) Even if the money can be traced to an illicit activity or designated group, proving the U.S. donors or NGOs knew where the money is going also can be extraordinarily difficult. Although there may be substantial grounds for suspicion, proving the knowledge required for a material support conviction is still very difficult.

(U) Compounding the problems, supporting foreign jihadists is not necessarily illegal. Judges see a material support charge and think Al Qaeda and killing civilians. They do not think about funding jihadist fighters engaged in military combat. It is not sufficient that the same jihadist fighters may be supporters and perpetrators of terror, unless that can be proven – which is very difficult. Thus, even open supporters of jihadist fighters may not be subject to prosecution in the U.S. The Neutrality Act is difficult to use in these circumstances. It is not clear that jihadist fighters engaged in military combat are engaged in the type of conduct, ["murder, kidnapping or maiming"] bringing their supporters within the scope of 18 U.S.C. sec. 956.

(U) Mr. Fitzgerald thinks a new law may be appropriate, which would make it criminal for a private citizen to provide funds to foreign military combatants. He

~~TOP SECRET~~ | E.O. 13526, section 1.4(c)

~~TOP SECRET~~ | E.O. 13526, section 1.4(c)

recognizes a carve-out may be required for people who want to support a country by buying war-bonds. The law, which he envisions would carry less severe penalties than material support, would provide a mechanism prosecutors could use to target jihadist fund-raising, even where they cannot show the money went to a terrorist or designated group.

(U) Although criminal prosecutions for terrorist financing are very difficult, Mr. Fitzgerald believes they need to be pursued to deter more fundraising. The best cases may well require luck, like a wiretap or an informant, revealing the fund-raiser's knowledge of the illicit use of the funds. He also said that forfeitures can be used to disrupt financing, but the forfeiture laws provide that the forfeited funds go to the U.S. Treasury, which means that money given by innocent donors cannot be returned to them. Designations and freezing can be useful, although then the money can be used to pay the designated entities legal fees – effectively a wealth transfer from the terrorist to the defense attorneys.

(U) We asked Mr. Fitzgerald about prosecuting fraud cases based on misrepresentations to donors, as he did in the Benevolence International Foundation (BIF) case [where the BIF leader, Enam Arnaout, pled to a RICO count based on his defrauding donors by telling them that their donations would be used for humanitarian purposes when BIF actually was using them to fund jihadist fighters]. Fitzgerald said such fraud cases require strong evidence of the misrepresentations. He got lucky in BIF because Arnaout made written representations to donors that were false, and certain donors were willing to come forward to testify they were misled. Such a case is impossible where there were no such representations or where the donors knew the true purpose of their donations.

(U) Mr. Fitzgerald believes there are three types of donors in the U.S. that provide terrorist financing: 1) knowing supporters of terror and jihad; 2) donors who generally support a militant cause, *e.g.,* Kashmiri rebels, and give to militant group without asking questions about where exactly their money is going; and 3) people who only want to support humanitarian aid, but give unwittingly to groups that divert funds. He said he cannot quantify the relative size of each group. He pointed out, however, that a prosecutor bringing a fraud case like he did in BIF could have real problems if the donors fall into the first or second category.

(U) Mr. Fitzgerald said he does not have a good sense of how successful the U.S. efforts to combat terrorist financing have been since 9/11. As to recommendations, in addition to the new law discussed above, he said the IRS needs to tighten up requirements for certifying charities and improve the process for de-certifying them. He noted that BIF was still a certified charity until very recently. Although money given to BIF was frozen, donations would still be tax deductible. He also suggested making it a crime to lie to the IRS about the true nature of a charity, which might provide an effective avenue for prosecution.

9

~~TOP SECRET~~ / [ ]                                    E.O. 13526, section 1.4(c)

(U) Mr. Fitzgerald said he is generally aware of the DHS-DOJ MOU designating the FBI as having the lead in investigating terrorist financing, although he has not read it. He generally thinks this makes sense because someone has to have the lead, and terrorist financing is part of terrorism, for which the FBI has lead responsibility. The downside of the arrangement is that ICE may disregard the terrorist aspects of a case, *e.g.*, treat it as a cigarette smuggling or fraud case, until very late in the day, so as to avoid having to give up the case to the FBI.

(U) Mr. Fitzgerald rejected the argument that the FBI lacks the financial investigative expertise to investigate terrorist financing. He said the FBI has some great financial investigators, and he does not know any agency that has better. He favors bringing criminal white collar agents into terrorist financing cases, as has been done in Chicago. As a general matter, he favors using experienced criminal agents on terrorism cases because they bring considerable expertise to the table that intelligence agents may lack. In particular, he thinks criminal agents are much better at squeezing the most information out of witnesses. The exercise of having to work with witnesses who will take the stand at trial for dissection by defense attorneys enhances the agents' abilities to break down a witness's lies and bring out the truth.

(U) Mr. Fitzgerald said that before 9/11 it would have been very hard for the FBI to aggressively target religious charities because of the civil liberties concerns. Had FBI leaders tried to move aggressively in this area, he suspects they would have wound having to explain their actions before a Senate committee.

### TEAM 6 QUESTIONS

(U) Mr. Fitzgerald said he prepared his October 11, 2001 memorandum to Larry Thompson in response to a "Red Cell" meeting he attended. He said people at the meeting were talking about Al Qaeda threats and plots that were vaguely familiar to him. Gradually, he realized that they were talking about information learned from his sources at meetings he attended. The people at the Red Cell meeting were three-steps removed from the original information and were generally getting the story wrong. He wrote the memo to get out the accurate facts.

(U) Mr. Fitzgerald did not know whether law enforcement information is being well disseminated to the intelligence community. He does think that the intelligence community needs to guard against the mindset that documents filed in open court are not "intelligence." In fact, they can be of tremendous intelligence value.

(FOUO) Mr. Fitzgerald believes that the FBI is sharing information much more freely with prosecutors now that the "Wall" is down. He noted that in the past, some FBI agents considered analysis of documents as a lower status job to be given to analysts. However, the FBI senior management appears to be taking steps to boost the status of analysts and document analysis.