# EXHIBIT B

Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's Motion
To Exclude the Testimony of Victor Comras

03 MDL 1570

July 31, 2023

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001**
**03-MDL-1570 (GBD) (SN)**

**EXPERT REBUTTAL REPORT OF VICTOR D. COMRAS**
**CONCERNING YASIN KADI and WAEL JULAIDEN**

I have been engaged by counsel for the Plaintiffs as an expert with regard to allegations concerning Yasin Kadi and Wael Julaidan's involvement in providing financial and logistical support to Osama bin Laden and al Qaeda. This Rebuttal addresses certain issues raised in an Expert Report filed in this case on behalf of Yasin Kadi by Jonathan Benthall which also includes critiques and criticisms of my Expert Report dated October 29, 2020.

I will begin by re-iterating in summary my own qualifications to respond to Mr. Jonathan Benthall's expert report and proceed to the following issues in the order that I will address them:

- The knowledge and qualifications of Mr. Benthall, and their relevancy to the allegations presented by the Plaintiffs in this case against Yasin Kadi and Wael Julaidan;
- The methodology employed by Mr. Benthall to examine and analyze the facts presented, and the allegations made by Plaintiffs in this case,
- Mr. Benthall's presentations concerning the humanitarian and business activities of Mr. Yasin Kadi, his charities, and business entities. (It should be noted here that Mr. Benthall does not address the activities of co-defendant Wael Julaidan except as they may have directly involved Mr. Kadi);
- The questions raised by Mr. Benthall concerning my own knowledge and qualifications to address the allegations presented by the Plaintiffs against Yasin Kadi and Wael Julaidan and the Islamic charities associated with them; and
- Ancillary points raised by Mr. Benthall on pages 40-48 of his report of February 2, 2021.

**My Knowledge and Qualifications**

I served for 35 years as a Foreign Service Officer and Senior Foreign Service Officer with the U.S. Department of State, retiring with the executive grade of Minister-Counselor.  Much of this service included postings in conflict areas in Africa and the Balkans where I served as Chief of Mission of our Embassy in Skopje, Macedonia.  I also served in leadership capacities regarding the development and implementation of our sanctions and export control policies, including policies directed at combating terrorism. In 2002, I was appointed by United Nations Security General Kofi Annan, with the concurrence of the United Nations Security Council, to serve as one of five members of the Security Council's Monitoring Group on Al Qaeda and the Taliban.  I served as the Monitoring Group's lead member on terrorism financing.  It was my principal responsibility, in that capacity, to monitor and report on the sources of funding, past and present then, for al Qaeda and the Taliban.  This entailed closely monitoring and reporting on the funding activities and financial practices of suspected sources of such funding.  The Security Council had already identified many such sources in its Consolidated List of Persons and Entities subject to Security Council measures.  The U.N. consolidated list included several Islamic charities, as well as the person of Yasin Kadi.[1]

The Monitoring Group on which I served briefed the Security Council and its Sanction Committee on a regular basis and submitted 5 detailed reports of its findings.  These reports included descriptions of the funding activities of numerous Islamic based charities.  Creating these reports entailed intensive research into the charities' financial activities, irregularities, and lack of transparency. From this experience I acquired a working knowledge of the role of charities and other non-profits in the financing of terror, including that of al Qaeda.[2]  I do not question Mr. Benthall's general descriptions concerning the humanitarian efforts of Islamic charities around the world.  However, I do

---

[1] Added to the UNSC Consolidated List on October 17, 2001.
[2] A more detailed description of my qualifications is contained in my Expert Report dated October 29, 2020

3

question the extent of Mr. Benthall's qualifications and analysis when it comes to their involvement, including Muwafaq, in terrorism financing.

**Knowledge and Qualifications of Mr. Jonathan Benthall Concerning the Facts as Presented in This Case**

I have reviewed Mr. Benthall's 13 page CV.  He has a nearly fifty year career as an anthropologist and an extensive background in studying charitable giving, and the role of charities in the Islamic world.  However, in his over 150 publications, over 40 presentations, and his field experience, he indicates no background, training or experience related to money-laundering, terrorism financing, the establishment and use of shell companies, the logistical support structure and financing of al Qaeda, nor any knowledge of the methodologies used to identify such activity.  Mr. Benthall does not indicate any study or attendance at courses or seminars dealing with terrorism financing prevention measures established by the Organization for Economic Co-operation's (OECD) Financial Action Task Force (FATF), or other institutions such as the Egmont Group, the Wolfsberg Group, the IMF, the Treasury Department's Office of Foreign Asset Control, or the Federal Financial Institutions Examination Council. Information concerning any such knowledge or experience would be relevant to voicing his positions on such questions.  Nor does Mr. Benthall demonstrate any awareness of the actual vulnerabilities, and the potential and real misuses of charities.  His vision of the possible presence of such activities is blurred at best.  I can only conclude that he has insufficient expertise to voice opinions concerning the diversion of charitable funds or business transactions to finance terrorism.

