# EXHIBIT C

Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's Motion
To Exclude the Testimony of Victor Comras

03 MDL 1570

July 31, 2023

THE ANNOTATIONS ON THIS TRANSCRIPT WERE DONE BY PETER C. SALERNO AND REFLECT
CORRECTIONS SUPPLIED IN A "CORRIGENDUM" BY THE DEPONENT

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 03-MDL-1570 (GBD)(SN)

5    -----------------------------------x

6    IN RE:  TERRORIST ATTACKS ON

7

8    SEPTEMBER 11, 2001

9    -----------------------------------x

10

11        REMOTE VIDEOTAPED DEPOSITION OF
                    VICTOR COMRAS

12             Ft. Lauderdale, Florida
                   July 23, 2021

13

14

15   Reported By:

16   ERIC J. FINZ

17

18

19

20

21

22

23

24

25

Page 2

1

2                              July 23, 2021

                               8:16 a.m.

3

4        Remote Videotaped Deposition of

5    VICTOR COMRAS, taken by Defendants,

6    pursuant to Notice, before ERIC J. FINZ,

7    a Shorthand Reporter and Notary Public

8    within and for the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1
 2   A P P E A R A N C E S: (All Via Remote)
 3   ANDERSON KILL P.C.
     Attorneys for Plaintiff O'Neill and
 4   Plaintiffs' Executive Committee
           1251 Avenue of the Americas
 5         New York, New York 10020
 6   BY:   JERRY S. GOLDMAN, ESQ.
           jgoldman@andersonkill.com
 7
 8
     MOTLEY RICE LLC
 9   Attorneys for Burnett Plaintiffs and for
     the Plaintiffs' Executive Committee
10         28 Bridgeside Boulevard
           Mount Pleasant, South Carolina 29465
11
     BY:   ROBERT T. HAEFELE, ESQ.
12         rhaefele@motleyrice.com
           JADE HAILESELASSIE, ESQ.
13         jhaileselassie@motleyrice.com
14
15   KREINDLER & KREINDLER LLP
     Attorneys for Plaintiffs' Executive
16   Committee
           750 Third Avenue
17         New York, New York 10017
18   BY:   ANDREW J. MALONEY, III, ESQ.
           amaloney@kreindler.com
19         JOHN FAWCETT, ESQ.
           jfawcett@kreindler.com
20
21
22
23
24
25
```

Page 4

1
2  A P P E A R A N C E S: (Continued)
3  LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
   Attorneys for The Muslim World League,
4  International Islamic Relief Organization
   and the Charity Officials
5          1101 New York Avenue NW
           Washington, D.C. 20005
6
   BY:   WALEED NASSAR, ESQ.
7          waleed.nassar@lbkmlaw.com
8
9  COZEN O'CONNOR
   Attorneys for Federal Insurance
10 Plaintiffs
           One Liberty Place
11         1650 Market Street
           Philadelphia, Pennsylvania 19103
12
   BY:   J. SCOTT TARBUTTON, ESQ.
13         starbutton@cozen.com.com
           SEAN CARTER, ESQ.
14         scarter@cozen.com
15
16 JONES DAY
   Attorneys for Dubai Islamic Bank
17         51 Louisiana Avenue NW
           Washington, D.C. 20001
18
   BY:   GABRIELLE PRITSKER, ESQ.
19         gpritsker@jonesday.com
           ABIGAEL BOSCH, ESQ.
20         abosch@jonesday.com
           ERIC SNYDER, ESQ.
21         esnyder@jonesday.com
22
23
24
25

Page 5

```
 1
 2   A P P E A R A N C E S: (All Via Remote)
 3   OMAR T. MOHAMMEDI LLC
     Attorneys for World Assembly of Muslim
 4   Youth
          233 Broadway
 5        New York, New York 10279
 6   BY:  OMAR T. MOHAMMEDI, ESQ.
          omohammedi@otmlaw.com
 7
 8
     SALERNO & ROTHSTEIN
 9   Attorneys for Yasin Kadi
          221 Schultz Hill Road
10        Pine Plains, New York 12567
11   BY:  PETER C. SALERNO, ESQ.
          peter.salerno.law@gmail.com
12        AMY ROTHSTEIN, ESQ.
          amyrothsteinlaw@gmail.com
13
14
     ALSO PRESENT:
15
          KATHARINE SILVERLEAF
16
          NOUR SOUBANI
17
          SUMAYYA KHATIB
18
          JODI FLOWERS
19
          LINDA HOFFMAN, Jones Day
20
          DUANE MILNER, Veritext Concierge
21
          CRAIG JONES, Videographer
22
23
24
25
```

```
 1                    VICTOR COMRAS
 2               THE COURT REPORTER:  Due to
 3          the need for this deposition to
 4          take place remotely because of the
 5          government's order for social
 6          distancing, the parties will
 7          stipulate that the court reporter
 8          may swear in the witness remotely
 9          and that the witness has verified
10          that he is in fact Victor Comras.
11               THE WITNESS:  Yes, I'm Victor
12          Comras.
13               MR. MALONEY:  Andrew Maloney
14          from Kreindler & Kreindler for
15          plaintiffs.
16               MR. SALERNO:  Agreed.
17    VICTOR COMRAS,
18    having been first duly sworn by the
19    Notary Public (Eric J. Finz), was
20    examined and testified as follows:
21               EXAMINATION BY
22               MR. SALERNO:
23          Q.   Good morning, Mr. Comras.  How
24      are you today?
25          A.   Good, thank you.  How are you?
```

```
 1                    VICTOR COMRAS
 2           identification, document headed
 3           "Corrigendum.")
 4   BY MR. SALERNO:
 5           Q.    Mr. Comras, I show you what
 6     has been marked as Exhibit 974, and ask
 7     if this is the corrigendum that you
 8     submitted to your main report sometime in
 9     July of 2021?
10           A.    It appears to be, yes.
11           Q.    And for the record, this
12     corrigendum changes the last sentence on
13     page 39 of your main report to state --
14           A.    That's correct.
15           Q.    And let me finish.
16                 And to state, please, that
17     the -- let me start again.
18                 My understanding is, and I'm
19     going to ask you if this is correct, that
20     this changes the last sentence on page 39
21     to state that the total of bounced checks
22     referred to is $1.7 million rather than
23     $27 million.  Is that correct?
24           A.    Yes.
25           Q.    And there are two additional
```

Page 23

```
 1                 VICTOR COMRAS
 2            Now, your list goes back to
 3     September 20, 2002.  Doesn't it?
 4        A.    I think it does, yes.
 5        Q.    How did you select what
 6     material to include in this list and what
 7     to exclude?
 8        A.    What I considered to be work
 9     that was relevant and important.  I've
10     written other things on the side that
11     have nothing to do with this issue,
12     particularly in the areas of
13     nonproliferation.
14        Q.    Thank you.
15            Mr. Comras, do you have any
16     experience analyzing pre-9/11 financial
17     transactions in Sudan?
18        A.    I cannot say specifically
19     Sudan.  I do have experience in dealing
20     with financial transfers from other
21     countries.  I may have come across
22     something when I was in the Office of
23     Sanctions Policy that dealt with Sudan.
24     But that would test my memory.
25        Q.    And do you have any experience
```

Page 45

1                    VICTOR COMRAS
2              What experience do you have in
3    forensic accounting?  Would it be the
4    same thing?
5         A.     Pretty much so.  Greatest
6    experience is being the lead person on
7    the Al Qaeda and Taliban Sanctions
8    Committee Monitoring Group for financial
9    sanctions.  And then following that,
10   having the same responsibility with
11   respect to north Korea, from 2009-2010.
12   In both of those times I was the man who
13   led our group's efforts with respect to
14   financial violations of sanctions.
15        Q.     Thank you.
16              Changing the subject, sir.
17   Did you read the entire transcript of
18   Mr. Kadi's deposition in this case?
19        A.     Yes.
20        Q.     And did you read the --
21        A.     Let me correct that.  I read
22   what was sent to me as volume 1.  I
23   assume that that was the whole
24   transcript.  I'm not sure if there was
25   anything more.  But I was provided what

Page 46

