# EXHIBIT I1

Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's Motion
To Exclude the Testimony of Victor Comras

03 MDL 1570

July 31, 2023

# MUWAFAG
# GENERAL

# ORIGINAL
# SIGNED
# WITNESS
# STATEMENTS

# GM/7496.3

KADI0002198

IN THE MATTER OF

## YASSIN ABDULLAH KADI

**and**

## THE OFFICE OF FOREIGN ASSETS CONTROL,
## US DEPARTMENT OF THE TREASURY



___

## INDEX TO
## STATEMENT OF YASSIN ABDULLAH KADI

___



| *Heading* | *Page No.* |
|---|---|
| **Personal background** | 2 |
| **Father's background** | 5 |
| **Mr Khalid bin Mahfouz** | 6 |
| **National Commercial Bank** | 7 |
| **Charitable and Commercial Activities** | 9 |
| **Muwafaq Charitable Foundation ("the Foundation")** | 10 |
| The Foundation's purposes | 10 |
| The Foundation's Trustees and Constitution | 12 |
| The Foundation's mode of operation | 14 |
| Holland and Belgium | 15 |
| USA | 16 |
| The Foundation's offices in Africa | 16 |

KADI0002199

| | |
|---|---|
| Chad | 17 |
| Closure of the Foundation in other countries where it was operating | 17 |
| The Foundation's programs | 17 |
| Article in USA Today – October 29, 1999 | 18 |
| **Charitable activities in other countries, both through the Foundation and other charitable activities** | 21 |
| Sudan | 21 |
| Pakistan | 27 |
| Amir Mehdi | 27 |
| Shifa International Hospitals Limited Islamabad | 29 |
| The arrest of Amir Mehdi | 31 |
| Afghanistan | 32 |
| Bosnia and Croatia | 33 |
| Chafiq Ayadi | 34 |
| FBIS Article dated July 31, 1995 | 36 |
| The Foundation's activities in Bosnia and Croatia | 38 |
| Introduction and first visit to Albania | 43 |
| Dr Abdul Latif Saleh | 44 |
| Albania | 47 |
| Building and running community centers and mosques in Kukes, Krome and Tirana | 48 |
| Classes and seminars | 49 |
| School | 50 |
| Kosovo | 52 |
| Waa'el Julaidan | 54 |
| Assistance provided to the SJRC | 56 |
| Ethiopia | 59 |
| Somalia | 60 |
| Germany | 62 |
| Austria | 62 |
| UK | 62 |
| Women's college and other humanitarian activities in Saudi Arabia | 63 |




KADI0002200

| | | |
|---|---|---|
| **Commercial activities** | | 66 |
| | Saudi Arabia | 66 |
| | Sudan | 68 |
| | Albania | 73 |
| | Kazakhstan | 75 |
| | Bosnia | 76 |
| | Depozitna Bank | 76 |
| | Other investments in Bosnia | 78 |
| **Saudi Arabian Financiers** | | 80 |
| | Al Barakah Bank | 80 |
| | Dar Al – Maal Al Islami Trust | 81 |
| | Bin Laden Group | 81 |
| | Mr Yahya bin Laden | 82 |
| | Mr Zuhair H Fayez | 82 |
| | Mr Qays Julaidan | 82 |
| | Mr Hussain Shobokshi | 82 |
| | Mr Saleh Kamel | 82 |
| | Dr Mohamed Abdu Yamani | 83 |
| | Mr Khalid bin Mahfouz | 83 |
| | Mr Abdul Rahman bin Mahfouz | 83 |
| | Mr Sultan Khalid bin Mahfouz | 83 |
| | Mr Rais bin Mahfouz | 83 |
| | Mr Talal Badkook | 84 |
| | Dr Mohamed El Gheiri | 84 |
| | Abdul Gani El Khereiji | 84 |
| | Mr Saleh Al-Turki | 84 |
| **Article in the Wall Street Journal dated November 26, 2002 by Glenn Simpson** | | 85 |
| | Quranic Literary Institute of Chicago, Illinois (QLI) | 86 |
| | BMI, Inc. | 90 |
| | Abrar Investments Inc. | 93 |

KADI0002201



| Summary | 94 |
|---|---|
| QLI | 95 |
| The Foundation | 95 |
| Chafiq Ayadi | 96 |
| FBIS Article | 96 |
| USA Today Article | 97 |
| Global Diamond Resources | 97 |
| Shifa International Hospitals | 98 |
| MM Badkook Co. for Catering & Trading | 98 |
| Al-Abrar Group International | 98 |
| Abrar Investments Inc. (Abrar USA) | 98 |
| So-called brother "Omar Al-Qadi" and Mercy International | 98 |
| Conclusion | 99 |



KADI0002202

**IN THE MATTER OF**

**YASSIN ABDULLAH KADI**

**and**

**THE OFFICE OF FOREIGN ASSETS CONTROL,
US DEPARTMENT OF THE TREASURY**

---

## STATEMENT OF YASSIN ABDULLAH KADI

---

I, **YASSIN ABDULLAH KADI** of Farsi Center, West Tower, 11th Floor, Suite 1103, Waly Al-Ahd Street, Ruwais District, Jeddah 21411, Saudi Arabia, **SAY AS FOLLOWS:-**

1.  I make this statement further to the meeting held at the Office of Foreign Assets Control (OFAC), US Department of the Treasury, in Washington DC on August 1 2002 attended by Mr R Richard Newcomb, Director of OFAC, and several of his colleagues together with my legal representatives. Although I was not personally present at that meeting, and without in any way waiving legal privilege, I am informed by my lawyers that Mr Newcomb asked additional questions about my commercial and charitable activities in various locations. I am informed by my lawyers that in this context Mr Newcomb requested details of my commercial

KADI0002203

and/or charitable activities (if any) in Bosnia, Kosovo, Albania and in countries which were formerly Soviet Republics such as Kazakhstan. I set out in this witness statement this information, as requested by Mr Newcomb, and additionally information he requested as to my relationships with other wealthy Saudi Arabian persons including, in particular, members of the Bin Mahfouz family. Furthermore, I have included additional information, to assist in removing any apparent ambiguities concerning my business and charitable activities. Page references in this statement are to the documents exhibited as "**YAK7**" to which I refer.

2.   As a general comment, I have found it very difficult to put this statement together for 3 reasons: firstly, I am apparently required to respond to allegations against me which OFAC has never specifically articulated other than by reference to the affidavit of FBI Agent Robert Wright sworn on June 9, 1998 ("the Robert Wright Affidavit"). I believe that my legal representatives refuted comprehensively the allegations relating to me in the Robert Wright Affidavit in their last presentation to OFAC on August 1, 2002. Secondly in order to investigate and respond to Mr Newcomb's questions my lawyers have had to review documents and interview witnesses concerning events which took place in numerous different jurisdictions. Thirdly those events occurred in some cases more than a decade ago. My assets have now remained frozen for over 14 months and the effect on my business and personal life has been devastating.

**My personal background**

3.   First, I believe it is useful to outline my personal and family background. I was born on February 23 1955 in Cairo, Egypt. I am of Saudi Arabian nationality. I

KADI0002204

lived in Cairo until I was 12, when I returned, with my family, to Saudi Arabia. During the 1960s until about 1969, my father worked for the Bank of America in Jeddah. My father was an important influence on me and from the outset he instilled in me an interest in, and affection for, Britain and America. My father introduced me to British sports, particularly soccer, which I have followed until now. Except for Egypt, my first visit abroad was to London. Throughout my childhood my father was concerned that I should learn to speak good English. Due to this, while I lived in Cairo, I was educated at a school where English was the main language spoken.   I was brought back to Saudi Arabia in 1967 where I continued my studies at the Royal School in Jeddah. At this school, I continued studying both English and French, among other subjects.

4.      When I finished school in Jeddah, I decided that I wanted to be an architect.  I then attended, from 1972 – 1977, the Faculty of Architecture, Alexandria University, a leading architectural college in Alexandria, Egypt, from where I graduated in 1977.

