# EXHIBIT L

Declaration of Peter C. Salerno
In Support of Defendant Yassin Kadi's Motion
To Exclude the Testimony of Victor Comras

03 MDL 1570

July 31, 2023

Exhibit
0978

188274v1

## ANSWERS TO QUESTIONS CONCERNING THE PETITION TO DELIST YASSIN ABDULLAH KADI

1.   **Who was responsible for the supervision of the Muwafaq Foundation?**

Mr Kadi has described the establishment and constitution of the Muwafaq Foundation ("the Foundation") in paragraphs 24 to 27 of his witness statement dated December 19, 2002 to which he refers.

In summary, during 1990/91, while Mr Kadi was working with Mr Khalid bin Mahfouz ("KBM") for National Commercial Bank, they developed a relationship of mutual trust and respect.  KBM told Mr Kadi that he wanted to set up a charitable foundation in memory of KBM's parents. KBM suggested a name for this Foundation, Muwafaq, an Arabic word which means, in essence, "Blessed Success" or "Holy Success". In this regard, Mr Kadi points out that, like most other faiths, philanthropy is a central tenet of religious practice for all Muslims, especially the wealthy among them.

The Foundation was founded as a charitable trust in Jersey, Channel Islands, by means of a Constitution and Declaration of Trust dated May 31, 1992, a copy of which is attached. The principal objectives and purposes of the Foundation were set out in the Constitution and Declaration of Trust. There were a total of 6 trustees of the Foundation.

Legally, of course, the board of trustees was responsible for the supervision of the Foundation. The trustees were all busy businessmen and they delegated to Mr Kadi the running and operation of the Foundation. In practice, therefore, Mr Kadi was the driving force behind the administration of the Foundation. He consulted as necessary with KBM.

1

KADI0002928

Mr Kadi administered the Foundation as a highly decentralised operation and accordingly the Foundation had no central administration. Mr Kadi organised the Foundation to carry out separate activities in various countries or regions.

Mr Kadi selected the managers responsible for the various countries. Where possible Mr Kadi appointed country managers who had previous experience of working for Saudi Arabian individuals or humanitarian organisations and based on recommendations Mr Kadi had received. Mr Kadi delegated authority to the various country managers who in turn took day-to-day responsibility for running the Foundation in the relevant locations.  Mr Kadi would work with the individual country or regional managers and the trustees to decide, for each relevant country, which charitable activities to engage in. Mr Kadi would consult primarily with KBM and discuss fund raising for the activities in each country or region with the manager responsible for that location.  Mr Kadi would help raise money for those activities.

Mr Kadi did not have an administrative staff at the Foundation. He ran the Foundation on a part-time basis. Mr Kadi relied on his small business staff to help him co-ordinate the activities of the Foundation in the various countries.

As stated above the Foundation was highly decentralised. Therefore it had no central accounting systems nor any central bank accounts. The individual country managers opened bank accounts for the Foundation in the various locations where the Foundation operated.

Mr Kadi would whenever possible make periodic visits to the various locations where the Foundation operated to meet with the country managers regarding the activities of the Foundation in that country. Typically Mr Kadi would when possible visit each active project country about 3 to 4 times a year.

KADI0002929

**1a**    **What actions did Mr Kadi take to audit or in any other way evaluate how the money in the Muwafaq accounts was being used?**

As stated above, the Foundation was highly decentralised and therefore had no central accounting records. There was no requirement to carry out an audit of the Foundation under Saudi Arabian law because the Foundation was not organised in Saudi Arabia. Likewise in Jersey, where the Foundation was established as a trust, there was no legal requirement for the Foundation's accounts to be audited.

Mr Kadi did however arrange for formal audits of the Foundation's accounts where there was a local requirement to do so and where this was possible i.e. in countries where appropriately qualified auditors were available to carry out the audit work. Thus the Foundation had annual audits carried out for its operations in Pakistan and Sudan.

Many of the other countries where the Foundation carried out its humanitarian and charitable activities had no financial infrastructure - and thus there were no appropriate auditors available in these countries  - due to the effects of war or communism. Ethiopia and Somalia were both war-stricken countries; Albania had only recently emerged from over 4 decades of communist rule and had no appropriately qualified auditors available to carry out audit work; and Bosnia/Herzegovina and Croatia were also war-stricken countries. Thus in these countries it was simply not possible to arrange a formal audit of the Foundation's accounts.   In Germany and Austria the Foundation existed for only a short time, it was ancillary to the main European operation in Bosnia/Croatia, and was considered not sufficiently substantial to merit an external audit of the Foundation's accounts.   In the foregoing countries there are no meaningful financial records available.

As stated above, Mr Kadi would whenever possible make periodic visits to the various locations where the Foundation operated to meet with the country managers regarding the activities of the Foundation and to review the implementation of the projects in that country. Typically Mr Kadi would when possible visit each active project country about 3 to 4 times a year.

3

**1b**    **Who was the auditor?**

In **Pakistan** the auditor was the firm formerly known as Sidat Hyder & Co., Chartered Accountants, which at that time represented Andersen Worldwide in Pakistan.

Currently this firm is known as: Ford Rhodes Sidat Hyder & Co. Its contact details are: attention: Shibli I. Rehan Esq., 3rd Floor, Eagle Plaza, 75 – West, Fazal – e – Haq Road, Blue Area, Islamabad 44000, Pakistan, Telephone [+ + 92 51] 287 0290 to 92, Fax [+ + 92 51] 287 0293 and E – mail: frsh.isb@pk.ey.com. The firm is now a member of Ernst & Young International.

In **Sudan** the firm of Ahmed Osman, Certified Accountants, PO Box 2911, Khartoum, Sudan, telephone 79772 or 55979, was used to audit the Foundation's accounts for the year 1991/1992.

In **Sudan** for subsequent years the firm of El Gadi & Co. was appointed to audit the Foundation's accounts as it was considered more financially competitive than Ahmed Osman. In addition the principal of the firm, Mr El Gadi, has a UK accounting qualification. The firm's contact details are: attention A. H. El Gadi, Fellow of the Association of Chartered Certified Accountants (UK), Islamic Bank Building, Sixth Floor, Qaser Street, P. O. Box 7124, (M. O. C. Post Office) Khartoum, Sudan, telephone number 785261. Note: Mr El Gadi is no relation to Mr Kadi whatever.

