**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ***IN RE:* TERRORIST ATTACKS ON SEPTEMBER 11, 2001** | : : : | **Civil Action No. 03 MDL 1570 (GBD) (SN)** |

*This document applies to:*

***Grazioso, et al. v. The Taliban, et al.***
1:22-cv-01188 (GBD) (SN)

**CERTIFICATE OF SERVICE**

# EXHIBIT D

The New York Times Company

620 8th Avenue
New York, NY 10018
nytimes.com

## PROOF OF PUBLICATION

May 3, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

5/3/2023, NY & NATL, pg B4

Larnyce Tabron

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2023.05.03 12:23:22 -04'00'

*Grazioso v. Taliban - 1:22-cv-01188*
CERTIFICATE OF SERVICE

**EXHIBIT D.1.**

**PUBLIC NOTICE**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN and 1:22-CV-01188-GBD-SN, on August 23, 2022, Plaintiff Deborah Grazioso, as Personal Representative of the Estate of Timothy Grazioso, Deceased, and 246 other Plaintiffs, filed a Second Amended Complaint against the Islamic Emirate of Afghanistan, *a/k/a* the Taliban, and others in connection with the terrorist attacks in the United States on September 11, 2001.

Pursuant to, *inter alia*, 18 U.S.C § 2333, 28 U.S.C § 1331 and § 1332(a)(2) and the Torture Victim Protection Act of 1991, PL 102-256, 106 Stat. 73, the *Grazioso* Plaintiffs seek judgment in their favor against Defendants, jointly, severally, and/or individually, for compensatory and punitive damages in excess of One Billion US Dollars (US $1,000,000,000), plus pre- and post-judgment interest, attorney's fees, costs of this action and further appropriate relief.

This is a notice that the pleadings have been filed. The pleadings are available in English and Pashto at the following website: www.wigginschilds.com/grazioso.

Nxxx,2023-05-03,B,004,Bs-BW,E2

# 'It's Not How White Men Fight,' Carlson Texted, Alarming Fox Bosses

FROM FIRST BUSINESS PAGE

The day after the discovery, the board told Fox executives it was bringing in an outside law firm to conduct an investigation into Mr. Carlson's conduct.

The text message added to a growing number of internal issues involving Mr. Carlson that led the company's leadership to conclude he was more of a problem than an asset and had to go, according to several people with knowledge of the decision. In other messages he had referred to women — including a senior Fox executive — in crude and misogynistic terms. The message about the fight also played a role in the company's decision to settle with Dominion for $787.5 million, the highest known payout in a defamation case.

A representative for Mr. Carlson said he had no comment.

The text is part of redacted court filings and its contents were previously unreported. The contents of the text were disclosed in interviews with several people close to the defamation lawsuit against Fox. The people spoke on the condition of anonymity because they did not want to be identified discussing a message that is protected by a court order. In public filings, it remains hidden behind a block of black text.

Mr. Carlson's messages were collected as part of the defamation lawsuit filed against Fox by Dominion, which accused the network of knowingly airing falsehoods about election fraud. Many of the messages shared in the case, including those among Fox executives and hosts, were released publicly. But others, like the one between Mr. Carlson and one of his producers in the hours after Jan. 6, 2021, remain redacted.

In that text, Mr. Carlson described his own emotions as he watched the video of the violent clash, which he said took place on the streets of Washington. Mr. Carlson did not describe the race of the man being attacked.

"I found myself rooting for the mob against the man, hoping they'd hit him harder, kill him. I really wanted them to hurt the kid. I could taste it," he wrote. "Then somewhere deep in my brain, an alarm went off: this isn't good for me. I'm becoming something I don't want to be."

After all, he wrote, "Somebody probably loves this kid, and would be crushed if he was killed."

"If I don't care about those things, if I reduce people to their politics, how am I better than he is?" he wrote.

The text message came to the attention of Fox's board of directors and even some senior executives only last month, on the Sunday before the trial was set to begin, according to two people with knowledge of Fox's internal deliberations. At the time, Fox's negotiators were entering discussions about an out-of-court settlement ahead of the swearing in of what was shaping up to be a diverse jury.

The next day, the board told Fox's leadership about its plan to have the law firm Wachtell, Lipton, Rosen and Katz investigate Mr. Carlson. That disclosure set up the possibility that there could be a continuing investigation into what was behind Mr. Carlson's messages at the same time as a trial, and as he was serving as its top host in prime time.

Fox has not commented about Mr. Carlson's ouster last week beyond an initial statement announcing that they "agreed to part ways" and thanking "him for his service." It did not respond to a request for comment on Tuesday on the contents of Mr. Carlson's redacted message.

It remains unclear how the text escaped more notice earlier, given that the Fox legal team was aware of it and other offensive texts written by Mr. Carlson. Fox's lawyers had produced the text as part of the discovery process and were involved in the redactions. Mr. Carlson had even been asked about it during a deposition, according to several people who have read the unredacted transcripts of his deposition.

*A message that also played a role in an expensive settlement.*

It was not guaranteed that the text would have been revealed in open court. Dominion's lawyers had still not decided whether they would introduce the text in front of the jury, according to people with knowledge of their plans. The two sides disagreed on whether the Dominion lawyers could have presented such a redacted message at trial if they had decided to do so, a decision that would have ultimately fallen to the judge. The difference became moot after Fox struck an 11th-hour deal on April 18 to pay Dominion $787.5 million and avoid trial.

How Fox's executives and board handled the case in the months before the trial was scheduled to begin is expected to be at issue in shareholder lawsuits filed against the company in Delaware.

Though Mr. Carlson's show, "Tucker Carlson Tonight," was only a small factor in the Dominion suit, his personal texts were drawing outsize scrutiny.

The text about the fight came on top of a damaging chain of messages that had been revealed publicly ahead of trial, and that were shocking in their own right. Writing to one of his producers after the assault on the Capitol, Mr. Carlson describes the president he championed on his show as a "demonic force" and a "destroyer."

A recurring theme of his show during the six years that it ran in prime time on Fox News was the displacement of white Americans by people of color. Mr. Carlson often framed topics in the news as part of a larger struggle between "us" and "them," with immigrants and other marginalized groups steadily and surely taking from whites what had long been theirs: political and cultural power in the United States.

He attacked Black social justice activists and portrayed immigrants from Central America as a blight on the nation. He said in 2018 that immigrants make the country "dirtier."

In the aftermath of a mass shooting in El Paso at the hands of a gunman who cited white supremacist beliefs in his manifesto, Mr. Carlson declared on his show that white supremacy was "not a real problem," likening it to a conspiracy theory.

On Monday, The New York Times and other news organizations urged the judge overseeing the Dominion case to release some of the messages that were redacted.

# Media Chief Used Role to Press for Sex, Anchor Says

By BENJAMIN MULLIN

A CNBC journalist accused Jeff Shell, the former chief executive of NBCUniversal, of pressuring her for sex over a period of years during her career at the business news network, according to a copy of her complaint reviewed by The New York Times.

The complaint, lodged in late March by Hadley Gamble, an anchor and senior international correspondent, kicked off an investigation that led to Mr. Shell's dismissal last week, sending shock waves across a far-flung media empire that includes NBC News, the Universal movie studio and DreamWorks Animation.

Less than a page of Ms. Gamble's complaint, which is more than a dozen pages, focused on allegations of sexual harassment by Mr. Shell. Much of the complaint raised accusations of bullying and discrimination at CNBC, saying women at the network's international division were harassed by their male colleagues on several different occasions.

TOM DULAT/GETTY IMAGES

The anchor Hadley Gamble's complaint kicked off an investigation that led to Jeff Shell's dismissal last week.

Comcast, NBCUniversal's parent company, hired the law firm Gibson, Dunn & Crutcher to investigate the complaint after it was sent to the company's executives in New York and London.

Last week, Comcast said that it had found evidence to corroborate allegations of sexual harassment against Mr. Shell and that it had fired him for cause. The company is not paying him severance.

A spokeswoman for Comcast said the company was continuing to investigate Ms. Gamble's complaint.

Mr. Shell said in a statement that he and Ms. Gamble had a "mutual and consensual relationship" and that "the complaint wildly misrepresents the facts of what happened."

Suann MacIsaac, a lawyer for Ms. Gamble, said that Mr. Shell "targeted" Ms. Gamble months before they met in person and continued his pursuit after his promotion to chief executive.

"We expect more attempts at revisionist history from a man who was just fired for cause following a decade-long campaign of sexual harassment, which began when he was C.E.O. of NBC Universal International," Ms. MacIsaac said.

Ms. Gamble, 41, is a journalist based in Abu Dhabi, the United Arab Emirates. She has interviewed major world figures including President Vladimir Putin of Russia, King Abdullah II of Jordan and Chancellor Olaf Scholz of Germany, and she has worked for CNBC for more than a decade in the Middle East and London, where she met Mr. Shell.

The complaint alleged that Mr. Shell invited Ms. Gamble to dinner in London — the complaint does not say what year — when she was a relatively junior producer and he was the head of NBC International. After the dinner, Mr. Shell accompanied Ms. Gamble back to her hotel and he pressured her to start a sexual relationship but was rebuffed.

Ms. Gamble did not work for the division Mr. Shell oversaw when they met, according to a person familiar with the matter.