Mr. Jonathan Benthall approaches his consideration of the activities of Yasin Kadi and the Muwafaq charity from an acutely academic perspective.  His research methodology, as he indicates, is based on social anthropology enhanced by principles of ethnography. Such an approach appears relevant to understanding ethnic culture and tradition and examining the Islamic tradition of charitable giving.  Alone, and without any terrorism financing inquiry component, it is skewed away from issues related to the use or abuse of

charities or of business entities for terrorism financing purposes, and unsuited to evaluating these very issues in this case. This lacuna may explain his general disinterest in or disregard for counter-terrorism-financing and money-laundering norms, and apparent disdain for experts investigating such abuses.  Thus, his report fails to address most of the allegations contained in my report of Muwafaq's and Yasin Kadi's involvement in terrorism financing; nor does Mr. Benthall's report address Yasin Kadi's business activities, apart from sparse references to Rowan and Loxhall, two of Kadi controlled companies operating in Sudan.

As indicated above I will refrain from commenting on the accuracy of Mr. Benthall's discourse on the general history of Islamic charities and their humanitarian contributions, or his section on why Islamic charities provide aid to Muslim communities in countries plagued by poverty, lack of education, wars and disasters.  It is my view that they are not relevant to this case. I will therefore jump to section two of his report dealing more specifically with Muwafaq.

**Activities and character of the Muwafaq Foundation**

Mr. Benthall presents a positive description of Muwafaq's humanitarian programs, operations and accomplishments in the Balkans, Pakistan, and Sudan during its operations. But, there is no mention of its Balkan director, Chafiq Ayadi, whose ties to al Qaeda and bin Laden were well publicized and clearly stated in the Narrative Summary on Ayadi provided by the United Nations Security Council's Sanction Committee. Nor is there mention of the July 31, 1995 FBIS report indicating that the Muwafaq Foundation office in Zagreb was acting as a front for Osama bin Laden's operations.

Muwafaq's director in Albania, Abdul Latif Saleh, also goes unmentioned despite the fact that he was deported from Albania because of his radical activities. He returned to Albania in 2000, but was again expelled in 2002 because of his involvement with Tirana-based charities linked to bin Laden.  These are facts that should have been addressed in Mr. Benthall's report.

5

While Mr. Benthall cites two Muwafaq reports relating to the Zagreb and Zenica offices' humanitarian activities and accomplishments, he makes no mention of the an internal Muwafaq report of the very same office, reported during that same period, that the Zenica office distributed 45 tons to military units including the mujahidin and an Al Qaeda cell.[3] Mr. Benthall dismisses this allegation as 'guilt by association' saying, "The Muwafaq Foundation reportedly supported a Bosnian fighters' group, one member of which was later arrested on terrorism charges," conveniently omitting that the 'reporting' was Muwafaq's own internal document and that the arrested person was Ahmed Ressam, arrested and convicted of a plot to bomb LAX on the millenium.

Mr. Benthall also ignores the sworn testimony outlining Muwafaq's logistical support to Al Qaeda.[4]  Though Mr. Benthall does note in a section titled 'Bosnia as the new site of jihad' of his most popular book, The Charitable Crescent, that "Certain Islamic NGOs such as the Third World Relief Agency (TWRA) or the Muwafaq Foundation seem to have arranged for combatants to reach the front."[5]

Mr. Benthall also does not address the allegations referenced in my report that Muwafaq, while active in the Balkans, also provided logistical support to an Al Qaeda training camp in Afghanistan.[6]

Mr. Benthall also dissimulates concerning the role of Muwafaq in Pakistan.  He describes Muwafaq's good deeds while ignoring questionable and illegal activities and the arrest of Muwafaq Pakistan's director Amir Medhi.  It was generally known that Amir Mehdi maintained a close association with bin Laden and al Qaeda activists, and that he was actively engaged with the Pakistani terrorist group Harakat ul- Mujahidin and Harakat-al-Ansar.[7]   Mr. Benthall also does not address key findings of audits of Muwafaq which reported financial discrepancies, undocumented loans to Mehdi and Julaidan,

---

[3] Comras Report p 44
[4] *Id.*
[5] The Charitable Crescent p135
[6] Comras Report p 44

unaccounted cash dispersals, and the use of personal bank accounts for Muwafaq transactions. When the auditors asked the Muwafaq Pakistan Director about these irregularities, he merely assured them all was well.