```
 1                  VICTOR COMRAS
 2    was called volume 1 of his transcript.
 3    It seemed to be complete.
 4         Q.    Thank you.
 5               There was also an errata
 6    sheet.  Did you ever see an errata sheet
 7    to that transcript?
 8         A.    I did not.
 9         Q.    Mr. Comras, prior to writing
10    your report in this case, did you have
11    any bias regarding defendant Yasin
12    Abdullah Kati?
13         A.    I don't know how to quite
14    answer that question.  I had some
15    knowledge of him.  I don't think that
16    that led to any bias, no.
17         Q.    So you don't think you had
18    bias, that's your answer?
19         A.    I think that I understood that
20    he was a designated entity.  And that
21    based upon the information available to
22    me in the Al Qaeda and sanctions
23    monitoring group, that there were reasons
24    for that designation.  So to the extent
25    that that may have influenced me, I don't
```

Page 47

```
 1                    VICTOR COMRAS
 2     know how you want to express that.  I
 3     would not call that bias, I would call it
 4     simply assessing the facts.
 5          Q.    Did you write a post for the
 6     counterterrorism blog titled "It's time
 7     to put Yasin Al-Kadi out of business"?
 8          A.    I did.
 9               MR. SALERNO:  I would ask the
10          court reporter to put up Exhibit
11          008 -- I'm sorry, 006, excuse me.
12               This is 976, correct, now?
13               THE CONCIERGE:  Yes, sir.
14               MR. SALERNO:  Can you put it
15          up, please.
16               (Deposition Exhibit 976 for
17          identification, blog titled "It's
18          time to put Yasin Al-Kadi out of
19          business," production numbers KADI
20          67861 through KADI 67862.)
21               MR. SALERNO:  We're waiting
22          for the court reporter to put up
23          the exhibit.
24               THE CONCIERGE:  My name is
25          Duane, I'll be the concierge tech,
```

Page 48

1                    VICTOR COMRAS
2          I'm actually putting the sticker on
3          it right at this moment.  It's kind
4          of an odd document.  I jut don't
5          want to have anything blocked with
6          that sticker.
7                I did get ahold of support and
8          we will have a videographer joining
9          us.
10                THE VIDEOGRAPHER:  I've
11          actually joined and started my
12          local recording.  If you'd like
13          I'll begin the Zoom recording as
14          well.
15                MR. HAEFELE:  We would object
16          to the Zoom recording.
17                THE VIDEOGRAPHER:  Okay.  I'll
18          just record local.
19                MR. SALERNO:  What's the
20          difference?
21                MR. HAEFELE:  Courts have
22          found Zoom recordings are not
23          something that are admissible.
24   BY MR. SALERNO:
25          Q.    I show you what has been

```
1                    VICTOR COMRAS
2    marked as Exhibit 976, and ask if that is
3    a true copy of the blog post you wrote
4    titled "It's time to put Yasin Al Kadi
5    out of business."
6         A.    I'm looking for the date.
7    Because I don't recall the exact wording
8    of the blog at that time.  But it looks
9    like what would be my blog, yes.
10        Q.    Well, I was going to ask.
11        A.    Could you scroll it a little
12   bit so that I could see a little bit more
13   of the blog.
14              If you have patience, I'll
15   read through it and recall -- refresh my
16   memory.
17        Q.    I'm just going to ask you if
18   that's your blog.  If you could look at
19   the end of the post, it's dated September
20   20, 2005.
21        A.    Okay, September 20, 2005, yup.
22        Q.    Okay.  Is this the blog you
23   wrote?
24        A.    It appears to be the blog I
25   wrote, yes.
```

```
 1                    VICTOR COMRAS
 2         Q.    Did you consider this post in
 3    writing either your initial report or
 4    your rebuttal report in this case?
 5         A.    To be honest, until this
 6    moment I had completely forgotten it.
 7         Q.    So is that the reason that you
 8    didn't list this article in your -- in a
 9    list of sample list of recent
10    publications?
11         A.    That's correct.  I think it's
12    very hard for me to get back the stuff on
13    the counterterrorism blog since it was
14    taken offline.
15              MR. HAEFELE:  I'd also lodge
16         an objection under Rule 26.  I
17         don't think he's required to list a
18         2005 publication.  But in any
19         event, we have it.
20              MR. SALERNO:  I'm just asking
21         the question, Mr. Maloney.
22              MR. MALONEY:  Well, no.  You
23         asked it in a way is that the
24         reason you didn't list it.  That's
25         not fair.  So I'm objecting to the
```

```
 1                    VICTOR COMRAS
 2          form of your question.  There are
 3          certain requirements under Rule 26
 4          for disclosure.  You know it and I
 5          know it.  The way you phrase the
 6          question was not proper.
 7                  MR. SALERNO:  Thank you,
 8          Mr. Maloney, I appreciate the
 9          clarification.
10   BY MR. SALERNO:
11          Q.    The final sentence of this
12      post, Mr. Comras, "When, if ever, will
13      the UN sanctions put him, Mr. Kadi, out
14      of business?"  Is that correct?
15          A.    I'm sorry.  It says "he
16      continues to run a number of these
17      businesses from his offices in Jeddah.
18      When, if ever, will the UN sanctions put
19      him out of business?"  Correct.
20          Q.    And in that post, you also
21      wrote, going back to the first page,
22      please, the second full paragraph.
23          A.    Can you scroll back to it,
24      please.
25                  MR. SALERNO:  Court reporter,
```

```
 1                    VICTOR COMRAS
 2           are you there?
 3           Q.    Second full paragraph.  Did
 4      you write that Muwafaq and its Blessed
 5      Relief charities were implicated directly
 6      in financing the 1998 U.S. Embassy
 7      bombings in Kenya and Tanzania?
 8           A.    Let me see.  Financial
 9      supporters.  He was the founder and key
10      financial supporter of Muwafaq, that were
11      implicated directly in financing.
12      Despite designations by the U.S. Treasury
13      Department.
14           Q.    And to be clear, you were
15      referring there to the Muwafaq Foundation
16      with which Yasin Al Kadi was affiliated.
17      Correct?
18           A.    Correct.
19           Q.    How was Muwafaq Foundation
20      implicated in the embassy bombings in
21      1998?
22           A.    Through the financing route to
23      those individuals and entities through
24      the al Shamal Bank and Farmers Bank that
25      reached Al Qaeda -- sorry, reached Al
```

1                    VICTOR COMRAS
2    Qaeda membership which were directly
3    implicated.  Has to do with the route of
4    financing at the time it believed to have
5    involved, as I expressed in my report as
6    well, financing directly from Muwafaq to
7    Al Qaeda in Sudan.  And that, it was the
8    implication.
9         Q.    So it's your testimony that
10   you had evidence that Mr. Kadi was
11   financing Al Qaeda?
12        A.    To the extent that I express
13   it in the report, correct.  Evidence
14   meaning what?  I mean, was I there, no.
15   Did I see it, no.
16        Q.    Beyond what you've just told
17   us, did you have any basis for the
18   statement that Muwafaq and its Blessed
19   Relief branch charities were implicated
20   directly in financing for the 1998 U.S.
21   Embassy bombings in Kenya and Tanzania?
22        A.    The only reference is whatever
23   is in my report.  I stand by the words in
24   my report.  That's the extent of my
25   knowledge of this transaction.

1                    VICTOR COMRAS

2          Q.     Thank you.

3                 You note in this post in the

4     first paragraph that the Albanian

5     authorities had seized assets of Mr. Kadi

6     owned in that country.  Correct?

7          A.     In Albania, yes, they had

8     seized assets of Al Kadi.

9          Q.     And the Albanians were

10    conducting a criminal investigation of

11    Mr. Kadi.  Correct?

12         A.     Correct.

13         Q.     Do you know the outcome of

14    that investigation?

15         A.     It was dropped.

16         Q.     So you were a contributing

17    expert to the Counterterrorism Blog.

18    Correct?

19         A.     I was a contributor to the

20    Counterterrorism Blog, correct.

21         Q.     You didn't have any kind of a

22    title that you would call contributing

23    expert?

24         A.     I did.  I was a contributing

25    expert.  It says so on the blog.  The

                    VICTOR COMRAS

1

2    not cite any authority for that?

3         A.    None that I can think of.

4         Q.    Do you have any authority for

5    that?

6         A.    I apparently do, but I have to

7    find it again.  Obviously I don't try to

8    use my words lightly.  It's come to my

9    attention that facts from the reading and

10   research, it may have been a lacuna to

11   not put in a footnote.

12        Q.    But as you sit here today --

13        A.    I think that there are other

14   footnotes showing his involvement in

15   those groups.  Not sure that he may have

16   referenced it also in his deposition

17   testimony.  Or statements to OFAC.  I'll

18   have to check that, sorry.

19        Q.    So you can't tell us then what

20   now, as you sit here today, what the

21   nature of Mr. Kadi's alleged association

22   with members of the Muslim Brotherhood

23   was, can you, or can you?

24        A.    I cannot go beyond what I

25   stated in the report.  That he was

Page 74