5.      In 1977, I returned to Jeddah where I started my own business, Jamjoom International, later renamed Jamjoom Hospital Supplies, ("Jamjoom") which was appointed sole agent in Saudi Arabia for American Hospital Supplies.  In addition to this, Jamjoom, at that time, was also involved in the computer and construction businesses. I started this business with my brother-in-law, **Kamal Jamjoom.**

6.      After about a year of working for Jamjoom, I wanted to branch out and enhance my experience and knowledge.   The opportunity arose for me to work as a trainee at the leading architectural firm of Skidmore, Owings & Merrill LLP in

KADI0002205

Chicago, USA. At that time my maternal uncle was president of King Abdulaziz University, which was then the only university in Jeddah. Skidmore, Owings & Merrill were then working on a project for the university. My father visited Dr Khan, one of the senior partners in Skidmore Owings & Merrill, and nominated Man of the Year by Time Magazine. Dr Khan arranged for me to be given a traineeship at Skidmore, Owings & Merrill's offices in Chicago where I started work at around the end of 1978/ beginning of 1979. I continued working there for almost 2 ½ years. I enjoyed the atmosphere in the USA and liked living and working there. During this period, I was married in Saudi Arabia, and took my wife to live with me in Chicago. My first son Muaz was born in Chicago in December 1980 and is a US citizen.

7.  In 1981, I returned to Saudi Arabia and rejoined Jamjoom as Vice-President. I began to develop the computer side of the business, purchasing IBM systems. IBM arranged for me to visit their US headquarters, and their manufacturing facilities in Florida and Ohio, where they manufactured, respectively, PCs and mainframes.

8.  During this time, Jamjoom continued its role as the sole agent of American Hospital Supplies the headquarters of which were in Chicago, where I also made frequent visits during the first half of the 1980's. I continued working for Jamjoom until March 1988.

9.  In April 1988 I was appointed Administration Manager of my father's company Saudi Orient Maritime Company Limited ("SOMCOL"), a position I held until October 1988 when I took up a position as Vice-President of MM Badkook Co.

KADI0002206

for catering and trading. MM Badkook Co. was then, and is now, one of the largest catering companies in Saudi Arabia with restaurants throughout Saudi Arabia.   As Vice-President, I was responsible for overall management of the business and developing strategy to increase sales.   Talal Badkook is a major shareholder in MM Badkook Co.

10.   Talal Badkook has been named as a Defendant in a civil law suit brought by Burnett & others in the US District Court for the District of Columbia, in which there is a reference to the "Al-Mustaqbal Group".   The background to this group is as follows: some years ago during the elections for the Saudi Arabian Chamber of Commerce a number of Saudi businessmen set up a group in a bid to be elected to the Saudi Arabian Chamber of Commerce. This group was called the Al-Mustaqbal Group.  I confirm I have never had any connection whatsoever with the Al-Mustaqbal Group.   To the best of my knowledge, at no time has Talal Badkook had any connection whatever with terrorism or similar activities.

11.   I worked as Vice-President of M M Badkook Co. until 1990, when I started business investing on my own account. This included trading in textiles and investing in a restaurant business.  It lasted a short period, of about a year.

**My father's background**

12.   It is appropriate that I should mention specifically some facts concerning my father. He was employed until about 1969 by the Bank of America, as I have mentioned above. He went on to set up his own business in conjunction with international partners in the fields of shipping, construction, medicine, commodity trading and other businesses.   He was a successful businessman from Jeddah,

KADI0002207

Saudi Arabia. In addition to his employment by Bank of America, he had other strong connections with the United States; ships chartered by his company SOMCOL used to carry oil for Saudi Aramco, a substantial oil company with interests in the US which is now part of a large US refining and marketing joint venture. I stress that I am the only son of my father, and have 6 sisters. Due to this, after my father died in November 1988 I inherited the majority of my father's wealth, which, at the time, amounted to several million dollars.

13.    In regard to my family, I would also mention that the US Treasury Department have alleged in a 2 page fax they supplied to UK Treasury (pages 1 to 2) that :

    **"[My] brother Omar Al-Qadi is the director of Mercy International – USA"**

This is totally untrue. I do not have any brother. As is well-known in Saudi Arabia, I have 6 sisters.

**Mr Khalid bin Mahfouz**

14.    I now describe my relationship with Mr Khalid bin Mahfouz, whom I will refer to for convenience as "KBM". I was first introduced to KBM socially in about 1989 and have known him since then. KBM and his family were at that time the leading bankers in Saudi Arabia. In 1990, I developed a professional relationship with KBM concerning the introduction of Islamic banking products at the National Commercial Bank ("NCB"), the largest and oldest bank in Saudi Arabia. In addition to our business relationship, I have carried out extensive humanitarian

KADI0002208

activities in conjunction with KBM through the Muwafaq Charitable Foundation ("the Foundation") which I established at his request in 1992.

**NCB**

15. In about 1990, I suggested to KBM introducing Islamic banking products into NCB.   KBM was at that time the most senior person with executive responsibilities within NCB.

16. By way of background, during the 1980's, there had been an unprecedented growth in banking activity in Saudi Arabia and the Gulf.  In Saudi Arabia the first licensed Islamic bank, that is to say a bank licensed by the Saudi Arabian Government to carry on business according to Islamic investment principles, was Al-Rajhi Banking and Investment Corporation ("Al-Rajhi"). For Al-Rajhi to offer banking services which complied strictly with the tenets of Islam (in particular the prohibition on usury) necessitated the introduction of specific financial instruments and investment products tailored to satisfy the requirements of Islamic precepts. Al-Rajhi grew to become the third biggest bank in Saudi Arabia. These developments reflected a strong trend and preference in Saudi Arabia, and elsewhere, for example in London and other financial centers, for interest free banking (or "Islamic banking" as it is commonly called).

17. Considering Al-Rajhi is listed as a Defendant in the Burnett civil law suit, I should mention for the sake of completeness that I have maintained various accounts at Al-Rajhi. At Al-Rajhi I have maintained normal bank accounts and an investment fund account. My dealings with Al-Rajhi have at all times been solely and exclusively for the purpose of banking. I have never known the identity of any of

KADI0002209

Al-Rajhi's other investors or clients. I have invested funds with Al-Rajhi for solely commercial reasons. I stress that at no time have I ever held any equity share or management role in Al-Rajhi nor have I ever had any business relationship with any of the individuals or entities behind Al-Rajhi.

18. KBM was aware of Al-Rajhi's successful introduction of Islamic banking services and knew that eventually every bank in Saudi Arabia would have to offer such services, or else lose market share to those institutions which did offer such services. He was determined to convert NCB from a bank which offered purely conventional banking services to one that could also offer Islamic banking products.

19. Due to the above, KBM turned to me to help him in realising this ambition. To do this, we established a new department within NCB called the Islamic banking department or "IBD"; and, secondly, we sought advice from an outside consultancy company on aspects of Islamic banking product development. I arranged for these consultancy services to be provided through the National Management Consultancy Center ("NMCC"), a company registered in Saudi Arabia, which had a licence from the Saudi Arabian Government to provide consultancy services in Saudi Arabia. NMCC advised and assisted NCB in developing Islamic banking products and designing and implementing training programs for NCB employees. Through this means, NCB established the Islamic Banking Department. These arrangements required a re-organisation of the NMCC, during which I took the position of chairman, a position I held from 1991 to 2001. NMCC ceased operations at the end of 2001 since when it has been dormant.

KADI0002210

20.     The introduction of Islamic banking services within NCB was extremely successful.    Other banks, both inside and outside Saudi Arabia, soon approached NMCC for consultancy services.  NMCC has, since then, established consultancy relationships with many other banks both within Saudi Arabia and elsewhere, such as the Saudi British Bank (an affiliate of HSBC in Saudi Arabia) and the Saudi Hollandi Bank (an affiliate of ABN-Amro).