Copies of the available audited accounts for the Foundation are attached as follows:

**Pakistan** for the following years:

| Title/Location | Year | Auditor's Name | Language |
|---|---|---|---|
| Muwafaq Foundation - Pakistan | Year ended 31/12/92 | Sidat Hyder Aslam & Co. (Representing Arthur Andersen in Pakistan) | English |

KADI0002931

| Title/Location | Year | Auditor's Name | Language |
|---|---|---|---|
| Muwafaq Foundation - Pakistan | Year ended 31/12/93 | Sidat Hyder Aslam & Co. (Representing Arthur Andersen in Pakistan | English |
| Muwafaq Foundation - Pakistan | Year ended 31/12/94 | Sidat Hyder Qamar Maqbool & Co. (Representing Arthur Andersen in Pakistan) | English |
| Muwafaq Foundation – Pakistan | Year ended 31/12/95 | Sidat Hyder Qamar Maqbool & Co. (Auditors) (Representing Arthur Andersen in Pakistan) | English |
| Muwafaq Foundation – Pakistan | Year ended 31/12/96 | Sidat Hyder Qamar Maqbool & Co. (Auditors) (Representing AA in Pakistan) | English |

**Sudan** for the following years (these accounts are all in Arabic):

| Title/Location | Year | Auditor's Name | Language |
|---|---|---|---|
| Audited Financial Accounts of the Muwaffaq Foundation – Sudan | Hijri Year 1412 (1991/92) | Ahmed Osman & Co. (Auditors) Khartoum,Sudan. | Arabic |
| Audited Financial Accounts of the Muwaffaq Foundation – Sudan | Hijri Year 1413 (1992/93) | ElGadi & Co. (Auditors) Khartoum, Sudan | Arabic |
| Audited Financial Accounts of the Muwaffaq Foundation – Sudan | 21/6/93 - 31/12/93 | ElGadi & Co. (Auditors) Khartoum, Sudan | Arabic |
| Audited Financial Accounts of the Muwaffaq Foundation – Sudan | 1/1/94 – 31/12/94 | ElGadi & Co. (Auditors) Khartoum, Sudan | Arabic |

5

KADI0002932

| Title/Location | Year | Auditor's Name | Language |
|---|---|---|---|
| Audited Financial Accounts of the Muwaffaq Foundation – Sudan | 1/1/95 – 31/12/95 | ElGadi & Co (Auditors) Khartoum, Sudan | Arabic |
| Audited Financial Accounts of the Muwaffaq Foundation - Sudan | 1/1/96 - 31/12/96 | ElGadi & Co (Auditors) Khartoum, Sudan | Arabic |

**1c**     **What was the scope of the auditor's responsibilities?**

Mr Kadi did not choose or appoint the selected auditor. The auditors were chosen by the local management who then advised Mr Kadi of the auditors' names. In those local jurisdictions where an audit took place the scope was as required by local law. The Foundation entered into a standard relationship with the audit firms to apply normal local charity audit standards. Neither the Foundation nor Mr Kadi set any special conditions, requirements or limitations on the auditors' role or function.

**1d**     **If any audits were performed are the auditor's records available for review?**

See 1b above.

**1e**     **What were the auditor's specific reporting responsibilities to Kadi, to the board of Muwafaq, and to any government agencies in the countries in which Muwafaq operated?**

The audit reports were addressed to the board of trustees of the Foundation in the normal way, as reflected by the attached audited accounts. The auditors submitted their audit reports to the local management of the Foundation who reviewed the reports. The local managers would supply a copy of the audit reports to Mr Kadi for his review and Mr Kadi would in turn supply a copy to KBM. So far as Mr Kadi

KADI0002933

can recall there were no formal meetings of trustees to discuss the audits although the trustees may have discussed them informally.

Since receiving OFAC's questions Mr Kadi's lawyers have researched and determined that in **Pakistan** the Foundation did have a requirement to file copies of the audit reports with the government. The local manager had responsibility to do this. Mr Kadi believes this was done but has been unable to confirm that at this date.

Mr Kadi's lawyers have also determined that the Foundation was not required to submit copies of the audited accounts to the government in Sudan or, so far as Mr Kadi knows, in any other country where the Foundation operated.

**1f     What control did Mr Kadi have or use over any auditors to the Muwafaq Foundation?**

Mr Kadi asked the country managers where possible to appoint auditors of repute, particularly auditors who were internationally certified or qualified.   Mr Kadi exercised no control over the auditors other than having notice of their appointment and reviewing their reports, which the auditors submitted to local management. Mr Kadi did not choose or appoint the selected auditor.   The auditors were chosen by the local management who then furnished the auditors' names to Mr Kadi.  Mr Kadi had no influence or control over the auditors.

**1g     Paragraph 65 of YAK7 states that the Muwafaq Foundation was closed in April 1997.  Was Muwafaq still operating and/or receiving money into any of its accounts in Pakistan after 1997?**

Mr Kadi refers to paragraph 67 of his statement dated 19 December 2002 and to the documents relating to this at pages 53 to 57 of exhibit YAK7. Mr Kadi has provided evidence that the Foundation was closed in Pakistan in April 1997. The closure announcement was published in 2 Pakistani newspapers, the NEWS and JANG.  The letter of 21 March 1997 (page 57, YAK7) from the Foundation's chartered accountants Sidat Hyder Qamar Maqbool & Co reflects that the Foundation was closed in Pakistan in April 1997.   Upon Mr Kadi's instructions the Foundation's

KADI0002934

lawyer in Pakistan, Mr Farrukh Qureshi, dealt with settling all outstanding claims by the Foundation's employees arising on termination of their employment. So far as Mr Kadi is aware the Foundation did not continue to operate after April 1997.   Mr Kadi has no knowledge that the Foundation operated at all in Pakistan or continued to receive any money into any of its accounts in Pakistan after April 1997.

**Note:**  Since receiving OFAC's questions Mr Kadi's lawyers in Pakistan have made inquiries to ascertain what has become of the assets of the Foundation in Pakistan. Since receiving this question, Mr Kadi has heard an unconfirmed rumour that a car or cars bearing the Muwafaq logo have been observed in Peshawar as recently as 2003. So far as Mr Kadi knows the assets of the Foundation in Pakistan were disposed of upon its closure in Pakistan in 1997 as instructed by Mr Kadi. Since April 1997, no person has had any authority to use the Muwafaq logo. Mr Kadi has instructed his lawyer in Pakistan to take steps to ensure there is no further unauthorised use of the Muwafaq logo.

Since receiving this question Mr Kadi's lawyers in Pakistan have also determined that a school started by the Foundation, called Muwafaq International School, on Jamrud Road, Peshawar continued to operate under the Muwafaq name until 2001, when the name was changed to "Al-Andalus Education Academy". A college also started by the Foundation, called Muwafaq University College, also continued to operate under the Muwafaq name until 2001 when it was closed. Until receipt of these questions, and the subsequent investigations, Mr Kadi had no knowledge of the continuation of these entities after 1997.

1h      **Was Mr Kadi ever aware of the Muwafaq Foundation being used to provide financial support for any entity involved in combat of any kind?**

No, Mr Kadi has no knowledge whatever that the Foundation or any of its employees or personnel or any of its funds were ever used to provide financial support for any people or entity involved directly or indirectly with combat of any kind or at any location. As stated in Mr Kadi's 19 December 2002 witness statement the Foundation worked closely with, and was accepted and recognised by, supranational bodies such as the World

8

KADI0002935

Food Programme, the World Health Organisation and UN organisations such as UNICEF and the United Nations High Commission for Refugees (see paragraphs 45, regarding Sudan, and 84, regarding Bosnia/Croatia). Mr Kadi believes that had the Foundation been involved in providing financial support for combatants it would not have been allowed to work with these reputable international humanitarian organisations.