Ms. Gamble and Mr. Shell eventually did begin a sexual relationship, according to the complaint, after it became clear to her that rebutting his advances would probably damage her career. The complaint said that Mr. Shell continued to use his position of power at NBCUniversal to pressure her for sex while pursuing her in London, New York and Dubai.

Mr. Shell pursued Ms. Gamble on and off over a period of years over text and email, according to two people familiar with their correspondence, and Ms. Gamble turned over those messages to the company as part of its investigation.

Elsewhere in the complaint, Ms. Gamble alleged specific instances of discrimination and inappropriate behavior toward numerous women at CNBC. In one instance, Ms. Gamble describes a manager calling her a vulgar epithet for women in front of her co-workers for raising concerns about bullying behavior from another journalist. In another, she alleges a co-worker berated her for ending an interview early, using coarse language, and snapping at her for rewriting headlines that she had to read on air.

*A complaint also alleges women faced bullying at CNBC.*

Ms. Gamble filed the complaint after CNBC did not renew her contract this year. A person familiar with Ms. Gamble's thinking said that her decision to file the complaint, which she had considered for years, was also based on frustration with what she viewed as a toxic culture of harassment and bullying at CNBC. Axios earlier reported on those aspects of the complaint.

John Casey, the president of CNBC International, told her in February that the network would not offer her a contract for a period longer than a month, according to the complaint. He told her that she had a behavioral problem and accused her of bullying other journalists at CNBC.

Ms. Gamble denied those accusations, according to her complaint. She said in her complaint that Mr. Casey had used the allegations of bullying to justify the decision not to renew her contract, adding that such claims would not have been leveled against a male peer.

Tension existed between Ms. Gamble and CNBC managers before the network's decision not to renew her contract. In June, the network told her that it was investigating a complaint made against her and a manager at CNBC who had supervised her.

Among other things, CNBC investigated whether she had used a romantic relationship with Tom Barrack, a private equity investor, to secure an interview with Jared Kushner, according to Ms. Gamble's complaint. The investigation concluded that Ms. Gamble did have a relationship with Mr. Barrack, but determined the relationship was disclosed and there was no evidence of impropriety, according to her complaint. Mr. Barrack was unmarried at the time of his relationship with Ms. Gamble, according to a person familiar with the relationship.

The investigation into Ms. Gamble also found that she had made inappropriate comments about some colleagues in the past, and that she had not always strictly complied with CNBC's travel and expense policy.

# Florida's Suit Against Disney Claims 'Back Room' Dealing

By BROOKS BARNES

In the latest chapter of the tussle between Disney and the state of Florida, the newly appointed board for a special tax district encompassing Walt Disney World sued the company in Orlando on Monday to try to regain control over expansion at the theme park complex.

BRYAN R. SMITH/AFP — GETTY IMAGES

The Magic Kingdom in Orlando, Fla. Disney World has operated as a special tax district for 56 years.

The district's complaint involves a pair of contracts that Disney World struck with a prior board that Disney controlled. The agreements — adopted at public forums — lock in a comprehensive plan for growth on Disney's 25,000-acre property near Orlando, including the possible construction of a fifth theme park and 14,000 additional hotel rooms.

"These agreements reek of a back room deal," the district's new board said in its 188-page lawsuit filed in state court. "Out of haste or ignorance, Disney's deals violate basic principles of Florida constitutional, statutory and common law. As a result, they are null and void — not even worth the paper they were printed on."

Disney declined to comment.

The lawsuit, which had been expected, is the latest volley in a 14-month dispute between Gov. Ron DeSantis of Florida and Disney World, the state's largest taxpayer and the nation's largest single-site employer. Last week, after the new board voted to nullify the development agreements, Disney sued Mr. DeSantis and the new board members, claiming "a targeted campaign of government retaliation." Disney filed its lawsuit in federal court in Tallahassee.

The conflict started in March 2022, when Disney joined other companies in criticizing a contentious state education law that, among other things, prohibits classroom discussion of sexual orientation and gender identity for young students. (Opponents labeled it "Don't Say Gay.") Mr. DeSantis and his Republican allies in the Florida Legislature immediately started to attack Disney as a "woke" company and began efforts to restrict its long-held autonomy in the state.

At the center of the fight is a 56-year-old special tax district that includes Disney World. The district effectively turned the property into its own county, giving Disney unusual control over fire protection, policing, waste management, road maintenance, bond issuance — and, crucially, the planning of real estate development.

In February, lawmakers stripped control of the district's five-member board from Disney and handed it to the governor. When Mr. DeSantis's appointees reported for duty, however, they were incensed to discover that the outgoing board had approved certain development agreements, limiting the new board's power for decades to come.

Disney has repeatedly described the agreements as "appropriate" and struck in public meetings advertised in The Orlando Sentinel. Florida lawyers who are not affiliated with Disney and experts on development contracts in Florida have said that Disney acted legally.

In its lawsuit on Monday, the new board said otherwise, contending that the agreements were illegal. The board said that the notifications in the Sentinel, for instance, "did not fully inform the public or other property owners of the purposes or contents of the development agreement."

Notably, the new board members are trying to wrest back control over a growth plan that was already cleared by the DeSantis administration.

But that was before Disney — concerned that a new, politicized board could interfere with the growth plan — took the additional step of locking in the approvals.

# Trump to End a Long Boycott and Appear on CNN, Signaling to Fox News That He Has Options

By JEREMY W. PETERS

After a long hiatus, former President Donald J. Trump will return to CNN.

Mr. Trump, who has openly feuded with CNN hosts and executives over the years, has not appeared on the network since his 2016 presidential campaign. But next Wednesday, May 10, he will appear at a town hall-style forum the network is hosting in New Hampshire.

CNN said that its morning show co-host, Kaitlan Collins, would moderate, and that the former president would take questions from Republicans and independents.

Mr. Trump's decision to sit for questioning on a network he considers less than friendly represents a shift in his approach with the media. In his post-presidency, Mr. Trump has largely shunned mainstream networks like CNN, preferring to speak with conservative outlets and talk show hosts.

And his on-again, off-again clashes with Fox News have meant he's been absent from its airwaves for months at a time. Though Fox helped introduce Mr. Trump to a conservative audience in the early 2010s and gave him a powerful platform from which to start his political career, it has also shunned him at times.

He has attacked the network in turn — most recently, he criticized them for firing its star host, Tucker Carlson — and still holds a grudge over its projection on election night in 2020 that he would lose Arizona. Fox was the first network to do so.

His decision to appear on a rival

SOPHIE PARK FOR THE NEW YORK TIM

Former president Donald J. Trum who has not appeared on CNN in years, is scheduled there next we

network, CNN, is a signal to F which is a crucial pipeline to publican primary voters: doesn't consider it the only ga in town. The move is also a way drawing a sharp contrast with one of his expected opponents in the race, Gov. Ron DeSantis of Florida, who largely shuts out the mainstream media.

Lately, Mr. Trump has fumed about the release of private emails that show how Rupert Murdoch, chairman of Fox Corporation, expressed derision and contempt for him and his false claims of being cheated in the 2020 election. Those messages were released as part of the defamation lawsuit that Dominion Voting Systems filed against the network for amplifying conspiracy theories that

least one of the first two debates with his rivals for the 2024 Republican nomination, according to several people familiar with his plans. The first, scheduled for August in Milwaukee, is being hosted by Fox News. He has said he does not want to give the lower-polling G.O.P. candidates the oxygen that a nationally televised debate would provide.

In recent weeks, however, Mr. Trump has started appearing more regularly on Fox News. He has done interviews with three Fox hosts since the end of March. And the network has aired cover

the mainstream media as the "enemy of the people," he has long cultivated relationships with a broad variety of reporters.

**PUBLIC NOTICE**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN and 1:22-CV-01188-GBD-SN, on August 23, 2022, Plaintiff Deborah Grazioso, as Personal Representative of the Estate of Timothy Grazioso, Deceased, and 246 other Plaintiffs, filed a Second Amended Complaint against the Islamic Emirate of Afghanistan, *a/k/a* the Taliban, and others in connection with the terrorist attacks in the United States on September 11, 2001.

Pursuant to, *inter alia*, 18 U.S.C § 2333, 28 U.S.C § 1331 and § 1332(a)(2) and the Torture Victim Protection Act of 1991, P.L. 102-256, 106 Stat. 73, the *Grazioso* Plaintiffs seek judgment in their favor against Defendants, jointly, severally, and/or individually, for compensatory and punitive damages in excess of One Billion US Dollars (US $1,000,000,000), plus pre- and post-judgment interest, attorney's fees, costs of this action and further appropriate relief.

This is a notice that the pleadings have been filed. The pleadings are available in English and Pashto at the following website: www.wigginschilds.com/grazioso.

*Grazioso v. Taliban - 1:22-cv-01188*

**CERTIFICATE OF SERVICE**

**EXHIBIT D.1.**



The New York Times Company

620 8th Avenue
New York, NY 10018
nytimes.com

## PROOF OF PUBLICATION

May 10, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

5/10/2023, NY & NATL, pg B4

Larnyce Tabron

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2023.05.10 16:03:28 -04'00'

*Grazioso v. Taliban - 1:22-cv-01188*
**CERTIFICATE OF SERVICE**

**EXHIBIT D.2.**

**PUBLIC NOTICE**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN and 1:22-CV-01188-GBD-SN, on August 23, 2022, Plaintiff Deborah Grazioso, as Personal Representative of the Estate of Timothy Grazioso, Deceased, and 246 other Plaintiffs, filed a Second Amended Complaint against the Islamic Emirate of Afghanistan, *a/k/a* the Taliban, and others in connection with the terrorist attacks in the United States on September 11, 2001.