It was in Sudan that some of the most important questions concerning Muwafaq's funding of terrorism arose.  Most concerning was the very close relationship between Muwafaq and the National Islamic Front (NIF) and the Turabi Government's "Peace and Development Foundation (PDF)."  The Peace and Development Foundation provided an effective channel for the NIF to spread its radical Islamic influence, along with arms and funds, throughout the horn of Africa, and particularly to Somalia and Ethiopia where Muwafaq also maintained branches. The U.S. Embassy in Khartoum stated that the NIF was using Muwafaq, among other charities, to promote its radical, anti-Western version of Islam.

It does not help Mr. Benthall's case that in the only instance he apparently actually visited Muwafaq in Sudan, he was prevented from questioning the displaced persons, prevented from taking photos and came away with the impression that the provision of aid was conditioned on adherence to political and religious criteria.[8]

Mr. Benthall also criticizes me for failing to provide any support for the following quote from my report, "Kadi allegedly became associated in the 1980's with members of the Muslim Brotherhood and supporters of the Makhtab al-Khidamat, also known as the Afghan Services Bureau."  Mr. Benthall omits the remainder of the paragraph which notes that the Makhtab was financed by Osama Bin Laden with whom Kadi met on several occasions.  I cited to Kadi 2944 an excerpt from a document in which Kadi describes a trip to Pakistan in order to help negotiate an agreement between various mujahidin factions and in which he met Osama Bin Laden. As for back-up to the role of the Makhtab al-Khidamat or Office for Services to the Mujahidin, I note that Mr.

[7] Kadi 10793, 15542-43 – Swiss Police Reports.
[8] See Benthall's The Charitable Crescent, p 124.   In 1996, as a journalist, Mr. Benthall visited a displaced person camp serviced by Muwafaq in Sudan.

Benthall's book states that it was founded by Abdallah Azzam and financed by Osama Bin Laden in order to "arrange logistics for the Muslim volunteers who came to join the front in Afghanistan."[9]

As part of the effort to disparage al Qaeda defector Jamal al Fadl, Mr. Benthall makes the statement that Kadi "never had any connection with the al Haramain Foundation or supported it in any way."  Mr. Benthall should know this is not to be the case from the information provided in my report which shows that support from Mr. Kadi via his Muwafq Foundation to the al Haramain Foundation is well documented.[10] In addition, in the U.S. and Saudi Arabia's designation of Al-Harmain as a supporter of al Qaeda, the two governments specified al Haramain's Albania address as being Irfan Tomini St #58. Kadi's Loxhall Company was also located at the same address.[11]

Mr. Benthall's failure to address these issues, starkly described in my own report, reflects a lack of expertise and disinterest in evaluating financial crimes.

**Understanding cultural and historical norms in assessing transactions engaged in by charities and individuals associated with them**

The gist of section 3 of Mr. Benthall's report dealing with cultural and historical norms in assessing charitable transactions is his belief that counter-terrorism financing concerns with Saudi and Gulf based charities, including Muwafaq, basically stem from a misunderstanding of Islamic traditions and the conditions under which such charities operated. The West is also partially to blame, according to his thesis, since it helped set in motion and assisted the mujahideen in their combat against the Soviet Union.

The al Qaeda and Taliban Monitoring Group on which I served reported that:

---

[9] The Charitable Crescent p73
[10] Comras Report p46-47.
[11] US Treasury Dept JS-1107 AHIF Designation Jan 22, 2004 and Kadi 14673. The Loxhall Corporation also held shares in Rowad Development alongside Osama Bin Laden. See Comras Report p38

> "The capture of al-Qa'idah operatives and the dismantling of the organization's camps and bases in Afghanistan has provided substantial information on al-Qa'idah financial operations and the emphasis it placed on fund-raising through charities and other non-governmental organizations. It also used these organizations for logistic support, as a cover for employment, false documentation, travel facilitation and training. This information has focused a greater international effort on closely monitoring and regulating the potential use of charities and other associations for these purposes." [12]

A key quotation from this part of his report is his claim that:

> "I am aware of no solidly grounded evidence of improper diversion of funds; but even if such evidence were forthcoming, I would submit that any organization working with as many offices, and in as many different countries, as the Muwafaq Foundation did in the early and mid-1990s would have had difficulty in maintaining full control of its finances and operations. I base this opinion on my experience of the practical management challenges faced by diversified international NGOs."