```
 1                  VICTOR COMRAS
 2         A.    It's broader than that.
 3         Q.    But --
 4         A.    Terrorism financing, you
 5    mentioned just transactions.  It's
 6    broader than transactions itself.  Well,
 7    financial transactions.  The red flags of
 8    terrorism financing, in the broad sense.
 9    They were developed by different
10    institutions for somewhat different
11    purposes, mainly to alert financial
12    institutions of possible transactions
13    that involved terrorism.  But also to
14    inform other regulators and investigators
15    of potential activities involving the
16    financial support of terrorism.
17         Q.    Your report at the bottom of
18    page 7 and continuing on page 8.
19         A.    7 and 8, yes.
20         Q.    That lists twelve red flags
21    that you say, quote, must be considered
22    in evaluating the likelihood of terrorism
23    financing, close quote.
24               Have I read that correctly?
25         A.    Yes, you have.
```

```
 1                    VICTOR COMRAS
 2          Q.    So you're not saying it's bad
 3    behavior to be a Saudi citizen; are you?
 4          A.    I'm not saying it's a bad
 5    behavior.  I'm saying it's a red flag
 6    along with other red flags that you use
 7    to evaluate risks.  These are risk
 8    factors.  It says red flag.  They are
 9    risk factors.  And you take these risk
10    factors and you look at transactions
11    using these risk factors to determine
12    whether something might have happened.
13    And you study the transaction to see if
14    it appears to be.
15               It's not the risk factors that
16    determine that they are, it's the risk
17    factors that point to the transaction to
18    be studied.
19               I hope that answers your
20    question.
21          Q.    Yes, I think it does.
22               MR. SALERNO:  Could the court
23          reporter please mark and put up --
24          I think I'm skipping one here, yes.
25          011, our internal tab 011.
```

```
 1              VICTOR COMRAS
 2    So if it flows through him to somebody,
 3    he's not the issuer, but he's the
 4    handler.
 5              So the issue is, did he issue
 6    it or did he handle it.  Did a check end
 7    up where it ended up.  We don't know
 8    that.  We don't know what checks he may
 9    have handled along the way.  But there is
10    reason to believe that he did.  That's
11    what I'm saying.
12        Q.    So how did Mr. Kadi -- I'm
13    sorry.  So you said in your opinion that
14    Mr. Kadi, quote, used, unquote, bearer
15    checks to mask questionable dealings.
16    Correct?
17        A.    Yes.
18        Q.    So how did Mr. Kadi use bearer
19    checks to mask questionable dealings?
20        A.    By passing them on.  By being
21    an intermediary in the handling of the
22    check.
23              (Reporter clarification.)
24              MR. MALONEY:  I just objected,
25         it was asked and answered.
```

```
                                          Page 107
 1                  VICTOR COMRAS
 2          A.    On April 23rd, the fund were
 3     sent by Kadi to the Islamic Investment
 4     Company of the Gulf.
 5          Q.    And in the sentence after that
 6     you state, "the Islamic Investment
 7     Company of the Gulf was the subject of
 8     multiple investigations concerning
 9     possibly links to terrorism."
10                Have I read that correctly?
11          A.    That's correct.
12          Q.    When did these investigations
13     of IICG occur?
14          A.    Let's take a look at 52.
15     Footnote 52.  Exhibit 21.
16          Q.    I'm asking you when these
17     investigations concerning possible links
18     to terrorism that you assert exist of the
19     Islamic Investment Company of the Gulf,
20     that's not in Exhibit 21.
21          A.    That's not in Exhibit 21,
22     okay.
23                Well, there were
24     investigations, I'm not sure how they
25     finally came out.  I think in the end
```

```
 1                    VICTOR COMRAS
 2      there was an issue settled on tax
 3      grounds.  But I cannot recall offhand all
 4      of the details about the investigations.
 5               But I know that they were
 6      under investigation at that time, for
 7      several things.  How that investigation
 8      resulted, I cannot tell you.  I do know
 9      that there was something, I'm thinking
10      from my memory now, there was something
11      in the end that ended up in a tax
12      violation.  What was the extent of the
13      investigation for several reasons, I
14      don't know.
15           Q.    It's your testimony that some
16      of these investigations were going on in
17      April of 1991; is that correct?  You said
18      at that time.
19           A.    That's right.  The
20      investigation subject -- they were the
21      subject of multiple investigations at
22      that time.
23           Q.    Concerning possible links to
24      terrorism?
25           A.    I believe that's the case.
```

```
 1                    VICTOR COMRAS
 2         Q.    But you can't cite us
 3    specifics as to any as you sit here
 4    today; can you?
 5         A.    Sitting here today I cannot,
 6    although I do have some -- I don't come
 7    up with things off the top of my head.
 8    There must have been something -- some
 9    source that I used to give me that
10    impression, or that information.
11         Q.    Okay.
12              MR. SALERNO:  Now I'm going to
13         ask the court reporter or
14         videographer to put up tab 012,
15         which is indeed Exhibit 21 to the
16         Kadi deposition.
17              THE WITNESS:  You're back on
18         the screen, by the way.
19              MR. SALERNO:  Veritext, I'm
20         not seeing my whole screen.  I've
21         got a postage stamp.
22              (Deposition Exhibit 981 for
23         identification, document headed
24         "Islamic Fidicuary {sic} Account,"
25         with attachments, production
```

Page 110

```
 1                    VICTOR COMRAS
 2          numbers KADI 34026 through KADI
 3          57011.)
 4   BY MR. SALERNO:
 5          Q.    I'm going back to page 17 of
 6     your report, where you say, about eight,
 7     nine lines down, "This transaction was
 8     never appropriately explained."
 9               Have I read that correctly.
10          A.    I believe you have, yes.
11     Never appropriately explained.
12          Q.    And to whom was it supposed to
13     be explained?
14          A.    To my satisfaction that it had
15     another purpose.  It should be --
16     transactions should provide information
17     today about who is the originator, who is
18     the beneficiary, and sometimes about what
19     the purpose is.  You just don't do a
20     transaction that's not explained.
21          Q.    And it's your testimony that
22     this requirement to explain it to your
23     satisfaction existed in 1991, what we're
24     talking about here?
25          A.    No.  It's not a requirement
```