**Charitable and Commercial Activities**

21.     I now describe, in response to Mr Newcomb's request at the meeting on  August 1, my charitable and commercial activities (if any) in the locations and countries mentioned by him.  I should preface my remarks by highlighting some common threads of my activities in many of the various countries.  It will be seen that in some cases I have conducted in parallel both charitable and commercial activities in those countries.  The reason for this is that war-torn countries are often emerging markets that can offer good investment returns for outside foreign investors albeit at relatively high risk. This is of course in addition to the humanitarian work, which is in many cases required there.

22.     In the case of Bosnia and Croatia, my first involvement in these countries was of a charitable nature in Croatia in 1992.  This was motivated by my concern at the humanitarian needs that existed there. Subsequently, following the Dayton Peace Accord in late 1995, I saw the opportunity for making good investment returns, and invested in business enterprises in these countries.  In other cases, namely Sudan and Albania, I was part of delegations of leading Arab and Muslim businessmen visiting these countries at the invitation of the host government.  In

KADI0002211

the case of both Sudan and Albania, I initially became active in these countries due to their status as emerging markets and the investment opportunities that existed there.  This reason for my initial introduction to Sudan and Albania was followed, in each case, by my making charitable donations and setting up charitable activities to meet what I perceived to be clear and pressing humanitarian needs in those countries.

23.    To the best of my knowledge, I have never, whether through commercial investment or charitable activities or in any other manner whatsoever, anywhere in the world, supported, or intended to support the activities of any terrorist group or individual including Osama bin Laden or Al-Qaeda.

**Muwafaq Charitable Foundation ("the Foundation")**

24.    During 1990/91, while I was working with KBM for NCB, we developed a relationship of mutual trust and respect.  KBM told me that he wanted to set up a charitable foundation in memory of his parents. He suggested a name for this foundation, Muwafaq, an Arabic word which means, in essence, "Blessed Success" or "Holy Success". In this regard, I would like to point out that, like most other faiths, philanthropy is a central tenet of religious practice for all Muslims, especially the wealthy among them.

**The Foundation's purposes**

25.    The Foundation was founded as a charitable trust in Jersey by means of a Constitution and Declaration of Trust dated May 31 1992, a copy of which is at pages 3 to 15. The principal objectives and purposes of the Foundation were set out in the Constitution and Declaration of Trust.  In summary the objectives and

KADI0002212

purposes were to provide relief to and for any individual suffering as a result of natural disaster, wars, revolutions, civil unrest of any description and famine; to provide financial assistance to organisations, institutions, hospitals, research centers to improve the standards of education of health of the needy; to provide guidance and education by compiling, printing and distributing books, tapes, video tapes, newspapers, magazines and other publications and other charitable purposes. I stress that the Foundation's objectives and purposes were not in any way limited to assisting Muslims.

26.   After KBM decided to endow a charitable cause in memory of his parents, he and I identified the famine-struck people of Sudan as the first beneficiaries deserving of support. KBM and I were both deeply concerned by the famine in large parts of Sudan during the two years following the 1989 coup. Sudan is a very close neighbour of Saudi Arabia but the quality of life enjoyed by its people was so dramatically different. Both KBM and I found the sufferings of the Sudanese people particularly distressing.  More generally we were also concerned at famine, poverty, lack of education and under-development amongst Muslims in the world. We determined to give some effect to our concerns by providing relief, education and the means to acquire basic skills to foster economic development. In relation to this, the Foundation was similar to many other major international charity organisations.  It was our wish to make the Foundation a significant charity of international standing equivalent to many major western charity organisations in terms of scope, management and efficiency.

KADI0002213

**The Foundation's Trustees and Constitution**

27.     There were a total of 6  trustees of the Foundation as follows:

- Myself

- Abdul Rahman bin Mahfouz (nominated and appointed by KBM), who is KBM's son and was, at the time of the formation of the Foundation, a student at University aged around 20

- Rais bin Mahfouz (also nominated by KBM), who is a distant relative of KBM, and is a medical doctor who headed the leading Al Salama Hospital in Jeddah, now named King Faisal Specialist Hospital

and the following 3 trustees nominated by me:

- Talal Badkook with whom, as explained above, I had worked closely in the late 1980's

- Dr Mohamed Ali El-Gari Bin Eid, who has a doctorate degree in Islamic Economics, and was the General Manager of NMCC who I had worked with closely in developing Islamic investment products for NCB

- Abdul Gani Al-Khariji, who is a friend and business associate of mine.  I describe in more detail on page 84 below my relationship with Abdul Gani Al-Khariji.

28.     I have mentioned that  KBM appointed his son, Abdul Rahman bin Mahfouz to be trustee of the Foundation. The background to this deserves explanation. Abdul Rahman bin Mahfouz was still a young man at the time, and so in appointing him

KADI0002214

as a trustee his father acted on his behalf. I believe that KBM respected me and the way I conducted my business and charitable affairs, so much so that he repeatedly asked his son Abdul Rahman, to meet with me and see what I did and how I conducted my working life. I believe KBM had a degree of paternal respect towards me such that he felt I was somebody whom his son Abdul Rahman should emulate.

29.   It is appropriate that I explain two further points about the constitution and establishment of the Foundation. I have already mentioned that the Foundation was founded as a charitable trust in Jersey by means of a Constitution and Declaration of Trust dated May 31 1992, (see pages 3 to 15). There was no secrecy in establishing the Foundation: it was established as a charitable trust in Jersey solely as a result of advice obtained from UK accountants and a UK solicitor that the setting up and maintenance of a trust in Jersey is relatively simple and free of formality. The trustees also wished the Foundation to be based outside Saudi Arabia, and considered that if it were based in Jersey it would have an international status. It was for these reasons **alone** that the Foundation was established as a charitable trust in Jersey, and **not** for any sinister or improper motive.

30.   For the avoidance of any doubt, I should also make clear that quite separately to the Foundation, I caused in the previous year, 1991, a company to be incorporated in the Isle of Man under the name **Muwaffaq Limited**. This company was formed for the sole purpose of holding my interest in Shifa International Hospitals Limited a public limited company in Pakistan whose shares are traded on the Karachi stock exchange in Pakistan. Shifa International

KADI0002215

Hospitals Limited is a leading hospital in Islamabad with state-of-the-art medical equipment.   The name **Muwaffaq Limited** was not selected because of any connection with the Foundation.  The reason I picked the same name was that I liked the name and believed it would bring me good luck.   Thus, Muwaffaq Limited of the Isle of Man, has never had any connection, financial or otherwise, with the Foundation (established in Jersey) and vice versa.  I believe this may be a potential source of confusion and I have set the position out in some detail in order to clear this matter up once and for all.

### The Foundation's mode of operation

31.   Although Sudan was the first country in which the Foundation was active, it subsequently operated in Pakistan, Afghanistan, Ethiopia, Somalia, Bosnia/Herzegovina, Albania, Austria and Germany.   In some of the aforementioned countries, the Foundation was also registered.  In addition to this the Foundation was also formally registered in the USA, and I have recently been told in Holland and Belgium, although it never operated in any of these countries. It is appropriate that I should now explain something about how the Foundation came to be registered in, and/or operated in, these countries.

32.   It was impossible for me personally to supervise either the registration formalities of the Foundation in the countries where it was registered or – in respect of the countries where the Foundation actually operated - to be involved in its day-to-day activities. For my part, I was involved in strategic decisions concerning the Foundation, for example which countries to operate in, decisions on how best to apply the Foundation's funds consistent with its charitable objects and purposes and decisions to close the Foundation in various countries. From time to time I

KADI0002216

visited the countries and locations where the Foundation operated and discussed

projects with local directors. I decided on budgets and received reports from local

directors.    It was the Foundation's policy wherever possible to recruit a local

director who was, if possible, a citizen of the country concerned (or was

otherwise very familiar with humanitarian work in that country) and had close ties

and/or experience of working with Saudis.