1i      **Was Mr Kadi aware of Muwafaq having any transactions of any type with Makhtab al-Khidmat?  If so, explain the nature (dates, amounts, purpose, etc.) of these transactions.**

No, to the best of Mr Kadi's knowledge neither the Foundation nor any of its employees or personnel has ever supported this organization or had any transactions of any type with it. Moreover, Mr Kadi personally has never had anything to do with this organisation.

Mr Kadi was of course aware of the existence of this organisation, which as is generally known existed in the 1980's to help in the US backed effort to drive out the Soviet occupying forces in Afghanistan and ceased to exist in 1989 (before the Foundation was established).

1j      **Was Mr Kadi aware of Muwafaq having any transactions of any type with the Abu Sayyaf group?  If so, explain the nature (dates, amounts, purpose, etc.) of these transactions.**

No, to the best of Mr Kadi's knowledge neither the Foundation nor any of its employees or personnel has ever supported this organization or had any form of transactions or connection with it.   Mr Kadi has never personally supported or had any transactions or connection whatsoever with this organisation or any of its members.

1k      **Was Muwafaq ever involved in the transportation of any members of any political party that was involved in advocating or pursuing the violent overthrow of any governments?**

No, to the best of Mr Kadi's knowledge the Foundation was never involved in the transportation of any such people.

KADI0002936

Even though the Foundation sometimes carried out charitable operations in countries where there was a war, the aims and objectives of the Foundation were and remained wholly and exclusively humanitarian. The Foundation went to great lengths not to become involved in any political activities and to remain apolitical.

2.    **Intermingling of funds between Muwafaq Foundation and any of Mr Kadi's businesses or any other charitable organizations with which he was affiliated.**

2a    **Did Muwafaq receive funds transfers from any of Mr Kadi's other businesses or charitable organizations?  If so, explain the nature (dates, amounts, purpose etc.) of these transactions.**

As stated above, in relation to the Foundation, Mr Kadi's major role was to raise funds for the specific charitable activities of the Foundation in specific countries. If Mr Kadi had concurrent business activity in that country he would sometimes arrange for his local businesses to make a contribution to the Foundation, or to finance specific expenditures of the Foundation in that country. An example of this is Sudan where, as is apparent from the audited accounts enclosed, the Foundation received funding from Leemount Limited, a company incorporated in the Isle of Man that Mr Kadi used to conduct many of his business activities in Sudan, as described in paragraph 147 of his 19 December 2002 witness statement. The **purpose** of all these transfers was to support the charitable activities of the Foundation. There are no meaningful records available of these transfers, which took place over a long period of time, and due to the time that has elapsed since the transfers were made. In each case the transfers were made to meet a specific need for supporting charitable work in a given country.

To the best of Mr Kadi's knowledge, the Foundation never received any funds from any other charitable organization connected with Mr Kadi.

KADI0002937

**2b    Did Muwafaq disburse payments on behalf of any of Mr Kadi's business or charitable organizations?**

No, as far as Mr Kadi is aware, the Foundation did not disburse payments on behalf of any of Mr Kadi's businesses, or any other charitable organization connected with him.

**2c    Were any expenses of Muwafaq's ever paid by any company controlled by Mr Kadi?**

Yes, there were instances of this, as described at 2a above. As a general rule the Foundation's charitable operations and Mr Kadi's businesses were handled independently, but since Mr Kadi did arrange to have contributions from his local companies made to the Foundation's activities, it is possible that those companies may have directly paid expenses of the Foundation.

**2d    If so, what was the reason for the use of the funds in this, or any other indirect, manner?**

When these transactions occurred, it was because it was administratively convenient for Mr Kadi's local businesses, which had an existing established infrastructure and cash flow, from time to time to make payments to support the Foundation's activities.

For example, funds may not have been in the Foundation account to meet expenses when they fell due.

**3.    Assistance to Terrorist Enterprises**

**3a    Is Mr Kadi aware of any money provided by Muwafaq going to other Islamic foundations which, whether designated under E.O. 13224 or not, were involved in providing funds or other support to terrorist individuals or enterprises?**

No. To the best of Mr Kadi's knowledge the Foundation never provided money to any terrorist individuals or organisations, whether or not designated under E.O.13224.

11

KADI0002938

At no time has either Mr Kadi or, to the best of his knowledge, the Foundation ever contributed any funds or otherwise supported any other Islamic foundations involved in providing funds or other support to terrorist individuals or enterprises including Usama bin Laden or Al-Qaeda. At no time has either Mr Kadi or, to the best of his knowledge, the Foundation ever acted as a conduit or channel for funds being passed to any such person or enterprise. Mr Kadi repeats that he is personally strongly opposed to terrorist activity in all forms. He considers those that support or participate in terrorism to be offensive to the Muslim faith and deserving of the most severe condemnation.

As Mr Kadi has stated in paragraph 90 of his 19 December 2002 witness statement, Mr Kadi supported in Bosnia, in addition to the Foundation, the Al Haramain Wa Al Masjed Al Aqsa charity which is totally unconnected with the completely separate charity with a similar name, Al Haramain which has been listed by the US government. For the avoidance of doubt Mr Kadi has had no connection whatever with Al Haramain, the charity listed by the US government.

As Mr Kadi has explained at length in his 19 December 2002 witness statement (paragraphs 69 to 73 and 115 to 119) he has had relationships with Chafiq Ayadi and Waa'el Julaidan both of whom have been designated under E.O. 13224. However in each case his relationships with these individuals pre-dated their designation (by 9 years and 20 years respectively) and none of Mr Kadi's transactions with them were directly or indirectly for the purpose of aiding terrorism.

**3b**    **What, if any, controls or monitoring of the recipients of funds provided by Muwafaq were used?**

In countries where there were audits, the recipients of funds were monitored by the audit process.

In countries where there were no audits, financial procedures and controls were established on a local level to account for both receipts and expenditures to ensure that funds provided by the Foundation were applied for the intended humanitarian purposes.

12

KADI0002939

As stated above, Mr Kadi would whenever possible make periodic visits to the various locations where the Foundation operated to meet with the country managers regarding the activities of the Foundation and to monitor the recipients of funds in that country. Typically Mr Kadi would when possible visit each active project country about 3 to 4 times a year.

In addition some members of the Bin Mahfouz family including for example Dr Saleem Bin Mahfouz, a medical doctor living in Saudi Arabia, a director of the Foundation's German office and brother of Rais Bin Mahfouz, one of the Foundation's trustees, made periodic visits to review the Foundation's activities in Sudan, Albania and Bosnia. They reported to both Mr Kadi and KBM on their visits.