Pursuant to, *inter alia*, 18 U.S.C § 2333, 28 U.S.C § 1331 and § 1332(a)(2) and the Torture Victim Protection Act of 1991, PL 102-256, 106 Stat. 73, the *Grazioso* Plaintiffs seek judgment in their favor against Defendants, jointly, severally, and/or individually, for compensatory and punitive damages in excess of One Billion US Dollars (US $1,000,000,000), plus pre- and post-judgment interest, attorney's fees, costs of this action and further appropriate relief.

This is a notice that the pleadings have been filed. The pleadings are available in English and Pashto at the following website: www.wigginschilds.com/grazioso.

# Dominion Settlement Pushes Fox to Net Loss

By MICHAEL M. GRYNBAUM

Lachlan Murdoch, the executive chairman of the Fox Corporation, conceded on Tuesday that a Delaware judge's pretrial rulings against the company "severely limited our defense at trial" and contributed to his decision to settle the landmark defamation case brought by Dominion Voting Systems.

Mr. Murdoch, on a call with investors and analysts, called the $787.5 million settlement — believed to be the largest in the history of defamation law — "a decision clearly in the best interest of the company and its shareholders."

In a remark that echoed the trademark defiance of his father, Rupert Murdoch, he also defended the conduct of Fox News personnel, saying the settlement "in no way alters Fox's commitment to the highest journalistic standards across our networks, or our passion for unabashedly reporting the news of the day."

His remarks came after Fox revealed a real-world consequence of the landmark settlement: The company swung to a net loss in the first three months of the year, its quarterly revenue erased — and then some — by payments associated with resolving the lawsuit with Dominion, an election technology firm.

Fox swung to a net loss of $50 million for the quarter, compared with earnings of $290 million during the same period last year. The loss came despite revenue increasing 18 percent, to $4.08 billion.

Lachlan Murdoch did not directly address his reasons for taking Tucker Carlson, Fox News's top-rated prime time anchor, off the air shortly after the settlement was announced. The sidelining of Mr. Carlson, who is negotiating an exit from the company that would allow him to work elsewhere, has placed Fox News in the cross hairs of some conservatives who accuse the network of placating to liberal critics.

"There's no change to our programming strategy at Fox News," Mr. Murdoch said. "It's obviously a successful strategy, and as always, we are adjusting our programming and our lineup, and that's what we continue to do."

Fox agreed to settle on the eve of a sensational public trial that would have exposed Rupert Murdoch and several star Fox anchors to harsh questioning on the stand. Anchors like Lou Dobbs and Maria Bartiromo had amplified baseless assertions by former President Donald J. Trump that Dominion rigged the 2020 presidential race in favor of his Democratic opponent, Joseph R. Biden Jr. The case also turned up evidence

BRENDAN McDERMID/REUTERS

Lachlan Murdoch tried to reassure Fox Corporation shareholders.

showing Fox executives rebuking their own journalists who attempted to fact-check Mr. Trump's false claims.

Mr. Murdoch said he was pleased with advertiser demand in prime time, and a Fox executive told Variety on Monday that more than 40 new advertisers had begun paying for airtime at 8 p.m. since Mr. Carlson departed the time slot.

The network's ratings, however, have significantly dropped. On Friday, for instance, Fox News finished last among cable news networks at 8 p.m. in a coveted advertising demographic, the kind of defeat to MSNBC and CNN that has rarely occurred in recent years.

On the Dominion case, Mr. Murdoch said that he remained confident in Fox's legal position that its broadcast of the false claims against Dominion were protected by the First Amendment. "We always acted as a news organization reporting on the newsworthy events of the day, which certainly included allegations made by the sitting president," he said.

That argument was rejected by Judge Eric M. Davis of Delaware Superior Court days before the Dominion trial was set to begin. Judge Davis said the claims against Dominion by Mr. Trump and his lawyers were clearly false.

Fox faces another major defamation suit from another election technology firm, Smartmatic. Mr. Murdoch called that lawsuit "a fundamentally different case" than the Dominion litigation and asserted that "our full complement of First Amendment defenses remain."

Fox said its advertising revenue for the first quarter of the year was up 43 percent from a year prior, attributing the increase to Super Bowl LVII, additional N.F.L. games and growth at an ad-supporting streaming service, Tubi.

"Our journalists bring compelling news home to our viewers every day," Mr. Murdoch said in his introductory remarks, adding: "As we look ahead, we are confident in the strength of the Fox brand."

# Carlson Announces Plan For a Program on Twitter

By Jeremy W. Peters, Benjamin Mullin and Ryan Mac

The former Fox News host Tucker Carlson, declaring, "We're back," said on Tuesday that he was starting a new show on Twitter, a sign that negotiations to reach an amicable separation with the network, where he is still under contract, had broken down.

Mr. Carlson offered no details of when his new program would begin or what kind of content it would have. The many unanswered questions highlighted the uncertainties surrounding his future — a career in which he would be deprived of a prime-time platform on Fox News.

Among the possibilities: Fox could ultimately block any attempt by the host to return to a prominent role in conservative media.

A representative for the Fox Corporation, which has been engaged in negotiations over the details of Mr. Carlson's exit from the network since he was taken off the air last month, had no comment.

On Monday, Mr. Carlson had a conversation with the Fox Corporation executive chairman, Lachlan Murdoch, to discuss a possible exit from the company, according to a person with knowledge of the meeting.

Mr. Carlson's remarks on Tuesday, posted on Twitter — a platform run by Elon Musk, a provocateur in a similar mold as the combative, contrarian host — consisted of a three-minute monologue delivered directly to the camera. The video could violate the terms of his contract with Fox, which prevent Mr. Carlson from hosting a show on an alternate network.

One way Fox could try to prevent Mr. Carlson from posting new videos would be to seek an injunction, said Andy Lee, an entertainment lawyer with Foley & Lardner. But the network would have to persuade a judge that Mr. Carlson was doing irreparable harm to the network, such as by damaging its reputation or disclosing sensitive information. It would also have to show a likelihood that it would win at trial, another hurdle.

Mr. Carlson would probably resist all those arguments and also argue that his Twitter videos were protected under the First Amendment.

"The burden is high for this remedy, but people get injunctions all the time," Mr. Lee said.

Bryan Freedman, Tucker Carlson's lawyer, did not respond to requests for comment.

In response to Mr. Carlson's tweet, Mr. Musk posted on Twitter that "we have not signed a deal of any kind whatsoever." He added that Mr. Carlson would be "subject to the same rules & rewards of all content creators."

Mr. Carlson started the monologue on Tuesday with a critique of the news industry, which he said was incapable of telling the truth. And he appeared to issue a veiled threat to disclose what he'd learned about the inner workings of the various media companies where he held various roles over the course of three decades.

"After more than 30 years in the middle of it, we could tell you stories," said Mr. Carlson, who eschewed his usual coat and tie for a button-up checkered shirt. He recorded the video from his studio in Maine, according to a person with knowledge of how it came together.

In the video, Mr. Carlson offered little in the way of explanation for what his new show might entail, saying only that it would resemble "the show we've been doing for the last six and a half years," a reference to his 8 p.m. Fox News program, "Tucker Carlson Tonight." Mr. Carlson said that "free speech" would be a major theme of the show, calling it "the main right you have."

"See you soon," Mr. Carlson said. He also launched a website, TuckerCarlson.com, promising subscribers "instant updates" on where and when they could watch the former Fox News host.

When Mr. Musk purchased Twitter last October for $44 billion, he justified the high price tag by saying he was protecting "free speech" and would reverse many of the content moderation decisions that had been made by a company he believed had become too left-leaning. He welcomed back many previously suspended or banned users, including known white nationalist accounts. Researchers reported more hate speech on the site, and many advertisers fled.

Last month, Mr. Musk went on Mr. Carlson's Fox show to talk about his ownership of Twitter. He described the financial pressures on the company, noting that he had just halved the internal valuation of the company to about $20 billion.

"But some things are priceless," Mr. Musk said. "And so whether I lose money or not, that is a secondary issue compared to ensuring the strength of democracy, and free speech is the bedrock of a functioning democracy."

That interview would be one of Mr. Carlson's last on Fox. The following week, shortly after Fox settled a defamation case partly involving Mr. Carlson for $787.5 million, the network canceled his popular show.

Mr. Carlson's personal text messages released as part of the court case, brought by Dominion Voting Systems, had become a major source of embarrassment for Fox News. Mr. Carlson was revealed to have disparaged former President Donald J. Trump as "a demonic force" and a "destroyer."

Later, in a text message that Fox concealed from the public record in the case, Mr. Carlson described how he had recently watched a video of a group of men beating up an "Antifa kid." "It's not how white men fight," he wrote to one of his producers, in an expression of racial superiority. He went on to say that he had wanted that group to kill the person, only to realize that he'd gone too far.

It's unclear if Mr. Carlson's show would be live or taped, and through which format it would be broadcast on Twitter.

*Questions linger on the terms of a host's exit from Fox News.*

It's also unclear whether Mr. Musk would pay for the production for the show or compensate Mr. Carlson.

One option for Mr. Musk could be to place Mr. Carlson's show behind a paywall on Twitter. Mr. Musk has pushed for creators to use Twitter to exclusively distribute their content and the company recently unveiled subscription features Mr. Musk hopes can contribute meaningful revenue that could wean the platform off its dependence on advertising.