Mr. Benthall provides no predicate on which to base such an assertion. The first part of his statement lacks value and credibility given Mr. Benthall's own lack of background or experience in the counter-terrorism financing field and, more particularly, his lack of knowledge of the norms developed by international organizations such as FATF to make such an evaluation.  The second part of his statement is disturbing coming from a presumed expert on the management of charities. Mr. Kadi has no one other than himself to blame for such failures given his claim of hands-on management and his questionable selection of Muwafaq branch directors.

**Characteristics of historical charity regulation and personal relationships in the Arab world prior to 9/11**

---

[12] United Nations Security Council Document S/2002/1338 conveying the Third Report of the Al Qaeda and Taliban Monitoring Group, paragraph 36.

In Section 4, Mr. Benthall addresses the loose charity oversight, lack of structural financial monitoring capabilities, and reliance on personal relationships in the Arab World.  If this section is meant to excuse the lack of transparency and accounting irregularities associated with Muwafaq it is misplaced.  First of all the absence of regulatory oversight, lack of transparency, and a management determined by fealty rather than competence, merely highlights the vulnerabilities and emphasizes the opportunities for the use of such charities for terrorism financing purposes. Such factors should also be considered as irrelevant since Mr. Kadi proclaimed his own hands-on approach. He surely had to be aware of the activities of the associates he chose to run Muwafaq for him.  Nevertheless, he placed them in key positions not only in running his charities but also in his businesses. He also provided them with loans and gifts in appreciation for their "good deeds."

**The regrettable result of the overreaction against Islamic charities**

I am truly not sure how I should comment on Section 6 of Mr. Benthall's report which so greatly undervalues the importance of ferreting out terrorism financing and holding those responsible accountable. Mr. Benthall has apparently confused such investigations, and the issues of this case, with an academic exercise that must meet strict peer review social science criteria.  Counter terrorism financing experts are not academics. They are regulators, investigators and accountants.  Their task is to uncover terrorism financing, identify the source, and impede such activities. Their findings do not stem solely from the study of academic literature but from overt investigation and intelligence gathering. They look for "red flags" that signal possible terrorism financing and related financial crimes, they rely on suspicious transaction reports, document review, investigation of publicly generated reports, and intelligence gathering. They are not over-zealous, as Mr. Benthall would have one believe even if they do not engage in evaluating the social, cultural or ethnological rationale for such activity.  Nor are they permitted to excuse such activity on the basis of such extraneous difficulties or factors. To suggest that they undertake their responsibilities lightly, or without care as to results, shows an ignorance of the actual in-depth consideration of the evidence, interagency and administrative legal

10

review.  In my government experience no one ever took such examination of the evidence and review lightly. Ultimately, those responsible must answer to a judge in a courtroom, not to their academic peers.  In this case, the burden that must be met to hold Muwafaq and Mr. Kadi accountable is a preponderance of the evidence, not peer acclaim.

**I now turn to Mr. Benthall's Rebuttal of my expert report dated October 29, 2020.**

Mr. Benthall acknowledges my counter-terrorism financing skills.  However, he disparages my social science research qualifications, apparently believing that such skills can only be academically trained based.  He disregards my more than 35 years of Foreign Service and international legal experience in studying, analyzing, reporting on, and responding to, real world and diverse international foreign country political, social, and cultural developments.  I will stand on my Foreign Service record, my advanced training in international law, the numerous articles I have published and the recognition and honors I have received to demonstrate my social science skills, particularly as they relate to the issues in this case.

Mr. Benthall is correct that my focus is on money laundering and terrorism financing. I believe this is where it should be, for this case is not about Muwafaq and other Non-Profit Organizations (NPO's) or the practical difficulties they may have faced.  It is about Yasin Kadi, Wa'el Julaidan and others use of charities and business entities to channel funds and material support for terrorism.  The practical difficulties which preoccupy Mr. Benthall, and on which he focuses, merely underscore the vulnerabilities of these charities for such purposes.

Let me now address his rebuttal of my own expert report.  I do so thematically rather than point by point:

**Red Flags**: Mr. Benthall's rebuttal concerning the relevance, use and value of "red flags" cited in my report completely misses the main point.  Red flags serve to alert regulators to potential money laundering and terrorism financing activities.  However, it is the

transactions themselves, not the red flags that raise the specter of culpability.  The fungibility of money, the fluidity of financial transactions, and the lack of transparency surrounding transactions such as those conducted by Muwafaq and Yasin Kadi make such "markers" essential tools in the investigation of terrorism financing.  I reference several of these tainted transactions in the main body of my report.  They include, for example, the Maram affair which involved funding for the construction of student housing at Al-Eman University in Yemen.  Between $926,000 and $1.28 million provided by Kadi and his Karavan company ostensibly for this project went missing. These funds were never accounted for.