```
 1                   VICTOR COMRAS
 2     that it be done to my satisfaction.  It
 3     is a factor, an indicator that for me, in
 4     formulating my opinion.  I mean, I look
 5     at the situation, the situation is full
 6     of different issues and facts and
 7     environment and scenery.  And I draw
 8     conclusions from what I see.
 9               That's my expertise, is to
10     take a look at something and see, oh,
11     maybe this is this, maybe this is that,
12     what do I think it is, what do I think it
13     is enough to express an expert opinion
14     about.  And that's how I derive my
15     opinions.  They are educated, informative
16     opinions based upon many factors taken
17     together, nothing independent of its own
18     stands as a foundation or as a structure
19     that will hold up my opinion, but many
20     factors together that leads to an
21     opinion.
22          Q.    You never asked -- you never
23     asked Mr. Kadi to explain it; did you?
24          A.    I never asked Mr. Kadi
25     anything, no.
```

Page 112

```
                          VICTOR COMRAS

 1          Q.      Did anyone ever ask Mr. Kadi
 2
 3      to explain it?
 4          A.      That I do not know.
 5                  MR. SALERNO:  Would the
 6          videographer please put up tab 013,
 7          which is the Kadi deposition
 8          transcript.  Which I believe would
 9          now be Exhibit 982, if I've
10          correctly marked up my stuff.
11                  (Deposition Exhibit 982 for
12          identification, deposition
13          transcript dated July 10, 2018.)
14                  MR. SALERNO:  Then could you
15          also put up Exhibit 014 for
16          completeness, it's not really
17          applicable to this deposition, but
18          for completeness, the errata sheet
19          to the Kadi deposition transcript.
20          And this is all asking Veritext to
21          do that.
22                  (Deposition Exhibit 983 for
23          identification, errata sheet.)
24                  THE CONCIERGE:  The errata
25          will be 0983.
```

```
 1                    VICTOR COMRAS
 2        Q.     In the sentence on page 17 of
 3   your report, and immediately after the
 4   one we've been talking about, and so this
 5   will be about, I'm eyeballing it, nine or
 6   ten or eleven lines from the top of page
 7   17, you say, "Consequently, Osama bin
 8   Laden had been present in Jeddah during
 9   this time and had been restricted from
10   transferring his funds out of Saudi
11   Arabia, raising suspicions that this $10
12   million transfer may have been made on
13   his behalf," close quote.
14             Have I read that correctly?
15        A.     Yes.
16        Q.     What did you mean by
17   "consequently" in that sentence, by the
18   way?
19        A.     Concurrently, a little bit
20   more than concurrently.  It was just
21   coincidentally.  Whatever you want to
22   read into it.  I don't think, maybe the
23   "consequently" was not the best use of a
24   word, consequently.
25        Q.     Okay.  We understand that
```

```
 1                    VICTOR COMRAS
 2      you're talking more about you mean
 3      coincidentally really, don't you?
 4           A.     Probably.  Enough to raise in
 5      my mind a suspicion, that's all.  It may.
 6           Q.     Do you know anybody --
 7                  (Simultaneous crosstalk.)
 8           Q.     Do you know anybody else
 9      besides yourself who had these
10      suspicions?
11           A.     I do not.
12           Q.     And what, if any, is the
13      evidence to support these suspicions?
14           A.     I do not provide any because I
15      say may.  I reached no particular
16      conclusion other than it raised a
17      question in my mind.  It was suspicious
18      to me.  I am reflecting that in my
19      opinion, that it was suspicious to me.
20      Nothing more.  That it may have been.  I
21      am not concluding that it did.  I am not
22      making any conclusions about that
23      sentence.  It's a very conditional
24      sentence.
25           Q.     Let's go on to the second
```

```
                                        Page 127
 1                    VICTOR COMRAS
 2          A.     Correct.
 3          Q.     So it's still your opinion,
 4     though, that the original source or
 5     purpose of these funds was never fully
 6     explained?
 7          A.     I'm sorry, I don't understand
 8     your question.
 9          Q.     You have said that the source
10     and purpose or source or purpose of these
11     funds was never explained in your report.
12     Correct?  My question is, is that still
13     your opinion after looking at --
14          A.     I'd like to know the
15     explanation.  Still, I don't understand.
16     All I know is that $30 million was
17     transferred from NCB to Leemount,
18     Leemount invested the money.  I don't
19     know what the purpose of the investment
20     was.  That it now was the purpose of the
21     issuing of the 30 million, I don't know.
22     Was the 30 million originally provided
23     for this investment, I don't know.
24          Q.     Okay.  You conclude in the
25     first, this first full -- you conclude
```

Page 128

1                    VICTOR COMRAS
2       this first full paragraph at page 42 with
3       the sentence, "This lack of accounting
4       information concerning the origin,
5       distribution and disbursement of these
6       funds, raises serious red flags
7       concerning the potential that some of
8       these funds were siphoned off for
9       terrorism or related illicit purposes,"
10      close paren.
11          A.    Let me go back to the
12      beginning of the paragraph.  Kadi again
13      used his Leemount company to funnel money
14      to Muwafaq for its projects.  He got,
15      according to the federal Swiss federal
16      police, which is my source of information
17      here --
18          Q.    Okay, that's fine.  Thank you.
19          A.    Kadi made deposits.
20              MR. MALONEY:  Mr. Salerno, you
21          got to let him finish.
22              MR. SALERNO:  I don't have to
23          let him filibuster, Mr. Maloney.
24              MR. MALONEY:  That's not
25          filibustering.  You posed a

```
 1                  VICTOR COMRAS
 2        question about explanation or lack
 3        thereof.  He's continuing to
 4        answer.
 5                  Continue, Mr. Comras.
 6        A.    It seems to me that I am
 7   reflecting the opinion of the Swiss
 8   investigators.
 9        Q.    By the way, the Swiss never
10   prosecuted, or never concluded any
11   prosecution of Mr. Kadi; did they?
12        A.    They never concluded any, no.
13        Q.    They investigated him for a
14   number of years and never charged him.
15   Correct?
16        A.    Never charged him, correct.
17        Q.    And you're aware that they
18   investigated him for a number of years.
19   Correct?
20        A.    Never have implicated him,
21   correct.
22        Q.    Never indicted him?
23        A.    Never indicted him.
24        Q.    Mr. Comras, you have not
25   traced any funds directly from Mr. Kadi
```

```
                                    Page 161

 1                  VICTOR COMRAS
 2     in line 1, of the second paragraph, "when
 3     referring to the assassination of Al
 4     Qaeda co-founder Abdullah Azzam, bin
 5     Laden stated, quote, we were all in one
 6     boat, as is known to you including our
 7     brother, Wael Julaidan, close quote.
 8                  You quoted the part about we
 9     were all in one boat, but you didn't say
10     when referring to the assassination of Al
11     Qaeda co-founder Abdullah Azzam; did you?
12                  MR. MALONEY:   Objection.
13          A.    I did not.  I did not quote
14     that because that was not part of what I
15     was trying to say.  What I was trying to
16     take, and I had found in several places,
17     was the interview.  That was not part of
18     the interview of Mr. Bin Laden at the
19     time.
20          Q.    So even the Treasury
21     Department is essentially saying in its
22     press release that the boat bin Laden is
23     referring to in that quote, contains
24     himself, Julaidan and Abdullah Azzam.  Is
25     that a fair characterization of what the
```

Page 162

1                  VICTOR COMRAS

2      Treasury Department saying?

3           A.   I'm sorry, will you repeat

4      what you just said?

5           Q.   Even the Treasury Department,

6      in the press release, the sentence we've

7      just read and any other part of this

8      release you wish to look at, is

9      essentially saying that the boat that bin

10     Laden is referring to contains himself,

11     Julaidan and Abdullah Azzam.  Isn't that

12     a fair characterization of what the

13     Treasury Department is saying?

14          A.   You can draw that conclusion.

15     Maybe I can too.  But that's not what I

16     read for sure says what they're saying,

17     no.

18          Q.   Do you know that Abdullah

19     Azzam was assassinated in 1989?

20          A.   Yes.

21          Q.   By the way, you know from this

22     very document that Wael Julaidan, was not

23     listed by OFAC until September 6, 2002.

24     Do you?  Or don't you?

25          A.   I do know that he was -- when