**Holland and Belgium**

33.      I understand that the Foundation's former European director Chafiq Ayadi

registered the Foundation in Holland and Belgium. Generally, the local directors

closed the Foundation's offices and/or de-registered it as appropriate in response

to my instructions.    Until recently I was not aware that the Foundation was

registered in Holland or Belgium.  This is perhaps because the Foundation had

no presence or operation in these countries, other than being formally registered

there.    My lawyers have recently discovered and had translated documents

relating to the registration of the Foundation there.  I note from these that the

Foundation was registered in Holland and Belgium in each case for an "indefinite"

period. Copies of these documents, with translations, are at pages 16 to 45.

34.      I have instructed my lawyers to investigate whether the Foundation continues

formally to be registered in Holland,  Belgium or in any other jurisdiction and as

soon as practicable to effect the de-registration of the Foundation in any

jurisdictions where the Foundation's registration may, inadvertently, have been

left in existence.

KADI0002217

**USA**

35.     I should also explain, because confusion has arisen on this issue, that I decided in early 1992, on the verbal advice of my ex senior business employee Osama Halawani, to set up an office for the Foundation in Delaware, USA. At the time of its incorporation in January 1992 I thought there might be a requirement at some stage for humanitarian work in the USA but after registering there it became clear to me that the focus of the Foundation's activities should be in the other countries.   Nevertheless, Muwafaq Foundation was formally registered in Delaware on January 14 1992.  A copy of the certificate of incorporation is at pages 46 to 47.  Muwafaq Foundation in Delaware, USA has always remained dormant.  No office was ever set up in the USA and the Foundation at no stage conducted any activities there save only for the formal registration of Muwafaq Foundation in Delaware. The present status of the Delaware company is that as a technical matter it remains dormant.

**The Foundation's offices in Africa**

36.     The Foundation had its principal office in Sudan.   I explain below how the Foundation in Sudan had the support and recognition of local regulatory authorities and international funding bodies. The Foundation also had offices in Ethiopia and, for a very limited period only, Uganda and Somalia. The Foundation never had any operation in Eritrea, Tanzania or, as mentioned below, in Chad. The Foundation applied to the Muslim Higher Council in Kenya for authority to open an office there but in the event it did not open any office in Kenya or operate there.

KADI0002218

**Chad**

37.    On the subject of the countries in which the Foundation was registered, I am aware of allegations in the Wall Street Journal that a retired colonel in the Sudanese army, Kamal Mahgoub Al-Rasheed, claimed that the Chadian authorities suspected the local director of the Foundation of active support and funding of extremists.  The allegation is completely untrue; I should say straight away that the Foundation has never had any local director in Chad, it has never operated or existed in any manner in Chad.

**Closure of the Foundation in other countries where it was operating**

38.    By way of further explanation of this, I would refer to pages 16 to 113 of **"YAK7"** which are the available documents relating to the registration and, where applicable, the closure of the Foundation in Holland, Belgium, USA, Pakistan, Afghanistan, Croatia, Bosnia, Albania, Germany, and Sudan.

**The Foundation's programs**

39.    To achieve its goals, the Foundation developed numerous programs, which I describe below specifically in relation to the countries referred to by Mr Newcomb at the meeting on  August 1 2002.  It will be seen however that in each case, health and education for adults and children of both sexes, Muslims and non Muslims alike were key elements of the Foundation's activities in the various countries where it operated.  The Foundation's educational projects were focused to give priority to modern education following internationally accepted standards for girls and boys, women and men, Muslims and non Muslims alike.   The Foundation also promoted self help programs for the poor and destitute; by way of example, in Sudan, the Foundation had numerous activities directed to helping

KADI0002219

women whose husbands were either dead or had disappeared to enable them to earn money to provide for their families.  In addition, in Sudan, the Foundation funded clinics to help women, as well as children and men, in areas struck by war. I mention this because quite clearly education for women and self help programs for women are wholly inconsistent with any religious fanaticism or extremism of any kind.

**Article in USA Today October 29 1999**

40.    I am aware of false claims published in an article in USA Today dated October 29 1999 to the effect that:-

> "... **prominent businessmen in Saudi Arabia continued to transfer tens of millions of dollars to bank accounts linked to indicted terrorist Osama bin Laden, senior US intelligence officials told USA TODAY.**
>
> **The money transfers, which began more than five years ago have been used to finance several terrorist acts by bin Laden, including the attempted assassination of Egyptian President Hosni Mubarak in Ethiopia, the officials said.**
>
> **...**
>
> **According to a Saudi government audit acquired by US intelligence, five of Saudi Arabia's top businessmen ordered the National Commercial Bank (NCB), the Kingdom's largest, to transfer personal funds, along with $3 million diverted from a Saudi pension fund, to New York and London banks.**

KADI0002220

> **The money was deposited into the accounts of Islamic charities, including Islamic Relief and Blessed Relief, that serve as fronts for bin Laden.**
>
> **The businessmen, who are worth more than $5 billion, are paying bin Laden "protection money" to stave off attacks on their businesses in Saudi Arabia, intelligence officials said.**
>
> **... The money transfers were discovered in April after the Royal Family ordered an audit of NCB and its founder and former chairman Khalid bin Mahfouz, US officials say."**

Insofar as these allegations concern me and/or the Foundation, they are totally untrue. As I have made clear in some detail in my December 2001 submission to OFAC, contrary to the allegations in the USA Today article, the true position is as follows:

41.    The Foundation has never had any account with the National Commercial Bank (NCB).  In any event, as appears from articles published in the UK and US press (the Guardian dated September 26 2001 and the Chicago Tribune dated October 28 2001 pages 114 to 121) NCB management have vehemently denied the existence of any Saudi government audit and described the allegations as "incorrect, false and frivolous".

42.    At no time have either I or, to the best of my knowledge, the Foundation ever contributed any funds or otherwise supported bin Laden or Al-Qaeda.  At no time

KADI0002221

have either I or, to the best of my knowledge, the Foundation ever acted as a conduit or channel for funds being passed to bin Laden or Al-Qaeda. I repeat that I am an honest and law-abiding citizen of Saudi Arabia and am personally strongly opposed to terrorist activity in all forms. I consider those that support or participate in terrorism to be offensive to the Muslim faith and deserving of the most severe condemnation.

43.   It is totally untrue that the Foundation was involved in the attempt to assassinate President Mubarak of Egypt.   In this regard the USA Today article repeats allegations made in 1995 in the London-based magazine Africa Confidential linking the Foundation to the attempted assassination in 1995 of President Mubarak of Egypt. I and my fellow Trustees of the Foundation were completely vindicated of these allegations in proceedings for libel which we commenced in 1995 in the High Court in London against the editor and publisher of Africa Confidential.   I have already provided OFAC with details of the settlement of those libel proceedings which included Africa Confidential's agreement to pay a substantial sum to me and my fellow Trustees,  their undertaking never to repeat the allegations complained of and their agreement to  participate in an agreed Statement read out in Open Court before a High Court Judge in London retracting the allegation concerning the attempted assassination of President Mubarak of Eqypt and apologising to me and my fellow Trustees. To reinforce how totally baseless this allegation is, I would add that earlier in the libel proceedings, Mr Justice Moses by Order dated June 30 1997 struck out that part of Africa Confidential's Defence which sought to contend that the Foundation was linked to the 1995 assassination attempt upon President Mubarak. Moreover in

KADI0002222

striking out this part of the Defence Mr Justice Moses refused Africa Confidential permission to appeal.

**My charitable activities in other countries, both through the Foundation and other charitable activities**

**Sudan**

44. As stated above, after KBM decided to endow a charitable cause in memory of his parents, he and I identified the neighbouring people of Sudan, many of whom were suffering from famine, as the first beneficiaries deserving of support. KBM and I were both deeply concerned by the famine in large parts of Sudan during the two years following the 1989 coup. We decided to try to give some practical effects to our concerns during the first half of 1991.

45. The Foundation was an international, non-governmental organisation that gave priority in its activities to comprehensive development in areas struck by natural or human-made disasters, i.e. in the South, West and East of Sudan. The Foundation's activities in Sudan were accepted and recognised by both local regulatory authorities and international funding bodies as is evident from the following documents at pages 122 to 159 to which I refer:

45.1 A copy of an Agreement with the Government of Sudan signed by the Commissioner General for Voluntary Agencies dated April 22, 1993.