As a general rule the activities engaged in by the Foundation were the support of local humanitarian activities, including providing housing, food, medicine and shelter to persons in need, and the rehabilitation of refugees or displaced people by education and vocational training. Towards this end the Foundation directed payments to individuals or entities that were providing humanitarian assistance or the provision of infrastructure that provided humanitarian assistance.   Normally the Foundation did not make cash payments to other charitable organisations.

3c    **Was Mr Kadi ever aware of any allegations that any recipients of funds of Muwafaq were involved in terrorist activities?**

No. Mr Kadi was never aware of any allegations of involvement in terrorist activities against either the Foundation, any of its employees, or against any organisations with which the Foundation engaged in various transactions.  It was only after the Foundation ceased operations  - and the publication of the USA Today article dated October 29, 1999 - that Mr Kadi became aware of any of these allegations.

The one single exception to the above was the publication of highly defamatory and wholly untrue allegations in the London based magazine Africa Confidential when it was claimed that an employee of the Foundation in Ethiopia was involved in an assassination attempt upon President Mubarak of Egypt in Addis Ababa. Mr Kadi and his fellow

KADI0002940

trustees of the Foundation took such a serious view of the publication of these wholly untrue allegations that they instituted libel proceedings against the editor and publisher of Africa Confidential before the High Court in London.  In May 2001 that litigation settled and Mr Kadi and his fellow trustees were completely vindicated of the allegations. Africa Confidential agreed to pay a substantial sum to Mr Kadi and his fellow trustees. Africa Confidential undertook never to repeat the allegations complained of and agreed to participate in a Statement in Open Court retracting the allegation concerning the attempted assassination of President Mubarak of Egypt and apologising to Mr Kadi and his fellow trustees.

Mr Kadi has described these proceedings against Africa Confidential at length in his witness statement dated 23 July 2002, and at pages 14 - 19 of exhibit "YAK6".

3d    **What actions, if any, were taken as a result of any reports or allegations that the recipients of any Muwafaq funds were involved in terrorist activities?**

To the best of Mr Kadi's knowledge, there were no allegations or reports made during the period when the Foundation was operational, with the sole exception of the Africa Confidential article, referred to above.  In the case of the Africa Confidential article, Mr Kadi took vigorous action and  - as described above - sued the editor and publishers of the Africa Confidential article for libel in the High Court in London.

All other allegations or reports that recipients of the Foundation's funds were involved in terrorism were brought to Mr Kadi's attention **after** the time the Foundation ceased operating.

In the case of the USA Today article dated October 29, 1999 this article alleged that the Saudi Royal Family had ordered an audit of National Commercial Bank (NCB) following allegations that

> *"five of Saudi Arabia's top businessmen ordered the NCB to transfer personal funds, along with $3 million diverted from a Saudi pension*

KADI0002941

*fund, to New York and London banks. The money was deposited into the accounts of Islamic charities, including Islamic relief and Blessed Relief, that serve as fronts for bin Laden".*

Immediately upon publication of this article Mr Kadi made inquiries to investigate these claims, especially with the NCB. As explained in Mr Kadi's 19 December 2002 witness statement (paragraphs 40 onwards) the allegations in the USA Today article are totally untrue: the Foundation never had any account with the NCB, the NCB management have vehemently denied the existence of any Saudi government audit and described the allegations in the USA Today article as "incorrect, false and frivolous". Moreover the USA Today article repeated totally untrue allegations in Africa Confidential claiming that an employee of the Foundation in Ethiopia was involved in the assassination attempt upon President Mubarak of Egypt, of which Mr Kadi and his fellow trustees were totally vindicated in the High Court in London.

4.      **Joint Accounts**

4a      **Has Mr Kadi ever personally maintained joint accounts, or accounts at which any individuals that have been designated under E.O 13224 have had signatory authority?**

No, Mr Kadi has held no joint accounts with anybody designated under E.O. 13224 including Waa'el Julaidan and Chafiq Ayadi.

4b      **If he has, what controls he has exercised over how funds have been put into the account(s), and taken out of the account(s)?**

Not applicable.

5.      **Bin Laden/Al Qaeda**

**Paragraph 42 of YAK7 states, "At no time have either I, or to the best of my knowledge, the Foundation ever contributed any funds or otherwise supported Bin Laden or Al-Qaeda.  At no time have either I or, to the best of my knowledge, the Foundation ever acted as a conduit or channel for funds being passed to Bin Laden or Al-Qaeda".**

KADI0002942

**5a      Has Mr Kadi ever managed money, or any business enterprises, for Usama bin Laden, or for the benefit of Bin Laden?**

No, Mr Kadi has never managed money, or any business enterprises, for Usama bin Laden, or for the benefit of Usama Bin Laden.

**5b      Was Mr Kadi ever aware of any allegation that any company which he was invested in or otherwise associated with funded by, controlled by or sponsored by Bin Laden?**

Mr Kadi was never aware of any allegation that any company, which he was an investor in or otherwise associated with, was funded by, controlled by or sponsored by Usama Bin Laden.

As described in paragraph 168 of Mr Kadi's 19 December 2002 witness statement, in 1999 - some years after the cessation of operations of the Foundation - he invested in Global Diamond Resources Inc., a US company. Mr Kadi was appointed to the board of directors of Global Diamond Resources as a nominee of New Diamond Holdings Limited, incorporated in the British Virgin Islands, a family company owned by Mr Kadi and his wife on behalf of their children. The Bin Laden Group is also a shareholder in Global Diamond Resources.  As Mr Kadi has clearly pointed out, and as is well known, the Bin Laden family, who own the Bin Laden Group, have publicly disowned Usama bin Laden. Mr Kadi has provided OFAC with details of his investment in Global Diamond Resources, which was completely visible and apparent from publicly available records.  His investment in Global Diamond Resources should not, therefore, be understood in any manner as implying any form of link or support or sympathy for Usama bin Laden or Al-Qaeda.  To the best of Mr Kadi's knowledge Usama bin Laden has no shares or interest in Global Diamond Resources.

**5c      What actions, if any, did Mr Kadi take in response to any information or allegations that Bin Laden had a financial interest in any of Mr Kadi's enterprises?**

Mr Kadi certainly had no information and was not aware of any allegation that Bin Laden had any financial interest in any of Mr Kadi's enterprises

KADI0002943

and, accordingly, the question of what actions Mr Kadi took does not arise.

5d   **Has Mr Kadi ever met Usama Bin Laden?   If so, please provide details.**

Yes.