In his tweet on Tuesday, Mr. Musk said the "rewards" available to Mr. Carlson "means subscriptions and advertising revenue share (coming soon), which is a function of how many people subscribe and the advertising views associated with the content."

Mr. Carlson may not only attract members of his older demographic to sign up for Twitter, but also get them to subscribe for exclusive content.

But giving a prominent platform to Mr. Carlson could risk further alienating many national brands, leading to fewer advertising dollars for Twitter.

# CNN's Town Hall With Trump Reignites a Debate

FROM FIRST BUSINESS PAGE

Jean Carroll. "Is @CNN still going to do a town hall with the sexual predator twice impeached insurrectionist?" Alexander S. Vindman, the Army colonel who was a witness in Mr. Trump's first impeachment trial, wrote on Twitter.

Mr. Trump is also, at the moment, the highest-polling Republican candidate in the 2024 presidential campaign and the de facto leader of his party. Some veteran TV journalists wonder: What's the alternative?

"So no more live political events, because politicians can be nasty? Because politicians can tell lies?" Ted Koppel, the former "Nightline" anchor, said in an interview. "I'm not sure that news organizations should necessarily be in the business of making ideological judgments. Is he a legitimate object of news attention? You bet."

Wednesday's town hall, where Mr. Trump will field questions from Republican and undecided voters, is in some ways a stress test — and an unsettling preview — for the television news industry as it prepares to cover a presidential contest that is likely, in its early stages at least, to prominently include Mr. Trump.

Any telecast featuring the former president is bound to be divisive. Were anchors too harsh? Too lenient? How quickly did they react to false claims? And foes of Mr. Trump will cringe at seeing him on air at all.

But Bob Schieffer, the longtime CBS anchor, said that interviews of important political figures were necessary. "There's no question he might well get the nomination," he said of Mr. Trump. "We're in the business of telling people who's running for what and what they stand for."

CNN faced criticism in 2016 for granting Mr. Trump hours of unfettered airtime during the Republican primary. Jeff Zucker, the network's president at the time later acknowledged he had overdone it.

Mr. Trump then spent years vilifying the network, leading chants of "CNN sucks" and barring its correspondent Jim Acosta from the White House. A YouGov poll last month found that CNN was the country's most polarizing major media source, with the widest gap between the portion of Democrats who trust it and the portion of Republicans who don't.

SOPHIE PARK FOR THE NEW YORK TIMES

Former President Donald J. Trump, campaigning in New Hampshire last month, has not appeared on CNN since 2016.

Mr. Trump last appeared on CNN in 2016, and since then much has changed. CNN was acquired by Warner Bros. Discovery, and Mr. Zucker was replaced; his successor, Chris Licht, pledged to broaden the network's appeal. He is backed by David Zaslav, the Warner chief executive, who has batted away objections to Wednesday's Trump town hall.

"The U.S. has a divided government; we need to hear both voices," Mr. Zaslav said last week on CNBC, where he was questioned repeatedly about the decision to host Mr. Trump. "When we do politics, we need to represent both sides. I think it's important for America."

Mr. Trump, meanwhile, has soured on Fox News, irked by Mr. Murdoch's support for a potential Republican rival, Gov. Ron DeSantis of Florida. And he has taken notice of Mr. DeSantis's aversion to appearing on mainstream outlets like CNN.

Mr. Trump and CNN are not exactly reconciled. There is the awkward fact that Mr. Trump still has a pending $475 million defamation lawsuit against the network. And in a missive on Truth Social on Tuesday, the former president told fans that CNN was "rightfully desperate to get those fantastic (TRUMP!) ratings once again." He added: "Could be the beginning of a New & Vibrant CNN, with no more Fake News, or it could turn into a disaster for all, including me. Let's see what happens?"

As olive branches go, it felt a bit spindly. But David Chalian, CNN's political director, shrugged it off. "We never stopped covering him as president despite everything he said about us," Mr. Chalian said in an interview. "We never stopped doing our jobs."

CNN executives will air Mr. Trump's remarks live, without any time delay. That means if Mr. Trump makes a false claim, it will be up to the moderator, Kaitlan Collins, or an onscreen graphic to correct him in real time. Mr. Trump's last three interviews on Fox News were prerecorded. (Fox recently paid $787.5 million to settle a defamation case brought by Dominion Voting Systems, after several of its anchors amplified Mr. Trump's falsehoods about the company.)

In the interview, Mr. Chalian said that CNN was "in the business of live news events — that's what we do." He added, "I obviously can't control what Donald Trump says, but what we can control is our journalism."

CNN did not agree to preconditions for the town hall, Mr. Chalian said — "No question is off the table" — and Ms. Collins has spent several days preparing for the broadcast. Selecting Ms. Collins to moderate is in keeping with Mr. Licht's emphasis on reporting over punditry; Ms. Collins is best known for day-to-day White House coverage and previously worked at The Daily Caller, a conservative outlet.

Mr. Koppel, in the interview, said Ms. Collins was a "tough and able" journalist who could handle Mr. Trump in a live setting. He said CNN had many reasons to go forward with the event.

"Has Trump pushed the boundaries of honesty, good taste, decency, humanity, to such a degree that we should not put him on the air at all, unless we've had the chance to sanitize what he has to say?" Mr. Koppel said. "I can understand that's a reasonable question to ask. But it puts a very heavy burden on the shoulders of the people who run our networks. Because it means we are going to let them decide who gets on the air, and who doesn't."

**PUBLIC NOTICE**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN and 1:22-CV-01188-GBD-SN, on August 23, 2022, Plaintiff Deborah Grazioso, as Personal Representative of the Estate of Timothy Grazioso, Deceased, and 246 other Plaintiffs, filed a Second Amended Complaint against the Islamic Emirate of Afghanistan, a/k/a the Taliban, and others in connection with the terrorist attacks in the United States on September 11, 2001.

Pursuant to, *inter alia*, 18 U.S.C § 2333, 28 U.S.C § 1331 and § 1332(a)(2) and the Torture Victim Protection Act of 1991, P.L. 102-256, 106 Stat. 73, the *Grazioso* Plaintiffs seek judgment in their favor against Defendants, jointly, severally, and/or individually, for compensatory and punitive damages in excess of One Billion US Dollars (US $1,000,000,000), plus pre- and post-judgment interest, attorney's fees, costs of this action and further appropriate relief.

This is a notice that the pleadings have been filed. The pleadings are available in English and Pashto at the following website: www.wigginschilds.com/grazioso.

COMMERCIAL REAL ESTATE BUSINESS OPPORTUNITIES

COMMERCIAL & INDUSTRIAL PROPERTIES (300)

New Jersey 375

BUILD TO SUIT MOVIE STUDIO AVAILABLE. 300,000sf, divided into 15K-20K sf studios. Sale or lease. Approvals by 2024 Hudson County. Call John at LRES at 201-259-7167

# Anchor Leaving CNBC After Accusing Chief of Harassment

By BENJAMIN MULLIN

CNBC on Tuesday said it was parting ways with Hadley Gamble, an anchor and senior correspondent who accused the former chief executive of NBCUniversal, the network's parent division, of sexual harassment.

In a brief and effusive statement, CNBC called Ms. Gamble, who worked at the business news network for more than a decade, "a distinguished journalist" who had developed "deep experience in the Middle East and beyond."

"Her initiative and drive have secured valuable interviews with several world political leaders. We wish her every success in her future endeavors," the statement said.

CNBC and Ms. Gamble have negotiated a financial settlement worth more than $1 million in connection with her exit, according to a person familiar with knowledge of the decision.

In late March, Ms. Gamble lodged a complaint that accused Jeff Shell, who was the chief executive of NBCUniversal, of sexual harassment. It also raised allegations of bullying and discrimination at CNBC. The complaint, which ran more than a dozen pages, also named managers at CNBC's international division.

That complaint kicked off an investigation that led to Mr. Shell's firing last month, sending reverberations across NBCUniversal's sprawling global enterp[...] chael Cavanagh, Comcas[...] dent, has stepped in to [...] NBCUniversal.

Comcast is still inve[...] aspects of Ms. Gambl[...] plaint pertaining to dis[...] tion at CNBC.

Ms. Gamble did not res[...] request for comment.

Mr. Shell has said that Ms. Gamble's complaint "wildly misrepresents the facts of what happened."

[...] bai, CNBC is navigating many of the same challenges as other cable channels, as viewers abandon traditional TV for streaming services.

The network is trying to offset that decline, in part, by attracting subscribers to products such as its CNBC Pro service and the CNBC Investing Club with Jim Cramer.

Ms. Gamble filed her complaint after the network decided not to renew her contract. Last June, CNBC told her it was investigating a complaint against her and a manager at CNBC who had supervision [...] ship was disclosed and there was no evidence of impropriety, according to her complaint.

*Grazioso v. Taliban - 1:22-cv-01188*
**CERTIFICATE OF SERVICE**

**EXHIBIT D.2.**



The New York Times Company

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

May 17, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

5/17/2023, NY & NATL, pg B4

Larnyce Tabron

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2023.05.17 10:58:17 -04'00'

*Grazioso v. Taliban - 1:22-cv-01188*
**CERTIFICATE OF SERVICE**

**EXHIBIT D.3.**

**PUBLIC NOTICE**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN and 1:22-CV-01188-GBD-SN, on August 23, 2022, Plaintiff Deborah Grazioso, as Personal Representative of the Estate of Timothy Grazioso, Deceased, and 246 other Plaintiffs, filed a Second Amended Complaint against the Islamic Emirate of Afghanistan, *a/k/a* the Taliban, and others in connection with the terrorist attacks in the United States on September 11, 2001.