Mr. Benthall also challenges the applicability of FATF's list of "red flags" on the grounds "of the practical difficulties that faced charities working in conflict zones." However, it is these very difficulties that accentuated Muwafaq's vulnerabilities for terrorism financing abuse.  And, such abuse would neither be justified nor mitigated by such "practical difficulties." In the 2014 Report on the risk of terrorist abuse of Non-Profit Organizations (NPOs) FATF clearly explains:

> "The NPOs most at risk appear to be those engaged in 'service' activities, and that operate in a close proximity to an active terrorist threat. This may refer to an NPO operating in an area of conflict where there is an active terrorist threat. However, this may also refer to an NPO that operates domestically, but within a population that is actively targeted by a terrorist movement for support and cover. In both cases the key variable of risk is not geographic, but the proximity to an active threat."[13] In such cases, the FATF report states, it is imperative that special attention be paid to terrorism financing abuse indicators, i.e., "red flags.[14]

Experience has led most financial regulators and investigators to conclude that the presence of numerous, frequent and repetitive transactions raising "red flags" does,

---

[13] FATF Report: "Risk of Terrorist Abuse in Non-Profit Organizations," June 2014, P.1, Key Finding 2.
[14] Id, Chapter 6, "Risk Indicators and Terrorism Abuse Indicators."

indeed, constitute probative evidence of money laundering and terrorism financing.[15] This is especially the case when the judgment standard is "more likely than not."

**Pre-1992 Mujahideen Support:** Discussion in my report of pre-1992 events are meant only to provide background.  I have not attributed culpability to any activities involving support for Mujahideen fighting the Soviet occupation. Is it Mr. Benthall's intention to challenge my statement concerning Kadi becoming associated during the 1980s with members of the Muslim Brotherhood and supporters of the Makhtab?  Or merely to point out that I lack a footnote?

**Association:**  The evidence presented in my report of Mr. Kadi's financial dealings with suspect colleagues is particularly compelling given the repetitive, frequent and questionable financial transfers by Yasin Kadi to persons and entities directly linked to al Qaeda and Osama bin Laden.  These people include, inter alia, Wa'el Julaidan, Amir Mehdi, Abdul Latif Saleh, and Chafiq Ayadi. These men were more than close associates. They were business partners and/or branch directors chosen by Yasin Kadi to run his Muwafaq charities.

As noted in an official OFAC Memorandum

> "It strains credulity that Al-Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character, and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists. These are individuals who Al-Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf."

As OFAC concluded "the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified, provides a reason to believe

---

[15] id

13

Yassin Al-Qadi has funded terrorist and extremist individuals and operations." This is more than mere "guilt by association," it is complicity.

**9/11 Report (P. 13)**: Mr. Benthall's criticism on page 40 of his report to a quote I used from the 9/11 Commission Report on page 13 of my report is disingenuous. A reading of the full paragraph contained in the 9/11 Commission Report shows that the use of ellipsis to shorten this quote is at most harmless error and of no real consequence. In any event, the al Wafa Organization is not a party to this case. The full 9/11 Commission Report paragraph reads:

> "Al Qaeda also collected money from employees of corrupt charities. It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities— particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation. Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda. In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, al Qaeda operatives controlled the entire organization, including access to bank accounts. Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."

I also referenced the related Staff Monograph on Terrorist Financing to the effect that "al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses…., entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization, including access to bank accounts."

I have again reviewed the text of the Memorandum for the Record covering the recounting of the interview with Patrick Fitzgerald, and I cannot agree with Mr. Benthall's claim that I materially misquoted the statements of Patrick Fitzgerald recorded therein. The phrase "he believes," is not part of the direct quote of Mr. Fitzgerald, contained in the inner quote part of that paragraph of the Memorandum. Rather, it is the Memorandum-writers impression as to what Mr. Fitzgerald believes to be true. In that context it certainly does not change the nature or "draw attention to the subjective and unverifiable character of Mr. Fitzgerald's stated opinion."

I do not believe that I have cited Fadl anywhere in my report as a source concerning events which Mr. Fadl had not personally participated or lacked personal knowledge. .