```
                                      Page 170
 1                  VICTOR COMRAS
 2     criteria."
 3              Have I read that correctly?
 4        A.    Correct.
 5        Q.    And am I correct that in your
 6     footnote to that statement, you cite
 7     Jonathan Benthall's "The Charitable
 8     Crescent", page 124.  Am I correct about
 9     that?
10        A.    Correct.
11        Q.    And am I correct in your
12     footnote you go on to state that, quote,
13     "In 1996, as a journalist, Mr. Benthall
14     visited a displaced person camp serviced
15     by Muwafaq in Sudan."
16              Have I read that correctly?
17        A.    You have.
18        Q.    Do you happen to have a copy
19     of "The Charitable Crescent" near you
20     today?
21        A.    I do not.
22        Q.    Do you possess it at all?
23        A.    I'm sorry?
24        Q.    Have you ever seen the entire
25     book, "The Charitable Crescent"?
```

Page 171

1                    VICTOR COMRAS
2          A.    Yes, I purchased it on Amazon.
3               MR. SALERNO:  I would ask the
4          court reporter, please, to put up
5          tab 021.  And mark it as 989, I
6          believe we're at.
7               (Deposition Exhibit 989 for
8          identification, excerpt from "The
9          Charitable Crescent.")
10              MR. SALERNO:  I think we have
11         it up.
12   BY MR. SALERNO:
13         Q.    Do you accept that what I'm
14     about to show you is from "The Charitable
15     Crescent"?
16         A.    Okay.  My cover is in color.
17         Q.    I didn't use a color scanner,
18     I apologize.
19              I want to direct your
20     attention, and the court reporter's
21     attention to page 124.  These are
22     excerpts.  So 124 will be some number of
23     pages into this excerpt, Exhibit 989.
24         A.    Okay.
25         Q.    You've seen this page before;

```
1                    VICTOR COMRAS
2         Q.    Mr. Benthall.  Okay.  Fine.
3              MR. MALONEY:  He has that in
4         his report, Peter.  I'm a little
5         confused at really what you're
6         asking.  It's in his report.
7              MR. SALERNO:  Andrew, in
8         another context I would love your
9         legal advice, but not this one.
10             MR. MALONEY:  It's not legal
11        advice.  It's the form of your
12        question that is confusing to
13        everybody.
14             MR. SALERNO:  Okay.  If I
15        heard a proper objection, that
16        would be sufficient.
17        Q.    In page 124 --
18        A.    Going back to the main report?
19        Q.    No.
20        A.    Okay.  In the document, got
21   you.  Sorry.
22        Q.    It identifies, toward the end
23   that first full paragraph, a total of 8
24   humanitarian organizations servicing the
25   camp the writer visits.  Doesn't it?
```

```
 1                  VICTOR COMRAS
 2        A.    Yes, it does.
 3        Q.    And one of them is the Sudan
 4   Council of Churches; isn't it?
 5        A.    Yes.
 6        Q.    And the writer identifies only
 7   three of those eight agencies as Islamic.
 8   Isn't that correct?
 9        A.    I'm sorry, what are you
10   saying?
11        Q.    I'm asking you if the writer
12   identifies only three of these eight
13   agencies as Islamic.
14        A.    Correct.
15        Q.    Thank you.
16              Is there any reason you did
17   not mention these other agencies,
18   especially the nonIslamic ones, in the
19   paragraph of your rebuttal where you
20   discuss it, or anywhere in your report?
21              MR. MALONEY:  Objection.
22        A.    Because it was irrelevant to
23   the report.  I'm sorry to talk about
24   relevance.  But it had nothing to do with
25   what I was writing.
```

Page 204

1           VICTOR COMRAS

2    said about investing in or dealing with

3    generally, can you describe the business

4    dealings in any more detail?

5           A.    Not much more, other than

6    there was the involvement, his

7    investments in these companies, financial

8    transactions with these companies through

9    his accounts in al Shamal Bank, through

10   his companies, including Leemount, Rowad,

11   it was one of the investments, he had

12   worked together with Loxhall, was

13   involved in the Rowad investigation.

14   Transactions, I'm sorry.  Starts with --

15          Q.    May I interrupt you.  Is it

16   your testimony that Mr. Kadi and Muwafaq

17   worked together with bin Laden in Rowad,

18   R-o-w-a-d?

19          A.    They were invested in Rowad

20   and that they also with Rowad sold sesame

21   and other agricultural products, yes.

22   Muwafaq was also a party to those

23   activities and was to receive, as I

24   understand it, percentage of the profits

25   or of the revenues produced by the

Page 205

                          VICTOR COMRAS
1
2      activity.
3           Q.    Also on page 55 you say that a
4      Kadi company engaged in, quote,
5      unmonitored business transactions with
6      Dan Fodio, or Dan Fodio.  I know it's not
7      a first name.
8           A.    Right.  Sorry, what's your
9      question?
10          Q.    What evidence do you have for
11     the proposition that any transactions
12     with Dan Fodio were unmonitored?
13          A.    There was no monitoring of any
14     companies by the Sudanese government.
15     They had no auditing capabilities, they
16     had no reporting capabilities and no
17     regulatory capabilities.  So all
18     transactions in a sense, especially with
19     the NIF companies, would not be subject
20     to any regulatory oversight.
21          Q.    So am I correct from your
22     answer that no Kadi company in Sudan had
23     an obligation to be monitored.  Is that
24     correct?
25                MR. MALONEY:  Objection.

Page 208

1                    VICTOR COMRAS
2      Wadi al Aqiq?
3           A.    Mr. Bin Laden.  Mr. Bin Laden
4      was already on the designation list for
5      the United States since 1995.  Even
6      before.  He was engaged in terrorism
7      activities and identified as a promoter
8      of terrorism.  He declared war on the
9      United States in 1992 or '93.
10          Q.    He declared war on the United
11     States in 1992 or '93?
12          A.    I think when he first did it.
13     In his first declaration.  Let me check
14     my dates.  It's at the front of my
15     report.
16                I'm sorry, I spoke too soon.
17     1996 he declared war against the Americas
18     occupying the land of two holy places.
19          Q.    Rowad was liquidated in 1996;
20     wasn't it?
21          A.    I'm sorry?
22          Q.    Rowad was liquidated in 1996;
23     wasn't it?
24          A.    Yes, I take that as a point.
25          Q.    And the relationship between