KADI0002223

45.2    Various World Food Programme (WFP) documents which authorise the release of emergency food stuffs to the Foundation for delivery.

45.3    A contract between the World Health Organization (WHO) and the Foundation dated October 20,1993

45.4    A letter from the UN to the Foundation dated November 15,1994 inviting the Foundation to participate in the Country Strategy Note for Sudan concerning employment creation.

45.5    A basic agreement between UNICEF and the Foundation dated August 8, 1996.

45.6    A letter of appreciation to the Foundation from UNHCR dated August 28, 1996.

45.7    A letter from the General Commissioner of the Humanitarian Aid Commission ("HAC"), the official Sudanese Government department in charge of voluntary organisations in Sudan, to the Foundation dated October 3 1996.

46.    To achieve its goals, the Foundation developed the following programs in Sudan:

46.1    **Education:** This included formal elementary education, kindergartens, literacy education and adult education

KADI0002224

46.2 **Health:** This was one of the major achievements of the Foundation in Sudan. By way of example, the Foundation's clinic at Mayo Farms in Sudan was visited and indeed commended by the Head of the Church of England, the then Archbishop of Canterbury, Dr Carey, in 1995. In addition to a health clinic, the Foundation provided at Mayo Farms educational and social services for displaced people from southern Sudan. Generally, the Foundation's activities in the health area included :

- curative and primary health care

- immunizations and health education

- mother and child care

- environmental health

- making available drugs in pharmacies at cost price

- co-operation with international organisations and UN agencies in the combat of indigenous diseases, for example, guinea worm and tuberculosis.

46.3 **Social Welfare Programs:** The Foundation supported the poor and destitute by giving them training in the field of soap making, tailoring, handicrafts, leatherworks and other income generating projects. Many of these were directed to women whose husbands were either dead or had disappeared to enable them to provide for their families.

46.4 **Agriculture:** The Foundation supported farmers by providing them with agricultural equipment, for example tractors, discs, irrigation pumps and seeds.

KADI0002225

46.5 **Small scale industries**: The Foundation established rural sugar cane production plants and conducted research to produce charcoal from agricultural by-products and cotton, so as to save forests from deforestation.

46.6 **Supply of drinking water**: The Foundation had an efficient well drilling machine that was established in the East of Sudan to supply drinking water for both humans and animals. This project was called the Al Raian Project which began in 1994 in the Red Sea Province of Sudan, drilling 33 fresh water wells in the south of Tokar and Port Sudan, as well as in the areas of Assaloum and Dolabyay.

I emphasise that all the aforementioned activities were directed to benefit adults and children of both sexes, Muslims and non-Muslims alike. Pupils of both sexes attended the Foundation's schools and the health clinics it funded benefited adults and children of both sexes. The Foundation's work in Sudan has been commended by many foreign visitors, dignitaries and diplomats, international relief agencies and the UN. As a mark of the esteem with which the Foundation was regarded by the international humanitarian relief community the Foundation received substantial material support from UNICEF, the World Food Programme (WFP) and other UN agencies, as well as from other international non-governmental organizations ("NGOs").

47. In 1996 I made the decision to close the Foundation in Sudan. I along with the Foundation's other trustees were fighting a major libel action in respect of the

KADI0002226

very seriously defamatory allegations published in Africa Confidential and considering this we wished to focus our resources and time on fighting the libel action and clearing our names of the false allegations which had been published about us in Africa Confidential. Accordingly in August 1996 I instructed the Foundation's Sudanese director, Siraj El Din Bari, to close down the activities of the Foundation in Sudan. Copy documents relevant to the Foundation's closure in Sudan are at pages 112 to 113.  The Foundation eventually ceased its activities completely in Sudan at the end of 1996.

48.   I now understand that under the regulations laid down by the relevant Sudanese authorities, when a charity organisation like the Foundation ceased to operate in Sudan its assets and services would be transferred to other relief agencies operating in the country.  In the case of the Foundation, its assets and services were transferred with the approval of the relevant Sudanese authorities to various charitable organizations including Sub-Saharan International Development Organization ("SIDO") a totally separate organization which had been registered and operating in Sudan since 1992. Documents relating to the transfer of some of the Foundation's activities are at pages 156 to 159. I am aware that there have been false claims that since 1996 the Foundation has continued to exist under the name of this separate organisation, SIDO.  These claims are completely untrue.  In view of the apparent confusion concerning this issue, I shall explain the background in some detail.

49.   When the Foundation finally ceased its activities in Sudan in late 1996, its local director, Siraj El Din Abdul Bari, commenced employment, as Director General,

KADI0002227

of SIDO, a totally separate organization which, as mentioned above, had already been operating in Sudan for some years since February 1992.

50.    I have recently learned that Siraj El Din Abdul Bari found himself obliged to write to correct many inaccurate and misleading statements contained in the Directory of Voluntary Organisations in Sudan published by the Humanitarian Co-ordination Unit of the UN in Khartoum.   The most significant of these errors, which Siraj was obliged to correct was that SIDO was the "former Muwafaq foundation." Copies of the relevant correspondence, together with translations, are at pages 160 to 164. To clear up the confusion, Siraj clearly pointed out that the SIDO was a separate organisation and registered with the Humanitarian Aid Commission ("HAC") (the official Sudanese Government department in charge of voluntary organisations in Sudan).   For the avoidance of any doubt, the Foundation never had any part in the establishment, operation or financing of SIDO and while the Foundation existed in Sudan the 2 organizations  were entirely separate.

51.    I should stress that the source of these false claims, or alternatively the person who has mainly promoted and amplified them, is Mr Patrick Smith, the Editor in Chief of Africa Confidential. The false claims which I believe Mr Smith has been responsible for promoting are to the effect that the Foundation has continued its activities in Sudan and elsewhere after closure at the end of 1996.  These claims are totally untrue.  I have already referred to similar false claims made in the press that the Foundation existed in Chad.  Once again, this is totally untrue because the Foundation has never existed, operated, registered or worked in any manner in Chad.

KADI0002228

**Pakistan**

52.     I first visited Pakistan with my maternal uncle, Dr Mohammed Omar Zubir, in
about 1988.  Between 1988 and 1990 we visited Pakistan 3 or 4 times.  At that
time there were, as a result of the Soviet occupation of Afghanistan, a great
many Muslim refugees entering Pakistan from Afghanistan, in particular in the
area near the city of  Peshawar in the North West Frontier Province (NWFP) of
Pakistan.

**Amir Mehdi**

53.     As a result of this in 1992, I established a regional office of the Foundation in
Islamabad, Pakistan with the approval of the Government of Pakistan.  The local
director of the Foundation in Pakistan was Amir Mehdi. I first met Amir Mehdi in
the following circumstances.  From his own contacts Amir Mehdi ascertained that
I was staying in Islamabad and was looking to appoint a local director to
supervise and manage the Foundation's charitable activities in Pakistan and
Afghanistan. He telephoned me asking for an appointment to see me stating his
objective to gain work and employment in the charitable sector. I interviewed him
and found he had Pakistani nationality, a good knowledge of the area and
knowledge of Arabic language. He provided the name of his brother Saleh
Hassan Mehdi as a reference who was then living in Saudi Arabia and whom I
knew. My office contacted Saleh Hassan Mehdi and obtained a good reference
for Amir Mehdi.  Accordingly I hired Amir Mehdi for the job.  Subsequently the
Foundation was registered in the City of Peshawar on August 13 1995 as
appears from page 52.

KADI0002229

54.     Through the Foundation's offices in Peshawar and Islamabad it implemented various projects including:

- Tajik Relief Project for the provision of food aid and other relief to Tajik refugees following the civil unrest in Tajikistan

- Qurbani Project for the distribution of food aid to the poor and needy in Pakistan and Afghanistan on the occasion of Eidu Al Adha (the great feast for Muslims)

- Iftaar Saim (breaking of fast at sunset during the month of Ramadan) for the distribution of food to poor Afghan refugees in Pakistan and local poor Pakistanis for them to break their fast during the 30 days of the month of Ramadan.