**In Chicago, USA, in 1980 - 1981:** Mashoor Al Maduri is Mr Kadi's brother-in-law.  Mr Al Maduri's wife and Mr Kadi's wife are sisters.  In about 1980 - 1981 Mashoor Al Maduri was working for the Saudi Bin Laden Group.  At that time he called Mr Kadi, who was working in Chicago as a trainee for Skidmore Owings & Merrill, the international architectural firm based in Chicago, USA. Mr Al Maduri requested Mr Kadi's help in recruiting engineers trained in the USA to work for the Saudi Bin Laden Group.  Mr Kadi found and short-listed about 4 or 5 engineers. Mashoor Al Maduri and Usama bin Laden then visited Chicago and saw Mr Kadi who introduced them to the short-listed candidates.  Mr Kadi believes this contact took place at the Hyatt Regency Hotel. Mr Kadi believes that perhaps 2 of these engineers were eventually recruited to work for the Saudi Bin Laden Group.

**In Pakistan in 1988-1989:** Mr Kadi's uncle is Dr. Omar Zubair who is a prominent and respected figure in the Kingdom and is the former President of King Abdulaziz University. Dr Zubair led a high profile delegation to Pakistan in order to mediate between rival factions in Afghanistan. Dr Zubair was accompanied by leading Islamic scholars with the aim of preventing the Afghani resistance fighters from turning against each other. During this period the delegation led by Dr Zubair met various leaders of the Afghanistan resistance fighters in Pakistan including Burhanuddin Rabbani, who later became President after the fall of the pro-Soviet government. Mr Kadi believes he may have accompanied his uncle to a meeting of many people, which possibly included Usama Bin Laden. Mr Kadi also believes that this meeting was also attended by senior officials from the Pakistan government.

**In Sudan 1992 - 1993:** Mr Kadi believes there may have been one or possibly two instances when he attended a business or governmental

KADI0002944

function in Sudan at which Usama Bin Laden may also have been present. These encounters, if indeed any occurred, were purely incidental and had nothing to do with terrorism or support for terrorism of any kind.

Mr Kadi believes he has neither seen nor communicated with Usama Bin Laden since 1993.

For the avoidance of doubt none of Mr Kadi's encounters with Usama Bin Laden at any time has concerned or involved terrorism or support for terrorism of any kind.

6.  **Chafiq Ayadi**

6a  **The circumstances of Mr Kadi's hiring of Chafiq Ayadi to run Muwafaq:**

(i) **Prior to the hiring of Chafiq Ayadi, were any background checks done of Ayadi concerning any associations with, or support of, any terrorist or extremist causes?**

As Mr Kadi has explained in his 19 December 2002 witness statement (paragraph 70), Waa'el Julaidan had from 1986 to 1989 been head of the Saudi Red Crescent, an organization equivalent to the Red Cross. In 1989 Waa'el Julaidan joined the Muslim World League. He became director of the Pakistan office of that organization, working in the areas of relief and education, a post he held until 1994.   In 1992 Waa'el Julaidan was additionally assigned by the Muslim World League to work in the humanitarian field assisting refugees in Croatia.

In 1992 Waa'el Julaidan recommended Chafiq Ayadi to Mr Kadi for the management of the Foundation in Croatia. Waa'el Julaidan introduced Mr Kadi to Chafiq Ayadi in Zagreb, Croatia, in about 1992 for this purpose.   This was the first time Mr Kadi ever met Chafiq Ayadi. At that time, in 1992, Mr Kadi had no reason or indication to suspect either Waa'el Julaidan or Chafiq Ayadi of supporting any terrorist or extremist causes.

18

Waa'el Julaidan told Mr Kadi that Chafiq Ayadi had gained extensive experience as a refugee relief worker in Pakistan; that Chafiq Ayadi had also supervised construction work in Pakistan and Afghanistan for the Muslim World League, during the time Waa'el Julaidan was director of that organization's Pakistan office; and that Chafiq Ayadi had expressed a wish to Waa'el Julaidan to relocate from Afghanistan. Waa'el Julaidan also told Mr Kadi that Chafiq Ayadi had long experience and practice in humanitarian work for refugees.

Waa'el Julaidan highly recommended Chafiq Ayadi to Mr Kadi for his experience and his abilities in the area of humanitarian work for refugees and for his honesty. This recommendation was based on Waa'el Julaidan's extensive first hand experience of working with Chafiq Ayadi in the humanitarian field.

Based on this recommendation there was no indication or evidence available to Mr Kadi prior to the hiring of Chafiq Ayadi that Chafiq Ayadi had any association with terrorist or extremist causes

(ii) **At any time, was any information brought to the attention of Mr Kadi, either through his own efforts and investigations, or volunteered by others, concerning allegations of Ayadi's association with, or support of terrorist of extremist causes?**

Mr Kadi was not aware of any allegations linking Chafiq Ayadi to terrorism or support for terrorism until Mr Ayadi was designated by OFAC in October 2001. Chafiq Ayadi's designation by OFAC was the first time that Mr Kadi became aware of any allegations linking Chafiq Ayadi to terrorist or extremist causes. At no point during the period in which Chafiq Ayadi was involved in the Foundation, or later when Mr Kadi was involved in business activities with Chafiq Ayadi, was there any suggestion or any allegation whatsoever regarding support by Chafiq Ayadi for such causes. Indeed, until Chafiq Ayadi's designation by OFAC nothing in Mr Kadi's relationship with Chafiq Ayadi indicated that Chafiq Ayadi was in any way involved with terrorist or extremist causes. Chafiq Ayadi never engaged in any conduct that caused Mr Kadi to suspect him of any support for such causes. In fact Mr Kadi was so impressed by the job Chafiq Ayadi did

19

KADI0002946

in relation to the Foundation that in 1996, after the Dayton Peace Accord, when Mr Kadi began to exploit business opportunities in Bosnia, Mr Kadi sought Chafiq Ayadi's help: Chafiq Ayadi held, as nominee, Mr Kadi's newly acquired interest in Depositna Bank.

(iii) **Were there any audits conducted of the operation of any of the Muwafaq offices headed by Ayadi?**

As explained above, it was not possible to audit the Foundation's accounts in Bosnia/Herzegovina or Croatia, the locations where Chafiq Ayadi operated during the time he was working for the Foundation, due to the lack of any financial infrastructure there, and the lack of any available auditors to do the audit work.

Mr Kadi had no reason to undertake any special financial reviews of the activities of the Foundation offices headed by Chafiq Ayadi while they were in operation. As stated above, Waa'el Julaidan had recommended Chafiq Ayadi to Mr Kadi for his long experience in the humanitarian field and for his honesty. Until Chafiq Ayadi was designated by OFAC, Mr Kadi had no reason or indication whatever to suspect Chafiq Ayadi of any association with or support for terrorist causes.

Since 1999 Mr Kadi has had no active ongoing professional or business relationship with Chafiq Ayadi.

1. **If so, what were the results of those audits?**
   Not applicable

2. **Was any written record created as a result of any audits?**
   Not applicable

6b **What were the circumstances of the removal of Chafiq Ayadi from his position with Depositna Bank?**

Chafiq Ayadi worked as manager of the Foundation in Bosnia/ Croatia until 1996. As stated above Mr Kadi was impressed by the job Chafiq

20

KADI0002947

Ayadi did for the Foundation. During Chafiq Ayadi's time at the Foundation, Mr Kadi found him to be a conscientious and dedicated worker in the humanitarian field.