Pursuant to, *inter alia*, 18 U.S.C § 2333, 28 U.S.C § 1331 and § 1332(a)(2) and the Torture Victim Protection Act of 1991, PL 102-256, 106 Stat. 73, the *Grazioso* Plaintiffs seek judgment in their favor against Defendants, jointly, severally, and/or individually, for compensatory and punitive damages in excess of One Billion US Dollars (US $1,000,000,000), plus pre- and post-judgment interest, attorney's fees, costs of this action and further appropriate relief.

This is a notice that the pleadings have been filed. The pleadings are available in English and Pashto at the following website: www.wigginschilds.com/grazioso.

**REGULATION**

# New Task Force Brings Charges, Citing the Theft Of Tech Secrets

By ANA SWANSON

WASHINGTON — The Biden administration announced arrests and criminal charges on Tuesday in five cases involving sanctions evasion and technology espionage efforts linked to Russia, China and Iran.

Two Russian nationals were taken into custody last week under accusations of sending aircraft parts to Russia in violation of sanctions imposed after the invasion of Ukraine. In another case, a former Apple engineer is accused of stealing the company's autonomous vehicle technology to provide it to a Chinese competitor.

The announcements were the work of a recently established "technology strike force," which aims to protect critical American technology or data from theft by hostile nations. The strike force was set up in February and brings together agents with the Commerce and Justice Departments, as well as the F.B.I. and local attorneys offices.

*Five individuals are said to have ties to foreign governments.*

Federal agents are working to trace the global movement of U.S. goods and data, as well as the funds used to pay for them. The effort seeks to crack down on the global networks that are channeling goods and technology through opaque jurisdictions and middlemen to try to circumvent sanctions and technology restrictions imposed by the United States.

In another case unveiled Tuesday, a California-based engineer is accused of trying to steal source code for advanced machinery that can be used to make parts for military submarines and aircraft to sell it to Chinese companies.

Two other cases were announced, including charges against China-based agents who were accused of attempting to send materials used in weapons of mass destruction to Iran, according to U.S. officials, and charges involving the alleged provision of advanced technology to Russia that could be repurposed by the Russian military.

Matthew G. Olsen, assistant attorney general of the Justice Department's national security division, told reporters that the cases showed the government's ability "to accelerate investigations and surge our collective resources to defend against these threats."

"Foreign nation states are working hard to acquire our most sensitive technologies," said Matthew Axelrod, the assistant secretary for export enforcement at the Commerce Department's Bureau of Industry and Security. "We're working even harder to stop them."

Oleg Patsulya and Vasilii Besedin, the two Russian nationals who were arrested last week under suspicion of trying to procure millions of dollars of prohibited parts for Russian airlines, were charged with conspiracy to violate the Export Control Reform Act and conspiracy to commit international money laundering. If convicted, they would face up to 20 years in prison for each charge.

The Commerce Department issued a temporary denial order Tuesday against the men, which prohibits them from transactions involving any U.S. products for 180 days.

The order also applies to a freight forwarder in the Maldives that the men had utilized to route shipments of prohibited products into Russia, as well as a Russian airline, Smartavia, that sought to purchase these products.

On Thursday, federal officials seized luxury goods purchased with proceeds of their scheme, a U.S. official said.

# OpenAI Chief Urges A.I. Regulation in Senate Hearing

FROM FIRST BUSINESS PAGE

it can go quite wrong. And we want to be vocal about that," he said. "We want to work with the government to prevent that from happening."

Mr. Altman made his public debut on Capitol Hill as interest in A.I. has exploded. Tech giants have poured effort and billions of dollars into what they say is a transformative technology, even amid rising concerns about A.I.'s role in spreading misinformation, killing jobs and one day matching human intelligence.

That has thrust the technology into the spotlight in Washington. President Biden this month said at a meeting with a group of chief executives of A.I. companies that "what you're doing has enormous potential and enormous danger." Top leaders in Congress have also promised A.I. regulations.

That members of the Senate subcommittee for privacy, technology and the law did not plan on a rough grilling for Mr. Altman was clear as they thanked Mr. Altman for his private meetings with them and for agreeing to appear in the hearing. Cory Booker, Democrat of New Jersey, repeatedly referred to Mr. Altman by his first name.

Mr. Altman was joined at the hearing by Christina Montgomery, IBM's chief privacy and trust officer, and Gary Marcus, a well-known professor and frequent critic of A.I. technology.

Mr. Altman said his company's technology may destroy some jobs but also create new ones, and that it will be important for "government to figure out how we want to mitigate that." Echoing an idea suggested by Dr. Marcus, he proposed the creation of an agency that issues licenses for the development of large-scale A.I. models, safety regulations and tests that A.I. models must pass before offered to the public.

"We believe that the benefits of the tools we have deployed so far vastly outweigh the risks, but ensuring their safety is vital to our work," Mr. Altman said.

But it was unclear how lawmakers would respond to the call to regulate A.I. The track record of Congress on tech regulations is grim. Dozens of privacy, speech and safety bills have failed over the past decade because of partisan bickering and fierce opposition by tech giants.

The United States has trailed the globe on regulations in privacy, speech and protections for children. It is also behind on A.I. regulations. Lawmakers in the European Union are set to introduce rules for the technology later this year. And China has created A.I. laws that comply with its censorship laws.

Senator Richard Blumenthal, Democrat of Connecticut and chairman of the Senate panel, said the hearing was the first in a series to learn more about the potential benefits and harms of A.I. to eventually "write the rules" for it.

He also acknowledged Congress's failure to keep up with the introduction of new technologies in the past. "Our goal is to demystify and hold accountable those new technologies to avoid some of the mistakes of the past," Mr. Blumenthal said. "Congress failed to meet the moment on social media."

Members of the subcommittee suggested an independent agency to oversee A.I.; rules that force companies to disclose how their models work and the data sets they use; and antitrust rules to prevent companies like Microsoft and Google from monopolizing the nascent market.

"The devil will be in the details," said Sarah Myers West, managing director of AI Now Institute, a policy research center. She said Mr. Altman's suggestions for regulations don't go far enough and should include limits on how A.I. is used in policing and the use of biometric data. She noted that Mr. Altman didn't show any indication of slowing down the development of OpenAI's ChatGPT tool.

"It's such an irony seeing a posture about the concern of harms by people who are rapidly releasing into commercial use the system responsible for those very harms," Ms. West said.

Some lawmakers in the hearing still displayed the persistent gap in technological know-how between Washington and Silicon Valley. Lindsey Graham, Republican of South Carolina, repeatedly asked witnesses if a speech liability shield for online platforms like Facebook and Google also applies to A.I.

*'We believe that the benefits of the tools we have deployed so far vastly outweigh the risks.'*

Sam Altman, chief executive of the San Francisco start-up OpenAI.

Mr. Altman, calm and unruffled, tried several times to draw a distinction between A.I. and social media. "We need to work together to find a totally new approach," he said.

Some subcommittee members also showed a reluctance to clamp down too strongly on an industry with great economic promise for the United States and that competes directly with adversaries such as China.

The Chinese are creating A.I. that "reinforce the core values of the Chinese Communist Party and the Chinese system," said Chris Coons, Democrat of Delaware. "And I'm concerned about how we promote A.I. that reinforces and strengthens open markets, open societies and democracy."

Some of the toughest questions and comments toward Mr. Altman came from Dr. Marcus, who noted OpenAI hasn't been transparent about the data its uses to develop its systems. He expressed doubt in Mr. Altman's prediction that new jobs will replace those killed off by A.I.

"We have unprecedented opportunities here but we are also facing a perfect storm of corporate irresponsibility, widespread deployment, lack of adequate regulation and inherent unreliability," Dr. Marcus said.

Tech companies have argued that Congress should be careful with any broad rules that lump different kinds of A.I. together. In Tuesday's hearing, Ms. Montgomery of IBM called for an A.I. law that is similar to Europe's proposed regulations, which outlines various levels of risk. She called for rules that focus on specific uses, not regulating the technology itself.

"At its core, A.I. is just a tool, and tools can serve different purposes," she said, adding that Congress should take a "precision regulation approach to A.I."

PHOTOGRAPHS BY HAIYUN JIANG/THE NEW YORK TIMES

Top, a Senate subcommittee heard from Sam Altman, chief executive of OpenAI, who spoke on the dangers and opportunities of artificial intelligence. Left, Gary Marcus, a critic of A.I., has urged greater transparency. Right, Christina Montgomery, IBM's chief privacy and trust officer, also addressed lawmakers.

# Biden Vetoes Legislation to Reinstate Tariffs on Some Solar Panels

By ZOLAN KANNO-YOUNGS

WASHINGTON — President Biden vetoed legislation on Tuesday that would have reinstated tariffs on solar panels from Chinese companies in Southeast Asia that had been found to be imported into the United States in violation of trade rules.

The Senate narrowly passed the resolution this month, with several key Democrats supporting the measure, in a sharp rebuke to Mr. Biden. The president announced a two-year pause on the tariffs last year after importers complained that the penalties would threaten broader adoption of solar energy in the United States.