**Guesthouse (P 14, n.38):** The referenced document should have been Kadi 28394 and the quote from that reference is: "The source advised that circa 1992, he saw Bin Laden and Al-Kadi together at the Dawa Organization guesthouse which was located in the Riyadh section of Khartoum."

**Bearer Checks:**  It is my opinion that the frequent and systematic use of bearer checks, shell companies, and circuitous routings, without financial justification gives rise to "red flags" that an attempt is being made to shield from view the nature and purpose of such transactions.  Given the multiple other circumstances suggesting terrorism financing, it is my opinion that: "Kadi tried to mask many of these questionable dealings … using bearer checks, shell companies and circuitous routings."

**Kadi's Sudan Businesses:**  Mr. Benthall's contentions that Mr. Kadi, a seasoned businessman, was unaware that Wadi al-Aqiq was a bin Laden company and that it was a shareholder of Rowad flies in the face of convincing evidence to the contrary.[16] Mr. Benthall also overlooks Kadi's investments and deposits in Al Shamal Bank in which bin Laden was a major shareholder/investor and held numerous accounts.

---

[16] Comras Report, Pp. 36-39

**Bonnant's Letter:**  Maitre Bonnant was an advocate on behalf of Mr. Kadi and not an independent evaluator of Kadi's activities.   I will leave it as Mr. Benthall's burden to establish the evidentiary value of Maitre Bonnant's letters and statements, and comment only that similar claims by Mr. Kadi were soundly rejected by OFAC and by the court in the case of Kadi v. Geithner.[17]  The testimony provided by Jamal al-Fadl concerning bin Laden and al Qaeda has been tested and accepted in court proceedings and frequently corroborated by other source information, Maitre Bonnant's discrediting efforts are to no avail.

**Vindication**:  Mr. Benthall draws attention, in his rebuttal, to the July 18, 2013 decision of the Grand Chamber of the European Court of Justice.  However, he completely misconstrues the import of that decision, which I shall attribute to a lapse in his research or absence of legal skills rather than bad faith.  That case involved an appeal of the earlier 2008 European Court of Justice ruling.  The appeal was brought by the European Commission and the United Kingdom, supported by the Council of the European Union and numerous EU members.  The earlier decision had, in effect, challenged the legality of the EU Commission's sanctions regulations vis a vis Yasin Kadi and had, in effect, overruled the obligation of the EU member states to abide by United Nations Security Council sanctions imposed under chapter VII of the United Nations Charter.  The earlier court had ruled that the restrictive measures against Yasin Kadi had been adopted by the EU and its member states "without furnishing any guarantee enabling [Kadi] to put his case to the competent authorities." This, they held amounted to "an unjustified restriction of his right to property."  The court did not put that decision in effect immediately but provided an opportunity for the due process defect to be corrected.

Following that decision the United Nations Security Council revised its own designation to require publication of a narrative summary of the reasons for such designation and established an Ombudsman to monitor this process.  The EU Commission and the United Kingdom based their appeal largely on this revision of the Security Council's designation

---

[17] 42 F. Supp. 3d 1 (D.D.C. 2012).  See also R. Richard Newcomb letter dated March 12, 2004 to Stanton Anderson, Esq at McDermott, Will & Emery (OFAC Newcomb Memorandum)

procedures.  They presented **only the narrative summary** to the Grand Chamber and **no other evidence concerning theirs or the United Nations findings concerning Yasin Kadi**. They again maintained the obligatory nature of Chapter VII resolutions should prevail and argued that the narrative summary and Ombudsman provisions met the Court's previously stated concerns.

When read in the context of the full Grand Chamber decision paragraph 153 only reflects the courts holding that the narrative summary alone, without the presentation of any backup evidence did not provide a sufficient basis for such EU restrictions. The limited Summary Narrative evidence presented to the court, they said was insufficient grounds for the imposition of the restrictive measures.[18] Under the circumstances of the case this ruling was clearly not meant to vindicate Yasin Kadi.

It must also be noted that this Grand Chamber decision came 8 months after the United Nations Sanctions committee had removed Yasin Kadi's name from the United Nations Consolidated Sanctions list so the matter of vindication was moot.

Neither does the letter of December 1, 2007 from Swiss Deputy Attorney General Claude Nicati absolve Mr. Kadi.  That letter merely indicates that the Swiss criminal investigation concerning Mr. Kadi was being dropped. No reasons are given.

**Fairness:**  I have been engaged as an expert by plaintiff attorneys to review and evaluate the facts related to this case, independently reach my own conclusions, and express my opinions.  I have done so forthrightly and honestly.