```
1                    VICTOR COMRAS
2         reporter to take it down.  Now it's
3         down.
4              MR. HAEFELE:  Thank you.
5              MR. SALERNO:  You're welcome.
6         Q.    You also say on page 38 and 39
7    that Al Qaeda colleagues of Osama bin
8    Laden used al Shamal Bank.  And I'm
9    asking, does that mean in your view that
10   anyone who had an account at that bank
11   was a member or a supporter of Al Qaeda?
12        A.    It is my view that Mr. Kadi
13   channelled funds into that bank, in
14   significant sums.  That those sums were
15   subsequently used to buy products from Al
16   Qaeda-related companies, or bin
17   Laden-related companies, yes.
18        Q.    Do you know how many banks in
19   Sudan handled commercial transactions in
20   the early 1990s?
21        A.    Not many.
22        Q.    Do you know how many offered
23   Islamic investment products?
24        A.    At least two, maybe three.
25        Q.    Besides al Shamal, do you know
```

Page 224

```
 1                    VICTOR COMRAS
 2     those who had engaged in such activities
 3     from continuing such activities.
 4          Q.    You're not expecting an actor
 5     in 1992 to know that someone is going to
 6     be listed eight years later; are you?
 7               MR. MALONEY:  Objection.
 8          A.    I'm sorry, I don't quite
 9     understand your question.
10          Q.    You're not expecting an actor
11     in 1992, by actor I mean a person doing
12     business in the circumstances we've been
13     discussing, in 1992, to be aware that a
14     person he is dealing with is going to be
15     designated eight years later; are you?
16               MR. MALONEY:  Objection.
17          A.    No, I'm not.  But the point is
18     not that.  The point is that I would know
19     who I -- I would think that Mr. Kadi, as
20     a wise businessman, would know with whom
21     he's dealing and would know who they are
22     involved in and what they are doing.  And
23     would have been aware of his
24     relationships with these groups.  And the
25     fact that he was not yet designated for
```

Page 225

1                    VICTOR COMRAS
2      that should be irrelevant.
3          Q.    Did you notice by any chance
4      that the Exhibit 994 that we are looking
5      at, we are looking at the Bates number
6      KADI 10793.  Turn back if you would one
7      page, both the tech person and
8      Mr. Comras, to 10792.
9          A.    I'm sorry, I didn't catch what
10     you said.
11         Q.    I'm asking you to look at what
12     is Exhibit 994, which is a Swiss police
13     report.
14         A.    Okay.
15         Q.    We've been talking about.  And
16     we've been on Bates number KADI 10793,
17     that we looked at.  And now I'm asking
18     you to turn back to 10792, one page
19     previously.
20         A.    I'm looking at it on the
21     screen.
22         Q.    Okay.  Do you notice where it
23     says, let's see if I can find this
24     myself -- did you notice that at the
25     bottom the regional director, Amir Mehdi,

Page 226

                    VICTOR COMRAS

1

2    it says that he once lived in Jeddah, he

3    was a lecturer at King Abdul Aziz

4    University -- I'm sorry, it was his

5    brother, who recommended Amir to Kadi.

6    Amir Mehdi had excellent local knowledge

7    because he had worked as a teacher in

8    Peshawar and Islamabad, that was why he

9    was appointed by Mr. Kadi.

10              Did you notice that when you

11   were writing your report?

12       A.    I noticed that when I was

13   writing my report, yes, I did.  But I'm

14   not sure what inference you take from

15   that.  I take that he was recommended,

16   and based upon a recommendation he

17   accepted to hire Amir Mehdi.  Either he

18   was a fool and didn't know about who he

19   was hiring, or he knew who he was hiring

20   and didn't care.

21       Q.    And you're assuming that who

22   he was hiring is in fact guilty of the

23   things that the various regulators eight

24   years later accused him of doing.

25   Correct?

Page 227

VICTOR COMRAS

1
2          A.    No, he was accused by the
3    Pakistani government very shortly
4    afterwards.  He was arrested, he was
5    engaged in a relationship with the
6    bombers in 1993 of the Twin Towers.  And
7    he was fired by Kadi right about that
8    time.
9          Q.    He was arrested.  Do you know
10   if he was tried and convicted or pled
11   guilty to any crime?
12         A.    He was not tried and
13   convicted.  But that does not mean that
14   he was vindicated.  The police did find
15   that he had a relationship through a
16   telephone conversation and others in his
17   books.  So he was engaged, the Pakistani
18   government knew who he was, yes.
19         Q.    Did the Pakistani government
20   find Mr. Mehdi's phone book before or
21   after they arrested him, do you know?
22         A.    They found it when they
23   arrested him.
24         Q.    And do you have any reason
25   to -- do you have any evidence that

Page 228

1                    VICTOR COMRAS

2   Mr. Kadi knew that Mr. Mehdi had a
3   suspicious person's name in his phone
4   book?
5          A.    I think that Mr. Kadi should
6   know who he's appointing as director of
7   his various companies, because he was not
8   only -- he was more than just the head of
9   the local Muwafaq director.  He served
10  Mr. Kadi in several capacities.  And
11  certainly Kadi placed a number of trusts
12  in this man.  Should have known, if he
13  didn't know, then he's just a lousy
14  businessman.  And I don't think he's a
15  lousy businessman.
16          You can't be an idiot and a
17  smart person at the same time.  You have
18  to know who you're dealing with.
19          Q.    Do you have any information
20  other than what is in your report about
21  Mr. Mehdi's alleged relationship with
22  Amir Mehdi Yousef, who is the person that
23  was in his phone book, apparently?
24          A.    You're asking me, I'm sorry,
25  you're asking me if there is other

Page 246

1                      VICTOR COMRAS
2       notes.
3            Q.    In deciding to list someone as
4       a founder of -- funder, excuse me, of
5       terrorism, the U.S. Security Council
6       Sanctions Committee doesn't conduct its
7       own investigation; does it?
8            A.    No, it does not.
9            Q.    It relies on information from
10      the member country that advocated for its
11      listing.  Correct?
12           A.    Yes.  It relies on information
13      obtained from the governments, members.
14           Q.    Changing the subject.
15                 When did it become known that
16      Chafiq Ayadi was allegedly a financial
17      facilitator, donor or supporter of other
18      gentleman Kadi group?
19           A.    Say the first name again.
20           Q.    Chafiq.  C-h-a-f-i-q.
21           A.    We're talking about Ayadi now.
22      Okay.  I'm sorry.
23           Q.    When did it become known that
24      Ayadi was allegedly a financial
25      facilitator, donor or supporter of Al

                         VICTOR COMRAS

1    Qaeda or other jihadi group?

2         A.    Sufficiently, before October

3    12, 2001, to provide enough information

4    to allow for his designation on that

5    date.

6         Q.    What was the information?

7         A.    I'm sorry, the information

8    is -- that's public is involved -- is

9    provided in the statement at the time.

10        Q.    What statement at the time?

11        A.    By Treasury Department, in

12   listing him.

13              Designation is a long process.

14   It requires interagency clearance, it

15   requires a basis -- a demonstration that

16   it is not being made on a capricious

17   basis, that it's a reasonable activity,

18   reasonable grounds to believe.  And there

19   are many sources that lead to that,

20                         Szubin

21   including, as Mr. Suez (phon) stated, who

22   was a subsequent director of OFAC,

23   intelligence sources.  So there are many

24   sources that lead to the belief and the

25   understanding that Mr. Ayadi was involved

Page 248

1                    VICTOR COMRAS
2      in terrorist financing.
3           Q.    And so you're just assuming
4      that Mr. Kadi had all this knowledge that
5      is reported with the listing after 9/11.
6      Am I correct?
7           A.    I am assuming that if it was
8      found out by intelligence sources it
9      should have been obvious to Mr. Kadi, who
10     is a businessman dealing so intimately
11     with Mr. Ayadi, along with certain
12     others.  He must have known who he's
13     dealing with.  He better than anybody
14     else.
15          Q.    You're assuming, aren't you,
16     that all intelligence information is
17     accurate?
18          A.    I'm assuming that it is
19     information that is credible.  Accurate
20     is a different issue.  I think there was
21     sufficient credible information
22     surrounding Mr. Ayadi to convince OFAC in
23     an intergovernmental process involving
24     much more than confidential information,
25     that Mr. Ayadi was involved in terrorist