- Muwafaq International School which provided English education to the poor children in Peshawar as supervised by the education department of the Government of North West Frontier Province (NWFP) and under their registration

- High Institute of Islamic Education which imparted education to the poor for classes 13 and 14 in accordance with the syllabus and curriculum approved by the University of Peshawar in the NWFP

- Pesh Imam courses and teacher training Institute for the training of teachers in modern educational techniques

- Samarra Farm, an income generation project for rearing buffaloes for milk and distributing milk to the households in the City of Peshawar to generate a source of income

KADI0002230

- Medical clinic in Peshawar, Tajabad Nasir-Bagh area, out patient medical faciliy for non-critical, and short-term ailments, immunization programs of Government of NWFP and first aid

- Muwafaq Computer Training Centre for software applications training, database programs and secretarial training.

**Shifa International Hospitals Limited Islamabad ("Shifa")**

55.   Shifa is a public limited company, shares in which are traded on the Karachi stock exchange. Shifa was incorporated in Islamabad, Pakistan, on September 29 1987.  The activities of the company are the provision of medical and surgical services for in-patients and out-patients.

56.   While the hospital was under construction (i.e. while building work was in progress) the project needed further capital for completion of building works and equipment. Shifa was at that time seeking to source further direct foreign investment in the project.

57.   The incumbent Government in Pakistan at the time had implemented legislation to open up the economy with a view to attracting foreign investors. Simultaneously around the world, the emerging markets were performing well and at this time the Pakistan Stock Exchanges were also showing some solid growth.

58.   Accordingly in 1991 and with a view to sourcing further foreign investment the sponsors of Shifa made a presentation to me.  During the presentation, it was highlighted that one aspect of the project was its commercial viability, but another

KADI0002231

important aspect was to attract foreign qualified technical and professional expatriate Pakistanis back into Pakistan in order to reverse the so called "brain drain." The presentation was conducted by Dr Zaheer Ahmed, a US citizen, who is also a medical doctor.

59.   Following this presentation I participated in the project through an off-shore company, Muwaffaq Limited incorporated in the Isle of Man. My strategic intention at the time was that I would exit at the time of an initial public offering or alternatively, through a private placement when the project matured.

60.   Since then, the hospital has become fully operational and is a multi-speciality healthcare institution, which provides the highest quality medical care to patients by an outstanding team of healthcare professionals. It is in fact one of the leading hospitals in Pakistan with state-of-the-art equipment and medical facilities. It was identified as the hospital to be used in case of emergency by both US President Clinton on the occasion of his visit to Pakistan in March 2000 and by US First Lady Mrs Hillary Clinton on the occasion of her visit to Pakistan in 1995. It has also been on standby on many occasions routinely during the visits of international dignitaries such as the Prime Minister of Japan, President of South Africa Nelson Mandela and others. The hospital also provided emergency care to the victims of the Islamabad church blast on March 17 2002 when more than 32 patients received emergency treatment there.

61.   Muwaffaq Limited owns some of the shares of Shifa, which are fully paid, issued and subscribed. I no longer own any shares in Muwaffaq Limited. However, Shifa's Board of Directors requested me to stay on their Board because, they

KADI0002232

said, it was an honour for them to retain me as being one of the earliest investors, and they wanted to maintain continuity in board policies and direction. I decided to resign from the Board of Directors of Shifa on June 21 2002, after the allegations against me following September the 11th,in order to avoid causing embarrassment to my fellow board members.

62.    Other shareholders in Shifa include Koninklijke Phillips Electronics N.V. and local banking and financial institutions that underwrote the share issue at the time of the initial public offering.

**The arrest of Amir Mehdi**

63.    On March 21 1995 the Pakistan Government raided the local offices of the Foundation in Islamabad.  Subsequently, the officials of the FIA (the Pakistan security services) arrested Amir Mehdi on March 29 1995. It should be noted that around this time the FIA also conducted raids and targeted other Muslim charities working in Pakistan with refugees. The FIA subsequently detained Amir Mehdi. The detention period was then extended by order dated April 20 1995 for another period of 30 days.

64.    It appears that Amir Mehdi was arrested without any information from the FIA as to the grounds of his arrest.  Subsequently, he was informed that telephone numbers including a telephone number installed at his residence had allegedly been used for contact by associates of terrorists operating in Pakistan and abroad.  The Pakistan authorities put forward no evidence to establish any link between Amir Mehdi and terrorism, the proceedings against him were

KADI0002233

discontinued and he was released.    At no time have I ever been aware of any link or connection between Amir Mehdi and any terrorist activity. I am not aware of any evidence or grounds to support the allegations made by the FIA which were, as I have explained, not pursued, and the criminal proceedings against Amir Mehdi were discontinued.

65.    Amir Mehdi's employment was terminated following his release and his deputy served as acting director.  In March 1997 I gave instructions to my lawyers and accountants in Pakistan to close the Foundation in Pakistan. The Foundation was closed in April 1997.  Copy documents relating to this are at pages  53  to 57 .

**Afghanistan**

66.    In addition to Pakistan, the Foundation set up offices in Afghanistan in 1992 for implementing humanitarian projects and co-ordinating with other relief agencies. The basic objective was to provide financial or material assistance to organizations, institutions or centres to improve the standards of health care, education and relief to civilians suffering from dislocation. In Afghanistan the Foundation supported the following projects:

66.1    **Mosab Bin Umair School** in Kabul, an orphanage for Afghan orphans;

66.2    **New Kabul Refugees project in Nanhangar** province,for the resettlement and distribution of food aid to displaced persons due to civil war in Afghanistan;

66.3    **Mother and Child Clinic** in Jalalabad, for the provision of out-patient medical care, pre and post natal and paediatric care. The Foundation also provided aid to UNICEF in Jalalabad;

KADI0002234

66.4    **Muhammed Bin Amin School in Kunar,** a primary school for Afghan children teaching in dari (Persian), Pushto languages, basic primary sciences, reading and writing, mathematics, calligraphy, sports and social responsibility;

66.5    **Rehabilitation Centre of Afghan Women in Jalalabad** for training in income generation skills such as sewing, embroidery, soap making and farming to support and supplement the family incomes.

**Bosnia and Croatia**

67.    As is widely known, during the early 1990's there was enormous concern at the plight of Muslims in Croatia and Bosnia.  There was naturally considerable desire and incentive among both Muslim and non-Muslim humanitarian organisations and governments around the world to provide relief to Muslims in this area.  When I first visited Croatia, during the early 1990's, some Muslim relief organizations had already established themselves there, for example, International Islamic Relief Organisation ("IIRO").  In addition to this, the United Nations High Commission for Refugees ("UNHCR") had also started work for refugees in the area.  In 1992, in response to appeals from world humanitarian agencies, I decided to register the Foundation in Zagreb.

68.    I registered the Foundation's first office in Zagreb with the Croatian Ministry of Foreign Works on November 10 1992.  This was followed approximately a year later with an office in Sarajevo, Bosnia, which was registered with the High Court in Sarajevo on October 22 1993.  Further offices followed in 1994-95 in Konjic, Zenica, Tuzla, Mostar, Jablanica and Kladusa in Bosnia and Split in Croatia.

KADI0002235

Zagreb was the head office until its closure in 1996. Thereafter Sarajevo was the head office until I gave instructions on March 1 1997 for the ceasing of all activities not yet implemented, to establish a committee to review all ongoing projects and to consider transferring these to other NGOs. The closure of the Bosnian offices, which included applications to the Bosnian Court for approval of the de-registration of the Foundation's offices in Bosnia, ran through to 1998 as will be noted from pages 87 to 94. Each office was headed by a director with, above them all, a general director. From 1992 until 1996 this was Chafiq Ayadi.

**Chafiq Ayadi**

69.    At this juncture, it is appropriate that I should explain my relationship with Chafiq Ayadi as he is an individual who has also been listed as a Specially Designated Global Terrorist ("SDGT") by the US Department of Treasury on October 12 2001 and designated by the United Nations as associated with Osama bin Laden. Moreover the UK Treasury allege, on the basis of information provided by their US counterparts, that I have an association with Mr Ayadi.