As explained in Mr Kadi's 19 December 2002 statement (paragraphs 156 -157), after the 1995 Dayton Peace Accord the prospects for social and economic regeneration in Bosnia seemed promising. Accordingly, Mr Kadi was happy to be part of that reconstruction process of the country and commit investment to it. In addition to this he was concerned to create employment opportunities for the people of that country who had suffered during the war in the 1990s. He therefore decided to make investments in the region.

In early 1996 Mr Kadi purchased a majority holding in Depositna Bank, based in Sarajevo. As a business proposition he found the idea attractive, not least because, assuming things continued to normalise, he would end up with a bank which benefited from a European banking licence. In addition to this, the price (the equivalent of around US$50,000 at that time) was right. Mr Kadi took the view that even if the investment turned out to be bad, his exposure would be limited to $50,000. As explained above, Mr Kadi sought the help of Chafiq Ayadi, who has Bosnian nationality. It was a requirement under local law that the shareholders of a Bosnian bank be of Bosnian nationality. Chafiq Ayadi held the shares in the bank as nominee for Mr Kadi.

Although Chafiq Ayadi represented Mr Kadi's interest in the bank, his expertise was in the humanitarian and construction fields. Mr Kadi intended to develop and grow the bank with a view to a sale of his majority interest in the bank. It therefore became clear to Mr Kadi that Chafiq Ayadi did not have sufficient business experience or training in banking or financial services to continue in his post at the bank. Mr Kadi felt the bank needed a new professional management with appropriate training in financial services, to prepare the bank for sale. Therefore at Mr Kadi's request, and by mutual agreement, Chafiq Ayadi agreed to step down from his position with Depositna Bank at the end of 1998.

21

KADI0002948

**6b (i)   At the time of his removal were there any allegations of Ayadi having embezzled any money from Muwafaq?**

No. There were no such allegations at the time of Chafiq Ayadi's removal from the bank. Moreover, Mr Kadi would like to stress that at no time was there any indication or evidence or allegations that Chafiq Ayadi had used either the Foundation's funds or funds intended for the Foundation to support terrorism or any extremist causes or activities.

There are however 2 issues that may have caused confusion regarding Chafiq Ayadi's removal from Depositna Bank.

First, after Chafiq Ayadi left Depositna Bank a minor dispute arose between him and Mr Kadi over past salary and severance pay, which Chafiq Ayadi alleged was due to him.  Before Chafiq Ayadi left the bank, he acquired as nominee on behalf of Euroinvest (another company in which they were both involved) title to various houses in Sarajevo. Euroinvest had provided the funds for the purchase of these houses, title to which Chafiq Ayadi continues to hold as nominee on behalf of Euroinvest.  Chafiq Ayadi refused to assign title to these houses to Euroinvest and in 2000 Euroinvest started a civil case against him for the recovery of the houses and to restrain him from selling them. The matter is still pending for decision by the Bosnian courts, but meanwhile an order has been granted in favour of Euroinvest stopping Mr Ayadi from selling the properties. Details of the properties in dispute are set out in a schedule attached.  This dispute has nothing whatsoever to do with embezzlement of any funds from Muwafaq.

Secondly, the Public Prosecutor of Bosnia brought a criminal action in August 1999 making essentially 2 allegations against Chafiq Ayadi: the first concerns Chafiq Ayadi's failure to pay taxes on the disposal of vehicles belonging to the Foundation. Mr Kadi understands that in about May 2002, the Appeal Court in Bosnia affirmed Mr Ayadi's acquittal of these charges.  This dispute concerned allegations against Chafiq Ayadi of defrauding the tax authorities in Bosnia and had nothing whatsoever to do with embezzlement of any funds from Muwafaq.

KADI0002949

In the criminal proceedings brought by the Public Prosecutor of Bosnia, in August 1999, it was also alleged that Chafiq Ayadi had abused his position of authority at Depositna Bank in relation to a loan advanced by the bank purportedly to the Foundation, but in fact directed to the accounts of Chafiq Ayadi and one Bedrein Ahmed.  Mr Kadi refers to the attached letter from Chafiq Ayadi's lawyer in Sarajevo, Advokat Semir Puzic. Mr Kadi has only learned of the existence of these allegations since receiving OFAC's questions. Mr Kadi understands that in regard to these allegations, criminal proceedings were also raised against Kerim Mejri, who took over from Chafiq Ayadi as manager of the Foundation's Bosnian office. Mr Kadi further understands that both Chafiq Ayadi and Kerim Mejri were acquitted of these allegations.

6b (ii)   **At the time of his removal was Mr Kadi aware of any allegations of Ayadi's involvement with, support for or association with any terrorist or extremist entities or operations?**

No, Mr Kadi was not aware of any such allegations.

7.   **Waa'el Julaidan**

At paragraph 117 of YAK 7, Mr Kadi states that his "relationship with **Waa'el Julaidan has never encompassed any element of support whatsoever for Usama bin Laden or Al-Qaeda".**

7(i)   **What is the full extent of Mr Kadi's knowledge of Julaidan's association with bin Laden?**

7(ii)   **Was Mr Kadi aware of any association Julaidan maintained with bin Laden at the time that Julaidan was working with Mr Kadi on Muwafaq, Euro invest, KA Stan or Abrar?**

It is common knowledge that during the 1980's Waa'el Julaidan was supporting US backed efforts in Afghanistan to drive out Soviet occupying forces, until their withdrawal from Afghanistan in 1989.   It is also common knowledge that Usama bin Laden was part of those efforts at that time.

KADI0002950

In 1994, Usama bin Laden fell out of favour with the authorities in Saudi Arabia and was stripped of his Saudi Arabian nationality. At no time since then has Mr Kadi had any knowledge of any possible continuing relationship between Waa'el Julaidan and Usama bin Laden.

It was Mr Kadi's firm belief that Waa'el Julaidan maintained no continuing association with Usama bin Laden after 1994. After 1994 there were several occasions when Mr Kadi asked Waa'el Julaidan whether he had any ongoing relationship with Usama Bin Laden. Waa'el Julaidan assured him that he had none and that he (Julaidan) was against the actions and the ideology of Usama Bin Laden. Moreover since 1994, Waa'el Julaidan has held senior positions in various humanitarian organisations backed by the Saudi Arabian government.   In 1999 Waa'el Julaidan was appointed as the executive director of the Saudi Arabian government backed Saudi Joint Relief Committee (SJRC), (see Mr Kadi's 19 December 2002 witness statement, paragraph 116). Had the Saudi Arabian authorities suspected Waa'el Julaidan of any continuing association with Usama bin Laden after 1994, Waa'el Julaidan, as a Saudi Arabian national, could not have held these positions of authority in reputable Saudi government backed charity organisations.