"Passage of this resolution bets against American innovation," Mr. Biden said in a statement on Tuesday. "It would undermine these efforts and create deep uncertainty for American businesses and workers in the solar industry."

A two-thirds majority of lawmakers in both houses would be needed to override Mr. Biden's veto.

The showdown has pitted Mr. Biden's climate goals against efforts to make the United States less reliant on China's supply of materials that are crucial for the American economy. Critics said the suspension on tariffs failed to defend American workers and solar manufacturers, who have pushed the administration to block the importing of cheap products.

"We must back up the message of wanting to build a U.S. supply chain with action — even if it is difficult and complicates some deployments," said Robbie Diamond, the chief executive of SAFE, a group that advocates reducing American dependence on oil. "If we're going to talk the talk, we must walk the walk."

Members of Congress tool at Mr. Biden's suspension of penalties after a U.S. trade court ruled in December that four Chinese companies illegally tried to evade American tariffs on solar

Factory workers producing sol majority of lawmakers would b

If not for Mr. Biden's halt on the tariffs, those companies would have been subject to higher duty rates to bring products into the United States. Some Democrats joined Republicans in accusing the administration of violating U.S. trade rules written to protect American manufacturers.

Representative Dan Kildee, Democrat of Michigan, said in a statement on Tuesday that Mr. Biden had failed "to hold China accountable."

"Failing to stand up to those who engage in unfair trade practices hurts American workers and manufacturers," Mr. Kildee said.

The administration, however, has argued that buying solar pan-

Grazioso v. Taliban - 1:22-cv-01188
**CERTIFICATE OF SERVICE**

# EXHIBIT D.3.

White House has also argued that the materials are needed as companies commit to building solar panels after Mr. Biden passed the Inflation Reduction Act, which provides $37 billion in incentives for companies to produce solar panels, wind turbines, batteries and crucial minerals in the United States.

"This action is a reaffirmation of the administration's commitment to business certainty in the clean energy sector, and a signal to companies to continue creating jobs, building domestic manufacturing capacity and investing in American communities," Abigail Ross Hopper, the president of the Solar Energy Industries Association, said in a statement.

Ana Swanson contributed reporting.

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

In re: INVACARE CORPORATION, et al.,[1] Debtors. | Chapter 11 | Case No. 23-90068 (CML) | (Jointly Administered)

**NOTICE OF (I) ENTRY OF AN ORDER CONFIRMING THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF INVACARE CORPORATION AND ITS DEBTOR AFFILIATES (TECHNICAL MODIFICATIONS) AND (II) OCCURRENCE OF EFFECTIVE DATE**

On April 28, 2023, the Honorable Christopher Lopez, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "Court"), entered the Order Confirming the *First Amended Joint Chapter 11 Plan of Invacare Corporation and Its Debtor Affiliates* (Docket No. 522) (the "Confirmation Order") confirming the Plan[2] of the above-captioned debtors (the "Debtors").

The Effective Date of the Plan occurred on **May 5, 2023**. All of the conditions precedent to the Effective Date of the Plan have been satisfied or waived in accordance with the Plan.

The Confirmation Order and the Plan are available for inspection. If you would like to obtain a copy of the Confirmation Order or the Plan, you may contact Epiq Corporate Restructuring, LLC, the Debtors' Claims and Noticing Agent in these Chapter 11 Cases, by (a) calling (855) 795-2124 (toll free for U.S. domestic calls), (503) 974-1666 (for international calls) or by email at Invacareinfo@epiqglobal.com; or (b) visiting the website of the Debtors' Claims and Noticing Agent at: https://dm.epiq11.com/invacare. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee at: https://ecf.txsb.uscourts.gov.

Unless otherwise provided by the Plan, the Confirmation Order, any other applicable order of the Bankruptcy Court, or agreed to by the Holder of an Administrative Claim and the Debtors, the deadline for filing requests for payment of Administrative Claims, is: (a) **with respect to Administrative Claims other than Professional Fee Claims, 30 days after the Effective Date**; and (b) **with respect to Professional Fee Claims, 45 days after the Effective Date** (the "Administrative Claims Bar Date"). **Holders of Administrative Claims that are required to, but do not, File a Claim with respect to such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date.**

The Court has approved certain discharge, release, exculpation, injunction, and related provisions contained in Article VIII of the Plan and the Confirmation Order.

The Plan and the Confirmation Order and their respective provisions are binding on the Debtors, the Reorganized Debtors, the Distribution Agent, and any Holder of a Claim or an Interest and such Holder's respective successors and assigns, whether or not the Claim or the Interest of such Holder is Impaired under the Plan, and whether or not such Holder voted to accept the Plan.

The Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

Houston, Texas, Dated: May 5, 2023, /s/ Matthew D. Cavenaugh, **JACKSON WALKER LLP**, Matthew D. Cavenaugh (TX Bar No. 24062656), Jennifer F. Wertz (TX Bar No. 24072822), J. Machir Stull (TX Bar No. 24070697), Victoria N. Argeroplos (TX Bar No. 24105799), 1401 McKinney Street, Suite 1900, Houston, TX 77010, Telephone: (713) 752-4200, Facsimile: (713) 752-4221, Email: mcavenaugh@jw.com, jwertz@jw.com, mstull@jw.com, vargeroplos@jw.com, *Co-Counsel to the Debtors and Debtors in Possession* -and- **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP**, Ryan Blaine Bennett, P.C. (admitted *pro hac vice*), Yusuf Salloum (admitted *pro hac vice*), Erica D. Clark (admitted *pro hac vice*), 300 North LaSalle Street, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: ryan.bennett@kirkland.com, yusuf.salloum@kirkland.com, erica.clark@kirkland.com, *Co-Counsel to the Debtors and Debtors in Possession* -and- **MCDONALD HOPKINS LLC**, Shawn M. Riley (admitted *pro hac vice*), David A. Agay (admitted *pro hac vice*), Nicholas M. Miller (admitted *pro hac vice*), Maria G. Carr (admitted *pro hac vice*), 600 Superior Avenue, E., Suite 2100, Cleveland, OH 44114, Telephone: (216) 348-5400, Facsimile: (216) 348-5474, Email: sriley@mcdonaldhopkins.com, dagay@mcdonaldhopkins.com, nmiller@mcdonaldhopkins.com, mcarr@mcdonaldhopkins.com, *Co-Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Invacare Corporation (8965); Freedom Designs, Inc. (4857); and Adaptive Switch Laboratories, Inc. (6470). The corporate headquarters and the mailing address for the Debtors is 1 Invacare Way, Elyria, Ohio 44035.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the *First Amended Joint Chapter 11 Plan of Invacare Corporation and Its Debtor Affiliates (Technical Modifications)* (Docket No. 502) (as modified, amended, and including all supplements, the "Plan").

**PUBLIC NOTICE**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN and 1:22-CV-01188-GBD-SN, on August 23, 2022, Plaintiff Deborah Grazioso, as Personal Representative of the Estate of Timothy Grazioso, Deceased, and 246 other Plaintiffs, filed a Second Amended Complaint against the Islamic Emirate of Afghanistan, *a/k/a* the Taliban, and others in connection with the terrorist attacks in the United States on September 11, 2001.

Pursuant to, *inter alia*, 18 U.S.C § 2333, 28 U.S.C § 1331 and § 1332(a)(2) and the Torture Victim Protection Act of 1991, PL 102-256, 106 Stat. 73, the *Grazioso* Plaintiffs seek judgment in their favor against Defendants, jointly, severally, and/or individually, for compensatory and punitive damages in excess of One Billion US Dollars (US $1,000,000,000), plus pre- and post-judgment interest, attorney's fees, costs of this action and further appropriate relief.

This is a notice that the pleadings have been filed. The pleadings are available in English and Pashto at the following website: www.wigginschilds.com/grazioso.

**COMMERCIAL REAL ESTATE BUSINESS OPPORTUNITIES**

**INVESTMENT PROPERTIES** (600)

Investment Properties Other Areas 605

FLORIDA, WPB. Class A investment. 7 luxury tenanted condos. The Villas At Emerald Dunes. NOI $27,456. Cap Rate 4.8%. Email for full listing details



The New York Times Company

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

May 24, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

5/24/2023, NY & NATL, pg B4

Larnyce Tabron

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2023.05.24 11:30:48 -04'00'

*Grazioso v. Taliban - 1:22-cv-01188*
**CERTIFICATE OF SERVICE**

**EXHIBIT D.4.**

**PUBLIC NOTICE**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN and 1:22-CV-01188-GBD-SN, on August 23, 2022, Plaintiff Deborah Grazioso, as Personal Representative of the Estate of Timothy Grazioso, Deceased, and 246 other Plaintiffs, filed a Second Amended Complaint against the Islamic Emirate of Afghanistan, *a/k/a* the Taliban, and others in connection with the terrorist attacks in the United States on September 11, 2001.

Pursuant to, *inter alia*, 18 U.S.C § 2333, 28 U.S.C § 1331 and § 1332(a)(2) and the Torture Victim Protection Act of 1991, PL 102-256, 106 Stat. 73, the *Grazioso* Plaintiffs seek judgment in their favor against Defendants, jointly, severally, and/or individually, for compensatory and punitive damages in excess of One Billion US Dollars (US $1,000,000,000), plus pre- and post-judgment interest, attorney's fees, costs of this action and further appropriate relief.