---

[18] See Thornton, Sean, "Introductory Note to European Commission et al v. Kadi (E.C. J.)," 52 ILM 1257 (2013): "The Kadi case rests on a simple legal proposition: There must be evidence to support restrictions against an individual….The dilemma for authorities …is that while the evidence exists, it tends to be sensitive, often classified – particularly with respect to terrorism…and the intelligence services that collect such information prefer to keep it closely held."

_Victor D. Comras_

_Executed this 16th day of February, 2021_

**List of Reliance Materials**

911 Commission Interview of Patrick Fitzgerald, Jan 28, 2004

911 Commission Report

911 Commission Staff Monograph on Terrorist Financing

Abbottabad Document- OBL Will Translation

Affidavit of Wael Hamzah Jelaidan

Aid Watch Factsheet on Al Haramain Islamic Foundation

Al Shamal Bank Website - Correspondents

Arab News, Badr Almotawa - US urged to give sound proof in Julaidan's case, Aug 9, 2002

Benthall, Jonathan and Bellion-Jourdan, Jerome - The Charitable Crescent

Bergen, Peter, The Osama Bin Laden I Know: An Oral History of Al Qaeda's Leader

BUR-PEC 63170-63210

BUR-PEC 75113-75133

Burr, Millard & Collins, Robert – Alms for Jihad

Burr, Millard & Collins, Robert - Revolutionary Sudan: Hasan Al-Turabi and the Islamist State, 1989-2000

Canada (Minister of Citizenship and Immigration) v. Jaballah

CIA – Balkans' Charities, 1996

CIA - Historical Background of the Islamic Army, Nov 26, 1996

CIA - The Plot and the Plotters, June 2003

CIA - Usama Bin Laden: Islamic Extremist Financer, 1996

CIA - Usama Bin Laden's Activities in Somalia and Sudanese NIF Support, April 30 1997

Congressional Hearing, Committee on International Relations, Al-Qaeda and the Global Reach of Terrorism, Oct 3, 2001

Declaration of Dr. Abdulrahman al Suwailem and Exhibits, Jan 10, 2005

Deposition of Yassin Abdullah Kadi Exhibits

Deposition of Yassin Abdullah Kadi, In the Matter of: In Re Terrorist Attacks, July 10, 2018

European Union Court of Justice, Judgment July 18, 2013

European Union Court of Justice, Judgment Sept 3, 2008

Executive Order 13224

FATF Report: Risk of Terrorist Abuse of Non-Profit Organizations, June 2014

FED-PEC 97363-97365

FED-PEC 203469-203470

FED-PEC 212243-212246

FED-PEC 212276-212281

FED-PEC 212309-212310

FED-PEC 212164-212167

FED-PEC 212659-212696

FED-PEC 213792-213854

FED-PEC 213923-213929

FRD-PEC 213978-213979

FED-PEC 215313-215314

FED-PEC 215391-215294

FFIEC BSA/AML Examination Manual, Appendix F "Money Laundering and Terrorist Financing "Red Flags

FORBES, Morais, Richard, "The Al Qadi Affair," January 24, 2008

Foreign Affairs, Indyk, Martin, Back to the Bazaar, January 2002

German Federal Office of Criminal Investigation report on TWRA

Global News Wire, Pakistan Frozen Accounts, June 23, 2003

Harrison v Sudan, DCDC Opinion, March 30 2012

Hegghammer, Thomas - The Caravan: Abdullah Azzam and the Rise of Global Jihad

IIRO 149637

IIRO 149642

IIRO 41030

Independent, Colin Brown, Bin Laden linked to Albanian Drug Gangs, October 21, 2001

International Criminal Tribunal for the Former Yugoslavia, Rasim Delic trial transcript Feb 10, 2008

International Criminal Tribunal for the Former Yugoslavia, Rasim Delic trial transcript Feb 9, 2008