```
 1                    VICTOR COMRAS
 2          Q.    And I asked you what a whole
 3    series meant.  And what are the red
 4    flags?
 5          A.    Well, I go to my own list of
 6    red flags.  And --
 7                MR. MALONEY:  Can I just ask
 8          for clarification, Peter.  What are
 9          the red flags in general or what
10          are the red flags in this case for
11          Mr. Comras?
12                MR. SALERNO:  What are the red
13          flags that Mr. Comras is referring
14          to in the sentence that I just
15          read, in the KA Stan transactions.
16                MR. MALONEY:   Okay.
17          A.    Let me summarize by saying
18    lack of any clear indication as to what
19    was involved, what wasn't involved, and
20    what happened to the funds.
21          Q.    And by your reference --
22          A.    Parties that were -- that meet
23    several of the criteria, that is funds
24    coming from a high risk area to people in
25    an area that are questionable.  So there
```

```
 1                 VICTOR COMRAS
 2    are many red flags.  There are a list of
 3    red flags that can be put together, and I
 4    would be glad to do so subsequently if
 5    you want to give me the time, is
 6    considerable.  Because the list of red
 7    flags is considerably longer than the
 8    list that I have provided.
 9         Q.    Well, can you tell me, in this
10    sentence about KA Stan specifically that
11    we are referring to, using FATF terms,
12    can you tell me which red flags are risk
13    indicators and which are terrorist abuse
14    indicators?
15         A.    That's a definition that's
16    created subsequently by OFAC -- sorry, by
17    FATF.  FATF began creating the issue, or
18    the resource of red flags starting in
19    2002.  The earliest reports -- in fact, I
20    have a list from 2004 that I can cite to
21    you.
22         Q.    Mr. Comras, please just stop
23    for a moment.  I'm asking you
24    specifically --
25         A.    I am going to -- you're asking
```

Page 299

                        VICTOR COMRAS

1

2       me for red flags.  And I'm going to give

3       you the list of red flags.

4            Q.    I didn't ask -- that was the

5       last question.

6            A.    All right.  You're asking me

7       to divide them between terrorist abuse

8       indicators and risk indicator.  I'm

9       sorry, that may be an exercise for

10      others.  That's not one of the exercises

11      that I went through.

12           Q.    Do you accept or you do not

13      accept the FATF's distinction between

14      risk indicators and terrorist abuse

15      indicators; do you?

16           A.    I do accept it.  It's not

17      something that I used, that's all, in

18      preparing my report.  I did not divide

19      out the two.

20           Q.    Okay.

21           A.    In my view, the accumulation

22      of information creates enough risk

23      indicators to do more than be just a

24      terrorist abuse indicator.  I've taken a

25      somewhat different approach in the use of

```
                                        Page 301
 1                  VICTOR COMRAS
 2    by "a steady series of losses"?
 3         A.    I mean only what was stated by
 4    Mr. Kadi himself in his deposition
 5    testimony.  And in his memo to OFAC.
 6    These are factors that he indicated, and
 7    I'm simply repeating them there.  That
 8    they had steady losses and that in the
 9    end he had to close the company in 1998.
10         Q.    Do you mean that Euro-invest
11    never had a profitable year?
12         A.    They may have had a profitable
13    year.  They certainly used their money
14    to -- as indicated, to provide funds for
15    Muwafaq and other purposes.  They were
16    very profitable years in the
17    construction.  These companies, if run
18    correctly, it should have made a
19    significant profit.  They were
20    investments made by Kadi because he felt
21    that there was great opportunities in
22    Albania and in the Balkans to make great
23    profits.
24              And in fact, he ran these
25    companies in a way that took whatever
```

1                    VICTOR COMRAS

2      funds that they made, he gave them away

3      in loans, in other activities.  He sold

4      things he says on credit, and never got

5      paid for them.  But not quite justified

6      by the activities of the company and by

7      they're simply statements to explain why

8      there were losses.

9               But most of this is taken from

10     his own testimony.

11          Q.    Moving on.  At the top of page

12     33 of your report, you refer to some --

13          A.    Sorry, let me get to 33,

14     please.

15               Okay.

16          Q.    You refer to some loans made

17     by Euro-invest and conclude that, quote,

18     "the rationale for these transactions is

19     never presented."  I'm looking at lines 3

20     and 4.  Correct?

21          A.    The rationale for these

22     transactions is never presented.  That's

23     correct.

24          Q.    And this includes a $6,200

25     personal loan to Julaidan.  Correct?

Page 303

1                        VICTOR COMRAS

2           A.      Correct.

3           Q.      I'll ask you a question that

4      may be familiar to you now.  To whom

5      should a rationale have been presented?

6           A.      It was a company, to its

7      records, to facilities that can kept -- a

8      company should do its own accounting,

9      shouldn't it not?  They should be

10     explained.  Their activities should be

11     explained.  If they go unexplained, they

12     raise questions.  If they raise

13     questions, they create risks.  If they

14     create risks, they are vulnerable.  If

15     they are vulnerable in an atmosphere

16     where a vulnerability can be taken

17     advantage of, their money is lost.

18                  So to whom should it be

19     explained?  To their own accountants, to

20     their own accounting facility.  Should

21     they have accounting, yes.  And what

22     company should not know what it's doing,

23     where its money is going, what's

24     happening.  But there is no record of any

25     of that in these cases.

```
 1                    VICTOR COMRAS
 2          Q.    Well, have you seen all the
 3    financial records of the Kadi companies
 4    we've been discussing?
 5          A.    I've seen enough to know that
 6    there are blanks.  And the companies
 7    where there were some recordings of
 8    accounting, such as in Pakistan, the
 9    accountants had to rely on information
10    that was simply relying on the statements
11    of the managers or the directors.
12          Q.    Well, your knowledge of what
13    you allege here is based entirely on your
14    assumption that documents that you have
15    not seen support the proposition that
16    they're still unexplained.  Am I not
17    correct about that?
18                MR. MALONEY:  Objection.
19          Q.    You can answer.
20          A.    Listen, they are unexplained
21    as far as I could tell.  If there is
22    explanation, I certainly hope it will be
23    presented.  That's not my job.  My job is
24    to take a look at what I know is to be
25    the situation.  And what I know to be the
```

Page 305

```
1                     VICTOR COMRAS
2      situation is that these are unexplained.
3      If there is an explanation, please
4      provide it.  That's your job, not mine.
5            Q.    On page 50 of your main
6      report.  I will pause for you to get
7      there.
8            A.    Thank you.  Okay.
9            Q.    You discuss the el-Eman, e-l,
10     new word, E-m-a-n, dormitory project for
11     which Kadi arranged Julaidan to arrange
12     construction.  Correct?
13           A.    Correct.
14           Q.    And you conclude that
15     between -- and this is a quote, between
16     926,000 and 1.28 million of the
17     Kadi/Karavan, Karavan with a K, provided
18     funding for this transaction remained
19     unaccounted for and was likely skimmed
20     off for our purposes including Al Qaeda,
21     close quote.
22                 Did I read that correctly?
23           A.    You did.
24           Q.    And then if you could turn to
25     page 33 of your main report.
```