70.    I was first introduced to Chafiq Ayadi in Zagreb, Croatia, by Waa'el Julaidan in around 1992 in the following circumstances. Waa'el Julaidan had previously been head of the Saudi Red Crescent, an organization equivalent to the Red Cross, and was in 1992 involved in refugee relief work in Croatia. He assisted me to establish an advanced teachers' college in Zagreb for helping women refugees to become teachers. He nominated Chafiq Ayadi for the management of this college and introduced me for the first time to Chafiq Ayadi. Waa'el Julaidan recommended Chafiq Ayadi highly for his experience and his ability in the area of humanitarian work for refugees and for his honesty.

KADI0002236

71.     I repeat that Chafiq Ayadi was an employee of the Foundation, employed as director in charge of the Foundation's European activities from late 1992 until March 1996 all of which, I should stress, were directed solely to providing relief and assisting refugees from Bosnia and Croatia.  The Foundation had no other purpose in Europe other than to assist Bosnian and Croatian refugees.

72.     My UK lawyers have made numerous requests to the UK Treasury for details of the allegations against Chafiq Ayadi but they have declined to say any more on this subject than merely that I have an association with Mr Ayadi and that he is an individual designated by the UN as a person associated with Osama bin Laden. My solicitors have examined an enormous quantity of documents and have interviewed a number of witnesses including former employees of the Foundation in connection with the Foundation's activities in Bosnia and Croatia and have found no evidence whatsoever that any transaction benefited Osama bin Laden, Al Qaeda, or any other terrorist activity or group.

73.     It may also assist if I recount my understanding of the circumstances as described by Chafiq Ayadi of his kidnapping in 1994 by the Serb forces and his detention for a period of several weeks.  During that time he was questioned by his captors who told him that they knew that he and the Foundation were not connected to Arab combatants and they knew that the Foundation was a genuine relief agency.  I understand from Chafiq Ayadi that their grievance was that the Foundation was providing relief only for Muslims, and not for Serbs.  Accordingly they requested a ransom for his release which I agreed to pay, thus securing his release.   I believe that had the Serbs had any suspicions that Chafiq was

KADI0002237

connected to Arab fighters, Chafiq would not be alive today.  In this regard the UNHCR was instrumental in helping to secure the release of Chafiq Ayadi.  I refer to a letter from the UNHCR to various NGOs in Bosnia dated June 4 1994, a copy of which is at page 164.

**FBIS article dated July 31, 1995**

74.     I am aware of false claims that the "Muwafaq Society in Zagreb" belonged to bin Laden.  These claims are totally untrue. These claims have been made in an article in Foreign Broadcast Information Service ("FBIS") dated July 31 1995, at pages 165 to 168, a copy of which has been supplied to my lawyers by the UK Treasury as part of their purported evidence against me.

75.     Contrary to the allegations in the FBIS article:-

75.1     The Foundation has at no time been a member or branch organisation of Human Concern International Society.

75.2     The "Muwaffaq Society in Zagreb" referred to in the FBIS article is not the name of the Foundation founded by me and my fellow Trustees. At pages 61 to 94 are documents relating to the Foundation's operation in Bosnia and Croatia in which the Foundation is referred to as Muwafaq Foundation or Fondacija and nowhere is it referred to as Muwaffaq Society.  My lawyers have investigated whether a society by any such name exists in Zagreb, and their conclusions have been negative.

KADI0002238

Additionally, as I have already asserted in my first submission to OFAC dated December 2001, and for the reasons explained below, I have grave doubts as to whether the so-called interview with bin Laden ever took place.

76.   It is clear on the face of the FBIS article that the alleged interview with bin Laden lacks any degree of credibility at all.  As would be apparent to any critical reader the so-called interview with bin Laden must be of highly doubtful authenticity for the following reasons:-

76.1   The "source date" of the FBIS article is stated as July 31 1995 and yet it purports to be based on an interview with Osama bin Laden published in the Egyptian Arabic language publication Rose Al -Yusuf nearly a year later, on June 17 1996.

76.2   The FBIS Article alleges that the interviewer Fayizah Sa'd interviewed bin Laden in London at a "luxury villa in Wembley, North London."

76.3   By February 1994 bin Laden had already been stripped of his Saudi nationality and was a well-known supporter of Islamic terrorist causes. It is highly unlikely that such a high profile terrorist would have been granted an entry visa and actually visited the UK.

77.   Quite apart from the above, the FBIS article is inherently implausible in several important respects. Bin Laden is quoted as saying he was born in Mecca, Saudi Arabia and is 44 years old. However according to the Interpol website (www.interpol.int) at page 169 bin Laden was born in Jeddah on March 10 1957,

KADI0002239

and so would have been 38 or at most 39 if the interview took place in 1996 and even younger if it had taken place any earlier.

78.   In the FBIS article the interviewer alleges (on page 167) that bin Laden was one of the founders of the Human Concern International Society "with the help of Iranian government and the CIA". The interviewer also quotes bin Laden as saying he is "on a mission for the US Embassy in London" which also seems inherently unlikely.

79.   In addition to this, if bin Laden had visited London and been interviewed in the 1990s, as has been alleged in the FBIS Article, I would expect this to have been reported by one or more of the leading London-based Arabic language newspapers. They have not reported on any such visit or interview by bin Laden.

80.   Given the inherent lack of credibility of the FBIS Article, and the highly doubtful authenticity of the so- called interview with bin Laden, the FBIS Article is a totally unreliable document and provides no proper basis for the maintenance of sanctions against me.

**The Foundation's activities in Bosnia and Croatia**

81.   As part of establishing the Foundation in Zagreb, I purchased 6 flats in the city. These were used as offices and as centers for the education courses run by the Foundation, which I describe below.  As foreign individuals and organisations were not permitted to own property in Croatia, the flats were purchased in the name of a local Islamic center, Islamska Zajednica, which organised an Islamic school in Zagreb and with which the Foundation worked.  During the period 1992-

KADI0002240

96, the Foundation used all 6 flats for its own activities but from 1997, the Foundation allowed Islamska Zajednica to use 4 of the flats, rent free, as student housing. In 2001, after the Foundation had ceased all its activities in Croatia, I donated the 6 flats to Islamska Zajednica. I am aware of claims which have been made that one or more of these flats was used as temporary accommodation for Arab fighters in Zagreb and/or for the purpose of storing weapons for them. To the best of my knowledge, this allegation is totally untrue. In any event, I have never allowed or authorised any such activities, and I have never seen any evidence to support these claims. I believe it stretches credulity that there were any Arab fighters in Zagreb because it is well known that at the time the Croatian authorities were extremely hostile to Arab Muslims.

82.   In 1992-93 when the Foundation's first offices were opened, the war in the former Yugoslavia was at its height. Serbian forces had taken control of large areas of Croatia and Bosnia and large numbers of people, mainly Bosnian Muslims, had been forced to leave their homes. The UNHCR has estimated that 1.2 million persons fled Bosnia as a result of the conflict and 1.3 million persons were internally displaced. The Foundation was a major contributor to the international humanitarian effort which was needed to keep these individuals alive. In the early days of its operation in Bosnia/Croatia a very important aspect of the Foundation's activities was the supply of basic necessities to refugees and "displaced persons". The Foundation supplied food, blankets and clothes to refugee camps. Some goods came in the form of contributions from the Foundation's offices in Germany and Austria, which were established in order to organise the collection of donations. In the main, however, the Foundation purchased goods for distribution. In relation to this most basic form of aid, which

KADI0002241

was intended literally to help people survive, I refer to the document entitled "Results and Achievements" of the Foundation's Balkans offices dated March 1995, a copy of which is at pages 170 to 183.

83.    To assist with the effective distribution of goods, the Foundation purchased trucks.  By 1995 the Foundation had a small fleet of trucks, many of which were registered with UNHCR, issued with UNHCR number plates and made available to that body for the transportation of aid, including hospital equipment.  To assist in this project the Foundation received contributions of fuel, oil, tires and other vehicle equipment from UNPROFOR, the United Nations Protection Force.