Based on this, Mr Kadi accordingly had no evidence or indication whatsoever to suspect Waa'el Julaidan of any support for terrorist or extremist causes or indeed any continuing connection with Usama Bin Laden until September 2002 when Julaidan was designated by OFAC.

**7(iii)   If Mr Kadi was aware of any relationship that Julaidan maintained with bin Laden, what if anything, did he do in reaction to it?**

See above. Mr Kadi was not aware of any suggestion or allegation of a continuation of the relationship between Julaidan and Usama

KADI0002951

bin Laden until Julaidan was designated by OFAC in September 2002. There was thus nothing Mr Kadi could do in reaction to it.

8.    **Asbat al-Ansar**

8a    **Has Mr Kadi ever provided funds directly or indirectly to Asbat al-Ansar or for the use of its leadership?**

No.  Mr Kadi does not know of this organisation and he has never had any relationship with it or anyone associated with it and he has certainly never provided financial support to it directly or indirectly.

8b    **Does Mr Kadi maintain social or business relationships with any of the leaders of Asbat al-Ansar?  In the past, has Mr Kadi maintained any social or business relationships with any of the leaders of Asbat al-Ansar?**

No. Mr Kadi does not know of this organisation, and he has never had any relationship with it or with any of its former or current members.

9.    **Abdul Latif Saleh**

9a    **Is the reference at Paragraph 101 of YAK7 of "the Jihad Group" a reference to the Egyptian Islamic Jihad, the Albanian Islamic Jihad, or some other group?**

Mr Kadi cannot say for certain. Mr Kadi first became aware of this allegation when his solicitors received a letter from the Wall Street Journal dated 23 October 2001 (see answer to 9c below). The letter does not specify which group is referred to.

9b    **Are you able to identify the "Western reliable source" mentioned in paragraph 101, YAK7?**

Confidentially, the sources were 2 reporters working for the Wall Street Journal who conducted investigations regarding allegations first raised by the Wall Street Journal in a letter to Mr Kadi's solicitors dated 23 October 2001 (see answer to 9c below).

25

KADI0002952

**9c**    **Was Mr Kadi ever aware of any allegations that Abdul Latif Saleh was involved in financing, supporting, or otherwise aiding terrorist or extremist groups or activities?  If so, did Mr Kadi do anything in response to being made aware of those allegations?**

Mr Kadi was at no time aware of any allegations that Abdul Latif Salah was involved in financing, supporting, or otherwise aiding terrorist or extremist groups or activities until 23 October 2001 when Mr Kadi's solicitors received a letter from the Wall Street Journal raising allegations that Abdul Latif Salah was suspected of being involved with Al Qaeda/ Islamic Jihad.  A copy of that letter is attached.

At that time, October 2001, the Foundation had already ceased its activities in Albania and Mr Kadi had ceased all active commercial activities with Abdul Latif Saleh; therefore Mr Kadi was not in a position to do anything in response to being made aware of those allegations.

So far as Mr Kadi was aware Abdul Latif Saleh had carried out excellent work in the health and relief fields in Albania and was rewarded by the Albanian government, which granted him Albanian citizenship. Abdul Latif Saleh was twice elected chairman of the United Nations Development Program ("UNDP"), which commended his work. In this regard Mr Kadi refers to the UNDP's letter to Dr Saleh dated 29 January 1994 attached.

It was therefore, a total surprise to Mr Kadi when he learned in November 1999 that Abdul Latif Saleh had been deported from Albania (see Mr Kadi's 19 December 2002 witness statement, paragraphs 99-100). Following Abdul Latif Saleh's deportation in November 1999, Abdul Latif Saleh contacted Mr Kadi to ask for his help. Abdul Latif Saleh explained to Mr Kadi that he had no idea why he had been deported. Abdul Latif Salah assured Mr Kadi that he was not involved in terrorism, that he did not know of any specific allegations against him and that he was taking steps to find out what the allegations were against him. Mr Kadi refers to Abdul Latif Saleh's letter dated 5 December 1999 to the US Ambassador in Tirana a copy of which is attached.

KADI0002953

10.     **Tunisian Islamic Front**

10a     **Has Mr Kadi provided any money or other material or logistical support for either the Tunisian Islamic Front itself or to any of its leaders individually?**

No. Mr Kadi has never heard of this group and he has never provided any support of any kind whatever to the group or any of the leaders of the group.

11.     **QLI**

11a     **Regarding Mr Kadi's association with QLI, how did Mr Kadi become involved with Ahmad Zaki Hameed?  Was there a prior or existing relationship with Hameed?**

As Mr Kadi has explained in his statement dated 23 July 2002 (paragraphs 17 onwards) between 1979 and 1981 he worked as a trainee for Skidmore Owings & Merrill, the international architectural firm based in Chicago, USA.  While living in Chicago, he met Dr Ahmad Zaki Hammad ("Dr Zaki") in about 1979.  Dr Zaki was introduced to Mr Kadi by his brother-in-law, who knew Dr Zaki's family. Dr Zaki was thus from the outset a close friend of Mr Kadi's family.

When Mr Kadi first came to Chicago in about 1979 Dr Zaki was one of the very few contacts he had there. In light of this it was natural that he spent some time with him and his family. Dr Zaki went out of his way to look after Mr Kadi and provide him with hospitality in Chicago, which at that time, to Mr Kadi, was an entirely foreign and unknown city. Also there was at that time a period of almost a year when Mr Kadi lived in the basement of the building where Dr Zaki lived in Chicago. Mr Kadi's first son Mu'az was in fact born while Mr Kadi lived there with his wife.  Mr Kadi has never been aware of any allegations of support for terrorism against Dr Zaki.

11b     **What was Mr Kadi's and Mr Hameed's involvement in, or relationship to, the Quran Project?**

Dr Zaki was the founder of QLI. In the early 1990's while Mr Kadi was visiting Chicago, he visited Dr Zaki.  Dr Zaki invited him to participate financially as a supporter of the QLI, a charitable project that Dr Zaki was establishing.  Dr Zaki explained to Mr Kadi that the objectives of the QLI

KADI0002954

were the translation and interpretation of the meaning of the Quran for Americans, the English speaking community generally, and others so that they could understand Islam. QLI's goals were to give the many non Arabic speaking Muslims around the world access to Islam's Sacred Texts; and to make Islam understandable to persons of other faiths, in order to try and bridge the gap of knowledge between Islam and other faiths. These goals would be achieved by presenting the meaning of Islam's Holy Book, the Holy Quran, in a clearly understandable English document, thus explaining it to English speaking people and furthering understanding between religions. In the immediate aftermath of the first Gulf War, when QLI was established, Mr Kadi believed these aims to be noble and deserving of support.

Mr Kadi agreed to support these charitable purposes of the QLI as he has described in detail in his statement of 23 July 2002. First, he extended to the QLI an interest free loan of $820,000 for the purchase of land at Woodridge, Illinois and it's development as an investment. Secondly, he also agreed to the request of Dr Zaki and his fellow board members to transfer some sums of money to QLI via the account of an individual named Mohamed Salah who was involved with QLI. Thirdly Mr Kadi also agreed to a separate arrangement with Dr Zaki personally to transfer money to his account to support him.