This is a notice that the pleadings have been filed. The pleadings are available in English and Pashto at the following website: www.wigginschilds.com/grazioso.

**LABOR | WORKPLACE | TECHNOLOGY**

# *Times Reaches Contract Deal With Newsroom Union After 2 Years*

By KATIE ROBERTSON

The New York Times reached a deal on Tuesday for a new contract with the union representing the majority of its newsroom employees, ending more than two years of contentious negotiations that included a 24-hour strike.

The agreement, if ratified, will give union members immediate salary increases of up to 12.5 percent to cover the last two years and 2023, and will raise the required minimum salary to $65,000, up from about $37,500. The previous contract expired in March 2021, and union members have not received contractual raises since 2020.

The union negotiating the deal, which is part of the NewsGuild of New York, represents nearly 1,500 employees in the newsroom, advertising and other areas of the company. More than 1,800 people work in The Times's newsroom.

The union said members would vote to ratify the five-year deal in the coming week.

"This deal is a victory for all the union members who fought for a fair contract that rewards our hard work and sacrifice," Bill Baker, The New York Times Guild's unit chair, said in a statement. "It shows that the company cannot take us for granted and must be held accountable."

Cliff Levy, a Times deputy managing editor, said in an email to Times union members that the contract provided them with "sizable, well-deserved raises, a big bonus and an array of important new benefits."

"From the beginning of this bargaining process, we've been determined to reach a contract that shows how much we value the contributions of NewsGuild members to The Times's success," Mr. Levy said.

The deal includes a contractual agreement on hybrid work and eligibility for paid sabbatical leave of four weeks for every 10 years worked at the company. The company also agreed that new newsroom jobs, including any expansion into local markets, would be part of the union and pay fair minimum salaries.

*'This deal is a victory for all the union members who fought for a fair contract that rewards our hard work and sacrifice.'*

Bill Baker, The New York Times Guild's unit chair.

The bargaining over the contract was frequently heated, with divisions sometimes spilling into public view. Negotiators diverged on salaries, health and retirement benefits, and other issues. The union accused The Times of slow-walking the negotiations and refusing to share the company's profits with employees, while Times executives pointed to a need for cautious budgeting amid an uncertain economic outlook.

In December, Times Guild members held a one-day strike, a rarity at The Times, which hasn't had a work stoppage longer than a day since the 1970s. Last month, union members protested outside the company's annual stockholder meeting and delivered a letter to the publisher, A.G. Sulzberger, signed by more than 1,000 members, that said: "Enough is enough."

Under the new contract, which would cover 2021 through February 2026, union members would receive a one-time retroactive bonus of 7 percent of their base pay from when the previous contract expired.

The union workers would get an initial salary increase on a sliding scale, with larger increases for those paid less. Workers making under $100,000 a year would get an immediate 12.5 percent increase, while those making more than $160,000 a year would receive an immediate 10.6 percent bump.

All Guild employees would receive a 3.25 percent increase in 2024 and a 3 percent increase in 2025.

# *Protection Sought for Workers Displaced by A.I., a 'Scary' Type of Automation*

FROM FIRST BUSINESS PAGE

nologies on the world, has asked the government to assume the bulk of responsibility in supporting workers through the labor market disruptions prompted by A.I. It's not yet clear how government will rise to that task.

Generative A.I. could automate activities equivalent to 300 million full-time jobs globally, according to a recent estimate by Goldman Sachs. Already the chief executive of IBM said he expected A.I. to affect white-collar clerical staffing, eliminating the need for up to 30 percent of certain roles while creating new ones. The White House on Tuesday is hosting workers for a discussion of their experiences with automation and monitoring technologies in the workplace.

Historically, when automation has led to job loss, the economic impact has tended to be offset by the creation of new jobs. Generative artificial intelligence, the Goldman report says, could raise U.S. labor productivity growth by nearly 1.5 percentage points per year over a decade. It could increase annual global gross domestic product by 7 percent. It could give rise to previously unimagined creative occupations.

But there will be great instability for displaced workers. Automation has been a major driver of income inequality in America, according to a study from researchers at the Massachusetts Institute of Technology and Boston University. By their estimates, 50 to 70 percent of changes in the U.S. wage structure since 1980 stemmed from loss of income among blue-collar and office workers because of automation.

Areas of the country where robots have been adopted most intensively, particularly manufacturing-heavy parts of the Midwest, have also seen the most precipitous declines in employment, according to research from Daron Acemoglu, an economist at M.I.T.

While makers of A.I. have tended to focus on the technology's potential for job creation, many workers will experience painful disruption as they try to train for and find new roles that pay well and are fulfilling.

"We've never been in a period where the scope of automation is so wide potentially," said Harry Holzer, an economist at Georgetown. "Historically, if your job gets automated, you find something new. With A.I., the thing that's kind of scary is it could simply grow and take over more tasks. It's a moving target."

Workers in administrative and clerical support may have particular cause for concern about generative A.I., according to the Goldman research. And many of them are already expressing anxieties.

"It's definitely scary," said Justin Felt, 41, a customer service worker in Pittsburgh, who has worked for Verizon Fios for nearly 12 years. He said employers have not been entirely upfront with their workers about the ways they are incorporating generative A.I. into customer support roles. "It's definitely taking our work."

These technologies are flooding into workplaces. BuzzFeed just introduced a chatbot that recommends recipes, McKinsey is helping clients use A.I. to fix technological bugs, and the accounting firm KPMG is using ChatGPT to generate code. So some economists have begun putting forward proposals to protect the workers likeliest to be affected.

Workers could benefit, for example, from paid leave policies that allow them to take time away from their jobs to develop new skills. Germany already has a similar program, in which workers in most German states can take at least five paid days a year for educational courses, an initiative the labor minister recently said he planned to expand.

Another possibility is a displacement tax, levied on employers when a worker's job is automated but the person is not retrained, which could make businesses more inclined to retrain workers. The government could also offer A.I. companies financial incentives to create products designed to augment what workers do, rather than replace them — for example, A.I. that provides TV writers with research but doesn't draft scripts, which are likely to be of low quality.

PATRICK SEMANSKY/ASSOCIATED PRESS

Senator Richard Blumenthal, left, with Sam Altman, chief executive of OpenAI, before a hearing on A.I. last week.

"If the government sets the agenda in developing technologies that are more complementary to humans, that would be very important," Mr. Acemoglu said. "Industry is looking to the government for leadership."

The government's previous efforts to support workers through periods of job displacement have had mixed results. A study of Trade Adjustment Assistance, a U.S. government program that provides financial assistance and training for workers who lose jobs because of trade, found that manufacturing employees who temporarily dropped out of the work force to participate in the program in the early 2000s still hadn't caught up on earnings several years later compared with workers who lost jobs but didn't qualify for T.A.A. support.

Many economists say employers could also play a role in helping displaced workers.

"Business always looks to government to deal with job loss," said Simon Johnson, a professor at M.I.T. and a co-author with Mr. Acemoglu of the book "Power and Progress." "But Microsoft and Alphabet — they are in the driver's seat, in regards to where they choose to put their technological resources."

Workers could benefit, for example, from employer apprenticeships and retraining programs. The accounting giant PwC recently announced a $1 billion investment in generative A.I., which includes efforts to train its 65,000 workers on how to use A.I. What spurred the initiative was the chief executive's trip to the World Economic Forum's gathering in Davos, Switzerland, where he heard constant discussion of generative A.I. "A number of us walking out of that room knew something had changed," recalled Joe Atkinson, the company's chief products and technology officer.

PwC's workers have expressed fears about displacement, according to Mr. Atkinson, especially as their company explores automating roles with generative A.I. Mr. Atkinson stressed, though, that PwC planned to retrain people with new technical skills so their work would change but their jobs wouldn't be eliminated.

Some tech companies are offering employees courses in cloud computing, cybersecurity and generative A.I. Among them is IBM, which also has an apprenticeship program that trains workers, including those without four-year degrees, for high-paying roles in fields like software development and data science. The company C3 AI offers its 1,000 employees bonuses of $250 to $1,500 for becoming certified in technological subjects including A.I. and cloud computing. KPMG is working to train every one of its employees to use generative A.I.

Community colleges are intensifying their focus on A.I., too. Miami Dade College has received over $15 million in grants for its technology programs, with some of the money used to open two centers focused on preparing students for careers in A.I. Houston Community College recently announced a bachelor's degree in A.I. and robotics, and Southwest Tennessee Community College is working to create an associate degree. The American Association of Community Colleges launched an A.I. incubator network focused on helping faculty teach about A.I. and colleges create A.I. degrees.

"As Wayne Gretzky once said when asked about his success, 'I skate to where the puck is going,'" said Dennis Natali, a professor at Pikes Peak State College in Colorado, which released a plan this year to roll out A.I. certificates. "Our college constantly assesses the work force landscape and prepares to support displaced workers."

As colleges and businesses scramble to retrain workers, some experts are optimistic about this technological transition. They note that throughout history people have feared technological advancement but often ended up benefiting from it, going back to the Luddites, weavers who protested the mechanization of the textile industry.

But that doesn't mean the transition period will unfold smoothly. Michael Chui, an A.I. expert at McKinsey, pointed out that even the Luddites saw their income stagnate for decades.

"Anyone who loses their job involuntarily — it's a difficult time," he said. "In some ways the Luddites weren't wrong about the risk."