James Owens v Republic of Sudan Memorandum Opinion

Kadi 103523

Kadi 103660

Kadi 104053

Kadi 104350-104353

Kadi 106559

Kadi 10758

Kadi 10778-10780

Kadi 10793

Kadi 10813

Kadi 11506

Kadi 115482

Kadi 115761

Kadi 116190

Kadi 116194

Kadi 116202

Kadi 116386

Kadi 116556

Kadi 11907

Kadi 11912

Kadi 12168

Kadi 12169

Kadi 122337

Kadi 125792

Kadi 126079

Kadi 131279

Kadi 135297-135299

Kadi 13588

Kadi 14673

Kadi 150486

Kadi 15390-13099

Kadi 15542-15543

Kadi 18587

Kadi 187044

Kadi 20348

Kadi 2191-2194

Kadi 2229

Kadi 27078

Kadi 27092

Kadi 27182-27183

Kadi 28389

Kadi 28396-28402

Kadi 2910-2912

Kadi 2933

Kadi 2944

Kadi 29646

Kadi 3070

Kadi 35071

Kadi 35392

Kadi 4273-4278

Kadi 44901

Kadi 45871

Kadi 50966

Kadi 51013

Kadi 51042

Kadi 51062

Kadi 51067-51071

Kadi 51226

Kadi 5129-5132

Kadi 51329

Kadi 51469

Kadi 52040

Kadi 52707

Kadi 6960

Kadi 72128-72132

Kadi 73949-73950

Kadi 79406

Kadi 79422-79423

Kadi 79434

Kadi 79615

Kadi 89787

Kadi 89825-89878

Kadi 93278

Los Angeles Times, 10 Arrested in Anti-Terrorism Raids in Albania, August 23, 1998

Madrid Indictment Spanish and English

Military Review Dec 2013

MWL 30817-30819

MWL 8691

OFAC Kadi Statement

OFAC Newcomb Memorandum

OFAC Szubin Declaration

Olivia Rux v Republic of Sudan Opinion and Order

PEC-FOIA 49927-49932

PEC-KSA 2133-2134

PEC-KSA 329-352

Rabita Trust Document Production

Saudi Arabia Embassy Press Release – Saudi Arabia and U.S. Track Down Assets of Bin Ladin Operative, Sep 10, 2002

Senate Judiciary Committee Kohlmann Testimony July 14, 2010

Sudan Transparency Initiative, Pursuing Transparency in Sudan's Oil Industry, January 20, 2016

Thornton, Sean, "Introductory Note to European Commission et al v. Kadi (E.C. J.)," 52 ILM 1257 (2013)

Turkish Corporate Records - Maram

U.S. Defense Dept.  JTF-GTMO Algeria 1452

U.S. Defense Dept.  JTF-GTMO SA 239

U.S. Defense Dept.  JTF-GTMO YM 170

U.S. Defense Dept.  JTF-GTMO YM 33

U.S. State Dept Cable – Bosnia's Dirty Dozen

U.S. State Dept. Cable - Anatomy-of-an-Islamist-NGO

U.S. State Dept. Cable - Sudanese Mischief-Making: Does it Matter

U.S. State Dept. Factsheet on UBL Aug 14 1996

U.S. State Dept. Patterns of Global Terrorism 1998

U.S. Treasury Dept.  Administrative Review

U.S. Treasury Dept.  Administrative Review – Answers to Questions.

U.S. Treasury Dept. Letter to Swiss Prosecutor Nov 29 2001

US Treasury Dept. Press Release JS-1107 Designation of AHIF Jan 22, 2004

U.S. Treasury Dept. Press Release JS-1190, Designation of Zindani

U.S. Treasury Dept. Press Release JS-2164, Designation of Batterjee

U.S. Treasury Dept. Press Release JS-2727, Designation of Saleh

U.S. Treasury Dept. Press Release PO-689, Designation of Kadi et al.

U.S. Treasury Dept. Protecting Charitable Organizations -A

U.S. Treasury Dept. Statement on the Designation of Wa'el Hamza Julaidan

U.S. v Arnaout Government's Evidentiary Proffer, Jan 31, 2003

U.S. v Bin Laden Indictment, Oct 7, 1998

U.S. v Bin Laden Trial Transcript February 6, 2001

United Nations Security Council 1267 Committee Consolidated List (2002)

United Nations Security Council 1267 Committee Narrative Summary for Al-Haramain & Al Masjed al-Aqsa Charity Foundation

United Nations Security Council 1267 Committee Narrative Summary for Wael Julaidan

United Nations Security Council 1267 Committee Narrative Summary for Yassin Qadi

United Nations Security Council 1267 Committee Narrative Summary for Rabita Trust

United Nations Security Council 1267 Committee Narrative Summary for Chafiq Ayadi

United Nations Security Council Monitoring Group Report #2 Nov 3, 2003

United Nations Security Council Document S/2002/1338 conveying the Third Report of the Al Qaeda and Taliban Monitoring Group

United Nations Security Council Report of the Ombudsperson, Jan 31, 2013

United Nations Security Council Resolution 1267 (1999)

United Nations Security Council Resolution 1333 (2000)

Witness Statement Ali Hamad

WJ 001-022

Yale University Library - Guide to the Islamic Fundamentalist Audio Recordings Collection excerpt