```
                                        Page 306

 1                  VICTOR COMRAS
 2        A.    Sorry, which page?
 3        Q.    33.  3-3.
 4        A.    Got it.
 5        Q.    Second full paragraph.  This
 6    is not a run-over paragraph, so it's also
 7    the second paragraph.
 8        A.    Okay.
 9        Q.    And the last sentence of that
10    paragraph is, "These suspicions were
11    exacerbated by a subsequent accounting
12    indicating that up to 300,000 of these
13    funds remain unaccounted for."  Second to
14    last sentence.
15        A.    Okay and?
16        Q.    You say "more about this Maram
17    project below."
18              Do you not see a discrepancy
19    between 300,926 to 1.28 million?
20        A.    I think you're comparing
21    apples and oranges.  I'm saying that a
22    certain amount of money unaccounted for
23    in a sense that we don't -- skimmed off,
24    what happened to it.  It did not
25    logically or clearly go for the projects
```

Page 307

1                    VICTOR COMRAS
2    concerned.  The 300,000 comes from a
3    report that was done, I think, by the
4    Swiss or the Germans, I'm not sure.  The
5    Swiss police, I think.  That they said
6    that 300,000 in the accounting was
7    unaccountable.
8              Money, again, is fungible.
9    You can find a purpose for the funds.
10   But the funds' purpose may be somewhat
11   off of the project that you're talking
12   about.  May have even been replaced by
13   other funds.  May involve other
14   transactions.
15             So when I looked at it, it
16   seemed to me that there was a real risk
17   or great amount of this money could have
18   been skimmed off.
19             Other sources also paid for
20   some of the projects that were ordered by
21   those involved, by Julaidan and others.
22             So I don't see a discrepancy
23   between the figures, no.  I just see that
24   they're involving two different
25   accountings by two different groups for

```
 1                    VICTOR COMRAS
 2      two different purposes.
 3           Q.    You used the phrase
 4      "unaccounted for" in reference to both
 5      sets of figures.  Correct?
 6           A.    Correct.  Unaccounted for for
 7      me may mean a different thing than
 8      unaccounted for for the Swiss police.
 9      And I was simply referring to the Swiss
10      police.  I think it was the Swiss police
11      report.
12           Q.    And you're sticking with the
13      926,000 to $1.28 million range as funds
14      that were never accounted for that you
15      claim may have been skimmed off?
16           A.    I said that were inefficiently
17      or insufficiently accounted for.  And may
18      have been skimmed off, would be a more
19      correct perhaps statement.
20           Q.    How did you calculate those
21      figures, by the way?
22           A.    I calculated them at the time
23      I created the report.  I would spend some
24      time recreating that calculation.  And I
25      don't think we have that within the hour
```

Page 309

                    VICTOR COMRAS

1
2    that's left.
3         Q.    No, we don't.
4               As you sit here today then,
5    just to be clear, you can't account for
6    yourself how you get to the figures of
7    $926,000 to $1.28 million as being
8    unaccounted for; can you?
9               MR. MALONEY:  Objection.
10        That's not what he said.
11        Mischaracterizes his testimony.
12        A.    I believe that I can stand by
13   my statement.  And if required, I can do
14   so.  I can put it back together again and
15   provide a decent rationale for that
16   statement, yes.
17        Q.    Can you --
18        A.    I don't think I'm in a
19   position do that standing here on Zoom,
20   no, in this deposition.
21        Q.    We agree.  But maybe perhaps
22   you do remember the methodology you used
23   to calculate those figures?
24        A.    The methodology is, again, the
25   fungibility of money.  I noted when I

Page 310

```
 1                    VICTOR COMRAS
 2      prepared the report that there were
 3      alternative sources of funds for the same
 4      items from other sources.  So I
 5      questioned what happened to which funds.
 6                    MR. SALERNO:  Can we put up,
 7           it's Mr. Kadi's deposition, which
 8           is Exhibit 982.  And then can we
 9           turn, please, to page 226.
10                    And I need to get the exhibit
11           myself.
12           Q.    I am directing your attention
13      to lines 10 through 12.  Where Mr. Kadi
14      said, it was okay that Julaidan will make
15      certain profit for his work and
16      supervision and contacting the companies.
17                    Do you recall seeing that at
18      the time you wrote your report?
19           A.    Yes, I do.
20           Q.    And I take it you don't think
21      it was relevant to put into your report
22      anything about Mr. Kadi's explanation for
23      a possible shortfall in these funds
24      relating to el-Eman?
25           A.    I did not give much
```

Page 422

```
 1                    VICTOR COMRAS
 2    commercial activity.
 3          Q.    Well, the sentence says, "the
 4    Albanian government then closed the
 5    activities of these companies."
 6                So I'm assuming it's every
 7    company on the list; correct?
 8          A.    I don't know that answer.  We
 9    could assume that.
10                MR. MALONEY:  I'm sorry, what
11          --
12                MR. SALERNO:  I want to
13          establish what companies that
14          Mr. Kadi was involved with that
15          your witness, Mr. Comras, thinks
16          are fictitious.  Okay, he cited
17          this.  I don't know were it's some
18          or all, and if it's some, which
19          ones.
20          A.    Okay, well, let's take a stab
21    and say, many, Campbell, Medicare,
22    Loxhall.  I know Karavan had many
23    different activities, but there were many
24    Karavans.  Some of them had more
25    substance than others.
```

Page 423

```
 1                      VICTOR COMRAS

 2               I'm not aware that each --

 3      when I look at the list of companies,

 4      including companies that I've never even

 5      heard of before, there must be at least

 6      50 or 60 companies that are supposedly

 7      created at some point by Mr. Kadi.  How

 8      he keeps track of all of them without

 9      accounting information, I have no idea.

10          Q.     Where do you get the number 50

11      or 60 companies, please?

12          A.     I'm taking an impressionist

13      perspective on that number.  But if we
                    add                          add
14      /had the companies in the Far East, we /had

15      the companies that he's registered in

16      Albania, the companies that he's

17      registered in Turkey, the companies that

18      he's registered in the Isle of Man and

19      Jersey, the companies that he registered

20      in Pakistan and Saudi Arabia.  If you

21      start counting them up, you get to a

22      considerable number.  I lost count.

23          Q.     Okay.  Getting back to, you

24      pulled out the names of some of these

25      companies and said those are the ones
```

Page 428

1                    VICTOR COMRAS
2    available to me or to others or in any
3    litigation that shows that they were
4    anything but.
5         Q.    So you say the burden is on
6    somebody to establish or us to establish
7    that they are not shell companies.  Is
8    that correct?
9         A.    No, I'm saying if somebody
10   wants to challenge my opinion, it's their
11   burden to show that my opinion is
12   incorrect.  I've stated my position and I
13   stand on my position and on the
14   information that I have provided.  I
15   believe it's sufficient information to
16   make that judgment.  And I believe my
17   background provides an opportunity for me
18   to do so, a basis for me to do so.
19              If somebody wants to challenge
20   that I'm incorrect, they should show me
21   why I'm incorrect.  They should not say
22   to me that I have to further evidence my
23   opinion.  My opinion is based upon my
24   expertise.  It's based upon other
25   factors.  It's based upon looking at

Page 429

                    VICTOR COMRAS

1
2    transactions and seeing the number of
3    companies.  That's the only tool in my
4    trade.
5              I'm not in a position go out
6    and delve specifically document by
7    document, prove company by company, to do
8    so.  I believe I have sufficient
9    information to discuss that opinion, to
10   provide that opinion in an expert report.
11   If somebody wants to challenge that
12   position, I invite them to do so.
13        Q.    What was your methodology in
14   determining these were shell companies?
15        A.    My methodology is well
16   expressed at the beginning of my report.
17              MR. MALONEY:  And at the
18         beginning of this deposition as
19         well.
20        Q.    Do you have anything to add to
21   what you've said in your report and at
22   this deposition on that topic?
23        A.    I do not at this time, no.
24        Q.    Why was this article by Eduart
25   Bala that is now -- it shouldn't be tab