84.    The Foundation worked closely with UN organisations throughout this period. Representatives of the Foundation attended the regular inter-agency meetings held by UNHCR and approximately 30 of the Foundation's staff including myself were issued with UNHCR identity cards.  The UNHCR made available to the Foundation all of their facilities to enable the Foundation to carry out its relief work in Bosnia and Croatia.  Aside from UNHCR identity cards, these facilities included bulletproof jackets, free travel on board UN flights to and from Bosnia, UNHCR car registration plates, fuel and meals for the Foundation's staff who were travelling as well as financial assistance for the Foundation's Bosnian projects.  The Foundation also worked with IFOR, the NATO Implementation Force and it had extensive links with other NGOs in Bosnia/Croatia.

85.    When the Foundation first set up its offices in Bosnia/Croatia the refugee situation was desperate, as described above.  This meant that the urgent and immediate priority was the provision of emergency relief.  Aid in the form of food

KADI0002242

and clothing remained extremely important but as the Foundation became more established it also began to concentrate on regenerating projects designed to assist in the rebuilding of the countries, including food production programs, dairy and poultry farms, fish farms and crop projects.

86.   In addition to this, the Foundation supported medical institutions, and also supported educational projects. The Foundation's investment in adult education included establishing technical centers for women, and the provision of skills-based courses and other courses such as languages, physics and computing. Many hundreds of students benefited from attending these courses, which were run from each of the Foundation's offices. The Foundation also supported education in other ways, for example through sponsorship of numerous schools in Bosnia.

87.   In addition to all of the above, the Foundation founded its own private school, in Sarajevo.  The school, originally named Muwafaq School, but now renamed Risala School, was set up in October 1996.  This was a significant project, which entailed a great deal of preparation and planning.  The Foundation purchased and completely renovated a derelict and bomb damaged building for the school. This was ready for use by the school in September 1998, which until then had occupied temporary premises. The standard of teaching is extremely high: in the academic year 2001-02, the school won first place in the public examinations in Bosnia-Herzegovina and was rated the best among the 58 schools in the country by the Bosnian Ministry of Education.

KADI0002243

88.   In 1998 when the Foundation closed its activities, it handed over the running of the school to Risala d.o.o, a Bosnian corporation in which I own a majority interest, and which was set up for this purpose. Until my assets were frozen, I continued to support Risala each year, meeting the shortfall between its costs and the fees paid by parents.

89.   In addition to all of the above, the Foundation, until its closure in 1998, promoted social and cultural activities.  It made donations to a large variety of small projects.  It also contributed to an organisation called Nahla which was a community center for Bosnian women which had a gym, library and other facilities for women.  The Nahla center was visited last year by the wife of the US Ambassador who commended its work.

90.   Quite apart from the Foundation, I also supported and was a board director of Al Haramain Wa Al Masjed Al Aqsa Charity (the two holy shrines and the Aqsa Mosque Charity), which was registered in Saudi Arabia and had a branch in Sarajevo. I was invited to join this charity by its chairman Mahmood Taiba who is related to me. This charity was authorised to perform the following: Al-Walidein-Gazzaz primary school for children who had lost their father or both parents and the financing and supervising of Dar Al Walidein (a home for up to 320 children and single mothers  who had lost their husbands/fathers as a result of the war in Sarajevo). I stress this institution has no connection with the totally separate charity with a similar name, Al Haramain, which has been listed by the US Government. I confirm for the avoidance of doubt, that I have never had any connection whatsoever with Al Haramain, the charity listed by the US Government.  Indeed, Al Haramain Wa Al Masjed Al Aqsa was investigated by

KADI0002244

the Bosnian Government, its accounts were frozen in April 2002 and on July 1
2002 the Bosnian authorities took a decision, having investigated the matter fully,
unconditionally to unfreeze the charity's accounts.

**My introduction and first visit to Albania**

91.    In 1991/1992 the political and economic circumstances in Albania underwent a
radical transformation; years of communist rule came to an end and, following a
general election held in March 1992, the Democratic Party won a landslide
victory with over 65% of the popular vote.   With this change in the political
climate, Albania underwent a difficult transition from a centralised communist
system to a more open-market economy.   Albania's economy rebounded in
1993/1995 after a severe depression accompanying the end of the previous
communism-based system. I now explain how I first visited that country in 1993.

92.    In 1993, I participated in the 1st Muslim-Albanian International Investment
Conference held in Tirana, Albania.  I was invited with a number of other leading
Saudi Arabian businessmen to participate in this conference hosted by the
Albanian Government and sponsored by the Islamic Development Bank ("IDB").
The conference was held in the Albanian Government's Palace of Congress.  It
was opened by the Albanian President and attended by senior members of the
Albanian Government, including, in addition to the President, the Prime Minister
and Finance Minister. The purpose of the conference was to encourage foreign
investment in Albania.

93.    By way of background, the IDB is an inter-governmental Muslim financial
institution the purpose of which is to foster the economic development and social

KADI0002245

progress of member countries and Muslim communities individually as well as jointly in accordance with the principles of Shari'ah law, i.e Islamic law. The present membership of the IDB consists of 54 Muslim countries.  The IDB's principal office is in Jeddah.

94.     I recall that the other leading Saudi businessmen attending the conference included Dr Abdu Yamani and the chairman of IDB Dr Ahmed Mohamed Ali.  I remember that, as in the case of my visit to Sudan, the Saudi delegation, including myself, attended the conference together.

**Dr Abdul Latif Saleh**

95.     At the conference I met, for the first time, **Dr Abdul Latif Saleh**, a Jordanian medical doctor.  In recognition of Dr Saleh's excellent work in Albania, both in the Tirana Polyclinic and more generally in the health field within Albania, in October 1992, the Albanian Government granted him Albanian citizenship to reflect its appreciation for his positive role in the transitory period of Albania following the end of communist rule there. I now provide some background information on Dr Saleh, which he has provided to me concerning himself, as he is an important figure in my account of my activities in Albania.

96.     In the period immediately after the collapse of communism, there had been no NGOs working in Albania for some 40 years.  Dr Saleh was in 1992 appointed medical supervisor of the Tirana Polyclinic (the central Polyclinic in Tirana) which was at that time run by the largest Saudi Arabian charity, the International Islamic Relief Organisation, otherwise known as the IIRO.  (I mention in passing that it was Dr Saleh's excellent local contacts in Albania and knowledge of the country,

KADI0002246

in addition to his experience of working with a Saudi organisation, the IIRO, that later in 1993 caused him to be of interest to me as a business associate).  During the period 1992-1993, Dr Saleh succeeded in turning this Polyclinic around so that it became widely known as the best medical facility of its kind in Albania and for the excellence of its medical care and services.

97.    The United Nations Development Program ("UNDP") initiated a forum for all NGOs working in Albania, both Albanian and foreign.   During 1993/1994 Dr Saleh was twice elected, by the foreign and Albanian NGO's attending, as chairman of the NGOs' forum in Albania. Under Dr Saleh's chairmanship, this NGOs' forum achieved recognition by the Albanian Government. For a period of 1 year he ran the office of the forum jointly with the American Catholic Relief Service. His outstanding work as representative of NGOs in Albania caused him to be selected to represent them before the European Council.  Dr Saleh was commended by the UNDP for his humanitarian works in Albania.  In addition to this he was appointed in 1993 as advisor to the Albanian Government's Ministry of Health.

98.    To understand why Dr Saleh was attending the IDB conference, it is necessary to explain that at that time in Albania there were only 3 embassies; and even those were headed by Chargés d'Affaires. None of them was Saudi Arabian.   Dr Saleh's work at the Tirana Polyclinic, and his other work in Albania, had made him well known.  The Polyclinic was, as I have mentioned, funded by the IIRO, which was at the time the largest Saudi Arabian charity in existence.  The Chief of Protocol to the Albanian President invited Dr Saleh to attend as an observer

KADI0002247