Mr Kadi never intended to conceal his involvement with QLI: the Annual Reports of QLI for the years 1994 to 1998, all of which are publicly available documents, all list Mr Kadi as one of the directors of QLI. Moreover Mr Kadi's interest in the Woodridge land was held through Kadi International, Inc., a company incorporated in New Jersey, USA, bearing Mr Kadi's name and most obviously associated with him. See Mr Kadi's 23 July 2002 witness statement paragraph 27 and pages 64 to 65 of "YAK4".

Mr Kadi's intention to support QLI, and not Mohamed Salah or any terrorist purposes, is further evident from the fact that after Mr Salah was arrested in January 1993 Mr Kadi continued to support QLI and its objectives; in December 1993, at the request of Dr Zaki, Mr Kadi

KADI0002955

transferred $30,000 to QLI's account at the Evergreen National Bank of Oak Lawn, Illinois.

**11c    Has Mr Kadi continued to be in contact with Mr Hameed?   If so, please provide details regarding the nature of the contact.**

Mr Kadi has continued to be in contact with Dr Zaki.   Mr Kadi has maintained social and family contacts with Dr Zaki.  Furthermore, Mr Kadi has been in periodic contact with Dr Zaki to discuss the circumstances surrounding QLI.   In this regard, Mr Kadi's lawyers met Dr Zaki in May 2002 in Jeddah when he co-operated with them by providing information and answering questions concerning QLI. The information Dr Zaki gave to Mr Kadi's lawyers has assisted in the extensive investigations carried out by McDermott, Will & Emery's Chicago office into the circumstances surrounding the Woodridge land transaction.   Extensive details of these investigations and extensive documentary evidence were provided to OFAC in Mr Kadi's witness statement dated 23 July 2002.

**12.    Muhammad Salah**

**12a    Please provide a description of Mr Kadi's history with, knowledge of, and dealings of any kind with Muhammad Salah (e.g. phone calls, e-mails, personal meetings and written correspondence).**

During Mr Kadi's visits to QLI in the early 1990's to meet Dr Zaki and his fellow QLI board members, he saw Mr Salah on, at the most, 2 or 3 occasions. All of these were purely incidental to his meetings with Dr Zaki or other board members of QLI and had nothing to do with terrorism or support for terrorism of any kind.  Mr Kadi understood that Mr Salah was involved with helping QLI, especially Dr Zaki, on the Quran Project.

Mr Kadi had no prior knowledge of Mr Salah.  Prior to Mr Salah's arrest, Mr Kadi knew nothing of Mr Salah's alleged terrorist connections.  Indeed, until Mr Kadi heard about Mr Salah's arrest, he was not aware, directly or indirectly, of any activity that Mr Salah had outside QLI, nor was he aware of any facts that might cause him to have grounds for any suspicion about any of Mr Salah's activities.

KADI0002956

Mr Kadi agreed to the request of Dr Zaki and his fellow board members to transfer money to Mr Salah for the support of Mr Salah and 2 other QLI volunteers. Mr Kadi understood before he made these transfers that the money he transferred was to be used to support the living expenses of these 3 individuals at the rate of $36,000 per year who were volunteering their time and services to the charitable purposes of QLI.

As stated above, Mr Kadi believes that he met Mr Salah on, at the most, 2 or 3 occasions. As far as Mr Kadi recollects there were no telephone calls. There were a few occasions when Mr Salah corresponded with Mr Kadi's office by fax. These were for purely administrative purposes involving the operation of QLI. For example, at pages 70 - 71 of "YAK4" is a fax from Mr Salah to Mr Kadi enclosing a draft loan agreement in respect of the interest-free charitable loan of $820,000. At page 99 of "YAK4" is a letter from Mr Salah enclosing information about his bank and account.

Mr Kadi has had no contact, direct or indirect, with Mr Salah since 1993.

**12b    Why was Mr Kadi sending money directly to Mr Salah's bank account, and what did he understand Salah would be doing with the money?**

As explained in detail in Mr Kadi's 23 July 2002 witness statement (paragraph 29 onwards) Mr Kadi agreed to the request of Dr Zaki and his fellow board members of QLI to transfer money to the account of an individual named Mohammed Salah who was involved with QLI. They explained that QLI as a nascent institution could not at that time undertake any financial burden resulting from employing any editors, computer operators or other employees. Mr Kadi agreed to transfer monies to Mohammed Salah's account for those purposes.

Mr Kadi clearly understood before he made the transfers that the money he transferred was to be used to support individuals working on behalf of QLI. Dr Zaki and his co-founders wanted money to live on from other sources outside QLI in order to enable QLI's money to accumulate so that QLI could stabilise and become capitalised.

KADI0002957

At the time that Mr Kadi made the money transfers to Mr Salah's account, Mr Salah had not been arrested let alone convicted of terrorism or any association with terrorism.   As explained in Mr Kadi's 23 July 2002 statement at paragraph 31, when Mr Kadi learned of Mr Salah's arrest in Israel, Mr Kadi immediately instructed his bank to stop payment of the one pending wire transfer.  A week later Mr Kadi sent his bank a follow up faxed instruction to ensure that the bank received clear and unequivocal instructions stopping that transfer to Mohammed Salah.   Prior to Mr Salah's arrest, Mr Kadi did not know of Mr Salah's alleged terrorist connections.  Indeed until Mr Kadi heard about Mohammed Salah's arrest he was not aware, directly or indirectly, of any activity that Mohammed Salah had outside QLI nor was he aware of any facts, which might cause him to have grounds for any suspicion about any of Mohammed Salah's activities.

Mr Kadi made these transfers into a bank account of Mohammed Salah the details of which Dr Zaki gave him.  This account was at the First National Bank of Chicago. Given Mr Salah's apparently spotless record prior to his arrest, there is nothing suspicious about Mr Kadi's transfers of money to Mr Salah's account to support the 3 volunteers who were giving their time and services to the charitable objectives of QLI.

As detailed in Mr Kadi's 23 July 2002 statement at paragraphs 34 and 35, there is no allegation or evidence that Mr Salah's First National Bank of Chicago account (the only account of his to which Mr Kadi ever transferred funds) was ever used to support terrorism. It is not alleged anywhere in the Robert Wright Affidavit that any funds in Mohammed Salah's First National Bank of Chicago account were connected in any way to any purposes related to Hamas or to any unlawful activity whatsoever.

Mr Kadi understood that by transferring funds to Mr Salah's account at the request of Dr Zaki he was providing approximately $36,000 to support the 3 individuals who were volunteering their time and services to the charitable purposes of QLI.  At no time did Mr Kadi ever transfer funds to Mr Salah to support terrorism or any activities related to terrorism.

**11 July 2003**

KADI0002958