# *BuzzFeed, in an Effort to Ride the A.I. Wave, Introduces a Free Recipe Chatbot, Botatouille*

By BENJAMIN MULLIN

BuzzFeed parlayed the rising power of social media into a digital media business worth more than a billion dollars at its peak. But when technology giants behind social platforms moved away from publishing, BuzzFeed's valuation cratered.

To rebound, BuzzFeed is again turning to new technology: artificial intelligence.

The company has tried a variety of experiments since announcing plans to incorporate A.I. a few months ago, embracing the technology more than most publishers. On Tuesday, BuzzFeed introduced its most ambitious offering yet, a free chatbot called Botatouille (no relation to Pixar's murine chef), which serves up recipe recommendations from Tasty, BuzzFeed's food brand.

Botatouille is built using the technology that drives OpenAI's popular ChatGPT program, customized with Tasty recipes and user data.

Rainy day? Botatouille recommends winter chili or lentil soup. Feeling lonely? Botatouille suggests chocolate chip cookies or a vegetable curry. Botatouille might also recommend shepherd's pie, which it quipped was its mother's recipe.

"Shifting from a sort of crumbling wave of social to a growing wave of generative A.I., to me, is an exciting transition," said Jonah Peretti, the company's chief executive. "And I think there's things we could definitely learn to make sure we capture more enduring value from a technological trend."

Though BuzzFeed is among the first media companies to experiment with artificial intelligence, many others are thinking about how to adapt to it. Executives at Bloomberg, Insider and The New York Times are all weighing the potential upside against risks to their existing businesses.

The possible pitfalls include a loss of traffic from search engines, as A.I.-powered chatbots answer search queries. And some companies that use artificial intelligence for content creation have already published error-ridden art

Jonah Peretti, BuzzFeed's chi business, but he insisted that

Mr. Peretti shut down Bu News last month, but in the he said, BuzzFeed plans to ment with A.I to enhance its news business, which is now organized

engines or brainstorm ways to tell certain stories.

But he said he didn't anticipate a future in which artificial intelligence would be used to replace HuffPost journalists.

"Even if you were, like, an evil C.E.O. trying to replace all journalists with A.I., you would be very unsuccessful," Mr. Peretti said. "It wouldn't work on the business side."

He said he was applying several lessons from BuzzFeed's uneven relationship with social media to its experiments with artificial intelligence.

When BuzzFeed used social media to expand its audience, it did not always make profitability a priority. The company grew quickly but has since fallen on harder times. It is now worth nearly $90 million — a small fraction of its peak of $1.7 billion in 2016. The shuttering of BuzzFeed News affected dozens of jobs.

The company is now focusing on building a sustainable business from the start, Mr. Peretti said. BuzzFeed plans to use artificial intelligence to sell subscriptions to its users by providing them personalized services and custom interactions on offerings like Botatouille, he said.

"We are much more focused on monetization, and focused on it much earlier than we were back in those days," Mr. Peretti said.

One big question for BuzzFeed: Will Botatouille work?

Before attending a party on Sunday evening, I asked the chat-

Botatouille then shared the recipe, a coherent concoction of vodka, champagne and fruit juices from concentrate, topped with a scoop of rainbow sherbet.

Later, I asked Botatouille to suggest meals for a laid-off digital media worker. It initially struggled to give a response. "Oops. Something went wrong," it said.

Then it had an idea.

"Hmm, it seems like you might be feeling a bit down. How about I recommend a meal that will lift your spirits?" Botatouille said. "For a laid-off digital media worker, I suggest trying the one-pan chicken and veggie meal prep 2 ways."

*Grazioso v. Taliban - 1:22-cv-01188*
**CERTIFICATE OF SERVICE**

# EXHIBIT D.4.

**UCC PUBLIC SALE NOTICE**

PLEASE TAKE NOTICE that on June 27, 2023 commencing at 11:00 a.m. Eastern Prevailing Time (the "Sale Date"), both in-person and remotely outside of the New York Supreme Court located at 60 Centre Street, New York, New York 10007, with access afforded in person and remotely via Zoom or other web-based video conferencing and/or telephonic conference program selected by Secured Party (defined below). The details of the sale will be provided to interested parties in advance of the Sale Date pursuant to the Terms of Public Sale (described below), based upon the occurrence of one or more Events of Default under certain documents (the "Loan Documents") copies of which are available for inspection as described below, pursuant to such Loan Documents and Article 9 of the Uniform Commercial Code as enacted in the State of New York ("UCC"), KBM Owner LLC, a Delaware limited liability company ("Secured Party") shall dispose of, by public sale, the right, title, and interest of Adventus Holdings LP, a Delaware limited partnership and Adventus Highland 5 GP LLC, a Delaware limited liability company, as pledgors (each a "Debtor" and collectively, "Debtors") in and to the following assets (collectively, the "Collateral"): (i) ninety-nine and one-half percent (99.5%) of the partnership interests in Adventus US Realty #9 LP, a Delaware limited partnership (the "Pledged Entity"); (ii) one-half of one percent (0.5%) of the partnership interests in the Pledged Entity; and (iii) all other assets pledged by either Debtor under the Loan Documents. The public sale shall be conducted by [illegible], Auctioneer, NYC License No. 1387302-DCA, or such other auctioneer licensed in the State of New York as is selected by Secured Party in its sole and absolute discretion.

Based upon information provided by Debtors, Pledged Entity, and certain other persons and entities affiliated with the Debtors or Pledged Entity, it is the understanding of Secured Party (but without any representation or warranty by Secured Party as to the accuracy or completeness of the following matters) that: (i) collectively Debtors own one hundred percent (100%) of the partnership interests in Pledged Entity (the "Partnership Interests"); (ii) Debtors collectively indirectly own a total of one hundred percent (100%) of the fee interest in the real property known as 3065 Highland Parkway, Downers Grove, Illinois 60515 (the "Premises"), as more particularly described in that certain Mortgage, Assignment of Leases and Rents and Security Agreement dated as of October 30, 2020, as amended by that certain First Amendment to Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 9, 2022, held by Secured Party (the "Mortgage"); and (iii) the Premises are encumbered by and subject to, among other things, the Mortgage securing indebtedness under the Loan Agreement dated as of October 30, 2020, as amended by that certain First Amendment to Loan Agreement, Omnibus Loan Modification Agreement and Reaffirmation by Guarantor dated as of November 9, 2022, in the original principal amount of $35,670,000, all of which are held by Secured Party.

The Collateral is offered "AS IS, WHERE IS", with all faults, and Secured Party makes no guarantee, representation, or warranty (including, without limitation, any representation or warranty of merchantability or fitness), express or implied, of any kind or nature whatsoever.

Secured Party will be permitted to bid at the sale, and notwithstanding any requirement in this UCC Public Sale Notice that the sale of the Collateral be for cash, Secured Party may credit bid all or any portion of the outstanding balance of the amounts due under the Loan Documents. Secured Party reserves the right, in its sole and absolute discretion, to (a) reject all bids and terminate the sale or adjourn the sale to such other date and time as Secured Party may deem proper, by announcement at the place and on the date of sale, and any subsequent adjournment of the sale, without further publication, and (b) impose any other commercially reasonable conditions upon the sale of the Collateral as Secured Party may deem proper in its sole and absolute discretion.

The Partnership Interests are unregistered securities under the Securities Act of 1933 as amended. Because of this, each prospective bidder seeking to be a "Qualified Bidder" (as determined by Secured Party in its sole and absolute discretion) shall be required, among other things, to execute and deliver to Secured Party a "Bidding Certificate" certifying, among other things, that such bidder: (i) will acquire the Collateral for investment purposes, solely for its own account and not with a view to distribution or resale; (ii) is an accredited investor within the meaning of the applicable securities laws; (iii) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Collateral; and (iv) will not resell or otherwise hypothecate the Collateral without either a valid registration under applicable federal or state securities laws or an available exemption from applicable federal or state laws, including without limitation the Securities Act of 1933 as amended.

The public sale of the Collateral shall be subject to the further terms and conditions set forth in the "Terms of Public Sale" (including without limitation terms and conditions with respect to the availability of additional information, bidding requirements, deposit amounts, bidding procedures, and the consummation of the public sale), which are available online at [illegible] and by contacting: Jones Lang LaSalle Americas, Inc., 330 Madison Avenue, New York, New York 10017, Attn: Brett Rosenberg, tel. (212) 812-5926, email Brett.Rosenberg@jll.com.

**PUBLIC NOTICE**

In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN and 1:22-CV-01188-GBD-SN, on August 23, 2022, Plaintiff Deborah Grazioso, as Personal Representative of the Estate of Timothy Grazioso, Deceased, and 246 other Plaintiffs, filed a Second Amended Complaint against the Islamic Emirate of Afghanistan, *a/k/a* the Taliban, and others in connection with the terrorist attacks in the United States on September 11, 2001.

Pursuant to, *inter alia*, 18 U.S.C § 2333, 28 U.S.C § 1331 and § 1332(a)(2) and the Torture Victim Protection Act of 1991, PL 102-256, 106 Stat. 73, the *Grazioso* Plaintiffs seek judgment in their favor against Defendants, jointly, severally, and/or individually, for compensatory and punitive damages in excess of One Billion US Dollars (US $1,000,000,000), plus pre- and post-judgment interest, attorney's fees, costs of this action and further appropriate relief.

This is a notice that the pleadings have been filed. The pleadings are available in English and Pashto at the following website: www.wigginschilds.com/grazioso.